# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *
PRODUCTS LIABILITY LITIGATION    *     Docket No.: 16-MD-2740
                                 *     Section "H(5)"
                                 *     New Orleans, Louisiana
Relates to:  Barbara Earnest     *     September 17, 2019
Case No.: 16-CV-17144            *
* * * * * * * * * * * * * * * *  *


DAY 2 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:        Barrios Kingsdorf & Casteix, LLP
                           BY:  DAWN M. BARRIOS, ESQ.
                           701 Poydras Street
                           Suite 3650
                           New Orleans, Louisiana 70139



For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                             & Warshauer, LLC
                           BY:  M. PALMER LAMBERT, ESQ.
                           1100 Poydras Street
                           Suite 2800
                           New Orleans, Louisiana 70163



For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                           BY:  CHRISTOPHER L. COFFIN, ESQ.
                           1100 Poydras Street
                           Suite 2505
                           New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:28PM 1 literature?

3:28PM 2 **A.**    I have.

3:28PM 3 **Q.**    Do you believe that there are reports in the medical

3:28PM 4 literature of ongoing or persistent hair loss with Adriamycin?

3:28PM 5 **A.**    There was zero cases with Adriamycin and Cytoxan -- with

3:28PM 6 Adriamycin, there were zero cases up to 2000 in the

3:28PM 7 pharmacovigilance database.  I think I see one or two patients

3:28PM 8 alone with Adriamycin, but it's exceptionally rare.

3:28PM 9 **Q.**    Doctor, I want you to focus on my question.

3:28PM 10 **A.**    Sure.

3:28PM 11 **Q.**    You searched the literature?

3:28PM 12 **A.**    I did.

3:28PM 13 **Q.**    Okay.  Did you see in your literature -- looking for

3:28PM 14 information from 2011 and before, did you see any reports of

3:29PM 15 persist or permanent or irreversible hair loss with Adriamycin?

3:29PM 16 Yes or no?

3:29PM 17 **A.**    I think I saw one case with Adriamycin alone, but I'd want

3:29PM 18 to check that.  It's -- I mean, I searched specifically for

3:29PM 19 that, and that was the best I could do.

3:29PM 20 **Q.**    Now, what about Cytoxan?  In your research, did you do

3:29PM 21 research to try to determine whether or not there were cases in

3:29PM 22 2011 and before of Cytoxan causing permanent hair loss?

3:29PM 23 **A.**    There are zero cases of Cytoxan.  If you look at the FDA

3:29PM 24 database of Cytoxan causing permanent alopecia, certainly,

3:29PM 25 through --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:29PM  1   **Q.**   Doctor, I didn't ask about the FDA database.  I asked
3:29PM  2   about the literature.  If you could answer my question.
3:29PM  3           And if the answer is you didn't find any, that's
3:30PM  4   fine.  I'm asking you, did you find any?
3:30PM  5   **A.**   I saw no case of monotherapy Cytoxan where Cytoxan caused
3:30PM  6   irreversible or permanent hair loss.  I did not see it any in
3:30PM  7   the medical literature, and I searched.
3:30PM  8   **Q.**   How about this?  Did you see any reports -- you slipped in
3:30PM  9   the word "monotherapy" there.
3:30PM  10          Did you see any reports in the medical literature
3:30PM  11  where the regimen included Cytoxan and there was a report of
3:30PM  12  permanent hair loss?
3:30PM  13  **A.**   Sure, of course.  Because in the FAC arm, that includes
3:30PM  14  Cytoxan.  So, of course, it included Cytoxan --
3:30PM  15  **Q.**   Okay.
3:30PM  16  **A.**   -- in that arm.
3:30PM  17  **Q.**   And the same thing for Adriamycin; correct?
3:30PM  18  **A.**   Correct.  But they were controlled.
3:30PM  19  **Q.**   So you can't say that there is no risk of any kind of
3:30PM  20  persistent hair loss with the FAC arm; correct?
3:30PM  21  **A.**   I certainly can, in a controlled trial.  You're missing
3:30PM  22  the point.  When you compare TAC versus FAC, the only
3:31PM  23  difference is the T; it's not the A and C.
3:31PM  24          You're explaining away the risk.  It's the biggest
3:31PM  25  mistake in drug safety.  You're explaining away the risk and

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:31PM 1    pointing to something else.

3:31PM 2    Q.    Let's go back to this real quick.  We talked about this

3:31PM 3    definition, "six months" was -- most of the time, was your most

3:31PM 4    common definition; correct?

3:31PM 5    A.    That was certainly one of the definitions.

3:31PM 6    Q.    Okay.  And you would have to agree with me that, in order

3:31PM 7    to know whether or not somebody actually had hair loss more

3:31PM 8    than six months after treatment, that patient would have to be

3:31PM 9    evaluated more than six months after treatment; correct?

3:31PM 10   A.    Exactly.

3:31PM 11   Q.    That's just logic; right?

3:31PM 12   A.    That's what 316 did.

3:32PM 13   Q.    Doctor, do you know -- in the work that you did reviewing

3:32PM 14   materials, looking at information in this case, do you know how

3:32PM 15   many of the 29 patients were actually evaluated more than six

3:32PM 16   months?

3:32PM 17   A.    That data is available.  It's not front of mind.  But it

3:32PM 18   is in the clinical study report, and I think you can -- at one

3:32PM 19   point, I did know the average follow-up period for that.

3:32PM 20   Q.    And I'm not talking about the average follow-up.

3:32PM 21         I'm talking about -- can you tell me how many people

3:32PM 22   of the 29 were actually followed up more than six months?

3:32PM 23   A.    It was a ten-year study.  We could pull that table.  It's

3:33PM 24   in your clinical study report.  You have it.

3:33PM 25         And I'm almost certain that -- certainly, in 316 --

OFFICIAL TRANSCRIPT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *      Docket No.: 16-MD-2740
                                  *      Section "H(5)"
                                  *      New Orleans, Louisiana
*Relates to:  Barbara Earnest*     *      September 18, 2019
*Case No.: 16-CV-17144*            *
* * * * * * * * * * * * * * * * *


DAY 3 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:24PM  1   A.   Yes, with the reversible drug-induced, it has.

5:24PM  2   Q.   Okay.  And that's a drug that's frequently used in

5:25PM  3   combination with place and Cytoxan; correct?

5:25PM  4   A.   Yes.  It was part of the clinical trials.  The FAC was

5:25PM  5   5-FU, Adriamycin, Cytoxan.  And then the other, TAC, was,

5:25PM  6   instead of 5-FU, Taxol.

5:25PM  7   Q.   Okay.  So I'll write "5-FU" here.  Okay.

5:25PM  8        And that was the as you said the first drug if one of

5:25PM  9   the arms of the TAX 316 clinical trial; correct?

5:25PM  10  A.   It was an interchangeable drug.  You took Taxol or you

5:25PM  11  took 5-FU, and the other drugs were the same.

5:25PM  12  Q.   And because it's almost 5:30 and I'm sure everyone's

5:25PM  13  tired, you would agree with me there's other drugs we could put

5:25PM  14  on that list; right?

5:25PM  15  A.   Yes.  Many drugs used to kill cancer cells will cause

5:25PM  16  drug-induced alopecia, hair loss.  It's common as a reversible

5:25PM  17  side effect.

5:26PM  18  Q.   Okay.  Now, let's move on to the next step in the chart

5:26PM  19  that we're making.  Okay?

5:26PM  20  A.   Okay.

5:26PM  21  Q.   So you would agree with me that you identified permanent

5:26PM  22  hair loss as a hazard, a hazard of the Taxol; correct?

5:26PM  23  A.   There are some case reports, yes.  That's true.

5:26PM  24  Q.   Okay.  So I wrote "persistent" here.  I'm going to change

5:26PM  25  it.  I'm going to write "permanent."  Okay?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:26PM 1    A.    I think the reports would fit either definition.

5:26PM 2    Sometimes it's called one and sometimes it's called the other.

5:26PM 3    Q.    Okay.  But let me just be clear.  When it came to Taxol

5:26PM 4    and the research and the work you did, you specifically

5:26PM 5    identified permanent hair loss as a hazard of Taxol; true?

5:26PM 6    A.    Within case reports, yes.  There were some case reports.

5:27PM 7    Q.    Let's talk about Adriamycin.  You identified permanent

5:27PM 8    hair loss as a hazard of Adriamycin; correct?

5:27PM 9    A.    Same answer.  There are some case reports for that as

5:27PM 10   well.  Not as many, but there are some.

5:27PM 11   Q.    But it's something you saw in the literature; correct?

5:27PM 12   A.    Yes, there are some case reports.

5:27PM 13   Q.    Okay.  And if we move to Cytoxan -- well, let me actually

5:27PM 14   stop for a moment.

5:27PM 15         Did you review the Adriamycin label?

5:27PM 16   A.    I believe that was on my reliance materials, yes.

5:27PM 17   Q.    Okay.

5:27PM 18   A.    I think I tell you that in my report, that I looked at the

5:27PM 19   labeling for the drugs that were used in combination with

5:27PM 20   Taxotere.

5:27PM 21   Q.    Okay.  And did you see that it says "reverse complete

5:27PM 22   alopecia occurs in most cases"?

5:27PM 23   A.    I don't recall the words.  I would have to pull it back

5:27PM 24   out.  But let me look at my report.  I might have it in here,

5:27PM 25   if you want me to -- I just don't recall the specific wording

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:27PM    1    in the label.

5:28PM    2    **Q.**   Okay.  Do you have any -- does that sound familiar to you?

5:28PM    3    Do you know one way or the other?  Does that sound right?

5:28PM    4    **A.**   I don't recall the specific wording, no.  I'm sorry, I

5:28PM    5    don't.

5:28PM    6    **Q.**   Okay.

5:28PM    7            **MS. SASTRE:**  Your Honor, may I approach?

5:28PM    8            **THE COURT:**  Sure.

5:28PM    9            **MS. SASTRE:**  Counsel?  There you are.

5:28PM   10                 There you go, Rand.

5:28PM   11            **MR. NOLEN:**  Your Honor, objection.  We're now talking

5:28PM   12    about the labeling of another product, doxorubicin.

5:28PM   13            **MS. SASTRE:**  Of course.

5:28PM   14            **THE COURT:**  I'm going to let her ask the question.

5:28PM   15            **MS. SASTRE:**  Can we come up for a moment, Judge?

5:29PM   16            **THE COURT:**  Sure.

5:29PM   17                 (WHEREUPON, the following proceedings were held at

5:29PM   18    the bench.)

5:29PM   19            **MS. SASTRE:**  Your Honor, her primary opinion is that

5:29PM   20    there's a higher rate of permanent or persistent hair loss with

5:29PM   21    Taxotere compared to other drugs.

5:29PM   22            **THE COURT:**  Right.

5:29PM   23            **MS. SASTRE:**  So this is just simply going to the fact

5:29PM   24    that there is a real rate and even a warning in the label for

5:29PM   25    Adriamycin that it is associated with irreversible hair loss.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:52PM  1          **MS. SASTRE:**  Okay.

5:52PM  2          **THE COURT:**  I'm going to allow it.  The jury can make

5:52PM  3  a determination as to what it means.

5:52PM  4          (WHEREUPON, the following proceedings were held in

5:52PM  5  open court.)

5:53PM  6          **MS. SASTRE:**  Your Honor, the defendant would move in

5:53PM  7  Exhibit D-388-D, then, Adriamycin labeling into evidence.

5:53PM  8          **THE COURT:**  Over plaintiff's objection, let it be

5:53PM  9  admitted.

5:53PM  10  **BY MS. SASTRE:**

5:53PM  11  **Q.**   Okay.  Very good.

5:53PM  12          I'll just go ahead and put it up on the ELMO just

5:53PM  13  because we have it right here.  And so what we were talking

5:53PM  14  about Dr. Plunkett is underneath the adverse reaction section,

5:53PM  15  Adriamycin states "reversible complete alopecia occurs in most

5:53PM  16  cases."  Correct?

5:53PM  17  **A.**   That's what is stated, which means most women will lose

5:53PM  18  their hair as a result of drug, which I believe is true, that

5:53PM  19  drug-induced alopecia.

5:53PM  20  **Q.**   Okay.  All right.  Thank you.

5:53PM  21          Now, if we go back to the chart that we're making,

5:53PM  22  let's talk about Cytoxan for a moment.  Okay?

5:54PM  23  **A.**   Okay.

5:54PM  24  **Q.**   You said that you knew or you found out recently that

5:54PM  25  Mrs. Earnest took Adriamycin; correct?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:54PM  1  **A.**   I assume.  I said I assume she did based on the fact that

5:54PM  2  she was -- she was taking it for breast cancer -- well, I say

5:54PM  3  taking it, Taxotere, as an adjuvant treatment.  So I assume

5:54PM  4  that she was taking Adriamycin and cyclophosphamide, but I

5:54PM  5  don't know for sure.  I'm not a case-specific expert.

5:54PM  6  **Q.**   Okay.  Well, your assumptions were right.  So Cytoxan, you

5:54PM  7  just used the word "cyclophosphamide"?

5:54PM  8  **A.**   Yes.

5:54PM  9  **Q.**   And just to be clear, Cytoxan is cyclophosphamide;

5:54PM  10  correct?

5:54PM  11  **A.**   Yes.  And I'm using that word because that's what's in the

5:54PM  12  literature most of the time.

5:54PM  13  **Q.**   Okay.  Is it okay if we use the term "Cytoxan"?

5:54PM  14  **A.**   That's fine.

5:54PM  15  **Q.**   Okay.  Very good.

5:54PM  16         So you now know that Mrs. Earnest was also taking

5:54PM  17  Cytoxan; correct?

5:54PM  18  **A.**   If you're going to tell me that's true, I will believe

5:54PM  19  that's true.

5:54PM  20  **Q.**   Okay.  All right.  So with regard to, again, your work in

5:55PM  21  this case, your search, your review, your analysis of the

5:55PM  22  literature, you would agree with me that you identified

5:55PM  23  permanent hair loss as a hazard of Cytoxan; correct?

5:55PM  24  **A.**   In terms of case reports, yes, there are some case

5:55PM  25  reports.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:55PM  1    Q.    Okay.  So I'm going to put a check mark there.  All right,
5:55PM  2    Doctor?
5:55PM  3          And then going on to 5-FU or what's called
5:55PM  4    5-fluorouracil.  Did I say that correctly?
5:55PM  5    A.    Yes.
5:55PM  6    Q.    Okay.  It's a miracle.
5:55PM  7          And you said that that was, again, in the TAX 316
5:55PM  8    study, there was the arm that got Taxotere, Adriamycin, and
5:55PM  9    Cytoxan; correct?
5:55PM  10   A.    Yes.
5:55PM  11   Q.    And then there was an arm that got 5-FU, right, or
5:55PM  12   5-fluorouracil, Adriamycin, and Cytoxan; correct?
5:55PM  13   A.    Yes.
5:55PM  14   Q.    Hence the name TAC versus FAC; correct?
5:56PM  15   A.    Yes.
5:56PM  16   Q.    And when we talk about FAC in the TAX 316 study, we're
5:56PM  17   talking about 5-FU; right?
5:56PM  18   A.    Yes.
5:56PM  19   Q.    Okay.  And you would agree with me, Doctor, that you also
5:56PM  20   identified permanent hair loss as a hazard of 5-FU; correct?
5:56PM  21   A.    One case report that I can find.
5:56PM  22   Q.    Okay.  But you would agree with me that in a combination
5:56PM  23   setting, where it was given with Adriamycin and Cytoxan, you
5:56PM  24   don't have to go any further than TAX 316 to agree that it is
5:56PM  25   identified as a hazard, at least in the combination setting,

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:56PM  1  when it comes to hair loss; true?

5:56PM  2  A.   I would agree that they did -- results of that study, yes.

5:56PM  3  It's different than Taxotere, but you're correct.  It had some

5:56PM  4  of those.

5:56PM  5  Q.   Okay.  So I'm going to put a check mark next to 5-FU for

5:56PM  6  permanent alopecia.  Okay?  Fair enough?

5:56PM  7  A.   With the idea that the evidence is different for the

5:56PM  8  drugs, but, yes.

5:57PM  9  Q.   I'm sorry, I didn't hear you.  The idea that what?

5:57PM  10  A.   With the understanding that there is different evidence

5:57PM  11  for different drugs, but, yes.

5:57PM  12  Q.   I didn't ask you about any of the evidence.  Just that you

5:57PM  13  identified permanent hair loss as a hazard for all of these

5:57PM  14  medications.  Okay?

5:57PM  15  A.   Well, that's what I'm having a problem with.  I don't

5:57PM  16  think I've said it's a hazard.  I think what I'm saying to you

5:57PM  17  is that there are some reports, and there's a different hazard

5:57PM  18  posed by different drugs.

5:57PM  19        If, under hazard assessment, I find a report, yes, I

5:57PM  20  agree with that.  That is there.

5:57PM  21  Q.   Well, there are reports for sure.  We can agree upon that;

5:57PM  22  correct?

5:57PM  23  A.   There is at least one case report for each of those.

5:57PM  24  That's true.

5:57PM  25  Q.   Okay.  Take a look at your deposition, please,

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:06PM   1          "A.  Yes.  And for cyclophosphamide -- and I think I

6:06PM   2     told you another one that I looked at and I didn't discuss

6:06PM   3     in that paragraph.  I did because I pulled literature.

6:06PM   4          "Q.  You also saw it for 5-FU; correct?

6:06PM   5          "A.  Yes.  Well, you see it in 5-FU in 316, and you

6:06PM   6     do see a few cases in combination with Adriamycin and

6:06PM   7     cyclophosphamide."

6:06PM   8          Did I read that correctly?

6:06PM   9     A.   Yes, you did.

6:06PM  10     Q.   Okay.  Thank you so much, Doctor.

6:06PM  11          Now, Taxotere is also on your list, right?  The list

6:06PM  12     that we're making together, of course.

6:06PM  13     A.   Absolutely.  I think that's what I said when I first

6:06PM  14     started talking.

6:06PM  15     Q.   Okay.  I'm going to put it on the list.  All right?

6:07PM  16          And I'm going to put a check mark next to it by

6:07PM  17     "permanent" because that's your opinion; right?  It's

6:07PM  18     associated with permanent alopecia?

6:07PM  19     A.   Yes, based on the three buckets of evidence we talked

6:07PM  20     about.

6:07PM  21     Q.   Okay.

6:07PM  22     A.   Actually, I don't think -- I don't think that is quite my

6:07PM  23     opinion.  And if that is my opinion, then I think what I told

6:07PM  24     you is that I believe that there's an increased risk of

6:07PM  25     permanent alopecia with the use of Taxotere, as compared to

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:07PM 1    other drugs.

6:07PM 2            And you said "may be associated."  I think that's

6:07PM 3    different.

6:07PM 4    Q.    Okay.  Thank you.

6:07PM 5    A.    But if you want to talk about another opinion, we can talk

6:07PM 6    about it.

6:07PM 7    Q.    That's all right.  Thank you, Doctor.  I appreciate the

6:07PM 8    clarification.

6:07PM 9            So I've put another column up on our chart, if you

6:07PM 10   will.

6:07PM 11   A.    Uh-huh.

6:07PM 12   Q.    And can you see it there?  It says "rate."

6:07PM 13   A.    Yes, I see that.

6:08PM 14   Q.    Okay.  So I want to spend just a couple moments with you

6:08PM 15   on the rate.

6:08PM 16           You'd agree with me, when it comes to Taxol, you do

6:08PM 17   not know what the incidence rate is for persistent alopecia

6:08PM 18   associated with the it; correct?

6:08PM 19   A.    No.  The data does not develop that, and I don't see any

6:08PM 20   evidence that would support you to be able to quantify a rate.

6:08PM 21   Q.    All right.  So I put a question mark there next to "rate."

6:08PM 22   Okay?

6:08PM 23   A.    Quantifying the rate, yes.

6:08PM 24   Q.    Okay.  Let me ask you, you don't know what the incidence

6:08PM 25   rate is for persistent alopecia associated is Taxol; correct?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:08PM 1  **A.**   I know it's less than Taxotere, but I don't know the

6:08PM 2  number.  And that's why I was using the word "quantify."  I

6:08PM 3  don't have the data to quantify it.

6:08PM 4  **Q.**   Okay.  But I really just need an answer to my question.  I

6:08PM 5  am looking for a number.  When I say "rate," I mean number.

6:08PM 6          So just tell me -- if you have a rate, you can tell

6:09PM 7  me what it is.  And if you don't have a rate, can you let me

6:09PM 8  know as well?

6:09PM 9  **A.**   Yes.

6:09PM 10 **Q.**   Okay.

6:09PM 11 **A.**   I will try to do that.

6:09PM 12 **Q.**   Okay.  Very good.  Now, when it comes to Adriamycin, you

6:09PM 13 don't note the rate for persistent alopecia either; correct?

6:09PM 14 **A.**   That's correct.  The data that I relied upon does not

6:09PM 15 quantify it other than qualitatively.

6:09PM 16 **Q.**   And when it comes to Cytoxan, you don't have an incidence

6:09PM 17 rate for persistent alopecia; true?

6:09PM 18 **A.**   That is true, other than I have a few reports.  But I

6:09PM 19 can't quantify a rate based on that.

6:09PM 20 **Q.**   And when it comes to 5-fluorouracil or 5-FU, one of drugs

6:09PM 21 that was given in combination in TAX 316, you don't have a

6:09PM 22 rate -- an incidence rate for persistent alopecia for 5-FU,

6:09PM 23 either; true?

6:09PM 24 **A.**   By itself, that is true.

6:10PM 25 **Q.**   And when it comes to Taxotere, you would agree with me

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:10PM  1  that you don't have a rate for it either, correct, as a single
6:10PM  2  agent?
6:10PM  3  A.    Not as a single agent, but we can get rates from the
6:10PM  4  study -- the clinical data that is available.
6:10PM  5  Q.    Okay.  But as you sit here today, when Taxotere is
6:10PM  6  given -- just like I asked on the other medications -- as a
6:10PM  7  single agent, you don't have a rate that you can share with the
6:10PM  8  ladies and gentlemen of the jury with regard to persistent
6:10PM  9  alopecia; true?
6:10PM  10  A.    Yes.  Because in the studies that have been single-agent,
6:10PM  11  they haven't attempted to monitor that.  So I can't get it from
6:10PM  12  the studies that are available.
6:10PM  13  Q.    Okay.  But I want to make sure I understand, then.
6:11PM  14          You don't have a rate for persistent or permanent
6:11PM  15  alopecia for any of these medications, but it is your opinion
6:11PM  16  to this jury, to a reasonable degree of scientific certainty,
6:11PM  17  that the incidence rate or the risk for development of
6:11PM  18  permanent alopecia with Taxotere is greater than every drug on
6:11PM  19  this list.
6:11PM  20          Is that your testimony?
6:11PM  21  A.    My testimony has to do an increased risk, yes, which is a
6:11PM  22  different assessment than quantifying rate.
6:11PM  23          Would you like me to explain?
6:11PM  24  Q.    No.  I just want to make sure I understand your opinions,
6:11PM  25  Doctor.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:11PM   1   **A.**   Well, to understand my opinion, I'd have to explain it.
6:11PM   2   But if you don't want to hear, that's fine.
6:11PM   3   **Q.**   Okay.  But I just want to be clear.
6:12PM   4         Even though you don't know what is the incidence rate
6:12PM   5   for any of these drugs, it's your opinion that persistent
6:12PM   6   alopecia with Taxotere occurs more frequently than with other
6:12PM   7   medications?
6:12PM   8   **A.**   It's my opinion, based on the evidence that we have, that
6:12PM   9   there's an increased risk.  And that has been my opinion.  And
6:12PM  10   I have a good reason for saying that, if you would like me to
6:12PM  11   explain.
6:12PM  12   **Q.**   And your opinion, because you don't have an incidence
6:12PM  13   rate, is based on something you call the weight of the
6:12PM  14   evidence; right?
6:12PM  15   **A.**   Yes.  It's what scientists do when they look at risk.
6:12PM  16   Risk is not always quantified with a specific number.  Risk
6:12PM  17   is -- can be looked at in terms of comparison qualitatively.
6:12PM  18         And that's what I'm talking about.  What type of
6:12PM  19   evidence do I have?  Are you more likely to see it with one
6:12PM  20   particular drug than another?
6:12PM  21         And that's what I'm talking about by increased risk.
6:12PM  22   **Q.**   Okay.  Well, let me ask you this.  So there were some
6:12PM  23   examples today.  I think my partner, Mr. Strongman, came up
6:13PM  24   here, and he had an example using a bag of fruit.
6:13PM  25         Did you hear that?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:39PM  1   the patients were on hormone therapy before you came into court

6:39PM  2   today; correct?

6:39PM  3   A.   No, I did not reanalyze this data.

6:39PM  4   Q.   So let's talk about what the data showed far a moment.

6:39PM  5   All right?

6:39PM  6   A.   Okay.

6:39PM  7   Q.   All right.  So first if we talk about the Taxotere,

6:39PM  8   Adriamycin, Cytoxan group, okay.  Where the TAC arm, as it's

6:39PM  9   called.

6:39PM  10  A.   Sure.

6:39PM  11  Q.   So in your report, you list the final results for ongoing

6:39PM  12  alopecia for the TAC arm as being 3.9 percent; correct?

6:39PM  13  A.   I'm going look and see.

6:39PM  14  Q.   Sure.

6:39PM  15  A.   I don't remember the numbers that I have in my report,

6:40PM  16  but...

6:40PM  17       Yes, that's correct.  It's in the sentence in my

6:40PM  18  paragraph 45.

6:40PM  19  Q.   Okay.  So for the TAC group, then, just to get it out

6:40PM  20  there, it's 3.9 percent; correct?  For ongoing alopecia?

6:40PM  21  A.   That's what I reported here, yes.

6:40PM  22  Q.   Okay.  And then for the FAC group, the reports or the

6:40PM  23  folks that were listed for ongoing alopecia was 2.2 percent;

6:41PM  24  correct?

6:41PM  25  A.   I don't have that in the paragraph, but I believe that's

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

1  true.

2  Q.   Do you want to take a look?

3  A.   No, I believe that's true.  I'm fine with saying I believe

4  that's true.

5  Q.   Okay.  All right.

6       Now, Doctor, you would agree with me that the FAC

7  group that had 2.2 percent ongoing alopecia, as you state, at

8  the ten-year mark at the end of study, none of those patients

9  got a drop of Taxotere; right?

10  A.   That is correct.  They were not exposed to Taxotere --

11  well, I can't tell you that they never were, but I've assumed

12  an exclusion criteria would indicate that that was true.

13       So, yes, I don't believe that they did.

14  Q.   Okay.  Now, you're familiar with the phrase "statistical

15  significance"; correct?

16  A.   Yes.

17  Q.   And, in fact, as you've told us, you were sitting in court

18  today and you saw Dr. Madigan testify?

19  A.   Yes, I did.

20  Q.   Okay.  And I know you are a toxicologist and a

21  pharmacologist; correct?

22  A.   Yes.

23  Q.   Okay.  But Dr. Madigan is something different.  He is a

24  statistician; correct?

25  A.   Yes.  That's what he does every day.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

6:42PM 1 **Q.**   Okay.
6:42PM 2 **A.**   Statistics.
6:42PM 3 **Q.**   And I think you referred a moment ago, and you said "Well,
6:42PM 4 wait a minute.  I didn't do that analysis."  You were referring
6:42PM 5 to the analysis that Dr. Madigan did; true?
6:42PM 6 **A.**   Yes, that's correct.
6:42PM 7 **Q.**   Okay.  And when we get to for, lack of a better
6:42PM 8 expression, the numbers, when we get down to brass tacks here
6:42PM 9 and we're talking about these numbers of 2.2 and 3.9, the guy
6:42PM 10 that did the analysis on those numbers was, in fact,
6:42PM 11 Dr. Madigan the statistician; correct?
6:42PM 12 **A.**   I don't know that he said it quite that way, but I think
6:43PM 13 his testimony would speak for himself.  I think he argued back
6:43PM 14 to you that that isn't quite what he set out to do, the way
6:43PM 15 you're describing it.  He was doing a meta-analysis, looking
6:43PM 16 across not just this data but combining it, which would combine
6:43PM 17 the rates within the studies.
6:43PM 18      But I think he did admit to you that there was not a
6:43PM 19 statistically significant difference at P05 of 3.9 and 2.2.
6:43PM 20 **Q.**   Okay.  I think we can agree that he did a deeper dive into
6:43PM 21 the numbers than you did because he's a numbers guy.
6:43PM 22      Can we agree upon that?
6:43PM 23 **A.**   Right.  I never set out to reanalyze the data like he did.
6:43PM 24 **Q.**   Okay.  And, again, you heard him talk about that for hours
6:43PM 25 today; true?

OFFICIAL TRANSCRIPT

915

LAURA MASSEY PLUNKETT - CROSS

| | | |
|---|---|---|
| 6:50PM | 1 | **Q.** Very good. |
| 6:50PM | 2 | Page 276, please. |
| 6:50PM | 3 | 276, Dr. Plunkett, and I'll start at line 11. |
| 6:50PM | 4 | **A.** Yes. |
| 6:50PM | 5 | **Q.** Okay. |
| 6:50PM | 6 | **A.** Well, the question -- oh, you're going to go to the |
| 6:50PM | 7 | question or the -- |
| 6:50PM | 8 | **Q.** Line 11 on 276 is a question. |
| 6:50PM | 9 | **A.** Oh, I see it now.  I apologize. |
| 6:50PM | 10 | **Q.** No worries.  It's getting late. |
| 6:50PM | 11 | Okay. |
| 6:50PM | 12 | "Q.  And then if we combine that with the number of |
| 6:50PM | 13 | patients in the GEICAM study, 532, I've done the math, |
| 6:51PM | 14 | it's 1,276 patients. |
| 6:51PM | 15 | "A.  I believe that's true.  Yes, I think I've seen |
| 6:51PM | 16 | that number. |
| 6:51PM | 17 | "Q.  And if we added the number that reported |
| 6:51PM | 18 | alopecia beyond this 31-day period, it's a total of 32 |
| 6:51PM | 19 | individuals out of 1,276?" |
| 6:51PM | 20 | And your answer was: |
| 6:51PM | 21 | "A.  So I disagree with you pooling these two |
| 6:51PM | 22 | together based on the significant problems with the GEICAM |
| 6:51PM | 23 | study on follow-up, but I absolutely agree your math is |
| 6:51PM | 24 | correct.  And if you're asking me do those numbers added |
| 6:51PM | 25 | come to the number, they do." |

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:51PM 1          Did I read that correctly?
6:51PM 2  **A.**    You did, but that is not what Dr. Madigan did.
6:51PM 3  **Q.**    Okay.  Just give me a second.
6:52PM 4          Doctor, you are not providing an opinion that
6:52PM 5  Taxotere causes persistent alopecia; true?
6:52PM 6  **A.**    That is correct.  I'm not here to speak with causation.
6:52PM 7  **Q.**    Okay.  And, likewise, we can agree you're not providing an
6:52PM 8  opinion that Taxotere caused persistent alopecia in
6:52PM 9  Mrs. Earnest; correct?
6:52PM 10 **A.**    That's correct.  I'm not case specific causation.
6:52PM 11         **MS. SASTRE:**  Thank you very much for your time.
6:52PM 12 Thank you, Your Honor, ladies and gentlemen.
6:52PM 13             Pass the witness.
6:52PM 14         **THE COURT:**  Dr. Plunkett, we're going to come back
6:52PM 15 tomorrow.
6:52PM 16         **THE WITNESS:**  I was -- I missed all my planes, so --
6:52PM 17         **THE COURT:**  Well, the problem I have is we've got
6:52PM 18 utilities until 7:00.
6:52PM 19         **MR. NOLEN:**  Five minutes.  Five minutes.  I'll take
6:53PM 20 five minutes.
6:53PM 21         **THE COURT:**  Five minutes.  Okay.
6:53PM 22                 **REDIRECT EXAMINATION**
6:53PM 23 BY MR. NOLEN:
6:53PM 24 **Q.**    Dr. Plunkett, did you review the Taxotere label, the 2011
6:53PM 25 Taxotere label?

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - REDIRECT

6:53PM   1   **A.**   Yes.

6:53PM   2   **Q.**   And did you see any warning at all for permanent hair

6:53PM   3   loss?

6:53PM   4   **A.**   Absolutely not.  It's not in the label.

6:53PM   5   **Q.**   And would you base an opinion about increased risk on --

6:53PM   6   an increased risk of permanent hair loss on case reports?

6:53PM   7   **A.**   No.

6:53PM   8   **Q.**   And --

6:53PM   9   **A.**   Not alone, no.

6:53PM  10   **Q.**   For the other drugs you were asked about -- Taxol, 5-FU,

6:53PM  11   Prednisone, busulfan, cisplatin -- did you find anything other

6:53PM  12   than case reports?

6:53PM  13   **A.**   That's all I found.  That's the difference between those

6:53PM  14   drugs and Taxotere.

6:54PM  15   **Q.**   And would you agree that it would be improper to base an

6:54PM  16   opinion about increased risk of permanent hair loss on just

6:54PM  17   those case reports?

6:54PM  18            **MS. SASTRE:**  Leading, objection.

6:54PM  19            **THE COURT:**  Overruled.

6:54PM  20            **THE WITNESS:**  Yes, that's correct.

6:54PM  21   BY MR. NOLEN:

6:54PM  22   **Q.**   When you were reviewing Sanofi's data related to 316,

6:54PM  23   TAX 316, did you believe that you could rely on their published

6:54PM  24   study results?

6:54PM  25   **A.**   Yes, I did.

OFFICIAL TRANSCRIPT

08:48:06

                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA



IN RE:   TAXOTERE (DOCETAXEL)
         PRODUCTS LIABILITY            Docket No.: 16-MD-2740
         LITIGATION                    Section "H(5)"
                                       September 19, 2019
                                       New Orleans, Louisiana

*Relates To*:  *Barbara Earnest*,
*Case No.: 16-CV-17144*


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


                    DAY 4, MORNING SESSION
              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                  UNITED STATES DISTRICT JUDGE



<u>APPEARANCES</u>:

For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                           BY:  DAWN BARRIOS, ESQ.
                           701 Poydras Street
                           Suite 3650
                           New Orleans, Louisiana 70139


For the Plaintiffs:        Gainsburgh, Benjamin, David,
                             Meunier & Warshauer, LLC
                           BY:  PALMER LAMBERT, ESQ.
                           2800 Energy Centre
                           1100 Poydras Street
                           New Orleans, Louisiana 70163-2800




                    *OFFICIAL TRANSCRIPT*

11:30:21 1   stem cells.

11:30:22 2   A.   So there are different stem cells in the hair follicle.

11:30:26 3   The most common, the one that everybody knows, are the

11:30:30 4   stem cells here in the bulge.

11:30:35 5           I don't know what I'm making.  Okay, found it.

11:30:37 6           Okay.  Here, where I put this arrow, is the bulge.

11:30:41 7   These are the epithelial stem cells of the hair follicle.

11:30:46 8   Epithelial.  It's a type of cell.

11:30:49 9           Then you have stem cells here in the epidermis, okay.

11:30:54 10  Then you have stem cells in the sebaceous gland.

11:31:02 11          Then, what we have are stem cells here in this factor

11:31:05 12  which is called the *dermal papilla*.  So the dermal papilla is

11:31:11 13  very, very important because many studies now show that you can

11:31:15 14  grow hair from the cells of the dermal papilla.

11:31:20 15          This is a big -- of course, very big business because

11:31:24 16  there are companies that take these cells, multiply the cells

11:31:32 17  in vitro, and grow new hair.  That's their purpose.

11:31:35 18          But these stem cells are very important because they

11:31:38 19  send signals to the cell, the epithelial cell -- of the bulge

11:31:44 20  to start cycling.  So it's quite complicated.

11:31:47 21          What Dr. Thompson did, he use a stain that is

11:31:53 22  utilized for this.  It's called *K15*.  It's utilized to look at

11:31:59 23  these stem cells.  But it didn't study at all the papilla.  The

11:32:10 24  *dermal papilla*, it's called.

11:32:11 25  Q.   What's your understanding of why Dr. Thompson stained the

**OFFICIAL TRANSCRIPT**

1004

11:32:19 1   cells with K15?  What was he interested in, if you know?

11:32:23 2   A.   K15 is a chemical stain that stain the stem cells of the

11:32:33 3   epidermal stem cells.  But it's not very specific.  It also

11:32:37 4   stains other cells.  But I'm not discussing that.

11:32:40 5        What I think he found, it was positive, meaning the

11:32:44 6   stem cells were there, but this stain doesn't show you if the

11:32:52 7   stem cells work.  It's like you do -- you, for instance, have

11:32:56 8   cirrhosis.  So your liver is there, but may not work.  So, this

11:33:02 9   stain just show that stem cells are there, doesn't show they

11:33:06 10  are working properly.

11:33:07 11  Q.   So I want to ask you a question, but understand if I'm

11:33:11 12  clear.  Did you say that results of the staining for stem cells

11:33:16 13  were positive in this situation for Barbara Earnest?

11:33:21 14  A.   Yes, the stain was positive.  The significance, I don't

11:33:26 15  think there is any significance.

11:33:27 16  Q.   Whether it was positive or negative, would it have any

11:33:31 17  significance to you?

11:33:32 18  A.   You know, I don't believe one case can ever make

11:33:39 19  significance, not diagnostic significance, and not even

11:33:43 20  significant to understand exactly what's happening.

11:33:48 21  Q.   As a scientist and a researcher, you said one case doesn't

11:33:55 22  have significance.  What kind of volume of cases would you need

11:33:59 23  on stem cells in order -- can you even answer that question?

11:34:05 24  A.   I don't know, maybe 100.  I don't know exactly the number.

11:34:13 25  A statistician should decide the number.

**OFFICIAL TRANSCRIPT**

11:34:15  1    Q.   Doctor, getting back to your conclusion concerning

11:34:24  2    permanent chemotherapy-induced alopecia, is permanent

11:34:29  3    chemotherapy-induced alopecia, is that different than just a

11:34:33  4    diagnosis of alopecia or hair loss?

11:34:36  5    A.   Yes.  Alopecia is like -- well, hair loss is like fever.

11:34:42  6    You have to give the specific name to each type of alopecia.

11:34:45  7    Alopecia is not a diagnosis.

11:34:46  8    Q.   So we've worked through your differential diagnosis,

11:34:57  9    correct?  Is that right?

11:34:59 10    A.   Yes.

11:35:00 11    Q.   Did you, Doctor, then make a determination as to which

11:35:05 12    chemotherapy drug caused Barbara Earnest's permanent

11:35:11 13    chemotherapy-induced alopecia?

11:35:12 14    A.   Yes.  I believe it was docetaxel, Taxotere.

11:35:18 15    Q.   What formed the basis for that conclusion?

11:35:26 16    A.   The basis from that conclusion is my personal experience

11:35:31 17    with this medication, my -- with this condition, sorry, my

11:35:36 18    personal experience with the -- with my literature review.

11:35:44 19    Q.   Let's first talk about your personal experience with this

11:35:53 20    condition and these medications.  You touched a little bit on

11:35:58 21    this earlier, but I want to come back to it.

11:36:02 22         Have you, as a clinician and practitioner, seen

11:36:10 23    permanent --

11:36:10 24         MS. SASTRE:  Your Honor's Motion in *Limine* ruling.  I

11:36:13 25    would be happy to come up, Your Honor.

*OFFICIAL TRANSCRIPT*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *      Docket No.: 16-MD-2740
                                  *      Section "H(5)"
                                  *      New Orleans, Louisiana
Relates to:  Barbara Earnest      *      September 19, 2019
Case No.: 16-CV-17144             *
* * * * * * * * * * * * * * * * * *


DAY 4 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:18PM  1   duly sworn, testified as follows.)

1:18PM  2                    **CROSS-EXAMINATION**

1:18PM  3   **BY MS. SASTRE:**

1:18PM  4   **Q.**   Dr. Tosti, hello.

1:18PM  5   **A.**   Hello.

1:18PM  6   **Q.**   I don't believe we've ever had the pleasure of meeting

1:18PM  7   before.  My name is Hildy Sastre.  I have some questions for

1:18PM  8   you, just like Mr. Schanker had.  All right?

1:18PM  9   **A.**   Yes, ma'am.

1:18PM  10              **MS. SASTRE:**  Before we start, Your Honor, I would

1:18PM  11   just like to give the witness a copy of her depositions in this

1:18PM  12   matter, if I may.

1:18PM  13              **THE COURT:**  Sure.

1:18PM  14              **MS. SASTRE:**  Okay.  Very good.

1:18PM  15              **THE WITNESS:**  Thank you.

1:18PM  16              **MS. SASTRE:**  You're welcome.

1:18PM  17   **BY MS. SASTRE:**

1:18PM  18   **Q.**   So, Dr. Tosti, you know that Mrs. Earnest had chemotherapy

1:18PM  19   in 2011; correct?

1:18PM  20   **A.**   Yes.

1:18PM  21   **Q.**   And that was to treat breast cancer; right?

1:18PM  22   **A.**   Yes.

1:18PM  23   **Q.**   And you understand that she was treated specifically with

1:18PM  24   a drug by the name of Adriamycin?

1:18PM  25   **A.**   Yes.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:18PM 1    Q.   And you'd agree with me that Adriamycin causes hair loss;
1:19PM 2    correct?
1:19PM 3    A.   Adriamycin can cause anagen effluvium, yes.
1:19PM 4    Q.   Okay.  When you say that, though, I'm asking you a very
1:19PM 5    specific question.
1:19PM 6         When a patient takes Adriamycin for chemotherapy,
1:19PM 7    Adriamycin can cause hair loss?
1:19PM 8    A.   Yes, hair loss, but not prevent regrowth.
1:19PM 9    Q.   I'm sorry.  Say that again.  Not what?
1:19PM 10   A.   Can cause hair loss.  But what she has is different.  She
1:19PM 11   has no regrowth.
1:19PM 12   Q.   Okay.  Well, my question is just simply it can cause hair
1:19PM 13   loss; right?
1:19PM 14   A.   Yes, it can cause hair loss.
1:19PM 15   Q.   Very good.  And you'd also agree with me that there are
1:19PM 16   reports in the literature of what you call -- what you talked
1:19PM 17   about this morning, persistent chemotherapy-induced alopecia
1:19PM 18   with Adriamycin; true?
1:19PM 19   A.   With Adriamycin alone, just a very, very high dosage, not
1:20PM 20   for breast cancer.
1:20PM 21   Q.   All right.  Let me see if I can ask you a different
1:20PM 22   question.
1:20PM 23        Is Adriamycin considered an anthracycline drug?
1:20PM 24   A.   Yes.
1:20PM 25   Q.   And there's case reports of persistent

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:20PM   1    chemotherapy-induced alopecia with anthracycline regimens;
1:20PM   2    true?
1:20PM   3    A.    Yes.
1:20PM   4    Q.    Okay.  Now, we can agree that Mrs. Earnest was also
1:20PM   5    treated with Cytoxan?
1:20PM   6    A.    Yes.
1:20PM   7    Q.    And another name for that is cyclophosphamide?
1:20PM   8    A.    Yes.
1:20PM   9    Q.    And you'd agree that Cytoxan causes hair loss; true?
1:20PM   10   A.    Yes.
1:20PM   11   Q.    And you'd also agree with me, Doctor, that there are
1:20PM   12   reports in the literature which you have seen personally of
1:20PM   13   persistent chemotherapy-induced alopecia with Cytoxan?
1:20PM   14   A.    Very rare.
1:20PM   15   Q.    But they exist was my question.
1:20PM   16   A.    Yes, but they are very rare.
1:20PM   17   Q.    Okay.  Now, there's also a group of chemotherapies used to
1:21PM   18   treat breast cancer known as taxanes; right?
1:21PM   19   A.    Yes.
1:21PM   20   Q.    And Taxotere is a taxane; true?
1:21PM   21   A.    Yes.
1:21PM   22   Q.    Taxol is a taxane?
1:21PM   23   A.    Yes.
1:21PM   24   Q.    And let's talk about Taxol for a moment.  I know you spoke
1:21PM   25   with Mr. Schanker about it on your direct exam.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:21PM 1    A.    Yes.

1:21PM 2    Q.    Okay.  So you agree that Taxol causes hair loss; true?

1:21PM 3    A.    Yes.

1:21PM 4    Q.    And you'd also agree with me there are reports of what you

1:21PM 5    call persistent chemotherapy-induced alopecia -- reports within

1:21PM 6    the literature of Taxol causing that condition; true?

1:21PM 7    A.    Yes.  But I don't call it.  It's a condition that it's

1:21PM 8    called by everyone.  It's recognized.

1:21PM 9    Q.    My question is just simply that there are reports in the

1:21PM 10   literature of Taxol causing PCIA or chemotherapy-induced

1:21PM 11   alopecia; correct?

1:21PM 12   A.    Absolutely, yes.

1:21PM 13   Q.    Okay.  Now, you understand that Mrs. Earnest first took

1:22PM 14   Adriamycin and Cytoxan as part of her regimen; correct?

1:22PM 15   A.    Yes.

1:22PM 16   Q.    Mrs. Earnest took what's known as a combination regimen;

1:22PM 17   correct?

1:22PM 18   A.    Yes.

1:22PM 19   Q.    Of multiple medications; true?

1:22PM 20   A.    True.

1:22PM 21   Q.    First Adriamycin, given at the same time as Cytoxan;

1:22PM 22   right?

1:22PM 23   A.    Yes.

1:22PM 24   Q.    And then, later, she took Taxotere; correct?

1:22PM 25   A.    Absolutely.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | |
|---|---|
| 1:22PM | 1 |
| 1:22PM | 2 |
| 1:22PM | 3 |
| 1:22PM | 4 |
| 1:22PM | 5 |

**Q.**    But that was all part of her regimen; right?

**A.**    Yes.

**Q.**    Okay.  Now, we can agree that it was during the course of Mrs. Earnest taking Adriamycin and Cytoxan which is when she lost her hair; correct?

**A.**    Absolutely, yes.

**Q.**    And that was before she ever took her first dose of Taxotere?

**A.**    Yes.  That's what happen with this regimen.  They lose their hair with the Adriamycin and Cytoxan, and then the hair does not regrow when they do the Taxotere.

**Q.**    But I just -- I need to make sure -- I don't know if I got an answer to my question before the explanation.

          **THE COURT:**  She said, "Absolutely, yes."

          **MS. SASTRE:**  She did?  Okay.  Very good.

BY MS. SASTRE:

**Q.**    Now, after Mrs. Earnest completed her chemotherapy of Adriamycin, Cytoxan, and Taxotere, you understand that she then had radiation therapy; true?

**A.**    Yes.

**Q.**    And when her radiation therapy was completed and after her chemotherapy was completed, she took a medication known as Arimidex?

**A.**    Yes.  That was three months after her chemotherapy was completed.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | |
|---|---|
| 1:23PM | 1 |
| 1:23PM | 2 |
| 1:23PM | 3 |
| 1:23PM | 4 |
| 1:23PM | 5 |
| 1:23PM | 6 |
| 1:23PM | 7 |
| 1:23PM | 8 |
| 1:24PM | 9 |
| 1:24PM | 10 |
| 1:24PM | 11 |
| 1:24PM | 12 |
| 1:24PM | 13 |
| 1:24PM | 14 |
| 1:24PM | 15 |
| 1:24PM | 16 |
| 1:24PM | 17 |
| 1:24PM | 18 |
| 1:24PM | 19 |
| 1:24PM | 20 |
| 1:24PM | 21 |
| 1:24PM | 22 |
| 1:24PM | 23 |
| 1:24PM | 24 |
| 1:24PM | 25 |

1  Q.    Okay.  And Arimidex is a form of hormone therapy given to

2  breast cancer patients?

3  A.    Yes.

4  Q.    Sometimes called endocrine therapy; right, Doctor?

5  A.    Yes.

6  Q.    All right.  And you'd agree with me that there are reports

7  in the literature, which you have seen, where it's stated that

8  Arimidex can cause persistent hair loss; true?

9  A.    Yes, but a different time of persistent hair loss.

10  Q.    And we'll talk about that in a moment because what you

11  have called -- here today in court, you've called the kind of

12  hair loss that you believe is associated with chemotherapy --

13  you've called it PCIA, persistent --

14        MR. SCHANKER:  I'm sorry.  I didn't mean to interrupt

15  the question.

16  BY MS. SASTRE:

17  Q.    -- persistent chemotherapy-induced alopecia; true?

18  A.    Yes.

19  Q.    And then there's a kind of hair loss known as

20  endocrine-induced permanent hair loss; correct?

21  A.    It's not "permanent."  It's endocrine-induced hair loss,

22  which is different.

23  Q.    Okay.  And you're familiar with that; correct?

24  A.    Absolutely, yes.

25  Q.    All right.  Now, you understand -- I believe you testified

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:54PM 1  **Q.**   Okay.  And let me try to pull those up.

1:54PM 2          You looked at cyclophosphamide; correct?

1:54PM 3  **A.**   Yes.  I don't know the data about these drugs exactly.  I

1:55PM 4  see here, but I don't know if they -- patients took these,

1:55PM 5  association.  Not just cyclophosphamide alone.  I don't know.

1:55PM 6  **Q.**   Okay.  Cyclophosphamide is listed; right?

1:55PM 7  **A.**   But it's listed maybe in association with methotrexate and

1:55PM 8  fluorouracil.

1:55PM 9  **Q.**   Well, Doctor, there may be a lot of things going on here.

1:55PM 10  I don't know.  I'm just asking you is cyclophosphamide listed?

1:55PM 11  **A.**   It's listed.

1:55PM 12  **Q.**   Okay.  And what it says next to cyclophosphamide, which is

1:55PM 13  Cytoxan, and then two other drugs that are listed, it has a

1:55PM 14  number of 13; correct?

1:55PM 15  **A.**   But you don't know which one as the number.  It's a mix to

1:55PM 16  it.

1:55PM 17  **Q.**   I didn't ask that, ma'am.  I'm just asking you is the

1:55PM 18  number 13 there.

1:55PM 19  **A.**   I see number 13, but it's for three drugs, not for one.

1:55PM 20  **Q.**   I understand.  And all I'm asking you is that some number

1:55PM 21  of those 13 patients, I know you don't know how many today, but

1:55PM 22  some number within those 13 patients took cyclophosphamide --

1:56PM 23  **A.**   I am very aware of this, yes.

1:56PM 24  **Q.**   -- and had persistent chemotherapy-induced alopecia?

1:56PM 25  **A.**   Yes.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:56PM  1    **Q.**   As you sit here today, you don't know if the number is
1:56PM  2    one, you don't know if the number is 10 for cyclophosphamide;
1:56PM  3    right?
1:56PM  4    **A.**   Absolutely, I don't know.
1:56PM  5    **Q.**   Okay.  And then if we look a little further down, it says
1:56PM  6    "doxorubicin."  Do you see that?
1:56PM  7    **A.**   Yes, I do.
1:56PM  8    **Q.**   And if lists other drugs as well?
1:56PM  9    **A.**   Yes.
1:56PM  10   **Q.**   Doxorubicin is Adriamycin; right?
1:56PM  11   **A.**   Yes.
1:56PM  12   **Q.**   And in your paper published in 2109, you recorded five
1:56PM  13   cases for a group of drugs, including Adriamycin, where you saw
1:56PM  14   five patients with persistent chemotherapy-induced alopecia;
1:56PM  15   correct?
1:56PM  16   **A.**   They were also taking Adriamycin.
1:56PM  17   **Q.**   Right.  And that's what I'm saying.  You don't know of
1:56PM  18   that five patients who had persistent chemotherapy-induced
1:56PM  19   alopecia, if it was two or three or four or even just one of
1:57PM  20   them that had that drug, but you know some of them did;
1:57PM  21   correct?
1:57PM  22   **A.**   Yes, but what I really think is that those drugs are, you
1:57PM  23   know, sometimes occasionally causing the problem.  I never said
1:57PM  24   they never cause.  It's just a question of, likely, frequency.
1:57PM  25   **Q.**   One of the other drugs that the jury has heard a little

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:57PM  1    bit about, and I think you discussed on your direct exam, is

1:57PM  2    fluorouracil; correct?

1:57PM  3    A.    No, I have no experience with that.  I discussed busulfan.

1:57PM  4    I have experience with busulfan.

1:57PM  5    Q.    All right.  But you've heard of fluorouracil; correct?

1:58PM  6    A.    Sorry?

1:58PM  7    Q.    Fluorouracil.  I just highlighted it on the page.

1:58PM  8    A.    Yes, I have no experience with that drug.

1:58PM  9    Q.    Okay.  But it's included within your group where some

1:58PM  10   number of patients within that 13 had persistent

1:58PM  11   chemotherapy-induced alopecia after taking fluorouracil; right?

1:58PM  12   A.    Yes.

1:58PM  13   Q.    Okay.  Now, the jury's heard a little bit about a drug

1:58PM  14   regimen.  They heard about FAC, F-A-C.  And they've also heard

1:58PM  15   about a regimen called FEC, F-E-C.  All right.  And do you

1:58PM  16   understand the E in FEC to be epirubicin?

1:58PM  17   A.    I'm not an oncologist, and to be honest, I don't feel I

1:58PM  18   can give an expert opinion, but I'm here and I will do what I

1:59PM  19   can do.

1:59PM  20   Q.    Well, let me ask you this, Doctor:  There's case reports

1:59PM  21   of persistent chemotherapy-induced alopecia with the F-E-C, or

1:59PM  22   FEC, regimen; true?

1:59PM  23   A.    I think so.

1:59PM  24   Q.    And the E in the FEC is also included within your study?

1:59PM  25   Right?  Epirubicin?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

1:59PM 1   **A.**   Yes.

1:59PM 2   **Q.**   Okay.  Let me find that.

1:59PM 3        I may have misspoke, and I apologize.  I couldn't

1:59PM 4   find it because you actually don't comment on epirubicin in the

2:00PM 5   study.

2:00PM 6        All right.  So let's -- let's go back to

2:00PM 7   Mrs. Earnest.  Okay?

2:00PM 8   **A.**   Yes.

2:00PM 9   **Q.**   All right.  Now, we talked about Mrs. Earnest taking

2:00PM 10  hormone therapy or Arimidex; true?

2:00PM 11  **A.**   Yes.

2:00PM 12  **Q.**   And I believe what these drugs are called -- and we

2:00PM 13  haven't spent as much time on them as we have the chemotherapy

2:00PM 14  drugs, so I'd like to just spend a moment here.

2:00PM 15       But I think what they're called is aromatase

2:00PM 16  inhibitors; true?

2:00PM 17  **A.**   Yes.

2:00PM 18  **Q.**   And doctors use Arimidex for women who have been diagnosed

2:00PM 19  with cancer, particularly if they're past menopause; right?

2:00PM 20  **A.**   Yes.

2:01PM 21  **Q.**   Like Mrs. Earnest; correct?

2:01PM 22  **A.**   Yes.  And I explained today that they're used for

2:01PM 23  estrogen-positive breast cancer, not always.

2:01PM 24  **Q.**   And you would agree with me that aromatase inhibitors,

2:01PM 25  like Arimidex, cause hormonal changes in the body?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:01PM  1   **A.**   They are used for that, yes.

2:01PM  2   **Q.**   Okay.  And Arimidex has an androgenetic effect; true?

2:01PM  3   **A.**   Yes.

2:01PM  4   **Q.**   And what that means is that Arimidex works by reducing the

2:01PM  5   level of estrogen in a woman's body; true?

2:01PM  6   **A.**   Yes.

2:01PM  7   **Q.**   And you'd agree with me that drugs like Arimidex, which

2:01PM  8   Mrs. Earnest has taken for the last eight years, can cause

2:01PM  9   androgenetic alopecia; true?

2:01PM  10  **A.**   Yes.

2:01PM  11  **Q.**   And you'd agree with me, Dr. Tosti, that drugs like

2:01PM  12  Arimidex, which Mrs. Earnest has taken for the last eight

2:01PM  13  years, can worsen androgenetic alopecia; true?

2:02PM  14  **A.**   If somebody has androgenetic alopecia, yes, but she didn't

2:02PM  15  have hair when she started the treatment, so that's very

2:02PM  16  unlikely even to think about this.

2:02PM  17  **Q.**   Well, we can agree that androgenetic alopecia is one of

2:02PM  18  the most common side effects of treatment with aromatase

2:02PM  19  inhibitors; true?

2:02PM  20  **A.**   I don't think it's the most common.

2:02PM  21  **Q.**   One of the most.  One of the most.

2:02PM  22  **A.**   Okay.  But that's not the most.

2:02PM  23  **Q.**   Okay.  Let me ask my question again.  Maybe we missed each

2:02PM  24  other.  That happens sometimes.

2:02PM  25          Androgenetic alopecia is one of the most common side

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:02PM   1    effects of treatment with aromatase inhibitors; correct?

2:02PM   2    A.    Yes.

2:02PM   3    Q.    Okay.  And, in fact, you've seen literature that says

2:02PM   4    aromatase inhibitors can cause alopecia in up to 30 percent of

2:02PM   5    the people that take them?

2:02PM   6    A.    Yes.

2:02PM   7    Q.    And there are reports that aromatase inhibitors, like

2:03PM   8    Arimidex, can also result in complete alopecia?

2:03PM   9    A.    That's wrong.  That's tamoxifen.

2:03PM   10   Q.    Okay.

2:03PM   11   A.    And I don't believe that case was really a true case.

2:03PM   12   Q.    Let me see if I can ask it to you and then maybe we can

2:03PM   13   avoid going to your deposition.  Okay?

2:03PM   14         Have you seen reports of aromatase inhibitors

2:03PM   15   resulting in complete alopecia?  Yes or no, please.

2:03PM   16   A.    No.

2:03PM   17   Q.    Okay.  Is tamoxifen an aromatase inhibitor?

2:03PM   18   A.    No.

2:03PM   19   Q.    Okay.  What is tamoxifen?

2:03PM   20   A.    Tamoxifen is a -- block the estrogen receptor.  So it's

2:03PM   21   the same type of drugs, but you use tamoxifen before menopause,

2:03PM   22   and aromatase inhibitor after menopause.

2:03PM   23   Q.    Okay.  Well, your study that we were just on a moment ago,

2:04PM   24   it included reports of persistent hair loss with aromatase

2:04PM   25   inhibitors; correct?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:04PM   1    **A.**   No.  It's never persistent.

2:04PM   2    **Q.**   Let's take a look, Doctor.

2:04PM   3    **A.**   I'm here.

2:04PM   4    **Q.**   Okay.  So, first of all, when we talk about the hair loss

2:04PM   5    discussed in your study with regard to chemotherapy

2:04PM   6    medications, in order to meet that definition, the patient

2:04PM   7    simply had to have hair loss in excess of six months; right?

2:04PM   8    **A.**   Incomplete hair regrow.

2:05PM   9    **Q.**   For six months?

2:05PM  10    **A.**   After six months.

2:05PM  11    **Q.**   After six months; correct?  Okay.

2:05PM  12         **MS. SASTRE:**  If I could have one second, please.

2:05PM  13         **THE COURT:**  Sure.

2:05PM  14    BY MS. SASTRE:

2:05PM  15    **Q.**   All right.  Well, we'll go back to it.  I have lots of

2:05PM  16    questions on this paper.

2:05PM  17         Your report certainly included -- or your study

2:05PM  18    certainly included reports of significant hair loss with

2:05PM  19    endocrine therapy; correct?

2:05PM  20    **A.**   Yes.

2:05PM  21    **Q.**   Okay.  Let's take a look at that column, which is the EIAC

2:06PM  22    column; right?

2:06PM  23         And that's right here; correct, Doctor?

2:06PM  24    **A.**   Yes.

2:06PM  25    **Q.**   And what you have there is 94 patients; true?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | | |
|---|---|---|
| 2:06PM | 1 | **A.**   Yes. |
| 2:06PM | 2 | **Q.**   And you see where it says "aromatase inhibitors"; correct? |
| 2:06PM | 3 | **A.**   Yes. |
| 2:06PM | 4 | **Q.**   And you indicated that of that group of patients on the |
| 2:06PM | 5 | medications listed, all aromatase inhibitors, that there were |
| 2:06PM | 6 | 58 that had endocrine-induced alopecia; correct? |
| 2:06PM | 7 | **A.**   Yes. |
| 2:06PM | 8 | **Q.**   And that was out of -- that's 62 percent of the patients |
| 2:06PM | 9 | that took that medication; correct? |
| 2:06PM | 10 | **A.**   Yes. |
| 2:06PM | 11 | **Q.**   Now, one of the things that you mentioned earlier, you |
| 2:06PM | 12 | said to counsel on direct exam, you said when it comes to |
| 2:06PM | 13 | chemotherapy, you said you know patients lose their eyebrows |
| 2:07PM | 14 | and their eyelashes.  Do you remember that? |
| 2:07PM | 15 | **A.**   Yes. |
| 2:07PM | 16 | **Q.**   And you'd agree with me here that underneath the endocrine |
| 2:07PM | 17 | therapy column, you had eyebrow or eyelash alopecia, 26 out of |
| 2:07PM | 18 | 92 of those who had endocrine alopecia, you noted also lost |
| 2:07PM | 19 | their eyebrows and eyelashes? |
| 2:07PM | 20 | **A.**   Yes. |
| 2:07PM | 21 | **Q.**   Which is out of that group who had the endocrine-induced |
| 2:07PM | 22 | alopecia that's 28 percent of those who took endocrine therapy |
| 2:07PM | 23 | lost their eyebrows and eyelashes? |
| 2:07PM | 24 | **A.**   Yes, that's true. |
| 2:07PM | 25 | **Q.**   And I know you made a comment a few times today, you said, |

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | | |
|---|---|---|
| 2:07PM | 1 | well -- if you have hair loss with endocrine therapy, you said, |
| 2:07PM | 2 | well, it's not that bad; right? |
| 2:07PM | 3 | A.   It most commonly is Grade 1. |
| 2:07PM | 4 | Q.   Well, let's take a look at that. |
| 2:08PM | 5 | So right here you see where it says Grade 2; right? |
| 2:08PM | 6 | Do you see that, Grade 2?  Doctor, Grade 2? |
| 2:08PM | 7 | A.   I see.  I also see that it's a significant difference |
| 2:08PM | 8 | between the two. |
| 2:08PM | 9 | Q.   Hold on.  I got to ask a question.  Hold on. |
| 2:08PM | 10 | And if we go over to the column to the right, it says |
| 2:08PM | 11 | that of those patients who took endocrine therapy and had |
| 2:08PM | 12 | alopecia from the endocrine therapy, 12 out of 92, or |
| 2:08PM | 13 | 13 percent, had Grade 2; right? |
| 2:08PM | 14 | A.   Yes. |
| 2:08PM | 15 | Q.   And you showed the jury a picture of what you said was |
| 2:08PM | 16 | Grade 2 alopecia.  And I'd like to find that.  Just give me one |
| 2:08PM | 17 | second. |
| 2:09PM | 18 | MS. SASTRE:  Do you have the Grade 2 photo? |
| 2:09PM | 19 | I'm sorry.  Give me one second. |
| 2:09PM | 20 | Okay.  I have it. |
| 2:09PM | 21 | BY MS. SASTRE: |
| 2:09PM | 22 | Q.   So... |
| 2:09PM | 23 | A.   I got that from another context, and I explained this |
| 2:09PM | 24 | morning very well that the problem with this situation -- |
| 2:09PM | 25 | THE COURT:  Hold on. |

OFFICIAL TRANSCRIPT

1065

ANTONELLA TOSTI - CROSS

| | | |
|---|---|---|
| 2:09PM | 1 | **THE WITNESS:**  I want to explain. |
| 2:09PM | 2 | **THE COURT:**  I think you need to ask a question. |
| 2:09PM | 3 | **THE WITNESS:**  Okay.  Sorry. |
| 2:09PM | 4 | BY MS. SASTRE: |
| 2:09PM | 5 | Q.   All I'm asking you, when you showed this picture to the |
| 2:09PM | 6 | jury, you said this is Grade 2 alopecia; true? |
| 2:09PM | 7 | A.   Yes. |
| 2:09PM | 8 | Q.   All right.  Thank you. |
| 2:09PM | 9 | And if we go back -- |
| 2:09PM | 10 | A.   Can I explain now? |
| 2:09PM | 11 | **THE COURT:**  Well, I think -- the question was just is |
| 2:09PM | 12 | this Grade 2 alopecia. |
| 2:09PM | 13 | BY MS. SASTRE: |
| 2:10PM | 14 | Q.   And, Doctor, if we want to know what Grade 2 is, beyond |
| 2:10PM | 15 | the picture of what you showed the jury, we can read your |
| 2:10PM | 16 | definition from your study.  And you state, "Grade 2 is hair |
| 2:10PM | 17 | loss of 50 percent or more of normal for that individual and is |
| 2:10PM | 18 | readily apparent to others.  Camouflage is necessary if the |
| 2:10PM | 19 | patient desires."  Correct? |
| 2:10PM | 20 | A.   Yes.  That's right, 50 percent or more.  So 50 percent can |
| 2:10PM | 21 | go to 90 percent.  And so that's the -- the problem of that |
| 2:10PM | 22 | grading. |
| 2:10PM | 23 | Q.   The grades in your paper? |
| 2:10PM | 24 | A.   The grading in general.  This is the grading of |
| 2:10PM | 25 | dermatological side effects.  And I explained this this |

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | |
|---|---|
| 2:10PM | 1 |
| 2:10PM | 2 |
| 2:10PM | 3 |
| 2:11PM | 4 |
| 2:11PM | 5 |
| 2:11PM | 6 |
| 2:11PM | 7 |
| 2:11PM | 8 |
| 2:11PM | 9 |
| 2:11PM | 10 |
| 2:11PM | 11 |
| 2:11PM | 12 |
| 2:11PM | 13 |
| 2:11PM | 14 |
| 2:11PM | 15 |
| 2:11PM | 16 |
| 2:11PM | 17 |
| 2:11PM | 18 |
| 2:11PM | 19 |
| 2:11PM | 20 |
| 2:11PM | 21 |
| 2:12PM | 22 |
| 2:12PM | 23 |
| 2:12PM | 24 |
| 2:12PM | 25 |

1  morning, that depending on the two grades, it doesn't really

2  give you the possibility to select it completely this way.

3  Q.    Just to be clear, when you say that it may be necessary

4  that the patients camouflage, you're talking about alopecia

5  Grade 2 in patients who've received endocrine therapy that it's

6  so severe that they do need to use things like wigs; correct?

7  That's what "camouflage" means.

8  A.    Yes.  But the definition of alopecia with endocrine

9  therapy required that the patient starts with hair.

10  Q.    Okay.

11  A.    That's the problem.

12  Q.    And when it comes to endocrine therapy, you'd agree with

13  me that up to 25 percent of patients with breast cancer

14  receiving endocrine therapy may develop endocrine

15  therapy-induced alopecia; true?

16  A.    Yes.

17  Q.    And that's exactly what you state in your paper, up to

18  25 percent; right?

19  A.    Yes.

20  Q.    Now, you talked about a couple times if a patient -- you

21  had your 192 patients, and you divided them up into two groups;

22  right?  And there's the chemotherapy group; right?  PCIA.  And

23  then there's the endocrine therapy group, EIAC; correct?

24  A.    Yes.

25  Q.    And in order to be within the endocrine therapy group, the

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:12PM 1    patient would have already had chemotherapy; true?

2:12PM 2    **A.**    Yes.

2:12PM 3    **Q.**    They would have lost their hair; true?

2:12PM 4    **A.**    Yes.

2:12PM 5    **Q.**    Their hair would have come back.  They would have had

2:12PM 6    complete regrowth; correct?

2:12PM 7    **A.**    Yes.

2:12PM 8    **Q.**    And then they would have started endocrine therapy and

2:12PM 9    then had the hair loss that you specifically identified and

2:12PM 10   counted in your paper.

2:12PM 11   **A.**    That's precise.  That's exactly what happens.

2:12PM 12   **Q.**    All right.  And you'd agree with me, ma'am, that in

2:12PM 13   between the time that Barbara Earnest concluded her

2:12PM 14   chemotherapy and the time just a couple months later when she

2:12PM 15   started her endocrine therapy, you don't have any evidence and

2:12PM 16   you've seen nothing in this record to indicate that she had

2:13PM 17   hair regrowth during that time; correct?

2:13PM 18   **A.**    She did not.  She did not grow in three months, which is

2:13PM 19   normally the time you should have almost complete regrowth.  So

2:13PM 20   she didn't regrow before starting the aromatase inhibitor.

2:13PM 21   **Q.**    But to be clear, I just want to make sure that we're

2:13PM 22   drawing the distinction, the patients in your study included in

2:13PM 23   the endocrine group, their hair completely regrew after chemo;

2:13PM 24   right?

2:13PM 25   **A.**    Yes.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:41PM 1    **A.**   You read it correctly, but I want to go to the previous

2:41PM 2    page where I probably explain what I was thinking.  So the

2:41PM 3    cause is unknown.  We don't know at cellular level what

2:41PM 4    happens.  That's different from not knowing which can cause.

2:41PM 5              Here, it's probably here.

2:41PM 6              **THE COURT:**  Okay.

2:41PM 7              **MR. SCHANKER:**  Your Honor, with the rule of

2:41PM 8    completeness.

2:41PM 9              **THE COURT:**  The rule of completeness, yes, sir.

2:41PM 10             **MR. SCHANKER:**  On that same page, I would like to

2:41PM 11   read the previous question and answer, if I may.

2:41PM 12             **THE COURT:**  Well, I'm going to let the witness read

2:41PM 13   it.

2:41PM 14             **MR. SCHANKER:**  Okay, Your Honor.  So that would be

2:41PM 15   page 29, lines --

2:41PM 16             **THE COURT:**  Well, let me see what it says first.

2:42PM 17             **MR. SCHANKER:**  Page 29, lines 4 through 9, which are

2:42PM 18   directly before the question.

2:42PM 19             **THE COURT:**  Let me read it.

2:42PM 20             I think under the rule of completeness, you can

2:42PM 21   ask the previous question and answer.  Why don't you read the

2:42PM 22   previous question.

2:42PM 23             **THE WITNESS:**  Yes.  So I read -- somebody with better

2:42PM 24   English reads.

2:42PM 25             I read?  Okay.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | |
|---|---|
| 2:42PM | 1 |

            "A.  So I look at some of the articles you wrote, and

2     then I also read your report.  And your report, with

3     regard to the causative role of chemotherapy and

4     persistent alopecia, you wrote that precise anatomical

5     process is not known."

6            Yes, that's what I said.

7            **THE COURT:**  Okay.  Now, proceed.

8            **MS. SASTRE:**  Thank you, Your Honor.

9  **BY MS. SASTRE:**

10  **Q.**    So with that in mind, the answer you just read, there is

11  something in medicine called a mechanism of action; right?

12  **A.**    Yes.

13  **Q.**    And you know what that means; right, Doctor?

14  **A.**    Yes, I do.

15  **Q.**    Okay.  And you believe the mechanism of action for

16  chemotherapy-induced alopecia is the stem cells are likely

17  damaged by chemotherapy; true?

18  **A.**    Yes.

19  **Q.**    And you believe this mechanism of action is not just

20  likely, you believe that it's very likely to cause damage to

21  the stem cells; true?

22  **A.**    Everybody believes that.

23  **Q.**    Okay.  Very good.

24         Now, you talked about a biopsy that had been taken of

25  Mrs. Earnest; true?

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:44PM  1    **A.**    She had two biopsies.
2:44PM  2    **Q.**    Okay.  And the biopsy was taken -- is it your
2:44PM  3    understanding it was taken here in New Orleans?
2:44PM  4    **A.**    Yes.
2:44PM  5    **Q.**    And then it was flown out of New Orleans; right?
2:44PM  6    **A.**    Yes.
2:44PM  7    **Q.**    Where was it sent?
2:44PM  8    **A.**    To Dr. Curtis Thompson.
2:44PM  9    **Q.**    Why is Dr. Thompson?
2:44PM  10   **A.**    Portland, Oregon.
2:44PM  11   **Q.**    So the biopsy, for some reason, it's taken here in New
2:44PM  12   Orleans.  I mean, there's pathologists right here; right?
2:44PM  13   **A.**    No.  There are very few hair pathologists here in United
2:44PM  14   States.  I'd say no more than 10.
2:44PM  15   **Q.**    Okay.  But my question is there's lots of pathologists
2:44PM  16   right here in New Orleans; true?
2:44PM  17   **A.**    None -- nobody known for hair, no.
2:44PM  18   **Q.**    Okay.  So there's no one in all of New Orleans --
2:44PM  19   **A.**    You know, that's --
2:44PM  20   **Q.**    -- that could take a biopsy?
2:44PM  21   **A.**    Could read a hair biopsy?  No.
2:44PM  22   **Q.**    No one in New Orleans knows anything about hair?
2:44PM  23   **A.**    You want me to answer -- there are very good
2:45PM  24   dermatologists.  They know.  But pathologists, there are maybe
2:45PM  25   ten pathologists in the U.S. who want to read hair.  They don't

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

| | | |
|---|---|---|
| 2:54PM | 1 | **A.**   Yes. |
| 2:54PM | 2 | **Q.**   Okay.  And you'd agree with me that Dr. Thompson -- well, |
| 2:54PM | 3 | you'd agree with me that you did not make reference or mention |
| 2:54PM | 4 | of the stem cell markers study done on Mrs. Earnest's scalp |
| 2:54PM | 5 | anywhere in your report; true? |
| 2:55PM | 6 | **A.**   True, because I don't think it's important.  Not at all. |
| 2:55PM | 7 | **Q.**   Well, putting aside how you feel about it, it was you and |
| 2:55PM | 8 | Dr. Thompson that arranged to have it done; true? |
| 2:55PM | 9 | **A.**   No. |
| 2:55PM | 10 | **Q.**   Didn't I just read that a second ago?  You said "We are |
| 2:55PM | 11 | going to take biopsies and send pathology and we are going to |
| 2:55PM | 12 | look at stem cell markers." |
| 2:55PM | 13 |         You sent that e-mail to Dr. Thompson; true? |
| 2:55PM | 14 | **A.**   In that e-mail I asked him to his lab -- |
| 2:55PM | 15 | **Q.**   No, no, ma'am -- |
| 2:55PM | 16 |         **THE COURT:**  Wait. |
| 2:55PM | 17 | BY MS. SASTRE: |
| 2:55PM | 18 | **Q.**   My question is just you sent that e-mail to Dr. Thompson; |
| 2:55PM | 19 | true? |
| 2:55PM | 20 |         **MR. SCHANKER:**  Your Honor, she can answer the |
| 2:55PM | 21 | question. |
| 2:55PM | 22 |         **THE COURT:**  We're going to be very careful about how |
| 2:55PM | 23 | this inquiry is fashioned. |
| 2:55PM | 24 |             Overruled.  But -- |
| 2:55PM | 25 |         **MS. SASTRE:**  I'll move on.  I'll move on.  Okay. |

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:55PM  1   BY MS. SASTRE:

2:56PM  2   Q.   And what you also knew before issuing your report was that

2:56PM  3   the biopsies from Mrs. Earnest's scalp, which was looking for

2:56PM  4   stem cell markers by Dr. Curtis Thompson in Oregon, you knew

2:56PM  5   the results were positive for stem cells; right?

2:56PM  6   A.   Positive for epithelial stem cells, and this is not the

2:56PM  7   diagnostic path.  It didn't include it in the report.

2:56PM  8   Q.   Doctor, my question is just that you knew the results --

2:56PM  9   A.   Yes.

2:56PM 10   Q.   -- of the stem cell markers on Mrs. Earnest's biopsies was

2:56PM 11   positive for stem cells; true?

2:56PM 12   A.   Positive for keratin 15, yes.

2:56PM 13   Q.   Positive for stem cells; true?

2:56PM 14        MR. SCHANKER:  Asked and answered, Your Honor.

2:56PM 15   BY MS. SASTRE:

2:56PM 16   Q.   Yes or no, if you know.

2:56PM 17        MR. SCHANKER:  Asked and answered.

2:56PM 18        THE COURT:  Overruled.

2:56PM 19        Was that a yes-or-no answer?

2:56PM 20        THE WITNESS:  Yes.

2:57PM 21        THE COURT:  Thank you.

2:57PM 22   BY MS. SASTRE:

2:57PM 23   Q.   And you know that Dr. Thompson didn't mention the results

2:57PM 24   in his report either; right?

2:57PM 25   A.   Yes.

OFFICIAL TRANSCRIPT

ANTONELLA TOSTI - CROSS

2:57PM  1   **Q.**   Let's change topics, and this is last topic I have for

2:57PM  2   you, Doctor.  When a patient comes to see you -- we're talking

2:57PM  3   about hair loss, okay, for persistent hair loss, you often

2:57PM  4   recommend treatment for them; true?

2:57PM  5   **A.**   If the patients come to see me, usually comes for

2:57PM  6   treatment, yes.

2:57PM  7   **Q.**   Okay.  And we can agree that there is good news that, in

2:57PM  8   fact, your article states, the one we were just looking at,

2:58PM  9   that there are treatment options for patients with permanent

2:58PM  10  chemotherapy-induced alopecia; true?

2:58PM  11  **A.**   I believe there are treatment options for mild Grade 1.

2:58PM  12  But in Grade 2, I don't believe.

2:58PM  13  **Q.**   Okay.  You've stated moderate to significant improvement

2:58PM  14  was observed in 36 out of 54 patients with permanent

2:58PM  15  chemotherapy-induced alopecia?

2:58PM  16  **A.**   The one with not severe alopecia.

2:58PM  17  **Q.**   Okay.  And that would be 67 percent of the patients; true?

2:58PM  18  **A.**   67 percent of probably the one with not severe alopecia.

2:58PM  19  It's not stated that -- it's not -- but that's my experience.

2:58PM  20  **Q.**   And that's something you note in your report, correct,

2:58PM  21  that patients do experience improvement with treatment even

2:59PM  22  after permanent chemotherapy-induced alopecia?  Correct?

2:59PM  23  **A.**   Yes.

2:59PM  24  **Q.**   So we've used the word -- I mean, we've been using this

2:59PM  25  word "permanent," but in order to meet that definition, it just

OFFICIAL TRANSCRIPT

08:48:06

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY          Docket No.: 16-MD-2740
6             LITIGATION                  Section "H(5)"
                                          September 20, 2019
7                                         New Orleans, Louisiana

8    *Relates To*:  *Barbara Earnest*,
     *Case No.: 16-CV-17144*
9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12                    DAY 5, MORNING SESSION
                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
13         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                  UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiffs:          Barrios, Kingsdorf & Casteix, LLP
                                   BY:  DAWN BARRIOS, ESQ.
17                                 701 Poydras Street
                                   Suite 3650
18                                 New Orleans, Louisiana 70139

19

20   For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                     Meunier & Warshauer, LLC
21                                 BY:  PALMER LAMBERT, ESQ.
                                   2800 Energy Centre
22                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163-2800
23

24

25

                          ***OFFICIAL TRANSCRIPT***

09:45:55  1    A.    That is correct.

09:45:55  2    Q.    We know that Taxotere was not approved until 1996,

09:46:00  3    correct?

09:46:01  4    A.    That's correct.

09:46:01  5    Q.    You certainly are not coming in here offering any

09:46:07  6    criticisms of physicians that prescribed Taxotere to

09:46:10  7    breast cancer patients, correct?

09:46:12  8    A.    That's correct.

09:46:13  9          MR. MICELI:  Your Honor, I object to this line.  It's

09:46:15 10    outside the scope.  She's not a specific causation expert.

09:46:21 11    Dr. Tosti is that.

09:46:21 12          MR. STRONGMAN:  It goes to her background and

09:46:23 13    experience with the drug she's talking about.  It's only going

09:46:28 14    to be brief.

09:46:28 15          THE COURT:  I'm going to allow brief examination in

09:46:30 16    this regard.

09:46:30 17    EXAMINATION BY MR. STRONGMAN:

09:46:32 18    Q.    Doctor, you came in today, and you're talking about

09:46:36 19    causation, correct?

09:46:37 20    A.    That's correct.

09:46:37 21    Q.    But you would agree with me that -- despite your opinions

09:46:40 22    that you've offered in court today, you would agree with me

09:46:44 23    that Taxotere is not only a reasonable choice to use in a

09:46:49 24    chemotherapy regimen to treat breast cancer, but that it's a

09:46:53 25    very reasonable regimen, correct?

                              *OFFICIAL TRANSCRIPT*

09:46:55  1          MR. MICELI:  Same objection, Your Honor.

09:46:56  2          THE COURT:  I think we're now really going far afield

09:46:59  3   of what her direct testimony was and her qualifications.

09:47:03  4   EXAMINATION BY MR. STRONGMAN:

09:47:04  5   Q.   Now, Doctor, with regard to the opinions that you offered

09:47:07  6   today regarding causation, you would agree with me, Doctor,

09:47:14  7   that there have been cases of permanent hair loss reported with

09:47:19  8   Taxol, correct?

09:47:19  9   A.   Correct.

09:47:20 10   Q.   You would agree with me that there have been cases of

09:47:23 11   permanent hair loss reported with cyclophosphamide, correct?

09:47:31 12   A.   I actually don't have isolated cyclophosphamide in here,

09:47:35 13   unless it's pooled with Freites-Martinez's article.  But it's

09:47:49 14   captured in my table.

09:47:50 15   Q.   Well, Doctor, let me just ask the question again.  You

09:47:53 16   would agree that there have been cases of permanent hair loss

09:47:56 17   reported with cyclophosphamide, correct?

09:47:59 18   A.   I can't tell from the Freites-Martinez paper, to tell you

09:48:03 19   the truth, but if it was, it was in that paper.

09:48:07 20          MR. STRONGMAN:  May I approach the witness, Your Honor?

09:48:08 21          THE COURT:  Yes, you may.

09:48:28 22          THE WITNESS:  Oh, I'm sorry.  It is in the AC regimen,

09:48:31 23   so yes.

09:48:31 24   EXAMINATION BY MR. STRONGMAN:

09:48:31 25   Q.   So let me just ask the question again, so we have a clear

                              *OFFICIAL TRANSCRIPT*

09:48:35  1    reference.

09:48:35  2    A.    I'm sorry, I thought you were talking about monotherapy.

09:48:38  3    So my apologies.

09:48:39  4    Q.    Would you agree with me that there have been cases of

09:48:42  5    permanent hair loss reported with cyclophosphamide?

09:48:44  6    A.    Yes.  Yes.

09:48:44  7    Q.    Would you agree with me that there have been cases of

09:48:48  8    permanent hair loss reported with Adriamycin?

09:48:52  9    A.    Correct.

09:48:53  10   Q.    Would you agree with me that there have been cases of

09:48:57  11   permanent hair loss reported with the AC regimen?

09:49:03  12   A.    Well, now I am a little confused.  I was including the

09:49:07  13   cyclophosphamide in the anthracycline answer, with combo.

09:49:12  14   Q.    But you would agree with me that in the AC regimen combo,

09:49:15  15   there have been cases of permanent hair loss?

09:49:16  16   A.    Yes, I do agree.

09:49:17  17   Q.    You would agree with me that there have been cases

09:49:19  18   reported of permanent hair loss with the AC Taxol regimen,

09:49:24  19   correct?

09:49:25  20   A.    I believe that's captured in some of the cases I have on

09:49:32  21   the --

09:49:34  22   Q.    So the answer is yes?

09:49:35  23   A.    Yes.  I'd have to look at the specifics of the article,

09:49:42  24   but I believe those were in combo.

09:49:48  25   Q.    Now, you talked through a chart of literature that you

*OFFICIAL TRANSCRIPT*

09:49:59  1   reviewed; is that correct?

09:49:59  2   A.    That's correct.

09:50:00  3   Q.    Okay.  One of the things that you did was you searched the

09:50:06  4   literature, and you came up with these articles, and then you

09:50:09  5   counted the reports; is that correct?

09:50:10  6   A.    Well, I reviewed the articles.

09:50:13  7   Q.    Fair enough.

09:50:14  8         But then you counted the reports, correct?

09:50:16  9   A.    Yes.  I looked at the number of events that were reported

09:50:19  10  in those papers, so I accurately described what was in the

09:50:22  11  papers.

09:50:22  12  Q.    I think you explained that your search was -- I think you

09:50:26  13  called it *comprehensive*, but not exhaustive; is that correct?

09:50:29  14  A.    That's a correct description.

09:50:30  15  Q.    You certainly remember during your deposition you were

09:50:33  16  shown some articles that had reports with other drugs that you

09:50:37  17  had not found during your original search, correct?

09:50:40  18  A.    They handed me articles that I had not found on my

09:50:43  19  original search, but I read them in realtime and, after reading

09:50:48  20  them, decided one would have gone in, the others would have

09:50:55  21  not.  Two were actually incorrect and were corrected in the

09:50:58  22  literature.

09:50:59  23  Q.    I think you testified several times that the topic under

09:51:04  24  consideration was Taxotere, right?  That's what you've said

09:51:07  25  today multiple times, correct?

*OFFICIAL TRANSCRIPT*

09:51:08  1    A.    Yes, that's my impression of why we're all here today.

09:51:10  2    Q.    You were laser focused on Taxotere, correct?

09:51:13  3    A.    Well, I was focused on issues relevant to Taxotere in the

09:51:17  4    setting of the treatments that breast cancer patients received.

09:51:21  5    So I looked at the regimens, if that's what you're asking.

09:51:25  6          MR. STRONGMAN:  May I approach, Your Honor?

09:51:26  7          THE COURT:  Yes, you may.

09:51:28  8    EXAMINATION BY MR. STRONGMAN:

09:51:41  9    Q.    Now, Dr. Feigal, one more question.  During your direct

09:51:48 10    examination with Mr. Miceli, you did not offer any opinions

09:51:53 11    about the overall exposure in the entire patient population for

09:51:59 12    each individual drug, correct?

09:52:00 13    A.    Well, I did talk about -- I thought I talked about the

09:52:05 14    cumulative dose for those papers.

09:52:07 15    Q.    Let me just ask it a different way.  You didn't offer any

09:52:11 16    opinions about how many patients worldwide were exposed to one

09:52:15 17    drug or another drug or another drug, correct?

09:52:17 18    A.    Worldwide?

09:52:19 19    Q.    Yes.

09:52:19 20    A.    No.

09:52:20 21    Q.    You didn't offer any opinions about that, correct?

09:52:22 22    A.    I didn't offer opinion on worldwide exposure.

09:52:25 23    Q.    Now, what I've handed you is the Crown poster, correct?

09:52:30 24    A.    Correct.

09:52:31 25    Q.    Crown is included in your list; is it not?

*OFFICIAL TRANSCRIPT*

09:52:35  1    A.    It is.

09:52:35  2    Q.    What we know about Crown is -- all you provided on your

09:52:43  3    chart was a number?

09:52:45  4    A.    That's true -- yes, that's true.

09:52:49  5    Q.    All right.  By the way, this was presented at the -- this

09:52:57  6    is a poster presentation, so this is the kind of document that

09:53:00  7    is presented at a conference, correct?

09:53:02  8    A.    Yeah.  It is true, actually, that -- I think this is the

09:53:07  9    poster where we couldn't figure out where it was presented.

09:53:10 10    Q.    But Crown is included in your chart, correct?

09:53:15 11    A.    Right.  I had both an abstract, where I know it was

09:53:18 12    presented, and a poster, where I tried to find out where it was

09:53:22 13    presented.  They are slightly different.  About five patients

09:53:25 14    different.

09:53:25 15    Q.    What we know is that when you prepared your original chart

09:53:28 16    before your deposition, Crown was not on it, correct?

09:53:31 17    A.    That's true.  My search did not find this particular

09:53:35 18    article.  That's true.

09:53:36 19    Q.    So when we showed up at your deposition, we handed you

09:53:39 20    this and said:  Look what you didn't find.  And you've now

09:53:43 21    included it, correct?

09:53:44 22    A.    That's correct.  I carefully reviewed it and agreed it

09:53:48 23    should be on my table.

09:53:48 24    Q.    So what we see when you really look at the data for Crown

09:53:53 25    is that -- it states that the overall incidence of permanent

*OFFICIAL TRANSCRIPT*

09:54:00  1    alopecia for patients receiving docetaxel was 15 percent.  You

09:54:03  2    see that?

09:54:03  3    A.    I see that.

09:54:05  4    Q.    It says Grade 2.  That's talking about the grade of

09:54:10  5    alopecia, correct?

09:54:11  6    A.    That's correct.

09:54:11  7    Q.    It says Grade 2, 3 percent, correct?

09:54:16  8    A.    That's correct.

09:54:16  9    Q.    Then it says the overall incidence of permanent alopecia

09:54:20 10    for patients receiving anthracyclines was 19 percent, correct?

09:54:25 11    A.    That's correct.

09:54:26 12    Q.    It says Grade 2, so the most severe permanent alopecia,

09:54:34 13    was 6 percent; is that right?

09:54:36 14    A.    That's correct.  You're reading that correctly.

09:54:38 15    Q.    Then next line says the overall incidence of permanent

09:54:42 16    alopecia for patients receiving paclitaxel -- and we know

09:54:46 17    that's Taxol, correct?

09:54:47 18    A.    That's correct.

09:54:47 19    Q.    That number is 13 percent, correct?

09:54:49 20    A.    That's correct.

09:54:50 21    Q.    For Grade 2 alopecia in that category, it lists 9 percent,

09:54:50 22    correct?

09:54:57 23    A.    That's correct.

09:54:57 24    Q.    So what you did was you just counted the cases, and you

09:55:01 25    said, because there were more patients on Taxotere in this

*OFFICIAL TRANSCRIPT*

1224

09:55:07 1    study, it just shows up on your chart as a higher tabulation

09:55:11 2    for Taxotere, correct?

09:55:13 3    A.    That is true.  The arms are not equal.  This was not a

09:55:16 4    randomized study.

09:55:17 5    Q.    When you look, though, at how it's presented, what we see

09:55:21 6    is that the highest incidence of permanent alopecia for

09:55:30 7    patients receiving anthracycline -- or, pardon me, for patients

09:55:31 8    receiving one of these drugs was for anthracyclines, correct,

09:55:34 9    at 19 percent?

09:55:35 10   A.    Yes.  There were, I believe, 12 patients we're talking

09:55:41 11   about --

09:55:41 12   Q.    Correct.

09:55:42 13   A.    -- compared to 265 on the Taxotere arm.

09:55:46 14   Q.    You certainly would agree with me 19 percent is higher

09:55:49 15   than 15 percent, and it's higher than 13 percent, correct?

09:55:53 16   A.    But the reason why --

09:55:55 17   Q.    Doctor, can you focus on my question.

09:55:55 18         THE COURT:  I think you need to answer the question.

09:55:57 19         THE WITNESS:  It's not a yes-or-no question.  You have

09:55:59 20   to look at numbers as well as percentage.

09:56:02 21              But, yes, I do agree you're reading that

09:56:04 22   correctly.

09:56:04 23   EXAMINATION BY MR. STRONGMAN:

09:56:04 24   Q.    Doctor, you would also agree with me that the highest

09:56:15 25   percentage as reported here for Grade 2 permanent alopecia was

*OFFICIAL TRANSCRIPT*

09:56:20  1   9 percent with Taxol, correct?

09:56:24  2   A.   You're reading that correctly.  Yes.

09:56:26  3   Q.   We can also agree that the second highest Grade 2 alopecia

09:56:32  4   number is for anthracyclines, correct?

09:56:36  5   A.   You're reading that correctly.

09:56:38  6   Q.   Just, again, we have been over this a few times, but when

09:56:41  7   you read anthracyclines, that would include -- Mr. Miceli said

09:56:45  8   this -- would include drugs such as Adriamycin, correct?

09:56:48  9   A.   That's correct.  That's correct.

09:56:52  10  Q.   So with regard to the chart that you were shown -- well,

09:57:07  11  let me back up just a second.

09:57:09  12       We can certainly agree that Mr. Miceli showed you the

09:57:16  13  Freites-Martinez article, as well, correct?

09:57:19  14  A.   Yes, I have that up here now.

09:57:20  15  Q.   As we know, and as the jury saw yesterday, that paper

09:57:23  16  reported more cases with Taxol than with Taxotere, correct?

09:57:29  17  A.   That's correct.

09:57:29  18  Q.   When you look at that paper, Dr. Tosti is listed as an

09:57:37  19  author, correct?

09:57:37  20  A.   Yes.

09:57:37  21  Q.   So when you're listed on a paper, it means something,

09:57:42  22  correct?

09:57:44  23  A.   Sometimes.

09:57:44  24  Q.   Yes or no?

09:57:48  25  A.   Yes.  It should mean something, yes.

*OFFICIAL TRANSCRIPT*

09:57:50  1    Q.   Now, your chart.  So when Mr. Miceli showed you the chart,

09:57:54  2    it had a category for Taxotere, it had a category for Taxol,

09:58:03  3    and then it had, I think, a category for maybe taxanes that you

09:58:05  4    couldn't differentiate, and then it had a non-taxane, correct?

09:58:11  5    A.   That's correct.

09:58:11  6    Q.   Now, what you know, though, is that when you really dig

09:58:14  7    into the data, when you focus on the details of those papers,

09:58:17  8    almost all of those patients were on combination therapies,

09:58:17  9    correct?

09:58:24 10    A.   That's correct.

09:58:32 11         MR. STRONGMAN:  May I approach the witness, Your Honor?

09:58:45 12         THE COURT:  Yes, you may.

09:58:46 13    EXAMINATION BY MR. STRONGMAN:

09:58:50 14    Q.   Now, Doctor --

09:58:54 15    A.   I don't know what you handed me.  You'll have to explain

09:58:57 16    it.

09:58:57 17    Q.   Now, Doctor, what I have handed you --

09:59:03 18         MR. MICELI:  Your Honor, may we approach?

09:59:05 19         THE COURT:  Yes.

09:59:07 20         THE WITNESS:  I've never seen this before.

09:59:08 21         THE COURT:  Let's take it down.  Thank you.

09:59:08 22         (WHEREUPON, at this point in the proceedings, a

09:59:08 23    conference was held at the bench.)

09:59:09 24         THE COURT:  What is this?

09:59:09 25         MR. STRONGMAN:  What this is, is this is her listing of

**OFFICIAL TRANSCRIPT**

| 10:08:28 | 1 | 5-fluorouracil, correct? |

A.    Correct.

Q.    We know that 45 were exposed to some type of anthracycline, which was the Adriamycin, correct?

A.    Right.  I'm just confused why you listed it twice, but that's okay.

        THE COURT:  That's -- that's -- Mr. Strongman.

        THE WITNESS:  I also don't see the 29 anywhere on this chart.

        THE COURT:  Doctor, you really just need to answer Mr. Strongman's questions.

EXAMINATION BY MR. STRONGMAN:

Q.    Now I want to talk about TAX316 very briefly, Doctor.

        Let me just ask one question.  I want to make sure I understood your answer.  So this is the chart that you had showed the jury with Mr. Miceli, correct?

A.    You know, I'm really sorry, I can't see that from here.

Q.    Do you have that one in front of you still?

A.    Well, I don't know what you're holding.

        THE COURT:  The chart that Mr. Miceli gave you.

EXAMINATION BY MR. STRONGMAN:

Q.    Do you have that one in front you still?

A.    Yeah, yeah, yeah.

Q.    Did you prepare this chart yourself?

A.    Yes.

*OFFICIAL TRANSCRIPT*

10:10:18  1    Q.   You typed it up?

10:10:20  2    A.   Yes.  Well, they provided the visual for the trial, but I

10:10:23  3    provided the table.

10:10:24  4    Q.   The actual -- you actually typed up this table?

10:10:27  5    A.   Yes, this is the data I put together.

10:10:30  6         MR. MICELI:  Your Honor, I object to the form of the

10:10:30  7    question, asked and answered.

10:10:32  8         THE COURT:  Sustained.

10:10:32  9         MR. MICELI:  Thank you.

10:10:32  10   EXAMINATION BY MR. MICELI:

10:10:36  11   Q.   Doctor, if I understand what you said earlier, is that

10:10:38  12   when you put -- you wrote *Taxotere* here, correct?

10:10:40  13   A.   That's correct.

10:10:40  14   Q.   The reason that you didn't include the A and the C was

10:10:44  15   because it didn't fit in that cell; is that correct?

10:10:46  16   A.   Correct.

10:10:47  17   Q.   You didn't think about maybe making it a landscape

10:10:52  18   version, so you could include that information?

10:10:54  19   A.   I'm just saying in headers -- no, I didn't have a big

10:11:01  20   header.  It was a Taxotere, and it was implied these are

10:11:04  21   Taxotere regimens.  None of these are monotherapy.

10:11:22  22   Q.   So, Doctor, we can also agree that when you looked at the

10:11:28  23   TAX316 data, just like with the Taxotere arm, there were cases

10:11:34  24   of what you're calling irreversible alopecia in the

10:11:44  25   non-Taxotere arm, correct?

*OFFICIAL TRANSCRIPT*

1236

10:11:44  1   A.   That's correct.

10:11:45  2   Q.   So, Doctor, my question to you is, for these -- there were

10:11:46  3   16 of them, correct?

10:11:47  4   A.   That's correct.

10:11:47  5   Q.   For those 16, was it the F that caused the permanent

10:11:59  6   alopecia, was it the A that caused the permanent alopecia, or

10:12:02  7   was it the C that caused the permanent alopecia?

10:12:06  8   A.   I just call it a non-taxane arm.

10:12:13  9   Q.   Well, Doctor, that wasn't my question.

10:12:15 10   A.   I didn't isolate the 16 according to which part of the

10:12:34 11   combo, that is correct.

10:12:35 12   Q.   Doctor, sitting here today, can you tell me that it was

10:12:38 13   the F that caused the permanent alopecia in 16, yes or no?

10:12:44 14   A.   Highly unlikely, because there is nothing in the

10:12:46 15   literature about the 5- FU.

10:12:48 16   Q.   Doctor, sitting here today, can you tell me, yes or no,

10:12:51 17   whether it was the A that caused the permanent alopecia in

10:12:53 18   those 16 patients?

10:12:54 19   A.   It could be either A or C or both.

10:12:57 20   Q.   And so you would agree with me that it could have been the

10:13:01 21   A, the C, or both, correct?

10:13:03 22   A.   It could have been both, right.

10:13:14 23   Q.   Now, Doctor, you also asked -- were asked some questions

10:13:26 24   about, I think, biologic plausibility, correct?

10:13:32 25   A.   That's correct.

*OFFICIAL TRANSCRIPT*

10:13:32  1    Q.   And mechanism of action, do you remember that?

10:13:34  2    A.   Yes.

10:13:34  3    Q.   And stem cells, do you remember that?

10:13:36  4    A.   Yes.

10:13:36  5    Q.   And I think you said you had quite a bit of -- quite a bit

10:13:42  6    of experience with stem cells, I think, was -- something along

10:13:45  7    those lines, right?

10:13:46  8    A.   Not specifically on hair stem cells, but on stem cell

10:13:51  9    research.

10:13:51 10    Q.   And when you were discussing your opinions with us, you

10:13:57 11    believed that the theory -- and I know it's a theory -- would

10:14:02 12    be that Taxotere damages stem cells in some fashion, correct?

10:14:06 13    A.   I think what I said in my depos and here is that the

10:14:12 14    hypothesis is that it damages stem cells and/or the signalling

10:14:18 15    between -- the communication.  So it may not affect the stem

10:14:23 16    cells directly.  It may affect the communication signals

10:14:26 17    between stem cells.  That is --

10:14:28 18    Q.   And I think?  I'm sorry.  Are you finished?  Go ahead.

10:14:30 19    A.   May I explain?

10:14:32 20    Q.   You may.  Certainly.

10:14:32 21    A.   That is in addition to the known mechanism of action in

10:14:36 22    terms of damaging hair cells and rapidly dividing cells.  So we

10:14:42 23    already know that Taxotere, as a cytotoxic chemotherapy, does

10:14:50 24    cause hair loss.  There is no question about that.  So it's on

10:14:53 25    top of what we already know about the product.

*OFFICIAL TRANSCRIPT*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *      Docket No.: 16-MD-2740
                                  *      Section "H(5)"
                                  *      New Orleans, Louisiana
*Relates to:  Barbara Earnest*     *      September 20, 2019
*Case No.: 16-CV-17144*            *
* * * * * * * * * * * * * * * * * *


DAY 5 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

|  |  |  |
|---|---|---|
| 12:16PM | 1 | <u>**AFTERNOON SESSION**</u> |
| 12:16PM | 2 | **(September 20, 2019)** |
| 12:16PM | 3 | ***** |
| 12:43PM | 4 | **THE DEPUTY CLERK:**  All rise. |
| 12:47PM | 5 | **(OFF THE RECORD)** |
| 12:48PM | 6 | **THE DEPUTY CLERK:**  All rise. |
| 12:48PM | 7 | (WHEREUPON, the jury entered the courtroom.) |
| 12:48PM | 8 | **THE COURT:**  All jurors are present.  Court's back in |
| 12:48PM | 9 | session.  You may be seated. |
| 12:48PM | 10 | Plaintiffs, call your next witness. |
| 12:48PM | 11 | **MR. COFFIN:**  Good afternoon, Your Honor.  The |
| 12:48PM | 12 | plaintiffs call the Sanofi corporate witness, the company |
| 12:48PM | 13 | witness, Mr. Michael Kopreski, by video. |
| 12:48PM | 14 | **THE COURT:**  Members of the jury, you'll be shown |
| 12:48PM | 15 | another video deposition.  I've previously given you |
| 12:48PM | 16 | instructions.  You should consider this testimony as you would |
| 12:48PM | 17 | any other.  I also tell you that this deposition is the company |
| 12:49PM | 18 | representative deposition. |
| 12:49PM | 19 | So please proceed. |
| 12:49PM | 20 | (WHEREUPON, the videotaped deposition of **Michael** |
| 12:49PM | 21 | **Steven Kopreski** was played.) |
| 12:49PM | 22 | **Q.**   Good morning.  Could you state your name for the record, |
| 12:49PM | 23 | please. |
| 12:49PM | 24 | **A.**   Good morning.  My name is Michael Steven Kopreski. |
| 12:49PM | 25 | **Q.**   And is it your understanding that Sanofi has elected to |

OFFICIAL TRANSCRIPT

12:49PM   1    designate you to appear today on behalf of Sanofi, to provide

12:49PM   2    binding testimony on behalf of the company during the course of

12:49PM   3    today's deposition?

12:49PM   4    A.    That's my understanding.

12:49PM   5    Q.    What I want to go over with you is briefly discuss safety

12:49PM   6    signals and how you determine if something is a safety signal

12:49PM   7    and why.    And we'll then apply that to the adverse event

12:50PM   8    reports.

12:50PM   9           So kind of the first stop on this roadway is going to

12:50PM  10    be discuss safety signals, and then we'll move from there to

12:50PM  11    discuss what Sanofi as learned through the adverse event

12:50PM  12    reports that were submitted during this time frame, from

12:50PM  13    January of 2005 to 2011.

12:50PM  14           Do you agree with me that, when we talk about the

12:50PM  15    detection of safety signals, that not all side effects or

12:50PM  16    adverse events are known to the company at the time that a drug

12:50PM  17    is first licensed to be sold?

12:50PM  18    A.    That's correct.

12:50PM  19    Q.    Some side effects are detected only after a drug is on the

12:50PM  20    market; correct?

12:50PM  21    A.    That's correct.

12:50PM  22    Q.    Not just with the Taxotere drug, but this is true -- it's

12:51PM  23    a problem that exists -- and when I say "problem," I don't

12:51PM  24    necessarily mean that it's a negative problem, but it's a

12:51PM  25    problem that exists with the marketing of all drugs; correct?

OFFICIAL TRANSCRIPT

A.   I don't think I would refer to it as a problem as to more of a reality that pertains to all drugs, that the number of -- the detection of side effects depends upon the rarity of the side effect and -- and the number of people that have been exposed to the drug.

So for very rare side effects, you would not expect to necessarily see it until large numbers of people have been exposed to the drug.

Q.   All right.  So that reality is addressed by a solution called pharmacovigilance; correct?

A.   One of the roles of pharmacovigilance is to detect such -- such rare side effects, that's correct.

Q.   And safety signal detection is part of that process; correct?

A.   That would be correct.

Q.   I'm going to show you, then, this definition and ask whether you agree with the definition or not.

Can you see that?

Pharmacovigilance -- and this is the definition that I read a moment ago, and then I was asking whether you agree with this.

Pharmacovigilance is the monitoring of effects of medical drugs after they've been licensed for use to identify and evaluate previously unreported side effects or new aspects of previously known side effects.

| | | |
|---|---|---|
| 12:52PM | 1 | Do you agree or disagree with that definition? |
| 12:52PM | 2 | **A.**   As I mentioned, I think that is one of the roles of |
| 12:52PM | 3 | pharmacovigilance.  Excuse me. |
| 12:52PM | 4 | **Q.**   And do you see -- |
| 12:52PM | 5 | **A.**   The -- the definition that you're providing here, the |
| 12:52PM | 6 | monitoring of the drugs to identify and evaluate previously |
| 12:53PM | 7 | unreported side effects or new aspects of side effects, is |
| 12:53PM | 8 | basically a -- pertains to a definition of signal detection? |
| 12:53PM | 9 | Signal detection is detecting either a new side |
| 12:53PM | 10 | effect or a new aspect of a previously known side effect.  But |
| 12:53PM | 11 | pharmacovigilance is more than -- the role of pharmacovigilance |
| 12:53PM | 12 | is more than simply signal detection. |
| 12:53PM | 13 | **Q.**   But yet this definition of "pharmacovigilance" came from |
| 12:53PM | 14 | a -- if this definition of pharmacovigilance came from a |
| 12:53PM | 15 | medical dictionary, would you disagree with the medical |
| 12:53PM | 16 | dictionary? |
| 12:53PM | 17 | **A.**   I -- |
| 12:53PM | 18 | **Q.**   Or do you agree with the definition; you just think that |
| 12:53PM | 19 | it's not -- that there's more to it than this definition? |
| 12:53PM | 20 | **A.**   For example, one of the roles of pharmacovigilance is |
| 12:53PM | 21 | reporting to regulatory authorities.  That's not part of that |
| 12:54PM | 22 | definition. |
| 12:54PM | 23 | So what I'm saying is I agree with that definition of |
| 12:54PM | 24 | pharmacovigilance as -- one of the roles of pharmacovigilance |
| 12:54PM | 25 | is signal detection, and that definition is referring to signal |

OFFICIAL TRANSCRIPT

1     detection.

2              But I'm saying that pharmacovigilance, as a section

3     of the company, has a much larger number of roles.

4     Q.   What I'm hearing from you is that you don't disagree with

5     this definition; you think that it's this definition plus more?

6     A.   What I'm -- what I'm saying is I think this definition

7     pertains to signal detection, which is one of the roles of

8     pharmacovigilance.

9              So I agree with that aspect, but I think there's --

10    Q.   At the bottom here, you see where it says "pharmaco" --

11    just in terms of -- the source of this word "pharmaco" is Greek

12    for "drug"?  Do you see that?

13    A.   Okay.

14    Q.   And "vigilance" is Latin and means to keep awake or alert,

15    to keep watch, the process of paying close and continuous

16    attention.

17             Do you agree that "pharmacovigilance" is -- relating

18    to drugs, the obligation to keep awake or alert, to keep watch,

19    the process of paying close and continuous attention to the

20    drug?

21    A.   I would agree with -- that's part of the response of

22    pharmacovigilance.  To put it very simply, pharmacovigilance is

23    responsible for the safety of the drug.

24    Q.   Right.  And "safety signal detection," it says, "Detecting

25    information about a new or known side effect or adverse event

OFFICIAL TRANSCRIPT

12:55PM 1    that may be caused by medicine and requires further
12:55PM 2    investigation."
12:55PM 3            Do you agree that that's what safety signal detection
12:55PM 4    is?
12:55PM 5    A.   Well, first, you have to understand what a safety signal
12:55PM 6    is.
12:55PM 7    Q.   Okay.
12:55PM 8    A.   So it's detection of a safety signal.
12:55PM 9            A safety signal is detection of a safety topic or an
12:56PM 10   adverse event which is new to the drug.  So the first
12:56PM 11   characteristic, it has to be new.
12:56PM 12           Or there's an -- there's an "or" to it.  Or it is
12:56PM 13   a -- it's a new aspect that would not be known to a known
12:56PM 14   effect of a drug.
12:56PM 15   Q.   Okay.  But is safety signal detection detecting
12:56PM 16   information about a new or known side effect that may be caused
12:56PM 17   by medicine and that requires further investigation?
12:56PM 18   A.   A safety signal is not a known aspect.
12:56PM 19   Q.   A new characteristic to a known side effect would be
12:56PM 20   included, based upon that second part that you described?
12:56PM 21   A.   If you have -- if you have a new aspect to a known
12:56PM 22   toxicity, that could be a safety signal.
12:57PM 23   Q.   All right.  Thank you.
12:57PM 24           And, again, just in terms of, you know, where we are
12:57PM 25   on this discussion, we'll kind of start with this first exit,

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 12:57PM | 1 |
| 12:57PM | 2 |
| 12:57PM | 3 |
| 12:57PM | 4 |
| 12:57PM | 5 |
| 12:57PM | 6 |
| 12:57PM | 7 |

this promise -- we're going to talk about the promise or
requirement to detect safety signals.  Okay?

        And when we look at safety signals, do you agree with
me that safety signals can be detected from a wide range of
sources?

A.    Yes.

Q.    And if you look at what I have here, would you agree with
me that some examples of locations or sources of safety signals
would include review of scientific literature and abstracts?

A.    Yes, that would be correct.

Q.    And clinical trials and studies?

A.    That's correct.

Q.    All right.  And spontaneous adverse event reports?

A.    Yes.

Q.    What is a spontaneous adverse event report?

A.    So adverse -- safety reports can be submitted to the
company either because they're solicited -- so you're asking
for the physician to send a report, and the example would be a
clinical trial.

Q.    Okay.

A.    So a clinical trial where it's an obligation of the
investigator to report adverse events.  And as part of -- part
of the protocol, that would be a solicited report.

        A spontaneous report would be a report where it's not
solicited but it is spontaneously sent in.  An example would be

```
 1                       UNITED STATES DISTRICT COURT
 2                       EASTERN DISTRICT OF LOUISIANA

 3     ********************************************************************

 4     IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
       PRODUCTS LIABILITY LITIGATION         Section H
 5                                           New Orleans, LA
       Relates to:  Barbara Earnest          Tuesday, September 24, 2019
 6                   16-CV-17144

 7     ********************************************************************

 8                       TRANSCRIPT OF TRIAL PROCEEDINGS
                  HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 9                       UNITED STATES DISTRICT JUDGE
                              DAY 7, MORNING SESSION
10

11     APPEARANCES:

12     FOR THE PLAINTIFF:              BACHUS & SCHANKER, LLC
                                       BY:  DARIN L. SCHANKER, ESQ.
13                                          J. KYLE BACHUS, ESQ.
                                       1899 Wynkoop St., Suite 700
14                                     Denver, CO 80202

15                                     FLEMING NOLEN & JEZ
                                       BY:  RAND P. NOLEN, ESQ.
16                                     2800 Post Oak Blvd., Suite 4000
                                       Houston, TX 77056
17
                                       GIBBS LAW GROUP, LLP
18                                     BY:  KAREN B. MENZIES, ESQ.
                                       6701 Center Drive West, 14th Floor
19                                     Los Angeles, CA 90045

20                                     DAVID F. MICELI, LLC
                                       BY:  DAVID F. MICELI, ESQ.
21                                     P.O. Box 2519
                                       Carrollton, GA 30112-0046
22
                                       PENDLEY BAUDIN & COFFIN
23                                     BY:  CHRISTOPHER L. COFFIN, ESQ.
                                       2505 Energy Centre
24                                     1100 Poydras St.
                                       New Orleans, LA 70163
25
```

09:29:26  1   A.  All I was concerned about at the time was her survival.

09:29:30  2   Q.  And the reason for that is because you wanted her to survive,

09:29:37  3   yes?

09:29:37  4   A.  That is correct.

09:29:38  5   Q.  And she did survive, correct?

09:29:43  6   A.  That is correct, yes, sir.

09:29:44  7   Q.  And your feelings for her have not changed at all?

09:29:48  8   A.  No, not a bit.

09:29:50  9   Q.  And the amount of hair that she has has not changed anything in

09:29:56 10   your mind about Barbara?

09:29:57 11   A.  That is correct, yes, sir.

09:30:01 12   Q.  And you do not regret the decision that Barbara made to go

09:30:08 13   forward with treatment to save her life?

09:30:09 14   A.  No, I do not because she is still with me.

09:30:12 15           MR. MOORE:  Thank you.  No further questions, your Honor.

09:30:14 16           THE COURT:  Thank you.  Redirect, Mr. Schanker?

09:30:17 17           MR. SCHANKER:  No questions, your Honor.

09:30:18 18           THE COURT:  Thank you.  You may step down, Mr. Earnest.

09:30:21 19           THE WITNESS:  Thank you.  Have a good day.

09:30:25 20           THE COURT:  Please call your next witness.

09:30:34 21           MR. COFFIN:  Your Honor, the plaintiffs call as their

09:30:37 22   next witness Michael Kopreski, who is a Sanofi employee, called by

09:30:42 23   video.  And it's approximately 40 minutes, your Honor.

09:30:45 24           THE COURT:  Ladies and gentlemen, we're going to have

09:30:50 25   deposition testimony.  And as I instructed you before, at a time

09:30:53  1    before this trial, the witness was placed under oath and

09:30:59  2    questioned, and you should consider this testimony as you do any

09:31:02  3    other.

09:31:04  4         (WHEREUPON, THE VIDEO DEPOSITION OF MICHAEL KOPRESKI WAS

09:31:09  5    PLAYED AS FOLLOWS:)

09:31:12  6    Q.  Good morning, Doctor.  Could you please state your full name

09:31:14  7    for the record?

09:31:15  8    A.  Yes.  My name is Michael Steven Kopreski.

09:31:19  9    Q.  Prior to your retirement, according to this business card, you

09:31:25 10    were the associate vice president, global pharmacovigilance and

09:31:31 11    epidemiology?

09:31:31 12    A.  That is correct.

09:31:32 13    Q.  And so you were head of the oncology area for Sanofi

09:31:40 14    responsible for safety surveillance and risk management?

09:31:43 15    A.  That's correct.  So if I can maybe assist you, Mr. Bachus, to

09:31:51 16    speed up, you'll see in 2002 to 2005 I was director -- I was a

09:31:55 17    global safety officer.  And then, in 2005, I became the head of the

09:32:00 18    unit and the titles and even the unit name changed, but I was

09:32:06 19    essentially the same position until my retirement.

09:32:09 20    Q.  All right.  In 2005 Taxotere was a marketed product for breast

09:32:17 21    cancer.  Would you agree?

09:32:19 22    A.  Yes.

09:32:19 23    Q.  Doctor, do you know now have Exhibit 6 in front of you?

09:32:25 24    A.  I do.

09:32:25 25    Q.  So this publication by Dr. Nabholtz was published in the

09:32:29  1    *Journal of Clinic Oncology*.  Do you see that?

09:32:32  2    A.  That's correct.

09:32:32  3    Q.  And it was published in January the 15th of 2001.  Do you see

09:32:38  4    that?

09:32:38  5    A.  Yes, I do.

09:32:39  6    Q.  So at the conclusion of the study and by time of publication,

09:32:53  7    Dr. Nabholtz is reporting that four out of 54 patients had alopecia

09:32:59  8    lasting longer than two years; is that accurate?

09:33:02  9    A.  That's -- I think that's -- I think that's accurate, yes.

09:33:11  10   Q.  And do you agree with me that 4 out of 54 represents 7.4

09:33:19  11   percent of the study -- patients in the study are reported to have

09:33:27  12   had alopecia lasting longer than two years, as published in the

09:33:37  13   *Journal of Clinical Oncology*?

09:33:45  14   A.  Well, in this -- I would have to do the math, but I am willing

09:33:57  15   to concede, I remember the number was around that in this study

09:34:04  16   involving the TAC regimen, the Taxotere, doxorubicin, and

09:34:11  17   cyclophosphamide regimen.

09:34:12  18   Q.  And this publication that is Exhibit 6 that was published on

09:34:24  19   January the 15th, 2001, this publication was known certainly to

09:34:31  20   Sanofi at the time of publication in January of 2001, correct?

09:34:37  21   A.  The information in here was Sanofi-confidential information

09:34:44  22   that Sanofi would have had -- had to basically agree with -- not

09:34:50  23   only agree with the publication, but likely provide the data and

09:34:54  24   support, as well as review the publication, so that would be a

09:34:59  25   correct statement.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *        16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *        Section H
                                  *
Relates to:  Barbara Earnest      *        September 24, 2019
             16-CV-17144          *
* * * * * * * * * * * * * * * * * *


DAY 7 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045

## BARBARA EARNEST - CROSS

02:11 1  **Q.**   Okay.  And it states:  "Side effects:  Temporary hair

02:11 2  loss, rare reports of permanent hair loss."

02:11 3        And my question to you is just simply:  Did you read

02:11 4  this information about permanent hair loss from this book at

02:11 5  any time?

02:11 6  **A.**   No.  No, I didn't read the book.  I read the inserts

02:11 7  that -- the pages that Lagarde told me about, and that was it.

02:11 8  And I put it in my closet and I forgot about it even being in

02:11 9  there.

02:11 10 **Q.**   Okay.  Thank you.

02:12 11       You told us, I believe, in your deposition that you

02:12 12 thought you might have been given some pamphlets by

02:12 13 Dr. Carinder's office.

02:12 14 **A.**   Yes.

02:12 15 **Q.**   Do you remember whether you were or weren't?

02:12 16 **A.**   I really don't remember.  I don't remember if I just took

02:12 17 them home and threw them away.  I really don't know.

02:12 18 **Q.**   Dr. Carinder said yesterday although he didn't hand things

02:12 19 out, he said that his nurses did.

02:12 20 **A.**   Right.

02:12 21 **Q.**   And he described something called *Chemocare* as being a

02:12 22 pamphlet they were giving out, and we looked at the 2011

02:12 23 *Chemocare*.

02:12 24       Do you remember getting that?

02:12 25 **A.**   I don't remember.

BARBARA EARNEST - CROSS

02:12  1   **Q.**   If you did, you don't remember reading that?

02:12  2   **A.**   No.

02:13  3   **Q.**   Let's change topics.  I just want to talk with you about

02:13  4   the timing of your hair loss.  Okay?  You recall getting four

02:13  5   cycles before treatment with Adriamycin and Cytoxan, right?

02:13  6   **A.**   Yes, uh-huh.

02:13  7   **Q.**   You would agree with me sometime between the second and

02:13  8   the third treatment or cycle of Adriamycin and Cytoxan when

02:13  9   your hair fell out, right?

02:13 10   **A.**   I wouldn't say it fell out completely.  I went to go wash

02:13 11   my hair, and when I did, I had a few strands if my hair, so I

02:13 12   knew it was beginning.

02:13 13   **Q.**   Okay.

02:13 14   **A.**   Do you want me to continue?

02:14 15   **Q.**   Yes, please.  Thank you.

02:14 16   **A.**   So that's when I got dressed, went outside, and talked to

02:14 17   my son Michael and asked him to cut my hair, and he started

02:14 18   crying.  And I said, "Hold up.  Never mind.  I'll go to

02:14 19   somebody else."

02:14 20           I went to my girlfriend, and had her cut my hair.

02:14 21   She shaved it all off because I didn't want to wake up and see

02:14 22   hair in my bed.  I didn't want to do that.

02:14 23   **Q.**   But you had lost more than a few strands of hair by that

02:14 24   time?

02:14 25   **A.**   No.  Like I said, that was the first time that I lost

BARBARA EARNEST - CROSS

02:14  1    hair, and it wasn't a lot.

02:14  2    Q.    Okay.

02:14  3    A.    I mean, I don't mean 10 little strands.  I don't know how

02:14  4    many strands.  I didn't count them.  It was more than 10; I

02:14  5    know that.  It was a lot -- a few in my hand, but it wasn't --

02:15  6    like I say, I wasn't bald at the top yet.  Let me put it that

02:15  7    way.

02:15  8    Q.    Let's take a look at one of your medical records, then.

02:15  9    P-621.  It's in evidence.  621, it's the May 10 visit -- I'm

02:15 10    sorry.  Oncology Associates, 260.

02:15 11            Ma'am, while we are looking, let me ask you this:

02:15 12    You heard Dr. Carinder testify yesterday that you lost your

02:15 13    hair after your second treatment of Adriamycin and Cytoxan?

02:16 14    A.    Yes.

02:16 15    Q.    He agreed that your hair was gone before you took

02:16 16    Taxotere?

02:16 17    A.    Yes.

02:16 18    Q.    You agree with that?

02:16 19    A.    Yes.

02:16 20    Q.    Okay.  Your medical records in this case, from May 10,

02:16 21    which was several weeks before you took Taxotere, says there's

02:16 22    "alopecia secondary to cytotoxic chemotherapy."

02:16 23            Do you have any reason to disagree with this record?

02:16 24    A.    I only know -- I'm not sure when my hair -- that I shaved

02:16 25    it.  I don't know if it was after the first chemo or after the

## BARBARA EARNEST - CROSS

02:16 1  second chemo, but when my hair started to fall out, I

02:16 2  immediately shaved it.  I didn't wait for any more to fall out

02:16 3  a second time.

02:16 4  **Q.**   From when you shaved it --

02:16 5  **A.**   That was it.

02:16 6  **Q.**   Hold on.

02:16 7  **A.**   I thought you were saying that was it.

02:16 8  **Q.**   Well, sort of.  From when you shaved it while you were --

02:16 9  right after your second treatment of Adriamycin and Cytoxan,

02:17 10 your hair was coming out, right?  Started to come out?

02:17 11 **A.**   When it came out at home, I shaved it immediately that

02:17 12 day.

02:17 13 **Q.**   Okay.  And then you had --

02:17 14 **A.**   That was the only time my hair ever came out.

02:17 15 **Q.**   You didn't need to shave your hair after that, right?

02:17 16 **A.**   No.

02:17 17 **Q.**   So you then had your third treatment of Adriamycin and

02:17 18 Cytoxan, right?

02:17 19 **A.**   Yes.

02:17 20 **Q.**   Then you had your fourth treatment, correct?

02:17 21 **A.**   Yes.

02:17 22 **Q.**   And then you had about three weeks before you took

02:17 23 Taxotere?

02:17 24 **A.**   Yes.

02:17 25 **Q.**   And your hair didn't need any further shaving, during that

BARBARA EARNEST - CROSS

02:17 1   period, by the time you started Taxotere?

02:17 2   A.   No.

02:17 3   Q.   Because there wasn't any hair to shave, right?

02:17 4   A.   Wasn't any hair to shave.

02:17 5   Q.   I would like to talk with you about Arimidex for a moment.

02:18 6   A.   Sure.

02:18 7   Q.   Arimidex is a medication you still take today,

02:18 8   Mrs. Earnest?

02:18 9   A.   Yes.

02:18 10  Q.   And Arimidex is something you take to prevent a

02:18 11  reoccurrence of your breast cancer, right?

02:18 12  A.   Correct.

02:18 13  Q.   It reduces the risk of your breast cancer coming back,

02:18 14  right?

02:18 15  A.   Correct.

02:18 16  Q.   You have taken Arimidex since -- shortly after your

02:18 17  chemotherapy ended, you started taking Arimidex.  Actually, I'm

02:18 18  sorry, that's wrong.  You started Arimidex shortly after your

02:18 19  radiation treatment ended?

02:18 20  A.   Yes.

02:18 21  Q.   That would have been back in 2011?

02:18 22  A.   Yes.

02:18 23  Q.   And you remain on it today --

02:18 24  A.   Yes.

02:18 25  Q.   -- in September of 2019, right?

BARBARA EARNEST - CROSS

02:18 1    A.    Yes.

02:18 2    Q.    You have taken it about eight years?

02:18 3    A.    Yes.

02:18 4    Q.    You understand that there's certain risks associated with

02:18 5    the Arimidex, true?

02:18 6    A.    Yes.

02:19 7    Q.    In fact, you went to see a doctor, Dr. Collins-Burow.  Do

02:19 8    you know who that is?

02:19 9    A.    Yes, that's my oncologist now.

02:19 10   Q.    Since you left Dr. Carinder, right?

02:19 11   A.    Yes.

02:19 12   Q.    So the jury hasn't heard much about Dr. Collins-Burow.

02:19 13   But you were with Dr. Collins-Burow in December of 2016, and at

02:19 14   that time you had been on Arimidex for about five years, right?

02:19 15   A.    Yes.

02:19 16   Q.    You had a conversation on that date with Dr. Collins-Burow

02:19 17   about whether you should continue to take it anymore, true?

02:19 18   A.    True.

02:19 19   Q.    Your doctor talked with you, on that date in particular,

02:19 20   about the risks of continuing to take Arimidex, right?

02:19 21   A.    Well, she didn't give me any risks.  She just told me to

02:19 22   continue taking it so I don't get breast cancer come back.

02:19 23         MS. SASTRE:  Let's take a look at the medical record,

02:19 24   please.

02:19 25         THE WITNESS:  I don't remember her telling me any

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
    ********************************************************************
 3
    IN RE:  TAXOTERE (DOCETAXEL)        Docket No. 16-MD-2740
 4  PRODUCTS LIABILITY LITIGATION       Section H
                                        New Orleans, LA
 5  Relates to:  Barbara Earnest        Wednesday, September 25, 2019
                 16-CV-17144
 6
    ********************************************************************
 7
                    TRANSCRIPT OF TRIAL PROCEEDINGS
 8        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
 9                     DAY 8, MORNING SESSION

10
    APPEARANCES:
11
    FOR THE PLAINTIFF:             BACHUS & SCHANKER, LLC
12                                 BY:  DARIN L. SCHANKER, ESQ.
                                        J. KYLE BACHUS, ESQ.
13                                 1899 Wynkoop St., Suite 700
                                   Denver, CO 80202
14
                                   FLEMING NOLEN & JEZ
15                                 BY:  RAND P. NOLEN, ESQ.
                                   2800 Post Oak Blvd., Suite 4000
16                                 Houston, TX 77056

17                                 GIBBS LAW GROUP, LLP
                                   BY:  KAREN B. MENZIES, ESQ.
18                                 6701 Center Drive West, 14th Floor
                                   Los Angeles, CA 90045
19
                                   DAVID F. MICELI, LLC
20                                 BY:  DAVID F. MICELI, ESQ.
                                   P.O. Box 2519
21                                 Carrollton, GA 30112-0046

22                                 PENDLEY BAUDIN & COFFIN
                                   BY:  CHRISTOPHER L. COFFIN, ESQ.
23                                 2505 Energy Centre
                                   1100 Poydras St.
24                                 New Orleans, LA 70163

25
```

<u>P R O C E E D I N G S</u>

(WEDNESDAY, SEPTEMBER 25, 2019)

(MORNING SESSION)

09:00:18   (OPEN COURT.)

09:00:20          THE COURT:  I believe there are some things that the

09:00:22   parties want to put on the record now.

09:00:29          MR. COFFIN:  Yes, your Honor.  Good morning.  Chris

09:00:32   Coffin on behalf of the plaintiff.

09:00:35          This particular argument relates to the Court's order and

09:00:40   reasons in Document 6160, which was the plaintiff's motion to

09:00:46   exclude expert testimony that relies upon defendant's employee

09:00:51   Dr. Michael Kopreski.

09:00:54          In the Court's order and reasons allowing experts, the

09:01:00   defense experts to rely on Dr. Kopreski's testimony and analysis,

09:01:06   your Honor specifically stated that on page 5, "Here, defendants

09:01:13   explain that their experts conducted independent reviews of

09:01:17   Dr. Kopreski's work.  Dr. Arrowsmith, for example, examined patient

09:01:23   data for two TAX316 patients and reached the same conclusions as

09:01:29   Dr. Kopreski leading her to conclude his analysis was reliable."

09:01:33          In other words, your Honor, the Court has ruled that

09:01:37   Dr. Kopreski's analysis can be used to support experts' opinions if

09:01:43   those experts conducted independent reviews of Dr. Kopreski's work.

09:01:48          The only expert that the defense is bringing to this

09:01:54   trial, and that the jury will hear from, specifically testified

09:02:01 1    with regard to Dr. Kopreski's analysis in his deposition on page

09:02:07 2    122 of Dr. Glaspy's deposition, the question is: "Okay.  Did you

09:02:13 3    have a direct role in the review that was taken that's shown in

09:02:18 4    Figure A?"

09:02:20 5            Objection to the form.

09:02:21 6            And then the answer, "I did not have a role in forming

09:02:25 7    the table or writing the table, planning the table, or suggesting

09:02:31 8    that the table be made."  That's talking about Figure A in

09:02:37 9    Dr. Kopreski's reanalysis, which is at the heart of this issue.

09:02:41 10           In Dr. Glaspy's deposition on page 123, the question was

09:02:50 11   stated: "QUESTION:  You cannot verify, then, that the material

09:02:54 12   contained in Figure A is accurate or complete?"

09:03:00 13           There was an objection.  And then: "ANSWER:  I -- not

09:03:05 14   independently.  I -- I can only comment assuming these are the

09:03:10 15   data, this is my conclusion.  That's all I can do."

09:03:16 16           It's very clear that Dr. Glaspy, the defendant's expert,

09:03:21 17   who intends to rely on the Kopreski reanalysis and testimony, did

09:03:26 18   not independently review that analysis and had nothing to do with

09:03:31 19   putting together any of the tables as he testified.

09:03:34 20           In addition, your Honor, to be clear, the defendant's

09:03:39 21   witness, Dr. Kopreski, is an employee of Sanofi.  He is not an

09:03:43 22   expert.  He has not been qualified as an expert.  He did a post hoc

09:03:48 23   analysis of data that Sanofi's lawyers pulled and put in front of

09:03:53 24   him.  It is not an expert report.  It's not an expert opinion, and

09:03:57 25   certainly not an expert analysis.  Yet, this morning the defendants

09:04:02  1    will be playing the videotaped deposition of Dr. Kopreski

09:04:06  2    explaining his analysis, and that is highly prejudicial to the

09:04:13  3    defendant -- to the plaintiffs, excuse me.  It's highly prejudicial

09:04:17  4    to the plaintiffs because the defendants are allowed to present

09:04:19  5    testimony from a non-expert about a post hoc analysis, and they

09:04:25  6    will not have an expert who has independently reviewed and relied

09:04:29  7    on that information.

09:04:30  8            So we would ask that Dr. Kopreski's testimony be stricken

09:04:35  9    and not be allowed to be played for this jury, and that Dr. Glaspy

09:04:40 10    not be permitted in any way to rely on that analysis in his

09:04:44 11    opinions.  Thank you.

09:04:46 12            THE COURT:  Thank you.  Okay.  Are we ready to bring in

09:04:51 13    the jury?  Okay.  Please bring the jury in.

09:05:15 14            Did y'all want to respond?

09:05:17 15            MS. SASTRE:  I'm sorry?

09:05:18 16            THE COURT:  I thought -- the fevered conversation.

09:05:23 17            MR. STRONGMAN:  No, I think your Honor has already ruled

09:05:26 18    on this.  Just based on all of the reasons and arguments previously

09:05:30 19    made.  Sorry about that.

09:05:30 20            MS. SASTRE:  Sorry, your Honor.

09:05:53 21         (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

09:05:53 22            THE COURT:  All jurors are present.  Court's back in

09:05:53 23    session.  You may be seated.

09:05:55 24            Good morning.  I apologize that we're a little late

09:05:58 25    getting started today.  We're just -- the lawyers and I have been

09:06:02  1    working through various things that we must deal with.

09:06:06  2            And now I ask the defendants, are you prepared to call

09:06:09  3    your first witness?

09:06:10  4            MS. SASTRE:  Yes, your Honor.  We would call Dr. Kopreski

09:06:13  5    to play our portion of his examination.

09:06:16  6            THE COURT:  Okay.  Before we get started, members of the

09:06:19  7    jury, I advise you that Dr. Kopreski has neither been offered nor

09:06:25  8    accepted by the Court as an expert.

09:06:27  9            With that, please begin the deposition.

09:06:30 10       (WHEREUPON, THE VIDEO DEPOSITION OF DR. MICHAEL S. KOPRESKI

09:06:33 11        WAS PLAYED AS FOLLOWS:)

09:06:33 12    EXAMINATION:

09:06:44 13    Q.  State your name, please.

09:06:46 14    A.  My name is Michael Kopreski.

09:06:47 15    Q.  And you are board certified in internal medicine and oncology?

09:06:51 16    A.  Yes.  I -- I -- I was board certified in both internal medicine

09:06:55 17    and in oncology.

09:06:58 18    Q.  I've marked as deposition Exhibit No. 16 a copy of your

09:07:01 19    curriculum vitae.  You were employed in pharmacovigilance at Sanofi

09:07:08 20    for approximately 15 years?

09:07:10 21    A.  That's correct.  I -- I retired about a year ago.

09:07:16 22    Q.  All right.  Very good.

09:07:17 23    A.  In the -- in the end of 2017.

09:07:20 24    Q.  Okay.  And you are here today to play a particular role in

09:07:22 25    terms of reviewing reports and clinical data with an eye to reports

09:07:27  1   of alopecia in a time period of 2005 to 2011?

09:07:31  2   A.  That's correct.

09:07:32  3   Q.  Okay.  As an oncologist, let's talk briefly about alopecia and

09:07:40  4   how frequently it's seen with chemotherapy drugs, generally.

09:07:48  5   A.  Well, first off, chemotherapy during this time period employed

09:08:00  6   agents that were often not specific only to the -- to the cancer,

09:08:09  7   but to other normal tissue, and had a range of very common side

09:08:18  8   effects.  Alopecia was one of those frequently observed side

09:08:21  9   effects with chemotherapy.

09:08:23 10           THE COURT:  I'm sorry.  Can we stop this?

09:08:23 11       (WHEREUPON, VIDEO WAS PAUSED.)

09:08:30 12           MR. COFFIN:  Can we approach, your Honor?

09:08:31 13           THE COURT:  Yes.

10:06:07 14       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

09:09:20 15           MR. MARKOFF:  The only agreement for close captioning is

09:09:20 16   for foreign witnesses; Dr. Aussel and the other foreign witness, I

09:09:20 17   forgot who it was now.  This is not a foreign witness.

09:09:20 18           MR. STRONGMAN:  I wasn't part of that conversation.

09:09:20 19           THE COURT:  Who was part of the conversation?

09:09:20 20           MR. MARKOFF:  It was Harley and myself.

09:09:20 21           MR. STRONGMAN:  We agreed not to put up closed

09:09:20 22   captioning?

09:09:20 23           MR. COFFIN:  That's correct.

09:09:20 24           MR. MARKOFF:  They didn't want it in our case either.

09:09:20 25           MR. STRONGMAN:  I'll see if he can take it down.

09:09:20  1          THE COURT:  Take it down.

09:09:20  2          MR. MARKOFF:  It's a switch.

09:09:20  3          THE COURT:  Okay.  Just take it down.

09:09:35  4        (OPEN COURT.)

09:09:35  5          THE COURT:  Okay.  Please proceed.

09:09:35  6        (WHEREUPON, THE VIDEO RESUMED PLAYING AS FOLLOWS:)

09:10:21  7  Q.  All right, Dr. Kopreski.  I want to shift gears and focus a

09:10:21  8  little bit on the time period of 2005 to 2011, and I want to spend

09:10:21  9  a little time talking about Taxotere and what kind of cancers

09:10:21 10  Taxotere was approved by the regulatory authorities to treat.  So

09:10:25 11  in this time period, what were the range of types of cancers that

09:12:33 12  Taxotere was authorized to treat?

09:12:33 13  A.  Well, before this time period in the United States, Taxotere

09:12:33 14  was approved for breast cancer and lung cancer.  But during this

09:12:33 15  time period, there was an increased use of Taxotere in other

09:12:33 16  indications.  And during this time period, indications such as

09:12:33 17  gastric cancer, prostate cancer, and head and neck cancer were, to

09:12:37 18  the best of my recollection, all received approval during this

09:12:37 19  period of time in the United States.

09:12:37 20  Q.  Okay.  And are you able to review Sanofi's documentation to

09:12:37 21  determine an estimate of the number of patients who would have been

09:12:37 22  treated for these various cancers by Taxotere in this time period

09:12:37 23  of 2005 to 2011?

09:12:37 24  A.  I did review estimates of marketing data from -- of

09:12:37 25  accumular -- from reports of PSURs.  I do have to caution that

09:12:37  1    these are estimates and rather indirect estimates in part because

09:12:37  2    of the -- they were not recording actual patient numbers, but they

09:12:37  3    were estimating the number of patients that would have been used

09:12:37  4    based on the amount of drug that was sold.  But they do provide

09:12:37  5    estimates that are provided to the regulatory authorities.

09:12:37  6    Q.  You may have said that number.  What is the estimate?

09:12:37  7    A.  The estimate during the time period of 2005 through 2011 that I

09:12:37  8    came up was over three million patients; approximately, 3.4 million

09:12:37  9    patients.

09:12:37 10    Q.  Okay.

09:12:37 11    A.  Okay.  So with that as an understanding, yes, I did review the

09:12:54 12    data of patients that were described as having alopecia that went

09:29:13 13    into the follow-up period, and was described as ongoing.

09:29:13 14    Q.  We're going to spend some more time on TAX316, but the first

09:29:13 15    thing I want to do, Doctor, is I want to have you described for the

09:29:13 16    jury what TAX316 meant in terms of clinical data of the efficacy of

09:29:13 17    Taxotere in treating women with node positive breast cancer.

09:29:13 18            And I am going to hand you what is Exhibit No. 21, which

09:29:13 19    is a study that was published in 2005, and that would be within

09:29:13 20    this time period, right?  2005?

09:29:13 21    A.  Correct.

09:29:13 22    Q.  Okay.  And I'm going to hand you Exhibit No. 21, and I will put

09:29:13 23    this on the ELMO, and I am going to ask a couple of quick questions

09:29:13 24    here, and then we can -- the *New England Journal of Medicine*, that

09:29:13 25    is a foremost peer-reviewed medical journal?

09:29:13  1    A.  Yes, I would consider it so.

09:29:13  2    Q.  And this is -- just tell the jury what this published study

09:29:13  3    represents as it relates to TAX316, and then we'll spend a little

09:29:13  4    time identifying some of the results of the study.

09:29:13  5    A.  Well, it appears this is a publication of the TAX316 55-month

09:29:13  6    data.  Now, that's important because -- one of the reasons why

09:29:13  7    TAX316 is important is that it was the basis of the approval of

09:29:13  8    Taxotere in combination with Adriamycin and cyclophosphamide for

09:29:13  9    the treatment of node positive women with breast cancer as adjuvant

09:29:13 10    treatment.  So this was basically a study that FDA used, and this

09:29:13 11    reflects of the data that the FDA would have used to approve

09:29:13 12    Taxotere for the treatment of adjuvant breast cancer.

09:29:13 13    Q.  And when this study speaks in terms -- and we'll talk of this

09:29:14 14    in more detail, but FAC and TAC, the TAC is a regimen that includes

09:29:14 15    Taxotere and the FAC is a regimen that does not?

09:29:14 16    A.  That is -- that is correct.  The study -- the study is

09:29:14 17    characterized by, first, being a very large study.  It's secondly

09:29:14 18    characterized by being a randomized study.  So that provides some

09:29:14 19    scientific power to evaluate the effect of Taxotere.

09:29:14 20          And by the randomization, it compared the TAC regimen to

09:29:14 21    commonly-used alternative regimen, which is the FAC.

09:29:14 22    Q.  Okay.  So, in particular, this statement here, which you can

09:29:14 23    look on the ELMO, "Treatment with TAC resulted in a 30 percent

09:29:14 24    reduction in the risk of death."  I think that's pretty obvious

09:29:14 25    what that means, but if you could just elaborate on that as a board

09:29:14   1   certified oncologist?

09:29:14   2   A.  Well, as a company representative, you know, I think it

09:29:14   3   indicates that there is substantial efficacy -- for this regimen,

09:29:14   4   when it is compared against the FAC regimen.  Now, note that both

09:29:14   5   of the arms have the Adriamycin and cyclophosphamide in there, so

09:29:14   6   the comparison, whether there is a difference between the Taxotere

09:29:14   7   and the fluorouracil, the comparison suggests that it's the

09:29:14   8   Taxotere which is predominantly making that difference, that

09:29:14   9   reduction in the risk of death that's being seen with this regimen,

09:29:14  10   the TAC regimen.

09:29:14  11   Q.  All right.  Is it also significant to you, Dr. Kopreski, the

09:29:14  12   statement here about quality of life scores decreased during

09:29:14  13   chemotherapy but returned to baseline levels after treatment?

09:29:14  14   A.  I take it as it reads; that they did a quality of life

09:29:14  15   assessment, and this was the finding that they found in the TAC

09:29:14  16   arm.

09:29:14  17   Q.  Okay.  And then the last sentence I want to ask you about is

09:29:14  18   the conclusion:  "Adjuvant chemotherapy with TAC, as opposed to

09:29:14  19   FAC, significantly improves the rates of disease-free and overall

09:29:14  20   survival among women with operable node positive breast cancer."

09:29:14  21           This study led to the approval of Taxotere for node

09:29:15  22   positive women with breast cancer?

09:29:15  23   A.  Yes.  If you could just give me a moment.  I agree with that

09:29:15  24   statement, but I also, particularly within that statement, I would

09:29:15  25   like you -- to draw your attention to page 2309 of the --

09:29:15  1   Q.  Okay.

09:29:15  2   A.  -- and I would like to draw your attention to the table on page

09:29:15  3   2309, which is a risk reduction of disease-free survival in

09:29:15  4   subgroups.  And you will see, if you look at the hormonal status,

09:29:15  5   whether the patient was hormone receptor-negative or hormone

09:29:15  6   receptor-positive.  They both had fairly similar risk reduction in

09:29:15  7   favor of the TAC.

09:29:15  8         So this is important because for women who have hormonal

09:29:15  9   receptor-positive status, which is roughly two-thirds of the women

09:29:15 10   with breast cancer, this Taxotere regimen provides them an option

09:29:15 11   that has a survival benefit.

09:29:15 12   Q.  Okay.  All right.  Very good.  All right.  I want to spend just

09:29:15 13   a little bit more time on the study design of TAX316, and then

09:29:15 14   we'll get in the particulars of some of the patients there.  But I

09:29:15 15   created this -- this rather crude graphic here, and the first thing

09:29:15 16   I want -- describe for the jury the information you requested with

09:29:15 17   respect to these TAX316 patients and why it was important to you.

09:29:15 18   A.  Well, in particular, since the focus of this -- of my testimony

09:29:15 19   has been regarding persistent alopecia, I thought it was important

09:29:15 20   to look at the -- the data of patients with ongoing alopecia in the

09:29:15 21   manner that my understanding was that persistent or permanent

09:29:15 22   alopecia was being defined, and that was patients who had alopecia

09:29:15 23   greater than six months duration after chemotherapy that did not

09:29:15 24   resolve.

09:29:15 25         Now, I -- I mentioned before, you know, this definition,

09:29:15  1    there is -- there was not a, you know, clear-set clinical

09:29:16  2    definition that we would say when we said persistent.  So in the

09:29:16  3    early reports, there might be some confusion as to when you say,

09:29:16  4    "persistent" or "ongoing" compared with the -- the definition I

09:29:16  5    just described of at least six months.

09:29:16  6    Q.  Okay.

09:29:16  7    A.  Okay?  So in view of that, and also in view that the analysis

09:29:16  8    described ongoing, which I previously talked about in the

09:29:16  9    definition of -- the meaning of "ongoing" to mean, you know,

09:29:16 10    alopecia was present, you know, when they died a month later, you

09:29:16 11    know.

09:29:16 12         So I review this data from a stricter standpoint in terms

09:29:16 13    of whether the criteria laid out of -- of at least six months

09:29:16 14    without resolution, six months after chemotherapy without

09:29:16 15    resolution was being fulfilled in these patients that were being

09:29:16 16    called "ongoing."

09:29:16 17    Q.  All right.  I've identified -- I know you've talked about some

09:29:16 18    of these already.  I want to just quickly go through some of the

09:29:16 19    features of TAX316, and I just want to just briefly have you

09:29:16 20    discuss some of the characteristics of this study being an

09:29:16 21    important part of its design.  So, the randomized aspect, just

09:29:16 22    briefly, what does that mean and why is that significant to the

09:29:16 23    study?

09:29:16 24    A.  Well, randomization is a way of trying to avoid and introduce

09:29:16 25    bias in -- in a study.  So if you're going to compare two treatment

09:29:16 1    groups, you could consciously or unconsciously skew the patients

09:29:16 2    that receive one treatment versus -- versus another.

09:29:16 3         Well, let's say, for example, you're doing a study at a

09:29:16 4    single institution, and you know who the patients are and what

09:29:16 5    treatment they're going to get.  You could, perhaps, put your

09:29:16 6    select patient so that the patient who has the worst prognosis will

09:29:16 7    get one treatment and the patient that has the best prognosis gets

09:29:16 8    another treatment.  That -- that introduces a bias in -- in terms

09:29:16 9    of interpreting not only the efficacy data, but also the safety

09:29:16 10   data.

09:29:16 11        You might -- a single institution might give one

09:29:16 12   treatment at one period of time, let's say, for five years, then

09:29:16 13   switch to another treatment, and then report all of the data

09:29:16 14   together.  That's -- that's a biased way --

09:29:16 15   Q.  Okay.

09:29:16 16   A.  -- of looking at the data.

09:29:16 17   Q.  Okay.

09:29:16 18   A.  So randomization, in a prospective manner -- in other words,

09:29:16 19   you're going back looking at what was given, but you're

09:29:16 20   prospectively proceeding with the trial and you're randomizing

09:29:17 21   patients so the characteristics of the patients are balanced in

09:29:17 22   both arms.

09:29:17 23   Q.  Okay.  Another feature was long-term follow-up.  Why was that

09:29:17 24   important to TAX316?

09:29:17 25   A.  This is particularly important in TAX316 because it -- it does

09:29:17 1   have not only long-term efficacy follow-up, but long-term safety

09:29:17 2   follow-up.  In a lot of trials, even randomize trials -- randomized

09:29:17 3   trials, you might see follow-up reported for survival and some

09:29:17 4   efficacy follow-up, but might not provide information on long-term

09:29:17 5   safety.

09:29:17 6        The absence of a report of a toxicity in the long-term

09:29:17 7   follow-up depends on how the study was conducted, and if you are

09:29:17 8   going to analyze a specific issue, it has to be planned for in --

09:29:17 9   preferably in a -- in a manner where the follow-up, such as

09:29:17 10  alopecia, is done on a regular basis to make assessments.

09:29:17 11  Q.  Okay.

09:29:17 12  A.  So -- so this study was very well designed and specifically

09:29:17 13  designed within a standpoint of looking not only at long-term

09:29:17 14  efficacy, but certain long-term safety issues.

09:29:17 15  Q.  Okay.  Quickly, there's two other -- there's three things that

09:29:17 16  I want to just identify of TAX316.  I think we've already talked

09:29:17 17  about it led to a new clinical indication that we just described in

09:29:17 18  the *New England Journal of Medicine*?

09:29:17 19  A.  Correct.

09:29:17 20  Q.  And then briefly talk about the multiple endpoints.  Why is

09:29:17 21  that important in TAX316?

09:29:17 22  A.  Can you clarify further what you mean by "multiple endpoints"?

09:29:17 23  Q.  Did they -- they were evaluating a whole host of side effects,

09:29:17 24  in addition to just alopecia, for example.  And just describe for

09:29:17 25  the jury, a study like this, the extensive consideration of how

09:29:17  1   they were doing and their, you know, their health as a whole.

09:29:17  2   A.  Okay.  So it's important to realize that there's an obligation

09:29:17  3   when the company's doing these trials that it doesn't only look at

09:29:18  4   one specific toxicity; it -- it needs to -- it needs to look at all

09:29:18  5   the toxicities that might occur and that might be made aware of.

09:29:18  6            So, during the course of the study, there are -- there

09:29:18  7   are a number of toxicities that were -- that were being evaluated,

09:29:18  8   and they were evaluated on a -- on a basis of intimate --

09:29:18  9   intermittent and follow-up.  The further out from the study the

09:29:19 10   patients got, the less frequent the follow-up was, but there was

09:29:19 11   well-prescribed intermittent follow-up.

09:29:19 12   Q.  Okay.  I want to direct your attention specifically to the

09:29:19 13   follow-up in TAX316 that tracked patients for alopecia.  Are you

09:29:19 14   with me?

09:29:19 15   A.  (Witness nodded.)

09:29:19 16   Q.  With me?

09:29:19 17   A.  Okay.

09:29:19 18   Q.  I've put up a graphic here that has some statistics on it, and

09:29:19 19   if you could just walk us through this flow chart and explain what

09:29:19 20   these numbers represent?

09:29:19 21   A.  The -- the 316 had two groups of patients, as I had mentioned.

09:29:19 22   The patients receiving TAC, and also the patients receiving FAC.

09:29:19 23   One is the Taxotere arm and -- the TAC, and the other was without

09:29:19 24   the Taxotere.  There were 744 patients in the safety population

09:29:25 25   being evaluated in the TAC arm.  It's 736 in the -- in the FAC arm.

1928

09:29:33   1          Now, this is ten-year follow-up data, but I think it's
09:29:48   2   important to understand what that -- what that means.  That doesn't
09:29:48   3   mean that every single patient is -- is seen for ten years.  It
09:29:49   4   means -- because some patients will have died within that ten-year
09:29:52   5   period; some patients will have been lost to follow-up or refused
09:29:57   6   to be followed, basically, refuse -- you know, refused to give it
09:30:05   7   further informed consent.  Some patient may have, due to recurrence
09:30:12   8   of the -- of their breast cancer, got onto other treatments, and --
09:30:18   9   and thus, might not be followed for certain conditions.  So the
09:30:26  10   follow-up is to -- goes ten years to evaluate, but it's important
09:30:31  11   not to be confused to think that every single patient has lived for
09:30:37  12   ten years and had a ten-year evaluation.
09:30:40  13          Okay.  So that's the first point I would like to make.
09:30:47  14   With -- with -- within that, patients were evaluated to see if they
09:30:52  15   had alopecia, did that alopecia persist into the follow-up period.
09:30:58  16          Now, what's the follow-up period?  The follow-up period
09:31:01  17   is 30 days after the last treatment with the Taxotere or the FAC
09:31:09  18   on -- on the protocol.  And that kicks in the follow-up period.  So
09:31:13  19   the question is:  Do patients have continuation into the follow-up
09:31:21  20   period?
09:31:23  21          Well, indeed, most patients, since hair grows rather
09:31:30  22   slowly, you know, most -- most patients take more than 30 days from
09:31:38  23   the last treatment to have resolution of their alopecia.  So, what
09:31:47  24   you have is a large number of the patients have alopecia going into
09:31:54  25   the follow-up period, and the question then is, of those who have

1929

09:31:57 1    alopecia, is -- is there resolution or is it ongoing?  And the vast

09:32:04 2    majority of patients will have document -- will resolve.

09:32:10 3            But this particular table classified 29 patients in the

09:32:14 4    TAC arm and 16 patients in the FAC arm as having alopecia that was

09:32:21 5    ongoing.

09:32:22 6            Now, I previously testified and we discussed, and I think

09:32:28 7    in some detail, that ongoing doesn't mean that it's -- that it has

09:32:35 8    persisted for more than six months.  "Ongoing" means that the last

09:32:39 9    time that there was a documentation, there was still alopecia.

09:32:44 10   That means that if the patient had alopecia at the time that they

09:32:53 11   died, it would be considered ongoing.  If they had alopecia at the

09:32:55 12   time that they removed their informed consent, it would be

09:32:59 13   considered ongoing.  If they had alopecia at the time they switched

09:33:02 14   therapy to another chemotherapy and were no longer seen, that would

09:33:08 15   be considered ongoing.

09:33:09 16   Q.  So what -- what did you do?  Explain to the jury what you did

09:33:15 17   to evaluate the patients and -- to have, according to the study of

09:33:23 18   29 ongoing to six persistent, briefly, how did you -- what work did

09:33:29 19   you do to evaluate these patients and determine what, in fact, was

09:33:32 20   the nature of their alopecia over the ten-year period?

09:33:36 21   A.  Okay.  So again, the criteria that I utilized for persistent

09:33:43 22   was if they had alopecia that lasted at least six months, was

09:33:51 23   documented to have lasted at least six months after chemotherapy,

09:33:55 24   and did not have any subsequent resolution.  That was -- that was

09:34:00 25   the criteria.

09:34:02  1          In order to -- in order to evaluate that, I looked at the

09:34:06  2   patients that were -- had -- were classified as ongoing.  The other

09:34:11  3   patients had already -- you know, the -- there -- there were

09:34:16  4   patients that were previously defined in the analysis of ongoing of

09:34:21  5   having been resolved.  So we didn't -- I didn't look at -- at all

09:34:27  6   of those patients that had already been classified as having been

09:34:31  7   resolved.

09:34:32  8          I looked at the patients from the 29 that were considered

09:34:35  9   to be ongoing, and I asked of those if there was documentation that

09:34:43 10   answered two questions, two simple questions:  Number 1, did we

09:34:50 11   have documentation, either from what was provided in the CRFs or

09:34:56 12   what was provided in terms of SAS or clinical trial datasets, that

09:35:04 13   were produced from the CRFs that showed documentation that the

09:35:12 14   alopecia was still present six months after the last chemotherapy.

09:35:18 15   So that was -- that was the first criteria:  Was the alopecia still

09:35:24 16   present six months after the last chemotherapy that was received.

09:35:28 17          The second criteria:  Was there any evidence of

09:35:34 18   resolution of that alopecia?  If there was any resolution, then it

09:35:39 19   would not be considered persistent.  So that -- that, very simply,

09:35:45 20   is -- is the process.  It was a very straightforward process.  It

09:35:51 21   was looking to see if -- if there was documentation for any of

09:35:54 22   those two characteristics.

09:35:56 23   Q.  Okay.  I just want to briefly ask you about the -- the fact

09:36:00 24   that the FAC -- that these patients did not have Taxotere; is that

09:36:04 25   right?

09:36:04  1    A.   Correct.

09:36:05  2    Q.   The fact that the FAC patients had evidence of both ongoing

09:36:10  3    alopecia and persistent alopecia?

09:36:12  4    A.   That is correct.

09:36:13  5    Q.   And how -- what is one explanation for why the FAC patients

09:36:20  6    were having ongoing and persistent alopecia and the TAC patients

09:36:24  7    were also having ongoing and persistent alopecia?  What's in common

09:36:29  8    with those two arms?

09:36:30  9    A.   Well, let me first go back to when I started testifying with

09:36:41  10   you, Mr. Keenan, that alopecia is -- is fairly common to a wide

09:36:47  11   range of chemotherapeutic agents.  So alopecia is not simply a

09:36:56  12   condition that occurs with Taxotere.

09:36:58  13        We -- we also -- I also testified that the AC causes --

09:37:06  14   which is the Adriamycin plus the cyclophosphamide, has a very high

09:37:11  15   incidence of alopecia.  I -- I believe it was roughly 90 percent,

09:37:20  16   and also a very high incidence of even severe alopecia, Grade 3-4

09:37:28  17   alopecia, which, by the grading, would include very -- very severe

09:37:31  18   alopecia.

09:37:32  19        So -- so this is -- this is common with chemotherapy,

09:37:39  20   such as Adriamycin and cyclophosphamide in combination.

09:37:42  21        Now, what you have is demonstration that in some of those

09:37:49  22   patients that receive Adriamycin and cyclophosphamide, the alopecia

09:37:52  23   persists for more than six months.  There were three patients where

09:37:56  24   it fit the criteria for persistent.  We also see that there were

09:38:02  25   six patients in the TAC arm that fit the persistence.

09:38:10  1          So I -- I think the presence of persistent alopecia being

09:38:15  2     in the -- in the FAC arm demonstrates that the AC is an important

09:38:22  3     component in the extent and the severity and duration, or is

09:38:31  4     likely, at least, to be a very important component of the extent,

09:38:36  5     severity, and duration of the -- of the alopecia in these patients.

09:38:39  6     Q.  One more question about this, and then I want to identify a

09:38:40  7     couple specific patients in this group.

09:38:42  8          Based on your review of the medical records and the study

09:38:48  9     of TAX316, were you able to identify what the percentage -- what

09:38:52 10     the frequency was of persistent or permanent alopecia with respect

09:38:59 11     to these two patient populations and are those numbers reflected

09:39:03 12     here in this?

09:39:04 13     A.  Yes, I believe those are correct reflection of six -- divided

09:39:10 14     by 200 and -- six out of 244 patients, 24 and three out of the 736

09:39:16 15     patients.  That's, I believe, rounded off --

09:39:16 16     Q.  Okay.

09:39:18 17     A.  -- to -- to the nearest tenth.

09:39:20 18     Q.  I previously marked as Exhibit No. 13 this document.  And

09:39:27 19     briefly, what -- what is Exhibit 13, if you could just describe

09:39:30 20     this?  I don't want to spend any time on it.  I just want to have

09:39:34 21     you identify this in your own --

09:39:36 22              MR. MICELI:  Your Honor, may we approach?

09:39:37 23              THE COURT:  Yes.

09:39:48 24              MR. MICELI:  Take that down, please.

10:06:07 25          (WHEREUPON, THE VIDEO WAS PAUSED AND THE FOLLOWING BENCH

10:06:07  1      CONFERENCE WAS HELD:)

09:39:54  2          MR. MICELI:  They said they weren't going to show it.

09:40:09  3  This IT fella back there puts it right up there.

09:40:09  4          THE COURT:  That is not supposed to come up.

09:40:09  5          MR. STRONGMAN:  Okay.  This video has been previewed.  I

09:40:09  6  am not putting up with Dr. Glaspy, he'll take it down.  I thought

09:40:09  7  that video had all been previewed on both sides.

09:40:15  8          THE COURT:  And we talked about --

09:40:15  9          MR. MICELI:  And we objected to --

09:40:15 10          THE COURT:  They objected and I said it's not going to up

09:40:20 11  because I didn't let the other stuff go up, so it's exactly -- I

09:40:34 12  don't know how that happened.  Okay.  How long is it going to take

09:40:34 13  to fix it?

09:40:34 14          MR. STRONGMAN:  I think he can click a button and it

09:40:34 15  takes off the screen.

09:40:34 16          THE COURT:  Click that button.

09:40:34 17      (OPEN COURT.)

09:40:52 18      (WHEREUPON, THE VIDEO WAS RESUMED.)

09:41:08 19  A.  -- to the nearest tenth.

09:41:11 20  Q.  I previously marked as Exhibit No. 13 this document.  And,

09:41:28 21  briefly, what -- what is Exhibit 13, if you could just describe

09:41:28 22  this?  I don't want to spend any time on it.  I just want to have

09:41:28 23  you identify this in your own -- in your own words.

09:41:28 24  A.  This appears to be a document that shows patients in the --

09:46:41 25  patients who were among the 29 TAC and the 16 FAC patients

09:46:41  1   identified as ongoing, who, upon further analysis, by my analysis,

09:46:41  2   failed to meet the criteria that I outlined of either being greater

09:46:41  3   than six months or not having resolution.

09:46:41  4         So -- so, essentially, these are patients in the TAC and

09:48:34  5   the FAC arm that do not meet -- my -- the criteria that I -- that I

09:48:34  6   defined as being persistent alopecia.

09:48:34  7   Q.  Okay.

09:48:34  8   A.  And I would just mention that the first group are the TAC arm

09:48:34  9   patients, and then, at the end of the document are the FAC arm

09:48:34 10   patients.  And, further, this is structured to be very simple with

09:48:45 11   the subject number, the treatment arm, the last date of

09:48:45 12   chemotherapy, and the last documented -- documentation of alopecia,

09:48:45 13   so you can see whether or not it was more than six months or not.

09:48:45 14   And then, also, there's a column for resolution.  And then, on the

09:48:45 15   far right is the -- is a clinical description with the Bates

09:48:45 16   numbers and documentations.

09:48:45 17   Q.  For the record, I've marked as Exhibit 22 the flow chart that

09:48:55 18   we were just discussing.

09:48:55 19         Doctor, I want to spend time talking about three patients

09:48:55 20   in particular that were part of the initial set of patients in the

09:48:55 21   29 that, upon your review, were determined not to be in the final

09:48:55 22   six.  Are you with me?

09:48:55 23   A.  Yes.

09:48:55 24   Q.  Okay.  Doctor, one of the patients that was in the initial

09:49:05 25   group of ongoing is Patient 12403.  Are you familiar with Patient

09:49:05  1   12403?

09:49:05  2   A.  I am, if you give me a second to find them on the --

09:49:05  3   Q.  Describe in a summary fashion what your review of the records

09:49:05  4   of Patient 12403 revealed.

09:49:05  5   A.  Well, this patient received six cycles of the TAC regimen, and

09:49:14  6   the last cycle was administered in December -- December 11th of

09:49:14  7   1998.  And, at this time, the patient had ongoing alopecia.

09:49:14  8           On the first follow-up visit of -- of April 7th, 1999,

09:49:14  9   the alopecia was recorded as resolved.  So that would have been --

09:49:15 10   that follow-up visit appears to have been less than six months, but

09:49:15 11   the resolution date was -- at that follow-up visit was listed as

09:49:15 12   January of 1999.

09:49:15 13   Q.  All right.

09:49:15 14   A.  So it was less than six months with a -- with a resolution date

09:49:15 15   specified, and a review of the additional -- next ten follow-ups

09:49:15 16   did not have alopecia record as an adverse event.

09:49:15 17   Q.  Okay.  Doctor, I've put this document on the screen, and I've

09:49:15 18   marked it Exhibit 24.  And this shows -- this is Patient 12403; is

09:49:15 19   that right?

09:49:15 20   A.  That's correct.

09:49:15 21   Q.  And does this show a tracking of alopecia on a date certain

09:49:15 22   that it would have resolved?

09:49:15 23   A.  That appears to be correct, and it says, "ceased January 1999."

09:49:15 24   Q.  All right.  So this would be a patient that would not be

09:49:15 25   considered a patient with permanent or irreversible alopecia?

09:49:15  1   A.  No, for -- for -- for two reasons.  The first is:  Does it meet

09:49:15  2   the six-month criteria?  And the answer to that is no.  And the

09:49:15  3   second is:  Does it meet the resolution criteria?  And in this

09:49:15  4   case, the patient also resolved.  So in -- in neither of those

09:49:15  5   criteria is there a basis of saying tis patient had permanent

09:49:15  6   alopecia.

09:49:15  7   Q.  Exhibit 25 identified as another patient, and this is Patient

09:49:15  8   17603.  If you could pull the notes up for 17603, and describe for

09:49:15  9   me what your notes reflect about the review of the records for this

09:49:15 10   patient who was in TAX -- in TAX316.

09:49:15 11   A.  Okay.  So patient 17603 received six cycles of the TAC regimen,

09:49:15 12   the Taxotere/Adriamycin/cyclophosphamide regimen.  The last cycle

09:49:15 13   was administered on 5/8/98.  May 8th of 1998.

09:49:15 14        On this date, the patient was recorded as having ongoing

09:49:15 15   alopecia.  The alopecia was recorded as ongoing -- during her first

09:49:15 16   three follow-up visits.  So it was recorded as being ongoing, with

09:49:15 17   the third follow-up visit being on the -- February 19th, 1999.

09:49:15 18   However, on the fourth follow-up visit of -- of May 7th, 1999, the

09:49:15 19   alopecia was listed as being resolved.

09:49:15 20        So in -- in -- in this patient, although it appears that

09:49:15 21   the alopecia continued for more than six months, the alopecia did

09:49:15 22   subsequently resolve and we have a resolution date.

09:49:15 23   Q.  Okay.

09:49:15 24   A.  Accordingly, this patient was not considered to have persistent

09:49:15 25   alopecia.

09:49:15  1    Q.   Okay.   And just for the record, I am marking this Exhibit 26.

09:49:15  2    Exhibit 26 reflects Patient 17603.

09:49:15  3    A.   Correct.

09:49:15  4    Q.   And then, in this record, does it reflect the alopecia and

09:49:15  5    its -- its status as resolved?

09:49:15  6    A.   It does.

09:49:15  7    Q.   Okay.   And would this be a patient that, upon your review, you

09:49:15  8    concluded would not meet the criteria of irreversible or permanent

09:49:16  9    alopecia as part of TAX316?

09:49:16 10    A.   That is correct.

09:49:16 11    Q.   Okay.   The final patient that I want to speak to, and then we

09:49:16 12    will take a break, is Patient No. 15002.   And I'll mark this as

09:49:16 13    Exhibit 27.

09:49:16 14         15002 is a little bit more complicated than the others.

09:49:16 15    If you could just take a moment and look at your notes and describe

09:49:16 16    why this patient is significant to you, Dr. Kopreski, and why it

09:49:16 17    was not counted in the final ten-year data as persistent alopecia.

09:49:16 18    A.   This patient received only one cycle of Taxotere arm, TAC, and

09:49:18 19    that cycle was administered on the 8th of -- I'm sorry, on August

09:49:24 20    the 26th, 1998.   The patient developed alopecia and was withdrawn

09:49:32 21    from the study after developing gastrointestinal mucositis

09:49:39 22    following the -- the administration of the TAC regimen.

09:49:43 23         On the September of 1998, the patient started alternative

09:49:54 24    chemotherapy with Adriamycin and cyclophosphamide, or the AC.

09:50:02 25    The -- the numbers of the cycle are not known.

09:50:05  1        She was seen in follow-up on November 3rd of 1998, at

09:50:14  2   which time alopecia was ongoing, but because the patient was on

09:50:24  3   another therapy and was no longer in this therapy, there was no

09:50:31  4   longer any follow-up due to the new chemotherapy.  It's recorded

09:50:38  5   that there's no longer follow-up due to the new chemotherapy

09:50:42  6   regimen started, and no further alopecia assessments were -- were

09:50:45  7   made for -- for the patient.

09:50:49  8   Q.  Okay.

09:50:49  9   A.  So the -- the documentation of -- of alopecia that we have was

09:50:55 10   less than six months, and then the patient received another therapy

09:50:59 11   instead of Taxotere, which was continuing.  She -- she later had a

09:51:04 12   breast cancer relapse and -- and was started on Taxol, but,

09:51:10 13   unfortunately, this patient later died from -- from her breast

09:51:17 14   cancer in August of 2001.

09:51:20 15   Q.  Okay.  So some of the records that you just described are here,

09:51:24 16   and I've marked these records as Exhibit 28.  This describes her

09:51:29 17   regimen of Taxol weekly, and obviously, that's -- Taxol is a -- is

09:51:40 18   not a drug made by Sanofi.

09:51:43 19   A.  That's correct.

09:51:44 20   Q.  And the next document reflects that, unfortunately, this woman

09:51:56 21   passed away?

09:52:01 22   A.  Unfortunately, that's the case for this patient.

09:52:04 23   Q.  Okay.  And so, obviously, Dr. Kopreski, TAX316 was an important

09:52:10 24   part of our submission to the FDA?

09:52:12 25   A.  Yes, it was.

09:52:13  1    Q.  Okay.  I've marked as Exhibit 32 from the journal called *The*
09:52:21  2    *Oncologist,* and it is a paper by Vishal Saggar, S-A-G-G-A-R, and I
09:52:26  3    ask you to take a moment and describe that study for me.  What are
09:52:36  4    we looking at here, Doctor?
09:52:38  5    A.  Well, this -- this paper by Saggar is entitled "Alopecia With
09:52:42  6    Endocrine Therapies in Patients With Cancer."  And it's a review of
09:52:51  7    various studies looking at various endocrine therapies, which I
09:53:00  8    referred to previously as hormonal therapy or antihormonal therapy.
09:53:06  9    But it -- so it's -- it's a review of -- of the literature, and
09:53:12 10    what it emphasizes is that patients very often will have alopecia
09:53:19 11    who are receiving these -- these endocrine therapies.
09:53:25 12           For example, just reading from the abstract in the
09:53:29 13    results section, Saggar state -- states that the incidence of
09:53:37 14    all-grade alopecia range from 0 to 25 percent with an overall
09:53:43 15    instance of 4.4 percent, the highest incidence.  And I'm -- I am
09:53:48 16    paraphrasing here, the highest incidence of all-grade alopecia was
09:53:52 17    observed in patients treated with tamoxifen in a Phase II study at
09:54:00 18    25.4 percent.
09:54:01 19    Q.  Now, what does that mean in plain English, Doctor?
09:54:04 20    A.  Well, when it says in this -- in this trial, looking at
09:54:06 21    patients treated with tamoxifen, in this particular trial, roughly
09:54:12 22    a quarter of the patients had alopecia.
09:54:14 23    Q.  Okay.
09:54:17 24    A.  So it -- it goes on also to say that the overall incidence of
09:54:21 25    Grade 2 alopecia, which we previously described as essentially

09:54:26  1   being a more severe alopecia, by meta-analysis was highest in

09:54:37  2   tamoxifen, and they have it at 6.4 percent.

09:54:43  3   Q.  And -- and this -- this study was a review of -- describes here

09:54:48  4   19,000 patients in 35 clinical trials.  Is that called a

09:54:55  5   meta-analysis, Doctor?

09:54:55  6   A.  Well, meta-analysis is more of a statistical term where they --

09:55:02  7   it's -- as -- to my understanding, it's a methodology of --

09:55:06  8   where -- that allows them to combine and analyze different studies

09:55:11  9   together.

09:55:13  10  Q.  Okay.  There were a couple other findings in this.  I want to

09:55:23  11  direct your attention to page 1130 where it has Incidence of

09:55:28  12  High-Grade Alopecia.  Do you see that, on page 1130?

09:55:44  13  A.  Yes.  Yes, I do.

09:55:45  14  Q.  Is that significant to you?

09:55:47  15  A.  Well, high-grade alopecia -- high-grade -- yes -- yes, it would

09:55:51  16  be significant to me in terms of representing a more severe

09:55:58  17  alopecia.  They -- high-grade would be, you know, above -- would be

09:56:11  18  patients that have more of a frank alopecia.

09:56:15  19  Q.  And this --

09:56:15  20  A.  It's more -- it would of greater severity.

09:56:15  21  Q.  And this is identifying the high-grade with tamoxifen.

09:56:18  22  A.  Well, the study says that the incidence of high-grade alopecia

09:56:22  23  range between 0.2 percent and 16.9 percent.  And it says that the

09:56:28  24  highest incidence of 16.9 percent was observed in a Phase II trial

09:56:33  25  studying the use of tamoxifen in treatment of, in this case, renal

09:56:40  1    cell carcinoma.

09:56:43  2    Q.  Okay.  All right.  And then there's one other finding here, and

09:56:46  3    that's on page 1132, the conclusion.  And I'll just read that.

09:56:46  4    A.  I -- I --

09:56:58  5    Q.  Do you have it there?

09:56:58  6    A.  Yes, I do have it.

09:57:00  7    Q.  Okay.

09:57:01  8    A.  Would you like me to read --

09:57:02  9    Q.  Sure.

09:57:03  10   A.  -- the conclusion?

09:57:04  11         "The results of this meta-analysis indicate that alopecia

09:57:07  12   is a common but underreported adverse event associated with

09:57:12  13   endocrine agents used to treat cancer, particularly of the breast.

09:57:16  14   This study aims to provide information that is critical for

09:57:20  15   counselling and intervention against alopecia.  These findings are

09:57:24  16   critical for pretherapy counselling, the identification of risk

09:57:29  17   factors, and the development of interventions that could mitigate

09:57:33  18   this psychosocially untoward event."

09:57:36  19   Q.  And this article also has a photograph of Grade 1 alopecia and

09:57:42  20   Grade 2 alopecia.  Do you see that, Doctor?

09:57:45  21   A.  I do.  So the -- the -- the -- I -- I would consider that the

09:57:52  22   terms the used in this article, the Grade 2 alopecia, would -- I --

09:57:56  23   I -- I would consider is what they consider high grade.

09:57:59  24   Q.  What is the value of more information as opposed to less

09:58:04  25   information when evaluating a spontaneous case report?  And I will

1942

09:58:08  1    put up on the ELMO a document that I will mark as Exhibit No. 34.

09:58:21  2    A.  Okay.  So -- so -- so let's consider what -- when one is doing

09:58:28  3    an analysis, one would like to have the best understanding you can

09:58:34  4    of the clinical situation.  One of the -- one of the questions that

09:58:43  5    from a corporate side would like to understand is -- is what role

09:58:49  6    is Taxotere potentially playing in -- in the event, and is there

09:58:57  7    anything to suggest that there are certain conditions in the -- in

09:59:04  8    the patient population or certain -- that would be important to

09:59:13  9    note, or is -- is -- is there -- are there other factors that might

09:59:21 10    be accounting for alopecia?

09:59:23 11         So in general -- in general one likes to have as much

09:59:29 12    information as possible.

09:59:30 13         Now, sometimes I think that results in doctors, perhaps,

09:59:36 14    ordering more tests than -- than -- that they would like to order.

09:59:42 15    But -- but, in general, when it comes to clinical assessment, one

09:59:47 16    wants to know as much information about the case as possible.

09:59:49 17    Q.  All right.  Without -- without -- we're going to come back to

09:59:53 18    this, but is this -- is this demonstrative, does this give a little

09:59:58 19    bit of context in terms of information that ideally you would like

10:00:01 20    to have in evaluating a case report of a man or woman who is having

10:00:09 21    a side effect of Taxotere?

10:00:12 22    A.  Well, this -- this case or -- or the document that you were

10:00:19 23    displaying indicates many considerations that we would want to

10:00:27 24    understand when evaluating a case of alopecia in -- and I think

10:00:36 25    we've already talked about one of those cases.

10:00:39  1          I see at the bottom you have hormonal therapy.

10:00:41  2   Q.  Right.

10:00:42  3   A.  And I've already talked about hormonal therapy being a very

10:00:46  4   common therapy in women with -- with breast cancer.  Keep in mind

10:00:51  5   the vast majority of the cases of the ones that we discussed today

10:00:55  6   are women with breast cancer.

10:00:57  7   Q.  We talked about chemotherapy drugs that cause alopecia, right?

10:01:01  8          In terms of the top of the chart it says, "treatment

10:01:05  9   dates."  Well, when did the alopecia occur with respect to when was

10:01:12 10   Taxotere received?  We noted that many of the combination regimens

10:01:19 11   involved giving a sequential combination instead of a concurrent

10:01:24 12   combination, such as receiving the FEC followed by the Taxotere.

10:01:32 13   That's the epirubicin combination plus Taxotere.  Or other times

10:01:36 14   it's the Adriamycin, such as AC, followed by Taxotere.

10:01:42 15          Well, if -- if you recall the -- the labelling

10:01:48 16   information --

10:02:29 17       (WHEREUPON, THE VIDEO WAS PAUSED AND A DISCUSSION WAS HELD OFF

10:02:29 18        THE RECORD.)

10:02:29 19       (WHEREUPON, THE VIDEO WAS RESUMED.)

10:02:33 20   A.  In terms of the top of the chart it says, "treatment dates."

10:02:33 21   Well, when did the alopecia occur with respect to when was Taxotere

10:02:46 22   received?  We noted that in many of the combination regimens

10:02:46 23   involved giving a sequential combination instead of a concurrent

10:02:49 24   combination, such as receiving the FEC followed by the Taxotere.

10:02:56 25   That's the epirubicin combination plus Taxotere.  Or other times

10:03:04  1   it's the Adriamycin, such is, AC followed by Taxotere.

10:03:08  2           Well, if -- if you recall the -- the labelling

10:03:13  3   information, there's a very high percent of patients who received

10:03:18  4   those drugs in their own right who developed alopecia.  So, if you

10:03:24  5   have a 90 percent expectation that the -- that the drug is going to

10:03:34  6   cause alopecia and you notice alopecia with -- with the regimen,

10:03:44  7   the one question is:  Did the alopecia occur even before the

10:03:44  8   Taxotere was given?

10:03:44  9   Q.  Right.  What about dose?

10:03:44 10   A.  The -- one wants to know that one is giving a proper dose

10:03:51 11   and -- and not an overdose.  So -- so knowing the dose and knowing

10:03:54 12   the time is making -- knowing -- one of the assessments you want to

10:04:00 13   know is whether the -- the patient received medication along the

10:04:03 14   lines of what's prescribed in our labelling.

10:04:10 15   Q.  Now, we're going to get --

10:04:10 16   A.  In other words, the company would want to know if you're

10:04:22 17   following the -- the way that the medicine is supposed to be given

10:04:22 18   in terms of dose.  You would want -- you would want to have that

10:04:23 19   information.

10:04:23 20           Obviously, there are other medications that may cause

10:04:27 21   alopecia that are not normally used in a chemotherapy regimen.

10:05:17 22   Q.  And generally speaking, when you talk about going over the

10:05:17 23   cases, what did your review include?

10:05:41 24   A.  Well, my review included looking at the -- the case.  Usually,

10:05:41 25   the CIOMS.  Trying to transcribe that case into my notes so that I

10:05:41  1   would be able to quickly respond to the case without having to

10:05:41  2   reread the entire case in -- in detail.

10:05:41  3           I -- I reviewed or tried to review, when there was

10:05:51  4   co-medications mentioned, which of those medications might have

10:05:51  5   caused alopecia or have alopecia in the -- in the label or

10:05:51  6   publications.

10:05:51  7           I -- I tried to review the case in terms of whether or

10:05:51  8   not there was sufficient support to show that the case was going

10:05:51  9   beyond six -- six months duration.  In many of these cases, there's

10:05:54 10   no clear documentation or it is unknown that these cases were going

10:05:54 11   beyond six months duration.  There was some cases where I -- I felt

10:06:22 12   that the documentation showed that it was less than six months in

10:06:22 13   duration.  I tried to understand their regimens that -- that the

10:06:22 14   case was receiving.  In some cases, that meant going back to an

10:06:22 15   abstract such as the ones that were provided in exhibit, or

10:06:28 16   referring to a regimen discussed in that abstract, such as the

10:06:46 17   exhibit that we had on -- on the PACS 01 trial.

10:06:46 18           The analysis also included paying particular attention to

10:07:32 19   the antihormonal agents and trying to categorize and note with the

10:07:32 20   cases if they were serious or not.  I paid attention to were these

10:07:32 21   adjuvant breast cancer or metastatic breast cancer when indicated,

10:07:32 22   what was the indication.  Was the indication being provided?

10:07:32 23   Q.  Doctor, if you look at Exhibit No. 38, it's the clinical study

10:07:33 24   report.

10:07:33 25   A.  This is the ten-year follow-up --

10:07:33  1    Q.  Yep.

10:07:33  2    A.  -- study report, correct?

10:07:33  3    Q.  Do you agree with me -- and you can look at the monitor if you

10:07:33  4    want, that the study completion date was January 25th, 2010,

10:07:46  5    correct?

10:07:46  6    A.  For the ten-year study report, correct.

10:07:46  7    Q.  Right.  Oh, now -- well, since you mentioned it, let's just

10:07:46  8    confirm that.  And the previous version was interim at 55 months,

10:07:52  9    and that was in January 2004, correct?

10:07:54 10    A.  That's correct.  The study was planned to have interim analysis

10:08:00 11    and a ten-year analysis, and that's what that reflects.

10:08:04 12    Q.  During your -- the testimony that you are giving on -- from

10:08:11 13    your lawyers, you referenced a patient with a patient number of

10:08:17 14    12403.  Do you remember that?  12403?

10:08:22 15    A.  This is on the TAX316 study?

10:08:25 16    Q.  Yes.

10:08:25 17    A.  Okay.

10:08:27 18    Q.  Do you remember that?

10:08:27 19    A.  Yes.

10:08:29 20    Q.  Can you see the patient number 12403?

10:08:32 21    A.  I do.

10:08:33 22    Q.  Okay.

10:08:33 23    A.  I do.

10:08:33 24    Q.  Do you see that your company made representation to regulatory

10:08:38 25    authorities that the last follow-up date with this particular

1947

10:08:51  1   patient was in 2009?  Do you see that?  And at the time -- do you

10:08:55  2   see that, sir?

10:08:56  3   A.  I -- I do.

10:09:08  4   Q.  Now, the material that you were given by the lawyers for your

10:09:08  5   company, is this document right here.  You guys entered it as an

10:09:09  6   exhibit when you were testifying.  Do you see the date on this

10:09:19  7   document, December the 9th, 2003?

10:09:25  8   A.  I do.

10:09:25  9   Q.  All right.  So the last follow-up that you were given related

10:09:30 10   to this patient was from December of 2003, but the last follow-up

10:09:47 11   according to regulatory submissions regarding this patient from

10:09:47 12   your company was some six years later.  Do you see that?

10:09:56 13   A.  I -- I -- okay.

10:10:33 14   Q.  That was one of the three examples that you gave of people who

10:10:33 15   should not be part of the persistent alopecia group at the end of

10:10:33 16   the follow-up study --

10:10:33 17   A.  But --

10:10:33 18   Q.  Let me -- let me ask you this:  Do you believe that you were

10:10:33 19   provided with a single follow-up line item data sheet that went

10:10:33 20   beyond the year 2003 as part of your preparation for today's

10:10:33 21   deposition?

10:10:33 22   A.  Was I provided with a single line item data sheet beyond 2003?

10:10:42 23   Q.  For the 29.

10:10:42 24   A.  In -- in my preparation in terms of if a patient showed

10:10:57 25   resolution, including data sheets that may have been derived from

10:10:57  1    the interim study report, if it showed a resolution, I would

10:10:57  2    consider that patient resolved.

10:10:57  3    Q.  Can you answer my question?  Do you believe that you were

10:10:57  4    provided with a single, by the lawyers who gave you the information

10:11:01  5    that you were relying upon, that you previously testified you don't

10:11:29  6    know whether it's complete or not, do you believe that the lawyers

10:11:29  7    gave you any follow-up data, data lines, after 2003, when you were

10:11:29  8    commenting about a study that ended in 2010?

10:11:29  9    A.  The ten-year follow-up ended in 2010.  If you look at the --

10:11:29 10    Q.  Can you answer my question, please?

10:11:29 11    A.  I don't -- I don't -- I don't know.  It's not -- it's not a

10:11:29 12    question that I had considered.

10:11:29 13    Q.  If you would look at Exhibit 39, just under the last patient

10:11:37 14    that we discussed under 12403, you'll see patient reference 12612.

10:11:46 15    Do you see that patient?

10:11:51 16    A.  Yes.  Yes, I do.

10:11:51 17    Q.  Do you see the representation made by Sanofi to regulatory

10:11:51 18    authorities regarding that patient in March of 2012 that the last

10:11:57 19    follow-up date with this patient was on June the 16th of 2009?

10:12:07 20    A.  I see the date of follow-up was June the 16th, 2009.

10:12:11 21    Q.  And according to the representations made by Sanofi to

10:12:15 22    regulatory authorities in 2012, that at the time of last follow-up

10:12:20 23    in June of 2009, 10.02 years in duration, that alopecia was ongoing

10:12:27 24    at the end of the follow-up period.  Do you see that representation

10:12:30 25    that's been made?  Third from the bottom, Patient 12612.

10:12:55  1    A.  Okay.  Yes.

10:12:55  2    Q.  All right.

10:12:55  3    A.  I see that.

10:12:55  4    Q.  But the material you were provided by the lawyers regarding

10:12:55  5    this patient is dated 2003.  Do you see that?

10:12:55  6    A.  I want to remind you that all of the patients of the 29 and the

10:12:57  7    6 -- and the 16 that were reviewed were analyzed as ongoing at the

10:13:03  8    end of the follow-up period.

10:13:04  9         The question is not whether it was ongoing at the end of

10:13:09 10    the follow-up period; the question was whether it meets the -- the

10:13:16 11    definition of -- of the persistence.  And that is why you have the

10:13:16 12    29 and the 16 because there -- so -- so you can -- you can go

10:13:19 13    through these, and it -- and it says, "ongoing" at the end of the

10:13:35 14    follow-up period, which is exactly what the table and study report

10:13:35 15    says with the patients.  But then next step that we went through,

10:13:35 16    as was detailed, was whether it meets the criteria.

10:13:35 17    Q.  Sir, did you -- can you answer my question?  Did you realize

10:13:46 18    that you -- that the information that was given -- that was given

10:13:46 19    to you in terms -- in terms of the patient data stopped in 2003,

10:13:48 20    six years before the end of the study?  Did you realize that when

10:14:00 21    you were reviewing it?

10:14:00 22    A.  I realize that much of the data that we were utilizing was data

10:14:00 23    that was available in the 55-month analysis.

10:14:01 24    Q.  Then why didn't you tell the jury that when you were

10:14:05 25    pontificating about the fact that you reviewed the full ten years

10:14:08  1    of follow-up data?

10:14:13  2    A.  I believe what I said to the jury, I think I went through and

10:14:13  3    detailed exactly how the analysis was -- was conducted.  And if

10:14:17  4    there was evidence of resolution or evidence of persistence, you

10:14:36  5    know, if there was evidence of persistence, then we certainly would

10:14:36  6    want to know was there any resolution beyond the 55 months.  But if

10:14:36  7    there was evidence of resolution, then the question was addressed.

10:14:41  8    If it resolved, it resolved.  If it resolved within the 55 months,

10:14:56  9    it resolved.

10:14:56 10    Q.  Let me ask you this:  When did Sanofi research and study

10:14:56 11    Taxotere and permanent alopecia in a clinical trial setting so that

10:14:56 12    you could make sure that you had all of this case assessment

10:15:01 13    information that you wanted to study, permanent alopecia and your

10:15:08 14    drug, whether in a monotherapy setting or in combination with

10:15:08 15    others?  When did you do that?

10:15:09 16    A.  Well, I previously testified that in the conduct of a clinical

10:15:14 17    trial, we don't restrict the gathering of safety information.  Only

10:15:19 18    to an event, or one event, such as alopecia, but we gather all

10:15:23 19    safety information.

10:15:26 20         Within the -- within the study of -- of recovery of

10:15:33 21    alopecia I previously cited that I think the best study trying to

10:15:38 22    control for these factors was the TAX316, which was initiated, I

10:15:44 23    believe, in 1997.

10:15:47 24    Q.  Didn't you previously testify in this very deposition that the

10:15:51 25    company had only limited information with respect to many of the

10:15:57  1  adverse event reports?

10:15:59  2  A.  I did.

10:16:01  3  Q.  Okay.  And all that I asked you previously was:  Wouldn't you

10:16:06  4  agree with me that the company didn't have the outcome information

10:16:09  5  or all of the information that the company would have liked to have

10:16:12  6  had in many of the adverse event reports that we discussed?  The

10:16:24  7  answer to that is yes, right?

10:16:24  8  A.  Well, you --

10:16:24  9  Q.  It didn't have all of the information that you wanted?

10:16:24 10  A.  I'm sorry.  You asked about processing.  So there's information

10:16:24 11  that we would like to have, but there's information that we need to

10:16:28 12  have for processing; and what I am drawing the distinction of is

10:16:31 13  there can be two groups of information.

10:16:34 14       All of those cases with limited information, obviously,

10:16:38 15  were processed and had sufficient information to process, but there

10:16:41 16  were limited information in terms of determining aspects such as,

10:16:46 17  you know, likelihood of cause.

10:16:49 18  Q.  Okay.  Let me mark and show to you Exhibit 45, which is a

10:17:12 19  document that may be more instructive on the issue of whether or

10:17:12 20  not there was an effort by the company to track alopecia as a side

10:17:27 21  effect for patients in TAX316, and I've got this on the ELMO.

10:17:27 22       What do these headings reflect, and how do these headings

10:17:28 23  differ from Exhibit 39 that was marked and shown to you by

10:17:32 24  Mr. Bachus?

10:17:33 25  A.  Well, I think this is a document based on the date of 15th of

1952

10:17:43  1    March 2012, so it would be based upon the ten-year data.   And in

10:17:49  2    contrast to the document shown by Mr. Bachus, you can see the

10:17:53  3    header of this document shows date of last follow-up of the adverse

10:17:58  4    event.

10:17:58  5    Q.  What does that mean?

10:18:00  6    A.  Well, that means if you want to see when was the last date that

10:18:05  7    the alopecia was actually recorded or had a follow-up, whether that

10:18:13  8    follow-up was resolved or ongoing but had a follow-up evaluation,

10:18:16  9    that would be shown in this document in the second-to-right column,

10:18:24 10    as opposed to the one that Mr. Bachus had shown us, which is only

10:18:28 11    the date of the last follow-up for the patient.

10:18:31 12            And on the right-hand column, you will have the duration

10:18:35 13    of the follow-up for that adverse event.   So if you really want to

10:18:41 14    determine the dates of the follow-up for alopecia, you would use

10:18:46 15    this document looking at the -- particularly looking at the last

10:18:50 16    two columns.

10:18:51 17    Q.  And was this document and this evaluation done independent of

10:18:54 18    your analysis?

10:18:55 19    A.  Yes, it was.

10:19:07 20    Q.  And --

10:19:07 21    A.  It was done in 2012.

10:19:07 22    Q.  Okay.  And are there a couple individual patients that are

10:19:07 23    listed here that are of interest to you that you want to talk about

10:19:09 24    briefly in greater detail?

10:19:11 25    A.  Well, I think all of the patients are of interest.  If you --

10:19:17  1   if you look down the entire list, you can see that, particularly

10:19:20  2   when you go to the -- it's even clearer on the next page, that the

10:19:26  3   vast majority of patients in the TAC arm have alopecia.  And,

10:19:32  4   again, this refers to, you know, patients that we had previously

10:19:41  5   looked at, including those with Mr. Bachus.  You can see the

10:19:45  6   numbers on the right are all, for the most part, very short

10:19:50  7   duration in years.  Most of them indicate less than six months of

10:19:59  8   duration.

10:20:00  9   Q.  And that's duration of alopecia?

10:20:01  10  A.  That's duration of alopecia.

10:20:03  11  Q.  Let's focus on Patient 40401.

10:20:03  12  A.  Okay.

10:20:10  13  Q.  What does the Exhibit 45 reflect in terms of duration of

10:20:14  14  alopecia?

10:20:14  15  A.  Well, if you look at -- this demonstrates the difference

10:20:24  16  between the document and Mr. Bachus, the way he interpreted, and

10:20:31  17  the actual duration of the alopecia.  So if you look in the

10:20:35  18  previous Exhibit 39 of Mr. Bachus, underneath 40401, which is

10:20:41  19  page -- numbered page 2 out of 32 --

10:20:41  20  Q.  Yes.

10:20:47  21  A.  -- you see that the last date reflected here is October 2008

10:20:50  22  and that the duration is 10.24 years.  Now, that's not the last

10:20:56  23  date of the alopecia.  That is when the last follow-up of the

10:21:01  24  patient was.

10:21:02  25           But if you want to know when the date of the ongoing

10:21:07 1    alopecia being followed is for that patient, if you look at this

10:21:11 2    Exhibit 45, underneath 40401, you see that, in actuality, the date

10:21:15 3    of the last follow-up is in September of 1998 and that the total

10:21:23 4    duration of the alopecia in years is 0.14 years, plus 30 days,

10:21:29 5    since the counting started 30 days after the last IV, so less than

10:21:33 6    six months.

10:21:33 7    Q.  Okay.

10:21:34 8    A.  So this is a clarification of ongoing with respect to alopecia.

10:21:40 9    Q.  Okay.  I want to spend my last few minutes talking about

10:21:44 10   Patient 12403, and that's also a patient that was part of the

10:21:51 11   TAX316 study; is that right?

10:21:53 12   A.  That is correct.

10:21:54 13   Q.  In Mr. Bachus's cross-examine of you in December, he asked you

10:22:00 14   questions about Patients 120 -- 12403 and represented to you that

10:22:09 15   was a patient who had alopecia that was ongoing into 2009.  Do you

10:22:13 16   recall that -- those questions?

10:22:15 17   A.  I do.

10:22:16 18   Q.  Okay.  I am going to mark as Exhibit No. 46 a document that I

10:22:22 19   think speaks to that question, and I'll hand you that Exhibit 46.

10:22:37 20   Exhibit -- exhibit -- I have just a few minutes left here.

10:22:37 21          Dr. Kopreski, I want to start here with the date here,

10:22:49 22   July 6, 2010, at the bottom of Exhibit 46.  And what does that tell

10:22:49 23   us, the origin of this document?

10:22:49 24   A.  This would indicate this is -- this is ten-year data.

10:22:55 25   Q.  And does this document also speak to this particular patient

10:23:00   1   12403 that was the subject of questions by you by Mr. Bachus?

10:23:05   2   A.  Yes, I believe it does.

10:23:07   3   Q.  Okay.  And just briefly, tell the jury what is this document

10:23:12   4   and what value does it add in terms of evaluating a particular

10:23:18   5   patient's progress in this particular TAX316 study?

10:23:24   6   A.  Well, this is -- this is the data by a cycle and follow-up

10:23:30   7   period that allows you to assess given events.  And you will see

10:23:39   8   for this patient, the alopecia, contrary to the way that was

10:23:44   9   previously described and the interpretation from Mr. Bachus's

10:23:49  10   document of it being ongoing for the period of time he mentioned,

10:23:57  11   you can see on page 38267 on the bottom where it says, "Follow-up

10:24:07  12   period 601 alopecia" provides an end date of January 1999.

10:24:17  13   Q.  And what does that mean?

10:24:19  14   A.  That means the patient -- alopecia resolved on January of 1999

10:24:27  15   in contrast to the suggestion that Mr. Bachus made that it was

10:24:35  16   ongoing.  This is Patient 02403.

10:24:47  17   Q.  12403?

10:24:49  18   A.  Yeah, 12403.  Mr. Bachus's document it has date of last

10:24:53  19   follow-up is February 2009.  So the last follow-up was in 2009, but

10:25:00  20   the resolution of the alopecia, consistent with my analysis, was in

10:25:05  21   January of 1999.

10:25:10  22          (WHEREUPON, THE VIDEO WAS CONCLUDED.)

10:25:10  23              MR. COFFIN:  Your Honor, may we approach?

10:25:12  24              THE COURT:  Yes.

10:25:22  25          (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

1956

10:25:22  1          MR. COFFIN:  With regard to this Kopreski testimony, your

10:25:28  2   Honor, we now have had Figure A, which is his reanalysis example,

10:25:33  3   shown to the jury, which your Honor specifically said was not, was

10:25:36  4   prohibited, shouldn't have been shown to the jury.  To be clear,

10:25:40  5   this is the deposition testimony of a witness that Sanofi -- was a

10:25:45  6   Sanofi employee, was not an expert.  We never saw this analysis

10:25:48  7   until it was sprung on us at that deposition and then they don't

10:26:29  8   bring him live.  Then they put the analysis up, which your Honor

10:26:29  9   said should not be shown to the jury.

10:26:29  10         Then they show pictures, comparison pictures that have to

10:26:29  11  do with tamoxifen, not an issue in this case.  They show a case

10:26:29  12  assessment, hormonal therapy assessment, sequence of treatment,

10:26:29  13  dosing, other chemotherapy drugs, this man has just given expert

10:26:29  14  opinion on multiple, multiple areas, extremely prejudicial,

10:26:29  15  extremely.  A lot of which has no probative value like tamoxifen.

10:26:29  16  It's really troubling.

10:27:12  17         THE COURT:  What are you asking me?

10:27:12  18         MR. COFFIN:  I mean, quite frankly I think we might have

10:27:12  19  to move for a mistrial.

10:27:12  20         MR. MOORE:  I think your Honor ruled on the designations,

10:27:12  21  I think that happened and --

10:27:12  22         THE COURT:  Yeah, but --

10:27:12  23         MR. MOORE:  The exhibit, I texted Harley because Dave was

10:27:12  24  not in the negotiations with your Honor yesterday.  Harley said

10:27:12  25  that that table was shown to you --

1965

10:39:37  1              MR. MARKOFF:  Your Honor, question about 381.L.  This is

10:39:37  2   the follow-up adverse experiences of one individual --

10:39:37  3              THE DEPUTY CLERK:  State your name.

10:39:37  4              MR. MARKOFF:  I'm sorry, Dan Markoff.  One individual

10:39:37  5   that was part of the 29 from TAX316.

10:39:37  6              THE COURT:  No.  We discussed -- and I know this becomes

10:39:37  7   a little problematic because we have met outside of open court to

10:39:37  8   work through the many and varied depositions that I have gone

10:39:37  9   through, and what I indicated is that these individual reports were

10:39:37 10   not coming in.  But it was that --

10:39:37 11              MR. MARKOFF:  So the rest are two learned treatises, your

10:39:37 12   Honor.

10:39:37 13              THE COURT:  But there was also that -- Harley, you and

10:39:37 14   Dan come up here.

10:39:58 15         (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

10:48:22 16         (WHEREUPON, A RECESS WAS TAKEN.)

10:52:48 17         (OPEN COURT.)

10:52:49 18              THE COURT:  All jurors are present.  Court's back in

10:52:49 19   session.  You may be seated.

10:52:50 20              Mr. Strongman, please call your next witness.

10:52:54 21              MR. STRONGMAN:  Sanofi calls Dr. John Glaspy.

10:53:09 22              THE DEPUTY CLERK:  Doctor, can I have you raise your

10:53:11 23   right hand.

10:53:11 24         (WHEREUPON, DR. JOHN GLASPY, WAS SWORN IN AND TESTIFIED AS

10:53:15 25         FOLLOWS:)

10:53:15  1        THE DEPUTY CLERK:  Thank you.  And you can have a seat.

10:53:19  2    And please state and spell your name for the record.

10:53:21  3        THE WITNESS:  John Glaspy, G-L-A-S-P-Y.

10:53:27  4                    VOIR DIRE EXAMINATION

10:53:27  5    BY MR. STRONGMAN:

10:53:31  6    Q.  Good morning, Dr. Glaspy.

10:53:34  7    A.  Good morning.

10:53:34  8    Q.  Can you please just introduce yourself to the jury, and tell

10:53:37  9    the jury what you do.

10:53:39 10    A.  So my name is John Glaspy, I am a medical oncologist.  I work

10:53:43 11    at UCLA Hospital, I see patients primarily with breast cancer, and

10:53:52 12    I have, play a lot of roles in the regulation internally of our

10:53:56 13    research and our doctors.

10:53:58 14    Q.  And, Dr. Glaspy, do you treat patients regularly?

10:54:04 15    A.  I do.

10:54:04 16    Q.  Explain a little bit about your daily practice with regard to

10:54:09 17    oncology.

10:54:10 18    A.  So I restrict my patient care, I try to, to three to three and

10:54:16 19    a half days a week.  On those days I'll see somewhere between 20

10:54:22 20    and 30 patients with cancer, most of them will have breast cancer.

10:54:29 21    The other days I am doing my research, doing administration, doing

10:54:34 22    paperwork.

10:54:35 23    Q.  And, Doctor, I want to put up your CV and walk through a couple

10:54:43 24    of things here.  And can you go through your educational background

10:54:48 25    for the jury?

10:54:49  1    A.  Starting with college?

10:54:50  2    Q.  Sure.

10:54:51  3    A.  So I have a bachelors of science degree from the University of

10:54:55  4    Santa Clara in California, I received that degree in 1975.  I then

10:55:02  5    went to UCLA and went to medical school, and at night I went to

10:55:07  6    public health school.  So over the four years, I earned an M.D. and

10:55:13  7    an MPH degree, a public health degree.  I then went to internship

10:55:21  8    and residency in internal medicine for three years.  And then I did

10:55:25  9    three years of fellowship, specialized training in blood and cancer

10:55:30 10    disease.

10:55:32 11    Q.  And are you board certified?

10:55:35 12    A.  I am.

10:55:35 13    Q.  And what board certifications do you hold?

10:55:37 14    A.  I am board certified in internal medicine, medical oncology and

10:55:41 15    hematology.

10:55:42 16    Q.  And those are three board certifications, is that correct,

10:55:50 17    Doctor?

10:55:51 18    A.  That's correct.

10:55:52 19    Q.  With regard to your professional experience, can you explain

10:55:57 20    your present position as it's stated on your CV?

10:56:02 21    A.  So I am a professor of medicine at UCLA.  I also hold an

10:56:09 22    endowed share in cancer research at UCLA.  So a donor gave the

10:56:15 23    university a corpus of money that was supposed to support a faculty

10:56:22 24    member who did research; the university did a search and I was

10:56:28 25    awarded the chair, and I've held that for quite awhile now.  I

10:56:32  1    think 2003 was when I sat in that chair.

10:56:36  2    Q.  And I see on your resumé it mentions the Jonsson Comprehensive

10:56:43  3    Cancer Center.  Do you see that?

10:56:44  4    A.  Yes.

10:56:44  5    Q.  Can you explain what that is?

10:56:47  6    A.  That's what I was doing all day yesterday.  So the major

10:56:50  7    universities in the country organize their cancer research and

10:56:56  8    treatment around a central grant that they submit to the federal

10:57:02  9    government, they're called a cancer center grant.  Our cancer

10:57:08  10   center grant is -- supports a center called the Jonsson

10:57:15  11   Comprehensive Cancer Center, which is really a reorganization of

10:57:16  12   faculty, researchers, and patient care and clinical research

10:57:20  13   activities, so it's a virtual center.  It doesn't exist physically,

10:57:25  14   it's a center that applies to the government.

10:57:31  15           And if you win, you get designated as a designated

10:57:37  16   compressive cancer center, and that brings benefits in terms of

10:57:42  17   prestige but also some other things you can access with the federal

10:57:47  18   government.  And we were up for our five-year review yesterday and

10:57:50  19   hopefully it went well.

10:57:52  20   Q.  And when you say you were up for your review, who specifically

10:57:56  21   were you talking with yesterday?

10:57:58  22   A.  So the National Cancer Institute makes us apply every year, but

10:58:06  23   they automatically grant renewal of the grant; except every fifth

10:58:11  24   year, they say, okay.  Now this is a competitive renewal, you could

10:58:15  25   lose the grant; and we have to write, rewrite the grant in total.

10:58:21  1   And then they sent, yesterday there were 25 cancer scientists and

10:58:26  2   doctors from around the country sitting at UCLA, and we had to

10:58:30  3   present to them what we were doing and how things were organized

10:58:34  4   and how many patients we placed on trials and all of those things.

10:58:37  5   Q.  And, Doctor, is being a national compressive cancer center a

10:58:44  6   prestigious thing?

10:58:45  7   A.  It is.  It also helps with participation in some critical

10:58:50  8   programs around the country that you can't participate in without

10:58:54  9   it.

10:58:54  10  Q.  And when you talk about programs, are you talking about

10:58:56  11  research?

10:58:57  12  A.  Everything; research, referrals of patients from national

10:59:06  13  websites, those kinds of things.

10:59:09  14  Q.  Doctor, moving through your CV a little bit more.  Are you

10:59:17  15  involved in the review process for peer-reviewed journals?

10:59:22  16  A.  I am.

10:59:23  17  Q.  And can you explain that for the jury what your involvement is?

10:59:26  18  A.  So there are two kinds of publications:  One are publications

10:59:31  19  that are not peer reviewed, and that means that you write your

10:59:37  20  paper and then the journal will publish it; and those that are peer

10:59:42  21  reviewed, meaning, it has to be sent out to referees who review the

10:59:48  22  publication and make comments.  Frequently they'll say you're not

10:59:52  23  ready to publish, go back and do this experiment, or add this

10:59:57  24  number of patients, or look at this aspect, or don't graph it that

11:00:01  25  way.  It's a way of making sure that the publications carry impact

11:00:11   1    and we can rely better on those publications.

11:00:14   2                  In order to do that, you have to -- somebody has to do

11:00:18   3    that refereeing, and so we share the duty reviewing each other's

11:00:23   4    papers.

11:00:24   5    Q.  And, Doctor, are you a reviewer for some of the most

11:00:28   6    prestigious medical journals in the country?

11:00:30   7    A.  I guess, yes.  Yeah.  Yes.

11:00:32   8    Q.  And that would include the *New England Journal of Medicine;* is

11:00:36   9    that correct?

11:00:37  10    A.  Yes.

11:00:37  11    Q.  And we've also heard about the *Journal of Clinic Oncology*

11:00:45  12    during this trial.  Can you explain what the *Journal of Clinical*

11:00:48  13    *Oncology* is?

11:00:48  14    A.  So the *Journal of Clinical Oncology* has become sort of the

11:00:52  15    central journal for cancer medicine.  So if something has enough

11:00:58  16    national impact that it extends beyond oncology, it might go in the

11:01:04  17    *New England Journal of Medicine*.  But the best articles that are

11:01:08  18    primarily of interest to oncologists more and more are in the

11:01:14  19    *Journal of Clinical Oncology*.  It's become the dominant journal in

11:01:19  20    cancer.

11:01:20  21    Q.  Doctor, in your CV you've also given a list here of numerous

11:01:31  22    lectures and presentations; is that correct?

11:01:34  23    A.  Yes.

11:01:35  24    Q.  And I think if I counted it up, there are several hundred of

11:01:39  25    them listed; is that right?

11:01:40  1   A.  Yes.

11:01:41  2   Q.  And, Doctor, throughout the course of your career, have you

11:01:44  3   given numerous lectures on breast cancer?

11:01:46  4   A.  I have.

11:01:46  5   Q.  And have you given numerous lectures on chemotherapy to treat

11:01:50  6   breast cancer?

11:01:51  7   A.  Yes.

11:01:51  8   Q.  And flipping forward in your CV, you also have a section for

11:02:03  9   research papers that have been peer reviewed; is that correct?

11:02:07  10  A.  Yes.

11:02:07  11  Q.  And you've been published in peer-reviewed journals any number

11:02:12  12  of times; is that correct?

11:02:13  13  A.  That's correct.

11:02:13  14  Q.  And, Doctor, are you involved any societies, professional

11:02:25  15  societies?

11:02:25  16  A.  I am when I remember to pay my dues, and occasionally I am not

11:02:30  17  a member for awhile.  But, yes.

11:02:32  18  Q.  Okay.  And one of the things that I wanted to talk about

11:02:37  19  briefly, tell me about your role with Stand Up to Cancer, what it

11:02:42  20  is and what your role has been historically and what it is

11:02:46  21  currently.

11:02:46  22  A.  So Stand Up to Cancer was the brain child of Laura Ziskin, who

11:02:55  23  was a famous producer, who developed breast cancer and was my

11:02:58  24  patient.  And she became very frustrated with the pace of research

11:03:04  25  in breast cancer and wanted to find out if there was something she

1972

11:03:10  1    could do that was different.

11:03:13  2            So we had a meeting, we convened a meeting of some of the

11:03:17  3    thought leaders in the field and identified areas where we're not

11:03:21  4    very good at -- with the current funding of research, we're not

11:03:27  5    good at cooperating, we're more focused on competing; we're not as

11:03:33  6    focused on breaking through to help the patients as quickly as

11:03:37  7    possible, we're focused on understanding things as well as

11:03:41  8    possible.

11:03:45  9            So she said she wanted to throw her weight as an

11:03:49 10    entertainment person behind a plan to do this.  And our initial

11:03:56 11    thought was -- she got the Oxygen Channel and Oprah to agree to

11:04:01 12    give them an hour to do a fundraiser.  Six other power women in

11:04:10 13    Southern California move circles got wind of this and said, why are

11:04:16 14    you doing that?  If we all put all of our power together, we can do

11:04:20 15    a national road block where when you watch TV -- I don't know if

11:04:24 16    you've noticed, but those nights those hit -- it's every other

11:04:27 17    night now, you can change the channel if you want, but the same

11:04:31 18    thing is on every channel.  The country every two years has a road

11:04:36 19    block, and if you want to watch television, you have to watch the

11:04:40 20    Stand Up to Cancer show.

11:04:42 21            That has developed a fund raising infrastructure, it

11:04:47 22    developed a close relationship with Major League Baseball, you've

11:04:51 23    probably seen people saying "I stand up" and that stuff on

11:04:54 24    television.

11:04:56 25            And it has raised approximately $150 million a year, and

11:05:02  1    we administer that money along the line -- Laura is not with us

11:05:06  2    anymore, but we administer that money along the lines of what Laura

11:05:11  3    wanted.

11:05:12  4             And so that's what Stand Up to Cancer is.  I am just a

11:05:17  5    dumb stand-by person.  It happened because of a magical meeting

11:05:24  6    that just happened in my office because I had a couple of patients

11:05:27  7    that had power.

11:05:28  8    Q.  And is that an organization and a movement that's important to

11:05:32  9    you?

11:05:32 10    A.  It is for both reasons:  One, it's -- I was very close to

11:05:40 11    Laura, and as long as this lives, she lives.  So that's number one.

11:05:44 12    And number two is, I think it's doing good work.

11:05:46 13    Q.  Now, Doctor, in your clinical practice, how long have you been

11:05:50 14    in clinical practice treating cancer?

11:05:52 15    A.  Since -- well, if we don't count fellowship because I was

11:05:56 16    practicing side-by-side with a faculty member, it would be 1985 or

11:06:01 17    '86.

11:06:01 18    Q.  And throughout that time, have you been using chemotherapies of

11:06:07 19    various kinds in your practice?

11:06:09 20    A.  Yes.

11:06:10 21    Q.  And have you been involved in clinical trials at all?

11:06:13 22    A.  Yes.

11:06:13 23    Q.  And explain your involvement in clinical trials.

11:06:16 24    A.  Well, do you mean the process of an individual trial or --

11:06:22 25    Q.  Just what your experience has been.  We'll get into, actually,

11:06:25 1    how a clinical trial works a little bit, but what's your

11:06:28 2    experience?

11:06:29 3    A.  We're very focused on -- because one of the responsibilities of

11:06:33 4    a university is to generate new knowledge, so we're very focused,

11:06:37 5    not just on trying to take care of patients but also trying to make

11:06:44 6    treatments better.  So to do that, you have to do clinical trials.

11:06:49 7            And I've been involved in that since the beginning.  I

11:06:55 8    have personally been the principal investigator on hundreds of

11:06:58 9    clinical trials over the years.  And I've trained fellows for the

11:07:04 10   last 20 years that are also now involved in clinical research at

11:07:09 11   UCLA and around the country.

11:07:12 12   Q.  As part of your involvement, both in clinical trial and in

11:07:15 13   terms of just treating patients on a day-to-day basis, tell the

11:07:18 14   jury what your familiarity is and what your expertise is with

11:07:21 15   regard to the -- we've been calling it label -- but the risk and

11:07:27 16   warning information for chemotherapy drugs.

11:07:32 17   A.  Well, I've been involved in one way with -- in drug

11:07:39 18   development.  I've been fortunate enough to have been involved as a

11:07:42 19   central investigator of several drugs that have gone all the way

11:07:47 20   through to --

11:07:48 21           MR. MICELI:  Your Honor, I have to object, it's outside

11:07:50 22   the scope of his expertise.

11:07:54 23           THE COURT:  I think we're just going through his CV,

11:07:57 24   right?

11:07:57 25           MR. STRONGMAN:  We're talking about his experience, yeah.

11:08:00  1          MR. MICELI:  We are.  And I will not be challenging him

11:08:02  2  as an oncologist.  I will give that up right now.  But I do object

11:08:08  3  to out of the scope of regulatory.

11:08:14  4          THE COURT:  Mr. Strongman -- I am going to allow him to

11:08:18  5  talk about his qualifications and his opinions will be limited to

11:08:24  6  those areas that he is --

11:08:29  7          MR. STRONGMAN:  Thank you, your Honor.

11:08:29  8  BY MR. STRONGMAN:

11:08:30  9  Q.  Go ahead.

11:08:32 10  A.  So I am trying to remember where I was.

11:08:35 11  Q.  Let me ask it this way.  As a doctor treating patients, do you

11:08:39 12  have to understand and be familiar with the label for the

11:08:44 13  chemotherapies that you're prescribing?

11:08:45 14  A.  Yes.

11:08:47 15  Q.  And as part of your practice throughout the 30 plus years that

11:08:51 16  you've been treating patients, do you review those labels?

11:08:55 17  A.  Yes.

11:08:56 18  Q.  And as part of your practice, do you make it your goal to

11:09:02 19  understand what the labels say so that you can know the risks and

11:09:08 20  you can then relay those as appropriate to your patients?

11:09:11 21  A.  Yes.  That's one -- that's not the only reason we look at

11:09:15 22  labels, but, yes.

11:09:16 23  Q.  What other reasons do you look at labels?

11:09:18 24  A.  Well, increasingly over time the FDA labels have come to be the

11:09:26 25  first place you look when you're trying to find out if an insurance

11:28:34  1    A.  If her goal was to optimize her cure rate, yes.

11:28:34  2    Q.  And, Doctor, we've heard a lot about persistent hair loss in

11:28:34  3    this case.  If Ms. Earnest was going to get chemotherapy with a

11:28:34  4    taxane, do you have an opinion as to whether there were any

11:28:34  5    regimens for the treatment of adjuvant breast cancer that did not

11:28:34  6    carry a risk of persistent hair loss?

11:28:34  7    A.  I believe there wasn't.

11:28:34  8    Q.  And finally, Doctor, you have reviewed Ms. Earnest's medical

11:28:34  9    records; is that correct?

11:28:34 10    A.  I have.

11:28:34 11    Q.  And, Doctor, do you have an opinion as to whether there is any

11:28:34 12    medically reliable way to trace Ms. Earnest's current alopecia to

11:28:34 13    Taxotere specifically?

11:28:34 14    A.  I believe it is impossible.

11:28:34 15    Q.  And are the opinions that you're going to offer today, do you

11:28:34 16    hold those to a reasonable degree of medical certainty?

11:28:34 17    A.  I do.

11:28:34 18    Q.  And I want to back up now and talk about just your experience

11:28:34 19    with Taxotere.  Okay.

11:28:34 20         When did you first get introduced to Taxotere and what

11:28:34 21    has your experience in your clinical practice?

11:28:34 22    A.  So we were fortunate to become involved early in the

11:28:34 23    development of Taxotere, so we participated in some of those early

11:28:34 24    Phase II trials.  Drugs go through a Phase I where you're just

11:28:34 25    trying to figure out the dose, a Phase II where you're trying to

11:28:34  1    look for signals of its ability to work in different diseases, and

11:28:34  2    then Phase III where you're trying to see if it's better than

11:28:34  3    what's already out there.  So that's when randomization kicks in

11:28:34  4    and it becomes important to randomize at the Phase III level.

11:28:34  5    Q.  And with regard to Taxotere, were you involved in clinical

11:28:35  6    trials?

11:28:35  7    A.  We were.  We were involved in 316 pretty heavily.

11:28:35  8    Q.  And explain what your involvement was, specifically your site's

11:28:35  9    involvement in TAX316.

11:28:35  10   A.  So that's a little complicated.  So the first and most

11:28:35  11   important one is we were a study center, we were putting patients

11:28:35  12   on the trial.  And so that's No. 1.  No. 2, the cooperative group,

11:28:35  13   which at the time was called BCIRG that was doing the trial, the

11:28:35  14   group doing the trial was led by UCLA faculty.  That cooperative

11:28:35  15   group is still to this day, it's not called BCIRG anymore, but it

11:28:37  16   was led by UCLA faculty members.  Dr. Nabholtz and Dr. Slamon were

11:28:37  17   key people at that cooperative group level.

11:28:37  18   Q.  And have you also had experience with Taxotere just in terms of

11:28:37  19   your clinical practice outside of a clinical trial setting?

11:28:37  20   A.  I have.

11:28:37  21   Q.  A couple of questions, Doctor.  Obviously you're getting

11:29:29  22   compensated for your time today; is that correct?

11:29:29  23   A.  Yes.

11:29:29  24   Q.  And your rate is $400 an hour; is that right?

11:29:29  25   A.  That's correct.

11:29:29  1    Q.  And, Doctor, does the University of California system have a

11:29:29  2    compensation plan?

11:29:29  3    A.  Yes.

11:29:29  4    Q.  And do you participate in that plan?

11:29:29  5    A.  I do.

11:29:29  6    Q.  Do you get any exemptions from that plan?

11:29:29  7    A.  No.

11:29:29  8    Q.  Just explain to the jury, do you stand to be able to make just

11:29:29  9    as much money as you want doing outside litigation consulting work?

11:29:29 10    A.  I do not.

11:29:29 11    Q.  Explain that to the jury.

11:29:29 12    A.  So, the university went through several iterations of this and

11:29:29 13    they're thinking of another one in the future.  But they, many

11:29:29 14    years ago before this whole litigation started, decided that we --

11:29:29 15    that faculty members can get some outside income, okay.  So rather

11:29:29 16    than say you can't have any, they said you can have some, and you

11:29:29 17    can't spend more than a day a week of your time doing this.

11:29:29 18             The amount -- do you want me to -- the total amount?

11:29:29 19    Q.  Sure.

11:29:29 20    A.  Okay.  So the total amount in a year is $40,000.

11:29:29 21    Q.  And you participate in that plan?

11:29:29 22    A.  I do.

11:29:29 23    Q.  And, Doctor, you have also, obviously you said you worked in

11:29:29 24    consulting with clinical trials with various drug manufacturers

11:29:29 25    over the years; is that correct?

1988

11:29:29  1    A.  That's correct.

11:29:29  2    Q.  And as part of your work in that, is there compensation

11:29:29  3    involved?

11:29:29  4    A.  There's compensation to the university, not to me.  So it comes

11:29:29  5    in under my name, but the check is written to the Regents of the

11:29:29  6    University of California.

11:29:29  7    Q.  Very good.  All right.  Let's take one step back even from

11:29:30  8    Taxotere.  Can you explain what cancer is and how it works?

11:29:30  9    A.  So cancer is a -- you can think of it as a loss of an

11:29:30 10    instruction book on the part of cells.  While I've been talking to

11:29:30 11    you today, just in this little bit of time, I have made maybe 80

11:29:36 12    billion blood cells.  In order to do that, my bone marrow has been

11:29:41 13    divided like crazy.  And because there are millions of genes that

11:29:45 14    have to be copied, mistakes are happening.  I've made mistakes

11:29:51 15    while we've been sitting here.

11:29:53 16          Our body is set up to correct those mistakes.  You have

11:29:57 17    incredible apparatus in the cells to find those mistakes and fix

11:30:03 18    them.  And then if they can't be fixed, because some cells are just

11:30:08 19    really screwed up, if they can't be fixed, then they either

11:30:13 20    self-destruct or they raise their hand and say, "I am an invader"

11:30:18 21    so the immune system will kill them.  It's an amazing system that

11:30:23 22    we have.

11:30:28 23          So I probably am going to escape today without getting

11:30:28 24    leukemia, probably.  But if that system works, one, it works

11:30:37 25    999,999 out of a million, it eventually is going to fail.  And when

| | | |
|---|---|---|
| 11:30:44 | 1 | that fails, a cell with a mutation survives.  Okay.  It wasn't |
| 11:30:51 | 2 | destroyed.  And then that cell is now unstable because part -- |
| 11:30:56 | 3 | somebody ripped one of the pages of the instruction book out and |
| 11:30:59 | 4 | threw it away.  And so now it's more likely to make a mistake next |
| 11:31:05 | 5 | time and not correct it. |
| 11:31:08 | 6 | And then as time goes on, you pile up these things, |
| 11:31:11 | 7 | they're called mutations, where our DNA is changing, and the |
| 11:31:16 | 8 | simplest cancers like -- breast cancer is a relatively simple |
| 11:31:21 | 9 | cancer -- there will be 50 or 60 million mutations, minimum, in a |
| 11:31:28 | 10 | breast cancer once it's clinically evident as breast cancer. |
| 11:31:34 | 11 | So this process unfolds over time.  This failure of |
| 11:31:37 | 12 | patrolling and gradual instability. |
| 11:31:49 | 13 | So when a cancer is fully developed, it's lost its |
| 11:31:49 | 14 | inhibitions on invading surrounding tissue, it has reopened its |
| 11:31:51 | 15 | ability to float around in the blood stream and eat out of a blood |
| 11:31:55 | 16 | vessel at a distant site and take up and establish a blood supply |
| 11:31:59 | 17 | and take up residence, it's got everything it needs to do to do |
| 11:32:03 | 18 | what cancers do to kill us. |
| 11:32:16 | 19 | That's what cancer is, it's an accumulated failure of |
| 11:32:16 | 20 | these safeguards that we have, that work pretty well.  Most of us |
| 11:32:16 | 21 | make it to reproductive age without getting cancer, which is, you |
| 11:32:18 | 22 | know, how nature designs us. |
| 11:32:32 | 23 | Q.  And, Doctor, with regard to breast cancer specifically, are you |
| 11:32:32 | 24 | familiar with the statistics regarding breast cancer in the |
| 11:32:32 | 25 | population? |

11:32:32 1    A.  Yes.

11:32:32 2    Q.  And what percentage of women will develop breast cancer in

11:32:32 3    their lives?

11:32:33 4    A.  So in the United States it's approximately one in eight.

11:32:37 5    Q.  And with regard to that statistic, that includes all types of

11:32:42 6    breast cancer, correct?

11:32:43 7    A.  It does.

11:32:43 8    Q.  And so that includes both metastatic breast cancer as well as

11:32:53 9    what we're calling in this case invasive breast cancer that hasn't

11:32:57 10   fully metastasized yet?

11:33:00 11   A.  And it also includes noninvasive breast cancer.  Sometimes

11:33:05 12   cancers get found before they invade.

11:33:08 13   Q.  Okay.  Very good.  And with regard to the breast cancer

11:33:10 14   statistics, how many women are living in the United States with

11:33:16 15   breast cancer?

11:33:17 16   A.  I think it's somewhere in the range of 3 million.  They've had

11:33:22 17   breast cancer and are alive and living.  Some of them aren't living

11:33:26 18   with it because it's gone, it's cured.

11:33:28 19   Q.  And I want to back up to 2011 when Ms. Earnest was diagnosed

11:33:32 20   with breast cancer, okay?

11:33:34 21   A.  Okay.

11:33:42 22             MR. STRONGMAN:  May I approach, your Honor?

11:33:44 23             THE COURT:  Yes, you may.

11:34:05 24   BY MR. STRONGMAN:

11:34:05 25   Q.  Doctor, what I've handed you is a document entitled breast

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)     *     16-MD-2740
PRODUCTS LIABILITY LITIGATION    *
                                 *
                                 *     Section H
Relates to:  Barbara Earnest     *
             16-CV-17144         *
                                 *     September 25, 2019
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


DAY 8 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>Appearances:</u>

For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045

JOHN GLASPY - DIRECT

02:01  1    in his report.

02:01  2                MR. STRONGMAN:  He did.

02:01  3                MR. MICELI:  He has a paragraph on page 26 -- and I

02:01  4    will show you, Your Honor -- that all he has -- I left my

02:01  5    glasses down there.

02:01  6                THE COURT:  I can find 26.

02:01  7                MR. MICELI:  I want to make sure it's 26.  There it

02:01  8    is right here.  This paragraph right there.  At the bottom of

02:01  9    that paragraph, it just says "Figure A."  There's no analysis

02:01 10    of what he did with Figure A, and then Figure A is stapled to

02:01 11    the back of his report.

02:01 12                And that's what's concerning.  In his

02:01 13    deposition, he said, I didn't validate anything.  I didn't

02:01 14    review the data.  If the data is wrong, I'm wrong.

02:01 15                MR. STRONGMAN:  This is what --

02:01 16                MR. MICELI:  That's the problem with this.  So this

02:01 17    is why we fought so hard to try to --

02:02 18                THE COURT:  I understand that.  I think you all filed

02:02 19    the wrong motion, if you want to know the truth.

02:02 20                I don't know why, but I think -- I'm going to

02:02 21    allow you to let him define it, and then you are moving on.

02:02 22    That's it.

02:02 23                MR. STRONGMAN:  Can I ask him a question about the

02:02 24    efficacy stuff, unrelated, just so it's -- I don't want

02:02 25    Mr. Miceli to feel like I've left an impression I'm going to

2039

JOHN GLASPY - DIRECT

02:02  1    then talk about it in relation --

02:02  2            THE COURT:  No, I think you can say -- this is what I

02:02  3    will allow you to say:  "What is statistical significance?"  It

02:02  4    gives you an opportunity to review whether or not the drugs --

02:02  5    they just happened to pick the wrong patients or that these

02:02  6    patients did better on this drug.  And that's it.  We will

02:02  7    leave it there.

02:02  8            MR. STRONGMAN:  Okay.

02:03  9            (End of bench conference.)

02:03 10            THE COURT:  Please proceed, Mr. Strongman.

02:03 11            MR. STRONGMAN:  All right.

02:03 12    BY MR. STRONGMAN:

02:03 13    Q.   Doctor, I had asked a question about statistical

02:03 14    significance, and I want to back up and ask a question before.

02:03 15            We are talking about TAC versus FAC, and that study

02:03 16    was aimed at looking at efficacy; is that right?

02:03 17    A.   That was the primary endpoint, yes.

02:03 18    Q.   And can you discuss what the results of the primary

02:03 19    endpoint were with that study and whether they were

02:03 20    statistically significant?

02:03 21    A.   The results were positive, meaning both progression-free

02:03 22    survival -- time to progression -- and overall survival were

02:03 23    better in the TAC than in the FAC arm.

02:03 24            And the difference was statistically significant,

02:03 25    meaning it's unlikely it arose by chance, that it's more likely

**JOHN GLASPY - DIRECT**

02:04  1    an effect of the difference in treatment.

02:04  2    **Q.**   And I think we have already -- I had asked you, you had

02:04  3    reviewed the information that Dr. Kopreski had put together on

02:04  4    the ongoing cases -- do you remember that? -- of alopecia, the

02:04  5    ongoing cases of alopecia, Dr. Kopreski's chart.

02:04  6             Do you remember that?

02:04  7    **A.**   I do.

02:04  8    **Q.**   And, Doctor, in review of that chart, the jury has heard

02:04  9    about 29 cases.

02:04 10             And in the review, were there cases, yes or no, that

02:04 11    didn't meet the definition of persistent alopecia going out to

02:04 12    six months?

02:04 13    **A.**   Yes.

02:04 14    **Q.**   And did that happen in both the TAC arm and the FAC arm?

02:04 15    **A.**   Yes.

02:04 16    **Q.**   And either way, when you look at both, were cases of

02:05 17    ongoing alopecia happening, as the study defined it, in both

02:05 18    arms of the study?

02:05 19    **A.**   Yes.

02:05 20    **Q.**   Doctor, based upon your review of the TAX 316 information,

02:05 21    including Dr. Kopreski's analysis, were there actually 29 cases

02:05 22    of permanent alopecia in the TAC arm?

02:05 23    **A.**   Not documented, right?  I mean, the difference in numbers

02:05 24    is due to the fact that for whatever reason, the patient didn't

02:05 25    have a safety follow-up.  So we don't know what happened to

JOHN GLASPY - DIRECT

02:05  1    that patient.

02:05  2    **Q.**   And can you explain that.

02:05  3    **A.**   So -- I will.  I just --

02:06  4    **Q.**   Can you --

02:06  5    **A.**   So when you look at those 29 cases, some of them did not

02:06  6    have a follow-up at six months.  They had not been followed up.

02:06  7    Even though this may have been seven years ago, the last time

02:06  8    that their hair was assessed on the case report form was less

02:06  9    than six months -- less than seven months after finishing

02:06 10    chemo.  So we don't know whether that patient's hair recovered

02:06 11    or not.

02:06 12         There were patients who weren't in the 29 because

02:06 13    there was a documented recovery date.  Those, we knew they

02:06 14    recovered.

02:06 15         So there were two ways that patients could be on that

02:06 16    list of 29 and not have permanent hair loss:  One was by being

02:07 17    lost to follow-up and actually having their hair recover and it

02:07 18    just was never seen; or the hair recovered.

02:07 19    **Q.**   And the same goes for the FAC arm too, right?

02:07 20    **A.**   Yes.

02:07 21         **MR. MICELI:**  Objection, Your Honor.  It's leading.

02:07 22    I'm sorry.

02:07 23         **THE COURT:**  Rephrase your question.

02:07 24    **BY MR. STRONGMAN:**

02:07 25    **Q.**   Doctor, would that analysis apply to the FAC arm?

JOHN GLASPY - DIRECT

02:07 1   A.   It did, yes.

02:07 2   Q.   I want to turn and talk about Mrs. Earnest, okay?

02:07 3        Doctor, what chemotherapy regimen did Mrs. Earnest

02:07 4   ultimately receive?

02:07 5   A.   She received dose-dense AC, followed by Taxotere.

02:07 6   Q.   And what was the --

02:07 7   A.   And the Taxotere dose was 100 per meter squared.

02:07 8   Q.   And when you look at the conversation we were having

02:07 9   earlier about tumor type, stage, etc., could you explain to the

02:07 10  jury what Mrs. Earnest's cancer type was and what her factors

02:08 11  were.

02:08 12  A.   Yeah.  She had an infiltrating ductile cancer, the most

02:08 13  common kind of invasive breast cancer.  It had hormone

02:08 14  receptors on it.  It did not have HER2/neu on it.  It was in a

02:08 15  lymph node, and so that made it a Stage 2B.

02:08 16  Q.   And, again, do you believe that chemotherapy was

02:08 17  appropriate for Mrs. Earnest?

02:08 18  A.   I do.

02:08 19  Q.   And do you believe that Mrs. Earnest, in order to optimize

02:08 20  overall survival, that she needed a taxane?

02:08 21  A.   Well, yes, with the proviso that that was the only way to

02:08 22  get the highest cure rate.

02:08 23  Q.   And we have talked about Taxol and the risk of neuropathy;

02:08 24  is that right, Doctor?

02:08 25  A.   We did.

**JOHN GLASPY - DIRECT**

02:08 1    Q.   Did Mrs. Earnest have any -- and we are talking about the

02:08 2    time period in 2011 and before.

02:08 3         Are you with me?

02:08 4    A.   I am.

02:08 5    Q.   In that time period, did Ms. Earnest have any risk factors

02:08 6    for neuropathy?

02:08 7    A.   She had prediabetes and high blood sugars.

02:09 8    Q.   Doctor, did Mrs. Earnest then go on hormone therapy as

02:09 9    well?  Is that right?

02:09 10   A.   She did.

02:09 11   Q.   And do you know whether, based on your review of the

02:09 12   records, she is continuing that therapy to this day?

02:09 13   A.   She is continuing it, so far as I can tell from the

02:09 14   records.

02:09 15   Q.   And, Doctor, with regard to Mrs. Earnest's hair loss, is

02:09 16   there any way to rule out the role that Cytoxan would play?

02:10 17   A.   No.

02:10 18   Q.   And same question:  With regard to Mrs. Earnest's hair

02:10 19   loss, is there any way to rule out the role that Adriamycin

02:10 20   could play?

02:10 21   A.   No.

02:10 22   Q.   Is there any way to rule out the role that Arimidex could

02:10 23   play in Mrs. Earnest's hair loss?

02:10 24   A.   No.

02:11 25   Q.   Just a couple of other questions and I will be done.

JOHN GLASPY - DIRECT

02:11  1          When Mrs. Earnest took her regimen, do you know, yes

02:11  2  or no, one way or the other, whether or not she received the

02:11  3  Adriamycin and the Cytoxan weeks before she received Taxotere?

02:11  4  A.   She did.

02:11  5  Q.   And based on your review, did Mrs. Earnest lose her hair

02:11  6  before she started taking Taxotere?

02:11  7  A.   Yes.

02:11  8  Q.   And when you talk about the neuropathy again, what is the

02:11  9  significance of risk factors for neuropathy when you are

02:11 10  evaluating chemotherapy options?

02:11 11          MR. MICELI:  Your Honor, I object to the form.  I

02:11 12  think we spoke about this in chambers, did we not?

02:11 13          THE COURT:  I think you all need to approach.

02:11 14          (The following proceedings were held at the bench.)

02:12 15          THE COURT:  I don't want to have this conversation in

02:12 16  front of the jury, but what I thought I said in chambers is you

02:12 17  couldn't put the chart up because it is what Dr. Carinder said.

02:12 18  So I think you have already asked him what risk factors she

02:12 19  had, and I think that's enough.

02:12 20          MR. STRONGMAN:  Okay.  Thank you.

02:12 21          (End of bench conference.)

02:12 22  BY MR. STRONGMAN:

02:12 23  Q.   Doctor, with regard to chemotherapy and the options

02:12 24  available to Mrs. Earnest, were there any risk-free options?

02:12 25  A.   No, but that's a relatively vague question.  "Risk-free"

JOHN GLASPY - CROSS

02:24 1        There are a lot of good choices for treating

02:25 2 early-stage breast cancer.

02:25 3 A.   I don't think the two statements are contradictory.

02:25 4 Something can be best and other options be reasonable options.

02:25 5 Q.   Okay.  So there are many reasonable options for

02:25 6 early-stage breast cancer?

02:25 7 A.   That's correct.

02:25 8 Q.   The way a woman should be able to make a choice about what

02:25 9 is her best option is that she should have a fully informed

02:25 10 discussion with her doctor, right?

02:25 11 A.   I agree.

02:25 12 Q.   The only way a doctor can be fully informed is if the

02:25 13 company tells them everything they know about their drug,

02:25 14 right?

02:25 15 A.   Yes.

02:25 16 Q.   From a safety standpoint?

02:25 17 A.   And an efficacy standpoint.

02:25 18 Q.   Certainly.  You want to make sure that you get the full

02:25 19 story on both ends, right?

02:25 20 A.   As full as they can know, right.

02:25 21        MR. MICELI:  Your Honor, may I approach the witness?

02:25 22        THE COURT:  Yes, you may.

02:26 23 BY MR. MICELI:

02:26 24 Q.   Do you recognize this article, Dr. Glaspy?

02:26 25 A.   I do.

JOHN GLASPY - CROSS

02:26 1   **Q.**   This is an article that you are a coauthor on, right?

02:26 2   **A.**   That's correct.

02:26 3   **Q.**   This is the publication of the TAX 316 BCIRG 001 study,

02:26 4   right?

02:26 5   **A.**   That's correct.

02:26 6   **Q.**   You were a study investigator on that one?

02:26 7   **A.**   Yes.

02:26 8   **Q.**   You weren't a study investigator for the whole time, were

02:26 9   you?

02:26 10  **A.**   Yes.

02:26 11  **Q.**   You were?

02:26 12  **A.**   I was.

02:26 13  **Q.**   I guess your partner -- is it Linnea Chap?

02:26 14  **A.**   Well, there were two UCLA faculty slots.  One went to

02:26 15  Dr. Nabholtz and one I gave to Linnea Chap.  She was my fellow.

02:26 16  **Q.**   She subsequently left the practice at UCLA, and you

02:26 17  stepped in, right?

02:26 18  **A.**   I didn't give her the -- I didn't give her the authorship

02:26 19  position anymore, that's correct.

02:26 20  **Q.**   You talked to Mr. Strongman a little bit about the TAX 316

02:27 21  study and how people may fall out of the study, and there may

02:27 22  be people that are removed from the study for other reasons

02:27 23  other than just removing their consent, right?

02:27 24  **A.**   Where you would stop collecting safety data, yes.

02:27 25  **Q.**   Let's look at page 79, if we can.

JOHN GLASPY - CROSS

02:27  1            MR. MICELI:  Your Honor, am I allowed to use the --
02:27  2       THE COURT:  Sure.
02:27  3       THE DEPUTY CLERK:  Is this for everyone to see?
02:27  4       MR. MICELI:  Yes.
02:27  5            You know what?  I'm not going to put that one
02:27  6  with my notes on it.  I apologize there.  Everyone in the room,
02:27  7  including myself, would not be able to read it.
02:27  8  BY MR. MICELI:
02:27  9  Q.   I want to direct your attention to the left side of the
02:27 10  page and the first highlighted section.  Do you see that, where
02:28 11  it starts "The intention to treat efficacy and safety analysis
02:28 12  were done as originally and prospectively defined in the study
02:28 13  protocol"?
02:28 14  A.   That's correct.
02:28 15  Q.   Now, a study protocol is something that puts all of the
02:28 16  rules on how that study is going to be conducted and sets it
02:28 17  out, how we are going to administer doses of medicine, how you
02:28 18  are going to collect data, and in part how you're going to
02:28 19  analyze the data, right?
02:28 20  A.   Yes.
02:28 21  Q.   And other aspects as well?
02:28 22  A.   Yes.
02:28 23  Q.   The next highlighted portion on the left side of the page
02:28 24  says:  "Few patients have been lost to follow-up."
02:28 25            I'm going to stop there for a second.  The

JOHN GLASPY - CROSS

02:37 1   **Q.**   I understand.

02:37 2   **A.**   That's why all the staff came from there.

02:37 3   **Q.**   That's why the name of the study is BCIRG 1?

02:37 4   **A.**   001.

02:37 5   **Q.**   001.

02:37 6   **A.**   Right.

02:37 7   **Q.**   If you keep flipping through, Doctor, page 3 of 104, it

02:37 8   starts to list -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,

02:37 9   14, 15, 18, 19, 20, 22, 23, 25, 26, 27, 28, 29, 30, 33, 34, 35,

02:38 10  36, 37 -- 38 individuals affiliated with Sanofi in this

02:38 11  protocol for the study that you were involved, yet when you --

02:38 12  **A.**   Can you --

02:38 13  **Q.**   Excuse me.  Not a question yet, Doctor.

02:38 14  **A.**   Okay.

02:38 15          **MR. MICELI:**  I'll settle down, Your Honor.

02:38 16  **BY MR. MICELI:**

02:38 17  **Q.**   You have -- what did we count up? -- 38 individuals?  And

02:38 18  a number from BCIRG.  But when you needed to form opinions in

02:38 19  this case, you looked at a chart that was put together by a

02:38 20  person that was selected by the attorneys who are defending

02:38 21  Sanofi in this case, who handpicked information, fed it to him,

02:38 22  and then he came up with his chart, and you, sir, relied upon

02:38 23  that in rendering opinions, correct?

02:38 24  **A.**   I don't believe that's a correct statement at all.  So I

02:38 25  wouldn't characterize it like that.

JOHN GLASPY - CROSS

02:38 1    **Q.**   We will talk through it, then.  What we do know is that

02:39 2    the report you provided in this litigation listed a number of

02:39 3    things that you reviewed.

02:39 4           Before you formed your opinions in this case, you

02:39 5    spoke to nobody at Sanofi, correct?

02:39 6    **A.**   That's correct.

02:39 7    **Q.**   You did not list any information in your report about

02:39 8    co-workers or co-investigators at BCIRG?  You followed a chart

02:39 9    written by a man who was a former employee of Sanofi, who was

02:39 10   taken by lawyers and hand-fed information.  You know that,

02:39 11   don't you, sir?

02:39 12   **A.**   I don't.  I don't know that at all.

02:39 13          But what I do know, that he was a former employee of

02:39 14   Sanofi.  But I viewed that as weighing in -- I admitted and

02:39 15   told you in my deposition I look at -- if the data that's in

02:40 16   that table is incorrect, then none of my opinions are valid.

02:40 17   If the data that's there is correct -- the date of the last

02:40 18   visit, the date of the completion of chemotherapy, if those

02:40 19   things are correct, then my opinions hold because I'm aware as

02:40 20   a clinical trialist how these confusions can arise, how people

02:40 21   can look at that and say, "How can this be 10-year follow-up

02:40 22   and you say it was persistent, but the last date you checked

02:40 23   the alopecia was nine years ago?"

02:40 24   **Q.**   Doctor, you don't know that it was nine years ago, do you?

02:40 25   Do you know that it was nine years ago?

JOHN GLASPY - CROSS

02:40 1   **A.**   No, I -- again --

02:40 2   **Q.**   Let me ask you a question.

02:40 3   **A.**   No, but you just asked me -- I need to be allowed to

02:40 4   answer it.

02:40 5              **MR. STRONGMAN:**  Objection.

02:40 6              **MR. MICELI:**  I didn't have a question.  He was

02:40 7   talking.

02:40 8              **THE COURT:**  Excuse me.

02:40 9              **MR. MICELI:**  Yes, ma'am.

02:40 10             **THE COURT:**  He is entitled -- the question was:

02:41 11  "Doctor, you don't know it was nine years ago, do you?  Do you

02:41 12  know that had it was nine years ago?"

02:41 13             You have to answer that question.

02:41 14             **THE WITNESS:**  Yes.

02:41 15             I know that it's listed there as nine years ago.

02:41 16  I have said and I will say again:  If the data in that chart

02:41 17  are wrong, then my opinions are wrong.  All my opinions come

02:41 18  from the chart.

02:41 19             **THE COURT:**  I don't think you answered the question.

02:41 20             Did you know that it was nine years ago?

02:41 21             **THE WITNESS:**  Well, again I --

02:41 22             **THE COURT:**  That's a yes or no.

02:41 23             **THE WITNESS:**  I know it's listed as nine years ago; I

02:41 24  don't know if it actually happened nine years ago, because I

02:41 25  didn't make the chart.

JOHN GLASPY - CROSS

02:41 1              THE COURT:  Thank you.

02:41 2    BY MR. MICELI:

02:41 3    Q.    You didn't make the chart.  You didn't do anything to

02:41 4    validate it either, did you?

02:41 5    A.    That's correct.

02:41 6    Q.    You just accepted what you were given by the same

02:41 7    attorneys that hired Dr. Kopreski to do the analysis, right?

02:42 8    A.    I don't know if they hired him.  I don't know what the

02:42 9    relationship is.

02:42 10   Q.    Okay.  But, Doctor, you are a master's of public health,

02:42 11   and you do a lot of research.  You have authored 178

02:42 12   peer-reviewed medical journals, correct?

02:42 13   A.    Probably more than that, but yes.

02:42 14   Q.    In the CV I have, it has 178.  I counted them and I looked

02:42 15   at the authors to see if I knew any.  I saw Dr. Bosserman.  You

02:42 16   have coauthored with Dr. Bosserman, correct?

02:42 17   A.    That's correct.

02:42 18   Q.    Every one of the papers you have, when you pick it up, you

02:42 19   can look for a section that's called "methodologies," right?

02:42 20   A.    It depends which journal because some journals don't

02:42 21   organize that way.

02:42 22   Q.    The ones that do, you can look at that methodology

02:42 23   section, you can tell exactly what the people did who were

02:42 24   writing that article, right?

02:42 25   A.    Sometimes.  Not always.

JOHN GLASPY - CROSS

02:42  1    Q.   You can't tell what Dr. Kopreski did, can you?

02:42  2    A.   In terms of how he got those numbers?

02:42  3    Q.   No, not how he got the numbers.  How he came to be in

02:43  4    possession of the records, why he did the analysis.  Do you

02:43  5    know anything about that?

02:43  6    A.   Well, I know what he said in his deposition because --

02:43  7    Q.   That's interesting, sir.  Can you turn to your expert

02:43  8    report, in Exhibit A, the materials provided?

02:43  9    A.   Right.

02:43 10    Q.   I want you to read to the jury which depositions you told

02:43 11    me you had reviewed before you gave your opinions.

02:43 12    A.   I don't think he had been deposed yet.

02:43 13    Q.   Oh, he hadn't been deposed.  But you didn't update that

02:43 14    report, did you?

02:43 15    A.   I did not.

02:43 16    Q.   Thank you.

02:43 17    A.   I have my report here.

02:43 18    Q.   Tell the jury if you had reviewed Mr. Kopreski's

02:43 19    deposition before you formed your opinions.

02:43 20    A.   Before I wrote this report, no, I had not.

02:43 21    Q.   You did not update that report for us either, did you?

02:43 22    A.   I did not.  And it didn't change my opinions.

02:43 23    Q.   It may not have changed your opinions, but before we came

02:43 24    to court today, I had no idea you had looked at anything other

02:44 25    than what you had told me you had looked at in forming your

JOHN GLASPY - CROSS

02:51 1   A.    Okay.  So there's that.

02:51 2          And there was interaction with the Canadian

02:52 3   authority.  I saw that.

02:52 4   Q.    Okay.

02:52 5   A.    Okay?  So I'm trying to stay out of --

02:52 6          THE COURT:  Okay.  Maybe you need to get to --

02:52 7          MR. MICELI:  That's fine.

02:52 8   BY MR. MICELI:

02:52 9   Q.    Let me just ask it this way:  Are those two items that you

02:52 10  alluded to information that is not disclosed on your expert

02:52 11  report disclosures?

02:52 12  A.    I think everything is there.  I think it's all there.

02:52 13  Q.    Okay.

02:52 14  A.    I think.

02:52 15  Q.    I'm not going to say agree to disagree, because I don't

02:52 16  want to -- but I --

02:52 17  A.    It's possible.

02:52 18  Q.    You didn't review any -- you didn't review the final

02:52 19  clinical study data, the actual datasets themselves, have you?

02:52 20  A.    No.  Only the ones I had in my physical hand, because I

02:52 21  filled out some of these case report forms, right.

02:52 22  Q.    But as far as what we heard from the statistician last

02:52 23  week who obtained the actual -- and you know what I mean when I

02:52 24  say a "locked clinical trial dataset," don't you?

02:52 25  A.    I do.

JOHN GLASPY - CROSS

02:52 1  Q.   When a clinical trial is run -- after 10 years in the case
02:53 2  of -- actually, more than 10 years; you have treatment and then
02:53 3  you had a ten-year follow-up, right, in TAX 316?
02:53 4  A.   Yes.
02:53 5  Q.   And then you had a period of time of about eight months
02:53 6  where a team of people at BCIRG and Sanofi confirmed and
02:53 7  validated everything, correct?
02:53 8  A.   That's correct.
02:53 9  Q.   And then after that happens, there comes a date where they
02:53 10 call data lock, right?
02:53 11 A.   That's correct.
02:53 12 Q.   And that data is locked and you don't get to change it and
02:53 13 you don't get to violate it, right?
02:53 14 A.   Yeah.  I don't know what the rules are about that, but
02:53 15 there does come a data lock date that's supposed to be final
02:53 16 and it's the analysis set.
02:53 17 Q.   And the statistical analyses are run on that dataset.
02:53 18 A.   That's correct.
02:53 19 Q.   And you know that the statistical analyses that were run
02:53 20 on that dataset, in the clinical study report that you were --
02:53 21 the final ten-year follow-up clinical study report reports
02:53 22 alopecia ongoing as 29 out of 744.
02:54 23 A.   Yeah, and I'm not disagreeing with that.
02:54 24 Q.   Okay.  And --
02:54 25 A.   I'm saying that that's ongoing when the patient was last

JOHN GLASPY - CROSS

02:54 1    seen, yes.

02:54 2    Q.   Well, have you looked at the protocol to see if that's how

02:54 3    they defined it?

02:54 4    A.   That wouldn't be protocol defined.

02:54 5    Q.   Have you looked at the statistical analysis plan?

02:54 6    A.   It wouldn't be there either.

02:54 7    Q.   Where would it be, sir?

02:54 8    A.   It wouldn't be any of those places.  This is the way data

02:54 9    is stored, and then when you punch a button, you can read it

02:54 10   out.  It's up to the person reading it out to interpret what it

02:54 11   means.

02:54 12   Q.   And you haven't looked at the -- you haven't looked at the

02:54 13   SAS programming to determine what it means?

02:54 14   A.   That's correct.

02:54 15   Q.   You haven't looked at the actual datasets, which are

02:54 16   ginormous spreadsheets of data, correct?

02:54 17   A.   That's correct, I did not.

02:54 18   Q.   You haven't looked at those.

02:54 19        And so your understanding of it is just -- comes from

02:54 20   the ether, or is it something that you learned from

02:55 21   Dr. Kopreski?

02:55 22   A.   Yeah, well, I don't think we have discussed ether today.

02:55 23   So --

02:55 24   Q.   Okay.

02:55 25   A.   So where it came from was the blood and guts of doing this

JOHN GLASPY - CROSS

02:55 1  clinical trial, being involved in its planning and its

02:55 2  execution and knowing how it took place, having been involved

02:55 3  in clinical trials over years, and having seen this kind of

02:55 4  interpretation need to be clarified.

02:55 5           But I will say again that if the data that

02:55 6  Dr. Kopreski put in that table isn't accurate, then my analysis

02:55 7  is flawed.  If it is accurate, I will stand by it.

02:55 8  Q.   Okay.  Before we go to that last document I gave you,

02:55 9  let's flip back to page 79 of the Mackey article.

02:55 10 A.   Okay.  I've got it.

02:55 11 Q.   Are you there at the bottom with me?  That paragraph

02:55 12 that's titled "Contributors," you go about four lines down and

02:56 13 there's a "JRM"?

02:56 14 A.   Yes.

02:56 15 Q.   And then you go over about five initials and there's a

02:56 16 "JG."

02:56 17          That's for John Glaspy, right?

02:56 18 A.   There we go.  Yes, it is.

02:56 19 Q.   And if you continue on in that sentence, it says the

02:56 20 individuals whose initials are there participated in data

02:56 21 collection, right?

02:56 22 A.   That's correct.

02:56 23 Q.   And that just means you enrolled patients at your study

02:56 24 center?

02:56 25 A.   No.  It means I filled out those case report forms and

**JOHN GLASPY - CROSS**

02:56  1   made determinations about whether a patient had a toxicity or

02:56  2   relapse or was dead, and made sure that that information got to

02:56  3   BCIRG.

02:56  4   Q.   But the way you operate UCLA's research centers, not every

02:56  5   person that's on a UCLA study has to come to Westwood, correct?

02:56  6   A.   In those days, that wasn't true.

02:57  7   Q.   That wasn't true?  The way it is now is not the way it was

02:57  8   then?

02:57  9   A.   That's correct.

02:57 10   Q.   You don't have to --

02:57 11   A.   We built all these satellites long after this study was

02:57 12   done.

02:57 13   Q.   But then the only people that had access to the full study

02:57 14   data were Miguel Martin, John Mackey, and Charles Vogel, right?

02:57 15   A.   They were more involved in the analysis of the data than I

02:57 16   was, yes.

02:57 17   Q.   Well, what it says here in this article, this

02:57 18   peer-reviewed journal article with your name on it, is their

02:57 19   initials, "as principal investigator and co-chairs of this

02:57 20   study, respectively, had full access to all of the data in the

02:57 21   study and take responsibility for the integrity of the data and

02:57 22   the accuracy of the data analysis."  That's what it says.

02:57 23   A.   Yeah, and that doesn't disagree with what I just said.  I

02:57 24   think we are saying the same thing.

02:57 25   Q.   All right.  Let's look at this last document.  I --