# EXHIBIT T

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION

Docket No.: 16-MD-2740
Section "H(5)"
September 16, 2019
New Orleans, Louisiana

*Relates To*: *Barbara Earnest,*
*Case No.: 16-CV-17144*

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DAY 1, MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Barrios, Kingsdorf & Casteix, LLP
BY: DAWN BARRIOS, ESQ.
701 Poydras Street
Suite 3650
New Orleans, Louisiana 70139

For the Plaintiffs: Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
BY: PALMER LAMBERT, ESQ.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800

back and something that can be disfiguring for a lifetime.

Just think if there is a -- my grandkids, you know, the tattoos -- if my grandkids had, you know, one of those --

MR. STRONGMAN: Objection, outside of the scope of the question.

THE COURT: Sustained. Let's proceed. I think the question was, if they're different, please explain that.

THE WITNESS: They are very different. Just think if you're a patient and I'm going to give you a drug and it's an important drug, there are other drugs that also can be given, and that's going to -- I'm going to say, you know, you're going to have hair loss and it's going to grow back in, you know, three months or six months. You'll say, hey, I'm not going to like that, but I'll probably endure that.

If I know that it's -- or there is a chance that it's going to be permanent, it's never going to grow back, that would be information that you would want.

EXAMINATION BY MR. NOLEN:

Q. And, Doctor, just to crystalize that --

THE COURT: Was there an objection?

MR. STRONGMAN: Go ahead. He finished.

THE COURT: Okay.

EXAMINATION BY MR. NOLEN:

Q. Just to crystalize that, Doctor, alopecia is the issue, right? That's the issue we're here about, permanent alopecia

**BY MR. STRONGMAN:**

**Q.** Ready to proceed?

**A.** I am.

**Q.** Very good. So, Doctor, you can agree with me that your definition of "irreversible alopecia" is in the medical literature, it was generally defined as six months with complete loss of growth or partial regrowth; correct?

**A.** I said the medical literature has generally defined it, right, but do note some exceptions to that.

**Q.** Very good. So there are there are several other definitions in the literature as well; correct?

**A.** Fair. Certainly within Sanofi, et cetera. And different doctors, different publications have different definitions.

**Q.** And, for example, we've seen definitions that go out to 12 months or 24 months, things like that; correct?

**A.** Correct.

**Q.** Okay. But you would agree with me that, most of the time in the literature, it's six months. That's the most common?

**A.** I think that's a reasonable period of time. There's no there's no magic to these numbers.

**Q.** Okay. And what we saw also in the literature is I doubt you saw any definition for what you're calling irreversible alopecia as being less than six months?

**A.** I think that would be correct because, in general, you know, before 2000, it was always expected, you know, that hair

familiar with how Sanofi recorded data?

A. Sure.

Q. Is that represented in their final clinical study trial data, that locked set that you were talking about?

A. Yes.

Q. How many patients did Sanofi record in the final clinical study data, the locked data, with ongoing persistent or permanent alopecia as of the end of the ten-year followup in TAX316?

A. So in 316, on the T arm, the Taxotere arm, there are 29 patients in there who had -- they refer to it in their documents as *ongoing alopecia*. So that was -- yeah, at the end of the study.

Q. Were you able to reproduce those numbers when you ran analyses based upon how Sanofi did them as well?

A. Yes, I can absolutely reproduce the numbers in their clinical study report.

Q. Were you able to verify the length of followup for these patients with ongoing persist permanent hair loss?

A. Yes.

Q. How many of those patients were represented in the final clinical study data as having followup less than six months?

A. So of the 29 patients with ongoing hair loss at the end of the study, of the 29 one of those patients had a followup of less than six months. It was 117 days for one patient.

11:00:27 and miniaturized.

11:00:28 Q. And, Doctor, we're looking at a picture. Is this picture from the medical literature?

11:00:35 A. Yes. This is a picture from a paper that has been published. This is the clinical picture showing the presentation of this condition.

11:00:45 Q. And if you could take us through what the indications are that support a diagnosis of permanent chemotherapy-induced alopecia, please.

11:01:02 A. The classical diagnosis depends on history that is incomplete hair regrowth six months after the end of chemotherapy. And this is Type 2, because there are only two severity grade, unfortunately, because this is what -- the way we grade the severity is just Type 1 and Type 2.

11:01:29 So, this is the severe type, which is called *Type 2*, when you have almost -- you know, involvement of almost the whole scalp with thinning. Severe, severe thinning. And involvement of eyebrows and eyelashes is also very typical.

11:01:50 Q. Explain that to the jury, if you would, eyebrows and eyelashes.

11:01:54 A. Eyebrows and eyelashes are lost as well. Become very thin.

11:01:59 Q. And with a presentation of permanent chemotherapy-induced alopecia, what is the result of a pull test?

11:02:07 A. A pull test is usually negative because they have no hair

with regard to Dr. Kopreski's analysis in his deposition on page 122 of Dr. Glaspy's deposition, the question is: "Okay. Did you have a direct role in the review that was taken that's shown in Figure A?"

Objection to the form.

And then the answer, "I did not have a role in forming the table or writing the table, planning the table, or suggesting that the table be made." That's talking about Figure A in Dr. Kopreski's reanalysis, which is at the heart of this issue.

In Dr. Glaspy's deposition on page 123, the question was stated: "QUESTION: You cannot verify, then, that the material contained in Figure A is accurate or complete?"

There was an objection. And then: "ANSWER: I -- not independently. I -- I can only comment assuming these are the data, this is my conclusion. That's all I can do."

It's very clear that Dr. Glaspy, the defendant's expert, who intends to rely on the Kopreski reanalysis and testimony, did not independently review that analysis and had nothing to do with putting together any of the tables as he testified.

In addition, your Honor, to be clear, the defendant's witness, Dr. Kopreski, is an employee of Sanofi. He is not an expert. He has not been qualified as an expert. He did a post hoc analysis of data that Sanofi's lawyers pulled and put in front of him. It is not an expert report. It's not an expert opinion, and certainly not an expert analysis. Yet, this morning the defendants

will be playing the videotaped deposition of Dr. Kopreski explaining his analysis, and that is highly prejudicial to the defendant -- to the plaintiffs, excuse me. It's highly prejudicial to the plaintiffs because the defendants are allowed to present testimony from a non-expert about a post hoc analysis, and they will not have an expert who has independently reviewed and relied on that information.

So we would ask that Dr. Kopreski's testimony be stricken and not be allowed to be played for this jury, and that Dr. Glaspy not be permitted in any way to rely on that analysis in his opinions. Thank you.

THE COURT: Thank you. Okay. Are we ready to bring in the jury? Okay. Please bring the jury in.

Did y'all want to respond?

MS. SASTRE: I'm sorry?

THE COURT: I thought -- the fevered conversation.

MR. STRONGMAN: No, I think your Honor has already ruled on this. Just based on all of the reasons and arguments previously made. Sorry about that.

MS. SASTRE: Sorry, your Honor.

(WHEREUPON, THE JURY ENTERED THE COURTROOM.)

THE COURT: All jurors are present. Court's back in session. You may be seated.

Good morning. I apologize that we're a little late getting started today. We're just -- the lawyers and I have been