1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   IN RE:  TAXOTERE (DOCETAXEL)    *       16-MD-2740
    PRODUCTS LIABILITY LITIGATION   *
5                                   *       Section H
                                    *
6   Applies to:  All Cases          *       December 5, 2019
                                    *
7                                   *       9:00 a.m.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *

8

9                      ORAL ARGUMENT BEFORE
10              THE HONORABLE JANE T. MILAZZO
                UNITED STATES DISTRICT JUDGE
11

12  Appearances:

13
    For the Plaintiffs:         Bachus & Schanker, LLC
14                              BY:  DARIN L. SCHANKER, ESQ.
                                1899 Wynkoop Street, Suite 700
15                              Denver, Colorado 80202

16
    For the Plaintiffs:         Morgan & Morgan, P.A.
17                              BY:  EMILY C. JEFFCOTT, ESQ.
                                700 S. Palafox Street, Suite 95
18                              Pensacola, Florida 32502

19
    For the Plaintiffs:         Gibbs Law Group, LLP
20                              BY:  ANDRE M. MURA, ESQ.
                                6701 Center Drive West, Suite 1400
21                              Los Angeles, California 90045

22
    For the Sanofi              Irwin Fritchie Urquhart
23  Defendants:                   & Moore, LLC
                                BY:  DOUGLAS J. MOORE, ESQ.
24                              400 Poydras Street, Suite 2700
                                New Orleans, Louisiana 70130

25

1   <u>Appearances</u>:

2

3   For the Sanofi          Shook Hardy & Bacon, LLP
     Defendants:             BY:   CONNOR J. SEARS, ESQ.
                             2555 Grand Boulevard
4                            Kansas City, Missouri 64108

5

6   For the Sanofi          DLA Piper, LLP
     Defendants:             BY:   ILANA H. EISENSTEIN, ESQ.
                             1650 Market Street, Suite 5000
7                            Philadelphia, Pennsylvania 19103

8

9   For the Hospira         Chaffe McCall, LLP
     Defendants:             BY:   JOHN F. OLINDE, ESQ.
                             1100 Poydras Street, Suite 2300
10                           New Orleans, Louisiana 70163

11

12  Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                             500 Poydras Street, Room B-275
                             New Orleans, Louisiana 70130
13                           (504) 589-7778

14

15

16  Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
17

18

19

20

21

22

23

24

25

1                              <u>**INDEX**</u>

2                                                    <u>Page</u>

3   Motion No. 1

4        Connor J. Sears, Esq.                        4
         Darin L. Schanker, Esq.                     10
5        Connor J. Sears, Esq.                       16

6
    Motion No. 2
7
         Emily C. Jeffcott, Esq.                     18
8        Douglas J. Moore, Esq.                      23
         Emily C. Jeffcott, Esq.                     30
9
10  Motion No. 3

11       Emily C. Jeffcott, Esq.                     32
         John F. Olinde, Esq.                        33
12       Emily C. Jeffcott, Esq.                     39

13
    Motion No. 4
14
         Andre M. Mura, Esq.                         41
15       Ilana H. Eisenstein, Esq.                   51
         Andre M. Mura, Esq.                         57
16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(December 5, 2019)**

  **THE DEPUTY CLERK:**  Court is in session.  You may be seated.

  **THE COURT:**  Which one are we doing first, the summary judgment?

  **THE DEPUTY CLERK:**  I believe so.

  **THE COURT:**  Are you ready to proceed?

  **MR. SEARS:**  Good morning, Your Honor.  I'm Connor Sears, and I'm arguing Sanofi's motion for summary judgment on Dr. Gahan's claims.

  **THE COURT:**  Okay.

  **MR. SEARS:**  The crux of Dr. Gahan's claims is that she and her treating oncologist, Dr. Borges, were failed to be warned of the risk of persistent alopecia after chemotherapy. Yet after taking her deposition and Dr. Borges' deposition, it's clear that they both knew of the risk of persistent alopecia after taking Taxotere regimens.  Because of that, they can't establish proximate causation.

  **THE COURT:**  Wasn't it really just anecdotal evidence? I remember Dr. Borges said, "Yeah, I had three patients prior to this, and I sent her a case note."

  **MR. SEARS:**  I'll skip ahead because there are a couple of slides on what they discussed.

  **THE COURT:**  Okay.  Good.

09:32   1            **MR. SEARS:**  So as you mentioned, what Dr. Borges said

2    is she had -- well, let me talk about the breast cancer she

3    had.  She had HER2 positive breast cancer.

4            **THE COURT:**  Right.

5            **MR. SEARS:**  So there is a regimen called TCH, which

6    is the Taxotere regimen.

7            **THE COURT:**  Right.

8            **MR. SEARS:**  Dr. Borges had three patients who were

9    treated before Dr. Gahan who received the same regimen and had

10    persistent hair loss.

11            **THE COURT:**  Right.

12            **MR. SEARS:**  So they talked about that, and they also

13    talked about the Dr. Sedlacek article.

14            **THE COURT:**  Right.

15            **MR. SEARS:**  That's the same article that plaintiffs'

16    experts rely on.  He is an oncologist in Denver, the same place

17    where Dr. Gahan and Dr. Borges live.  This reports a rate of

18    6.3 percent of ongoing alopecia after Taxotere regimens.

19            So this information was all available to her,

20    and Dr. Gahan also independently did research.  She went online

21    and she found the "A Head of Our Time" website, which is the

22    Taxotears group that I think Your Honor is aware of.  There's

23    reports there of women who had ongoing alopecia after Taxotere

24    regimens.  She also did a PubMed search and found additional

25    articles reporting ongoing alopecia after Taxotere regimens.

09:33

1    This is all information that was available to her before making

2    her chemotherapy treatment decision.

3              **THE COURT:**  Right.

4              **MR. SEARS:**  It's interesting when you think about the

5    label now.  The label now says that there's been case reports

6    of ongoing alopecia, but Dr. Gahan actually had more

7    information than that at the time that she made her

8    treatment-related decisions.

9                   So ultimately what we know is that she and

10   Dr. Borges discussed two chemotherapy regimens.  They discussed

11   the ATCH regimen, which is the Taxol regimen, and the TCH

12   regimen, which is the Taxotere regimen.  The key difference

13   between those regimens is that the Taxol regimen comes with

14   Adriamycin.  Your Honor probably remembers it's called the red

15   devil --

16             **THE COURT:**  The red devil.

17             **MR. SEARS:**  -- and that's because there's really

18   nasty side effects with it.  You can have cardiac toxicity

19   which can lead to death and you can have leukemia which can

20   lead to death, but the Taxotere regimen does not have that.

21                  So Dr. Gahan and Dr. Borges had these

22   discussions about which regimen to use, the side effect

23   profiles of the various regimens, the risk of persistent

24   chemotherapy with the Taxotere regimen.  Dr. Gahan weighed all

25   of that and made the choice to take the Taxotere regimen.  So

09:34  1    she had the information available to her, she weighed the
2    options, and she made the choice to take Taxotere.  So because
3    she had the information available to her, she cannot establish
4    proximate causation.
5                In addition, under the learned intermediary
6    doctrine, if the treating physician would have made the same
7    treatment decision with an additional or different warning,
8    then summary judgment is appropriate.  So before Dr. Borges'
9    deposition she had, I think, three meetings with plaintiffs'
10    attorneys, and they provided her with a bunch of stuff,
11    including the Sanofi clinical trials.  I believe they gave her
12    some additional papers.  Dr. Borges read all of that.
13                Then I asked her, "After reading all those
14    materials, would you still make the same treatment
15    recommendation that you made to Dr. Gahan?"
16                She said, "I would."
17                I said, "What about the label change?  Would you
18    make the same treatment recommendation to Dr. Gahan?"
19                She said, "I would," and she would.  She would
20    make the same recommendation because TCH is a better regimen
21    for Dr. Gahan and her age and treatment profiles.
22                So ultimately Dr. Borges had independent
23    knowledge that PCIA was a risk with Taxotere.  Dr. Gahan had
24    independent knowledge that PCIA was a risk with Taxotere.  They
25    discussed that.  Dr. Gahan made the choice to take the Taxotere

09:35   1   regimen knowing of the risk.  There's an independent ground for
2   summary judgment there because you can't establish causation.
3   Then under the learned intermediary doctrine, there's another
4   ground for summary judgment because Dr. Borges would have made
5   the same recommendation.
6          Thank you.
7          **THE COURT:**  I think we are still back to the same
8   thing with learned intermediary.  You guys keep trying to write
9   out any decision that the plaintiff has in this process.  I
10   read carefully what you submitted to me from Dr. Borges'
11   deposition and she talks about, "We discussed it, and then it
12   was ultimately Dr. Gahan's decision."  She said, "I agree.
13   After we had these three robust discussions, this would still
14   be my recommendation, but at the end of the day it's
15   Dr. Gahan's decision."  Can we agree on that?
16          **MR. SEARS:**  We agree on that.
17          **THE COURT:**  Okay.  Good.  So I guess this is what has
18   been -- it's been a fundamental disagreement that I think we
19   have had.  It's the recommendation of the doctor.  It doesn't
20   matter that the patient would not have chosen to take it or the
21   patient has a right to determine what chemotherapy they agree
22   on.  I guess I'm just venting.
23          **MR. SEARS:**  I understand your position.  I read
24   Your Honor's order from -- I believe it was the *Earnest* case,
25   and you went through the various factors and talked about

09:37   1   how --

2           **THE COURT:**  Chemotherapy is not like prescribing

3   amoxicillin or Keflex.  It's a very robust, significant

4   conversation that patients and their oncologists have.  The

5   patient has got to give informed consent.  It's not like when

6   you walk home with an antibiotic or a muscle relaxer.  So it's

7   a little different, but certainly the patient can't prescribe

8   their own chemotherapy.

9               I think it requires more than just saying the

10   doctor would have made this recommendation, period.  I see the

11   learned intermediary as the duty, where does the duty flow to,

12   and it flows to the doctor.  Then it's what happens, would his

13   prescribing decision change.  His prescribing decision may

14   change if the patient says, "I'm not willing to take that

15   risk."

16          **MR. SEARS:**  That's one of the reasons why I focused

17   on the information that was available to Dr. Gahan.

18          **THE COURT:**  The causation argument is -- I will tell

19   you.  I'm less impressed with the learned intermediary, that

20   the doctor would have made the same recommendation.  "Oh,

21   okay."

22          **MR. SEARS:**  When I was trying to think about how to

23   argue this, I was thinking about --

24          **THE COURT:**  Could you speak -- I'm really struggling.

25          **MR. SEARS:**  Sure.

09:39 1      **THE COURT:**  You just have a softer voice.

2      **MR. SEARS:**  I was trying to think about what would

3  have been different today if they had the same conversation --

4      **THE COURT:**  Right.

5      **MR. SEARS:**  -- and really nothing, because she had

6  the same information available to her at the time she made the

7  choice that would have been available to her today.  She knew

8  about the risk.  The label today talks about the risk, which is

9  case reports.  She had the case report information available to

10  her at the time, so there's no difference.  She was informed,

11  she knew that there was risk, and then she still chose to take

12  the Taxotere regimen.

13      **THE COURT:**  Right.

14      **MR. SEARS:**  So that's why --

15      **THE COURT:**  No, I see that.  I will be interested to

16  see what plaintiff has to say in response to that.  When I read

17  Dr. Gahan's deposition, at least those portions of it that were

18  provided to me, she seems to have done significant research, as

19  you would expect.

20      **MR. SEARS:**  Do you have any other questions?

21      **THE COURT:**  Uh-uh.

22      **MR. SEARS:**  Thank you.

23      **THE COURT:**  Thank you.

24          Mr. Schanker.

25      **MR. SCHANKER:**  Good morning, Your Honor.

09:40  1          THE COURT:  Good morning.

2          MR. SCHANKER:  Darin Schanker on behalf of plaintiff,

3    Dr. Gahan.

4                Are you okay?

5          THE COURT:  I'm okay.

6          MR. SCHANKER:  I saw you grimacing a little bit

7    there.

8                If I may, could we address the issue that you

9    just brought up.  As Mr. Sears said, what would be different

10   today?  Defense spends a lot of time focusing on what

11   Dr. Borges knew at the time.  Interestingly, Colorado law

12   interprets what happened in that conversation, in that

13   collaborative decision, to really --

14         THE COURT:  I think what's interesting,

15   Mr. Schanker -- what is problematic for you, in my view, is

16   that Dr. Borges did say, "Since 2011 -- I'm prescribing this to

17   you in 2013 -- I've had three patients that have had persistent

18   chemotherapy-induced alopecia," and then there's this other

19   study, and then Gahan takes that and does this other research.

20         MR. SCHANKER:  If I may, let me address that.

21         THE COURT:  That's what you need to do.

22         MR. SCHANKER:  First of all, I think you used the

23   right -- it's anecdotal information.  Dr. Borges is clear --

24   and it's in our papers -- that she trusted the company.  She

25   trusted that Sanofi would have told her if they had information

09:41  1    on causation.

2                 I asked her specifically in her deposition --

3    and you read it -- if she had known of the clinical trials,

4    would she have passed that information along to Dr. Gahan.  She

5    said absolutely she would have.  If she had known of additional

6    information, if she would have known that the company -- that

7    Amy Freeman, global safety officer, admitted to causation back

8    in 2006, is that information she would have passed on?

9                 As a matter of fact, she got very emotional and

10   teared up during her deposition and explained absolutely.

11   That's information that would have been vital.  Her practice

12   centers on young women who are diagnosed with early stage

13   breast cancer, and she understands how big a deal this hair

14   loss stuff is.  So that is additional information that she

15   would certainly have passed on.

16              **THE COURT:**  You know, when I look at what -- the

17   label today says cases of permanent chemotherapy-induced

18   alopecia have been reported.

19              **MR. SCHANKER:**  It's not adequate.  I don't think we

20   should be seeing that as an adequate label.  That's a false

21   premise, cases have been reported.  That's not what the

22   abundance of information supports, and I think that's a key

23   distinction.  What we instead have is --

24              **THE COURT:**  I think Dr. Gahan said that would have

25   affected her if she had read that.

09:43

1    **MR. SCHANKER:**  That may have affected her, and if

2    that's enough to tip the scale -- and a jury could reasonably

3    find that that information would have been enough because what

4    happened is -- and you are right.  It was a very robust

5    discussion because Dr. Gahan was concerned about this.

6              "Oh, my gosh.  Is it a reality that I may lose

7    my hair and it's not going to come back?"

8              In essence, what Dr. Borges said is, "You know

9    what, I trust the company.  If the company had information that

10   this is real, they would have passed it on."

11             Dr. Borges is not a hair expert.  The three

12   patients that she had that had association of lack of hair

13   regrowth following, she didn't do any kind of background on

14   them to find out are they suffering from androgenic alopecia or

15   some other condition.  She just noted that and she passed that

16   information on, as a good doctor would.

17             Compare that information to the abundance of

18   information that Sanofi had which would have led to a

19   legitimate label change, which then Dr. Borges would have

20   passed on to Dr. Gahan.  It's reasonable that a jury could

21   conclude, you know what, that would have tipped the scale.  A

22   woman in Dr. Gahan's situation, who is this concerned about the

23   hair loss issue, any of that information may have tipped the

24   scale where she would have said, "I'll take another regimen."

25             I think one other important aspect is, when we

09:44 1   are talking about would Dr. Borges have changed her

2   prescription decision, look at what she does today.  Dr. Borges

3   claims she did a retrospective study after all this came up and

4   realized, "Oh, my gosh.  Six percent of my patients are

5   suffering."  She didn't even know that.  Six percent of her

6   patients over a 10-year period were suffering from PCIA with

7   the Taxotere regimen.

8              So guess what she does.  She has adjusted the

9   dosage, and now she pretty much mandates a prescription for a

10  cold cap.  That has eliminated the problem.  That right there

11  is a change in prescription that Dr. Gahan could have

12  reasonably had an opportunity to utilize and she wouldn't be in

13  the situation she is right now.

14             Your Honor, going back to the beginning, as we

15  articulate in our papers, defense skips an important step.

16  That important step because they phrase this on proximate

17  cause -- they phrase it on not proximate cause, but rather on

18  learned.  As you identified in learned, this learned

19  intermediary motion fails.  Proximate cause is a different

20  issue that we spent time talking about, but that's not how they

21  styled their motion.  That's not what they asked for relief

22  concerning.

23             **THE COURT:**  They argued it and you responded to that.

24  It's not just because they put the wrong title.  I'm less

25  concerned about that because I think it's been briefed, the

09:46  1    issue on causation, which is significant.  If she knew that

2    there was an increased risk of permanent alopecia with the use

3    of Taxotere --

4            MR. SCHANKER:  She didn't know that.  She knew that

5    there were anecdotal cases.  That information had been passed

6    on.  As a matter of fact, in her deposition concerning the

7    Sedlaceck study, Dr. Borges poo-poos the study.  She says, "Oh,

8    I know Scott.  Scott is a good guy," Scott Sedlaceck, but again

9    that's just anecdotal information.  That's not reliable

10   science.  "I'm trusting the company.  I'm trusting Sanofi.  If

11   Sanofi knew, they would tell me."  Sanofi didn't tell the

12   doctor, so she wasn't able to pass that information on to the

13   patient.

14           THE COURT:  So, Mr. Schanker, are you telling me that

15   doctors don't rely on anything but information directly from

16   the company; even if they have these reports from other doctors

17   in the field that are seeing this and they are performing case

18   studies and they are reporting this and they are going to these

19   conventions so that they can learn information about what the

20   drugs are doing, that that's information that they should not

21   rely on?

22           MR. SCHANKER:  Well, they certainly rely on their

23   life experiences, which I think is what you are saying.  They

24   absolutely do.

25           THE COURT:  What other doctors are telling them, as I

09:47   1   appreciate it, that's part of these conferences that these

2   medical providers attend.  They hear from other oncologists --

3   and we heard during the course of the trial some have boards,

4   some have complete presentations.  I think the Sedlaceck study

5   was presented at one of these conferences.  Are you telling me

6   that unless the company is reporting it, it's not something

7   that a doctor --

8           MR. SCHANKER:  I'm just telling you Dr. Borges, how

9   she digested it, and then what she claims happened in that

10  room.

11          THE COURT:  Right.

12          MR. SCHANKER:  In that room is, "Yes, I filter that

13  information.  I certainly consider that information," but she

14  isn't going to change what she believes is an effective

15  treatment regimen based on one study and based on anecdotal

16  information.  If she had the abundance of information that

17  Sanofi possessed and failed to pass on, that's a totally

18  different story.  As a matter of fact, now that she has that

19  information, she has completely changed her advisory, her

20  recommendation, and ultimately her prescription.

21          THE COURT:  Thank you.

22          MR. SCHANKER:  Thank you, Your Honor.

23          THE COURT:  Mr. Sears.

24          MR. SEARS:  Just a few points.  I understand your

25  position on the learned intermediary doctrine.

09:48  1          **THE COURT:**  I know, and I know you-all think I'm

2  wrong.  That's okay.

3          **MR. SEARS:**  Just for preservation purposes, we do

4  think it is a causation doctrine.

5          **THE COURT:**  That's okay.  Let me assure you that on

6  any given day 50 percent of the people in this courtroom think

7  I'm wrong.

8          **MR. SEARS:**  So there's a couple of points that were

9  made about the label.  So claims that the current label is not

10  effective are preempted, and you may remember from the

11  preemption argument that Dr. Gahan petitioned the FDA to

12  strengthen the label yet again in 2017 and the FDA said no.

13  They rejected that.

14        Cold caps were discussed.  Those actually were

15  offered to Dr. Gahan, and she rejected them because she didn't

16  want circulating tumor cells in the scalp for fear of

17  metastases and recurrence.

18        As far as the Sedlaceck article, I wanted to

19  note that all of plaintiffs' experts rely on that, and they

20  call it an epidemiological study.  So a claim that is just case

21  reports is inconsistent with the positions that they are taking

22  in this litigation.

23        Ultimately I want to come back to what Dr. Gahan

24  and Dr. Borges knew.  They both knew that there was a risk of

25  PCIA from the Taxotere regimen, and they took that into account

09:50  1    in both saying that she should take Taxotere and then Dr. Gahan

2    choosing to take Taxotere.

3           **THE COURT:**  Thank you.

4           **MS. JEFFCOTT:**  Your Honor, before I get started, I

5    have a copy of a tracked changes version of the allegations.  I

6    don't know if that would be helpful for you to have.

7           **THE COURT:**  I've got it somewhere.

8           **MS. JEFFCOTT:**  May it please the Court.  Good

9    morning.  My name is Emily Jeffcott of the firm Morgan &

10   Morgan, and I'm here on behalf of the PSC.

11                  Presently before the Court is plaintiffs' motion

12   for leave to file their third amended master complaint.  Now,

13   with this amended master complaint, plaintiffs are not seeking

14   to have this retroactively applied to previously dismissed

15   cases, and I think the only allegations that are in dispute

16   are: (1) those allegations in the proposed amended complaint

17   that pertain to the definition of permanent chemotherapy-

18   induced alopecia; (2) those allegations that pertain and really

19   add additional flavor to the plaintiffs' fraudulent concealment

20   claim, which plaintiffs previously pled in their original

21   master complaint.

22                  Now, in the Fifth Circuit, leave to amend is

23   typically given freely absent a showing of undue prejudice, bad

24   faith, failure to correct prior deficiencies, undue delay, or

25   futility of the amendment.  In looking at the case law within

09:52   1   the Fifth Circuit, you see that typically leave is denied when

2   a party seeking to add a new claim of relief, a new cause of

3   action, a new theory of damages --

4        **THE COURT:**  Why so late, Ms. Jeffcott?

5        **MS. JEFFCOTT:**  Your Honor, I respectfully disagree

6   that it is so late.

7        **THE COURT:**  Well, we have tried one of the

8   bellwethers, general discovery is closed, and specific

9   discovery as to the remaining bellwethers, but this is late.

10       **MS. JEFFCOTT:**  Yes, Your Honor.  In terms of undue

11   delay, it's not just the matter of the length of time that has

12   passed.  If you look to the Fifth Circuit decision in -- I'm

13   going to butcher this -- *Dussouy v. Gulf Coast Investors Corp.*,

14   it is not just the length of time that has passed that gives

15   rise to whether or not something is considered to be unduly

16   delayed.  In here the circumstances giving rise to the need to

17   amend is defendants' persistent mischaracterization of the

18   definition of permanent alopecia that applies in this case.

19            Now, here defendants have in summary judgment

20   motions and, in fact, in *Daubert* motions said that plaintiffs

21   are using a single definition to define the instance of

22   permanent alopecia.  Now, in fact, in *Daubert* hearings this

23   past August, defendants said that Dr. Kessler was using a

24   single definition and claimed that he had failed to consider

25   this definition amongst all the evidence, and I stood up here

09:53   1   and showed Your Honor this excerpt from Dr. Kessler's report.

2                    I showed Your Honor this excerpt from

3   Dr. Kessler's report that showed that he had utilized, in fact,

4   multiple definitions for permanent hair loss.  In fact, I also

5   explained that Dr. Kessler had considered these multiple

6   definitions, including the inconsistent definitions provided by

7   Sanofi, in analyzing evidence.

8                    Despite this, Sanofi persisted and even now

9   still claimed that a single definition has been used.  Because

10  Sanofi has persisted and defendants, in general, persisted in

11  claiming that we are using the wrong or the single definition,

12  plaintiffs felt incumbent that they needed to update their

13  pleadings in order to reflect the accurate and science-based

14  definition.

15                   Now, it's not just Dr. Kessler that defendants

16  claim uses a single definition.  Defendants also claim that the

17  remainder of plaintiffs' experts also use the single

18  definition -- Dr. Tosti, Dr. Feigal, Dr. Plunkett, and even

19  Dr. Madigan -- but that's not true.  All of them have looked

20  and considered multiple definitions, and why is that?  Because

21  that's the status of the science.  What I mean by that is the

22  status of the science, the medical literature, what's out there

23  today.

24                   This is an excerpt of a chart of the medical

25  literature pertaining to Taxotere and permanent hair loss.

09:55  1   Now, in the column on the left, it's the definition used in
       2   those studies for permanent hair loss.  As you can see, the
       3   first study, Nabholtz 2001, used a definition of two years.
       4   Notably, Nabholtz was published by Sanofi.  The second study,
       5   Sedlaceck 2006, published five years later, used a different
       6   definition of 12 months.  You really don't see the six-month
       7   definitions come about until 2012 or so, and it certainly
       8   doesn't paint a picture that this six-month definition has been
       9   universally adopted.
      10              I think, in terms of timeliness, it's not just
      11   the timeliness itself that warrants a denial of a motion for
      12   leave.  It's whether or not it causes undue prejudice, which
      13   goes back to Sanofi's assertion that because plaintiffs are
      14   adding or clarifying these allegations that somehow they will
      15   be unduly prejudiced such that discovery will need to be
      16   reopened to consider these, quote, new definitions, but that's
      17   just not the case.
      18              All of this medical literature and the related
      19   opinions from plaintiffs' experts have all been thoroughly
      20   evaluated by Sanofi and the defendants during discovery.  These
      21   are nothing new.  In fact, those definitions that have been
      22   considered by plaintiffs' experts have been evaluated and were
      23   discussed during trial, which would provide another avenue
      24   under Rule 15(b) in order to align really the evidence that was
      25   presented at trial with the pleadings that exist today in terms

09:57  1    of a master complaint.

2                    Now, in terms of the fraudulent concealment

3    allegations, Sanofi and defendants again say that it's

4    prejudicial and that they would be required to reopen

5    discovery, but there isn't really any precise reasoning exactly

6    why it's prejudicial or what new discovery would need to be

7    had.  In fact, there is no surprise with these allegations.

8    They were learned of during discovery.

9                    These new fraudulent concealment allegations,

10   they really are three buckets, with the first bucket being

11   Sanofi's internal audits of its current labeling, the second

12   bucket being statements by foreign regulators regarding the

13   (b)(2) --

14                    **THE COURT:**  Do you need some water?

15                    **MS. JEFFCOTT:**  I do.

16                    -- statements by foreign regulators advising

17   Sanofi that they needed to update their label because of the

18   psychological impacts to these women about not warning of

19   permanent hair loss.  That third bucket is Sanofi's efforts to

20   scrub Facebook from references to permanent hair loss.

21                    Now, these facts were learned of during

22   discovery, Your Honor, and there is no surprise with them.

23   Even Sanofi acknowledged that many of these facts were before

24   the Court in motions in limine, but whether or not evidence is

25   considered admissible has no bearing on whether leave to amend

09:58   1   should be denied.  In fact, if Sanofi has issue with the
2   substance of those allegations, there are appropriate vehicles
3   in which to address them, those being in fact motions in limine
4   and motions for summary judgment, but a motion for leave to
5   amend a complaint is just not one of those vehicles.
6            Now, finally, even if this Court finds that
7   there is some merit to untimeliness or prejudice, the Court
8   also has to consider the prejudice to plaintiffs in denying
9   leave to amend, and here that prejudice is acute.  If leave is
10   not granted, plaintiffs will be in the position of having to
11   individually amend the short form complaints to add these
12   additional allegations to ensure that the correct and accurate
13   and up-to-date definition of permanent alopecia is used.
14            Furthermore and really fundamentally is that
15   this master complaint in a litigation such as this serves as
16   the road map if and when these cases are remanded.  It's
17   incumbent upon us to make sure that this road map, that this
18   master complaint reflects evidence that is accurate and
19   pleadings that are accurate and reflect the state of the
20   science as it is.
21            Thank you, Your Honor.
22            **THE COURT:**  Thank you.
23            Mr. Moore.
24            **MR. MOORE:**  Good morning, Your Honor.  Douglas Moore
25   on behalf of Sanofi.

10:00

1        I don't think it's a secret why this amendment
2    is being advanced.  In opposing the amendment, we want to make
3    clear that we are not opposing it because we believe that if
4    this amendment were permitted that it would change the outcome
5    of any individual plaintiff's statute of limitations.  We are
6    opposing this amendment because we think it's improper, it is
7    prejudicial, and it is futile.
8        In looking at the rules that govern amendments
9    to pleadings, specifically Rule 15, 15(a)(1) is the provision
10    that talks about when you can amend without leave of court.
11    15(a)(2) is the provision that talks about when leave of court
12    is required, and it says that amendments should be freely given
13    when justice requires it.
14        That provision, 15(a)(2), and the imposition of
15    justice is one we think that applies equally to the defendant
16    because the defendant has the right to defend itself against
17    allegations that are not ever changing.  We have the right to
18    have a predictable course of litigation, and the way that's
19    accomplished in the federal rules is in part by Rule 16.  What
20    Rule 16 authorizes a district court to do is impose deadlines,
21    and one of the things specified under Rule 16 for deadlines is
22    a deadline to amend pleadings.
23        We have a deadline in this case.  It was in June
24    of 2018, and it hasn't been complied with.  If you are going to
25    make a filing that is inconsistent with a deadline in a case

10:02   1   management order, you're supposed to come to court and answer
2   the very first question you asked:  Why couldn't you do this
3   before?  Why is this so far past the deadline?  What is the
4   good cause establishing the basis to add these allegations
5   after a case has been tried in this litigation?  That's wholly
6   unaddressed in their motion to make this amendment, and for
7   that reason we think it's improper.
8   We also think it is prejudicial.  When you look
9   at what is sought to be accomplished by this amendment, there
10   are basically three things.  They want to add in allegations
11   about foreign regulatory and foreign labeling that Your Honor
12   excluded from the first bellwether trial, they want to add in
13   allegations about this Facebook business that Your Honor
14   excluded from the first bellwether trial, and then they want to
15   change the definition of the injury that is at issue in this
16   case.
17   We think that we would be entitled to a
18   Rule 12(f) motion on this supposed fraudulent concealment
19   evidence as it being immaterial and impertinent.  It's already
20   evidence that's been excluded in this case.
21   All of the discovery has been completed as to
22   Sanofi, all the expert reports have been served, all the data
23   has been analyzed, and all of that was based on the definition
24   of the injury that was in the complaint, it was in the fact
25   sheets, it was in the motions, it was in the depositions, and

10:03   1    that is permanent chemotherapy-induced alopecia is alopecia

2    that persists beyond six months following treatment.

3                The motion practice that will ensue from this

4    chart, Your Honor, would be legion.  You don't have to look any

5    further than the Prevezas study.  Are the plaintiffs now saying

6    that a plaintiff does not have permanent chemotherapy-induced

7    alopecia until they make it seven years?  Barbara Earnest, five

8    years after treatment, she didn't have permanent

9    chemotherapy-induced alopecia?  Is that the argument that I

10   just heard?  How many people are within seven years of

11   treatment date in this MDL now?  Should we dismiss them all?

12   Is that where this goes?

13               Your Honor, we think that allowing them to

14   change the definition of the injury in the case would require

15   us to file a 12(e) motion for a more definite statement because

16   now we have a definition of an injury that has no discernable

17   onset.  We know the reason they are doing it is because they

18   want to alter or eliminate the onset of the injury because of

19   Your Honor's statute of limitations ruling in *Francis* and

20   *Johnson*.

21               The problem with that is that this definition

22   that they are advancing is inconsistent with what happened to

23   these people.  This is a follow-up period.  There's nothing in

24   Prevezas that says that permanent chemotherapy-induced alopecia

25   starts at seven years.  If you don't have hair at seven

years --

THE COURT:  Doesn't the allegation -- I'm looking at paragraph 194.  "The scientific literature has variously referred to permanent chemotherapy-induced alopecia as occurring between 12 and 24 months following treatment.  Some literature has indicated that it could be deemed persistent six months beyond chemotherapy."

MR. MOORE:  Here's how I would answer that.  What those are referring to are follow-up periods, how a researcher or people at the company analyze clinical data to say if you have a report in your follow-up period of this side effect after this period of time, we are going to put you in the ongoing bucket --

THE COURT:  Right.

MR. MOORE:  -- or the persistent bucket.  But that person who didn't have hair at seven years or three years or two years or 12 months, they didn't have it at six months, and when were they told it was going to grow back?

THE COURT:  Right.

MR. MOORE:  When does hair generally grow back?  What happened to these people -- and we don't know because whenever they took the medicine -- it happened when they took the medicine.  Whatever the medicine did to them, to their stem cells or whatever they are going to say, that happened when they took the medicine.  When did that effect manifest itself?

10:06  1   It manifested itself when something that usually happens, when

2   something that generally happens didn't happen, and we know

3   when that is.

4          Dr. Carinder got on the stand in this case, and

5   we asked him in his testimony -- I brought it with me just so I

6   would quote it properly.  Maybe I didn't.  I thought I had it.

7          Thank you.  I left it behind.

8          What we asked him -- and this is page 1587 of

9   the trial transcript:

10         "QUESTION:  And if a patient didn't get their hair

11      back six months after chemotherapy, that would be an

12      amount of time where you would start to be concerned?

13         "ANSWER:  That would be unusual.

14         "QUESTION:  Did you discuss it with Ms. Earnest after

15      she had gone about six months without her hair returning?

16      Was there a discussion between you two about that?

17         "ANSWER:  Yes.

18         "QUESTION:  And did you tell her you were concerned

19      that her hair hadn't grown back?

20         "ANSWER:  I said it's not common.  It's uncommon to

21      see hair take this long to come back.

22         "QUESTION:  Approximately when would you start to

23      have that conversation with the patient?

24         "ANSWER:  I would say six to eight months."

25         What he testified is that hair typically comes

10:07 1   back between six and ten weeks following the administration of

2   chemotherapy.  That's when it generally happens.

3           So the fact that that person whose hair didn't

4   come back when they expected it to, when it generally does for

5   other patients, and the fact that it didn't come back at that

6   time period when their oncologist would expect it to, that same

7   person may not have hair in two years or three years or seven

8   years, however long the follow-up period is, but that doesn't

9   change the definition of the injury.

10           The injury has a definition in the medical and

11   scientific literature.  It's that same definition that was

12   espoused verbatim by Ellen Feigal and by many of their other

13   experts as to what the injury in this case is.  So for that

14   reason because an amendment of this nature to change the

15   definition or eliminate the definition to affect the onset date

16   of the injury at issue -- it would be futile because it's not

17   consistent with what happened to these people.  It's not

18   consistent with what their testimony is.  It's not consistent

19   with what their oncologist says.  We don't think it has any

20   impact.

21           We understand why they are doing it, but we

22   think that to allow this amendment, to allow them to put these

23   allegations in that were derived from discovery, the whole

24   fraudulent concealment stuff -- the complaint is supposed to be

25   closed before discovery happens.  We think it would be

10:08  1    incredibly prejudicial, we think it's improper for this
2    amendment to have been advanced, and we ask that Your Honor
3    deny it.
4              THE COURT:  Thank you.
5                   Mr. Olinde.
6              MR. OLINDE:  There's a motion to amend the short form
7    complaints.  I don't know if I need to address that now or
8    whether you-all are doing that now.
9              MS. JEFFCOTT:  I want to do my rebuttal, and then I
10   can handle that.
11             MR. OLINDE:  Very good.  Thank you.
12             THE COURT:  That's not set for oral argument.
13             MR. OLINDE:  Your Honor, we had by agreement said
14   that we were going to set it for oral argument, among the
15   parties.  We sent something to Sam just saying that we were
16   going to include that.  We would ask that we do it.  I think it
17   will save time if Your Honor is willing to hear it.
18             THE COURT:  I'm here.
19             MS. JEFFCOTT:  Your Honor, just a few points.
20                  First, you brought up the issue of whether or
21   not this was untimely.  This motion to amend the complaint is
22   certainly not untimely for the 11,000 plaintiffs who have not
23   undergone or completed individual discovery in this case.
24                  Furthermore, regarding the term of the
25   definition that's been used in this case, defendants claim that

10:10   1   this definition is that permanent alopecia manifest itself no

2   later than six months after the end of chemotherapy.

3             Plaintiffs -- nor plaintiffs' experts -- have

4   never accepted that definition, because that would mean that

5   after six months you don't have your hair return and then you

6   affirmatively are diagnosed with permanent alopecia even if,

7   per se, it recovers it sometime later, and that's not what the

8   science shows.  The signs at minimum says that you have to

9   have --

10            THE COURT:  Well, Ms. Jeffcott, you knew that before

11  2019.

12            MS. JEFFCOTT:  From discovery, Your Honor, that's

13  correct, we did know that, and from the medical literature.

14  What I would say is that the pleadings itself, they are not

15  seeking to add new definitions, but are seeking to clarify

16  what's there already.

17            Six months is the minimum that you need in order

18  to establish permanent alopecia, but that doesn't mean for

19  every plaintiff it manifests or it's knowable within that six

20  months, and that's exactly what the science shows.

21            Opposing counsel states that the 6- to 24-month

22  window is the follow-up.  That's not accurate.  In fact,

23  Nabholtz 2001 looked at two years.  Miteva 2011 required a

24  minimum of one year; and the same thing for Sedlaceck, required

25  that permanent alopecia persist for at least one year.  The

10:11

1    follow-up ranges were much longer than that.  The same thing

2    for Kang.  The follow-up range in that was three years.  So to

3    say that six years is always the black-and-white definition is

4    simply inaccurate, and that's not what the science reflects.

5              Furthermore, the need to address and update the

6    complaint is to ensure that it provides the most accurate and

7    relevant, up-to-date information for those individual

8    plaintiffs that have yet to go through individual discovery and

9    might go through the remand process.  That bears truth for the

10   allegations related to fraudulent concealment.  There isn't any

11   surprise, and it's commonly allowed to amend a complaint to

12   address new facts learned of in discovery.

13             Thank you, Your Honor.

14        **THE COURT:**  Thank you.

15             Do we want to do the short one now?

16        **MS. JEFFCOTT:**  So briefly, Your Honor, plaintiffs

17   filed an amendment to a short form complaint pursuant to the

18   agreed scheduling order in CMO 14.  We met that deadline.

19             I believe defendants are complaining that we

20   incorporated many of the new allegations from the proposed

21   amended third master complaint, and we did that because the

22   motion for leave was still pending.  Now, we offered defendants

23   an opportunity to delay consideration of this, but they

24   refused, so here we are now.

25             Essentially, Your Honor, for the reasons that we

10:13

1  stated in our motion for leave, we believe that it's

2  permissible to update the short form complaint as well and

3  align it with the third amended complaint.

4           Really, the remaining issues that Sanofi and

5  other defendants have, they go to the substance of those

6  allegations.  There is a vehicle to address that, and that's

7  through a motion for summary judgment or an answer.  So really

8  the specific allegations are not at issue with this motion for

9  leave.

10          **THE COURT:**  Thank you.

11          Mr. Olinde.

12          **MR. OLINDE:**  Your Honor, John Olinde.  I'm going to

13  be representing Sandoz, Hospira, and Accord for the purposes of

14  the argument here.  Just for the Court's knowledge, the motion,

15  the docket number is 8577.  It was a motion to amend short form

16  complaints and it was filed about two months ago, but let me

17  explain what happened.

18          This is the three cases that the Court selected

19  for the third trial.  We had one that was for Sandoz, one was

20  for Hospira, one was for Accord.  The way this was supposed to

21  work is that after the selection process you were going to have

22  a week by which to file a short form complaint or to amend your

23  short form complaint, and the reason for that is because you

24  want to take a specific case -- in this case all three of these

25  cases were Louisiana cases.  You were to take that and you were

10:15   1    to determine -- based upon the plaintiff, based upon the state
    2    law, and based upon the defendant, you were supposed to narrow
    3    whatever the allegations were going to be as to that particular
    4    case.
    5            You have a master complaint, which we have
    6    talked about and we have joined in because we agree that this
    7    is very late, but you also have a short form complaint.  The
    8    purpose of that was to narrow the issues in the case so the
    9    Court would know and the parties would know what is this
    10   particular plaintiff going to do in this particular case.
    11           It's all set out.  Pretrial Order No. 37A is
    12   where this is stated, and specifically it tells the parties --
    13   and the Court has issued this.  It says individual plaintiff's
    14   counsel shall tailor the form to correspond to each plaintiff's
    15   claims and allegations.
    16           So what we expected was going to happen is there
    17   was a pending short form complaint in each one of these cases.
    18   The cases are *Wanda Stewart*, *Dora Sanford*, *Alice Hughes*.  What
    19   we expected to get -- because we gave them even an extra week
    20   by which to do this -- is that they were going to take these
    21   Louisiana cases and tell us what Louisiana claims that they
    22   were going to be prosecuting so that we could go to trial.
    23   That's what we expected.
    24           What we got was something completely different.
    25   I have it here, if the Court wants to see it, because it may

10:16   1   make it a little bit simpler to take a look at it.  You can see

2   what was originally filed versus what is proposed now.  If the

3   Court would like to take a look at these two, these are already

4   exhibits to these motions.  One is to the actual motion itself;

5   one is to the opposition.

6           Your Honor, if you take a look at it, one is the

7   current, meaning the one that's in place right now --

8           **THE COURT:**  Right.

9           **MR. OLINDE:**  -- and the other is what is being

10   proposed.  To make it simple so the Court understands exactly

11   why it is that we opposed here, it has to go to the question of

12   case management.  This Court really has known because it has a

13   number of cases -- the *Stolier* case, I know, the *Boeing* case --

14   which this Court has issued.  It has to do with case management

15   as to why you oppose a Rule 15 motion to amend, which is that

16   it has to be something by which the Court has to have control,

17   and because this is an MDL this is even more magnified.  We

18   can't have a situation where you have things which are brought

19   in late, things which can be subject to a Rule 12(b) motion,

20   because it really makes it messy for the Court.  It's something

21   which needs to be cleaned up.

22           Take a look at these two.  Look at the motion,

23   for example, on the current.  If you look at the way that it's

24   set up on pages --

25           **THE COURT:**  4.

10:18   1           **MR. OLINDE:**  -- 4, and you see where it says the

2     venue.  It tells you about what the venue is going to be, and

3     then on page 5 it does the same thing.

4                Now, the way that this was originally done was

5     the plaintiffs put down as you see on page 4 on the current

6     short form complaint -- they basically list all of the various

7     counts as to the defendant in this case.  You see they put down

8     the fraudulent misrepresentations, negligent

9     misrepresentations, and that's No. 13.

10                Look at the proposed --

11           **THE COURT:**  I get it.

12           **MR. OLINDE:**   -- and you see where it has number one,

13     the count, "Strict Products Liability - Failure to Warn."  Now,

14     that is not an LPLA claim.  There is no strict product

15     liability failure to warn.  So we oppose the motion, short form

16     complaint, because this is a Louisiana case that doesn't have

17     this type of allegation.

18                Now, you say, well, there is failure to warn in

19     Louisiana, but take a look at page 12 of the proposed short

20     form complaint, and you see where they put in an LPLA claim,

21     failure to warn.

22                So we think that from the standpoint of the

23     claim itself that the non-LPLA claim which is in No. 13 needs

24     to be dismissed based upon futility.  There is no non-LPLA

25     claims in Louisiana, and we pointed that out.  They haven't

10:20   1   dismissed it.  It's, again, something to prevent having to come
2   back and do another motion.
3          THE COURT:  Right.
4          MR. OLINDE:  Then if you look at the way this is set
5   up on No. 13 -- what you are supposed to do on a short form
6   complaint is that if you have any other additional claims that
7   are going to be alleged, you are to check off the other, which
8   they did on page 4 of the proposed, and they put in the
9   non-LPLA claim.  But then what they do is they try to bring
10  into the short form complaint all of the various allegations in
11  the master complaint, which is something -- if you read these,
12  these really have nothing for do with the 505(b)(2) defendants.
13  There's 32 allegations.  None of them have to do with the
14  505(b)(2) defendants.
15          Based upon looking at a short form complaint,
16  they shouldn't be here.  It's not something which is what this
17  particular complaint was meant to do.  So, again, it's futile.
18  As we have said before, we have been through all of this too,
19  but this is not something which is specific to these particular
20  defendants.
21          Then one other reason we have -- first of all,
22  our objection is non-LPLA claim.  Second is because you are
23  bringing an allegation which has nothing do with these
24  505(b)(2) defendants, plus they are late.  And then third is if
25  you look at the answer to No. 12 -- and this has to do with the

10:22   1    *Alice Hughes* case.

2                   In the original or the current short form

3    complaint, you see where the question is "nature and extent of

4    alleged injury (including duration, approximate date of onset,

5    and description of alleged injury)."  You see where it says

6    "Hair Loss and Thinning - August 2012," very specific.  In

7    fact, in the depositions for Alice Hughes -- the plaintiff

8    deposition, her particular statements -- and the short form

9    complaint, she says the same thing.  Onset was 2012.

10                  Brandon Cox, who is in the courtroom today

11   representing Accord, can answer specific questions about that,

12   but it is something which has been stated and testified to.

13   Look how it's being changed in No. 12 from the proposed.  They

14   are taking out that specific statement about the date of onset

15   even though it's asked.  They are just saying it has to be

16   permanent, irreversible, disfiguring alopecia.

17                  So we believe, Your Honor -- the reason why we

18   came to oppose the short form complaints amendment is because

19   they are all alike.  Every one is like the ones that I have

20   shown you here as to what they are trying to do, which is to

21   bring in a non-LPLA claim.  They are seeking to bring in master

22   complaint allegations that do not involve the 505(b)(2)

23   defendants.

24                  What we are asking the Court to do is not to

25   say, "Go back and amend again," because we are probably going

10:23  1  to be here if we do that.  We don't want that.  What we believe

2  is the best way is to use the Court's broad discretion and to

3  strike the non-LPLA claim, which under Louisiana law all three

4  of these are.  It's clearly something the Court can do and has

5  done in the past.

6           We ask the Court to strike out those allegations

7  on page 4 which are bringing in the master complaint because,

8  again, first of all, it's late.  Secondly, those are

9  allegations which have not much to do with the 505(b)(2)

10  defendants.  Third, we have asked that for the *Alice Hughes*

11  case that this allegation which is trying to change Question 12

12  to take out the date of onset when the plaintiff has already

13  testified as to the date of onset and has confirmed that it's

14  August of 2012 -- and the short form complaints do the same --

15  that that also should not be allowed.

16           So what we are trying to do from a case

17  management standpoint -- and it's really something which going

18  forward is important -- is to make those limitations so it is

19  plaintiff specific, state specific, and also defendant

20  specific, which is not being done here.

21           Thank you, Your Honor.

22      **THE COURT:**  Thank you.

23           Ms. Jeffcott.

24      **MS. JEFFCOTT:**  Your Honor, so going to Section 13 of

25  both the original short form complaint and then the amended, I

10:25  1   think this can explain rather simply the reason that --

2               **THE COURT:**  I can't hear you.

3               **MS. JEFFCOTT:**  I'm sorry.  So between the original

4   and then the amended, plaintiffs removed a number of counts,

5   and really counts that aren't applicable in Louisiana.  The

6   reason that plaintiffs left in Count I is because there are

7   allegations in that count that are applicable to the LPLA

8   failure to warn.  So it wasn't that we were trying to plead a

9   strict product liability, but there are allegations within it

10  that we need in order to plead the LPLA failure-to-warn claim.

11              Now, with regard to the other allegations that

12  are listed in Section 13, some of those are applicable not just

13  to Sanofi, but the regulatory landscape for all Taxotere

14  products as well.  In addition, they include the proposed

15  additions to the third amended master complaint, which we think

16  are appropriate to add to this short form complaint given that

17  the Court has not ruled on that motion for leave.  In

18  particular here, the Court imposed a deadline for amending the

19  complaints and plaintiff complied with it.

20              Now, quickly moving back to, I believe it was,

21  12 on page 4, Your Honor, which was the question regarding

22  nature and extent of the alleged injury, defendants complain

23  that plaintiffs have removed the, quote, date of onset, but

24  defendants failed to note one thing that's in parentheses, and

25  it says "if known."  The plaintiffs in this case misinterpreted

10:27  1   that as what time did they know; was it present sense

2   impression with the hindsight of 20/20 or was it then, in

3   August 2012.  Out of an abundance of caution, plaintiffs have

4   removed that because in August of 2012 they didn't know that

5   their hair loss was permanent.  It's only with the benefit of

6   hindsight and present sense impression.  That's the only

7   reason, the basis for the change.

8             In general, Your Honor, I think the concerns and

9   complaints that defendants voice really go more to the

10  substance of the allegations, which are more appropriately

11  dealt with on a motion for summary judgment when we get closer

12  to trial.

13            Thank you, Your Honor.

14       **THE COURT:**  Thank you.

15            I need to take a 5-minute break.

16       **THE DEPUTY CLERK:**  All rise.

17       (Recess.)

18       **THE COURT:**  Court is back in session.

19            Are you ready?  Mr. Mura.

20       **MR. MURA:**  Thank you, Your Honor.

21            We are here on plaintiffs' motion for a new

22  trial.  This Court's *Daubert* ruling only allowed the Kopreski

23  reanalysis if it was independently verified by qualified

24  experts.  At trial it never was.  Dr. Glaspy was Sanofi's only

25  expert witness, and he testified that "If Kopreski is wrong,

10:33  1    none of my opinions are valid."  In answer to the question,

2    "You didn't do anything to validate, did you?" he said,

3    "Correct."

4            At several different points he explains that his

5    analysis, his agreement with Kopreski, if Kopreski was wrong,

6    he was wrong; if Kopreski was right, he was right.  He could

7    say nothing about whether he had actually validated or

8    independently reviewed the Kopreski reanalysis.

9            **THE COURT:**  Was it really a reanalysis?

10           **MR. MURA:**  It was.

11           **THE COURT:**  This came to me in an unusual -- the

12   *Daubert* motion, in my view, was very different, which was don't

13   allow the experts to rely on this reanalysis of Kopreski, and

14   so I didn't have a report or anything from Kopreski.  I have to

15   tell you.  Even before this motion was filed, I have thought

16   about this a great deal, about what Dr. Kopreski did.

17           My question to you is what opinions did

18   Dr. Kopreski give -- because, you know, I think the thing was,

19   well, he is giving opinion testimony, and what he did was open

20   files and say this is -- wasn't that factual testimony?

21           **MR. MURA:**  It was not, Your Honor.

22           **THE COURT:**  Tell me why.

23           **MR. MURA:**  Sure.  What he did and what we call the

24   reanalysis is he went back to TAX 316 --

25           **THE COURT:**  Right.  Right.

10:35  1           **MR. MURA:**  -- and this was the heart of Sanofi's

2    defense.   TAX 316 as reported to the FDA, as always publically

3    reported -- well, I think this is the important point.   It

4    reported 4 percent of patients followed for 10 years ongoing.

5    Right?  So what he did is he went back and he said, "Well, they

6    never looked at the actual underlying data."  Right?  So that's

7    part of the reanalysis.

8               What data is he looking at?  Is he looking at

9    all the data?  He only looked at 55-month data.  He didn't look

10   at 77-month or 10-year data.  He only looked at data that was

11   provided by, he said at his deposition, quote, his attorneys.

12   He was referencing the attorneys that represent Sanofi.  Right?

13   So they collected the data that was provided to him.

14               He was asked questions.  "Did you look at all

15   the forms?"  There was a lot of confusion because he was just

16   presented with a package -- he only looked at that -- that was

17   produced by the defense attorneys for Sanofi.  Right?  And he

18   went back and did a recalculation.

19               It's very hard to understand with the

20   methodology -- you have our sympathies in terms of there was no

21   report, but that was part of the problem.  Sanofi is trying to

22   sneak in what would otherwise be expert evidence through

23   nonexperts, and then they are having their expert witnesses

24   testify about it without actually independently validating it.

25   So it came up in a very unusual posture at the *Daubert* setting.

10:37

**THE COURT:** It was.

**MR. MURA:** Yes.

**THE COURT:** I struggled with it.

**MR. MURA:** We struggled, too, about how do we bring a motion to address this. We brought a motion targeting each expert's reliance on Kopreski. Right? So we are not trying to relitigate this Court's *Daubert* ruling; we are taking it as a given. What this Court's *Daubert* said is that the experts --

**THE COURT:** I know what I said.

**MR. MURA:** Yeah. Well, importantly, the Court took Sanofi's representation that its experts could independently verify it and had done so. Right? And it said, "Okay. Well, you have to do that at trial," and that did not happen.

So the important point of why this testimony was so damaging was because you have the incidence rate for Taxotere at 4 percent. Right? So at that rate, between 1 and 10 percent, it's considered common.

**THE COURT:** Right.

**MR. MURA:** What they did is they sought to bring down the incidence rate for Taxotere to below 1 percent.

**THE COURT:** Right.

**MR. MURA:** At that rate, it's rare. So what the jury is hearing is about the A and the C and the T and all these other drugs. They are also hearing from Sanofi, "Look, it's all rare. It's all rare. The A, the C, and the T is all rare,

10:38 1  so for specific causation you cannot know whether it was the A
2  or the C or the T or the Arimidex."  That was their entire
3  argument.
4           Then they said, "The only person who looked
5  under the hood of TAX 316 was Dr. Kopreski.  He is the only
6  one.  You can't trust plaintiffs' experts who are testifying
7  that the T is common, that the T stands apart, that you do know
8  that the T was the specific cause because none of those experts
9  looked under the hood.  The only one who did that was
10  Dr. Kopreski."
11           That's why it was so damaging to plaintiffs'
12  case because it cut at the heart of what all the evidence
13  showed, which was that the T really did stand apart.  You
14  didn't have this issue of permanent hair loss until Taxotere
15  became introduced into the market for this particular injury.
16           So that was really the difference and why they
17  had brought this evidence, the Kopreski reanalysis, and why not
18  having Dr. Glaspy having independently verified it made it
19  impossible to cross-examine him about it.  The jury essentially
20  heard unreliable evidence because it was provided through first
21  Dr. Kopreski and then it was buttressed by Dr. Glaspy, who
22  said, "That's right.  It's 1 percent."  Then on
23  cross-examination he said, "Well, I'm assuming it's 1 percent
24  because I can't say.  I never actually did any of this work."
25           So if you sort of discount the T in that way and

10:39  1  you create this false equivalency, it creates a really damaging

2  problem for specific causation.  If you don't do that, then you

3  don't have that specific causation problem because, as the

4  Court knows and the jury was instructed, you don't have to show

5  sole cause for specific causation.  Right?  So it wouldn't

6  really matter.

7          Defendants said in their brief, well, there was

8  evidence and plaintiffs' experts -- Dr. Feigal, Dr. Plunkett --

9  they admitted that there were reports of the A and the C and

10  these other drugs.  Well, so what?  The real difference is that

11  one is common and one is rare.  So if you allow that evidence

12  in, it damages that case.

13          If that evidence had not been introduced, there

14  was no other evidence to discount the incidence rate of the T,

15  and that's critically important because that goes to show

16  exactly why this was substantial harm to plaintiffs' case.

17          Now, the defendants have made a couple of

18  responses.  I'll address them, and I'm sure we will hear them

19  in a minute.  The first one they say is that the *Daubert* order

20  provided no requirement that Glaspy independently verify

21  Kopreski.  I don't know how they can say that with a straight

22  face.  This Court's order explicitly accepted the

23  representation that defendants' experts could and did

24  independently verify it, and the Court cited case law which

25  requires experts to independently verify the opinions of

10:41  1   another expert.

2                    Here you have a little bit of an odd

3   circumstance because you have Sanofi's experts, quote/unquote,

4   supposedly having to independently verify the opinion of a

5   nonexpert.  Right?  Put that aside.  You still don't have the

6   independent verification.  I think it was clear as day this

7   Court set those ground rules, and those ground rules were

8   violated.

9                    Again, I said before we are being accused of

10  challenging and relitigating this Court's *Daubert* ruling.  We

11  are not.  The Court understands that we disagreed with the

12  Court at the *Daubert* stage, but we are taking that ruling as a

13  given.  Those were the ground rules and they were violated.

14                   The next question was we have been accused of

15  misrepresenting the record because Dr. Glaspy was involved in

16  the blood and guts, sweat and tears -- I don't remember the

17  phrase -- of TAX 316.  The question is not whether Dr. Glaspy

18  was involved in TAX 316.  The question is his involvement in

19  the reanalysis, and there was no involvement in the reanalysis.

20  That comes almost a decade later.  Those reports have never

21  been provided to anyone.

22                   It's an entire mystery how they came up with

23  these numbers, methodology, why they only looked at the

24  55-month data.  We were at the very least entitled to have an

25  expert from the defendant sit on that stand and defend that

10:42

1  opinion.  That never happened, and the jury was allowed to hear

2  that there was a less than 1 percent incidence rate of the

3  Taxotere, and that again severely damaged the specific

4  causation case.

5          Defendants also reference *Hunt v. McNeil*.

6  That's this Court's opinion.  We referenced that as well.  We

7  are told that that's distinguishable because in that case there

8  was a concession from the experts that he was merely parroting

9  the opinion in that case.  I think the expert copied it to the

10  point where typos were copied.  Right?

11          Here you don't even have a report.  I actually

12  think that makes it worse than in *McNeil*.  But, of course, you

13  have a concession here.  On page 13 of our brief, we have put

14  in the testimony.  Dr. Glaspy testified, "I admitted and told

15  you in my deposition if the data that's in Kopreski's

16  reanalysis table is incorrect, then none of my opinions are

17  valid."  I don't know how you can get a clearer concession on

18  that.  Then he was asked, "You didn't make the charts?"  This

19  was Table A.  It was attached to his opinion.

20          **THE COURT:**  I remember.

21          **MR. MURA:**  It was flashed to the jury even though it

22  shouldn't have been.  "You didn't do anything to validate it

23  either, did you?"  He replied, "That's correct."  I mean, it

24  was clear as day.

25          So then the next thing that they argue is that,

10:43  1    look, again, there were these other medications that can cause

2    permanent hair loss.  Right?  But, again, those medications --

3    first of all, that's just a general causation statement.

4    Right?  And the A and the C, those are rare.  But if you bring

5    down the T in this way, it causes a severe problem.

6              Again, the evidence on our side was

7    overwhelming.  The only medical doctor to examine Plaintiff

8    Earnest was Dr. Tosti.  There was no countervailing evidence

9    that could have sort of ameliorated this because they had no

10   one.  No one.  Dr. Glaspy never examined the patient.  So for

11   specific causation there was no one else except Dr. Tosti who

12   said this drug did cause Plaintiff Earnest's hair loss.

13             All the discussion of the A and the C and the

14   Arimidex, that was all general causation testimony.  There was

15   no testimony from the experts specifically blaming those

16   medications for her particular condition.  So you know that

17   this had a damaging effect on the jury because the jury never

18   got past Question 1.  It was very surprising for the jury,

19   given all the evidence that was presented to it, for it to

20   never get past Question 1.

21             Obviously, the Kopreski analysis had an

22   incredible and damaging effect on them, and it was the

23   highlight of plaintiffs' closing.  If you look at plaintiffs'

24   closing -- excuse me, Sanofi's closing.

25             Sanofi's closing describes for pages the

10:45   1   importance of Kopreski, how he was the only one to look under
        2   the hood, how the numbers reported for TAX 316, the company's
        3   own study, was wrong.  They went through those numbers and they
        4   described that testimony again and they highlighted it, and
        5   they said the whole case fails.
        6            This is not an instance in which the error was
        7   sort of ancillary.  They said the whole case fails once you
        8   look at TAX 316.  They said you never have to get past the
        9   first question, which was specific causation.  We know the jury
       10   never did get past that question.  So the question is --
       11            THE DEPUTY CLERK:  Mr. Mura, you are at 12 minutes.
       12            MR. MURA:  Oh, I apologize.  Was there a time limit?
       13            THE COURT:  Yes.
       14            MR. MURA:  May I continue a little bit and then have
       15   a little rebuttal?
       16            THE COURT:  Yes.
       17            MR. MURA:  Okay.  Thank you, Your Honor.
       18            So I was just about to say the whole question is
       19   whether her substantial rights were violated.  You look at the
       20   entire record, and under the Fifth Circuit standard the
       21   question is did the error -- you have to consider whether the
       22   error did not influence or have a very slight effect on the
       23   jury.  I don't think this is a circumstance in which you can
       24   credibly say that this had a very slight effect or no effect on
       25   the jury.  Clearly it had a substantial effect.

10:46

1        Earnest is entitled to a fair trial, and that

2   fair trial involves following the ground rules that the Court

3   set and, in particular, on the linchpin of the defense's case,

4   which was to bring down the T so that it all looked like an

5   equivalency, which is false.

6        The MDL, frankly, is entitled to a fair trial as

7   well.  This was the first trial that was supposed to give us a

8   real guidepost and, arguably, it didn't because it went off on

9   a case-specific issue.  So that was entirely disappointing to

10   the MDL.

11        If the Court grants plaintiffs' motion, the

12   *Earnest* case could be tried in March.  It could be another case

13   that the Court can consider for the March trial.  It's

14   perfectly positioned for that.  Everyone knows.  It's all

15   prepared.

16        For those reasons I would ask that the Court

17   grant plaintiffs' motion.

18        **THE COURT:**  Thank you, Mr. Mura.

19        Ms. Eisenstein.

20        **MS. EISENSTEIN:**  Good morning, Your Honor.  Ilana

21   Eisenstein on behalf of Sanofi.

22        Your Honor, the plaintiffs ask for what amounts

23   to an extraordinary remedy, which is a new trial after the jury

24   heard two weeks of evidence.  That's reserved, as Your Honor

25   knows, for the high bar of substantial injustice.  This claim,

10:48

1    which is really a rehash of issues that were raised repeatedly

2    before trial, during trial, and rejected rightfully by this

3    Court, is no basis for a new trial.

4            The claims about Dr. Kopreski's testimony are

5    those that this Court painstakingly reviewed in terms of the

6    admissibility of his evidence and correctly admitted it as fact

7    evidence.  That's really where this new trial motion falls

8    flat, in addition to their mischaracterization of Dr. Glaspy's

9    reliance on it.

10           Let's just start from Dr. Kopreski.  First of

11   all, plaintiffs never moved to exclude Dr. Kopreski.  They

12   never claimed it was improper expert testimony as to the piece

13   that was played and, notably, they played.  They were the ones

14   who introduced Dr. Kopreski, and we provided certain evidence

15   about Dr. Kopreski in our own case.

16           The part of Dr. Kopreski's testimony that they

17   are really upset about is where he opened up the hood and he

18   looked at the case files from a factual standpoint and reported

19   on what were the dates of follow-up and what was the permanent

20   alopecia situation at that time and why were these patients

21   still reported as ongoing.

22           So the plaintiffs' motion for a mistrial

23   rehashed exactly the same argument, and the Court noted that

24   the plaintiffs were given -- I'm quoting from Your Honor --

25   wide latitude in cross-examining Dr. Glaspy related to the

10:49  1    testimony of Dr. Kopreski.  He admitted he relied on
       2    Dr. Kopreski and if that information was wrong, his own
       3    testimony was wrong.  That information, meaning Dr. Kopreski's
       4    information and Dr. Glaspy's reliance, was fully vetted for the
       5    jury, and that's why Your Honor rightfully denied that motion
       6    at the time and should deny this motion on the same basis.
       7                I want to talk about Dr. Glaspy for a minute and
       8    his purported failure to independently verify Dr. Kopreski's
       9    testimony because they are sort of glossing over a few aspects
      10    of Dr. Glaspy's testimony.
      11                Dr. Glaspy, when he talked about the blood and
      12    guts, knowing the blood and guts of this study, what he was
      13    talking about was the methodology for how ongoing adverse
      14    events were reported.  Dr. Glaspy had personal knowledge of
      15    that because he was one of the investigators in charge of
      16    making those reports.  Dr. Glaspy, in his testimony, spoke
      17    specifically about that.  That "blood and guts" statement was
      18    with respect to the fact that he knew how the 10-year follow-up
      19    data could be misinterpreted.
      20                I'm going to quote from the section where
      21    Dr. Glaspy talked about his reliance on Kopreski's analysis,
      22    and he said, "I admitted and told you in my deposition" -- this
      23    is Dr. Glaspy on cross at page 2060.  "I told you in my
      24    deposition I look at if the data in the table is incorrect,
      25    then none of my opinions are valid.  If the data that's there

is correct" -- and what is that data that he is talking about?
It's factual data.  This isn't opinion data.

"The date of the last visit, the date of the
completion of chemotherapy, if those things are correct, then
my opinions hold because I'm aware, as a clinical trialist, how
those confusions can arise, how people can look at that and
say, 'How can this be 10-year follow-up and you said it was
persistent, but the last date you checked alopecia was nine
years ago?'"

So what Dr. Glaspy is saying is the piece that
he relied on of Dr. Kopreski was the factual piece.  He didn't
go back and reevaluate the raw data.  Dr. Glaspy did not go
back and look and see was the follow-up six months or was it
10 years.  Dr. Glaspy relied on Dr. Kopreski, which was
properly admitted fact evidence, for that piece.  But what he
knew from his personal knowledge was the methodology of the
study and how Dr. Kopreski -- how the flaw in TAX 316, in the
reliance on the permanent alopecia numbers in TAX 316, was this
ongoing alopecia report.

So I think that the premise of plaintiffs'
motion is mistaken.  In any event, in terms of Rule 703 and
Your Honor's *Daubert* ruling, independently verified is not the
sort of benchmark standard.  The standard is reasonable
reliance.  I think that is what Your Honor said at page 5 of
Your Honor's opinion.  That is the standard that is the

10:52   1   baseline here.  There is no doubt that Dr. Glaspy, to the

2   extent he relied -- which was to a limited extent -- on

3   Dr. Kopreski's analysis, that that reliance on the factual

4   component was entirely reasonable.  That was evidence that was

5   admitted at this trial, and so certainly an expert can rely on

6   that and comment on it.

7           That's one of the very distinguishing aspects of

8   the cases that the plaintiffs cite.  The plaintiffs cite cases

9   in which experts relied on evidence that was not admitted, on

10   experts and reports that were not admitted at trial, didn't

11   even read them, just parroted them back, and then that was the

12   basis of their expert testimony.  Those are very, very

13   different than here where Dr. Glaspy, to the extent we are just

14   talking about Kopreski, relied on evidence admitted at trial

15   and, moreover, did do independent verification and had direct

16   personal knowledge of the very study on which Dr. Kopreski was

17   examining the data and knew from his own experience that the

18   problem that Dr. Kopreski was examining was one that was, in

19   fact, present in the study because Dr. Glaspy was part of that

20   reporting protocol.

21           The *Hunt* case, in particular, I mean, it

22   couldn't be more distinguishable.

23           **THE COURT:**  I understand.

24           **MS. EISENSTEIN:**  I won't get into that.

25           I just want to talk about the substantial

10:54 1  injustice prong.  Even if there was some concern that

2  Your Honor had about this testimony, it is far short of a

3  substantial injustice that would warrant a new trial in this

4  case.  The issue here is specific causation.  Yes, the

5  diminishment of the T arm and the number of reported cases in

6  TAX 316 is one component of it, but it is actually a very small

7  component of the deficits in plaintiffs' specific causation

8  case.

9           They had only one expert who talked about

10  specific causation, which was Dr. Tosti.  Dr. Tosti was roundly

11  impeached, including by her own study, which showed that there

12  were other -- she had said on direct examination, "Well, I

13  think Taxotere is the one that causes permanent alopecia, not

14  these other agents," and then we impeached her with her own

15  study that showed that there were reported cases in her paper

16  of Adriamycin, Cytoxan, and other agents causing permanent

17  alopecia.

18           She admitted that the Arimidex could also cause

19  persistent alopecia.  She also admitted that Ms. Earnest had

20  stem cells and that she also admitted that she had failed to

21  seek treatment.  So Dr. Tosti was the one who was relied upon

22  by the plaintiffs to advance their case for specific causation

23  here and there were plenty of reasons, including just a

24  credibility determination that the jury was entitled to make,

25  that Dr. Tosti's testimony could have been discredited

10:55  1  rightfully and reasonably by the jury.

2  Then you add to that the other experts that
3  plaintiffs put on, including Dr. Feigal and Dr. Plunkett, each
4  of whom had to acknowledge on cross-examination that the other
5  agents that Ms. Earnest took also caused permanent
6  chemotherapy-induced alopecia.

7  Let's not forget that this is a case -- and this
8  is just sort of the commonsense piece.  This is a case where
9  Ms. Earnest had lost all of her hair before even taking
10  Taxotere.  Now, I know that their argument is it's the failure
11  to grow back not the loss of the hair.  But from a commonsense
12  perspective, you know, in looking at who can discern which drug
13  it is that substantially caused Ms. Earnest's injury, it was a
14  fair and reasonable inference under the circumstances for the
15  jury to conclude that the plaintiffs had failed to meet their
16  burden to prove specific causation on a variety of evidence
17  well before Dr. Glaspy even took the stand.

18  So on all of those grounds, Your Honor, this
19  rehashing of the Dr. Kopreski challenge and certainly
20  Dr. Glaspy's reasonable reliance on it must fail.  It is no
21  basis for a new trial in this matter.

22  **THE COURT:**  Thank you.

23  Mr. Mura.

24  **MR. MURA:**  Very briefly, Your Honor.

25  This whole issue of facts versus analysis, I

10:57

1    think we are entirely past this.  If this was just facts, the

2    Court's *Daubert* ruling wouldn't have come out as it did.  The

3    Court required independent validation entirely consistent with

4    *Hunt v. McNeil* for when an expert is providing an opinion.

5    They have to have a reasonable basis for it, an independent

6    validation, so that they can be cross-examined about it.  That

7    didn't happen here.

8               If you look at the analysis, we talk about it

9    on -- I think it's page 4 of our brief.  This wasn't just

10   facts.  Dr. Kopreski only looked at 29 reports, not the full

11   744 participants.  Even as to those 29, he couldn't verify the

12   completeness of the data because it was just selected by the

13   attorneys.  He recalled that for some of those 29 he didn't get

14   a case report form.  For some of those 29 he couldn't verify

15   the completeness of the patient information request forms.  So

16   there was lots of problems with his analysis, and it was an

17   analysis.  We have always understood that to be the case.  So

18   Dr. Glaspy's sort of acceptance of that is completely improper

19   under the case law.

20              Next let me say that there was a statement that

21   these other drugs caused the hair loss and that the jury was

22   presented with that evidence.  There was no testimony from any

23   witness, including from the defense witness, that these other

24   drugs did, in fact, cause her hair loss.  There was a lot of

25   cross-examination and a lot of innuendo, which is not evidence.

10:59

1   Cross-examination and questions are not evidence.  The jury was

2   instructed on that.  So I think the evidence is really

3   one-sided here, and the effect of the Kopreski analysis is

4   incredibly obvious.  This is not a case in which the Kopreski

5   analysis was some ancillary issue.  It was at the heart of

6   defendants' case.

7            The last thing I will say is that there has to

8   be a consequence.  We don't think this is a close question that

9   they violated the order, that that violation of the order

10  substantially damaged plaintiffs' case, and did so on the very

11  issue on which the jury unanimously decided against us.  There

12  has to be a consequence.

13           At the end of our trial, there was a series of

14  questions that Mr. Schanker posed to Mrs. Earnest asking about

15  when she learned about Taxotere.  She talked about a

16  commercial, and there wasn't a follow-up question about when

17  her brother called, the date.  Right?  Afterwards we came to

18  you and we said, "We would like to reopen the evidence," and

19  you said no.  You said, "You could have asked that question."

20  There was a consequence.

21           After Dr. Glaspy said, "I can't validate

22  anything.  I don't know," they could have brought another

23  witness.  They have said that multiple of their witnesses have

24  validated Dr. Kopreski's analysis.  They didn't bring a single

25  other witness.  There has to be a consequence here.

11:00   1                   Thank you very much.

2          THE COURT:   Thank you.  You-all will be hearing from

3   me likely not before Christmas.  I think we need to set the

4   next follow-up status conference.

5                   Sam, did we say January 9?

6          THE LAW CLERK:  Yes, we did.

7          THE COURT:  Our regular time.  Is there anything

8   further?

9                   Thank you.

10                        * * *

11                     <u>CERTIFICATE</u>

12          I, Toni Doyle Tusa, CCR, FCRR, Official Court

13   Reporter for the United States District Court, Eastern District

14   of Louisiana, certify that the foregoing is a true and correct

15   transcript, to the best of my ability and understanding, from

16   the record of proceedings in the above-entitled matter.

17

18

19                        <u>/s/ Toni Doyle Tusa</u>
                          Toni Doyle Tusa, CCR, FCRR
20                        Official Court Reporter

21

22

23

24

25