UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

**THIS DOCUMENT RELATES TO:**

**Cynthia Thibodeaux, Case No. 2:16-cv-15859.**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS**

Plaintiff Cynthia Thibodeaux's claims are barred by Louisiana's one-year statute of limitations, which begins "to run from the day injury or damage is sustained." *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4 Cir. 1998). Here, Ms. Thibodeaux sustained her alleged injury and was aware of its potential relationship to her Taxotere chemotherapy regimen by January 2010 (at the latest), more than six years before she filed suit in October 2016. The undisputed material facts here are substantially identical to those in *Johnson* and *Francis*, which the Court dismissed as time-barred. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 16-2740, 2019 WL 2995897, at *1 (E.D. La. July 9, 2009). The key similarities include:

- Ms. Thibodeaux's claim is time-barred on its face. As in *Johnson* and *Francis*, Ms. Thibodeaux alleges her injury first occurred six months after completing chemotherapy, which was years before she filed suit.

- Ms. Thibodeaux had enough notice to call for an inquiry no later than six months after she completed chemotherapy. As in *Johnson* and *Francis*, Ms. Thibodeaux testified she had always attributed her hair loss to chemotherapy.

- Finally, Ms. Thibodeaux did nothing to investigate why her hair was not growing back—including never asking a doctor about her hair loss—until she saw an advertisement for a lawsuit more than six years later.

As in *Johnson* and *Francis*, no genuine issue of disputed fact exists here to toll the statute of limitations, and Sanofi is entitled to summary judgment.

## BACKGROUND

In late-November 2007, Ms. Thibodeaux's health care provider found a suspicious mass in her right breast. **Ex. A**, Ochsner Health System at 538–539. Concerned that it might be malignant, Ms. Thibodeaux made an appointment with her doctor. **Ex. B,** Thibodeaux Dep. Vol. I 122:23–123:20. A mammogram and biopsy confirmed Ms. Thibodeaux's fears. *Id.* at 123:21–124:24. Ms. Thibodeaux was diagnosed with breast cancer on January 10, 2008. **Ex. C**, Plaintiff's Fact Sheet ("PFS") § V.5.[1]

Part of Ms. Thibodeaux's treatment plan involved chemotherapy, for which Ms. Thibodeaux agreed to participate in a clinical trial. **Ex. B** at 167:17–19; 176:7–12; **Ex. C** at § V.12. The clinical trial randomly assigned patients, including Ms. Thibodeaux, to receive chemotherapy combinations involving six different drugs: bevacizumab (Avastin), gemcitabine (Gemzar), capecitabine (Xeloda), docetaxel (Taxotere), doxorubicin (Adriamycin), and cyclophosphamide (Cytoxan). **Ex. D**, Clinical Trial Consent Form.

Participating in this clinical trial—known as NSABP-40—required Ms. Thibodeaux to read and sign a consent form that warned of possible side effects. **Ex. B** at 170:6–171:20. The consent form identified "hair loss" as the first and most common side effect of five of the drugs used in the study (capecitabine, doxorubicin, cyclophosphamide, docetaxel [Taxotere], and gemcitabine). **Ex. D** at 11–16, 27. The consent form also stated, "[m]any side effects go away soon after you stop taking your study drugs[,]" however, "[i]n some cases, side effects may be ***very serious, long-lasting, or may never go away***." *Id.* at 11 (emphasis added). It is undisputed that

---

[1] "PFS" refers to Plaintiff's Thirteenth Amended PFS, **Ex. C**.

Ms. Thibodeaux signed her consent form on January 28, 2008. *Id.* at 27; **Ex. B** at 170:2–5. Ms. Thibodeaux started treatment two weeks later on February 12, 2008. **Ex. B** at 256:1–5. According to her medical records, Ms. Thibodeaux re-read the side effects of all the chemotherapy drugs before beginning her first cycle of chemotherapy. **Ex. E**, Ochsner Health System 598, NSABP 58, PPR 76. Ms. Thibodeaux testified she understood she was at risk for side effects, but that she was trying to get treatment without thinking about all the negatives. **Ex. B** at 181:9–19. She also understood that taking the study drugs could offer her a higher chance of recovery, something "above the standard of care." **Ex. B** at 196:18–197:3; 190:15–22.

Within two or three weeks of starting her regimen, which included three of five chemotherapies (one of which was Taxotere), Ms. Thibodeaux began losing her hair. **Ex. B** at 256:1–257:11; **Ex. F**, Ochsner Health System 599–604, 673–674. Ms. Thibodeaux had expected chemotherapy to cause her hair to fall out because of information she had received from her doctor, as well as from knowing other people who had chemotherapy and who also lost their hair. **Ex. B** at 60:3–9; 68:6–12. Prepared for her hair to fall out, Ms. Thibodeaux had already purchased a wig. *Id.* at 59:23–60:5. Ms. Thibodeaux, however, expected her hair to regrow to its previous state once she completed chemotherapy. *Id.* at 68:21–69:12; 321:5–9. Knowing that her wigs lasted about three months, and believing her hair was "going to come back after chemo . . . maybe a few months later," Ms. Thibodeaux expected to buy only one or two wigs during and after her chemotherapy treatment. *Id.* at 60:23–61:9; 98:12–18; 278:15–279:7. Ms. Thibodeaux knew other women whose hair grew back after chemotherapy. For example, Ms. Thibodeaux's mother had a friend who lost her hair twice during two rounds of chemotherapy, but each time it came back. *Id.* at 99:7–16. Ms. Thibodeaux testified that she believed she would be no different. *Id.* at 99:7–100:25; 101:16–22; 182:16–183:11.

According to her deposition testimony, however, Ms. Thibodeaux's hair regrowth was different. Ms. Thibodeaux completed her chemotherapy treatment in June 2009.[2] Although some of Ms. Thibodeaux's hair began growing back initially, her hair regrowth stopped completely by the beginning of 2010—more than six months after she completed chemotherapy. *Id.* at 276:3–6; **Ex. H**, Thibodeaux Dep. Vol. II 394:20–23. During this time, Ms. Thibodeaux had been taking a multi-vitamin hoping it would help her hair to grow back, but seeing no such benefit, Ms. Thibodeaux quit taking the multi-vitamin no later than 2010. **Ex. B** at 63:18–64:8. Though she expected to buy only one or two wigs during and after her chemotherapy treatment, Ms. Thibodeaux has purchased a new wig every three months since 2008. Stated differently, she had purchased approximately 10 wigs by the year 2010 and well over 30 wigs before she filed her lawsuit in 2016. *Id.* at 59:8–17.

Ms. Thibodeaux "wondered why [her hair] didn't grow back." *Id.* at 323:24–324:5. Ms. Thibodeaux even testified that she was "devastated wondering why." *Id*. And Ms. Thibodeaux has always attributed her hair loss to chemotherapy. *Id.* at 280:20–281:4. Specifically, she testified:

> **Q.** Have you ever thought that your hair loss could be caused by anything other than chemotherapy?
>
> **A.** No.
>
> **Q.** Always attributed it to a chemotherapy drug?

---

[2] In her PFS, Ms. Thibodeaux indicates that her last treatment date was April 16, 2008 (*see* **Ex. C** at § V.12), which is her last Taxotere infusion. **Ex. F**, Ochsner Health System 599-604, 673–674. It is undisputed, however, that Ms. Thibodeaux did not complete her overall (and subsequent, non–Taxotere) chemotherapy treatment until over one year later in June 2009. *See* **Ex. G**, Ochsner Health System 1045–1050, 1070–1075, 1194–1199, 1265–1266 (Ms. Thibodeaux received ten cycles of Avastin from December 3, 2008, until June 10, 2009). For purposes of this motion, Sanofi does not rely on the date she ended treatment with Taxotere. Instead, Sanofi relies on the end of Ms. Thibodeaux's overall chemotherapy, in June 2009, which is more generous to Ms. Thibodeaux but nonetheless fails to save her claim.

4

**A.** Yes.

*Id.* Despite her devastation, Ms. Thibodeaux never inquired about her hair loss with any of her physicians. *Id.* at 279:8–19; 321:18–322:6; **Ex. H** at 406:14–22; 418:18–21; **Ex. C** at § VI.8. Ms. Thibodeaux met with a dermatologist, Dr. Julie Danna, three times after completing chemotherapy—on September 22, 2010 (for a mole check), June 6, 2013 (about a mole on her right lower cheek), and December 15, 2015 (about hyperpigmentation). **Ex. I**, Danna Dep. 37:9–17; 38:2–19; 40:12–21; 43:3–13. Ms. Thibodeaux, despite visiting her dermatologist multiple times, never asked Dr. Danna about hair loss. *Id.* at 37:9–21; 45:1–4. Nor did Ms. Thibodeaux investigate her claim by asking her oncologist (Dr. Zoe Larned) about her hair growth. **Ex. J**, Larned Dep. 103:1–8; 121:22–122:10.[3] Instead of investigating her hair loss, Ms. Thibodeaux simply kept purchasing wigs—every three months for 8 years—without ever investigating her injury. **Ex. B** at 59:13–17. It was not until October 26, 2016 (more than 2695 days after completing chemotherapy) that Ms. Thibodeaux was prompted to file her lawsuit after seeing a television commercial. *Id.* at 27:5–15; 321:18–25; **Ex. H** at 550:25–551:14.

Ms. Thibodeaux's Complaint alleges that she developed permanent alopecia, which she defines as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." Second Amended Master Complaint ("AMC") (Rec. Doc. 4407) at ¶ 181; *see also* Rec. Doc. 8702 (Order and Reasons on Motion for Leave to File Plaintiffs' Third Amended Master Long-Form Complaint and Jury Demand). Per Ms. Thibodeaux's definition of her injury, and her testimony, Ms. Thibodeaux began suffering permanent alopecia in ***January 2010***, six months after completing chemotherapy treatment in June 2009. *See* AMC at ¶ 181; **Ex. B** at 276:3–

---

[3] Ms. Thibodeaux also had a close friend who had thinning hair before she had breast cancer, and then could wear nothing but wigs after treatment. **Ex. B** at 112:12–117:3. Ms. Thibodeaux, however, never discussed with her friend what caused her friend's hair loss or whether her friend had undergone chemotherapy as part of her breast cancer treatment. *Id.* at 113:20–25, 114:7–11.

5

6; **Ex. H** at 394:20–23. Ms. Thibodeaux needed to file her lawsuit by January 2011 to be timely. Given Ms. Thibodeaux's knowledge of her injuries, it would be unreasonable for her "to think that [s]he can sit on [her] rights indefinitely until an attorney tells [her s]he is actually entitled to benefits." *Causby v. Pergue Floor Covering*, 707 So. 2d 23, 27 (La. 1998). Ms. Thibodeaux:

- Signed a consent form that warned of various side effects (including hair loss) and warned that some side effects may never go away;
- Knew that her hair had fallen out during chemotherapy, which she completed in June 2009;
- Expected her hair to grow back to its previous state within a few months;
- Knew that her hair had stopped growing back by the beginning of 2010;
- "Wondered" why her hair had not grown back;
- Always attributed her hair loss to her chemotherapy;
- Saw a dermatologist multiple times about conditions *other than* her hair loss; and,
- Purchased a new wig every three months beginning in 2008.

The objectively reasonable plaintiff in these circumstances would have been excited to do something to inquire about a claim. Her inaction was unreasonable as a matter of law. On these facts, no tolling exception applies. Ms. Thibodeaux's claims are time-barred, and Sanofi is entitled to summary judgment.

## **LEGAL STANDARD**

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at

249–50 (internal citations omitted).

In the *Francis* and *Johnson* matters, the Court granted Sanofi's motions for summary judgment on statute-of-limitations grounds. The Court found those Plaintiffs' claims were prescribed on their face, specifically noting there was **no dispute** those Plaintiffs did not investigate their injuries. *In re Taxotere*, 2019 WL 2995897, at *3 ("Johnson has presented no evidence demonstrating that she investigated her injury."); *id.* at *4 ("Francis knew her hair had not returned as expected, yet she never investigated."). The absence of any dispute of fact about whether Plaintiffs investigated their injuries precluded any triable issue on *contra non valentem*.

In *Earnest*, on the other hand, the Court found a disputed issue of material fact. The Court explained that "[s]ix months after completing her chemotherapy," Ms. Earnest "became concerned that her hair had not grown back as expected, prompting her to ask her oncologist" about her hair loss. *Id.* at *4. Importantly, the Court noted that Ms. Earnest testified that her doctor told her that her hair was "going to come back. It just takes time." *Id.* The Court found that this testimony distinguished Ms. Earnest's case from the *Francis* and *Johnson* matters because Ms. Earnest "**inquired with her doctor** about her injury" and "**was led to believe** that she had no actionable injury." *Id.* (emphasis added). Here, however, as in the *Johnson* and *Francis* matters, there is no dispute of material fact about whether Ms. Thibodeaux ever investigated her injury. She did not, and summary judgment is accordingly appropriate.

## ARGUMENT

The Court should grant summary judgment for two reasons. First, the untimeliness of Ms. Thibodeaux's case is apparent from the pleadings. Second, the uncontroverted record evidence demonstrates that there is no disputed question of material fact regarding *contra non valentem*. The facts are clear on their face—Ms. Thibodeaux had actual or constructive knowledge of her

7

injury and simply failed to investigate it. *Contra non valentem* does not toll Ms. Thibodeaux's claims.

### I. On the Face of Her Complaint, the One-Year Prescriptive Period for Ms. Thibodeaux's Claims Began to Run No Later than January 2010.

As the Court has recognized, the Master Complaint in this MDL alleges that all Plaintiffs' hair loss became permanent six months after the completion of chemotherapy. Rec. Doc. 8702 (Order and Reasons on Motion for Leave to File Plaintiffs' Third Amended Master Long-Form Complaint and Jury Demand); *see also In re Taxotere*, 2019 WL 2995897, at *1. This is consistent with Ms. Thibodeaux's pleadings, wherein she alleges that her injury became permanent six months after completing chemotherapy. *See* **Ex. K**, Thibodeaux Amended Short Form Complaint at 1 (incorporating by reference the Amended Master Long Form Complaint); **Ex. C** at § VI.5 (defining her injury as "[s]ignificant thinning of the hair on your head after six (6) months of discontinuing Taxotere® or Docetaxel treatment").[4] In this case, the prescriptive period began to run six months after Ms. Thibodeaux completed chemotherapy, or by January 2010. Ms. Thibodeaux's claim is thus barred on its face because she filed her lawsuit more than six years after her alleged injury, and well outside Louisiana's one-year prescription period. *In re Taxotere*, 2019 WL 2995897, at *2 n.12.

### II. No Exception Saves Ms. Thibodeaux's Claims.

When "the face of the petition shows that the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred." *In re Taxotere*, 2019 WL 2995897, at *2 (quoting *Hoerner v. Wesley-Jensen*, 684

---

[4] In her PFS, Ms. Thibodeaux actually alleges her injuries manifested even earlier, in February 2008. **Ex. C** at § VI.5. But, at the latest, Ms. Thibodeaux completed her chemotherapy in June 2009, and so her injuries manifested no later than January 2010.

8

So. 2d 508, 510 (La. App. 4 Cir. 1996)). Because Ms. Thibodeaux's complaint is prescribed on its face, she bears the burden of proof. *Id.*

Ms. Thibodeaux cannot meet her burden. The *contra non valentem* doctrine provides that prescription begins to run when the plaintiff has "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort" or "actual or constructive knowledge of a causal relationship between the object or product and the injury." *Id.* (quoting *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017)). Importantly, however, *contra non valentem* is only applied in "extreme circumstances," *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010), and "[a]s a judicial exception to the statutory rule of prescription, Louisiana courts strictly construe this doctrine and only extend its benefits up to the time that the plaintiff has actual or constructive knowledge of the tortious act." *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 743 (5th Cir. 2000) (internal quotation marks omitted).

"[A] plaintiff will be deemed to know what [s]he could by <u>reasonable diligence</u> have learned." *Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002) (internal quotation marks omitted) (emphasis added). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *In re Taxotere*, 2019 WL 2995897, at *2 (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002)).[5] Courts will not reward plaintiffs for failing to diligently investigate their alleged injuries. Stated differently, "[p]laintiffs may not simply sit

---

[5] Ms. Thibodeaux is a highly educated individual. She is now retired, but before her career she obtained an undergraduate degree in sociology with a minor in psychology, as well as a master's degree in social work from Tulane University. **Ex. B** at 32:18 – 24, 87:1–20.

9

on their hands and do nothing to investigate their [injury] and expect their actions to be deemed reasonable." *Eastin v. Entergy Corp.*, 865 So. 2d 49, 56 (La. 2004). Rather, they must allege "facts which show that their delay in joining the suit is reasonable." *Id.* It is unreasonable for a plaintiff "to think that [s]he can sit on h[er] rights indefinitely until an attorney tells h[er] s]he is actually entitled to benefits." *Causby*, 707 So. 2d at 27; *see also In re Taxotere*, 2019 WL 2995897, at *2 ("There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run." (quoting *Xarelto*, 2017 WL 4517287, at *2)).

Ms. Thibodeaux had actual or constructive knowledge about the possible link between chemotherapy and her hair's failure to regrow fully no later than January 2010, and her failure to take any action before filing a lawsuit in 2016 was unreasonable.

First, the undisputed facts establish that Ms. Thibodeaux had actual or constructive knowledge of the risk of permanent side effects, including hair loss, before she began her chemotherapy treatment in January 2008. Ms. Thibodeaux received Taxotere as part of a clinical trial. **Ex. B** at 167:17–19; 176:7–12; **Ex. C** at § V.12. As a clinical trial participant, Ms. Thibodeaux initialed every page of a 27-page consent form (**Ex. D**), which explained repeatedly that "hair loss" was a likely side effect of Taxotere.[6] **Ex. D** at 11–12; **Ex. B** at 170:6–171:20. The consent form further stated, "[m]any side effects go away soon after you stop taking your study drugs[,]" however, "[i]n some cases, side effects may be *very serious, long-lasting, or may never go away*." **Ex. D** at 11 (emphasis added). Ms. Thibodeaux signed the consent form on January 28, 2008. *Id.* at 27. When Ms. Thibodeaux's hair failed to grow back as expected in 2009, she knew or should have known of a "causal relationship between the . . . product and the injury." *In*

---

[6] Ms. Thibodeaux does not dispute that she read or signed the consent form. *See Hogg v. Chevron USA, Inc.*, 45 So. 3d 991, 998–99 (La. 2010) (finding it appropriate to consider at summary judgment whether letter received and read by the plaintiff constituted actual or constructive knowledge as a question of law); **Ex. B** at 170:6–171:20.

*re Taxotere*, 2019 WL 2995897, at *2 (quoting *Xarelto*, 2017 WL 4517287, at *2). It does not matter that she does not know which drug was the cause until, as she alleges, she saw a Taxotere commercial. *See Mason v. Danek Med., Inc.*, No. Civ. A. 95-3481, 1998 WL 774176, at *1 (E.D. La. Oct. 30, 1998) (finding claims prescribed where "plaintiff's symptoms which are the basis for this suit manifested themselves to such a degree after his [treatment] that he should have known by exercising reasonable diligence that there was a reasonable possibility that his problem was caused by" one of several medical products involved in treatment); *Bultman v. Danek Med. Inc.*, No. 96-cv-3447, 1999 WL 33537321, at *3 (E.D. La. Dec. 17, 1999) (same); *see also Oil Ins. Ltd. v. Dow Chem. Co.*, 977 So. 2d 18, 21, 23–24 (La. App. 2007*), writ denied*, 976 So. 2d 1284 (La. 2008) (finding limitations triggered where plaintiff had suspected that defendant's conduct "may have been" a "possible" or "potential" cause of injury, over objection that the "true cause" was not "confirmed," noting that *contra non valentem* "does not allow the plaintiff to wait until the cause of the damage is certified or confirmed," and that "certitude is not a prerequisite to the commencement of prescription"). Indeed, Plaintiffs have already advanced this argument in connection with the *Francis* matter, *see* **Ex. L** (Tr. from Oral Argument before Judge Milazzo May 22, 2019) at 92–93, and the Court has rejected it, *see In re Taxotere*, 2019 WL 2995897, at *1.

Second, even if the Court concludes that the consent form does not establish that Ms. Thibodeaux had actual or constructive knowledge, under this Court's prior analysis, Ms. Thibodeaux had constructive knowledge when her hair stopped growing back as expected by January 2010. **Ex. B** at 276:3–6, **Ex. H** at 394:20–23. In the *Johnson* matter, this Court previously explained that Ms. Johnson finished her chemotherapy treatment in 2010, and Ms. Johnson became concerned as early as 2010 that her hair might not grow back at all. *In re Taxotere*, 2019 WL 2995897, at *3. Recognizing that "Plaintiff Johnson testified that she did not think anything other

11

than her chemotherapy had caused her hair loss," the Court determined—as early as 2010 but no later than six months after she completed chemotherapy (June 2011)—that Ms. Johnson had actual or constructive knowledge of her injury. *Id.* Given that knowledge, Ms. Johnson "had a duty to investigate [but] failed to do so." *Id.* The Court concluded that Ms. Johnson's claims prescribed no later than June 2012. *Id.*

Likewise, the Court also held that Ms. Francis's claims had prescribed. The Court recognized that "[Ms.] Francis attributed her hair loss to her chemotherapy," and Ms. Francis "knew her hair had not returned as expected, yet she never investigated." *Id.* at *4. The Court explained that Ms. Francis completed chemotherapy in October 2009, and thus her injury was realized six months later in April 2010. *Id.* Because Ms. Francis "made no effort to investigate her injury or to identify which drug and which manufacturer was responsible for her injury[,]" her claim prescribed no later than April 2011. *Id.*

Like Ms. Johnson and Ms. Francis, Ms. Thibodeaux's claims have prescribed. Ms. Thibodeaux completed her chemotherapy in June 2009. *See* **Ex. G** at 1045–1050, 1070–1075, 1194–1199, 1265–1266. Ms. Thibodeaux thought her hair would come back "maybe a few months" after she completed chemotherapy, but it did not come back fully. **Ex. B** at 278:15–279:7. Six months later, by the beginning of 2010, Ms. Thibodeaux's hair had stopped growing back. **Ex. B** at 276:3–6; **Ex. H** at 394:20–23. ("So by the beginning of 2010, you're not seeing any more improvements to the regrowth density-wise of your hair; right? A. Right."). Ms. Thibodeaux has always attributed her hair loss to her chemotherapy. **Ex. B** at 280:20–281:4 ("Q. Have you ever thought that your hair loss could be caused by anything other than chemotherapy? A. No. Q. Always attributed it to a chemotherapy drug? A. Yes."). Thus, by January 2010, Ms. Thibodeaux

12

had enough information to excite her attention that she suffered an injury purportedly caused by Taxotere.

Also like MDL Plaintiffs Ms. Johnson and Ms. Francis, Ms. Thibodeaux failed to investigate her injury:

> **Q.** Did you ever talk to a doctor about the hair loss that you're claiming in this lawsuit.
>
> **A.** No.
>
> **Q.** Never sought to ask if there were any treatment options available?
>
> **A.** No, I didn't.
> …
>
> **Q.** And you've never asked a doctor if there's anything you could do to regrow hair; correct?
>
> **A.** I didn't.

**Ex. B** at 279:13–19; **Ex. H** at 418:18–21. Dr. Zoe Larned has been treating Ms. Thibodeaux since 2008. **Ex. J** at 103:1–3. Consistent with Ms. Thibodeaux's testimony, Dr. Larned testified that Ms. Thibodeaux has never talked to her about her hair loss.[7] *Id.* at 103:1–8 ("Q. Has she ever talked to you about Taxotere? A. No. Q. And if she had talked to you about hair loss, would you have noted it in your records? A. Yes."); *see also id.* at 121:22–122:10. Ms. Thibodeaux also met with dermatologist Dr. Julie Danna three times after she completed chemotherapy. **Ex. I** at 37:9–17; 38:2–16; 40:12–18; 43:3–10. Yet, Ms. Thibodeaux did not ask Dr. Danna about hair loss or

---

[7] Ms. Thibodeaux never asked her doctor about the possible link between Taxotere and her hair loss, and thus she cannot rely on a doctor's statement to argue that prescription was tolled. But, even if she had asked her doctor, *contra non valentem* would not apply. Notably, the Louisiana Supreme Court has declined to apply *contra non valentem* even where a plaintiff asks her doctor about her injury and the doctor tells the patient her injury may resolve. *See Fontenot v. ABC Ins. Co.*, 674 So. 2d 960, 964–65 (La. 1996).

alopecia at any of those meetings. *Id.* at 37:9–21 ("Q. She never mentioned hair loss to you? A. Not according to my notes. Q. You never treated her for hair loss? A. No."); 45:1–4.

Ms. Thibodeaux—like both Ms. Johnson and Ms. Francis—made no effort to investigate her claim within the prescription period. Instead, Ms. Thibodeaux did not take any action until she saw a television advertisement describing an alleged link between Taxotere and permanent hair loss. Ms. Thibodeaux's failure to investigate before seeing the advertisement was unreasonable as a matter of law. *See Luckett v. Delta Airlines*, 171 F.3d 295, 300 (5th Cir. 1999) ("[T]he prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." (citing *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. App. 1st Cir. 1997)). Ms. Thibodeaux had a duty to investigate by January 2010. She did not. There is no genuine issue of disputed fact, and Ms. Thibodeaux's claim prescribed as a matter of law no later than January 2011.

## CONCLUSION

For the foregoing reasons, Sanofi is entitled to summary judgment on Ms. Thibodeaux's claims.

Date: December 19, 2019

                                                Respectfully submitted,
                                                /s/ *Douglas J. Moore*
                                                Douglas J. Moore (Bar No. 27706)
                                                **IRWIN FRITCHIE URQUHART &**
                                                **MOORE LLC**
                                                400 Poydras Street, Suite 2700
                                                New Orleans, LA 70130
                                                Telephone: 504-310-2100
                                                Facsimile: 504-310-2120
                                                dmoore@irwinllc.com

>Harley V. Ratliff
>Adrienne L. Byard
>**SHOOK, HARDY& BACON L.L.P.**
>2555 Grand Boulevard
>Kansas City, Missouri 64108
>Telephone: 816-474-6550
>Facsimile: 816-421-5547
>hratliff@shb.com
>abyard@shb.com
>
>*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

>*/s/ Douglas J. Moore*