**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                                    **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                                              **SECTION "H" (5)**

**THIS DOCUMENT RELATES TO:**

**Cases listed on attached Exhibit A.**

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFFS WHOSE**
**TAXOTERE TREATMENT STARTED BEFORE DECEMBER 15, 2006**

---

The overwhelming majority of jurisdictions recognize that a prescription drug manufacturer has a duty to warn only of risks that the manufacturer knew or should have known of <u>at the time of manufacture</u>. That timing is dispositive here. The Plaintiffs' Steering Committee ("PSC") has provided no evidence that Sanofi knew or should have known of a possible causal association between Taxotere and permanent hair loss at any point ***before December 15, 2006***.[1]

Specifically, the PSC's regulatory and label expert, Dr. David Kessler, testified that "by as early as 2009," and no earlier than December 15, 2006, there first existed reasonable evidence of a causal association between Taxotere and permanent hair loss requiring Sanofi to change the Taxotere label. No expert offered by the PSC has or will testify that Sanofi had actual or constructive knowledge of such evidence (or a corresponding duty to warn) any earlier than this date. On this record, the Court should dismiss every case identified in **Exhibit A** because these Plaintiffs started their Taxotere treatments before December 15, 2006, and thus began using

---

[1] Dr. Kessler relies on an abstract by Dr. Scot Sedlacek that was presented at the San Antonio Breast Cancer Symposium on December 15, 2006.  Ex. C, Kessler Rpt. at 27; Ex. D, (Sanofi_04196131).

Taxotere before any duty to warn allegedly arose.[2]  As a matter of law, those Plaintiffs cannot establish the essential element of duty (or breach or causation) for their failure-to-warn claims. Accordingly, summary judgment is warranted.

## **LEGAL STANDARD**

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).

## **CHOICE OF LAW**

All of the Plaintiffs in **Exhibit A** elected to directly file their cases in this MDL.[3] Accordingly, the applicable law is the law of the "originating state" (*i.e.*, the state where the case originated) where each plaintiff alleges she was prescribed or received Taxotere/docetaxel treatment.  *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09–md–02100, 2011 WL 1375011, at *6 (S.D. Ill. Apr. 12, 2011) ("[T]he Court considers the originating state to be the state where the plaintiff purchased and was prescribed the subject drug"); *In re Avandia Mktg.*, *Sales Prac. & Prods. Liab. Litig.*, No. 3:09–md–02100, 2012 WL

---

[2] Sanofi contends the Taxotere label has always been adequate and warned of the risk of permanent alopecia.  For purposes of this Motion only, Sanofi takes Plaintiffs' allegations on the adequacy of the label without counter.

[3] "Cases that are directly filed in an MDL court are treated 'as if they were transferred from a judicial district sitting in the state where the case originated.'" *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348 (5th Cir. 2017) (citing *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2011 WL 1375011, at *6 (S.D. Ill. Apr. 12, 2011)); *Wahl v. Gen. Elec. Co.*, 786 F.3d 491, 496 (6th Cir. 2015) ("[T]he weight of authority has adopted *Yasmin's* rule"); *see also* Pretrial Order No. 4 (Rec. Doc. 122) ("[Direct filing] will have no impact on choice of law that otherwise would apply to an individual case had it been originally filed in another district court and transferred to this Court pursuant to 28 U.S.C. § 1407.").

3205620, at *2 (E.D. Pa. Aug. 7, 2012) (explaining that direct-filed cases "should be governed by the law of the states where Plaintiffs received treatment and prescriptions for Avandia").[4]

For the Court's convenience, **Exhibit B** summarizes the failure-to-warn law that comprise the "overwhelming majority of jurisdictions [that] support[] the proposition that a manufacturer has a duty to warn only of risks that were known or should have been known to a reasonable person."[5]  Restatement (Third) of Torts: Prod. Liab. § 2 reporters' note to comment *m* (1998); *In re Chantix (Varenicline) Prod. Liab. Litig.*, 881 F. Supp. 2d 1333, 1338 (N.D. Ala. 2012) ("While the elements of a failure to warn claim vary from state to state, the requirements of a such a claim generally include that 'where the manufacturer . . . of a product has actual or constructive knowledge of danger to users, the . . . manufacturer has a duty to give warning of such dangers.'" (citing *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 611 (2011))); 1 David G. Owen & Mary J. Davis, Owen & Davis on Prod. Liab. § 9.3 (4th ed. 2019) ("Most jurisdictions agree that no seller, manufacturing or otherwise, will be obligated to provide warnings of a risk that is unknown or unknowable at the time of initial distribution of the product.").[6]

---

[4] Alternatively, the Court may look to the state where Plaintiffs have alleged that they would filed their cases in the absence of the direct filing Order.  *In re Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig.*, 76 F. Supp. 3d 294, 304 (D. Mass. 2015) (considering the forum that direct filing MDL plaintiffs designated on their Short Form Complains as the originating home forum for choice of law purposes).

[5] As the Restatement (Third) of Torts has recognized, only a few jurisdictions eliminate "knowability" from the concept of a label's adequacy.  From Sanofi's review, only two continue to impose so-called super-strict liability for failure-to-warn claims, apparently without distinguishing prescription drug claims:  Hawaii and Montana.  *See In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806, 816 (9th Cir. 1992); *Sternhagen v. Dow Co.*, 935 P.2d 1139, 1142 (Mont. 1997).  To the extent that these states do not impose a foreseeability requirement for strict liability claims, summary judgment is still warranted because the PSC has no evidence that Sanofi's label before 2006 was inadequate.  This is a failure-to-warn pharmaceutical drug litigation, and Plaintiffs premise their claims on the notion that a label or warning was inadequate at some point in time.  Dr. Kessler, however, has never provided an opinion stating that the Taxotere label before 2006 was inadequate.  Ex. F, Sept. 17, 2019 Trial Tr. 434:9–12; 435:6–10.  Further, the PSC has stated, "[f]rom a liability standpoint," the most relevant "time period for Sanofi [is] between 2012 and 2015" due to a lack of case reports or evidence of company knowledge prior to that period.  *See* Ex. J, PSC's CMO 20 Submission for the Fourth and Fifth Bellwether Trials (Aug. 9, 2019).  Without any evidence of inadequacy, the Court should also grant summary judgment against Plaintiffs whose claims are governed by Hawaii or Montana law.

[6] For example, these jurisdictions all recognize that a manufacturer has a duty to warn only of known or knowable risks.  *See, e.g.*, *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 272 n.11 (5th Cir. 2002) (Louisiana law); *Swanson v. Abbott Labs.*, No. 2:14-cv-1052, 2017 WL 5903362, at *9 (S.D. Ohio Nov. 28, 2017); *Brazil v. Janssen Research*

This MDL Court has the authority to enter dispositive pretrial orders. *See Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 904–05 (2015) ("Congress anticipated that, during the pendency of pretrial proceedings, final decisions might be rendered in one or more of the actions consolidated pursuant to § 1407."); *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 364 (3d Cir. 1993) ("It seems to be widely accepted that § 1407 and the rules promulgated thereunder empower a transferee court to enter dispositive orders to terminate a case[.]").

To that end, a transferee court is well within its discretion to consider the laws of multiple states to decide whether common issues warrant summary judgment against some—or even all— of the MDL plaintiffs. *See In re TMJ Implants Prods. Liab. Litig.*, 872 F. Supp. 1019, 1024 (D. Minn. 1995) (explaining that the transferor court "has considered the law of each of the states that would apply in the individual actions" in products liability MDL and entering summary judgment in two defendants' favor based on raw material supplier defense and bulk supplier/sophisticated purchaser rule); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 227 F. Supp. 3d 452, 490 (D.S.C. 2017) (explaining that ruling on omnibus motions for summary judgment in MDLs that involve issues common to all cases "'will promote the just and efficient conduct' of these actions"). Here, when Sanofi knew or should have known about the alleged risk of permanent hair loss embraces an issue common to all Plaintiffs. *In re Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig.*, 76 F. Supp. 3d at 298 (explaining that what defendants knew or should have known was a common factual question in the MDL). Accordingly, summary judgment is warranted on this common issue because the PSC's hand-

---

*& Dev. LLC*, 196 F. Supp. 3d 1351, 1360 (N.D. Ga. 2016); *Prather v. Abbott Labs.*, 960 F. Supp. 2d 700, 708, 711 (W.D. Ky. 2013); *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 706 (W.D.N.C. 2003); *Barrow v. Bristol-Myers Squibb*, No. 96-cv-689, 1998 WL 812318, at *30 (M.D. Fla. Oct. 29, 1998); *Carlin v. Superior Court*, 920 P.2d 1347, 1352 (Cal. 1996); *Hahn v. Richter*, 673 A.2d 888, 891 (Pa. 1996); *Griggs v. Combe, Inc.*, 456 So. 2d 790, 792 (Ala. 1984); *Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex. 1978).

selected expert, Dr. Kessler, has given an opinion that serves as a general concession that the earliest date by which Sanofi could have known of the risk of permanent alopecia was not until December 15, 2006.

## ARGUMENT

For every case in **Exhibit A**, the applicable law provides that a manufacturer's duty to warn extends only to known or knowable risks. A particular risk must be "known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available *at the time of manufacture and distribution*." *Carlin v. Superior Court*, 920 P.2d 1347, 1352 (Cal. 1996); *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1172 (Colo. 1993); *see also Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1089 (5th Cir. 1973); *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 854 (10th Cir. 2003) (explaining that the "adequacy of a warning is commensurate with the manufacturer's knowledge of the effects of the drug"). Without this limitation, manufacturers would become virtual insurers of their products—that is, drug manufacturers would be liable for injuries from risks that were not and could not be discovered at the time of distribution. *See Woodill v. Parke Davis & Co.*, 402 N.E.2d 194, 199 (Ill. 1980).

The corollary of this basic principle is that Plaintiffs may not premise their failure-to-warn claims on risks unknowable to the manufacturer at the time of distribution. In these cases, the defendant may move for summary judgement to establish that it has no duty to warn as a matter of law. One way is where, as here, Plaintiffs' own experts concede that the manufacturer should have known about an alleged risk only *after* Plaintiffs were injured. *See Mack v. Stryker Corp.*, 893 F. Supp. 2d 976, 987 (D. Minn. 2012) (granting summary judgment for defendant manufacturer after plaintiff's expert acknowledged that the medical community did not draw the connection between the medical device and the injury until three years after plaintiff's injury);

*Meharg v. I-Flow Corp.*, No. 1:08-cv-184, 2010 WL 711317, at *4 (S.D. Ind. Mar. 1, 2010) (granting summary judgment for defendant manufacturer after Plaintiffs' own expert did not find that there was a known risk of harm at the time of [plaintiff's] surgery"); *Johnson & Johnson Talcum Powder Cases*, 249 Cal. Rptr. 3d 642, 663 (Cal. Ct. App. 2019) (concluding that baby powder manufacturer had no duty to warn of product's risk of ovarian cancer, in part, because plaintiff's expert acknowledged that the risk became scientifically known two decades after manufacturer ceased production).   A drug manufacturer may also "present evidence to show that there was no 'reasonably scientifically knowable risk' because, at the time of distribution, the cause of the alleged adverse effect was too speculative to have been reasonably attributable to the drug by a scientist conducting state-of-the-art research."   *Carlin*, 920 P.2d at 1353.

For this Motion, the Court may consider the PSC's expert, Dr. Kessler, as the "scientist conducting state-of-the-art research."   The PSC—tasked with "[c]onduct[ing] all discovery in a coordinated and consolidated manner on behalf and for the benefit of all plaintiffs"—chose Dr. Kessler as its sole regulatory and label expert.   *See* Pretrial Order No. 1 (Rec. Doc. 4).   The PSC has emphasized that, "[a]s a medical doctor, former dean of two medical schools, and former commissioner of the Food and Drug Administration ("FDA"), Dr. Kessler is extremely well-qualified to render his opinions on the matters detailed in his report."   Pls.' Opp. to Mot. to Exclude (Rec. Doc. 7467).[7]

Further, Dr. Kessler represents that he has based his conclusion on the universe of available scientific evidence.   Ex. G, Kessler Suppl. Rpt. at 2.   Through the first bellwether trial, the PSC has paid Dr. Kessler more than $395,000 to spend nearly 400 hours conducting an allegedly exhaustive review of these sources.   Ex. H, Dec. 20, 2018 Kessler Dep. 17:4–18; Ex. I, Nov. 26,

---

[7] For purposes of this Motion, Sanofi sets aside without waiver its challenges to Dr. Kessler, which it briefed for the Court's ruling.  (Rec. Docs. 6146, 7616, 8153).

2019 Kessler Dep. 18:25–19:25; Ex. K, Kessler Dec. 1, 2018 Invoice; Ex. L, Kessler Dec. 31, 2018 Invoice; Ex. M, Kessler Sept. 20, 2019 Invoice.  Dr. Kessler also purported to consider a trove of documents produced during a thorough discovery period against Sanofi, which closed in December 2018.  In sum, Dr. Kessler states his opinion is based on the following:

- 37 depositions and all accompanying exhibits;

- 538 internal Sanofi documents;

- 124 FDA documents, totaling more than 5,200 pages;

- 29 US Package Insert labels for Taxotere;

- All past and current Canadian product monographs and EU SmPC's for Taxotere;

- 7 alternate chemotherapy drug labels; and

- More than 100 scientific and medical articles and other documents.

*See* Ex. C, Kessler Rpt. and App. C; Ex. G, Kessler Suppl. Rpt. and Suppl. App. C.  Taken together, Dr. Kessler's opinion addresses what was "reasonably scientifically knowable" based on the then-existing evidence in the medical community.  *Carlin*, 920 P.2d at 1353 ("[W]hen a plaintiff's claim is based on an allegation that a particular risk was 'reasonably scientifically knowable,' an inquiry may arise as to what a reasonable scientist operating in good faith should have known under the circumstances of the evidence.").

Apparently armed with a full picture of the available scientific knowledge, Dr. Kessler consistently has asserted that Sanofi's duty to warn began in 2008 or 2009, but not earlier than December 15, 2006.  For example:

**December 2018 Deposition:**   At his first deposition, Dr. Kessler testified that he considered Dr. Sedlack's December 15, 2006 abstract as the linchpin triggering Sanofi's duty to warn physicians of the risk of permanent hair loss.  As he testified, "if you look at Sedlacek in

2006 found zero out of X and seven out of a hundred something, and it's statistically significant at 12 months, I think that's a pretty good cutoff. . . . Sedlacek's date in 2006 the bells should be going off." Ex. H, Dec. 20, 2018 Kessler Dep. 137:9–138:10. He further explained that, "if you look at this scientifically, and that's what Pharmacovigilance is, that's what Sanofi should have done, this data was publicly available, it was at the major breast conference, it was put out in 2006, but in 2006 this was over, as far as causation." *Id.* at 250:17–252:1.

**First Bellwether Trial:** Dr. Kessler affirmed this opinion at trial. At the invitation of Plaintiff's counsel, Dr. Kessler was asked whether he had "made a determination about approximately when the information was sufficient to put Sanofi on notice that it needed to provide a permanent hair loss warning[,]" and Dr. Kessler testified that he thought "not later than about 2009, and probably as early as around 2006." Ex. F, Sept. 17, 2019 Trial Tr. 331:3–10. Plaintiff's counsel then asked Dr. Kessler "it [was] fair to say that – that Sanofi should have warned about permanent hair loss as early as '06?" Dr. Kessler response was unequivocal: "Yes. Because in addition to the reasonable evidence of a causal association, I think permanent hair loss is serious, certainly a clinically significant hazard, that can be life-changing." *Id.* at 386:15–24.

**Expert Reports:** In his report, Dr. Kessler applied the FDA labeling guidance factors to the available data. Ex. C, Kessler Rpt. at 39–54. After considering the seven factors, Dr. Kessler concluded that "a Warning regarding irreversible alopecia was warranted by as early as 2009." *Id.* at 54. Dr. Kessler later submitted a supplement to his report, which further solidified his opinion and concluded that "based on all scientific evidence, Sanofi should have warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label by as early as 2006, and certainly by 2008. This is consistent with my prior testimony." Ex. G, Kessler Suppl. Rpt. at 1.

**November 2019 Deposition:** At his second deposition, Dr. Kessler did not waver,

testifying that the available evidence did not raise a safety signal until 2006 at the earliest:  "Q. When did a safety signal exist between irreversible alopecia and Taxotere?  A. Based on the totality of the evidence?  Q.  Based on your – what's your opinion?  A.  So my sense is, as I have testified both I think in my first deposition and my trial testimony, I think it's probably safe to say as early as 2006 and certainly no later than 2008."  Ex. I, Nov. 26, 2019 Kessler Dep. 158:10-18.

At his deposition, at trial, and in his reports, Dr. Kessler's opinion has been and remains that Sanofi's duty to warn did not arise until December 15, 2006.  His opinion is instructive because the law holds a manufacturer to the knowledge of an expert in the field when determining whether a risk was knowable.  *See Borel*, 493 F.2d at 1089.  Here, the PSC has had more than four years to gather evidence to address this issue.   And Dr. Kessler—the PSC's designated expert and former FDA Commissioner—has spent nearly 400 hours reviewing the available data.  His conclusion over the past two years has remained constant:  Sanofi's duty to warn physicians about the risk of permanent hair loss did not arise until December 15, 2006.  The PSC has come forward with no evidence that Sanofi knew or should have known about the alleged link between Taxotere and permanent hair loss before that date.  The PSC thus has no evidence that the Taxotere label was inadequate before that date.[8]

Because the PSC's own expert establishes that Sanofi had no duty to warn before December 15, 2006, Sanofi is entitled to summary judgment against each Plaintiff identified in

---

[8] Sanofi notes that Dr. David Madigan also conducted statistical analyses to identify potential "safety signals."  A "safety signal" refers to a concern about an excess of adverse events compared to what would be expected to be associated with a product's use.'"  *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2:12-cv-07263, 2016 WL 4039271, at *3 (E.D. Pa. July 28, 2016) (citation omitted).  Although two analyses allegedly identify potential pre-2006 "safety signals," neither signal is material to the Court's analysis.  First, a safety signal merely prompts a duty to investigate whether a causal connection might exist.  *Id.* at *3.  Second, Plaintiffs have not offered Dr. Madigan on the subject of when there was reasonable evidence of a causal association for purposes of updating the Taxotere label.  Sanofi includes Dr. Madigan in its Motion only to the extent that Dr. Kessler relied on the underlying data used by Dr. Madigan.  Ultimately, the legal issue for resolution by the Court turns not on Dr. Madigan's data, but on the conclusions drawn by Dr. Kessler from that data.

**Exhibit A** who started chemotherapy treatment before that date.[9]  *Mack.*, 893 F. Supp. 2d at 987;

*Meharg*, 2010 WL 711317, at *4; *Johnson & Johnson Talcum Powder Cases*, 249 Cal. Rptr. 3d at

663; *see also Stupak v. Hoffman-La Roche, Inc.*, 326 F. App'x 553, 560 (11th Cir. 2009) ("Without

any evidence that Roche knew or should have known that Accutane could cause suicide without

premonitory symptoms, Stupak cannot maintain a claim that Roche had a duty to provide a separate

warning of that danger.").

 For example, bellwether Plaintiff **Della Martin** was diagnosed with breast cancer on

December 16, 2005.  Ex. N, Martin Eighth Amended Plaintiff Fact Sheet ("PFS") § V.5.  Ms.

Martin started her chemotherapy regimen, which included Taxotere, on February 23, 2006.  *Id.* §

V.12.  After receiving four cycles of Taxotere, Ms. Martin completed her regimen on July 18,

2006, in Jacksonville, Florida.  *Id.* § V.13, 15.  While Ms. Martin completed Phase I discovery as

a bellwether plaintiff, this dispositive information was known from her PFS alone.  Because Dr.

Kessler's unrebutted testimony states that Sanofi's duty to warn did not arise until December 15,

2006, the Court should enter summary judgment against Ms. Martin.  *See Barrow v. Bristol-Myers*

*Squibb*, No. 96-689-CIV-ORL-19B, 1998 WL 812318, at *30 (M.D. Fla. Oct. 29, 1998)

("[M]anufacturers are not required to warn of every risk which might be remotely suggested by

any obscure tidbit of available knowledge, but only of those risks which are discoverable in light

of the 'generally recognized and prevailing best' knowledge available.").

 Ms. Martin's case is not unique.  Her case is representative of the Plaintiffs who have filed

lawsuits based on pre-2007 Taxotere use:

---

[9] On page 37 of Exhibit A, two Plaintiffs did not include the date of their first Taxotere treatments. Ex. A at 37. These
Plaintiffs, however, have alleged that they completed their respective Taxotere treatments before December 15,
2006. Accordingly, Sanofi seeks summary judgment against these two Plaintiffs.

| YEAR OF FIRST TAXOTERE TREATMENT | NUMBER OF PLAINTIFFS |
|---|---|
| 1996 | 1 |
| 1997 | 3 |
| 1998 | 12 |
| 1999 | 32 |
| 2000 | 39 |
| 2001 | 64 |
| 2002 | 137 |
| 2003 | 185 |
| 2004 | 240 |
| 2005 | 289 |
| 2006 (through December 15) | 368 |
| TOTAL | 1370 |

As the chart above demonstrates, many Plaintiffs received Taxotere treatment before the risk became knowable. To put a finer point on it, 473 Plaintiffs received Taxotere before the FDA approved it for adjuvant chemotherapy treatment in 2004. And Dr. Kessler's opinions—which were prompted by and prepared for the benefit of the PSC—establish that Sanofi's duty to warn of the potential risk of permanent hair loss was not triggered until December 16, 2006.

Like Ms. Martin, the Court may readily determine whether a case is dispositive on this issue by examining the PFS's and short form complaints alone. Coupled with **Exhibit B**, the Court may cross-reference the applicable law of the relevant jurisdiction. As examples, by selecting five relevant states and pre-2007 Plaintiffs, the Court can conclude summary judgment is warranted:

**Louisiana: Dorothy Magee** was diagnosed with breast cancer on September 1, 1999. Ex. O, Magee Fifth Amended PFS § V.6. Her oncologist, Dr. Carl Kardinal, prescribed four cycles of Taxotere to Ms. Magee, which she started on March 8, 2000 in New Orleans, Louisiana. *Id.* § V.12–14. In Louisiana, the "manufacturer's duty to warn a particular plaintiff is measured by the state of scientific and/or technical knowledge at the time the product left the manufacturer's

control." *Stahl*, 283 F.3d at 271 n.11.  Accordingly, Ms. Magee started treatment six years before the state of scientific knowledge prompted a duty to warn.

**California:**  To treat her breast cancer, **Sheila Griffith** underwent chemotherapy treatment, a right mastectomy, and radiation in Vallejo and Fairfield, California.  Ex. P, Griffith Second Amended PFS § V.5.  Ms. Griffith alleges that her first treatment with Taxotere was on June 12, 1998, more than eight years before Plaintiffs' expert states that Sanofi should have been aware of the risk.  *Id.* § V.12.  Summary judgment against Ms. Griffith is appropriate because "[t]he rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution."  *Carlin*, 920 P.2d at 1351.

**Texas:**  On April 23, 2003, **Rebecca Mozisek** began the first of four cycles of Taxotere to treat her breast cancer in Dallas, Texas.  Ex. Q, Mozisek Second Amended PFS § V.5, 12.  Ms. Mozisek completed her treatment two months later on October 15, 2003.  *Id.* § V.12.  Under Texas law, "[i]f a manufacturer knows or should know of potential harm to a user because of the nature of its product, the manufacturer is required to give an adequate warning of such dangers."  *Gonzales*, 561 S.W.2d at 804.  But here, as Dr. Kessler has opined, the duty to warn arose three years after Ms. Mozisek began treatment.

**Missouri:  Kyna Hunt** received chemotherapy treatment to treat her breast cancer at the St. Louis University Medical Center in St. Louis, Missouri.  Ex. R, Hunt Second Amended PFS § V.7, 12, 14.  Ms. Hunt's treatment, which ran from November 13, 2003 to October 13, 2004, included Taxotere.  *Id.* §V.12.  Missouri has statutorily adopted a state-of-the-defense, which provides manufacturers a complete defense if "the dangerous nature of the product . . . could not

reasonably be discovered at the time the product was placed in the stream of commerce." Mo. Ann. Stat. § 537.764(1)-(2). Under Missouri law, Ms. Hunt's claims are barred because Sanofi could not have discovered the risk for another three years.

**Pennsylvania:** From August 18, 2006 to December 1, 2006, **Kimberly Lawless** received six cycles of chemotherapy to treat her breast cancer. Ex. S, Lawless Second Amended PFS §V.12. Ms. Lawless's chemotherapy regimen, which was administered at a treatment facility in Langhorne, Pennsylvania, included Taxotere. *Id.* § V.14. Although Ms. Lawless began chemotherapy just four months before the Sedlacek abstract was presented, Dr. Kessler's expert opinion creates a bright-line test for the Court to apply. *Bell v. Boehringer Ingelheim Pharm., Inc.*, No. CV 17-1153, 2018 WL 928237, at *3 (W.D. Pa. Feb. 15, 2018) (citing *Hahn v. Richter*, 673 A.2d 888, 890 (Pa. 1996)).

These five women took Taxotere with a label that Plaintiffs' experts do not dispute was adequate at the time. Ex. F, Trial Tr. 434:9-12; 435:6-10. Another 1365 Plaintiffs raise analogous facts under analogous failure-to-warn laws. Accordingly, the Court should grant summary judgment against all **Exhibit A** Plaintiffs who started their Taxotere treatment before December 15, 2006.

## CONCLUSION

The Court should grant Sanofi's motion for summary judgment because there is no genuine issue of material fact as to the adequacy of the Taxotere label before December 15, 2006.

Date: January 7, 2020

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2020, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*