# EXHIBIT F

Page 257

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY            Docket No.: 16-MD-2740
LITIGATION        Section "H(5)"
September 17, 2019
New Orleans, Louisiana

Relates To: Barbara Earnest,
Case No.: 16-CV-17144

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DAY 2, MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:    Barrios, Kingsdorf & Casteix, LLP
                       BY: DAWN BARRIOS, ESQ.
                       701 Poydras Street
                       Suite 3650
                       New Orleans, Louisiana 70139

For the Plaintiffs:    Gainsburgh, Benjamin, David,
                       Meunier & Warshauer, LLC
                       BY: PALMER LAMBERT, ESQ.
                       2800 Energy Centre
                       1100 Poydras Street
                       New Orleans, Louisiana 70163-2800

Page 258

1  APPEARANCES:
2  For the Plaintiffs:    Simmons Hanly Conroy
                          BY: DAVID F. MICELI, ESQ.
3                         One Court Street
                          Alton, Illinois 62002
4
5
   For the Plaintiffs:    Gibbs Law Group, LLP
6                         BY: KAREN BARTH MENZIES, ESQ.
                          400 Continental Boulevard
7                         6th Floor
                          El Segundo, California 90245
8
9
   For the Plaintiffs:    Pendley, Baudin & Coffin, LLP
10                        BY: CHRISTOPHER COFFIN, ESQ.
                          1100 Poydras Street
11                        Suite 2505
                          New Orleans, Louisiana 70163
12
13
   For the Plaintiffs:    Bachus & Schanker, LLC
14                        BY: DARIN SCHANKER, ESQ.
                          BY: J. KYLE BACHUS, ESQ.
15                        1899 Wynkoop Street
                          Suite 700
16                        Denver, Colorado 80202
17
18 For the Plaintiffs:    Fleming, Nolen & Jez, LLP
                          BY: RAND P. NOLEN, ESQ.
19                        2800 Post Oak Boulevard
                          Suite 4000
20                        Houston, Texas 77056.
21
22 For the Plaintiffs:    Morgan and Morgan
                          BY: EMILY C. JEFFCOTT, ESQ.
23                        7010 S. Palafox Street, Suite 95
                          Pensacola, Florida 32502
24
25

Page 259

1  APPEARANCES:
2
   For Sanofi-Aventis U.S.,
3  LLC and Sanofi US
   Services, Inc.:        Irwin Fritchie Urquhart
4                           & Moore, LLC
                          BY: DOUGLAS J. MOORE, ESQ.
5                         400 Poydras Street, Suite 2700
                          New Orleans, Louisiana 70130
6
7
   For Sanofi-Aventis U.S.,
8  LLC and Sanofi US
   Services, Inc.:        Shook Hardy & Bacon, LLP
9                         BY: HARLEY V. RATLIFF, ESQ.
                          BY: JON A. STRONGMAN, ESQ.
10                        2555 Grand Boulevard
                          Kansas City, Missouri 64108
11
12
   For Sanofi-Aventis U.S.,
13 LLC and Sanofi US
   Services, Inc.:        Shook Hardy & Bacon, LLP
14                        BY: HILDY SASTRE, ESQ.
                          201 Biscayne Boulevard
15                        Suite 3200
                          Miami, Florida 33131
16
17
   Official Court Reporter:  Cathy Pepper, CRR, RMR, CCR
18                           Certified Realtime Reporter
                             Registered Merit Reporter
19                           500 Poydras Street, Room B-275
                             New Orleans, Louisiana 70130
20                           (504) 589-7779
                             Cathy_Pepper@laed.uscourts.gov
21
22 Proceedings recorded By mechanical stenography. Transcript
   produced by computer-aided transcription.
23
24
25

Page 260

1                    I N D E X
2
3                                             PAGE
4
5  AMY FREEDMAN VIDEOTAPED DEPOSITION................ 265
6  DAVID KESSLER, MD................................. 285
7  VOIR DIRE EXAMINATION BY MR. NOLEN................ 286
8  DIRECT EXAMINATION BY MR. NOLEN................... 302
9  LUNCHEON RECESS................................... 375

Page 329

1  Q. And I notice, too, there is additional language that I've
2  highlighted. When is it that those adverse reactions -- when
3  is it that any type of warning is supposed to be updated?
4  A. The bottom line is when it's important for doctors and
5  patients to have that information. Specifically in the
6  regulations, in the adverse event section when it talks about
7  nature, severity, duration, any information -- the guidance
8  says when it's necessary -- any information necessary to
9  interpret that adverse event.
10  Q. And you've just said some words there that I think we find
11  right here.
12      "For adverse reaction with clinical significant
13  implications, the listings must be supplemented with additional
14  detail about the nature, frequency and severity of the adverse
15  reaction."
16      Do you see that, Doctor?
17  A. Correct.
18  Q. Is that consistent what you just told us?
19  A. It is.
20  Q. So, Doctor, this the rule that a drug company must follow;
21  is that correct?
22  A. I think you probably put an "s" on that, and I would
23  agree. There are a number of different rules for the warning
24  section, and there is rules for the adverse event section.
25  Q. And in your view, Doctor, did Sanofi comply with this with

Page 330

1  regard to permanent hair loss?
2  A. No.
3  Q. And you reviewed the Taxotere label, I think you told us
4  that already, correct?
5  A. Correct.
6  Q. And did you ever find a warning about permanent hair loss
7  in any section?
8  A. In the label that you've shown me.
9  Q. From a regulatory standpoint, is it your belief that that
10  should have been warned about?
11      MR. STRONGMAN: Objection. Leading.
12      THE COURT: Rephrase -- no, overruled.
13      THE WITNESS: Yes, it should have been warned -- Sanofi
14  should have warned clearly and prominently about the risks of
15  irreversible hair loss.
16  EXAMINATION BY MR. NOLEN:
17  Q. What have you reviewed in this case to come here and
18  provide opinions today?
19  A. I've reviewed, you know, thousands and thousands of pages
20  of documents. I have looked at Sanofi's pharmacovigilance
21  database. I have looked at their clinical trials. I've looked
22  at the medical literature. I've read testimony, deposition
23  testimony. I've read company internal correspondence.
24  Q. So I want to be clear about this. Is it your opinion that
25  by 2011, the time that Ms. Earnest took Taxotere, there should

Page 331

1  have been a warning about permanent hair loss?
2  A. Yes.
3  Q. With regard to the information that you have reviewed,
4  have you made a determination about approximately when the
5  information was sufficient to put Sanofi on notice that it
6  needed to provide a permanent hair loss warning?
7  A. Yes, I have made that determination.
8  Q. When, approximately, was that?
9  A. I think not later than about 2009, and probably as early
10  as around 2006.
11  Q. We talked about this earlier, but I need to be clear. Did
12  Sanofi need FDA to tell it to make a labeling change to add
13  permanent to the alopecia warning?
14  A. No, it does not.
15  Q. I think you told us about changes being effected. How
16  does that process work?
17  A. Changes being effected is if you have evidence of a safety
18  hazard, if you have any new information that you think doctors
19  and patients should have, it's one of the ways you can get that
20  information on the label. You can go ahead and make that
21  changes -- that change to the label, even without FDA approval.
22  But then you have to come in to FDA, and FDA ultimately gets to
23  review that label.
24  Q. Okay. But the labeling change itself is not FDA
25  generated; is that correct?

Page 332

1  A. Under a changes being effected, that would be correct.
2  Q. All right. I want to direct your attention back just for
3  a moment, if I could, to the label itself. We talked about how
4  thick this thing is. It's big. It's thick. There is a lot of
5  information here that's aimed at doctors.
6      Is there any information that is aimed towards
7  patients?
8  A. Yes.
9  Q. Where is that information found?
10  A. First -- I do want to underscore this -- I think the
11  entire label, ultimately, is about patients. It's doctors
12  conveying the information to patients.
13      But there is a special section of the label, at the
14  very end of the label, excuse me, that I believe is titled
15  Patient Counseling Information.
16  Q. If I can -- see if I can locate exactly where that starts.
17  Yes. Yes. Right here. It's page 58. 58.
18      It says, Patient Information. Do you see that? Is
19  this what you're referring to?
20  A. Correct. One thing we did when we were at FDA is we
21  encouraged drug companies to do exactly this. We call this the
22  patient package insert, the patient information section of the
23  label.
24  Q. What's the purpose of it?
25  A. Not to supplant the physician/patient discussion, that's

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION    *   Docket No.: 16-MD-2740
                                 *   Section "H(5)"
                                 *   New Orleans, Louisiana
Relates to: Barbara Earnest      *   September 17, 2019
Case No.: 16-CV-17144            *
* * * * * * * * * * * * * * * * *

DAY 2 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:     Barrios Kingsdorf & Casteix, LLP
                        BY: DAWN M. BARRIOS, ESQ.
                        701 Poydras Street
                        Suite 3650
                        New Orleans, Louisiana 70139

For the Plaintiffs:     Gainsburgh Benjamin David Meunier
                         & Warshauer, LLC
                        BY: M. PALMER LAMBERT, ESQ.
                        1100 Poydras Street
                        Suite 2800
                        New Orleans, Louisiana 70163

For the Plaintiffs:     Pendley Baudin & Coffin, LLP
                        BY: CHRISTOPHER L. COFFIN, ESQ.
                        1100 Poydras Street
                        Suite 2505
                        New Orleans, Louisiana 70163

OFFICIAL TRANSCRIPT

Page 2

APPEARANCES:

For the Plaintiffs:     Gibbs Law Group, LLP
                        BY: KAREN BARTH MENZIES, ESQ.
                        6701 Center Drive West
                        Suite 1400
                        Los Angeles, California 90045

For the Plaintiffs:     Bachus & Schanker, LLC
                        BY: J. KYLE BACHUS, ESQ.
                            DARIN L. SCHANKER, ESQ.
                        1899 Wynkoop Street
                        Suite 700
                        Denver, Colorado 80202

For the Plaintiffs:     Fleming Nolen & Jez, LLP
                        BY: RAND P. NOLEN, ESQ.
                        2800 Post Oak Boulevard
                        Suite 4000
                        Houston, Texas 77056

For the Plaintiffs:     DAVID F. MICELI, LLC
                        BY: DAVID F. MICELI, ESQ.
                        Post Office Box 2519
                        Carrollton, Georgia 30112

For the Plaintiffs:     Morgan & Morgan, P.A.
                        BY: EMILY C. JEFFCOTT, ESQ.
                        700 S. Palafox Street
                        Suite 95
                        Pensacola, Florida 32502

For the Sanofi          Irwin Fritchie Urquhart
Defendants:              & Moore, LLC
                        BY: DOUGLAS J. MOORE, ESQ.
                        400 Poydras Street
                        Suite 2700
                        New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

Page 3

APPEARANCES:

For the Sanofi          Shook Hardy & Bacon, LLP
Defendants:             BY: HARLEY V. RATLIFF, ESQ.
                            JON A. STRONGMAN, ESQ.
                        2555 Grand Boulevard
                        Kansas City, Missouri 64108

For the Sanofi          Shook Hardy & Bacon, LLP
Defendants:             BY: HILDY M. SASTRE, ESQ.
                        201 Biscayne Boulevard, Suite 3200
                        Miami, Florida 33131

Official Court Reporter:    Jodi Simcox, RMR, FCRR
                            500 Poydras Street
                            Room HB-275
                            New Orleans, Louisiana 70130
                            (504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

OFFICIAL TRANSCRIPT

Page 4

I N D E X

                                                       Page

DAVID KESSLER
    Direct Examination By Mr. Nolen:                    381
    Cross-Examination By Mr. Strongman:                 388
    Redirect Examination By Mr. Nolen:                  506

PROFFER
    Examination By Mr. Strongman:                       528

PROFFER
    Examination By Mr. Miceli                           534

OFFICIAL TRANSCRIPT

## Page 9

385

DAVID KESSLER - DIRECT

1:07PM 1  to chemotherapy, there is at least a plausible mechanism. So
1:08PM 2  you need that just to -- it's a check on making sure that, you
1:08PM 3  know, you just don't believe the statistics alone. It's --
1:08PM 4  again, it's the totality. So biological plausibility was also
1:08PM 5  an important factor.
1:08PM 6  Q. Okay. So applying the regulatory -- let me try to phrase
1:08PM 7  this appropriately.
1:08PM 8       Applying the regulatory criteria, did you determine
1:08PM 9  whether or not there is a causal association between Taxotere
1:08PM10  and permanent hair loss?
1:08PM11  A. Yes.
1:08PM12  Q. And --
1:08PM13  A. So I think under -- under both standards, the standard for
1:08PM14  the warning and the standard for adverse events that we saw
1:09PM15  this morning, I think it's fair to say there's reasonable
1:09PM16  evidence, not perfect evidence -- rarely is there perfect
1:09PM17  evidence. There's reasonable evidence of a causal association.
1:09PM18  Q. And you told us you were in the courtroom this morning for
1:09PM19  Dr. Freedman's testimony.
1:09PM20       Remember that?
1:09PM21  A. Correct.
1:09PM22  Q. The deposition testimony?
1:09PM23  A. I heard that, yes.
1:09PM24  Q. Did you hear in that testimony that there was an
1:09PM25  association as early as 2006?

## Page 10

386

DAVID KESSLER - DIRECT

1:09PM 1       MR. STRONGMAN: Objection. Misstates the evidence.
1:09PM 2  Foundation.
1:09PM 3       THE COURT: I think -- just rephrase your question.
1:09PM 4  BY MR. NOLEN:
1:09PM 5  Q. Did anything Dr. Freedman testified to that you heard in
1:09PM 6  court today differ from any opinions that you've offered?
1:09PM 7       MR. STRONGMAN: Objection. Foundation. Misstates
1:09PM 8  the evidence.
1:10PM 9       THE COURT: I'm going to allow him to answer the
1:10PM10  question. I think I'll allow him to answer the question.
1:10PM11       THE WITNESS: Dr. Freedman's statement that Taxotere
1:10PM12  caused permanent hair loss in 2006, her statement I would
1:10PM13  corroborate.
1:10PM14  BY MR. NOLEN:
1:10PM15  Q. Okay. And so is it fair to say that -- that Sanofi should
1:10PM16  have warned about permanent hair loss as early as '06?
1:10PM17  A. Yes. Because in addition to the reasonable evidence of a
1:10PM18  causal association, I think permanent hair loss is serious,
1:10PM19  certainly a clinically significant hazard, that can be
1:10PM20  life-changing.
1:10PM21       So the two together, I think, meet the definition of
1:11PM22  reasonable evidence of a causal association, as well as the
1:11PM23  standard for an adverse event, which is reasonably associated
1:11PM24  or some basis to believe. Both standards, I believe, would be
1:11PM25  met.

## Page 11

387

DAVID KESSLER - DIRECT

1:11PM 1  Q. And where were they supposed to warn?
1:11PM 2  A. Clearly and prominently in the label.
1:11PM 3  Q. And so -- and I want to go back, because I'm concerned
1:11PM 4  that there may be some confusion.
1:11PM 5       In 2007, we looked at, a moment ago, a warning
1:11PM 6  that -- about permanent hair loss that was in a clinical trial;
1:11PM 7  correct?
1:11PM 8  A. It was a warning in a informed consent that was for just
1:11PM 9  the clinical trial, correct.
1:11PM10  Q. All right. But that warning about permanent hair loss was
1:12PM11  not appearing in labeling --
1:12PM12  A. Correct.
1:12PM13  Q. -- all the way through 2011?
1:12PM14  A. Correct.
1:12PM15  Q. Thank you.
1:12PM16       MR. NOLEN: I pass the witness.
1:12PM17       THE COURT: Mr. Strongman.
1:12PM18       MR. STRONGMAN: If I could take a moment just to set
1:12PM19  up, Your Honor.
1:12PM20       THE COURT: Of course.
1:13PM21       Can you all see the easel?
1:13PM22       A JUROR: Yes.
1:13PM23       THE COURT: Okay. Thank you.
1:13PM24       MR. STRONGMAN: Dr. Kessler, can you see?
1:13PM25       THE WITNESS: Yes.

## Page 12

388

DAVID KESSLER - CROSS

1:13PM 1       THE COURT: Please proceed.
1:13PM 2       MR. STRONGMAN: Good afternoon, ladies and gentlemen.
1:13PM 3            CROSS-EXAMINATION
1:13PM 4  BY MR. STRONGMAN:
1:13PM 5  Q. Good afternoon, Dr. Kessler. How are you?
1:13PM 6  A. Good afternoon.
1:13PM 7  Q. So you and I have not had a chance to meet before, but you
1:13PM 8  are no stranger to the courtroom; correct?
1:13PM 9  A. That's fair.
1:13PM10  Q. I think you've testified more than 40 times; correct?
1:14PM11  A. Approximately.
1:14PM12  Q. And I thought I heard during your testimony that you said
1:14PM13  you like to review labels in your spare time.
1:14PM14       Do you remember that?
1:14PM15  A. I think I said something to that effect.
1:14PM16  Q. Right. And the truth is you actually spend quite a bit of
1:14PM17  your spare time reviewing drug labels for plaintiffs' lawyers
1:14PM18  at $1,000 an hour; isn't that correct?
1:14PM19  A. Absolutely.
1:14PM20  Q. In fact, that's the role that you find yourself in here
1:14PM21  today; isn't that right?
1:14PM22  A. I find myself testifying, absolutely.
1:14PM23  Q. All right. And you know how this process works.
1:14PM24       You create an expert report; isn't that correct?
1:14PM25  A. Right here, sir, correct.

## Page 29

405

DAVID KESSLER - CROSS

1:35PM  1  A.  There's a negotiation, fair.
1:35PM  2  Q.  And, at times, the FDA, as part of this negotiation, will
1:35PM  3  sometimes suggest additions or subtractions from the label;
1:35PM  4  correct?
1:35PM  5  A.  Yes.  FDA is -- it's a back-and-forth process.
1:35PM  6  Q.  And as a reasonable drug manufacturer, it's at least
1:35PM  7  reasonable to consider the negotiation?  It's reasonable to
1:35PM  8  consider what proposals the FDA makes; true?
1:35PM  9         MR. NOLEN:  Objection, Your Honor.  402, 403.
1:35PM 10         THE COURT:  I think you all need to approach.
1:35PM 11         (WHEREUPON, the following proceedings were held at
1:35PM 12  the bench.)
1:36PM 13         THE COURT:  How far are you going with this?  Because
1:36PM 14  I've got to tell you, I'm getting nervous.
1:36PM 15         MR. STRONGMAN:  Well, Your Honor, where we're going
1:36PM 16  is, if he answers those questions that it is reasonable to
1:36PM 17  consider, that's it.
1:36PM 18         I'm not in any way implying that it's not the
1:36PM 19  drug manufacturer's responsibility.  I'm not going to imply
1:36PM 20  that it's not our responsibility what's in the label, just that
1:36PM 21  it's part of the conversation.  That's where it ends.
1:36PM 22         MR. NOLEN:  To a large degree, Your Honor, just the
1:36PM 23  questions that he's already elicited that I did not object to
1:36PM 24  go pretty far along in implying that what Your Honor gave as an
1:36PM 25  instruction this morning is not correct, that it somehow is the

OFFICIAL TRANSCRIPT

## Page 30

406

DAVID KESSLER - CROSS

1:36PM  1  FDA.
1:36PM  2         Because I didn't know where he was going.  I
1:36PM  3  wanted to hear the question before I stood up and objected.  I
1:36PM  4  gave him a lot of wiggle room on that before I stood up and
1:37PM  5  made an objection.  And I think we clearly are headed down this
1:37PM  6  road.
1:37PM  7         MR. STRONGMAN:  Your Honor, it's certainly relevant
1:37PM  8  what we proposed.  I will preface any question with, "It's
1:37PM  9  still our responsibility -- even if the FDA says something
1:37PM 10  different, it's still our responsibility."  And I'm not going
1:37PM 11  to get into it.
1:37PM 12         THE COURT:  The problem I have is -- the problem I
1:37PM 13  have is that I have seen no evidence that they did not -- that
1:37PM 14  you were precluded from changing the label.  I know that there
1:37PM 15  was some conversation, but nobody ever said you cannot do that,
1:37PM 16  you cannot do that.  And I think that's relevant.
1:37PM 17         MR. STRONGMAN:  And, Your Honor, just for the record,
1:37PM 18  what the FDA said was in 2004 -- in 2004, the FDA proposed to
1:38PM 19  delete certain information, and that doesn't mean --
1:38PM 20         THE COURT:  Yeah, the clinical adverse reports.  Not
1:38PM 21  a warning, but signs of adverse events.
1:38PM 22         MR. STRONGMAN:  -- in the section that Dr. Kessler
1:38PM 23  just said we could have put information in.  Now, I'm not
1:38PM 24  saying we're precluded from telling FDA you were wrong in
1:38PM 25  deleting it or proposing a change.  It's just the fact that it

OFFICIAL TRANSCRIPT

## Page 31

407

DAVID KESSLER - CROSS

1:38PM  1  was a negotiation.  That's all.
1:38PM  2         MR. COFFIN:  Your Honor, this is exactly what we
1:38PM  3  talked about so much in this case, because it's the heart of
1:38PM  4  the case.  And Albrecht changes what the defense is entitled to
1:38PM  5  do, and they keep --
1:38PM  6         THE COURT:  Look, we're not tag-teaming.  We've
1:38PM  7  already had --
1:38PM  8         MR. COFFIN:  I understand.  The only reason I'm here
1:38PM  9  is because I've made these arguments multiples times, and I
1:38PM 10  apologize.
1:38PM 11         MR. STRONGMAN:  I can -- I mean, in terms of these
1:38PM 12  are general questions, I haven't gotten any specifics.  I can
1:38PM 13  move on for now as well.  I can move on.
1:38PM 14         So -- but that's the issue is that as we move
1:39PM 15  down the road, the facts show that we made a proposal, the FDA
1:39PM 16  made proposed changes.  That's just a fact.  And it's just a
1:39PM 17  matter of whether it's reasonable or not for us --
1:39PM 18         THE COURT:  I'm going to allow you to ask him if
1:39PM 19  there are conversations that occur.  Because I did instruct the
1:39PM 20  jury this morning that in making those changes, they have to
1:39PM 21  comply with FDA regulations.  But you're skating on thin ice.
1:39PM 22         MR. STRONGMAN:  Understood.
1:39PM 23         THE COURT:  And I will stop you without an objection
1:39PM 24  if I feel like you've crossed the line.
1:39PM 25         MR. COFFIN:  Can I be clear on something?  If they're

OFFICIAL TRANSCRIPT

## Page 32

408

DAVID KESSLER - CROSS

1:39PM  1  talking about the 2004 strike-through, that's been ruled on.
1:39PM  2         THE COURT:  Will you stop.  This is his witness.  And
1:39PM  3  maybe that's something for us to do at a recess, but I'm not
1:39PM  4  going to have this tag-team every time we get up to the bench.
1:39PM  5         MR. COFFIN:  I apologize.
1:39PM  6         THE COURT:  Mr. Nolen is doing a fine job handling
1:39PM  7  himself.
1:39PM  8         MR. COFFIN:  I apologize.
1:39PM  9         MR. STRONGMAN:  It is our understanding that the 2004
1:40PM 10  situation has not been affirmatively ruled on.  It was an
1:40PM 11  objected-to document, so it wasn't in opening.  So that's where
1:40PM 12  we're at posture-wise.
1:40PM 13         THE COURT:  And that's something we need to talk at a
1:40PM 14  recess.
1:40PM 15         MR. STRONGMAN:  We can do that.  We'll deal with that
1:40PM 16  at a recess.
1:40PM 17         THE COURT:  Okay.
1:40PM 18         (WHEREUPON, the following proceedings were held in
1:40PM 19  open court.)
1:40PM 20  BY MR. STRONGMAN:
1:40PM 21  Q.  So, Doctor, we were talking about the FDA.
1:40PM 22  A.  Right.
1:40PM 23  Q.  And we were discussing that there is a negotiation,
1:40PM 24  there's a conversation; right?
1:40PM 25  A.  Generally, yes.

OFFICIAL TRANSCRIPT

## Page 33

409

DAVID KESSLER - CROSS

1:40PM 1  Q. Fair enough. And you're proud of the work that you did at
1:40PM 2  the FDA; isn't that true?
1:41PM 3  A. I think that would be fair.
1:41PM 4  Q. And that also included the work of overseeing the
1:41PM 5  commission when Taxotere was approved in 1996; correct?
1:41PM 6  A. It's not a commission, but that's okay.
1:41PM 7  Q. The administration?
1:41PM 8  A. Fair. It's an agency, yes.
1:41PM 9  Q. Very good.
1:41PM 10 A. Yes. And I stand behind what the agency did in 1996.
1:41PM 11 Q. Very good. Let's talk about another area I think we might
1:41PM 12 be able to agree on some things on.
1:41PM 13 A. Sure.
1:41PM 14 Q. And that's breast cancer.
1:41PM 15       All right. So you understand, certainly, to
1:41PM 16 understand the risk profile of a drug, when you're talking
1:41PM 17 about the labeling, you have to also understand something about
1:41PM 18 the disease condition that you're treating; correct?
1:41PM 19 A. For the risk -- for the overall risk-benefit equation of
1:41PM 20 whether you should approve a drug, you want to weigh the risks
1:41PM 21 versus the benefits. For that ultimate question of whether a
1:42PM 22 drug is safe, it's really a risk-benefit question, correct.
1:42PM 23 Q. And, Doctor, you understand that breast cancer is common
1:42PM 24 in the United States; correct?
1:42PM 25 A. Regrettably so, yes.

OFFICIAL TRANSCRIPT

## Page 34

410

DAVID KESSLER - CROSS

1:42PM 1  Q. Yes. And you understand that a woman living in the United
1:42PM 2  States has a 1-in-8 chance of being diagnosed with breast
1:42PM 3  cancer; correct?
1:42PM 4  A. Yes. And I also understand that oncologists will come --
1:42PM 5  and while I've done a good deal of oncology in taking care of a
1:42PM 6  lot of oncology patients, I think it's probably best to allow
1:42PM 7  the oncologists to testify on breast cancer specifically. But
1:42PM 8  happy to answer your questions, sir.
1:42PM 9  Q. Appreciate that. And you also understand, obviously, that
1:42PM 10 breast cancer is a life-threatening disease; correct?
1:42PM 11 A. It can be. Not all -- again, let the oncologists talk
1:42PM 12 about that. I wouldn't want to make any generalities. I
1:42PM 13 wouldn't want to scare people. There are also many treatable
1:42PM 14 forms of -- with very good outcomes.
1:43PM 15 Q. And one thing I think -- as you were going through your
1:43PM 16 background, one of things that was mentioned is you had gotten
1:43PM 17 several awards.
1:43PM 18       Do you remember that?
1:43PM 19 A. Yes.
1:43PM 20 Q. And one of the things -- or awards that was mentioned was
1:43PM 21 that you got an award from the American Cancer Society, I think
1:43PM 22 you said; is that right?
1:43PM 23 A. Correct.
1:43PM 24 Q. And the American Cancer Society is a reliable
1:43PM 25 organization, isn't it?

OFFICIAL TRANSCRIPT

## Page 35

411

DAVID KESSLER - CROSS

1:43PM 1  A. Sure. Just, again, let's get everything right. Yes,
1:43PM 2  generally, that's a fair statement.
1:43PM 3  Q. Sure. And the American Cancer Society puts out
1:43PM 4  information for people on cancer statistics; correct?
1:43PM 5  A. Fair.
1:43PM 6  Q. And they put out some information that can be used for
1:43PM 7  doctors and patients also, just on basic risks and cancer
1:43PM 8  information; correct?
1:43PM 9  A. Correct. I just don't want to say that everything is
1:43PM 10 perfectly right. But, yes, of course, it's good -- it's a very
1:43PM 11 good-intended organization that serves a very valuable
1:43PM 12 function.
1:43PM 13 Q. And at the time of 2011, you understand that there were
1:44PM 14 nearly 3 million women living in the United States with breast
1:44PM 15 cancer; correct?
1:44PM 16 A. I'll take your representation on exact numbers.
1:44PM 17 Q. Very good. And at that same time, you understood that
1:44PM 18 nearly 40,000 women would die from breast cancer annually as of
1:44PM 19 2011?
1:44PM 20 A. Regrettably, there are forms that we've not made
1:44PM 21 advancements; there are forms we have made advancements.
1:44PM 22 Q. And you also know that, when it comes to the treatment of
1:44PM 23 breast cancer, that every chemotherapy has risks; correct?
1:44PM 24 A. Sure, as does every drug. I would agree with that
1:44PM 25 statement.

OFFICIAL TRANSCRIPT

## Page 36

412

DAVID KESSLER - CROSS

1:44PM 1  Q. And, in fact, most chemotherapies have some very serious
1:44PM 2  side effects; correct?
1:44PM 3  A. Yes. That's -- when you use the term "chemotherapy." But
1:44PM 4  there are other therapies, anticancer, that are not
1:44PM 5  chemotherapy that we're lucky to have today that don't have the
1:44PM 6  effects of chemo. So, again, it's across the board.
1:44PM 7  Q. And --
1:45PM 8       MR. NOLEN: Objection. Counsel's outside --
1:45PM 9  objection. 611. Outside the scope.
1:45PM 10      THE COURT: I'm going to allow him to go there. This
1:45PM 11 is an expert.
1:45PM 12 BY MR. STRONGMAN:
1:45PM 13 Q. And, Doctor, when it comes to treating breast cancer, it's
1:45PM 14 good to have multiple options for doctors and patients;
1:45PM 15 correct?
1:45PM 16 A. I'll support that statement.
1:45PM 17 Q. Okay. Now, I want to talk a little bit about Taxotere.
1:45PM 18 Okay.
1:45PM 19      And as we mentioned, Taxotere was approved in 1996;
1:45PM 20 correct?
1:45PM 21 A. Correct.
1:45PM 22 Q. And that was for metastatic breast cancer?
1:45PM 23 A. Correct.
1:45PM 24 Q. Okay. Now, when Taxotere came on the market in 1996,
1:45PM 25 there was another taxane that was also on the market as well,

OFFICIAL TRANSCRIPT

## Page 57

433

DAVID KESSLER - CROSS

2:13PM 1  would grow back.  But sometimes it would take three to six
2:13PM 2  months for that to happen.
2:14PM 3  Q.  Okay.  And with that kind of framework, we've kind of got
2:14PM 4  some working definition here.  I want to talk a little bit
2:14PM 5  about what is in the labeling.  Okay?
2:14PM 6  A.  Sure.
2:14PM 7  Q.  Okay.  And --
2:14PM 8         MR. STRONGMAN:  May I approach, Your Honor?
2:14PM 9         THE COURT:  Yes, you may.
2:14PM10         THE WITNESS:  Thank you, Counsel.
2:14PM11  BY MR. STRONGMAN:
2:14PM12  Q.  Of course.  Doctor, what I've handed you has been marked
2:14PM13  as Defendants' Exhibit 215.
2:14PM14         And this is the 1996 approval letter from the FDA;
2:15PM15  correct?
2:15PM16  A.  Correct, signed by Dr. Temple.
2:15PM17         MR. STRONGMAN:  And Sanofi would move into evidence
2:15PM18  Defendants' Exhibit 215.
2:15PM19         THE COURT:  Any objection?
2:15PM20         MR. NOLEN:  No objection, Your Honor.
2:15PM21         THE COURT:  Let it be admitted.
2:15PM22  BY MR. STRONGMAN:
2:15PM23  Q.  Okay.  And, Doctor, with the approval letter that we've
2:15PM24  got here, Defendants' Exhibit 215, there's also the labeling
2:15PM25  attached; correct?

OFFICIAL TRANSCRIPT

## Page 58

434

DAVID KESSLER - CROSS

2:15PM 1  A.  Correct.
2:15PM 2  Q.  Okay.  And as we know, earlier when you were testifying
2:15PM 3  about time frames, I think you may have said something about
2:15PM 4  2009, maybe 2006, in terms of when a label should have been
2:15PM 5  changed.
2:15PM 6         Do you remember that?
2:15PM 7  A.  When there was evidence of a -- association or causal
2:16PM 8  association, yes.
2:16PM 9  Q.  But we can certainly agree that you're not offering any
2:16PM10  opinions that there was an inadequacy with regard to any kind
2:16PM11  of hair-loss warning in the 1996 label; correct?
2:16PM12  A.  That would be correct, yes.
2:16PM13         MR. STRONGMAN:  May I approach, Your Honor?
2:16PM14         THE COURT:  Sure.
2:16PM15  BY MR. STRONGMAN:
2:16PM16  Q.  Doctor, I'm going to hand you what I've marked as Defense
2:16PM17  Exhibit 317.  If you could take a look at that.
2:16PM18  A.  Yes.
2:16PM19  Q.  And this is the approval letter from the FDA for the 2004
2:17PM20  Taxotere application; correct?
2:17PM21  A.  Correct.
2:17PM22  Q.  And included with the approval letter also is the
2:17PM23  labeling; is that correct?
2:17PM24  A.  Correct.
2:17PM25         MR. STRONGMAN:  Defendants would move into evidence

OFFICIAL TRANSCRIPT

## Page 59

435

DAVID KESSLER - CROSS

2:17PM 1  Defense Exhibit 317.
2:17PM 2         THE COURT:  Any objection?
2:17PM 3         MR. NOLEN:  No objection, Your Honor.
2:17PM 4         THE COURT:  Let it be admitted.
2:17PM 5  BY MR. STRONGMAN:
2:17PM 6  Q.  And, Doctor, we can also agree, based on what you said
2:17PM 7  this morning, that you've not offered any opinions that the
2:17PM 8  labeling for Taxotere, as it relates to hair loss, was
2:17PM 9  inadequate in the 2004 labeling; correct?
2:17PM10  A.  That would be fair.
2:17PM11  Q.  And I asked you this already, but we can agree that the
2:18PM12  definition of "alopecia" -- you've been asked this -- it's hair
2:18PM13  loss; correct?
2:18PM14  A.  "Alopecia" means hair loss, correct.
2:18PM15  Q.  And we can agree that "alopecia" was always in the
2:18PM16  Taxotere label; correct?
2:18PM17  A.  "Alopecia" was in the Taxotere label.
2:18PM18  Q.  And if I take out Webster's dictionary and look up
2:18PM19  "alopecia," the definition will just be loss of hair; correct?
2:18PM20  A.  I'm sure that would be correct.
2:18PM21  Q.  And we talked about the American Cancer Society a little
2:18PM22  bit earlier.
2:18PM23         Do you remember that?
2:18PM24  A.  Correct.
2:18PM25  Q.  And the American Cancer Society, we established, is a

OFFICIAL TRANSCRIPT

## Page 60

436

DAVID KESSLER - CROSS

2:18PM 1  reliable organization that puts out information into the
2:18PM 2  public; correct?
2:18PM 3  A.  Correct.
2:18PM 4  Q.  And they put out information about how terms are defined;
2:18PM 5  correct?
2:18PM 6  A.  They put -- a lot of organizations may have glossaries or
2:18PM 7  other things, yes.
2:19PM 8         MR. STRONGMAN:  May I approach?
2:19PM 9         THE COURT:  Yes, you may.
2:19PM10  BY MR. STRONGMAN:
2:19PM11  Q.  Doctor, what I've handed you is entitled "The American
2:19PM12  Cancer Society Breast Cancer Dictionary."
2:19PM13         Do you see that?
2:19PM14  A.  Thank you very much.
2:19PM15  Q.  Okay.  It has a date of 2006 on it; correct?
2:19PM16  A.  I'll take you're representation.  I'm sure it's here
2:19PM17  somewhere.  I'm just not seeing it, but I'll take your
2:19PM18  representation.
2:19PM19         MR. STRONGMAN:  Permission to publish, Your Honor?
2:19PM20         THE COURT:  Is this in evidence?
2:19PM21         MR. STRONGMAN:  This is a learned treatise.  It's a
2:19PM22  reliable publication by a reliable organization.
2:20PM23         THE COURT:  I think you're going to need to lay a
2:20PM24  foundation that's it's a learned treatise.
25

OFFICIAL TRANSCRIPT