# EXHIBIT G

## SUPPLEMENTAL EXPERT REPORT

## DAVID A. KESSLER, M.D.

I.      **Background**

1.      Except as stated herein, for purposes of this Supplemental Expert Report ("Supplement"), I incorporate my Expert Report dated November 6, 2018 ("November 2018 Report") as if fully set forth herein.

2.      My understanding is that the bellwether plaintiffs at this time include but are not limited to: 1) Cynthia Thibodeaux v. Sanofi S.A., et al., Case No. 2:16-cv-15859; and 2) Sheila Crayton v. Sanofi S.A., et al., Case No. 2:17-cv-05923.[1]  Both of these plaintiffs were administered Taxotere in 2008.

II.     **Supplement of Opinions in November 2018 Report.**

      A.      **Opinions Regarding Sanofi's Duty to Warn Physicians and Patients About the Risk of Irreversible Alopecia Associated With Taxotere as of 2008.**

3.      Based on the reasons set forth in my November 2018 Report, as supplemented herein,[2] I conclude that my opinions regarding Sanofi's duties as of 2008 are the same as those provided in my November 2018 Report.[3]

4.      My opinion is that based on all scientific evidence, Sanofi should have warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label by as early as 2006, and certainly by 2008.  This is consistent with my prior testimony.[4]

---

[1] An updated Schedule 2, MDL Bellwether Cases, is attached to this Supplement.

[2] As noted in paragraph 11 and footnote 5 of my November 2018 Report, I reserved the right to review additional documents or information.  For purposes of this Supplement, I have reviewed additional documents and information set forth in Supplemental Appendix C.

[3] As noted in paragraph 11 and footnote 5 of my November 2018 Report, I reserved the right to analyze the issues at both earlier and later dates.

[4] *See* Deposition of Dr. David Kessler, December 20, 2018 at 250:17-252:1; Trial Testimony of Dr. David Kessler, September 17, 2019 at 331:3-10, 386:24-387:2, 434:2-8.

**B.     Clarification Regarding What Section of the Taxotere Label Sanofi Should Have Warned.**

5.     For clarification regarding what section of the label Sanofi should have warned patients and physicians about the risk of irreversible alopecia with Taxotere by as early as 2006, and certainly by 2008, my opinion is that based on all scientific evidence, Sanofi should have clearly and prominently warned patients and physicians about the risk of irreversible alopecia with Taxotere or Taxotere-containing regimens in its label.

6.     I have concluded that the available scientific evidence warranted Sanofi providing patients and physicians with a Warning regarding irreversible alopecia with Taxotere.

7.     I have also concluded that the available scientific evidence warranted Sanofi advising patients and physicians about the risk of irreversible alopecia with Taxotere in other sections of the label, including the Adverse Reactions section.

7.1.     As set forth in paragraph 66 and footnote 66 of my November 2018 Report, the standard for advising patients in the Adverse Reactions section of the label concerns "those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."[5]

7.2.     In my opinion, the available scientific evidence cited in my November 2018 Report provided "some basis to believe there is a causal relationship" between Taxotere and irreversible alopecia.

7.3.     The standard for advising patients in the Adverse Reactions section further states that "additional detail about the nature, frequency, and severity of the adverse reaction and

---

[5] *See* 71 Fed. Reg. 3922-3997 (January 24, 2006) at 3990.

the relationship of the adverse reaction to drug dose and demographic characteristics, if data are available and important."[6]

7.4.    The FDA's 2006 Guidance for Industry on "Adverse Reactions Section for Labeling for Human Prescription Drug and Biological Products" cited in paragraph 101.1 and footnote 110 of my November 2018 Report states "[t]o the extent information is available and relevant, additional detail about the nature, frequency, severity, duration, dose-response, and demographic characteristics of those adverse reactions with significant clinical implications."[7]

7.5.    In addition, the standard for advising patients in the Adverse Reactions section states that the list of adverse reactions "must be preceded by the information necessary to interpret the adverse reactions."[8]

7.6.    In my opinion, because irreversible alopecia has significant clinical implications and information about irreversible alopecia with Taxotere was available, relevant, and important, Sanofi should have provided patients and physicians the information necessary to interpret the alopecia with Taxotere, including additional detail about the nature, frequency, severity and duration of alopecia with Taxotere.

7.7.    Sanofi's statement in its label listing only "alopecia" or, in certain labels, that "hair generally grows back", was misleading when there was available and relevant information about the nature, frequency and duration of irreversible alopecia with Taxotere.

---

[6] This standard is also set forth in the FDA's 2006 Guidance for Industry on "Adverse Reactions Section for Labeling for Human Prescription Drug and Biological Products", which is cited in paragraph 101.1 and footnote 110 of my November 2018 Report ("To the extent information is available and relevant, additional detail about the nature, frequency, severity, duration, dose-response, and demographic characteristics of those adverse reactions with significant clinical implications.") (citing 21 CFR § 201.57(c)(7)(ii)(A)).

[7] See FDA Guidance for Industry: Adverse Reactions Section for Labeling for Human Prescription Drug and Biological Products – (Jan. 2006) (citing 21 CFR § 201.57(c)(7)(ii)(A)).

[8] 21 CFR § 201.57(c)(7)(i), (ii)(B); see also FDA's 2006 Guidance for Industry on "Adverse Reactions Section for Labeling for Human Prescription Drug and Biological Products.

These statements in the label did not provide the information necessary to interpret irreversible alopecia with Taxotere.

7.8.    Sanofi's Taxotere labeling in 2008 and continuing through 2019 included statements regarding the nature, frequency and duration of adverse reactions experienced with Taxotere and/or Taxotere-containing regimens (including TAC) other than irreversible alopecia.[9]

## III.    Supplemental Opinion on General Causation.

8.    During both my prior deposition and trial testimony in the Taxotere litigation, Sanofi raised the question of whether I was providing an opinion on general causation.[10]   I testified during both my prior deposition and trial testimony in this Taxotere litigation that, although there is an interplay between the "reasonable evidence of a causal association" standard from a regulatory perspective and the standard for analyzing general causation, I was not at that time providing an opinion on general causation.[11]

9.    Utilizing my education, training and skill in the fields of epidemiology and biostatistics, and my experience of more than 40 years studying pharmacoepidemiology and the causal relationship between adverse events and drugs, I have now reviewed and analyzed the weight of the evidence to determine whether there is a causal relationship between Taxotere and irreversible alopecia.  To be clear, although I am analyzing some of the same evidence from my November 2018 Report, I am now providing an additional opinion regarding general causation in this Supplement.

---

[9] *See, e.g.*, 2008 and 2019 Taxotere labels.

[10] *See* Deposition of Dr. David Kessler, December 20, 2018 at 268:18-270:15; Trial Testimony of Dr. David Kessler, September 17, 2019 at 398:3-14.

[11] *Id.*

10.     This general causation opinion reviews and analyzes two issues: (i) whether there is a statistically significant increased risk of irreversible alopecia with Taxotere; and (ii) application of the Bradford Hill criteria.

**A.     Evidence of a Statistically Significant Increased Risk of Irreversible Alopecia With Taxotere.**

11.     In order to determine whether there is evidence of a statistically significant increased risk of irreversible alopecia with Taxotere, I first identified, reviewed and analyzed the following data sources: (i) Sanofi's TAX 316 and TAX 301 clinical trial data; (ii) reports of irreversible alopecia in Sanofi's internal global pharmacovigilance database;  (iii) a statistical analysis of the FDA's Adverse Event Reporting System database; (iv) medical literature discussing or identifying reports of irreversible alopecia after treatment with Taxotere, Taxotere-containing regimens, or other chemotherapy drugs; (v) Sanofi's internal documents; and (vi) Sanofi's communications with and submissions to U.S. and foreign regulatory authorities.

12.     In the regular course of my training and experience, I routinely request biostatisticians to provide statistical calculations of scientific data and evidence for my review. In my November 2018 Report, I discussed certain statistical calculations performed upon my request by Dr. David Madigan that I reviewed and agreed with.  I incorporate that discussion and analysis from my November 2018 Report herein.

13.     Specifically, in my November 2018 Report, I discussed statistical analysis comparing the adverse event rate for irreversible alopecia in the TAC versus FAC arms from the TAX 316 and TAX 301 clinical trials that demonstrated a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus the FAC arm at nearly all time

periods in the TAX 316 clinical trial.[12]  I have seen no evidence that Sanofi conducted any statistical analysis comparing the risk of irreversible alopecia in the TAC versus FAC arms of either the TAX 316 or TAX 301 clinical trials at any other time.[13]

      14.      Moreover, a pooled analysis (random effects meta-analysis) of the adverse event rates for irreversible alopecia from the TAX 316 and TAX 301 clinical trials demonstrated a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus the FAC arm (a rate ratio of 1.85 with a corresponding 95% confidence interval (1.04, 3.31) and a p-value of 0.04).[14]

---

[12] The risk ratio of irreversible alopecia for patients in the TAC arm versus the FAC at the 2009 final time period for the TAX 316 clinical trial is 1.80, 95% confidence interval (0.98, 3.28).  (*See* November 2018 Report).  Nevertheless, based on my review, the incidence rate for irreversible alopecia in both GEICAM 9805/TAX 301 and TAX 316 may be under reported.  *See id.*

The number of subjects followed into the follow-up period for GEICAM 9805/TAX 301 was only 49/532 (9.2%).  *See* TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 301/GEICAM 9805 Clinical Study Report, Nov. 9, 2009 (Sanofi_00799597).  As Sanofi states, the final clinical trial report for GEICAM 9805/TAX 301 states "during 5 year follow-up, the CSR [clinical trial report] notes 'Most TEAEs were followed into the follow-up period at the discretion of the Investigator.'  This implies that the most of cases of alopecia were not followed during the follow up period in the GEICAM study."  Nanae Hangai, Docetaxel Labeling Queries from PMDA [Japan's Pharmaceutical and Medical Devices Agency], May 24, 2016 (Sanofi_01331114).

For TAX 316, Sanofi states that its follow-up reporting and collection strategy did not include capturing adverse event start and stop dates to fully understand the duration of adverse events like irreversible alopecia  *See, e.g.*, Email from Jean-Philippe Aussel to Catherine Crane and Michael Kopreski, May 21, 2012 (Sanofi_02932469) ("I confirm also that the CRF AE modules did not capture AE start and stop dates . . . .  Note for very large adjuvant trials conducted on product with a well known safety profile (here Taxotere) and in which AE durations are not analyzed, the collection of AE start and stop dates would have yielded only extra validation, queries etc for no added value in terms of safety results.  FYI-similar AE collection strategy (without dates) was applied for the TAX-316/BCIRG-001 early breast cancer pivotal registration study without any consequences on the positive outcomes of the FDA/EMA approvals.").

[13] *See also* Deposition of Barry Childs, M.D., October 26, 2018 at 113:23-114:9 ("Q. Do you know whether Sanofi ever engaged in any clinical trials to determine whether or not Taxotere can cause permanent hair loss in some people who are administered the drug?  A. I'm not aware that Sanofi did that, and I certainly was not part of anything that they did with respect to that.") (objection omitted).  I also reviewed Sanofi's internal Summary of Clinical Pharmacology Information and the deposition testimony of Dr. Paul Chew and accompanying exhibits.  Based on this evidence, 221 of 1,024 studies performed by Sanofi were lost or destroyed.  Of these 221 studies, 49 were Taxotere studies.

[14] *See* November 2018 Report.

15.    In addition to the statistical calculations analyzed in my November 2018 Report, for purposes of my general causation opinion, I requested that Dr. Madigan perform certain additional statistical calculations of the evidence I identified and reviewed.[15]

16.    Specifically, I requested statistical calculations regarding: 1) data reported by Sanofi from its clinical trial studies TAX 316 and TAX 301 at different points in time, 2) data from certain studies in the medical literature that compared irreversible alopecia with Taxotere versus other comparator drugs; and 3) a logistic regression analysis of data from the FAERS database.

17.    I requested that statistical analyses be performed of Safety Update Reports regarding the TAX 316 clinicial trial prepared by Sanofi as part of Sanofi's ongoing obligations in Europe.[16]  These statistical calculations were based on the number of patients with irreversible alopecia reported annually by Sanofi in these reports from 2004 through 2009.[17]

18.    The statistical analysis demonstrates a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus the FAC arm in each year being reported by Sanofi from TAX 316 (a rate ratio of 2.60).[18]

19.    A random effects meta-analysis combining the results of TAX 301 annually demonstrated that the results were also statistically significant each year (a rate ratio of 2.63).[19]

---

[15] To the extent any of the additional statistical calculations discussed herein are based on evidence available as of 2008, such evidence also supports the regulatory opinions provided in my November 2018 Report, as supplemented and clarified in this Supplement

[16] Expert Report of David Madigan, Ph.D., dated October 20, 2019 at 23-26 ("Madigan October 2019 Report"); *see also* Sanofi_01294774 (2005 Safety Update Report); Sanofi_05956179 (2006 Safety Update Report).; Sanofi_04014414 (2007 Safety Update Report); Sanofi_03929385 (2008 Safety Update Report).' Sanofi_03935020 (2009 Safety Update Report); Sanofi_01294924 (2006 Rapporteur Assessment Report).

[17] Madigan October 2019 Report at 23-26.

[18] *Id.*

[19] *Id.*

20.     A statistical analysis of the only four studies in the medical literature identifying original reports that presented an analysis of novel patient data comparing docetaxel to other cancer drugs in relation to irreversible alopecia demonstrated that three of the studies yielded a statistically significant increased risk of irreversible alopecia for patients administered docetaxel.[20]

21.     A meta-analysis of the four studies yielded an odds ratio of 4.13 with a 95% confidence interval (1.44, 11.81) and a p-value of 0.008.[21]

22.     A logistic regression analysis of results from the FAERS database comparing docetaxel versus comparator drugs demonstrated that docetaxel became statistically significant compared to the other drugs in 2003 and remained statistically significant through 2017.[22]

23.     I have reviewed and agree with the requested statistical analysis and calculations in my November 2018 Report and this Supplement.

---

[20] *Id.* at 22-23 (citing to Crown, J., Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer, *Annals of Oncology*, *28* (2017, suppl_5); Kang, D., Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A 3-Year Prospective Cohort Study, *The Oncologist*, (2019, *24*(3) at 414-420); Martín, M., Persistent major alopecia following adjuvant docetaxel for breast cancer: incidence, characteristics, and prevention with scalp cooling, *Breast Cancer Research and Treatment*, (2018, *171*(3) 627-634, at 635-636); Sedlacek, S., Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer. *Breast Cancer Research and Treatment*, (206, *100*); noting statistically significant results in Kang, Martin, and Sedlacek studies).

The statistical analysis demonstrated that Crown (odds ratio 1.37, p=0.80), Sedlacek (odds ratio 54.7, p=2.6 x $10^{-5}$) and Martin (odds ratio 3.61, p=1.2 x $10^{-8}$) were all statistically significant. The fourth study, Kang, did not provide data regarding the number of patients receiving each regimen, but did provide an odds ratio comparing docetaxel to non-docetaxel treatment regimens of 8.01 (95% confidence interval 1.20-53.26).

[21] *Id.* Dr. Madigan noted that there is significant between-study heterogeneity, $I^2$=62.9%, although not statistically significant.

[22] *Id.* at 16-19. Dr. Madigan also included methotrexate, gemcitabine and bevacizumab amongst the comparative drugs studied. The results for this comparator do not change my analysis or opinions. In 2003, the analysis yielded an odds ratio for docetaxel of 2.96, with a 95% confidence interval (1.30, 6.73). By 2017, the analysis yielded an odds ratio for docetaxel of 6.74, with a 95% confidence interval (5.24, 8.67). Docetaxel was the only study drug that was statistically significant as of the end of 2017. As of 2008, docetaxel was the only study drug ever demonstrating a statistically significant increased risk. As of 2008, the analysis yielded an odds ratio of 2.55, with a 95% confidence interval (1.31, 4.95). From 2012 through 2016, 5-fluorouacil was also statistically significant, though at a considerably lower odds ratio than docetaxel (*e.g.*, in 2012, the odds ratio for docetaxel was 7.53 versus 2.34 for 5-fluorouacil).

24.     Based on my identification, review, and analysis of the available scientific evidence, my review of the requested statistical analysis and calculations, and my experience, training, and education, there is evidence of a statistically significant increased risk of irreversible alopecia with Taxotere.

### B.     Application of the Bradford Hill Criteria.

25.     In his seminal 1965 article "The Environment and Disease: Association or Causation?" Sir Austin Bradford Hill laid out nine "aspects of [an] association" to consider in determining whether the association is causal, now often referred to in pharmacoepidemiology as the Bradford Hill factors or criteria.[23]   The complete list of the nine Bradford Hill factors is as follows: (1) strength of the association; (2) consistency (whether the association has been repeatedly observed "by different persons, in different places, circumstances and times"); (3) specificity (whether there are alternative causes of a condition); (4) temporality (whether the condition followed the exposure to the agent); (5) biological gradient (whether a dose-response relationship exists); (6) plausibility (whether the association is biologically plausible); (7) coherence (whether the association "seriously conflict[s] with the generally known facts of the natural history and biology of the disease"); (8) experiment (whether the condition improves upon removal of the hypothesized causative agent); and (9) analogy.[24]

---

[23] Hill, Austin Bradford (1965). "The Environment and Disease: Association or Causation?" Proceedings of the Royal Society of Medicine. 58(5): 295-300. PMC 1898525.

[24] See id. In my November 2018 Report, I analyzed whether there is reasonable evidence of a causal association between Taxotere and irreversible alopecia by assessing the seven factors set forth in the 2011 FDA Guidance.  As I noted in my November 2018 Report, the epidemiological literature has utilized many of these factors in assessing the relationship between a drug and an adverse event for decades also.

26.     No one Bradford Hill factor is determinative, and a causal relationship does not require satisfaction of all nine factors.[25]

27.     To determine whether this is a causal relationship between Taxotere and irreversible alopecia, I have applied the Bradford Hill criteria to the available evidence, including the evidence cited in my November 2018 Report and the additional evidence set forth in this Supplement, including Supplemental Appendix C.

28.     Because many of the factors overlap with the factors from the FDA Guidance, I incorporate herein my analysis of those factors and the evidence relevant to my assessment of those factors from my November 2018 Report.  However, for purposes of my epidemiological opinions in this Supplement, my analysis of the Bradford-Hill criteria is not limited to evidence available as of 2008 or any other particular timeframe.[26]

29.     Below is an analysis of the key evidence supporting my application of each Bradford-Hill criteria.

### i.     Strength of Association

30.     The Bradford Hill Criteria for strength of association is similar to the FDA Guidance factor for controlled trial group analysis.  I incorporate my discussion of this factor from my November 2018 Report herein.[27]

31.     The contemporary application of this fact looks not only at the magnitude of association but also the statistical significance of the association.  Even weak associations can be

---

[25] Hill, Austin Bradford (1965). "The Environment and Disease: Association or Causation?" Proceedings of the Royal Society of Medicine. 58(5): 295-300. PMC 1898525.  This is similar to application of the factors set forth in the FDA Guidance, as discussed in my November 2018 Report.

[26] To the extent any of the additional evidence discussed herein was available as of 2008, it also supports the regulatory opinions provided in my November 2018 Report, as supplemented and clarified in this Supplement.

[27] *See* November 2018 Report at 39-47, as supplemented with additional evidence cited in this Supplement.

significant if derived from strong study design and methodology, which minimizes bias, the possibility of chance, and the role of confounders.[28]

32.     The strength of association factor is supported in this case by the following non-exhaustive list of key evidence.

32.1.   I reviewed Sanofi's TAX 316 and TAX 301 clinical trial data including: (i) the rate of irreversible alopecia in the TAC arm at various points in time, as represented by Sanofi in internal documents and submissions to regulatory authorities and as described above in my discussion regarding the statistically significant increased risk of irreversible alopecia with Taxotere; and (ii) Dr. Madigan's statistical analysis of Sanofi's TAX 316 and TAX 301 clinical trial data from both annual submissions and the final clinical trial data, including his meta-analyses of this data, demonstrating a statistically significant increased risk of irreversible alopecia with the TAC arm versus the FAC comparator arm at multiple points in time including at the end of the clinical trials.[29]

32.2.   I also reviewed the publicly available medical literature and identified four comparative studies that contained sufficient data to perform a statistical analysis of irreversible alopecia reported with Taxotere-containing regimens as compared to regimens without Taxotere (Kang 2018, Martin 2018, Crown 2017, and Sedlacek 2006). A statistical analysis of the data presented in each of these studies, as confirmed by Dr. Madigan, demonstrates a statistically

---

[28] Lucas, Robyn M. et al. 2004. Association or causation: evaluating links between "environment and disease." Bulletin of W.H.O. 83(10).

[29] I have reviewed the transcripts from the testimony of Dr. Michael Kopreski played during the Barbara Earnest Taxotere trial regarding his re-analysis of the TAX 316 clinical trial.  Dr. Kopreski's review is a post-hoc analysis of a small subset of limited interim data from one clinical trial that has not been independently verified, is not based on any clinical protocol plan, is not peer reviewed, is not final, locked data, and has never been submitted to any regulatory authority.  In fact, from the date the final clinical trial data was locked in 2010, Sanofi presented data and statistical calculations both internally and in regulatory submissions that are consistent with the evidence I relied on in my November 2018 Report and this Supplement. *See, e.g.*, Sanofi's 2015 Causation Analysis; Taxotere 2018 Label; Taxotere 2019 Label; Sanofi_02540992; Sanofi_00811960; Sanofi_01101022; Sanofi_01331114.

significant increase of irreversible alopecia with Taxotere.[30]  In addition, a pooled meta-analysis of these four comparative studies likewise demonstrates a statistically significant increased risk of irreversible alopecia.[31]

33.     In addition, the strength of association factor is supported by paragraphs 127 through 133 of my November 2018 Report.

34.     In my opinion, evidence exists to demonstrate that the strength of association between irreversible alopecia and Taxotere is statistically meaningful as compared to other chemotherapy agents.

### ii.     Consistency

35.     The Bradford Hill consistency factor is similar to the FDA Guidance factor for frequency of reporting.  I incorporate my discussion of this factor from my November 2018 Report herein.[32]

36.     The present application of this factor looks at the consistency of the outcome in a variety of different circumstances, such as among different populations or environments.[33]

---

[30] The statistical analysis demonstrated that Crown (odds ratio 1.37, p=0.80), Sedlacek (odds ratio 54.7, p=2.6 x 10$^{-5}$) and Martin (odds ratio 3.61, p=1.2 x 10$^{-8}$) were all statistically significant.  The fourth study, Kang, did not provide data regarding the number of patients receiving each regimen, but did provide an odds ratio comparing docetaxel to non-docetaxel treatment regimens of 8.01 (95% confidence interval 1.20-53.26).

[31] a pooled analysis (random effects meta-analysis) of the adverse event rates for irreversible alopecia from the TAX 316 and TAX 301 clinical trials demonstrated that there is a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus the FAC arm (a rate ratio of 1.85 with a corresponding 95% confidence interval (1.04, 3.31) and a p-value of 0.04).

[32] *See* November 2018 Report at 39-47, as supplemented with additional evidence cited in this Supplement.

[33] Lucas, Robyn M. et al. 2004. Association or causation: evaluating links between "environment and disease." Bulletin of W.H.O. 83(10).

37.     A useful tool to evaluate this factor is post-market surveillance, which is required of all drug manufacturers.[34]  Post-market surveillance allows for the collection of real-world adverse event data across varying populations and environments.

38.     The consistency factor is supported by the following non-exhaustive list of key evidence.

38.1.     I reviewed Sanofi's internal global pharmacovigilance database for reports of irreversible alopecia.[35]  In addition to the analysis of Sanofi's internal global pharmacovigilance database discussed in my November 2018 Report,[36] I also requested that Dr. Madigan calculate the number of reports (excluding reports labeled as "recovered") as a percentage of total alopecia reports.[37]  Between 1999 and 2015, the range of reports of irreversible alopecia as a percentage of total alopecia reports ranged from 0.2% in 2001 to 52.3% in 2010, with an average of 18.04%.[38]

38.2.     I reviewed the medical literature for reports of irreversible alopecia with Taxotere-containing regimens, as detailed in my November 2018 Report and my updated Schedule 5, and identified reports of irreversible alopecia in as early as 2004 for Taxotere-

---

[34] *See* 21 CFR § 314.80(b).

[35] *See* Sanofi_04353203 (CIOMS Suspect Adverse Reaction Reports).

[36] *See* November 2018 Report ¶¶ 120-121.

[37] Madigan October 2019 Report at 20-21.  This methodology is similar to the methodology used and reported by Sanofi in its 2015 Causation Analysis (reporting 5.3% reports of "permanent alopecia" out of the total alopecia reports in Sanofi's internal database), which I also reviewed.  Sanofi_01268143.  Although not specifically noted in the text of the document, Sanofi's 2011 Clinical Overview identified 8.8% of total alopecia reports in Sanofi's internal database as reporting "persistent alopecia."  Sanofi_04353204.

[38] *Id.*  The only years in which reports of irreversible alopecia as a percentage of total alopecia were below 1% occurred in 2001 and 2002.  The lowest percentage in any other year between 1999 and 2015 was 4.3% in 2003.  In 2008, 8.7% of total alopecia reports in Sanofi's internal database were reports of irreversible alopecia.

containing regimens used in the treatment of early stage breast cancer.[39]  These reports have steadily increased over time.

38.3.    I requested that Dr. Madigan perform an analysis of the FAERS database, which identified a safety signal between Taxotere and irreversible alopecia based on the application of several different disproportionality methodologies.[40]

38.4.    I reviewed internal Sanofi email correspondence and attachments from 2012 that detail the duration of follow-up for the 29 patients with ongoing alopecia at the end of the follow-up period in the TAX 316 clinical trial and all but one patient reported a follow-up duration of greater than 6 months.[41]

38.5.    I reviewed internal Sanofi spreadsheets of call and web inquiries from physicians and patients reporting cases of irreversible alopecia and seeking information from Sanofi about the risk of irreversible alopecia with Taxotere.[42]  According to these spreadsheets, Sanofi began consistently receiving inquiries regarding irreversible alopecia in 2004.

39.    In addition, the consistency factor is supported by paragraphs 110 through 126 of my November 2018 Report.

40.    In my opinion, evidence exists to demonstrate the consistency of irreversible alopecia among patients treated with Taxotere.

---

[39] I have supplemented Schedule 5 to my November 2018 Report to provide a summary of the conclusions from the medical literature I identified, reviewed, and analyzed.  An updated Schedule 5, Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report, is attached to this Supplement.  *See also* Sanofi_05969209.

[40] I have considered the methodology used to identify reports of irreversible alopecia with Taxotere in the FAERS database.  As I previously stated at my deposition, safety signals from the FAERS database do not, in and of themselves, establish causation.  While there are inherent limitations in FAERS analysis given the nature of the database, the proportionality analyses and search methodologies utilized to identify irreversible alopecia described herein are widely accepted tools for identifying safety signals.

[41] Sanofi_05319538; *see also* Sanofi_05319537; Sanofi_02368847.

[42] Sanofi_00792534 (List of inquiries regarding certain events of irreversible alopecia); Sanofi_00792535 (List of inquiries regarding certain events of irreversible alopecia).

### iii.    Biological Gradient

41.    This Bradford Hill criteria is similar to the FDA Guidance factor for dose response.  I incorporate my discussion of this factor from my November 2018 Report herein.[43]

42.    The biological gradient factor is supported by the following non-exhaustive list of key evidence.

    42.1.    I reviewed the publicly available medical literature and identified reports evidencing a dose-response relationship between Taxotere and irreversible alopecia, including Martin's 2018 study, Crown's 2017 study, and Bourgeois's 2014 presentation.[44]

43.    In addition, the biological gradient factor is supported by paragraphs 134 through 139 of my November 2018 Report.

44.    In my opinion, evidence exists to demonstrate a biological gradient between irreversible alopecia and patients treated with Taxotere.

### iv & v. Plausibility and Coherence

45.    These two Bradford Hill criterions are similar to the FDA Guidance factor analyzing whether the adverse event is consistent with the pharmacology of the drug.  I incorporate my discussion of this factor from my November 2018 Report herein.[45]

46.    As originally applied, biological plausibility had limited utility given the limitations in what is biologically knowable.  The challenge of assessing biological plausibility remains, and the current interpretation of these factors evaluate whether the cause-and-effect

---

[43]  *See* November 2018 Report at 47-48, as supplemented with additional evidence cited in this Supplement.

[44] *See also* Uptodate.com ("[T]here is now convincing evidence of permanent or prolonged alopecia after standard-dose chemotherapy for breast cancer (particularly with docetaxel, which is dose and duration dependent)").

[45]  *See* November 2018 Report at 48-50, as supplemented with additional evidence cited in this Supplement.

interpretation of an association fits with what is presently known about the disease at issue.[46]  In other words, is the adverse event consistent with the pharmacology of the drug.

47.    The plausibility and coherence factors are supported by the following non-exhaustive list of key evidence.

47.1.    Descriptions of biological plausibility in Sanofi's internal documents, including Sanofi's 2015 Causation Analysis.[47]

47.2.    I also reviewed the publicly available medical literature discussing the plausible biological mechanism of irreversible alopecia with Taxotere, including Fonia's 2017 study, Miteva's 2011 study, and Paus's 2013 study.

48.    In addition, the plausibility and coherence factors are supported by paragraphs 140 through 149 of my November 2018 Report.

49.    In my opinion, evidence exists to demonstrate that irreversible alopecia is biologically plausible and coheres to our current understanding of the pharmacology of Taxotere.

###    vi.    Temporality

50.    This Bradford Hill criteria is similar to the FDA Guidance factor for temporal association.  I incorporate my discussion of this factor from my November 2018 Report herein.[48]

51.    The temporality factor is supported by the following non-exhaustive list of key evidence.

---

[46] Lucas, Robyn M. et al. 2004. Association or causation: evaluating links between "environment and disease." Bulletin of W.H.O. 83(10).

[47] *See also* Sanofi_05969184; Sanofi_05969189; Sanofi_05969209.

[48] *See* November 2018 Report at 50-51, as supplemented with additional evidence cited in this Supplement.

51.1.    As indicated in the above discussions of the strength of association and consistency factors, and as discussed in my November 2018 report,[49] Sanofi received adverse event reports of irreversible alopecia occurring in patients following their exposure to Taxotere.

51.2.    Likewise, I reviewed the medical literature for reports of irreversible alopecia with Taxotere-containing regimens, as detailed in my November 2018 Report and my updated Schedule 5, and identified reports of irreversible alopecia in patients following their exposure to Taxotere.

52.    In addition, the temporality factor is supported by paragraphs 150 through 154 of my November 2018 Report.

53.    In my opinion, evidence exists to demonstrate a temporal association between irreversible alopecia and Taxotere.

### vii.    Specificity

54.    The Bradford Hill criteria for specificity is generally considered to be a weak or irrelevant factor from an epidemiologic standpoint.  Rather, specificity is often evaluated by the occurrence of the adverse event and the rarity of occurrence of the event in the general population.

55.    The specificity factor is supported by the following non-exhaustive list of key evidence.

55.1.    I reviewed the publicly available medical literature review to identify reports of irreversible alopecia with other comparator regimens in the treatment of early-stage breast cancer, including reports prior to Taxotere's initial approval in 1996 and approval for

---

[49] *See* November 2018 Report ¶¶ 120-121.

early-stage breast cancer in 2004.[50]  I could not locate any reports of irreversible alopecia for other comparator regimens in the treatment of early-stage breast cancer prior to the approval of Taxotere.[51]

   55.2. I also reviewed the French Health Authorities response to Sanofi's March 2011 Assessment of the Safety Review of Persistent Alopecia in Patients Treated with Docetaxel.  According to the response, the French Health Authorities reviewed "[a]ll cases [of irreversible alopecia that] were reported since 1999 or 2000," finding that "[b]efore this date, anthracyclines, anticancer drugs known to induce severe alopecia, were already used in the treatment of breast cancer, and no case of persistent alopecia was reported in published literature or in the French pharmacovigilance database."[52]  This finding from the French Health Authorities is consistent with the results of my review of the publicly available medical literature of reports of irreversible alopecia as described above.

   55.3. I requested that Dr. Madigan analyze the FAERS database for reports of irreversible alopecia with Taxotere and other comparator agents.  Dr. Madigan found a safety signal between Taxotere and irreversible alopecia based on the application of several different disproportionality methodologies, but found no signal (or only a smaller, weakening signal) with

---

[50] *See* updated Schedule 5.  I also reviewed the labels for other comparator or concomitant drugs, including Adriamycin, Cyclophosphamide, Taxol, and 5-Flouralouricil, to analyze what information those labels provided about adverse reactions, including but not limited to the risk of temporary and irreversible hair loss, and to review when these drugs came on the market.

[51] My Schedule 5 identifies some reports of irreversible alopecia with non-Taxotere regimens and also identifies that Taxotere is often administered in combination with other chemotherapy drugs.  However, based upon my review and analysis, the number of reports of irreversible alopecia is greater and more consistently identified with Taxotere regimens than non-Taxotere regimens, and there are limited or no reports of irreversible alopecia with other chemotherapy drugs used in combination with Taxotere prior to Taxotere's initial approval in 1996 or approval for early stage breast cancer in 2004.

[52] Sanofi_02540992.

all other comparator drugs.[53]  In addition, a lasso logistic regression analysis of the FAERS data demonstrated an approximately 10-fold increased reporting rate of Taxotere and irreversible alopecia against all other drugs.  The logistic regression analysis demonstrated that the risk of irreversible alopecia with docetaxel became statistically significant with Taxotere compared to all other drugs in 2003 and continued through the end of his analysis in 2017.

56.     In my opinion, evidence exists to demonstrate the specificity factor between irreversible alopecia and Taxotere.

### viii.    Analogy

57.     The Bradford Hill criteria for analogy is similar to the FDA Guidance factor analyzing whether the adverse event is known to be caused by related drugs.  I incorporate my discussion of this factor from my November 2018 Report herein.[54]

58.     In evaluating this factor, I reviewed the medical publicly available medical literature, Sanofi's clinical trial data, and Dr. Madigan's analysis of the FAERS data. Based on my review, while many of these drugs are associated with alopecia, reports regarding irreversible alopecia are more prevalent and consistent with Taxotere than these other drugs.[55]

---

[53] The data in FAERS dates back to 1969.  As of 1996 when Taxotere was initially approved, there were zero reports of irreversible alopecia in FAERS for any of the comparator drugs.  As of 2004 when Taxotere was approved for early stage breast cancer, there were still zero reports of irreversible alopecia in FAERS for doxorubicin and cyclophosphamide.

[54] *See* November 2018 Report at 52-54, as supplemented with additional evidence cited in this Supplement.

[55] As noted above, my updated Schedule 5 identifies some reports of irreversible alopecia with non-Taxotere regimens and also identifies that Taxotere is often administered in combination with other chemotherapy drugs. However, based upon my review and analysis, the number of reports of irreversible alopecia is greater and more consistently identified with Taxotere regimens than non-Taxotere regimens, and there are limited or no reports of irreversible alopecia with other chemotherapy drugs used in combination with Taxotere prior to Taxotere's initial approval in 1996 or approval for early stage breast cancer in 2004.  Also, the data in FAERS dates back to 1969.  As of 1996 when Taxotere was initially approved, there were zero reports of irreversible alopecia in FAERS for any of the comparator drugs.  As of 2004 when Taxotere was approved for early stage breast cancer, there were still zero reports of irreversible alopecia in FAERS for doxorubicin and cyclophosphamide.

59.     Based on my discussion of the factors above, my opinion is that there is insufficient evidence to conclude that other related drugs are also known to cause irreversible alopecia.

### ix.     Experiment

60.     The Bradford Hill factor for experiment is similar to the FDA Guidance factor for dechallenge and rechallenge.  I incorporate my discussion of this factor from my November 2018 Report herein,[56] and as stated there is insufficient information to assess this Bradford Hill factor due to ethical considerations.[57]

### x.     Summary of Bradford Hill Criteria

61.     In my opinion, based on my application of the Bradford Hill criteria, a substantial number of the Bradford Hill criteria are satisfied.

### C.     Summary of General Causation Opinion

62.     Based on my review and analysis of the available scientific evidence, including the evidence of a statistically significant increased risk of irreversible alopecia with Taxotere, and my application of the Bradford Hill factors finding that a substantial number of the Bradford Hill criteria are satisfied, it is my opinion to a reasonable degree of medical probability that there is  more likely than not a causal relationship between Taxotere and irreversible alopecia.

63.     My opinion that there is a causal relationship between Taxotere and irreversible alopecia is supported by statements from Sanofi's employees.

63.1.     Amy Freedman, M.D., Sanofi's Global Safety Officer, testified:

---

[56] *See* November 2018 Report at 52-54, as supplemented with additional evidence cited in this Supplement.

[57] *See* November 2018 Report at 51-52 regarding my prior discussion of the FDA Guidance re-challenge, de-challenge factor.

> Q.    Based upon your knowledge at Sanofi in 2006, Sanofi knew that Taxotere could cause irreversible alopecia, correct?
>
> A.    Yes.[58]

63.2.    Leslie Fierro, Sanofi's Head of Medical Information Services, testified:

> Q.    Let me ask you this: as a pharmacist, do you understand today that Taxotere can cause permanent hair loss?
>
> A.    Correct, yes.[59]

63.3.    Nanae Hangai, M.D., Ph.D., Sanofi's Global Safety Officer, testified that "Docetaxel/Taxotere may cause permanent hair loss, but it's case-by-case."[60]

63.4.    In January 2007, in an informed consent form drafted by Sanofi for a Phase II clinical trial at the Cross Cancer Institute in Canada, Sanofi represented that "hair loss" was a Reported Side Effect of Adriamycin and Cyclophosphamide, but "permanent hair loss" was a Reported Side Effect of Docetaxel.[61]

64.    In addition, my opinion that there is a causal relationship between Taxotere and irreversible alopecia is supported by subscription based resources, such as UpToDate, which are designed to provide clinical information to physicians.  For instance, the information contained in UpToDate[62] regarding permanent chemotherapy induced alopecia states: "[s]ome

---

[58] Deposition of Amy Freedman, M.D., dated October 26, 2018, at 195:20-196:2.

[59] Deposition of Leslie Fierro, dated January 17, 2019, at 89:22-90:1.

[60] Deposition of Nanae Hangai, M.D., PhD, dated February 1, 2018, at 17:23-18:2.

[61] Sanofi_01034325, Sanofi_03029992 (Palatinsky Ex. 19).  *Compare with* Ochsner Clinic Foundation Research Informed Consent, December 12, 2006.

[62] Information in UpToDate is authored by a subject matter expert and reviewed by at least two separate physician reviewers. "This group works together to perform a comprehensive review of the literature, culminating in clear recommendations for treatment and screening which allow clinicians to improve care. These recommendations are always based on evidence."  UpToDate Editorial Process, https://www.uptodate.com/ja/node/261.

chemotherapy agents may cause prolonged or permanent alopecia, including docetaxel given at doses of 75 mg/m$^2$ or higher per cycle, although the true incidence is unknown (see 'Recovery and reversibility' below).  It is important to advise patients about this risk before starting treatment with a specific regimen, as treatment alternatives may be available if patients are bothered by the possibility of permanent alopecia."[63]

_____

David A. Kessler, M.D.

_____10/ 21/ 2019_____

Date

---

[63] *Id.* (also stating that "there is now convincing evidence of permanent or prolonged alopecia after standard-dose chemotherapy for breast cancer (particularly with docetaxel, which is dose and duration dependent) . . . . The impact of hair loss and potential alternative chemotherapy approaches should be discussed with each patient **before** the initiation of therapy that may lead to alopecia. This preemptive approach is important for minimizing the emotional distress associated with hair loss. For patients with breast cancer who are receiving docetaxel at doses higher than 75 mg/m$^2$ per infusion, it is important to advise patients about the risk of prolonged or permanent alopecia.").

Supplemental Appendix C

In addition to the materials specifically referenced and/or discussed within my November 2018 Report or the Supplement and accompanying schedules (as updated) and appendices, the other materials considered are as follows:

Depositions

Deposition of Paul Chew, M.D. and all exhibits.
Deposition of Amy Freedman and all exhibits.
Deposition of Leslie Fierro and all exhibits.
Corporate and individual depositions of Michael S. Kopreski, M.D. and all exhibits.

Internal Documents

Sanofi_00193549
Sanofi_00792534
Sanofi_00792535
Sanofi_01019994
Sanofi_01294774
Sanofi_01294924
Sanofi_01902063
Sanofi_01954872
Sanofi_02649521
Sanofi_03847507
Sanofi_03929385
Sanofi_03935020
Sanofi_04014414
Sanofi_04196129
Sanofi_04353203
Sanofi_05273484
Sanofi_05319538
Sanofi_05935025
Sanofi_05956179
Sanofi_05969184
Sanofi_05969189
Sanofi_05969194
Sanofi_05969205
Sanofi_05969209


Other Documents

Expert Report of David Madigan, Ph.D., dated October 20, 2019.
Ochsner Clinic Foundation Research Informed Consent, December 12, 2006.
Materials specifically referenced and/or discussed within this Supplement and accompanying schedules.