# EXHIBIT H

Page 1

1         UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF LOUISIANA
2

3                                MDL NO.: 2740
                                 SECTION: H
4

5    IN RE:  TAXOTERE (DOCETAXEL)
     PRODUCTS LIABILITY LITIGATION
6

7    This Document Relates To:
8    Antoinette Durden, Case No. 2:16-cv-16635;
9    Tanya Francis, Case No. 2:16-cv-17410;
10   Barbara Earnest, Case No. 2:16-cv-17144.
11   _____/
12
13          Thursday, December 13, 2018
14
15        Videotape Deposition of DAVID A.
16   KESSLER, MD, taken at the Whitfield Bryson &
17   Mason LLP, 5101 Wisconsin Avenue NW, Suite 305,
18   Washington, D.C., beginning at 8:55 a.m.,
19   before Ryan K. Black, a Registered Professional
20   Reporter, Certified Livenote Reporter and Notary
21   Public in and for the District of Columbia.
22
23
24
25   Job No. NJ3173488

Page 14

1   THE VIDEOGRAPHER: Good morning.
2   We are going on the record at 8:55 a.m. on
3   December 20th, 2018. Please note that the
4   microphones are sensitive and may pick up
5   whispering, private conversations, and cellular
6   interference. Please turn off all cell phones,
7   or place them away from the microphones, as they
8   can interfere with the deposition audio. Audio
9   and video recording will continue to take place
10  unless all parties agree to go off -- to go off
11  the record.
12      This is Media Unit 1 of the
13  video-recorded deposition of Dr. David Kessler,
14  taken in the matter of In Re: Taxotere
15  Docetaxel Products Liability Litigation,
16  filed in the United States District Court for
17  the Eastern District of Louisiana, MDL Number
18  2740.
19      This deposition is being held at the
20  Law Offices of Whitfield Bryson and Mason LLP,
21  located at 5101 Wisconsin Avenue Northwest,
22  Washington, D.C.
23      My name is Solomon Francis, from
24  the firm of Veritext Legal Solutions, here is
25  my colleague, Glenn Fortner, and we're from

Page 15

1   Veritext Legal Solutions. The court reporter is
2   Ryan Black, of Veritext Legal Solutions.
3       At this time will counsel present
4   please state their appearances and affiliations
5   for the record.
6       MS. JEFFCOTT: Emily Jeffcott, on
7   behalf of the Plaintiff Steering Committee.
8       MR. ABRAMSOM: Brian Abramson, on
9   behalf of Plaintiff.
10      MR. MICELI: David Miceli, Plaintiff
11  Steering Committee.
12      MR. TAM: Jonathan Tam, from Dechert,
13  for the 505(b)(2) Defendants Hospira and Pfizer.
14      MR. DEPAZ: Matt Depaz, Shook Hardy &
15  Bacon, on behalf of Sanofi.
16      MR. KEENAN: Matthew Keenan, Shook,
17  Hardy & Bacon, on behalf Sanofi.
18      THE VIDEOGRAPHER: At this time will
19  the court reporter please swear in the witness
20  and we can proceed.
21          * * *
22  Whereupon --
23          DAVID A. KESSLER, MD.,
24  called to testify, having bee first duly sworn
25  or affirmed, was examined and testified as

Page 16

1   follows:
2           EXAMINATION
3   BY MR. KEENAN:
4       Q. State your name, please.
5       A. David Kessler.
6       Q. Dr. Kessler, we met briefly before
7   the deposition. My name is Matthew Keenan.
8   I represent Sanofi, and we're here today for
9   your deposition. Are you ready to proceed?
10      A. I am.
11      Q. Very good. I'm going to try very hard
12  to be respectful of your time. I think I'm
13  organized. I'm going to move quickly. We'll
14  take a break every hour, and, hopefully, we can
15  move things along relatively quickly so you can
16  you can make your flight tonight. I know it's
17  a -- it's a late flight, so I don't think
18  there's any -- that's not at jeopardy. But you
19  are prepared today to defend your opinions in
20  the Taxotere litigation, correct?
21      A. To discuss the opinions, yes.
22          (Kessler Deposition Exhibit No. 1, the
23  Notice of Deposition of Dr. Kessler, was
24  marked.)
25  ///

Page 17

1       (Kessler Deposition Exhibit No. 2, Dr.
2   Kessler's Expert Report, was marked.)
3   BY MR. KEENAN:
4       Q. Okay. Very good.
5           I've marked as Exhibit Number 1 the
6   Notice of Deposition, and I'm going to mark
7   -- I've marked as Exhibit 2 the Expert Report of
8   David Kessler.
9           Do you see this in front of me?
10      A. Yes.
11      Q. And you have -- you have your report
12  here, as well?
13      A. I have -- I have my copies here.
14      Q. Very good.
15          Your -- your report had attached to it
16  an extensive reliance list of documents, and I
17  want to be sure there aren't any additions to
18  the reliance list since you filed your report?
19      A. I don't believe -- I don't believe
20  there's any additional reliance --
21      Q. Okay.
22      A. -- materials.
23          There was an objection filed on some
24  of the -- on -- on the Notice.
25      Q. Right.

Page 134

1  alopecia in the NCI dictionary of Cancer Terms,
2  and I wasn't able to find any definition of the
3  following words: Chronic alopecia, persistent
4  alopecia, permanent alopecia, irreversible
5  alopecia or long-term alopecia.
6      Do you see where -- do you see where
7  those documents reflect that?
8      A.  I -- I see what you've done.
9      Q.  Is -- is the term -- so two more
10 questions and then we'll take a break.
11     Is -- the term irreversible alopecia,
12 is that defined in any authoritative databases
13 that you looked?
14     Did you look?
15     A.  No, I've, you know, had to think about
16 that in terms of both FAERS and -- and in the PV
17 search.
18     Q.  Right.
19     A.  And, I mean, in some ways you can do
20 it if you know -- if we have a month -- you have
21 the word resolved or you have ongoing, and you
22 put 12 months, is it ongoing at 12 months, is
23 it resolved. It depends on -- so, I mean, there
24 are words like resolved or ongoing that everyone
25 understands, and there are databases that would

Page 135

1  allow you to search for -- I mean, is it -- for
2  example, let me see if I can remember -- or
3  check, so in 301 it was ongoing at various
4  times.
5      Q.  Okay.
6      A.  So we had ongoing, so you -- you had
7  it -- you had ongoing hair loss at, for example,
8  60 months, 120 months --
9      Q.  Mm-hmm. Mm-hmm.
10     A.  -- in that. In 316 it was at the
11 time of follow-up, so it was ongoing.
12     So your question was, is it defined
13 -- you confined it in a database, but you have
14 to look for ongoing at a certain period of
15 time, --
16     Q.  Yeah.
17     A.  -- and that would tell you whether it
18 was -- had reversed or not. Is that --
19     Q.  I think -- I didn't mean to interrupt
20 you.
21     Maybe the better question is, there
22 wasn't a clear consensus of the definition of
23 irreversible alopecia. Can we agree with that?
24     MS. JEFFCOTT: Object to the form.
25     THE WITNESS: Yeah. I think I can --

Page 136

1  I think you can -- you certainly -- I think
2  everybody would agree -- I mean with the rule
3  that you can never say never, and there's
4  always, you know, one-offs, I think when you're
5  talking about a year-plus, you begin to start
6  talking about irreversibility. And I think your
7  dermatologists can come in and talk, but I think
8  most people would talk about, when you're
9  talking about years, you're talking
10 irreversibility.
11 BY MR. KEENAN:
12     Q.  All right. And we're going to take a
13 break, but I did mark as Exhibit 16 -- does that
14 just briefly describe what Exhibit 16 reflects?
15 Are those some of the --
16     A.  It will give you the definition of
17 irreversible alopecia, in essence, as it's
18 operationally defined by the company and its
19 analyses and its studies and by Madigan, yes.
20     MR. KEENAN: Very good. We can take a
21 break now.
22     THE VIDEOGRAPHER: The time is 11:24
23 a.m. This completes Media Unit Number 2. We're
24 now off the record.
25     (Recess taken.)

Page 137

1     THE VIDEOGRAPHER: The time is 11:41.
2  This begins Media Unit Number 3. We're now on
3  the record.
4     Please proceed, Counsel.
5  BY MR. KEENAN:
6     Q.  Okay. Doctor, I want to go back to
7  this discussion of irreversible alopecia.
8     A.  Sure.
9     Q.  And do you have a definitive
10 cutoff for when it reaches the threshold of
11 irreversible alopecia and becomes a -- a
12 condition that you believe Sanofi should have
13 warned of?
14     A.  Any question that has the word
15 definitive cutoff, I'm going to yield to the
16 other experts, --
17     Q.  Okay.
18     A.  -- because that would require a
19 scientific -- precise scien -- more scientific.
20     So if you -- if you ask me to -- if
21 you take out the word definitive, okay, and
22 recognizing that any cutoff has some -- by the
23 nature, some judgment associated with it, I
24 think that one looks -- for example, I think
25 Sedu -- Sedulick -- Sedlacek -- Sedlacek, sorry,

|  | Page 138 |  | Page 140 |
|---|---|---|---|
| 1 | I always pronounce his name wrong, if you look | 1 | A.  I mean, that's -- that's a -- in |
| 2 | at Sedlacek in 2006 found zero out of X and | 2 | the -- in honor of the Philosopher Ludwig |
| 3 | seven out of a hundred something, and it's | 3 | Wittgenstein, you know, the difference, when |
| 4 | statistically significant at 12 months, I think | 4 | does ongoing become irreversible, that's the |
| 5 | that's a pretty good cutoff. | 5 | same thing as a cutoff.  So it's a sem -- you -- |
| 6 | Q.  Okay. | 6 | you -- your -- your semantic words. |
| 7 | A.  So, again, I think others in the | 7 | I think ongoing, a reasonable period |
| 8 | literature have six months.  I adopt that.  But | 8 | that people would agree on, whether it's a year, |
| 9 | I think when you get to Sedu -- Sedlacek's date | 9 | it's not coming back, doesn't mean miracles |
| 10 | in 2006 the bells should be going off. | 10 | don't happen, it doesn't mean there's not |
| 11 | Q.  So bear with me, because I just want | 11 | one-offs, it doesn't mean it can never, but I |
| 12 | to -- I want to drill down on this a little bit | 12 | think that when you see the data in Sedlacek |
| 13 | further, but, in your opinion, does irreversible | 13 | you -- ongoing at 12 months' irreversibility, I |
| 14 | alopecia require a medical diagnosis by a | 14 | think that's -- that would be appropriate for a |
| 15 | physician specialized to treat those conditions? | 15 | warning, certainly. |
| 16 | MS. JEFFCOTT:  Object to form. | 16 | Q.  So in your mind, a -- a -- to be |
| 17 | THE WITNESS:  You're asking me about | 17 | classified as irre -- having irreversible |
| 18 | standard of care question? | 18 | alopecia would not require a punch biopsy? |
| 19 | BY MR. KEENAN: | 19 | MS. JEFFCOTT:  Object to form. |
| 20 | Q.  No. | 20 | THE WITNESS:  Okay.  For -- for |
| 21 | A.  You're asking me -- tell me -- what's | 21 | regulatory purposes of warning? |
| 22 | the regulatory -- | 22 | BY MR. KEENAN: |
| 23 | Q.  Does irrevers -- | 23 | Q.  For purposes of your opinion about |
| 24 | A.  I just don't understand the question. | 24 | irreversible alopecia. |
| 25 | Sorry. | 25 | A.  No.  No.  For -- I mean, you can -- if |
|  | Page 139 |  | Page 141 |
| 1 | Q.  For purposes of your opinion, does | 1 | hair doesn't grow back by a certain date, you |
| 2 | irreversible alopecia require a diagnosis by | 2 | don't need to have punch biopsies. |
| 3 | a physician who specializes in that area? | 3 | Q.  Okay. |
| 4 | A.  No.  I think that -- | 4 | A.  The fact that it didn't grow back is |
| 5 | MS. JEFFCOTT:  Object to form. | 5 | enough, for regulatory purposes, to -- to warn. |
| 6 | THE WITNESS:  -- if you look at the | 6 | Q.  Okay. |
| 7 | protocols, for example, the protocols simp | 7 | A.  If you -- if a patient comes to you |
| 8 | -- did require, and in contrast to some things | 8 | and says, Doc, I want to know everything about |
| 9 | that were said to regulators, as I read the | 9 | my case, about my hair follicles, what stage |
| 10 | protocol, the protocol did require the | 10 | -- what the chances are in -- what are the very |
| 11 | investigators to note alopecia at certain points | 11 | particulars of my case, I'll let the |
| 12 | in time, and, certainly, of the significant | 12 | dermatologist answer, but for regulatory |
| 13 | safety hazards.  So you have -- you have to note | 13 | purposes, absolutely not. |
| 14 | -- you don't need to be a specialized doctor or | 14 | Q.  Okay.  So I'm going to run |
| 15 | a dermatologist or an alopecia specialist.  I | 15 | through just -- I know you'll defect -- you'll |
| 16 | think if it's ongoing and you record it ongoing, | 16 | deflect to the -- the dermatologists on this, |
| 17 | I think that's enough data that allows one to | 17 | but in terms of the diagnostic criteria for |
| 18 | draw conclusions. | 18 | androgenic alopecia, you wouldn't know that? |
| 19 | BY MR. KEENAN: | 19 | A.  I'm going to let -- I'm going to let |
| 20 | Q.  In your mind, is ongoing alopecia the | 20 | derma -- I'll defer to the dermatologists to |
| 21 | same as irreversible alopecia? | 21 | make that -- to make that decision. |
| 22 | A.  That's a Wittgensteinian question. | 22 | Q.  The same is true of scarring and |
| 23 | Q.  That's a what? | 23 | traction alopecia? |
| 24 | A.  Wittgensteinian question. | 24 | A.  I can -- I'm happy to discuss it with |
| 25 | Q.  Okay. | 25 | you, but for the purposes of this case I think |

Page 250

1  other drugs. Of course, there's going to be
2  background wing of these cases.
3      Q.  And in cases where patients have taken
4  AC first, that is -- that is Doxorubicin and
5  Cytoxin and then Taxotere, are you with me,
6  Doctor?
7      A.  TAC?
8          Again, you've gotta be careful as to
9  whether it's T plus AC or ACT.
10     Q.  ACT.
11     A.  Right.
12     Q.  Okay.  And they have lost their hair
13 with the commencement of the AC therapy, are you
14 with me, --
15     A.  Yes.
16     Q.  -- right?
17         How can you determine that the
18 alopecia that you define as irreversible
19 alopecia is a product of the Taxotere and not
20 the -- you say not the Doxorubicin?
21     A.  So -- so if you look at the scientific
22 data, and let me just go over this, let me just
23 get for a second -- just give me a second and
24 then I'll answer your question.
25         So if you look at Sedlacek in 2006 and

Page 251

1  you're comparing PAC to TAC, --
2      Q.  Okay.
3      A.  -- AC is the same, okay?
4      Q.  Okay.  All right.
5      A.  All right.  If you do a risk
6  difference, you get a risk difference of 6.25
7  percent.
8          If you then look at the Fisher exact,
9  right, the difference between that seven, in the
10 one arm, and zero in the other, when you -- when
11 you look at Group C in Sedlacek, which is versus
12 Groups A and B without Taxane and C with Taxane,
13 and you get a Fisher Exact P value of .00005,
14 all right?  So you have statistical significance
15 in Sedla -- Sedlacek as of 2006, where the only
16 difference between those two arms, the AC is the
17 same, right, as the P and the T.  And T gets you
18 a rate difference of 6.25 percent that is highly
19 statistically significant.
20         So that's why, if you look
21 at this scientifically, and that's what
22 Pharamacovigilance is, that's what Sanofi should
23 have done, this data was publicly available, it
24 was at the major breast conference, it was put
25 out in 2006, but in 2006 this was over, as far

Page 252

1  as causation.
2      Q.  You're re -- you're reviewing Exhibit
3  51?  Is that --
4      A.  Yes.
5      Q.  Okay.  And Sedlacek was -- those
6  reports.
7          THE REPORTER:  I lost my feed here.
8  So can we just stop for two minutes?  It's not
9  going from my machine to the system.
10         THE WITNESS:  Well, I don't need it.
11 Let him ask his question first, and then we can
12 stop.
13         THE REPORTER:  No, it's not feeding
14 into my system, which isn't good.
15         THE WITNESS:  Oh, I guess we need
16 that.
17         THE VIDEOGRAPHER:  The time is 3:01.
18 We're going off the record.
19         (Recess taken.)
20         THE VIDEOGRAPHER:  Recess taken The
21 time is 3:05 p.m.  We're back on the record.
22         Please proceed, Counsel.
23 BY MR. KEENAN:
24     Q.  Doctor, when we were rudely
25 interrupted by Ryan, you were talking about

Page 253

1  Sedlacek, and Sedlacek's important -- very
2  important to you, the findings of that abstract,
3  right?
4      A.  It's -- it's another factor, yes.
5      Q.  The -- you would have expected that
6  Sanofi would have reported those cases of
7  Sedlacek to the FDA?
8      A.  I would have expected Sanofi to have
9  looked at the analysis and added a warning to
10 the label.
11     Q.  Okay.  You would have expected Sanofi
12 to follow up with Dr. Sedlacek to capture as
13 much data about those patients as possible.
14 Fair?
15     A.  Certainly, that would be fair, but
16 you'd -- yes.
17     Q.  Okay.  The Dr. Sedlacek's regimen, was
18 that on-label or off-label in that time period?
19     A.  So let's look, specifically.
20         So Dr. Sedlacek, I believe, followed,
21 what, a hundred -- he -- there wasn't one
22 regimen.  He had multiple regimens in multiple
23 groups, so he had -- he had one, two, three,
24 four, five, six, seven, eight, nine, 10, 11, 12,
25 13, 14 -- I count 15 regimens broken down.