# EXHIBIT I

Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2
    - - - - - - - - - - - - - - - - - - - - - x
3    IN RE: TAXOTERE (DOCETAXEL) PRODUCTS       :
     LIABILITY LITIGATION                       :
4                                               :  MDL No. 2740
     This Document Relates To:                  :  SECTION:  H
5                                               :
     Sheila Crayton Case No. 2:17-cv-05923      :
6    Cynthia Thibodeaux Case No. 2:16-cv-15859  :
    - - - - - - - - - - - - - - - - - - - - - x
7                           Tuesday, November 26, 2019
                                     Washington, D.C.
8
9
10
11
12  Videotaped Deposition of:
13              DAVID A. KESSLER, Ph.D.,
14  called for oral examination by counsel for the Defendants,
15  pursuant to notice, at the offices of the American
16  Association of Justice, 777 Sixth Street, Northwest,
17  Suite 200, Washington, D.C. 20001, before Christina S.
18  Hotsko, RPR, CRR, of Veritext Legal Solutions, a Notary
19  Public in and for the District of Columbia, beginning at
20  9:07 a.m., when were present on behalf of the respective
21  parties:
22
23
24
25

Page 18

1 first deposition you produced an invoice that I
2 think the invoice date was either December 1st
3 or the end of November 2018.
4     Do you remember that?
5   A. I leave it to all of you to do the
6 invoices.
7   Q. So the hours reflected on Exhibit 2,
8 those hours would have been in addition to the
9 hours that were on the first invoice, correct?
10   A. You know, I have no reason to dispute
11 what you're saying.
12   Q. Okay.
13   A. I don't know exactly. I don't -- you
14 know, again, I didn't prepare this.
15   Q. Understood.
16     (Kessler Deposition Exhibit 3 marked
17     for identification and attached to the
18     transcript.)
19 BY MR. MCRAE:
20   Q. I'm handing you what I'm going to mark
21 as Exhibit 3. And that appears to be your
22 invoice dated September 20th, 2019; is that
23 right?
24   A. Correct.
25   Q. And that is for 188-1/2 hours; is that

Page 19

1 correct?
2   A. Correct, sir.
3   Q. And the amount invoiced was $195,000
4 and --
5   A. Correct.
6   Q. -- some change?
7   A. Correct.
8   Q. And has that invoice been paid?
9   A. Yes. I, again, would assume that that
10 has been paid.
11   Q. Okay. And that 188-1/2 hours, that
12 would -- would those be hours in addition to
13 the hours that were identified in Exhibit 2?
14   A. I have every reason to believe that
15 would be correct.
16   Q. Okay. Very good.
17     So between the invoice from your first
18 deposition and these two in front of you, does
19 that account for all of your time spent on the
20 Taxotere matter up to September 20th, 2019?
21   A. Should.
22   Q. All right. I think you can put those
23 two away, Doctor. If you go back with me --you
24 know what? You can even put Exhibit 1 away, I
25 think, at least for the moment.

Page 20

1     All right.
2   A. Can I just put on the record, I mean,
3 there were objections, as I understand it, that
4 were filed.
5   Q. Sure. Yes. We received those last
6 night. And to be honest with you, I have not
7 spent much time with them. So...
8     (Kessler Deposition Exhibit 4 marked
9     for identification and attached to the
10     transcript.)
11 BY MR. MCRAE:
12   Q. All right. And, Doctor, I'm handing
13 you Exhibit 4. Could you identify that for us,
14 please?
15   A. This appears to be my opening report.
16   Q. All right. Dated November 6th, 2019;
17 is that right?
18   A. Correct, sir.
19   Q. All right.
20     (Kessler Deposition Exhibit 5 marked
21     for identification and attached to the
22     transcript.)
23 BY MR. MCRAE:
24   Q. And then Exhibit 5. And is Exhibit 5
25 the supplemental report you served in this

Page 21

1 matter?
2   A. Correct.
3   Q. Dated October 21st, 2019?
4   A. Correct.
5   Q. All right. Now, do those two reports,
6 Exhibits 4 and 5, do they contain all the
7 opinions you plan to offer in this case?
8   A. As of -- I mean, again, if my
9 deposition stopped right now, the answer would
10 be yes, including anything at trial and
11 anything that I previously testified to.
12 Obviously I'm testifying today, and you may ask
13 me questions and they may be -- in answering
14 that, you may elicit opinions or, probably more
15 appropriately, subopinions or sub-subopinions.
16 So - but as -- again, if we stopped right now.
17 The whole goal was to make sure you saw the
18 entirety of my opinions and what I relied on.
19   Q. Okay. Is there any work that you
20 wanted to complete in this case but for any
21 reason did not complete?
22   A. No.
23   Q. Other than attorneys for plaintiffs,
24 did anybody assist you in any way in creating
25 Exhibits 4 or 5?

| Page 158 | Page 160 |
|---|---|
| 1  to determine when a safety signal existed with<br>2  respect to irreversible alopecia and Taxotere?<br>3      A.  I mean, I think it is one of many<br>4  threads that were included and that I looked<br>5  at.<br>6      Q.  Okay.<br>7      A.  I mean, but -- but as we discussed<br>8  earlier, I would not hold it out to be -- I<br>9  mean, there are many other threads.<br>10     Q.  When did a safety signal exist between<br>11 irreversible alopecia and Taxotere?<br>12     A.  Based on the totality of the evidence?<br>13     Q.  Based on your -- what's your opinion?<br>14     A.  So my sense is, as I have testified<br>15 both I think in my first deposition and my<br>16 trial testimony, I think it's probably safe to<br>17 say as early as 2006 and certainly no later<br>18 than 2008.<br>19     Q.  All right.  And that's true<br>20 notwithstanding the fact that Dr. Madigan's<br>21 EB05 analysis did not identify a signal by<br>22 2006?<br>23     A.  Of course.  I mean, I think that -- you<br>24 have Sanofi internal data, you have clinical<br>25 trial data, you have medical literature, you | 1  different points in time.<br>2      Q.  But for purposes of your opinion, in<br>3  2006, there was not a signal using the SEBGM<br>4  metric in 2006, right?<br>5      A.  You -- you have the data that I just<br>6  cited.<br>7      Q.  Okay.<br>8      A.  I mean, again, the data are what the<br>9  data are.<br>10     Q.  All right.  And you mentioned something<br>11 specifically about the PRR, right?<br>12     A.  Yes.<br>13     Q.  What's PRR?<br>14     A.  It is a -- one of multiple<br>15 disproportionality re -- it's proportional<br>16 reporting rate is the actual terminology that<br>17 is used.  That's what it stands for.<br>18     Q.  Okay.  And would you agree that the PRR<br>19 metric has some limitations specific to that<br>20 metric?<br>21     A.  So as I said that every -- all of these<br>22 metrics have limitations.  But it is the<br>23 foundational sort of -- it was the foundational<br>24 metric upon which many other methodologies were<br>25 developed and were based. |
| Page 159 | Page 161 |
| 1  have a logistic regression.  I could go on and<br>2  on.<br>3          I mean, based on the totality of<br>4  evidence, I think that it certainly supports<br>5  2006.<br>6      Q.  Okay.  And that's true despite the fact<br>7  that Dr. Madigan's analysis using the SEBGM<br>8  metric did not show a safety signal by 2006?<br>9      A.  Again, Dr. Madigan's analysis showed<br>10 that the PRR, EBGM and the logistic regression<br>11 were all statistically significant.<br>12         And again, even that, I mean, is --<br>13 those are threads and those are pieces of<br>14 evidence.  And when you put it all together, I<br>15 think that it's clear this was --<br>16     Q.  But the EBGM actually didn't show a<br>17 signal until the second quarter of 2008, right?<br>18     A.  So --<br>19     Q.  Just so the record is clear.<br>20     A.  So if I'm correct, that it crossed the<br>21 threshold in 2000 and it was 2.19 in 2000 and<br>22 2.09 in 2004, and then it was 1.92 -- right? --<br>23 in 2006.<br>24     Q.  Okay.<br>25     A.  So you have different numbers at | 1      Q.  Okay.  And it's true that the PRR<br>2  metric does not adjust for multiplicity, right?<br>3      A.  Oh, you want to talk about Bonferroni?<br>4  We could spend the next couple of hours...<br>5      Q.  Could you answer my question?<br>6      A.  Yeah.  I'll let Dr. Madigan engage with<br>7  you on multiplicity.<br>8      Q.  Okay.<br>9      A.  I'm sure he would love that better than<br>10 I would.<br>11     Q.  Well, we tried.  I'm not sure we --<br>12     A.  Yeah, he --<br>13     Q.  -- knew what we were talking about --<br>14     A.  He's the expert.  I can -- I'm pretty<br>15 good, but I'm going to leave it to Dr. Madigan<br>16 to talk about multiplicity because you're --<br>17 let me just say this:  Multiplicity would have<br>18 some value in raising if you were engaging in<br>19 data mining.  That's not what's occurring here.<br>20 Right?<br>21         So when you have a specific hypothesis,<br>22 is this drug associated with that event, and<br>23 you're just not casting about looking among --<br>24 and you have a specific hypothesis -- again,<br>25 I'll leave it to my brother statisticians to |