UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| THIS DOCUMENT RELATES TO: ALL CASES | SECTION "H" (5) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO AMEND PRETRIAL ORDER 70B REGARDING *EX PARTE* CONTACT WITH MDL PLAINTIFFS' PRESCRIBING AND TREATING PHYSICIANS**

In failure-to-warn cases involving prescription medicines, prescribing physicians are critical non-party fact witnesses. Permitting only one side to contact a plaintiff's physicians, particularly when that one side is allowed to discuss matters outside the physician's care and treatment of the plaintiff, creates concerns of improper influence and "poisoning the well." There is a danger—as recently borne out in this MDL—that counsel will exploit their *ex parte* communications to "woodshed" the prescriber, including using company documents and other materials entirely unrelated to the physician's treatment of the plaintiff, to present a one-sided account of the case.

In the first bellwether trial it became apparent that Plaintiffs' counsel abused their privilege to communicate with Plaintiff's physicians and engaged in exactly the type of improper conduct they previously assured the Court would not happen. In the days leading up to and during the trial of Barbara Earnest, counsel met repeatedly with Ms. Earnest's prescribing physician, Dr. James Carinder, paying him $1,000 an hour for the meetings.[1] Plaintiffs' counsel showed Dr. Carinder

---

[1] The two *ex-parte* meetings Plaintiffs' counsel held with Dr. Carinder just prior to his trial testimony were in addition to three meetings they organized with Dr. Carinder prior to his deposition, bringing Plaintiffs' counsel's total number of *ex parte* meetings with Dr. Carinder to five.

1

company documents and lawyer-prepared trial demonstratives unrelated to his treatment of Ms. Earnest. Further, the trial demonstratives included evidence the Court had already *excluded* in its pre-trial rulings. When Plaintiff called Dr. Carinder at trial, the influence of these *ex parte* meetings was obvious, as his direct examination testimony closely tracked Plaintiff's key trial themes.

Defendants request the Court amend PTO 70B to avoid further prejudice as the parties prepare additional cases for trial. Specifically, Defendants request the Court preclude Plaintiffs' counsel from *ex parte* contact with MDL Plaintiff's prescribing or treating physician in the same manner applicable to defense counsel. Alternatively, Defendants request the Court limit Plaintiffs' counsel to a single *ex parte* meeting prior to that physician's deposition, during which the only documents shown or provided are the physician's medical records for that MDL Plaintiff, and the subject matter is limited to the physician's care and treatment of such Plaintiff.

## BACKGROUND

In October 2017, Defendants requested the Court enter a protocol to govern the parties' *ex parte* contacts by counsel with treating physicians. (Rec. Doc. 917). Under Defendants' proposal, defense counsel was prohibited from communicating with treating physicians about specific MDL plaintiff/patients they treated and was prohibited from using as an expert a physician of any trial pool Plaintiff, unless and until that Plaintiff's case was dismissed. *Id.* at p.2-3. Defendants also requested the scope of Plaintiffs' counsel's *ex parte* contacts be limited to the MDL Plaintiff's care and treatment, and that Plaintiffs' counsel be prohibited from disclosing to the physicians any materials the physician had not previously seen outside the scope of litigation. *Id.* at p.3. Plaintiffs vehemently opposed Defendants' motion and argued "[t]he request to take away Plaintiffs' ability to communicate freely with prescribing and treating physicians is based on unsubstantiated concerns" and that there was "nothing evenhanded about Defendants' proposal to regulate both

Plaintiffs' and Defendants' *ex parte* communications with treating prescribing physicians." (Rec. Doc. 976, at p.1). Plaintiffs further argued:

> Where there is no evidence of "woodshedding"—**and here there is none**—or where "defendants can only cite to … one isolated instance even though tens and probably hundreds of thousands of MDL and mass tort cases have been filed," then "***defendants are proposing a solution to a problem that does not exist***" and "simply have not shown good cause to grant the … relief they request."

*Id.* at p.3 (internal citations omitted) (emphasis added).

In November 2017, Judge Engelhardt entered Pretrial Order 70 (Rec. Doc. 1137), granting Defendants' request, in part. The Order, however, rejected Defendants' request to limit Plaintiffs' counsel's *ex parte* contacts solely to discussions and documents related to the physician's care and treatment of the MDL Plaintiff/patient. Subsequently, the Court entered Pretrial Order 70A on January 26, 2018. (Rec. Doc. 1528). Ultimately, on November 13, 2018, the Court entered Pretrial Order 70B, replacing PTO 70 and 70A. (Rec. Doc. 5256).

Under PTO 70B, Plaintiffs' counsel may engage in an unlimited number of *ex parte* contacts with any MDL Plaintiff's prescribing or treating physician both before their deposition and again before their trial testimony, subject only to limited disclosure requirements. *Id.* at ¶ 1-2. PTO 70B places no substantive limitations on the subject matter Plaintiffs' counsel may discuss with the physician, nor limits the type or volume of written materials shown or provided to the physician. Conversely, PTO 70B precludes defense counsel from engaging in any *ex parte* communications other than for the purpose of obtaining physician-experts.[2] *Id.* at ¶ 4, 5.

---

[2] However, any *ex parte* communications by Defendants' counsel conducted prior to that physician's deposition are limited to non-substantive discussions until the physician affirmatively expresses a bona fide interest in being considered as a retained expert by defense counsel. *Id.* at ¶ 5.a.

3

**LAW AND ARGUMENT**

**A. Plaintiff's Counsel's Improper *Ex Parte* Contacts with Barbara Earnest's Physicians Warrant Modification of Pretrial Order No. 70B.**

In the days leading up to and during Barbara Earnest's trial, Defendants discovered that Plaintiff's trial counsel had been meeting with Dr. Carinder, Ms. Earnest's prescribing physician, for the purpose of influencing his trial testimony to align with Plaintiff's trial themes (as opposed to reviewing Plaintiff's medical records or discussing his treatment of Plaintiff). Less than one week before trial started – and just hours *after* the Court ordered that all trial witnesses be sequestered – Plaintiff's counsel disclosed they provided Dr. Carinder with litigation-related documents such as product labeling not previously seen by Dr. Carinder,[3] company documents, and Plaintiff's opening statement demonstratives. *See* Exhibit A, September 12, 2019 PTO 70B Disclosure re: Communication with Dr. Carinder.

Importantly, each of the opening statement demonstratives was, at the time, *subject to pending objections* by Sanofi. *Id.*; *see also* Exhibit B, Plaintiff's proposed opening demonstratives #26, 32, 59. For example, Plaintiffs' proposed opening demonstrative Slide No. 59, entitled "Sanofi's Knowledge," provide a purported "timeline" of contested testimony and evidence previously unknown to Dr. Carinder that Plaintiffs' counsel hoped to present at trial. *Id.* The "timeline" was replete with objectionable representations prepared by counsel for Ms. Earnest, including: "Sanofi clinical trial doctor gives Sanofi *adverse event reports* of hair not growing back"; "Sanofi receives *20 adverse event reports* of permanent hair loss in the same month"; "Sanofi met to discuss two kinds of hair loss after Taxotere use *for European label*; temporary and

---

[3] During Dr. Carinder's deposition, at which Plaintiff's trial counsel was present, Dr. Carinder made clear that he had never read the 2010 Taxotere label Plaintiff's counsel showed him in the days just before the trial started. *See* Exhibit C, Carinder Dep. at p. 119:3-14.

4

non-reversible"; "Amy Freeman [sic], Sanofi's Global Safety Officer *admits Sanofi knew Taxotere causes* permanent hair loss"; "Sanofi's *Canadian informed consent* warned of two kinds of hair loss after Taxotere use: temporary and permanent"; "Sanofi hired company to *monitor Facebook 24/7*"; "Sanofi's 10-year results *confirmed* permanent hair loss as *common*"; and "Barbara Earnest started Taxotere, not knowing about the *common* risk of permanent hair loss." *Id.* (emphasis added).

Obviously, none of these documents involved Dr. Carinder's care and treatment of Ms. Earnest. Rather, the only reason to show Dr. Carinder those documents was to shape his testimony to mirror Plaintiff's key themes in Plaintiff's liability case against Sanofi—to "poison the well." In fact, the foregoing lawyer-prepared opening statement demonstrative on this "timeline" not only grossly mischaracterizes arguments masquerading as facts, but also references evidence and testimony plainly excluded under the Court's *in Limine* rulings (*e.g.*, Sanofi's alleged "Facebook monitoring" (violating Rec. Doc. 8201 at 7), "adverse event reports of hair not growing back" and "Sanofi receives 20 adverse event reports of permanent hair loss in the same month" (violating Rec. Doc. 8216), and Foreign Regulatory Actions (violating Rec. Doc. 8201 at 5)). Further, at the time of this disclosure, the Court had *not yet issued rulings on Sanofi's objections to testimony and exhibits referenced* in these demonstratives—making the sharing of the demonstratives with Dr. Carinder an end-run on the Court's reasoned limitations on the order and scope of trial evidence.

In response to Sanofi's objections to Plaintiffs' interactions with Dr. Carinder, Judge Milazzo spoke briefly to Dr. Carinder and the other treating physician at trial just prior to their testimony in order to admonish them regarding their role at trial—to provide testimony *limited to* the physician's treatment of Mrs. Earnest and decisions made during that treatment. *See e.g.,* Exhibit D, Tr. at pp. 1392:22-1393:8 (Judge Milazzo admonishment to Carinder).

5

Notwithstanding the Court's admonition, Dr. Carinder's direct examination testimony clearly demonstrated Ms. Earnest's counsel's improper influence over Dr. Carinder's testimony following their five *ex parte* meetings with him. His testimony at trial reflected numerous instances in which Dr. Carinder gave one answer during Plaintiff's counsel's questioning on direct examination, and then provided completely opposite answers to the same lines of questioning by defense counsel. The first instance of this occurred when Dr. Carinder testified about his knowledge of the risk of permanent hair loss with Taxotere. When asked by Plaintiff's counsel, Dr. Carinder testified that he was not aware of the risk:

> Q. At that time in 2011, did you warn Barbara that she could experience permanent hair loss from using Taxotere before you prescribed it to her?
> A. No.
> Q. Why not?
> A. Because we weren't aware of that.

*Id.* at p. 1395:1-6. In response to Defendants' cross-examination, however, Dr. Carinder revealed that a decade prior to his treatment of Mrs. Earnest, he read a journal article in which four patients reported persistent hair loss after *taking the same chemotherapy regimen as Mrs. Earnest*:

> Q. So, Doctor, just a couple quick questions on it, okay? You see it's from 2001, right, sir?
> A. Yes.
> Q. Which we can agree, of course, was years before you treated Mrs. Earnest, true?
> A. True.
> Q. And you see that there are four patients in the study who were identified as having long-lasting partial alopecia, and they were treated with Taxotere, Adriamycin, and Cytoxan, correct?
> A. Yes.
> Q. Okay. And so that's something, when you reviewed this article, you would have learned of Taxotere, Adriamycin, and Cytoxan being associated with four reports of persistent hair loss, correct?
> A. Yes.

*Id.* at pp. 1556:5-1556:20.

A second instance occurred when Dr. Carinder was asked about a former patient who experienced persisting alopecia while taking the *exact same* chemotherapy regimen as Mrs. Earnest. When asked by Plaintiff's counsel, Dr. Carinder testified that he did not tell Mrs. Earnest about his former patient:

> Q. So when you spoke with – and we'll get into this in more detail, but when you spoke with Barbara [Earnest] prior to her chemotherapy, did you explain to her about that prior patient?
> A. No.
> Q. And explain to the jury why you didn't.
> A. I just didn't think it was relevant.

*Id.* at pp. 1420:22-1421:2. But when asked the same question by Defendants' counsel on cross-examination, Dr. Carinder's testimony was, once again, completely different:

> Q. It's true, you would agree with me, you always told your patients, if they were on dose-dense AC followed by Taxotere, you would tell them about the prior patient, true?
> A. Yes.
> Q. As you sit here today, sir, you don't have any reason that you deviated from that practice when it came to Mrs. Earnest, right?
> A. No.
> Q. So you would have told her about that patient, correct?
> A. Yes.

*Id.* at pp. 1537:13-22.

The foregoing demonstrates that an admonition by the Court is insufficient to address the severe prejudice sustained when Plaintiff's counsel is permitted unfettered *ex parte* contacts with a prescribing oncologist. The improper *ex parte* contact between Plaintiff's counsel and Dr. Carinder just prior to Ms. Earnest's trial, coupled with the lack of limits on the subject matter allowed Plaintiff's counsel to provide the key fact witness with prejudicial and one-sided documents. This highlights the potential for abuse and prejudice under the current physician

7

contact order, which should now be amended in order to prevent the risk of similar instances of prejudice in future trials.

And, Dr. Carinder was not the only physician Ms. Earnest's counsel attempted to bias over the course of her case. For example, during deposition, Dr. Lagarde disclosed that counsel for Ms. Earnest met with her the day before her deposition.[4] Exhibit E, Transcript from Nov. 1, 2018 deposition of Dr. M. Celeste Lagarde. Dr. Lagarde testified that Ms. Earnest's counsel represented to her during the *ex parte* meeting that a "full disclosure of long-term side effects" of chemotherapy had not been made to Ms. Earnest. *Id.* at p. 15:6-18. Dr. Lagarde further testified that, based on statements made to her by Ms. Earnest's counsel, the "supposition that [she] got" was that Sanofi had "known something and then not disclosed their findings." *Id.* at 15:16-16:24.

It is now necessary to amend the current physician contact order to prevent future improper contact by Plaintiffs' counsel that creates an uneven playing field for the trial's most significant fact witnesses—the prescribing and treating physicians—and which runs the risk of tainting the entire trial.

### B. This Court Should Modify PTO 70B Regarding Contact with a Plaintiff's Prescribing or Treating Physician.

When this Court entered PTO 70B, Plaintiffs assured the Court that there would be no "woodshedding" of doctors. But that is exactly what happened in the first trial. None of the documents counsel showed to Dr. Carinder were related in any way to his care and treatment of Ms. Earnest. Rather, the only reason to show them to Dr. Carinder was to shape his trial testimony in order to mirror Plaintiff's key points in Plaintiff's liability case against Sanofi and to "poison

---

[4] Plaintiff's counsel neglected to make a PTO 70B disclosure in connection with meeting before Dr. Lagarde's deposition. Email from Baehr to Schanker dated 11/2/2018, copy attached as Exhibit F.

the well." As a result, Defendants request that the Court enter one of two alternate forms of relief to prevent this highly prejudicial conduct from occurring again and to preserve the reliability of each physician as a fact witness in this litigation.

1. **This Court Should Prohibit *Ex Parte* Contacts with a Plaintiff's Prescribing or Treating Physician.**

Defendants request the Court modify PTO 70B to prevent Plaintiffs' counsel from *ex parte* contact with any MDL Plaintiff's prescribing or treating physician in the same manner as counsel for Defendants. This was the approach taken by the Court in *Gaus v. Novartis Pharmaceuticals Corp.*, in which the Court noted that "both parties should have the same right of access to all non-party witnesses, including Plaintiffs' own treating physicians," and therefore ruling that "no party – Plaintiffs nor Defendants – shall engage in *ex parte* contacts with Plaintiffs' treating physicians or influence the deposition or trial testimony of Plaintiffs' treating physicians"). Docket No. L-7014-07MT (*In re Aredia and Zometa Litig.*, Case No. 278), 2009 N.J. Super. Unpub. LEXIS 3282, at *39–40 (N.J. Super. Ct. Law Div. Oct. 29, 2009). Here, Plaintiffs' counsel opposed Defendants' original motion for restrictions on *ex parte* contacts with physicians on the basis that Defendants had not identified any evidence of improper conduct. But Plaintiffs' counsel's actions in *Earnest* leave no doubt that that they have engaged in exactly the kind of witness woodshedding that courts have found impermissible. *See, e.g.*, *Gaus*, 2009 N.J. Super. Unpub. LEXIS 3282, at *39–40.

Defendants' proposed amendment would level the playing field, putting the parties in the same position to elicit factual testimony in depositions and at trial without the risk of prejudice and bias that occurs when Plaintiffs' counsel unfettered ability to engage in *ex parte* contact with an MDL plaintiff's prescribing or treating physician. When only one party has the ability to hold

9

*ex parte* meetings with a non-party fact witness, the witness hears—and indeed, learns—just one side of the case, and the entire trial is at risk of being tainted by those meetings.

## 2. In the Alternative, the Court Should Permit a Single, Limited *Ex Parte* Meeting.

In the event that the Court continues to allow *ex parte* communications between an MDL Plaintiff's prescribing or treating physician and Plaintiffs' counsel, Defendants request that the Court modify PTO 70B to permit Plaintiffs' counsel to hold a single *ex parte* meeting with any particular prescribing or treating physician *prior to* that physician's deposition, during which the only documents that may be shown or provided to the physician are the MDL Plaintiff's medical records, and the subject matter discussed is limited to the physician's care and treatment of that Plaintiff. Defendants' alternative proposed amendment would curtail Plaintiffs' counsel's ability to discuss their liability theories with an MDL Plaintiff's prescribing or treating physician, and prevent counsel from providing the physician with litigation-related documents such as product labeling, company documents, and trial demonstratives—the precise categories of documents shown to Dr. Carinder just days before the trial in Barbara Earnest's case.

### a. Any Meeting Should Be About the Treatment of the Plaintiff.

The reason some courts have allowed Plaintiffs' counsel to have *ex parte* contacts with physicians is because Plaintiffs, unlike Defendants, have a physician-patient relationship with their doctors. In this MDL, however, the actual plaintiff (patient) has not been present for any of the *ex parte* meetings Plaintiffs' counsel have orchestrated with prescribing or treating physicians, nor have Plaintiffs' counsel ever disclosed providing a treating physician with the plaintiff's medical records.  Further, the physician-patient rationale does not justify allowing Plaintiff's counsel to attempt to influence the physician with documents unrelated to the treatment of the Plaintiff. Accordingly, when Plaintiffs' counsel are allowed to have *ex parte* contacts, many courts limit the

10

subject matter and documents addressed during the *ex parte* meetings to the treatment of the Plaintiff.

For example, this approach was taken by the Court in the *In re Ortho Evra* MDL, in which defendants sought "to prevent an unfair advantage by Plaintiffs lobbying their theories of liability and causation upon the treating physicians during the *ex parte* contact." *In re Ortho Evra Prds. Liab. Litig.*, MDL Docket No. 1742, No. 1:06-md-40000, 2010 WL 320064, at *1 (N.D. Ohio Jan. 20, 2010). Ultimately, Judge David A. Katz ordered that while plaintiffs' counsel could have *ex parte* contact with treating physicians, such contact must be limited to the "physician's records, course of treatment and related matters." *Id.* at *2. In so holding, the Court reasoned that such "[c]ommunications are often prohibited from including liability issues or theories, product warnings, Defendant research documents or related materials." *Id.*

Since then, the same approach has been taken in mass tort litigation across the country. *See, e.g., In re Actos Prods. Liab. Cases*, No. BC411678, 2015 WL 1387938 at *8 (Cal. Super. Ct. Mar. 20, 2015) (limiting plaintiffs' counsel *ex parte* contact with physicians to "discussion of the physicians' records, course of treatment and related issues such as diagnosis and prognosis," and prohibiting plaintiffs' counsel from discussing "liability issues or theories, product warnings, Defendants' research documents, medical literature, or related materials"); *In re Pelvic Mesh/Gynecare Litigation*, Docket No. ATL-L-6341-10, at 6 (N.J. Super. Ct. Law Div. Dec. 3, 2013) (limiting plaintiffs' counsel *ex parte* contact with physicians to "the facts of the treatment . . . and the plaintiff's medical condition and medical history," such as "diagnosis, prognosis and causation as it relates to the particular patient/plaintiff," but prohibiting discussion of general risks and benefits of mesh products, past and present use of those products, outside sources of information about risks and benefits, or plaintiffs' theories of liability); *In re Chantix Prods. Liab.*

11

*Litig.*, No. 2:09-cv-2030, 2011 WL 9995561, at *4 (N.D. Ala. June 30, 2011) (limiting plaintiffs' counsel *ex parte* contact with physicians to communications about "care of the individual plaintiffs" such as "treatment, medical records and conversations with their health care providers" and prohibiting plaintiffs' counsel from discussing defendant's internal documents *ex parte*).

### b. Plaintiffs Should Be Limited to One Pre-Deposition Meeting.

In addition to limiting the subject matter and documents addressed in plaintiffs' counsel's meetings with a treating physician, the Court should limit the number of meetings between plaintiffs' counsel and the physicians, as well as the timing of those meetings, and should prohibit any such meetings for trial purposes. Plaintiffs' counsel has demonstrated their inclination to influence a prescriber's testimony on the eve of (and during) trial. Allowing plaintiffs' counsel a single opportunity to meet with a prescribing physician *prior to* that physician's first deposition in the litigation in order to discuss the individual patient's diagnosis and treatment is vastly different from allowing unfettered access to the physician up to and during trial. Plaintiffs' counsel exploited their right in *Earnest* by providing trial demonstratives and other improper documents and information to the prescribing physician, and there is no reason to believe they will not continue to do the same in other trial and trial pool cases. The Court should not permit any additional meetings after the deposition.

This limitation is also supported by the law on sequestration and witness tampering. As discussed above, prior to the Earnest trial, Plaintiff's counsel disclosed that they met with Dr. Carinder on September 10, 2019—just hours *after* the Court ordered that all trial witnesses be sequestered. *See* Exhibit A. The Fifth Circuit has recognized that "[t]he purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365,

12

1373 (5th Cir. 1981). Notwithstanding the Court's sequestration order, which would preclude Dr. Carinder from attending trial and viewing the opening statement and evidence presented at trial, Plaintiff's counsel not only met with Dr. Carinder and showed him documents to attempt to influence his testimony, but they also showed him their own one-sided, objected to trial demonstratives and other evidence.

The Fifth Circuit has recognized a witness can violate the sequestration order by *reading material* just the same as by hearing testimony in open court. *Miller*, 650 F.2d at 1373 ("The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court."). In fact, a witness provided with reading material may be even more harmful, as the witness "can thoroughly review and study" while formulating their own testimony. *Id.* Thus, even without being physically present during trial, key fact witnesses such as Plaintiffs' prescribing and/or treating physicians may still be subject to the "shaping of testimony" to "match that" of other witnesses—the kind of "fabrication" and "collusion" contemplated by the Fifth Circuit in *Miller. Id.* Thus, in order to comport with the purpose of the sequestration rule, as articulated by the Fifth Circuit in *Miller*, PTO 70B should, at the very least, be modified to prevent Plaintiffs' counsel from holding *ex parte* meetings with those prescribing and/or treating physicians as fact witnesses sequestered for an upcoming trial.

## **CONCLUSION**

Defendants seek modification of Pretrial Order 70B to prevent Plaintiffs' counsel from *ex parte* interactions with any MDL Plaintiff's prescribing or treating physician in the same manner as counsel for Defendants. Alternatively, Defendants request that PTO 70B be amended to allow Plaintiffs' counsel to hold a single *ex parte* meeting with any MDL Plaintiff's prescribing or treating physician *prior to* that physician's first deposition, during which the only documents

13

shown or provided to the physician are that plaintiff's medical records, and the subject matter discussed is limited to the physician's care and treatment of that Plaintiff.

          Respectfully submitted,

          */s/ Douglas J. Moore*
          Douglas J. Moore (Bar No. 27706)
          **IRWIN FRITCHIE URQUHART & MOORE LLC**
          400 Poydras Street, Suite 2700
          New Orleans, LA 70130
          Telephone: 504-310-2100
          Facsimile: 504-310-2120
          dmoore@irwinllc.com

          Harley Ratliff
          Adrienne L. Byard
          **SHOOK, HARDY & BACON L.L.P.**
          2555 Grand Boulevard
          Kansas City, Missouri 64108
          Telephone: 816-47p4-6550
          Facsimile: 816-421-5547
          hratliff@shb.com
          abyard@shb.com

          *Counsel for sanofi-aventis U.S. LLC*

          GREENBERG TRAURIG, LLP

          */s/ R. Clifton Merrell*
          R. Clifton Merrell
          Evan Holden
          Terminus 200
          3333 Piedmont Road NE, Suite 2500
          Atlanta, GA 30305
          Telephone: 678-553-2100
          Facsimile: 678-553-2100
          merrellc@gtlaw.com
          holdene@gtlaw.com

ADAMS AND REESE LLP

/s/ *Deborah B. Rouen*
Deborah B. Rouen
E. Paige Sensenbrenner
One Shell Square
701 Poydras Street, Suite 4500 New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
debbie.rouen@arlaw.com
paige.sensenbrenner@arlaw.com

*Attorneys for Sandoz Inc.*

TUCKER ELLIS LLP

*/s/ Julie A. Callsen*
Julie A. Callsen
Brandon D. Cox
950 Main Avenue, Suite 1100 Cleveland, OH 44113-7213
Telephone:       216-592-5000
Facsimile:        216-592-5009
Julie.callsen@tuckerellis.com
brandon.cox@tuckerellis.com

*Attorneys for Accord Healthcare, Inc.*


DECHERT LLP

*/s/ Mara Cusker Gonzalez*
Mark Cheffo
Mara Cusker Gonzalez
51 Madison Avenue, 22nd Floor New York, NY 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
mark.cheffo@dechert.com
maracusker.gonzalez@dechert.com

15

CHAFFE McCALL, L.L.P.

/s/ *John F. Olinde*
John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No.1848)
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com
rotolo@chaffe.com

*Attorneys for Hospira, Inc., Hospira Worldwide, LLC formally d/b/a Hospira Worldwide, Inc., and Pfizer, Inc.*

HINSHAW & CULBERTSON LLP

*/s/ Geoffrey M. Coan*
Geoffrey M. Coan
Kathleen E. Kelly
53 State Street, 27th Floor
Boston, MA 02109
Telephone: 617-213-7000
Facsimile: 617-213-7001
gcoan@hinshawlaw.com
kekelly@hinshawlaw.com

*Attorneys for Sun Pharmaceuticals Industries, Inc. f/k/a Caraco Laboratories, Ltd.*

ULMER & BERNE LLP

/s/ *Michael J. Suffern*
Michael J. Suffern
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Telephone: 513-698-5064
Telefax: 513-698-5065
msuffern@ulmer.com

*Attorneys for Defendant Actavis Pharma, Inc. and Actavis LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 22, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*
Douglas J. Moore