# EXHIBIT D

## Page 1389

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
*********************************************************************
IN RE: TAXOTERE (DOCETAXEL)    Docket No. 16-MD-2740
PRODUCTS LIABILITY LITIGATION    Section H
                New Orleans, LA
Relates to: Barbara Earnest    Monday, September 23, 2019
16-CV-17144
*********************************************************************

        TRANSCRIPT OF TRIAL PROCEEDINGS
     HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
         UNITED STATES DISTRICT JUDGE
              DAY 6, MORNING SESSION

APPEARANCES:
FOR THE PLAINTIFF:    BACHUS & SCHANKER, LLC
                     BY: DARIN L. SCHANKER, ESQ.
                         J. KYLE BACHUS, ESQ.
                     1899 Wynkoop St., Suite 700
                     Denver, CO 80202
                     FLEMING NOLEN & JEZ
                     BY: RAND P. NOLEN, ESQ.
                     2800 Post Oak Blvd., Suite 4000
                     Houston, TX 77056

                     GIBBS LAW GROUP, LLP
                     BY: KAREN B. MENZIES, ESQ.
                     6701 Center Drive West, 14th Floor
                     Los Angeles, CA 90045
                     DAVID F. MICELI, LLC
                     BY: DAVID F. MICELI, ESQ.
                     P.O. Box 2519
                     Carrollton, GA 30112-0046

                     PENDLEY BAUDIN & COFFIN
                     BY: CHRISTOPHER L. COFFIN, ESQ.
                     2505 Energy Centre
                     1100 Poydras St.
                     New Orleans, LA 70163

## Page 1390

                     BARRIOS KINGSDORF & CASTEIX
                     BY: DAWN M. BARRIOS, ESQ.
                     701 Poydras St., Suite 3650
                     New Orleans, LA 70139
                     GAINSBURGH BENJAMIN DAVID
                     MEUNIER & WARSHAUER
                     BY: M. PALMER LAMBERT, ESQ.
                     2800 Energy Centre
                     1100 Poydras St.
                     New Orleans, LA 70163

                     MORGAN & MORGAN
                     BY: EMILY C. JEFFCOTT, ESQ.
                     700 S. Palafox St., Suite 95
                     Pensacola, FL 32502

FOR THE DEFENDANT:    SHOOK HARDY & BACON
                     BY: HILDY M. SASTRE, ESQ.
                     201 Biscayne Blvd., Suite 3200
                     Miami, FL 33131
                     SHOOK HARDY & BACON
                     BY: JON A. STRONGMAN, ESQ.
                         HARLEY V. RATLIFF, ESQ.
                     2555 Grand Blvd.
                     Kansas City, MO 64108
                     IRWIN FRITCHIE URQUHART & MOORE
                     BY: DOUGLAS J. MOORE, ESQ.
                     400 Poydras St., Suite 2700
                     New Orleans, LA 70130

Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR, RMR
                            500 Poydras Street, B-275
                            New Orleans, Louisiana 70130
                            (504) 589-7776

 Proceedings recorded by mechanical stenography, transcript
produced by computer.

## Page 1391

           INDEX

WITNESSES FOR THE PLAINTIFF:            PAGE/LINE:

DR. JAMES CARINDER

  Direct Examination by Mr. Schanker         1393/16

## Page 1392

           PROCEEDINGS

        (MONDAY, SEPTEMBER 23, 2019)
           (MORNING SESSION)

        (OPEN COURT.)
        THE COURT: All jurors are present. Court's back in session. You may be seated.
        Please call your first witness.
        MR. SCHANKER: Good morning, your Honor.
        THE COURT: Good morning.
        MR. SCHANKER: We would like to call Dr. James Carinder to the stand.
        THE DEPUTY CLERK: You can step around here. Doctor, can you raise your right hand, please.
        (WHEREUPON, JAMES CARINDER, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)
        THE DEPUTY CLERK: And please state and spell your name for the record.
        THE WITNESS: James Carinder, C-A-R-I-N-D-E-R.
        THE COURT: Can I have counsel approach, please?
        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
        THE COURT: I just want to talk to you a little bit out of presence of the jury. Very frankly, I am doing it this way because it just slipped my mind when I first walked in.
        I know your report's as an oncologist, and I know what

Page 1393

1  you're doing. But your testimony, you should know, is going to be
2  limited to your treatment of Mrs. Earnest and not anything outside
3  of that. And, you know, a case -- and both parties, the plaintiff,
4  have certain positions, and the defendants have positions as well.
5  And I just want you to recognize that both parties have the firm
6  beliefs in their respective positions. But what I am concerned
7  about with you is that your testimony be limited to your treatment
8  and those decisions you made with Ms. Earnest. Fair enough?
9          MS. SASTRE: Yes.
10         THE COURT: Anything?
11         MS. SASTRE: That's fine, your Honor.
12         (OPEN COURT.)
13         THE COURT: Please proceed.
14         MR. SCHANKER: Thank you, your Honor.
15              DIRECT EXAMINATION
16  BY MR. SCHANKER:
17  Q. Sir, could you go ahead and introduce yourself to the jury this
18  morning?
19  A. James Carinder. I am a medical oncologist and hematologist.
20  Q. And what part of town do you work in? What part of the
21  community do you work in, Doctor?
22  A. Covington.
23  Q. And were you subpoenaed here today?
24  A. Yes.
25  Q. Doctor, were you part of the team that treated Barbara Earnest

Page 1394

1  for her early stage breast cancer in 2011?
2  A. Yes.
3  Q. And do you recognize Barbara Earnest here in the courtroom here
4  today?
5  A. Yes.
6  Q. You remember her as a patient?
7  A. Yes.
8  Q. And as part of that team that treated Barbara Earnest for her
9  early stage breast cancer in 2011, did you prescribe the drug
10 Taxotere to Barbara?
11 A. Yes.
12 Q. Doctor, in your experience, is Taxotere a good drug?
13 A. Yes.
14 Q. And at the time you treated Barbara in 2011, did the Taxotere
15 label warn you about Taxotere's risk of permanent hair loss?
16 A. No.
17 Q. Doctor, when Barbara came to you in 2011, what was her
18 prognosis?
19 A. With appropriate treatment, good.
20 Q. Doctor, I asked you about whether or not you were warned of the
21 risk of permanent hair loss with Taxotere. Following up on that,
22 at the time you treated Barbara in 2011, at that time had Sanofi
23 provided you with a warning by any other avenue that Taxotere
24 caused permanent hair loss?
25 A. No.

Page 1395

1  Q. At that time in 2011, did you warn Barbara that she could
2  experience permanent hair loss from using Taxotere before you
3  prescribed it to her?
4  A. No.
5  Q. And why not?
6  A. Because we weren't aware of that.
7  Q. Doctor, generally speaking, in the course of your practice, has
8  a drug company ever warned you about a new side effect after the
9  drug is on the market?
10 A. Yes.
11         MS. SASTRE: Objection, your Honor. Relevancy; lack of
12 foundation.
13         THE COURT: Rephrase your question.
14 BY MR. SCHANKER:
15 Q. Doctor, understanding your background and whether or not this
16 is the process of your understanding and receiving warnings, have
17 you ever been warned by a drug company -- setting aside Taxotere,
18 just in general, have you ever been warned by a drug company about
19 a new side effect after the drug was on the market?
20 A. Yes.
21 Q. And does one in particular come to mine?
22 A. Bevacizumab.
23 Q. So when you receive a warning like that after a drug is on the
24 market, does that inform your prescribing decisions?
25         MS. SASTRE: Objection, leading, your Honor.

Page 1396

1          THE COURT: Rephrase your question.
2  BY MR. SCHANKER:
3  Q. Doctor, what do you do with that information when you receive
4  it? If you receive from a drug company information after that drug
5  is on the market about a new or emerging side effect, how does that
6  inform your prescribing decision? What do you do with it?
7  A. Well, it depends on the adverse event.
8  Q. Tell us.
9  A. Well, when bevacizumab had several adverse events that were
10 made public after it was released, one being risk of arterial
11 thrombosis, and so that would potentially alter your decision in
12 using that in someone that, say, had bad vascular disease.
13 Q. And so in situations like that, what do you do with that
14 information?
15 A. If it's -- it depends on the adverse event. In some cases, I
16 won't use the drug. And in other cases, I make the patient aware.
17 Q. But do you or do you not modify your prescribing decision based
18 upon that?
19         MS. SASTRE: Objection, your Honor, relevancy. This has
20 nothing to do with Taxotere.
21         THE COURT: Overruled. Overruled. I'm going to allow
22 him to answer it.
23         THE WITNESS: Can you repeat it, please?
24         MR. SCHANKER: Yes.
25 BY MR. SCHANKER:

Page 1417

1  article and notify you of any information concerning permanent hair
2  loss and Taxotere?
3  A. No.
4  Q. Have you ever had a -- well, first of all, Doctor, what is an
5  abstract? Explain to the jury what an abstract is in the medical
6  context.
7  A. An abstract is -- when you read a journal article, an abstract
8  is a brief summary that kind of summarizes the entire article
9  before you read the whole thing. It's kind of just a bullet
10 presentation of the whole article.
11 Q. Have you, on occasion, had pharmaceutical companies send you an
12 abstract on a particular drug?
13 A. Yes.
14 Q. To your knowledge, prior to the time that you treated Barbara
15 back in 2011, had Sanofi ever sent you a reprint of an abstract
16 notifying you that it had important information about permanent
17 hair loss and Taxotere?
18 A. No.
19 Q. Doctor, talking about how you get information. Do you get on
20 the computer and just Google to get information?
21 A. On occasion.
22     MS. SASTRE: Objection. Vague and ambiguous, your Honor.
23     THE COURT: Overruled.
24     THE WITNESS: On occasion.
25 BY MR. SCHANKER:

Page 1418

1  Q. And in the time period of 2011 -- we'll keep it to that and
2  prior being that that's Barbara Earnest's time frame -- do you
3  consider just getting on the computer and Googling an overall
4  reliable source for you to get your information?
5  A. No.
6  Q. And why not?
7  A. Because a lot of what you Google, a lot of the stuff that pops
8  up is not peer-reviewed literature.
9  Q. Explain to the jury what you mean by "peer-reviewed
10 literature."
11 A. Peer-reviewed, meaning, that it's been reviewed by a group of
12 thought leaders that are experts in the field. A lot of what is
13 published on the web is not peer reviewed and a lot of it is very
14 inaccurate.
15 Q. Have you heard of the word anecdotal before?
16 A. Yes.
17 Q. What does that mean in the medical context?
18 A. Isolated case.
19 Q. Speaking about an isolated case, the jury's heard that you had
20 another patient that had hair loss, permanent hair loss prior to
21 Barbara Earnest. Do you recall that patient?
22 A. Yes.
23 Q. When -- do you recall when you treated -- and, obviously, we
24 won't violate any HIPAA rules here, but do you recall when you
25 treated this particular patient?

Page 1419

1  A. About 2005.
2  Q. And Barbara Earnest treated in 2011?
3  A. Yes.
4  Q. How old was that prior patient, the 2005 patient, when you
5  treated her, approximately?
6  A. About 69 or 70.
7  Q. So was she older or younger than Barbara Earnest at the time
8  you treated Barbara?
9  A. Older.
10 Q. Do you recall what her hair was like when you treated her, this
11 prior patient?
12 A. Thin, almost light pattern hair loss.
13 Q. How was her hair, this prior patient's -- we're talking about
14 prior to the chemotherapy, correct, when you say, "pattern hair
15 loss"?
16 A. Yes.
17 Q. So this -- just so we're clear. The prior patient from 2005
18 had light pattern hair loss prior to her chemotherapy?
19 A. Yes.
20 Q. How did her hair loss compare to Barbara's hair loss -- I'm
21 sorry. How did --
22     MR. SCHANKER: It's a bad question, your Honor. Can I
23 start over?
24     THE COURT: Rephrase.
25     MR. SCHANKER: I apologize.

Page 1420

1  BY MR. SCHANKER:
2  Q. Talking about the prior 2005 patient, how did her hair prior to
3  chemotherapy compare to Barbara's hair prior to chemotherapy?
4  A. Thinner.
5  Q. Whose was thinner?
6  A. The 2005 patient.
7  Q. Do you recall what treatment you gave to that other patient?
8  A. AC for four cycles and then docetaxel for four cycles.
9  Q. And did you follow-up with that patient?
10 A. Yes.
11 Q. Doctor, are you a dermatologist?
12 A. No.
13 Q. Before you treated Mrs. Earnest, did you have any idea what
14 caused the 2005's patient's hair to be thinner, to not come back?
15 A. The chemotherapy.
16 Q. And describe for the jury that prior patient what her hair was
17 like after the chemotherapy when you indicated it didn't come back
18 or didn't all come back. Paint a picture for the jury so they
19 understand.
20 A. All she has now is just very short -- like stub. It never --
21 you know, it was thin before, but that's what it was after that.
22 Q. So when you spoke with -- and we'll get into this in more
23 detail, but when you spoke with Barbara prior to her chemotherapy,
24 did you explain to her about that prior patient?
25 A. No.

8 (Pages 1417 to 1420)

Page 1421

1  Q. And explain to the jury why you didn't.
2  A. I didn't think it was relevant.
3  Q. Explain why. In the context of anecdotal.
4  A. I -- the assumption I had was that because her hair was already
5  very thin, that's why it was just an idiosyncratic case.
6  Q. What does an idiosyncratic case mean to you?
7  A. Odd, out of the ordinary.
8  Q. And as a medical practitioner, do you change your prescribing
9  habits based on one idiosyncratic case?
10 A. No.
11 Q. Why not? Why would that not be a good idea? Why don't you do
12 it?
13 A. Because I don't think it's -- that's not a strong enough
14 argument to change your entire practice and technique.
15 Q. And make sure the jury understands why that is, why you don't
16 change your entire practice and technique based on one
17 idiosyncratic case?
18 A. Because you'll have an anecdotal case from now and then.
19 Unless it's an extreme adverse event, it wouldn't deter me from my
20 usual practice pattern.
21 Q. Doctor, we've talked about how -- let me ask you this: Do you
22 believe that you stay updated on the relevant portions of the drug
23 label for drugs that you prescribe?
24 A. Yes.
25 Q. And we've gone through ways that you stay updated. I just want

Page 1422

1  to make sure we're clear. Are those the ways that you stay updated
2  on the relevant drugs that you prescribe and those drug labels?
3  A. Yes.
4  Q. And based upon that, Doctor, do you believe that you were
5  up-to-date on the relevant contents of the Taxotere label at the
6  time that you prescribed Taxotere to Barbara Earnest?
7  A. You mean the label for use?
8  Q. Yes.
9  A. Yes.
10 Q. Doctor, in your deposition, you indicated that you read the
11 Taxotere drug label for the first time around the time -- when you
12 started prescribing that -- prescribing the drug; is that fair?
13 A. Yes.
14 Q. And you indicated that was sometime 1999 you believe?
15 A. Yes.
16 Q. Doctor, when you read that 1999 label, did you read it to mean
17 that Taxotere causes permanent hair loss?
18 A. No.
19 Q. Doctor, I would like to show you the label from 1999; is that
20 okay?
21 A. (WITNESS NODS HEAD IN THE AFFIRMATIVE.)
22    MR. SCHANKER: One moment. May I approach, your Honor?
23    THE COURT: Yes, you may.
24 BY MR. SCHANKER:
25 Q. Doctor, if you could flip to Tab 1 in that big binder that you

Page 1423

1  have before you. Do you see Tab 1?
2  A. Yes.
3     MR. SCHANKER: And that, your Honor, is Plaintiff's
4  Exhibit 28.
5  BY MR. SCHANKER:
6  Q. Do you have that before you, Doctor, Tab 1 that says
7  Plaintiff's Exhibit 28?
8  A. Yes.
9  Q. I'll show this to the jury. Doctor, does this appear to you to
10 be the label -- what's referred to as the label from 1999? And
11 also look on the screen there. Do you see down in the lower left,
12 do you see where I just highlighted?
13 A. (WITNESS NODS HEAD IN THE AFFIRMATIVE.)
14 Q. What is that date?
15 A. 12/23/99.
16 Q. So, Doctor, does this appear to be the label for the drug
17 Taxotere from 1999?
18 A. When you say, "label" -- when I use the term "label," label
19 means what the FDA indications are, what the FDA approves the drug
20 to be used to treat. Okay. This is a warning, a set of adverse
21 events.
22    When I use the term "label," when you say it's off label,
23 meaning, that you're not -- you're using it for a non-FDA approved
24 use, okay. If it's on label, that means that the FDA has approved
25 the drug for a particular use.

Page 1424

1  So when you said label, that's why I said I just want to
2  clarify that.
3  Q. And what would you call this document, just so we're using the
4  same terminology?
5  A. Warning label.
6  Q. Okay. And just so we're clear, Doctor, in your practice are
7  you up-to-date on the warning labels for the drugs that you
8  prescribe?
9  A. Yes.
10 Q. And at the time when you're prescribing Taxotere, you were
11 up-to-date on the information in the document warning label that we
12 have before you here, fair enough?
13 A. Yes.
14    MS. SASTRE: Your Honor, I object to the leading.
15    MR. SCHANKER: Just trying to move it along, your Honor.
16    THE COURT: I understand. You need to ask the questions
17 and let him answer.
18    MR. SCHANKER: Fair enough. I just don't want us to be
19 here all day with this witness.
20    THE COURT: We don't need any commentary. Let's just
21 proceed.
22 BY MR. SCHANKER:
23 Q. Doctor, let's turn to page 29 in this document, the 1999
24 warning label as you've indicated. So can you read, Doctor, what
25 this section is entitled -- do you see that (INDICATING)?

```
                     UNITED STATES DISTRICT COURT

                     EASTERN DISTRICT OF LOUISIANA



    IN RE:  TAXOTERE (DOCETAXEL)      *        16-MD-2740
    PRODUCTS LIABILITY LITIGATION     *
                                      *        Section H
                                      *
    Relates to:  Barbara Earnest      *        September 23, 2019
                 16-CV-17144          *
    * * * * * * * * * * * * * * * * * *



                        DAY 6 - AFTERNOON SESSION
                     TRANSCRIPT OF JURY TRIAL BEFORE
                      THE HONORABLE JANE T. MILAZZO
                       UNITED STATES DISTRICT JUDGE


    Appearances:


    For the Plaintiffs:           Barrios Kingsdorf & Casteix, LLP
                                  BY:  DAWN M. BARRIOS, ESQ.
                                  701 Poydras Street, Suite 3650
                                  New Orleans, Louisiana 70139


    For the Plaintiffs:           Gainsburgh Benjamin David Meunier
                                    & Warshauer, LLC
                                  BY:  M. PALMER LAMBERT, ESQ.
                                  1100 Poydras Street, Suite 2800
                                  New Orleans, Louisiana 70163


    For the Plaintiffs:           Pendley Baudin & Coffin, LLP
                                  BY:  CHRISTOPHER L. COFFIN, ESQ.
                                  1100 Poydras Street, Suite 2505
                                  New Orleans, Louisiana 70163


    For the Plaintiffs:           Gibbs Law Group, LLP
                                  BY:  KAREN BARTH MENZIES, ESQ.
                                  6701 Center Drive West, Suite 1400
                                  Los Angeles, California 90045
```

Page 1535

1  BY MS. SASTRE:
2  Q. Doctor, isn't it true that you always told patients who
3  were on dose-dense Adriamycin and Cytoxan, followed by
4  Taxotere, that you did have a patient who didn't recover her
5  hair?
6  A. No.
7     MS. SASTRE: Your Honor, may I approach the witness?
8     THE COURT: Yes, you may.
9     MS. SASTRE: Okay. Thank you.
10        Your Honor, would you like a copy?
11    THE COURT: Please.
12    MS. SASTRE: Counsel, do you need a copy?
13 BY MS. SASTRE:
14 Q. Dr. Carinder, I have just handed you your deposition which
15 was taken in this case. You see, sir -- I'm sure you will
16 recall. It's dated January 11, 2018, right?
17 A. Yes.
18 Q. In your deposition you took an oath, just like you did
19 here today, coming into court. Right, sir?
20 A. Yes.
21 Q. Both sides asked you some questions that day, as we heard,
22 for, I think, about three hours or four hours, correct?
23 A. Yes.
24 Q. Okay, sir. If I get you to turn, please, to page 125 of
25 your deposition, line 4, sir.

Page 1536

1     MR. SCHANKER: Your Honor, improper use of showing
2  the depo. She can certainly read it, but showing the entire
3  page of the deposition -- I ask that it be read.
4     THE COURT: It's appropriate to read it to him.
5     MS. SASTRE: Okay, Your Honor.
6     MR. SCHANKER: What's the page number? I'm sorry.
7     MS. SASTRE: Sure. 125. I thought both sides had
8  done that, Judge, but I'm happy to just read it, Your Honor.
9  BY MS. SASTRE:
10 Q. So page 125, line 4.
11    "QUESTION: Did you ever warn patients who were on
12    the dose-dense AC, and then followed by Taxotere cycle, of
13    the possibility of permanent hair loss?
14    "ANSWER: Patients have asked about that, and at the
15    time I always told them -- I said, I have one lady, I
16    said, who still hasn't recovered her hair yet. But prior
17    to her, I had never seen anyone have long-lasting
18    alopecia."
19       Did I had read that correctly, sir?
20 A. Yes.
21    MR. SCHANKER: Your Honor, the time frame is not in
22 response to the question. Improper use of the deposition.
23    THE COURT: Mr. Schanker, overruled. The jury will
24 make that determination.
25    MR. SCHANKER: Thank you.

Page 1537

1     THE COURT: Let's proceed.
2     MS. SASTRE: Okay. Thank you.
3  BY MS. SASTRE:
4  Q. So, Dr. Carinder, you see you said here you always told
5  your patients, right? I just read that to you?
6  A. Yes.
7  Q. So does that refresh your recollection in any way that, in
8  fact --
9  A. Yes.
10 Q. Okay, sir. So let me just make sure I get the whole
11 question out for the record, Dr. Carinder.
12 A. Yes.
13 Q. It's true, you would agree with me, you always told your
14 patients, if they were on dose-dense AC followed by Taxotere,
15 you would tell them about the prior patient, true?
16 A. Yes.
17 Q. As you sit here today, sir, you don't have any reason that
18 you deviated from that practice when it came to Mrs. Earnest,
19 right?
20 A. No.
21 Q. So you would have told her about that patient, correct?
22 A. Yes.
23 Q. After having heard about that patient and after learning
24 about the possibility that her hair might not grow back, you
25 would agree with me that Mrs. Earnest accepted your treatment

Page 1538

1  plan and agreed to proceed with the same regimen of dose-dense
2  AC followed by Taxotere, true?
3  A. Yes.
4     MR. SCHANKER: Your Honor, it misstates the
5  testimony.
6     THE COURT: You're going to have a time in redirect
7  to cover this.
8     MR. SCHANKER: Thank you.
9  BY MS. SASTRE:
10 Q. One of the things that you said, Dr. Carinder, on direct
11 exam, you said something like permanent hair loss can be a big
12 deal to women, right?
13 A. Yes.
14 Q. Okay, sir. So, again, because of that, that would be why
15 you were sharing information like this, true?
16 A. Yes.
17 Q. Okay, sir. Okay.
18    So let's switch gears a little bit. I want to talk
19 with you, I think, first, about the 2004 Taxotere label. I
20 know you call it the "package insert." Right? And I will tell
21 you, only in this courtroom we have been calling it the
22 "label," but I mean all of the information that comes with the
23 drug. Is that okay?
24 A. You mean like a warning label?
25 Q. Yes.

Page 1555

1  Q. And, sir, that's a journal that you get, right?
2  A. Yes.
3  Q. I think you told us you get it every month?
4  A. Yes.
5  Q. Is that something that is a peer-reviewed journal, sir?
6  A. Oh, absolutely.
7  Q. I mean, it's a good one, right?
8  A. Yes.
9  Q. It's reliable, the information contained in it?
10 A. Yes.
11 Q. It's considered authoritative?
12 A. That's ASCO's journal.
13 Q. Okay. So let me ask you this, sir: Did you see this
14 paper?
15 A. Yes.
16 Q. You have seen it previously?
17 A. Yes --
18 Q. Okay.
19 A. -- years ago.
20     MS. SASTRE: Your Honor, I would like to go ahead and
21 put it up, please. Okay.
22     THE COURT: Are you offering it into evidence?
23     MS. SASTRE: Well, it's medical literature. I don't
24 think we have been moving it in --
25     THE COURT: All right.

Page 1556

1      MS. SASTRE: -- but we have been publishing it.
2      THE COURT: That's fine. You can publish it.
3      MS. SASTRE: Okay. Thank you, Your Honor.
4  BY MS. SASTRE:
5  Q. So, Doctor, just a couple quick questions on it, okay?
6     You see it's from 2001, right, sir?
7  A. Yes.
8  Q. Which we can agree, of course, was years before you
9  treated Mrs. Earnest, true?
10 A. True.
11 Q. And you see that there are four patients in the study who
12 were identified as having long-lasting partial alopecia, and
13 they were treated with Taxotere, Adriamycin, and Cytoxan,
14 correct?
15 A. Yes.
16 Q. Okay. And so that's something, when you reviewed this
17 article, you would have learned of Taxotere, Adriamycin, and
18 Cytoxan being associated with four reports of persistent hair
19 loss, correct?
20 A. Yes.
21 Q. And, again, this is something that's published and
22 available in the literature, true? Publicly available even,
23 true?
24 A. Yes.
25 Q. Did you share this information with Mrs. Earnest?

Page 1557

1  A. No.
2  Q. Okay.
3  A. I guess I didn't focus on that when I read this. This
4  would never be a regimen I would use with somebody with
5  metastatic disease.
6  Q. Fair enough.
7  A. It's too harsh.
8  Q. Okay, sir. Let's take a look at another article.
9     So, Dr. Carinder, I just handed you an article, do
10 you see, from 2009, sir.
11 A. Yes.
12 Q. And it's called the Prevezas article, correct? That's the
13 author? Do you see that, sir?
14 A. No.
15    MR. SCHANKER: Your Honor, I would like this to be
16 established as a learned treatise. This is a dermatology --
17    THE COURT: Wait. I think the first question is -- I
18 think she needs to lay a foundation.
19    MR. SCHANKER: Yes.
20    MS. SASTRE: Okay. Sure.
21 BY MS. SASTRE:
22 Q. So my question is simply: Do you see that this was
23 published in 2009?
24 A. Yes.
25 Q. Okay. And it's published in -- it's the British Journal

Page 1558

1  of Dermatology.
2     Do you see that?
3  A. Yes.
4  Q. Is this something that you saw before you treated
5  Mrs. Earnest in 2011, this article?
6  A. No.
7  Q. Do you see, if you look at the article --
8     MR. SCHANKER: Your Honor, we would object.
9     THE COURT: Wait.
10    MR. SCHANKER: This is a derma --
11    THE COURT: I think --
12    MR. SCHANKER: There's no foundation laid within his
13 area of expertise.
14    THE COURT: I think we need to lay a foundation that
15 this is something he would have relied on.
16    MS. SASTRE: Okay.
17 BY MS. SASTRE:
18 Q. Well, let me ask you this, sir: I mean, have you heard of
19 the Journal of Dermatology before?
20 A. Yes.
21    MR. SCHANKER: Misstates the title. That's not the
22 title.
23    THE COURT: Mr. Schanker, let's see if we can get
24 past this line of questioning first, if a foundation is going
25 to be laid. But I'm going to allow some questions.