UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO ALL CASES | |

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSES
UNDER LA. REV. STAT. § 9:2800.59

MAY IT PLEASE THE COURT:

An affirmative defense to a traditional failure-to-warn claim under the Louisiana Products Liability Act (LPLA) is that the manufacturer did not know, and could not have known, that the product in question had a potentially damage-causing characteristic prior to it leaving the manufacturer's control. Here, it is irrefutable that Sanofi knew its product, Taxotere, possessed a risk of permanent hair loss. This can be said for many reasons, not the least of which is that on January 26, 2007, Sanofi expressly approved a warning for "permanent hair loss" in an informed consent form for use in its clinical trials. If the question is what Sanofi knew and when Sanofi knew it, that inquiry can begin and end with a document in which Sanofi expressly warns study participants that "permanent alopecia" is "one of the [Taxotere's] side effects we *know* about at present." (emphasis added)

But a closer inspection of the events leading up to Sanofi's approval of that language reveals the reasons likely behind that decision—and why Sanofi may have known or should have known years earlier of the risk of permanent hair loss with its drug. First, the study site that proposed this change to the informed consent form had, since at least 2001, reported persistent hair loss that investigators regularly observed in its Taxotere patients. These cases were not one-off

1

rarities that Sanofi could dismiss as anomalous but instead closely followed participants in multi-year, company-sponsored clinical trials, those unrelated to its TAX 316 and TAX 301 studies.  By August 2, 2004, these investigators—and Sanofi—found there to be a causal relationship between Taxotere and a patient's persistent hair loss.

Second, Sanofi was warned by oncologist Dr. Scot Sedlacek that the prevalence of "persistent significant alopecia" with Taxotere in his clinical practice was alarming as compared against the background rate of zero with comparator drugs.  After receiving eight reports in 2005 of Taxotere-related "PSA" from Dr. Sedlacek's practice, the company responded internally that "permanent alopecia" and "permanent hair loss" were already side effects warned of in Taxotere's label.  In mid-2006, when Dr. Sedlacek informed Sanofi's sales team that his experience showed a risk of "persistent significant alopecia" with Taxotere—a risk the sales reps passed on to others in the company—its employees called these findings "an excuse" for not prescribing Taxotere.

Finally, Dr. Sedlacek presented his formalized findings that 6.3% of his Taxotere patients failing to regrow hair for several years after treatment at an oncology convention and in a medical journal in December 2006, prompting the company finally to have "a dialogue" with him about the risk.

Regardless of what ultimately caused Sanofi to approve an affirmative warning of "permanent alopecia" as a known risk of Taxotere in January 2007, there is a wealth of evidence supporting that conclusion—and making clear that it could have come to it sooner.  For all of these reasons, explained more fully below, the Court should enter partial summary judgment in Plaintiffs' favor on the question of when Sanofi knew of a risk of permanent alopecia with Taxotere, setting that date at January 26, 2007, while reserving for individual Plaintiffs the ability to establish an earlier date before a trier of fact.

I.   FACTS

    A. **Sanofi Approves Dr. Mackey's Clinical Trial Warning of "Permanent Alopecia."**

On January 26, 2007, Emanuel Palatinsky, a global safety officer for Taxotere, approved modifications to an informed consent form for a Sanofi clinical trial. (Pls' LR 56.1 Statement of Undisputed Fact ("LR 56.1 Statement") ¶13.) Among the modifications was the addition of "permanent hair loss" as one of the "side effects" of Taxotere. (*Id.* at ¶15.) The consent form read as follows:

> The following are the side effects of each drug used in this study. These side effects may or may not be more severe when the drugs are taken together. *These are the side effects we know about at present. However, since this is a study of new treatments there may be other side effects that we do not know about yet*.

(*Id.* at ¶16 (emphasis added).) For the other drugs listed in the informed consent—namely, cyclophosphamide, trastuzumab, and carboplatin—"permanent hair loss" is not listed as a side effect. (*Id.* at ¶17.) In approving these modifications, Dr. Palatinsky expressly accepted the permanent hair loss warning, noting that the informed consent did not need to warn of "hair loss" and "permanent hair loss" because "permanent [hair loss] is sufficient once." (*Id.* at ¶15.)

The modifications to the informed consent form approved by Dr. Palatinsky were submitted by Dr. John Mackey, a Principal Investigator in a number of Sanofi-sponsored clinical trials.[1] Before approving the addition of "permanent hair loss" to Dr. Mackey's informed consent, Sanofi had steadily received reports from Dr. Mackey's office since 2003 about patients experiencing permanent hair loss after completing chemotherapy treatment with Taxotere. These patients had volunteered to participate in a Sanofi clinical trial, and as the Principal Investigator,

---

[1] Notably, Dr. Mackey served as Chairman of Sanofi's TAX 316 clinical trial—the pivotal study that Sanofi used to obtain approval for use Taxotere in the adjuvant setting—and as a Principal Investigator and primary author in other published clinical studies sponsored by Sanofi and involving Taxotere. *See id*.

3

Dr. Mackey and his predecessor, Dr. Nabholtz,[2] had followed and reported their ongoing hair loss for years.

For example, on August 20, 2003, Sanofi received a report from Dr. Mackey's site[3] regarding a patient in a Sanofi clinical trial[4] (patient no. 10511) whose hair loss persisted for more than year following completion of chemotherapy treatment with Taxotere. (*Id.* at ¶20.) Less than a month later, on September 19, 2003 Sanofi received a similar report from Dr. Mackey's site about another patient in the clinical trial (patient no. 11158) whose hair loss had persisted since completing Taxotere chemotherapy treatment in June 2002. (*Id.* at ¶21.)[5] Sanofi entered this report into its pharmacovigilance database, noting that "the investigator has reported that [the alopecia] was likely permanent" and the "[i]nvestigator's assessment for causal relationship: [r]elated to study medication." (*Id.*) In February of 2005, Sanofi updated its pharmacovigilance database, stating that "[n]ew follow-up information received does not change the previous assessment for this case." (*Id.*)

Likewise, between 2003 and 2004, Dr. Mackey reported at least fifteen reports[6] of patients with permanent hair loss, including:

- On August 13, 2003, Sanofi received a report of 61-year old female patient from Dr. Mackey's site (patient no. 10517) with "significant hair thinning" ongoing after completion of Taxotere treatment on January 30, 2002. The causality was assessed as "[p]ossibly related to study medication." Sanofi received follow-up information on October 22, 2004, confirming the patient's ongoing Grade 2 alopecia. (*Id.* at ¶22.)

---

[2] Dr. Mackey replaced Dr. Nabholtz as Primary Investigator during the TAX 316 clinical trial. *See id.* at ¶30.

[3] Dr. Mackey's site is also identified by Investigator ID: BCA0021. *See id.* at ¶19.

[4] This Sanofi clinical trial, TAX-GMA-301, which Dr. Mackey served as a Principal Investigator compared the safety and efficacy of Taxotere given in combination (TAC) versus sequentially (AC-T).

[5] This Sanofi document incorrectly states the date of the last cycle of Taxotere as June 26, 2003. The correct year is 2002. *See id.*

[6] *Id.* at ¶18.

4

- On October 24, 2003, Sanofi received a report of 49-year old female patient from Dr. Mackey's site (patient no. 11293) who completed chemotherapy with Taxotere on September 2, 2002. The patient underwent a hair transplant and her alopecia was marked "recovered." Sanofi received a follow-up report on August 4, 2004, noting "the physician observed thinness of hair on top; therefore, grade 1 alopecia continues." (*Id.* at ¶23.)

- On December 15, 2003, Sanofi received a report of a 60-year old female patient from Dr. Mackey's site (patient no. 10230) who continued to experience "balding [] over the back of the [] head" despite having completed Taxotere chemotherapy treatment more than two years earlier on November 1, 2001. The causality was assessed to be "[r]elated to study medication." Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶24.)

- On December 15, 2003, Sanofi received another report from Dr. Mackey's site. This report related to a 48-year old female patient (patient no. 10854) whose hair had not regrown despite completing treatment with Taxotere on June 2, 2002. The causality was assessed as "[r]elated to study medication." Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶25.)

- On March 24, 2004, Sanofi received a report of a 61-year old female from Dr. Mackey's site (patient no. 11714) who continued to experience ongoing hair loss after completion of chemotherapy on October 2, 2002. The causality of the hair loss was assessed to be related to study medication. Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶26.)

- On July 7, 2004, Sanofi received a report of a 64-year old female from Dr. Mackey's site (patient no. 12994) who completed chemotherapy with Taxotere on May 14, 2003. The patient's alopecia did not resolve, and the causality was assessed as "related to study medication." Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶27.)

- On August 2, 2004, Sanofi received a report of a 44-year old female from Dr. Mackey's site (patient no. 12607) who continued to experience Grade 2 alopecia after completing chemotherapy treatment with Taxotere on March 19, 2003. Dr. Mackey's site assessed the causality as "related to study medication." Sanofi updated the report in 2005, 2012, and 2013, noting the patient had "not recovered" from the alopecia and that it remained "ongoing." (*Id.* at ¶28.)

Notably, Dr. Mackey was not the first doctor at this investigator site to report ongoing persistent hair loss. Dr. Nabholtz preceded him as the Primary Investigator at this site, and he reported in a 2001 publication "long lasting [hair loss] (longer than two years)" in 7.4% of

5

metastatic breast cancer patients taking Taxotere in a Sanofi sponsored clinical trial. (*Id.* at ¶31.) Although the exact number of patients enrolled at Dr. Mackey's site is unknown to Plaintiffs, Dr. Mackey had at least 80 patients enrolled in the study. (*Id.* at ¶29.) Even if Dr. Mackey had 160 patients in the clinical trial—twice more than validated by March 31, 2005—the rate at which he reported ongoing permanent hair loss amounted to almost 10% of his patients.

Sanofi documented the reports from Dr. Mackey's site in its pharmacovigilance database, and importantly, in the August 2, 2004 entry regarding a 44-year-old patient (patient no. 12607, described above), Sanofi assessed causality of the patient's permanent hair loss as "related to study medication." (*Id.* at ¶28.) Sanofi continued to update the information for this patient and the other reported patients with follow-up data received from Dr. Mackey's site in 2005 and later. (*Id.*) These actions by Sanofi occurred prior to Dr. Palatinsky approving Dr. Mackey's modification warning about the risk of permanent hair loss with Taxotere.

### B. Dr. Sedlacek Reports the Risk of Permanent Alopecia to Sanofi, Twice Privately and Finally Publicly.

Just weeks prior to Sanofi's approval of the addition of a "permanent alopecia" warning to its clinical study informed consent, Dr. Sedlacek published his own research findings of an increased risk of "persistent significant alopecia"[7] following chemotherapy with Taxotere, which he presented on at the 29th Annual San Antonio Breast Cancer Symposium in San Antonio, Texas. (*Id.* at ¶¶1, 8.) There Dr. Sedlacek discussed his findings, based data from his own clinical oncology practice (and as reported to Sanofi in 2005), in a presentation entitled "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer." (*Id.* at ¶¶1, 12.) Dr. Sedlacek analyzed data from the

---

[7] Dr. Sedlacek defined the outcome of "persistent significant alopecia" as "hair regrowth less than 50% of the pre-chemotherapy amount of hair as judged by both the patient and the author." (*Id.* at ¶3.)

women he had treated with adjuvant chemotherapy from January 1994 through December 2004, including only women who had at least one year of follow-up post therapy and excluding women who had undergone high-dose chemotherapy with stem cell rescue. (*Id.* at ¶2.) His analysis organized the patients into three groups: Group A received doxorubicin with no taxanes; Group B received doxorubicin plus Taxol; and Group C received doxorubicin plus Taxotere. (*Id.*)

Dr. Sedlacek's research findings were as follows:

- None (0%) of the 258 women in Group A (the non-Taxane patients) experienced persistent significant alopecia;

- None (0%) of the 126 women in Group B (the Taxol patients) experienced persistent significant alopecia; and

- Seven (6.3%) of the 112 women in Group C (the Taxotere patients) experienced persistent significant alopecia.

(*Id.* at ¶5.) Dr. Sedlacek described the number and volume of doses for each patient reporting PSA, as well as the presentation of the condition (described resembling "male pattern baldness"). (*Id.* at ¶4.) He concluded:

> Significant advances in the prevention of metastases in women with localized breast cancer have been accomplished over the past 15 years. Likewise, advances in the management of side effects and toxicities such as nausea/vomiting and cytopenias, have been just as impressive. Unfortunately, the one side effect possibly most dreaded by the patient is alopecia. Yet, we have always told our female patients don't worry, it will always come back.
> This last statement may not be true.
> \*   \*   \*
> It appears from this data set, that when docetaxel is administered after 4 doses of AC, there is ***a small but significant possibility of poor hair regrowth*** lasting up to 7 years. Such an emotionally devastating long term toxicity from this combination must be taken into account when deciding on adjuvant chemotherapy programs in women who likely will be cured of their breast cancer.

(*Id.* at ¶6.) (emphasis added).)

7

Sanofi has acknowledged that the company "had a dialogue" with Dr. Sedlacek around the time of this publication. (*Id.* at ¶9.) However, the company's internal salesforce documents show that the company knew of Dr. Sedlacek's findings by, August 2006, months before his presentation and publication. (*See id.* at ¶10.) In an "Oncology Coaching Report," District Manager Perry Monaco advises Sanofi Representative Christine Muhlenhaupt as follows:

> With Dr. Sedlacek, he is bending, but not breaking. He informed you that he is no longer using dose dense for he er+ patients, but is now using traditional AC followed by Taxol. There is no reason why this should have been his regimine [sic] of choice. The excuse of permanent alopecia is a concern of his, but should not stop him from giving TAC an opportunity. He even mentioned that he had limited experience in that area. Keep your sales calls consistent with him and don't back down. He likes the confrontation and I have seen you do some of your best work when pushed up against the wall with him. Don't let him off the hook!!!!!!
> \*   \*   \*
> Chris, one of the things I would like to really start work on with you is selling the data a little harder. You have excellent clinical knowledge and can hold your own with the most intelligent of physicians as observed with Dr. Sedlacek on Thursday.

(*Id.*) In a section titled "Action Steps," Monaco instructs Muhlenhaupt, "Communicate with Kara the information from Dr. Sedlacek." (*Id.* at ¶11.) In response, Muhlenhaupt wrote: "I have already relayed the information from Sedlacek to Kara. You are right, just when I think it is hopeless he shows a little bend even if not in the right direction. DON't [sic] give up!!!" (*Id.*)

Sanofi, however, had also been made aware, over a year before that in July and October 2005, of the cases of permanent alopecia underlying those findings. (*Id.* at ¶12.)

## II.    STANDARD OF REVIEW

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

8

of law." Fed. R. Civ. P. 56(c).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

The court must view the facts in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).  "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the non-movant's response. *See Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).

### III.     ARGUMENT

"To successfully maintain a failure-to-warn claim under the LPLA, a plaintiff must demonstrate that the product in question has a potentially damage-causing characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 264 (5th Cir. 2002).  An affirmative defense to a failure to warn claim exists where "the manufacturer proves that, at the time the product left his control, he did not know and, in light of then-existing reasonably available scientific and technological knowledge, could not have known of the characteristic that caused the

9

damage or the danger of such characteristic." La. Rev. Stat. §9:2800.59(B). As detailed below, there is no genuine factual issue on whether, in light of then-existing reasonably available scientific and technological knowledge, Sanofi knew of permanent alopecia with Taxotere no later than January 2007.

### A. There Is No Genuine Issue of Material Fact that Sanofi Knew of Taxotere's Risk of Permanent Alopecia Based on the Reports from its Principal Investigators and its Approval of a 2007 Warning for Permanent Alopecia.

Even with all reasonable inferences drawn in Sanofi's favor, Sanofi cannot seriously contend that it had no basis to believe that Taxotere carried a risk of permanent alopecia by, at the latest, January 2007. This is for many reasons, not the least of which is that Sanofi *actually warned of this risk* at that time in the informed consent for its clinical study. (*See* LR 56.1 Statement ¶15) Importantly, the document characterized permanent alopecia a "side effect[] *we know about at present*." (*Id.* at ¶16.) Further, of all the drugs listed in the informed consent, including doxorubicin and cyclophosphamide, Taxotere is the *only* drug with this side effect listed. (*Id.* at ¶17 (co-therapies listing only "hair loss," while Taxotere lists "permanent hair loss").) The only inference that can be drawn from this is that Sanofi understood that Taxotere posed a unique risk of permanent alopecia that its co-therapies did not. Stated simply, Sanofi cannot deny that it was aware of a risk of which it was expressly warning its patients.

But such an inference is not needed here. This is because Sanofi knew years earlier that Principal Investigators in its clinical trials had reported "long term" or "permanent" hair loss in Taxotere patients. Sanofi had received reports from Dr. Mackey regarding at least 15 Taxotere patients experiencing permanent hair loss between 2003 and 2004. (*Id.* at ¶18.) These reports, measured conservatively, accounted for likely 10% of Dr. Mackey's patient population. This is particularly noteworthy—not only because Dr. Mackey has served in distinguished clinical

10

research positions for Sanofi, including co-Chairmen of Sanofi's TAX 316 clinical trial—but also because Sanofi, on August 4, 2004, agreed with Dr. Mackey's conclusion that there is a causal relationship between Taxotere in permanent hair loss. (*Id.* at ¶28.)

Further, this is not surprising given Dr. Mackey's predecessor as co-Chairman of TAX 316 and Principal Investigator at this location, Dr. Nabholtz, also reported "long lasting [hair loss] (longer than two years)" in a 2001 publication of Sanofi clinical trial results. (*Id.* at ¶31.) Sanofi, through its FRCP 30(b)(6) designee, testified that this publication was the company's own document warning the medical community of this adverse event's occurrence. (*Id.* at ¶32.) As such, Sanofi's 2007 clinical trial warning of Taxotere's risk of permanent alopecia did not materialize from thin air; rather, it was the culmination of years of reporting from those carefully monitoring, at Sanofi's behest and instruction, patients taking Taxotere.

### B. There Is No Genuine Issue of Material Fact that Sanofi Knew of Taxotere's Risk of Permanent Alopecia Reported by Dr. Sedlacek.

In addition to Dr. Mackey and Dr. Nabholtz's Sanofi's sponsored clinical research, Sanofi was also aware of the research and reports of long-term persistent hair loss of an oncologist in Colorado—Dr. Scot Sedlacek. In July and October of 2005, Dr. Sedlacek's office reported at least eight Taxotere patients who had experienced long-term alopecia. (*Id.* at ¶32.) Dr. Sedlacek presented on this topic at the 29th Annual San Antonio Breast Cancer Symposium in December 2006. (*Id.* at ¶1.) Therein, Dr. Sedlacek discussed his findings, based on data from his own clinical oncology practice, in a presentation entitled "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer," which findings were published concurrently in the Journal of Breast Cancer Research and Treatment. (*Id.* at ¶¶1, 8.)

11

Dr. Sedlacek analyzed data from the women he had treated with adjuvant chemotherapy for breast cancer through December 2004 who had at least one year of follow-up post therapy. (*Id.* at ¶2.) His statistically significant findings[8] showed an increased risk of "PSA"[9] in women receiving Taxotere: 6.3% of the 112 women who received chemotherapy that included Taxotere were experiencing PSA, while 0% of the 384 women who received chemotherapy without Taxotere had this experience. (*Id.* at ¶5.) He concluded:

> It appears from this data set, that when docetaxel is administered after 4 doses of AC, there is a small but significant possibility of poor hair regrowth lasting up to 7 years. Such an emotionally devastating long term toxicity from this combination must be taken into account when deciding on adjuvant chemotherapy programs in women who likely will be cured of their breast cancer.

(*Id.* at ¶6.) Sanofi admits having discussed these findings with Dr. Sedlacek around the time of his presentation and abstract. (*Id.* at ¶9.)

However, the company's internal salesforce documents show that the company knew of Dr. Sedlacek's findings months before he presented them publicly. (*Id.* at ¶10.) In an "Oncology Coaching Report," District Manager Perry Monaco advised Sanofi Sales Representative Christine Muhlenhaupt as follows:

> With Dr. Sedlacek, he is bending, but not breaking. He informed you that he is no longer using dose dense for he er+ patients, but is now using traditional AC followed by Taxol. There is no reason why this should have been his regimine [sic] of choice. The excuse of permanent alopecia is a concern of his, but should not stop him from giving TAC an opportunity. He even mentioned that he had limited experience in that area. Keep your sales calls consistent with him and don't back down. He likes the confrontation and I have seen you do some of your best work when pushed up against the wall with him. Don't let him off the hook!!!!!!
> [     *     *     *     ]

---

[8] *Id.* at ¶7.

[9] Dr. Sedlacek defined "persistent significant alopecia" as less than 50% hair regrowth at as compared to prior to treatment and as judged by the patient and Dr. Sedlacek. *Id.* at ¶3.

> Chris, one of the things I would like to really start work on with you is selling the data a little harder. You have excellent clinical knowledge and can hold your own with the most intelligent of physicians as observed with Dr. Sedlacek on Thursday.

(*Id.*) Monaco then instructed Muhlenhaupt to "[c]ommunicate with Kara the information from Dr. Sedlacek," and she replied that she had already done so. (*Id.* at ¶11.)

In the context of this document, the only reasonable inference of what this "information from Dr. Sedlacek" comprises is his findings on the stark difference in outcomes for hair regrowth between the Taxotere and non-Taxotere patients he assessed firsthand. Given this, Sanofi cannot plausibly dispute that it was aware of the risks it warned about in its January 2007 informed consent, well before it approved that document in January 2007.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment in Plaintiffs' favor on the factual issue of when Sanofi knew of a risk of permanent alopecia with Taxotere for purposes of the affirmative defense available to Sanofi under La. Rev. Stat. § 9:2800.59(B) and set that date no later than January 26, 2007.

Dated: February 7, 2020                                   Respectfully submitted,

*/s/ Christopher L. Coffin*                               */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                            Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                          Andre Mura ((CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505                           GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                              6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                                     Los Angeles, California 90045
Fax: (504) 355-0089                                       Telephone: 510-350-9700
ccoffin@pbclawfirm.com                                    Facsimile: 510-350-9701
                                                          kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                          *Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

### PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886

14

Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT