UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*Certain Cases* | MDL No. 2740<br><br>SECTION: H<br><br>JUDGE MILAZZO<br><br>MAG. JUDGE NORTH |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (PRE-DECEMBER 15, 2006)**

**Introduction**

Sanofi's summary judgment motion is premised on a falsehood: that Dr. Kessler has opined that the earliest that Sanofi knew or could have known that Taxotere causes permanent hair loss is December 15, 2006—the date of Dr. Sedlacek's report. (Rec. Doc. 8977.) That is not Dr. Kessler's opinion; it is a distortion of what he said.

Dr. Kessler offered opinions for certain trial picks. These women were administered Taxotere between 2008 and 2011. Dr. Kessler has never offered an opinion for any Plaintiff in this MDL who was administered Taxotere before December 15, 2006. Rather, he "*reserve[d] the right to study the issues at both earlier and later dates*." (Kessler Report ¶11 n.5) (emphasis added).

The bellwether process that this Court has established does not demand that either party secure expert opinions for the thousands of women who are not selected for that role. These women cannot be faulted for failing to do something that this Court has never required of them—to present expert testimony in support of their claims. And there is no basis to weaponize Dr. Kessler's words related to opinions in other Plaintiffs' cases against them.

1

These insuperable deficiencies aside, Sanofi's motion also fails on its own terms. Sanofi asks this Court to hold that it is irrefutable that it did not know and could not have known that Taxotere causes permanent hair loss before December 2006. Where, then, is the summary judgment evidence to support such a sweeping statement? Sanofi has submitted *none*. Not even a sworn declaration from the corporation. Its position instead rests entirely on the canard that Dr. Kessler opined that the company knew nothing about permanent hair loss before December 2006. Sanofi itself, then, has provided no grounds for an expansive ruling in its favor.

Nor could it. Sanofi has chosen December 15, 2006, based on Dr. Sedlacek's report. What Sanofi fails to tell the Court, however, is that the company knew of Dr. Sedlacek's findings before that date. That evidence easily defeats Sanofi's request for judgment as of December 2006. To be sure, there is other significant evidence that also establishes Sanofi's knowledge before then. But Sanofi's motion hinges on December 2006 and proposes no alternate date, so there is no need to review that copious evidence.

These are problems of Sanofi's own making. Sanofi cannot switch gears and propose an earlier date, and it cannot submit new evidence in support of this motion, because courts do not entertain new arguments or evidence in reply. Another problem: Sanofi's list of affected Plaintiffs is littered with errors. Even a quick glance at the list reveals that Sanofi gets many dates of administration wrong, and its request for summary judgment ignores that many of these women have asserted claims other than for failure to warn. Yet another problem: Sanofi invites a ruling on practically 50 state laws based on a cursory survey, but that approach ignores the complex choice-of-law rulings this Court would need to make for each of those cases, not to mention rulings on tort law of many different states. The Court has refused to entertain motions such as these,

including when limited to just a few states such as Texas and Michigan, and it should do so again here.

The Court should deny Sanofi's motion.

## Argument

### I. Sanofi has no basis to seek summary judgment against women whose cases have not been worked up for such motion practice.

Sanofi's motion presents no evidence in support of summary judgment. The motion rests entirely on the contrived claim that Dr. Kessler has opined that Sanofi neither knew nor could have known before December 15, 2006 that Taxotere causes permanent hair loss. Just as fanciful, Sanofi imagines that the cases of all women in the MDL who were administered Taxotere before that date must be summarily dismissed because they have no expert in their corner to say otherwise.

Sanofi is describing an alternate reality. That is not the considered approach that this Court has taken with case management, and Dr. Kessler said no such thing. Begin with the bellwether procedures established by this Court, as first set forth in Case Management Order No. 3. With that Order, the Court set the timeline on which case-specific discovery was to proceed for the first trial selection: first, the selection of the "Primary Plaintiff" from a pool of 10; second, the exchange of expert reports 11 weeks later; and third, the conclusion of expert-related discovery another 12 weeks later. (*See* Pls' LR 56.2 Counterstatement of Fact ("LR 56.2 Statement") ¶1 (CMO 3 setting the dates of February 16, 2018, May 4, 2018, and July 27, 2018, respectively).)[1]

Pursuant to that Order, after the selection of the primary plaintiff and alternates, the PSC offered the report of Dr. David Kessler, who explicitly stated its intended use was in the *Durden*, *Francis*, and *Earnest* trials. (*See id.* at ¶2.) Dr. Kessler's report went on to specify "I have been

---

[1] Throughout this memorandum, citations to Plaintiffs' Counterstatement of Facts will refer to the Statement of Material Facts beginning at page 2 and not to the admissions and denials found on pages 1 and 2.

3

asked [. . .] because of the date of Taxotere administration to the bellwether plaintiffs cited above, to specifically provide opinions about Sanofi's duty by as early as 2009." (*Id.* at ¶3.) Dr. Kessler took care to say that he was reserving judgment on time periods that were both before and after these women had been administered Taxotere: "I reserve the right to study the issues at both earlier and later dates." (*Id.*)

For the second bellwether, the Court repeated this process, first selecting the Primary and alternate plaintiffs, then requiring the exchange of reports and, if case-specific opinions were being offered, allowing for expert depositions. (*Id.* at ¶4.) Pursuant to that Order, Dr. Kessler issued a supplemental report expressly relating to the trial selections *Thibodeaux* and *Crayton* in which he noted, "Both of these plaintiffs were administered Taxotere in 2008." (*Id.* at ¶¶5–6.)

asked [. . .] because of the date of Taxotere administration to the bellwether plaintiffs cited above, to specifically provide opinions about Sanofi's duty by as early as 2009." (*Id.* at ¶3.) Dr. Kessler took care to say that he was reserving judgment on time periods that were both before and after these women had been administered Taxotere: "I reserve the right to study the issues at both earlier and later dates." (*Id.*)

For the second bellwether, the Court repeated this process, first selecting the Primary and alternate plaintiffs, then requiring the exchange of reports and, if case-specific opinions were being offered, allowing for expert depositions. (*Id.* at ¶4.) Pursuant to that Order, Dr. Kessler issued a supplemental report expressly relating to the trial selections *Thibodeaux* and *Crayton* in which he noted, "Both of these plaintiffs were administered Taxotere in 2008." (*Id.* at ¶¶5–6.)

It is clear from the plain language of these Orders and expert reports that both the Court and the PSC (if not the Defendants) understood that Dr. Kessler was being offered only for purposes of these bellwether plaintiffs, all of whom took Taxotere in 2008 or later. In no way did the Court's procedure require the PSC to use these first two bellwethers to present evidence supporting the entire inventory of claims in this MDL. Conversely, neither did the parties or the Court intend for all remaining MDL plaintiffs (including those for whom the post-2008 bellwethers were not factually representative) to be bound by the evidence presented therein.

Despite the clarity of this procedure, Sanofi now attempts to convince the Court that it has somehow authorized the dismissal of entire categories of MDL plaintiffs based on the evidence from *Earnest* and *Thibodeaux*. Specifically, Sanofi seeks to leverage Dr. Kessler's statements about Dr. Sedlacek's study into grounds for estopping a wide swath of MDL plaintiffs from ever presenting their cases to a jury. But there is simply no precedent or basis in law for doing so. Defendants are self-consciously aware of this, too, having cited only cases considering the effect

asked [. . .] because of the date of Taxotere administration to the bellwether plaintiffs cited above, to specifically provide opinions about Sanofi's duty by as early as 2009." (*Id.* at ¶3.) Dr. Kessler took care to say that he was reserving judgment on time periods that were both before and after these women had been administered Taxotere: "I reserve the right to study the issues at both earlier and later dates." (*Id.*)

For the second bellwether, the Court repeated this process, first selecting the Primary and alternate plaintiffs, then requiring the exchange of reports and, if case-specific opinions were being offered, allowing for expert depositions. (*Id.* at ¶4.) Pursuant to that Order, Dr. Kessler issued a supplemental report expressly relating to the trial selections *Thibodeaux* and *Crayton* in which he noted, "Both of these plaintiffs were administered Taxotere in 2008." (*Id.* at ¶¶5–6.)

It is clear from the plain language of these Orders and expert reports that both the Court and the PSC (if not the Defendants) understood that Dr. Kessler was being offered only for purposes of these bellwether plaintiffs, all of whom took Taxotere in 2008 or later. In no way did the Court's procedure require the PSC to use these first two bellwethers to present evidence supporting the entire inventory of claims in this MDL. Conversely, neither did the parties or the Court intend for all remaining MDL plaintiffs (including those for whom the post-2008 bellwethers were not factually representative) to be bound by the evidence presented therein.

Despite the clarity of this procedure, Sanofi now attempts to convince the Court that it has somehow authorized the dismissal of entire categories of MDL plaintiffs based on the evidence from *Earnest* and *Thibodeaux*. Specifically, Sanofi seeks to leverage Dr. Kessler's statements about Dr. Sedlacek's study into grounds for estopping a wide swath of MDL plaintiffs from ever presenting their cases to a jury. But there is simply no precedent or basis in law for doing so. Defendants are self-consciously aware of this, too, having cited only cases considering the effect

that admissions by a plaintiff's expert have *on that same plaintiff's claims*.  (*See* Def.'s Br. 5–6 (citing *Mack v. Stryker Corp.*, 893 F. Supp. 2d 976, 987 (D. Minn. 2012); *Meharg v. I-Flow Corp.*, No. 1:08-cv-184, 2010 WL 711317, at *4 (S.D. Ind. Mar. 1, 2010); *Johnson & Johnson Talcum Powder Cases*, 249 Cal. Rptr. 3d 642, 663 (Cal. Ct. App. 2019); *Stupak v. Hoffman-La Roche, Inc.*, 326 F. App'x 553, 560 (11th Cir. 2009).)  Accordingly, Sanofi's attempts to revise the history of this litigation and subvert its established procedures such that pre-2007 plaintiffs somehow *missed their opportunity* to have their claims heard by a jury should be rejected.

Essentially acknowledging the weakness of this position, Defendants go on to argue in the alternative that the pre-2007 plaintiffs simply *will not* present evidence showing company knowledge and that they are therefore entitled to summary judgment—*prospectively*.  In doing so Sanofi asks the Court to accept nothing more than its own speculation as to the substance of the testimony that these plaintiffs will offer when the proper time arises, either as test cases or on remand.  In this MDL, only plaintiffs with injuries in 2008 or later have been worked up as test cases and presented evidence regarding Sanofi's knowledge or notice of a risk of permanent alopecia with Taxotere. Indeed, the Plaintiffs Sanofi cites as examples of cases warranting dismissal (Della Martin, Dorothy Magee, Sheila Griffith, Rebecca Mozisek, Kyna Hunt, and Kimberly Lawless) have yet to enter any phase of discovery during which they would have the opportunity to proffer an expert opining on company knowledge as of their respective dates of treatment.[2] These and all other plaintiffs whose treatments predate 2008, although a small minority of cases in this MDL, are absolutely deserving of the same opportunity to build cases specific to the time of their injuries—either through individually developed evidence on remand or, if the

---

[2] Although Louisiana Plaintiff Della Martin was part of the initial trial pool for bellwether number one, her case underwent only limited discovery that did not reach the phase involving expert work. (*See* Case Management Order No. 3, Doc. 669, July 21, 2017, pp. 1–2, 4.)

Court prefers to dispose of the issue now, through work-up of a representative trial pick. As Plaintiffs show below, any expert retained by Plaintiffs would have no shortage of evidence showing notice before December 15, 2006, of a risk of permanent alopecia with Taxotere sufficient to put the question of constructive knowledge before a jury.

## II. Sanofi's motion fails because it knew of the evidence that it now claims proves company knowledge before its publication in December 2006.

Sanofi accepts that as of December 15, 2006, the company knew that Taxotere can cause permanent hair loss, because that is when Dr. Sedlacek presented his research on the risk of "persistent significant alopecia" following chemotherapy with Taxotere. (LR 56.2 Statement ¶7.) At that conference, Dr. Sedlacek discussed his findings, based on data from his own clinical oncology practice, in a presentation entitled "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer," which findings were published concurrently in the Journal of Breast Cancer Research and Treatment. (*See id*. at ¶¶7, 8.) Dr. Sedlacek analyzed data from the women he had treated with adjuvant chemotherapy from January 1994 through December 2004 and concluded "that when docetaxel is administered after 4 doses of AC, there is *a small but significant possibility of poor hair regrowth* lasting up to 7 years." (*Id.* at ¶9 (emphasis added).)

Having accepted that Dr. Sedlacek's report of December 2006 suffices to establish company knowledge, Sanofi's motion for summary judgment is easily defeated because there is evidence that Sanofi knew of Dr. Sedlacek's findings before that publication date. Sanofi has acknowledged that the company "had a dialogue" with Dr. Sedlacek around the time of this publication. (*Id.* at ¶10.) And the company's internal salesforce documents show evidence that the company knew of Dr. Sedlacek's findings months before his presentation and publication. (*See*

6

*id*. at ¶¶11, 12.)  In an "Oncology Coaching Report," District Manager Perry Monaco advises Sanofi Representative Christine Muhlenhaupt as follows:

> With Dr. Sedlacek, he is bending, but not breaking.  He informed you that he is no longer using dose dense for he er+ patients, but is now using traditional AC followed by Taxol.  There is no reason why this should have been his regimine [sic] of choice.  The excuse of permanent alopecia is a concern of his, but should not stop him from giving TAC an opportunity.  He even mentioned that he had limited experience in that area.  Keep your sales calls consistent with him and don't back down.  He likes the confrontation and I have seen you do some of your best work when pushed up against the wall with him.  Don't let him off the hook!!!!!!
> [   *   *   *   ]
> Chris, one of the things I would like to really start work on with you is selling the data a little harder.  You have excellent clinical knowledge and can hold your own with the most intelligent of physicians as observed with Dr. Sedlacek on Thursday.

(*Id.* at ¶11.)  In a section titled "Action Steps," Monaco instructs Muhlenhaupt, "Communicate with Kara the information from Dr. Sedlacek." (*Id.* at ¶12.)  In response, Muhlenhaupt wrote: "I have already relayed the information from Sedlacek to Kara.  You are right, just when I think it is hopeless he shows a little bend even if not in the right direction.  DON't [sic] give up!!!" (*Id.*)

Sanofi also knew of each of Dr. Sedlacek's individual cases of "PSA" much earlier in a cluster of adverse event reports ("AERs") received in July and October 2005 from a nurse at Dr. Sedlacek's practice. (*Id.* at ¶13 ("My understanding is that those patients are patients from Dr. Sedlacek's site and most likely the patients from the study.").)  Upon receiving each of these AERs, Sanofi commented that the event was considered "listed" in the Core Data Sheet. (*Id.* at ¶14.)[3]

The *only* basis for summary judgment argued by Sanofi is that Plaintiffs have not and will not supply any evidence creating a question of fact "as to the adequacy of the Taxotere label before

---

[3] An adverse event is considered "listed" if it appears in the drug's label. *Id.* at ¶15.

December 15, 2006." (Def's Br. 13.)  This is because, Sanofi claims, the company could not have learned of a risk of permanent alopecia before Dr. Sedlacek published his research findings on that date.  This claim is false, or at the very least highly suspect, as the evidence makes clear that Sanofi had multiple dealings with the author in the years before he published this research in December 2006.  And because Sanofi's motion is predicated on December 2006 and proposes no alternate date, there is no need to review the significant other evidence that also proves Sanofi's knowledge before that date. "[C]ourts will generally not consider new arguments in replies because doing so would deprive the nonmovant of a meaningful opportunity to respond." *Spedag Americas, Inc. v. Bioworld Merch., Inc.*, No. 3:17-CV-0926-BT, 2019 WL 4689011, at *1 (N.D. Tex. Sept. 25, 2019) (quotation marks and citations omitted)).

That evidence would also doom Sanofi's motion, since Sanofi's notice of Taxotere's causal association with permanent alopecia did not begin with Dr. Sedlacek in 2006.  Sanofi's principal investigators in sponsored clinical studies had been alerting Sanofi to this issue for years prior, causing the company, on January 26, 2007, to approve modifications by one of those principal investigators, Dr. John Mackey, to the informed consent given to trial participants at his study site. (*Id.* at ¶16.) Among these modifications was the addition of "permanent hair loss" as one of the "side effects" of Taxotere. (*Id.* at ¶17.) The consent form read as follows:

> The following are the side effects of each drug used in this study. These side effects may or may not be more severe when the drugs are taken together.  *These are the side effects we know about at present.  However, since this is a study of new treatments there may be other side effects that we do not know about yet*.

(*Id.* at ¶18 (emphasis added).)[4] Sanofi's Global Safety Officer Dr. Palatinsky, who accepted the "permanent hair loss" warning, noted that the informed consent did not need to warn of both "hair loss" and "permanent hair loss" because "permanent h[air] l[oss] is sufficient once." (*Id.* at ¶17.)

Dr. John Mackey, the physician from whom this "permanent alopecia" warning originated, had been a principal investigator in a number of Sanofi-sponsored clinical trials.[5] Before approving the addition of "permanent hair loss" to Dr. Mackey's informed consent, Sanofi had steadily received reports from Dr. Mackey's office since 2003 about patients experiencing permanent hair loss after completing chemotherapy treatment with Taxotere. These patients had volunteered to participate in a Sanofi clinical trial, and as the Principal Investigator, Dr. Mackey had followed and reported their ongoing hair loss for years.

For example, on August 20, 2003, Sanofi received a report from Dr. Mackey's site[6] regarding a patient in a Sanofi clinical trial[7] (patient no. 10511) whose hair loss persisted for more than a year following completion of chemotherapy treatment with Taxotere. (Sanofi_06248381). Less than a month later, on September 19, 2003, Sanofi received a similar report from Dr. Mackey's site about another patient in the clinical trial (patient no. 11158) whose hair loss had persisted since completing Taxotere chemotherapy treatment in June 2002. (*Id.* at ¶23.)[8] Sanofi entered this report into its pharmacovigilance database, noting that "the investigator has reported

---

[4] For the other drugs listed in the informed consent—namely, cyclophosphamide, trastuzumab, and carboplatin—"permanent hair loss" was not listed as a side effect. *Id.* at ¶19.

[5] Notably, Dr. Mackey served as Chairman of Sanofi's TAX 316 clinical trial—the pivotal study that Sanofi used to obtain approval for use Taxotere in the adjuvant setting—and as a Principal Investigator and primary author in other published clinical studies sponsored by Sanofi and involving Taxotere. *Id.* at ¶20.

[6] Dr. Mackey's site is also identified by Investigator ID: BCA0021. *Id.* at ¶21.

[7] This Sanofi clinical trial, TAX-GMA-301, in which Dr. Mackey served as a Principal Investigator, compared the safety and efficacy of Taxotere given in combination (TAC) versus sequentially (AC-T).

[8] This Sanofi document incorrectly states the date of the last cycle of Taxotere as June 26, 2003. The correct year is 2002. *Id.* at ¶24.

9

that [the alopecia] was likely permanent" and the "[i]nvestigator's assessment for causal relationship: [r]elated to study medication." (*Id.* at ¶25.) In February of 2005, Sanofi updated its pharmacovigilance database, stating that "[n]ew follow-up information received does not change the previous assessment for this case." (*Id.*)

Notably, Dr. Mackey was not the first doctor at this study site to report ongoing persistent hair loss. Dr. Nabholtz preceded him as this site's primary investigator,[9] and he reported in a 2001 publication "long lasting [hair loss] (longer than two years)" in 7.4 % of metastatic breast cancer patients taking Taxotere in a Sanofi-sponsored clinical trial. (*Id.* at ¶28.) Likewise, between 2003 and 2004, Dr. Mackey reported at least fifteen cases of patients with permanent hair loss,[10] including:

- On August 13, 2003, Sanofi received a report of 61-year old female patient from Dr. Mackey's site (patient no. 10517) with "significant hair thinning" ongoing after completion of Taxotere treatment on January 30, 2002. The causality was assessed as "[p]ossibly related to study medication." Sanofi received follow-up information on October 22, 2004, confirming the patient's ongoing Grade 2 alopecia. (*Id.* at ¶30.)

- On October 24, 2003, Sanofi received a report of 49-year old female patient from Dr. Mackey's site (patient no. 11293) who completed chemotherapy with Taxotere on September 2, 2002. The patient underwent a hair transplant and her alopecia was marked "recovered." Sanofi received a follow-up report on August 4, 2004, noting "the physician observed thinness of hair on top; therefore, grade 1 alopecia continues." (*Id.* at ¶31.)

- On December 15, 2003, Sanofi received a report of a 60-year old female patient from Dr. Mackey's site (patient no. 10230) who continued to experience "balding [] over the back of the [] head" despite having completed Taxotere chemotherapy treatment more than two years earlier on November 1, 2001. The causality was assessed to be "[r]elated to study medication." Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶32.)

- On December 15, 2003, Sanofi received another report from Dr. Mackey's site. This report related to a 48-year old female patient (patient no. 10854) whose hair

---

[9] *Id.* at ¶27.

[10] *Id.* at ¶26.

10

      had not regrown despite completing treatment with Taxotere on June 2, 2002. The causality was assessed as "[r]elated to study medication." Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶33.)

- On March 24, 2004, Sanofi received a report of a 61-year old female from Dr. Mackey's site (patient no. 11714) who continued to experience ongoing hair loss after completion of chemotherapy on October 2, 2002. The causality of the hair loss was assessed to be related to study medication. Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶34.)

- On July 7, 2004, Sanofi received a report of a 64-year old female from Dr. Mackey's site (patient no. 12994) who completed chemotherapy with Taxotere on May 14, 2003. The patient's alopecia did not resolve, and the causality was assessed as "related to study medication." Sanofi updated the report in 2005 and 2012, noting the patient had "not recovered" from the alopecia. (*Id.* at ¶35.)

- On August 4, 2004, Sanofi received a report of a 44-year old female from Dr. Mackey's site (patient no. 12607) who continued to experience Grade 2 alopecia after completing chemotherapy treatment with Taxotere on March 19, 2003. Dr. Mackey's site assessed the causality as "related to study medication." Sanofi likewise assessed causality as "related to study medication." Sanofi updated the report in 2005, 2012, and 2013, noting the patient had "not recovered" from the alopecia and that it remained "ongoing." (*Id.* at ¶36.)

Although the exact number of patients enrolled at Dr. Mackey's site is unknown to Plaintiffs, Dr. Mackey had at least 80 patients enrolled in the study. (*Id.* at ¶37.) Even if Dr. Mackey had 160 patients in the clinical trial—twice more than validated by March 31, 2005—the rate at which he reported ongoing permanent hair loss amounted to almost 10% of his patients.

Sanofi documented the reports from Dr. Mackey's site in its pharmacovigilance database and importantly, in the August 4, 2004 entry regarding a 44-year old patient (patient no. 12607, described above), Sanofi assessed causality of the patient's permanent hair loss as "related to study medication." (*Id.* at ¶36.) Sanofi continued to update the information for this patient and the other reported patients with follow-up data received from Dr. Mackey's site in 2005 and later. (*Id.*)

11

These actions by Sanofi occurred prior to Dr. Palatinsky's approving Dr. Mackey's modification to the informed consent adding a warning about the risk of permanent hair loss with Taxotere.

Finally, Plaintiffs' expert biostatistician, Dr. David Madigan, analyzed data from the company's annual Safety Update Reports from the TAX 316 study, which show that by 2004 Sanofi was witnessing this adverse event occur at a 2.42 times higher rate[11] with Taxotere than without it, which jumped to 2.60 by 2005 and remained in all subsequent years. (*Id.* at ¶38.) When one includes the GEICAM data in those numbers, the rates increase to 2.47 and 2.63, respectively. (*Id.*) To be clear, these rates are calculated using Sanofi's own data from 2004, 2005, and 2006.[12] Sanofi attempts to discount this evidence, claiming that only Dr. Kessler's opinions on this data matter. (Def's Br. 9 n. 8.) But again, Dr. Kessler has not been asked to opine on the specific question raised in Sanofi's motion; indeed, no expert has. *See supra* at Part I, pp. 3–6. Dr. Madigan's analysis nevertheless shows that, at a minimum, there is evidence that creates a factual dispute about what Sanofi knew or should have known about Taxotere's risk of permanent hair loss before December 2006.

Accordingly, a genuine dispute exists regarding Sanofi's knowledge of the risk of permanent alopecia with Taxotere before December 15, 2006, and Sanofi's motion should be denied.

---

[11] Dr. Madigan's calculations for each year are all statistically significant with p-values ranging from 0.013 to 0.020. *Id.*

[12] Sanofi is wrong to call "safety signals" irrelevant to the issue of constructive notice, because the question of notice typically takes into account the manufacturer's affirmative, continuous duty to conduct pharmacovigilance—and even to conduct testing with the safety risk at issue as the primary endpoint. *E.g., Grundberg v. Upjohn Co.*, 813 P.2d 89, 97 (Utah 1991); *see also* Def's Br. Ex. "B" at 4, 6 (discussing a manufacturer's testing obligations under Massachusetts and New Hampshire law).

**III.     There are a host of other problems with Sanofi's motion that preclude the Court from granting it.**

In its motion, Sanofi asks the court to undertake the Herculean effort of determining both the choice of law and substantive law provisions that would apply in 1,370 cases—all before beginning to analyze the substance of those claims. Sanofi's brief, of course, is less than candid about the level of effort that this would entail, opting instead to conflate the pertinent law of 48 states and the District of Columbia into one monolithic standard—"knowledge"—that it urges the Court to apply indiscriminately across all claims. This reductionist approach ignores the multiple levels of complexity inherent in the course of action Sanofi urges.

First, Sanofi's "Exhibit B," which purports to recite the law governing failure-to-warn claims in 49 jurisdictions, shows that the pertinent standards for a manufacturer's knowledge are anything but uniform. Instead, this chart contains quote after quote highlighting the nuanced differences observed from one state to the next.[13] These range from liability for dangers that the drug maker "knew or should have known" (Alabama, Def's Ex. B, p. 2), to those that were "foreseeable" (District of Columbia, *id* at p. 3), to those that were "discoverable" (Florida, *id.*), to those that were simply not *"unknown"* (Indiana and Kentucky, *id.* at pp. 3, 4). Moreover, these various inquiries often take into account a manufacturer's affirmative obligations to ensure the safety of its products. (*See* Massachusetts, *id.* at p. 4 ("could not have been discovered by way of reasonable testing prior to marketing the product") and New Hampshire, *id.* at p. 6 ("knowledge a manufacturer should have acquired" and "tests it should have conducted.") *Accord. Grundberg v.*

---

[13] Further, Exhibit B's representations of law are rife with errors and contradictions. For example, Sanofi's case citation on Idaho law pertains not to failure to warn claims, but rather to strict liability design defect claims (*see* Def's Ex. B, p. 3 (citing *Toner v. Lederle Labs., a Div. of Am. Cyanamid Co.*, 112 Idaho 328, 339, 732 P.2d 297, 308 (1987)), while Sanofi's entries for North Dakota and South Carolina fail to require any element of *mens rea* for products liability claims (*id.* at pp. 6-7).

*Upjohn Co.*, 813 P.2d 89, 97 (Utah 1991) ("manufacturers were under a 'continuous duty' to be aware of scientific developments and to provide adequate warning upon actual or constructive notice of risks")). Additionally, Sanofi's analysis makes no distinction between jurisdictions where company knowledge or notice is an element of the plaintiff's claim, and those where, as an affirmative defense, it is the manufacturer's burden to disprove. *See*, *e.g.*, *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1199–200 (Alaska 1992) (finding reversible error where jury instructions included only elements of a negligence claim and not a strict liability failure-to-warn claim, which requires defendant to "prove that the risk was scientifically unknowable at the time the product was distributed to the plaintiff."); *see also* La. Rev. Stat. § 2800.69(B) ("a manufacturer of a product shall not be liable for damage proximately caused by a characteristic of the product if the manufacturer proves that [. . .] he did not know [. . .] and could not have known of the characteristic that caused the damage or the danger of such characteristic.").

These substantive differences from state to state render multi-jurisdictional analysis of this breadth and depth wholly impracticable. For example, the U.S. District Court for the Southern District of Illinois, considering a class certification motion in a tobacco products liability suit, observed:

> Even if the claims were susceptible to classwide proof, the elements vary from state to state. As to strict liability not every state has adopted Restatement Section 402A [regarding design defect claims]. Some states do not even recognize strict liability in tort. Other states have developed and adopted their own strict liability law without regard to Section 402A. Some states have adopted Section 402A, but among those states, there are considerable variations.

*Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501–02 (S.D. Ill. 1999) (citations omitted). Observing the same sort of unclear or inconsistent approaches in the substantive law raised by Sanofi's

14

motion, the court in *Clay* concluded: "Given these uncertainties, it would be a daunting task for this Court to determine whether to impose such liability on the defendants [. . . .]" *Id.* at 502.

This task appears even more daunting when one accounts for the threshold choice of law inquiries it would entail—a labor-intensive step that Sanofi's motion completely glosses over. This would include, for each of the 1,370 cases at issue, determinations of: (1) which state's choice of law provisions would apply, and (2) which state's substantive laws will apply. Although Plaintiffs do not concede the accuracy of Sanofi's Exhibit A, which purports to assemble relevant allegations from the short-form complaints and fact sheets in 1,370 member cases, this chart suggests on its face that such determinations would prove quite difficult. For example, Exhibit A lists 106 cases in which the state of treatment, the state of residence during treatment, and the state of injury are not all the same, including 44 cases in which the state of treatment and the state of injury differ. Further, Exhibit A lists 211 cases in which the plaintiff has alleged proper venue in a state that is not the state of treatment, residence, or injury. Whether Sanofi acknowledges it or not, its motion would require that the Court first resolve questions over which law governs for each plaintiff referenced in its motion, including the 300+ cases where the answer is far from obvious.

What's more, Sanofi's motion cannot be granted in its current form because it is predicated on incorrect representations of fact.[14] For example, Sanofi's Exhibit A lists an incorrect treatment date of 2002 for plaintiff Sheena Wright, who was first treated with Taxotere in 2009. (*Id.* at ¶39.) It also lists Plaintiff Elizabeth Parrish as having received Taxotere at an unknown date in late 2004, when in fact she was first administered Taxotere in 2008. (*Id.* at ¶40.) Likewise, many plaintiffs

---

[14] Counsel for several plaintiffs have reported to Co-Liaison Counsel that the plaintiffs were erroneously included on Exhibit A to Sanofi's motion.

who first received Taxotere in 2007 were erroneously listed, including Sheriba Alexander (*id.* at ¶41), Judy Gaffney (*id.* at ¶42), Janet Laudat (*id.* at ¶43), Michelle Shearin (*id.* at ¶44), Alice Gray (*id.* at ¶45), Dawn Johnson (*id.* at ¶46), Dorothy Tatum (*id.* at ¶47), and Monique Blacknell (*id.* at ¶48). Sanofi's list also appears to be unreliable when it comes to plaintiffs who experienced multiple episodes of cancer, both before and after 2006. Plaintiffs Mollie Diggs (*id.* at ¶49), Elaine Rutledge (*id.* at ¶50), and Helen Weeks (*id.* at ¶51) are included despite the fact that they treated with Taxotere upon the return of their cancers after 2006.[15] Taken together, these errors throughout Exhibit A raise serious concerns about its reliability as a basis for dismissing claims in this MDL.

Moreover, Sanofi's motion ignores the likelihood that the vast majority of lawsuits listed in its Exhibit A include state law causes of action beyond a failure-to-warn — claims that would remain viable even if Sanofi's motion were granted. For example, reference to the short form complaint of Ms. Dorothy Magee, one of the plaintiffs singled out in Sanofi's memorandum, will reveal several claims beyond failure to warn:

- Count II: Strict Products Liability for Misrepresentation;
- Count III: Negligence;
- Count IV: Negligent Misrepresentation;
- Count V: Fraudulent Misrepresentation;
- Count VI: Fraudulent Concealment;
- Count VII: Fraud and Deceit;
- Count VIII: Breach of Express Warranty;
- And additional claims of Fraud and violations of the Louisiana Unfair Trade Practices Act

---

[15] Further, Sanofi has included many plaintiffs whose course of Taxotere treatment began before December 15, 2006 date, even when treatment continued well past that date, like Marie Beauchemin, *id.* at ¶52; Sylvia Hill, *id.* at ¶53; Sue Nicodemus, *id.* at ¶54; and several others.

16

(*Id.* at ¶55.) Sanofi's other exemplar plaintiffs—Shelia Griffith, Rebecca Mozisek, Kyna Hunt, and Kimberly Lawless—plead nearly all of the same counts. (*Id.* at ¶¶56–60.) For this reason, Sanofi's inaptly styled Motion for Summary Judgment is at best a motion for partial summary judgment that neglects to address these additional claims.

## Conclusion

Remarkably, Sanofi's first fencepost motion is a thirteen-page brief that seeks summary judgment against over a thousand women based solely on an opinion that an expert never gave. More remarkable still, Sanofi picks the date of a report in December 2006 as establishing the earliest time that it could have known that Taxotere causes permanent hair loss—despite evidence that it knew about this report before it was published. Sanofi's insistence that this fencepost motion is important to the resolution of the MDL is difficult to take seriously given the motion's many flaws.

For all of the foregoing reasons, the motion should be denied.

Dated: February 7, 2020                                   Respectfully submitted,

*/s/ Christopher L. Coffin*                               */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                            Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                          Andre Mura ((CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505                           GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                              6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                                     Los Angeles, California 90045
Fax: (504) 355-0089                                       Telephone: 510-350-9700
ccoffin@pbclawfirm.com                                    Facsimile: 510-350-9701
                                                          kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                          *Plaintiffs' Co-Lead Counsel*


*/s/M. Palmer Lambert*                                    */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                                Dawn M. Barrios (#2821)

GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

| | |
|---|---|
| Alexander G. Dwyer<br>Kirkendall Dwyer LLP<br>440 Louisiana, Suite 1901<br>Houston, TX 77002<br>Phone: (713) 522-3529<br>Fax: (713) 495-2331<br>adwyer@kirkendalldwyer.com | Rand P. Nolen<br>Fleming, Nolen & Jez, L.L.P.<br>2800 Post Oak Blvd., Suite 4000<br>Houston, TX 77056<br>Phone: (713) 621-7944<br>Fax: (713) 621-9638<br>rand_nolen@fleming-law.com |
| Emily C. Jeffcott<br>Morgan & Morgan<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32505<br>Phone: (850) 316-9074<br>Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT