UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Elizabeth Kahn, Case No. 2:16-cv-17039.

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

Plaintiff Elizabeth Kahn's claims are barred by Louisiana's one-year statute of limitations, which begins "to run from the day injury or damage is sustained." *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4 Cir. 1998) (quoting La. Civ. Code Ann. art. 3492). Consistent with Plaintiffs' Second Amended Master Complaint, Ms. Kahn alleges that she suffered her injury (permanent hair loss) six months after completing chemotherapy in July 2009. Accordingly, Ms. Kahn had until January 2011 to file her claim. Because she did not file her lawsuit until almost five years later, in December 2016, her claims are untimely.

Ms. Kahn also cannot invoke *contra non valentem* to save her claims. "[T]o toll prescription, a plaintiff who suspects that something is wrong **must act reasonably** to discover the cause of the problem; otherwise, contra non valentem will not apply." Rec. Doc. 9110 at 4 (emphasis added). Ms. Kahn, however, failed to take the reasonable steps required by Louisiana law to investigate the source of her injury *after* she alleges the injury occurred but *before* the prescriptive period had run. Her inaction was unreasonable as a matter of law, and summary judgment should be granted in Sanofi's favor.

**BACKGROUND**

Twelve years ago, on April 11, 2008, Ms. Kahn was diagnosed with breast cancer at the age of 50.  Ex. A, PFS §§ I.15, V.5.[1]  Ms. Kahn moved quickly to treat the disease.  Like MDL Plaintiff Cynthia Thibodeaux, Ms. Kahn agreed to participate in NSABP B-40, an experimental chemotherapy clinical trial.  Ex. B, December 7, 2017 Kahn Dep. 185:15–186:14.  Before starting, Ms. Kahn received the clinical trial's Consent Form, which identified "hair loss" as the first and most common side effect of five of the drugs used in the study: capecitabine (Xeloda), doxorubicin (Adriamycin), cyclophosphamide (Cytoxan), docetaxel (Taxotere), and gemcitabine (Gemzar).  Ex. C, Consent Form 1666–71.

The Consent Form explained that "[m]any side effects go away soon after you stop taking your study drugs[,]" however, "**[i]n some cases, side effects may be very serious, long-lasting, or may never go away**."  *Id.* at 1665 (emphasis added).  Ms. Kahn's oncologist, Dr. Carl Kardinal, and clinical trial nurse, Ms. Shevonda Thomas, went over each page of the Consent Form with Ms. Kahn; Ms. Kahn had the opportunity to read each page; and she signed each page on May 14, 2008.  Ex. B, December 7, 2017 Kahn Dep. 189:15–190:23; Ex. C, Consent Form 1681.

Ms. Kahn began her first round of chemotherapy on May 29, 2008.  This included a combination of Taxotere, Xeloda, and Avastin, and was completed on July 31, 2008.  Ex. L, Infusion Pharmacy Ochsner Health System 41–42; Ex. M, NSABP 63–64; Ex. D, Ochsner Health System 1006–07.  Ms. Kahn lost her hair during her first round of chemotherapy in June 2008.  Ex. E, January 31, 2018 Kahn Dep. 13:15–24.  She purportedly also lost her eyebrows and eyelashes.  Ex. B, December 7, 2017 Kahn Dep. 46:15–23, 49:9–15.  Neither event was a surprise to Ms. Kahn – she testified that she expected to lose her hair, and she expected it to regrow

---

[1] "PFS" refers to Plaintiff's Third Amended Fact Sheet, Ex. A.

sometime after chemotherapy. *Id.* at 217:10–218:16   Ms. Kahn testified that, when her hair fell out, she specifically attributed it to Taxotere. *Id.* at 228:23–229:10.

After her first round of chemotherapy, Ms. Kahn received Adriamycin, Cytoxan, and Avastin for two cycles; the first on August 21, 2008 and the second on September 11, 2008. Ex. F, Infusion Pharmacy Ochsner Health System 33–34, 31–32; Ochsner Health System 1037–1039. Ms. Kahn then received Adriamycin and Cytoxan for two cycles – on October 2, 2008 and October 23, 2008. Ex. G, Infusion Pharmacy Ochsner Health System 29–30, 27–28. Finally, Ms. Kahn received Avastin for 10 cycles, which she finished on July 16, 2009, thus completing her chemotherapy. Ex. H, Infusion Pharmacy Ochsner Health System 25–26, 52; 23–24, 51; 21–22, 50; 19–20, 49; 17–18, 48; 15–16, 47; 13–14, 46; 11–12, 45; 9–10, 44; 7–8, 43.

Ms. Kahn believed that her hair would grow back fully after chemotherapy. Ex. B, December 7, 2017 Kahn Dep. 218:23–219:6, 231:4–6. Although Ms. Kahn experienced some hair regrowth, she testified that the thickness of her hair was not the same as before chemotherapy. *Id.* at 45:12–46:5. She also testified that, after chemotherapy, her eyebrows never grew back and that, as such, she has drawn on her eyebrows every morning for more than a decade. *See id.* at 46:15–23.[2]

Despite her lack of regrowth, Ms. Kahn did not investigate the cause of her alleged injuries, which she sustained six months after completing chemotherapy. Between January 16, 2010, and January 16, 2011, Ms. Kahn met with her oncologist, Dr. Zoe Larned, every three months for follow-up appointments per NCCN guidelines. Medical records indicate that Ms. Kahn noted thinning hair loss to Dr. Larned several times. Ex. I, Ochsner Health System 1334–35, 1363–64, 1385–86, 1406; Ex. J, February 22, 2018 Larned Dep. 78:24–79:11, 79:22–80:4, 80:13–20. Ms.

---

[2] Ms. Kahn also purports to have lost her eyelashes, and, in 10 years, only a few have grown back. *Id.* at 49:9–15.

3

Kahn, however, never asked Dr. Larned about the potential cause of her hair thinning, the likelihood of regrowth, or whether something was wrong. February 21, 2018 Larned Dep. 82:24–83:25. To the contrary, according to Dr. Larned, Ms. Kahn never raised any issue about her hair beyond noting it was somewhat thinner:

> Q. When you noted in your records prior to February of 2012, "hair is growing back in, pleased her hair is growing back in, still notes thinning hair or still notes thinning hair, slightly better" -- beyond those words, do you remember Ms. Kahn saying anything else to you in addition to that about her hair?
>
> A. No.
>
> Q. And would you have made notations if she said additional comments about her hair?
>
> A. Yes.
>
> Q. Did she ever ask you to refer her to someone that could diagnose or possibly treat her hair issues?
>
> A. Not that I recall. I would have documented it if we were doing a dermatology referral.
>
> Q. And there is no documentation of a dermatology referral, correct?
>
> A. Not in here.
>
> Q. And no discussion of any sort of conversation with Ms. Kahn about conversations for referral or for treatment, correct?
>
> A. I would have documented it if we had that discussion.

*Id.*

Instead, Ms. Kahn took no action until 2016, when a friend told her about a television advertisement for a lawsuit against the manufacturer of Taxotere. Ex. B, December 7, 2017 Kahn Dep. 22:8–25:16. Ms. Kahn thereafter filed her lawsuit on December 9, 2016. Ex. A, PFS § I.4.

4

Ms. Kahn's Complaint alleges that she developed permanent alopecia, which she defines as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." Second Amended Master Complaint ("AMC") (Rec. Doc. 4407) ¶ 181; *see also* Rec. Doc. 8702 (Order and Reasons on Motion for Leave to File Plaintiffs' Third Amended Master Long-Form Complaint and Jury Demand). Per her own definition of the injury, Ms. Kahn began suffering permanent alopecia in **January 2010**, six months after completing chemotherapy in July 2009. *See* AMC ¶ 181. To be timely, Ms. Kahn needed to file her lawsuit by January 2011. She did not. And, in light of her knowledge of her injuries, her inaction was unreasonable. Ms. Kahn:

- Signed a consent form that warned of various side effects (including hair loss) and warned that some side effect may never go away;

- Knew that her hair had fallen out during chemotherapy, which she completed in July 2009;

- Specifically attributed her hair loss to Taxotere – and no other chemotherapy drug – when her hair fell out during chemotherapy;

- Recognized that her hair had grown back thinner than before chemotherapy;

- Has allegedly drawn on her eyebrows every day for more than 10 years after they fell out during chemotherapy;

- Met with her oncologist multiple times after sustaining her injury but never asked about her hair loss;

- Never sought treatment from any doctors after sustaining her injury.

These undisputed facts would have excited an objectively reasonable plaintiff to inquire about a claim. Ms. Kahn did not, and *contra non valentem* is thus inapplicable. Ms. Kahn's claims are time-barred, and Sanofi is entitled to summary judgment.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute

5

of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

## ARGUMENT

As it did in *Francis*, *Johnson*, and *Thibodeaux*, the Court should grant summary judgment in Sanofi's favor for two reasons. First, Ms. Kahn's pleadings make it apparent that her claims are untimely. Second, because she failed to reasonably investigate her claim after she suffered her injury, *contra non valentem* does not apply.

**I.     On the Face of Her Complaint, the One-Year Prescriptive Period for Ms. Kahn's Claims Began to Run No Later Than January 2010.**

The Court has recognized that Plaintiffs' hair loss became permanent six months after completing chemotherapy. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No. 16-CV-15607, 2020 WL 375597, at *2 (E.D. La. Jan. 23, 2020) ("Both as a general matter and for purposes of prescription, this MDL requires defining Plaintiffs' injury. This Court used a definition that the medical literature has adopted and that Plaintiffs have espoused."); Rec Doc. 9110 at 4–5; *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No. 16-15607, 2019 WL 2995897, at *2 n.12 (E.D. La. July 9, 2019). Ms. Kahn's pleadings adopt this definition of the injury.[3] As such, Ms. Kahn was injured (*i.e.*, began suffering permanent alopecia) in January 2010, six months after completing chemotherapy treatment in July 2009. *See* AMC ¶ 181. Because Ms. Kahn filed her lawsuit five years after prescription ran, her claims are barred on their face. *In re Taxotere*, 2019 WL 2995897, at *2 n.12; Rec. Doc. 9110 at 5.

---

[3] Ms. Kahn alleges she developed permanent alopecia, which she defines as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." AMC ¶ 181; Ex. K, Kahn Am. Short Form Compl. 1.

6

## II.     No Exception Saves Ms. Kahn's Claims.

When "the face of the petition shows [that] the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred." *In re Taxotere*, 2019 WL 2995897, at *2 (quoting *Hoerner v. Wesley-Jensen*, 684 So. 2d 508, 510 (La. App. 4 Cir. 1996)).  Because Ms. Kahn's Complaint is prescribed on its face, she bears the burden of proof. *Id.*

Ms. Kahn cannot meet her burden. C*ontra non valentem* provides that prescription begins when the plaintiff, like Ms. Kahn, has "actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." *Id.* (quoting *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017)).  Prescription thus occurs "when the plaintiff has actual or constructive knowledge of a causal relationship between the object or product and the injury." *Id.* (quoting *Xarelto*, 2017 WL 4517287, at *2). "There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run." *Id.* (quoting *Xarelto*, 2017 WL 4517287, at *2). Instead, prescription begins "when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Id.* (quoting *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999)).

A "plaintiff who suspects something is wrong **must act reasonably** to discover the problem; otherwise, *contra non valentem* will not apply." Rec. Doc. 9110 at 4 (citing *Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 894 (5th Cir. 2010)) (emphasis added). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Id.* (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002)).

Here, prescription started when Ms. Kahn had actual or constructive knowledge of a causal connection between the object or product and the injury.

Such is the case here for two reasons:

**First,** Ms. Kahn had actual knowledge of the risk of permanent side effects, including hair loss, before starting chemotherapy in May 2008. Like Ms. Thibodeaux, Ms. Kahn received Taxotere during an experimental clinical trial. Ex. B, December 7, 2017 Kahn Dep. 185:15–186:14; Ex. L, Infusion Pharmacy Ochsner Health System 41–42; Ex. M, NSABP 63–64; Ex. D, Ochsner Health System 1006–07. Before starting the trial, Ms. Kahn received a consent form, which identified "hair loss" as the first and most common side effect of five of the drugs used in the study. Ex. C, Consent Form at 1666–71. It also explained that "[m]any side effects go away soon after you stop taking your study drugs[,]" but, "[i]n some cases, side effects may be very serious, long-lasting, or may never go away." *Id.* at 1665. Ms. Kahn's doctor and clinical trial nurse reviewed each page of the Consent Form and Ms. Kahn signed it May 14, 2008. Ex. B, December 7, 2017 Kahn Dep. 190:11–23; Ex. C, Consent Form at 1684. When Ms. Kahn's hair failed to grow back as expected, the information in the clinical trial form would have alerted a reasonable patient in Ms. Kahn's position to recognize a "causal relationship between the . . . product and the injury." *In re Taxotere*, 2019 WL 2995897, at *2 (quoting *Xarelto*, 2017 WL 4517287, at *2).

**Second**, Ms. Kahn's own testimony establishes her actual or constructive knowledge of a causal relationship between her injury and Taxotere. Ms. Kahn expected to lose her hair, and she expected it to regrow sometime after chemotherapy. Ex. B, December 7, 2017 Kahn Dep. 217:10–218:16. And, when she lost her hair in June 2008, she attributed her hair loss not just to chemotherapy generally, but to Taxotere specifically. *Id.* at 228:23–229:10. Although Ms. Kahn

8

...

remained hopeful that her hair would grow back after chemotherapy, she recognized that her hair came back thinner than she expected. *Id.* at 45:12–46:5, 218:23–219:6. Also, according to Ms. Kahn, her eyebrows never grew back, and she has drawn on her eyebrows each morning for more than a decade. *See id.* at 46:15–23. Given these facts, a reasonable plaintiff in Ms. Kahn's position would have been excited to investigate.

Yet, between January 16, 2010 (when she sustained her injury) and January 16, 2011 (when the prescription period ended), Ms. Kahn made no inquiry into her potential claims. *Id.* at 318:4–24. Ms. Kahn's lack of post-injury investigation mirrors Ms. Thibodeaux's case. There, the Court rejected the argument that Ms. Thibodeaux's oncologist,[4] who could see that Ms. Thibodeaux routinely wore a wig after chemotherapy, should have known of the injury *and* affirmatively offered a diagnosis. Rec. Doc. 9110 at 6. As the Court explained, Ms. Thibodeaux could not invoke *contra non valentem* "simply because others observed her injury and could have offered unsolicited advice to help her but did not. This falls short of 'act[ing] reasonably to discover the cause of the problem as the law requires.'" *Id.* (citation omitted).

Likewise, Ms. Kahn may not rely on *contra non valentem* because she noted thinning hair to Dr. Larned during the prescriptive period but never sought clarity as to the cause. Instead, Ms. Kahn met with Dr. Larned several times in 2010 for routine, post-treatment follow-up appointments. Ex. I, Ochsner Health System 1334–35, 1363–64, 1385–86, 1406. At no time, however, did Ms. Kahn ask Dr. Larned about the cause of her permanent hair loss, express concern that something was amiss, or take further action to investigate. Dr. Larned testified that – beyond these routine medical record notes – Ms. Kahn made no inquiry about her alleged injury. Ex. J, February 21, 2018 Larned Dep. 82:24–83:25.

---

[4] Dr. Larned also treated Ms. Thibodeaux. Ex. J, February 21, 2018 Larned Dep. 8:11–16.

9

In contrast, Ms. Kahn's post-treatment investigation bares little similarity to that of MDL Plaintiff Barbara Earnest. In *Earnest*, the Court found Plaintiff's delay in filing suit reasonable because her oncologist assured her that her hair would grow back when she asked six months after completing chemotherapy:

> Q. And what is your recollection of what Dr. Carinder told you?
>
> A. That it's going to come back. It just takes time. So I just kept waiting.

*In re Taxotere*, 2019 WL 2995897, at *3. To distinguish Ms. Earnest's case, the Court has stressed the necessity of reliance. *See* Rec. Doc. 9110 at 6 ("[T]his is not the same as inquiring with a physician and, for example, reasonably relying on his or her medical opinion that hair regrowth may take some time."). *Contra non valentem* applied because Ms. Earnest actively investigated her injury only allegedly to be told that she had no injury.

Here, Ms. Kahn did not actively investigate her injury or rely on her oncologist's assurances (because there were none). Unlike Ms. Earnest, Ms. Kahn never sought out Dr. Larned specifically to discuss hair loss. Instead, Ms. Kahn attended her quarterly follow-up appointments with Dr. Larned where thinning hair was noted but not addressed.[5] Dr. Larned, in turn, provided no alternative causes, clinical diagnoses, or promises that hair growth may take longer than expected. *Cf. Hoerner*, 684 So. 2d at 514 (applying *contra non valentem* where plaintiff's doctor attributed eye injury to a "bug" and not the true cause: wearing extended-wear contacts). Accordingly, Ms. Kahn did not reasonably rely on any statement by Dr. Larned.

To that end, Ms. Kahn's claim do not survive prescription based on her doctors' statements *before* she suffered her injury. For example, around April 2009 – while she was in the middle of

---

[5] For example, during her appointment in 2010, Ms. Kahn's eyebrows had not grown back for about a year. Ms. Kahn, however, never asked Dr. Larned about a possible connection to Taxotere, even though Ms. Kahn has testified that she attributed her hair loss to Taxotere when her hair fell out.

her chemotherapy treatment – Ms. Kahn attended her annual wellness exam with her gynecologist, Dr. Margaret Roberie. *See* Ex. B, December 7, 2017 Kahn Dep. 257:14–258:5, 270:24; Ex. N, Ochsner Health System 1257–1258.[6] Ms. Kahn's testimony – which finds no supports in her medical records – is that she allegedly asked Dr. Roberie about when hair would grow back fully. Ex. B, December 7, 2017 Kahn Dep. 257:14–258:5, 270:24. Although Dr. Roberie purportedly told Ms. Kahn that age could affect the thinness of Ms. Kahn's hair, Ms. Kahn dismissed the notion:

> I was 50 at the time, and most 50-year-old's hair do not thin. You know, 80, maybe, but not 50. So when she told me that, I was a little taken aback, but -- so I dropped it.

*Id.* at 258:1–5. That Ms. Kahn allegedly asked Dr. Roberie about hair regrowth during chemotherapy is unsurprising: Ms. Kahn expected to lose her hair and expected it to regrow sometime after chemotherapy. *Id.* at 217:10–218:16; *see* AMC ¶¶ 180–181 (explaining that hair regrowth can be expected within three to six months of chemotherapy treatment). But Ms. Kahn – per her own definition – did not sustain her injury until six months after chemotherapy. AMC ¶ 181. And, when her hair did not grow back as expected at that time, Ms. Kahn then was put on notice that something was amiss. *See* Rec. Doc. 9110 at 7.

Likewise, Ms. Kahn attended a routine follow-up appointment with Dr. Larned four months after finishing chemotherapy. Ex. B, December 7, 2017 Kahn Dep. 255:5–24; Ex. E, January 31, 2018 Kahn Dep. 49:5–52:2. Here, Ms. Kahn also allegedly asked when her hair would grow back. But Dr. Larned did not give Ms. Kahn a definitive answer:

---

[6] Ms. Kahn has testified that this meeting occurred when she was 50. Ex. B, December 7, 2017 Kahn Dep. 257:14–258:5, 270:24. Based on Ms. Kahn's medical records, it appears this meeting occurred on April 6, 2009, when Ms. Kahn was 51. Ex. N, Ochsner Health System 1257–1258; PFS § I.15. In any event, Ms. Kahn's meeting with Dr. Roberie occurred before she suffered her injury in January 2010.

11

> Q. And -- or did you ask it a different way? I want to understand what you said to her.
>
> A. When will my hair grow back.
>
> Q. And what was her response?
>
> A. She had none. She couldn't explain. She couldn't give me a date. She couldn't explain.

Ex. B, December 7, 2017 Kahn Dep. 255:17–24.  As with Dr. Roberie, Ms. Kahn's pre-injury meeting with Dr. Larned has no bearing on *contra non valentem*.  Instead, after these office visits – which occurred either during or within six months of chemotherapy – Ms. Kahn never sought treatment for her hair after sustaining her injury:

> Q. Okay. At any point, have you sought treatment of any kind to address the condition of your hair that you are complaining about?
>
> A. No.
>
> Q. Why not?
>
> A. Because when I talked to my doctors, they didn't say anything that it was about -- that it was -- they didn't give me an option to -- I don't know how to say it. They didn't suggest that there was anything to treat -- a way to treat my hair.
>
> Q. Who didn't suggest that?
>
> A. Dr. Larned or Dr. Roberie.
>
> Q. And you didn't ask the question.
>
> A. I only talked to them about when would -- would my hair grow out fully. And that's what we talked about.
>
> Q. So you didn't say, Is there any treatment option I can attempt?
>
> A. No.

*Id.* at 318:4–24.

Under this Court's formulation of *contra non valentem*, Ms. Kahn is like Ms. Thibodeaux, not Ms. Earnest, and her case represents an important boundary line for this Court. Specifically, the Court should hold that a Plaintiff cannot toll prescription simply by noting a change in her hair to her doctor six months after chemotherapy without inquiring about the cause. Holding to the contrary would create a rule-swallowing exception to prescription—*i.e.*, it is reasonable to assume *both* that Plaintiffs will visit their oncologists six months after chemotherapy, per NCCN guidelines, and experience changes to their hair after chemotherapy. Ex. J, February 21, 2018 Larned Dep. 55:4–12. Simply noting these observations in a medical record sets the bars impermissibly low. Instead, and consistent with the Court's holding in *Earnest*, Ms. Kahn must show affirmative reliance.[7] Because she cannot, her claims should be dismissed.

In brief, Ms. Kahn took no action for many years—not until 2016, when a friend told her about a television advertisement for a lawsuit against the drug manufacturer of Taxotere. Ex. B, December 7, 2017 Kahn Dep. 22:8–25:16. Her failure to investigate before learning about the advertisement was unreasonable as a matter of law. *See Luckett*, 171 F.3d at 300 ("[T]he prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." (citing *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. App. 1st Cir. 1997))). Ms. Kahn had a duty to investigate by January 2011. She did not. Her claims thus prescribed no later than January 2011.

## CONCLUSION

For the foregoing reasons, Sanofi is entitled to summary judgment on Ms. Kahn's claims.

---

[7] To that end, Ms. Kahn's testimony that she remained hopeful that her hair would grow back does not toll prescription. Ex. B, December 7, 2017 Kahn Dep. 220:17–23. As this Court has recognized, *contra non valentem* requires reasonable action, not unsupported hope that a Plaintiff's hair will return at some point in the future. Rec. Doc. 9110 at 6–8.

13

Date: February 14, 2020

Respectfully submitted,

| | |
|---|---|
| /s/ *Douglas J. Moore* | Harley V. Ratliff |
| Douglas J. Moore (Bar No. 27706) | Adrienne L. Byard |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | **SHOOK, HARDY& BACON L.L.P.** |
| 400 Poydras Street, Suite 2700 | 2555 Grand Boulevard |
| New Orleans, LA 70130 | Kansas City, Missouri 64108 |
| Telephone: 504-310-2100 | Telephone: 816-474-6550 |
| Facsimile: 504-310-2120 | Facsimile: 816-421-5547 |
| dmoore@irwinllc.com | hratliff@shb.com |
| | abyard@shb.com |

*Counsel for Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*