UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO:

June Phillips, Case No. 2:16-cv-15397.

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON WARNINGS CAUSATION

Plaintiff June Phillips claims Sanofi failed to provide an adequate warning concerning the risk of permanent alopecia and Taxotere.[1] Among the many elements of that claim, Plaintiff must prove warnings causation. Here, summary judgment on warnings causation is warranted under the frameworks articulated by both the Fifth Circuit and this Court.

First, under the Fifth Circuit's two-part test, there is no duty to warn where, as here, Plaintiff's treating physician, Dr. Scott Sonnier, *already knew* about a "potential risk" of permanent hair loss and Taxotere when he treated Plaintiff. He learned of that risk from lay press articles in 2010 that reported cases of permanent hair loss and Taxotere. When he treated Plaintiff in 2013, his practice was to advise patients "there's some concern about permanent hair loss" and Taxotere; and he addressed that "potential risk" with Plaintiff. Second, when Dr. Sonnier prescribed "TCH" (Taxotere, Carboplatin, Herceptin) to Plaintiff, he believed it had "the best risk benefit profile for a patient in that situation." Plaintiff cannot establish causation because Dr. Sonnier unequivocally testified he would make the same decision—knowing what he knows today.

---

[1] *See generally* Second Amended Long Form Master Complaint ¶¶ 221-31; 240-47. Defendants dispute Plaintiffs' allegations and maintain the Taxotere warning has always been adequate to warn of the potential for permanent hair loss.

Plaintiff also cannot satisfy this Court's four-part framework. To treat Plaintiff's aggressive breast cancer, Dr. Sonnier recommended adjuvant therapy consisting of chemotherapy, followed by both radiation therapy and then hormone therapy. Dr. Sonnier warned Plaintiff of a "potential risk" of permanent alopecia and Taxotere, and Plaintiff was provided a written informed-consent (which she read, understood, and signed) that disclosed "permanent hair loss" as a potential risk of radiation therapy. On both occasions, Plaintiff never inquired about alternatives to avoid the risk of "permanent hair loss." And even if she had inquired, Dr. Sonnier would not have prescribed Plaintiff one of the preferred alternatives to the TCH regimen because <u>all</u> preferred alternative regimens in 2013 contained Adriamycin,[2] which posed serious risks to Plaintiff's health given her prior cardiac issues. Instead, Dr. Sonnier would have given Plaintiff a non-Adriamycin regimen, which would not have reduced Plaintiff's risk of recurrence to the same degree as TCH. Under these circumstances, there is no evidence that Plaintiff (or any "reasonable patient") would have done anything other than follow Dr. Sonnier's original prescribing decision.

For these reasons, the Court should enter summary judgment on Plaintiff's lawsuit for failure to establish causation—an essential element of all her claims.

## STATEMENT OF UNDISPUTED FACTS

Defendants have submitted a separate statement of facts, pursuant to LR 56. Defendants discuss the pertinent facts below in the Argument, with citations to "DSOF ¶" as appropriate.

## STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. The party seeking summary judgment initially has the burden to identify those portions of the record that demonstrate the absence of a genuine issue of material fact.

---

[2] "Doxorubicin" is the generic name for Adriamycin. For ease of reference, Defendants use "doxorubicin" and "Adriamycin" interchangeably.

*Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the moving party has met its burden, the nonmoving party bears the burden of coming forward with evidence of each essential element of its claim, such that a reasonable jury could find in its favor. *Id.* The existence of a mere scintilla of evidence to the support the nonmoving party's position, however, will not defeat summary judgment; there must be sufficient evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be no genuine issue as to any material fact, since there has been a complete failure of proof concerning an essential element of the nonmoving party's case." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002) (internal quotation marks and citations omitted).

## ARGUMENT

**I.     PLAINTIFF CANNOT ESTABLISH WARNINGS CAUSATION UNDER THE FIFTH CIRCUIT'S TWO-PRONGED TEST.**

Warnings claims "must be viewed through the lens of the learned intermediary doctrine, which Louisiana law applies to claims of failure to warn involving drugs or medical devices dispensed by a physician." *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 765 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001). Under the learned-intermediary doctrine, "[a prescription drug] manufacturer has no duty to warn the patient, but need only warn the patient's physician." *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991).[3]

---

[3] *See also* Restatement (Third) of Torts, Physical & Emotional Harm § 7, cmt. i (2010) ("[I]n the field of products liability, courts have declared that the warning obligation of prescription-drug manufacturers ordinarily is limited to the prescribing physician and does not extend to warning the patient directly. They reason that the physician can best assess the relevant risk information and determine the appropriate course of treatment. When appropriate, the physician can inform the patient of means by which the patient may minimize the risk of adverse side effects. . . . Courts have, through this duty limitation, made a categorical determination that having manufacturers provide safety

3

To prove a failure-to-warn claim under the learned-intermediary doctrine in the Fifth Circuit, Plaintiff must meet a two-pronged test:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.
>
> Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.

*Stahl*, 283 F.3d at 265-66 (internal citation omitted); *Willett*, 929 F.2d at 1098; *Grenier*, 99 F. Supp. 2d at 765. Here, Plaintiff cannot meet either prong.

### A. Plaintiff cannot establish the first prong because the risk of permanent alopecia and Taxotere was "otherwise known" to Dr. Sonnier.

Plaintiff cannot establish the first prong, which concerns the duty element of her failure-to-warn claim. Under the LPLA, "[a] manufacturer is not required to provide an adequate warning about his product when . . . [t]he user or handler of the product *already knows* or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic." La. Stat. Ann. § 9:2800.57(B)(2) (emphasis added).

Here, Dr. Sonnier prescribed Plaintiff's adjuvant therapy, including TCH chemotherapy, on October 29, 2013. DSOF ¶ 8. By that time, Dr. Sonnier *already knew* that "[p]ermanent chemotherapy-induced alopecia is a rare but, none the less, possible side effect associated with many chemotherapy regimens." DSOF ¶ 24. He also *already knew* by that time "that there could have been an association with Taxotere and permanent alopecia, permanent hair loss," based on lay press articles he saw that reported cases of permanent hair loss and Taxotere. DSOF ¶¶ 25-26; 29-30.

---

information to physicians, rather than to patients, is the appropriate manner for minimizing the costs of adverse side effects. Such a categorical determination also has the benefit of providing clearer rules of behavior for actors who may be subject to tort liability and who structure their behavior in response to that potential liability.")

4

Those articles influenced Dr. Sonnier's patient-counseling practices, including in this case. By 2013, his practice was to advise patients "that there were some cases that -- where there's some concern about permanent hair loss" and Taxotere. DSOF ¶ 30. In this case, Dr. Sonnier had a discussion with Plaintiff regarding the "potential risk" of "permanent hair loss" and Taxotere. DSOF ¶ 29. On these undisputed facts, Plaintiff cannot establish the first prong of the Fifth Circuit's test, since Dr. Sonnier *already knew* the information she claims should have been included in an adequate warning.

> **B.     Plaintiff cannot establish the second prong because there is no evidence any "additional non-disclosed risk" would have changed Dr. Sonnier's decision.**

Nor can Plaintiff cannot establish the second prong, which concerns the causation element. *Allgood v. GlaxoSmithKline PLC*, 2008 WL 483574, at *4 (E.D. La. Feb. 20, 2008) (drug manufacturer is entitled to summary judgment "if it can demonstrate the absence of a genuine factual dispute concerning the second prong of the learned-intermediary test, namely causation").

Here, Plaintiff's claim is that Dr. Sonnier chose a Taxotere-containing regimen due to an inadequate warning concerning permanent hair loss, and that "but for" that inadequate warning, he would not have prescribed Taxotere and Plaintiff would have avoided her injuries. Plaintiff cannot establish the causation aspects of that claim for at least two reasons:

*First*, as discussed above in Part I.A, Dr. Sonnier was *already aware* of the possible risk of permanent alopecia and Taxotere. Thus, Plaintiff cannot show the alleged inadequacy of the Taxotere warning played any casual role in his decision; Dr. Sonnier's pre-existing knowledge negates causation. *See Pustejovksy v. Pliva, Inc.*, 623 F.3d 271, 276 (5th Cir. 2010) ("Where the evidence demonstrates that the physician was aware of the possible risks involved in the use of the

5

product but decided to use it anyway, the plaintiff cannot show that the inadequacy of the warning was a producing cause.") (citations and quotation marks omitted).[4]

*Second*, when Dr. Sonnier prescribed TCH to Plaintiff in 2013, he believed it had "the best risk benefit profile for a patient in that situation." DSOF ¶ 17. Plaintiff has failed to meet her burden to show that a different warning regarding permanent alopecia and Taxotere would have changed Dr. Sonnier's risk-benefit "decisional calculus" and caused him not to prescribe the TCH regimen to Plaintiff. *See Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992).

That failure is dispositive because, under Louisiana law, "the plaintiff must show that a proper warning would have changed the decision of *the treating physician*, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product." *See Willett*, 929 F.2d at 1099 (emphasis added); *Huffman v. Squibb*, 2016 WL 6024532, at *2 (E.D. La. Oct. 14, 2016) ("To demonstrate causation under Louisiana law, the plaintiff must ultimately show that **the doctor** would not have prescribed [the drug] had the doctor received a proper warning.").[5]

Dr. Sonnier's unequivocal testimony is that he would make the *same* prescribing decision

---

[4] *See also Hall v. Sinn, Inc.*, 102 F. App'x 846, 849 (5th Cir. 2004) ("[Plaintiff's treating physician's] affidavit acknowledges that . . . he was aware of the risks of the drug independently of Wyeth's labels; therefore, Wyeth's warning (adequate or inadequate) played no role in the events leading to Hall's injury"); *Ehlis v. Shire Richwood, Inc.*, 367 F.3d 1013, 1016 (8th Cir. 2004) ("the causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had substantially the same knowledge as an adequate warning from the manufacturer should have communicated to him."); *In re Cook Med., Inc. IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*, 2018 WL 6415585, at *2 (S.D. Ind. Dec. 5, 2018) ("[W]here 'a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, courts typically conclude that ... the causal link is broken and the plaintiff cannot recover.'" (quoting *Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272 (11th Cir. 2002)).

[5] *See Rhodes v. Bayer Healthcare Pharm. Inc.*, 2013 WL 1282450, at *4 (W.D. La. Mar. 28, 2013) ("Plaintiffs bear the burden to show that a proper warning would have changed the decision of Dr. Chandler, i.e., that but for the inadequate warning, he would not have used or prescribed Avelox."); *Pellegrin v. C.R. Bard*, 2018 WL 3046570, at *4 (E.D. La. June 20, 2018) ("This causation requirement means that the plaintiff must show that 'a proper warning would have changed the decision of the treating physician, i.e., that but for the inadequate warning, the treating physician would not have used or prescribed the product.'" (quoting *Willett*, 929 F.2d at 1099)).

6

today. He testified that, even today, he believes TCH has "the best risk benefit profile" for a patient in Plaintiff's situation, and he would again make the same treatment recommendation for Plaintiff. DSOF ¶ 21. He further testified that the addition of the sentence "cases of permanent alopecia have been reported" to the December 2015 label did not materially alter his "risk-benefit assessment of Taxotere." DSOF ¶ 18. And Plaintiff has not identified any "additional non-disclosed risk" that was sufficiently high to change Dr. Sonnier's prescribing decision. *Thomas*, 949 F.2d at 814. On this record, Plaintiff cannot establish that a different warning would have changed Dr. Sonnier's decision to prescribe TCH, and thus Plaintiff cannot establish the causation prong of the Fifth Circuit's test.

**II.     PLAINTIFF ALSO CANNOT ESTABLISH WARNINGS CAUSATION UNDER THE COURT'S FOUR-PART FRAMEWORK.**

Summary judgment also is warranted under the four-part framework previously articulated by this Court for analyzing warnings causation in cases involving chemotherapy:

> The question is not simply "what would the doctor have prescribed" but *[1] whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere, [2] whether the patient would have inquired about other options, [3] what the doctor would have recommended, and [4] what decision the plaintiff would have ultimately made.* The Court will consider these questions with the goal being to assess what the doctor and the patient would have decided together. While a doctor may testify that his or her recommendation would not have changed, the issue is whether the plaintiff's ultimate decision would have changed.

Order and Reasons, Rec. Doc. 7571 at 16 (emphasis and numerals added). Plaintiff cannot satisfy her burden under this framework.

The first element asks "whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere." That question contains an implicit premise

7

(*i.e.*, that Plaintiff's doctor was not aware of the risk) and then asks "whether and how" patient-counseling would be different in a counterfactual world (in which the doctor was aware).

Here, the implicit premise does not apply; Dr. Sonnier was *already aware* of the possible risk of permanent alopecia associated with Taxotere when he treated Plaintiff, and he did have a discussion with Plaintiff regarding the "potential risk" of "permanent hair loss" and Taxotere. DSOF ¶ 29.  That discussion was consistent with his general practice in 2013 to advise patients "that there were some cases that -- where there's some concern about permanent hair loss" and Taxotere.  DSOF ¶ 30.

In this counterfactual setting, the second element asks "whether the patient would have inquired about other options."  The undisputed evidence points to no.  There is no evidence that Plaintiff inquired about other options after Dr. Sonnier discussed with her the "potential risk" of "permanent hair loss" and Taxotere.  DSOF ¶ 30.  There also is no evidence that Plaintiff inquired about other options after she reviewed and signed an "informed consent" for the radiation course of her cancer treatment, which identified "permanent hair loss" as one of the risks.  DSOF ¶¶ 31, 34.

The third element asks "what the doctor would have recommended" (assuming Plaintiff had inquired about alternatives).  This is the Court's first occasion to hear the treatment decision-making testimony in a case involving a plaintiff with HER2+ cancer (where TCH is the gold standard regimen) and with significant concerns about cardiac toxicity resulting from alternative chemotherapy treatments.  The undisputed evidence is that Dr. Sonnier would have stuck to his original prescribing decision (the TCH regimen).  When Dr. Sonnier prescribed TCH to Plaintiff, he believed it had "the best risk benefit profile for a patient in that situation."  DSOF ¶ 17.  Dr. Sonnier specifically selected TCH to avoid the "significant cardio toxicity" posed by Adriamycin,

which was present in <u>all</u> the preferred alternative chemotherapy regimens.  DSOF ¶ 13.  In Dr. Sonnier's opinion, Plaintiff was not an "ideal candidate" for any regimen with Adriamycin.  DSOF ¶ 15.  As Dr. Sonnier explained, Adriamycin "is a cardio toxic agent that we wanted to specifically avoid in her case," due to Plaintiff's age (75 at the time of treatment) and preexisting cardiac condition, which further increased her risk of cardiotoxicity. DSOF ¶ 14.  Indeed, Dr. Sonnier's decision to prescribe TCH in Plaintiff's case was consistent with the 2013 NCCN Guidelines, which classifies the TCH regimen as a "preferred regimen, especially in those with risk factors for cardiac toxicity."  DSOF ¶ 16.

When asked if he would have prescribed Plaintiff an alternative regimen with Adriamycin, Dr. Sonnier's answer was decisive:

**"I would not give it."**

DSOF ¶ 37 (emphases added).  Instead, he would have had "a serious discussion about the risk of cardiac toxicity," and told her "I think that's a very risky proposal."  *Id.*  After that discussion, if Plaintiff insisted on a regimen with Adriamycin, Dr. Sonnier "would have felt very concerned, and would have felt that [he] was placing her cardiac status at great risk," DSOF ¶ 37, a risk that was "not acceptable" to him, *id*.  And he would again decline to give the Adriamycin regimen.  *Id.*  Indeed, Dr. Sonnier testified that, had Plaintiff insisted on a different regimen, he would have recommended her a non-Adriamycin regimen, which would not have reduced Plaintiff's risk of recurrence to the same degree as TCH—*i.e.*, one that would not have treated Plaintiff's cancer with the same efficacy as TCH.  On this record, there is no evidence Dr. Sonnier would have done anything other than strongly recommend the more effective TCH regimen, had Plaintiff inquired about alternatives.

9

The fourth element ("what decision the plaintiff would have ultimately made") points only in Defendants' favor. On informed-consent issues like this, Louisiana law requires application of a "reasonable patient" standard (rather than relying on a plaintiff's subjective testimony about what he or she would have done in a given situation) in order to avoid "the likelihood of a patient's bias in testifying in hindsight on . . . hypothetical matter[s]." *Hondroulis*, 553 So. 2d at 412. Although Plaintiff testified that she would have demanded an alternative treatment had she known of the alleged risk of permanent hair loss associated with Taxotere, that testimony is self-serving and belied by the fact that Plaintiff did not inquire about alternative treatments after Dr. Sonnier discussed that risk with her and after she reviewed and signed an "informed consent" for the radiation course of her cancer treatment, which identified "permanent hair loss" as one of the risks. DSOF ¶¶ 29-34.

Before she started treatment, Plaintiff made the decision, "[w]hatever it takes to get rid of [the cancer], let's do it." DSOF ¶ 32. If Plaintiff did not receive adjuvant therapy, her risk of recurrence was 40 to 50 percent. DSOF ¶ 11. However, if Plaintiff's breast cancer were to recur, it would be incurable. DSOF ¶ 12. And any alternative that Dr. Sonnier would have recommended would not have contained Adriamycin because of Plaintiff's pre-existing cardiac concerns and, therefore, would not have reduced Plaintiff's risk of recurrence to the same degree as TCH. DSOF ¶¶ 37-38. No reasonable patient in Plaintiff's circumstances would reject a TCH regimen in favor of a non-Adriamycin regimen. DSOF ¶ 45. Indeed, Plaintiff understood these facts about her cancer and accepted the risks of treatment discussed by Dr. Sonnier and identified in the informed-consent forms—*in real time*—because she was determined to do everything she could to get rid of her cancer. DSOF ¶ 35.

10

Plaintiff also expressed concern about possible cardiac side effects, and admitted she cannot say she would have taken an alternative chemotherapy regimen that would have negatively affected her heart:

> Q. You would want to know what the effect on your heart would be from the other drug. Is that correct?
>
> A. Yeah. I would want more information.
>
> Q. Before you would agree to take that drug?
>
> A. Yes.
>
> Q. So, without that information you can't say for sure that you would have taken the other drug?
>
> A. **I can't. No. I can't say for sure what I would have done. I don't know what I would have done.**

DSOF ¶ 39 (emphasis added). Likewise, Plaintiff testified that she would have refused an alternative chemotherapy regimen that carried a risk of permanent hair loss:

> Q. So I'm not sure I understand your answer. If the other drug had a risk of permanent hair loss, would have refused to take that drug, too?
>
> A. Yes**.**

DSOF ¶ 40. However, alternative regimens containing drugs such as Adriamycin and Taxol carried a risk of permanent hair loss. DSOF ¶ 41. According to Plaintiff, she would have refused regimens containing those chemotherapy drugs, leaving Plaintiff with only non-Adriamycin alternatives that would not reduce her risk of recurrence, thereby increasing the risk that her cancer would recur and become incurable. DSOF ¶¶ 12, 39-40. Neither Plaintiff nor a reasonable patient in Plaintiff's circumstances would reject a TCH regimen in favor of a non-Adriamycin regimen that reduced her chances of survival. DSOF ¶¶ 32, 42-47.

Accordingly, Plaintiff's actual actions at the time of treatment belie any self-serving testimony, years later in litigation, about what she allegedly would have done had she known about

the risk of "permanent hair loss." She knew that risk and accepted it, just as any reasonable patient would have done.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion for summary judgment on Plaintiff's claims.

Date: February 14, 2020

Respectfully submitted,

| | |
|---|---|
| */s/ Douglas J. Moore*<br>Douglas J. Moore (Bar No. 27706)<br>**IRWIN FRITCHIE URQUHART & MOORE LLC**<br>400 Poydras Street, Suite 2700<br>New Orleans, LA 70130<br>Telephone: 504-310-2100<br>Facsimile: 504-310-2120<br>dmoore@irwinllc.com | Harley Ratliff<br>Adrienne L. Byard<br>**SHOOK, HARDY & BACON L.L.P.**<br>2555 Grand Boulevard<br>Kansas City, Missouri 64108<br>Telephone: 816-474-6550<br>Facsimile: 816-421-5547<br>hratliff@shb.com<br>abyard@shb.com<br><br>***Counsel for Sanofi Defendants***<br>***Sanofi US Services Inc. and***<br>***Sanofi-Aventis U.S. LLC*** |

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ Douglas J. Moore

12