# EXHIBIT C

Page 1

```
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA

                           NO. 2:16-cv-15397

                              JUNE PHILLIPS

                                 VERSUS

              SANOFI S.A., SANOFI-AVENTIS U.S. L.L.C., and
                          AVENTIS-PHARMA S.A.
                 Videotaped deposition of DR. SCOTT
         SONNIER, 1401 Foucher Street, New Orleans,
         Louisiana 70115, taken in the offices of
         CRESCENT CITY HEMATOLOGY ONCOLOGY on Thursday,
         November 1, 2018, at 1:03 p.m.
         APPEARANCES:
              PENDLEY, BANDIN, AND COFFIN, LLP
              Attorneys at Law
              BY:  NICHOLAS ROCKFORTE, ESQUIRE
              24110 Eden Street
              Plaquemine, Louisiana  70765
                  ATTORNEYS FOR PLAINTIFF

              STUEVE SIEGEL HANSON
              Attorneys at Law
              BY:  ABBY MCCLELLAN, ESQUIRE
              460 Nichols Road, Suite 200
              Kansas City, Missouri  64112
                  ATTORNEYS FOR PLAINTIFF
              IRWIN, FRITCHIE, URQUHART & MOORE
              Attorneys at Law
              BY:  DOUG MOORE, ESQUIRE
              400 Poydras Street, Suite 2700
              New Orleans, Louisiana  70131
                  ATTORNEYS FOR DEFENDANT

      VIDEOGRAPHER:  WILLIAM MYERS

      REPORTED BY:

              THERESA (TERRI) MATHERNE
              Certified Court Reporter
         AFFILIATED REPORTING           Ph. (504)568-9111
       www.affiliatedreporting.com    Fax (504)568-9110
```

Page 10

1  involved in a clinical trial with Taxotere.
2  Q. Just as you sit here today, you don't recall
3    any?
4  A. Right.
5  Q. Have you ever presented at any seminars or
6    Congresses or anything related to Taxol are
7    Taxotere?
8  A. I have not.
9  Q. When you say Taxotere, Taxol, would you agree
10    with me that those fall into a class of drugs
11    called taxanes?
12  A. Correct.
13  Q. Have you ever served on any speakers' bureaus
14    for a pharmaceutical company or a manufacturer
15    of a pharmaceutical drug?
16  A. Years ago, so perhaps early 2000s.
17  Q. Similar question, have you ever served on
18    speaker bureau for any company that designed
19    or manufactured a taxane?
20  A. I believe I did attend one session with
21    speakers' bureau on Taxotere.
22  Q. What do you recall about that, Doctor?
23  A. That was basically uses of Taxotere in the
24    treatment of various malignancies.
25  Q. Were you a speaker or did you attend?

Page 11

1  A. We attended, not as a speaker.
2  Q. If you recall, do you have a general time
3    frame of when that speakers' bureau was?
4  A. Perhaps 2002, perhaps, maybe 2003.
5  Q. So the case that brings us here today, have
6    you had an opportunity to look over the
7    medical records for Ms. June Phillips?
8  A. I sure have.
9  Q. Correct me if I'm wrong, I note that you
10    administered a regimen that included Taxotere;
11    is that right?
12  A. Correct.
13  Q. Today, in your practice, do you use Taxol and
14    Taxotere interchangeably?
15  A. I wouldn't say interchangeably. But I do use
16    them, and I do use them fairly often.
17  Q. Has that changed? Or some point in time in
18    your previous regimen, were you using Taxol or
19    Taxotere more often?
20      MR. MOORE:
21        Let me enter an objection to the
22    form of the question.
23  BY MR. ROCKFORTE:
24  Q. Sure. I can ask a better question. If you
25    don't understand the question, you can ask me

Page 12

1    to rephrase it.
2  A. Yes.
3  Q. At some point in time, you were using -- which
4    drug did you start using first, Taxol or
5    Taxotere?
6  A. Taxol was available earlier than Taxotere. So
7    Taxol was the one that -- this goes back to
8    training in '98 to '01. I believe Taxotere
9    came along maybe '99, 2000. So before that
10    was, essentially, all Taxol.
11  Q. When Taxotere came on the market, you began
12    using it. And around the time frame of today,
13    what would you say is the percentage of your
14    usage in terms of Taxol versus Taxotere?
15      MR. MOORE:
16        Object to the form of the question.
17  BY MR. ROCKFORTE:
18  Q. Your best estimate.
19  A. So it's not -- I don't use them
20    interchangeably. But I guess to clear, give
21    you a clearer example. There are -- there's
22    not a regimen that I use that consist of
23    taxane fill in the blank.
24  Q. Okay.
25  A. Taxol or Taxotere. The regimens that are

Page 13

1    available, call for either Taxol or Taxotere.
2      There are certain malignancies where you
3    may use a taxane. And in that instance, if
4    there is a selection of either Taxol or
5    Taxotere, and more currently Abraxane,
6    Taxotere tends to still be a drug that I tend
7    to favor more so than Taxotere -- I'm story,
8    Taxotere it what I favor more than Taxol.
9  Q. Why is that, Doctor?
10  A. The neuropathic side effects of Taxotere can
11    be very severe and very -- and can be lifelong
12    and be very debilitating when Taxol is used
13    compared to Taxotere.
14  Q. I guess that leads me in a line of
15    questioning. How do you determine the
16    appropriate chemo regimen for a particular
17    patient?
18  A. Based on clinical trials, and published
19    clinical trials, and standards of care and
20    guidelines.
21  Q. When you mention standard of care and
22    guidelines, are you referring to NCCN
23    guidelines?
24  A. Yes. But not all.
25  Q. What do you mean by that?

Page 14

1  A.  NCCN guidelines, it's a good set of guidelines
2      to follow, but it's not the Bible in terms of
3      having to use those every case in medical
4      care.
5  Q.  When you first start using a chemo drug
6      Doctor, what are some of the sources that you
7      turn to in order to learn about information
8      about that drug, such as indications, dosing,
9      the risk safety profile, those sorts of
10     things?
11 A.  So clinical trials, published clinical trials,
12     product inserts, and those, essentially, are
13     the standards.
14 Q.  When you refer to product inserts, is that
15     simply the labeling for the drug?
16 A.  Correct.
17 Q.  And would that also be true with respect to
18     your knowledge of Taxotere?
19 A.  Correct.
20 Q.  Just so I understand you correctly.  Do you
21     recall when you first became aware of the
22     safety profile of Taxotere?
23 A.  When it came out.
24 Q.  Would that have involved reviewing the product
25     information?

Page 15

1  A.  Correct.
2  Q.  Do you recall, I guess in your general
3      practice when you're learning about a drug,
4      the product information generally given to you
5      by sales reps?  Or how do you get that
6      information?
7  A.  Generally, with several sources online, such
8      as Up-To-Date, is a website which --
9      Up-To-Date.  There's Epocrates online.
10         There are some company-sponsored material
11     that comes in, but with the objective product
12     insert and product labeling present.  And of
13     course, with just the general basic research
14     studies, published medical literature on it.
15 Q.  Do you have an understanding that Taxotere was
16     manufactured and designed by the company
17     Sanofi?
18 A.  Correct.
19 Q.  Have you ever had the opportunity to be called
20     upon or meet with reps of Sanofi in connection
21     with Taxotere?
22 A.  Yes, I have.
23 Q.  At any point in time do you know if these
24     Sanofi reps provided information to you in
25     connection with the drug Taxotere?  Do you

Page 16

1      recall that?
2  A.  Yes, I have.
3  Q.  Do you remember in particular what type of
4      information was provided to you?
5  A.  Usually, just clinical efficacy of Taxotere.
6      Of course, there are comments about side
7      effects.
8  Q.  Are you familiar with the term "Dear Doctor
9      letter"?  I know we use that as attorneys.
10         Have you ever received letters from drug
11     companies advising you of new side effects or
12     new information related to their product once
13     it's already been out on the market?  Does
14     that make sense?
15 A.  I believe so, yes.
16 Q.  So when you receive those letters, is that
17     something that you would read and consider in
18     your practice?
19 A.  Yes.
20 Q.  Were you ever made aware that the use of
21     Taxotere has been causally associated with
22     incidents of permanent hair loss?
23         MR. MOORE:
24             Let me object to the form of the
25         question.

Page 17

1          THE WITNESS:
2              No.  The permanent hair loss
3          information that I received on Taxotere
4          have been mainly lay press, lay press.
5              There is a -- in the product insert,
6          there was warnings with alopecia being a
7          complication.
8  BY MR. ROCKFORTE:
9  Q.  When you mention "lay press," what do you mean
10     by that?
11 A.  Television commercials, newspaper articles.
12 Q.  At some point you learned that there could
13     have been an association with Taxotere and
14     permanent alopecia, permanent hair loss; is
15     that right?
16 A.  Yes.
17 Q.  About what time frame did you learn of that
18     connection?
19 A.  Perhaps five, ten years ago, five to seven
20     years ago.
21 Q.  What was the means in which you learned about
22     that connection?
23 A.  Just the general -- there's the lay press
24     articles on the concern about permanent hair
25     loss.

5 (Pages 14 - 17)

Page 18

1  Q. Doctor, have you had the opportunity to look
2     at the product labeling for Taxotere?
3  A. It's been a little while since I have looked
4     it up and researched it, just because it's a
5     drug that's been around for quite some time.
6  Q. You would believe that you had the opportunity
7     at some point, and you've reviewed the
8     clinical -- I'm sorry, the product information
9     for Taxotere; is that right?
10 A. Uh-huh.
11 Q. I'm going to hand you what I'm marking as
12    Exhibit 3, which I'll represent to you is the
13    product labeling for Taxotere. You see the
14    top left-hand corner says Taxotere? It shows
15    it's revised 6/2013. Do you see that?
16         (Exhibit 3, product labeling, was
17         marked for identification.)
18 A. Uh-huh.
19 Q. You see there's an adverse reaction section on
20    the right-hand side?
21 A. Uh-hun.
22 Q. It says, "Most common adverse reactions across
23    all Taxotere," do you see that section?
24 A. Correct.
25 Q. At the bottom, it's says "alopecia"?

Page 19

1  A. Correct.
2  Q. You see that this document at the bottom
3     right-hand corner, some Bates stamps on it.
4     You see at the very -- 00855?
5        If you turn for me to Sanofi 000913, which
6     is five or six pages from the end, patient
7     information.
8  A. Uh-huh.
9  Q. There's nothing in that section, the patient
10    information, related to hair loss until you
11    get to the second to last page, Sanofi 00916.
12    Do you see that?
13 A. Yes.
14 Q. It mentions hair loss. Do you see it?
15 A. Yes.
16 Q. It doesn't say permanent hair loss; is that
17    correct?
18 A. Correct.
19 Q. Put that one aside.
20    Were you aware at some point in time that
21    Sanofi changed the product information to
22    report cases of permanent alopecia?
23 A. I don't recall particularly any major change
24    in the labeling.
25 Q. But were you aware at some point in time that

Page 20

1     there was a label change that reported cases
2     of permanent alopecia in connection with
3     Taxotere?
4  A. I believe so. Maybe it would be associated
5     with the controversy about the hair loss. I
6     believe there may have been a label change.
7  Q. The label change that you're talking about is
8     one in which reports of permanent alopecia was
9     reported. Is that what we're talking about?
10    I want to make sure we're on the same page.
11 A. I believe so, but I like to --
12 Q. We can look at it. I have it here. It's not
13    a trick question. Take a look at it.
14       What I have for you is marked Exhibit 4.
15    It is the product labeling. You see that's
16    Taxotere, top left-hand corner?
17         (Exhibit 4, product labeling, was
18         marked for identification.)
19 A. Uh-huh.
20 Q. Revised December of 2015. Do you see that?
21 A. Uh-huh.
22 Q. If you look at about midway through, Sanofi
23    001138. See post-marketing experiences?
24 A. Uh-huh.
25 Q. Cutaneous. And it says, "Cases of permanent

Page 21

1     alopecia have been reported."
2  A. I see that.
3  Q. Is that what you recall as being part of the
4     label change in December of 2015?
5  A. I believe so.
6  Q. When were you first made aware, Doctor, of
7     this December 2015 label change in which these
8     cases of permanent alopecia was reported?
9  A. I can't remember exactly when.
10 Q. It would have been sometime after
11    December 2015. Right?
12 A. Correct.
13 Q. Is this when you first became aware that there
14    could be association between Taxotere and
15    permanent alopecia?
16    MR. MOORE:
17         Object to form.
18    THE WITNESS:
19         I believe there was, again, some lay
20    press concern about that. I believe that
21    preceded 2015. But exactly when, I don't
22    know.
23         Three years ago, seems like there's
24    been a lot on my subjective recollection.
25    Seems like there's been more than just a

6 (Pages 18 - 21)

Page 22

1     three-year lay press reporting.
2  BY MR. ROCKFORTE:
3  Q. Let's talk a little bit about the lay press
4     that you're discussing. Are you referring
5     primarily to lawyer advertising that's been on
6     T.V. related to permanent hair loss associated
7     with Taxotere?
8  A. There's a predominance of that. But if I
9     recall, there's also been newspaper articles
10    about cases that have been made about the
11    permanent hair loss.
12 Q. You just have no idea the time frame of when
13    that may have come out?
14 A. I can't recall. Certainly after 2010. But in
15    terms of before 2015, how long, I can't
16    remember.
17 Q. It could have been 2015?
18 A. Right.
19 Q. Then again, if you turn, I think it's the
20    second to last page, Bates stamp Sanofi
21    001167. I'll wait for you to get there.
22 A. Sure.
23 Q. Under the most common side effects of
24    Taxotere, it says, "Includes hair loss. In
25    most cases, normal hair growth should return.

Page 23

1     In some cases, frequency not known, permanent
2     hair loss has been observed."
3        Again, it references permanent hair loss
4     there; is that right?
5  A. Correct.
6  Q. In the previous 2013 version, there was no
7     reference to hair loss?
8  A. Correct.
9        MR. MOORE:
10           Object to the form of the question.
11 BY MR. ROCKFORTE:
12 Q. I want to talk a little bit about, shifting
13    gears a little bit, about your counseling of
14    patients when they first see you.
15       When you determine the type of chemo
16    regimen that you're going to give them, is a
17    meeting when you sit down and discuss the
18    regimen with them?
19 A. I do.
20 Q. What type of information do you provide to
21    them, Doctor?
22 A. Provide the rational for choosing a certain
23    therapy, the benefits, and certainly the risks
24    that can be encountered. Risks being side
25    effects when speaking about drugs.

Page 24

1  Q. During that discussion prior to -- have you
2     ever had any patients, when you gave them a
3     certain risk of a chemo drug, say, "Doctor, I
4     don't think I want to go through that risk. I
5     want to try an alternative"? Have you ever
6     had a patient tell you that?
7        MR. MOORE:
8           Object to the form.
9  BY MR. ROCKFORTE:
10 Q. Have you ever been in that situation?
11 A. Yeah.
12 Q. I guess it's a poor question. I should
13    restate it.
14       The better question is, you're recommending
15    a course of treatment that you think is the
16    best option for these patients. Right?
17 A. Yes.
18 Q. But ultimately, it's the patient's decision of
19    whether they want to go forward with that
20    regimen. You agree with that?
21 A. Correct.
22 Q. So when you sit down with those patients, it's
23    a coordinated approach, you as a professional
24    giving them advice, but it's ultimately their
25    decision; is that right?

Page 25

1  A. Correct.
2  Q. If they decided they wanted to go forward with
3     some other regimen, you would be okay with
4     moving forward with that regimen, as long as
5     it was one of those tools that you thought
6     would be useful in treating their cancer; is
7     that accurate?
8        MR. MOORE:
9           Object to form.
10       THE WITNESS:
11          It's kind of simplistic. Because
12    there are cases when there are no
13    alternative regimen. For the most part,
14    most patients, when they come in here, do
15    not have an idea what are so called
16    consolation-type of protocols.
17 BY MR. ROCKFORTE:
18 Q. Let's talk a little bit about your discussion
19    with patients. Prior to you having an
20    understanding that Taxotere could cause
21    permanent hair loss, what type of discussions
22    would you have with patients about hair loss?
23       MR. MOORE:
24          Object to the form of the question.
25 BY MR. ROCKFORTE:

7 (Pages 22 - 25)

Page 30

1  oncology evaluation on whether adjuvant
2  therapy was to be of any benefit.
3  Q. In terms was staging, how did you stage her
4     cancer? I think it's on the last page.
5  A. Stage 2-B.
6  Q. Have you ever had any patients who have
7     refused chemotherapy with stage 2-B?
8  A. Yes.
9  Q. What else had you determined in terms of
10    staging the cancer here in terms of tumor?
11 A. She had two of 11 lymph nodes that were
12    involved, with extranodal extension on the
13    positive lymph nodes. And she had HER-2/neu
14    over-expressed tumor, as well as estrogen
15    receptor positive tumor as well.
16 Q. Then under section two, there's a section
17    where you discussed the risk of cardiac
18    toxicity, hematologic toxicity, GI toxicity,
19    hair loss, and other matters.
20       In discussing hair loss, obviously this is
21    in October 2013, prior to the label change.
22    At that point in time, were you telling
23    patients, typically, that, "You should
24    experience hair loss, but it's going to come
25    back"? Would that have been your general

Page 31

1     practice in 2013?
2        MR. MOORE:
3           Object to the form of the question.
4        THE WITNESS:
5           I believe, and I'm fairly certain,
6     if I can recall correctly here, that at
7     the time of Ms. Phillips' case, that
8     there were some reports about the concern
9     about permanent hair loss. Certainly, we
10    touched on that then as a potential risk.
11 BY MR. ROCKFORTE:
12 Q. And when you're talking about hair loss being
13    a potential risk, you're talking about, you
14    didn't advise her about permanent hair loss at
15    that point in time, did you?
16       MR. MOORE:
17          Object to the form of the question.
18       THE WITNESS:
19          One more time.
20 BY MR. ROCKFORTE:
21 Q. At that point in time -- we've taken her
22    deposition previously. She's testified
23    numerous times in that deposition that when
24    you were advising her about hair loss at this
25    point in time, you told her that she would

Page 32

1     most likely lose hair, but it would return.
2        Is that in line with what you were advising
3     patients at this point in time?
4  A. At that point it was that it's likely to
5     return. And that there were some cases
6     that -- where there's some concern about
7     permanent hair loss.
8  Q. Do you have an independent recollection of
9     Ms. June Phillips or treatment of Ms.
10    Phillips? I know you treat lots of patients.
11 A. Uh-huh.
12 Q. You do?
13 A. Do I have any particular --
14 Q. An independent recollection of Ms. Phillips.
15 A. Absolutely, yeah.
16 Q. Do you have an independent recollection of
17    that particular discussion about advising her?
18 A. Right. As I said, I guess this goes back a
19    few years ago.
20       So in terms of what exactly was said and
21    information that was exactly shared, I'm not
22    sure. But she is somebody who is very
23    engaging. So I do kind of vaguely, more than
24    vaguely recall some of the specifics there.
25 Q. I guess it's fair to say you would have no

Page 33

1     reason to dispute her testimony that
2     discussion she had with you was that you had
3     advised her she would lose her hair but that
4     it would come back?
5  A. I think that's fair.
6  Q. You have no reason to dispute that?
7        MR. MOORE:
8           Object to the form of the question.
9        THE WITNESS:
10          Right.
11 BY MR. ROCKFORTE:
12 Q. I want to talk a bit more about the lay press
13    reports that you were referring to. I know we
14    can't pinpoint the timeline. I want to try to
15    pinpoint the source.
16       To the best of your recollection, what's
17    the source of that information?
18 A. In terms of when it first came out, I believe
19    there were newspaper articles about it. But
20    I'm not -- I can't pinpoint exactly where that
21    was.
22       Around the same time, there certainly were
23    advertisements about legal cases against --
24    I'm not even sure if it was Sanofi that was
25    mentioned, but the manufacturer of Taxotere.

9 (Pages 30 - 33)

Page 34

1  Q. Just so I'm clear. I know you don't know the
2      timeline. Best we can to try to pinpoint is,
3      the lay press articles that you saw that
4      reported cases of permanent alopecia
5      associated with Taxotere came out about the
6      same time as the legal advertisements related
7      to hair loss related to Taxotere; is that
8      accurate?
9          MR. MOORE:
10             Object to form.
11         THE WITNESS:
12             Yes.
13 BY MR. ROCKFORTE:
14 Q. So is it possible that these lay press
15     articles related to, that you referred to,
16     related to Taxotere, could have actually been
17     after the label change in December of 2015?
18         MR. MOORE:
19             Object to the form of the question.
20         THE WITNESS:
21             I don't believe so. I think they
22             preceded the label change.
23 BY MR. ROCKFORTE:
24 Q. Just not sure?
25 A. Right.

Page 35

1  Q. Now, before we move on from the first visit,
2      you made a decision to, you recommended a
3      course of treatment that included Taxotere; is
4      that right?
5  A. Correct.
6  Q. Do you recall why that might have been the
7      recommended course of treatment with respect
8      to Ms. Phillips?
9  A. Yes, I can.
10        So I believe just prior to her visit, there
11     was approval of a certain regimen called TCH
12     regimen, which is referenced in the initial
13     visit.
14        She had some features of her case that
15     suggested that other aggressive therapies, she
16     was not an ideal candidate for. Those
17     aggressive therapies used medication called
18     doxorubicin, which is a cardio toxic agent
19     that we wanted to avoid specifically in her
20     case.
21 Q. Did she have any alternative treatments other
22     than the course of treatment that --
23 A. Yes, there were. Yes, there is.
24 Q. If after discussing your recommended course of
25     treatment she wanted to try something else,

Page 36

1      you would have been okay with her trying this
2      other course of treatment?
3          MR. MOORE:
4              Object to form.
5  BY MR. ROCKFORTE:
6  Q. If it was one of the ones you had chosen?
7          MR. MOORE:
8              Object to the form.
9          THE WITNESS:
10             I don't understand.
11 BY MR. ROCKFORTE:
12 Q. I'm sorry, that's one of those examples where
13     I ask a poor question.
14        You mentioned that there were alternative
15     treatments available to her.
16 A. Uh-huh.
17 Q. I guess the better question is, in her
18     situation, what were the other alternative
19     treatments?
20 A. There's a regimen called AC followed by Taxol.
21     A regimen called TAC: Taxotere, Adriamycin,
22     and Cyclophosphamide.
23        Then kind of getting to -- so with her
24     situation of having lymph node positive
25     disease and there's a high risk of recurrence,

Page 37

1      you would tend to favor giving the three
2      active medications that we use for adjuvant
3      treatment.
4         Prior to this regimen of TCH, which had
5      just been approved, there was, generally, the
6      three were Cyclophosphamide, Taxotere, I
7      should say a taxane, which is Taxol or
8      Taxotere, and Adriamycin.
9         So just prior to the approval of TCH, there
10     was no regimen that did not contain an
11     anthracycline, which is a cardio toxic
12     medication. With the recent passage of the
13     TCH protocol, we avoided the anthracycline
14     use.
15 Q. When you say "recent," when did that occur?
16 A. I want to say maybe '12, '11 or '12. It could
17     have been as early as '11. But within the
18     previous year or two.
19 Q. At the time that you recommended Taxotere, if
20     Ms. Phillips had said, "Look, I don't want to
21     go forward with the Taxotere regimen because,"
22     if you had known the risk of permanent hair
23     loss, "I don't want to go forward with that
24     risk. I'm willing to go forward with AC plus
25     the Taxol," would you have allowed her to go

Page 38

1  forward with that treatment as your patient?
2      MR. MOORE:
3          Object to the form.
4      THE WITNESS:
5          We would have a serious discussion
6      about the risk of cardiac toxicity. And
7      I, I don't know if I included in my note
8      here, but I'm fairly certain -- again, I
9      kind of remember some cases at that
10     initial conversation. And part of the
11     discussion was the alternative of
12     anthracycline-based therapies, and the
13     serious concern we had about the cardiac
14     toxicity.
15 BY MR. ROCKFORTE:
16 Q. And ultimately, it's the patient's decision.
17    She could have chosen that other course had
18    she wanted to; is that accurate?
19 A. Correct.
20 Q. Take a look, Doctor. I know you have your
21    full records. I'll try to direct you to, I
22    think it's dated February 26, 2014.
23 A. Can I just look?
24 Q. Yes, I think that's easier. I think we're on
25    Exhibit 5.

Page 39

1      It looks like you were copied on this
2   record as part of your records. I think it is
3   a radiology therapy.
4          (Exhibit 5, radiology therapy
5           consult, was marked for
6           identification.)
7 A. Radiation oncology.
8 Q. Yeah. I'll give you a minute to look at it
9    before I ask you some questions.
10 A. Okay.
11 Q. Are you familiar with this document? Is it
12    part of your medical records?
13 A. Yes, it is.
14 Q. We will mark it as Exhibit 5.
15     If you look, I think it's about two-thirds
16    of the way down. We're looking at a document
17    dated February 26, 2014, related to June
18    Phillips. Do you see that?
19 A. I see.
20 Q. It says she went to receive five cycles of THC
21    with Dr. Sonnier. Do you see that?
22 A. Uh-huh.
23 Q. She had an unremarkable course with her
24    chemotherapy for the first two cycles. With
25    the third cycle, she reports the onset of

Page 40

1    shortness of breath and dyspnea with exertion.
2    Do you see that?
3 A. Correct.
4 Q. It goes on a few lines down and says,
5    "Considering her side effects, the last cycle
6    of chemotherapy was held. She has reportedly
7    had a cardiac workup, which was negative. She
8    presents today to discuss adjuvant radiation
9    therapy."
10    So does this refresh your recollection of
11    whether you had taken her off of the
12    chemotherapy for some reason?
13 A. Let me --
14 Q. Take your time.
15 A. I do have it. So April 25th.
16 Q. April 25th is what we're looking at?
17 A. Uh-huh.
18 Q. What does your record reflect, Doctor?
19 A. So continued to have worsen toxicity with
20    chemotherapy. Still able to tolerate it.
21    Stop chemotherapy. Forego cycle six because
22    of toxicity. Continue her Herceptin.
23 Q. As I'm understanding this record and what you
24    just read there, she was having some side
25    effects associated with the Taxotere-related

Page 41

1    included regimen, that you took her off of
2    that; is that right?
3 A. Correct.
4 Q. Can you explain what you saw there?
5 A. Just having more shortness of breath with kind
6    of simple activities.
7 Q. Is that a common side effect of Taxotere?
8      MR. MOORE:
9          Object to the form.
10 BY MR. ROCKFORTE:
11 Q. In your opinion.
12 A. I wouldn't say it's a common side effect.
13 Q. Have you seen that as a side effect?
14 A. Absolutely.
15 Q. Doctor, have you seen permanent hair loss as a
16    side effect of Taxotere in your practice?
17      MR. MOORE:
18          Object to the form of the question.
19      THE WITNESS:
20          Permanent hair loss, have I seen it?
21          No, I have not.
22 BY MR. ROCKFORTE:
23 Q. You were going to explain permanent hair loss.
24    Can you expand on that?
25 A. There's a spectrum there between -- there's a

11 (Pages 38 - 41)

Page 42

1  question of what is meant by permanent hair
2  loss. Because there's scalp hair, eyebrows,
3  facial hair, there's hair throughout the body.
4  So what is generally meant by permanent hair
5  loss is non specific.
6 Q. For us lay folks, and those folks like me who
7  couldn't cut it in med school, what would be
8  the best definition for someone whose hair did
9  not return as one would expect after
10  chemotherapy?
11     MR. MOORE:
12        Object to the form of the question.
13     THE WITNESS:
14        I would say that that's abnormal
15  hair growth.
16 BY MR. ROCKFORTE:
17 Q. Have you seen abnormal hair growth in
18  connection with patients that you have given a
19  regimen of Taxotere?
20 A. I have.
21 Q. You have?
22 A. Uh-huh.
23 Q. Have you seen the same type of abnormal hair
24  growth with those patients that you've given
25  regimens that included Taxol?

Page 43

1 A. I have.
2 Q. Do you have an understanding of the percentage
3  one versus the other? Would you say that
4  you've seen a higher rate of hair loss
5  associated, or irregular hair growth
6  associated with Taxotere?
7     MR. MOORE:
8        Object to the form.
9 BY MR. ROCKFORTE:
10 Q. In your practice.
11 A. Abnormal hair growth, do I see any difference?
12  I do not.
13 Q. Based on your medical records and your review
14  of the medical records, or your recollection
15  of Ms. Phillips, do you recall any
16  conversations with Ms. Phillips about her hair
17  loss after her chemotherapy regimen?
18 A. Yeah. I know that she had expressed some, I
19  guess, dissatisfaction with the way that her
20  hair growth was taking shape, I guess, after
21  chemotherapy, and just made a comment or two
22  about it.
23 Q. Is that information in your medical records?
24 A. I don't know.
25 Q. Let's see.

Page 44

1 A. I don't recall if it is or not. I don't
2  recall seeing it. If you run across it, I'm
3  more than happy --
4 Q. I don't know if I've seen any either. I just
5  wanted to see if I didn't miss something.
6 A. Right.
7 Q. In connection with this litigation, Doctor,
8  defendant, Sanofi, has produced some documents
9  through discovery that relate to information
10  related to you, information they may have
11  provided to you, or sales reps coming to see
12  you.
13     In connection with a document that they
14  produced to us, they referenced that you have
15  been involved in, perhaps in a clinical trial
16  related to Taxotere or related to Sanofi.
17 A. Okay.
18 Q. Do you recall, is that the one you were
19  referencing earlier?
20 A. I think earlier the question you asked, right.
21  I don't remember particular ones. But I would
22  not be surprised if they were. We do have
23  several clinical trials ongoing.
24 Q. They also produced a log of calls that, I
25  think these are calls that were made upon you

Page 45

1  by Sanofi sales reps in connection with
2  Taxotere. That corresponds with your
3  recollection of meeting with Sanofi folks and
4  discussing Taxotere; is that right?
5 A. Correct.
6 Q. Have you ever had a discussion, since the
7  label, changed with Sanofi representatives
8  about this association with permanent hair
9  loss that is referenced in that label?
10  It could have been after the lawyer
11  advertisements that you saw. Have you ever
12  had a discussion with Sanofi representatives
13  about that?
14     MR. MOORE:
15        Object to the form.
16     THE WITNESS:
17        I don't know.
18 BY MR. ROCKFORTE:
19 Q. You just don't recall?
20 A. I don't recall.
21     I will tell you that Taxotere has gone off
22  of patent. At some point off of patent,
23  Sanofi representatives were not promoting the
24  drug Taxotere. So I'm not quite sure when
25  that took place.

Page 46

```
 1  Q. Doctor, when you say -- I got to ask.  When
 2     you say "promoting," that's another way of
 3     saying showing up and trying to make sales; is
 4     that right?
 5         MR. MOORE:
 6            Object to form.
 7         THE WITNESS:
 8            I don't want -- no.
 9  BY MR. ROCKFORTE:
10  Q. I know you're going to give the best treatment
11     for your clients, for your patients.  In their
12     world, that's what they're doing; is that
13     right?
14         MR. MOORE:
15            Object to form.
16         THE WITNESS:
17            They're providing a drug.  They're
18     providing an agent that can benefit.
19     Whether or not it sales or -- information
20     exchange.
21         MR. ROCKFORTE:
22            Can we go off the record for just a
23     minute?
24            (Off the record.)
25  BY MR. ROCKFORTE:
```

Page 47

```
 1  Q. Doctor, I'm going to bounce around just a
 2     little bit, hopefully conclude here.
 3         I'm going to talk about your counseling
 4     with patients and your discussion of side
 5     effects with patients.
 6         Would you agree that the issue of hair loss
 7     as it relates to chemotherapy treatment is
 8     something that has been important to some of
 9     the patients that you've seen?
10  A. Absolutely.
11  Q. And why is that, Doctor?
12  A. I believe hair growth, normal hair pattern I
13     think is an important quality, humanistic
14     quality.  Certainly, people are concerned
15     about their general appearance after they are
16     finished with chemotherapy.
17  Q. I guess you would agree with me, to women,
18     hair is a big part of their identity.  Would
19     you agree with that?
20  A. I believe so.
21  Q. Has that been your experience in treating
22     these ladies with breast cancer, their hair
23     has been part of their identity?
24         MR. MOORE:
25            Object to form.
```

Page 48

```
 1         THE WITNESS:
 2            Yes.
 3  BY MR. ROCKFORTE:
 4  Q. I read the deposition testimony of
 5     Ms. Phillips.  And she mentioned that you had
 6     indicated to her that this issue of permanent
 7     hair loss may not have been disclosed to
 8     doctors in the United States until this
 9     December of 2015 label change.
10         Does that refresh your recollection of when
11     that became an issue among oncologists such as
12     yourself?
13         MR. MOORE:
14            Object to form.
15         THE WITNESS:
16            I simply can't remember
17     specifically.  But as I mentioned, I
18     believe we had this discussion about
19     reports of permanent hair loss when we
20     talked earlier in 2013.
21  BY MR. ROCKFORTE:
22  Q. So it's your recollection that you had a
23     discussion with her about permanent hair loss
24     during --
25  A. About concerns about permanent hair loss.
```

Page 49

```
 1     Whether or not -- maybe those were early on.
 2     And so I can't recall if they were --
 3     initially, when these reports came out, that
 4     there was a big question of, how valid is
 5     this?  What's the science behind it?  What's
 6     the data behind it?  There wasn't a lot to
 7     pinpoint.
 8  Q. Do you know for sure whether or not you had a
 9     discussion with her about permanent hair loss
10     when you were first advising her about the use
11     of Taxotere?
12  A. I'll say that I can't say for sure.
13  Q. I guess it's fair to say that you could not
14     have had this discussion about permanent hair
15     loss until you actually knew about those
16     reports; is that accurate?
17         MR. MOORE:
18            Object to form.
19         THE WITNESS:
20            Correct.  I'll just answer that by
21     saying that in terms of the timeline
22     about some of the reports about hair loss
23     and when they actually changed the
24     product insert, I can't remember that
25     timeline.
```

13 (Pages 46 - 49)

Page 54

1  Correct.
2  BY MR. MOORE:
3  Q. In fact, I think you said, in your experience,
4     cases of incomplete hair growth following
5     chemotherapy agent with Taxotere and Taxol
6     were comparable. Did I hear that right?
7  A. Correct.
8  Q. Let me go through my notes of Mr. Rockforte's
9     questions. Then I'll turn over and ask you
10    some questions about some of the records.
11       You indicated during your examination that
12    you underwent post medical school training in
13    Atlanta?
14 A. Correct.
15 Q. What was the facility?
16 A. Emory University.
17 Q. You said internal medicine?
18 A. Internal medicine initially, first three
19    years. Then residency and fellowship in
20    hematology oncology.
21 Q. That was all at Emory, yes?
22 A. Correct.
23 Q. And you're board certified?
24 A. Correct.
25 Q. You had mentioned that in your current

Page 55

1     practice -- I want to make sure that the
2     testimony in this was clear, because I think
3     you may have interchanged the word Taxotere
4     and Taxol once.
5        You were asked about whether or not you
6     favor Taxol or Taxotere in your current
7     practice.
8  A. Okay.
9  Q. I understood you to say that due to certain
10    neuropathic side effects associated with
11    Taxol, that you prefer to use Taxotere; is
12    that right?
13 A. As a generality, yes.
14 Q. You were asked a lot of questions about when
15    you became aware of the possibility of
16    permanent alopecia associated with the use of
17    Taxotere.
18 A. Right. Correct.
19 Q. And when you were first asked that question,
20    you said you thought it was about five to
21    seven years ago?
22 A. Generally.
23       MR. ROCKFORTE:
24          Object to form.
25 BY MR. MOORE:

Page 56

1  Q. That would have been before you treated
2     Ms. Phillips?
3  A. Again, she's kind of at -- when she was
4     diagnosed, it was kind of at that cusp about
5     five to seven years ago. So it's hard to know
6     exactly when all this information was
7     transmitted and appreciated, and whether or
8     not it was transferred to her.
9  Q. Right. I think you said you had some
10    recollection of the specifics of having that
11    kind of discussion with her.
12       MR. ROCKFORTE:
13          Object to form.
14 BY MR. MOORE:
15 Q. Is that right?
16 A. I have some recollection of it.
17 Q. To the best of your recollection, you recall
18    having a discussion with her about hair loss
19    associated with Taxotere use?
20 A. Correct.
21 Q. And that's codified in your note. Correct?
22 A. Correct.
23 Q. You indicated that -- you used the phrase
24    "abnormal hair regrowth." Do you recall that?
25 A. Yes, I do.

Page 57

1  Q. You had indicated that you had seen patients
2     in your practice who -- I thought I heard you
3     indicate that you had patients in your
4     practice who had experienced abnormal hair
5     regrowth following chemotherapy, yes?
6  A. Correct.
7  Q. And you've seen that with Taxol?
8  A. I've seen it with Taxol.
9  Q. And you've seen it with Taxotere?
10 A. Yes, I have.
11 Q. And you've seen it with other chemotherapy
12    agents?
13 A. I have.
14 Q. Sometimes the hair doesn't come back the same
15    way?
16 A. Correct.
17 Q. Sometimes it's not as full?
18 A. Correct.
19 Q. Sometimes it has different texture?
20 A. Correct.
21 Q. Sometimes it comes back a different color?
22 A. Yes.
23 Q. And sometimes it comes back with less hair?
24 A. Correct.
25 Q. That's something that you've known since your

15 (Pages 54 - 57)

| Page 58 | Page 60 |
|---|---|
| 1  residency? | 1  A. No, I have not. |
| 2  A. Yes. | 2  Q. Have you talked to Ms. Phillips about the |
| 3  Q. You're also aware that there have been reports | 3     deposition? |
| 4     in the medical literature attributing | 4  A. Not about the deposition. |
| 5     permanent chemotherapy-induced alopecia with | 5  Q. Is there something else related to the |
| 6     other chemotherapy regimens, yes? | 6     litigation you have talked about? |
| 7        MR. ROCKFORTE: | 7  A. Just in passing on a clinic visit, she had |
| 8           Object to form. | 8     said that she wanted to -- that she was going |
| 9        THE WITNESS: | 9     to get into the litigation about hair loss |
| 10          Yes. But I wouldn't say near as | 10    quite a while ago. |
| 11       much as what is present about Taxotere. | 11 Q. That was something that she told you just |
| 12 BY MR. MOORE: | 12    during a visit? |
| 13 Q. There's certainly been more lay press about | 13 A. Correct. |
| 14    it. Right? | 14 Q. Do you recall when that was? |
| 15 A. Correct. | 15 A. No. |
| 16 Q. And there's been lawyer advertising about it. | 16 Q. It's probably not -- |
| 17    Right? | 17 A. Two years ago maybe, a year and a half ago |
| 18 A. Correct. | 18    maybe. |
| 19 Q. You were asked about -- and I'll ask you some | 19 Q. Are you a member of any professional |
| 20    more specifics about this later. But since it | 20    organizations? |
| 21    was one of the things that Mr. Rockforte asked | 21 A. Yes, I am. |
| 22    you about. | 22 Q. Which ones? |
| 23       You were shown some information in the | 23 A. American Society of Clinical Oncology, |
| 24    Taxotere prescribing information that was | 24    American Society of Hematology, AMA. I think |
| 25    dated December 2015? | 25    that's about it right now. |

| Page 59 | Page 61 |
|---|---|
| 1  A. Correct. | 1  Q. Do you hold a faculty position anywhere? |
| 2  Q. And the language that he cited to you referred | 2  A. No, I do not. |
| 3     to there being cases of permanent alopecia | 3  Q. Other than the clinical trial that you think |
| 4     being reported? | 4     you might have participated in back, I guess |
| 5  A. Correct. | 5     it was early -- |
| 6  Q. But Taxotere is still a medicine that you use | 6  A. Early 2000s. |
| 7     today. Correct? | 7  Q. Have you ever done any other kind of |
| 8  A. Yes. | 8     consulting for the pharmaceutical industry? |
| 9  Q. Has that -- in light of all the side effects | 9  A. No, I have not. |
| 10    that are associated with chemotherapy, has the | 10 Q. I want to talk, if we could, a little bit |
| 11    addition of that sentence, cases of permanent | 11    about that first visit that you had with |
| 12    alopecia have been reported, has that | 12    Ms. Phillips. |
| 13    materially altered your risk benefit | 13       You were asked about that during your |
| 14    assessment of Taxotere? | 14    direct examination. Do you recall that? |
| 15 A. No. | 15 A. Yes, I do. |
| 16 Q. Tell me real quickly, if you could, Doctor, | 16 Q. I think you indicated -- do you have the note |
| 17    other than reviewing your chart, did you do | 17    in front of you? That way, we don't have to |
| 18    anything to prepare for today's deposition? | 18    attach another exhibit. |
| 19 A. No. | 19 A. Sure. |
| 20 Q. Did you meet with anybody? | 20 Q. I think you told us during your direct |
| 21 A. No. | 21    examination that she was a grade -- what was |
| 22 Q. Have you ever meet these lawyers before? | 22    the grade? |
| 23 A. Have not. | 23 A. Stage? |
| 24 Q. Have you ever meet any lawyers representing | 24 Q. Stage, right. |
| 25    Ms. Phillips? | 25 A. Stage 2-B. |

16 (Pages 58 - 61)

Page 62

1  Q. Stage 2-B. And this was a node-positive
2     disease?
3  A. Correct.
4  Q. And this was a hormone receptive disease?
5  A. Correct.
6  Q. Do those factors, both the size of the tumor,
7     the fact that there was metastatic carcinoma
8     found in a lymph node, and that it was hormone
9     receptive positive, does that place her at a
10    high risk of recurrence?
11 A. Yes. And the fact that HER-2/neu was
12    over-expressed was another factor. And there
13    was extranodal extension. Those are all
14    factors that are associated with a high risk
15    of recurrence.
16 Q. If metastatic breast cancer recurs, would you
17    agree that the chances of survival
18    dramatically decrease?
19 A. Correct. It's incurable at that point.
20 Q. And so is that why, according to your note
21    under assessment and plan, you talked to her
22    about the importance of adjuvant therapy?
23 A. Correct.
24 Q. Describe briefly, if you could, what is a
25    adjuvant chemotherapy?

Page 63

1  A. Adjuvant is adjunctive therapy to improve
2     somebody's risk of disease-free survival or
3     living without recurrence, in addition to
4     surgery, which is the main treatment used to
5     eliminate the cancer.
6  Q. If you had to place a percentage on her risk
7     of recurrence when she presented to you back
8     in October of 2013, what would you estimate
9     that was?
10       MR. ROCKFORTE:
11          Object to the form.
12       THE WITNESS:
13          Forty to 50 percent risk of
14    recurrence within that five to ten-year
15    period.
16 BY MR. MOORE:
17 Q. Would you agree that the use of adjuvant
18    chemotherapy has improved survival rates for
19    people who were in Ms. Phillips' situation?
20 A. Yes, it has.
21 Q. That was why you recommended that she undergo
22    adjuvant therapy. Right?
23 A. Yes, it was.
24 Q. And you indicated before, that you had
25    recommended that she pursue adjuvant TCH?

Page 64

1  A. Correct.
2  Q. And TCH is Taxotere, Carboplatin, and
3     Herceptin, yes?
4  A. Yes.
5  Q. And then Mr. Rockforte asked you some
6     questions during your direct examination about
7     what other alternatives there were.
8  A. Correct.
9  Q. And whether you would have been okay with her
10    undertaking some of those alternatives. Do
11    you remember that?
12 A. Correct.
13 Q. So he also talked to you about the NCCN
14    guidelines. Do you remember that?
15 A. Correct.
16 Q. I think you indicated during your direct
17    examination that the TCH alternative was
18    something that was recently approved. Do you
19    remember that?
20 A. Correct.
21 Q. So the TCH regimen is a regimen that does not
22    contain Adriamycin. Right?
23 A. Correct.
24 Q. And Adriamycin is a medicine that is part of
25    basically all the other alternatives for

Page 65

1     someone in her situation back in 2013?
2  A. Yes.
3  Q. And Adriamycin is a medicine that carries with
4     it significant cardio toxicity?
5  A. Correct.
6  Q. And those cardio toxicities are increased in a
7     person who is over the age of 65. Correct?
8  A. Correct.
9  Q. And she was 75?
10 A. Correct.
11 Q. They're also increased in individuals who have
12    preexisting cardiac disease. Right?
13 A. Correct.
14 Q. Did she have any sort of preexisting cardiac
15    disease that would counsel against the use of
16    Adriamycin?
17       MR. ROCKFORTE:
18          Object to the form.
19       THE WITNESS:
20          Not that was identified.
21 BY MR. MOORE:
22 Q. Did she talk to you about having something
23    called paroxysmal atrial tachycardia?
24 A. I'm sorry, yeah. Yes, she did. I do see it
25    in the note.

17 (Pages 62 - 65)

Page 66
1  Q. Were you aware at that time that she had also
2     had a previous diagnosis in 2006 of
3     dyslipidemia and diffuse arterial sclerotic
4     plaquing?
5        MR. MOORE:
6           Object to the form.
7        THE WITNESS:
8           I was not aware at that time, as
9           indicated in my note.
10 BY MR. MOORE:
11 Q. But certainly, those two things would counsel
12    against giving someone Adriamycin, given the
13    cardiac toxicity risks?
14       MR. MOORE:
15          Object to the form.
16       THE WITNESS:
17          I think the issue, the atrial
18          tachycardia, would have been more of a
19          caution, compared to dyslipidemia as well
20          as the arterial plaquing.
21 BY MR. MOORE:
22 Q. Is that part of the reason why you had
23    recommended TCH therapy in Ms. Phillips' case?
24 A. Correct.
25 Q. And it indicates in your note, I believe, that

Page 67
1     you discussed with her a variety of risks,
2     including cardiac toxicity, hematologic
3     toxicity, GI toxicity, hair loss, neurologic
4     toxicity, and long term hematologic toxicity.
5     Are those the things you listed there?
6  A. Yes, it is.
7  Q. She mentioned in her deposition that she also
8     had to go to chemo school. Do you remember
9     that?
10 A. Correct.
11 Q. What is chemo school?
12 A. Chemotherapy school is a separate visit in
13    which, generally, the nursing staff goes over
14    many of the risks, risks of chemotherapy, with
15    a little more of a spin, so to speak, on just
16    kind of how it is to live life on
17    chemotherapy, things to notify us about,
18    things to, situations that may develop on
19    chemotherapy that may not be as important to
20    inform us about.
21        So it's just an extra education session
22    about chemotherapy and the risks.
23 Q. That's something that happens where?
24 A. In the office. I can't recall back in '13
25    whether or not we were giving them upstairs in

Page 68
1     one of the teaching rooms or if it was down in
2     a little more informal session with the nurses
3     here.
4  Q. When you make a recommendation to a patient
5     about a certain chemotherapy regimen, are you
6     balancing all of the known risks and side
7     effects associated with that regimen?
8  A. Yes.
9  Q. And you're balancing that against the hope
10    benefit of the medicine. Right?
11 A. Correct.
12 Q. And the hope benefit is it will save their
13    life?
14 A. Correct.
15 Q. Amongst the risks of the chemotherapy regimen
16    that you were recommending to her at the time,
17    TCH, was the risk that you might have
18    incomplete hair regrowth?
19 A. Correct.
20       MR. ROCKFORTE:
21          Object to the form.
22 BY MR. MOORE:
23 Q. What percentage of your patient population are
24    breast cancer patients would you estimate?
25 A. I would say 15 percent.

Page 69
1  Q. What is the -- what comprises the other
2     85 percent?
3  A. Lung cancer, colon cancer, other GI
4     malignancies. A variety of different cancers,
5     of course.
6        There's a fair amount of hematology that we
7     have in our practice as well.
8  Q. What is hematology? What does that mean?
9  A. Blood disorders, anything from low blood
10    counts or abnormal blood counts to
11    malignancies of the blood.
12 Q. If Ms. Phillips had said to you -- strike
13    that.
14       If someone with Ms. Phillips' medical
15    history came in to you today with the same
16    tumor type, same medical history, would you
17    make the same recommendation for her
18    treatment?
19       MR. ROCKFORTE:
20          Object to the form.
21       THE WITNESS:
22          Yes.
23 BY MR. MOORE:
24 Q. And if that patient said, "Well, Doctor, I saw
25    a T.V. commercial from lawyers saying there is

Page 70

1  permanent alopecia with Taxotere, I would
2  rather take the other medicine, the
3  Adriamycin," would you try and talk her out of
4  that?
5  A. It would be a discussion. So whether or not I
6  would try to talk her out of it, or I could
7  discuss the alternatives if she did bring up
8  issues about her concern about hair loss.
9  Q. It would be your decision to recommend TCH
10  because, in your judgment, that has the best
11  risk benefit profile for a patient in that
12  situation?
13  A. Correct.
14  Q. That was true then and that's true now.
15  Correct?
16  A. Correct.
17  Q. You were asked about the reference to alopecia
18  in the 2013 labeling for Taxotere. Do you
19  recall that?
20  A. Yes.
21  Q. It was pointed out to you that the phrase
22  didn't say permanent alopecia. Do you recall
23  that?
24  A. Correct.
25  Q. Does it say temporary alopecia?

Page 71

1  A. No.
2  Q. It doesn't place any indication as to the
3  duration of alopecia. Right?
4  A. Correct.
5  Q. Permanent chemotherapy-induced alopecia is a
6  rare but, none the less, possible side effect
7  associated with many chemotherapy regimens?
8  A. Correct.
9  Q. That's something you knew back in 2013?
10  A. Correct.
11      MR. ROCKFORTE:
12          Object to the form.
13  BY MR. MOORE:
14  Q. After you saw Ms. Phillips that initial time
15  and made the recommendation for her to undergo
16  the treatment course, which involved the TCH,
17  and then it looks like she was going to
18  undergo radiation treatment as well. Right?
19  A. Correct.
20  Q. And then she was going to undergo a certain
21  period of time of hormone supression. Right?
22  A. Correct.
23  Q. How long was she to undergo hormone
24  supression?
25  A. At the time I think we were discussing five

Page 72

1  years of therapy.
2  Q. That's something that begins after she
3  completes the chemotherapy and the radiation?
4  A. Correct.
5  Q. What is the purpose of placing her on the
6  hormone supression?
7  A. It's yet another adjuvant form of therapy to
8  reduce the risk of recurrence.
9  Q. In the simplest terms, her tumor was shown to
10  feed off of hormones. Right?
11  A. Correct.
12  Q. And so the idea behind suppressing the
13  hormones would be to possibly prevent further
14  or later occurrences?
15  A. Correct.
16  Q. Once she goes into the chemotherapy regimen,
17  do you monitor her care on a periodic basis?
18  A. Yes, I do.
19  Q. What's the first time that she came in to see
20  you after that initial visit?
21  A. Initial visit or after chemotherapy?
22  Q. Yes. So the note that I'm looking at is dated
23  December 2, 2013. Do you have it there? I
24  can give you a copy.
25  A. It might be faster.

Page 73

1  Q. For the record, what I'm handing you is page
2  51 of the Crescent City Hematology Oncology
3  production.
4  A. Okay.
5  Q. Do you see the date there, December 2, 2013?
6  A. Correct.
7  Q. Then it says, name of regimen, TCH. Right?
8  A. Right.
9  Q. Cycle number, last given number one?
10  A. Correct.
11  Q. Then it has the date of that cycle,
12  November 22?
13  A. Uh-huh.
14  Q. So this would be a visit with her after her
15  first cycle of chemotherapy. Right?
16  A. Correct.
17  Q. Then there's a box here at the top of this
18  clinic note that has sort of a fill in type of
19  information there. Do you see that?
20  A. Correct.
21  Q. Is that something that your office has come up
22  with to really just capture the most important
23  stuff at the beginning?
24  A. My way of doing it.
25  Q. That's your way of doing it. Okay.

Page 78

1  fibrillation, abnormal cardiac rhythm. And
2  she informed me that she was being seen at
3  Tulane University Cardiology for atrial
4  fibrillation.
5  Q. Did you notice anything in terms of your
6     oncology treatment of her that was concerning?
7  A. No. From the oncology prospective, she was
8     doing well. She was still on Anastrozole.
9       In follow up, there's been, I don't want to
10    say -- there was initial concern about
11    post-radiation changes to her breasts. She
12    had silicone implants, not to go into detail
13    because I don't think it's related. There
14    was -- she just had some post-radiation
15    changes to some of her implants that she has.
16 Q. As of today, as the last time you saw her,
17    she's had no recurrence of her cancer?
18 A. Correct.
19 Q. That was the goal of treating her with the
20    TCH?
21 A. Correct.
22 Q. I want to show you an email from Ms. Phillips
23    that is dated, we'll mark this as -- April --
24    I'm sorry. We'll mark this the next numbered
25    exhibit, which is nine.

Page 79

1       I want to ask you about this and see if it
2     refreshes your recollection at all. In this
3     email, which is dated April 25, 2016, it says,
4     "Common name is costar. Drug name is
5     losartan."
6          (Exhibit 9, email, was marked for
7          identification.)
8  A. Losartan.
9  Q. What kind of medicine is that?
10 A. Those are blood pressure medications.
11 Q. It says, "Six months ago, he upped the
12    milligrams, and my hair started getting really
13    thin." Do you see that?
14 A. Correct.
15 Q. Did she ever talk to you about the fact that
16    her blood pressure medicine had been
17    increased, and after that, her hair started
18    getting thin?
19 A. I kind of -- I didn't include it in my note.
20    But I kind of vaguely recall her mentioning
21    something about that just a couple of months
22    ago.
23 Q. This would have been, this is April 2016; is
24    that right?
25 A. I'm sorry. Scratch my answer. No, I don't

Page 80

1  recall her saying, mentioning this. Maybe
2  vaguely in the past, '16.
3  Q. I didn't see anything in your notes about it.
4     I'm just wondering if it rings a bell.
5  A. Right.
6  Q. But in April of 2016, that would have been
7     over two years after she stopped chemotherapy
8     with TCH?
9  A. Correct.
10 Q. Can blood pressure medicine, to your
11    knowledge, cause hair thinning?
12       MR. ROCKFORTE:
13          Object to the form.
14       THE WITNESS:
15          Not commonly. But medications, in
16    general, can change the pattern of
17    someone's hair. It's not unusual where I
18    had complaints about changes in hair
19    growth and question of whether or not
20    medications of a variety of different
21    types have caused it, related to it.
22 BY MR. MOORE:
23 Q. You can put that in the stack.
24       Let me hand you what I marked Exhibit 11,
25    which is Exhibit 26 from Ms. Phillips'

Page 81

1  deposition. This is another email.
2     I'm sorry, got to change the number. What
3  this is, this is an email two months later
4  than Exhibit No. 9. It's dated June 22, 2016.
5     This is an email from June Phillips to
6  someone named Marcy. It looks like she's
7  asking for a hair piece. Do you see that?
8  For her thinning hair.
9          (Exhibit 10, email, was marked for
10         identification.)
11 A. Uh-huh.
12 Q. It says, she -- oh, Heidi. I think she's
13    referring to someone named Heidi. "As Heidi
14    probably told you, I had breast cancer in
15    2013. After chemo and radiation, I was put on
16    medication for five years. The meds block
17    estrogen. And because of that, cause hair
18    loss and thinning." Do you see that?
19 A. Uh-huh.
20 Q. Do you have any recollection of having any
21    conversation with Ms. Phillips about what's
22    written here?
23       MR. ROCKFORTE:
24          Object to the form.
25       THE WITNESS:

21 (Pages 78 - 81)

Page 98
1    patients. That's how I would leave it.
2  BY MR. ROCKFORTE:
3  Q. But ultimately, the client makes the ultimate
4    decision about which regimen to go forward
5    with?
6  A. I wouldn't say that. Because had she come in
7    and said, "I want Adriamycin as my regimen," I
8    would say, "I think that's a very risky
9    proposal," and that I would not give it.
10    If she would have wanted to pursue an
11    Anthracycline course, her -- I think at that
12    time, knowing what I know now, would have been
13    going with a non Anthracycline therapy, which
14    would have lessened the efficacy and not as --
15    would not have reduced her risks of recurrence
16    to the same degree as TCH.
17  Q. In 2013, when you recommended this course of
18    chemotherapy, there was another alternative
19    that was available to her. Correct?
20      MR. MOORE:
21        Object to the form of the question.
22  BY MR. ROCKFORTE:
23  Q. Correct?
24  A. Yes.
25  Q. And that was the AC plus Taxol?

Page 99
1  A. That would have been a consideration, correct.
2  Q. That would have been another alternative?
3      MR. MOORE:
4        Object to the form.
5  BY MR. ROCKFORTE:
6  Q. Correct? Yes?
7  A. That I would have felt was very risky because
8    of the cardiac toxicity.
9  Q. Right. But it would have been an alternative
10    that could have been discussed and considered?
11  A. Correct.
12  Q. And had she chosen to go with that
13    alternative, that would have been okay with
14    you, as long as you discussed all the side
15    effects, the risks, and everything associated?
16  A. I don't think it would have been okay with me.
17    I would have felt very concerned, and would
18    have felt that I was placing her cardiac
19    status at great risk.
20  Q. But ultimately, it would have been her
21    decision; is that right?
22  A. It's her decision, I would say that it's not
23    right. Because someone cannot -- someone can
24    come in with a sense that they can get
25    something and have a firm decision that's the

Page 100
1    case. Whether or not a person would get that
2    is based on our recommendation and our
3    ordering. I would say that that's not, that
4    that's not the case.
5  Q. I think what you mentioned -- I understand
6    that.
7      What you mentioned earlier is that, that
8    was an alternative, but it does have another
9    risk of cardiac toxicity. Right?
10  A. Yes.
11  Q. And that would have been something that would
12    have been considered at the time?
13  A. Correct.
14  Q. But it's still an alternative that was
15    available to her?
16  A. Correct.
17  Q. You mentioned earlier that you had patients
18    that you recommended chemotherapy, and they've
19    chosen not to even go forward with the
20    chemotherapy at all; is that right?
21  A. Correct.
22  Q. I'm discussing this in that similar vein.
23    Have you also had patients that had a
24    recommendation for certain chemotherapy, and
25    after discussing certain risks, you've

Page 101
1    decided, based off your recommendation and
2    experience and their concerns, that, hey,
3    let's go another path, let's take another
4    alternative? Have you had patients that
5    you've done that with?
6      MR. MOORE:
7        Object to the form.
8      THE WITNESS:
9        Yes. As I mentioned, a lot of these
10    treatments are -- a lot of treatment
11    recommendations are based on a
12    conversation about risks and benefits.
13      If certain risks are not acceptable,
14    then alternatives are discussed. If it's
15    felt that a regimen is even more riskier,
16    then usually there's a good discussion
17    about that, and why that reason is not --
18    I mean, why that treatment is not
19    reasonable and not recommended.
20  BY MR. ROCKFORTE:
21  Q. I think you said a mouth full there,
22    discussion about the risk and benefits.
23    If a drug company does not make all the
24    risks known to the doctor and the patient,
25    it's difficult to have a full disclosure and

26 (Pages 98 - 101)

Page 102
1  discussion about the full picture. Would you
2  agree with that?
3  A. Yes.
4  Q. I don't have any further questions.
5  EXAMINATION BY MR. MOORE:
6  Q. Real quick, a couple follow-up questions,
7     Doctor.
8        You were asked several times about the
9     alternative for Ms. Phillips.
10 A. Correct.
11 Q. And you told me before that the alternatives
12    back in 2013 would have involved Adriamycin.
13    Right?
14 A. One possible course would have been using
15    Adriamycin with, of course, the risk that I
16    felt were not acceptable.
17 Q. I think I heard you say -- basically, a
18    patient can't prescribe chemotherapy
19    themselves. Right?
20 A. Correct.
21 Q. And if someone comes in and wants to take on
22    an unnecessary and high risk of something like
23    cardio toxicity, that's something that you
24    might not approve of?
25        MR. ROCKFORTE:

Page 103
1        Object.
2        THE WITNESS:
3        Correct.
4  BY MR. MOORE:
5  Q. Have you ever had a patient, after providing
6     information about whatever was in the 2015
7     label change for Taxotere, decide they want to
8     use a different regimen after you recommended
9     TCH for them?
10       MR. ROCKFORTE:
11          Object to the form.
12       THE WITNESS:
13          No, I have not.
14 BY MR. MOORE:
15 Q. And then you were asked about what information
16    was out there concerning permanent alopecia or
17    incomplete hair regrowth.
18       I want to mark as Exhibit number 11, for
19    identification, this is the prescribing
20    information for doxorubicin hydrochloride,
21    which is dated 2011. So that would have been
22    before you would have treated Ms. Phillips.
23    Correct?
24       (Exhibit 11, prescribing
25          information on doxorubicin

Page 104
1          hydrochloride, was marked for
2          identification.)
3  A. Correct.
4  Q. For the record, doxorubicin is what?
5  A. It's a type of chemotherapy. It's in the
6     class of medicines called anthracyclines.
7  Q. What is its name?
8  A. Doxorubicin or Adriamycin.
9  Q. We've been calling it Adriamycin. When we
10    talked about Adriamycin, they were talking
11    about doxorubicin?
12 A. Correct.
13 Q. And this is the Adriamycin prescribing
14    information, yes?
15 A. Yes.
16 Q. For the generic medicine?
17 A. Correct.
18 Q. If you flip towards the end, fifth to last
19    page under the patient information section,
20    you will see there's a picture of Pfizer
21    injectables. Before that, right there.
22       If you go to the third page of that, there
23    is a title that says, "The most common side
24    effects." Do you see that?
25 A. Yes.

Page 105
1  Q. It says, "The most common side effects of
2     doxorubicin include hair loss, alopecia."
3  A. Uh-huh.
4  Q. Period. Do you see that?
5  A. Yes, I do.
6  Q. It says, "Your hair may regrow after
7     treatment." Do you see that?
8  A. Yes, I do.
9  Q. That was something that you knew was
10    associated with Adriamycin back then, that
11    your hair may grow?
12 A. Correct.
13 Q. It may not?
14 A. Correct.
15 Q. Let me show you something that I will mark as
16    Exhibit number 12. This is something, it says
17    on the first page, do you see there, it says,
18    "Breast cancer dictionary." Do you see that?
19       (Exhibit 12, breast cancer
20          dictionary, was marked for
21          identification.)
22 A. Yes.
23 Q. And then in the upper left-hand corner, it
24    says, "American Cancer Society." Do you see
25    that?