UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                           MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION: "H" (5)

THIS DOCUMENT RELATES TO:

Elizabeth Kahn, Case No. 2:16-cv-17039.

### DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON WARNINGS CAUSATION

Defendants Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. (collectively "Defendants" or "Sanofi"), hereby submit this Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, pursuant to Local Rule 56.1:

**A.      Taxotere**

1.      Taxotere is a chemotherapy prescribed to treat various forms of cancer, including breast cancer.  Second Am. Master Compl. ¶ 4.[1]

2.      Taxotere was first approved for use in the United States in 1996, and its FDA-approved labeling has always warned that hair loss is one of the drug's most common side effects.  *Compare* 1996 Taxotere Labeling (Ex. A), *with* 2018 Taxotere Labeling (Ex. B).

3.      Taxotere has never been removed from the market, and oncologists continue to prescribe Taxotere to treat potentially life-threatening forms of breast cancer.  *See, e.g.*, Dep. of Dr. Zoe Larned ("Larned Dep.") at 37:19-25 (Ex. C).

---

[1] Docetaxel is the generic version of Taxotere.  For ease of reference, Defendants use "Taxotere" and "docetaxel" interchangeably.

**B.      Plaintiff's Diagnosis and Chemotherapy Treatment Plan**

4.      Plaintiff Elizabeth Kahn is a 62-year-old resident of New Orleans, Louisiana.  Kahn Third Am. PFS at 2 (Ex. D).

5.      On April 11, 2008, Plaintiff was diagnosed with early-stage breast cancer, ER-positive, PR-positive, and HER-2-positive.  *Id.* at 10-12; *see also* Kahn Dep. (Dec. 7, 2017) 170:5-24 (Ex. E).

6.      Before she started treatment of any kind, Plaintiff made the decision that she was going to do everything she could to survive.  *Id.* 156:9-20.

7.      Plaintiff wanted to conserve as much of her breast as possible.  *Id.* 158:13-161:16. Plaintiff initially met with her surgeon, Dr. Corsetti, to discuss treatment options before ultimately meeting with her oncologist, Dr. Carl Kardinal, on April 22, 2008.  *See id.*; *see also id.* 164:1-13.

8.      Dr. Kardinal informed Plaintiff that she was an ideal candidate for a clinical trial on neoadjuvant chemotherapy with or without Avastin®.  *Id.* 169:8-172:10.

9.      Dr. Kardinal specifically recommended Plaintiff participate in the clinical trial because it offered state-of-the art treatment in addition to the standard of care regimen for Plaintiff's type of breast cancer.  *Id.* 88:25-89:12, 93:15-25.

10.     The clinical trial, NSABP B-40, included several different chemotherapy regimens, and the determination of which regimen a participant received was randomly selected by a computer program.  Shevonda Thomas Dep. (Jan. 10, 2018) 110:23-112:21 (Ex. F).  Neither the participant nor the doctor could choose the regimen that the patient would receive.  *Id.*

11.     As part of the clinical trial, patients received three of the standard chemotherapy drugs, "docetaxel followed by the combination of doxorubicin and cyclophosphamide."  Kardinal Dep. (Jan. 17, 2018) 96:14-19, 98:3-8 (Ex. G).  Patients also received investigational drugs that had not been approved by the FDA for use in treating breast cancer, including capecitabine

2

(Xeloda®), gemcitabine (Gemzar®), and bevacizumab (Avastin®). *See* Kahn Dep. (Dec. 7, 2017) 174:22-176:23; Kardinal Dep. 58:20-61:12.

12. Plaintiff understood that one purpose of the study was "to learn more about the side effects of the combinations and drugs used in the study." Kahn Dep. (Dec. 7, 2017) 191:7-16. And, by participating in the study, Plaintiff agreed to help her doctors understand what those side effects may be, even though they did not know what specific side effects may result from combining the different drugs at that time. *See id.* 187:15-190:23, 199:23-201:11.

13. Plaintiff kept detailed notes of her conversations with her doctors. One such note of her conversation with her surgeon, Dr. Corsetti, read, "Chemotherapy most important part of treatment." Kahn Dep. (Jan. 31, 2018) 30:9-22 (Ex. H).

14. Plaintiff also noted that "25 percent chemo causes cancer to shrink to nothing" and that Adriamycin—one of the chemotherapy agents Plaintiff eventually received—was known as the "red devil" because of the side effects it can have on patients who take it. *Id.* 30:23-31:3, 33:20-35:1.

**C.    Dr. Kardinal's Awareness of "Permanent Chemotherapy-Induced Alopecia"[2]**

15. Dr. Kardinal testified that, before he retired in 2011, he had seen some cases of permanent chemotherapy-induced alopecia in patients who had received Adriamycin. In particular, Dr. Kardinal testified that those patients experienced persistent thinning lasting longer than six months after their last dose of Adriamycin. Kardinal Dep. 87:14-88:2, 23:9-24:6.

16. Based on her experience, Dr. Zoe Larned, who took over Plaintiff's treatment during on June 19th, 2008, testified that incidence of persistent hair loss with Taxotere is low when

---

[2] For the purposes of this Motion, Defendants adopt Plaintiff's definition of this term as set forth in the Second Amended Long Form Master Complaint ¶ 181 ("an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy").

compared to other chemotherapy drugs. Larned Dep. 148:12-17.

17. Dr. Larned also testified that "it has been known for a long time that certain chemotherapy drugs can cause permanent changes to hair," such as changes to texture, color, fullness/thinning, and hair loss. *Id.* 55:4-56:18. Specifically, Dr. Larned testified that she has seen these changes with "[p]retty much all" chemotherapy regimens." *Id.* 56:16-18. They are not specific to docetaxel, and occur in patients who take, for example, Taxol or Adriamycin. *Id.* 56:19-57:17.

18. In Dr. Larned's experience, "having treated hundreds or patients over [her] career . . . not everyone grows their hair back completely, irrelevant of Taxotere." *Id.* 121:9-12.

D.    **Dr. Kardinal's Approach to Patient Counseling**

19. Before he retired, Dr. Kardinal typically only informed his patients about anticipated side effects of chemotherapy. Kardinal Dep. 86:16-21. He also informed patients "there are other side effects that are not necessarily frequent or known." *Id.* 84:4-5.

20. With respect to clinical trials, Dr. Kardinal typically would explain to patients "the potential risks and benefits of a clinical trial [and] would also let the patient know that she did not have to participate in the clinical trial; that [he] would certainly treat the patient anyway." *Id.* 91:24-92:8.

21. Likewise, Dr. Larned does not warn patients of every possible side effect, because that can have an overwhelming effect on patients. Larned Dep. 40:17-41:24. However, like Dr. Kardinal, once Dr. Larned discusses the anticipated side effects with her patients, she also warns patients that there are unknowns to chemotherapy and that there may be unanticipated side effects. *Id.*

22. In his more than 35 years of practice, Dr. Kardinal did not warn his patients about the risk of persistent or permanent hair loss for any chemotherapy drugs because, in his experience,

4

the risk was unexpected—even though Dr. Kardinal had seen some cases of persistent thinning lasting longer than six months in patients who received Adriamycin. Kardinal Dep. 87:14-88:2, 23:9-24:6. And Dr. Larned only recently began warning patients about the potential risk of persistent or permanent hair loss associated with chemotherapy drugs, which she attributes to this litigation—not to anything in Taxotere's label or any other chemotherapy drug's label. Larned Dep. 50:20-51:20.

23. Neither Dr. Kardinal nor Dr. Larned guarantees that their patients' hair will grow back after chemotherapy. *See* Larned Dep. 50:6-19; Kardinal Dep. 102:1-8. Instead, as Dr. Kardinal explained, they "[a]lways want to leave the door open" for unanticipated results. *See, e.g.*, Kardinal Dep. 102:1-8.

E. **Plaintiff's Awareness of the Risks of Treatment**

24. Before starting treatment, Plaintiff was made aware of the risks associated with the chemotherapy drugs she would receive during the clinical trial. *See* Kahn Dep. (Dec. 7, 2017) 187:15-189-14.

25. In discussing the clinical trial informed-consent with Plaintiff, Dr. Kardinal and his clinical trial nurse, Shevonda Thomas, explained the risks and potential side effects of the treatment to Plaintiff and her husband in "GREAT lengths." *See id.*; *see also* Thomas Dep. 99:5-24 ("You wrote in all caps, that you covered the trial in -- capital G-R-E-A-T -- great is capitalized -- lengths. What does that mean? A. That means I was in there a long time."); *see also* Kahn Dep. (Dec. 7, 2017) 190:15-19 ("my doctor and the nurse went over each page with me"). "[Plaintiff and her] husband both [had] plenty of questions," which Nurse Thomas answered to their satisfaction. Thomas Dep. 100:20-101:1; Kahn Dep. (Dec. 7, 2017) 188:20-190:23.

26. Nurse Thomas testified that, in discussing the clinical trial informed-consent with patients, she explained risks or side effects as stated in the informed-consent—nothing more,

nothing less. Thomas Dep. 67:8-70:12. Specifically, Ms. Thomas testified that she only ever based the warnings and side effects that she told a patient based on the consent she was having them sign, and she never made any guarantees to patients about the outcomes of their chemotherapy treatment "[b]ecause [she couldn't] guarantee them." *Id.* 69:9-25. Instead, "[w]hatever was in the consent that they sign, that's what [she] gave them." *Id.* 70:10-12.

27.     Ms. Thomas further testified that she "could never promise anybody anything because there's no guarantee of [anything.] It's all a risk. [She] couldn't do that. . . . That's false hope," and she would never do anything to give a patient false hope. *Id.* 89:1-90:13.

28.     The side effects listed on the consent included the risk of ***hair loss***, heart damage, irregular heartbeats, heart attack, kidney failure, gastrointestinal problems, life-threatening blood clots, liver failure, acute leukemia, bleeding in various parts of the body, high blood pressure, stroke, and death. Kahn Dep. (Dec. 7, 2017) 196:20-199:20, 201:18-202:6; *see also* Informed Consent (Ex. I). Moreover, the consent form for the clinical trial stated clearly that, "[i]n some cases, side effects may be very serious, long-lasting ***or may never go away***." *Id.* 204:8-21 (emphasis added). The consent also informed Plaintiff that "there may be other side effects [her doctors] could not predict." *Id.* 203:4-21.

29.     Plaintiff initialed each page of the clinical trial's consent, indicating that she understood and accepted the risks of participating in the clinical trial, including risks that may be permanent. Kahn Dep. (Dec. 7, 2017) 190:3-23, 203:4-205:10.

30.     At the time she elected to participate in the clinical trial, Plaintiff understood and accepted the risk of permanent hair loss:

> Q.     Okay. In other words, ***you understood that any side effect could be long-lasting or might not go away***, correct?
>
>        . . .

6

      A.    *That's what I read here*.

Kahn Dep. (Dec. 7, 2017) 205:4-10 (emphases added).

31. Despite these risks, and despite the fact that her treatment plan would be randomly selected by the clinical trial's computer program, Plaintiff consented to participate in the clinical trial because she believed it provided her with the best chance of survival. *Id.* 179:23-180:5.

32. Plaintiff also believed that the clinical trial gave a chance of living "a month or two longer" than she would have if she had taken the standard of care drugs alone. Kahn Dep. (Dec. 7, 2017) 173:21-174:9.

33. Notwithstanding her understanding that there were no guarantees about her treatment, Dr. Kardinal's typical counseling conversation with patients, Nurse Thomas' unequivocal testimony that she never deviated from the risks and side effects stated in consent, and Plaintiff's own testimony that she understood and accepted the risk that any side effect, *including hair loss*, "may be very serious, long-lasting *or may never go away*," Plaintiff testified that Dr. Kardinal and his staff assured her that her hair would grow back after she completed chemotherapy. Kahn Dep. (Dec. 7, 2017) 205:12-207:21, 208:7-14, 209:19-211:5, 215:15-22, 216:7-23; *but see id.* 216:25-217:8 (conceding that nothing in consent form indicates hair loss will be temporary).

### F.    Plaintiff's Chemotherapy Successfully Shrank Her Tumor

34. Plaintiff underwent three phases of chemotherapy. Phase I included Taxotere, Avastin, and Xeloda. Phase II consisted of Adriamycin, Cytoxan, and Avastin. Larned Dep. 71:10-24. After her last cycle of Phase II chemotherapy on October 23, 2008, Plaintiff had surgery to remove the remaining breast tumor. Kahn Dep. (Dec. 7, 2017) 227:22-228:22. She then received her final phase of chemotherapy, Phase III, which consisted of Avastin. Before

completing chemotherapy, Plaintiff began radiation and hormone treatments. *Id.*; *see also* Larned Dep. 71:10-73:25, 60:14-62:20.

35. Taxotere was highly effective at shrinking Plaintiff's cancer before she underwent surgery to have the tumor removed.

36. When Dr. Kardinal began treating Plaintiff, her primary tumor was 4cm in size. *See* Pl.'s Medical Records, Bates No. Ochsner Health System 941 (Ex. J). The Taxotere portion of her treatment was responsible for reducing the size of her tumor to 1cm, where it stayed throughout the duration of her treatment with multiple other chemotherapy drugs until she underwent a breast-sparing lumpectomy. *See* Aug. 25, 2008 Tumor Response Form at NSABP 65-67 (Ex. K); *see also* Plaintiff's Blog at 5, Bates No. Kahn, Elizabeth–Other 4-13915 (Ex. L); Nov. 13, 2008 Tumor Response Form at NSABP 87-89 (Ex. M).

37. In a November 18, 2008 blog entry, Plaintiff wrote, "I am going into surgery on Wednesday, December 10th. The mass has shrunk to nothing, and I will be able to have a lumpectomy or breast conservation surgery." *See* Ex. L at 5. Plaintiff's medical records also note "Complete response. Target Breast lesion (primary tumor) measures 00.0 cm." *See* Ex. M at NSABP 87-89.

38. Consistent with Plaintiff's successful chemotherapy treatment, Drs. Kardinal and Larned testified that breast cancer survival rates have increased since the time they started practicing medicine, and taxanes, including Taxotere, have helped increase survival rates. *See* Larned Dep. 34:24-35:19; Kardinal Dep. 68:21-69:8, 75:19-22.

**G.     Plaintiff's Alleged Injury**

39. Plaintiff's alleged injury in this case is not complete baldness, but rather incomplete hair regrowth. In other words, Plaintiff alleges that her hair did not regrow as full as it was before she underwent chemotherapy. Kahn Dep. (Dec. 7, 2017) 43:4-44:4 ("No, I'm not completely

8

bald."); 45:12-46:5 ("The thickness is the point . . . in terms of thickness in covering my head, it is not the same"); 238:1-240:17.

## H. Alternatives to Plaintiff's Treatment

40. In 2008, when he treated Plaintiff, Dr. Kardinal authored a Chemotherapy Source Book in which he stated that docetaxel was "the drug of choice in breast cancer" and "the most active agent yet available for the treatment of advanced breast cancer [and] may have some activity in paclitaxel resistant breast cancer."[3]  Kardinal Dep. 74:7-22.

41. Dr. Kardinal preferred Taxotere over another taxane known as Taxol because Taxol carries serious side effects that Taxotere does not, including neuropathy and severe infusion reactions. *Id.* 71:25-73:23.

42. Dr. Larned echoes Dr. Kardinal's praise for Taxotere, testifying that she prescribes Taxotere because "[i]t's beyond liking it. It has survival data in the neoadjuvant and the adjuvant setting for multiple cancers. It also has survival data for metastatic prostate cancer, which is where [she] use[s] it quite a bit as well." Larned Dep. 37:19-25. She also testified that it carries fewer serious side effects than Taxol. *Id.* 38:1-40:3. And, despite the alleged risk of permanent or persistent hair loss, Dr. Larned continues to prescribe Taxotere to patients today. *Id.* 52:1-4.

43. Dr. Kardinal testified that he reviewed the Taxotere label at the time he first started prescribing Taxotere to patients in the late 1990s, but he has no recollection of reviewing it since. Kardinal Dep. 28:2-15, 30:3-10.

44. The effective dates of the various Taxotere labeling versions between 2000 and 2008 are: 7/9/2002, 7/30/2002, 1/3/2003, 4/24/2003, 5/19/2004, 8/18/2004, 1/6/2005, 8/11/2005, 3/22/2006, 6/7/2006, 10/17/2006, 9/28/2007. Sanofi_001169 (Ex. N).

---

[3] Paclitaxel is the generic version of Taxol. For ease of reference, Defendants use "Taxol" and "paclitaxel" interchangeably.

45. During deposition, Dr. Kardinal testified that—had Plaintiff opted not be participate in the clinical trial—he would have treated her with nearly the same regimen, recommending Taxotere over Taxol: "Adriamycin and Cytoxan followed by a taxane . . . Usually Taxotere is what I would use . . . because of the -- has lesser neurological toxicity than Taxol." Kardinal Dep. at 104:6-105:8.

46. When asked by Plaintiff's counsel whether other chemotherapy drugs were adequate alternatives, Dr. Kardinal testified that they were adequate *in terms of efficacy*. But he never testified that he would have *recommended* anything other than Taxotere to treat Plaintiff. To the contrary, Dr. Kardinal testified:

> Q. And Doctor . . . If I'm remembering correctly, Mr. Miceli phrased a question that if you knew -- something to the effect of if you knew that Taxotere had a risk of persistent hair loss and a patient expressed a concern about persistent hair loss, you would potentially prescribe Taxol to that patient. Was that your testimony?
>
> . . .
>
> A. No.

Kardinal Dep. 219:10-19.

47. A reasonable patient in Plaintiff's circumstances would not reject a Taxotere-containing chemotherapy regimen in favor of a regimen with Taxol.

48. A reasonable patient in Plaintiff's circumstances—with knowledge that "cases of permanent alopecia have been reported" with Taxotere—would not reject a Taxotere-containing chemotherapy regimen in favor of a regimen with Taxol.

49. A reasonable patient in Plaintiff's circumstances would not reject the state-of-the art, neoadjuvant therapy that Dr. Kardinal prescribed in Plaintiff's case.

10

**I.     Dr. Kardinal Unequivocally Stands By His Prescribing Decision**

50.     Drs. Kardinal and Larned both testified that the language in Taxotere's 2008 label—that hair "generally grows back"—does not guarantee that a patient's hair will regrow after the patient completes chemotherapy. Kardinal Dep. 105:12-14; Larned Dep. 143:1-5. Both doctors agreed that "[t]o say it generally grows back, that doesn't necessarily mean always." *Id*.

51.     In December 2015, Sanofi, following discussions with FDA, added the following language to the post-marketing section of Taxotere's package insert: "cases of permanent alopecia have been reported." 2015 Taxotere Labeling (Ex. O).

52.     During deposition, Dr. Kardinal unequivocally testified that he stands by his decision to prescribe Taxotere to Plaintiff—even knowing what he knows today about Taxotere, including the December 2015 label change. Kardinal Dep. 106:2-9.

53.     Moreover, although Dr. Kardinal acknowledged that patients participate in their treatment, they do not "do their own prescribing"—ultimately, Dr. Kardinal is the trained oncologist and it is up to him to prescribe the appropriate treatment for his patients. *Id.* 154:11-25.

54.     Neither Dr. Kardinal nor Dr. Larned could say "to a reasonable degree of medical certainty, that M[s.] Kahn's hair would look any different today if she took Taxol instead of Taxotere." Kardinal Dep. 108:10-15; Larned Dep. 149:10-15.

55.     Today, Plaintiff is cancer-free. Kahn Dep. (Dec. 7, 2017) 16:19-23.

**J.     Plaintiff Could Not Say Whether She Would Have Accepted a 3% or Lower Risk of Permanent Hair Loss**

56.     When asked whether she would have sought other options had she been told that Taxotere had a 3% or lower risk of permanent hair loss, Plaintiff could not answer the question:

11

Q. If you had been told that there was a 3 percent chance of permanent or persisting hair loss, would you have asked for other options?

A. And then that gets tricky because you can pull out the paper that talked about those damages that 3 percent or less had, and that I signed off on. So I can't -- when it gets down to percentages, I don't know.

Q. So you are saying you're afraid to give me your testimony because of how it impacts the other --

A. No. It's just, I can't -- I don't know. I can tell you, at 10 percent, I certainly would. When you start going down in smaller numbers, I can't give you a definitive answer what I would have said at the time. In hindsight, I would say I would definitely ask for other options

Kahn Dep. (Dec. 7, 2017) 302:12-303:5.

Date: February 14, 2020

Respectfully submitted,

*/s/ Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com

*Counsel for Sanofi Defendants*
*Sanofi US Services Inc. and*
*Sanofi-Aventis U.S. LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*