UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

**THIS DOCUMENT RELATES TO:**

**Elizabeth Kahn, Case No. 2:16-cv-17039.**

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON WARNINGS CAUSATION

Plaintiff Elizabeth Kahn claims Defendants failed to provide an adequate warning concerning the risk of permanent alopecia and Taxotere.[1] Among the many elements of that claim, Plaintiff must prove warnings causation. Summary judgment on causation is warranted for the following reasons:

First, it is undisputed that Plaintiff's treating physician, Dr. Carl Kardinal, would not have changed his decision to prescribe Taxotere to Plaintiff—even knowing what he knows today about Taxotere, including the December 2015 label change. Dr. Kardinal recommended that Plaintiff participate in a randomized clinical trial (in which all six potential arms contained Taxotere). Dr. Kardinal testified that, had Plaintiff opted not to participate in the clinical trial, he would have treated her with Adriamycin and Cytoxan followed by Taxotere. Dr. Kardinal preferred Taxotere[2] over Taxol[3] because Taxotere carries fewer and less severe side effects than Taxol, such as

---

[1] *See generally* Second Amended Long Form Master Complaint ¶¶ 221-31; 240-47. Defendants dispute Plaintiffs' allegations and maintain the Taxotere warning has always been adequate to warn of the potential for permanent hair loss.

[2] Docetaxel is the generic version of Taxotere. For ease of reference, Defendants use "Taxotere" and "docetaxel" interchangeably.

[3] Paclitaxel is the generic version of Taxol. For ease of reference, Defendants use "Taxol" and "paclitaxel" interchangeably.

neuropathy and severe infusion-site reactions. Moreover, Dr. Kardinal testified that his decision to recommend that Plaintiff participate in the clinical trial would not have changed even knowing what he knows today about the December 2015 change to Taxotere's label. Put simply, Plaintiff has adduced no evidence that the potential risk of permanent alopecia was so great (*i.e.*, *sufficiently high*) that it would have caused Dr. Kardinal to change his prescribing decision for this Plaintiff. This absence of evidence is dispositive.

Second, Plaintiff adduced no evidence that choosing another chemotherapy regimen *without* Taxotere would have avoided her alleged injury. The Fifth Circuit requires Plaintiff to prove that she would not have sustained permanent hair loss "but for" Taxotere, *i.e.* that a chemotherapy regimen existed that did not pose the risk of her alleged injury. However, both Dr. Kardinal, who prescribed Plaintiff's chemotherapy, and Dr. Zoe Larned, who took over Plaintiff's treatment after her first Taxotere infusion, testified that they had patients who experienced "permanent chemotherapy-induced alopecia"[4] on other "standard of care" drugs used to treat Plaintiff's type of cancer. Dr. Larned further testified that incidence of persistent hair loss with Taxotere is low compared to other chemotherapy drugs. She also testified that, in her experience "having treated hundreds of patients over [her] career[,] . . . not everyone grows their hair back completely, irrelevant of Taxotere." DSOF ¶ 18. Thus, Plaintiff cannot show that another chemotherapy regimen existed that would have avoided her injury.

Third, a different warning would have been futile in Plaintiff's case since there is no

---

[4] For the purposes of this Motion, Defendants adopt the definition of "permanent chemotherapy-induced alopecia" ("PCIA") set forth in Plaintiff's Second Amended Long Form Master Complaint. *See* Second Am. Long Form Master Compl. ¶ 181 (defining PCIA as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy" and alleging Plaintiffs in the MDL suffer from PCIA); *see also* Order & Reasons, Rec. Doc. 8702 at 2 (denying motion for leave to file a amend complaint in part because, in deciding significant issues in the MDL, the "Court looked to Plaintiffs' complaint, which alleged that their hair loss became permanent when it had not grown back six months after completions of chemotherapy").

2

evidence Dr. Kardinal read any Taxotere warnings after the late 1990s. He testified he read the Taxotere package insert when he initially began prescribing it for patients in the late 1990s, but he had no recollection of ever reading it after. By his own testimony, any subsequent information added to the Taxotere labeling between 1999 and 2008 would have had no effect on his decision to prescribe Taxotere to Plaintiff in 2008. Plaintiff cannot prove causation when giving a different warning would have been futile.

Finally, Plaintiff cannot meet her burden under the Court's framework articulated in *Earnest*. Under that analysis in the *Earnest* case, the parties argued about what Plaintiff would or would not have done had her doctor warned her of the risk of permanent hair loss, and whether or not a "reasonable patient" standard applies in light of the decision in *Hondroulis v. Schuhmacher*, 553 So. 2d 398, 412 (La. 1988) (adopting an objective, "reasonable patient," standard of causation). However, this case (like the *Phillips*[5] case) presents a different situation: Plaintiff's medical records conclusively establish that, at the time of treatment, Plaintiff understood and accepted the risk that the side effects of her treatment, including hair loss, may be permanent—ultimately signing a consent that advised Plaintiff that side effects such as hair loss "may never go away." Moreover, Plaintiff gave up the option to control which chemotherapy drugs she would receive—choosing to participate in a *randomized* clinical trial involving investigational drug combinations for which the full range of side effects were unknown—because she believed the clinical trial gave her the best chance of survival. Plaintiff nevertheless did what any reasonable patient would do, she put her survival above all else. Plaintiff's actions remove any doubt

---

[5] *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Phillips)*, No. 2:16-cv-15397. In *Phillips*, the plaintiff signed two consent forms, each of which identified hair loss as among the risks of treatment. As in this case, one of the consent forms in *Phillips* warned the plaintiff of the risk of *permanent hair loss*.

concerning "what decision she would have made" had she known her treatment carried a risk of permanent hair loss.

For these reasons, the Court should enter summary judgment on Plaintiff's lawsuit for failure to establish causation—an essential element of all her claims.

## STATEMENT OF UNDISPUTED FACTS

Defendants have submitted a separate statement of facts, pursuant to LR 56. Defendants discuss the pertinent facts below in the Argument, with citations to "DSOF ¶" as appropriate.

## STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. The party seeking summary judgment initially has the burden to identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the moving party has met its burden, the nonmoving party bears the burden of coming forward with evidence of each essential element of its claim, such that a reasonable jury could find in its favor. *Id.* The existence of a mere scintilla of evidence to the support the nonmoving party's position, however, will not defeat summary judgment; there must be sufficient evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be no genuine issue as to any material fact, since there has been a complete failure of proof concerning an essential element of the nonmoving party's case." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002) (internal quotation marks and citations omitted).

**ARGUMENT**

I.  **PLAINTIFF CANNOT ESTABLISH WARNINGS CAUSATION UNDER THE FIFTH CIRCUIT'S REQUIREMENTS.**

Warnings claims "must be viewed through the lens of the learned intermediary doctrine, which Louisiana law applies to claims of failure to warn involving drugs or medical devices dispensed by a physician." *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 765 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001). Under the learned intermediary doctrine, "[a prescription drug] manufacturer has no duty to warn the patient, but need only warn the patient's physician." *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991); *see also Grenier*, 99 F. Supp. 2d at 766 ("Defendants' duty runs only to the implanting physician as learned intermediary").[6]

To prove a failure-to-warn claim under the learned intermediary doctrine, the Fifth Circuit has articulated a two-pronged test:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.
>
> Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury."

---

[6] *See also* Restatement (Third) of Torts, Physical & Emotional Harm § 7, cmt. i (2010) ("[I]n the field of products liability, courts have declared that the warning obligation of prescription-drug manufacturers ordinarily is limited to the prescribing physician and does not extend to warning the patient directly. They reason that the physician can best assess the relevant risk information and determine the appropriate course of treatment. When appropriate, the physician can inform the patient of means by which the patient may minimize the risk of adverse side effects. . . . Courts have, through this duty limitation, made a categorical determination that having manufacturers provide safety information to physicians, rather than to patients, is the appropriate manner for minimizing the costs of adverse side effects. Such a categorical determination also has the benefit of providing clearer rules of behavior for actors who may be subject to tort liability and who structure their behavior in response to that potential liability.")

*Stahl*, 283 F.3d at 265-66 (internal citation omitted); *Willett*, 929 F.2d at 1098; *Grenier*, 99 F. Supp. 2d at 765.  Plaintiff cannot meet her burden to prove warnings causation for the following reasons:

### A. There is no evidence the purported "additional non-disclosed risk" would have changed Dr. Kardinal's decision.

Plaintiff must prove causation with evidence specific to her treating physician, *i.e.* that "but for the inadequate warning, the ***treating physician*** would not have used or prescribed the product." *See Willett*, 929 F.2d at 1099 (emphasis added).  To do so, Plaintiff must "demonstrate that ***the additional non-disclosed risk was sufficiently high*** that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) (emphasis added).  In other words, Plaintiff must identify a *quantifiable* risk of permanent alopecia associated with Taxotere, not otherwise known to Dr. Kardinal, and show such risk was so great that it would have changed his decision to prescribe Taxotere.

Here, it is undisputed that the allegedly non-disclosed risk of permanent alopecia *would not have changed Dr. Kardinal's decision to prescribe Taxotere to Plaintiff*. DSOF ¶ 52.  Specifically, Dr. Kardinal testified that he steadfastly stands by his decision to recommend Plaintiff participate in the NSABP clinical trial, in which all patients received Taxotere plus a combination of investigational drugs, to treat her breast cancer.[7]  *Id.*  Dr. Kardinal recommended Plaintiff participate in the clinical trial because it offered state-of-the-art treatment in addition to the standard of care regimen for her type of breast cancer.  DSOF ¶ 9.  However, even if Plaintiff

---

[7] Plaintiff underwent three phases of chemotherapy during the clinical trial.  Phase I included Taxotere, Avastin, and Xeloda.  Phase II consisted of Adriamycin, Cytoxan, and Avastin.  After her last cycle of Phase II chemotherapy on October 23, 2008, Plaintiff had surgery to remove the remaining breast tumor.  She then received her final phase of chemotherapy, Phase III, which consisted of Avastin.  Before completing chemotherapy, Plaintiff began radiation and hormone treatments.  (DSOF ¶ 34.)

6

opted not to participate in the clinical trial, Dr. Kardinal nevertheless would have treated her with a Taxotere regimen.  DSOF ¶ 45.  In fact, when questioned about alternative regimens, Dr. Kardinal merely testified that some were adequate *in terms of efficacy*, but responding "**No**" when asked if his testimony about efficacy meant he would "potentially prescribe Taxol to that patient." DSOF ¶ 46 (emphases added).

There also is no basis to speculate that the information in the December 2015 label update[8] would have changed Dr. Kardinal's prescribing decision.  Dr. Kardinal specifically testified that his treatment decision for Plaintiff would not have changed even if he had known then what he now knows about Taxotere, including the information included in the December 2015 update to Taxotere's label, which warned that "cases of permanent alopecia have been reported."  DSOF ¶¶ 50-52.

Dr. Kardinal testified that the language in the 2008 label—*i.e.*, that hair "generally grows back"—"doesn't necessarily mean always."  DSOF ¶ 50.  Thus, Dr. Kardinal's understanding of the language in the 2008 label already was consistent with the language added in the December 2015 update: that hair loss could be permanent.  Under these circumstances, Plaintiff cannot meet her burden "to demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Thomas*, 949 F.2d at 814.

---

[8] In December 2015, after discussions between Defendants and the FDA, as well as the FDA's review of relevant safety data, Defendants revised the "post-marketing experiences" section of the Taxotere package insert to include the following language: "[c]ases of permanent alopecia have been reported."  DSOF ¶ 51.  This change had no impact on Taxotere's risk-benefit profile. Nor did the FDA recommend that doctors change their prescribing practices or avoid using the drug in certain classes of patients.

7

### B. Plaintiff has adduced no evidence that choosing a chemotherapy regimen not containing Taxotere would have avoided her alleged injury.

As to the second prong, Plaintiff also must prove that she would not have sustained permanent hair loss "but for" Taxotere. Plaintiff must accordingly adduce evidence that a treatment regimen existed that did not pose the risk of her alleged injury. *See Willett*, 929 F.2d at 1098-99; *see also* Jury Instructions, *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)*, No. 16-cv-17144, Rec. Doc. 8283 at 10 (defining "proximate cause" as "the cause without which the injury would not have occurred"). Plaintiff has not done so.

Plaintiff's alleged injury in this case is not complete baldness, but rather incomplete hair regrowth. That is, Plaintiff alleges her hair did not regrow as full as it was before she underwent chemotherapy. DSOF ¶ 39. The Fifth Circuit therefore requires Plaintiff to prove that she would not have sustained incomplete hair regrowth "but for" Taxotere. However, Dr. Kardinal testified that, in his experience, he had seen some cases of permanent chemotherapy-induced alopecia in patients who received other standard of care chemotherapy drugs. Even before he treated Plaintiff, some of Dr. Kardinal's patients had experienced persistent hair thinning lasting longer than six months after completing chemotherapy containing Adriamycin. DSOF ¶ 15. Thus, although he did not recall any patients with complete permanent baldness, he had experienced patients who met Plaintiff's definition of permanent chemotherapy-induced alopecia after completing chemotherapy before he treated Plaintiff. *See, supra,* n.4.

Dr. Larned also testified the incidence of persistent hair loss with Taxotere is low when compared to other chemotherapy drugs. DSOF ¶ 16. Dr. Larned further testified that "it has been known for a long time that certain chemotherapy drugs can cause permanent changes to hair," such as changes to texture, color, fullness/thinning, and hair loss. DSOF ¶ 17. Specifically, Dr. Larned testified she has seen these changes with "[p]retty much all" chemotherapy regimens. *Id.* They

8

are not specific to docetaxel, and occur in patients who take, for example, Taxol or Adriamycin. *Id.* In Dr. Larned's experience, "having treated hundreds of patients over [her] career . . . not everyone grows their hair back completely, irrelevant of Taxotere." DSOF ¶ 18.

Based on Dr. Kardinal's testimony that he would have treated Plaintiff with a regimen consisting of Adriamycin, Cytoxan, and a taxane (Taxotere being his preferred taxane) had Plaintiff opted out of the clinical trial, the only other regimen available to Plaintiff would have been Adriamycin, Cytoxan, and Taxol. DSOF ¶¶ 40-45. However, as Dr. Larned testified, Taxol also carries a potential risk of permanent hair loss. DSOF ¶ 17. And Dr. Kardinal testified that Adriamycin—a component of any regimen he considered prescribing Plaintiff—carried a risk of persistent hair thinning lasting longer than six months. DSOF ¶ 15. Thus, as a matter of law, Plaintiff cannot prove that she would not have sustained permanent hair loss "but for" Taxotere.

### C. There is no evidence Dr. Kardinal would have read updated labeling before prescribing Taxotere to Plaintiff.

If Plaintiff's treating physician testifies that he would not have read an adequate warning, Plaintiff cannot establish causation. *See, e.g.*, *Felice v. Valleylah, Inc.*, 520 So. 2d 920, 927 (La. App. 1987) (holding "the jury's finding of liability . . . was clearly wrong, since there is absent the essential element of cause in fact" because "[Plaintiff's treater] admitted that she had never read the warning label on the device itself, and that she had never read the manual"); *see also Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) (plaintiff did not meet summary judgment opposition burden of establishing alleged inadequate warning was "producing cause" of injury under Texas' similar learned-intermediary doctrine where prescribing physician testified she did not recall ever reading package insert).

Here, Dr. Kardinal, testified unequivocally that he had no recollection of reading the Taxotere prescribing information was after he first began prescribing it to patients in the late 1990s.

9

DSOF ¶ 43. In fact, there were a dozen Taxotere labeling versions between 2000 and 2008. DSOF ¶ 44. Dr. Kardinal's testimony is that he did not recall reading any of them. As in *Felice*, providing a warning to Dr. Kardinal at any point after 1999 or 2000 "would have been futile under the circumstances." *Felice*, 520 So. 2d at 927.

## II. PLAINTIFF ALSO CANNOT ESTABLISH WARNINGS CAUSATION UNDER THE FOUR-PART FRAMEWORK PREVIOUSLY ARTICULATED BY THE COURT.

Summary judgment also is warranted under the four-part framework previously articulated by the Court for analyzing warnings causation in cases involving chemotherapy:

> The question is not simply "what would the doctor have prescribed" but ***[1] whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere, [2] whether the patient would have inquired about other options, [3] what the doctor would have recommended, and [4] what decision the plaintiff would have ultimately made.*** The Court will consider these questions with the goal being to assess what the doctor and the patient would have decided together. While a doctor may testify that his or her recommendation would not have changed, the issue is whether the plaintiff's ultimate decision would have changed.

Order & Reasons, Rec. Doc. 7571 at 16 (emphasis and numerals added). Plaintiff cannot satisfy her burden under this framework.

### A. Physician-Specific Elements

The first element asks "whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere." That question contains an implicit premise (*i.e.*, that Plaintiff's doctor was not aware of the risk) and then asks "whether and how" patient-counseling would be different in a counterfactual world (in which the doctor was aware).

Here, the implicit premise does not apply because Dr. Kardinal's actual counseling conversation with Plaintiff in this case included a discussion of the consent for the clinical trial, including the risk of side effects such as hair loss that may be "long-lasting ***or may never go away***."

10

DSOF ¶ 28 (emphases added).  As such, Dr. Kardinal already was aware that Plaintiff's treatment carried a risk of permanent hair loss but he nevertheless determined that the benefits of the treatment outweighed the risks and recommended she proceed with treatment.  Moreover, Dr. Kardinal testified his general practice included discussing the risks and benefits with patients. DSOF ¶ 20.  Dr. Kardinal's clinical trial nurse also discussed informed-consents with patients.  In Plaintiff's case, Dr. Kardinal's clinical trial nurse, Shevonda Thomas, explained the risks and potential side effects of the treatment to Plaintiff and her husband in "GREAT lengths," DSOF ¶ 25 (emphasis in original), and answered all of Plaintiff's and her husband's questions to their satisfaction, *id.*  Nurse Thomas further testified that, in discussing the clinical trial consent with patients, she was careful to avoid giving patients a sense of false hope, so she explained risks and side effects as stated in the consent—nothing more, nothing less.  DSOF ¶¶ 26-27.  Thus, even with a specific warning of permanent alopecia, Dr. Kardinal (and his clinical trial nurse) would have discussed the clinical trial consent with Plaintiff, along with the stated risk that hair loss may never go away.

     Dr. Kardinal also testified he did not warn patients of every single possible side effect of chemotherapy or specific chemotherapy drugs; instead, he warned them of anticipated side effects and discussed with patients the possibility of unanticipated side effects.  DSOF ¶ 19.  For instance, even though Dr. Kardinal had seen some patients who experienced persistent hair thinning on Adriamycin, he still did not warn patients (including Plaintiff) about the risk specific to Adriamycin because it was not a side effect that he anticipated patients to experience when taking the drug based on his more than 35 years of practice.  DSOF ¶ 22.  There is no evidence the alleged risk of permanent alopecia associated with Taxotere was sufficiently high to cause Dr. Kardinal to advise Plaintiff differently.  Rather, Dr. Kardinal testified that the change to Taxotere's label in

December 2015 would not have caused him to advise Plaintiff any differently. DSOF ¶¶ 50-54. As such, there is no evidence Dr. Kardinal would have warned Plaintiff that Taxotere allegedly is associated with a risk of permanent alopecia.

On the third element ("what the doctor would have recommended"), Dr. Kardinal unequivocally testified he stands by his decision to prescribe Taxotere to Plaintiff—even knowing what he knows today about Taxotere, including the December 2015 label change. DSOF ¶ 52. Taxotere, according to Dr. Kardinal, presented fewer severe side effects, such as neuropathy and severe infusion-site reactions. DSOF ¶ 41. Indeed, at the time he treated Plaintiff, Dr. Kardinal had authored a Chemotherapy Source Book in which he wrote that "docetaxel [is] the drug of choice in breast cancer" and that docetaxel "is the most active agent yet for available for treatment of advanced breast cancer [and] may have some activity in paclitaxel resistant breast cancer." DSOF ¶ 40. Although Dr. Kardinal encouraged patients to be active participants in their health care, he "was not an idle bystander" and explained that "[t]he patient doesn't . . . do their own prescribing." DSOF ¶ 53.

When asked by Plaintiff's counsel whether other chemotherapy drugs were adequate alternatives, Dr. Kardinal testified they were adequate *in terms of efficacy*. But he never testified that he would have *recommended* anything other than Taxotere to treat Plaintiff. To the contrary, Dr. Kardinal testified:

> Q. And Doctor . . . If I'm remembering correctly, Mr. Miceli phrased a question that if you knew -- something to the effect of if you knew that Taxotere had a risk of persistent hair loss and a patient expressed a concern about persistent hair loss, you would potentially prescribe Taxol to that patient. Was that your testimony?
>
> . . .
>
> A. No.

12

DSOF ¶ 46.  Dr. Kardinal's preference for Taxotere over Taxol is due, in part, to the fact that Taxotere has a lower rate of neuropathy and severe infusion-site reactions.  DSOF ¶¶ 41, 45.  Put simply, there is no evidence Dr. Kardinal would have prescribed Plaintiff anything other than Taxotere to treat her breast cancer.

### B. Plaintiff-Specific Elements

The second and fourth elements of the Court's counterfactual framework focus on the patient.  The second element asks "whether the patient would have inquired about other options," and the undisputed evidence points to no.  There is no evidence Plaintiff inquired about other options after Dr. Kardinal and Nurse Thomas explained the risks of the clinical trial to her, including the risk that hair loss may be "long-lasting or *may never go away*."  DSOF ¶ 28 (emphasis added).  Instead, Plaintiff's actions ***at the time of treatment*** confirm that she did what any reasonable patient would have done under the same circumstances: she put saving her life above all else.  Thus, on the second element, the Court need only look to Plaintiff's actions at the time of her treatment to determine conclusively that Plaintiff would not have inquired about other options and would have chosen to proceed with Taxotere-based treatment despite the alleged risk of permanent hair loss.

Moreover, when asked whether she would have sought other options had she been told that Taxotere had a 3% or lower risk of permanent hair loss, Plaintiff admitted she could not truthfully testify she would have done so:

> Q. If you had been told that there was a 3 percent chance of permanent or persisting hair loss, would you have asked for other options?
>
> A. And then that gets tricky because you can pull out the paper that talked about those damages that 3 percent or less had, and that I signed off on.  So I can't -- when it gets down to percentages, I don't know.

13

> Q. So you are saying you're afraid to give me your testimony because of how it impacts the other --
>
> A. No. It's just, I can't -- I don't know. I can tell you, at 10 percent, I certainly would. When you start going down in smaller numbers, I can't give you a definitive answer what I would have said at the time. In hindsight, I would say I would definitely ask for other options.

DSOF ¶ 56. Plaintiff's testimony shows that, even now, she cannot say whether she would have asked for other options depending on the circumstances.

Although Plaintiff's self-serving testimony suggests that she would have inquired about an alternative treatment had she known of the alleged risk of permanent hair loss associated with Taxotere, DSOF ¶ 33, 56, reliance on such testimony is not necessary here: her *actions* when faced with the very same decision unequivocally demonstrate exactly what she would have done under the circumstances. *Nor is such reliance permissible under Louisiana law*. Louisiana law requires application of an objective standard on informed-consent issues such as this. *See Hondroulis*, 553 So. 2d at 412. "Because of the likelihood of a patient's bias in testifying in hindsight"—as Plaintiff admitted she was doing—"on . . . hypothetical matter[s], this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed." *Id.* Here, there is no evidence that a reasonable patient in Plaintiff's circumstances would reject state-of-the art treatment in a clinical trial for an alternative regimen. DSOF ¶¶ 47-49.

As to the final element ("what decision the plaintiff would have ultimately made"), the "reasonable patient" standard also applies. However, Plaintiff's actions at the time of treatment again establish she would not have decided to forego participation in the clinical trial, which she believed gave her a chance of living "a month or two longer" than the "standard of care" treatment at the time, had Dr. Kardinal specifically warned her of the alleged association between Taxotere

14

and permanent hair loss. At the time she elected to participate in the clinical trial, Plaintiff already understood and accepted the risk of permanent hair loss:

> Q. Okay. In other words, *you understood that any side effect could be long-lasting or might not go away*, correct?
>
> . . .
>
> A. *That's what I read here*.

DSOF ¶ 30 (emphases added).[9] Moreover, Plaintiff gave up the option to control which chemotherapy drugs she would receive—choosing to participate in a *randomized* clinical trial involving investigational drug combinations for which the full range of side effects were unknown—because she believed the clinical trial gave her the best chance of survival. DSOF ¶ 31. Plaintiff therefore cannot establish causation under this Court's earlier framework. Because Plaintiff cannot establish an essential element of her claims, the Court should enter summary judgment in Defendants' favor.

### III. PLAINTIFF'S REDHIBITION CLAIM IS SUBJECT TO DISMISSAL ON ALTERNATIVE GROUNDS.

Plaintiff has also brought a claim for breach of warranty in redhibition. *See* Pl.'s Am. Short Form Compl. at 6. Because Plaintiff's redhibition claim sounds in failure to warn (*e.g.*, Plaintiff alleges "Defendants were aware of the substantial risks of disfiguring permanent alopecia associated with TAXOTERE but failed to fully disclose those risks to Plaintiff." *Id.* at 6, ¶ 15), that claim is governed by the learned intermediary doctrine and subject to dismissal for the same reasons as her claim for inadequate warnings under LSA-RS 9:2800.57. *See supra* Part I and II;

---

[9] Plaintiff also received Chemocare sheets explaining the side effects she could expect for each chemotherapy drug she received. Unlike the sheets for Adriamycin and Cytoxan, which stated unequivocally that hair loss is "temporary" or that patients' hair "will grow back" after treatment, the Chemocare sheet for Taxotere does not offer such temporal limitation. Instead, it simply states "hair loss" and further explains that "side effects are almost always reversible"— but not always—"after treatment." (collectively, Ex. P).

*In re Norplant Contraceptive Prod. Liab. Litig.*, 955 F. Supp. 700, 709 (E.D. Tex. 1997), *aff'd sub nom. In re Norplant Contraceptive Prod. Litig.*, 165 F.3d 374 (5th Cir. 1999).

To the extent the Court finds Plaintiff's breach of redhibition claims are not controlled by the learned intermediary doctrine, Defendants are entitled to summary judgment on alternative grounds: Plaintiff has no evidence of any manufacturing or design defect with respect to Taxotere, nor is there any evidence that some "vice" rendered Taxotere "useless" or "inconvenient" under La. Civ. Code Ann. Art. 2520.

None of Plaintiff's witnesses claim Taxotere is wholly or substantially useless. To the contrary, Taxotere was highly effective at shrinking Plaintiff's cancer before she underwent surgery to have the tumor removed. DSOF ¶ 35. Specifically, Plaintiff was concerned about conserving as much of her breast as possible. DSOF ¶ 7. To that end, Dr. Kardinal recommended Plaintiff undergo neoadjuvant chemotherapy to reduce the size of the cancer before surgery. DSOF ¶ 8. When Dr. Kardinal began treating Plaintiff, her tumor was 4 cm in size. DSOF ¶ 36. The Taxotere portion of her treatment was responsible for reducing her tumor to 1 cm in size, where it stayed throughout the duration of her treatment with multiple other chemotherapy drugs until she underwent a breast-sparing lumpectomy. *Id.* In fact, Plaintiff wrote in a November 18, 2008 blog entry about her treatment, "The mass has shrunk to nothing, and I will be able to have a lumpectomy or breast conservation surgery." DSOF ¶ 37.

Plaintiff also does not complain of any physical or functional failure in the Taxotere she received. Nor could she. It is undisputed that Plaintiff participated in the NSABP B-40 clinical trial, each arm of which included Taxotere, because she believed it gave her the best chance of survival. DSOF ¶¶ 11, 31. And, today, Plaintiff is cancer-free. DSOF ¶ 55. Because Taxotere is demonstrably effective and worked as intended, Plaintiff cannot establish a redhibitory defect. *See*

Order, Rec. Doc. 7571 at 25-26 (granting summary judgment on and dismissing with prejudice redhibition claims because "Taxotere is demonstrably effective and worked as intended"); *see also In re Norplant Contraceptive Prod. Liab. Litig.*, 955 F. Supp. at 709; *In re Rezulin Prods. Liab. Litig.*, 361 F. Supp. 2d 268, 280 (S.D.N.Y. 2005) (granting defendant summary judgment in MDL case applying Louisiana law where plaintiffs could not demonstrate a redhibitory defect in a prescription medication because the drug was effective in treating the intended condition).

## CONCLUSION

For these reasons, the Court should grant Defendants' motion for summary judgment on Plaintiff's claims.

Date: February 14, 2020

Respectfully submitted,

| | |
|---|---|
| */s/ Douglas J. Moore* | Harley Ratliff |
| Douglas J. Moore (Bar No. 27706) | Adrienne L. Byard |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | **SHOOK, HARDY & BACON L.L.P.** |
| 400 Poydras Street, Suite 2700 | 2555 Grand Boulevard |
| New Orleans, LA 70130 | Kansas City, Missouri 64108 |
| Telephone: 504-310-2100 | Telephone: 816-474-6550 |
| Facsimile: 504-310-2120 | Facsimile: 816-421-5547 |
| dmoore@irwinllc.com | hratliff@shb.com |
| | abyard@shb.com |

*Counsel for Sanofi Defendants
Sanofi US Services Inc. and
Sanofi-Aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

17