# EXHIBIT F

```
                                                              1
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4  CYNTHIA THIBODEAUX,
           Plaintiff,
 5
    VERSUS             CIVIL ACTION NO. 2:16-cv-15859
 6
    SANOFI S.A., SANOFI-AVENTIS U.S.
 7  L.L.C., SANOFI US SERVICE, INC., and
    AVENTIS-PHARMA S.A.,
 8         Defendants.
    ------------------------------------------------
 9  ELIZABETH KAHN,
           Plaintiff,
10
    VERSUS             CIVIL ACTION NO. 2:16-cv-17039
11
    SANOFI S.A., SANOFI-AVENTIS U.S.
12  L.L.C., SANOFI US SERVICE, INC., and
    AVENTIS-PHARMA S.A.,
13         Defendants.

14

15
         VIDEOTAPED DEPOSITION OF SHEVONDA THOMAS
16

17      Taken at the Offices of Irwin, Fritchie,

18      Urquhart & Moore, LLC, 400 Poydras Street,

19      Suite 2700, New Orleans, Louisiana, on

20      Wednesday, January 10, 2018, beginning at

21      9:07 a.m.

22

23  JOB NO. 2783235

24

25
```

66

1  you, the only drugs I remember is Bevacizumab,
2  Capecitabine and Gem -- and the Gemcitabine. And
3  at that time, when I needed to give them
4  information, whatever it took, whether it be a
5  book or that computer, I found what I needed to
6  find to give it to them.
7      So if it came to side effects, they were
8  -- I would give them the information. It -- you
9  know, I just did what I can to make my job
10 sufficient, and to assure that my patients were
11 trained -- were educated.
12     Q. Sure. Did you -- the Informed Consent
13 for NSABP B-40 identifies risks and side effects
14 related to the drugs given. And in connection
15 with Exhibit 2, I'm looking at Page 11 of 25 --
16 really, the -- and for numerous pages after
17 that --
18     A. Uh-huh.
19     Q. -- discussing risks and side effects.
20     Would you have looked to the risks and
21 side effects identified in the actual Informed
22 Consent you were giving the patient when
23 identifying risks and side effects to them?
24     A. Yes. Now, I do remember seeing things
25 like this. And I can guarantee you, if it's a

67

1  consent that I obtained, it's probably circled,
2  it's highlighted, it's written on, because that's
3  the things that I do. I write over everything.
4      So I -- this -- I do recall this
5  information in reference to drugs. I don't recall
6  the actual drug. But I remember breakdowns of
7  something slightly -- or vaguely remembered that.
8      Q. But in terms of educating a patient on
9  the risks and side effects related to NSABP 40,
10 you would have relied on the actual risks and side
11 effects identified in the Informed Consent,
12 correct?
13     A. Yes. I would review the entire Informed
14 Consent with the patient; but, prior to me going
15 in with any patient, I always, I educate myself
16 first.
17     I would look at this. I would go through
18 this. But if something is in here that I don't
19 understand, I would look to other information
20 because I would schedule the patient to come to
21 see me. So prior to the patient coming, I would
22 be prepared for them, with this information, with
23 things already highlighted, maybe asterisks by it
24 or circled, so that I can, you know, knowledgeably
25 give them what they need.

68

1      Q. Would you ever identify -- would you ever
2  represent the risks and side effects of a clinical
3  trial that were different from what was --
4      A. No.
5      Q. Let me get my question out --
6      A. Go ahead.
7      Q. -- if you don't mind. I'm so sorry. I
8  just want to get a clean record.
9      Would you ever have identified for a
10 patient risks or side effects that were different
11 from what was identified in the Informed Consent
12 document they were signing?
13     A. No, because when I sit with my patient, I
14 sit with my patient with this.
15     When I'm researching or looking up
16 things, I'm looking up things for myself. It's to
17 educate me.
18     And so when I sit with my patient and we
19 read through this entire packet, we go through the
20 packet so that they can be knowledgeable of
21 whatever information, whether it be this packet or
22 whatever packet goes with it.
23     When I sat with my patient, I sat with my
24 patient with their study because I had to explain
25 to them where they fell once we received their --

69

1  their arm, which -- or their group. And then once
2  we get past this, I would literally go through
3  each page with them. And it would take a long
4  time, but I would go through here.
5      And then by the time we get to the end,
6  there was the opportunity for them to decide, if
7  they wanted to, you know, get on it or not. I
8  just remember it look a long time.
9      Q. So the only document that you would base
10 what warnings or side effects you told a patient
11 about was the actual Informed Consent document
12 that you were having them sign, correct?
13     A. Yes.
14     Q. Okay. Do you ever make any guarantees to
15 patients about the outcome of their chemotherapy
16 treatment?
17     A. No.
18     Q. Can you -- why not?
19     A. Because I can't guarantee them.
20     Q. And can you predict how a chemotherapy
21 medication will affect a particular patient?
22     A. No.
23     Q. Do you ever tell patients that they won't
24 get a certain listed side effect?
25     A. No.

70

1  Q. Do you recall if you ever talked to any
2  of your breast cancer patients about hair loss?
3  A. If I talked to them about side effects,
4  hair loss is one of the possible side effects.
5  Q. And did you warn all breast cancer
6  patients you had about the possibility of hair
7  loss, regardless of the chemotherapy that they
8  were taking, or did you do it in connection with a
9  specific drug?
10  A. Whatever is in this -- whatever was in
11  the consent that they signed, that's what I gave
12  them.
13  Q. So during your time at Ochsner, you were
14  caring for patients -- is it fair to say that you
15  were caring for patients who hadn't yet started
16  chemotherapy, who were in chemotherapy, and who
17  had finished chemotherapy?
18  A. No. It's not safe to say that because
19  all I did was follow up with some patients. I
20  didn't care for them. So to care for them would
21  be me to meet with them one on one and -- well, I
22  guess maybe I did because whatever -- if they had
23  any problems, I would go to Dr. Kardinal, if he
24  was available, to explain to him what the problems
25  were, so that we can find some form of resolution.

71

1  But for those who weren't having problems
2  and who felt they were doing fine, then I had -- I
3  didn't have to do anything for them but to chart
4  that the patient states that they were fine.
5  So I really don't know how to answer that
6  because it can be a yes or a no, because I didn't
7  see everybody. And a lot of those patients, I
8  was -- I inherited and I didn't need to do
9  anything with. So I just don't know how to answer
10  that.
11  Q. I guess I'm trying to get a sense of how
12  many patients you would have met with while you
13  were at Ochsner that had already finished
14  chemotherapy.
15  A. I have no idea.
16  Q. Do you know how far out from chemotherapy
17  was the -- strike that. I'm trying to figure out
18  how to ask the question I'm trying to ask.
19  I'm interested to know, did you see
20  patients who were more than six months out from
21  chemotherapy?
22  A. So that would depend if the patient was
23  placed on a study once I started and then
24  completed, but it would have to have been a short
25  trial. So I really don't know. Because that

72

1  means that I would be that person to follow up
2  after six months. I was only there a year and a
3  half, and most of the trials are very long.
4  But then the short trials, I really never
5  had, so I -- I don't know. Because that means
6  they would have to be finished -- they would have
7  had to have been finished somewhere in September
8  to October. For me to provide follow-up in May,
9  the first week of June, that will be six months
10  out. I don't recall that, so I don't know.
11  Because January to September, in that
12  process I was learning and putting people on
13  studies. So they would have to have been finished
14  for me to actually do a six-month eval or
15  follow-up. So I don't know.
16  Q. Do you recall ever talking to patients
17  after the Informed Consent, after they had started
18  chemo, or after they had finished chemo, about
19  hair loss?
20  A. I don't recall.
21  Q. Have you ever led a chemo class?
22  A. No.
23  Q. Have you ever led a chemotherapy --
24  forgive my shorthand. Have you ever led a
25  chemotherapy support group?

73

1  A. No.
2  Q. Do you know when NSABP B-40 started?
3  A. No, ma'am.
4  Q. Do you know when Ochsner began
5  participating in the study?
6  A. No, ma'am.
7  Q. You started at Ochsner in January of
8  2007, correct?
9  A. Yes.
10  Q. Did you have to complete the CITI Human
11  Research Training course before you could work
12  with patients?
13  A. I don't know.
14  Q. Do you know if you had to complete any
15  training before you could work with patients?
16  A. I don't remember.
17  Q. Do you know when you first assisted a
18  patient in the NSABP B-40 clinical trial?
19  A. Like the first month or date I picked --
20  no.
21  Q. You don't know?
22  A. I don't know.
23  Q. Did you get information about NSABP B-40
24  beyond the Informed Consent form that you would go
25  over with patients?

19 (Pages 70 to 73)

```
                                                        86
 1    Q.  And you would go page by page through a
 2  consent with your patients?
 3    A.  With mine, yes.
 4    Q.  You said the appointment -- I believe you
 5  testified that the appointments would take a long
 6  time.
 7    A.  Well, as Ochsner, they did.
 8    Q.  Approximately how long?
 9    A.  I don't remember, but I know I was in
10  there a long time.  I don't remember.
11    Q.  You told me earlier that you were aware
12  that a patient could have changes to their hair
13  following chemotherapy, correct?
14    A.  Yes.
15    Q.  More than temporary changes, correct?
16    A.  You're saying I said that they could have
17  more than temporary?  I didn't say that.  I said
18  they could have changes.  They could have changes
19  from the texture.  It can go from thin -- it could
20  thin out, or it can be a loss.  But I didn't say
21  it can be temporary or permanent.  I don't know.
22    Q.  So what about hair that you're saying --
23  I think you said hair can go from straight to
24  curly.
25    A.  My mom's hair was straight.  And her hair
```

```
                                                        87
 1  then, for some reason, it did change texture and
 2  curled up.  And it could have been because of the
 3  loss, the thinning.  I don't know.  I'm -- that's
 4  her.
 5    Q.  Sure.
 6    A.  That's for African-American hair.
 7        I don't recall any patient's hair going
 8  from thin to curly, and that's why I asked was it
 9  in reference to a patient or anyone.  So when I
10  was discussing it, it was about my mom.
11    Q.  So is it fair to say you don't know --
12  strike that.
13        Is it fair to say that you don't know,
14  either way, if there is a risk of persistent
15  changes to hair following chemotherapy?
16  MR. MAHER:
17        Object to the form.
18    A.  Persistent?  Yes, it is safe to say.  I
19  don't know if there's a -- if it will continue,
20  you mean, like a continuance of the change?
21  MS. BIERI:
22    Q.  Uh-huh.  Yes.
23    A.  Yeah, it's safe to say.  Because the
24  patients, I wasn't there long enough with, and
25  then my mom died before anything could change.
```

```
                                                        88
 1    Q.  And so from those experiences or any
 2  others?
 3    A.  I can't confirm that it would be
 4  consistent.
 5    Q.  That it would be --
 6    A.  I can't confirm that it would be a
 7  consistent or a persistent change.
 8  MR. MAHER:
 9        Same objection.
10    A.  I don't think I would know that.
11  MS. BIERI:
12    Q.  For any chemotherapy drug, correct?
13    A.  I don't -- no.  I wasn't there long
14  enough.  The only cancer patient that I had
15  contact with outside of Ochsner was my mother.
16  She passed before I can even confirm that her hair
17  would even thicken back up.  I was not at Ochsner
18  long enough to determine if any patient's hair
19  would grow back or if it would thicken up.
20        So I would say that I can't confirm that
21  the changes would happen where their hair would
22  revert back to normal.  I don't know.
23    Q.  Sure.  And I'm talking about the
24  knowledge of a risk, not of actual experience of
25  patients.
```

```
                                                        89
 1    A.  If the consent form gives that risk, this
 2  is all I would give them.  I would give them the
 3  risk from here.
 4    Q.  You wouldn't add language to it?
 5    A.  I don't need to add language because it's
 6  in the paperwork.
 7    Q.  Okay.  So would you ever promise a
 8  patient that their hair would grow back fully,
 9  just as it was before chemotherapy?
10  MR. MAHER:
11        Object to the form.
12    A.  I could never promise anybody anything
13  because there's no guarantee of nothing.  It's all
14  a risk.  I couldn't do that.
15  MS. BIERI:
16    Q.  Right.  And I'll even take the word
17  "guarantee" out of it.  You would never tell --
18  would you ever tell anyone, your hair will grow
19  back after chemotherapy just like it was before
20  chemo?
21  MR. MAHER:
22        Object to the form.  You can go ahead and
23  answer.
24    A.  Okay.  Say that again.
25  MS. BIERI:
```

Veritext/NJ Reporting Company
800-227-8440                                          973-410-4040

90

1  Q. Sure. Would you ever tell a chemotherapy
2  patient, your hair will grow back the way that it
3  was before chemotherapy?
4  MR. MAHER:
5      Object to the form.
6  A. No. I wouldn't do that. I wouldn't -- I
7  don't recall ever saying that. I couldn't see me
8  saying that because I can't guarantee that.
9  MS. BIERI:
10  Q. And you wouldn't want to give them false
11  hope?
12  A. That's false hope. I wouldn't -- I
13  couldn't see doing that.
14  Q. And you have no recollection of ever
15  saying that to anyone, correct?
16  A. No. I don't have a recollection of
17  anything going back that far.
18  Q. You have a recollection of some things
19  going back, to be fair.
20  A. I would just -- I mean -- I just, I
21  couldn't see that. I can't imagine that I would
22  do that because I'm already hurting for an
23  individual that is going through some form of
24  life-threatening situation. I can't say, God,
25  yes, your hair is going to grow back. I mean, I

91

1  can't imagine that.
2  Q. And is that because you don't know how
3  chemotherapy is going to affect an individual
4  person's body?
5  A. I didn't have enough knowledge of the
6  therapy. I had only been there for a short period
7  of time. That's why I couldn't because I didn't
8  have enough knowledge to do that.
9  Q. Do you agree with me that chemotherapy
10 affects different people who receive it
11 differently?
12 MR. MAHER:
13     Object to the form.
14 A. I would say I agree that chemotherapy
15 affects each individual who may receive it
16 differently. I'll agree to that. If that's the
17 question, yes, I agree that chemotherapy would
18 affect each individual receiving it, it would and
19 could affect them differently, yes.
20 MS. BIERI:
21 Q. Okay. Ms. Thomas, I want to turn and
22 talk to you now about plaintiff Elizabeth Kahn.
23 So unless I say otherwise, from now on, I'm
24 talking about plaintiff Elizabeth Kahn. When I
25 talk about plaintiff, I'm talking about her.

92

1  Okay?
2      At the beginning of the deposition, I
3  think you told me that her name was familiar to
4  you. Is that right?
5  A. Uh-huh.
6  COURT REPORTER:
7      Is that yes, ma'am?
8  A. Yes.
9      (Exhibit K-4 was marked.)
10 MS. BIERI:
11 Q. I'm going to hand you a photograph that
12 has been marked as Kahn Exhibit 4. And for the
13 benefit of the record, what I've handed her
14 previously had an Exhibit 10 sticker on it, and
15 that was from Ms. Kahn's deposition. I have put
16 this deposition exhibit sticker that says Kahn
17 Exhibit 4 over the prior exhibit sticker, so that
18 you can no longer see that.
19     Does seeing this photograph refresh your
20 recollection about Ms. Kahn in anyway?
21 A. No.
22 Q. So your testimony about the care of
23 Ms. Kahn will be based solely on the medical
24 records in this case, correct?
25 A. Yes.

93

1  Q. Have you had any interaction with
2  Ms. Kahn since you left Ochsner?
3  A. No.
4  Q. Aside --
5      (Exhibit K-5 was marked.)
6  MS. BIERI:
7  Q. I'm going to hand you what's being marked
8  as Kahn Exhibit 5. That's the notice of your
9  deposition, right?
10 A. Uh-huh. That's in my purse, uh-huh.
11 Q. That let you know to come here today,
12 right?
13 A. Yes.
14 Q. Did you see, on the sixth page of the
15 document, going on to the seventh page of the
16 document, that we asked -- that it was asked that
17 you bring certain documents with you, if you had
18 them?
19 A. No. I didn't even -- uh-uh. Uh-uh.
20 Q. I think you might be looking at the
21 eighth page. That should be, that you are looking
22 at now, the seventh page.
23     Okay. We marked your CV as an exhibit.
24 And we got that -- you emailed it to me and to the
25 court reporter.

Page 98

1  wasn't told I need to research anything.  And I
2  was told I was going to only be here approximately
3  two to four hours.
4          (Exhibit K-6 was marked.)
5  MS. BIERI:
6     Q.  I'm going to hand you what's been marked
7  as Kahn Deposition Exhibit 6.  You can take a
8  minute and familiarize yourself with that.
9     A.  Let me get my glasses.
10    Q.  Absolutely.
11    A.  Okay.
12    Q.  Do you know what this is?
13    A.  My note.
14    Q.  And when did you create this record?
15    A.  On April 22nd of 2008.
16    Q.  And was this record made at or near the
17 time of your treatment of Ms. Kahn?
18    A.  Yes.
19    Q.  And are these your words in Exhibit 6?
20    A.  I'm reading it.  Let me see.  Yes, ma'am.
21    Q.  And was it your regular practice to
22 create such records in the course of your nursing
23 work at Ochsner?
24    A.  I was very thorough, yes.  Yes.
25    Q.  You were what?

Page 99

1     A.  Very thorough.
2     Q.  Oh.
3     A.  Yes.  I can read this, and I can see our
4  communication, yes.
5     Q.  Was this -- does this record, Exhibit 6,
6  document your first interaction with Ms. Kahn?
7     A.  According to this, patient seen in the
8  breast clinic by Dr. Kardinal on 4/28.  And it
9  looks like --
10    Q.  I think 4/22, I believe.
11    A.  4/22.  And it looked like I signed with
12 her on May the 14th.  It looks like it.
13    Q.  Do you have any recollection of being at
14 the meeting on 4/22?
15    A.  No.  I didn't say that.  Patient seen in
16 breast clinic by Dr. Kardinal.  I wasn't there.
17    Q.  Okay.  You wrote in all caps, that you
18 covered the trial in -- capital G-R-E-A-T -- great
19 is capitalized -- lengths.  What does that mean?
20    A.  That means I was in there a long time.
21    Q.  You didn't capitalize great in every
22 record of Informed Consent, did you?
23    A.  That was probably because I was in there
24 a long time.
25    Q.  Do you remember if Ms. Kahn asked you

Page 100

1  questions?
2     A.  I don't remember.  If I wrote it in here,
3  she did.  If I didn't write it -- I mean, I don't
4  remember.
5     Q.  So you don't know any specific
6  questions --
7     A.  Patients are notified if they should come
8  in -- great length --
9  COURT REPORTER:
10        Ma'am, if you say something, I have to
11 write it down.
12 MS. BIERI:
13        I think the court -- I think you were
14 just reading -- trying to read to yourself, but
15 when it's audible, the court reporter has to take
16 it down.
17    Q.  But what my question is going to be -- do
18 you want to take a minute?  I'm so sorry.
19    A.  No.  Go ahead.  I'm ready.
20    Q.  Okay.  Do you have any recollection of
21 what, if any, questions Mr. Kahn or her husband
22 asked you when you met with them on 5/14 of 2008?
23    A.  She asked questions, because I say she
24 had plenty of questions, and all those were
25 answered, but I can't tell you what those

Page 101

1  questions were.
2     Q.  And is this the appointment where you
3  would have gone over the Informed Consent with
4  Ms. Kahn?
5     A.  Yes.
6     Q.  And the consent was for NSABP B-40,
7  correct?
8     A.  The B-40 consent, yes.
9     Q.  Is it fair to say that your job was to
10 make sure that Ms. Kahn had enough information to
11 provide an Informed Consent and make an informed
12 decision about whether she wanted to participate
13 in the clinical trial?
14    A.  Yes.
15         (Exhibit K-7 was marked.)
16 MS. BIERI:
17    Q.  I'm handing you what is marked as Kahn
18 Exhibit 7.  And take a minute, if you'd like, and
19 review that document.
20    A.  Okay.
21    Q.  Is this the Informed Consent document
22 that you went over with Mrs. Kahn?
23    A.  Yes, ma'am.
24    Q.  And would you have gone over it page by
25 page with her?

26 (Pages 98 to 101)

110

1  will learn about side effects will be whether or
2  not adding Bevacizumab to chemotherapy for breast
3  cancer will affect the heart."
4      What does that mean to you?
5      A.  They're going to include it in to see if
6  there's going to be any possible side effects to
7  the heart.
8      Q.  Did you describe these purposes of the
9  study to Ms. Kahn?
10     A.  I'm pretty sure -- because I do not
11 recall -- I read the consent.
12     Q.  You would have read the consent to her?
13     A.  We would have gone through the consent.
14     Q.  Well, those are different.  You would
15 have read it with her?
16     A.  I don't remember.
17     Q.  But you would have gone through it with
18 her page by page, correct?
19     A.  For her to sign it, yes, I would have.
20     Q.  You would never be trying to hide the
21 purpose of a clinical trial from one of your
22 patients, correct?
23     A.  No.  I don't benefit from it.
24     Q.  Would you have represented to Ms. Kahn
25 that the purpose of NSABP 40 was anything

111

1  different than as represented in the Informed
2  Consent document?
3      A.  No, because I didn't have enough
4  knowledge to say that.  I had just started there.
5  So even the little time I was there, it's still
6  not enough time to say I'm going to branch off and
7  just give information.  Because this is very
8  serious, and it's a lot of information, so, no, I
9  wouldn't have done that.
10     Q.  Can you tell me how a specific
11 chemotherapy treatment regimen was determined for
12 a participant in this study?  And if it helps you
13 to look at Page 1658, feel free.
14     A.  No.  I would just go in the computer --
15 because this is, like, overwhelming because
16 there's so much information here.  And I know what
17 I did.  It's nine years later.
18     Q.  Sure.
19     A.  And I can tell you that when a patient
20 comes in, I receive a chart.  I would input that
21 information into the computer.  They would be then
22 given an arm, which a group, and then that group
23 would then be established with the patient.
24     Once this information comes out, they
25 would then agree to -- well, they -- we've already

112

1  signed the study.  Then we would actually place
2  them on it.  Sometimes, some of them were notified
3  of exactly what arm they were in, like what drugs
4  they were going on.
5      But to be honest, I don't remember the
6  specifics of it.  All I can go by is what I have
7  written.
8      Q.  Uh-huh.
9      A.  That was nine years ago.
10     Q.  I understand.  And that's why we're
11 talking about your records.
12     A.  Okay.
13     Q.  So when we're talking about how patients
14 were selected, a computer picked?
15     A.  Basically.
16     Q.  You didn't get to pick?
17     A.  No.
18     Q.  The patient didn't get to pick?
19     A.  No.
20     Q.  And Dr. Kardinal didn't get to pick?
21     A.  Right.
22     Q.  And as described on Page 1658, when the
23 patient signed -- so, for example, Ms. Kahn signed
24 the Informed Consent.  She knew she wasn't going
25 to get to pick which arm of the study she was in.

113

1      A.  Right.
2      Q.  Looking at the study arms that are on
3  Page 1660 and 1662, do you agree that Ms. Kahn
4  would get Docetaxel regardless of which of the six
5  groups she was in?
6      A.  Yes.
7      Q.  And do you agree that regardless of the
8  six groups that she was in, she would get AC?
9      A.  Yes.
10     Q.  And do you understand that AC stands for
11 Adriamycin and Cyclophosphamide?
12     A.  Now that you're telling me.
13     Q.  You do understand that?
14     A.  Now that you're telling me.  I see the AC
15 there.  I don't recall -- I don't remember all of
16 this stuff like that.  But according to this, I
17 see that they're going to get AC.
18     Q.  And if you look -- for example, if you
19 look at Page 1659 -- and this is just an
20 example -- but if you look under Group 1A, and
21 then there's a Part 1 and a Part 2.  It's close to
22 the top of the page.  It's in the shorter
23 paragraph.
24     A.  Uh-huh.  I see it.
25     Q.  It says -- this is for Group 1A, but it