# EXHIBIT G

```
                                                                    1
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4  ELIZABETH KAHN,

 5  Plaintiff,

 6   vs.                         Case No. 2:16-cv-17039

 7  SANOFI S.A., SANOFI-AVENTIS U.S.
    L.L.C., SANOFI US SERVICE, INC., and
 8  AVENTIS-PHARMA S.A.,

 9  Defendants.

10
                 * * * * * * * * * *
11

12  CYNTHIA THIBODEAUX,

13  Plaintiff,

14   vs.                         Case No. 2:16-cv-15859

15  SANOFI S.A., SANOFI-AVENTIS U.S.
    L.L.C., SANOFI US SERVICE, INC., and
16  AVENTIS-PHARMA S.A.

17  Defendants.

18

19          Videotape Deposition of CARL KARDINAL, M.D.,

20  taken on behalf of the defendants, at the residence of

21  Carl Kardinal, M.D., 6008 Dornagh Court, in the city

22  of Columbia, State of Missouri, on the 17th day of

23  January 2018, before Heather L. Shallow, Certified

24  Court Reporter, Registered Professional Reporter,

25  Registered Merit Reporter.            Job No. NJ2783240
```

Page 22

1  A. That was discussed, yes.
2  Q. Can you remember anything else about the
3  discussion?
4  A. No.
5  Q. Did you ask Plaintiffs' counsel to see
6  Exhibit 1 or did they provide it to you gratuitously?
7     MR. MICELI: Object to the form.
8  A. They just provided it to me.
9  Q. (By Ms. Bieri) You did not ask to receive
10 Exhibit 1?
11 A. No.
12 Q. Did they leave with you a copy of --
13 A. Yes.
14 Q. -- Exhibit 1?
15 A. Yes.
16 Q. Do you have that here at your house?
17 A. Yeah. I have it in the other room if you
18 want it.
19 Q. Yeah.
20 A. At least I think I have it in the other
21 room.
22 Q. When we go on to a break, I'll ask you --
23 A. Oh.
24 Q. -- to get that.
25    How long -- do you remember how long you

Page 23

1  spent looking at Exhibit 1 during your meeting with
2  Plaintiffs' counsel?
3  A. How long I spent looking at Exhibit 1?
4  Q. Yeah, during your meeting with Plaintiffs'
5  counsel.
6  A. Oh, 10 minutes maybe.
7  Q. Do you remember anything you said to
8  Plaintiffs' counsel during your meeting with them?
9  A. That hair loss was common, you know, with
10 multiple chemotherapy drugs. Over the years, hair
11 loss was rarely permanent. It came back and they
12 often came back a little different than it was
13 originally: Sometimes more wavy, sometimes more full.
14 But other than that, nothing specific.
15 Q. So you said over the years, hair loss was
16 rarely permanent. Have you seen cases of permanent
17 hair loss after the use of a chemotherapy drug or
18 chemotherapy regimen?
19 A. I don't know that I've permanent -- that
20 I've definitely seen that. I've had some patients
21 that have -- particularly with Adriamycin who have had
22 some thinning that has never -- I guess you could say
23 it was permanent, but it was not that they were bald
24 and just had some thinning.
25 Q. It wasn't complete, no-hair baldness?

Page 24

1  A. Correct.
2  Q. But it was a loss of volume of hair; is that
3  correct?
4  A. Correct. Correct.
5  Q. And you had a few patients --
6  A. Well, particularly with Adriamycin.
7  Q. Dating -- oh, forgive me, sir.
8  A. Well, Adriamycin was around for a long time
9  and so I had considerably more experience with
10 Adriamycin.
11 Q. Was it -- for these patients, was it
12 thinning enough that it was something that you could
13 observe with your eye?
14 A. Oh, they were close observation.
15 Q. And how early -- with regard to these
16 Adriamycin patients that you noticed thinning of hair
17 with, how early did you -- strike all of that.
18     That was going to be a really ugly question.
19 A. Okay. Well, strike all ugly questions.
20 Q. Dating back how far do you think you saw the
21 first Adriamycin patient who had thinning, permanent
22 thinning of their hair?
23     MR. MICELI: Object to the form.
24 A. The first time I ever used Adriamycin,
25 whenever that was, which went back probably to the

Page 25

1  1970s.
2  Q. (By Ms. Bieri) Approximately how many
3  Adriamycin patients --
4  A. Many.
5  Q. -- had thinning of hair?
6  A. Essentially all of them had thinning, but it
7  tended to regrow.
8  Q. But did -- did it regrow to its
9  prechemotherapy fullness?
10     MR. MICELI: Object to the form.
11 A. Usually, in many times, even more full, you
12 know.
13 Q. (By Ms. Bieri) Were there instances that
14 you observed regarding Adriamycin where a person's
15 hair did not grow back to the prechemotherapy
16 fullness?
17 A. I can't recall specifically. It was -- if
18 so, it was minimal.
19 Q. But there may have been some?
20     MR. MICELI: Object to the form.
21 A. Possibly. My first experience with hair
22 loss goes back to the 1960s when I treated people with
23 nitrogen mustard.
24 Q. (By Ms. Bieri) Do you have an opinion about
25 why you think Plaintiffs' counsel showed you

7 (Pages 22 to 25)

26

1 Exhibit 1?
2     A. I think in here somewhere that there is not
3 specific reference to permanent hair loss.
4     Q. Well, let me direct you --
5     A. Okay. Because I failed to be clear or --
6     Q. Let me direct you to the second-to-last page
7 of the document. It's marked with a 56 in the bottom
8 middle.
9     A. 56?
10    Q. Yes, please, sir.
11    A. I see 45 and then it -- everything starts
12 over again.
13    Q. I think that's 54. So --
14       MR. MICELI: Right in the bottom in the
15 middle.
16    Q. (By Ms. Bieri) I was looking at these page
17 numbers.
18    A. Oh, oh. I was --
19    Q. You were looking at the sides. Sure.
20    A. Yeah.
21    Q. So let me --
22    A. Okay. So 56?
23    Q. Mm-hmm.
24    A. All right.
25    Q. May I direct you, on the left-hand side --

27

1     A. Yeah. To?
2     Q. -- there's a paragraph that says Hair Loss.
3     A. Yeah.
4     Q. Can you read the last sentence of that
5 paragraph that starts with the word "Once," please?
6     A. Okay. "Once you have completed all your
7 treatments, hair generally grows back."
8     Q. Did Plaintiffs' counsel direct you to that
9 language?
10    A. I don't recall.
11    Q. Do you have any recollection of seeing
12 Exhibit 1, the Taxotere label, at any time prior to
13 meeting with Plaintiffs' counsel last month?
14    A. I'm going to have to give you a "probably"
15 on that. I've been using new drugs that we relied
16 heavily on the package insert in terms of the action
17 of the drug and potential toxicity of the drug.
18    Q. Are you saying that when a new drug came out
19 onto the market, you would look to the drug's label?
20    A. Package insert, yes.
21    Q. Do you have any memory --
22    A. Of course not.
23    Q. Hold on. I'm sorry. I want -- for the
24 benefit of the record and the court reporter, let me
25 get my question out.

28

1     A. Of course.
2     Q. Do you have any memory of reviewing
3 Exhibit 1, the Taxotere label, at any time after you
4 start -- first started prescribing it until the time
5 you met with Plaintiffs' counsel?
6     A. I can remember reviewing, you know, the
7 label at the time I was prescribing the drug years
8 ago, but in terms of remembering specifics, I cannot.
9     Q. When, to your recollection, did Taxotere
10 come onto the market?
11    A. Certainly in the 1980s, 1990s we were using
12 Taxol and Taxotere in clinical trials when we were
13 doing a lot of clinical trials, but I don't think it
14 became commercially available until 1990 or so.
15    Q. Maybe the late 1990s?
16    A. Yeah.
17    Q. So would you have been looking -- I'm just
18 trying to understand your common practice of looking
19 at chemotherapy drug labels. Was it your practice to
20 refer back to them -- let's say -- strike all that.
21       Say you had been prescribing a chemotherapy
22 drug for five years.
23    A. Yeah.
24    Q. Was it your practice to look at the
25 chemotherapy drug label after you'd been prescribing

29

1 it for some period of years?
2       I -- Dr. Kardinal, I'm trying to get a sense
3 of if it was common for you just to review labels in
4 the early days of prescribing a drug or if you would
5 have reviewed the Taxotere label at some point later.
6       MR. MICELI: Let me just object to the -- to
7 the form because it's compound. And Kelly, I don't
8 mean to interrupt, but you asked a question, then
9 before he answered, you adjusted your question. I
10 don't know if you want to just start all over again so
11 it's clear for the record. Or you can -- I'll just
12 sit back and be quiet.
13       MS. BIERI: I will ask a different question.
14       MR. MICELI: Okay. Again, I don't want to
15 interrupt. I just wanted to -- it's a strange
16 objection but I want to make sure we were clear.
17 Thank you.
18    Q. (By Ms. Bieri) Dr. Kardinal --
19    A. You're going to ask another question?
20    Q. Let me try a different question. How often
21 did you reread labels after you first started
22 prescribing a drug?
23    A. If something unexpected happened, I would
24 refer back to it.
25    Q. Do you have any recollection of reviewing

8 (Pages 26 to 29)

```
                                                    30
 1  the Taxotere label after the mid 2000s?
 2      A.  Of course not.
 3      Q.  Do you have any recollection of reviewing
 4  the Taxotere label at all?
 5      A.  Yes.  I reviewed it at the time that we
 6  started using Taxotere.
 7      Q.  And no -- and did you -- do you have any
 8  memory of reviewing it after the time when you started
 9  prescribing and using Taxotere?
10      A.  Not specifically.
11      Q.  Beyond Exhibit 1, this label --
12      A.  This?
13      Q.  Beyond this document, did Plaintiffs'
14  counsel show you any other documents?
15      A.  I don't recall.
16      Q.  Do you recall if you discussed any other
17  documents with Plaintiffs' counsel?
18      A.  That's very vague.
19      Q.  Well, I asked you if you recall if they
20  showed you any other documents.  I'm asking --
21      A.  And my answer at that time was?
22      Q.  That you didn't recall.
23      A.  Okay.
24      Q.  Now I'm asking you if you remember
25  discussing any other documents that may not have
```

```
                                                    31
 1  actually been shown to you.
 2      A.  I don't recall.
 3      Q.  Other than the communications that you've
 4  told me about, the meeting that you've told me about,
 5  have you had any written or oral communication with
 6  counsel for Plaintiff?
 7      A.  No.
 8      Q.  Did you take any notes when you --
 9      A.  No.
10      Q.  -- met --
11          Did you take any notes when you met with
12  counsel for Plaintiff?
13      A.  No.  No.
14      Q.  When counsel called to set up the meeting
15  with you, did you take any notes about when the
16  meeting was going to be?
17      A.  Well, I'm not stupid.  Of course I did.
18      Q.  Where would you have taken those?
19      A.  On a yellow pad similar to what you're
20  scribbling on.
21      Q.  Do you have that piece of paper --
22      A.  No.
23      Q.  -- or that pad still?
24      A.  Why would you -- why would you even want
25  that?  No.  I don't keep...
```

```
                                                    32
 1      Q.  Did you discuss payment of any kind with
 2  Plaintiffs' counsel?
 3      A.  Payments for my depositions you're talking
 4  about or what are you talking about?
 5      Q.  Did you discuss payment of any kind with
 6  Plaintiffs' counsel?
 7      A.  Can you be more specific?
 8      Q.  No.
 9      A.  Possibly that the deposition could be
10  charged for was the only thing.
11      Q.  Do you mean --
12      A.  I mean this deposition.
13      Q.  Is that something they told you?
14      A.  I asked.
15      Q.  What did you ask?
16      A.  Is my time reimbursable for the deposition.
17      Q.  And what was the answer that you were given?
18      A.  Yes.
19      Q.  And was anything else said?
20      A.  There was something about payment or per
21  hour, but I don't honestly remember what that was.
22      Q.  Did Plaintiffs' counsel tell you that they
23  would pay you by the hour in relation to your
24  deposition?
25          MR. MICELI:  Object to the form.
```

```
                                                    33
 1      A.  They didn't say that they would pay me for
 2  anything specific.
 3      Q.  (By Ms. Bieri)  You -- you mentioned that
 4  there was a discussion of payment by the hour.
 5      A.  Yeah.  It was -- it was -- whatever it is,
 6  my time is worth twice as much talking to you.
 7      Q.  Is it your understanding that Plaintiffs'
 8  counsel is going to give -- excuse me.  Is it your
 9  understanding that Plaintiffs' counsel is going to
10  give you a check for your time here today?
11      A.  No.
12          MR. MICELI:  Object to the form.
13      A.  No.
14      Q.  (By Ms. Bieri)  Beyond talking to
15  Plaintiffs' counsel --
16      A.  Yes.
17      Q.  -- did you do anything to prepare for your
18  deposition today?
19      A.  No.
20      Q.  Based on what you said, Dr. Kardinal -- I
21  think I know the answer to this, but I'm going to ask
22  you a question anyway -- have spoken with
23  Miss Elizabeth Kahn --
24      A.  No.
25      Q.  -- since your treatment --
```

58

1 at Ochsner, but I did not do that primarily.
2    Q. What would you say you did primarily?
3    A. I was the -- in terms of clinical trials, I
4 was the principal investigator at Ochsner for clinical
5 trials in the NSABP which is this here what stands for
6 the National Surgical Adjuvant Breast Project. Was
7 also the principal investigator for clinical trials
8 for the North Central Cancer Treatment Group which was
9 home based at Mayo. And I saw patients also who were
10 not on clinical trials.
11    Q. So would you be considered the principal
12 investigator for any trial that doctors at -- strike
13 that.
14    Would you be considered the principal
15 investigator for any oncology clinical trial through
16 the NSABP or the NCC --
17    A. TG.
18    Q. -- TG?
19    A. Yes.
20    Q. Okay. This is going to be a broad question.
21 Generally speaking, can you explain what a clinical
22 trial is?
23    A. Clinical trial is where we're investigating
24 -- well, there are, several times, a Phase III trial
25 which we participated in primarily. It's a randomized

59

1 trial which is comparing a standard treatment to a new
2 treatment that we have reason to think should be
3 better. And -- go ahead.
4    Q. I didn't -- I don't want to cut you off.
5    A. Well, I mean, the patients are assigned to
6 that type of clinical trial on a random basis.
7    Q. Was NSABP B-40 a Phase III clinical trial?
8    A. As I recall, yes. It actually started out
9 off with B-01.
10    Q. Do you believe that clinical trial work is
11 important?
12    A. It's critical to finding out what's better.
13 Not all of them are successful which is, you know, I
14 mean, not every one of them proves that the treatment
15 arm is -- is better. Very few of them show that the
16 treatment arm is worse, fortunately.
17    Q. Worse how so? What do you mean?
18    A. That the disease-free interval, meaning the
19 time for -- that the treatment -- breast --
20 disease-free interval was short.
21    Q. Are you aware of if there have been any --
22 if anyone has drawn conclusions about NSABP B-40 in
23 any peer-reviewed literature?
24    A. Just a minute.
25    THE VIDEOGRAPHER: Can we -- Veritext

60

1 requires I change media at 90 minutes. I'm five
2 minutes away from that.
3    MS. BIERI: You know what? Would you-all be
4 amenable to taking a break now?
5    MR. MICELI: Yeah.
6    MS. BIERI: The court -- not the court
7 reporter. The videographer has requested to change
8 tapes.
9    MS. PEREZ REYNOLDS: Sure.
10    MS. BIERI: We can go off. Thank you.
11    MR. MICELI: We'll just table the question.
12 He can answer it and come back. Yeah.
13    THE VIDEOGRAPHER: Okay. The time is
14 9:59 a.m. We are off the record. This completes
15 Media 1.
16    (A brief recess was had.)
17    THE VIDEOGRAPHER: Okay. We are back on the
18 record. This is the beginning of Media 2, and the
19 time is 10:21 a.m.
20    MS. BIERI: Madame court reporter, would you
21 be willing to read back the last question that was
22 asked?
23    (The requested material read back by the reporter.)
24    Q. (By Ms. Bieri) Did you understand that
25 question, Doctor?

61

1    A. I understand the question, yes. I suspect
2 the answer is -- is "yes" because they review these
3 clinical trials and then they publish their clinical
4 trials. I don't happen to know specifics --
5    Q. You don't know what --
6    A. -- what the publication is.
7    Q. You don't know what the conclusions
8 regarding NSABP B-40 are; correct?
9    A. Let me see. "Neoadjuvant trial of palpable
10 operable breast cancer, effective pathologic complete
11 response in capecitabine, gemcitabine, docetaxel."
12 No, I don't know the results of the trial.
13    Q. Okay. While we were -- excuse me. While we
14 were on the break I was handed some documents.
15    A. Yes.
16    Q. And an envelope. And Dr. Kardinal, what was
17 in the envelope?
18    A. It was just a notice of the deposition.
19    Q. Okay. So you did get the notice of
20 deposition?
21    A. Yeah. Right.
22    Q. I was also handed what I'm going to mark as
23 Exhibit 8 -- would you like me to take that out of
24 your way, Doctor?
25    A. Yeah.

16 (Pages 58 to 61)

66

1  A. From probably 1974 through 2010. Many
2  years.
3  Q. Outside of the context of clinical trials,
4  did you generally follow the guidelines or
5  recommendations of any organizations in providing care
6  to your breast cancer patients?
7  A. Certainly the American Society of Clinical
8  Oncology.
9  Q. Are you -- are you familiar with the
10 National Comprehensive Cancer Network?
11 A. I was not part of that. We'd -- we worked
12 with the comprehensive cancer center at Mayo Clinic,
13 but not the entire comprehensive network.
14 Q. So if you weren't -- if you weren't dealing
15 with a patient who was in a clinical trial, did you
16 look to any guidelines to help establish what you were
17 going to prescribe to them --
18 A. Certainly.
19 Q. -- for a chemotherapeutic regimen?
20 A. In the currently active journals such as the
21 Journal of Clinical Oncology.
22 Q. We talked about the fact that you have
23 published a lot.
24 A. Yes.
25 Q. Do you have numerous publications on the

67

1  topic of chemotherapy?
2  A. Yes.
3  Q. Do you have any on the potential long-term
4  side effects of a cancer treatment drug?
5  A. No.
6  Q. Any on the topic of chemotherapy side
7  effects at all?
8  A. No. I mean, they would be included in the
9  discussions of it, but not specifically related topic.
10 Q. Did you serve as the author of a chapter of
11 a textbook?
12 A. Yes.
13 Q. And was that -- what was that book called?
14 A. Oh, God. If you -- if you have a copy of my
15 CV, it's in there.
16 Q. I do not, but I -- I do think I may know the
17 name of the book.
18 A. Good for you.
19 Q. Is the name -- is the name of the book The
20 Chemotherapy Source Book?
21 A. Yes. Yes.
22 Q. Okay.
23 A. John Yarbrough was the senior editor of
24 that.
25 Q. And did you author chapters for multiple

68

1  editions of that book?
2  A. For at least two or three.
3  Q. Did you -- beyond The Chemotherapy Source
4  Book and journal articles, do you have any other
5  publications in other mediums that you can think of?
6  A. No.
7  Q. Okay. I'm going to take you back to 2008
8  when you were in New Orleans.
9  A. Okay.
10 Q. Were you affiliated with any hospitals or
11 cancer centers beyond Ochsner?
12 A. I had some loose affiliations with Tulane as
13 well as LSU, but they were -- we actually had cancer
14 program at Ochsner that was far superior to theirs.
15 Q. Was Ochsner the only hospital at which you
16 had privileges?
17 A. Yes.
18 Q. And were you -- from 1980 until
19 approximately 2008 were you employed by Ochsner?
20 A. Correct.
21 Q. Okay. Generally speaking, from the time
22 that you started practicing until the time that you
23 stopped, would you say that breast cancer survival
24 rates have increased?
25 A. That's a long time span, but the answer is

69

1  yes. Yes.
2  Q. Can you tell me how survival rates for
3  breast cancer have increased with the advent of
4  taxanes including Taxotere?
5  A. I presume they have. I don't -- since they
6  are -- you have a couple of current publications
7  there; so... Some of those publications came out sort
8  of as I was retiring.
9  Q. Is it your understanding that -- when is it
10 your understanding that taxanes first came onto the
11 market?
12 A. I think there's really two questions there.
13 One is at what time did we start using taxanes in
14 clinical trials, and second question is when did they
15 become commercially available.
16 Q. Yeah. I -- and I'm happy to hear the answer
17 to both. I was focusing on the latter, when they
18 became commercially available and on the market, but I
19 would love to hear when you first started using
20 taxanes in clinical trials.
21 A. Well, we started using taxanes in clinical
22 trials -- well, it was before I retired from Ochsner
23 so it had to be back around 2000, 2005. They became
24 commercially available around 2010.
25 Q. It's your understanding that taxanes first

Page 70

1  became commercially available in 2010?
2      A. I know you know the answer to that. You can
3  tell me. I don't -- I'm not exactly positive when
4  they became commercially available.
5      Q. And -- and Doctor, I'm just trying to get an
6  understanding of -- of your knowledge --
7      A. What?
8      Q. -- of your knowledge of the evolution --
9      A. Of my memory.
10     Q. Absolutely not.
11        Do you know -- strike that.
12        Would you agree with me that while docetaxel
13 and paclitaxel are structurally similar, they are not
14 the same drug?
15     A. Yeah, that's correct.
16     Q. Would you agree that they carry different
17 risks and different benefits?
18     A. They're -- they're very similar but they're
19 slightly different toxicity.
20     Q. I read something in the 2008 Chemotherapy
21 Source Book chapter --
22     A. Written by me?
23     Q. Yes.
24     A. Okay.
25     Q. Your name is --

Page 71

1      A. What did I say?
2      Q. Your name is listed as the first author.
3      A. All right. What did I say?
4      Q. Well, it talks about the development of
5  taxanes and indicating that paclitaxel, the prototype
6  taxane, came from the bark of the Pacific yew tree --
7      A. Right.
8      Q. -- and had supply concerns. Do you recall
9  what you were referring to in that publication about
10 the supply concerns related to paclitaxel?
11     A. Not -- no.
12     Q. Okay. In terms of -- you said they have
13 different toxicities.
14     A. Yes.
15     Q. Can you tell me, in 2008, for example, would
16 you -- would you say that paclitaxel was associated
17 with cardiotoxicity more so than docetaxel?
18        MR. MICELI: Object to the form.
19     A. Neither of the drugs were terribly
20 cardiotoxic. I mean certainly not like Adriamycin.
21     Q. (By Ms. Bieri) Any thoughts on the use of
22 paclitaxel with Adriamycin?
23     A. I have no specific recollection, you know,
24 memory of that.
25     Q. Would you agree that neuromuscular toxicity

Page 72

1  was considerably less common with docetaxel than with
2  paclitaxel?
3         MR. MICELI: Object to the form of the
4  question.
5      A. Well, I'll agree to that, yeah.
6      Q. (By Ms. Bieri) Can you --
7      A. Neurotoxicity with paclitaxel was a big
8  concern.
9      Q. And tell me a little bit more about the
10 neurotoxicity that was associated with paclitaxel.
11 What would that look like for a patient? Or what
12 could that look like for a patient?
13     A. Well, there was sensory neuropathy which,
14 you know, that people would have abnormal sensation in
15 their hands and feet. May be severe enough to
16 interfere with their gait. The -- there appeared to
17 be less neurotoxicity with docetaxel than there was
18 with paclitaxel which was one of the reasons I tended
19 to use docetaxel in preference to paclitaxel.
20     Q. Did -- were you aware of any cases of
21 permanent neuropathy with paclitaxel?
22     A. At the time, no.
23     Q. Ever?
24     A. See, I can't say ever. You know, I retired
25 way before "ever" happened.

Page 73

1      Q. Well, you can tell me if you're aware of any
2  cases of permanent neuropathy with paclitaxel.
3      A. Permanent is defined as when I stopped
4  practicing.
5      Q. For you. Okay.
6      A. You know. I mean, I can't say permanent is
7  permanent.
8      Q. Okay.
9      A. You know. There were patients that retained
10 the neuropathy at the time I retired. So that --
11     Q. Are you familiar with cases of long lasting
12 neuropathy --
13     A. Yes.
14     Q. -- with paclitaxel?
15     A. With paclitaxel, yes. Perhaps less so with
16 docetaxel.
17     Q. Would you dispute that in the chapter of The
18 Chemotherapy Source Book you wrote, "Neuromuscular
19 toxicity is considerably less common with docetaxel"?
20     A. If I said it then, I believe it now.
21     Q. Were there concerns with infusion reactions
22 related to paclitaxel?
23     A. Yes.
24     Q. Can you tell me a little bit about those?
25     A. I can't tell you too much because we didn't

74

1  -- we didn't use paclitaxel nearly as much as
2  docetaxel.
3      Q. But you were aware that -- were you aware of
4  concerns of infusion reactions with paclitaxel?
5          MR. MICELI: Object to the form.
6      A. Yes.
7      Q. (By Ms. Bieri) In -- I'll represent to you
8  that in the 2008 Chemotherapy Source Book you wrote
9  that docetaxel was the drug of choice in breast
10 cancer.
11     A. Well, I thought it was at the time.
12     Q. So what things did you consider when
13 choosing Taxotere, docetaxel, over other
14 chemotherapeutic agents?
15     A. Well, mostly I was comparing taxanes, and
16 the neuropathy with paclitaxel was greater than it was
17 with docetaxel.
18     Q. I also saw language, "Docetaxel is the most
19 active agent yet available for the treatment of
20 advanced breast cancer. Docetaxel may have some
21 activity in paclitaxel resistant breast cancer."
22     A. If I said it, it must be true.
23         MR. MICELI: Object to the form.
24     Q. (By Ms. Bieri) Do you know, sitting here
25 today, what you were referring to -- what was being

75

1  referred to in that statement?
2          MR. MICELI: Object to the form.
3      A. (Shakes head.)
4      Q. (By Ms. Bieri) Are you aware that some
5  studies have found the docetaxel molecule twice as
6  potent at inhibiting mitosis?
7          MR. MICELI: Object to the form.
8      A. It may be but that doesn't tell me anything
9  specific about its activity. It may be more potent in
10 inhibiting mitosis but that doesn't mean it's more
11 effective in treatment.
12     Q. Necessarily to you?
13     A. Not necessarily.
14         MR. MICELI: Object to the form.
15     A. Maybe but not necessarily.
16     Q. (By Ms. Bieri) Do you think that Taxotere
17 is an effective drug that saves lives?
18         MR. MICELI: Object to the form.
19     A. Does Taxotere save lives? Perhaps. As does
20 paclitaxel perhaps. If survival after a clinical
21 trial with docetaxel is greater than without a taxane,
22 then the answer to that is yes. Is it better than
23 Taxol? The answer is who knows. Not --
24     Q. (By Ms. Bieri) I'm so sorry. Go ahead.
25     A. Well, that -- that question would not be

76

1  answered.
2      Q. I'm asking you just generally.
3      A. Huh?
4      Q. You prescribed Taxotere during your
5  practice; correct?
6      A. Yeah.
7      Q. And did you prescribe it because you thought
8  that it was a good drug that gave patients the best
9  chance of survival when you prescribed it?
10         MR. MICELI: Object to the form.
11     A. Okay, I'll give you a "yes."
12     Q. (By Ms. Bieri) Do you agree with that?
13     A. It was an active drug, and whether -- the
14 superiority over Taxol was probably marginal, but it
15 -- but it was probably better than not using a taxane.
16     Q. So let me make sure I understand. You
17 believe using Taxotere was better than not using a
18 taxane and you believe that there was some level of
19 superiority over Taxol; is that correct?
20         MR. MICELI: Object to the form.
21     A. My main reason for selecting Taxotere over
22 Taxol was the toxicity, neuropathy.
23     Q. (By Ms. Bieri) Okay. We're kind of
24 straying away from what my original question was.
25     A. Which -- which is?

77

1      Q. One, did you believe that in prescribing --
2  did you prescribe Taxotere because you thought that it
3  would help your patients survive?
4          MR. MICELI: Object to the form.
5      A. Yes. I didn't pick it over Taxol for that
6  because I'm sure both the taxanes were fairly
7  equivalent in terms of survival.
8      Q. (By Ms. Bieri) Well, you said a couple
9  different things about --
10     A. I don't doubt it.
11     Q. No, I just want to make sure I understand
12 what your position is. Are you saying that you
13 believe that Taxotere does or does not have some
14 superiority in efficacy to Taxol?
15         MR. MICELI: Object to the form.
16     A. No.
17     Q. (By Ms. Bieri) You don't know one way or
18 the other?
19     A. (Shakes head.) No.
20     Q. Have you ever read any studies regarding the
21 efficacy rates of Taxotere versus Taxol?
22     A. I've been retired for multiple years. I
23 have not tended to keep up with every little thing.
24     Q. Sure. And I wasn't even trying to limit it
25 to when you retired. Just if you had any recollection

Page 82

1 question imaginable.
2    Q. We have a --
3    A. And -- and probably several times over.
4    Q. That has not been my intent at all. Let's
5 keep going then so we can get going. And we know we
6 have --
7    A. Let's get done. And -- and I think I'll
8 give you another 30 minutes and then you explode and
9 disappear. The clock is running.
10    Q. You know, I was trying to go through my
11 notes to see if I could make it be faster for you.
12    A. Good.
13    Q. Are you aware of any chemotherapy drugs that
14 don't have a lot of side effects?
15    A. It depends on how you define a chemotherapy
16 drug. I mean, if a hormonal agent is a chemotherapy
17 drug, they do not tend to have that many side effects.
18    Q. Are you talk --
19    A. If you're talking about cytotoxic drugs,
20 they all have side effects.
21    Q. You were talking about hormonal drugs.
22    A. Yeah.
23    Q. Are you talking about things such as
24 aromatase inhibitors?
25    A. Yes.

Page 83

1    Q. Or SERMs?
2    A. SERMs?
3    Q. Well, I was trying to distinguish aromatase
4 inhibitors such as Arimidex from, for example,
5 tamoxifen. Is that -- is tamoxifen also a hormonal --
6    A. Sure.
7    Q. -- treatment?
8    A. Sure.
9    Q. Is it your understanding that aromatase
10 inhibitors such as Arimidex carry a risk of changes to
11 hair?
12    A. It's minimal.
13    Q. What's that based on?
14    A. What's that based on?
15    Q. Mm-hmm.
16    A. Having used Arimidex over a period of
17 20 years.
18    Q. What -- are you aware of any risk of
19 persistent or permanent hair loss with Arimidex?
20    A. I'm sure it must happen or you wouldn't ask
21 the question, but I am not personally aware.
22    Q. When you are prescribing chemotherapy drugs
23 to patients, do you go over every possible side effect
24 that the patient could experience?
25    A. I do the best I can. There are always

Page 84

1 unforeseen side effects that come up that you don't --
2 that are rare or whatever. Certainly all common side
3 effects are discussed with the patient. I would
4 usually throw in a comment that there are other side
5 effects that are not necessarily frequent or known.
6    Q. In a general way you would say that?
7    A. Yeah. You'd have to write a telephone book
8 on every drug you prescribe.
9    Q. Well, and that's what I was getting at when
10 I asked you about do chemotherapy drugs have a lot of
11 side effects. So I was -- I mean, it would -- I was
12 wondering if you could go through -- even if you could
13 go through all of the possible side effects with a
14 patient.
15       MR. MICELI: Is that a question? Because
16 I'm going to object to it if it is.
17       MS. BIERI: You can object.
18       MR. MICELI: Okay. Object to the form.
19    Q. (By Ms. Bieri) Do you agree that no two
20 patients will necessarily experience the same side
21 effects from a chemotherapeutic agent?
22    A. Well, there are some side effects that are
23 very predictable.
24    Q. But not every single person who takes the
25 drug gets the exact same side effects; correct?

Page 85

1    A. Well, you just answered the question.
2    Q. No. I was asking a question.
3    A. Every patient is not exactly the same,
4 certainly.
5    Q. Can you think of an instance where a patient
6 had a side effect that was unexpected to you, that you
7 didn't know about?
8    A. I'm sure I've experienced that, but I can't
9 specifically remember.
10    Q. Sure. And I understand you've been retired
11 for several years. I was just wondering if any came
12 to mind.
13       So would you warn patients that there were
14 unknowns related to chemotherapy?
15    A. Of course.
16    Q. In your experience was -- strike that.
17       Have you ever seen a patient who's had
18 permanent or persistent hair loss following
19 chemotherapy?
20    A. Well, clearly the patients being discussed
21 today had permanent and persistent hair loss.
22    Q. Well -- and that's based on what --
23    A. That's based on the lawsuit.
24    Q. The fact that they brought a lawsuit --
25    A. Sure.

22 (Pages 82 to 85)

86

1  Q. -- makes you say that?
2  A. However, in terms of my own personal
3  experience, hair tended to come back sometimes even
4  before you stopped treating the patient. Sometimes it
5  came back curly where it was straight before.
6  Q. Did you ever see any cases of permanent or
7  persistent hair loss associated with chemotherapy?
8  A. Who knows? Perhaps, you know, but I cannot
9  specifically recall permanent hair loss.
10 Q. So if you can't recall it, is it fair to say
11 that if it happened, it would have been something that
12 happened rarely?
13     MR. MICELI: Object to the form.
14 A. Well, it would be something that did not
15 happen commonly.
16 Q. (By Ms. Bieri) And you said you warned
17 about the common side effects of chemotherapy drugs;
18 correct?
19 A. That's all you can do. You can't give
20 everybody, you know, a consent form that's 25 pages
21 long.
22 Q. So you would not have warned about the risk
23 of -- so you -- you're saying you're not sure if you
24 ever saw permanent or persistent hair loss, and if you
25 did, it was something that didn't happen commonly?

87

1  A. It was not common.
2  Q. Do you remember telling me that you warned
3  of common side effects?
4  A. Yeah.
5  Q. Okay. So would you have warned of the risk
6  of persistent hair loss?
7  A. Not unless it was in the package insert. If
8  it was in the package insert, I would have warned
9  about it.
10 Q. Tell me a drug for which the package insert
11 says that there's a risk of permanent or persistent
12 hair loss.
13 A. Can't do that. Don't know.
14 Q. For what drugs did you warn of a risk of
15 permanent or persistent hair loss?
16 A. I did not warn about permanent or persistent
17 hair loss because, in my experience, hair came back.
18 Q. So for no chemotherapy drug at any time did
19 you ever warn about the risk of permanent or
20 persistent hair loss?
21     MR. MICELI: Object to the form.
22 A. No.
23 Q. (By Ms. Bieri) No, you did not?
24 A. Correct.
25 Q. And that was based on your experience that

88

1  you did not see that?
2  A. Correct.
3     MR. MICELI: Object to the form. Pardon me.
4  Q. (By Ms. Bieri) Have you ever seen any
5  literature at all regarding any chemotherapy drug
6  regarding reporting cases of permanent or persistent
7  hair loss?
8     MR. MICELI: Object to the form.
9  A. Not during the time I was practicing.
10 Q. (By Ms. Bieri) Have you seen something
11 since then?
12 A. No. I haven't kept up.
13 Q. Sure. Understood. I just wanted to make
14 sure I understood your testimony.
15 A. I was pretty up to date at the time I
16 retired, but since that time, I've not been keeping
17 up.
18 Q. Let me turn and ask you a little bit about
19 NSABP-40. And to the extent it helps you, in the pile
20 you have, there are some documents related to that.
21 A. Okay.
22 Q. To the extent you want to look at those
23 while we're talking.
24 A. All right.
25 Q. Do you know when you first assisted a

89

1  patient who was enrolled in NSABP-40?
2  A. Do I know when I first --
3  Q. (Nods head.)
4  A. -- enrolled a patient in that? Probably
5  would have been sometime in 2007 or '8. I thought
6  very strongly that if a clinical trial was available
7  for a given patient that we should try to enroll the
8  case because -- for two reasons: One, they were
9  always state-of-the-art treatment, and secondly, we
10 would be able to answer a question, with regard to the
11 treatment of breast cancer, whether one treatment was
12 preferable to another.
13 Q. How did you learn about clinical trials such
14 as NSABP-40 such --
15 A. I was a member of NSABB.
16 Q. And so who at Ochsner decided if doctors at
17 Ochsner participated in certain clinical trials? So a
18 clinical --
19 A. Was it me?
20 Q. Was it you? I don't know. Was it?
21 A. I was the principal investigator for Ochsner
22 for NSABP. So I guess the answer to that is "yeah."
23 Q. Okay. So in NSAB --
24 A. I made these trials available. We discussed
25 them. If they -- another physician had a suitable

23 (Pages 86 to 89)

90

1  patient, they would sometimes discuss it with me or
2  sometimes just discuss it directly with the patient.
3  But I couldn't dictate that they would put a patient
4  on a clinical trial.
5      Q. No, I think you answered my question. I was
6  trying to understand just how Ochsner would become
7  affiliated with clinical trials such as NSABP-40 and I
8  think you answered that.
9         Did you get information on how to explain
10 the clinical trial NSABP-40 to your patients?
11     A. Specifically about the trial, how to explain
12 it to a patient?
13     Q. Mm-hmm.
14     A. Well, we discussed the trials at, like, an
15 NSABP meeting and the risks and potential benefits and
16 the gains and so forth, but I don't know that we ever
17 specifically talked about recruitment for a trial.
18     Q. You answered the question I was asking, I
19 think. I was curious about how you learned about how
20 to talk to a patient about it, and you're telling you
21 discussed the risks and benefits at meetings with
22 NSABP; is that correct?
23     A. Correct.
24     Q. And then were you given a sample informed
25 consent --

91

1      A. Sure.
2      Q. -- to use?
3      A. Yes.
4      Q. Beyond the informed consent that a patient
5  would sign, did you provide patients about any other
6  information regarding NSABP-40?
7         Do you want me to ask again?
8      A. Yeah.
9      Q. Sure. Beyond the informed consent
10 document --
11     A. Right.
12     Q. -- did you give patients other written
13 materials about NSABP B-40?
14     A. No.
15     Q. Tell me typically -- you don't have any
16 specific -- do you have any specific recollection of
17 going over the consent form with Miss Kahn?
18     A. (Shakes head.)
19     Q. Do you have any specific recollection of
20 going over the consent --
21     A. No.
22     Q. -- form with Miss Thibodeaux?
23     A. No.
24     Q. Okay. Let me ask you a more general
25 question. Typically when going over clinical trial

92

1  consent forms with your patients, did you have a
2  practice on how you would do that?
3      A. I would try to go through the potential
4  risks and benefits of a clinical trial. I would also
5  let the patient know that she did not have to
6  participate in the clinical trial; that we would
7  certainly treat the patient anyway. I don't know
8  whether that answers your question or not.
9      Q. Well, I notice that a woman named Shevonda
10 Thomas also signed the informed consent form.
11     A. It's in here somewhere.
12     Q. Did you have -- let me ask you this
13 question: Did you have clinical protocol -- clinical
14 trial nurses?
15     A. Yes.
16     Q. And was it the job of the clinical trial
17 nurses to also go over with the patients the informed
18 consent forms?
19     A. Yes.
20     Q. Is it fair to say that your job was to
21 ensure that patients had sufficient information about
22 the clinical trial to make an informed decision
23 regarding participation?
24     A. Well, we try.
25     Q. Generally speaking, when you talk to

93

1  patients about clinical trials, would you review the
2  risks listed for each of the drugs as identified in
3  the informed consent?
4      A. I tried to. Yeah.
5      Q. Would you -- I'm so sorry.
6      A. Yes. I tried to be as comprehensive as
7  possible. That doesn't mean I succeeded every single
8  time because patients often didn't quite understand
9  but didn't let you know they -- embarrassed to let you
10 know that they didn't quite understand.
11     Q. But just because a patient didn't understand
12 doesn't mean you didn't say it; correct?
13     A. Correct.
14        MR. MICELI: Object to the form.
15     Q. (By Ms. Bieri) Okay. You said you felt
16 strongly that patients should be in clinical trials if
17 available.
18     A. Correct.
19     Q. Do you mean that you would recommend a trial
20 for a patient even if you might otherwise prescribe a
21 slightly different regimen?
22     A. The answer to that is I wouldn't prescribe a
23 slightly different regimen. If I didn't think that
24 the clinical trial was equal to or whatever the
25 standard therapy was, I wouldn't recommend the trial.

Page 94

1   Q. Okay. Let's look specifically in relation
2   to --
3   A. I mean, that doesn't mean that the results
4   of the clinical trials were always superior. But you
5   had to have a reason for asking the question. The
6   question was answered by the clinical trial.
7   Q. So in -- looking at Exhibit 6, on the second
8   page, I'm looking at the second sentence. It says,
9   "Three of the chemotherapy drugs used in this study
10  are docetaxel followed by the combination of
11  doxorubicin and cyclophosphamide --
12  A. Yes.
13  Q. -- AC, a standard treatment for breast
14  cancer."
15  A. Right.
16  Q. Would you agree that the standard treatment
17  for breast cancer in 2008 was what's described there,
18  docetaxel followed by doxorubicin and
19  cyclophosphamide?
20      MR. MICELI: Object to the form.
21  A. The question -- one of the questions being
22  asked is does docetaxel add some benefit to the use of
23  Adriamycin and Cytoxan.
24  Q. (By Ms. Bieri) Well, are you sure about
25  that?

Page 95

1   A. I don't know what the hell you're driving
2   at, lady.
3   Q. Well --
4   A. You know, we try to do a good job and we try
5   to be very sincere when we recommend a clinical trial.
6   We weren't trying to do any bullshit.
7   Q. Of course not. I was just trying to direct
8   you to what the purpose of the study was. The title
9   says, "A Randomized Phase III Trial of Neoadjuvant
10  Therapy in Patients With Palpable and Operable Breast
11  Cancer Evaluating the Effect on Pathological Complete
12  Response of Adding Capecitabine or Gemcitabine to
13  Docetaxel When Administered Before AC With Or Without
14  Bevacizumab and Correlative Science Studies Attempting
15  to Identify Predictors of High Likelihood for pCR With
16  Each of the Regimens."
17      And so what I was asking you is, in looking
18  at the title and also in the section that says, "Why
19  is this research being done?" on the second page,
20  would you agree that the purposes of the study were to
21  evaluate adding capecitabine, gemcitabine and
22  bevacizumab to the standard treatment for breast
23  cancer which was docetaxel, doxorubicin, and
24  cyclophosphamide?
25      MR. MICELI: Object to the form.

Page 96

1   A. We're always trying to make -- we're always
2   trying to make things better. That's the whole
3   purpose of doing the clinical trial.
4   Q. (By Ms. Bieri) Was this study, NA --
5   A. NSABP.
6   Q. Yes. -- NSABP B-40 looking at the addition
7   of bevacizumab, gemcitabine, and capecitabine?
8   A. Capecitabine.
9   Q. Thank you.
10  A. That's what it says; right?
11  Q. And was that what the purpose of the study
12  was?
13  A. Yeah.
14  Q. Okay. So I just want to make sure -- in
15  fact, in looking at this same paragraph I was
16  directing you to, it said, "Three of the chemotherapy
17  drugs used in this study are docetaxel followed by the
18  combination of doxorubicin and cyclophosphamide --
19  A. Right.
20  Q. -- a standard treatment for breast cancer."
21  A. Right.
22  Q. "This study will add the drug capecitabine
23  and the drug gemcitabine to docetaxel to see --
24  A. Right.
25  Q. -- if either drug improves the effectiveness

Page 97

1   of the standard drugs at killing all of the tumor
2   cells in the breast and nearby lymph nodes."
3   A. So your question is what?
4   Q. Do -- do you agree that the standard drugs
5   that they were talking about --
6   A. At the time.
7   Q. Yeah, at the time in connection with this
8   study were --
9   A. Yeah. That's what it said. Yes.
10  Q. -- doxorubicin, cyclophosphamide, and
11  docetaxel; correct?
12  A. And your point is?
13  Q. Just that. Because we had some confusion
14  about whether the study was looking about adding
15  docetaxel and I just wanted to make sure that the
16  record was clear on that point. That was my point.
17  A. I'm still not sure I really understand what
18  you're driving at.
19  Q. At the beginning of the deposition you told
20  me that Phase III clinical trials --
21  A. Right.
22  Q. -- evaluated standard drugs --
23  A. Standard versus something you think's
24  better.
25  Q. Right. Something that might be better.

98

1  Correct?
2      A. Yeah, that's --
3      Q. And I was just trying to establish that in
4  the paragraph that I was showing you that the standard
5  that they were going to evaluate against was
6  doxorubicin, cyclophosphamide, and docetaxel. Is that
7  correct?
8      A. Yeah.
9      Q. Okay. Okay. Doctor, what I'd like to do,
10 if it's okay with you, I'd like to really try to
11 condense my notes because I don't want to take up more
12 of your time than I have to. Can I -- do you -- are
13 you guys amenable -- I don't even know where we are in
14 terms of lunch.
15         MR. MICELI: We got about 40 minutes, it
16 looks like, by my watch if you said noon.
17         MR. HARMON: Yeah, noon.
18         MS. BIERI: Well, the good news is that
19 they're sandwiches and they might keep for a second,
20 but I think if we took a few minutes now, I might be
21 able to condense and save the doctor some time. Are
22 you-all okay with that?
23         THE DEPONENT: I would love that.
24         MS. BIERI: Absolutely. Why don't we do
25 that. Can we go off the record?

99

1          MR. MICELI: I'll do the same thing. I've
2  already been doing it in my head.
3          THE VIDEOGRAPHER: Okay. The time is
4  11:21 a.m. We are off the record and this ends Media
5  2.
6          (A lunch recess was had.)
7          THE VIDEOGRAPHER: Okay. The time is
8  12:42 p.m. and we are back on the record.
9      Q. (By Ms. Bieri) Dr. Kardinal, when you are
10 deciding what chemotherapy drugs or regimen to
11 prescribe for a patient, what factors do you consider?
12     A. Obviously we -- what disease she has, what
13 stage of the disease does she have, is she relatively
14 newly diagnosed or is this a recurrence. These are
15 all factors that come in.
16     Q. In looking at Exhibit 4 --
17     A. Four?
18     Q. Yes, please.
19     A. Okay.
20     Q. We'll talk about that in a minute.
21     A. Yeah. Okay.
22     Q. When you were -- what factors about
23 Miss Kahn did you consider when you decided to
24 recommend NSABP B-40?
25     A. Well, she had, you know, a mass in her

100

1  breast that was fairly large and it was one that was
2  going to require preoperative chemotherapy, and we had
3  a very good clinical trial which was comparing, you
4  know, all good treatment versus the test arm which was
5  felt to be possibly better and this is why we
6  considered her for that clinical trial.
7      Q. In looking at Exhibit 4 on the first page,
8  the last sentence --
9      A. This; right? Yeah.
10     Q. Yes, please. The last sentence of the first
11 paragraph suggests that to be in NSABP-40, Miss --
12 patients had to be HER2 negative. Is that your
13 recollection?
14     A. Yes. Yes.
15     Q. So you said that you prescribed or
16 recommended NSABP-40 to patients because you thought
17 it was the standard of care or more; right?
18     A. Correct.
19     Q. Did you talk to patients enrolled in
20 NSABP-40 about the possibility of hair loss during
21 chemotherapy?
22     A. It's difficult to remember what you said
23 back multiple years ago, but I'm sure I did.
24     Q. So tell me -- did you under -- can
25 Adriamycin cause alopecia?

101

1      A. Absolutely.
2          MR. MICELI: Object to the form.
3      Q. (By Ms. Bieri) Can cyclophosphamide cause
4  alopecia?
5      A. Yes.
6          MR. MICELI: Same objection.
7      Q. (By Ms. Bieri) Can Taxotere cause alopecia?
8      A. Sure. Yes.
9      Q. When -- even outside of the clinical trial,
10 when you were prescribing those medications --
11 Adriamycin, cyclophosphamide, and Taxotere -- did you
12 talk to your patients about hair loss?
13     A. Yes.
14     Q. And what would you say?
15     A. I'd generally say that the probabilities are
16 such that she would probably have hair loss with the
17 use of this drug. And perhaps it was naive of me, but
18 I would generally say that the hair would come back.
19     Q. You would say that the hair would generally
20 come back?
21     A. Yes.
22         MR. MICELI: Object to the form.
23     Q. (By Ms. Bieri) You wouldn't guarantee that
24 a patient's hair would return, would you?
25         MR. MICELI: Object to the form.

26 (Pages 98 to 101)

102

1  Q. (By Ms. Bieri) Let me rephrase it. Would
2  you guarantee to a patient that her hair would return
3  after chemotherapy?
4  A. I said -- no; that it probably would come
5  back. You always want to leave the door open, you
6  know, but at that point in time -- or at -- when I was
7  using Adriamycin and so forth, the hair basically
8  inevitably came back.
9  Q. You did talk to me earlier in the deposition
10 about some instances on Adriamycin where patients had
11 significant hair thinning. Do you remember that?
12 A. Yes.
13 Q. Persistent significant hair thinning;
14 correct?
15     MR. MICELI: Object to the form.
16 A. Persistent. Right.
17 Q. (By Ms. Bieri) And is it fair to say that
18 you -- did you ever specifically warn Adriamycin
19 patients of the risk of significant persistent hair
20 thinning?
21     MR. MICELI: Object to the form.
22 A. It was, in my -- again, your personal
23 experience is not statistically significant but it
24 does influence what you do, and at that point in time
25 with the use of Adriamycin, I had not seen a patient

103

1  where it had not come back. It's a double negative, I
2  know.
3  Q. Are you talking about not come back at all?
4  A. Correct. I had not -- we're getting into
5  all sorts of negatives here.
6  Q. Well, let me ask you a question. Do you
7  distinguish significant hair thinning from -- strike
8  that.
9     Do you distinguish persistent significant
10 hair thinning from persistent alopecia?
11 A. I'm not sure I really did.
12 Q. Is alopecia something different to you than
13 significant hair thinning?
14 A. If you have significant hair thinning, that
15 would be part of alopecia, yeah, but it's not total
16 alopecia.
17 Q. And you had seen patients who had
18 significant hair thinning with Adriamycin; correct?
19     MR. MICELI: Object to the form.
20 A. Yeah.
21 Q. (By Ms. Bieri) But you didn't specifically
22 warn about that as a risk because it was rare in your
23 experience; correct?
24 A. I would -- why don't you repeat the
25 question.

104

1  Q. Because the incidence of significant hair
2  thinning that you saw in patients with Adriamycin, it
3  was rare, you didn't specifically warn them of the
4  risk of persistent significant hair thinning; correct?
5  A. Correct.
6  Q. If -- if Miss Kahn had said to you, "I don't
7  know if I want to be an NSABP B-40," what, if
8  anything, would you offer her as an alternative?
9  A. I would have treated her very -- very
10 similarly.
11 Q. And what does that mean?
12 A. Meaning I would have used Adriamycin and
13 cyclophosphamide followed by a taxane.
14 Q. And if Miss Thibodeaux had said --
15 A. Same.
16 Q. And I forgive -- forgive me for doing this
17 but I have to do the full question for the record. If
18 Miss Thibodeaux had said, "Is there another option
19 other than being in a clinical trial?" what would you
20 have recommended to her?
21 A. I would have recommended treating her with
22 Adriamycin and Cytoxan followed by a taxane.
23 Q. Followed by Taxotere?
24     MR. MICELI: Object to the form.
25 A. Taxane. Either. Usually Taxotere is what I

105

1  would use.
2  Q. You typically used Taxotere?
3  A. I used Taxotere because of the -- has lesser
4  neurological toxicity than Taxol.
5  Q. So then would you have recommended Taxotere
6  over Taxol?
7     MR. MICELI: Object to the form.
8  A. Yes.
9  Q. (By Ms. Bieri) Do you agree that saying
10 hair generally grows back is not the same as saying
11 hair always grows back?
12 A. They're not exactly the same. To say it
13 generally grows back, that doesn't necessarily mean
14 always.
15 Q. Did you recommend to Miss Kahn NSABP --
16 strike that.
17 A. B-40.
18 Q. Strike that. If the Taxotere label, which I
19 understand you can't remember when you last looked at
20 other than from Plaintiffs' counsel about a month
21 ago -- if the Taxotere label had said, "In most cases,
22 normal hair growth should return. In some cases,
23 frequency not known, permanent hair loss has been
24 observed," would that change your recommendation that
25 Miss Kahn participate in NSABP B-40?

106

1  A. No.
2  Q. If -- I'm going to ask you the question same
3  about Miss Thibodeaux, for the record. If the
4  Taxotere label had said, "In most cases, normal hair
5  growth should return. In some cases, frequency not
6  known, permanent hair loss has been observed," would
7  that change your recommendation that Miss Thibodeaux
8  participate in NSABP B-40?
9  A. No.
10 Q. Can you say, to a reasonable degree of
11 medical certainty, that Miss Kahn would survive --
12 would have survived if she didn't participate in NSABP
13 B-40?
14     MR. MICELI: Object to the form.
15 A. Well, she would have been treated
16 essentially the same.
17 Q. (By Ms. Bieri) I'm not talking about
18 comparisons right now. We know Miss Kahn was treated
19 with NSABP B-40; right?
20 A. Mm-hmm.
21 Q. And we know that she has survived; correct?
22 Can you --
23 A. Wouldn't be talking here if she hadn't
24 survived.
25 Q. Can you say that you know, to a reasonable

107

1  degree of medical certainty, what her outcome would
2  have been if she had been on some other chemotherapy
3  regimen?
4      MR. MICELI: Object to the form.
5  A. We probably would have treated her the same,
6  as I said. Or very similarly.
7  Q. (By Ms. Bieri) With ACT; correct?
8  A. Right.
9  Q. And you believe she would have survived on
10 ACT?
11 A. Same risk.
12 Q. Can you say, to a reasonable degree of
13 medical certainty -- let me ask you that about
14 Miss Thibodeaux. Can you say, to a reasonable degree
15 of medical certainty, that Miss Thibodeaux's outcome
16 would have been the same if she had undertaken a
17 different chemotherapy regimen?
18     MR. MICELI: Object to the form.
19 A. Well, I wouldn't -- you're talking about
20 treating her with totally different drugs and --
21 Q. (By Ms. Bieri) What I'm saying is we know
22 what she was treated with; right?
23 A. Yes.
24 Q. Can you say if she was treated with
25 something else, not what she received in NSABP B-40,

108

1  that her outcome would have been the same?
2      MR. MICELI: Object to the form.
3  A. No.
4  Q. (By Ms. Bieri) And you don't know -- do you
5  know the reported rate of persistent or permanent hair
6  loss with Taxol?
7  A. Do I personally know that?
8  Q. Mm-hmm.
9  A. No.
10 Q. Can you say, to a reasonable degree of
11 medical certainty, that Miss Kahn's hair would look
12 different today if she took Taxol instead of Taxotere?
13     MR. MICELI: Object to the form.
14 A. (Shakes head.) I don't know that there
15 wasn't any different at all.
16 Q. Can you say, to a reasonable degree of
17 medical certainty, that Miss Thibodeaux's hair would
18 look any different today if she had been treated with
19 Taxol instead of Taxotere?
20     MR. MICELI: Same objection.
21 A. No.
22 Q. (By Ms. Bieri) I want to direct you to just
23 a few of the records of Plaintiff. Let me fix my mic
24 quickly. There we go.
25     On the second page of Exhibit 4 is it your

109

1  understanding that this record, the page you're
2  looking at and the prior page, address your first
3  encounter with -- with Mrs. Kahn?
4  A. My first encounter with her?
5  Q. Yes.
6  A. Is this the first one in the record? If it
7  is, it was my first encounter. I don't remember
8  whether this was my first encounter or second
9  encounter.
10 Q. Okay. In the first -- forgive me for
11 pointing. In the first paragraph on the second page
12 that's Bates numbered 861, you wrote, "I had a long
13 discussion lasting 20 or more minutes with the patient
14 and her husband with regard to neoadjuvant
15 chemotherapy." Do you have any recollection of what
16 you would have discussed with her?
17 A. The risks and benefits of treatment.
18 Q. Of neoadjuvant chemotherapy?
19 A. Correct.
20 Q. And at this point it hadn't been determined
21 if she was going to be in NSABP-40 yet; correct?
22 A. No. We would have treated her essentially
23 the same.
24 Q. Let me direct you to a page in Exhibit 4
25 that's Bates labeled 953. So the numbers in the

28 (Pages 106 to 109)

154

1  Q. (By Mr. Miceli) Okay. Now, I asked you
2  before, and you answered me, but -- that you would
3  have discussed with the patients the adverse event of
4  permanent hair loss being associated with the use of
5  Taxotere as adjuvant care for breast cancer and that
6  if that patient -- your patient decided not to use it
7  for that reason, you would give an alternative
8  medicine; correct?
9     A. Correct.
10     MS. BIERI: Object to the form.
11     Q. (By Mr. Miceli) Okay. And is that because
12  ultimately the patient has the say in what product
13  they take when they learn of the risks?
14     A. The patient doesn't describe -- do their own
15  prescribing.
16     Q. No, but they --
17     A. We'd certainly make a strong recommendation
18  on what we think is best.
19     Q. But in your -- in your experience and in
20  your practice did you encourage the patient to be an
21  active participant in their health care?
22     A. Well, that's -- that's open-ended. I think
23  the answer to that is "yes."
24     Q. Okay.
25     A. But I was not an idle bystander.

155

1     Q. Oh, I understand. And Doctor, because
2  Ms. Bieri was so thorough, you're going to see me just
3  looking down the page and checking. That means I'm
4  not asking you questions.
5     A. That sounds good.
6     MS. BIERI: Object to the form to the extent
7  that was a question.
8     MR. MICELI: It was a compliment, but you
9  can object to it if you want.
10     A. He was just passing by, I guess.
11     Q. (By Mr. Miceli) And I told you that we
12  would come back to this -- I need my copy of the form.
13  I'm going to -- I'll direct you to the page that we
14  need to talk about. I'll give you yours, and if you
15  flip with me Doctor, to page 6.1. Or excuse me.
16  Page 14, section 6.1. Now --
17     A. All right.
18     Q. Do you see where it says "Clinical Trial
19  Experience"?
20     A. Right.
21     Q. "Breast cancer" and then "Monotherapy with
22  Taxotere for locally advanced metastatic breast cancer
23  after failure of prior chemotherapy." Do you see
24  that?
25     A. Yes.

156

1     Q. Now, that description for the indication for
2  use of Taxotere is -- is not the reason you used
3  Taxotere in the treatment of Ms. Thibodeaux; correct?
4     A. That's correct.
5     MS. BIERI: Object to the form.
6     Q. (By Mr. Miceli) And the described
7  indication for use under 6.1, Breast Cancer
8  Monotherapy, was not the indication for which you
9  prescribed the use of Taxotere in the neoadjuvant
10  therapy for Ms. Kahn; correct?
11     MS. BIERI: Object to the form.
12     A. Correct.
13     Q. (By Mr. Miceli) So if we flip over to
14  page 17, do you see the section there Cutaneous
15  starting at --
16     A. Yes.
17     Q. -- paragraph -- or line 5 and extending
18  through line 12?
19     A. Yes.
20     Q. Okay. If you read that to yourself, if you
21  -- if you would, please, tell me if you see any
22  warning or -- excuse me -- mention in this paragraph
23  about permanent hair loss.
24     A. No. Do you?
25     Q. No, I do not. And then if you look at lines

157

1  12 -- 11 and 12, "Severe nail disorders were
2  characterized by hypo- or hyperpigmentation and
3  occasionally by onycholysis" -- did I say that
4  correctly?
5     A. Lysis.
6     Q. Lysis. -- [as read] in point -- 0.8 percent
7  of patients with solid tumors and pain. Do you see
8  that?
9     A. Uh-huh. Yes.
10     Q. What is onycholysis?
11     A. That's damage to the fingernails.
12     Q. Okay. Does that include them falling off?
13     A. Yeah.
14     Q. And --
15     A. It probably does.
16     Q. And they're reporting in this instance
17  regarding onycholysis an incidence rate of
18  .8 percent --
19     A. Right.
20     Q. -- with -- in persons -- in patients with
21  solid tumors; correct?
22     A. Right.
23     MS. BIERI: Object to the form.
24     Q. (By Mr. Miceli) All right. And if you'd
25  flip with me to page 20.

40 (Pages 154 to 157)

218
1  A. Absolutely.
2  Q. You would never guarantee that someone's
3  hair was going to grow back; correct?
4      MR. MICELI: Object to the form.
5  A. How do I remember specifically what I said
6  to any individual patient?
7  Q. (By Ms. Bieri) And --
8  A. In general, you would say your hair -- I
9  have never personally, up to this point, seen a
10 patient whose hair did not come back. And that's over
11 approximately 45 years. And that's apparently good
12 experience particularly when you're using drugs that
13 cause hair loss.
14 Q. And do you agree that you haven't seen
15 either Miss Kahn or Miss Thibodeaux since 2008;
16 correct?
17 A. No, I have not.
18 Q. Okay. So --
19 A. And evidently their hair has not come back
20 or you wouldn't be sitting there.
21 Q. Well -- we talked a bit about the photos
22 earlier. Would it be -- Mr. Miceli asked you if you
23 would necessarily know if someone in the medical
24 community was acting as a key opinion leader or
25 otherwise consulting with a pharmaceutical company

219
1  when they were speaking. Have you ever seen an
2  agreement between Sanofi and any doctor regarding
3  consulting?
4  A. No.
5  Q. Do you know what Sanofi requires regarding
6  disclosures of that relationship?
7  A. No. Nor have I been involved or seen or
8  witnessed or -- nor have I been a consultant for
9  Sanofi.
10 Q. And Doctor, I think I just have about --
11 just a few more questions. If I'm remembering
12 correctly, Mr. Miceli phrased a question that if you
13 knew -- something to the effect of if you knew that
14 Taxotere had a risk of persistent hair loss and a
15 patient expressed a concern about persistent hair
16 loss, you would potentially prescribe Taxol to that
17 patient. Was that your testimony?
18     MR. MICELI: Object to the form.
19 A. No.
20 Q. (By Ms. Bieri) Sorry. Tell me your
21 testimony.
22 A. If Sanofi said that Taxotere may cause
23 permanent hair loss, then that should, at a minimum,
24 be included in the consent form for the use of that
25 drug. And if they stated that the incidence of

220
1  permanent hair loss were X percent or whatever, those
2  things should be made known to the patient.
3  Q. Let me ask you this: Would it be misleading
4  to you, Doctor, if Sanofi told you that there was a
5  risk associated with a drug even though there was no
6  substantial evidence?
7  A. What?
8      MR. MICELI: Hold on. Object to the form of
9  the question.
10 A. I mean, that's not even a question.
11 Q. (By Ms. Bieri) It is. Do you remember
12 Mr. Miceli talking to you about --
13 A. Try again.
14 Q. Do you remember Mr. Miceli talking to you
15 about the term "substantial evidence"?
16 A. That's --
17 Q. I'm trying to reorient you because I think
18 you thought my question was out of left field.
19 A. Well, if I remember -- you're not coming
20 across right now at all.
21 Q. I apologize. Thank you for telling me. Let
22 me try again.
23 A. Yes.
24 Q. If a drug manufacturer didn't have
25 substantial evidence to support something, would it

221
1  be --
2  A. If it doesn't have substantial evidence,
3  they should come out and tell you they suspect
4  something. They have to have substantial evidence if
5  they're going to come out and give you a warning on
6  something. Not just talk off the top of their head.
7  Q. Mr. Miceli showed you Plaintiff's Exhibit 15
8  and he represented to you that that was a 2009
9  document, I believe.
10 A. Yes.
11     MR. MICELI: Which one is that?
12 A. (Indicates.)
13     MR. MICELI: Oh, yeah.
14 Q. (By Ms. Bieri) With regard to The
15 Chemotherapy Source Book --
16 A. Yes.
17 Q. -- that you authored a chapter of --
18 A. On breast cancer, yes.
19 Q. Yes. And we've marked that as Exhibit 21.
20 Will you agree that that was published in 2008?
21 Exhibit 21.
22 A. Yes. Correct.
23 Q. And I'm looking at page 372.
24 A. All right.
25 Q. In the last sentence of the first