# EXHIBIT E

```
                                                                1
 1            UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF LOUISIANA
 2

 3                             MDL NO.: 2740
                               SECTION: H
 4

 5  IN RE:  TAXOTERE (DOCETAXEL)
    PRODUCTS LIABILITY LITIGATION
 6

 7  This Document Relates To:

 8  Antoinette Durden, Case No. 2:16-cv-16635;

 9  Tanya Francis, Case No. 2:16-cv-17410;

10  Barbara Earnest, Case No. 2:16-cv-17144.

11  _____/

12

13            Thursday, December 13, 2018

14

15        Videotape Deposition of DAVID A.

16  KESSLER, MD, taken at the Whitfield Bryson &

17  Mason LLP, 5101 Wisconsin Avenue NW, Suite 305,

18  Washington, D.C., beginning at 8:55 a.m.,

19  before Ryan K. Black, a Registered Professional

20  Reporter, Certified Livenote Reporter and Notary

21  Public in and for the District of Columbia.

22

23

24

25  Job No. NJ3173488
```

Page 22

```
 1  that represents company documents or company
 2  testimony that you've received since you
 3  prepared and filed your expert report?
 4      A.  Everything -- again, with the
 5  subject [sic] that I just want to look at the --
 6  the objections to the dep -- to the notice, my
 7  -- my -- my sense is that everything, from what
 8  I can remember, is on the reliance list.  There
 9  may be things in -- I -- I would never say
10  never.
11      Q.  All right.
12      A.  I just don't want to be -- because,
13  you know, I'm -- I am -- I am looking online, I
14  am cutting and pasting things, there's always a
15  chance that --
16      Q.  Okay.
17      A.  -- there's something here that's not
18  in there.  But my intent was to be -- try -- my
19  intent was to be comprehensive in my report.
20      Q.  Fair enough.
21          Now, there's some additional materials
22  over here to your right, and can you describe
23  what those are?
24      A.  So -- so those -- again, you asked for
25  things that I -- in the notice, that I bring my
```

Page 23

```
 1  files.  So I may have -- sometimes I cut and
 2  pasted and put stuff in my notes here or --
 3      Q.  Okay.
 4      A.  -- or I scribbled here.
 5      Q.  Okay.
 6      A.  Sometimes I just printed stuff out.
 7      Q.  Okay.
 8      A.  Sometimes, you know, there's
 9  information, you know, that I've had --
10      Q.  Okay.
11      A.  -- here.  So these are individual
12  documents, and happy to go through them.  Or
13  they -- they could be charts or excerpts or
14  they're information, you know -- if you asked me
15  -- you know, so -- there's -- there -- these are
16  pieces of paper that you asked me to bring.
17      Q.  Thank you.  I appreciate you bringing
18  those in, and -- and I think that's responsive
19  enough for now.
20          You didn't bring -- you also brought
21  your invoices and your -- your time spent on
22  this endeavor so far?
23      A.  Yes.  And I asked counsel to -- to
24  bring that, --
25      Q.  Okay.
```

Page 24

```
 1      A.  -- and you were kind enough to mention
 2  my wife in the notice of -- the -- the --
 3          MS. JEFFCOTT:  Deposition notice.
 4          THE WITNESS:  -- deposition notice.
 5  BY MR. KEENAN:
 6      Q.  I mentioned your --
 7          MS. JEFFCOTT:  You actually mentioned
 8  my wife.  And so this was the invoice, and it
 9  was December.
10  BY MR. KEENAN:
11      Q.  Okay.  Well, I -- if we mentioned your
12  wife, --
13      A.  That's okay.
14      Q.  -- that was -- I'm confident that was
15  inadvertent.
16          I'm going to mark this as Exhibit
17  Number 3, and this would reflect your time?
18      A.  Yes, sir.
19          (Kessler Deposition Exhibit No. 3, a
20  copy of Dr. Kessler's invoices, was marked.)
21  BY MR. KEENAN:
22      Q.  Would that -- that would not include,
23  obviously, today's deposition, right?
24      A.  No, sir.
25          MS. JEFFCOTT:  And there are two
```

Page 25

```
 1  copies attached.  It's one exhibit and then two
 2  additional copies.  It's not three separate
 3  invoices.
 4          MR. KEENAN:  Very good.  May we have
 5  these copies, then?
 6          MS. JEFFCOTT:  Mm-hmm.
 7          MR. KEENAN:  All right.  Making
 8  progress.
 9  BY MR. KEENAN:
10      Q.  Now, a couple other preliminary
11  matters.
12          You are a non case-specific expert,
13  is that fair?
14      A.  Correct.
15      Q.  Okay.  And I've read your other
16  testimony.  You -- you, obviously, know what
17  that means, right?
18      A.  Yes, sir.
19      Q.  So with respect to any of the
20  Bellwether plaintiffs, their medical records,
21  their conditions, their prognosis, what meds
22  they took and all that, other than the fact
23  that, presumably, they took Taxotere, you're not
24  here to offer opinions about their care and
25  treatment, correct?
```

7 (Pages 22 to 25)

250

1 other drugs. Of course, there's going to be
2 background wing of these cases.
3     Q. And in cases where patients have taken
4 AC first, that is -- that is Doxorubicin and
5 Cytoxin and then Taxotere, are you with me,
6 Doctor?
7     A. TAC?
8         Again, you've gotta be careful as to
9 whether it's T plus AC or ACT.
10    Q. ACT.
11    A. Right.
12    Q. Okay. And they have lost their hair
13 with the commencement of the AC therapy, are you
14 with me, --
15    A. Yes.
16    Q. -- right?
17        How can you determine that the
18 alopecia that you define as irreversible
19 alopecia is a product of the Taxotere and not
20 the -- you say not the Doxorubicin?
21    A. So -- so if you look at the scientific
22 data, and let me just go over this, let me just
23 get for a second -- just give me a second and
24 then I'll answer your question.
25        So if you look at Sedlacek in 2006 and

251

1 you're comparing PAC to TAC, --
2     Q. Okay.
3     A. -- AC is the same, okay?
4     Q. Okay. All right.
5     A. All right. If you do a risk
6 difference, you get a risk difference of 6.25
7 percent.
8        If you then look at the Fisher exact,
9 right, the difference between that seven, in the
10 one arm, and zero in the other, when you -- when
11 you look at Group C in Sedlacek, which is versus
12 Groups A and B without Taxane and C with Taxane,
13 and you get a Fisher Exact P value of .00005,
14 all right? So you have statistical significance
15 in Sedla -- Sedlacek as of 2006, where the only
16 difference between those two arms, the AC is the
17 same, right, as the P and the T. And T gets you
18 a rate difference of 6.25 percent that is highly
19 statistically significant.
20        So that's why, if you look
21 at this scientifically, and that's what
22 Pharamacovigilance is, that's what Sanofi should
23 have done, this data was publicly available, it
24 was at the major breast conference, it was put
25 out in 2006, but in 2006 this was over, as far

252

1 as causation.
2     Q. You're re -- you're reviewing Exhibit
3 51? Is that --
4     A. Yes.
5     Q. Okay. And Sedlacek was -- those
6 reports.
7        THE REPORTER: I lost my feed here.
8 So can we just stop for two minutes? It's not
9 going from my machine to the system.
10       THE WITNESS: Well, I don't need it.
11 Let him ask his question first, and then we can
12 stop.
13       THE REPORTER: No, it's not feeding
14 into my system, which isn't good.
15       THE WITNESS: Oh, I guess we need
16 that.
17       THE VIDEOGRAPHER: The time is 3:01.
18 We're going off the record.
19       (Recess taken.)
20       THE VIDEOGRAPHER: Recess taken The
21 time is 3:05 p.m. We're back on the record.
22       Please proceed, Counsel.
23 BY MR. KEENAN:
24    Q. Doctor, when we were rudely
25 interrupted by Ryan, you were talking about

253

1 Sedlacek, and Sedlacek's important -- very
2 important to you, the findings of that abstract,
3 right?
4     A. It's -- it's another factor, yes.
5     Q. The -- you would have expected that
6 Sanofi would have reported those cases of
7 Sedlacek to the FDA?
8     A. I would have expected Sanofi to have
9 looked at the analysis and added a warning to
10 the label.
11    Q. Okay. You would have expected Sanofi
12 to follow up with Dr. Sedlacek to capture as
13 much data about those patients as possible.
14 Fair?
15    A. Certainly, that would be fair, but
16 you'd -- yes.
17    Q. Okay. The Dr. Sedlacek's regimen, was
18 that on-label or off-label in that time period?
19    A. So let's look, specifically.
20       So Dr. Sedlacek, I believe, followed,
21 what, a hundred -- he -- there wasn't one
22 regimen. He had multiple regimens in multiple
23 groups, so he had -- he had one, two, three,
24 four, five, six, seven, eight, nine, 10, 11, 12,
25 13, 14 -- I count 15 regimens broken down.