# EXHIBIT I

Page 1

```
        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA
                  - - -

                               :
IN RE: TAXOTERE                :
(DOCETAXEL) PRODUCTS           : MDL No. 2740
LIABILITY LITIGATION           : Section H(5)
_____        :
                               :
This Document Relates to:      :
All Cases                      :


                  - - -
            December 12, 2018
                  - - -


        MICHAEL S. KOPRESKI, M.D.

               (VOLUME I)

                  - - -
```

Transcript of the videotaped deposition of Sanofi U.S. Services, Inc., pursuant to Fed. R. Civ. P. 30(b)(6) held at McElroy Deutsch Mulvaney & Carpenter, LLP, 1300 Mt. Kemble Avenue, Morristown, New Jersey, commencing 9:22 a.m. on the above-referenced date, as taken by and before Constance E. Perks, CRR, CRC, RSA, a Federally-Approved Certified Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377  |  fax 917.591.5672
deps@golkow.com

Michael S. Kopreski, M.D.

Page 98

1  -- I -- I think that would be correct.  11:28:51
2  If you -- let me just  11:28:54
3  clarify. The question about the ongoing,  11:28:56
4  which cases, that you don't want me to  11:28:58
5  ans -- to go through these and answer  11:29:02
6  them anymore.  11:29:03
7  Q. Oh, I do, but I haven't  11:29:04
8  asked that question.  11:29:07
9  A. Okay.  11:29:08
10  Q. Let -- going to -- back to  11:29:08
11  Exhibit No. 14 -- I mean Exhibit 2, tab  11:29:10
12  14, with the patient identifier as 4337?  11:29:17
13  A. Yes.  11:29:22
14  Q. The report made to the  11:29:23
15  company by a healthcare provider  11:29:25
16  regarding the patient identified as 4337  11:29:27
17  was that this patient had a last dose of  11:29:32
18  Taxotere in March of 2005, right?  11:29:42
19  A. Correct.  11:29:46
20  Q. And the report made to the  11:29:49
21  company was that this patient experienced  11:29:52
22  alopecia, which persisted nine months  11:29:56
23  later, correct?  11:30:00
24  A. Correct.  11:30:01
25  Q. Yet, from the company's  11:30:02

Page 99

1  perspective, this is not a report of  11:30:06
2  alopecia that was ongoing after the last  11:30:10
3  docetaxel treatment?  11:30:20
4  A. Well, first off, I never  11:30:22
5  alluded to that as being the company  11:30:24
6  perspective. What I said is, I would  11:30:27
7  need to review the case before answering  11:30:28
8  the question.  11:30:30
9  Upon reviewing this case, I  11:30:31
10  do believe that alopecia in this case  11:30:33
11  could likely be considered ongoing at the  11:30:35
12  time of the report.  11:30:37
13  Q. All right. So the question  11:30:38
14  that I was asking was: Are there cases  11:30:45
15  of the 228 where you believe that there  11:30:49
16  is not a report to the company about  11:30:52
17  alopecia existing, ongoing, existing,  11:30:56
18  whatever word -- not -- just if you look  11:31:03
19  the word up in the dictionary -- after  11:31:07
20  docetaxel treatment ended? The day  11:31:11
21  after, a week after, a month after, a  11:31:15
22  year after? The reports describe various  11:31:18
23  time frames.  11:31:20
24  A. I think the majority of  11:31:22
25  these reports, if not all of the reports,  11:31:25

Page 100

1  are -- report patients who have alopecia  11:31:28
2  or had alopecia some time and had  11:31:31
3  received Taxotere or Taxotere plus other  11:31:37
4  drugs.  11:31:44
5  Q. The start date for purposes  11:32:01
6  of this deposition is January 1 of 2005.  11:32:05
7  Do you agree with me that Exhibit 2, tabs  11:32:12
8  3 -- tabs 2, 3, 4, 5, 6, 7, and 8  11:32:20
9  represent the report of a cluster of  11:32:27
10  patients reported to the company on  11:32:32
11  July the 25th, 2005?  11:32:33
12  A. I'm sorry. Could you give  11:32:37
13  me those numbers a little more slowly?  11:32:48
14  You said 2 --  11:32:55
15  Q. 2 through 8.  11:33:03
16  A. 2 through 8.  11:33:06
17  I would agree that -- I  11:33:35
18  would agree that there was a -- that  11:34:04
19  these cases are part of a group of cases  11:34:06
20  that were reported to the company on --  11:34:09
21  from the same source.  11:34:19
22  Q. Do you agree with me that  11:34:21
23  this group of cases, there -- there was  11:34:30
24  an initial report that was received from  11:34:36
25  a company sales representative on behalf  11:34:39

Page 101

1  of a nurse?  11:34:41
2  A. Yes, I do.  11:34:42
3  Q. In July of 2005, correct?  11:34:43
4  You can look at Exhibit 2. Tab 2 is, I  11:35:03
5  believe, regarding -- is the individual  11:35:13
6  case safety report for Patient 1 of 8.  11:35:15
7  A. Yes. Tab 2 is July of 2005.  11:35:28
8  As is tab 3, as is tab 4, as is tab 5, as  11:35:37
9  is tab 6, as is tab 7, and as is tab 8.  11:35:56
10  Yes, I agree.  11:36:12
11  Q. The report originally was  11:36:16
12  received from a sales representative on  11:36:18
13  behalf of the company, received from a  11:36:20
14  nurse; is that right?  11:36:23
15  A. Yes, that is -- that is  11:36:25
16  correct.  11:36:28
17  Q. And then follow-up  11:36:28
18  information was obtained on October the  11:36:30
19  10th, 2005?  11:36:32
20  A. On which case?  11:36:34
21  Q. On all of the cases. If you  11:36:36
22  look at --  11:36:41
23  A. October 10th of 2005?  11:36:41
24  Q. If you would look at, again,  11:36:44
25  Exhibit 2, tab 2, there's an addendum on  11:36:46

Page 102

1  page 2 of 3 of the suspect adverse         11:36:53
2  reaction report the details that an        11:37:01
3  addendum of information occurred on        11:37:03
4  October the 10th, 2005.                    11:37:05
5      A.  The follow-up was obtained         11:37:09
6  in case 2 on October the 10th of 2005.     11:37:13
7  As was on case 3, as was in case 4, as     11:37:15
8  was in case 5, as was in case 6, as was    11:37:28
9  in case 7, and as was in case 8.           11:37:41
10        Yes, I agree with that              11:37:48
11 statement.                                 11:37:51
12     Q.  And in the follow-up, the          11:37:51
13 nurse who -- well, the sales               11:37:54
14 representative initially reported in       11:37:57
15 July of 2005 that the nurse indicated      11:37:58
16 that there were five patients who had      11:38:01
17 been treated with Taxotere in an adjuvant  11:38:06
18 therapy setting, who had ongoing hair      11:38:12
19 loss.  That was the initial report to the  11:38:15
20 sales represent -- by the sales            11:38:17
21 representative from the nurse, correct?    11:38:25
22     A.  That is correct.                   11:38:26
23     Q.  And then in October of 2005,       11:38:26
24 additional information was obtained from   11:38:28
25 the nurse reporter, and the nurse then     11:38:30

Page 103

1  reported that there were eight, not five   11:38:33
2  patients that she was aware of, correct?   11:38:38
3      A.  Well, I -- I'm not sure            11:38:41
4  that's entirely correct in that the eight  11:38:42
5  cases were reported in July as -- as --    11:38:46
6  as you highlighted previously.             11:38:52
7      Q.  All right.  Do you agree           11:38:54
8  with me that the words written in the --   11:38:57
9  page 2 of the CIOMS report of tab 2 of     11:39:01
10 Exhibit 2, states: "The nurse reports      11:39:08
11 eight," in parens "(not five) patients     11:39:11
12 who experienced alopecia following doce    11:39:16
13 -- Taxotere, docetaxel therapy"?           11:39:18
14     A.  That's -- that's correct.          11:39:22
15     Q.  All right.                         11:39:22
16     A.  But again --                       11:39:23
17     Q.  And --                             11:39:23
18     A.  -- the -- the eight cases          11:39:23
19 were submitted in July.                    11:39:24
20     Q.  All right.  In each of these       11:39:26
21 eight cases, a determination was made      11:39:28
22 that they were serious.  We were talking   11:39:30
23 earlier today about serious versus         11:39:37
24 nonserious.  The determination for each    11:39:41
25 of these eight cases was that they were    11:39:43

Page 104

1  serious.  Would you agree with that?       11:39:49
2      A.  Well, first off, you -- you        11:39:50
3  mentioned seven of the eight.  Could you   11:39:51
4  point out the eighth case that you want    11:39:55
5  to discuss?                                11:39:57
6      Q.  I'm asking about, at this          11:39:59
7  point, tabs 2 through 8.                   11:40:01
8      A.  Okay.  That's seven cases.         11:40:11
9      Q.  Okay.  Seven cases.                11:40:13
10     A.  Okay.                              11:40:13
11     Q.  And each of the seven cases        11:40:13
12 identified as -- in Exhibit 2 as tabs 2    11:40:15
13 through 8, this cluster of cases reported  11:40:17
14 by this nurse, the determination was that  11:40:22
15 each of those seven were considered to be  11:40:25
16 serious?                                   11:40:28
17        MR. KEENAN:  Object to the          11:40:29
18     form.                                  11:40:30
19        THE WITNESS:  Each of those         11:40:54
20     seven cases are considered to be       11:40:59
21     serious cases.                         11:41:01
22 BY MR. BACHUS:                             11:41:01
23     Q.  All right.  And in terms of        11:41:02
24 the causal assessment, the nurse's causal  11:41:03
25 assessment was that docetaxel therapy was  11:41:10

Page 105

1  suspected as a cause?                      11:41:15
2      A.  Well, these cases have             11:42:00
3  multiple adverse events being reported.    11:42:02
4  So, are you asking with regard to the      11:42:07
5  alopecia?                                  11:42:09
6      Q.  Can you read into the record       11:42:09
7  what it says under Nurse's Causal          11:42:11
8  Assessment on page 2 of the CIOMS report   11:42:15
9  on tab 2 of Exhibit 2.                     11:42:21
10     A.  For case 2, it says Nurse's        11:42:26
11 Causal Assessment is suspected.  That's    11:42:29
12 for case 2.                                11:42:33
13     Q.  All right.  Thank you.             11:42:36
14        MR. KEENAN:  Did you just           11:42:37
15     want him to stick to --                11:42:38
16        MR. BACHUS:  The --                 11:42:39
17        MR. KEENAN:  Wait just a            11:42:39
18     second.  You want only the one on      11:42:40
19     tab 2, or you want --                  11:42:42
20        MR. BACHUS:  Yes, that's            11:42:43
21     what I asked him.                      11:42:50
22        MR. KEENAN:  Okay.  Just tab        11:42:50
23     2.                                     11:42:52
24        THE WITNESS:  Okay, because         11:42:52
25     it's not the same in all the           11:42:53

Page 226

1  reporter; would you agree?
2  A. It would seem reasonable,
3  but, again, I don't have any knowledge of
4  the process that was applied to
5  responding to these -- these requests.
6  Q. Here you have this
7  Dr. Sedlacek publishing an abstract where
8  the doctor indicates that "We've always
9  told our female patients, 'Don't worry,
10 it will always come back.'" Do you see
11 that? It's right above Materials and
12 Methods.
13 A. I see the statement in the
14 -- in the abstract. I don't know who the
15 "we" is. I assume he's talking about his
16 practice.
17 Q. Oncologists in general?
18 Isn't it --
19 A. Well, I -- the abstract in
20 his name, from his Rocky Mountain Cancer
21 Center, I -- I would assume that that is
22 a statement that he makes to his -- his
23 patients. That's the way that I would
24 interpret that.
25 Q. This was regarding a

Page 227

1  presentation that Dr. Sedlacek was going
2  to give at the San Antonio Breast Cancer
3  Conference in 2006?
4  A. This is a publication that
5  appears in Breast Cancer Research
6  Treatment, 2006.
7  Q. At least from Dr. Sedlacek's
8  perspective, as he committed to writing,
9  the belief of this oncologist, who was
10 going to be presenting, was that when
11 patients use Taxotere, their hair will
12 come back, right?
13 MR. KEENAN: Object to the
14 form.
15 THE WITNESS: Well, again,
16 he -- he -- he makes this
17 statement that you've just read in
18 2006, which is a time where the
19 TAC regimen has been described as
20 having ongoing alopecia in a
21 number of patients, and the
22 Nabholz publication describes
23 patients who have prolonged,
24 persistent alopecia.
25 So, he makes the statement,

Page 228

1  but, again, that that -- that this
2  is his abstract and his statement.
3  BY MR. BACHUS:
4  Q. When you contacted
5  Dr. Sedlacek after this was published and
6  inquired further about his findings and
7  his opinions, what did he say?
8  A. Well, my understanding is
9  that -- that this abstract reflects
10 patients that were seen at the Rocky
11 Mountain Cancer Center.
12 Q. And my question was: What
13 did he say when you spoke to him?
14 MR. KEENAN: Wait, wait,
15 wait, wait, wait. No, no. He's
16 answering your question.
17 MR. BACHUS: Okay. Okay.
18 Good.
19 MR. KEENAN: Let him answer.
20 BY MR. BACHUS:
21 Q. How about we start with when
22 did the conversation occur?
23 A. I'm sorry. May I continue?
24 Q. No. I'll withdraw the last
25 question.

Page 229

1  When did the conversation --
2  MR. KEENAN: No, no,
3  Counsel, he gets to --
4  BY MR. BACHUS:
5  Q. -- with Dr. Sedlacek --
6  MR. KEENAN: -- answer your
7  question.
8  MR. BACHUS: I can withdraw
9  questions.
10 MR. KEENAN: Not when he's
11 in the middle of answering it.
12 MR. BACHUS: I can withdraw
13 a question whenever I want to.
14 THE WITNESS: Okay. Go --
15 go ahead, Mr. Bachus.
16 BY MR. BACHUS:
17 Q. When was the contact with
18 Dr. Sedlacek made after the publication
19 of his abstract in 2000 -- December 15th,
20 2006?
21 A. The contact and the
22 follow-up with Dr. Sedlacek's site, and I
23 cannot say whether it was with him
24 personally or not, but with his site,
25 occurred on -- on these patients before

Michael S. Kopreski, M.D.

Page 230

```
 1  the publication.  There's extensive      15:20:47
 2  discussion and follow-up.                15:20:50
 3       My understanding is that            15:20:52
 4  these patients are the patients that you 15:20:53
 5  previously went through in -- in the     15:20:55
 6  group of eight patients, starting with --15:20:56
 7  with your case 2 of the exhibit.  If you 15:21:05
 8  look at those -- those eight cases,      15:21:12
 9  you'll see that there is extensive       15:21:15
10  follow-up and -- and discussions with    15:21:19
11  that site.                               15:21:21
12     Q.   Thank you.  Let me see if I      15:21:21
13  can be clearer.                          15:21:23
14       Your testimony is that              15:21:29
15  patients 2 through 9 in Exhibit 2 are the15:21:30
16  patients from Dr. Sedlacek's study?      15:21:33
17     A.   My understanding is that         15:21:36
18  those patients are patients from         15:21:38
19  Dr. Sedlacek's site and most likely the  15:21:44
20  patients from the study.  I have certain 15:21:49
21  restrictions placed upon me, personally, 15:21:58
22  in terms of patient identification and   15:22:01
23  confidentiality, so I -- I rely upon     15:22:03
24  information that I obtained from legal   15:22:05
25  counsel.                                 15:22:11
```

Page 231

```
 1     Q.   Outside of -- which legal        15:22:12
 2  counsel has the patient identities?      15:22:14
 3     A.   I'm sorry?                       15:22:20
 4     Q.   Which legal counsel has --       15:22:20
 5     A.   My -- my legal counsel.          15:22:20
 6     Q.   Mr. Keenan --                    15:22:21
 7     A.   Mr. Keenan --                    15:22:21
 8     Q.   -- and --                        15:22:25
 9     A.   -- and associates.               15:22:25
10     Q.   -- Harley Ratliff, they have     15:22:26
11  the patient information?  It's been      15:22:26
12  disclosed to them?                       15:22:29
13     A.   I haven't spoken with Harley     15:22:29
14  Ratliff.                                 15:22:31
15     Q.   Okay.  But they --               15:22:32
16     A.   I'm --                           15:22:32
17     Q.   Your understanding is that       15:22:32
18  they have the actual patient names?      15:22:33
19     A.   I'm sorry?                       15:22:36
20     Q.   Your understanding is that       15:22:36
21  they have the actual patient names?      15:22:36
22     A.   My understanding is that         15:22:37
23  they felt they could identify these cases15:22:38
24  leading back to the Sedlacek abstract.   15:22:41
25     Q.   By patient name?                 15:22:45
```

Page 232

```
 1     A.   By patient --                    15:22:49
 2     Q.   By patient names --              15:22:49
 3     A.   -- names?                        15:22:49
 4     Q.   -- question mark?                15:22:49
 5     A.   I don't -- I don't know the      15:22:52
 6  answer to that.  I -- I -- I think those 15:22:52
 7  names are redacted.                      15:22:54
 8     Q.   All right.                       15:22:57
 9       Outside of the CIOMS reports        15:22:57
10  that you've identified as 2 through 9, is15:23:00
11  there any further documentation of       15:23:04
12  communication with Sedlacek's office     15:23:06
13  regarding his abstract?                  15:23:10
14     A.   Regarding this -- regarding      15:23:21
15  the abstract, I'm not sure if the -- was 15:23:21
16  the abstract part of the notice?         15:23:22
17     Q.   Yes.                             15:23:24
18     A.   Okay.  I -- I don't have         15:23:25
19  information on -- on any communications  15:23:37
20  subsequent or following -- following the 15:23:39
21  abstract.                                15:23:39
22     Q.   Your understanding is that       15:23:40
23  there were physician-based reports that  15:23:41
24  we've gone over today, 2 through 9, of   15:23:44
25  Exhibit 2 that were reported in to the   15:23:49
```

Page 233

```
 1  company that your lawyers have been able 15:23:52
 2  to identify as having come from that     15:23:56
 3  treatment center during that time frame, 15:23:58
 4  correct?                                 15:24:01
 5     A.   That's my understanding.         15:24:01
 6     Q.   But other than whatever was      15:24:13
 7  reported in those CIOMS documents, you're15:24:15
 8  unaware of any further communications    15:24:18
 9  with Dr. Sedlacek after the publication  15:24:21
10  occurred, correct?                       15:24:24
11     A.   I'm not -- I'm not aware of      15:24:28
12  what communications may have been        15:24:30
13  conducted with Dr. Sedlacek.             15:24:33
14     Q.   Did you see any                  15:24:35
15  documentation in your preparation        15:24:36
16  documenting discussions with Dr. Sedlacek15:24:42
17  about his abstract or the patients that  15:24:45
18  are contained in --                      15:24:51
19     A.   Well, I would consider that      15:24:53
20  outside the notice.                      15:24:55
21       MR. KEENAN:  Yeah, I think          15:24:56
22  we're here about the patients, but       15:24:56
23  that's fine.  Go on.
24       Can we go another 15 minutes
25  and take a break?
```