**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)             **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                            **SECTION "H" (5)**

THIS DOCUMENT RELATES TO
Kahn v. Sanofi-Aventis, et al, Case No. 2:16-cv-17039

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**BASED ON THE STATUTE OF LIMITATIONS**

MAY IT PLEASE THE COURT:

Sanofi appears not to contest the reasonableness of Ms. Kahn's inquiries about her hair loss to her healthcare providers; rather, Sanofi claims that Ms. Kahn's case is stale and untimely on the basis that (1) the investigation Ms. Kahn undertook was too early and (2) it was unreasonable for Ms. Kahn to rely on the healthcare providers' responses to her inquiry. Sanofi's first point fails because it is factually inaccurate, at best, and its second point fails because, at the very least, there are genuine issues of material fact that must necessarily be resolved by a factfinder in order to evaluate the Louisiana's tolling rule, i.e., *contra non valentem*.

Setting aside the disputed issue of material fact whether Ms. Kahn had actual or constructive knowledge of sustaining permanent chemotherapy induced alopecia (PCIA), and the genuine issue of material fact whether Ms. Kahn in fact has PCIA (a fact which history tells us from the trial of Ms. Earnest's case Sanofi will dispute at trial), Ms. Kahn made *multiple* inquiries to her healthcare providers about her lack of hair regrowth within one year and six months of completion of her cytotoxic chemotherapy with Taxotere.  Ms. Kahn has alleged that, and has provided sufficient evidence for the jury to evaluate whether, she reasonably relied on statements of her healthcare providers such that *contra non valentem* is applicable.  Furthermore, Ms. Kahn

1

has alleged sufficient facts through the common allegations set forth in the Second Amended Master Long Form Complaint (Doc. 4407) that Sanofi's actions in concealing its knowledge of the association between permanent hair loss and Taxotere prevented Ms. Kahn and her physicians from knowing of (and choosing to consider, recommend, and accept or reject) Taxotere's risk of causing permanent hair loss.

For these reasons more fully outlined below, and under the Court's prior holdings in this MDL applying the Louisiana law of liberative prescription and *contra non valentem*, Ms. Kahn's claims are not prescribed.

## I.     INTRODUCTION AND BACKGROUND

In 2008, Plaintiff Elizabeth Kahn agreed to participate in a clinical trial study conducted by The National Surgical Adjuvant Breast and Bowel Project (NSABP) and Ochsner Clinic Foundation.  Each arm of the trial included administration of Taxotere in a manner the study describes as "a standard treatment for breast cancer." The study included 1,200 patients who were divided into six (6) groups. Ms. Kahn was placed in group "2B," which meant that she would be receive treatment in three phases: "Part 1," "Part 2," and "After surgery."

Parts 1 and 2 of Ms. Kahn's treatment involved Taxotere, Xeloda, Adriamycin, and Cyclophosphamide—all cytotoxic chemotherapy agents known at the time to cause temporary hair loss. *See* Response to SOF, ¶4. In fact, NSABP Clinical Trial Consent Form she received and reviewed lists "hair loss" as a likely side effect associated with four of the drugs Ms. Kahn received *Id*. While Ms. Kahn accepted the risks of the study drugs as set forth in the consent form, she did not understand, appreciate or accept the undisclosed risk of permanent hair loss with Taxotere that was unknown to all but Sanofi. *Id* at ¶4-5. Rather, Ms. Kahn understood this "hair loss" to be

2

temporary in nature and expected to experience this adverse reaction in the course of her chemotherapy. *Id.* at ¶4.

Ms. Kahn began cytotoxic chemotherapy in May 2008, and the hair on her head, eyebrows, and eyelashes fell out in June 2008, following her first administration of Taxotere. *Id.* at ¶8-9. Ms. Kahn attributed her initial hair loss (*i.e.*, her hair falling out) to her first round of toxic chemotherapy; however, Ms. Kahn believed her hair loss would only be temporary and expected that after finishing chemotherapy in Parts 1 and 2 of the study, her hair would begin to regrow. *Id.* at ¶4,5,10,11.

After Ms. Kahn completed cytotoxic chemotherapy with Taxotere in October 2008, Ms. Kahn underwent breast surgery to remove her tumor followed by "After surgery" treatment. This "After surgery" treatment involved administration of a drug called Avastin (bevacizumab). *Id.* at ¶11. The addition of Avastin to standard chemotherapy was considered to be one of the main experimental components of the clinical trial study. *Id.* at ¶3. Hair loss is not associated with the use of Avastin, and Avastin is not cytotoxic chemotherapy. *Id.* at ¶4,7. As explained in the consent form, Avastin is not chemotherapy—indeed, "Angiogenesis inhibitors and chemotherapy work in different ways. Bevacizumab [Avastin] keeps the tumor from being able to make new blood vessels. Without new blood vessels, the growth of the tumor is slowed. Chemotherapy drugs kill cancer cells more directly." *Id.* at ¶7. Ms. Kahn's "After surgery" treatment with Avastin was completed on July 16, 2009. *Id.* at ¶14.

Ms. Kahn's hair did not regrow during her "After surgery" treatment. In April of 2009—six months after completing chemotherapy treatment with Taxotere—Ms. Kahn inquired with her gynecologist, Dr. Roberie, about the lack of hair regrowth. *Id.* at ¶15. Ms. Kahn recalls asking Dr. Roberie why her hair had not fully re-grown and being advised by Dr. Roberie that her hair

loss might be caused by her age. *Id.* at ¶15,17. Ms. Kahn was shocked by this suggestion as she was only in her early 50s at the time. *Id*. Dr. Roberie testified Ms. Kahn's hair became noticeably thin after completing chemotherapy, with her scalp visible, for an extended and prolonged period of time. *Id.*

Sanofi incorrectly asserts that Ms. Kahn was in the "middle" of cytotoxic chemotherapy treatment when, in April of 2009, she asked Dr. Roberie about her lack of hair regrowth. *Id.* at ¶15. Rather, Ms. Kahn's cytotoxic chemotherapy treatments with Taxotere, Xeloda, Adriamycin, and Cyclophosphamide, which are known to be associated with chemotherapy induced temporary hair loss, ended in October of 2008. *Id.* By the time Ms. Kahn visited Dr. Roberie in April of 2009 she had been off of cytotoxic chemotherapy for approximately six months. *Id.*

In addition to inquiring with Dr. Roberie, Ms. Kahn discussed her hair loss with two other healthcare providers. Sometime in 2009 or 2010, Ms. Kahn made an inquiry with her treating oncologist, Dr. Zoe Larned. *Id.* at ¶16. She asked Dr. Larned when her hair would fully regrow, but Dr. Larned was unable to provide her with a specific timeframe. *Id*. In addition, Ms. Kahn was advised by a dermatologist in July of 2009 that she might try taking Biotin to encourage faster hair regrowth. *Id.* at ¶20.

In sum, Ms. Kahn made at least three inquiries to her physicians between six months and a year and a half after her cytotoxic chemotherapy treatment. Ms. Kahn reasonably relied on what she understood from her doctors as a result of these inquiries. Importantly, neither doctor suggested that she had PCIA, let alone that Taxotere was its cause. Following these inquiries, Ms. Kahn continued to experience a lack of complete hair regrowth, but she held out hope that after completing "toxic" chemotherapy her hair would fully re-grow until learning of the connection

between Taxotere and permanent hair loss. *Id.* at ¶21-28. In December 2016, within approximately six (6) months of this discovery, Ms. Kahn filed the instant action. *Id.* at ¶27-28.

## II.    LEGAL STANDARD

Summary judgment is improper unless the moving party shows there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Generally, the fact finder should resolve exceptions to liberative prescription because the determination of when a prescriptive period accrues is an inquiry dependent on the testimony of the plaintiff and her healthcare providers.  *See Chiasson v. Medtronic Inc.*, Nos. 16-789, 16-3552, 16-3721, 2016 WL 4191837, at *6 (E.D. La. August 9, 2016) ("In cases of medical products liability, the accrual of a case and the reasonableness of delay in filing suit often hinge on the testimony of the plaintiff and his or her doctor."); *see also Body by Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 838 (E.D. La. 2014) (The application of "*contra non valentem* is generally a question of fact that may go to the jury for resolution."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)  ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

## III.    ARGUMENT

In Louisiana, the applicable statute of limitations—otherwise known as the prescriptive period—for actions under the Louisiana Product Liability Act ("LPLA") is one year from the day injury or damage is sustained.  *See* La Civ. Code art. 3492; *Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 2012), 99 So.3d 739, 741 (noting that La. Civ. Code art. 3492 applied to claims under the LPLA). "When the issue of prescription is raised, '[t]he burden of proof generally rests on the party asserting prescription.  However, when a complaint reveals on its face that the

5

prescriptive period has lapsed, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period.'" *Becnel v. Mercedes-Benz USA, LLC*, No. 14-0003, 2014 WL 1918468, at *4 (E.D. La. May 13, 2014) (quoting *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 842 (E.D. La. 2011)); *see also Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502, 508. Based on a misreading of paragraph 181 in the Plaintiffs' Steering Committee's ("PSC") Second Amended Master Long Form Complaint (Rec. Doc. 4407), Sanofi applies a *de facto* six month trigger date for prescription,[1] claiming that Ms. Kahn's prescriptive period began to run six months after Ms. Kahn completed chemotherapy, or by 2009.

Even if the defining of an injury in a complaint can be interpreted as an allegation of knowledge at the time the injury was being suffered, as Sanofi suggests, the Louisiana Supreme Court recognizes the doctrine of *contra non valentem,* "which is a judicially created exception to the general rules of prescription that is applied to ameliorate the sometimes harsh consequences resulting from the strict interpretation of prescription statutes." *Morgan v. Entergy New Orleans, Inc.*, 234 So. 3d 113, 116 (La. App. 4 Cir. 2017). This doctrine tolls the prescriptive period when the plaintiff is prevented from acting under one of four scenarios, including "where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant" and "where the defendant has done some act effectually to prevent the

---

[1] Notably, Sanofi adopted this "six month" definition only in this litigation and does not internally define permanent injury as hair loss existing six months after chemotherapy. As the PSC has repeatedly stated, there is no definitive definition for permanent alopecia. Indeed, Sanofi's expert epidemiologist, Dr. Ellen Chang, agrees that there is no single definition despite Sanofi's insistence (in the courtroom) otherwise:

> I consider terms such as "irreversible alopecia," "permanent alopecia," "nonreversible alopecia," "persistent alopecia," and "persisting alopecia" to refer to the same concept, that is, hair loss that continues over an extended duration of time, without subsequent resolution. There is no universal or authoritative clinical definition of this condition, and various scientists and clinicians may define it differently, for example, based on the duration of persistence or the degree of hair regrowth.

(Ex. T, Report of Ellen Chang, Sc.D. at 4).

plaintiff from availing himself of his cause of action." *Id.* As discussed below, both scenarios are applicable to toll the prescriptive period of Ms. Kahn's claims against Sanofi.

### A.      There are Genuine Issues of Material Fact Concerning When Ms. Kahn Discovered Her Injuries and Their Relationship To Taxotere.

Under the doctrine of *contra non valentem*, prescription is suspended "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 245  (La. 2010).  Just as with a "discovery rule," prescription is tolled until "a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort." *Campo*, 828 So. 2d at 510*; see also In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017).

### 1.      Ms. Kahn Reasonably Believed Her Hair Would Grow Back Until She Learned of an Attorney Advertisement in 2016.

Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Campo*, 828 So. 2d at 510-11.  But constructive knowledge "requires more than a mere apprehension that something might be wrong.  Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable." *Griffin v. Kinberger*, 507 So.2d 821, 823 (La. 1987) (citing *Cardova v. Hardford Accident & Indemnity Co.*, 387 So.2d 571 (La. 1980)).

Here, Ms. Kahn did not know she had suffered permanent alopecia—much less its risk from Taxotere—until she learned from a friend of an attorney advertisement in 2016 regarding litigation about Taxotere and permanent hair loss.  *See* Response to SOF at ¶27.  Before such time, it was not unreasonable for Ms. Kahn to believe that her hair would eventually return. Temporary

alopecia is a well-known side effect of chemotherapy treatment, and Ms. Kahn knew that chemotherapy could cause temporary hair loss. When Ms. Kahn was provided with and signed an informed consent before enrolling in study, the form identified a risk of hair loss in all chemotherapy drugs involved in the study. *Id.* at ¶4.

Sanofi claims that the informed consent put Ms. Kahn on notice of the risk of permanent hair loss, citing the following underlined language (Doc. 9295-2 at 8):

> **What side effects or risk can I expect from being in the study?**
>
> You may have side effects while on this study. Most of these are listed here, but there may be other side effects that we cannot predict. Side effects will very from person to person. Everyone taking part in the study will be carefully watched for any side effects. However, doctors do not know all the side effects that may happen. Side effects may be mild or very serious. Your health care team may give you medications to help lessen some of the side effects. Many side effects go away soon after you stop taking your study drugs. <u>In some cases, side effects may be very serious, long lasting, or may never go away.</u> *There is also a risk of death.*

(Ex. A, NSABP Clinical Trial Consent at NSABP at 000030 (underline supplied, italics in original)). This language does no such thing. It is part of a 29-page, single-spaced consent form. The form identifies *known* side effects, noting that some are temporary and some are permanent. Hair loss is called out specifically as a known side effect and is not identified among those known side effects that are permanent. (*See, e.g.* Ex. A, NSABP Clinical Trial Consent Form at NSABP at 000031-35 ("Irregular or <u>permanent</u> stoppage of menstrual cycle" and "Severe lung problems (including shortness of breath, inflammation, and damage that could be <u>permanent</u>")). In contrast, the catch-all paragraph that Sanofi identifies concerns *unknown* side effects—"doctors do not know all the side effects that may happen." In the form's own words, this paragraph addresses those side effects that "are [not] listed here." Nothing in this paragraph which refers to unknown side effects, then, may fairly be read to provide actual or constructive knowledge that hair loss, a known side effect that the form identifies as temporary, is in fact permanent.

Dr. Kardinal's nurse acknowledged as much, testifying that the consent form did not warn of permanent hair loss, and had Dr. Kardinal's nurse known of the risk of permanent hair loss, she would have warned her patients.  (Ex. V, Deposition of Thomas, Jan. 10, 2018 ("Thomas Dep.") at 68:09-14, 69:09-13, 178:20-179:17).  Dr. Kardinal also recognized the limits of long informed consent forms, stating that he would warn patients of common side effects because "[y]ou can't give everybody, you know, a consent form that's 25 pages long." (Ex. U, Deposition of Kardinal, Jan. 17, 2018 ("Kardinal Dep.") at 86:19-21).  Further, Ms. Kahn's second oncologist, Dr. Zoe Larned, who took over for Dr. Kardinal in 2009, amended the informed consent form this past year to explicitly warn about permanent hair loss.  (Ex. S, Deposition of Larned, Feb. 21, 2018 ("Larned Dep.") at 109:12-110:05, 110:11-23).  It also bears mentioning that Ms. Kahn's treating oncologist, Dr. Kardinal, has testified that he routinely informed his patients that hair loss from chemotherapy would be temporary and that he was unaware that Taxotere carried a risk of permanent hair loss. (Ex. U, Kardinal Dep. at 175:9-17, 87:2-22.) Ms. Kahn recalls that both Dr. Kardinal and Nurse Thomas advised her that her hair loss would be temporary (Ex. P, Deposition of Kahn, Dec. 7, 2017 ("Kahn Dep.") at 254:20-255:4) and that Nurse Thomas encouraged her by showing photos of another patient who regrowing post treatment. (*Id.* at 205:21-206:19).

Accordingly, the informed consent form executed by Ms. Kahn did not put her on notice of the risk of permanent hair loss.  The form merely stated that hair loss from chemotherapy was temporary.  As a result, it was not unreasonable for Ms. Kahn to believe that chemotherapy would cause only temporary—and not permanent—hair loss.  It was likewise reaonsable for Ms. Kahn, as a cancer survivor, to remain positive and believe that her hair would return.

2.   **Even if Ms. Kahn had Constructive Knowledge Six Months After Completion of Cytotoxic Chemotherapy with Taxotere, She Undertook a Reasonable Inquiry that Tolled the Running of Prescription under the Doctrine of Contra Non Valentem**

"[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may be reasonable for the specific injury, and when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010) (internal citations omitted). "The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo*, 828 So 2d at 511 (internal citations omitted). "Courts have summarized the *contra non valentem* doctrine as an inquiry into the 'reasonableness' of the victim's behavior in light of his perceived injuries." *Jenkins v. Bristol-Myers Squibb*, 2016 WL 10100281, at *6 (E.D. La. July 8, 2016) (internal citations omitted).

Approximately six months after Parts 1 and 2 of her treatment regimen, *i.e.*, following the cytotoxic chemotherapy portion of her regimen that included Taxotere, Ms. Kahn inquired about her hair condition with her gynecologist, Dr. Roberie. *See* Response to SOF at ¶15. As set forth *supra*, Ms. Kahn testified that Dr. Roberie indicated her lack of regrowth might be caused by her age. Dr. Roberie performed no differential diagnosis nor prescribed any treatment. *Id.* Also, within 1.5 years of her chemotherapy, Ms. Kahn inquired with her second treating oncologist, Dr. Larned, about when her hair was expected to regrow. *Id.* at ¶16-20. Ms. Kahn recalls that Dr. Larned did not provide a specific timeframe during which regrowth was expected. *Id.* In July 2009, Ms. Kahn made a separate inquiry to her dermatologist, who suggested she take Biotin to encourage faster hair regrowth. *Id.* at ¶20. Importantly, none of her doctors ever suggested there was any permanent condition to treat. *Id.* Ms. Kahn reasonably relied on these responses of three separate physicians

10

and held out hope that her hair would fully regrow. *Id.* at ¶21,25-27. Ms. Kahn did not realize that her hair might never grow back, much less why her hair had not returned, until she was informed by a friend of an attorney advertisement linking Taxotere with permanent hair loss in 2016. *Id.* at ¶27. This lawsuit was initiated shortly thereafter, within months of Ms. Kahn learning that her hair would not regrow because of Taxotere. *Id.* at 28.

Sanofi faults Ms. Kahn for believing that her hair would regrow.  But improperly placing blame on the victim is precisely what the doctrine of *contra non valentem* seeks to avoid.  *See Wimberly v. Gatch,* 635 So. 2d 206, 212 (La. 1994) (doctrine arising from a "long-established principle of law that one should not be able to take advantage of his own wrongful act."). Indeed, the facts at bar align with those in cases where *contra non valentem* was found to apply.  For example, in *Hoerner v. Wesley–Jensen, Inc.,* 684 So.2d 508 (La. App. 4 Cir. 1996), the plaintiff developed a severe eye infection, necessitating a corneal transplant, as a result of a defective extended-wear contact lens.  More than two years after developing the eye infection, the plaintiff reviewed a magazine article regarding the connection between the use of extended-wear lenses and the significantly increased risk of eye infections. The defendants argued that the causal relationship between contact lenses and ulcerative keratitis was widely evident prior to the plaintiff's eye infection, and that common knowledge should have been construed as constructive knowledge on the part of the plaintiff. The court rejected those arguments, holding that "the knowledge that contact lens use in general could cause infection is not sufficient to put [the plaintiff] on notice that her infection and ensuing injury resulted from wearing the extended-wear contact lenses." *Id.*

Similarly, in *Guillot v. Daimlerchrysler Corp.*, 50 So.3d 173 (La. App. 4 Cir. 2010), the Fourth Circuit Court of Appeals upheld a finding that prescription was tolled until the plaintiffs

had sufficient facts to elicit a cause of action. There, the plaintiffs, a husband and wife, were preparing for a drive in their Jeep Grand Cherokee when the vehicle suddenly went into reverse and crushed the wife and their unborn child. *Id.* at 178.  The plaintiffs believed the husband had unknowingly placed the vehicle in reverse. *Id.* at 182.  More than two years following the accident, plaintiffs learned of a defect in Grand Cherokees that would cause them to spontaneously reverse in such a way and filed suit.  *Id.* 179-180. The defendant claimed that the plaintiffs' claim had prescribed because plaintiffs were aware on the date the accident the facts upon which to base a cause of action. The Fourth Circuit Court affirmed the trial court's application of *contra non valentum*, holding that the plaintiffs had no reason to suspect anything other than the husband's driving mistake until they received information more than two years later regarding the defect. *Id.* at 182-83.

In *Cortez v. DePuy Orthopaedics, Inc.*, No. 15-617, 2016 WL 633665, at *1 (E.D. La. Feb. 17, 2016), the plaintiff began experiencing pain in her knee in March 2012 and was notified by her orthopedic surgeon that she required revision surgery because the tibial component of her prosthetic knee had loosened in November 2013.  However, the plaintiff's orthopedic surgeon testified that loosening of a prosthetic knee could stem from multiple causes.  *Id.* at *3.  Indeed, the plaintiff's orthopedic surgeon suspected that a knee infection caused the loosening, and neither the plaintiff nor her orthopedic surgeon knew that the cement had not integrated until he performed the revision surgery in February 2014.  *Id.* at *1.  As such, the court rejected the defendant's argument that prescription commenced in November 2013 because the plaintiff did not have actual or constructive notice that the defendant's bone cement caused the loosening until February 2014. *Id.* at *4.

Likewise, as in those cases, Ms. Kahn did not attribute her failure to regrow her hair to chemotherapy (which she understood to cause only temporary alopecia) until 2016, when she learned otherwise through media.  Further, medical guidelines, such as Up-To-Date, that Dr. Larned and other physicians rely on for clinical information, did not identify permanent hair loss as a risk—much less a common risk—until after 2016.  In fact, only as a result of this litigation has Dr. Larned started warning about the potential risk of permanent hair loss with Taxotere.  (Ex. S, Larned Dep. at 109:12-110:05).   Accordingly, Ms. Kahn's understanding through these intervening years was reasonable and in line with that of physicians prescribing these chemotherapy drugs, many of whom did not link Taxotere to permanent hair loss before the time Ms. Kahn filed suit in 2016, years after completing her chemotherapy.

**B.    A Factual Dispute Exists as to Whether Sanofi Prevented Ms. Kahn from Availing Herself of Her Cause of Action in a Way that Tolled the Running of Prescription under the Doctrine of *Contra Non Valentem*.**

The doctrine of *contra non valentem* provides an exception to Louisiana's one-year liberative prescription also in cases "where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action." *Morgan*, 234 So. 3d at 116.

Here, Sanofi elected, on multiple occasions, not to inform the medical community and patients of the risk of permanent hair loss with Taxotere with a label change.  For example, in March 2006, Sanofi's pharmacovigilance department received an inquiry from a physician about the reversibility of alopecia following Taxotere treatment, noting that a patient had been experiencing alopecia since 2004.  (Ex. E, Sanofi_01035459). In response, Taxotere Global Safety Officer Amy Freedman, who testified at the Earnest trial by deposition, acknowledged in internal company communications that cases of irreversible alopecia had occurred during Sanofi's clinical trials for Taxotere and that the medical literature might contain additional reports of irreversible

alopecia. (*Id.*) Despite this, she advised her colleagues against doing a literature search on the topic of irreversible alopecia and Taxotere. (*Id.*)

By early 2010, Sanofi had received hundreds of reports of permanent hair loss in women following treatment with Taxotere. (*See, e.g.* Ex. F, Sanofi_00792534). Despite this fact, Sanofi sought no change in the label and continued to conceal the evidence of Taxotere's causal association with permanent alopecia from the medical community and consumers, including Plaintiffs. Later in 2010, Sanofi completed its analysis of the ten-year follow-up results for TAX 316, the clinical trial used to support the adjuvant breast cancer indication. (Ex. G, Sanofi_02645200). This analysis found that 4.2% of TAX 316 patients reported persisting hair loss at the end of the ten year follow-up. (*Id.* at 37). This represented an increase in the incidence of persistent alopecia from approximately 3% to 4.2%. Sanofi had previously decided in 2009 to submit to the FDA only the Final Clinical Study Report for TAX 316, which is over a thousand pages long, without submitting a labeling change. (Ex. H, Sanofi_03336652). As a result, Sanofi continued to conceal this information from the medical community and consumers, including Plaintiffs.

Nonetheless, Sanofi's Global Safety Officer told French Health Authorities in a January 2011 Taxotere clinical overview that there was insufficient evidence to determine that Taxotere caused permanent alopecia. (Ex. I, Sanofi_043353204). The following month, the French Health Authorities rejected Sanofi's overview of persisting alopecia, and concluded that patients and healthcare providers should be provided information about the risk of permanent alopecia given the serious psychological consequences of this adverse effect. (Ex. J, Sanofi_02540992 at 4). Sanofi did not share this information with the United States medical community or patients in the United States.

In April 2011, Sanofi's Compliance Department issued an internal audit of drug labeling for various drug products, including Taxotere, to evaluate the accuracy and completeness of the safety data presented in the drug labeling.  (Ex. K, Sanofi_02983328.) For Taxotere, the audit revealed that the labeling failed to include the incidence rate of persistent alopecia from TAX 316. Sanofi did not add this information to the United States label for Taxotere until 2018. (*Id.* at 7.)

In June of 2011, the European Medicines Agency adopted the consensus of the French Health Authorities regarding persistent alopecia, informing Sanofi that the label for Taxotere needed to be updated to inform patients of the risk of irreversible alopecia. (Ex. L, Sanofi_04864365; Ex. M, Sanofi_01112867 at 7.)  Sanofi updated the Taxotere label distributed in the European Union but did not update the label in the United States, choosing instead to continue to conceal this information from the U.S. medical community and consumers.

Likewise, the FDA asked Defendants for a list of all cases reporting permanent or irreversible alopecia in March 2015.  (Ex. N, Sanofi_00837648). Only after prompting from FDA (*Id.*) did Sanofi acknowledge that sufficient evidence of a causal association existed between Taxotere and permanent alopecia and internally noting "[t]his is going to be fun submitting >4 year old labeling changes to the FDA now." (Ex. O, Sanofi_05207927).

As shown above, the discovery process has supplied evidence of what Sanofi knew and failed to share about permanent hair loss during the same period of time in which Sanofi claims Ms. Kahn should have realized she should bring an action against Sanofi. This Court has found that such concealment was sufficient to allow a fraud claim for Plaintiff Jacqueline Mills to proceed under Georgia law, because Sanofi failed to include any reference to *permanent* hair loss in its label until 2015.  *See* Order (Doc. 7571), July 9, 2019, at 18-19.  Here too, the portion of the Louisiana Supreme Court's test for application of *contra non valentem* based on the same conduct

by Sanofi strongly weighs in favor of finding Ms. Kahn's claims are timely.  These disputed material facts regarding concealment preclude a finding that this case is prescribed as a matter of law.

### IV.   CONCLUSION

Under this Court's prior rulings applying Louisiana law on liberative prescription and contra non valentem, Plaintiff's case is not prescribed.  Ms. Kahn made multiple inquiries to her healthcare providers regarding her hair condition between six (6) months and 1.5 years after completing chemotherapy with Taxotere. In light of this testimony from Ms. Kahn and her healthcare providers and the evidence demonstrating Sanofi's concealment of the risk permanent hair loss with Taxotere, there are genuine issues of material fact for the jury necessary to evaluate liberative prescription.

Dated: February 28, 2020                    Respectfully submitted,


                                            */s/ Christopher L. Coffin*
                                            Christopher L. Coffin (#27902)
                                            Jessica A. Perez (#34024)
                                            PENDLEY, BAUDIN & COFFIN, L.L.P.
                                            1100 Poydras Street, Suite 2505
                                            New Orleans, Louisiana 70163
                                            Phone: (504) 355-0086
                                            Fax: (504) 355-0089
                                            ccoffin@pbclawfirm.com

                                            *Attorneys for Plaintiff*

16

**FOR THE PLAINTIFFS' STEERING COMMITTEE**

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT