# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NO. 2:16-cv-15397

JUNE PHILLIPS

VERSUS

SANOFI S.A., SANOFI-AVENTIS U.S. L.L.C., and AVENTIS-PHARMA S.A.

Videotaped deposition of DR. SCOTT SONNIER, 1401 Foucher Street, New Orleans, Louisiana 70115, taken in the offices of CRESCENT CITY HEMATOLOGY ONCOLOGY on Thursday, November 1, 2018, at 1:03 p.m.

APPEARANCES:

PENDLEY, BANDIN, AND COFFIN, LLP
Attorneys at Law
BY: NICHOLAS ROCKFORTE, ESQUIRE
24110 Eden Street
Plaquemine, Louisiana 70765
ATTORNEYS FOR PLAINTIFF

STUEVE SIEGEL HANSON
Attorneys at Law
BY: ABBY MCCLELLAN, ESQUIRE
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
ATTORNEYS FOR PLAINTIFF

IRWIN, FRITCHIE, URQUHART & MOORE
Attorneys at Law
BY: DOUG MOORE, ESQUIRE
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70131
ATTORNEYS FOR DEFENDANT

VIDEOGRAPHER: WILLIAM MYERS

REPORTED BY:

THERESA (TERRI) MATHERNE
Certified Court Reporter

AFFILIATED REPORTING Ph. (504)568-9111
www.affiliatedreporting.com Fax (504)568-9110

Q. Can you tell us about your professional endeavors since your training and schooling?
A. Professional endeavors, essentially, fellowship training in hematology oncology. Again, that was in Atlanta, Emory University. Since then, private practice oncology. Private practice oncology work.
Q. Doctor, I'm going to bounce around a bit because I know we're on a pretty strict timeline to get you out of here.
In connection with any of your schooling or your practice, have you ever been involved in any studies, clinical trial studies?
A. We have. We have participated in research.
Q. What type of research?
A. Basically, clinical research with oncology products and treatments.
Q. I have to ask you, have you been involved in any clinical research with the drugs Taxotere or Taxol?
A. I recall -- if I was involved in research with Taxol or Taxotere, it was earlier in my career. And I do not have any particular studies that come to mind.
But I would not doubt whether or not I was

available, call for either Taxol or Taxotere.

There are certain malignancies where you may use a taxane. And in that instance, if there is a selection of either Taxol or Taxotere, and more currently Abraxane, Taxotere tends to still be a drug that I tend to favor more so than Taxotere -- I'm story, Taxotere it what I favor more than Taxol.

Q. Why is that, Doctor?

A. The neuropathic side effects of Taxotere can be very severe and very -- and can be lifelong and be very debilitating when Taxol is used compared to Taxotere.

Q. I guess that leads me in a line of questioning. How do you determine the appropriate chemo regimen for a particular patient?

A. Based on clinical trials, and published clinical trials, and standards of care and guidelines.

Q. When you mention standard of care and guidelines, are you referring to NCCN guidelines?

A. Yes. But not all.

Q. What do you mean by that?

A. NCCN guidelines, it's a good set of guidelines to follow, but it's not the Bible in terms of having to use those every case in medical care.

Q. When you first start using a chemo drug Doctor, what are some of the sources that you turn to in order to learn about information about that drug, such as indications, dosing, the risk safety profile, those sorts of things?

A. So clinical trials, published clinical trials, product inserts, and those, essentially, are the standards.

Q. When you refer to product inserts, is that simply the labeling for the drug?

A. Correct.

Q. And would that also be true with respect to your knowledge of Taxotere?

A. Correct.

Q. Just so I understand you correctly. Do you recall when you first became aware of the safety profile of Taxotere?

A. When it came out.

Q. Would that have involved reviewing the product information?

alopecia have been reported."

A. I see that.

Q. Is that what you recall as being part of the label change in December of 2015?

A. I believe so.

Q. When were you first made aware, Doctor, of this December 2015 label change in which these cases of permanent alopecia was reported?

A. I can't remember exactly when.

Q. It would have been sometime after December 2015. Right?

A. Correct.

Q. Is this when you first became aware that there could be association between Taxotere and permanent alopecia?

MR. MOORE:

Object to form.

THE WITNESS:

I believe there was, again, some lay press concern about that. I believe that preceded 2015. But exactly when, I don't know.

Three years ago, seems like there's been a lot on my subjective recollection. Seems like there's been more than just a

In some cases, frequency not known, permanent hair loss has been observed."

Again, it references permanent hair loss there; is that right?

A. Correct.

Q. In the previous 2013 version, there was no reference to hair loss?

A. Correct.

MR. MOORE:

Object to the form of the question.

BY MR. ROCKFORTE:

Q. I want to talk a little bit about, shifting gears a little bit, about your counseling of patients when they first see you.

When you determine the type of chemo regimen that you're going to give them, is a meeting when you sit down and discuss the regimen with them?

A. I do.

Q. What type of information do you provide to them, Doctor?

A. Provide the rational for choosing a certain therapy, the benefits, and certainly the risks that can be encountered. Risks being side effects when speaking about drugs.

Q. During that discussion prior to -- have you ever had any patients, when you gave them a certain risk of a chemo drug, say, "Doctor, I don't think I want to go through that risk. I want to try an alternative"? Have you ever had a patient tell you that?

MR. MOORE:

Object to the form.

BY MR. ROCKFORTE:

Q. Have you ever been in that situation?

A. Yeah.

Q. I guess it's a poor question. I should restate it.

The better question is, you're recommending a course of treatment that you think is the best option for these patients. Right?

A. Yes.

Q. But ultimately, it's the patient's decision of whether they want to go forward with that regimen. You agree with that?

A. Correct.

Q. So when you sit down with those patients, it's a coordinated approach, you as a professional giving them advice, but it's ultimately their decision; is that right?

A. Correct.

Q. If they decided they wanted to go forward with some other regimen, you would be okay with moving forward with that regimen, as long as it was one of those tools that you thought would be useful in treating their cancer; is that accurate?

MR. MOORE:

Object to form.

THE WITNESS:

It's kind of simplistic. Because there are cases when there are no alternative regimen. For the most part, most patients, when they come in here, do not have an idea what are so called consolation-type of protocols.

BY MR. ROCKFORTE:

Q. Let's talk a little bit about your discussion with patients. Prior to you having an understanding that Taxotere could cause permanent hair loss, what type of discussions would you have with patients about hair loss?

MR. MOORE:

Object to the form of the question.

BY MR. ROCKFORTE:

Q. In connection with the use of Taxotere.

A. The issue with Taxotere is that -- I'm sorry, the conversation I have is one where I do mention that hair loss is a risk with Taxotere, and that the hair loss after the initial treatment, certainly there's variety of different ways that hair growth, or abnormalities in hair growth can occur.

Q. Prior to this label change and your knowledge if it could be permanent hair loss, would you tell patients who were going on a Taxotere regimen that you would expect the hair loss to return?

MR. MOORE:

Object to the form.

BY MR. ROCKFORTE:

Q. Is that your standard practice?

MR. MOORE:

Object to the form of the question.

THE WITNESS:

Yes, that the hair loss would return.

BY MR. ROCKFORTE:

Q. Since you learned about this potential association with Taxotere causing, having the

understood what their decision implied on their overall health and well-being.

Q. Let's talk somewhat about Ms. June Phillips. You have your patient charts and records before you.

Have you had the opportunity to review the medical records prior to today's deposition?

A. Yes.

Q. Do you have an understanding of how she came to see you?

A. She was diagnosed with breast cancer.

Q. Can you take us through your first visit with her?

A. Okay.

Q. Please.

A. I'll just kind of go through --

Q. I think it's the October 2013.

A. Right. Let's see, results of screen mammogram revealed area of suspicion in left breast mass. She had a screen mammogram.

Was diagnosed with an abnormality, very suspicious for breast cancer. And that led to surgery and resection of her breast cancer, in which she had the cancer removed.

And then she was here for general medical

oncology evaluation on whether adjuvant therapy was to be of any benefit.

Q. In terms was staging, how did you stage her cancer? I think it's on the last page.

A. Stage 2-B.

Q. Have you ever had any patients who have refused chemotherapy with stage 2-B?

A. Yes.

Q. What else had you determined in terms of staging the cancer here in terms of tumor?

A. She had two of 11 lymph nodes that were involved, with extranodal extension on the positive lymph nodes. And she had HER-2/neu over-expressed tumor, as well as estrogen receptor positive tumor as well.

Q. Then under section two, there's a section where you discussed the risk of cardiac toxicity, hematologic toxicity, GI toxicity, hair loss, and other matters.

In discussing hair loss, obviously this is in October 2013, prior to the label change. At that point in time, were you telling patients, typically, that, "You should experience hair loss, but it's going to come back"? Would that have been your general

most likely lose hair, but it would return.
Is that in line with what you were advising patients at this point in time?
A. At that point it was that it's likely to return. And that there were some cases that -- where there's some concern about permanent hair loss.
Q. Do you have an independent recollection of Ms. June Phillips or treatment of Ms. Phillips? I know you treat lots of patients.
A. Uh-huh.
Q. You do?
A. Do I have any particular --
Q. An independent recollection of Ms. Phillips.
A. Absolutely, yeah.
Q. Do you have an independent recollection of that particular discussion about advising her?
A. Right. As I said, I guess this goes back a few years ago.
So in terms of what exactly was said and information that was exactly shared, I'm not sure. But she is somebody who is very engaging. So I do kind of vaguely, more than vaguely recall some of the specifics there.
Q. I guess it's fair to say you would have no

reason to dispute her testimony that discussion she had with you was that you had advised her she would lose her hair but that it would come back?
A. I think that's fair.
Q. You have no reason to dispute that?
MR. MOORE:
Object to the form of the question.
THE WITNESS:
Right.
BY MR. ROCKFORTE:
Q. I want to talk a bit more about the lay press reports that you were referring to. I know we can't pinpoint the timeline. I want to try to pinpoint the source.
To the best of your recollection, what's the source of that information?
A. In terms of when it first came out, I believe there were newspaper articles about it. But I'm not -- I can't pinpoint exactly where that was.
Around the same time, there certainly were advertisements about legal cases against -- I'm not even sure if it was Sanofi that was mentioned, but the manufacturer of Taxotere.

Q. Now, before we move on from the first visit, you made a decision to, you recommended a course of treatment that included Taxotere; is that right?
A. Correct.
Q. Do you recall why that might have been the recommended course of treatment with respect to Ms. Phillips?
A. Yes, I can.
So I believe just prior to her visit, there was approval of a certain regimen called TCH regimen, which is referenced in the initial visit.
She had some features of her case that suggested that other aggressive therapies, she was not an ideal candidate for. Those aggressive therapies used medication called doxorubicin, which is a cardio toxic agent that we wanted to avoid specifically in her case.
Q. Did she have any alternative treatments other than the course of treatment that --
A. Yes, there were. Yes, there is.
Q. If after discussing your recommended course of treatment she wanted to try something else,

you would have been okay with her trying this other course of treatment?

MR. MOORE:

Object to form.

BY MR. ROCKFORTE:

Q. If it was one of the ones you had chosen?

MR. MOORE:

Object to the form.

THE WITNESS:

I don't understand.

BY MR. ROCKFORTE:

Q. I'm sorry, that's one of those examples where I ask a poor question.

You mentioned that there were alternative treatments available to her.

A. Uh-huh.

Q. I guess the better question is, in her situation, what were the other alternative treatments?

A. There's a regimen called AC followed by Taxol. A regimen called TAC: Taxotere, Adriamycin, and Cyclophosphamide.

Then kind of getting to -- so with her situation of having lymph node positive disease and there's a high risk of recurrence,

you would tend to favor giving the three active medications that we use for adjuvant treatment.

Prior to this regimen of TCH, which had just been approved, there was, generally, the three were Cyclophosphamide, Taxotere, I should say a taxane, which is Taxol or Taxotere, and Adriamycin.

So just prior to the approval of TCH, there was no regimen that did not contain an anthracycline, which is a cardio toxic medication. With the recent passage of the TCH protocol, we avoided the anthracycline use.

Q. When you say "recent," when did that occur?

A. I want to say maybe '12, '11 or '12. It could have been as early as '11. But within the previous year or two.

Q. At the time that you recommended Taxotere, if Ms. Phillips had said, "Look, I don't want to go forward with the Taxotere regimen because," if you had known the risk of permanent hair loss, "I don't want to go forward with that risk. I'm willing to go forward with AC plus the Taxol," would you have allowed her to go

forward with that treatment as your patient?

MR. MOORE:

Object to the form.

THE WITNESS:

We would have a serious discussion about the risk of cardiac toxicity. And I, I don't know if I included in my note here, but I'm fairly certain -- again, I kind of remember some cases at that initial conversation. And part of the discussion was the alternative of anthracycline-based therapies, and the serious concern we had about the cardiac toxicity.

BY MR. ROCKFORTE:

Q. And ultimately, it's the patient's decision. She could have chosen that other course had she wanted to; is that accurate?

A. Correct.

Q. Take a look, Doctor. I know you have your full records. I'll try to direct you to, I think it's dated February 26, 2014.

A. Can I just look?

Q. Yes, I think that's easier. I think we're on Exhibit 5.

Whether or not -- maybe those were early on. And so I can't recall if they were -- initially, when these reports came out, that there was a big question of, how valid is this? What's the science behind it? What's the data behind it? There wasn't a lot to pinpoint.

Q. Do you know for sure whether or not you had a discussion with her about permanent hair loss when you were first advising her about the use of Taxotere?

A. I'll say that I can't say for sure.

Q. I guess it's fair to say that you could not have had this discussion about permanent hair loss until you actually knew about those reports; is that accurate?

MR. MOORE:

Object to form.

THE WITNESS:

Correct. I'll just answer that by saying that in terms of the timeline about some of the reports about hair loss and when they actually changed the product insert, I can't remember that timeline.

practice -- I want to make sure that the testimony in this was clear, because I think you may have interchanged the word Taxotere and Taxol once.

You were asked about whether or not you favor Taxol or Taxotere in your current practice.

A. Okay.

Q. I understood you to say that due to certain neuropathic side effects associated with Taxol, that you prefer to use Taxotere; is that right?

A. As a generality, yes.

Q. You were asked a lot of questions about when you became aware of the possibility of permanent alopecia associated with the use of Taxotere.

A. Right. Correct.

Q. And when you were first asked that question, you said you thought it was about five to seven years ago?

A. Generally.

MR. ROCKFORTE:

Object to form.

BY MR. MOORE:

Q. That would have been before you treated Ms. Phillips?
A. Again, she's kind of at -- when she was diagnosed, it was kind of at that cusp about five to seven years ago. So it's hard to know exactly when all this information was transmitted and appreciated, and whether or not it was transferred to her.
Q. Right. I think you said you had some recollection of the specifics of having that kind of discussion with her.
MR. ROCKFORTE:
Object to form.
BY MR. MOORE:
Q. Is that right?
A. I have some recollection of it.
Q. To the best of your recollection, you recall having a discussion with her about hair loss associated with Taxotere use?
A. Correct.
Q. And that's codified in your note. Correct?
A. Correct.
Q. You indicated that -- you used the phrase "abnormal hair regrowth." Do you recall that?
A. Yes, I do.

Q. Stage 2-B. And this was a node-positive disease?

A. Correct.

Q. And this was a hormone receptive disease?

A. Correct.

Q. Do those factors, both the size of the tumor, the fact that there was metastatic carcinoma found in a lymph node, and that it was hormone receptive positive, does that place her at a high risk of recurrence?

A. Yes. And the fact that HER-2/neu was over-expressed was another factor. And there was extranodal extension. Those are all factors that are associated with a high risk of recurrence.

Q. If metastatic breast cancer recurs, would you agree that the chances of survival dramatically decrease?

A. Correct. It's incurable at that point.

Q. And so is that why, according to your note under assessment and plan, you talked to her about the importance of adjuvant therapy?

A. Correct.

Q. Describe briefly, if you could, what is a adjuvant chemotherapy?

A. Adjuvant is adjunctive therapy to improve somebody's risk of disease-free survival or living without recurrence, in addition to surgery, which is the main treatment used to eliminate the cancer.

Q. If you had to place a percentage on her risk of recurrence when she presented to you back in October of 2013, what would you estimate that was?

MR. ROCKFORTE:

Object to the form.

THE WITNESS:

Forty to 50 percent risk of recurrence within that five to ten-year period.

BY MR. MOORE:

Q. Would you agree that the use of adjuvant chemotherapy has improved survival rates for people who were in Ms. Phillips' situation?

A. Yes, it has.

Q. That was why you recommended that she undergo adjuvant therapy. Right?

A. Yes, it was.

Q. And you indicated before, that you had recommended that she pursue adjuvant TCH?

Q. What is the -- what comprises the other 85 percent?

A. Lung cancer, colon cancer, other GI malignancies. A variety of different cancers, of course.

There's a fair amount of hematology that we have in our practice as well.

Q. What is hematology? What does that mean?

A. Blood disorders, anything from low blood counts or abnormal blood counts to malignancies of the blood.

Q. If Ms. Phillips had said to you -- strike that.

If someone with Ms. Phillips' medical history came in to you today with the same tumor type, same medical history, would you make the same recommendation for her treatment?

MR. ROCKFORTE:

Object to the form.

THE WITNESS:

Yes.

BY MR. MOORE:

Q. And if that patient said, "Well, Doctor, I saw a T.V. commercial from lawyers saying there is

permanent alopecia with Taxotere, I would rather take the other medicine, the Adriamycin," would you try and talk her out of that?

A. It would be a discussion. So whether or not I would try to talk her out of it, or I could discuss the alternatives if she did bring up issues about her concern about hair loss.

Q. It would be your decision to recommend TCH because, in your judgment, that has the best risk benefit profile for a patient in that situation?

A. Correct.

Q. That was true then and that's true now. Correct?

A. Correct.

Q. You were asked about the reference to alopecia in the 2013 labeling for Taxotere. Do you recall that?

A. Yes.

Q. It was pointed out to you that the phrase didn't say permanent alopecia. Do you recall that?

A. Correct.

Q. Does it say temporary alopecia?

A. No.
Q. It doesn't place any indication as to the duration of alopecia. Right?
A. Correct.
Q. Permanent chemotherapy-induced alopecia is a rare but, none the less, possible side effect associated with many chemotherapy regimens?
A. Correct.
Q. That's something you knew back in 2013?
A. Correct.

MR. ROCKFORTE:

Object to the form.

BY MR. MOORE:

Q. After you saw Ms. Phillips that initial time and made the recommendation for her to undergo the treatment course, which involved the TCH, and then it looks like she was going to undergo radiation treatment as well. Right?
A. Correct.
Q. And then she was going to undergo a certain period of time of hormone supression. Right?
A. Correct.
Q. How long was she to undergo hormone supression?
A. At the time I think we were discussing five

years of therapy.
Q. That's something that begins after she completes the chemotherapy and the radiation?
A. Correct.
Q. What is the purpose of placing her on the hormone supression?
A. It's yet another adjuvant form of therapy to reduce the risk of recurrence.
Q. In the simplest terms, her tumor was shown to feed off of hormones. Right?
A. Correct.
Q. And so the idea behind suppressing the hormones would be to possibly prevent further or later occurrences?
A. Correct.
Q. Once she goes into the chemotherapy regimen, do you monitor her care on a periodic basis?
A. Yes, I do.
Q. What's the first time that she came in to see you after that initial visit?
A. Initial visit or after chemotherapy?
Q. Yes. So the note that I'm looking at is dated December 2, 2013. Do you have it there? I can give you a copy.
A. It might be faster.

Q. For the record, what I'm handing you is page 51 of the Crescent City Hematology Oncology production.
A. Okay.
Q. Do you see the date there, December 2, 2013?
A. Correct.
Q. Then it says, name of regimen, TCH. Right?
A. Right.
Q. Cycle number, last given number one?
A. Correct.
Q. Then it has the date of that cycle, November 22?
A. Uh-huh.
Q. So this would be a visit with her after her first cycle of chemotherapy. Right?
A. Correct.
Q. Then there's a box here at the top of this clinic note that has sort of a fill in type of information there. Do you see that?
A. Correct.
Q. Is that something that your office has come up with to really just capture the most important stuff at the beginning?
A. My way of doing it.
Q. That's your way of doing it. Okay.

previous questions, the comment of permanent hair loss is very nondescript. I think it varies from what is usually seen in practice. I think in pure black and white, this refers to absence of hair growth in general.

I don't -- there's been no clear-cut cases where there's just total absence of hair, hair growth, that I have seen, and not many other colleagues of mine have seen.

BY MR. ROCKFORTE:

Q. I'm looking at the Taxotere December 2015 product labeling and the revised section where they made the label change to reference permanent hair loss.

What's discussed there in the two sections, it says, "Cases of permanent alopecia have been reported." Then in the second section that says, "In some cases, frequency not known, permanent hair loss has been observed."

In your opinion, you believe that terminology is not well defined in terms of your practice. Is that fair in what you would say?

MR. MOORE:

Object to form.

THE WITNESS:

Yes, I would say that.

BY MR. ROCKFORTE:

Q. I want to talk a bit more -- go ahead, I didn't mean to cut you off.

A. It's very non-specific because is that loss of all hair growth? That is unusual, and I've never, I never have witnessed that. Colleagues of mine have not witnessed that.

And whether or not there's a certain, like, patch of hair that may not be, that may -- are they referring to a patch? Or are they referring to an area of the body? So you're kind of left with a lot of non specificity in that labeling.

Q. Well, sure. And that raises an interesting question that I've had. We know that Sanofi representatives have come to you and provided you information related to Taxotere, right, over time?

A. Correct.

Q. And they provided you information related to the efficacy of the drug; is that right?

A. Correct.

Q. And provided you information related to the safety of drugs; is that right?

A. Correct.

Q. Have they ever come to you and provided you information about what this means in the label? What is permanent alopecia? What does permanent hair loss mean?

A. I don't recall.

Q. Is that something that you would have liked to have known in terms of a discussion in your practice, "Why did you make this label change? Can you explain to me"?

MR. MOORE:

Object to form.

THE WITNESS:

I have had conversations with representatives about this. But as I mentioned, in terms of prior experience with the use of Taxotere, that labeling change was somewhat -- that caught many oncologists off guard because of the -- because we do witness hair growth changes in people after knowing Taxotere and other chemotherapy drugs.

BY MR. ROCKFORTE:

Q. When you say it caught oncologists off guard, the label change, do you mean it caught oncologists off guard in that the change stating that there were cases of permanent alopecia was a notification of some information that you had not known previously?

MR. MOORE:

Object to the form.

THE WITNESS:

I wouldn't say that. Again, when you have the previous label that listed alopecia as a side effect, the labeling changed to where there was a little more of a, just a hint of a suggestion of a specific type of alopecia, was what many oncologists have seen with not only Taxotere, but other medications, when alopecia is applied to the labeling. I think that's how it was somewhat surprising to see that.

BY MR. ROCKFORTE:

Q. I want to back up a bit when we talked about this label change in December 2012. You said you have had some discussion with Sanofi reps

I guess my understanding is that once you had these discussions with this rep, is it fair to say that the label change from 2013 to 2015, where it says permanent alopecia, permanent hair loss, is it correct to use the word, that's a stronger labeling, meaning worsening hair loss?

A. Right.

Q. In your opinion, that stronger labeling is made, showing that there is a higher risk or a stronger risk of hair loss, that you would believe that there is some support behind that label change?

MR. MOORE:

Object to the form of the question.

BY MR. ROCKFORTE:

Q. Would that have been your understanding?

A. Yeah. That there was something, even though there was no case reports. I mean, no reports that were in medical oncology literature, no stronger reports in medical oncology literature. That's a statement that would have you take more notice of.

Q. And I think, as you testified earlier, once you became known of this stronger -- you were

notified of this stronger warning about permanent alopecia, you then started notifying or advising your client that there's now a risk of permanent alopecia associated with Taxotere; is that fair?

A. That's fair, yes.

MR. MOORE:

Object to the form.

BY MR. ROCKFORTE:

Q. I want to back up a bit. We went through this line of questioning, but I want to go there again just to make sure there is clarity.

A. Sure.

Q. When advising clients, patients, you mentioned there is a host of potential sources of information used to gather information related to the safety and efficacy of the drug that you provide them. Do you remember that discussion?

A. Yes.

Q. And part of that discussion was, you mentioned product labeling and you mentioned clinical trial data. Right?

A. Correct.

Q. Any other sources of information that you,

besides product labeling and besides clinical trial data, that you would put in your toolbox of information?

A. I think just discussion among colleagues about properties of certain drugs certainly would be. And that could be in the form of discussions amongst colleagues here or in discussions in the oncology world, conferences and all.

Q. And the reason, when you meet with a client, that you use things such as product labeling that may have some support behind it in science or clinical trial, it may have some support behind it in science, is that there is some support. You bring that information to bear when you're advising clients; is that right?

MR. MOORE:

Object to form.

THE WITNESS:

Correct.

BY MR. ROCKFORTE:

Q. Likewise, on the other hand, if there is just lay discussion about some particular efficacy or some risk, that's not necessarily something

you would bring to bear in discussing with a client if it's not been supported by some good science. Would you agree with that?

MR. MOORE:

Object to form.

THE WITNESS:

For the most part, yes.

BY MR. ROCKFORTE:

Q. For example, lawyer advertising is not going to send you out on a wave of discussing a certain risk with clients, would it?

A. I think it would be communicated to them that there is some lay advertisement out there that may influence a perceived property, I guess, of a medication.

Q. Just so I'm clear. The lay news reports that you discussed came out about the same time as the lawyer advertising related to permanent hair loss?

MR. MOORE:

Object to form.

THE WITNESS:

If I recall correctly, about the same time, if I recall correctly.

BY MR. ROCKFORTE:

Q. I'll piggyback that question. Those reports that you became aware of could have been after the label change in December 2015; is that right?

MR. MOORE:

Objection.

THE WITNESS:

It could've been after. I don't remember the timeline.

BY MR. ROCKFORTE:

Q. I know we're talking about a bunch of dates, it's difficult.

I'm looking at the deposition testimony of Mrs. June Phillips. In here, she states, "Dr. Sonnier said I would lose my hair but that it would come back."

In 2013, was that your standard to advise patients at that time, prior to the label change, that, "Hey, you probably will lose your hair, but it's going to come back"? Would that have been your practice then?

A. My practice then would have been, "You would lose your hair, but it would tend to come back, but it may take on different qualities when it does come back. And that could be

different texture, different color, different pattern."

That's kind of been my discussions maybe since even starting practice.

Q. You have no reason to dispute that what she's testified here, that you told her she would lose her hair and it would come back? You have no reason to dispute that?

MR. MOORE:

Object to form.

THE WITNESS:

Wouldn't dispute it.

BY MR. ROCKFORTE:

Q. I want to look at this picture we marked as Exhibit 8. For the record, you can't see the back side of her head; is that right?

A. Correct.

Q. Mr. Moore has asked you whether this label change has altered your risk benefit analysis related to Taxotere. Do you remember that?

A. Yes, I do.

Q. You mentioned that it hasn't. But you disclosed to us that it has altered the disclosures in which you've made to your patients, and that you now report to them that

there can be permanent hair loss associated with Taxotere.

MR. MOORE:

Object to the form of the question.

BY MR. ROCKFORTE:

Q. Is that right?

A. Yes.

Q. Last question I have. We talked about the regimen of treatment that you've given, that you recommended for Ms. Phillips.

I think, as you mentioned, there was another alternative. This is clearly a recommendation based off your expertise, and that there was an alternative. And it was ultimately the client's, the patient's choice to make that decision. Would you agree with that?

MR. MOORE:

Objection to the form of the question.

THE WITNESS:

I won't agree with that wholeheartedly. Usually, the discussion is kind of a joint, shared information and recommendations and agreement from

patients. That's how I would leave it.

BY MR. ROCKFORTE:

Q. But ultimately, the client makes the ultimate decision about which regimen to go forward with?

A. I wouldn't say that. Because had she come in and said, "I want Adriamycin as my regimen," I would say, "I think that's a very risky proposal," and that I would not give it.

If she would have wanted to pursue an Anthracycline course, her -- I think at that time, knowing what I know now, would have been going with a non Anthracycline therapy, which would have lessened the efficacy and not as -- would not have reduced her risks of recurrence to the same degree as TCH.

Q. In 2013, when you recommended this course of chemotherapy, there was another alternative that was available to her. Correct?

MR. MOORE:

Object to the form of the question.

BY MR. ROCKFORTE:

Q. Correct?

A. Yes.

Q. And that was the AC plus Taxol?

A. That would have been a consideration, correct.
Q. That would have been another alternative?
MR. MOORE:
Object to the form.
BY MR. ROCKFORTE:
Q. Correct? Yes?
A. That I would have felt was very risky because of the cardiac toxicity.
Q. Right. But it would have been an alternative that could have been discussed and considered?
A. Correct.
Q. And had she chosen to go with that alternative, that would have been okay with you, as long as you discussed all the side effects, the risks, and everything associated?
A. I don't think it would have been okay with me. I would have felt very concerned, and would have felt that I was placing her cardiac status at great risk.
Q. But ultimately, it would have been her decision; is that right?
A. It's her decision, I would say that it's not right. Because someone cannot -- someone can come in with a sense that they can get something and have a firm decision that's the