# EXHIBIT C

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3
4  ELIZABETH KAHN,
5  Plaintiff,
6   vs.                          Case No. 2:16-cv-17039
7  SANOFI S.A., SANOFI-AVENTIS U.S.
   L.L.C., SANOFI US SERVICE, INC., and
8  AVENTIS-PHARMA S.A.,
9  Defendants.
10
                * * * * * * * * * *
11
12 CYNTHIA THIBODEAUX,
13 Plaintiff,
14  vs.                          Case No. 2:16-cv-15859
15 SANOFI S.A., SANOFI-AVENTIS U.S.
   L.L.C., SANOFI US SERVICE, INC., and
16 AVENTIS-PHARMA S.A.
17 Defendants.
18
19         Videotape Deposition of CARL KARDINAL, M.D.,
20 taken on behalf of the defendants, at the residence of
21 Carl Kardinal, M.D., 6008 Dornagh Court, in the city
22 of Columbia, State of Missouri, on the 17th day of
23 January 2018, before Heather L. Shallow, Certified
24 Court Reporter, Registered Professional Reporter,
25 Registered Merit Reporter.        Job No. NJ2783240

1    A.   Of course.
2    Q.   Do you have any memory of reviewing
3    Exhibit 1, the Taxotere label, at any time after you
4    start -- first started prescribing it until the time
5    you met with Plaintiffs' counsel?
6    A.   I can remember reviewing, you know, the
7    label at the time I was prescribing the drug years
8    ago, but in terms of remembering specifics, I cannot.
9    Q.   When, to your recollection, did Taxotere
10   come onto the market?
11   A.   Certainly in the 1980s, 1990s we were using
12   Taxol and Taxotere in clinical trials when we were
13   doing a lot of clinical trials, but I don't think it
14   became commercially available until 1990 or so.
15   Q.   Maybe the late 1990s?
16   A.   Yeah.
17   Q.   So would you have been looking -- I'm just
18   trying to understand your common practice of looking
19   at chemotherapy drug labels.  Was it your practice to
20   refer back to them -- let's say -- strike all that.
21        Say you had been prescribing a chemotherapy
22   drug for five years.
23   A.   Yeah.
24   Q.   Was it your practice to look at the
25   chemotherapy drug label after you'd been prescribing

Page 29

1  it for some period of years?
2          I -- Dr. Kardinal, I'm trying to get a sense
3  of if it was common for you just to review labels in
4  the early days of prescribing a drug or if you would
5  have reviewed the Taxotere label at some point later.
6          MR. MICELI:  Let me just object to the -- to
7  the form because it's compound.  And Kelly, I don't
8  mean to interrupt, but you asked a question, then
9  before he answered, you adjusted your question.  I
10 don't know if you want to just start all over again so
11 it's clear for the record.  Or you can -- I'll just
12 sit back and be quiet.
13         MS. BIERI:  I will ask a different question.
14         MR. MICELI:  Okay.  Again, I don't want to
15 interrupt.  I just wanted to -- it's a strange
16 objection but I want to make sure we were clear.
17 Thank you.
18         Q.  (By Ms. Bieri)  Dr. Kardinal --
19         A.  You're going to ask another question?
20         Q.  Let me try a different question.  How often
21 did you reread labels after you first started
22 prescribing a drug?
23         A.  If something unexpected happened, I would
24 refer back to it.
25         Q.  Do you have any recollection of reviewing

Page 50

1  your oncology practice in just a moment, but first I
2  want to talk about some things that you're not an
3  expert in, that I think you're not an expert in based
4  on what I know.  Is it fair to say that you've not
5  been involved in the manufacture, testing, or
6  marketing of pharmaceutical products?
7       A.   Testing only in the sense that I was
8  involved in clinical trials.  As a matter of fact,
9  these patients were involved with clinical trials.
10      Q.   Do you -- do you agree that the
11 manufacturing, testing, and marketing of
12 pharmaceutical products is regulated by the federal
13 Food and Drug Administration?
14      A.   Yes.
15      Q.   Do you agree that you're not an expert in
16 the regulatory process as it pertains to prescription
17 drugs?
18      A.   Correct.
19      Q.   Do you agree that you're not a
20 dermatologist?
21      A.   Yes.  That's safe to say.
22      Q.   Do you agree that you are not a
23 cardiologist?
24      A.   Oh, come on.  We going to go through the
25 whole list?

Page 51

```
 1         Q.   Nope.  Just a few.
 2         A.   All right.  No, I'm not a cardiologist.
 3         Q.   Do you agree that you are not an expert on
 4    alopecia or hair loss generally?
 5         A.   Well, look at this hair.  No.
 6         Q.   Do you agree with that statement?
 7         A.   That I'm not an expert on alopecia?
 8         Q.   Correct.
 9         A.   Can you define what an expert in alopecia
10    is --
11         Q.   Well --
12         A.   -- so I can answer the question?
13         Q.   Do you think that you're someone who could
14    provide medical testimony, to a reasonable degree of
15    medical certainty, regarding, like -- for example,
16    like a dermatologist might regarding the causes of
17    alopecia?
18         A.   With regard to chemotherapy, the answer
19    would be yes with regard to general causes of
20    alopecia.
21         Q.   Are you talking about based on your
22    experience and that you've seen cases of alopecia
23    following the administration of certain chemotherapy
24    drugs?
25         A.   Yes.
```

Page 52

```
 1        Q.   Would it be based on anything else?
 2        A.   No.
 3        Q.   Do you agree that you are not an expert in
 4   the FDA labeling or warnings regarded to prescription
 5   drugs?
 6        A.   Right.  Yes.
 7        Q.   Yes, you agree?
 8        A.   (Nods head.)
 9        Q.   Okay.  You mentioned that you are currently
10   retired.
11        A.   Yes.
12        Q.   Since what year?
13        A.   May have to verify this with my wife.
14   Probably 2007 or '8.
15        Q.   Let me ask you this question.
16        A.   Yeah.
17        Q.   Did you retire immediately after you left
18   Ochsner?
19        A.   No.  I worked for the University of Missouri
20   here for one or two years.  Then I became 80 and then
21   it was time to quit.
22        Q.   What did you do for the University of
23   Missouri?
24        A.   Oncology.
25        Q.   In what capacity?  Did you teach?  Did you
```

```
 1        A.   It was not common.
 2        Q.   Do you remember telling me that you warned
 3   of common side effects?
 4        A.   Yeah.
 5        Q.   Okay.  So would you have warned of the risk
 6   of persistent hair loss?
 7        A.   Not unless it was in the package insert.  If
 8   it was in the package insert, I would have warned
 9   about it.
10        Q.   Tell me a drug for which the package insert
11   says that there's a risk of permanent or persistent
12   hair loss.
13        A.   Can't do that.  Don't know.
14        Q.   For what drugs did you warn of a risk of
15   permanent or persistent hair loss?
16        A.   I did not warn about permanent or persistent
17   hair loss because, in my experience, hair came back.
18        Q.   So for no chemotherapy drug at any time did
19   you ever warn about the risk of permanent or
20   persistent hair loss?
21             MR. MICELI:  Object to the form.
22        A.   No.
23        Q.   (By Ms. Bieri)  No, you did not?
24        A.   Correct.
25        Q.   And that was based on your experience that
```

Page 88

1  you did not see that?
2       A.  Correct.
3           MR. MICELI:  Object to the form.  Pardon me.
4       Q.  (By Ms. Bieri)  Have you ever seen any
5  literature at all regarding any chemotherapy drug
6  regarding reporting cases of permanent or persistent
7  hair loss?
8           MR. MICELI:  Object to the form.
9       A.  Not during the time I was practicing.
10      Q.  (By Ms. Bieri)  Have you seen something
11 since then?
12      A.  No.  I haven't kept up.
13      Q.  Sure.  Understood.  I just wanted to make
14 sure I understood your testimony.
15      A.  I was pretty up to date at the time I
16 retired, but since that time, I've not been keeping
17 up.
18      Q.  Let me turn and ask you a little bit about
19 NSABP-40.  And to the extent it helps you, in the pile
20 you have, there are some documents related to that.
21      A.  Okay.
22      Q.  To the extent you want to look at those
23 while we're talking.
24      A.  All right.
25      Q.  Do you know when you first assisted a

1     Q.  Okay.  You don't have any reason to know
2  what "superiority" means from an FDA regulatory
3  standpoint?  To the extent it has a particular meaning
4  in that context.
5     A.  I guess not.
6     Q.  Okay.  When you were talking about -- with
7  Ms. Bieri about Arimidex and thinning hair -- do you
8  remember that series of questions?
9     A.  Yes.
10    Q.  Okay.  When -- when Arimidex is removed from
11 the patient using it, does -- does the hair generally
12 grow back?
13         MS. BIERI:  Object to the form.
14    A.  Well, Arimidex is not associated with much
15 hair loss --
16    Q.  (By Mr. Miceli)  Fair.
17    A.  -- to start with, so -- I don't know that
18 I've had a patient with Arimidex who had significant
19 hair loss.
20    Q.  And I want to make sure I understood you
21 correctly earlier when you were discussing with
22 Ms. Bieri what you would warn about with a patient.
23 I've written down here that you would not warn of
24 permanent hair loss unless it were in the label.  Did
25 I get that correct?

Page 140

1      MS. BIERI: Object to the form.
2      A.  That -- that's correct.
3      Q.  (By Mr. Miceli) Okay. And to flip that
4  around, if the words "permanent hair loss" were
5  associated with the use of Taxotere, would you discuss
6  that with your patient?
7      MS. BIERI: Object to the form.
8      A.  Yes, and it should be included in the
9  consent form.
10     Q.  (By Mr. Miceli) Thank you. Now, you
11 retired in 2012; correct?
12     A.  (Nods head.)
13     Q.  That's "yes" for her?
14     A.  Yes.
15     Q.  Sorry. I know it's getting late in the day,
16 Doctor.
17     A.  Yes.
18     Q.  Have you -- aside from the meeting that you
19 and I -- or we had with you back in December here --
20     A.  Yes.
21     Q.  -- have you looked over any other product
22 inserts of chemotherapy agents since retiring?
23     A.  No.
24     Q.  Okay. So for the last five years you
25 haven't reviewed any product inserts?

1      A.   Correct.
2      Q.   And again, I keep -- because I'm going
3  through my notes of what you talked about with
4  Ms. Bieri, I want to make sure that I have this
5  correct.  Did you say earlier that you were not aware
6  of any chemotherapy label that lists permanent
7  alopecia or permanent hair loss as an adverse event?
8      A.   Permanent hair loss?
9      Q.   Correct.
10     A.   You know, the answer is I -- I don't recall
11  reviewing one that ever listed permanent hair loss.
12     Q.   Okay.
13     A.   They may possibly have been there, but...
14     Q.   Okay.  But you're not -- as we sit here
15  today, you don't recall one?
16     A.   I don't recall --
17     Q.   Okay.
18     A.   -- a specific one that says permanent.
19     Q.   And you practiced medicine for 40 some-odd
20  years?
21     A.   Yes.
22     Q.   So based on the fact that, as we sit here,
23  you can't recall the product insert, product label
24  that listed permanent hair loss as a potential side
25  effect, would it be a fair statement to say that if

Page 142

1  you received a letter from a pharmaceutical company
2  updating you on their label, that they were changing
3  it to include permanent hair loss as a adverse event
4  associated with the use of their drug, would that be
5  news to you?
6         MS. BIERI:  Object to the form.
7     A.  Yeah.
8     Q.  (By Ms. Bieri)  And would that change what
9  you discuss with your patient concerning that drug?
10        MS. BIERI:  Object to the form.
11    A.  It would be something that would have to be
12 included in the discussion.
13    Q.  (By Mr. Miceli)  Okay.
14    A.  I may -- may perhaps still recommend the use
15 of the drug.
16    Q.  But it's something you would discuss with
17 your patient?
18    A.  Yes.
19    Q.  And if, after discussing it with your
20 patient, your patient told you, because of that, they
21 did not wish to take that drug --
22    A.  Correct.
23    Q.  -- and asked you for other options, would
24 you discuss other options with them?
25        MS. BIERI:  Object to the form.

1      A.   Correct.
2      Q.   (By Mr. Miceli)  Okay.  And is paclitaxel an
3  adequate alternative to docetaxel?
4           MS. BIERI:  Object to the form.
5      A.   In terms of its efficacy?
6      Q.   (By Mr. Miceli)  Yes.
7      A.   They're very similar.
8      Q.   Okay.  And are there other adjuvant
9  therapies that do not include taxanes that are also
10 within the standard of care for use in patients?
11          MS. BIERI:  Object to the form.
12     A.   Yes.
13     Q.   (By Mr. Miceli)  Okay.
14          MR. MICELI:  Where's your phone?  I need to
15 see that.
16          MS. PEREZ REYNOLDS:  Give me a second.
17          MR. MICELI:  Okay.  All right.  I'll let you
18 find that.
19     Q.   (By Mr. Miceli)  Now, in Exhibit 6 to your
20 deposition -- I believe that was one of the informed
21 consents.  I'm going to do my best to locate it for
22 us, Doctor.  On page 2 there was some discussion -- I
23 think it's in this first paragraph -- I apologize for
24 pointing there -- about what standard care was.  Do
25 you remember that?

Page 144

1  A. Well, the talk in this that AC, which was
2  Adriamycin and Cytoxan, is a standard treatment for
3  breast cancer.
4  Q. With docetaxel; correct?
5  A. With docetaxel?
6  Q. If you look at that, three chemo -- "Three
7  of the chemotherapy drugs used in this study are
8  docetaxel followed the combination of doxorubicin and
9  cyclophosphamide --
10 A. Okay.
11 Q. -- AC, a standard treatment for breast
12 cancer." Do you see that?
13 A. Yeah. It is the standard treatment.
14 Q. Okay. And is the -- is the docetaxel plus
15 doxorubicin plus cyclophosphamide sometimes referred
16 to as TAC?
17 A. Yeah.
18 Q. Okay. Now, are you familiar with the
19 treatment option FAC?
20 A. Right.
21 Q. And that's --
22 A. 5FU.
23 Q. 5FU, doxorubicin, and cyclophosphamide?
24 A. Right.
25 Q. And is that -- is that a standard of care --

Page 145

1  or is that a -- is that a treatment option within the
2  applicable standard of care --
3          MS. BIERI:  Object to the form.
4     Q.   -- for adjuvant therapy?
5          MR. MICELI:  Go ahead.  I'm sorry.
6          MS. BIERI:  Object to the form.
7     A.   That was an old treatment and it probably
8  doesn't have the potency or efficacy of TAC.
9     Q.   (By Mr. Miceli)  Okay.
10    A.   It would not be something I would choose.
11    Q.   How about AC only without docetaxel?  Is
12 that within the standard of care?
13         MS. BIERI:  Object to the form.
14    A.   I think in selected cases of multi node
15 positive breast cancer, AC by itself is -- is not
16 adequate.
17    Q.   (By Mr. Miceli)  Okay.  How about
18 doxorubicin, paclitaxel and cyclophosphamide?  Is that
19 an adequate standard of care treatment option?
20         MS. BIERI:  Object to the form.
21    A.   Paclitaxel, I would think that would be an
22 adequate -- fairly equivalent treatment.
23    Q.   (By Mr. Miceli)  So if your patient came to
24 you and said because of -- and assume -- this would
25 assume that you were warned about the hair loss in the

1   label -- so -- strike that question.
2           Assuming that you had been warned about the
3   use -- or the permanent alopecia being associated with
4   the use of docetaxel, Taxotere, and your client -- and
5   you advised your client of that association -- or your
6   patient of that association, and she informed you she
7   did not wish to use that product, would the
8   combination of paclitaxel, cyclophosphamide, and
9   doxorubicin be an adequate treatment option for that
10  person?
11          MS. BIERI:  Object to the form.
12      A.  Well, it should be fairly equivalent.
13      Q.  (By Mr. Miceli)  Okay.  And with neoadjuvant
14  treatment for --
15      A.  Yes.
16      Q.  -- for Ms. Thibodeaux, that ultimately --
17  her treatment ultimately included a surgery to remove
18  her --
19      A.  Tumor.
20      Q.  -- her tumor; correct?
21      A.  Yes.
22      Q.  And do you recall that -- that the removal
23  of the tumor included good, clean margins of the
24  tumor?
25          MS. BIERI:  Object to the form.

Page 175

1          MS. BIERI:  Object to the form.
2          A.   Yeah.  Any patient on potent chemotherapy is
3     feeling kind of crummy.
4          Q.   (By Mr. Miceli)  And is -- is Sanofi's
5     statement in this document that "The fatigue will go
6     away gradually after treatment is completed"
7     consistent with how you advised your patients?
8          A.   Yes.
9          Q.   Okay.  And similarly, we talked about -- I
10    should have asked you this before when we were talking
11    about alopecia, but explaining that alopecia is a
12    common, yet temporary, side effect of some cancer
13    medications, is that consistent with how you advised
14    your patients about hair loss related to Taxotere?
15         MS. BIERI:  Object to the form.  Misstates
16    testimony.
17         A.   Yes.
18         Q.   (By Mr. Miceli)  Okay.  And then if you flip
19    to the page that ends in 488.
20         A.   Okay.
21         Q.   Okay.  And this is the page that's titled
22    "Neuropathy and Myalgia."
23         A.   Correct.
24         Q.   And that is in parentheses underneath "Nerve
25    and Muscle Side Effects"; correct?