# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
IN RE:  TAXOTERE (DOCETAXEL)      *   16-MDL-2740
        PRODUCTS LIABILITY LITIGATION  *
                                  *   Section H
Relates To All Cases              *   September 17, 2019
                                  *
*****************************************************************
```

REPORTER'S OFFICIAL TRANSCRIPT OF THE
**STATUS CONFERENCE**
BEFORE THE HONORABLE MICHAEL NORTH,
UNITED STATES MAGISTRATE JUDGE.
*****************************************************************

APPEARANCES:

For the Plaintiffs:
Andrew Lemmon, Esq.           Jason Fraxedas, Esq.
Larry Centola, Esq.           Lindsay Stevens, Esq.

For the Defendants:
Julie Callsen, Esq.           Mara Cusker Gonzalez, Esq.
R. Clifton Merrell, Esq.      John Olinde, Esq.
Beth Toberman, Esq.           Karina Pundeff, Esq.
Chad Vacarella, Esq.

REPORTED BY:   Mary V. Thompson, RMR, FCRR
               500 Poydras Street, Room B-275
               New Orleans, Louisiana  70130
               (504)589-7783

**OFFICIAL TRANSCRIPT**

---

2

1    **P R O C E E D I N G S**
2
3        THE COURT:  Hello everybody.  Y'all can have a seat.
4        All right.  Who's got this issue for Accord -- the two
5   issues for Accord?
6        MS. CALLSEN:  Me.
7        THE COURT:  All right.
8        MR. LEMMON:  Lindsay, are you on the phone?
9        THE COURT:  Is anyone there?
10       MS. STEVENS:  Yes, I'm here.  I had my phone on mute
11  because I believe Andrew is going to be doing the majority of our
12  argument.
13       THE COURT:  All right.  So I have a couple of
14  questions.
15       You-all say Accord performs pharmacovigilance functions
16  pursuant to regulatory responsibility.
17       MS. CALLSEN:  Correct.
18       THE COURT:  Does it rely in any way on the information
19  that's contained in this Lambda database in doing that?
20       MS. CALLSEN:  Not --
21       THE COURT:  I have to believe the answer is "yes."
22       MS. CALLSEN:  Not really.  I mean, the thing is, Lambda
23  evaluates the adverse events that we, meaning Accord, provides to
24  them.  They then provide their analysis to Accord in the adverse
25  event reports themselves as well as the PADER, which are the

OFFICIAL TRANSCRIPT

---

3

1   periodic updates as well as the quarterly reports.
2        So that data -- that's what Accord relies upon.
3        THE COURT:  That data is what comes back from Lambda?
4        MS. CALLSEN:  Correct.
5        I have a PADER, as an example.  It is a 222-page
6   document, and it goes through the analysis of each adverse event
7   report with respect to docetaxel that Lambda has analyzed and
8   sent back to us.
9        Then Accord takes that and finalizes it into the report
10  that's required -- into the format for the report that's required
11  by the FDA and submits it.
12       THE COURT:  And what you-all are looking for is the raw
13  material in the Lambda analysis?
14       MR. LEMMON:  Right.  We need to be able to peek at the
15  data and reach our own conclusions which may be different.
16       And Accord -- you know, the pharmacovigilance
17  obligation is a non-delegable responsibility, and it is with
18  Lambda -- I'm sorry, it is with Accord.  And Accord seems to be
19  saying that they're attempting, basically, to delegate it to
20  Lambda and all they get is a report, and then they turn in the
21  report and that's that, and we can't then go and find out what
22  goes on before the report gets prepared.  That's what we're
23  trying to see.
24       MS. CALLSEN:  That's not true.  Lambda does the actual
25  medical affairs analysis of the report.  We collect the reports.

OFFICIAL TRANSCRIPT

---

4

1   We submit them to this third party who then analyzes the data.
2   They take a look at whether it's the -- the whole summary that's
3   in our PADERs.  They look at the label; assess whether it is --
4        THE COURT:  But they are looking for all the
5   information that is used to get to the --
6        MS. CALLSEN:  Correct.  So the raw data Accord never
7   sees.  Accord sees the analysis and they analyzes that data and
8   they then submit it to the FDA.
9        THE COURT:  You told me initially that the raw data is
10  sent from Accord to Lambda; that's how they get it.
11       MS. CALLSEN:  Right.  Well, they submit the actual
12  adverse report.
13       THE COURT:  Right.
14       MS. CALLSEN:  But in the format that Lambda puts it
15  into, whatever database they maintain, we never see that.
16       So if Accord gets an adverse event, they submit it to
17  Lambda to do the analysis and summary.
18       Lambda also, on their own, does literature reviews, and
19  if there's an adverse event reported in the literature, they then
20  look at that, they summarize it, and they provide it back to
21  Accord.
22       THE COURT:  There's just no way that that stuff is not
23  discoverable.
24       MS. CALLSEN:  We've already provided --
25       THE COURT:  No, you've provided your documents created

OFFICIAL TRANSCRIPT

## Page 13

1  November 2017 and ended -- or would have ended in March of 2019.
2  Is that right or wrong?
3      MR. LEMMON: It's correct that when it was -- it
4  began -- it started on that date and then the trial was
5  continued. And so that was-- no one -- there was nothing done.
6  There were no documents offered. There were no depositions
7  taken. There were some documents that were produced.
8      THE COURT: Was there an agreement to extend the
9  deadline to July 2019?
10     MR. LEMMON: There was not.
11     MS. CUSKER GONZALEZ: We submitted it to Ms. Menzies.
12     MR. LEMMON: We had a discussion about the deadlines,
13 what was the deadline going to be, and we agreed that the
14 earliest that the deadline could be was July, and that we would
15 report back to the Court in April. That's what we agreed to, and
16 that's all we agreed to.
17     THE COURT: This says after the Sanofi trial was
18 continued, Hospira -- am I pronouncing that right?
19     MS. CUSKER GONZALEZ: Yes.
20     THE COURT: -- Hospira was willing to extend the
21 deadline another five months to December 2019. It does not say
22 that there's an agreement, but it does say that they offered to
23 do that.
24     MR. LEMMON: They offered to do that.
25     THE COURT: And y'all --

## Page 14

1      MR. LEMMON: Well, the other way around. We offered
2  90 days before trial. They offered December 20th. We offered
3  120 days before trial. That's the end of the discussion.
4      THE COURT: What is 120 days before trial?
5      MR. LEMMON: It would be April. That's the full extent
6  of the negotiation.
7      MS. CUSKER GONZALEZ: Your Honor, Mara Cusker Gonzalez
8  for Hospira.
9      The dates are as you laid out. We started discovery in
10 late 2017. We were producing documents, I think all three
11 defendants, starting in early 2018. At the same time we were
12 working up some cases in the trial pool. Eventually a number of
13 those cases dropped out for various reasons, but we continued
14 discovery.
15     We've all now been added to another trial pool. We
16 have been working up cases. We've been doing a lot of work on
17 our side and we've been continuing productions.
18     The broader schedule did shift out, and that's why we
19 agreed, yes, of course we'll extend to July. Ms. Menzies
20 submitted a letter to Your Honor memorializing that agreement.
21 Everybody reserved their rights, of course, but there was an
22 agreement out through July.
23     The schedule shifted again. We again agreed to move
24 it, but we think it really needs to fall before expert reports
25 are due, and that's really the way it has been working.

## Page 15

1      THE COURT: So before you say anything, I agree with
2  what was just said. I think that the general discovery deadline
3  needs to fall before expert reports are due. That's the key
4  part.
5      MR. CENTOLA: We don't know if there's a Hospira trial.
6  We don't have a date for a Hospira trial yet.
7      THE COURT: Do you have a date for any expert reports?
8      MS. CUSKER GONZALEZ: Yes, sir.
9      MR. CENTOLA: It is only depending on what defendant is
10 going to trial in August.
11     THE COURT: So that's going to be decided in October?
12     MR. CENTOLA: Correct. And if it is not Hospira, there
13 is no reason to have a discovery deadline of December 2019 when
14 it is so obvious there is a lot of discovery left to do.
15     THE COURT: And I don't disagree with that.
16     My main concern is that we not wind up back in the
17 situation we were in at the beginning of this case and having
18 expert reports being written and you-all paying experts a bunch
19 of money with discovery still going on.
20     MR. CENTOLA: Sure. I understand.
21     THE COURT: I don't want that to happen.
22     MR. CENTOLA: Understood.
23     THE COURT: So I think -- what y'all are telling me is
24 that there is no current deadline except perhaps for the one that
25 has already lapsed.

## Page 16

1      MR. LEMMON: That's right.
2      MS. CUSKER GONZALEZ: That's right.
3      MR. CENTOLA: No. Because one fact that they are not
4  telling you is that there were bellwether cases that were in the
5  trial pool, and then those were removed, as Ms. Gonzalez said,
6  and at that point Hospira said, You are not allowed to do
7  discovery. We are going to shut you off and completely --
8      THE COURT: Here is what we are going to do.
9      MR. CENTOLA: There is no deadline.
10     THE COURT: We're going to get an answer in October as
11 to what is going to happen, and then you-all are going to sit
12 down and talk about a discovery plan that makes sense vis-a-vis
13 expert disclosures. If you still can't come to an agreement,
14 then you can get on the phone with me or come see me and we'll
15 work that out.
16     MR. CENTOLA: Yes, sir.
17     THE COURT: Just keep in mind that I don't want to have
18 this jacked-up situation where y'all are taking expert
19 depositions and still doing fact discovery, and now we've got an
20 avalanche of supplemental reports and re-depositions and all of
21 that. I don't want any of that.
22     MR. LEMMON: None of us want that either.
23     MS. CUSKER GONZALEZ: Your Honor, just to correct the
24 record, we did say that we think discovery as to us should be
25 stayed as we don't have a case in this pool. They disagreed. We

17

```
 1  said fine.  We served our responses to interrogatories.  We've
 2  continued discovery throughout the last two years.
 3          THE COURT:  I don't know why you would want to stay
 4  discovery.
 5          MS. CUSKER GONZALEZ:  And we did not.  We agreed to --
 6          THE COURT:  Sooner or later you're going to do it so
 7  you might as well do it now.
 8          MS. CUSKER GONZALEZ:  And we agreed.
 9          MR. CENTOLA:  But they pushed depositions off.  We are
10  not here to cast aspersions.  We understand what you are saying.
11  We understand Your Honor's position on this, and it will be
12  dependent on what cases are selected to move forward.
13          THE COURT:  So you-all -- the first thing that happens
14  after Judge Milazzo makes that decision is you-all get together
15  and try to come up with a plan that makes sense, and, you know,
16  you don't have to involve me unless you have to involve me.
17          MR. CENTOLA:  Absolutely.
18          MR. LEMMON:  Our next status conference I understand is
19  going to be the --
20          MR. OLINDE:  We have one other issue.
21          MR. LEMMON:  -- the 18th of October, which is a week
22  after.
23          THE COURT:  A week later.
24          MR. LEMMON:  Perhaps if the hearing were set in the
25  afternoon, maybe that morning we could get together and try and
```

OFFICIAL TRANSCRIPT

18

```
 1  come up with something.
 2          THE COURT:  Just talk to Blanca about when the hearing
 3  is set.  I stopped trying to do that.
 4          MR. LEMMON:  I didn't mean to interrupt, if there is
 5  something else.
 6          MR. OLINDE:  You are part of this.
 7          THE COURT:  Come on.
 8          MR. OLINDE:  We sent you an e-mail.  We sent you an
 9  e-mail, Judge, on Thursday.
10          THE COURT:  There is a pretty good chance I didn't see
11  it.
12          MR. OLINDE:  I figured that is what the case was.
13          THE COURT:  Well, I don't like people that make those
14  excuses, but in this case we just changed our entire e-mail
15  system over the weekend and all kinds of crazy stuff has
16  happened.  So there is an actual reason why I might not have seen
17  it.
18          MR. OLINDE:  You were in a settlement conference.  I
19  know Andrew called.  We were on the phone.  We said we would like
20  to have a chance to chat with you about it.
21          This was one specific issue which we have an agreement
22  on, and we just needed you to bless it, which is that there is
23  a --
24          THE COURT:  I don't need to know what it is.
25          MR. OLINDE:  You bless it.  Okay.
```

OFFICIAL TRANSCRIPT

19

```
 1          THE COURT:  No, go ahead and tell me.
 2          MR. OLINDE:  I have a loan -- no.
 3          Well, the -- this is a case.  It is the Dora Sanford
 4  case.  It is in the third trial pool.  There is -- the Phase I
 5  discovery ends September 20th.  The problem is that the doctor,
 6  the treating physician, the prescribing physician, who is
 7  Dr. Judd Patten, is retired, and we're not really sure where he
 8  is.  We've tried to locate him.  We've jointly sent some letters
 9  to him because both sides want to take his deposition.
10          So we think we might have an address for him in
11  Baton Rouge, and we want to try to subpoena him in Baton Rouge,
12  but there is no way we could get that completed by the 20th of
13  September.  So what we suggested in our e-mail was can you, for
14  the specific purpose of taking this deposition, extend the
15  September 20th deadline to October 10th?
16          And so I can give you -- well, I've written all over my
17  e-mail here, but I can send it to you again.
18          THE COURT:  Send it to me again and I'll act on it.
19          MR. OLINDE:  I gave you the civil action number.
20          But it is just to make -- for that one particular
21  purpose.  And so we're going to go ahead and try to subpoena.
22  And if we can't get the doctor, we may come back to you and try
23  to figure out what to do at that point.
24          THE COURT:  If you'd resend me the e-mail because I
25  might not be able to find it.
```

OFFICIAL TRANSCRIPT

20

```
 1          MR. OLINDE:  Is it the same e-mail address?
 2          THE COURT:  Yes.  It's just a whole new program.
 3          MR. OLINDE:  I will do that.
 4          THE COURT:  How they manage to get almost everything
 5  from one to the other, I don't know.
 6          MR. LEMMON:  So we're good with that.
 7          THE COURT:  Okay.  Very good.  Thank you-all.
 8                  (Proceedings adjourned.)
 9
10                        * * * *
11                       CERTIFICATE
12
13      I hereby certify this 18th day of September, 2019, that
14  the foregoing is, to the best of my ability and understanding, a
15  true and correct transcript of the proceedings in the
16  above-entitled matter.
17
18                              /s/ Mary V. Thompson
19                          _____
                               Official Court Reporter
```

OFFICIAL TRANSCRIPT