UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)　　　　　　　　　　MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

　　　　　　　　　　　　　　　　　　　　　　　　　　　　SECTION "H" (5)

THIS DOCUMENT RELATES TO:

June Phillips, Case No. 2:16-cv-15397.

DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT ON WARNINGS CAUSATION

For failure-to-warn cases involving chemotherapy drugs, this Court has articulated a framework that contemplates a vigorous, albeit hypothetical, discussion between patients and their prescribing physicians. The Court's analysis requires Plaintiff to come forward with evidence supporting each of the Court's four contemplated scenarios: "[1] whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere, [2] whether the patient would have inquired about other options, [3] what the doctor would have recommended, and [4] what decision the plaintiff would have ultimately made." Order & Reasons, Rec. Doc. 7571 at 16 (numerals added). Plaintiff's Opposition confirms there is no triable issue under the Court's previous rulings.

1. **Plaintiff has not adduced evidence that her treating physician would have advised her differently.**

The first step of the Court's analysis rests on the premise that Plaintiff's treating physician was not aware of the alleged risk of permanent hair loss and then asks "whether and how" patient-counseling would be different in the hypothetical discussion between doctor and patient. Here, Plaintiff concedes that, by 2013, Dr. Sonnier already knew that "[p]ermanent chemotherapy-induced alopecia was associated with many chemotherapy regimens." Pl.'s Opp. at 6 (internal

quotation marks omitted).  Dr. Sonnier also testified that he was aware of the possible risk of permanent alopecia associated with Taxotere when he treated Ms. Phillips and he had a discussion with her regarding the potential risk:

> THE WITNESS:
>> I believe, and I'm fairly certain, if I can recall correctly here, that at the time of Ms. Phillips' case, that there were some reports about the concern about permanent hair loss. Certainly, we touched on that then as a potential risk.
>>
>> . . .
>
> Q.    … Is that in line with what you were advising patients at this point in time?
>
> A.    At that point it was that it's likely to return.  And that there were some cases that -- where there's some concern about permanent hair loss.

Sonnier Dep. 31:4-10, 31:21-32:7, Defs.' Ex. C, Rec. Doc. 9299-5.  Although Plaintiff cites testimony from Dr. Sonnier suggesting he could not pinpoint the *exact* date he learned of these reports, he testified repeatedly that he recalled learning of the "potential risk" by 2013 (before Plaintiff's treatment date) and that he, as the learned intermediary, relayed that information to Ms. Phillips.  DSOF ¶¶ 24-26.

Plaintiff also erroneously contends that Dr. Sonnier "did not state that his practice in 2013 was to advise patients about concerns about permanent hair loss and Taxotere" and that Dr. Sonnier "does not use lay reports not backed by science in his patient counseling."  Pl.'s Opp. at 7 & 6 (respectively).  But Plaintiff's counsel asked Dr. Sonnier whether relaying the risk of permanent hair loss was "in line with what [Dr. Sonnier was] advising patients at [that] point in time," and Dr. Sonnier explained that he advised patients that their hair likely would return but there was "concern about permanent hair loss."  Dr. Sonnier also affirmatively testified that he <u>would</u> share information he learned from some non-scientific, lay reports with his patients:

> Q. For example, lawyer advertising is not going to send you out on a wave of discussing a certain risk with clients, would it?
>
> A. I think it would be communicated to them that there is some lay advertisement out there that may influence a perceived property, I guess, of a medication.

Sonnier Dep. 94:9-15, Defs.' Ex. C, Rec. Doc. 9299-5.

Put simply, Dr. Sonnier knew of the "potential risk" of permanent hair loss and recalls having conveyed that risk to Ms. Phillips before treatment. Plaintiff's attempt to create a material dispute of fact is therefore unavailing. Under the Court's analysis, the first step asks whether and how Plaintiff's treating physician would have advised Plaintiff of the risk of permanent alopecia associated with Taxotere had he known of such risk. Here, there is no dispute that Dr. Sonnier already knew of such risk, meaning that what he would have done with that information is irrelevant: he either conveyed it to Plaintiff as Dr. Sonnier testified or did not as Plaintiff herself claims. Either way, there is no evidence that lack of awareness of the risk impacted whether or how the treating physician would have advised June Phillips.

**2. Plaintiff failed to present any evidence that a different warning would have caused Dr. Sonnier to change his prescribing decision.**

The Court's recent decision in the *Gahan* case reiterated that Plaintiff still must prove that "an adequate warning would have changed her doctor's prescribing decision." Order & Reasons, Rec. Doc. 9440 at 4 (citing Rec. Doc. 7571). Plaintiff concedes that Dr. Sonnier steadfastly stands by his prescribing decision. Pl.'s Opp. at 7 ("Dr. Sonnier stated that he would have recommended the same chemotherapy to Plaintiff.").

Nevertheless, Plaintiff seeks to create a factual dispute by arguing that Dr. Sonnier would have recommended *and prescribed* a non-Adriamycin regimen had Ms. Phillips refused Taxotere (*she did not*). *Id.* Plaintiff, however, ignores Dr. Sonnier's serious medical concerns about alternative regimens. For Ms. Phillips, Dr. Sonnier specifically selected TCH (Taxotere,

3

Carboplatin, and Herceptin) to avoid the "significant cardio toxicity" posed by Adriamycin, which was present in <u>all</u> of the alternative <u>preferred</u> chemotherapy regimens.  DSOF ¶ 13.  Plaintiff concedes as much. PSOF ¶¶ 13-15 (acknowledging that Adriamycin regimens posed cardiotoxicity risk to Plaintiff);[1] Pl.'s Opp. at 7 (focusing on non-Adriamycin regimens).  Given Ms. Phillips' aggressive breast cancer, Dr. Sonnier identified minimizing the risk of recurrence as a key treatment consideration:

> Q. Do those factors, both the size of the tumor, the fact that there was metastatic carcinoma found in a lymph node, and that it was hormone receptive positive, does that place her at a high risk of recurrence?
>
> A. Yes.  And the fact that HER-2/neu was over-expressed was another factor.  And there was extranodal extension.  Those are all factors that are associated with a high risk of recurrence.
>
> Q. If metastatic breast cancer recurs, would you agree that the chances of survival dramatically decrease?
>
> A. Correct.  **It's incurable at that point**.

Sonnier Dep. 62:6-19 (emphases added), Defs.' Ex. C, Rec. Doc. 9299-5.

If Ms. Phillips had asked Dr. Sonnier for a regimen with Adriamycin, Dr. Sonnier adamantly testified: "**I would not give it.**" DSOF ¶ 37 (emphasis added).  As Dr. Sonnier testified, any remaining alternatives were simply not as effective:

> If she would have wanted to pursue an [Adriamycin] course, her -- I think at that time, knowing what I know now, would have been going with a [non-Adriamycin] therapy, **which would have lessened the efficacy and not as -- would not have reduced her risks of recurrence to the same degree as TCH**.

Sonnier Dep. 98:10-16 (emphases added), Defs.' Ex. C, Rec. Doc. 9299-5; *see also* DSOF ¶ 13. In other words, a non-Adriamycin regimen would have increased Plaintiff's chances of recurrence

---

[1] Defendants refer to Plaintiff's Response to Defendants' Statement of Undisputed Facts as "PSOF."

4

and "dramatically decreased" her chances of survival, rendering her cancer incurable. Moreover, Dr. Sonnier identified the non-Adriamycin regimen as a possible alternative based on what he "know[s] now"—not his understanding of the various regimens and other considerations at the time he treated Ms. Phillips. There is no evidence that Dr. Sonnier would have actually *prescribed* Ms. Phillips a less effective non-Adriamycin regimen for her aggressive breast cancer.

Plaintiff dodges these concerns by arguing that Dr. Sonnier would have blindly respected her wishes with respect to the regimen of her choice. Dr. Sonnier, however, offered no such testimony. Plaintiff's citation to Dr. Sonnier's testimony stops mid-answer and curiously cuts off the portion of his answer in which he explicitly states that he disagrees with this position. *See* Pl.'s Opp. at 3 (citing Sonnier Dep. 98:3-99:22). Instead, while Dr. Sonnier clearly views his patients as having a highly involved role in their care, he considers it his job to advise them of the risks and ensure that his orders reflect the best interests of his patients:

> Q. But ultimately, it would have been her decision; is that right?
>
> A. It's her decision, **I would say that it's not right**. Because someone cannot -- someone can come in with a sense that they can get something and have a firm decision that's the case. **Whether or not a person would get that is based on our recommendation and our ordering. I would say that that's not, that's <u>not</u> the case.**

Sonnier Dep. 99:20-100:4, Defs.' Ex. C, Rec. Doc. 9299-5 (emphases added).

The undisputed evidence is that Dr. Sonnier would have stuck both to his original prescribing recommendation and decision. Dr. Sonnier testified that the TCH regimen had "the best risk benefit profile for a patient in that situation," DSOF ¶ 17, and the December 2015 labeling did not materially alter Dr. Sonnier's "risk-benefit assessment of Taxotere," DSOF ¶ 18.

**3.    Plaintiff failed to present a legally sufficient ground to find that she would have chosen a non-Taxotere regimen.**

Even if there were a triable issue on the second step—whether Plaintiff would have inquired about other options—the final step of the Court's framework still requires Plaintiff to prove "what decision the [she] would have ultimately made." Rec. Doc. 7571 at 16. Plaintiffs in this litigation cannot satisfy their burden by simply declaring, in hindsight, that they would not have taken Taxotere had they known that their hair would not return exactly as it was before.

Under this Court's framework, Plaintiffs must adduce evidence that their oncologists would have changed their prescribing decision and recommended a chemotherapy without Taxotere, and, in turn, that the Plaintiff would have accepted this treatment after being advised of and weighing the unique risks and benefits. This is not an inquiry that can be made in the abstract; and this Court's framework is not one that can be satisfied by declaring that the plaintiff would have used "something else."

As this Court knows, all chemotherapies have unique risks and benefits; and they must further be matched against the cancer type and the patient's health history. It is undisputed that numerous other chemotherapies are associated with reports of permanent hair loss—irrespective of Taxotere.[2] Consequently, to present a triable issue of fact, Plaintiff must demonstrate: (1) which other chemotherapy regimens would have been offered by the oncologist; (2) what the oncologist would have conveyed to her about their risks and benefits during the vigorous and robust informed consent discussion; and then finally, (3) what the patient would have ultimately decided to do after having been fully informed of the risks and benefits of whatever other chemotherapy the physician

---

[2] Plaintiff's expert witnesses, Dr. Ellen Feigel, Dr. Laura Plunkett, and Dr. Antonella Tosti each testified in the *Earnest* trial that the alternatives to Taxotere are associated with reports of permanent hair loss. Trial Tr. at 1236:12-22 (Dr. Feigel), Rec. Doc. 8412; Trial Tr. at 861:3-10, 873:20-874:21 (Dr. Plunkett), Rec. Doc. 8408; Trial Tr. at 1030:6-1031:16, 1057:17-1058:23, 1128:24-1129:2 (Dr. Tosti), Rec. Doc. 8411.

might have been willing to prescribe.  Without evidence sufficient to satisfy this, there is no triable issue of fact.

When a plaintiff fails to testify that a different warning would have caused her to ask for and choose an alternative, this Court has held the plaintiff cannot meet her burden.  For example, in *Hunt v. McNeil Consumer Healthcare*, this Court held that "no reasonable jury could find that Plaintiff has established causation [including because] Plaintiff did not testify that a different warning label would have changed her decision to administer Children's Motrin to M.H., nor was she ever asked questions to this effect by counsel."  2014 WL 1779471, at *3 (E.D. La. May 5, 2014).  There, the plaintiff testified about the risk information she would have liked to have known about Motrin, but failed to testify that a different warning would have caused her to administer the drug differently (or not at all).  *See id.*  Based on this uncertainty, the Court held that no reasonable jury could find for the plaintiff as a matter of law.

Here, Plaintiff's evidence falls far short.  Plaintiff cites to Dr. Sonnier's testimony that certain alternatives existed, such as preferred alternatives that were not an option (Adriamycin regimens) and non-preferred alternatives (non-Adriamycin regimens) that decreased survival.  *See* Pl.'s Opp. at 8.  Plaintiff's Opposition, however, omits critical testimony from Dr. Sonnier explaining why those supposed alternatives were not appropriate for Ms. Phillips.  Dr. Sonnier testified that he would have refused to prescribe Adriamycin regimens, which all preferred alternatives contained, because of the risk of cardiotoxicity.  DSOF ¶ 13.  And non-Adriamycin regimens "would have lessened the efficacy and not as -- would not have reduced her risks of recurrence to the same degree as TCH."  Sonnier Dep. 98:10-16.  For these reasons, Dr. Sonnier would have stuck to his original prescribing recommendation and decision because TCH had "the best risk benefit profile for a patient in [Plaintiff's] situation."

7

Plaintiff also has not carried her burden to show that, after being advised of the risks, she would have accepted them in lieu of TCH. To the contrary, Plaintiff testified:

> Q. You would want to know what the effect on your heart would be from the other drug. Is that correct?
>
> A. Yeah. I would want more information.
>
> Q. Before you would agree to take that drug?
>
> A. Yes.
>
> Q. So, without that information you can't say for sure that you would have taken the other drug?
>
> A. **I can't. No. I can't say for sure what I would have done. I don't know what I would have done.**

DSOF ¶ 39 (emphasis added). Plaintiff conceded in her deposition that she had never seen anything about the potential side effects of any supposed alternatives:

> Q. Do you agree that you never saw any information about the side effects of the other drug you say you would have taken?
>
> A. That's right.

Phillips Dep. 134:19-22, Defs.' Ex. D, Rec. Doc. 9299-6. Plaintiff failed to offer any evidence that she would have accepted the risks of any supposed alternatives had Dr. Sonnier discussed them with her. She also offered no evidence to show what she would have done without first knowing the risks, benefits, and differences between Taxotere and any supposed alternatives. *See Hunt*, 2014 WL 1779471, at *3. In fact, there is no evidence in this record that Dr. Sonnier would have even altered his consent discussion with Ms. Phillips concerning hair loss.[3] Plaintiff therefore has failed to carry her burden.

---

[3] Notably, Dr. Sonnier testified that, in his clinical experience, incomplete hair re-growth following chemotherapy is comparable between Taxotere and Taxol. *See* Sonnier Dep. at 42-43, 54, Defs.' Mot. Ex. C, Rec. Doc. 9299-5. This is consistent with a recent article authored by Dr. Antonnella Tosti, which documents more cases of Taxol induced PCIA than Taxotere. Freites-Martinez A, et al., inc. Tosti, A., *Assessment of Quality of Life and Treatment Outcomes of Patients With Persistent Postchemotherapy Alopecia,* JAMA Dermatol. 2019 Jun 1;155(6):724-728. doi: 10.1001/jamadermatol.2018.5071.

8

## **CONCLUSION**

For these reasons, the Court should grant Defendants' motion for summary judgment on Plaintiff's claims.

Respectfully submitted,

| | |
|---|---|
| */s/ Douglas J. Moore* | Harley Ratliff |
| Douglas J. Moore (Bar No. 27706) | Adrienne L. Byard |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | **SHOOK, HARDY & BACON L.L.P.** |
| 400 Poydras Street, Suite 2700 | 2555 Grand Boulevard |
| New Orleans, LA  70130 | Kansas City, Missouri 64108 |
| Telephone: 504-310-2100 | Telephone: 816-474-6550 |
| Facsimile:  504-310-2120 | Facsimile:  816-421-5547 |
| dmoore@irwinllc.com | hratliff@shb.com |
| | abyard@shb.com |
| | |
| | *Counsel for sanofi-aventis U.S., LLC and Sanofi US Services, Inc.* |

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ Douglas J. Moore