## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**MDL NO. 16-2740**

**IN RE: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION**

*This document relates to:*
Dora Sanford, Case No. 2:17-cv-09417

## HOSPIRA'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT BASED ON THE
## STATUTE OF LIMITATIONS

Plaintiff Dora Sanford's claims are prescribed by the one-year Louisiana statute of limitations.

*First*, Mrs. Sanford's claims are untimely on their face because she filed her lawsuit more than *three years* after she allegedly sustained her injury.  Louisiana's one-year statute of limitations begins to run on the date of injury.  Mrs. Sanford alleges that she suffered her injury of permanent hair loss by June 2014—six months after she completed chemotherapy in January 2014.  Yet Mrs. Sanford did not file her complaint until September 21, 2017—more than three years later.  Mrs. Sanford's claims are therefore untimely on their face.

*Second*, the doctrine of *contra non valentem* does not save Mrs. Sanford's claims.  As this Court has repeatedly recognized, "to toll prescription, a plaintiff who suspects that something is wrong must act reasonably to discover the cause of the problem; otherwise, *contra non valentem* will not apply."  *In re Taxotere (Docetaxel) Prods. Liab. Litig.("Thibodeaux")*, ECF No. 9110, at 4; *see In re Taxotere (Docetaxel) Prod. Liab. Litig. ("Johnson/Francis")*, 2019 WL 2995897, at *2 (E.D. La. July 9, 2019), *reconsideration denied*, 2020 WL 375597 (E.D. La. Jan. 23, 2020).  The undisputed evidence demonstrates that Mrs. Sanford knew or should have known of a possible

causal relationship between her Docetaxel use and alleged hair loss, yet did not undertake any investigation of her claims, as is required by Louisiana law.  Thus, as in *Francis*, *Johnson*, and *Thibodeaux*, *contra non valentem* does not apply, and her claims should be dismissed.

*Third*, Mrs. Sanford's claims are barred for an additional reason:  by her own admission, she was on notice of her claim more than one year before she filed her complaint.  Mrs. Sanford testified that she attributed her hair loss to Docetaxel after seeing an attorney advertisement on television.  The undisputed evidence is that Mrs. Sanford saw the advertisement and subsequently contacted her attorneys no later than August 8, 2016—*thirteen months before* she filed her lawsuit on September 21, 2017.  The proof is in Mrs. Sanford's own signature:  thirteen months before this suit was filed, Mrs. Sanford signed a medical release that her attorneys (and current counsel of record) used to obtain her medical records.  Apart from her lack of investigation, there can be no dispute that Mrs. Sanford's claims are untimely because, by her own account, she discovered the alleged cause of her injury more than one year before she filed her lawsuit.  Thus, the Court should grant summary judgment and dismiss Mrs. Sanford's claims with prejudice.

In addition, the Court should impose conditions on the dismissal and permit Hospira to de-designate one of the plaintiffs currently eligible for Trial 5.  Even though this case was plainly time-barred, the Plaintiffs' Steering Committee ("PSC") selected this case for the trial pool, forcing the parties and Court to engage in unnecessary and costly discovery and motions practice.  Hospira brought this case-dispositive record to the attention of the PSC and Mrs. Sanford's counsel and requested that they dismiss Mrs. Sanford's case with conditions and avoid motions practice.  The PSC refused to do so, forcing Hospira to file the present Motion.  Thus, the Court should permit Hospira to de-designate a trial pool plaintiff, consistent with the procedure set forth by CMO 14C.

## BACKGROUND

I.      **Mrs. Sanford's Cancer Diagnosis and Treatment**

Following an abnormal mammogram in March 2013, Mrs. Sanford's treating physicians diagnosed her with stage IA cancer in her left breast and stage IIIA cancer in her right breast. Hospira's Statement of Undisputed Material Facts ("SOF") ¶¶ 4-6.  Mrs. Sanford's "aggressive" breast cancer carried a high risk of metastasizing, spreading to other parts of her body, and recurring in her breasts.  Ex. 4 (OLOL Med. Recs.) at -00027; *see* SOF ¶¶ 7-8.  Mrs. Sanford's physicians accordingly recommended surgery and adjuvant chemotherapy for treatment.  *See* SOF ¶¶ 9-11.  Mrs. Sanford followed her doctors' recommendations.  SOF ¶ 19.

On June 20, 2013, surgeon Dr. Celia Cuntz performed a double mastectomy on Mrs. Sanford.  SOF ¶ 9.  Following Mrs. Sanford's surgery, oncologist Dr. Judd Patten determined that chemotherapy was appropriate and recommended a sequential chemotherapy regimen of Adriamycin (doxorubicin) alone, followed by a combination of Docetaxel, Carboplatin, and Herceptin.  SOF ¶¶ 10-11, 22-23.

Mrs. Sanford's doctors informed her of the risk of hair loss from her chemotherapy, including possible permanent hair loss.  *See* SOF ¶¶ 12-18.  Her oncologist, Dr. Patten, was aware of the risk of permanent hair loss and told Mrs. Sanford that it was possible her hair may not grow back completely after chemotherapy:

> Q. Did you understand at the time you prescribed chemotherapy to Mrs. Sanford that there was a risk she would experience permanent hair loss from her chemotherapy treatment?
> A. Yes.
> Q. Did you discuss hair loss as a risk of chemotherapy with Mrs. Sanford?
> A. Yes.
> Q. Did you tell her that her hair was guaranteed to grow back?
> A. No.
> Q. *Did you tell her it was possible that her hair may not grow back after chemotherapy?*

A. *Yes.*

Ex. 5 (Patten Dep.) at 32:19-33:7 (emphasis added).  Although Dr. Patten could not recall his "specific discussion of permanent hair loss" with Mrs. Sanford, *id.* at 47:12-19, he was clear that he "did warn patients that they would have hair loss and that their hair may not grow back completely," *id.* at 42:22-43:20.  *See also id.* at 43:12-17 ("I discussed hair loss . . . . [T]hat's something that can be either temporary or permanent.").

Before Mrs. Sanford began chemotherapy, she also received oral and written chemotherapy education.  SOF ¶ 12.  Dr. Patten's nurse discussed printed chemotherapy education materials with Mrs. Sanford.  SOF ¶ 12.  Those materials warned of various side-effects, including that chemotherapy treatment can "cause inconvenience, discomfort, and occasionally even fatality to patients."  Ex. 8 (Chemo. Educ.) at -00738.  Hair loss was specifically listed as a "[c]ommon side effect[]," and patients were advised to "[n]ever hesitate to call [the oncologist's office] for *any* problem that is important to you."  *Id.* at -00737-39.  On August 6, 2013, after her chemotherapy education, Mrs. Sanford gave her written informed consent to begin treatment.  SOF ¶ 20.  Mrs. Sanford admits that at the time she took chemotherapy, she understood that her treatment carried a risk of hair loss.  SOF ¶ 27.

Mrs. Sanford first experienced hair loss in August 2013, during her first phase of chemotherapy treatment with Adriamycin alone.  SOF ¶ 28.  She received three infusions of Adriamycin, on August 6, 2013; August 27, 2013; and September 17, 2013.  SOF ¶ 22.  In the second phase of Mrs. Sanford's chemotherapy treatment, Dr. Patten treated Mrs. Sanford with a combination of Carboplatin, Docetaxel, and Herceptin.  SOF ¶ 23.  Mrs. Sanford received this combination therapy on October 8, 2013; October 29, 2013; November 19, 2013; December 10, 2013; December 30, 2013; and January 21, 2014.  SOF ¶ 23.  After Mrs. Sanford's "final cycle of

chemotherapy" on January 21, 2014, she continued to take only Herceptin, a protein blocker, to prevent her cancer regrowth, until September 9, 2014.  Ex. 4 (OLOL Med. Recs.) at -00083; *see id.* at -00128-29; SOF ¶ 24.  Accordingly, Mrs. Sanford's last chemotherapy treatment, and last treatment involving Docetaxel, was on January 21, 2014.  *See* SOF ¶¶ 23-24.  Mrs. Sanford's breast-cancer treatment was successful; she currently is breast cancer-free and has been since 2014. SOF ¶ 25.

## II.     Mrs. Sanford's Failure to Investigate Her Alleged Injury

By her own measure, Mrs. Sanford began experiencing permanent alopecia in June 2014, six months after completing chemotherapy.  *See* 2d Am. Master Compl. ("AMC") ¶ 181, ECF No. 4407 (defining as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy.").  Mrs. Sanford testified that, despite her belief that her hair would grow back fully after chemotherapy, her "hair never did grow back."  Ex. 2 (Sanford Dep.) at 164:7-11.  She believed her hair loss was a "side effect" of her chemotherapy.  *Id.* at 194:19-195:6.  Mrs. Sanford has worn a wig daily since she lost her hair in 2013.  SOF ¶ 33.

Although her hair had not regrown, Mrs. Sanford did not investigate the cause of her alleged injuries.  Mrs. Sanford saw Dr. Patten on at least three occasions from June 2014 until August 2014, but she never discussed her hair loss with him.  SOF ¶ 37-38.  Nor did Ms. Sanford discuss the cause of her hair loss with any of the other medical providers she saw, including her surgeon Dr. Cuntz, oncologist Dr. Bryan Bienvenu (whom she saw after Dr. Patten retired), and dermatologist Dr. Laci Theunissen, who treated Mrs. Sanford for seborrheic dermatitis on her face and scalp.  SOF ¶¶ 39-42.

### III.    Mrs. Sanford's Lawsuit

Mrs. Sanford took no action at all until 2016, when she saw a television advertisement for a lawsuit against the manufacturers of Taxotere and Docetaxel.  *See* SOF ¶ 47.  Mrs. Sanford thereafter decided to contact her attorneys, the McGartland Law Firm.  SOF ¶ 48.  At her deposition, Mrs. Sanford could not recall the month in 2016 when she saw the advertisement.  Ex. 2 (Sanford Dep.) at 17:3-23.  However, the records show that she executed a release *on August 8, 2016*, requesting that her chemotherapy records be provided to the McGartland Law Firm, which remains her counsel of record in this matter:

Ex. 16 (Med. Auth.) -00485.[1]  Thus, Mrs. Sanford first saw the attorney advertisement and contacted her lawyers sometime before August 8, 2016.  However, Mrs. Sanford did not file her complaint until September 21, 2017, more than one year later.   Am. Short Form Compl. ("Compl."), at 1, *Sanford v. Hospira Worldwide, LLC*, No. 2:17-cv-09417 (E.D. La. Sept. 21, 2017), ECF No. 1.

In November 2018, the PSC nonetheless selected Mrs. Sanford's case for inclusion in the pool of potential plaintiffs for the third trial before this Court.  Thereafter, Hospira engaged in months of costly case-specific discovery, including eleven case-specific depositions.  Most of these case-specific depositions were based on Mrs. Sanford's listing of witnesses on a trial witness

---

[1] Mrs. Sanford also executed other releases, but we do not know their original dates because they were whited out and replaced by later dates in 2018.  *See* Ex. 16 (collecting medical authorization forms).

list she served on November 21, 2019.  Of the eleven depositions, Hospira took four pursuant to CMO 10 as part of the initial phase of discovery.  The remaining seven case-specific depositions were witnesses whom Mrs. Sanford chose to include on her trial witness list, even after a request from Hospira on December 6, 2019 to winnow the list.

After Hospira discovered Mrs. Sanford's August 2016 medical records release in February 2020, Hospira brought this issue to the PSC's attention on March 3, 2020.  To avoid unnecessary motions practice and the waste of further Court and party resources, Hospira proposed that the PSC dismiss Mrs. Sanford's case with prejudice, and agree that Hospira would be permitted to de-designate another case from the trial pool, making that case ineligible for Trial 5 selection. Plaintiffs rejected Hospira's proposal, forcing Hospira to file the present Motion.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id*. at 249-50 (citations omitted).

## ARGUMENT

### I.      Hospira Is Entitled to Summary Judgment

This case fits squarely within this Court's previous decisions in *Francis*, *Johnson*, and *Thibodeaux*:  Mrs. Sanford's claims are untimely based on the face of the pleadings, and because she failed to investigate her claim after she suffered her injury, *contra non valentem* does not apply. Moreover, Mrs. Sanford waited more than a year to file suit even after she *admits* that she believed

Docetaxel caused her alleged injury and contacted her lawyers.  This Court therefore should enter judgment in favor of Hospira and dismiss Mrs. Sanford's claims.

### A.  Mrs. Sanford's Claims Are Barred on Their Face by Louisiana's One-Year Statute of Limitations.

Louisiana's one-year statute of limitations begins "to run from the day injury or damage is sustained."  *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4th Cir. 1998) (quoting La. Civ. Code Ann. art. 3492).  This Court has recognized that, on the basis of the allegations in the Second Amended Master Complaint, a plaintiff's hair loss becomes permanent six months after completing chemotherapy.  *See Thibodeaux*, ECF No. 9110 at 4 ("Both as a general matter and for purposes of prescription, this MDL requires defining Plaintiffs' injury.  This Court used a definition that the medical literature has adopted and that Plaintiffs have espoused.");  *Francis/Johnson*, 2019 WL 2995897, at *2 n.12 (similar).  Mrs. Sanford's pleadings adopt the Second Amended Master Complaint's definition of her alleged injury.  *See* Compl. at 1.  As such, Mrs. Sanford sustained her alleged injury (*i.e.*, began experiencing permanent alopecia) no later than June 2014, six months after completing chemotherapy treatment in January 2014.  *See* AMC ¶ 181.  Because Mrs. Sanford filed her lawsuit on September 21, 2017, more than three years after her alleged injury, her claims are barred on their face.  *Francis/Johnson*, 2019 WL 2995897, at *2 n.12; *Thibodeaux,* ECF No. 9110, at 4.

### B.  Mrs. Sanford Cannot Establish Any Exception to Louisiana's One-Year Statute of Limitations.

Where, as here, "the face of the petition shows [that] the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred."  *Francis/Johnson*, 2019 WL 2995897, at *2 (quoting *Hoerner v. Wesley-Jensen*, 684 So. 2d 508, 510 (La. App. 4 Cir. 1996)); *Thibodeaux*, ECF No. 9110, at 3.  As

explained above, Mrs. Sanford's Complaint is prescribed on its face.  Mrs. Sanford therefore bears the burden of proof of demonstrating that an exception applies.  *See Francis/Johnson*, 2019 WL 2995897, at *2; *Thibodeaux*, ECF No. 9110, at 5.  Based on the undisputed facts, Mrs. Sanford cannot meet her burden.

*Contra non valentem* does not apply here.  Under that exception, Mrs. Sanford must have filed her claims within a year of having "actual or constructive knowledge of a causal relationship between the object or product and the injury." *Francis/Johnson*, 2019 WL 2995897, at *2 (quoting *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017)).  In other words, prescription begins "when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Id.* (quoting *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999)). Louisiana law does not require "that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run." *Id.* (quoting *Xarelto*, 2017 WL 4517287, at *2).

A "plaintiff who suspects something is wrong must *act reasonably* to discover the problem; otherwise, *contra non valentem* will not apply." *Thibodeaux*, ECF No. 9110 at 4 (citing *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 894 (5th Cir. 2010)) (emphasis added).  "The ultimate issue is the reasonableness of the plaintiff's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Id.* (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002)).

The undisputed evidence demonstrates that Mrs. Sanford knew or should have known of a possible causal connection between Docetaxel and her alleged injury more than one year before she filed suit.  Mrs. Sanford's doctors informed her of the risk of hair loss, including possible permanent hair loss, before she started her chemotherapy in August 2013.  SOF ¶¶ 12-19.  Mrs.

Sanford knew, as of the time of chemotherapy, that her treatment carried the risk of hair loss, but that she expected it to regrow sometime after chemotherapy.  SOF ¶¶ 27, 31.  However, her hair did not grow back, as she expected, and in 2013 she began wearing a wig daily.  SOF ¶¶ 30-33.  Although Mrs. Sanford remained hopeful that her hair would grow back after chemotherapy, she saw no regrowth.  SOF ¶¶ 31-32.  Under these facts, there was ample information available to put Mrs. Sanford on notice of a possible "causal relationship between the . . . product and the injury," and trigger her duty to investigate a potential claim.  *See Johnson/Francis*, 2019 WL 2995897, at *2 (quoting *Xarelto*, 2017 WL 4517287, at *2).

Yet Mrs. Sanford did nothing to investigate her potential claim.  She did not ask any of her doctors what caused her hair loss.  SOF ¶¶ 45-46.  Her only discussions with her doctors about hair loss was to tell them about her wig use, but she did not seek their medical advice or opinions regarding what may have caused her alleged injury.  *See* SOF ¶ 38-42.  Mrs. Sanford testified that she "mention[ed] . . . the hair thing" to Dr. Patten "one time," when he complimented her hair, and she told him she was wearing a wig, but they "never talked about the permanent hair loss."  Ex. 2 (Sanford Dep.) at 125:12-16.  She never informed Dr. Patten of her concerns about her hair loss, asked what might have caused it, or undertook any other investigation.  *Id.* at 125:12-16, 184:1-9, 213:20-214:6; *see* SOF ¶¶ 37-46.  Similarly, Mrs. Sanford removed her wig in the presence of her dermatologist, Dr. Theunissen, when she sought treatment for seborrheic dermatitis on her scalp and face, but did not have "any discussions whatsoever" with her regarding the causes of her hair loss and never sought treatment for her hair loss.  Ex. 2 (Sanford Dep.) at 213:20-214:6; *see* SOF ¶¶ 41-42.

Under this Court's precedents, these interactions do not qualify as a reasonable investigation.  In *Thibodeaux*, the Court held that a plaintiff cannot invoke *contra non valentem*

even if "others observed her injury and could have offered unsolicited advice to help her but did not. *This falls short of 'act[ing] reasonably to discover the cause of the problem' as the law requires*." ECF No. 9110, at 6 (citation omitted) (emphasis added). Likewise, in *Earnest,* the Court denied the motion for statute of limitations on the basis that she had investigated the cause of her injury and had relied on her doctor's assurance that "it's going to come back" and "[i]t just takes time." *Johnson/Francis*, 2019 WL 2995897, at *3. In contrast, Mrs. Sanford did not rely on doctors' assurances that her hair would grow back because Mrs. Sanford never inquired, and none of her doctors made any assurances.

Accordingly, because Mrs. Sanford did not make any inquiry as to the cause of her hair loss, she did not conduct a reasonable investigation. She took *no action* to investigate her potential claim and did not file suit until September 2017, more than three years after her alleged injury, after seeing an attorney advertisement on television. SOF ¶¶ 47-48. As this Court has recognized, and as is equally true here: "At some point, [she] should have investigated why her hair was not growing back. Her inaction is not the kind of conduct that warrants the application of *contra non valentem*." *Thibodeaux*, ECF No. 9110, at 6-7. Thus, Mrs. Sanford's claims are prescribed.

### C. Mrs. Sanford's Claims Are Time-Barred Based on Her Own Testimony.

Setting aside Mrs. Sanford's failure to investigate her injury for years, her claims are still categorically prescribed by Louisiana's statute of limitations. Mrs. Sanford waited to file her lawsuit for an additional *thirteen months* after she admits she believed that Docetaxel could have caused her alleged injury and contacted her lawyers about her claim. Thus, by her own account, Mrs. Sanford's claims are time-barred, and no equitable doctrine could excuse this further delay.

Consistent with other MDL plaintiffs, Mrs. Sanford testified that "the first time that [she] believed that docetaxel could have caused [her] hair loss was when [she] saw an advertisement by

lawyers on the television."  Ex. 2 (Sanford Dep.) at 18:5-13.  That advertisement prompted Mrs. Sanford to contact the attorneys she retained in this matter.  *Id.* at 17:3-23.  Mrs. Sanford could not provide an exact date on which she saw the lawyer advertisement, but she recalled it was sometime in 2016.  *Id.* at 192:7-17.

The undisputed record evidence establishes that Mrs. Sanford saw this commercial, and contacted her attorneys, no later than August 2016—*more than a year before she filed suit*. Specifically, on August 8, 2016, Mrs. Sanford executed a medical records release for her attorneys to access her chemotherapy records.  Ex. 16 (Med. Auth.) at -00485.  Yet, Mrs. Sanford did not file her lawsuit until September 21, 2017, thirteen months later.  As discussed above, *contra non valentem* does *not* mean that "a plaintiff must *know* the cause of her damage" before the prescriptive period begins to run, because that would "tak[e] away the constructive knowledge component of the rule."  *Luckett*, 171 F.3d at 300.  Thus, Mrs. Sanford's prescriptive period began to run before August 2016.  But even if Mrs. Sanford could avail herself of *contra non valentem* and toll the prescriptive period, which she cannot, her claims are still out-of-time.  By her own admission, she knew of her claim no later than August 2016 and contacted her attorneys.  Thus, apart from her lack of investigation, there can be no dispute that the prescriptive period started by then, yet Mrs. Sanford did not file her complaint within one year, as required by Louisiana law.

There is no credible response on this point.  Plaintiffs in this litigation have repeatedly conceded that viewing an attorney advertisement regarding a plaintiff's alleged injury is sufficient to trigger the prescriptive period.  For example, in *Francis*, the plaintiff conceded that the prescriptive period "commence[d]" and the plaintiff was "put on notice by advertisements of the connection between Taxotere and permanent hair loss."  ECF No. 6610, at 13.  Similarly, in *Johnson*, the plaintiff conceded that seeing "information about [Ms. Johnson's] medical

situation[]" through an attorney advertisement "put [Johnson] on notice of a link between the product and injury."  ECF No. 6536, at 19.  Thus, in light of these repeated concessions, any argument that Mrs. Sanford was not "on notice" of her claims after seeing the attorney advertisement that led her to believe Docetaxel caused her alleged injury*, thirteen months before she filed suit*, should be rejected.  Mrs. Sanford's claims are indisputably time-barred for this additional reason.

## II.     Hospira Should Be Permitted to De-Designate a Plaintiff From the Trial Pool.

Mrs. Sanford's case never should have been brought; and at a minimum, Mrs. Sanford's counsel and the PSC should have ferreted out this statute-of-limitations issue before proposing that the case be included in the trial pool and thus subject to trial-pool discovery.  Moreover, the PSC should not benefit from refusing to dismiss this case, which never should have been filed in the first place.  As explained above, Mrs. Sanford's August 8, 2016 medical records release— authorizing her current counsel to retrieve her chemotherapy records—is dispositive and irrefutable evidence that Mrs. Sanford's claims are untimely.  This information was well within Mrs. Sanford's counsel's knowledge when they filed her lawsuit *more than thirteen months later*, when they and the PSC thereafter selected it for the trial pool the next year, and when they continued to proceed with it as a trial case even after CMO 14C was entered and even after this Court selected it as one of three cases for Trial 3.

The failure of Mrs. Sanford's counsel and the PSC to take reasonable steps to ensure there existed a good-faith basis to pursue this case has imposed unnecessary costs on Hospira and squandered judicial resources.  Thus, Hospira respectfully requests that, in addition to dismissing Mrs. Sanford's claims, the Court permit Hospira to de-designate one current trial pool plaintiff, consistent with CMO 14C.

CMO 14C sets forth the protocol for Plaintiffs to voluntarily dismiss or de-designate a plaintiff included in the trial pool.  If the dismissal or de-designation comes more than 14 days after selection, and without good cause, CMO 14C permits Defendants to "de-designate a Plaintiff from the trial pool."   CMO 14C ¶ 2(d).   Further, "[i]f a Trial Pool case is determined to be ineligible" based on "information that was known to the other party but not disclosed," more than 30 days after the case was selected, "the party who did not receive this information may de-designate a Plaintiff from the Trial Pool." *Id.* ¶ 2(f).  While that provision envisioned ineligibility based on "venue or product identification information," it should apply with equal force to evidence in the possession of Plaintiff's counsel that conclusively establishes the claims are untimely.  Plaintiffs should not be able to avoid the effect of CMO 14C by refusing to voluntarily dismiss Mrs. Sanford's case and forcing unnecessary motions practice.   Thus, the Court should allow Hospira to de-designate one of the seven Hospira plaintiffs that remain in the trial pool for Trial 5 (the 505(b)(2) trial scheduled for April 2021).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Mrs. Sanford's claims and permit Hospira to de-designate a trial pool plaintiff.

Dated: March 12, 2020                                         Respectfully submitted,

                                                                               */s/ Mark S. Cheffo*
                                                                               Mark S. Cheffo

Mara Cusker Gonzalez
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3500
Fax: (212) 698-3599
mark.cheffo@dechert.com

Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Phone: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc., and Pfizer Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

_/s/ Mark S. Cheffo_