# EXHIBIT 5

```
         UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * *

IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION        MDL NO. 2740

This Document Relates To:            SECTION "N"(5)

Dora Sanford vs. Hospira Inc.,       JUDGE MILAZZO
Et al
No. 2:17-cv-09417                    MAG JUDGE NORTH

* * * * * * * * * * * * * * * * * * * * * * * * *


         VIDEO DEPOSITION OF DR. JUDD PATTEN, M.D.,

         taken on Tuesday, February 4, 2020, at the law

         offices of Chaffe McCall, 8550 United Plaza

         Boulevard, Training Center Room, Baton Rouge,

         Louisiana


         REPORTED BY:  TAMRA K. KENT  C.C.R.
* * * * * * * * * * * * * * * * * * * * * * * * *
            Court Reporters of Louisiana, LLC
             9522 Brookline Avenue, Suite 217
             Baton Rouge, Louisiana 70809
            (225)201-9650 Office * (225)201-9651 Fax
```

1     A. She did.

2     Q. What did the pathology report show
3 regarding her breast cancer according to this note
4 in Exhibit #2?

5     A. According to my notes, "The pathology from
6 June 20, 2013, showed a right breast cancer
7 4.4 centimeters, Grade III, lymphovascular
8 invasion.  Estrogen receptor 100%.  Progesterone
9 receptor 50%.  HER2/neu oncogene negative.
10 Sentinel lymph nodes 5 out of 5 positive.  One of
11 the lymph nodes 1.3 centimeters in size had
12 extranodal extension.  Additional right axiliary
13 lymph nodes 4 of 15 lymph nodes positive; for a
14 total of 9 of 20 positive lymph nodes.

15     "Left breast cancer 1.2 centimeters.
16 Estrogen receptor 92%.  Progesterone receptor 0%.
17 HER2/neu 3+ overexpression.  Sentinel lymph nodes
18 4 of 4 negative."

19     Q. What did this information from the
20 pathology report that you just read tell you about
21 Mrs. Sanford's right breast cancer?

22     A. It was very serious.  It was a likelihood
23 for metastatic disease; it was very high.  Her
24 prognosis for relapse with metastatic disease was
25 also very high.

1          It told me that she could benefit from
2    adjuvant therapy, but the adjuvant therapy might
3    not be effective.
4         Q.   And what did the information from the
5    pathology report about the left-sided breast cancer
6    tell you?
7         A.   Even though it was a smaller tumor of
8    1.2 centimeters, the overexpression of the HER2/neu
9    oncogene also -- well, made this cancer also a
10   concerning malignancy for metastatic spread.
11         And our assessment was that she would
12   definitely benefit, based on the literature, by
13   receiving adjuvant therapy with a drug that -- with
14   a regimen that would include a drug called
15   Herceptin.
16        Q.   Do I understand correctly that Mrs. Sanford
17   had different types of cancers in her left and her
18   right breasts?
19        A.   Yes.
20        Q.   Was that significant to you?
21        A.   Yes.  It made it challenging to determine
22   the treatment regimen and the timing of various
23   treatments and try and deliver treatments in the
24   best way possible that would give her the greatest
25   benefits and the greatest chance for relapse-free

```
 1   survival.
 2           One cannot discount either one.  You have
 3   to take into consideration both the right-sided
 4   breast cancer with the multi-lymph nodes positive,
 5   and the left-sided breast cancer with the HER2/neu
 6   gene overexpression.
 7       Q.  On Page 2 of Exhibit #2, under Impression
 8   and Plan, at No. 1, you note that Mrs. Sanford is
 9   at high risk for recurrence from her lymph node
10   positive disease and large right breast cancer
11   primary, correct?
12       A.  That's correct.
13       Q.  What was Mrs. Sanford at high risk of
14   occurrence for?
15       A.  For metastases to a lung, to bone, to
16   liver.  Even to brain.  High risk for spread of the
17   malignancy and subsequent mortality.
18       Q.  Moving down to "3" under Impression and
19   Plan, can you please read that point?
20       A.  "Chemotherapy regimen is under discussion.
21   I plan to obtain a MUGA," which is a multigated
22   heart scan "prior to considering chemotherapy.  As
23   Adriamycin as a single agent is effective in both
24   HER2/neu positive and HER2/neu negative disease,
25   consideration might be given for her treatment to
```

1    you'll get a higher cancer-cell kill.
2             And based on that literature, I felt that
3    3 cycles of Adriamycin at 90 milligrams per meter
4    squared may get that treatment portion finished
5    quicker.  And also avoid the exposure of another
6    agent called Cytoxan that is, oftentimes, paired
7    with Adriamycin.
8        Q.   And then the TCH, you said "T" was
9    Taxotere.
10            Do you understand Taxotere to be the brand
11   name for Docetaxel?
12       A.   I do.
13       Q.   Why at this point were you considering a
14   treatment regimen that included 6 cycles of
15   Docetaxel, carboplatin, and Herceptin?
16       A.   That was a standard treatment for HER2/neu
17   overexpressing breast cancer.  Taxotere and
18   carboplatin is also effective in non-HER2/neu
19   overexpressing breast cancers.
20            Taxotere as a single agent was shown that,
21   in patients with metastatic disease, to be equally
22   and sometimes more effective than a single agent of
23   Adriamycin if given at the standard dose; not the
24   high dose that I use.
25            And so it seemed, after some thought and

1  review of the literature and looking at the
2  options, that this would be the best choice for
3  Miss Sanford if she -- if she had the required
4  constitution -- had a good heart, had good liver
5  function, had good bone-marrow function, had no
6  other contraindications -- that this regimen, in my
7  mind, after studying the various options, would
8  give her the greatest opportunity for prolonged
9  survival.
10        Q.  And did you satisfy yourself that
11 Miss Sanford did have the constitution to proceed
12 with this regimen?
13        A.  Not at this particular time.  But after the
14 evaluations of the CT and the PET Scan not showing
15 any demonstrative metastatic disease, and after the
16 heart scan showing that she has a good heart
17 function, and after our blood tests showing her
18 liver function and her kidney function and her
19 blood-cell counts were adequate, yes, I was
20 satisfied.
21        Q.  Dr. Patten, I'm going to hand to you what
22 we have marked as Exhibit #3.  What is this
23 document?
24             (Whereupon, the document was duly marked
25             for identification as "Exhibit #3" and

1   Q.  Is there any way to predict which patients
2   are going to experience hair loss?
3       A.  Based on the chemotherapy agent, we have an
4   idea of which patients will have hair loss and how
5   much it will be.
6           Some patients have tried to avoid hair loss
7   by using ice packs on their scalp during
8   chemotherapy; however, that is wrought with some
9   hazards as metastases have occurred to areas where
10  blood flow didn't reach because of that kind of a
11  practice.
12          So we know that, for example, Adriamycin,
13  the hair loss will be most oftentimes complete.
14  Now, there will be a regrowth of hair.  And how
15  dense or thick the hair may be -- or even the color
16  and consistency -- may be completely different from
17  the original hair that the patient has.  I've had
18  redheads turn brunette.
19      Q.  Did you understand at the time you
20  prescribed chemotherapy to Mrs. Sanford that there
21  was a risk she would experience permanent hair loss
22  from her chemotherapy treatment?
23      A.  Yes.
24      Q.  Did you discuss hair loss as a risk of
25  chemotherapy with Mrs. Sanford?

```
1        A.   Yes.
2        Q.   Did you tell her that her hair was
3   guaranteed to grow back?
4        A.   No.
5        Q.   Did you tell her it was possible that her
6   hair may not grow back after chemotherapy?
7        A.   Yes.
8        Q.   Did you tell her that chemotherapy could
9   result in her hair coming back a different texture?
10       A.   I don't recall.
11       Q.   Do you recall if you told Mrs. Sanford
12  chemotherapy could result in her hair coming back a
13  different color?
14       A.   I might have.
15       Q.   Do you recall if you told her that
16  chemotherapy could result in her hair coming back
17  in a different thickness?
18       A.   Yes.
19       Q.   And after you told Mrs. Sanford all of the
20  risks that her hair may not grow back, did she
21  still agree to proceed with the chemotherapy
22  program you recommended?
23       A.   Yes.
24       Q.   And that included the use of Docetaxel as
25  one of the chemotherapy medications?
```

```
 1        A.   Yes.
 2        Q.   Does the informed consent form also discuss
 3   the risks of damage to major organs with
 4   chemotherapy?
 5        A.   It does.
 6        Q.   Does it also identify the risk of secondary
 7   cancer from chemotherapy?
 8        A.   Yes.
 9        Q.   Was it your understanding that Mrs. Sanford
10   accepted those risks?
11        A.   Yes.
12        Q.   Was it your medical judgment that the
13   benefits that the chemotherapy regimen you
14   prescribed to Mrs. Sanford outweighed the risks?
15        A.   Yes.
16        Q.   Did you believe that the chemotherapy
17   regimen you prescribed to Mrs. Sanford could save
18   her life?
19        A.   I did.
20        Q.   At her deposition, Mrs. Sanford testified
21   that she has been cancer free since she completed
22   her chemotherapy treatments.
23             Based on that, do you consider her
24   treatment of breast cancer to be successful?
25        A.   Yes.  Based on the survival and relapse
```

1  curves that I try to keep in my mind, I think she's
2  among the few that are still cancer free and alive.
3       Q.  Do you credit her survival, in part, to the
4  chemotherapy you prescribed to her?
5       A.  I would like to.  I would have to say there
6  might be higher powers involved.  I always feel
7  that I should not take credit and feel that the
8  science that was developed was a gift for us to use
9  to help patients live longer and better.  And I
10 think she benefitted from the treatment.
11      Q.  When you recommended chemotherapy with
12 Docetaxel for Mrs. Sanford's breast cancer on
13 August 2013, was that your best medical judgment of
14 what was right for the treatment of her breast
15 cancer?
16      A.  Yes.
17      Q.  Do you stand behind that decision?
18      A.  Yes.
19      Q.  You prescribed chemotherapy treatment to
20 Mrs. Sanford in 2013 knowing that there are certain
21 risks associated with those medications, correct?
22      A.  Correct.
23      Q.  Including the risk of permanent hair loss?
24      A.  Yes.
25      Q.  And so even though you knew at the time you

1  prescribed Docetaxel to Mrs. Sanford in 2013 that
2  there was a risk of permanent hair loss, you
3  believed that was part of the best treatment
4  regimen for her at the time, correct?
5      A.  Yes, I do.
6      Q.  Dr. Patten, did Mrs. Sanford complain about
7  hair loss to you while she was your patient?
8      A.  I would have to review the record to answer
9  that.
10     Q.  Do you have a --
11     A.  I don't have a recollection of it.
12     Q.  If Mrs. Sanford had complained to you about
13 hair loss, would you have noted that in your
14 records?
15     A.  Yes.
16     Q.  Do you recall if Mrs. Sanford sought
17 treatment from you for hair loss?
18     A.  No.
19     Q.  No, you don't recall?  Or no, she did not?
20     A.  She did not seek treatment for hair loss.
21     Q.  Do you have any personal knowledge of
22 Mrs. Sanford's current condition, her current
23 health condition?
24     A.  The only -- the knowledge I have is based
25 on a review, complete review of the medical records

1  temporary nausea and vomiting?

2      A.  No, it would be more related to the

3  administration of the chemotherapy itself.  Not to

4  say that some people don't have long-term

5  gastrointestinal problems following chemotherapy.

6      Q.  That goes hand in hand with No. 7,

7  constipation and/or diarrhea.

8          That's not referring to permanent

9  constipation; would it be?

10     A.  There are some drugs that can cause a bowel

11 dysmotility that have to be considered as something

12 that may cause a chronic constipation.

13         And oftentimes radiation therapy to the

14 lower rectum can cause a chronic diarrhea like

15 syndrome so --

16     Q.  I'm referring --

17     A.  -- usually when we put this in the

18 discussion with the patient, you're right.  We're

19 talking about most -- usually we're referring to

20 the immediate events that occur within a -- within

21 the first few days or weeks of chemotherapy.

22     Q.  But you specifically recall discussing

23 permanent hair loss with Miss Sanford?

24     A.  Well, I did tell her at one point that many

25 of my patients accused me of trying to make them

```
 1   look like me -- in the form of hair loss -- so I
 2   knew that permanent hair loss was a potentiality.
 3           If you're asking me to recall my specific
 4   discussion with her, that's something that's very
 5   difficult for me to do.
 6      Q.  So you can't recall whether you discussed
 7   permanent hair loss with Miss Sanford in
 8   particular, can you?
 9           MS. WADHWANI:
10                Objection to form.
11           THE WITNESS:
12                I discussed hair loss.  And the nurse
13           practitioner that we trained and that my
14           partner supervises usually is clear on
15           that, on the hair loss.
16                I mean, that's something that can be
17           either temporary or permanent.  But the
18           hair may grow back either in a patchy
19           fashion or it -- if you're lucky, you might
20           get a full head of hair.
21   BY MR. CENTOLA:
22      Q.  And as of this date, August 22, 2013, how
23   did you know that there was a risk of permanent
24   hair loss with chemotherapy?
25      A.  From past experience with patients.
```

1          As of August 2013, were you aware of any
2     published literature noting any chemotherapy had an
3     increased risk of permanent hair loss?
4        A.  Some of the patients -- you're asking me to
5     dig deep in my recollection -- so some of the
6     patients who have received high-dose chemotherapy
7     with stem cell, you know, or bone-marrow
8     transplantation, in my recollection, experienced
9     permanent hair loss.
10         And that was published in the literature to
11    my recollection.
12       Q.  But, again, you're not sure whether you
13    discussed permanent hair loss or not with
14    Mrs. Sanford?
15            MS. WADHWANI:
16                Objection.
17            THE WITNESS:
18                I'm -- I don't recall our specific
19                discussion of permanent hair loss.
20    BY MR. CENTOLA:
21       Q.  In this chemotherapy consent form, if you
22    look at Page 2, Doctor, No. 4, "Reasonable
23    therapeutic alternatives and the risk(s) associated
24    with such alternatives are," it said,
25    "Alternative Chemotherapy."

```
 1    remission and cure if possible.
 2        Q.  Was it your habit and practice, Dr. Patten,
 3    to warn patients of the risks of permanent hair
 4    loss from chemotherapy?
 5            MR. CENTOLA:
 6                Objection to form.
 7            THE WITNESS:
 8                I'll say this.  That I did warn
 9            patients that they would have hair loss and
10            that their hair may not grow back
11            completely.  So if you take that to mean
12            "permanent hair loss," you could say yes.
13    BY MS. WADHWANI:
14        Q.  So was that true in 2013; that was your
15    habit and practice?
16        A.  Yes.
17            MS. WADHWANI:
18                I have no further questions.  Thank you
19            very much.
20            THE VIDEOGRAPHER:
21                It is now 4 o'clock.  This deposition
22            is concluded.
23        (Thereupon, the witness' testimony was
24        concluded.)
25
```

```
 1              C E R T I F I C A T E
 2
 3         This certification is valid only for a
 4  transcript accompanied by my original signature and
 5  original required seal on this page.
 6
 7         I, Tamra K. Kent, Certified Court Reporter
 8  in and for the State of Louisiana, as the officer
 9  before whom this testimony was taken, do hereby
10  certify that DR. JUDD PATTEN, M.D., to whom the
11  oath was administered, after having been first duly
12  sworn by me upon authority of RS 37:2554, did
13  testify as hereinbefore set forth in the foregoing
14  60 pages;
15         That this testimony was reported by me in
16  stenographic machine shorthand, was prepared and
17  transcribed by me or under my personal direction
18  and supervision, and is a true and correct
19  transcript to the best of my ability and
20  understanding;
21         That the transcript has been prepared in
22  compliance with transcript format guidelines
23  required by statute or by rules of the board, and
24  that I am informed about the complete arrangements,
25  financial or otherwise, with the person or entity
```

1    making arrangements for deposition services; that I
2    have acted in compliance with the prohibition on
3    contractual relationships, as defined by Louisiana
4    Code of Civil Procedure Article 1434 and in rules
5    and advisory opinions of the board; that I have no
6    actual knowledge of any prohibited employment or
7    contractual relationship, direct or indirect,
8    between a court reporting firm and any party
9    litigant in this matter, nor is there any such
10   relationship between myself and a party litigant;
11
12          That I am not related to counsel or to the
13   parties herein, nor am I otherwise interested in
14   the outcome of this matter.
15
16
17
18   Tamra K. Kent   83070
     Certified Reporter in and for
19   the State of Louisiana
20
21
22
23
24
25