1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

IN RE:  TAXOTERE (DOCETAXEL)          *
5          PRODUCTS LIABILITY           *   Docket No.: 16-MD-2740
         LITIGATION                    *   Section "H(5)"
6                                       *   January 9, 2020
This Document Relates To:            *   New Orleans, Louisiana
7   Cynthia Thibodeaux,                 *
Case No.: 16-CV-15859                *
8   * * * * * * * * * * * * * * * * * * *

9              TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
10                  UNITED STATES DISTRICT JUDGE

11

APPEARANCES:
12

For the Plaintiffs:            Morris Bart, LLC
13                                  BY:  RICHARD L. ROOT, ESQ.
                               601 Poydras Street
14                                  24th Floor
                               New Orleans, Louisiana 70130
15

16

For Sanofi S.A.:               Irwin Fritchie Urquhart
17                                    & Moore, LLC
                               BY:  DOUGLAS J. MOORE, ESQ.
18                                  BY:  KELLY BRILLEAUX, ESQ.
                               400 Poydras Street, Suite 2700
19                                  New Orleans, Louisiana 70130

20

21   Official Court Reporter:       Jodi Simcox, RMR, FCRR
                               500 Poydras Street
22                                  Room B-406
                               New Orleans, Louisiana 70130
23                                  (504) 589-7780

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

OFFICIAL TRANSCRIPT

<u>**PROCEEDINGS**</u>

**(January 9, 2020)**

**\*\*\*\*\*\*\***


**THE COURT:**  We're ready to proceed with the motion, Sanofi's motion on statute of the limitations, Cynthia Thibodeaux.

**MR. MOORE:**  Good morning, Your Honor.  Douglas Moore on behalf of Sanofi.  I will be presenting the argument on our motion for summary judgment under Article 3492 of the Louisiana Civil Code based on the fact that we believe that this case has prescribed.

You'll recall that when we filed this motion, Sanofi had indicated that we did not believe that oral argument was necessary, and so I thought I would focus my comments -- and I prepared some pictures to help speed me along -- as to why we think this case is subject to dismissal under Article 3492, and it's based on Your Honor's ruling in this litigation in the *Johnson* and *Francis* matter.

We think that what that decision does is it provides a framework for us to evaluate cases under Louisiana law to determine really two principal questions:  Number one, is the case prescribed on its face; and then, number two, have they demonstrated certain facts -- has the plaintiff demonstrated certain facts that entitle them to invoke contra

1  non valentem under Louisiana law, the discovery rule to toll

2  the statute of limitations.

3              And so we think under the framework that the

4  Court established that Deborah Johnson's and Tanya Francis'

5  case is no different than Cynthia Thibodeaux's case and it

6  should be dismissed.

7              In your ruling on page 1, you established the

8  definition of the injury in this case, and it comes from the

9  plaintiffs' master complaint, disfiguring permanent alopecia

10  manifested six months after the completion of chemotherapy.

11  That definition was affirmed by Your Honor in your order and

12  reasons that were issued on December 12th when the master

13  complaint was sought to be amended by the plaintiffs.  And what

14  Your Honor concluded, that there was an informed decision to

15  define the injury the way that it was and that we were not

16  going to change it.

17              That is the definition of the injury that is

18  applicable to Ms. Thibodeaux's case, and it is consistent with

19  her testimony; it is consistent with her fact sheet; it is

20  consistent with the medical and scientific literature that the

21  plaintiff's experts rely upon; it is consistent with the

22  plaintiff's expert reports.

23              So how does that apply to Ms. Thibodeaux's case?

24  She underwent treatment in February of 2008 until June of 2009.

25  I put an asterisk there just to point out that that is, as Your

1   Honor may recognize from what you've learned in this
2   litigation, what we've all learned, that is an incredibly long
3   time period to be undergoing chemotherapy.  That is because
4   Ms. Thibodeaux underwent -- was part of a clinical trial that
5   involved an extremely lengthy period of chemotherapy regimens.
6           Her Taxotere use actually ended in April of
7   2008, but she stayed on other chemotherapy medicines all the
8   way until June of 2009.  So we're using June of 2009 as the
9   operative date for the completion of her treatment.  And then
10  if we move six months beyond that, it establishes the date of
11  the injury, the onset of permanent chemotherapy-induced
12  alopecia as January of 2010.  And the lawsuit was filed on
13  October 26th, 2016.
14          So what does that mean under the Court's ruling?
15  If the face of the petition shows that the prescriptive period
16  has already elapsed, then the claim is prescribed on its face
17  and plaintiffs bear the burden of proving.  And under Your
18  Honor's ruling, what do they have to prove?
19          They have to prove that they lacked actual or
20  constructive knowledge of a relationship between the object and
21  their injury.  This is a determination that Your Honor
22  determined did not require that the plaintiff be informed by an
23  attorney as to when prescription begins to run.  And they do
24  not need to have all the facts and evidence to make out their
25  claim; they just need to have sufficient notice to call for an

OFFICIAL TRANSCRIPT

1   inquiry about a claim.

2                And so how did that apply to Deborah Johnson?

3   Deborah Johnson's testimony, she did not think anything other

4   than chemotherapy caused her hair loss.  She testified that as

5   early as 2010, she became very concerned her hair may not grow

6   back.  And as a consequence, she had actual constructive

7   knowledge of a causal relationship between the object or

8   product and her injury.

9                The same result was reached for Tanya Francis

10  based on her testimony that her hair, although it began to

11  regrow, it came back thinner and with a different texture.  And

12  she reported in her fact sheet that her injury occurred in

13  2009.

14                So how does that analysis, that framework, work

15  with Mrs. Thibodeaux?  Well, this is the definition of the

16  injury in her complaint, which we've already seen.  This is her

17  testimony:

18           "Q.  Have you ever thought that your hair loss could

19       be caused by anything other than chemotherapy?"

20                Answer:

21       "A.  No."

22       "Q.  Always attributed to a chemotherapy drug?"

23                Answer:

24       "A.  Yes."

25                Her testimony almost mirrors the language quoted

OFFICIAL TRANSCRIPT

1  by Your Honor in the Deborah Johnson case.

2              She was asked:

3        "Q.  When -- when do you think your hair should have

4     come back?"

5              And the question was premised with:

6        "Q.  I have to know when you think your hair should

7     have come back.  When did you think your hair should have

8     come back?"

9              Her answer was:

10       "A.  I thought it was going to come back after chemo.

11    Once chemo was completed, maybe a few months later."

12       "Q.  That's what you expected, your expectation, for

13    your hair to come back a few months after chemo was

14    completed?"

15             Answer:

16       "A.  Uh-huh."

17       "Q.  And it didn't do that?"

18       "A.  It didn't do that."

19             And so how did that affect her?  According to

20   her testimony, she was devastated.

21             We think that the result that was reached with

22   Deborah Johnson and Tanya Francis is the result that we believe

23   is required with Cynthia Thibodeaux based on the testimony that

24   she provided.  And the reason being is that Deborah Johnson and

25   Tanya Francis -- and this is the excerpt of their rulings --

1   they failed to demonstrate that -- any facts entitling them to

2   the application of contra non valentem.

3              Both of those plaintiffs did not investigate

4   their claim.  They did not talk to a doctor.  They did not

5   receive any information that would put a reasonable person --

6   that would -- that a reasonable person would believe and make

7   that person believe they don't have a claim.  They didn't do

8   anything.

9              And that was the situation with Deborah Johnson,

10   that was the situation with Tanya Francis, and that is the

11   situation with Cynthia Thibodeaux.  It's the inability to

12   invoke the doctrine.  So it's not a situation where these

13   plaintiffs demonstrated that they did something and then the

14   question became, "Okay.  What did you do?  And what is the

15   reasonableness of that?  And what are those facts?  And are

16   those factual issues disputed?"

17              The doctrine, as you say here with Tanya

18   Francis -- you said it also with Deborah Johnson -- "Contra non

19   valentem is inapplicable to her claims because there was a

20   failure to investigate and a duty to do so."

21              So what did Cynthia Thibodeaux say?

22         "Q.  You told me you thought your hair was going to

23      come back a couple months after chemo.  It did not, but

24      you continued.  So you didn't talk to a doctor; correct?"

25              Answer:

1          "A.   No.   About my hair loss not coming back, no, I
2     didn't."
3               Later in the deposition she's asked:
4          "Q.   So from the lawyer's ad, you determined it must
5     have been Taxotere?"
6               Answer:
7          "A.   Yes."
8          "Q.   Never talked to a doctor, though?"
9          "A.   No."
10         "Q.   Of any kind?"
11         "A.   No."
12         "Q.   At any time?"
13         "A.   No."
14              We believe that under the framework that Your
15     Honor has established in the *Johnson*, and *Francis*, and *Earnest*
16     case, we believe that Cynthia Thibodeaux squarely fits within
17     the framework for Deborah Johnson and Tanya Francis.
18              I want to address a couple of points about the
19     plaintiff's opposition before I sit down.  First, I began
20     looking at the opposition two days ago in close detail to
21     understand what is the factual references, what is the
22     deposition testimony that they're going to support for some of
23     their things.
24              They didn't provide us with a countervailing
25     statement of material facts.  But what I did get was the first

OFFICIAL TRANSCRIPT

1    three pages of the brief just has the recitation of information

2    without any citations to the record.  There are record cites in

3    the body of the argument.  And when I looked at some of that

4    testimony, it didn't necessarily support the proposition that

5    was being made.

6                    I wanted to point out two things.  First, in the

7    opposition on page 1, it says:  "It is undisputed from the time

8    of her initial hair loss until the day she saw the

9    advertisement, Ms. Thibodeaux believed that her hair would

10   eventually grow back."

11                   Her testimony was not that.  Her testimony was

12   she believed it would come back within a couple of months after

13   chemotherapy, which is consistent with what everyone expects to

14   happen when they undergo chemotherapy.

15                   And I've already showed you this testimony.

16                   The argument that is presented in the opposition

17   almost seems to suggest that Ms. Thibodeaux was not injured

18   until she saw the lawyer's advertisement.  As if she was

19   walking through society for nine years without any emotional

20   injury, without feeling bad about her hair loss, without

21   suffering from this permanent disfigurement that she alleges in

22   her lawsuit because she had this belief that someday it would

23   come back.

24                   That's an argument that has already been

25   rejected by this Court, that it doesn't -- the statute of

OFFICIAL TRANSCRIPT

 1   limitations doesn't begin to run with lawyer advertising.  It's
 2   inconsistent with the plaintiff's testimony because she
 3   testified that she was devastated by her hair loss, that she
 4   expected it to come back a couple of months after she completed
 5   therapy.  And accepting that argument would be just simply an
 6   end run around the effort to change the definition of the
 7   injury, which Your Honor has already not permitted in the
 8   amended complaint.
 9               There was also a reference in the opposition
10   that she had some consultation with her mother and her husband,
11   but she was steadfastly assured that her hair would return.
12               If you look at that testimony, it's in the
13   second volume of the deposition.  There wasn't a citation to it
14   here, but Mr. Root is examining his client, Ms. Thibodeaux, and
15   what she's talking about is how she would have good days and
16   bad days.  That she would feel bad.  She'd be concerned about
17   her hair.  She would, you know, be devastated about it.  That
18   her emotions ebbed and flowed.
19               And what they're talking about is who did they
20   consult for that.  It was her mother and her father -- or her
21   husband.  And, of course, like Ralph Earnest, her husband was
22   being a good husband and assuring her.  But his testimony is --
23   her testimony was that he would say to her, "If it doesn't grow
24   back, I don't care.  The wig looks fine."
25               There's no assurance there.  And certainly this

1    isn't part of an investigation that she's undertaking, and

2    certainly not some reasonable conveyance of information that

3    would make her believe she's not injured when she's actually

4    seeking counseling from those around her because she is

5    injured.

6              So we think that event actually supports the

7    fact that she recognized and was devastated by this event.

8              Quickly, there are arguments on page 14 of the

9    opposition about futility.  That was an argument that Your

10   Honor rejected expressly in the *Francis* case.  I would also

11   point out that in the master complaint, there are allegations

12   about news stories on CBS News and the Daily Mail from 2010,

13   the Taxotears' Web site, it's predecessor, Ahead of Our Time,

14   were Internet Web sites that existed in 2010.  The medical and

15   scientific literature that their experts reported on is

16   findable through Google at that time frame.

17             So the idea that they wouldn't have discovered

18   anything had they actually investigated, I think is belied by

19   the facts that they allege in their own complaint.  Shirley

20   Ledlie wrote a book more than -- well more than a year before

21   this lawsuit was ever filed.

22             The second point I wanted to address with this

23   argument is, "Well, I couldn't have known.  The statute of

24   limitations doesn't run because Sanofi didn't put it in their

25   warning label."

OFFICIAL TRANSCRIPT

1              There's a circular component to that.  Because

2  if we had -- if we had done what you think we should have done

3  in the warning label to put you on notice, then you -- of your

4  claim, you wouldn't have a claim.  This is a failure to warn

5  claim.

6              This is what -- excuse me, this is what her

7  testimony was:

8         "Q.  You're saying you wish you would have been told

9     that your hair might not grow back fully?

10              Answer:

11         "A.  Yes."

12         "Q.  How should you have been warned?"

13         "A.  I think that would have been for the medical

14     professionals to warn me."

15         "Q.  And they didn't tell you that?"

16         "A.  I have no knowledge of that."

17              So that's what she has knowledge of.  She has

18  knowledge that she expected her hair to come back a couple of

19  months after completion of therapy.  She had knowledge that it

20  did not come back.  And she had knowledge that she was not

21  informed of that being a risk, and it's her belief that she

22  should have been.  All of those entities existed back in 2010,

23  and that's why we think that this case fits squarely within the

24  Deborah Johnson and Tanya Francis framework.

25              Prescription in Louisiana begins to run when an

OFFICIAL TRANSCRIPT

1  injury or damage is sustained, that's six months following

2  completion of chemotherapy, in this case, January of 2010.  To

3  invoke contra non valentem, it simply requires there to be

4  sufficient information to incite curiosity -- incite curiosity,

5  excite attention, and put someone on guard, a reasonably minded

6  person, to call for inquiring.

7            But this is an exceedingly stringent standard

8  applicable in only exceptional circumstances.  And when you do

9  not do anything to investigate your claim, as Your Honor has

10  held, contra non valentem is not applicable.  And for those

11  reasons, Your Honor, we'd ask that you dismiss this case with

12  prejudice.

13            **THE COURT:**  Thank you.

14            Mr. Root.

15            **MR. ROOT:**  Good morning, Your Honor.  Richard Root

16  for Cynthia Thibodeaux.

17            Sanofi's brief cites language in *Campo v.*

18  *Correa*, Your Honor, a case that you cited in the *Johnson*,

19  *Earnest*, *Francis* SOL decision.  And it states:  "The ultimate

20  issue is the reasonableness of the plaintiff's action or

21  inaction in light of the education, intelligence, severity of

22  the symptoms, and the nature of defendant's conduct."

23            With that quote, Your Honor, is the last time

24  defendant's conduct is mentioned in their brief, and you heard

25  not a word of it here in oral argument, and for good reason.

1  Because that citation reveals the clear mandate of the
2  Louisiana Supreme Court that the defendant's conduct has to be
3  looked at in light of the reasonableness of the plaintiff's
4  actions.
5            Certainly, for all of the category 4 discovery
6  cases, and obviously for the category 3 fraudulent concealment
7  cases, the defendant's conduct is central.  We quoted the *Wells*
8  case in our brief, a 2012 Louisiana Supreme Court decision
9  where they repudiated the appellate court's analysis of the
10 reasonableness of the plaintiff's actions, the very same
11 analysis urged by Sanofi, and ask that you look at the
12 plaintiff's actions in a vacuum without looking at the
13 defendant's conduct.
14           They specifically said that the appeal court
15 denied contra non valentem stating that the appellate court
16 said, "The record is devoid of efforts on the part of the
17 plaintiff to keep abreast of their property."
18           That's a mineral lease case.  And for 40 years,
19 they did absolutely nothing, didn't visit the site, didn't talk
20 to neighbors, did nothing to ascertain their rights, and yet
21 the Supreme Court said their case was not untimely.  Because
22 when you looked at the defendant's conduct, there was a
23 statutory duty on the part of the defendant to notify the
24 plaintiff of the proceeds.  They never did that, so the
25 plaintiff never had notice of the cause of action, and they

1  found it timely.

2                    To reinforce that, in that same case, the *Wells*

3  case, they mentioned a previous decision*, Amoco v. Texaco*.

4  There, as opposed to a lay person who doesn't know about oil

5  leases, you had Amoco, a sophisticated entity, and for 13 and

6  18 years, they didn't know about a lease that had been canceled

7  and purchased by one of the defendants for their benefit.  They

8  found out about it many, many years later, and defendant said,

9  "It's 18 years later.  You're sophisticated.  You could have

10 gone to the courthouse and seen the lease cancelations."

11                   And the Supreme Court there said, "No, you had a

12 contractual agreement to notify them of the cancelation.  When

13 you breached that agreement, they had no notice and, therefore,

14 it's timely."  And that decision, the *Wells* decision, also

15 noted the --

16          **THE COURT:**  But isn't this different?  I guess, you

17 know, if I have a lease on my property and it's been canceled

18 and I have no mechanism to -- I mean, this lady,

19 Ms. Thibodeaux, must have known that she didn't -- she had lost

20 her hair.  It wasn't -- it wasn't that -- something that could

21 have occurred without her knowledge.  And I think that's where

22 I see the disconnect.

23                   In this circumstance, Ms. Thibodeaux knows her

24 hair didn't grow back.  She anticipated it would grow back

25 sometime after chemotherapy.  And she doesn't go to her doctor

1  and say, "I thought this" -- "what happened?  This wasn't

2  supposed to happen to me."  Just anything.  It almost appears

3  that she kind of thought, "Well, perhaps this was a risk."

4          **MR. ROOT:**  Where the concept of the defendant's --

5  where the defendant's conduct comes into play in this, Your

6  Honor, is the fact that -- in *Amoco*, there was a contractual

7  duty.  In *Wells*, there was a duty that was statutory.  Then we

8  cited the *Lindquist* case, a medical malpractice case, where a

9  physician has the duty to tell the patient that which they

10 know.  And in that case, the plaintiff complained of metal left

11 in their back --

12         **THE COURT:**  Right.

13         **MR. ROOT:**  -- and the doctor didn't tell them.  And

14 so they said, "You had a duty to tell me this, which would have

15 triggered the fact that I could have brought a suit."

16             All three of those involved different types of

17 duties breached by a defendant; and in each of those cases, the

18 breach by the defendant prevented notice to the plaintiff of

19 their right to bring the suit.

20             Here at the most elementary --

21         **THE COURT:**  But let me go back.  I mean, even if --

22 if the surgeon leaves a bit of metal or a microwave in your

23 belly, you don't know that until you're put on notice that this

24 occurred and this damage has occurred.  Ms. Thibodeaux knew

25 her -- maybe this is what I can tell you --

OFFICIAL TRANSCRIPT

1    **MR. ROOT:**  Well, but here's the connection --

2    **THE COURT:**   -- Mr. Root, when did prescription start

3    to run?

4    **MR. ROOT:**  The connection, Your Honor, is that the

5    knowledge of the link between the permanent alopecia and

6    Taxotere is knowledge Sanofi had, with the duty to disclose to

7    the physicians to tell her, and they never did.

8    And because the physicians didn't know,

9    essentially you're saying, "You should have asked the

10   physicians who were hoodwinked to tell you about that which

11   they wouldn't have told you, and I'm blaming you for the

12   successful fraud in not telling the providers."  Because she

13   never knew what the providers knew because they didn't know it.

14   It was hidden.

15   Had the providers known it -- I agree with you,

16   if they had told the doctors about that and she failed to

17   mention anything to the doctors, "What caused my hair loss,"

18   shame on you, Ms. Thibodeaux.  You should not be able to bring

19   your suit.  But it's this -- this --

20   **THE COURT:**  Well, if the doctors knew and didn't tell

21   her, that's on the doctors.

22   **MR. ROOT:**  Well, the doctors didn't know, Your Honor,

23   and that's the construct.  When the defendant deprives the

24   person under the law with the duty to tell the sides effects to

25   the patient, and they deprive the doctors of that knowledge and

1  therefore deprive the patients of that knowledge, that's on the
2  defendant.
3          And all those lines of cases show when the
4  defendant breaches a duty whether it's contractual or statutory
5  or the patient/doctor duty is the same as the manufacturer duty
6  because they just pass it through the physician through learned
7  intermediary.  But the information has to come from the
8  manufacturer.
9          Otherwise, you're saying, "I'm blaming you
10 because you didn't ask your physician who wouldn't have known
11 about it because you were not told by the defendant."  It's
12 just not equitable and just to say, "You did not have
13 information that was unobtainable."
14         The whole point is, if you search around and
15 find your cause of action, it's fair to say you failed to look.
16 But if there was no way you could have found it through the
17 beach of a duty of the defendant, then it is not equitable.
18 Because contra non valentem is an equitable doctrine.  And
19 you're essentially rewarding their failure to say what they
20 should have said to the defendant, and you're saying,
21 "Congratulations, your failure to speak, your breach of your
22 duty, you're going to be rewarded for it."
23         So why on earth should they ever say something
24 bad?  Because if they can just be quiet for a long enough time,
25 they'll win a prescription battle.  And that was the point of

all these cases is that when you look at the defendant's
conduct, it's crucial because it's an equitable consideration.

And, Your Honor, I can't use your prior decision
to discuss that matter because there was actually no discussion
of the defendant's conduct in the *Johnson*, *Earnest*, and *Francis*
decision.  But it's crucial, according to the Louisiana Supreme
Court, not to look at the plaintiff's efforts in a vacuum
because it's the impossibility of Ms. Thibodeaux knowing the
cause of action because her physicians didn't know.  Asking her
to know complex issues of chemotherapy interaction with the
cells of her hair --

**THE COURT:**  I'm not -- I understand that, perhaps,
had she gone to her physician, he would not have been able to
answer the question at that time, but she didn't.  She didn't
do anything.

**MR. ROOT:**  She didn't know what caused her hair loss,
but she maintained consistently, "I hoped it would grow back."

**THE COURT:**  Right.  Right.

**MR. ROOT:**  And the point I'm trying to make, Your
Honor, is in all of these cases, I have been unable to find any
case where a defendant had a duty to the plaintiff who was a
late filer and the defendant's actions contributed to the
failure to know what you should have known to bring the suit,
that the court said, "No, we're punishing you.  We're not
applying contra non valentem."

1              There are cases that say, you didn't research
2   enough, you didn't ask enough, but those cases, you don't have
3   a defendant with a firm duty to tell the plaintiff that which
4   is required to be constructive knowledge, then to bring your
5   cause of action.  And that is the key, Your Honor.
6              Because, certainly, there are lots of cases
7   where a defendant hurts you, and then you don't ask about --
8   you know, constructive knowledge questions that would give rise
9   to the action, and you deserve then not to be able to bring
10  your suit if you don't find information.
11             But there's lots of cases where the defendant
12  doesn't have an absolute non-delegable duty to tell you about
13  the dangers of their product because the only one who knows
14  about the dangers of their product is the defendant.  You can't
15  get it any other place.  You can't even get it from your
16  doctors.
17             Dr. Cardinal said he didn't know.  Her
18  subsequent oncologist, Dr. Larned, said in 2018 in her
19  deposition, "Ochsner is getting around to amending our warning
20  to say 'permanent alopecia.'"  This is 2018.  Her dermatologist
21  said, "I have no knowledge of permanent alopecia and
22  chemotherapy."  So if the physicians don't know about it --
23             **THE COURT:**  She asked her dermatologist?
24             **MR. ROOT:**  The dermatologist said she was unaware of
25  that link.  Her oncologists are unaware of that link.

OFFICIAL TRANSCRIPT

1     **THE COURT:**  Let me go back to the question I had,

2  Mr. Root, because you kind of didn't answer it.  When do you

3  argue that prescription began to run in this case for

4  Ms. Thibodeaux?

5     **MR. ROOT:**  We've always argued, Your Honor, that her

6  first notice that her chemotherapy and Taxotere was the cause

7  of her failure for her hair to regrow as differentiated from

8  her hair falling out -- which defendant always likes to talk

9  about, she knew her hair fell out -- was when she saw the

10  lawyer ad.

11     I know this is not the *Johnson* case, but the

12  physician in *Johnson* said, "I saw the lawyer ad.  That's when I

13  saw the link."  Even Dr. Larned said all the women coming in

14  asking about permanent hair loss because they saw the ads is

15  one of the reasons why Ochsner changed their warning label.

16     So if the people who we claim, "Shame on you,

17  you didn't ask them," if those people were essentially

18  defrauded by the defendant's failure to tell them of the side

19  effects, it is simply not in the philosophy of equity to blame

20  the plaintiff because the defendant successfully hid the

21  information her provider needed to know to warn her of the

22  trigger and the start of the cause of her permanent alopecia,

23  even though she knew her hair wasn't growing back.

24     And the purpose of an equity statute is to say,

25  "Well, is it fair?"  And I just don't believe, Your Honor, it

1   is fair to say when you successfully keep the exact information
2   you need to give your doctors the information to inform you of
3   your rights, that you reward that with a dismissal of their
4   case.

5              And at best, Your Honor --

6              **THE COURT:**  So I guess what I'm hearing is in failure
7   to warn cases, there is no prescriptive period.  Because in all
8   of the failure to warn cases, the physician, whether -- if it's
9   a prescription drug, through the learned intermediary is the
10  person warned, and over-the-counter, it's direct warning, and
11  if so, in all of those cases, there would never be a
12  prescriptive period because the person that has sustained the
13  damage as a result of ingestion of that substance would
14  never -- never know until -- is that it?

15             **MR. ROOT:**  Well, Your Honor, actually, one of the
16  cases you cited was the *Carter v. Matrixx* case.  And in that
17  case -- it's a federal decision, but they cite the Louisiana
18  state court decision, *Sharkey v. Sterling Drug*.  It's an
19  aspirin case where this poor, unfortunate child developed
20  Reye's Syndrome.

21             And what they said in that case is:
22  "Prescription will not begin to run at the earliest possible
23  indication that a plaintiff may have suffered some wrong."
24  And:  "Prescription should not be used to force a person who
25  believes they may have been damaged in some way to rush to file

1  suit against all parties," including all of the six different
2  potential clinical trial drug manufacturers.
3          But here's the important thing, they said, "We
4  note at the outset, as did the trial court, that the
5  defendant's contention that the action was prescribed is
6  greatly undermined by their own contention that the cause of
7  Reye's Syndrome is unknown.  If the cause is unknown for
8  purposes of the defendant's liability, then they can hardly
9  argue the cause is known for the purpose of the plaintiff
10 bringing their suit."
11         And here, as we see in the first trial, they say
12 it doesn't cause permanent alopecia yet today, Your Honor.  And
13 everyone knows that they didn't put it in their warning labels
14 until 2015.  And the documents we submitted to the Court, their
15 internal documents, show in 2014, they're talking about, "Oh,
16 my God, we got to tell the FDA this four-year-old information."
17         That is key, Your Honor.  That four-year
18 information, if you think about it, 2010 to 2015 is the exact
19 time period they are blaming Cynthia Thibodeaux for not knowing
20 this information and not bringing her suit.  That information
21 should have been told when the European drug agency forced them
22 to say it in 2011 or when their own internal studies in 2006
23 and 2008 showed it.
24         **THE COURT:**  Mr. Root, I'm going to ask you the
25 question I asked again:  Are you telling me that there's no

1  prescriptive period in failure to warn cases?

2       **MR. ROOT:**  What I'd say, Your Honor, is there's so

3  many issues of material fact regarding their duty to disclose

4  and what they knew and when they know it, that that's more

5  properly a jury question than a question for summary judgment

6  because, obviously, there's so many factors about her

7  reasonableness in light of what she said.

8       I have to say, we don't even agree on what the

9  deposition testimony says.  So, certainly, it seems like that

10  should be a jury question.  And the conduct should not be

11  eliminated.

12       In fact, Your Honor, I firmly believe that

13  you -- when the Supreme Court's instruction says you have to

14  look at this in light of their conduct, that you simply can't

15  divorce it and look at the plaintiff's conduct.

16       And to be fair to both, perhaps both sides can

17  put on their best case to the jury, we could have a jury

18  instruction, and we can find out whether she was reasonable,

19  whether her conduct impacted her knowledge.  We suggest that

20  would be the proper way to go.  Because this is certainly, I

21  believe, genuine issues of material fact inherent in this case.

22       And so with all of that, I think that is

23  probably perhaps the wisest way to go, Your Honor.

24       **THE COURT:**  Wait.  Mr. Lambert is rushing up.

25       **MR. ROOT:**  Certainly, prescription can't run when the

OFFICIAL TRANSCRIPT

1  defendant actively conceals something.  Why we cited the

2  *Lindquist* case, Your Honor, is simply because they said,

3  "Silence in the face of a duty to speak is fraud."  Well, is

4  there a duty to let the plaintiff know what the defendant knew

5  about their product?  We think so.

6          We certainly know there's a duty.  That Sanofi

7  has never said there's not a duty to tell patients about the

8  warnings of their product.  And if it's material -- and

9  actually all we're talking about is what caused the permanent

10 alopecia, so it has to be material and relevant.

11         So in light of that, Your Honor, we think there

12 are so many questions that at this point dismissal on statute

13 of limitations and summary judgment is inapplicable.

14         **THE COURT:**  Thank you, Mr. Root.

15         Mr. Moore.

16         **MR. MOORE:**  Your Honor, just a couple of comments in

17 rebuttal.

18         I think a lot of what we heard today are

19 arguments that we heard back in April and May when we

20 considered the *Johnson*, *Francis*, and *Earnest* cases.

21         There are a couple of points that I do want to

22 make.  First, the *Campo* case.  We talked about the *Campo* case

23 when we were crafting the jury instructions in the *Earnest*

24 matter.  And you recall that Mr. Centola and I and Your Honor

25 discussed the application of that case in the context of a

OFFICIAL TRANSCRIPT

1  products liability matter.

2  　　　　　And the reason I bring that up is because *Campo*

3  is a medical malpractice case.  And while that case emphasizes

4  that in contra non valentem in medical malpractice cases, the

5  focus requires some consideration of the defendants' conduct.

6  That's because the Medical Malpractice Act commences the

7  statute of limitations under the med mal act from the date of

8  the act of malpractice.

9  　　　　**THE COURT:**  Right.

10  　　　　**MR. MOORE:**  In products liability law, it's the date

11  the injury or damage is sustained.  So we think that's an

12  important distinction for all of this emphasis on the

13  defendant's conduct.

14  　　　　　I think Your Honor hit the nail on the head when

15  you asked the question and ultimately had to answer it

16  yourself, and that is, that if these arguments are to be

17  believed, there is no statute of limitations for a failure to

18  warn case.

19  　　　　　The failure to warn claim is that they did not

20  and were not informed of the risk.  Sanofi, under the learned

21  intermediary doctrine, has no duty to warn the plaintiff of

22  anything directly.  And the fact that the plaintiff did not

23  learn this was a risk is sufficient information for her to be

24  on notice of her claim.

25  　　　　　And then, lastly, Your Honor, I have not had an

1  opportunity to look at the Reye's Syndrome cases that Mr. Root
2  referred to.  Those are probably aspirin cases or Tylenol.
3          The two things I suspect we would see if we
4  looked at those cases, number one, they're pediatric cases.
5  The statute is suspended against product manufacturers in
6  pediatric cases, number one.
7          Number two, Reye's Syndrome is something that
8  can occur regardless of medicines.  It can happen after a viral
9  infection or a bacterial infection or after chicken pox, and
10  it's not something that someone would necessarily automatically
11  connect to the administration of a medicine.  Here the
12  testimony is clear, her testimony was that she never thought
13  anything other than chemotherapy caused her injury.
14          So for those reasons, Your Honor, we think that
15  the dye is cast for this case.  We think that it should go the
16  same way as the *Francis* and *Johnson* case and be dismissed with
17  prejudice.
18          **THE COURT:**  Thank you.
19          (WHEREUPON, the proceedings were concluded.)
20
21
22
23
24
25

OFFICIAL TRANSCRIPT

```
 1                              *****
 2                           CERTIFICATE
 3           I, Jodi Simcox, RMR, FCRR, Official Court Reporter
 4  for the United States District Court, Eastern District of
 5  Louisiana, do hereby certify that the foregoing is a true and
 6  correct transcript, to the best of my ability and
 7  understanding, from the record of the proceedings in the
 8  above-entitled and numbered matter.
 9
10
11                          s/Jodi Simcox, RMR, FCRR
                            Jodi Simcox, RMR, FCRR
12                          Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
```

OFFICIAL TRANSCRIPT