UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


In Re:  TAXOTERE (DOCETAXEL)                          MDL NO. 16-2740
PRODUCTS LIABILITY LITIGATION


THIS DOCUMENT RELATES TO:
*Sanford v. Hospira, et al.,* Case No. 2:17-cv-09417


**PLAINTIFF'S  RESPONSE AND MEMORANDUM IN OPPOSITION TO
DEFENDANT HOSPIRA'S MOTION FOR SUMMARY JUDGMENT
<u>BASED ON THE STATUE OF LIMITATIONS</u>**


MAY IT PLEASE THE COURT:

Despite testimony and documentary evidence to the contrary, Defendant Hospira has filed

its Motion for Summary Judgment Based on the Statute of Limitations as to Mrs. Sanford alleging

(1) she suffered permanent hair loss by June 2014 – six months after she completed chemotherapy

– but did not file her Complaint until just over three (3) years later on September 21, 2017; (2) the

doctrine of *contra non valentem* does not apply to toll Mrs. Sanford's prescription period because

she allegedly did not act reasonably to discovery her problem; and (3) Mrs. Sanford was on notice

of her claim more than one year before she filed her Complaint.  (Doc. 9508-1)


However, as set out in detail hereinbelow, under the facts of this case: (1) Mrs. Sanford

reasonably believed her hair loss was temporary; and (2) given the alternative causes of her hair

loss, she could not have reasonably linked her hair loss to the administration of Docetaxel

manufactured by Hospira until less than one year before filing the instant cause of action.  The

uncontroverted facts establish the following:

1. Mrs. Sanford was administered four (4) separate chemotherapy medications (Adriamycin, only, them a combination of Docetaxel, Carboplatin and Herceptin) – three (3) of which carried warnings of the potential side effect of temporary hair loss;

2. The verbal and written warnings she received indicated the side effect of hair loss would be temporary;

3. She began to lose her hair while receiving the chemotherapy medication Adriamycin - PRIOR TO beginning the administration of Docetaxel.

4. Mrs. Sanford was told – both verbally and in writing - she took Taxotere, however, she actually received Docetaxel produced by Defendant Hospira which was discovered only after counsel conducted investigation of medical records.

5. Mrs. Sanford first became aware her hair loss may be permanent in August 2016 approximately 2 years after completion of her breast cancer treatment in September 2014. In the interim, she was diagnosed and treated for medullary thyroid cancer including taking the hormone replacement drug Synthroid which also warns that "[h]air loss may occur during the first few months of treatment."

6. Mrs. Sanford became aware of her claim against Defendant Hospira – at the very earliest – in October 2016 when her medical records were received and filed her lawsuit on September 21, 2017 - THE SAME MONTH Defendant Hospira finally changed its label information to include a warning of permanent hair loss.

Moreover, Defendant Hospira is arguing in direct contravention of the position it took in *Defendants' Motion to Dismiss Pursuant to CMO No. 12 and Supporting Memorandum* (Doc. 1904 and 1904-1) in which it asserted numerous plaintiffs' claims should be dismissed for "failing to collect Product ID Information prior to filing suit."  <u>Defendant Hospira previously argued to this Court that "Plaintiffs are obligated to determine whether a factual basis exists to sue a particular defendant *prior* to filing suit."</u>  *Id.* at p. 1, FN 2, *citing Avandia Mktg. Sales Prac. & Prods. Liab. Litig.*, No. 2007-md-1871, 2010 WL 4720335, at *1 (E.D. Pa. Nov. 15, 2015)(emphasis added).[1]  This is exactly what Mrs. Sanford did in the instant case.  After becoming aware her hair loss might be permanent through an attorney's advertisement, Mrs. Sanford began

---

[1] Ex. S – Defendants' Motion to Dismiss Pursuant to CMO No. 12 and Supporting Memorandum (Doc. 1904-1).

an investigation by calling "to get some information" and then turned the investigation over to counsel.[2]

Pursuant to the facts of this case and the Court's prior rulings in this litigation applying the Louisiana law of liberative prescription and *contra non valentem*, Mrs. Sanford's claims are not prescribed, and Defendant Hospira's Motion for Summary Judgment should be denied.  At the very least, genuine issues of material fact regarding the onset of constructing knowledge preclude summary judgment.

## I.        INTRODUCTION AND BACKGROUND

The facts, and timing, of Plaintiff Sanford's medical care and treatment clearly delineate a situation in which she did not have notice:  (1) that her hair loss was permanent, or (2) that her hair loss was the result of being treated with Hospira's Docetaxel.

### A.  Ms. Sanford's Medical Care and Treatment

Mrs. Sanford was diagnosed with bilateral breast cancer in July 2013 following an abnormal mammogram and subsequent biopsies.  She was diagnosed with stage IA cancer in her left breast, but with an "aggressive" stage IIIA cancer in her right breast with a high risk for metastasis and reoccurrence.  She also had metastasis to her lymph nodes.  Consequently, her oncologist, Dr. Patton prescribed an "aggressive" chemotherapy regimen of three (3) cycles of Adriamycin – during which she experienced significant hair loss - followed by six (6) cycles of

---

[2] Ex. A, Sanford Dep., 16: 16-18; Ex. H, Sanford Affidavit at ¶2.

Docetaxel, carboplatin and Herceptin.   As a result of her treatment, Mrs. Sanford began experiencing <u>significant hair loss **prior to** beginning her treatment with Docetaxel</u>.[3]

Unfortunately, in November 2014 – only one month after completing her breast cancer treatment - Mrs. Sanford was diagnosed with medullary thyroid cancer.  She underwent a total thyroidectomy and was placed on hormone replacement using the drug Synthroid.  She began taking Synthroid which also carries <u>a known side effect of potential hair loss **after** her completion of chemotherapy treatment.</u>[4]

The following is a timeline of Mrs. Sanford's medical care and treatment relevant to the timeliness her claims herein as documented in her medical records:

- June 20, 2013 – Mrs. Sanford underwent a bilateral mastectomy following abnormal mammogram and biopsies;

- August 2, 2013 – Oncologist, Dr. Patton, prescribed:  "Adriamycin 90 mg/m2 x 3 cycles followed by six cycles of TCH therapy [*i.e.,* Docetaxel, carboplatin and Herceptin].  I discussed with the patient and her husband the intensity of this chemotherapy program."[5]

- **August 6, 2013** – she began Adriamycin, only, treatment. [6]
    - o Mrs. Sanford underwent "Chemotherapy Education/Counseling" with Nurse Practitioner Judy Owens.

- August 27, 2013 –
    - o Nurse Owens noted:  "**The patient does have <u>alopecia secondary to her first dose of Adriamycin</u> . . . .**"
    - o Mrs. Sanford underwent her second treatment of Adriamycin, only.[7]

- September 17, 2013 – Mrs. Sanford underwent her third, and final, treatment of Adriamycin, only.[8]

---

[3] Ex. I, Our Lady of the Lake Physician Group/Dr. Judd Patton Medical Record Excerpts at p. 00019; 00034; 00040.
[4] Ex. H, Sanford Affidavit at ¶5 and attachment.
[5] Ex. I, Medical Record Excerpts of Our Lady of the Lake Physician Group/Dr. Judd Patton at p. 00008-9.
[6] *Id.* at p. 10-11.
[7] *Id.* at p. 19-20 (emphasis added).
[8] *Id.* at p. 25.

- **October 8, 2013** – she began chemotherapy treatment of TCH (Docetaxel, Carboplatin and Herceptin).[9]
    - Medical records document:  "**The patient does have <u>alopecia secondary to her first dose of Adriamycin</u>** . . . ."
- October 29, 2013 – 2d of six (6) cycles of TCH Chemotherapy (Docetaxel, carboplatin and Herceptin).[10]
    - Medical records again document:  "**The patient does have <u>alopecia secondary to her first dose of Adriamycin</u>** . . . ."

- 11/19/2013 – 12/30/13 - 3[rd,]  4th and 5th of six (6) cycles of TCH Chemo (Docetaxel, carboplatin and Herceptin).[11]

- **1/21/2014** – completed six (6) cycles of TCH Chemo (Docetaxel, carboplatin and Herceptin).[12]

- **3/5/2014 – 5/15/2014** – Radiation treatment for breast cancer with "locoregional right chest wall irradiation".[13]

- **9/9/2014** – Mrs. Sanford completed seventeen (17) rounds of Herceptin, only, injections administered every two (2) weeks, which began 2/11/2014.[14]

- **9/23/2014** – PET Scan for follow-up breast cancer care showed thyroid nodule.[15]  A biopsy was performed and on 11/19/14, the Pathology Report revealed a diagnosis of "medullary thyroid carcinoma.[16]

- **1/13/15** – Mrs. Sanford underwent a Total Thyroidectomy and Bilateral Neck Dissections for "Medullary thyroid carcinoma with metastasis to the right neck".
    - Prescribed Synthroid upon discharge.[17]

- **1/16/15** – Mrs. Sanford began taking Synthroid.[18]
    - Current Drug Education Monograph provided to Mrs. Sanford by her pharmacy, CVS, states, in part, the following:
        - "**SIDE EFFECTS:** . . . <u>**Hair loss may occur during the first few months of treatment.**</u>  This effect is usually temporary as your body adjusts to this medication."[19]

---

[9] *Id.* at p. 34-35 (emphasis added).
[10] *Id.* at p.40-41(emphasis added).
[11] *Id.* at 45-46; 53-54; and 58-59.
[12] *Id.* at p. 65-66.
[13] Ex. J., Mary Bird Perkins Cancer Center/Dr. Renee Levin medical record excerpt (Centrality Doc. #455315)
[14] Exhibit I., Our Lady of the Lake Medical Records Excerpts at p. 68–9; 107–8; 110-1.
[15] *Id.* at p. 112-13.
[16] *Id.* at p. 00398-99.
[17] *Id*. at p. 00832-40.
[18] *Id.* at p. 00808.  *See also* CVS Pharmacy Records uploaded via Centrality Doc. #455314.
[19] Ex. H, Sanford Affidavit, attachment 1 (emphasis added).

Given the timing of her treatments and the alternative causes of Mrs. Sanford's hair loss which she experienced **both before _and_ after receiving treatment with Docetaxel**, it was not only unreasonable, but, in fact, virtually impossible for Mrs. Sanford to appreciate that her hair loss was permanent, much less be able to connect her hair loss to her treatment with Docetaxel.

## II.    LEGAL STANDARD

Summary Judgment is improper unless the moving party shows there is no genuine issue as to any material fact thereby entitling the moving party to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "In determining whether summary judgment is appropriate, all the evidence and factual inferences must be viewed in the light most favorable to the non-movant and all reasonable doubts must be resolved accordingly.  _Crochet v. Bristol-Myers Squib Co., Otsuka America Pharmaceutical Incorp._, No. 19-30026 (5th Cir. March 13, 2020)(unpublished) (copy attached as Exhibit T) _citing Terrebonne Parish Sch. Bd. v. Mobil Oil Corp._, 310 F.3d 870, 877 (5th Cir. 2002

"[A] prescription claim is often pregnant with facts" to be resolved by a trier of fact. _Chiasson v. Medtronic Inc._, Nos. 16-789; 16-3552; 16-3721, 2016 WL 4191837 at *5.  "In cases of medical products liability, the accrual of a case and the reasonableness of delay in filing suit often hinge on the testimony of the plaintiff and his or her doctor." _Id._  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 255 (1986).  The application of "_contra non valentem_ is generally a question of fact that may go to the jury for resolution." _Body by Cook v. Ingersoll-Rand Co._, 39 F.Supp.3d 827, 838 (E.D. La. 2014).

## III.     ARGUMENT

### A.  Louisiana Law on Prescription and Application of *Contra Non Valentem*

The Louisiana applicable statute of limitations, or prescriptive period, for actions under the Louisiana Product Liability Act ("LPLA") is one year from the day the injury or damage is sustained. LA. CIV. CODE art. 3492. *See also Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 2012-270 (La.App. 3 Cir. 2012), 99 so.3d 739, 741 (noting application of LA. CIV. CODE art. 3492 to claims asserted under LPLA). "This prescription commences to run from the day injury or damage is sustained." *Id.* Louisiana law dictates that damages are considered "sustained" "only when [the damage] has manifested itself with sufficient certainty to support accrual of a cause of action." *Cole v. Celotex Corp.*, 620 So.2d 1154, 1156 (La. 1993)(citing *McCray v. New England Ins. Co.*, 579 So.2d 1156 (La. App. 2 Cir. 1991)). Louisiana law mandates "that prescription statutes are to be strictly construed against prescription and in favor of the claim sought to be extinguished." *Crochet,* No. 19-30026 at *10 *citing Bailey v. Khoury*, 2004-0620 (La. 1/20/05), 891 So.2d 1268, 1275.

Additionally, Louisiana law recognizes the doctrine of *contra non valentem*, "which is a judicially created exception to the general rules of prescription that is applied to ameliorate the sometimes harsh consequences resulting from the strict interpretation of prescription statutes." *Morgan v. Entergy New Orleans, Inc.*, 234 S.3d 113. 116 (La. App. 4 Cir. 2017). "The contra non valentem doctrine operates to suspend prescription when the plaintiff is prevented from acting under one of four scenarios: . . . . (3) where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action; and (4) where the cause of action is not

7

known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant." *Id.*

Under the fourth scenario, "prescription does not run against one who is ignorant of facts upon which the cause of action is based as long as such ignorance was not willful, negligent, or unreasonable." *Fontenot v. ABC Ins. Co.*, 95-1707 (La. 06/07/96); 674 So.2d 960, 963. "[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may be responsible for the specific injury." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010). "The prescriptive period begins when a potential plaintiff discovers or should have discovered the delict, the damage, and the relationship between the two. Constructive knowledge is 'more than apprehension that something might be wrong but less than actual knowledge." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 299 (1999)(internal citations omitted) *quoting The Kendall Co. v. Southern Medical Supplies*, 913 F.Supp. 483, 488 (E.D.La. 1996). "When a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period does not begin to run until he has a reasonable basis to pursue a claim against a specific defendant." *Chevron USA, Inc.,* 604 F.3d at 894.[20]

## B. There are Genuine Issues of Material Fact Concerning When Ms. Sanford Could, or Should, Have Discovered Her Injuries and Their Relationship to Docetaxel

Plaintiff does not dispute that she was advised by her healthcare providers that she would experience hair loss a result of her breast cancer treatment. However, genuine issues of fact exist as to whether Mrs. Sanford could have reasonably determined her hair loss may have been permanent prior to 2016. *Contra non valentem* suspends "the running of prescription until such

---

[20] *See also Chochet*, No. 19-30026 at *11, applying the standard of *Luckett* in finding summary judgment was not appropriate as "'it was not unreasonable for the plaintiff to not be aware' of the connection" between his injury and the fact it was caused by malpractice.

time as the plaintiff knew or reasonably should have known that his or her damages were the fault of the defendant's negligent act." *Carter v. Haygood*, 04-0646 (La. 01/19/05), 892 So. 2d 1261, 1268.

In this case, Mrs. Sanford did not know she had suffered permanent alopecia – much less that it was attributable to her use of Docetaxel – until she saw an attorney advertisement in 2016.[21] Defendant Hospira asserts it is "undisputed . . . that Mrs. Sanford knew or should have known of a possible connection between Docetaxel and her alleged injury more than one year before she filed suit." (Memo. Br., Doc. 9508-1 at p. 9). However, this representation is simply inaccurate. As set forth below, Mrs. Sanford did not know, and could not have reasonably known, her hair loss might be permanent prior to 2016.

1. <u>Written Information Provided to Mrs. Sanford Specified Hair Loss Would Be Temporary</u>

Judy Owens is a certified oncology nurse practitioner who worked at Hematology and Associates in 2015 and was involved in the care and treatment of Mrs. Sanford.[22] Nurse Owens conducted a teaching session with Mrs. Sanford regarding the treatment regimen prescribed by Dr. Patton.[23] During the teaching session, Nurse Owen provided Mrs. Sanford with Educational Handouts containing information about the four (4) chemotherapy drugs she was prescribed. The Handouts concerning Adriamycin, Taxotere and Cytoxan/Carboplatin all warn of the potential for hair loss. The Adriamycin and Taxotere handouts, explicitly state the following:

> "**side effects are <u>almost always reversible</u> and will go away after treatment is complete**."

---

[21] Ex. B, Sanford Dep., 103: 21-2; 205: 16-9; Ex. H., Sanford Affidavit, ¶3.
[22] Ex. K, Judy Owens Deposition, 20-1: 24-23.
[23] *Id.* at 28, 31-2.

Ex. C, Adriamycin Handout at p. 2; Ex B, Taxotere Handout at p. 2, (emphasis added).

The Handout Mrs. Sanford received for Cytoxan/Carboplatin contained similar language:

> Hair Loss:  <u>Temporary</u> – usually begins 3-6 weeks after the start of therapy.
> <u>Hair will grow back after treatment is completed</u> although the color and/or
> texture may be different.

Ex. C, Cytoxan Handout at p. 3 (emphasis added).   Additionally, a Chemotherapy Handout

provided to Mrs. Sanford advised:

> Chemotherapy can cause hair loss.  <u>Your hair will grow back, but it may be
> somewhat different in color and texture.</u>

Ex. E, Chemo Handout (emphasis added).

Mrs. Sanford's understanding was consistent with the information contained in the

Educational Handouts outlined above.  Specifically, Mrs. Sanford testified:

> Q.  And what do you remember about the information in those documents?
>
> A. I remember no, no hair loss <u>no permanent hair loss</u>.  I remember for the
> Taxotere, they say hair loss, but no permanent hair loss.
>
> . . .
>
> A.  It say[s]—it didn't say 'permanent hair loss.'  <u>It say[s]—all it [said was]</u>
> <u>'hair loss', so in my, in my way, I'm hoping my hair will grow back</u>.

Ex. A, Sanford Dep. 29: 10-14; 30: 12-14.

2.  <u>Alternative Cause of Mrs. Sanford's Hair Loss Resulting from Adriamycin, Only,
Treatment</u>

As to Mrs. Sanford's initial chemotherapy treatment with Adriamycin alone, Nurse Owen

testified as follows:

> -  "Especially when a patient was getting <u>Adriamycin, I wanted them to be prepared</u> that their
> hair doesn't fall out that day, but in about a week, in about 23, 36-hour period, their <u>hair</u>

comes out in giant clumps, and it is usually very upsetting. . . . I would <u>recommend or just say that some people prefer to get their hair cut short</u>" so it would be less traumatic.[24]

- Mrs. Sanford "had <u>three cycles of **Adriamycin.  So most people would be completely bald by the second one**</u>."[25]

Oncologist, Dr. Judd Patton, treated Mrs. Sanford for her bilateral breast cancer from June 12, 2013, until his retirement in August 2014.[26]  Relative to Mrs. Sanford's hair loss caused by Adriamycin, Dr. Patton testified he informed Mrs. Sanford that she could expect "complete" hair loss.  Specifically, Dr. Patton testified:

- "Based on the chemotherapy agent, we have an idea of which patients will have hair loss and how much it will be. . . . So we know, for example, **Adriamycin, the hair loss will be most oftentimes complete.  Now, there will be a regrowth of hair**."[27]

- "[W]e expected that, after **<u>a complete shedding of the hair – with Adriamycin</u>**, of course, that most patients, but not all, would have a significant hair regrowth.  And so we--I told patients as a rule that after –**with Adriamycin, they were going to lose their hair in two or three weeks, so they might as well cut their hair, get it really short before that occurred.**  Because when it occurred, they would be emotionally upset."[28]

- "[T]he **Adriamycin experience earlier, that hair loss would be complete**. . . . So possibly based on my own experience **I would highlight something that I wanted the patient to know**."[29]

---

[24] *Id.* at p.53-4.

[25] *Id.* at p. 69 (emphasis added).  Nurse Owen saw Mrs. Sanford again on November 5, 2013, and recalled Mrs. Sanford "had lost her hair and had . . . a little wrap around her head."  *Id.* 15: 16-18.

[26] Ex. G., Patton Dep., 9: 9-10; 14: 2-21.  Dr. Patton recommended Mrs. Sanford undergo chemotherapy treatment of "Adriamycin, (3) cycles" followed by TCH (Taxotere carboplatin and herceptin) radiation and then Herceptin, only, treatment.  With the "goal to treat both cancers at the same time."  *Id.* at 21-2: 23-20.  He prescribed "a higher dose of Adriamycin" for Mrs. Sanford because of her "aggressive breast cancer."  *Id.* at 22: 21; 27: 5-7, 18-19.

[27] *Id.* at p. 32: 3-14 (emphasis added).

[28] *Id.* at p. 45-6: 17-1 (emphasis added).

[29] *Id.* at p. 56: 5-14 (emphasis added).

Mrs. Sanford testified that she began to experience hair loss "<u>after her first dose of Adriamycin.</u>"[30]  She began to wear a wig during her course of treatment with Adriamycin, only, due to the amount of hair loss she was experiencing.[31]

Based on this testimony of both Dr. Patton and Nurse Owens, it was completely reasonable for Mrs. Sanford to believe her hair loss was an expected side effect of her treatment with Adriamycin – independent of any side effects which may have been caused by Docetaxel.

3. <u>Testimony Regarding Whether Mrs. Sanford Could Expect Her Hair Loss to be Temporary and Would Regrow</u>

Mrs. Sanford was advised her hair loss from chemotherapy would be temporary.  Nurse Owens testified as follows:

- "<u>Usually say and of course **most people get their hair back**, and in my **26 years I don't know of anybody else who had permanent hair loss**</u>."[32]

- "[W]hen [she] advised a patient that most people get their hair back, . . . [she was] **not** communicating a warning to Ms. Sanford that if she used Docetaxel she may experience permanent hair loss."[33]

- When she discussed the probability of hair loss with Mrs. Sanford in 2013, she was "<u>talking about a likely probability of **temporary hair loss**</u>" . . . "**not** <u>discussing a likely probability of **permanent hair loss** . . .</u> ."[34]

- The warning of a risk of hair loss referred to in the Patient Consent to Medical Treatment was **NOT "warning the patient of permanent hair loss"** based on her "knowledge and experience".[35]

---

[30] Ex.  A., Sanford Dep., 143: 15-20 (emphasis added).
[31] Ex. H., Sanford Affidavit, ¶1.
[32] Ex. K., Owens Dep., 15-8 (emphasis added).
[33] *Id.* at 51: 10-20.
[34] *Id* at 55: 7-18 (emphasis added).
[35] *Id.* at 67: 18-25 (emphasis added).  *See also* Ex. L., Patient Consent to Medical Treatment or Surgical Procedure and Acknowledgement of Receipt of Medical Information of 8/6/13.

As to whether Mrs. Sanford was told her hair loss from chemotherapy would be temporary vs. permanent, Dr. Patton testified:

-   The risk of hair loss reflected in the Patient Consent form did **not** "say anything with respect to whether hair loss would be temporary or permanent."[36]

-   He was **not** "aware of" any patients that experienced permanent alopecia from Docetaxel prior to August 2013 – the time Mrs. Sanford's treatment began.[37]

-   He "did warn patients that they would have hair loss and that their hair <u>may not grow back</u> ***completely***. So, if you take that to mean [warning of] 'permanent hair loss' you could say yes."[38]

Mrs. Sanford's testimony was consistent with the testimony of Nurse Owen and Dr. Patton outlined above. Mrs. Sanford testified Nurse Owens "never told [her] about permanent hair loss . . . ."[39] Similarly, Mrs. Sanford testified that Dr. Patton "didn't tell [her] about the permanent hair loss . . . . I'm hoping all the time that my hair was going to grow back."[40]

Based on this testimony, it was entirely reasonable for Mrs. Sanford to rely on the information she was provided by Dr. Patton and Nurse Owen in concluding her hair loss was temporary and would regrow.

4.  <u>Additional Alternative Cause of Mrs. Sanford Hair Loss – Intervening Diagnosis of Medullary Thyroid Cancer and Treatment with Synthroid</u>

As part of her follow-up breast cancer care and treatment, Mrs. Sanford underwent a PET Scan in September 2014 and was found to have medullary thyroid cancer - *<u>less than one (1) month</u>*

---

[36] Ex. G., Patton Dep., 31: 17-21; Ex. L., Patient Consent to Medical Treatment Form.
[37] *Id.* at 57: 12-18.
[38] *Id.* at 60: 8-12. This testimony is consistent with the Chemo Handout: "hair will grow back, but may be somewhat different in color or texture."
[39] Ex. A., Sanford Dep., 89: 19-20.
[40] *Id.* at p.106: 9-12.

*after completing her breast cancer treatment regimen*.[41]   Mrs. Sanford underwent a total

thyroidectomy and began taking the hormone replacement drug Synthroid on January 16, 2015.[42]

Mrs. Sanford was provided product information/warnings by her pharmacy concerning

Synthroid, the current version of which is attached to her Affidavit, and states:

> "**SIDE EFFECTS: . . . <u>Hair loss may occur during the first few months
> of treatment.</u>**  This effect is usually temporary as your body adjusts to this
> medication."

Ex. H., Sanford Affidavit att. 1 (emphasis added).

Mrs. Sanford is treated by an endocrinologist, Dr. Husain, and undergoes frequent blood

tests to adjust her Synthroid medication.[43]  Her dosage of Synthroid has been adjusted on

multiple occasions since 2015.[44]

5. <u>Mrs. Sanford's Observation of Other Breast Cancer Survivors' Hair Regrowth</u>

As part of her recovery, Mrs. Sanford began participating in a breast cancer survivors'

group in 2015.[45]  Mrs. Sanford testified

> A. . . Some of my survivor group, my support group, **they had hair grow
> back.**
>
> Q. **So based on your friend's experience, you believed your hair would
> grow back?**
>
> A. **Yes**.

Ex. A, Sanford Dep., 137: 2-6 (emphasis added).

---

[41] Ex. I., Our Lady of the Lake/ Dr. Bienvenu Med. Rec. at p. 112-3.
[42] Ex. A., Sanford Dep., 40: 8-9.
[43] Ex. A., Sanford Dep., 68-9: 13-9.
[44] *Id.* at 69: 16-19.
[45] *Id.* at 207: 2-19.

Mrs. Sanford was given continued hope of her hair returning by "seeing my other support group friends, ladies that in the support group with me, their hair [grew] back."[46]

The Louisiana Supreme Court found in *Cole v. Celotex Corp*, "[w]hen prescription begins to run depends on the reasonableness of a plaintiff's action or inaction" based on "the totality of the circumstances."[47] In that case, the plaintiff began to exhibit symptoms in 1982 and was told to stay away from asbestos. He underwent another exam in 1983 where doctors recognized the potential of asbestos related lung disease, but were unable to rule out alternative causes of his condition. *Id.* The plaintiff was finally diagnosed with asbestosis in 1985 and filed suit with the one-year statute of limitations. The Louisiana Supreme Court concluded that because his condition "could be the result of several causes . . . based on the totality of the circumstances" the prescriptive period was tolled and his suit was timely. *Id.*[48]

In the instant case, the information received by Mrs. Sanford that her hair loss was temporary and the alternative causes of her hair loss, the "totality of the circumstances", led her to the reasonable conclusion that her hair loss was temporary and the prescriptive period did not begin to run based on established Louisiana law.[49]

### C. Mrs. Sanford Undertook a Reasonable Investigation Once Placed on Notice that her Hair Loss May Be Permanent

---

[46] *Id.* at 188: 19-21.

[47] *Cole v. Celotex Corp.*, 620 So.2d at 1157.

[48] *See also Cortez v. DePuy Orthopaedics, Inc.*, 2016 WL 633665 *not reported* (E.D.La. Feb. 17, 2016)(relying on *Cole v. Celotex Corp.* in holding plaintiff was aware initial knee surgery failed but was unaware of reason for failure until time of revision surgery due to potential alternative causes of injury).

[49] Very recently, the Fifth Circuit applied its rulings in *Luckett* and *Carter*, in disputed material facts existed as to whether "it was reasonable for the [the plaintiff] to remain unaware of the connection between [his] damages and Abilify." *Crochett*, unreported, No. 19-30026 at p. 6. Ex. T.

"[W]hen a plaintiff suspects something is wrong, he must 'seek out those whom he believes may be responsible for the specific injury.'"   *Chevron USA, Inc.*, at 894 *quoting Jordan v. Employee Transfer Corp.*, 509 So.2d 420, 424 (La. 1987).   "When a plaintiff acts reasonably to discover the cause of the problem, 'the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant.'"   *Id. citing Jordan*, 509 So.2d at 424.

1. Mrs. Sanford Did Not Learn Her Hair Loss May Be Permanent Until 2016

Mrs. Sanford consistently testified she thought her hair loss was temporary until she saw a television advertisement in 2016 at which time she began to look into whether her hair loss might be permanent and what the potential cause might be.[50]

As to when she first she learned her hair loss might be permanent, Mrs. Sanford testified:

- When she "agreed to receive Taxotere" her "understanding was that the hair loss associated with it would be temporary . . . ."[51]   "I didn't know anything about permanent hair loss until I [saw] the commercial."[52]

- Dr. Patton "didn't tell me about the permanent hair loss, that one of the chemos, until I [saw] the commercial on TV.  I'm hoping all the time that my hair was going to grow back."[53]  "No doctor never—no one never told me that I had permanent hair loss.  Like I said, when I [saw] the commercial on TV, that when I called, yes."[54]

- **"After I found out about the permanent hair loss on the TV, that's when I started doing research**."[55]   "Before the commercial, I'm waiting and sitting and waiting, hoping that my hair will grow back." . . . "I was thinking, I was thinking it was going to grow back."[56]

---

[50] Ex. A., Sanford Dep., 17-18: 6-13.
[51] *Id.* at 205: 16-19.
[52] *Id.* at 103: 21-2.
[53] *Id.* at 106: 9-12 (emphasis added).  *See also Id.* at 136: 20-24 (testifying she "understood at the time [she] took chemotherapy that there was a risk of hair loss . . . but always knowing the hair would grow back."
[54] *Id.* at 186: 5-8.
[55] *Id.* at 186: 18-20 (emphasis added).
[56] *Id.* at 188: 5-7, 14-15.

Mrs. Sanford specifically testified:

> Q. And what about that lawyer advertisement prompted you to call an attorney?
>
> A. Because I know that my hair never did grow back, and I took Taxotere, **so I just wanted to get some information about it, so I called**.
>
> Q. Did you retain a lawyer at that point after you spoke with them?  And I'm not looking for you to tell me any conversations you've had with attorneys.
>
> A. Yes.
>
> Q. Prior to seeing the lawyer advertisement, had any of your doctors told you that the docetaxel had caused your hair loss?
>
> A. No.
>
> Q. When was the first time that someone told you that docetaxel may have caused your hair loss?
>
> A. When I [saw] the commercial on TV.

Ex. A., Sanford Dep., 17-8: 7-13 (emphasis added).

Upon seeing the ad, Mrs. Sanford called "to get some information" and turned the investigation over to counsel.[57]

2.  <u>Investigation Undertaken by Counsel Resulted in Notice of Claim in October 2016</u>

Mrs. Sanford contacted counsel some time in August 2016 in response to an advertisement she had seen regarding the potential for permanent hair loss caused by the administration of "Taxotere".[58]  In order to begin counsel's investigation of whether a potential claim existed, Mrs. Sanford executed a Medical Authorization on August 8, 2016.[59]

---

[57] Ex. A., Sanford Dep., 17: 17-18; Ex. H, Sanford Affidavit, ¶3.
[58] Ex. H., Sanford Affidavit at ¶3; Ex. M, Medical Authorization signed by Mrs. Sanford 8/8/16.
[59] Ex. M., Medical Authorization; Ex. H., Sanford Affidavit at ¶3.

Mrs. Sanford was not aware she received Docetaxel - instead of Taxotere – until she was "told so by [her] lawyer."[60]  She testified, she believed "Taxotere" – not Docetaxel - was one of the four (4) chemotherapy drugs she received as part of her breast cancer treatment.[61]  This belief was based on the information she received from her healthcare providers – both written and oral. Mrs. Sanford received an Educational Handout for "Taxotere" (not Docetaxel) with a handwritten notation by Nurse Owen that she would receive "Taxotere, Cytoxan and Herceptin" chemotherapy medications.[62]  Additionally, Dr. Patton and Nurse Owen both testified the discussed Mrs. Sanford's administration of "Taxotere" with her.[63]

However, only after counsel's investigation was it discovered that, in fact, Mrs. Sanford was, in fact, administered Docetaxel manufactured by Defendant Hospira.  Counsel for Mrs. Sanford ordered medical records from her administration facility, Mary Bird Perkins Center, on August 25, 2016.[64]  Counsel's third-party medical records vendor, Choice Legal, faxed the request to Mary Bird Perkins Center on September 23, 2016.[65]  Based on the medical records received by defense counsel, the facility documented its receipt of the medical records request as September 26, 2016, prepared the records for production on September 28, 2016 and appears to have

---

[60] Ex. H, Sanford Affidavit at ¶4.
[61] Ex. A., Sanford Dep., 118: 5-8; 120: 1-5; 123: 1-9.
[62] Ex. B., Taxotere Handout including handwritten notation of "Taxotere Cytoxan Herceptin".
[63] Ex. L., Patient Consent Form documenting "Treatment/Procedure" as "Adriamycin 3 cycles followed by <u>TCH – Taxotere, Carboplatin + Herceptin</u>".  (emphasis added).  Ex. G., Patton Dep.,  21: 2-5; 22-3: 5-19; 26: 23-4; Ex. K., Owens Dep., 26: 1-6; 34: 3-6; 69:17 (noting discussions with Mrs. Sanford concerning administration of Taxotere, not Docetaxel).
[64] Ex. N., 8/25/16 Corr. to Records Custodian of Mary Bird Perkins Center from counsel with Med. Auth. Attached.
[65] Ex. O., 9/23/16 fax cover sheet of from Choice Legal to Records Custodian of Mary Bird Perkins Center.

forwarded the records to Choice Legal on October 10, 2016.[66]  The records provided to counsel were stamped "Printed 9/26/16".[67]

The pharmacy records received by counsel in October 2016, indicate Mrs. Sanford was administered "TCH – Taxotere75/Carbo6/Herceptin8/6).[68]  Counsel contacted the facility to secure the National Drug Code ("NDC") to identify the producer of the chemotherapy drugs Mrs. Sanford was administered.  On November 22, 2016, the Director of Health Information Management at responded with a "Certification of No Billing Records" which stated, in part:

> **no such records exist** in our files, SCIP Reporting Records or itemized billing records **containing NDC Code**.

Ex. R, Certification of No Billing Records (emphasis added).[69]

Based on this information, the very earliest counsel and Mrs. Sanford could have been placed on notice a claim might exist was when the medical records were received, presumably, some time in October 2016.  <u>Even using the "printed 9/26/16" date reflected on the records, Mrs. Sanford's suit was filed against Defendant Hospira within the one (1) year prescriptive period when her suit was filed on September 21. 2017</u>.  Consequently, Defendant's Motion for Summary Judgment it not supported by the facts of this case and should be denied.

## D. Defendant's Argument Contradicts Its Previous Argument in this Litigation and is Contrary to Established Louisiana Law

---

[66] Ex. P., Choice Legal medical records request of 9/23/16 (p. 2 of 4) with Mary Bird Perkins Cancer Center stamp showing dates the following dates: "Date Rec'd:  9/26/16; Prepared: 9/28/16; Prebilled: 9/28/16; [illegible] 10/10/16".  Exhibit P was obtained from records produced by Defendant via Centrality on 4/25/19, Doc. 345774, p. 4624-4625.

[67] Ex. Q., Pharmacy Records excerpts from Our Lady of the Lake Physician Group – Louisiana Hematology Oncology Assc. showing "Printed 9/26/2016 11:31:18AM".  These records were produced via Centrality on February 9, 2018.

[68] *Id.*

[69] On Nov. 29, 2018, the Mary Bird Perkins Cancer Center Director of Health Information Management certified "the attached presents a true and correct copy of the medical records described in your request . . . ."

In a surprising change of position, Defendant Hospira argues Mrs. Sanford's claims are time-barred because she and counsel undertook a reasonable investigation prior to filing suit.  (Doc. 9508-1, p. 11.)  Hospira's current argument is completely counter to its position of March 2018 when Hospira, and other Defendants, asked this Court to dismiss plaintiffs' claims for "fail[ing] to collect Product ID Information prior to filing suit."[70]  Defendant Hospira explicitly argued **"[i]n any lawsuit, Plaintiffs are obligated to determine whether a factual basis exists <u>to sue a particular defendant *prior* to filing suit.</u>"**[71]  The investigation by counsel on behalf of Mrs. Sanford to determine a factual predicate prior to bringing suit against Defendant Hospira is exactly what Hospira correctly argued was required in March of last year.[72]

Essentially, Defendant Hospira is now attempting to have it both ways.  Hospira argued in March 2018 that certain plaintiffs' claims should be dismiss for failing to "collect Product ID Information prior to filing suit"; and now, argues Mrs. Sanford's claims should be time barred because she did exactly what they claim was required in their March 2018 pleading.  Fundamental principles of judicial estoppel, as well a fairness, should prevent Defendant Hospira from advancing this contrary argument.

Moreover, Hospira's argument is completely counter to Louisiana law.  Defendant Hospira's current argument would require Mrs. Sanford and her counsel to sue any possible tortfeasor before knowing whether a claim existed.  This simply is not the law.  Louisiana law is well-established that

---

[70] Ex. S - Defendants' Memo. In Support of Motion to Dismiss Pursuant to CMO No. 12, filed 3/18/18,Doc. 1904-1.
[71] *Id.* at p. 1, FN 2.
[72] *Chevron, USA Inc.* v. Aker Mar. Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010)("When a plaintiff acts reasonably to discover the cause of the problem, the prescriptive period does not begin to run until he has a reasonable basis to pursue a claim against a specific defendant.")

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. **Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage**.

*Jordan v. Employee Transfer Corp.*, 509 S.2d 420, 423 (La. 1987) (emphasis added).

"**The purpose of *contra non valentem* is precisely to avoid this absurdity**." *Carter v. Matrixx Initiatives, Inc.*, 391 Fed.Appx. 343 *citing Jordan*, 509 So.2d at 432 (emphasis added). "[T]he prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Jordan* at 424 (emphasis added).

Mrs. Sanford was administered four (4) separate chemotherapy drugs, and further, was told – verbally and in writing – that she received "Taxotere", instead of the Docetaxel manufactured by Hospira.[73]  Mrs. Sanford and her counsel were not on notice of her claim against Defendant Hospira until their investigation was conducted at which time the prescriptive period began to run.

**E. A Factual Dispute Exists as to Whether Hospira Prevented Mrs. Sanford from Availing Herself of Her Cause of Action in a Way that Tolled the Running of the Prescription under the Doctrine of *Contra Non Valentem***

"[W]here the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action" the doctrine of *contra non valentem* prevents the running of the prescriptive period. *Morgan,* 234 So.3d at 116.  Although discovery on the issue of when Hospira was on notice of the potential risk of permanent alopecia related to Docetaxel and expert reports have not yet been exchanged, discovery has confirmed that Defendant Hospira was on notice of

---

[73] Ex. A., Sanford Dep., 120: 1-5; 123: 1-9; Ex. B., Taxotere Handout with handwritten notation of "Taxotere Cytoxan and Herceptin." Ex. L., Patient Consent Form; Ex. G., Patton Dep., 21: 2-5; 22-3: 5-19; 26: 23-4; Ex. K., Owens Dep., 26: 1-6; 34: 3-6; 69:17 - all indicating "Taxotere" not Docetaxel was administered to Mrs. Sanford.

the potential side effect of permanent alopecia by at least **2013** but did not change its label to warn of same until **September 2017**.

Defendant Hospira's label change to warn of the risk of permanent hair loss in **September 2017**, was, coincidentally, the same month Mrs. Sanford filed the instant lawsuit.  By way of example, discovery in this case has shown:

- In 2012, Hospira's labels in Israel, Hungary, the UK other countries referenced a summary of the risk of permanent hair loss from the TAX 316 study and in July 2013, Hospira changed at least five (5) European labels to the TAX 316 information.

- In April 2013, Hospira hired the Sanofi Vice President of Safety Surveillance and Product Safety, Juergen Schmider, who had responsibilities for Taxotere from March 2011 – April 2013 and was aware of the risk of permanent hair loss from the TAX 316 study.[74]

- In September 2016, after Hospira was purchased by Pfizer, a clinical overview was conducted that revealed 146 cases of alopecia of which 29% were described as "permanent" or "irreversible".[75]

However, Hospira did not seek a label change in the U.S. to warn of the risk of permanent hair loss until March 2017  - more than three (3) years after she received her last dose of Docetaxel and Hospira's label change didn't occur until September 2017 - the same month she filed suit.

Hospira delayed sharing information about permanent hair loss for approximately five (5) years.  Remarkably, Defendant Hospira argues Mrs. Sanford should have discovered her claim and brought the instant lawsuit <u>BEFORE</u> Hospira even got around to changing its label to warn of the risk of permanent hair loss.  Clearly, Defendant Hospira's inaction in failing to warn of the risk of permanent hair loss until September 2017 effectually prevented Mrs. Sanford from "availing

---

[74] Ex. F., Juergen Schmider Dep., 47-9.
[75] March 2017 – HOS002000030958.

[herself] of [her] cause of action" and therefore, the doctrine of *contra non valentem* prevents the running of the prescriptive period.  *Morgan,* 234 So.3d at 116.

## IV.    PSC RESPONSE TO HOSPIRA'S PREMATURE AND IMPROPER REQUEST FOR SANCTION AGAINST OTHER MDL PLAINTIFFS

In its motion for summary judgment against Ms. Sanford, Hospira prematurely and improperly includes complaints about PSC action or inaction in connection with the nomination of Ms. Sanford's case for trial pool number 3.  Hospira further seeks remedies that are unsupported by precedent and Orders in this MDL which, therefore, should be rejected out of hand.

The PSC is disappointed to have received, in this "early motion" which the Court intended to limit to liberative prescription and/or learned intermediary challenges, a demand by Hospira for "conditions on the dismissal" of Ms. Sanford, including its direct and indirect suggestions that a sanction against other individual MDL plaintiffs is somehow appropriate.  Not only is this demand contrary to an agreement that was negotiated and reached between Hospira and the PSC (which Hospira conveniently omits from its inaccurate and incomplete factual statement of the posture of this motion), but it is also contrary to the Court's Orders in this case.[76]

After review of Hospira's papers, the PSC requested that the sections of the brief directed at the PSC and other plaintiffs be voluntarily withdrawn by Hospira until the parties have an opportunity to ask the Court whether it wishes to entertain such a dispute, but Hospira's counsel refused.  Accordingly, and despite Hospira's refusal to delete arguments that are entirely improper in the context of this early motion, the PSC will briefly outline the terms of the agreement for the

---

[76] CMO 14C (Doc. 6789) does not provide for imposition of a "strike" when a party wins a contested motion, and, moreover, even if the Court were inclined to allow a strike, the Court has been clear that the strike would only be allowed against another plaintiff from the same pool (i.e., trial pool 3, in which Ms. Sanford was selected).

Court's benefit, but will refrain from filing a motion to strike the improper arguments unless the Court instructs the parties that it wishes to consider the issues now.

Hospira had the subject HIPAA authorization signed and dated by Ms. Sanford in its possession via MDL Centrality for over two years prior to taking the position that Ms. Sanford's claims had prescribed under Louisiana law.  Hospira notified the PSC of this position last month.  While it is true that Hospira included a proposal to resolve its concerns without motion practice, the substance of its proposal is misstated in its brief, or is at best incomplete.  Hospira proposed the following to the PSC to avoid motion practice: (1) immediate dismissal with prejudice (by Ms. Sanford); (2) payment of an undisclosed amount of costs (by Ms. Sanford); and (3) a strike of one of the recently selected Trial Pool 5 plaintiffs (from the PSC).  Plaintiffs Liaison Counsel informed counsel for Ms. Sanford of Hospira's demands.  Ms. Sanford rejected the portions of the proposal directed at her, and, for the reasons set forth more fully below, the PSC rejected the proposal that the PSC agree to a strike of an unrelated plaintiff's case from Trial Pool 5.

The PSC engaged in a negotiation with Hospira, but set aside Hospira's strike proposal given the improper nature of the proposal's attempt to pit the interests of all MDL plaintiffs against the interests of an individual plaintiff and her counsel.  In the discussions, counsel for Hospira acknowledged that the PSC would not engage in a negotiation related to strikes, so that term was not "on the table".  The PSC proposed that Hospira not request a monetary sanction of cost/fee shifting or a strike in exchange for the plaintiffs' agreement to produce general expert reports to Hospira while also agreeing to stay any requirement that Hospira conduct any other  discovery in connection with Ms. Sanford's case (i.e., their only case selected to proceed through phase II discovery for MDL Trial 3) to avoid expending additional costs and resources in the case.  Under the PSC's understanding of the agreement, a portion of which is mostly memorialized in the joint

24

email submitted by Mr. Olinde to the Court on March 19, 2020, the above terms were accepted by Hospira.[77]

The substantive request of Hospira for a strike in Trial Pool 5 based on its belief that the Court will grant its motion for summary judgment and dismiss a Trial Pool 3 plaintiff's case lacks any merit. Assuming, arguendo, that the Court dismisses Ms. Sanford's claims, which plaintiff denies, the Court should not permit Hospira to de-designate one of the four Hospira plaintiffs recently nominated by the parties for Trial Pool 5.  Plaintiff is a Trial Pool 3 plaintiff and Hospira seeks removal of a Trial Pool 5 plaintiff.  Hospira improperly cites CMO 14C as authorizing de-designation.  The de-designation procedures in CMO 14C are only triggered by a plaintiff's unilateral attempt to remove a case from a trial pool without good cause or a health condition preventing her from proceeding. This Court has never authorized a case to be de-designated (from a different pool) when a motion for summary judgment is granted.  No provision of CMO 14C permits de-designation of a plaintiff from a trial pool if the Court grants dismissal as a result of a contested motion.

Moreover, Hospira's request is directly contrary to the Court's prior decisions with regard to de-designation of plaintiffs as conveyed to the parties in chambers.  Because of the actions of two other plaintiffs (Ms. Warren and Ms. Gabriel) who sought unilateral removal from Trial Pool 3, the Sanofi Defendants filed a notice a de-designation of two plaintiffs (Doc. 6807), seeking to strike Ms. Earnest and Ms. Thibodeaux from eligibility for Trials 1 and 2.  The Court denied that request and determined that a de-designated plaintiff must be from the same round of trial

---

[77] While the PSC firmly believes the improper and inaccurate statements from page 2 and argument section II of Hospira's memorandum should be stricken or withdrawn, the PSC has elected to refrain from filing a motion to strike until the Court has an opportunity to review this response.  Should the Court wish to receive declarations of counsel in this regard, email correspondence between counsel, or a more complete briefing of the side agreement, the PSC would request that a schedule be entered for such briefing.

discovery pool plaintiffs as the plaintiff dismissed.  As such, Sanofi was permitted to de-designate

only Ms. Collins and Ms. Stevenson, both of whom had been selected to Trial Pool 3. Doc. 6929.

For all of the above reasons, Hospira's request for a sanction against plaintiffs is improper,

premature, and misguided, and therefore should be denied.

## V.    CONCLUSION

Pursuant to the Court's previous ruling in this litigation applying Louisiana law on

liberative prescription and *contra non valentem*, Plaintiff Sanford's claims are not prescribed.  Mrs.

Sanford was not aware her hair loss might be permanent until August 2016 at which time she began

an investigation, through her counsel, which – at the very earliest – revealed the existence of a

claim in October 2016, when counsel received her medical records.[78]  Defendant Hospira is unable

to point to any point in time prior to October 2016, during which Mrs. Sanford could have possibly

been on notice of her claim against this particular Defendant.  Mrs. Sanford filed the lawsuit less

than one (1) year later on September 21, 2017.  Consequently, Defendant Hospira's Motion for

Summary Judgment fails as a matter of law and should be denied.

Dated: April 9, 2020                              Respectfully submitted,

/s/ *Michael P. McGartland*
Michael P. McGartland
MS Bar No. 100487
McGartland Law Firm, PLLC
University Centre I, Suite 500
1300 South University Drive
Fort Worth, Texas 76107
Telephone: (817) 332-9300
Facsimile: (817) 332-9301
mike@mcgartland.com
*Plaintiff's Counsel*

/s/ *Christopher L. Coffin*

---

[78] Even using the "printed 9/26/16" date reflected on the medical records, Plaintiff's suit was still filed within the one (1) year requirement.

Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2020, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of

record who are CM/ECF participants.

*/s/ Michael P. McGartland*
MICHAEL P. MCGARTLAND