# EXHIBIT G

## DR. JUDD PATTON, M.D.
## DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION          MDL NO. 2740

This Document Relates To:              SECTION "N"(5)

Dora Sanford vs. Hospira Inc.,         JUDGE MILAZZO
Et al
No. 2:17-cv-09417                       MAG JUDGE NORTH

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEO DEPOSITION OF DR. JUDD PATTEN, M.D.,

taken on Tuesday, February 4, 2020, at the law

offices of Chaffe McCall, 8550 United Plaza

Boulevard, Training Center Room, Baton Rouge,

Louisiana

REPORTED BY:  TAMRA K. KENT  C.C.R.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Court Reporters of Louisiana, LLC

9522 Brookline Avenue, Suite 217

Baton Rouge, Louisiana 70809

(225)201-9650 Office \* (225)201-9651 Fax

1                    I N D E X

2                                      Page

3    Caption                    1

4    Appearances                3

5    Agreement of Counsel       4

6    Examination

7        BY MS. WADHWANI        6

8        BY MR. CANTELO         40

9    Re-examination

10       BY MS. WADHWANI        59

11

12   Reporter's Certificate     61/62

13

14              *   *   *   *   *

15   EXHIBITS:

16   #1...  Miss Sanford's Visit June 12, 2013...    12

17   #2...  July 25, 2013 Progress Note...........   16

18   #3...  August 2, 2013 Progress Note..........   24

19   #4...  Informed Consent Form................    30

20

21

22

23

24

25

```
 1     APPEARANCES:
 2     Representing the Plaintiff:
 3         PENDLEY, BAUDIN & COFFIN
           Attorneys at Law
 4         Post Office Drawer 71
           Plaquemine, Louisiana 70765
 5
           BY:  MR. EVAN P. FONTENOT
 6
                     -and
 7
           MARTZELL, BICKFORD & CENTOLA
 8         Attorneys at Law
           338 Lafayette Street
 9         New Orleans, Louisiana 70130
10         BY:  MR. LARRY J. CENTOLA
11
12     Representing the Defendants:
13         CHAFFE McCALL
           Attorneys at Law
14         1100 Poydras Street, Suite 2300
           New Orleans, Louisiana 70163
15
           BY:  MR. PETER J. ROTOLO, III
16
                     -and-
17
           WILLIAMS & CONNOLLY
18         Attorneys at Law
           725 Twelfth Street, N.W.
19         Washington, D.C.  20005
20         BY:  MS. KATHERINE PETTI
               MS. NEELUM J. WADHWANI
21
22
       Videographer:  Shawn O'Rourke
23
24     Reported by:  Tamra K. Kent, Certified Court
                     Reporter #83070, in and for the
25                   State of Louisiana
```

1                    S T I P U L A T I O N

2

3          IT IS STIPULATED AND AGREED by and between

4    Counsel that the video testimony of the witness,

5              DR. JUDD PATTEN, M.D.,

6    is hereby being taken pursuant to Notice under the

7    Federal Rules of Civil Procedure for all purposes

8    permitted under law.

9

10         The witness waives the right to read and

11   sign the deposition.  The original is to be

12   delivered to and retained by Neelum Wadhwani,

13   Attorney, for proper filing with the Clerk of

14   Court.

15

16         All objections, except those as to the form

17   of the questions and/or responsiveness of the

18   answers, are reserved until the time of the trial

19   of this cause.

20

21              *   *   *   *   *

22

23         Tamra K. Kent, Certified Court Reporter in

24   and for the State of Louisiana, #83070, officiated

25   in administering the oath to the witness.

```
 1              DR. JUDD PATTEN, M.D., having been first
 2    duly sworn, was examined and testified as follows:
 3                        EXAMINATION
 4         THE VIDEOGRAPHER:
 5              Today is February 4th of 2020.  It's
 6         approximately 2:29 p.m.  This is the
 7         videotaped deposition of Dr. Judd Patten
 8         taken in the matter of Dora Sanford versus
 9         Hospira, Inc., et al.  This deposition is
10         being held at the offices of Chaffe McCall,
11         located at 8550 United Plaza Boulevard in
12         Baton Rouge.
13              My name is Shawn O'Rourke,
14         videographer.  The court reporter today is
15         Tamra Kent.  Would counsel present please
16         introduce themselves and state their
17         affiliation.
18         MR. CENTOLA:
19              Larry Centola and Evan Fontenot for the
20         plaintiff.
21         MS. WADHWANI:
22              Neelum Wadhwani from Williams &
23         Connolly for Hospira.
24         MS. PETTI:
25              Katherine Petti from Williams &
```

1          Connolly also on behalf of Hospira.

2          MR. ROTOLO:

3              Peter Rotolo of Chaffe McCall on behalf

4          of Hospira.

5          THE VIDEOGRAPHER:

6              Will the court reporter please swear in

7          the witness.

8          (Witness duly sworn.)

9    BY MS. WADHWANI:

10       Q.  Good afternoon, Dr. Patten.

11       A.  Good afternoon.

12       Q.  My name is Neelum Wadhwani, and I represent

13   Hospira.

14          You and I have never met before today; is

15   that correct?

16       A.  That's correct.

17       Q.  Do you understand that we are here today

18   because of a lawsuit that Dora Sanford, a former

19   patient of yours, has filed against Hospira?

20       A.  That's my assumption, yes.

21       Q.  Do you understand that you've not been

22   named as a defendant in this case?

23       A.  I do.

24       Q.  And, certainly, nobody on behalf of my

25   client, Hospira, has indicated to you that you did

1   anything wrong in your care and treatment of

2   Mrs. Sanford, or that they intend to sue you in

3   this case; is that correct?

4       A.  That's correct.

5       Q.  Other than those letters requesting your

6   deposition that my firm sent to you, you and I have

7   never communicated before today; is that correct?

8       A.  That's correct.

9       Q.  Have you spoken with me or any counsel for

10  Hospira?

11      A.  No.

12      Q.  You have communicated with a paralegal

13  named Cindy Bray at Chaffe McCall in New Orleans;

14  is that correct?

15      A.  That's correct.

16      Q.  What did you discuss with Miss Bray?

17      A.  I understand she's also a nurse

18  practitioner or has medical background.  And the

19  only thing we discussed was the deposition, the

20  timing and aspects of where it would be held.

21      Q.  Did you have any communications related to

22  your care and treatment of Mrs. Sanford with

23  Miss Bray?

24      A.  No.

25      Q.  Have you had any communications related to

1    your care and treatment of Mrs. Sanford with me or

2    any counsel or paralegals for Hospira?

3        A.   No.

4        Q.   Do you understand that you are here today,

5    however, to testify about your care and treatment

6    of Mrs. Sanford?

7        A.   Yes.

8        Q.   Do you have an independent recollection of

9    Mrs. Sanford?

10       A.   I recollected her name but not all the

11   details of her care or her medical issues until I

12   received the records that was brought to my house

13   by Federal Express.

14       Q.   When you say "the records," are you

15   referring to medical records for Mrs. Sanford?

16       A.   Yes.  These medical records I have with --

17   that I brought with me were delivered to my home.

18   And they appear to be the records from Louisiana

19   Hematology Oncology Associates, my former practice.

20       Q.   Are those medical records reflecting your

21   care and treatment of Mrs. Sanford?

22       A.   They do.

23       Q.   Have you read those records?

24       A.   Yes.

25       Q.   When did you review those records last?

**DR. JUDD PATTEN, M.D.**                                    2/4/2020

Page 9

1        A.   Last?  Yesterday.  In detail, every page.

2        Q.   When is the last time you saw Mrs. Sanford?

3        A.   From the record, it appears that I saw her

4   in August of 2014.  That's my recollection.  I

5   could go to that progress note if you wish.

6        Q.   That's okay.

7             Your best understanding, based on your

8   recollection and your review of your records, is

9   that you last saw Mrs. Sanford in August 2014,

10  correct?

11       A.   That's correct.

12       Q.   When is the last time you spoke with

13  Miss Sanford?

14       A.   That day.

15       Q.   Are you aware that Mrs. Sanford has been

16  free of breast cancer for over five years?

17       A.   Now I am.  I wasn't before yesterday.

18       Q.   Is the fact that she has been free of

19  breast cancer for five plus years significant to

20  you?

21       A.   Very significant given the extent of her

22  disease when she first presented for consultation.

23  Very significant.

24       Q.   And what do you mean by that?

25       A.   She had advanced disease, Stage III.  And

```
 1    the prognosis, based on the number of lymph nodes
 2    that were positive at the time of surgery, is
 3    considered quite great.  And survival curves for
 4    patients who present with similar findings -- and
 5    she not only had one type of breast cancer; she had
 6    two -- and those survival curves over five years
 7    are not good at all.
 8         I would -- I would have to guess, but I
 9    would say that less than 90 percent survival.
10    Q.   And, I'm sorry, the air conditioning just
11    kicked on, and I'm not sure I heard the last what
12    you said.
13         Did you say when Miss Sanford first
14    presented to you, based on her breast-cancer
15    presentation, you thought she had less than a
16    90 percent chance of survival?
17         MR. CENTOLA:
18              Objection to form.
19         THE WITNESS:
20              That wasn't at the first presentation.
21              It was after her surgery was performed and
22              the complete analysis of her lymph-node
23              status and of the -- what we call the
24              oncogene status.
25              When those things became, you know,
```

```
 1              available, it was clear that she was facing

 2              a very challenging prognosis.  In fact,

 3              people with this presentation might have

 4              been randomized at one point in our

 5              history -- and I would have to go back to a

 6              clinical trial -- where they received high-

 7              dose chemotherapy and bone-marrow

 8              transplantation in an attempt to increase

 9              their survival.

10                  She wasn't offered a clinical trial at

11              this time -- at that time -- but that was

12              the gravity of her situation.

13    BY MS. WADHWANI:

14        Q.  Okay.  When did Miss Sanford first become

15    your patient?

16        A.  June 12, 2013.

17        Q.  Is your knowledge of that date because you

18    are reviewing a medical record from June 12, 2013?

19        A.  That's correct.

20        Q.  Dr. Patten, I see and appreciate that you

21    have records in front of you?

22        A.  Yes.

23        Q.  I'm going to mark what is likely some of

24    those same records as an exhibit.

25        A.  Okay.
```

**DR. JUDD PATTEN, M.D.**                                    2/4/2020

1        Q.   Once you have confirmed that you are

2    looking at the same document I have marked as an

3    exhibit, you are free to consult your document.

4    But for the record, we are going to have to mark

5    certain documents as exhibits so that the court

6    reporter, at the end of the day, can take those and

7    make that part of your deposition.  Is that fair?

8        A.   I understand.

9        Q.   I'm going to hand you what I have marked as

10   Exhibit #1.

11            (Whereupon, the document was duly marked

12            for identification as "Exhibit #1" and

13            attached hereto.)

14            What is the document that I have handed you

15   that I've marked as Exhibit #1?

16            MR. CENTOLA:

17                 Do you have a copy?

18       A.   It is Exhibit #1, Hematology Oncology

19   Consultation, Our Lady of the Lake Physician Group,

20   Louisiana Hematology Oncology Associates.  Dora

21   Sanford.  Date of birth, 7/27/57.  Medical record

22   L131653, on June 12, 2013.

23       Q.   Have you seen this document before?

24       A.   Yes.

25       Q.   Did you dictate the contents of this

1     document?

2         A.   Yes.

3         Q.   Does this document reflect your notes of

4     the June 12, 2013, visit with Mrs. Sanford?

5         A.   Yes.

6         Q.   Dr. Patten, during your career, was it your

7     regular practice to try and maintain complete and

8     accurate records of your patient's medical

9     treatment?

10        A.   Yes.

11        Q.   Did you rely on the accuracy and

12    completeness of your medical records in order to

13    help you provide proper treatment to your patients?

14        A.   Yes.

15        Q.   Was it your practice to record the symptoms

16    and complaints that patients report to you?

17        A.   Yes.

18        Q.   Would you agree that the medical records

19    for your patients, including Mrs. Sanford, contain

20    the information you deemed relevant to your care of

21    her?

22        A.   Yes.

23        Q.   And would you defer to your medical records

24    for information you do not recall about

25    Mrs. Sanford?

1      A.   Yes.

2      Q.   Turning back to the June 12, 2013, record

3   that we have marked as Exhibit #1, when

4   Mrs. Sanford first came to you in 2013, what was

5   your impression of her breast cancer?

6           MR. CENTOLA:

7               Objection to form.

8   BY MS. WADHWANI:

9      Q.   So from time to time, Mr. Centola may

10  object to my question.  He is signaling to me that

11  he thinks there's something wrong with the form of

12  my question.  After Mr. Centola lodges any

13  objection, you should, please, go ahead and answer.

14     A.   My impression was that -- that the patient

15  appeared to have three, separate lesions.  Two in

16  the left breast and one in the right.

17          Because of the biopsy, I felt that it was

18  great importance to note that one was HER2/neu

19  oncogene overexpressing.  And the HER2/neu

20  overexpression is an indication for postoperative

21  adjuvant therapy.

22          And I discussed with her how this was an

23  important finding and how it was related to

24  potentially how malignancy spreads, with the growth

25  factor and vascular endothelia growth factor

**DR. JUDD PATTEN, M.D.**                                    2/4/2020

1    associated with the HER2/neu gene.

2        Q.   And just so we are clear for the record,

3    were you just reading from Exhibit #1 under the

4    section called "Impression"?

5        A.   I was.

6        Q.   When you wrote that Mrs. Sanford had a

7    lesion which was HER2/neu overexpressing, what does

8    that mean in layman's terms?

9        A.   It means that there was a gene activated or

10   duplicated many times within the cancer cell that

11   allows that cell a greater propensity to enter the

12   bloodstream and signal the production of new blood

13   vessels to feed it so that it can grow wherever it

14   may lodge.

15           I don't know if that was clear.

16       Q.   Could you break down that a little bit more

17   in terms of what it means for a patient to have an

18   HER2/neu overexpression.

19       A.   I guess my best example would be that a

20   patient with a very small tumor, possibly even

21   5 millimeters in size, could develop -- even though

22   the tumor was removed -- could develop metastases

23   in other parts of her body very quickly because of

24   the HER2/neu overexpression.

25       Q.   So does HER2/neu carry a risk for

**DR. JUDD PATTEN, M.D.**                    2/4/2020

1   metastasis?

2       A.   I would consider it the most high-risk

3   marker for metastasis.

4       Q.   You go on to note in this sentence, "This

5   HER2/neu overexpressing, of course, is an

6   indication for postoperative adjuvant therapy."

7            What is postoperative adjuvant therapy?

8       A.   It's therapy that has been demonstrated to

9   reduce the risk or delay the time of appearance of

10   metastatic disease.

11       Q.   Is it chemotherapy?

12       A.   It can be.  Adjuvant therapy can be either

13   chemotherapy, or in the case of some patients, an

14   immune therapy.  Or both combined.

15       Q.   Doctor, I'm handing you what we have marked

16   as Exhibit #2.

17       A.   Is it important I find it?

18       Q.   No, it is not.  You can certainly follow

19   along with Exhibit #2.

20            (Whereupon, the document was duly marked

21            for identification as "Exhibit #2" and

22            attached hereto.)

23       A.   All right.

24       Q.   Dr. Patten, what is the document we have

25   marked as Exhibit #2?

```
 1        A.    It's a progress note from -- a Hematology

 2   Oncology Progress Note for an encounter on July 25,

 3   2013, for patient Dora Sanford.  Medical record

 4   L131653 that I dictated and electronically

 5   approved.

 6        Q.    Does Exhibit #2 reflect your notes from a

 7   July 25, 2013, visit with Mrs. Sanford?

 8        A.    It does.

 9        Q.    At the top of Page 1, is there a section

10   called "Subjective"?

11        A.    There is.

12        Q.    Could you please read what is written

13   there?

14        A.    "This is a pleasant, but unfortunate lady

15   with a history of bilateral breast cancer with

16   multi-lymph node positive disease and HER2/neu

17   overexpression.  The patient's recent path report

18   has been obtained and was discussed at length with

19   the patient during our visit."

20        Q.    You refer to a path report.  What is that?

21        A.    That is a report from the pathologist that

22   is rendered after surgery giving a diagnosis of the

23   tissue that was submitted by the surgeon.

24        Q.    Did Mrs. Sanford have pathology taken on

25   both her right and her left breast cancers?
```

```
1        A.  She did.
2        Q.  What did the pathology report show
3    regarding her breast cancer according to this note
4    in Exhibit #2?
5        A.  According to my notes, "The pathology from
6    June 20, 2013, showed a right breast cancer
7    4.4 centimeters, Grade III, lymphovascular
8    invasion.  Estrogen receptor 100%.  Progesterone
9    receptor 50%.  HER2/neu oncogene negative.
10   Sentinel lymph nodes 5 out of 5 positive.  One of
11   the lymph nodes 1.3 centimeters in size had
12   extranodal extension.  Additional right axiliary
13   lymph nodes 4 of 15 lymph nodes positive; for a
14   total of 9 of 20 positive lymph nodes.
15           "Left breast cancer 1.2 centimeters.
16   Estrogen receptor 92%.  Progesterone receptor 0%.
17   HER2/neu 3+ overexpression.  Sentinel lymph nodes
18   4 of 4 negative."
19       Q.  What did this information from the
20   pathology report that you just read tell you about
21   Mrs. Sanford's right breast cancer?
22       A.  It was very serious.  It was a likelihood
23   for metastatic disease; it was very high.  Her
24   prognosis for relapse with metastatic disease was
25   also very high.
```

1        It told me that she could benefit from
2   adjuvant therapy, but the adjuvant therapy might
3   not be effective.
4        Q.   And what did the information from the
5   pathology report about the left-sided breast cancer
6   tell you?
7        A.   Even though it was a smaller tumor of
8   1.2 centimeters, the overexpression of the HER2/neu
9   oncogene also -- well, made this cancer also a
10  concerning malignancy for metastatic spread.
11       And our assessment was that she would
12  definitely benefit, based on the literature, by
13  receiving adjuvant therapy with a drug that -- with
14  a regimen that would include a drug called
15  Herceptin.
16       Q.   Do I understand correctly that Mrs. Sanford
17  had different types of cancers in her left and her
18  right breasts?
19       A.   Yes.
20       Q.   Was that significant to you?
21       A.   Yes.  It made it challenging to determine
22  the treatment regimen and the timing of various
23  treatments and try and deliver treatments in the
24  best way possible that would give her the greatest
25  benefits and the greatest chance for relapse-free

1    survival.

2           One cannot discount either one.  You have

3    to take into consideration both the right-sided

4    breast cancer with the multi-lymph nodes positive,

5    and the left-sided breast cancer with the HER2/neu

6    gene overexpression.

7        Q.  On Page 2 of Exhibit #2, under Impression

8    and Plan, at No. 1, you note that Mrs. Sanford is

9    at high risk for recurrence from her lymph node

10   positive disease and large right breast cancer

11   primary, correct?

12       A.  That's correct.

13       Q.  What was Mrs. Sanford at high risk of

14   occurrence for?

15       A.  For metastases to a lung, to bone, to

16   liver.  Even to brain.  High risk for spread of the

17   malignancy and subsequent mortality.

18       Q.  Moving down to "3" under Impression and

19   Plan, can you please read that point?

20       A.  "Chemotherapy regimen is under discussion.

21   I plan to obtain a MUGA," which is a multigated

22   heart scan "prior to considering chemotherapy.  As

23   Adriamycin as a single agent is effective in both

24   HER2/neu positive and HER2/neu negative disease,

25   consideration might be given for her treatment to

**DR. JUDD PATTEN, M.D.**                          2/4/2020

1    start with Adriamycin, 3 cycles at 90 milligrams

2    per liter squared, followed by TCH -- Taxotere --

3    followed by Herceptin 6 cycles, followed by

4    Herceptin and radiation, followed by Herceptin and

5    aromatase inhibitors."

6        Q.   Why did you want a MUGA scan before

7    considering chemotherapy?

8        A.   Her heart function was of key importance to

9    receiving the drug Adriamycin and also the drug

10   Herceptin.

11        So one cannot give Adriamycin and Herceptin

12   together because they're both potentially

13   cardiotoxic.  I needed to know that she could

14   tolerate the Adriamycin treatment.

15        And even after the Adriamycin treatment,

16   serial MUGA scans were performed to continue to

17   assess her heart function as we prepared and gave

18   her Herceptin.  And also to follow her heart

19   function during the Herceptin, unless we needed to

20   stop it at any point due to a diminished heart-

21   pumping ability or ejection fraction.  That is what

22   we usually measure.

23        Q.   Was it your goal to treat both cancers at

24   the same time?

25        A.   Yes.

DR. JUDD PATTEN, M.D.                                    2/4/2020

Page 22

1       Q.  Why was that important to do?

2       A.  I felt that it was both -- it was important

3   to kill the last cell of both cancers.  One doesn't

4   cure the patient without killing the last cell.

5       Q.  And at this point in time, as you just

6   read, you were considering a treatment regimen of

7   Adriamycin 3 cycles, followed by Taxotere,

8   carboplatin and Herceptin, 6 cycles.

9       A.  And followed by additional Herceptin.  That

10  standard would be to give Herceptin for one year.

11          So one would finish the TCH after 6 cycles,

12  given every 3 weeks -- so 18 weeks -- and then

13  complete a full 52 weeks, approximately, with the

14  Herceptin.

15      Q.  And at this point in time, why were you

16  considering this treatment regimen?

17      A.  It had been published in a San Antonio

18  breast conference as an aggressive regimen that was

19  tolerated by patients.  It had had some track

20  record.

21          The Adriamycin at higher doses than -- and

22  given as a single agent was effective in other

23  human tumors.  There is a dose-response curve

24  that's well demonstrated in certain human tumors

25  where, if you give a higher dose of Adriamycin,

1    you'll get a higher cancer-cell kill.

2          And based on that literature, I felt that

3    3 cycles of Adriamycin at 90 milligrams per meter

4    squared may get that treatment portion finished

5    quicker.  And also avoid the exposure of another

6    agent called Cytoxan that is, oftentimes, paired

7    with Adriamycin.

8      Q.  And then the TCH, you said "T" was

9    Taxotere.

10         Do you understand Taxotere to be the brand

11   name for Docetaxel?

12     A.  I do.

13     Q.  Why at this point were you considering a

14   treatment regimen that included 6 cycles of

15   Docetaxel, carboplatin, and Herceptin?

16     A.  That was a standard treatment for HER2/neu

17   overexpressing breast cancer.  Taxotere and

18   carboplatin is also effective in non-HER2/neu

19   overexpressing breast cancers.

20         Taxotere as a single agent was shown that,

21   in patients with metastatic disease, to be equally

22   and sometimes more effective than a single agent of

23   Adriamycin if given at the standard dose; not the

24   high dose that I use.

25         And so it seemed, after some thought and

DR. JUDD PATTEN, M.D.                    2/4/2020

Page 24

1    review of the literature and looking at the

2    options, that this would be the best choice for

3    Miss Sanford if she -- if she had the required

4    constitution -- had a good heart, had good liver

5    function, had good bone-marrow function, had no

6    other contraindications -- that this regimen, in my

7    mind, after studying the various options, would

8    give her the greatest opportunity for prolonged

9    survival.

10        Q.  And did you satisfy yourself that

11   Miss Sanford did have the constitution to proceed

12   with this regimen?

13        A.  Not at this particular time.  But after the

14   evaluations of the CT and the PET Scan not showing

15   any demonstrative metastatic disease, and after the

16   heart scan showing that she has a good heart

17   function, and after our blood tests showing her

18   liver function and her kidney function and her

19   blood-cell counts were adequate, yes, I was

20   satisfied.

21        Q.  Dr. Patten, I'm going to hand to you what

22   we have marked as Exhibit #3.  What is this

23   document?

24            (Whereupon, the document was duly marked

25            for identification as "Exhibit #3" and

DR. JUDD PATTEN, M.D.                                    2/4/2020

1              attached hereto.)

2      A.  This is a progress note dated August 2,

3   2013, for a patient Dora Sanford.  Medical record

4   131653.  Dictated by me and electronically approved

5   by me.

6      Q.  Does the document that we have marked as

7   Exhibit #3 reflect your notes from an August 2,

8   2013, visit with Mrs. Sanford?

9      A.  It does.

10     Q.  On Page 2, under Impression and Plan, you

11  wrote, "Aggressive breast cancer" -- sorry, let me

12  say that clearly.

13         On Page 2 under Impression and Plan, you

14  wrote, "Aggressive breast cancer."  What does this

15  mean?

16     A.  Well, I would consider an aggressive breast

17  cancer as one that is likely to spread and

18  metastasize.

19         The left breast cancer, I noted before, was

20  HER2/neu overexpressing.  The right breast cancer

21  had evidence of aggressive behavior.  It had

22  lymphatic invasion that the pathologist noted.

23         The lymph-node capsule, one of the lymph

24  nodes had been penetrated by the malignancy.  That,

25  in and of itself, shows an aggressive behavior.

1        And the fact that more than the sentinel

2    lymph nodes, additional axillary lymph nodes were

3    positive at the time of surgery was also an

4    indication of how aggressive this breast cancer was

5    behaving.

6        Q.  And in this note, you identify that you

7    discussed various treatment options with

8    Mrs. Sanford.  Do you recall what those were?

9        A.  Well, we always have to offer patients the

10   option of no treatment.  I felt that that would be

11   foolish in this situation, to not take any

12   treatment at all.  So that was on the table.

13        One other treatment was on the table that

14   was possible is what we call dose-dense treatment

15   with AC given every two weeks, and, again, followed

16   by Taxotere and Herceptin or TCH.

17        So one could use either single-agent

18   Taxotere, which is not uncommon, every three weeks.

19   Or some people have used weekly Taxol which seems

20   to be of similar efficacy; however, every-

21   three-week Taxol was not as effective as every-

22   three-week Taxotere.

23        I felt that using the combination of

24   Taxotere, carboplatin, and Herceptin would have a

25   greater benefit than using a single taxol -- we

DR. JUDD PATTEN, M.D.                              2/4/2020

1    classify Taxotere and Taxotere as taxol.

2            So we have some options.  And we have the

3    AC times four, regular or dose dense, followed by

4    T -- Taxol or Taxotere -- with Herceptin.

5            Given my great concern, I chose one of the

6    most aggressive regimens possible in the hope that

7    we could effect a cure.  And that's why I discussed

8    that with the patient and her husband in detail.

9            Not to say that they couldn't change their

10   mind in the midst of therapy if they found it too

11   difficult to proceed.  They could say "Uncle" if

12   they needed to and opt out of additional therapy.

13           I tried to communicate my desire to give

14   the best possible hope for her not to have to deal

15   with breast cancer again, and I felt this was the

16   regimen.

17       Q.  So did you conclude at this time that

18   Adriamycin with 3 cycles, followed by 6 cycles of

19   Docetaxel, carboplatin and Herceptin was the best

20   treatment option for Mrs. Sanford's breast cancer?

21       A.  Yes.

22       Q.  I take it, then, that you did not feel

23   another option would have been a better treatment

24   for her cancer?

25       A.  I felt it would be less toxic, but it

DR. JUDD PATTEN, M.D.                                    2/4/2020

1   wouldn't be as effective.

2       Q.   Were there risks to Mrs. Sanford from other

3   chemotherapy treatments?

4       A.   There were risks from this regimen that I

5   have laid out for her.  There would have been

6   similar risks to the other -- to the other

7   chemotherapy treatments.

8            I thought that they would be quite similar;

9   although, the intensity of those treatments would

10  be a little bit less and possibly the treatment

11  would be more tolerable.

12           But the risks of -- excuse me; I'm sorry --

13  the risk of having of all the things that

14  potentially can go wrong with chemotherapy would

15  still be present in what might be called a

16  watered-down regimen, or a more tolerable regimen.

17  It would still provide benefit.  It would still

18  give a reduction in relapse risk or prolong the

19  time until a relapse occurred.  But this is the

20  regimen that I felt would be in her best interest.

21      Q.   You referred to today and you noted the San

22  Antonio breast cancer meeting.  What is that?

23      A.   It's a meeting that's held every year,

24  usually in the beginning of December, where papers

25  are presented from various researchers that update

1    their experience with various chemotherapy

2    regimens, treatments, evaluations, and diagnostics,

3    all kinds of evidence as it relates to the

4    treatment of patients with breast cancer.

5        Q.   Do you attend regularly?  Or did you?

6        A.   There was always a question of whether you

7    were going to attend the San Antonio breast cancer

8    meetings or the American Society of Hematology.

9    They seem to occur at the same time each year, in

10   December.

11        Even though I didn't attend regularly, we

12   often reviewed the highlights of the conference for

13   specific advances.

14        Q.   And was your review of one of the

15   highlights from the San Antonio conference where

16   you learned about the regimen that you recommended

17   to Mrs. Sanford for treatment of her breast cancer?

18        A.   Yes.  It appears to just be a slight

19   modification of what was a standard regimen at that

20   time.

21        Q.   Was the regimen that you recommended to

22   Mrs. Sanford within the standard of care?

23        A.   Yes.

24        Q.   You mentioned a little bit ago in your note

25   here, and Exhibit #3 also refers to the intensity

1    of the chemotherapy regimen that you recommended to

2    Mrs. Sanford.

3          What are the risks of this chemotherapy

4    program?

5      A.   There are quite a few.  We detail them in a

6    -- in the chemotherapy teaching session that we

7    had.  It's also been mandated that we give patients

8    this list from the Louisiana Medical Disclosure

9    Panel that identified material risks associated

10   with chemotherapy.

11         And so there's a list that I have in my

12   notes here from Miss Sanford's consent form that

13   was signed after she received an independent

14   teaching session with our nurse practitioner, Judy

15   Owens, that was electronically cosigned and

16   supervised by my associate, David Hanson.

17     Q.   I'm going to hand you a document we have

18   marked as Exhibit #4, Dr. Patten.

19     A.   Okay.

20          (Whereupon, the document was duly marked

21          for identification as "Exhibit #4" and

22          attached hereto.

23     Q.   Is Exhibit #4 the consent form you were

24   just referring to with the risks?

25     A.   Yes.

1      Q.  So what are some of the risks that you

2  discussed with Mr. and Mrs. Sanford during this

3  visit on August 2, 2013?

4      A.  Hair loss, that was -- that's number one on

5  the list.  That -- that was highlighted as a

6  definite event that would take place.

7      Q.  Do you agree that hair loss is a risk of

8  chemotherapy?

9      A.  Yes.

10     Q.  Is hair loss an expected side effect of

11 most chemotherapy treatments?

12     A.  Many, many chemotherapy.  It may be most.

13 But the number of drugs continues to grow.  It's

14 hard for me to keep up with a lot of this.

15         But, yes, with many chemotherapy agents.

16 Probably most.

17     Q.  And does this informed consent form that we

18 have marked as Exhibit #4 say anything with respect

19 to whether hair loss would be temporary or

20 permanent?

21     A.  No.

22     Q.  Does the reference to hair loss on this

23 consent form reflect your understanding that hair

24 loss could be temporary or permanent?

25     A.  Yes.

1       Q.  Is there any way to predict which patients

2   are going to experience hair loss?

3       A.  Based on the chemotherapy agent, we have an

4   idea of which patients will have hair loss and how

5   much it will be.

6           Some patients have tried to avoid hair loss

7   by using ice packs on their scalp during

8   chemotherapy; however, that is wrought with some

9   hazards as metastases have occurred to areas where

10  blood flow didn't reach because of that kind of a

11  practice.

12          So we know that, for example, Adriamycin,

13  the hair loss will be most oftentimes complete.

14  Now, there will be a regrowth of hair.  And how

15  dense or thick the hair may be -- or even the color

16  and consistency -- may be completely different from

17  the original hair that the patient has.  I've had

18  redheads turn brunette.

19      Q.  Did you understand at the time you

20  prescribed chemotherapy to Mrs. Sanford that there

21  was a risk she would experience permanent hair loss

22  from her chemotherapy treatment?

23      A.  Yes.

24      Q.  Did you discuss hair loss as a risk of

25  chemotherapy with Mrs. Sanford?

```
 1        A.   Yes.
 2        Q.   Did you tell her that her hair was
 3   guaranteed to grow back?
 4        A.   No.
 5        Q.   Did you tell her it was possible that her
 6   hair may not grow back after chemotherapy?
 7        A.   Yes.
 8        Q.   Did you tell her that chemotherapy could
 9   result in her hair coming back a different texture?
10        A.   I don't recall.
11        Q.   Do you recall if you told Mrs. Sanford
12   chemotherapy could result in her hair coming back a
13   different color?
14        A.   I might have.
15        Q.   Do you recall if you told her that
16   chemotherapy could result in her hair coming back
17   in a different thickness?
18        A.   Yes.
19        Q.   And after you told Mrs. Sanford all of the
20   risks that her hair may not grow back, did she
21   still agree to proceed with the chemotherapy
22   program you recommended?
23        A.   Yes.
24        Q.   And that included the use of Docetaxel as
25   one of the chemotherapy medications?
```

1       A.   Yes.

2       Q.   Does the informed consent form also discuss

3   the risks of damage to major organs with

4   chemotherapy?

5       A.   It does.

6       Q.   Does it also identify the risk of secondary

7   cancer from chemotherapy?

8       A.   Yes.

9       Q.   Was it your understanding that Mrs. Sanford

10  accepted those risks?

11      A.   Yes.

12      Q.   Was it your medical judgment that the

13  benefits that the chemotherapy regimen you

14  prescribed to Mrs. Sanford outweighed the risks?

15      A.   Yes.

16      Q.   Did you believe that the chemotherapy

17  regimen you prescribed to Mrs. Sanford could save

18  her life?

19      A.   I did.

20      Q.   At her deposition, Mrs. Sanford testified

21  that she has been cancer free since she completed

22  her chemotherapy treatments.

23          Based on that, do you consider her

24  treatment of breast cancer to be successful?

25      A.   Yes.  Based on the survival and relapse

**DR. JUDD PATTEN, M.D.**                                    2/4/2020

Page 35

1   curves that I try to keep in my mind, I think she's

2   among the few that are still cancer free and alive.

3       Q.  Do you credit her survival, in part, to the

4   chemotherapy you prescribed to her?

5       A.  I would like to.  I would have to say there

6   might be higher powers involved.  I always feel

7   that I should not take credit and feel that the

8   science that was developed was a gift for us to use

9   to help patients live longer and better.  And I

10  think she benefitted from the treatment.

11      Q.  When you recommended chemotherapy with

12  Docetaxel for Mrs. Sanford's breast cancer on

13  August 2013, was that your best medical judgment of

14  what was right for the treatment of her breast

15  cancer?

16      A.  Yes.

17      Q.  Do you stand behind that decision?

18      A.  Yes.

19      Q.  You prescribed chemotherapy treatment to

20  Mrs. Sanford in 2013 knowing that there are certain

21  risks associated with those medications, correct?

22      A.  Correct.

23      Q.  Including the risk of permanent hair loss?

24      A.  Yes.

25      Q.  And so even though you knew at the time you

1    prescribed Docetaxel to Mrs. Sanford in 2013 that

2    there was a risk of permanent hair loss, you

3    believed that was part of the best treatment

4    regimen for her at the time, correct?

5         A.   Yes, I do.

6         Q.   Dr. Patten, did Mrs. Sanford complain about

7    hair loss to you while she was your patient?

8         A.   I would have to review the record to answer

9    that.

10        Q.   Do you have a --

11        A.   I don't have a recollection of it.

12        Q.   If Mrs. Sanford had complained to you about

13   hair loss, would you have noted that in your

14   records?

15        A.   Yes.

16        Q.   Do you recall if Mrs. Sanford sought

17   treatment from you for hair loss?

18        A.   No.

19        Q.   No, you don't recall?  Or no, she did not?

20        A.   She did not seek treatment for hair loss.

21        Q.   Do you have any personal knowledge of

22   Mrs. Sanford's current condition, her current

23   health condition?

24        A.   The only -- the knowledge I have is based

25   on a review, complete review of the medical records

1    which include dates where she saw Dr. Bryan

2    Bienvenu following my departure from the practice

3    of Louisiana Hematology Oncology Associates.

4          So I've reviewed that history and

5    understand that, at some point, she probably -- a

6    year and a half ago, she moved to Virginia, and

7    that he transferred her care.  But at that time,

8    she was disease free.

9          And I understand, based on those records,

10   that she had another malignancy that is gene

11   related that she was cared for by my former

12   partner.

13      Q.  I take it, however, that you have not

14   examined Mrs. Sanford --

15      A.  Oh, no.

16      Q.  -- in over five years?

17      A.  That's correct.

18      Q.  Just so the record is clear, you, Doctor,

19   sorry --

20      A.  Go ahead.

21      Q.  You, Dr. Patten, have not examined

22   Mrs. Sanford in over five years, correct?

23      A.  That's correct.

24      Q.  And so because you haven't seen her or

25   examined her in over five years, you're not in a

1   position to say what caused any hair loss

2   Mrs. Sanford might be experiencing, correct?

3       A.   Correct.

4       Q.   And you are not here to offer an opinion

5   regarding the cause of Mrs. Sanford's hair loss,

6   correct?

7       A.   Well, yes, that's -- that's why I'm here, I

8   suppose.  You're asking me that?  I'm here to offer

9   an opinion about her hair loss; is that right?

10      Q.   No, I'm asking you.

11           Are you in a position to state, to a

12  reasonable degree of medical certainty, what caused

13  any hair loss Mrs. Sanford may be experiencing now?

14      A.   No, I'm not -- not in a position to do

15  that.  I misunderstood your question.

16      Q.   I apologize.  I'm sure it was a bad

17  question.

18           Dr. Patten, when did you first start

19  prescribing Docetaxel for the treatment of breast

20  cancer?

21      A.   My guess is around 1997.  That's my guess.

22  Maybe earlier.  I'm not sure exactly when it was

23  approved.  I think it was in 1997.

24      Q.   When did you retire?

25      A.   2014.  I still keep an active license, but

1    I don't actively see patients on a regular basis or

2    have an office where I bill from.

3        Q.  Were you still prescribing Docetaxel for

4    treatment of breast cancer when you retired in

5    2014?

6        A.  Yes.

7        Q.  Before you prescribed Docetaxel for the

8    first time, did you review the physician

9    information on the label?

10       A.  Yes.

11       Q.  Did you have any discussions with

12   colleagues about their experience with Docetaxel?

13       A.  Over the course of time, yes.  Over the

14   course of our initiating the use of Docetaxel in

15   our practice, yes.

16       Q.  Did you review published literature?

17       A.  Yes.

18       Q.  How did you make a decision to prescribe --

19   strike that.

20           Do you agree that Docetaxel represents a

21   standard of care for adjuvant breast cancer

22   therapy?

23       A.  Yes.

24           MS. WADHWANI:

25               I think I'm going to pass you to

1           Mr. Centola for any questions he may have.

2           After Mr. Centola asks you some questions,

3       I may have some follow-up.

4                   *   *   *   *   *

5                       EXAMINATION

6   BY MR. CENTOLA:

7       Q.  Want to keep going?

8       A.  It's your choice.

9       Q.  It's up to you.  You're in charge.

10          MR. CENTOLA:

11              Let's take a break, Doctor.

12          THE VIDEOGRAPHER:

13              It's 3:23; we're going off the record.

14          (Brief recess was taken.)

15              This begins Tape 2 of this deposition.

16          It's now 3:27; we're back on the record.

17  BY MR. CENTOLA:

18      Q.  Good afternoon, Doctor.  My name is Larry

19  Centola, and I represent the plaintiff in this

20  matter, Miss Sanford, along with a number of other

21  attorneys.

22              You testified that you spoke with the nurse

23  practitioner in advance of this deposition about

24  the scheduling?

25      A.  I spoke with Cindy Bray who, among her

1    credentials, I think she may be a nurse

2    practitioner who helps to coordinate depositions.

3    So I just happened to notice on her credentials

4    that that was present there.

5         Q.   How many times did you speak with

6    Miss Bray?

7         A.   Well, we had communication by text message,

8    by e-mail, and probably one phone conversation.

9         Q.   Did Miss Bray tell you what the subject of

10   this lawsuit was about?

11        A.   I just knew it involved Dora Sanford and

12   Taxotere.  I didn't know the specifics of what the

13   issue at hand was.  I'm presuming, based on the

14   line of questioning, that a lot of it has to do

15   with the hair issue.

16        Q.   I direct your attention to Exhibit #4 which

17   is the consent form that you went over earlier.

18   And number -- and Page 3 of the consent form, that

19   says, "Cancer chemotherapy, 1, hair loss."

20             And you testified that, in your opinion,

21   hair loss refers to permanent and temporary hair

22   loss?

23        A.   That's correct.

24        Q.   Okay.  Look at No. 6, nausea and/or

25   vomiting.  Does that refer to permanent and

DR. JUDD PATTEN, M.D.                                    2/4/2020

Page 42

```
1    temporary nausea and vomiting?
2        A.   No, it would be more related to the
3    administration of the chemotherapy itself.  Not to
4    say that some people don't have long-term
5    gastrointestinal problems following chemotherapy.
6        Q.   That goes hand in hand with No. 7,
7    constipation and/or diarrhea.
8             That's not referring to permanent
9    constipation; would it be?
10       A.   There are some drugs that can cause a bowel
11   dysmotility that have to be considered as something
12   that may cause a chronic constipation.
13            And oftentimes radiation therapy to the
14   lower rectum can cause a chronic diarrhea like
15   syndrome so --
16       Q.   I'm referring --
17       A.   -- usually when we put this in the
18   discussion with the patient, you're right.  We're
19   talking about most -- usually we're referring to
20   the immediate events that occur within a -- within
21   the first few days or weeks of chemotherapy.
22       Q.   But you specifically recall discussing
23   permanent hair loss with Miss Sanford?
24       A.   Well, I did tell her at one point that many
25   of my patients accused me of trying to make them
```

DR. JUDD PATTEN, M.D.                                    2/4/2020

1    look like me -- in the form of hair loss -- so I

2    knew that permanent hair loss was a potentiality.

3         If you're asking me to recall my specific

4    discussion with her, that's something that's very

5    difficult for me to do.

6         Q.  So you can't recall whether you discussed

7    permanent hair loss with Miss Sanford in

8    particular, can you?

9              MS. WADHWANI:

10                  Objection to form.

11             THE WITNESS:

12                  I discussed hair loss.  And the nurse

13             practitioner that we trained and that my

14             partner supervises usually is clear on

15             that, on the hair loss.

16                  I mean, that's something that can be

17             either temporary or permanent.  But the

18             hair may grow back either in a patchy

19             fashion or it -- if you're lucky, you might

20             get a full head of hair.

21   BY MR. CENTOLA:

22        Q.  And as of this date, August 22, 2013, how

23   did you know that there was a risk of permanent

24   hair loss with chemotherapy?

25        A.  From past experience with patients.

1      Q.  Were you aware of any literature, studies,

2    or any controlled studies that discussed permanent

3    hair loss as a side effect of chemotherapy?

4      A.  I can't cite any, no.  It was just based on

5    my personal experience.

6      Q.  And as of this date, August 2, 2013, did

7    you have any information that one chemotherapy had

8    the potential to cause permanent hair loss to a

9    greater degree than any other type of chemotherapy?

10          MS. WADHWANI:

11             Objection to form.

12          THE WITNESS:

13             It wasn't something that I would, you

14          know, spend a lot of time thinking about.

15          There were certain drugs that I would know

16          that would cause more chances for a more

17          complete hair loss rather than just a

18          thinning.

19             We expected people who got chemotherapy

20          and had hair loss and then had a radiation

21          therapy to the brain would, most likely,

22          have complete hair loss.  That was one of

23          the things we often thought about.

24             Also based on their age, you know, and

25          their familial type of, you know, issues,

1                 there was, I think, a greater chance that

2                 their hair would not grow back.

3     BY MR. CENTOLA:

4         Q.   Okay.

5         A.   Repeated rounds of chemotherapy for

6     palliation for metastatic disease, where someone

7     was exposed to multi-agents over multi-years was

8     oftentimes associated with more permanent hair

9     loss.

10        Q.   Would you have discussed with Miss Sanford

11    that, although she should expect hair loss, she

12    should also expect her hair to regrow?  It may not

13    come back the same color.  It may not come back the

14    same consistency, but she should expect her hair to

15    regrow?

16        A.   We may have -- it's hard to say what I

17    discussed with her at that time.  But we expected

18    that, after a complete shedding of the hair -- with

19    Adriamycin, of course, that most patients, but not

20    all, would have a significant hair regrowth.

21             And so we told -- I told patients as a rule

22    that after -- with Adriamycin, they were going to

23    lose their hair in two or three weeks, so they

24    might as well cut their hair, get it really short

25    before the day occurred.  Because when it occurred,

```
 1    they would be emotionally upset.

 2          And I tried to prepare them for that event,

 3    because it was a common event with Adriamycin.

 4       Q.  But you would also discuss with them that

 5    they would expect their hair to regrow in some

 6    fashion?

 7          MS. WADHWANI:

 8             Objection to form.

 9          THE WITNESS:

10             I don't recall that.  But we did expect

11             some -- some potential growing or regrowing

12             of the hair after -- after chemotherapy

13             because that had been the most common type

14             of thing that would happen.

15    BY MR. CENTOLA:

16       Q.  Because as of August 2013, you're not aware

17    of any reports in the published literature that

18    there are any chemotherapies that are known to

19    cause permanent hair loss, are you?

20          MS. WADHWANI:

21             Objection to form.

22          THE WITNESS:

23             That's a hard question.

24    BY MR. CENTOLA:

25       Q.  Well, I will rephrase.
```

1          As of August 2013, were you aware of any

2    published literature noting any chemotherapy had an

3    increased risk of permanent hair loss?

4        A.   Some of the patients -- you're asking me to

5    dig deep in my recollection -- so some of the

6    patients who have received high-dose chemotherapy

7    with stem cell, you know, or bone-marrow

8    transplantation, in my recollection, experienced

9    permanent hair loss.

10          And that was published in the literature to

11    my recollection.

12       Q.   But, again, you're not sure whether you

13    discussed permanent hair loss or not with

14    Mrs. Sanford?

15          MS. WADHWANI:

16              Objection.

17          THE WITNESS:

18              I'm -- I don't recall our specific

19          discussion of permanent hair loss.

20    BY MR. CENTOLA:

21       Q.   In this chemotherapy consent form, if you

22    look at Page 2, Doctor, No. 4, "Reasonable

23    therapeutic alternatives and the risk(s) associated

24    with such alternatives are," it said,

25    "Alternative Chemotherapy."

1           There were other regimens that were

2   available to Miss Sanford besides the regimen that

3   you prescribed; is that fair to say?

4       A.   That is fair to say, yes.

5       Q.   And this is obviously a very complicated

6   case, and you did an excellent job.

7           But there were other regimens that did not

8   include Docetaxel that would have been within the

9   standard of care to prescribe to Miss Sanford?

10      A.   (No oral response.)

11      Q.   For instance, I think you mentioned, you've

12  mentioned one --

13      A.   She could have received a regimen of

14  Adriamycin, cytoxan, followed by Taxol and

15  Herceptin instead of Taxotere.

16          Although, we felt, based on the literature

17  and based on what we knew at the time, that her

18  response would be inferior but it may be better

19  tolerated.

20      Q.   When you are discussing chemotherapy with a

21  patient, you're trying to give a patient all of the

22  relevant information so the patient can make an

23  educated decision; fair to say?

24      A.   Yes.

25      Q.   And if a patient was informed that there's

DR. JUDD PATTEN, M.D.                                    2/4/2020

Page 49

```
 1    a greater risk of permanent hair loss with one

 2    chemotherapy versus another chemotherapy without

 3    that risk of permanent hair loss, and that patient

 4    selected the regimen without the risk of permanent

 5    hair loss -- and that regimen was within the

 6    standard of care -- would you, as a physician, go

 7    along with the patient's wishes and prescribe the

 8    regimen that was within the standard of care but

 9    has less of a risk of permanent hair loss?

10         MS. WADHWANI:

11              Objection to form.

12         THE WITNESS:

13              In all of this, it was the patient's

14         choice I felt.  And there were patients who

15         chose to take what I thought was inferior

16         treatments that wouldn't give them as much

17         of a benefit, a potential benefit, for

18         relapse-free survival or for avoiding

19         metastatic disease that chose to take

20         regimens that would be less toxic.

21              And one of those toxicities did include

22         hair loss as a -- as something that they

23         would consider -- hair loss, nerve damage,

24         you know, potential for problems with their

25         heart.
```

```
 1              Some patients had family members who

 2         had received chemotherapy in the past and

 3         had experience with certain drugs and had

 4         had a bad experience with a certain drug

 5         unfortunately.  And they were very keen on

 6         not to receive that particular drug based

 7         on their familial experience.

 8              So that's a long answer to your

 9         question.

10    BY MR. CENTOLA:

11         Q.  No, I appreciate that.

12              You would have patients that would say, "My

13    relative took Cisplatin and had such a bad reaction

14    that under no circumstances will I take Cisplatin.

15    Doctor, please prescribe something else," even if

16    you thought Cisplatin was the proper chemotherapy

17    for that given diagnosis?

18         A.  That's correct.

19         Q.  And I use Cisplatin just because that's

20    something I'm familiar with, but that could be any

21    number.  It could be Adriamycin.  It could be a

22    number of other chemotherapies?  Is that correct?

23              MS. WADHWANI:

24                   Objection to form.

25    BY MR. CENTOLA:
```

1      Q.  You have to answer out loud.  Is that
2   correct?
3      A.  Yes.
4      Q.  Okay, thank you.
5          The treatment regimen was successful for
6   Miss Sanford as we have established.  But I believe
7   your prior testimony was that we can't really
8   determine what saved Miss Sanford's life; is that
9   correct?
10         MS. WADHWANI:
11             Objection to form.
12         THE WITNESS:
13             Statistically speaking, based on the
14         mortality curves and the expectations of
15         the experience of, you know, the science,
16         we would -- we would like to claim -- at
17         least scientists would like to claim --
18         that Miss Sanford is one of those few that
19         were cured by chemotherapy.
20   BY MR. CENTOLA:
21      Q.  She's a success story thanks to your
22   efforts.
23      A.  Now, could she have not taken anything and
24   still remained alive?  The likelihood would have
25   been very small.  But would -- would there be a

1    one-in-a-million case?  Would there be, you know, a

2    one-in-10-million case that would have survived

3    without chemotherapy?  Who can say.

4        Q.  But we can't say that Docetaxel saved her

5    life, can we?

6            MS. WADHWANI:

7                Objection to form.

8            THE WITNESS:

9                Could her life had been -- I'm going to

10               re -- I'm going to answer your question in

11               sort of a different-thinking pattern.

12   BY MR. CENTOLA:

13       Q.  Certainly.

14       A.  Could she have been salvaged with, you

15   know, AC followed by, you know, weekly Taxol and

16   Herceptin?

17               There probably were -- there probably could

18   be some people that were salvaged with that

19   regimen.  If she would have gotten that, I couldn't

20   have been sure.  But, yes, there's a possibility

21   she could have been cured with that regimen.

22               I think the numbers -- the numbers would

23   say it is not as many, you know.

24       Q.  In Exhibit #2, which is your note from

25   July 25, 2013, and under Impression and Plan,

1    No. 3, "Chemotherapy regimen.  Chemotherapy regimen
2    is under discussion."
3          Who was discussing the chemotherapy
4    regimen?
5      A.  Well, I always discuss the regimens with my
6    partners.  We had a weekly meeting where we would
7    present cases and usually new-chemotherapy starts.
8    And we would present the case and hear feedback
9    from the partners.  At that time it was
10   Dr. Billings, Dr. Spell, and Dr. Bienvenu.
11         And, on occasion, we would present the case
12   to a tumor board.  Usually at Our Lady of the Lake
13   Regional Medical Center.  I don't believe that we
14   presented her case.  We could have presented her
15   case at Woman's Hospital; they also have a tumor
16   board.
17         And so one thinks about the options
18   realizing, of course, that they may be limited
19   based on information that is yet to be obtained.
20   And that's usually why -- that's probably why I
21   said "Chemotherapy regimen is under discussion,"
22   and cannot be decided at the present time is
23   because I don't have a MUGA scan.
24         And if -- if the cows are already out of
25   the barn -- which was quite a big possibility, that

1    there was already metastatic disease, given the

2    lymph-node status -- then one would not choose

3    something so aggressive.

4           So, you know, potentially debilitating is

5    what I chose to treat her with.  We would treat her

6    palliatively and something that would, you know, be

7    beneficial without too much toxicity.

8           So I think that's the best answer I can

9    think of for your question.

10   Q.   Thank you, Doctor.  When you prescribe

11   Taxotere, do you know the manufacturer of the

12   Docetaxel or Taxotere that the patient will

13   eventually be infused with?

14   A.   No.  I mean, do I know the manufacturer of

15   the drug?  No, I don't.  I do not.

16          I presume based on our -- you know, the

17   subpoena -- that the manufacturer is Hospira.

18   Q.   Did you know that, as of August 2013,

19   Hospira's European label referenced specifically

20   persisting alopecia?

21          MS. WADHWANI:

22              Objection to form.

23          THE WITNESS:

24              I did not know that.

25   BY MR. CENTOLA:

```
 1        Q.   And you're aware that the 2013 Hospira
 2   United States' label did not mention persisting
 3   alopecia?  Were you aware of that?
 4             MS. WADHWANI:
 5                  Objection to form.
 6             THE WITNESS:
 7                  I can't say that I'm acutely aware of
 8             that.
 9   BY MR. CENTOLA:
10        Q.   Is that something that you would have liked
11   to have known in 2013 when you're prescribing
12   Docetaxel to patients, that the European label for
13   Docetaxel specifically references persisting
14   alopecia?
15             MS. WADHWANI:
16                  Objection to form.
17             THE WITNESS:
18                  I'm not sure if it would have changed
19             our consent form, because we decided to
20             adopt the consent form that was pretty much
21             mandated by the Louisiana Disclosure Panel,
22             and so we felt that that was our best
23             standard to use in discussing chemotherapy
24             side effects with patients, is to go
25             through that.
```

DR. JUDD PATTEN, M.D.                                      2/4/2020

Page 56

```
1              From time to time, we did tend to

2         highlight some of the -- some of the --

3         some of the side effects based on what our

4         experience had been.

5              For example, we gave the -- I gave the

6         Adriamycin experience earlier, that hair

7         loss would be complete.  And, you know, I

8         had seen leukemias from Novantrone and

9         other chemotherapy drugs that rose as

10        secondary malignancies following

11        chemotherapy.

12             So possibly based on my own experience

13        I would highlight something that I wanted

14        the patient to know.

15   BY MR. CENTOLA:

16        Q.   Okay.

17        A.   So if I had -- you know, had -- and I'm

18   giving this as a hypothetical -- if I had a patient

19   who had had complete and persistent alopecia for

20   some -- any agent -- I might have been more

21   inclined to highlight that to them at the time of

22   the discussion.

23        Q.   But as of August 2013, you didn't have a

24   patient that had persisting and complete alopecia?

25        A.   Not to my recollection.
```

```
1              MS. WADHWANI:

2                  Objection to form.

3              THE WITNESS:

4                  Not to my recollection.

5     BY MR. CENTOLA:

6         Q.  Okay.

7         A.  I have had patients who had complete

8     alopecia.  But you're asking in relation to

9     Docetaxel?  That's what I'm taking to be your

10    question.

11        Q.  Well, I'll ask it both ways.

12             Prior to August 2013, did you have any

13    patients that had permanent alopecia from

14    Docetaxel?

15             MS. WADHWANI:

16                 Objection to form.

17             THE WITNESS:

18                 Not that I was aware of.

19    BY MR. CENTOLA:

20        Q.  Prior to August 2013, did you have patients

21    that had complete alopecia due to any other

22    chemotherapy regimen?

23        A.  Yes, yes.

24        Q.  When you are discussing side effects of

25    chemotherapy with a breast-cancer patient, with a
```

```
 1    female, in your experience, are females concerned
 2    about hair loss?
 3        A.  Yes.
 4            MS. WADHWANI:
 5                Objection to form.
 6    BY MR. CENTOLA:
 7        Q.  Is it --
 8        A.  I mean, that's -- I think they're more
 9    concerned with hair loss than males.  That's just
10    my bias.
11        Q.  Okay.
12        A.  But I have to live with myself.
13        Q.  Have you had patients delay chemotherapy
14    treatment because of their concerns of hair loss?
15        A.  No, I don't think so.  But I have had
16    patients choose alternative chemotherapy because of
17    concerns of hair loss.
18            MR. CENTOLA:
19                Doctor, thank you for answering the
20                questions.  Please, answer any questions
21                counsel may have.  Thank you for your time.
22            MS. WADHWANI:
23                Can we have just a couple of minutes
24                for a break.
25            THE VIDEOGRAPHER:
```

1          It is 3:52; we're going off the record.

2          (Brief recess was taken.)

3          It is 3:57.  We're back on the record.

4          *   *   *   *   *

5          RE-EXAMINATION

6    BY MS. WADHWANI:

7       Q.  Dr. Patten, is it true that, when you were

8    practicing medicine, you cannot force a patient to

9    take any treatment, correct?

10      A.  Correct.

11      Q.  You could not force a particular regimen

12   upon a patient, correct?

13      A.  Correct.  I felt it was a responsibility to

14   give them their choice, to present them with as

15   clear a picture as possible of what their risk

16   would be in either not taking treatment or taking

17   treatment as far as cancer recurrence and

18   longevity.

19      Q.  Was it your best medical judgment, in

20   August of 2013, that the regimen you prescribed to

21   Mrs. Sanford gave her the best chance of survival

22   over other potential regimens?

23      A.  I had a strong feeling at that time that

24   that was the best possible regimen, given her

25   circumstances, for her to have a long-term

```
1    remission and cure if possible.

2        Q.  Was it your habit and practice, Dr. Patten,

3    to warn patients of the risks of permanent hair

4    loss from chemotherapy?

5            MR. CENTOLA:

6                Objection to form.

7            THE WITNESS:

8                I'll say this.  That I did warn

9                patients that they would have hair loss and

10               that their hair may not grow back

11               completely.  So if you take that to mean

12               "permanent hair loss," you could say yes.

13   BY MS. WADHWANI:

14       Q.  So was that true in 2013; that was your

15   habit and practice?

16       A.  Yes.

17           MS. WADHWANI:

18               I have no further questions.  Thank you

19               very much.

20           THE VIDEOGRAPHER:

21               It is now 4 o'clock.  This deposition

22               is concluded.

23       (Thereupon, the witness' testimony was

24       concluded.)

25
```

```
 1              C E R T I F I C A T E

 2

 3         This certification is valid only for a

 4    transcript accompanied by my original signature and

 5    original required seal on this page.

 6

 7         I, Tamra K. Kent, Certified Court Reporter

 8    in and for the State of Louisiana, as the officer

 9    before whom this testimony was taken, do hereby

10    certify that DR. JUDD PATTEN, M.D., to whom the

11    oath was administered, after having been first duly

12    sworn by me upon authority of RS 37:2554, did

13    testify as hereinbefore set forth in the foregoing

14    60 pages;

15         That this testimony was reported by me in

16    stenographic machine shorthand, was prepared and

17    transcribed by me or under my personal direction

18    and supervision, and is a true and correct

19    transcript to the best of my ability and

20    understanding;

21         That the transcript has been prepared in

22    compliance with transcript format guidelines

23    required by statute or by rules of the board, and

24    that I am informed about the complete arrangements,

25    financial or otherwise, with the person or entity
```

1   making arrangements for deposition services; that I

2   have acted in compliance with the prohibition on

3   contractual relationships, as defined by Louisiana

4   Code of Civil Procedure Article 1434 and in rules

5   and advisory opinions of the board; that I have no

6   actual knowledge of any prohibited employment or

7   contractual relationship, direct or indirect,

8   between a court reporting firm and any party

9   litigant in this matter, nor is there any such

10  relationship between myself and a party litigant;

11

12          That I am not related to counsel or to the

13  parties herein, nor am I otherwise interested in

14  the outcome of this matter.

15

16

17

18  Tamra K. Kent   83070
    Certified Reporter in and for
19  the State of Louisiana

20

21

22

23

24

25