# EXHIBIT K

JUDY OWENS, NP

DEPOSITION TRANSCRIPT

Page 2

```
 1  VIDEOGRAPHER: MARC ENCALADE
 2
    REPORTED BY:
 3
        LINDY ROOT
 4      Certified Court Reporter
        Registered Professional Reporter
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  INDEX
 2
 3             Page, Line
 4
 5  Exhibit #1         18    17
 6  Exhibit #2         28    13
 7  Exhibit #3         32    14
 8  Exhibit #4         35    9
 9  Exhibit #5         43    2
10
11
12  EXAMINATION BY MS. WADHWANI    6    5
13  EXAMINATION BY MS. PEREZ      45    1
14  EXAMINATION BY MS. WADHWANI   72    6
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      IN RE:  TAXOTERE (DOCETAXEL)
 2      PRODUCTS LIABILITY LITIGATION
 3
 4      This Document Relates to:
 5    Dora Sanford vs. Hospira, Inc., et al
 6          No. 2:17-cv-09417
 7
 8      Deposition of JUDY OWENS, NP
 9        Taken on February 5, 2020
10
11          EXHIBIT INDEX
12
13 1  Notice of Deposition and Subpoena
14 2  Hematology Oncology Progress Note
15    Dated August 6, 2013
16 3  Chemotherapy Education
17 4  Chemotherapy Consent
18 5  Hematology Oncology Progress Note
19    Dated September 5, 2013
20
21
22
23
24
25
```

Page 5

```
 1        S T I P U L A T I O N
 2      It is stipulated and agreed by and
 3  between counsel for the parties hereto that
 4  the deposition of the aforementioned witness
 5  is hereby being taken under the Federal Rules
 6  of Civil Procedure, for all purposes, in
 7  accordance with law;
 8      That the formalities of reading and
 9  signing are specifically waived;
10      That the formalities of sealing,
11  certification and filing are specifically
12  waived;
13      That all objections, save those as to the
14  form of the question and the responsiveness of
15  the answer, are hereby reserved until such
16  time as this deposition, or any part thereof,
17  may be used or sought to be used in evidence.
18          *    *    *    *
19      LINDY ROOT, Registered Professional
20  Reporter, and Certified Court Reporter, in and
21  for the Parish of Orleans, State of Louisiana,
22  officiated in administering the oath to the
23  witness.
24
25
```

2 (Pages 2 - 5)

Page 6

1    (Video introduction.)
2         JUDY OWENS, NP,
3  after having been first duly sworn by the
4  above-mentioned court reporter, did testify
5  as follows:
6  EXAMINATION BY MS. WADHWANI:
7  Q. Good morning, Ms. Owens.
8  A. Good morning.
9  Q. My name is Neelum Wadhwani, and I represent
10   Hospira.
11      We met before your deposition started this
12   morning, but before today have you and I ever
13   met before?
14  A. No.
15  Q. Have you and I ever spoken before today?
16  A. No.
17  Q. Have you ever been deposed before?
18  A. No.
19  Q. So let me tell you a little bit about the
20   process.
21      I'm going to ask you some questions today,
22   and Ms. Perez may ask you some questions as
23   well. All right?
24      To each of our questions you have to give
25   a verbal answer. The court reporter is taking

Page 7

1  everything down, and she cannot record a nod
2  of a head --
3  A. Okay.
4  Q. -- or a shake of the head or uh-huh or uh-uh.
5     So if your answer includes a yes or no,
6  you have to say yes or no. Is that fair?
7  A. Yes.
8  Q. I am going to try my best today to not speak
9  until you are finished with your answers, and
10   if you could try your best to let me finish my
11   questions before you speak, again, that will
12   help the court reporter, because she can't
13   record two people speaking at once.
14      Is that fair?
15  A. Yes.
16  Q. Today you are here to answer some questions.
17   We are not asking you to guess or speculate.
18   We are just interested in knowing the facts
19   that you know and remember.
20      So if you get asked a question today that
21   you don't know the answer to or you don't
22   recall the answer to, it's just fine to say
23   that. Is that fair?
24  A. Yes.
25  Q. Okay. From time to time Ms. Perez may object

Page 8

1  to my questions and vice versa. Those
2  objections are not directed towards you, but
3  it's making our record between the attorneys,
4  and after any objection you should still
5  please go ahead and answer.
6     Is that okay?
7  A. Yes.
8  Q. Do you understand that we are here today
9  because of a lawsuit that Dora Sanford
10   has -- Let me try that again without tripping
11   over my tongue.
12      Do you understand that we are here today
13   because of a lawsuit that Dora Sanford, former
14   patient of Dr. John Patten's, has filed
15   against Hospira?
16  A. Yes.
17  Q. You understand that you have not been named as
18   a defendant in this case?
19  A. Yes.
20  Q. And certainly nobody on behalf of my client
21   Hospira has indicated to you that you did
22   anything wrong in the care and treatment of
23   Ms. Sanford. Correct?
24  A. Yes.
25  Q. Have you ever spoken with me or any other

Page 9

1  counsel for Hospira?
2  A. No.
3  Q. You communicated with a paralegal named Cindy
4  Bray at Chaffe McCall here in New Orleans.
5     Correct?
6  A. Correct.
7  Q. Is it correct that you had never had any
8  communications related to the care and
9  treatment of Mrs. Sanford with Ms. Bray?
10  A. Correct.
11  Q. Did your communications with Ms. Bray focus on
12   the logistics of the deposition here today?
13  A. Correct. I didn't even know her name.
14  Q. You didn't --
15  A. Ms. Sanford's name until last Monday when we
16   set the date and time.
17  Q. So is it fair to say that you have not had any
18   communications related to the care and
19   treatment of Ms. Sanford with any counsel or
20   paralegals for Hospira?
21     Is that right?
22  A. Correct.
23     I did ask my Genentech people was there a
24   problem, my employer now, and they said, oh,
25   no.

3 (Pages 6 - 9)

1 Q. Okay.
2 A. So I didn't even speak with a lawyer.  I just
3    spoke with someone, because they were there
4    where I was last week, and I said is there any
5    problem with me giving a deposition concerning
6    a patient from my previous employer, and they
7    said, oh, no, don't worry.
8 Q. So you spoke with your current employer which
9    is Genentech --
10 A. Yes.
11 Q. -- to alert them you were going to be subject
12    to this deposition?
13 A. Yes.  It was just an HR person.
14 Q. Okay.  When is the last you saw or spoke with
15    Mrs. Sanford?
16 A. Years.  I couldn't give you a date, but I left
17    that practice in 2015 so --
18 Q. Which practice did you leave in 2015?
19 A. Louisiana Hematology Oncology Associates at
20    Mary Bird Perkins in Baton Rouge.
21 Q. Have you had any communications with Mrs.
22    Sanford since you left Louisiana --
23 A. No.
24 Q. Just let me finish my question.
25 A. I'm sorry.

1 Q. It's okay.
2    Are you aware that Mrs. Sanford has been
3    cancer free for over five years?
4 A. No.
5 Q. Is that significant to you?
6 A. Very.
7 Q. Why?
8 A. Because she had a very aggressive disease in
9    bilateral breasts with a lot of positive lymph
10    nodes, and she was HER2 Neu positive which is
11    very aggressive disease.
12    So just the fact that she has gone five
13    years, if she doesn't have a reoccurrence of
14    that disease, we usually consider she is
15    probably cured, and the rate of recurrence and
16    death are much greater in an advanced cancer
17    that was like that at diagnosis.
18    So I am happy to hear that she has not
19    recurred.
20 Q. Have you communicated with Ms. Sanford or her
21    family about her lawsuit?
22 A. No.
23 Q. Have you communicated with Ms. Sanford's
24    lawyers at any time before this deposition?
25 A. No.

1 Q. Have you received any notes, letters, any
2    other kind of written communication from Ms.
3    Sanford's counsel?
4 A. No.
5    The only thing I got was a certified copy
6    of her chart which Cindy Bray sent me I think
7    last Friday.
8 Q. Let me just make sure I understand that.
9    Did you receive medical records from Ms.
10    Sanford's treatment for her breast cancer from
11    the facility?
12 A. No.
13    When you're saying facility, where I
14    worked, no.
15 Q. Sorry.
16    Ms. Bray sent you medical records?
17 A. A certified copy.
18 Q. Okay.  Those were medical records related to
19    the care and treatment of Mrs. Sanford for her
20    breast cancer.  Correct?
21 A. Yes.  It was like 1200 pages from 2013 to
22    2014.
23 Q. Did you read those?
24 A. I skimmed through, and found my first personal
25    note that I had written for her on page 702.

1 Q. Okay.  Did you read that note?
2 A. I did.
3 Q. Did you read any other notes?
4 A. There's another -- there was one other one
5    that I saw her, and it brought -- I remembered
6    her.  I remembered her name, but I couldn't
7    remember very many details, except that she
8    was very nice and she had significant disease.
9    I remember that.
10    But then when I read my two notes that I
11    found it just brought a few things back.  But
12    no great detail.  I had to see the note to
13    remember the detail as far as her disease, and
14    what treatment she got.
15 Q. Okay.  When did you learn that Mrs. Sanford
16    had filed this lawsuit?
17 A. Last Monday, a week from yesterday, was the
18    first I ever heard the name.
19    I did recognize it right away, but before
20    that I had been contacted first by e-mail by
21    Cindy Bray just telling me that they wanted me
22    to be a witness for a patient and that I
23    wasn't being sued.
24    I got the gist of what -- I would just be
25    a witness, but I did not know the name until I

4 (Pages 10 - 13)

Page 14

```
 1    received -- the same day that I received the
 2    subpoena which was last Monday the 27th.
 3 Q. Okay.
 4 A. January 27.
 5 Q. Were you aware that Mrs. Sanford alleges
 6    permanent hair loss resulting from her use of
 7    chemotherapy agent Docetaxel?
 8 A. No, I did not know that.
 9 Q. Did you just become aware of that right now?
10 A. Yes.
11       Now it occurred to me, because on late
12    night lawyer advertisement TV they mentioned
13    that.  But there are a lot of other things it
14    could have been as well.
15       So I did not know what she -- what
16    problems she had.
17 Q. Okay.  So today is the first time that you
18    learned that Ms. Sanford alleges hair loss
19    from her use of Docetaxel.
20       Is that right?
21 A. Permanent hair loss, yes.  She did have hair
22    loss during the time period that I saw her
23    when she was on active chemotherapy.
24 Q. Okay.  When Ms. Sanford was someone with who
25    you visited as a patient of Dr. Patten's, did
```

Page 15

```
 1    you provide any treatment to her for any
 2    issues related to permanent hair loss?
 3 A. No.
 4 Q. Have you ever examined or treated Mrs. Sanford
 5    for any issues related to permanent hair loss?
 6 A. No.  The two times that I am aware that I saw
 7    her, the first she had all her hair, because
 8    she hadn't started treatment, and I did her
 9    original teaching which was probably like
10    close to an hour visit, at which time I told
11    her hair loss is a possible side effect,
12    probable side effect, and that most people get
13    their hair back.
14       Then after that when I saw her later she
15    was on active chemo.  I believe just
16    Adriamycin at that time.  So she had lost her
17    hair and had like a little wrap around her
18    head.
19 Q. Okay.  When you talked with Mrs. Sanford in
20    this teaching that you gave her before she
21    began chemotherapy, did you ever guarantee to
22    her that her hair would grow back?
23       MS. PEREZ REYNOLDS:
24          Object to form.
25 EXAMINATION BY MS. WADHWANI:
```

Page 16

```
 1 Q. You can answer.
 2 A. I'm sorry.  Can you say it again?
 3       Did she ask or did I say?
 4 Q. Did you ever guarantee to Mrs. Sanford that
 5    her hair would grow back?
 6       MS. PEREZ REYNOLDS:
 7          Same objection.
 8       THE WITNESS:
 9          No.
10 EXAMINATION BY MS. WADHWANI:
11 Q. You can go ahead.
12 A. No.
13       We literally say -- you kind of get the
14    same verbiage because we do this so much.
15       Usually say and of course most people get
16    their hair back, and in my 26 years I don't
17    know of anybody else who had permanent hair
18    loss.
19       But it is mentioned, and there's a whole
20    sheet that she's given that day that talks
21    about hair loss.
22 Q. Okay.  You never promised her her hair would
23    grow back.  Correct?
24       MS. PEREZ REYNOLDS:
25          Object to form.
```

Page 17

```
 1       THE WITNESS:
 2          No.
 3 EXAMINATION BY MS. WADHWANI:
 4 Q. Just so it's clear, because I asked you a
 5    question that ended in correct, and you said
 6    no.
 7       I want to make sure the record is clear.
 8    It's not at all your fault.
 9       Did you ever guarantee to Mrs. Sanford
10    that her hair would grow back after
11    chemotherapy?
12       MS. PEREZ REYNOLDS:
13          Object to form.
14       THE WITNESS:
15          No.
16 EXAMINATION BY MS. WADHWANI:
17 Q. Have you ever been retained as an expert in
18    this matter?
19 A. Just a witness.
20 Q. Just a fact witness?
21 A. Uh-huh (affirmative response).
22 Q. So I take it that you are not here to offer
23    expert testimony.  Correct?
24 A. No.
25 Q. Are you here to offer expert testimony?
```

5 (Pages 14 - 17)

Page 18

1     Again, I'm just going back, because when I
2 said correct, you said no.  So it makes it
3 sound like you are saying that you are here to
4 offer expert testimony.
5     I understand your response to be that you
6 are not, but so that it is clear for the folks
7 who aren't in the room later, I am just going
8 to ask you the question again.
9     Are you here to offer expert testimony?
10 A. Not to my knowledge, no.
11 Q. So is it correct then that you are not here to
12   offer an opinion regarding the cause of Mrs.
13   Sanford's hair loss?
14 A. Correct.
15 Q. I am going to hand you two documents that I am
16   marking as Exhibit #1 together.
17     (Exhibit #1 was marked for
18       identification.)
19     The first is notice of deposition of Judy
20 Owens, and the second is a subpoena to testify
21 at deposition in the civil action.
22     Have you seen these documents before?
23 A. Yes.
24 Q. Are these the documents requesting your
25   presence here today?

Page 19

1 A. Correct.  Yes.
2 Q. Okay.  Did you bring any documents, materials
3   with you here today?
4 A. Just a copy of an e-mail from Cindy Bray so
5   that I would have the address.
6 Q. Okay.  What, if anything, did you do to
7   prepare for your deposition today?
8 A. After Cindy Bray sent me the certified copy of
9   the 1200 pages of chart that she had, I looked
10   through just really scanning to find my visits
11   with her, and I could see from the very
12   beginning that her doctor was not the doctor
13   that I saw all the patients for.
14     That's the reason I was only in there a
15   few times, because there's a nurse
16   practitioner that saw her much more often than
17   myself.
18     But, like I said, for some reason I really
19   remembered her name.  Dora is just a little
20   different.
21     And like I said, I went like to page 702,
22   strictly flip flip flip until I knew what my
23   note would look like, and so I did read that.
24     I looked more and found another note I
25   think a month later or weeks later.

Page 20

1     I actually only found two notes that I had
2 written for her.  There may have been another
3 one, but I kind of got the gist of what
4 disease, what treatment, and that type of
5 thing.
6     And while I may not remember every word
7 that I said to her, I know what I normally
8 would say at a teaching.
9 Q. We will get to that in just a few minutes.
10     Did you review any other materials
11   regarding Mrs. Sanford for this litigation
12   before your deposition today?
13 A. I looked at her original pathology report,
14   because I wanted have to it straight in my
15   head what her disease process was so that I
16   would have an understanding of why she was
17   getting what she got and why the doctor chose
18   such an aggressive treatment.
19 Q. Are you trained as a nurse?
20 A. Yes.
21 Q. Are you licensed as a nurse?
22 A. Yes.
23 Q. Are you licensed as a doctor?
24 A. No.  Just a nurse practitioner.
25 Q. Okay.  I think you told us just a few minutes

Page 21

1 ago that you stopped working at Louisiana
2 Hematology Oncology Associates in 2015.
3     Correct?
4 A. October, 2015.
5 Q. Okay.  While you were with Louisiana
6 Hematology Oncology Associates what kind of
7 nurse were you?
8 A. Oncology nurse practitioner.
9 Q. What does an oncology nurse practitioner do
10   just generally speaking?
11 A. In this practice I saw patients that came into
12   the office.  Not in the hospital.
13     That came into the office for usually
14   cancer or hematological treatment, education,
15   and symptom management.
16     I was an acute care nurse practitioner
17   when I came, and within a year or two I became
18   nationally certified as a oncology nurse
19   practitioner.
20 Q. How many years were you an oncology nurse?
21 A. I still am, and so now it is counting RN
22   oncology nurse I started in 1995.  So it's 26
23   years.
24 Q. Okay.  I think you just told me a few minutes
25   ago that you didn't typically provide care to

6 (Pages 18 - 21)

Page 22

1    Dr. Patten's patients.  Is that correct?
2  A. Correct.  It would mean either that the other
3    nurse practitioner was full or not there.
4  Q. You would step in from time to time?
5  A. Yes.  Correct.
6  Q. What other physicians did you work for at
7    Louisiana Hematology Oncology Associates?
8  A. I worked for all of them.  It was
9    Dr. Bienvenu, Dr. Spell, Dr. Schmeeckle,
10    Dr. Billings, and Dr. David Hanson was my
11    primary physician.
12      If I was there I usually saw all of -- say
13    95 percent of my patients that day would be
14    his.
15  Q. Approximately how many patients on average
16    would you see in a week?
17  A. Between 80 and 100.
18  Q. Was that true in 2013 as well?
19  A. Probably on the lower end.
20      Well, no.  I have to say yes.
21  Q. In 2014 were you also seeing on average
22    between 80 and 100 patients a week?
23  A. Yes.
24  Q. I take it though that over the years you
25    worked from time to time with Dr. Patten.

Page 23

1    Correct?
2  A. Oh, yes.
3  Q. Did you consider him to be a good doctor?
4  A. Excellent.  He was yes, a excellent doctor.
5      I had worked with him with periodic
6    patients for the 13 years prior to that when I
7    was an RN in the hospital working in oncology.
8      So that is how I knew almost all the
9    oncologists.
10  Q. Okay.  Did you consider Dr. Patten to be a
11    physician who cared deeply about his patients?
12  A. Yes.  More.  I think he cared more deeply than
13    some.
14  Q. Was your experience with Dr. Patten that he
15    wanted to save women's lives?
16    MS. PEREZ REYNOLDS:
17        Object to form.
18    THE WITNESS:
19        Yes.
20  EXAMINATION BY MS. WADHWANI:
21  Q. In your experience did he try and prescribe
22    the best treatment for a particular patient
23    and her breast cancer?
24  A. Yes.
25    MS. PEREZ REYNOLDS:

Page 24

1    Object to form.
2  EXAMINATION BY MS. WADHWANI:
3  Q. As a nurse practitioner do you diagnose
4    patients and their cancers?
5  A. I am legally able to, and at that practice
6    where I worked from 2007 until 2015 I
7    diagnosed symptoms like nausea, DVT, that type
8    of thing.
9      However, I was not the person who
10    diagnosed the original cancer, and I was not
11    the provider that chose the cancer treatment.
12  Q. Okay.  And that was true of Mrs. Sanford as
13    well, you did not diagnose her cancer and you
14    did not select her treatment.
15      Is that correct?
16  A. Correct.
17      While it would have been legal for me to
18    do so, and nurse practitioners do it all over,
19    that particular practice philosophy was
20    that the doctor would take care of the
21    diagnosis and the treatment, and generally the
22    very first time I would see that patient would
23    be to do the original teaching based on the
24    decisions that the doctors had made.
25  Q. And in this case was it also true that

Page 25

1    Dr. Patten is the person who made the decision
2    along with Ms. Sanford about what her
3    chemotherapy regimen would be?
4  A. Correct.
5  Q. Now you mentioned this morning already that it
6    appears that you had two visits with Mrs.
7    Sanford.  Correct?
8  A. Yes.
9  Q. And both those visits occurred at the
10    Louisiana Hematology Oncology Associates in
11    Baton Rouge.  Is that right?
12  A. Correct.  As part of the Mary Bird Perkins
13    Cancer Center.
14  Q. Okay.  You mentioned that you believe that
15    your first visit with Mrs. Sanford was in
16    August, 2013.  Correct?
17  A. Correct.
18  Q. Was that the first time you had ever met Mrs.
19    Sanford?
20  A. Yes.
21  Q. Did you know anything about Mrs. Sanford
22    before that first visit in August, 2013?
23  A. No.  Often if I had a teaching that day I
24    would look ahead.
25      When I say look ahead, that morning,

7 (Pages 22 - 25)

Page 26

1 because the doctor would have written out a
2 consent with the treatment in it, and that way
3 I knew what I was going to teach, and that meant
4 that he had already spoken to her about it,
5 and he had already signed it. I believe she
6 had already signed it.
7 Q. Okay.
8 A. I'm not sure. I don't remember the date on
9 the form.
10 Q. Sure. We can look at in a little bit to help
11 refresh your recollection.
12 Do you recall that your second visit with
13 Mrs. Sanford was in November of 2013?
14 A. I don't really recall the date, but I
15 do -- when I looked at it she was in active
16 treatment at that point. She had received
17 chemotherapy.
18 Q. Did you see Mrs. Sanford again after your
19 second visit with her?
20 A. I'm not aware. Because I didn't see another
21 note in the -- but it's possible I could have
22 seen her again.
23 One thing that she had that sometimes we
24 didn't have a note on is later she was on a
25 anticoagulant, and because you're not

Page 27

1 compensated for that, if the patient doesn't
2 have to have their medication changed, often
3 we just looked at the result and okayed that
4 she did not need any change, and there would
5 be the record of the lab work that
6 demonstrated that she didn't need any, but we
7 didn't write a note, and there was no charge
8 for that visit.
9 Q. Sitting here today do you have a recollection
10 of seeing or speaking with Mrs. Sanford after
11 the second visit in November, 2013?
12 A. Not offhand for sure.
13 Q. Okay.
14 A. I did attempt to look at the rest of the chart
15 down to the 1200, but I was doing it quickly.
16 I may not have caught another visit.
17 But I didn't find another one, and I don't
18 recall.
19 Q. Okay. When you first met with Mrs. Sanford
20 did you understand that Dr. Patten had already
21 discussed chemotherapy with Mrs. Sanford?
22 A. Yes.
23 Q. Did you understand that Mrs. Sanford and her
24 husband were willing to proceed with
25 chemotherapy?

Page 28

1 A. Yes.
2 Q. Was the prescription of Mrs. Sanford's
3 chemotherapy regimen your decision?
4 A. No.
5 Q. Was it the decision of Dr. Patten and Mrs.
6 Sanford?
7 A. Correct. Yes.
8 Q. Now, you mentioned that you provided a
9 teaching session to Mrs. Sanford. Correct?
10 A. Yes.
11 Q. I am handing you what we marked as Exhibit #2.
12 Please take a moment to look at that.
13 (Exhibit #2 was marked for
14 identification.)
15 What is this document?
16 A. This is in my knowledge the first time I saw
17 Ms. Sanford where I did a pretty extensive
18 visit. It's usually 45 minutes to an hour,
19 and part of this day's documents would have
20 been several pages that included the different
21 things that I taught her.
22 As part of the computer program you went
23 in and customized for each patient what the
24 side effects would be for their specific
25 chemotherapy. You marked those, and then it

Page 29

1 would automatically print up any teaching that
2 you needed so that you could give that to the
3 patient after although you went over
4 everything.
5 Q. Okay. Did you dictate the contents of this
6 document we marked as Exhibit #2?
7 A. Yes.
8 Q. Does this reflect your notes of the August 6,
9 2013, visit with Mrs. Sanford?
10 A. Yes.
11 If I could add one thing. She also filled
12 out a stress form that day, which was
13 something I addressed, because she had placed
14 her distress at eight out of ten.
15 So a lot of people write that they have no
16 problems. So I do remember stressing that
17 under psychosocial assessment.
18 Q. Okay. What was your understanding about her
19 distress and what the nature of it was?
20 A. She documented that just dealing with her
21 adult children, calming them down, having to
22 worry about her visits, and just the rigors of
23 going through chemotherapy were her main
24 concerns at the time, and she had the
25 understanding that she had aggressive disease.

8 (Pages 26 - 29)

Page 30

1 Q. Okay. Was she concerned about having such an
2   aggressive disease?
3 A. I think so. My memory is that she did.
4 Q. Okay.
5 A. It was part of my responsibility for her to
6   understand that she did have aggressive
7   disease, that while we were going for a cure
8   that certainly wasn't guaranteed.
9 Q. What did you tell her about the nature of her
10   disease?
11 A. I explained to her that because of her
12   positive lymph nodes, because of the fact that
13   she had cancer in both breasts, this means
14   that the cancer had time to become more
15   advanced, and results would not necessarily be
16   as good as we hoped.
17      However, despite the fact that she had
18   HER2 Neu positive disease, which is a more
19   aggressive cancer, due to the fact she
20   was going to be receiving Herceptin or
21   Trastuzumab the current statistics on that
22   were if you received specific treatment for
23   HER2 Neu disease, which is more aggressive,
24   that your results were very similar to the
25   patients who did not have HER2 Neu positive

Page 31

1   disease, because we were specifically
2   addressing that, which ten years before that
3   if you had HER2 Neu positive disease before
4   Herceptin came out you had a much worse
5   prognosis.
6 Q. Okay. On page 2 of your note here you state
7   that the services were provided to Mrs.
8   Sanford in the office of Dr. Hanson, and that
9   these services were furnished under the
10   physician's direct personal supervision.
11      Were you under supervision of Dr. Hanson
12   for this August, 2013, visit?
13 A. I was in that obviously I would think that it
14   was because Dr. Patten was not there, and in
15   the State of Louisiana you have to have a
16   contracting physician that you're under direct
17   supervision, and so Dr. Hanson was my
18   supervising physician that day, and even
19   though he did co-sign it was just saying that
20   he was there if I had needed him or if I did
21   ask him any questions, and this would show not
22   that Dr. Patten wasn't the prescribing
23   physician, but he was not on site.
24 Q. Okay. Is this the same day that Mrs. Sanford
25   started her chemotherapy?

Page 32

1 A. Correct.
2 Q. Was it typical for you to give the education
3   the day of chemotherapy starting?
4 A. Not typically.
5      Generally we would have just an education
6   day. Maybe the patient would be starting the
7   next day, but sometimes just the way the
8   schedules landed whether they could be seen in
9   the chemo room or whether the patient maybe
10   couldn't come another day.
11      So this happened occasionally.
12 Q. I am handing you a document we marked as
13   Exhibit #3.
14      (Exhibit #3 was marked for
15       identification.)
16      Have you seen this document before?
17 A. Yes. This was a routine printout that I would
18   go through the patient's chemo that they were
19   going to get, and I checked the box that gave
20   the side effect that we thought they would
21   have from -- as a side effect from their
22   specific chemotherapy.
23      I would mark those, and then automatically
24   the program would print out educational pages
25   that were specific to that patient's

Page 33

1   treatment.
2 Q. Okay. Is this document the document that you
3   were referring to earlier with regards to the
4   computer program that would generate --
5 A. Yes.
6 Q. -- a report based on the information you had
7   input?
8 A. Yes.
9 Q. Okay. If you turn, please, to page 4 of this
10   document that ends in the bottom right with
11   the number 739. Do you see that?
12 A. Yes.
13 Q. Did you discuss the common side effects that
14   have a checkmark in the box on this page with
15   Mrs. Sanford?
16 A. Yes.
17 Q. Does hair loss appear on the list on page 4?
18 A. Yes.
19 Q. Is it checked?
20 A. Correct. Yes.
21 Q. Did you discuss hair loss with Mrs. Sanford?
22 A. Yes.
23 Q. Did Mrs. Sanford express any questions or
24   concerns about hair loss as part of this
25   session?

9 (Pages 30 - 33)

Page 34

1 A. Not that I recall.
2     It's only fair to say that she had two
3 specific drugs, two parts of her treatment
4 that both would cause alopecia. Adriamycin
5 causes you to lose your hair pretty quickly as
6 well as Taxotere.
7 Q. Okay. And what are you basing that on?
8 A. Documentation in the drug information as well
9     as my experience.
10    I had given, even though I wasn't giving
11 the drug anymore like I had in the hospital, I
12 was very familiar with many patients who had
13 received Adriamycin as well many patients who
14 had received Taxotere.
15 Q. When you talked with Mrs. Sanford in 2013, you
16 were aware of the risk of hair loss from the
17 medication she was taking. Is that correct?
18    MS. PEREZ REYNOLDS:
19    Object to form.
20    THE WITNESS:
21    Yes.
22 EXAMINATION BY MS. WADHWANI:
23 Q. Did you tell her of the risks of hair loss
24 associated with the chemotherapy medications
25 that Mrs. Sanford had been prescribed?

Page 35

1    MS. PEREZ REYNOLDS:
2    Object to form.
3    THE WITNESS:
4    Yes. And not even as a possibility,
5    but that it would be a probability.
6 EXAMINATION BY MS. WADHWANI:
7 Q. I am handing you a document we marked as
8 Exhibit #4.
9    (Exhibit #4 was marked for
10    identification.)
11    Please take a moment to look at that.
12 A. Okay.
13 Q. What is this document?
14 A. This is the consent form that the physicians
15 at Louisiana Hematology Oncology, they would
16 fill it out with the prescription of treatment
17 they were going to give, and generally this
18 was when they brought it up to the patient,
19 and in this particular case Dr. Patten had
20 filled it out on August 2, and obviously
21 wasn't going to be here that day.
22    Both Mrs. Sanford and I signed it on
23 August 6, which was the day I actually did the
24 teaching.
25 Q. Okay. So here on page 3 with the last few

Page 36

1    numbers of 751 you see your name and
2    signature?
3 A. I do.
4 Q. You see Mrs. Sanford's name and signature?
5 A. I do.
6 Q. You see Dr. Patten's name and signature?
7 A. Yes.
8 Q. Does this form indicate that Mrs. Sanford had
9    been apprised of her treatment and its risks?
10 A. She did sign it on the 6th, and I realized it
11 has a lot on it, but if you look on the top of
12 that page hair loss is number one, and because
13 that is such a traumatic thing to patients,
14 while I can't remember every detail of that
15 visit, I feel very confident that I discussed
16 hair loss at length.
17    So it seems all signs to me that she did
18 understand that.
19 Q. Okay. It's your understanding that you
20 discussed with Mrs. Sanford at length on
21 August 6 before she signed this document the
22 risks of hair loss from the chemotherapy.
23    Is that right?
24 A. Yes.
25    MS. PEREZ REYNOLDS:

Page 37

1    Object to form.
2 EXAMINATION BY MS. WADHWANI:
3 Q. Have you ever told a patient in connection
4    with going through this form that she won't
5    acquire or get a certain listed side effect?
6 A. No. I may say most people don't have this
7    issue or most people do.
8    My personal knowledge of this would be
9    that everyone who had Adriamycin even by
10 itself and everyone who had Taxotere would
11 have hair loss.
12    Maybe not complete hair loss, but
13 significant hair loss.
14 Q. You told that to Mrs. Sanford before she
15 signed this document?
16 A. Yes. It's normally a -- it's something that
17 most women are very concerned about as well as
18 men, and usually you go into a little bit of
19 detail about it so they know what to expect so
20 it won't be quite as upsetting.
21 Q. Do you recall any questions asked of you by
22 Mrs. Sanford during your visit with her on
23 August 6, 2013?
24 A. Not specifically. I think she asked some
25 questions, but nothing stands out to me that

10 (Pages 34 - 37)

Page 38

1 she was shocked or worried about a specific
2 one really more than the stress she was under.
3 Q. Okay.  Can you tell me, please, your typical
4 procedure of going through this consent form
5 with a patient?
6 A. Yes.  Usually it was signed at the end after
7 we had gone over everything, and as a general
8 rule I started the visit off with a very
9 specific lesson, so to speak, about what their
10 disease was because some people don't really
11 get it about where their disease falls in the
12 spectrum.
13     Then we addressed each thing, and at the
14 very end we would go over the forms, and then
15 I would ask if there are any additional
16 questions, any specific concerns, and then
17 they signed.
18 Q. Okay.  Do you believe that that is the
19 procedure you went through with Mrs. Sanford?
20 A. I believe so, yes.
21 Q. When you met with Mrs. Sanford to go through
22 this document, did you go through the section
23 on page 2, paragraph 5 which has got a header
24 of no guarantees?
25 A. Oh, no guarantees number five.  Yes.

Page 39

1 Q. Did you talk through that section with Mrs.
2 Sanford?
3 A. I don't think I read the whole thing aloud to
4 her, but I think as the teaching went it was
5 sometimes this happens, some people have
6 worse, some people have less, that type of
7 thing so I felt she could understand that.
8 Q. Did you give Mrs. Sanford an opportunity to
9 read this document for herself?
10 A. My understanding was that she had seen it the
11 day that Dr. Patten printed it out but -- and
12 Dr. Patten had written up at the top when she
13 was going to be coming for the teaching.
14     So generally after we finish the teaching
15 I would read what was written in the blanks.
16     So I assumed that she had looked at it.
17 She may not have read every word, but I pretty
18 much told her -- routinely I would tell people
19 the different things that could possibly
20 happen.
21     Not all the side effects that we talked
22 about would happen, but sometimes things we
23 didn't talk about could also happen.
24 Q. Did you give Mrs. Sanford an opportunity to
25 ask questions?

Page 40

1 A. Oh, yes.
2 Q. Going back to the third page here, the list of
3 risks under the disclosure of risks that you
4 were discussing earlier, as you mentioned, the
5 first risk identified is hair loss.
6     Does this informed consent form say
7 anything with respect to whether the hair may
8 or may not grow back?
9     MS. PEREZ REYNOLDS:
10         Object to form.
11     THE WITNESS:
12         Not that I see, no.
13 EXAMINATION BY MS. WADHWANI:
14 Q. Does the reference to hair loss on this
15 informed consent form reflect your
16 understanding that hair may or may not grow
17 back?
18     MS. PEREZ REYNOLDS:
19         Object to form.
20     THE WITNESS:
21         I don't remember if I said that it
22     may not grow back.
23         Just that she would lose her hair,
24     and that most people it grew back.
25 EXAMINATION BY MS. WADHWANI:

Page 41

1 Q. Did you have an understanding, however, that
2 her hair may not grow back?
3 A. Not really.  In that I had never seen at that
4 point in the 13 plus -- you know, 20 years I
5 had never seen anybody's hair not grow back
6 from chemotherapy.  Although I had seen
7 people's hair not grow back from radiation.
8 Q. But you yourself never told Mrs. Sanford that
9 her hair would definitely grow back.  Correct?
10 A. Not in my memory, no.
11 Q. Continuing with this list of risks.
12     Does this also discuss damage to brain,
13 heart, kidneys, liver, lungs, nervous system,
14 and skin?
15 A. Yes.
16     And as a general thing that I would say is
17 I didn't necessarily list every one of these
18 aloud as the patient is looking at it.
19     However, I would always say even death.
20 So that they knew there was always the
21 possibility of even death.
22     So to me these were usually less serious
23 than death, but to know that that is always
24 possible anytime you're treating serious
25 disease.

11 (Pages 38 - 41)

Page 42

1  Q. Okay. So as part of your standard practice
2     would you have told Mrs. Sanford there was a
3     risk of death from her chemotherapy?
4        Is that a yes?
5  A. Yes. I don't have exact memory of saying
6     that. It's something I routinely said just
7     for them to know the serious -- the nature of
8     the seriousness of the treatment they would be
9     getting.
10 Q. After you went through this informed consent
11    form with Mrs. Sanford, did she express an
12    unwillingness to proceed?
13 A. No.
14    MS. WADHWANI:
15        Can we take a break for a moment?
16    MS. PEREZ REYNOLDS:
17        Sure.
18    THE VIDEOGRAPHER:
19        We are now off the record at 11:57.
20    (Off the record.)
21    THE VIDEOGRAPHER:
22        We are now back on the record at
23        12:03.
24 EXAMINATION BY MS. WADHWANI:
25 Q. Okay. Ms. Owens, I am going to hand you a

Page 43

1     document we have marked as Exhibit #5.
2        (Exhibit #5 was marked for
3        identification.)
4        Have you seen this document before?
5  A. Yes.
6  Q. What is this document?
7  A. This appears to be the second visit that I saw
8     Ms. Sanford on November 5, and at this point
9     she had received part of her chemotherapy and
10    was presenting for a follow-up checkup which
11    we would do in between every visit to check
12    counts and to manage side effects.
13 Q. And do you have a recollection of why you were
14    being asked to visit with Mrs. Sanford this
15    day as opposed to Dr. Patten's usual nurse?
16 A. It could be that he was not there. But it
17    could also occasionally she might be
18    overbooked, and then I would get it, and we
19    would do the same with each other.
20 Q. Okay. Is this the last time that you saw Mrs.
21    Sanford?
22 A. It's the last time that I saw documentation of
23    it. If I did see her again, either I didn't
24    see the note, or as I mentioned before because
25    she later was on anticoagulation sometimes we

Page 44

1     would just look.
2        The patient had to come in to get the
3     blood test. We would look at the result, and
4     if they did not require a change of the
5     Coumadin dose we might not see them unless
6     they said they were having a problem, and if I
7     did look at that I would go out to the waiting
8     room myself to tell them.
9  Q. Do you have any recollection of doing that
10    with Mrs. Sanford?
11 A. Not specifically, no. It's just something we
12    routinely did. So it's possible.
13    MS. WADHWANI:
14        I think I will pass the witness.
15        I will pass you to Ms. Perez for any
16        questions she has, and then I might have
17        some follow-up after Ms. Perez asks you
18        questions.
19    MS. PEREZ REYNOLDS:
20        Sorry. I just need a moment to get
21        organized here.
22    MS. WADHWANI:
23        You want to take a break?
24    MS. PEREZ REYNOLDS:
25        I think I'm okay. We can go.

Page 45

1  EXAMINATION BY MS. PEREZ REYNOLDS:
2  Q. Thank you for being here today, Ms. Owens.
3        Again, my name is Jessica Perez, and I
4     have just a few questions for you based on
5     some of the testimony you have already
6     provided here today.
7  A. Okay.
8  Q. I believe you testified earlier that you did
9     not routinely care for Dr. Patten's patients
10    during the time period of 2013.
11       Is that fair?
12 A. Anytime that I was there.
13 Q. Oh, okay. Because you did not routinely care
14    for his specific patients, are you aware of
15    what his education practices were when he was
16    with a patient advising them about the risk of
17    chemotherapy?
18 A. In general, yes.
19 Q. Were you present for any of those in person
20    education sessions that Dr. Patten may have
21    had with Mrs. Sanford?
22 A. No.
23 Q. Okay. So you don't know as you sit here today
24    what information Dr. Patten may have shared
25    with Ms. Sanford regarding any side effects

12 (Pages 42 - 45)

Page 46

1    associated with the drugs he prescribed to
2    her?
3 A. No.  Not specifically with her.
4       I just at that point had known him since
5    '95, and he always spent a long time with the
6    patient and was known, because he was a
7    pharmacist prior to being a physician, he was
8    known to go into that.
9       I don't have direct knowledge of this.
10 Q. Okay.  So based on your knowledge of
11   Dr. Patten, it's your belief he did likely
12   spend some time with Ms. Sanford, you just
13   don't know personally know what the content of
14   their conversations were?
15 A. Yes.
16 Q. Is that fair?
17 A. Correct.
18 Q. And I believe according to the records that we
19   reviewed here today it looks like you saw Ms.
20   Sanford for sure on at least two occasions.
21       Correct?
22 A. Yes.
23 Q. And I believe you testified earlier that on
24   the first visit you had with her which was
25   when you did -- I think you call it the

Page 47

1    teaching session.  Did I get that right?
2 A. Correct.
3 Q. And is it accurate that you recall her having
4    hair at that initial teaching session?
5 A. Yes.
6 Q. Okay.  As we sit here today do you recall what
7    her hair looked like on that visit?
8 A. Not really.
9 Q. Fair enough.
10 A. I recognize -- I mean I recognized her name
11   and her general appearance.
12 Q. Okay.  When you say you recognize her general
13   appearance, in terms of her hair, could you
14   describe at all what it looked like?
15       Did she have a full head of hair?
16   MS. WADHWANI:
17       Object to form.
18   THE WITNESS:
19       I can't say that she didn't have
20       thinning hair, but she looked perfectly
21       normal to me like I would expect someone
22       to look prior to treatment.
23 EXAMINATION BY MS. PEREZ REYNOLDS:
24 Q. Okay.  So prior to treatment when you
25   interacted with her for this teaching session,

Page 48

1    do you recall noticing any visible bald spots
2    or bald patches on her scalp?
3    MS. WADHWANI:
4       Object to form.
5    THE WITNESS:
6       No, do not recall, and I think I
7       would have documented it.
8 EXAMINATION BY MS. PEREZ REYNOLDS:
9 Q. Yes, ma'am.
10      In general, Ms. Owens, would you agree
11   that there is a difference between a temporary
12   side effect and a permanent side effect?
13 A. Yes.
14 Q. And in your experience as an oncology nurse,
15   and actually a nurse practitioner, if a
16   company had information that a side effect
17   associated with one of its drugs may be
18   permanent, is that information that you
19   believe would be important for the company to
20   share with someone in your role?
21 A. Yes.  Definitely.
22   MS. WADHWANI:
23       Object to form.
24 EXAMINATION BY MS. PEREZ REYNOLDS:
25 Q. I believe you stated earlier that prior to

Page 49

1    learning about Ms. Sanford's lawsuit, and the
2    allegations that have been shared about what
3    that lawsuit entails with permanent hair loss,
4    that you are not personally aware of any other
5    patient who's undergone chemotherapy and
6    suffered permanent hair loss.
7       Is that accurate?
8 A. That's correct.  I'm not aware of that with 21
9    years of patient to patient, person to
10   patient.
11 Q. And it sounds like you probably have done
12   quite a few teaching sessions in your career?
13 A. Probably hundreds.
14 Q. I was just about to say if I asked you to give
15   us an estimate of how many teaching sessions
16   you think you have completed with patients,
17   would you be able to do that?
18 A. I would say an average of a minimum of one a
19   week, and I only worked there eight years.
20 Q. Okay.
21 A. I worked in oncology for 13 years prior to
22   that time, and for 10 of those years I was in
23   outpatient infusion.  So that meant all we did
24   all day long was give chemotherapy.
25      And you don't just teach that first visit.

13 (Pages 46 - 49)

Page 50

1    Every time you go over if they have had
2    treatment, are you experiencing nausea, tell
3    me what -- how you have been feeling.
4        So you really are doing some teaching
5    every single visit, and if I would have -- if
6    I saw something going on I would be reporting
7    it to the doctor.
8  Q. When you were providing teaching sessions to
9    patients that you were responsible for, is it
10   fair to say that you based a part of the
11   education you provided to the patients on your
12   own clinical knowledge and experience?
13 A. Yes.
14 Q. And I believe in response to a question
15   earlier you stated that in the 2013 time frame
16   when Ms. Sanford was treated that at that time
17   you didn't necessarily have a reason to
18   believe that if she took Docetaxel that her
19   hair would not regrow.  Is that fair?
20       MS. WADHWANI:
21          Objection to form.
22       THE WITNESS:
23          Yes.
24 EXAMINATION BY MS. PEREZ REYNOLDS:
25 Q. Okay.

Page 51

1  A. And that's yes, I did not have knowledge.
2  Q. Okay.  Yes, ma'am.
3        And thank you for clarifying, and feel
4    free to do that when I ask a poor question
5    because my questions may not always be clear.
6    So feel free to let me know.
7        Because of that based on your clinical
8    knowledge and the fact that you were not aware
9    of that particular risk at that time, is it
10   fair to say that when you advised a patient
11   that most people get their hair back, that at
12   least based on your own personal knowledge and
13   experience you were not communicating a
14   warning to Ms. Sanford that if she used
15   Docetaxel she may experience permanent hair
16   loss?
17       MS. WADHWANI:
18          Objection to form.
19       THE WITNESS:
20          Yes.
21 EXAMINATION BY MS. PEREZ REYNOLDS:
22 Q. So you did not intend that statement to be a
23   warning specifically to Ms. Sanford that she
24   may be at risk for permanent hair loss if she
25   used Docetaxel?

Page 52

1  A. Correct.  I meant it as a general statement.
2  Q. Yes, ma'am.
3        In 2013 had you ever been informed or
4    received any type of information from any
5    source whether it was a fellow nurse, an
6    oncologist, scientific literature, maybe
7    information from a company that the use of
8    Docetaxel might carry with it a risk for
9    permanent hair loss?
10 A. I don't recall that I did, and I would get
11   things in the mail periodically of a possible
12   side effect or a possible contamination of
13   things, things to be looking out for, and I
14   don't recall that at that time.
15 Q. If that would have been information that you
16   would have received or been aware of at that
17   time, do you think that that is something that
18   you likely would have remembered?
19       MS. WADHWANI:
20          Objection to form.
21       THE WITNESS:
22          Generally if I got something like
23       that I would take it to the physician,
24       because I wasn't sure if they just threw
25       it away and didn't really look at it.

Page 53

1  EXAMINATION BY MS. PEREZ REYNOLDS:
2  Q. I see.
3  A. I would have taken it to the physician,
4    usually Dr. Hanson since he is who I worked
5    with the most, just to say have you seen this,
6    and a lot of times it was things that were
7    kind of out there that I had never heard of
8    happening.
9        So I would not have taken it to the
10   patient.  I would not have said it to the
11   patient.
12 Q. Understood.
13       Earlier you had testified that when you
14   were discussing hair loss with Ms. Sanford on
15   I believe some of these perhaps informed
16   consent form and your initial teaching session
17   that -- Sorry.  Let me back up for a second.
18       It's accurate to say, correct, that you
19   don't remember the specific words that you
20   used with Ms. Sanford.  Right?
21 A. I do not.  I know my general verbiage.
22 Q. Correct.
23 A. Especially when a patient was getting
24   Adriamycin, I wanted them to be prepared that
25   their hair doesn't fall out that day, but in

14 (Pages 50 - 53)

Page 54

1 about a week, in about a 24, 36-hour period
2 their hair comes out in giant clumps, and it
3 is usually very upsetting.
4     But if they know that that is going to
5 happen it's a lot easier to deal with when
6 they are washing their hair and they get a big
7 handful.
8     So I tended to tell people if I thought it
9 was going to be a dramatic episode so that
10 they wouldn't be so upset, and often I would
11 recommend or just say that some people prefer
12 to get their hair cut short prior to the first
13 chemo so that it's not -- especially if they
14 had long hair -- that it's not just
15 everywhere.
16     It's just more traumatic versus short hair
17 that is falling out.
18 Q. Based on your experience as an oncology nurse
19 practitioner, did you observe that hair loss
20 for women undergoing chemotherapy tended to be
21 a potential dramatic event in their life?
22 A. Yes.
23     MS. WADHWANI:
24         Objection to form.
25 EXAMINATION BY MS. PEREZ REYNOLDS:

Page 55

1 Q. And I believe you characterized it earlier as
2 saying that you generally told your patients
3 in the teaching sessions that hair loss was a
4 likely probability of their use of
5 chemotherapy?
6 A. Depending on their specific therapy.
7 Q. If I understood your testimony earlier, I
8 believe you said that with Docetaxel and I
9 believe Adriamycin that you felt that it was a
10 likely probability for hair loss?
11 A. Correct.
12 Q. When you are discussing a likely probability
13 of hair loss in 2013, are you talking about a
14 likely probability of temporary hair loss?
15 A. Yes.
16 Q. So you are not discussing a likely probability
17 of permanent hair loss then?
18 A. Correct.
19 Q. And I just have a few questions about some of
20 the exhibits if we could just look at some of
21 those.
22     I apologize. I have to flip through here.
23 A. That's okay.
24 Q. Could we take a look at actually Exhibit #2 to
25 start with. I apologize for that.

Page 56

1     We will try to go in order. We will look
2 at 2 first.
3 A. Okay.
4 Q. And if you wouldn't mind flipping to the
5 second page. I think the Bates label there at
6 the bottom there is 748.
7 A. Okay.
8 Q. And then if you see number two where it says
9 chemotherapy education and counseling. In the
10 second sentence there it says included were
11 discussion and audiovisual film and written
12 materials and handouts.
13     Do you see that sentence?
14 A. Yes.
15 Q. Do you happen to recall what handouts or
16 written materials you may have provided to Ms.
17 Sanford?
18 A. They are the ones that you triggered on the
19 program, and then they would be printed out.
20     I can tell you one thing that I see. I
21 think our film had disappeared at that point,
22 and this was a -- I would say that first
23 sentence who the patient came with into the
24 recording device.
25 Q. I see.

Page 57

1 A. And then the rest of that was like a
2 pre-written paragraph, and then the patient
3 was given prescriptions, and then I listed the
4 prescriptions that would be specific to that
5 person.
6 Q. So as we sit here today reflecting back on
7 2013 and this particular visit with Ms.
8 Sanford, is it correct then that actually this
9 note may be in error in terms of the
10 audiovisual film?
11 A. Yes.
12 Q. Okay.
13 A. I'm not sure of the exact time that all the
14 sudden we couldn't find the video. So I'm not
15 positive, but I know that it kind of
16 disappeared along the way, and we eventually
17 got a new one.
18     But I'm just mentioning because I noticed
19 that.
20 Q. Sure.
21 A. Like I said, I would be specific to who they
22 came with and what prescriptions they got, and
23 then also each of the specific pages that she
24 got were triggered at the time of that visit,
25 and then they were given to her.

15 (Pages 54 - 57)

Page 58

1  Q. But in terms of the other items that are
2     discussed, is it accurate that you did have a
3     discussion with Ms. Sanford on that date about
4     potential side effects?
5  A. Oh, definitely.
6  Q. And you're not 100 percent sure one way or the
7     other about the video --
8  A. Correct.
9  Q. -- on that date, but you did provide her
10    written materials and handouts.  Correct?
11 A. Yes.  And that was in the number 3.
12 Q. So Exhibit #3 would be one of the handouts or
13    written materials that was provided?
14 A. Yes.  All of those pages were triggered at the
15    time of her visit, and almost always I looked
16    at all of this prior and would go through the
17    computer, and because you will see not every
18    one is -- not every single one is checked off
19    like memory changes and pain.
20       I only marked the ones that I felt were
21    possible or -- well, they are all possible,
22    but probable for her specific treatment.
23 Q. Okay.  So let's go ahead and look at
24    Exhibit #3.  I think you were looking at the
25    page that you were discussing earlier.  I

Page 59

1  think that's the back of the second page which
2  is 739 on the Bates.
3  A. Yes.
4  Q. And my understanding earlier was that you when
5     you would check one of these adverse event
6     topics that the computer program would then
7     print a handout or information sheet?
8  A. Associated.
9  Q. Associated?
10 A. Yes.
11 Q. And I see there are quite a few that you did
12    check, and hair loss is one of them.
13       You testified earlier that hair loss as
14    it's listed here doesn't state permanent hair
15    loss.  Correct?
16 A. Correct.
17 Q. It likewise doesn't state temporary hair loss?
18 A. Correct.
19 Q. Correct?
20       And looking at some of the other side
21    effects listed, nausea, for example, does it
22    define whether or not nausea is temporary or
23    permanent on this checklist?
24 A. No.
25 Q. When you were providing this checklist and the

Page 60

1  associated handouts, were you in any way
2  warning a patient that nausea may be
3  permanent?
4     MS. WADHWANI:
5        Objection to form.
6  THE WITNESS:
7        I don't think I would have done that.
8  I don't have memory.
9        I can tell you that my routine
10 teaching explained, because I had to
11 instruct them on those medications, and
12 if you will see the three medications
13 she got were all anti-nausea drugs, when
14 to take them.
15    Like Emend was a scheduled thing you
16 started the date of chemotherapy.  The
17 others were PRN.
18    But I would tell patients because of
19 the high propensity for Adriamycin to
20 cause nausea that I recommended the
21 first three days that they took it
22 scheduled even though it was ordered as
23 needed.
24    So with things that -- In other
25 words, I got more specific even though

Page 61

1  this doesn't necessarily say, and I
2  would tell people your anti-nausea
3  medication is working the most for the
4  first three days.
5     But a lot of times once that is worn
6  off, then you may still have some nausea
7  that you will have to take the PRN drug
8  for.
9     So I did specifically try to instruct
10 on that, on how best to take it.
11    Because people would call and say I'm
12 nauseated, and you would say did you
13 take the anti-nausea medicine.  Well,
14 not today.
15    So there were things that we would go
16 to if what we gave them wasn't working.
17    So I think I gave more details than
18 just saying you are going to be
19 nauseated, but I don't think I would
20 have told them that they would be
21 permanently nauseated.
22 EXAMINATION BY MS. PEREZ REYNOLDS:
23 Q. So the use of the word nausea in and of itself
24    in your mind during these education sessions
25    wasn't a warning that nausea may be permanent?

16 (Pages 58 - 61)

Page 62

1  A. Correct.
2  Q. Okay. And assuming that would also be true
3     for say diarrhea --
4  A. Correct.
5  Q. -- that a warning about diarrhea even though
6     it doesn't --
7        MS. WADHWANI:
8           I was just trying to say let her
9        finish the question, and take a beat to
10       allow any objections.
11       THE WITNESS:
12          Sorry. Go ahead.
13       MS. WADHWANI:
14          It's very hard. I appreciate that.
15 EXAMINATION BY MS. PEREZ REYNOLDS:
16 Q. Especially when you already know what your
17    answer is.
18       But with diarrhea as well I notice there's
19    no use of the word permanent.
20       So when you were discussing diarrhea with
21    a patient, did you intend for this checklist
22    or any of the handouts with the use of just
23    the word diarrhea alone to be a warning for
24    permanent diarrhea?
25 A. Correct. I don't.

Page 63

1        MS. WADHWANI:
2           Objection to form.
3        THE WITNESS:
4           I did not expect it to be permanent.
5  EXAMINATION BY MS. PEREZ REYNOLDS:
6  Q. And then if we could just look very quickly at
7     Exhibit #4.
8        This is the informed consent that Ms.
9     Sanford signed, and I believe your signature
10    is also on it as well.
11 A. Yes.
12 Q. Okay. And if I understood your testimony
13    earlier, you did not personally observe Ms.
14    Sanford read every single paragraph or review
15    every single sentence of this document.
16       Is that correct?
17 A. Correct.
18 Q. To your knowledge Ms. Sanford received this
19    document prior to coming to the education
20    training with you or the teaching session?
21 A. I gave it to her the day that she came in for
22    the teaching.
23 Q. I see.
24 A. She did not have it as far as I know.
25       My understanding is that the doctor went

Page 64

1     over it with her, and then I personally went
2     over everything that was written in the
3     specific blanks, and at this point normally we
4     would have touched on all of these that were
5     specific to her treatment.
6        But I always added even death, because I
7     just wanted every patient to understand
8     sometimes worse things happen than we expect.
9  Q. Okay. I wanted to ask you about I believe
10    it's paragraph 5 in the way it's numbered. So
11    it's on the back of the first page there.
12 A. Okay.
13 Q. You had discussed earlier this paragraph 5
14    about no guarantees.
15       Is this paragraph -- Well, first let me
16    ask you did you draft this document?
17 A. No.
18 Q. Do you know who did?
19 A. No.
20       I do know that it was updated prior to
21    this document. During my time there it was
22    updated.
23 Q. Okay. Do you know whether or not paragraph 5
24    is intended to cover side effects that may not
25    be known?

Page 65

1        MS. WADHWANI:
2           Objection to form.
3        THE WITNESS:
4           Yes. And specifically also that it
5        may not work.
6  EXAMINATION BY MS. PEREZ REYNOLDS:
7  Q. Would you also agree that if there is a side
8     effect that is known that it's important to be
9     able to share the information that is known
10    about a drug?
11 A. Yes.
12       MS. WADHWANI:
13          Objection to form.
14 EXAMINATION BY MS. PEREZ REYNOLDS:
15 Q. Then if we could just look at that last page
16    of the informed consent form right before the
17    signature where it lists some of
18    perhaps -- Well, let me ask you.
19       Under this last section here where it has
20    A, and then it lists some side effects 1
21    through 11, do you know why these particular
22    side affects were selected to go in this
23    section?
24 A. I don't know. I didn't have anything to do
25    with the drafting of this. However, these are

17 (Pages 62 - 65)

Page 66

1  every day common side effects from many
2  chemotherapy.
3  Q. I see.
4  A. So they are things that are most likely to
5  happen.
6  Q. And I also notice that it has similar language
7  or descriptions as in Exhibit #3 with the
8  checklist that you had.  I see it has number
9  one is hair loss, and then if we look at six
10  and seven we have nausea and/or vomiting, and
11  then seven constipation and diarrhea.
12 A. Correct.  I would like to add that I chose
13  myself which things to put the checkmark based
14  on my knowledge, and whereas I didn't have
15  anything to do with this list.
16 Q. I see.
17 A. And as you will see they aren't all there.
18     For instance, loss of -- the number nine,
19  loss of lining of interstitial tract from
20  mouth.  It is supposed to say mouth to anus.
21 Q. That's an important clarification.
22 A. Yes.
23     So I am just saying I didn't go by that
24  list.  I went by my personal knowledge of what
25  the chemo could do.

Page 67

1  Q. So Exhibit #3 then, if I understand correctly,
2  is one where you had more input into the side
3  effects that you selected?
4  A. I'm the one who decided what to check on this
5  one based on my knowledge of the specific
6  chemotherapy she was getting, and I felt
7  confident about it, and my doctors felt
8  confident about me being able to choose.
9     Just as in any other credentialing, I have
10  been certified as a nationally certified
11  oncology nurse since 1998.  So I'm not saying
12  I never made a mistake.
13     I'm just saying I had years of experience
14  and knowledge for me to decide, plus what my
15  doctor felt was important just from working
16  with him.
17 Q. Certainly.
18     And I just have a handful more questions
19  about this exhibit on Exhibit #4.
20     When we look at the term hair loss there,
21  based on your knowledge and experience is the
22  use of the term hair loss in this informed
23  consent warning the patient of permanent hair
24  loss?
25 A. No.

Page 68

1     MS. WADHWANI:
2        Objection to form.
3  EXAMINATION BY MS. PEREZ REYNOLDS:
4  Q. And then the same question as to six, the use
5  of the term nausea based on your knowledge and
6  experience, was that intending to be a warning
7  for permanent nausea?
8     MS. WADHWANI:
9        Objection to form.
10    THE WITNESS:
11       No.
12 EXAMINATION BY MS. PEREZ REYNOLDS:
13 Q. And then the same with number seven.  We will
14  use constipation this time instead of
15  diarrhea.
16    But based on your knowledge and
17  experience, was the use of the word
18  constipation alone intended to be a warning
19  for permanent constipation?
20    MS. WADHWANI:
21       Objection to form.
22    THE WITNESS:
23       No.  Not that I know of.
24 EXAMINATION BY MS. PEREZ REYNOLDS:
25 Q. And then if we just could look very quickly at

Page 69

1  Exhibit #5.
2     I believe this is the last visit that we
3  are certain of in which you saw Ms. Sanford,
4  and that appears to have been in November of
5  2013.  Correct?
6  A. Uh-huh (affirmative response).
7     Correct.
8  Q. I believe earlier in your testimony you told
9  us that this second visit with Ms. Sanford you
10  seemed to recall that she did have hair loss
11  and that she had already started chemotherapy.
12     Is that correct?
13 A. At this point she had already had three cycles
14  of Adriamycin.  So most people would be
15  completely bald by the second one.
16     And then she also had had two cycles of
17  Taxotere, Carboplatin, and Herceptin.
18 Q. Do you know as we sit here today what her hair
19  looked like when you saw her on this November
20  visit?
21 A. I can't be 100 percent certain, but I thought
22  she had her head covered.
23 Q. Okay.  After this November date you're not
24  aware of any other time after that which you
25  saw or treated Ms. Sanford?

18 (Pages 66 - 69)

Page 70

1 A. Not specifically, and it's only because she
2   later got on Coumadin that I know it might not
3   have a note to go with it, although it would
4   have lab work to go with it.
5 Q. And my understanding from your testimony is
6   that if she would have come in for an issue
7   related to the Coumadin, you may have briefly
8   seen her, but it wouldn't have been in this
9   kind of setting?
10 A. If she had an issue there would have been a
11   note.
12 Q. Okay.
13 A. There should have been a note.
14 Q. Since 2013 have you seen Ms. Sanford?
15 A. Not that I know of.
16 Q. Okay. And is it fair to say that you have not
17   seen -- Well, let me rephrase that.
18     Is it fair to say that as we sit here
19   today you don't have any independent knowledge
20   about what Ms. Sanford's hair or scalp looks
21   like?
22 A. No, I don't.
23     Sometimes I see people out in public, and
24   I will be honest with you, I never remember
25   their name. But it's just like, oh, I know

Page 71

1   from Dr. So-and-so's office. It's that kind
2   of thing.
3     So if I ever saw her again my only thing
4   would be maybe something like that, but I have
5   no memory of seeing her that I knew that it
6   was her.
7 Q. Okay. And last question.
8     I know you testified earlier that you have
9   not previously met defense counsel or anyone
10   that works with her office.
11 A. Correct.
12 Q. But prior to meeting me this morning for this
13   deposition, have you ever met or spoken with
14   me?
15 A. No.
16 Q. Okay. And have you ever met or spoken with
17   anyone associated from my office prior to
18   today?
19 A. No. No.
20     Cindy Bray was the only person I had any
21   contact with, and most of it was e-mail.
22     MS. PEREZ REYNOLDS:
23     Those are all the questions that I
24   have for you right now.
25     MS. WADHWANI:

Page 72

1     I need a quick break.
2     THE VIDEOGRAPHER:
3     We are now off the record at 12:34.
4   (Off the record.)
5     THE VIDEOGRAPHER:
6     Now back on the record at 12:50.
7 EXAMINATION BY MS. WADHWANI:
8 Q. Ms. Owens, how many years have you been
9   involved in the care and treatment of breast
10   cancer patients?
11 A. 26.
12 Q. And did I hear you state correctly that in all
13   those years, 26 years you haven't seen a
14   patient with permanent hair loss from taking
15   Adriamycin?
16 A. Correct.
17 Q. And in those 26 years in which you
18   participated in the care and treatment of
19   breast cancer patients, you had not seen a
20   patient with permanent hair loss from taking
21   Docetaxel or Taxotere?
22     MS. PEREZ REYNOLDS:
23     Object to form.
24     THE WITNESS:
25     That's correct.

Page 73

1 EXAMINATION BY MS. WADHWANI:
2 Q. Are you aware of the interactions that Hospira
3   has had with the Food and Drug Administration
4   related to Docetaxel?
5 A. No.
6 Q. Are you aware of what information the FDA
7   knows about Docetaxel?
8     MS. PEREZ REYNOLDS:
9     Object to form.
10     THE WITNESS:
11     Only what's in the PI.
12     Now I have heard the late night
13   advertisements about the claims that
14   they are saying for if you have
15   permanent. Seems like they say
16   peripheral neuropathy.
17 EXAMINATION BY MS. WADHWANI:
18 Q. My question is are you aware of what
19   information the FDA knows about Docetaxel?
20     MS. PEREZ REYNOLDS:
21     Same objection.
22     THE WITNESS:
23     Nothing specific, no.
24 EXAMINATION BY MS. WADHWANI:
25 Q. Have you communicated with the FDA about

19 (Pages 70 - 73)

Page 74

1  Docetaxel?
2  A. No.
3  Q. I want to direct your attention please back to
4  Exhibit #3.  Let's please look again on page 4
5  of this document which ends with the last
6  three numbers 739.
7     You have checked here as part of the
8  process that you described earlier nerve
9  changes.  Correct?
10 A. Correct.
11 Q. Do you agree that nerve changes from
12 chemotherapy can be permanent?
13 A. Yes.
14 Q. You have also checked here sexual and
15 fertility changes in women.  Correct?
16 A. Yes.
17 Q. Do you agree that sexual and fertility changes
18 in women from chemotherapy can be permanent?
19 A. Yes.
20 Q. If you could turn, please, to Exhibit #4.  It
21 should be the informed consent form unless I
22 got my exhibits wrong.
23    MS. PEREZ REYNOLDS:
24       That's correct.
25 EXAMINATION BY MS. WADHWANI:

Page 75

1  Q. Thank you.
2     And looking again on page 3 where the list
3  of material risks is located.
4     Are you there?
5  A. Yes.
6  Q. The third risk states damage to brain, heart,
7  kidneys, liver, lungs, nervous system, and
8  skin.
9  A. Yes.
10 Q. Can that damage be permanent?
11 A. Yes.
12 Q. It also states in number five sterility.
13    Can sterility be permanent?
14 A. Yes.
15 Q. In fact, sterility is permanent.  Correct?
16 A. Most of the time.  Yes.
17 Q. Okay.  So is it fair to say that you didn't
18 understand these lists of the risks in
19 Exhibit #3 and Exhibit #4 to simply identify
20 temporary side effects?
21    MS. PEREZ REYNOLDS:
22       Object to form.
23    THE WITNESS:
24       I think that these are -- they don't
25    specify permanent or temporary.  I think

Page 76

1     that is on purpose, because we don't
2     always know.
3  EXAMINATION BY MS. WADHWANI:
4  Q. We don't always know what side effects are
5  going to be temporary or permanent in any
6  patient, do we?
7  A. Correct.
8     MS. PEREZ REYNOLDS:
9        Object to form.
10 EXAMINATION BY MS. WADHWANI:
11 Q. And you never guarantee to any patient that a
12 risk would be temporary or permanent.
13    Is that correct?
14    MS. PEREZ REYNOLDS:
15       Object to form.
16    THE WITNESS:
17       Correct.
18 EXAMINATION BY MS. WADHWANI:
19 Q. And that is true of Mrs. Sanford, you never
20 gave her any guarantee that any of these side
21 effects would be temporary or permanent.
22    Correct?
23    MS. PEREZ REYNOLDS:
24       Object to form.
25    THE WITNESS:

Page 77

1     I don't recall specific, but I can't
2     imagine that I would have.  So I would
3     say no.
4  MS. WADHWANI:
5     That's all I have.  Thank you very
6  much.
7  MS. PEREZ REYNOLDS:
8     I don't have any further questions.
9  THE VIDEOGRAPHER:
10    Today's deposition consists of one
11 media.  We are now off the record at
12 12:55.
13 (Conclusion.)

20 (Pages 74 - 77)

Page 78

```
 1          REPORTER'S CERTIFICATE
 2      I, LINDY ROOT, Certified Court Reporter, as
 3  the officer before whom this testimony was taken,
 4  do hereby certify that the above-mentioned
 5  witness, after having been duly sworn by me upon
 6  authority of R.S. 37:2554, did testify as
 7  hereinabove set forth; that this testimony was
 8  reported by me in the stenotype reporting method,
 9  was prepared and transcribed by me or under my
10  personal direction and supervision, and is a true
11  and correct transcript to the best of my ability
12  and understanding; that the transcript has been
13  prepared in compliance with transcript guidelines
14  required by statute or by rules of the board,
15  that I have acted in compliance with the
16  prohibition on contractual relationships, as
17  defined by Louisiana Code of Civil Procedure
18  Article 1434 and in rules and advisory opinions
19  of the board; that I am not related to counsel or
20  the parties herein, nor am I otherwise interested
21  in the outcome of this matter.
22
23
24
25          LINDY ROOT, CCR, RPR
```

Veritext Legal Solutions
www.veritext.com
212-279-9424                                                    212-490-3430