# EXHIBIT T

*Crochet v. Bristol-Myers Squibb Co.,*
No. 19-30026 (5th Cir. March 13, 2020) (unpublished)

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 19-30026

United States Court of Appeals
Fifth Circuit
**FILED**
March 13, 2020
Lyle W. Cayce
Clerk

RAYMOND CROCHET,

    Plaintiff - Appellant

v.

BRISTOL-MYERS SQUIBB COMPANY; OTSUKA AMERICA PHARMACEUTICAL, INCORPORATED,

    Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:16-CV-36

Before SOUTHWICK, GRAVES, and ENGELHARDT, Circuit Judges.
PER CURIAM:*

    Raymond Crochet appeals the district court's entry of summary judgment in favor of Defendants, Bristol-Myers Squibb Company and Otsuka America Pharmaceutical, Inc. Crochet alleges that Defendants created an unreasonably unsafe drug and subsequently failed to adequately warn of its dangers. On appeal, he asserts that the district court erred in resolving

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Case 2:16-md-02740-JTM-MBN   Document 9918-21   Filed 04/09/20   Page 3 of 13
Case 2:16-md-02740-JTM-MBN   Document 9548-3   Filed 03/14/20   Page 3 of 13

No. 19-30026

genuine issues of material fact against him, the non-movant, and in holding his claim is time barred by the one-year Louisiana prescriptive period. Because we find a genuine issue as to whether Crochet's claim prescribed, we REVERSE.

I.

In August 2005, Crochet began a decade-long battle with depression. He struggled through countless trials of different antidepressant medications with limited to no success. In July 2012, Crochet was admitted to Greenbrier Hospital for a psychiatric stay. After he was released and began out-patient treatment, he was prescribed Abilify, an antipsychotic drug used to treat Major Depressive Disorder, at five milligrams per day. Over the course of the next year, his doctors steadily increased his dosage until he was taking twenty milligrams of Abilify per day. The FDA-approved label for Abilify in use at the time when Crochet began treatment warned that tardive dyskinesia[1] ("TD") is a serious side effect associated with Abilify and that the symptoms of TD may start after use of Abilify is stopped.

During an appointment on July 28, 2014, Crochet's primary care physician, Dr. Clinton Sharp, noticed that Crochet had developed a shuffling gait. Dr. Sharp suspected Parkinsonism and referred Crochet to a neurologist, Dr. James Houser. On August 1, 2014, Dr. Houser similarly observed an abnormal gait, noting Crochet's station was "stooped, [with] short steps, [and] slow with dec[reased] arm swing." Dr. Houser diagnosed Crochet with Parkinsonism "hopefully due to neuroleptics." He referred Crochet to a psychiatrist, advised Crochet to avoid neuroleptics, recommended decreasing Abilify to ten milligrams a day, and suggested a follow up appointment if

---

[1] "Tardive dyskinesia is a severe neurological disorder that causes involuntary muscle movements, or twitching." *Jenkins v. Bristol-Myers Squibb Co.*, 689 F. App'x 793, 795 (5th Cir. 2017).

2

Case 2:16-md-02740-JTM-MBN Document 9318-21 Filed 04/09/20 Page 4 of 13
Case 2:16-md-02740-JTM-MBN Document 9548-3 Filed 03/14/20 Page 4 of 13

No. 19-30026

symptoms "did not resolve off Abilify." Crochet stopped taking Abilify and, shortly thereafter, his Parkinsonism symptoms subsided.

On September 18, 2014, Crochet was seen by Scott St. Amant, his mental health Nurse Practitioner at LifeNet Psychiatry. At this appointment, St. Amant observed Crochet's shuffling gait but, for the first time, also noted that he presented with "obvious lip-smacking." St. Amant recommended that Crochet follow-up with a neurologist for his orofacial movements. On October 3, 2014, Crochet visited with St. Amant for a second time. By this appointment, St. Amant described Crochet's abnormal gait as "attenuated,"[2] but because he continued to exhibit lip-smacking, St. Amant again stressed the importance of following up with a neurologist. In his later deposition, St. Amant recounted that "he became concerned about tardive dyskinesia after this appointment" but did not recall telling Crochet specifically about TD. On October 7, 2014, Crochet was seen by his neurologist, Dr. Houser. After observing his mouth movements, Dr. Houser diagnosed Crochet with TD.

Exactly one year later, on October 7, 2015, Crochet filed his products liability lawsuit in Louisiana state court. Crochet sought damages for personal injuries and alleged that Defendants violated LA. CIV. CODE art. 2520 on warranty against redhibitory defects as well as the Louisiana Products Liability Act ("LPLA"). LA. STAT. ANN. § 9:2800.51 et seq. Specifically, he claimed that he was entitled redress based on (1) Abilify's unreasonably dangerous design; (2) inadequate warnings and failure to warn of TD; (3) inadequate warning as to the severity of TD's conditions; and (4) inadequate warnings as to the procedures necessary to monitor patients taking Abilify.

---

[2] St. Amant explained that attenuated "means that it wasn't a pronounced, extensive, I guess, symptom that I saw. I thought that there was some appreciation for a shuffle in his gait, but I didn't think it was severe at the time."

3

No. 19-30026

Defendants removed the case to the United States District Court for the Middle District of Louisiana pursuant to 28 U.S.C. § 1332(a).

In September 2017, Defendants moved for summary judgment, asserting that (1) Crochet's suit was filed more than a year after he had notice of his claims, (2) he cannot show that a deficiency in the Abilify warning caused his injuries, and (3) he has not proffered any expert testimony on design defect as required by Louisiana law. Based on the Louisiana one-year prescriptive period, the district court found that Crochet's claim was time barred and granted Defendant's motion for summary judgment on that ground alone. After the district court denied Crochet's motion for a new trial, he timely filed this appeal.

II.

We review the grant of summary judgment *de novo*. *Callahan v. Gulf Logistics, L.L.C.*, 456 F. App'x 385, 389 (5th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, all the evidence and factual inferences are viewed in a light most favorable to the non-moving party, resolving all reasonable doubts accordingly. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). "A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Id.* Material facts are those that "might affect the outcome of the suit under the governing law." *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003) (internal quotation marks and citation omitted). Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed. *Terrebonne*, 310 F.3d at 877. Thereafter, the burden shifts to the non-movant to identify or produce evidence that establishes a

No. 19-30026

genuine dispute of material fact. *Allen v. Rapides Par. Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000).

This court generally upholds district court grants of summary judgments against parties who attempt to retract sworn statements which are fatal to their claims. *Albaugh Chem. Corp. v. Occidental Electrochemicals Corp.*, 4 F.3d 989, 989 (5th Cir. 1993) (gathering cases). Generally, the "nonmoving party cannot defeat a summary judgment motion by attempting to create a disputed material fact through the introduction of an affidavit that directly conflicts with his prior deposition testimony." *Callahan*, 456 F. App'x at 392 (internal citations omitted). Explanations of or supplementations to prior deposition testimony do not offend these rules as they do not "clearly contradict" that deposition testimony. *Id.*

### III.

Under the Louisiana Products Liability Act, Crochet's claims are subject "to a liberative prescription of one year." LA. CIV. CODE art. § 3492. Prescription begins to run the day injury or damage is sustained. *Id.* Damages are "sustained" when they are "actual and appreciable and not merely speculative." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 299 (5th Cir. 1999). But "[i]n order to mitigate occasional harshness of the operation of the prescription statute[,] our courts have implemented the jurisprudential doctrine of *contra non valentem*." *Harvey v. Dixie Graphics, Inc.*, (La. 1/17/1992), 593 So. 2d 351, 354. For instance, in the case of a "plaintiff who is unaware that the damage suffered is the fault of the defendant," *contra non valentem* suspends "the running of prescription until such time as the plaintiff knew or reasonably should have known that his or her damages were the fault of the defendant's negligent act." *Carter v. Haygood*, 04-0646 (La. 01/19/05), 892 So. 2d 1261, 1268.

5

No. 19-30026

To determine whether Crochet's claim is time-barred, a brief review of the key dates here is useful. On August 1, 2014, Crochet was observed to have a shuffling gait, diagnosed with Parkinsonism, and told to reduce his Abilify intake. At some unknown point between August 1 and September 18, 2014, Crochet stopped taking Abilify and his shuffling gait ceased, but he began to experience abnormal mouth movements. He had appointments with St. Amant on September 18 and October 3, 2014. Then, on October 7, 2014, Dr. Houser officially diagnosed Crochet with TD as a side effect of his prolonged use of Abilify. Crochet filed suit exactly one year later, on October 7, 2015. Thus, under Louisiana's one-year prescription period, Crochet's suit is timely if statutory prescription would not commence until October 7, 2014 or if *contra non valentem* suspends prescription until that date.

We will assume, *arguendo*, that statutory prescription would commence on August 1, 2014 — the earliest possible date that Crochet could have realized symptoms and sustained damages stemming from TD. *Contra non valentem* would save even this otherwise time-barred claim if and for as long as it was reasonable for Crochet to remain unaware of the connection between those damages and Abilify. The resolution of this appeal hinges, then, on whether Crochet acquired "actual or constructive" knowledge of the connection between his abnormal mouth movements and Abilify prior to October 7, 2014[3] (i.e., one year before he filed his claim). *Campo v. Correea*, 2001-0646 (La. 6/21/02), 828 So. 2d 502, 510. If he did, *contra non valentem* cannot save his claim.

The district court held that "the undisputed facts establish that prior to October 7, 2014, Crochet exhibited cognizable injuries... and he was aware of

---

[3] We note that October 7, 2014 is also the date that Crochet was diagnosed with TD and learned that Abilify caused his damages. Therefore, October 7, 2014 is the last day *contra non valentem* could toll the running of prescription.

6

Case 2:16-md-02740-JTM-MBN Document 9918-21 Filed 04/09/20 Page 8 of 13
Case 2:16-md-02740-JTM-MBN Document 9548-3 Filed 03/14/20 Page 8 of 13

No. 19-30026

their connection to Abilify." The court found the following deposition exchange to be dispositive:

> Q. [defense counsel]. Did you know before you looked up Abilify that it was the Abilify that was probably –
>
> A. [Crochet]. Yes, I knew that when I stopped taking the drug this started happening. That's the only variable there was.
>
> Q. So you're taking Abilify, you stop taking Abilify, and then you start experiencing the mouth movements. And so at that point you knew it had to be the Abilify because that's what happened when you stopped taking it?
>
> A. Yes.
>
> Q. And so that's why you looked it up?
>
> A. Yes.

Indeed, the court emphasized that in reaching its conclusion, it "did not rely on" evidence that St. Amant discussed orofacial movements with Crochet prior to October 7, 2014. Rather, citing to the excerpt above, the court affirmed that it was "Crochet's own testimony [that] established that he was aware that his symptoms were being caused by Abilify before October 7, 2014."

The court's interpretation of this passage — that Crochet connected his mouth movements to Abilify almost immediately after he began experiencing those symptoms — is certainly reasonable. But it is not the only reasonable interpretation. Equally plausible is that Crochet's answer was insight that came only with the benefit of hindsight. That is, it was only after October 7, 2014, when Dr. Hauser finally explained that Crochet's mouth movements were a side effect of Abilify, that Crochet was able to reflect back and realize Abilify was "the only variable." The latter interpretation is more credible when read in context of Crochet's deposition.

7

No. 19-30026

Specifically, Crochet also testified that when he was prescribed Abilify, he "never... read anything that described [TD]," and that at the time his mouth movements began, he did not think to research Abilify. Rather, he testified that he did not research Abilify until "months" after the mouth movements started. The crucial deposition excerpt above implies that Crochet's research and epiphany that Abilify caused his mouth movements occurred simultaneously. Thus, this testimony that the research came "months" after his symptoms began (potentially in September) could mean that the connection was also not made until *after* October 7, 2014.

Relatedly, Crochet explained that "If there's a side effect, if I'm having trouble with something, I go to [the doctor], you know. I don't try and diagnose myself." He testified that until his October 7, 2014 visit with Dr. Houser, he "never knew the word[s] [tardive dyskinesia] existed." Again, Crochet iterated that before October 7, 2014, he was not aware that his lip smacking was a symptom of tardive dyskinesia. Still, other inconsistencies are patent. While Crochet testified that he looked up Abilify because he was "trying to figure out... what was causing this to happen," he was inconsistent in the same line of questioning by intimating that he looked up Abilify only because he definitively knew it caused his abnormal mouth movements.[4]

Deposition testimony from Crochet's treatment providers also supports the notion that Crochet did not connect his mouth movements to Abilify until after his diagnosis. Dr. Sharp testified that after the Parkinsonism diagnosis, he did not warn Crochet to look out for other side effects of Abilify. Similarly, when asked whether he warned Crochet about other movement disorders that

---

[4] During his deposition, Crochet explained that he looked up Abilify "because that's what was causing it." Crochet also claimed that he did not have mouth movements until his second visit with Dr. Houser on October 7, 2014. Crochet then admitted that he "probably did [speak with St. Amant about his mouth movements] because [he] probably had those symptoms at that time."

8

Case 2:16-md-02740-JTM-MBN Document 9918-21 Filed 04/09/20 Page 10 of 13
Case 2:16-md-02740-JTM-MBN Document 9348-3 Filed 03/14/20 Page 10 of 13

No. 19-30026

Abilify can cause, Dr. Houser responded that he "probably would [not] have done that." Finally, St. Amant documented lip-smacking in September 2014 but testified that it was "likely" he did not warn Crochet that it was TD because he was wary of "putting a label on it that would scare him." When asked whether he told Crochet that the Abilify could possibly be causing the mouth movements, St. Amant replied "I don't think so."

In sum, viewed in a light most favorable to the non-movant, deposition testimony reveals that prior to October 7, 2014: Crochet did not think to research Abilify as it related to his mouth movements; his doctors did not warn him that decreasing his dosage of Abilify might be causing other movement disorders; Crochet did not voice any concerns about Abilify in either of his two appointments with St. Amant after the mouth movements manifested; and, Crochet did not know that mouth movements were indicative of a serious side effect of Abilify.[5] Based on the foregoing, a reasonable factfinder[6] could conclude that before his diagnosis on October 7, 2014, Crochet had not yet made a connection between his abnormal mouth movements and Abilify — nor would a reasonable person have definitively made that connection. [7]

---

[5] Considering TD is a known and labeled side effect of Abilify, it may be reasonable to charge Crochet with notice that TD is a side effect of Abilify. But because Crochet's underlying claim challenges the sufficiency of Abilify's warning label, we treat this as another issue of material fact that must be construed in favor of the nonmovant. Defendants raised this issue in a second motion for summary judgment, which was denied as moot after the district court found the claim prescribed. On remand, when considering whether it was reasonable for Crochet to connect his mouth movements to Abilify prior to October 7, 2014 (and, thus, whether *contra non valentem* saves his claims), the district court may consider the sufficiency of the notice.

[6] This case is slated for a bench trial.

[7] To be sure, "commencement of prescription does not necessarily wait for the pronouncement" of a diagnosis. *Luckett*, 171 F.3d at 300. But Crochet need not have "conclusive, dispositive proof of a causal connection between the suspected injury and the putative tortfeasor" to trigger the running of prescription. *Carter v. Matrixx Initiatives, Inc.*, 391 F. App'x 343, 345-46 (5th Cir. 2010). And "[m]ere apprehension that something might be wrong is insufficient to commence the running of prescription." *Lecompte v. St. Dep't of*

No. 19-30026

Admittedly, Crochet's deposition testimony is confusing and, at times, out-right contradictory. But to overcome summary judgment, Crochet was only required to produce or identify[8] evidence that raises a reasonable doubt that he connected Abilify to his mouth movements before his diagnosis. *Luckett*, 171 F.3d at 299. The court wholly relied on a single vague excerpt of deposition testimony and did not establish a specific date on which Crochet acquired the requisite knowledge. Even "thin" contrary evidence can be "sufficient to create a fact issue." *Callahan*, 456 F.App'x at 394. We find that Crochet satisfied his burden.[9] Our decision here is further bolstered by Louisiana's mandate that prescription statutes are to be strictly construed against prescription and in favor of the claim sought to be extinguished. *Bailey v. Khoury*, 2004-0620 (La. 1/20/05), 891 So. 2d 1268, 1275.

Finally, we note that in granting summary judgment to defendants, the district court found *Jenkins v. Bristol Myers-Squibb*, 689 F. App'x 793 (5th Cir. 2017) persuasive. Jenkins, like Crochet, was prescribed Abilify, began experiencing TD symptoms, and filed suit more than one year later. *Id.* at 795. The defendants in *Jenkins* also moved for summary judgment on grounds that the claim — filed in October 2014 — had prescribed. *Id.* We agreed, finding prescription commenced when "Jenkins knew that his twitching may have

---

*Health & Hum. Resources*, 97-1878, p.5-6 (La. App. 1 Cir. 9/25/98), 723 So. 2d 474, 477 (*citing Cordova v. Hartford Accident & Indemnity Company*, 387 So. 2d 574, 577 (La.1980)).

[8] While an explanatory affidavit from Crochet would likely have been helpful, it was not — as Appellants assert — necessary. FED. R. CIV. P. 56(c)(1)(A); *see Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004) ("The nonmoving party's response, by affidavit *or otherwise*, must set forth specific facts showing that there is a genuine issue for trial") (emphasis added).

[9] At a minimum, the statements identified by Crochet show inconsistencies within his deposition testimony. Resolving this lack of clarity "is inconsistent with fundamental rules of summary judgment. By choosing which testimony to credit and which to discard, the court improperly weighed the evidence and resolved disputed issues in favor of the moving party." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236 (5th Cir. 2015) (finding a genuine issue of material fact where, based on inconsistencies in depositions, "there is doubt [Defendant] knew of [Plaintiff's] internet use when he made the termination decision").

10

No. 19-30026

been related to Abilify [more than one year prior] in April 2013." *Id.* at 796. Although "the crucial date for the prescriptive period is… not the date of diagnosis," we based our holding on Jenkins's testimony that in April 2013, his doctor explained to him that Abilify may have caused his symptoms. *Id.* at 796-97. Imperatively, Jenkins did not dispute that he was aware of the connection between his symptoms and Abilify in April 2013. Our decision in *Jenkins* does not compel affirmance here, where the district court found that prescription began at a time before Crochet's doctors gave him any warning about Abilify and at a time Crochet argues he was unaware of the connection between Abilify and his mouth movements.

The facts of this case are more similar to *Cordova v. Hartford Accident & Indemnity, et. al.*, 66,585, (La. 7/23/1980), 387 So. 2d 574. There, the plaintiff underwent a negligently performed surgery and, initially, he experienced one set of side effects that resolved shortly thereafter. *Id.* at 575-76. When he later began to suffer different symptoms, the Supreme Court of Louisiana found the first symptoms "gave him no special insight into the possible causes of his malady." *Id.* at 577. Prescription did not begin when the second symptoms manifested because "[i]t was not unreasonable for plaintiff not to be aware" of the connection to the malpractice when the initial symptoms subsided. *Id.* Ultimately, the court held that "[t]he law does not impose upon a layman the obligation to self-diagnose a psychopathological condition" and "mere apprehension by plaintiff that something was wrong is not sufficient to start prescription." *Id.* at 577 (internal citations omitted).

Likewise, it was reasonable for Crochet not to be aware that Abilify caused his mouth movements when he had stopped taking the medication and the other gait related symptoms had disappeared. His abnormal gait (associated with Parkinsonism) gave him no special insight into the possible causes of his later manifesting mouth movements (associated with TD).

11

No. 19-30026

Crochet acted reasonably in scheduling two appointments with his mental health nurse practitioner and one with his neurologist within about one month of experiencing new symptoms. As in *Cordova*, Crochet raised a question of whether he had more than a "mere apprehension that something was wrong" prior to his TD diagnosis on October 7, 2014. *Id.* (internal citations omitted).

## IV.

Our decision today holds only that a genuine issue remains as to whether *contra non valentem* can preserve Crochet's claim from the beginning of prescription until one year before he filed his claim — October 7, 2014. The resolution of Crochet's testimony and determining whether Crochet's claim prescribed is, without a doubt, a close call. But cognizant that disputed material facts and prescription should be construed in favor of Crochet, we find that such an issue is better fitted for a determination by the factfinder after testimony is heard. For the reasons stated above, we REVERSE.