# EXHIBIT A

| Plaintiff | MDLC Plaintiff ID # | PFS Treatment Date | PFS Upload Date (Sanofi Used for Ex. A – Filed Jan. 7, 2020) | MDL Centrality Doc ID # | New PFS Treatment Date | PFS Upload Date for New Treatment Date | MDL Centrality Doc ID # | Law Firm |
|---|---|---|---|---|---|---|---|---|
| Wright, Sheena | 11110 | 04/??/2002 | 11/4/2019 | 417787 | 8/13/2009 | 2/6/2020 | 439910 | Fears \| Nachawati |
| Parrish, Elizabeth | 2893 | 11/14/2004 | 6/25/2018 | 191548 | 11/14/2008 | 1/31/2020 | 438396 | Bachus & Schanker, LLC |
| Alexander, Sheriba | 2410 | 6/1/2006 | 6/25/2018 | 191311 | 3/6/2007 | 1/17/2020 | 434387 | Bachus & Schanker, LLC |
| Gaffney, Judy | 7531 | 2/1/2006 | 6/28/2018 | 193903 | 3/8/2007 | 1/30/2020 | 438190 | Bachus & Schanker, LLC |
| Laudat, Janet | 2251 | 10/12/2006 | 6/24/2018 | 190600 | 1/4/2007 | 1/31/2020 | 438348 | Bachus & Schanker, LLC |
| Shearin, Michelle | 13181 | 11/??/2006 | 10/29/2019 | 416286 | 1/12/2007 | 2/6/2020 | 439914 | Fears \| Nachawati |
| Gray, Alice | 7028 | 11/17/2006 | 6/4/2018 | 177031 | 11/17/2006 | 6/4/2018 | 177031 | Johnson Becker |
| Johnson, Dawn | 12371 | 9/??/2006 | 6/21/2019 | 381368 | 9/??/2006 | 6/21/2019 | 381368 | Reyes\|Browne\|Reilley |
| Tatum, Dorothy | 10977 | 11/3/2006 | 8/21/2019 | 401144 | 2/8/2007 | 1/21/2020 | 435301 | Morris Bart, LLC |
| Blacknell, Monique | 12654 | 10/??/2006 | 8/21/2019 | 401091 | 10/??/2006 | 8/21/2019 | 401091 | Terry & Thweatt, P.C. |
| Diggs, Mollie | 1483 | --/--/2001 | 11/6/2017 | 33529 | --/--/2001 | 11/6/2017 | 33529 | Allan Berger & Associates |
| Rutledge, Elaine | 7988 | 1/1/2004 | 12/20/2018 | 282391 | 1/1/2004 | 12/20/2018 | 282391 | Brown & Crouppen |
| Weeks, Helen | 11524 | 11/18/1999 | 1/3/2020 | 430525 | 12/1/2009 | 1/17/2020 | 434518 | Morris Bart, LLC |
| Beauchemin, Marie | 2499 | 10/23/2006 | 4/9/2018 | 132787 | 10/23/2006 | 4/9/2018 | 132787 | Johnson Becker |
| Hill, Sylvia | 12641 | 11/16/2006 | 5/17/2019 | 360689 | 11/16/2006 | 5/17/2019 | 360689 | Johnson Becker |
| Nicodemus, Sue | 12536 | 12/8/2006 | 5/8/2019 | 354067 | 12/8/2006 | 5/8/2019 | 354067 | Johnson Becker |

# EXHIBIT B

| State | Case |
|-------|------|
| Alabama | To establish the defendant's duty to warn, the plaintiff must prove that: (1) the defendant placed the product in question on the market, (2) the product was substantially unaltered when the plaintiff used it, (3) the product was imminently dangerous when put to its intended or customary purpose, and (4) the defendant knew or should have known that the product could create a danger when used in its intended or customary manner. *Campbell v. Robert Bosch Power Tool Corp.*, 795 F. Supp. 1093, 1097 (M.D. Ala. 1992). |
| Alaska | If such a defect is the proximate cause of the plaintiff's injuries, the manufacturer is strictly liable unless the defendant manufacturer can prove that the risk was scientifically unknowable at the time the product was distributed to the plaintiff. *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1200 (Alaska 1992). |
| Arizona | The trial court did not err by instructing the jury that it could only consider whether, at the time of the M–26's distribution, Taser knew or should have known that the M–26 was unreasonably dangerous unless accompanied by an adequate warning. *Powers v. Taser Int'l, Inc.*, 174 P.3d 777, 784 (Ariz. Ct. App. 2007). |
| Arkansas | The issue of due care in giving adequate warning, essentially in the same terms used to define negligence, is placed squarely in the strict liability instruction. Foreseeability is an inherent consideration in determining negligence, and the instruction makes it so with respect to strict liability. *DeLuryea v. Winthrop Labs.*, 697 F.2d 222, 228–29 (8th Cir. 1983) (applying Arkansas law). |
| California | The rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. *Carlin v. Superior Court*, 920 P.2d 1347, 1351 (Cal. 1996). |
| Colorado | A manufacturer cannot warn of dangers that were not known to it or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution. *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1175 (Colo. 1993). |
| Connecticut | Though the [CPLA] does not specifically describe the boundaries of the seller's duty, any more than the CPLA spells out the elements of any of the causes of action it was enacted to encompass, the fundamental principle that a seller's duty to warn is premised on the existence of its knowledge or its reason to know of the hazards is evident. *LaMontagne v. E.I. Du Pont De Nemours & Co.*, 41 F.3d 846, 859 (2d Cir. 1994) (Connecticut law). |
| Delaware | The manufacturer's duty to warn is dependant [sic] on whether it had knowledge of the hazards associated with its product. Colgain, however, does |

| | |
|---|---|
| | not need to present evidence that Finska Mineral had actual knowledge of those dangers. It is enough that he merely establish that the manufacturer should have known of them. *In re Asbestos Litig.*, 799 A.2d 1151, 1152 (Del. 2002). |
| District of Columbia | The bulk of the case law . . . holds that a manufacturer is not an insurer of his product, and that he may not be held liable for failure to warn absent a finding that the injury resulting from his product because it was inadequately labelled was reasonably foreseeable. *Payne v. Soft Sheen Prod., Inc.*, 486 A.2d 712, 722 n.8 (D.C. 1985). |
| Florida | [M]anufacturers are not required to warn of every risk which might be remotely suggested by any obscure tidbit of available knowledge, but only of those risks which are discoverable in light of the 'generally recognized and prevailing best' knowledge available. *Barrow v. Bristol-Myers Squibb*, No. 96-689-CIV-ORL-19B, 1998 WL 812318, at *30 (M.D. Fla. Oct. 29, 1998). |
| Georgia | To establish a failure to warn claim, "a plaintiff must show that (1) the defendant knew, or had reason to know, that the product is likely to be dangerous for the intended use; (2) the defendant had no reason to believe that the user would realize the danger; and (3) the defendant failed to exercise reasonable care to inform the user about the danger." *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1360 (N.D. Ga. 2016). |
| Idaho | While sellers need not be clairvoyant, they are held to the knowledge and experience of experts in their fields. Knowledge of the product's risks based on reliable and obtainable information is imputed to the seller. Thus, the balancing between benefits and risks is based on the best available information at the time of distribution, not merely the information known to the seller. *Toner v. Lederle Labs.*, 732 P.2d 297, 307 (Idaho 1987) (internal citations omitted). In *Toner*, the Idaho Supreme Court – while discussing a strict liability design defect claim – explained that "as we recently stated: '[T]here generally is little difference in the requirements and analysis of the duty to warn under either a negligence of strict liability theory[.]'" *Id.* at 305 n.7 (Idaho 1987) (quoting *Sliman v. Aluminum Co. of Am.*, 731 P.2d 1267, 1270 (Idaho 1986)). |
| Illinois | We perceive that requiring a plaintiff to plead and prove that the defendant manufacturer knew or should have known of the danger that caused the injury, and that the defendant manufacturer failed to warn plaintiff of that danger, is a reasonable requirement, and one which focuses on the nature of the product and on the adequacy of the warning, rather than on the conduct of the manufacturer. *Woodill v. Parke Davis & Co.*, 402 N.E.2d 194, 198 (Ill. 1980). |
| Indiana | Because a manufacturer cannot be required to warn of a risk unknown to science, the knowledge chargeable to him must be limited to that of the period during which the plaintiff was using the product in question. *Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 548 (Ind. Ct. App. 1979). |

| | |
|---|---|
| Iowa | We conclude, therefore, that the manufacturer Ortho had no duty to warn when it did not know or should not have known of the danger. The contention that plaintiffs urge would impose a duty on a manufacturer to warn of unknown dangers, and we do not adopt such a requirement. *Moore v. Vanderloo*, 386 N.W.2d 108, 116 (Iowa 1986). |
| Kansas | Ortho is under a duty to make known to the medical profession, or at least those physicians who are prescribing that drug, any of the dangerous side effects of which it knows or has reason to know. *Wooderson v. Ortho Pharm. Corp.*, 681 P.2d 1038, 1062 (Kan. 1984). |
| Kentucky | Generally, a manufacturer has a duty to warn of dangers that it either knew or should have known. . . .  A manufacturer will not be charged with constructive knowledge of a risk that was unknown in the medical community. *Prather v. Abbott Labs.*, 960 F. Supp. 2d 700, 708, 711 (W.D. Ky. 2013). |
| Louisiana | [A] manufacturer's duty to warn a particular plaintiff is measured by the state of scientific and/or technical knowledge at the time the product left the manufacturer's control. *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 272 n.11 (5th Cir. 2002). |
| Maine | Under this standard, when the strict liability defect consists of a failure to warn, reasonableness of the manufacturer's conduct is a factor in determining whether the manufacturer had a duty to warn.  The conduct should be measured by knowledge at the time the manufacturer distributed the product. Given the scientific, technological and other information available when the product was distributed, did the manufacturer know or should he have known of the danger. In other words, did he have actual or constructive knowledge of the danger. *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 538 (Me. 1986). |
| Maryland | Thus, where a product lacks a warning because of insufficient knowledge on the part of the manufacturer or in the scientific field involved, the product is not defective.  As defectiveness is an element to be proven by the plaintiff, the knowledge or state of the art component is not an affirmative defense. *Gourdine v. Crews*, 955 A.2d 769, 781 n.10 (Md. 2008) (quoting *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 641 n.8 (Md. 1992)). |
| Massachusetts | In recognition of the clear judicial trend regarding the duty to warn in products liability cases, and the principles stated in Restatement (Third) of Torts: Products Liability, supra at § 2(c) and comment m, we hereby revise our law to state that a defendant will not be held liable under an implied warranty of merchantability for failure to warn or provide instructions about risks that were not reasonably foreseeable at the time of sale or could not have been discovered by way of reasonable testing prior to marketing the product. *Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909, 923 (Mass. 1998). |

| | |
|---|---|
| Michigan | In a product liability action brought against a manufacturer or seller for harm allegedly caused by a failure to provide adequate warnings or instructions, a manufacturer or seller is not liable unless the plaintiff proves that the manufacturer knew or should have known about the risk of harm based on the scientific, technical, or medical information reasonably available at the time the specific unit of the product left the control of the manufacturer.  Mich. Comp. Laws Ann. § 600.2948(3). |
| Minnesota | Under Minnesota law, a manufacturer has a duty to warn users of its products of all dangers associated with those products of which it has actual or constructive knowledge.  Failure to provide such warnings will render the product unreasonably dangerous and will subject the manufacturer to liability for damages under strict liability in tort.  *Karjala v. Johns-Manville Prod. Corp.*, 523 F.2d 155, 158 (8th Cir. 1975). |
| Mississippi | [T]he manufacturer, designer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller, the manufacturer, designer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.  Miss. Code. Ann. § 11-1-63. |
| Missouri | As used in this section, "state of the art" means that the dangerous nature of the product was not known and could not reasonably be discovered at the time the product was placed into the stream of commerce.<br><br>The state of the art shall be a complete defense and relevant evidence only in an action based upon strict liability for failure to warn of the dangerous condition of a product. This defense shall be pleaded as an affirmative defense and the party asserting it shall have the burden of proof.<br><br>Mo. Ann. Stat. § 537.764(1)-(2). |
| Nebraska | The additional language suggests that manufacturers should have supplied warnings reporting any scientific or medical evidence tending to show an association between inhalation of asbestos dust and mesothelioma regardless of whether that evidence represented the generally recognized and prevailing best technology reasonably available to the industry during the 1940s.  Under a state-of-the-art defense, warnings of scientific or medical concerns should not be required if the concerns are not generally recognized as reflecting the best data reasonably available at the time. *Menne v. Celotex Corp.*, 861 F.2d 1453, 1472 (10th Cir. 1988) (Nebraska law). |

| | |
|---|---|
| Nevada | Many courts have examined and compared the application of strict liability and negligence theories and concluded that there is sometimes little, if any, difference between the 2 theories in the failure to warn context. Under both theories the duty to warn rests on the negligence concept of foreseeability . . . [and] recovery ultimately depends upon . . . what constitutes reasonable warning. . . . Thus, it has been said that the test of liability for failure to warn still contains a standard of reasonableness. *Forest v. E.I. DuPont de Nemours & Co.*, 791 F. Supp. 1460, 1464 (D. Nev. 1992). |
| New Hampshire | "Foreseeability"—i.e., what a manufacturer "knew or should have known" about the dangers of its product—is substantially determined by the knowledge a manufacturer 'should have' acquired, and the tests it "should have" conducted. *Cheshire Med. Ctr. v. W.R. Grace & Co.*, 853 F. Supp. 564, 570 (D.N.H. 1994), *aff'd*, 49 F.3d 26 (1st Cir. 1995). |
| New Jersey | Similarly, as to warnings, generally conduct should be measured by knowledge at the time the manufacturer distributed the product. Did the defendant know, or should he have known, of the danger, given the scientific, technological, and other information available when the product was distributed; or, in other words, did he have actual or constructive knowledge of the danger? *Feldman v. Lederle Labs.*, 479 A.2d 374, 386 (N.J. 1984). |
| New Mexico | The supplier of a product which is defective by reason of a latent production flaw is universally held liable under strict products liability notwithstanding the fact that by inspection, testing, X-ray or any other means known to science at the time the product was placed on the market, it was not possible to know of the unreasonable risk of injury. *Stang v. Hertz Corp.*, 83 N.M. 730, 497 P.2d 732 (1972) (rented tire defective because of impact damage which was not discoverable by normal inspection procedures). While it may be an illogical inconsistency to hold that an unreasonably dangerous design or inadequate warning can give rise to strict products liability based only on what the supplier could reasonably know at the time the product was placed on the market, the New Mexico Supreme Court has not yet addressed this issue in a design or warning case. NMRA, Rule 13-1407. |
| New York | To prevail on [a failure to warn] claim, plaintiff must prove that "(1) a manufacturer has a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so was the proximate cause of the harm." *Adeghe v. Janssen Pharm., Inc.*, No. 16 CIV. 2235 (LGS), 2017 WL 3741310, at *5 (S.D.N.Y. Aug. 30, 2017) (quoting *State Farm Fire & Cas. Co. v. Nutone, Inc.*, 426 F. App'x 8, 10 (2d Cir. 2011)). |
| North Carolina | A duty to warn arises when the supplier of a product knows or has reason to know that the product is, or can be, dangerous for the use for which it is supplied. *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 706 (W.D.N.C. 2003); *see also* N.C. Gen. Stat. Ann. § 99B-5. |

| | |
|---|---|
| North Dakota | This court, in *Olson v. A.W. Chesterton Company*, 256 N.W.2d 530 (N.D.1977), recognized that under Restatement (Second) Torts, § 402A, one who manufactures or sells a product has a duty to warn of dangers inherent in its intended use and also to warn of dangers involved in a use which can be reasonably anticipated.  Thus a manufacturer or seller can be held liable under a products-liability theory for selling a product which, although meeting every requirement for its designed utility and although properly manufactured, is marketed without adequate warnings to make the product free from unreasonable danger to the user. *Mauch v. Manufacturers Sales & Serv., Inc.*, 345 N.W.2d 338, 345 (N.D. 1984); *Harris v. McNeil Pharm.*, No. CIV 3:98-cv-105, 2000 WL 33339657, at *3 n.2 (D.N.D. Sept. 5, 2000). |
| Ohio | The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages[.]  Ohio Rev. Code Ann. § 2307.76. |
| Oklahoma | Our products liability law generally requires a manufacturer to warn consumers of danger associated with the use of its product to the extent the manufacturer knew or should have known of the danger. *Edwards v. Basel Pharm.*, 933 P.2d 298, 300 (Okla. 1997). |
| Oregon | [A] seller is required to give warning of a danger when the danger is "not generally known" and if the seller "has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge," of the presence of the danger. *Benjamin v. Wal-Mart Stores, Inc.*, 61 P.3d 257, 264 (Or. Ct. App. 2002). |
| Pennsylvania | [A] seller of prescription drugs [has a duty] to warn not only of risks of which he reasonably should have knowledge, but also warn of risks of which he did, in fact, have knowledge. *Bell v. Boehringer Ingelheim Pharm., Inc.*, No. CV 17-1153, 2018 WL 928237, at *3 (W.D. Pa. Feb. 15, 2018) (citing *Hahn v. Richter*, 673 A.2d 888, 890 (Pa. 1996)). |
| Rhode Island | For the same reasons of public policy we reject plaintiff's assertion that a drug manufacturer should be held strictly liable for failure to warn of risks inherent in a drug even though it neither knew nor could have known by the application of scientific knowledge available at the time of distribution that the drug could produce the undesirable effects suffered by plaintiff. *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 782 (R.I. 1988). |
| South Carolina | The distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven. *Bragg v.* |

| | |
|---|---|
| | *Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995). This Court can predict that the South Carolina Supreme Court would follow the vast majority of jurisdictions that impose liability only for known or knowable risks. *Compare id.* (quoting *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn. 1984)), *with* Minnesota Jury Instruction Guides, Civil 75.25 (6th ed. 2014) (collecting cases for the proposition that the Minnesota Supreme Court's case law indicates the duty to warn is based primarily on negligence principles); *see also* 5 Louis R. Frumer et al., Products Liability § 50.04[1] (2019) ("[A] few states continue to adhere to the illogical rule that manufacturers may have to warn of the unknowable in strict liability cases generally . . . although in [] some of the jurisdictions adhering to the minority rule, it is inapplicable for prescription drugs."). |
| South Dakota | The South Dakota Supreme Court has cautioned that Section 402A "does not make the manufacturer an absolute insurer against any injuries caused by his product." *Engberg v. Ford Motor Co.,* 87 S.D. at 205, 205 N.W.2d at 109. This court believes the South Dakota Supreme Court would apply comments j and k of Restatement Section 402A to this prescription drug case, in light of the absence of any evidence that Lilly knew of, or should have foreseen, in 1949, the potential adverse side effects of DES here involved. *McElhaney v. Eli Lilly & Co.*, 575 F. Supp. 228, 232 (D.S.D. 1983), *aff'd*, 739 F.2d 340 (8th Cir. 1984). |
| Tennessee | We believe inquiry on this issue was properly limited to the scientific and medical knowledge available to Ciba-Geigy at the time Ritalin left the control of Ciba-Geigy. *Witherspoon v. Ciba-Geigy Corp.*, No. C.A. 1023, 1986 WL 2138, at *3 (Tenn. Ct. App. Feb. 12, 1986). |
| Texas | If a manufacturer knows or should know of potential harm to a user because of the nature of its product, the manufacturer is required to give an adequate warning of such dangers. *Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex. 1978). |
| Utah | To establish a claim in strict liability for a failure to warn, the Plaintiffs must rely on evidence tending to show that (1) MPP knew or should have known of the risk involved, (2) the risk was not disclosed or adequately disclosed rendering the product unreasonably dangerous, and (3) the failure to provide an adequate warning caused the injury. *Herrod v. Metal Powder Prod.*, 413 F. App'x 7, 18–19 (10th Cir. 2010) (Utah law). |
| Vermont | [A] product manufacturer escapes liability for its product absent proof that the manufacturer knew or should have known of the risk about which it failed to warn. *Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 704 n.5 (D. Vt. 2010). |
| Virginia | It is well settled that the manufacturer of an ethical drug has a duty to provide timely and adequate warnings to the medical profession of any dangerous side |

| | |
|---|---|
| | effects produced by its drugs of which it does, or should, know. *Stanback v. Parke, Davis & Co.*, 502 F. Supp. 767, 770 (W.D. Va. 1980). |
| Washington | Until recently, it appeared that Washington courts applied a strict liability standard to all failure to warn and inadequate warning claims brought under RCW 7.72.030(1)(b). . . .  However, in *Estate of LaMontagne v. Bristol–Myers Squibb* . . . , the Washington State Court of Appeals firmly stated that "[w]hether a prescription drug manufacturer provides adequate warning to physicians is governed by the negligence standard under the *Restatement (Second) of Torts § 402A, cmt. k* (1965)," thereby distinguishing prescription drug products[.] . . . Like RCW 7.72.030(1), comment k imposes a duty on a drug manufacturer to warn of the known dangers and risks associated with prescription drugs. *Laisure-Radke v. Par Pharm., Inc.*, 426 F. Supp. 2d 1163, 1171 (W.D. Wash. 2006). |
| West Virginia | A manufacturer is not required to produce an accident-free product; however, if the danger encountered by the plaintiff was reasonably foreseeable, the manufacturer has a duty to warn of that hazard. *Church v. Wesson*, 385 S.E.2d 393, 396 (W. Va. 1989). |
| Wisconsin | Hence, in order to maintain an action against a manufacturer for harm arising from the manufacturer's failure to warn of a danger, whether pursuant to a negligence theory or a strict liability theory, the plaintiff must prove that the manufacturer knew or should have known of the danger which caused the harm at issue. *Stupak v. Hoffman-La Roche, Inc.*, 326 F. App'x 553, 557–58 (11th Cir. 2009) (Wisconsin law). |
| Wyoming | The manufacturer is not required to warn of unknown or unforeseeable risks. *Jacobs v. Dista Prod. Co.*, 693 F. Supp. 1029, 1033 (D. Wyo. 1988) (predicting Wyoming law); *Estates of Tobin by Tobin v. Smithkline Beecham Pharm.*, 164 F. Supp. 2d 1278, 1288 (D. Wyo. 2001). |

# EXHIBIT C
## *Filed Under Seal*

# EXHIBIT D

257

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)

        PRODUCTS LIABILITY          Docket No.: 16-MD-2740

        LITIGATION               Section "H(5)"

                              September 17, 2019

                              New Orleans, Louisiana

Relates To:  Barbara Earnest,

Case No.: 16-CV-17144


* * * * * * * * * * * * * * * * * * * * * * * * * * * * *


                  DAY 2, MORNING SESSION

          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

      HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO

             UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:      Barrios, Kingsdorf & Casteix, LLP

                      BY:  DAWN BARRIOS, ESQ.

                      701 Poydras Street

                      Suite 3650

                      New Orleans, Louisiana 70139


For the Plaintiffs:      Gainsburgh, Benjamin, David,

                       Meunier & Warshauer, LLC

                      BY:  PALMER LAMBERT, ESQ.

                      2800 Energy Centre

                      1100 Poydras Street

                      New Orleans, Louisiana 70163-2800

330

1 regard to permanent hair loss?
2 A. No.
3 Q. And you reviewed the Taxotere label, I think you told us
4 that already, correct?
5 A. Correct.
6 Q. And did you ever find a warning about permanent hair loss
7 in any section?
8 A. In the label that you've shown me.
9 Q. From a regulatory standpoint, is it your belief that that
10 should have been warned about?
11 MR. STRONGMAN: Objection. Leading.
12 THE COURT: Rephrase -- no, overruled.
13 THE WITNESS: Yes, it should have been warned -- Sanofi
14 should have warned clearly and prominently about the risks of
15 irreversible hair loss.
16 EXAMINATION BY MR. NOLEN:
17 Q. What have you reviewed in this case to come here and
18 provide opinions today?
19 A. I've reviewed, you know, thousands and thousands of pages
20 of documents. I have looked at Sanofi's pharmacovigilance
21 database. I have looked at their clinical trials. I've looked
22 at the medical literature. I've read testimony, deposition
23 testimony. I've read company internal correspondence.
24 Q. So I want to be clear about this. Is it your opinion that
25 by 2011, the time that Ms. Earnest took Taxotere, there should

331

1 have been a warning about permanent hair loss?
2 A. Yes.
3 Q. With regard to the information that you have reviewed,
4 have you made a determination about approximately when the
5 information was sufficient to put Sanofi on notice that it
6 needed to provide a permanent hair loss warning?
7 A. Yes, I have made that determination.
8 Q. When, approximately, was that?
9 A. I think not later than about 2009, and probably as early
10 as around 2006.
11 Q. We talked about this earlier, but I need to be clear. Did
12 Sanofi need FDA to tell it to make a labeling change to add
13 permanent to the alopecia warning?
14 A. No, it does not.
15 Q. I think you told us about changes being effected. How
16 does that process work?
17 A. Changes being effected is if you have evidence of a safety
18 hazard, if you have any new information that you think doctors
19 and patients should have, it's one of the ways you can get that
20 information on the label. You can go ahead and make that
21 changes -- that change to the label, even without FDA approval.
22 But then you have to come in to FDA, and FDA ultimately gets to
23 review that label.
24 Q. Okay. But the labeling change itself is not FDA
25 generated; is that correct?

332

1 A. Under a changes being effected, that would be correct.
2 Q. All right. I want to direct your attention back just for
3 a moment, if I could, to the label itself. We talked about how
4 thick this thing is. It's big. It's thick. There is a lot of
5 information here that's aimed at doctors.
6 Is there any information that is aimed towards
7 patients?
8 A. Yes.
9 Q. Where is that information found?
10 A. First -- I do want to underscore this -- I think the
11 entire label, ultimately, is about patients. It's doctors
12 conveying the information to patients.
13 But there is a special section of the label, at the
14 very end of the label, excuse me, that I believe is titled
15 Patient Counseling Information.
16 Q. If I can -- see if I can locate exactly where that starts.
17 Yes. Yes. Right here. It's page 58. 58.
18 It says, Patient Information. Do you see that? Is
19 this what you're referring to?
20 A. Correct. One thing we did when we were at FDA is we
21 encouraged drug companies to do exactly this. We call this the
22 patient package insert, the patient information section of the
23 label.
24 Q. What's the purpose of it?
25 A. Not to supplant the physician/patient discussion, that's

333

1 not the purpose, but to make sure that the patient has the
2 information that he or she would need to make a decision, do I
3 want to take this drug? Do I want to take another drug? Do I
4 want to -- what should I be looking for? What's the correct
5 dose?
6 So it gives basic information that's important --
7 that would be important to consider or to be looking out for or
8 to know about in using a drug.
9 Q. Does it include this section called What are Possible Side
10 Effects?
11 A. It does.
12 Q. That's page 60 of this label. It identifies potential
13 side effects with the drug; is that correct?
14 A. Correct.
15 Q. If we turn to page 61, which is the next page, do you see
16 a warning about hair loss?
17 A. Yes.
18 Q. Under the most common side effects of Taxotere include --
19 and we've got that list, again -- it looks like diarrhea, rash,
20 nausea and vomiting, and hair loss. Right?
21 A. Correct.
22 Q. Is there anywhere in this patient information that
23 permanent hair loss was labeled?
24 A. No.
25 Q. So we're clear, I want to be sure that we're entirely

## Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  TAXOTERE (DOCETAXEL)   *
PRODUCTS LIABILITY LITIGATION   *   Docket No.: 16-MD-2740
                                *   Section "H(5)"
                                *   New Orleans, Louisiana
Relates to:  Barbara Earnest   *   September 17, 2019
Case No.: 16-CV-17144   *
* * * * * * * * * * * * * * * * * *

DAY 2 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:      Barrios Kingsdorf & Casteix, LLP
                         BY:  DAWN M. BARRIOS, ESQ.
                         701 Poydras Street
                         Suite 3650
                         New Orleans, Louisiana 70139

For the Plaintiffs:      Gainsburgh Benjamin David Meunier
                          & Warshauer, LLC
                         BY:  M. PALMER LAMBERT, ESQ.
                         1100 Poydras Street
                         Suite 2800
                         New Orleans, Louisiana 70163

For the Plaintiffs:      Pendley Baudin & Coffin, LLP
                         BY:  CHRISTOPHER L. COFFIN, ESQ.
                         1100 Poydras Street
                         Suite 2505
                         New Orleans, Louisiana 70163

OFFICIAL TRANSCRIPT

## Page 2

APPEARANCES:

For the Plaintiffs:      Gibbs Law Group, LLP
                         BY:  KAREN BARTH MENZIES, ESQ.
                         6701 Center Drive West
                         Suite 1400
                         Los Angeles, California 90045

For the Plaintiffs:      Bachus & Schanker, LLC
                         BY:  J. KYLE BACHUS, ESQ.
                              DARIN L. SCHANKER, ESQ.
                         1899 Wynkoop Street
                         Suite 700
                         Denver, Colorado 80202

For the Plaintiffs:      Fleming Nolen & Jez, LLP
                         BY:  RAND P. NOLEN, ESQ.
                         2800 Post Oak Boulevard
                         Suite 4000
                         Houston, Texas 77056

For the Plaintiffs:      DAVID F. MICELI, LLC
                         BY:  DAVID F. MICELI, ESQ.
                         Post Office Box 2519
                         Carrollton, Georgia 30112

For the Plaintiffs:      Morgan & Morgan, P.A.
                         BY:  EMILY C. JEFFCOTT, ESQ.
                         700 S. Palafox Street
                         Suite 95
                         Pensacola, Florida 32502

For the Sanofi           Irwin Fritchie Urquhart
Defendants:               & Moore, LLC
                         BY:  DOUGLAS J. MOORE, ESQ.
                         400 Poydras Street
                         Suite 2700
                         New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

## Page 3

APPEARANCES:

For the Sanofi           Shook Hardy & Bacon, LLP
Defendants:              BY:  HARLEY V. RATLIFF, ESQ.
                              JON A. STRONGMAN, ESQ.
                         2555 Grand Boulevard
                         Kansas City, Missouri 64108

For the Sanofi           Shook Hardy & Bacon, LLP
Defendants:              BY:  HILDY M. SASTRE, ESQ.
                         201 Biscayne Boulevard, Suite 3200
                         Miami, Florida 33131

Official Court Reporter:   Jodi Simcox, RMR, FCRR
                         500 Poydras Street
                         Room HB-275
                         New Orleans, Louisiana 70130
                         (504) 589-7780

Proceedings recorded by mechanical stenography, transcript

produced by computer.

OFFICIAL TRANSCRIPT

## Page 4

I N D E X

                                                    Page

DAVID KESSLER
     Direct Examination By Mr. Nolen:              381
     Cross-Examination By Mr. Strongman:           388
     Redirect Examination By Mr. Nolen:            506

PROFFER
     Examination By Mr. Strongman:                 528

PROFFER
     Examination By Mr. Miceli                     534

OFFICIAL TRANSCRIPT

## Page 17

393

DAVID KESSLER - CROSS

1:19PM 1 to offer a case-specific opinion?  You understand what that

1:19PM 2 means in the context of litigation; correct?

1:19PM 3 A.  I did go to law school.  Yes, I think I understand that.

1:19PM 4 Q.  And so you're not here talking about Ms. Earnest today;

1:19PM 5 correct?

1:19PM 6 A.  Please, you're exactly correct, Counselor.  Others will

1:19PM 7 testify.  I'm here to talk about the framework for drug safety.

1:19PM 8 Q.  But you do know, Doctor, that Ms. Earnest is cancer-free

1:19PM 9 today?  You do know that; correct?

1:19PM 10 A.  Again, I'm under oath.

1:19PM 11 Q.  You don't know?

1:19PM 12 A.  I will leave it to her doctors to talk.

1:20PM 13 Q.  Nobody told you that?

1:20PM 14 A.  Again, I don't want to make any statements.  People have

1:20PM 15 told me.  I've looked at certain things.  But please have her

1:20PM 16 doctors please testify.  I just want to be very respectful and

1:20PM 17 stay within the areas that I have studied.

1:20PM 18 Q.  Right.  I understand that, Doctor.

1:20PM 19       But you don't you think it would have been important

1:20PM 20 to know that Ms. Earnest is cancer-free today?

1:20PM 21       Isn't that the kind of information you'd want to know

1:20PM 22 before you come into this courtroom and offer an opinion in

1:20PM 23 Ms. Earnest's case?

1:20PM 24 A.  So I did ask for all the medical records.  But I think, to

1:20PM 25 answer the question whether Sanofi should have warned, I think

OFFICIAL TRANSCRIPT

## Page 18

394

DAVID KESSLER - CROSS

1:20PM 1 that question is independent.

1:20PM 2 Q.  So it's not important to know whether Ms. Earnest is

1:20PM 3 cancer-free?  Just yes or no.

1:20PM 4       MR. NOLEN:  Objection.  Mischaracterizes the

1:20PM 5 testimony.

1:20PM 6       THE COURT:  Overruled.  I think he can answer the

1:20PM 7 question under cross-examination.

1:20PM 8       THE WITNESS:  There are a lot of things that are

1:20PM 9 important in this case, but they're beyond my testimony.

1:21PM 10 BY MR. STRONGMAN:

1:21PM 11 Q.  Okay.  Do you know who Dr. James Carinder is?

1:21PM 12 A.  I believe he is the oncologist, yes.

1:21PM 13 Q.  All right.  And so in this case, sitting here today,

1:21PM 14 you're also not offering any opinions about Dr. Carinder;

1:21PM 15 correct?

1:21PM 16 A.  That would be correct.  That's beyond the scope of my

1:21PM 17 expertise or my assignment.

1:21PM 18 Q.  But what we can say for sure is that you're not coming in

1:21PM 19 here offering any criticisms of Dr. Carinder for using

1:21PM 20 Taxotere; correct?

1:21PM 21 A.  I would not do that, no.

1:21PM 22 Q.  And do you know anything about the dose that Dr. Carinder

1:21PM 23 used when he treated Ms. Earnest?

1:21PM 24 A.  I have some information on that.  I've inquired, but

1:21PM 25 again --

OFFICIAL TRANSCRIPT

## Page 19

395

DAVID KESSLER - CROSS

1:21PM 1 Q.  Not within the scope of your opinions?

1:21PM 2 A.  It depends on Your Honor -- everything is up to Your

1:22PM 3 Honor.

1:22PM 4 Q.  Okay.

1:22PM 5 A.  I mean, I would -- I'd respectfully stay away from that

1:22PM 6 and let others testify about, but I have some familiarity with

1:22PM 7 that.

1:22PM 8 Q.  Now, setting aside Dr. Carinder for a minute.

1:22PM 9       When a prescription drug like Taxotere is approved,

1:22PM 10 in the label -- and we saw the label -- there are dosages and

1:22PM 11 regimens specifically called out; is that correct?

1:22PM 12 A.  Correct.

1:22PM 13 Q.  And so when you're prescribing something on-label, so

1:22PM 14 that's within the four corners of that drug label, that's using

1:22PM 15 the dose that's set out in the label; correct?

1:22PM 16 A.  A little more complicated than that.

1:22PM 17 Q.  So let me just ask it this way:  In the adjuvant breast

1:22PM 18 cancer setting -- are you with me so far?

1:22PM 19 A.  I am.

1:22PM 20 Q.  Okay.  So adjuvant breast cancer, that we're dealing with

1:22PM 21 is chemotherapy treatment after there has been some sort of

1:22PM 22 intervention surgically, normally; is that correct?

1:23PM 23 A.  Correct.  That's the definition of "adjuvant."

1:23PM 24 Q.  And so we've we have a patient who's had surgery, and now

1:23PM 25 they're undergoing chemotherapy; is that correct?

OFFICIAL TRANSCRIPT

## Page 20

396

DAVID KESSLER - CROSS

1:23PM 1 A.  Correct.

1:23PM 2 Q.  Okay.  And you understand that Taxotere has indication in

1:23PM 3 that setting; is that correct?

1:23PM 4 A.  Yes.  And that's generally where off-label attaches to.  I

1:23PM 5 mean, it's for a certain type of breast cancer.  That's usually

1:23PM 6 how I would use off-label.  You're using "off-label" with

1:23PM 7 regard to dose.

1:23PM 8 Q.  Very good.  But you know that, in the approval for

1:23PM 9 Taxotere, correct, that the regimen that was approved was T

1:23PM 10 with A with C all together; correct?

1:23PM 11 A.  Correct.

1:23PM 12 Q.  Okay.  And the dose of the T -- so that's the dose of the

1:23PM 13 Taxotere -- in that regimen was approved at 75 milligrams per

1:23PM 14 meter squared in the adjuvant setting; correct?

1:23PM 15 A.  That's not entirely correct.  Times how many doses?  So

1:24PM 16 that's what's key.

1:24PM 17 Q.  Yeah.

1:24PM 18 A.  Because you have to look at cumulative dose, right.  So it

1:24PM 19 gets a little more complicated than --

1:24PM 20 Q.  Understood.  Understood.

1:24PM 21 A.  It's the dose times the number of treatments that really

1:24PM 22 is key.  Oncology has its own complexities, I think it's fair

1:24PM 23 to say.

1:24PM 24 Q.  Very good.  But the dosage that was included in the

1:24PM 25 label -- and we're talking about a dose that's given how many

OFFICIAL TRANSCRIPT

# EXHIBIT E

1

```
1              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF LOUISIANA
2

3                             MDL NO.: 2740
                              SECTION: H
4

5  IN RE:  TAXOTERE (DOCETAXEL)
   PRODUCTS LIABILITY LITIGATION
6

7  This Document Relates To:

8  Antoinette Durden, Case No. 2:16-cv-16635;

9  Tanya Francis, Case No. 2:16-cv-17410;

10 Barbara Earnest, Case No. 2:16-cv-17144.

11 _____/

12

13           Thursday, December 13, 2018

14

15        Videotape Deposition of DAVID A.

16 KESSLER, MD, taken at the Whitfield Bryson &

17 Mason LLP, 5101 Wisconsin Avenue NW, Suite 305,

18 Washington, D.C., beginning at 8:55 a.m.,

19 before Ryan K. Black, a Registered Professional

20 Reporter, Certified Livenote Reporter and Notary

21 Public in and for the District of Columbia.

22

23

24

25 Job No. NJ3173488
```

22

1  that represents company documents or company
2  testimony that you've received since you
3  prepared and filed your expert report?
4      A.  Everything -- again, with the
5  subject [sic] that I just want to look at the --
6  the objections to the dep -- to the notice, my
7  -- my -- my sense is that everything, from what
8  I can remember, is on the reliance list.  There
9  may be things in -- I -- I would never say
10  never.
11      Q.  All right.
12      A.  I just don't want to be -- because,
13  you know, I'm -- I am -- I am looking online, I
14  am cutting and pasting things, there's always a
15  chance that --
16      Q.  Okay.
17      A.  -- there's something here that's not
18  in there.  But my intent was to be -- try -- my
19  intent was to be comprehensive in my report.
20      Q.  Fair enough.
21      Now, there's some additional materials
22  over here to your right, and can you describe
23  what those are?
24      A.  So -- so those -- again, you asked for
25  things that I -- in the notice, that I bring my

23

1  files.  So I may have -- sometimes I cut and
2  pasted and put stuff in my notes here or --
3      Q.  Okay.
4      A.  -- or I scribbled here.
5      Q.  Okay.
6      A.  Sometimes I just printed stuff out.
7      Q.  Okay.
8      A.  Sometimes, you know, there's
9  information, you know, that I've had --
10      Q.  Okay.
11      A.  -- here.  So these are individual
12  documents, and happy to go through them.  Or
13  they -- they could be charts or excerpts or
14  they're information, you know -- if you asked me
15  -- you know, so -- there's -- there are these
16  pieces of paper that you asked me to bring.
17      Q.  Thank you.  I appreciate you bringing
18  those in, and -- and I think that's responsive
19  enough for now.
20      You didn't bring -- you also brought
21  your invoices and your -- your time spent on
22  this endeavor so far?
23      A.  Yes.  And I asked counsel to -- to
24  bring that, --
25      Q.  Okay.

24

1      A.  -- and you were kind enough to mention
2  my wife in the notice of -- the -- the --
3      MS. JEFFCOTT:  Deposition notice.
4      THE WITNESS:  -- deposition notice.
5  BY MR. KEENAN:
6      Q.  I mentioned your --
7      MS. JEFFCOTT:  You actually mentioned
8  my wife.  And so this was the invoice, and it
9  was December.
10  BY MR. KEENAN:
11      Q.  Okay.  Well, I -- if we mentioned your
12  wife, --
13      A.  That's okay.
14      Q.  -- that was -- I'm confident that was
15  inadvertent.
16      I'm going to mark this as Exhibit
17  Number 3, and this would reflect your time?
18      A.  Yes, sir.
19      (Kessler Deposition Exhibit No. 3, a
20  copy of Dr. Kessler's invoices, was marked.)
21  BY MR. KEENAN:
22      Q.  Would that -- that would not include,
23  obviously, today's deposition, right?
24      A.  No, sir.
25      MS. JEFFCOTT:  And there are two

25

1  copies attached.  It's one exhibit and then two
2  additional copies.  It's not three separate
3  invoices.
4      MR. KEENAN:  Very good.  May we have
5  these copies, then?
6      MS. JEFFCOTT:  Mm-hmm.
7      MR. KEENAN:  All right.  Making
8  progress.
9  BY MR. KEENAN:
10      Q.  Now, a couple other preliminary
11  matters.
12      You are a non case-specific expert,
13  is that fair?
14      A.  Correct.
15      Q.  Okay.  And I've read your other
16  testimony.  You -- you, obviously, know what
17  that means, right?
18      A.  Yes, sir.
19      Q.  So with respect to any of the
20  Bellwether plaintiffs, their medical records,
21  their conditions, their prognosis, what meds
22  they took and all that, other than the fact
23  that, presumably, they took Taxotere, you're not
24  here to offer opinions about their care and
25  treatment, correct?

7 (Pages 22 to 25)

250

1 other drugs.  Of course, there's going to be
2 background wing of these cases.
3     Q.   And in cases where patients have taken
4 AC first, that is -- that is Doxorubicin and
5 Cytoxin and then Taxotere, are you with me,
6 Doctor?
7     A.   TAC?
8          Again, you've gotta be careful as to
9 whether it's T plus AC or ACT.
10    Q.   ACT.
11    A.   Right.
12    Q.   Okay.  And they have lost their hair
13 with the commencement of the AC therapy, are you
14 with me, --
15    A.   Yes.
16    Q.   -- right?
17         How can you determine that the
18 alopecia that you define as irreversible
19 alopecia is a product of the Taxotere and not
20 the -- you say not the Doxorubicin?
21    A.   So -- so if you look at the scientific
22 data, and let me just go over this, let me just
23 get for a second -- just give me a second and
24 then I'll answer your question.
25         So if you look at Sedlacek in 2006 and

251

1 you're comparing PAC to TAC, --
2     Q.   Okay.
3     A.   -- AC is the same, okay?
4     Q.   Okay.  All right.
5     A.   All right.  If you do a risk
6 difference, you get a risk difference of 6.25
7 percent.
8          If you then look at the Fisher exact,
9 right, the difference between that seven, in the
10 one arm, and zero in the other, when you -- when
11 you look at Group C in Sedlacek, which is versus
12 Groups A and B without Taxane and C with Taxane,
13 and you get a Fisher Exact P value of .00005,
14 all right?  So you have statistical significance
15 in Sedla -- Sedlacek as of 2006, where the only
16 difference between those two arms, the AC is the
17 same, right, as the P and the T.  And T gets you
18 a rate difference of 6.25 percent that is highly
19 statistically significant.
20         So that's why, if you look
21 at this scientifically, and that's what
22 Pharamacovigilance is, that's what Sanofi should
23 have done, this data was publicly available, it
24 was at the major breast conference, it was put
25 out in 2006, but in 2006 this was over, as far

252

1 as causation.
2     Q.   You're re -- you're reviewing Exhibit
3 51?  Is that --
4     A.   Yes.
5     Q.   Okay.  And Sedlacek was -- those
6 reports.
7          THE REPORTER:  I lost my feed here.
8 So can we just stop for two minutes?  It's not
9 going from my machine to the system.
10         THE WITNESS:  Well, I don't need it.
11 Let him ask his question first, and then we can
12 stop.
13         THE REPORTER:  No, it's not feeding
14 into my system, which isn't good.
15         THE WITNESS:  Oh, I guess we need
16 that.
17         THE VIDEOGRAPHER:  The time is 3:01.
18 We're going off the record.
19         (Recess taken.)
20         THE VIDEOGRAPHER:  Recess taken The
21 time is 3:05 p.m.  We're back on the record.
22         Please proceed, Counsel.
23 BY MR. KEENAN:
24    Q.   Doctor, when we were rudely
25 interrupted by Ryan, you were talking about

253

1 Sedlacek, and Sedlacek's important -- very
2 important to you, the findings of that abstract,
3 right?
4     A.   It's -- it's another factor, yes.
5     Q.   The -- you would have expected that
6 Sanofi would have reported those cases of
7 Sedlacek to the FDA?
8     A.   I would have expected Sanofi to have
9 looked at the analysis and added a warning to
10 the label.
11    Q.   Okay.  You would have expected Sanofi
12 to follow up with Dr. Sedlacek to capture as
13 much data about those patients as possible.
14 Fair?
15    A.   Certainly, that would be fair, but
16 you'd -- yes.
17    Q.   Okay.  The Dr. Sedlacek's regimen, was
18 that on-label or off-label in that time period?
19    A.   So let's look, specifically.
20         So Dr. Sedlacek, I believe, followed,
21 what, a hundred -- he -- there wasn't one
22 regimen.  He had multiple regimens in multiple
23 groups, so he had -- he had one, two, three,
24 four, five, six, seven, eight, nine, 10, 11, 12,
25 13, 14 -- I count 15 regimens broken down.

64 (Pages 250 to 253)

EXHIBIT F

1

1          UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - - - - - - - - x

3   IN RE: TAXOTERE (DOCETAXEL) PRODUCTS      :

    LIABILITY LITIGATION                      :

4                                             :  MDL No. 2740

    This Document Relates To:                 :  SECTION:  H

5                                             :

    Sheila Crayton Case No. 2:17-cv-05923     :

6   Cynthia Thibodeaux Case No. 2:16-cv-15859  :

- - - - - - - - - - - - - - - - - - - - x

7                              Tuesday, November 26, 2019

                                     Washington, D.C.

8

9

10

11

12  Videotaped Deposition of:

13              DAVID A. KESSLER, Ph.D.,

14  called for oral examination by counsel for the Defendants,

15  pursuant to notice, at the offices of the American

16  Association of Justice, 777 Sixth Street, Northwest,

17  Suite 200, Washington, D.C. 20001, before Christina S.

18  Hotsko, RPR, CRR, of Veritext Legal Solutions, a Notary

19  Public in and for the District of Columbia, beginning at

20  9:07 a.m., when were present on behalf of the respective

21  parties:

22

23

24

25

46

1    A.  I do.
2    Q.  Do you know anything else about
3  Ms. Thibodeaux's medical history?
4    A.  I've seen her pictures, both pre and
5  post.  I've seen photos.  I believe she was --
6  the answer is yes, I know some information.
7    Q.  So you've seen photos.  Were those
8  photos provided to you by counsel for
9  plaintiffs?
10    A.  Yeah, it's the only way I could have
11  gotten them.
12    Q.  Understood.
13    A.  At my request.
14    Q.  Have you reviewed anything else?
15    A.  I have her medical records.  I have
16  some of her medical records.  What I wanted was
17  the context.  I wanted her node status, I
18  wanted her biomarker status.  That's the
19  information that I focused on.
20    Q.  Anything else other than those two
21  things?
22    A.  I mean, I have some general other
23  information, but generally, that was the
24  context that I wanted to understand.
25    Q.  And why was that context important to

47

1  you?
2    A.  Well, I think that this entity -- I
3  wanted to fully understand the adverse event,
4  the disease, the syndrome that Ms. Thibodeaux
5  experienced because I think that's very -- I
6  wanted to understand that in the context of the
7  diagnosis of, you know, permanent
8  chemotherapy-induced alopecia, and I wanted to,
9  you know, see that this wasn't female pattern
10  baldness or areata totalis.  So I wanted a
11  context of what we were dealing with.
12    Q.  Did you make a determination in this
13  case that Ms. Thibodeaux was not suffering from
14  those two hair-related medical conditions you
15  just mentioned?
16    A.  I don't -- I mean, I'm a pediatrician,
17  and I'll leave it to the dermatologists and the
18  hair specialists.  But you don't have to be a
19  specialist to know that she got chemotherapy
20  and her hair fell out and her hair remained
21  what -- the pictures remained [sic].  Those
22  things were -- are obvious to see, that these
23  are chemotherapy-induced permanent alopecia.
24    Q.  Okay.  So then -- do you have an
25  opinion, then, as to the specific cause of

48

1  Ms. Thibodeaux's hair loss?
2    A.  I think there's no -- I mean, again,
3  I'll let the hair -- the derm folks and people
4  who have spent their career -- but I think
5  there's no question this is
6  chemotherapy-induced hair loss.
7    Q.  Is that opinion expressed in either of
8  your reports?
9    A.  It's -- it's clear -- I'm not -- again,
10  I'll let the dermatologists talk about
11  Ms. Thibodeaux.  But you're asking me -- this
12  is a woman who had a full set of hair and had
13  rapid hair loss.  And I see it -- that's
14  chemotherapy-induced hair loss and it should be
15  obvious to anybody with an M.D.  It's -- I'll
16  let others testify to that.  But you're asking
17  me what my view is.
18    Q.  But -- I'm not sure exactly what
19  question you were answering there, but I'll ask
20  my question again.
21    Is that opinion expressed in any of
22  your expert reports?
23    MS. JEFFCOTT:  Object to form.
24    THE WITNESS:  I'd have to go back and
25  see.  I think I only mentioned Ms. Thibodeaux

49

1  in a schedule, so I don't believe I -- and I
2  believe I saw these pictures after my --
3  finishing my supplemental.  So the answer would
4  be no.
5  BY MR. MCRAE:
6    Q.  Okay.  Thank you.
7    Did you review the informed consent for
8  Ms. Thibodeaux's breast cancer treatment in
9  this case?
10    A.  I think I have it, but I don't know --
11  I don't remember looking at it.
12    Q.  Did that -- can you say whether that
13  informed your opinions in this case?
14    A.  Again, just so it's clear, Counsel, I'm
15  only too happy to -- I'm not going to give
16  case-specific opinions with Ms. Thibodeaux.
17  I've only done it for a context of being able
18  to talk about the regulatory and causation
19  aspects in a general sense.
20    Q.  Are you aware that Ms. Thibodeaux is
21  cancer-free today?
22    A.  I have no knowledge of that, sir.
23    Q.  Okay.
24    A.  I am not disputing that.  I just have
25  no knowledge and wouldn't want to make that

13 (Pages 46 to 49)

# EXHIBIT G

| | |
|---|---|
| **From:** | David  Miceli <dmiceli@miceli-law.com> |
| **Sent:** | Tuesday, January 21, 2020 3:16 PM |
| **To:** | Byard, Adrienne (SHB); Ratliff, Harley (SHB); McRae, Chris (SHB); Douglas Moore; Olinde (Olinde@chaffe.com) |
| **Cc:** | Palmer Lambert; 'Chris Coffin'; Karen Barth Menzies - Gibbs Law (kbm@classlawgroup.com); Dawn Barrios; David  Miceli |
| **Subject:** | Expert Discovery/Continuation of Kessler and Madigan (postponement) |

**EXTERNAL**

Adrienne, Harley, et al.

Following our meet and confer on the future trial schedules, and our agreement to disagree on whether the next trial case opens all experts for new depositions, we feel that our interests would be best served in seeking the Court's input on whether the preparation of additional round #2 trial group cases (Kahn and Phillips) allows for re-deposition of general causation experts. As Drs. Kessler, Madigan, Feigal and Plunkett offer no case specific opinions, and have no present plan to offer any additional opinions for the August 10 trial, we see re-deposing these witnesses as a waste of both time and resources for both parties, particularly at a time when we are facing other tight deadlines for necessary discovery. Judge North has ordered an additional two hours with Drs. Kessler and Madigan, and we absolutely intend to comply with the Court's directive, and likewise obtain the information requested in connection with Dr. Wei's deposition. However, due to the concerns Sanofi raised last Friday that case specific discovery could somehow impact general causation testimony – and we disagree with Sanofi on this point – if that is the case, we suggest putting off the scheduled two-hour continuation depositions until Sanofi can complete the case specific depositions it feels may impact the need to question Plaintiffs' general causation experts. Then, if the Court agrees that all experts are to be fully deposed again, Sanofi can include the examination of the new calculation in its next round of expert depositions. Otherwise, we can simply complete the remaining two hour depositions ordered by Judge North.

Judge North already expressed his concern that all experts do not need to be deposed for a full seven hours each round. This is uniquely true of experts that offer no case-specific opinions. Thus, as we prepare to submit our proposed schedule to the Court for Trial 2A, we feel it is prudent to seek the Court's input on what depositions are included in the line items for "expert depositions." If Plaintiff does not offer any new opinions through their general causation experts, then it remains our position that no additional deposition is warranted of those experts. The same would apply to Plaintiff's examination of Defense experts, assuming no change in the expert and his/her report. Any expert that offers case specific opinions will need to be deposed; for experts that offer both general and specific – Glaspy and Love, for instance – would only need to provide a case-specific supplemental report.

As a result, until we can resolve what expert depositions will need to be taken in relation to the next trial, we intend to postpone the currently scheduled continuations of Drs. Kessler and Madigan. We can reschedule these depositions as soon as we have clarity on this issue. I am certain Sanofi continues in its disagreement with our position, and we are happy to include this issue during tomorrow's call if you like.

Dave

# EXHIBIT H
## *Filed Under Seal*

# EXHIBIT I

Michael S. Kopreski, M.D.

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

- - -

                     :
IN RE: TAXOTERE          :
(DOCETAXEL) PRODUCTS   : MDL No. 2740
LIABILITY LITIGATION   : Section H(5)
_____ :
                     :
This Document Relates to: :
All Cases                :


- - -

December 12, 2018

- - -


MICHAEL S. KOPRESKI, M.D.

(VOLUME I)


- - -

        Transcript of the videotaped
deposition of Sanofi U.S. Services, Inc.,
pursuant to Fed. R. Civ. P. 30(b)(6) held
at McElroy Deutsch Mulvaney & Carpenter,
LLP, 1300 Mt. Kemble Avenue, Morristown,
New Jersey, commencing 9:22 a.m. on the
above-referenced date, as taken by and
before Constance E. Perks, CRR, CRC, RSA,
a Federally-Approved Certified Realtime
Reporter and Notary Public.


- - -


GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377 | fax 917.591.5672
deps@golkow.com

Michael S. Kopreski, M.D.

Page 98

1    -- I -- I think that would be correct.    11:28:51
2        If you -- let me just    11:28:54
3    clarify. The question about the ongoing,    11:28:56
4    which cases, that you don't want me to    11:28:58
5    ans -- to go through these and answer    11:29:02
6    them anymore.    11:29:03
7        Q.   Oh, I do, but I haven't    11:29:04
8    asked that question.    11:29:07
9        A.   Okay.    11:29:08
10       Q.   Let -- going to -- back to    11:29:08
11   Exhibit No. 14 -- I mean Exhibit 2, tab    11:29:10
12   14, with the patient identifier as 4337?    11:29:17
13       A.   Yes.    11:29:22
14       Q.   The report made to the    11:29:23
15   company by a healthcare provider    11:29:25
16   regarding the patient identified as 4337    11:29:27
17   was that this patient had a last dose of    11:29:32
18   Taxotere in March of 2005, right?    11:29:42
19       A.   Correct.    11:29:46
20       Q.   And the report made to the    11:29:49
21   company was that this patient experienced    11:29:52
22   alopecia, which persisted nine months    11:29:56
23   later, correct?    11:30:00
24       A.   Correct.    11:30:01
25       Q.   Yet, from the company's    11:30:02

Page 99

1    perspective, this is not a report of    11:30:06
2    alopecia that was ongoing after the last    11:30:10
3    docetaxel treatment?    11:30:16
4        A.   Well, first off, I never    11:30:22
5    alluded to that as being the company    11:30:24
6    perspective. What I said is, I would    11:30:27
7    need to review the case before answering    11:30:28
8    the question.    11:30:30
9        Upon reviewing this case, I    11:30:31
10   do believe that alopecia in this case    11:30:33
11   could likely be considered ongoing at the    11:30:35
12   time of the report.    11:30:37
13       Q.   All right. So the question    11:30:38
14   that I was asking was:  Are there cases    11:30:45
15   of the 228 where you believe that there    11:30:49
16   is not a report to the company about    11:30:52
17   alopecia existing, ongoing, existing,    11:30:56
18   whatever word -- not -- just if you look    11:31:03
19   the word up in the dictionary -- after    11:31:07
20   docetaxel treatment ended? The day    11:31:11
21   after, a week after, a month after, a    11:31:15
22   year after? The reports describe various    11:31:18
23   time frames.    11:31:20
24       A.   I think the majority of    11:31:22
25   these reports, if not all of the reports,    11:31:25

Page 100

1    are -- report patients who have alopecia    11:31:28
2    or had alopecia some time and had    11:31:31
3    received Taxotere or Taxotere plus other    11:31:37
4    drugs.    11:31:44
5        Q.   The start date for purposes    11:32:01
6    of this deposition is January 1 of 2005.    11:32:05
7    Do you agree with me that Exhibit 2, tabs    11:32:12
8    3 -- tabs 2, 3, 4, 5, 6, 7, and 8    11:32:20
9    represent the report of a cluster of    11:32:27
10   patients reported to the company on    11:32:32
11   July the 25th, 2005?    11:32:33
12       A.   I'm sorry. Could you give    11:32:37
13   me those numbers a little more slowly?    11:32:48
14   You said 2 --    11:32:55
15       Q.   2 through 8.    11:33:03
16       A.   2 through 8.    11:33:06
17       I would agree that -- I    11:33:35
18   would agree that there was a -- that    11:34:04
19   these cases are part of a group of cases    11:34:06
20   that were reported to the company on --    11:34:09
21   from the same source.    11:34:19
22       Q.   Do you agree with me that    11:34:21
23   this group of cases, there -- there was    11:34:30
24   an initial report that was received from    11:34:36
25   a company sales representative on behalf    11:34:39

Page 101

1    of a nurse?    11:34:41
2        A.   Yes, I do.    11:34:42
3        Q.   In July of 2005, correct?    11:34:43
4    You can look at Exhibit 2. Tab 2 is, I    11:35:03
5    believe, regarding -- is the individual    11:35:13
6    case safety report for Patient 1 of 8.    11:35:15
7        A.   Yes. Tab 2 is July of 2005.    11:35:28
8    As is tab 3, as is tab 4, as is tab 5, as    11:35:37
9    is tab 6, as is tab 7, and as is tab 8.    11:35:56
10   Yes, I agree.    11:36:12
11       Q.   The report originally was    11:36:16
12   received from a sales representative on    11:36:18
13   behalf of the company, received from a    11:36:20
14   nurse; is that right?    11:36:23
15       A.   Yes, that is -- that is    11:36:25
16   correct.    11:36:28
17       Q.   And then follow-up    11:36:28
18   information was obtained on October the    11:36:30
19   10th, 2005?    11:36:32
20       A.   On which case?    11:36:34
21       Q.   On all of the cases. If you    11:36:36
22   look at --    11:36:41
23       A.   October 10th of 2005?    11:36:41
24       Q.   If you would look at, again,    11:36:44
25   Exhibit 2, tab 2, there's an addendum on    11:36:46

26  (Pages 98 to 101)

Michael S. Kopreski, M.D.

Page 102

1    page 2 of 3 of the suspect adverse        11:36:53
2    reaction report the details that an       11:37:01
3    addendum of information occurred on       11:37:03
4    October the 10th, 2005.                   11:37:05
5        A.   The follow-up was obtained       11:37:09
6    in case 2 on October the 10th of 2005.    11:37:13
7    As was on case 3, as was in case 4, as    11:37:15
8    was in case 5, as was in case 6, as was   11:37:28
9    in case 7, and as was in case 8.          11:37:41
10       Yes, I agree with that               11:37:48
11   statement.                                11:37:51
12       Q.   And in the follow-up, the        11:37:51
13   nurse who -- well, the sales              11:37:54
14   representative initially reported in      11:37:57
15   July of 2005 that the nurse indicated     11:37:58
16   that there were five patients who had     11:38:01
17   been treated with Taxotere in an adjuvant 11:38:06
18   therapy setting, who had ongoing hair     11:38:12
19   loss.  That was the initial report to the 11:38:15
20   sales represent -- by the sales           11:38:17
21   representative from the nurse, correct?   11:38:25
22       A.   That is correct.                 11:38:26
23       Q.   And then in October of 2005,     11:38:26
24   additional information was obtained from  11:38:28
25   the nurse reporter, and the nurse then    11:38:30

Page 103

1    reported that there were eight, not five  11:38:33
2    patients that she was aware of, correct?  11:38:38
3        A.   Well, I -- I'm not sure          11:38:41
4    that's entirely correct in that the eight 11:38:42
5    cases were reported in July as -- as --   11:38:46
6    as you highlighted previously.            11:38:52
7        Q.   All right.  Do you agree         11:38:54
8    with me that the words written in the --  11:38:57
9    page 2 of the CIOMS report of tab 2 of    11:39:01
10   Exhibit 2, states:  "The nurse reports    11:39:08
11   eight," in parens "(not five) patients    11:39:11
12   who experienced alopecia following doce   11:39:16
13   -- Taxotere, docetaxel therapy"?          11:39:18
14       A.   That's -- that's correct.        11:39:22
15       Q.   All right.                       11:39:22
16       A.   But again --                     11:39:23
17       Q.   And --                           11:39:23
18       A.   -- the -- the eight cases        11:39:23
19   were submitted in July.                   11:39:24
20       Q.   All right.  In each of these     11:39:26
21   eight cases, a determination was made     11:39:28
22   that they were serious.  We were talking  11:39:30
23   earlier today about serious versus        11:39:37
24   nonserious.  The determination for each   11:39:41
25   of these eight cases was that they were   11:39:43

Page 104

1    serious.  Would you agree with that?      11:39:49
2        A.   Well, first off, you -- you      11:39:50
3    mentioned seven of the eight.  Could you  11:39:51
4    point out the eighth case that you want   11:39:55
5    to discuss?                               11:39:57
6        Q.   I'm asking about, at this        11:39:59
7    point, tabs 2 through 8.                  11:40:01
8        A.   Okay.  That's seven cases.       11:40:11
9        Q.   Okay.  Seven cases.             11:40:13
10       A.   Okay.                           11:40:13
11       Q.   And each of the seven cases      11:40:13
12   identified as -- in Exhibit 2 as tabs 2   11:40:15
13   through 8, this cluster of cases reported 11:40:17
14   by this nurse, the determination was that 11:40:22
15   each of those seven were considered to be 11:40:25
16   serious?                                  11:40:28
17           MR. KEENAN:  Object to the        11:40:29
18   form.                                     11:40:30
19           THE WITNESS:  Each of those       11:40:54
20   seven cases are considered to be          11:40:59
21   serious cases.                            11:41:01
22   BY MR. BACHUS:                            11:41:01
23       Q.   All right.  And in terms of      11:41:02
24   the causal assessment, the nurse's causal 11:41:03
25   assessment was that docetaxel therapy was 11:41:10

Page 105

1    suspected as a cause?                     11:41:15
2        A.   Well, these cases have           11:42:00
3    multiple adverse events being reported.   11:42:02
4    So, are you asking with regard to         11:42:07
5    alopecia?                                 11:42:09
6        Q.   Can you read into the record     11:42:09
7    what it says under Nurse's Causal         11:42:11
8    Assessment on page 2 of the CIOMS report  11:42:15
9    on tab 2 of Exhibit 2.                    11:42:21
10       A.   For case 2, it says Nurse's      11:42:26
11   Causal Assessment is suspected.  That's   11:42:29
12   for case 2.                               11:42:33
13       Q.   All right.  Thank you.           11:42:36
14           MR. KEENAN:  Did you just         11:42:37
15   want him to stick to --                   11:42:38
16           MR. BACHUS:  The --               11:42:39
17           MR. KEENAN:  Wait just a          11:42:39
18   second.  You want only the one on         11:42:40
19   tab 2, or you want --                     11:42:42
20           MR. BACHUS:  Yes, that's          11:42:43
21   what I asked him.                         11:42:50
22           MR. KEENAN:  Okay.  Just tab      11:42:50
23   2.                                        11:42:52
24           THE WITNESS:  Okay, because       11:42:52
25   it's not the same in all the              11:42:53

Michael S. Kopreski, M.D.

Page 226

1   reporter; would you agree?         15:16:08
2         A.   It would seem reasonable,    15:16:10
3   but, again, I don't have any knowledge of   15:16:15
4   the process that was applied to       15:16:17
5   responding to these -- these requests.   15:16:19
6         Q.   Here you have this        15:16:29
7   Dr. Sedlacek publishing an abstract where  15:16:31
8   the doctor indicates that "We've always   15:16:33
9   told our female patients, 'Don't worry,   15:16:35
10  it will always come back.'"  Do you see   15:16:38
11  that?  It's right above Materials and    15:16:40
12  Methods.                  15:16:56
13        A.   I see the statement in the   15:16:56
14  -- in the abstract.  I don't know who the  15:16:58
15  "we" is.  I assume he's talking about his  15:17:00
16  practice.                15:17:03
17        Q.   Oncologists in general?     15:17:11
18  Isn't it --                15:17:20
19        A.   Well, I -- the abstract in   15:17:20
20  his name, from his Rocky Mountain Cancer   15:17:22
21  Center, I -- I would assume that that is   15:17:32
22  a statement that he makes to his -- his   15:17:34
23  patients.  That's the way that I would    15:17:36
24  interpret that.              15:17:38
25        Q.   This was regarding a      15:17:39

Page 227

1   presentation that Dr. Sedlacek was going  15:17:40
2   to give at the San Antonio Breast Cancer   15:17:43
3   Conference in 2006?            15:17:47
4         A.   This is a publication that   15:17:59
5   appears in Breast Cancer Research      15:18:01
6   Treatment, 2006.             15:18:04
7         Q.   At least from Dr. Sedlacek's  15:18:10
8   perspective, as he committed to writing,   15:18:13
9   the belief of this oncologist, who was    15:18:17
10  going to be presenting, was that when    15:18:21
11  patients use Taxotere, their hair will    15:18:26
12  come back, right?             15:18:30
13        MR. KEENAN:  Object to the     15:18:31
14  form.                  15:18:32
15        THE WITNESS:  Well, again,     15:18:33
16  he -- he -- he makes this        15:18:36
17  statement that you've just read in     15:18:39
18  2006, which is a time where the      15:18:43
19  TAC regimen has been described as     15:18:51
20  having ongoing alopecia in a       15:18:55
21  number of patients, and the        15:18:59
22  Nabholz publication describes       15:19:01
23  patients who have prolonged,       15:19:07
24  persistent alopecia.           15:19:09
25        So, he makes the statement,     15:19:11

Page 228

1   but, again, that that -- that this   15:19:13
2   is his abstract and his statement.   15:19:15
3   BY MR. BACHUS:              15:19:25
4         Q.   When you contacted       15:19:26
5   Dr. Sedlacek after this was published and  15:19:28
6   inquired further about his findings and   15:19:32
7   his opinions, what did he say?       15:19:38
8         A.   Well, my understanding is   15:19:46
9   that -- that this abstract reflects    15:19:47
10  patients that were seen at the Rocky    15:19:59
11  Mountain Cancer Center.          15:20:03
12        Q.   And my question was:  What   15:20:06
13  did he say when you spoke to him?      15:20:07
14        MR. KEENAN:  Wait, wait,      15:20:07
15  wait, wait, wait.  No, no.  He's     15:20:08
16  answering your question.         15:20:08
17        MR. BACHUS:  Okay.  Okay.
18  Good.
19        MR. KEENAN:  Let him answer.
20  BY MR. BACHUS:
21        Q.   How about we start with when  15:20:09
22  did the conversation occur?        15:20:09
23        A.   I'm sorry.  May I continue?   15:20:12
24        Q.   No.  I'll withdraw the last  15:20:12
25  question.                 15:20:12

Page 229

1         When did the conversation --   15:20:12
2         MR. KEENAN:  No, no,        15:20:12
3   Counsel, he gets to --          15:20:13
4   BY MR. BACHUS:              15:20:13
5         Q.   -- with Dr. Sedlacek --
6         MR. KEENAN:  -- answer your
7   question.
8         MR. BACHUS:  I can withdraw
9   questions.
10        MR. KEENAN:  Not when he's
11  in the middle of answering it.
12        MR. BACHUS:  I can withdraw
13  a question whenever I want to.
14        THE WITNESS:  Okay.  Go --
15  go ahead, Mr. Bachus.
16  BY MR. BACHUS:              15:20:22
17        Q.   When was the contact with   15:20:22
18  Dr. Sedlacek made after the publication   15:20:24
19  of his abstract in 2000 -- December 15th,  15:20:27
20  2006?                   15:20:32
21        A.   The contact and the      15:20:32
22  follow-up with Dr. Sedlacek's site, and I  15:20:34
23  cannot say whether it was with him     15:20:39
24  personally or not, but with his site,    15:20:42
25  occurred on -- on these patients before   15:20:45

58 (Pages 226 to 229)

Michael S. Kopreski, M.D.

Page 230

1    the publication.  There's extensive        15:20:47
2    discussion and follow-up.        15:20:50
3          My understanding is that        15:20:52
4    these patients are the patients that you        15:20:53
5    previously went through in -- in the        15:20:55
6    group of eight patients, starting with --        15:20:56
7    with your case 2 of the exhibit.  If you        15:21:05
8    look at those -- those eight cases,        15:21:12
9    you'll see that there is extensive        15:21:15
10   follow-up and -- and discussions with        15:21:19
11   that site.        15:21:21
12       Q.   Thank you.  Let me see if I        15:21:21
13   can be clearer.        15:21:23
14          Your testimony is that        15:21:29
15   patients 2 through 9 in Exhibit 2 are the    15:21:30
16   patients from Dr. Sedlacek's study?        15:21:33
17       A.   My understanding is that        15:21:36
18   those patients are patients from        15:21:38
19   Dr. Sedlacek's site and most likely the        15:21:44
20   patients from the study.  I have certain        15:21:49
21   restrictions placed upon me, personally,        15:21:58
22   in terms of patient identification and        15:22:01
23   confidentiality, so I -- I rely upon        15:22:03
24   information that I obtained from legal        15:22:05
25   counsel.        15:22:11

Page 231

1        Q.   Outside of -- which legal        15:22:12
2    counsel has the patient identities?        15:22:14
3        A.   I'm sorry?        15:22:20
4        Q.   Which legal counsel has --        15:22:20
5        A.   My -- my legal counsel.        15:22:20
6        Q.   Mr. Keenan --        15:22:21
7        A.   Mr. Keenan --        15:22:21
8        Q.   -- and --        15:22:25
9        A.   -- and associates.        15:22:25
10       Q.   -- Harley Ratliff, they have        15:22:26
11   the patient information?  It's been        15:22:26
12   disclosed to them?        15:22:29
13       A.   I haven't spoken with Harley        15:22:29
14   Ratliff.        15:22:31
15       Q.   Okay.  But they --        15:22:32
16       A.   I'm --        15:22:32
17       Q.   Your understanding is that        15:22:32
18   they have the actual patient names?        15:22:33
19       A.   I'm sorry?        15:22:36
20       Q.   Your understanding is that        15:22:36
21   they have the actual patient names?        15:22:37
22       A.   My understanding is that        15:22:37
23   they felt they could identify these cases    15:22:38
24   leading back to the Sedlacek abstract.        15:22:41
25       Q.   By patient name?        15:22:45

Page 232

1        A.   By patient --        15:22:49
2        Q.   By patient names --        15:22:49
3        A.   -- names?        15:22:49
4        Q.   -- question mark?        15:22:49
5        A.   I don't -- I don't know the        15:22:52
6    answer to that.  I -- I -- I think those    15:22:52
7    names are redacted.        15:22:54
8        Q.   All right.        15:22:57
9          Outside of the CIOMS reports        15:22:57
10   that you've identified as 2 through 9, is    15:23:00
11   there any further documentation of        15:23:04
12   communication with Sedlacek's office        15:23:06
13   regarding his abstract?        15:23:10
14       A.   Regarding this -- regarding        15:23:21
15   the abstract, I'm not sure if the -- was    15:23:21
16   the abstract part of the notice?        15:23:22
17       Q.   Yes.        15:23:24
18       A.   Okay.  I -- I don't have        15:23:25
19   information on -- on any communications        15:23:37
20   subsequent or following -- following the    15:23:39
21   abstract.        15:23:39
22       Q.   Your understanding is that        15:23:40
23   there were physician-based reports that        15:23:41
24   we've gone over today, 2 through 9, of        15:23:44
25   Exhibit 2 that were reported in to the        15:23:49

Page 233

1    company that your lawyers have been able    15:23:52
2    to identify as having come from that        15:23:56
3    treatment center during that time frame,    15:23:58
4    correct?        15:24:01
5        A.   That's my understanding.        15:24:01
6        Q.   But other than whatever was        15:24:13
7    reported in those CIOMS documents, you're    15:24:15
8    unaware of any further communications        15:24:18
9    with Dr. Sedlacek after the publication    15:24:21
10   occurred, correct?        15:24:24
11       A.   I'm not -- I'm not aware of    15:24:28
12   what communications may have been        15:24:30
13   conducted with Dr. Sedlacek.        15:24:33
14       Q.   Did you see any        15:24:35
15   documentation in your preparation        15:24:36
16   documenting discussions with Dr. Sedlacek    15:24:42
17   about his abstract or the patients that    15:24:45
18   are contained in --        15:24:51
19       A.   Well, I would consider that    15:24:53
20   outside the notice.        15:24:55
21          MR. KEENAN:  Yeah, I think        15:24:56
22   we're here about the patients, but        15:24:56
23   that's fine.  Go on.
24          Can we go another 15 minutes
25   and take a break?

# EXHIBIT J



EXHIBIT 7
Kopreski
Date: 9-6-18
MLG, CSR, RPR, CRR

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | : : : | MDL No. 2740 |
| | : | SECTION "H" (5) |
| | : : | |
| THIS DOCUMENT RELATES TO: ALL CASES | : : : | HON. JANE T. MILAZZO |

## PLAINTIFF'S SECOND AMENDED NOTICE OF VIDEOTAPED DEPOSITION OF SANOFI U.S. PURSUANT TO FED. R. CIV. P. 30(b)(6)

**TO:** **DEFENDANTS SANOFI U.S. SERVICES, INC. F/K/A SANOFI-AVENTIS U.S. INC., and SANOFI-AVENTIS U.S. LLC Through its Counsel of Record: Harley Ratliff, Esq. SHOOK HARDY & BACON, LLP 2555 Grand Blvd Kansas City, MO 64108**

**PLEASE TAKE NOTICE**, that pursuant to Fed. R. Civ. P. 30(b)(6), the video-recorded, stenographic deposition of Sanofi U.S. Services, Inc. f/k/a Sanofi-Aventis U.S. Inc., Sanofi-Aventis U.S. LLC (hereinafter "SANOFI") will be taken before a qualified Notary Public at **McElroy, Deutsche, Mulvaney & Carpenter, LLP, 1300 Mt. Kemble Avenue, Morristown, New Jersey 07962-2075,** on **September 6, 2018** at **9:00 A.M.** and thereafter by adjournment until the same shall be completed.

Pursuant to Fed. R. Civ. P. 30(b)(3), Plaintiffs intend to utilize a stenographic method of recording which permits the "real time" instant visual display of testimony.

Pursuant to Fed. R. Civ. P. 30(b)(3)(A), the deposition testimony will be recorded by stenographic and audiovisual means. The deposition will be videotaped and be available to view

live during the deposition to interested party attorneys.  Plaintiffs reserve the right to use at the trial of this action the video recording of the deposition.

### DEFINITIONS AND INSTRUCTIONS

The following definitions apply to this Notice of Deposition and are deemed to be incorporated into each subject listed below:

1.  "YOU", "YOUR", and "DEFENDANT", means party-Defendants Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc., and their responses shall be consistent with the Stipulation of Terms Related to Defendants, Sanofi and Aventis Pharma S.A. (Doc. 1072). Defendants will include Foreign sources and locations in responding to each area of inquiry.  Sanofi-Aventis U.S. LLC and Sanofi U.S. Services Inc. will respond in accordance with information known or reasonably available to them and the Foreign sources and locations will not exclude sources or information based on the dismissal of the Sanofi S.A. and Aventis Pharma S.A.

2.  "TAXOTERE" is used to refer, as broadly as possible, to docetaxel (TAXOTERE®), a chemotherapy agent used in the treatment of cancer. Also included in the definition of Taxotere are any chemical equivalents marketed in the United States or any foreign countries.

4.  "Relating to," "related to", "relate to," "referring to," "refer to," "reflecting," "reflect," "concerning," or "concern" shall mean evidencing, regarding, , discussing, embodying, describing, summarizing, containing, constituting, showing, mentioning, reflecting, pertaining to, dealing with, referring to in any way or manner, or in any way logically or factually, connecting with the matter described in that paragraph, including documents attached to or used in the preparations of or concerning the preparation of the documents.

5.  "Or" and "and" will be used interchangeably.

7.     Per Magistrate Judge North's Order, each deponent is instructed to produce at the beginning of the deposition: a list of any and all documents reviewed or read upon in preparation for the deposition;

8.     Each deponent is instructed to produce at the beginning of the deposition: Copies of any and all documents or tangible things related to or referring to the subjects listed in this notice contained in the deponent's files, papers, or other materials; and a copy of his/her resume or C.V.

## **DEPOSITION SUBJECT MATTER**

Pursuant to Federal Rules of Civil Procedure, Rule 30(b)(6), the deponent is required to designate and fully prepare one or more officers, directors, employees, or managing agents, or other persons who consent to testify on its behalf, and whom it has fully prepared to testify regarding all information that is known or reasonably available regarding the following designated areas:

1.     Reports of any kind between 01/01/1992 and 12/31/2004 regarding persisting alopecia being associated and/or related in any way with the use of TAXOTERE (alone or in combination) regardless of the source of such report(s), and including but not limited to the following potential sources:

        a.  Solicited reports;
        b.  Unsolicited reports;
        c.  Global pharmacovigilance database;
        d.  ICSRs;
        e.  Scientific Literature;
        f.  Product Complaints Database;
        g.  Company Sponsored Websites;
        h.  Clinical Trials and Other Studies in Humans;

i.   Non-Clinical Safety Information;

j.   Pharmacoepidemiology Studies;

k.   Media;

l.   Competitive Intelligence;

m.   Queries/Requests from Regulatory Authorities;

n.   Safety Information Tracking Systems;

o.   Adverse Events reported; and

p.   Other means.

The deponent shall have knowledge of all such reports, including, but not limited to the reports existing in the following Reference Numbered/Bates Numbered documents:

## TABLE 1:

|     | Bates Beg Number | Estimated Date of Report | Reference No. |
|-----|------------------|--------------------------|---------------|
| 1.  | SANOFI_00695624  | Fri 08/07/1992           | Patient 252   |
| 2.  | SANOFI_00630096  | Wed 08/07/1996           | Patient 05183 |
| 3.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05265    |
| 4.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05266    |
| 5.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05267    |
| 6.  | SANOFI_02705693  | Tue 02/09/1999           | US90-05268    |
| 7.  | SANOFI_02705693  | Fri 02/19/1999           | US90-05288    |
| 8.  | SANOFI_02705693  | Tue 05/18/1999           | US01-21837    |
| 9.  | SANOFI_02705693  | Tue 07/20/1999           | US01-22336    |
| 10. | SANOFI_00364461  | Tue 10/05/1999           | Patient 26809 |
| 11. | REMOVED          |                          |               |
| 12. | SANOFI_02705693  | Mon 12/06/1999           | US01-23443    |
| 13. | REMOVED          |                          |               |
| 14. | SANOFI_02680953  | Tue 02/01/2000           | US01-23859    |
| 15. | REMOVED          |                          |               |
| 16. | REMOVED          |                          |               |
| 17. | SANOFI_02705693  | Mon 12/04/2000           | 200020984JP   |
| 18. | SANOFI_02705693  | Wed 12/06/2000           | 200021077JP   |
| 19. | REMOVED          |                          |               |
| 20. | SANOFI_02705693  | Tue 02/27/2001           | 200111952US   |
| 21. | REMOVED          |                          |               |
| 22. | REMOVED          |                          |               |
| 23. | REMOVED          |                          |               |
| 24. | REMOVED          |                          |               |
| 25. | SANOFI_02705693  | Thu 04/26/2001           | 200113638US   |
| 26. | SANOFI_02705693  | Wed 06/27/2001           | 200112281JP   |
| 27. | REMOVED          |                          |               |
| 28. | SANOFI_02705871  | Fri 09/07/2001           | 200120360EU   |

| | Bates Beg Number | Estimated Date of Report | Reference No. |
|---|---|---|---|
| 29. | REMOVED | | |
| 30. | REMOVED | | |
| 31. | REMOVED | | |
| 32. | REMOVED | | |
| 33. | REMOVED | | |
| 34. | SANOFI_02705871 | Mon 11/26/2001 | 200121748FR |
| 35. | SANOFI_02705693 | Mon 12/17/2001 | 200120826JP |
| 36. | REMOVED | | |
| 37. | SANOFI_02705693 | Tue 02/05/2002 | 200210242JP |
| 38. | SANOFI_02705693 | Fri 03/01/2002 | 200212410DE |
| 39. | SANOFI_02705693 | Wed 07/31/2002 | 200217798US |
| 40. | SANOFI_02705693 | Fri 09/27/2002 | 200215813DE |
| 41. | SANOFI_02705693 | Tue 10/15/2002 | 200215940DE |
| 42. | SANOFI_02705693 | Tue 10/15/2002 | 200215942DE |
| 43. | REMOVED | | |
| 44. | REMOVED | | |
| 45. | SANOFI_02705693 | Mon 11/18/2002 | 200214577FR |
| 46. | REMOVED | | |
| 47. | SANOFI_02705693 | Sat 05/31/2003 | 200315104US |
| 48. | SANOFI_02647849 | Wed 08/13/2003 | 200317903GDDC |
| 49. | SANOFI_02647849 | Thu 08/14/2003 | 200317924GDDC |
| 50. | SANOFI_02705871 | Mon 08/18/2003 | 200318032GDDC |
| 51. | SANOFI_02705871 | Fri 09/05/2003 | 200318617GDDC |
| 52. | SANOFI_02705871 | Fri 09/05/2003 | 200318637GDDC |
| 53. | SANOFI_02647849 | Mon 10/13/2003 | 200319936GDDC |
| 54. | SANOFI_02705871 | Fri 10/24/2003 | 200320929GDDC |
| 55. | SANOFI_02705693 | Mon 10/27/2003 | 200319314US |
| 56. | SANOFI_02705693 | Tue 11/12/2003 | 200314232FR |
| 57. | SANOFI_02343937 | Thu 12/04/2003 | 200317927US |
| 58. | SANOFI_02343937 | Thu 12/04/2003 | 200318614GDDC |
| 59. | SANOFI_02343937 | Thu 12/04/2003 | 200319153US |
| 60. | SANOFI_02705693 | Tue 12/09/2003 | 200313681EU |
| 61. | SANOFI_02705693 | Wed 12/10/2003 | 200313710EU |
| 62. | SANOFI_02705871 | Mon 12/15/2003 | 200322626GDDC |
| 63. | SANOFI_02705871 | Mon 12/15/2003 | 200322629GDDC |
| 64. | SANOFI_02670563 | Wed 01/21/2004 | 200410497US |
| 65. | SANOFI_02705693 | Wed 01/21/2004 | 200410498US |
| 66. | SANOFI_02705693 | Wed 01/21/2004 | 200410499US |
| 67. | SANOFI_02705693 | Wed 01/21/2004 | 200410500US |
| 68. | SANOFI_02705693 | Wed 01/21/2004 | 200410501US |
| 69. | SANOFI_02705871 | Mon 01/26/2004 | 200410633US |
| 70. | SANOFI_02705693 | Tue 01/27/2004 | 200410408FR |
| 71. | SANOFI_02705871 | Mon 02/16/2004 | 200411167US |
| 72. | SANOFI_02705871 | Mon 03/01/2004 | 200412698GDDC |

|      | **Bates Beg Number** | **Estimated Date of Report** | **Reference No.** |
|------|----------------------|------------------------------|-------------------|
| 73.  | SANOFI_02705693      | Fri 03/12/2004               | 200412005US       |
| 74.  | SANOFI_02705693      | Tue 03/16/2004               | 200413195GDDC     |
| 75.  | SANOFI_02705693      | Wed 03/24/2004               | 200413453GDDC     |
| 76.  | SANOFI_02705693      | Wed 04/07/2004               | 200413926GDDC     |
| 77.  | SANOFI_02705693      | Wed 05/12/2004               | 200413785US       |
| 78.  | SANOFI_02705693      | Fri 06/18/2004               | 200416170GDDC     |
| 79.  | SANOFI_02705693      | Wed 07/07/2004               | 200416744GDDC     |
| 80.  | SANOFI_02705693      | Mon 08/02/2004               | 200417622GDDC     |

2. For each report (as described in Number 1 above) between 01/01/1992 and 12/31/2004 regarding persisting alopecia:

   a. The first date on which YOU received or became aware of the information or the report;

   b. To whom was the report sent;

   c. Who received the report;

   d. When the report was received;

   e. The source of the report;

   f. Whether there were Standard Operating Procedures ("SOP"s) in place regarding YOUR receipt and handling of the report;

   g. The Standard Operating Procedures ("SOP"s) regarding receipt of such reports;

   h. Whether YOU followed Standard Operating Procedures ("SOP"s) regarding the report;

   i. How YOU categorized and recorded the report;

   j. Every database in which the report was recorded;

   k. Actions taken by anyone associated with YOU regarding the report;

   l. All follow-up efforts by YOU regarding the report, both internally and externally;

   m. Whether and how the report was handled in the regular course and scope of YOUR business;

   n. Was the report submitted by YOU to any regulatory authority and if so for each by whom, to whom, when and in what manner and/or form (i.e., did you full provide the full case report, did you provide the CIOMS report, did you simply report it as a numerical incidence of alopecia, etc.);
   and

o. Whether the report alone or in combination with other report(s) constitutes a safety signal and why.

3. The identity of each patient, by reference number, who reportedly experienced persisting alopecia while enrolled as a participant in the TAX316 and/or TAX301/GEICAM and/or NABHOLTZ Phase II Study of Docetaxel, Doxorubicin, and Cyclorubicin as First-Line Chemotherapy for Metastatic Breast Cancer studies, so that it can be determined whether each such patient is included in Table 1.

4. The full plan to study and/or analyze the "Reversibility" of Alopecia (referenced in the Statistical Analysis Plan for the TAX316 study Bates No. SANOFI_01234420) including but not limited to the execution, methodology, all follow up actions, the recording of results and reporting of results related in any way to the plan, study, and/or analysis related to the Reversibility of Alopecia.

5. The reversibility of alopecia as observed and documented in PSUR 4 dated September 30, 1997.

6. The findings regarding alopecia as a TEAE persisting into the follow-up period in TAX316 at the median follow-up of 55 months.

Dated: August 31, 2018

/s/ J. Kyle Bachus
J. Kyle Bachus (CO Bar #24441)
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone: 303-893-9800
Facsimile: 303-893-9900
E-Mail: kyle.bachus@coloradolaw.net
**Plaintiff's Executive Committee**

/s/ Christopher L. Coffin
Christopher L. Coffin (LA Bar # 27902)
Pendley, Baudin & Coffin, L.L.P.

Respectfully submitted:

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
Barrios, Kingsdorf & Casteix
701 Poydras Street, Suite 365
New Orleans, LA 70139
Telephone: 504-524-3300
Facsimile: 504-524-3313
E-Mail: barrios@bkc-law.com
**Plaintiffs' Co-Liaison Counsel**

**Plaintiffs' Executive Committee**
Christopher L. Coffin
Karen Barth Menzies

1515 Poydras Street, Suite 1400 New
Orleans, LA 70112
Telephone: 504-355-0086
Facsimile: 504-523-0699
E-Mail: ccoffin@pbclawfirm.com
***Plaintiffs' Co-Lead Counsel***

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
Gibbs Law Group LLP
400 Continental Boulevard, 6th Floor
El Segundo, CA 90245
Telephone: 510-350-9700
Facsimile: 510-350-9701
E-Mail: kbm@classlawgroup.com
***Plaintiffs' Co-Lead Counsel***

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
Gainsburgh Benjamin, et al.
2800 Energy Centre, 1100 Poydras
Street New Orleans, LA 70163-2800
Telephone: 504-522-2304
Facsimile: 504-528-9973
E-Mail: plambert@gainsben.com
***Plaintiffs' Co-Liaison Counsel***

J. Kyle Bachus
David F. Miceli
Dawn M. Barrios, *ex officio*
M. Palmer Lambert, *ex officio*

***Plaintiffs' Steering Committee***
Anne Andrews
J. Kyle Bachus
Lawrence J. Centola, III
Christopher L. Coffin
Alexander G. Dwyer
Emily C. Jeffcott
Andrew A. Lemmon
Daniel Markoff
Abby E. McClellan
Karen Barth Menzies
David F. Miceli
Rand P. Nolen
Hunter J. Shkolnik
Genevieve Zimmerman

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day August 2018, the foregoing copy of

the Second Amended Notice of Videotaped 30(b)(6) Deposition of was served upon Defendants

through Defendants' Liaison Counsel.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT
Plaintiffs' Co-Liaison Counsel

# EXHIBIT K

*Filed Under Seal*

# EXHIBIT L

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  TAXOTERE (DOCETAXEL)      *
    PRODUCTS LIABILITY       * Docket No.: 16-MD-2740
    LITIGATION         * Section "H(5)"
            * August 8, 2019
Relates To 16-CV-17144      * New Orleans, Louisiana
* * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF ORAL ARGUMENT
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:    Barrios, Kingsdorf & Casteix, LLP
        BY: DAWN BARRIOS, ESQ.
        701 Poydras Street
        Suite 3650
        New Orleans, Louisiana 70139

        Gainsburgh, Benjamin, David,
         Meunier & Warshauer, LLC
        BY:  PALMER LAMBERT, ESQ.
        2800 Energy Centre
        1100 Poydras Street
        New Orleans, Louisiana 70163-2800

## Page 2

1   APPEARANCES:
2   For Plaintiffs:    Simmons Hanly Conroy
            BY: DAVID F. MICELI, ESQ.
3           One Court Street
            Alton, Illinois 62002
4
5           Gibbs Law Group, LLP
6           BY:  KAREN BARTH MENZIES, ESQ.
            400 Continental Boulevard
7           6th Floor
            El Segundo, California 90245
8
9           Gibbs Law Group, LLP
10          BY:  ANDRE MURA, ESQ.
            505 14th Street, Suite 1110
11          Oakland, CA 94612
12
13          Morgan & Morgan, P.A.
            BY: EMILY C. JEFFCOTT, ESQ.
14          700 S. Palafox Street
            Suite 95
15          Pensacola, Florida 32502
16
17          Williams Hart Boundas Easterby,
            BY: BRIAN A. ABRAMSON, ESQ.
18          8441 Gulf Freeway, Suite 600
            Houston, Texas 77017
19
20
21          Bachus & Schanker, LLC
            BY: DARIN SCHANKER, ESQ.
22          1800 Wynkoop Street
            Suite 700
            Denver, Colorado 80202
23
24
25

## Page 3

1   APPEARANCES:
2
    For Sanofi S.A.:      Irwin Fritchie Urquhart
3               & Moore, LLC
                BY:  DOUGLAS J. MOORE, ESQ.
4               400 Poydras Street, Suite 2700
                New Orleans, Louisiana 70130
5
6
                Shook Hardy & Bacon, LLP
7               ADRIENNE L. BYARD, ESQ.
                JON STRONGMAN, ESQ.
8               TORREY M. PETERSON, ESQ.
9               2555 Grand Boulevard
10              Kansas City, Missouri 64108
11  Official Court Reporter:    Jodi Simcox, RMR, FCRR
                500 Poydras Street
12              Room B-406
                New Orleans, Louisiana 70130
13              (504) 589-7780
14
15
    Proceedings recorded by mechanical stenography, transcript
16  produced by computer.
17
18
19
20
21
22
23
24
25

## Page 4

1               I N D E X
2                       Page
3
    GENERAL CAUSATION                   6

    SPECIFIC CAUSATION                  55

    PREEMPTION                  79
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

OFFICIAL TRANSCRIPT

1  to that that we are not going to go beyond the 2015 label in
2  the Earnest case.
3        So this entire discussion about the warnings and
4  precautions and whether the label could have included a warning
5  in that section versus the adverse reaction section, which we
6  know -- I mean, there isn't any dispute about the adverse
7  reaction section.  That dispute is academic.  It's not
8  presented in the Earnest case.
9        That's a legal controversy that's going to come
10 up later potentially in the litigation when you have a
11 plaintiff who was administered the drug with the 2015 label.
12 Because at that point, the label says -- has language in the
13 adverse reaction section, but not in the warnings and
14 precautions section, and therefore the argument there is
15 different -- the preemption argument is quite different.
16       So you don't have to address any of these
17 arguments in the Earnest case, especially now that we've told
18 the courts that we don't plan to go beyond the 2015 label.  So
19 all these arguments are -- there's no legal controversy about
20 the meaning of preemption in the Earnest case.
21       And you're essentially being asked to render an
22 advisory opinion about what the FDA might have done had sanofi
23 actually asked to change the label for the warnings and
24 precautions.  It never asked the FDA or -- and it never sought
25 unilaterally through the changes being effected process to

1  change the label to warn in the warnings and precautions.  And
2  I'll talk a little bit more about that, but that's an issue
3  that's going to come up later.
4        I'm happy to answer any questions about that
5  specific point before turning --
6        THE COURT:  Well, I think what I heard from sanofi is
7  that your expert's going to say that belonged in the warnings.
8        MR. MURA:  And I just told you, we've represented no.
9  The experts --
10       THE COURT:  Do you have expert testimony that say
11 that this label needed to be changed and we --
12       MR. MURA:  Our expert testimony also concerns the
13 adverse reaction section.  And so that's at Kessler paragraphs
14 109, 126, 133 to 139, 149, I believe it's 154, 164 to 65.  This
15 is in our response to the notice of supplemental authority.
16 There's significant testimony from Dr. Kessler about the
17 adverse reaction section.  And there really isn't any debate.
18 If you read sanofi's motion on preemption, they say, "Our issue
19 is with any plaintiff who goes beyond the 2015 label."
20       They take no -- that's on page 2.  They take no
21 issue with a plaintiff who's arguing that the label was
22 inadequate because it didn't include language in the adverse
23 reaction section.  So there can be no preemption -- there's no
24 preemption argument before the Court with respect to that.
25       And Dr. Kessler can testify about the adverse

1  reaction section.  He discusses it in his report.  So I don't
2  think there's a legal controversy here that the Court needs to
3  address given the representation that we've made, and given the
4  nature of -- the limited nature of the preemption motion that
5  sanofi has filed.
6        THE COURT:  Okay.
7        MR. MURA:  But I would like to respond on the merits
8  to the arguments that the Court will see later with respect to
9  Albrecht and Wyeth v. Levine.  I do think that -- I feel like
10 I'm back in 2009 in the sense that so many of the arguments
11 that sanofi made today were the exact arguments that Wyeth made
12 before the U.S. Supreme Court.  They said, "Look, we're working
13 together with the FDA.  We present them all the information.
14 There's no information missing.  And the FDA didn't tell us to
15 make these changes to the label."
16       And what the Supreme Court said in Wyeth against
17 Levine is, "The manufacturer is primarily responsible at all
18 times for the content of the label."  So you asked the
19 question, "Don't you have to do an analysis?"  And the answer
20 to that is yes.  And you can just look at Wyeth against Levine.
21       So what the Court said there is, okay.  There
22 were about 20 incidents that presented the injury, and the
23 company was aware of this.  And so the question was, you know:
24 Was it enough that Wyeth had submitted all the information over
25 time to the FDA and had worked with the FDA to change the

1  drug's label over time?
2        And the court said, "Wyeth could have analyzed
3  the accumulating data and added a stronger warning."  It just
4  didn't.  And so it couldn't meet the first aspect of the Levine
5  and Albrecht tests.  It couldn't show clear evidence because it
6  couldn't prove that it had actually fully informed the FDA.
7        And one of the ways you inform the FDA is
8  through a label change, by either proposing a label change
9  through the prior approval supplement process, or unilaterally
10 changing the label, and then it's up to the FDA.  The FDA can
11 then reject that label.  Right?  And so if the FDA then rejects
12 that label through a considered and formal process --
13       THE COURT:  Mr. Mura, when do you think the label
14 should have been changed?
15       MR. MURA:  Well, Dr. Kessler's testified, and he gave
16 a -- I think it should have been changed as early as 2006.
17 There's evidence of that.  And there's a Sedlacek report.  I'm
18 happy to go through that.  It's in our statement of facts.  But
19 we only have to provide a case specific response based on the
20 date of administration.
21       THE COURT:  Right, which is for Ms. Earnest.
22       MR. MURA:  So for Ms. Earnest, certainly by 2011, and
23 that is the only opinion that Dr. Kessler needs to give with
24 respect to Ms. Earnest.
25       Sanofi has said that this is contrived because

# EXHIBIT M



# Sanofi's knowledge

**June 22, 2011**
Barbara Earnest started Taxotere, not knowing about the common risk of permanent hair loss

**2010**
Sanofi's 10 year results confirmed permanent hair loss (TAX316)

**2009**
Doctor reported 66 cases of persistent alopecia in western France

**2009**
Sanofi's 77 month results show permanent hair loss in 6.1% of women (GEICAM)

**2006**
Sanofi met to discuss two kinds of hair loss after Taxotere use: temporary and non-reversible

Doctor reported that 6.3% of Taxotere patients had permanent hair loss

Amy Freedman, Sanofi's Global Safety Officer, admits Sanofi knew Taxotere causes permanent hair loss

**2006**
Sanofi's 77 month results confirmed permanent hair loss in 3.1% of women (TAX316)

**2005**
Sanofi receives 20 adverse event reports of permanent hair loss in the same month

**2004**
Sanofi's 55 month results showed permanent hair loss in 3.2% of women (TAX316)

**2001**
Same doctor published in *Journal of Clinical Oncology*: hair did not grow back in 7.4% of women after Taxotere use

**2002**
Sanofi planned to analyze if hair loss after Taxotere is reversible (TAX316)

**1999**
Sanofi clinical trial doctor gives Sanofi adverse event reports of hair not growing back

**1997**
Sanofi's clinical trial began (TAX316)

**1996**
Sanofi launched Taxotere

**Sanofi's clinical trials**

2011   2010   2009   2006   2005   2004   2002   2001   1999   1997   1996

# EXHIBIT N

*Filed Under Seal*

# EXHIBIT O
*Filed Under Seal*

# EXHIBIT P

Δ'd protoc to Taxotere
due to Taxol RXNS X 2

University Medical Center
Lafayette, Louisiana

PT# 75149 MR ████ 070106
MENARD, SHERIBA A   2 / F
████████   5
NO CC PCP LISTED ON

## Chemotherapy Flow sheet

addressograph/label

| Date: 2006 Mo/Day | 7/21/0 | 7/28/0 | | | | | |
|---|---|---|---|---|---|---|---|
| Day of Study | | #2 | | | | | |
| Weight | 218# | 220# | | | | | |

**MEDICATIONS**

| | | 7/21/0 | 7/28/0 | | | |
|---|---|---|---|---|---|---|
| 1 | Decadron 4mg | 4mg | 4mg | | | |
| 2 | Zofran 16 mg | 16mg | 16mg | | | |
| 3 | Carboplatin 205mg | 205mg | 205mg | | | |
| 4 | Taxotere 160mg | 160mg | 160mg | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |

**RESULTS / LAB**

| | 7/21/0 | 7/28/0 | | | | |
|---|---|---|---|---|---|---|
| Hgb | 12.4 | 11.6 | | | | |
| Hct | 36.7 | 33.2 | | | | |
| RBC | 3.88 | 3.6 | | | | |
| Platelets | 190 | 176 | | | | |
| WBC | 4.7 | 2.3 | | | | |
| Neutrophils | 82 | 66 | | | | |
| Bands | | 13 | | | | |
| ANC | | 1817 | | | | |
| Lymphocytes | 6 | 13 | | | | |
| Monocytes | 12 | 6 | | | | |
| Eosinophiles | 0 | 1 | | | | |
| BUN | 11 | 10 | | | | |
| Creatinine | 0.9 | 1 | | | | |
| Total Protein | 6.0 | 6 | | | | |
| Total Bilirubin | 0.7 | 0.6 | | | | |
| Calcium | 8.5 | 8.4 | | | | |
| Alkaline Phosphate | 70 | 66 | | | | |
| Ferritin | | | | | | |
| TIBC | | | | | | |
| Iron | | | | | | |
| Iron Sat | | | | | | |
| LDH | | | | | | |
| Uric Acid | | | | | | |
| Mg | | | | | | |
| Phosphorus | | | | | | |
| 24 Hr Urine Cr Cl | | | | | | |
| Muga% | | | | | | |
| DLCO% | | | | | | |

Hosp Number: 136778
Patient: (R) Port 136778
Diagnosis: (R) Breast CA
Wt: 218#   Ht: 66"
Total Body Surface: >2.0
Allergies: hypersensitivity to Taxol
Informed Consent: ☑ Yes ☐ No

7/21/06 chemo given
as per protocol via MP.
tol well   m

7/28/06 chemo #2 given
per Mediport. Tol well. KR.

University Medical Center
  Lafayette, Louisiana

PT# 2852775 MR ▮▮▮   060606
MENARD , SHERIBA A ▮▮▮   2 / F
                                        1

## Taxol/Carboplatin Weekly Protocol

All patients are presented to Oncology Staff prior to prescribing chemotherapy and/or radiation therapy.
**All Protocols Must be Signed by Staff MD.**

Diagnosis: Ⓡ BRCA          Height: 6'6½"  Weight: ~~20~~ 220#  BSA: >2.0
                                        Karnofsky Performance Status: _____

Protocol: Taxol/Carboplatin every week

**Lab results required** prior to each chemotherapy:  CBC/D, CMP

Prior to chemotherapy:
  Benadryl 50 milligrams intravenous push
  Tagamet 300 milligrams intravenous piggyback
  Decadron 20 milligrams intravenous piggyback
  Zofran 16 milligrams by mouth or intravenous piggyback

One course consists of:

| Drug | Daily Dose | | Schedule |
|---|---|---|---|
| Taxol | ☒ 30 milligrams/m² | 60 milligrams intravenous piggyback | every week |

**If receiving radiation therapy**
-OR-

| | ☐ 60 milligrams/m² | _____ milligrams intravenous piggyback | every week |

**If NOT receiving radiation therapy**

Carboplatin (AUC ☐ 1.5 OR ☒ 2)  205 milligrams intravenous piggyback   every week
  Age  48
  Serum creatinine  1.0  6-6-06
  Date of creatinine  6/6/06

Repeat cycle every week

Number of courses to be administered: during XRT

*(handwritten, circled) 7/18/06 — Discontinue TAXOL — b/of S03 increased effect — Start TAXOTERE weekly w/ carboplatin*

*XRT consult 6/8/06*

Monitor: _Vital signs:  every 5 minutes times 3, then every 15 minutes for 1 hour, then hourly until complete_
  **RN must remain at the bedside for the first 15 minutes**
  -Rate of administration:  start infusion of Taxol at 250 milliliters/hour for 15 minutes, then increase rate to
  500 milliliters/hour

Parameters for treatment: Check with Oncology Staff before cancelling any chemo due to abnormal parameters, as listed below.
  WBC 3,000UL or greater.  Absolute neutrophil count (ANC) 1500 or greater.  (ANC = Neutrophils plus bands times WBC).
  Platelet count 100,000UL or greater.
Dose limiting factors: myelosuppression, neutropenia, neurotoxicity, thrombocytopenia, renal toxicity
Other Potential Side Effects: hypersensitivity reactions, transient bradycardia, rhythm disturbances, arrhythmias, alopecia, mucositis, diarrhea,
nausea, vomiting, onycholysis, electrolyte imbalance, peripheral neuropathy, allergic reactions, amenorrhea, sterility

Date:  6/4/06                                    _____
                                                 Attending Physician Signature

*(handwritten) Δ pre-med to Decadron 4mg IVP*
*Zofran 16mg PO*

*Faxed to Selena + pharmacy on 7/18/06*

                                                 _____
                                                 Attending Staff Signature

*Juan Rodriguez, M.D. Medical #4075990   023*

### Dosage Changes

| Drug | Daily Dose Changes | | Date | Staff Signature |
|---|---|---|---|---|
| Taxotere | 30 milligrams/m² 60 milligrams | | 7/18/06 | |
| Carboplatin | ~~_____ milligrams/m²~~ 205 milligrams | | 7/28/06 | |
| | _____ milligrams/m² _____ milligrams | | | |
| | _____ milligrams/m² _____ milligrams | | | |