**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

**IN RE: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION**

**MDL NO. 16-2740**

*This document relates to:*
Dora Sanford, Case No. 2:17-cv-09417

**HOSPIRA'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
BASED ON THE STATUTE OF LIMITATIONS**

Plaintiff's Opposition confirms that, for multiple reasons, her claims are prescribed.

*First*, this Court has issued five opinions in this MDL applying the Louisiana statute of limitations, yet the Opposition does not even cite those decisions, let alone attempt to apply or distinguish them. The reason is obvious: under this Court's prior rulings, Mrs. Sanford's claims are prescribed. Mrs. Sanford first experienced permanent hair loss in June 2014, six months after her last chemotherapy treatment, but *the Opposition admits that Plaintiff did not conduct any investigation* for more than two years, until after she saw an attorney advertisement in the summer of 2016. The Opposition attempts to excuse this failure to investigate on the basis that Mrs. Sanford did not know her hair loss was permanent and what caused it, but this Court has repeatedly rejected these same arguments. Mrs. Sanford "knew or should have known six months after her treatment that something was amiss," *In re Taxotere (Docetaxel) Prods. Liab. Litig.* ("*Kahn*"), ECF No. 9885 at 6 (E.D. La. April 7, 2020), but she *did nothing* to investigate. "The doctrine of contra non valentem does not suspend prescription for this kind of inaction." *In re Taxotere (Docetaxel) Prods. Liab. Litig.* ("*Francis/Johnson*"), 2019 WL 2995897, at *3 (E.D. La. July 9, 2019). Thus, Plaintiff's claims should be dismissed under Louisiana law and a straightforward application of this Court's precedents.

*Second*, even after Mrs. Sanford admits she was on notice of her claims and retained counsel, she *still* waited more than thirteen months to file suit. The Opposition's only explanation for this additional delay is that she needed to confirm which specific docetaxel product she took,

but it is undisputed that this information was readily available from her medical records, which she obtained well within a year from the date on which she claims she was first on notice. Thus, this process was part of a routine investigation into her claims, not a basis for extending the prescriptive period. Her claims are therefore prescribed for this independent reason.

Finally, the Opposition fails to offer any valid reason why the Court should deny Hospira's request to strike a plaintiff from the current trial pool. It makes procedural arguments that are not only erroneous, but also miss the point: Plaintiffs selected this clearly prescribed case for the trial pool, thus requiring Hospira and the Court to expend resources unnecessarily in discovery and now motion practice. When Plaintiffs selected the case for the trial pool, counsel certainly knew, or easily could have determined by looking at their file, that Mrs. Sanford saw the advertisement and contacted an attorney more than thirteen months before suit was filed. This is the type of limited circumstance where a strike is the proper remedy.

**I.     Mrs. Sanford's Claims Are Barred by The Statute of Limitations.**

**A. Mrs. Sanford's Claims Should Be Dismissed Under this Court's Precedents.**

There is no dispute that Mrs. Sanford's claims are "prescribed on the face of the pleadings." *In re Taxotere (Docetaxel) Prods. Liab. Litig.* ("*Thibodeaux*"), ECF No. 9110 at 6 (E.D. La. Jan. 23, 2020). Mrs. Sanford alleges that she suffered her injury—permanent chemotherapy-induced alopecia—six months after completing her chemotherapy. Hospira's Statement of Undisputed Material Facts ("SOF") ¶ 26. The Opposition acknowledges that Mrs. Sanford completed her chemotherapy in January 2014. Pl.'s Resp. to Hospira's Statement of Undisputed Material Facts ("PSOF") ¶ 34.[1] Accordingly, the prescription period started in June 2014 (six months later) and

---

[1] Mrs. Sanford's post-chemotherapy treatment with radiation and Herceptin continued until September 2014, six months after her chemotherapy ended. PSOF ¶ 34. As this Court has recognized, this "[a]fter surgery" treatment is irrelevant to the present statute-of-limitations analysis. *Kahn,* at 6 n.17. Moreover, even if the start of the prescription period were extended until she finished her after-surgery treatment in September 2014, Mrs. Sanford's complaint was still filed well beyond the one-year deadline.

2

ended in June 2015, yet Mrs. Sanford did not file her complaint until September 2017. Her claims are therefore untimely on their face.

The Opposition argues that, under the doctrine of *contra non valentem*, prescription should be tolled because she "did not know she had suffered permanent alopecia—much less that it was attributable to her use of Docetaxel—until she saw an attorney advertisement in 2016." Opp. 9. But this Court has repeatedly rejected this argument, and it should do so again here.

At the outset, Plaintiff's argument is fundamentally flawed because it fails to recognize that, under Louisiana law, the prescription period begins to run "when there is enough notice *to call for an inquiry about a claim*, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Thibodeaux*, at 4 (citation omitted) (emphasis added). Thus, the question is not whether Mrs. Sanford was fully aware of her injury and what caused it, but whether she had sufficient information to trigger her *duty to investigate*. The undisputed facts show that she had ample information to prompt such an investigation. Mrs. Sanford understood that chemotherapy carried a risk of hair loss, PSOF ¶ 27, that she experienced hair loss during chemotherapy, *id.* ¶ 28, that she believed her hair would grow back, *id.* ¶ 31, and that she experienced no regrowth after her chemotherapy ended in June 2014, *id.* ¶ 32. Moreover, Mrs. Sanford testified that she attributed her hair loss to her chemotherapy. SOF ¶ 30. Under this Court's prior rulings, this information was enough to call for an inquiry.

There is no material difference between Mrs. Sanford's circumstances and those of Plaintiff Thibodeaux, who testified that "she thought her hair 'was going to come back after chemo,'" but it did not grow back. *Thibodeaux*, at 5 n.18. The same is true of *Francis*, where the plaintiff should have investigated after she "attributed her hair loss to her chemotherapy" and "knew her hair had not returned as expected." *Francis/Johnson*, at *4. Similarly, in *Johnson*, the plaintiff had "actual or constructive knowledge" where "she did not think anything other than her chemotherapy had caused her hair loss" and "became very concerned that her hair might not grow back at all." *Id.* at *3; *see also id.* (requiring plaintiff Earnest to demonstrate *contra non valentem* applied after she "testified that she attributed her hair loss to her chemotherapy treatment"); *Kahn*,

3

at 6 ("Even setting aside the definition of PCIA in the Master Complaint, Kahn knew or should have known six months after her treatment that something was amiss when her hair had not grown back as she expected."). Nothing sets Mrs. Sanford's case apart.

Further, Mrs. Sanford does not dispute, and cannot escape, that *she failed to conduct any investigation* after she experienced hair loss during chemotherapy and her hair did not grow back as expected. *See* PSOF ¶¶ 37-42. This crucial fact puts Mrs. Sanford's case at odds with all instances in which this Court has denied prescription. In *Earnest*, for example, the plaintiff "inquired with her doctor about her injury, and she was led to believe that she had no actionable injury." *Francis/Johnson*, at *3. Here, after she claims she suffered hair loss, Mrs. Sanford cannot point to any assurance by any health care professional that her hair would grow back. That is because she never sought any treatment of any kind for her hair loss.

The Opposition advances a series of reasons why the statute of limitations should not bar Mrs. Sanford's claims, but none of them sets this case apart from this Court's previous decisions. To the contrary, they further demonstrate that Mrs. Sanford's claims are untimely under Louisiana law.

1. The Opposition attempts to justify Mrs. Sanford's failure to investigate on the grounds that she had received information that led her to believe her hair loss would be temporary. She states that "the verbal and written warnings she received indicated the side effect of hair loss would be temporary." Opp. 2; *see id.* at 9-10, 12-13.[2] She also contends that she had "continued hope" of hair regrowth because women in her support group had their hair grow back. *Id.* at 14-15. But this expectation that her hair would grow back is not a point in Mrs. Sanford's favor: rather, this Court has consistently held that plaintiffs should have investigated when, contrary to their expectations, their hair did not grow back after chemotherapy. Indeed, in *Thibodeaux,* the Court

---

[2] Notably, the informed consent that Ms. Sanford executed did not say "temporary"; it informed her of the risk of "Hair Loss." Opp. Ex. L. Moreover, the Docetaxel-specific warning cited by the Opposition informed Mrs. Sanford that side effects, including hair loss, are "*almost* always reversible and will go away after treatment is complete," Opp. 9 (quoting Ex B, at p. 2) (emphasis added). It did *not* inform her that her hair was guaranteed to grow back. *See id.*

4

specifically rejected the plaintiff's attempt to rely on information provided by her health care provider. As here, Thibodeaux argued that she "kept believing her hair loss was temporary because the [informed consent] form had said it would be," but the Court disagreed, explaining that even "[i]f she remembered what the form said, this should have excited her attention and prompted an investigation." *Thibodeaux*, at 6. The Court should also reject Mrs. Sanford's attempt to rely on information from her health care providers. Her alleged expectations from this information only confirm that she had a duty to investigate but failed to do so.

    2. The argument that Mrs. Sanford's claims did not accrue until she saw a lawyer advertisement about Docetaxel because Mrs. Sanford experienced hair loss with Adriamycin, another chemotherapy medication, Opp. 10-12, also fails. *First*, there is no evidence that Mrs. Sanford believed that only Adriamycin, and not Docetaxel, caused her permanent hair loss. The Opposition (at 12) argues that "it was completely reasonable for Mrs. Sanford to believe" that Adriamycin caused her hair loss, but notably cites no evidence—in her deposition or in her new Affidavit—that she actually held that belief. That is because Mrs. Sanford attributed her alleged permanent hair loss to chemotherapy generally, not to any specific treatment. SOF ¶ 30.

    *Second*, regardless of her subjective belief, Mrs. Sanford did not need to know which particular chemotherapy agent caused her hair loss to trigger her duty to investigate. *See Mason v. Danek Med., Inc.,* 1998 WL 774176, at *1 (E.D. La. Oct. 30, 1998) ("[P]laintiff's symptoms which are the basis for this suit manifested themselves to such a degree after his [treatment] that he should have known by exercising reasonable diligence that there was a reasonable possibility that his problem was caused by [one of several medical products involved in treatment]."); *Bultman v. Danek Med., Inc.*, 1999 WL 33537321, at *3 (E.D. La. Dec. 17, 1999) (same). In *Francis*, *Johnson*, and *Thibodeaux*, the plaintiffs also took combination therapy. *See* Pl.'s Resp. to Def.'s SOF, ECF No. 6610-1, ¶ 6 (*Francis*); Johnson Dep. Tr., ECF No. 5734-5, at 260:6-262:11 (*Johnson*); Def.'s SOF, ECF No. 8779-1, ¶¶ 4-5 (*Thibodeaux*). Like Mrs. Sanford, they attributed their hair loss to chemotherapy generally, not to Docetaxel in particular; this Court nevertheless found that they were on notice of their claims when their hair did not grow back. *Francis/Johnson*,

5

at *3-4; *Thibodeaux*, at 5 n.18.  The same is true here.  The fact that Mrs. Sanford took other chemotherapy medications with the risk of hair loss does not distinguish her case.

*Third*, Plaintiff's allegations regarding Adriamycin as a potential "alternate cause" of her hair loss only *heightened* her duty to investigate.  The Opposition points out that Mrs. Sanford first experienced hair loss when taking Adriamycin, before she took Docetaxel, Opp. 10-11, and that the Adriamycin- and Docetaxel-specific chemotherapy education materials she received contained an identical warning regarding hair loss, *id.* at 9.  But that shows only that when her hair did not grow back as expected, Mrs. Sanford had even *more* reason to investigate: she had taken *multiple* chemotherapy medications with a risk of hair loss.  Instead, Mrs. Sanford did nothing.

3. The Opposition's argument that, beginning in January 2015, Mrs. Sanford took Synthroid to treat unrelated thyroid cancer, Opp. 13-14, fails for similar reasons.  *First*, there is no evidence that Mrs. Sanford ever attributed her alleged permanent hair loss to Synthroid.

*Second*, there is no logical basis for tolling the prescription period based on her subsequent Synthroid use.  Mrs. Sanford points to Synthroid's warning that "hair loss may occur during the first few months of treatment," *id.* at 14, but Mrs. Sanford began using Synthroid *one year* after her last chemotherapy treatment and *six months* after her alleged permanent hair loss.  *See* SOF ¶ 34.  And she testified that she lost all her hair during chemotherapy, and that she experienced no regrowth at all.  SOF ¶ 30. Thus, the duty to investigate began long before Synthroid ever came into the picture.  Indeed, Plaintiff's argument—that any subsequent medication that carries a risk of hair loss absolves a plaintiff of her duty to investigate earlier hair loss—would lead to absurd results.  It would render the statute of limitations a nullity for the many plaintiffs who attributed their hair loss to chemotherapy and later took one of the many medications that may carry a risk of hair loss.

*Third*, the Opposition's position is inconsistent with the Court's ruling in *Kahn.*  In that case, there was a dispute regarding whether the prescription period began when plaintiff finished her chemotherapy or when she finished post-chemotherapy treatments ("[a]fter surgery" treatment).  The Court held "that Plaintiff's injury was realized six months after taking Taxotere,

6

not six months after she finished her 'After surgery' treatment." *Kahn*, at 6 n.17. Similarly, Plaintiff's subsequent Synthroid treatment, unrelated to her breast cancer, does not toll the prescription period, which had already begun to run.

  4. The Opposition relies on cases that emphasize the central importance of a reasonable investigation. In *Cole v. Celotex Corporation*, 620 So. 2d 1154, 1157 (La. 1993), the plaintiff, who had evidence of plaque in his lung, "continued to be monitored on an annual basis" despite having "no ill effects or symptoms" for what was later diagnosed to be asbestosis. *Id.* at 1157-58. Multiple doctors concluded that the plaque "could be due to several causes besides asbestosis," and it was only years later that the plaintiff received a definitive diagnosis. *Id.* Likewise, in *Cortez v. Depuy Orthopaedics, Inc.*, 2016 WL 633665, at *1 (E.D. La. Feb. 17, 2016), the plaintiff sought medical treatment for the alleged injury, but the surgeon could not determine the cause of the injury until he performed an invasive surgery. And in *Chevron USA, Inc., v. Aker Maritime, Inc.*, 604 F.3d 888, 893-94 (5th Cir. 2010), the court specified that "*when a plaintiff acts reasonably to discover the cause of a problem*, the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant." *Id.* at 894 (emphasis added) (alterations in original) (citation omitted). Here, by contrast, Mrs. Sanford admits that she did *no investigation* as to the cause of her injuries, let alone relied on information from health care providers based on that investigation. Thus, these cases are inapposite.

  **B. Mrs. Sanford's Claims Are Barred Based on Her Own Testimony.**

  The Opposition does not dispute that Plaintiff filed her September 2017 lawsuit more than one year after she had seen a television advertisement and contacted her present counsel in August 2016. *See* Opp. 17. Instead, it raises three invalid arguments:

  1. The Opposition argues that the prescriptive period did not start until her counsel concluded their investigation and determined which company manufactured the docetaxel product Mrs. Sanford took. Opp. 17-18. But under the doctrine of *contra non valentem*, "a plaintiff is deemed to know what he could have learned by reasonable diligence," including information that can be obtained by "closely examining the medical records." *Edwards v. Alexander*, 960 So. 2d

7

336, 348-49 (La. Ct. App. 2007) (citation omitted); *see also Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245-46 (La. 2010) ("[A] plaintiff will be deemed to know what he could by reasonable diligence have learned.")  Courts have not excused untimely complaints where, as here, a reasonable investigation would have revealed—and here, clearly did reveal—the defendant's identity *within the prescriptive period*.  *See Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953-54 (La. 2002); *Morgan v. Entergy New Orleans, Inc.*, 234 So. 3d 113, 121 (La. App. 2017).  In *Renfroe*, for example, a car accident case in which plaintiff initially named the State transportation agency rather than the local entities that owned the road at issue, the Louisiana Supreme Court held that an amended complaint naming the local entities was prescribed because "[t]he fact that the portion of the roadway was owned by some party other that [*sic*] the [State] was 'reasonably knowable' by the plaintiff within the prescriptive period."  809 So. 2d at 954.  Here, as there, "the doctrine of *contra non valentem* does not apply."  *Id.*

Indeed, here, the medical records confirm that it took Mrs. Sanford's counsel at most *two months* after they obtained her medical authorizations in August 2016 to determine which manufacturer's Docetaxel was at issue.  Opp. 19; *See* Ex. 17 (NDC Records).  Mrs. Sanford and her counsel were aware of which defendant to sue well within one year of August 2016, when Mrs. Sanford claims she first had notice of a potential action involving Docetaxel; yet, she did not file her complaint until September 2017.  Thus, even according to her own testimony about when she learned of her claims, Mrs. Sanford's claim is time-barred.

2.  Likewise, Hospira's motion is entirely consistent with its 2018 position that, once a plaintiff is on notice of a potential claim, she should confirm the proper defendant before filing suit.  Opp. 20.  Plaintiff's fundamental misunderstanding, however, is that *this investigation should take place during Louisiana's one-year prescriptive period*.  *See Renfroe*, 809 So. 2d at 953-54.  The information on product identification was "known or reasonably knowable" to Plaintiff from the medical records, *Edwards*, 960 So. 2d at 348, and was obtained almost immediately.  Thus, Plaintiff had all the information she needed to file her suit within one year of when she admits she was on notice, yet failed to do so.

8

3. Finally, the Court should reject the argument that a plaintiff is excused from prescription because the docetaxel labeling did not include the word "permanent" with respect to hair loss until 2017. Opp. 21-22. First, the Hospira labeling change is irrelevant because the Opposition does not claim that it prompted Mrs. Sanford to file suit—it was the attorney advertisement she saw in 2016 that "began [her] investigation." *Id.* at 2-3.[3] *Second*, this Court has repeatedly rejected this "circular argument," recognizing that "[p]rescription cannot be tolled because the manufacturer did not issue an adequate warning," since "[i]f the manufacturer had issued an adequate warning about permanent hair loss, Plaintiff Thibodeaux would not have a failure to warn claim." *Thibodeaux*, at 7; *see Francis/Johnson*, at *1 n.8. The same reasoning holds true here.

## II. Hospira Should Be Permitted to Strike a Plaintiff From the Trial Pool.

The Opposition's response to Hospira's request to strike a plaintiff from the trial pool consists of misguided technicalities.

1. The Opposition argues that the Court should not consider Hospira's request because it violates the parties' agreement. Opp. 23-25. This is inaccurate. Hospira never agreed to waive its ability to request this strike. When Hospira learned in February 2020 of the medical record that conclusively showed that Mrs. Sanford's claims were prescribed, and never should have been brought, it brought it to the attention of the PSC and Mrs. Sanford's counsel. The parties reached an agreement that Hospira would not seek costs in its motion, and the PSC would serve their general expert reports against Hospira, regardless of the outcome of Hospira's motion. Plaintiffs now claim they misunderstood this agreement to include a commitment by Hospira to withdraw its request to strike a trial pool plaintiff. Opp. 24. But there was no such agreement. And even if Plaintiff had a misunderstanding, there is no basis for the Opposition's argument that Hospira's request is "improper" and should not be considered by the Court.

---

[3] Hospira's Docetaxel labeling included the word "permanent" in March 2017, not September 2017, as Plaintiff contends. Ex. 18 (Halloran Dep.) at 106:10-108:8.

9

2. The Opposition argues that CMO 14C does not expressly apply in these circumstances. But Hospira never argued otherwise. Rather, Hospira's position is that a strike is consistent with the purposes of CMO 14C. It is no different than if a party picked a case that it knew or should have known was not in a proper venue and did not bring it to the attention of the other side. The reason that CMO 14C has this strike provision is to make sure that each party examines carefully each case before they select it or shortly thereafter. It prevents the waste of resources for the parties and the Court. Plaintiff's counsel did not conduct any such investigation of this case before it was selected. Accordingly, in light of the defect in Mrs. Sanford's case, the proper course of action would have been for the PSC to remove Mrs. Sanford from the trial pool. Their inclusion of Mrs. Sanford in the trial pool, and refusal to remove her, has resulted in the waste of the Court's and the parties' resources. Hospira understands that the remedy of a strike requires special circumstances and does not seek this remedy lightly. Those special circumstances are present here.

3. Plaintiff contends that "the strike would only be allowed against another plaintiff from the same pool." Opp. 25. But Hospira's request reflects that the current Trial 3 pool will become part of the Trial 5 pool once the Trial 3 plaintiff is selected. Thus, given this issue is arising now as a result of Plaintiff's failings, it is appropriate that the strike come from the current trial pool.

4. The Opposition suggests that Hospira should have discovered the issue earlier because it was included among thirteen thousand pages of Mrs. Sanford's medical records. *Id.* at 24. But Mrs. Sanford was the PSC's trial pool pick. And Plaintiff's counsel clearly had in its files the date of the lawyer advertisement and the date the firm was first contacted. Their argument that Hospira should have identified this issue defies logic.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Mrs. Sanford's claims and permit Hospira to strike a trial pool plaintiff.

10

Dated: April 21, 2020						Respectfully submitted,

*/s/ Mark S. Cheffo*
Mark S. Cheffo
Mara Cusker Gonzalez
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3500
Fax: (212) 698-3599
mark.cheffo@dechert.com

Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Phone: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc., and Pfizer Inc.*

11

## CERTIFICATE OF SERVICE

      I hereby certify that on April 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ <i>Mark S. Cheffo</i>