# EXHIBIT B

2020 WL 1016273
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana,
Monroe Division.

Jay THOMAS
v.
BRACCO DIAGNOSTICS INC.

CASE NO. 3:19-CV-00493
|
Signed 02/27/2020

**Attorneys and Law Firms**

[Amanda Lynn Washington](), [Daniel Julian McGlynn](), McGlynn Glisson & Mouton, Baton Rouge, LA, [William B. Curtis](), Pro Hac Vice, Curtis Law Group, Dallas, TX, for Jay Thomas.

[Rachel Guajardo Webre](), [Ernest P. Gieger, Jr.](), Gieger Laborde & Laperouse, New Orleans, LA, [Paul S. Penticuff](), Pro Hac Vice, [Thomas N. Sterchi](), Pro Hac Vice, Baker Sterchi et al., Kansas City, MO, for Bracco Diagnostics Inc.

### REPORT AND RECOMMENDATION

[Karen L. Hayes](), United States Magistrate Judge

 *1 Before the Court is Bracco Diagnostics Inc.'s ("BDI") motion to dismiss [doc. # 25] pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of [28 U.S.C. § 636]() and the standing orders of the Court.

For reasons stated below, the undersigned recommends that the motion be **GRANTED.**

### Background

On April 17, 2019, plaintiff Jay Thomas filed suit under the Louisiana Products Liability Act ("LPLA"), seeking damages for injuries allegedly sustained from [intravenous injections]() of MultiHance, a GBCA sold, manufactured, and marketed by BDI. Plaintiff's original complaint did not contain a date of occurrence, but his amended complaint alleges that he was injected with Multihance on May 4, 2018. GBCAs are contrast agents used to create clearer, sharper images in MRI and MRA scans. BDI manufactures and markets two GBCAs: MultiHance, a linear GBCA, and ProHance, a macrocyclic GBCA. At the time of the injection, Thomas had normal kidney function. (Am. Compl. ¶ 13).

After his injection, Thomas experienced a burning sensation, clouded mentation, confusion, weakness, fatigue, difficult and painful movement, inflammation, muscle cramps, numbness, tingling sensations, aching joints, and lumps and rashes on his body. *Id.* Thomas's complaint alleges that these symptoms are consistent with Gadolinium Deposition Disease ("GDD"). GDD is purportedly seen in people with normal kidney function who develop symptoms consistent with the known toxic effects of retained gadolinium after a GBCA injection. (Am. Compl. ¶ 14).

On May 29, 2019, BDI filed its first motion to dismiss for failure to state a claim. [doc. # 5]. That motion was granted in part and denied in part, dismissing with prejudice Thomas's negligence, negligent misrepresentation, negligence per se, breach of implied warranty, fraudulent misrepresentation and concealment, and civil battery claims, and denying the motion as to Thomas's defective design, failure to warn, and breach of express warranty claims. [doc. #'s 16, 22].

On September 5, 2019, the undersigned granted Thomas's motion for leave to file an amended complaint, which reasserted and added detail to Thomas's defective design, failure to warn, and breach of express warranty claims. [doc. #'s 17, 21, 24].

On October 9, 2019, BDI filed a motion to dismiss the first amended complaint. [doc. # 25]. Thomas filed his memorandum in opposition on November 1, 2019, and BDI filed its reply on November 8, 2019. [doc. #s 36 and 37]. The matter is ripe.

### Standard of Review

[Federal Rule of Civil Procedure 12(b)(6)]() sanctions dismissal when a plaintiff fails "to state a claim upon which relief can be granted." A pleading states a claim for relief when it contains, *inter alia*, "a short and plain statement ... showing that the pleader is entitled to relief." [Fed. R. Civ. P 8(a)(2)]().

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007)). A claim is facially plausible when it contains sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires more than just the "sheer possibility" that a defendant acted unlawfully, *id.*; it calls for enough facts "to raise a reasonable expectation that discovery will reveal evidence" to support the elements of the claim. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955. Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" do not suffice. *Id.* at 555, 127 S.Ct. 1955.

**\*2** Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its own judicial experience and common sense." *Iqbal, supra* (citation omitted). In deciding a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations, although the same presumption does not extend to legal conclusions. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. A court may permit a well-pleaded complaint to proceed even when "actual proof of those facts is improbable" or recovery is unlikely. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955. But a court will dismiss a complaint "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Furthermore, "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Florida, Inc.*, 295 Fed. Appx. 710, 713 (5th Cir. Oct. 10, 2008)(unpubl.)(citations and internal quotation marks omitted). "Specific facts are not necessary; the statement needs only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)(quoting *Bell. Atl.*, 127 S.Ct. at 1958).

When considering a motion to dismiss, courts generally are limited to the complaint and its proper attachments, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)(citation omitted); however, courts may rely upon "documents incorporated into the complaint by reference and matters of which a court may take judicial notice—including public records." *Dorsey, supra*; *Norris v. Hearst Trust*, 500 F.3d 454, 461 n9 (5th Cir. 2007)(citation omitted)(proper to take judicial notice of matters of public record). Furthermore, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)(citations and internal quotation marks omitted).

### Law and Analysis

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law. *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L.Ed.2d 659 (1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L.Ed. 1188 (1938). Because Louisiana law applies, [1] "courts must begin every legal analysis by examining primary sources of law, including the State's Constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana." *Ayala v. Enerco Grp., Inc.*, 569 Fed.Appx. 241, 246 (5th Cir. 2014)(citation omitted). Therefore, this court must look first to the LPLA, and only secondarily to judicial decisions (i.e., decisions of the Louisiana Supreme Court). *Id.,see also Moore v. State Farm Fire & Casualty Co.*, 556 F.3d 264, 269 (5th Cir. 2009)(citation omitted).

### A. The LPLA

#### 1. LPLA principles

The LPLA provides the exclusive remedy against a manufacturer for damages caused by its product. La. R. S. 9:2800.52. A plaintiff cannot recover under any theory of liability against a manufacturer that is not set forth in the LPLA. *Id.; see also Stahl v. Novartis Pharm Corp.*, 283 F.3d 254, 261-62 (5th Cir. 2002).

To hold a manufacturer liable under the LPLA, a plaintiff must establish "damage proximately caused by a characteristic of the product that rendered its product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. R. S. 9:2800.54(A). A product is unreasonably dangerous "if and only if" it is unreasonably dangerous (1) in construction or composition; (2) in design; (3) because of inadequate warning; or (4) because it does not conform to an express warranty. La. R.S. 9:2800.54(B). Ultimately, a cause of action under the LPLA requires proof:

**\*3** 1. That the defendant is a manufacturer of the product;

2. That the claimant's damage was proximately caused by a characteristic of the product;

3. That the characteristic made the product unreasonably dangerous in one of the four ways provided in the statute; and

4. That the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

*Jefferson v. Lead Industries Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1997).

**2. The unreasonably dangerous design claim**
The LPLA provides that "[a] product is unreasonably dangerous in design if, at the time the product left its manufacturer's control":

> There existed an alternative design for the product that was capable of preventing the claimant's damage; and the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product. La. R.S. 9:2800.56.

BDI argues the Court should dismiss Thomas's LPLA unreasonably dangerous design claim because the amended complaint failed to allege facts showing that "the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." In response, Thomas states that his first amended complaint specifically points out that BDI already manufactures and sells ProHance, and alleges that ProHance is a safer GBCA agent with an alternative design which is more readily eliminated by the body.

Thomas claims that BDI could have used macrocyclic bonds instead of linear bonds, as it purportedly does in other products, that macrocylic bond products were less likely to be retained in the body, and that the burden of using macrocyclic bonds was less than the potential harm caused by the failure to do so. (Am. Compl. ¶¶ 72-80). Thus, Thomas specifically identifies a feasible alternative which he alleges would have been safer and would have lessened the likelihood of injury. [2] Additional specificity is not required at this stage of the litigation to satisfy Louisiana's pleading standards. Therefore, dismissal of the defective design claim on this basis is not warranted. However, because BDI also moves for dismissal on the basis of preemption, this recommendation does not dispose of the motion to dismiss Plaintiff's defective design claim.

**3. The failure to warn claim**
In the first report and recommendation, the undersigned recommended denial of the motion to dismiss with respect to the failure to warn claim, stating:

> **\*4** Based on these allegations, the Court can reasonably infer that BDI failed to provide an adequate warning of the risks associated with the use of MultiHance. Accordingly, Thomas has sufficiently pleaded an inadequate warning claim under the LPLA against BDI, and BDI's motion should be denied as to this claim.

[doc. #16 at 9]. BDI now argues that the Court should dismiss the failure to warn claim because it is barred by the learned intermediary doctrine. In response, Thomas claims that the Court previously ruled on this issue and should abide by its original ruling.

The LPLA provides:

> [a] product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

La. R.S. 9:2800.57(A). Thus, to "maintain a failure-to-warn claim under the LPLA, a plaintiff must demonstrate that the product in question has a potentially damage-causing characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic." *Stahl v. Novartis Pharm Corp.*, 283 F.3d 254, 264 (5th Cir. 2002)(citation omitted).

For claims involving drugs or medical devices that are dispensed by a physician, Louisiana law applies the learned intermediary doctrine as a defense to failure to warn claims. *Guidry v. Aventis Pharm., Inc.*, 418 F.Supp.2d 835, 840-41 (M.D. La. 2006). The healthcare provider is the learned intermediary to whom the warning is directed and is the one who makes the decision to use the product. Thus, a warning to the healthcare provider is considered a warning to the patient. In this motion to dismiss, BDI argues that the failure to warn claim should be dismissed because Thomas's complaint necessarily implicates the learned intermediary doctrine. Thomas's amended complaint does generally allege that "Defendant failed to warn Plaintiff and his healthcare providers about the serious health risks associated with GBCAs and failed to disclose the fact that there were safer alternatives." (Am. Compl. ¶ 25). However, Plaintiff's amended complaint also contains additional factual allegations relating to the knowledge of his healthcare providers. Plaintiff asserts the existence of a whole host of studies, stretching back as far as 1988, regarding alleged gadolinium retention. (Am. Compl., ¶¶ 31 – 44). According to him, these studies put the radiology community on "high alert." (Am. Compl. ¶ 45). He further asserts that the FDA voted in 2017 to require a warning that "gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys." (Am. Compl., ¶ 47). He also specifically alleges that the FDA "published a revised Product Labeling with the Medication Guide for all [GBCAs] in April 2018." (See Am. Compl., ¶ 30). He claims to have used MultiHance on May 4, 2018. (*See* Am. Compl., ¶ 28). Thus, it appears that Plaintiff was administered MultiHance <u>after</u> studies allegedly discussing gadolinium deposition had been in the public domain for nearly 30 years, <u>after</u> the entire radiology community (which would necessarily include the radiologist who decided to administer MultiHance to Plaintiff) was on "high alert," and <u>after</u> the FDA had already made public pronouncements on the subject and revised the labeling to warn of the exact issue which is the subject of Plaintiff's failure to warn claim. Simply taking his allegations at face value, Plaintiff cannot show that "his physician was not warned of a risk associated with MultiHance that was not otherwise known to the physician." Rather, the amended complaint asserts that an entire medical community was well aware of the alleged risk of which Plaintiff complains, had reached this awareness before he was administered MultiHance, and that the FDA label at the time he was administered MultiHance specifically warned of gadolinium retention. Based on his own allegations, Plaintiff's failure to warn claim is barred by the learned intermediary doctrine.

**\*5** Therefore, it is recommended that the motion to dismiss the failure to warn claim on this basis be GRANTED.

**4. Breach of express warranty claim**

The undersigned recommended denial of the first motion to dismiss with respect to the breach of express warranty claim, finding the allegations sufficient to support the claim. [doc. # 16 at 10].

In this renewed motion to dismiss, BDI provides the Court with a copy of MultiHance's label. BDI now argues the breach of express warranty claim should be dismissed because no reasonable person could believe that the MultiHance label warranted that all gadobenate ion is eliminated from the body. BDI asks the court to take judicial notice of the actual label. Thomas responds that the Court has already considered the issue and should decline to revisit its previous ruling.

Under La. R.S. 9:2800.58,

> [a] product is unreasonably dangerous when it does not conform to an express warranty made at any time

by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue.

The relevant portion of the complaint states "the 'Pharmacokinetics' section of the MultiHance label represented that 'Gadobenate ion is eliminated' from the body but that BDI knew that gadobenate was not completely eliminated from the body." (Am. Compl. ¶¶ 67-68). Thomas contends that BDI knew or should have known these representations were false, misleading, and untrue. *Id.*, ¶ 69. Thomas also claims that members of the medical community relied on BDI's representations in prescribing MultiHance, causing him damages. *Id*., ¶¶ 70-71.

In support of its motion to dismiss, BDI identified and referenced the relevant label.[3] Specifically, the label states:

> Gadobenate ion is eliminated predominately via the kidneys, with 78% to 96% of an administered dose recovered in the urine. Total plasma clearance and renal clearance estimates of gadobenate ion were similar, ranging from 0.093 ± 0.010 to 0.133 ± 0.270 L/hr/kg and 0.082 ± 0.007 to 0.104 ± 0.039 L/hr/kg, respectively. The clearance is similar to that of substances that are subject to glomerular filtration. The mean elimination half-life ranged from 1.17 ± 0.26 to 2.02 ± 0.60 hours. A small percentage of the administered dose (0.6% to 4%) is eliminated via the biliary route and recovered in feces. *See* April 2018 Highlights of Prescribing Information, at 11.

Nothing else in the label prior to April of 2018 discusses the elimination of the gadobenate ion. Thomas alleges that the label warranted that MultiHance would be completely eliminated from the body; however, a plain reading of the language of the label contains no express warranty that all gadobenate ion would be eliminated, but instead gives ranges of elimination percentages through various means, with no statement that guarantees 100% elimination. Where, as here, there is a conflict between the allegations in the complaint and the exhibits referenced in the complaint, the latter control. *U.S. ex. rel Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004)(citation omitted). BDI argues that no reasonable person could think that the label warranted that all gadobenate would be eliminated. The undersigned agrees.

**\*6** Thomas's claim that the label warranted that gadobenate would be completely eliminated is contradicted by the label, which does not so promise. There cannot be a breach of an express warranty when there is no warranty expressed.

The warranty claim should also be dismissed because, even if the label had contained an express warranty, the complaint inadequately pleads that the plaintiff was induced by the warranty. The complaint makes the conclusory allegation that "members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff, relied upon the representations and warranties of Defendant for use of MultiHance in recommending, prescribing, and/or using these drugs." (Am. Compl. ¶ 69). This language does no more than recite a required element of an LPLA express warranty claim. *SeeIqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Thomas fails to plead any facts to show how an express warranty induced him to use the product. *See, e.g.,Andrews v. Pella Corp.*, 2013 WL 5530295, at \*2 (E.D. La. Oct. 7, 2013)(dismissing an LPLA breach of express warranty claim because plaintiffs failed to plead how they were induced by the warranty); *Parra v. Coloplast Corp.*, 2017 WL 247494, at \*4, (E.D. La. Jan. 3, 2017)(dismissing an LPLA breach of warranty claim because it does not identify how the warranty induced plaintiffs to use the product).

Finally, it should be noted that Plaintiff's amended complaint specifies that he was injected with MultiHance on May 4, 2018. In April 2018, FDA approved the revised GBCA product warning that applies to all linear and macrocyclic GBCA agents marketed in the United States. It required GBCA manufacturers, including BDI, to state the following in the product's labeling:

**5.3 Gadolinium Retention**

Gadolinium is retained for months or years in several organs. The highest concentrations (nanomoles per gram

of tissue) have been identified in the bone, followed by other organs (for example, brain, skin, kidney, liver, and spleen). The duration of retention also varies by tissue and is longest in bone. Linear GBCAs cause more retention than macrocyclic GBCAs. At equivalent doses, gadolinium retention varies among the linear agents with Omniscan (gadodiamide) and Optimark (gadoversetamide) causing greater retention than other linear agents [Eovist (gadoxetate disodium), Magnevist (gadopentetate dimeglumine), MultiHance (gadobenate dimeglumine) ]. Retention is lowest and similar among the macrocyclic GBCAs [Dotarem (gadoterate meglumine), Gadavist (gadobutrol), ProHance (gadoteridol) ].

Consequences of gadolinium retention in the brain have not been established. Pathologic and clinical consequences of GBCA administration and retention in skin and other organs have been established in patients with impaired renal function [*see Warnings and Precautions (5.1)*]. There are rare reports of pathologic skin changes in patients with normal renal function. Adverse events involving multiple organ systems have been reported in patients with normal renal function without an established causal link to gadolinium retention [*see Adverse Reactions (6.2)*].

While clinical consequences of gadolinium retention have not been established in patients with normal renal function, certain patients might be at higher risk. These include patients requiring multiple lifetime doses, pregnant and pediatric patients, and patients with inflammatory conditions. Consider the retention characteristics of the agent when choosing a GBCA for these patients. Minimize repetitive GBCA imaging studies, particularly closely spaced studies, when possible.

**\*7** U.S. Prescribing Information for MultiHance § 5.3. [4]

Given the fact that Plaintiff's injection admittedly occurred after the above labeling change, it is even more patent that no reasonable person could believe that BDI warranted that all Gadolinium was expressly warranted to be eliminated from the body. In addition, while the labelling change added the above language, it did not change the previously cited language regarding elimination, thus affirming that the previously cited language does not expressly warrant that all gadolinium is eliminated from the body. Therefore, the undersigned recommends that the breach of express warranty claim be DISMISSED.

### B. Dismissal because of lack of acceptance of Scientific/Medical Community

In its first motion to dismiss, BDI argued for dismissal of the entire suit because of a lack of acceptance in the medical community for the existence of GDD. The undersigned found the argument premature and told BDI to raise this argument in a motion for summary judgment. Nevertheless, BDI now wants the court to reconsider this ruling via a second motion to dismiss, claiming that new decisions from other District Courts—*Davis v. McKesson Corp.*, 2019 WL 3532179, 2019 U.S. Dist. LEXIS 129369 (D. Ariz. Aug. 2, 2019)and *McGrath v. Bayer Healthcare Pharmaceuticals, Inc.*, 393 F.Supp. 3d 161 (E.D.N.Y. Jun. 24, 2019)—compel this Court to change its ruling. The court again recommends denial of the motion on this basis as premature. Neither opinion discusses this argument in the context of a 12(b)(6) motion—the *Davis* court discusses lack of acceptance after expert discovery occurred, while the *McGrath* court does not use lack of acceptance in the medical community as a basis for dismissal.

### C. Preemption

#### 1. Preemption principles

The Supremacy Clause of the Constitution prohibits state laws from conflicting with federal law. *Gomez v. St. Jude Medical Daig Div. Inc.*, 442 F.3d 919, 928-29 (5th Cir. 2006)(citing U.S. CONST. art. VI, cl. 2). Accordingly, "state laws that conflict with federal law are 'without effect.' " *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008)(quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Without an express provision for preemption, "state law must yield to a congressional Act ... [w]hen Congress intends federal law to 'occupy the field' or "to the extent of any conflict with a federal statute." " *Id.* (internal citations omitted). "Conflict preemption" exists where (1) "it is impossible for a private party to comply with both state and federal law," and (2) the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-73, 120 S.Ct. 2288.

**\*8** The FDA, pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), is charged with the oversight

of pharmaceutical and medical device production, sales, labeling, and marketing. *See* 21 U.S.C. § 301. Federal statutes and regulations govern the "safety information that appears on the labels of prescription drugs that are marketed in the United States." *Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S.Ct. 1668, 1672, 203 L.Ed. 2d 822 (2019). The FDA has a rigorous approval process for new drugs and devices that requires each product to be tested for safety and efficacy. *See* 21 U.S.C. § 355.

Dismissal under Rule 12(b)(6) may be appropriate when a successful affirmative defense appears on the face of the pleadings. *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012)(citing *Kansa Reinsurance Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994)).

BDI argues that it is impossible to comply with both the federal regulatory scheme and Louisiana requirements. "Impossibility pre-emption is a demanding defense." *Wyeth v. Levine,* 555 U.S. 555, 573, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). The court "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 565, 129 S.Ct. 1187 (citations omitted). Then, the court identifies the defendant's duties under state law. *Bartlett,* 133 S.Ct. at 2473. Next, the court ascertains whether federal law expressly prohibits the defendant from complying with state law. *Id.* at 2476. If federal law does not expressly prohibit the defendant from complying with state law, the court then determines whether the defendant has presented "clear evidence" that the FDA would have prohibited the defendant from taking the necessary steps under state law. *SeeLevine,* 555 U.S. at 571, 129 S.Ct. 1187.

### 2. The unreasonably dangerous design claim

BDI argues that the defective design claim is preempted because of the Supreme Court's decision in *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013) and the Sixth Circuit's decision in *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015). BDI points out that this claim is premised on the notion that it should have designed MultiHance differently. It argues that federal law prohibits a drug manufacturer from changing the chemical composition of a prescription drug without FDA approval, making it impossible for BDI to unilaterally change the design.

While there can bee two distinct time periods at play when considering whether a state law defective design claim is federally preempted: the post-FDA approval stage and the pre-FDA approval stage, Thomas's complaint does not implicate the pre-FDA approval stage. Thomas recites the elements of an LPLA claim by contending generally that "safer alternatives were both technologically and economically feasible when Defendant's GBCAs left the control of Defendant," (Am. Compl. ¶ 51), but specifically alleges only facts that implicate a claim that BDI should have changed the design after it obtained FDA approval.[5] Thus, in the absence of factual allegations to support a pre-FDA approval claim in the first place, the undersigned need only consider whether any post-FDA approval claim is preempted.

**\*9** In *Bartlett*, the Supreme Court recognized that "once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.' " *Bartlett*, 133 S.Ct. at 2471 (quoting 21 C.F.R § 314.70(b)(2)(i)). Minor changes need only be reported in an annual report to FDA. § 314.70(d). "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing,* 564 U.S. 604, 620, 131 S.Ct. 2567, 180 L.Ed. 2d 580 (2011). "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24, 131 S.Ct. 2567. The alternative design proposed by Thomas—switching from using linear bonds to macrocyclic bonds—is a change to the qualitative formula and thus a major change. After the FDA approves the drug, a design defect claim proposing major changes is preempted. *SeeGuidry v. Janssen Pharmaceuticals, Inc.*, 206 F.Supp.3d 1187 (E.D. La. Aug. 29, 2016)("to the extent the plaintiff contends that the defendants should have adopted a new design [for the drug] after it was approved by the FDA, her defective design claim is preempted"); *Yates v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 808 F.3d 281, 298 (6th Cir. 2015)("[plaintiff's] post-approval design defect claim is clearly preempted by federal law"); Aaron D. Twerski, The Demise of Drug Design Litigation: Death by Federal Preemption, 68 Am. U. L. Rev. 281, 295 (2018)("... post-*Bartlett*, it would seem quite clear that, for a drug that has received FDA approval, any argument that it can be modified by a [reasonable alternative design] is federally preempted").

BDI could not have independently adopted an alternative design for MultiHance after the FDA approved the drug because federal drug regulations prohibit BDI from altering its composition. Accordingly, any state requirement that BDI should have adopted an alternative design after FDA approval is preempted.

### 3. Failure to warn claim

BDI also argues that the failure to warn claim is preempted. Specifically, it argues Thomas does not plead the existence of newly acquired information that would allow BDI to make a label change under the FDA's "changes being effected" ("CBE") regulation, and that there is clear evidence to show that the FDA would not have approved the changes proposed by Plaintiff. In response, Thomas says BDI fails to meet the "high burden" necessary to establish the defense.

In the context of conflicts between pharmaceutical products liability claims and FDA labeling regulations, "clear evidence that FDA would not have approved a change to the drug's label preempts a claim, grounded in state law, that a drug manufacturer failed to warn consumers of the change-related risks associated with using the drug."*Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S.Ct. 1668, 1672, 203 L.Ed.2d 822 (2019)(quoting *Wyeth v. Levine*, 555 U.S. 555, 571, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)). Accordingly, the failure to warn claim is preempted if there is clear evidence FDA would not have approved the warning that a plaintiff alleges was required under state tort law. Whether there is clear evidence preempting the claim is a question for the court, not a jury. *Albrecht*, 139 S.Ct. at 1679. In answering the question of "clear evidence," the judge must determine whether the relevant federal and state laws 'irreconcilably conflict.' " *Id.*

The FDA's CBE regulations allow brand manufacturers to modify a product label without prior FDA approval. *Albrecht*, 139 S.Ct. at 1679. Changes under the CBE must be based on "newly acquired information" and, in relevant part, be to "add or strengthen the labeling." 21 C.F.R. § 314.70; 21 C.F.R. § 314.70(c)(6)(iii). "Newly acquired information is data, analyses, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses *reveal risks of a different type or greater severity or frequency than previously included in submissions to the FDA.*" 21 C.F.R. § 314:3(b) (emphasis added).

The amended complaint alleges that, despite well-documented evidence, BDI failed to warn customers and healthcare providers on its labels about the serious risk of bodily harm to consumers and failed to update its labels since 2012. (Am. Compl. ¶ 51). The well-documented evidence cited by Thomas includes findings of retained gadolinium in patients' brains by Japanese researchers in 2013, findings of desecrated tissues in brains of patients injected with gadolinium by the Mayo Clinic in 2014, a safety alert by the FDA in July 2015, and a warning added by the FDA's medical advisory committee in 2017. (*Id.* at ¶¶ 43-47).

**\*10** Notably, the studies and reports included in Thomas's complaint discuss how gadolinium can be retained, but do not demonstrate proof of any adverse effects from gadolinium retention. None of the studies shows an adverse effect "for which the evidence of a causal association satisfies the standard for inclusion in the labeling." 21 C.F.R. § 314.70(c)(6). Nor is there any factual allegation that BDI had new information between 2012 and Thomas's May 4, 2018, injection that would have permitted it to unilaterally change the label.

Thomas's complaint points only to studies that showed gadolinium can be *retained*; he does not provide additional factual allegations of a causal association between a GBCA and clinically significant adverse reactions prior to the injection date, and therefore does not plead that BDI had newly acquired information that would have allowed it to change the label under the CBE exception. *SeeKlein v. Bayer Healthcare Pharm. Inc.*, No. 2:18-cv-01424-APG-EJY, 2019 U.S. Dist. LEXIST 142610, 2019 WL 3945652, at *2 (D. Nev. Aug. 21, 2019); *McGrath v. Bayer Healthare Pharm. Inc.*, 393 F.Supp.3d 161 (E.D.N.Y. 2019); *Goodell v. Bayer Healthcare Pharm. Inc.*, No. 18-cv-10694-IT, 2019 U.S. Dist. LEXIS 167931, 2019 WL 4771136, at *4 (D. Mass. Sep. 30, 2019)(all concluding that the plaintiffs must provide additional factual allegations of a causal association between a GBCA and clinically significant adverse reactions prior to the injection date).

In addition, and more importantly, there is clear evidence that the FDA would not have approved a warning about the alleged adverse health consequences of a GBCA injection. As discussed above, only a month before the Plaintiff's May 2018 injection, the FDA had actually issued a revised warning

informing the medical community that retention occurred but specifically adding that no causal relationship between retained gadolinium and any adverse effect in patients with normal renal function has been established. The language of the label change, issued very shortly before the Plaintiff's injection with MultiHance, and specifically stating facts contrary to the warning sought by the Plaintiff, is clear evidence that the FDA would not have approved a label change which warned of such adverse effects. Thus, the failure to warn claim is preempted and should be dismissed.

### 4. Breach of express warranty claim

Lastly, because the label itself does not contain the express warranty alleged by the Plaintiff, the court need not address whether such a claim would have been preempted.

### Conclusion

For the foregoing,

**IT IS RECOMMENDED** defendant Bracco Diagnostics Inc.'s motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) be **GRANTED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, shall bar an aggrieved party, except on the grounds of plain error, from attacking on appeal the unobjected-to factual findings and legal conclusions accepted by the District Judge.**

**All Citations**

Slip Copy, 2020 WL 1016273

## Footnotes

1. No party contests that the substantive issues raised by defendant's motion are governed by Louisiana law. See *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007).
2. It is not lost on the undersigned that the alternative design proposed by plaintiff is quite similar to the design of ProHance.
3. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021357s016s017,021358s015s016lbl.pdf (last visited November 18, 2019). The court may take judicial notice of publicly available FDA documents that are matters of public record. See *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).
4. This is available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021357s016s017,021358s015s016lbl.pdf.
5. For example, the amended complaint alleges "despite the knowledge that MultiHance's design would cause Plaintiff damages, Defendant continued to design, manufacture, market, and sell the more dangerous linear MultiHance GBCA." (Am. Compl. ¶ 78).

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.