1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  TAXOTERE (DOCETAXEL)      *       MDL No. 16-2740
     PRODUCTS LIABILITY LITIGATION     *
5                                      *       Section H
                                       *
6    Relates to:  All Cases            *       May 7, 2020
                                       *
7    * * * * * * * * * * * * * * * * *

8

9                  ORAL ARGUMENT BEFORE
              THE HONORABLE JANE T. MILAZZO
10              UNITED STATES DISTRICT JUDGE

11
     Appearances:
12

13   For the Plaintiffs:        Gibbs Law Group, LLP
                                BY:  ANDRE M. MURA, ESQ.
14                              6701 Center Drive West, Suite 1400
                                Los Angeles, California 90045
15

16   For the Sanofi             Shook Hardy & Bacon, LLP
     Defendants:                BY:  HARLEY V. RATLIFF, ESQ.
17                                   JON STRONGMAN, ESQ.
                                2555 Grand Boulevard
18                              Kansas City, Missouri 64108

19
     Official Court Reporter:   Toni Doyle Tusa, CCR, FCRR
20                              500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
21                              (504) 589-7778

22

23

24   Video conference proceedings recorded by mechanical stenography
     using computer-aided transcription software.
25

## INDEX

                                                              Page

Motion No. 1                                                    3

Motion No. 2                                                   20

Motion No. 3                                                   29

1          **<u>PROCEEDINGS</u>**

2              **(May 7, 2020)**

3          **THE COURT:**  Thank you.  Let's proceed.

4              The defendants' motion as to pre-2006 we will

5    take up first.  Mr. Strongman, please proceed.

6          **MR. STRONGMAN:**  Thank you, Your Honor.  May it please

7    the Court.  Jon Strongman on behalf of Sanofi.

8              Your Honor, one of the central powers given to

9    any MDL court is the power to address common issues, the power

10   to make rulings to promote efficiency, to set the fence posts

11   for the parties to work within.  Fence posts are something that

12   we have talked a lot about.

13             In this case, in this MDL, the plaintiffs have

14   put forward one expert, one general expert on the Taxotere

15   labeling issues, and that's Dr. Kessler.  Dr. Kessler testified

16   clearly that Sanofi's duty to warn arose in 2006 and not

17   before.  This is an opinion that Dr. Kessler has reaffirmed

18   over and over and over again.  Dr. Kessler has drawn a line in

19   the sand, and it's a line that the plaintiffs should have to

20   live with.

21             **THE COURT:**  Mr. Strongman, this is a question that I

22   have.  Dr. Kessler testified in Ms. Earnest's trial and that

23   was considering Louisiana law.  As I looked at what this

24   judgment that you're asking me to render would do, I think it

25   would necessarily require that I look to what that knowledge is

1   in the 50 jurisdictions.  I know some have said knew or should

2   have known; some it's actual knowledge, that they actually

3   knew; others almost have a strict liability standard.  What

4   would this order look like, factoring in that I'm dealing with

5   50 different jurisdictions, 50 different standards that define

6   what *knowledge* means?

7            MR. STRONGMAN:  Your Honor, I think the key point

8   here is that when you look at actually what the substance is of

9   the various states' laws, there is actually great uniformity in

10  what the laws say.  When you look at our brief and you look

11  at -- for example, there's a treatise on product liability that

12  we cite, *Owen & Davis on Products Liability*, and the quote

13  there is:  "The courts are virtually uniform in imposing

14  warning duties only as they apply to such adverse reactions or

15  side effects of which the manufacturer knew or should have

16  known at the time of manufacture."  The courts are virtually

17  uniform.

18            So when you look at what other MDL courts have

19  done, for example -- and this may come up later with regard to

20  the 2015 motion, but the issue is no different than when you

21  are dealing with adequacy of the warning.  Every state has its

22  own law on what a warning requires, but virtually every state

23  has a requirement that the warning is based on what is known or

24  should have been known.  Even with that, MDL courts

25  specifically having routinely granted motions across all of the

applicable jurisdictions.

I would point to the *Chantix* ruling,
*In re Chantix*, which is 881 F. Supp. 2d 1333.  In that case the
court dealt with an adequacy issue and specifically said that
while the equitable elements may vary from state to state, the
requirements of a claim generally all include the same type of
issues.  So what we are dealing with here is something that is
virtually uniform across at least 48 states, and that's that
the plaintiffs need to prove what Sanofi knew or should have
known as of the time of manufacture.

When you look at what Dr. Kessler testified in
*Earnest*, yes, the *Earnest* trial was obviously specific to
Louisiana law, but Dr. Kessler's testimony was not.

Dr. Kessler, in the *Earnest* trial, was asked by
plaintiffs' counsel himself:  "When did Sanofi need to provide
a warning?"

Dr. Kessler says:  "I made a determination."

He is asked:  "When approximately was that?"

Dr. Kessler's testimony under oath:  "I think
not later than about 2009 and probably as early as around
2006."

So this was Dr. Kessler's testimony in September
of 2019.  What's important is that following the trial
Dr. Kessler issued a supplemental expert report.  That report
came out in October 2019.  In that report Dr. Kessler doubled

1   down on the same opinions.  If you look at it -- this is

2   obviously attached to our briefing, and it's paragraph 4 of

3   Dr. Kessler's supplemental report.  The section heading of the

4   report specifically says here's an opinion I'm offering about

5   Sanofi's duty to warn.  In paragraph 4 it says:  "Sanofi should

6   have warned patients and physician about the risk of

7   irreversible alopecia with Taxotere in its label by as early as

8   2006 and certainly by 2008.  This is consistent with my prior

9   testimony."

10              So that was Dr. Kessler's supplemental report

11  after the trial, and we deposed Dr. Kessler again.  This is in

12  November of 2019, and we asked him:  "Are you sure?  What is

13  your opinion on when we should have changed the label?"

14              He again doubled down on the same opinion.  To

15  quote his testimony, he said:  "I think it's probably safe to

16  say as early as 2006 and certainly no later than 2008."  So we

17  have Dr. Kessler doubling down yet again on the same 2006

18  opinion.

19              So what's happened since then?  Sanofi filed

20  this fence post motion in January 2020.  The plaintiffs' expert

21  reports for the *Kahn* case were due in March.  So to the extent

22  that Dr. Kessler needed to clarify something, to the extent

23  Dr. Kessler had another opinion after our fence post motion was

24  filed, he certainly had an opportunity to do so.

25              So what happened in March 2020?  Dr. Kessler did

10:12

1   not even issue a new report.  He simply said, "I'm adopting my

2   prior reports and my prior opinions.  They are general.  They

3   are not case specific."

4           So we have Dr. Kessler at least four times

5   affirming that 2006 is the date.  When you look at our brief,

6   you will notice that we cited specifically December 15, 2006,

7   and there's a reason for that.  Dr. Sedlacek's article was

8   published and presented on December 15, 2006.  This Sedlacek

9   abstract was the first piece of evidence that Dr. Kessler cited

10  to when asked why 2006, and you can look at his deposition

11  testimony.  It's in our motion, Exhibit E.

12          He specifically set out that this article for

13  the first time actually involved a comparison between a

14  Taxotere group and a non-Taxotere group and did a statistical

15  analysis and was published.  So that is why the December 15,

16  2006, date.  This is something that Dr. Kessler has not backed

17  off on.  As I have said, again, it's something that Dr. Kessler

18  has reaffirmed again and again.

19          When you look at our briefing and when you look

20  at the case law, when an expert on the plaintiffs' side

21  concedes to a date or to when knowledge was known or should

22  have been known, that can be a basis for a summary judgment

23  motion.  I know that the plaintiffs pointed out in their

24  brief -- and one of the things that Your Honor was asking

25  about -- the state law issues.  So there's a couple of states

10:14

1  where the burden might be on the defendants.  So whether you

2  look at this as an absence of evidence on the plaintiffs'

3  side -- plaintiffs have no evidence from an expert saying that

4  the warning before 2006 was inadequate -- or our burden in the

5  few states where that may be the case, we have put forward the

6  evidence of Dr. Kessler's testimony to say that 2006 is the

7  cutoff.  That distinction should not make a difference, and the

8  burdens have been met either way we look at it.  The state law

9  differences on that should not make any impact on the ruling

10 here.

11          So when you really look at the argument that the

12 plaintiffs made in this case, there are really four.  The first

13 one is Dr. Kessler didn't really mean what he said.  I think

14 they call it a canard in their brief.  Dr. Kessler's testimony

15 is clear, it's unambiguous, and he has repeated it over and

16 over again.

17          The next argument that the plaintiffs made was

18 that Dr. Kessler was case specific.  But when you look at his

19 testimony and you look at his reports, it's clear that he is

20 not.  Dr. Kessler was asked directly:

21      "QUESTION:  You are not a case-specific expert.  Is

22    that fair?

23      "ANSWER:  Correct."

24          What the plaintiffs are proposing here

25 potentially would be the idea that every plaintiff in the

10:15

1    litigation should get to put forward their own expert, and that

2    is antithetical and contrary to the very notion of an MDL.  The

3    plaintiffs have put forward a general expert here.  That

4    general expert applies across the litigation.  Dr. Kessler has

5    drawn a line and he has refused to cross it.  The Court should

6    hold the plaintiffs to that line.

7                 The next argument in plaintiffs' brief that I

8    will address briefly is:  "We, the plaintiffs' lawyers, can

9    point to things before 2006 that we think are relevant."  The

10   key consideration here is that when you look at the plaintiffs'

11   brief, every single piece of evidence that they cite was

12   considered, reviewed, and relied upon by Dr. Kessler in forming

13   his opinion.

14                 So Dr. Kessler is the expert.  We have cited law

15   in our brief that when you are dealing with an issue of what

16   someone should have known in terms of the manufacture of a

17   pharmaceutical product, it's a complicated, complex issue that

18   is the subject of expert testimony.  So Dr. Kessler has looked

19   at everything that the plaintiffs have proposed in their brief

20   when he formed his opinion and he drew his line in 2006.

21                 The next argument and the last one is:  "This is

22   really just complicated, so the Court should avoid it."  But

23   this is the MDL's job, and it's in the MDL's power to take up

24   these common issues.  MDL courts do it routinely on adequacy

25   issues, on causation issues, on learned intermediary issues.

10:17

1    When you have an issue of law like this that is virtually

2    uniform across a wide number of jurisdictions, it is

3    appropriate for the efficient use of the parties' time and the

4    Court's time to set a fence post and provide guidance to us.

5           When you look at Dr. Kessler's report, he

6    specifically says that he considered all scientific information

7    from 1990 to 2015.  So taking Dr. Kessler at his own word, he

8    is not case specific and he has considered all the relevant

9    information.

10          At the end of the day, Your Honor, there are

11   well over a thousand plaintiffs that took Taxotere before

12   Dr. Kessler's 2006 cutoff.  These plaintiffs cannot proceed on

13   a failure-to-warn claim, and this Court has the power to draw

14   that line just like Dr. Kessler did and should grant Sanofi's

15   motion.  Thank you.

16          **THE COURT:**  Mr. Mura.

17          **MR. MURA:**  Good morning, Your Honor.  I want to begin

18   with the argument in our view Sanofi is trying to revise the

19   history of this litigation and to subvert the procedures and,

20   in particular, CMO 3 and the way in which this litigation has

21   been organized such that pre-2007 plaintiffs somehow missed

22   their opportunity to have their claims heard by a jury, missed

23   their opportunity to have their own experts opine as to the

24   relevant period for them.

25          If you look at Dr. Kessler's report, the

10:18

1    entirety of this motion for summary judgment, in which Sanofi

2    advances no evidence in support -- they are simply predicating

3    their motion for summary judgment on a statement in

4    Dr. Kessler's report where he was asked to opine for bellwether

5    plaintiffs who had been injured after the time period we are

6    discussing.  He said very clearly in his report -- and I did

7    not hear Mr. Strongman address it, but he said in his report,

8    "I reserve the right to study the periods before 2006 and after

9    2015."  He did not opine on those periods because he wasn't

10   asked to opine on those periods.

11              THE COURT:  Mr. Mura, we have talked about these

12   motions being filed for months.  Dr. Kessler has been working

13   with the plaintiffs for at least four years in moving this

14   litigation along.  Are you telling me that he could not have

15   looked at this and given you an affidavit that the Court can

16   rely on?

17              MR. MURA:  We could have a process where the pre-2007

18   plaintiffs have an opportunity to hire an expert -- it might

19   not be Dr. Kessler, it could be Dr. Kessler -- where they have

20   an opportunity to develop that evidence and present it and then

21   Sanofi could attack it, but what Sanofi has done -- and,

22   frankly, the fence post motion that we were anticipating was as

23   to a specific plaintiff, and yet they filed this omnibus motion

24   solely based on the Sedlacek report in 2006 saying there is no

25   evidence in the record, in the entire MDL, that the company

10:20

1    could have known before December 2006 about what Dr. Sedlacek

2    reported in Colorado at that time.

3              That's obviously wrong because the company was

4    in contact with Dr. Sedlacek before then.  So clearly that

5    cutoff is wrong.  That's the only cutoff that they asked for.

6    Frankly, we do think it's contrived to say that Dr. Kessler

7    made a definitive determination for pre-2006.  He did not.  He

8    was not asked to do that.

9              This Court's procedures didn't require the PSC

10   to use the first two bellwethers to present evidence supporting

11   the entire inventory of claims in this MDL.  That's just not

12   how --

13        **THE COURT:**  It's before us now.  This was an

14   opportunity to present something to the Court from some expert

15   this information was available.

16        **MR. MURA:**  Well, we did in our opposition identify

17   information from years in the late 1990s that an expert could

18   rely on, including the 2000s, and I'm happy to go over that

19   evidence.  I mean, there is significant evidence on which

20   Dr. Kessler or someone else could rely to establish that the

21   company knew.  We have pointed out very simply that the company

22   knew about Dr. Sedlacek before 2006.

23             So even taking what Dr. Kessler said, I just

24   don't know how the company can establish summary judgment

25   evidence that it didn't know and could not have known before

10:22

1    December 2006.  That's the legal position they have staked out.

2    They clearly can't establish the own line that they have drawn.

3              I don't understand why they drew that line,

4    Your Honor.  I understand this was an opportunity for them to

5    file a fence post motion, but this is the fence post motion

6    that they have filed, bringing forth no evidence and trying to

7    twist the words of an expert who was simply opining in

8    bellwether cases because that is the process that the parties

9    all thought we were putting together.  So if we wanted to have

10   a process where --

11             I don't know if Judge Milazzo disappeared,

12   but --

13        **THE DEPUTY CLERK:**  Did we lose the judge?

14        **MR. STRONGMAN:**  She is gone on my screen too.

15        **THE DEPUTY CLERK:**  Okay.  This is Erin.  Hold on.

16   I'm sure she is trying to get back on.

17        (Off the record.)

18        **THE COURT:**  This is my life.

19             Okay.  Mr. Mura.

20        **MR. MURA:**  Sure.  If I can just pick up.

21             We understand that they had an opportunity to

22   bring a fence post motion, but this is just simply not how the

23   MDL was structured, and nothing precluded Sanofi from bringing

24   forward its own evidence.

25             In very important ways, I mean, there's been

10:24

1    just a complete failure to establish summary judgment pre-2007

2    with respect to the company knowledge.  I mean, there's no

3    affidavit or corporate statement from anyone at Sanofi taking

4    this position under oath.

5              We had Dr. Madigan testify in his supplemental

6    reports.  He analyzed data from the company's safety update

7    reports from TAX 316 which showed that by 2004 -- this is on

8    page 12 of our opposition, Your Honor -- that by 2004 Sanofi

9    was witnessing an adverse event occurrence at .42 times a

10   higher rate with Taxotere than without it and that that jumped

11   ahead even more in 2005.

12             Now, Sanofi's only response is, "Oh, you should

13   ignore everything Dr. Madigan said and Dr. Kessler is the only

14   expert that matters."  We all sat through a two-week trial.

15   This is not a one-expert case.  So Dr. Madigan did talk about

16   safety signals, and such safety signals are important to the

17   issue of constructive knowledge.  They can't just be brushed

18   aside.  So we do have an expert here that's talking about

19   before 2006 and Sanofi simply ignores that.

20             More to the point, I think, if you look at the

21   evidence, you also have the Nabholtz publication, which Sanofi

22   said at trial, "We weren't trying to hide Nabholtz.  That was

23   our publication."  I mean, that dates back to 2001, and the

24   evidence in the record shows that that was based on a cluster

25   of adverse event reports that were available to Sanofi in 1999.

10:26

1   So I don't think the company can say, "Yes, this was our study

2   as early as 2001.  We weren't trying to hide anything.  We were

3   trying to let the world know about this problem," and then come

4   in here and say that there is just simply no evidence before

5   2007.

6                   The other problem with that -- I could go on.

7   From 2003 to 2004, there were ongoing clinical trials -- this

8   is discussed in our brief as well -- where Dr. Mackey was made

9   aware of patients in Canada who were experiencing permanent

10  hair loss.  Dr. Mackey, working with Dr. Palatinsky, revised

11  the informed consent form in early 2007 -- which is the basis

12  for our motion which we will argue in a second -- but there

13  clearly was knowledge in the company before 2006 that an expert

14  could opine on.

15                  Frankly, Dr. Kessler was simply not being asked

16  to opine just -- it was academic to him.  I mean, if you ask

17  him what did the company know in 2001, he has the bellwether

18  plaintiff who he is testifying for who was injured much later

19  in time.  So he is offering an opinion about that, and he is

20  explicitly writing in his report that he is reserving the right

21  to study other periods.

22                  Now, if Sanofi wanted to tee up this issue, we

23  should have had a discussion about presenting expert evidence

24  on both sides for the pre-2007.  Sanofi should have proposed

25  that a bellwether plaintiff be from before 2007.  I don't

10:28

1    believe it has ever done that.

2           You know, big picture, if you look at

3    Palatinsky's 2011 clinical overview, nearly 25 percent of

4    permanent hair loss adverse events predate 2006.  So in our

5    view there's very good evidence to defeat the motion.

6           It is a bit contrived in our view.  I just don't

7    think the parties or the Court intended for all of the

8    remaining MDL plaintiffs, including the post-2008 bellwethers

9    or before, were going to be bound by the evidence presented in

10   the *Earnest* trial.

11          I mean, Sanofi made certain statements about

12   general causation in its closing and during trial.  We all saw

13   during the second week where Sanofi said, "Look, all these

14   drugs cause permanent hair loss.  You just can't point to our

15   drug as causing permanent hair loss for Ms. Earnest."  Should

16   we now file a motion for summary judgment where we get the

17   benefit of those general causation statements in the *Earnest*

18   trial?  I mean, I don't think that this MDL has been structured

19   in that way; but if that's the way it's going to go, then it

20   should go that way for plaintiffs as well.

21          The cases that Sanofi is citing are cases where

22   there was an admission by a plaintiffs' expert on that same

23   plaintiff's claims.  I mean, those cases couldn't be more

24   farther apart.  The *Chantix* case was a case about a black box

25   warning that plaintiffs claimed was inadequate.  It was a very

10:29

1    different case.  I just don't think it's comparable.

2                  You do have a problem here.  Beyond that,

3    Your Honor identified a problem that we raised in our brief.

4    There are 50 different jurisdictions here.  It would be

5    entirely complicated to decide this uniformly.

6                  The other problem is there's a huge choice of

7    law problem.  Choice of law is very complicated.  Just looking

8    at Sanofi's chart, you see the various states where their

9    plaintiffs are from, where they might have received their

10   infusions.  I mean, it would be a very complicated analysis.

11   Their motion was 12, 13 pages and had a very simple proposed

12   order to get rid of thousands of cases.

13                  I mean, I understand there was a fence post

14   motion coming, but we really were not expecting this sort of

15   motion and to us it seems a bit of a blunderbuss, especially

16   when you look at those lists.  I can tell you that we received

17   many phone calls from local counsel for these women saying, "I

18   don't understand why my plaintiff is on this list.  If you look

19   at the date of administration, it's wrong."

20                  So I don't even think the Court could just grant

21   the proposed order as written.  There would have to be a

22   process to figure out who is actually affected by this.  We

23   raised some examples of the errors, but we don't even know the

24   scope of them.  We think the motion should be denied entirely.

25                  Sanofi could have filed a very different motion,

10:31

1    but this is the motion it chose to file.  It clearly cannot

2    establish summary judgment type evidence that it had no

3    knowledge of permanent hair loss as being a risk of Taxotere

4    before December 2006.

5              THE COURT:  Okay.

6              MR. MURA:  Unless the Court has any questions --

7              THE COURT:  No, I don't.

8              MR. STRONGMAN:  Your Honor, I will be brief, but I

9    think there are a few things that I am compelled to respond to

10   here.

11             Number one, when you read Dr. Kessler's expert

12   report, which I'm sure the Court has, this is what Dr. Kessler

13   was asked to do:  "I have been asked to address Sanofi's duty

14   to warn physicians and patient about the risks of irreversible

15   hair loss associated with Taxotere from the years 1990 to

16   2015."  "1990 to 2015," those are Dr. Kessler's words.

17             With regard to Dr. Madigan, Dr. Madigan is a

18   statistician.  Dr. Madigan admits he is not offering any

19   opinion on when Sanofi should have warned.  Dr. Madigan did his

20   analysis for Dr. Kessler.  Dr. Kessler then took that analysis,

21   analyzed it, and rendered his opinion.  Dr. Kessler's opinion,

22   as we know was, 2006, was the earliest date.

23             Nabholtz.  Guess what?  Dr. Kessler considered

24   it.  Dr. Kessler read it.  All of the adverse events that

25   Mr. Mura talked about, Dr. Kopreski's deposition Mr. Mura

10:32

1    talked about, Dr. Kessler reviewed, relied, considered that.

2    When we asked him flat out when should Sanofi have warned, his

3    opinion was 2006.

4                The plaintiffs are under some notion that they

5    could go get some other expert to contradict Dr. Kessler

6    looking at the exact same information.  That's simply not

7    practical, it unreliable, and it's not the way an MDL works.

8    Dr. Kessler looked at all the information and has repeatedly

9    said 2006.

10               With regard to the idea of a bellwether for

11   pre-2006, we all know the plaintiffs would never try a case for

12   a plaintiff before 2006.  It wouldn't happen.  When we talk

13   about bellwether parameters, 2006 is a cutoff.  They are not

14   even going to put into the hopper a case from 2006.  We know

15   that.  It's because their own expert, the former FDA

16   commissioner, the person that they hold up as the expert, has

17   said 2006.  That's the deadline.

18               The plaintiffs certainly, as Your Honor pointed

19   out, could have come forward with some evidence, from

20   Dr. Kessler or otherwise, in this case to contradict what he

21   said before, to make some sort of issue of fact, and they

22   didn't.  Dr. Kessler had every opportunity, including after our

23   motion was filed, to issue a report.  He didn't.  His opinion

24   is the same.  The fact that the plaintiffs' lawyers can point

25   to facts that they like before 2006 cannot get them over the

10:34

1   hump.  Dr. Kessler is the expert, not the plaintiffs' lawyers,

2   and Dr. Kessler has looked at it all.

3               The bottom line is the time for the plaintiff to

4   have come forward with an expert or for Dr. Kessler to make

5   some sort of statement different than he has testified, it was

6   now; it was in response to the motion.  They didn't do it.  So

7   for those reasons we believe our motion should be granted.

8               THE COURT:  Thank you.  This motion is submitted.

9               Mr. Mura, plaintiffs have a motion for summary

10  judgment as well on the issue of knowledge.

11              MR. MURA:  Yes, Your Honor.  Thank you very much.

12              One of Sanofi's affirmative defenses under the

13  LPLA denies knowledge and so Sanofi has introduced this

14  question of knowledge.  Our summary judgment motion attacks

15  that and draws the line at January 2007, which is one month

16  after the December 2006 Sedlacek abstract that Sanofi has based

17  its motion on, which Sanofi says provided the company with

18  sufficient knowledge about the potential risk of permanent hair

19  loss.  So we are even more conservative than Sanofi has been.

20              If you look at the basis for our motion, it's

21  Sanofi's own words.  There was an informed consent form that

22  Sanofi edited and approved.  Specifically, it was Sanofi's

23  global safety officer, Dr. Palatinsky, who accepted the

24  addition of the words *permanent hair loss* in a warning.  He not

25  only accepted it, he wrote a note that said you don't need to

1    warn about both hair loss and permanent hair loss -- because

2    both phrases were in the informed consent -- because permanent

3    hair loss is sufficient once.  That's what he said.

4                So Sanofi can't even say that this was something

5    that we are not sure Dr. Palatinsky saw.  He saw it.  He

6    approved it.  He was global safety officer.  That was a

7    suggestion from Dr. Mackey's office, who since 2003 had been

8    seeing patients experiencing permanent hair loss after

9    completing chemotherapy treatment with Taxotere.  So this was

10   part of a clinical trial and he was a principal investigator,

11   and he had reported their ongoing hair loss for years.

12               Sanofi's response is essentially that this isn't

13   good enough summary judgment evidence, and we really don't see

14   why not.  When you look at how Sanofi has approached knowledge

15   throughout this litigation, Sanofi has repeatedly pointed to

16   consent forms to say that plaintiffs were on notice that they

17   were injured.

18               So in the *Earnest* trial, for example, if you

19   recall, Your Honor, the plaintiff had received some lengthy

20   educational patient handbook.  She had received it before she

21   even knew that she was going to have Taxotere.  Sanofi found

22   language in there that could suggest that Taxotere could be

23   permanent.  Sanofi said, "Well, this is actual or constructive

24   knowledge.  She was given this book."  I mean, they argued that

25   to the jury, and there was no evidence that, you know,

10:37

1    Ms. Earnest really understood what was going on at that time.

2              In *Durden*, Sanofi argued that publicly available

3    documents should put the plaintiff on notice of potential

4    causes.

5              I think the best example is *Kahn*.  There Sanofi

6    claimed plaintiff's actual knowledge of the risk of permanent

7    side effects was from a clinical trial informed consent form.

8    That informed consent form didn't say permanent hair loss; it

9    talked about only hair loss.  Then the basis for Sanofi to say

10   that the plaintiff, Kahn, should have understood this was

11   permanent was a generalized statement elsewhere in the document

12   that said in some cases side effects may be serious,

13   long-lasting, or may never go away.  That was sort of a

14   discussion.

15             So Sanofi has been arguing throughout this

16   litigation that these sorts of statements establish knowledge,

17   and here we have an even clearer statement because you have the

18   word *permanent* in this document and it was approved of by

19   Sanofi.  Now, I understand that the --

20             **THE COURT:**  Mr. Mura.  Mr. Mura.

21             **MR. MURA:**  Yes.

22             **THE COURT:**  Where did you go?

23             **MR. MURA:**  Oh, can you not see me?

24             **THE COURT:**  No.

25             **MR. MURA:**  Can you see me now?

10:39

1          **THE COURT:**  There you are.

2          **MR. MURA:**  My apologies.

3          **THE COURT:**  No, that's okay.  These are trying times.

4  I apologize that I had to interrupt you because I do like

5  looking at who is arguing.

6          **MR. MURA:**  I apologize, Your Honor.

7          **THE COURT:**  Okay.  Please proceed.

8          **MR. MURA:**  Okay.  Thank you.

9          Yes.  I was going to say this is just a much

10  stronger case for establishing company knowledge.

11          Now, Sanofi's main argument is that plaintiffs

12  can't establish general causation as of 2007, but that confuses

13  concepts.  There is nothing in the LPLA that -- that sort of

14  confuses foreseeability with general causation.  I see

15  Your Honor nodding, so I won't press too hard.

16          In our brief we do talk about how, if Sanofi

17  were right, it would be highly problematic under the law

18  because first you would have to establish -- you would have to

19  establish general causation twice, first in your case in chief,

20  and then you would have to do it again based on the knowledge

21  at the time of the injury, and that's just simply not the law.

22  Sanofi has not offered any justification why foreseeability has

23  to establish general causation.

24          So unless the Court has any questions for me, if

25  I could reserve a little time for rebuttal --

10:40

1      **THE COURT:** Please.

2      **MR. MURA:** Okay. Thank you.

3      **THE COURT:** Thank you.

4        Mr. Strongman.

5      **MR. STRONGMAN:** Thank you, Your Honor.

6        While Dr. Kessler may have drawn a line in 2006,

7 everything after that remains highly contested in this case by

8 the documents, by the witnesses, and by the experts. There is

9 a genuine issue of material fact as to what Sanofi knew or

10 should have known as of January 2007.

11        Mr. Mura wanted to talk a lot about statute of

12 limitations or prescription. Those were the cases that he was

13 talking about with regard to Sanofi pointing out an informed

14 consent or Sanofi pointing out Ms. Earnest's handbook. This is

15 not an issue regarding the prescription statute. This is an

16 issue regarding a product liability statute under Louisiana

17 law.

18      **THE COURT:** I don't think the handbook had anything

19 to do with the prescription issue, as I recall. What I recall

20 is during the course of the trial it was presented to show that

21 she was aware that this could cause permanent hair loss, and

22 that would go to the issue of whether or not she would have

23 chosen this medicine regimen because -- she knew or she should

24 have known, that this was her knowledge. Okay.

25      **MR. STRONGMAN:** Let me address that. When you look

10:41

1    at the actual language in the product liability statute that we

2    are talking about, the language is did the manufacturer know or

3    could they have known of the characteristic that caused the

4    damage.  That's the language.  So when you look at that

5    statute, you have to look at the context we are talking about

6    also, which is a prescription chemotherapy treatment.  This

7    isn't a lawnmower.

8              So when you look at a prescription drug, you

9    cannot entirely take apart the issues of warning and causation.

10   They are not identical, but they are intertwined.  As you have

11   heard in the trial, the standard for when a warning needs to be

12   updated is when there is reasonable evidence of a causal

13   association.  It isn't merely when we find one document we like

14   in the company documents or we get one case report.  That isn't

15   it.  The standard is reasonable evidence of a causal

16   association.

17             The plaintiffs admit that there is a fact issue

18   as to general causation in this case and that alone -- when you

19   look at the FDA regulations and how warnings have to be done

20   for a prescription drug that's regulated by the FDA, that

21   creates a fact issue.  When you look at all of the documents in

22   Sanofi's possession that have been in evidence, that have been

23   discussed over and over again, what you see is certainly a

24   dispute about when or if the warning should be changed.  We

25   have cited many of those documents in the brief.

10:43

1    Clinical overviews in 2011, for example, that
2    determined that the FDA standard for updating a label was not
3    satisfied, that document alone creates a genuine issue of
4    material fact as to whether Sanofi knew or should have known in
5    January 2007, which is what the plaintiffs are asking.  When
6    you look at the law, plaintiffs have cited not one single case
7    where a court has ever done what the plaintiffs are asking, and
8    that's to grant a summary judgment motion on something like
9    this, in this type of case, on an affirmative defense.
10   Essentially what the Court is being asked to do
11   is create an unprecedented order that essentially is going to
12   handcuff how Sanofi can even defend a failure-to-warn claim
13   when we all know that the documents, the witnesses, and the
14   experts have very different and disputed opinions and facts
15   about when a warning should have been changed, if at all.  Our
16   experts disagree with the plaintiffs' experts on this issue.
17   That's a genuine issue of material fact.  Dr. Palatinsky's
18   testimony, Dr. Palatinsky's documents in 2011 that we have
19   cited, those alone create an issue of fact.
20   So what the plaintiffs are asking for here is,
21   "Hey, we don't like what Dr. Kessler said about 2006, but at
22   least throw us a bone and draw us a line too."  What we have is
23   a disputed fact, clearly, based on the record, and so as a
24   result the plaintiffs' motion should be denied.
25        **THE COURT:**  Thank you.

1       Mr. Mura.

2       **MR. MURA:**  Thank you, Your Honor.

3          I think Sanofi doesn't want to take the bitter

4   with the sweet here.  They are insisting that there is a 2006

5   cutoff on knowledge, but then in response to our motion they

6   claim that it's a dispute of fact whether the company had that

7   knowledge.

8          One point about general causation.  If it's true

9   that you have to establish general causation to establish

10  knowledge, then the LPLA affirmative defense wouldn't make

11  sense because the standard for foreseeability is knew or should

12  have known, and should have known would make no sense if you

13  have to establish general causation.  I have seen no law and

14  Sanofi has not brought forth any cases to show that general

15  causation is a requirement to establish foreseeability.

16         One last response.  Sanofi is suggesting that

17  this is going to either end the MDL or it's going to be

18  extraordinary.  We don't think so.  Sanofi barely, if at all,

19  challenged the fact that it knew that permanent hair loss could

20  be a risk of Taxotere.  It just made very different arguments

21  in the *Earnest* trial and I'm sure would make those arguments

22  again, so the *Earnest* trial -- and future trials might look

23  very much like the *Earnest* trial in the types of arguments that

24  are raised.

25         It defeats an affirmative defense that Sanofi

10:47

1   has raised in this case.  Sanofi has introduced the argument
2   that it didn't have knowledge and could not have known of the
3   risk, and here we have a clear statement by the company.  It
4   doesn't matter that the statement wasn't published or shared or
5   that the informed consent didn't go forward.  The question is
6   what did the company know and when did it know it, and that
7   statement is powerful evidence, uncontroverted evidence that
8   the company knew.
9                I would just point you to page 8.  I believe
10  this is our brief in response to the prior motion we just
11  argued, but this is what the consent form said.  Sanofi is now
12  saying the consent form doesn't establish knowledge.  The
13  consent form says -- before the permanent hair loss, it says:
14  "These are the side effects we know about at present."
15               "These are the side effects we know about at
16  present."  The question of knowledge is not disputed.
17               Thank you, Your Honor.
18          THE COURT:  Thank you.
19               I know we now have the post-2015 argument.  I'm
20  going to ask anyone who is on their telephone to please
21  double-check that you are on mute because I am getting
22  something, and I don't know if it's from another telephone.  If
23  you are participating by phone -- I don't know what it is I'm
24  hearing, but it appears to be a little garbled.  If everyone
25  can double-check that you are indeed on mute.

10:49

1          Mr. Ratliff, are you ready to proceed?

2          **MR. RATLIFF:**  Yes.  Your Honor, can you give me a few

3  seconds?

4          **THE COURT:**  Take your time.

5          **MR. RATLIFF:**  Your Honor, I'm ready to proceed

6  whenever the Court is ready.

7          **THE COURT:**  Okay.  Let's proceed.

8          **MR. RATLIFF:**  Good morning, Your Honor.

9          As the Court is aware, in December of 2015 the

10  FDA approved an update to the Taxotere label to add a warning

11  about permanent alopecia.  This was the culmination of a nearly

12  yearlong inquiry by FDA led by their oncology division and two

13  of their breast cancer oncologists, who had been trained at

14  Johns Hopkins, to look into this specific side effect,

15  permanent alopecia, in this particular chemotherapy, docetaxel.

16          The inquiry started by hearing from patients,

17  both in writing and in teleconferences, to hear about their

18  concerns that there was not a warning about permanent alopecia.

19  It continued on with communications with Sanofi, where FDA

20  requested information on this particular side effect,

21  information that Sanofi then provided to FDA in a comprehensive

22  manner that included information about TAX 316 and GEICAM 9805,

23  the two studies that plaintiffs' experts contend establish

24  causation.

25          It included an inquiry and an analysis of

10:51

1    Sanofi's adverse event database that showed the number of

2    adverse events related to alopecia and how many of those cases

3    fell into the category of permanent alopecia.  It itemized the

4    individual patients, their regimens, what the narrative was

5    about their particular injury.  It included information about

6    relevant medical literature, the Miteva article and the Kluger

7    article: Miteva, who had said that he believed that Taxotere

8    was the cause of the permanent alopecia in his patients; the

9    Kluger article, which rendered the same opinion and said he

10   believed there to be an at least 2 percent incident rate, if

11   not higher.

12            All of that was submitted to FDA.  That was all

13   reviewed by FDA.  It was reviewed by two of FDA's breast cancer

14   teams.  What happened was FDA then concluded and required

15   Sanofi to update the label to include a warning about alopecia.

16   FDA said it will go in this section.  They mandated that it

17   will go in the Adverse Reactions section.  That was FDA's

18   decision after a comprehensive review on this particular side

19   effect.

20            They approved the recommended and required

21   language about permanent alopecia, and what did that language

22   look like in the warning after 2015?  Well, there was language

23   in the Adverse Reactions section advising doctors that cases of

24   permanent alopecia had been reported.  There was language in

25   the Counseling section telling doctors advise your patients of

10:52

1    this risk.  Then there was information in the FDA-approved

2    patient leaflet section, in layman's terms, that said hair loss

3    is a common side effect of Taxotere; permanent hair loss has

4    been observed.

5              Nevertheless, Your Honor, since 2015 there have

6    been more than 300 cases filed in this MDL of women who were

7    treated with Taxotere in 2016, 2017, 2018, and 2019 who still

8    assert as the basis for their lawsuit that permanent alopecia

9    was undisclosed to them and undisclosed to their doctors.

10             Nevertheless the PSC, they acknowledge the

11   warning exists, but they say it's inadequate.  Why do they say

12   it's inadequate?  The thrust of their motion, Your Honor, is

13   this.  They say, "Well, we know the warning is there.  We admit

14   the warning is there.  We know it has been in there for a long

15   time.  But it should have been in the Precautions section, not

16   the Adverse Reactions section."

17             Your Honor, this is just moving the target

18   further and further away.  More bluntly, Your Honor, it doesn't

19   comport with reality.  It was FDA who chose to put it in the

20   Adverse Reactions section.  It is Dr. Kessler, plaintiffs'

21   expert, who opined at the *Earnest* trial that an appropriate

22   warning could go in either the Precautions section or the

23   Adverse Reactions section.

24             It is also plaintiffs' master complaint that

25   plaintiffs' opposition is contrary with.  Paragraph 188 of

10:54

1    plaintiffs' master complaint says:  "We know the warning is in

2    there.  It's been in there since 2015.  We consider it

3    inadequate because it doesn't appear in the Warnings and

4    Precautions section or the Adverse Reactions section."

5            We know that's not correct, Your Honor.  It does

6    appear in the Adverse Reactions section.  It appeared there in

7    2015, it appeared there in 2018 when FDA revisited this

8    warning, it appeared there in 2019 when FDA revisited this

9    warning again, and it appears there now.  The PSC's opposition,

10   they are on an island even from their own master complaint.  So

11   the idea that this label is inadequate as a matter of law just

12   because it's not in the Precautions section doesn't comport

13   with reality.

14           The second thing they quibble with, Your Honor,

15   as to adequacy is the detail, the level of detail, and to that

16   they put forward three kind of broad assertions.  They say,

17   one, there should be more information about the prevalence of

18   permanent alopecia.

19           Well, Your Honor, Sanofi cannot calculate the

20   incidence rate of permanent alopecia with Taxotere-based

21   regimens.  FDA has conceded they cannot calculate the incidence

22   rate of permanent alopecia with Taxotere regimens.

23   Dr. Kessler, plaintiffs' general causation expert, has said the

24   true incidence of permanent alopecia with Taxotere-based

25   regimens remains unknown.  There is no information, accurate

10:55

1    information -- which is what is required under the FDA

2    regulations -- that Sanofi could add to make this, to them, an

3    adequate label.

4              They talk about the strength of association,

5    that there should be more language about the strength of

6    association, and they cite a number of articles to that.

7    Your Honor, that determination was already made.  When FDA

8    required Sanofi to update the label with permanent alopecia,

9    FDA had already concluded that there was a potential causal

10   association between Taxotere and permanent hair loss.  That

11   determination was made, that analysis was done, before the

12   label was updated in 2015.  As courts have held, Your Honor, in

13   considering this particular issue, it's that when the risk

14   appears in the label, it is implicit that there is some causal

15   relationship between the risk and the taking of the drug.  So

16   that request goes by the wayside.

17             The last part, Your Honor, that they quibble

18   with when it comes to detail is they say it doesn't reflect the

19   severity of the injury.  Your Honor, the label says that you

20   will lose your hair and it may be permanent.  Permanent is as

21   severe as it gets.  It doesn't say it's going to be

22   long-standing.  It doesn't say it might come back.  It says if

23   you lose your hair, it may be permanent.

24             Plaintiffs say, "Well, there's all these severe

25   psychological, distressing side effects of permanent alopecia,"

1   but that's information FDA considered before 2015, when they
2   updated the label as part of this particular inquiry.  They
3   heard it from Sanofi in their clinical overview.  More
4   importantly, Your Honor, they heard it from patients; patients
5   who had reached out to FDA, who had emailed FDA, who had had
6   teleconferences with FDA, with their oncology department, to
7   talk about the emotional consequences of permanent alopecia.
8   That's something that was already considered and that's
9   something that is encapsulated, in terms of the severity of the
10  injury, as it appears in the label.

11          So, Your Honor, there are two parts about why
12  they think the label remains inadequate even though it warns of
13  the exact injury that appears in the master complaint.  Neither
14  one of those is a valid one.

15          The other thing, Your Honor, that I think has to
16  be considered in this is that it's not about the perfect
17  warning.  It's not about the absolute best warning.  The test
18  really is:  Is the warning adequate?  You could look at any
19  label, you could look at any side effect and suggest more
20  detail could be added, but that's not the inquiry, Your Honor.

21          The inquiry is a qualitative assessment of the
22  label as a whole.  It is not to look through the nitpicking
23  lens of an interested legal advocate after the fact who says,
24  "I see the label, but here I think more information should be
25  put into it."  Certainly FDA did not think that, and certainly

10:58

1   Dr. Kessler does not think that.

2              In fact, we asked Dr. Kessler.  We said, "Where

3   should this go on the label?"

4              He said, "It can go in either section."

5              We asked him, "Okay.  Well, what should the

6   label say?  What would an adequate label say?"

7              First he said, "Well, I can't give you that, but

8   I can tell you in general terms what it should be."  This is

9   what he testified in his deposition.  "The general thrust of

10  this is pretty simple.  There's a risk, and there are cases of

11  permanent alopecia."

12             Your Honor, that is what's in the label in 2015.

13  That's what's in the label today.  The Taxotere label aligns

14  perfectly with what Dr. Kessler has testified to in terms of

15  the location, Adverse Reactions, and the substance.

16             For those reasons, Your Honor, we believe that

17  this label is adequate as a matter of law, something that

18  courts have found routinely across the country -- courts in

19  MDLs, whether it's the *Chantix* MDL or the *Meridia* MDL, have

20  found they can make omnibus rulings of this type of nature --

21  and something that we are asking Your Honor to do here.

22             I think the second part, Your Honor, as to why

23  we should win this particular motion rests on preemption.

24  Your Honor, I know that you dealt with preemption in the

25  *Earnest* case, and that was a period of time that I believe

11:00

1    Ms. Earnest was treated in 2008.  You looked at that world view

2    as it existed in 2008, in that time period, and what could

3    Sanofi have done or not done to employ the preemption defense,

4    and you said preemption doesn't happen here.

5                    Your Honor, we are in a fundamentally different

6    time period.  The FDA has considered the exact risk -- exact

7    risk -- that plaintiffs allege.  They considered where the

8    warning should go.  They considered the comprehensive

9    information.  They did it through their oncology team.  This

10   wasn't just a passing interest.  This was a yearlong inquiry by

11   FDA.  They chose, through their inherent powers, to put it in

12   this section, 6.2, Adverse Reactions.

13                   So I think when you look at the plaintiffs'

14   opposition, Your Honor, one of the things that gets lost in

15   their view of the preemption analysis is that it's really a

16   two-step process.  It's not simply that Sanofi or the drug

17   manufacturer proposes the warning that plaintiffs want -- even

18   though they won't tell us what that is -- and that the FDA

19   then, therefore, rejects it.  The first step is:  Can the

20   defendant employ the CBE regulation at all, the changes being

21   effected regulation?

22                   To do that, Your Honor, to use that regulation,

23   there must be what's called newly acquired information, not

24   just new information, Your Honor.  *Newly acquired information*

25   is a regulatory term.  It is a term of art that allowed a

1    defendant to use the CBE process.  That evidence must be in

2    place.

3              Here the information that plaintiffs cite in

4    their brief is not newly acquired information.  It is not new

5    information that is substantively different than all of the

6    information that FDA previously considered when they made the

7    label change in 2015.

8              So what did they rely on, Your Honor?  Well,

9    they cite a number of new articles after 2015 that talk about

10   the emotional consequences of permanent alopecia.  That's new

11   information, Your Honor, but it's not newly acquired

12   information.  That type of information was considered by FDA

13   and submitted by Sanofi to FDA when they made the 2015 label

14   change.

15             They referenced some additional medical

16   literature about permanent alopecia.  That information, it's

17   new, but it's not newly acquired information.  What's in that

18   medical literature, Your Honor, is simply more analyses of case

19   reports of permanent alopecia.

20             So, Your Honor, FDA had already considered

21   TAX 316.  They had considered GEICAM 9805.  They had even

22   considered a full, robust inquiry of Sanofi's pharmacovigilance

23   database.  They had reviewed the relevant literature.  They had

24   heard from patients.  That's not newly acquired information.

25             So what do the plaintiffs rest most of their

1   case on in terms of newly acquired information?  They say,

2   "Well, Sanofi didn't do the tests that our biostatistician,

3   David Madigan, did; and if they had done those, then that would

4   be newly acquired information."

5           Your Honor, the tests for analyses of a paid

6   expert for the plaintiffs is not a way to manufacture newly

7   acquired information in order to defeat preemption.  If that

8   were the case, if you take that to its logical extreme, then

9   any party could find some expert to perform some test that was

10  not done and say, "Aha.  Sanofi didn't perform that test and

11  they didn't submit that to FDA."  You could essentially

12  purchase newly acquired information.

13          That's something that should not be a fact or a

14  piece of evidence that becomes newly acquired information that

15  then triggers the CBE process.  So there is nothing to even get

16  you through the front door.  The analysis on preemption starts

17  and stops at newly acquired information.

18          If you are going to look past that, Your Honor,

19  if you are going to look back to the clear evidence standard

20  and *Albrecht,* what I would say to that is this.  *Albrecht* said

21  that there must be clear evidence and it must come from the

22  agency with federal powers.  They did not determine a

23  disapproval method.  In fact, they said, "The method for

24  disapproval is not before us."  So it's not a simple matter of

25  Sanofi submits the warning plaintiffs want, FDA rejects it, we

11:04

win.  There are various approval methods so long as it fits
within FDA's inherent authority.

So, for example, the Tenth Circuit recently,
there was a citizens petition requesting a label change.  FDA
rejected that.  They did not choose to update the label.
Preemption applied.  Here we have FDA who had looked at this
information.  They considered the warning that the plaintiffs
wanted.  They chose the warning in 2015 that they thought was
appropriate.  Your Honor, they have revisited that warning time
and time again, and they have never made a change.

The one thing I want to bring to your attention,
Your Honor, before I wrap up -- and we think it's important --
is that an MDL plaintiff reached out to FDA in 2018.  They
emailed FDA.  They emailed the head of the oncology department
and they said, "We want a stronger warning.  There needs to be
a stronger warning."  It was Dr. Gahan, whose case was recently
dismissed.

The FDA responded and they said, "FDA officials
determined that the appropriate place for the possible
permanent alopecia is in Section 6.2, Postmarketing Experience,
and in Section 17, Patient Counseling Information, of the
Taxotere label," where it was in 2015, where it was today.
Your Honor, that's not an informal communication.  That's a
reaffirmation of FDA's formal position on this issue that FDA
officials determined.

11:06

1          So for those reasons, Your Honor, we believe
2    that (1) the label is adequate; and (2) we believe that any
3    case after 2015 is preempted by federal law.  Thank you.
4          **THE COURT:**  Thank you.
5          Mr. Mura.
6          **MR. MURA:**  Thank you, Your Honor.
7          Mr. Ratliff talked a lot about what the FDA did,
8    but what he didn't talk about is what Sanofi didn't do.  What
9    Sanofi has never done is it's never asked and proposed or
10   unilaterally invoked CBE to propose a change to the Warnings
11   and Precautions section of the Taxotere label.
12         We know that the different sections of the label
13   say different things and mean different things, and a change to
14   an Adverse Reactions portion of a label does not relieve a
15   manufacturer of the obligations to make sure that all aspects
16   of the label are adequate.
17         **THE COURT:**  Mr. Mura, don't you need an expert to
18   tell me what this label should look like and where it belongs?
19         **MR. MURA:**  Your Honor, we are in the same pickle we
20   are with the pre-2006.  We have not had an expert opine on
21   post-2015 cases.  We have not had a bellwether for post-2015
22   cases and so we don't have an expert report.
23         **THE COURT:**  These cases have been filed in this MDL
24   and I think -- pre-2006 it's a little bit different, but at
25   this point there is indeed a label that includes language

1    cautioning that cases of permanent alopecia have been reported.

2    I don't know how you come to me, in response to a summary

3    judgment, saying, "Just believe me.  It ought to be different."

4              I think the very nature of summary judgment is

5    you have to bring forth evidence that creates an issue of fact.

6    That's going to require somebody to tell me for this reason it

7    belongs in Warnings because --

8              **MR. MURA:**  Right.

9              **THE COURT:**  -- I'm looking at what things are in

10   Warnings.  It could cause a stroke.  It could cause you to die.

11   It can cause high blood pressure.  It can cause other physical

12   maladies that can result in death or serious bodily injury.

13   Tell me why I should not require you to meet this standard in

14   response to this motion for summary judgment.

15             **MR. MURA:**  Well, if we are required to come up with

16   an expert, we can do that, and we don't feel that procedurally

17   we have been given the opportunity.  We are not asking you to

18   just take our word for it.  The case law is very clear -- and

19   this is Sanofi's argument.  They simply say that because

20   language is in the Adverse Reactions section that necessarily

21   means that the label is adequate, and that is not the law.

22             I mean, how does Sanofi explain away *Albrecht*?

23   In *Albrecht*, the FDA approved a change to the Adverse Reactions

24   section to warn of the injury there and it said no to a change

25   to the Warnings section.  If it were the case that that change

11:09

1    made the label adequate as a matter of law, which is Sanofi's
2    argument, you wouldn't even have *Albrecht*.  I mean, the case is
3    continuing in the Third Circuit.
4            We cite the *Fosamax* case on page 4, where the
5    court clearly says that Warnings and Precautions section, you
6    know, changes to that, that obligation is not relieved by or
7    inconsistent with the condition's inclusion in the drug's
8    Adverse Reactions section.
9            So Sanofi hasn't really made an argument about
10   evidence.  It's made an argument on the law about the adequacy
11   of the label is established as a matter of law if the injury is
12   identified anywhere.  That's Sanofi's legal argument, that's
13   the premise of its motion, and that's legally incorrect.  So
14   that is what we have responded to.
15           If Sanofi had put forth evidence and its own
16   experts -- which it hasn't.  It just simply keeps pointing to
17   Dr. Kessler and the absence of what he said.  Sanofi is the
18   movant here.
19           THE COURT:  But --
20           MR. MURA:  It's not bringing forward evidence, and so
21   I think what Dr. Kessler would -- I'm sorry, Your Honor.  I see
22   you wanted to --
23           THE COURT:  No, no, no, no.
24           Everyone, would you put your phone on mute.
25   Let's start there.

11:10

1           Dr. Kessler was offered as an expert, and he

2    said this caution needs to be placed in either Warnings or

3    adverse events.  My thought is if they put it there, is it by

4    his definition, as an expert, that that's adequate?  I think

5    that's where I'm in a pickle here trying to understand how I

6    can rule on this without somebody saying, no, because of the

7    nature of this particular malady it belongs in Warnings.

8           **MR. MURA:**  So the difference is that the label, as

9    the Court knows, pre-2015 said nothing about --

10          **THE COURT:**  Exactly.

11          **MR. MURA:**  Right?  So under the LPLA, plaintiffs'

12   responsibility is to show legally that the label was

13   inadequate.

14          **THE COURT:**  Right.

15          **MR. MURA:**  Our legal responsibility is not to show

16   what an adequate label should look like, and we have cited case

17   law on these lines in our opposition.  That's not our legal

18   burden.  So we don't have to come forward and say --

19          **THE COURT:**  Right.

20          **MR. MURA:**  -- it would have been adequate if it did

21   at least this.  We have to show that it was inadequate because

22   it didn't sufficiently warn.  We can easily do that by

23   saying -- and Dr. Kessler said this -- it's nowhere in the

24   label.  So if it had been somewhere, maybe that would have made

25   a difference, but it was nowhere.  His answer really is that

11:12

 1    it's nowhere; and because it's nowhere, it's inadequate.

 2              That's a very different opinion from asking

 3    someone whether a label that has an Adverse Reactions warning

 4    but not something in the Precautions section, is that adequate.

 5    That is the question for the post-2015 plaintiffs, none of

 6    which have been identified as a bellwether.  We haven't gone

 7    through *Daubert*.  We haven't gone through the expert process.

 8    We haven't heard Sanofi's explanation for why it thinks that

 9    that is adequate.  It's simply doing this in the context of

10    preemption.

11              You have the *Albrecht* decision, which is

12    directly on point here.  I mean, I don't know how it could be

13    more factually similar because there you have a change to the

14    Adverse Reactions section, but not the Warnings and Precautions

15    section.

16              Now, Sanofi keeps saying you have to go through

17    this two-step process, and the case they are citing is a

18    district court case called *Utz* from New York.  That case

19    predates *Albrecht*.  They are trying to shift the burden on us

20    to show newly acquired evidence when that's not the standard

21    for preemption.  It wasn't the standard as why it's stated, it

22    wasn't the standard under *Albrecht*, and it's not the standard

23    that this Court imposed when it first decided preemption.

24              The Court was very clear.  You can't just say,

25    "We submitted a bunch of evidence to the FDA, the FDA didn't do

1   anything, and it's the FDA fault.  We get legal immunity."  I

2   mean, the Court has been consistent in that, and that's correct

3   on the law.  Yet Mr. Ratliff started today by going over all

4   that the FDA did and then effectively blaming the FDA.

5             The best two cases for the Court to consider are

6   the *Avandia* decision and the *Crockett* decision, which we cite

7   and which Sanofi says nothing about.  Here's what *Crockett*

8   said:  "Preemption is limited in state law failure-to-warn

9   situations where the FDA has actually rejected a proposed

10  labeling change."  You have never had a proposed labeling

11  change to the Warnings and Precautions section.

12            So for the 2015 cases the fight is about whether

13  that label -- we just have to show that it's inadequate.  We

14  have significant evidence and it's documented that it isn't

15  adequate because it doesn't go over the strength of

16  association, the prevalence of risk, and the severity of

17  outcome.

18            Now, Sanofi is trying to restart the clock at

19  2015.  They are saying, Your Honor, only think about newly

20  acquired evidence in terms of everything that happened after

21  2015, but that presupposes that the FDA rejected a change to

22  the Warnings and Precautions section and somehow started the

23  clock again.  That's not how it works.  You can refer to

24  pre-2015 evidence.

25            In fact, we think that Sanofi should have

11:15

1   proposed a change to the Warnings and Precautions even in 2015.

2   It did not.  So we can refer to the entire spectrum of evidence

3   as supporting a change to the Precautions section, which has

4   different standards and different effects.

5           A label that has language in an Adverse

6   Reactions section doesn't establish as a matter of law that the

7   label is adequate if it doesn't have that language in the

8   Warnings and Precautions section.  I mean, that's *Fosamax*.

9   That's *Albrecht*.  We just wouldn't even have these cases.

10  Their legal position makes no sense.

11          They cite this Tenth Circuit case with a citizen

12  petition.  There is no citizen petition here.  A citizen

13  petition is a regulatory process that is highly formalized,

14  where the FDA sometimes responds in a formal way.  So the fight

15  there is about the formality and the clearness of the FDA's

16  response.

17          They are citing now to emails?  I mean, *Albrecht*

18  clearly rejects a reliance on emails/telephone calls as

19  establishing an indicia that the FDA would have taken some

20  action.  Right?  I mean, that's the hypothetical world that the

21  Supreme Court has said that's not going to cut it.  We are not

22  going to let emails from some FDA person 10 down the line in

23  the chain preempt wide swaths of law.  If you are going to have

24  preemption, you need to have a formal ask or a CBE, and then

25  you need to have the FDA say no through one of its formalized

11:16

1    regulatory processes.  You have none of that there.

2              In *Avandia*, the defendants there cited a bunch

3    of telephone calls.  They said, "Look, in these telephone

4    calls, the FDA basically told us this is good enough," and the

5    court said, "No, you can't rely on that.  You didn't propose a

6    change."

7              So the different aspects of the label matter.

8    We are not in a situation where we have had to come forward

9    with evidence at this stage.  They filed a motion for summary

10   judgment making this highly formalistic legal argument that

11   because the information is in one section of the label that

12   ends the game.  They have also cited Dr. Kessler, who again --

13   and, respectfully, he has not been asked to opine on a

14   bellwether post-2015.  We don't have one.  Maybe we should.  I

15   don't know that Sanofi has ever proposed one.

16             There are all sorts of solutions here to get to

17   these arguments.  The way in which Sanofi is framing this, it's

18   not allowing the Court to just toss away through summary

19   judgment the claims of -- here it's a fewer number than

20   pre-2006, but it's still significant, and those women have not

21   had an opportunity to hire an expert.  We haven't gone through

22   *Daubert*.  All of this has been shortchanged.

23             We know Sanofi has a rush to establish fence

24   posts, and we have our own fence posts too.  We are fine with

25   fence posts as a concept, but they have not made a legal

1   entitlement to judgment against hundreds of women.

2          Again, we have the same problem that we have

3   with the same pre-2006.  It's not clear that all these women

4   are implicated by this motion.  Some of them may have been

5   injured or received infusions before the December 2015 cutoff.

6   So it's a little more complicated than Sanofi is making it out

7   to be.  I don't think that their motion could even be granted

8   as written.

9          We certainly don't think that the label is

10  adequate when there is sufficient evidence to show that you

11  could have improved the label by adding information to the

12  Warnings and Precautions.  I will say that Dr. Kessler does

13  talk about the Warnings and Precautions, and he does explain

14  how the evidence in this case would support such a change.  So

15  it's not correct to say that we don't have any evidence to

16  say --

17          **THE COURT:**  Was it attached to your response?

18          **MR. MURA:**  All his reports have said here is the

19  evidence that supports a change to the Adverse Reactions, and

20  here is the evidence that supports a change to the Warnings and

21  Precautions.  So this isn't anything new.  He has just said it

22  could go in either because he was opining on a label where it

23  said it nowhere, but he did talk about information and why the

24  different aspects of the labeling, both aspects, were met.

25          We know from *Albrecht* that you don't end the

11:19

1    case because one aspect of the label is changed.  The label

2    sections are different and independent and perform different

3    functions.  So, you know, we just think we have to go forward

4    with these cases.  Perhaps we can do it on an expedited fashion

5    or we can select it as a bellwether, but Sanofi simply hasn't

6    established as a matter of law that --

7           THE COURT:  There's lots troubling here.  I have read

8    your opposition, but there is nothing there.  Dr. Kessler's

9    testimony was not included in the opposition.  I have some

10   vague recollection of what he testified to at trial, but --

11   anyway.  Okay.

12          MR. MURA:  Well, his reports were attached to

13   Sanofi's.  They are part of the record, his reports, and he has

14   discussed the evidence that supports a change to the Warnings

15   and Precautions.  It's not like we have done no work here.  We

16   have done --

17          THE COURT:  I know.

18          MR. MURA:  -- significant work.

19          THE COURT:  I know.

20          MR. MURA:  We just did it in the context of the

21   label, where it said nothing.

22              The legal responses that Sanofi has proposed

23   here, they are inconsistent with *Albrecht*, *Avandia, Crockett*,

24   all the cases which require you to actually propose or

25   unilaterally change the label and get a no.  That just isn't

11:21

1    met here.  That's plain as day.  Sanofi is trying to blame the

2    FDA.  They are pointing to emails now.  None of that is going

3    to cut it.

4              The courts don't take away these issues from the

5    jury.  I mean, the inadequacy of the label is a question for

6    the jury.  Again, I think an important point is that our

7    obligation under the LPLA is to show that the label is

8    inadequate.  It's not to show that the label is adequate.

9              So unless the Court has any more questions for

10   me, I'm happy to address --

11             **THE COURT:**  No, that's fine.  Thank you.

12             **MR. RATLIFF:**  Your Honor, may I just address this

13   very briefly?

14             Exhibit 90 to our motion is David Kessler's

15   trial transcript, in pertinent part reading, when asked:  "I

16   think in either section, as long as it's clearly and properly

17   warned of, permanent hair loss, that's what I care about."

18   That's from the trial transcript, Exhibit 90.

19             Exhibit 93 to our motion is the November 26,

20   2019, deposition from the *Thibodeaux* case:  "I believe that

21   either in the Warnings section or the adverse events section.

22   I can give you a general thrust."  That was the language that I

23   had read earlier, that it's pretty simple that there's a risk

24   and that there's cases of permanent alopecia.

25             So I think Dr. Kessler has been very clear on

11:22

1   what the warning would look like in 2015 or what it should look
2   like per his opinion.
3           As to Mr. Mura's comment that this is
4   procedurally not the right time or they procedurally did not
5   have the right opportunity, Your Honor, why are we here today?
6   Is this not the procedurally right time to submit the kind of
7   countervailing evidence to create a genuine issue of material
8   fact, rather than to suggest that now we have to go try a
9   post-2015 or 2019 exposure?
10           I think the other thing, Your Honor, that
11   Mr. Mura was conflating is adequacy and preemption, which are
12   different concepts.  A label can be adequate.  It doesn't have
13   to be -- just because it's in two different sections or this
14   section or that section, the test for adequacy is a qualitative
15   assessment of the label as a whole.
16           Is it clear?  Unambiguous?  Accurate?  The
17   Taxotere label after 2015, no question, meets that.  Does it
18   include the precise malady that occurred?  Yes.  It includes
19   permanent alopecia.  That is there.  Is it based on the
20   reasonable scientific knowledge at the time?  Yes, that is
21   there.  So I think that is something that Mr. Mura is mixing up
22   concepts.
23           So the last thing, Your Honor, that I would say
24   is that as it relates to *Albrecht* and this idea about Warnings
25   or Adverse Reactions, I think what's interesting to look at

11:24

1   is -- *Albrecht* obviously is a preemption decision, but *Albrecht*

2   came out of the *Fosamax* MDL.  The *Fosamax* MDL, that preemption

3   decision predated an update to the Fosamax label in 2011.

4           The defendants in that case, which we cited that

5   *Fosamax* case, once they updated the label in 2011 -- much like

6   Sanofi updated the label in 2015 -- the court found that label,

7   that warning adequate as a matter of law, and that decision was

8   affirmed by the Sixth Circuit.  That's the stream of *Fosamax*

9   cases we should be looking at as it relates to adequacy, not

10  trying to pigeon in a preemption decision on that type of

11  determination.

12          So, Your Honor, that's all I have.  Thank you

13  very much for your time.

14          **THE COURT:**  Thank you all.

15          **MR. RATLIFF:**  Unless you have any questions.

16          **THE COURT:**  No.  I'm good.  I'm just grateful that we

17  survived this.  I think we are going to be having hearings like

18  this for some time at least.  We will just see.  Thank you all

19  very much.  We will be working on it, and you will hear from me

20  as soon as we have resolved it.  Thank you.

21          (Proceedings adjourned.)

22                          *  *  *

23

24

25

1                                  **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                     */s/ Toni Doyle Tusa*

                                   Toni Doyle Tusa, CCR, FCRR
10                                  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25