# EXHIBIT 4

Page 920

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)
        PRODUCTS LIABILITY        Docket No.: 16-MD-2740
        LITIGATION                Section "H(5)"
                                  September 19, 2019
                                  New Orleans, Louisiana
Relates To:  Barbara Earnest,
Case No.: 16-CV-17144

*******************************

              DAY 4, MORNING SESSION
       TRANSCRIPT OF JURY TRIAL PROCEEDINGS
   HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
           UNITED STATES DISTRICT JUDGE

APPEARANCES:
 For the Plaintiffs:   Barrios, Kingsdorf & Casteix, LLP
                       BY:  DAWN BARRIOS, ESQ.
                       701 Poydras Street
                       Suite 3650
                       New Orleans, Louisiana 70139

 For the Plaintiffs:   Gainsburgh, Benjamin, David,
                        Meunier & Warshauer, LLC
                       BY:  PALMER LAMBERT, ESQ.
                       2800 Energy Centre
                       1100 Poydras Street
                       New Orleans, Louisiana 70163-2800
```

Page 921

```
 1  APPEARANCES:
 2   For the Plaintiffs:   David F. Micelli, LLC.
                           BY:  DAVID F. MICELI, ESQ.
 3                         P. O. Box 2519
                           Carrolllton, GA 30112
 4
 5
     For the Plaintiffs:   Gibbs Law Group, LLP
 6                         BY:  KAREN BARTH MENZIES, ESQ.
                           6701 Center Drive West, Suite 1400
 7                         Los Angeles, California 90045
 8
 9   For the Plaintiffs:   Pendley, Baudin & Coffin, LLP
                           BY:  CHRISTOPHER COFFIN, ESQ.
10                         1100 Poydras Street
                           Suite 2505
11                         New Orleans, Louisiana 70163
12
13   For the Plaintiffs:   Bachus & Schanker, LLC
                           BY:  DARIN SCHANKER, ESQ.
14                         BY:  J. KYLE BACHUS, ESQ.
                           1899 Wynkoop Street
15                         Suite 700
                           Denver, Colorado 80202
16
17
     For the Plaintiffs:   Fleming, Nolen & Jez, LLP
18                         BY:  RAND P. NOLEN, ESQ.
                           2800 Post Oak Boulevard
19                         Suite 4000
                           Houston, Texas 77056
20
21
     For the Plaintiffs:   Morgan and Morgan
22                         BY:  EMILY C. JEFFCOTT, ESQ.
                           7010 S. Palafox Street, Suite 95
23                         Pensacola, Florida 32502
24
25
```

Page 922

```
 1  APPEARANCES:
 2
    For Sanofi-Aventis U.S.,
 3  LLC and Sanofi US
    Services, Inc.:        Irwin Fritchie Urquhart
 4                          & Moore, LLC
                           BY:  DOUGLAS J. MOORE, ESQ.
 5                         400 Poydras Street, Suite 2700
                           New Orleans, Louisiana 70130
 6
 7
    For Sanofi-Aventis U.S.,
 8  LLC and Sanofi US
    Services, Inc.:        Shook Hardy & Bacon, LLP
 9                         BY:  HARLEY V. RATLIFF, ESQ.
                           BY:  JON A. STRONGMAN, ESQ.
10                         2555 Grand Boulevard
                           Kansas City, Missouri 64108
11
12
    For Sanofi-Aventis U.S.,
13  LLC and Sanofi US
    Services, Inc.:        Shook Hardy & Bacon, LLP
14                         BY:  HILDY M. SASTRE, ESQ.
                           201 Biscayne Boulevard
15                         Suite 3200
                           Miami, Florida 33131
16
17
    Official Court Reporter:  Cathy Pepper, CRR, RMR, CCR
18                            Certified Realtime Reporter
                              Registered Merit Reporter
19                            500 Poydras Street, Room B-275
                              New Orleans, Louisiana 70130
20                            (504) 589-7779
                              Cathy_Pepper@laed.uscourts.gov
21
22  Proceedings recorded By mechanical stenography.  Transcript
    produced by computer-aided transcription.
23
24
25
```

Page 923

```
 1                      INDEX
 2
 3                                                  PAGE
 4
 5  ANTONELLA TOSTI, M.D.............................. 929
 6  VOIR DIRE EXAMINATION BY MR. SCHANKER................ 929
 7  DIRECT EXAMINATION BY MR. SCHANKER................... 942
 8  LUNCHEON RECESS...................... 1023
```

Page 948

1   Q. So hair loss, can you begin to educate the jury about
2   hair loss.
3   A. You know, there are many conditions that cause hair loss.
4   Hair loss is like fever. So we have a hair loss. We have to
5   find out what's causing. Then you have to distinguish between
6   hair loss and failure of hair to grow, meaning alopecia.
7   Q. So let me stop you there. I believe you said you have to
8   distinguish between hair loss and failure of hair to regrow.
9   Are those two different things?
10  A. Maybe together sometimes. Sometimes are two different
11  things. So you have -- this is a very important part of the
12  examination and the history of the patient.
13  Q. So, examination and history of a patient, is that -- that
14  is an important part, an aspect in determining the cause of
15  hair loss, is it?
16  A. Absolutely. This is important in any field of medicine.
17  You cannot make a diagnosis without seeing the patient and
18  talking to the patient, you know. Because this is very, very
19  important, in my personal experience, to talk with the patient
20  and to learn from the patient, because sometimes the patient
21  knows much more than everybody else.
22  Q. You mentioned a clinical evaluation. I want to talk to
23  you about that. Are there steps to a clinical evaluation?
24  A. You know, everybody has his own steps. So for patients
25  with hair disorder, for instance, the first thing I want to do

Page 949

1   is to look at the patient, briefly, but to understand what he
2   may have.
3        So I ask the questions that are important depending
4   on what I see. Because, you know, any hair disorder may
5   require different studies, different questions. Then --
6   Q. So just so we're clear, you said you ask the patient, you
7   talk to the patient?
8   A. I start by saying, can you please have a seat. Can I
9   please look at you one moment. I want to understand how --
10  what she has. Then I go and start my clinical history, which
11  is, as I said, very, very important. But the question I ask
12  depends on what I see, because if I see a patient with partial
13  alopecia, I ask questions that are different if I see a patient
14  who is bald, you know.
15  Q. So I want to take you through each of these steps, but is
16  it fair to say, do you first do the history, you talk to the
17  patient?
18  A. Uh-huh (affirmative response). Yes.
19  Q. Then you mentioned a clinical exam; is that right?
20  A. Yes.
21  Q. Let's go ahead and talk about the clinical exam, because
22  you just began to touch on that. What is it that you're
23  looking for and what exactly do you do in a clinical exam?
24  A. I first look at the scalp of the patient. I do something
25  that is called a pull test. This is to see if the patient is

Page 950

1   losing more hair than normal.
2        So I take, like, a tuft, usually it should be 50
3   hair, and I pull gently. If I find hair in my hands, that
4   means that is shedding more than normal. And this is important
5   because gives me some information.
6   Q. I want to take you back to the clinical exam. You started
7   to touch on something, and I may have interrupted you. So just
8   so we're all clear, the clinical exam, you're sitting with the
9   patient; is that right?
10  A. I stand up and the patient is sitting.
11  Q. Thank you.
12       And when you're doing that, this is a patient that's
13  presented to you with some issue or condition typically, I'm
14  assuming?
15       MS. SASTRE: Objection, Your Honor.
16       THE COURT: Let me just -- approach a little bit --
17  approach.
18       (WHEREUPON, at this point in the proceedings, there was
19  a conference held at the bench.)
20       THE COURT: I'm going to let her -- I think because of
21  her pretty thick accent, I might let a little bit of follow-up
22  because sometimes I'm having to look at realtime, and I know
23  the jury can't --
24       MR. SCHANKER: I'll do my best not to --
25       THE COURT: Sometimes it's just "you said that." I'm

Page 951

1   going to allow some of that simply because -- just a pretty
2   thick accent. I'm not going to let him testify.
3        MR. SCHANKER: They don't want to hear from me.
4        THE COURT: All right. Thank you.
5        (WHEREUPON, at this point in the proceedings, the bench
6   conference concluded.)
7        THE COURT: Please proceed.
8   EXAMINATION BY MR. SCHANKER:
9   Q. Yes. Clinical evaluation, what are you looking for? Are
10  there conditions -- hair conditions that you're looking for in
11  that clinical -- that initial clinical evaluation?
12  A. I look at the pattern of the hair loss. If it's patchy,
13  if it's diffuse, if it affects certain area of the scalp. I
14  look, you know, like the pull test, as I said. You see some
15  example of patchy, you see a patch.
16  Q. If you could, because these are probably new terms or
17  scientific terms here, let's just make sure we drill down on
18  these, Dr. Tosti. You mentioned patchy alopecia --
19  A. You see here is a patch; that you don't have a complete
20  loss all over the scalp. You have patches. And here you have
21  a kind of diffuse, you know. And here, in this one, the
22  hair loss is on the top of the scalp. We call pattern
23  alopecia.
24  Q. Doctor, you indicated -- you explained to us what the pull
25  test was. And then we have a dermoscopy. You shared with us

Page 960

1  A. You see here that you have a space between the hair.
2  Normally you should have one hair close to the other one.
3  Q. You also mentioned hair thinning. Is there a distinction
4  between hair density and hair thinning?
5  A. You know, they may go together, but here you see that you
6  have less hair -- let's see if I can make it -- this area that
7  have no hair. Okay? And then you see that this hair, for
8  instance, is much thinner than this one. So, you have some
9  hair that became very loose, that became thinner, miniaturized.
10       THE REPORTER: What did you say?
11       THE WITNESS: Miniaturized.
12  EXAMINATION BY MR. SCHANKER:
13  Q. So we see some -- just so I'm clear, too, along with
14  Cathy, we see some hairs that are miniaturized; is that right?
15  A. Yes. Then we see all these yellow dots are openings
16  without the hair. The hair is so small that you don't see it.
17  Q. Doctor, working through the steps --
18       MS. SASTRE: Objection.
19       THE COURT: Yes. I think we need to approach. Was
20  there an objection?
21       MS. SASTRE: Yes.
22       (WHEREUPON, at this point in the proceedings, there was
23  a conference held at the bench.)
24       MS. SASTRE: The yellow dots was taken out of the
25  slide. It was my understanding she was told not to talk about

Page 961

1  it.
2       THE COURT REPORTER: I can't hear you.
3       MS. SASTRE: The yellow dots issue, we argued that this
4  morning. I know you said you took it out of the slides. I
5  would assume she was told not to talk about it as well. Same
6  objection. It's not in her report. That's why they took it
7  out of the slides.
8       THE COURT: I'm going to overrule. I think she
9  was just --
10       MS. SASTRE: Well, I'm just afraid, Your Honor, that --
11  they agreed to take it out of the slides because it's not in
12  her report, so she just can't keep talking about something
13  that's not in her report, Judge. Now, I'm not suggesting there
14  is anything that counsel did incorrectly.
15       MR. SCHANKER: I'm not going to ask her questions about
16  it. I'm not going to elicit any testimony --
17       THE COURT: You've changed the slide?
18       MR. SCHANKER: Yeah, I went through and redacted it.
19       MS. SASTRE: Because you don't have it electronically?
20  You had to cross it out?
21       MR. SCHANKER: I just crossed it out. I've been told
22  that Harley agreed to that.
23       MS. SASTRE: Okay. There's nothing we can do. Okay.
24  Thanks.
25       (WHEREUPON, at this point in the proceedings, the bench

Page 962

1  conference concluded.)
2       THE COURT: Please proceed.
3       MR. SCHANKER: Thank you, Your Honor.
4  EXAMINATION BY MR. SCHANKER:
5  Q. So working our way through the clinical evaluation,
6  Dr. Tosti, after the dermoscopy and analyzing your findings,
7  what -- what did you do next as far as your analysis? What are
8  the steps? What came next?
9  A. After that, I -- she already had biopsy results because
10  she had the biopsy before, so I looked at her biopsy results.
11  And I didn't order any lab because she was not shedding hair or
12  she had no features that suggested any hormonal problem.
13  Q. We'll talk about those biopsy results later. But what I
14  would like to move on to now -- and just to clarify, you didn't
15  order the lab tests?
16  A. No, I did not because she didn't need.
17  Q. Doctor, are you familiar with a phrase differential
18  diagnosis?
19  A. Yes, I do.
20  Q. And could you please explain to the jury what -- for a
21  medical doctor, what a differential diagnosis is.
22  A. You know, when you see a patient, you see a condition in
23  your head came, all the conditions that may look similar, and
24  you have -- one by one, compare and decide. This is all in
25  medicine for any type of problem.

Page 963

1  Q. And just so I'm clear, is that -- how does a doctor use a
2  differential diagnosis in her practice?
3  A. To -- use a differential diagnosis to rule out the other
4  possible diseases. Because you have, for instance, somebody
5  who complains that he has pain in the chest, and you have to
6  rule out all possible causes of chest pain. The same is for
7  hair. I see a diffuse alopecia, I have to exclude the other
8  possible causes of diffuse alopecia.
9  Q. And did you perform a differential diagnosis on Barbara?
10  A. Yes, I did.
11  Q. And just so we're clear, I understand you were educated in
12  Europe as a medical doctor. Do they do differential diagnoses
13  in Europe?
14  A. They do, but in a different way. So, in Europe, you
15  usually go to the diagnoses and then exclude. In the
16  United States, we go one by one. Now I do go around in the
17  United States, we go one by one.
18  Q. And which way did you do it in Barbara's case?
19  A. I did the United States way.
20  Q. And is that what you're going to share with us here?
21  A. Yes.
22  Q. So, based upon the condition that you found on
23  Barbara Earnest's scalp, what did you consider in working
24  through your differential diagnosis?
25  A. I consider those conditions that cause diffuse hair loss.

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)      *   Docket No.: 16-MD-2740
PRODUCTS LIABILITY LITIGATION    *   Section "H(5)"
                                 *   New Orleans, Louisiana
Relates to: Barbara Earnest      *   September 19, 2019
Case No.: 16-CV-17144            *
* * * * * * * * * * * * * * * *

DAY 4 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:    Barrios Kingsdorf & Casteix, LLP
                       BY: DAWN M. BARRIOS, ESQ.
                       701 Poydras Street
                       Suite 3650
                       New Orleans, Louisiana 70139

For the Plaintiffs:    Gainsburgh Benjamin David Meunier
                         & Warshauer, LLC
                       BY: M. PALMER LAMBERT, ESQ.
                       1100 Poydras Street
                       Suite 2800
                       New Orleans, Louisiana 70163

For the Plaintiffs:    Pendley Baudin & Coffin, LLP
                       BY: CHRISTOPHER L. COFFIN, ESQ.
                       1100 Poydras Street
                       Suite 2505
                       New Orleans, Louisiana 70163

OFFICIAL TRANSCRIPT

## Page 2

APPEARANCES:

For the Plaintiffs:    Gibbs Law Group, LLP
                       BY: KAREN BARTH MENZIES, ESQ.
                       6701 Center Drive West
                       Suite 1400
                       Los Angeles, California 90045

For the Plaintiffs:    Bachus & Schanker, LLC
                       BY: J. KYLE BACHUS, ESQ.
                           DARIN L. SCHANKER, ESQ.
                       1899 Wynkoop Street
                       Suite 700
                       Denver, Colorado 80202

For the Plaintiffs:    Fleming Nolen & Jez, LLP
                       BY: RAND P. NOLEN, ESQ.
                       2800 Post Oak Boulevard
                       Suite 4000
                       Houston, Texas 77056

For the Plaintiffs:    DAVID F. MICELI, LLC
                       BY: DAVID F. MICELI, ESQ.
                       Post Office Box 2519
                       Carrollton, Georgia 30112

For the Plaintiffs:    Morgan & Morgan, P.A.
                       BY: EMILY C. JEFFCOTT, ESQ.
                       700 S. Palafox Street
                       Suite 95
                       Pensacola, Florida 32502

For the Sanofi         Irwin Fritchie Urquhart
Defendants:              & Moore, LLC
                       BY: DOUGLAS J. MOORE, ESQ.
                       400 Poydras Street
                       Suite 2700
                       New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

## Page 3

APPEARANCES:

For the Sanofi         Shook Hardy & Bacon, LLP
Defendants:            BY: HARLEY V. RATLIFF, ESQ.
                           JON A. STRONGMAN, ESQ.
                       2555 Grand Boulevard
                       Kansas City, Missouri 64108

For the Sanofi         Shook Hardy & Bacon, LLP
Defendants:            BY: HILDY M. SASTRE, ESQ.
                       201 Biscayne Boulevard, Suite 3200
                       Miami, Florida 33131

Official Court Reporter:   Jodi Simcox, RMR, FCRR
                           500 Poydras Street
                           Room HB-275
                           New Orleans, Louisiana 70130
                           (504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

OFFICIAL TRANSCRIPT

## Page 4

I N D E X

                                                      Page

ANTONELLA TOSTI
    Cross-Examination By Ms. Sastre:                  1029
    Redirect Examination By Mr. Schanker:             1109

MICHAEL EARNEST
    Direct Examination By Mr. Schanker:               1130
    Cross-Examination By Mr. Moore:                   1141
    Redirect Examination By Mr. Schanker:             1146

ELLEN FEIGAL
    Voir Dire By Mr. Miceli:                          1149

OFFICIAL TRANSCRIPT

1 (Pages 1 to 4)

## Page 53

1076

ANTONELLA TOSTI - CROSS

2:23PM 1  Q.  Okay.  Let me -- let's take steps.  Okay?  Let's try and
2:23PM 2  go through what you just said.
2:23PM 3  A.  Yes.
2:23PM 4  Q.  Did you ask the lawyers that hired you for all the photos
2:23PM 5  of Mrs. Earnest from when she lost her hair until you saw her?
2:24PM 6         MR. SCHANKER:  Okay.  Asked and answered.
2:24PM 7         THE WITNESS:  Yes.
2:24PM 8         THE COURT:  It has been asked and answered.
2:24PM 9  BY MS. SASTRE:
2:24PM10  Q.  And what did you receive?
2:24PM11  A.  I received pictures of her before the chemotherapy.  I
2:24PM12  think -- I don't recall exactly because I thought were not
2:24PM13  important.  I received pictures of her just after the
2:24PM14  chemotherapy when she had no hair at all.  And then I didn't
2:24PM15  receive any other pictures except for the pictures of 2018.
2:24PM16  Q.  Okay.  So the stack of photographs that was produced in
2:24PM17  this case, they were not provided to you by plaintiff's
2:24PM18  counsel?
2:24PM19         MR. SCHANKER:  Objection, Your Honor.
2:24PM20         THE WITNESS:  Which photographs?
2:24PM21         MR. SCHANKER:  Asked and answered.
2:24PM22         THE COURT:  Sustained.  Sustained.
2:24PM23         You don't need to answer that question.
2:24PM24  BY MS. SASTRE:
2:25PM25  Q.  Let me ask you this:  Would it surprise you to learn that

OFFICIAL TRANSCRIPT

## Page 54

1077

ANTONELLA TOSTI - CROSS

2:25PM 1  there are photographs of Mrs. Earnest after her chemotherapy
2:25PM 2  from 2014 and 2015 and 2016 and 2017?
2:25PM 3  A.  I would be very upset to learn that, but I -- I -- that's
2:25PM 4  my answer.
2:25PM 5  Q.  Because by the time you saw Mrs. Earnest, it was seven
2:25PM 6  years after her chemotherapy had been completed; true?
2:25PM 7  A.  Yes.
2:25PM 8  Q.  And we can agree, Doctor, that was seven years after
2:25PM 9  Mrs. Earnest had lost her hair; true?
2:26PM10  A.  Yes.
2:26PM11  Q.  Okay.  Let's just talk about alopecia for a couple of
2:26PM12  minutes.  All right?
2:26PM13  A.  Yes.
2:26PM14  Q.  Change topics.
2:26PM15  A.  Okay.
2:26PM16  Q.  Okay.  You'd agree with me there's multiple types of
2:26PM17  alopecia; true?
2:26PM18  A.  Absolutely.
2:26PM19  Q.  And you'd agree with me that diagnosing the type of
2:26PM20  alopecia that a patient has, it can be difficult?
2:26PM21  A.  Absolutely.  You need to look at the -- see the patient.
2:26PM22  You do not make diagnosis on pictures.
2:26PM23  Q.  Okay.  And it's possible for a dermatologist to confuse
2:26PM24  one type of alopecia for another; true?
2:26PM25  A.  Absolutely.

OFFICIAL TRANSCRIPT

## Page 55

1078

ANTONELLA TOSTI - CROSS

2:26PM 1  Q.  Now, one of the types of alopecia you spoke with counsel
2:27PM 2  about is called androgenetic alopecia; true?
2:27PM 3  A.  Yes.
2:27PM 4  Q.  Okay.  And I think that's also sometimes called female
2:27PM 5  pattern hair loss?
2:27PM 6  A.  Yes.
2:27PM 7  Q.  And there are a number of risk factors for it; true?
2:27PM 8  A.  I didn't understand the question.  Sorry.
2:27PM 9  Q.  I'm sorry.  There are a number of risk factors for
2:27PM10  androgenetic alopecia?
2:27PM11  A.  No.
2:27PM12  Q.  Okay.  Well, let's go through a couple things.
2:27PM13         Does age increase the probability for a patient to
2:27PM14  experience androgenetic alopecia?
2:27PM15  A.  Yes.
2:27PM16  Q.  Okay.  And does the data show that 50 percent of women may
2:27PM17  develop androgenetic alopecia after the age of 50?
2:27PM18  A.  Yes.
2:27PM19  Q.  Okay.  And changes in a woman's hormone level are also a
2:27PM20  risk factor for androgenetic alopecia?
2:27PM21  A.  Yes.
2:27PM22  Q.  Including what we talked about earlier, one of the main
2:27PM23  points in a woman's life where her hormone levels change is
2:27PM24  menopause; right?
2:27PM25  A.  Yes.

OFFICIAL TRANSCRIPT

## Page 56

1079

ANTONELLA TOSTI - CROSS

2:28PM 1  Q.  Now -- sorry.  Just one second.  I'm going to show you
2:28PM 2  something.
2:28PM 3         Do you have it?  Maybe I have a copy up here.  Okay.
2:28PM 4         Well, Doctor, let me show you -- it's got a little
2:28PM 5  bit of my writing on it, but I'll try and capture the part that
2:28PM 6  doesn't -- so -- so the picture -- well, first, let's do this.
2:29PM 7         The picture on the left is Mrs. Earnest; correct?
2:29PM 8  A.  Yes.
2:29PM 9  Q.  Okay.  And I think we can agree -- and I know you talked
2:29PM10  about this a bit, but I want to be clear.
2:29PM11         There is more hair on the back and the sides of
2:29PM12  Mrs. Earnest's scalp than there is on the top; true?
2:29PM13  A.  True.
2:29PM14  Q.  Okay.  And the -- and the picture of her here depicts
2:29PM15  that; correct?
2:29PM16  A.  The picture?
2:29PM17  Q.  Yeah.  The picture of Mrs. Earnest, we can see that
18  there's more hair in the back and on the sides; true?
2:29PM19  A.  Very little more.
2:29PM20  Q.  Okay.  Well -- and you see the picture on the right is of
2:30PM21  endocrine-induced hair loss.
2:30PM22         Are you familiar with that photo?  Have you seen it
2:30PM23  before?
2:30PM24  A.  No.
2:30PM25  Q.  Okay.

OFFICIAL TRANSCRIPT