Case 2:16-md-02740-JTM-MBN   Document 10815   Filed 07/21/20   Page 1 of 20

1

```
09:58:37   1                   UNITED STATES DISTRICT COURT
                                EASTERN DISTRICT OF LOUISIANA
           2    ****************************************************************
                IN RE:   TAXOTERE (DOCETAXEL)
           3    PRODUCTS LIABILITY LITIGATION
                                                      Docket No. 16-MD-2740
           4                                          Section "H"
                                                      New Orleans, Louisiana
           5                                          Wednesday, March 11, 2020
                [THIS DOCUMENT RELATES TO:
           6    CASE NO. 16-CV-15397 JUNE PHILLIPS
                and ALL CASES]
           7    ****************************************************************

           8                    TRANSCRIPT OF MOTION PROCEEDINGS
                        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
           9                      UNITED STATES DISTRICT JUDGE

          10
                APPEARANCES:
          11
                FOR THE PLAINTIFFS:              MORRIS BART & ASSOCIATES
          12                                     BY:  RICHARD ROOT, ESQ.
                                                 Pan American Life Center
          13                                     601 Poydras St., 24th Floor
                                                 New Orleans, LA 70130
          14
                                                 BACHUS & SCHANKER, LLC
          15                                     BY:  DARIN L. SCHANKER, ESQ.
                                                 1899 Wynkoop St., Suite 700
          16                                     Denver, CO 80202

          17                                     PENDLEY BAUDIN & COFFIN
                                                 BY:  CHRISTOPHER L. COFFIN, ESQ.
          18                                     2505 Energy Centre
                                                 1100 Poydras St.
          19                                     New Orleans, LA 70163

          20                                     GAINSBURG BENJAMIN DAVID
                                                 MEUNIER & WARSHAUER
          21                                     BY:  M. PALMER LAMBERT, ESQ.
                                                 1100 Poydras St., Suite 2800
          22                                     New Orleans, LA 70163

          23

          24

          25
```

```
 1   FOR SANOFI S.A.:              IRWIN FRITCHIE URQUHART & MOORE
                                   BY:  DOUGLAS J. MOORE, ESQ.
 2                                      KELLY E. BRILLEAUX, ESQ.
                                   400 Poydras St., Suite 2700
 3                                 New Orleans, LA 70130

 4                                 SHOOK HARDY & BACON
                                   BY:  JON A. STRONGMAN, ESQ.
 5                                 2555 Grand Blvd.
                                   Kansas City, MO 64108
 6

 7

 8   Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
                                   500 Poydras Street, B-275
 9                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
10

11
        Proceedings recorded by mechanical stenography, transcript
12   produced by computer.
```

P R O C E E D I N G S

(WEDNESDAY, MARCH 11, 2020)

(STATUS CONFERENCE)

(OPEN COURT.)

THE COURT: Good morning. I have received your order that you would like to argue in and that's fine.

Before we get started, let me just say that I have spent lots of time and you have read lots of opinions coming from me, and I think they're pretty consistent how I read contra non valentem, what I think learned intermediary means, and how I view causation. So I would hope that you don't read what I've already said back to me, and spend some time just telling me what the uncontested facts are in each of these that I should focus on. Are we good?

MR. MOORE: I believe so, your Honor. Thank you. Good morning. Douglas Moore on behalf of Sanofi.

And thank you for your Honor's indulgence on proceeding in the sort of batting ordering that we proposed, starting first with a Motion For Summary Judgment Based on Warnings Causation in the June Phillips case. And in thinking about what I would present to your Honor in the time that I have for this motion, I did think about a comment that you've made to us many times, and that is any time you make an important ruling, 50 percent of the litigants are dissatisfied.

THE COURT: Oh, yeah.

```
10:00:01   1              MR. MOORE:  And certainly with respect to the learned
10:00:03   2   intermediary doctrine, we proposed a framework to your Honor that
10:00:08   3   was different than what your Honor ultimately imposed in the
10:00:12   4   Earnest case, in the Mills case and in this litigation.  And so
10:00:17   5   rather than try and convince your Honor to do something different
10:00:20   6   than you've already done -- because we've seen that doesn't work
10:00:24   7   very well, we tried that, both sides have learned that lesson -- I
10:00:29   8   thought it would be more sensible to respect the framework that
10:00:34   9   your Honor has given us and try and demonstrate to you why we think
10:00:38  10   there is no triable issue of fact under that framework with the
10:00:41  11   facts specific to this case.
10:00:43  12              THE COURT:  Right.
10:00:44  13              MR. MOORE:  And so consistent with your request, I am
10:00:47  14   going to try and focus my comments there.
10:00:49  15              But before I get to that point, I think it's important to
10:00:56  16   sort of identify what our responsibilities here are under Rule 56
10:01:01  17   in a federal court.  My job as the party who does not have the
10:01:04  18   burden at trial is simply to demonstrate that they lack evidence on
10:01:08  19   an essential element of their claim.  Their responsibility at that
10:01:11  20   point is to come forward with specific evidence, specific facts.
10:01:16  21              The evidence has to be significantly probative, can't be
10:01:23  22   mere assertion, can't be colorable, we can't simply say that there
10:01:27  23   is a fact issue or this is an issue that should be decided by the
10:01:31  24   jury because there's -- it's in by its nature a fact issue.  It
10:01:37  25   is -- there has to be evidence and they have to come forward with
```

```
10:01:39   1   that evidence and the time to do it is now.
10:01:44   2              So what is the framework that your Honor established for
10:01:46   3   us?  I've just put it on the screen here so that we know precisely
10:01:52   4   what we're talking about.  I think that this particular framework
10:01:56   5   in the context of this case with this evidence is simply not
10:02:01   6   satisfied by the evidence that exists in this case.  They have not
10:02:04   7   come forward with evidence that establishes the framework that your
10:02:08   8   Honor established; which focuses again on what happens in that
10:02:12   9   room, how would that discussion change, what would the plaintiff
10:02:16  10   have said, what options would the doctor have offered, what would
10:02:19  11   the doctor have said about those options in terms of their side
10:02:22  12   effects, their risks, their benefits, and then what would the
10:02:26  13   plaintiff have asked for.  And then ultimately, as you confirmed in
10:02:29  14   the Gayhand decision most recently, it has to end with the doctor
10:02:35  15   saying he would go ahead and prescribe that medicine if given those
10:02:38  16   options to the plaintiff, that's where it has to end.
10:02:41  17              And so to understand why we don't have evidence in the
10:02:44  18   June Phillips case to establish those elements of their case, it's
10:02:47  19   important to know a little bit about the June Phillips case.  She
10:02:52  20   was diagnosed in October of 2013, so this is about two and a half
10:02:56  21   years after Barbara Earnest's diagnosis.  She was diagnosed with
10:03:00  22   ER-positive/PR-positive node positive disease, that means that the
10:03:05  23   tumor is outside, the cancer has spread from the tumor, it's into
10:03:09  24   the lymph nodes now, and she had a particular pathological finding
10:03:13  25   called HER2-positive.  If you're a breast cancer patient and you're
```

1  waiting for your pathology to come back, you do not want it to say
2  HER2-positive. It is a very aggressive type of cancer. She was
3  staged at IIB with a high risk of recurrence; 40 to 50 percent
4  according to her oncologist. And recurrence in this clinical
5  setting, according to the testimony in this case, means that it is
6  incurable. So for her, back in October of 2013, it is literally a
7  coin toss.
8        And so how does Dr. Sonnier address a person who has
9  HER2-positive disease? And you'll remember this from the Earnest
10 trial, and in the Earnest trial we were on the left side of the
11 page with all of these various options and regimens that could have
12 been offered that would have been better than Taxotere, according
13 to my adversaries. But for HER2-positive disease, the plaintiffs
14 are required to be on the right side, and that is they're required
15 to take a medicine called Herceptin, the generic name is
16 Trastuzumab -- I practiced that several times this morning, but
17 I'll call it Herceptin because it's easier to pronounce -- and all
18 of the regimens for HER2-positive disease require a Herceptin
19 containing regimen for HER2-positive disease.
20       And you can see up on this side of the equation that
21 there are far fewer options under the NCCN guidelines. And this is
22 certainly consistent with Dr. Sonnier's testimony that I'll get to
23 in a second. So in looking at these questions, under the Court's
24 framework, you know, what would have happened if the warning was
25 different? What would he have said to her about hair loss, what

1  would she have said about other options, what would he have
2  identified those options to be, what are the risks and benefits of
3  that, and what decision would ultimately be made by the plaintiff
4  and by the prescribing doctor.
5         So in the opposition that we received, the argument was,
6  it says specifically he would have recommended a non-anthracycline
7  therapy in light of her concerns about permanent hair loss and his
8  concerns about cardiac toxicity.  And so the reason the focus is on
9  a non-anthracycline therapy, it's not identified, we don't know
10 what medicines they're talking about, we don't know the risks or
11 benefits of those medicines.  Dr. Sonnier talked about it a little
12 bit, and I am going to show you that testimony in just a second.
13 But the reason we're talking about non-anthracycline therapy in
14 June Phillips' case is because she has a pre-existing cardiac
15 abnormality.  And because she had this cardiac abnormality,
16 anthracycline-based therapy - that's doxorubicin, which is
17 Adriamycin, the "A", and also epirubicin, which is the "E", we
18 heard about FEC in the other trial, we see that in the guidelines,
19 that's also an Anthracycline, those are not options for someone in
20 June Phillips' clinical scenario.
21        So to balance this statement against the testimony, I
22 thought it would make sense just to quickly walk through it.  This
23 was Ms. Phillips' lawyer at the deposition.  He asks:  "There was
24 another alternative?  Ultimately the client, the patient's choice
25 to make that decision, would you agree with that?"  And

```
10:06:35  1   Dr. Sonnier -- I make a form objection -- Dr. Sonnier says, "I
10:06:40  2   wouldn't agree with that wholeheartedly."
10:06:43  3              And then the lawyer doubles down, "The client makes the
10:06:47  4   ultimate decision about which regimen to go forward with?  I
10:06:51  5   wouldn't say that."  And the reason he wouldn't say that is because
10:06:54  6   in her clinical circumstance, the proposal that was being made in
10:06:58  7   the deposition was you can give her AC followed by Taxol.  And AC
10:07:04  8   is Adriamycin and what he said in her circumstances, I would not
10:07:08  9   give it.
10:07:09 10              And then this is the testimony that they rely upon to
10:07:12 11   suggest that he would have recommended a non-anthracycline therapy.
10:07:18 12   He says, "If she wanted to pursue an anthracycline course, her -- I
10:07:22 13   think that at that time, knowing what I know, would have known been
10:07:24 14   going with a non-anthracycline therapy, which would have lessened
10:07:28 15   the efficacy and would not have reduced her risk of recurrence to
10:07:34 16   the same degree of TCH, and he stops there.
10:07:37 17              Then the discussion continues about whether AC plus Taxol
10:07:43 18   is an available option.  And he continues.
10:07:46 19              "A. This would have been another alternative."  And he
10:07:48 20   says, "that I would have felt was very risky because of the cardiac
10:07:53 21   toxicity.
10:07:55 22              Q. And would she have chosen to go with that alternative
10:07:58 23   that would have been okay with you as long as you discussed all of
10:08:02 24   the side effects, the risks, and everything associated?
10:08:04 25              A. I don't think that would be okay with me."
```

```
10:08:07  1              Doubles down again:
10:08:08  2              "Q. But it's still her decision, right?
10:08:10  3              A.  I wouldn't say that.  It's not right.  Whether or not
10:08:15  4   a person -- whether or not a person would get that is based on our
10:08:20  5   recommendation and our ordering, I would say that that's not --
10:08:25  6   that that's not the case."
10:08:26  7              And so what Dr. Sonnier is saying in this disposition is
10:08:29  8   that June Phillips could not have come in and said give me an
10:08:35  9   Adriamycin-containing course.  And the reason that's important --
10:08:42 10   if my clicker would work -- oops, I'm going the wrong way.
10:08:58 11              The reason that's important is you cannot give Taxol in a
10:09:05 12   Herceptin-containing regimen without an anthracycline.  So what we
10:09:09 13   have, what we end up with, if a plaintiff can't be prescribed
10:09:14 14   anthracycline and she says she is not going to take docetaxel, then
10:09:18 15   AC followed by T is out; TCH is out; docetaxel and the
10:09:25 16   anthracycline in that one, that one is out; AC followed docetaxel,
10:09:28 17   that one's out; she didn't have neoadjuvant treatment, that's where
10:09:33 18   you have the surgery after the chemotherapy, she didn't have that.
10:09:35 19              So what we're left with is this one option chemotherapy
10:09:38 20   followed by trastuzumab sequentially, that's the Herceptin.  So
10:09:44 21   what is that regimen?  Let me clear this.
10:09:59 22              So what is the regimen that he said he would have
10:10:03 23   prescribed?  He was never even asked if he would prescribe another
10:10:07 24   regimen other than TCH for this patient.  He certainly never
10:10:11 25   testified about what the risks or benefits of that particular
```

```
10:10:15   1   regimen would have been.  And there's certainly no testimony that
10:10:18   2   after he had this other discussion with the plaintiff that he would
10:10:21   3   actually have written the prescription.
10:10:27   4             This is all he says about this non-anthracycline course,
10:10:32   5   is it would not have reduced her risk of recurrence.  And that's
10:10:34   6   not the testimony that is necessary to meet the framework that your
10:10:38   7   Honor established.
10:10:40   8             I will get this going in the right direction at some
10:10:43   9   point.  Oh, I'm hitting the top and bottom, that's why.  Here we
10:10:50  10   go.
10:10:50  11             So this is what his testimony shows:  He wouldn't have
10:10:54  12   given her a different medicine.
10:10:56  13             I want to focus two last points on the framework that
10:10:59  14   your Honor gave us and then I will turn it over to my adversaries.
10:11:02  15   One of the other points that you asked them to establish is how
10:11:06  16   would the doctor have advised the patient of the risk of permanent
10:11:10  17   alopecia associated with Taxotere.  And we've had this litigation
10:11:12  18   advanced from the beginning that there is these two interchangeable
10:11:16  19   options, Taxotere and Taxol, one has the risk of permanent hair
10:11:21  20   loss, one does not.
10:11:21  21             We know that the evidence in the case has not borne that
10:11:25  22   out, and that there is a risk of permanent chemotherapy induced
10:11:28  23   alopecia with all sorts of medicines, it's there with the A, it's
10:11:31  24   there with the C, it's there with Taxol.  Dr. Tosti's recent
10:11:36  25   article in which she was an author showed a study which actually
```

1  had more cases with Taxol than with Taxotere.  So this isn't really
2  a situation where we have risk versus no risk.
3          But in this doctor's experience, what would he have said
4  about the risk of permanent hair loss with these medicines?  He's
5  known about it since his residency, the incomplete hair regrowth,
6  it doesn't come back the same way.  And in his experience, it's
7  comparable between Taxotere and Taxol.  So what evidence is there
8  based on his testimony about what his experience is that he would
9  have actually told her, "Hey, there is a higher risk," or that the
10 risk is exponentially higher.  There is no testimony to that effect
11 that would have ever put her in a position to ask for other
12 regimens.
13         And then lastly, what's the decision that the plaintiff
14 would have ultimately made?  We asked her, "Wouldn't you want to
15 know about the side effects of these other medicines?  You would
16 want to know how it would affect your heart?  So without that
17 information you can't say for sure that you would have taken the
18 other drug?  Her answer was, "I can't.  No, I can't say for sure
19 what I would have done.  I don't know what I would have done."
20         She testified that she didn't know anything about any of
21 the side effects of this other drug she was testifying that she
22 would have taken.
23         And the reason we think that's important, we've cited in
24 our papers, and I put it up on the screen, your Honor's decision in
25 a *Motrin* case.  And in that case, the plaintiff did not testify

```
10:13:11   1   that she would have done something differently, and in that case
10:13:15   2   under those circumstances, it entitled the defendant to judgment as
10:13:18   3   a matter of law.
10:13:18   4            So to sum up, we don't believe that any of the elements
10:13:24   5   of the Court's framework exist, and the time for evidence on that
10:13:30   6   framework to exist is now.  And, therefore, we think that we're
10:13:35   7   entitled to judgment as a matter of law, Judge.
10:13:37   8            THE COURT:  Thank you.  Mr. Root.
10:13:40   9            MR. ROOT:  Good morning, your Honor.  Richard Root for
10:13:43  10   June Phillips.
10:13:46  11            I do, in fact, agree with the four-part discussion of the
10:13:51  12   different elements of learned intermediary in this case in
10:13:56  13   causation.  The first one being whether and how the doctor would
10:14:00  14   advise the patient of risk of permanent hair loss.  In Exhibit B
10:14:05  15   there are several instances where the doctor describes how he has
10:14:10  16   that initial meeting with the patient and he goes over the
10:14:13  17   therapies, the benefits, the risks, and he certainly is a competent
10:14:18  18   physician who would have that discussion and did have that
10:14:21  19   discussion.
10:14:21  20            On page 33 of Exhibit B he is asked, "Once you became
10:14:26  21   known of the stronger warning about permanent alopecia, you started
10:14:30  22   notifying your patients?"  And he said, "That's fair, yes."  And
10:14:34  23   certainly later on he said, in page 38 of Exhibit B, he's asked,
10:14:39  24   "You disclosed to us that it altered your disclosures in which
10:14:42  25   you've made to your patients and you now report to them that there
```

10:14:46  1   could be permanent hair loss associated with Taxotere; is that
10:14:49  2   right?  Yes."  So as to the first question, he does have a
10:14:52  3   discussion and he does and would have told them about the permanent
10:14:56  4   hair risk -- permanent hair loss risk.
10:14:59  5         Second one, when a patient would have inquired about
10:15:03  6   other options; and certainly June would have, she is a very strong
10:15:07  7   woman and very involved in her health care.  Her exhibit,
10:15:09  8   Exhibit C, when they talk about her understanding of risk of
10:15:14  9   permanent hair loss there is this question from defense counsel,
10:15:18 10   "My question is, hypothetically, if it did, would you have refused
10:15:21 11   to take the drug?"  I would have -- and Ms. Phillips answered, "I
10:15:26 12   would have to find out what the options were of the other drugs."
10:15:28 13   And later asked her opinion, she goes, "My opinion is that if there
10:15:34 14   was a different kind of chemo other than Taxotere that hadn't
10:15:39 15   caused permanent hair loss, I should have been given the option of
10:15:42 16   taking that.  But I wasn't given that option because the doctors
10:15:46 17   didn't know that."
10:15:47 18         THE COURT:  But, Mr. Root, doesn't that beg the question,
10:15:51 19   was there another option that was not dangerous to this woman?  And
10:15:54 20   I understand because I've said that from the beginning, this is a
10:15:57 21   joint decision, and when the doctor is saying, "these are the risks
10:16:02 22   with this" and you're sitting there and you're trying to decide how
10:16:07 23   you're going to proceed, you sometimes say, "Well, Doctor, what
10:16:12 24   else do you have in that toolbox?  Tell me what other options I
10:16:17 25   have, and then let me do, with your guidance, a risk/benefit

```
10:16:21   1   analysis and make the decision."  And was there anything else in
10:16:26   2   his toolbox at that time?
10:16:29   3              MR. ROOT:  Well, that just moves to the third question,
10:16:32   4   your Honor, and that's that what would the doctor have recommended.
10:16:36   5   And a couple of points here.  First, the NCCN guidelines are
10:16:46   6   guidelines.  Dr. Sonnier himself in his deposition says it's not
10:16:50   7   the Bible.
10:16:51   8              THE COURT:  Right.
10:16:52   9              MR. ROOT:  So there's alternate treatments he can make.
10:16:54  10   Now, I am the first to admit, I would have loved to have had a more
10:16:58  11   robust discussion of the various options that the patient had in
10:17:03  12   that deposition, but there are three or four different places where
10:17:06  13   he's asked about other treatments, that's with an S, that's plural,
10:17:10  14   and he agreed, yes, there are.  Now, there's not a complete listing
10:17:15  15   of all of them and it's true they discussed Adriamycin and some its
10:17:20  16   negatives having to do with toxicity, but that goes to the entire
10:17:26  17   premise here, your Honor, of preference versus another option
10:17:31  18   available.  The fact that there is a preferred option the doctor
10:17:34  19   wants is really not the only question.  The question is are there
10:17:38  20   other chemotherapy options available that would help with their
10:17:42  21   chance of survival and yet are acceptable to the physician, because
10:17:46  22   there's no requirement under the law that we have to give the
10:17:50  23   doctor's preferred regimen.
10:17:53  24              THE COURT:  No.
10:17:54  25              MR. ROOT:  And so if you gave one of the chemotherapy
```

1  drugs, that's better than none.  There were certainly chemotherapy
2  drugs that existed for many decades prior to every new regime that
3  comes out that are available, not as successful perhaps.  But
4  surgery is the main key for surviving cancer and then you get an
5  additional boost when you have adjuvant therapy.
6          And so the question is, is there something they can do to
7  help her, and they talked about the drug treatment that she was on
8  that's helpful, but also he talks about taxanes.  There's a cite in
9  here where he talks about different alternatives and one of them is
10 Taxol.  He doesn't say that treatment with Taxol is unacceptable.
11 He says that I would -- in a regimen of TCH, which had just been
12 approved, they're generally, the three were cyclophosphamide,
13 Taxotere, I should say a taxane, which is Taxol or Taxotere, and
14 Adriamycin in talking about TAC.  So he doesn't like --
15          THE COURT:  But she can't take Adriamycin.
16          MR. ROOT:  He doesn't like Adriamycin, that's for sure,
17 but you can give Taxol; you can give Taxotere and have hair loss or
18 have Taxol without hair loss.  So you don't have to give TAC, you
19 could give some components of TAC.
20          And in all due respect to Mr. Moore, that's a heck of a
21 lot of his medical testimony to you that doesn't appear in the
22 record of what the options are.  Dr. Sonnier says that those
23 guidelines are not the Bible.  You can give other options.  He said
24 three different times in his deposition that there are other
25 treatments, with an "S", available.  So we know that's the case,

```
10:19:38   1   your Honor.
10:19:39   2              And I wish there were a greater discussion about what the
10:19:43   3   different options were in the deposition, but the deposition does
10:19:46   4   say that there are other treatments available.  And he does not say
10:19:50   5   anywhere in there that there are no treatments I would give her.
10:19:53   6              And so there certainly is a genuine issue of fact as to
10:19:58   7   what his other treatments might be, but we certainly have evidence
10:20:02   8   of other treatments being acceptable to the physician and were
10:20:06   9   available because he says expressly, yes, there were other options
10:20:09  10   available.  And I think that meets the element of proof for
10:20:13  11   purposes of summary judgment, and I'm sure they'll have an expert
10:20:18  12   to say that no other treatment is acceptable and there's nothing
10:20:22  13   else she could do.
10:20:23  14              THE COURT:  But isn't that your burden at summary
10:20:26  15   judgment?
10:20:29  16              MR. ROOT:  I think my burden is to show that there's
10:20:31  17   other chemotherapy treatments available and the doctors testified
10:20:34  18   that that was the case, your Honor.  And by agreeing multiple times
10:20:40  19   to other treatments available, not just TAC, that's a treatment;
10:20:43  20   but there's other treatments, because, of course, the guidelines
10:20:46  21   are not the Bible.  And so we know that there's --
10:20:49  22              THE COURT:  I know, we heard that last time.
10:20:53  23              MR. ROOT:  So we know there's a universe of treatments
10:20:55  24   available from the doctor's deposition, and I am saying that I
10:20:58  25   believe that meets that burden, your Honor.
```

Case 2:16-md-02740-JTM-MBN   Document 10815   Filed 07/21/20   Page 17 of 20

17

```
10:20:59   1              And we certainly know that June has very much expressed
10:21:04   2   how she would, in fact, make a decision that involves a drug
10:21:09   3   without permanent hair loss.  She is a lady who cares very much
10:21:12   4   about her appearance.  She is in her 70s, and she has a
10:21:16   5   dermatologist for cosmetic reasons rather than health reasons.
10:21:20   6              And so I think you're focused on the doctor's prescribing
10:21:25   7   choice.  But I think, your Honor, we do a disservice when we talk
10:21:29   8   about what the doctor's preference is versus other options.  And
10:21:33   9   since there are other options, it may be unwise if she chooses an
10:21:38  10   option that's not as successful.  But it's not wrong.
10:21:42  11              And I have to tell you, your Honor, a year ago I was
10:21:45  12   diagnosed with Stage III colon cancer.  I was on a regime that I
10:21:50  13   picked that my oncologist said, "I don't think you should have
10:21:53  14   this.  You would be my only patient on this."  That's what I took
10:21:57  15   and that's what I completed, because in that relationship with your
10:22:00  16   oncologist, it's not that I took the one she wanted me to take, but
10:22:04  17   it was available and that's the one I chose.  And here when the
10:22:07  18   doctor says, "there are choices available to her, not my pick, not
10:22:11  19   the one I want," it then becomes the decision of the patient
10:22:15  20   weighing what they think is important in their standard of living,
10:22:20  21   quality of life, and their health care to make that choice.
10:22:23  22              And I think what we forget here is the power of that
10:22:25  23   patient choice when we focus on the physicians as the ruler of what
10:22:30  24   you get to do.  Because certainly they don't feel that --
10:22:34  25              THE COURT:  I said that from the beginning.  And I will
```

10:22:37  1  tell you, this side of the room has been flippant since I said
10:22:44  2  that.  I do think it is a joint decision and it is driven by a
10:22:50  3  plaintiff understanding what the risks are, understanding what the
10:22:53  4  benefits are, making an informed decision since they require
10:23:01  5  informed consent.  But I think --
10:23:04  6           What bothers me in this case is we know this lady
10:23:10  7  couldn't take Adriamycin because of the cardiac toxicity and the
10:23:14  8  doctor says I would not have given that.  Which is fine.  And then
10:23:18  9  I just wonder, well, then, what else -- and I'll go back to my
10:23:23 10  analogy, what else is in your toolbox?  Tell me, Doctor, what else
10:23:27 11  is there that I can take that is not going to result in my death?"
10:23:32 12           MR. ROOT:  To that point, your Honor, I would like you to
10:23:35 13  look very much at that doctor's testimony about Adriamycin, because
10:23:38 14  it seemed to me that there were -- it wasn't exactly on point to
10:23:42 15  the question of June Phillips.  It was to the point of can a
10:23:47 16  patient choose just anything and the doctor will agree.  I think
10:23:50 17  the doctor was pushing back on the concept of "if I don't want to
10:23:53 18  do Adriamycin, I don't have to."
10:23:55 19           If you read it, your Honor, I don't believe it's saying I
10:23:59 20  don't want to prescribe -- I would not have prescribed that for
10:24:02 21  Ms. Phillips.  I think he is saying to the concept of patient wins
10:24:06 22  no matter what.  Well, no, if it's harmful to the patient, the
10:24:11 23  physician can say no and June can go to another physician and maybe
10:24:15 24  another physician will have a different take.  And certainly, if
10:24:19 25  she very much has a problem with a permanent hair loss causing

```
10:24:24   1   drug, then that was an option.
10:24:28   2              Also the chart said neoadjuvant therapy.  Well, if you
10:24:35   3   can give therapy before your surgery but you can give that same
10:24:37   4   treatment after that surgery, there's no rule that prohibits that.
10:24:40   5   So that is an option that the defendant said.  Here is something
10:24:43   6   you can do.  Here is the choice of a drug for neoadjuvant therapy.
10:24:49   7   If your patient says, I am not taking your TAC and I am not going
10:24:51   8   to take your other option, well, here is a chemotherapy drug that
10:24:55   9   obviously works because they give it to you before your surgery,
10:24:58  10   take that one, that's a possibility.
10:25:01  11              So I think we met all of those, the four different steps,
10:25:04  12   and I think at least we have issues sufficient to go forward to
10:25:08  13   trial.  Thank you.
10:25:08  14              THE COURT:  Thank you, Mr. Root.
10:25:13  15              MR. MOORE:  Your Honor, just one comment before moving on
10:25:18  16   to the Kahn motion.  I've been up here a couple of times with
10:25:23  17   Mr. Root, and we've had the pleasure of working with him and his
10:25:26  18   firm in this litigation for a couple of years.  I think he is a
10:25:29  19   fine gentleman, I think he is a very professional lawyer.  His
10:25:32  20   interactions with us have always been the case.  And I am glad to
10:25:36  21   see he's doing well.
10:25:39  22              But to be frank, it's not enough for Mr. Root to say it.
10:25:46  23   It's not enough for Mr. Root to come up to this lectern and say
10:25:50  24   "could have given her Taxol," that's what I wrote down, "could have
10:25:55  25   given her Taxol."  Dr. Sonnier has to say it, he has to say that
```

```
10:25:59   1   that's in his toolbox, and then he has to say that he would have
10:26:03   2   prescribed it.  This has to culminate, as your Honor said, in the
10:26:07   3   doctor changing his prescribing decision, which means there has to
10:26:11   4   be testimony from the doctor saying that he would have written the
10:26:15   5   prescription.  I think that's the perfect segue --
           6        (WHEREUPON, THE PORTION CONCERNING JUNE PHILLIPS WAS
           7        CONCLUDED.)
           8
           9                        * * * * *
          10
          11                  REPORTER'S CERTIFICATE
          12
          13        I, Karen A. Ibos, CCR, Official Court Reporter, United
          14   States District Court, Eastern District of Louisiana, do hereby
          15   certify that the foregoing is a true and correct transcript, to the
          16   best of my ability and understanding, from the record of the
          17   proceedings in the above-entitled and numbered matter.
          18
          19
          20                        ___/s/ Karen A. Ibos_____
          21                        Karen A. Ibos, CCR, RPR, CRR, RMR
          22                        Official Court Reporter
          23
          24
          25
```