# EXHIBIT D

Page 1

 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
 2
                    MDL No. 2740
 3                  SECTION:  H
 4     IN RE: TAXOTERE (DOCETAXEL)
 5     PRODUCTS LIABILITY LITIGATION
 6     This Document Relates To:
 7     Sheila Crayton, Case No. 2:17-cv-05923;
       Cynthia Thibodeaux, Case No. 2:16-cv-15859;
 8     _____/
 9                        1633 North Bayshore Drive
                          Miami, Florida
10                        December 12, 2019
                          9:08 a.m. - 6:13 p.m.
11
12          VIDEO DEPOSITION OF ANTONELLA TOSTI, M.D.
13       Taken before SUZANNE VITALE, R.P.R., F.P.R.
14     and Notary Public for the State of Florida at Large,
15     pursuant to Notice of Taking Deposition filed in the
16     above cause.
17
18
19
20
21
22
23
24
25

Page 26

1  Q. So what have you done to prepare for your
2  deposition today?
3  A. I studied all the medical records, which
4  are a lot because she has like -- I don't know how
5  many pages of medical records. I reviewed the
6  literature on the topic. And that's basically what
7  I did.
8      I read my deposition, all my depositions.
9  I read Dr. Thompson deposition. And maybe I did
10 something else that I don't remember in this moment.
11 Q. And when you said you read Dr. Thompson's
12 deposition, are you talking about the most recent
13 one that was taken a few weeks ago?
14 A. Yes.
15 Q. Did you read his depositions from the
16 first set of cases?
17 A. I think I did. I don't remember it,
18 honestly.
19 Q. Did you have any thoughts or impressions
20 after reading Dr. Thompson's deposition?
21     MR. SCHANKER: Objection, form.
22     THE WITNESS: No.
23 BY MR. SEARS:
24 Q. Did you think I did a good job?
25     MR. SCHANKER: Objection, form.

Page 27

1      THE WITNESS: Absolutely.
2      MR. SCHANKER: Leading.
3      MR. SEARS: Hey, man, I got to get credit
4   however I can, you know.
5  BY MR. SEARS:
6  Q. Do you know who Sheila Crayton is?
7  A. Who?
8  Q. Sheila, S-H-E-I-L-A. Crayton,
9  C-R-A-Y-T-O-N.
10 A. I don't remind of this name, but I may
11 know, you know. I don't know.
12 Q. Do you know if you've reviewed any of her
13 medical records?
14 A. No.
15 Q. Do you know if you've looked at any of her
16 photographs?
17 A. That may be. You know, I review a lot of
18 photographs and I don't remember at all the names of
19 the persons.
20 Q. Have you had any conversations about
21 whether you could evaluate her in person?
22 A. Not yet.
23 Q. Have you had any conversations about
24 whether she could have a biopsy taken?
25 A. No.

Page 28

1  Q. Have you had any conversations about
2  whether she could consent to having a biopsy taken?
3  A. No.
4  Q. Have you had any conversations about how
5  she's not going to be sent to you because she cannot
6  consent to a biopsy?
7  A. No.
8  Q. If you were unable to do a biopsy on a
9  person, could you still perform trichoscopy on them?
10     MR. SCHANKER: Objection, form.
11     THE WITNESS: Yes. I believe trichoscopy
12  is very, very useful.
13 BY MR. SEARS:
14 Q. Have you had any conversations about
15 whether you could prepare an expert report on
16 Ms. Crayton?
17 A. No.
18 Q. Have you ever had a patient that has been
19 unable to consent to a biopsy?
20     MR. SCHANKER: Objection, form.
21     THE WITNESS: Outside this litigation,
22  yes. It's very common that they don't want a
23  biopsy.
24 BY MR. SEARS:
25 Q. I think I asked you a wrong question.

Page 29

1      I understand that people may not want a
2  biopsy, but have you ever had a patient that was
3  mentally incapable of consenting to a biopsy?
4      MR. SCHANKER: Objection, form.
5      THE WITNESS: Of course, I may have, you
6   know, younger children. I may have patients
7   with mental disorders and then there is
8   somebody that consent for them.
9  BY MR. SEARS:
10 Q. So I reviewed the report that was prepared
11 for this case.
12     Does that report contain the opinions that
13 you're going to offer?
14 A. Yes.
15 Q. So have we -- excluding conversations you
16 may have had with plaintiffs' attorneys, have we
17 covered all the conversations that you've had about
18 this case and the Taxotere litigation?
19 A. Yes.
20     (Thereupon, the referred-to document was
21 marked by the court reporter for Identification as
22 Defendants' Exhibit 8.)
23 BY MR. SEARS:
24 Q. I'm handing you what was marked as Exhibit
25 D to your report, and I've marked it as Exhibit 8.

8 (Pages 26 - 29)

Page 226

1    And second, I really think Taxotere alone
2    probably won't cause.  It's adding Taxotere to
3    other regimens that cause the PCIA.
4  BY MR. SEARS:
5    Q.  So if I understand what you're saying,
6  it's your opinion that Taxotere alone would be
7  insufficient to cause PCIA?
8    MR. SCHANKER:  Objection, form.
9    THE WITNESS:  I don't like the word
10   "insufficient."
11   I believe that Taxotere is the factor that
12   cause PCIA in patients on other chemotherapy
13   agents, on combination chemotherapy, let's say.
14  BY MR. SEARS:
15   Q.  And if Taxotere was given alone, it would
16  not cause PCIA, right?
17   MR. SCHANKER:  Objection, form.
18   THE WITNESS:  Very rarely.  There are few
19   reports but rarely.
20  BY MR. SEARS:
21   Q.  Hence, the addition of the other drugs to
22  Taxotere that results, in your opinion, in a much
23  higher prevalence of PCIA?
24   MR. SCHANKER:  Objection, form.
25   THE WITNESS:  Yes.

Page 227

1  BY MR. SEARS:
2    Q.  Do you know if Taxotere is used for head
3  and neck cancers?
4    A.  I don't know.  If you ask me, probably
5  yes.
6    Q.  Do you know if it's used to treat prostate
7  cancer?
8    A.  Again, I don't know.  I'm not an
9  oncologist.
10   Q.  Do you know if it's used to treat gastric
11  cancer?
12   A.  I don't know.
13   Q.  Have you seen any reports of Taxotere -- a
14  Taxotere-containing regimen causing PCIA in either
15  lung cancer, prostate cancer, gastric cancer or a
16  head and neck cancer setting?
17   A.  You know, as I said, in our own paper on
18  quality of life, there are patients with other type
19  of cancer, you know, and maybe they had Taxotere or
20  Taxol.  I don't know from the data.
21   Q.  Really, what I'm looking for is anything
22  that you can definitively point to and say, yes.
23   Can you definitively point to anything
24  that you've seen that says that Taxotere, when used
25  to treat lung, prostate, gastric or head and neck

Page 228

1  cancer, has resulted in PCIA?
2    MR. SCHANKER:  Objection, form.
3    THE WITNESS:  I didn't see any specific
4    report of Taxotere causing PCIA in other type
5    of cancer, but I didn't look for it.
6  BY MR. SEARS:
7    Q.  So do you think that PCIA is a medical
8  condition?
9    MR. SCHANKER:  Objection, form.
10   THE WITNESS:  Yes.
11  BY MR. SEARS:
12   Q.  Do you think that PCIA is diagnosable?
13   A.  Absolutely, yes.
14   Q.  Do you think it can look similar
15  clinically to other forms of alopecia?
16   A.  Absolutely, yes.  You need to examine when
17  the patient do the trichoscopy, and sometimes the
18  biopsy to confirm the diagnosis.
19   Q.  So for a patient to receive a diagnosis of
20  PCIA, do you think that they need to go to a
21  qualified dermatologist and be assessed before they
22  can be diagnosed with that condition?
23   MR. SCHANKER:  Objection, form.
24   THE WITNESS:  You know, clinical history,
25   of course, is important.  So if you are an

Page 229

1  oncologist and you have a patient doing
2  chemotherapy and developing -- that don't
3  regrowing the hair after then, after
4  chemotherapy, you may guess that's PCIA.
5  BY MR. SEARS:
6    Q.  Really, what I'm asking is, do you think
7  that a patient needs to be assessed by a qualified
8  medical doctor before they can have a diagnosis of
9  PCIA?
10   MR. SCHANKER:  Objection, form.
11   THE WITNESS:  I think a doctor should make
12   the diagnosis.
13   MR. SCHANKER:  Is this a good time for a
14   break?  We've been going for about an hour.
15   MR. SEARS:  Sure.
16   MR. SCHANKER:  Okay.
17   THE VIDEOGRAPHER:  We're off the record.
18   The time is 3:07 p.m.
19   (Short recess taken.)
20   THE VIDEOGRAPHER:  We're back on the
21   record.  The time is 3:21 p.m.
22  BY MR. SEARS:
23   Q.  Are you ready to keep going?
24   A.  Yes, absolutely.
25   Q.  So let's talk a little bit about causes of

58 (Pages 226 - 229)