# Exhibit B

## Specific Objections to Plaintiffs' Proposed Limitations Allegations

| BROWN, CYNTHIA (10668-3) | |
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Plaintiff received chemotherapy treatment beginning October 9, 2008 at Columbus Hematology & Oncology in Columbus, Mississippi. | Futility |
| 2. Prior to undergoing chemotherapy treatment, Plaintiff discussed the potential chemotherapy side effects with her prescribing doctor, John Whitecar, MD. | Non-particularized Futility |
| 3. Prior to Plaintiff's chemotherapy treatment, Dr. Whitecar advised Plaintiff that she would likely have temporary hair loss during her chemotherapy treatment. However, Dr. Whitecar explained to Plaintiff that her hair would re-grow after the chemotherapy treatment. | Non-particularized Futility |
| 4. Plaintiff did not receive or know of any warnings that her use of Taxotere/Docetaxel in her chemotherapy might or would result in permanent hair loss. | Non-particularized Futility |
| 5. Plaintiff believed that her hair loss would be temporary and was uncertain as to when her hair would begin to grow back after her chemotherapy treatment. | Non-medical Non-particularized Futility |
| 6. Plaintiff completed her chemotherapy treatment regimen on January 16, 2009. | Futility |
| 7. Approximately six months after the chemotherapy treatment ended, Plaintiff went for a follow-up visit at Dr. Whitecar's office. Plaintiff's hair slowly came in and was very short on her head. By October 2009, Plaintiff had a very short afro. Plaintiff did not at this time suspect a problem because she figured it would take time for it to grow out to the full head of hair she had prior to chemotherapy treatment. | Futility |
| 8. Plaintiff first complained to Dr. Whitecar, MD in late 2011 or early 2012 about her hair thinning after her chemotherapy treatment. Dr. Whitecar seemed dismissive about Plaintiff's concerns and told Plaintiff that "it would be okay." Plaintiff understood this to mean that the lack of full hair regrowth was a normal occurrence and still expected her hair to re-grow as prior to chemotherapy treatment. | Conflicts with PFS VII.5[1] Futility |
| 9. At a follow-up visit in approximately 2011 at the Columbus AFB in Columbus, MS, a base doctor performed a thyroid test to determine whether Plaintiff's thyroid might be causing the failure of Plaintiff's hair re-growth. Plaintiff then subsequently visited with a dermatologist at Columbus AFB where a second | Conflicts with PFS VII.5[2] Futility |

---

[1]   *See* Ex. C at 3.
[2]   *See* Ex. C at 3.

| | |
|---|---|
| thyroid test was done. Neither thyroid test showed results that linked thyroid problems to the hair's failure to re-grow normally. Nurse Practitioner Paula Hardy at the Westmoreland Dermatology Center diagnosed Plaintiff with alopecia and prescribed special shampoo and Biotin in late 2016. Plaintiff diligently followed Ms. Hardy's orders, including adding OTC Men's Rogaine, but after about a year, Plaintiff realized that the special shampoo, Biotin, and Rogaine treatment was having no effect to help bolster her hair volume, fix her hair thinning, and cause it to re-grow. | |
| 10. In 2016 Plaintiff saw an attorney advertisement online on Facebook regarding the association between Taxotere/Docetaxel and her hair's thinning and failure to re¬grow as prior to her chemotherapy treatment. | Non-medical Non-particularized Futility |

| GREER, JUANITA (10668-6) ||
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Prior to administration of TAXOTERE® /docetaxel, Plaintiff was told by her healthcare providers that if any hair loss occurred it would be temporary and would come back. | Non-particularized Futility |
| 2. Prior to Plaintiff consenting to the administration of TAXOTERE® /docetaxel, Plaintiff was NOT told that TAXOTERE® /docetaxel could cause permanent hair loss. Plaintiff believed and was told by her healthcare providers that if hair loss occurred, it was temporary and would come back. | Non-particularized Futility |
| 3. Plaintiff first suspected that her hair may not regrow on or around May of 2016 when her daughter saw advertisements concerning TAXOTERE® /docetaxel and permanent hair loss. | Non-particularized Futility |
| 4. Plaintiff recalls complaining to at least one, if not more, male oncologists at Jefferson Medical Associates that her hair was not growing back. This conversation occurred some months after she discontinued use of TAXOTERE® /docetaxel to present. The male doctor did not have any reasons as to why Plaintiff's hair was not growing back. | Conflicts with PFS VII.5[3] Futility |
| 5. Plaintiff also recalls discussing her hair loss with family, friends, and her beautician. | Non-medical Non-particularized Futility |
| 6. Plaintiff took treatment suggestions from her beautician, and tried vitamins and topical solutions to promote hair growth. These treatments would have occurred from approximately discontinued use of TAXOTERE® /docetaxel to present. | Conflicts with PFS VII.19[4] Futility |
| 7. Plaintiff first learned of any association of her hair's failure to grow back and TAXOTERE® /docetaxel on or around May of 2016 when her daughter saw advertisements concerning TAXOTERE® /docetaxel and permanent hair loss. | Non-particularized Futility |
| 8. Prior to on or around May of 2016, Plaintiff always expected, waited and hoped her hair would re-grow. | Non-medical Non-particularized Futility |

---

[3] *See* Ex. C at 5.
[4] *See* Ex. C at 7.

| GRINES, HATTIE (10668-7) ||
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Plaintiff, prior to undergoing chemotherapy treatment in December of 2009, discussed potential side effects with her prescribing oncologist, Dr. Jones. | Non-particularized Futility |
| 2. Plaintiff was instructed by Dr. Jones that although she may experience hair loss during the course of her chemotherapy treatments, her hair loss would be temporary. | Non-particularized Futility |
| 3. At no time did Plaintiff receive a warning that her use of Taxotere may result in permanent hair loss. In fact, Plaintiff was instructed that her hair would grow back following chemotherapy. | Non-particularized Futility |
| 4. Plaintiff believed that she would experience full hair re-growth following completion of her chemotherapy treatments. | Non-medical Non-particularized Futility |
| 5. Plaintiff completed chemotherapy in April of 2010. | Futility |
| 6. At some time after completing chemotherapy, Plaintiff noticed that although she had some hair re-growth, her hair was not re-growing as fast or as fully as she had anticipated. | Non-medical Non-particularized Futility |
| 7. Within six months to a year after completing chemotherapy, Plaintiff asked her treating oncologist, Dr. Jones, how long it would take for her hair to fully re-grow. She was instructed that a specific timeframe could not be given but that her hair should fully re-grow. | Conflicts with PFS VII.5[5] Futility |
| 8. Plaintiff tried the use of Biotin to encourage her hair to re-grow faster. Plaintiff also used Rogaine in hopes of fully re-growing her hair. Neither worked well enough to cause Plaintiff's hair to fully re-grow. | Futility |
| 9. Plaintiff did not suspect she may be suffering from permanent hair loss caused by Taxotere until she observed legal advertisements, in 2016. | Non-medical Non-particularized Futility |
| 10. This was the first time Plaintiff suspected that her lack of full hair regrowth might actually be permanent hair loss caused by her use of Taxotere. | Non-medical Non-particularized Futility |

---

[5]  *See* Ex. C at 9.

| KUMAR, MILDRED (10603-1) ||
|---|---|
| **Allegation** | **Objection(s)** |
| 1. On or about October 14, 2010, Plaintiff underwent her first round of Docetaxel Injections with her treating Oncologist. | Futility |
| 2. As she was being escorted by her treating physician to receive her first round of chemotherapy, Plaintiff was advised by her oncologist that she was going to lose her hair, but it would grow back. | Futility |
| 3. During the course of chemotherapy, Plaintiff suffered hair loss and thinning of the hair, over her entire head, along with bald-spotting and thinning of the hair, hair loss and thinning around the temples, eyebrows, body, and genital areas. | Futility |
| 4. Plaintiff's last chemotherapy treatment occurred on or about April 21, 2011. | Futility |
| 5. Plaintiff reasonably relied on the statements provided by her physician. Plaintiff did experience some return of hair growth over an extended period of time, as suggested by her physician. | Futility |
| 6. Plaintiff was never provided any information by her physician or the manufacturer of her chemotherapy drug upon which to reasonably know that negligence had occurred. Specifically, no statements made by her doctors or their staff, or contained within Plaintiff's medical records, or notices or warnings provided by her chemotherapy drug manufacturer, or otherwise available to her upon reasonable investigation would have suggested anything other than what she was informed by her doctor. | Non-factual Futility |
| 7. Not until Plaintiff saw legal advertisements on television, did she even begin to realize her hair loss and thinning of the hair were likely permanent and the negligence which caused injury. Not until such time, did she realize the "who, when, how, and by what" had she been permanently injured. | Non-medical Non-particularized Futility |
| 8. As a layperson, it was unrealistic for Plaintiff to perceive any injury at the time of the wrongful acts complained of herein, or six months thereafter or later, as she cannot reasonably be held to have knowledge of negligent acts and corresponding injuries which were known only to the manufacturer of her chemotherapy drug, and kept secret, and a few informed attorneys. | Non-factual Futility |
| 9. As a result of the actions of the Defendants as set forth herein, Plaintiff has suffered compensable injuries based on the following Counts, inter alia. | Non-factual Futility |

| PIGOTT, SHIRLON (10668-9) ||
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Plaintiff, prior to undergoing chemotherapy treatment on March 2, 2010, discussed potential side effects with her prescribing oncologist, Dr. James Herrington. Plaintiff was instructed by Dr. Herrington and the nurses that although she may experience hair loss during the course of her chemotherapy treatments, her hair loss would be temporary. | Non-particularized Futility |
| 2. At no time did Plaintiff receive a warning that her use of Taxotere may result in permanent hair loss. | Non-particularized Futility |
| 3. Although Plaintiff understood that her hair loss would be temporary, Plaintiff was unsure of when her hair would start to re-grow following the end of chemotherapy. | Non-medical Non-particularized Futility |
| 4. In 2011, Plaintiff asked her treating oncologist, Dr. Herrington, about her concerns regarding the rate of her hair re-growth. Dr. Herrington re-assured her that she didn't need to worry, that the hair loss was temporary and eventually her hair would fully re-grow. As a result, Plaintiff held out hope that over time her hair would continue to fully re-grow, as Dr. Herrington did not inform her that her hair loss may be permanent. | Futility |

| ROACH, MELISSA (10668-10) ||
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Plaintiff, prior to undergoing chemotherapy treatment in October of 2009, discussed potential side effects with her prescribing oncologist, Dr. Alnas. | Non-particularized Futility |
| 2. Based on these conversations and on her knowledge of other persons who had been through chemotherapy, Plaintiff anticipated that she would experience temporary hair loss as a result of her chemotherapy treatments. | Futility |
| 3. At no time did Plaintiff receive a warning that her use of Taxotere may result in permanent hair loss. | Non-particularized Futility |
| 4. Plaintiff believed that she would experience full hair re-growth following completion of her chemotherapy treatments. | Non-medical Non-particularized Futility |
| 5. Plaintiff completed chemotherapy in the later part of 2010. | Futility |
| 6. At some time after completing chemotherapy, Plaintiff noticed that although she had some hair re-growth, her hair was not re-growing as fast or as fully as she had anticipated. | Non-medical Non-particularized Futility |
| 7. Within six months to a year after completing chemotherapy, during a follow up visit with her oncologist, Dr. Alnas acknowledged that he could see some hair regrowth and reassured Plaintiff that it would only be a matter of time before her hair fully re-grew. | Conflicts with PFS VII.5[6] Futility |
| 8. Unfortunately, Plaintiff's hair did not fully re-grow. Plaintiff independently investigated the potential for using Rogaine to try and encourage faster hair re-growth, but decided against it due to its expense and requirement of continuous daily use. | Futility |
| 9. Plaintiff was never instructed by Dr. Alnas or any other medical provider that her hair loss might in fact be permanent, let alone that her hair loss might have been caused by Taxotere. | Non-particularized Futility |
| 10. Plaintiff did not suspect she may be suffering from permanent hair loss caused by Taxotere until she observed a legal advertisement on Facebook. | Non-medical Non-particularized Futility |
| 11. This was the first time Plaintiff suspected that her lack of full hair regrowth might actually be permanent hair loss caused by her use of Taxotere. | Non-medical Non-particularized Futility |

---

[6]  *See* Ex. C at 11.

| SMITH, CINDY (10668-11) | |
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Plaintiff received chemotherapy treatment beginning June 10, 2014 at Singing River Hospital in Pascagoula, Mississippi. | Futility |
| 2. Prior to undergoing chemotherapy treatment, Plaintiff discussed the potential chemotherapy side effects with her prescribing doctor, Elizabeth Herrington, MD. | Non-particularized Futility |
| 3. Prior to Plaintiff's chemotherapy treatment, Plaintiff had a full head of hair. | Futility |
| 4. Prior to Plaintiff's chemotherapy treatment, Plaintiff was advised by her prescribing doctor, Dr. Elizabeth Herrington, that she would likely have temporary hair loss during her chemotherapy treatment. Dr. Herrington also advised Plaintiff that her hair would re-grow after the chemotherapy treatment. | Non-particularized Futility |
| 5. Plaintiff did not receive any warnings that her use of Taxotere/Docetaxel may or would result in permanent hair loss. | Non-particularized Futility |
| 6. Plaintiff believed that her hair loss would be temporary and was uncertain when her hair would begin to grow back after her chemotherapy treatment. | Non-medical Non-particularized Futility |
| 7. Plaintiff completed her chemotherapy treatment regimen on September 23, 2014. | Futility |
| 8. Approximately one month after the chemotherapy treatment ended, Plaintiff's hair begin to re-grow much thinner than prior to treatment. Plaintiff continued to believe and hope that her hair would re-grow to its pre-chemotherapy-treatment thickness and body. | Non-particularized Futility |
| 9. Approximately six months after the chemotherapy treatment ended, Plaintiff went for a follow-up visit at Dr. Herrington's office. Dr. Herrington continued to encourage Plaintiff to use OTC products to assist with her hair re-growth. At no time did Dr. Herrington insinuate that Plaintiff's hair loss and thinning was permanent or in any way associated with the Taxotere/Docetaxel product. | Futility |
| 10. By mid-2015, Plaintiff began researching Wonderbrow and Keranique products as options to help her hair re-growth after visits with Dr. Herrington and Dermatologist Dr. Thomas Garrott who encouraged her to do so. Plaintiff also took OTC Biotin beginning in January 2015 for two years on the advice of Dr. Garrott and Dr. James Gatewood, but it has not helped to stimulate or restore Plaintiff's hair re-growth or ameliorate her hair thinning. | Futility |

| | |
|---|---|
| 11. Plaintiff discussed her concerns about her hair thinning and not growing back as it was prior to chemotherapy treatment with family and close friends, but none of her discussions gave Plaintiff any idea that her permanent alopecia was related to the use of Taxotere. | Non-medical Non-particularized Futility |
| 12. In approximately January 2016 Plaintiff saw attorney advertisements online on Facebook and on television regarding the association between Taxotere/Docetaxel and her hair's thinning and failure to re-grow as prior to her chemotherapy treatment. | Non-medical Non-particularized Futility |

| WILLIE, EMMA (10668-12) ||
|---|---|
| **Allegation** | **Objection(s)** |
| 1. Plaintiff received chemotherapy treatment beginning January 29, 2015 at Baptist Cancer Center in Southaven, Mississippi. | Futility |
| 2. Prior to undergoing chemotherapy treatment, Plaintiff discussed the potential chemotherapy side effects with her prescribing doctor, Sadanand I. Patil, MD. | Non-particularized Futility |
| 3. Plaintiff was told by Dr. Patil that she would likely have temporary hair loss, but that her hair loss would be temporary and that her hair would grow back thicker than before the treatment. | Non-particularized Futility |
| 4. Plaintiff did not receive any warnings that her use of Taxotere/Docetaxel may or would result in permanent hair loss. | Non-particularized Futility |
| 5. Plaintiff believed that her hair loss would be temporary. | Non-medical Non-particularized Futility |
| 6. Plaintiff completed her chemotherapy treatment regimen on April 2, 2015. | Futility |
| 7. Shortly after the chemotherapy treatment ended, Plaintiff went for a follow-up visit at Dr. Patil's office where a staff member asked whether Plaintiff's hair was growing back. Plaintiff responded that it was not. The staff member assured Plaintiff that her hair would re-grow and to give it time. Nothing more was said at this visit about Plaintiff's hair loss or that it might be permanent, and Plaintiff continued to hope that her hair would fully return in the future. | Futility |
| 8. Approximately 4-5 months prior to June 2016, Plaintiff began to see television advertisements for lawsuits related to the Taxotere chemotherapy drug and its effects on patients' hair loss. Plaintiff contacted and signed a retainer agreement with her attorneys on June 13, 2016. | Non-medical Non-particularized Futility |
| 9. Plaintiff complained to dermatologist Terri H. Henson, MD on August 31, 2016 about her hair loss after her chemotherapy treatment. Dr. Henson found that Plaintiff had "scarring alopecia, not the typical chemo induced alopecia..." and prescribed clobetasol/Rogaine 5%. This was the first time Plaintiff had any idea that her hair loss may not be temporary in nature. | Futility |
| 10. At a follow-up visit on February 28, 2017, Dr. Henson's assessment of Plaintiff's condition was "prob. Permanent alopecia from Taxotere." This assessment helped to confirm that Plaintiff's lack of hair re-growth might indeed be permanent alopecia caused by the Taxotere/Docetaxel. | Futility |