# EXHIBIT A

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA

2

        _____

3    IN RE:   TAXOTERE (DOCETAXEL)      MDL NO. 2740
     PRODUCTS LIABILITY LITIGATION

4                                       SECTION: H

5    This Document Relates To:

6    Sheila Crayton, Case
     No. 2:17-CV-05923;

7    Cynthia Thibodeaux, Case
     No. 2:16-CV-15859

8    _____

9

10

11              VIDEOTAPED DEPOSITION OF
                LAURA MASSEY PLUNKETT, M.D.

12

                   November 19, 2019

13                     9:05 A.M.

14              1230 Peachtree Street, NE
                      Suite 1200

15                  Atlanta, Georgia

16       Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

17

18

19

20

21

22

23

24

25

```
 1      allow me to -- to make that statement that I believe
 2      that it is associated with.
 3           Q.   Is associated in your mind equal to cause
 4      and effect?
 5           A.   It's not a full causation analysis, no.
 6           Q.   Okay.
 7           A.   But it's a -- so it is different.  When
 8      I -- it's -- I try to be very careful in my report.
 9      If I'm doing a full causation analysis, I will use
10      "caused" or "can cause."  When I use the word
11      "associated," it's because I'm looking at sort of
12      the understanding of what is either biologically
13      plausible or an understanding of the mechanism and
14      I'm looking at the data in that way.
15           Q.   Okay.
16           A.   But I haven't done a full Bradford Hill
17      analysis to use the word "cause."
18           Q.   Right.
19           A.   Because that's how I would use it.  When I
20      draft reports, that's what I would do.
21           Q.   Understand.  And that's all -- all I
22      really wanted to know was whether when you say
23      "associated," if that is a synonym for "cause."
24           A.   I don't mean it to be.
25           Q.   Okay.
```

Page 100

1     in combination.
2            Q.   Okay.
3            A.   Or most -- most likely used in
4     combination.  They can be used independently, but
5     there isn't the studies available publicly.
6            Q.   Okay.  And then what I'm going to say is
7     your last opinion, as summarized in paragraph 62,
8     is, "When used in combination, Taxotere has been a
9     substantially contributing factor to PCIA."
10            Is that a accurate summation of that
11     opinion?
12            A.   Yes.
13            Q.   Okay.  Define for me "substantially
14     contributing factor."  What does --
15            MR. MICELI:  Object.
16            Q.   (By Mr. Ratliff)  -- that mean?
17            MR. MICELI:  Object to the form.
18            But go ahead.
19            THE WITNESS:  So -- so --
20            Q.   (By Mr. Ratliff)  Outside the context of
21     Taxotere, I want to know what that term means to
22     you.
23            MR. MICELI:  Same objection.
24            THE WITNESS:  It means --
25            MR. MICELI:  Well, you know, I'll -- no,

1          you said "to you."

2               So go ahead.  Sorry.  No objection to that

3          one.

4               THE WITNESS:  So regardless of whether I'm

5          talking about Taxotere or not, that's your

6          question?

7          Q.   (By Mr. Ratliff)  Yeah, what does -- what

8     does that term mean when you say a "substantially

9     contributing factor"?

10         A.   It means it's something that you can

11    isolate as -- as having a relationship.  So to me

12    the opinion about carrying an independent risk and

13    then that -- that allows you to make the opinion

14    that it can be a substantial contributing factor.

15              It's the idea that you can see something

16    unique about that agent that can contribute to a

17    situation even though we know, in many of the health

18    assessments I do, even outside of drugs, there can

19    be multiple things that people have been exposed to.

20              For example, let's just talk about

21    something everybody probably understands.  You can

22    do -- you can look at epidemiological studies and

23    you have confounding factors.  And so those

24    confounding factors, when controlled for, can help

25    to identify something that would be a substantial

Page 102

1    contributing factor because the signal for risk is
2    still there.
3            Q.    Right.
4            A.    So that's an example how you might define
5    it in other -- for other compounds.
6            Q.    Can you put a percentage on what
7    constitutes something that becomes from being a
8    contributing factor to a substantially contributing
9    factor?
10           A.    Well, I believe it's more likely than not
11   that it would happen.  I mean --
12           Q.    51 percent?
13                 MR. MICELI:  Object to the form.
14                 THE WITNESS:  It's -- it's the idea of the
15           weighing of the evidence.  So you weigh the
16           evidence, and you come up with whether or not
17           you believe that something has its own risk or
18           could be a -- something that could initiate or
19           lead to.
20                 So, yeah, I could use that word more
21           likely than not there.
22           Q.    (By Mr. Ratliff)  And more likely than not
23   in percentages is what to you?
24           A.    Well, in -- in the legal cases I work on,
25   it means the scales have tipped, which can be more

1     than 50 percent.

2          Q.   Okay.

3          A.   In -- in the science world, if you want to

4     talk about statistics, you could talk about it with

5     confidence intervals and other ways as well.  But --

6          Q.   I just want to talk about the way you're

7     using it, Dr. Plunkett.

8          A.   Well, I'm not meaning it to be either one

9     of those necessarily.  I'm -- I'm forming this

10    opinion because I -- it's my understanding that

11    there can be confusion over -- over the fact that

12    you could have individuals exposed to combinations

13    of things and how you determine or whether or not

14    you can make a statement over whether or not that --

15    a particular exposure is indeed a contributing

16    factor to a condition.

17         Q.   You're --

18         A.   And -- and so in -- in my -- it is -- it

19    is related to my legal work because I understand

20    that that is a standard that is often used --

21         Q.   Right.

22         A.   -- to describe, for example, to a jury.

23    I'm asked that question sometimes at trial.

24         Q.   So you're --

25              MR. MICELI:  Excuse me, I'm going to keep

1          objecting because you keep talking over, and I

2          understand you want to get your next question

3          out.  But she has to be allowed and the court

4          reporter has to create an accurate record for

5          us.

6               MR. RATLIFF:  Okay.  Thank you.

7               MR. MICELI:  But were you done, Doctor?

8               MR. RATLIFF:  Yeah.  She was done.

9               MR. MICELI:  Well, I'll let the doctor

10         answer for herself.

11              Can you read back the last question and

12         the last answer so she can say --

13              MR. RATLIFF:  We -- we don't need to read

14         back the whole thing.

15              COURT REPORTER:  I don't think I have it

16         anyway.

17              MR. RATLIFF:  Okay.

18              THE WITNESS:  But as long as you got on

19         the record, Ms. Court Reporter, that I said

20         it's something that I have -- I know I have

21         used at trial to describe to a jury as -- as to

22         how to --

23         Q.   (By Mr. Ratliff)  Right.

24         A.    -- talk to -- about the science in a way

25      that people can understand what -- what is meant.

1   Q.   Right.  So when -- you're aware that
2   substantially contributing factor is a legal term;
3   correct?
4   A.   I'm aware that it is, yes.
5   Q.   Yeah.  And it means more likely than not;
6   correct?
7          MR. MICELI:  Object to the form.
8          THE WITNESS:  So in civil litigation, as I
9       use it, I understand it to be that, yes.
10   Q.   (By Mr. Ratliff)  Okay.  More likely than
11   not meaning scales tipped, and I think as you said,
12   just a little bit more one way than the other;
13   correct?
14          MR. MICELI:  Object to the form.
15          THE WITNESS:  It may -- it may only have
16       to be a little more, but I would argue in this
17       case it's a lot more than just a little.
18   Q.   (By Mr. Ratliff)  Either one.
19          MR. MICELI:  Object to the form.
20   Q.   (By Mr. Ratliff)  So what I'm asking for
21   is when you use the term "substantially contributing
22   factor," are you using it in the legal sense when
23   you use that -- when you're going to use that term
24   before a jury in New Orleans?
25          MR. MICELI:  Object to the form.

1           THE WITNESS:  It is not a legal opinion,

2        no.  It's a way that I describe the evidence to

3        a layperson.  If I talk to a layperson about

4        p-values and statistical significance, people

5        glaze over.  But -- and -- and if I even talk

6        about weight of the evidence, sometimes people

7        have an under- -- have a -- have a difficulty

8        understanding how you would describe that.  But

9        if you use word -- words to a jury -- again,

10       because I -- or actually I would argue I do

11       this when I teach in the classroom, too.  When

12       I talk about risk assessment to students, I

13       have to explain to them how you make judgments

14       to take actions.

15          And so part of those judgments in the

16       regulatory world, when you take actions, have

17       to do whether or not the weight of the

18       evidence --

19       Q.   (By Mr. Ratliff)  Right.

20       A.   -- tells you it's more likely than not.

21   It doesn't always -- policy is not always driven by

22   statistical significance.  It's driven by other

23   things as well.

24       Q.   Okay.  So what I'm asking, though,

25   Dr. Plunkett, is when you use the term

1      "substantially contributing factor" in giving your

2      opinion before a jury in New Orleans, are you saying

3      that means more likely than not?

4               MR. MICELI:  Object to the form.

5               THE WITNESS:  I believe I'm telling you

6          that I believe it means it's independent risk;

7          and in my opinion the weight of the evidence

8          builds to more likely than not that that is

9          true.  So that's what I'm -- I'm stating.

10              Q.   (By Mr. Ratliff)  So the answer is yes,

11     you're going to say that means more likely than not?

12              MR. MICELI:  Object to the form.  Her

13         answer stands as it is, and it's been asked and

14         answered.

15              MR. RATLIFF:  No, it has not.

16              MR. MICELI:  Yes.

17              MR. RATLIFF:  Madam court reporter, read

18         back my question.

19              Dave, you obviously can see the issue

20         here.  This is a legal term -- that she's using

21         a legal term.

22              MR. MICELI:  She's using --

23              MR. RATLIFF:  And she won't answer whether

24         it's a legal term or not a legal term.

25              MR. MICELI:  No, no.  She's using -- I

```
 1           disagree with you, Harley.  I think that it is
 2           she is using a term that is also a legal term
 3           of art, and you're trying to get a toxicologist
 4           to give a legal opinion.  And I'm going to
 5           continue to object.  And this is like the
 6           fourth time we've asked it.  And because of the
 7           way Judge North has instructed, as opposed
 8           to -- scold is the word I'm going to -- not
 9           going to use -- we will call him and say, Look,
10           she's answered it, this is what her answer has
11           been, and Mr. Ratliff continues to ask it.  Can
12           I instruct her not to answer it for the fourth
13           time.
14                MR. RATLIFF:  Okay.  Good luck with that.
15                MR. MICELI:  I will.  I mean, I agree with
16           you, Harley.  It's going to -- it's not going
17           to make him happy that I'm going to have to do
18           it because I can't have you asking the same
19           questions.
20           Q.   (By Mr. Ratliff)  When you use the term
21      "contributing factor" --
22                MR. MICELI:  Well, I'm going to finish
23           my -- yeah, my comment first.  I want to make
24           sure.
25           Q.   (By Mr. Ratliff)  -- does it mean more
```

Page 109

1      likely than not?

2           A.    I think you should wait for her.

3                 But when I use it, I'm using it as I use

4      it to explain to a jury or to explain to a group of

5      students.  And --

6           Q.    Which, does that mean more likely than

7      not?

8                 MR. MICELI:  Object to the form.

9                 THE WITNESS:  And it can mean more likely

10               than not, and I use those words.  But I'm not

11               giving a legal opinion.  I'm telling you that I

12               know the standards that I apply as a scientist

13               when I -- when I make a judgment.  And

14               there's --

15          Q.    (By Mr. Ratliff)  Does it mean adhere?

16                MR. MICELI:  Hold on.

17          Q.    (By Mr. Ratliff)  Does it mean adhere,

18     Dr. Plunkett?

19                MR. MICELI:  Hold on.  You're interrupting

20               her, Harley.

21                MR. RATLIFF:  She needs to answer the

22               question.

23                MR. MICELI:  Well, you know what, let's

24               go -- we're going to take a break and we're

25               going to call the judge.  This is -- I'm not

Page 110

1          going to sit here and keep doing this.
2              MR. RATLIFF:  She needs to answer the
3          question, Dave.
4              MR. MICELI:  And I'm objecting and I'm
5          going to say we're going stop and we're going
6          to call the judge.  Because I'm not --
7              MR. RATLIFF:  She won't answer the
8          question.
9              MR. MICELI:  She has answered -- I'm
10         sorry.  You tell me when you're ready for me to
11         talk.
12             COURT REPORTER:  Go ahead.
13             MR. MICELI:  Okay.  What I'm saying is you
14         have asked the question.  You may not have
15         gotten the answer you desired.  She has
16         answered the question more than once, more than
17         twice --
18             MR. RATLIFF:  That is a yes or no --
19             MR. MICELI:  Hold on.
20             MR. RATLIFF:  It's a yes or no question,
21         Dave.
22             MR. MICELI:  Now you're interrupting me,
23         and what we're going to do is we're going to
24         call the judge.
25             MR. RATLIFF:  Okay.  Okay.

Page 111

1              MR. MICELI:  Let's --

2              MR. RATLIFF:  Take a break.

3              MR. MICELI:  -- let's just do that.

4              MR. RATLIFF:  Call the judge.

5              VIDEOGRAPHER:  Off the record at 10:35.

6              (Thereupon, there was an interruption in

7          the proceedings.)

8              VIDEOGRAPHER:  We're back on the record at

9          10:52.

10             MR. MICELI:  All right.  We are back on

11         the record.  And before we get started, I just

12         wanted to note on the record the reporter,

13         court reporter, has made a reasonable request

14         that all parties and witness slow down in

15         speech and not talk over each other because of

16         her concern of the record being in jeopardy

17         regarding accuracy if we continue to behave or

18         talk the way we have been doing.

19             Harley, if you want to put anything on the

20         record about our discussion with Judge North,

21         feel free, or we can just move forward.

22             MR. RATLIFF:  Yeah.  No.  I would say that

23         I'll do my best to not interrupt Dr. Plunkett.

24         At the same time, Dr. Plunkett has given long,

25         rambling, nonresponsive answers to most of my

Page 112

1          questions.  And if that continues, we intend to

2          hold this deposition open.

3                MR. MICELI:  Okay.

4          Q.   (By Mr. Ratliff)  So as it relates to

5    Magistrate Judge North, Dr. Plunkett, did you have

6    an opportunity to talk to Mr. Miceli about his

7    ruling?

8          A.   Yes.

9          Q.   And what did Mr. Miceli represent was his

10   ruling?

11               MR. MICELI:  Well, object to the form.

12               I would instruct you not to discuss

13          what -- what I informed you.  I will -- I will

14          counsel the witness on what Judge North -- if

15          you want to ask her what she understands Judge

16          North is --

17               MR. RATLIFF:  What did you coun- -- what

18          did you counsel the witness on?

19               MR. MICELI:  That the judge said if

20          possible that she -- that that sounds like a

21          simple question to answer yes or no, she is to

22          either answer yes or no; and if she can't do

23          so, she better have an explanation why she

24          can't.

25               MR. RATLIFF:  Very good explanation, I

1       believe.

2               MR. MICELI:  Well, I would hope you

3           wouldn't give a bad explanation.  But...

4           Q.   (By Mr. Ratliff)  When you use the term

5       "substantially contributing factor," are you using

6       that to mean that it's more likely than not that

7       Taxotere causes permanent chemotherapy-induced

8       alopecia in a multidrug regimen?

9               MR. MICELI:  Same objection as previously.

10          Q.   (By Mr. Ratliff)  Yes or no?

11          A.   No, that -- no, but can I explain --

12          Q.   No.

13          A.   -- what I do believe I am saying?

14              MR. MICELI:  Okay.  That's fine.

15          Q.   (By Mr. Ratliff)  No.

16              So when you use the term -- just so we're

17      all clear, when you use the term "substantially

18      contributing factor," that does not mean more likely

19      than not?

20          A.   Those three words, no.

21          Q.   Does it mean more than 50 percent

22      likelihood?

23          A.   Those three words, no.

24          Q.   Does it mean less than 50 percent

25      likelihood?

Page 114

1          A.   No.  Those three words have a specific
2      meaning that is not what I'm meaning.
3          Q.   Okay.  Does -- are you able to put any
4      type of numerical percentage on when something
5      becomes a substantially contributing factor in a
6      multidrug regimen?
7               MR. MICELI:  Object to the form.
8               THE WITNESS:  No, because I would not
9          typically put a -- a quantifier on that.
10         Q.   (By Mr. Ratliff)  Okay.  So let's talk
11     about that, then.
12              If someone has permanent
13     chemotherapy-induced alopecia and they took
14     Taxotere, Adriamycin, and cyclophosphamide, what
15     percentage is Taxotere responsible for, in your
16     opinion as a toxicologist and a pharmacologist?
17              MR. MICELI:  Object to the form.
18              THE WITNESS:  So I haven't formed the
19         opinion that it's any specific percentage.
20              Do you want me to explain what I have
21         done?
22         Q.   (By Mr. Ratliff)  You have -- but you've
23     not formed that opinion?
24         A.   The way you're describing it, no.
25         Q.   Okay.

Page 115

```
 1          A.   I have an opinion about what it means.
 2          Q.   We'll get to that.  I'm asking about my
 3     question, though.
 4          A.   I answered that.  I said no, not the way
 5     you're describing it.
 6          Q.   No.  So at trial, you wouldn't be able to
 7     get up and say that for a particular plaintiff or a
 8     particular regimen that Taxotere was X percentage of
 9     the contributing factor to the permanent hair loss?
10          A.    No, I wouldn't use those percentage words.
11          Q.   Could you -- would you be able to give any
12     percentage?
13          A.   I wouldn't form that opinion as a
14     percentage, no.
15               Would you like me to explain?
16          Q.   No.  We'll come back to it.
17               Dr. Plunkett, are you familiar with who
18     the Plaintiff is for the trial that's scheduled for
19     March of next year?
20          A.    No, I'm -- I have -- I'm not
21     case-specific.
22          Q.   Okay.  So I -- you don't even know her
23     name?
24          A.   I was told her name.
25          Q.   What is it?
```

1      going to give at trial any type of informed consent

2      opinion; correct?

3              A.   I don't believe so.  Those -- those words

4      are not in my report, no.

5              Q.   Okay.  And you're not going to give an

6      opinion that Sanofi violated any type of FDA

7      regulations or adverse event reporting regulations;

8      is that correct?

9              A.   That is correct.  I'm not.

10             Q.   Okay.  Dr. Plunkett, you hold yourself out

11     as an expert pharmacologist and toxicologist; is

12     that correct?

13             A.   I do, based on my training and experience,

14     yes.

15             Q.   Okay.  You are not an oncologist; correct?

16             A.   I am not.

17             Q.   Okay.  You've never prescribed a

18     chemotherapy to a woman with breast cancer; is that

19     correct?

20             A.   That is correct.  I have not.

21             Q.   You've never made a decision about what is

22     the safe or best chemotherapy to treat a woman's

23     breast cancer; is that correct?

24             A.   That is correct.  I have not.

25             Q.   Okay.  And you've never made -- because

1     you're not an oncologist, you've never made any

2     determination based on a patient's medical history

3     as to what would be the most appropriate

4     chemotherapy for that particular patient; is that

5     correct?

6          A.    That is correct.  I have not.

7          Q.    Okay.  And you've never made a

8     determination, since you're not an oncologist, as to

9     which patient might be more susceptible to certain

10    types of chemotherapy toxicities than other; is that

11    correct?

12         A.    That is correct.  I have not.

13         Q.    Okay.  And likewise, Dr. Plunkett, you are

14    not a dermatologist; is that correct?

15         A.    That is correct.  I'm not.  That is a

16    physician, and I'm not a physician.

17         Q.    Okay.  Okay.  So you've never identified

18    or diagnosed or treated anyone with hair loss; is

19    that correct?

20         A.    That is correct.  I have not.

21         Q.    Okay.  And likewise, you have no

22    experience in diagnosing hair loss or permanent hair

23    loss; is that correct?

24         A.    That is correct.

25         Q.    Okay.  So if someone presented to you with

Page 146

1          list again?

2          Q.   (By Mr. Ratliff)  Correct.

3          A.   Because the last question was limited.

4               I would expect to see that in the label,

5    yes.

6          Q.   Okay.  And you say that

7    chemotherapy-induced alopecia --

8          A.   So where are you?

9          Q.   Well, I'm just -- now I'm just talking.

10         A.   Oh, okay.

11         Q.   -- is normally reversible?

12         A.   Yes.

13         Q.   Is it always reversible?

14         A.   Well, that is -- no.  That's the issue

15    here.  There's -- with -- with this particular drug,

16    we have something that doesn't regrow.

17         Q.   Okay.

18         A.   So you've gone from hair loss to lack of

19    regrowth.

20         Q.   Okay.  So is it your testimony that if

21    somebody takes a chemotherapy, that their hair --

22    and they lose their hair, that it should regrow

23    exactly as it was before?

24               MR. MICELI:  Object to the form.

25               THE WITNESS:  So what do you mean by

1           "exactly as it was before"?  I --

2           Q.   (By Mr. Ratliff)  I don't --

3           A.   There -- I'm sorry.  What did you say?

4           Q.   So if someone experiences hair loss during

5      chemotherapy, your expectation is their hair would

6      regrow exactly as it was before; is that correct?

7                MR. MICELI:  Same objection.

8                THE WITNESS:  Depends what you mean by

9           "exactly as it grows before."  So, for example,

10          there are reports that after chemotherapy hair

11          will regrow, may have a different texture.

12          Q.   (By Mr. Ratliff)  Uh-huh.

13          A.   May have a different color.

14          Q.   May be thinner?

15               MR. MICELI:  Object to the form.

16               THE WITNESS:  You want me to finish or do

17          you want to ask?

18          Q.   (By Mr. Ratliff)  Yeah.  Go ahead.  Go

19     ahead.

20          A.   I would agree, it could be -- it could be

21     thinner -- thinner, but there is a difference in

22     that versus what -- what we're talking about here

23     which is the issue of permanent hair loss.

24          Q.   And you've also seen it reported that when

25     someone loses their hair during chemotherapy it may

Page 148

1    grew back -- grow back with reduced density --
2              MR. MICELI:  Object.
3         Q.   (By Mr. Ratliff) -- or reduced volume; is
4    that correct?
5              MR. MICELI:  Object to the form.
6              THE WITNESS:  I have seen people talk
7         about volume, yes.  But there the issue is it's
8         regrowing, and I'm talking about the lack of
9         regrowth with the permanent alopecia.
10        Q.   (By Mr. Ratliff)  What degree of lack of
11   regrowth?  I think you call in your report
12   substantial lack of regrowth.  Will you put a
13   percentage on that for me?
14        A.   I haven't put a percentage.  I -- you can
15   go to the literature and see the different papers I
16   relied upon where they will grade it based upon how
17   different doctors are looking at it.  The key is the
18   time period being them defining it as something that
19   is seen many months to years after the cessation of
20   chemotherapy.
21        Q.   Okay.  So when you say lack of substantial
22   regrowth, will you define that for me?
23        A.   Defining it as -- as recognizable, and I'm
24   defining it based the way that the individuals in
25   the papers do.  They -- that's a term that these --

                                                Page 149

1      these -- some of these physicians will use.  And I'm

2      just trying to put it into context with the

3      literature.

4          Q.   Uh-huh.

5          A.   Where not everyone that is described will

6      be totally bald, but they certainly do not have

7      normal hair regrowth.  And there are significant --

8      the doctors talk about significant pattern within

9      that lack of regrowth of -- of baldness or parts of

10     the hair where it doesn't grow back.

11         Q.   So more than 50 percent?  Less than

12     50 percent?

13              MR. MICELI:  Object to the form.

14              THE WITNESS:  I haven't formed that

15         opinion, and I don't believe the doctors --

16              MR. RATLIFF:  Can you mark that?

17              THE WITNESS:  I haven't seen doctors

18         describe it that way.  It's possible that a

19         dermatologist can tell you something different,

20         and I'd refer you to them.

21         Q.   (By Mr. Ratliff)  When does something

22     become -- go from chemotherapy-induced alopecia,

23     where maybe it grows back with less density, to

24     permanent chemotherapy-induced alopecia, where you

25     say it's a lack of substantial regrowth?  Where is

```
 1      that -- where is that bright line for me?
 2                 MR. MICELI:  Object to the form.
 3                 THE WITNESS:  So I don't diagnose it, and
 4            I think that's a diagnosis question you're
 5            asking me.  But I would say to you based on the
 6            literature that I look at that the doctors are
 7            very clear that they're describing something
 8            different when they talk about permanent
 9            alopecia --
10      Q.   (By Mr. Ratliff)  Okay.
11      A.   -- or use those two acronyms, as I
12      described, which is why I use them, because you'll
13      see those used actually in the paper.
14      Q.   Okay.
15      A.   So I'm -- I would -- we can pull out the
16      papers and look how doctors describe it, but I'm
17      not -- I don't diagnose so I would say speak to a
18      dermatologist to get his diagnosis -- or his or her.
19      I shouldn't assume it's a him.
20                 MR. RATLIFF:  Okay.  Can you mark that as
21            Exhibit 6?
22                 MR. MICELI:  Do you have one of these for
23            me?
24                 MR. RATLIFF:  There you go.
25                 COURT REPORTER:  It's Exhibit 7.
```

1    permanent chemotherapy-induced alopecia; is that

2    correct?

3         A.   That is correct.  Those are the ones I'm

4    aware of.

5         Q.   Okay.  So in terms of a weight of the

6    evidence, how did you weight the Sedlacek abstract

7    versus -- did you give it, like, a numerical weight?

8         A.    I don't -- I already answered the last

9    deposition, I do not give them a numerical weight.

10   I give it a weight based on the type of information

11   it is.  I talked at trial about this, about the fact

12   that controlled clinical studies are given more

13   weight than --

14        Q.   Okay.  Would you call this a controlled

15   clinical study?

16        A.   This particular is not, no.

17        Q.   Okay.

18        A.   This is a type of -- I tell you in my

19   report.  I call it a type of epidemiological

20   investigation.

21        Q.   And in this study, Dr. Sed- -- or this

22   abstract, Dr. Sedlacek compared what he called

23   group A, group B, and group C; is that correct?

24        A.   Yes.

25        Q.   And group A was a small handful of

1    did it.  I'm asking are you going to do it?

2          A.   I don't plan to, and I'm saying -- what

3    I'm saying to you is I also don't think that that

4    would be asked of me either.

5          Q.   Okay.

6          A.   I've given you two answers there.

7          Q.   And when you say it's a substantial

8    contributing factor to permanent

9    chemotherapy-induced alopecia, just so I'm clear,

10   that is also not your way of saying that Taxotere

11   causes permanent chemotherapy-induced alopecia;

12   correct?

13         A.   That is correct.

14         Q.   Okay.

15         A.   I'm saying that it's -- it's a -- it's a

16   factor that can't be ruled out, that's the issue of

17   substantial contributing cause, right, when you're

18   looking at that assessment.  But I'm not doing a

19   casual analysis.  Instead what I'm doing is I'm

20   saying based upon the biologically plausible

21   relationship that exists, the weight of the evidence

22   that you look at, that -- that indeed it's been

23   shown with the clinical data that the TAC regimen

24   with the Taxotere specifically is an increased risk

25   and therefore is a substantial contributing factor.

Page 240

1      A.    Yes.

2      Q.    Okay.  Prior to 2009, are you aware of any

3      other pieces of literature or published reports of

4      permanent hair loss with Taxotere?

5      A.    Not within the published scientific

6      literature, no --

7      Q.    So --

8      A.    -- I have published -- I have provided --

9      I have provided what I can find in the published

10     literature.  I will say that there is, in that time

11     period, a clinical study report for the interim

12     analysis of 316 from 2004, I believe, or '05, that

13     would fit in there.  And so that fits in that time

14     frame.

15     Q.    Okay.  So we have the Nabholtz article

16     from 2001.  We have the Sedlacek abstract from 2006.

17     And we have the interim TAX 316 data -- or the

18     interim, I guess, clinical study report.

19          Those would be the three pieces of

20     evidence or reports of what you would call permanent

21     hair loss prior to 2009; is that correct?

22          MR. MICELI:  Object to the form.

23          THE WITNESS:  Let me check one thing.  I

24     would say I believe that's true.  But let me

25     just check.  I'd have to check on the GEICAM

1           very specific patient, then to me that's a

2           diagnosis.  And I would say ask the doctor.

3                However, I would say, if you were to ask

4           me as a pharmacologist, based on what the

5           doctor has said, would that fit a definition of

6           a contributing factor or a substantial

7           contributing factor, yes, I would indicate it

8           would.

9                But that is not the opinion that I formed

10          based on trying to look and -- and take this

11          one piece of data by itself.

12               Again, my substantial contributing factor

13          opinions are based on my weight of the

14          evidence, not just one paper.

15          Q.   (By Mr. Ratliff)  Okay.  But at least as

16     to this one paper, this would fit into what you

17     said, as a pharmacologist or toxicologist, would

18     fall into the realm of a contributing or

19     substantially contributing factor to this lady's

20     permanent hair loss?

21               MR. MICELI:  Object to the form.

22               THE WITNESS:  I think I've already

23          answered.  I would stick with my previous

24          answer.  I believe that's -- I believe that's

25          how I would state it.

1          A.   If you're going to ask about it, I would

2     need to look at it.

3          Q.   No, I just -- if you haven't -- if you

4     haven't looked about it -- looked at it, I just -- I

5     was curious.  If you had looked at it, I was going

6     to have some questions for you.

7          A.   I mean, I've read the abstract.  So I --

8     because that's all I have done.  I -- if you -- if

9     you want to ask me questions about what's in here, I

10    would need to take a look at it.

11         Q.   Okay.  Well, in the abstract it says,

12    "Taxanes are a leading cause of severe and often

13    permanent chemotherapy-induced alopecia."

14              Do you see that?

15         A.   I do.

16         Q.   Do you agree with that statement that

17    taxanes, which would be Taxotere and Taxol, are a

18    leading cause of severe and often permanent

19    chemotherapy-induced alopecia?

20         A.   I have not formed that opinion.  So, no, I

21    can't -- I wouldn't state it that way.

22         Q.   So you can neither agree or disagree with

23    that statement?

24         A.   That's correct because I have not done a

25    causation analysis which is what this is -- that

Page 348

1    statement is.

2         Q.   And he goes on to say, "As the underlying

3    pathobiology of taxane chemotherapy-induced alopecia

4    remains poorly understood..." --

5              MR. MICELI:  You might want to slow

6         down --

7              MR. HOLDEN:  Yeah.

8              MR. MICELI:  -- for the court reporter.

9              COURT REPORTER:  Thank you.

10        Q.   (By Mr. Ratliff)  All right.

11             -- "... we investigated how paclitaxel and

12   docetaxel damage human scalp follicles in a

13   clinically relevant ex vivo organ culture model."

14             Do you see that?

15        A.   I do.

16        Q.   And what would you say is your

17   understanding of what is being described there, if

18   you know?

19        A.   Well, I -- I -- I understand what the

20   sentence says.  Is that what you're asking me?

21        Q.   Yeah.  What's your understanding of that?

22        A.   They're looking at a model in -- in an

23   organ which is cells within an organ to look at

24   what -- how different types of cells respond to the

25   presence of paclitaxel and docetaxel.

Page 354

1        Q.    And --

2        A.    I was not --

3        Q.    Sorry.  Go ahead.

4        A.    Because I was not doing a full causation

5   analysis.

6        Q.    Okay.  And this was not anything that you

7   would have looked at when performing an analysis as

8   to the biological plausibility of Taxol to cause

9   permanent chemotherapy-induced alopecia?

10       A.    Well, I -- I don't believe this paper

11  would have been something I would have sought for

12  any of the work I have done so far in this case.

13  And I tried to explain why.  And that's all I can

14  say.

15       Q.    Yeah.  Even though you have not read the

16  paper?

17       A.    Well, I can tell by the title on the

18  abstract and what we just read into the record that

19  this -- this paper is doing something different.  In

20  order to answer any more, I've told you I would need

21  to evaluate the validity of the design as it relates

22  to human exposure.

23            When I developed my biological

24  plausibility opinions, I was focusing on the human

25  experience because that is something that I could do

Page 369

1        some point in time, that was language that appeared

2        in the FDA-approved USPI for Taxotere; correct?

3                A.   Yes, it does.

4                Q.   Okay.  When or if it ever came out of

5        label, you're telling me that you do not know?

6                A.   Without looking.  I don't recall the year.

7        I did -- I -- I -- I do believe I did at one time

8        look for that language, but I don't recall.  And I

9        don't think it's in my report.  So --

10               Q.   Right.

11               A.   -- I'd have to go back and pull the

12       labeling.  I would say to you, it was definitely

13       not -- it was definitely there early on.  I just

14       can't tell you when it disappeared.

15               Q.   Okay.  So let's -- another question.

16                    Is there anything different about your

17       Taxotere-is-more-toxic-than-Taxol opinion than what

18       you described in your previous deposition?

19               A.   Well, I've -- I think I've worded it a

20       little bit differently in my report.  I may have a

21       different sentence or so in there, and I need to

22       look at that, I think.  But I wouldn't -- there's no

23       new evidence that I would point to.  I -- I -- as I

24       described that 311, I believe that's correct, 311

25       study --