# EXHIBIT C

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
     IN RE: TAXOTERE              )
 3   (DOCETAXEL) PRODUCTS         )
     LIABILITY LITIGATION         )
 4                                )   MDL No. 2740
     This Document Relates To:    )
 5                                )   SECTION: H
     Antoinette Durden, Case      )
 6   No. 2:16-cv-16635            )
                                  )
 7   Tanya Francis, Case          )
     No. 2:16-cv-17410;           )
 8                                )
     Barbara Earnest, Case        )
 9   No. 2:16-cv-17144            )
10
11   ******************************************************
12              ORAL VIDEOTAPED DEPOSITION OF
13                 LAURA PLUNKETT, PH.D.
14                   DECEMBER 10, 2018
15   ******************************************************
16
17
          ORAL VIDEOTAPED DEPOSITION OF LAURA PLUNKETT,
18   PH.D., produced as a witness at the instance of the
     Defendants and duly sworn, was taken in the
19   above-styled and numbered cause on the 10th day of
     December, 2018, from 9:21 a.m. to 5:22 p.m., before
20   Stephanie Barringer, Certified Realtime Reporter
     (CRR), Registered Professional Reporter (RPR), and
21   Certified Shorthand Reporter (CSR) in and for the
     State of Texas, reported by stenographic means at the
22   offices of Fleming, Nolen & Jez, LLP, 2800 Post Oak
     Blvd., Suite 4000, Houston, Texas  77056, pursuant to
23   the Federal Rules of Civil Procedure and the
     provisions stated on the record or attached hereto.
24
25   Job No. NJ3152742
```

Page 9

1     A.    All right.
2     Q.    Okay.  Now, I know you've been deposed
3  many times in the past, true?
4     A.    Yes.
5     Q.    How many times?
6     A.    A total number, I don't know.  This last
7  year, at least 25 times, I would imagine.
8     Q.    In the past year?
9     A.    Yes.
10    Q.    And so what's your best estimate, since
11 you've been providing expert witness services, how
12 many times you've been deposed?
13    A.    Well over 100 times totally.  I don't
14 have an exact number.  I've been doing this -- my
15 first testimony was back in 1993 when I worked for
16 Environ Corporation.  So hundreds of times,
17 probably, over 20-some years now.
18    Q.    Okay.  And you said you've given
19 25 depositions this year, in 2018?
20    A.    I believe that's true, yes.
21    Q.    And has that rate typically been true
22 for, say, the last ten-year period, about
23 25 depositions a year?
24    A.    Well, it's not just depositions.
25 25 trial and deposition appearances.

Page 10

1      Q.   Uh-huh.
2      A.   And that would -- no, not necessarily.
3  Some years, more.  Some years, less.  20 years ago,
4  not as many --
5      Q.   Okay.
6      A.   -- as I do today.
7      Q.   So it's been a busy year for you?
8      A.   Yes.  More things are going to trial now
9  than -- than ever did in, I would say, the last
10 three or four years.
11     Q.   Okay.  So you're no stranger to the
12 litigation process; is that fair?
13              MR. MICELI:  Object to the form.
14     A.   That's true.
15     Q.   (BY MS. SASTRE)  Okay.  And you've either
16 testified at trial and/or been in depositions, you
17 said, hundreds of times, true?
18     A.   In depositions and trials over 20 years,
19 yes, that's probably true.
20     Q.   All right.  When you say "hundreds of
21 times," is it closer to 2- or 300, or is it closer
22 to 7- or 800?
23     A.   Oh, it's closer to a hundred to 200.  I
24 think -- I've had someone count before.  A defense
25 attorney had mentioned a number about 150.  I don't

1  the scientific -- in the scientific information
2  that I have seen.
3      Q.   You have never, as you said, made the
4  decision as to whether a specific patient should be
5  given Taxol or Taxotere, true?
6      A.   That's true.  Because I'm not a
7  physician.
8      Q.   Right.
9           You're not an oncologist?
10     A.   That's true.  I am not.
11     Q.   Right.
12          And other than what you've read,
13 you don't have any information available to you
14 that would tell us exactly how oncologists make
15 that decision, correct?
16     A.   I can't tell you how an oncologist makes
17 that decision, no.  I can tell you what -- what
18 is -- what scientists and the FDA and different
19 individuals that talk about the use of these drugs
20 say.
21          But certainly I'm not an
22 oncologist.  So I can't tell you what oncologists
23 would say.
24     Q.   Okay.  You'd agree with me that no
25 medical or scientific organization anywhere in the

Page 80

1  Q.  And you'd agree that the use of Taxotere
2  is within the standard of care for treating early
3  stage breast cancer?
4         MR. MICELI:  Object to the form.
5  A.  So I'm not a physician so I don't for
6  opinions on, quote, unquote, standard of care.  But
7  I would agree that I know that physicians do use it
8  interchangeably.  That's the best I can answer that
9  for you based on what I have reviewed.
10 Q.  (BY MS. SASTRE)  Now, you've told us
11 several times that you are a pharmacologist and a
12 toxicologist, true?
13 A.  Yes.
14 Q.  You told us you are not a medical doctor,
15 true?
16 A.  Yes.
17 Q.  You don't see patients in a clinical
18 setting, correct?
19 A.  That is correct.  I --
20 Q.  Or at all; is that fair?
21 A.  That is correct.  I do not.
22 Q.  Okay.  You've never diagnosed or treated
23 breast cancer, true?
24 A.  That is correct.  I have not.
25 Q.  You've never even -- you've never been in

1   the position of having to determine what would be
2   the most appropriate chemotherapy regimen for a
3   given patient?
4        A.   That is correct.  Because I'm not a
5   physician.
6        Q.   Okay.  You're not an expert in the field
7   of oncology?
8        A.   No.  I'm not an oncologist, so I'm not an
9   expert in that field.
10       Q.   You're not an expert in dermatology?
11       A.   No.  Again, I'm not a dermatologist, so I
12  don't consider myself an expert in that field.
13       Q.   Not an expert in pathology?
14       A.   It would be the same answer.  I'm not a
15  pathologist by -- by training.
16       Q.   And you're not an expert in epidemiology,
17  correct?
18       A.   I have expertise in epidemiology.  But I
19  am not a -- I'm not degreed in epidemiology.  So
20  it's a tool I use every day, but it certainly is
21  not my degree.
22       Q.   There are a number of depositions that
23  you reviewed.  Are they all of Sanofi company
24  witnesses or employees?
25       A.   Yes, the ones I have reviewed.

Page 108

1    A.   I would agree that there are reports in
2  the literature, in some of the trials, of some
3  people taking longer, yes.
4    Q.   Okay.  Outside of the work that you've
5  done in the litigation context -- because you also
6  do work that's not related to lawsuits and
7  litigation, true?
8    A.   I do.
9    Q.   And so in that setting, your
10 non-litigation work, have you published any
11 literature or studies on hair loss?
12   A.   No.  Not in the peer-reviewed literature,
13 if that's what you're asking me.  No, I have not.
14   Q.   What about in the non-peer reviewed
15 literature?  Have you published any papers or
16 literature on permanent hair loss?
17   A.   Not that would be publicly available.  I
18 have -- I have looked at hair loss as an endpoint
19 for clients before in different projects I've done
20 and reports for clients but not something that's
21 been made available to the public.
22   Q.   In what setting were you looking at hair
23 loss for clients, generally?
24   A.   So looking at toxicity studies in animals
25 where hair loss is an endpoint that's monitored.

```
 1   Interpreting data.  Also in my patent work, there
 2   are different applications I've worked on where the
 3   data that I'm evaluating to support the patent
 4   application has to be -- do -- has to do with
 5   treatments for hair loss.
 6        Q.   Okay.  Have you ever presented on
 7   permanent hair loss?
 8        A.   No.  I've not done a presentation.
 9        Q.   Okay.  And have you been published with
10   regard to breast cancer?
11        A.   No.  I don't think I've published a study
12   or presented any -- an abstract at a meeting on
13   that, no.
14        Q.   And have you published a study or
15   presented on the treatment of breast cancer, in
16   particular chemotherapy?
17        A.   No.  Again, I would expect a physician to
18   be the one who would do that.
19                  (Discussion off the record.)
20        Q.   (BY MS. SASTRE)  You agree it's well
21   known that chemotherapy can cause hair loss?
22        A.   I would --
23                  MR. MICELI:  Object -- excuse me.
24   Object to the form.
25        A.   I would state that it's -- I believe that
```

Page 157

1    MS. SASTRE: Oh.
2    MR. MICELI: Whenever you want to
3    stop.
4    MS. SASTRE: Yeah. Let me take a
5    look for another minute or two.
6    MR. MICELI: Okay. Okay.
7    MS. SASTRE: Thank you. I
8    appreciate the reminder.
9    MR. MICELI: Yep.
10       Q.   (BY MS. SASTRE) You'd agree that simply
11   because a side effect is associated with a drug, it
12   does not necessarily mean that the drug is the
13   causing fact of the side effect?
14       A.   I think it depends on what -- what
15   evidence you're pointing to. But I would agree
16   that you wouldn't just assume that just generally
17   on -- on mentioning the word "side effect." But
18   certainly there are studies or information that
19   allow you to make those -- those links.
20       Q.   Uh-huh. Uh-huh. Uh-huh.
21            And here, have you specifically
22   performed a causation analysis when you're looking
23   at Taxotere being taken in the combination setting,
24   specifically with Adriamycin and cyclophosphamide?
25       A.   I am not doing a causation analysis, no.

Page 158

1  Q. Okay. So when you look at Taxotere being
2 provided in the combination setting, which it was
3 in the studies that you relied upon, you do not
4 have an opinion as to whether it was the Taxotere,
5 the Adriamycin or the cyclophosphamide which was
6 the cause of any specific individual patient's hair
7 loss.
8             You've not done that analysis,
9 true?
10  A. For specific patients, no. But I do have
11 an opinion that I've expressed in my report about
12 the issue of the way to interpret the data, for
13 example, in the 316 study. And I think I have
14 expressed that.
15             But I believe that the
16 information in that study allows you to conclude
17 that Taxotere shows an increased risk of that event
18 as compared to the comparator arm of the study.
19  Q. But you did not specifically do a
20 causation analysis with regard to Taxotere, true?
21             MR. MICELI: Object to the form.
22  A. I answered that. I'm not the -- it's --
23 I am not the causation expert in these cases. It's
24 my understanding of that that that is not my role.
25  Q. (BY MS. SASTRE) And, likewise, Doctor,

1  if I said the single.
2           But some of the most important
3  pieces of evidence or information that you relied
4  upon were the studies that you listed, TAX 316,
5  TAX 311 and GEICAM, true?
6       A.   Those were certainly very important
7  pieces of evidence for Taxotere, yes, absolutely.
8       Q.   That clinical trial information, you did
9  not have for any of the other medications or drugs
10 that you studied, including Taxotere, including
11 5-FU, including doxorubicin, cyclophosphamide,
12 correct?
13      A.   I can't say that I had no clinical
14 information.  Because the labeling described
15 clinical information that was available for those
16 drugs.  But certainly I did not have the same
17 access to confidential documents.  So that -- there
18 is a different level of analysis that you can do
19 when I actually have access to the clinical study
20 reports, for example.
21           (Discussion off the record.)
22      Q.   (BY MS. SASTRE)  Okay.  Okay.  Did you
23 assign a specific amount of weight to the
24 information that you relied upon?
25      A.   I don't know what you mean by specific

1   weight.  It's not like there's a numerical factor.
2   Is that what you mean by specific weight?
3        Q.   Did you somehow put them in some order as
4   to what was the most important to your opinions to
5   the least important?
6        A.   To some extent, yes, I do do that in any
7   of my weight of the evidence analysis.  So, for
8   example, if I'm looking at something like this,
9   permanent alopecia, which is something that I
10  wouldn't be able to see that specific endpoint
11  demonstrated in animal studies --
12       Q.   Uh-huh.
13       A.   -- instead I would be relying -- I would
14  be looking for human data and human experience,
15  absolutely.  That would be information that would
16  be -- would be of importance to forming that
17  opinion with permanent alopecia.
18                 You can get information sometimes
19  on alopecia from animal studies, general alopecia,
20  drug-induced alopecia.  But I've not seen an animal
21  model that would be -- that I have seen used in
22  the -- for the specific endpoint of permanent
23  alopecia.
24       Q.   Okay.  And I guess all I'm saying is that
25  there is hierarchy, how to evaluate medical

Page 301

1  showing that the hair follicle is a target organ of
2  mammals generally.
3     Q.  Uh-huh.
4     A.  And then -- then it's followed up by
5  the -- by the clinical observations of that -- that
6  occurring as well.
7     Q.  Uh-huh.
8     A.  So biologic plausibility is built from --
9  up from -- as a pharmacologist and toxicologist,
10 I'd build it from cell studies where you can kill
11 cells up to observations in humans.  It's just one
12 brick in a wall of causal analysis.  But I'm not
13 doing a causal analysis.
14    Q.  Right.
15    A.  I have a brick, which is biologic
16 plausibility, that comes from pharmacology and
17 toxicology.
18              But I am not here -- I want to
19 make sure you know that I'm not here as the
20 causation expert.  But I do believe that, to a
21 reasonable degree of scientific certainty, we can
22 understand that the relationship would be
23 biologically plausible.
24    Q.  And -- sure.
25              And so what you're saying is

Page 306

1 reviewed which indicated to you that it is not
2 biologically plausible that there's a relationship
3 between Taxol and permanent alopecia?
4                     MR. MICELI:  Object to the --
5 object to the form.
6      A.   So I haven't done the analysis one way or
7 the other to say that's true or not true.  But I
8 will tell you what I have seen was not the same --
9 I haven't seen the same information as I have seen
10 for Taxotere.
11                     So I haven't -- I haven't
12 attempted to look at the biologic plausibility of
13 Taxol.  Again, it's my understanding that others
14 are handling causation.
15      Q.   (BY MS. SASTRE)  But you agree that
16 there's the same mechanism of action with Taxotere
17 and Taxol, true?
18                     MR. MICELI:  Object to the form.
19      A.   Not exactly the same, no.  One affects
20 three cell -- three phases of the cell cycle, which
21 is Taxotere.  And one only affects two.  So it's
22 very possible, based on that difference in the
23 mechanism, that you would see something potentially
24 different.  So it's not exactly the same.
25                     That was why I had that paragraph