# EXHIBIT E

Page 1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                    CASE NO. 2:16-cv-17039

3

4    ELIZABETH KAHN,                    ) VIDEOCONFERENCE
                                        ) VIDEOTAPED
5                                       ) DEPOSITION OF:
                     Plaintiff,         )
6                                       )
        v.                              ) LAURA M.
7                                       ) PLUNKETT,
                                        ) Ph.D., DABT
8                                       )
     SANOFI S.A., SANOFI-AVENTIS        )
9    U.S. L.L.C., SANOFI US SERVICE,    )
     INC., and AVENTIS-PHARMA S.A.,     )
10                                      )
                     Defendants.        )
11   _____   )

12

13                   TRANSCRIPT of the stenographic notes of

14   the proceedings in the above-entitled matter, as

15   taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,

16   held via Zoom videoconference from multiple

17   locations, with the witness located at 13923 Carriage

18   Walk Lane, Houston, Texas, on Monday, April 27, 2020,

19   commencing at 2:59 p.m.

20

21

22

23

24

25

1      chemotherapy-induced alopecia?

2             A.     I don't.  Again, I have seen no medical

3      records, and have no -- I've not seen materials

4      describing any of her condition.

5             Q.     Okay.  And so other than just

6      confirming that she took Taxotere, you have no

7      further information on what her chemotherapy regimen

8      was?

9             A.     At this time, that is correct.

10            Q.     Okay.  Now, Dr. Plunkett, I think --

11     and again, maybe trying to confirm some things from

12     previous depositions -- you are not here to give

13     what is known as a specific causation opinion.  Is

14     that correct?

15            A.     Yes, that's correct.  That is -- that

16     is exactly right.

17            Q.     Okay.  And just so we're clear, you're

18     not going to come in to trial and opine that

19     Ms. Kahn's hair loss was caused by Taxotere.  Is

20     that correct?

21            A.     That is correct.  There are others

22     that, it's my understanding, will handle that, but

23     it's not me.

24            Q.     Okay.  And likewise, there's something

25     known as a general causation expert.  I believe you

1   told me previously, Dr. Plunkett, that while you

2   have done that in other cases, you are not going to

3   give a general causation opinion in this particular

4   matter.  Is that correct?

5                MR. MICELI:  Object to the form.

6        A.     Yes.

7        Q.     I'm sorry, did you say yes?

8        A.     I did say yes; and then wanted to make

9   sure the objection got in.

10               But yes, that's correct; I am not here

11  to do, or I have not performed a general causation

12  analysis at this time.

13       Q.     And just out of curiosity, what

14  typically goes into -- or when you have performed

15  general causation analyses in the past, what

16  methodology do you use?

17               MR. MICELI:  Object to the form.

18       A.     I use a standard methodology of many

19  people like myself; which would be first a gathering

20  of all of the scientific information that's

21  available that is relevant to causation for the

22  particular end points.  So literature searches;

23  maybe internal clinical trial information, for

24  example, for a drug.

25               And then I organize that information

Page 20

```
 1       into groups, guided by the Hill considerations,

 2       looking at --

 3                  (Court reporter clarification.)

 4       A.       Hill considerations.  So it's a --

 5       Bradford-Hill considerations are a standard tool

 6       that many people use for these kinds of analysis;

 7       particularly in cases like this, involving

 8       litigation.

 9                  So I put that together; and I would

10       essentially pocket the information that I have

11       available; understanding where I have data, where I

12       don't have data; whether -- and then making a

13       determination whether or not the information I have

14       allows me to answer all the key questions about --

15       that I would be addressing, based upon that

16       analysis.

17       Q.       Thank you.  So when you were talking

18       about the Bradford-Hill criteria, that is not an

19       analysis that you have performed in this case.  Is

20       that correct?

21       A.       That -- that's correct.  I have not

22       done a full analysis.  I've looked at pieces of

23       information that someone could use for such an

24       analysis, but I have not done that analysis.

25       Q.       Thank you.  And are you aware of any --
```

Page 25

```
1    else -- where the witness cannot hear.  Because I
2    want -- I just want to make something clear to you.
3    I don't want --
4                    MR. RATLIFF:  I would like her to
5    answer the question first, to be honest.
6                    MR. MICELI:  Well, I think it's simply
7    improper.
8                    But go ahead.
9    BY MR. RATLIFF:
10        A.    I have not ever seen this e-mail, so --
11   and again, I didn't write it.  So you'd have to ask
12   Mr. Lambert.
13        Q.    Okay.  But you do not -- although
14   Mr. Lambert has represented to the Court that you
15   are one of the plaintiff's general causation
16   experts, your testimony here is today that you are
17   not one of the general causation experts for the
18   plaintiffs in this litigation.  Is that correct?
19                    MR. MICELI:  Object to the form.
20        A.    I am not a general causation expert,
21   based on my understanding of what "general
22   causation" means, which is what I described for you
23   a few minutes ago; it would be going through this
24   analysis.
25                    I have no idea whether, within the
```

Page 109

1    your new report from your 2019 report that says, "It

2    is my opinion to a reasonable degree of scientific

3    certainty that Taxotere/docetaxel is more toxic than

4    Taxol/paclitaxel when used to treat breast cancer."

5              And the addition is the line "when used

6    to treat breast cancer."  Do you see that?

7         A.    I do.

8         Q.    Could you tell me why that was added to

9    your report?

10        A.    Because that's a more specific

11   statement of the study data I'm relying upon.  The

12   population at issue in this case.  So I wanted -- I

13   mean, I think I told you in the beginning of my

14   report that I was talking about the use of these

15   drugs to treat breast cancer.  So it's more -- it is

16   more correct for me to put that in there, because

17   that is what my analysis dealt with:  Looking at the

18   drug and the toxicity, as it's compared to people

19   that are taking the drug for treatment of breast

20   cancer.

21        Q.    Yes.  And would you say that this

22   opinion, that Taxotere is more toxic than Taxol, is

23   the same as in your previous reports?

24        A.    What do you mean by --

25              MR. MICELI:  Object to the form.

1      Q.      Are you giving -- are you giving the

2   same opinion that you gave before?

3      A.      Well, I mean, I am saying -- I am

4   saying that -- I guess the opinion is that Taxotere

5   is more toxic than Taxol was in my previous report.

6   So that opinion is there.

7              I think that the discussion is very

8   similar.  I -- maybe -- I don't believe I changed

9   that part of my report that much.  So I would say

10   that this should be consistent with that.

11      Q.      Okay.  And Dr. Plunkett, you're not

12   going to appear at trial and testify that, as it

13   relates to Elizabeth Kahn, that Taxotere would be

14   more toxic to her specifically.  Correct?

15      A.      No, because I'm not case-specific.

16      Q.      Okay.  And you go on to say,

17   "Irreversible alopecia is not the same as

18   drug-induced alopecia."  Is that correct?

19      A.      Yes, that is my opinion, yes.

20      Q.      Can you define for me "drug-induced

21   alopecia"?

22      A.      It's alopecia that is --

23              MR. MICELI:  Objection -- object --

24   object to the form.

25              But go ahead.

Page 112

1    chemotherapy-induced alopecia?

2            A.      I defined it in my report as being

3    reported by clinicians as alopecia that is something

4    that is seen more than six months after treatment

5    with the drug.  I'm not a clinician, I'm not

6    redefining it.  I'm using it in the way that the

7    clinical literature describes it, and how I read

8    that as a pharmacologist and a toxicologist.

9            Q.      If a person takes chemotherapy and

10   loses their hair, and then it grows back, would that

11   be drug-induced alopecia, or would that be permanent

12   chemotherapy-induced alopecia?

13                  MR. MICELI:  Object to the form.

14           A.      That's a diagnosis, so I don't do that.

15   I can't answer that for you.  I can tell you how

16   it's been described in the literature, and what I

17   have relied upon, but I don't -- I can't -- I don't

18   diagnose patients, so I can't tell you.

19           Q.      Yeah, I'm not asking you to diagnose

20   anybody, Dr. Plunkett.  I'm just asking you -- let

21   me ask you this.  If someone takes a chemotherapy,

22   and loses her hair, and then their hair grows back;

23   based on what you've seen in the literature, which

24   bucket would that fall into?

25                  MR. MICELI:  Object to the form.

Page 138

```
 1        Q.    Well, what would you consider to be,

 2   for a general causation analysis, the most important

 3   piece of information?  Or evidence?

 4              MR. MICELI:  Object to the form.

 5   Excuse me.  Object to the form.

 6        A.    So I'm not doing a causation analysis

 7   here.  But in places where I do that, again, just

 8   like I did, I would focus on human evidence.  If I'm

 9   talking about a human causal relationship between

10   exposure --

11              (Court reporter clarification.)

12        A.    -- and response.

13              In some cases I work on in causation,

14   in cases that involve environmental exposures, I

15   often have to spend more time looking at data

16   outside of humans, because we don't have the same

17   type of availability of controlled studies, like we

18   do in a drug -- in the drug world, where we actually

19   have clinical data to look at.

20        Q.    Okay.  Doctor, throughout your report,

21   you use the word "linked," L-I-N-K-E-D.  What does

22   that mean to you, as you use it?

23        A.    That two things can be related in some

24   way.  So exposure and response in a pharmacodynamic

25   study, or in a pharmacokinetic study, you can link a
```