**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                                  **MDL NO. 2740**
**PRODUCTS LIABILITY LITIGATION**

                                                              **SECTION "H" (5)**

**THIS DOCUMENT RELATES TO:**
**Elizabeth Kahn, Case No. 2:16-cv-17039**

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE**
**TESTIMONY OF JOHN GLASPY, M.D.**</u>

Sanofi's expert oncologist, Dr. John Glaspy, offers opinions that are beyond his area of

expertise and that are unsupported by a reliable methodology.

Specifically, Dr. Glaspy is not qualified to offer his wide ranging opinions regarding the

presentation and cause of various types of alopecia or what specifically caused Ms. Kahn's hair to

not regrow. Dr. Glaspy is not a dermatologist, and even if he had examined Ms. Kahn, which he

did not, he is unable to differentiate between the different kinds and causes of hair loss. Dr. Glaspy

is also not qualified to offer regulatory opinions. Not only does Dr. Glaspy fail to identify his

regulatory opinions beyond general points that he intends to "discuss" in the future, but Dr. Glaspy

admits that he is not an expert in FDA regulatory practices.

Additionally, Dr. Glaspy failed to use a reliable methodology in opining that Taxotere *does*

*not cause* persistent hair loss but that other chemotherapy drugs, hormonal therapies, and medical

conditions *do cause* persistent hair loss[1]. Without a reliable methodology to support his general

causation opinions, Dr. Glaspy's specific causation opinion falls like a house of cards. Having

never examined Ms. Kahn and lacking the knowledge of how to differentially diagnose persistent

---

[1] "Persistent hair loss" used herein and in the accompanying motion is used interchangeably with and includes PCIA, irreversible and permanent hair loss or permanent alopecia.

1

hair loss, Dr. Kahn's opinion as to what caused Ms. Kahn's hair loss is fundamentally unreliable, unsupported, and prejudicial.

These opinions, as explained in more detail below, fail to meet the stringent *Daubert* requirements, and this Court should exclude them in accordance with its gatekeeping function. This Court should further exclude opinions that are not fully set out in Dr. Glaspy's report, and for which he offers no basis or data underlying his anticipated opinion, or for which he offers no methodology at all, pursuant to FRCP, Rules 26(a)(2)(B) and 37(c).

## **LEGAL STANDARD**

An expert's testimony is only admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Further, any expert designated under FRCP, Rule 26(a)(2)(B), must produce a report that contains " (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; . . .; and (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years. . . ."   The trial judge is obligated to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). When an expert's testimony is demonstrated to be speculative and lacking of any established methodology the Court should exclude such testimony.  *In re: Vioxx Prod. Liability Litigation*, 414 F. Supp.2d 574, 579 (E.D. La 2006) (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998)).

Expert testimony is inadmissible when "the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 136 F.3d 935, 937 (5th Cir. 1999). And, it must be excluded where it "go[es] beyond the scope of his expertise in giving his opinions." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)).

Even if a witness is qualified his/her opinions may still be excluded if they are unreliable or irrelevant, or risk confusing the jury. The Eastern District of Louisiana has adopted a two-part inquiry requiring the Court to determine (1) if the proffered expert testimony is reliable and (2) whether the experts reasoning or methodology is relevant. *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015).

Testimony is unreliable when based merely on subjective belief or unsupported speculation; it must be excluded as such conclusions lack valid underlying reasoning and/or methodology. *Id*. This is particularly true of Dr. Glaspy's "eyeball test." The Court's "reliability analysis applies to all aspects of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion," *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998).

If the expert's reasoning or methodology does not fit the facts of the case, or simply lacks an adequate basis, the testimony is inadmissible as it will not assist the trier of fact. *Burst*, 120 F.

Supp. 3d at 551. Likewise, testimony should be stricken as irrelevant when there is "too great an analytical gap" between the data or facts considered and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, opinion evidence is inadmissible if it is only tethered to existing facts through the *ipse dixit* of the expert. *Id.*

In order for a qualified expert to offer opinion testimony he/she must derive opinions from a sufficient factual basis or data, to which he/she applies an established and reliable methodology, and then applies that methodology in a reliable way to form opinions. *Moore*, 151 F.3d at 275-76. Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. *Stephens v. Florida Marine Trans. Inc.*, No. 12-1873, 2013 WL 11257508 at *4 (E.D. La. 2013) (citing *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012)). Where an expert's opinions are not the product of "reliable principals and methods," or has no methodology or authority to support the opinion, they fail Rule 702 and must be excluded. *Douglas v. Chem Carrier Towing, LLC*, 431 F. Supp. 3d 830, 836 (E.D. La. 2019).

Lastly, "[t]hough courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinions, Rule 703 nonetheless requires courts to examine the reliability of those sources." *Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir. 1983). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

## ARGUMENT

### I.   DR. GLASPY IS NOT QUALIFIED TO OPINE AS TO THE DIFFERENT KINDS OF ALOPECIA AND THEIR CAUSES, THE CAUSE OF MS. KAHN'S ALOPECIA, OR THE FDA DRUG APPROVAL PROCESS

Expert testimony is inadmissible when "the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 136 F.3d 935, 937 (5th Cir. 1999). Similarly, an expert's testimony should be excluded where it "go[es] beyond the scope of [her] expertise in giving [her] opinions." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)). Where the expert lacks the "scientific knowledge" of the area of expertise, never investigated the subject, never trained in the area of expertise, never performed any studies in the area of expertise, and has never written any research papers in the area of expertise, he was due to be excluded. *See Verzwyvelt v. St. Paul Fire & Marine Insurance Co.*, 175 F. Supp. 2d 881, 886 (W.D. La. 2001) (wherein the court found the coroner was not qualified to testify as to whether a Listeria infection caused the decedent's death because the coroner "concedes that he has little or no scientific knowledge concerning listeria, listeria infections, or the subfield of hematopathology. He did not find evidence of listeria in decedent's body at the time of autopsy and performed no tests related to listeria."). As explained below, Dr.Glaspy lacks the requisite "scienfic knowledge" needed to opine on the presentation and causes of the varying types of alopecia—generally or as it relates to Ms. Kahn—or the FDA regulatory process and his opinions on these topics should therefore be excluded.

**A.      Dr. Glapsy is Not Qualified to Opine as to the Presentation and Causes of the Different Kinds of Alopecia**

Dr. Glapsy intends to "offer opinions regarding types of alopecia and causes of alopecia," and "regarding … [Ms. Kahn's] alopecia.[2] In his report, Dr. Glapsy describes the presentation of different kinds of alopecia and their potential causes.[3] After summarizing Ms. Kahn's chemotherapy treatment, Dr. Glaspy concludes that Taxotere could not have caused her hair loss,[4] stating that other drugs or her aging could have caused her hair loss.[5]

But Dr. Glaspy never examined or performed a differential diagnosis of Ms. Kahn's hair loss. He is not a dermatologist or an expert in dermatology.[6] He is not credentialed in dermatology or permitted to provide dermatology services at any of the hospitals where he treats cancer patients.[7,8] Dr. Glaspy does not understand the fundamentals of hair loss science and confesses he does not know how to measure hair density.[9] Nor does Dr. Glaspy differentiate between different types of alopecia.[10] He cannot articulate what type of alopecia is caused by a vitamin deficiency, iron deficiency, or a thyroid problem, and he cannot differentiate one type of suspected hair loss from another.[11] He cannot describe the clinical presentation of persistent hair loss or how it differs

---

[2] Ex. A, Glapy Rep. 4/29/2020 at 21, 37.

[3] Ex. A, Glapy Rep. 4/29/2020 at 21-28.

[4] Ex. A, Glapy Rep. 4/29/2020 at 46.

[5] Ex. A, Glapy Rep. 4/29/2020 at 48.

[6] Ex. B, Glaspy Dep. 1/9/2020 at 203:16-20.

[7] *Id.* at 116:8-21 and 117:17-118:22.

[8] If the hospitals where Dr. Glaspy treats patients do not permit him to render dermatology services in their hospitals, this Court should not recognize him as an expert qualified to render dermatology opinions.

[9] Ex. B, Glaspy Dep. 1/9/2020 at 103:9-10.

[10] *Id.* at 203:21-204:9.

[11] Ex. B, Glaspy Dep. 1/9/2020 at 197:2-10; 198:18-25.

from other forms of alopecia.[12] Dr. Glaspy is unfamiliar with the diagnostic criteria for persistent hair loss.[13]

Under Fifth Circuit precedent, to reliably opine on the specific cause of a particular condition, a medical expert must have a specialized expertise relating to the cause of that condition. For example, in *Tanner v. Westbrook*, the Fifth Circuit reversed the district court's admission of Dr. Nestrud's opinion as to the cause of a child's cerebral palsy. 174 F.3d 542 (5th Cir. 1999), *superseded in part by rule on other grounds*, Fed. R. Evid. 103(a) (2000). While the Court found Dr. Nestrud well-qualified to testify regarding the standard of care to be given a baby suffering from asphyxia, it nonetheless determined that his opinions regarding causation were unreliable because he "did not have the kind of specialized knowledge required to testify regarding causation, nor did he rely upon medical literature directly addressing the causation issue in this case." *Id.* at 548.

At his deposition, Dr. Glaspy conceded that it is best left to an expert dermatologist to assess the underlying cause or type of alopecia from which a patient may be suffering, admitting that "[he] does not need to be involved in that."[14] These admissions render him unqualified to offer opinions on dermatology, more specifically the presentation and causes of alopecia and what may (or may not) have caused Ms. Kahn's hair loss.

---

[12] Ex. B, Glaspy Dep. 1/9/2020 at 200:19-204:9

[13] *Id.*. at 209:20-24 ("Do you know the diagnostic markers for permanent chemotherapy-induced alopecia on biopsy? A. I don't, except you won't have scarring.")

[14] *Id.* at 203:21-204:9.

B.      **FDA, its regulations, and the drug development and approval process**

In his report, Dr. Glaspy states that he intends to opine on the broad topic of "FDA regulation and drug development,"[15] identifying the following topics he intends to "discuss":

- "Another part of the FDA approval process is the New Drug Application. . . . I will discuss *the NDA process, including the information that the NDA provides to the FDA.*"[16]

- "I will discuss *continuing reporting requirements following approval of the NDA.*"[17]

- "The underlying data from TAX 311, TAX 316, and GEICAM 9805 were all submitted to the FDA. *Submitting underlying data from clinical trials to the FDA is common, required and accepted.*"[18] [19]

- I will discuss labels/prescribing information for chemotherapy drugs, including Taxotere. I will also discuss that the FDA works with companies, like Sanofi, in developing the label.[20]

Dr. Glaspy provides no explanation as to what he intends to opine with respect to these topics, nor does he offer citation or support for sweepings statements, such as "FDA works with companies, like Sanofi, in developing the label," what information is provided in unidentified chemotherapy drug labels, and the content of unidentified FDA submissions and approvals.[21],[22]

---

[15] Ex. A, Glaspy Rep. 4/29/2020 at 34-35.

[16] Ex. A, Glaspy Rep. 4/29/2020 at 34-35.

[17] Ex. A, Glaspy Rep. 4/29/2020 at 35.

[18] Ex. A, Glaspy Rep. 4/29/2020 at 35.

[19] Even more bizarre is Dr. Glaspy's report statement that the TAX 311 data (as well as the TAX 316 and GEICAM 9805 data) were submitted to the FDA. But when asked if he reviewed the final clinical study data sets for TAX 311, he stated that he "read the paper." In this regard Dr. Glaspy's report is materially, factually incorrect, and Sanofi's counsel is acutely aware of this through repeated discovery disputes concerning Sanofi's inability to locate the TAX 311 clinical study datasets, including analysis files.

[20] Ex. A, Glaspy Rep. 4/29/2020 at 35.

[21] Ex. A, Glaspy Rep. 4/29/2020 at 35-36.

[22] Another unsupported statement made by Dr. Glaspy is that "the underlying data from TAX311, TAX316 and GEICAM 9805 were all submitted to the FDA." Sanofi's own internal documents contradict Dr. Glaspy's unsupported statement. Sanofi's Director of Regulatory Affairs, Linda Gustavson, provided testimony that Sanofi did not, in fact, submit the underlying data for TAX 316 to FDA. Ex. C, Gustavson Dep. 5/3/2018 at 228:8-229:12. Similarly, the deposition testimony and exhibits of Mark Gaydos, Vice President of Regulatory Affairs, make clear that the TAX 311 Clinical Study Report, and not the underlying data, was provided to FDA. Ex. D, Gaydos Dep. 4/20/2018 at

These failures alone form a sufficient basis to exclude his regulatory opinions under Rule 26, which provides that an expert must produce a report that contains "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). Moreover, Dr. Glaspy's lack of qualifications provide another, independent basis to preclude these opinions. Dr. Glaspy has no education, training or experience in FDA regulation or the drug application or approval process, and Dr. Glaspy readily admits that he is not a regulatory expert: "I would not hold myself out as a [regulatory] expert."[23] Indeed, Dr. Glaspy does not believe he is being called to testify about what the FDA would or would not accept concerning clinical studies.[24] Accordingly, Dr. Glaspy's undefined opinions on the FDA regulatory process should be excluded.  All of this begs the question: if Dr. Glaspy doesn't believe that he is being called as an expert in the area of FDA regulation and admits he is not an expert in the subject matter, why did he include such opinions in his report?[25] It is at the very least odd that Dr. Glaspy would author and sign an expert report where he claims familiarity with FDA regulations, then so easily disavows expertise in the subject area.   It is clear, this opinion – or threat to offer an opinion, is due to be excluded.

---

254:18-259:4 and Ex. E, Exhibit 18 to Gaydos Dep. 4/20/2018 (Sanofi_05448066). ("On one hand, the letter states that we can't reconstruct the trial and the results due to missing information, for example financial disclosures, SAS analysis datasets, et cetera, and on another, it claims that the trial was able to confirm the response rate, toxicities and clinical benefit of Taxotere *as reported in the submitted clinical study report.*" Ex. D*,* Gaydos Dep. 4/18/2018 at 258:15-24. (Italics added.)

[23] Ex. F, Glaspy Dep. 5/13/2020 at 54: 8-20. "Q. But you've never worked for the FDA, correct? A. That's correct.  Q. Right. You're not a regulatory expert, correct? [] A. I wouldn't hold myself out as an expert."

[24] *Id.* at 53:25-54:7.

[25] Ex. A, Glaspy Rep. 4/29/2020 at 34-35

II.     **DR. GLASPY'S OPINIONS ON CAUSATION ARE NOT BASED ON A VALID SCIENTIFIC METHODOLOGY AND MUST BE EXCLUDED AS UNRELIABLE**

Louisiana courts require expert testimony to establish both general and specific causation in a pharmaceutical products liability case. *Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008), *aff'd*, 326 F.App'x 721 (5th Cir. 2009) (citing *Knight v. Kirby*, 482 F.3d 347, 351 (5th Cir. 2007)); *see Burst v. Shell Oil Co*., No. 14-109, 2015 WL 3755953, at *3 (E.D. La. 2015).   As this Court has previously recognized, "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."Court's Order and Reasons (Rec. Doc. 8094, at 5) (citing *Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 351 (5th Cir.2007)).

To determine whether a drug causes disease, this Court has employed a two-prong test used to assess whether causation exists between an agent and a disease which requires: (1) evidence showing a "statistically significant association" between the agent and the disease and, only if an association is found, (2) evidence demonstrating that a true causal relationship underlies the association through the use of a reliable methodology.  Court's Order and Reasons (Rec. Doc. 8094, at 5)*, Burst*, 2015 WL 3755953, at *5; *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 803-804 (E.D. La. 2011). In order to evaluate the second prong, most experts apply the Bradford Hill Criteria which uses the following factors to establish general causation: (1) temporal relationship; (2) strength of association; (3) dose- response relationship; (4) replication of findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge. *Burst*, 2015 WL 3755953, at *5.

Here, Dr. Glaspy improperly concludes that Taxotere does not cause persistent hair loss by relying on, without any attempt of independent validation, a litigation-driven re-analysis of TAX-316 allegedly completed by Dr. Kopreski, a former employee of Sanofi with no direct contemporaneous involvement conducting TAX 316, or in the assessment of TAX 316 data. In addition, Dr. Glaspy renders a number opinions regarding other causes of persistent hair loss without articulating a reliable methodology or meeting this Court's two-prong test.[26] Dr. Glapsy supports these opinions by improperly relying on case studies and anecdotal reports of patients where he "eyeballed" their hair-loss. Accordingly, Dr. Glaspy's causation opinions should be excluded.

## A.   Dr. Glaspy's Opinion that Taxotere Does Not Cause Persistent Hair Loss Improperly Relies on Dr. Michael Kopreski's Re-Analysis

In preparation for his report, Dr. Glaspy admits reviewing the reports of other Sanofi experts, Dr. Chang in particular, as well as a re-analysis of counsel-selected data by former Sanofi employee, Dr. Michael Kopreski.[27] Dr. Glaspy admits that like, Dr. Chang and Dr. Arrowsmith, he relied upon the re-analysis conducted by Dr. Kopreski.[28] Dr. Glaspy admits that he does not know how Dr. Kopreski conducted his re-analysis or whether Dr. Kopreski used the final locked clinical trial data.[29] Of course, Dr. Kopreski confirmed that he only reviewed some data on 29 patients documented as having ongoing alopecia at the end of the 10-year follow-up period.[30]  Dr.

---

[26] Ex. A, Glaspy Rep. 4/29/2020 at 21-28.

[27] Ex. B, Glaspy Dep. 1/9/2020 at 131:19-138:19.

[28] *Id.*

[29] *Id.*

[30] Ex. G, Kopreski Dep. 12/13/2018 at 492:17-493:2 and 495:22-496:6, (When questioned about the completeness of the records reviewed, Dr. Kopreski testified that "would be a question to refer to my attorneys."). Dr. Kopreski acknowledges that the only patient data he was given pertained to the 29 reports of ongoing alopecia, and not the full 744 participants.  *Id.*

Glaspy admitted that *if* Dr. Kopreski's re-analysis and the numbers he reported are not valid or reliable, then his opinions "would not be valid."[31] As explained in greater detail in Plaintiff's Daubert Challenge to the Admission of Testimony of Dr. Michael Kopreski filed August 13, 2020, the re-analysis conducted by Dr. Kopreski is unreliable and is premised upon very limited, counsel-selected information from interim Case Report Forms from only four years of TAX 316, and not the final Clinical Trial Study datasets that Sanofi itself operates from  when analyzing data for regulatory agencies.[32] Dr. Glaspy's opinion that there is no statistical association between Taxotere and persistent hair loss is premised on Dr. Kopreski's attorney-driven re-analysis, and must be excluded since it relies exclusively on the inadmissible expert testimony of Dr. Kopreski.[33]

### B. Dr. Glaspy's Opinion that Fifteen Chemotherapy Agents Cause Persistent Hair Loss is Not Supported by a Reliable Methodology

Dr. Glapsy opines or insinuates that fifteen chemotherapy drugs, including Adriamycin, Herceptin, Cyclophosphamide, and Taxol, cause persistent alopecia; he states that "cases of persistent alopecia have been reported with" fifteen different drugs.[34] However, Dr. Glaspy candidly admits there is no established causal association between persistent hair loss and ***any*** of the fifteen chemotherapy drugs he lists in his report:

> Q.    Now, if you want, you can go back and look, but you may be able to answer without it. At the bottom of page 21, running to page 23 we went over that list of 15 drugs that you say cases have been reported with.
>
> A.    I see it.

---

[31]Ex. B, Glaspy Dep. 1/9/2020 at 131:19-138:19.

[32] Ex. H, Mancini Dep. 3/23/3018 at 67:20-69:23; 326:12-327:15.

[33] *Id.*

[34] Ex. A, Glaspy Rep. 4/29/2020 at 23-25.

Q.     In your review of the literature, did you ever make any attempt to determine how many case reports of permanent chemotherapy-induced alopecia were associated with each of the drugs you listed?

A.      I did not, and in part for the same reasons we were talking about earlier, about the limited value of observational, especially case report level observational data in determining relative risk.[35]

Furthermore, he admits no established causal link exists between any of the fifteen drugs on which he opines can cause persistent hair loss, and he cannot articulate what, if any, incidence rate exists for any drug causing persistent hair loss.[36]

In addition, Dr. Glaspy admits that he did not employ any methodology by way of literature search, review of randomized clinical trial data, and/or the application of the Bradford Hill criteria to investigate the relationship between persistent hair loss and Taxol,[37] 5-FU,[38] epirubicin,[39] methotrexate,[40] Gemzar,[41], Cisplatin, Epirubicin, Gemcitabine, or any other chemotherapy drugs.[42] This failure to properly investigate a potential causal relationship between any chemotherapy drug and persistent hair loss renders his general causation opinions inadmissible as to these potential alternative causes of persistent alopecia.

Dr. Glapsy's specific causation opinions likewise falter. Even if he were qualified to offer such an opinion, his opinion that Tamoxifen caused Ms. Kahn's hair loss is unreliable because of his admitted failure to apply any methodology to investigate and determine if there is a causal

---

[35] Ex.B, Glaspy Dep. 1/9/2020 at 88:7-23, 206:5-17.

[36] Ex. B, Glaspy Dep. 1/9/2020 at 206:5-207:11.

[37] Ex. F, Glaspy Dep. 5/13/2020 at 178:10-24.

[38] Ex. F, Glaspy Dep. 5/13/2020 at 179:2-5.

[39] Ex. F, Glaspy Dep. 5/13/2020 at 179:7-11.

[40] Ex. F, Glaspy Dep. 5/13/2020 at 179:13-16.

[41] Ex. F, Glaspy Dep. 5/13/2020 at 179:18-180:3.

[42] Ex. F, Glaspy Dep. 5/13/2020 at 180:5-19.

relationship between Adriamycin, Cyclophosphamide,Tamoxofin or Avastin, and other drugs, and persistent hair loss.[43] Accordingly, Dr. Glaspy's general and specific cauation opinions regarding other-chemotherapy drugs and persistent hair loss should be excluded.

### C.   Dr. Glapsy's Opinion that Tamoxifen and Aromatase Inhibitors Cause Persistent Hair Loss is Not Supported by a Reliable Methodology

Dr. Glaspy opines hormonal therapies, such as Tamoxifen or aromatase inhibitors cause persistent hair loss.[44] But Dr. Glaspy fails to provide *any* data to support a "statistically significant association" between Tamoxifen and persistent hair loss. The basis for his opinion that Tamoxifen and/or aromatase inhibitors cause delayed and/or persistent alopecia is based entirely upon his own subjective beliefs.[45] Although he states he believes there is a causal link between Tamoxifen and hair loss, he admits that he has no clinical trial data to demonstrate a causal link, and that the referenced case reports with Tamoxifen do not establish causation.[46] Rather, Dr. Glaspy's subjective belief is based on "eyeballing" the hair loss of his patients taking Tamoxifen.[47] He admits he has never performed a differential diagnosis to rule in or rule out Tamoxifen as a cause of his patient's hair loss.[48] Dr. Glaspy admits that he did not employ any methodology by way of literature search, review of randomized clinical trial data, and/or the application of the Bradford Hill criteria to investigate the relationship between Tamoxifen and persistent hair loss.[49]

---

[43]  Ex. F, Glaspy Dep. 5/13/20 at 174:12-175:5 (Adriamycin), 175:13-176:4 (Cyclophosphamide), 176:22-177:8 (Avastin).

[44]  Ex. A, Glapsy Rep. 4/29/2020 at 25.

[45]  Ex. B, Glaspy Dep. 1/9/2020 at 113:12-115:13. The same list of chemotherapy drugs can be found at Ex. A, Glaspy Report 4/29/2020 at 23-25.

[46]  Ex. B, Glaspy Dep. 1/9/2020 at 100:7-101:6.

[47]  Ex. B, Glaspy Dep. 1/9/2020 at 103:16-22

[48]  Ex. B, Glaspy Dep. 1/9/2020 at 113:12 to 115:13.

[49]  Ex. F, Glaspy Dep. 5/13/2020 at 177:20 – 178:8

Accordingly, Dr. Glaspy's opinion that Tamoxifen and aromatase inhbitors cause persistent hair loss should be excluded. In addition, having applied no reliable methodology to support his general causation opinion, Dr. Glaspy's conclusion that Tamoxifen specifically caused Ms. Kahn's hair loss[50] is likewise unsupportable, as he never even examined Ms Kahn in person. It would be highly prejudicial, moreover, to allow such speculative opinion on general and specific causation. *See Viterbo*, 826 F.2d at 422; Fed. R. Evid. 703.

### D.    Dr. Glaspy Provides No Support for His Opinion that Other "Conditions" Cause Peristent Hair Loss

Dr. Glaspy mentions multiple other medical conditions which he opines can cause alopecia.[51] Despite concluding that underlying medical conditions may cause Ms. Kahn's persistent hair loss, Dr. Glaspy cites no literature in support of this.[52] Furthermore, Dr. Glaspy is unable to explain what types of alopecia would be caused by any of the undisclosed conditions he comments on, or how to differentiate the unidentified underlying causes of persistent hair loss through a differential diagnosis.[53] Given his stated inability to differentiate between the different kinds of alopecia, Dr. Glaspy's opinions that Ms. Kahn's age, post-menopausal status and other medical conditions could contribute to her alopecia are unreliable and speculative.[54] Further, as discussed above, Dr. Glaspy lacks the necessary qualifications or underlying scientific knowledge to diagnose the various types and causes of hair loss. Therefore, his opinions that medical conditions cause permanent hair loss should be excluded.

Dr. Glaspy must set out a complete statement of all opinions that he will express, the basis

---

[50] Ex. F, Glaspy Dep. 5/13/2020 at 177:15-178:8, 186:13-187:4.

[51] Ex. A, Glaspy Rep. 4/29/2020 at 22.

[52] Ex. A, Glaspy Rep. 4/29/2020 at 48.

[53] Ex. B, Glaspy Dep. 1/9/2020 at 196:23-201:3.

[54] Ex. A, Glaspy Rep. 4/29/2020 at 48.

and reasons for them, and the facts or data considered in forming his opinions, under FRCP, Rule 26(a)(2)(B).

Sanofi disclosed Dr. Glaspy as an expert pursuant to FRCP, Rule 26(a)(2)(B).[55] Like all experts designated under Rule 26(a)(2)(B), Dr Glaspy must properly disclose a complete statement of all opinions that he will offer, the basis and reasons for the opinions, and the facts and data considered in forming his opinions.

In addition to Dr. Glaspy opinions addressed above, he offers an additional eight areas of anticipated testimony for which he states, "I will discuss," yet offers no citation in support or reference, and does not explain any facts, investigation or methodology beyond his preview statement, all contrary to FRCP 26(a)(2)(B).[56]   Further, although Dr. Glaspy states he "will discuss" these topics, he does not include any such discussion or analysis in his report.   For the Court's convenience, Plaintiff provides the below table of Dr. Glaspy's eight topics of anticipated testimony for which insufficient disclosure:

| Report page | Report Statements | Support offered by Sanofi/Dr. Glaspy |
|---|---|---|
| P. 7 | "I will discuss common sentiments breast cancer patients may have. | Dr. Glaspy offers no support or reference and does not explain beyond this preview statement, contrary   to FRCP, Rule 26(a)(2)(B)(i). |
| | | |
| P. 12 | "I will discuss survival rates for breast cancer, including the impact that various chemotherapy regimens have had on improving overall survival rates." | Dr. Glaspy offers no support or reference and does not explain beyond this preview statement, contrary   to FRCP, Rule 26(a)(2)(B)(i).   Dr. Glaspy does not identify which regimens' survival rate he "will discuss." |
| P. 14 | "I will discuss the difference in survival rates between the older regimens and taxane-containing regimens." | Dr. Glaspy offers no support or reference and does not explain beyond this preview statement, contrary   to FRCP, Rule 26(a)(2)(B)(i).   Dr. Glaspy does   not |

[55] Ex. I, Sanofi Defendants' April 29, 2020 Disclosure of Expert Testimony
[56] Ex. A, Glaspy Rep. 4/29/2020 at 7, 12, 14-17,19-20 and 35.

16

| | | |
|---|---|---|
| | | identify which regimens' survival rate he "will discuss." |
| P. 14 -15 | "I will discuss the development of Taxanes." <br> • Sub-topics without reference or support: <br> 1. History of Cancer Chemotherapy National Service Center (CCNS) <br> 2. The extraction process of Taxol from the Pacific Yew Tree. <br> 3. Environmental concerns and limited supply of the Pacific Yew tree. <br> 4. Researchers continued work to synthesize molecules, and specifically Pierre Portier. <br> 5. *In vivio* testing demonstrating that Taxotere showed greater anti-cancer activity than Taxol. <br> 6. The progression from phase I – III clinical trials, and through Taxotere's approval in 1998, and the 2004 adjuvant care approval. <br> 7. "Taxotere is a life-saving drug." <br> 8. Taxotere is included on the WHO list of essential medicines, which is defined as "the most efficacious, safe and cost-effective medicines for priority conditions." | Dr. Glaspy offers 11 paragraphs of factual and scientific information, and only one substantive source, "THE TAXOL STORY", J. Goodman and V. Walsh. Beyond this he offers no support or reference and does not explain beyond his preview statement. Dr. Glaspy's statement that "[he] will discuss" undisclosed and unsupported topics violates FRCP, Rule 26(a)(2)(B)(i). Specifically, Dr. Glaspy offers no support or reference for any of the points of fact and/or opinion in sub-topics 1-8, listed, and his "materials reviewed" do not include materials that include the facts listed in these sub-topics. |
| P. 16- 17 | "I will discuss the tradeoffs with alternatives to Taxotere-containing regimens and the absence of any guarantees in the onocological setting." | Dr. Glaspy offers no support or reference and does not explain beyond that he "will discuss," contrary to FRCP, Rule 26(a)(2)(B)(i). Dr. Glaspy does not discuss in his report the tradeoffs with any alternatives to Taxotere-containing regimens. |
| P. 17 | "I will discuss chemotherapy regimens used to treat HER2- breast cancer. | Dr. Glaspy offers no support or reference and does not explain beyond this preview |

| | | statement, contrary to FRCP, Rule 26(a)(2)(B. Beyond this preview statement, Dr. Glaspy does not discuss the chemotherapy regimens used to treat HER2- breast cancer. |
|---|---|---|
| P. 19 | "I will discuss the efficacy and side effects of older chemotherapy regimens, including FEC, FAC, AC and CMF. | Dr. Glaspy offers no support or reference and does not explain beyond this preview statement, contrary to FRCP, Rule 26(a)(2)(B)(i). Beyond this preview statement, Dr. Glaspy does not discuss the efficacy and side effects of older chemotherapy regimens, including FEC, FAC, AC and CMF. |
| P. 20 | "I will discuss side effects of chemotherapy drugs, how clinicians weigh side effects, and how and what side effects are communicated to the patient." | Dr. Glaspy offers no support or reference and does not explain beyond this preview statement, contrary to FRCP, Rule 26(a)(2)(B)(i). |

When an expert fails to properly support his or her opinion under FRCP 26(a)(2)(B), and fails to apply a reliable and accepted methodology to arrive at his/her opinions, they are essentially offering no opinion at all, and they should be excluded. Dr. Glaspy offers no explanation as to the reason he fails to discuss the eight areas for which he states "[he] will discuss." Dr. Glaspy fails to appreciate that as an expert he has obligations under FRCP 26(a)(2)(B), to properly disclose and support his opinions. But if he does not understand and appreciate this fact, Sanofi's counsel does understand the requirements of Rule 26(a)(2)(B).[57] But Dr. Glapsy provides nothing by way of reference or support for the topics he states he "will discuss." As a result, the saving provisions of Rule 37 do not apply in this instance. There is nothing harmless or justified about Dr. Glapsy's report failures, and the sanction of exclusion is "automatic and mandatory." Fed. R. Civ. P.

---

[57] Fed. R. Civ. P., Rule 26(a)(2), Advisory Committee Notes on Rules – 2010 Amendments, "The refocus of disclosure on 'facts or data' is meant to limit disclosure to material of a factual nature by excluding theories or mental impressions of counsel. At the same time, the intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients. The disclosure obligation extends to any facts or data "considered" by the expert in forming the opinions to be expressed, not only those relied upon by the expert."

37(c)(1); *Jenkins v. Bartlett*, 487 F.3d 482, 487 (7th Cir. 2007); *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir. 2005).   As recounted in this memorandum, Sanofi offers an expert whose deposition testimony repeatedly contradicts the statements made in his report.  The lack of excuse is even more clear when, as here, Dr. Glaspy admits to not being offered as an expert in at least two critical substantive areas in his report  that he now disavows: dermatology and FDA regulation and compliance. [58]

Dr. Glaspy's "I will discuss" areas of testimony are not a proper disclosure under FRCP 26(a)(2)(B), and his unsupported threat to provide expert testimony concerning broad oncology opinions is ripe for exclusion under FRCP 37(c).   Dr. Glaspy's explanation of his expertise, and that he "knows" because he is an expert, is not sufficient under FRCP 26(a)(2)(B).[59]

Each time Dr. Glaspy offers an "I will discuss" prediction of an opinion in waiting, and fails to provide the *required* Rule 26(a)(2)(B) elements, the court  must disallow his testimony under FRCP, Rule 37(c).   Such a warning of an opinion to come at an unknown time in the future prevents Plaintiff's counsel from adequately testing the witness's opinions and preparing an effective Rule 702/*Daubert* challenge, or cross examination for trial.   This type of surprise gamesmanship is precisely what Rule 26(a)(2)(B) was meant to protect parties against.

The clear language of Rule 26(a)(2)B) requires that an expert specifically set out out "(i) a complete statement of *all opinions the witness will express and the basis and reasons for them*." (emphasis added)  Dr. Glaspy's report fails to do so concerning the above eight areas.  Dr. Glaspy only provides warnings that he "will discuss" the above topics without ever offering an opinion, or a basis and methodology for how he has formulated, or will formulate, his opinions. Such a non-

---

[58] Ex. B, Glaspy Dep. 1/9/2020 at 203:16-20 ("I am not a dermatologist, and I'm not an expert dermatologist); Ex. F, Glaspy Dep. 5/13/2020 at 53:21-54:16 (" . . .  You're not a regulatory expert, correct? [] I would not hold myself out as an expert.").

[59] Ex. F, Glaspy Dep. 5/13/2020 at 114:25-117:20.

disclosure of opinions prevents Ms. Kahn from knowing Dr. Glaspy's opinions until he speaks them from the witness stand during trial. Because he did not set out his opinions, and chose instead to provide only topics on which he will offer an opinion at a later date, the Court should preclude such testimony and silence Dr. Glaspy from delivering his opinions for the first time at trial.

## **CONCLUSION**

Sanofi offers Dr. Glaspy to voice opinions on general causation, dermatology and FDA regulation and drug development. Dr. Glaspy's general and specific causation opinions lack a valid scientific methodology and are unreliable. Concerning dermatology, drug development and FDA regulations, Dr. Glaspy admits to lacking expertise in these fields, and does not believe he is being offered to express such opinions, yet they are included in his report. And many of the areas he would be "discussing" are areas where he *admits* no expertise. It is not fair to ask a jury to separate expert testimony from non-expert pontification and comments on topics for which he has no expertise, it would not assist the jury in rendering its verdict, and no amount of curative instruction can prevent the devastating prejudice that would result to Plaintiff.

At multiple points in his expert report Dr. Glaspy states that he "will discuss" topical areas and offer comments or opinions without further explanation. Such non-disclosures are not proper expert disclosures and do not comply with the strict mandates of FRCP Rule 26(a)(2)(B), and Dr. Glaspy should not be allowed to offer opinions that are not properly set out in his report pursuant to Rule 26(a)(2)(B). Such comments or opinions are due to be excluded under Rule 37(c).

Specifically, Plaintiff, Elizabeth Kahn, requests that the Court:

1. Preclude Dr. Glaspy from offering opinions on the general and specific causation of any chemotherapy drug, or Tamoxifen, and a potential causal relationship with PCIA. Dr. Glaspy is clear that he did not perform any causation analysis to

investigate a causal relationship between any chemotherapy drug, or Tamoxifen, and PCIA;

2.    Preclude Dr. Glaspy from offering opinions that Ms. Kahn's general health status or specific medical diagnoses and other medical conditions caused her PCIA, or what caused Ms. Kahn's PCIA.  Dr. Glaspy testified that he did not follow any methodology to determine the cause of Ms. Kahn's PCIA, and that he does not know how to differentiate between types or causes of PCIA. Any testimony from Dr. Glaspy concerning medical status or conditions would be subjective speculation, and could not assit the jury.

3.    Preclude Dr. Glaspy from offering dermatology opinions, including, but not limited to, the presentation, causes, and diagnosis of the different kinds  of alopecia.  Dr. Glaspy admits that he does not know how to diagnose alopecia, or differentiate between types of alopecia.  Dr. Glaspy admits that he is not an expert dermatologist, and any dermatology opinions he could offer would not be helpful to the jury, and would serve to confuse or mislead the jury.

4.    Preclude Dr. Glaspy from offering any regulatory opinions, specifically on the FDA, FDA regulations, labeling,  compliance and post marketing responsibilities of Sanofi, or how companies work with FDA in the drug development, approval and labeling processes. Dr. Glaspy admits that he is not an expert in FDA regulations, and the related topics, and testified that he does not believe he is being called to testify as an expert in this area.

5.    Preclude Dr. Glaspy from offering any opinions that Taxotere does not cause persistent hair loss, on the follow-up times for PCIA or ongoing alopecia in TAX

316 clinical trial, based upon the flawed re-analysis of Dr. Michael Kopreski.  Dr. Glaspy admits that he does not know how Dr. Kopreski performed his re-- analysis, what her reviewed in his reanalysis, and he did not validate any portion of Dr. Kopreski's analysis.

6.      Preclude Dr. Glaspy from offering any opinion that Tamoxifen and Aromatase Inhibitors cause persistent hair loss.   Dr. Glaspy's statement of this causal connection is based upon his subjective "eyeballing" his patients' hair loss.

7.      Preclude Dr. Glaspy from offering testimony on all topics for which he and Sanofi fail to provide properly disclosed opinions, bases and reasoning consistent with FRCP, Rule 26(a)(2)(B).

WHEREFORE, Plaintiff prays that the Court will exclude the testimony of John Glaspy, M.D. as set forth herein.

Dated: August 13, 2020                      Respectfully submitted,


*/s/ Christopher L. Coffin*                   */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)           Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.   Andre Mura ((CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505          GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163             6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                       Los Angeles, California 90045
Fax: (504) 355-0089                          Telephone: 510-350-9700
ccoffin@pbclawfirm.com                    Facsimile: 510-350-9701
                                                    kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                    *Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS