UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO: *Kahn v. Sanofi S.A., et al.*, No. 2:16-cv-17039 | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF JANET ARROWSMITH, M.D.**</u>

Plaintiff moves this Court to exclude certain expert opinions of Janet Arrowsmith, M.D., pursuant to Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Fed. R. Civ. P. 26(a)(2)(B) and 37(c). The Court should exclude Dr. Arrowsmith from opining on (1) general causation concerning which chemotherapy drugs can cause permanent chemotherapy induced alopecia (PCIA), (2) the follow-up of adverse events, particularly regarding alopecia, for patients enrolled in Sanofi's TAX 316 clinical trial, and (3) whether Sanofi acted appropriately in failing to change its Taxotere label to include a "warning or precaution" or "adverse drug experience" under 21 CFR § 201.57(c)(6) and (c)(7), respectively.

By her own admission, Dr. Arrowsmith did not implement any methodology or undertake any causation analysis to assess whether or not *any* chemotherapy drug, or hormone therapy (i.e., tamoxifen), can cause PCIA. As a result, any opinions and comments pertaining to general causation set forth in Dr. Arrowsmith's December 9, 2019 report must be excluded as they are unreliable, and not based on sound methodology. Also, Dr. Arrowsmith should not be permitted to offer opinions concerning the follow-up times for any adverse events experienced by patients in Sanofi's TAX 316 clinical trial. Her entire opinion rests upon her parroting a re-analysis of limited information performed by Michael Kopreski, M.D., a former employee of Sanofi whose

opinions were not disclosed under FRCP, 26(a)(2)(B), and whose methods were not verified by Dr. Arrowsmith.[1] Finally, Dr. Arrowsmith's opinions concerning whether Sanofi acted appropriately in not updating its Taxotere label must be excluded as Dr. Arrowsmith's report never sets out an opinion based upon the recognized standards for updating labels under 21 CFR § 201.57(c)(6) and (c)(7). As a result, any opinions that Dr. Arrowsmith attempts to offer on these subject matters are unsupported, subjective opinions, and are thus irrelevant and unreliable.

Dr. Arrowsmith's opinions should be limited to her area of expertise, for which she demonstrates a sufficient, reliable basis and methodology, consistent with FRE 702 and *Daubert,* and which she properly discloses pursuant FRCP, 26(a)(2)(B).

## **LEGAL STANDARD**

An expert's testimony is only admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Further, any expert designated under FRCP, Rule 26(a)(2)(B), must produce a report that contains "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; . . .; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years. . . ." And the trial judge is obligated to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). When an expert's testimony is demonstrated to be

---

[1] Dr. Kopreski's undisclosed expert opinions are challenged separately as unreliable.

2

speculative and lacking any established methodology the Court should exclude such testimony. *In re: Vioxx Prod. Liability Litigation*, 414 F. Supp.2d 574, 579 *citing* Moore, 151 F.3d at 279.

Expert testimony is inadmissible when "the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 136 F.3d 935, 937 (5th Cir. 1999). And it must be excluded where it "go[es] beyond the scope of [her] expertise in giving [her] opinions." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)).

Even if a witness is qualified, his/her opinions may still be excluded if they are unreliable or irrelevant, or risk confusing the jury. The Eastern District of Louisiana has adopted a two-part inquiry requiring the Court to determine (1) if the proffered expert testimony is reliable and (2) whether the experts reasoning or methodology is relevant. *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015).

Testimony is unreliable when based merely on subjective belief or unsupported speculation; it must be excluded as such conclusions lack valid underlying reasoning and/or methodology. *Id*. The Court's "reliability analysis applies to all aspects of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion," *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision).

If the expert's demonstrated reasoning or methodology does not fit the facts of the case, or simply lacks an adequate basis, the testimony is inadmissible as it will not assist the trier of fact. *Burst*, 120 F. Supp. 3d at 551. Likewise, testimony should be stricken as irrelevant when there is "too great an analytical gap" between the data or facts considered and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, opinion evidence is inadmissible if it is only tethered to existing facts through the *ipse dixit* of the expert. *Id.*

In order for a qualified expert to offer opinion testimony he or she must derive opinions from a sufficient factual basis or data, to which he/she applies an established and reliable methodology, and then applies that methodology in a reliable way to derive opinions. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998). Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. *Stephens v. Florida Marine Trans. Inc.*, 2013 WL 11257508 (E.D. La.) at *4 *citing United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012). Where an expert's opinions are not the product of "reliable principals and methods," or has no methodology or authority to support the opinion they fail FRE702 scrutiny and must be excluded. *Douglas v. Chem Carrier Towing, LLC*, 431 F. Supp. 3d 830, 836 (E.D. La. 2019), *Burgo v. Davis*, 2016 WL 3257589 (E.D. La.).

As will be addressed herein, Dr. Arrowsmith's testimony presents both situations – it is unreliable and lacks relevant methodology.

**ARGUMENT**

I. **Dr. Arrowsmith's Opinions on General Causation Lack a Valid Scientific Methodology and Must Be Excluded as Unreliable.**

Louisiana courts require expert testimony to establish both general and specific causation in a pharmaceutical products liability case. *Seaman v. Seacor Marine LLC*, 564 F. Supp. 2d 598, 600 (E.D. La. 2008), aff'd, 326 F.App'x 721 (5th Cir. 2009) (citing *Knight v. Kirby*, 482 F.3d 347,

351 (5th Cir. 2007)); *See Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *3 (E.D. La. June 16, 2015). As this Court has previously recognized, "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *See* Court's Order and Reasons Doc. No. 8094, at p. 5, *citing Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).

This Court has applied a two-prong test used to assess whether general causation exists between an agent and an injury, disease or condition requires: (1) evidence showing a "statistically significant association" between the agent and the disease and, only if an association is found, (2) evidence demonstrating that a true causal relationship underlies the association through the use of a reliable methodology. *See* Court's Order and Reasons Doc. No. 8094, at p. 5. In order to assess evidence to establish the second prong, most experts apply the Bradford Hill Criteria which uses the following factors to establish general causation: (1) temporal relationship; (2) strength of association; (3) dose-response relationship; (4) replication of findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure (de-challenge, re-challenge); (8) specificity of the association; and (9) consistency with other knowledge. *Id*.

**A. Dr. Arrowsmith's General Causation Opinions are Unreliable.**

Dr. Arrowsmith is unable to meet the first prong required to establish general causation as she does not set out any data to support that a "statistically significant association" exists between permanent hair loss and *any* of the drugs which he opines of insinuates can cause permanent or persistent hair loss. In fact, Dr. Arrowsmith, like all of Sanofi's experts, admits that she has not done a causation analysis to assess a potential causal relationship between PCIA and any non-

5

Taxotere drug.[2]  And also like all of Sanofi's other experts, Dr. Arrowsmith agrees that "cases of permanent alopecia have been reported," or case reports alone, are insufficient to establish causation.[3] And in the end Dr. Arrowsmith admits that she does not intend to offer testimony that valid scientific evidence demonstrates a statistically significant causal association between any chemotherapy drug and PCIA.[4]

Dr. Arrowsmith's attempt to call into question whether Taxotere can cause PCIA is unreliable for two separate reasons. First, she relies entirely upon the re-analysis performed by Dr. Kopreski, at counsel's request. This will be addressed more fully later, herein. Secondly, when deposed, Dr. Arrowsmith stated that ¶ 113 of her report demonstrates that she performed an analysis – part of a causal analysis – on TAX 316 data.[5] While Dr. Arrowsmith claims to have performed a Fisher's-exact test, applying a statistical comparison between patients in the TAC and FAC arms of TAX 316, what she actually states in her report is

> 113. With respect to "ongoing alopecia" there were 29 cases (4.2%) in the TAC arm and 16 (2.5%) in the FAC arm from the TAX 316 final clinical study report. These results do not constitute a signal of an increased risk for an association between TAC and "ongoing alopecia" as there is not a statistically significant difference between the incidence of "ongoing alopecia" in the two arms.

What Dr. Arrowsmith doesn't do in ¶ 113 is state that she did any calculation at all; she never mentions a Fisher's-exact test, and she agrees that she does not describe, identify or set out any actual calculation that she performed.[6]  Dr. Arrowsmith agrees that she reviewed Sanofi documents that state the substance of her own ¶ 113.[7]  It is impossible to tell from reading her report whether

---

[2] *See* Ex. A, Arrowsmith II, 7/29/2020, 36:5-10, and 39:3 – 41:22. (Dr. Arrowsmith did not perform a causation analysis to assess PCIA and any potential causal association with: Adriamycin, 5-FU/Fluorourosil, cyclophosphamide, epirubicin, paclitaxel/Taxol, Xeloda, Avastin, tamoxifen, and methotrexate.)
[3] *Id.* at 40:12-17.
[4] *Id.* at 47:1-9.
[5] *Id.* at 41:24 – 43:11.
[6] *Id.* at 44:8-19 and 45:4-14.
[7] *Id.* at 45:17- 22.

Dr. Arrowsmith did any calculation at all, or simply regurgitated a line from document that she reviewed along the way. She does not provide "a complete statement of her opinions. . . [or] the basis and reasons for them," as required by FRCP, Rule 26(a)(2)(B). Similarly, at ¶ 114 of her report Dr. Arrowsmith states that she "reviewed the protocols, statistical analysis plan and Clinical Study Reports for the TAX 316 study," but she fails to address anywhere in her report how the protocols or statistical analysis plan define how the study data is to be analyzed. Instead, she accepts the self-styled analysis of Dr. Kopreski, that was performed at counsel's request and not pursuant to protocol.[8]

It is important when trying to understand these oversights that this is not Dr. Arrowsmith's first rodeo. She has been serving as an expert in cases like this for over twenty-one years, and understands the need to be thorough and complete when setting out her opinions in a report.[9] In fact, Dr. Arrowsmith has experience in serving as a defense expert for Sanofi's counsel – Shook, Hardy & Bacon – in prior pharmaceutical litigations: Baycol and Yasmin.[10] Yet despite her knowledge of what is required in giving a FRCP 26 report, and her twenty-one years of experience in serving as an expert, and in working with the very lawyers in this case in two separate pharmaceutical litigations, Dr. Arrowsmith gives only a conclusory opinion, and fails to set forth her methods or even identify the calculation she claims to have performed.[11] This is just the sort of *ipse dixit* that the Supreme Court in *Gen. Elec. Co. v. Joiner, supra.,* instructs should be excluded.

### B. Dr. Arrowsmith Improperly Relies on Dr. Kopreski's Reanalysis of TAX 316 Without Performing Any Sort of Independent Validation.

---

[8] *Id.* at 157:2 – 158:1.
[9] *Id. at* 24:13 – 25:20.
[10] *Id.* at 27:11-19.
[11] *Id.* at 45:24-46:23. ("You didn't put the chart in, and you didn't explain that that's what you did either, did you? A. I guess not, and I apologize for that, but that's how I came to the conclusion.")

Dr. Arrowsmith's sole basis for her opinion, as set out in ¶¶ 116 – 123 of her report, (i.e., that TAX 316 does not provide support for Taxotere causing PCIA) is the deposition of Dr. Michael Kopreski, a former employee of Sanofi.[12] In fact, to be more precise, Dr. Arrowsmith cites to only twenty-four (24) pages of Dr. Kopreski's October 11, 2018 deposition testimony to support her own opinions.[13] This is interesting in light of the fact that Sanofi's counsel provided Dr. Arrowsmith with twenty-six (26) depositions of past or current Sanofi employees, several of whom had direct involvement in planning, conducting, collecting and analyzing TAX 316 study data, yet Dr. Arrowsmith only relies upon Dr. Kopreski's testimony.[14] Dr. Arrowsmith only learned about Dr. Kopreski and his post-hoc re-analysis of limited TAX 316 data through Sanofi's counsel.[15] And Dr. Arrowsmith understood that Dr. Kopreski had no contemporaneous role in conducting TAX 316 or in assessing or evaluating the study data.[16] And she could not recite knowledge of any demonstrated expertise that would qualify Dr. Kopreski to assess the TAX 316 clinical trial data.[17] Yet knowing so little of Dr. Kopreski, aware of his unfamiliarity with TAX 316, or any clinical trials, Dr. Arrowsmith bases her entire would-be opinion on Dr. Kopreski's 24-pages of testimony, and admits that she did nothing to validate his re-analysis.[18] Instead, all Dr. Arrowsmith did was "review the [re-]analysis of the TAX 316 final data performed by Michael Kopreski."[19]

---

[12] *See* Ex. B, Arrowsmith Report, 12/9/19, ¶¶ 116 -123.
[13] *Id.* at ¶¶ 117 (737 – 759, 22 pages); 121 (729:7 – 730:3, 1 page); and 122 (725:12-17, 5 lines rounded up to 1 page).
[14] A review of Dr. Arrowsmith's report reveals that her entire recitation of testimony concerning the follow-up times for alopecia adverse events in TAX 316 are found in ¶¶ 117 – 123 of her report, which coincidentally include only references to testimony from Michael Kopreski, and no other current or former Sanofi employee.
[15] *See* Ex. A, 33:1-24.
[16] *Id.*
[17] *Id.* at 148:15 – 149:3.
[18] *Id.* at 154:20-24 and 156:3-5.
[19] *Id.* at 153:4-10; *also see* Ex. B, at ¶ 119.

Despite her contradictory statement at ¶ 119 of her report that she "reviewed [Kopreski's] [re-]analysis of the TAX 316 final data. . . ," Dr. Arrowsmith ultimately had to concede she had no knowledge of what Dr. Kopreski reviewed, or what he was provided by Sanofi's counsel. When initially questioned about what Dr. Kopreski was provided to review, Dr. Arrowsmith gave a rambling and disjointed narrative that began with a reference to data tables, but then included a discussion of several disconnected musings.[20] Upon further examination Dr. Arrowsmith admitted that she does not know what Dr. Kopreski was provided to review, or how complete the material he reviewed was.[21] When Dr. Kopreski was questioned about the completeness of the material he reviewed, he (Kopreski) referred Plaintiff's counsel to Sanofi's lawyers.[22] Dr. Arrowsmith could only "assume [Kopreski] had access available through Sanofi" and admitted that "[she] didn't know specifically what he was provided, [or] what he reviewed."[23] Dr. Arrowsmith ultimately retreated from her statement that Dr. Kopreski's reanalysis was of the final TAX 316 study data, and again admitted that she was unaware of the nature, extent or completeness of what Dr. Kopreski was provided by Sanofi's counsel.[24]

Lastly, concerning Dr. Arrowsmith's opinions concerning the TAX 316 study findings, and whether they demonstrate evidence of PCIA, to compound her unreasonable reliance on the Kopreski re-analysis, Dr. Arrowsmith ignores the testimony of Sanofi employees with direct involvement in TAX 316 and the analysis of the study data. Dr. Arrowsmith does not reference at all the deposition of Kimberly Bassi, Sanofi's TAX 316 clinical trial manager, charged with

---

[20] *Id*. at 143:22 – 145:19.
[21] *Id*. at 146:24 - 148:13.
[22] *See* Ex. C, Kopreski, Vol. II, 10/1/2018, 492:17 – 493:2, and 495:22 – 496:6, (When questioned about the completeness of the records reviewed, Dr. Kopreski testified that "would be a question to refer to my attorneys."). Dr. Kopreski acknowledges that the only patient data he was given pertained to the 29 reports of ongoing alopecia, and not the full 744 participants. *Id.*
[23] *See* Ex. A, 147:14 – 148:5.
[24] *Id*. at 153:15 – 154:6.

9

operationally executing the clinical trial from protocol to clinical study report.[25] Dr. Arrowsmith does not recall reading the deposition of the study manager, Ms. Bassi, although she lists it on Exhibit B, "Materials Reviewed," to her December 9, 2019 report;[26] nor does Dr. Arrowsmith rely upon, or even make passing reference to, Pierre Mancini, Global Biostatistics Head, Medical Affairs and Data Mining.[27]

Mr. Mancini authored for Sanofi a response to the European Medicines Agency (EMA), submitted by Sanofi on January 22, 2013, that addressed the very question that Dr. Arrowsmith relies upon Dr. Kopreski to answer – persistent alopecia at the end of the 10-year follow-up in TAX 316.[28] Sanofi represented to EMA:

> TAX316: in the TAC group, 728 (97.8%) patients experienced alopecia during the treatment period. Among those patients, alopecia persisted into the post-treatment period in 687 patients (92.3%). By the end of the follow-up period, 29 TAC patients (4.2%) still had persistent alopecia.

When questioned on Sanofi's representation to EMA, Dr. Arrowsmith attempted to protect the narrative, and stated that Sanofi was only using terminology ("persistent alopecia") that was dictated by EMA.[29] But this is not true. Sanofi's January 22, 2013 submission to EMA, Sanofi_04938203, (Ex. 7 to Dr. Arrowsmith's deposition, and Ex. 29 to Mancini I) clearly restates the agency's question: "Could you please clarify the number/percentage of patients with *long term/permanent alopecia* from the pivotal breast cancer studies?" It is Sanofi and Dr. Arrowsmith that are, in fact, changing the terminology from "long term/permanent alopecia" to "persistent," and it is Dr. Arrowsmith that is incorrect and attempting to shift the focus away from Sanofi's

---

[25] *See* Ex. D, K. Bassi, 8/10/2018, 59:2-9.
[26] *Id.* at 137:11-20.
[27] *See* Ex. E, Mancini I, 3/23/2018, Ex. 2.
[28] *See* Ex. A, *Ex. 7* to Arrowsmith II, 7/29/2020; *also see* Ex. E, *Ex. 29* to Mancini I, 3/23/2018.
[29] *Id.* at 140:13 – 141:23.

10

clear representation to EMA to allow for Kopreski's/Sanofi's creating the need to redefine the TAX 316 findings. If Sanofi had already determined the number and percentage of TAX 316 patients with persistent alopecia there is no need for Dr. Kopreski to create a new definition for his contrived re-analysis. However, Sanofi represented the TAX 316 findings as demonstrating long term/permanent, or persistent, alopecia years before this litigation began, and over half a decade before the need to enlist Dr. Kopreski to manufacture his new definitions and findings.

But all of this is being brought to the Court's attention not for the purpose of determining what is correct, but to demonstrate that Dr. Arrowsmith, alone or with the assistance of counsel, limits her reliance to a single witness who creates *post hoc* evidence to assist in the defense of this action, while ignoring all other witnesses and evidence. In fact, when asked which depositions she reviewed, other than Kopreski, to educate yourself on the follow-up durations in TAX 316, Dr. Arrowsmith could not name a single person involved with the TAX 316 study.[30] Her report only includes the deposition of Dr. Kopreski regarding follow-up durations in TAX 316, and as pointed out herein Kopreski had no contemporaneous role in conducting TAX 316 or assessing clinical trial study data.

Dr. Arrowsmith's blind reliance on Dr. Kopreski's analysis, while ignoring the testimony of other relevant witnesses, and relevant documents, demonstrates the type of flawed methodology that a court sitting as the gatekeeper must exclude. The Court's "reliability analysis applies to all aspects of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). Dr. Arrowsmith lists in her Exhibit B, "Materials Reviewed" twenty-six depositions of current or former Sanofi employees, eight reports of Plaintiff's experts,

---

[30] *Id.* at 29:16 – 30:1.

six depositions of Plaintiff's experts, the trial testimony of Dr. David Kessler, and over 1,150 Sanofi documents.[31] Yet when called upon to offer an opinion concerning the follow-up times for adverse events in TAX 316, Dr. Arrowsmith admits she relies only upon Dr. Kopreski; however, she: (1) does not know the nature, extent or completeness of what Kopreski reviewed and has done nothing to validate Kopreski's re-analysis; (2) does no causation analysis of her own, and sets out no methodology in her own report; (3) ignores relevant witnesses and evidence; and (4) cites to just twenty-four pages of Kopreski's deposition to render, or rather parrot, the "findings" of Kopreski's re-analysis. And while Dr. Arrowsmith admits to having no knowledge of the extent and completeness of Kopreski's material reviewed, she testifies to reviewing Kopreski's deposition wherein *he acknowledges* that his own review and opinions are based entirely upon what was provided to him by counsel for Sanofi.[32] And similar to Dr. Arrowsmith's inability to speak to the completeness of what Dr. Kopreski reviewed, Dr. Kopreski himself testified that he, too, could not speak to the completeness of the material that *he* reviewed, compounding the troublesome provenance of what exactly Dr. Kopreski or Dr. Arrowsmith rely upon in attempting to offer opinions.[33]

"The information upon which an expert bases [her] testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes." See *Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004). The same should apply here, where the expert either fails to address the contrary evidence available and allegedly reviewed by the expert or cooperates with counsel in a limited review of information in providing an expert report and

---

[31] *See* Ex. B, "Janet Arrowsmith, Exhibit B - List of Materials Reviewed."
[32] *See* Ex. C, 492:17 – 493:2.
[33] *Id.* at 493:3 – 494:7.

12

opinion. Under either circumstance, Dr. Arrowsmith's opinions concerning the follow-up of adverse events in Sanofi's TAX 316 clinical trial must be excluded.

### C. Dr. Arrowsmith fails to state an opinion whether Sanofi acted appropriately in failing to change its Taxotere label to include a "warning or precaution" or "adverse drug experience" under 21 CFR § 201.57(c)(6) and (c)(7), respectively.

Dr. Arrowsmith has the experience and education to offer regulatory and labeling opinions, if properly disclosed pursuant to FRCP 26(a)(2)(B), and if properly supported by sufficient facts and sound methodology under the Rule 26 and FRE 702. But Dr. Arrowsmith fails to properly disclose her opinions and fails to set out any reasoning in her report.

At ¶ 29 of her report Dr. Arrowsmith sets out the proper standard for the inclusion of a warning or precaution in the label. The standard is whether "reasonable evidence of a causal association exists, a causal relationship need not have been definitively established."[34] In providing her opinion, however, Dr. Arrowsmith, while acknowledging the standard codified in 21 CFR § 201.57(c)(6), she then adds that "in this context, reasonable evidence of a causal association means a signal is confirmed and not merely a 'weak' or 'potential' signal referred for further evaluation."[35] But Dr. Arrowsmith offers no support for this portion of her opinion, or anything else in ¶ 29; she recognizes the standard set forth in the Code of Federal Regulation, but adds to the standard without reference or support.[36]

Similarly, concerning 21 CFR § 201.57(c)(7)[Adverse Reactions], Dr. Arrowsmith again agrees that the Adverse Reactions section of the label "must describe the overall adverse event profile of the drug based on the entire database," and "that an adverse reaction is an undesirable effect."[37] Dr. Arrowsmith also agrees that the standard as set out in the Code of Federal Regulation

---

[34] *See* Ex. A, 47:17 – 48:12 (citing 21 CFR § 201.57(c)(6)); and 53:8 – 54:4.
[35] *See* Ex. B, ¶ 29.
[36] *See* Ex. A, 54:11 – 56:7.
[37] *Id.* at 56:14 – 57:1.

13

for including an adverse reaction in the label is that there must be "some basis to believe that there is a causal relationship between the drug and the occurrence of the adverse event."[38] Finally, Dr. Arrowsmith agrees that 21 CFR § 201.57 labeling obligations apply to supplemental new drug applications.[39]

Yet, although Dr. Arrowsmith recognizes the standards of "reasonable evidence of a causal association" and "some basis to believe there is a causal relationship" to update the "Warnings and Precautions" and "Adverse Reactions" sections of a drugs labeling, respectively, she does not offer an opinion in her report that evidence did not exist at the time of Ms. Kahn's use of Taxotere that met these standards. Instead, what Arrowsmith offers is an opinion based on a different standard: one of an "unequivocal causal role" in causing PCIA.[40] But Dr. Arrowsmith recognized that the standard is not one of unequivocal proof under 21 CFR § 201.57(c)(6) or (7), yet she chose to not address the appropriate standard, and offers an opinion on an inapplicable and irrelevant standard of unequivocal proof. As a result, Dr. Arrowsmith, and Sanofi, have not disclosed any relevant opinion concerning the applicable standard for inclusion of either a "Warning and Precaution" or an "Adverse Reaction" pursuant to FRCP, Rule 26(a)(2)(B), or a methodology for how she assessed Sanofi's obligations under 21 CFR § 201.57(c)(6) and (c)(7). As a further result Sanofi and Dr. Arrowsmith should be precluded from offering any opinion on the Taxotere label, and its compliance with 21 CFR § 201.57(c)(6) and (c)(7), at trial.

## II.     Conclusion

Sanofi offers Dr. Arrowsmith to voice opinions on general causation, the follow-up of adverse events in TAX 316 and FDA regulation and labeling/warnings. Dr. Arrowsmith's general

---

[38] *Id.* at 57:10-21.
[39] Id. at 59:14-16.
[40] *See* Ex. B, ¶ 141.

causation opinions lack a valid scientific methodology and are unreliable, as demonstrated herein. Additionally, although she intimates throughout her report that she will opine, or assume as a given, general causation between various chemotherapy drugs and PCIA, Dr. Arrowsmith admits that she "does not intend to offer testimony that valid scientific evidence demonstrates a causal association, statistically significant causal association, between any chemotherapy agent and PCIA." Given the above, allowing Dr. Arrowsmith to offer testimony or comment upon general causation could not assist the jury in rendering its verdict, and could only serve to confuse the jury, and no amount of curative instruction can prevent the devastating prejudice that would result to Plaintiff.

Dr. Arrowsmith's sole basis for offering testimony on the follow-up of adverse events in TAX 316 is based entirely on the litigation driven, backdoor expert opinion of Dr. Kopreski, whose testimony Plaintiff concurrently seeks to exclude, and who thus cannot provide support for Dr. Arrowsmith's opinions. Further, Dr. Arrowsmith has admitted to not validating Dr. Kopreski's work, and thus cannot rely upon it. Further still, her testimony demonstrates both a blind faith in Dr. Kopreski's analysis, to the exclusion of all other evidence to the contrary, and a flawed methodology that cannot pass the court's gatekeeping scrutiny.

Finally, because Dr. Arrowsmith recognizes the proper standard that must be applied for the inclusion of "Warnings and Precautions" and "Adverse Reactions" in a drug's labeling, and yet consciously chose to apply another, and irrelevant, standard to apply to the facts of the current case, she and Sanofi have offered no relevant opinions on whether the labeling for Taxotere at the time of Ms. Kahn's use was appropriate or deficient. As a result, Dr. Arrowsmith's opinion as stated in her report – based on a standard of "unequivocal" proof of cause - must be excluded, and

Dr. Arrowsmith should be precluded from offering any other labeling opinion at trial for failure to properly disclose an opinion under FRCP 26(a)(2)(B). This exclusion is automatic. FRCP 37(c).

Because the aforesaid opinions do not meet the *Daubert* hurdle for allowing expert testimony to be heard by a jury, the Court should exclude Dr. Arrowsmith's opinions as prayed for herein.

**WHEREFORE**, as a result of the foregoing, Plaintiff, Elizabeth Kahn, prays this Court Order and Direct that:

1. Dr. Arrowsmith be precluded from offering any opinion on general or specific causation of any drug, but specifically chemotherapy drugs and tamoxifen, and their causal relationship with PCIA;

2. Dr. Arrowsmith be precluded from offering any opinion on the follow-up times for PCIA or ongoing alopecia in TAX 316, based upon the flawed re-analysis of Michael Kopreski;

3. Dr. Arrowsmith be precluded from relying upon the flawed re-analysis of limited TAX 316 data performed by Michael Kopreski;

4. Dr. Arrowsmith be precluded from offering any opinion on the appropriateness of label "warnings and precautions" and/or "adverse reactions" for her failure to set out such opinions in her report; and

5. Dr. Arrowsmith be precluded from offering comment directly or indirectly concerning these precluded topics, and further that she be precluded from offering directly or indirectly, opinions not fully and properly set out in her report.

Dated: August 13, 2020

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
Andre Mura ((CA Bar # 298541) (on the brief)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

### PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South

| | |
|---|---|
| 15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ M. Palmer Lambert
**M. PALMER LAMBERT**