## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Elizabeth Kahn, Case No. 2:16-cv-17039

---

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE
## EXPERT TESTIMONY OF LINDA BOSSERMAN, M.D.

In *Earnest*, the Court significantly limited Dr. Bosserman's testimony for reasons that are also present here. The Court should again limit Dr. Bosserman's testimony as follows:

First, the Court should preclude Dr. Bosserman from offering any case-specific opinions. The Court ruled in *Earnest* that where "Plaintiff's treating physician . . . is available to testify, Dr. Bosserman will not be allowed to opine on the facts of [Plaintiff's] case. [Plaintiff's treating physician] can testify about how he would have responded to an adequate warning from Defendants."[1] Here, as in *Earnest*, Plaintiff Elizabeth Kahn and her treating physicians have provided testimony on these topics. Dr. Bosserman's case-specific opinions are still based on nothing more than reading the depositions of Ms. Kahn and her treating physicians, ignoring contrary testimony, and presenting that narrative as expert opinion. These litigation-driven opinions are inadmissible under Rule 702, and should be excluded, just as they were in *Earnest*.

---

[1]   Rec. Doc. 7807, at 4-6 (Order and Reasons, Defs. Mot. to Exclude Expert Test. of Dr. Linda Bosserman)

Second, the Court should again exclude testimony concerning online predictive tools.  As the Court previously held, Dr. Bosserman should not be "permitted to testify about these tools in connection with [Plaintiff's] case."[2]  As in *Earnest*, Ms. Kahn and her treating physicians have testified about what alternative treatment options were considered, the weighing of the risks and benefits of each, and their specific decisions—without the use of online tools.  Accordingly, Dr. Bosserman should again be precluded from offering Plaintiff-specific opinions concerning online predictive tools.

Third, the Court should preclude Dr. Bosserman from testifying about what was "known or knowable" by Sanofi or Plaintiff's treating physicians in 2008 regarding permanent hair loss.  Her opinions on this score are inadmissible because they are unreliable and unhelpful, in addition to being case-specific (to the extent Dr. Bosserman attempts to opine what Plaintiff's physicians knew).  Dr. Bosserman admits that she will leave the "issue of what was known when, et cetera, in terms of the labeling and warnings to other experts."[3]

## **LEGAL STANDARD**

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony.  Pursuant to Rule 702, the Court must first exercise its gatekeeping function to determine whether an expert is ***qualified***; then the Court must determine whether the expert's reasoning is ***reliable*** and ***relevant***.  *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015).  The standards for reliability apply to "*all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added).  Importantly, "the

---

[2]   *Id.* at 6.

[3]   **Ex. A**, Bosserman Dep. 174:10-174:24, Apr. 17, 2020.

expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion." *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision).

As to relevance, the Court must determine "whether the reasoning or methodology 'fits' the *facts of the case* and will thereby assist the trier of fact to understand the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d at 551 (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand").

Finally, courts must consider whether the expert's opinions are litigation-driven or results-driven. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). The Court's gatekeeping function is essential to ensure an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In making this assessment, courts have considered "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317)). Defendants do not bear the burden of demonstrating its inadmissibility. *See Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

## FACTUAL BACKGROUND

Plaintiff Elizabeth Kahn is a 62-year-old resident of New Orleans, Louisiana.[4]  On April 11, 2008, Ms. Kahn was diagnosed with infiltrating cancer in her left breast—ER-positive, PR-positive, and HER-2-negative.[5]  After her diagnosis, Ms. Kahn met with Dr. Ralph Corsetti, a surgical oncologist, and Dr. Carl Kardinal, a medical oncologist, to discuss treatment options.[6]  Dr. Kardinal informed Ms. Kahn that she was an ideal candidate for a clinical trial on neoadjuvant chemotherapy with or without Avastin.[7]  In 2008, Ms. Kahn also began receiving counseling from Dr. Zoe Larned, a medical oncologist, who continues to treat Ms. Kahn.[8]

The clinical trial, known as NSABP B-40, included six different chemotherapy regimens, and the determination of which regimen a participant received was randomly selected.[9]  As part of the clinical trial, patients received three standard chemotherapy drugs, "docetaxel [Taxotere] followed by the combination of doxorubicin and cyclophosphamide."[10]  In addition, participants were randomly assigned to receive three investigational drugs—Xeloda, Gemzar, and Avastin.[11] Neither the participant nor the doctor could choose the participant's group, and the participant did not "know what group [they were] going to be in" until they agreed to participate.[12]

In discussing the clinical trial with Ms. Kahn, Dr. Kardinal and his clinical trial nurse

---

[4]   **Ex. B**, Kahn PFS at 2.

[5]   *Id.* 10-12.

[6]   **Ex. C**, Kahn Dep. 158:9-160:7, 162:9-24, 164:1-23, 169:8-174:21, Dec. 7, 2017.

[7]   *Id.* 170:8-13, 172:5-174:21.

[8]   **Ex. D**, Larned Dep. 66:14-24; 71:10-24; 77:10-20, Feb. 21, 2018.

[9]   **Ex. E**, NSABP 21-49.

[10]   **Ex. F**, Kardinal Dep. 96:14-19, 98:3-8, Jan. 17, 2018.

[11]   Ex. E, NSABP 21-49.

[12]   Ex. C, Kahn Dep. 171:10-13, Dec. 7, 2017.

Shevonda Thomas explained the risks and potential side effects of the treatment.[13]  Nurse Thomas noted that she "reviewed and discussed [the clinical trial consent' in great lengths" with Ms. Kahn before she agreed to participate in the clinical trial.[14]  Ms. Thomas noted that Ms. Kahn had "plenty [of] questions" during the consent process, and that "all questions [were] answered to both patient and husbands satisfaction, both verbalized understanding."[15]  While participating in the clinical trial, Ms. Kahn also raised a variety of concerns regarding side effects with her treating oncologist, Dr. Larned.[16]

Ms. Kahn understood that one purpose of the study was "to learn more about the side effects of the combinations of drugs used in this study."[17]  The side effects that were explained to her included hair loss, heart damage, heart attack or heart failure, gastrointestinal problems, acute leukemia, blood clots, high blood pressure, bleeding in various parts of the body, stroke, liver failure, lung damage, and death.[18]

Ms. Kahn also understood that "there could be side effects that [her] doctors could not predict," including side effects that "could be long-lasting or ***might not go away***."[19]  She initialed each page of the clinical trial's consent form, indicating that Ms. Kahn understood and accepted the risks of participating in the clinical trial, including risks that may be permanent.[20]

---

[13]   *Id.* 187:4-190:23; **Ex. G**, Thomas Dep. 67:8-16, 86:1-3, 101:17-102:20, Jan. 10, 2018.

[14]   Ex. G, Thomas Dep. 67:8-16; 86:1-3; 101:17-102:20, Jan. 10, 2018.

[15]   *Id.* 102:13-20; Ex. C, Kahn Dep. 188:20-189:14, Dec. 7, 2017.

[16]   Ex. D, Larned Dep. 71:25-92:5, Feb. 21, 2018; Ex. C, Kahn Dep. 256:22-257:5, Dec. 7, 2017.

[17]   Ex. C, Kahn Dep. 192:1-5, Dec. 7, 2017.

[18]   *Id.* 196:20-202:6.

[19]   *Id.* 203:18-205:10 (emphasis added).

[20]   *Id.* 189:25-190:23.

## **ARGUMENT**

### I.    **DR. BOSSERMAN'S CASE-SPECIFIC TESTIMONY IS INADMISSIBLE.**

In *Earnest*, the Court held, "[b]ecause Plaintiff's treating physician . . . is available to testify, Dr. Bosserman will not be allowed to opine on the facts of [Plaintiff's] case."[21]  Despite that ruling, Ms. Kahn has designated Dr. Bosserman to offer case-specific opinions concerning: (1) what her treating physicians would have said and done with regard to prescribing Taxotere, had they been provided unspecified information about permanent alopecia; (2) what her treating physicians would have said regarding the risks and benefits of an alternative, non-chemotherapy regimen, and (3) what Ms. Kahn would have decided after considering such information.[22]  These case-specific opinions are based on nothing more than reading the depositions of Ms. Kahn and her treating physicians, ignoring contrary testimony, and presenting that narrative as expert opinion.  None of those opinions are admissible.

First, warnings causation turns on the testimony of Plaintiff's treating physicians—here Drs. Kardinal and Larned—who have both testified about their treatment of Plaintiff in this case. In light of Ms. Kahn and her treating physicians' own testimony, Dr. Bosserman's speculative opinion about what they would have done with "different" information is irrelevant and should be excluded.  *See Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099 (5th Cir. 1991) ("the plaintiff must show that a proper warning would have changed the decision of the *treating physician*.") (emphasis added); *Ferguson v. Proctor & Gamble Pharms., Inc.*, 353 F. Supp. 2d 674, 679 (E.D. La. 2004) ("In order to demonstrate causation, 'the plaintiff must show that a proper warning would have changed the decision of the ***treating physician***, i.e., that but for the inadequate warning, the treating

---

[21]    Rec. Doc. 7807, at 4-6 (Order and Reasons, Defs. Mot. to Exclude Expert Test. of Dr. Linda Bosserman).

[22]    **Ex. H**, Taxotere Rule 26 Report of Linda Bosserman, M.D., at 55-56, ¶¶ 1-6, Apr. 3, 2020.

physician would not have used or prescribed the product.'") (emphasis added) (citations omitted); *Grenier v. Med. Eng'g Corp.,* 99 F. Supp. 2d 759, 766 (W.D. La. 2000)*, aff'd,* 243 F.3d 200 (5th Cir. 2001) ("The affidavit of Dr. Louie Worthing submitted by Plaintiffs is the exact information needed to carry their burden through the gauntlet of the learned intermediary doctrine—if only the information had come from Dr. Ramey, the person who the inquiry must revolve around.  Coming from Dr. Worthing, it is ***irrelevant*** to the learned intermediary analysis.").[23]

Second, Dr. Bosserman should be prohibited from testifying about what alternative treatments Dr. Kardinal would have offered or what choices *Ms. Kahn* would have made.  This is so for three reasons: (1) any opinions Dr. Bosserman may have concerning what chemotherapy regimen Ms. Kahn's treating physicians may have prescribed or what regimen she may have chosen are inherently speculative and inadmissible; (2) Ms. Kahn's treating physician, Dr. Kardinal, already testified that he would have prescribed Plaintiff a chemotherapy regimen consisting of AC plus a taxane (either Taxotere or Taxol) had she elected not to participate in the clinical trial;[24] and (3) Ms. Kahn elected to participate in a clinical trial that randomized her chemotherapy regimen, thus abandoning the option to choose the specific chemotherapy she ultimately received.

Dr. Bosserman testified that she is not "offering any criticisms" or "second guessing any of the decisions that Dr. Kardinal made with regard to what type of medication to prescribe for

---

[23]   *See also Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1322 (W.D. Okla. 2006) ("Likewise irrelevant is plaintiff's argument regarding what a reasonable physician would do"); *Fraley v. Am. Cyanamid Co.*, 589 F. Supp. 826, 828 (D. Colo. 1984) ("The acts of the treating physician, not the average or 'reasonable' physician, are the acts relevant to proximate cause.  One must prove what that particular physician would have done in that particular circumstance."); *Gronniger v. Am. Home Prod. Corp.*, 2005 WL 3766685, at *5 (Pa. Com. Pl. Oct. 21, 2005) (expert testimony "as to what a 'reasonable doctor' would have done with appropriate knowledge is not admissible [and] irrelevant").

[24]   Ex. F, Kardinal Dep. at 104:16-105:8, Jan. 17, 2018.

Ms. Kahn."[25]  It is Dr. Bosserman's opinion that the NSABP-40 clinical trial "was an appropriate option" for Ms. Kahn.[26]  Dr. Bosserman agrees that "receiving chemotherapy and receiving neoadjuvant chemotherapy" were also both appropriate options for Ms. Kahn.[27]  Further, Dr. Bosserman agrees that "Dr. Kardinal can testify about what recommendations he did or would make," as well as "his decision to enroll Ms. Kahn in the NSABP B-40 clinical trial," and his hypothetical decision to recommend a Taxotere regimen "even knowing of a risk of permanent hair loss."[28]  Dr. Bosserman admits that her role is not "to replace [her] judgment for Dr. Kardinal's."[29]  Thus, Dr. Bosserman's opinions regarding what alternative treatment options may have been discussed between Dr. Kardinal and Ms. Kahn are not only speculation, they are irrelevant.

Ms. Kahn's own treating physician already testified how he would have treated her had she not participated in the clinical trial.  Dr. Kardinal testified that—had Ms. Kahn opted not to participate in the clinical trial—he would have treated her with nearly the same regimen ("I would have treated her very – very similarly").[30]  Specifically, Dr. Kardinal would have recommended Taxotere over Taxol: "Adriamycin and Cytoxan followed by a taxane . . . Usually Taxotere is what I would use . . . because of the – has lesser neurological toxicity than Taxol."[31]  As such, Dr. Bosserman's opinions concerning alternative treatment available in January 2008 are irrelevant, unhelpful, speculative, and unreliable.

---

[25]   Ex. A, Bosserman Dep. 71:11-21, Apr. 17, 2020.

[26]   *Id.* at 71:15-21.

[27]   *Id.* at 176:2-4.

[28]   *Id.* at 73:1-74:11.

[29]   *Id.* at 175:19-21.

[30]   Ex. F, Kardinal Dep. 104:6-13, Jan. 17, 2018.

[31]   *Id.* at 104:16-105:8.

Additionally, any opinions Dr. Bosserman may have concerning Ms. Kahn's treatment choices, including the opinion that she had a preference "for different acute, chronic and permanent toxicities like PCIA" when making her treatment decision, are *wholly* speculative.[32]   As Dr. Bosserman has previously admitted, doctors cannot practice medicine with a crystal ball, and treatment decisions are not made with the benefit of hindsight.[33]  Dr. Bosserman understands that there is no certainty that Ms. Kahn would be cancer-free today, or that she would not have permanent hair loss if she received an alternative chemotherapy regimen.[34]  As Dr. Bosserman previously testified, "the crystal ball doesn't exist."[35]

And finally, the fact that Ms. Kahn elected to participate in a randomized clinical trial, giving up her ability to choose which chemotherapy regimen she received, further underscores the speculative nature of Dr. Bosserman's opinions.  As part of the clinical trial, patients received three of the standard chemotherapy drugs, "docetaxel [Taxotere] followed by the combination of doxorubicin and cyclophosphamide."[36]   Patients also received some combination of three investigational drugs—Xeloda, Gemzar, and Avastin.  Plaintiff accepted that she would not know what combination of these drugs she would receive until she agreed to participate in the trial.

Despite the stated risk of hair loss, heart damage, heart attack, kidney failure, severe infection, liver failure, acute leukemia, blood clots, severe lung problems, stroke, death, and other side effects, Ms. Kahn consented to participate in the clinical trial because she believed it provided her with the best chance of survival.[37]   Whatever other regimens existed in 2008, Ms. Kahn

---

[32]   Ex. H, Taxotere Rule 26 Report of Linda Bosserman, M.D., at 56, Apr. 3, 2020.

[33]   **Ex. I**, Bosserman Dep. 113:15-19, 120:12-15, Dec. 3, 2018.

[34]   Ex. A, Bosserman Dep. 174:25-175:21, Apr. 17, 2020; *see, e.g.*, **Ex. J**, Bosserman Dep. 278:2-7, Nov. 22, 2019.

[35]   Ex. J, Bosserman Dep. 278:2-7, Nov. 22, 2019.

[36]   Ex. F, Kardinal Dep. 96:14-19, 98:3-8, Jan. 17, 2018.

[37]   Ex. C, Kahn Dep. 180:3-5, 189:25-190:23, 196:20-205:10, Dec. 7, 2017.

ultimately left the determination of what chemotherapy she would receive to random selection. Dr. Bosserman's opinions concerning alternative treatment options, or opinions on what Ms. Kahn would do with different information, are therefore, irrelevant and unhelpful.

## II.   DR. BOSSERMAN'S TESTIMONY REGARDING CERTAIN "ONLINE" TOOLS IS INADMISSIBLE.

Notwithstanding the Court's prior ruling prohibiting Dr. Bosserman from offering testimony regarding online "predictive" tools in connection with Plaintiff's case, Dr. Bosserman devotes a substantial portion of her report to that very topic.[38]  Dr. Bosserman again relies on online "predictive" tools to discuss alternative treatment options and possible survival outcomes had Ms. Kahn received an alternative treatment.  Dr. Bosserman references two online predictive tools: "Adjuvant! Online" and "Predict," as well as the "MD Anderson nomogram for predicting outcomes," to support her opinion that "Ms. Kahn had several equally effective chemotherapy regimens to reduce her risk of tumor recurrence and improve her survival. . . ."[39]  Such testimony is inadmissible and should be excluded.

There is no evidence that Ms. Kahn's treating oncologist used Adjuvant! Online in his treatment practice, and Predict was not available until 2010—two years after Plaintiff was treated. Thus, neither tool could possibly have played a role in the "informed consent" discussion between Ms. Kahn and Dr. Kardinal, nor could they have played a role in her decision to participate in the clinical trial.  This Court previously held that Dr. Bosserman was not "permitted to testify about these tools in connection with [Plaintiff's] case."[40]  Accordingly, because Ms. Kahn and her treating physician have testified, and are available to testify, about what alternative treatment

---

[38]   Ex. H, Taxotere Rule 26 Report of Linda Bosserman, M.D., at 31-40, Apr. 3, 2020.

[39]   *Id.*

[40]   Rec. Doc. 7807, at 6 (Order and Reasons, Defs. Mot. to Exclude Expert Test. of Dr. Linda Bosserman).

options were considered, and the weighing of the risks and benefits of each, Dr. Bosserman should

be precluded from offering Plaintiff-specific opinions on these issues using online predictive tools.

### III.   DR. BOSSERMAN'S OPINIONS REGARDING A "KNOWN OR KNOWABLE" RISK OF PERMANENT HAIR LOSS IN 2008 SHOULD BE EXCLUDED.

Dr. Bosserman's case-specific "informed consent" opinions hinge on the notion that Dr.

Kardinal would have relayed a known risk of permanent hair loss to Ms. Kahn, or that there was a

known risk to be conveyed.[41]  Specifically, Dr. Bosserman repeatedly offers some variation of the

following, with no citation or support: "At the time Ms. Kahn entered the [clinical] trial, Sanofi

was in fact aware of the risk of PCIA yet did not warn physicians or patients.  As a result, this

information was not in the [informed] consent form."[42]  Dr. Bosserman further opines without

citation: "[n]either Dr. Kardinal, nor his oncology nurse, Shevonda Thomas, nor the writers of the

national NSABP B-40 informed consent form, were informed about the risk of PCIA from Sanofi's

adjuvant clinical trials . . . ."[43]

When asked to cite to support for the opinion that information was "knowable" or withheld

from the authors of NSABP-40, Dr. Bosserman testified "I refer you to Dr. Feigal," disclaiming

any personal knowledge of the subject.[44]  In Dr. Bosserman's own report, she simply refers to "the

Rule 26 Report of Ellen Feigal," stating she has "not copied this material but intend[s] to rely on

it as though set forth in this report in full."[45]  However, Dr. Bosserman also admits that she will

leave the "issue of what was known when, et cetera, in terms of the labeling and warnings to other

---

[41]   Ex. H, Taxotere Rule 26 Report of Linda Bosserman, M.D., at 55-56, ¶¶ 1-6, Apr. 3, 2020.

[42]   *Id.* at 52-54.

[43]   *Id.* at 52.

[44]   Ex. A, Bosserman Dep. 174:10-24, Apr. 17, 2020.

[45]   Ex. H, Taxotere Rule 26 Report of Linda Bosserman, M.D., at 53, Apr. 3, 2020.

experts."[46]  Having no reliable grounds for such opinions—and having disclaimed such opinions —Dr. Bosserman should not be permitted to testify about what was "known or knowable" by Sanofi or to Plaintiff's treating physicians in 2008 regarding permanent hair loss.  *See Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) ("conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion").

## <u>CONCLUSION</u>

The Court should exclude the aforementioned testimony of Dr. Bosserman under Federal Rule of Evidence 702.[47]


Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE  URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

---

[46]  Ex. A, Bosserman Dep. 174:10-174:24; 176:10-177:15, Apr. 17, 2020.

[47]  Defendants assert the additional arguments made in *Earnest* against Dr. Bosserman that this Court rejected.  Rec. Doc. 7807 (Order and Reasons, Defs. Mot. to Exclude Expert Test. of Dr. Linda Bosserman).  *See Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 8 n.4 (1st Cir. 2001) ("Circumstances change from trial to trial, and admissibility rulings may also change from judge to judge and trial to trial."). For purposes of the record, Sanofi incorporates its prior motion and reply in support thereof as if fully set forth here. Rec. Doc. 6130 (Defs. Mot. to Exclude Expert Test. of Dr. Linda Bosserman); Rec. Doc. 6752 (Reply Mem. in Supp. of Defs. Mot. to Exclude Expert Test. of Dr. Linda Bosserman).

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*