# EXHIBIT A

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2                  CASE NO. 2:16-cv-17039
 3
 4      ELIZABETH KAHN,               ) VIDEOCONFERENCE
                                        VIDEOTAPED
 5                                    ) DEPOSITION OF:
                        Plaintiff,    )
 6                                    )
           v.                         ) LINDA
 7                                    ) BOSSERMAN, M.D.
                                      )
 8      SANOFI S.A., SANOFI-AVENTIS   )
        U.S. L.L.C., SANOFI US SERVICE,)
 9      INC., and AVENTIS-PHARMA S.A.,)
                                      )
10                      Defendants.   )
        _____)
11
12
13              TRANSCRIPT of the stenographic notes of
14      the proceedings in the above-entitled matter, as
15      taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,
16      held via Zoom videoconference from multiple
17      locations, with the witness located at 3803 Seashore
18      Drive, Newport Beach, California on Friday, April 17,
19      2020, commencing at 11:34 a.m.
20
21
22
23
24
25
```

1      A.     From my understanding, she met the
2    requirements for the doctors that was part of the
3    trial and evaluated her for that.  I didn't evaluate
4    her independently.
5      Q.     That be would the evaluation that was
6    done by Dr. Kardinal.  Correct?
7      A.     Correct.
8      Q.     And are you offering any criticisms of
9    Dr. Kardinal's treatment of Ms. Kahn in this case?
10     A.     No, I am not.
11     Q.     Are you second guessing any of the
12   decisions that Dr. Kardinal made with regard to what
13   type of medication to prescribe for Ms. Kahn?
14     A.     I am not.
15     Q.     Do you believe that it was appropriate
16   for Ms. Kahn to participate in the NSABP clinical
17   trial?
18     A.     I think --
19            MR. MICELI:  Object to the form.
20     A.     I think it was an appropriate option
21   that she talked about with her doctor.
22     Q.     And do you believe that the NSABP B-40
23   clinical trial was a reasonable option for
24   Dr. Kardinal to offer Ms. Kahn?
25     A.     I do agree with that.  Looking -- based

Page 73

1    Q.    Well, Doctor, would you agree with me
2  that Dr. Kardinal can testify about what he did and
3  did not know.  Correct?
4    A.    Yes.
5    Q.    Dr. Kardinal can testify about what
6  recommendations he did or would make.  Correct?
7    A.    He can, yes.
8    Q.    And you're not here to second guess
9  whatever his testimony on those issues may be.
10  Correct?
11   A.    Correct.
12   Q.    And you're aware that Dr. Kardinal
13  stands by his decision to enroll Ms. Kahn in the
14  NSABP B-40 clinical trial.  Correct?
15         MR. MICELI:  Object to the form.
16   A.    As I read his deposition, with what he
17  knew, he made that decision.  He also states if he
18  knew about the permanent hair loss risk, he may have
19  made a different decision or would have included it
20  in his information.
21   Q.    And you actually did read Dr. Kardinal's
22  deposition.  Correct?
23   A.    I did.
24   Q.    When was the last time you read it?
25   A.    A few weeks ago.

1      A.     I did not recall seeing that.
2      Q.     And please skip to page 62 with me of
3  your report.
4      A.     Okay.
5      Q.     At the end of paragraph 5 there, is
6  that -- on that page, do you see that there's a
7  sentence that says "at the time"?
8             Do you see that?
9      A.     Yes.
10     Q.     You say, "At the time Ms. Kahn entered
11 the trial, Sanofi was, in fact, aware of the risk of
12 PCIA, yet did not warn physicians or patients."
13            Do you see that?
14     A.     Yes.
15     Q.     What is your authority or basis for that
16 statement?
17     A.     I refer you to Dr. Feigal, who really
18 addressed the trials and the studies and what was
19 available to Sanofi and their internal documents.
20            (Court reporter clarification.)
21     Q.     And will you leave the issue of what was
22 known when, et cetera, in terms of the labeling and
23 warnings to other experts?
24     A.     Yes.
25     Q.     And, Doctor, we can agree that there's

1     no way to know that Ms. Kahn would be cancer-free
2     today if she had not participated in the NSABP B-40
3     clinical trial.  Correct?
4                 MR. MICELI:  Object to the form.
5          A.     That's actually a crystal ball question.
6          Q.     And the answer is we don't have a
7     crystal ball.  Correct?
8          A.     We don't have a crystal ball.  But what
9     we have is that more likely than not, she would be in
10    remission based on the probability that surgery and
11    hormonal therapy alone would give her the majority of
12    all the benefits in preventing recurrence.
13                So more likely than not is that the
14    chemo was -- was not necessary and was not the
15    contributing factor.
16         Q.     But we have no way to know, correct,
17    Doctor?
18         A.     We do not have that ability.
19         Q.     You're not here to replace your judgment
20    for Dr. Kardinal's.  Correct?
21         A.     That is not my opinion.
22         Q.     And, Doctor, you would agree that not
23    only was it appropriate for Ms. Kahn to receive
24    chemotherapy, it was also appropriate for her to
25    receive neoadjuvant chemotherapy?

1             MR. MICELI:  Object to the form.
2        A.    I think both her receiving chemotherapy
3    and receiving neoadjuvant chemotherapy were
4    appropriate options.
5        Q.    Doctor, do you have any criticisms of
6    the consent process that Ms. Kahn went through as
7    part of her participation in the clinical trial?
8        A.    To what --  what actually do you mean by
9    "process"?
10       Q.    Well, let me start this way:  Do you
11   have any criticisms of the consent form that Ms. Kahn
12   signed as far as the clinical trial?
13       A.    I have no criticism of the form other
14   than that I think it's established had Sanofi
15   disclosed what they knew, that would have been
16   included; just like what was known and disclosed for
17   bevacizumab was included in detail, as you and I
18   reviewed.
19       Q.    And you're speculating on what the
20   authors of the NSABP informed consent actually had
21   available to them when they wrote the informed
22   consent for the B-40 trial.  Correct?
23            MR. MICELI:  Object to the form.
24       A.    I'm not speculating.  When you write a
25   national informed consent, you have available the

Page 177

1    evidence that you have available.  Sanofi had not
2    provided that evidence.  I think that's pretty clear.
3         Q.    When was the TAC 316 clinical trial
4    completed?  When was the ten-year study completed?
5         A.    Oh, I would have to look back at my
6    notes on that.  I don't remember offhand those dates.
7         Q.    Do you know if it was --  go ahead.  I
8    didn't mean to cut you off.
9         A.    I have to look at the actual dates.
10              (Court reporter clarification.)
11        A.    Yes, I have to look at the actual dates.
12        Q.    Do you know whether or not TAX 316 was
13   even finished in 2008?
14        A.    Offhand, I'm totally blanking, after a
15   long day here, on the exact dates.
16        Q.    So you don't know one way or another
17   sitting here right now whether or not the ten-year
18   study was completed by 2008?
19              That's just not a date you have in your
20   mind.  Correct?
21        A.    I don't have the date that the
22   ten-year -- I know when the ten-year study was
23   concluded.
24              (Court reporter clarification.)
25        A.    I don't have the exact date it was