# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

************************

*

ELIZABETH KAHN, * CASE NO.

Plaintiffs * 2:16-CV-17039

*

*

VERSUS *

*

*

SANOFI S.A., ET AL *

Defendants *

*

************************

Job No. NJ2756392

Deposition of ELIZABETH SARA KAHN, taken on Thursday, December 7, 2017, commencing at 8:34 a.m., at the law offices of Pendley, Baudin & Coffin, 1515 Poydras Street, Suite 1400, New Orleans, Louisiana 70112.

maybe all I need to talk about on Exhibit 4.

Okay. I'm handing you what has been marked as Exhibit 5. And it's titled Notice of Deposition of Plaintiff Elizabeth Kahn.

Have you ever seen a copy of this document before today?

A. Yes, I have.

Q. When did you see it?

A. About two weeks ago?

Q. Okay. Can you turn to Page 5 and 6 for me.

A. Uh-huh (affirmative).

Q. Do you see that this asks you to bring to the deposition, the items that were referenced or requested in your most recent Plaintiff Fact Sheet?

A. Well, I'm reading up there, that it says: Items to be produced. But I followed the directions of my attorneys.

Q. And what was the direction of your attorneys?

MR. COFFIN:

Object to the form.

Don't answer that.

She's not going to tell you what

answer your most recent Plaintiff Fact Sheet.
Do you have documents responsive to that?
A. Yes.
Q. And are they the documents that are in the clinical -- or, in the binder that you referenced earlier in the deposition?
A. Yes.
Q. And you have not brought those today.
A. No.
Q. And you have not brought them today on the advice of counsel, correct?
MR. COFFIN:
Object to the form.
You can't answer that question.
MS. BIERI:
She can answer that question.
MR. COFFIN:
No, she can't. She can't talk about advice of counsel at all.
MS. BIERI:
She's already told me she didn't bring them here today because you told her not to.
MR. COFFIN:

could have the same efficacy with a lumpectomy as with a mastectomy?

MR. COFFIN:

Object to the form.

THE WITNESS:

Well, I'm not a doctor, so all I could do is buy what they explained to me.

EXAMINATION BY MS. BIERI:

Q. Why don't we talk about that appointment. So you go in and you see Dr. Corsetti, correct?

A. Uh-huh (affirmative).

Q. Tell me what you remember about that appointment.

A. He sat down and started talking to us about what our options are. He told me about the size of my tumor, and that I'm going to have some choices. And you can have a surgery, a mastectomy, then chemotherapy, and then radiation; or you can have chemo -- and there's a special name for it. I forgot.

Q. Neoadjuvant.

A. Yeah. You can have chemo before your surgery, in hopes that the tumor will shrink to a size that you can have a lumpectomy and

then have -- so you'd have chemo, surgery, and then radiation. And that's the -- and he thought -- he explained that they were equal. If we can shrink the tumor, it was equally workable for me.

Q. So if you thought that having a lumpectomy wouldn't have given you as good of a shot at beating cancer, would you have chosen that option?

A. Well, that wasn't one of the options. He didn't say -- and we didn't know until chemo was finished as to what exactly was going to happen with the surgery, so . . .

Q. What do you mean? That if it would shrink the tumor?

A. Well, if it didn't shrink, I was still going to -- I was going to have to have a mastectomy.

Q. So you wanted to try and see if the chemo would shrink the tumor. If it didn't, you would have a mastectomy; if it did, you would have a lumpectomy.

A. Correct.

Q. Did he ever say to you: I think that your chances of survival with a lumpectomy

with neoadjuvant chemo, surgery, and then radiation, your chances of survival were the same as if you took the other course ,of mastectomy, chemo, and radiation?

A. I'm thinking he probably did because I chose -- I mean, I got the lumpectomy, so . . .

Q. And you wouldn't have chosen that if you thought that you had a less chance of survival, doing that, correct?

MR. COFFIN:

Object to the form.

THE WITNESS:

Yes. Probably that -- yes. I went with what I thought was best for me.

EXAMINATION BY MS. BIERI:

Q. Saving your life.

MR. COFFIN:

Object to the form.

THE WITNESS:

Well, to me, any -- saving my life was going to happen. I went in it thinking that. So . . .

EXAMINATION BY MS. BIERI:

Q. You thought that either route that

EXAMINATION BY MS. BIERI:

Q. I'm talking about a specific type of chemotherapy drug.

MR. COFFIN:

Same objection.

THE WITNESS:

Not with my surgeon.

EXAMINATION BY MS. BIERI:

Q. Okay. So had you determined, at the time that you walked out of your surgeon's office -- Dr. Corsetti's office, at that first meeting with him --

A. Uh-huh (affirmative).

Q. -- that you wanted to do chemotherapy, then a lumpectomy, and then radiation?

A. Yes. That was what we planned to do.

Q. And was that his recommendation to you?

A. I think he felt either course was fine for me.

Q. Was going to be equally affective in saving your life.

A. Yes, equally affective.

Q. Did you have any concerns about that

Q. After you saw Dr. Corsetti, did you go to see Dr. Kardinal?
A. We had an appointment, but I -- yes, at some point after, we saw Dr. Corsetti, yes.
Q. Okay. And Dr. Kardinal was your first oncologist, right?
A. Yes.
Q. And would it sound right that your first meeting with him was April 22nd of 2008?
A. Yes, that would be -- that sounds exactly right.
Q. Okay. Did anybody go with you to that meeting?
A. My husband.
Q. Did you bring in a list of questions you wanted to talk to him about? Talk to Dr. Kardinal about, that is.
A. I had questions almost every appointment. Whether I had them then or not, I don't know because it was my first visit to him. I wanted to hear what he had to say.
Q. And would you write out questions beforehand --

first appointment with Dr. Kardinal was?

A. No.

Q. Over an hour?

A. I can't even imagine what it was. I have no clue.

Q. No ability to guess.

A. No.

Q. Okay. So you go in. And I want you to tell me what you remember about that appointment, in as much detail as you possibly can.

A. I can give -- I cannot give much detail. He talked to me about my diagnosis and --

Q. What did he say about your diagnosis? What did he tell --

A. I don't remember. And then he said -- and starts talking about the chemotherapy and the possibility of a clinical trial, and then talking to us about what that meant.

Q. Okay. What did he say about -- you can't remember anything he said about your type of cancer?

A. Well, he probably did, but I don't --

Q. But you can't remember it.

A. No.

Q. You can't tell me anything today. No recollection.

A. No. It was ten years ago. No.

Q. You talked about treatment options, correct?

A. Yes.

Q. Tell me what you remember about the treatment options you discussed.

A. Well, he recommended a clinical trial. And the big thing about the clinical trial is, it's standard of care or better. And so that's what we discussed. And he discussed what the clinical trial was for.

Q. And what did he say about that?

A. It was for the drug Avastin, that they had been giving to late-stage cancers, but they want to try to see if it will prolong the life of people with early-stage cancers like mine. And so he thought it would be a good choice for us and that we didn't -- I don't think -- I don't know if we -- I don't think we made the decision that first day.

Q. Did he talk -- was it your

understanding that only Avastin was going to be used in the trial?

A. No. Avastin is on top of the chemotherapy drugs.

Q. And did he discuss what other chemotherapy drugs would be used?

A. I think he did, but depending -- I don't know if they were -- they weren't the same for every group. And before you get -- before you decide -- you don't know what group you're going to be in until you sign off, saying you're going to be in the clinical trial.

Q. So did he tell you anything at all about -- I mean, so you know that there are different drugs that can be used. Okay?

A. Right.

Q. Did he mention what drugs were potentially going to be used?

A. Probably, he did.

Q. Do you have any recollection of that discussion?

A. No.

Q. Do you remember discussing Taxotere specifically?

A. No.

Q. No, you didn't discuss it; or, no, you don't remember?

A. I don't remember.

Q. And it was his recommendation that you participate in a clinical trial, correct?

A. Yes.

Q. Did you discuss any options that didn't involve neoadjuvant chemotherapy?

A. No.

Q. Adjuvant. Forgive me. Neoadjuvant.

A. Yeah. No, we did not.

Q. So you've said you thought that the clinical trail -- that he told you that the clinical trial would be the standard of care or better.

A. Uh-huh (affirmative).

Q. Was there any other reason that you thought that that option would be a good one for you?

MR. COFFIN:

Object to the form.

MS. BIERI:

What's the basis of your objection, Chris?

MR. COFFIN:

It's a compound question.

Would you like to read back the question? She asked two questions in one.

(Reporter complies).

MR. COFFIN:

Previous question --

MS. BIERI:

Well, we're --

MR. COFFIN:

-- where it's all one question.

MS. BIERI:

Let's just start --

MR. COFFIN:

That's the objection.

MS. BIERI:

Let's start fresh.

THE WITNESS:

Okay.

EXAMINATION BY MS. BIERI:

Q. Is there a reason beyond that he said that the clinical trial was the standard of care or better, that you thought a clinical trial would be a good option for you?

A. Are you asking me why I thought it

would be a good option?

Q. Exactly.

A. Because it was standard of care or better. So if we got in the group that was standard of care, I'd be getting what they would have given me anyway. And if I got standard of care or better, maybe that might be a better -- you know, I might live a month or two longer.

Q. What did you understand to be the standard of care part of it?

A. Was what the drugs they were giving for breast cancer at the time.

Q. And did he tell you what those were, or did he just say standard of care?

A. I'm sure he did tell me what they were. I don't remember him talking about them. Because we talked a lot about the Avastin. But I would imagine that he probably did talk to me about them, but I don't recall.

Q. And at the time you did the clinical trial, Avastin wasn't approved for your type of breast cancer, correct?

MR. COFFIN:

Object to the form.

THE WITNESS:

They weren't using it regularly for early-stage cancers.

EXAMINATION BY MS. BIERI:

Q. Do you know if Avastin was approved for early-stage breast cancers at the time you were in the clinical trial?

MR. COFFIN:

Object to the form.

Do you want to know the basis?

MS. BIERI:

Yes, I do.

MR. COFFIN:

Approved by who for what? Are you talking about agency?

MS. BIERI:

Well, early-stage breast cancer.

MR. COFFIN:

Are you asking for an expert opinion?

MS. BIERI:

I'm asking for what she understood. She's allowed to tell me.

MR. COFFIN:

Approved by who?

MS. BIERI:

FDA.

EXAMINATION BY MS. BIERI:

Q. Do you understand --

MR. COFFIN:

Maybe you should ask her that then.

MS. BIERI:

Let me ask her that.

MR. COFFIN:

Go for it.

EXAMINATION BY MS. BIERI:

Q. Do you understand that Avastin had not been approved by the FDA for early -- for breast cancer such as yours?

A. I didn't. I didn't know. I don't know.

Q. So what do you think the purpose of the clinical trial was?

A. The idea was to find out if it would prolong your life longer than what the current, at the time, standard of care was.

Q. Do you remember asking Dr. Kardinal any questions at that appointment?

A. That particular -- yes, I trusted that particular recommendation.

Q. And you thought that was going to give you your best chance of survival?

A. Yes.

Q. At that appointment, the first meeting on April 22nd, were you given any materials on the clinical trial?

A. I'm sure I was. I don't remember.

Q. If you don't remember, how are you sure that you were?

A. Because they constantly gave me papers, and that's why I kept that binder, so that everything was in there. And I would imagine, if you look in that binder, you will find information about the clinical trial.

Q. I'm trying to figure out if at that appointment, you got any information about the clinical trial.

A. I probably did, but I can't tell you that it came exactly at that appointment.

Q. So you got something about the clinical trial. Was it an informed consent -- was it an informed consent document that told you about what the trial was going to be

on that second appointment. I don't remember the chronology of signing for it. I just don't remember what it is.

Q. Can you look at Exhibit 7 for me?

A. Uh-huh (affirmative).

Q. Thank you.

A. Oh, I don't have 7.

Q. No, you should.

A. Oh, there it is. It's under 1. Okay. Yes.

Q. Okay. Does the name Shevonda Thomas mean anything to you?

A. Yes. That was the first clinical trial nurse that I was assigned.

Q. Okay. And it looks like this record is dated 5/14/08 at 4:10 and 48 seconds p.m.

A. Correct.

Q. Okay. In the second line of the second paragraph, it said: Patient seen this a.m.

A. Uh-huh (affirmative). So I guess that's when I met her, and that's when we signed the consent form.

Q. Okay. Had you seen the consent form prior to that day?

A. Probably, but I don't remember.

Q. You don't remember if the day you signed it was the first time you saw the consent form?

A. Correct.

Q. Did you review the consent form before you signed it?

A. Yes. And I'm sure they talked about that with me and told me exactly what I was signing.

Q. Did you read every page of it?

A. I don't remember how long it is.

Q. Do you remember if you talked to just Nurse Thomas that day, or if you also talked to Dr. Kardinal?

A. I don't remember.

Q. Quote -- I'm looking at the second line of the second paragraph now.

A. Uh-huh (affirmative).

Q. The B-40 consent was given, reviewed, and discussed in great -- great is all capitalized --

A. Uh-huh (affirmative).

Q. -- lengths with both patient and husband. Patient and husband both have

plenty of questions. All questions answered to both patient and husband's satisfaction. Both verbalized understanding. Patient and husband given time alone to discuss her possible participation. Patient states she is interested in participating in the trial.

Did I read that right?

A. Yes, you did.

Q. So you think that in addition to getting the clinical trial consent form -- in addition to that, someone also went over the risks and the benefits of the trial with you verbally?

A. Yes. Yes, they did.

Q. Okay. But you got this form that -- forgive me. Let's mark it. I'm going to hand you what's been marked as Exhibit 8.

A. Okay.

Q. There you go. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It's the document that they gave me to explain about the clinical trial.

Q. Let's look at Page 1681. Is that

your -- oh. Let me know when you're there.

A. Uh-huh (affirmative).

Q. Is your signature on Page 1681?

A. Yes, that's my --

Q. And what does your signature evidence?

A. What do you mean?

Q. Does it evidence your intent to participate in the clinical trial?

A. Yes.

Q. Okay. Now, aside from the last page, which you also signed, are your initials on the bottom of every other page?

A. Yes, they are.

Q. And does that mean that you read those pages of the consent?

A. Yes. And that my doctor and the nurse went over each page with me. And they went over each page, and then I would sign.

Q. So you had the opportunity to read it, then they would talk about it, and then you would sign it; is that correct?

A. Yes.

Q. Okay. So let's talk about the purpose of the study. I think you talked a

Q. Okay. The document says: A purpose of this study is to learn more about the side effects of the combinations of drugs used in this study, correct?

A. Yes.

Q. So that means that they didn't know what the side effects of the combinations of drugs used in the study would be, correct?

MR. COFFIN:

Object to the form.

EXAMINATION BY MS. BIERI:

Q. Is that your understanding?

A. Well, not exactly.

Q. What is your understanding then?

A. Because it's the combination -- it's to see about whether there are side effects regarding the heart and then the side effects regarding how patients recover from breast surgery. Those are the side effects that they're looking at.

Q. Well --

A. So it's not just side effects in general. It's about those specific.

Q. Let's read the next sentence. The first word of the sentence is: Included in

this study, right?

A. Yes, I did know that.

Q. Did you think that there was a possibility that the heart could be negatively affected?

A. No.

Q. Despite having this document and initialing Page 1657 and signing the back of this consent, you had no belief that your heart could be negatively impacted.

A. No.

Q. Does the language saying that they want to know how -- whether or not adding Avastin to chemotherapy for breast cancer will affect the heart, does that suggest to you that there is an unknown about how your heart will react when Avastin is added?

A. Yes. That means there could be an unknown.

Q. Let's look at Page 1668. I'm looking at the bottom part of the written page, where it lists side effects that occur in less than 3 percent of patients. So up to --

A. Uh-huh (affirmative).

Q. -- 3 percent of patients could have

liver failure. The document says that, correct?

A. Yes.

Q. Gastrointestinal problems?

A. Yes.

Q. Acute leukemia?

A. Yes.

Q. Blood clots that may be life threatening?

A. Yes.

Q. Heart damage?

A. Yes.

Q. Lung damage?

A. Yes.

Q. Despite that language, you thought that there was no possibility that you could have damage to your heart in taking the study and participating in the study?

MR. COFFIN:

Object to the form.

THE WITNESS:

I don't think that really had anything to do with the study because I imagine -- I don't know, right off the top of my head, but if you looked at the less than

3 percent of patients of any of these chemo drugs, they may have similar side effects. So it may not have mattered whether I was in the study or not in the study.

EXAMINATION BY MS. BIERI:

Q. Okay.

A. It would have been the same.

Q. Okay. Let's turn to Page 1671 then.

A. (Witness complies).

Q. Towards the bottom of the page.

A. Uh-huh (affirmative).

Q. The underlined language: Risks and side effects related to Avastin.

A. Uh-huh (affirmative).

Q. And I'm using the word Avastin where the document actually says B-E-V-A-C-I-Z-U-M-A-B. And it says -- and Avastin is what we're talking about right now, right? You and I --

A. Yes.

Q. -- in this deposition.

Okay. So let's -- and it says there's a 25 percent or more chance of high blood pressure, correct?

A. Correct.

Q. Now, let's skip to Page 1673. And if you want to look to confirm that we're still talking about the risks of Avastin, please confirm that.

So at 1672, it says: These side effects occur in less than 3 percent of patients.

A. Okay.

Q. And we've got, first, bleeding in various parts of the body, leading to disability, including stroke or death, especially in lung cancer patients, for example. There's others.

But then, at the top of Page 1673, it says: Heart problems, including irregular heart beats, changes in blood pressure, fluid collection surrounding the heart, chest pains, and possibly heart attack or heart failure. Correct?

A. Correct.

Q. Will you agree with me that this document makes clear that there was a risk of heart damage from participating in the clinical study?

MR. COFFIN:

Object to the form.

THE WITNESS:

It might have been, but the list might not have been any different with some of the other drugs that I took also that would have been standard of care.

EXAMINATION BY MS. BIERI:

Q. Okay. I first showed it to you in connection -- on Page 1667, with the groups 2A and 2B, related to -- it's really from Page 1667 to 1668 --

A. Uh-huh (affirmative).

Q. -- for groups taking Xeloda and Taxotere. Heart damage is in that group, right?

A. Uh-huh (affirmative). Yes.

Q. And it's also discussed in connection specifically with Avastin, correct?

A. Right. It's in connection with both drugs, yes.

Q. Okay. And then, turning back to Page 1657: Included in what we will learn about side effects will be whether or not adding bevacizumab to chemotherapy for breast cancer will affect the heart.

Do you take that to mean that they were trying to see how the combination of drugs would -- if that would negatively affect your heart?

A. It's what would happen to my heart. I don't know. I don't know. Yes. I mean, my heart could be affected by taking that drug.

Q. And it could be affected negatively, correct?

A. I guess so.

Q. And as we just talked about in connection specifically with the Avastin, you understood that you had up to a 3 percent chance of heart problems.

A. But that was the same with the other drug, also. It was 3 percent.

Q. You were willing to take the risk of a 3-percent chance -- up to a 3-percent chance of liver failure, acute leukemia, heart damage, and lung damage, correct?

MR. COFFIN:

Object to the form.

THE WITNESS:

Ask me the question again.

MS. BIERI:

Can you read it back?

(Reporter complies).

THE WITNESS:

Yes. It's one of the -- it's the side effects that are listed here.

EXAMINATION BY MS. BIERI:

Q. Why were you willing to take that risk?

MR. COFFIN:

Object to the form.

THE WITNESS:

Because there were many risks with chemotherapy.

EXAMINATION BY MS. BIERI:

Q. Any kind of chemotherapy you take, there are a lot of risks, right?

A. Yes. Every single drug that I took had possible risks.

Q. Do you think that there's a chemotherapy drug out there that you could take that doesn't have risks?

A. I don't know.

Q. Are you aware of any?

A. Not that I know of. But drugs change

all the time, and I haven't been treated for cancer in the last ten years, so I don't know.

Q. Okay. Let's look at Page 1665. Okay? So under -- let's look at the section that says: What side effects or risks can I expect from this study?

And it says: You may have side effects while on this study. Most of these are listed here, but there may be other side effects that we cannot predict. Side effects will vary from person to person. Everyone taking part in the study will be carefully watched for any side effects. However, doctors do not know all of the side effects that may happen. Side effects may be mild or very serious.

So you understood that there could be side effects that your doctors couldn't predict, correct?

A. Yes.

Q. You understood that you couldn't know all of the side effects that could happen.

MR. COFFIN:

Object to the form.

EXAMINATION BY MS. BIERI:

Q. Is that what you understood from reading that paragraph?

A. Yes.

Q. And do you understand that you were at risk for some very serious side effects?

A. Yes.

Q. And the last sentence says: In some cases, side effects may be very serious, long-lasting, or may never go away. There is also a risk of death.

The potential of long-lasting or permanent side effects was not specific to any particular side effect, correct? This isn't discussed in connection with a particular side effect, right?

MR. COFFIN:

Object to the form.

THE WITNESS:

They're not being particular here.

EXAMINATION BY MS. BIERI:

Q. No.

A. Or specific here.

Q. They're speaking overall about the

risks and potential side effects of being in the study, right?

A. Yes.

Q. Okay. In other words, you understood that any side effect could be long-lasting or might not go away, correct?

MR. COFFIN:

Object to the form.

THE WITNESS:

That's what I read here.

EXAMINATION BY MS. BIERI:

Q. Okay. Now, did you understand that hair loss was a likely side effect of participating in this study?

A. I knew that temporary hair loss was going to happen. And I was told that by my doctors, and I was told that by my nurses.

Q. Okay. You answered a little bit different question than what I asked, but we're going to take them both.

You said that your doctors and your nurses told you that you would have temporary hair loss; is that right?

A. Correct.

Q. Let's start with this. Who told you

said?

A. No.

Q. When you talked to Dr. Larned in 2009 or 2010, did you believe that your hair loss was due to Taxotere?

MR. COFFIN:

Object to the form.

THE WITNESS:

We didn't discuss any particular thing about why it wasn't growing back at the rate that I had hoped it would grow back.

EXAMINATION BY MS. BIERI:

Q. Well, you were talking to your oncologist, correct?

A. Correct. But we didn't talk about any particular drugs or causes.

Q. Did you think, at that point, it was due to chemotherapy?

A. Well, I lost it because of chemotherapy. I had no clue about the growing back.

Q. So was there a potential in your mind at that point that your hair was not growing back due to something other than a chemotherapy drug?

A. I didn't know. And Dr. Larned was one of the doctors that I saw frequently. I think I saw her every three months for a while. So I talked to her because she's the one that I would see all the time.

Q. Did Dr. Larned recommend that you do anything with regard to your hair loss?

A. No. She had no suggestions.

Q. Have you ever -- through today's date, have you ever talked to any health care provider about whether Taxotere caused or contributed to your hair thinning?

A. No.

Q. Have you ever asked any health care provider why they thought your hair is thinner than it was before chemotherapy?

A. I talked once to my gynecologist, and her comments were back -- her comment to me was, Well, as you age, your hair gets thinner.

Q. And which gynecologist was this?

A. Dr. Roberie.

Q. So have you considered whether the current condition of your hair is affected by the aging process?