# EXHIBIT G

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4   CYNTHIA THIBODEAUX,
             Plaintiff,
 5
     VERSUS              CIVIL ACTION NO. 2:16-cv-15859
 6
     SANOFI S.A., SANOFI-AVENTIS U.S.
 7   L.L.C., SANOFI US SERVICE, INC., and
     AVENTIS-PHARMA S.A.,
 8           Defendants.
     ---------------------------------------------------
 9   ELIZABETH KAHN,
             Plaintiff,
10
     VERSUS              CIVIL ACTION NO. 2:16-cv-17039
11
     SANOFI S.A., SANOFI-AVENTIS U.S.
12   L.L.C., SANOFI US SERVICE, INC., and
     AVENTIS-PHARMA S.A.,
13           Defendants.
14
15
          VIDEOTAPED DEPOSITION OF SHEVONDA THOMAS
16
17      Taken at the Offices of Irwin, Fritchie,
18      Urquhart & Moore, LLC, 400 Poydras Street,
19      Suite 2700, New Orleans, Louisiana, on
20      Wednesday, January 10, 2018, beginning at
21      9:07 a.m.
22
23   JOB NO. 2783235
24
25
```

Page 67

1  consent that I obtained, it's probably circled,
2  it's highlighted, it's written on, because that's
3  the things that I do.  I write over everything.
4        So I -- this -- I do recall this
5  information in reference to drugs.  I don't recall
6  the actual drug.  But I remember breakdowns of
7  something slightly -- or vaguely remembered that.
8     Q.   But in terms of educating a patient on
9  the risks and side effects related to NSABP 40,
10 you would have relied on the actual risks and side
11 effects identified in the Informed Consent,
12 correct?
13    A.   Yes.  I would review the entire Informed
14 Consent with the patient; but, prior to me going
15 in with any patient, I always, I educate myself
16 first.
17         I would look at this.  I would go through
18 this.  But if something is in here that I don't
19 understand, I would look to other information
20 because I would schedule the patient to come to
21 see me.  So prior to the patient coming, I would
22 be prepared for them, with this information, with
23 things already highlighted, maybe asterisks by it
24 or circled, so that I can, you know, knowledgeably
25 give them what they need.

Page 86

1  Q. And you would go page by page through a
2  consent with your patients?
3  A. With mine, yes.
4  Q. You said the appointment -- I believe you
5  testified that the appointments would take a long
6  time.
7  A. Well, as Ochsner, they did.
8  Q. Approximately how long?
9  A. I don't remember, but I know I was in
10 there a long time. I don't remember.
11 Q. You told me earlier that you were aware
12 that a patient could have changes to their hair
13 following chemotherapy, correct?
14 A. Yes.
15 Q. More than temporary changes, correct?
16 A. You're saying I said that they could have
17 more than temporary? I didn't say that. I said
18 they could have changes. They could have changes
19 from the texture. It can go from thin -- it could
20 thin out, or it can be a loss. But I didn't say
21 it can be temporary or permanent. I don't know.
22 Q. So what about hair that you're saying --
23 I think you said hair can go from straight to
24 curly.
25 A. My mom's hair was straight. And her hair

```
                                                     Page 101
 1   questions were.
 2       Q.   And is this the appointment where you
 3   would have gone over the Informed Consent with
 4   Ms. Kahn?
 5       A.   Yes.
 6       Q.   And the consent was for NSABP B-40,
 7   correct?
 8       A.   The B-40 consent, yes.
 9       Q.   Is it fair to say that your job was to
10   make sure that Ms. Kahn had enough information to
11   provide an Informed Consent and make an informed
12   decision about whether she wanted to participate
13   in the clinical trial?
14       A.   Yes.
15              (Exhibit K-7 was marked.)
16   MS. BIERI:
17       Q.   I'm handing you what is marked as Kahn
18   Exhibit 7.  And take a minute, if you'd like, and
19   review that document.
20       A.   Okay.
21       Q.   Is this the Informed Consent document
22   that you went over with Mrs. Kahn?
23       A.   Yes, ma'am.
24       Q.   And would you have gone over it page by
25   page with her?
```

```
                                              Page 102

 1       A.   Yes, ma'am.
 2       Q.   And you would have given her an
 3  opportunity to read it separately, as well; is
 4  that correct?
 5       A.   Yes, ma'am.
 6       Q.   Did you give her and her husband time
 7  alone to discuss her participation in the trial?
 8       A.   I don't remember if I would have walked
 9  out.  I don't remember.
10       Q.   Can I direct you to deposition -- forgive
11  me for reaching -- Exhibit 6.
12       A.   Uh-huh.
13       Q.   This says, "The B-40 consent was given,
14  reviewed and discussed in great lengths with both
15  patient and husband.  Patient and husband both had
16  plenty questions, all answered to both patient and
17  husband's satisfaction.  Both verbalized
18  understanding.  Patient and husband given time
19  alone to discuss her possible participation."
20       A.   If that's what I said, that's what I did.
21       Q.   So reading -- or now looking at your
22  Exhibit 6, your record, you do believe you would
23  have left the room and allowed them time to
24  discuss alone?
25       A.   If that's what I wrote, that's what I
```