UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)            MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Elizabeth Kahn, Case No. 2:16-cv-17039

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
EXPERT TESTIMONY OF ELLEN FEIGAL, M.D.**

---

Dr. Feigal's opinions in this case mirror her opinions in the *Earnest* case. Dr. Feigal continues to assert opinions that were previously excluded or disclaimed, and which should be excluded again here. In addition, Dr. Feigal asserts opinions that—given concessions made during the *Earnest* trial—should now be precluded.

First, the Court should again preclude Dr. Feigal from offering any Plaintiff-specific opinions regarding the standard of care for informed consent or alternative treatments available to Ms. Kahn, because her treating physicians have provided testimony on these subjects, and are available to testify at trial.

Second, the Court should preclude Dr. Feigal from offering any opinion that the dissemination of risk information regarding permanent alopecia and Taxotere was inadequate. While Dr. Feigal has expressly disclaimed any such opinion and has articulated no reliable methodology to support it, she has nevertheless offered testimony implying the warnings were inadequate. Such testimony should be excluded.

Third, the Court should preclude Dr. Feigal from offering any general-causation opinions, and revisit its prior ruling in this respect, because concessions from the *Earnest* trial reveal that Dr. Feigal failed to accurately analyze the number of cases of permanent chemotherapy-induced alopecia ("PCIA") in the literature associated with Taxotere as opposed to other chemotherapy drugs.

## **LEGAL STANDARDS**

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, the Court's gatekeeping function first involves determining whether the expert is **qualified**; then it "involves a two-part inquiry into **reliability** and **relevance**." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. June 9, 2015) (citations omitted and emphasis added).

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id.* As to relevance, the Court must determine, as part of its gatekeeping role, whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (finding that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). The Court's gatekeeping function is essential to ensure an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The scientific world recognizes the hierarchy of evidence as a "fundamental principle of

2

evidence-based medicine."[1]  At the top of the hierarchy are well-designed, randomized controlled clinical trials.  *See, e.g.*, *Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 311 (5th Cir. 1989) (finding that, in a pharmaceutical case, "[u]ndoubtedly, the most useful and conclusive type of evidence in a case such as this is epidemiological studies"); *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *4 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016) ("Epidemiology provides the best evidence of general causation in toxic tort cases.").  There are two clinical trials at the center of Plaintiff's general causation opinions (TAX316 and GEICAM9805/TAX301).  Neither clinical trial on its own demonstrates a statistically significant association between permanent alopecia and Taxotere.  Neither clinical trial was designed to evaluate alopecia—let alone permanent alopecia—following Taxotere use.  And patients in both clinical trials were given other chemotherapy drugs associated with permanent alopecia (Adriamycin and Cytoxan).

The Court's gatekeeping role in analyzing an expert's testimony as well as the sources relied upon is critical given that "expert evidence can be both powerful and quite misleading." *Daubert*, 509 U.S. at 595 (citation omitted).

## FACTUAL BACKGROUND

Plaintiff Elizabeth Kahn is a 62-year-old resident of New Orleans, Louisiana.[2]  On April 11, 2008, Ms. Kahn was diagnosed with infiltrating cancer in her left breast—ER-positive, PR-positive, and HER-2-negative.[3]  After her diagnosis, Ms. Kahn met with Dr. Ralph Corsetti, a

---

[1]  Federal Judicial Center, *Reference Manual on Scientific Evidence* at 723 (3d ed. 2011) ("RMSE").

[2]  **Ex. A**, Kahn PFS, at 2.

[3]  *Id.* 10-12.

3

surgical oncologist, and Dr. Carl Kardinal, a medical oncologist, to discuss treatment options.[4] Dr. Kardinal informed her that she was an ideal candidate for a clinical trial on neoadjuvant chemotherapy with or without Avastin.[5] In 2008, Ms. Kahn also began receiving counseling and treatment from Dr. Zoe Larned, a medical oncologist, who continues to treat Ms. Kahn.[6]

The clinical trial, known as NSABP B-40, included six different chemotherapy regimens, and the determination of which regimen a participant received was randomly selected.[7] As part of the clinical trial, patients received three standard chemotherapy drugs, "docetaxel [Taxotere] followed by the combination of doxorubicin and cyclophosphamide" or "TAC."[8] In addition, participants were randomly assigned to receive three investigational drugs—Xeloda, Gemzar, and Avastin.[9] Neither the participant nor the doctor could choose the participant's group, and the participant did not "know what group [they were] going to be in" until they agreed to participate.[10] In Ms. Kahn's case, she received three phases of chemotherapy during the clinical trial: Phase I included Taxotere, Avastin, and Xeloda; Phase II included Adriamycin, Cytoxan, and Avastin; and Phase III included Avastin.

Dr. Kardinal guided Ms. Kahn through the informed consent process, and treated her during Phase I. Dr. Larned took over Ms. Kahn's care while she was receiving Phase I chemotherapy.[11] In discussing the trial with Ms. Kahn, Dr. Kardinal and his clinical trial nurse,

---

[4] **Ex. B**, Kahn Dep. 158:9-160:7, 162:9-24, 164:1-23, 169:8-174:21, Dec. 7, 2017.

[5] *Id.* 170:8-13, 172:5-174:21.

[6] **Ex. C**, Larned Dep. 66:14-24; 71:10-24; 77:10-20, Feb. 21, 2018.

[7] **Ex. D**, NSABP 21-49.

[8] **Ex. E**, Kardinal Dep. 96:14-19, 98:3-8, Jan. 17, 2018.

[9] Ex. D, NSABP 21-49.

[10] Ex. B, Kahn Dep. 171:10-13, Dec. 7, 2017.

[11] Ex. C, Larned Dep. 66:14:-24; 71:10-24, Feb. 21, 2018.

Shevonda Thomas, explained the risks and potential side effects of treatment.[12] Nurse Thomas noted that she "reviewed and discussed [the clinical trial consent] in great lengths" with Ms. Kahn before she agreed to participate in the clinical trial.[13] Ms. Thomas noted that Ms. Kahn had "plenty [of] questions" during the consent process, and that "all questions [were] answered to both patient and husbands satisfaction, both verbalized understanding."[14] While participating in the clinical trial, Ms. Kahn also raised a variety of concerns regarding side effects with her treating oncologist, Dr. Larned.[15]

Ms. Kahn understood that one purpose of the study was "to learn more about the side effects of the combinations of drugs used in this study."[16] The side effects that were explained to her included hair loss, heart damage, heart attack or heart failure, gastrointestinal problems, acute leukemia, blood clots, high blood pressure, bleeding in various parts of the body, stroke, liver failure, lung damage, and death.[17]

Ms. Kahn also understood that "there could be side effects that [her] doctors could not predict," including side effects that "could be long-lasting or *might not go away*."[18] She initialed each page of the clinical trial's consent form, indicating that Ms. Kahn understood and accepted the risks of participating in the clinical trial, including risks that might be permanent.[19]

---

[12] *Id.* 187:4-190:23; **Ex. F**, Thomas Dep. 67:8-16, 86:1-3, 101:17-102:20, Jan. 10, 2018.

[13] Ex. F, Thomas Dep. 67:8-126; 86:1-3; 101:17-102:20, Jan. 10, 2018.

[14] *Id.* 102:13-20; Ex. B, Kahn Dep. 188:20-189:14, Dec. 7, 2017.

[15] Ex. C, Larned Dep. 71:25-92:5, Feb. 21, 2018; Ex. B, Kahn Dep. 256:22-257:5, Dec. 7, 2017.

[16] Ex. B, Kahn Dep. 192:1-5, Dec. 7, 2017.

[17] *Id.* 196:20-202:6.

[18] *Id.* 203:18-205:10 (emphasis added).

[19] *Id.* 189:25-190:23.

**ARGUMENT**

**I. DR. FEIGAL AGAIN SHOULD BE PRECLUDED FROM OFFERING ANY PLAINTIFF-SPECIFIC OPINIONS.**

In her report and deposition, Dr. Feigal purports not to offer any plaintiff-specific opinions about Ms. Kahn, her prescribing and treating oncologists, the risk/benefit discussions that took place, Plaintiff's hair loss, or specific causation ("I'm not doing any case-specific opinions").[20] Nevertheless, Dr. Feigal offers numerous opinions concerning informed consent, dissemination of risk/benefit information to physicians, and the alternative treatments available at the time Ms. Kahn was treated —all of which touch on plaintiff-specific issues.

In *Earnest*, the Court held, "where Plaintiff's treating physician . . . is available to testify," Dr. Feigal would not be permitted to opine on the facts of the plaintiff's case. More specifically, the Court allowed Dr. Feigal to "testify about the standard of care for physicians for informing patients through the decision-making process," but did not permit Dr. Feigal to "testify about the application of these principles to Earnest's case."[21] The Court likewise allowed Dr. Feigal to "offer general opinions on how pharmaceutical companies disseminate risk information and what alternative treatments exist for Taxotere patients," but prohibited Dr. Feigal from offering "specific

---

[20] **Ex. G**, Feigal Dep. 56:15-16, Apr. 10, 2020.

[21] Rec. Doc. 8094, at 18 (Order and Reasons, Defs. Mot. to Exclude Expert Test. on Gen. Causation, Mot. to Exclude Expert Test. of Dr. Madigan, Mot. to Exclude Expert Test. of Dr. Feigal). Defendants continue to assert that Dr. Feigal should not be permitted to offer generic opinions about what a "reasonable physician" would or should do. Defendants likewise continue to assert the additional arguments made against Dr. Feigal in *Earnest*—not repeated here—that this Court rejected. *See Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 8 n.4 (1st Cir. 2001) ("Circumstances change from trial to trial, and admissibility rulings may also change from judge to judge and trial to trial."). For purposes of the record, Sanofi incorporates its prior challenge and reply in support thereof as if fully set forth here. Rec. Doc. 6149 (Mot. to Exclude Expert Test. of Ellen Feigal, M.D.); Rec. Doc. 7608 (Defs.' Reply Mem. Supp. of Mot. to Exclude Expert Test. of Ellen Feigal, M.D.).

opinions on these topics as they relate to Plaintiff Earnest's case."[22] The Court again should preclude Dr. Feigal from offering any plaintiff-specific opinions.

In the Fifth Circuit, warnings causation turns on the testimony of Plaintiff's treating physicians—here Dr. Kardinal and Dr. Larned—who have already testified about their treatment of Ms. Kahn. *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099 (5th Cir. 1991) ("the plaintiff must show that a proper warning would have changed the decision of the *treating physician*. . . .") (emphasis added); *Ferguson v. Proctor & Gamble Pharms., Inc.*, 353 F. Supp. 2d 674, 679 (E.D. La. Mar. 23, 2004) ("In order to demonstrate causation, 'the plaintiff must show that a proper warning would have changed the decision of the *treating physician*, i.e., that but for the inadequate warning, the treating physician would not have used or prescribed the product.'") (emphasis added) (citations omitted).

As in *Earnest*, Drs. Kardinal and Larned can testify at trial about "how [they] would have responded to an adequate warning from Defendants."[23] Dr. Kardinal, in fact, has already testified that had Ms. Kahn opted not to participate in the clinical trial, he would have treated her with nearly the same regimen ("I would have treated her very – very similarly").[24] Specifically, Dr. Kardinal would have recommended Taxotere over Taxol: "Adriamycin and Cytoxan followed by a taxane . . . . Usually Taxotere is what I would use . . . because of the – has lesser neurological toxicity than Taxol."[25]

---

[22]   *Id.* at 18-19.

[23]   Rec. Doc. 8094, at 18 (Order and Reasons, Defs. Mot. to Exclude Expert Test. on Gen. Causation, Mot. to Exclude Expert Test. of Dr. Madigan, Mot. to Exclude Expert Test. of Dr. Feigal).

[24]   Ex. E, Kardinal Dep. 104:6-13, Jan. 17, 2018.

[25]   *Id.* at 104:16-105:8.

7

Dr. Larned also testified that she did not rely on specific language in the Taxotere label when discussing the possibility of hair loss with patients.[26] In fact, Dr. Larned testified that a change in the Taxotere label regarding hair loss would not cause her to "warn any differently" than she currently does.[27] Also as in *Earnest*, Dr. Kardinal and Dr. Larned can testify about the risk information they received and alternative treatments available to Ms. Kahn. Because Dr. Kardinal and Dr. Larned have been deposed, Dr. Feigal must again be precluded from offering any plaintiff-specific opinions regarding Ms. Kahn or her treatment.

## II. ANY OPINION THAT DEFENDANTS DID NOT ADEQUATELY COMMUNICATE RISK INFORMATION TO PHYSICIANS SHOULD BE EXCLUDED BECAUSE IT LACKS A RELIABLE METHODOLOGY.

In her deposition for the *Earnest* case, Dr. Feigal expressly disclaimed any opinion on the adequacy of risk information communicated to clinicians ("I am not offering opinions on what should be in their label."); ("I will not opine on the adequacy of the Taxotere label.").[28] Despite that disclaimer, Dr. Feigal still asserted that she did "have an opinion about whether or not communication of relevant information to physicians was done."[29] Because Dr. Feigal appeared to be contradicting her own disclaimer, Defendants moved to exclude such testimony in *Earnest*.[30]

In her opposition brief, Ms. Earnest affirmed that Dr. Feigal was not offering any opinion about the adequacy of the warning; rather, she was only opining regarding the standard-of-care for informed-consent discussions.[31] Given that concession, the Court did not rule on Dr. Feigal's

---

[26] Ex. C, Larned Dep. 143:25-144:10, Feb. 21, 2018.

[27] *Id.* at 52:25-53:10.

[28] **Ex. H**, Feigal Dep. 97:10-16, 100:23-101:2, 102:13-16, 116:8-11, Dec. 7, 2018.

[29] *Id.* at 116:12-117:9.

[30] Rec. Doc. 6149, at 8-10 (Defs.' Mot. to Exclude Expert Test. of Ellen Feigal, M.D.).

[31] Rec. Doc. 7474, at 5-6 (Pls.' Resp. in Opp. to Sanofi's Mot. to Exclude Expert Test. of Ellen Feigal, M.D.).

8

ability to testify regarding the adequacy of risk information in *Earnest*. And during the *Earnest* trial, Dr. Feigal was qualified only in the fields of clinical research, clinical study design and interpretation, and general causation, not warnings adequacy.[32]

In her *Kahn* report, however, Dr. Feigal concluded that "[h]ad physicians been informed of the risk of permanent chemotherapy-induced alopecia," they could have discussed those risks with their patients—necessarily implying that the warnings provided were inadequate.[33] Yet, at her deposition, Dr. Feigal again disclaimed offering any opinion that the Taxotere prescribing information provided to physicians was inadequate ("The content, the opinions, and the conclusions are the same" as in *Earnest*).[34]

Because Dr. Feigal again contradicts herself, Defendants again move to preclude Dr. Feigal from testifying regarding the adequacy of risk information provided to physicians. The law "does not require the District Court to take [an expert] at [her] word" that she is not offering a certain opinion. *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1249 (11th Cir. 2018) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Rather, the Court may look beyond Dr. Feigal's assertions and assess the true nature of her testimony. *See Jones v. Novartis Pharm. Corp.*, 235 F. Supp. 3d 1244, 1258 (N.D. Ala. 2017) (excluding expert testimony because "[d]espite her assertions to the contrary, [the expert] has implicitly provided her own causation opinion in both her report and her deposition" and finding expert was engaging in "verbal semantics" by claiming

---

[32] **Ex. I**, Trial Tr. at 1161:18-21, Sept. 19, 2019.

[33] **Ex. J**, Expert Report of Ellen G. Feigal, M.D., at 72, ¶ 7, Mar. 23, 2020.

[34] Ex. G, Feigal Dep. 22:12-23:13, Apr. 10, 2020.

otherwise). Dr. Feigal is engaging in "verbal semantics" by insisting she will not opine as to the adequacy of the label, while implying that the warnings given were inadequate.

Any opinion Dr. Feigal intends to offer about the adequacy of the label must be excluded, because Dr. Feigal has articulated no reliable methodology for reaching such an opinion. *See Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at 550 (E.D. La. June 16, 2015) ("The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the experts testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation."). Rather, as in *Earnest*, Dr. Feigal's opinions are based on nothing more than her personal belief and, therefore, must be excluded.[35] *See In re Bard IVC Filters Prods. Liab. Lit.*, No. 15-2641, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) ("Personal views on proper corporate behavior are not appropriate expert opinions.").

### III. DR. FEIGAL'S GENERAL-CAUSATION OPINIONS SHOULD BE EXCLUDED AS IRRELEVANT AND UNRELIABLE.

The Court permitted Dr. Feigal to offer general-causation opinions in *Earnest*. However, concessions made during the *Earnest* trial, as well as changes made to Dr. Feigal's opinions for *Kahn*, merit revisiting the Court's *Earnest* order.[36]

As in the *Earnest* case, but with slight modifications, the key support for Dr. Feigal's opinion is a chart ("Table 2") that shows 347 patients drawn from both Sanofi's TAX clinical trial data as well as published medical literature, who Dr. Feigal claims developed permanent alopecia

---

[35] Rec. Doc. 6149, at 9-10 (Mot. to Exclude Expert Test. of Ellen Feigal, M.D.).

[36] Defendants continue to assert the additional arguments made in Earnest – not repeated here – that this Court rejected. *See Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 8 n.4 (1st Cir. 2001) ("Circumstances change from trial to trial, and admissibility rulings may also change from judge to judge and trial to trial."); Rec. Doc. 6163 (Mot. to Exclude Expert Test. on General Causation).

following treatment with Taxotere.[37] During the *Earnest* trial, Dr. Feigal admitted that, for a patient taking a combination regimen containing Adriamycin (A) and Cytoxan/Cyclophosphamide (C), either the A or the C or both could have caused that patient's "permanent alopecia."[38]

> Q. Doctor, sitting here today, can you tell me, yes or no, whether it was the A that caused the permanent alopecia in those 16 patients?
>
> A. It could be either A or C or both.
>
> Q. And so you would agree with me that it could have been the A, the C, or both, correct?
>
> A. It could have been both, right.[39]

All participants in the TAX clinical trials took a combination regimen that included both A and C. In addition, many of the patients in the medical literature received combination regimens that included A or C (or both):

> Q. Out of those 347 reports, how many of those regimens also include Adriamycin?
>
> A. Many of them included Adriamycin.
>
> . . . .
>
> Q. Do you know how many of those 347 included cyclophosphamide?
>
> A. Many of them also would include cyclophosphamide.[40]

Yet, as in *Earnest*, Dr. Feigal counted all of these as PCIA cases associated with Taxotere (not A or C), resulting in an astronomically skewed count for Taxotere cases and no control for the relative

---

[37] Ex. J, Expert Report of Ellen G. Feigal, M.D., at 40, Mar. 23, 2020.

[38] **Ex. K**, Trial Tr. at 1236:16-22, Sept. 20, 2019.

[39] *Id.*

[40] Ex. G, Feigal Dep. at 178:18-179:2, April 10, 2020.

risk of permanent alopecia associated with chemotherapies commonly taken with Taxotere *which Dr. Feigal admits also cause permanent hair loss*.

Given her trial concessions, Dr. Feigal changed her *Earnest* report, which purported to count "Taxotere/docetaxel" cases, to now count "Taxotere/docetaxel *regimens*" for *Kahn*. Dr. Feigal thereby admitted that she cannot count cases of permanent alopecia allegedly caused by Taxotere alone, but can only purport to tally the cases caused by a chemotherapy regimen containing multiple drugs. Yet nothing about Dr. Feigal's methodology reflects an attempt to isolate Taxotere, as opposed to another drug, as causing a particular patient's permanent alopecia. Instead, Dr. Feigal merely counts cases of patients who have been exposed to a range of chemotherapies associated with a condition, and then uses that count as a basis for opining that only one of them (Taxotere) is capable of causing permanent alopecia.[41] That cannot pass Rule 702 scrutiny, as there is too large an analytical gap between the data Dr. Feigal analyzed (related to T, A, and C), her concession that A and C cause permanent alopecia, and her conclusion (related only to T).

This Court reached this same conclusion in *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015). In *Burst,* the plaintiff alleged her husband's cancer was caused by regular exposure to gasoline containing benzene during his work at a gas station. *Id.* at *1. Plaintiff offered the expert testimony of an epidemiologist, Dr. Infante, who opined that low-level benzene exposure can cause cancer. *Id.* The Court excluded Dr. Infante's opinion for a number of reasons, including Dr. Infante's "reliance on studies that did not isolate gasoline exposure from exposure to other substances [containing benzene]," and his failure to "acknowledge that the

---

[41] Ex. J, Expert Report of Ellen G. Feigal, M.D., at 70, Mar. 23, 2020 (applying the Bradford Hill criteria to the patients counted in Table 2).

workers in [one study Dr. Infante relied on] sustained potential exposure to gasoline vapor, benzene, solvents, lubricating oils, asbestos, welding fumes, and car and truck exhaust," which also posed a carcinogenic risk.  *Id.* at *11.  The Court reiterated that "a study that notes 'that the subjects were exposed to a range of substances and then nonspecifically note[s] increases in disease incidence' can be disregarded."  *Id.* at *7 (citing *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that an expert's reliance on a study was misplaced when the subjects of the study "had been exposed to numerous potential carcinogens"); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 353 (5th Cir. 2007) ("Of all the organic solvents the study controlled for, it could not determine which led to an increased risk of cancer . . . . The study does not provide a reliable basis for the opinion that the types of chemicals appellants were exposed to could cause their particular injuries in the general population.")); *see also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is 'too great an analytical gap between the data and the opinion proffered.'") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

That is precisely what Dr. Feigal did here.  As a result, Dr. Feigal's general-causation opinions must be excluded.

## CONCLUSION

The Court should exclude the aforementioned expert testimony of Dr. Feigal under Federal Rule of Evidence 702.

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*

14