UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATES TO: Elizabeth Kahn, Case No. 2:16-cv-17039 | |

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE CERTAIN OPINIONS OF ELLEN T. CHANG, Sc.D

Sanofi has retained Ellen T. Chang, Sc.D as an expert in epidemiology[1] to provide the following opinions:

> I have been asked by counsel for Sanofi to evaluate ***the available scientific evidence*** on the occurrence of irreversible or permanent alopecia among breast cancer patients using chemotherapeutic regimens containing docetaxel (Taxotere®), and to use the science of epidemiology to address whether a causal relationship has been established between docetaxel and irreversible or permanent alopecia.[2]

Plaintiff seeks to exclude the following opinions of Dr. Chang pursuant to Federal Rules of Evidence 702, 401, and 403, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny:

1. Dr. Chang's opinion(s) attempting to revisit the final clinical study results of TAX316 showing a 4.2% rate of ongoing alopecia because her methodology is improper and unreliable.

---

[1] Epidemiology is the study of "the incidence, distribution, and etiology of disease in human populations." Federal Judicial Center, Reference Manual on Scientific Evidence 551 (3d ed.2011).

[2] **Ex. 1,** Chang Report, 4/17/2020, p. 3 (Emphasis added). For purposes of this briefing, Plaintiff refers to "irreversible or permanent alopecia" as "PCIA" - <u>P</u>ermanent <u>C</u>hemotherapy <u>I</u>nduced <u>A</u>lopecia. Dr. Chang's April 17, 2020 Report is in excess of 100 pages; however, Dr. Chang sets forth a concise list of her conclusions on pages 110-111. She also submitted an expert report dated December 9, 2019 (*See* **Ex. 2**), and has been deposed twice in this litigation. **Ex. 3,** Chang Depo., 1/7/2020 ("Chang I") and **Ex. 4,** Chang Depo. 5/19/2020 ("Chang II").

1

2. Dr. Chang's opinions purporting to establish, or assume as given, general causation between *any* drugs other than Taxotere/docetaxel and PCIA because such opinions are unreliable and irrelevant.

3. Dr. Chang's opinions regarding types of alopecia, their risk factors, and their frequency because Dr. Chang is unqualified to render such non-epidemiological, medical opinions, and they are nevertheless unreliable and irrelevant.

**I.  LEGAL STANDARD**

In the Fifth Circuit, *Daubert* provides the analytical framework for determining whether expert testimony is admissible under Federal Rule of Evidence 702:

> Many factors bear on the inquiry into the reliability of scientific and other expert testimony. In *Daubert,* the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony. These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. In the later case of *Kumho Tire Co. v. Carmichael,* the Supreme Court emphasized that the *Daubert* analysis is a "flexible" one, and that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." **The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field**."

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (footnotes omitted) (emphasis added).

In applying these factors, the District Court must act as the "gatekeeper" to ensure the party offering the expert's testimony has proved by a preponderance of the evidence that the expert is qualified, and the opinions are reliable and relevant. *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998); *see also Pipitone*, 288 F.3d at 243.

Expert testimony is inadmissible when "the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 136 F.3d 935, 937 (5th Cir. 1999). Similarly, an expert's testimony should be excluded where it "go[es] beyond the scope of his expertise in giving his opinions." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)).

Even if a witness is qualified, expert testimony is admissible *only* if it is reliable and relevant. *See Pipitone*, 288 F.3d at 243. "The reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (Citations omitted). This "reliability analysis applies to all aspects of an expert's testimony," including "the methodology, ***the facts underlying the expert's opinion***, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added).

"The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *See Johnson*, 685 F.3d at 459. If the reasoning or methodology undertaken by the expert is found not to fit the facts of the case, then the testimony must be excluded as it will not assist the trier of fact. *See Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015). Likewise, testimony should be stricken as irrelevant when there is "too great an analytical gap" between the data or facts considered and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, opinion evidence is inadmissible if it is only tethered to existing facts through the *ipse dixit* of the expert. *See id.*

## II.     ARGUMENT AND APPLICATION

### A.     Dr. Chang's Attempt to Revisit the Final Clinical Study Results of TAX316 Showing a 4.2% Rate of Ongoing Alopecia is Unreliable.

TAX316 is Sanofi's clinical study conducted to gain approval for Taxotere's use in the adjuvant care of early stage breast cancer.[3] TAX316 began in 1997 and culminated in a Final Clinical Study Report ("Final TAX316 CSR") in 2010. The TAX316 Statistical Analysis Plan ("SAP") required a 10-year follow-up period in order to assess adverse events, including alopecia.[4] Additionally, TAX316's SAP stated that all patients "have to be followed for 10 years," with evaluation visits planned at specified intervals, including once a year during years 6 through 10.[5] Further, the TAX316 SAP sets forth the plan for the statistical analysis of the "reversibility" of alopecia in the study.[6]

As noted by Pierre Mancini – Sanofi's Global Head of Biostatistics and Datamining—the TAX316 study "was designed to assess whether [alopecia] is still there after 10 years or not," and, under the SAP, Sanofi "would know from the data" if a patient's alopecia is "still there at the end of the follow-up."[7] The Final TAX316 CSR states that upon the conclusion of the study period, *the final 10-year analyses for TAX316 were conducted in accordance with the SAP and set forth in the Clinical Study Report*.[8]

Dr. Chang acknowledges that the Final TAX316 CSR revealed that ". . . 29 patients with TAC and 16 treated with FAC were classified as having "ongoing" alopecia during the follow-up period."[9] Yet, rather than conduct a review of the very same data underlying the Final TAX316

---

[3] **Ex. 5,** John Glaspy, MD, dep., 5/13/2020 (Glaspy III), 52:19–53:6.
[4] **Ex. 6,** Mancini I, 3/23/2018, 332:15–333:5; *see also* **Ex. 7,** SAP, p. 8.
[5] **Ex. 7,** SAP, p. 8.
[6] **Ex. 6,** Mancini I, 3/23/2018, 330:20-25, 332:8-14; *see also,* **Ex. 7,** SAP, "§ 11.7 REVERSIBILITY," p. 30.
[7] **Ex. 6,** Mancini I, 3/23/2018, 334:21–335:12; 335:20–336:1.
[8] **Ex. 8,** TAX316 Clinical Study Report, 10-year follow-up (Sanofi_00724262), § 6.3, p. 15 (The final 10-year analyses were conducted in accordance with the statistical analysis plan (SAP) version 3.0 dated 28 February 2002.")
[9] **Ex. 1,** Chang Report, 4/17/2020, p. 89.

4

CSR with respect to *all* 1,491 patients in TAX316, Dr. Chang's analysis focused only on the 45 patients that were categorized as having ongoing alopecia at the end of the 10-year follow-up period.[10] As such, Dr. Chang focused on only 3% of the *entire* population in TAX316. By doing so, she assumed that the Final TAX316 CSR findings are incorrect as to the 45 patients found to have ongoing, or persistent, alopecia at the end of the ten your follow-up, while assuming the remaining 1,446 patients were appropriately assessed by the study investigators. Sanofi cannot demonstrate how this post-hoc, selective and litigation-driven sleight of hand meets any standard of scientific integrity, or how such findings can be extrapolated to the study as a whole when 97% of the study participants were ignored entirely.

Moreover, for the 45 out of 1,491 patients whose data Dr. Chang even attempted to review, Sanofi provided Dr. Chang with only sparce and incomplete information. For example, Dr. Chang admitted she was only provided with interim Case Report Forms for 13 of the 29 patients in the TAC arm.[11] What happened to the other 16? For some of the others, she was provided with only summaries of unknown provenance, and for others information was "missing."[12]

Sanofi *never* provided Dr. Chang with the Final TAX316 CSR or other final underlying clinical study trial data to assess.[13] In fact, Sanofi never made Dr. Chang aware of the existence of a source of full and complete TAX316 study data.[14] So, when Dr. Chang states at page 3 of her April 2020 report that "[she was] asked by counsel for Sanofi to evaluate the *available scientific evidence* [ . . . ] to address whether a causal relationship has been established between docetaxel

---

[10] *Id.* at 89-93; **Ex. 3,** Chang I, 1/7/2020, 196:19-24.
[11] **Ex. 3** Chang I, 1/7/2020, 201:13–202:1.
[12] Dr. Chang received additional case report forms for possible review in March 2020, but her opinions/"Conclusions" in her April 19, 2020 report remain the same as the "Conclusion" set out in her prior report of December 9, 2019 (**Ex. 2**).
[13] **Ex. 4,** Chang II, 5/19/2020, 70:24–71:8; **Ex. 3,** Chang I, 1/7/2020, 193:16-24 (Q. Have you reviewed any of the underlying SAS files for TAX 316 that were produced by Sanofi in this case? A. Do you mean, SAS as in, like, SAS data sets? Q. SAS data sets? A. I have not. Q. You have not. Did you ask for them? A. No.").
[14] **Ex. 4,** Chang II, 5/19/2020, 68:14 – 69:23.

and irreversible or permanent alopecia," the "*available scientific evidence*" was not provided. Sanofi did not arm her with all *available scientific evidence*. It failed to provide her the final, validated TAX316 study data that, as described by Mr. Mancini, allowed Sanofi "to know from the data" if a patient's alopecia is "still there at the end of the follow-up."[15]

From 1997 through 2010, Sanofi designed, conducted, followed-up, and ultimately verified and assessed clinical study data, culminating in the Final TAX316 CSR. Now, for purposes of this litigation - and this litigation only - Sanofi attempts to impeach and discredit its own TAX316 findings.[16] Dr. Chang was retained in 2019, provided limited data, and asked to opine on what TAX316 demonstrates about study participants and irreversible alopecia.[17] Sanofi retained Dr. Chang to re-write the Final TAX316 CSR conclusions based on partial information that it or its counsel selected so that it could argue to a jury that it should disregard the TAX316 findings that 4.2% of patients receiving a Taxotere regimen experienced persistent alopecia at the end of the 10-year follow-up. But the conclusions set out in the Final TAX316 CSR are precisely what Sanofi represented to the European Medicines Agency ("EMA") in January 2013 concerning persistent alopecia:

> TAX316: in the TAC group, 728 (97.8%) patients experienced alopecia during the treatment period. Among those patients, alopecia persisted into the post-treatment period in 687 patients (92.3%). *By the end of the follow-up period, 29 TAC patients (4.2%) still had persistent alopecia.* In the FAC group, a total of 715 patients (97.1%) experienced alopecia during treatment, including 645 patients (87.6%) with alopecia persisting during the follow-up period. By the end of the follow-up period, 16 FAC patients (2.5%) still had persistent alopecia.[18] (emphasis added)

---

[15] **Ex. 6,** Mancini I, 3/23/2018, 204:8-12.
[16] Dr. Chang freely admits in her deposition that *she does not intend to publish* the methodology/findings set forth in her April 17, 2020. **Ex. 3,** Chang I, 1/7/2020, 288:25-289:7. Importantly, Dr. Chang also confesses that her results *have not been peer reviewed*. **Ex. 3,** Chang I, 336:21-22.
[17] **Ex. 1,** Chang Report, 4/17/2020, at p. 89.
[18] **Ex. 9**, Mancini I, Exhibit 29. Sanofi_04938203.

Sanofi's calculated decision to selectively funnel limited information to its expert and embark on revisionist history aimed at undermining its own data utterly fails to satisfy Federal Rule of Evidence 702 and *Daubert* scrutiny.  Strangely, Dr. Chang claims to have read Mr. Mancini's deposition, in which he testified about the 10-year follow-up for adverse events, including alopecia, and his authoring the above response to EMA wherein he represented that "(b)y the end of the [10-year] follow-up period, 29 TAC patients (4.2%) still had persistent alopecia." But, Dr. Chang and Sanofi want to conveniently ignore Sanofi's Global Head of Biostatistics' conclusions, its response to regulatory agencies, and its current Taxotere label, all to rewrite a story for this courtroom alone.

It is Sanofi's burden to establish that Dr. Chang's opinions are reliable, and the "reliability analysis applies to *all* aspects of [her] testimony," including "the methodology, the facts underlying [her] opinion, [and] the link between the facts and the conclusion." *Knight*, 482 F.3d at 355.  Sanofi has failed to demonstrate the reliability of Dr. Chang's testimony. *Id.*  As gatekeeper, the Court must make a preliminary assessment of whether the reasoning or methodology underlying Dr. Chang's testimony is scientifically valid and whether it can be properly applied to the facts in issue. *In re Vioxx Prod. Liab. Litig.*, 414 F. Supp. 2d 574, 580 (E.D. La. 2006). Dr. Chang does not follow a reliable or generally accepted methodology in coming to her conclusions. She does not even follow her own methodology of reviewing ***all available scientific evidence***; she simply accepts that what Sanofi's counsel has provided is actually complete or represents "all available evidence." There has been no showing that what has been provided is sufficient evidence to draw conclusions that apply to the study population as a whole. Moreover, Dr. Chang readily admits that her methods were not pre-specified, her results or

methods have never been peer reviewed, and she does not intend to subject them to peer review via an attempt to publish.[19]

Dr. Chang's re-calculation of the incidence rate is based on selectively provided and insufficient data, which renders her opinion invalid. It is Sanofi's burden to demonstrate how Dr. Chang's *post hoc* analysis of only limited, attorney-selected information is valid. It has failed to do so. As stated at the outset, Sanofi has not established how Dr. Chang's opinions based on such a limited review of data can be reliably applied to the overall findings of the study, particularly when Sanofi itself represents to everyone, except those involved in the MDL, the TAX316 data to this day consistently with its Final TAX316 CSR. Nor can it demonstrate how her methods are scientifically valid. When an expert's testimony is demonstrated to be speculative and lacking in scientific validity, as here, and where counsel are complicit in limiting what is reviewed, trial courts are encouraged to exclude the expert's testimony. Dr. Chang's incidence rate opinion is unreliable and must be stricken.

> **B. This Court Must Exclude Any Opinion by Dr. Chang that Purports to Establish Possible General Causation Between *Any* Drugs Other Than Taxotere/docetaxel and PCIA Because They are Unreliable and Not Relevant.**

Dr. Chang opines that:

Many medications, including several types of cancer chemotherapy, can cause alopecia and may confound or bias observed associations with nonrandomized treatments.[20]

In support of this opinion, Dr. Chang references numerous medications other than Taxotere/docetaxel, and states that "[a] broad range of medications are known to cause alopecia," listing categories including: "anticancer chemotherapies"; "certain other antitumor antibiotics";

---

[19] **Ex. 3**, Chang I at 336:21-25.
[20] **Ex. 1,** Chang Report, 4/17/2020, p. 26.

8

"targeted therapies"; "endocrine anticancer agents"; and "aromatase inhibitors."[21] Dr. Chang also states that:

> Numerous other common medications have been reported to cause alopecia. Because cancer patients often use concomitant medications other than chemotherapy, these drugs could act as potential confounders of observed associations between anticancer chemotherapy use and irreversible or permanent alopecia.[22]

Dr. Chang includes a veritable encyclopedia of categories of drugs to which this comment applies, including: retinoids, beta blockers, angiotensin-converting enzyme inhibitors, proton pump inhibitors, anticoagulants, anticonvulsants, antithyroid medications, antidepressants, mood stabilizers, antifungals, antivirals, inotropic agents, androgenic hormones, and nonsteroidal anti-inflammatory drugs.[23] Finally, she states that:

> … [I]n light of the many types and potential causes of alopecia, many of which may be common among cancer patients and many of which may not be ascertained in research studies, the randomized controlled trial is the most suitable study design for identifying the potential causal effect of docetaxel on irreversible or permanent alopecia.

*Id.* at p. 28.

This Court should exclude Dr. Chang's backhanded attempt at commenting on the litany of drugs and drug categories that she lists and inferring general causation between any non-Taxotere drug and PCIA because her opinions on this issue are unreliable and not relevant.

In her report, Dr. Chang admitted that for purposes of giving an expert opinion as an epidemiologist, she would need to do a full and complete systematic literature search to assess causality.[24] In terms of a *Daubert* analysis, this is her *methodology* to determine causation. Nevertheless, in her report she acknowledges that:

---

[21] *Id.* at pp. 26-27.
[22] *Id.* at 27.
[23] *Id.* at pp. 26-27. Dr. Chang's report lists *numerous* drugs in these various categories.
[24] **Ex.4,** Chang II, 5/19/2020, 124:15-125:1.

9

> I did not directly assess whether a causal relationship has been established between use of any other specific chemotherapeutic agent and irreversible or permanent alopecia. I also did not directly investigate the incidence of irreversible or permanent alopecia among breast cancer patients using chemotherapeutic agents other than docetaxel."[25]

During her deposition, Dr. Chang admitted that she did not directly assess whether a causal relationship has been established between any non-Taxotere drug and PCIA, including adriamycin, cyclophosphamide, Xeloda, Avastin, tamoxifen, Taxol (also known as Paclitaxel), 5-fluorouracil, epirubicin, methotrexate, and Gemzar.[26] Dr. Chang also testified that she had not ". . . seen systematic literature reviews of epidemiological studies of any chemotherapy as far as [she could] remember, and permanent or irreversible alopecia."[27] Moreover, Dr. Chang admitted that she has not done a "separate systematic literature search with respect to any of these medications and permanent or irreversible alopecia,"[28] nor has she even attempted to "systematically review[] the literature on hormone therapies or tamoxifen and permanent or irreversible alopecia."[29] Further, although Dr. Chang stated that any drug causing reversible alopecia can likewise cause PCIA by the same mechanism,[30] she admitted that she does not perform mechanism studies, and therefore lacks any expertise to guide this assumption.[31]

Sanofi has failed to prove that Dr. Chang's opinions on the causal relationship between these other drugs and PCIA is "grounded in the methods and procedures of science." *See Johnson*,

---

[25] **Ex. 1,** Chang Report, 4/17/2020, p. 4.
[26] **Ex. 4,** Chang II, 5/19/2020, 117:23–129:15. Dr. Chang also specifically admitted that she will not offer an opinion that Gemzar causes permanent chemotherapy-induced alopecia based on a single trial conducted by *Delfino*, et al., *Id.* at 129:19-130:5. Dr. Chang admits the same with respect to the *Delfino* publication and Taxol (paclitaxel). *Id.* at 130:23-131:6.
[27] *Id.* at 137:20-24.
[28] *Id.* at 132:15–133:6.
[29] *Id.* at 136:20-23.
[30] **Ex. 1,** Chang Report, 4/17/2020.
[31] **Ex. 4,** Chang II, at 140:19-141:3.

10

685 F.3d at 459. Thus, because these opinions are pure conjecture and unsupported speculation, they are unreliable and must be excluded.[32] *See id*.

In addition, these opinions are also irrelevant. "The relevance prong *requires* the proponent to demonstrate that the expert's '*reasoning or methodology*.'" *See Johnson*, 685 F.3d at 459. In other words, if there is no reasoning or methodology employed, there can be no "fit" to the facts of the case, and the opinion must be excluded. Here, Dr. Chang admits to not applying a methodology to assess whether any other drug caused Ms. Kahn's PCIA, or PCIA generally. Because there is no methodology at all to support these opinions and no "fit" exists for this opinion, Dr. Chang's opinions on the causal relationship between non-Taxotere drugs and PCIA is not relevant.

> **C.     Dr. Chang's Opinions Regarding Types of Alopecia, Their Risk Factors, and Their Frequency Should be Excluded Because She is Unqualified to Render such Opinions, and They are Otherwise Unreliable and Irrelevant.**

Dr. Chang expounds at length in her April 2020 Report about the "numerous forms and risk factors" of alopecia.[33] Dr. Chang opines that "*[a]lopecia has numerous forms and risk factors*; if these are unevenly distributed across nonrandomized treatment groups, then estimated associations with treatment will be biased." When queried, Dr. Chang explained that her opinions only "relate[] to whether there is valid evidence, scientific evidence in general . . . that docetaxel causes permanent or irreversible *alopecia*, or docetaxel-containing regimens cause permanent or irreversible *alopecia* in breast cancer patients."[34] Critically, Dr. Chang *did not testify* that her opinions relate to whether docetaxel (or docetaxel-containing regimens) *causes any particular type*

---

[32] Plaintiff challenges Dr. Chang's ability to offer opinions regarding Taxotere and PCIA, but regarding the above argument Dr. Chang is clear that she never investigated a causal relationship for any drug other than Taxotere.
[33] **Ex. 1**, Chang Report, 4/17/2020, pp. 24-26.
[34] **Ex. 4**, Chang II at 97:14-98:6.

11

*of alopecia*.[35] However, Plaintiff anticipates that Dr. Chang will attempt to offer opinions regarding the types of alopecia, their risk factors, and their frequency.[36] This Court should exclude any such opinions because Dr. Chang is not qualified to offer such opinions, and they are otherwise unreliable and irrelevant.

### 1. Dr. Chang Is Not Qualified To Offer The Opinions.

Dr. Chang is not qualified to offer opinions on the types, frequency, causes of, or risk factors for alopecia.[37] Dr. Chang is an epidemiologist; by her own admission, she looks at and observes data from controlled and sometimes observed populations to measure disease occurrences and patterns.[38] Dr. Chang is *not* a medical doctor with the license or ability to diagnose, treat, or prescribe treatment for patients.[39] Dr. Chang is *not* an oncologist or dermatologist.[40] Dr. Chang admits that because she is not a dermatologist, she has never had to distinguish between types of alopecia, such as scarring versus non-scarring.[41] Dr. Chang has not published or studied alopecia, hair cycling, or hair generally, outside the context of this litigation.[42]

Dr. Chang also admitted that she does not perform mechanism studies as an epidemiologist, and specifically has not done so with respect to chemotherapy agents.[43] And despite describing histopathology in her report, Dr. Chang admits that she does not intend to offer opinions at trial about the mechanism of action or histopathology of alopecia.[44] Dr. Chang may be able to discuss

---

[35] **Ex. 1**, Chang Report, 4/17/2020, p. 24.
[36] **Ex. 4,** Chang II, 162:24 – 163:9.
[37] *Id.* at 88:14–89:4; 93:2-6.
[38] *Id.* at 92:3-9
[39] *Id.* at 88:4-13.
[40] *Id.* at 88:18-21, 88:25-89:4; 106:9-10.
[41] *Id.* at 93:7-13; 96:25–97:9 (She admits she is not a clinician and does not describe anything from the standpoint of an expert clinician).
[42] *Id.* at 93:21–94:13.
[43] *Id.* at 140:19-141:3.
[44] *Id.* at 154:2-12 ("With respect to the topic of histopathology of alopecia, whether it be reversible and temporary or permanent or irreversible, yeah, I am citing others for that information. It's not a separate opinion that I've formulated on my own based on epidemiology."). Dr. Chang repeatedly uses tepid, non-scientific language when describing what she reportedly "knows" about alopecia: to wit, "it is based on my understanding," *Id.* at 145:9-25; "it is also based on

what the studies she reviewed reveal, but absent some particularized expertise, she cannot opine about what is in the studies: dermatology, cancer, pathology, etc.

### 2. Dr. Chang's Alopecia Opinions Are Not Reliable or Relevant Under a *Daubert* Analysis.

Even if the Court deemed Dr. Chang qualified to opine on alopecia, her opinions are nevertheless unreliable and irrelevant because they are not "grounded in the methods and procedures of science," are nothing "more than unsupported speculation or subjective belief," and there is simply no fit between the opinions and the facts. Therefore, these opinions will not be helpful to the jury and should be excluded. *Johnson*, 685 F.3d at 459.

As an epidemiologist, Dr. Chang acknowledged that when investigating a causal relationship, she performs literature searches and reads articles that demonstrate statistics about what may be most common in a particular condition or presentation.[45] But with respect to her alopecia opinions, Dr. Chang testified that she "generally accepted what [she] saw in various articles where others had reviewed the literature."[46] When pressed, Dr. Chang admitted that the "various articles" Dr. Chang reviewed totaled only two: "the Varothai and Bergfeld 2014 articles."[47]

Accordingly, by not performing a thorough and exhaustive literature search, Dr. Chang admits that she did not follow her own methods for investigating the types of alopecia. Moreover, Dr. Chang admits that she relies on nothing more than "common knowledge" when opining about "the most common type of alopecia."[48] But Dr. Chang is not a dermatologist, and has never studied

---

this general understanding," *Id.* at 146:2-11; and "I can generally understand," *Id.* at 146:19–147:4. These are not the language of science and experts, but instead demonstrate Dr. Chang's lack of qualifications to offer dermatology opinions.
[45] **Ex. 4,** Chang II, 99:13–100:11; *see also id.* at 138:19–139:14.
[46] *Id.* at 99:22-100:5
[47] *Id.*
[48] *Id.* at 101:19–102:3.

or published on the topic of alopecia or hair cycling. Therefore, her "general" or "common" knowledge is nothing more than subjective belief, and her testimony on alopecia should be excluded as unreliable and not relevant.

## III. CONCLUSION

Wherefore, Plaintiff respectfully moves this Court to exclude the expert testimony of Ellen Chang, ScD, at the trial of this matter. Specifically, Plaintiff, Elizabeth Kahn, requests that the Court order the exclusion of:

1. Dr. Chang's opinion(s) attempting to revisit the final clinical study results of TAX316 showing a 4.2% rate of ongoing alopecia because her methodology is improper and unreliable.

2. Dr. Chang's opinions purporting to establish, or assume as given, general causation between *any* drugs other than Taxotere/docetaxel and PCIA because such opinions are unreliable and irrelevant. Further, despite testimony and report statements to the contrary, Dr. Chang states at p. 4 of her report: "I …did not directly investigate the incidence of irreversible or permanent alopecia among breast cancer patients using chemotherapeutic agents other than docetaxel."

3. Dr. Chang's opinions regarding types of alopecia, their risk factors, and their frequency because Dr. Chang is unqualified to render such non-epidemiological, medical, opinions, and they are nevertheless unreliable and irrelevant

For the reasons set forth above, and for any other reason this Court finds just and proper, the challenged opinions of Dr. Chang should be excluded.

Dated: August 13, 2020					Respectfully submitted,

<u>/s/ Christopher L. Coffin</u>
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, LA 70163
Telephone: 504-355-0086
Facsimile: 504-523-0699
Email: ccoffin@pbclawfirm.com
*Plaintiffs' Co-Lead Counsel*

<u>/s/ Karen B. Menzies</u>
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*

<u>/s/M. Palmer Lambert</u>
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN
DAVID MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Telephone: 504-522-2304
Facsimile: 504-528-9973
Email: plambert@gainsben.com
*Plaintiffs' Co-Liaison Counsel*

<u>/s/Dawn M. Barrios</u>
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Telephone: 504-524-3300
Facsimile: 504-524-3313
Email: barrios@bkc-law.com
*Plaintiffs' Co-Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS
