UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                          MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                    SECTION "H" (5)

THIS DOCUMENT RELATES TO
Kahn v. Sanofi-Aventis, et al, Case No. 2:16-cv-17039

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON CAUSATION

For the reasons set forth in this memorandum, the Court should enter Partial Summary Judgment in Plaintiff's favor on the issue of general causation – specifically, that Taxotere (docetaxel) can cause permanent, irreversible alopecia.

I.    FACTS

In 2015, Defendant Sanofi told the Food and Drug Administration (FDA) that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia."[1]  Yet, before this Court, Sanofi claims that Taxotere does not cause permanent hair loss.  But the analysis employed by Sanofi in finding a causal association is also supportive of a causal relationship as independently demonstrated by Plaintiff's experts.

To begin, the type of baldness that is a common adverse event of cytotoxic drugs, including agents like Taxotere, is called anagen effluvium and involves the pathologic loss of hair during the anagen phase (the first phase) of the hair's regrowth cycle.[2]  As Sanofi explained in its 2015 causation analysis, "[c]ytotoxic chemotherapy agents target rapidly dividing cells and as a result the highly proliferative hair matrix cells are an unintended target."[3]  Massive apoptosis of these hair

---

[1] Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment on Causation at ¶1.
[2] Id. at ¶2.
[3] Id. at ¶3.

matrix cells of the hair bulbs cause the anagen-phase hairs to be rapidly lost.[4]  When it comes to the permanent or irreversible alopecia observed in some docetaxel patients, Sanofi acknowledged that docetaxel causes permanent hair loss[5]; however, the precise pathogenetic process is not known.[6]  Nevertheless, a plausible biological mechanism differs from a known biological mechanism, and biological plausibility is satisfied if the relationship is consistent with the current body of knowledge regarding the etiology and mechanism of disease.[7]

Permanent or irreversible alopecia is likely caused by the hair follicle's or derma papilla stem cell's permanent damage or destruction, which results in markedly reduced hair density.[8] Sanofi's 2015 causation analysis included a section specific to the "Biologic Plausibility" of docetaxel's causation of permanent or irreversible alopecia and articulated the following hypotheses: "toxic damage to stem cells/hair matrix cells of the hair bulb or disturbance of the signaling pathway to the secondary hair germ."[9]  This is likewise supported in the medical literature.[10]

Data on the incidence and quality of adverse events of permanent or irreversible alopecia related to Taxotere may be observed in clinical trials and spontaneous reporting.  TAX316 was a Sanofi-sponsored phase III controlled trial that randomized patients with high-risk operable breast cancer to either docetaxel (TAC) or 5-fluouracil (FAC), both provided in combination with doxorubicin and cyclophosphamide.[11] The study began in 1997 and the last patient visit occurred

---

[4] *Id.*
[5] *Id.* at ¶4.
[6] *Id.* at ¶5.
[7] *Id.* at ¶6.
[8] *Id.* at ¶7.
[9] *Id.* at ¶8.
[10] *Id.*
[11] *Id.* at ¶9.

in January 2010.[12]  Study treatment comprised six 3-week cycles.[13]  Follow-up visits were every 12 weeks for the first two years, every six months for years 3 to 5, and then annually until the end of the 10-year follow-up period.[14]  The majority of patients in TAX316 experienced alopecia while on treatment (98% of TAC patients and 97% of FAC patients).[15]  At the study's conclusion, 29 (3.89%) of the 744 TAC patients had ongoing alopecia as compared to 16 (2.16%) of the 738 FAC patients.[16]

TAX301 was a similar phase III controlled trial sponsored by Sanofi that also randomized patients with high-risk operable breast cancer to either TAC or FAC regimens.[17]  The study began in 1999 with six 3-week treatment cycles.[18]  Follow-up visits were to be every 12 weeks for the first two years, every six months for years 3 to 5, and then annually until the end of the 10-year follow-up period.[19]  The majority of patients in TAX301 also experienced alopecia while on treatment (97% of TAC patients and 98% of FAC patients).[20]  Unfortunately, the TAX301 trial data fails to explicitly capture either the continuation of alopecia into the follow-up phase or alopecia resolution for the majority of patients.[21]  This is apparent because only 49 of the 531 TAC patients and 35 of the 520 FAC patients were noted as having alopecia in the follow-up period.[22]  Of those 49 TAC patients, only 3 were unresolved at the study completion, as compared with 1 of

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* at ¶10.
[16] *Id.*
[17] *Id.* at ¶11.
[18] *Id.*
[19] *Id.*
[20] *Id.* at ¶12.
[21] *Id.*
[22] *Id.*

the 35 FAC patients.[23]   Underreporting is supported by the fact that the 49 TAC patients with alopecia into the follow-up were concentrated in only 12 of the 55 study sites, with more than half of those patients in 2 of the 55 sites, each with rates of ongoing alopecia exceeding 80%.[24]   The remaining 43 of the 55 study sites failed to record a single patient with alopecia in follow-up.[25] Follow-up for non-alopecia adverse events was also poor: only 137 (13.0%) of the 1,051 patients in TAX301 were reported with adverse events in follow-up, as compared with 1,267 (85.6%) of 1,480 patients involved in TAX316.[26]

David Madigan, PhD, one of Plaintiff's statistics and pharmacovigilance experts, performed a comparison of the numbers of patients in TAX316 with unresolved alopecia in the TAC-arm versus the FAC arm, which resulted in a rate ratio of 1.79 at 120 months.[27]   His comparison of the numbers of patients in TAX301 with unresolved alopecia in the TAC-arm versus the FAC arm resulted in a rate ratio of 2.94 at 120 months.[28]   Analyses of both studies demonstrate a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus FAC at nearly all time periods during the clinical trials.[29]   Dr. Madigan's random effects meta-analysis combining the data from the two studies at completion yields a rate ratio of 1.85 with a corresponding 95% confidence interval (1.04, 3.31) and a p-value of 0.04.[30]   The interim and final data from the TAX301 and TAX316 studies provide an incidence rate or rate of occurrence of irreversible alopecia ranging from 3.2 to 9.2%.[31]   Sanofi has referenced these

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.* at ¶13.
[27] *Id.* at ¶14.
[28] *Id.*
[29] *Id.* at ¶15.
[30] *Id.*
[31] *Id.* at ¶16.

incidence rates in internal presentations and e-mail correspondence, in responses to correspondence and requests for information from foreign regulatory authorities, and in certain Summaries of Product Characteristics provided in Europe.[32]  Further, Sanofi's 2015 causation analysis cited to the TAX316 and TAX301 clinical trial studies and the adverse event rates of irreversible alopecia reported therein in support of its conclusion of a causal association between docetaxel and permanent/irreversible alopecia.[33]

Dr. Madigan performed an analysis of Sanofi's global pharmacovigilance database from 1999 to 2015, which yielded a result of 311 reports of persisting or irreversible alopecia, 282 of which reported no outcome of "recovered," or no end date.[34]  In Sanofi's 2015 causation analysis, the drugmaker performed a review of the same database and identified 117 cases alone when limited to "a verbatim event that included either 'permanent' or 'irreversible' or alopecia that lasted more than 2 years with an outcome of not recovered/recovering/unknown."[35]  This represented 5.3% of the 2,172 cases reporting the high-level term "alopecia," despite the fact that the definition used did not conform to the definition of irreversible alopecia generally set forth in the medical literature.[36]  Sanofi has recognized internally that if the two-year time period was reduced, there would be "more cases."[37]  Moreover, Sanofi's 2015 causation analysis cites these reports of irreversible alopecia after Taxotere treatment to support its conclusion of a causal association.[38]

Dr. Madigan also performed a statistical analysis of reports in FDA's Adverse Event Reporting System (FAERS) database in which reporters had made a connection between docetaxel

---

[32] *Id.* at ¶17.
[33] *Id.* at ¶18.
[34] *Id.* at 19.
[35] *Id.* at 20.
[36] *Id.*
[37] *Id.* at ¶21.
[38] *Id.* at ¶22.

and irreversible alopecia.[39]   This yielded notably increased signaling rates for docetaxel as compared to several drugs used as comparator and concomitant drugs by Sanofi: paclitaxel, 5-fluorouracil, cyclophosphamide, doxorubicin, and cisplatin.[40]   This statistical analysis results in a proportional reporting ratio (PRR) signal markedly higher than that of paclitaxel.[41]   This signal begins in the first quarter of 2000 and continues without interruption through the end of his analysis in the fourth quarter of 2017.[42]   Sanofi's pharmacovigilance department has cited use of PRR as a part of safety signal detection management.[43]

Dr. Madigan's statistical analysis of adverse event reports in the FAERS database also yields strong irreversible alopecia signals for docetaxel throughout 2000-2012 when measured by stratified EBGM (SEBGM) and stratified EB05 (SEB05), and no signals for the comparator drugs for the same period.[44]   Dr. Madigan performed a "lasso logistic regression" analysis of relevant reports in the FAERS database through 2017 that yields a signal rate five times the conventional reporting threshold and estimated to be approximately 10 times higher than the comparator drugs, which did not meet the signaling threshold.[45]

Finally, while performing a literature search using the electronic databases PubMed, Embase, and Scopus, Dr. Madigan discovered four observational studies that compared Taxotere to other cancer drugs in relation to irreversible alopecia: Crown, Kang, Martin, Sedlacek.[46]   Dr. Madigan "used the following keywords for the searches: (docetaxel OR taxotere) AND alopecia

---

[39] *Id.* at ¶23.
[40] *Id.*
[41] *Id.* at ¶24.
[42] *Id.* at ¶25.
[43] *Id.* at ¶26.
[44] *Id.* at ¶27.
[45] *Id.* at ¶28.
[46] *Id.* at ¶29.

AND (permanent OR irreversible OR persisting OR persistent)."[47]  He also "searched references cited in the identified papers and reviews for potentially relevant studies that the search failed to capture."[48]  The four observational studies met the following criteria: "papers had to be published in the scientific literature as an original report and had to present an analysis of novel breast cancer patient data comparing docetaxel to other cancer drugs in relation to irreversible alopecia."[49]  Dr. Madigan excluded from his search any review articles, case reports, case series, editorials or letter to the editor not including original data.[50]  "A random effects meta analysis of these four studies yields an odds ratio of 4.13, 95% confidence interval ( 1.44 , 11.81 ), p=0.008.  I note that there is some between-study heterogeneity, I2=62.9%, albeit not statistically significant (Q=7.10, p=0.07). Appendix 6 provides the R code."[51]  As such, his systematic meta analysis of observational studies supports the causal conclusion that Taxotere causes permanent alopecia.[52]

David A. Kessler, M.D., Plaintiff's regulatory and pharmacovigilance expert, reviewed and analyzed the available scientific evidence, including the evidence of a statistically significant increased risk of irreversible alopecia with Taxotere, and applied the Bradford Hill Criteria to determine whether there is a causal relationship between Taxotere and irreversible alopecia as outlined in his supplement expert report.[53]  Dr. Kessler opined that "to a reasonable degree of medical probability that there is more likely than not a causal relationship between Taxotere and irreversible alopecia."[54]

---

[47] *Id.* at ¶30.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at ¶31.
[52] *Id.*
[53] *Id.* at ¶32.
[54] *Id.*

Patients receiving docetaxel regimens at a cumulative dose equal to or greater than 400 mmg/m² have been shown to have a significantly higher incidence of irreversible alopecia, including complete irreversible alopecia.[55]   As compared to other chemotherapy regimens, including lower dose regimens of docetaxel, the prevalence of irreversible alopecia increased 33-52% in patients with that cumulative dose.[56]   In the same study, the patients receiving docetaxel regimens at a lesser dose showed no instances of complete irreversible alopecia.[57]   There is reproducible evidence from multiple studies that the risk of irreversible alopecia with docetaxel is dose-dependent.[58]   Reproducible evidence of a dose response relationship between Taxotere and irreversible alopecia began as early as 2009.[59]

## II.   LAW AND ARGUMENT

### A.   Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

The court must view the facts in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor.  *See Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).  "A party seeking summary judgment always bears the initial

---

[55] *Id.* at ¶33.
[56] *Id.*
[57] *Id.*
[58] *Id.* at ¶34.
[59] *Id.* at ¶35.

responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the non-movant's response.  *See Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).

## B.    General Causation Standard

"Louisiana law requires that a plaintiff suing under a products liability theory prove causation." *Autery v. GlaxoSmithKline, L.L.C.*, 496 F. App'x 388, 389 (5th Cir. 2012) (citing *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 260–61 (5th Cir.2002)). "'Causation' in a pharmaceutical liability case involves both 'general causation' and 'specific causation.'" *Id.* (citing *Wells v. SmithKline Beecham Corp.,* 601 F.3d 375, 377–78 (5th Cir.2010)). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir.2007) (citation and quotation marks omitted).

This Court has previously recognized a two-prong test used to assess whether general causation exists between an agent and a disease: (1) evidence showing a "statistically significant association" between the agent and the disease and, only if an association is found, (2) evidence must be established to demonstrate that a true causal relationship underlies the association through the use of a reliable methodology.  *See* Order and Reasons (Rec. Doc. 8094).  In order to evaluate

the second prong, most experts apply the Bradford Hill Criteria which look to the following factors to establish general causation: (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge.  *Id.*

## C.   There Is No Genuine Issue of Material Fact Regarding Taxotere's Ability to Cause Permanent or Irreversible Alopecia.

The evidence is such that no reasonable jury could conclude other than that Taxotere is capable of causing permanent or irreversible alopecia in its users.  A finding of general causation is well supported by the results of Sanofi's large-scale, long follow-up clinical studies, by third-party studies, and by other statistically significant safety signals reported since 2000.  Plaintiff's experts had no difficulty reaching the same conclusion as Sanofi and the FDA in 2015 that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia."[60]  Beyond Sanofi's conclusion of a causal association, Plaintiff's experts independently demonstrate a true causal relationship between Taxotere and permanent or irreversible alopecia through application of the Bradford Hill criteria.

### 1.   Evidence shows a "statistically significant association" between Taxotere and permanent or irreversible alopecia.

Sanofi's TAX316 study, a phase III controlled trial that randomized and followed 1400+ patients, resulted in a statistically significant incidence of ongoing alopecia in Taxotere patients at the 10-year follow-up versus the control group (3.89% vs. 2.16%).[61]  In TAX301, a similar study where the follow-up was not well managed and AEs were undoubtedly underreported, 3 Taxotere

---

[60] *Id.* at ¶1.
[61] *Id.* at ¶10.

10

patients concluded the follow-up with ongoing alopecia, as compared to 1 in the control group.[62] The interim and final data from these two studies provide an incidence rate or rate of occurrence of irreversible alopecia ranging from 3.2% to 9.2%[63], which Sanofi referenced internally and to regulatory authorities.[64]

Further, analyses of adverse events outside of Sanofi's clinical studies show a high frequency of reporting that contrast starkly with the low or non-existent rates for comparator drugs. Dr. Madigan performed an analysis of Sanofi's global pharmacovigilance database from 1999 to 2015, which yielded a result of 311 reports of persisting or irreversible alopecia, 282 of which reported no outcome of "recovered," or no end date.[65]   In Sanofi's 2015 causation analysis, the drugmaker performed a review of the same database and identified 117 cases alone when limited to "a verbatim event that included either 'permanent' or 'irreversible' or alopecia that lasted more than 2 years with an outcome of not recovered/recovering/unknown."[66]   This represented 5.3% of the 2,172 cases reporting the high-level term "alopecia," despite the fact that the definition used did not conform to the definition of irreversible alopecia generally set forth in the medical literature.[67] Sanofi has recognized internally that if the two-year time period was reduced, there would be "more cases."[68]

Dr. Madigan also conducted statistical analysis of reports in FDA's FAERS database in which reporters had made a connection between docetaxel and irreversible alopecia.[69]   This

---

[62] Id. at ¶12.
[63] Id. at ¶16.
[64] Id. at ¶17.
[65] Id. at ¶19.
[66] Id. at ¶20.
[67] Id.
[68] Id. at ¶21.
[69] Id. at ¶23.

analysis yields increased signaling rates for docetaxel as compared to several drugs used as comparator and concomitant drugs in Sanofi's studies.[70]  This analysis results in a PRR signal markedly higher than paclitaxel[71], beginning in the first quarter of 2000 and continuing without interruption through the end of the analysis in the fourth quarter of 2017.[72] The other drugs registered no signal.[73]  This is a reliable statistical measure as Sanofi's pharmacovigilance department has cited use of PRR as a part of safety signal detection management.[74]

Dr. Madigan's review of the FAERS database also yields both stratified EBGM (SEBGM) and stratified EB05 (SEB05) signals throughout 2000-2012, where none exist for the comparator drugs during the same.[75] Dr. Madigan's fourth analysis of FAERS is a "lasso logistic regression" analysis yielding a signal rate well above the conventional reporting threshold and estimated to be approximately 10 times higher than the comparator drugs, which did not meet the signaling threshold, adjusting for all other drugs as well as age, sex, and year of report.[76]  Dr. Madigan strengthened his opinion on general causation through a meta analysis of four comparative studies that demonstrated a statistically significant increased risk of irreversible alopecia with Taxotere.[77]

## 2. A true causal relationship underlies the association between Taxotere and permanent or irreversible alopecia.

Application of the Bradford Hill Criteria support a causal relationship between Taxotere and permanent or irreversible alopecia:

---

[70] *Id.*
[71] *Id.* at ¶24.
[72] *Id.* at ¶25.
[73] *Id.* at ¶24.
[74] *Id.* at ¶26.
[75] *Id.* at ¶27.
[76] *Id.* at ¶28.
[77] *Id.* at ¶¶29-30.

### a. Temporal relationship

As shown *supra*, Sanofi received numerous adverse event reports of irreversible alopecia involving Taxotere. For example, Dr. Madigan identified 311 cases of irreversible alopecia in Sanofi's internal global pharmacovigilance database from 1999 through 2015.[78] Taxotere exposure preceded the outcome events of irreversible alopecia. Further, Sanofi's 2015 causation analysis cited reports of irreversible alopecia *after Taxotere treatment* to support its conclusion of a causal association.[79]

### b. Strength of the association

By Dr. Madigan's analysis, comparison of the numbers of patients in TAX316 with unresolved alopecia in the TAC-arm (29) versus the FAC arm (16) results in a rate ratio of 1.79 at 120 months.[80] The same comparison in TAX301 results in a rate ratio of 2.94 at 120 months.[81] Analyses of both studies demonstrate a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus FAC at nearly all time periods during the clinical trials.[82] Further, Dr. Madigan's random effects meta-analysis combining the data from the two studies at completion yields a rate ratio of 1.85 with a corresponding 95% confidence interval (1.04, 3.31) and a p-value of 0.04.[83] Again, Sanofi's 2015 causation analysis cited to these clinical trial studies and the adverse event rates of irreversible alopecia reported to support its conclusion that the "cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia."[84]

---

[78] *Id.* at ¶19.
[79] *Id.* at ¶22.
[80] *Id.* at ¶14.
[81] *Id.*
[82] *Id.* at ¶15.
[83] *Id.*
[84] *Id.* at ¶18.

### c. Dose-response relationship

Dr. Kessler considered there to be strong evidence of a dose-response relationship between Taxotere and adverse events of permanent or irreversible alopecia supporting a causal finding. He based this on his review of the literature showing that patients receiving docetaxel regimens at a cumulative dose equal to or greater than 400 mmg/m² have been shown to have a significantly higher incidence of irreversible alopecia, including complete irreversible alopecia.[85] As compared to other chemotherapy regimens, including lower dose regimens of docetaxel, the prevalence of irreversible alopecia increased 33-52% in patients with that cumulative dose.[86] Dr. Kessler explains that, in the same study, the patients receiving docetaxel regimens at a lesser dose showed no instances of complete irreversible alopecia.[87] Dr. Kessler is of the opinion that there is reproducible evidence from multiple studies that the risk of irreversible alopecia with docetaxel is dose-dependent[88], and that reproducible evidence of a dose response relationship between Taxotere and irreversible alopecia began as early as 2009.[89]

### d. Replication of findings and consistency with other knowledge

As set forth *supra*, data on the incidence and quality of adverse events of permanent or irreversible alopecia related to Taxotere are well observed in clinical trials, spontaneous reporting, and published studies.

### e. Biological plausibility

The type of baldness that is a common adverse event of cytoxic drugs, including agents like Taxotere, is called anagen effluvium and involves the pathologic loss of hair during the anagen

---

[85] *Id.* at ¶33.
[86] *Id.*
[87] *Id.*
[88] *Id.* at ¶34.
[89] *Id.* at ¶35.

phase (the first phase) of the hair's regrowth cycle.[90]  As Sanofi explained in its 2015 causation analysis, "[c]ytotoxic chemotherapy agents target rapidly dividing cells and as a result the highly proliferative hair matrix cells are an unintended target."[91]  Massive apoptosis of these hair matrix cells of the hair bulbs cause the anagen-phase hairs to be rapidly lost.[92]  When it comes to the permanent or irreversible alopecia observed in some docetaxel patients, the precise anatomical process is not known.[93]  However, a plausible biological mechanism differs from a known biological mechanism, and biological plausibility is satisfied if the relationship is consistent with the current body of knowledge regarding the etiology and mechanism of disease.[94]

Permanent or irreversible alopecia is likely caused by the hair follicle's or derma papilla stem cell's permanent damage or destruction, which results in markedly reduced hair density.[95] Sanofi's 2015 causation analysis included a section specific to the "Biologic Plausibility" of docetaxel's causation of permanent or irreversible alopecia and articulated the following hypotheses: "toxic damage to stem cells/hair matrix cells of the hair bulb or disturbance of the signaling pathway to the secondary hair germ."[96]  The medical literature likewise supports these hypotheses.[97]

### f.   Consideration of alternative explanations and specificity of the association

As noted *supra*, Dr. Madigan analyzed the appearance of safety signals in FAERS for adverse events associated with irreversible alopecia and the related drugs: paclitaxel, fluorouracil,

---

[90] *Id.* at ¶2.
[91] *Id.* at ¶3.
[92] *Id.*
[93] *Id.* at ¶5.
[94] *Id.* at ¶6.
[95] *Id.* at ¶7.
[96] *Id.* at ¶8.
[97] *Id.*

cyclophosphamide, doxorubicin, and cisplatin.[98]   Dr. Madigan's calculations of PRR signal

detection yielded a much lower signal for paclitaxel than for Taxotere, whose signal begins in the

first quarter of 2000 and continues without interruption through the end of his analysis in the fourth

quarter of 2017.[99]   He found no signal for fluorouracil, cyclophosphamide, doxorubicin, or

cisplatin.[100] Again, Sanofi's pharmacovigilance department has cited use of PRR as a part of safety

signal detection management.[101]   In Dr. Madigan's analysis, Taxotere is the only drug to ever

exhibit a safety signal using SEBGM, SEB05, or lasso logistic regression analysis at any time.[102]

Notably, Dr. Madigan' lasso logistical regression yielded a signal rate five times the conventional

reporting threshold and estimated to be approximately 10 times higher than the comparator drugs,

which did not meet the signaling threshold.[103]

### g.  Cessation of exposure

This factor is not applicable because an adverse event of permanent or irreversible alopecia

remains after a patient completes treatment with Taxotere (docetaxel).

The foregoing Bradford Hill Criteria analysis of general causation by Plaintiff's experts

reveals that Taxotere meets a substantial number of the factors, showing a strong causal link

between the drug and permanent or irreversible alopecia.

## III.  **CONCLUSION**

In light of Plaintiff's evidence supporting Taxotere's general causation of permanent or

irreversible alopecia and Defendants' lack of evidence to the contrary, there is no genuine issue of

---

[98] *Id.* at ¶23.
[99] *Id.* at ¶¶24-25.
[100] *Id.* at ¶24.
[101] *Id.* at ¶26.
[102] *Id.* at ¶¶27-28.
[103] *Id.* at ¶28.

material fact as to whether Taxotere (docetaxel) can cause permanent, irreversible alopecia and, accordingly, Plaintiff is entitled to partial summary judgment.

Dated: August 13, 2020                       Respectfully submitted,

/s/ Christopher L. Coffin                     /s/ Karen B. Menzies
Christopher L. Coffin (#27902)               Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.             GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2505              6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                 Los Angeles, California 90045
Phone: (504) 355-0086                        Telephone: 510-350-9700
Fax: (504) 355-0089                          Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                       kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                 *Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert                         /s/Dawn M. Barrios
M. Palmer Lambert (#33228)                   Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                     BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                      701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street      New Orleans, LA 70139
New Orleans, LA 70163-2800                   Phone: 504-524-3300
Phone: 504-522-2304                          Fax: 504-524-3313
Fax: 504-528-9973                            barrios@bkc-law.com
plambert@gainsben.com
                                             *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews                                 Daniel P. Markoff
Andrews & Thornton                           Atkins & Markoff Law Firm
4701 Von Karman Ave., Suite 300              9211 Lake Hefner Parkway, Suite 104
Newport Beach, CA 92660                      Oklahoma City, OK 73120
Phone: (800) 664-1734                        Phone: (405) 607-8757
aa@andrewsthornton.com                       Fax: (405) 607-8749
                                             dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT