**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                             **MDL NO. 2740**
**PRODUCTS LIABILITY LITIGATION**

                                                        **SECTION "H" (5)**

**THIS DOCUMENT RELATES TO**
*Kahn v. Sanofi S.A., et al.*, 2:16-cv-17039

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**</u>
<u>**MOTION TO EXCLUDE TESTIMONY OF MICHAEL KOPRESKI**</u>

**INTRODUCTION**

The PSC moves this Court to exclude Michael Kopreski under Federal Rules of Evidence

702 and 703, and Federal Rules of Civil Procedure 26(a)(2)(B), 26(a)(2)(C) and 37(c)(1). Sanofi

seeks to evade the requirements of FRCP, Rule 26(a)(2)(B) and the evidentiary burdens of FRE,

Rule 702 and 703. To accomplish this, Sanofi uses a former employee, Michael Kopreski, M.D.

(hereinafter, "Kopreski"), to review limited data and render expert opinions, but the company fails

to identify him as an expert witness, or to demonstrate that he is qualified to render expert opinions.

Beyond that, Dr. Kopreski's opinions are unreliable, unsupported, and prejudicial. Dr.

Kopreski forgoes any independent analysis and relies exclusively on cherry-picked information an

interested party provides him.

**RELEVANT FACTS**

**A.  <u>The TAX316 Study</u>**

    **1.  Purpose and Design**

TAX316 was a Sanofi-sponsored clinical trial that began in 1997 to test the efficacy of

docetaxel in the adjuvant care of early stage breast cancer — systemic therapy given to prevent a

recurrence of cancer after the primary treatment of surgery.[1] The trial subjects were women diagnosed with early stage breast cancer, spread outside of the primary tumor to at least one lymph node.[2] The study was divided into two arms: the "TAC" arm, with 744 patients on a regimen of Taxotere ("T"), Adriamycin ("A"), and cyclophosphamide ("C");[3] and a control/comparator arm called "FAC," substituting another chemotherapy agent, fluorouracil, for Taxotere.[4]

TAX316 was planned and conducted pursuant to study prespecified protocols that defined how the study was to be conducted, and how the study data was to be analyzed.[5,6]

## 2. Statistical Analysis Plan

TAX316 was conducted pursuant to established protocols and a predetermined "statistical analysis plan" (SAP) that governed how the data was generated and collected into final data sets, and how those final data sets would be analyzed by Sanofi.[7] The SAP for TAX316[8] was approved by Sanofi before commencement of the study and amended only as the needs of the study required.[9] The document sets forth the plan for the statistical analysis of the "reversibility" of alopecia in the study.[10] Following treatment, the protocol required a 10-year follow-up period to

---

[1] Rule 30(b)(6) Dep. of Michael Kopreski, M.D., 671:11-19, 681:14-17, Oct. 11, 2018 ("Kopreski Dep. Vol. II"), attached as Ex. A.

[2] *Id*. at 680:5-13, 681:22 – 682:3.

[3] *Id*. at 670:19-24, 723:3-6.

[4] *Id*. at 670:23 – 671:3. In some cases, treatment also included hormone therapy. (*Id.* at 671:21 – 672:5).

[5] Dep. of Kimberly Bassi, 59:13-21, Aug. 10, 2018 ("Bassi Dep.") attached hereto as Ex. B. Bassi was Sanofi's clinical study "Trial Manager" and was tasked with ensuring the proper execution of the TAX316 study protocols. (*Id.* at 58:18 – 59:21)("Q. You execute the protocol or the rules of how the study is to be conducted so that data is collected and it can ultimately result in an accurate clinical study report. Is that a fair statement? A. Yes.")

[6] Dep. of Pierre Mancini, 206:22 – 207:4, 212:9 – 13, 326:12 – 327:15, 327:16 – 328:4, Mar. 23, 2018 ("Mancini Dep. Vol I") attached hereto as Ex. C. Mancini is Sanofi's head of global biostatistics, medical affairs and data mining. His involvement in clinical trials was to assess trial data for use in either submissions or for internal purposes at Sanofi. (Mancini, 353:25 – 354:4, 354:24 – 355:7, Oct. 12, 2018 ("Mancini Dep Vol II"), attached hereto as Ex. D.)

[7] *See* Ex. B, 59:13-2; and Ex. C, 206:22 – 207:4, 212:9 – 13, 326:12 – 327:15, 327:16 – 328:4.

[8] TAX316 Statistical Analysis Plan (2002) ("SAP"), attached hereto as Exhibit "E."

[9] *See* Ex. C, 327:16 – 328:23; and Ex. E.

[10] *See* Ex. C, 330:20-25, 332:8-14.

assess adverse events, including alopecia.[11]  This is set out clearly in the Final Clinical Study Report as well.[12] Dr. Kopreski agreed with this definition of the follow-up period in his initial deposition.[13] TAX316's protocol states that all patients "have to be followed for 10 years," with evaluation visits planned at specified intervals, including once a year during years 6 through 10.[14] The TAX316 study "was designed to assess whether it [alopecia] is still there after 10 years or not," and, under the protocol, Sanofi "would know from the data" if a patient's alopecia is "still there at the end of the follow-up."[15]

### 3.     Clinical Study Report

After the conclusion of the study period,[16] the final 10-year analyses for TAX316 were conducted according to the prespecified SAP and set forth in the Clinical Study Report ("CSR").[17] The CSR noted that "[t]he focus of this safety evaluation is on the follow-up period because this includes new data beyond what has been presented in the interim study report at a median follow-up time of 55 months."[18] At the end of the 10-year follow-up, the Final CSR reported 29 of patients (or 4.2%) in the TAC arm, which is the Taxotere containing arm, experienced alopecia that persisted into follow-up and was ongoing at the end of the follow-up period.[19] Importantly, Pierre

---

[11] *Id.* at 332:15 – 333:5; and Ex. E, § 11.7, p.30 of 47; *see also*, Mackey, et al., Lancet Oncol, 2013;14:72-80. "Background: We compared standard adjuvant anthracycline chemotherapy with anthracycline–taxane combination chemotherapy in women with operable node-positive breast cancer. Here we report the final, 10-year follow-up analysis of disease-free survival, overall survival, and long-term safety."

[12] *See* Ex. G, 2010 CSR, Sanofi_00724262. P. 34, "§9 SAFETY EVALUATION. . . 'Follow-up period' is defined as the period of time beginning after the end of the treatment period and *ending at the completion of the 10-year follow-up period.*" (emphasis added).

[13] Rule 30(b)(6) Dep. of Michael Kopreski, M.D., 80:1-19, Sept. 6, 2018, ("Kopreski Dep. Vol I") attached hereto as Ex. F.

[14] Ex. E, SAP 8. Similarly, The TAX316 protocol dictated that all adverse events regardless of severity will be followed and analyzed. Ex. E, SAP 27–28.

[15] Ex. C, Mancini Dep. Vol. I 334:21 – 335:12, 335:6-12, 335:20 – 336:1.

[16] The CSR defines "study period" as including both the treatment and follow-up periods. (*See* Clinical Study Report TAX316 (EFC6041/BCIRG001) 9 ("2010 CSR") attached hereto as Ex. G (excluding appendices).)

[17] See generally Ex. G, §§ 6.3 and 6.3.2, pp. 15-17.

[18] *Id.* at p. 34, § 9, Safety Evaluation.

[19] *Id.* at 37.

Mancini explained that after the study was completed, and after the data had been verified and cleaned, the biostatistics department assessed all the data.[20] This is quite different than what Dr. Kopreski was instructed to review; Dr. Kopreski admits that he was only given select information on 29 patients, does not discuss any attempt at data validation, and when asked about the information's completeness he deferred to counsel.[21]

### B. Dr. Kopreski's Post Hoc TAX316 Re-Analysis

#### 1. Relevant Discovery History

In 2018, Dr. Kopreski was retained by Sanofi's counsel to review information on less than 5% of the TAX316 study population and asked to draw critical opinions about the follow-up times for ongoing alopecia experienced in the study.[22] Kopreski's work in reevaluating incomplete TAX316 data is being used to assist in the defense of the MDL actions, including Ms. Kahn's case. TAX316 was a Sanofi-sponsored clinical trial that began in 1997 and culminated in a Final Clinical Study Report in 2010. Kopreski is a former employee of Defendant Sanofi who left the company in 2017. While employed by Sanofi, Kopreski had no direct responsibility for or contemporaneous job duties that involved the TAX316 clinical study.

On November 20, 2018, Plaintiffs noticed a second 30(b)(6) deposition of Sanofi on the issue of notice and designated as a topic: "[t]he findings regarding alopecia as a TEAE [Treatment Emergent Adverse Event] persisting into the 10-year follow-up period in TAX316 as provided in

---

[20] Ex. C, 104:22 – 105:12.

[21] Everything that Dr. Kopreski reviewed regarding TAX316 was provided by Sanofi's attorneys. When asked about the completeness of the records reviewed, Dr. Kopreski testified that "would be a question to refer to my attorneys." (Ex. A, 492:17 – 493:2; 495:22 – 496:6.) Dr. Kopreski acknowledges that the only patient data he was given pertained to the 29 reports of ongoing alopecia, and not the full 744 participants.

[22] Dr. Kopreski was provided with limited case report forms and case report form summaries on 29 patients out of the 744 patients in the TAC arm of the TAX316 study. The 29 patients only represent 3.9% of the total population in the TAC arm of the study.

the Clinical Study Report on September 9, 2010, so that it can be determined whether each such patient is included" in a list of AEs previously known to Plaintiffs.[23]

In its Responses and Objections to Plaintiffs' notice, Sanofi listed the Subject IDs of the 29 patients from the TAC arm that were listed in the CSR as having experienced ongoing alopecia at the end of the 10-year follow-up period.[24] Sanofi further appended, on its own initiative, an "analysis" in the form of a spreadsheet purporting to show "those patients from the TAX316 final study report who are listed with ongoing alopecia but do not meet the definition of persistent alopecia as defined by Judge North."[25] This was a remarkable disclosure, considering (1) that no such post-hoc reanalysis of the TAX316 study was requested by Plaintiffs; and (2) that neither Judge North nor Judge Milazzo has ever issued any ruling defining "persistent alopecia" for any substantive purpose in this litigation. Additionally, Exhibit A to Sanofi's objections (Ex. I) were not responsive to Plaintiff's depositions notice as it did not address the TEAE's "as provided in the Clinical Study Report of September 9, 2010." Nonetheless, Dr. Kopreski "analyzed" the limited information from counsel-selected clinical report forms, not the final datasets described by Mr. Mancini, and now concluded that 22 of the 29 adverse events originally reported as "ongoing" alopecia in the TAC-arm did not qualify as "persistent" under Dr. Kopreski's – or perhaps counsel's -- new definition for "persisted."[26] The result of this non-scientific sleight of hand was to bring the study's incidence rate for the AE below 1%, significantly less than the 4% figure appearing in both the final CSR and the Taxotere labeling. This is despite the fact that the

---

[23] See Pls' 2nd Am. Not. of Videotaped Dep. of Sanofi U.S. Pursuant to Fed. R. Civ. P. 30(b)(6) at 12, Nov. 20, 2018, attached hereto as Ex. H (emphasis added).
[24] Defs' Objections and Responses to Pls' 2nd Not. of Dep. of Sanofi U.S. Pursuant to Fed. R. Civ. P. 30(b)(6) at 20-21 ("Defs' Objections & Responses") attached hereto as Ex. I.
[25] See *id.* at Ex. A, p. 25.
[26] No Sanofi document provided in discovery utilizes the definition for persisted used by Kopreski in his 2019 reanalysis. And there is no evidence that Sanofi ever adopted Kopreski's definition for any purpose other than defending claims in this MDL.

TAX316's final CSR considers those 29 cases of alopecia as having "persisted" and being "ongoing."[27,28,29]

Sanofi produced its representative (again, Dr. Kopreski) for examination on December 12 and 13, 2018. During this deposition, counsel for Plaintiffs, concerned that Sanofi was attempting to peddle its own Exhibit A as a scientifically reliable analysis through its corporate representative, examined Kopreski on how Sanofi arrived at these new conclusions. Because Kopreski's conclusions contradicted Sanofi's own reporting to the FDA of the study results, its representations to the European Medical Agency ("EMA"), what Sanofi's current counsel apparently advocated to be included in the Taxotere label on March 16, 2017, and what is presently in Sanofi's Taxotere label, Plaintiff's counsel examined Kopreski on the bases for his opinions.[30]

Dr. Kopreski provides no recognized methodology for his post-hoc reanalysis and cannot demonstrate that his analysis was conducted pursuant to prespecified protocols or the TAX316 SAP. He admits, however, that his review and opinions are based entirely upon what was provided to him by counsel for Sanofi.[31] In this regard, Dr. Kopreski is attempting to offer expert opinions, drawing conclusions and testifying based upon materials provided by Sanofi's counsel. But as stated throughout this brief, Dr. Kopreski was never disclosed as an expert pursuant to FRCP 26(a)(2)(B). Dr. Kopreski's testimony revealed both the troubling provenance of a basis for his testimony, and the lack of any demonstrated methodology plaguing his reanalysis of select and incomplete data that Sanofi attempts to offer. This is precisely why Rule 26(a)(2)(B) exists, and

---

[27] *See* Ex. G, CSR 37.

[28] During this period, Sanofi understood these TAX316 cases to represent "persisting" alopecia. (*See, e.g.*, Ex. C, 275:19 – 282:7.)

[29] *See also*, Sanofi_04938203, EMA submission from 1/22/2013, attached hereto as Ex. R.

[30] *See generally* Dep. of Michael Kopreski, M.D., pp. 486 – 513, 649 – 667, Dec. 13, 2018, ("2nd Kopreski Dep., Vol. II"), attached hereto as Ex. J; *see also*, Sanofi_05173852, and Taxotere label, 2020, attached hereto as Ex. S.

[31] *See* Ex. J at 492:17 – 493:2.

requires experts to provide detailed reports, but it may also demonstrate why a report was not provided.

### 2.    Data and Methodology

Dr. Kopreski was not involved in the data analysis of the TAX316 study while employed by Sanofi.[32] Indeed, any "analysis" by Dr. Kopreski regarding TAX316 and ongoing or persistent alopecia was done during this litigation at the request of Sanofi's attorneys from Shook, Hardy & Bacon.[33] Everything that Dr. Kopreski reviewed regarding TAX316 was provided by Sanofi's attorneys. When questioned about the completeness of the records reviewed, Dr. Kopreski testified that it "would be a question to refer to my attorneys."[34] Dr. Kopreski admitted that he only "received specific documentation towards – regarding the question" of persistent alopecia within the study.[35] Regarding the Taxotere, or "TAC," arm of TAX316, Dr. Kopreski acknowledges that the only patient data he was given pertained to the 29 reports of ongoing alopecia, and not the full 744 participants.[36] And even as to those 29 patients, he could not verify the completeness of the data given to him.[37] In fact, Dr. Kopreski was incredibly uninformed about the material he was provided by Sanofi's counsel. And unlike Sanofi's other experts disclosed under FRCP, Rule 26(a)(2)(B), Dr. Kopreski was never even disclosed or endorsed as an expert witness as mandated by FRCP, Rule 26. This is because Sanofi knows that Dr. Kopreski's "expert" opinions could never satisfy the gate keeping requirements of FRE 702.  Because Dr. Kopreski was never disclosed as an expert, no attempt was made by Sanofi to comply with the disclosure requirements

---

[32] *Id.* at 490:21-24.
[33] *Id.* at 492:4-10. In this regard, Dr. Kopreski looks eerily similar to all of Sanofi's other experts. He was provided documents (incomplete and carefully selected by counsel) and asked to draw conclusions based upon his review. As the old saying goes, "if it walks like a duck, and quacks like a duck. . . . "
[34] *Id.* at 492:17 – 493:2.
[35] *Id.* at 495:22 – 496:6.
[36] *Id.* at 493:3 – 494:7.
[37] *Id.*

of FRCP, Rule 26(a)(2)(B).  Dr. Kopreski did not provide a list of materials reviewed in forming

his opinions, nor did he produce an expert report.

In deposition, Dr. Kopreski described the process he used in winnowing those 29 TAC-

arm cases of "ongoing" alopecia down to only 7 cases of "persistent" alopecia as follows:

> I looked at the patients from the 29 that were considered to be
> ongoing, and I asked of those if there was a documentation that
> answered two questions, two simple questions:
>
> Number one, did we have documentation either from what was
> provided in the CRFs, [case report forms] or what was provided in
> terms of SAS or clinical trial datasets that were produced from the
> CRFs that showed documentation that the alopecia was still present
> six months after the last chemotherapy. So that was—that was the
> first criteria: Was the alopecia still present six months after the last
> chemotherapy that was received.
>
> The second criteria, was there any evidence of resolution of that
> alopecia. If there was any resolution, then it would not be considered
> persistent.
>
> So that—that, very simply is – is the process. It was a very
> straightforward process. It was looking to see if—if there was
> documentation for any of those two characteristics.[38]

By his own admission, Dr. Kopreski looked *only* at documentation from the 55-month interim

review period (2003 or earlier) and did not review the *six years of follow-up data* that, under the

TAX316 protocol, was not only required to be collected by Sanofi but also submitted to the

relevant regulatory agencies.[39] By not reviewing the complete data set for TAX316, Dr. Kopreski

missed contradictory data demonstrating that certain patients continued to experience alopecia.[40]

---

[38] *Id*. at 562:6 – 563:11.

[39] *Id.* at 562:6 – 563:11. The term "datasets" used by Dr. Kopreski during the cited testimony, and throughout the discussion of his reanalysis of a portion of TAX316 data, should not be confused with the definition of "datasets" as it is otherwise used within Sanofi's biostatistics department. Sanofi's actual clinical trial datasets are stored in Sanofi's WISE database and were analyzed for purposes of the CSR using SAS programs. *See* Ex. C, 64:03 –69:23.

[40] *See, e.g.,* Ex. A, 649:6 – 657:19.

Taken together, these facts show a robust effort by Sanofi, its counsel, and its experts to re-define the TAX316 clinical trial as something other than what it is to support its defense. And we should not lose sight of the fact that this litigation is the **only** place that Sanofi represents TAX316 safety follow-up to be anything less than 10-years, or that ongoing or persistent alopecia is any different than what is reported in the September 2010 Final Clinical Study Report. Sanofi's examination of Kopreski is a blatant attempt at subverting FRCP 26(a)(2)(B) and FRE 702, and cannot be tolerated.

### C.  Sanofi's Disclosed Experts' Rely on Dr. Kopreski's Reanalysis

Two of Sanofi's designated experts, Dr. Janet Arrowsmith and Dr. John Glaspy, have cited to Exhibit A to Sanofi's Responses to Plaintiffs' Second Notice of 30(b)(6) Deposition and Dr. Kopreski's testimony as information they relied on to reach their expert opinions.[41] Both experts rely on these materials to opine in some form, consistent with Dr. Kopreski's 30(b)(6) testimony and "Exhibit A" to Sanofi's objections to the second 30(b)(6) notice, that the actual incidence of Taxotere patients in the TAC arm of the TAX 316 study was significantly lower than roughly 4% of patients reported in the CSR and labeling.  However, no expert provides an independent analysis or validation of Dr. Kopreski's findings.[42]

#### 1.  Dr. Arrowsmith Relies on Dr. Kopreski's Reanalysis

Dr. Arrowsmith, Sanofi's regulatory expert, cites to Sanofi's Exhibit A in support of her opinion that "the TAX316 study only reported 'ongoing' alopecia; it did not report 'permanent' or 'persistent' alopecia" as well as her (demonstrably false) opinion there is no documentation that patients listed on Sanofi's Exhibit A had alopecia lasting more than six months after completion

---

[41] *See* Report of Janet Arrowsmith, MD (12/9/2019)(Ex. K, ¶¶ 117, 119, 121-123); and *See* Report of John Glaspy, MD (4/29/2020) Figure A, and p. 33, attached as Ex. L.

[42] Ex. M, Dep. of Glaspy, 1/9/2020, 133:22 – 134:1; 92:12 – 94:12; Ex. N, 2nd Dep. of Janet B. Arrowsmith, 7/29/2020, 154:20 – 156:5.

of chemotherapy.[43] Dr. Arrowsmith further adopts Dr. Kopreski's opinion as her own: "It is therefore simply incorrect for Plaintiffs' experts to suggest that the results of the TAX 316 study demonstrate that approximately 4% of Taxotere patients experience 'permanent' or 'irreversible' alopecia. In actuality, fewer than 1% of the Taxotere patients in the TAX 316 study had alopecia more than six months after chemotherapy."[44] This "opinion" is founded entirely on Dr. Kopreski's improper, litigation-driven opinion testimony, Sanofi's Objections and Responses to Plaintiffs' Second Notice of Deposition, and Arrowsmith's understanding of what Dr. Kopreski did to reach his opinions.[45]

## 2.    Dr. Glaspy Relies on Dr. Kopreski's Reanalysis

Echoing Dr. Arrowsmith, Sanofi's oncology expert Dr. Glaspy opines: "the TAX316 study only reported on 'ongoing' alopecia, it did not report on 'permanent' or 'persistent' alopecia. The distinction is important, because for the majority of patients identified as having 'ongoing' alopecia, there is no documentary evidence to support any claim that those patients had alopecia more than six months after chemotherapy."[46] This statement from Dr. Glaspy is particularly troubling for two reasons. First, Dr. Glaspy lists Dr. Kopreski's depositions on his materials reviewed, Exhibit B to his report, and thus is aware that Dr. Kopreski improperly attempts to re-cast the TAX316 clinical trial as a 55-month study. And second, because Dr. Glaspy is both a study investigator on the TAX316 study, and a study author on the publication of the 10-year follow-up of the TAX316 study, he is abundantly aware that TAX316 was designed, conducted, assessed and published as a study with a 10-year follow-up for efficacy *and safety*. Allowing Dr. Glaspy to

---

[43] *See* Ex. K, ¶117; *see also* Dep. of Janet B. Arrowsmith 103:2-5, Jan. 18, 2019 ("Arrowsmith Dep. I") attached hereto as Ex. O.)
[44] *See* Ex. K, ¶117.
[45] *See* Ex. O, 117:19 – 118:1.)
[46] *See* Ex. L, p. 33.

accept Dr. Kopreski's opinions and findings that contradict and attempt to impeach TAX316's published and reported findings, and to use them as a basis for his own opinions, defies logic and impugns the very concept of scientific integrity.  The Court allowed Glaspy to testify previously based upon his being "heavily involved" in TAX316.[47] But this is clearly not so. Dr. Glaspy was not listed as a BCIRG001 (TAX316) investigator at the time of the publication of the interim results and is only identified as an investigator in 2013.[48]

Accepting Sanofi's endorsement of experts to support and parrot the litigation-driven opinion of Dr. Kopreski cannot be allowed. Sanofi's strategy blocks Plaintiffs' right to conduct expert discovery of Dr. Kopreski's opinions. By failing to designate Dr. Kopreski as an expert, pursuant to FRCP 26(a)(2)(B), neither Plaintiff nor the Court can effectively test his qualifications or the reliability of his opinions and methods, although he admits he followed no pre-specified protocol and only reviewed what counsel provided. Sanofi's attempt at this backdoor expert opinion demonstrates precisely why the Court must exercise its gatekeeping responsibilities. It is offensive to both the scientific and legal process and cannot be condoned.

## LEGAL STANDARD

Fed. R. Evid. 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

---

[47] *See* Doc. 9294, p. 4.
[48] *See* Ex. P, NEJM, M. Martin, et al., 2005; 352:2302-2313. "Adjuvant Docetaxel For Node Positive Breast Cancer." Dr. Glaspy is not listed as an investigator; the only study investigator included in the list of investigators/authors is Linnea Chap, MD. Dr. Glaspy does not appear on any TAX316 publication or investigation document until the 2013 publication of Mackey, et al., *infra*. (*See* Ex. M, 54:8-16), although he was a paid presenter for Sanofi and Taxotere on doctor-to-doctor talks around the country.

(c) the testimony is the product of reliable principles and methods;

(d) and the expert has reliably applied the principles and methods to the facts of the case.

This version of Rule 702 "reflects the United States Supreme Court decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)." *Stephens v. Florida Marine Transporters, Inc.*, Case No. 12-1873, 2013 WL 11257508, at *2 (E.D. La. Sept. 3, 2013). Under *Daubert*, in order to allow an expert's testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592–93. "Stated differently, 'the trial judge must determine whether the expert testimony is both reliable and relevant.'" *Burleson v. Texas Dep't of Criminal Justic*e, 393 F.3d 577, 584 (5th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589). Sanofi bears the burden of demonstrating "that the pertinent admissibility requirements are met.'" *Romero v. Wyeth Pharm., Inc.*, No. 1:03-cv-1367, 2012 WL 13036355, at *2 (E.D. Tex. Apr. 25, 2012) (quoting *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003)); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

When a proponent of specialized expert testimony cannot demonstrate that the testimony is based on sufficient facts, the application of a recognized methodology, and supported by appropriate validation of what is known, the expert's opinion should be excluded. *See In re: Vioxx*, 414 F. Supp. 2d 574, 592-593 (E.D. La. 2006). The present matter is a prime example of when exclusion is appropriate. Dr. Kopreski's opinions are based on admittedly incomplete data and information. Sanofi's counsel selectively funneled limited documents to Dr. Kopreski for review,

with full knowledge that a source of complete and validated final clinical trial data existed.[49] Then, Dr. Kopreski applied a self-determined definition for "persistent" alopecia, disregarding protocol definitions, and applied a "methodology" that has not been identified or disclosed in an expert report. Dr. Kopreski's analysis reached a conclusion that, fortunately for Sanofi, discredits, impeaches, and changes Sanofi's TAX316 study findings that were derived from a prespecified protocol and SAP. It should not be lost on the Court that Dr. Kopreski's recruitment, assignment and fortuitous findings occurred during the pendency of this action, not before, and have never been shared outside of this MDL. This type of manipulation of evidence is the clearest example of litigation-driven junk science that *Daubert* and Rule 702 are meant to exclude.

"[W]hether an expert's testimony is reliable is a fact-specific inquiry." *Burleson*, 393 F.3d at 584 (citation omitted). "The inquiry authorized by Rule 702 is a flexible one; however, a scientific opinion, to have evidentiary relevance and reliability, must be based on scientifically valid principles." *Moore*, 151 F.3d at 276. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis added). And "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*,

---

[49] In offering Kopreski's reanalysis, Sanofi disregards the testimony of the Global Head of Biostatistics analysis of the TAX316, when he testifies that the "TAX316 study "was designed to assess whether it [alopecia] is still there after 10 years or not," and Sanofi "would know from the data" if a patient's alopecia is "still there at the end of the follow-up." (Ex. C, Mancini Dep. Vol. I 334:21 – 335:12, 335:6-12, 335:20 – 336:1.) The importance of the quality assurance process data goes through before Sanofi will analyze its own data. *See* Ex. C, 220:11 – 222:11. Neither Sanofi nor Kopreski addresses how Kopreski's review of limited, unverified data is valid for drawing conclusions for the entire study, or if it is valid at all. In fact, Sanofi's expert John Glaspy, M.D., states that post hoc analyses are "hypothesis generating" but cannot demonstrate study findings. *See* Ex. M, 126:20-23.

303 F.3d at 266; *accord Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 253 (2d Cir. 2005); *see also Crowley v. Chait,* 322 F. Supp. 2d 530, 542 (D.N.J. 2004) ("It is axiomatic that the information upon which an expert bases his opinion must be reliable.").

The *Daubert* Court offered a non-exclusive list of factors that bear on the inquiry into reliability of an expert's testimony: (1) whether the technique in question has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community. *U.S. v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).

Beyond Rule 702's standard, Fed. R. Evid. 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if: (1) they are of the kind reasonably relied upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect. Fed. R. Evid. 703; *see Crowley*, 322 F. Supp. 2d 530 at 542 ("The information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes.").

## ARGUMENT

### I.     Sanofi failed to disclose Dr. Kopreski as an expert witness.

Any expert that a party intends to call to testify at trial "must provide a written report unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony.  The report must contain [among other items]: a complete statement of all opinions; the facts or data considered by the witness in forming them; the witness's

qualifications, including a list of all publications authored in the previous 10 years." Fed. R. Civ. P. 26(a)(2)(B).

Sanofi failed to disclose Dr. Kopreski as an expert witness and produced no report regarding Dr. Kopreski's proposed expert testimony.  As it relates to Dr. Kopreski, Sanofi did not attempt to meet any of the disclosure requirements under Rule 26. Therefore, he cannot provide expert opinions in this case.

In addition, Dr. Kopreski cannot offer factual testimony based upon his experience and involvement in the TAX316 study, because he had no role in conducting TAX 316. Like all other experts retained by Sanofi, Dr. Kopreski was provided with documents selected by Sanofi's counsel, and asked to reach conclusions in support of Sanofi's defense. There is nothing in Dr. Kopreski's reanalysis of TAX316 that was sanctioned, commissioned, or directed by Sanofi's corporate governance that demonstrates his actions were taken as an employee of Sanofi. Rather, Dr. Kopreski was retained by Sanofi's defense counsel to conduct his reanalysis and offer opinions, in the same manner as a Rule 702 expert.

Further, Dr. Kopreski has not worked for Sanofi since 2017. Dr. Kopreski's reanalysis is not Sanofi's analysis, and Sanofi has never adopted the erroneous findings of Dr. Kopreski's reanalysis outside of this litigation. Sanofi's analysis is found in its 10-year Follow-Up Clinical Study Report and reiterated in its current label at the urging of Sanofi's counsel – yet the same counsel offers Dr. Kopreski's reanalysis in this case and urging it as scientifically valid. Dr. Kopreski's reanalysis contradicts the TAX316 protocol and seeks to impeach the findings of Sanofi's own study. It further contradicts the repeated representations that Sanofi has made to the Food and Drug Administration (FDA) and European Medicines Agency, and currently makes in its current Taxotere label.

Clearly, Dr. Kopreski's reanalysis of limited data from TAX316 is not Sanofi's analysis of TAX316. Although Defendants would like to disguise Dr. Kopreski's testimony as fact testimony, it is obviously expert opinion testimony coming from a witness that has not be disclosed as an expert. Consequently, Dr. Kopreski's testimony should be excluded

## II.    Dr. Kopreski is not qualified to offer expert testimony.

Rules 26(a)(2)(B) and 26(a)(2)(C) presuppose that Dr. Kopreski possesses the requisite expertise to offer expert opinions at all. But because Sanofi did not provide a Rule 26(a)(2)(B) report for Dr. Kopreski, Sanofi cannot establish that Dr. Kopreski is qualified to offer expert opinions. The party offering expert testimony must demonstrate by a preponderance of the evidence the expert's qualifications, and the relevance and reliability of their testimony. *See. Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 275-276 (5th Cir. 1998). Sanofi has done neither. Dr. Kopreski was not involved in the assessment of the TAX316 final clinical study trial data, and there has been no demonstration by way of expert disclosure that Dr. Kopreski has even a passing familiarity with, let alone any expertise in, the assessment of clinical trial data.[50] That was not his role when he was employed by Sanofi, but it is precisely what Sanofi's counsel asked him to do for purposes of this litigation only.

In sum, Sanofi has not and cannot establish Dr. Kopreski's expertise to offer the opinions expressed in his reanalysis. For this reason, his testimony should be excluded. Accordingly, Plaintiff moves to exclude Dr. Michael Kopreski's opinion testimony on the grounds Sanofi failed

---

[50] In fact, as a former Sanofi pharmacovigilance employee, Dr. Kopreski's opinions contradict those of Sanofi's current Global Safety Officer, and pharmacovigilance employee, Nanae Hangae, MD, who concluded in 2015: "Based on review of the Sanofi global pharmacovigilance database, worldwide scientific literature, clinical studies, and biological plausibility, the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel." Sanofi_01336880, attached hereto as Ex Q.

to disclose this proposed expert and his opinions pursuant to FRCP, Rules 26(a)(2)(B), 26(a)(2)(C) and 37(c)(1).

### III.     Dr. Kopreski's opinions are unreliable, unsupported, and prejudicial.

Dr. Kopreski's litigation-driven reanalysis of the TAX316 study fails every prong of Rules of Evidence 702 and 703's requirements. Yet Sanofi intends to offer at trial multiple expert opinions that rely on Dr. Kopreski's flawed and unreliable reanalysis. If allowed, these opinions would offer the jury nothing more than Sanofi's dressed-up legal argument impugning its own published randomized-clinical study and leave Plaintiffs no opportunity to cross-examine those who concocted it. Under Fed. R. Evid. 702, an expert must "bring to the jury more than the lawyers can offer in argument." *Eymard v. Pan American World Airways*, 795 F.2d 1230, 1233 (5th Cir.1986); *see also In re Vioxx Prod. Liab. Litig.*, 414 F. Supp. 2d 574, 580 (E.D. La. 2006). Accordingly, Dr. Arrowsmith and Dr. Glaspy should be excluded from offering any opinion based on Dr. Kopreski's results-oriented reanalysis of TAX316, or making any reference to it at trial.[51] Dr. Kopreski's reanalysis must be excluded under FRCP 37(c) because of Sanofi's failure to disclose its expert and his opinions under FRCP, Rule 26(a)(2)(B), and under each element of FRE 702, as addressed above.

As shown above, TAX316 took thirteen years to complete, with a 10-year follow-up for efficacy *and safety*, with over 1,400 subjects, governed by comprehensive prespecified protocols and a statistical analysis plan, and reviewed by a number of scientists globally, peer-reviewed, and submitted to regulatory authorities. By contrast, Dr. Kopreski's reanalysis of TAX316 seeks to recalculate study findings by using a definition that he himself devised (perhaps with counsel),

---

[51] To the extent Sanofi will seek to offer directly either Exhibit A or Dr. Kopreski's corporate deposition testimony to support the claim of a supposed lower incidence of persistent alopecia from the TAX316 study, such statements are inadmissible hearsay offered for truth. Fed. R. Evid. 802. Accordingly, Sanofi must avail itself of the expert hearsay exceptions in Fed. R. Evid. 702 and 703, and for all the reasons discussed here, this it cannot do.

through the application of criteria devised only by him, pursuant to a "methodology" that has never been reviewed—let alone committed to paper—and based upon documents selectively filtered to him by Sanofi's counsel. Unlike the TAX316 protocols and SAP, Kopreski's methods were not overseen, tested, peer-reviewed, published, or accepted by anyone in the scientific community, or even by Sanofi. Indeed, Kopreski's findings have never been adopted by Sanofi internally, published in Taxotere labeling, reported by Sanofi to the FDA, or used by Sanofi or anyone else, in any way, outside this litigation.[52] As a result, Kopreski's ad hoc approach to re-analyzing limited information lacks the baseline reliability required by *Daubert*.[53]

Courts have exercised their gatekeeping function to exclude opinion testimony under similar circumstances. For example, in *Montgomery Cty. v. Microvote Corp.*, the Third Circuit affirmed the trial court's exclusion of expert testimony, when the expert was unable to identify the source or basis underlying data, and the expert relied largely on a data sampling provided by counsel. 320 F.3d 440, 448–49 (3d Cir. 2003). The trial court in *Montgomery Cty.* had found it "disturbing" that the expert was unable to identify and verify source data and instead relied on attorney-provided information, and the Third Circuit confirmed that the trial court's exclusion of such testimony was proper. *See id.* (excluding testimony on grounds that, *inter alia*, expert had based his opinion on a skewed sampling of information selected by counsel: "If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.") (internal quotations and citations omitted).

---

[52] Interestingly, in March 2017, Sanofi's lead counsel in this MDL, Harley Ratliff, attended a Sanofi Label Review Committee meeting at which the final TAX316 numbers for "ongoing alopecia" were discussed and determined to be appropriate for inclusion in the Taxotere label. The language discussed at that meeting remains in the label to this day. Notwithstanding, Sanofi now wants to put before a jury Dr. Kopreski's manufactured evidence that directly contradicts the data in its current label. *See* Ex. S.

[53] *See also* Exh. S, Relevant Facts §B, *supra* (outlining Sanofi's designated experts' complete lack of involvement in the reanalysis).

Similarly, in *Crowley v. Chait*, the U.S. District Court for the District of New Jersey excluded expert testimony when the expert "relied on summaries prepared by counsel" and "conducted little independent investigation into the witnesses beyond the summaries prepared for him." 322 F. Supp. 2d 530, 545–47 (D.N.J. 2004). The *Crowley* court reasoned that the "highly filtered" nature of the evidence provided to the expert fundamentally undermined the reliability of the expert's testimony: "to allow him to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable." *Id.* The court further noted that the filtered review conducted by the expert led the expert to reach conclusions contradicted by the evidence, which "illustrate[d] the perils of relying on evidence hand-selected and even edited by counsel. By reviewing only those depositions provided to him by Plaintiff's counsel, and by reviewing what appears to be for the most part only preselected excerpts of those depositions, Kramer relied upon information that is simply too unreliable to be trusted." *Id.* Sanofi's Kopreski "analysis" suffers from the same fatal problems identified in *Montgomery Cty.* and *Crowley.* It is fundamentally based on select, attorney-filtered evidence that leads to conclusions that are contradicted by the evidence withheld from consideration, which alone warrants its exclusion at trial.

Compounding these problems, Sanofi and Dr. Kopreski use their own definition of "Persistent Alopecia" to discredit and undermine contrary evidence derived through adherence to TAX316's established and prespecified protocols and SAP. Sanofi is seeking to have this Court ignore Sanofi's longstanding conclusions from TAX316's 10-year follow up and allow Dr. Kopreski's reanalysis to masquerade as legitimate science. However, when presented with the 10-year data showing that many of the 22 cases of alopecia he excluded as "resolved" were actually ongoing at follow up, Dr. Kopreski explained: "So **for you to show that those patients had**

**analysis of ongoing at follow-up is not inconsistent**. But the question is not whether or not it was ongoing; **the question is whether or not it met the criteria for persistence as -- as was defined**."[54] "*As was defined*" is a curiously relevant (and fatal) phrase for Dr. Kopreski to use: Dr. Kopreski defines – or rather, redefines – the operative adverse event being investigated. He ignores the fact that TAX316 was designed, conducted, and analyzed via pre-defined protocols and a Statistical Analysis Plan. It is only through self-defining, and in re-defining, the event "under study" by Dr. Kopreski alone that he can work the magic he was commissioned to do. It is simply not scientifically valid to ignore a protocol driven study's findings that were thirteen years in the making, and allow a former employee with no demonstrated experience in assessing clinical trial data, with total disregard for the study's protocols, to create new a definition for an event and apply a new and undisclosed means for assessing data. Moreover, it is contrary to established law to allow that former employee to create new findings he developed, based on his new definition and assessment, all to suit the company's defense of thousands of lawsuits. Yet that is precisely what Sanofi is attempting to do with Dr. Kopreski's undisclosed expert testimony.

Dr. Kopreski's "methodology" is to ignore the contemporaneously generated, protocol-driven clinical study evidence that Sanofi is still relying upon in its product information. Kopreski's *ad hoc* and arbitrary criteria fatally undermines the reliability of his reanalysis and the opinions of Sanofi's designated experts who rely on it. As aresult, Dr. Kopreski and those experts who rely on his reanalysis, including Drs. Arrowsmith and Glaspy, should be excluded.

Lastly, Dr. Kopreski's litigation-driven reanalysis is not "the kind[] of facts or data" reasonably relied on by experts in the fields of epidemiology, regulatory compliance, and oncology – and certainly not without taking independent steps to verify its accuracy. *See In re H & M Oil &*

---

[54] *See* Ex. J, 663:13 –664:7 (emphasis added).

*Gas, LLC*, 511 B.R. 408, 421–22 (Bankr. N.D. Tex. 2014) ("[T]here is nothing in the [. . .] record to indicate that experts in the field of valuation 'reasonably rely' on valuation reports without taking any steps to verify the accuracy of such reports."); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726–27 (E.D. Wis. 2008) (holding that expert "should have independently verified the reliability of the data before opining [. . .], as opposed to accepting it at the word of [. . .] counsel"). "Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Id*. (citing *Loeffel Steel Prods. Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)).

Because Dr. Kopreski's reanalysis is not the type of data reasonably relied upon by experts in the field of epidemiology, regulatory compliance or oncology, not only should Dr. Kopreski's testimony be excluded, but so too should the testimony of those experts who offer opinions based on the reanalysis but have failed to independently verify its accuracy.  None of the experts in this litigation, including Drs. Arrowsmith and Glaspy, have undertaken such independent verification and, therefore, must be excluded as well.[55]

## CONCLUSION

For the foregoing reasons, the Court should prohibit Dr. Kopreski's from offering any expert opinion in this case in both his individual capacity and while serving in his role as corporate designee as a result of Sanofi's failure to disclose him as expert under FRCP, Rule 26(a)(2)(B) or Rule 26(a)(2)(C), or, in the alternative, because his testimony and reanalysis are unreliable, unsupported, and prejudicial under Fed R. Evid. 702 and 703. Consequently, and in addition to the

---

[55] Plaintiff has filed separate motions to exclude the testimony of Drs. Arrowsmith and Glaspy, among others.

forgoing, Sanofi's remaining experts should be precluded from relying, in any way, upon Dr.

Kopreski's *post hoc* reanalysis of the limited and incomplete TAX316 data provided by counsel.

Dated: August 13, 2020                              Respectfully submitted,

/s/ Christopher L. Coffin                           /s/ Karen B. Menzies
Christopher L. Coffin (#27902)                      Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                    Andre Mura ((CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505                     GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                        6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                               Los Angeles, California 90045
Fax: (504) 355-0089                                 Telephone: 510-350-9700
ccoffin@pbclawfirm.com                              Facsimile: 510-350-9701
                                                    kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                    *Plaintiffs' Co-Lead Counsel*


/s/M. Palmer Lambert                                /s/Dawn M. Barrios
M. Palmer Lambert (#33228)                          Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                           BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                            701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street            New Orleans, LA 70139
New Orleans, LA 70163-2800                          Phone: 504-524-3300
Phone: 504-522-2304                                 Fax: 504-524-3313
Fax: 504-528-9973                                   barrios@bkc-law.com
plambert@gainsben.com
                                                    *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews                                        Daniel P. Markoff
Andrews & Thornton                                  Atkins & Markoff Law Firm
4701 Von Karman Ave., Suite 300                     9211 Lake Hefner Parkway, Suite 104
Newport Beach, CA 92660                             Oklahoma City, OK 73120
Phone: (800) 664-1734                               Phone: (405) 607-8757
aa@andrewsthornton.com                              Fax: (405) 607-8749
                                                    dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
**M. PALMER LAMBERT**