UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                     MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                                                            SECTION "H" (5)

THIS DOCUMENT RELATES TO:
Elizabeth Kahn, Case No. 2:16-cv-17039

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## TO EXCLUDE TESTIMONY OF PROFESSOR L.J. WEI

Sanofi hired Professor L.J. Wei, a biostatistician, "to respond to the question of whether there is a reliable statistical evidence that Taxotere is associated with an increased risk of permanent or irreversible alopecia as compared to other cancer- treatment regimens"[1]. Sanofi also asked Professor Wei to "review and respond to the opinions presented by Dr. Madigan"[2].

Professor Wei, however, admitted that he never examined other drugs; rather, he looked only at Taxotere. He failed to provide Sanofi with what it hired him for: comparing Taxotere to other chemotherapy drugs. The Court should exclude Professor Wei as he never answered Sanofi's request.

Further, his general opinions about Taxotere, regarding general causation and adverse event follow-up time, are unreliable and unsupported. His opinion on the true rate of alopecia in all patients in the TAX 316 trial is based on a flawed methodology and woefully incomplete data. Professor Wei's opinions must be excluded as the jury would have to find the needle in the

---

[1] Ex. A, Wei Rep. 12/10/2018, paragraph 5.
[2] *Id.* at ¶ 6.

haystack of his opinions.[3] A jury should be presented with credible, supportable, reliable evidence to make determinations, and not have to sift for gold.

To compound all the issues with Professor Wei's opinions, he admits that he based his opinions on the work of another, Dr. James Wu, and that he never verified the accuracy of the Dr. Wu's work that supports his opinions.[4] To make matters worse, Professor Wei's original and subsequent reports and subsequent reports never disclosed that it was Dr. Wu who did the underlying calculations.

For these many reasons, Professor Wei's opinions do not pass the *Daubert* threshold and his entire testimony should be excluded.

## **LEGAL STANDARD**

A qualified expert's testimony is only admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party offering the expert testimony bears the burden of establishing each of these elements by a preponderance of the evidence. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998). The trial judge is obligated to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

---

[3] As will be addressed further in this brief, Professor Wei's initial report of 12/10/2018 does not address the follow-up of patients in the TAX 316 clinical study, and while his Appendix B to his reports lists a volume of final clinical trial data, he admits he has only seen some data on only 45 TAX 316 patients. Professor Wei's supplemental report only notes two additional documents on which he relied, neither of which included the documented follow up times for adverse events in the final TAX 316 clinical trial data. Despite not having or reviewing all patient data to review, Professor Wei opines directly on all patient follow-up as it relates to alopecia.

[4] This situation seems to be how Sanofi hires and prepares expert witnesses, as it did the same with the Dr. Kopreski re-analysis which he never verified.

First and foremost, the Court determines if an expert is qualified. Expert testimony is inadmissible when "the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 136 F.3d 935, 937 (5th Cir. 1999). Similarly, an expert's testimony should be excluded where it "go[es] beyond the scope of his expertise in giving his opinions." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)).

Even if a witness is qualified, his/her opinions may still be excluded if they are determined to be unreliable or irrelevant. This Court has routinely recognized Rule 702 as setting forth a two-part inquiry which requires the Court to determine (1) if the proffered expert testimony is reliable and (2) whether the expert's reasoning or methodology is relevant. *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015).

As to the first prong, if the testimony proffered is found to be based merely on subjective belief or unsupported speculation, it must be excluded as such conclusions lack valid underlying reasoning and/or methodology. *Id*. This "reliability analysis applies to all aspects of an expert's testimony," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), provide that "conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion," *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. Aug. 20, 1998) (Table Decision). Courts also consider "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation,

or whether they have developed their opinions expressly for purposes of testifying.'" *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II)).

As to the second prong, if the expert's reasoning or methodology does not fit the facts of the case, the testimony must be excluded as it will not assist the trier of fact. *Burst*, 120 F. Supp. 3d at 551. Expert testimony is inadmissible unless "the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case." *Tripkovich v. Ramirez*, No. 13-6389, 2015 WL 3849392, at * (E.D. La. 2015) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993)). Likewise, testimony should be stricken as irrelevant when there is "too great an analytical gap" between the data or facts considered and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, opinion evidence is inadmissible if it is only tethered to existing facts through the *ipse dixit* of the expert. *Id.*

## ARGUMENT

**A. Professor Wei should not be allowed to opine on drugs other than Taxotere, because he has not examined other drugs.**

Professor Wei has been working on the Taxotere litigation for years.[5] Professor Wei has issued one full report, two supplements and an addendum, all adopting his original report.[6] Sanofi requested that Professor Wei review and respond to Dr. Madigan's opinions on Taxotere. Furthermore, Professor Wei never investigated any drug but Taxotere, and he offers no

---

[5] Ex. A, Wei Rep. 12/10/2018. Professor Wei was retained a year before his first report. Ex. B, Wei Dep. 12/20/2019, 27:15-28:4.
[6] Ex. C, Wei Supp. Rep. 12/9/2019; Ex. D, Wei Addendum 12/19/2019; and Ex. E, Wei Second Supp. Rep. 4/17/2020. ("I stand by my Original Report, my First Supplemental Report and my Addendum as if fully set forth here in this Second Supplemental Report." *Id.*, at ¶ 1)

independent opinions of his own concerning any drug.[7]  Professor Wei said it best: "I cannot comment on other chemotherapy.  I'm here as a – commenting on Taxotere."[8]

If he failed to study other chemotherapy drugs as he admits, the Court should not allow him to testify as to risks associated with Taxotere versus other chemotherapy drugs.  His failure to study other chemotherapy drugs also excludes his testimony about other chemotherapy drugs and related (or allegedly unproven) risks.   In short, Sanofi cannot now use Professor Wei to discuss the possible alternative causes of Ms. Kahn's PCIA.  Sanofi cannot satisfy the second *Moore* factor when its own expert admits that he has never investigated any other drug other. *Moore*, 151 F.3d at 275-276.

Sanofi has offered no opinions through Professor Wei that any drug that could be fairly included within its fifteenth, nineteenth, and twenty-seventh asserted affirmative defense(s), because Professor Wei has not demonstrated a statistically significant increased risk of PCIA with any other drugs.  Professor Wei was never provided or reviewed anything that concludes, nor has he himself opined, that Adriamycin, doxorubicin/cyclophosphamide, Avastin, Tamoxifen, Taxol/paclitaxel, 5-FU (5-fluorouracil), epirubicin, methotrexate, Gemzar/gemcitabine or any chemotherapy drug can cause PCIA.[9]   In his reports, he does not attempt to address or investigate the statistical association or general causation of any chemotherapy drug, or tamoxifen, and PCIA.  In sum, he has reviewed *nothing* to opine that any chemotherapy-related drug Ms. Kahn took causes PCIA.

---

[7] Professor Wei admits that he offers no opinion that the following drugs cause PCIA: Adriamycin, cyclophosphamide, Avastin, Taxol/paclitaxel, 5-flurourocil, epirubacin, methotrexate or Gemzar. Ex. B, Wei Dep. 12/20/2019, 24:5-28:5.  And further Professor Wei admits that he has not reviewed anything that would provide a proper scientific basis to offer an opinion that these drugs, or Tamoxifen, causes PCIA. *Id.* at 31:22 – 36:3.
[8] Ex. B, Wei Dep. 12/20/2019, 85:2-3.
[9] Ex. F, Wei Dep. 5/5/2020, 31:22-32:4.

Sanofi attempts an end-run around *Daubert*, FRE 702, and FRCP 26(a)(2)(B) on general causation for these other drugs by trying to imply that they cause PCIA through a vague phrase of "cases have been reported." But like Sanofi's other experts Dr. Glaspy and Dr. Chang, [10] Professor Wei agrees that "cases have been reported" is not a statement of causation.[11] Sanofi has presented no expert witness report that offers an affirmative causation opinion with regards to other (non-Taxotere) drugs causing PCIA, just like it failed to do in the *Earnest* case.[12] As the Court is well aware, Sanofi carries the burden of proof on each of its affirmative defenses. But as the Court has said, choices have consequences; thus, Sanofi's experts, including Professor Wei, should not be allowed to directly or indirectly opine about the risks of other chemotherapy drugs, that other drugs cause PCIA, or to make such a hint or suggestion through the use of "case reports."

### B. Professor Wei's use of only selected portions of TAX316 patient data renders his analysis of TAX 316 and Dr. Madigan's opinions unreliable.

In his latest report supplement, Professor Wei offers opinions about the follow-up of patients in and the final results of TAX316 as they relate to persistent alopecia. In doing his "analysis," he – or rather Dr. Wu[13] – used limited data to calculate different percentages for women who have persistent alopecia than Sanofi represented in January 2013 to the European Medicines Agency (EMA), and from what Sanofi determined and listed in its final clinical study

---

[10] *Id.* See also, Ex. G, Glaspy Dep. 1/9/2020, 82:22-84:24 and Ex. H, Chang Dep. 5/19/2020, 162:9-163:9.

[11] Ex. B, Wei Dep. 12/20/2019, 85:16-86:1.

[12] Causation cannot be established merely by anecdotal evidence like "cases of permanent alopecia have been reported with"; no expert for Sanofi has undertaken a rigorous analysis of data from various sources, as has been done by Dr. Feigal, Dr. Kessler, and Dr. Madigan. This is what is required, but Sanofi does not attempt to do so with any of its experts, or for any non-Taxotere product. An opinion lacking any basis whatsoever also lacks a valid methodology and must be excluded. *Wehling v. Sandoz Pharm. Corp.*, No. 97-2212, 162 F.3d 1158, 1998WL54607, at *5 (4th Cir. Aug. 20, 1998).

[13] Ex. B, Wei Dep. 12/20/2019, 16:5-17:9; 29:18-30:16; 117:19-118:6; and 182:12-183:13. Dr. Wu is a statistician that works for a company owned by Professor Wei, Blue Null. Dr. Wu and other statisticians who work for Professor Wei/Blue Null perform all of Professor Wei's calculations Professor Wei uses to form his opinions. No statistician other than Professor Wei is identified in Professor Wei's report.

report for TAX316.[14]  Because he only examined 45 patients' data, and not all patients' data, Dr. Wei should not be allowed to testify about the prevalence of alopecia among all patients in the study.

In challenging Dr. Madigan's opinions Professor Wei's report contains a dot-plot graph of the allegedly correct alopecia follow-up times for a select group of patients in the TAX 316 study created by Dr. Wu.  While Professor Wei claims to have reviewed "the same dataset as Dr. Madigan," his deposition testimony reveals this is not true.  The dot-plot chart of Dr. Wu includes and looks at only 45 of the 1,491 patients in TAX 316.  In other words, the Wei-Wu "re-analysis" of the prevalence of PCIA at the end of the TAX 316 10-year follow up period was based on limited data on just 45 patients.[15]  Sanofi cannot argue that this limited analysis is applicable to the study as a whole as Professor Wei never looked at the protocols for TAX 316 and admits that he has not seen all of the clinical trial data.[16]  Nor has Dr. Wei done anything to properly conclude that his analysis of 45 patients can be extrapolated across the entire patient population.

Professor Wei claims he has "extensive experience in clinical trials," and he admits his work as a biostatistician must conform with study protocols.  But in his work here to render his opinions, he has failed to do that. [17]  In each of Professor Wei's reports he states "[a]ll materials reviewed and used for the preparation of my report are listed in Appendix B."[18]  The TAX 316 protocols are not included in any Appendix B to any of the three expert reports of Professor Wei

---

[14] Ex. I, Sanofi_04938203 and Ex. J, Sanofi_04289172 TAX 316 Final Clinical Study Report, Table 7.
[15] Ex. B, Wei Dep. 12/20/2019, 243:18-246:16.  While Professor Wei claims to have reviewed "the same data sets as Dr. Madigan," when asked about the final TAX 316 clinical trial datasets, Dr. Wei stated: ". . . we don't have trial data.  We have a report. . . [] We only have 45 patients, sir, the follow up time, not entire 744."
[16] *Id. at* 59:24-63:12
[17] *Id.*
[18] Ex. A, Wei Rep. 12/10/2018; Ex. C. Wei Supp. Rep. 12/9/2019; Ex. D., Wei Addendum 12/19/2019; Ex. E, Wei Second Supp. Rep. 4/17/2020.

that Sanofi has served in this MDL, and they are not described or referenced the protocols in any of his reports.[19]

The obvious reason Professor Wei *never* reviewed the TAX 316 protocols is because Sanofi never provided them to him. Although Professor Wei includes various production volume numbers that correlate to clinical trial data productions, his testimony is very clear that he has not received or reviewed the full, final TAX 316 clinical trial datasets that resulted from the TAX 316 clinical trial protocols. When asked if he reviewed the final TAX 316 clinical trial datasets, he testified "we don't have it." Pressed by Plaintiff's counsel on his statement that "[his] opinions are based upon information available," and what in fact was available to him, Professor Wei stated "[m]aybe you can ask Chris [McRae – Sanofi's counsel] about this." Simply put, Professor Wei relied on what Sanofi gave him to review and nothing more other than a quick google search.[20] Why that is the case is a question for Sanofi's counsel.

Professor Wei admits that he failed to do any independent research to investigate the statistical relationship between Taxotere and PCIA other than a google search.[21] Likewise, Professor Wei did not do any investigation into whether there was a statistical signal for PCIA and Taxotere or any other drug; he only offers criticisms and comments on the statistical work performed by Dr. Madigan.[22]

At his deposition, Dr. Wei was asked how his analysis of 45 patients' alopecia resolution compared with the full clinical trial data set (produced in SA Volume 170) and the TAX316

---

[19] Ex. K, listing of documents included in the cumulative Appendix B to Wei Second Supp. Rep. 4/17/2020; compare to Ex. L, Appendix B to Wei Rep. 12/10/2018. Ex.
[20] Ex. B, Wei Dep. 12/20/2019, 274:15-18; for further context, see 272:11-274.
[21] *Id.* at 56:24-57:10
[22] *Id.* at 116:9-117:23

protocols. He responded "I don't think you have that column say 'resolved.'"[23] This is flatly wrong, as the SA Volume 170 does, indeed, include whether a Sanofi clinical trial doctor marked a patient's alopecia as "resolved," data which Dr. Madigan used to form the bases of his opinions.[24] Since Professor Wei conceded he only had data on 45 patients and not the full 1,491 patients, he didn't review the same data set as Dr. Madigan.[25] If he didn't study the same material as Dr. Madigan, how can he intelligently review and respond to Dr. Madigan's opinions? This is yet another example of where Sanofi clearly has documents relevant and applicable to its expert's opinion, but chose to selectively provide documents to Professor Wei, and instruct him on their meaning, while preventing their statistician from reviewing relevant evidence. And based on his limited review, Professor Wei offers an opinion concerning proper, study-wide follow-up done by Dr. Madigan. Such a limited review of data for him to critique Dr. Madigan justifies exclusion of Professor Wei's opinions.

The fundamental problem is that Sanofi did not provide Professor Wei the needed documents to review to properly opine on patient follow-up for all of TAX 316's patients; it was selectively filtered by Sanofi and its counsel, who then instructed Professor Wei on what the documents meant.[26] How can this restrictive review form an admissible critqiue of Dr. Madigan? Professor Wei admitted as a biostatistician analyzing data for a clinical study, he must follow the protocol of the clinical trial.[27] Professor Wei did not review the protocols for TAX 316, and as a result he does not know if the analysis he did, or had Dr. Wu do, for his report conformed to the study protocols for TAX 316.

---

[23] *Id.* at 237:8-14.
[24] Ex. M, Madigan Rep. 10/20/2019, ¶61, Table 8; ¶64, Table 8 and 9. Dr. Madigan further provided the code he wrote to extract the data tables from the TAX 316 final clinical trial study data that are included in his report.
[25] Ex. B, Wei Dep. 12/20/2019, 244:12-246:16; *see also,* Ex. N, Madigan Rep. 11/2/2018, ¶¶47-53, and Appendix 6.
[26] Ex. B, Wei Dep. 12/20/2019, 258:5-259:1.
[27] *Id.* at 28:5-14

Professor Wei never knew the road map of TAX 316. Which is precisely why Professor Wei cannot credibly state at paragraph 21 of his report that the Case Report Form Completion Guidelines are "consistent with the follow-up of the TAX 316 Study."[28] The selective filtering of information for Dr. Wu's 45-patient re-analysis renders his methodology fatally flawed. This, of course, assumes that Dr. Wu performed a re-analysis, as no work of Dr. Wu or Professor Wei is set out in any of Professor Wei's reports.

Professor Wei's acknowledgment that protocols define how clinical trials are conducted, and how clinical trial data is to be analyzed, condemns his work, and that of Dr. Wu. Professor Wei opines the limited documents provided[29] is consistent with the follow-up in TAX 316, while at the same time conceding that he never reviewed the study protocols that set out how data would be collected and analyzed.[30] In attempting to offer this opinion, Professor Wei is not applying the same level of scientific integrity and rigor as Dr. Madigan does, or that Professor Wei does himself when serving as a statistician outside of this litigation. A study statistician follows protocols that define how data is collected and analyzed; but in this litigation, he ignores or is prevented from understanding the TAX 316 study protocol or Statistical Analysis Plan and offers opinions based upon the review of limited data on 3% of the study participants. (45 ÷ 1,491 = .03)

Professor Wei has done nothing to analyze the prevalence of alopecia among all of TAX316's patients. Why? Because Sanofi's counsel chose to not provide Professor Wei with the necessary data to do so. His methodology is fundamentally flawed, which is why Dr. Wei's

---

[28] Ex. C, Wei Supp. Rep. 12/9/2019, ¶ 21.
[29] The meaning of one of the documents he reviewed was explained to him by Sanofi's counsel.
[30] Ex. B, Wei Dep. 12/20/2019, 227:4-229:4.

litigation position contradicts what Sanofi currently represents about the prevalence of permanent alopecia in TAX 316 in the Taxotere Label

### C. Dr. Wei's failure to validate the work of Dr. Wu and others who did work for him renders his analysis unreliable.

Professor Wei not only failed to examine other drugs and failed to examine all TAX 316 patient data, but he failed to validate the work of others, work which forms the basis for his opinions. When Plaintiff's expert Dr. Kessler asked Dr. Madigan to perform a mathematical analysis for him to be included in his report, the result was disclosed in Dr. Madigan's most recent report. Sanofi then deposed Dr. Madigan over the separate analysis. By contrast, Professor Wei has used potentially five other statisticians to perform calculations for his report: Dr. James Wu, Professor Lu Tian, Dr. Brian Cladgett, Professor Lihui Zhao, and Dr. Ryan Sun, none of which were disclosed in any of his reports.[31] Professor Wei owns a consulting group, Blue Null, that retain consultants who perform the statistical analyses for him, and he claims their work as his own, and yet fails to verify it.[32]

The main analysis from another that Professor Wei failed to validate was Dr. Wu's dot-plot chart purporting to show alopecia duration in some TAX 316 patients. But Dr. Wu did not provide Professor Wei with the calculations or code utilized to produce the dot-plot, so Professor Wei was unable to validate it.[33] In fact, Professor Wei did not know what what methodology Dr. Wu used to create it, let alone what computer operating system or calculating environment Dr. Wu used to generate the dot-plot diagram that was inserted into Professor Wei's report.[34]

---

[31] Ex. B, Wei Dep. 12/20/2019, 16:5-19:6
[32] *Id.* at 16:5-19:6
[33] *Id.* at 183:1-9
[34] *Id.* at 183:10-21

The statistical analyses, like the dot-plot chart, that allegedly went into supporting the opinions expressed in Professor Wei's report (to the extent any analyses were done at all), were performed by previously undisclosed persons whose work has not been subject to discovery, and who have not been disclosed pursuant to FRCP 26(a)(2)(B), and whose work Professor Wei did not validate. This is simply inappropriate under *Daubert*; the case law recognizes that an expert's independent evaluation is particularly important when the information that underlies the expert opinion comes from a party or its counsel. See *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1047–51 (N.D. Ind. 2013) ("[W]hen an expert relies on information given to him by a party or counsel, she must independently verify that information before utilizing it in her calculations"); see also *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798–99 (N.D. Tex. 2013) ("Although in forming an independent opinion an expert can rely on information provided by a party's attorney, an expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him.").

To the extent Professor Wei's counting dots with his finger could be possibly considered statistical validation, Professor Wei does not even know what he is validating, because he does not know anything about how it was created by Dr. Wu. Not knowing how Dr. Wu created it, how can he determine if it is correct, especially given that the dot-plot conclusion contradicts what is included in Sanofi's Final Clinical Study Report, its current U.S. label, and what Sanofi represents worldwide about the number of patients with persisting alopecia at the end of the 10-year follow-up?[35] The only other thing Professor Wei had was a single document given to him by counsel. But that is not scientific, it is contrived and overly selective to the point of rendering Professor Wei's opinions useless to a jury.

---

[35] Ex. I, Sanofi_04938203 (". . . By the end of the follow-up period, 29 TAC patients (4.2%) still had *persistent alopecia*.") (emphasis added)

In sum, Professor Wei makes no illusions about his lack of validation of the work performed by other consultants from Blue Null, and he does not disclose which portions of his report or calculations were performed by persons other than himself.[36] This sort of report by committee does not comport with the strict requirements of FRCP 26(a)(2)(B), and demands that Professor Wei's opinions be excluded.

## CONCLUSION

Plaintiff specifically requests that the Court order the exclusion of all of Professor Wei's opinions for the foregoing reasons. Alternatively, Plaintiff requests that the Court preclude Dr. Wei from testifying about drugs other than Taxotere (as he did not examine any) and exclude his opinions about the follow-up time for alopecia in TAX 316, because no one (whether he himself or someone for him) analyzed data for all of TAX 316's patients and he himself failed to validate Dr. Wu's 45 patient analysis.

Dated: August 13, 2020                                Respectfully submitted,

*/s/ Christopher L. Coffin*                           */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                        Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.                      Andre Mura ((CA Bar # 298541) (on the brief)
1100 Poydras Street, Suite 2505                       GIBBS LAW GROUP LLP
New Orleans, Louisiana 70163                          6701 Center Drive West, Suite 1400
Phone: (504) 355-0086                                 Los Angeles, California 90045
Fax: (504) 355-0089                                   Telephone: 510-350-9700
ccoffin@pbclawfirm.com                                Facsimile: 510-350-9701
                                                      kbm@classlawgroup.com
*Plaintiffs' Co-Lead Counsel*
                                                      *Plaintiffs' Co-Lead Counsel*

---

[36] See Wei Reports, generally (Ex. A, Ex. C, Ex. D, Ex. E). Professor Wei does not identify any other persons' work in his reports.

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

| | |
|---|---|
| Alexander G. Dwyer<br>Kirkendall Dwyer LLP<br>440 Louisiana, Suite 1901<br>Houston, TX 77002<br>Phone: (713) 522-3529<br>Fax: (713) 495-2331<br>adwyer@kirkendalldwyer.com | Rand P. Nolen<br>Fleming, Nolen & Jez, L.L.P.<br>2800 Post Oak Blvd., Suite 4000<br>Houston, TX 77056<br>Phone: (713) 621-7944<br>Fax: (713) 621-9638<br>rand_nolen@fleming-law.com |
| Emily C. Jeffcott<br>Morgan & Morgan<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32505<br>Phone: (850) 316-9074<br>Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

/s/ Dawn M. Barrios
DAWN M. BARRIOS