**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**

**MDL NO. 2740**

**SECTION "H" (5)**

**THIS DOCUMENT RELATES TO:**

**Kahn v. Sanofi S.A., et al.,**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. LAURA PLUNKETT**

**INTRODUCTION**

Defendants moved to exclude certain opinions of Dr. Laura Plunkett ("Dr. Plunkett") regarding her proposed testimony on 1) the toxicity of Taxotere and Taxol, 2) Taxotere carrying an independent risk and substantial contributing factor of PCIA, 3) the differences in drug-induced alopecia and permanent chemotherapy-induced alopecia, and 4) all of her opinions based upon the "weight-of –the-evidence" methodology.

Dr. Plunkett is an experienced pharmacologist and toxicologist. She has performed countless risk and toxicity assessments over her career. Utilizing well-recognized tools commonly employed by pharmacologists and toxicologists, including a "weight-of-the-evidence" assessment, Dr. Plunkett evaluated and examined the available scientific information for the product at issue, Taxotere, which included information from multiple sources of documents produced during this litigation, studies, literature, and regulatory documents to reach her conclusions in this case.

Again, Defendants attack Dr. Plunkett's opinions based on disagreements with her ultimate conclusions which is not grounds for exclusion. Defendants take issue with Dr. Plunkett's methodology but Dr. Plunkett had sufficient scientific information to conduct her

pharmacology/toxicology risk assessment through scientifically valid and accepted methodologies to reach her opinions. Indeed, the Court, and based upon the same opinions and methodologies contained in her Expert Report, previously accepted Dr. Plunkett as an expert "in pharmacology, toxicology and risk assessment".[1] Accordingly, the Court should deny Defendants' Motion.

**LEGAL STANDARDS**

Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admission of expert testimony. Under this framework, the district court acts as a "gatekeeper" to ensure a proposed expert is qualified as such, and his or her testimony is both reliable and relevant. *Daubert*, 509 U.S. at 596-97; *Williams v. Manitowac Cranes*, L.L.C. 898 F.3d 607, 623 (5th Cir. 2018); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1352860 at *1 (E.D. La. Apr. 12, 2017) (Fallon, J.).

One can be qualified as an expert on the basis of "knowledge, skill, experience, training or education." Fed. R. Evid. 702. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452. And Sanofi fails to identify an expert in the areas of pharmacology or toxicology to demonstrate what exactly

The reliability inquiry focuses on the reasoning or methodology underlying the testimony. *See Daubert*, 509 U.S. at 592-93. This inquiry is not concerned with whether the expert's testimony is correct. *MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015). The focus is on whether the testimony is based upon reasoning and methodology that is "scientifically valid." *Daubert*, 509 U.S. at 595; *MM Steel L.P.*, 806 F.3d at 850-51. "The aim is

[1] Ex. 1, Trial Tr. 802:9-11, Sept. 18, 2019.

to exclude expert testimony based merely on subjective belief or unsupported speculation." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (*citing Daubert*, 509 U.S. at 590). The test of reliability is "flexible." *Daubert*, 509 U.S. at 594. "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kuhmo Tire Co.* 526 U.S. at 142 (emphasis in original). "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 253.

The Court's relevancy determination focuses on whether the proposed testimony "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. 592. To be relevant, "the expert's 'reasoning or methodology [must] be properly applied to the facts at issue.'" *Puga v. RCX Solutions, Inc.*, 914 F.3d 976, 985 (5th Cir. 2019) (quoting *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). "When performing this analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga*, 914 F.3d at 985.

The gatekeeper role, while essential, "is not intended to supplant the adversary system or the role of the jury; rather, vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[T]he court's role … is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role…." *Puga*, 914 F.3d at 985. Under this system, "'[r]ejection of expert testimony is the exception rather than the rule.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee notes).

## ARGUMENTS

### I. DR. PLUNKETT'S "MORE TOXIC" THAN TAXOL TESTIMONY FITS THE FACTS OF THIS CASE AND SHOULD NOT BE EXCLUDED

Dr. Plunkett's opinion that Taxotere is more toxic than Taxol is based on sufficient facts and data and the product of a scientifically valid reasoning and methodology. She reached this opinion as part of her overall analysis, as more fully set forth herein, using the standard methods she applies in all of her work as a pharmacologist and toxicologist in both litigation and non-litigation contexts. Among the materials Dr. Plunkett reviewed in her analysis included Defendants' own clinical studies, including TAX 311 that indicated an increased general toxicity for Taxotere over Taxol.[2] While Sanofi appears to criticize Dr. Plunkett again for not isolating any toxicities beyond permanent alopecia in her analysis, Dr. Plunkett made clear in her testimony that her analysis took them all into account and she looked across the toxicity profile.[3] Dr. Plunkett's "more toxic" opinion is reliable and the product of a scientifically valid reasoning and methodology. She reached this conclusion as part of pharmacological and toxicological analysis of the data available as outlined in her report. Defendants may disagree with her conclusion, but this simply another area for cross examination, not exclusion.

Moreover, this opinion is relevant and "fits" the facts of this case. Dr. Plunkett's opinion is not a generalized comparison without a methodology as Defendants contend. Permanent hair loss is a toxicity and was specifically focused upon in Dr. Plunkett's Expert Report using the "weight of the evidence" methodology which has already been accepted by this Court.[4] The opinion is a comparison of a wealth of scientific literature and Defendants' own case studies that all reach the conclusion that Taxotere is more toxic than Taxol when looking at hair loss adverse

---

[2] Defs' Ex. B, Plunkett Report at 21-22 (¶ 47), March 23, 2020.
[3] Ex. 2, Plunkett Dep. 138:12-140:20, Dec. 10, 2018.
[4] Rec. Doc. 8097 at 11-19 (Order and Reasons, Sanofi's Mtn Exclude Expert Testimony of Dr. Laura Plunkett).

events. For example, Dr. Plunkett supports her opinion that Taxotere is more toxic than Taxol with Defendants' own study report from TAX311.[5] Indeed, Defendants' own expert, Dr. John Glaspy, even addressed overall toxicities of Taxotere and Taxol to the facts of this case and agreed that there was a ten-fold increase in toxicity of Taxotere over Taxol.[6] All of the sources used by Dr. Plunkett including Defendants' own witnesses' testimony, support this opinion that there is a link between permanent hair loss and Taxotere and not just overall toxicity.[7]

And, as explained previously,[8] Taxotere and Taxol are similar drugs that many within the medical community consider to be interchangeable products.[9] If Taxotere had an increased risk of permanent alopecia over Taxol, a critical fact that doctors and patients would want to know is how it relates to Taxol on the issue of overall toxicity. If Taxotere had a greater risk of permanent alopecia but Taxol was otherwise more toxic, doctors and patients may still elect to use Taxotere. However, if Taxotere has a greater risk of permanent alopecia and is also more toxic generally, then obviously the risk-benefit analysis would change for both the doctor and the patient. Accordingly, Dr. Plunkett's opinion regarding the overall toxicity of Taxotere is relevant and should not be excluded in *Kahn*. This is particularly so where Dr. Glaspy's testimony supports the demonstrated overall toxicity profile of a drug is of critical importance in testing its usage in an adjuvant setting.

---

[5] Defs' Ex. B, Plunkett Report at 29 (¶ 58), March 23, 2020. See also Ex. 3 Plunkett Dep. 105:3-106:16, April 27, 2020.

[6] Ex. 4, Glaspy Dep. 102:15-104:8, May 13, 2020; Ex. 5, Glaspy Dep. 45:6-46:6, January 9, 2020 ". . . you look for signals in a place like metastatic breast cancer. . ."

[7] Defs' Ex. B, Plunkett Report at 16-24 and 26-30.

[8] Rec Doc. 7465 (Pl Opp. To Sanofi's Motions to Exclude Expert Testimony of Dr. Plunkett). For purposes of the record, Plaintiffs incorporates its prior opposition in support thereof as if fully set forth here.

[9] Ex. 6, Kardinal Dep. 69:2-70:19 and 74:7-17, January 17, 2018: "they're very similar but they're slightly different toxicity" and "I was mostly comparing taxanes."

## II. DR. PLUNKETT DOES NOT OFFER "TWO NEW CAUSATION-BASED CONCLUSIONS"

Contrary to Defendants' assertions, Dr. Plunkett has not offered two new causation-based conclusions to her report. First, Dr. Plunkett's statement that Taxotere carries an independent risk of PCIA and that the risk is not rare are given from a toxicology standpoint which demonstrates toxicity and independent risk. Second, Dr. Plunkett's statement that Taxotere has been a substantial contributing factor is not causation-based or an impermissible legal conclusion.

### A. DR. PLUNKETT HAS SHOWN HER WORK AND SHOULD AGAIN BE ALLOWED TO PROVIDE CAUSATION OPINIONS

Defendants again are asserting implications that are just not there. Dr. Plunkett is not offering causation opinions and has only ever asserted that her opinions are limited to her experience as a toxicologist. Those statements are not medical causation opinions; these statements are derived from a review of the available data that indicate that Taxotere has been associated with irreversible hair loss (a particular and identifiable toxicity) to a greater extent that other chemotherapeutic drugs and is not a rare event based on evidence from controlled clinical trial data, epidemiological data and individual case reports.[10] As such, a two-part test using a methodology like the Bradford-Hill criteria was not and is not necessary for Dr. Plunkett to offer her toxicological opinions. She is *not* offering causation opinions. Also, if anyone is engaging in "verbal semantics" its Defendants; Dr. Plunkett has never testified that she would only use the phrase "can cause" if she is providing a causation opinion.[11] Dr. Plunkett merely stated that "If I'm doing a full causation analysis, I will use 'caused' or 'can cause'." Nothing in science or the law limits the use of that phrase to just causation opinions. Dr. Plunkett uses the phrase in describing her toxicology opinion.

[10] Defs' Ex. B, Plunkett Report at 15-18, March 23, 2020.
[11] Rec. Doc. 10918-1 at 9.

Further, Dr. Plunkett was not excluded in *Byrd* on similar grounds. The facts and evidence of that case are entirely different from this case, and how another court analyzed her opinions under different circumstances is not a consideration under *Daubert*.[12] Unlike *Byrd*, Dr. Plunkett's opinions here do not include general causation opinions; her current opinions are limited to the pharmacology and toxicology of Taxotere and Taxol, and are based upon, but not limited to, scientific literature, FDA documents, testimony from individuals involved in the litigation, and Defendants' employees, former employees and documents produced in this litigation.[13] This Court previously accepted Dr. Plunkett as an expert and allowed the same opinions in *Earnest* trial, and the Court should do the same in *Kahn,* for the same and additional reasons set out in its previous ruling.

**B. DR. PLUNKETT'S "SUBSTANTIAL CONTRIBUTING FACTOR" STATEMENT IS NOT AN IMPROPER LEGAL CONCLUSION**

At no point does Dr. Plunkett's statement invade the province of a jury. Dr. Plunkett explained that when she uses the words "substantial contributing factor" that it is in relation to describing combination therapy and identifying something in that therapy that has an independent risk to state that factor as contributing to that particular experience. Dr. Plunkett specifically stated that "I'm talking about it as a toxicologist. In other words, when something can be seen independently, I believe that that independent risk based on, then, the experience in the published literature about the fact that Taxotere was one of the more commonly reported drugs…commonly reported drugs that's linked to that."[14] Dr. Plunkett has clearly defined her definition of "substantial

---

[12] *Byrd v. Janssen Pharm., Inc.*, 333 F. Supp. 3d 111, 127-130 (N.D.N.Y. 2018), *appeal withdrawn,* No. 18-3137, 2019 WL 1791403 (2d Cir. Jan. 24, 2019).
[13] Defs' Ex. B, Plunkett Report at pg. 3, March 23, 2020.
[14] Ex. 3, Plunkett Dep. at 127:17-128:13, April 27, 2020.

contributing factor". Defendants are manifesting confusion that doesn't exist and this Court should not exclude this testimony.

## III. Dr. Plunkett's Opinions Include Medical Literature That Distinguishes Between DIA and PCIA and Is Admissible

It is true that Dr. Plunkett expanded her discussion of the differences between DIA and PCIA in her most recent Expert Report, but explaining the distinction is necessary and appropriate.[15] That discussion includes a definition of PCIA that is taken from a review of the scientific literature and the descriptions given for PCIA in that material.[16] Dr. Plunkett uses the definitions the authors of the literature use; she does not create definitions. As such, Dr. Plunkett is not offering any expert opinion on what it takes to meet a diagnosis of PCIA, yet the discussion of how published articles define PCIA is permissible and within her expertise. More importantly, this Court has recognized Dr. Plunkett's ability to rely upon this literature, and previously rejected Defendants' arguments in the context of Dr. Plunkett's risk opinions concerning toxicities like DIA and PCIA. The assessment of toxicities is within Dr. Plunkett's expertise.

First, it is within Dr. Plunkett's expertise in pharmacology and toxicology to discuss toxicities like DIA and PCIA, and the differences between the two conditions, which are separate and distinct toxicities.[17] Dr. Plunkett is not providing a causation opinion on the parameters of two medical conditions and so it is not necessary for her to have conducted a study, written or published literature on the forms of alopecia. Dr. Plunkett is, however, summarizing the distinctions made in the scientific literature to describe these different conditions/toxicities, which is within her purview.[18]

---

[15] "DIA" is an acronym for "drug-induced alopecia" and "PCIA" is an acronym for "permanent-chemotherapy-induced alopecia".
[16] Defs' Ex. B, Plunkett Report at 56, Appendix B (Reliance Materials) and materials cited in her report.
[17] Defs' Ex. B, Plunkett Report at 14, March 23, 2020.
[18] Defs' Ex. B, Plunkett Report at 14-15, March 23, 2020.

Second, Dr. Plunkett's limited discussion of DIA and PCIA is helpful to the trier of fact. The definitions given are not Dr. Plunkett's definitions and are not in any way vague. Dr. Plunkett specifically testified that:

> A. I have opined before and I talk about this in my report, that there is a difference between alopecia, versus persistent or permanent alopecia.
>
> Q. What you call drug-induced alopecia, versus irreversible alopecia. Is that correct?
>
> A. Yes, and I spent some time in my report going through that. And you and I have had the discussion, I believe at a deposition, where I told you that I do believe that just saying the word "alopecia" is not descriptive of permanent or irreversible alopecia.[19]
>
> Q. And so if someone took an anthracycline-based regiment, there is a chance that they're going to lose their hair during chemotherapy. Would you agree with that?
>
> A. Again, when you're talking about the initial drug-induced alopecia? Yes that's true.[20]

Moreover, Dr. Plunkett has testified that she can distinguish between DIA and PCIA:

> Q. Can you define for me "drug-induced" alopecia?
>
> A. I'm not a clinician/physician that diagnoses. However, certainly being a toxicologist and a pharmacologist, I see drug-induced alopecia as hair loss; whereas, the issue of the persistent alopecia, irreversibility, is a different injury; it's the inability to regrow. So to me, as a toxicologist, they are two different things.
>
> Q. Would you define for me permanent chemotherapy-induced alopecia?
>
> A. I defined it in my report as being reported by clinicians as alopecia that is something that seen more than six months after treatment with the drug. I'm not a clinician, I'm not redefining it. I'm using it the way that the clinical literature describe it and how I read that as a pharmacologist and toxicologist.[21]

[19] Ex. 3, Plunkett Dep. 35:16-36:2, April 27, 2020.
[20] Ex. 3, Plunkett Dep. 95:23-96:4, April 27, 2020.
[21] Ex. 3, Plunkett Dep. 110:20-112:8, April 27, 2020.

These descriptions are grounded in science, distinguishable based upon that science and are helpful to understanding the toxicities at issue in this case. It would be helpful for a jury to understand that there are experts in the field of toxicology that look at how drugs are associated with particular events. The Reference Manual on Scientific Evidence describes toxicology as "identifying and understanding the adverse effects of external chemical and physical agents on biological systems."[22] This is precisely what Dr. Plunkett's opinions address.

Further, and as discussed above, the difference between DIA and PCIA are not "new opinions." Those are terms used throughout the scientific and medical literature to discuss medical conditions/toxicities associated with hair regrowth, or the lack of regrowth. Defendants' attempts to characterize Dr. Plunkett's use of these terms as "disease parameters" and her "opinions" is misleading. As stated herein, while Defendants have an issue with Dr. Plunkett's conclusions that is not grounds for admissibility. The discussion of the terms is clearly relevant to the issue of permanent hair loss and should not be excluded.

## IV. DR. PLUNKETT RELIABLY APPLIED THE WEIGHT-OF-THE-EVIDENCE" METHODOLOGY

Dr. Plunkett's opinions are based on sufficient facts and data and the product of a scientifically valid reasoning and methodology. To reach her opinions, Dr. Plunkett used the standard methods she applies in her work as a pharmacologist and toxicologist in litigation and non-litigation contexts. This involved using her training and experience to review, examine, and evaluate studies, scientific literature relating to the pharmacology and toxicology of taxanes (Taxotere and Taxol), product labeling for Taxotere and Taxol, publicly available documents related to Taxotere and Taxol's approval by the FDA, regulatory submissions that describe the pharmacology and toxicology of Taxotere, and documents produced during this litigation.

---

[22] Reference Manual on Scientific Evidence, 3rd Ed. (2011), Reference Guide on Toxicology, 633, *et seq.*

The particular method that Dr. Plunkett used, of which Defendants complain, is a "weight-of-the evidence" assessment.[23] The weight-of-the-evidence analysis performed by Dr. Plunkett is described in the *Reference Manual on Scientific Evidence* as a tool used by experts in the process of evaluating a body of data or studies.[24]

As outlined in her report, Dr. Plunkett reviewed all pertinent data that was available and conducted her assessment in the same fashion she would in conducting her work as a pharmacologist and toxicologist for companies outside the litigation context.[25] The following is simply a sampling of the wide array of facts, data, and scientific literature she considered in conducting her analysis:

- That the first report of docetaxel-induced irreversible hair loss appeared in the scientific literature as early as 2001, when a paper authored by an investigator for Sanofi, Dr. Nabholtz, discussed a Phase II clinical study that placed the percentage of docetaxel patients with irreversible alopecia at 7.4% [26]
- That during a presentation during a 2006 Breast Cancer Symposium, Dr. S.M. Sedlacek reported that alopecia associated with docetaxel therapy as an adjuvant to doxorubicin/cyclophosphamide chemotherapy was irreversible in some patients—the rate reported for the three different treatment groups in his study were 6.3% permanent persistent alopecia in women administered doxorubicin plus Taxotere, 0% in women administered doxorubicin plus Taxol, and 0% in women administered doxorubicin without a taxane;[27]
- That at least two clinical studies performed by Sanofi with Taxotere provided important information concerning irreversible alopecia, TAX 316 and GEICAM, wherein a group of patients received Taxotere and a group of patients did not:[28]
    - TAX 316 was a phase III clinical study of Taxotere in node positive breast cancer patients. The study involved a comparison of two groups—(i) the TAC group, where Taxotere was used an adjuvant in combination with doxorubicin and cyclophosphamide, and (ii) the FAC group, where patients received 5-fluorouracil in combination with doxorubicin and cyclophosphamide, and the data of the study indicated that Taxotere-treated

[23] Defs' Ex. B, Plunkett Report at 3-4 (¶¶ 10-11).
[24] Defs' Ex. B, Plunkett Report at 4 (¶ 11).
[25] Defs' Ex. B, Plunkett Report at 3 (¶ 10).
[26] Defs' Ex. B, Plunkett Report at 13-14 (¶ 31).
[27] Defs' Ex. B, Plunkett Report at 14 (¶ 32).
[28] Defs' Ex. B, Plunkett Report at 19-20 (¶¶ 45-46).

patients were nearly twice as likely to experience irreversible alopecia (3.9% TAC group v. 2.2 % FAC group);

- GEICAM was a similar phase III clinical study, but the patients were node negative breast cancer patients. The rate of irreversible alopecia was originally reported as 6.1%[29] in the TAC group, which Dr. Plunkett admits is not necessarily accurate given serious problems with the follow-up of patients in this study, but it does provide additional important evidence when combined with TAX 316 that irreversible alopecia is not a rare event with Taxotere use in women;

- That Sanofi themselves found based on their review that "[t]he cumulative weighted evidence is sufficient to support a causal association between Docetaxel and Permanent/Irreversible alopecia in patients who receive docetaxel";[30]
- That the 2014 Company Core Data Sheet for Taxotere identified the most common adverse event that persisted into a follow-up period with a median of over 10 years was alopecia;[31]
- That in 2015, the FDA found that it and Sanofi "concur that the available evidence supports a potential causal association between docetaxel and permanent alopecia and that the label should be updated to alert clinicians and patients of this responsibility;[32]
- That the reports in the medical literature linking Taxotere to permanent alopecia have been more frequent than Taxol, and that the scientific literature supports that it is high dose use of docetaxel that is more likely associated with irreversible alopecia.[33]

Using her knowledge, experience and training as a pharmacologist and toxicologist, Dr. Plunkett was able to review, examine and evaluate this information (along with all of the other information she identified in her report), assess and weigh-the-evidence and make her conclusions. This is the same standard technique she uses in both her litigation and non-litigation work and, as indicated above, is a recognized method of risk assessment in the fields of pharmacology and toxicology.

[29] Dr. Plunkett identifies this figure as 6.7% in her report but explained it should have read 6.1% in her deposition. (Ex. 2, Plunkett Dep. 148:8-17, Dec. 10, 2018).
[30] Defs' Ex. B, Plunkett Report at 18 (¶ 40).
[31] Defs' Ex. B, Plunkett Report at 18 (¶ 42).
[32] Defs' Ex. B, Plunkett Report at 18 (¶ 41).
[33] Defs' Ex. B, Plunkett Report at 23 (¶ 50).

While Sanofi attacks Dr. Plunkett's methodology, Sanofi's contentions are nothing more than disagreements with her conclusions. Dr. Plunkett has "shown her work." Dr. Plunkett's Expert Report describes in detail, as summarized herein, the process by which she gathered the evidence in this case. She reviewed all of the scientific literature available on permanent hair loss and the toxicities of Taxotere in relation to same. Dr. Plunkett has also explained how the "pieces of evidence", the scientific literature, the case reports and case studies and Defendants' own witness testimony and confidential documents all considered together lead her to her conclusions in this case. There is no evidence that Dr. Plunkett has substituted her personal judgment for sound toxicology opinions. There is, however, evidence of Dr. Plunkett explaining the weight of the evidence and why it is scientifically valid on multiples occasions:

A. So often with many of the other things that you may look at in this body of literature, you have to consider, obviously, whether or not the doctors or the individuals describing the cases are looking at the experience of a patient, and based on what they took. Which is why I find some of those case reports informative, where the physician in the paper actually may have a combination of drugs, but indeed, has attributed causation to docetaxel in some of those.[34]

A. Which is why the clinical trial was so important. That is correct. The clinical trial

Q. When you say "the clinical trial," are you referring to TAX 316?

A. Yes, in the clinical trial, that is where – I think you and I discussed it before -- that number would indicate that this particular adverse event, or this particular toxicity would not be rare, based upon the results of their own clinical study.[35]

A. I have looked across all of that information and for Taxotere, I have the clinical data, which is an important – as I've been saying over and over, is a really important piece of the puzzle that allows you to say something about comparative risk.[36]

---

[34] Ex. 3, Plunkett Dep. 50:5-15, April 27, 2020.
[35] Ex. 3, Plunkett Dep. 59:21-60:5, April 27, 2020.
[36] Ex. 3, Plunkett Dep. 131:18-22, April 27, 2020.

Q. Dr. Plunkett, is there a hierarchy of evidence?

A. So certainly as a pharmacologist and a toxicologist, yes, there is certain information – not so much a hierarchy, but that's more relevant than others and that's – what I've applied in my analysis. So that evidence would be looking for human data in particular that was discussing the specific end point of concern for my analysis. So looking at persistent or irreversible alopecia, and what data was available in humans to be able to make that comparison.[37]

A. In other words, I'm not just pulling this out of the air. I have clinical studies, where they report the existence of or the or so many percentage of patients that are reported to have persistent alopecia. Or I have an analysis from a case report, where a qualified physician has gone through and described his experience with a patient. Or I have the pharmacokinetic data, where I see a study that was either described in the literature or in the labeling for the drug, for example.[38]

Q. Did you somehow put them in some order as to what was the most important to your opinions to the least important?

A. To some extent, yes. I do do that in any of my weight of the evidence analysis. So for example, if I'm looking at something like this, permanent alopecia, which is something that I wouldn't be able to see that specific endpoint demonstrated in animal studies – instead I would be replying – I would be looking for human data and human experience, absolutely. That information would be of importance to forming that opinion with permanent alopecia.[39]

Dr. Plunkett used accepted and recognized principles of pharmacology and toxicology to make reasoned determinations in this case. Dr. Plunkett did exactly what pharmacologists and toxicologists do in these types of real-world risk analyses: she examined and evaluated the scientific literature and data that was available to her and was able to reach a conclusion to a reasonable degree of scientific certainty. Dr. Plunkett is not regurgitating the conclusions of another—she reached her own conclusions based on her evaluation of the scientific information

[37] Ex. 3, Plunkett Dep. 136:18-137:15, April 27, 2020.
[38] Ex. 3, Plunkett Dep. 140:13-24, April 27, 2020.
[39] Ex. 2, Plunkett Dep. 196:3-23, Dec. 10, 2018.

and data available. As Judge Stengel opined regarding similar opinions offered by Dr. Plunkett in *In re: Tylenol (Aceminophen) Marketing, Sales Practices, and Prods. Liab. Litig.*, "I see nothing unreliable about Dr. Plunkett's explanations. . . She is a toxicologist who specializes in studying how the body processes drugs. She has reviewed the medical literature and interpreted it based on her knowledge of toxicity, pharmacology, and pharmacokinetics." 2016 WL 4039329 (E.D. Pa. July 28, 2016) (Stengel, J.) This is precisely what Dr. Plunkett has done in the present case.

Moreover, this is the same methodology used to support her opinions in *Earnest* and Dr. Plunkett should again be allowed to provide all her opinions in *Kahn*. Sanofi offers no new line of attack on the opinions offered by Dr. Plunkett. Instead, Sanofi attempts to reframe basic scientific terminology as "new opinions" of Dr Plunkett's, and then seek to exclude her testimony as outside of her expertise. The Court should see Sanofi's current motion for what it is: a retread of its former motion, with the added twist of an irrelevant semantic rebranding attempt.

**CONCLUSION**

For the reasons set forth above, the Court should deny defendants' Motion to Exclude Expert Testimony of Dr. Laura Plunkett. Dr. Plunkett is qualified to render the opinions at issue, the opinions are based upon sufficient data and facts, they are the product of a scientifically valid reasoning and methodology, and they will assist the jury in understanding the facts at issue in this case.

Dated: September 14, 2020

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
Andre Mura ((CA Bar # 298541) (on the brief)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Genevieve Zimmerman
Meshbesher & Spence Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS