# EXHIBIT 3

Page 1

1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2                    CASE NO. 2:16-cv-17039

3

4      ELIZABETH KAHN,                    ) VIDEOCONFERENCE
                                         ) VIDEOTAPED
5                                         ) DEPOSITION OF:
                    Plaintiff,           )
6                                         )
           v.                            ) LAURA M.
7                                         ) PLUNKETT,
                                         ) Ph.D., DABT
8                                         )
      SANOFI S.A., SANOFI-AVENTIS         )
9      U.S. L.L.C., SANOFI US SERVICE,    )
      INC., and AVENTIS-PHARMA S.A.,      )
10                                        )
                    Defendants.          )
11     _____    )

12

13                    TRANSCRIPT of the stenographic notes of

14     the proceedings in the above-entitled matter, as

15     taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,

16     held via Zoom videoconference from multiple

17     locations, with the witness located at 13923 Carriage

18     Walk Lane, Houston, Texas, on Monday, April 27, 2020,

19     commencing at 2:59 p.m.

20

21

22

23

24

25

1    the context of the label, but you and I have

2    discussed that in the context of other information

3    and studies.  So I would be prepared to talk about

4    that word, in the context of some of the other

5    studies you and I have been through.

6         Q.    Well, I guess I want to -- I understand

7    that, Dr. Plunkett.  We can go there if we need to.

8    But just as it relates to what is in the label, are

9    you going --

10        A.    I'm going -- I'm sorry.

11        Q.    Are you going to give testimony that

12   "alopecia," as used in the Adverse Reaction section

13   of the Taxotere label, means reversible alopecia?

14        A.    I do not believe I would be asked that,

15   to do that, because I'm not the person to talk about

16   the specifics of the label.  However, I have opined

17   before, and I talk about this in my report, that

18   there is a difference between alopecia, versus

19   persistent or permanent alopecia.

20        Q.    What you call drug-induced alopecia,

21   versus irreversible alopecia.  Is that correct?

22        A.    Yes, and I spent some time in my report

23   going through that.  And you and I have had the

24   discussion, I believe at a deposition, where I told

25   you that I do believe that just saying the word

1       "alopecia" is not descriptive of permanent or

2       irreversible alopecia.

3              Q.     Okay.  But my question is:  Do you

4       intend to give testimony, as it relates to the word

5       "alopecia" as used in the Taxotere label, as to

6       whether that means reversible or temporary?

7              A.     I have not been asked to give labeling

8       opinions, so no; I don't think I would be prepared

9       to do that, or even asked to do that.

10             Q.     Okay.  And then just one other thing,

11      so we're on the same page, Dr. Plunkett.  If you

12      look under "Indications," to the left-hand side,

13      where it says "Indications and Usage"?

14             A.     Yes, I see that.

15             Q.     Okay.  And then the area that we're

16      interested in, correct, is the breast cancer.

17      Correct?

18             A.     Yes, that's my understanding.  These

19      cases are all about breast cancer.

20             Q.     All right.  And so for breast cancer,

21      the indication is "Single agent for locally advanced

22      or metastatic BC after chemotherapy failure."

23                    Do you see that?

24             A.     That's the first one, yes.

25             Q.     And your understanding is that would be

1    one variable being different, the presence of

2    Taxotere or the presence of 5FU.  So you have a --

3    you're able to, in that study, look at the effect of

4    one variable at a time.

5              So, often, with many of the other

6    things that you may look at in this body of

7    literature, you have to consider, obviously, whether

8    or not the doctors or the individuals describing the

9    cases are looking at the experience of a patient,

10   and based on what they took.

11             Which is why I find some of those case

12   reports informative, where the physician in the

13   paper actually may have a combination of drugs, but

14   indeed, has attributed causation to docetaxel in

15   some of those --

16        Q.    So for this article right here -- at

17   least the way I'm understanding it is -- you're

18   saying you don't know whether the paclitaxel

19   patients were on a SERM or Tamoxifen; or the

20   docetaxel patients were on anastrozole or letrozole;

21   and those confounding factors add additional

22   variables?

23             MR. MICELI:  Object to the form.

24        A.    Well, I don't know if that's what you

25   and I exactly said.  I think what I was pointing to

1    statement here, no.  I don't see that in this

2    section.

3            Q.     Okay.  And Dr. Plunkett, under the

4    World Health Organization guidelines that you refer

5    to in paragraph 34 of your report, what would

6    30 percent represent?

7                   MR. MICELI:  Excuse me.  Object to the

8    form.  I'm trying to -- you said 34 of her report?

9                   MR. RATLIFF:  Paragraph 34 of her

10   report.

11           A.     This 30 percent would represent

12   nothing; because this is not an incidence rate, in

13   this paper.  Whereas the WHO is talking about

14   incidence rate; where you have both a denominator

15   and a numerator that you have specifically

16   quantified.

17           Q.     So is your position that the only way

18   the World Health Organization guidelines that you

19   refer to are applicable, is if you have a numerator

20   and a denominator?

21           A.     Which is why the clinical trial was so

22   important.  That is correct.  The clinical trial --

23           Q.     When you say "the clinical trial," are

24   you referring to TAX 316?

25           A.     Yes, in the clinical trial, that's

Page 60

1    where -- I think you and I discussed it before --

2    that number would indicate that this particular

3    adverse -- this particular adverse event, or this

4    particular type of toxicity would not be rare, based

5    upon the results of their own clinical study.

6           Q.    Okay.  And so in TAX 316, it's your

7    opinion that there were three -- well, strike that.

8                 In TAX 316, 3.9 percent of the patients

9    in the Taxotere, Adriamycin, and cyclophosphamide

10   regimen were reported with ongoing alopecia.

11                Does that sound right?

12          A.    I think that's correct, but if you want

13   me to clarify exactly that percent, let me look real

14   quick.  I believe that's true.

15          Q.    It's in paragraph 56 of your report.

16          A.    Yes, that's correct.

17          Q.    Okay.  And under the WHO guidelines

18   that you employ, 3.9 percent would make that a

19   common adverse event.  Correct?

20          A.    Yes, that's correct.

21          Q.    Okay.  And with the FAC regimen, the

22   non-Taxotere regimen, 5FU, Adriamycin and

23   cyclophosphamide in combination, the number was

24   2.2 percent of the patients who are listed as having

25   ongoing alopecia in TAX 316.  Is that correct?

1      consistent with the discussion that I had with you

2      in my last deposition.

3            Q.      And you also agree that it's not always

4      going to be the case that it's reversible.

5                   MR. MICELI:  Object to the form.

6            A.      Are you asking me for Taxol, or for

7      paclitaxel -- I'm sorry, are you asking me for

8      Taxol, or for Taxotere, or for taxanes generally?

9            Q.      Well, I'm asking you with a Taxol-based

10     regimen?

11           A.      With Taxol, there are indications that

12     it may not always be reversible, but it doesn't

13     carry the same amount of information to show that

14     it's something that would be seen repeatedly in

15     patients, because you don't have that clinical trial

16     data that allows you to look at those differences

17     between the two.

18                  So that's why I have not formed the

19     same opinions -- or that's why I have been very

20     careful, when I describe my opinions, to talk about

21     the basis of -- the basis being in more than just a

22     case report, for example.

23           Q.      Gotcha.  Okay.  And so if someone took

24     an anthracycline-based regimen, there is a chance

25     that they're going to lose their hair during

Page 96

1    chemotherapy.  Would you agree with that?

2         A.    Again, when you're talking about the

3    initial drug -- drug-induced alopecia?  Yes, that's

4    true.

5         Q.    And you'd also agree that typically,

6    that alopecia is going to be reversible.  Correct?

7              MR. MICELI:  Object to the form.

8         A.    I haven't done a separate assessment of

9    anthracycline.  But on the information I have seen,

10   I would -- it appears to be different, as compared

11   to Taxotere.  So yes, typically it appears to be --

12   to be reversible.

13        Q.    But you'd also agree that might not

14   always be the case.  It might not come back with an

15   anthracycline-based regimen.  Correct?

16             MR. MICELI:  Object to the form.

17        A.    No, I don't think that's what I said.

18   I think what I've said -- what we discussed is that

19   the inability to regrow is a different -- different

20   consideration than the hair loss itself.

21        Q.    I'm just asking you, Dr. Plunkett, that

22   if someone takes an anthracycline regimen, although

23   their hair typically will grow back, you'll agree

24   that is not always the case?

25             MR. MICELI:  Object to the form.

Page 105

1                    THE WITNESS:  29.

2                    MR. MICELI:  29, okay.

3          Q.     And on paragraph 58, this includes

4     starting with the sentence that says, "Sanofi's

5     expert, Dr. John Glaspy."

6                    Do you see that, Dr. Plunkett?

7          A.     I do.

8          Q.     Okay.  From there to the end of that

9     paragraph, that is all new to your report, from your

10    previous report.  Do you agree with that?

11         A.     Are you asking me from the 2019 report?

12         Q.     Correct.

13         A.     Yes, that's true.

14         Q.     Okay.  Why did you add that?

15         A.     I added that because I read through

16    Dr. Glaspy's report in more detail, and I felt that

17    this was something that was worth pointing out, when

18    you look at this issue of how to compare the

19    toxicity.

20         Q.     Okay.  And just so we're on the same

21    page again; TAX 311 was a clinical study performed

22    or sponsored by Sanofi that compared Taxotere versus

23    Taxol.  Correct?

24         A.     Yes.

25         Q.     And that study was for women who had

1    metastatic breast cancer.  Correct?

2           A.     Yes, that's correct.

3           Q.     And those drugs were used as single

4    agents or monotherapy; meaning, they were not

5    combined with other chemotherapies.  Is that

6    correct?

7           A.     Right, and that's kind of the point of

8    what I was pointing to for Dr. Glaspy's discussion.

9           Q.     Right.  And as it relates to the hair

10   loss, TAX 311 did not track long-term hair loss in

11   the patients in either the Taxotere or the Taxol

12   arm.  Is that correct?

13          A.     That is correct.  And as I've stated

14   before, that would have been something that would

15   have -- would have been good to have, but we don't

16   have that from that study.

17          Q.     And you're not aware of any study --

18   wait.  Strike that.

19                 You're not aware of any clinical study,

20   any clinical trial study, whether performed by

21   Sanofi or another company, that compares Taxotere

22   and Taxol in the adjuvant setting that has data on

23   relative permanent or persistent hair loss between

24   the two drugs.  Is that correct?

25          A.     That's correct, and that's what I've

Page 110

1          Q.     Are you giving -- are you giving the

2     same opinion that you gave before?

3          A.     Well, I mean, I am saying -- I am

4     saying that -- I guess the opinion is that Taxotere

5     is more toxic than Taxol was in my previous report.

6     So that opinion is there.

7                    I think that the discussion is very

8     similar.  I -- maybe -- I don't believe I changed

9     that part of my report that much.  So I would say

10    that this should be consistent with that.

11         Q.     Okay.  And Dr. Plunkett, you're not

12    going to appear at trial and testify that, as it

13    relates to Elizabeth Kahn, that Taxotere would be

14    more toxic to her specifically.  Correct?

15         A.     No, because I'm not case-specific.

16         Q.     Okay.  And you go on to say,

17    "Irreversible alopecia is not the same as

18    drug-induced alopecia."  Is that correct?

19         A.     Yes, that is my opinion, yes.

20         Q.     Can you define for me "drug-induced

21    alopecia"?

22         A.     It's alopecia that is --

23                    MR. MICELI:  Objection -- object --

24    object to the form.

25                    But go ahead.

Page 111

1          A.      In my -- I think I define it for you

2     specifically, early in my report, as a type of

3     alopecia that is caused by exposure to drugs; in

4     particular, I'm focusing on chemotherapy drugs.

5          Q.      And is chemotherapy- or drug-induced

6     alopecia always reversible?

7                  MR. MICELI:  Object to the form.

8          A.      There are descriptions that

9     drug-induced alopecia is typically reversible, yes.

10    Different people describe it in different ways.  But

11    I'm not a clinician; so instead, what I have

12    described it as there being a difference between --

13    here.

14                  (A discussion is held off the record.)

15                  MR. RATLIFF:  Hey, Palmer, I think

16    you're off mute.  Get on mute, perhaps.

17                  MR. LAMBERT:  Right.

18          A.      I'm not a clinician/physician that

19    diagnoses.  However, certainly being a toxicologist

20    and a pharmacologist, I see drug-induced alopecia as

21    hair loss; whereas, the issue of the persistent

22    alopecia, irreversibility, is a different injury;

23    it's the inability to regrow.  So to me, as a

24    toxicologist, they are two different things.

25          Q.      Would you define for me permanent

Page 112

1    chemotherapy-induced alopecia?

2         A.     I defined it in my report as being

3    reported by clinicians as alopecia that is something

4    that is seen more than six months after treatment

5    with the drug.  I'm not a clinician, I'm not

6    redefining it.  I'm using it in the way that the

7    clinical literature describes it, and how I read

8    that as a pharmacologist and a toxicologist.

9         Q.     If a person takes chemotherapy and

10   loses their hair, and then it grows back, would that

11   be drug-induced alopecia, or would that be permanent

12   chemotherapy-induced alopecia?

13              MR. MICELI:  Object to the form.

14        A.     That's a diagnosis, so I don't do that.

15   I can't answer that for you.  I can tell you how

16   it's been described in the literature, and what I

17   have relied upon, but I don't -- I can't -- I don't

18   diagnose patients, so I can't tell you.

19        Q.     Yeah, I'm not asking you to diagnose

20   anybody, Dr. Plunkett.  I'm just asking you -- let

21   me ask you this.  If someone takes a chemotherapy,

22   and loses her hair, and then their hair grows back;

23   based on what you've seen in the literature, which

24   bucket would that fall into?

25              MR. MICELI:  Object to the form.

Page 127

1      someone else, a clinician, couldn't do something

2      different.

3              Q.      Okay.

4              A.      In terms of diagnosing patients.  They

5      may describe it a different way.

6              Q.      So do you intend to give an opinion

7      that, as it relates to Ms. Kahn's specific

8      chemotherapy regimen, that Taxotere was an

9      independent risk to her of developing permanent

10     chemotherapy-induced alopecia?

11             A.      I'm not --

12                     MR. MICELI:  Object to the form.

13                     THE WITNESS:  I'm sorry, David.

14             A.      I'm not case-specific, so I don't

15     believe that I would be forming that opinion or

16     providing that opinion, no.

17             Q.      Okay.  And then would you define

18     "substantial contributing factor" for me?

19             A.      So we -- this is another thing we spent

20     a lot of time on last time.  Essentially, when I use

21     the words "substantial contributing factor," that is

22     in relationship that when you use it as combination

23     therapy, for something that has an independent risk,

24     we can identify Taxotere as contributing to that

25     particular experience.

Page 128

1               So "substantial contributing factor"

2       can have a legal term, but I'm not a lawyer.  I'm

3       talking about it as a toxicologist.  In other words,

4       when something can be seen independently, I believe

5       that that independent risk based on, then, the

6       experience in the published literature about the

7       fact that Taxotere was one of the more commonly

8       reported --

9                   (Court reporter clarification.)

10          A.      Commonly reported drugs that's linked

11      to that; that is part of my -- how I am defining

12      "substantial contributing factor."  I'm not giving

13      it a specific percentage, though.

14          Q.      Okay.  If -- could you point me,

15      Dr. Plunkett, to what would you consider the -- the

16      leading medical dictionary for a pharmacologist,

17      where these terms would be defined?

18          A.      Well, it's not just for

19      pharmacologists.  There's medical dictionaries.  I

20      would say this would probably be defined, not within

21      a medical dictionary, but probably within my

22      textbooks that talk about factors that contribute to

23      exposure response.

24                  I don't know that I could find you that

25      exact -- an exact definition.  But it is described.

1          drugs.  I have the clinical study.  But if you want

2          to just focus on an individual case series, or an

3          individual document, there were some documents where

4          you and I read, where people are reporting so many

5          cases of this one or so many cases of that one.

6                        Yes, those numbers exist.  But I'm

7          talking about looking across the evidence that

8          includes, importantly, more than just the case

9          reports.

10              Q.      When you say "those numbers exist,"

11         what do you mean by that?

12              A.      We can find a number reported for

13         individual drugs in individual papers.  So and

14         we've done -- you and I have done that, I've agreed

15         with you; that number is in that column for that

16         drug or this drug.

17                        But that's not the analysis I have

18         done.  I have looked across all of that information;

19         and for Taxotere, I have the clinical data, which is

20         an important -- as I've been saying over and over,

21         is a really important piece of the puzzle that

22         allows you to say something about comparative risk.

23              Q.      Yes.  So I'm asking, though,

24         Dr. Plunkett, about just this:  Are there more

25         reports with taxane-based therapies than

Page 136

1          Q.      I'll withdraw the question.  That's

2     fine.

3                  MR. RATLIFF:  We'll take a quick break,

4     and we'll finish this up.

5                  MR. MICELI:  I'll probably have a few

6     follow-ups, but when we come back, maybe we can find

7     out how much time is left.

8                  THE VIDEOGRAPHER:  Thank you.  This is

9     the videographer.  Please stand by.

10                 The time is 6:06 p.m. Eastern.  We're

11    going off the record.  This is the end of Media

12    File 4.

13                 (A brief recess takes place.)

14                 THE VIDEOGRAPHER:  Okay.  The time is

15    6:14 p.m. Eastern Time.  We're back on the record.

16    This is the beginning of Media File 5.

17    BY MR. RATLIFF:

18         Q.      Okay.  Dr. Plunkett, is there a

19    hierarchy of evidence?

20         A.      So are you asking for scientific

21    studies, such as in causation analysis, or are you

22    asking me -- is there a specific area?

23    Pharmacology, toxicology, what?

24         Q.      I'm just asking you what your answer

25    is; is there a hierarchy of evidence that you have

Page 137

1    employed in this report?

2         A.    Well, that's a different question.  So

3    certainly as a pharmacologist and a toxicologist,

4    yes; there is certain information -- not so much a

5    hierarchy, but that's more relevant than others.

6    And that's --

7         Q.    What would those be?

8         A.    -- that's what I've applied in my

9    analysis.  So that evidence would be looking for

10   human data in particular that was discussing the

11   specific end point of concern for my analysis.  So

12   looking at persistent or irreversible alopecia, and

13   what data was available in humans to be able to make

14   that comparison.  Because that is a disease or a

15   condition that is a human condition.

16        Q.    Is there a hierarchy of evidence in --

17   do you have a hierarchy of evidence when you do a

18   general causation assessment?

19        A.    That's a different question.  So

20   certainly if I was doing one, then there is often --

21   I wouldn't call it a hierarchy; I would call it an

22   assessment of the certainty that you can draw from

23   certain types of data versus others, when you're

24   doing causation.

25             Do you want me to explain?

Page 140

1    question being asked; what word you may use could be

2    more appropriate than another.

3                  In my report, as a pharmacologist and a

4    toxicologist, I'm using words such as "linked,"

5    "relationship," "related to," "linked to,"

6    "associated with;" it means I have evidence to show

7    that one thing and the other have actually been

8    shown to happen, based upon a piece of data or

9    evidence.

10        Q.     You said one thing has been shown to

11   happen based on a piece of evidence.  Can you

12   explain that to me?

13        A.     In other words, I'm not just pulling

14   this out of the air.  I have clinical studies, where

15   they report the existence of or the -- or so many

16   percentage of patients that are reported to have

17   persistent alopecia.  Or I have an analysis from a

18   case report, where a qualified physician has gone

19   through and described his experience with a patient.

20                  Or I have the pharmacokinetic data,

21   where I see a study that was either described in the

22   literature or in the labeling for the drug, for

23   example.  Some of the pharmacokinetic information

24   comes from the drug labeling.

25        Q.     So as it relates to TAX 316, in the FAC