UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |
| THIS DOCUMENT RELATEDS TO: | |
| Elizabeth Kahn, Case No. 2:16-cv-17039 | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SANOFI'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. DAVID MADIGAN**

**I.      INTRODUCTION**

Dr. David Madigan is an exceedingly qualified expert whose opinions on biostatistical, statistical, and pharmacovigilance issues have been admitted by the Court in the *Earnest* trial. Here, Sanofi seeks to exclude Dr. David Madigan from testifying on: (1) medical general causation; (2) his statistical calculation based on the TAX 316 follow-up data (3) his "incidence rate" calculation based on Sanofi's safety database; (4) his meta-analysis of four observational studies; and (5) his analysis of case reports located in the FDA's adverse event report database ("FAERS") and Sanofi's safety database. However, Dr. Madigan's expert opinions on the statistical evidence that supports a causal association between Taxotere and permanent/irreversible alopecia will undoubtedly assist the trier of fact in this case, is supported by Dr. Madigan's education, training, and experience, and is consistent with Sanofi's own internal assessment and conclusions. For the reasons set forth herein, Dr. Madigan's expert opinions are admissible, and Sanofi's motion should be denied.

**II.     STANDARD OF REVIEW**

Under Federal Rule of Evidence 702, a witness who is qualified as an expert may testify if (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to

1

determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702.  The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for assessing whether an expert's testimony is admissible under Rule 702 by determining whether the testimony is both reliable and relevant. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).

Relevancy is "determined on the basis of assisting the trier." Fed. R. Evid. 702 Advisory Comm. Note. Under Rule 401, evidence is "relevant" if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Reliability of expert testimony "is determined by assessing 'whether the reasoning and methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (internal citation omitted). A nonexclusive set of factors for determining reliability has been developed and include: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain "flexible" as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). A trial judge has "considerable leeway in … determining whether particular expert testimony is reliable."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006).

"The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to 'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the basis and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *Nagle v. Gusman*, 2016 WL 560688 at *4 (E.D. La. Feb. 12, 2016) (internal citation omitted). As such, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes (2000).

### III. ARGUMENT

#### A. Dr. Madigan does not offer a new medical general causation opinion.

Sanofi seeks the exclusion of an opinion not offered by Dr. Madigan. Like in the *Earnest* trial, Dr. Madigan intends to opine on the statistical evidence that supports a causal association between Taxotere and permanent/irreversible alopecia.[1] Contrary to Sanofi's assertion that Dr. Madigan's opinions are no longer limited to statistics, Dr. Madigan has not expanded his opinions to include an opinion on medical general causation nor performed a Bradford Hill criteria analysis. Rather, he continues to provide statistical analyses in support of the general causation inquiry.

The Court has already allowed Dr. Madigan to offer such opinions at trial.[2] In doing so, the Court stated that Dr. Madigan "explains the statistical analysis he conducted and expressly states that he agrees with Sanofi's 2015 conclusion that the evidence supports a causal association

---

[1] Sanofi's Ex. B, Expert Report of Dr. David Madigan, Mar. 23, 2020 at p. 26 ¶ 68 ("Based on my education, training and experience, and the data analyzed herein, including the identification of safety signals in FAERS in the 2000's, my analyses of Sanofi's internal pharmacovigilance database, my review of observational studies, and the results from Sanofi's TAX 316 and TAX 301 clinical trials, there is adequate statistical evidence that docetaxel causes permanent/ irreversible alopecia.").
[2] Sanofi's Ex. A, Earnest Trial Tr., Sept. 18, 2019 at 648:21–649:5.

3

between docetaxel and permanent alopecia."[3]  The Court further quoted deposition testimony of Dr. Madigan in its Order and Reasons as follows:

> Q. What I want to know is, have you independently done the work necessary to form an independent opinion that [T]axotere causes irreversible alopecia?
>
> A. Sure. I believe it does. I believe there is a causal effect established here.
>
> Q. And the work that you did to establish that [T]axotere causes irreversible alopecia includes what elements?
>
> A. So the analysis from the randomized trials. So the meta-analysis of the randomized trials and the analysis of the individual trials, the analysis of the FAERS database and my analysis of the internal database.[4]

Dr. Madigan's testimony from the *Earnest* trial and his recent deposition and statement from his *Kahn* expert report that Sanofi cites in support of its argument are clearly within the confines of the Court's prior determination on the admissibility of Dr. Madigan's opinions. Dr. Madigan should therefore not be prohibited from continuing to opine on the statistically significant association between Taxotere and permanent/irreversible alopecia.

    **B.**    **Dr. Madigan's new analyses are reliable and relevant.**

Sanofi moves to exclude three new analyses conducted by Dr. Madigan in support his opinions and reported in his *Kahn* expert report. Specifically, Sanofi disputes the reliability and/or relevancy of Dr. Madigan's statistical calculation based on the TAX 316 follow-up data, "incidence rate" calculation based on Sanofi's safety database, and meta-analysis of four observational studies. However, Sanofi's criticisms of these new analyses go to the weight of Dr. Madigan's testimony, and not its admissibility.

---

[3] Order and Reasons, Rec. Doc. 8094 at p. 6.
[4] *Id.* at pp. 6–7.

First, Dr. Madigan's conclusion that there is a statistically significant risk of permanent/irreversible alopecia associated with Taxotere is supported by his analysis of the TAX 316 follow-up data on alopecia at two years.[5] Dr. Madigan's statistical calculation based on the TAX 316 follow-up data on alopecia was not cherry-picked for litigation purposes, but conducted in direct response to the analysis of Sanofi's expert, Dr. Michael Kopreski.

Dr. Madigan applied a mid-p p-value in his statistical calculation based on the TAX 316 follow-up data on alopecia. As Dr. Madigan explained in his deposition, the mid-p p-value is a standard practice of adjustment that is widely accepted and used by statisticians when small numbers are involved in a statistical calculation.[6] Here, Dr. Madigan conducted a statistical calculation with the numbers zero and five, and, therefore, he appropriately applied a mid-p p-value.

By analyzing the TAX 316 follow-up data on alopecia at two years, Dr. Madigan is neither defining nor redefining permanent/irreversible alopecia as lack of hair regrowth two years after chemotherapy. Dr. David Kessler selected the follow-up data on alopecia at two years because the time delay of two years confirms the permanent nature of the injury and "was the most conservative" option.[7] Indeed, Sanofi defined permanent alopecia as lack of hair regrowth two years after chemotherapy in 2015.[8]

Sanofi criticizes Dr. Madigan for not conducting statistical calculations at all TAX 316 follow-up durations. As Dr. Kessler explained, if there is a statistically significant risk of permanent alopecia at two years after treatment with Taxotere, the results of calculations at earlier

---

[5] Sanofi's Ex. B, Expert Report of Dr. David Madigan, Mar. 23, 2020 at p. 26 ¶ 67 ("…alopecia with a duration of two years or more occurred in five TAC [sic] patients but did not occur in any TAC patients, a statistically significant imbalance, P=0.03.").
[6] Ex. A, Deposition of Dr. David Madigan, April 9, 2020 at 41:13-42:15, 45:12-46:1.
[7] Ex. B, Deposition of Dr. David Kessler, May 8, 2020 at 82:6-83:19.
[8] *Id.* at 82:11-19.

5

follow-up durations would not be informative.[9]  Sanofi's dissatisfaction with the result of Dr. Madigan's statistical calculation at two years follow-up does not make it less reliable or unhelpful to the trier of fact.  Sanofi may certainly cross-examine Dr. Madigan on the type of calculation and various durations of TAX 316 follow-up data on alopecia.

Second, Dr. Madigan analyzed the number of reports of irreversible alopecia excluding "recovered" as a percentage of the total alopecia reports in Sanofi's global pharmacovigilance database in support of his conclusion that there is a statistically significant risk of permanent/irreversible alopecia associated with Taxotere.[10]  Sanofi mischaracterizes Dr. Madigan's calculations as "incidence rates."  Dr. Madigan simply divided the number of reports of irreversible alopecia excluding "recovered" by the total number of reports of alopecia in Sanofi's global pharmacovigilance database for each year from 1999 to 2015.  He has never claimed that the results of his calculations represent an incident rate of permanent/irreversible alopecia associated with Taxotere.  Dr. Madigan's calculations based on Sanofi's safety database only reveal that a high percentage of the total reports of alopecia that Sanofi received from 1999 to 2015 were permanent/irreversible alopecia.

Sanofi's argument that a jury would be mislead by one of Dr. Madigan's simplest calculations falls flat.  Dr. Madigan used the total alopecia reports in Sanofi's global pharmacovigilance database for a given year as the denominator in his calculations, rather than the total number of patients who were treated with Taxotere.  It would be impossible to extrapolate an incidence rate for Taxotere and permanent alopecia without using the total number of patients who were treated with Taxotere.  His calculations need not be conclusive of causation to be relevant.  This type of evidence complements Dr. Madigan's conclusion that there is a statistically significant

---

[9] *Id.* at 85:15-86:2.
[10] Sanofi's Ex. B, Expert Report of Dr. David Madigan, Mar. 23, 2020 at pp. 20–21, Table 6.

risk of permanent/irreversible alopecia associated with Taxotere and will help the jury understand what information was available to Sanofi. Again, Sanofi may cross examine Dr. Madigan on the limitations of his calculations.

Finally, Dr. Madigan conducted a meta-analysis of four observational studies, which supports his opinion that there is a statistically significant risk of permanent/irreversible alopecia associated with Taxotere. The bulk of Sanofi's argument to exclude Dr. Madigan's meta-analysis focuses on the biases of observational studies. But, consistent with Dr. Madigan's publications cited by Sanofi in its motion, Dr. Madigan acknowledged in his deposition that the meta-analysis of observational studies is only a supportive strand of evidence that is of lesser quality than randomized clinical trial evidence.[11] Indeed, Dr. Madigan stated the following in his most recent expert report:

> Randomized controlled trials represent the gold standard in estimating the clinical effects of medical interventions. However, medical researchers often turn to non-interventional studies where the researchers observe the treatment assignment rather than control it…I have published several papers describing the limitations of observational studies. Nonetheless, nearly 80,0000 observational studies were published in the decade 1990-2000. In the following decade, the number of studies grew to more than 260,000.[12]

Dr. Madigan further considered the heterogeneity of the observational studies.[13] Despite a relatively high heterogeneity, the evidence by no means should be dismissed.[14] It is entirely

---

[11] Ex. A, Deposition of Dr. David Madigan, April 9, 2020 at 88:21-89:12; Ex. C, Deposition of Dr. David Madigan, Nov. 14, 2019 at 192:25-193:8.
[12] Sanofi's Ex. B, Expert Report of Dr. David Madigan, Mar. 23, 2020 at p. 11 ¶ 35.
[13] *Id.* at p. 23 ¶ 58 ("I note that there is some between-study heterogeneity, $I^2$=62.9%, albeit not statistically significant (Q=7.10, p=0.07). Appendix 6 provides the R code.").
[14] Three of the observational studies that Dr. Madigan analyzed are independently statistically significant as admitted by Sanofi's expert, Dr. Ellen Chang. (Ex. D, Deposition of Dr. Ellen Chang, Jan. 7, 2020 at 37:16-21).

appropriate for Dr. Madigan to rely on observational studies in support of his opinion, and the limitations of a meta-analysis of observational studies are proper for cross examination.

Sanofi's argument that Dr. Madigan only analyzed one observational study that pre-dated Ms. Kahn's treatment with Taxotere is a red herring. Dr. Madigan investigated the statistical evidence that supports a causal association between Taxotere and permanent/irreversible alopecia. His investigation is not specific to Ms. Kahn or the time frame in which she received treatment with Taxotere. The law does not require that evidence supporting general causation be tied to the particular plaintiff like specific causation. Indeed, the Court has stated that "[g]eneral causation is whether a substance is capable of causing a particular injury or condition in the **general population**…"[15] Plaintiff does not intend to offer Dr. Madigan as an expert to address any plaintiff-specific issues. As such, the time frame of the observational studies is inconsequential, and Dr. Madigan properly considered evidence that post-dates Ms. Kahn's injuries.

    C.    **Sanofi's renewed criticisms of Dr. Madigan's analysis of case reports located in the FAERS database and Sanofi's internal pharmacovigilance database are misplaced.**

Sanofi renews its argument that Dr. Madigan's analysis of case reports located in the FAERS database and Sanofi's internal pharmacovigilance database is deficient because he did not review the individual, underlying case reports and directs the Court's attention to Section 7 of FDA's draft guidance titled "Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff" issued for comment purposes in November 2019. The Court previously rejected Sanofi's criticisms of Dr. Madigan's analysis of case reports.[16] Now Sanofi

---

[15] Order and Reasons, Rec. Doc. 8094 at p. 5 (emphasis added); *see also Comardelle v. Pennsylvania General Ins. Co.*, 76 F. Supp. 3d 628, 630 n. 10 (E.D. La. 2015).
[16] *Id.* at p. 9.

8

claims that the FDA's draft guidance issued after the *Earnest* trial should trigger the Court to reverse its prior determination on admissibility.

Sanofi confuses signal identification with signal evaluation. Section 7 of the FDA's new draft guidance is titled "Signal Evaluation and Documentation" and describes the processes to conduct "an integrated, comprehensive evaluation of the prioritized signal to determine whether and what regulatory actions(s) are indicated."[17] Section 7 of the FDA's new draft guidance does not guide Dr. Madigan's analysis. Rather, Dr. Madigan's analysis of case reports is related to safety signal identification corresponding to the methodology described in Section 6 of the FDA's draft guidance. Indeed, Section 6 titled "Safety Signal Identification" includes "screening FAERS, VAERS, and the medical literature, as well as accessing other information sources, to identify potential safety signals."[18]

In fact, applying processes from Section 7, such as a case definition, to Dr. Madigan's analysis would degrade its statistically accuracy. Reviewing individual, underlying case reports is not contemplated as part of FAERS disproportionality analysis because the methodology inherently centers on a review of this FDA database without possible access to the underlying case reports. As such, any effort by Dr. Madigan to seek to obtain access to these case reports and subjectively review them would be inappropriate. Further, as Dr. Madigan explained, any analysis of individual case reports would also require the similar review of *every* case report contemplated in the entire FAERS database, as each event is viewed against the background rate of all other events included in the database.[19] Such a review is not only impractical, but impossible.

Further, Dr. Madigan details in his report how limitations in FAERS means that invariably

---

[17] Sanofi's Ex. X, FDA Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff, Nov. 6, 2019 at p. 27.
[18] *Id.* at p. 21.
[19] Ex. E, Deposition of Dr. David Madigan, Dec. 7, 2018 at 129:2-131:4.

there can be over-counting and under-counting. Dr. Madigan conducted a disproportionality analysis that compared a Taxotere rate in the numerator with a background rate in the denominator. In doing so, the potential exists for over-counting and under-counting both in the numerator (Taxotere) and the denominator (the background rate). Sanofi takes issue with Dr. Madigan's report by cherry-picking certain underlying case reports to try and illustrate over-counting in the numerator. Curiously, however, Sanofi never mentions or acknowledges that similar examples likely exist in the denominator or how, as noted in Dr. Madigan's report, there is a well-documented concern of under-reporting.

Indeed, the same type of FAERS analysis Dr. Madigan performed in this case has been routinely admitted by other courts. *See, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-CV-144, 2015 WL 13022172, at *12–13 (S.D. Ohio Oct. 2, 2015), *aff'd*, No. 16-3347, 2017 WL 680349 (6th Cir. Feb. 21, 2017); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6302573, at *17 (S.D. Ill. Dec. 16, 2011); *see also In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242–43 (W.D. Wash. 2003) (allowing experts' testimony taking into consideration all lines of evidence, including FAERS data and one epidemiology study). Dr. Madigan's FAERS methodology is reliable and generally accepted in the scientific community. *Rheinfrank*, 2015 WL 13022172, at *13; *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.*, No. CIV.A. 08-08, 2013 WL 1558690, at *8–9 (D.N.J. Apr. 10, 2013). His methodology is highly similar to that used not only by the FDA, but by Sanofi itself on multiple occasions, including in submissions to FDA to support new drug indications for its products and in publications authored by the company.[20] Also, his methodology was based on the FDA's own

---

[20] *See* Colilla S. (2017). Validation of New Signal Detection Methods for Web Query Log Data Compared to Signal Detection Algorithms Used With FAERS. Drug Safety DOI 10.10007/s40264-017-0507-4 (article **published by Sanofi** personnel in global pharmacoepidemiology, global safety sciences noting "[s]ignal detection algorithms (SDAs), such as disproportionality and Empirical Bayes geometric

guidance and utilized terms supported by Plaintiffs' regulatory expert Dr. David Kessler as most

---

mean (EBGM) metrics, have been used as the primary tools to detect signals in spontaneous AE reporting systems such as FAERS."); Kurzinger, M. (2018). Web-Based Detection Using Medical Forums Data in France: Comparative Analysis. Journal of Medical Internet Research, vol. 20(iss. 11) (article **authored by Sanofi** personnel in epidemiology and benefit risk evaluation department using PRR, EBGM, EB05 from FAERS database to analyze rates of reporting); *see also* **the following Sanofi submissions to the FDA**: Sanofi NDA 208471 to FDA for Adlyxin injection, Other Review(s), 2016, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/208471Orig1s000OtherR.pdf ("For the disproportionality analysis in the AWARE database, Sanofi used the proportional reporting ratio (PRR) with corresponding chi-square value "to compare the observed count for a product-event combination with an 'expected' count." A signal is considered to be positive if the threshold of PRR>2, PRR chi-square>4, and the number of reports ≥ 3 are met."); Sanofi NDA 201613 to FDA for Fexofenadine HCI, Medical Review(s), 2010, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201373Orig1s000MedR.pdf ("The Sponsor [Sanofi] performed a data mining analysis of the FDA AERS database from 01 February 1969 (the beginning of the database) to 30 June 2009 … . It is a disproportionality method used to identify drug-event combinations reported more frequently than expected based on overall rates of drug-event associations in the database. The program calculates adjusted reporting ratio values, or "Empirical Bayes Geometric Mean" (EBGM) values, together with the lower and upper bounds of 95% confidence limits for these values, denoted EB05 and EB95 respectively. The EBGM values indicate the strength of the reporting relationship between a particular drug and adverse event, using the adjusted ratios of observed-to-expected counts for drug-event combinations. Signal scores (EBGM05) are defined to screen for potential safety signals. A threshold of 2 is currently used, which means that for any drug-event combination with signal scores greater than or equal to 2, that particular combination is reported at least twice as often as expected. …The Sponsor performed only the data mining analysis of the AERS and WHO databases and did not review the narrative case reports unless they were reported to Sanofi-aventis directly."); Sanofi NDA 201373 to FDA for Fexofenadine for Children, Other Review(s), 2011, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201373Orig1s000OtherR.pdf. ("Methodology: Empirica Signal® software and the Multi-item Gamma Poisson Shrinker (MGPS) datamining algorithm quantifies reported drug-event associations by producing a set of values or scores that indicate varying strengths of reporting relationships between drugs and events. These scores, denoted as Empirical Bayes Geometric Mean (EBGM) values, provide a stable estimate of the relative reporting rate of an event for a particular drug relative to all other drugs and events in the database being analyzed. MGPS also calculates lower and upper 90% confidence limits for the EBGM values, denoted EB05 and EB95, respectively. Limitations: The association between fexofenadine and the particular event in AERS is a result of the relative reporting for various events among all drugs in the database. … The exact degree of risk or causality for the various associations between benzonatate and these HLTs (in all patients ever exposed to the drug worldwide) cannot be elicited from this data mining analysis alone, because obviously the association scores (EBGM values) are generated from AERS which consists of spontaneous adverse events reports. Finally, reporting and detection biases can occur in AERS and effects of concomitant illnesses or therapy cannot be fully controlled in data mining analyses using MGPS. Because of the spontaneous nature of reporting, the results of this analysis should not be interpreted as a formal comparison of treatment groups or of their relative risks.").

reasonable to capture the injury at issue.[21]

Dr. Madigan's methodology has not changed since the *Earnest* trial in which the Court determined Dr. Madigan's opinions were admissible. The FDA's draft guidance issued after the *Earnest* trial in November 2019 is not a basis for the Court to reverse its prior determination on admissibility. In fact, the FDA's draft guidance further supports the Court's finding that Dr. Madigan's methodology is reliable.

### IV. CONCLUSION

For the reasons discussed above, the Court should deny, in its entirety, Sanofi's Motion to Exclude Expert Testimony of Dr. Madigan.

Dated: September 14, 2020

Respectfully submitted,

/s/ Christopher L. Coffin
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

/s/ Karen B. Menzies
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

---

[21] Sanofi's Ex. B, Expert Report of Dr. David Madigan, Mar. 23, 2020 at pp. 4–10.

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, Florida 32505
Phone: (850) 316-9074

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000

| | |
|---|---|
| Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT
