# EXHIBIT E

1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4  ELIZABETH KAHN,
 5  Plaintiff,
 6   vs.                         Case No. 2:16-cv-17039
 7  SANOFI S.A., SANOFI-AVENTIS U.S.
    L.L.C., SANOFI US SERVICE, INC., and
 8  AVENTIS-PHARMA S.A.,
 9  Defendants.
10
                * * * * * * * * * *
11
12  CYNTHIA THIBODEAUX,
13  Plaintiff,
14   vs.                         Case No. 2:16-cv-15859
15  SANOFI S.A., SANOFI-AVENTIS U.S.
    L.L.C., SANOFI US SERVICE, INC., and
16  AVENTIS-PHARMA S.A.
17  Defendants.
18
19         Videotape Deposition of CARL KARDINAL, M.D.,
20  taken on behalf of the defendants, at the residence of
21  Carl Kardinal, M.D., 6008 Dornagh Court, in the city
22  of Columbia, State of Missouri, on the 17th day of
23  January 2018, before Heather L. Shallow, Certified
24  Court Reporter, Registered Professional Reporter,
25  Registered Merit Reporter.        Job No. NJ2783240
```

Page 26

1  Exhibit 1?
2      A. I think in here somewhere that there is not
3  specific reference to permanent hair loss.
4      Q. Well, let me direct you --
5      A. Okay. Because I failed to be clear or --
6      Q. Let me direct you to the second-to-last page
7  of the document. It's marked with a 56 in the bottom
8  middle.
9      A. 56?
10     Q. Yes, please, sir.
11     A. I see 45 and then it -- everything starts
12 over again.
13     Q. I think that's 54. So --
14        MR. MICELI: Right in the bottom in the
15 middle.
16     Q. (By Ms. Bieri) I was looking at these page
17 numbers.
18     A. Oh, oh. I was --
19     Q. You were looking at the sides. Sure.
20     A. Yeah.
21     Q. So let me --
22     A. Okay. So 56?
23     Q. Mm-hmm.
24     A. All right.
25     Q. May I direct you, on the left-hand side --

Page 27

1      A. Yeah. To?
2      Q. -- there's a paragraph that says Hair Loss.
3      A. Yeah.
4      Q. Can you read the last sentence of that
5  paragraph that starts with the word "Once," please?
6      A. Okay. "Once you have completed all your
7  treatments, hair generally grows back."
8      Q. Did Plaintiffs' counsel direct you to that
9  language?
10     A. I don't recall.
11     Q. Do you have any recollection of seeing
12 Exhibit 1, the Taxotere label, at any time prior to
13 meeting with Plaintiffs' counsel last month?
14     A. I'm going to have to give you a "probably"
15 on that. I've been using new drugs that we relied
16 heavily on the package insert in terms of the action
17 of the drug and potential toxicity of the drug.
18     Q. Are you saying that when a new drug came out
19 onto the market, you would look to the drug's label?
20     A. Package insert, yes.
21     Q. Do you have any memory --
22     A. Of course not.
23     Q. Hold on. I'm sorry. I want -- for the
24 benefit of the record and the court reporter, let me
25 get my question out.

Page 28

1      A. Of course.
2      Q. Do you have any memory of reviewing
3  Exhibit 1, the Taxotere label, at any time after you
4  start -- first started prescribing it until the time
5  you met with Plaintiffs' counsel?
6      A. I can remember reviewing, you know, the
7  label at the time I was prescribing the drug years
8  ago, but in terms of remembering specifics, I cannot.
9      Q. When, to your recollection, did Taxotere
10 come onto the market?
11     A. Certainly in the 1980s, 1990s we were using
12 Taxol and Taxotere in clinical trials when we were
13 doing a lot of clinical trials, but I don't think it
14 became commercially available until 1990 or so.
15     Q. Maybe the late 1990s?
16     A. Yeah.
17     Q. So would you have been looking -- I'm just
18 trying to understand your common practice of looking
19 at chemotherapy drug labels. Was it your practice to
20 refer back to them -- let's say -- strike all that.
21        Say you had been prescribing a chemotherapy
22 drug for five years.
23     A. Yeah.
24     Q. Was it your practice to look at the
25 chemotherapy drug label after you'd been prescribing

Page 29

1  it for some period of years?
2        I -- Dr. Kardinal, I'm trying to get a sense
3  of if it was common for you just to review labels in
4  the early days of prescribing a drug or if you would
5  have reviewed the Taxotere label at some point later.
6        MR. MICELI: Let me just object to the -- to
7  the form because it's compound. And Kelly, I don't
8  mean to interrupt, but you asked a question, then
9  before he answered, you adjusted your question. I
10 don't know if you want to just start all over again so
11 it's clear for the record. Or you can -- I'll just
12 sit back and be quiet.
13       MS. BIERI: I will ask a different question.
14       MR. MICELI: Okay. Again, I don't want to
15 interrupt. I just wanted to -- it's a strange
16 objection but I want to make sure we were clear.
17 Thank you.
18     Q. (By Ms. Bieri) Dr. Kardinal --
19     A. You're going to ask another question?
20     Q. Let me try a different question. How often
21 did you reread labels after you first started
22 prescribing a drug?
23     A. If something unexpected happened, I would
24 refer back to it.
25     Q. Do you have any recollection of reviewing

Veritext/NJ Reporting Company
800-227-8440                                                                 973-410-4040

30

1  the Taxotere label after the mid 2000s?
2      A. Of course not.
3      Q. Do you have any recollection of reviewing
4  the Taxotere label at all?
5      A. Yes. I reviewed it at the time that we
6  started using Taxotere.
7      Q. And no -- and did you -- do you have any
8  memory of reviewing it after the time when you started
9  prescribing and using Taxotere?
10     A. Not specifically.
11     Q. Beyond Exhibit 1, this label --
12     A. This?
13     Q. Beyond this document, did Plaintiffs'
14  counsel show you any other documents?
15     A. I don't recall.
16     Q. Do you recall if you discussed any other
17  documents with Plaintiffs' counsel?
18     A. That's very vague.
19     Q. Well, I asked you if you recall if they
20  showed you any other documents. I'm asking --
21     A. And my answer at that time was?
22     Q. That you didn't recall.
23     A. Okay.
24     Q. Now I'm asking you if you remember
25  discussing any other documents that may not have

31

1  actually been shown to you.
2      A. I don't recall.
3      Q. Other than the communications that you've
4  told me about, the meeting that you've told me about,
5  have you had any written or oral communication with
6  counsel for Plaintiff?
7      A. No.
8      Q. Did you take any notes when you --
9      A. No.
10     Q. -- met --
11         Did you take any notes when you met with
12  counsel for Plaintiff?
13     A. No. No.
14     Q. When counsel called to set up the meeting
15  with you, did you take any notes about when the
16  meeting was going to be?
17     A. Well, I'm not stupid. Of course I did.
18     Q. Where would you have taken those?
19     A. On a yellow pad similar to what you're
20  scribbling on.
21     Q. Do you have that piece of paper --
22     A. No.
23     Q. -- or that pad still?
24     A. Why would you -- why would you even want
25  that? No. I don't keep...

32

1      Q. Did you discuss payment of any kind with
2  Plaintiffs' counsel?
3      A. Payments for my depositions you're talking
4  about or what are you talking about?
5      Q. Did you discuss payment of any kind with
6  Plaintiffs' counsel?
7      A. Can you be more specific?
8      Q. No.
9      A. Possibly that the deposition could be
10  charged for was the only thing.
11     Q. Do you mean --
12     A. I mean this deposition.
13     Q. Is that something they told you?
14     A. I asked.
15     Q. What did you ask?
16     A. Is my time reimbursable for the deposition.
17     Q. And what was the answer that you were given?
18     A. Yes.
19     Q. And was anything else said?
20     A. There was something about payment or per
21  hour, but I don't honestly remember what that was.
22     Q. Did Plaintiffs' counsel tell you that they
23  would pay you by the hour in relation to your
24  deposition?
25         MR. MICELI: Object to the form.

33

1      A. They didn't say that they would pay me for
2  anything specific.
3      Q. (By Ms. Bieri) You -- you mentioned that
4  there was a discussion of payment by the hour.
5      A. Yeah. It was -- it was -- whatever it is,
6  my time is worth twice as much talking to you.
7      Q. Is it your understanding that Plaintiffs'
8  counsel is going to give -- excuse me. Is it your
9  understanding that Plaintiffs' counsel is going to
10  give you a check for your time here today?
11     A. No.
12         MR. MICELI: Object to the form.
13     A. No.
14     Q. (By Ms. Bieri) Beyond talking to
15  Plaintiffs' counsel --
16     A. Yes.
17     Q. -- did you do anything to prepare for your
18  deposition today?
19     A. No.
20     Q. Based on what you said, Dr. Kardinal -- I
21  think I know the answer to this, but I'm going to ask
22  you a question anyway -- have spoken with
23  Miss Elizabeth Kahn --
24     A. No.
25     Q. -- since your treatment --

9 (Pages 30 to 33)

106

1 A. No.
2 Q. If -- I'm going to ask you the question same
3 about Miss Thibodeaux, for the record. If the
4 Taxotere label had said, "In most cases, normal hair
5 growth should return. In some cases, frequency not
6 known, permanent hair loss has been observed," would
7 that change your recommendation that Miss Thibodeaux
8 participate in NSABP B-40?
9 A. No.
10 Q. Can you say, to a reasonable degree of
11 medical certainty, that Miss Kahn would survive --
12 would have survived if she didn't participate in NSABP
13 B-40?
14 MR. MICELI: Object to the form.
15 A. Well, she would have been treated
16 essentially the same.
17 Q. (By Ms. Bieri) I'm not talking about
18 comparisons right now. We know Miss Kahn was treated
19 with NSABP B-40; right?
20 A. Mm-hmm.
21 Q. And we know that she has survived; correct?
22 Can you --
23 A. Wouldn't be talking here if she hadn't
24 survived.
25 Q. Can you say that you know, to a reasonable

107

1 degree of medical certainty, what her outcome would
2 have been if she had been on some other chemotherapy
3 regimen?
4 MR. MICELI: Object to the form.
5 A. We probably would have treated her the same,
6 as I said. Or very similarly.
7 Q. (By Ms. Bieri) With ACT; correct?
8 A. Right.
9 Q. And you believe she would have survived on
10 ACT?
11 A. Same risk.
12 Q. Can you say, to a reasonable degree of
13 medical certainty -- let me ask you that about
14 Miss Thibodeaux. Can you say, to a reasonable degree
15 of medical certainty, that Miss Thibodeaux's outcome
16 would have been the same if she had undertaken a
17 different chemotherapy regimen?
18 MR. MICELI: Object to the form.
19 A. Well, I wouldn't -- you're talking about
20 treating her with totally different drugs and --
21 Q. (By Ms. Bieri) What I'm saying is we know
22 what she was treated with; right?
23 A. Yes.
24 Q. Can you say if she was treated with
25 something else, not what she received in NSABP B-40,

108

1 that her outcome would have been the same?
2 MR. MICELI: Object to the form.
3 A. No.
4 Q. (By Ms. Bieri) And you don't know -- do you
5 know the reported rate of persistent or permanent hair
6 loss with Taxol?
7 A. Do I personally know that?
8 Q. Mm-hmm.
9 A. No.
10 Q. Can you say, to a reasonable degree of
11 medical certainty, that Miss Kahn's hair would look
12 different today if she took Taxol instead of Taxotere?
13 MR. MICELI: Object to the form.
14 A. (Shakes head.) I don't know that there
15 wasn't any different at all.
16 Q. Can you say, to a reasonable degree of
17 medical certainty, that Miss Thibodeaux's hair would
18 look any different today if she had been treated with
19 Taxol instead of Taxotere?
20 MR. MICELI: Same objection.
21 A. No.
22 Q. (By Ms. Bieri) I want to direct you to just
23 a few of the records of Plaintiff. Let me fix my mic
24 quickly. There we go.
25 On the second page of Exhibit 4 is it your

109

1 understanding that this record, the page you're
2 looking at and the prior page, address your first
3 encounter with -- with Mrs. Kahn?
4 A. My first encounter with her?
5 Q. Yes.
6 A. Is this the first one in the record? If it
7 is, it was my first encounter. I don't remember
8 whether this was my first encounter or second
9 encounter.
10 Q. Okay. In the first -- forgive me for
11 pointing. In the first paragraph on the second page
12 that's Bates numbered 861, you wrote, "I had a long
13 discussion lasting 20 or more minutes with the patient
14 and her husband with regard to neoadjuvant
15 chemotherapy." Do you have any recollection of what
16 you would have discussed with her?
17 A. The risks and benefits of treatment.
18 Q. Of neoadjuvant chemotherapy?
19 A. Correct.
20 Q. And at this point it hadn't been determined
21 if she was going to be in NSABP-40 yet; correct?
22 A. No. We would have treated her essentially
23 the same.
24 Q. Let me direct you to a page in Exhibit 4
25 that's Bates labeled 953. So the numbers in the

28 (Pages 106 to 109)

**Page 110**

1  bottom right-hand corner are 953.
2      A. 953?
3      Q. Yes, please.
4      A. Oh, okay. All right.
5      Q. At the end of the first paragraph, it's
6  really the middle, there's a sentence that starts with
7  the word "She."
8      A. Yeah.
9      Q. "She has been enrolled on NSABP protocol
10 B-40. She was randomized to receive bevacizumab,
11 Taxotere, and Xeloda."
12     A. Right.
13     Q. "This will be her first course of treatment.
14 We discussed risks and benefits as well as side
15 effects of each of the individual medications."
16     A. Right.
17     Q. As to hair loss, would your discussion have
18 been any different from what you told me when we were
19 speaking generally?
20         MR. MICELI: Object to the form.
21     A. No. And of course this was dated '08 --
22     Q. (By Ms. Bieri) Yes.
23     A. -- which is a few years ago.
24     Q. Yes.
25     A. Exactly what was discussed cannot be

**Page 111**

1  recalled.
2      Q. Sure. Do you have any reason to believe
3  that what you discussed with Miss Kahn was different
4  than your -- your typical discussion of hair loss that
5  you've already told us about in this deposition?
6      A. No. It would have been -- would have been
7  the same.
8      Q. Do you know what other risks or benefits you
9  would have talked about regarding bevacizumab,
10 Taxotere, or Xeloda? Would --
11     A. Huh? No.
12        MR. MICELI: It's a bird.
13     Q. (By Ms. Bieri) You don't recall?
14     A. No.
15     Q. Let me direct you to Exhibit 5, please,
16 Doctor. Would you like me to help you?
17     A. Yeah.
18     Q. I know there's a bunch of them there, aren't
19 there? Hmm. Well --
20     A. I don't appear to have 5.
21        MS. BIERI: Can we go off for a minute and
22 find 5?
23        MR. MICELI: Yeah. Sure.
24        MS. BIERI: Thank you.
25        THE VIDEOGRAPHER: The time is 1:02 and we

**Page 112**

1  are off the record.
2         (A brief recess was had.)
3         THE VIDEOGRAPHER: The time is 1:03 and we
4  are back on the record.
5      Q. (By Ms. Bieri) Doctor, I'd like to direct
6  you to Exhibit 5. Can you tell me what patient
7  specific factors related to Miss Thibodeaux you
8  considered when recommending she participate in NSABP
9  B-40?
10     A. Well, she had a very definite mass in her
11 right breast. She was a candidate for so-called
12 neoadjuvant chemotherapy meaning chemotherapy given
13 before other operative-type treatment, and had a
14 fairly large lesion in her breast. And the --
15     Q. Did you -- oh, I'm so sorry, Doctor.
16     A. Well, I was just going to say that the
17 clinical trial offered what was good treatment being
18 compared to something we thought might be better.
19     Q. Meaning comparing ACT to what was being
20 studied in the trial; correct?
21     A. Correct.
22     Q. And did you determine her cancer to be a T3
23 NO?
24     A. It was a T3. She was clinically NO and --
25 meaning that on exam. Now, she wasn't necessarily

**Page 113**

1  pathologically NO.
2      Q. Because she hadn't had surgery yet?
3      A. Sure.
4      Q. And at the bottom of the first page that
5  you're looking at, it says, "We did discuss NSABP
6  protocol B-40 in detail."
7      A. Mm-hmm.
8      Q. "This protocol evaluates standard
9  chemotherapy with or without Avastin, also known as
10 bevacizumab." Correct?
11     A. Right.
12     Q. Okay. Do you have any recollection of what
13 that discussion would have entailed?
14     A. Not in -- not in any detail, no.
15     Q. Would it have mirrored what was in the
16 informed consent?
17     A. Yes.
18     Q. Looking at your note for April 16th of 2008
19 which has a Bates number 681 in the bottom right-hand
20 corner.
21     A. All right.
22     Q. Looking at the third paragraph, what does
23 that first sentence say?
24     A. "It does appear that she's beginning to get
25 a good response to chemotherapy, and she should return