**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**


**In Re: TAXOTERE (DOCETAXEL)**                                    **MDL NO. 2740**
**PRODUCTS LIABILITY LITIGATION**


                                                                    **SECTION "H" (5)**


**THIS DOCUMENT RELATES TO:**

**Elizabeth Kahn, Case No. 2:16-cv-17039**

_____

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF JANET ARROWSMITH, M.D.**

_____

The PSC seeks to exclude the testimony of Dr. Janet Arrowsmith, a board-certified internal medicine doctor, epidemiologist, and FDA veteran,[1] retreading arguments this Court previously rejected, ignoring Dr. Arrowsmith's unique qualifications and considerable experience, and advancing meritless technical arguments more appropriately addressed on cross-examination. The PSC's motion should be denied for the following reasons:

First, Dr. Arrowsmith's opinions related to alopecia associated with other drugs are reliable and admissible. Plaintiff, not Sanofi, bears the burden of *affirmatively proving* that Taxotere has a statistically significant causal relationship with permanent alopecia. Sanofi may then challenge that evidence, as this Court already recognized.

Second, Dr. Arrowsmith's opinion that "the *currently* available scientific evidence does not support an unequivocal causal role for Taxotere alone in persistent or permanent alopecia" is admissible. Contrary to the PSC's assertions, Dr. Arrowsmith conducted an independent analysis of the TAX 316 study data, and her conclusion that the study does not demonstrate statistical

---

[1]    **Ex. A**, Dec. 9, 2019 Arrowsmith Rpt. at ¶ 3–5.

significance aligns with every expert (Plaintiff or Defense) who has analyzed this data.  Moreover,

the Court has already rejected the PSC's argument that Dr. Arrowsmith improperly relied on Dr.

Kopreski's testimony regarding TAX 316, finding Dr. Arrowsmith conducted her own,

independent review of that study's data.

Finally, Dr. Arrowsmith is uniquely qualified to offer testimony on FDA labeling

requirements and the sufficiency of the Taxotere label under those requirements.  In addition to

her extensive, 36-year career in private practice and academia, Dr. Arrowsmith has held numerous

positions at FDA.  And the PSC's arguments that Dr. Arrowsmith did not adequately disclose those

opinions are baseless.

## ARGUMENT

**I.      Dr. Arrowsmith's Opinions Challenging Plaintiff's Causation Evidence are Reliable and Admissible.**

As set forth in more detail in Sanofi's Opposition to Plaintiff's Motion for Partial Summary

Judgment on General Causation and Sanofi's Opposition to Plaintiff's Motion for Partial Summary

Judgment on Affirmative Defenses Concerning Alternative Causes, the PSC's challenge to Dr.

Arrowsmith's causation testimony misinterprets both law and fact and should be denied.

### A. Dr. Arrowsmith's Opinions About Taxotere and PCIA are Reliable and Admissible.

The PSC claims that Dr. Arrowsmith's testimony is unreliable because she did not conduct

the full two-part general causation analysis adopted by this Court in order to prove general

causation.[2]  However, it is Plaintiff—not Sanofi—who bears the burden of proof on proximate

---

[2]    Rec. Doc. 10926-1 at 5–7 (Pl.'s Mot. To Exclude Test. of Janet Arrowsmith, M.D.) (asserting that Dr. Arrowsmith should have performed a full causation analysis, including analyzing the Bradford-Hill criteria, for her causation opinion to be reliable and admissible).

causation.[3]  Dr. Arrowsmith is not required to analyze the statistical significance between Taxotere and permanent hair loss, apply the Bradford-Hill criteria, or disprove causation.[4]  Indeed, Dr. Arrowsmith neither claims nor attempts to prove that Taxotere *does not* cause permanent alopecia.

Instead, Dr. Arrowsmith offers reasonable rebuttal evidence and challenges the sufficiency of Plaintiff's "proof" that Taxotere is the sole cause of Plaintiff's alleged permanent hair loss, or "PCIA."[5]  Specifically, Dr. Arrowsmith opines that:

> the *currently* available scientific evidence does not support an unequivocal causal role for Taxotere alone in persistent or permanent alopecia…[because] the data [is] too confounded to make such an assertion with any scientific or medical certainty."[6]

In addition to her 36 years of academic and professional experience in post-market safety surveillance,[7] Dr. Arrowsmith arrived at this conclusion after reviewing and analyzing the TAX 316 study protocols, the study's statistical analysis plan, multiple clinical study reports, the study's 2004 interim analysis, and the 2009 final analysis.[8]  In total, Dr. Arrowsmith reviewed and analyzed nearly 5,000 pages of TAX 316 data.  Dr. Arrowsmith further conducted her own test for statistical significance (the Fisher Exact test)[9] comparing the occurrence of patients with alopecia listed as "ongoing" in the study's TAC regimen versus the same patients in the study's FAC regimen.[10]  Based on this analysis, Dr. Arrowsmith concluded that the results of TAX 316 do not

---

[3]   *Id.*

[4]   *See Rando v. Anco Insulations, Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (establishing that plaintiff bears the burden of proving the cause of her injury).

[5]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at ¶ 116.

[6]   *Id.* at Section II(i).

[7]   *Id*. at ¶¶ 3–9.

[8]   *Id.* at ¶¶ 114–18.

[9]   This is the same test for statistical significance utilized by Dr. Madigan, Plaintiff's expert biostatistician. *See* **Ex. B**, Mar. 23, 2020 Madigan Rpt. at ¶ 56, Table 7; **Ex. C**, Apr. 10, 2020 Madigan Dep. 44:6–9; 45:6–46:1.

[10]  **Ex. D**, July 29, 2020 Arrowsmith Dep. at 42:19–44:7.

support a causal relationship between Taxotere and persistent alopecia because there is no statistically significant difference between the incidence of "ongoing alopecia" in the study participants who received TAC versus those who received FAC.[11]   Moreover, Dr. Arrowsmith's findings are consistent with every expert to consider the issue, including Plaintiff's own expert biostatistician, Dr. David Madigan.[12]

In addition to her own analysis, Dr. Arrowsmith also analyzed the testimony of Dr. Michael Kopreski, which the PSC (as in *Earnest*) once again claims was improper because Dr. Arrowsmith allegedly did not independently verify his testimony.  The PSC's argument is still wrong.  Based on Fifth Circuit jurisprudence, this Court previously held that "experts are permitted to rely on analyses or studies conducted by others, provided such reliance is reasonable."[13]  The Court went on to explain that "[Defense experts] are not required to check every aspect of Dr. Kopreski's work for [their] reliance on the work to be reasonable."[14]  Further, the Court recognized that Dr. Arrowsmith "examined patient data for two TAX 316 patients and reached the same conclusions as doctor Kopreski," and her reliance on Dr. Kopreski's testimony was accordingly reasonable.[15] That continues to be true, and the PSC has presented no new evidence or circumstance that merits revisiting that ruling.

---

[11]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at ¶¶ 113, 116.

[12]   Ex. B, Mar. 23, 2020 Madigan Rpt. at ¶ 64; *see also* **Ex. E**, Sept. 18, 2019 *Earnest* Trial Tr. 704:4–706:11 (Dr. Madigan admitted during the *Earnest* trial that neither TAX 316 nor TAX 301 showed a statistically significant relationship between Taxotere and ongoing alopecia).

[13]   Rec. Doc. 7974 (Order and Reasons Denying Pl.'s Mot. to Exclude Expert Test. that Relies Upon Defendants' Employee Dr. Michael Kopreski); Rec. Doc. 9294 (Order and Reasons Denying Pl.'s Mot. for New Trial).

[14]   Rec. Doc. 9294 (Order and Reasons Denying Pl.'s Mot. for New Trial).

[15]   *Id.*

### B. Dr. Arrowsmith's Opinions about Other Drugs and PCIA are Reliable and Admissible.

The PSC also bears the burden for eliminating possible alternate causes for Ms. Kahn's alleged hair loss.  Here, Dr. Arrowsmith opines, based on the relevant literature, that permanent hair loss is associated with a host of chemotherapies, including Adriamycin, Taxol, and Taxotere, among a number of others.[16]  Plaintiff's own experts have repeatedly acknowledged that other chemotherapy drugs and hormonal therapies are associated with persistent hair loss.[17]  Further, the Court has already addressed this issue in *Earnest*, denying the PSC's similar motion *in limine* to preclude Sanofi's experts from asserting the undisputed fact that permanent hair loss, or "PCIA," is associated with multiple other chemotherapies and anti-cancer agents.[18]  In *Earnest*, the Court confirmed that "Plaintiff has the burden of proof," and Sanofi must be permitted to challenge those findings.[19]  Accordingly, the PSC's challenges to Dr. Arrowsmith's opinions must be denied.

## II.        Dr. Arrowsmith's Labeling Opinions Are Reliable and Admissible.

### A.        Dr. Arrowsmith's Report Satisfies Rule 26(a)(2)(B) and Federal Rule of Evidence 702.

The PSC concedes that "Dr. Arrowsmith has the experience and education to offer regulatory and labeling opinions,"[20] but claims that she did not adequately disclose those opinions in her report.[21]  Moreover, the PSC argues that Dr. Arrowsmith's entire labeling opinion should be excluded because Dr. Arrowsmith defines the term "reasonable evidence" "without reference or support."[22]  In making this argument, the PSC ignores that Dr. Arrowsmith's opinions are premised on her extensive experience in the field.

Pursuant to FDA regulations,[23] safety signals should be included in a drug label's "Warning or Precautions" section when "reasonable evidence of a causal association exists."[24]  Dr.

5

Arrowsmith defines "reasonable evidence" of a causal association as a signal that is "confirmed and is not merely a 'weak' or 'potential' signal referred for further evaluation.[25]

As Dr. Arrowsmith explains in her report, in some contexts, using medical and regulatory judgment to define a term is necessary when, like here, statutory definitions are not available.[26] Dr. Arrowsmith's definition of "reasonable evidence" is based on her decades of experience in the regulatory sector (including nine years at FDA).  When Plaintiff inquired about this at Dr. Arrowsmith's deposition, she confirmed that her definition of "reasonable evidence" is based on her knowledge of safety signals and how they are evaluated.[27]  Indeed, her opinions are squarely

---

[16]   *See, e.g.*, Ex. A**,** Dec. 9, 2019 Arrowsmith Rpt. at ¶ 118 (explaining that all TAX 316 patients "who were recorded as having persistent alopecia were also treated with doxorubicin and cyclophosphamide, both of which are associated with reports of persistent alopecia in the absence of Taxotere treatment," and citing reports as support).

[17]   Rec. Doc. 10704 at 7 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59) ("Plaintiffs' own experts have acknowledged that [Adriamycin and Cytoxan] are associated with permanent hair loss."); Ex. E, Sept. 20, 2019 *Earnest* Trial Tr. at 1219:4–9 (Dr. Feigal testifying during the *Earnest* trial that there have been cases of permanent hair loss reported for both Cytoxan and Adriamycin); Sept. 18, 2019 *Earnest* Trial Tr. at 861:7–9, 873:19–21 (Dr. Plunkett testifying during the *Earnest* trial that she identified permanent hair loss as a hazard associated with Adriamycin and Cytoxan).

[18]   Rec. Doc. 8198 at 1 (Minute Entry Granting in Part and Denying in Part Pl.'s Mot. *in Limine* to Preclude Testimony and Evidence Regarding Other Chemotherapy Medications or Medical Conditions That Purportedly Cause Permanent Hair Loss); *see also* Rec. Doc. 7651 (Pl.'s Mot. *in Limine* to Preclude Testimony and Evidence Regarding Other Chemotherapy Medications or Medical Conditions That Purportedly Cause Permanent Hair Loss).

[19]   **Ex. F**, Sept. 5, 2019 Hr'g Tr. at 35:2–14.

[20]   Rec. Doc. 10926-1 at 13 (Pl.'s Mot. To Exclude Test. of Janet Arrowsmith, M.D.).

[21]   *Id*. at 13–14.

[22]   *Id*. at 13.

[23]   21 CFR § 201.57(c)(6).

[24]   Rec. Doc. 10926-1 at 13 (Pl.'s Mot. To Exclude Test. of Janet Arrowsmith, M.D.) (citing 21 CFR § 201.57(c)(6)).

[25]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at ¶ 29.

[26]   *Id.* at ¶ 28 ("It is my opinion, based on my experience at FDA and my regulatory work since leaving the Agency, that in determining which adverse reactions may be 'important medical events' but do not meet the strict regulatory definition of a serious adverse reaction, the Agency considers a variety of factors such as the indication, the relative seriousness of the disease or condition treated, and the incidence of the adverse reaction. . . Thus, medical and regulatory judgment are necessary in determining what 'important medical events' are of clinical significance and should be included in the 'Warnings' or 'Warnings and Precautions' section of the labeling.").

[27]   Ex. D, July 29, 2020 Arrowsmith Dep. at 54:11–55:8 ("Q: You next go in the report – your report at paragraph 29, you state that 'In this context, reasonable evidence of a causal association means a signal is confirmed and is

in accord with FDA's own interpretation of safety signals as they relate to labeling decisions.  As

Dr. Arrowsmith explains in her report:

> [s]afety signal refers to a concern about an excess of adverse events
> compared to what would be expected to be associated with a
> product's use. . . . Signals generally indicate the need for further
> investigation, which may or may not lead to the conclusion that the
> product caused the event.[28]

This supports Dr. Arrowsmith's opinion that "reasonable evidence" is more than just a "weak" or

"potential signal."  The PSC acknowledges that Dr. Arrowsmith is qualified on labeling issues

based on her extensive experience—that same experience qualifies her to testify as to how

"reasonable evidence" is defined.  Further, as the Supreme Court explained in *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, "[v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence." 509 U.S. 579, 595 (1993).  Accordingly, Plaintiff's arguments

must be rejected.

### B.     Plaintiff Intentionally Conflates Dr. Arrowsmith's Labeling and Causation Opinions.

The PSC also argues that Dr. Arrowsmith used the incorrect "standard for the inclusion of

a warning or precaution" in her analysis of the Adverse Reactions section of Taxotere's label.[29]

Specifically, the PSC suggests that Dr. Arrowsmith "does not offer an opinion in her report that

evidence [of PCIA] did not exist at the time of Plaintiff's use of Taxotere" such that it would fail

---

not merely a 'weak' or 'potential' signal referred for further evaluation,' right?  A: Yes.  Q: In the section that we
just reviewed for warnings and precautions, they do not say anything about weak or potential signals, do they?
A: No. . . .   Q: That's your interpretation of what it would take to meet or to not met the standard of a causal
association, right?  A: Certainly knowing what a signal is and how they're evaluated, that's correct.").

[28]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at ¶ 53 (quoting FDA Guidance for Industry, Good Pharmacovigilance
Practices and Pharmacoepidemiologic Assessment, March 2005).

[29]   Rec. Doc. 10926-1 at 13–14 (Pl.'s Mot. To Exclude Test. of Janet Arrowsmith, M.D.).

the "reasonable evidence of a causal association" standard.[30]  Instead, the PSC asserts that Dr. Arrowsmith applies the "unequivocal causal role" standard when determining whether the Adverse Reactions section of a prescription drug label should be changed.[31]

Plaintiff, however, misstates Dr. Arrowsmith's opinions, conflating Dr. Arrowsmith's labeling and causation-based opinions in an attempt to preclude her from offering labeling opinions at trial.  Dr. Arrowsmith does not, as the PSC asserts, offer any labeling opinion based on the standard of "unequivocal causal role."  Instead, and throughout her Report, Dr. Arrowsmith uses the "unequivocal causal role" standard solely when discussing Plaintiff's general-causation evidence.[32]  Indeed, at her deposition, Dr. Arrowsmith agreed that unequivocal proof is not necessary before a label update can be made.[33]  The PSC's arguments take sections of Dr. Arrowsmith's report out of context and must be denied.

### C.      Dr. Arrowsmith's Labeling Opinion is Straightforward and Reliable.

Dr. Arrowsmith's Report sets forth a clear explanation of FDA's prescription drug labeling requirements, and provides valuable insight into the ways these regulations have changed over time.[34]  As Dr. Arrowsmith explains, FDA's labeling requirements for prescription drugs are largely set out in various regulations including, but not limited to, 21 CFR § 201.56 and 201.57.[35] To underscore the sufficiency of Taxotere's label, Dr. Arrowsmith's Report is replete with information regarding FDA's prescription drug labeling guidelines.

---

[30]   *Id*. at 14.

[31]   *Id.*

[32]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at Section II(i), ¶ 141.

[33]   Ex. D, July 29, 2020 Arrowsmith Dep. at 162:20–163:5.

[34]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at ¶¶ 22–36; 59–85.

[35]   *Id.* at ¶ 23.

For example, before 2006, Dr. Arrowsmith explains the label section "Warnings" could only include "serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur."[36]  As used in this context, "serious adverse reactions" only included "adverse drug experience[s] occurring at any dose that results in any of the following outcomes: Death, a life threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or  a congenital anomaly/birth defect."[37]  During this time, the "Precautions" section of the label contained "information that did not merit inclusion in the Warnings."[38]  FDA labeling guidelines were later revised in 2006 to combine the Warnings and Precautions sections.[39]

Dr. Arrowsmith's labeling opinion is straightforward.  Under FDA regulations, permanent alopecia was not appropriate in the "Warnings and Precautions" section of the U.S. Package Insert because FDA does not consider alopecia a "serious adverse event."[40]  The inclusion of alopecia *was* appropriate in the "Adverse Reaction" section of the label, but it was not, according to Dr. Arrowsmith, necessary to include information on "permanent" alopecia because alopecia is a broad term that encompasses all durations of alopecia—from temporary to permanent.[41]  Further, the inclusion of the phrase "hair generally grows back" into the patient information section was also appropriate because it further emphasized to patients that there was a chance their hair would not

---

[36]   *Id.* (citing 21 CFR § 201.57(e)).

[37]   *Id*. (citing 21 CFR § 314.80; 21 CFR § 312.32.).

[38]   *Id.* (citing 21 CFR § 201.57(f)(1) (April 1, 2005)).

[39]   *Id.* at ¶¶ 26–27.

[40]   *Id.* at ¶ 162; Ex. D, July 29, 2020 Arrowsmith Dep. 175:3–20 ("Q. Do you recall reviewing Linda Gustavson's testimony that Sanofi did not include any warning or precaution for hair loss in its submission of this slide deck? . . . A. Well, knowing what the definition of warnings and precautions is, alopecia, hair loss, would not be included in the warnings or precautions section or the combined section after 2006, so it would not be appropriate for inclusion in the Warnings or Precautions.").

[41]   Ex. A, Dec. 9, 2019 Arrowsmith Rpt. at ¶ 67–68.

come back.[42]  The PSC has not presented any legitimate arguments to bar Dr. Arrowsmith from

offering these opinions at trial.

## CONCLUSION

For all of the reasons stated above, Plaintiff's Motion to Exclude the Testimony of Dr.

Arrowsmith should be denied.

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and*
*Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2020, I electronically filed the foregoing with the

Clerk of the Court using the ECF system which sent notification of such filing to all counsel of

record.

/s/ *Douglas J. Moore*

---

[42]    *Id.* at ¶ 65, 168.