**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                 **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                                 **SECTION "H" (5)**

**THIS DOCUMENT RELATES TO:**

**Elizabeth Kahn, Case No. 2:16-cv-17039**

---

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN GLASPY, M.D.

---

The opinions that Dr. Glaspy is offering in this case are the same opinions that this Court allowed in *Earnest*. The PSC's arguments are not new and have been rejected multiple times. These recycled arguments have no merit, and the PSC's motion should be denied for the following reasons:

<u>First</u>, Dr. Glaspy is qualified. At trial, over the PSC's similar objections, this Court accepted Dr. Glaspy as an expert in the field of oncology, breast cancer care and treatment, labeling, risk information for chemotherapy, clinical trials, informed consent, and the side effects of chemotherapy.[1] The PSC raises nothing new to alter this outcome.

<u>Second</u>, Dr. Glaspy offers opinions on the sufficiency of the evidence Plaintiff and her experts rely on regarding Taxotere and persistent hair loss. Specifically, Dr. Glaspy opines that the scientific evidence is not sufficient to reliably conclude that Taxotere causes persistent hair loss. Instead, the medical literature and clinical data demonstrate an association between numerous

---

[1] *See* **Ex. A**, *Earnest* Trial Tr. 1976:21-1980:24 (Sept. 25, 2019).

anti-cancer medications and persistent hair loss—including several that were used to treat Ms. Kahn (i.e., Adriamycin, cyclophosphamide, Taxotere, and Tamofixen). Dr. Glaspy's opinion is that any association with Taxotere is no more significant than the association with these other chemotherapies and anti-cancer agents. As a result, there is no medically reliable way to trace Ms. Kahn's alopecia to Taxotere specifically, as opposed to the other risk factors to which she was exposed. Dr. Glaspy's opinions about the risk factors associated with persistent hair loss, the quality of the evidence regarding these associations, and the inadequacies of the Plaintiff's "general causation" evidence is not equivalent to offering an affirmative opinion on general causation as the PSC suggests. These are the same opinions that were allowed in *Earnest* and they are proper here.[2]

Third, Dr. Glaspy's Report properly discloses his opinions and the bases for his opinions consistent with Rule 26(a)(2)(B). The PSC's suggestions to the contrary ignore page after page of Dr. Glaspy's report covering the very topics they argue are absent.

When taken as a whole, the PSC's Motion attempts to improperly shift the burden of proof to Sanofi to *disprove* causation, while simultaneously re-litigating issues the PSC has previously raised and this Court has already addressed. For these reasons, the PSC's Motion to Exclude the Expert Testimony of Dr. Glaspy should be denied in its entirety.

## ARGUMENT

### I.     Dr. Glaspy Is Qualified to Offer the Opinions Expressed in His Report.

The PSC's "all or nothing" approach to qualifications misses the point and is unsupported by the law. Simply because Dr. Glaspy is not a board certified dermatologist does not mean that his expertise does not touch alopecia. And just because Dr. Glaspy is not a "regulatory expert"

---

[2]    *See, e.g.*, **Ex. B**, *Earnest* Trial Tr. 2017:11-2021:3; 2043:15-24 (Sept. 25, 2019).

does not mean that his expertise does not touch issues such as clinical trials, submission of data, and labeling. Dr. Glaspy has over 34 years of experience treating patients with cancer, prescribing chemotherapies and other anti-cancer medications, running clinical trials, and studying the risks and side effects of such medications.[3] As Dr. Glaspy explained, there is "a venn diagram"[4] between oncology and other areas of expertise. This includes areas such as alopecia and clinical trial or labeling issues. This Court has already addressed Dr. Glaspy's qualifications (and the PSC's objections to the same) and there is no basis to change that determination.[5]

### A. This Court has Already Accepted Dr. Glaspy as an Expert in Breast Cancer Care and Treatment and the Side Effects of Chemotherapy.[6]

Alopecia is a well-known side effect of chemotherapy and anti-cancer medications and something oncologists deal with on a daily basis in the care and treatment of their breast cancer patients.[7] Dr. Glaspy has sufficient expertise, based on his experience and training, to offer testimony regarding the common types and causes of alopecia he observes and treats in his breast cancer patients. *See Huss v. Gayden*, 571 F.3d 442, 453-56 (5th Cir. 2009) (holding that doctor who treated patients with similar conditions could rebut the plaintiff's expert causation opinion and rejecting trial court's decision that an expert could only testify if they were board certified in particular specialties); *In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 1352860, at *5 (E.D. La. Apr. 13, 2017) (holding expert's reliance on clinical experience, peer-reviewed studies, and labeling was adequate to offer opinion on causation); *Holbrook v. Lykes*

---

[3]  *See* Ex. A, *Earnest* Trial Tr. 1966:10-1971:17; 1973:13-1976:24 (Sept. 25, 2019).

[4]  **Ex. C**, Glaspy Dep. 164:21-24 (Jan. 18, 2019) ("You're talking now about where dermatology and [oncology] leave off and pick up. And I think there's a little bit of a venn diagram there, I think.").

[5]  *See* Ex. A, *Earnest* Trial Tr. 1966:10-1971:17; 1973:13-1976:24 (Sept. 25, 2019).

[6]  *Id.* 1976:21-1980:24 (Sept. 25, 2019).

[7]  Ex. C, Glaspy Dep. 96:11-23 (Jan. 18, 2019) ("It was of great professional interest because it was – it's part of the daily issues that I have to deal with, with patients. So I care a lot about it."); **Ex. D**, Glaspy Dep. 107:22-108:4 (Jan. 9, 2020) ("Again, this is one of the things that oncologists deal with every day.").

*Bros. S.S. Co*., 80 F.3d 777 (3d Cir. 1996) (allowing physicians to testify about areas that they see in their daily practice).  Simply because Dr. Glaspy is not a dermatologist does not exclude him from offering any testimony on alopecia, and certainly on the "presentation and causes of alopecia"—particularly as they relate to his clinical practice.[8]

Dr. Glaspy testified alopecia is "of great professional interest," because it is "part of the daily issues" he addresses with patients.[9]  He counsels women on the risks of anti-cancer medications, and specifically, the risk of hair loss.[10]  He also frequently relies on his clinical experience and training to identify and treat his patients' hair loss.[11]  For example, he has treated thousands of women with hair loss and thinning following hormonal therapies, and the duration of hair loss and amount of recovery has varied from patient to patient.[12]  In fact, Dr. Glaspy has provided testimony, based on his clinical experience and training, on the presentation of

---

[8]  *See* Ex. D, Glaspy Dep. 209:6-19 (Jan. 9, 2020); **Ex. E**, Glaspy Dep. 40:19-41:13 (May 13, 2020) ("I have practiced oncology with the majority of my practice being women, and the majority of those women receiving adjuvant treatment for breast cancer for more than 30 years. So on a daily basis I study the effects of all live - - everything that comes with the whole breast cancer diagnosis and treatment, so I think that gives me a pretty good handle on what the impacts of these are on these women. In fact, I would argue that's a better handle than doing academic research and sending out questionnaires.").

[9]  Ex. C, Glaspy Dep. 96:11-23 (Jan. 18, 2019) ("It was of great professional interest because it was – it's part of the daily issues that I have to deal with, with patients. So I care a lot about it."); Ex. D, Glaspy Dep. 107:22-108:4 (Jan. 9, 2020) ("Again, this is one of the things that oncologists deal with every day.").

[10]  Ex. B, Earnest Trial Tr. 2014:1-20 ("Then we have to talk about the side effects of chemotherapy, and they include increased risk of infection that can be fatal, heart damage, leukemia at some point in the future, nerve damage, rashes, allergic reactions, nausea, vomiting.  And hair loss is a side effect of all these regimens; that would be part of the discussion as well.").

[11]  *See* Ex. E, Glaspy Dep. 68:1-19 (May 13, 2020) ("there isn't an oracle of established literature to go to say here's the once and forever definition of permanent alopecia, and here's how you measure it, and here's the rate in this trial or that trial . . . . but there are plenty of doctors out there who have been doing this for more than 25 years, and I think that's where the best repository right now is for experience with these drugs and this side effect.").

[12]  Ex. D, Glaspy Dep. 100:7-101:20 (Jan. 9, 2020) ("But to me, as a practicing oncologist, the thinning of hair, when women receive these hormonal drugs, is pretty - - happens commonly enough that we know they're linked."); *id.* at 105:1-8 ("Q. What about with your personal experience? Is it just the one patient? A. No. My personal experience is with thousands of women. I've been doing this for a long time. These drugs are old. They've been around forever.").

androgenetic alopecia,[13] endocrine therapy-induced alopecia,[14] chemotherapy-induced alopecia,[15] and various other medical conditions associated with alopecia.[16]  Dr. Glaspy has already been accepted as an expert in the side effects of anti-cancer medications and alopecia is no exception.

**B.  This Court has Already Accepted Dr. Glaspy as an Expert in Labeling, Risk Information for Chemotherapy, Clinical Trials and Informed Consent.[17]**

Labeling, risk information for chemotherapies, clinical trials, and informed consent inevitably intersect with what the PSC is calling "regulatory" opinions.  Yet, these are all areas where Dr. Glaspy has extensive experience and areas he should be allowed to testify on as he did in *Earnest*.

Dr. Glaspy has repeatedly explained that his experience enables him to comment on aspects of the "regulatory" process as they relate specifically to his experience with clinical trials, the drug approval process, the submission of data from a clinical trial to the FDA, and prescription drug

---

[13]   Ex. D, Glaspy Dep. 100:21-25 (Jan. 9, 2020) ("Q. What type of alopecia does Tamoxifen cause? A. Well, what it looks like most is androgenetic alopecia. It can be patchy and it can be diffuse. In general, in women, they don't - - the hairline doesn't recede as much as it does in men."); *id.* at 192:6-10 ("Q. Can you tell me how a female patient with androgenetic alopecia presents clinically? A. With either thinning hair, just diffusely thinning hair, or patchy alopecia, and less commonly with a receding hairline."); *id.* at 199:16-18 ("Androgenetic, as I've said a few times today, can be patchy. It's usually not, but it can be patchy.").

[14]   Ex. D, Glaspy Dep. 119:21-120:2 (Jan. 9, 2020); *id.* at 199:16-18.

[15]   Ex. D, Glaspy Dep. 102:11-22 (Jan. 9, 2020) ("Q. How did you quantify the person's hair loss? A. You can do it by inspection. You can start to see scalp where before you saw hair, and by feeling it. But I've never had a person who had hair loss that didn't know it. They tell you what's happening"); *id.* at 199:11-200:5.

[16]   Ex. D, Glaspy Dep. 202:15-203:15 (Jan. 9, 2020) ("We're mixing some diseases, some kinds of alopecia, and a mechanism. So we're saying telogen effluvium is a disease, it's not. It's a mechanism of hair loss that happens with several of the things that can happen. The hormonal abnormalities, for instance, and liver disease and stress and surgery, and all those things can cause alopecia through telogen effluvium. . . . I don't do dermoscopy, but I wouldn't broadly agree that I don't know anything about what's going on in the hair follicle with these different illnesses."); *see also id.* at 102:11-5 ("It was ruled in. She had lupus. The question was, how much of her alopecia was being caused by the lupus."); *id.* at 197:2-14 (regarding hypothyroidism and vitamin deficiencies, "When I've seen it it's been diffuse thinning of the hair.").

[17]   *See* Ex. A, *Earnest* Trial Tr. 1976:21-1980:24 (Sept. 25, 2019) ("The court is going to accept Dr. Glaspy as an expert in the field of oncology, breast cancer care and treatment, labelling, risk information for chemotherapy, clinical trials, informed consent with side effects of chemotherapy qualified to render opinions in those areas.").

labeling.[18]  Dr. Glaspy has extensive experience in the drug development and approval process through clinical trials, and has participated in new drug applications for stem cell factor, Neulasta, Neuopen, Aranesp, and Herceptin.[19]  Dr. Glaspy's clinical practice involves reviewing labeling, as well as extensive informed consent conversations about risk information.[20]  Finally, Dr. Glaspy is also an Endowed Chair at UCLA, and as a result, a part of his practice requires him to coordinate with the University, pharmaceutical companies, and the FDA as they develop clinical trial research.[21]  This education, training, and experience more than qualifies Dr. Glaspy to offer the opinions in his report.

## II.   Dr. Glaspy's Opinions on the Adequacy of the Evidence Regarding Taxotere and Persistent Hair Loss as well as The Evidence Regarding the Association Between Other Medications and Persistent Hair Loss are Admissible.

The PSC's argument hinges on their false assertion that Dr. Glaspy is "opining that Taxotere *does not cause* persistent hair loss but that other chemotherapy drugs, hormonal therapies, and medical conditions *do cause* persistent hair loss."[22]  Dr. Glaspy is offering no such opinion. To the contrary, Dr. Glaspy offers the opinion that the scientific evidence is insufficient to reliably

---

[18]  *See, e.g.*, Ex. A, Earnest Trial Tr. 1973:13-1980:24 (discussing qualifications); Ex. B, Earnest Trial Tr. at 2021:20-2026:1 (discussing Taxotere labeling); *id.* at 2026:4-2029:23 (discussing clinical trials); Ex. F, Expert Report of John Glaspy, M.D., at 30-36 (Apr. 29, 2020).

[19]  Ex. A, Earnest Trial Tr. 1976:15-19 (Sept. 25, 2019) (offering testimony regarding new drug applications); *see also* Ex. C, Glaspy Dep. 160:14-161:21 (Jan. 18, 2019) (discussing new drug applications).

[20]  *See* Ex. A, Earnest Trial Tr. 1966:10-1971:17 (discussing qualifications); *id.* at 1973:13-1976:24 (discussing qualifications); Ex. B, Earnest Trial Tr. 2021:20-2026:1 (discussing Taxotere labeling) (Sept. 25, 2019); Ex. F, Expert Report of John Glaspy, M.D., at 8-10, 35-36 (Apr. 29, 2020).

[21]  *See* Ex. A, Earnest Trial Tr. 1967:19-1969:13 (Sept. 25, 2019); Ex. C, Glaspy Dep. 160:14-21 (Jan. 18, 2019) (discussing new drug applications); *id.* at 51:9-52:5 (discussing work with pharmaceutical companies on clinical trials through explanation of financial disclosures to UCLA); *id.* at 121:4-17 (discussing regulatory paperwork Dr. Glaspy completed to enroll UCLA in the TAX 316 clinical trial); Ex. F, Expert Report of John Glaspy, M.D., at 34-35 (Apr. 29, 2020).

[22]  Rec. Doc. 10924-1, at 12 (Plaintiff's Mot. to Exclude Testimony of John Glaspy, M.D.).  In addition, Ms. Kahn's counsel is aware that Dr. Glaspy's opinions are not "statements of causation," rather they are statements of association.  *See, e.g.*, Ex. E, Glaspy Dep. 69:11-20 (May 13, 2020); Ex. D, Glaspy Dep. 88:7-23 (Jan. 9, 2020).

establish that Taxotere causes persistent hair loss.[23]

Additionally, Dr. Glaspy also opines that, as with Taxotere, in the medical literature and clinical data there are associations between many other anti-cancer medications and persistent hair loss, including Adriamycin, cyclophosphamide, and Tamofixen.[24]   These possible alternative causes are "reasonable hypotheses" that are not "remote, conjectural, [or] speculative."  *Weber v. Fidelity & Cas. Ins. Co. of NY*, 250 So. 2d 754, 757–58 (La. 1971); *Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F. Supp. 890, 896 (E.D. La. 1972); *see also Rando v. Anco Insulations, Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (requiring plaintiffs to rule out reasonable hypotheses).   Plaintiff's own experts have admitted this repeatedly.[25]   And when there are numerous associated risk factors to which a plaintiff is exposed, as Ms. Kahn was, Dr. Glaspy opined (as he did in *Earnest*) that it is impossible to reliably trace alopecia to Taxotere

---

23   *See* Ex. D, Glaspy Dep. 108:13-109:1 (Jan. 9, 2020).

24   **Ex. F**, Expert Report of John Glaspy, M.D., at 23-28 (Apr. 29, 2020); *see also* Ex. C, Glaspy Dep. 158:23-159:12 (Jan. 18, 2019); Ex. D, Glaspy Dep. 88:7-89:24 (Jan. 9, 2020); Ex. B, Earnest Trial Tr. 2017:25-2018:18 (Sept. 25, 2019).

25   Rec. Doc. 10704, at 7 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59) ("Plaintiffs' own experts have acknowledged that [Adriamycin and Cytoxan] are associated with permanent hair loss."); **Ex. G**, Tosti Dep. 180:8-16; 313:24-314:8 (Dec. 12, 2019) (testifying there are reports of PCIA from Adriamycin and cyclophosphamide); **Ex. H**, *Earnest* Trial Tr. 1219:4–9 (Dr. Feigal testifying during the *Earnest* trial that there have been cases of permanent hair loss reported for both Cytoxan and Adriamycin); **Ex. I**, *Earnest* Trial Tr. 478:10-18 (Dr. Kessler testifying during the *Earnest* trial that he has seen reports of PCIA associated with both Cytoxan and Adriamycin); **Ex. J**, *Earnest* Trial Tr. 861:7–10, 873:20-25 (Dr. Plunkett testifying during the *Earnest* trial that she identified permanent hair loss as a hazard associated with Adriamycin and Cytoxan); **Ex. K**, *Earnest* Trial Tr. 1057:17–24 (Dr. Tosti testifying "what I really think is that those drugs are, you know, sometimes occasionally causing the problem. I never said they never cause. It's just a question of, likely, frequency."); *id.* at 1030:23–1031:3 (reports of PCIA with anthracyclines); *id.* at 1031:11–16 (reports of PCIA with cyclophosphamide); *id.* at 1058:9–12 (5-FU); *id.* at 1058:20–23 (FEC); *id.* at 1066:12–19 (Tosti co-authored a paper that reported 25% of patients receiving post-chemotherapy endocrine therapy experienced endocrine-induced alopecia); **Ex. L**, Bosserman Dep. at 109:2–11; 142:19–143:18 (Dec. 3, 2018); **Ex. M**, Bosserman Dep. at 417:9–17 (Dec. 10, 2018); **Ex. N**, Kessler Dep. at 238:14–22, 246:12–17, 247:8–249:9 (Dec. 20, 2018); **Ex. O**, Kessler Dep. at 347:25–348:17 (Nov. 26, 2019); **Ex. P**, Madigan Dep. at 208:18–21 (Dec. 7, 2018); **Ex. Q**, Madigan Dep. at 207:10–213:3 (Nov. 14, 2019); **Ex. R**, Plunkett Dep. at 115:1–117:16 (Dec. 10, 2018); **Ex. S**, Plunkett Dep. at 254:5–259:21; 288:20–24, 292:4–25, 297:20–24 (Nov. 19, 2019).

specifically.[26]

Offering an opinion that evidence is insufficient to prove causation does not equate to an opinion that a "drug does not cause" a side effect.  Similarly, stating that there are multiple associated risk factors for an outcome that cannot be reliably excluded does not equate to an opinion that a specific drug "did cause" the outcome in a specific patient.  Plaintiff has the burden to prove causation in this case, not Dr. Glaspy.  It is more than appropriate for Dr. Glaspy to offer criticisms of Plaintiff's causation evidence as well as to explain why alternate explanations for hair loss cannot be excluded.  Dr. Glaspy's methodology was reliable and was the same as the one he used in *Earnest* where he was allowed to offer the same opinions he is offering here.[27]

### A.  Dr. Glaspy's Opinions on the Sufficiency of Plaintiff's "General Causation" Evidence are Admissible and were Properly Allowed by the Court in *Earnest*.

Dr. Glaspy's opinion that there is insufficient evidence to establish that Taxotere causes persistent alopecia is admissible and based on a reliable methodology.  The PSC argues that Dr. Glaspy must follow the same two-prong test that Plaintiff's experts are required to follow when putting forth an affirmative causation opinion.[28]  This simply does not make sense, as Dr. Glaspy is not offering such a causation opinion.  Instead, he is pointing to the weaknesses in Plaintiff's evidence, including the lack of statistical significance in clinical data, such as TAX 316.  This opinion was admitted in *Earnest* and should be admitted here.[29]

Dr. Glaspy bases his opinion that there is insufficient evidence to conclude that Taxotere causes persistent hair loss on: (1) the medical literature and clinical data; (2) his experience

---

[26]   Ex. D, Glaspy Dep. 108:13-109:7 (Jan. 9, 2020); Ex. A, *Earnest* Trial Tr. 1985:11-14 (Sept. 25, 2019); *see also* Ex. F, Expert Report of John Glaspy, M.D., at 48 (Apr. 29, 2020).

[27]   *See, e.g.*, Ex. B, *Earnest* Trial Tr. 2017:11-2021:3; 2043:15-24 (Sept. 25, 2019).

[28]   Rec. Doc. 10924-1, at 3-4 (Pltfs. Mot. to Exclude Test. Of John Glaspy, M.D.).

[29]   Ex. B, *Earnest* Trial Tr. 2017:11-2021:3; 2039:13-2042:1; 2043:15-24 (Sept. 25, 2019).

working with clinical trial data generally, and TAX 316 data specifically; (3) the analysis of Dr. Ellen Chang, an epidemiologist, and Dr. Lee-Jen Wei, a statistician; (4) the analysis of Dr. David Madigan, Plaintiff's statistician; and (5) the testimony of Dr. Kopreski.[30]   The PSC, however, specifically focuses their brief on Dr. Glaspy's opinions on TAX 316 and the testimony of Dr. Kopreski.  The Court has repeatedly addressed and rejected this same argument.

Dr. Glaspy has the foundation necessary to opine on the TAX 316 data.  Dr. Glaspy has been "the principal investigator on hundreds of clinical trials" and has "trained fellows for the last 20 years that are also now involved in clinical research at UCLA and around the country."[31]  With respect to TAX 316, Dr. Glaspy not only completed the "regulatory paperwork" to secure UCLA's participation in the trial, he was also a clinical investigator.[32]  He placed patients on the trial and treated them into the follow-up period, filling out the forms at issue in this case to record side effects, including alopecia.[33]  Dr. Glaspy was also involved in the interpretation of TAX 316 data as the trial progressed, and co-authored an article analyzing the study's ten-year follow-up data.[34] Dr. Glaspy has testified to his own, independent, knowledge and expertise as it relates to the tracking of patients in clinical trials generally, and tracking patients on the TAX 316 trial into the follow-up period, specifically.[35]

---

[30]   Ex. B, *Earnest* Trial Tr. 2039:13-2042:1 (Sept. 25, 2019); Ex. F, Expert Report of John Glaspy, M.D., at 30-37 (Apr. 29, 2020); Ex. D, Glaspy Dep. 70:1-72:19 (Jan. 9, 2020); Ex. E, Glaspy Dep. 160:2-161:4 (May 13, 2020) (Q. Did you do anything to validate anything that Dr. Chang did? A. I didn't do any mathematical analyses that she did. I did read . . . all of the papers that she found, and I did go through a process of evaluating those for myself. It was similar to her process. But I didn't repeat any mathematics she might have done. . . Q. And that's the same thing you [did] for Dr. Wei's report, correct? A. That's correct.").

[31]   Ex. A, *Earnest* Trial Tr. 1974:7-11 (Sept. 25, 2019).

[32]   Ex. C, Glaspy Dep. 121:4-21; 124:13-125:10 (Jan. 18, 2019).

[33]   Ex. C, Glaspy Dep. 121:4-21; 124:13-125:10 (Jan. 18, 2019).

[34]   Ex. C, Glaspy Dep. 121:4-21; 123:13-125:10 (Jan. 18, 2019); Ex. D, Glaspy Dep. 56:19-24 (Jan. 9, 2020).

[35]   *See, e.g.*, Ex. D, Glaspy Dep. 67:1-73:2 (Jan. 9, 2020); Ex. C, Glaspy Dep. 124:13-125:3 (Jan. 18, 2019).

Dr. Glaspy also reviewed the expert analysis of Drs. Chang and Wei—who have both provided their own analysis on the statistical interpretation of the TAX 316 data—and Dr. Madigan, Plaintiff's statistician.[36]  In arriving at her expert opinions, Dr. Chang conducted her own review of case report forms and other clinical trial documentation from TAX 316 for patients who were classified as having "ongoing" treatment-emergent alopecia, or alopecia that "persisted into the follow-up period," and lays out her conclusions in her Report.[37]  Dr. Wei similarly reviewed the available data, and reached the conclusion that there is no statistical evidence showing Taxotere increases the risk of permanent alopecia as compared to other cancer-treatment regimens.[38]

In addition to his reliance on his own experience and the expert Reports and testimony of Drs. Chang, Wei, and Madigan, Dr. Glaspy also reviewed Dr. Kopreski's testimony as Sanofi's 30(b)(6) witness.  When asked about the extent of his reliance on Dr. Kopreski's corporate testimony in forming his opinions, Dr. Glaspy testified:

> Q.    So, in your personal experience, as a witness, you don't have any information about the follow-up of patients in the [TAX] 316, and you're relying 100 percent on Mr. Kopreski's analysis?
>
> A.    **No, I think it actually went the other way.** When I was required to write my report, when it was due, he was still being deposed, and we didn't have a deposition.  And as somebody familiar with clinical trials and how we record

---

[36]    Ex. D, Glaspy Dep. 109:23-25 (Jan. 9, 2020) ("you read Dr. Chang's report and you reference it in your report; correct? A. That's correct); *id.* at 72:12-19 ("Q. Okay. And you've reviewed Dr. Wei's supplemental report. A. And his initial report . . . Q. and you have reviewed Dr. Madigan's report as well; right? A. I have."); Ex. E, Glaspy Dep. 160:2-161:4 (May 13, 2020) (Q. Did you do anything to validate anything that Dr. Chang did? A. I didn't do any mathematical analyses that she did. I did read . . . all of the papers that she found, and I did go through a process of evaluating those for myself. It was similar to her process. But I didn't repeat any mathematics she might have done. . . Q. And that's the same thing you [did] for Dr. Wei's report, correct? A. That's correct."); Ex. F, Expert Report of John Glaspy, M.D., at n.33 (Apr. 29, 2020).

[37]    **Ex. T**, Expert Report of Ellen T. Chang, Sc.D. at 89-93 (Apr. 17, 2020).

[38]    **Ex. U**, Second Supplemental Expert Report of Prof. Lee-Jen Wei at 2-6 (Apr. 17, 2020).

data, Sanofi's attorneys asked me to comment on this – on what persistent alopecia means in the context of a clinical trial.

And I did that.

And we had the table, just not the deposition, so I added it on.

So **it wasn't that I read what he said and then took it for what it meant. It's that, independent of what he was saying, I am able to understand what's going on here; that this isn't – these patients don't necessarily have what we've been calling 'permanent alopecia.'**

Their alopecia score hasn't been reversed yet either, because they weren't followed up, or they still have alopecia, or they disappeared from the clinical trial, those kinds of things.[39]

Finally, in denying Ms. Earnest's motion for a new trial, the Court also rejected Plaintiff's exact argument regarding Dr. Glaspy:

This Court remains convinced that Dr. Glaspy's testimony was appropriate for the jury. **His reliance on Dr. Kopreski's work was reasonable under Federal Rule of Evidence 703**. Dr. Glaspy testified that he was "heavily" involved in the TAX 316 study. He testified that based on his own review of the TAX 316 results, the numbers were not accurate. … Accordingly, Dr. Glaspy knew that the results of TAX 316 were limited. **He simply relied on Dr. Kopreski to specifically illuminate those limitations by analyzing each of the 29 cases. Dr. Glaspy was not required to check every aspect of Dr. Kopreski's work for his reliance on the work to be reasonable**.[40]

"Federal Rule of Evidence 703 allows experts to base their opinions on facts or data that the expert has been made aware of or personally observed, which includes the efforts of other experts, provided that 'experts in the particular field would reasonably rely on those kinds of facts

---

[39]   Ex. C, Glaspy Dep. 118:2-119:28 (Jan. 18, 2019) (emphasis added).

[40]   Rec. Doc. 9294, at 4 (Order and Reasons Denying Pltfs. Mot. For New Trial (Doc. 8394)) (emphasis added).

or data in forming an opinion on the subject."[41]   As this Court acknowledged in *Earnest*, "[g]reat

liberality is allowed the expert in determining the basis of his opinions."[42]

This Court considered Dr. Glaspy's review of Dr. Kopreski's testimony in *Earnest*, and

correctly ruled that Dr. Glaspy's testimony was admissible.[43]   As the Court noted, "[o]n cross-

examination, Plaintiff can illuminate for the jury that these experts relied on Dr. Kopreski's re-

analysis.  Plaintiff can ask these experts to explain why such reliance was warranted, and the jury

can decide whether to credit the experts' testimony."[44]   Plaintiff did just this at the *Earnest* trial,

as this Court acknowledged in denying the PSC's new trial motion.[45]   Here, again, Ms. Kahn will

have the opportunity to cross-examine Dr. Glaspy on his reliance and general methodology.

### B.  Dr. Glaspy's Opinions Regarding Other Medications and Risk Factors Associated with Persistent Hair Loss are Admissible and were Properly Allowed by the Court in *Earnest*.

Plaintiff bears the burden of proof on causation, including eliminating causes other than

Taxotere for her alleged permanent hair loss—not Sanofi.  *See Rando v. Anco Insulations, Inc.*,

2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (plaintiff without direct evidence of causation must

---

[41]   Rec. Doc. 7974, at 4 (Order and Reasons Denying Pltffs. Mot. To Exclude Expert Testimony that Relies Upon Defs. Employee Dr. Michael Kopreski (Doc. 6160)); *see also Tajonera v. Black Elk Energy Offshore Operations, LLC*, 2016 WL 3180776, at *10 (E.D. La. June 7, 2016).

[42]   Rec. Doc. 7974, at 4 (Order and Reasons Denying Pltffs. Mot. To Exclude Expert Testimony that Relies Upon Defs. Employee Dr. Michael Kopreski (Doc. 6160)); *see also Eggert v. Meritain Health, Inc.*, 428 Fed. App'x 558, 567 (6th Cir. 2011) (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 853 (6th Cir.1981)).

[43]   Rec. Doc. 7974 (Order and Reasons Denying Pltffs. Mot. To Exclude Expert Testimony that Relies Upon Defs. Employee Dr. Michael Kopreski (Doc. 6160)).

[44]   Rec. Doc. 7974 (Order and Reasons Denying Pltffs. Mot. To Exclude Expert Testimony that Relies Upon Defs. Employee Dr. Michael Kopreski (Doc. 6160)).

[45]   Rec. Doc. 9294, at 4 (Order and Reasons Denying Pltfs. Mot. For New Trial (Doc. 8394)); **Ex. V**, Trial Tr. 2148:22–2153:17 (Sept. 26, 2019).  "I know both prior to and following the testimony of Dr. Kopreski the Court specifically told the jury that Dr. Kopreski was not -- had not been tendered not accepted by this Court as an expert in this field.   The Court gave Mr. Miceli wide latitude in cross-examining Dr. Glaspy related to his testimony of Dr. Kopreski, and he did[.]"  *Id.* at 2152:20–25.  Also, before Sanofi presented Dr. Kopreski's video testimony during its case, this Court instructed the jury that Dr. Kopreski was "neither offered nor accepted by the Court as an expert."  Ex. A, Trial Tr. 1917:6–8 (Sept. 25, 2019).

eliminate other causes); *see also Llewellyn v. Lookout Saddle Co.*, 315 So. 2d 69, 71 (La. App. 2d Cir. 1975) (same); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 n.5 (5th Cir. 2002) ("[T]he plaintiff may prove causation by establishing '*with reasonable certainty* that all other alternatives are impossible.'") (citing *Joseph v. Bohn Ford, Inc.*, 483 So.2d 934, 940 (La. 1986) and *Todd v. State*, 96-3090 (La. 9/9/97), 699 So. 2d 35, 43). Ms. Kahn "must exclude every other reasonable hypothesis with a fair amount of certainty." *Rando v. Anco Insulations, Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (plaintiff without direct evidence of causation must eliminate other causes).[46] "Reasonable" hypotheses are those supported by at least some evidence that are not "remote, conjectural, [or] speculative." *Weber v. Fidelity & Cas. Ins. Co. of NY*, 250 So. 2d 754, 757–58 (La. 1971) (disregarding other "intimations of fault" where there was no evidence to support them); *Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F. Supp. 890, 896 (E.D. La. 1972) ("[o]ther possible causes of an accident which are 'remote, conjectural and speculative ... as a possible cause in fact' may be disregarded.") (citing *Metrailer v. F&G Merc., Inc.*, 230 So. 2d 395, 400 (La. App. 1 Cir. 1969)); *see also Wheat v. Pfizer*, 31 F.3d 340, 342–43 (5th Cir. 1994) (summary judgment for defendant where plaintiff, alleging a particular drug caused her hepatitis, failed to rule out other possible causes including contact with a family member who had hepatitis and another drug also associated with hepatitis that plaintiff took).

Ms. Kahn cannot avoid this burden by precluding any discussion of alternative explanations for her hair loss. Nor can Ms. Kahn transfer this burden to Sanofi by misrepresenting

---

[46] *See also* Sanofi's Opp. To Pltffs. Mot. for Partial Summary Judgement on Affirmative Defenses Concerning Alternative Causes.

Dr. Glaspy's testimony as tantamount to offering affirmative general or specific causation opinions.[47]  The Court rejected the same arguments in *Earnest* that the PSC now advances.

Before the *Earnest* trial, Plaintiffs filed two Motions *in limine* on this issue: one to "exclude evidence of unrelated medical conditions . . . and unrelated medication usage,"[48] and a second to "preclude testimony and evidence regarding other chemotherapy medications or medical conditions that purportedly cause permanent hair loss."[49]  In both, the PSC argued generally that because no defense expert had "specifically link[ed]" or offered "evidence to a reasonable degree of medical certainty" that those treatments or conditions "caused or contributed" to the plaintiff's hair loss, the court should exclude such evidence.[50]  The Court denied both motions, holding that so long as Sanofi had a proper foundation for the plaintiff's medical conditions and medications, Sanofi could introduce evidence "relevant to determining the cause of Plaintiff's alleged hair loss."[51]

At oral argument, the Court was clear:

> ***Plaintiff has the burden of proof.***  You have the burden of proof on causation and the defendants have to challenge that.  Now, I think [defendants] have to have a good faith basis for the challenge[,] . . . but I think ***[defendants are] going to have to be able to question your experts about other chemotherapy drugs that were prescribed to [Plaintiff] and whether or not those caused permanent alopecia***

---

[47]  Rec. Doc. 10924-1, at 11 (Plaintiff's Mot. to Exclude Testimony of John Glaspy, M.D.) ("Dr. Glaspy improperly concludes that Taxotere does not cause persistent hair loss by relying on . . . .").

[48]  Rec. Doc. 7647, at 1 (MIL to Exclude Evidence of Unrelated Medical Conditions, Familiar History of Cancer, and Unrelated Medication Usage) at 1.

[49]  Rec. Doc. 7651, at 1 (MIL to Preclude Testimony and Evidence Regarding Other Chemotherapy Medications or Medical Conditions that Purportedly Cause Permanent Hair Loss); *see also* **Ex. W**, Hr'g Tr. at 34:8-40:19 (Sept. 5, 2019).

[50]  Ex. W, Hr'g Tr. at 34:8-40:19 (Sept. 5, 2019); *see also* Rec. Doc. 8201, at 2 (Order and Reasons re: MIL to Exclude Evidence of Unrelated Medical Conditions Familiar Medical History of Cancer, and Unrelated Medication Usage).

[51]  Rec. Doc. 8201, at 2 (Order re: MIL to Exclude Evidence of Unrelated Medical Conditions Familial Medical History of Cancer, and Unrelated Medication Usage).

and ***I'm not going to preclude them from -- from challenging your causation experts***.[52]

At trial, this is exactly what happened.  For example, like Plaintiff's experts, Dr. Glaspy was allowed to offer opinions regarding the reports of persistent hair loss associated with other relevant medications, without objection:

> Q.    Doctor, in your review of the medical literature, are there reports of persistent hair loss with regimens containing Adriamycin?
>
> A.    Yes.
>
> Q.    Are there reports of persistent hair loss with regimens containing Cytoxan?
>
> A.    Yes.
>
> Q.    Are there reports of persistent hair loss with regimens containing Taxol?
>
> A.    Yes.
>
> Q.    Of course, there are reports of persistent hair loss with regimens containing Taxotere too. Is that correct?
>
> A.    That's correct.[53]

Dr. Glaspy was also allowed to offer opinions on the inability to rule out such risk factors:

> Q.    And, Doctor, do you have an opinion as to whether there is any medically reliable way to trace [Plaintiff's] current alopecia to Taxotere specifically?
>
> A.    I believe it is impossible.[54]
>
> …
>
> Q.    And Doctor, with regard to [Plaintiff's] hair loss, is there **any way to rule out the role** that Cytoxan would play?

---

[52]    Ex. W, Hr'g Tr. at 35:2- 14 (Sept. 5, 2019) (emphasis added).

[53]    Ex. B, Earnest Trial Tr. 2017:25-2018:18 (Sept. 25, 2019).

[54]    Ex. A, Earnest Trial Tr. 1985:11-14 (Sept. 25, 2019).

A.    No.

Q.    And same question: With regard to [Plaintiff's] hair loss, is there **any way to rule out the role** that Adriamycin could play?

A.    No.

Q.    Is there **any way to rule out the role that** [hormonal therapy] could play in [Plaintiff's] hair loss?

A.    No.[55]

Dr. Glaspy applied a reasonable methodology to reach this opinion in *Earnest* just as he did in this case.  This included reliance on his extensive clinical experience, his experience with chemotherapy side effects, and a review of the same peer-reviewed medical literature and clinical data Ms. Kahn's experts considered.[56]  The PSC's insistence that his opinions be excluded simply because Dr. Glaspy did not also conduct a Bradford Hill analysis is based on a fundamental misapplication of the law.  As stated above, Dr. Glaspy is not offering a general causation opinion to satisfy the burden of proof as Plaintiff's experts are.

Finally, Plaintiff's experts have repeatedly acknowledged that other chemotherapy drugs and hormonal therapies are associated with persistent hair loss, a fact not lost on this Court ("Plaintiffs' own experts have acknowledged that [Adriamycin and cyclophosphamide] are associated with permanent hair loss.").[57]  Indeed, Ms. Kahn's dermatology expert, Dr. Tosti, has

---

[55]   Ex. B, Earnest Trial Tr. 2043:15-24 (Sept. 25, 2019) (emphasis added).

[56]   Ex. F, Expert Report of John Glaspy, M.D., at 23-25 (Apr. 29, 2020); Ex. D, Glaspy Dep. 23:22-24:8 (Jan. 9, 2020) ("Yes, I performed all of my own literature searches."); **Ex. X**, Expert Report of Ellen Feigal, M.D. at 40-68 (Mar. 23, 2020); **Ex. Y**, Linda Bosserman, M.D., Materials Reviewed (Apr. 3, 2020); **Ex. Z**, Taxotere Rule 26 Report, Linda Bosserman, MD (Apr. 3, 2020); **Ex. AA**, Docetaxel and Irreversible Alopecia, David Madigan, PhD, at 22-23 (Mar. 23, 2020); *see also* Ex. T, Expert Report of Ellen T. Chang, Sc.D. (Apr. 17, 2020); Ex. U, Second Supplemental Expert Report of Prof. Lee-Jen Wei (Apr. 17, 2020)**.**

[57]   Rec. Doc. 10704, at 7 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59) ("Plaintiffs' own experts have acknowledged that [Adriamycin and Cytoxan] are associated with permanent hair loss."); Ex. G, Tosti Dep. 180:8-16; 313:24-314:8 (Dec. 12, 2019) (testifying there are reports of PCIA from Adriamycin and cyclophosphamide); Ex. H, Earnest Trial Tr. 1219:4–9 (Dr. Feigal testifying during

published an article analyzing the association between persistent hair loss and hormonal therapies.[58]  The Court decided this issue correctly the first time.  Dr. Glaspy should be allowed challenge Ms. Kahn's experts' causation opinions through reasonable testimony regarding alternative explanations for Ms. Kahn's hair loss.

### III.      Dr. Glaspy's Report Satisfies the Requirement of Rule 26(a)(2)(B)

Dr. Glaspy has satisfied the requirements of Rule 26(a)(2)(B).  At the end of the PSC's motion, they list eight topics that Dr. Glaspy says he will discuss in his report.  The PSC's argument that Dr. Glaspy offers no support or basis for these "I will discuss" topics is incorrect and contradicted by page-after-page of opinion and support provided on these vary topics in Dr. Glaspy's report.

The "I will discuss" statements cited by the PSC in Section I.B and Section II.D are topic sentences meant to offer a roadmap to Dr. Glaspy's opinions.  The PSC has pulled these sentences out-of-context, often from the start or end of a multi-paragraph section.  For example, the PSC claims the sentence "I will discuss common sentiments breast cancer patients may have" has no

the *Earnest* trial that there have been cases of permanent hair loss reported for both Cytoxan and Adriamycin); Ex. I, Earnest Trial Tr. 478:10-18 (Dr. Kessler testifying during the *Earnest* trial that he has seen reports of PCIA associated with both Cytoxan and Adriamycin); Ex. J, Earnest Trial Tr. 861:7–10, 873:20-25 (Dr. Plunkett testifying during the *Earnest* trial that she identified permanent hair loss as a hazard associated with Adriamycin and Cytoxan); Ex. K, Earnest Trial Tr. 1057:17–24 (Dr. Tosti testifying "what I really think is that those drugs are, you know, sometimes occasionally causing the problem. I never said they never cause. It's just a question of, likely, frequency."); *id.* at 1030:23–1031:3 (reports of PCIA with anthracyclines); *id.* at 1031:11–16 (reports of PCIA with cyclophosphamide); *id.* at 1058:9–12 (5-FU); *id.* at 1058:20–23 (FEC); *id.* at 1066:12–19 (Tosti co-authored a paper that reported 25% of patients receiving post-chemotherapy endocrine therapy experienced endocrine-induced alopecia); Ex. L, Bosserman Dep. at 109:2–11; 142:19–143:18 (Dec. 3, 2018); Ex. M, Bosserman Dep. at 417:9–17 (Dec. 10, 2018); Ex. N, Kessler Dep. at 238:14–22, 246:12–17, 247:8–249:9 (Dec. 20, 2018); Ex. O, Kessler Dep. at 347:25–348:17 (Nov. 26, 2019); Ex. P, Madigan Dep. at 208:18–21 (Dec. 7, 2018); Ex. Q, Madigan Dep. at 207:10–213:3 (Nov. 14, 2019); Ex. R, Plunkett Dep. at 115:1–117:16 (Dec. 10, 2018); Ex. S, Plunkett Dep. at 254:5–259:21; 288:20–24, 292:4–25, 297:20–24 (Nov. 19, 2019).

[58]   **Ex. BB**, Azael Freites-Martinez, MD et al., *Assessment of Quality of Life and Treatment Outcomes of Patients With Persistent Postchemotherapy Alopecia*, 155(6) JAMA Dermatol. 724, 725–26 (2019) (Dr. Tosti among co-authors of the study).

"support or reference and does not explain beyond this preview statement."[59]  This is incorrect. The entire sentence reads: "In addition, I will discuss common sentiments breast cancer patients may have *and express to me regarding treatment and survival*."[60]  Dr. Glaspy then goes on to explain, in great detail, the common sentiments women newly-diagnosed with breast cancer express to him in his clinical practice—including that "survival is their greatest priority," or that women are often forced to make "treatment-related decisions that have an impact on their appearance."[61]  Following that half-quoted sentence by the PSC, Dr. Glaspy provides three full paragraphs explaining the basis and reasons for his testimony, as well as his actual opinion on the topic.

This out-of-context approach is equally true for each of the seven remaining statements:

- Dr. Glaspy's statement that he will discuss "survival rates for breast cancer, including the impact that various chemotherapy regimens have had on improving survival rates," is supported by citations to the Data Sources for the National Center for Health Statistics as well as "Cancer Stat Fact," and specifically lists the 5-year and 10-year survival rates for invasive breast cancer.[62]

- Dr. Glaspy's statement that he will "discuss the difference in survival rates between the older regimens and taxane-containing regimens" is the final sentence in a section with four paragraphs that discuss the development of chemotherapy, the shifting standard of care, and the specific regimens he believes "have lower survival rates, compared to taxane-containing regimens."[63]

- Dr. Glaspy's statement that he will "discuss the development of taxanes" is supported by eleven paragraphs of information and data, based both on the referenced book, which he cites, and his own extensive experience as a clinician during the development of the taxanes.

- Dr. Glaspy's statement that he will discuss "the tradeoffs with alternatives to Taxotere-containing regimens and the absence of any guarantees in the oncological setting" is again

---

[59]   Rec. Doc. 10924-1, at 16 (Pltfs. Mot. to Exclude Test. Of John Glaspy, M.D.).

[60]   Ex. F, Expert Report of John Glaspy, M.D., at 7 (Apr. 29, 2020) (emphasis added).

[61]   *Id.*

[62]   *Id.* at 12-13 (Apr. 29, 2020).

[63]   *Id.*

the final sentence in a six paragraph section discussing, in detail, the tradeoffs between Taxotere and Taxol.[64] Ms. Kahn's statement that "Dr. Glaspy does not discuss in his report the tradeoffs with any alternatives to Taxotere-containing regimens," is comical, as the entire paragraph preceding the sentence discusses why a patient may want to use a Taxol-containing regimen (frequency of administration) over a Taxotere-containing regimen.

- Dr. Glaspy's statement that he will "discuss chemotherapy regimens used to treat HER2-breast cancer," is supported by nine paragraphs of information detailing the treatment of HER2- cancers.  Ms. Kahn's statement that "Dr. Glaspy does not discuss the chemotherapy regimens used to treat HER2- breast cancer" is clearly stated in bad faith, as the very next sentence in the Report states: "My preferred chemotherapy regimen for HER2- breast cancer is often TC (Taxotere, Cyclophosphamide)." Dr. Glaspy then goes on to discuss *in detail* the different chemotherapy regimens used to treat HER2- cancers, and the development of those regimens over multiple paragraphs.

- Dr. Glaspy's statement that he will "discuss the efficacy and side effects of older chemotherapy regimens, including FEC, FAC, AC, AND CMF," is not only supported by his clinical experience and the discussion of the preceding paragraphs, it is also supported by multiple sections of his Report, where he discusses the lower "overall survival rates" of "older non-taxane containing regimens, including FEC, FAC, CMF, and AC," and the side effects of these chemotherapy regimens.[65]

- Finally, Dr. Glaspy's statement that he will "discuss side effects of chemotherapy drugs, how clinicians weigh side effects, and how and what side effects are communicated to the patient," is immediately followed by a discussion of the common side effects of chemotherapeutic drugs, as well as a discussion about how he "as a clinician," warns "about common side effects and side effects that are life threatening."[66]

The PSC's extreme request that Dr. Glaspy's report be stricken as a sanction for including "I will discuss" statements is contrary to the spirit and application of Rule 26(a)(2)(B)'s disclosure requirements.[67]  Dr. Glaspy is using the phrase "I will discuss" to provide the PSC with a roadmap

---

[64]  *Id.* at 15-16.

[65]  *See, e.g., id.* at 11-12

[66]  *Id.* at 21.

[67]  *See, e.g., See Honey-Love v. U.S.*, 664 F. App'x 358, 361 (5th Cir. 2016) (excluding an expert report because it entirely omitted case-specific opinions the expert then offered, stated conclusory opinions on ultimate issues in the case without providing a basis or reason, failed to reference any exhibits in support, including 6000 pages of the plaintiff's medical records, and did not provide a list of his previous testimony); *Beane v. Util. Trailer Mfg. Co.*, 934 F. Supp. 2d 871, 877-78 (W.D. La. 2013) (excluding affidavit submitted by expert to supplement his report with entirely new opinion that he previously disclaimed); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010) (excluding report for failing to comply with five of the six requirements of Rule

to his testimony, in accordance with Rule 26(a)(2)(B).  *See, e.g.*, Fed. R. Evid. 26(a)(2)(B).  There

is no surprise to the opinions Dr. Glaspy is offering.  Dr. Glaspy provides page after page of support

and bases for the very opinions that the PSC seeks to limit.  Dr. Glaspy's report complies with

Rule 26 and none of the areas identified by the PSC should be limited.

## CONCLUSION

For all of the reasons stated above, Ms. Kahn's Motion to Exclude the Testimony of Dr.

Glaspy should be denied in its entirety.

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE  URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
Facsimile:  504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile:  816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and*
*Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2020, I electronically filed the foregoing with the

Clerk of the Court using the ECF system which sent notification of such filing to all counsel of

record.

/s/ *Douglas J. Moore*

---

26(a)(2)(B), including providing only 'cursory support' for conclusion that defendants had copied plaintiff's
software).