# EXHIBIT A

## Page 1911

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*****************************************************************

IN RE: TAXOTERE (DOCETAXEL)         Docket No. 16-MD-2740
PRODUCTS LIABILITY LITIGATION       Section H
                New Orleans, LA
Relates to: Barbara Earnest         Wednesday, September 25, 2019
16-CV-17144

*****************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE
DAY 8, MORNING SESSION

APPEARANCES:

FOR THE PLAINTIFF:    BACHUS & SCHANKER, LLC
                      BY: DARIN L. SCHANKER, ESQ.
                          J. KYLE BACHUS, ESQ.
                      1899 Wynkoop St., Suite 700
                      Denver, CO 80202

                      FLEMING NOLEN & JEZ
                      BY: RAND P. NOLEN, ESQ.
                      2800 Post Oak Blvd., Suite 4000
                      Houston, TX 77056

                      GIBBS LAW GROUP, LLP
                      BY: KAREN B. MENZIES, ESQ.
                      6701 Center Drive West, 14th Floor
                      Los Angeles, CA 90045

                      DAVID F. MICELI, LLC
                      BY: DAVID F. MICELI, ESQ.
                      P.O. Box 2519
                      Carrollton, GA 30112-0046

                      PENDLEY BAUDIN & COFFIN
                      BY: CHRISTOPHER L. COFFIN, ESQ.
                      2505 Energy Centre
                      1100 Poydras St.
                      New Orleans, LA 70163

## Page 1912

                      BARRIOS KINGSDORF & CASTEIX
                      BY: DAWN M. BARRIOS, ESQ.
                      701 Poydras St., Suite 3650
                      New Orleans, LA 70139

                      GAINSBURGH BENJAMIN DAVID
                      MEUNIER & WARSHAUER
                      BY: M. PALMER LAMBERT, ESQ.
                      2800 Energy Centre
                      1100 Poydras St.
                      New Orleans, LA 70163

                      MORGAN & MORGAN
                      BY: EMILY C. JEFFCOTT, ESQ.
                      700 S. Palafox St., Suite 95
                      Pensacola, FL 32502

FOR THE DEFENDANT:    SHOOK HARDY & BACON
                      BY: HILDY M. SASTRE, ESQ.
                      201 Biscayne Blvd., Suite 3200
                      Miami, FL 33131

                      SHOOK HARDY & BACON
                      BY: JON A. STRONGMAN, ESQ.
                          HARLEY V. RATLIFF, ESQ.
                      2555 Grand Blvd.
                      Kansas City, MO 64108

                      IRWIN FRITCHIE URQUHART & MOORE
                      BY: DOUGLAS J. MOORE, ESQ.
                      400 Poydras St., Suite 2700
                      New Orleans, LA 70130

Official Court Reporter:   Karen A. Ibos, CCR, RPR, CRR, RMR
                           500 Poydras Street, B-275
                           New Orleans, Louisiana 70130
                           (504) 589-7776

Proceedings recorded by mechanical stenography, transcript produced by computer.

## Page 1913

INDEX

WITNESSES FOR THE DEFENDANT:                        PAGE/LINE:

VIDEO DEPOSITION OF MICHAEL S. KOPRESKI             1917/10

DR. JOHN GLASPY
 Voir Dire Examination by Mr. Strongman             1966/5
 Traverse Examination by Mr. Miceli                 1977/22
 Direct Examination by Mr. Strongman                1981/2

## Page 1914

PROCEEDINGS
(WEDNESDAY, SEPTEMBER 25, 2019)
(MORNING SESSION)

(OPEN COURT.)

THE COURT: I believe there are some things that the parties want to put on the record now.

MR. COFFIN: Yes, your Honor. Good morning. Chris Coffin on behalf of the plaintiff.

This particular argument relates to the Court's order and reasons in Document 6160, which was the plaintiff's motion to exclude expert testimony that relies upon defendant's employee Dr. Michael Kopreski.

In the Court's order and reasons allowing experts, the defense experts to rely on Dr. Kopreski's testimony and analysis, your Honor specifically stated that on page 5, "Here, defendants explain that their experts conducted independent reviews of Dr. Kopreski's work. Dr. Arrowsmith, for example, examined patient data for two TAX316 patients and reached the same conclusions as Dr. Kopreski leading her to conclude his analysis was reliable."

In other words, your Honor, the Court has ruled that Dr. Kopreski's analysis can be used to support experts' opinions if those experts conducted independent reviews of Dr. Kopreski's work.

The only expert that the defense is bringing to this trial, and that the jury will hear from, specifically testified

Page 1915

1   with regard to Dr. Kopreski's analysis in his deposition on page
2   122 of Dr. Glaspy's deposition, the question is: "Okay. Did you
3   have a direct role in the review that was taken that's shown in
4   Figure A?"
5       Objection to the form.
6       And then the answer, "I did not have a role in forming
7   the table or writing the table, planning the table, or suggesting
8   that the table be made." That's talking about Figure A in
9   Dr. Kopreski's reanalysis, which is at the heart of this issue.
10      In Dr. Glaspy's deposition on page 123, the question was
11  stated: "QUESTION: You cannot verify, then, that the material
12  contained in Figure A is accurate or complete?"
13      There was an objection. And then: "ANSWER: I -- not
14  independently. I -- I can only comment assuming these are the
15  data, this is my conclusion. That's all I can do."
16      It's very clear that Dr. Glaspy, the defendant's expert,
17  who intends to rely on the Kopreski reanalysis and testimony, did
18  not independently review that analysis and had nothing to do with
19  putting together any of the tables as he testified.
20      In addition, your Honor, to be clear, the defendant's
21  witness, Dr. Kopreski, is an employee of Sanofi. He is not an
22  expert. He has not been qualified as an expert. He did a post hoc
23  analysis of data that Sanofi's lawyers pulled and put in front of
24  him. It is not an expert report. It's not an expert opinion, and
25  certainly not an expert analysis. Yet, this morning the defendants

Page 1916

1   will be playing the videotaped deposition of Dr. Kopreski
2   explaining his analysis, and that is highly prejudicial to the
3   defendant -- to the plaintiffs, excuse me. It's highly prejudicial
4   to the plaintiffs because the defendants are allowed to present
5   testimony from a non-expert about a post hoc analysis, and they
6   will not have an expert who has independently reviewed and relied
7   on that information.
8       So we would ask that Dr. Kopreski's testimony be stricken
9   and not be allowed to be played for this jury, and that Dr. Glaspy
10  not be permitted in any way to rely on that analysis in his
11  opinions. Thank you.
12      THE COURT: Thank you. Okay. Are we ready to bring in
13  the jury? Okay. Please bring the jury in.
14      Did y'all want to respond?
15      MS. SASTRE: I'm sorry?
16      THE COURT: I thought -- the fevered conversation.
17      MR. STRONGMAN: No, I think your Honor has already ruled
18  on this. Just based on all of the reasons and arguments previously
19  made. Sorry about that.
20      MS. SASTRE: Sorry, your Honor.
21      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)
22      THE COURT: All jurors are present. Court's back in
23  session. You may be seated.
24      Good morning. I apologize that we're a little late
25  getting started today. We're just -- the lawyers and I have been

Page 1917

1   working through various things that we must deal with.
2       And now I ask the defendants, are you prepared to call
3   your first witness?
4       MS. SASTRE: Yes, your Honor. We would call Dr. Kopreski
5   to play our portion of his examination.
6       THE COURT: Okay. Before we get started, members of the
7   jury, I advise you that Dr. Kopreski has neither been offered nor
8   accepted by the Court as an expert.
9       With that, please begin the deposition.
10      (WHEREUPON, THE VIDEO DEPOSITION OF DR. MICHAEL S. KOPRESKI
11  WAS PLAYED AS FOLLOWS:)
12  EXAMINATION:
13  Q. State your name, please.
14  A. My name is Michael Kopreski.
15  Q. And you are board certified in internal medicine and oncology?
16  A. Yes. I -- I -- I was board certified in both internal medicine
17  and in oncology.
18  Q. I've marked as deposition Exhibit No. 16 a copy of your
19  curriculum vitae. You were employed in pharmacovigilance at Sanofi
20  for approximately 15 years?
21  A. That's correct. I -- I retired about a year ago.
22  Q. All right. Very good.
23  A. In the -- in the end of 2017.
24  Q. Okay. And you are here today to play a particular role in
25  terms of reviewing reports and clinical data with an eye to reports

Page 1918

1   of alopecia in a time period of 2005 to 2011?
2   A. That's correct.
3   Q. Okay. As an oncologist, let's talk briefly about alopecia and
4   how frequently it's seen with chemotherapy drugs, generally.
5   A. Well, first off, chemotherapy during this time period employed
6   agents that were often not specific only to the -- to the cancer,
7   but to other normal tissue, and had a range of very common side
8   effects. Alopecia was one of those frequently observed side
9   effects with chemotherapy.
10      THE COURT: I'm sorry. Can we stop this?
11      (WHEREUPON, VIDEO WAS PAUSED.)
12      MR. COFFIN: Can we approach, your Honor?
13      THE COURT: Yes.
14      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
15      MR. MARKOFF: The only agreement for close captioning is
16  for foreign witnesses; Dr. Aussel and the other foreign witness, I
17  forgot who it was now. This is not a foreign witness.
18      MR. STRONGMAN: I wasn't part of that conversation.
19      THE COURT: Who was part of the conversation?
20      MR. MARKOFF: It was Harley and myself.
21      MR. STRONGMAN: We agreed not to put up closed
22  captioning?
23      MR. COFFIN: That's correct.
24      MR. MARKOFF: They didn't want it in our case either.
25      MR. STRONGMAN: I'll see if he can take it down.

Page 1963

1  MR. MOORE: This is the same exercise we've been doing
2  with every video deposition --
3  MR. MICELI: Well, I apologize. Your Honor, I'll step
4  aside. If this has been done through the depo cuts, let me get my
5  colleague.
6  MR. MOORE: It has.
7  THE COURT: And I will be honest with you, I had already
8  ruled on those as the testimony was coming in. What I indicated
9  was that the individual adverse event reports were not coming in,
10 which has been a consistent ruling all along; but then I did say
11 that flow chart -- I don't know if you call it a flow chart.
12 MR MARKOFF: Seibel chart. That was from Fierro's
13 deposition that you allowed in.
14 THE COURT: That. That came in.
15 MR. MARKOFF: That's correct.
16 MR. MOORE: Just getting organized here.
17 MR. MICELI: I apologize for sticking my nose in. I'm
18 going back over here, Judge.
19 MR. NOLEN: Your Honor --
20 THE COURT: You may make your record. Please come
21 forward and make your record.
22 MR. MOORE: SO in accordance with the testimony of
23 Dr. Kopreski, Defendants would offer and file and introduce into
24 evidence Defense Exhibit 381.E, 381.G, 381.I, 381.L, 381.N, 381.K,
25 and 381.M.

Page 1964

1  MR. COFFIN: We would just like to look through these,
2  your Honor, in light of the discussions we just had.
3  THE COURT: Yes, go through them.
4  MR. COFFIN: Your Honor, we will reserve our objections
5  as we have already stated.
6  And in addition, the issue of learned treatises going
7  back to the jury, it's our understanding from the Federal Rules of
8  Evidence that that doesn't happen. So any of those that are in
9  here, we need to pull out. We object to, let me say it that way.
10 MR. MOORE: We will have to meet and confer on what
11 exhibits have been admitted through depositions, which of those are
12 scientific literature.
13 THE COURT: You need to, but I think you're right, they
14 don't go back. But they can use it. You can show them.
15 MR. NOLEN: Right.
16 THE COURT: They can refer to them. But like
17 depositions, they don't go back.
18 MR. MOORE: Because there's other things admitted through
19 their deposition designations that may be articles we would want to
20 have the same rule apply to, we just have to sort that out.
21 MR. COFFIN: In addition, your Honor, I just noticed that
22 I think Mr. Moore mentioned a demonstrative that is not supposed to
23 go back to the jury.
24 THE COURT: That is not going back.
25 MR. MOORE: Oh, yeah, sorry. That would be 381.I.

Page 1965

1  MR. MARKOFF: Your Honor, question about 381.L. This is
2  the follow-up adverse experiences of one individual --
3  THE DEPUTY CLERK: State your name.
4  MR. MARKOFF: I'm sorry, Dan Markoff. One individual
5  that was part of the 29 from TAX316.
6  THE COURT: No. We discussed -- and I know this becomes
7  a little problematic because we have met outside of open court to
8  work through the many and varied depositions that I have gone
9  through, and what I indicated is that these individual reports were
10 not coming in. But it was that --
11 MR. MARKOFF: So the rest are two learned treatises, your
12 Honor.
13 THE COURT: But there was also that -- Harley, you and
14 Dan come up here.
15 (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)
16 (WHEREUPON, A RECESS WAS TAKEN.)
17 (OPEN COURT.)
18 THE COURT: All jurors are present. Court's back in
19 session. You may be seated.
20 Mr. Strongman, please call your next witness.
21 MR. STRONGMAN: Sanofi calls Dr. John Glaspy.
22 THE DEPUTY CLERK: Doctor, can I have you raise your
23 right hand.
24 (WHEREUPON, DR. JOHN GLASPY, WAS SWORN IN AND TESTIFIED AS
25 FOLLOWS:)

Page 1966

1  THE DEPUTY CLERK: Thank you. And you can have a seat.
2  And please state and spell your name for the record.
3  THE WITNESS: John Glaspy, G-L-A-S-P-Y.
4  VOIR DIRE EXAMINATION
5  BY MR. STRONGMAN:
6  Q. Good morning, Dr. Glaspy.
7  A. Good morning.
8  Q. Can you please just introduce yourself to the jury, and tell
9  the jury what you do.
10 A. So my name is John Glaspy, I am a medical oncologist. I work
11 at UCLA Hospital, I see patients primarily with breast cancer, and
12 I have, play a lot of roles in the regulation internally of our
13 research and our doctors.
14 Q. And, Dr. Glaspy, do you treat patients regularly?
15 A. I do.
16 Q. Explain a little bit about your daily practice with regard to
17 oncology.
18 A. So I restrict my patient care, I try to, to three to three and
19 a half days a week. On those days I'll see somewhere between 20
20 and 30 patients with cancer, most of them will have breast cancer.
21 The other days I am doing my research, doing administration, doing
22 paperwork.
23 Q. And, Doctor, I want to put up your CV and walk through a couple
24 of things here. And can you go through your educational background
25 for the jury?

Page 1967

1   A. Starting with college?
2   Q. Sure.
3   A. So I have a bachelors of science degree from the University of
4   Santa Clara in California, I received that degree in 1975. I then
5   went to UCLA and went to medical school, and at night I went to
6   public health school. So over the four years, I earned an M.D. and
7   an MPH degree, a public health degree. I then went to internship
8   and residency in internal medicine for three years. And then I did
9   three years of fellowship, specialized training in blood and cancer
10  disease.
11  Q. And are you board certified?
12  A. I am.
13  Q. And what board certifications do you hold?
14  A. I am board certified in internal medicine, medical oncology and
15  hematology.
16  Q. And those are three board certifications, is that correct,
17  Doctor?
18  A. That's correct.
19  Q. With regard to your professional experience, can you explain
20  your present position as it's stated on your CV?
21  A. So I am a professor of medicine at UCLA. I also hold an
22  endowed share in cancer research at UCLA. So a donor gave the
23  university a corpus of money that was supposed to support a faculty
24  member who did research; the university did a search and I was
25  awarded the chair, and I've held that for quite awhile now. I

Page 1968

1   think 2003 was when I sat in that chair.
2   Q. And I see on your resumé it mentions the Jonsson Comprehensive
3   Cancer Center. Do you see that?
4   A. Yes.
5   Q. Can you explain what that is?
6   A. That's what I was doing all day yesterday. So the major
7   universities in the country organize their cancer research and
8   treatment around a central grant that they submit to the federal
9   government, they're called a cancer center grant. Our cancer
10  center grant is -- supports a center called the Jonsson
11  Comprehensive Cancer Center, which is really a reorganization of
12  faculty, researchers, and patient care and clinical research
13  activities, so it's a virtual center. It doesn't exist physically,
14  it's a center that applies to the government.
15       And if you win, you get designated as a designated
16  compressive cancer center, and that brings benefits in terms of
17  prestige but also some other things you can access with the federal
18  government. And we were up for our five-year review yesterday and
19  hopefully it went well.
20  Q. And when you say you were up for your review, who specifically
21  were you talking with yesterday?
22  A. So the National Cancer Institute makes us apply every year, but
23  they automatically grant renewal of the grant; except every fifth
24  year, they say, okay. Now this is a competitive renewal, you could
25  lose the grant; and we have to write, rewrite the grant in total.

Page 1969

1   And then they sent, yesterday there were 25 cancer scientists and
2   doctors from around the country sitting at UCLA, and we had to
3   present to them what we were doing and how things were organized
4   and how many patients we placed on trials and all of those things.
5   Q. And, Doctor, is being a national compressive cancer center a
6   prestigious thing?
7   A. It is. It also helps with participation in some critical
8   programs around the country that you can't participate in without
9   it.
10  Q. And when you talk about programs, are you talking about
11  research?
12  A. Everything; research, referrals of patients from national
13  websites, those kinds of things.
14  Q. Doctor, moving through your CV a little bit more. Are you
15  involved in the review process for peer-reviewed journals?
16  A. I am.
17  Q. And can you explain that for the jury what your involvement is?
18  A. So there are two kinds of publications: One are publications
19  that are not peer reviewed, and that means that you write your
20  paper and then the journal will publish it; and those that are peer
21  reviewed, meaning, it has to be sent out to referees who review the
22  publication and make comments. Frequently they'll say you're not
23  ready to publish, go back and do this experiment, or add this
24  number of patients, or look at this aspect, or don't graph it that
25  way. It's a way of making sure that the publications carry impact

Page 1970

1   and we can rely better on those publications.
2       In order to do that, you have to -- somebody has to do
3   that refereeing, and so we share the duty reviewing each other's
4   papers.
5   Q. And, Doctor, are you a reviewer for some of the most
6   prestigious medical journals in the country?
7   A. I guess, yes. Yeah. Yes.
8   Q. And that would include the New England Journal of Medicine; is
9   that correct?
10  A. Yes.
11  Q. And we've also heard about the Journal of Clinic Oncology
12  during this trial. Can you explain what the Journal of Clinical
13  Oncology is?
14  A. So the Journal of Clinical Oncology has become sort of the
15  central journal for cancer medicine. So if something has enough
16  national impact that it extends beyond oncology, it might go in the
17  New England Journal of Medicine. But the best articles that are
18  primarily of interest to oncologists more and more are in the
19  Journal of Clinical Oncology. It's become the dominant journal in
20  cancer.
21  Q. Doctor, in your CV you've also given a list here of numerous
22  lectures and presentations; is that correct?
23  A. Yes.
24  Q. And I think if I counted it up, there are several hundred of
25  them listed; is that right?

Page 1971

1   A. Yes.
2   Q. And, Doctor, throughout the course of your career, have you
3   given numerous lectures on breast cancer?
4   A. I have.
5   Q. And have you given numerous lectures on chemotherapy to treat
6   breast cancer?
7   A. Yes.
8   Q. And flipping forward in your CV, you also have a section for
9   research papers that have been peer reviewed; is that correct?
10  A. Yes.
11  Q. And you've been published in peer-reviewed journals any number
12  of times; is that correct?
13  A. That's correct.
14  Q. And, Doctor, are you involved any societies, professional
15  societies?
16  A. I am when I remember to pay my dues, and occasionally I am not
17  a member for awhile. But, yes.
18  Q. Okay. And one of the things that I wanted to talk about
19  briefly, tell me about your role with Stand Up to Cancer, what it
20  is and what your role has been historically and what it is
21  currently.
22  A. So Stand Up to Cancer was the brain child of Laura Ziskin, who
23  was a famous producer, who developed breast cancer and was my
24  patient. And she became very frustrated with the pace of research
25  in breast cancer and wanted to find out if there was something she

Page 1972

1   could do that was different.
2       So we had a meeting, we convened a meeting of some of the
3   thought leaders in the field and identified areas where we're not
4   very good at -- with the current funding of research, we're not
5   good at cooperating, we're more focused on competing; we're not as
6   focused on breaking through to help the patients as quickly as
7   possible, we're focused on understanding things as well as
8   possible.
9       So she said she wanted to throw her weight as an
10  entertainment person behind a plan to do this. And our initial
11  thought was -- she got the Oxygen Channel and Oprah to agree to
12  give them an hour to do a fundraiser. Six other power women in
13  Southern California move circles got wind of this and said, why are
14  you doing that? If we all put all of our power together, we can do
15  a national road block where when you watch TV -- I don't know if
16  you've noticed, but those nights those hit -- it's every other
17  night now, you can change the channel if you want, but the same
18  thing is on every channel. The country every two years has a road
19  block, and if you want to watch television, you have to watch the
20  Stand Up to Cancer show.
21      That has developed a fund raising infrastructure, it
22  developed a close relationship with Major League Baseball, you've
23  probably seen people saying "I stand up" and that stuff on
24  television.
25      And it has raised approximately $150 million a year, and

Page 1973

1   we administer that money along the line -- Laura is not with us
2   anymore, but we administer that money along the lines of what Laura
3   wanted.
4       And so that's what Stand Up to Cancer is. I am just a
5   dumb stand-by person. It happened because of a magical meeting
6   that just happened in my office because I had a couple of patients
7   that had power.
8   Q. And is that an organization and a movement that's important to
9   you?
10  A. It is for both reasons: One, it's -- I was very close to
11  Laura, and as long as this lives, she lives. So that's number one.
12  And number two is, I think it's doing good work.
13  Q. Now, Doctor, in your clinical practice, how long have you been
14  in clinical practice treating cancer?
15  A. Since -- well, if we don't count fellowship because I was
16  practicing side-by-side with a faculty member, it would be 1985 or
17  '86.
18  Q. And throughout that time, have you been using chemotherapies of
19  various kinds in your practice?
20  A. Yes.
21  Q. And have you been involved in clinical trials at all?
22  A. Yes.
23  Q. And explain your involvement in clinical trials.
24  A. Well, do you mean the process of an individual trial or --
25  Q. Just what your experience has been. We'll get into, actually,

Page 1974

1   how a clinical trial works a little bit, but what's your
2   experience?
3   A. We're very focused on -- because one of the responsibilities of
4   a university is to generate new knowledge, so we're very focused,
5   not just on trying to take care of patients but also trying to make
6   treatments better. So to do that, you have to do clinical trials.
7       And I've been involved in that since the beginning. I
8   have personally been the principal investigator on hundreds of
9   clinical trials over the years. And I've trained fellows for the
10  last 20 years that are also now involved in clinical research at
11  UCLA and around the country.
12  Q. As part of your involvement, both in clinical trial and in
13  terms of just treating patients on a day-to-day basis, tell the
14  jury what your familiarity is and what your expertise is with
15  regard to the -- we've been calling it label -- but the risk and
16  warning information for chemotherapy drugs.
17  A. Well, I've been involved in one way with -- in drug
18  development. I've been fortunate enough to have been involved as a
19  central investigator of several drugs that have gone all the way
20  through to --
21      MR. MICELI: Your Honor, I have to object, it's outside
22  the scope of his expertise.
23      THE COURT: I think we're just going through his CV,
24  right?
25      MR. STRONGMAN: We're talking about his experience, yeah.

Page 1975

1    MR. MICELI: We are. And I will not be challenging him
2 as an oncologist. I will give that up right now. But I do object
3 to out of the scope of regulatory.
4    THE COURT: Mr. Strongman -- I am going to allow him to
5 talk about his qualifications and his opinions will be limited to
6 those areas that he is --
7    MR. STRONGMAN: Thank you, your Honor.
8 BY MR. STRONGMAN:
9 Q. Go ahead.
10 A. So I am trying to remember where I was.
11 Q. Let me ask it this way. As a doctor treating patients, do you
12 have to understand and be familiar with the label for the
13 chemotherapies that you're prescribing?
14 A. Yes.
15 Q. And as part of your practice throughout the 30 plus years that
16 you've been treating patients, do you review those labels?
17 A. Yes.
18 Q. And as part of your practice, do you make it your goal to
19 understand what the labels say so that you can know the risks and
20 you can then relay those as appropriate to your patients?
21 A. Yes. That's one -- that's not the only reason we look at
22 labels, but, yes.
23 Q. What other reasons do you look at labels?
24 A. Well, increasingly over time the FDA labels have come to be the
25 first place you look when you're trying to find out if an insurance

Page 1976

1 company is going to cover a medicine for a person that you want to
2 treat with that medicine. It's unfortunately just part of the way
3 it is now that the only way to be sure there's going to be
4 reimbursement, say, from Medicare, is that label. So that becomes
5 a very important thing for oncologists to stay in contact with as
6 well.
7 Q. And throughout your practice --
8 A. And excuse me. There's also, when a drug first comes out, if
9 it wasn't something you were involved in developing, you look to
10 the label for precautions for dosing, for -- it's not just how many
11 milligrams, it's also what do you mix it in and how fast do you
12 give it, and how big a volume do you put it in, and all of those
13 things; it's an instruction book for how the FDA thinks that drug
14 should be administered.
15 Q. And I think you actually have had some experience in working on
16 what's called a new drug application; is that correct? With
17 Neupogen?
18 A. I have with several drugs, stem cell factor, Neulasta,
19 Neupogen, Aranesp, Herceptin.
20 Q. Very good.
21    MR. STRONGMAN: And, your Honor, I would offer Dr. Glaspy
22 as an expert in oncology, breast cancer care and treatment,
23 labelling risk information for chemotherapy, clinical trials,
24 informed consent, and side effects of chemotherapy.
25    MR. MICELI: Your Honor, we do not object to Dr. Glaspy's

Page 1977

1 qualifications as an oncologist and as a clinical researcher. For
2 all others, we would contest his qualifications. Particularly as
3 it goes to regulatory.
4    THE COURT: I don't think I heard that.
5    MR. MICELI: Labelling, your Honor. I put labelling
6 under the umbrella of regulatory.
7    MR. STRONGMAN: And in his expertise as it relates to his
8 use of labelling as a treating physician, your Honor.
9    MR. MICELI: Your Honor, as a physician it has to look at
10 labels, I don't challenge that, he is an oncologist. But --
11    THE COURT: Okay. I will tell you, as the conversation
12 that we had this morning, within those parameters is there an
13 objection outside of the parameters we addressed this morning?
14    MR. MICELI: Yes. We haven't put it officially on the
15 record, but we can do that when we break later.
16    THE COURT: Okay. Then do you want to voir dire this
17 witness?
18    MR. MICELI: I would briefly like to voir dire this
19 witness, your Honor, yes.
20    THE COURT: Please proceed.
21                TRAVERSE EXAMINATION
22 BY MR. MICELI:
23 Q. Good morning.
24 A. Good morning.
25 Q. Just briefly, I will have my opportunity later.

Page 1978

1    You do not have any specific training in FDA regulatory
2 law, do you?
3 A. I do not.
4 Q. And you don't have any specific training in FDA regulation
5 compliance?
6 A. That's correct.
7 Q. You've never worked for the FDA?
8 A. I have not.
9 Q. And you've not undertaken a review of the regulatory history of
10 Taxotere?
11 A. I have to some extent, but --
12 Q. Have you done that since your deposition, sir?
13 A. No. There was -- I think -- I want to avoid stepping on some
14 areas you've agreed not to step on.
15 Q. Understood.
16 A. But I think if you look at the totality of my deposition,
17 you'll see an area in there where I can't honestly answer that
18 question no.
19 Q. Okay.
20 A. Okay.
21    MR. MICELI: I think perhaps Mr. Strongman and I may need
22 to talk to the judge. But may I just show him some of this
23 testimony, your Honor, to refresh his recollection?
24    THE COURT: Why don't you come up here.
25    MR. MICELI: Sure.

Page 1979

1  (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)
2  THE COURT: What is your objection of this man? He is
3  not going to testify about FDA regulations, he is going to say as a
4  treating oncologist I read --
5  MR. MICELI: I am entirely fine with that, that's where
6  we're going. But when I read his report that's not what I get out
7  of it, your Honor, and I have to be hesitate to say --
8  MR. STRONGMAN: I haven't implied I am going to do
9  anything other than --
10 THE COURT: I saw one paragraph of his report -- because
11 there was no Daubert motion filed on behalf of Dr. Glaspy.
12 MR. MICELI: Right.
13 THE COURT: So what I saw was that one area he is not
14 being tendered as an expert in the field of FDA regulations.
15 MR. MICELI: As long as that's what we hear, I am fine
16 with that. But I read it differently.
17 What had happened was, your Honor, in the deposition we
18 have a question that says he hasn't undertaken it, he would defer
19 to regulatory experts. Then he said that he looked at an e-mail
20 that was not disclosed in his review material, and that is the
21 strike through e-mail that seems like every witness in this case
22 has looked at, and I was concerned that there may be some testimony
23 because of that testimony in the deposition.
24 MR. STRONGMAN: That's not my intent.
25 MR. MICELI: It's not the intent, that's fine.

Page 1980

1  MR. STRONGMAN: Just what we talked about this morning.
2  MR. MICELI: I don't challenge him as an oncologist.
3  THE COURT: I was trying to figure out where you were
4  going with this.
5  MR. MICELI: I understand. Thank you.
6  THE COURT: So do you want to say there is no objections,
7  but that's fine if you want to continue your voir dire.
8  MR. MICELI: I won't continue with my voir dire so long
9  as we have the agreement on what we discussed; and if there's
10 anything outside of that, I'll make my objections.
11 THE COURT: Make your objection at the time. Okay.
12 Thank you.
13 (OPEN COURT.)
14 THE COURT: Mr. Miceli.
15 MR. MICELI: Oh, I'm sorry. I have nothing further and
16 we don't object to the areas of expertise with the understanding
17 that he will be testifying to what an oncologist --
18 THE COURT: To those areas.
19 MR. MICELI: Yes, thank you.
20 THE COURT: The Court is going to accept Dr. Glaspy as an
21 expert in the field of oncology, breast cancer care and treatment,
22 labelling, risk information for chemotherapy, clinical trials,
23 informed consent with side effects of chemotherapy qualified to
24 render opinions in those areas. Please proceed.
25 MR. STRONGMAN: Thank you.

Page 1981

1  DIRECT EXAMINATION
2  BY MR. STRONGMAN:
3  Q. Now, Doctor, have you formed some opinions in this case?
4  A. I have.
5  Q. And can you discuss briefly what you reviewed in forming your
6  opinions?
7  A. So I reviewed the medical records of Mrs. Earnest. I've
8  reviewed the depositions of many of the experts, if not all of the
9  experts, that have been deposed in this case, together with all of
10 their attachments. I reviewed literature and based also my
11 opinions on my own experience and my own literature, that I didn't
12 re-review as part of the preparation.
13 Q. And, Doctor, do you have an opinion as to whether Ms. Earnest
14 needed chemotherapy?
15 A. I do. And I believe she did.
16 Q. And, Doctor, do you have an opinion as to whether a
17 chemotherapy regimen with Taxotere was the best choice for her
18 treatment?
19 A. I think to be really balanced, I would say it was one of the
20 best choices. There were more than one best choice available at
21 the time.
22 Q. And, Doctor --
23 A. In terms of treatment for her cancer, there were two dominant
24 ones. I would have favored the one she receive -- well, not the
25 one she received, but one similar to the one she received for

Page 1982

1  special reasons for her.
2  Q. Explain.
3  A. So the two -- by 2011 we knew -- we've skipped all of the
4  history of this -- but by 2011, we knew that in terms of preventing
5  breast cancer death in a woman who had a significant risk of --
6  that he was harboring micrometastatic disease, that's what we're
7  doing when we treat early breast cancer. We're taking a woman
8  where her scans are clear but we know there's a pretty good chance
9  that there's cancer hiding somewhere beneath our ability to see it
10 on a scan, because we can't see things until there's many millions
11 of cells in one spot.
12 So those women, if they're treated before it becomes big
13 enough to see, are still potentially curable. That's why survival
14 goes up when they receive some chemotherapy, because you're curing
15 that disease that otherwise would have caused a relapse and that
16 relapse would not have been curable.
17 So we've been working since -- this all unfolded while I
18 was growing up as an oncologist, it all unfolded over the period
19 between the mid 1980s and now, where it was shown that chemotherapy
20 improved survival. And then the question was, "How can we make it
21 better?" And so we went through several generations.
22 When the taxanes became available, two major regimens in
23 the United States rose to the top; one was Adriamycin/Cytoxan,
24 you've heard these a lot now, AC, followed by Taxol. With the
25 Taxol given weekly. That was one dominant regimen in the United

Page 1983

1  States in 2011.
2       The other was substituting Taxotere for the Taxol.
3  Usually, that was given all three drugs at once, so it was TAC or
4  DAC, if you want to call it docetaxel so it doesn't get confusing,
5  DAC, given every three weeks to patients. That was the most common
6  one.
7       But some people were mixing them and doing AC followed by
8  Taxotere. That ultimately was what she received. So there's that.
9  That's the background.
10      Now, why I would favor the use of docetaxel in her case
11 was twofold: One was --
12 Q. So the jury has heard this, too, but docetaxel is Taxotere?
13 A. Taxotere, right. We'll go back to the T, but it's gets
14 confusing because when you talk about regimens, yes.
15      So the reason I would have favored that is that -- you
16 need to hear a little bit of detail. The taxanes major issues when
17 they first were administered to human beings were that they had a
18 very high chance of causing a serious allergic reaction. That was
19 limiting during those early times when it was being developed
20 initially in ovarian cancer. And it became known that if you gave
21 steroids, corticosteroids -- not the ones that make you make muscle
22 but the ones that prevent allergic reactions -- the day before, the
23 day of, and the day after the taxane chemotherapy, that now we
24 could give them to humans with better safety.
25      So now when an oncologist is contemplating giving either

Page 1984

1  Taxol or Taxotere to a patient, you have to factor in that you're
2  going to be giving them high doses of steroids the day before, the
3  day of, and the day after chemotherapy.
4       If somebody has high blood sugars or is prediabetic, the
5  steroids will often cause very high blood sugars during those
6  periods of time; and you can end up getting sick from that, you
7  know, your doctor gets a phone call that your blood sugar is 400 in
8  the ER.
9       So we get concerned about steroids. And if you're giving
10 Taxol in 2011, my opinion, the optimal way to give it is weekly,
11 which means 12 treatments to get it all in, which means 12 weeks
12 when you're getting three of the days high-dose steroids. Whereas
13 Taxotere was given every three weeks, so there were only six times
14 when you needed to get the steroids spread over a period of
15 18 weeks. So it minimized the steroid exposure.
16      The second reason was that by 2011, my opinion, we were
17 convinced that both drugs could cause neuropathy but that Taxol had
18 more neuropathy complications than Taxotere. And if you are
19 diabetic or prediabetic, the risk of neuropathy goes up. So that
20 would have been another thing drawing me towards Taxotere.
21 Q. And, doctor, even backing up we talked about taxanes; is that
22 right?
23 A. I did.
24 Q. And do you believe that Ms. Earnest needed a taxane in her
25 chemotherapy regimen?

Page 1985

1  A. If her goal was to optimize her cure rate, yes.
2  Q. And, Doctor, we've heard a lot about persistent hair loss in
3  this case. If Ms. Earnest was going to get chemotherapy with a
4  taxane, do you have an opinion as to whether there were any
5  regimens for the treatment of adjuvant breast cancer that did not
6  carry a risk of persistent hair loss?
7  A. I believe there wasn't.
8  Q. And finally, Doctor, you have reviewed Ms. Earnest's medical
9  records; is that correct?
10 A. I have.
11 Q. And, Doctor, do you have an opinion as to whether there is any
12 medically reliable way to trace Ms. Earnest's current alopecia to
13 Taxotere specifically?
14 A. I believe it is impossible.
15 Q. And are the opinions that you're going to offer today, do you
16 hold those to a reasonable degree of medical certainty?
17 A. I do.
18 Q. And I want to back up now and talk about just your experience
19 with Taxotere. Okay.
20      When did you first get introduced to Taxotere and what
21 has your experience in your clinical practice?
22 A. So we were fortunate to become involved early in the
23 development of Taxotere, so we participated in some of those early
24 Phase II trials. Drugs go through a Phase I where you're just
25 trying to figure out the dose, a Phase II where you're trying to

Page 1986

1  look for signals of its ability to work in different diseases, and
2  then Phase III where you're trying to see if it's better than
3  what's already out there. So that's when randomization kicks in
4  and it becomes important to randomize at the Phase III level.
5  Q. And with regard to Taxotere, were you involved in clinical
6  trials?
7  A. We were. We were involved in 316 pretty heavily.
8  Q. And explain what your involvement was, specifically your site's
9  involvement in TAX316.
10 A. So that's a little complicated. So the first and most
11 important one is we were a study center, we were putting patients
12 on the trial. And so that's No. 1. No. 2, the cooperative group,
13 which at the time was called BCIRG that was doing the trial, the
14 group doing the trial was led by UCLA faculty. That cooperative
15 group is still to this day, it's not called BCIRG anymore, but it
16 was led by UCLA faculty members. Dr. Nabholtz and Dr. Slamon were
17 key people at that cooperative group level.
18 Q. And have you also had experience with Taxotere just in terms of
19 your clinical practice outside of a clinical trial setting?
20 A. I have.
21 Q. A couple of questions, Doctor. Obviously you're getting
22 compensated for your time today; is that correct?
23 A. Yes.
24 Q. And your rate is $400 an hour; is that right?
25 A. That's correct.