# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA



IN RE:  TAXOTERE (DOCETAXEL)    *   16-MD-2740
PRODUCTS LIABILITY LITIGATION   *
                                *
                                *   Section H
Relates to:  Barbara Earnest    *
             16-CV-17144        *
                                *   September 25, 2019
* * * * * * * * * * * * * * * * *


                    DAY 8 - AFTERNOON SESSION
                 TRANSCRIPT OF JURY TRIAL BEFORE
                  THE HONORABLE JANE T. MILAZZO
                   UNITED STATES DISTRICT JUDGE



Appearances:


For the Plaintiffs:         Barrios Kingsdorf & Casteix, LLP
                            BY:  DAWN M. BARRIOS, ESQ.
                            701 Poydras Street, Suite 3650
                            New Orleans, Louisiana 70139


For the Plaintiffs:         Gainsburgh Benjamin David Meunier
                              & Warshauer, LLC
                            BY:  M. PALMER LAMBERT, ESQ.
                            1100 Poydras Street, Suite 2800
                            New Orleans, Louisiana 70163


For the Plaintiffs:         Pendley Baudin & Coffin, LLP
                            BY:  CHRISTOPHER L. COFFIN, ESQ.
                            1100 Poydras Street, Suite 2505
                            New Orleans, Louisiana 70163


For the Plaintiffs:         Gibbs Law Group, LLP
                            BY:  KAREN BARTH MENZIES, ESQ.
                            6701 Center Drive West, Suite 1400
                            Los Angeles, California 90045
```

Page 2014

1  Then we have to talk about the side effects of
2  chemotherapy, and they include increased risk of infection that
3  can be fatal, heart damage, leukemia at some point in the
4  future, nerve damage, rashes, allergic reactions, nausea,
5  vomiting. And hair loss is a side effect of all these
6  regimens; that would be part of the discussion as well.
7  Q. When you're having these conversations with a patient, do
8  you ever make guarantees about whether someone will or will not
9  have a side effect?
10  A. No. I can't think of a time.
11  Q. With regard to hair loss, do you ever make guarantees to a
12  patient that their hair will for sure come back?
13  A. No. I actually do the opposite. I tell women, with these
14  regimens that they can expect they are going to get hair loss
15  and that there is a -- not a small chance that they will be
16  unhappy with the recovery, that that happens, and that
17  unhappiness can be because of color or texture, but often
18  because of thinness, because it's thin. We also, if she has
19  hormone receptors, we talk about the interplay of hormone
20  therapy with that problem.
21  Q. Describe that. When you talk about "hormone therapy,"
22  what is that? And describe how it has an impact on the hair.
23  A. So for a woman that has hormone-positive breast cancer,
24  there are actually two things that can be done to clean up
25  these metastatic deposits around the body. One of them is

Page 2015

1  chemotherapy, and the other one is medicines that block
2  estrogen's effect on her cancer cells by either lowering her
3  estrogen even more than a postmenopausal woman's usually is
4  lowered or by taking a medicine to change how estrogen works in
5  the body.
6  In postmenopausal women we usually use the one that
7  just lowers the estrogen level. That's what Mrs. Earnest got
8  because she had a hormone-positive cancer.
9  Those are the two options. It turns out you can kill
10  breast cancer cells that are hormone-dependent by taking
11  hormone levels down. It's also true that those things can
12  cause hair thinning and hair changes. And so that can make the
13  situation with the chemotherapy hair loss worse.
14  Q. I want to talk about another risk for a minute. You have
15  mentioned it earlier. You talked about neuropathy and nerve
16  damage, but could you elaborate on what that is and how that
17  risk plays into the conversation, particularly when you are
18  talking about Taxotere and Taxol?
19  A. So one of the side effects that happens with the taxanes
20  in general is damage to peripheral nerves, meaning nerves after
21  they have left your spine, primarily sensory nerves. So the
22  symptoms can be numbness and tingling and pain -- more than
23  weakness -- in an extremity, etc., although weakness can
24  happen. These medicines, because they are interfering with
25  those tubules that pull the chromosomes apart, seem to have an

Page 2016

1  effect on nerve cells through a similar mechanism because all
2  of the taxanes have a risk of neuropathy.
3  As it happens, Taxol's neuropathy risk is higher than
4  Taxotere's neuropathy risk. If you get neuropathy, it could be
5  mild -- a little bit of tingling that goes away before the next
6  dose of chemotherapy -- or it can be severe. I have seen
7  people in wheelchairs because of taxane neuropathy. So it can
8  be a big deal as well. What we talked about this morning was
9  incidence in diabetics. It can be worse.
10  Q. When you say -- is there a difference between the severity
11  of neuropathy dealing with Taxotere and taxane?
12  A. Both the incidence and the grade, the neuropathy -- the
13  severity.
14  Q. When you are talking about severity, elaborate a little
15  bit more on how bad can neuropathy be and what are the ultimate
16  consequences of severe neuropathy.
17  A. I have only seen it once, but the wheelchair example is
18  the worst, I think, can happen.
19  It can be debilitating. People can't button their
20  shirt without looking, because they can't feel where the button
21  is. People who like to knit can't knit anymore. Fine motor
22  functions -- tying ties, fixing watches -- those kinds of
23  things are affected.
24  It's bothersome. If you have ever had numbness in
25  something, it really can bug you. To have your hand be numb

Page 2017

1  can really bother you even when you are not trying to button
2  your shirt. Finally, it can be painful.
3  Q. Is neuropathy a consideration that a lot of patients take
4  into play when making a decision on what chemotherapy to use?
5     MR. MICELI: Objection. Calls for speculation.
6     THE COURT: Sustained.
7  BY MR. STRONGMAN:
8  Q. Is neuropathy one of the risks that you discuss with your
9  patients?
10  A. It is.
11  Q. I want to turn and talk a little bit more about hair loss.
12  And, Doctor, based on your experience and your review of the
13  information -- Doctor, are there any chemotherapy drugs used in
14  the adjuvant treatment of breast cancer that don't result in
15  alopecia?
16  A. So asked that way, I would have to say 5-FU might be the
17  answer to your question. Yes, that 5-FU -- you asked drugs
18  that are used. I don't think 5-FU causes much alopecia at all.
19  But if you say regimens that are used, then no, they all cause
20  alopecia.
21  Q. Do you ever use 5-FU alone in the treatment of adjuvant
22  breast cancer?
23  A. Never. It was a phrasing issue. I'm trying to answer
24  precisely.
25  Q. Doctor, in your review of the medical literature, are

Page 2018

1  there reports of persistent hair loss with regimens containing
2  Adriamycin?
3  A. Yes.
4  Q. Are there reports of persistent hair loss with regimens
5  containing Cytoxan?
6  A. Yes.
7  Q. Are there reports of persistent hair loss with regimens
8  containing Taxol?
9  A. Yes.
10 Q. Of course, there are reports of persistent hair loss with
11 regimens containing Taxotere too. Is that correct?
12 A. That's correct.
13 Q. Is it possible, Doctor, to prescribe one of these regimens
14 to a patient in the adjuvant setting without some risk of
15 persistent hair loss for that patient?
16      MR. MICELI: Object to the form. Speculation.
17      THE COURT: Overruled.
18      THE WITNESS: I believe it's not possible.
19      MR. STRONGMAN: May I approach, Your Honor?
20      THE COURT: Yes, you may.
21 BY MR. STRONGMAN:
22 Q. Dr. Glaspy, what I have handed you is a chart that
23 Dr. Feigal presented to this jury. Do you see it?
24 A. I do.
25 Q. Do you have it in front of you?

Page 2019

1  A. I do.
2  Q. So Dr. Feigal went through -- and the jury has seen
3  Dr. Feigal's chart. This is Dr. Feigal's chart. She went
4  through and she tabulated cases, and you can see that there,
5  Doctor, in front of you?
6  A. I see it in front of me. I just don't see it on the
7  screen here.
8  Q. Doctor, is going through the literature and tabulating
9  cases solely on Taxotere or Taxol or nontaxane like this a
10 reliable way to determine risk?
11 A. Not in my opinion.
12 Q. Why not?
13 A. Because risk means you need to have an idea of
14 percentages. You need the denominator. You need to know how
15 many patients were at risk before you can tell a patient what
16 the risk is. You can't say it's happened 20 times and not know
17 what to divide that by in order to advise somebody of their
18 risk.
19 Q. In addition to that, is it also important to know the
20 exposure? how many people are using Taxotere relative to other
21 medications? Is that an important factor?
22 A. Yes, that's the denominator. You need to know the
23 denominator.
24 Q. When you do your analysis of the reports and the
25 literature, should you also calculate whether the report

Page 2020

1  contains Adriamycin with it or whether it contains Cytoxan with
2  it as well?
3       MR. MICELI: Object. Leading.
4       THE COURT: Sustained.
5       MR. STRONGMAN: I'll rephrase my question.
6       THE COURT: Rephrase your question.
7  BY MR. STRONGMAN:
8  Q. If you were to go through the literature, should you
9  include or exclude Adriamycin and Cytoxan when you are looking
10 at regimens and hair loss?
11 A. When we are talking about early breast cancer, the answer
12 is you should include.
13 Q. Doctor, in your opinion, were there any available
14 chemotherapy regimens for the type of cancer Mrs. Earnest had
15 that did not carry a risk of persistent hair loss?
16      MR. MICELI: Object. Asked and answered, I believe.
17      THE COURT: That has been asked and answered.
18 Sustained.
19 BY MR. STRONGMAN:
20 Q. I think you have reviewed the medical records. I think
21 you indicated Mrs. Earnest is on a hormone treatment as well.
22 Is that correct?
23 A. That's correct.
24 Q. What's the name of that treatment?
25 A. It's an aromatase inhibitor. She is receiving Arimidex.

Page 2021

1  Q. We have talked about that. Have you indicated that
2  Arimidex can result in hair problems as well?
3  A. Yes.
4  Q. When it comes to this conversation that you are having
5  with your patient, where does a doctor get his or her
6  information in terms of the risks? What are the sources of
7  information?
8  A. We get it initially from the package insert when a drug is
9  new, from literature, from medical meetings, from sometimes
10 other online sources of information, like UpToDate, that stays
11 up to date and provides doctors with some helpful information.
12 Those kinds of things.
13      And then as time goes on, you base it more and more
14 on your experience. It's like anything else in life: You
15 don't read the instructions when you have done something a lot
16 of times.
17 Q. So, Doctor, what we need is that the drug label isn't the
18 only source of information for a doctor. Is that fair?
19 A. That's fair.
20 Q. That being said, Doctor, throughout your career have you
21 reviewed the Taxotere drug label?
22 A. I have.
23      MR. STRONGMAN: May I approach, Your Honor?
24      THE COURT: Yes, you may.
25

Page 2022

1  BY MR. STRONGMAN:
2  Q.  Doctor, what I have handed you is --
3         MR. STRONGMAN:  Actually, for the Court's record,
4  this will get -- I could go ahead and admit it because I have
5  entered the document with the same number before.
6         What I have handed the Doctor is Defense 401.4,
7  I believe, which is the 2004 package insert for Taxotere.  I
8  believe this was already admitted under D-317 as well.
9         THE COURT:  Okay.
10 BY MR. STRONGMAN:
11 Q.  Doctor, when you look at the 2004 package insert -- I want
12 to point your attention to the second page.  Do you see that
13 this is information on hair loss?  Do you see that down there?
14 You can also look at your screen.
15 A.  Yes, I do.  I see it.
16 Q.  What we know and what the jury has heard is that the
17 Taxotere labeling has said:  "Once you have completed all of
18 your treatments, hair generally grows back."  Do you see that?
19 A.  Yes.
20 Q.  Doctor, as an oncologist with decades of experience, what
21 does that language mean to you?
22 A.  To me it means that -- hair usually grows back would be a
23 synonym.
24 Q.  Doctor, does it mean that hair always grows back?
25 A.  It does not.

Page 2023

1  Q.  Based on your knowledge of the Taxotere labeling, is
2  alopecia also always listed as a potential side effect?
3  A.  Yes.
4  Q.  Doctor, as an oncologist who has these conversations who
5  knows the contents of drug labeling, what does "alopecia" mean
6  to you?
7  A.  To me it means hair loss, and I think it means that to
8  everybody.
9         But to me it would -- what it calls to mind is that
10 initial loss of pretty much all the hair on the head following
11 some of these chemotherapy drugs.
12 Q.  Doctor, does alopecia include both the possibility that
13 your hair may return and the possibility that it may not?
14        MR. MICELI:  Object.  Leading.
15        THE COURT:  Rephrase your question.
16 BY MR. STRONGMAN:
17 Q.  Doctor, does "alopecia" by definition include any kind of
18 temporal aspect?
19        MR. MICELI:  Still leading, Your Honor.
20        THE COURT:  I'm going to let him answer the question.
21        THE WITNESS:  So if the medicine that's causing it is
22 being stopped, generally the hair starts to regrow; but I have
23 already testified that in my experience, it's not infrequent
24 that women are not happy with what grows back.  And that is
25 often because of thinness, and that could be something that I

Page 2024

1  can't see.  Doesn't matter if she is unhappy.  It can be
2  something that looks really severe.  It can be anywhere along
3  that spectrum.
4  BY MR. STRONGMAN:
5  Q.  Doctor, in your practice is the language "hair generally
6  grows back" consistent with what you see in your patient
7  population?
8  A.  Yes.
9  Q.  Doctor, in your opinion, was the label that we have looked
10 at here for Taxotere -- does that label adequately warn of the
11 risk of alopecia, including the possibility of hair not
12 returning following treatment?
13        MR. MICELI:  Object.  Leading again.
14        THE COURT:  I'm going to allow him to answer the
15 question.
16        MR. MICELI:  Excuse me, Your Honor.  May we approach?
17        THE COURT:  Yes.
18        (The following proceedings were held at the bench.)
19        MR. MICELI:  Your Honor, this was the labeling issue
20 I talked about before.  If he is going to talk about what a
21 normal doctor, normal oncologist wants to look at, and now he
22 wants to talk about what a label should include, I think that's
23 a little different.
24        THE COURT:  I think his report says that as he read
25 the label, that's what it meant to him as an oncologist.  The

Page 2025

1  question I'm seeing here is:  Does that label adequately warn
2  of the risk of alopecia?
3         So are you saying that that requires some sort
4  of --
5         MR. MICELI:  Well, for him -- if it warns him, that's
6  fine.  But he can't speak for -- he said he doesn't do
7  regulatory.  What is an adequate warning --
8         MR. STRONGMAN:  I can say, "I'm not asking you for an
9  FDA opinion."  I'm going to ask his opinion as a clinical
10 oncologist.
11        THE COURT:  "Your opinion in the treatment of
12 cancer."
13        MR. STRONGMAN:  Yeah.
14        THE COURT:  Okay.  Thank you.
15        (End of bench conference.)
16        THE COURT:  Rephrase your question, please.
17 BY MR. STRONGMAN:
18 Q.  And I'm talking about in your role as a clinical
19 oncologist, okay?  Are you following?
20 A.  I'm following.
21 Q.  And in that role as an oncologist treating patients, does
22 the Taxotere label that we are looking at here from 2004 with
23 the language that hair generally grows back, does that label
24 adequately warn of the risk of alopecia, including the
25 possibility that hair may not return?

Page 2026

1  A.  As an oncologist, that informs me of that, yes.
2  Q.  I want to back up and talk a little bit more about
3  clinical trials for a second, Doctor.
4       I think you've talked a little bit about how clinical
5  trials get started because they are looking for new therapies.
6  Can you talk a little bit more about how a clinical trial is
7  actually run in terms of patient follow-up and in terms of the
8  way that safety and efficacy is monitored in a clinical trial.
9  A.  To make this efficient, can we focus on Phase III trials?
10 Q.  Sure.
11 A.  Okay.
12 Q.  Go ahead.
13 A.  Then we don't have to go through all the other . . .
14      So when you do a Phase III trial, patients will be
15 randomly assigned to get the old standard and the new
16 treatment.  And in chemotherapy trials, they will be treated
17 for a period of time, say 18 weeks, and then they will be
18 followed for a period of time.
19      The patients, when they sign into the trial, are
20 given a subject's bill of rights.  And that subject's bill of
21 rights informs them that they can withdraw their consent any
22 time they want, for the reasons of their own, with no argument.
23 So the patients have the control over their follow-up,
24 especially once they are done with treatment and they are just
25 being followed.

Page 2027

1       They will generally be followed for two things:  One
2  is efficacy, meaning did the treatment work; in this case, in
3  early breast cancer, are they having a relapse?  And so they
4  will be scanned periodically.  Once they are done with the
5  chemo, they will be brought in to be scanned to see if there is
6  a relapse so that people can see if there's a difference
7  between the two groups in how long it takes the cancer to come
8  back.
9       They will also be followed to see if they are alive.
10 Now, that is recorded -- every time the doctor sees the
11 patient, they fill out what's called a case report form that is
12 aimed at efficacy.  So it asks you about has the patient
13 relapsed, is there evidence of relapse, etc., and is the
14 patient alive.
15      Then there's a second thing that's checked, and
16 that's safety.  And those are a second case report form that
17 you fill out, and the side effects of interest, whatever they
18 are, are recorded there.
19      Sometimes patients go through the chemotherapy part
20 of this, say, and then they decide that they don't want to keep
21 coming in every month and they don't want to do the scans or
22 they don't want to have the blood tests, and they withdraw
23 their consent.  They call up and say, I'm not going to stay on
24 the study, so I'm not going to come in for these visits.
25      If that happens, sometimes they will say, It's okay

Page 2028

1  if you call me to make sure I'm alive, but I'm just not coming
2  in.  So on those patients, we would call them when their visit
3  was due and at least get that information, the survival
4  information; but we wouldn't have scan follow-up and we
5  wouldn't have safety follow-up.  We would have some follow-up,
6  but not all of it.
7       When you do clinical trials, you anticipate that this
8  is going to happen.  It's called the dropout rate, and you
9  build this into your clinical trials so that you are treating
10 more patients than you're actually going to need in order to
11 find out your real endpoint survival, because you are
12 anticipating that there are going to be dropouts.
13      Another thing that can happen is that --
14      MR. MICELI:  Your Honor, I believe this is just a
15 narrative.  There's been no breaking question.
16      MR. STRONGMAN:  I think he is just explaining how
17 patients are followed up in Phase III clinical trials.  And
18 I'll ask some questions.
19      THE COURT:  I think we are starting to get to a
20 narrative, so --
21      BY MR. STRONGMAN:
22 Q.  And so, Doctor, one of the questions that I want to follow
23 up on, one of the points I want to follow up on, is I think you
24 indicated that there can be an occasion when a patient in a
25 clinical trial is followed for an adverse event for a certain

Page 2029

1  period of time.
2       Is that correct?
3  A.  Yes.
4  Q.  And then, let's just say hypothetically, that patient has
5  a recurrence and goes onto different medication, and so they
6  drop out of the study as it relates to the adverse event
7  follow-up.
8       Is that an example of what you are talking about?
9       MR. MICELI:  Your Honor, that's a leading narrative.
10      THE COURT:  I think you need to rephrase your
11 question.
12      BY MR. STRONGMAN:
13 Q.  Can you give the jury an example of how someone could be
14 followed up for a certain period of time for an adverse event,
15 but followed up for a longer period of time for overall
16 survival?
17 A.  I have given one example, which is the patient just drops
18 out.
19      Another example in the -- in, say, the TAC/FAC trial,
20 another example would be that the patient's cancer came back
21 and they started another chemotherapy drug.  And at that point,
22 you're not going to be collecting safety data on the previous
23 chemotherapy drug used, so you stop collecting safety data.
24 Q.  So, Doctor, you certainly are familiar with -- have
25 established you're familiar with TAX 316, correct?

Page 2038

1  in his report.
2      MR. STRONGMAN: He did.
3      MR. MICELI: He has a paragraph on page 26 -- and I
4  will show you, Your Honor -- that all he has -- I left my
5  glasses down there.
6      THE COURT: I can find 26.
7      MR. MICELI: I want to make sure it's 26. There it
8  is right here. This paragraph right there. At the bottom of
9  that paragraph, it just says "Figure A." There's no analysis
10 of what he did with Figure A, and then Figure A is stapled to
11 the back of his report.
12     And that's what's concerning. In his
13 deposition, he said, I didn't validate anything. I didn't
14 review the data. If the data is wrong, I'm wrong.
15     MR. STRONGMAN: This is what --
16     MR. MICELI: That's the problem with this. So this
17 is why we fought so hard to try to --
18     THE COURT: I understand that. I think you all filed
19 the wrong motion, if you want to know the truth.
20     I don't know why, but I think -- I'm going to
21 allow you to let him define it, and then you are moving on.
22 That's it.
23     MR. STRONGMAN: Can I ask him a question about the
24 efficacy stuff, unrelated, just so it's -- I don't want
25 Mr. Miceli to feel like I've left an impression I'm going to

Page 2039

1  then talk about it in relation --
2      THE COURT: No, I think you can say -- this is what I
3  will allow you to say: "What is statistical significance?" It
4  gives you an opportunity to review whether or not the drugs --
5  they just happened to pick the wrong patients or that these
6  patients did better on this drug. And that's it. We will
7  leave it there.
8      MR. STRONGMAN: Okay.
9      (End of bench conference.)
10     THE COURT: Please proceed, Mr. Strongman.
11     MR. STRONGMAN: All right.
12 BY MR. STRONGMAN:
13 Q. Doctor, I had asked a question about statistical
14 significance, and I want to back up and ask a question before.
15     We are talking about TAC versus FAC, and that study
16 was aimed at looking at efficacy; is that right?
17 A. That was the primary endpoint, yes.
18 Q. And can you discuss what the results of the primary
19 endpoint were with that study and whether they were
20 statistically significant?
21 A. The results were positive, meaning both progression-free
22 survival -- time to progression -- and overall survival were
23 better in the TAC than in the FAC arm.
24     And the difference was statistically significant,
25 meaning it's unlikely it arose by chance, that it's more likely

Page 2040

1  an effect of the difference in treatment.
2  Q. And I think we have already -- I had asked you, you had
3  reviewed the information that Dr. Kopreski had put together on
4  the ongoing cases -- do you remember that? -- of alopecia, the
5  ongoing cases of alopecia, Dr. Kopreski's chart.
6      Do you remember that?
7  A. I do.
8  Q. And, Doctor, in review of that chart, the jury has heard
9  about 29 cases.
10     And in the review, were there cases, yes or no, that
11 didn't meet the definition of persistent alopecia going out to
12 six months?
13 A. Yes.
14 Q. And did that happen in both the TAC arm and the FAC arm?
15 A. Yes.
16 Q. And either way, when you look at both, were cases of
17 ongoing alopecia happening, as the study defined it, in both
18 arms of the study?
19 A. Yes.
20 Q. Doctor, based upon your review of the TAX 316 information,
21 including Dr. Kopreski's analysis, were there actually 29 cases
22 of permanent alopecia in the TAC arm?
23 A. Not documented, right? I mean, the difference in numbers
24 is due to the fact that for whatever reason, the patient didn't
25 have a safety follow-up. So we don't know what happened to

Page 2041

1  that patient.
2  Q. And can you explain that.
3  A. So -- I will. I just --
4  Q. Can you --
5  A. So when you look at those 29 cases, some of them did not
6  have a follow-up at six months. They had not been followed up.
7  Even though this may have been seven years ago, the last time
8  that their hair was assessed on the case report form was less
9  than six months -- less than seven months after finishing
10 chemo. So we don't know whether that patient's hair recovered
11 or not.
12     There were patients who weren't in the 29 because
13 there was a documented recovery date. Those, we knew they
14 recovered.
15     So there were two ways that patients could be on that
16 list of 29 and not have permanent hair loss: One was by being
17 lost to follow-up and actually having their hair recover and it
18 just was never seen; or the hair recovered.
19 Q. And the same goes for the FAC arm too, right?
20 A. Yes.
21     MR. MICELI: Objection, Your Honor. It's leading.
22 I'm sorry.
23     THE COURT: Rephrase your question.
24 BY MR. STRONGMAN:
25 Q. Doctor, would that analysis apply to the FAC arm?

Page 2042

1  A. It did, yes.
2  Q. I want to turn and talk about Mrs. Earnest, okay?
3     Doctor, what chemotherapy regimen did Mrs. Earnest
4  ultimately receive?
5  A. She received dose-dense AC, followed by Taxotere.
6  Q. And what was the --
7  A. And the Taxotere dose was 100 per meter squared.
8  Q. And when you look at the conversation we were having
9  earlier about tumor type, stage, etc., could you explain to the
10 jury what Mrs. Earnest's cancer type was and what her factors
11 were.
12 A. Yeah. She had an infiltrating ductile cancer, the most
13 common kind of invasive breast cancer. It had hormone
14 receptors on it. It did not have HER2/neu on it. It was in a
15 lymph node, and so that made it a Stage 2B.
16 Q. And, again, do you believe that chemotherapy was
17 appropriate for Mrs. Earnest?
18 A. I do.
19 Q. And do you believe that Mrs. Earnest, in order to optimize
20 overall survival, that she needed a taxane?
21 A. Well, yes, with the proviso that that was the only way to
22 get the highest cure rate.
23 Q. And we have talked about Taxol and the risk of neuropathy;
24 is that right, Doctor?
25 A. We did.

Page 2043

1  Q. Did Mrs. Earnest have any -- and we are talking about the
2  time period in 2011 and before.
3     Are you with me?
4  A. I am.
5  Q. In that time period, did Ms. Earnest have any risk factors
6  for neuropathy?
7  A. She had prediabetes and high blood sugars.
8  Q. Doctor, did Mrs. Earnest then go on hormone therapy as
9  well? Is that right?
10 A. She did.
11 Q. And do you know whether, based on your review of the
12 records, she is continuing that therapy to this day?
13 A. She is continuing it, so far as I can tell from the
14 records.
15 Q. And, Doctor, with regard to Mrs. Earnest's hair loss, is
16 there any way to rule out the role that Cytoxan would play?
17 A. No.
18 Q. And same question: With regard to Mrs. Earnest's hair
19 loss, is there any way to rule out the role that Adriamycin
20 could play?
21 A. No.
22 Q. Is there any way to rule out the role that Arimidex could
23 play in Mrs. Earnest's hair loss?
24 A. No.
25 Q. Just a couple of other questions and I will be done.

Page 2044

1     When Mrs. Earnest took her regimen, do you know, yes
2  or no, one way or the other, whether or not she received the
3  Adriamycin and the Cytoxan weeks before she received Taxotere?
4  A. She did.
5  Q. And based on your review, did Mrs. Earnest lose her hair
6  before she started taking Taxotere?
7  A. Yes.
8  Q. And when you talk about the neuropathy again, what is the
9  significance of risk factors for neuropathy when you are
10 evaluating chemotherapy options?
11    MR. MICELI: Your Honor, I object to the form. I
12 think we spoke about this in chambers, did we not?
13    THE COURT: I think you all need to approach.
14    (The following proceedings were held at the bench.)
15    THE COURT: I don't want to have this conversation in
16 front of the jury, but what I thought I said in chambers is you
17 couldn't put the chart up because it is what Dr. Carinder said.
18 So I think you have already asked him what risk factors she
19 had, and I think that's enough.
20    MR. STRONGMAN: Okay. Thank you.
21    (End of bench conference.)
22 BY MR. STRONGMAN:
23 Q. Doctor, with regard to chemotherapy and the options
24 available to Mrs. Earnest, were there any risk-free options?
25 A. No, but that's a relatively vague question. "Risk-free"

Page 2045

1  meaning "hair loss risk-free"?
2  Q. How about were there any options that Mrs. Earnest had
3  that didn't have a risk of hair loss?
4  A. No.
5  Q. And, Doctor, in your opinion, is giving Taxotere to
6  Mrs. Earnest by Dr. Carinder, was that a reasonable decision?
7  A. I believe his treatment was reasonable.
8  Q. Doctor, have you offered all the opinions that you have
9  stated today to a reasonable degree of medical certainty?
10 A. Yes.
11    MR. MICELI: Your Honor, as we said before lunch, I'm
12 going to have a little setup time. Could we take five?
13    THE COURT: Sure. Court will be at recess for five
14 minutes.
15    THE DEPUTY CLERK: All rise.
16    (Recess.)
17    THE COURT: Are we ready?
18    THE DEPUTY CLERK: All rise.
19    THE COURT: All jurors are present. Court is back in
20 session. You may be seated.
21    Dr. Glaspy, I remind you you are under oath.
22    THE WITNESS: Okay.
23    THE COURT: Okay. Mr. Miceli.
24    MR. MICELI: Yes.
25