# EXHIBIT C

John A. Glaspy, M.D., M.P.H.

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  TAXOTERE (DOCETAXEL)     )
PRODUCTS LIABILITY LITIGATION    )
                                 )   MDL No. 2740
                                 )   SECTION: "H"
                                 )   Judge Milazzo
This Document Relates To:        )   Mag. Judge North
ALL CASES                        )
_____  )

VIDEOTAPED DEPOSITION OF

JOHN A. GLASPY, M.D., M.P.H.

Friday, January 18, 2019

10:06 A.M. TO 4:19 P.M.

Los Angeles, California

Golkow Litigation Services

John A. Glaspy, M.D., M.P.H.

Page 50

1  have you give some idea -- why don't you inspect the
2  document and see if there is accuracy.
3      A.  Yeah, I don't have any reason to disagree.
4  This is, for sure, what I believe what the -- or
5  very likely to be what the pharma reported to them.
6  We don't check it when they do that.
7      Q.  All right.  So these are various payments
8  for travel, meals, speaking, consulting, that have
9  been paid by the -- by various pharmaceutical
10 companies in the listed years.
11     And I don't know whether it's complete.
12 And this only covers the years 2009 through 2013, it
13 appears.
14     This is a document I got off the Internet.
15     But certainly during these years -- strike
16 that.
17     Is there some way that I can find out when
18 earnings were capped --
19     A.  I --
20     Q.  -- by UCLA?
21     A.  I can see if I can find out.  I don't know
22 how you would go about doing that.  But I can try
23 and have an answer to that at some point in the
24 future.
25     Q.  Okay.  And I understand that --

Page 51

1      A.  But -- excuse me.
2          But before that it was:  Don't keep
3  anything, give it to us.  Right?
4      Q.  Oh.
5      A.  And then before that it was:  You can keep
6  whatever you want.
7          And that was up until, I think, the
8  beginning of the 21st century.
9      Q.  All right.
10     A.  So -- and part of this -- this kind of
11 data-keeping on the part of pharma helped the
12 University decide what to do, because it -- it
13 doesn't do a lot of good to have rules that some
14 people follow and now having a way that people can
15 check.
16     What they're sometimes wrong about is what
17 was for what.  Right?
18     So I've had times when I -- I called a
19 company and said:  If we're going to do this study,
20 I want to see the data sheets from the phase 2.  Can
21 you photocopy them for me?
22     And then they put the photocopy fee on as
23 a -- as income by me, because they sent me these
24 things after they photocopied them.  Those kinds of
25 things show up.

Page 52

1      And also, you know, like, here's a couple
2  that are research, where, if we do a clinical trial,
3  we make the sponsor pay the cost of the clinical
4  trial.  And it comes in under my name, but that
5  money is the University's.
6      And so with those provisos, I think that
7  these numbers definitely, or very likely reflect
8  what pharma reported.  And I don't have any reason
9  to think that there's major errors in what they're
10 reporting or what they're attributing it to.
11     The hard part is going to be what -- what
12 the contribution was to my personal income.
13 That's -- that's complex.
14     Q.  All right.  And so apart from the funds
15 that were paid, or -- to you and the funds that were
16 passed through by you to UCLA, do you recall that
17 you served -- that you were called upon by Sanofi at
18 various times to make presentations that were --
19 were sponsored presentations by Sanofi.  Correct?
20     A.  Yes, I believe that did happen.  Yes.
21     Q.  And at least from the standpoint of Sanofi,
22 they were hoping that your presentation would go to
23 the benefit of those who heard your talk, such that
24 they would decide that it would be best for them to
25 use their drug.

Page 53

1          MR. STRONGMAN:  Objection.  Form.
2          You can answer.
3      A.  Okay.  So I can't believe -- the contrary
4  would be ridiculous, so it must be true, right?
5  That they would ask me to give a talk and hope it
6  was deleterious to the audience.  I doubt that that
7  was their ...
8  BY MR. THORNTON:
9      Q.  Okay.  There's a couple of entries on
10 Exhibit 4 -- let me get the original 4.
11     A.  There's no Sanofi on here.
12         Do you have anything for Sanofi?
13     Q.  I don't.
14     A.  Okay.  All right.  So that's --
15     Q.  I don't.
16     A.  Okay.
17     Q.  The Sanofi documents that I have seem to be
18 from '9 and '6, that I was able to locate on my
19 search of the portal.
20     A.  Before the Sunshine Act started getting
21 these things reported?
22     Q.  Must be.
23     A.  Okay.
24     Q.  Looking at Exhibit 4, there's a couple
25 things I have a question about.

John A. Glaspy, M.D., M.P.H.

Page 94

1  Q. And your hourly rate, is it different --
2  I'm sure it's in your report, but I'll just ask you:
3  Is it different for deposition or trial than it is
4  for record review?
5  A. No. I've never understood why that made
6  sense.
7  Q. This is supposed to be a terribly stressful
8  experience.
9  A. Is that it?
10 Q. That's the argument.
11 A. Yeah, it doesn't make sense that just
12 because somebody's on the other side that you charge
13 them more. An hour of my time is worth X, and
14 that's what everybody should pay.
15 Q. Fair enough.
16     MR. THORNTON: Are you picking up all my
17 whispering to my colleague?
18     MR. STRONGMAN: You've revealed all of your
19 secrets --
20     MR. THORNTON: I could probably say --
21     MR. STRONGMAN: Just giving you a hard
22 time.
23     (LAUGHTER)
24     MR. THORNTON: All right. I don't know
25 that we've altogether concluded with Exhibit 2,

Page 95

1  which was the depo notice, so I don't lose that in
2  the ether.
3     Request number 5 -- I'm going to ignore the
4  four templates. I think -- I don't know what kind
5  of templates I'm even asking for. So it didn't make
6  sense to me, it couldn't have made sense to you.
7  A. No.
8  BY MR. THORNTON:
9  Q. But let me move on to 5.
10    "All documents, including presentations,
11 speeches, slides, notes, handouts, or posters
12 regarding any presentation or speech by you
13 concerning the risk of alopecia from chemotherapy."
14    And I understand from the response that
15 there are no documents responsive to that request.
16 A. That's my understanding too. Yes.
17 Q. So from that may I conclude that you have
18 never given a speech or a presentation in a public
19 forum or with your colleagues, about alopecia in --
20 as it's related to chemotherapy of any kind?
21 A. Well, or that I may have done that in a
22 public -- you know, we do these things where the
23 public are invited to ask questions, and we give a
24 little talk about something. It's not recorded,
25 there's no record of it, but it's possible it came

Page 96

1  up at one of those.
2  Q. All right.
3  A. So that would have been a public speech
4  that would have been responsive if I saved a copy,
5  but we didn't.
6  Q. And may I take it from the fact that you're
7  conjecturing that you may have done it, you equally
8  may not have done it?
9  A. Correct. I don't have any recollection of
10 having done it.
11 Q. And additionally, that at least prior to
12 the call of -- to examine this literature in this
13 case, it wasn't a subject of great professional
14 interest to you?
15 A. It was of great professional interest
16 because it was -- it's part of the daily issues that
17 I have to deal with, with patients. So I care a lot
18 about it.
19    I just haven't gone around talking about it
20 saying, you know, because we haven't had something
21 to prevent it, other than the cold caps. And, you
22 know, that's a fully baked idea until we invent a
23 better cold cap.
24 Q. Would it be accurate to say that you hadn't
25 done extensive research on -- in this subject of

Page 97

1  chemotherapy induced alopecia?
2  A. That's correct.
3  Q. Do you have informed consent --
4     As you can see, I'm turning to request
5  number 6.
6     Do you utilize a form "informed consents"
7  in your clinical practice?
8  A. We do. But not -- so first of all, the
9  major consent is a discussion between the oncologist
10 and the patient.
11    The written material that patients receive
12 and that we also do is a general consent that --
13 where it just gives us permission to treat them.
14 And it doesn't list side effects.
15    And then we use -- we use UpToDate, which
16 is a medical information database that is kept
17 updated. Hence, the name. And they have patient
18 information materials on each drug.
19    And so our nurse practitioners print --
20 once we've ordered the chemotherapy, they print the
21 printout for each drug in that regimen and give that
22 to the patient as well. That's not really a consent
23 form but it's information packet.
24 Q. There's also a patient information form
25 that is part of the formal FDA label; is there not?

John A. Glaspy, M.D., M.P.H.

Page 118

1  Q. So, in your personal experience, as a
2  witness, you don't have any information about the
3  follow-up of patients in the TAC 316, and you're
4  relying 100 percent on Mr. Kopreski's analysis?
5      MR. STRONGMAN: Objection. Form.
6  A. No, I think it actually went the other way.
7      When I was required to write my report,
8  when it was due, he was still being deposed, and we
9  didn't have a deposition. And as somebody familiar
10 with clinical trials and how we record data,
11 Sanofi's attorneys asked me to comment on this -- on
12 what persistent alopecia means in the context of a
13 clinical trial.
14     And I did that.
15     And we had the table, just not the
16 deposition, so I added it on.
17     So it wasn't that I read what he said and
18 then took it for what it meant. It's that,
19 independent of what he was saying, I am able to
20 understand what's going on here; that this isn't --
21 these patients don't necessarily have what we've
22 been calling "permanent alopecia."
23     Their alopecia score hasn't been reversed
24 yet either, because they weren't followed up, or
25 they still have alopecia, or they disappeared from

Page 119

1  the clinical trial, those kinds of things.
2      MR. THORNTON: All right. I think you were
3  not -- the question didn't respond to my question --
4  your answer didn't respond to my question, and
5  that's why I'm going to move to strike it. But let
6  me just make sure I understand:
7  BY MR. THORNTON:
8      Q. While you were participating in however you
9  may have participated in the TAC/FAC trial known as
10 TAC 316, do I understand correctly that you did not
11 participate at that time in any follow-up of the
12 patients, as to whether or not they had hair loss?
13     MR. STRONGMAN: Objection. Form.
14 A. We did, it's just that none of our patients
15 showed up in this persistent alopecia chart, because
16 they came back for follow-up and weren't -- so I
17 didn't see any patients who show up in this chart.
18 BY MR. THORNTON:
19 Q. So you participated in one of the trial
20 centers?
21 A. Yes.
22 Q. And so -- and none of the patients from
23 your center were found in follow-up to have hair
24 loss for some length of time beyond the, I believe
25 it was the six-month cutoff?

Page 120

1  A. I don't want to be nonresponsive. But that
2  isn't what -- how a patient ends up in this table
3  isn't necessarily by having alopecia that persists.
4  Q. I understand that's the point that you --
5  you wish to make.
6      I'm just trying to find out what -- do you
7  know of your personal knowledge, in terms of the
8  observation of actual patients, and getting reports
9  from actual patients at your center.
10 A. Correct. We -- none of these patients were
11 our patients.
12 Q. How many patients -- and the center, of
13 course, was UCLA at that point. Right?
14 A. Yes.
15 Q. How many patients in the TAC/FAC study
16 called 316, TAC 316, were involved in the study?
17 A. What was the total number enrolled in
18 TAC -- we'd have to look that up. Yeah, I don't
19 have that memorized.
20 Q. Would that take long?
21 A. The article ought to be here somewhere.
22     Hundreds. I just don't remember the
23 number, so ...
24     MR. STRONGMAN: (Proffering document to
25 witness) That's your report.

Page 121

1      THE WITNESS: Right.
2  A. So 1480.
3  BY MR. THORNTON:
4  Q. And what was your personal contribution, or
5  role in the clinical trial as it was conducted at
6  your center?
7  A. I put patients on the trial.
8      And I did the regulatory paperwork to have
9  it get through the committees at UCLA and get
10 implemented.
11     I also -- it wouldn't be just for the UCLA
12 patients. But one of the investigators at the --
13 that was heavily involved in this trial was an UCLA
14 faculty member.
15     And so we saw all the data when it came
16 out. And I was involved in its interpretation, but
17 not with respect to alopecia.
18 Q. All right. So you were not involved with
19 interpretation of the alopecia data in TAC 316.
20     MR. STRONGMAN: Objection. Form.
21 A. Correct, yes. At the time. Yes.
22 BY MR. THORNTON:
23 Q. And the colleague that was very involved in
24 the study, who are you -- which of the authors are
25 you referring to?

31 (Pages 118 to 121)

John A. Glaspy, M.D., M.P.H.

Page 122

1  A. It was Jean-Marc Nabholtz.
2  N-A-B-H-O-L-T-Z. And Jean is J-E-A-N.
3  THE REPORTER: Thank you.
4  BY MR. THORNTON:
5  Q. And was Dr. Nabholtz personally involved in
6  the follow-up data concerning alopecia?
7  A. I don't know.
8  Q. Have you spoken with Dr. Nabholtz about
9  that matter?
10  A. No.
11  Q. So you had some role, then, in the review
12  that is purported to be shown in figure A, if I
13  understand your testimony, that you suggested that
14  it be done.
15  MR. STRONGMAN: Objection. Form.
16  A. No. I did not suggest it be done.
17  BY MR. THORNTON:
18  Q. Okay. Did you have a direct role in the
19  review that was then -- that's shown in figure A?
20  MR. STRONGMAN: Objection. Form.
21  A. I did not have a role in forming the table,
22  or writing the table, planning the table, or
23  suggesting that the table be made.
24  BY MR. THORNTON:
25  Q. Okay. And did you review any of the data

Page 123

1  that went into the table?
2  A. Only when I -- only when I saw the tables
3  as part of preparing my report.
4  Q. Okay. So you saw the table as it's
5  contained here as Exhibit A, but you have not
6  reviewed any of the data that went into the report.
7  Is that correct?
8  MR. STRONGMAN: Objection to form.
9  A. It -- what do you mean by review?
10  This is the data. There are data here.
11  BY MR. THORNTON:
12  Q. Okay.
13  A. So I did review data. But I didn't look at
14  the case report forms that -- that these reflect.
15  You know, I haven't checked to see that these dates
16  are correct or any of that.
17  Q. All right. And if, in fact, the dates were
18  reported incorrectly, you can't verify that --
19  strike that. Let me ...
20  You cannot verify, then, that the material
21  contained in figure A is accurate or complete?
22  MR. STRONGMAN: Objection. Form.
23  A. I -- not independently. I -- I can only
24  comment, assuming these are the data, this is my
25  conclusion. That's all I can do.

Page 124

1  BY MR. THORNTON:
2  Q. And, of course, if the data is not
3  accurate, then any assumptions you make about the
4  data, based on Exhibit A, would also be inaccurate.
5  Correct?
6  MR. STRONGMAN: Objection to form.
7  A. Could be, yes.
8  BY MR. THORNTON:
9  Q. Could be.
10  MR. THORNTON: Okay. I think I'm through
11  with this.
12  BY MR. THORNTON:
13  Q. Do you have any personal knowledge of the
14  follow-up of hair loss that was conducted at the
15  UCLA center in TAC 316?
16  A. Yes. Yes. We -- we saw these patients
17  afterward, and filled out forms that -- that
18  recorded what side effects we were -- we were
19  seeing, or had seen, what adverse events that
20  existed. And one of the things that was scored was
21  alopecia.
22  So we were involved in filling out those
23  forms, and those forms are what gave rise to that
24  table. Just not on our -- those weren't our
25  patients. It's the same sort of collection of data.

Page 125

1  If the patient's there, you can ask them if
2  they have X symptom, and you can write down whether
3  they have ongoing alopecia.
4  Q. Okay. So none of either the FAC or the TAC
5  arm patients that were reported to have hair loss
6  of -- for an extended period of time came out of the
7  UCLA center. Correct?
8  MR. STRONGMAN: Objection. Form.
9  A. That's the best of my recollection and
10  knowledge, yes.
11  BY MR. THORNTON:
12  Q. All right.
13  I believe just before the break, it was
14  your testimony that three of the patients that you
15  have had, who had complete loss of hair that didn't
16  return after chemotherapy, were taking -- were
17  administered Busulfan. Is that right?
18  A. That's correct.
19  Q. And do you acknowledge that Busulfan has
20  been found to be a chemotherapy drug that causes
21  permanent chemotherapy induced alopecia?
22  MR. STRONGMAN: Objection. Form.
23  A. I -- I wouldn't say it's been found to
24  cause it. I'd say it's been included in regimens
25  that are associated with it.

32 (Pages 122 to 125)

Page 158

1  BY MR. THORNTON:
2      Q.  Well, just take, for instance, you, as an
3  expert, who have concluded and written that you do
4  not believe that Taxotere regimens cause permanent
5  chemotherapy-induced alopecia, if, in fact, the
6  treating doctor had concluded otherwise, since you
7  don't actually tell your patients that Taxotere
8  regimens have a higher risk of causing permanent
9  chemotherapy-induced alopecia, you have no
10 experience whatever on patients reacting to the
11 warning, do you?
12         MR. STRONGMAN:  Objection, form.
13     A.  To that warning, no.  But I --
14 BY MR. THORNTON:
15     Q.  That's my only question.
16     A.  Well, no, because you put a phrase at the
17 beginning of the question that I wanted to -- that I
18 wanted to respond to.  What -- can we read back the
19 question?
20         MR. THORNTON:  Sure.
21         (REPORTER READ FROM THE RECORD)
22         THE WITNESS:  That's enough.
23     A.  So I wanted to say I haven't -- I don't
24 know if -- if -- I know that we see inadequate hair
25 recovery, in the eye of the woman, with all

Page 159

1  chemotherapy regimens.
2         I don't know that it's more common -- it
3  hasn't been my observation that it's more common.
4  And I don't think the literature is there to prove
5  it.  So I don't know whether one regimen causes that
6  more often than the other.
7         In my personal experience, I haven't seen
8  one regimen cause it more than others.  Okay?
9         But it -- I didn't want to -- I didn't want
10 to say that I had concluded it's been proven not to
11 be the case.  I just don't think we have data to --
12 that inform us on that.
13 BY MR. THORNTON:
14     Q.  I understand.
15     A.  Okay.
16         MR. THORNTON:  So I'm going to move to
17 strike that part.  But I understand your point.
18         THE WITNESS:  Okay.
19         MR. THORNTON:  Yeah, let's take a break
20 now.
21         THE VIDEO OPERATOR:  We are going off the
22 record.  The time is 3:43 P.M.
23         (RECESS TAKEN FROM 3:43 TO 3:56 P.M.)
24         THE VIDEO OPERATOR:  We are back on the
25 record.  The time is 3:56 P.M.

Page 160

1  BY MR. THORNTON:
2      Q.  So I'm ...
3         Doctor, I'm going to ask you a number of
4  questions, basically about your qualifications as a
5  regulatory expert.  A lot of these questions are the
6  kind of questions "you never did this, you never did
7  that."  It's not to discount what you have done in
8  your distinguished professional career.  It's just
9  that I want to find out --
10     A.  I understand.
11     Q.  So have you ever had any specific training
12 in FDA law?
13     A.  No.
14     Q.  Have you ever participated directly in a
15 new drug application for a drug?
16     A.  Yes.
17     Q.  Okay.  What drug?
18     A.  For GCSF, which -- which became known as
19 Neupogen, N-E-U-P-O-G-E-N.
20         And with the FDA label expansion on Aranesp
21 A-R-A-N-E-S-P.
22     Q.  All right.  What did you do with Neupogen?
23     A.  I had been involved in all the clinical
24 trials.  And so I reviewed some of the things that
25 were being written -- this was a long time ago, back

Page 161

1  in 1987, or '89.
2         I participated in the trials and there
3  weren't a lot of doctors.  Amgen at the time was a
4  small company.  And so they needed somebody to
5  re-read it and write and comment, and so I did that.
6         But I didn't -- I wasn't the primary writer
7  of the product license application and the IND.  And
8  I had nothing to do with the regulatory part of it
9  or the preclinical part of it.
10     Q.  And what did you do with -- I'm sorry, I
11 can't even read my own writing.
12     A.  Aranesp.
13     Q.  Yeah, Aranesp.
14     A.  Yeah.  It was the same thing, only they had
15 more doctors.  It's just that I had been sort of the
16 major figure in the clinical trials.  I had done all
17 of them and designed several of them.
18         They wanted me to look at it and make sure
19 that all the data that we -- as we presented it,
20 were presented the right way, and that there wasn't
21 important things that we'd left out.
22     Q.  Okay.  There are a number of regulatory
23 experts on both sides of this case.
24         Have you undertaken a complete review of
25 the regulatory history of -- of Taxotere?

John A. Glaspy, M.D., M.P.H.

Page 162

1  A. I have not. All I have -- and I would
2  defer to those regulatory experts on issues -- on
3  questions of FDA law and FDA regulations.
4       I did look at the labels of Taxotere and
5  some of the interaction e-mails between Sanofi and
6  the FDA, but only with a view toward whose idea was
7  it for this to "drop out of the label" kind of
8  thing, not -- not in any organized approach.
9  Q. Did you ever see a document from someone in
10 the FDA in which they expressly said words to the
11 effect of: I don't want you to have a warning in
12 the label about persistent alopecia or --
13     You understand when I say "persistent," I
14 mean any form of persistent alopecia?
15     MR. STRONGMAN: Objection to the form --
16 A. Yeah, I don't recall seeing any document
17 like that.
18 BY MR. THORNTON:
19 Q. Did your --
20 A. I did see the strike-through e-mail where
21 it's stricken through. But that doesn't, I don't
22 think, contain a statement by -- the reason we're
23 striking this out is we don't want you to have
24 any -- anything about persistent alopecia.
25 Q. Was there anything that even said expressly

Page 163

1  why the strike-through was made, or the policy
2  reasons to have made it?
3  A. I don't think I saw anything like that.
4  And if I saw it, I don't remember it.
5  Q. So just seeing a strike-through would not
6  be sufficient evidence for you to draw a reliable
7  inference as to the reason it was struck through,
8  would it?
9      MR. STRONGMAN: Objection to form.
10 A. I think I would rather, at that point, if I
11 was being asked that, say that's not my area of
12 expertise. You have experts on that, and I defer to
13 them.
14 BY MR. THORNTON:
15 Q. Fair enough.
16     And there's also some dermatologists and
17 pathology experts in this case.
18     At one point you appeared to give an
19 opinion that, in order for there to be permanent
20 hair loss from chemotherapy, that there would have
21 to be some kind of scarring alopecia process.
22 A. That if you wanted to say this isn't going
23 to recover, you'd want to have a biopsy that tells
24 you that the -- that the follicles are gone. Right?
25     And that, I think, is part of a thorough

Page 164

1  going workup, before you call something irreversible
2  or permanent.
3  Q. All right.
4  A. But I'll say again, if there's a
5  dermatologist on both sides, I would, on a
6  dermatologic question, defer to them and suggest the
7  trier-of-fact weigh their two opinions side-by-side
8  and come to a conclusion.
9      That's different than saying, if you're an
10 oncologist and you have a patient who says: I
11 really -- I've had no hair recovery. I would -- I
12 would be -- it would be within my expertise to opine
13 that that oncologist shouldn't draw a conclusion,
14 without sending them to a dermatologist for a
15 biopsy.
16 Q. All right. Understood.
17     MR. THORNTON: Though, I think I'm going to
18 strike that last part of your testimony, because --
19 I understand your opinion but I don't think it was
20 responsive.
21 A. Okay. You're talking now about where
22 dermatology and we leave off and pick up. And I
23 think there's a little bit of a venn diagram there,
24 I think.
25 BY MR. THORNTON:

Page 165

1  Q. Okay. And at one point I think your report
2  states that Tanya Francis did not lose hair -- I
3  want to quote it because I don't want to ...
4  A. Let me know the page number when you got
5  it.
6  Q. Yeah, here we go. Page 35. Let's go
7  straight to page 35.
8      "In sum, the chronology, including
9  photographs of Ms. Francis before and following
10 treatment, demonstrate that her hair grew back after
11 chemotherapy and that subsequent changes in her hair
12 are not associated with the fixed period in the time
13 of her treatment."
14     You formed a fact opinion that Ms. Francis
15 did not have hair loss that persisted after
16 chemotherapy?
17     MR. STRONGMAN: Objection. Form.
18 A. Yeah. So I -- I lay out the only reasons I
19 have for saying that up above, that her -- that
20 her -- her doctors were not listing this as an
21 ongoing problem. And -- so that was the main
22 reason.
23     (Perusing document) Let me...
24     So are we talking about the stuff on
25 page 36? Is that where we're ...

42 (Pages 162 to 165)