# EXHIBIT D

John A. Glaspy, M.D.

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)        )
PRODUCTS LIABILITY                 )   No. MDL No. 2740
LITIGATION                         )   SECTION: "H"
                                   )   JUDGE MILAZZO
This Document Relates To:          )   MAG. JUDGE NORTH
ALL CASES                          )
_____    )

THURSDAY, JANUARY 9, 2020

VIDEO DEPOSITION OF JOHN A. GLASPY, M.D., held at 2049 Century Park East, Suite 3000, Los Angeles, California 90067, commencing at 9:20 a.m. on the above date before Lindsay Pinkham, Certified Shorthand Reporter No. 3716, CCRR.

---

GOLKOW LITIGATION SERVICES

877.370.3366 ph | 917.591.5672 fax

deps@golkow.com

John A. Glaspy, M.D.

Page 22

1  plan reporting form for Category 1 and 2, compensated
2  outside professional activities. And then it gives the
3  dates for the fiscal years ending June 30, '17, '18, and
4  '19, and all activities that will be required to be
5  reported as of June 30, 2020.
6      And what we've received are the OATS report
7  forms that appear to be generated from a computer for
8  the years, fiscal year ending 2019, and the partial one
9  that will end June 30 of 2020. Correct?
10     A   That's correct.
11     Q   And those are Exhibits 4 and 5 respectively;
12 right?
13     A   That's correct.
14     Q   If you could, look at Exhibit 4 for me. Strike
15 that. I'm sorry. Exhibit 5.
16         Exhibit 5 would include September of --
17 actually, will include July of 2019 to the present.
18 Correct?
19     A   That is correct.
20     Q   Now, can you tell me where on Exhibit 5 there's
21 a disclosure for your time spent as an expert witness at
22 the trial of the Earnest matter?
23     A   I think that comes in -- what's the dates on
24 this?
25     Q   The first one I think is July of 2019.

Page 23

1      A   Okay. This is the most recent one. Maybe it's
2  on this one.
3      Q   When you say "this one," you're referring to
4  Exhibit 4?
5      A   Exhibit 4, yeah. Give us a minute to look
6  here. All right. So it's listed here on page 2 of 3
7  towards the bottom. Date 9-26-19.
8      Q   And how much time was billed there?
9      A   It doesn't say time, does it? Yes, it says
10 48.25 hours.
11     Q   How long were you in New Orleans?
12     A   I was in New Orleans for less than 24 hours.
13     Q   And then if you can -- staying on Exhibit 5,
14 can you see where it's documented, your research into
15 the additional information that went into your most
16 recent report, where it is documented on there for us?
17     A   I haven't billed for any of the work done since
18 New Orleans.
19     Q   So no work from September of 2019 to the
20 present would be reflected on your OATS report.
21     A   That's correct. I just haven't billed it.
22     Q   Okay. Did you perform all of your own
23 literature searches for the additional information
24 concerning alopecia and -- did you perform all of your
25 own literature searches for the additional information

Page 24

1  concerning alopecia and permanent chemotherapy-induced
2  alopecia related to or not related to chemotherapy that
3  went into doing your report?
4         MR. STRONGMAN: Objection. Form.
5         THE WITNESS: Yes, I performed all of my own
6  literature searches. I believe that the Shook attorneys
7  also were doing their own literature searches. But I
8  have identified all of the ones that are in my report.
9      Q   BY MR. MICELI: When you say you've identified
10 all of the ones that are in your report, whether you
11 found those or whether they were provided to you by the
12 Shook attorneys?
13     A   The ones that the Shook attorneys found were
14 the same ones I had found.
15     Q   Okay. There was absolutely overlap between the
16 two?
17     A   I can't think of an exception.
18     Q   All right.
19     A   We're talking about the alopecia references
20 now.
21     Q   Yes.
22     A   Yes.
23     Q   We go to request No. 19. If you could just
24 read that to yourself. Would this also be information
25 that is that contained in the OATS reports that you have

Page 25

1  provided?
2      A   It is. You weren't here for my first
3  deposition, so I'll refresh -- the University of
4  California still hasn't settled down in how they are
5  going to be monitoring outside activity. For many years
6  it was -- you were sort of on your own honor, and if you
7  got caught, you got in trouble. But there was no
8  monitoring.
9      Q   Okay.
10     A   And that was the case until -- that's what the
11 OATS system is designed to try to gain some control
12 over. But previously there were years when you could do
13 whatever you wanted and keep it, there were years when
14 you couldn't do anything and keep it, and then there
15 were years when you could do what you wanted -- we're
16 not talking about Category 1 now. We're talking about
17 other categories.
18     Q   Correct.
19     A   Thank you for educating me about the
20 categories.
21        The other ones you could keep up to a certain
22 amount, and then you had to give them in. So in those
23 days it was really cumbersome. My secretary would get
24 checks and we would call through the department and say,
25 "Is he over or under?" And if I was over, I would sign

7 (Pages 22 to 25)

John A. Glaspy, M.D.

Page 54

1  registration studies that elucidate the usefulness or
2  potential usefulness of different regimens using
3  Taxotere.
4     A   That's correct. It's a different bar that you
5  clear to convince the treating community that a given
6  regimen is another way to go than it is to have the FDA
7  agree to put that on the label.
8     Q   Okay. And back in that 2008 time frame, and I
9  think perhaps before and after, you actually spoke as an
10 approved speaker for Sanofi, did you not?
11    A   Yeah, I think we went through this in my other
12 deposition. I don't have a memory of whether I served
13 as a Sanofi-sponsored talk speaker or they sponsored me
14 to come into town and I wasn't one of -- I just don't
15 have any memory. But you did find some internal
16 communications at Sanofi that we talked about at trial.
17    Q   Right.
18    A   And if it's a true copy, then that means that
19 they had some concerns.
20    Q   Right. And there's -- I'm not going to go into
21 that. I know what you're referring to. My only purpose
22 for bringing it up was that while you may have spoken
23 for Sanofi as a Sanofi-approved speaker or sponsored
24 speaker on Taxotere, let's just assume you did so in,
25 say, 2008. In 2008 you were aware that TAC, at the

Page 55

1  75 milligrams per meter squared with Adriamycin and
2  Cytoxan, was the only label approved use, but that there
3  were other regimens in the NCCN guidelines containing
4  Taxotere.
5        MR. STRONGMAN: Objection. Form.
6        THE WITNESS: I was, yes.
7     Q   BY MR. MICELI: And would it be fair to say
8  that you recognized as a speaker -- who was speaking to
9  other oncologists; correct?
10    A   That's correct.
11    Q   That those other oncologists like yourself
12 understood that the NCCN guidelines recommended or
13 approved of uses, the use of Taxotere in regimens other
14 than TAC?
15    A   Could you do it one more time?
16    Q   Let me try to just clean it up. And I'll ask
17 it differently.
18        Would you agree that it was reasonably
19 foreseeable for a clinical medical oncologist like
20 yourself to have understood that Taxotere would be used
21 in regimens other than TAC?
22        MR. STRONGMAN: Objection. Form.
23        THE WITNESS: I think that's reasonable, that
24 we would assume that as time went on, additional ways of
25 using it would happen. That was already evident in

Page 56

1  2008. There was the TC regimen was already out there
2  and had been published.
3     Q   BY MR. MICELI: Okay. And other -- I mean,
4  there are multiple regimens; correct?
5     A   There were. But I just want to make sure, I am
6  pretty sure still as we sit here today that I never went
7  around giving a TAC-versus-FAC talk. Okay? I thought
8  the paper spoke for itself, and I provided a copy of the
9  slides that I was using in those days as part of my
10 first deposition. They exist someplace for you.
11        But the point that I was trying to make is if
12 we're asking the question right now, it should be, do we
13 need the Adriamycin. My talk was built around that.
14    Q   Okay. Because we sort of confirmed some of
15 this a little while ago, and we talked about this at
16 trial.
17        (Deposition Exhibit 9 was marked for
18        identification.)
19    Q   BY MR. MICELI: This is the Mackey, et al.
20 article that publishes the final ten-year follow-up
21 results of the TAX 316 study; correct?
22    A   That's correct.
23    Q   And it is -- you're a coauthor on this study?
24    A   I am.
25    Q   And if we go to page 79.

Page 57

1     A   Okay.
2     Q   We've already gone over the fact that TAX 316
3  was a properly randomized and controlled clinical trial;
4  correct?
5     A   Correct.
6     Q   And on page 79 at the top of the left column,
7  first full paragraph, second sentence, it notes that:
8         "The intention-to-treat efficacy and
9         safety analyses were done as originally
10        and prospectively defined in the study
11        protocol."
12        Correct?
13    A   Yes.
14    Q   And protocols are what define how a clinical
15 trial is to be conducted.
16    A   That's one of the documents that speaks to
17 that. There are others when there's a big clinical
18 trial like this. But yes.
19    Q   But before the trial is conducted, the first --
20 well, I'm not going to say the first -- protocols are
21 drawn up that will define how the clinical trial will be
22 conducted; fair enough?
23    A   Right. But other documents are also drawn up
24 that define how it's conducted. There's a lot of
25 paperwork that goes into a clinical trial.

15 (Pages 54 to 57)

John A. Glaspy, M.D.

Page 66

1  So you can't figure out an event rate.
2      Q   BY MR. MICELI:  Right.  Or if you just take a
3  group of 385 individuals who suffered permanent
4  alopecia, you don't know the denominator or the total
5  number of individuals at risk who took the drugs that
6  these 385 people used; correct?
7      A   As a general rule, that's true, yes.  There are
8  exceptions, but yes.
9      Q   Okay.  Now, I know I'm jumping around a little
10 bit.  But we know that TAX 316 was a randomized,
11 controlled trial; right?
12     A   We do.
13     Q   And we're going to talk much more about this
14 later today.  But we also know that at the end of the
15 follow-up period, what was reported in the TAX 316
16 clinical study report was that 29 individuals had
17 ongoing alopecia in the TAC group, and 16 in the FAC
18 group; right?
19     A   They were being scored as ongoing; that's
20 correct.
21     Q   And we'll discuss that.  Because we can agree
22 to disagree about what that means.  And we know
23 that's part of what --
24     A   Yes, but I'm conscious of the fact that I'm
25 under oath and answering on videotape.

Page 67

1      Q   So we had 29 individuals in one population and
2  69 -- or 16 individuals in the FAC population.  Right?
3      A   That's correct.
4      Q   And they're randomized into those two groups,
5  and we have controlled for the identical use of
6  Adriamycin and Cytoxan and tamoxifen in both
7  populations; right?
8      A   That's correct.
9      Q   To isolate the issue of Taxotere versus 5-FU.
10     A   Yes.
11     Q   Okay.  It would not be appropriate to say that
12 we have 45 outcomes on Adriamycin and Cytoxan in the TAX
13 316 study and attempt to determine an event rate for
14 permanent chemotherapy-induced alopecia caused by
15 Adriamycin and Cytoxan, based on TAX 316.  Fair?
16         MR. STRONGMAN:  Objection.  Form.
17         THE WITNESS:  I think I disagree.  So first of
18 all, we jumped from their being scored as ongoing to
19 permanent and irreversible alopecia.
20     Q   BY MR. MICELI:  That's a fair statement.  Let's
21 withdraw that and let me go back to just using "scored
22 as ongoing."  It would be inappropriate to say that you
23 have 45 individuals who are scored as ongoing trying to
24 establish an event rate for a relative risk of ongoing
25 alopecia for Adriamycin and Cytoxan; right?

Page 68

1          MR. STRONGMAN:  Objection.  Form.
2          THE WITNESS:  I still think I would disagree.
3  And I would disagree because we haven't added in one
4  factor, which is that in randomized, controlled trials,
5  even if you do the identical treatment in both arms,
6  numerically the outcomes won't be the same in both arms,
7  because we're sampling -- we're trying to predict what
8  the universe would show by sampling a small number from
9  the universe.
10     Q   BY MR. MICELI:  That's what epidemiology is;
11 right?
12     A   Epidemiologists know about this.  So do
13 statisticians.
14         The thing that is missing in your hypothetical
15 is, you haven't said "and this difference is
16 statistically significant."  At that point, then, you
17 can start to say, well, I can make inferences that
18 ending up scored as ongoing is not just randomly
19 distributed; it's actually systematically in one arm
20 versus the other.  And that might be due to one of the
21 drugs being different.  It might be due to other sources
22 of systematic error.
23         One of the problems for analysis of the -- you
24 know, we're using the 316 to analyze something that
25 wasn't directly designed to analyze, when we start

Page 69

1  talking about irreversible alopecia.
2          The protocol called -- not the protocol, but
3  the instructions to the study staff called for the
4  follow-up of adverse events to stop when the patient
5  progressed, because they were going to get other drugs,
6  and it would complicate the analysis.  That makes sense
7  to me.  That made sense to me at the time.
8          That means that as time goes on, these two
9  groups are different, because one of them has more
10 people still getting their adverse events analyzed than
11 the other group, because the TAC group was relapsing
12 slower and with fewer numbers.  So that introduces an
13 analytic complexity to this.
14         But in general, my main objection to what you
15 said would be, you didn't add in that that difference is
16 statistically significant.
17     Q   Okay.  I've got to unbundle some of what you
18 said there.
19         First of all, are you going to be offering
20 opinion -- I didn't see it in your report, but are you
21 going to be offering an opinion that there was some
22 analytical complexity of the slower progression in
23 disease rate in the TAC arm that accounts for the higher
24 number of individuals who were coded as ongoing?
25     A   No.

18 (Pages 66 to 69)

John A. Glaspy, M.D.

Page 70

1  Q  Okay. That's not going to be part of your
2  opinion?
3  A  No. But I might have an opinion, if somebody
4  gave me a hypothetical like this, that that weakens your
5  ability to draw conclusions. Because just doing
6  statistical significance testing depends on the two
7  groups still not having any systematic difference, one
8  from the other. And Dr. Chang explained that in her
9  report.
10  Q  But there were different absolute numbers of
11  patients in the TAC arm versus the FAC arm. They were
12  close, but they weren't exactly the same.
13  A  You mean the total numbers? Yes, there were.
14  Q  N equals.
15  A  Yes.
16  Q  That number was different between the TAC arm
17  and the FAC arm. Right?
18  A  That's correct.
19  Q  Okay. And that's not uncommon in clinical
20  studies.
21  A  It would make me wonder about the randomization
22  if it wasn't different.
23  Q  Well, like for instance the TAX 311 study, the
24  evaluated populations were both N equals 222; right?
25  A  Yes, but that doesn't happen often.

Page 71

1  Q  Needle in a haystack, but most of the time
2  they're not the same.
3  A  Right. That's true.
4  Q  And you can still evaluate the populations
5  regardless of the analytical complexity of dropouts or
6  time to progression, because what you're looking at are
7  relative relapse rates; right?
8  A  Correct. You're looking for a risk of relapse
9  and a time to relapse. You're doing an event-time
10  analysis.
11  Q  And even though you're doing relative
12  risk-reduction analyses, you can still look at the
13  absolute risk reduction, and you would expect that to be
14  smaller if the active arm, the TAC arm, had a slower
15  progression rate; correct?
16  A  It could. There's lots of ways this could
17  break. It depends how early it happens, too. So all
18  I'm saying is, it makes it more complicated. But I'll
19  go back and again say, I think part of the contested
20  points in this trial, in trials, is going to be
21  statistical significance of that difference. Not just
22  whether we do ongoing or we go through and look for what
23  ongoing meant, but also even if we just look at the ones
24  that were ongoing, is that statistically significant or
25  not without doing something to the numbers to make it

Page 72

1  significant.
2  Q  Right. But just so we're clear for the
3  record -- and you may have reviewed this -- your
4  opinions do not include any reliance upon statistical
5  evaluation of the relative difference in the time to
6  progression impacting the relative relapse rates.
7       MR. STRONGMAN: Objection. Form.
8       THE WITNESS: That's correct. And I didn't see
9  that any of the statisticians who looked at this were
10  interested in doing that. But there was analysis of the
11  statistical significance of the two.
12  Q  BY MR. MICELI: Right. Okay. And you've
13  reviewed Dr. Wei's supplemental report.
14  A  And his initial report.
15  Q  Oh, you did review --
16  A  I did review Wei's initial report.
17  Q  And you have reviewed Dr. Madigan's report as
18  well; right?
19  A  I have.
20  Q  Okay. And in reviewing Dr. Wei's report, were
21  you able to determine which portions of his report may
22  or may not have been performed by him personally? What
23  calculations?
24  A  I wasn't. I didn't see any guide to that.
25  Q  You didn't see any reference to how many other

Page 73

1  individuals might have assisted with his calculations?
2  A  If I did, I've forgotten it.
3  Q  I didn't see them either. I just want to make
4  sure I wasn't missing something.
5       Let's look real quickly at this over here.
6  We're up to No. 10 now? Okay.
7       (Deposition Exhibit 10 was marked
8       for identification.)
9  Q  BY MR. MICELI: Doctor, do you recognize this
10  as the Freites-Martinez, et al. study, or excuse me,
11  publication?
12  A  I do.
13  Q  Now, this is an observational study; correct?
14  A  Yes.
15  Q  And before we get started, because of how this
16  was referred to at trial, I want to go to the back -- if
17  you count in from the back, the fourth page -- maybe I
18  should just say -- well, actually, page 1 at the bottom
19  right-hand corner.
20  A  Page 1 meaning 742 -- 724?
21  Q  I have a different copy. This page right here.
22  A  Let me make sure it's --
23  Q  You have it. Down at the bottom, corresponding
24  author is Mario Lacouture; correct?
25  A  Yes.

19 (Pages 70 to 73)

Page 86

1    A   Oh, you mean among these?  Yes.  No, none of
2  these are randomized, controlled trials.  I'm sorry.
3    Q   Okay.
4    A   I'm sorry.
5    Q   Okay.  What we have, though, is on page 21 you
6  have a sentence that says "cases of persistence alopecia
7  have been reported with," and you say Adriamycin,
8  carboplatin, CMF.  Then there's a -- page 22 lists more,
9  and then on page 23 lists more, ending with
10 cyclophosphamide and footnote 39.
11      So footnotes 25 through 39, all of what you've
12 cited here are observational studies.  Correct?
13   A   They're all associations.  Not proven causal.
14   Q   These do not prove causal.
15   A   As stand-alone articles by themselves, they're
16 associations.
17   Q   Okay.  Now, we don't need to go through each
18 one of these.  We can if we want to just spend a lot of
19 time doing it.  But each of the articles that are listed
20 in footnotes 25 through 39 are not limited to
21 observational studies in patients with early stage
22 breast cancer; correct?
23   A   That's correct.
24   Q   You looked at all comers.  You looked at all
25 types of cancers that were --

Page 87

1    A   Right.  I was interested in drug and alopecia.
2    Q   Not indication of use.
3    A   Correct.
4    Q   And if it was breast cancer, it didn't have to
5  be early stage adjuvant care studies.  It could be
6  metastatic.
7    A   That's correct.
8    Q   And it could be any other type of cancer beyond
9  breast cancer.
10   A   That's correct.
11   Q   Okay.  And the citations in footnotes 25
12 through 39 do not, standing alone, provide valid
13 scientific evidence of the existence of a causal
14 relationship between any of the 15 listed drugs and
15 permanent chemotherapy-induced alopecia.
16      MR. STRONGMAN:  Objection.  Form.
17      THE WITNESS:  I would feel more comfortable
18 with the language, "do not establish a causal
19 relationship."
20      They do provide, you know, if there's a chain
21 of evidence in drawing a conclusion, if you're the first
22 link in that chain, we can't say there's no evidence.
23 We just have to say that there's no proof to have a
24 causal relationship.
25   Q   BY MR. MICELI:  One link does not a chain make.

Page 88

1    A   Yeah, that is pretty much what I'm saying.
2    Q   And so hypothesis generation is the first link
3  in a chain.
4    A   Often.  First or second; right.
5    Q   First or second.  Two links don't make a chain.
6    A   Usually not.  For busulfan, it did.
7    Q   Okay, fair enough.  You're not going to come
8  into court at the trial of this next case and offer
9  testimony to a reasonable degree of scientific certainty
10 that what you cite on pages 21 through 23, footnotes 25
11 through 39, establishes a causal chain, link of chain --
12 links of chain to establish causation that any of the
13 drugs listed here, these 15 drugs, to a reasonable
14 degree of scientific certainty, causes or can cause
15 permanent chemotherapy induced alopecia; correct?
16      MR. STRONGMAN:  Objection.  Form.
17      THE WITNESS:  That's correct.  We'll only talk
18 about it in association.
19   Q   BY MR. MICELI:  But the first link in a causal
20 association chain that has not been established; right?
21   A   That hasn't been completed.  The first link is
22 established.  It's just the proof of causal link hasn't
23 been established.
24   Q   I can tell you, I think I can see right now
25 using a demonstrative aid at the next trial with a

Page 89

1  single link of chain.
2       On page 23 you then go on to say -- let's take
3  a look at this.  That first full paragraph that starts
4  with "because":
5           "Because Taxotere for early stage
6       breast cancer is given as...a multi-drug
7       regimen and not a single agent, it is
8       impossible to conclude that Taxotere
9       causes permanent alopecia."
10      Those are your words; right?
11   A   Correct.
12   Q   But we know we have a randomized, controlled
13 trial where 29 individuals versus 16 individuals were
14 documented as having ongoing alopecia at the end of the
15 ten-year follow-up period; correct?
16      MR. STRONGMAN:  Objection.  Form.
17      THE WITNESS:  We know that there were patients
18 who are being scored as ongoing alopecia at that time.
19 And then we've got all we're going to talk about, what
20 that did or didn't mean.
21      And then we also have left out again the
22 statement of statistical significance.  It's not enough
23 that they be numerically different.  It has to be
24 something that didn't arise by randomness.
25   Q   BY MR. MICELI:  Are you going to offer the

John A. Glaspy, M.D.

Page 98

1   and the other "n" is 16. I think it's reasonable to
2   make that inference. It's 29 versus 16.
3       Q   BY MR. MICELI: That's all I want to look at on
4   that one for now.
5           Isn't it true, randomized, controlled trials,
6   the purpose for controlling and randomizing is it allows
7   us to make causal inferences for both safety and
8   efficacy; correct?
9       A   That's correct.
10      Q   If they're done properly.
11      A   If they're done properly and the numerical
12  differences are subjected to statistical analysis;
13  that's correct.
14      Q   Flip back to page 19 with me of your report.
15  The top paragraph talks about -- the first full
16  paragraph talks about tamoxifen and aromatase inhibitors
17  reduce estrogenic stimulation of ER-positive breast
18  cancer; correct?
19      A   That's correct.
20      Q   And then you say:
21          "Both of the hormonal therapy
22          approaches can cause hair thinning and
23          loss as alopecia."
24          And you have footnote 14; correct?
25      A   I do.

Page 99

1       Q   Now, I want to focus on the words there you
2   chose. Did you type this report yourself, or did you
3   dictate it and have somebody type it?
4       A   This was going back and forth between --
5           MR. STRONGMAN: Objection. Just one second.
6   Draft reports are protected, and so to the extent you're
7   talking about draft reports or what not, that's --
8           MR. MICELI: I don't want to get copies of --
9   okay. You tell me if I cross the line, and we may agree
10  to disagree, but we don't need to worry about that right
11  now.
12          MR. STRONGMAN: I'm just saying communications
13  with lawyers and the like, Doctor, you understand that.
14          THE WITNESS: How about if I take ownership for
15  these words? It wasn't something somebody imposed on
16  me.
17      Q   BY MR. MICELI: Okay. That was going to be one
18  of my questions. Ultimately, you take ownership of
19  these words.
20      A   Yes.
21      Q   Okay. Now, without telling me
22  communications -- well, drafting of this report included
23  communication with other individuals; correct?
24      A   Yes.
25      Q   Okay. And the final product of your report

Page 100

1   includes the sentence:
2           "Both of these hormonal therapy
3           approaches can cause hair thinning and
4           loss as alopecia."
5           And then you put footnote 14 in. Right?
6       A   I did.
7       Q   I want on focus on the words "can cause." Are
8   you going to come into court and testify that there is
9   valid scientific evidence that supports a causal
10  relationship between tamoxifen and permanent alopecia?
11          MR. STRONGMAN: Objection.
12          THE WITNESS: I will come in and testify that
13  it's obvious to all practicing oncologists that when you
14  treat patients with these drugs, they experience hair
15  thinning. They can experience hair thinning. Some
16  don't. But they can experience hair thinning that
17  doesn't resolve until the drug is finished, and
18  sometimes doesn't resolve. But the problem is --
19  doesn't resolve even when you are finished. Their hair
20  remains thinner.
21          But another thing has happened. She's now ten
22  or five years older than she was before. And all of
23  our -- my hair is less than half what it once was. So
24  all of us, as we get older, our hair diminishes.
25          And so I don't think that it's ever been

Page 101

1   demonstrated in a randomized, controlled trial. There
2   have been randomized trials, but people don't follow the
3   alopecia carefully. But this is one of those things
4   that, like the busulfan baldness, is obvious to me, and
5   I believe that causal is linked, because we treat so
6   many people with these, and we see it so often.
7       Q   BY MR. MICELI: When you wrote this sentence or
8   accepted it as your own, you don't say that based upon
9   your clinical experience. You just say both of these
10  hormonal approaches can cause hair thinning and loss as
11  alopecia. And you cite to the Freites-Martinez article,
12  the single link chain that we discussed before that is
13  not proof, not valid scientific proof of a causal
14  relationship; right?
15      A   Right. Which I just -- I kind of repeated that
16  and agreed with you on that point. But -- and I'll
17  apologize for the bad wording here. But to me, as a
18  practicing oncologist, the thinning of hair, when women
19  receive these hormonal drugs, is pretty -- happens
20  commonly enough that we know they're linked.
21      Q   What type of alopecia does tamoxifen cause?
22      A   Well, what it looks most like is androgenetic
23  alopecia. It can be patchy and it can be diffuse. In
24  general, in women, they don't -- the hairline doesn't
25  recede as much as it does in men.

John A. Glaspy, M.D.

Page 102

1  Q  Have you ever examined an individual with
2  permanent tamoxifen-related alopecia with the use of a
3  dermatoscope?
4  A  I have not.
5  Q  Have you ever ordered a biopsy on a person that
6  you suspected as having permanent tamoxifen-related
7  alopecia?
8  A  I have.
9  Q  You have?
10 A  I have.
11 Q  And what were the pathologic characteristics of
12 tamoxifen-related permanent alopecia?
13 A  I wanted to make sure, because she had lupus, I
14 wanted to make sure it wasn't scarring alopecia, that we
15 couldn't approach this by approaching her lupus a little
16 better. And so that's why I did it. I wasn't doing it
17 to prove the tamoxifen; I was doing it to rule out the
18 lupus.
19 Q  Okay. I'm trying to think if hair is related
20 to lupus, but I'm drawing a blank.
21    Before you did a biopsy, did you do an ANA test
22 to rule out lupus?
23 A  It was ruled in. She had lupus. The question
24 was, how much of her alopecia was being caused by the
25 lupus.

Page 103

1  Q  Did you collect data from this patient?
2  A  Well, drawing bloods and checking labs and
3  doing biopsies is collecting data. Did I have an
4  intention to publish it and collect the data in an
5  organized way? No.
6  Q  Did you measure hair density in any organized
7  way?
8  A  No.
9  Q  Do you know how to measure hair density?
10 A  I've never done it.
11 Q  How did you quantify the person's hair loss?
12 A  You can do it by inspection. You can start to
13 see scalp where before you saw hair, and by feeling it.
14 But I've never had a person who had hair loss that
15 didn't know it. They tell you what's happening.
16 Q  I don't know if I said qualitative or
17 quantitative. Did you attempt to quantify the amount of
18 hair loss for that patient?
19 A  Visually she had about half of the hair she had
20 before. She was right at that interface.
21 Q  So it was an eyeball test.
22 A  Yes.
23 Q  You didn't use a dermatoscope to try to do hair
24 counts of the particular sites on the scalp?
25 A  That's correct.

Page 104

1  Q  Okay. Now, the Palamaras study, that's a
2  publication of two case reports; correct, one with
3  Taxol, one with Taxotere?
4  A  I believe so, yes.
5  Q  Okay. That, standing alone, is not valid proof
6  of a causal relationship between tamoxifen and permanent
7  alopecia, is it?
8  A  Proof of a causal relationship, no. It's the
9  association.
10 Q  And the same would hold true of the Park
11 observational study?
12 A  The Park? You're talking about which one, now?
13 Q  You only list four under --
14 A  Park. I found it. Yes, that's true.
15 Q  And then Fonia, it says there it's a cohort of
16 ten patients. That's not valid -- that observational
17 study's not valid scientific proof of a causal
18 relationship --
19 A  As a stand-loan, doesn't establish a causal
20 relationship.
21 Q  And those four studies or four publications
22 combined don't provide you with valid scientific
23 evidence of a causal relationship, do they?
24 A  Without any -- without my personal experience
25 of what we talked about, no.

Page 105

1  Q  What about with your personal experience? Is
2  it just the one patient?
3  A  No. My personal experience is with thousands
4  of women. I've been doing this for a long time. These
5  drugs are old. They've been around forever.
6  Q  Are you saying that you've seen thousands of
7  women with hair loss related to tamoxifen?
8  A  Yes.
9  Q  And you've used Taxotere with thousands of
10 women?
11 A  Yes.
12 Q  And have you seen permanent alopecia in the
13 thousands of women that you've treated with Taxotere?
14 A  We just switched from hair thinning to
15 permanent alopecia.
16 Q  We're talking about hair thinning. This
17 statement in your report at page 19 about tamoxifen is
18 about hair thinning. It's not about permanent hair
19 loss, then. Right?
20 A  Well, as I told you, it often doesn't recover.
21 But it's not clear that that's because they had
22 tamoxifen as opposed to they're ten years older than
23 they were.
24 Q  Okay, all right. Have you done -- have you
25 applied, as to any drug that you list in your report --

John A. Glaspy, M.D.

Page 106

1   let me back up.
2       You're familiar with the Bradford-Hill
3   criteria?
4       A   Yes.
5       Q   Have you attempted to apply the Bradford-Hill
6   criteria to establish causation as to any chemotherapy
7   agent being related with permanent hair loss -- I guess
8   that's my question.
9       A   The Bradford-Hill criteria are meant to be
10  applied to observational trials and to be ways of
11  assessing how likely there is a causal relationship. So
12  it's a way to take the observational data and make it
13  talk to you about the level of confidence you have that
14  this is a causal relationship. Because most of the
15  settings that observational trials are done in, there is
16  no chance for a randomized trial. You can't randomize
17  people to smoke and not smoke. There are times when you
18  always have to work backward and try to find it.
19      So looking for whether it makes sense
20  scientifically, looking for whether it's consistent,
21  looking for all of those factors that are in the Hill
22  criteria is that attempt. And I have not made an
23  attempt to apply that to any of these drugs, including
24  the taxanes.
25      Q   Okay. I want to -- just because I appreciate

Page 107

1   your answer, but because it was long, I want to make
2   sure I have a crisp question and a crisp answer.
3       You have not made an attempt to apply the
4   Bradford-Hill criteria to any of the drugs listed in
5   your report, including the taxanes.
6       MR. STRONGMAN: Objection. Form.
7       THE WITNESS: That's correct. All I've done is
8   read what other people have done.
9       Q   BY MR. MICELI: Okay. And then if we go to the
10  next paragraph on page 19 -- not the next one, but the
11  second to the last paragraph above side effects of
12  chemotherapy drugs, the one that starts "in addition."
13      A   What page are we talking --
14      Q   19.
15      A   Got it.
16      Q   You say:
17          "In addition to persistence
18          alopecia, tamoxifen and aromatase
19          inhibitors have other side effects."
20      Then you give those side effects; correct?
21      A   That's correct.
22      Q   But your statement that "in addition to
23  persistent alopecia," you're referring to -- you don't
24  refer to anything there for that comment, but I'm
25  assuming what you mean is the same thing we've just

Page 108

1   discussed about the articles listed in footnote --
2       A   That's correct. That's correct. Again, this
3   is one of the things that oncologists deal with every
4   day.
5       Q   Okay. You have made no attempt to assess data
6   to reach a causation conclusion as to any of the 15 --
7   strike that.
8       You have not made an attempt in your report to
9   analyze data to reach a causal relationship conclusion
10  or opinion as to any drug listed in your report,
11  including the taxanes. Is that a fair statement?
12      MR. STRONGMAN: Objection. Form.
13      THE WITNESS: I think I have concluded that
14  there isn't an established causal link that has all the
15  links in the chain finished for Taxotere being a cause
16  of persistent alopecia. I don't even think that that
17  exists for Taxotere-containing regimens, let alone
18  Taxotere alone. Because I think -- you don't want me to
19  wander much, but the -- I think the experts are starting
20  to converge here, at least, as I read them, that the
21  observational data on permanent alopecia as a
22  stand-alone isn't enough in this case. I think that
23  both sides have sort of said that, that you need the TAX
24  316, and there are two conflicting approaches to
25  interpreting the TAX 316. Both groups point to it to

Page 109

1   say, "This makes my point."
2       But without that, without the TAX 316, I don't
3   think anyone except maybe Dr. Kessler -- I'm not sure
4   about that -- thinks that the observational data alone
5   is enough to draw a causal relationship between Taxotere
6   and permanent, irreversible alopecia or even
7   Taxotere-containing regimens.
8       Q   BY MR. MICELI: You have not attempted to apply
9   a methodology, whether it's the Bradford-Hill criteria
10  or any other methodology, to -- you don't set it out in
11  your report -- to assess causal relationship between any
12  drugs, including Taxotere and permanent
13  chemotherapy-induced alopecia. Is that a fair
14  statement?
15      MR. STRONGMAN: Objection. Form.
16      THE WITNESS: I think in my report I refer to
17  Dr. Chang's report, and so in that sense, I point to
18  Dr. Chang's report, because she went through the studies
19  you're talking about, the observational trials, those 16
20  trials that she chose to analyze. And so in that sense,
21  it is in my report. It's a reference to the Chang
22  article, the Chang report.
23      Q   BY MR. MICELI: You read Dr. Chang's report and
24  you reference it in your report; correct?
25      A   That's correct.

28 (Pages 106 to 109)

John A. Glaspy, M.D.

Page 118

1  So there are dermatologic diseases that
2  overlap. But I think the spirit of your question was,
3  do I do dermatology services and consultations, and I
4  don't.
5      Q   And you don't regularly diagnose and treat
6  alopecias, do you?
7      A   I regularly diagnose them in the sense that I
8  develop a sense of what I think it's due to. I can't
9  remember the rest of the compound.
10     Q   He didn't even object. But thank you.
11         When you say you develop a sense of what may be
12 causing it, is that the eyeballing of the patient that
13 you were talking about?
14     A   Well, let's make it so -- if I give a patient
15 carboplatin and Taxol chemotherapy, and three weeks
16 later their hair starts falling out, I make a diagnosis
17 the hair's falling out because three weeks ago I gave
18 them Taxol. So within the limits of your question, that
19 patient would count.
20         But I don't have patients sent to me saying,
21 the hair's falling out, figure out why. It's usually
22 the hair's falling out; it's probably my fault.
23     Q   Now, let me switch it up a little bit. When
24 you see patients who have alopecia, is it fair to say
25 that it is usually related to the use of chemotherapy

Page 119

1  drugs?
2      A   That would be the most common patient in my
3  practice with alopecia, because of what I do for a
4  living.
5      Q   You don't see people for general dermatologic
6  issues that are unrelated to cancer or cancer treatment?
7      A   No.
8      Q   You don't test hair diameter as part of your
9  practice?
10     A   I do not.
11     Q   You don't evaluate the biology of the hair
12 follicle in your treatment of patients, do you?
13     A   If by "evaluate" you mean biopsy and look at
14 it, no. But if I'm concluding that I caused this
15 alopecia with my medicine, I'm concluding that I did
16 something to the hair follicle. So I'm making a hair
17 follicle conclusion.
18     Q   But you don't do an examination of the hair
19 follicle.
20     A   That's correct.
21     Q   Do you know how endocrine therapy affects the
22 hair follicle?
23     A   The anagen effluvium for chemotherapy we talked
24 about this morning, this would be more telogen
25 effluvium. So it's more hairs in the rest phase falling

Page 120

1  out than hairs in the growth phase being killed, more
2  often than not. At least, that's the theory.
3      Q   But do you make or do you document clinical
4  manifestations of scarring alopecia as an oncologist?
5      A   Only in the sense we talked about earlier.
6  There's a rare patient that has a problem that I need to
7  know whether it's the lupus or the --
8      Q   It's not something you regularly do with early
9  stage breast cancer patients?
10     A   That's true.
11     Q   Okay. Let's go back to your report, if we
12 could. Go to page 25. We're going to start talking a
13 little bit about some of your statements regarding
14 Taxol.
15         In the middle of the second paragraph you have
16 a sentence that reads:
17         "Yet Taxol therapy results in hair
18      loss and has been associated with alopecia
19      after the conclusion of chemotherapy."
20         Right?
21     A   Right.
22     Q   Is that a statement that you recall writing
23 yourself, or is that one that you take ownership for?
24     A   Both.
25     Q   You wrote this one, and you chose the citation

Page 121

1  for it to the Freites-Martinez article we've talked
2  about several times today.
3      A   I think I chose the reference. I don't
4  remember that specifically. But I do remember
5  wordsmithing this sentence.
6      Q   Okay. That "Taxol therapy results in hair loss
7  and has been associated with alopecia after the
8  conclusion of chemotherapy," and I know this is going to
9  sound redundant, but again, this is not a statement that
10 represents -- that there is -- strike that. That the
11 Freites-Martinez publication represents valid scientific
12 evidence to support on its own to support a causal
13 relationship between Taxol and permanent
14 chemotherapy-induced alopecia?
15     A   That's correct. And I've done a better job of
16 careful wording here and called it "associated with."
17 Remember, that's where we were going to this morning.
18     Q   Okay. Now, did the authors of the -- we looked
19 at it, and we can look at it again, if you like. But
20 did the authors of the Freites-Martinez article draw
21 conclusions about even association of Taxol with
22 permanent chemotherapy-induced alopecia, or is that your
23 conclusion from the article?
24     A   I think that the table in the article that has
25 this many patients have received Taxol is saying there

John A. Glaspy, M.D.

Page 190

1  this case?
2  A  So I haven't added it all up.  The way the
3  process would be, whenever there's an appointment with
4  those attorneys and I, we block it on my calendar.  So
5  that's saved, and it's easy to go back and get those
6  hours.  When I am reviewing things, I have a sense of
7  how long it takes to read each thing, so then I go back
8  through the list and reconstruct that when I get a
9  chance to do this.
10      In this case, there were only two patients.  A
11  big driver of the record review is the patients, because
12  of the medical literature I've been through a few times
13  in my life.  And the -- but the medical records from the
14  patients, the depositions, and the pictures and all
15  this, and all the medical records, those take time.  And
16  this time there were only two patients.  If we'd known
17  about Crayton, we could have made it one patient.
18      So this will probably come out on the front end
19  to be less than two-thirds what it was last time,
20  because last time it was three patients, and this time
21  it's two patients.  So that would be my prediction of
22  how that will come out.  So whatever I had billed before
23  deposition last time will probably be -- this will be
24  two-thirds of that, give or take.  That would be a good
25  ballpark way to estimate it.

Page 191

1  Q  Okay.
2  A  That make sense?
3  Q  It does make sense.
4  A  Then we're going to bill them for the two hours
5  it took me to figure out the OATS system, because it
6  forced me into the OATS system for the first time.  My
7  secretary showing me how it worked.
8  Q  It's interesting how sometimes people who help
9  us really can control us, because they know how to do
10  things we don't.
11      Let me do this.  I know it's probably a short
12  time, but I think if I take a break, I may be able to be
13  done in 10, 15 minutes.  I'm going to take another
14  break, because I see a lot of stuff we've covered.  I'll
15  be right back.
16      THE VIDEOGRAPHER:  We're now going off the
17  record.  The time is approximately 3:08 p.m.
18         (Recess)
19      THE VIDEOGRAPHER:  We are now back on the
20  record.  The time is approximately 3:20 p.m.
21  Q  BY MR. MICELI:  Okay.  Dr. Glaspy, you ready to
22  continue?
23  A  Yes.
24  Q  You're looking at your report again?
25  A  I am.

Page 192

1  Q  I didn't want to -- no problem with that.  I
2  just didn't want to be directing you to something that I
3  may not need.  Okay.  These are, I hope, questions at
4  least for right now that may not require the report, but
5  they may.
6      Can you tell me how a female patient with
7  androgenetic alopecia presents clinically?
8  A  With either thinning hair, just diffusely
9  thinning hair, or patchy alopecia, and less commonly
10  with a receding hairline.
11  Q  What diagnostic characteristics would you see
12  in a woman with androgenetic alopecia under dermoscopy?
13  A  I don't do dermoscopy.
14  Q  Since you don't, you would not know?
15  A  I don't know.
16  Q  Can a female patient ever have male pattern
17  baldness?
18  A  Yes, but by definition, I guess no, because you
19  can't have male stuff if you're female.  But they do
20  sometimes have exactly the same kind of pattern baldness
21  that men do as they get older.
22  Q  Have you ever diagnosed a female with male
23  pattern baldness?
24  A  Not really, but I don't typically make
25  diagnoses.  I don't put anything in the chart.  When I

Page 193

1  see a patient who I've treated, say, and she has
2  alopecia and I've decided what I think it's from, then I
3  often don't put that in the chart at all.
4  Q  Is that part of what I referred to earlier
5  today as sort of the eyeball test of the patient?
6  A  In general.  The only evaluation I do is some
7  examination of the scalp, if it's bothering her.
8  Because sometimes it isn't.  And the eyeballing and the
9  knowing clinically what I've done for her.  It would be
10  rare that I need to do something, or that there's
11  something to be done, because in the business I'm in, I
12  usually know what I think caused it.
13  Q  But while you may have a sense of what you
14  believe caused it, you don't formally diagnose
15  individuals or women with androgenetic alopecia?
16  A  I wouldn't ever write that.  I give people a
17  hormonal medicine, they present with something that
18  looks like that, and I blame myself for the medicine I
19  gave her.  And then we do have a discussion about
20  whether she's going to continue her hormonal therapy.
21  If her risk was small, there's room for her to make some
22  decisions.
23  Q  Do you use any scales, grading scales to
24  measure the severity of alopecia?
25  A  I don't.  The current established ones, the

49 (Pages 190 to 193)

John A. Glaspy, M.D.

Page 194

1  ones that have been evolving, the National Cancer
2  Institute grading system or the WHO, are pretty blunt
3  tools, and it's grade 1, grade 2 for the NCI. It's bad
4  enough to need a wig, or it's not bad enough to need a
5  wig. Those are the two. And it's under 50 percent,
6  it's over 50 percent. Those kinds of things.
7       That's not that useful a grading tool. If
8  somebody's having to wear a wig, it almost by definition
9  means that the alopecia's bothering them. That's the
10 message it tells me.
11      Q   So the only scale that you're familiar with as
12 an oncologist is the NCI common toxicity criteria of 1
13 and 2, and the threshold is less than 50 percent or more
14 than 50 percent.
15      A   And wears a wig, doesn't wear a wig. And
16 doesn't tell you, okay, let's say it's over 50 percent
17 but she's not wearing a wig. Which one are you going to
18 call her? It's not -- it's sort of a -- this isn't
19 going to sound right. It's a backwater hole of toxicity
20 management. There isn't a lot of nuance and fine tuning
21 that's gone on in the grading of alopecias.
22      Q   Are you familiar with different scales for
23 specifically assessing or grading androgenetic alopecia?
24      A   No. I just use the cancer ones.
25      Q   Makes sense, because you're an oncologist.

Page 195

1       A   It's gotten me this far.
2       Q   Do you -- not necessarily breast cancer, but do
3  you treat men?
4       A   Yes.
5       Q   Do you use different scales for judging levels
6  of alopecia different for men and women, or is it all
7  the common toxicity criteria?
8       A   I would use the common toxicity criteria. But
9  it is a much less important issue in many, because they
10 don't have this disease where we're causing hair issues
11 for years in people who are going to survive their
12 cancer for years. The closest they have is prostate
13 cancer, where, if they're on medicines to lower their
14 testosterone, their balding can get worse, but they
15 don't much care. So there's that issue too.
16      Q   If you could turn with me to page 20 of your
17 report. There is one portion I want to look at with
18 you. Are you there with me?
19      A   I am.
20      Q   In the second paragraph under alopecia
21 generally, about two-thirds of the way down there's a
22 sentence that begins with "approximately." You see
23 that?
24      A   Yes.
25      Q   (Reading)

Page 196

1       "Approximately 50 to 60 of women
2       have some degree of androgenetic
3       alopecia by age 50."
4       You see that?
5       A   Yes.
6       Q   You don't have a reference for that. Can you
7  tell me where you drew that conclusion from?
8       A   This is a second missing reference number.
9       Q   But you don't diagnose types of alopecia. You
10 just do the wig/no wig, grade 1/grade 2. Correct?
11      A   That's correct. This was a literature
12 statement. The only point I'm making is that if
13 somebody develops alopecia who's also getting a cancer
14 treatment, it's not inconceivable that it could be the
15 common alopecia that appears as people get older.
16      Q   But --
17      A   And we should have the reference here, and I
18 don't.
19      Q   And you believe that came from some literature
20 that you reviewed?
21      A   I do.
22      Q   Can you get that to Mr. Strongman?
23      A   I'll get on it.
24      Q   What type of hair loss is caused by
25 hypothyroidism?

Page 197

1       A   What do you mean by "type of hair loss"?
2       Q   In your report, you say that hair loss can be
3  caused by hyperthyroidism, vitamin deficiency --
4       A   Hypothyroidism.
5       Q   Hypothyroidism. Vitamin deficiency or iron
6  deficiency. And I'm just wondering, what type of hair
7  loss are you referring to?
8       A   I don't know which -- how you would type it.
9  When I've seen it, it's been diffuse thinning of the
10 hair.
11      Q   When you see it, do you make a formal diagnosis
12 and grade the hair shaft diameter, that sort of detail?
13      A   No. I fix the thyroid. I give them their
14 thyroid pills.
15      Q   And if a person has -- is that like Synthroid?
16      A   Usually, yes.
17      Q   And if a person is taking Synthroid and their
18 thyroid hormones are in proper balance, would you expect
19 that to resolve the thinning hair?
20      A   Or at least stop it from getting worse.
21      Q   Is that hair loss from hypothyroidism
22 permanent?
23      A   I suppose it could be. I'm not an expert at
24 that.
25      Q   And you're not going to offer any testimony

50 (Pages 194 to 197)

Page 198

1  that Ms. Thibodeaux's thinning hair or hair loss or hair
2  not returning is related to hypothyroidism, are you?
3      A   Well, there's a separate issue, and that is
4  that the question of whether hypothyroidism increases
5  the scalp toxicity of other things that damage hair.  So
6  it could be a contributing factor in her chemotherapy
7  alopecia, for instance.  That kind of thing.  And I
8  don't have enough data or knowledge to form a
9  probability opinion on that.
10     Q   Okay.  So you won't be offering that to a
11 reasonable degree of medical probability.
12     A   That's correct.  I will only say that the
13 thyroid issues can interact and make the situation
14 worse, but I don't know if that happened in this case.
15     Q   Do you cite to any medical literature that
16 demonstrates that?
17     A   No.  It's just something I was always taught.
18     Q   How can you differentiate between hair loss
19 related to hypothyroidism, iron deficiency, or vitamin
20 deficiency, from, say, androgenetic alopecia?
21     A   Again, I have a much more practical approach to
22 this.  If there's something you can fix, fix it.  And
23 that's a -- rather than sit there and try to figure out
24 what percent is from iron deficiency and what's from
25 thyroid, just fix both and hope things get better.

Page 199

1      Q   And you reviewed Ms. Thibodeaux's medical
2  records, and you note that she does take Synthroid;
3  right?
4      A   I do.
5      Q   And her hormones, thyroid hormones stay in
6  relatively good check?
7      A   Her TS -- the goal isn't to check her thyroid
8  hormone.  It's to lower her TSH, which means her brain
9  is saying, I have enough thyroid hormone.  And her TSH
10 has been adequately suppressed.
11     Q   What type of alopecias are considered to be
12 patchy alopecias?
13     A   Name some types.  You mean -- because I'm not
14 understanding what we mean by "types."  You mean what
15 causes of alopecia?
16     Q   No, you know, is it androgenetic?
17     A   Androgenetic, as I've said a few times today,
18 can be patchy.  It's usually not, but it can be patchy.
19     Q   To your knowledge, what other types of
20 alopecias can be patchy?
21     A   Chemotherapy alopecia can be patchy.  So that's
22 another one.  Hypothyroid I'm sure can be patchy.  The
23 alopecia areata is patchy.  I guess there's relatively
24 few.  The lupus alopecias are patchy often.
25     Q   How do you clinically differentiate between

Page 200

1  androgenetic alopecia and endocrine-induced alopecia?
2      A   I'm not sure they're that different.  I think
3  they may have the same underpinning.  They're due to
4  hormonal changes that happens as we age or that some
5  oncologist does to you.
6      Q   If a patient comes in to see you and they've
7  been on a endocrine therapy, like tamoxifen, and
8  they're, say, 60 to 65 years old, and they have some
9  level of hair thinning, do you make any attempt without
10 complaint or prompting from the patient to try to
11 differentiate between androgenetic alopecia, some other
12 type of alopecia, and endocrine-induced alopecia?
13     A   No, because I don't believe that I can rule out
14 endocrine-induced alopecia in any of those.  I could
15 easily be wrong.  And so if she probably doesn't need
16 the hormone therapy and she's really bothered by it, I
17 would sit down with her and say, maybe we should stop a
18 year early.  Because that's the one thing I can do.
19     Q   Do you know what CCCA alopecia is?
20     A   CCCA?  I don't.  If you told me what CCCA
21 stands for, maybe I could.
22     Q   Central -- centrifugal -- I don't even know
23 what it is.
24     A   So that would mean scarring alopecia.
25     Q   Do you know what the diagnostic features are

Page 201

1  for a patient that presents with CCCA?
2      A   I'm not an expert, but my presumption would be
3  a biopsy showing scarring.
4      Q   You understand that pCIA stands for "permanent
5  chemotherapy-induced alopecia"?
6      A   Yeah, I think it's been made up as -- it's
7  become a rubric now within this field.
8      Q   When you say "this field," you mean
9  dermatology?  Oncology?  Or are you talking about me?
10     A   No, I think that this whole Taxotere issue has
11 raised awareness that people would like to know more
12 about that.  And so it's worth having something that
13 makes it easier to say.
14     Q   Do you attempt to differentiate clinically
15 between pCIA, endocrine-induced alopecia, androgenetic
16 alopecia, cicatricial -- CCCA, or telogen effluvium?
17     A   First of all, until we got the telogen
18 effluvium, I would say I usually don't.  But with the
19 cicatricial alopecias, a referral to a dermatologist to
20 biopsy them I think is a reasonable thing to do, just so
21 that you know that you're dealing with a scarring
22 alopecia.  Because that allows you to tell the woman
23 things that you otherwise wouldn't know.
24         But in terms of the other things, what I
25 attempt to do is to determine whether there's something

51 (Pages 198 to 201)

Page 202

1  that I can do as an oncologist to make the situation
2  better. If it's pCIA, the answer at this point is no.
3  Because it's an established thing. You can try
4  minoxidil and those things, but all you can do is kind
5  of wished you'd used a cold cap. It could be that, but
6  it also could be the hormones she's on.
7      Then again, you sit down and say, you know,
8  your risk was really high, you need to stay out of the
9  hormonal therapy. We're going to have to work through
10 this hair thing with you as best we can. Or, you know,
11 at this point it's not -- you probably don't need this
12 hormone anymore. Let's stop it and see if this hair
13 gets better. Because that's at least something you can
14 do.
15     Q  All right. Let me -- I'm going to ask this
16 sort of in a global way, because I think I know the
17 answer, and I don't want to go through each one
18 individually. So I'm going to ask, would it be fair to
19 say that regarding the clinical presentation of the hair
20 follicle itself in the various forms of alopecia that we
21 just went over -- pCIA, androgenetic, telogen effluvium,
22 CCCA, or endocrine-induced alopecia -- you as an
23 oncologist would not be able to describe the clinical
24 presentations by way of either dermoscopy or pathology
25 for each of those types of alopecia?

Page 203

1     A  We're mixing some diseases, some kinds of
2  alopecia, and a mechanism. So we're saying telogen
3  effluvium is a disease. It's not. It's a mechanism of
4  hair loss that happens with several of the things that
5  can happen. The hormonal abnormalities, for instance,
6  and liver disease and stress and surgery, and all those
7  things can cause alopecia through telogen effluvium. So
8  that's one of the things that's throwing me off a little
9  bit.
10     I don't do dermoscopy, but I wouldn't broadly
11 agree that I don't know anything about what's going on
12 in the hair follicle with these different illnesses. I
13 would say that I don't make efforts to look at the hair
14 follicles, especially microscopically, in patients
15 unless I think they have scarring alopecia.
16    Q  Okay. But your area of expertise is not
17 dermatology.
18    A  That would be a much shorter way of getting to
19 the end of this one. That is true, I am not a
20 dermatologist, and I'm not an expert dermatologist.
21    Q  And as an oncologist, you don't regularly make
22 an attempt to differentiate between types of alopecia.
23 You basically eyeball your patients.
24    A  Right. And I'm pretty sure I would do that if
25 I was a dermatologist, just because of my predilection

Page 204

1  to focus on what I can do. If there was three
2  reversible things that could be causing this, I would
3  fix all three. I wouldn't try and figure out which one
4  it was.
5     Q  But if you can't differentiate between them,
6  that doesn't mean that a dermatology expert can't --
7     A  I think the dermatology experts can have the
8  dialog about what is and isn't diagnosable, and I don't
9  need to be involved in that.
10    Q  Thank you. Okay. Can you, do you feel you're
11 well positioned to determine what type of hair loss
12 Ms. Thibodeaux is suffering from today?
13    A  In terms of being in the best position, no,
14 because I haven't seen her personally. But I have seen
15 lots of pictures of her. And so I can't tell by looking
16 at -- and also, there's the complicating factor that
17 she's having to cut her hair so that she can wear her
18 wig. And so there's a certain amount of problem there
19 in trying to figure out whether she's -- how much of
20 this hair is her baseline problem and how much is the
21 fact that she's cutting her hair back.
22    I also know that there's been some discussion
23 of torsion alopecia in her case. That is going to get
24 discussed probably not by me, but what she looks like is
25 that if she has ongoing alopecia, it could be from the

Page 205

1  hormonal therapy she received, it could be unrelated to
2  the chemotherapy or the hormonal therapy, or persistent
3  effects of chemotherapy. I can't tell how severe it is
4  because of all the things we've talked about.
5     Q  Have you ever spoken with Dr. Jerry Shapiro?
6     A  I've probably spoken with -- one of the
7  problems is in medicine there's a lot of Jerry Shapiros.
8  The answer is yes, I've talked to Dr. Jerry Shapiro.
9  But I don't know which one you're talking about.
10 Probably not.
11    Q  Have you spoken with the person who's been
12 retained by Sanofi as an expert dermatologist in hair by
13 the name of Jerry Shapiro from New York City?
14    A  I have not.
15    Q  Okay. All right. In your report I did not see
16 where you make an attempt to offer an opinion about the
17 cause of Ms. Thibodeaux's alopecia. Is that true?
18    A  That's correct. If you detect anything there,
19 it's a skepticism on my part that we can tell with
20 certainty what's causing all of her issues and whether
21 there's more than one.
22    Q  Okay. And you don't make an attempt in your
23 report to try to determine the type of alopecia she is
24 currently -- the type or types of alopecia she is
25 currently suffering from?

John A. Glaspy, M.D.

Page 206

1  A  I don't try to find one cause, because I'm not
2  convinced there is one cause.
3  Q  Okay.  Cause or causes.
4  A  Correct.
5  Q  Now, if you want, you can go back and look, but
6  you may be able to answer this without.  At the bottom
7  of page 21, running to page 23, we went over that list
8  of 15 drugs that you say cases have been reported with.
9  A  I see it.
10  Q  In your review of the literature, did you ever
11  make an attempt to determine how many case reports of
12  permanent chemotherapy-induced alopecia were associated
13  with each of the drugs you listed?
14  A  I did not, and in part for the same reasons we
15  were talking about earlier, about the limited value of
16  observational, especially case report level
17  observational data in determining relative risk.
18  Q  All right.  And then what is your knowledge, if
19  any, of the strength of association between any of the
20  15 listed on pages 21 to 23 and permanent
21  chemotherapy-induced alopecia?
22  A  I don't think there is an established
23  scientifically proven causal link for any of those, as
24  long as we use the word "persistent."  I think they all
25  cause postchemotherapy alopecia.  I've seen it, and I

Page 207

1  know that it happens.  But the permanent aspect, I don't
2  think there's a -- I have a handle on the relative risk
3  of each drug.  It can't be common, because otherwise I
4  would see a lot of it.
5  Q  Okay.  And do you know what the incidence rates
6  reported in the literature are for permanent
7  chemotherapy-induced alopecia for any of the 15 listed
8  drugs on the bottom of page 21 to the top of page 23?
9  A  I'm not sure that it exists in the literature.
10  Q  So the answer would be no, you don't?
11  A  That's correct.
12  Q  Just a few more.
13      Can you describe for me how premature
14  desquamation of the inner root of the root sheath
15  presents histologically?
16  A  I wouldn't have an opinion.  It sounds like it
17  presents histologically exactly as it's described,
18  because that's a histological description.
19  Q  Do you know what types of alopecia can result
20  in premature desquamation?
21  A  In other words, which ones, if you were to do
22  biopsy, would show premature desquamation?  I don't.
23  Q  Do you know what the incidence rate of
24  androgenetic alopecia is among various races?
25  A  I don't.

Page 208

1  Q  Do you know how different levels or severity of
2  alopecia are graded by dermatologists?
3  A  Only what we've talked about.  There is at
4  least in the cancer setting an established grading
5  system.
6  Q  You don't know what the established grading
7  system or systems are for dermatologists?
8  A  My suspicion is there's probably a lot of them.
9  A lot of different ones.  But I don't have any direct
10  knowledge.
11  Q  And so we'll go with that.  Obviously, but then
12  you don't know how the different grading systems
13  categorize the levels of alopecia.
14  A  Not beyond what we've talked about.  Basically,
15  you know, it can be a percent of hair that's lost, and
16  it can have to do with prosthetic devices.  Those are
17  two different ways to approach it.
18  Q  So if I asked you, how does the Ludwig scale
19  break down severity, you wouldn't be able to tell me?
20  A  That's correct.
21  Q  Would it be fair to say you don't have the
22  expertise to differentiate clinically among the various
23  forms of alopecia?
24  A  No, it would be I think more appropriate to say
25  that there are people with more ability along those

Page 209

1  lines than I have.
2  Q  And those would be board-certified
3  dermatologists?
4  A  Or dermatologists who are very good and aren't
5  board-certified.
6  Q  There you go.  And would you defer to those
7  individuals?
8  A  On making a diagnosis in an individual patient
9  clinically, yes, with the following proviso:  If we're
10  talking in the chemotherapy setting where somebody has
11  had chemotherapy and they have alopecia, and they looked
12  at it and said, this isn't from chemotherapy, and I'd
13  seen it a bunch of times following chemo, I would
14  disagree with them.  That happens when you use a
15  consultant and they come to a conclusion that you don't
16  agree with.  That can happen.
17      But when we're talking about, let's do the
18  Ludwig criteria for some CCCA spontaneously occurring in
19  a Samoan in Riverside, not me.
20  Q  Do you know what the diagnostic markers are for
21  permanent chemotherapy-induced alopecia on biopsy?
22      MR. STRONGMAN:  Objection.  Form.
23      THE WITNESS:  I don't, except that you won't
24  see scarring.
25  Q  BY MR. MICELI:  All right.  If you had examined

53 (Pages 206 to 209)