# EXHIBIT E

John A. Glaspy, M.D.

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

*******************************

IN RE:  TAXOTERE

(DOCETAXEL) PRODUCTS          MDL No. 2740

LIABILITY LITIGATION          Section: "H"

                              Judge Milazzo

This Document Relates to:  Mag. Judge North

All Cases

*******************************


          Remote Videotaped Deposition of

JOHN A. GLASPY, M.D., held at the location

of the witness in Los Angeles, California,

commencing at 9:05 a.m., on the 13th of May,

2020, before Maureen O'Connor Pollard,

Registered Diplomate Reporter, Realtime

Systems Administrator, Certified Shorthand

Reporter.

                    – – –


          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com

John A. Glaspy, M.D.

1  BY MR. MICELI:
2      Q.   I understand.
3      A.   Okay.
4      Q.   Your study investigators
5  through BCIRG, now TRI Oncology, your
6  contract research organization investigators,
7  would not follow unimportant adverse events,
8  would they?
9          MR. STRONGMAN:  Objection.
10     Form.
11     A.   First of all, I didn't say --
12  let's unpack it.  I am not --
13  BY MR. MICELI:
14     Q.   Well, no, I --
15     A.   Hang on a minute.  Your
16  question included a statement "your company."
17  I have no ownership position on TRIO.  I
18  serve for free on the board of directors, and
19  that's it.  So I want to make sure we don't
20  leave that dangling.
21         There's a -- I didn't say that
22  alopecia didn't have importance to patients.
23  I said that life-threatening side effects are
24  most important.  Okay.  You can be important
25  and not be most important.  And alopecia is

1  important in clinical practice.  In clinical
2  research it hasn't been for several reasons
3  we may get into.
4      Q.   Okay.  But you would agree with
5  me that patients should be made aware of
6  potentially permanent side effects, wouldn't
7  you?
8      A.   I would say that patients
9  should be made aware of life-threatening --
10  and I think I've said this a bunch of
11  times -- life-threatening side effects even
12  if they're uncommon.  They should be made
13  aware of common side effects.  And when we're
14  talking about side effects that fall into one
15  of those categories that are common or
16  life-threatening, that what the chances are
17  of it resolving should be discussed.
18     Q.   Okay.
19     A.   Okay.  So I think I've said
20  that multiple times in different depositions
21  here, and I'll stand by it.
22     Q.   Okay.  My question was a little
23  bit different.
24         My question to you, sir, is, do
25  you believe that patients should be made

1  aware, patients who are being treated in the
2  adjuvant setting or neoadjuvant setting for
3  early stage breast cancer, should be made
4  aware of potentially permanent side effects?
5  Yes or no.
6          MR. STRONGMAN:  Objection.
7      Form.
8      A.   Because it's an open-ended
9  question, if there was something that
10  happened .0001 percent of the time and was
11  always permanent, it wouldn't be something we
12  would discuss.  So permanence isn't enough to
13  make it discussible.
14  BY MR. MICELI:
15     Q.   Okay.
16     A.   But commonness or seriousness,
17  especially life-threatening seriousness, does
18  raise it to that level.
19     Q.   Okay.  Have you done any
20  research to determine how important -- or any
21  survey information to determine how important
22  alopecia is, even temporary alopecia is, to
23  patients who have early stage breast cancer?
24     A.   Yes and no.  I haven't done any
25  academic research or published any papers on

1  that point.  I have practiced oncology with
2  the majority of my practice being women, and
3  the majority of those women receiving
4  adjuvant treatment for breast cancer for more
5  than 30 years.
6          So on a daily basis I study the
7  effects of all live -- everything that comes
8  with the whole breast cancer diagnosis and
9  treatment, so I think that gives me a pretty
10  good handle on what the impacts of these are
11  on these women.  In fact, I would argue
12  that's a better handle than doing academic
13  research and sending out questionnaires.
14     Q.   Okay.  Doctor, you have never
15  published anything on the effect alopecia has
16  on women who are diagnosed with early stage
17  breast cancer, have you?
18     A.   I don't believe so, no.
19     Q.   Okay.  And there's nothing in
20  your report that reflects that you've
21  conducted any research for the giving of
22  these opinions in this case that addresses
23  the issue of how women view alopecia in the
24  context of early stage breast cancer?
25         MR. STRONGMAN:  Objection.

John A. Glaspy, M.D.

Page 66

1  literature, by a review of randomized
2  controlled trials, or the application of a
3  Hill-type criteria to whether -- and
4  regardless of what definition you use for
5  permanent chemotherapy-induced alopecia, to
6  assess causation as it relates to Adriamycin?
7        MR. STRONGMAN:  Objection.
8  Form.
9        A.    You're sort of -- you're piling
10  on a question from a couple questions ago,
11  and we were doing fine until you got to by
12  any methodology whatsoever.  When you threw
13  that in, then I have to say again, because
14  clinical trials have not followed alopecia
15  recovery, because we don't have a literature
16  basis to turn to, there have not been
17  definitive randomized trials aimed at how
18  much hair recovery do we see, and how much
19  don't we see, and how are we going to define
20  that.  That hasn't happened.
21        So the best way currently on
22  the planet is for somebody to say, I'm going
23  to go into an oncology clinic and take care
24  of women with early breast cancer, and do
25  that for many years and accumulate a lot of

Page 67

1  experience, and get an idea of what happens.
2  That methodology I have applied.
3        Q.    Okay.
4        A.    I haven't applied Hill criteria
5  or anything else.  But when you got to by any
6  methodology whatsoever, that triggers that,
7  and I don't want to conceal that and then
8  spring it at trial.  That, I think, is -- you
9  know, when I was reading Larned's deposition,
10  her second oncologist, she struck me as an
11  experienced oncologist who has the same sorts
12  of experience as I do, that you see
13  unsatisfactory hair recovery with many of
14  these drugs.  Adriamycin is one of them, the
15  taxanes are one of them, or two of them, or
16  three of them now.  The cyclophosphamide is
17  one of them.  We see these cases of -- and
18  it's not uncommon that women think that their
19  hair recovery isn't optimal.
20        Q.    Okay.
21        A.    Is that alopecia or isn't it,
22  or do you need a certain hair density to call
23  it that?  But we deal with this problem all
24  the time.  We deal with it with the hormonal
25  therapies.

Page 68

1        I don't think there's any good
2  literature to go to on this, and we're
3  finding that out in this case, that there
4  isn't an oracle of established literature to
5  go to say here's the once and forever
6  definition of permanent alopecia, and here's
7  how you measure it, and here's the rate in
8  this trial or that trial, and we made sure we
9  counted hairs in every woman for 25 years to
10  get to the bottom of this.  Those kinds of
11  clinical trials don't exist.
12        But there are plenty of doctors
13  out there who have been doing this for more
14  than 25 years, and I think that's where the
15  best repository right now is for experience
16  with these drugs and this side effect.
17        Q.    What you're talking about is
18  your personal experience, right, Dr. Glaspy?
19        A.    That's correct.
20        Q.    Okay.  Your personal experience
21  is not the substitute for a randomized
22  controlled trial, is it?
23        MR. STRONGMAN:  Objection to
24  form.
25        A.    It is not.

Page 69

1  BY MR. MICELI:
2        Q.    Okay.  Now, Dr. Glaspy, you
3  stated in this report, and we talked at great
4  length as it concerns your last report, you
5  list a bunch of drugs that are followed -- or
6  that follow a statement that "cases of
7  persistent alopecia have been reported with."
8        Do you recall that series of
9  questions in your last deposition?
10        A.    I do.
11        Q.    Okay.  And you agreed with me
12  in your last deposition that a statement of
13  "cases of persistent alopecia have been
14  reported with" is not a statement of
15  causation, correct?
16        A.    Right.  I think I called it a
17  statement of association.
18        Q.    Right.  Okay.
19        A.    Now we're restricting it to
20  literature.
21        Q.    All right.  Now, what I want to
22  know, and I'm going to take our by any
23  methodology -- let me strike that.  I'm going
24  to go back.
25        Is the "any other methodology"

18  (Pages 66 to 69)

John A. Glaspy, M.D.

Page 158

1  call this permanent.
2          Because I see women who recover
3  years after they've received their
4  chemotherapy.  And so whether you call
5  something permanent or not depends on what
6  you mean by "permanent."
7          So -- and Taxotere hasn't
8  helped us with this.  We still don't have a
9  definition.  We who see patients know that
10  when we give Taxol, Taxotere, Adriamycin, any
11  number of drugs, we see hair loss, and we
12  often see patients who are not happy with the
13  degree of recovery they've had.  If that's
14  permanent chemotherapy-induced alopecia,
15  we're awash in it.  It happens a lot.
16      Q.   Doctor, do you remember what my
17  question was?
18      A.   I do.
19      Q.   Do you know what my last
20  question was?
21          MR. MICELI:  Maureen, could you
22      please read it back?
23          (Whereupon, the reporter read
24      back the requested question.)
25              ///

Page 159

1  BY MR. MICELI:
2      Q.   Now, the answer to that
3  question is no, correct, Doctor?
4          MR. STRONGMAN:  Objection to
5      form.
6      A.   How about this.  I have no
7  literature to add to that that's in my
8  report.
9  BY MR. MICELI:
10      Q.   Okay.  Thank you.
11      A.   Because we haven't defined
12  permanent chemotherapy-induced --
13      Q.   Doctor, I don't need another
14  explanation about what's defined.  I just
15  asked you is it there, is it there.  The
16  answer is no, if it's not in your report it's
17  not there.  That's your answer, right?
18          MR. STRONGMAN:  Objection.
19      Form.
20          Please don't cut him off.
21      A.   You were asking me if I had
22  found literature, and what I have found is in
23  my report.
24  BY MR. MICELI:
25      Q.   Okay.  Thank you.

Page 160

1      A.   It's also --
2      Q.   Doctor, can I ask you -- now,
3  you refer to Dr. Chang's report one time at
4  footnote 55 of your report, correct?
5      A.   That's correct.
6      Q.   Okay.  Did you do anything to
7  validate anything that Dr. Chang did?
8      A.   I didn't do any mathematical
9  analyses that she did.  I did read --
10      Q.   Okay.
11      A.   -- all of the papers that she
12  found, and I did go through a process of
13  evaluating those for myself.  It was similar
14  to her process.  But I didn't repeat any
15  mathematics that she might have done.
16      Q.   Okay.  And you didn't set out
17  what that process was in your report, you
18  just simply say "see also expert report of
19  Dr. Chang," correct?
20      A.   That is correct.
21      Q.   And that's the same thing you
22  do for Dr. Wei's report, correct?
23      A.   That's correct.
24      Q.   Okay.  And did you -- well,
25  have you done anything further than what

Page 161

1  we've discussed previously in your prior two
2  depositions to validate what's in Figure A of
3  your report?
4      A.   I have not.
5      Q.   Okay.  I'll tell you what,
6  let's take -- it's almost -- I don't know,
7  it's not quite three hours into the
8  deposition yet, let's take about a five to
9  ten-minute break.  I want to talk to my
10  co-counsel who is on this -- in this
11  deposition with me, and then I'm going to
12  shorten some things up and wrap this up.
13      A.   Okay.
14          MR. MICELI:  Let's take five to
15      ten minutes.  Thank you.
16          THE WITNESS:  Thank you.
17          THE VIDEOGRAPHER:  The time is
18      12:05 p.m.  We are off the record.
19          (Whereupon, a recess was
20      taken.)
21          THE VIDEOGRAPHER:  The time is
22      12:19 p.m.  We are back on the record.
23  BY MR. MICELI:
24      Q.   Okay.  Ready to continue,
25  Dr. Glaspy?

41 (Pages 158 to 161)