# EXHIBIT B

**SUPPLEMENTAL EXPERT REPORT OF PROFESSOR LEE-JEN WEI**
**IN RE TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**
**SUBMITTED DECEMBER 9, 2019**

## I.  INTRODUCTION

1.      On December 10, 2018, I filed an expert report in the above-mentioned matter ("Original Report").  Since then, I have been asked to provide additional opinions in response to new expert reports filed by Plaintiffs' experts.  I stand by and incorporate my Original Report dated December 10, 2018 as if fully set forth here in this Supplemental Report.

2.      My updated *curriculum vitae*, which includes a complete list of my publications, is attached hereto as Appendix A.

3.      All materials reviewed and used for the preparation of my Original Report and Supplemental Report are listed in Appendix B.

4.      A list of my testimony for the last four years is attached as Appendix C.

5.      I am being compensated at the rate of $450 per hour for my time incurred on this matter.

## II.  SUPPLEMENTAL OPINIONS

### A.      Overview

6.      I was asked to review and comment on the analysis, results and opinions presented by Dr. Madigan, Plaintiffs' expert biostatistician witness, who filed an expert report with new analyses and opinions on October 20, 2019.

7.      Dr. Madigan analyzed the TAX 316 data in his updated report.  This included the patients who were reported to have "ongoing" alopecia at the end of the TAX 316 study.  At the end of 10 years, there were 29 patients with "ongoing" alopecia in the TAC arm and 16 patients with "ongoing" alopecia in the FAC arm, for a total of 45 patients.

8.      Dr. Madigan also analyzed the FAERS database and added an additional new analysis – Exponentiated Logistic Regression.

9.      Finally, Dr. Madigan for the first time performed a meta-analysis of a small number of observational studies.

10.     My opinions are based on the information available at this time.  I reserve the right to supplement this report should additional documents or information become available.

**B.      Alopecia Follow-up in TAX 316**

11.     Dr. Madigan created Figure 4 in his updated report.  Dr. Madigan represents Figure 4 to be the actual length of time the 45 patients, who were noted to have "ongoing" alopecia, had alopecia as an adverse event.  In other words, Dr. Madigan believes this is how long each patient had hair loss.

12.     I was asked to determine how long each of the 45 patients with "ongoing" alopecia in the TAX 316 study were followed for their alopecia.

13.     By reviewing the same data set as Dr. Madigan,[1] the vast majority of the 45 patients with ongoing alopecia in the TAX 316 study were followed for their alopecia for less than 6 months.  There could be various reasons for this, including breast cancer reoccurrence, treatment with additional anti-cancer therapies, or withdrawal from the study.

---

[1] This analysis uses SAS data files from SA-VOL-170.

2

14.      I was able to calculate the TAX 316 follow-up times for *alopecia* specifically in

Figure A.  This represents the last time the patient was followed for her alopecia.



Figure A: Follow-up duration for alopecia for each of the 45 patients in the TAX 316 Study.


15.      There were 4 patients in the FAC arm that have follow-up durations for alopecia

longer than 6 months and 7 patients in the TAC arm that have follow-up durations for

alopecia longer than 6 months.  The other 34 patients have follow-up durations for alopecia

of less than 6 months.

16.     As discussed in my Original Report, there is not statistical significance between the TAC and FAC arms at 10 years even when using the "ongoing" alopecia data in TAX 316.

17.     When using the follow-up duration for alopecia, as identified in Figure A, there is also not statistical significance between the 7 TAC patients and the 4 FAC patients that have follow-up durations for alopecia longer than 6 months (RR 1.731, 95% confidence interval 0.509 - 5.889).

**C.     Efficacy Follow-up in TAX 316**

18.     I understand that in some clinical trials patients are followed for overall survival, even if the patients are no longer are followed for adverse events, even after the patients receive additional anticancer therapy.

19.     In TAX 316, the secondary endpoint of the study was overall survival.  The study was designed to follow patients for their overall survival, even if the patient had additional anticancer therapy or had a recurrence or relapse.

20.     I was able to use the TAX 316 follow-up times for efficacy and recreate Dr. Madigan's Figure 4 (see below as Figure B).  This shows that Dr. Madigan's Figure 4 is not the length of time each Plaintiff had alopecia, but rather, it was the last time the investigator followed the patient for overall survival.



Figure B: Last efficacy follow-up recorded for each of the 45 patients in the TAX 316 Study that also were recorded as having "ongoing" alopecia.

21.     Further, I have reviewed the TAX 316 Case Report Form Completion Guidelines. Sanofi_01602463.  This manual tells investigators how to complete the forms for the TAX 316 study.  The Case Report Form Complete Guidelines explains that ongoing adverse events will not be followed if a patient receives additional anticancer therapy.  This document is consistent with the follow-up of the TAX 316 study.

22.     I have also reviewed the health authority submission regarding the definition of "ongoing" as it pertains to TAX 316.  *See* Sanofi_02368838.  This submission is consistent with how adverse events were followed in TAX 316 and how they were recorded in the Clinical Study Report and presented to health authorities.  This submission is also consistent

with my explanation of "ongoing" adverse events in my Original Report. The alopecia follow-up times within this document are consistent with Figure A.

### D. FAERS Exponentiated Lasso Regression Issues

23. I have reviewed the additional FAERS analyses Dr. Madigan performed. As with Dr. Madigan's prior FAERS analyses, these new analyses suffer from a number of flaws and limitations.

24. Lasso-regularized logistic regression assumes a particular prior distribution for the regression coefficients in the "working" logistic regression model. This step is needed, since without appropriate prior distribution, the logistic regression cannot be fitted well with the limitation of the sample size in spontaneous reporting system ("SRS") databases. However, there is no empirical evidence on the appropriateness of the choice of this prior distribution, which statisticians mainly use for computational convenience. In addition, the lasso regularization is in particular not a satisfactory tool for adjusting the "bystander" effect, since it is well known that if there is a group of variables among which the pairwise correlations are very high, then the lasso tends to select only one variable from the group and does not care which one is selected.

25. In other words, when two drugs tend to be used together and are associated with a higher risk of an adverse event, then the lasso-regularization may "randomly" select one drug as the responsible one.

26. The ridge regression is similar to lasso-regularization in that it also assumes a prior distribution without any empirical support.

27. The results of both ridge and lasso regression are sensitive to the choice of penalty parameters. Dr. Madigan's report does not provide any details of their selection, which is

6

odd since this is the conventional method of minimizing the prediction error.  For example, it has been reported that minimizing prediction error "might miss covariates that are only weakly associated with the outcome but strongly associated with the treatment and hence still induce confounding bias."  Those missing covariates may form a strong bystander effect collectively.[2]

28.     Furthermore, Tables 3 and 4 in Dr. Madigan's report only provide the estimated odds ratios (ORs), but not the corresponding credible or confidence intervals. Without an interval estimate for the "true" odds ratio, it is not clear how reliable the reported estimated ORs are. The choices of various specifications of the model maximize the exploratory capacity but may introduce bias from strong incentive to believe in particular outcome. Experts in the field recommend taking a more skeptical view and cross-examining the results with those generated from other models.

29.     Table 5 in Dr. Madigan's report includes the confidence interval the odds ratios in a conventional multivariate logistic regression. However, the adjustment of the effect of "innocent bystander" is very limited, since only seven selected comparators are included as possible bystander and there is a risk of missing important confounding factors.

30.     Depending on the different analysis method (lasso, ridge regression or full regression with selected comparators), the estimated odds ratio associated with docetaxel varies from 6.1 to 10.0 despite the seemly large sample size, demonstrating the sensitivity of the results to the analysis method.

---

[2] Witte, Janine, and Vanessa Didelez. "Covariate selection strategies for causal inference: Classification and comparison." *Biometrical Journal* 61.5 (2019): 1270-1289.

31.     While all the adjustments (lasso, ridge or full regression with selected comparators) assume a simple parametric model, the actual bystander effect may be more complex, e.g., including higher order interactions.

**E.     Meta-Analysis of Observational Studies**

32.     I have also reviewed Dr. Madigan's meta-analysis of four observational studies.

33.     I agree with Dr. Madigan that "[i]n an observational study, myriad factors can influence treatment choice, making it challenging to estimate the effect of the treatment." Madigan Report at ¶ 35.  Observational studies can suffer from numerous biases, including selection bias and confounding, that can result in spurious results.  Care therefore must be taken when relying on such studies.

34.     Each of the studies used in Dr. Madigan's meta-analysis suffer from limitations that must be considered when analyzing the study.  Additionally, the act of combining studies into a meta-analysis does not eliminate the limitations or flaws of the underlying studies.  It is well-understood that when there is bias in the underlying studies, a meta-analysis of those studies will inherit that bias.

35.     Kang[3] is a prospective cohort study of 61 patients from a single cancer center in South Korea.  The authors defined "permanent chemotherapy-induced alopecia" as absent or incomplete hair regrowth at ≥ 6 months after chemotherapy.  The study compared three different Taxotere-containing regimens (TC, TAC, AC+T) to two different non-Taxotere regimens (AC, FAC).  Kang adjusted for age, hair density and thickness at diagnosis.  At six

---

[3] Kang D, Kim IR, Choi EK, Im YH, Park YH, Ahn JS, Lee JE, Nam SJ, Lee HK, Park JH, Lee DY, Lacouture ME, Guallar E, Cho J. Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A 3-Year Prospective Cohort Study. Oncologist 2019;24(3):414-420.

months, there was no statistically significant difference of "permanent chemotherapy-induced alopecia" between the Taxotere and non-Taxotere groups, but at three years there was a significant difference.  As the Kang authors acknowledge, there are several limitations to this study.  First, "[t]he study was conducted at a single institution and had a small sample size, and the findings may not be generalizable to patients in other settings."  Additionally, "study participants may have self-selected to participate because they were interested in CIA or had prior hair problems compared with patients who did not participate, and participants may have over-reported hair changes or problems due to chemotherapy therapy."

36.     Martin[4] is a retrospective analysis of breast cancer patients from three different oncology centers.  The study examined grade 1 persistent alopecia (defined as ("weakening of hair or partial alopecia and not leading to the use of a wig" at least 18 months after the end of adjuvant chemotherapy) and grade 2 persistent alopecia ("complete alopecia that requires a wig" at least 18 months after the end of adjuvant chemotherapy).  The study did not provide any information on the baseline status of each patient's hair.  Three different Taxotere-containing regimens were examined and compared to numerous different non-Taxotere regimens.  Martin reported that grade 1 persistent alopecia was found with all chemotherapy regimens, while grade 2 persistent alopecia was only seen in patients receiving docetaxel at a cumulative dose of greater than or equal to 400 mg/m2.  The authors do not report any adjustment or statistical analysis to control for confounding effects.

---

[4] Martin M, de la Torre-Montero JC, Lopez-Tarruella S, Pinilla K, Casado A, Fernandez S, Jerez Y, Puente J, Palomero I, Gonzalez Del Val R, Del Monte-Millan M, Massarrah T, Vila C, Garcia-Paredes B, Garcia-Saenz JA, Lluch A. Persistent major alopecia following adjuvant docetaxel for breast cancer: incidence, characteristics, and prevention with scalp cooling. Breast Cancer Res Treat 2018b;171(3):627-634.

37.      Sedlacek[5] is an unpublished conference abstract that was presented at the 29th

Annual San Antonio Breast Cancer Symposium in December 2006.  It is a retrospective

analysis of one doctor's patients over an 11-year period from 1994 through 2004.  Even

though it was presented in 2006, the abstract has not been published as a full manuscript in a

peer-reviewed scientific journal.  Since it is only an abstract, little information is provided

about the design of the study.  For example, no information is provided on the baseline status

of any patients' hair before chemotherapy.  The author defined "persistent significant

alopecia" as hair regrowth less than 50% of the pre-chemotherapy amount of hair at least one

year post adjuvant chemotherapy as judged by both the patient and the author.  The study

consists of three different Groups, with each group receiving various chemotherapy regimens

for analysis.  Group A received three different treatment options (AC, FAC, A/CMF).  Group

B received five different treatment options (AC/Taxol, AT/Taxol, AC/T dose dense, ATC,

AC/THerceptin).  Group C received six different treatment options (AC/Tax, A/Tax, ACTax,

AC/TaxXeloda, AC/TaxHerceptin, ATax/CAF, CAF/Tax).  Of the seven patients identified

with persistent significant alopecia, two patients only received one dose of docetaxel.  The

author does not report any adjustment or statistical analysis to control for confounding

effects.

38.      Crown[6] is an unpublished abstract from 2017 that was presented at two different

conferences--the annual meetings of the American Society of Clinical Oncology and the

---

[5] Sedlacek SM. Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer. Abstract presented at the 29th Annual San Antonio Breast Cancer Symposium, San Antonio, TX. December 14-17, 2006 [Abstract].  2006.

[6] Crown J, Walshe J, Fennelly D, Long JC, Cairney S, McDonnell D, Ballot J, Wildes D, Sills E, Gullo G. 206P. Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer [Abstract]. Annals of Oncology 2017b;28(suppl_5).

European Society for Medical Oncology.  It is a retrospective analysis of 295 patients treated for early stage breast cancer.  Data was gathered via a telephone survey, although the authors do not provide the survey itself or the survey participation rate.  The study examined "Grade 1" and "Grade 2" alopecia and defined permanent alopecia as "ongoing alopecia" more than one year after chemotherapy.  Two docetaxel containing regimens (Taxotere and not Anthracyclines, Taxotere and Anthracyclines) were compared with two non-Taxotere regimens (Anthracycline no Taxotere, Anthracycline plus Taxol).  The non-Taxotere groups reported a higher rate of "Grade 2" permanent alopecia than the docetaxel group.  Overall there was not a statistically significant difference in the rates of permanent alopecia between the docetaxel and the non-docetaxel groups.  The authors do not report any adjustment or statistical analysis to control for confounding effects.

39.    Overall, the four studies Dr. Madigan's uses in his meta-analysis use different designs (one prospective, three retrospective), different docetaxel-containing regimens, different non-docetaxel-containing regimens, different methods to collect data, different definitions of permanent alopecia, and different ways to assess permanent alopecia.

40.    Dr. Madigan's meta-analysis using random effects model also has severe drawbacks, when applying to only four studies. The validity of the point estimator and the associated 95% confidence interval and p-value requires that the number of studies is reasonably large, which is not the case here as there were only four studies.

**F.      Conclusion**

41.      In conclusion, based on these additional analyses I still cannot find any statistical

evidence that shows Taxotere increases the risk of permanent or irreversible alopecia as

compared to other cancer-treatment regimens.

_____

Lee-Jen Wei, Ph.D.

12