# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

**THIS DOCUMENT RELATES TO:**

Elizabeth Kahn, Case No. 2:16-cv-17039

---

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSES CONCERNING ALTERNATIVE CAUSES

---

In an attempt to re-litigate this Court's rulings in *Earnest*, the PSC requests partial summary judgment on "Sanofi's affirmative defenses" related to alternative causation. The PSC argues that Sanofi's experts failed to prove that Ms. Kahn's alleged permanent hair loss (sometimes referred to as "PCIA") was caused by something other than Taxotere, but that is not Sanofi's burden. Plaintiff bears the burden to eliminate other potential causes, something her experts have made no attempt to do. Summary judgment could never be warranted on this record.

Indeed, procuring a Rule 56 judgment would require an even more demanding showing than the PSC failed to make in support of their identical motion *in limine* lost in *Earnest*. Here, the PSC asks the Court to remove the alternative-causation question from the jury—a ruling that would require this Court to accept all of the PSC's experts' conclusions, reject all of Sanofi's challenges to those conclusions, accept all of the PSC's challenges to Sanofi's experts' conclusions, and ignore the PSC's failure to meet their affirmative burden to disprove reasonable alternative causes of Ms. Kahn's alleged permanent hair loss. That would be an extraordinary result, particularly when the Court already has recognized that a jury must weigh and might reject

the PSC's causation evidence in its entirety. In fact, the *Earnest* jury did just that, finding the PSC had not proven that Ms. Earnest had PCIA caused by Taxotere. The Court should deny the PSC's Motion for the following reasons:

First, Plaintiff—not Sanofi—bears the burden of proof on proximate causation, including eliminating possible causes other than Taxotere as the cause of Ms. Kahn's alleged hair loss. As the Court directed the jury in *Earnest*, "[w]here two or more *possible* causes for an injury are identified, *Plaintiff must establish with reasonable probability that [Plaintiff's] injury resulted from a cause for which Defendants would be liable*." The PSC's Motion, however, asks the Court to impermissibly shift the burden to Sanofi to prove that something other than Taxotere caused Ms. Kahn's alleged injury. That is not the law.

Second, the Court already decided this *exact* issue in *Earnest*, denying the PSC's motion *in limine* to exclude evidence of other drugs and medical conditions that cause PCIA.[1] As the Court recognized in rejecting this request, Plaintiff bears the burden on causation and Sanofi may present a "good faith" challenge to Plaintiff's proof by submitting evidence of other reasonable potential causes and questioning Plaintiff's experts about them. The same conclusion must be reached here.

Finally, the PSC could never prove that Sanofi has no "good faith" basis for its challenges to Plaintiffs' causation evidence. As this Court already stated: "Plaintiffs' own experts have acknowledged that [other chemotherapy drugs taken by Ms. Kahn] are associated with permanent hair loss." Indeed, Plaintiff's own dermatology expert, Dr. Antonella Tosti, conceded that

---

[1] *See* Rec. Doc. 7651 (Pl. Earnest's Mot. *in Limine* No. 11); Rec. Doc. 8198 at 1 (Minute Entry Granting in Part and Denying in Part Pl.'s Mot. *in Limine* No. 11); *see also* **Ex. 45**, Sept. 5, 2019 Hr'g Tr. at 35:2–14.

2

chemotherapies other than Taxotere *cause* PCIA. For her, it's "just a question of . . . frequency."[2] Plaintiff's other experts agree. Summary judgment is not warranted on this record.

## ARGUMENT

### I. PLAINTIFF BEARS THE BURDEN ON CAUSATION.

The PSC asks the Court to rule that Sanofi failed to prove its "affirmative defenses" that Ms. Kahn's permanent hair loss was caused by something other than Taxotere.[3] The PSC's motion misstates the law and ignores Plaintiff's burden of proof. It is not Sanofi's burden to prove that something other than Taxotere caused Ms. Kahn's alleged permanent alopecia. It is, instead, *Plaintiff's burden* to prove that Taxotere—and not something else—was the cause.

In Louisiana, the plaintiff has the burden of proving that [her] injuries were not the result of separate, independent and intervening causes.[4] *See Laurent v. Jolly-Wright*, 2005-1499 (La. App. 4 Cir. 1/10/07), 950 So. 2d 47, 49, *writ denied*, 2007-0283 (La. 3/23/07), 951 So. 2d 1108. Moreover, there is no "alternative cause" affirmative defense in Louisiana upon which summary judgment can be entered, and Plaintiff's motion must be denied for that reason alone. *See* LA-C.C.P. Art. 1005 (listing available affirmative defenses in Louisiana; "fault" is one, "cause" is not); *see also* Fed. R. Civ. P. 8 ("alternative cause" is not an affirmative defense under the Federal Rules, either).

The law on medical causation in Louisiana is clear: a plaintiff may prove the cause of her injury through circumstantial evidence, but she "must exclude every other reasonable hypothesis

---

[2] *See* Sanofi's Opp. to Pl.'s Stmt. of Facts & Affirmative Stmt. of Facts at ¶ 26 n.81 & accompanying text [*hereinafter* "Sanofi's Stmt. of Facts"].

[3] *See* Rec. Doc. 10928 (Pl.'s Mot. for Partial Summ. J. on Affirmative Defenses re Alternative Causes) at 1.

[4] Defendants' answer to the Master Complaint was not jurisdiction-specific and included affirmative defenses that might not be applicable in every state.

3

with a fair amount of certainty." *Rando v. Anco Insulations, Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (plaintiff without direct evidence of causation must eliminate other causes); *see also Llewellyn v. Lookout Saddle Co.*, 315 So. 2d 69, 71 (La. App. 2d Cir. 1975) (same); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 n.5 (5th Cir. 2002) ("[T]he plaintiff may prove causation by establishing '*with reasonable certainty* that all other alternatives are impossible.'") (citing *Joseph v. Bohn Ford, Inc.*, 483 So. 2d 934, 940 (La. 1986) and *Todd v. State*, 96-3090 (La. 9/9/97), 699 So. 2d 35, 43). "Reasonable" hypotheses are those supported by at least some evidence that are not "remote, conjectural, [or] speculative." *Weber v. Fidelity & Cas. Ins. Co. of NY*, 250 So. 2d 754, 757–58 (La. 1971) (disregarding other "intimations of fault" where there was no evidence to support them); *Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F. Supp. 890, 896 (E.D. La. 1972) ("[o]ther possible causes of an accident which are 'remote, conjectural and speculative ... as a possible cause in fact' may be disregarded.") (citing *Metrailer v. F&G Merc., Inc.*, 230 So. 2d 395, 400 (La. App. 1 Cir. 1969)); *see also Wheat v. Pfizer*, 31 F.3d 340, 342–43 (5th Cir. 1994) (summary judgment for defendant where plaintiff, alleging a particular drug caused her hepatitis, failed to rule out other possible causes including contact with a family member who had hepatitis and another drug also associated with hepatitis that plaintiff took).

Ms. Kahn has no—and could not have any—direct evidence that Taxotere caused her alleged permanent hair loss, as her experts admit:

> Q. Do you agree that there's no test that can be used to determine which chemotherapy drug caused PCIA in any specific patient? [objection]
>
> A. Yes, I agree.[5]

---

[5] Sanofi's Stmt. of Facts ¶ 26 n.82; *see also* **Ex. 46**, Nov. 21, 2019 Thompson Dep. 201:24–202:7 (Dr. Curtis Thompson, the PSC's expert pathologist, testified that a person would need a "time machine to go in the future when we have more experience with some of these drugs" in order to make a claim or distinction about whether "a specific chemotherapy drug caused ongoing alopecia in any specific individual.").

Ms. Kahn's breast cancer treatment included multiple chemotherapies (including Adriamycin and cyclophosphamide), followed by nine years of hormone therapy (Tamoxifen). Each of these drugs, among others, are widely recognized in the literature and by Plaintiff's experts as being directly associated with permanent alopecia.[6] Indeed, in denying the PSC's recent motion for summary judgment, the Court recognized that "Plaintiffs' own experts have acknowledged that [Adriamycin and cyclophosphamide] are associated with permanent hair loss."[7] Similarly, Plaintiff's experts also have testified that there is a risk of permanent hair loss associated with hormone therapies, including Tamoxifen, which Ms. Kahn took daily for nearly a decade.[8] To meet her burden on causation, therefore, Ms. Kahn must establish "with a fair amount of certainty" that none of these medications caused her alleged permanent hair loss and that Taxotere is the only possible remaining cause. *Pipitone*, 288 F.3d at 243 n.5.

The jury charge in *Earnest* was consistent with these principles:

> Plaintiff must show to a reasonable degree of medical probability that … Taxotere caused permanent hair loss for [plaintiff]. … Where two or more possible causes for an injury are identified, *plaintiff* must establish with reasonable probability that [plaintiff's] injury resulted from a cause for which defendants would be liable.[9]

The evidence regarding Ms. Kahn is similar to the evidence that the Court considered in *Earnest*. Like Ms. Kahn, Ms. Earnest took both Adriamycin and cyclophosphamide, as well as a hormone therapy that also is associated with permanent hair loss.[10] After hearing the evidence, the *Earnest*

---

[6] *See* Sanofi's Stmt. of Facts at 2 n.2 (collecting medical literature reporting cases of PCIA associated with these and other chemotherapy drugs), 6 n.12 (collecting instances in which Plaintiff's experts have conceded that these and other chemotherapy drugs are associated with PCIA); *see also id.* at 23–25, ¶¶ 25–33.

[7] Rec. Doc. 10704 at 7 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59).

[8] *See infra* Section III & nn.20–35.

[9] **Ex. 47**, Trial Tr. 2238:23–2239:4.

[10] *Id.* 1034:1–9:

5

jury found that Ms. Earnest had not met her burden of proving that Taxotere had caused her permanent hair loss.[11] While Ms. Kahn may want to avoid the same result, she cannot do so by asking the Court to shift to Sanofi her burden to exclude other possible causes of her injury. That request is inconsistent with the law and this Court's prior holdings.

## II. THE COURT HAS ALREADY DECIDED THIS ISSUE.

The PSC litigated this precise issue in *Earnest* and lost.[12] There, the PSC filed a motion *in limine* asking the Court to "preclude testimony and evidence regarding other chemotherapy medications or medical conditions that purportedly cause permanent hair loss."[13] The PSC asserted that, because Sanofi's experts had not offered "evidence to a reasonable degree of medical certainty that any of these other treatments or conditions caused or contributed to [the plaintiff's] permanent hair loss" the Court should "preclude [Defendants] and all witnesses from introducing any evidence, testimony, or argument relating to other medications or medical conditions purportedly causing permanent hair loss."[14]

The Court denied the motion, and at oral argument, the Court was clear:

---

> Q. Okay. And Arimidex is a form of hormone therapy given to breast cancer patients?
>
> A. Yes.
>
> Q. Sometimes called endocrine therapy; right, Doctor [Tosti]?
>
> A. Yes.
>
> Q. All right. And you'd agree with me that there are reports in the literature, which you have seen, where it's stated that Arimidex can cause persistent hair loss; true?
>
> A. Yes, but a different time [*sic*] of persistent hair loss.

[11] Rec. Doc. 8284 (Jury Verdict).

[12] *See* Rec. Doc. 7651 (Pl.'s Mot. to Preclude Test. and Evid. Regarding Other Chemotherapy Medications or Medical Conditions that Purportedly May Cause Permanent Hair Loss); Rec. Doc. 8198 (Order Denying Pl.'s Mot. in Part).

[13] Rec. Doc. 7651 at 1.

[14] Rec. Doc. 7651-1 at 1.

> ***Plaintiff has the burden of proof.*** You have the burden of proof on causation and the defendants have to challenge that. Now, I think [defendants] have to have a good faith basis for the challenge[,] . . . but I think ***[defendants are] going to have to be able to question your experts about other chemotherapy drugs that were prescribed to [Plaintiff] and whether or not those caused permanent alopecia*** and I'm not going to preclude them from -- from challenging your causation experts.[15]

The PSC's motion should be denied for the same reasons it was denied in *Earnest*, as well as for the additional reason that the standard applicable to the PSC's summary judgment motion is more onerous than that for a motion *in limine*. Plaintiff bears the burden, including ruling out all "reasonable hypotheses" that something other than Taxotere caused her supposed injury. Plaintiff has made no attempt to meet that burden, nor could she when Plaintiff's experts consistently have conceded that other chemotherapies are associated with permanent hair loss. On this record, Plaintiff could never prove that she is entitled to judgment and that the issue should be removed from the jury's consideration. Sanofi, as this Court has already held, must be able to challenge Plaintiff's proof with evidence that Ms. Kahn took Adriamycin, cyclophosphamide, and Tamoxifen, among others, all of which Plaintiff's experts (and Sanofi's experts) agree are associated with "PCIA."

### III. DEFENDANTS' ALTERNATIVE CAUSE EVIDENCE MEETS THE "GOOD FAITH" STANDARD.

The Court made clear in *Earnest* that Sanofi may present evidence of alternative causes, and question Plaintiff's experts about them, as long as Sanofi has a "good faith" basis for doing so—*i.e.*, as long as the possible alternative causes Sanofi raises are "reasonable hypotheses" that are not "remote, conjectural, [or] speculative." *Weber*, 250 So. 2d at 757–58 (La. 1971); *Houston-*

---

[15] Ex. 45, Sept. 5, 2019 Hr'g Tr. at 35:2–14 (emphases added).

7

*New Orleans, Inc.*, 353 F. Supp. at 896; *see also Rando*, 16 So. 3d at 1089 (requiring plaintiffs to rule out reasonable hypotheses).

Contrary to the PSC's argument here and in their *Daubert* motions (which repeat the arguments made on summary judgment), Sanofi's experts need not perform a general causation analysis regarding alternative causes (*i.e.*, analyze a specific drug for statistical significance with PCIA and then assess it for causality via the Bradford-Hill criteria) or a differential diagnosis regarding alternative causes (*i.e.*, to prove specific causation) in order to present evidence regarding them. Sanofi need only undertake those analyses if the burden of proving causation were theirs, but it is not.

There can be no doubt that Sanofi's experts present "good faith" challenges to Plaintiff's causation evidence based on "reasonable hypotheses." It is undisputed that Ms. Kahn received five chemotherapy medications—Adriamycin (doxorubicin), Avastin (bevacizumab), cyclophosphamide, Taxotere, and Xeloda (capecitabine).[16] Ms. Kahn also received Tamoxifen for approximately nine years after completing chemotherapy.[17] Sanofi's experts Drs. Arrowsmith, Chang, Glaspy, and Miletello each opine, based on the relevant literature and their relevant experiences, that permanent hair loss is associated with a host of chemotherapies, including Adriamycin, cyclophosphamide, Taxol, and Taxotere, among others.[18] Drs. Chang, Glaspy, and Miletello also opine, based on relevant literature and their relevant experiences, that endocrine

---

[16]  Rec. Doc. 10928-1 at 1–2 (Pl.'s Mem. of Law in Supp. of Mot.)

[17]  *Id.*; *see also* Sanofi's Stmt. of Facts at 21 ¶ 9.

[18]  *See* Sanofi's Stmt. of Facts at 6 n.12; *see also id.* at 6–20, 23–24 ¶¶ 18–24.

8

therapies, such as Tamoxifen, have also been associated with permanent hair loss.[19]  On these issues, Plaintiff's experts and Sanofi's experts are in accord.

There also is no genuine dispute regarding the validity of those conclusions.  "Plaintiffs' own experts have acknowledged that [Adriamycin and cyclophosphamide] are associated with permanent hair loss."[20]  Dr. Antonella Tosti, whom Plaintiff's counsel have characterized as among the leading dermatology experts in this field, testified during the *Earnest* trial that other chemotherapy drugs can cause PCIA:  "what I really think is that those drugs are, you know, sometimes occasionally causing the problem.  *I never said they never cause.*  It's just a question of, likely, frequency."[21]  Dr. Tosti more specifically testified that "PCIA" is associated with Adriamycin and cyclophosphamide, among others, as well as endocrine therapy drugs including Tamoxifen, all of which were taken by Ms. Kahn.[22]

In fact, Dr. Tosti co-authored an eight-year cohort study in 2019 in which she addressed multiple patients alleged to have "PCIA" or endocrine-induced alopecia after chemotherapy.  In her study, the patients could only be evaluated if they had a clinical diagnosis of permanent hair loss.[23]  The authors reported that 47 of the patients who had "PCIA" took a chemotherapy regimen containing Taxol; 13 patients who had "PCIA" took a chemotherapy regimen containing cyclophosphamide; and five took "other" chemotherapy regimens, including regimens containing

---

[19] *See id.*

[20] Rec. Doc. 10704 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59) at 7.

[21] Sanofi's Stmt. of Facts at 27 ¶ 26 (emphases added).

[22] *Id.* n.82.

[23] *Id.* at 2 n.2 (citing Ex. 4, Azael Freites-Martinez, MD et al., *Assessment of Quality of Life and Treatment Outcomes of Patients With Persistent Postchemotherapy Alopecia*, 155(6) JAMA DERMATOL. 724, 725–26 (2019) (Dr. Tosti among co-authors of the study)).

Adriamycin.[24]  Dr. Tosti reported that 26 patients had permanent alopecia after taking Tamoxifen upon completion of their chemotherapy.[25]  She testified that the data from her eight-year study revealed more reports of "PCIA" with Taxol than Taxotere.[26]

Dr. Tosti is not alone in those opinions.  Plaintiff's other experts universally agree that Adriamycin, cyclophosphamide, Tamoxifen, Taxol,[27] among others, all are associated with "PCIA":

- Dr. Bosserman, a trained medical oncologist and Ms. Kahn's purported "informed consent" expert, testified that there have been cases of "PCIA" reported with Adriamycin, cyclophosphamide, Taxol, the AC regimen, and the AC-Taxol regimen.[28]  Dr. Bosserman further testified that she believes "a rare side effect" like "PCIA" could "happen to anybody from any chemotherapy drug"[29] and "anything can happen on any regimen."[30]

- Dr. Feigal, Ms. Kahn's general causation expert, testified that there have been cases of permanent hair loss reported for Adriamycin; cyclophosphamide; Taxol; the AC regimen; the AC-Taxol regimen; and endocrine therapies, such as Tamoxifen.[31]

- Dr. Kessler, Ms. Kahn's regulatory and general causation expert, testified that he has seen reports of "PCIA" associated with Adriamycin; cyclophosphamide; Taxol; the 5-Fluorouracil-

---

[24] *Id.*

[25] *Id.*

[26] Sanofi's Stmt. of Facts at 25 ¶ 28 & n.86.  Plaintiff's motion focuses on alternative *causes* of Ms. Kahn's alleged permanent hair loss.  But association of permanent hair loss with other medicines that she did not take (*i.e.*, Taxol, CMF, or others) also is relevant to whether Ms. Kahn's prescriber, Dr. Kardinal, could have prescribed a "risk-free" alternative.

[27] Although the PSC's Motion does not explicitly address opinions regarding Taxol, their Statement of Fact No. 7 states that "Taxol was one of various other viable chemotherapy treatment options without the increased risk of permanent hair loss available to Ms. Kahn at the time she underwent treatment." Rec. Doc. 10928-2 at 2, ¶ 7.  However, as discussed below, both Plaintiff's and Defendants' experts agree that PCIA is associated with Taxol.  *See also supra* nn.20–25 & accompanying text; *see also* Sanofi's Stmt. of Facts at 4 & n.8 (Resp. to Plaintiff's Statement No. 7).

[28] Sanofi's Stmt. of Facts at 4 & n.8; *id.* at 25 ¶ 29.

[29] *Id.* at 25 ¶ 29.

[30] *Id.*

[31] *See id.* at 25 ¶ 30.

10

        Adriamycin-cyclophosphamide regimen; and hormonal therapies, such as Tamoxifen.[32]

- Dr. Madigan, Ms. Kahn's biostatistics expert, testified that there have been reports of "PCIA" with Taxol, cyclophosphamide, and other chemotherapies.[33]

- Dr. Plunkett, Ms. Kahn's expert toxicologist, testified that cases of "PCIA" have been reported with Adriamycin, cyclophosphamide, Taxol, Tamoxifen, and the AC regimen.[34] Indeed, Dr. Plunkett testified that Adriamycin, cyclophosphamide, Taxol, and Taxotere all attack rapidly dividing cells like hair follicles.[35]

Likewise, the medical literature consistently has identified numerous chemotherapies and other cancer treatments that have been associated with permanent alopecia, including Adriamycin, cyclophosphamide, Taxol (paclitaxel), carboplatin, trastuzumab, busulfan, thiotepa, melphalan, etoposide, Adriamycin/cyclophosphamide (AC), fluorouracil/epirubicin/cyclophosphamide (FEC), fluorouracil/Adriamycin/cyclophosphamide (FAC), Tamoxifen, and cisplatin.[36] Indeed, the medical literature provides ample record for the association between permanent hair loss and Adriamycin, cyclophosphamide, Tamoxifen, and Taxol, among other medications:

- Dr. Tosti's eight-year cohort study of PCIA and endocrine induced alopecia after chemotherapy demonstrates that more patients experienced PCIA on Taxol than any other chemotherapy, and 26 out of 27 patients who experienced endocrine-induced alopecia after chemotherapy took Tamoxifen.[37] The authors also reported that 13 patients who had PCIA took a chemotherapy regimen containing cyclophosphamide; and five took "other" chemotherapy regimens, including regimens containing Adriamycin.

---

[32] *Id.* ¶ 31.

[33] *Id.* ¶ 32.

[34] *Id.* ¶ 33.

[35] *Id.*

[36] *See* Sanofi's Stmt. of Facts at 2 & n.2 (collecting medical literature discussing association between PCIA and various chemotherapies and Tamoxifen).

[37] *See supra* n.23 at 726.

- In 2017, the Kim study, relied upon by Plaintiff's experts, reported 29 patients (25.9%) treated with the AC regimen, but not Taxotere, developed grade 1 or grade 2 PCIA.[38] The Kim study reported that "Permanent alopecia following chemotherapy has been considered a rare event, and most cases have followed the use of high-dose chemotherapy and bone marrow transplantation. More recently, several case reports of CIIA after standard dose chemotherapy for breast cancer were published. Masidonski et al. reported their experience in 13 women treated for breast cancer with AC or AC followed by taxane. Kluger et al. analyzed the clinical and histological features of severe and CIIA following a sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel regimen for adjuvant breast cancer treatment in 20 patients. However, the prevalence and characteristics of CIIA remain unknown."

- The 2017 Crown study, also relied on by Plaintiff's experts, reported grade 2 alopecia in 8% of patients who received Adriamycin *without* Taxotere and 13% of patients who received Adriamycin plus Taxol.[39]

- In a 2009 study, Pat Masidonski and Suzanne M. Mahon reported that two of the study's 13 reported cases of PCIA occurred in patients treated with the AC regimen, but not Taxotere.[40] Plaintiff's experts also rely upon this study.[41]

- Additional studies have linked Tamoxifen to persistent alopecia. For instance, a 2013 meta-analysis of studies assessing hair regrowth in patients treated with hormonal therapies following chemotherapy for breast cancer found that 9.3% of patients who took Tamoxifen reported alopecia and 6.4% reported grade 2 alopecia.[42] The study

---

[38] Sanofi's Stmt. of Facts at 2 n.2 (citing Ex. 7, Gun Min Kim et al., *Chemotherapy-induced irreversible alopecia in early breast cancer patients*, BREAST CANCER RESEARCH AND TREATMENT 163.3 (2017): 527–33); **Ex. 48**, March 23, 2020 Feigal Rpt. at 45 (Table 2 – Publications on PCIA in the Treatment of Breast Cancer); **Ex. 49**, March 13, 2020 Plunkett Rpt. at ¶ 43.

[39] Sanofi's Stmt. of Facts at 2 n.2 (citing Ex. 2, J. Crown et al., *Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer*, J. CLIN. ONCOL. (2017) (cases of PCIA reported with Adriamycin)); *see also, e.g.*, Ex. 48, March 23, 2020 Feigal Rpt. at 48 (Table 2 – Publications on PCIA in the Treatment of Breast Cancer); Ex. 49, March 13, 2020 Plunkett Rpt. at ¶ 45 n.12.

[40] Sanofi's Stmt. of Facts at 2 n.2 (citing Ex. 9, Pat Masidonski & Suzanne M. Mahon, *Permanent alopecia in women being treated for breast cancer*, CLIN. J. OF ONCOL. NURSING 13.1 (2009): 13.)

[41] *See, e.g.*, Ex. 48, March 23, 2020 Feigal Rpt. at 54 (Table 2 – Publications on PCIA in the Treatment of Breast Cancer); *see also* Ex. 49, March 13, 2020 Plunkett Rpt. at ¶ 45 n.12.

[42] Sanofi's Stmt. of Facts at 2 n.2 (citing Ex. 11, Vishal Saggar et al., *Alopecia with endocrine therapies in patients with cancer*, THE ONCOLOGIST 18.10 (2013): 1126–34.)

        also found the relative risk for alopecia in patients treated with hormonal therapies like Tamoxifen was 8.51% compared to control groups not treated with those therapies.[43]

Given this record, the PSC cannot credibly argue that Sanofi has no good faith basis for raising these chemotherapies as possible causes of Ms. Kahn's permanent hair loss. Rather, based on the literature, Sanofi's experts' experiences, and Plaintiff's own experts' opinions, it is a "reasonable hypothesis," and not "remote, conjectural, [or] speculative," that Ms. Kahn's purported PCIA could have been caused by Adriamycin, cyclophosphamide, Tamoxifen, or some combination of those medications, and not Taxotere alone. Sanofi accordingly may present testimony regarding these possible causes through its own experts and cross-examine Plaintiff's experts about them. And Plaintiff, in turn, bears the burden of excluding these possible causes "with a fair amount of certainty." Plaintiff has made no attempt to do so. On this record, Plaintiff's motion must be denied.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's Motion for Partial Summary Judgment on Affirmative Defenses Concerning Alternative Causes.

---

[43] *Id.*

Respectfully submitted,

| | |
|---|---|
| /s/ *Douglas J. Moore* | |
| Douglas J. Moore (Bar No. 27706) | Harley V. Ratliff |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | Jon Strongman |
| 400 Poydras Street, Suite 2700 | Adrienne L. Byard |
| New Orleans, LA 70130 | **SHOOK, HARDY & BACON L.L.P.** |
| Telephone: 504-310-2100 | 2555 Grand Boulevard |
| Facsimile: 504-310-2120 | Kansas City, Missouri 64108 |
| dmoore@irwinllc.com | Telephone: 816-474-6550 |
| | Facsimile: 816-421-5547 |
| | hratliff@shb.com |
| | jstrongman@shb.com |
| | abyard@shb.com |

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*