# EXHIBIT 32

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

*******************************

IN RE: TAXOTERE

(DOCETAXEL) PRODUCTS        MDL No. 2740

LIABILITY LITIGATION        Section: "H"

                                      Judge Milazzo

This Document Relates to:   Mag. Judge North

All Cases

*******************************


        Remote Videotaped Deposition of
ELLEN T. CHANG, Sc.D., held at the location of
the deponent in Santa Clara County,
California, commencing at 9:08 a.m., on the 19th
of May, 2020, before Maureen O'Connor
Pollard, Registered Diplomate Reporter,
Realtime Systems Administrator, Certified
Shorthand Reporter.


                            - - -


       GOLKOW LITIGATION SERVICES
   877.370.3377 ph | 917.591.5672 fax
          deps@golkow.com

Page 138

1  couple of questions in followup to that
2  because of what we've talked about thus far.
3          If Sanofi's lawyers stand up at
4  trial and say that Dr. Chang assessed other
5  chemotherapies by way of a comprehensive
6  systematic literature search or literature
7  review and has determined that a causal
8  association exists between any of the drugs
9  you've listed on pages 26 through 28 and
10 irreversible or permanent alopecia, you and I
11 can agree you have not done that, correct?
12     A.   I agree that I have not done a
13 systematic literature review on any of these
14 drugs except for docetaxel with respect to
15 permanent or irreversible alopecia.
16          For docetaxel, I think I have
17 done a systematic literature review, trying
18 to find everything that's out there.
19     Q.   Okay.  Now, do you believe that
20 your review of the literature on docetaxel
21 and irreversible permanent alopecia has been
22 exhaustive, or would you say it has been
23 thorough?  I'm giving you thorough, I'm not
24 going below that.
25     A.   I've tried my best to find

Page 139

1  everything out there in terms of relevant
2  epidemiological studies.  If I missed
3  anything, it was unintentional, and I'd like
4  to know because then I would include it.
5          So in terms of being exhaustive
6  or thorough, I mean exhaustive to me -- I
7  don't like using words like exhaustive or
8  comprehensive just in case, you know, I've
9  messed up and missed something by mistake.
10 But I tried my best to identify all the
11 relevant epidemiologic studies out there.
12     Q.   Okay.
13     A.   So my intent was to be
14 exhaustive.
15     Q.   All right.  Now, your
16 assumption concerning biologic plausibility
17 is that if a drug is capable of causing, or
18 has a biologically plausible mechanism for
19 causing reversible or temporary alopecia, you
20 assume that that -- that by that same
21 mechanism it can cause permanent alopecia.
22 Am I correct in my statement there?
23     A.   I guess I want to be specific
24 about what I -- you know, when you ask if I
25 assume that it can cause permanent or

Page 140

1  irreversible alopecia, I just want to be
2  specific about what that verb "can" would
3  entail.
4          I agree that if any drug or any
5  other factor, for instance, including, you
6  know, tight hair, pulling, or aging, that
7  sort of thing, if there's an establish cause
8  of temporary or reversible alopecia, then I
9  agree that it is -- that I then consider it a
10 biologically plausible cause of permanent or
11 irreversible alopecia through the same
12 biological mechanism, because my
13 understanding is that there's no clear
14 histopathological or clinical distinction
15 between permanent or irreversible alopecia
16 and the temporary or reversible kind.
17     Q.   Okay.  I think we'll talk about
18 that a little bit more later in your report.
19          Now, you do not do mechanistic
20 studies, correct?
21     A.   That's correct that I don't
22 perform mechanistic studies as part of -- I
23 mean now as an epidemiologist.  I have done
24 biochemistry experiments and published
25 biochemistry papers in the past.

Page 141

1      Q.   Okay.  And concerning
2  chemotherapy agents?
3      A.   No.
4      Q.   Okay.  And you have not been
5  trained in pharmacology or toxicology,
6  correct?
7      A.   I don't have -- I don't have
8  formal -- I don't have a degree in
9  toxicology, for instance.  I have received
10 educational training in toxicology just as
11 part of my education and part of my
12 professional training.  I work with
13 toxicologists.
14     Q.   Okay.  I mean, I understand you
15 work with toxicologists.  But when you work
16 on studies or publications with
17 toxicologists, do they stay in their lane of
18 toxicology and you stay in your lane of
19 epidemiology?
20     A.   I would say when I'm working
21 with them on projects we often overlap.  In
22 terms of litigation we do try to stay in our
23 own lanes.  But, like, I would not give an
24 expert opinion on toxicology, but I certainly
25 understand toxicology.  I read and interpret

Page 142

1  toxicological studies on a regular basis.
2  But I wouldn't put myself forward as a
3  toxicologists or a person with credentials in
4  toxicology.
5      Q.  Okay.  I understand that.  But
6  you review published literature that discuss
7  those issues, but you yourself are not expert
8  in those fields?
9      A.  I have expertise in those
10  fields, but I'm not a designated expert in
11  toxicology in the litigation sense.
12      Q.  Okay.  Do you feel you have the
13  -- and you just answered this for me, but I
14  want to make sure I'm clear.  Do you feel you
15  have the education, training, and experience
16  to offer expert toxicology or pharmacology
17  opinions?
18      A.  No, I wouldn't offer separate
19  opinions on those topics.
20      Q.  Okay.
21      A.  I do incorporate them into
22  epidemiology, if that makes sense.  So my
23  opinions would be on epidemiology with an
24  understanding of relevant toxicology or
25  pharmacology.

Page 143

1      Q.  Sure.
2          Assessing whether or not a
3  biologically plausible mechanism exists would
4  be part of your causation analysis, right?
5      A.  That's right.
6      Q.  Okay.  But doing the studies to
7  establish what the biologically plausible
8  mechanism may be by way of in vivo studies is
9  not something you would do, right?
10      A.  I would not currently do
11  in vivo studies or in vitro studies, that's
12  correct.
13      Q.  Okay.
14      A.  I have done both in the past.
15      Q.  Let's turn to page 108 of your
16  report.
17      A.  Okay.
18      Q.  In the middle of the page
19  there's a paragraph that reads as follows.
20  I'm going to read part of it.  "To my
21  understanding" -- are you with me, Doctor?
22      A.  Yes.
23      Q.  "To my understanding, the
24  mechanism of action by which docetaxel may
25  cause irreversible or permanent alopecia is

Page 144

1  unknown, and irreversible or permanent
2  alopecia is histopathologically
3  indistinguishable from reversible or
4  temporary alopecia."
5          Have I read it correctly thus
6  far?
7      A.  Yes.
8      Q.  Okay.  And you continue on here
9  and you say, "Therefore, I generally consider
10  any agent that can cause alopecia, including
11  docetaxel and certain other anticancer
12  chemotherapies, other types of medicines,
13  certain health conditions (including breast
14  cancer and metastasis), physiological or
15  physical stressors, age, and other risk
16  factors, to be biologically plausible causes
17  of irreversible or permanent alopecia," and
18  then in parenthesis you cite to Chon,
19  C-H-O-N, 2012, Patel 2013, Saggar,
20  S-A-G-G-A-R, 2013, Mubki, M-U-B-K-I, 2014b,
21  Guzman-Sanchez and Asz, A-S-Z, Siegall,
22  S-I-E-G-A-L-L, 2015, Phillips 2017, and
23  Freites, F-R-E-I-T-E-S, Martinez 2019b, close
24  paren, period.
25          Did I get that correct?

Page 145

1      A.  Yes.  With the exception that
2  you said medicines where I had written
3  "medications."  And then -- these are
4  unimportant, but Mubki, et al, I cited
5  "2014b" and "a".
6      Q.  Okay.  I apologize.
7      A.  Other than that, yes, I think
8  that's correct.
9      Q.  Now, this paragraph, I don't
10  want to talk about the individual articles
11  here at this point, but this paragraph sets
12  out your -- I don't want to mischaracterize
13  you, but is this your assumption that any
14  drug that causes reversible alopecia can also
15  cause irreversible or permanent alopecia?
16      A.  I would say it's more than an
17  assumption because it is based on an
18  understanding of the existing science.  So my
19  understanding from looking at published
20  papers, for instance, is that there's no way
21  to distinguish histopathologically, that is,
22  you know, under a microscope, between
23  permanent or irreversible alopecia and
24  temporary or irreversible alopecia, so they
25  look the same.

Page 146

1  Q.   Okay.
2  A.   And so it's more than a just
3  theoretical assumption, it's based in part on
4  that, you know, the lack of a standard or a
5  separate clinical or histopathological
6  definition for irreversible or permanent
7  alopecia.
8       I would say, you know, it's
9  also based on this general understanding that
10 alopecia can be caused -- you know, there are
11 these different types of alopecia, there's
12 the anagen, a-n-a-g-e-n, related alopecia
13 that interferes with, you know, hair growth.
14 There's the telogen alopecia that interferes
15 with hair in its resting phase.  There's, you
16 know, this autoimmune alopecia that attacks
17 -- where the cells of the body attack the
18 hair follicles.
19      So without having done any of
20 these mechanistic studies and without being,
21 you know, a toxicologist, I can understand
22 that -- I can generally understand that if
23 something interferes with the hair cycle or,
24 you know, attacks the body's cells, then
25 broadly speaking it would be biologically

Page 147

1  plausible that it could do so -- if it can do
2  so on a temporary basis, I don't see why it
3  couldn't also do that for a longer period of
4  time.  Biologically it seems plausible.
5       And so I'm just trying to make
6  it clear that this is not a blind assumption
7  or a baseless assumption, it has science
8  behind it, but I would say it's not
9  established because, in general, I don't
10 think that causes of permanent or
11 irreversible alopecia per se have been very
12 well-studied separately.
13 Q.   All right.  That gives me a lot
14 to chew on, and I'm going to have to unpack
15 some of that.
16      You said that it was more than
17 an assumption, and that you base it on the
18 existing science.  And is that the science as
19 referenced and set out in the literature that
20 you cite here in this paragraph?
21 A.   Yes, in part.  It's also based
22 on the science referenced and cited on pages
23 24 to 27 of my report where I talk about the
24 numerous forms and risk factors of alopecia.
25 So I start that section talking about the

Page 148

1  hair growth cycle and the different phases,
2  and then the different forms of alopecia, and
3  the different causes of alopecia in general,
4  so the temporary or reversible form by and
5  large.
6  Q.   Okay.
7  A.   And so yes, that is --
8  generally speaking, the science that I'm
9  referring to is in the two places.  I mean,
10 I've also, you know, looked at, for example,
11 Dr. Plunkett's, I think, expert report where
12 she talks about mechanisms and, you know, she
13 talks about mechanisms by which different
14 agents might cause alopecia, so, you know, I
15 got -- I would say I have looked at other
16 documents that are relevant to that topic.
17 Q.   Okay.  And with regard to the
18 literature that is cited, your opinions
19 concerning the types and causes of alopecia,
20 their diagnostic differences or the
21 diagnostic marker differences between the
22 types of alopecia and the potential causes of
23 alopecia are based upon the literature that
24 you cite and that you have reviewed in
25 offering your opinions as an epidemiologist,

Page 149

1  correct?
2  A.   Yes.  My perspective on that
3  literature is that of an epidemiologist.
4  Q.   Right.  That's why I went over
5  before the clinical stuff, the education, so
6  I wanted to make sure I was very clear here
7  at this point in your report -- okay.  I
8  think I miss -- I think I'm back where I need
9  to be.
10      So for purposes of
11 understanding what anagen effluvium or
12 telogen effluvium or alopecia areata are, or
13 cicatricial alopecia, that's based solely
14 upon your reading of articles, and not upon
15 any knowledge based upon training in the
16 field of dermatology or pathology, right?
17 A.   It's correct that I have no --
18 it's not based on any training in dermatology
19 or pathology.
20      As I mentioned before, I also
21 know just a little bit about alopecia areata
22 because of a friend who has it whom I've
23 known for, I don't know, more than 30 years.
24 So there's some personal knowledge in there,
25 but also, yes, in general it is based on --

Ellen T. Chang, Sc.D.

Page 150

1   my understanding is based on reading the
2   literature as an epidemiologist, other than
3   my personal knowledge.
4       Q.   All righty.  Concerning your
5   comment on page 128 that "irreversible or
6   permanent alopecia is histopathologically
7   indistinguishable from reversible or
8   temporary alopecia," where do you -- where
9   did you come to your understanding of that
10  statement?  Because that's one particular
11  place where you offer no reference.
12      A.   I think that came from -- so
13  that came in part from my review of
14  depositions and reports.  And I think there's
15  also an article by Tallon, T-A-L-L-O-N.
16      Q.   Correct.
17      A.   I think that that article also
18  mentions -- I think, I think I cited that
19  earlier in my report, but I didn't there.
20  It's in my reference list, but I didn't cite
21  it there for some reason.
22      Q.   Right.  And Tallon was an
23  article that was published on two case
24  studies, one where a patient received Taxol
25  regimen, and one where a patient received a

Page 151

1   Taxotere regimen, correct?
2       A.   I don't remember the details,
3   but that sounds reasonable.
4       Q.   Okay.  Now, concerning the
5   depositions and reports of other experts that
6   you've reviewed, did you ask to receive
7   those?
8       A.   No.  In general, no.  I have
9   asked -- you know, I've pointed out, for
10  example, where I received someone's report
11  but not their deposition transcript.  So
12  there have been some instances where I asked
13  for a specific report or a transcript,
14  deposition transcript, but I don't remember
15  with --
16      Q.   Have your -- I'm sorry, I keep
17  interrupting you.  I apologize.
18      A.   Sorry.
19      Q.   Have you ever reviewed the
20  deposition transcript of a Dr. Smart, Chandra
21  Smart?
22      A.   No.
23      Q.   Have you ever reviewed the
24  deposition transcripts of Dr. Curtis
25  Thompson?

Page 152

1       A.   No.
2       Q.   Okay.  Would you agree with me
3   that if you wanted to learn the most about
4   what histopathologically is known about the
5   pathology of alopecia, it would be helpful to
6   know the opinions of a dermatopathologist?
7       A.   I think in general it would be
8   helpful to have a dermatopathologist's
9   opinion.  I don't know -- in general, if I
10  wanted to find that out, I would do a
11  literature search on it.  I don't think I
12  would necessarily ask for an expert report or
13  deposition transcript on that issue.
14      Q.   Would you be interested in
15  seeing what a dermatopathologist cites by way
16  of literature for support of their opinions
17  concerning the histopathology of alopecia?
18      A.   Potentially, yes, if I were
19  to -- potentially yes, if I wanted to
20  investigate that question further.
21      Q.   Okay.  And dermatopathology is
22  not within your general expertise as an
23  epidemiologist such as you are, and you're
24  basing your opinions on the review simply of
25  medical literature in that expertise,

Page 153

1   correct?
2       A.   So with respect -- I guess here
3   we're referring to my opinion about the lack
4   of a distinction between permanent or
5   irreversible alopecia and temporary or
6   reversible alopecia histopathologically, is
7   that the opinion that we're --
8       Q.   Yes.
9       A.   -- we're addressing?  So there
10  I do --
11      Q.   Hold on.  Because I agreed with
12  you on that, let me just say -- let me ask
13  you first, do you offer that opinion, or do
14  you just make this statement here as a
15  statement of your understanding?  Because I
16  don't see you offering an opinion as a
17  dermatopathologist or giving histopathology
18  opinions, is this an opinion or is this just
19  a recognition of your understanding of what
20  the literature shows?
21      A.   It is the latter.  I used the
22  word "opinion" because I think in your
23  question you asked about my opinions, and so
24  I was trying to specify, or trying to get an
25  understanding of what you were asking about.