Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF LOUISIANA
 3    _____
                                      )
 4    IN RE:  TAXOTERE (DOCETAXEL)    )MDL No. 2740
      PRODUCTS LIABILITY LITIGATION   )
 5                                    )Section:  H
      This Document Relates to:       )
 6                                    )
      Sheila Crayton,                 )
 7    Case No. 2:17-cv-05923;         )
      Cynthia Thibodeaux,             )
 8    Case No. 2:16-cv-15859          )
      _____  )
 9
10
11
12
13
14      VIDEOTAPED DEPOSITION OF LINDA D. BOSSERMAN, M.D.
15                    Costa Mesa, California
16                  Friday, November 22, 2019
17                         Volume I
18
19
20
21    Reported by:
      DENISE BARDSLEY
22    CSR No. 11241
23    Job No. 3771292
24
25    PAGES 1 - 313
```

|  | Page 94 |  | Page 96 |
|---|---|---|---|
| 1 | Sedlacek article? | 1 | A  I wouldn't agree completely with that. |
| 2 | A  No. | 2 | Q  Where in your expert -- well, let me back |
| 3 | Q  Do you remember back when you and I had an | 3 | up. |
| 4 | opportunity to talk in the deposition back in 2018 | 4 |     Have you ever heard of the phrase "specific |
| 5 | we talked about not cherry-picking information. | 5 | causation"?  Do you know what I'm referring to? |
| 6 |     Do you remember that conversation? | 6 | A  I've heard of the phrase.  I'm not an |
| 7 | A  Not in detail. | 7 | expert on that definition. |
| 8 | Q  Would you agree with me that as a medical | 8 | Q  Are you offering a specific opinion in this |
| 9 | doctor and as a scientist, it is not appropriate to | 9 | case as to what caused Ms. Thibodeaux's hair loss? |
| 10 | cherry-pick information that's only helpful to one | 10 | Yes or no? |
| 11 | side? | 11 | A  I'm not the causation expert for this. |
| 12 |     MR. MICELI:  Object to the form. | 12 | Q  And so in answer to my question, yes or no, |
| 13 |     THE WITNESS:  I think it is important as a | 13 | are you offering an opinion as to the specific cause |
| 14 | clinician to look at the literature and put it in | 14 | of Ms. Thibodeaux's hair loss? |
| 15 | perspective for the patient, that's my focus. | 15 | A  I do not believe that's the scope of my |
| 16 | BY MR. STRONGMAN: | 16 | testimony.  But I do believe the chemotherapy caused |
| 17 | Q  Doctor, I want to take a step back.  I'm | 17 | it so, you know. |
| 18 | talking about the methodology as it relates to | 18 | Q  Do you defer to the other experts that are |
| 19 | forming your opinions in this case.  Okay? | 19 | offering causation testimony in this case? |
| 20 | A  I think it's important to look at the | 20 | A  I do. |
| 21 | available information and make an opinion. | 21 | Q  Doctor, do you know who Sheila Crayton is? |
| 22 | Q  And when you look at the available | 22 | A  I don't have a recollection. |
| 23 | information in forming your opinions in this case, | 23 | Q  And, Doctor, do you know that -- |
| 24 | it's important to consider both sides of the story, | 24 | A  Is that another -- another plaintiff, |
| 25 | correct? | 25 | possibly. |
|  | Page 95 |  | Page 97 |
| 1 | A  Well, you're saying there's two sides to | 1 | Q  In your expert report marked as Exhibit |
| 2 | the story.  I think there is science that discusses | 2 | Number 4, do you offer any opinions specific to |
| 3 | what the issues are.  I don't think there's, | 3 | Sheila Crayton? |
| 4 | necessarily, two sides to all these things. | 4 | A  I offer opinion only on Ms. Thibodeaux. |
| 5 | Q  Doctor, for example, you list Sanofi | 5 | Q  Did you review any medical records or |
| 6 | documents in this materials reviewed list, correct? | 6 | pictures related to Sheila Crayton? |
| 7 | A  Yes. | 7 | A  I have the medical records.  I did not |
| 8 | Q  Do you know how many Sanofi documents were | 8 | review them. |
| 9 | available to be chosen from? | 9 | Q  Did you review any pictures of Ms. Crayton? |
| 10 | A  I do not. | 10 | A  I did not. |
| 11 | Q  No idea? | 11 | Q  Did plaintiffs' counsel send you any |
| 12 | A  I do not. | 12 | pictures of Ms. Crayton? |
| 13 | Q  Do you have any idea whether there's | 13 | A  I believe I have the full record. |
| 14 | documents that contradict the Sanofi documents that | 14 | Q  But despite having the full record |
| 15 | you were given in terms of themes or in terms of | 15 | regarding Ms. Crayton, you have not offered an |
| 16 | data?  Do you have any idea? | 16 | opinion on her case in your expert report? |
| 17 | A  That's not the subject of my expert | 17 | A  That's not the subject of my report, |
| 18 | testimony. | 18 | correct. |
| 19 | Q  And so with regard to the subject of your | 19 | Q  Why? |
| 20 | expert testimony, I just want to make sure I still | 20 |     MR. MICELI:  Object to the form. |
| 21 | have that clear.  Okay?  All right? | 21 |     THE WITNESS:  I was asked to prepare a |
| 22 | A  Okay. | 22 | report on Ms. Thibodeaux, who is the topic of our |
| 23 | Q  Would you agree that you're not offering | 23 | discussion. |
| 24 | any opinion as to the cause of Ms. Thibodeaux's hair | 24 | BY MR. STRONGMAN: |
| 25 | loss? | 25 | Q  Just so I'm clear, you were sent records |

Page 98

1  regarding Ms. Crayton, but you did not review them;
2  is that correct?
3     A   Correct.
4     Q   So did you form any opinions regarding
5  Ms. Crayton in any way --
6        MR. MICELI:  Object to the form.
7        THE WITNESS:  I did not review any
8  materials and I formed no opinions about her.
9  BY MR. STRONGMAN:
10    Q   Okay.  Doctor, would you agree CMF has a
11 risk of permanent hair loss?
12       MR. MICELI:  Object to form.
13       THE WITNESS:  I don't know any specific
14 numbers on that.  I think a fluke can happen for any
15 patient, but it is not of anything significant that
16 I'm aware of, and I used it for years.
17 BY MR. STRONGMAN:
18    Q   My question was:  Would you agree that
19 there is a risk of permanent hair loss with CMF?
20 Yes or no?
21       MR. MICELI:  Object to form.
22       THE WITNESS:  I don't know a number to say
23 yes or no to that.
24 BY MR. STRONGMAN:
25    Q   You would certainly agree that there are

Page 99

1  reports in the medical literature regarding
2  permanent hair loss with CMF, correct?
3     A   I would not be surprised to see that.
4     Q   Do you recall reviewing any reports in the
5  medical literature regarding permanent hair loss
6  with CMF?
7     A   I don't have independent recollection of
8  that.
9     Q   Did you do any specific search in the
10 medical literature to try to identify cases of
11 permanent hair loss with CMF?
12    A   I did general searches back in '18, but I
13 don't remember, specifically, searching for any.
14       I remember I looked at the 30-year
15 follow-up review by Bonadonna of CMF, but I don't
16 remember an independent permanent hair loss
17 category.
18    Q   And when you say "category," you don't
19 remember doing a specific search to try to identify
20 cases of permanent or persistent hair loss with CMF?
21    A   I look for permanent hair loss with
22 chemotherapy, any chemotherapy.
23    Q   Do you remember coming across any examples
24 with CMF?
25    A   I don't have independent recollection of

Page 100

1  that right now as we sit here.
2     Q   In your expert report we marked as Exhibit
3  Number 4, did you identify any cases in the medical
4  literature regarding CMF and permanent hair loss?
5     A   I don't remember addressing that.  I'd have
6  to go reread that part of the report.
7     Q   For example, in your report, one of the
8  things you talk about is presenting patients with
9  alternatives that did not have a risk of what you
10 call pCIA.
11       Do you remember that?
12    A   Yes.
13    Q   My question is:  Does CMF have a risk of
14 pCIA, as you've stated that in your report?
15    A   It's not something I ever present to
16 patients.  If it's there, it is so rare it is in the
17 fluke category.
18       Most patients don't even lose their hair
19 with CMF, as I quoted from the patient education
20 sites, most don't even need a wig, let alone have
21 permanent.
22       So, as you know, we're interested in those
23 that are significantly documented in randomized
24 clinical trials of which Taxotere is consistently
25 having a very significant risk over any other thing

Page 101

1  it is compared to.
2     Q   There's a lot to deconstruct there, and I
3  will.
4        Do you remember what percentage of patients
5  in the Bergland (sic) article had hair loss problems
6  more than two years after taking CMF?
7     A   I do not remember the number, no.
8     Q   Do you remember if it was a fluke?
9     A   I don't remember the numbers as we sit
10 here.
11       Again, Dr. Feigal has charts and graphs and
12 has really addressed it specifically, scientifically
13 in detail.
14    Q   You would defer to Dr. Feigal on those
15 issues?
16    A   Yes.
17       (Deposition Exhibit 7 was marked for
18       identification by the court reporter
19       and is attached hereto.)
20 BY MR. STRONGMAN:
21    Q   I'm going to hand you what I marked as
22 Deposition Exhibit Number 7.
23       This is the Freites-Martinez article that
24 was published in 2019; is that correct?
25    A   Yes.

26 (Pages 98 - 101)

|  |  |
|---|---|
| Page 102 | Page 104 |
| 1  Q  Do you recall reviewing this article?<br>2  A  I remember reading it.  I said I have read<br>3  it.<br>4  Q  And if you turn to the table on page 726<br>5  with me -- do you see that?<br>6  A  I do.<br>7  Q  There is a table that's entitled, "Baseline<br>8  Characteristics of Female Patients with Cancer with<br>9  Alopecia After Cytotoxic Chemotherapy."<br>10     Do you see that?<br>11  A  I see that.<br>12  Q  And so in the category -- there's two<br>13  separate categories at the top; is that right?<br>14  There's -- well, strike that.<br>15     There is a category for what's called pCIA.<br>16     Do you see that?<br>17  A  I see that.<br>18  Q  There's a category for EIAC.<br>19     Do you see that?<br>20  A  I see that.<br>21  Q  Do you understand what EIAC is?<br>22  A  I looked at that and I see their definition<br>23  here.  They must have it in the body, it's not here<br>24  on the -- endocrine therapy-induced alopecia.<br>25  Q  And that's endocrine therapy-induced | 1  between paclitaxel and docetaxel.<br>2     Do you see that?<br>3  A  I see that report.<br>4  Q  And based on this article that we marked as<br>5  Deposition Exhibit Number 7, were more cases of pCIA<br>6  reported with Taxol or with Taxotere?<br>7  A  I really don't understand this table, so I<br>8  really -- I can't really comment on that.<br>9     Again, Dr. Feigal reviewed this in detail<br>10  with you and really analyzed all the data, and I<br>11  really defer these to her.<br>12  Q  Doctor, you are capable of reading the<br>13  numbers on the table, fair enough?<br>14  A  To actually --<br>15     MR. MICELI:  Excuse me.<br>16     Object to the form.<br>17     THE WITNESS:  As an editor of the journal,<br>18  what gets here has to be in context with the paper,<br>19  what else they say, whether this is accurate.  So I<br>20  don't know -- I haven't really done a critical<br>21  review of this paper.  That's Dr. Feigal as to what<br>22  this actually means.<br>23  BY MR. STRONGMAN:<br>24  Q  Doctor, my basic question is:  When you<br>25  look under the reports of pCIA in that column, there |
| Page 103 | Page 105 |
| 1  alopecia after chemotherapy, correct?<br>2  A  Yes.<br>3  Q  And you understand that the authors of this<br>4  article are reporting on cases of endocrine-induced<br>5  alopecia after chemotherapy as one of the<br>6  categories, correct?<br>7  A  I'm not an expert.  Dr. Feigal really<br>8  talked about this in detail.  I completely defer all<br>9  those details to her.<br>10  Q  Do you know whether or not Dr. Tosti was<br>11  one of the authors of this article?<br>12  A  I see her on the author list.<br>13  Q  And, obviously, you did not talk to<br>14  Dr. Tosti about this article; is that correct?<br>15  A  That's correct.<br>16  Q  All right.<br>17     And if you look at the table we were just<br>18  on, I just want to see if we can agree on some basic<br>19  premises here.<br>20     There is a category for taxane-based<br>21  chemotherapy.<br>22     Do you see that?  And this is under the<br>23  pCIA category.<br>24  A  I see that category, uh-huh.<br>25  Q  And then under the taxanes its broken up | 1  is a total of 98 reports?<br>2  A  Correct.<br>3  Q  Okay.  There's 80 reports with taxanes,<br>4  correct?<br>5  A  That's what it says.<br>6  Q  And then it breaks those down into<br>7  paclitaxel, docetaxel and combination, correct?<br>8  A  I see that number.<br>9  Q  And based on this article, Deposition<br>10  Exhibit Number 7, were there more reports with Taxol<br>11  or with Taxotere?<br>12  A  I'd have to calculate.  Isn't it saying<br>13  there's 31 docetaxels of 39 versus 47 of 59?  I'm<br>14  trying to understand how --<br>15  Q  We can go through this.  This is not that<br>16  complicated.  We can go through this step by step,<br>17  if we need to, Doctor, so --<br>18     MR. MICELI:  Hold on.  Hold on.<br>19     Object to the form.<br>20  BY MR. STRONGMAN:<br>21  Q  So taxane-based therapy, taxanes 80.<br>22     Do you see that?<br>23  A  I don't even remember what the details of<br>24  this paper were.  Let me get a sense.<br>25     So this is a paper about quality of life |

Page 258
1  risk of pCIA with Taxotere?
2      MR. MICELI: Object to the form.
3  BY MR. STRONGMAN:
4    Q  Yes or no?
5    A  That's like saying, if you landed on the
6  moon, would you be on the moon?  It is irrelevant.
7  These are to go to experts who know the context.  I
8  have no idea the context of this.
9    Q  You understand if I handed you
10  Ms. Thibodeaux medical records and you looked at
11  them and I said, is there evidence that she has had
12  hair loss past six months after chemotherapy
13  treatment, you could answer that question, couldn't
14  you?
15    A  Depends what's all in the records and how
16  long they last and what was documented.
17    Q  Right.  But if I asked you that, you could
18  answer that question -- you have perfect capability
19  of answering those factual medical details about a
20  patient, true?
21    A  I --
22      MR. MICELI: Hold on.  Hold on.
23      Object to the form of the question.
24      THE WITNESS: I reviewed her case, and I
25  have an opinion on her case.

Page 259
1  BY MR. STRONGMAN:
2    Q  And so my question is very simple.  On the
3  basis of the facts stated in Exhibit 12, is there
4  any evidence that this patient had alopecia more
5  than six months after Taxotere?  Yes or no?
6      MR. MICELI: Same objection.
7      THE WITNESS: I haven't reviewed it and I
8  don't have an opinion.
9  BY MR. STRONGMAN:
10    Q  You have reviewed it.  You just looked at
11  it.  It is three pages long.
12    A  I don't have an opinion.
13    Q  I will let you review every single word of
14  it for as long as you need to.
15      MR. MICELI: Objection.
16      THE WITNESS: I don't have an opinion.
17  This is not in the scope of what I reviewed and am
18  testifying about.  This is the expertise of others.
19  BY MR. STRONGMAN:
20    Q  You have reviewed Dr. Madigan's expert
21  report, correct?
22    A  I've looked through them.
23    Q  You have reviewed Dr. Madigan's expert
24  report based on the materials reviewed list you
25  provided me?

Page 260
1      MR. MICELI: Object to the form.
2      THE WITNESS: I looked through it.  That's
3  not my area of expertise.
4  BY MR. STRONGMAN:
5    Q  So you are unwilling to simply say, based
6  on the facts stated in this document, whether or not
7  there is a report of alopecia more than six months
8  after Taxotere use?
9    A  Correct.
10    Q  You will not simply look at the document
11  and answer that question?
12    A  Correct.
13    Q  Why?
14    A  Because that's not what I'm here for.
15    Q  And with all due respect, Doctor, you don't
16  get decide which questions to answer or not based on
17  what you think you're here for.  I can ask you the
18  questions that I think are appropriate, and if you
19  can answer them, I think you should.
20      And so my question is:  Based on what is in
21  Exhibit 12, is it your testimony that you cannot
22  read what is there and answer a question about
23  whether or not it says alopecia was six months after
24  chemotherapy or not?
25      MR. MICELI: Object to the form.

Page 261
1      THE WITNESS: I'm not going to give a
2  clinical opinion based on this.
3  BY MR. STRONGMAN:
4    Q  It's insufficient information to do so?
5    A  I don't know that.  I've not reviewed this
6  in any context, and I'm not prepared to do that.
7    Q  And, again, this MedWatch form I've handed
8  to you, as an oncologist, would be of no value,
9  correct?
10      MR. MICELI: Object to the form.
11  BY MR. STRONGMAN:
12    Q  Is that what you're saying?
13    A  Yes.
14    Q  Wouldn't put you on notice of anything,
15  correct?
16    A  I don't know of any MedWatch forms that are
17  given to oncologists out of context.
18    Q  Will you agree with me on some very basic
19  facts, that February 8th, 1999 is less than six
20  months after December 17th, 1998?
21    A  What's the date?
22    Q  February 8th --
23    A  Uh-huh.
24    Q  -- 1999.
25      Is that more or less than six months after

|  |  |
|---|---|
| Page 262<br>1  December 17th, 1998?<br>2    A   That is less than six months.<br>3        (Deposition Exhibit 13 was marked for<br>4        identification by the court reporter<br>5        and is attached hereto.)<br>6  BY MR. STRONGMAN:<br>7    Q   I'm going to hand you what I've marked as<br>8  Exhibit 13. Okay? This is a MedWatch form from<br>9  February 1998.<br>10       Do you see that?<br>11   A   I don't see that here.<br>12   Q   February 1998.<br>13   A   This document is dated February 4th.<br>14   Q   Correct, 1998?<br>15   A   Yes.<br>16   Q   And if you turn the page --<br>17   A   Again, I haven't reviewed this. This is<br>18  not what I'm here to testify about.<br>19       MR. MICELI: Jon, just so we're clear, her<br>20  opinions are on clinical oncology. This is far<br>21  outside the scope --<br>22       MR. STRONGMAN: Okay.<br>23       MR. MICELI: -- but if you want to -- I<br>24  don't think I can stop the deposition, but if it --<br>25  I'm not going to interrupt you anymore. | Page 264<br>1       1998 of progressive disease."<br>2       Do you see that?<br>3    A   I see that line.<br>4    Q   And my question to you: Is January 11th,<br>5  1998 more or less than six months after<br>6  September 16th, 1997?<br>7    A   You're asking me calendar date differences<br>8  now?<br>9       So your question, again, is January how far<br>10  from where?<br>11   Q   This patient last received docetaxel<br>12  September 16th, 1997 and died January 11th, 1998.<br>13   A   Okay.<br>14   Q   So my question is: Is January 11th, 1998<br>15  more or less than six months after September 16th,<br>16  1997?<br>17   A   Those dates are less than six months apart.<br>18   Q   And as a clinical treating oncologist, if<br>19  you were handed this, would this put you on notice<br>20  of a risk of pCIA with Taxotere?<br>21       MR. MICELI: Object to the form of the<br>22  question.<br>23       THE WITNESS: I have no interpretation for<br>24  this study.<br>25       (Deposition Exhibit 14 was marked for |
| Page 263<br>1       Go ahead.<br>2  BY MR. STRONGMAN:<br>3    Q   Doctor, if you look at this MedWatch form,<br>4  this one indicates that a 60-year-old -- a<br>5  68-year-old man with non-small cell lung cancer<br>6  received his third course of docetaxel on<br>7  September 16th, 1997.<br>8       Do you see that?<br>9    A   You're reading it off the form.<br>10   Q   Correct.<br>11       Do you see that I read that correctly?<br>12   A   That's what you read, yes.<br>13   Q   And then if you go over to the last page,<br>14  it indicates at the bottom of the big paragraph<br>15  there, about two-thirds of the way down, the patient<br>16  died.<br>17       Do you see that?<br>18   A   Where?<br>19       Again, I haven't reviewed this, I don't<br>20  see --<br>21   Q   I'm just right there.<br>22   A   What did you read?<br>23   Q   It states on this form, Deposition Exhibit<br>24  Number 13:<br>25       "The patient died on January 11th, | Page 265<br>1       identification by the court reporter<br>2       and is attached hereto.)<br>3  BY MR. STRONGMAN:<br>4    Q   I'm going to hand you Exhibit Number 14<br>5  and, again, for the record, this is Bates number<br>6  00675884.<br>7       Looking at the face of this document, it<br>8  states that -- right here it says date of this<br>9  report, February 1, 1999.<br>10       Do you see that?<br>11   A   I see that typed.<br>12   Q   Okay. And then under the narrative it<br>13  indicates that:<br>14       "This patient with non-small cell<br>15       cancer received her first course of<br>16       docetaxel on December 7th, 1998."<br>17       Do you see that?<br>18   A   You read that.<br>19   Q   Correctly?<br>20   A   Yes.<br>21   Q   And my question to you: Is February 1,<br>22  1999 more or less than six months after<br>23  December 7th, 1998?<br>24   A   Those dates are less than six months apart.<br>25   Q   And is there anything in Exhibit 14 that |

Page 266

1  would put on you notice, as a treating clinical
2  oncologist, of a risk of pCIA with Taxotere?
3      A   I have no --
4          MR. MICELI:  Object to the form.
5          THE WITNESS:  I have no clinical opinion on
6  this.
7          MR. MICELI:  Jon, how many more of these
8  MedWatch forms do you want to go through?  Because
9  if so, I'm going to ask the witness to step outside
10 and have a discussion on the record and maybe a
11 phone call.
12         MR. STRONGMAN:  Not very many more.
13         MR. MICELI:  Can you step outside?
14         MR. STRONGMAN:  No, no.
15         MR. MICELI:  Well, I don't want you to say
16 I'm instructing her.
17         MR. STRONGMAN:  Well, I don't want her to
18 step outside and talk to you, either.
19         MR. MICELI:  No, I'm going to step outside.
20 I'm going to talk to you here.
21         MR. STRONGMAN:  Oh, I thought you were
22 talking outside.
23         MR. MICELI:  No, no, no.  No, no, no.  I'm
24 going to talk to you on the record and then we can
25 make a decision if we need to call anybody if we can

Page 267

1  call anybody in New Orleans.  I just don't want you
2  to think I'm instructing her, that's why I want her
3  to step outside while you and I have a discussion.
4          MR. STRONGMAN:  I have three more to go
5  through.
6          MR. MICELI:  Well, then I think she needs
7  to step outside.  I don't want there to be a claim
8  that I'm instructing her.
9          MR. STRONGMAN:  I understand.
10         MR. MICELI:  Do you and I want to step out?
11         MR. STRONGMAN:  I feel this would be most
12 efficient if you are going to object to the form of
13 my question, I can ask, the witness can answer them
14 as she can, and we will move on, as she has done.
15         MR. MICELI:  Well, there has been some
16 issues about scope that were discussed, as you
17 know -- I don't want to do this in front of her.
18         MS. MENZIES:  Let's have her step out.
19         MR. STRONGMAN:  It will take longer for us
20 to go through this than it will for me to just walk
21 through three more.
22         MR. MICELI:  I'm sure, but that's why I
23 want to talk about it, because this is so far
24 outside the scope of a clinical oncology opinion.
25         MR. STRONGMAN:  I --

Page 268

1          MR. MICELI:  No, no, no.  You and I know
2  what other experts address those three that you just
3  went through.  Some of us were in the deposition
4  last week about that, and this is not her area.  And
5  this is why I don't want to have this in front of
6  her.
7          That's why I'm asking you, let me get the
8  witness to step outside.
9          We're so far beyond clinical oncology with
10 what you're doing.
11         MR. STRONGMAN:  You and I can -- we
12 disagree on that.
13         MR. MICELI:  I know, but the problem is if
14 we can't stop this, then we're going to call
15 somebody, we're going to call Judge North or
16 Judge Milazzo.
17         MR. STRONGMAN:  That I'm asking a witness
18 about a MedWatch form?
19         MR. MICELI:  Yes.
20         MR. STRONGMAN:  That I'm asking a clinical
21 oncologist about a MedWatch form?
22         MR. MICELI:  It is my witness and she has
23 been put up and she's provided a report on issues of
24 clinical oncology, informed consent and how clinical
25 oncologists make decisions, and she's giving you the

Page 269

1  basis for her opinions, none of which include much
2  of what you've shown her --
3          MR. STRONGMAN:  I don't mean to cut you
4  off.  I feel like we're at a point where I've got my
5  time --
6          MR. MICELI:  I hear you.
7          MR. STRONGMAN:  -- I can use my time.  I'm
8  not abusing the witness.  She'll answer the
9  questions as she can.  And if you object to the
10 form, you can object to the form.  I just feel
11 like --
12         MR. MICELI:  Jon, let me say this, I don't
13 think that you've been rude to the witness, I'm not
14 saying that you're beating her up.  What I'm saying
15 is we are so far beyond the scope that I'm at a
16 point where I think we need to address it with the
17 court because you're asking her -- you're asking a
18 clinical oncologist questions about subject areas
19 that she has -- we have no intention of calling her
20 as a witness for.  We have not provided any
21 indication in her report that she is going to be
22 testifying to these issues.  And I'm at a point
23 where I want to call the court.  And it is my
24 witness and I suppose I could tell her to go
25 outside, but I'm trying to do this politely and say