# EXHIBIT A

2020 WL 5835125
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Kimberly A. LYONS Individually,
as Next of Kin, and as Personal
Representative of the Estate of Cora
V. Underwood, Deceased, Plaintiff,
v.
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC., Defendant.

CIVIL ACTION FILE NO.: 1:18-CV-04624-WMR
|
Signed 09/29/2020

**Attorneys and Law Firms**

Charles Andrew Childers, Childers, Schlueter & Smith, LLC, Atlanta, GA, Neal L. Moskow, Ury & Moskow LLC, Fairfield, CT, for Plaintiff.

Ben J. Scott, Eric E. Hudson, Butler Snow O'Mara Stevens & Cannada, Memphis, TN, Christopher Sean Berdy, Butler Snow, LLP, Birmingham, AL, John James DeBoy, Shankar Duraiswamy, Paul W. Schmidt, Covington & Burling, LLP, Washington, DC, Mark A. Dreher, Orlando R. Richmond, Sr., Pro Hac Vice, Butler Snow LLP, Ridgeland, MS, David R. Helmick, Neal J. Callahan, Waldrep, Mullin & Callahan, LLC, Columbus, GA, E. Righton Johnson Lewis, Butler Snow LLP, Atlanta, GA, for Defendant.

**ORDER**

WILLIAM M. RAY, II, UNITED STATES DISTRICT JUDGE

*1 This matter now comes before the Court on Defendant's Motion for Summary Judgment [Doc. 75], Defendant's Motion to Exclude Certain Opinions of Laura Plunkett [Doc. 76], Defendant's Motion to Exclude the Testimony of Winston H. Gandy, M.D. [Doc. 77], Defendant's Motion to Exclude Certain Opinions of Robert Gosselin [Doc. 78], and Defendant's Motion to Exclude Certain Opinions of Glenn Chertow, M.D. [Doc. 79]. The Court heard oral arguments on June 1, 2020. After consideration of the parties' arguments, the applicable law, and all appropriate matters of record, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment [Doc. 75] and **DENIES** Defendant's Motions to Exclude [Docs. 76, 77, 78, 79] as **MOOT**.

**I. FACTUAL BACKGROUND**
Plaintiff Kimberly A. Lyons, individually as next of kin and as personal representative of the estate of Cora V. Underwood, brings this civil action against Boehringer Ingelheim Pharmaceuticals, Inc. ("Defendant") asserting claims for damages arising out of Ms. Underwood's use of Defendant's drug, Pradaxa. Plaintiff alleges failure to warn, design defect, negligence, negligent misrepresentation and/or fraud, fraudulent concealment, punitive damages, pre-death injury and pain and suffering, and wrongful death.

**A. Pradaxa's Regulatory History and FDA-Approved Warnings**
Pradaxa (dabigatran) is a prescription medicine approved by the U.S. Food and Drug Administration ("FDA") in October 2010 to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation. [*See* Doc. 75-3 at p. 1].[1] Pradaxa is manufactured, marketed, and distributed in the United States by Defendant. [Doc. 1 at p.3 ¶ 6]. Anticoagulants like Pradaxa impede the blood's ability to clot and can prevent injuries such as strokes. [Doc. 75-19 at p. 2]. For this reason, anticoagulants also present the inherent risk of serious bleeding. [*Id.*]

The FDA approved a 150 mg dose of Pradaxa for all patient groups, but it rejected a lower 110 mg dose that was approved in other countries. [Doc. 75-2 at p. 14 ¶ 50]. When the FDA approved Pradaxa, it did not require that plasma concentrations of the medicine be monitored by physicians. [Doc. 75-12 at p. 44; Doc. 75-13 at p. 5 ("Follow-up of anticoagulant activity is generally not needed"); Doc. 75-14]. Since Pradaxa was first approved by the FDA in October 2010, the medicine's label has consistently warned that Pradaxa "can cause serious and, sometimes, fatal bleeding." [Doc. 75-3; Doc. 75-31; Doc. 75-33, Doc. 75-47].

In this case, Plaintiff alleges that Defendant failed to adequately warn physicians of the impact of Pradaxa plasma concentrations (the level of Pradaxa in a patient's blood, also referred to as "exposure") on bleeding risk and, based on that impact, instruct physicians to monitor Pradaxa plasma concentrations to confirm that patients do not have

concentrations that are excessive or outside a therapeutic range. [Doc. 1]. Additionally, Plaintiff alleges that Defendant failed to adequately warn that various patient characteristics—such as weight, age, gastrointestinal impairment, renal impairment, and usage of other medications—may increase bleeding risk due to their effect on Pradaxa plasma concentration levels. [*Id.*]

1. The FDA's Pre-Approval Understanding of Exposure Response Relationships and Its Rejection of Plasma Concentration Monitoring

**\*2** Defendant's pre-approval submissions to the FDA included detailed analyses of plasma concentration data. These submissions described the relationship between plasma levels, stroke risk, and bleed risk (also known as exposure-response analyses). [*See, e.g.*, Doc. 75-30 at p. 55 ("There was a strong relationship between trough dabigatran [Pradaxa] concentration and an increased probability of having a major bleed"); Doc. 75-11 at p. 34 ("The increase of trough total dabigatran [Pradaxa] concentration was associated with increased probability of having major bleeds") ]. These analyses also showed that as plasma concentrations increased, the risk of stroke decreased, but that this effect was more pronounced at lower plasma concentrations as opposed to higher plasma concentrations. [*See, e.g.*, Doc. 75-30 at p. 157 ("Increasing plasma dabigatran [Pradaxa] concentrations lowers the stroke risk, although at concentrations above 50 ng/mL this effect is modest") and p. 54 (noting that "the slope of the [stroke] curves decreases with increasing dabigatran plasma concentrations" and that "[t]here is relatively little difference in stroke risk across a wide range of higher dabigatran trough concentrations") ].

Defendant's pre-approval submissions to the FDA also described the effect of specific patient characteristics—such as age, gastrointestinal impairment, renal impairment, and accompanying use of P-gp inhibitors—on Pradaxa plasma concentrations and bleeding risk. [Doc. 75-11 at pp. 26-31, 71-78]. Prior to approving Pradaxa, the FDA reviewed Defendant's submissions, undertook its own independent analyses, and authored numerous memoranda detailing its multi-disciplinary review of the medicine's safety and efficacy. [*See, e.g.*, Doc. 75-12; Doc. 75-13; Doc. 75-28; Doc. 75-29; Doc. 95-13]. Like Defendant's pre-approval analyses, the FDA's independent pre-approval analyses found that increasing plasma concentrations were associated with an increased risk of bleeding. [Doc. 75-12 at pp. 18-20, 34].

The FDA's analyses also found, like Defendant's analyses, that increasing plasma concentrations were associated with a lower risk of stroke, though the FDA recognized that this effect was less pronounced at higher concentrations. [*Id.* at pp. 19-20, 58; Doc 75-37 at p. 133 ("[A]t the low concentrations the [stroke risk] curve is steeper than at higher concentrations where it seems to flatten out a little bit more") ]. In addition, the FDA's pre-approval memoranda addressed the impact of patient characteristics like age, renal function, and concomitant medications on Pradaxa's safety. [*See, e.g.*, Doc. 75-12 at pp. 11-12, 25-27; Doc. 75-13 at p. 5; Doc. 75-29 at p. 7].

As part of its drug approval process, the FDA convened an Advisory Committee of independent experts to review Pradaxa's safety, recommended dosage, and efficacy. [Doc. 75-24; Doc. 75-29; Doc. 75-37]. At that meeting, both the FDA and Defendant presented their analyses of the relationship between plasma concentration and patient outcomes (i.e., risk of strokes and bleeds). [Doc. 75-37]. When one meeting participant raised the possibility of monitoring plasma levels, the FDA Pharmacometrics Reviewer, Dr. Kevin Krudys, responded that the FDA saw no need for such monitoring given Pradaxa's favorable safety-efficacy profile across all subgroups. [Doc. 75-37 at pp. 164-65].

On September 27, 2010, Defendant sent the FDA proposed labeling for Pradaxa and attached Pradaxa Proposed Prescribing Information. [Doc. 75-15; Doc. 75-16]. Defendant's proposed label included recommendations regarding use of the lower 110 mg dose for patients who present a high bleeding risk. [Doc. 75-16 at pp. 4, 10]. It also included language regarding the aPTT test, a blood test that approximates Pradaxa plasma concentrations and anticoagulant activity, stating that an "aPTT test maybe useful to assist in determining an excess of anticoagulant activity" and that "[a]n aPTT greater than 80 sec is associated with a higher risk of bleeding." [*Id.* at p. 5]. In response to Defendant's proposed label recommendations, however, the FDA rejected these proposed warnings. [Doc. 75-17; Doc. 75-18; *see also* Doc. 75-39] (FDA directing Defendant to "please delete all dabigatran 110 [mg] information" from the proposed label).

**\*3** On October 19, 2010, the FDA approved Pradaxa at a dose of 150 mg, without any requirement for monitoring plasma concentrations, adjusting doses, or treatment based on such measurements. [Doc. 75-14; Doc. 75-3; *see also*

Doc. 75-40 (expert testimony acknowledging that the FDA concluded that routine plasma concentration monitoring is not required for Pradaxa) ]. At the time of approval, the FDA approved Pradaxa's "launch label" which included the warning that "PRADAXA can cause serious and, sometimes, fatal bleeding." [Doc. 75-3 at p. 2]. Although the FDA-approved launch label did not contain any recommendation to monitor plasma concentrations, the label warned of the bleeding risk factors, including patient characteristics, that must be considered when prescribing Pradaxa. [*Id.* at pp. 3-4].

2. <u>Post-Approval Discussions on Plasma Monitoring</u>

Following Pradaxa's approval, Defendant continued to analyze the relationship between Pradaxa plasma concentrations and stroke and bleed risk. In 2012, a number of computer simulation analyses were performed "to explore whether exposure measurement using trough plasma concentration might further improve Pradaxa's "positive benefit-risk balance." [Doc. 75-44 at p. 6]. In reviewing this data, Defendant's experts concluded that the simulations had limitations and were unable to accurately predict the dose-response difference between the 110mg and 150mg dose benefit-risk factors seen in a "RE-LY" trial. [Doc. 75-26 at p. 21; Doc. 95-9 at pp. 6-8; Doc. 95-10 at pp. 7-8]. Subsequently, Defendant provided an explanation and analysis of the dose titration simulations to the European Medicines Agency (EMA) as well as to the FDA. [Doc. 75-42; Doc. 75-43]. The EMA "endorsed" Defendant's conclusion that the simulations had "limitations" that rendered them unable to predict actual patient outcomes or the dose-response difference between the 110 mg and 150 mg doses of Pradaxa (dabigatran), and Defendant shared the EMA's conclusion with the FDA. [Doc. 75-26, particularly at p. 22].

Additionally, in February 2014, Defendant's scientist Dr. Paul Reilly, along with other scientists involved in the RE-LY trial, published a research paper (hereinafter "the Reilly Paper") on the effect of Pradaxa (dabigatran) plasma concentrations and patient characteristics on the frequency of ischemic stroke and major bleeding in atrial fibrillation patients. [Doc. 75-25]. The Reilly paper showed that plasma concentrations increased with age and that bleed risk increased as plasma concentrations increased. The Reilly paper also showed that the risk of stroke decreased as plasma concentrations increased, although this effect was less pronounced at the higher concentration levels. [*Id.* at pp. 4-327]. In the Reilly paper, the scientists considered whether the exposure-response analysis could suggest a therapeutic range and what that range might be, but ultimately, they reached the conclusion that "[t]here is no single plasma concentration range that provides optimal benefit–risk for all patients." [Doc. 75-25 at p. 9]. This conclusion was consistent with the FDA's pre-approval statements that the exposure-response analyses did not suggest a need for monitoring plasma concentrations and adjusting dosage. [Doc. 75-37 at p. 165 ("we didn't see a need for ... monitoring the concentration because we saw in a study, favorable results in all subgroups") ].

3. <u>The FDA's Continued Rejection of Plasma Monitoring and Plaintiff's Other Warning Criticisms</u>

In the decade since Pradaxa's approval, the FDA has approved Pradaxa's U.S. labeling on nineteen separate occasions. None of those labels recommend plasma monitoring. [*See e.g.*, Doc. 75-3; Doc. 75-31; Doc. 75-33, Doc. 75-47; *see also* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.proces s & applno=022512]. During this time, the FDA has issued numerous statements reaffirming Pradaxa's safety and efficacy when used as directed by the U.S. label, without any requirement for plasma monitoring or dose adjustment. [*See* Doc. 75-19 at p. 4 ("We are constantly examining patient safety data and conducting other surveillance activities after products are on the market to ensure that the labels reflect current knowledge with regard to benefits and risks.... Based on this evaluation [of new reports], FDA has not changed its recommendations regarding the use of Pradaxa; it provides an important health benefit when used as directed"); Doc. 75-20 at p. 2 ("As a result of our latest findings [regarding bleed risk in older patient populations], we still consider Pradaxa to have a favorable benefit to risk profile and have made no changes to the current label or recommendations for use"); Doc. 75-21 at p. 3 (article by three FDA authors on post-marketing reports of bleeding, concluding that "[w]e believe that dabigatran provides an important health benefit when used as directed"); Doc. 75-22 at p. 3 (FDA update of risk of serious bleeding, stating that "FDA has not changed its recommendations regarding Pradaxa. Pradaxa provides an important health benefit when used as directed. Healthcare professionals who prescribe Pradaxa should carefully follow the dosing recommendations in the drug label ... to reduce the risk of bleeding") ].

**\*4** In October 2015, after receiving a large number of reports of bleeding among Pradaxa users, the FDA published an

article comparing the various anticoagulant drugs that are used in treating atrial fibrillation. [Doc. 75-19]. In the article, the FDA noted that, when compared to patients who were new users of warfarin, new users of Pradaxa had lower risks of clot-related stroke, bleeding in the brain, and death, but an increased risk of major gastrointestinal bleeding, which was consistent with observations from the large clinical trial used to approve Pradaxa. [*Id.* at p. 4]. The FDA further noted that the "freedom from the need to have periodic blood test monitoring" was one of Pradaxa's principal advantages" over warfarin. [*Id.* at p. 3].

Additionally, in 2018, a "Think-Tank" meeting sponsored by the FDA and the Cardiac Safety Research Consortium ("CSRC") convened to discuss whether laboratory monitoring and dose adjustment to customize drug exposure would improve the safety and efficacy of novel oral anticoagulants (such as Pradaxa) in patients with atrial fibrillation. [Doc. 75-48]. Following this meeting, four senior FDA scientists co-authored an article along with several other scientists summarizing their findings. [Id.] In this article, the scientists acknowledged that the consensus position is that "[r]outine PK-PD measurements to guide NOAC [novel oral anticoagulant] dosing cannot currently be recommended." [*Id.* at p. 9].

(a) Effects of Age

The record shows that Defendant submitted detailed information regarding the impact of increasing age on Pradaxa plasma concentrations and bleeding rates to the FDA prior to approval. [*See, e.g.*, Doc. 75-11 at p. 27 (discussing age effects on Pradaxa plasma concentrations), and at p. 71 (discussing the increased rate of major bleeding as age increases). The FDA also conducted its own pre-approval review of the impact of age on Pradaxa plasma concentrations and patient outcomes. [Doc. 75-12 at p. 25 (recognizing increase in Pradaxa plasma concentrations with increasing age); Doc. 75-28 at p. 127 (discussing perceived increased bleeding risk in older patients and finding that there is no reason to adjust dose in the elderly).

After the FDA's approval of Pradaxa, Defendant continued to provide the FDA with additional information regarding the medicine's safety—including more recent exposure-response and dose-titration analyses. [*See* Doc. 75-42; Doc. 75-43; Doc. 75-45; Doc. 75-26]. At the time Ms. Underwood was prescribed the medicine, the label warned about increased bleeding risk with age. [Doc. 75-31 at p. 8].

(b) Effects of Renal Impairment

Before approval, BI and the FDA also repeatedly analyzed the clinical data as it relates to renal function, including the impact of mild to moderate renal impairment on plasma concentrations and bleeding risk. [*See, e.g.*, Doc. 75-11 at pp. 51, 73-74] (presenting bleed and stroke data for Pradaxa 150 mg versus warfarin, a similar drug, in patients with mild and moderate renal impairment, and concluding that "[d]ecreasing renal function is associated with decreasing advantages of dabigatran over warfarin in the rate of major bleeding"); Doc. 75-12 at pp. 11-12, 26-27 (analyzing increase in exposure to dabigatran in patients with mild and moderate renal impairment).

After the FDA's approval of Pradaxa, Defendant continued to provide the FDA with additional information regarding the medicine's safety—including more recent exposure-response and dose-titration analyses. [*See* Doc. 75-42; Doc. 75-43; Doc. 75-45; Doc. 75-26]. At the time Ms. Underwood was prescribed Pradaxa, the label warned about the impact of renal impairment on exposure to Pradaxa and the importance of assessing renal impairment. [Doc. 75-31 at p. 13].

(c) Drug interaction between Pradaxa and P-gp inhibitors

**\*5** Simvastatin is a medication that is prescribed to treat patients with high cholesterol. It is one of many medications known as a P-gp inhibitor because it inhibits the transport of P-glycoproteins. [Doc. 75-11 at 29, 53]. Prior to the approval of Pradaxa, Defendant informed the FDA that "eight studies assessed potential interactions with various P-gp inhibitors, substrates or inducers." [Doc. 75-30 at pp. 46-50]. Defendant shared with the FDA its conclusions that concomitant use of P-gp inhibitors can increase Pradaxa plasma concentrations and, therefore, increase the risk of bleeding. [*Id.* at p. 156 ("Several Phase I studies demonstrated that there was an interaction with increased exposure to dabigatran [with] various P-gp inhibitors" and the "risk for increased bleeding due to an increased dabigatran exposure with administration of P-gp inhibitors cannot be ruled out") and at p. 49 (table showing the percentage of increased risk of major bleeding with P-gp inhibitor co-medication) ].

The FDA analyzed Pradaxa's potential interaction with P-gp inhibitor medications, ultimately concluding that there is "an interaction liability of dabigatran and ... P-gp inhibitors." [Doc. 75-12 at p. 33]. At the time Ms. Underwood was prescribed Pradaxa, the label warned that "P-gp inhibition and impaired renal function are the major independent factors that result in increased exposure to dabigatran." [Doc. 75-31 at pp. 7, 13]. In 2012, Defendant twice sought to provide additional warnings that P-gp inhibitor co-medication increases the risk of bleeding, but the FDA rejected Defendant's proposals, stating that P-gp inhibition is an "independent risk factor[ ] for bleeding" that "do[es] not need to be called specifically in the label." [Doc. 75-34 at p. 2].

Thus, the record is clear that, after Pradaxa's approval, Defendant continued to provide the FDA with additional information regarding the medicine's safety—including the very exposure-response and dose-titration analyses that Plaintiff claims constituted "newly acquired information." Having had this information in its possession for years, the FDA has taken no action to update Pradaxa's labeling to require plasma monitoring or dose-titration—as would be the FDA's responsibility if it was concerned about patient safety—reflecting a rejection of the substance of Plaintiff's proposed warnings. *See* 21 U.S.C. § 355(o)(4) (requiring the FDA, if it "becomes aware of new safety information" that it "determines should be included in the labeling," either from a manufacturer's submission or through its own monitoring of adverse event reports, to notify the manufacturer and initiate a process to institute a labeling change, even over the manufacturer's objection).

### B. Ms. Underwood's Use of Pradaxa

Ms. Underwood began taking Pradaxa on January 25, 2016. At that time, she was 75 years old and was already taking the P-gp inhibitor Simvastatin. [Doc. 75-4 at pp. 3-4 - Interrogatory Response Nos. 2-3; Doc. 75-50 at p. 15, transcript page no. 53; Doc. 75-8 at p. 4]. The prescribing physician, cardiologist Kuchela Reddy, M.D., testified that he knew and understood the risks and warnings associated with Pradaxa when he prescribed the drug for Ms. Underwood. [Doc. 75-50 at pp. 13-14, transcript page nos. 43-47 (dosing guided by renal function); *id.* at pp. 15-16, transcript page nos. 50-53 (risk of bleeding and potentially fatal bleeding event, renal impairment could increase bleeding risk, concomitant use of certain other drugs could increase bleeding risk, bleeding risk increased with age) ]. Knowing all of this, Dr. Reddy also understood Pradaxa does not require monitoring of blood plasma levels. [*Id.* at p. 14, transcript page no. 48].

After an assessment of Ms. Underwood's renal function indicated that she had a normal creatinine clearance, Dr. Reddy prescribed Pradaxa in the 150 mg dose according to the recommended Pradaxa dosing instructions. [Doc. 75-50 at pp. 13-14, transcript page nos. 42-47; *id.* at p. 15, transcript page no. 51; *id.* at pp. 24-25, transcript page nos. 89-90; *id.* at p. 56, transcript page nos. 215-217].[2]

**\*6** On March 17, 2016, Ms. Underwood was admitted into Intensive Care Unit of the Piedmont Henry Hospital, where she was diagnosed as having a cardiac tamponade. [Doc. 75-5 at p. 5, transcript page nos. 10-12]. A cardiac tamponade occurs when the presence of fluid in the pericardial sac around the heart (a pericardial effusion) reaches a level of pressure that acutely interferes with the heart's ability to pump blood throughout the body. [Doc. 75-6 at p. 13, transcript page nos. 42-44]. She was evaluated by Dr. Gregory Erdelyan, who later performed a pericardial window procedure and "removed between six and 700 CC's of ... bloody pericardial fluid." [Doc. 75-7 at p. 5, transcript page no. 10; *id.* at p. 14, transcript page no. 49]. Following the procedure, Ms. Underwood received two doses of Praxbind, the product-specific reversal agent for Pradaxa. [Doc. 75-5 at pp. 14-15, transcript page nos. 49-50]. A few days later, Ms. Underwood improved and was transferred out of ICU. [Doc. 75-6 at p. 40, transcript page no. 153]. However, subsequent testing indicated that she was still "over-anticoagulated." [Doc. 75-8 at p. 5]. On March 26, 2016, Ms. Underwood died. [Doc. 75-5 at p. 5, transcript page nos. 11-13]. Ms. Underwood's death certificate indicates that the immediate cause of death was "multisystem organ failure due to, or as a consequence of, cardiac tamponade." [Doc. 75-9].

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A defendant who moves for summary judgment must support its motion with evidence that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the defendant discharges its burden of showing an absence of evidence to support the plaintiff's case, the burden then shifts to the nonmoving party to "respond with evidence sufficient to withstand a directed verdict motion at trial." *Id.* In determining whether

a genuine dispute of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is relevant or necessary to the outcome of the suit. *Id.*

### III. ANALYSIS

Plaintiff brings various causes of action premised around the allegation that Defendant failed to adequately warn of certain risks of its anticoagulant drug Pradaxa. Plaintiff's claim is that Defendant failed to adequately warn physicians that the blood plasma concentrations of Pradaxa should be monitored. Plaintiff also alleges that Defendant failed to adequately warn about the impact of various patient characteristics—such as age, renal impairment, and concomitant Simvastatin use—on Pradaxa plasma concentrations and bleed risk. [*See* Doc. 1].

Having considered the parties' arguments on motion for summary judgment, the Court concludes that Plaintiff's failure to warn, negligence, negligent misrepresentation/fraud, and fraudulent concealment claims are preempted by federal law, for two independent reasons. First, Plaintiff has not met her burden of showing "newly acquired information" supporting her warning criticisms. This is information that was "not previously submitted to the [FDA]" and that "reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). Second, the FDA's repeated rejection of the need for plasma monitoring and dose adjustment based on plasma levels constitutes "clear evidence" that the FDA would have rejected Plaintiff's proposed warnings. Indeed, three separate courts in four different cases have concluded that claims similar to the ones at issue in this case are preempted. *See Roberto v. Boehringer Ingelheim Pharm., Inc.*, No. CPL-HHD-CV-16-6068484-S, 2019 WL 5068452 at *21 (Conn. Super. Ct. Sept. 11, 2019); *Pradaxa Cases (Lawson)*, No. CJC-16-004863, 2019 WL 6043513, at *3-4 (Cal. Super. Ct. Nov. 8, 2019); *Adkins v. Boehringer Ingelheim Pharm., Inc.*, No. HHD-CV-16-6065131-S, slip opinion at 16–21, 23–25, 2020 WL 1890681 (Conn. Super. Ct. Mar. 13, 2020) ("*Adkins* Order"), ECF No. 98-1; *Ridings v. Maurice*, 444 F.Supp.3d 973, 997–99 (W.D. Mo. 2020). This Court agrees with the general reasoning of the above cases in holding that Plaintiff's warning claims are preempted here.

**\*7** The Court also concludes that Defendant is entitled to summary judgment on Plaintiff's design defect claim because she has no evidence of defective design or design defect causation.

Finally, as a result of these rulings, Defendant is entitled to summary on Plaintiff's claims for wrongful death, damages for pre-death pain and suffering, and punitive damages.

### A. Preemption

The doctrine of federal preemption has origins stemming from the Supremacy Clause of the United States Constitution. U.S. CONST. art. VI, cl. 2. This doctrine generally means that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623–24, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). Accordingly, state-law failure-to-warn claims are preempted if FDA approval is needed to add the warning that a plaintiff alleges state law requires. See *Wyeth v. Levine*, 555 U.S. 555, 568, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); *Mensing*, 564 U.S. at 623–24, 131 S.Ct. 2567. "Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application." *Levine*, 555 U.S. at 568, 129 S.Ct. 1187. However, manufacturers can unilaterally add a warning under the "changes being effected" (CBE) regulation. 21 C.F.R. § 314.70(c)(6)(iii). This regulation "allows drug manufacturers to change [a label] without the FDA's preapproval if the changes.. 'reflect newly acquired information.' " *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) (quoting 21 C.F.R. § 314.70(c)(6)(iii)).

The FDA nonetheless "retains authority to reject labeling changes" made through the CBE process. *Levine*, 555 U.S. at 571, 129 S.Ct. 1187. Accordingly, even if newly acquired information exists, a manufacturer can still establish impossibility preemption through "clear evidence that the FDA would not have approved a change" to the label. *Id.*

The Court's preemption analysis proceeds in two steps. "First, the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without FDA approval." See *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644; *see also Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S. Ct. 1668, 1679, 203 L.Ed.2d 822 (2019) (recognizing that a drug manufacturer can change a drug's label through the CBE process if there is "newly

acquired information" to justify the label change) (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)). However, "newly acquired information" is not only new data, but can also mean "new analyses of previously submitted data". 73 Fed. Reg. 49604; *Levine*, 555 U.S. at 569, 129 S.Ct. 1187 (stating that "if the sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.' "). Absent such a showing, Plaintiff's claims are preempted.

Second, "a manufacturer may still—even after the plaintiff has identified 'newly acquired information'—establish impossibility preemption through 'clear evidence that the FDA would not have approved a change' to the label." *See Utts*, 251 F. Supp. 3d at 661 (quoting *Wyeth*, 555 U.S. at 571, 129 S.Ct. 1187); *see also Albrecht*, 139 S. Ct. at 1672.

**\*8** Plaintiff argues that while the Judge must decide the factual question of whether the FDA would not have approved a change under *Albrecht*, the newly acquired information is an issue of fact for the jury. *Id.* However, this Court finds that in order to answer the former question, the latter must also be answered by the Judge. Like all other court's that have addressed this question post-*Albrecht*, this Court finds that both the "newly acquired information" and "FDA action" questions are for a Judge to decide, not a jury. *See Roberto*, 2019 WL 5068452, at \*21; *Pradaxa Cases*, 2019 WL 6043513, at \*3-4; *Adkins* Order at 16-21, 23-25 [Doc. 98-1]; *Ridings*, 444 F.Supp.3d at 997–99. Because "a judge, not the jury, must decide the pre-emption question," the Court " 'may have to resolve subsidiary factual disputes' that are part and parcel of the broader legal question." *See Albrecht*, 139 S. Ct. at 1676; *see also id.* at 1680 (explaining that factual issues do not "warrant submission alone or together with the larger pre-emption question to a jury" because "these factual questions [are] subsumed within an already tightly circumscribed legal analysis").

1. No Newly Acquired Information

Plaintiff has not met her burden of showing that Defendant possessed newly acquired information that would have enabled it unilaterally to change Pradaxa's labeling after the FDA's October 2010 approval and before Ms. Underwood's alleged March 2016 injury. "Newly acquired information is data, analyses, or other information not previously submitted to the Agency" that "reveal[s] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). Newly acquired information "cannot be rooted in conjecture or hypothesis. Rather, it must conclusively establish, by scientifically valid measurable and statistically significant data, that the different or increased risks are actual and real." *Pradaxa Cases*, 2019 WL 6043513, at \*3. Additionally, Plaintiff must show that BI acquired the new information before Ms. Underwood's alleged injury. *See id.* at \*4; *Roberto*, 2019 WL 4806271, at \*14, 19 n.36.

(a) The Reilly Exposure-Response Paper and Schumacher Analysis

Plaintiff claims the Reilly paper constitutes newly acquired information, but every court to address this argument post-*Albrecht* has rejected it. *See Ridings*, 444 F.Supp.3d at 985–87, 995–98; *Adkins* Order at 24, ECF No. 98-1; *Pradaxa Cases*, 2019 WL 6043513, at \*3 n.6; *Roberto*, 2019 WL 5068452, at \*15–17. For similar reasons, this Court concludes that the Reilly paper is not newly acquired information.

First, the FDA was already "well aware" of the "correlation between plasma levels and bleed risk" reported in the Reilly paper. [Doc. 75-12 at 18-19, 33]. The paper did not reveal any "risks of a different type or greater severity or frequency." *Roberto*, 2019 WL 5068452, at \*17; *see also Ridings*, 444 F.Supp.3d at 1000 n.34 ("[T]he FDA was aware of this correlation dating back to the original Boehringer submissions for Pradaxa in 2010."). The FDA also understood the relationship between plasma concentrations and stroke risk prior to approval. *Adkins* Order at 23-25 ("[T]o the extent that the plaintiff correctly interprets the Reilly article as finding no significant stroke prevention benefit at higher doses, that finding does not differ from the FDA's information, which found only a 'gradual' or 'minimal' stroke reduction benefit at higher concentrations without finding statistical significance. Thus, the Reilly study does not 'reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.' ") (citation omitted).

Second, the Reilly paper's conclusion that "[t]here is no single plasma concentration range that provides optimal benefit-risk for all patients" is squarely in line with the FDA's pre-approval conclusion that plasma monitoring is not necessary.

See *Ridings*, 444 F.Supp.3d at 997 (quoting Reilly paper [Doc. 75-25 at 328] ).

**\*9** Third, Defendant published the paper and submitted it to the FDA nearly two years before Plaintiff's alleged injury in March 2016. [Doc. 95-17 at 48-51]; *see also Ridings*, 444 F.Supp.3d at 986. As a result, it cannot be newly acquired information because it was "previously submitted to the [FDA]." 21 C.F.R. § 314.3(b).

Nor do the early drafts or emails reflecting preliminary discussions about the Reilly paper and the underlying analyses cited by Plaintiff constitute newly acquired information. [*See* Doc. 87 at 27-29]. These documents simply reflect an ongoing scientific dialogue regarding proposed revisions to drafts of the paper and, at best, preliminary conclusions about the meaning of the data and analysis. They do not constitute new data or analyses substantiating a different or greater risk with unmonitored Pradaxa. *See Roberto*, 2019 WL 5068452, at \*16 ("These preliminary discussions do not provide reliable evidence of new risks. They are essentially uncorroborated trial balloons.... [U]ltimately, a preliminary opinion or dissenting voice is just that—it is not a final opinion").

Finally, the email from Defendant's scientist Dr. Helmut Schumacher referenced by the Plaintiff [Doc. 87, Ex. 610] does not qualify as newly acquired information. That email reflects early "exploratory analyses" of what would become the Reilly paper. *Id.* Additionally, this email was written before the modeling analysis was completed. [Doc. 95-7 (the modeling continued into 2012) ]. The email reflects one scientist's interpretation based on an incomplete analysis of substantially similar data that was submitted to the FDA previously.

(b) Patent Application

The simulations conducted by Defendant in 2012, and subsequently explained to the FDA, reflect preliminary efforts to "explore whether exposure measurement ... might further improve" Pradaxa's "positive benefit-risk balance." [Doc. 75-44]; [Doc. 75-1]. Based on these preliminary efforts, Defendant filed a patent application regarding the general idea of adjusting doses based on plasma levels. But after further analysis, Defendant concluded that the preliminary computer simulations were statistically unreliable and that the data could not support the theory. [Doc.

95-9 at 529-531; Doc. 95-10 at 1092-1093; Doc. 75-43]. Defendant ultimately withdrew its application patent due to the unreliable data. Thus, this Court finds that the patent application was not newly acquired information, but just a failed opinion. [*See* Doc. 75-44; *see also Ridings*, 444 F.Supp.3d at 996 (explaining that "Boehringer's computer simulation testing was a bad idea that simply did not pan out. It does not constitute newly acquired evidence under the CBE regulation").

(c) European Label

Plaintiff argues that the European warning label for Pradaxa is significantly different from the one approved by the FDA. Due to this, Plaintiff argues that this constitutes newly acquired information that should have prompted Defendant to unilaterally change the label the U.S. label of Pradaxa. While evidence may exist that supports the European label's differences, substantially similar evidence was presented to the FDA and it decided not to give the same warning. Accordingly, Defendant is still entitled to rely upon the defense of federal preemption. "[I]nformation previously submitted to the FDA is preempted because the CBE regulation cannot be used to make a label change based on such information." *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 185 F.Supp.3d 761, 769 (D.S.C. 2016); *see also Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018) (newly acquired information claim "fails because the undisputed evidence shows that the FDA was aware of the nature of the data it received"); 21 C.F.R. § 314.3 ("Newly acquired information is data, analyses, or other information not previously submitted to the Agency").

**\*10** This Court concludes that warnings approved for a foreign label are not newly acquired evidence when they are based on substantially similar evidence. Furthermore, foreign drug labels are based on different regulatory standards. "The mere existence of a differently structured and written European label does not establish that the U.S. label is insufficient, misleading, or legally inadequate." *McDowell v. Eli Lilly & Co.*, 2015 WL 845720, op. at \*5 (S.D.N.Y. Feb. 26, 2015); *see also Meridia Prod. Liability Litigation v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006) (the fact that "the warning label for [the drug's] European equivalent contained more detailed instructions for the treating physician" was not enough for the U.S. label to be declared inadequate).

(d) Medical Literature

Plaintiff cites various articles in medical literature, but none of these articles constitutes newly acquired information. Plaintiff's response brief references seven articles, [Doc. 87 at 38], but Plaintiff fails to explain how any of these articles "reveal a risk of a different type or greater severity or frequency than previously included in submissions to FDA" under 21 C.F.R. § 314.3(b).

The Chin paper, published in 2014, "proposed a 'potential dosing algorithm' in which '[a]nticoagulant tests can be used to check for excessive effect' in certain patient subgroups after dosing based on certain patient characteristics like renal function." *Ridings*, 444 F.Supp.3d at 987 (quoting Paul K.L. Chin, et al., *A Proposal for Dose-Adjustment of Dabigatran Etexilate in Atrial Fibrillation Guided by Thrombin Time*, 78(3) Brit. J. Clin. Pharm. 599-609 (2014). However, this is a proposal based upon substantially similar data that was previously available to the FDA, for which it found a "gradual" or "minimal" stroke reduction benefit at higher concentrations and still concluded monitoring was not necessary. *Adkins* Order at 23-25 (citation omitted). Differing conclusions of the Chin paper and the FDA scientists based upon substantially similar data does not constitute newly acquired information.

The Reiffel article discusses a potential "sweet spot" based on the same data regarding the relationship between plasma concentration and bleed risk that was known to the FDA prior to Pradaxa's approval. *See Roberto*, 2019 WL 5068452, at *25 n.12. Moreover, the Reiffel article recognized that whether such monitoring "should be used to guide NOAC dosing remained unresolved or at least without consensus," pending "further discuss[ion] in a follow-up CSRC think tank meeting." James A. Reiffel et al., *NOAC Monitoring, Reversal Agents, and Post-Approval Safety & Effectiveness Evaluation: A Cardiac Safety Research Consortium Think Tank*, 177 Am. Heart J. 74, 82 (2016). Due to the inconclusive nature of this article and data already known to the FDA, it cannot be used as newly acquired information. Overall, a close comparison of the documents relied upon by Plaintiff, including but not limited to the two articles above, with the information that Defendant submitted to the FDA prior to approval and before Ms. Underwood's alleged injury, reveals no newly acquired information that would have allowed Defendant to change its warnings to require plasma monitoring without FDA approval.

This conclusion is reaffirmed by the 2018 Chan paper, the FDA's most recent statement on plasma monitoring. In the Chan paper, which post-dates Defendant's Reilly paper, the internal discussions leading up to the Reilly paper, the company's dose titration modeling and patent application/withdrawal, and the European label, the FDA concluded that "[r]outine PK-PD measurements to guide NOAC dosing cannot currently be recommended" due to "lack of clinical evidence of benefit" and "lack of data to guide appropriate dosing." [Doc. 75-48 at 66]. This reflects the FDA's judgment that no newly acquired information exists to recommend plasma monitoring. *See Roberto*, 2019 WL 5068452, at *19 (considering the Chan paper, "the court cannot conclude that there is any newly acquired information concerning blood monitoring").

2. Evidence FDA Would Not Have Approved Change in Warning

*11 This Court concludes, using the analysis set forth above, that Defendant has established through "clear evidence that the FDA would not have approved a change." *Wyeth*, 555 U.S. at 571, 129 S.Ct. 1187. Additionally, based on the same data and analyses that Plaintiff uses as a basis for their warning label criticisms, the FDA has twice rejected Defendant's proposal to warn that the risk of bleeding is increased in elderly patients who are also taking P-gp inhibitors. The FDA rejected Defendant's proposal and by stating that "all independent risk factors for bleeding ... do not need to be called specifically in the label" because "we do not want [the label] to become too long to be useful." [Doc. 75-34 at p. 2]. The FDA's repeated refusal to allow Defendant to warn that P-gp inhibitor co-medication is a risk factor for bleeding constitutes clear evidence that the FDA would have rejected the warning the Plaintiff seeks. [*See* Doc. 75-32; Doc. 75-33; Doc. 75-34].

Finally, using the aforementioned Chan paper [Doc. 75-48], the FDA has further indicated as recently as 2018 that there is a "lack of clinical evidence of benefit" and "lack of data to guide appropriate dosing" with regards to plasma monitoring. [Doc. 75-48 at 66]. While this study was published after the Plaintiff's injury, it further shows the FDA's consistency in its intial conclusions with regard to plasma monitoring and shows the FDA would have rejected the warning the Plaintiff seeks.

3. Patient-Specific Failure to Warn Claims

Plaintiff alleges that Defendant failed to warn that Ms. Underwood's specific patient characteristics—increased age, renal impairment, and concomitant simvastatin use—increased her risk of bleeding because they made her more likely to have high plasma concentrations. *See, e.g.*, [Doc. 77-2; Doc 77-3].

The Court concludes that Plaintiff's patient-specific warning claims are also preempted. Plaintiff has presented no data or analyses regarding the use of Pradaxa in these groups that demonstrates a different or greater risk than the risks the FDA was already aware of based on Defendant's previous submissions upon which the FDA based their approval decision. *See* 21 C.F.R. § 314.3(b).

Furthermore, these patient characteristics are only relevant insofar as they impact plasma concentration levels, so these claims are preempted for the same reasons as the overall plasma concentration labeling theory. *See Pradaxa Cases*, 2019 WL 6043513, at *4 (ruling that plaintiff's "additional patient-specific risk factors ... are covered by [p]laintiff's plasma concentration theory" and preempted for the same reasons).

### B. Plaintiff's Design Defect Claims

Under Georgia law, Plaintiff must show, through expert testimony, that the product was defective and that the defect was the proximate cause of the alleged injury. *Silverstein v. Procter & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312, 1316 (S.D. Ga. 2009); *see also* Ga. Code Ann. § 51-1-11(b)(1) (manufacturer may be liable where the product's "condition when sold is the proximate cause of the injury sustained"). Georgia courts have adopted the risk-utility analysis to determine whether a manufacturer should be liable for an allegedly defectively designed product. *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 450 S.E.2d 671, 675 (1994). A "non-exhaustive list of general factors" is usually considered by court's when conducting this analysis:

> the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger, i.e., the user's knowledge of the product, publicity surrounding the danger, or the efficacy of warnings, as well as common knowledge and the expectation of danger; the user's ability to avoid danger; the state of the art at the time the product is manufactured; the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and the feasibility of spreading the loss in the setting of the product's price or by purchasing insurance.

**\*12** *Id.* at 675, n.6.

Defendant argues that Plaintiff has no proof of any defect in the design of Pradaxa, cannot show that a defect in Pradaxa's design caused her alleged injuries, and that the basis of her claim is failure-to-warn, not a defect in the actual design of Pradaxa.

In response, Plaintiff argues that Georgia law permits warning defects to be considered as part of the risk-utility analysis and that her claim should therefore survive summary judgment. However, Plaintiff's argument shows that the basis of her claims actually involves the adequacy of Pradaxa's warning label, not any defect or deficiency in the chemical composition or formulation of the drug itself. Additionally, the Plaintiff has not put forward a "safer alternative design" to Pradaxa, something the Supreme Court of Georgia has described as the "heart of [proving] a design defect case" under Georgia law. *See Jones v. NordicTrack, Inc.*, 274 Ga. 115, 550 S.E.2d 101, 118-19 (2001). As Plaintiff has failed to support allegations of some design defect in Pradaxa with any evidence, and these claims are dismissed.

### C. Claims for Wrongful Death, Damages for Pain and Suffering, and Punitive Damages

Plaintiff's claims for wrongful death, damages for pre-death pain and suffering, and punitive damages are premised on and a derivative of her underlying claims. As summary judgment is granted in favor of Defendant as to the underlying claims based on the analysis set forth above, the derivative claims are also dismissed. *See Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1335 (N.D. Ga. 2009); *see also United Health Servs. of Ga., Inc. v. Norton*, 300 Ga. 736, 797 S.E.2d 825, 827 (2017) (holding that it is "longstanding precedent that a wrongful death action is wholly derivative of a decedent's right of action"); *Mowell v. Marks*, 269 Ga.App. 147, 603 S.E.2d 702, 704 (2004) ("A survivor cannot recover for the decedent's wrongful death if the decedent could not have recovered in his or her own right").

### D. Defendant's Motions to Exclude Testimony

The Court has concluded that Defendant is entitled to summary judgment based on the analysis set forth above. As the testimony that Defendant seeks to exclude has no bearing

on that analysis, Defendant's various motions to exclude that testimony are DENIED as moot.

### IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment [Doc. 75] is **GRANTED**. It is further ORDERED that the Defendant's Motion to Exclude Certain Opinions of Laura Plunkett [Doc. 76], Defendant's Motion to Exclude the Testimony of Winston H. Gandy, M.D. [Doc. 77], Defendant's Motion to Exclude Certain Opinions of Robert Gosselin [Doc. 78], and Defendant's Motion to Exclude Certain Opinions of Glenn Chertow, M.D. [Doc. 79] are **DENIED AS MOOT**.

IT IS SO ORDERED, this 29th day of September, 2020.

**All Citations**

--- F.Supp.3d ----, 2020 WL 5835125

Footnotes

1      For the purposes of this Order, all references to page numbers in documents refer to the ECF (or .pdf) page number, not the page number of the original document.

2      Even though Dr. Reddy had knowledge of Ms. Armstrong's alleged bleeding event at the time of his deposition, Dr. Reddy testified that he still stood by his decision in 2016 to prescribe Pradaxa to Ms. Underwood, even after he was questioned by Plaintiff's counsel about the need for additional warnings. [Doc. 75-50 at p. 34, transcript page no. 128; *id.* at p. 63, transcript page no. 244].

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.