```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ********************************************************
     IN RE: TAXOTERE (DOCETAXEL)          MDL NO. 16-2740
 4   PRODUCTS LIABILITY LITIGATION        SECTION "H" (5)
                                          Tuesday, October 6, 2020
 5   This document relates to:
     Certain cases
 6   ********************************************************

 7                   TRANSCRIPT OF MOTION HEARINGS
           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 8                   UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:

11   FOR PLAINTIFFS:                 Dawn M. Barrios, Esquire
                                     BARRIOS, KINGSDORF & CASTEIX
12                                   701 Poydras Street, Suite 3650
                                     New Orleans, LA 70139
13

14
                                     M. Palmer Lambert, Esquire
15                                   Claire E. Berg, Esquire
                                     GAINSBURGH, BENJAMIN, DAVID
16                                       MEUNIER & WARSHAUER
                                     1100 Poydras Street, Suite 2800
17                                   New Orleans, LA 70163

18

19                                   J. Kyle Bachus, Esquire
                                     BACHUS & SCHANKER
20                                   1899 Wynkoop Street, Suite 700
                                     Denver, CO 80202
21

22
                                     David F. Miceli, Esquire
23                                   DAVID F. MICELI, LLC
                                     Post Office Box 2519
24                                   Carrollton, GA 30112

25


                           OFFICIAL TRANSCRIPT
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR PLAINTIFFS:              Emily C. Jeffcott, Esquire
                                   (VIA ZOOM VIDEO CONFERENCE)
 4                                 MORGAN & MORGAN
                                   220 West Garden Street, 9th Floor
 5                                 Pensacola, FL 32505

 6

 7                                 Andre Mura, Esquire
                                   (VIA ZOOM VIDEO CONFERENCE)
 8                                 GIBBS LAW GROUP
                                   6701 Center Drive West
 9                                 Suite 1400
                                   Los Angeles, CA  90045
10

11

12

13    FOR DEFENDANTS:             Douglas J. Moore, Esquire
                                   IRWIN, FRITCHIE, URQUHART & MOORE
14                                 400 Poydras Street, Suite 2700
                                   New Orleans, LA  70130
15

16                                 Jon Strongman, Esquire
                                   Chris McRae, Esquire
17                                 Matt DePaz, Esquire
                                   Torrey Peterson, Esquire
18                                 SHOOK, HARDY & BACON
                                   2555 Grand Boulevard
19                                 Kansas City, MO 64108

20

21    Official Court Reporter:    Alexis A. Vice, RPR, CRR
                                   500 Poydras Street, HB-275
22                                 New Orleans, LA 70130
                                   Alexis_Vice@laed.uscourts.gov
23

24

25    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
      PRODUCED BY COMPUTER.

                          OFFICIAL TRANSCRIPT
```

1                              <u>INDEX</u>

2                                                      PAGE

3

4   Defense Motion to Exclude                           5
        Testimony of Dr. David Kessler
5

6   Plaintiff Motion for Reconsideration               25

7

8   Plaintiff Motion for Partial Summary Judgment
        On Comparative Fault                           45
9

10
    Defense Motion to Exclude
11      Testimony of Dr. David Madigan                  55

12

13  Plaintiff Motion for Partial Summary Judgment
        On Affirmative Defenses
14      Concerning Alternative Causes                   69

15

16  Plaintiff Motion to Exclude
        Testimony of Dr. John Glaspy                    86
17

18  Plaintiff Motion to Exclude
        Testimony of Dr. Janet Arrowsmith              102
19

20  Plaintiff Motion to Exclude
        Testimony of Dr. Larned and Dr. Kardinal       118

21

22

23

24

25

                      OFFICIAL TRANSCRIPT

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                   TUESDAY, OCTOBER 6, 2020
 3                      (MOTION HEARINGS)
 4
 5               (Court was called to order.)
 6          DEPUTY CLERK: Good morning.  This is MDL 16-2740,
 7   Taxotere oral argument.
 8          THE COURT: Court's in session.  Before we proceed,
 9   this is a little unorthodox that we are -- and I want the
10   record to be very clear.  I think I have to do this so that
11   they can hear me.
12          I want the record to be clear that we have convened
13   this session of court in a conference room at Irwin Fritchie
14   Law Firm in New Orleans.  All parties are present.  I'd like
15   the parties on the record to waive their appearance in the
16   courtroom, and this is as a result of the pandemic and some of
17   the problems that we're having.  The courthouse is not
18   officially open.
19          So in order to have the oral argument, we had moved
20   it to this outside location, and I'd like the parties to waive
21   their appearance at the courthouse.
22          MR. MOORE: Douglas Moore on behalf of Sanofi.  We
23   waive our appearance at the courthouse for these proceedings.
24          THE COURT: Thank you.  Mr. Lambert.
25          MR. LAMBERT: Good morning, Your Honor.  Palmer
```

OFFICIAL TRANSCRIPT

1  Lambert, co-liaison counsel for plaintiffs.  We'd also waive
2  the appearance in the courthouse and proceed with the Court's
3  accommodations and also Mr. Moore's conference room.
4         THE COURT: Are we ready to proceed?  I understand
5  that the first motion that's pending before the Court is a
6  motion to exclude the expert testimony of David Kessler.  This
7  is Document No. 10999.  This argument will be Chris McRae will
8  argue and Emily Jeffcott.
9         Ms. Jeffcott, where are you?
10         MS. JEFFCOTT: Your Honor, can you see me?  I'm via
11  Zoom.
12         THE COURT: Now I can see you, okay.  Are we ready,
13  Mr. McRae?
14         MR. MCRAE: Yes, Your Honor.  Good morning, Your
15  Honor.  My name is Chris McRae.  On behalf of Sanofi, I'll be
16  arguing the motion to exclude the expert testimony of Dr. David
17  Kessler.
18         Your Honor is familiar with Dr. Kessler -- as he
19  testified at the *Earnest* trial.  This morning we're going to be
20  talking about something a little bit different.
21         THE COURT: Wait.  Can you hear, Ms. Vice?
22         DEPUTY CLERK: No, we're picking up like every other
23  word.  Judge, I can hear you okay.  Maybe Mr. McRae --
24         THE COURT: When I was in second grade my teacher told
25  me my voice carried.  So Mr. McRae, use your carry voice.

OFFICIAL TRANSCRIPT

1    MR. MCRAE: That's not usually a problem, but I will
2 do my best.

3    DEPUTY CLERK: Just speak a little slower and clearer.
4 It's not the loudness, you know.  It's not the volume.  It's
5 just kind of breaking up.

6    MR. MCRAE: Okay, very good.  I'm going to focus this
7 morning on Dr. Kessler's novel causation opinion, and I say
8 it's novel for a couple of different reasons.

9    Your Honor, first, Dr. Kessler did not offer a
10 causation opinion at the *Earnest* trial, and in fact, he
11 repeatedly testified that he's not offering such.  And second,
12 Dr. Kessler has never offered a general causation opinion in
13 the more than 45 litigations in which he's testified.

14    And there's a perfectly good reason for that.  He's
15 simply not qualified to offer such an opinion.  Rule 702
16 dictates that an expert needs to have the requisite education,
17 training, knowledge -- sorry, education, training, knowledge,
18 or skill to testify as an expert in a particular field.

19    So Dr. Kessler does not have the requisite education
20 or training to offer a general causation opinion.  He's not an
21 epidemiologist, and he has no degree in epidemiology, no
22 master's degree, no Ph.D.  He certainly does have a medical
23 degree, but he doesn't have any particular expertise or
24 training in the field of oncology or dermatology in order to
25 explain to the Court how he can offer an opinion that a

OFFICIAL TRANSCRIPT

1  cytotoxic chemotherapy causes permanent chemotherapy-induced
2  alopecia.  He has no formal training in epidemiology, oncology.
3          Now the plaintiffs in their papers note that
4  Dr. Kessler has specialized training in epidemiology because he
5  attended a graduate program from Johns Hopkins University in
6  1987.  Well, we actually found the information about that
7  program and showed it to Dr. Kessler at his deposition, and it
8  turns out it was a three-week summer program starting in June
9  and going to July 11, 1987.
10          THE COURT: What about the course that he taught this
11  year at UCSF?
12          MR. MOORE: Well, when I deposed Dr. Kessler, Your
13  Honor, I asked him when the last time he taught a course in
14  epidemiology was, and he said, "I don't teach courses in
15  epidemiology.  I use epidemiological methods in things that I
16  teach."
17          And when I deposed him, I also showed him the course
18  catalog from the University of California, San Francisco where
19  he currently teaches, and I asked him, "Dr. Kessler, can you
20  show me a course in epidemiology that you teach in this course
21  catalog?"  And he -- and it just goes back to this --
22          THE COURT: Wait, wait.  This isn't working for the
23  court reporter.
24          DEPUTY CLERK: Judge, Alexis is wondering if maybe she
25  can just go over there if we get permission from Carol Michel.

OFFICIAL TRANSCRIPT

1    It's really -- we could hear Doug this morning in the middle of
2    this room, but I don't know if it's standing behind the
3    partition.
4              THE COURT: See if she can get permission from Carol
5    Michel.
6              DEPUTY CLERK: All right, yes, ma'am.
7        (A short recess was taken while the court reporter
8    relocated from the courthouse to the conference room at Irwin,
9    Fritchie, Urquhart & Moore.)
10             THE COURT: All right.  Well, Court's back in session.
11   We've had a bit of a rough start this morning; so we will
12   restart argument as to Docket No. 10999 which is motion to
13   exclude expert testimony of David Kessler filed by defendant
14   Sanofi.
15             And Mr. McRae, are you ready to proceed?
16             MR. MCRAE: Yes, Your Honor.
17             THE COURT: Please.
18             MR. MCRAE: Good morning, Your Honor.  My name is
19   Chris McRae.  On behalf of Sanofi, I'll be arguing the motion
20   to exclude the expert testimony of Dr. David Kessler.
21             Your Honor is familiar with Dr. Kessler's regulatory
22   opinions as he provided those at the *Earnest* trial.  I'm going
23   to focus this morning on Dr. Kessler's novel causation
24   opinions.
25             I say it's novel for two reasons.  First, Dr. Kessler

                         OFFICIAL TRANSCRIPT

1    did not offer such an opinion at the *Earnest* trial and
2    repeatedly testified that he was not offering such an opinion.
3    In addition, Dr. Kessler has never offered a general causation
4    opinion in the more than 45 litigations in which he's
5    testified.  If he were allowed to do so here, it would be the
6    first time he's ever offered such an opinion at trial.

7            Rule 702 dictates that an expert needs the requisite
8    education, training, experience, or skill to offer an opinion
9    in a particular field.  Dr. Kessler lacks that here.  He does
10   not have the requisite education or training.  He has no degree
11   in epidemiology, and epidemiology is the science of causation.
12   He doesn't have a master's in that.  He doesn't have a Ph.D. in
13   that.  He's not an oncologist or a dermatologist.  His medical
14   training was in pediatrics, and plaintiffs offer no explanation
15   as to why that training would permit him to come into court and
16   testify about how a cytotoxic chemotherapy causes permanent
17   hair loss.

18           Plaintiffs mention in their papers a summer program
19   course Dr. Kessler took at Johns Hopkins in epidemiology.  But
20   we found information about that course; and as it turns out, it
21   was a three-week summer program offered June to July of 1987.
22   It covered, in that three weeks, it covered 13 different
23   topics.  Only one of which was pharmacoepidemiology.  This is
24   not the kind of specialized training contemplated by Rule 702
25   in order to offer an opinion in the field of epidemiology.

OFFICIAL TRANSCRIPT

1          In addition, Dr. Kessler doesn't have the requisite

2   experience to offer such an opinion.  Plaintiffs note that he

3   was a commissioner at FDA and seem to indicate, "Well, that's

4   enough.  He can offer causation opinions because he was a

5   commissioner."  But that doesn't track.  FDA hires its own

6   epidemiologists.  In fact, Dr. Janet Arrowsmith, Sanofi's

7   regulatory expert, worked as an epidemiologist at FDA, not so

8   for Dr. Kessler.

9          Plaintiffs also indicated in their papers that

10  Dr. Kessler teaches epidemiology.  That's simply not the case.

11  At his deposition, I asked Dr. Kessler, "When is the last time

12  you taught a course in epidemiology?"

13         He answered, "I don't teach courses in epidemiology."

14  It couldn't be clearer.

15         He's currently at the University of California, San

16  Francisco.  I showed him the course catalog at his deposition.

17  I asked him, "Dr. Kessler, indicate for me anywhere in this

18  course catalog where it says you teach a course in

19  epidemiology?"  And he couldn't.

20         THE COURT: What does he mean by, "I use

21  epidemiological methods in things that I teach"?

22         MR. MCRAE: Well, that's a great question, Your Honor.

23  I think what he's referring to is that he does teach courses in

24  public health.  And I think as part of his teaching public

25  health, he does touch on epidemiological methods.  But that,

OFFICIAL TRANSCRIPT

1    again, is different than actually an expert in epidemiology,

2    someone who teaches students, "Here's how it's done."  Instead

3    he might apply it a little bit in his public health courses,

4    but that's the most he can say about it.

5            For all of those reasons, we don't think Dr. Kessler

6    is qualified to offer a general causation --

7            MS. BARRIOS: Your Honor, Ms. Jeffcott just got kicked

8    out of the meeting.

9            MS. JEFFCOTT: Your Honor, I am back.  I don't know

10   what happened.  Everything froze, and then my Zoom screen went

11   away.

12           But I have returned, and the last thing I heard was

13   Mr. McRae talking about Dr. Kessler's epidemiology course.

14           THE COURT: Okay, let's go back.  I think I asked what

15   does he mean by, "I use epidemiological methods in things that

16   I teach"?

17           MR. MCRAE: And my response to that, Your Honor, now

18   that I get a second bite at the apple, would be pretty much

19   what I said before; but in addition, he was vague at his

20   deposition about what exactly that means.  And plaintiffs are

21   vague in their papers about what that means.  They will say

22   that he has addressed issues germane to epidemiology, for

23   example.  I frankly don't have any idea what that means.

24           What we can tie together here is that he teaches

25   courses in public health.  As part of that, he might address

OFFICIAL TRANSCRIPT

1   epidemiological principles, like incidence rates or rates of

2   occurrence, but that's as far as it goes.  So for all those

3   reasons, we would argue he's not qualified to offer a general

4   causation opinion under 702.

5          But even if he were found to be qualified, his

6   causation methodology is still unreliable.  This is pulled

7   straight from Dr. Kessler's report.  It includes the data

8   sources that he reviewed in forming his causation opinion.  And

9   you can see there at the top it includes human clinical trial

10  data; and then at the very bottom, it includes Sanofi internal

11  documents and statements made to regulators.

12         Dr. Kessler purports to apply a

13  weight-of-the-evidence approach in forming his opinion; but in

14  fact, Dr. Kessler didn't weigh any of the evidence.  We asked

15  him at his deposition, "In reviewing these six data sources,

16  did you yourself assign different weights or credibility

17  determinations to these six data sources?"  And he answered no,

18  he did not.

19         In so doing, Dr. Kessler rejects the hierarchy of

20  evidence.  This is a well-established epidemiological principle

21  that states that particular forms of scientific evidence are

22  more credible than others.  This quote is pulled from the

23  *Reference Manual on Scientific Evidence* from the Federal

24  Judicial Center.  It's cited in our papers, and it explains the

25  concept of this hierarchy.

OFFICIAL TRANSCRIPT

1        At the very top, you have human clinical trial data.

2  At the bottom, you have unsystematic clinical observations is

3  how they refer to it, meaning, case reports or FAERS data.

4  This evidence is not equal in the world of epidemiology, but

5  Dr. Kessler treated it as such for purposes of his causation

6  opinion.

7        And again, here, this is another pull from the

8  reference manual.  It says, "Although they are at the bottom of

9  the evidence hierarchy" --

10       THE COURT: I think we can skip that part.  We've

11  talked a lot about that over the course of this litigation.

12       MR. MCRAE: Thank you, Your Honor.

13       And finally, I would just address -- I promised I

14  would focus on his causation opinion.  Just one quick slide on

15  his regulatory opinion.  Dr. Kessler, just like at the *Earnest*

16  trial, relies on post-ingestion evidence for his labeling

17  opinion.  As this Court found in *Earnest,* that is not

18  appropriate, and we say the same ruling should apply here.

19       And I think with that, I've probably said enough,

20  Your Honor.  So for the reasons set forth in our papers, we

21  argue that Dr. Kessler's testimony should be excluded.

22       THE COURT: Ms. Jeffcott.

23       MS. JEFFCOTT: Yes, Your Honor.  My name is Emily

24  Jeffcott.  I'm with the firm Morgan & Morgan, and I'm here on

25  behalf of the PSC.  May it please the Court.


OFFICIAL TRANSCRIPT

1           And Your Honor, I want to first start out by saying
2   thank you for letting us appear via Zoom.  Personally, that
3   means a lot to allow this kind of flexibility.  And with that,
4   I'll jump right into it.
5           Sanofi challenges Dr. Kessler's opinions in three
6   respects:  His qualifications as an epidemiologist, his
7   methodology, and the reliability of his regulatory opinions.
8   And Your Honor, as I will explain, all these three challenges
9   are without merit.
10          So let's jump right into qualification.  Sanofi
11  claims that Dr. Kessler lacks the necessary epidemiological
12  experience, but Dr. Kessler's professional career has relied on
13  the application of epidemiology.  Indeed, at his depo,
14  Dr. Kessler told Sanofi that he has spent his life doing
15  epidemiology.  Now Sanofi could have asked him, "In what way
16  have you spent your life doing this and how?"  But Sanofi
17  didn't.  And if Sanofi had asked, Dr. Kessler could have walked
18  them through his over three decades of teaching epidemiology.
19          Now Mr. McRae tries to downplay this.  There's a
20  one-month course not directly pertaining to epidemiology.  But
21  Your Honor, I represent that's a misrepresentation of his
22  testimony.  If you look at his most recent deposition -- what
23  Mr. McRae was citing from was his November 2019 deposition.  If
24  you look at his most recent which was in April of 2020,
25  Mr. McRae went back and asked him, and Dr. Kessler was very

OFFICIAL TRANSCRIPT

1    specific and actually said, "Look, you know, I've looked, and I
2    actually have taught courses on epidemiology.  And in fact, I
3    just got done teaching a course in March of 2020 at the
4    University of California."  And he even provided the course
5    materials that outlined exactly what he went through.

6            Now Sanofi doesn't mention this testimony in their
7    reply, but it's included in Plaintiff's Exhibit -- can you
8    still hear me?

9            THE COURT: Yes.

10           MS. JEFFCOTT: Okay, sorry.  It's included in
11   Plaintiff's Exhibit 2 from pages 37 to 38.

12           Now if you also look at Dr. Kessler's résumé, it's
13   clear he's been a devoted teacher to the subject since 1988
14   when he began teaching epidemiology to medical students at the
15   Albert Einstein College of Medicine.  He has continued to teach
16   epidemiology to the present as I just discussed at the
17   University of California.

18           THE COURT: Does he teach a course entitled
19   epidemiology, or is it a course that in conjunction with the
20   course that you discuss epidemiological studies?

21           And in my view, that's two separate things.  Can you
22   hear me?

23           MS. JEFFCOTT: I can.  It's a little quiet, but I
24   think I understand the question which is whether or not
25   Dr. Kessler has taught a course in epidemiology or whether the

                        OFFICIAL TRANSCRIPT

1   course involves epidemiology; is that right?

2           THE COURT: Yes.

3           MS. JEFFCOTT: Okay.  So the answer is yes, he has

4   taught courses.  And in fact, I spoke with him just a few weeks

5   ago, and he represented to me that he had just got done

6   teaching another course in epidemiology.  And the course that

7   he taught in March 2020 was also in epidemiology.

8           I'm not sure, Your Honor, if those course materials

9   were attached to defendant's motion, but I'm happy to provide

10  those to you as well.  In addition --

11          THE COURT: They should have been attached to your

12  opposition; right?

13          MS. JEFFCOTT: Well, Your Honor, we referenced the

14  testimony from March -- from April 2020 where he describes his

15  coursework and also goes through the materials with Mr. McRae.

16  So that is attached in Exhibit 2 from pages 37 to 38, Your

17  Honor.

18          In addition, his CV details that he did teach courses

19  of epidemiology at the Albert Einstein College of Medicine

20  beginning in 1988.  He also taught college courses in public

21  health which implicate epidemiology concerns at, I believe it

22  was Duke Medical School.  I can look real quick, Your Honor.

23  It was at Yale University School of Medicine.

24          And Your Honor, even if Dr. Kessler didn't teach

25  epidemiology, his experience at FDA makes him eminently

OFFICIAL TRANSCRIPT

1    qualified.  And that's because when an expert is evaluating

2    general causation, they're determining, quote, "whether a

3    substance is capable of causing a particular injury or

4    condition in the general population."  Now I'm quoting from

5    *Meade versus Parsley* which is a case cited by defendants.

6            Now Dr. Kessler's work at FDA focused on identifying

7    and rectifying harms to the population at large.  For example,

8    Dr. Kessler spent years at FDA devoted to researching and

9    exposing the enormous health consequences caused by combustible

10   cigarettes.  At his deposition, Dr. Kessler explained this and

11   its relationship to epidemiology which can be found at

12   Plaintiff's Exhibit 1, page 313, lines 6 through 22 which, Your

13   Honor, we refiled, I believe, on Sunday to include this

14   specific cite.  And Dr. Kessler has also done epidemiological

15   research in investigating obesity, medical devices, and other

16   medical drugs.

17           Dr. Kessler has also published on epidemiological

18   research and reviews.  For example, Dr. Kessler published on

19   tobacco, including, an article in the *Journal of Pediatrics*

20   that explained how nicotine addiction is a pediatric disease.

21   Likewise, Dr. Kessler has also published on diseases caused by

22   breast implants and other drugs.  These are all outlined in his

23   CV that Sanofi glosses over as if they don't exist.

24           And not surprisingly, Your Honor, Dr. Kessler has

25   been permitted to offer epidemiological opinions in other

OFFICIAL TRANSCRIPT

1  courts such as the *Actos* litigation, and that decision can be
2  found at 2014 Westlaw --

3        THE COURT: In *Actos*, he gave an opinion on general
4  causation?

5        MS. JEFFCOTT: No, Your Honor.  He offered
6  epidemiological opinions using his base knowledge from what he
7  gathered at FDA in providing opinions regarding the warnings
8  that should have been included in the Actos label.

9        But that actually brings me to a point.
10 Dr. Kessler's opinions and testimony have been offered in the
11 causation phase of the case, and I point Your Honor to the
12 *Benicar* litigation.  That case didn't go to trial.  It did
13 settle beforehand.  But Dr. Kessler's opinions were offered in
14 the causation phase.  And the one thing I do want to point out,
15 though, is that, you know, his causation opinions in that case
16 were using -- were based on the FDA guidance factors.

17       And that's because it is Dr. Kessler's opinion that
18 the FDA guidance factors have significant overlap with the
19 Bradford Hill factors; and that by analyzing either set of
20 factors, you can assess causality.  Now obviously, in his first
21 report, he didn't explain that overlap between Bradford Hill
22 and the FDA guidance factors which is why he supplemented his
23 report to exactly spell that out to demonstrate how there is
24 overlap in assessing causality from the FDA guidance factors to
25 Bradford Hill.

OFFICIAL TRANSCRIPT

1           Now I think this is also, you know, worth mentioning,

2    that in the *Earnest* trial, Sanofi didn't object to Dr. Kessler

3    being offered as a medical expert in epidemiology and in

4    biostatistics.  And if their only complaint regarding his

5    qualifications for general causation is with respect to

6    epidemiology, well, they've already accepted that he is a

7    medical expert within that field.  Now Your Honor, simply put,

8    Dr. Kessler is an expert in epidemiology.

9           Now I'd like to switch to the reliability of the

10   methodology employed by Dr. Kessler.  Sanofi claims that

11   Dr. Kessler's weight-of-evidence approach to Bradford Hill is

12   not reliable and that the approach is weak and a fallback

13   strategy that is generally frowned upon by courts.  But the

14   cases cited by Sanofi don't stand for this proposition.  In

15   fact, the cases that Sanofi relies heaviest on, *Milward* and *In*

16   *Re:  Zoloft*, really support the reliability of Dr. Kessler's

17   methodology.

18          For example, in *Milward*, the First Circuit expressly

19   rejected the claim that Sanofi is making here.  Stated, quote,

20   "No serious argument can be made that the

21   weight-of-the-evidence approach is inherently unreliable."  Now

22   more importantly, the expert at issue in *Milward* followed an

23   approach very similar to Dr. Kessler's, evaluating different

24   threads of evidence without identifying the specific best piece

25   of evidence that Sanofi claims is required.

OFFICIAL TRANSCRIPT

1          And that's because under the weight-of-the-evidence
2    approach, you don't have to pick out your best piece of
3    evidence.  You weigh the strengths of the Bradford Hill
4    factors, evaluating which factors are present, which are not,
5    which may be stronger than others, determine whether causality
6    is present.
7          Now just as in *Milward*, Dr. Kessler considered what
8    he calls many threads of evidence, noting that some factors
9    have more than others.  For example, he found that two factors,
10   analogy and experiment, lacked evidence; but that the other
11   factors, such as, strength of association, consistency,
12   biological plausibility, were well supported by multiple
13   threads of evidence.  Based on his cumulative analysis of this
14   evidence under Bradford Hill, Dr. Kessler determined that there
15   was causality just as the expert in *Milward* did.
16         Now *In Re: Zoloft* is also unhelpful to Sanofi.
17   There, the Third Circuit affirmed the exclusion of an expert
18   statistician, but not for applying the weight-of-evidence
19   approach.  Rather, the statistician failed to consistently
20   apply the scientific standards of his field.
21         For example, the court pointed to the expert's
22   reanalysis of a study similar to what Dr. Kopreski did.  In
23   *Zoloft*, the expert looked at a published study that originally
24   showed no statistical significance and reanalyzed it to show
25   statistical significance.  The court said you can't do that.

OFFICIAL TRANSCRIPT

1    The court said you also have to look at the evidence, not just
2    the good evidence.
3              Now finally, the court said the expert didn't tie his
4    analysis to Bradford Hill.  Well, that's not at issue here.  In
5    a very sequential manner, Dr. Kessler took every Bradford Hill
6    factor, identified the corresponding FDA guidance factor, and
7    then either identified evidence supporting it or acknowledged a
8    lack of support which is the hallmark of the weight-of-evidence
9    approach and its reliable application.
10             Now Sanofi also claims that Dr. Kessler failed to
11   rule out other causes citing the *Mirena II* decision.  Now I
12   think Sanofi misreads that decision.  There, the expert relied
13   on a single epidemiological study, and the authors of that
14   study specifically said you can't use it to prove causality
15   because there are other possible alternative causes.  Well,
16   that expert ignored that.  And when the court came back, it
17   said, well, you can't just ignore those alternative causes that
18   the study authors pointed out.
19             Now that didn't happen here.  And as a general
20   causation expert, Dr. Kessler is not required to disprove all
21   other possible causes.  His role is to say that Taxotere causes
22   it.  And the *Milward* decision, cited and relied upon by Sanofi,
23   articulates this well, stating, quote, "The fact that another
24   explanation might be right is not a sufficient basis for
25   excluding an expert's testimony."

                    OFFICIAL TRANSCRIPT

```
 1              And here, Dr. Kessler even did look at alternative
 2      causes, and this is explained on page 8 of plaintiff's
 3      opposition.  I'm happy to go through all of those, but I think
 4      I'm actually running short on time, Your Honor.  But I think
 5      the overall point is that Dr. Kessler explained his work, and
 6      his methodology is sound and reliable.
 7              Now I want to quickly touch on his regulatory
 8      opinions.  Now Sanofi seems to claim that there's no data by
 9      which Dr. Kessler can rely on to support his opinion that the
10      Taxotere label should have been updated by 2008, but that's
11      just not accurate.  As detailed on pages 11 and 12 of
12      plaintiff's brief, there is a list of the pre-2009 data cited
13      in Dr. Kessler's supplemental report.  All of which Sanofi
14      ignores.  In addition, there is evidence in his original report
15      that goes to pre-2009 evidence that likewise supports his
16      opinion that Taxotere labels should have been updated in as
17      early as 2008, if not earlier.
18              Now I think I want to make one final point, and
19      that's this draft guidance that Sanofi cites --
20              THE COURT: Yes.
21              MS. JEFFCOTT: -- as a basis for Dr. Kessler having to
22      look at individual case reports.  And first thing, it's a
23      draft.  But even if it weren't, I think looking at the table of
24      contents and identifying the section where Sanofi is quoting
25      from tells us what we need to know, and that's that -- the
```

OFFICIAL TRANSCRIPT

1  section that's quoted comes from signal identification and
2  signal evaluation.  And more importantly, it's not the only
3  method used to identify or evaluate signals.  That guidance
4  includes multiple methods, including, the methodology employed
5  by Dr. Kessler and Dr. Madigan.
6        And that makes sense because you want multiple ways
7  to evaluate signals depending upon the level of evidence.  If
8  there are enough reports, then it should show up statistically.
9  But if there are only select few reports and it's of a
10 significant adverse effect, maybe, perhaps, one that causes
11 fatality, in that circumstance, it would make sense to look at
12 each individual case report.
13       Now circling back, and I just want to touch one more
14 thing on Dr. Kessler's qualifications regarding epidemiology.
15 Your Honor, none of the case law cited by Sanofi speaks
16 directly unto the qualifications, the extensive qualifications
17 that Dr. Kessler has.  And in fact, I would direct Your Honor
18 to the *Magistrini versus One Hour Martinizing Dry Cleaning*
19 case.  And there, while the expert's opinion was determined to
20 be unreliable for epidemiological reasons, I just think that
21 case also details why Dr. Kessler's qualifications are more
22 than sufficient.
23       In the *Magistrini* case, the expert was qualified to
24 opine on general causation where he was licensed to practice
25 medicine; and as part of his medical training, he studied

OFFICIAL TRANSCRIPT

1    oncology, hematology, and pharmacology as well as he was

2    trained in epidemiology.  There is no question here as

3    Dr. Kessler has testified as part of his medical training that

4    he obviously took courses in pharmacology, epidemiology; and he

5    has, in fact, prescribed oncology medications including Taxol,

6    Adriamycin, cyclophosphamide.  Also, as similar to the

7    *Magistrini* decision where that expert had taught in public

8    health, had also taught in epidemiology, Dr. Kessler has done

9    the same here.

10             So Your Honor, based on the totality, Dr. Kessler is

11   more than qualified to offer opinions and has been accepted by

12   other courts, including, this Court, as an expert in

13   epidemiology.  Likewise, his methodology applying the Bradford

14   Hill factors is sound, and his regulatory opinions are based on

15   more than sufficient facts.  For those reasons, Your Honor,

16   Sanofi's motion to exclude Dr. Kessler's testimony should be

17   denied.  Thank you.

18             THE COURT: Thank you.

19             MR. MCRAE: Your Honor, may I have your indulgence for

20   30 seconds?

21             So Ms. Jeffcott noted Dr. Kessler's tender in the

22   *Earnest* trial, and we would say since Dr. Kessler in *Earnest*

23   was not offering general causation opinions, was not offering

24   opinions in epidemiology, we didn't think it was necessary to

25   object to that tender at that time and certainly can't be used

OFFICIAL TRANSCRIPT

1  as a basis here to somehow say that Dr. Kessler is now

2  qualified in the *Kahn* case.

3         And I would just reiterate if Dr. Kessler gets on the

4  stand in *Kahn* and offers a general causation opinion, it will

5  be the very first time he has ever done that in his extensive

6  litigation experience.  We don't think that's appropriate.

7  Thank you, Your Honor.

8         THE COURT: Thank you.

9         MS. JEFFCOTT: Your Honor?

10        THE COURT: Yes, ma'am.

11        MS. JEFFCOTT: Again, I just wanted to thank you for

12  letting us do this by Zoom.  It was incredibly helpful.  I

13  really appreciate it.

14        THE COURT: You're welcome.  No problem.

15        The next argument is Motion for Reconsideration,

16  Document No. 10667.  Plaintiff's counsel is Palmer Lambert and

17  Jon Strongman for defense.

18        Mr. Lambert, are you ready to proceed?

19        MR. LAMBERT: Yes, Your Honor.

20        THE COURT: I just have to say something before we get

21  started, and this is not going to go against time.  I issued an

22  order and reasons; and in the original order and reasons, I

23  referenced a report that was not part of the record before me

24  or filed in.  And very frankly, I dug out the original Madigan

25  report because I was looking for the proverbial Table 9 that

OFFICIAL TRANSCRIPT

1    was not existent in the original report.

2            I have to tell you I was a little taken aback when I

3    read the motion for reconsideration because I felt like I

4    was -- there's a great deal of criticism that I didn't delve

5    into the report that was not attached or referenced in that and

6    not done a more thorough study before I made a finding based

7    upon the conclusions.

8            MR. LAMBERT: Yes, Your Honor.

9            THE COURT: And I just needed to get that off my

10   chest.

11           MR. LAMBERT: I appreciate you bringing that up.  It

12   was in my outline, of course, to address.  The intent was not

13   to blame in any way the Court for our error.

14           THE COURT: Good.

15           MR. LAMBERT: And it was a clear error.  The statement

16   of facts did reference a report; and unfortunately, my office,

17   which is the one that's supposed to check each one of those,

18   did not attach that particular report.  It is attached to the

19   motion for reconsideration.

20           THE COURT: And it contains a Table 9?

21           MR. LAMBERT: It contains a Table 9.  It contains

22   multiple, different tables that were not in the first report.

23           THE COURT: Right.

24           MR. LAMBERT: And we do think that the gravity of the

25   situation with the 1300 plaintiffs requires that it at least be

OFFICIAL TRANSCRIPT

1    considered.

2            THE COURT: Now I will tell you the fact that I got

3    that off my chest has nothing to do with the validity of your

4    argument or anything associated with that.  It has no bearing,

5    but I just felt like I just needed to get it off my chest that

6    I was a bit taken aback.  And I will tell you, I dug out the

7    old report because I thought maybe there's something here that

8    will address it.

9            But with that, we can proceed.  And I will tell you

10   that I am primarily interested in the merits, not in whether or

11   not I should take up a motion for reconsideration.  That's not

12   anything that I'm particularly interested in now.  I'm more

13   concerned with the merits.  Whether or not I should take it up,

14   we can read that --

15           MR. LAMBERT: Great.

16           THE COURT: -- and make a finding on that rule

17   ourselves.

18           MR. LAMBERT: Thank you, Your Honor.  And I would also

19   add to what you said, not only did the Court look for the prior

20   report, the Court also looked at Dr. Madigan's trial testimony

21   which, you know, we appreciate, and we did fail to attach it to

22   the original opposition.

23           So starting again, Your Honor, Palmer Lambert from

24   Gainsburgh Benjamin, co-liaison counsel for plaintiffs, and may

25   it please the Court, I will try to stick to about six minutes

OFFICIAL TRANSCRIPT

1    and reserve a little bit of time.

2            THE COURT: I got to tell you, Mr. Lambert, I just

3    have a lot of questions which is why I asked this to be a part

4    of oral argument today.

5            MR. LAMBERT: Sure.

6            THE COURT: Once I had the new Madigan report, I

7    looked at it, and it seems to me -- and this is what has gotten

8    me a bit perplexed.  We've talked a lot about general

9    causation.  And I remember during the *Earnest* trial and some of

10   the motions that led us to the *Earnest* trial and whether or not

11   you had to have one expert that put together all of those

12   factors or if you could do it piecemeal, and I believe that I

13   found that you could do it piecemeal.  You could have that

14   person that provides the statistical analysis and that other

15   person for biological capability.  I'm just going to call it

16   that.  I know there's probably some other term that I'm just

17   not right.

18           But there is a medical component.  Can this device or

19   this medicine or this treatment cause this?  And then when we

20   look at these studies, is there a statistical significance?

21   What I'm wondering is are you telling me that we can skip

22   completely the biological findings.  That is, can this cause

23   this?  I mean I know we see what Dr. Madigan says, and that may

24   be enough to get over the hump.

25           But when I look at the Louisiana statute, acquires

OFFICIAL TRANSCRIPT

1   knowledge of a characteristic of the product, does that not

2   require some science or something that says, "This can cause

3   it," as opposed to just, well, we've got statistics that show

4   this is happening, but we're not -- the statistician cannot

5   deal with the compounding factors or whether or not this person

6   had 18 rounds of chemotherapy.  That's what I'm concerned

7   about.  So just so you know, this is where I'm stuck.

8          MR. LAMBERT: Okay, yes, Your Honor.  I hope I can try

9   to clear that up.

10         THE COURT: Please.

11         MR. LAMBERT: I think that what Your Honor is

12  referencing is general causation --

13         THE COURT: Yeah.

14         MR. LAMBERT: -- which we believe is very different

15  than the regulations that require a company, a reasonable

16  company to change their warning label upon, quote, "some basis

17  to believe there is a causal relationship," end quote.  That's

18  21 CFR 201.57 Subsection (c)(7), and then there's another one,

19  Subsection (c)(6).  And the difference between this and general

20  causation is really important here because what we're talking

21  about is we're talking about what the plaintiffs need to do in

22  terms of an expert's opinion in order to be able to bring a

23  case in 2006, for example, with an administration in 2006.

24         And there's a case -- I'm not sure that it's cited in

25  our briefs.  It's a case out of the District of Columbia, and

OFFICIAL TRANSCRIPT

1  it is cite 686 A.2d 567, December 23rd, 1996.  And what it

2  talks about is, and if you read it carefully, a regulatory

3  expert in a pharma case has to come in and lay the foundation

4  for the standard of care because the complex regulatory issues

5  at hand with the FDA.  But the important thing is that an

6  expert other than a regulatory expert can come in and give the

7  jury the information that they need to have in order to meet

8  that some basis test to begin the process of changing their

9  label.

10         And so when you go into detail here, just reading a

11  quick quote from the opening statement in the *Earnest* trial

12  related to the Nabholtz 2001 publications, "We showed you this

13  slide, ladies and gentlemen, and we told you it was a study

14  from 2001, and you heard that there were some patients in the

15  study who took Taxotere and had partial hair loss after

16  two years.  But what you'll learn from the evidence, ladies and

17  gentlemen, is that Sanofi sponsored the study, Sanofi supported

18  the study, and Sanofi had the results of this study published,

19  including, the persistent hair loss information."

20         And then I'll skip along.  It talks about how this is

21  in the *Journal of Clinical Oncology* and Dr. Carinder looked at

22  it.  The quote resumes, "But I wanted to show you at the

23  outset, this is an example of Sanofi sharing the information,

24  publishing the information, giving it to the medical community,

25  information about persistent hair loss and Taxotere.  This

OFFICIAL TRANSCRIPT

1   isn't how you keep information from physicians."

2          And so in its original motion seeking summary

3   judgment, Sanofi makes two fatal errors.  It claims that

4   Dr. Kessler made a hard cutoff on his opinions on the exact

5   date of December 15, 2006.  He did not do that.  He says,

6   quote, "probably as early as around 2006," end quote, and he

7   bases that on the Sedlacek information.  If you look carefully

8   at Exhibit 4 and Exhibit 5 attached to our original opposition,

9   what he's referencing is the underlying information related to

10  Sedlacek.

11         And I have a quote from Dr. Kopreski about the

12  Sedlacek information.

13         "Question:  When was the contact with Dr. Sedlacek

14  made after the publication of his abstract December 15, 2006?"

15         "Answer:  The contact and the follow-up with

16  Dr. Sedlacek site, and I cannot say whether it was with him

17  personally or not, but with his site occurred on, on these

18  patients before the publication.  There's extensive discussion

19  and follow-up."

20         So even if Your Honor disagrees with us that

21  Dr. Madigan's expert report and information is enough for a

22  jury to find this some basis standard and even if it all has to

23  live and die with Dr. Kessler's testimony, we're not stuck with

24  December 15, 2006.  The underlying patient data from that

25  study, that abstract was available in the summer of 2005 to

OFFICIAL TRANSCRIPT

 1  Sanofi.

 2          The material facts set forth in plaintiff's original

 3  opposition, the evidence appended thereto, along with the

 4  supplemental information from Dr. Madigan's *Thibodeaux* and *Kahn*

 5  reports provide that there is a clear genuine dispute of

 6  material facts related to when Sanofi should have changed their

 7  warning label.

 8          And I'm getting close to my time unfortunately here.

 9          THE COURT: No, that's okay because I'm really

10  struggling with this.

11          MR. LAMBERT: May I just add one more thing, Your

12  Honor?  When Your Honor ruled upon Dr. Madigan's *Daubert*

13  challenge last year in advance of the *Earnest* trial, there were

14  a couple of things in that August 23rd, 2019 order that we

15  feel are very important and relevant to the Court's analysis

16  here.

17          And that is, quote, "Dr. Madigan's report,

18  supplemented by his deposition testimony, leaves no guesswork

19  for defendants."  And then it continues, "Dr. Madigan's report

20  shows that he was more precise in his analysis than Sanofi

21  admits.  He pointed to safety signals that emerged in 2000 and

22  2008.  He need not pinpoint the exact date by which Sanofi

23  should have identified a safety signal for his opinions to be

24  helpful to the jury."

25          THE COURT: But I accept that.  I accept that there is

OFFICIAL TRANSCRIPT

1    sufficient statistical information from Dr. Madigan.   My

2    question is:   Because under the Louisiana statute, they speak

3    to acquired knowledge of characteristic of the product, does it

4    necessarily -- and maybe I'm just getting caught in some -- do

5    they have to look to what is the biological plausibility?

6               For example, and this may be a really bad example.

7    If you have a statistician that says, oh, my gosh, people that

8    drive, you know, they sold 100,000 Corvettes in 2019, and

9    25,000 Corvettes resulted in total wrecks.   Does that

10   necessarily mean that Corvettes in and of themselves are a

11   dangerous vehicle, that there's a problem with the Corvette; or

12   could it be that people just drive fast in Corvettes?   So it's

13   not that there's a characteristic of the car, but it's that

14   it's being misused.

15              That's why I'm wondering can we just solely rely on

16   some statistical data, or do we have to look at what is it

17   about this Corvette.   Is it the way it's designed, or is it

18   misused?   And that's why I'm wondering do we have to -- does

19   Sanofi have to know more than we're seeing?   And that's what

20   I'm asking.

21              MR. LAMBERT: They did have more than just the

22   statistical analysis.   And under both Louisiana law which has a

23   continuing duty for the manufacturer --

24              THE COURT: Right, right, and that's what I'm reading.

25              MR. LAMBERT: -- and this statute that I've cited,

OFFICIAL TRANSCRIPT

1  they're continually looking at evidence all the time in their
2  pharmacovigilance.

3          THE COURT: Right.

4          MR. LAMBERT: And when they see things and they use
5  the very proportionality ratios and the biostatistics that
6  Dr. Madigan points to, the FDA looks at that stuff in order to
7  look at triggers for these types of label changes.

8          And so we do think that is very pertinent to look at
9  that statistical significance information and the added
10  information from Dr. Madigan's second report in order to come
11  to that conclusion.  And we do think it's a jury question for
12  them to be able to decide is this enough.  I mean is Nabholtz
13  enough?  Is the 2003 information, where there's a statistically
14  significant signal, enough?  Is the 2000 safety signal enough
15  where it just crosses some of the lines?

16          You know, Sanofi, in this case in this motion, took
17  an opportunity to try to set a fencepost.  And they had a
18  choice.  They could have said, well, we're going to try in 2000
19  where they have no expert evidence of statistical significance
20  of anything, or they could have tried to set it in 2003 when
21  Dr. Madigan's report sets statistical significance in terms of
22  a safety signal.

23          But what they did was they went all the way up to
24  2006, the end of 2006, and they're asking Your Honor basically
25  to give them loan time type relief because they're saying that

OFFICIAL TRANSCRIPT

1   all of these non-bellwether plaintiffs had to have an expert
2   come in and testify or give a report in support of their case.
3   And this is over 1300 plaintiffs who have never had a
4   scheduling order or deadline to bring an expert report.  And so
5   at this point, they don't need to do that.

6          And we understand how Your Honor feels about that.
7   But this particular MDL was set up in the bellwether process
8   frankly before Your Honor had it, and so Judge Engelhardt set
9   up MDL general causation discovery, general discovery, and then
10  a set of bellwether trials.  There wasn't a be-all, end-all
11  point for general cause experts.  And in fact, we've deposed
12  and given reports on general cause experts three times now in
13  connection with *Earnest*, *Thibodeaux*, and *Kahn*.  And we have a
14  different regulatory expert for Trial 3 for the 505(b)(2)s.

15         And so what I'm trying to say is that these
16  plaintiffs shouldn't be wed to Dr. Kessler's testimony.  His
17  testimony was not of exclusion, that it could never happen
18  before 2006.  It was stated --

19         THE COURT: I remember what he said.  I think December
20  of 2006 is a good time because that's when the Sedlacek article
21  came out.  I remember that.

22         MR. LAMBERT: As early as 2006.

23         And for all those reasons, Your Honor, we would ask
24  that you grant reconsideration, consider the additional reports
25  of Dr. Madigan, and reverse the previous judgment.

                        OFFICIAL TRANSCRIPT

1              THE COURT: Thank you, Mr. Lambert.

2              I just need to take a five-minute break.  Court's at

3   recess for five minutes.

4         (A short recess was taken.)

5              THE COURT: Mr. Strongman, ready?

6              MR. STRONGMAN: Are you ready to proceed, Your Honor?

7              THE COURT: I am.  Thank you.

8              MR. STRONGMAN: Good morning, Jon Strongman on behalf

9   of Sanofi.

10             And Your Honor, I think the best place to start in

11  responding to some of the questions that I heard and some of

12  the issues that were raised is to reorient ourselves on two

13  things; one being, what is the question we're here talking

14  about.  And the first question is the legal duty to warn, when

15  did it arise and how does that work under the law.  So that's

16  Question No. 1.

17             And there's this conversation that Mr. Lambert was

18  having about general causation and duty to warn, and these are

19  two different things.  And Mr. Lambert, in fact, referenced

20  some FDA regulations, and I'm going to talk about that in just

21  a second.  So first, we're here talking about when did Sanofi

22  have a duty to warn under the law.

23             The second orientation that I think we need to have

24  is what is the role of the respective experts in the case and

25  how does it fit together.  And so what I want to start with on

OFFICIAL TRANSCRIPT

1  that is to talk about what Dr. Madigan does and does not do.

2  And I know there's been a lot of talk, from the plaintiffs in

3  their briefing and whatnot, about Dr. Madigan's new reports.

4  But when you really look at them, there's nothing new in

5  Dr. Madigan's reports.  They're all the same.

6          He has some tables that he has added, but the data

7  that he is presenting, the opinions that he is offering are the

8  same.  From *Earnest* to *Kahn* to *Thibodeaux,* they're the same.

9  And what was Dr. Madigan's role?  Dr. Madigan was asked by

10  Dr. Kessler to run statistics on various things, including,

11  what were called signal statistics.  So Dr. Madigan did that.

12          And in his report, if you look, and it's the same

13  footnote, I believe, in each and every one of his reports, on

14  Footnote 23, he readily admits that he is not a regulatory

15  expert, and he is not offering opinions on the FDA regulations.

16  And the FDA regulations are the very basis for determining when

17  Sanofi had a duty to warn.  So who is offering opinions on the

18  FDA regulations?  It's Dr. Kessler.

19          So Dr. Madigan ran these signaling statistics for

20  Dr. Kessler.  Now a signal, I think it's important to note as

21  well, is not equal to a duty to warn.  And in fact, the

22  plaintiffs in their briefing talk about a host of dates in

23  Dr. Madigan's report and ignore a lot of other dates, namely,

24  that Dr. Madigan put out an opinion that there were signals

25  over a whole wide range of dates.  Some of his statistics

OFFICIAL TRANSCRIPT

1  showed signals in 2008 which is after 2006.  Some showed 2010;
2  some showed 2012.

3          And why does that matter?  Because then the
4  regulatory expert looks at all of those statistics, looks at
5  all of the different -- what Dr. Kessler called threads of
6  information, and he then offered an opinion about when the duty
7  to warn arose.

8          As we all know, Dr. Kessler was actually designated
9  on this very topic, and he offered the very opinion that we're
10 here talking about.  And I think Your Honor, in her order,
11 called it damaging testimony, and it is.  It is damaging
12 testimony.  And when we asked Dr. Kessler, "So you considered
13 Dr. Madigan's signals," yes, he did.  He said it was one of the
14 many threads that he looked at.

15         So there is nothing that the plaintiffs have
16 presented to the Court that Dr. Kessler did not look at, and it
17 is Dr. Kessler that made the determination on when the duty to
18 warn arose.  And his testimony has been clear, and it has been
19 consistent.  If anything, the plaintiffs should have come
20 forward with testimony from Dr. Kessler in the motion for
21 reconsideration, but they didn't.  They have had ample
22 opportunity to get Dr. Kessler to offer an opinion that
23 Sanofi's duty to warn arose before 2006, and they haven't.

24         And we just heard in the argument before about how
25 Dr. Kessler is a supremely qualified expert.  And yet the

OFFICIAL TRANSCRIPT

1   plaintiffs are going to come in and try to argue in this motion
2   that Dr. Madigan's opinion somehow undermines or rebuts what
3   Dr. Kessler said.  That just doesn't make sense.  Dr. Madigan
4   ran statistics to support Dr. Kessler, and Dr. Kessler said
5   2006.

6           Mr. Lambert raised the point that Sanofi could have
7   asked for 2000 or some other date.  Sanofi didn't choose 2006.
8   Dr. Kessler chose 2006 and with good reason.  And when you look
9   at the different dates that Mr. Lambert brought up, the Court
10  already looked at all the information regarding the Sedlacek
11  articles, regarding the underlying information on that, and
12  we've gone over this.  But why December 15, 2006?  That's when
13  Sedlacek's abstract was published, and that matters because it
14  was the first time when you had all of the controlled data from
15  both sides of the study presented to the public.  And that's
16  when Sanofi knew about both sides of the study according to
17  Dr. Kessler.

18          So Dr. Kessler's opinion has been clear.  It has not
19  changed, and we know that under the law, so Dr. Kessler
20  again -- go ahead.

21          THE COURT: Are you saying, Mr. Strongman, that only a
22  regulatory expert could rebut this, or could it be one of the
23  causation experts along with the testimony of Dr. Madigan; or
24  is a regulatory expert the only person that can testify in
25  response or present rebuttal evidence in this case?

OFFICIAL TRANSCRIPT

1          MR. STRONGMAN: I think the opinion would have to come

2    from an expert qualified in offering an opinion on when a duty

3    to warn arose under the regulations.  And if you want to call

4    that a regulatory expert, you can.  Perhaps, there are fields

5    that are a little broader than that.

6          What we know is that Dr. Madigan is not qualified to

7    do that, and he has admitted he is not doing that.  And so what

8    you have is a concession, an admission repeatedly given by

9    Dr. Kessler.  So it's not logical to essentially let the

10   plaintiffs try to get over this motion to reconsider by saying

11   Dr. Madigan, who Dr. Kessler asked to do the statistics for

12   him, actually rebuts Dr. Kessler.  That just doesn't make

13   sense.

14         And so the law, I think, is clear as well.  When you

15   have an expert concession like we have here, that justifies

16   summary judgment.  And these are two cases that go to that that

17   are cited in our brief.

18         But to answer directly Your Honor's question, I think

19   you do have to have an expert, and it has to be an expert

20   qualified to offer an opinion on the duty to warn under the

21   regulations, and Dr. Madigan is not.  And so we have no

22   response to Dr. Kessler's testimony still to this day.

23   Dr. Kessler has considered the new -- what we're calling the

24   new reports.  Dr. Kessler has looked at every single piece of

25   regulation.

OFFICIAL TRANSCRIPT

```
 1            THE COURT: Is it under the regulations or under
 2   Louisiana law?  I think sometimes it gets to be a little less
 3   clear because the regulations say one thing, and we talk about
 4   that in preemption, but what does Louisiana law require you to
 5   do.
 6            MR. STRONGMAN: I think the two things sort of
 7   dovetail.
 8            THE COURT: They do, but the language is --
 9            MR. STRONGMAN: When you're looking at a prescription
10   drug, I think you have the overlay --
11            THE COURT: Right, right, right.
12            MR. STRONGMAN: -- which is when a duty to warn arises
13   being described by an FDA regulation.  So I think it comports
14   with when you look at Louisiana law saying when a manufacturer
15   should have known, I think there's an overlay when you go to a
16   prescription drug that is the FDA regulation.  It's how you
17   define the duty in this specific context when you have a
18   prescription drug that is regulated by the FDA.
19            And at either rate, whether you set -- even if you
20   set that distinction aside --
21            THE COURT: That's what I think I'm...
22            MR. STRONGMAN: Dr. Kessler, his statements are clear.
23   2006 is when they knew or should have known.  There's really no
24   ambiguity regardless of what standard you're talking about.
25            But the bottom line -- and I'm happy to answer any
```

OFFICIAL TRANSCRIPT

1  other questions that the Court has about Dr. Madigan or

2  Dr. Kessler.  But the bottom line is Dr. Madigan is not

3  offering an opinion on the very issue that we're here talking

4  about.  All he did was run statistics that Dr. Kessler then

5  pulled together and offered an opinion based on.  And I know

6  that there's --

7           THE COURT: I guess what's problematic for me, and

8  just in that last question I asked you which was, you know, you

9  talked about when we're looking at the FDA regulations, and I

10 understand that.  And it is this very difficult way that we, in

11 my view, have to connect the two, the various state law duties

12 and then the FDA regulatory process.

13          But I know when I was initially looking at this, I

14 looked at the duty to warn under Louisiana law which is what

15 the original decision, that order was issued addressing.  And

16 then I looked, for example, I think -- oh, gosh, I'm probably

17 going to mess this up.  Was it Montana that has a very

18 different -- is it Montana?  I don't know.  There are some

19 states that have very different --

20          MR. STRONGMAN: I think you cited New Hampshire,

21 perhaps.

22          THE COURT: There are different duties under the

23 various state laws.

24          MR. STRONGMAN: And if I can answer that?

25          THE COURT: I think you need to.


                        OFFICIAL TRANSCRIPT

1        MR. STRONGMAN: I think we actually addressed this

2   somewhat in the argument last time as well.  That Sanofi's

3   point is that -- and I'm not going to get into preemption

4   exactly, but there's preemptive concepts at play here which is

5   we know that you cannot have the state law asking or mandating

6   that the manufacturer do something different than what is

7   required by the FDA law.

8        So our position has always been, and I think in our

9   initial moving papers it said there may be different language

10  in how the duty to warn is articulated in the different states.

11  But what we know is that at their core, they are essentially

12  the same in terms of what they're going to require for an FDA

13  prescription product because they can't conflict with the FDA

14  regulations.

15       So yes, no doubt there's some different articulations

16  in the states.  But what we know is that, I think, there's

17  consensus across them when it comes to an issue that we're

18  dealing with here, which is for a prescription drug, when does

19  the duty to warn arise.  And we know what Dr. Kessler has said.

20  So I think those differences in the state law should not trip

21  up the application of this motion and certainly are not a basis

22  to reconsider Your Honor's ruling.

23       THE COURT: Okay, thank you.

24       Mr. Lambert.

25       MR. LAMBERT: Just very briefly, Your Honor.  In

OFFICIAL TRANSCRIPT

1    response to some of what Mr. Strongman pointed out, I would say
2    that if I understood the argument correctly, Dr. Sedlacek, on
3    this particular date when he released the abstract, was able to
4    show a statistically significant association between Taxotere
5    and permanent alopecia.

6         It's clear from the papers that we submitted that
7    Sanofi had this information from Dr. Kopreski's 30(b)(6)
8    testimony, the company speaking, had extensive communications
9    with Dr. Sedlacek before the issuance of this abstract, and
10   Sanofi has, I would say, a different amount of bargaining power
11   here.  They're the ones that receive all of the adverse events.
12   Sedlacek is just looking at limited information.

13        And you know, Louisiana Revised Statutes 9:2800.57
14   Subsection C provides the LPLA's continuing duty to warn when a
15   manufacturer, "acquires knowledge of a characteristic of the
16   product that may cause damage and the danger of such
17   characteristic, or who would have acquired such knowledge had
18   he acted as a reasonably prudent manufacturer, is liable for
19   the damage," blah, blah, blah, blah, blah.

20        So those have to be read together, that duty and the
21   duty when you have just some evidence of a causal association
22   under the CFR statute that I had cited.  And on behalf of these
23   more than 1300 women, I believe it's important to read those
24   two together.  It's important to consider the evidence here
25   that Sanofi knew prior to issuance of that abstract and find

OFFICIAL TRANSCRIPT

1  that they've just picked a date that is too close in time to

2  result in the death knell for all of these cases.  Thank you,

3  Your Honor.

4          THE COURT: Thank you, Mr. Lambert.

5          The next motion is motion for partial summary

6  judgment on comparative fault of treating physicians and misuse

7  of Taxotere filed by the plaintiffs.  Mr. Kyle Bachus will

8  argue this motion on behalf of the plaintiffs, Mr. Doug Moore

9  on behalf of the defendants.

10          Mr. Bachus, are you ready to proceed?

11          MR. BACHUS: Yes, Your Honor.  Good morning, Kyle

12  Bachus from Bachus & Schanker on behalf of the PSC.  May it

13  please the Court.

14          We are here today asking for partial summary judgment

15  on some important issues that are raised and addressed in no

16  less than eight of the designated affirmative defenses from

17  Sanofi.  Interesting here, Your Honor, is that despite our

18  moving for summary judgment, the defense in this case really

19  provides zero basis and essentially concedes the argument.

20          And so Rule 56 provides that, "A party may move for

21  summary judgment, identifying each claim or defense -- or the

22  part of each claim or defense -- on which summary judgment is

23  sought.  The Court shall grant summary judgment if the movant

24  shows that there is no genuine dispute as to any material fact,

25  and the movant is entitled to summary judgment as a matter of

OFFICIAL TRANSCRIPT

 1   law."

 2            We have come to you, Your Honor, because we are

 3   attempting to narrow actual issues that remain for trial.

 4            THE COURT: What I don't understand, Mr. Bachus -- I

 5   agree with you.  I think they've said, yeah, we're not going to

 6   present that evidence.  But what I don't understand, and maybe

 7   this is a question for Mr. Moore, is there was a request that

 8   we put it off for motions in limine.  I thought if you don't

 9   intend to address that, I'm not sure why we can't just deal

10   with it now.

11            MR. BACHUS: Yes, Your Honor, I think with all respect

12   to opposing counsel, I think that there's some conflation

13   happening with respect to what we're asking for and what may

14   come down the road with respect to motions in limine that may

15   be impacted by the rulings that you make on the motion for

16   summary judgment.

17            We believe the first step is we need to come to the

18   Court and say, "These are issues that as a matter of law are

19   taken off the table."  Then the implication may be addressed in

20   a motion in limine as to what they can or can't say based upon

21   those rulings.  So I think that we're not trying to put both

22   horses in front of the carriage today.  We're going to put one

23   in front.  Then we'll move forward with the others based upon

24   the rulings.

25            THE COURT: You know, Mr. Bachus, I think the better

OFFICIAL TRANSCRIPT

1  way to proceed is let me hear from Mr. Moore because I'm not

2  sure, and then maybe respond.

3          MR. BACHUS: Sure, I'd be happy to.  And I've tried to

4  distill very simply what we're asking for.

5          THE COURT: No, I got that.  And maybe I'll have

6  questions once I hear from Mr. Moore.

7          I think this is comparative fault of treating

8  physicians and misuse of Taxotere.  What you told me is we

9  don't have that; right?

10          MR. MOORE: I think that's right, Your Honor.  Douglas

11  Moore on behalf of Sanofi.

12          What I think that we had mentioned when these motions

13  were filed, and it might have been in one of our Zoom chamber

14  meetings, is that some of these motions that are brought under

15  Rule 56 or brought under Rule 702 are motions seeking to

16  adjudicate issues that were raised in the *Earnest* trial as

17  evidentiary issues; and the Court made rulings on those

18  evidentiary issues.  And so with this particular motion, we

19  think this is a perfect example of it.

20          THE COURT: But does it matter if in this case you

21  have no evidence that you intend to show that Ms. Kahn's

22  physicians were at fault or they operated below the standard of

23  care?  I mean unless you have evidence of that, why wouldn't I

24  grant a summary judgment on it?

25          MR. MOORE: So what we've asked the Court to do is

OFFICIAL TRANSCRIPT

1   deny the motion as moot.  Our concern with -- and what they're
2   asking you to do is adjudicate a theory of the case that we're
3   not advancing for this reason:  To seek an order prohibiting
4   any evidence or testimony on the following topics.
5         That's what -- and I think Mr. Bachus just said that.
6   He said, well, we're going to do this, and then this is going
7   to give us the reason to come back to the motions in limine and
8   exclude all of the testimony about what actually happened with
9   this particular patient when she went into that room with
10  Dr. Kardinal.
11        THE COURT: Wait, I read this motion -- I guess I read
12  it that there is no evidence that Dr. Kardinal or Dr. Larned
13  committed medical malpractice and that's what caused this
14  problem.
15        MR. MOORE: Right.  Well, this would be something that
16  we would normally expect them to raise through, ask us for a
17  stipulation that we're not going to put on standard of care
18  evidence or that we're not going to make, you know, to
19  stipulate to those things.  It wouldn't necessarily require --
20        THE COURT: Maybe I'm not smart enough.  I just don't
21  follow.  Maybe there's something going on behind the scenes
22  that I'm not seeing.  I think -- okay, go ahead.
23        I'm sorry.  I keep interrupting you, and you're
24  trying to talk.
25        MR. MOORE: No, no, that's fine.  That's fine because

OFFICIAL TRANSCRIPT

1    I want to answer the questions that you have.

2            And I agree that the context in which this has been

3    brought and our response to it, you know, we're almost in some

4    ways, you know, when you prepare a witness for a deposition,

5    you just tell them to answer the question.  Don't try and

6    answer the inference.  But here, we're answering the inference

7    in our motion papers.

8            I mean we could have argued that Dr. Kardinal

9    violated the standard of care.  We're not doing that.  We think

10   he did a perfectly fine job of saving Elizabeth Kahn's life.

11   But this patient was in a clinical trial.  This patient was

12   given the medicine inconsistent with the labeling.  It was

13   off-label prescription.  She received a treatment regimen that

14   was outside the NCCN guidelines, and Dr. Kardinal had not read

15   the labeling since the 1990s.  And so all of those facts --

16           THE COURT: But would that be precluded if I grant

17   this motion?

18           MR. MOORE: Well, we would hope not.

19           THE COURT: I don't think you're saying that he

20   committed malpractice, and that's why she's lost her hair.

21   We're not saying that he committed malpractice.  It's just this

22   is how it was prescribed.

23           MR. MOORE: Correct.  And what we want to be able to

24   do -- and let me just jump down to my last slide.

25           THE COURT: I'm sorry.


                           OFFICIAL TRANSCRIPT

```
 1              MR. MOORE: Well, my clicker is not working; so it's a
 2   little wonky.
 3              THE COURT: Maybe I'm missing it.
 4              MR. MOORE: Let's see.  So if we get to the point in
 5   the case where Dr. Kardinal gets on the stand, I mean, he's
 6   83 years old.  He lives in Missouri.
 7              THE COURT: He might not be on the stand.
 8              MR. MOORE: He might not be on the stand in the
 9   courtroom.  Hopefully, we're doing it over there and not here.
10              But if he gets on the stand and says that these words
11   in the labeling, cases of permanent alopecia have been
12   reported, "Then I would have done something different.  I would
13   have had this different conversation.  These events would have
14   occurred, and then I would have chosen not to use that
15   medicine."  We get to challenge him on that.
16              We get to challenge him on that with the facts, the
17   facts of how he has used labeling, how this was in a clinical
18   trial, a clinical trial where it had a 40-page consent where
19   she signed every single page.  It listed hair loss and then
20   told her some of these side effects might not go away because
21   she's literally participating in a scientific experiment.  So
22   that's what our opposition to this motion was.
23              In terms of why wouldn't you grant it, the only thing
24   I can say to that is as the defendant in the case, I go second.
25   I don't know how the evidence is going to come in.  If
```

1   Dr. Kardinal gets on the stand and says, "You know what, you're
2   right.  I should have read the label.  I didn't.  I should have
3   read the literature.  I didn't do that.  My patients expect me
4   to do that.  It's my responsibility to do that, and I didn't.
5   That's on me."  If he says that, you know, if this motion is
6   granted, then I don't even have the ability at that point.

7          We're not arguing that he violated the standard of
8   care.  Like I said, he did a perfectly fine job of saving her
9   life.  But if he's going to come in court and say that this
10  would have made a difference based on the facts of this
11  clinical trial and how he has used labeling and how he has used
12  the NCCN guidelines.  If he's not reading the labeling, if he's
13  not following the guidelines, then it's directly relevant to
14  warnings causation and whether or not a different warning would
15  have made a difference.

16         And so we've asked you to deny the motion because we
17  think it's moot because we're not advancing that claim.  If
18  Your Honor feels it's necessary to grant it now and not defer
19  it to the Rule 50 stage, let the evidence come in, that's fine.
20  Our only concern is being able to challenge this physician in
21  the event he gets up and says that those words would have made
22  a difference and to challenge him on his history of using the
23  label and the fact that this was a clinical trial and it was
24  outside the guidelines.

25         THE COURT: That's what I wanted to know.  Thank you.


                         OFFICIAL TRANSCRIPT

1          Mr. Bachus.

2          MR. BACHUS: Thank you, Your Honor, may it please the

3 Court.  If you follow Counsel's last argument, there would

4 never be a summary judgment motion granted in any case because

5 somebody might come into the courtroom and say something

6 different than what they've said in discovery.  They might

7 endorse a witness.  A witness might change their testimony.

8 The rule permits us to request it, and we're entitled to it.

9          And I think that one of the reasons I wanted to --

10 Doug, is it possible to put it back, the PowerPoint?

11          MR. MOORE: Oh, sure.

12          MR. BACHUS: One of the reasons I wanted to just go

13 through what we're asking for in great clarity so that we all

14 understand that what we're seeking is, No. 1, an order from

15 you, Your Honor, that confirms that as a matter of law, this

16 kind of medical providers, including, Dr. Kardinal and

17 Dr. Larned, did not breach the standard of medical care in

18 their diagnosis, care, and treatment of Ms. Kahn's breast

19 cancer.

20          All of the experts agree to this.  And so we're

21 asking for that order so that it's -- we're narrowing the

22 issues that are going to be at trial based upon the evidence.

23 That's the first prong of what we're requesting from the Court.

24 And again, it's implicated by no less than eight different

25 affirmative defenses that have not ever been withdrawn.

OFFICIAL TRANSCRIPT

1          No. 2, please.  Thank you, Doug.

2          No. 2, the off-label Taxotere treatment regimen

3    prescribed to Ms. Kahn was appropriate and within the standard

4    of care as a matter of law.  That's what every expert who's

5    been asked about it in their depositions has agreed.

6          No. 3, Taxotere was not used improperly by Ms. Kahn

7    or by her medical providers.  And this is, again, there was --

8    these questions were asked of defense experts and plaintiff's

9    experts, and everybody agrees.  There's not a single deposition

10   line or sentence cited by Sanofi in their motion.

11         And the final thing we're asking the Court to grant

12   us in terms of partial summary judgment, Ms. Kahn and her

13   medical providers were not negligent.  And again, this, despite

14   what the defense has said this morning about the acquiescence,

15   these affirmative defenses have never been withdrawn.  They're

16   all stated, and we have won on these issues based upon the

17   discovery that has occurred in the case.  And there is no need

18   for the jury to consider any of these issues, and it will

19   simplify the issues that the jury is left to decide.

20         And so pursuant to Rule 56, we're entitled to it.

21   We've demonstrated our entitlement to it, and we're asking the

22   Court to enter an order.

23         THE COURT: Let me ask you, Mr. Bachus, because I know

24   you were listening to Mr. Moore, and he said what if

25   Dr. Kardinal or Dr. Larned is on the stand, or wherever, and is

OFFICIAL TRANSCRIPT

1 asked whether or not he reads the product inserts and if he
2 knew this, would he have told her.  I'm trying to figure how
3 his question went.

4 But basically, where the doctor would say, "Listen,
5 this is on me.  I should have read it.  I should have warned
6 her about it.  I should have known these things" would that be
7 precluded by these orders, by this order?

8 MR. BACHUS: Well, first, I think that they had the
9 opportunity to ask those very questions when they took the
10 deposition and to develop those facts if they thought they were
11 important to develop before we got here on the motion for
12 summary judgment.  So I'm presuming that these very skilled
13 lawyers did their jobs and asked the questions that they wanted
14 the answers to, and we're going to stand by the record that has
15 been created.

16 I would guess that if they had some information in
17 that testimony that was different than what we're asking the
18 Court to do, you would have seen or heard about it in their
19 response to this.  And then if the doctor came in, he might be
20 saying something different than what he said under oath.  I'm
21 not aware of him making any such statements.  And if they had a
22 concern, now is the time.

23 You know, could there be a motion to reconsider?
24 Sure, we just heard a motion to reconsider, and certainly, that
25 can occur.  But again, we all have to follow the rules, and the

OFFICIAL TRANSCRIPT

1    rules permit us to request this relief.  They had ample

2    opportunity to develop it.  They had ample opportunity to say

3    under Rule 56 that they wanted more time to ask more questions

4    before you ruled on this.  None of that was done.  So the

5    record is what the record is.

6              Thank you, Your Honor.  Do you have any other

7    questions for me?

8              THE COURT: No, I don't think so.

9              The next motion is a motion to exclude the testimony

10   of Dr. David Madigan.  That's Document 11003.  Arguing this

11   motion is Torrey Peterson for the defendant, and Claire Berg

12   for plaintiffs.  This is defendant's motion.

13             Please proceed, Ms. Peterson.

14             MS. PETERSON: Good morning, Your Honor, Torrey

15   Peterson on behalf of Sanofi.  May it please the Court.

16             Since Your Honor's *Daubert* ruling in the *Earnest*

17   trial, Dr. Madigan has expanded several of his opinions and

18   conducted some new analyses that we believe warrant exclusion.

19   First up is Dr. Madigan's expanded general causation opinion.

20             THE COURT: Didn't somebody say this morning that

21   Dr. Madigan's opinion didn't change?  Somebody said that this

22   morning, and I don't remember --

23             MR. STRONGMAN: I said with regard to his signal

24   analysis it did not.

25             THE COURT: Okay.


                         OFFICIAL TRANSCRIPT

1          MS. PETERSON: Your Honor, I can clarify that for you.

2          THE COURT: Just checking.  I see lots of inconsistent

3    arguments.

4          MS. PETERSON: Your Honor, a couple of Dr. Madigan's

5    analyses stayed the same.  Most of the data that he used is the

6    same.  But what he did with that is he did some new analyses on

7    that data that we believe has some issues with it.

8          And this one is actually not a new analysis.  It's

9    just frankly a discrepancy on how we interpret your general

10   causation order.  And we believe that Dr. Madigan -- so for the

11   general causation, there's a two-part test that Your Honor has

12   laid out for an expert to be able to opine on general

13   causation:  First, statistical significance; and two, an

14   assessment on causality.

15         Dr. Madigan only did the first step of that analysis,

16   and your order clearly said that he didn't even purport to do

17   the causality assessment.  He limits his opinion to statistics

18   and just provides that foundation for Dr. Feigal or other

19   experts to take that and do the assessment.

20         But since that order, Dr. Madigan has repeatedly

21   testified that Taxotere causes permanent hair loss.  So because

22   Dr. Madigan hasn't done that second prong, the causality

23   assessment, we think that his opinions and testimony needs to

24   be limited to the statistics and not go that second step since

25   he hasn't done that work.

OFFICIAL TRANSCRIPT

1          So the next new analysis that Dr. Madigan did is
2    based on the TAX316 data which Your Honor is very familiar
3    with.  In *Earnest*, Dr. Madigan's analysis of the TAX316 data
4    alone did not result in statistical significance.  So getting
5    ready for the *Kahn* trial, Dr. Kessler and Dr. Madigan did a new
6    analysis of a different subset of the data to reach statistical
7    significance, but it's cherrypicked for two very clear reasons.
8          The first is the type of calculation that they did,
9    and you can see the cutout here.  This is actually from a
10   handwritten note that Dr. Kessler did.  So of this new data,
11   Dr. Kessler pretested the type of calculation that was going to
12   be run.  The first is the Fisher's exact which resulted in .06,
13   not statistically significant.  So Dr. Kessler picked a second
14   type of calculation, the mid-P P-value which .03 does result in
15   statistical significance.  So what Dr. Kessler did is he
16   directed Dr. Madigan to only do the mid-P P-value.
17         And what Dr. Madigan told us at his deposition, he
18   did one calculation and one calculation only, and that's the
19   one that reached significance.  They didn't disclose that there
20   was another calculation that was ran.  They didn't put it in
21   the report that there was one that didn't reach significance.
22         The second reason this is cherrypicked is the
23   duration.  For the first time in either Dr. Madigan's or
24   Dr. Kessler's report, they're using a two-year cutoff.  And the
25   reason this is, is because for this dataset, any point prior to

OFFICIAL TRANSCRIPT

1  two years it didn't result in statistical significance.  So

2  it's clear that this new calculation on the TAX316 data is a

3  litigation-driven analysis that should be excluded.

4           So next is we have this new -- oh, go ahead, Your

5  Honor.

6           THE COURT: You know, this is the only thing that I'm

7  curious about because I know the complaint speaks to

8  six months, and I've required the plaintiffs live with that

9  much to their chagrin.

10          But I have heard from multiple people with Sanofi

11  saying, well, we don't know if it's six months, it's really not

12  permanent.  We don't know if permanent is two years, ten years,

13  five years, and when do we know it's permanent.

14          And so I guess, I don't know, I find it interesting

15  that at two years, that's where we really see the difference,

16  but anyway.

17          MS. PETERSON: Well, Your Honor, for this particular

18  analysis, two years did make a difference.  But if we're going

19  to hold the plaintiffs to what is alleged in their complaint

20  which is six months, it doesn't result in statistical

21  significance.

22          THE COURT: So is that going to be what we're going to

23  do with all of defendant's experts, hold them to six months?

24  Because that's what I heard repeatedly during the *Earnest* trial

25  is, well, we don't know if it's six months.  Six months would

OFFICIAL TRANSCRIPT

1    not be permanent.  We have to go to two years, four years,
2    ten years.  Then we know if it's permanent.

3          That's what problematic about this, just an
4    observation, but I understand that you cannot have cherrypicked
5    calculations.  But on the other hand, we heard a great deal
6    about six months really isn't permanent.

7          MS. PETERSON: Sure.  But for Dr. Madigan and
8    Dr. Kessler, this is the first time they have chosen to vary
9    from that definition.

10          So then the next one is Dr. Madigan's new -- this
11    incidence rate calculation or the calculation he did on
12    Sanofi's internal safety database.  And so Table 6, the first
13    three columns is what he did for the *Earnest* trial.  So the new
14    portion is at Column 4.  It's highlighted for Your Honor.  And
15    this is a misleading calculation in which Dr. Madigan used
16    Table 6 throughout his direct testimony at trial as a
17    demonstrative.  And if you add in Column 4 -- and for example,
18    Ms. Kahn was treated in 2008 -- a juror could believe that
19    11.6 percent of the patients who were receiving Taxotere were
20    developing permanent hair loss.

21          But regardless if, you know, a jury is misled or not,
22    what is more important here is we asked Dr. Madigan what
23    significance does this calculation have, and he said the PSC --

24          THE COURT: Nothing.

25          MS. PETERSON: Yeah, nothing.  It's trivial.  There's

OFFICIAL TRANSCRIPT

1    no significance.  And while plaintiffs actually ignored this

2    testimony in their opposition -- I mean Sanofi agrees.  We

3    agree that it's a trivial calculation, and therefore, it should

4    be excluded.

5         Okay, the fourth analysis that's new to Dr. Madigan's

6    report is a meta-analysis where he combined four observational

7    studies and derived one composite calculation.  In real life,

8    however, Dr. Madigan says you don't do this.

9         THE COURT: Right.

10        MS. PETERSON: Dr. Kessler, same thing.  It's

11   problematic at best.

12        And the case law is also clear on this, that for any

13   type of meta-analysis, it can be observational, it can be

14   controlled clinical trial, the quality of the meta-analysis is

15   dependent upon the data that you're using.  When the studies

16   are different from one another, the end result of the

17   meta-analysis are uninformative.  And that's exactly what we

18   have here.  We have four studies with different definitions of

19   the injuries.  They evaluated the patient's hair-loss in

20   different ways.  The methodology they used to collect the data

21   was all different.

22        And in plaintiff's opposition, they say you can

23   ignore -- they can be overlooked because Dr. Madigan calculated

24   something called the heterogeneity.  There are two responses to

25   that.  Even if we take plaintiffs at their word, it still

OFFICIAL TRANSCRIPT

1  fails.  Dr. Madigan's heterogeneity calculation for this

2  meta-analysis is 63 percent, and that represents substantial

3  heterogeneity.  By Dr. Madigan's own words that in the face of

4  significant or substantial heterogeneity, you don't do a

5  meta-analysis.  You just don't do it.  So it doesn't matter if

6  he calculated it or not.

7          But second, heterogeneity, it's a mathematical

8  calculation.  All it does is compute the difference in the

9  population sizes of each of the four studies.  Heterogeneity,

10  it can't calculate that in the Crown abstract that patients

11  were called via telephone interview to collect their data.

12  Heterogeneity can't capture that in the Martin article 14

13  different chemotherapy regimens were used.  So while his

14  calculation alone definitely warrants the exclusion, there are

15  other issues and differences amongst these four studies that

16  make it inappropriate for a courtroom.

17          Finally is the new guidance from FDA.  So in November

18  of 2019, FDA issued new draft guidance for the evaluation of

19  case reports.  Now in plaintiff's opposition, they don't argue

20  that Dr. Madigan shouldn't follow FDA best practices in this

21  new guidance.  Instead what they argue is that you don't follow

22  Section 7, but only Section 6 applies to what Dr. Madigan did

23  here.  But it doesn't matter if you're looking at Section 6 or

24  Section 7 because both of them require the reviewer to look at

25  the underlying case report, read the narrative to ensure that

OFFICIAL TRANSCRIPT

1  the description is matching what you're trying to analyze which

2  Dr. Madigan failed to do.

3          And it's crucial in this case because Sanofi did go

4  and look at those case reports.  In all of the reports

5  Dr. Madigan used for Ms. Kahn's case, not a single one is a

6  case of permanent hair loss, and that's something plaintiffs

7  failed to even acknowledge in their opposition.

8          So Your Honor, for the reasons that are said here and

9  that are set forth in our brief, Sanofi respectfully requests

10 that you grant our motion to exclude Dr. Madigan's testimony.

11         THE COURT: Thank you.  Ms. Berg.

12         Oh, wait, Ms. Peterson, you got to wipe everything.

13         MS. BERG: Is the clicker working?

14         MR. MOORE: It should be.  If it isn't, just tell me,

15 and I'll make it move forward.

16         MS. BERG: Okay.  Good morning, Your Honor.

17         THE COURT: Good morning.

18         MS. BERG: Claire Berg from Gainsburgh Benjamin on

19 behalf of the PSC and the plaintiff Ms. Kahn.

20         I'm going to try to touch on all five areas that

21 Sanofi seeks to exclude Dr. Madigan's testimony, and I want to

22 start where Ms. Peterson just left off.  This is the argument

23 concerning the FAERS database and Sanofi's internal drug safety

24 database.  Now Your Honor is well-versed in these analyses

25 performed by Dr. Madigan.

OFFICIAL TRANSCRIPT

1          THE COURT: Well, that might be a stretch.
2   Statistics, I avoided just so you know.
3          MS. BERG: I understand completely.  But these
4   analyses were discussed before and during the *Earnest* trial.
5   So I want to focus on this FDA draft document that Sanofi has
6   brought before the Court which I'm going to say is not at odds
7   with Dr. Madigan's methodology.
8          A disproportionality analysis, like the one performed
9   by Dr. Madigan, is still regularly used by drug regulators and
10  drug manufacturers alike.  Dr. Madigan looked at the FAERS
11  database and Sanofi's internal database to determine whether
12  and when a safety signal emerged for Taxotere and permanent
13  alopecia.  His analysis is akin to procedures described in
14  Section 6 of the FDA draft document, and it certainly
15  contemplates a higher-level overview look of these case
16  reports.
17         And despite that, Sanofi desperately wants
18  Dr. Madigan to look at the underlying case reports which
19  plaintiffs maintain is completely inappropriate and virtually
20  impossible for him to do.  He's a biostatistician.  His role is
21  not to subjectively analyze each and every underlying case
22  report at an individual level.  And honestly, undertaking such
23  an analysis would degrade the value of his statistical work.
24         Now with regard to the three new calculations for
25  analyses that Sanofi seeks to exclude in this motion that

OFFICIAL TRANSCRIPT

1   Dr. Madigan has put forth in his report for the trial involving
2   plaintiff Ms. Kahn, the first of those is Dr. Madigan's
3   meta-analysis of the four observational studies.  I want to
4   point out that the centerpiece of Dr. Madigan's opinions is his
5   analysis of the randomized controlled clinical data, but it is
6   good statistical practice to look at other sources of evidence
7   such as these observational studies.

8         Dr. Madigan readily admits there are limitations in
9   observational studies, and that is proper for
10  cross-examination.  But that does not mean that the evidence
11  should be deemed inadmissible completely.  And I'm going to try
12  to pronounce the word correctly, the heterogeneity, that rate,
13  he determined that it was not statistically significant, and
14  therefore, this evidence is still supportive of a causal
15  effect.

16        The second new calculation that Sanofi takes qualms
17  with is the calculation using the two-year follow-up data from
18  TAX316.  I don't want to spend much time on this because to be
19  frank I think that this is proper for cross-examination.
20  Sanofi may cross-examine Dr. Madigan on the calculation using
21  the conventional P-value and the calculations at various
22  follow-up periods.  Your Honor astutely noticed that the
23  two-year follow-up duration is a conservative duration compared
24  to six months.  So if there's a statistically significant
25  increased risk of permanent alopecia at two years, that's very

1    informative to Dr. Madigan, and therefore, Dr. Kessler.

2             I want to turn to the third new analysis by

3    Dr. Madigan.

4             THE COURT: But why did that change?  Why did that

5    change from *Earnest* to the *Kahn* case in using this midpoint

6    analysis, this midpoint calculation that we did not do -- he

7    did not do in the *Earnest* case?  This was something new and

8    different.

9             MS. BERG: Yes, I understand.  So Dr. Kessler asked

10   Dr. Madigan to use a mid P exact value, and that is proper

11   under statistics using small numbers that they're evaluating.

12   They actually think it becomes more accurate.  They're using

13   the numbers zero and 5.  They chose to use this mid P-value to

14   create more accuracy among the calculations.  That's why that

15   was chosen for this specific calculation.

16            I want to turn to Table 6.  Let's see if I can get

17   this to pop up.  There we go.

18            Sanofi's counsel put this up as well.  They take

19   issue with this final column on the right.  Now only Sanofi has

20   come in and described this as an incidence rate.  Dr. Madigan

21   does not define this as an incidence rate.  In fact, he admits

22   you cannot calculate the incidence rate.  He clearly defines

23   this as the number of reports excluding recovery as a

24   percentage of the total alopecia reports that Sanofi collected

25   in its internal database from 1999 to 2015.


                        OFFICIAL TRANSCRIPT

1              It shows that a high percentage of the reports of
2    alopecia collected by Sanofi during this time period, it shows
3    a high percentage of them were permanent irreversible alopecia.
4    And that's what you would expect if there's a causal effect
5    between the drug and permanent alopecia.  So again, this is
6    just a strand of evidence that bolsters Dr. Madigan's ultimate
7    causal effect conclusion.
8              And speaking of that, his opinions on causation have
9    not changed as Sanofi seems to admit at some points and not at
10   others.  I want to read some quotes from the first bellwether
11   trial before Your Honor of Dr. Madigan's testimony.
12             He testified, "There's a real causal effect here."
13   He testified, "There was a statistically significant elevated
14   risk of irreversible hair-loss on Taxotere.  And from this, I
15   infer that Taxotere causes irreversible hair-loss."  He also
16   testified, "In light of the clinical trials, I would say to
17   them we've established there's a causal effect here."
18             Now his report for Ms. Kahn's bellwether trial
19   states, "There's adequate physical evidence that docetaxel
20   causes permanent irreversible hair-loss."
21             Your Honor, his opinions on causation remain grounded
22   in statistics and are within the limits of this Court's
23   previous decisions.
24             For these reasons, plaintiffs ask that Your Honor
25   deny Sanofi's motion to exclude the testimony of Dr. Madigan

OFFICIAL TRANSCRIPT

1    unless you have any other questions.

2            THE COURT: I think when we're talking about when

3    Dr. Madigan says that Sanofi's database, that's a trivial

4    calculation of no significance to him, why would that go to the

5    jury?

6            MS. BERG: I think that he's comparing this type of

7    evidence to the focal point, the centerpiece of his opinion,

8    the controlled, randomized clinical trial data which is of

9    higher quality admittedly.  So I think he's comparing the

10   importance of that.  I think that that would come out at trial

11   if he were allowed to opine on it.

12           THE COURT: But do we, you know, is that something we

13   want experts to get up and say, "Listen, this is of no

14   significance, it's trivial, but I'm going to throw it out there

15   anyway"?

16           MS. BERG: It does support his ultimate causal effect

17   opinion.  It shows that a high percentage were permanent that

18   were reported during that time.

19           THE COURT: Okay, thank you.

20           MS. BERG: Thank you, Your Honor.

21           THE COURT: Ms. Peterson, anything in response?

22           MS. PETERSON: Yeah, just a few things, Your Honor.

23           Your Honor, on that very last point of the incidence

24   rate calculation, the trivial calculation, however you want to

25   title it here, Ms. Berg's interpretation of what Dr. Madigan's

                        OFFICIAL TRANSCRIPT

1    testimony is, Dr. Madigan's testimony stands on its own.  We
2    asked him what it meant to him, and he told us it means nothing
3    to him.

4            But more importantly with that, and we cited this in
5    our brief, the reason that he did this wasn't because he
6    thought it was important to his overall opinions or analysis.
7    He said that it was the plaintiff's attorneys that asked him to
8    put it in here.  But to him, it's trivial.  So I just wanted to
9    emphasize that.  Those citations are in our briefing as well.

10           Most of what Ms. Berg just explained is that
11   everything is pretty much just up for cross-examination, but
12   what they ignore is all of the case law that excludes experts
13   from doing this over and over again.  They didn't cite that in
14   their brief to say this case law is incorrect or it doesn't
15   apply here.  It does apply.  And there are limitations to what
16   an expert can come in and do at court.  And while we do have an
17   ability to cross-examine them on those points, that doesn't
18   mean that just anything can be allowed into court even if there
19   are grounds to cross-examine on it.

20           And the case law in these instances have been clear.
21   Whether it's the cherrypicking, whether it's the meta-analysis
22   issues, it's clear that this should not be allowed in a
23   courtroom.

24           And with that, we just ask that Your Honor grant the
25   motion.  Thank you.


                          OFFICIAL TRANSCRIPT

1          THE COURT: Thank you.  It's 12:15.  I need a break.
2     The Court will be at recess.  It's 12:15.  Let's come back at
3     1:30.
4          (A lunch recess was taken.)
5          THE COURT: The next motion is plaintiff's motion for
6     partial summary judgment on affirmative defenses concerning
7     alternative causes.  We have Palmer Lambert arguing for
8     plaintiffs, Doug Moore for the defendants.
9          Mr. Lambert, are you ready to proceed?
10          MR. LAMBERT: Yes, Your Honor.  Good afternoon, Your
11     Honor, Palmer Lambert again, and may it please the Court.
12          This is plaintiff's motion for partial summary
13     judgment on affirmative defenses concerning alternative causes.
14     And Your Honor, I must say that I'm a little bit confused.  I
15     received Sanofi's supplemental memorandum yesterday evening on
16     this particular motion, and I'll summarize what I believe it
17     is.  I'm sure Mr. Moore will --
18          THE COURT: I don't think -- I didn't read it.
19          MR. LAMBERT: Your Honor, I'll summarize what I
20     believe it says, and then I'll allow Mr. Moore to talk about
21     it.  Basically, he has supplemented the motion with the
22     deposition testimony of our dermatologist and
23     dermatopathologist that were taken just in the last two weeks.
24     The reason why I'm confused, Your Honor, is because this is not
25     a motion to change the plaintiff's burden of proof.  It's not a

OFFICIAL TRANSCRIPT

```
1   motion to disallow the defendants from challenging our expert's
2   causation statements.
3           What it is, is a motion for partial summary judgment
4   on affirmative defenses.  And as Mr. Bachus said this morning,
5   those affirmative defenses are Sanofi's burden to prove, and
6   they're listed in my PowerPoint here which I won't read
7   through.  But the common thread in all of those affirmative
8   defenses is that somebody else is at fault, somebody else has
9   caused this.  And we don't believe that their experts have done
10  the work in order to make those types of suggestions to the
11  jury.
12          THE COURT: Mr. Lambert, I've read these cases and
13  some, I think, that weren't even cited.  And I have to tell you
14  I'm really, this is harder than I thought it would be.  Because
15  I think the question might be just is it a challenge -- you
16  have the burden of proof on causation.  But what is it that
17  you're asking me to eliminate from testimony during the course
18  of the trial?  And I think in the cases they talk to is who has
19  the burden of proof on that issue.
20          And so we looked at who's got the burden of proof on
21  affirmative defenses; and the cases say, well, it depends on
22  who's got the burden of proof.
23          MR. LAMBERT: I understand that.  I understand Your
24  Honor's concern there and questioning.
25          THE COURT: Well, it's not a question.  I mean I'm
```

OFFICIAL TRANSCRIPT

1  struggling with this, and I thought it would be not so
2  difficult.
3              MR. LAMBERT: Frankly, Your Honor, it is complicated.
4  But if you read through in our memorandum the listed
5  affirmative defenses that were filed in the Master Answer, they
6  say things like, "If plaintiff suffered or sustained a loss,
7  damage, injury, harm, expense, diminution, or deprivation
8  alleged," which Sanofi denies, of course, "the same was caused
9  in whole or in part or was contributed to by the negligence of
10 plaintiffs or caused by some other product or the result of the
11 fault of another person or persons, attributable to persons,
12 firms, corporations other than the Sanofi defendants."
13             And so what we feel is inappropriate is to allow
14 Sanofi to come in and basically say, "Adriamycin might have
15 caused this.  And gee, shouldn't that warning label have also
16 had permanent hair loss in it too?  And maybe it's the
17 manufacturers of Adriamycin that caused this problem."  And so
18 there is no evidence in this case that Sanofi has brought that
19 suggests that any other manufacturer has failed to do anything.
20 And so that question we believe is firmly answered by the
21 discovery thus far.
22             And Sanofi's experts confirm that they did no
23 research.  This is Dr. Wei, their biostatistician, no research
24 or reviewed any information on any drug other than Taxotere.
25 Does not provide an opinion that Taxotere may cause PCIA,

OFFICIAL TRANSCRIPT

1  not -- any other drug other than Taxotere can cause PCIA.

2          The same thing with their expert oncologist, just

3  basically *ipse dixit* opinions on other things might be an issue

4  here, but none of that is supportive of fault by anybody else.

5  The same thing with Dr. Glaspy, does not attempt to establish

6  with any methodology, other than subjective beliefs, a causal

7  link between any chemotherapy drug, tamoxifen, included, and

8  PCIA.

9          THE COURT: Well, are these affirmative defenses --

10 and I know they've been raised in the answer filed by Sanofi --

11 really affirmative defenses?  It seems like that's what the

12 courts look to, is it really an affirmative defense.  Are they

13 really going to say -- or is it a challenge to your burden?

14 Does that make sense?

15         Because I think that's where it becomes a little

16 trickier, and so I just want to understand what you're asking

17 from this Court.  Are you asking that they not be allowed to

18 say what you just said, which is, the real problem and the real

19 person at fault are the manufacturers of Adriamycin; or are you

20 seeking to preclude their presentation of any evidence about

21 what other drugs may cause hair loss?

22         MR. LAMBERT: It's the former.  And so what we're

23 saying is without doing the underlying general causation or any

24 other analysis with respect to these other drugs, Sanofi

25 shouldn't be able to say that her PCIA, if she has PCIA, is the

OFFICIAL TRANSCRIPT

1    fault of any other third party because they haven't provided

2    the work or the background information in a *Daubert*-acceptable

3    manner to say that any of these other drugs cause PCIA.

4            Now they can come in and they can argue that

5    Dr. Tosti's differential diagnosis was not right.  They can

6    come in with their dermatologist and dermatopathologist who

7    haven't even given reports yet and say, you know, we think that

8    she has endocrine-induced alopecia or androgenetic alopecia.

9            THE COURT: But could they ask her treating physician

10   if she was also on -- I don't know what she was on --

11   Adriamycin and ask them, "Doesn't Adriamycin cause permanent

12   hair loss?"  I mean on cross-examination, I think as long as

13   there's a good faith belief in it, it's fair game.

14           MR. LAMBERT: Sure.  So what we believe they can ask

15   is they can ask about the methodology and the conclusions of

16   our experts.  They can ask Dr. Tosti if these drugs in her

17   opinion cause PCIA, and she can respond as she has in

18   depositions which is it might happen.

19           But we don't have any general causation testimony

20   from any of their experts that passes the *Burst* muster in terms

21   of this drug is shown through Bradford Hill and other criteria

22   to cause PCIA.  And so we don't believe that it's appropriate

23   for them to be able to say that.

24           THE COURT: So they couldn't ask Dr. Glaspy, for

25   example, "In your practice, have you reviewed literature that

OFFICIAL TRANSCRIPT

1  shows that," and I'm just going to pick, "Adriamycin has been
2  found to cause PCIA?"  They couldn't ask him that?

3          MR. LAMBERT: What I believe the testimony has shown
4  is they can say that there are case reports out there showing
5  there's an association.  But the problem is when you say, "can
6  cause," and then you get into the idea of causation proof
7  that's necessary under the *Burst* case and other cases, you get
8  into a problem.  And so I think that the questions obviously
9  can address the methodology and the conclusions of the experts,
10 but...

11         THE COURT: So those questions would be reserved for
12 cross-examination for the experts of plaintiff?

13         MR. LAMBERT: Yes.

14         THE COURT: But not direct testimony from defendant's
15 expert because it doesn't pass *Daubert* criteria?

16         MR. LAMBERT: That's correct, Your Honor.  And we've
17 brought individual challenges to the defendant's experts along
18 those lines and along the lines of what's in my slides here for
19 each expert; so I won't go through them.

20         But I think what I would say in summary is, you know,
21 the defendants conflate the right to challenge causation
22 opinions with the presentation of affirmative assertions of
23 alternative causes, and particularly, fault of third parties.
24 And there is just no evidence that there's fault of any other
25 manufacturer involved in this case.  Certainly, no failure to

1  warn has been shown, proven, or even the underlying work done

2  to show that there's been a failure to warn by any other

3  manufacturer.

4          THE COURT: So I read the response of the defendants,

5  and they spoke to what my rulings were at the motion in limine

6  stage.  And that would not be -- that's not the same thing.

7          MR. LAMBERT: No.

8          THE COURT: So are you basically like two ships in the

9  night that you're not communicating?  Because what I'm hearing

10  is you have no objection to aggressive cross-examination of

11  your experts about, particularly, literature that shows that

12  these other medicines can cause alopecia in crossing the

13  witnesses.  Your objection is in the defense being able to

14  present alternate causes because they haven't done the work.

15          MR. LAMBERT: That's effectively it, Your Honor, I

16  think that --

17          THE COURT: I know there's probably more nuance, but

18  that's my simplistic.

19          MR. LAMBERT: Yeah, what our experts have done is

20  they've addressed -- for example, Dr. Madigan has addressed

21  safety signals of other drugs.  The experts have been

22  questioned in their depositions extensively about Adriamycin,

23  Cytoxan, and other chemotherapies.  And they've consistently

24  said that case reports -- on both sides, case reports do not

25  equal causation.  Both sides' experts have said that.

OFFICIAL TRANSCRIPT

1          And so the only experts in this case that have done a

2    sufficient analysis to show the general causation under the

3    *Burst* case, Bradford Hill criteria, etcetera, are the

4    plaintiff's experts.  Sanofi should be allowed to cross-examine

5    vigorously on those conclusions as well as the methodology

6    which Your Honor has stated in the motions, both the general

7    cause *Daubert* motion and the motion in limine.

8          But we are ships passing in the night because what

9    I've said at the beginning of this argument is this is a

10   challenge to their affirmative defenses.  This is not a

11   challenge to their ability to cross-examine or test the

12   causation conclusions of our experts.

13          THE COURT: Thank you.  Mr. Moore.

14          MR. MOORE: Okay.  Good afternoon, Your Honor, Douglas

15   Moore on behalf of Sanofi.

16          I want to make two quick points, I think, related to

17   the questions that Your Honor had and some of the responses

18   that Mr. Lambert made.  First, as it relates to the supplement

19   that we filed yesterday, you'll recall that we had some

20   discussions amongst liaison counsel about when this motion

21   should be heard and when should the briefing be set up for this

22   motion.

23          And Your Honor agreed with the plaintiffs that we

24   should move forward on it then, notwithstanding our position

25   that we thought it should go in the second round because we

OFFICIAL TRANSCRIPT

1  thought it might be related to some of the things that will

2  come up with Dr. Tosti.  And you said if you need to, you know,

3  move it, if there's something related, tell me.  What we

4  decided to do was just get it in.  We filed a supplemental last

5  night based on Dr. Tosti's deposition.

6          THE COURT:  Now I remember that.

7          MR. MOORE:  Okay, so that's what that's about, and we

8  filed it yesterday.

9          THE COURT:  Well, for future reference, when we have

10  16 motions set for argument, remind me.

11          MR. MOORE:  Yes.  We emailed it to Erin yesterday in

12  the midst of all of --

13          THE COURT:  No.  Remind me not to do 16 in two days

14  and give me every opportunity to push it off.  But okay.

15          MR. MOORE:  So the second point I wanted to raise is

16  this is not a motion about fault.  That motion was argued by

17  Mr. Bachus this morning, the comparative fault motion.  This

18  motion is about alternative causation.  And Your Honor is

19  correct that alternative causation is not an affirmative

20  defense upon which a defendant carries the burden of proof.

21          Do we have affirmative defenses to that effect in our

22  Master Answer?  Of course, we do.  But the Master Answer

23  applies to 50 states' laws.  In Louisiana, alternative

24  causation is not something upon which I carry the burden of

25  proof.  I don't have to come into court and prove that

OFFICIAL TRANSCRIPT

1  Adriamycin caused her injury.  My job under the law in
2  Louisiana is to put forth reasonable hypothesis, and it's their
3  burden to prove causation to exclude them, to prove that those
4  reasonable hypotheses are impossible.

5          Before I get to the merits of it, though, because
6  this is Elizabeth Kahn's case, I thought we could spend just
7  one or two minutes talking about Elizabeth Kahn.  She was
8  diagnosed with cancer in, I believe it's April of 2008.  The
9  picture on the left is just before she underwent chemotherapy
10 with Taxotere first, then Adriamycin, then Cytoxan.  She
11 received Avastin overlapping those chemotherapy regimens and
12 also another medicine called Xeloda.  She was participating in
13 a clinical trial that I mentioned this morning that she signed
14 up with through Ochsner.

15         She had ER-positive, PR-positive, HER2-negative
16 disease.  There was no implication that they saw it in the
17 lymph nodes which is good, but the tumor was really big.  It
18 was 3 centimeters by 3 centimeters which is why she underwent
19 what is called neoadjuvant chemotherapy.  So she went through
20 chemo first and then had a lumpectomy.  But as part of the
21 clinical trial, she wasn't done.

22         And so what I put on the right here is sort of an
23 interim point in her treatment.  These are pictures of her from
24 2009/2010 after having undergone chemotherapy with Taxotere,
25 Adriamycin, Cytoxan, Avastin, and Xeloda.  At this point in

OFFICIAL TRANSCRIPT

1  2009/2010, she's continuing with even more chemotherapy as part
2  of the clinical trial followed by endocrine treatment for about
3  eight or nine years.
4          But my point of putting this up here, and this is --
5  in fairness, their allegation is that her hair did not come
6  back from the chemotherapy.  That's what PCIA is.  The
7  chemotherapy causes the hair to fall out, and then it doesn't
8  come back.  And that happens six months after the end of
9  chemotherapy.
10          THE COURT: Right.
11          MR. MOORE: Obviously, what her hair looked like at
12  various points in time following her treatments will be a
13  factual debate that we'll have in this.  These pictures are
14  probably more favorable to the defense.  I think they're a
15  little grainy.  But their argument is that her hair did not
16  come back the way -- the picture on the right is not the same
17  as the picture on the left.
18          THE COURT: We're not going to decide that today,
19  though; right?
20          MR. MOORE: I know.  I just didn't want you to think
21  that it's -- because it's a little -- these aren't the best
22  pictures.
23          Anyway, after she gets done with the first sort of
24  phase of chemotherapy, she goes through six months of Avastin
25  treatment, nine years of tamoxifen treatment.  That's an

OFFICIAL TRANSCRIPT

1    endocrine therapy.  During those time periods, she's also
2    taking lisinopril which is a blood pressure medicine that is
3    associated with hair loss.  She had testosterone treatment in
4    there as well.
5         So this is a picture of her hair from a month ago,
6    and these are actually the biopsy locations with Dr. Thompson.
7    And this is in our supplement that we submitted last night.
8    Chose the locations for her biopsy for their specific causation
9    case.  And with the biopsy that's at the frontal scalp, their
10   pathologist determined that she had androgenetic alopecia,
11   female pattern hair loss.
12        So when we talk about alternative causes in Elizabeth
13   Kahn's case, you mentioned Adriamycin.  We know that that's
14   been associated -- all of their experts admit that.  All of our
15   experts state that as well.  Cyclophosphamide, same thing,
16   Cytoxan.  Tamoxifen, Dr. Tosti published on it.  It's an
17   endocrine treatment associated with persisting alopecia as part
18   of a chemotherapy regimen.  Lisinopril, it's in the labeling.
19   Testosterone therapy, androgenetic alopecia.  I just showed you
20   the pathology.  These are all the things that are potential
21   alternative causes in the case.
22        And so why does plaintiff lose the motion?  For the
23   point, I think, that Your Honor mentioned and which I
24   mentioned, there is nothing to adjudicate on causation against
25   the defendant because I don't carry any burden of proof.  They

OFFICIAL TRANSCRIPT

1  have the burden of proof, and they must exclude every other
2  reasonable hypothesis with a fair amount of certainty.
3        My job as a defendant is to put forward evidence, not
4  just through cross-examination, but through our own experts
5  about reasonable hypothesis.  Our experts ultimately -- I'm
6  going to show you in just a second Dr. Tosti's testimony -- say
7  the same thing that Dr. Tosti says; and that is, you can't rule
8  out androgenetic alopecia.  You can't rule out
9  endocrine-induced alopecia.  You'll probably get a motion at
10 the next phase on specific causation from Dr. Tosti's testimony
11 about not being able to rule out these other things.
12       But for the purpose of this motion, what we're
13 obligated to do for alternative causation is put forth
14 reasonable hypotheses.  And so this was what you said.  I think
15 you referenced this on the motions in limine.  We're allowed to
16 talk about what other medicines are associated with
17 chemotherapy drugs and whether or not those cause permanent
18 alopecia, and we're allowed to challenge their experts on that.
19 That's all that we want to do.
20       And that's the same thing that our experts say.  You
21 cannot rule out Adriamycin.  The quality of the medical and
22 scientific evidence surrounding Adriamycin, Cytoxan,
23 lisinopril, all the issues that are implicated by this person's
24 clinical course cannot be legitimately ruled out.  They make
25 the argument that you can rule them out.  Our experts say that

1   the quality of evidence is insufficient to do that; so it's

2   their medical opinion that you cannot put this solely on

3   Taxotere.  Those are their opinions in the case.

4           So when we look at these, this is Dr. Tosti's

5   testimony, same time, this is Mr. Strongman asking the

6   question, "You would agree you cannot rule out androgenetic

7   alopecia for Ms. Kahn in some degree; correct?"

8           She says, "It's unlikely," but she cannot rule it

9   out.  And the reason she can't rule it out is because the

10  pathologist determined under the microscope that it's present.

11  And I think what we're going to hear is that she has

12  androgenetic alopecia overlaying the chemotherapy-induced

13  alopecia.

14          And I'm sure they'll have some way of telling us

15  which hairs fell out from the androgenetic alopecia and which

16  ones fell out from the chemotherapy, but they can't rule that

17  out.  And that's an alternative cause that we can put forward

18  as a reasonable hypothesis just based on Dr. Tosti's testimony.

19          We asked her the same thing about tamoxifen,

20  endocrine-induced alopecia.  She was on endocrine therapy for

21  nine years.  "I don't think she has endocrine-induced alopecia,

22  but I can't -- I don't think I can rule it out," is what she

23  says.

24          So under the standard that we're obligated to adhere

25  to in a legal case as a defendant, we don't have any burden

OFFICIAL TRANSCRIPT

1  here because all we're responsible for doing is putting forward
2  alternatives.  It's their burden to exclude them.  Their own
3  expert cannot and has not done that.  We think that this motion
4  should be denied.  Our experts don't have to do a Bradford Hill
5  analysis to put forward a reasonable alternative hypothesis and
6  challenge the legitimacy of the scientific conclusions that are
7  reached by the plaintiff's experts which is what they've done.
8  Thank you, Your Honor.

9         THE COURT: Thank you.  Mr. Lambert.

10         MR. LAMBERT: Yes, Your Honor, just very briefly a
11 response.  What Mr. Moore has focused on is specific causation.
12 And clearly, with his presentation, he is suggesting that we
13 are in some way trying to remove their ability to cross-examine
14 Dr. Tosti on what injury Ms. Kahn has.

15         And I think it's very interesting.  Sanofi proceeded
16 with this same argument in the *Earnest* trial if you would
17 recall.  They are going to argue to the jury that she doesn't
18 have PCIA, that she has hormone-induced reversible alopecia.
19 And that we just don't -- we can't tell the difference.  The
20 dermatopatholgy and dermatology experts don't sufficiently
21 prove more likely than not that this is what she has.

22         We're not saying that they can't make those
23 arguments.  We're saying that they can't come in under the
24 affirmative defenses in the master claim and argue that
25 somebody else caused this, that the fault of somebody else

OFFICIAL TRANSCRIPT

1   caused this.  And it is a little confusing.

2          This is a case where we believe our experts have

3   shown a significant increased risk of this problem, PCIA,

4   associated with Taxotere and that it's more likely than not

5   that Ms. Kahn has PCIA caused by Taxotere, caused by the

6   Taxotere regimen that she was prescribed.  And when you talk

7   about causation, it does include a bunch of different things.

8   It's their failure to warn about it, their failure to disclose

9   their knowledge about it, their failure to put forth an

10  adequate warning label, and the removal of the choice that

11  Ms. Kahn had to undertake --

12         THE COURT: Would they have to do -- are you saying in

13  your argument that for them to show -- let me go back to my

14  Adriamycin.  Is it not enough for the defendants to say, "We

15  think Adriamycin caused this because it's been shown to cause

16  permanent alopecia, you know.  We have some literature that

17  shows that she was given," I don't know, "excessive doses of

18  Adriamycin"?  You see where I'm going.

19         Are you telling me they would then have to say, "And

20  she was not warned about the risk of Adriamycin," or is it just

21  the actual cause of the alopecia?  And I see those things as

22  two different.  It's one thing to be at fault in your failure

23  to warn about this.  It's quite another that this medicine or

24  hormone therapy or age resulted in the alopecia, and it's

25  unrelated to the administration of Taxotere.

OFFICIAL TRANSCRIPT

```
 1              MR. LAMBERT: So for Adriamycin --
 2              THE COURT: Let's just take that, whether or not it's
 3    got any relevance.
 4              MR. LAMBERT: Let's take that example.  I don't think
 5    that they have done the work to show that Adriamycin, with any
 6    reliability or methodology, causes PCIA, and I don't think that
 7    they can say that.  I think that they can say that there are
 8    case reports, and they can ask our experts why those case
 9    reports don't amount to causation which is exactly what their
10    experts say.  It's a little bit different with tamoxifen, for
11    example.
12              THE COURT: I don't want to get into what's -- I think
13    you started talking about failure to warn.  And I thought that
14    that would not be a part of this, I'm guessing.
15              MR. LAMBERT: And perhaps, Sanofi is agreeing with me
16    that they're not going to come in and say that some other
17    manufacturer is at fault here, and that would solve the
18    problem.
19              But in order to suggest to the jury the things that
20    are in these affirmative defenses, one of which includes a cite
21    to Louisiana law about joint and divisible obligations, you
22    know, we don't think that they've set forth any proof to
23    support those affirmative defenses; and therefore, we think
24    that our motion should be granted.  Unless Your Honor has
25    additional questions?
```

OFFICIAL TRANSCRIPT

1          THE COURT:  No, I think I -- I get it.

2          MR. LAMBERT:  Thank you, Judge.

3          THE COURT:  Okay, thank you.  Our sixth motion for

4  today is motion to exclude the testimony of Dr. John Glaspy,

5  and this is a motion brought by plaintiffs and being argued by

6  Mr. Miceli for the plaintiffs and Mr. Strongman for the

7  defendants.  Mr. Miceli.

8          MR. MICELI:  Yes, Your Honor.

9          THE COURT:  Hello.  I haven't seen you today.

10          MR. MICELI:  I have not seen you in a very long while,

11  and I'm happy to be here and happy to see people.  Maybe not in

12  this setting, but to see all of you.  Thank you.  May it please

13  the Court.

14          I'm here to discuss the motion to exclude Dr. John

15  Glaspy.  I need to make sure I know how to work this.  When we

16  were here 15 months ago, Mr. Strongman made a comment that

17  resonated with me, and I wanted to start my presentation here.

18  "Experts must put forward specific and reliable evidence, and

19  they must do it by reliable methodology.  The particulars

20  matter."  He said that a couple of times, "The particulars

21  matter."

22          Particulars with expert testimony starts with

23  Rule 26.  The report must contain a complete statement of the

24  opinions, the bases and the reasons for them, the facts or data

25  considered in them.  And that's where we want to start because

OFFICIAL TRANSCRIPT

1  the keys to excluding Dr. Glaspy's opinions begin here.

2           There's five points I want to make.  First,

3  Dr. Glaspy is not a dermatologist, and he admits to not being

4  an expert in the area.

5           He's not an FDA regulatory expert.  Your Honor

6  probably recalls Mr. Strongman and I being at your bench

7  discussing what his report says.  His report says more than

8  just, "I'm going to talk as an oncologist."  He is not a

9  regulatory expert, and he admits to not being a regulatory

10 expert.

11          In their opposition to our motion, the defendants

12 state that they simply provide a roadmap to Dr. Glaspy's

13 opinions, and I contend that it is a roadmap to nowhere.  He

14 says, "I will discuss," 11 times in his report; but he never,

15 ever discusses what he says he will discuss.

16          Regardless of how well we think of Dr. Glaspy and how

17 well qualified he is, if he is going to offer opinions under

18 Rule 26, he has to abide.  The particulars matter.  Dr. Glaspy

19 admits that he did not attempt to apply the methodology, to

20 investigate the potential relationship between any drug and

21 PCIA.

22          And Your Honor, I want to stop here just for one

23 second.  Because during the last argument, there was some

24 questions that were asked about isn't there literature that

25 says Adriamycin or Cytoxan or some other drug causes

OFFICIAL TRANSCRIPT

1   chemotherapy -- permanent chemotherapy-induced alopecia.   There
2   is no medical or scientific literature that does anything other
3   than say case reports.   And every one of Sanofi's experts
4   agreed with us.   We amended our outlines on how we would depose
5   their experts because of how the trial went in the *Earnest*
6   case.

7          Every one of the defendant's experts -- and you will
8   hear it today in this argument, with Dr. Arrowsmith in just a
9   moment, tomorrow with others -- that every one of their experts
10  will say they did not attempt a methodology and that case
11  reports do not equal proof of causation.   That's critical
12  because all they show is that case reports have been reported
13  with those drugs.

14         Particularly, with Cytoxan, the defendant's experts
15  cite an article by an author by the name of DeJong, D-E,
16  capital J-O-N-G.   In that particular article, they state that
17  cyclophosphamide does not cause permanent chemotherapy-induced
18  alopecia.   It was used with two other drugs.   We don't need to
19  go into them.   They're not relevant to the treatment Ms. Kahn
20  received.   But both of those drugs cause permanent alopecia is
21  what the author says.   Cyclophosphamide does not.   Beyond that
22  article, all they can show is case reports.

23         No. 5, Dr. Glaspy was the only expert to testify in
24  the *Earnest* trial for Sanofi.

25         THE COURT: Right.


OFFICIAL TRANSCRIPT

1          MR. MICELI: Other than Dr. Kopreski which we may have

2     a disagreement on how he should be characterized.  However,

3     Dr. Glaspy does not state Dr. Kopreski's name in his report.

4     He simply amends or appends to his report Exhibit A.  He

5     doesn't discuss validating Dr. Kopreski's work or even how he

6     analyzed Dr. Kopreski's work.

7          So let's move through these quickly.  Dr. Glaspy is

8     not a dermatologist.  I would like to tell you why, but

9     Dr. Glaspy does a better job.  "That is true.  I am not a

10    dermatologist.  I'm not an expert dermatologist."

11         When we talked about how you differentiate alopecias,

12    "I think that's a dialogue for the dermatology experts.  I

13    don't need to be involved in that."

14         He lacks not only the methodology, but he lacks the

15    knowledge of a methodology.  He doesn't know how to

16    differentiate.  He doesn't know the diagnostic criteria.  He

17    doesn't do a differential diagnosis.  He doesn't know how to

18    measure hair density.  The particulars matter, and Dr. Glaspy

19    is entirely unfamiliar with the particulars of permanent

20    chemotherapy-induced hair loss.

21         He's not an FDA expert or a regulatory expert.  "I

22    would not hold myself out as an expert."

23         I asked him again, "You wouldn't hold yourself out as

24    a regulatory expert?"

25         "That's correct."

OFFICIAL TRANSCRIPT

1          Despite this testimony, what his report continues to
2    include, from the first report to the last report, "I will
3    discuss the NDA process, discuss reporting requirements, the
4    submissions of these three clinical studies to FDA."

5          And what's interesting, and it's in our initial
6    briefing, TAX311, Sanofi could not produce the clinical trial
7    data to us in the discovery in this case.  Yet Dr. Glaspy,
8    without Sanofi being able to locate that data, is testifying or
9    saying he's going to testify about its submission to FDA.  It
10   is simply incredible in the truest sense of the word.  And he
11   also says he's going to talk about labeling, but he's not a
12   regulatory expert.

13         He provides no methodology.  If you look to pages, I
14   think, it's 34 to 36 of his report, he goes on for paragraph
15   after paragraph without a citation as to any FDA regulations
16   that are implicated, how the facts of this case are applied to
17   it, anything.  He does nothing.  Federal Rules of Civil
18   Procedure 26(a) demands more because the particulars matter.
19   That's what Sanofi argued the last time.  That's what we're
20   arguing today.

21         The roadmap to nowhere.  These are just a few of the
22   examples of the 11 portions of his report where he says,
23   Dr. Glaspy states, "I will discuss":  Survival rate,
24   comparisons between older regimens and taxane regimens,
25   differences in survival rates in those regimens, Taxotere as a

OFFICIAL TRANSCRIPT

1  lifesaver, regimens used.  But he never actually goes into
2  detail.
3          The particulars matter.  He needs to set out his
4  methodology.  He needs to set out his particular opinions, but
5  he never does.  We're not arguing that he's not a qualified,
6  well-educated, well-positioned, clinical oncologist.  But if he
7  is the best oncologist in the world, he still has to comply
8  with the particulars of Rule 26, and his report simply doesn't
9  do that.
10          This is what I -- I wanted to put this one up there
11  as sort of tongue-in-cheek, his analysis of all the issues he
12  says he will discuss because he doesn't do a thing.  He did not
13  investigate the causal relationship between any drug and PCIA.
14          You've talked to Mr. Lambert about what is necessary.
15  But when we asked Dr. Glaspy, "Have you included in your report
16  any methodology or an attempt at applying one by way of
17  literature search, review of randomized trials, application of
18  a causal analysis, including, Bradford Hill?  You didn't do
19  that?"
20          "That's correct.  That's true, yes."
21          Went through all of the drugs that he lists in his
22  report that he says cases have been reported with, "Did you
23  do -- did you assess causation based on a review of literature,
24  trials, Bradford Hill?  Did you do that for the drug tamoxifen
25  specifically?"

OFFICIAL TRANSCRIPT

1    "You asked me that, and I did not."  He simply

2  doesn't do it, and the particulars matter.

3         This is the final slide, Your Honor.  Dr. Glaspy does

4  not mention Dr. Kopreski.  Unlike other experts like

5  Dr. Arrowsmith who we'll discuss in a moment, Dr. Glaspy does

6  not mention him by name, does not mention his analysis, doesn't

7  mimic his analysis.  He simply attaches an exhibit to his

8  report that he did not create and he does not know the source

9  of.  No validation, no explanation of what it purports to

10  represent, no statement of the source, no analysis whatsoever.

11  He should not be permitted to rely upon an analysis that he

12  cannot even describe what it is and he didn't validate it.

13         So unless you have questions, Your Honor, I would

14  like to have a couple of minutes for rebuttal after we hear

15  from Mr. Strongman.

16         THE COURT: Okay, thank you.

17         MR. MICELI: Thank you, Your Honor.

18         MR. STRONGMAN: I think Your Honor will be glad to

19  hear that that PowerPoint didn't get put over into the deck.

20  So it's just me, no PowerPoint.

21         Are you ready to proceed, Your Honor?

22         THE COURT: I am.

23         MR. STRONGMAN: Jon Strongman on behalf of Sanofi.

24  And Your Honor, the scope of what Dr. Glaspy is talking about

25  in the *Kahn* case is exactly the same as the scope of what he

OFFICIAL TRANSCRIPT

1  offered opinions on and talked about in the *Earnest* case.   And

2  Dr. Glaspy was properly allowed in *Earnest*, and he should

3  properly be allowed in the *Kahn* case as well.

4        When you go to the trial transcript, Mr. Miceli had a

5  debate at sidebar about what the scope of Dr. Glaspy's opinions

6  should be.   And after that debate, after the objections, this

7  Court determined, quote, "This Court is going to accept

8  Dr. Glaspy as an expert in the field of oncology, breast cancer

9  care and treatment, labeling, risk information for

10 chemotherapy, clinical trials, informed consent, the side

11 effects of chemotherapy, qualified to render opinions in those

12 areas."

13       And in this case, we're not asking Dr. Glaspy to do

14 anything other than what he has done before, and so there

15 should be nothing different about the scope of what Dr. Glaspy

16 is allowed to talk about.

17       THE COURT: Is he going to talk about the types of

18 alopecia and their causes?

19       MR. STRONGMAN: What Mr. Miceli leaves out is that

20 Dr. Glaspy explains in his testimony that while he may not be a

21 dermatologist or a regulatory expert, he says, and this is

22 Dr. Glaspy's explanation, there is a Venn diagram between

23 different specialties.   And you can picture the three circles.

24 You have a regulatory circle, a dermatology circle, and an

25 oncology.   And there are points where they cross.

OFFICIAL TRANSCRIPT

1          So can Dr. Glaspy talk about side effects of
2    chemotherapy being alopecia?  Yes, he can.

3          Can Dr. Glaspy talk about side effects of other
4    anticancer medications being alopecia like tamoxifen that he
5    uses with his patients?  Yes, he can.

6          Now is he going to tell you the particulars of what a
7    dermatopathologist would say?  No, and he would admit that, and
8    those are the admissions that Mr. Miceli puts up.

9          Not the part where Dr. Glaspy explains that, "There
10   are times and there are areas where I have to deal with
11   alopecia in my population because it's a side effect of cancer
12   treatments," right.

13         And so, the same goes for regulatory, and Dr. Glaspy
14   has to deal with the labeling for cancer drugs.  He has to deal
15   at times with the development process of drugs in clinical
16   trials.  That inevitably involves some regulatory part of that
17   Venn diagram.  But he's not going to go into a whole host of
18   other regulatory opinions.  And so Dr. Glaspy's scope, as I
19   said, is not going to be any different in this case than it was
20   in the *Earnest* case.

21         Now with regard to the causation opinions, and I know
22   Mr. Miceli picked up a line that I used in the arguments way
23   back when --

24         THE COURT: I think there's lots of lines that both
25   sides used that can be used.


                        OFFICIAL TRANSCRIPT

1          MR. STRONGMAN: Well, I know what it was about, right.
2    This was in my argument way back when about general causation
3    and the plaintiff's ability to establish general causation with
4    their experts.  And our argument has always been that the
5    evidence is insufficient scientifically under the law to
6    establish that Taxotere causes permanent alopecia.

7          THE COURT: Right.

8          MR. STRONGMAN: And so Dr. Glaspy has offered the
9    opinion that the evidence is insufficient to establish that
10   Taxotere causes permanent alopecia, and he explains why.  That
11   being, there are case reports.  Mr. Miceli talks about that.
12   Of course, Dr. Glaspy admits case reports are not enough to
13   prove general causation.  They prove an association.
14   Dr. Glaspy admits that.

15         And so on the general causation piece, what
16   Dr. Glaspy says is that what the plaintiffs have put forward is
17   not enough in the medical and scientific world.  He challenges
18   the plaintiff's burden of proof.  He explains the weaknesses in
19   the plaintiff's evidence on general causation, and that is
20   absolutely appropriate.

21         With regard to Dr. Kopreski, I think this issue has
22   been gone over a number of times and I think was decided most
23   recently in the Court's order on new trial, and there's nothing
24   different.  There's nothing that's changed on the issue.  So
25   what Mr. Miceli pointed out about what Dr. Glaspy did is

OFFICIAL TRANSCRIPT

1 exactly the same as what he did in the *Earnest* case.

2         THE COURT: I'm just curious, there were arguments,

3 and I want to make sure that Dr. Glaspy is going to stay

4 within, "In my practice, I treat women that lose hair as a

5 result of the chemotherapy regimen that they have been

6 diagnosed.  And some of the case reports, I've seen case

7 reports that show Adriamycin," and I know this is my drug of

8 the day, "Adriamycin can cause permanent chemotherapy-induced

9 alopecia."

10         But I'm not going to hear from him that, "I look and

11 I can see the scarring alopecia," or some of the other terms

12 that we hear from the dermatologist.  It's going to be in those

13 areas that's part of his practice as an established oncologist.

14         MR. STRONGMAN: Yes, that is correct.

15         THE COURT: Okay, all right.

16         MR. STRONGMAN: And Dr. Glaspy knows the difference

17 between scarring alopecia and not, but that's not what we're

18 going to bring him to talk about.

19         THE COURT: Right.  He's not going to as to his

20 opinions regarding labeling.  Okay, I get it, all right.

21         Let me ask this question.  What's the difference

22 between Dr. Glaspy and Dr. Miletello?

23         MR. STRONGMAN: To be totally honest, Dr. Glaspy and

24 Dr. Miletello's opinions overlap a decent amount.  Dr. Glaspy

25 has a bit more in terms of general opinions.  His involvement

OFFICIAL TRANSCRIPT

1  in clinical trials, he's got more national involvement in

2  various organizations and clinical trials.  So in the general

3  sense, Dr. Glaspy may be a bit more broad.  On the case

4  specific side, to be totally honest, there's overlap there.

5          THE COURT: I thought you were going to say one is

6  from California and one is from Baton Rouge.

7          MR. STRONGMAN: Well.

8          THE COURT: Because I'm not seeing much difference in

9  what you want from these gentlemen, and I'm concerned about

10  cumulative evidence that I'm not going to allow.

11          MR. STRONGMAN: I understand.  Certainly, there's

12  cumulative evidence all over the place on both sides of this

13  case.

14          THE COURT: Right.

15          MR. STRONGMAN: And we would not do that.  If we were

16  to bring Dr. Miletello to talk about Ms. Kahn's specific

17  particulars, we would not bring Dr. Glaspy to talk about that

18  same thing.  And to be honest, as you can imagine, there's

19  always circumstances where we're trying to look forward, and

20  you want to have some --

21          THE COURT: Backup.

22          MR. STRONGMAN: Yes.  You want to have some sort of

23  ability to have options depending on circumstances.  But we are

24  certainly aware of the cumulative evidence and have no

25  intention of putting on cumulative evidence.


                    OFFICIAL TRANSCRIPT

1          THE COURT: I just read the briefing of both, and I
2  thought...
3          MR. STRONGMAN: Well, and with regard to the briefing
4  in both, a significant portion of the briefs in both cases, and
5  I will leave Dr. Miletello to Mr. DePaz, I believe, is handling
6  that, but they talk about this whole -- it's the same,
7  quote/unquote, alternative cause issue again.
8          THE COURT: Right, right.
9          MR. STRONGMAN: And what I think -- and I know we just
10  heard about that from Mr. Moore.  I don't intend to -- I agree
11  with what Mr. Moore said.
12          THE COURT: Really?  I didn't see that coming.
13          MR. STRONGMAN: The point being that the plaintiffs
14  here are trying to suggest that this *Burst* standard of a
15  statistically significant epidemiological study plus the
16  Bradford Hill criteria applies to our experts' opinions like
17  Adriamycin and tamoxifen.
18          THE COURT: No, I get that.
19          MR. STRONGMAN: And the reality is that it's a
20  misconstruction of what our experts are saying.  So our experts
21  say there isn't enough evidence on Taxotere.  What exists are
22  case reports and things like that that show an association.
23  Guess what?  Those same things exist with Adriamycin,
24  tamoxifen, cyclophosphamide.  So how can you look at this
25  picture, these reasonable hypotheses as Mr. Moore said, and

1  exclude them?  You can't.  So that's the opinion that
2  Dr. Glaspy, Dr. Miletello, I think, are subject to these
3  motions.

4           THE COURT:  I was just asking about whether it was
5  cumulative.

6           MR. STRONGMAN:  The point being that the arguments are
7  cumulative too.  They're similar across all of the briefs.  And
8  the reality is our experts should be allowed to comment on the
9  nature of the scientific evidence, the quality of the evidence
10 as it relates to Taxotere, as well as these other risk factors
11 that plaintiff has been exposed to, to put out those reasonable
12 hypotheses, and challenge the plaintiff's experts and their way
13 of analyzing the scientific data.

14          Now the last point I want to make, subject to any
15 questions that Your Honor may have, Mr. Miceli had his list of
16 "I will discuss" things up there.  And to be honest with you,
17 it is -- well, for example, let me just give you one.
18 Plaintiffs say --

19          MR. MOORE:  I have the slide up, sorry.

20          MR. STRONGMAN:  That's fine.  Dr. Glaspy says, quote,
21 "I will discuss chemotherapy regimens used to treat
22 HER2-negative breast cancer."  That's one of the things that
23 plaintiffs say he doesn't go on to talk about.  There is
24 paragraph after paragraph in his report about the treatment of
25 HER2 breast cancer.  We're all here talking about

                        OFFICIAL TRANSCRIPT

1   chemotherapies for HER2 breast cancer.  Any number of these

2   examples of the, quote/unquote, "I will discuss," there are

3   paragraphs and paragraphs in Dr. Glaspy's report about these

4   very topics.  The idea that there isn't anything in his report

5   about them is strange.

6         And when you go back to the *Earnest* trial and what

7   Mr. Miceli argued that Dr. Feigal should be allowed to talk

8   about based on what was in her report, to say that these things

9   aren't in Dr. Glaspy's report is bold.  They're there.  They're

10  in there page after page and paragraph after paragraph.

11        And so with that, subject to any questions you have,

12  Dr. Glaspy should be allowed to testify consistent with what he

13  did in *Earnest*.  His opinions are consistent, and plaintiff's

14  motion should be denied.

15        THE COURT: Thank you.

16        MR. MICELI: Your Honor, can I just have a few

17  moments, then?

18        THE COURT: Yes.

19        MR. MICELI: I have five quick points.  I'm just going

20  to hit them bullet point style.  I'm going to start with the

21  last one.  Mr. Strongman addressed the "I will discuss."  And

22  he said paragraph after paragraph after paragraph.  In their

23  brief and in his argument, he never pointed you to, directed

24  you to where Dr. Glaspy analyzes FEC, FAC, CMF, TC, AC.  He

25  just simply doesn't do it.  He does not go through the

OFFICIAL TRANSCRIPT

1   regimens.  He does not go through the risk profile.  He does
2   not go through -- he does not compare.  He says he will, but
3   then he don't which is why we call it a road to nowhere.

4           Again, Mr. Strongman questioned whether or not they
5   should be allowed to test the evidence that our experts rely
6   upon.  That's not something I stood here and argued for
7   exclusion of.  That wasn't one of the five categories.  We
8   understand they're going to cross-examine our experts.  Our
9   concern is that where their experts do not set out a
10  methodology and they admit to it, that we did not look at it.
11  We have what they want to call a reasonable hypothesis of
12  alternate causation, and they walk up to the line and they say
13  a rooster crowed and the sun rose.  Did the rooster crowing
14  cause the sun to rise?  The answer is no.

15          And all they have -- again, I think you had asked the
16  question of Mr. Strongman.  Say somebody says -- Dr. Glaspy
17  says there's an article that says Adriamycin causes PCIA.  That
18  article does not exist.  In fact, we asked the question to
19  Dr. Glaspy.  All of these 19 drugs, and I think it's on
20  pages 23 through 25 of his report, any of these drugs, does the
21  evidence you put here demonstrate causation?  No, these are
22  just case reports.  Cases have been reported.

23          Nobody, nobody has come forward to say here is a
24  case, here is a piece of literature that supports that any drug
25  causes PCIA other than Dr. Feigal's analysis.  And she sets out

OFFICIAL TRANSCRIPT

1  every article, which one addresses which of the Bradford Hill

2  criteria.  I'd gladly compare Dr. Feigal to Dr. Glaspy's

3  analysis because you have analysis versus no analysis.  That's

4  an easy win.

5          You know what, I left my glasses.  Pardon me, Your

6  Honor.  I'm so used to looking at the PowerPoint, I didn't need

7  my glasses.

8          Mr. Strongman said, you know, we've talked about

9  cancer treatment.  We've talked about side effects.  He has a

10  lot he has to do concerning labels.  Dr. Glaspy has to deal

11  with patients who lose hair.  He has to talk about cancer to

12  patients.  All that is true.  All we ask is examine his report

13  to see if he complies with Rule 26.  Does he set out his

14  opinions?  Does he give us a basis?  Does he give us a

15  rationale?  I think you will find the answer to that question

16  is no, he does not.  Thank you, Your Honor.

17          THE COURT: Thank you.

18          MR. MICELI: I think I have the next one as well.

19          Your Honor, can we take a five-minute recess between

20  arguments?

21          THE COURT: That's great.

22     (A short recess was taken.)

23          THE COURT: The next motion that we're going to argue

24  is Document 10926, motion to exclude the testimony of Janet

25  Arrowsmith filed by plaintiffs.  Mr. David Miceli is going to

OFFICIAL TRANSCRIPT

1  argue on behalf of the plaintiffs, and Matt DePaz is going to

2  argue on behalf of the defendants.

3          Mr. Miceli, are you ready to proceed?

4          MR. MICELI: Yes, Your Honor.  Thank you.  I will not

5  be quoting any other counsel at this point.

6          I'm just going to move straight into the three keys

7  to excluding Dr. Arrowsmith.  Like Dr. Glaspy, she admits that

8  she offers no methodology to support that any non-Taxotere drug

9  can cause PCIA.  And that term is very important because when

10  we say "can cause," that is a term of art for general

11  causation.

12         "Cases have been reported with" is the catchphrase of

13  the defense experts.  Cases have been reported with, however,

14  is agreed to by all of the defense experts with plaintiffs,

15  that cases have been reported does not equal causation.

16         Dr. Arrowsmith's opinion concerning TAX316 and the

17  follow-up in TAX316 is unreliable and based on selectively

18  provided information from counsel.  That being what we refer to

19  as the Kopreski analysis.

20         And then Dr. Arrowsmith fails to state her regulatory

21  opinions consistent with Rule 26 of the federal rules.  Again,

22  we provide a couple of quotes from Dr. Arrowsmith.

23         "In your report, do you set out a causation analysis

24  to determine whether Adriamycin can cause PCIA?"

25              "No, I was not -- I didn't do a causation analysis."

OFFICIAL TRANSCRIPT

1         And then between pages 38 and near the bottom of

2    page 41, we go through cyclophosphamide, paclitaxel or Taxol,

3    Xeloda, Avastin, 5-FU, the Fluorourosil that was used in the

4    TAX316 study, epirubicin.  All of the potential alternative

5    medications that Ms. Kahn could have used, we asked

6    Dr. Arrowsmith specifically, "Did you set out a causation

7    analysis in your report to determine whether or not they can

8    cause PCIA?"

9         And the answer always came up, "No, I did not."

10        "Do you intend to offer -- you do intend to offer

11   testimony that valid scientific evidence demonstrates a causal

12   association?"

13        Jump to the end there, "No, I do not intend to offer

14   that.  No.  That opinion, no."

15        She will not offer an opinion that other drugs can

16   cause permanent chemotherapy-induced alopecia, and she can't do

17   that because she didn't do the difficult work to figure it out.

18   Case reports alone or cases have been reported, again, their

19   catchphrase, do not establish causation.  She admits it like

20   all other Sanofi experts.  That's the deposition cites.

21        Now this is sort of the meat of the coconut for

22   Dr. Arrowsmith.  Dr. Arrowsmith's opinions regarding the

23   follow-up and the TAX316 study are unreliable and based

24   entirely upon selectively provided information from counsel.

25   And I just summarize what she received:  26 depositions of

OFFICIAL TRANSCRIPT

1    Sanofi's current or former employees, eight of our expert
2    reports, six depositions of plaintiff's experts, the trial
3    testimony of Dr. Kessler, over 1100 specific Bates numbered
4    documents from Sanofi.  In all, over 50,000 pages of documents
5    or depositions and corporate documents.
6            But she relies, and we set it out in our report in
7    better specificity, Dr. Arrowsmith, between paragraphs 116 and
8    123 of her report, she cites to only 24 pages of testimony from
9    Michael Kopreski.  Now comparing those two things, the
10   50,000-plus pages, that would be ten boxes, paper boxes which,
11   of course, are stacked side by side inside the box.  So that
12   would be 20 reams of paper stacked high, certainly taller than
13   me.  Probably as tall as this ceiling.  Versus 24 pages of his
14   testimony, of Kopreski's testimony is all that Dr. Arrowsmith
15   relies upon for her follow-up and TAX316 opinions.
16           Again, Rule 26 is where the particulars begin.  You
17   have to state what your opinions are, what you base them on,
18   and the reasons for them and the facts and data considered.
19   Look at her report.  Paragraphs 116 to 123, the only citation
20   she makes for her opinion is the testimony of Dr. Kopreski, not
21   the documents, not anything else.
22           I expect what we'll hear is that Dr. Arrowsmith
23   performed a Fisher's exact test, just like Dr. Madigan did, to
24   test the statistical significance of what TAX316 demonstrated.
25   However, words that do not appear in Dr. Arrowsmith's report

OFFICIAL TRANSCRIPT

1  are Fisher's exact test, or "I did a calculation for
2  statistical significance."
3         She simply does not set out what her methodology is.
4  She doesn't reference it, and she certainly does not provide an
5  appendix like Appendix 6 to Dr. Madigan's report where he sets
6  out his statistical calculation in code; so another computer
7  statistics person could come in and do the same thing.
8         Why does she even rely upon Dr. Kopreski?  It's the
9  only source of her information.  She only knows about
10 Dr. Kopreski because counsel informed her of his existence.
11 She had 50,000 pages of information about TAX316, about Sanofi
12 and its internal workings.  She didn't learn about Dr. Kopreski
13 because Dr. Kopreski was involved in TAX316, and she saw his
14 name and said, "Aha, I need to find out what this man said."
15 The only way she finds out about Dr. Kopreski is when Sanofi's
16 lawyers hand delivered to her selective documents for her to
17 review.
18        She doesn't validate them.  Every reference to study
19 participant information that you will find in Dr. Arrowsmith's
20 report is pulled nearly word for word from Sanofi's Exhibit A
21 to their 30(b)(6) response which was created by counsel for
22 serving with the deposition objections.
23        And what does Dr. Arrowsmith admit?  You're going to
24 hear an argument that Sanofi will say that she did a full
25 analysis of the database -- of the datasets.  What she said, "I

OFFICIAL TRANSCRIPT

1   didn't have this full dataset, that's correct.  I did not

2   validate it myself, that's correct."  That's her testimony.

3          Dr. Arrowsmith admits that she does not know what

4   Kopreski reviewed or the completeness of what he reviewed.  But

5   what is most shocking is Dr. Kopreski, when asked by Mr. Bachus

6   in his deposition about the completeness of what he reviewed,

7   he referred the question to Sanofi's counsel to talk about the

8   completeness of what he reviewed.  That's important because

9   what Dr. Kopreski was reviewing was new to him.  He was not

10  involved in TAX316, and he did not review the clinical study

11  trial data.  He reviewed case report forms that were selected

12  for him by counsel.

13         We cite Your Honor to this, "When information upon

14  which an expert bases her opinion or testimony must be reliable

15  and the selective furnishing of information by counsel to an

16  expert runs afoul of 703, which in addition to 702, must be

17  considered by the Court for *Daubert* purposes."  You can't just

18  wash Kopreski's opinions through legitimate experts.

19         THE COURT: I know, but we have Kopreski, argument on

20  Kopreski tomorrow.

21         MR. MICELI: Tomorrow.

22         THE COURT: Beyond the reliance of Dr. Arrowsmith on

23  Dr. Kopreski's -- I don't even know what word I want to say --

24  his findings.

25         MR. MICELI: His follow-up of the TAX316.


OFFICIAL TRANSCRIPT

```
1            THE COURT: Yes, I know exactly what it is.  My
2    question is if I say reanalysis, the defendants go crazy.  It's
3    not a reanalysis.  If I say his report, you go crazy.  It's a
4    reanalysis.  So I'm just trying to just say his findings --
5            MR. MICELI: Right.
6            THE COURT: -- whatever they are, and I will make that
7    determination.
8            But beyond that, because I'm going to defer what I
9    think about Kopreski and I'm not going to make that
10   determination today.
11           MR. MICELI: Correct, yes, Your Honor.
12           THE COURT: And I'm not going to even give --
13           MR. MICELI: A hint.
14           THE COURT: -- a hint.  What else about Dr. Arrowsmith
15   are you complaining about?  I will tell you, I did not see the
16   word Fisher's exact test in her report either.  But maybe it's
17   somewhere, and I just didn't see it.  What else?
18           MR. MICELI: If you search on your computer for
19   "Fisher," you won't find it.  If you do "exact," you won't find
20   it.  If you do "test," you'll find it.  You'll find the word
21   "test," but it won't be a Fisher's exact test.
22           What I will say, Your Honor, is two things.  Without
23   Dr. Kopreski, she has no basis for an opinion stated in her
24   report and certainly does not set out a methodology for
25   assessing the follow-up time to TAX316, period.  We'll let
```

OFFICIAL TRANSCRIPT

1  Mr. Bachus address Dr. Kopreski tomorrow.

2          What I would say then is we flip to the very last

3  slide that I have.  And Dr. Arrowsmith is a well-traveled

4  expert.  She's testified in many a litigation, many an MDL.

5  And she is a former employee of FDA and has testified about

6  regulatory issues, about label changes.  21 CFR Sections

7  201.57(c)(6) and (c)(7) set out the proper standards for label

8  changes for warnings and for adverse events, and it gives very

9  specific thresholds.

10          And she agreed with me in her deposition about those

11  thresholds.  It's either got to be reasonable evidence of a

12  causal association, specific causation does not need to be

13  provided; or there has to be some evidence that there's a

14  relationship between the event and the drug.  Those are the two

15  relative thresholds that you have to meet.  She recognizes

16  those in her deposition.  She doesn't have them in her report,

17  but she recognizes them in her deposition.

18          But in her report, she applies a different standard,

19  and that's that second to last main bullet point.  The evidence

20  doesn't establish Taxotere's unequivocal causal role in causing

21  PCIA.  She actually agreed with me that that's not a standard

22  for changing a label.  She agreed with the proper warnings and

23  adverse events standards.  But in her report, she sets out no

24  methodology whereby she assesses appropriately the evidence in

25  this case against the standards of 201.57(c)(6) or (c)(7).


                    OFFICIAL TRANSCRIPT

1          And with no opinion stated under Rule 26 and no

2     analysis or application of the available evidence judged

3     against a proper standard, she gives us nothing under a Rule 26

4     disclosure; and exclusion is mandatory under Federal Rule of

5     Civil Procedure 37.

6          Unless you have other questions, I'll reserve a

7     little bit of time.

8          THE COURT: That will be fine.  Thank you.

9          Mr. DePaz.

10         MR. DEPAZ: Good afternoon, Your Honor.  Matt DePaz on

11    behalf of Sanofi.

12         I'd like to start by addressing Dr. Arrowsmith's

13    regulatory opinion that Mr. Miceli ended on.  And I'd also like

14    to say that it's undisputed that Dr. Arrowsmith is qualified to

15    give a regulatory opinion.  I think the plaintiffs also note

16    that she has been testifying for 20-plus years, and they have

17    not identified a single case where one of her regulatory

18    opinions was excluded.

19         Her regulatory opinions are straightforward.  It's

20    that alopecia was appropriate in the adverse reaction section

21    of the label from -- at all times.  Second, that hair generally

22    grows back was appropriate in the patient leaflet to interpret

23    alopecia and communicate to plaintiffs that hair may not always

24    grow back.

25         She also then addresses whether or not something can

OFFICIAL TRANSCRIPT

1    be -- whether or not permanent alopecia can be elevated to the
2    warnings and precautions section, and she does this in two
3    parts.  First, addressing whether permanent alopecia is not
4    serious or clinically significant or stating that permanent
5    alopecia is not serious or clinically significant; and second,
6    stating that there's no validated safety signal for permanent
7    alopecia.  And this is the term that Dr. Arrowsmith uses and
8    explains based on her experience at FDA translates to
9    reasonable evidence.  And the reason being, Your Honor, is that
10   there's no definition of reasonable evidence in the regulation.
11   That's the term she uses.

12         This is a two-part test, Your Honor.  And the first
13   part is, is permanent alopecia an important medical event in
14   the context of cancer and chemotherapy.  The regulations set
15   forth multiple scenarios where it could be death,
16   life-threatening, something that requires hospitalization.  And
17   Dr. Arrowsmith opines that permanent alopecia does not meet
18   that standard.  So her opinion with respect to warnings and
19   precautions that plaintiffs are analyzing could stop there
20   because they do not satisfy the first prong of the test.

21         But she went further.  She analyzed whether there was
22   reasonable evidence of causal association or some basis for a
23   causal association.  She states for No. 2, "Plaintiff's experts
24   conclude there was a safety signal.  None of these opinions are
25   reliably drawn."

OFFICIAL TRANSCRIPT

1          Now plaintiffs like to cherrypick from her report and

2     focus on some of the causation rebuttal opinions that she

3     offers; but they ignore Dr. Arrowsmith's section of the report,

4     145 through 63, where she's addressing the evidence set forth

5     by Dr. Kessler and Dr. Madigan with respect to what met

6     reasonable evidence.  She says, "You cannot exclude the role of

7     chemotherapies in an adverse event reports.  Case reports are

8     the lowest level of medical information and couldn't support

9     the signal in this case."

10          She addresses the unreliability of the FAERS database

11    analysis that Dr. Madigan did and states that it could only be

12    used to identify a signal, but it can't be used to validate

13    one.  It can't be used for causation evidence because you never

14    look at the underlying reports to see what they say.

15          And finally, she addresses Sedlacek which is the

16    basis for Dr. Kessler's opinion.  And she says, "Dr. Kessler

17    placed significant emphasis on a 2006 abstract for Dr. Sedlacek

18    suggesting that the abstract should have required Sanofi to

19    update the Taxotere label.  I disagree."

20          Your Honor, applying the some evidence, reasonable

21    evidence standard, not the definitive causation standard that

22    Mr. Miceli is pulling out of her opinions rebutting general

23    causation.  She says the limited data available, the off-label

24    nature of this treatment, and the absence of peer-reviewed

25    publications providing details about the patient's limits is

OFFICIAL TRANSCRIPT

1   inutility.

2           THE COURT: Is that as to the Sedlacek report?

3           MR. DEPAZ: Yes, Your Honor.

4           THE COURT: Okay.  I think that's what Dr. Kessler

5   said, but okay.

6           MR. DEPAZ: I'm sorry?

7           THE COURT: I don't think Dr. Kessler said the label

8   should have been changed on this date because of that.  I think

9   that was -- anyway, go ahead.

10          MR. DEPAZ: Okay.  So Your Honor, Dr. Arrowsmith, with

11  respect to a regulatory opinion, directly applies this lower

12  threshold of causation evidence and addresses the evidence set

13  forth by the plaintiffs.

14          I'd also like to talk about TAX316.  I won't belabor

15  the point on Kopreski.

16          THE COURT: Yeah.

17          MR. DEPAZ: Okay.  But Your Honor, Mr. Miceli points

18  out that one of Dr. Arrowsmith's opinions is that there's no

19  statistical significance with respect to the TAX316 study when

20  looking at the ongoing alopecia.  This is something that is

21  undisputed by the plaintiff's experts.

22          In preparing her report, Dr. Arrowsmith reviewed

23  Dr. Madigan's analysis and reviewed his report, and she was

24  responding directly to it.  She also disclosed her opinion in

25  her report stating that there was no statistical significance,

OFFICIAL TRANSCRIPT

1  and she provided the data that she reviewed in making that

2  determination.

3          Now Mr. Miceli is upset because she didn't or maybe

4  challenges the report because she did not put the word Fisher's

5  exact test in the report.  But Your Honor, she disclosed at the

6  deposition that that's what she used, and they have all the

7  information that they need to cross-examine her.  Additionally,

8  Your Honor, I would also say it's ironic --

9          THE COURT: Did she describe the Fisher's?

10         MR. DEPAZ: The Fisher's exact test?

11         THE COURT: The Fisher's exact test, did she describe

12 that analysis and just not say the name in her report?

13         MR. DEPAZ: Well, Your Honor, she just -- well, she

14 says it was not statistically significant and then goes over

15 the data that she reviewed for it.  But the Fisher's exact test

16 is a very straightforward test.  You create a box and input

17 four numbers.  And it's something that Dr. Madigan did, and

18 it's something that's undisputed in this case.

19         And Your Honor, I find it ironic that this is the

20 argument that the plaintiffs are using.  Because for the

21 *Earnest* trial, Dr. Kessler did the exact same thing with

22 respect to Sedlacek.  Sedlacek was mentioned once in a footnote

23 for the assertion that there had been case reports of the

24 permanent alopecia.  But at his deposition, he raised that he

25 did a Fisher's exact test with respect to Sedlacek, found

OFFICIAL TRANSCRIPT

1 | statistical significance, and that that was the basis for his
2 | opinion or part of the basis for his opinion.
3 | And we raised that in our reply brief, Your Honor, on
4 | *Daubert*.  And while the Court did not address that point
5 | explicitly, the Court did permit Dr. Kessler to offer that
6 | opinion at trial, and it is something that the Court noted when
7 | addressing his *Daubert* argument.
8 | I won't -- because we're going to save Kopreski for
9 | later, I won't go into it.
10 | THE COURT: Please.
11 | MR. DEPAZ: And I will turn it back over to
12 | Mr. Miceli, Your Honor.
13 | THE COURT: Thank you, Mr. DePaz.
14 | MR. DEPAZ: Sure.
15 | THE COURT: Mr. Miceli.
16 | MR. MICELI: I just have a couple of quick points, and
17 | I'm going to go in reverse order.
18 | THE COURT: Mr. Miceli, the mask.  It's easier for
19 | everybody.
20 | MR. MICELI: Right, I apologize.
21 | THE COURT: No, no, don't apologize.
22 | MR. MICELI: The deposition of an expert is not the
23 | place for a proper Rule 26 disclosure.  That's the report.
24 | That's where you set out your opinions and your bases and your
25 | reasons for them.  She does not go over her methodology in her

OFFICIAL TRANSCRIPT

1    report, but fails to state the words Fisher's exact test.  In

2    fact, when I was deposing her and she was trying to explain how

3    that's what she did, I said, well, these exact words are in

4    multiple documents from Sanofi, not statistically significant,

5    4.2 percent, 2.4 percent, whatever.

6          And she said, "Yes, but I didn't look at those until

7    after I had done my own test."  Well, this is her third report

8    that we're talking about, and this is the same paragraph 113

9    that was in her first report.  So she's saying that she came to

10   these conclusions, she did this test, and then looked at

11   documents that said that, some documents that are on her

12   reliance list.

13         Dr. Kessler did the Fisher's exact test and then sat

14   for another deposition to explain how he did it and why he did

15   it.  It was not --

16         THE COURT: Was it in his report?

17         MR. MICELI: It was not in his report.  That's why he

18   sat for another deposition, correct.  They never asked to

19   exclude it.  What they asked for was to depose him again, and

20   we allowed that.  We sat for another two-hour deposition on, as

21   Mr. DePaz said, a two-by-two four square.

22         The second to last slide Mr. DePaz had up, he said

23   that Dr. Arrowsmith validated two of the cases of

24   Dr. Kopreski's analysis.  And I would request that the Court

25   take a look at those two, and they're in paragraphs 114 to 116,

OFFICIAL TRANSCRIPT

1  and then investigate Exhibit A which was attached to the

2  30(b)(6) notice.  It's also Exhibit A to Dr. Glaspy's report.

3  It is word for word Dr. Kopreski's or whomever's Exhibit A.

4  She did not do that.  She even said that.  We put the quote up

5  there.  She couldn't validate because she didn't have the same

6  datasets that he had.

7          With regard to comparing what Dr. Arrowsmith did to

8  Dr. Madigan, his FAERS analysis, he clearly states multiple

9  times across multiple depositions the FAERS analysis is simply

10  a signal detection device.  We, plaintiffs and Dr. Madigan,

11  never attempt to say that FAERS establishes causation.  That's

12  a hollow argument because it's not what we state.  It's not in

13  Dr. Madigan's report, and it's not what we've argued to the

14  Court.

15          What Dr. Madigan did, though, was a FAERS analysis

16  which is appropriate, and it's explained in the guidance to

17  industry from FDA, and he did it.  He explained it in his

18  report, and he provided an appendix to demonstrate to anybody

19  who would want to read it and want to recreate his analysis.

20  He gave his program for it.  So we're very different.

21  Dr. Madigan's use of the Fisher's exact test or calculation is

22  very different than what Dr. Arrowsmith claims.  Thank you.

23          THE COURT: Okay, thank you.  Y'all want to stretch a

24  little bit?

25          MR. LAMBERT: Sure.


                           OFFICIAL TRANSCRIPT

1          (A short recess was taken.)

2              THE COURT: We're ready to proceed with our eighth and

3      final motion for today, and that's a motion to exclude

4      testimony of Dr. Larned and Dr. Carl Kardinal.  And this will

5      be argued by plaintiff's counsel Andre Mura and Mr. Moore for

6      defendants.

7              Mr. Mura, you can hear everything?

8              MR. MURA: Yes, I can hear you, Your Honor.  Can you

9      hear me okay?

10             THE COURT: I can.  Are you ready to proceed?

11             MR. MURA: Thank you.  Sanofi seeks to elicit

12     testimony from Dr. Kardinal and Dr. Larned, oncologists who

13     treated Ms. Kahn, about matters that qualify as expert

14     testimony.

15             Specifically, Sanofi asked about causation and

16     toxicity at the deposition; even though Sanofi's disclosures

17     nowhere provide the subject matter for facts and opinion on

18     which the witnesses were expected to testify.  Under the law,

19     failure to comply with the deadline for disclosure requirements

20     results in mandatory and automatic exclusion, and such failure

21     here was not substantially justified or harmless.

22             So I would like to begin, if I could, with just the

23     legal standard because I think it's helpful in drawing this

24     line between what these two oncologists as treaters can talk

25     about and what they should not be permitted to talk about given

OFFICIAL TRANSCRIPT

1   that there was no disclosure; and then I'll give the Court a
2   couple of examples of what I'm talking about where we think the
3   testimony elicited crosses the line.

4          So courts have determined, and we cite a case, Your
5   Honor, of *Warren against Mallory* which is an Eastern District
6   of Louisiana case.  In our view, that case has a pretty nice
7   recitation of the law.  So we hope that it's helpful to the
8   Court, and it's very recent.  It's from the summer of 2020.

9          And there, the judge says, "Courts have determined
10  that treating physicians may offer testimony as non-retained
11  experts if the testimony is confined to those facts or data the
12  physician learned during actual treatment of the plaintiff.
13  However, where testimony consists of opinions based on
14  scientific, technical, or other specialized knowledge,
15  regardless of whether those opinions were formed during the
16  scope of interaction with the party prior to litigation, the
17  testimony is that of an expert."

18         And the Court gives two examples.  "For example,
19  testimony as to causation or as to future medical treatment has
20  been considered the province of expert testimony subject to the
21  requirements of Rule 26 disclosure."  None of which were met
22  here.

23         So obviously, testimony about future medical
24  treatment of the plaintiff is expert testimony because it is
25  not testimony confined to those facts or data the physician

OFFICIAL TRANSCRIPT

1  learned during actual treatment.  It's an opinion based on

2  future medical treatment where this doctor is drawing on

3  specialized knowledge, scientific information; and that would

4  need to be disclosed.  That runs into the field of expert

5  testimony.

6          A treating physician may be able to talk about those

7  things if the treating physician makes a disclosure, the other

8  side knows that the treating physician is going to talk about

9  that expert testimony, and there's an opportunity -- there's no

10  surprise in that instance.  And that's how the courts have

11  required treating physicians to meet those standards, and

12  they've done so since 2010.

13          Past medical treatments of other patients is the same

14  expert treatment -- expert testimony, excuse me, because it's

15  the development of medical opinions based on scientific or

16  specialized knowledge.

17          So let me give the Court a couple of examples.  And

18  I'm looking at page 71 of the deposition transcript of

19  Dr. Kardinal, and Dr. Kardinal here is being asked about an

20  article.  The question is, "Your name is listed as the first

21  author."

22          "All right.  What did I say?"

23          And so quite clearly, the doctor didn't even know he

24  was going to be asked about this.  Plaintiffs didn't know he

25  was going to be asked about this because there was no

OFFICIAL TRANSCRIPT

1   disclosure.

2           And the article appears to be about the developments

3   of taxanes, including, paclitaxel.  And then a series of

4   questions are posed concerning toxicity.

5           "Can you tell me in 2008, would you say that

6   paclitaxel was associated with cardiotoxicity," and so he

7   starts to answer.

8           And he's asked very general questions.  These are not

9   questions confined to the facts or data the physician learned

10  during the actual treatment of the patient.  These are

11  questions about an article and general opinions based on past

12  experience.  Past experience, future experience, future

13  hypothesis about treatments, all of that is the subject of

14  expert testimony because it's not confined to facts or data

15  that the physician learned during actual treatment.

16          So he's asked, "Any thoughts on the use of paclitaxel

17  with Adriamycin?"

18          "I have no specification recollection."

19          "Would you agree that neuromuscular toxicity was

20  considerably less common with docetaxel than with paclitaxel?"

21          "Well, yeah, I'll agree to that."

22          I mean this sort of testimony is really the testimony

23  that you might expect assuming -- putting aside all the

24  arguments that we've heard today about Dr. Glaspy and all the

25  other experts, you can certainly imagine that if an expert is

OFFICIAL TRANSCRIPT

1   qualified and there's a basis to do it, that such experts might

2   be able to testify about that, but not Dr. Kardinal and

3   Dr. Larned who are just oncologists.

4          They've just been asked and we were notified that

5   they would testify as treaters.  So we reasonably expected that

6   they would confine their opinions to the facts or data that the

7   physician learned during actual treatment.  They went far

8   beyond that.

9          I'm looking at page 72 of the same, of Dr. Kardinal's

10  deposition.  And so here's the question, "And tell me a little

11  bit more about the neurotoxicity that was associated with the

12  paclitaxel.  What would that look like for a patient, or what

13  could that look like for a patient?"  So we're far afield from

14  the sort of facts or data the physician learned during the

15  actual treatment of the plaintiff.

16         And I'll give you one more, Your Honor.  The next

17  page on page 73, apparently, the doctor worked on a book, and

18  there's a question about a chapter in *The Chemotherapy Source

19  Book*.  And he doesn't really remember.  He said, "If I said it

20  then, I believe it now."

21         But that's why if Sanofi had wanted these treaters to

22  opine, to provide expert opinion, they should have gone through

23  the process under Rule 26.  No one is blaming -- to my

24  knowledge, no one has blamed the doctors with malpractice.  So

25  it's really not necessary for them to sort of provide a lot of

1   this testimony.

2          And again, if Sanofi wants to develop this

3   testimony -- I mean they've said it today, that it doesn't have

4   any burden and it doesn't have to purport experts to establish

5   many of these points.  It simply has to put forth a reasonable

6   hypothesis through its experts.  All that being said, if it

7   does that through its experts, that's one thing; but the rule

8   certainly does not allow Sanofi to do these things through

9   treating physicians and questions that go far afield beyond the

10  confinement of Rule 26.

11         And so for that reason, we've asked the Court to

12  apply the standard set forth in *Warren* to these two treating

13  physicians.  They can talk about facts or data they learned

14  during the actual treatment of the plaintiff, but it should go

15  no further.

16         Sanofi certainly had an opportunity to develop that

17  testimony, and the introduction of this testimony should not be

18  excused.  It's not substantially justified that Sanofi should

19  now get the opportunity to ask these sorts of scientific

20  questions and to draw sort of -- through scientific testimony

21  questions, such as, "Oh, how many patients have you treated?"

22         "Ten."

23         "Did you ever see this in one of the patients?"

24         "I saw it out of one out of ten."

25         So then the jury is hearing, "Oh, one out of ten.  I

OFFICIAL TRANSCRIPT

1  will draw some statistical inference based on that."

2          This is entirely inappropriate given the lack of

3  disclosures and the fact that there's been no process to

4  qualify these two oncologists to testify about matters that are

5  beyond the facts or data that the physicians learned during the

6  treatment of the plaintiff.

7          So unless the Court has any questions, I'll yield my

8  time and, perhaps, save a little for rebuttal if that's okay.

9          THE COURT: Thank you, Mr. Mura.

10         Mr. Moore.

11         MR. MOORE: Andre, do you want me to push you back; so

12  you can see me talking, or is it okay where it is?

13         MR. MURA: I'll just envision you.  Thank you.

14         MR. MOORE: Thank you, Your Honor.  Douglas Moore,

15  again, on behalf of Sanofi.

16         This is the third motion that I've argued today.  All

17  three of these motions are motions that we did not see in the

18  *Earnest* case.  They are motions, I don't think, we got to in

19  the *Thibodeaux* case, but I'm beginning to feel like the

20  plaintiffs don't want us to have the opportunity to defend

21  ourselves in this litigation.  They don't want us to be able to

22  put on evidence of how the medicine was used with the labeling.

23  They don't want us to talk about other medicines that are

24  associated with the very condition that they are blaming us

25  for, and now we have a motion that's designed to prevent us

OFFICIAL TRANSCRIPT

1  from talking about the doctors' risk/benefit decision-making
2  for this plaintiff.
3            THE COURT: I didn't hear that.  And I'm kind of tired
4  of saying the same thing that I've been saying since May of
5  2018.  I think what happened in that room is important, and I
6  would anticipate that that's what the examination of that
7  doctor would entail.
8            And not going afield of that and saying, "Oh, by the
9  way, you wrote this book on that," even if it's not necessarily
10 pertinent to that treatment.
11           MR. MOORE: So, right.  I think we heard exactly that.
12 I heard what Mr. Mura said was exactly related to the
13 risk/benefit decision.  Because if you listen to the first
14 question he read on page 71, the question was about this
15 article and about the neurotoxicity of another choice back in
16 2008.  That's when he was in that room with Ms. Kahn.
17           And if the argument in this case is that had this
18 additional information and labeling been provided, this doctor
19 would have changed his course of action in that room, they have
20 to show, well, what else would he have done.  What were his
21 other options?
22           THE COURT: Right.
23           MR. MOORE: What are the side effects of those other
24 options?
25           THE COURT: Right.

OFFICIAL TRANSCRIPT

1      MR. MOORE: This neurotoxicity issue was one that was
2  present in the *Earnest* case.
3      THE COURT: Right.
4      MR. MOORE: Again, that time, through a motion in
5  limine, and Your Honor overruled that motion in limine.
6      THE COURT: Right, right.
7      MR. MOORE: Because it comes down to the question of
8  what would this doctor have done had this different information
9  existed.
10     THE COURT: Exactly.
11     MR. MOORE: And so that's why I make the comment that
12 if we can't talk about the side effects of the other medicines
13 that this doctor is being asked to presume he could write a
14 prescription for, then we're not able to live in that
15 hypothetical.  We're not able to put what the actual man's
16 knowledge was at that time and test it and see what he would
17 have done.
18     And we've had doctors, and you've granted summary
19 judgment motions on doctors that said, "I wouldn't change my
20 mind.  I guess, yeah, even if she told me, 'I want to take
21 Taxol,' no."  So that's a critical issue in this case.
22     And so these are the four opinions that -- the five
23 things that they have itemized in their motion that they want
24 to exclude from the case.  And I'm going to go through these
25 kind of when we get to the end, but I want to focus on the

OFFICIAL TRANSCRIPT

1  arguments that they're making because this is not really a

2  substantive motion.  This is a procedural motion.

3          And the first argument that they make -- well, I'll

4  skip this because we already talked about that -- is that we

5  have the objection to have provided some sort of disclosure

6  under Rule 26.  And what the law says -- I've cited the

7  *McIntyre* case, and this is in our papers -- is that treating

8  physicians don't have to provide a report when their testimony

9  and opinions derive from the actual treatment of the patient

10 rather than some subsequent evaluation as if they're specially

11 retained.

12         We didn't specially retain these treating physicians.

13 We didn't have them review company documents.  We didn't

14 provide them with information that was not available to them as

15 a treating oncologist making a decision for this patient back

16 in 2008.

17         So the first argument is that our Rule 26(a)(2)(C)

18 disclosure was inadequate.  I've put it up here on the board.

19 This is the defendant's one.  The plaintiff's is exactly the

20 same.  It is word-for-word identical for these precise doctors.

21 The disclosure we made is the disclosure they made.  So if

22 there's an insufficiency of the disclosure that was made for

23 these two witnesses, then that shoe has to be worn on the other

24 foot as well.

25         But what I want to point out about this is what we

OFFICIAL TRANSCRIPT

1    say we're going to offer the witnesses for are a mixture of
2    fact and opinion testimony on the subject matters expressed in
3    their depositions.  So we have to make this disclosure at a
4    particular time.  We don't have to make this disclosure before
5    they're deposed.  You can't complain that we didn't make a Rule
6    26(a)(2) disclosure before the deposition when the deadlines in
7    the CMO require that disclosure to come later.  So we did that.
8            They didn't get this and say, "Well, wait a minute.
9    I need to go depose this now if you're going to be offering
10   opinion testimony from these witnesses so that I can expound on
11   these expressions that they made at their deposition."
12           But the point of Rule 26 is to prevent prejudice and
13   surprise.  They were at the deposition.  Some of the testimony
14   that we will be pointing to is testimony that was offered in
15   response to questions that Mr. Miceli actually asked.  I don't
16   understand how they can claim prejudice for us not providing a
17   summary of the testimony and a summary of the opinions when we
18   provided the actual testimony that they were present for
19   two years ago.
20           So if we go -- well, I didn't hear this from Mr. Mura
21   in his argument; so I'm going to pass over it.  They make this
22   fleeting reference to *Daubert* and Rule 702, but there's no real
23   argument in their papers that these individuals are not
24   qualified to render the testimony that they did.  It just
25   simply says because 26(a)(2) refers to 702, they should have to

1   be subject to *Daubert* scrutiny.  There's nothing in their

2   motion to enable the Court to conclude that they're either not

3   qualified or that their opinions aren't based on, you know,

4   their experience and training and expertise in the field of

5   oncology.

6            So I'll just hop right to the back here and just look

7   at these opinions.  The first point I want to make is Opinion

8   No. 1, any opinions from Dr. Zoe Larned or Dr. Carl Kardinal

9   not set out in their respective medical charts on plaintiff

10  Elizabeth Kahn.

11           And because we made the same disclosure, the exact

12  same 26(a)(2) disclosure, you will not find any statement in

13  Elizabeth Kahn's medical records from Dr. Carl Kardinal that

14  says, "I would have prescribed Taxol if I had a different

15  warning."  That's not in there.  So if that's the rule and the

16  26(a) disclosure we made is insufficient, then we can go home

17  because it would apply to them too, and they can't ask those

18  questions either.

19           The second point, opinions about the diagnosis,

20  cause, or permanency of persistent hair loss, the only question

21  they reference -- the question and answer they reference in the

22  testimony, and I think it pertains to Dr. Larned, is a question

23  about whether or not she can testify that Elizabeth Kahn would

24  look any different today if she had taken Taxol instead of

25  Taxotere, or if she took a non-taxane-containing regimen and

OFFICIAL TRANSCRIPT

1  still had Adriamycin or cyclophosphamide.  I can't remember the
2  precise questions.  And of course, she testified that she could
3  not.

4          And I think this is important in the context of a
5  clinical trial because a clinical trial oncologist, it's not a
6  situation where you come in and you have that meeting in the
7  room and they turn you over to the oncology nurse and then you
8  go get your infusions, you come back once every six months.  In
9  the context of a clinical trial, they are prospectively
10 monitoring you, both for the efficacy, for the chance of
11 recurrence, and also for the onset of any side effects
12 associated with the medicines that they are prescribing as part
13 of the clinical trial.

14         And so the fact that the persons are supposed to be
15 monitoring the adverse events in the context of the clinical
16 trial are not making a conclusion that they are suffering this
17 particular side effect that they claim she suffered or
18 attributing it either to endocrine therapy or chemotherapy or
19 to Taxotere in particular, we think are relevant questions of
20 those witnesses.

21         We already talked about neurotoxicity.  Well, it's
22 the same issue in the *Kahn* case.  When we get back in that room
23 and we say we can't prescribe Taxotere because it has this hair
24 warning, you know, what are the other choices.  And there was a
25 time in this litigation, and you know, I was reading

OFFICIAL TRANSCRIPT

1  Dr. Kardinal's deposition where I think the principle

2  argument -- you see it coming through in the questions that

3  were asked by Mr. Miceli, that Taxol was the other alternative,

4  that that was going to be the argument.  It was just Taxol.

5       I think Taxol was the, I think when Hildy referred to

6  it, Ms. Sastre referred to it in the *Earnest* trial as the magic

7  medicine that doesn't have any other side effects, doesn't have

8  any chance of permanent chemotherapy alopecia, but will save

9  your life just as good as Taxotere will.

10       But what we know now, and Dr. Tosti authored some

11  literature on this, is that Taxol is associated with PCIA as

12  well.  So this is no longer a case about risk versus no risk.

13  It's a question of differential risk.

14       THE COURT: Right.

15       MR. MOORE: And so if the other option is another

16  taxane combined with Adriamycin and cyclophosphamide that are

17  all now associated in the literature with PCIA, somebody has to

18  come in this court, if it's not the treating doctors, one of

19  their experts has to come in and say that had they had this

20  other regimen, her hair would look different.

21       Nobody did that in *Earnest*.  Nobody is doing that in

22  this case.  I would submit that I don't think anybody can do

23  that in any of these cases because of the fact that all of

24  these medicines are prescribed together, and they have all been

25  associated with this condition in the literature.  Those are

OFFICIAL TRANSCRIPT

1  still relevant questions to ask.

2          I'm not sure what No. 4 is, any opinions or facts --

3  I mean if it's not in the deposition and we didn't ask about

4  it, it's not something that we disclosed.

5          And then the last, No. 5, is the point I was just

6  making, is the rates of persistent hair loss with other drugs.

7  I think that comes right down to the situation when we go back

8  into that room and if this information was disclosed in the

9  labeling, what were your other choices, what would you have

10  done, and how would that have affected your patient.  Those are

11  all relevant questions of the treating doctors and clearly

12  consistently related to their care and treatment of the

13  patient.

14          So for that reason, Judge, we'd ask that you deny the

15  motion.

16          THE COURT: Thank you.  Mr. Mura.

17          MR. MURA: Yes, Your Honor.  Let me just clarify.  I

18  think there is a suggestion that the shoe is on the other foot.

19  I didn't quite hear the expression, but I think I understood

20  the point.

21          I don't think that's accurate because we are not

22  seeking to elicit expert-type testimony from the treating

23  physician.  So it's not the case that we would need to disclose

24  anything.  We simply wanted to ask them about what happened in

25  the room.  What happened in the room is descriptive.  It's

OFFICIAL TRANSCRIPT

1   questions about what did you give the patient, what was the
2   patient's medical history.  That's descriptive questions.

3         But Mr. Moore gave me another great example.  He said
4   if she had taken Taxol instead of Taxotere, well, that's future
5   medical treatments.  I mean that's hypothetical based on a
6   comparison.  He said we would need testimony about differential
7   risk of some of those associated in the literature.  That is
8   classic scientific testimony.

9         And asking these two treaters about that differential
10  risk is exactly the type of testimony that you should be
11  getting, if you should get it at all, from experts.  It's not
12  testimony that's appropriate from a treating physician whose
13  testimony under the rule is confined to those facts or data the
14  physician learned during the actual treatment of the plaintiff.

15        THE COURT: But he would have to, I guess -- where are
16  you, Mr. Mura?  There you are.

17        I don't think that Mr. Moore said that he expected to
18  get that information from the treating physician, what the hair
19  would look like.  But I would think that you need from the
20  treating physician what history he brings into that
21  conversation.

22        You're not saying that he would not be able to say,
23  "Well, why did you make this recommendation?"  "Well, these
24  were the alternatives to me.  And because I had done a study in
25  this area, I was very concerned about neurotoxicity," or

OFFICIAL TRANSCRIPT

1  whatever.

2         MR. MURA: I think there's some questions that can go

3  to sort of what happened in the room and are descriptive of

4  what the treatment was and what the physician learned.

5         But many of these questions that Sanofi is asking go

6  far beyond that; and they go to questions about, you know,

7  general, general testimony that requires, you know, an expert,

8  so questions about neurotoxicity, questions about causation.

9  And these doctors are testifying based on their experience

10  seeing patients, but they're being asked about literature,

11  medical literature.  They're being asked about reports.

12         And the jury is hearing from this snippet of

13  information, and then they're also hearing from experts to talk

14  about case reports.  And they're just being given the

15  presentation that all these other drugs have serious side

16  effects when they should be deciding between the expert

17  testimony with respect to those drugs and how serious the side

18  effects are, how common they are, whether one drug causes a

19  certain side effect more often than another.  That sort of

20  dialogue needs to be coming from the experts.  It shouldn't be

21  coming through the treating physicians.  So that's generally

22  the concern that plaintiffs have, and that's the concern of

23  Rule 26.

24         THE COURT: And maybe I'm splitting, maybe it's

25  splitting hairs.  But it seems to me that my treating physician

OFFICIAL TRANSCRIPT

1  can say, "I prescribed Celebrex to her instead of, you know,

2  Ibuprofen because, you know, I'm concerned about this side

3  effect and knowing her history."  So you would necessarily have

4  to get some of that information.

5       I'm just trying to pull, I guess, I'm just tired of

6  talking about neurotoxicity.  But it seems to me that the

7  doctor has got to say, "My history in treating, I just see a

8  great deal of permanent damage, you know, cardiac damage,

9  neurotoxicity and that sort of thing, and I was concerned with

10 this lady.  And as a result, I made this recommendation.  Now

11 had I known that there was a risk of permanent hair loss, I

12 would have thrown it in there, maybe."  Or he may say, "I would

13 have never told her because I didn't think that was important."

14 And that's a whole different matter.

15      Or if he said, "I would have told her that.  And if

16 she said, 'Then give me the other drug,' I would have really

17 cautioned against it for these reasons."  So I think you have

18 to allow some of that.

19      MR. MURA:  Your Honor, we're not moving to exclude all

20 of their testimony.  We're simply trying to draw a line in the

21 sand between the testimony that's impermissible which is

22 scientific, or you know, the sorts of testimony about studies,

23 about how often something happens based on treatment of other

24 patients because that just gives the jury an impression that

25 you would expect to hear in sort of a scientific dialogue

OFFICIAL TRANSCRIPT

1  between experts.  And the whole point of Rule 26 is that there
2  is a disclosure.  We learn what the basis for that expert
3  opinion is, and that, we think, is different.

4        So again, we're not trying to exclude all of their
5  testimony.  They can certainly talk about what was in the room.
6  What they can't do is go beyond what *Warren* v *Mallory* talks
7  about which is to provide causation testimony or testimony
8  about future medical treatment or testimony that's really
9  about, you know, offering a scientific opinion that's very
10 general and not really about this patient.

11       THE COURT: Thank you.

12       MR. MURA: Thank you.

13       THE COURT: We're done.  We're in recess until
14 tomorrow at 10:00 a.m.

15    (Whereupon this concludes the proceedings.)

16

17                    **CERTIFICATE**

18    I, Alexis A. Vice, RPR, CRR, Official Court Reporter for
19 the United States District Court, Eastern District of
20 Louisiana, do hereby certify that the foregoing is a true and
21 correct transcript, to the best of my ability and
22 understanding, from the record of the proceedings in the
23 above-entitled and numbered matter.

24

25                    */s/Alexis A. Vice, RPR, CRR*
                      Alexis A. Vice, RPR, CRR
                      Official Court Reporter

                   OFFICIAL TRANSCRIPT