UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)   MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Brenda Mixon, No. 18-6581.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON THE CLAIMS OF PLAINTIFF
BRENDA MIXON AND ENTRY OF ORDER TO SHOW CAUSE**

---

Plaintiff Brenda Mixon opposes Defendants Sanofi-Aventis U.S., LLC and Sanofi US Services, Inc. ("Sanofi")'s motion for summary judgment and entry of order to show cause. The Michigan Products Liability Act ("MPLA" or "the Act") should not be interpreted so as to completely and categorically extinguish Ms. Mixon's claims, regardless of the facts proving Defendants' culpability.

## I.     INTRODUCTION

By at least January 2007, Sanofi certainly knew that Taxotere caused permanent hair loss in a significant percentage of patients, but it failed to warn patients of this fact, leading thousands of unsuspecting women to develop permanent and disfiguring hair loss. Brenda Mixon developed breast cancer and was treated with Taxotere in the summer of 2008, at least a year and a half after Sanofi positively knew that its product caused permanent hair loss. Because she was treated with Taxotere, Ms. Mixon has suffered a large bald area on her head and permanent thinning of the remaining hair, as well as permanent loss of her body hair. Because she is a Michigan resident who received treatment there, Defendants contend that this fact alone controls her claims, and that this

1

fact alone immunizes them from the permanent disfigurement to which they knowingly subjected her. This desultory dispensation of justice in inconsistent with constitutional and statutory law.

Sanofi contends that it has carte blanche to inflict any harm—theoretically unlimited harm—upon Ms. Mixon, because the MPLA allows it to do so. However, by its terms, the MPLA only precludes liability on the part of a drug manufacturer or seller "if the drug was approved for safety and efficacy by the [FDA] and the drug and its labeling were in compliance with the [FDA]'s approval at the time the drug left the control of the manufacturer or seller." MICH. COMP. LAWS § 600.2946(5). The statute has a number of exceptions based on action by the FDA or action toward the FDA:

- However, this subsection does not apply to a drug that is sold in the United States after the effective date of an order of the United States food and drug administration to remove the drug from the market or to withdraw its approval.

- This subsection does not apply if the defendant at any time before the event that allegedly caused the injury does any of the following:

    (a)   Intentionally withholds from or misrepresents to the United States food and drug administration information concerning the drug that is required to be submitted under the federal food, drug, and cosmetic act, chapter 675, 52 Stat. 1040, 21 U.S.C. 301 to 321, 331 to 343-2, 344 to 346a, 347, 348 to 353, 355 to 360, 360b to 376, and 378 to 395, and the drug would not have been approved, or the United States food and drug administration would have withdrawn approval for the drug if the information were accurately submitted.

    (b)   Makes an illegal payment to an official or employee of the United States food and drug administration for the purpose of securing or maintaining approval of the drug.

*Id.* The statute works together to make drug manufacturers liable if the FDA finds something wrong with the drug, if the defendant bribes an FDA official, or ***if the FDA would have found something wrong with the drug absent the defendant's wrongdoing.*** Sanofi's analysis, by which

2

they are immunized from their wrongdoing at Ms. Mixon's expense, is fatally flawed because it overlooks the MPLA's important exceptions, which were intended by the Michigan Legislature to safeguard against the miscarriage of justice demanded by Sanofi in this case.

## II.  STATEMENT OF FACTS AND BACKGROUND

Sanofi knew by January 2007 that permanent hair loss, and the ensuing irreversible disfigurement, constituted a physically and emotionally damaging side effect of using their drug, Taxotere. In the face of this knowledge, Sanofi did nothing to notify the FDA of Taxotere's side effects. When Brenda Mixon was exposed to Taxotere nearly a year and a half later, she had no way of knowing that the product was going to cause her permanent hair loss. She was deprived of her right to material information, to decline consent accordingly, and to opt for one of the many other drug treatments that would not sentence her to a lifetime of permanent baldness. Sanofi knew what Taxotere would do to patients like Ms. Mixon, but she did not.

Copious evidence proves Sanofi's material knowledge of the permanent disfigurement that its product caused. On January 26, 2007, Emanuel Palatinsky, a global safety officer for Taxotere, approved modifications to an informed consent form for a Sanofi clinical trial that added "permanent hair loss" as one of the "side effects" of Taxotere. *See* Plaintiff's Statement of Additional Disputed Facts ("SDF") 1. Before approving the addition of "permanent hair loss" to the informed consent form, Sanofi had steadily received reports from the office of the principal investigator in a number of its clinical trials, Dr. John Mackey. SDF 6-7. Specifically, beginning in circa 2003, Sanofi received a steady stream of reports recounting patients suffering permanent hair loss after completing chemotherapy treatment with Taxotere. Even earlier, the study site that proposed this change to the informed consent form had reported persistent hair loss that investigators regularly observed in its Taxotere patients. *See* SDF 7 (citing Mackey TAX-GMA-

301 Reports of Permanent Alopecia; Ex. 2, Sanofi_04353203_2562; Ex. 3, Sanofi_04353202_2279; Ex. 4, Sanofi_04353202_2301; Ex. 5, Sanofi_04353202_2566; Ex. 6, Sanofi_04353203_2283; Ex. 7, Sanofi_04353203_2297; Ex. 8, Sanofi_04353203_2301; Ex. 9, Sanofi_04353203_2316; Ex. 10, Sanofi_04353203_2320; Ex. 11, Sanofi_04353203_2323; Ex. 12, Sanofi_04353203_2327; Ex. 13, Sanofi_04353203_2521; Ex. 14, Sanofi_04353203_2534; Ex. 15, Sanofi_04353203_2539; Ex. 16, Sanofi_04353203_2551; Ex. 17, Sanofi_04353203_2559; Ex. 18, Sanofi_06248358; Ex. 19, Sanofi_06248364; Ex. 20, Sanofi_06248323; Ex. 21, Sanofi_04353202_2539; Ex. 22, Sanofi_04353202_2563 at 1-2). These cases were not one-off rarities that Sanofi could dismiss as anomalous but instead closely followed participants in multiyear, company-sponsored clinical trials, those unrelated to its TAX 316 and TAX 301 studies. *See* SDF 8. By August 2004, these investigators—and Sanofi—found there to be a causal relationship between Taxotere and a patient's persistent and irrevocable hair loss. SDF 9.

In addition to these constant incoming reports of the permanent disfigurement suffered by Taxotere-treated patients, Sanofi was warned by oncologist Dr. Scot Sedlacek that the prevalence of "persistent significant alopecia" with Taxotere in his clinical practice—6.3% of all patients— was alarming as compared against the background rate of *__zero__* with comparator drugs. SDF 11-15. Dr. Sedlacek presented these findings at the San Antonio Breast Cancer Symposium December 14-17, 2006. *See* SDF 10. Sanofi "had a dialogue" with Dr. Sedlacek around the time of his publication. SDF 16. With tragic consequences to patients like Ms. Mixon, Sanofi abdicated its duties by opting to cover-up what it knew.

Sanofi was not entitled to cover-up the information that it had regarding the permanent side effects of the drug it was selling. The FDA has stated, "Once a product is marketed, there is generally a large increase in the number of patients exposed, including those with co-morbid

4

conditions and those being treated with concomitant medical products. Therefore, postmarketing safety data collection and risk assessment based on observational data are critical for evaluating and characterizing a product's risk profile and for making informed decisions on risk minimization." *See* SDF 17. Sanofi was required to report unexpected adverse drug experiences, which include adverse events that are "related to an event listed in the labeling, but differ from the event because of greater severity or specificity." 21 CFR 314.80. Permanent hair loss was an unexpected and more severe drug experience, and it was required to be reported. SDF 18. 21 CFR 314.81(b)(2)(i) requires "[a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of the actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study."

After the FDA learned that Taxotere caused permanent hair loss, as Sanofi had known since January 2007, the FDA approved new labeling on December 11, 2015, noting that "[c]ontent of labeling must be identical to the enclosed labeling text for the package insert and text for the patient package insert." *See* SDF 19-20.

Brenda Mixon was diagnosed with breast cancer in March 2008. SDF 21. She was treated by lumpectomy and removal of lymph nodes, radiation, and chemotherapy. SDF 22. Ms. Mixon received four cycles of Taxotere, one every three weeks, between May 9, 2008 and July 11, 2008—nearly a year and a half after Sanofi knew that its drug caused permanent hair loss but over seven years before the FDA would know and require a label change. SDF 23. After using Taxotere, she suffered permanent hair thinning and a large bald area in the hair on her head, as well as the permanent loss of body hair. SDF 24. "The medical literature discussing alopecia and irreversible

5

alopecia (including not just scalp hair, but also loss of eyebrows, eyelashes, and hair in other body regions) describes the distressing nature of this injury and its profound impact on mental health, physical, psychosocial and psychological distress, quality of life, patient compliance, and patient willingness to undergo chemotherapy or instead choose a different therapy or treatment." SDF 25.

### III.  ARGUMENT AND AUTHORITIES

The draconian result demanded by Sanofi suffers from two independent problems: federal preemption and Ms. Mixon's constitutional rights. As explained below, there is an intra-Circuit split of federal authority on the issue of whether the MPLA is preempted by the federal FDCA, and reasoning in a Fifth Circuit decision, while not on all fours, nonetheless supports a finding of preemption. *See* § III.A *infra*. If preemption applies, then the preempted clause is not severable from the statutory language invoked by Sanofi, and the MPLA does not bar Ms. Mixon's case. *See* § III.A.1 *infra*. If, however, the Court resolves the intra-Circuit split against finding federal preemption, then the allegedly preempted exception saves Ms. Mixon's claims. *See* § III.A.2 *infra*. Either way, Sanofi's interpretation of the MPLA's application to this case is incorrect. Independently, the MPLA violates Ms. Mixon's equal protection rights, and in the alternative, the question of how Michigan's Constitution applies to the MPLA should be certified to the Michigan Supreme Court. *See* § III.B *infra*.

**A.  MPLA Subsection (5) of Section 600.2946 Is Either Preempted in Its Entirety or Subject to the Sub-subsection (a) Exception.**

In *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 966 (6th Cir. 2004), the Sixth Circuit found that the Sub-subsection (a) exception to Subsection (5) of Michigan Compiled Laws Section 600.2946 is preempted in cases where the FDA has not made actual findings that it was defrauded by the defendant. The Second Circuit disagreed with *Garcia*, in *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 93–98 (2d Cir. 2006), *aff'd by an equally divided court sub nom. Warner–*

6

*Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008). The Fifth Circuit has not ruled on preemption of sub-subsection (a) exception of subsection (5) of Section 600.2946 specifically, but it has discussed the issue in dicta and agreed with the Sixth Circuit. Specifically, in *Lofton v. McNeil Consumer & Specialty Pharmaceuticals*, 672 F.3d 372, 380 (5th Cir. 2012), the Fifth Circuit noted that "the Sixth Circuit's approach [in *Garcia*] is more faithful to *Buckman [Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001)]. In cases like this, where the FDA has not found fraud, the threat of imposing state liability on a drug manufacturer for defrauding the FDA intrudes on the competency of the FDA and its relationship with regulated entities." *Id.*

If the Court follows *Garcia* and the dicta in *Lofton* on the issue of preemption, then as argued below (§ III.A.1 *infra*), federal preemption applies to the entire Subsection (5), and Sanofi's defense based on this provision fails under the weight of federal preemption. But even if, on the other hand, the Second Circuit is correct and federal preemption is inapplicable, then Subsection (5) does not bar Ms. Mixon's case because the sub-subsection (a) exception is applicable. *See* § III.A.2. *infra*.

> 1. **Because Sub-subsection (a) of Subsection (5) of Section 600.2946 is not severable from the other provisions of Subsection (5), the statutory language upon which Sanofi's defense depends is preempted.**

In this case, sub-subsection (a) of subsection (5) of Section 600.2946 of the MPLA cannot be severed from the remainder of the statute, and certainly sub-subsection (a) cannot be carved out of subsection (5), without doing violence to the Legislature's intent. Here, deletion of the preempted language of the statute would leave the remaining portion of the statute incomplete, inoperative, and inconsistent with the intent of the Michigan Legislature. Sanofi cannot have it both ways: either the statutory provision is preempted, or it is not. Sanofi cannot cherry-pick the language that stands contrary to Mrs. Mixon while at the same time excising language ***in the very***

*same subsection* that grants her an exception to the alleged statutory bar. Subsection (5) grants defendants a sword while simultaneously creating a shield (i.e., (5)(a), the withholding-information exception) that is available to plaintiffs in defined circumstances. By the plain, statutory language, the Legislature never intended for the bar in (5) to apply under the circumstances defined in (a).

Michigan law provides that:

> In the construction of the statutes of this state the following rules shall be observed, *unless such construction would be inconsistent with the manifest intent of the legislature*, that is to say:
> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act *which can be given effect without the invalid portion or application,* provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

MICH. COMP. LAWS § 8.5 (emphasis added).

A proper application of the operative standards for severability compels the conclusion that if sub-subsection (a) is preempted, then the remainder of subsection (5) is preempted as well. "[I]f invalid or unconstitutional language can be deleted from an ordinance and *still leave it complete and operative* then such remainder of the ordinance be permitted to stand." *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W.2d 683, 713 (Mich. 2011) (quoting *Eastwood Park Amusement Co. v. East Detroit Mayor*, 38 N.W.2d 77, 81 (Mich. 1949) (emphasis added). The Court must consider whether "the Legislature 'would have passed the statute had it been aware that portions therein would be declared to be invalid and, consequently, excised from the act.'" *In re Constitutionality of 2011 PA 38*, 806 N.W.2d at 713 (quoting *Pletz v. Secretary of State*, 336 N.W.2d 789, 809 (Mich. Ct. App. 1983)). The valid portion of the act must "remain[ ] reasonable in view of the act as originally drafted." *See Citizens for Logical Alternatives*

*& Responsible Env't v. Clare Cty. Bd. of Comm'rs*, 536 N.W.2d 286, 288 (Mich. Ct. App. 1995) (citing *Pletz*, 336 N.W.2d 789). Here, the Act as originally drafted has the sub-subsection (a) exception baked into the statutory language.

The Michigan Legislature did not intend for the MPLA to stand alone without the critical withholding-information-from-FDA exception in sub-subsection (a) of subsection (5). The statute "represents a legislative determination as a matter of law of ***when a manufacturer or seller of a prescription drug has acted sufficiently reasonably***, solely for the purpose of defining the limits of a cognizable products liability claim under Michigan law." *Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 137 (Mich. 2003) (emphasis added). The statute as written works to make drug manufacturers liable if the FDA finds something wrong with the drug, if the defendant bribes and FDA official, or **if the FDA *would have* found something wrong with the drug absent the defendant's wrongdoing**. If any of these things are true, the defendant has *not* acted sufficiently reasonably to escape liability under the Act.

If the withholding-information exception in sub-subsection (a) is preempted, and the defendant cannot be held liable for its own wrongdoing in misrepresenting information to or concealing information from the FDA, then the legislative balance drawn by MPLA Section 600.2946 is fatally undermined. Under such a fatally flawed approach to preemption and severability, manufacturers will commit without consequence the very wrongdoing for which the Legislature explicitly preserved liability. The exception clause is not severable because the statute would then be left incomplete and inconsistent with the intent of the Legislature. *See In re Constitutionality of 2011 PA 38*, 806 N.W.2d at 713. Because the statute would become substantially incomplete and inconsistent with the Legislature's intention without the withholding-

information exception of sub-subsection (a), the provision is not severable from the remainder of subsection 600.2946(5), which must be found preempted in its entirety.

In a mere two paragraphs of faulty reasoning, the *Garcia* decision found that the provision is severable, allegedly because, without the exception, "it will merely place responsibility for prosecuting bribery or fraud on the FDA in the hands of the Federal Government rather than state courts." *Garcia*, 385 F.3d at 967. This reasoning is notably deficient as it departs from the Michigan jurisprudence quoted above. Extracting (a) but leaving the rest of the subsection intact is not what the Michigan Legislature intended. It *did* intend for the courts to have a role in policing manufacturers' conduct that fell below a sufficiently reasonable level. It *did* intend for the courts to be able to hold a defendant liable who conceals important information from the FDA even when the FDA makes no findings of fault. Without this provision, the statute does not operate as it was intended, and it should be stricken as preempted in its entirety.

*Garcia's* reasoning, whereby it usurps the role of the Michigan Legislature to essentially re-write the statute, is defectively flawed, because the responsibility of the sub-subsection (a) exception is **not** being handled by the FDA. The Institute of Medicine and Government Accountability Office has noted that the FDA's ability to oversee drug safety has been constrained. In its report titled "The Future of Drug Safety: Promoting and Protecting the Health of the Public," the Institute of Medicine stated, "the drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER [Center for Drug Evaluation and Research] that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." Kessler Report at ¶ 39, p. 10 (quoting Institute of Medicine, "The Future of Drug Safety: Promoting and Protecting the Health of the Public," at 4 (2007), available at

http://www.nap.edu/openbook.php?record_id=11750&page=4). The report added: "the committee found that the FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion." *Id.* In light of the evidence of the FDA's constrains and failures to function optimally, diverting tort liability to FDA regulation is not equivalent or inconsequential to the liability established by the Michigan Legislature. If it is what the Michigan Legislature intended, it would not have included a provision that did *not* rely on FDA findings, FDA action, or any FDA involvement.

Of course, the decision of the Sixth Circuit in *Garcia* is not binding on this Court: "Opinions 'bind' only within a vertical hierarchy. A district court must follow [its own court of appeals'] decisions, but it owes no more than respectful consideration to the views of other circuits." *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994).

Nothing prevents this Court from reaching the issue of severability. The Fifth Circuit has been asked but has declined to rule on the severability of a similar provision because it was raised for the first time on appeal. *Lofton*, 672 F.3d at 375, 380–81. It has certainly not addressed the issue in the context of the MPLA. There is no binding authority from the Fifth Circuit. This Court has the question before it, and it should find that the provision is not severable, the MPLA is preempted in its entirety or at least as to the entirety of Subsection (5), and Plaintiff is entitled to bring a products liability claim under MPLA Section 600.2946(2) and/or Section 600.2949a.

If the Court determines that resolution of this issue depends on determination of the severability of the sub-subsection (a) exception, Ms. Mixon asks that, in the alternative to ruling

11

in her favor at this time, the Court certify the question to the Michigan Supreme Court, as Section III.C, *infra*, explains.

> **2.  If Sub-subsection (a) to Subsection (5) of Michigan Compiled Laws Section 600.2946 is not preempted, then the exception applies and Ms. Mixon's claims are accordingly saved by the exception.**

Exception (5)(a) to Michigan Compiled Laws Section 600.2946 creates an exception to the statutory protection granted to drug companies, if the defendant "[i]ntentionally withholds from or misrepresents" to the FDA "information concerning the drug that is required to be submitted under" a list of statutes including the false or misleading labeling prohibition (21 U.S.C. §352), and "the drug would not have been approved, or the United States food and drug administration would have withdrawn approval for the drug if the information were accurately submitted." MICH. COMP. LAWS § 600.2946(5)(a). The exception applies because, as proven by subsequent changes to the label since Ms. Mixon's treatment and permanently disfiguring injury, the drug as labeled would not have been approved, and the drug cannot now be sold with a label omitting the warning that was in fact omitted when Ms. Mixon was exposed. After the FDA learned that Taxotere caused permanent hair loss, as Sanofi had known since January 2007, the FDA approved new labeling on December 11, 2015, noting that "[c]ontent of labeling must be identical to the enclosed labeling text for the package insert and text for the patient package insert." *See* SDF 19-20.

Because the sub-subsection (a) provision is an exception rather than a cause of action, the Second Circuit found that it is not preempted by *Buckman*. *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 93–98 (2d Cir. 2006), *aff'd by an equally divided court sub nom. Warner–Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008). *Desiano* finds that the withholding-information exception (exception 600.2946(5)(a)) is not preempted because it did not create a cause of action based on

fraud on the FDA, but rather allowed a plaintiff to proceed with a state law cause of action when victims could meet the exception.

*Desiano* analyzes the reasons behind the *Buckman* Court's preemption conclusion, finding that the gravamen of *Buckman* is that "*policing fraud on the FDA* through a tort action could interfere with how the FDA might wish to police that kind of fraud itself." *Desiano,* 467 F.3d at 93 (emphasis in original). The conflict with federal law that the *Buckma*n plaintiffs' fraud-on-the-FDA claims presented "stem[ed] from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives." *Buckman,* 531 U.S. at 348.

According to *Desiano*, "[t]here are three differences between the nature of the claim which NMHJYU67 § 2946(5) exempts from abolition and the claim in *Buckman*. Given the bases of *Buckman*'s holding, each of these is crucial." 467 F.3d at 93. First, the Supreme Court recognizes a presumption against federal preemption of state law that applies here but did not apply in *Buckman*. *Desanio,* at 93-34.[1] This presumption did not apply in *Buckman,* because "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Buckman*, 531 U.S. at 347; *Desiano*, 467 F.3d at 93 (quoting same). *Buckman*'s presumption analysis is completely distinguishable to the issue of the exception, because "[t]he Michigan legislature's desire to rein in state-based tort liability falls squarely within its prerogative to

---

[1] When plaintiffs are pursuing state-court causes of action: "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Particularly in cases "in which Congress has 'legislated ... in a field which the States have traditionally occupied,'" courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*. (citation omitted).

'regulat[e] matters of health and safety,' which is a sphere in which the presumption against preemption applies, indeed, stands at its strongest." *Desiano*, 467 F.3d at 94 (quoting *Buckman*, 531 U.S. at 348; further citation omitted). *Buckman* is distinguishable for the second reason that Ms. Mixon, as did the appellants in *Desiano*, is asserting a claim sounding in traditional state tort law and not a "newly-concocted duty between a manufacturer and a federal agency." *Desiano*, 467 F.3d at 94-95. "Third, and once more unlike *Buckman,* the Michigan Supreme Court has indicated that proof of fraud against the FDA is not even an *element* of a products liability claim like the one here brought." *Desiano*, 467 F.3d at 96 (discussing *Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 131 (Mich. 2003)).

Whatever decision this Court makes—finding preemption per the discussion in *Lofton,* or distinguishing *Lofton* in favor of the *Desanio* conclusion, Sanofi's MPLA argument fails: if preemption applies, it applies to both the bitter and the sweet of Subsection 600.2946(5), and this provision does not bar Ms. Mixon's claim because it is entirely preempted. If there is no preemption, then the sub-subsection (a) exception applies, and there is an exception to the statutory bar accordingly.

    **B.**    **The MPLA Violates Brenda Mixon's Equal Protection Rights: Carving Out the Michigan Victims of Drug Torts from Other Product Torts Is an Arbitrary and Capricious Distinction in Violation of Michigan Constitution Article 1, Section 2.**

"No person shall be denied the equal protection of the laws[.]" MICH. CONST. ART. 1, § 2. Here, Sanofi argues that the claims be dismissed pursuant to Subsection (5) of Michigan Compiled Laws Section 600.2946. This statutory subsection is specific to drugs. Subsection (4) applies to products generally. Of course, drugs are also a product that can do harm to individuals exposed to them. But subsection (4), and not Subsection (5), allows the plaintiff to establish an actual knowledge exception:

> In a product liability action, if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge in the manufacture or distribution of the product, then sections 2946(4), 2946a, 2947(1) to (4), and 2948(2) do not apply.

MICH. COMP. LAWS § 600.2949a. As the evidence addressed above proves, Sanofi had this actual knowledge.

"The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment." *Crego v. Coleman*, 615 N.W.2d 218, 223 (Mich. 2000) (citing *Miller v. Johnson*, 515 U.S. 900, 919 (1995), *cert. denied,* 531 U.S. 1074 (2001); further citation omitted). Other jurisdictions have found equal protection violations where, as here, a statute cuts off the rights of access to courts based on arbitrary categories.[2]

---

[2] *See, e.g.*, *Farley v. Engelken*, 740 P.2d 1058 (Kan. 1987) (abrogation of collateral-source rule in medical malpractice action violated Kansas equal protection clause); *Coffey v. Bresnahan*, 506 A.2d 310 (N.H. 1986) (under the State constitution, the legislature could not constitutionally bar the suits of tort plaintiffs in survival actions after only two years); *Shessel v. Stroup*, 316 S.E.2d 155, 158 (Ga. 1984) (arbitrary three-way classification constituted a denial of equal protection), *superseded by statute*, OCGA § 9-3-71(a); *Boucher v. Sayee Articled*, 459 A.2d 87, 93 (R.I. 1983) ("The statute constitutes special class legislation enacted solely for the benefit of specially defined defendant health-care providers.") (federal Constitution); *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978) ($300,000 limitation on recovery in medical malpractice cases is a violation of the equal protection provision of the North Dakota Constitution); *Broome v. Truluck*, 241 S.E.2d 739 (S.C. 1978) (statute of repose applicable to claims brought against engineers, architects and builders violates equal protection); *Loyal Order of Moose, Lodge 1785 v. Cavaness*, 563 P.2d 143, 148 (Okla. 1977) ("if one class of defendants, owners and tenants, is excluded from this protection, the 14th Amendment to the United States Constitution is violated and the legislation is not valid"); *Fujioka v. Kam*, 514 P.2d 568, 572 (Haw. 1973) (statute of repose applicable to claims brought against engineers and contractors deprived plaintiffs of right to equal protection of law; "the statute calls for arbitrary and capricious discrimination and must therefore be declared an invidious discrimination violative of the equal protection guaranty"); *Skinner v. Anderson*, 231 N.E.2d 588 (Ill. 1967) (statute of repose applicable to claims against architects, engineers and builders violated equal protection); *Jeanne v. Hawkes Hosp. of Mt. Carmel*, 598 N.E.2d 1174, 1179 (Ohio Ct. App.), *cause dismissed on applicants' application,* 62 Ohio St. 3d 1437 (Ohio 1991) ("This court does

15

To determine whether a legislative classification violates equal protection, the reviewing court applies one of three tests. *Crego,* 615 N.W.2d at 223-24. If the legislation creates an inherently suspect classification or affects a fundamental interest, the "strict scrutiny" test applies. *Vargo v. Sauer,* 576 N.W.2d 656, 661 (Mich. 1998). Other classifications that are suspect but not inherently suspect are subject to the "substantial relationship" test. *Neal v. Oakwood Hosp. Corp.,* 575 N.W.2d 68, 76 (Mich. Ct. App. 1997). The third possibility is rational basis. The court upholds a statute under the rational basis standard if it furthers a legitimate governmental interest and if the challenged classification is rationally related to achieving that interest. *Vargo*, 576 N.W.2d at 661.

Access to the court system is a fundamental right. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977). In *Rodriguez v. Grand Trunk W. R. Co.*, 328 N.W.2d 89, 92 (Mich. Ct. App. 1982), the court recognized that "access to the court system is a fundamental constitutional right," and applying this standard, held that a venue statue "does not impermissibly burden the exercise of this right," because "[t]he statute does not bar plaintiff from the court system but merely restricts the choice of forum." *Id*. Here, Ms. Mixon and the other Michigan residents are categorically denied access to justice—justice that is available to residents of other states and to Michigan residents hurt by other products. In other contexts, geographic discrimination laws have been stricken.[3] At a minimum, Ms. Mixon should be afforded the Section 2949a exception that is available in Michigan product cases not arising from drug-induced damages.

---

not find that the state's interest in protecting medical malpractice defendants and their insurers and in reducing the cost of defending and indemnifying medical claims substantially furthers a legitimate state interest."); *Duren v. Suburban Community Hosp.*, 482 N.E.2d 1358 (Ohio Com. Pl. 1985) (damage cap violates equal protection).

[3] *Cf. Murray v. City of Battle Creek,* 257 N.W. 696 (Mich. 1934) (ordinance requiring itinerant wholesale produce dealers to give bond and pay license fee was void as discriminating in favor of local establishments; rejecting argument that protection of public health supported proper nondiscriminatory purpose);

The Court of Appeals has applied the rational basis test to economic legislation, reasoning that:

> Under rational-basis review, courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose. To prevail under this highly deferential standard of review, a challenger must show that the legislation is "arbitrary and wholly unrelated in a rational way to the objective of the statute."

*Phillips v. Mirac, Inc.*, 651 N.W.2d 437, 444 (Mich. Ct. App. 2002) (quoting *Crego*, 615 N.W.2d 218), *aff'd*, 685 N.W.2d 174 (Mich. 2004). Here, the distinction is irrational. Section 600.2949a grants plaintiffs access to judicial remedies if they can demonstrate actual knowledge that the product was defective, and substantial likelihood the defect would cause injury. It is arbitrary and capricious to allow drug manufacturers to deliberately, with knowledge aforethought, harm Brenda Mixon with completcompilede impunity, when other product manufacturers must answer for their knowing infliction of harm.

The Michigan Court of Appeals has found that the damages limitation of Section 600.2946a is not arbitrary. *Kenkel v. Stanley Works*, 665 N.W.2d 490, 499–500 (Mich. Ct. App. 2003). Here, Ms. Mixon's challenge is to the drug distinction, and the impact is not just to cap damages but to extinguish any recovery at all, effectively barring access to courts for any dollar amount. Therefore, the Michigan decisions regarding the damages cap are distinguishable.

In the alternative to ruling in Ms. Mixon's favor at this time, she requests certification to the Michigan Supreme Court, as the next section explains.

### C.     As Noted Above, There Are Important issues Here That Should Be Certified to the Michigan Supreme Court.

"Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources and hel[p] build a cooperative judicial federalism.'" *Arizonans for Official English v. Arizona*, 520 U.S. 43,

77 (1997) (quoting *Lehman Brothers v. Schein*, 416 U.S. 386, 391 (1974); further citation omitted). In *Arizonans*, the District Court and the Court of Appeals had ruled out certification to the state appellate court, and the Supreme Court found that to be "puzzling." 520 U.S. at 77. The benefit of certification is to allow federal courts "faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response." *Id.* at 76. The Supreme Court found that the issue on appeal before it had become moot due to the plaintiff's job change, but went on to vacate the judgment, because of the "federalism concern" raised by the decisions of the federal District Court and Court of Appeals to interpret the Arizona law. *Id*. at 75. "The teaching of *Arizonans*, therefore, is that we should consider certifying in more instances than had previously been thought appropriate, and do so even when the federal courts might think that the meaning of a state law is 'plain.'" *Tunick v. Safir*, 209 F.3d 67, 73 (2d Cir. 2000) (quoting 520 U.S. at 76).

Here, the Michigan Supreme Court's rules allow certification of questions from federal courts, providing that:

> (a) When a federal court, another state's appellate court, or a tribal court considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Court.
>
> (b) A certificate may be prepared by stipulation or at the certifying court's direction, and must contain
>
> (i) the case title;
>
> (ii) a factual statement; and
>
> (iii) the question to be answered.
>
> The presiding judge must sign it, and the clerk of the federal, other state, or tribal court must certify it.

Mich. Ct. R. 7.308.

Plaintiff Mixon respectfully asks that the Court certify the questions raised herein, specifically the severability of exception (a) to Subsection 2946(5) of the MPLA and whether MICH. COMP. LAWS § 600.2946(5) violates Michigan's Equal Protection Clause, to the Michigan Supreme Court, and files a proposed order in compliance with the Michigan rule. The draconian result of singling out the Michigan residents and categorically foreclosing their claims, regardless of the extent of their disfigurement, should be placed in the hands of the Michigan Supreme Court.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff urges the Court to find that exception (a) to Subsection 2946(5) of the MPLA is preempted and cannot be severed from the remainder of the statute. Alternatively, if the Court does not find preemption, then exception (a) applies and saves Ms. Mixon's claims from a statutory bar arising from Subsection (5). Independently, MPLA Section 2946(5) violates the Equal Protection Clause of the Michigan Constitution. Plaintiff asks that, at a minimum, the issues of the severability of these issues exception (a) to Subsection 2946(5) and the construction of Michigan Constitutional law be certified to the Michigan Supreme Court.

Dated: October 20, 2020                                Respectfully submitted,

                                                       /s/ Jason S. Long

                                                       Jason S. Long
                                                       Texas State Bar No. 24098012
                                                       Darren P. McDowell
                                                       Texas State Bar No. 24025520
                                                       Misty A. Farris
                                                       Texas State Bar No. 00796532
                                                       **FEARS NACHAWATI, PLLC**
                                                       5473 Blair Road
                                                       Dallas, Texas 75231
                                                       Telephone: (214) 890-0711
                                                       Facsimile: (214) 890-0712
                                                       jlong@fnlawfirm.com
                                                       dmcdowell@fnlawfirm.com
                                                       mfarris@fnlawfirm.com

          */s/ Kristie L. Fischer*

SCOTT K. CANEPA, ESQ.
Nevada Bar No. 4556
TERRY W. RIEDY, ESQ.
Nevada Bar No. 3895
BRYAN T. ABELE, ESQ.
Nevada Bar No. 7250
KRISTIE L. FISCHER, ESQ.
Nevada Bar No. 11693
**CANEPA RIEDY ABELE**
851 S. Rampart Boulevard
Suite 160
Las Vegas, Nevada 89145
Tel: (702) 304-2335
Fax: (702) 304-2336
scanepa@canepariedy.com
triedy@canepariedy.com
babele@canepariedy.com
kfischer@canepariedy.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

          */s/ Jason S. Long*