UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)           MDL No. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

THIS DOCUMENT RELATES TO:
*Juanita Greer*, Case No. 2:18-cv-11728

### PLATINIFF'S SUPPLEMENTAL PLEADING IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT ON THE PLEADINGS BASED ON THE STATUTE OF LIMITATIONS

MAY IT PLEASE THE COURT:

In further support of her opposition memorandum, which provided two independent bases to support the tolling of the applicable statute of limitations and denial of Sanofi's Motion, i.e., (1) the discovery rule and (2) fraudulent concealment, Ms. Greer supplements her opposition with recent testimony of Sanofi's expert dermatologist in this MDL litigation.

Recently, Sanofi's expert Dr. Mamina Turegano gave testimony in the *Kahn* matter that provides insight into the evaluation and interpretation of pleadings vis-à-vis tolling, discovery rule and latency of injury under Mississippi law. Dr. Turegano testified as follows:

> Q. What's your definition of PCIA?
> A. Gosh, I mean, based on the literature review, I'm -- I'm under the understanding that it is persistent hair loss, so hair that hasn't regrown for at least six months after starting chemotherapy -- after finishing chemotherapy and -- yeah.
> Q. And based on the opinions that you've set forth in this report, it's your position that tamoxifen can make that determination difficult, right, PCIA versus something else?
> A. It can.
> Q. Okay. So until the person comes off the endocrine therapy, it's your belief that you really can't tell, right?
> A. I mean, unless their hair regrew after chemotherapy and before starting endocrine therapy, but in general, yes. Like if they still had persistent hair loss after completing chemotherapy and then they continued on to some type of endocrine therapy, it's hard to say what the culprit is.
> Q. So it could be a latent injury or a latent diagnosis, right?

1

Q. Do you know what the term "latent" means?

A. I do, but, I mean -- I think I'm just trying to remember when endocrine therapy is typically introduced once chemotherapy is completed. Like I'm trying to remember if it can be introduced like before six months is over, because that can kind of muddy the waters of the definition of PCIA, if it's like less than six months after completing treatment, you start the -- you start the -- the medicine, the endocrine medicine.

Q. So it could be a latent injury or a latent diagnosis, right? (End of readback.)

A. Oh, right. That wasn't my answer. That was me saying that was the question. It -- just from my reading, the diagnosis -- the general consensus that I'm gathering from the definition of PCIA is that the diagnosis is hair loss that remains six months or longer. So if the hair -- so I don't see it being like a late -- a latent type of process because it would just be like persistent hair loss that doesn't go away after six months, not like -- not like hair regrows and then later on hair gets lost. So no, I guess, would be my answer.

Q. Okay. I guess that answers part of the question, but it could be a latent diagnosis though, correct?

A. Oh, latent diagnosis? Okay. Yeah. It could be a latent diagnosis if the -- if the patient wasn't concerned about it and didn't bring it up until, you know, like more than six months later.

Q. Or if the tamoxifen or aromatase therapy began around six months, it might result in a latent diagnosis?

A. If the tamoxifen -- I think if -- I guess it's – I mean, if there was persistent hair loss after alopecia -- I mean, sorry, after chemotherapy, let's say, like, at month four and then tamoxifen or some type of endocrine therapy was introduced at month four, and then the hair loss still -- you know, there was still persistent hair loss, it's hard to say -- it would be hard to say whether you attribute it to PCIA versus tamoxifen. So I don't think -- I don't -- it -- it wouldn't be like that it would make -- give it a latent diagnosis. It would be that you just couldn't make the diagnosis.

Q. Okay. So it's fair to say in that situation, that hypothetical that you just made, that a dermatologist that doesn't have a background in hair loss might not be able to make that diagnosis at that time, right?

A. At which time?

Q. At six months, for example.

A. If -- yes, if a dermatologist wasn't aware of PCIA or the definition of it, uh-huh.

Q. Okay. Even harder for a layperson, right?

A. Yeah, I would say that the layperson, they wouldn't know -- I mean, yeah. They -- unless they had a discussion with their

        oncologist on like when to expect hair regrowth, they wouldn't potentially have a good idea as to when their hair was supposed to regrow.

Q. So the tamoxifen or aromatase inhibitor might hide the underlying diagnosis, right? Or the underlying condition. Sorry.

A. If the tamoxifen or endocrine therapy was introduced before six months and the patient still has the same exact hair as it was like -- the same exact level of hair loss as they did, you know, when they finished -- right when they finished chemo, then it -- it could.

Q. Okay. Is there a certain amount of regrowth between months – between finishing chemotherapy and six months that you believe rules out PCIA, a certain percentage of regrowth?

A. I feel like that's hard to quantify. Yeah, I can't give you a number on that.

Q. And then I guess another question is when a patient is started on tamoxifen or aromatase inhibitors, I think your report -- your opinion is that those cause hair loss, right?

A. They can.

Q. Okay. So a patient wouldn't necessarily expect or suspect a permanent injury if they're taking tamoxifen or an aromatase inhibitor, right?

A. I think that the side effects of, you know, tamoxifen -- tamoxifen -- I mean, I think the side effects of hair loss with tamoxifen is significant enough that that's something that should be discussed with the patient before the oncologist prescribes it.

Q. Okay. Now, your definition of PCIA that you described earlier related to six months. Six months is not some magic number where at day 182? follicle just, poof, goes way, right?

A. Right.

Q. Okay. So for some people, the time may be six months. Some people might be a year or two years before you could diagnose

A. My understanding is that the hair loss -- it's not that the follicle goes away. It's that the follicle -- it's like the hair hasn't regrown. So at six -- I'm not sure how the consensus came about with six months, but -- but there are cases of PCIA that, yeah, that last longer than six months, but it's -- from my understanding, it's -- it's the same level of hair loss since they ended chemo. It's just persistent. So I'm not sure if I answered your question, but I -- I just -- yeah. I don't think that...

Q. I guess let me ask it this way: One of the pathological features that dermatopathologists and -- who have studied PCIA have found is a reduction in hair follicles; is that true?

A. You can get reduction in hair follicles --

Q. Okay.

A. -- in PCIA.

3

> Q. Okay. But that reduction in hair follicles doesn't just magically appear at day 182?, right?
> A. I'm not sure when it starts. I mean, it's possible that it could have -- it could be that the follicles were destroyed or that the follicles, you know, were affected during chemo and just lost their ability to -- I mean, they were affected and then could have just not gained the ability to regrow hair.[1]

From this testimony, it is clearly a reasonable interpretation of the pleadings that Ms. Greer has provided sufficient allegations to trigger the discovery rule and/or fraudulent concealment.

The timeliness inquiry under Mississippi law involves genuinely disputed questions concerning the complex dermatologic condition from which Ms. Greer alleges to suffer, i.e., PCIA. Resolution of these questions requires analysis of underlying facts of the case, including but not limited to discovery/discoverability of hair loss, discussions with her physicians, information provided to (or wrongfully withheld from) her physicians, and her use of an hormone therapy after chemotherapy. Sanofi's own expert admits that persisting hair loss is not something a layperson could even attribute to PCIA and acknowledges could be a hidden condition because of use of another drug that Sanofi will argue (like in *Earnest*) to the jury is the cause of her dermatologic condition. Genuine issues of material fact regarding discovery, latency, and concealment of Ms. Greer's dermatologic condition, remain in dispute for a jury to consider.

It also bears mentioning that Dr. Turegano herself testified regarding the knowledge of a layperson, confirming the understanding of complex dermatologic conditions is not something she knew about after completing a college degree but before medical school:

> Q. Okay. All right. And I'm going to rephrase the question and see if I can make it make sense this time. Before you went to medical school, did you know the difference between temporary alopecia after chemotherapy, anagen effluvium versus PCIA?
> A. No.[2]

---

[1] Ex. A, Dep. of Mamina Turegano, M.D. taken Oct. 23, 2020, 140-48 (form objections omitted).
[2] *Id.* at 169.

If Sanofi will (as it did in the trial Ms. Earnest's case) argue to the jury that its drug does not cause PCIA and that Ms. Greer does not have PCIA, then how can Ms. Greer's case have prescribed years ago? And particularly when Sanofi did not warn doctors of the risk of the condition from which she suffers and (according to Sanofi) should have recognized years ago. These are the same oncologists whose conversations with Ms. Greer Sanofi now seeks to minimize and exclude from this conversation when, at a pleadings analysis stage, they are relevant to the Court's analysis in a light most favorable to Ms. Greer.

Ms. Greer's claims against Sanofi are not untimely on the face of the pleadings under Mississippi law, and interests of equity, fairness and the need for determination of genuinely disputed material facts preclude summary judgment.

Date: November 2, 2020

Respectfully Submitted,

/s/ Alexandra W. Robertson
Alexandra W. Robertson (Bar #395619)
Timothy J. Becker
**JOHNSON BECKER, PLLC**
444 Cedar Street, Suite 1800
St. Paul, Minnesota 55101
(612) 436-1800 (telephone)
(612) 436-1801 (facsimile)
arobertson@johnsonbecker.com
tbecker@johnsonbecker.com

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

5

/s/M. Palmer Lambert
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

/s/Dawn M. Barrios
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews & Thornton
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Phone: (800) 664-1734
aa@andrewsthornton.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@atkinsandmarkoff.com

J. Kyle Bachus
Bachus & Schanker, LLC
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Phone: (303) 893-9800
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2505
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

| | |
|---|---|
| Alexander G. Dwyer<br>Kirkendall Dwyer LLP<br>440 Louisiana, Suite 1901<br>Houston, TX 77002<br>Phone: (713) 522-3529<br>Fax: (713) 495-2331<br>adwyer@kirkendalldwyer.com | Rand P. Nolen<br>Fleming, Nolen & Jez, L.L.P.<br>2800 Post Oak Blvd., Suite 4000<br>Houston, TX 77056<br>Phone: (713) 621-7944<br>Fax: (713) 621-9638<br>rand_nolen@fleming-law.com |
| Emily C. Jeffcott<br>Morgan & Morgan<br>700 S. Palafox Street, Suite 95<br>Pensacola, Florida 32505<br>Phone: (850) 316-9074<br>Fax: (850) 316-9079<br>ejeffcott@forthepeople.com | Hunter J. Shkolnik<br>Napoli Shkolnik PLLC<br>360 Lexington Avenue, 11th Floor<br>New York, NY 10017<br>Phone: (212) 397-1000<br>hunter@napolilaw.com |
| Andrew Lemmon<br>Lemmon Law Firm, LLC<br>P.O. Box 904<br>15058 River Road<br>Hahnville, LA 70057<br>Phone: (985) 783-6789<br>Fax: (985) 783-1333<br>andrew@lemmonlawfirm.com | Genevieve Zimmerman<br>Meshbesher & Spence Ltd.<br>1616 Park Avenue South<br>Minneapolis, MN 55404<br>Phone: (612) 339-9121<br>Fax: (612) 339-9188<br>gzimmerman@meshbesher.com |

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ M. Palmer Lambert