# EXHIBIT A

2020 WL 6110909
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Edward G. SILVERSTEIN, Berta Marquez, and Esteban Gorgoll, Plaintiffs,

v.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., Defendant.

Case No. 19-CIV-81188-Ruiz/Reinhart
|
Entered on FLSD Docket 10/07/2020

**REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT (ECF NO. 53, 63)**

BRUCE REINHART UNITED STATES MAGISTRATE JUDGE

 **\*1** Before the Court are cross-motions for summary judgment that were referred to me for a Report and Recommendation by the Honorable Rodolfo A. Ruiz, II. ECF No. 82. I have reviewed the relevant pleadings and the respective statements of undisputed material facts. Oral argument was heard on August 26, 2020. ECF No. 97. I recommend that Defendant's Motion for Summary Judgment (ECF No. 53) be **GRANTED** and Plaintiff's Cross-Motion for Summary Judgment (ECF No. 63) be **DENIED**.

**TABLE OF CONTENTS**

I. BACKGROUND 1

II. CLAIMS AND DEFENSES 3

III. LEGAL PRINCIPLES 4

  1. *Summary Judgment* 4

  2. *FDA Labeling Requirements* 11

  3. *Impossibility Preemption* 14

  4. *Adequacy of Warning Labels* 16

  5. *Loss of Consortium* 17

  6. *Burden of Persuasion/Burden of Production* 17

    a. Impossibility Preemption 18

    b. Adequacy of the Label Warnings 23

IV. UNDISPUTED MATERIAL FACTS 24

  1. *RE-LY Clinical Trial* 24

  2. *Plaintiff's Bleed* 26

  3. *Pradaxa FDA Approval and Initial Label* 26

  4. *Pradaxa European Approval* 32

    a. European Label 32

    b. Clinical Overview Statement 34

  5. *Post-Approval Data Analyses* 35

    a. Schumacher Modeling 35

    b. Lehr Titration Analysis 37

    c. Reilly Paper 39

  6. *British Medical Journal Articles and Regulatory Follow-up* 49

    a. BMJ Articles 49

    b. EMA 50

    c. FDA 52

  7. *Labeling History* 53

  8. *Additional Publications* 55

V. DISCUSSION 56

  1. *Newly Acquired Information* 56

    a. "Cut-off" Point 57

    b. Therapeutic Monitoring 611

    c. Plasma Concentration Laboratory Testing 66

    d. Specific Covedilol Warning 69

2. *Futility* 70

3. *Adequacy of the Label Warnings* 70

4. *Loss of Consortium* 73

VI. RECOMMENDATION 73

## I. BACKGROUND

This case involves Pradaxa, a cardiac medication manufactured by Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BI") and approved for use in the United States by the U.S. Food and Drug Administration ("FDA"). Pradaxa is an oral anticoagulant drug, also known as a "blood thinner." It is designed to treat patients with Atrial fibrillation (AFib).

> More than 3 million Americans have atrial fibrillation, a problem with the electrical system of the heart that causes an irregular heart rhythm. Atrial fibrillation can produce palpitations, shortness of breath, lightheadedness, weakness, and chest pain, or may occur without symptoms. The main concern, however, is that atrial fibrillation can lead to the formation of blood clots in the heart, which can travel to the brain and cause a stroke.

> There are a number of treatments -- drugs and procedures -- intended to correct the fundamental heart rhythm problem in patients with atrial fibrillation, but the main focus of treatment is to try to decrease the rate of stroke by preventing the formation of these blood clots. This is accomplished with taking anticoagulant drugs or 'blood thinners.'

ECF No. 54-52 at 2[1] (E. Unger, *Atrial Fibrillation, Oral Anticoagulant Drugs, and Their Reversal Agents* (Oct. 16, 2015), https://www.fda.gov/drugs/news-events-human-drugs/atrial-fibrillation-oral-anticoagulant-drugs-and-their-reversal-agents (last visited 10/7/20). Although beneficial in preventing AFib, anti-coagulant drugs carry their own risks – "they prevent clotting in locations and situations where clotting is desireable. In other words, they can cause bleeding." *Id.* For many years, warfarin (brand name Coumadin) was the leading AFib treatment option. One issue for patients was that "the anticoagulant effect of warfarin must be carefully monitored with periodic blood tests." *Id.*[2]

**\*2** At least as early as 2003, BI was trying to develop an alternative to warfarin. *See* FDA Center for Drug Evaluation and Research, Summary Review of Application Number 22-512 at 2 (noting Investigative New Drug application filed July 7, 2003), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022512Orig1s000SumR.pdf (last visited 10/7/20). BI filed New Drug Application (NDA) 22-512 on December 15, 2009, seeking approval of dabigatran etexilate (DE) as a treatment for AFib. ECF No. 54-7 at 14. BI ultimately proposed the brand name "Pradaxa" for this medication. *See* FDA Approval Letter for NDA 22-512, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/022512s000ltr.pdf (last visited 10/7/20). This process culminated on October 19, 2010 when the FDA approved "the use of PRADAXA 75 mg and 150 mg capsules, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation." *Id.*

Simultaneously, the FDA approved the labeling for Pradaxa. *Id.* According to the FDA website, "The FDA approved label is the official description of a drug product which includes indication (what the drug is used for); who should take it; adverse events (side effects); instructions for uses in pregnancy, children, and other populations; and safety information for the patient. Labels are often found inside drug product packaging." https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-instructions-health-information (last visited 10/7/2020); *see* 21 U.S.C. § 321(k), (m) ("labeling" includes all "written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."). The approved labeling warned that Pradaxa "increases the risk of bleeding and can cause significant, and, sometimes, fatal bleeding." ECF No. 54-2 at 3, § 5.1; *see also id.* at 2 ("PRADAXA can cause serious and, sometime, fatal bleeding").

BI markets Pradaxa as a better medication than warfarin because, among other reasons, Pradaxa does not require ongoing routine monitoring of blood levels and diet. *See, e.g.,* https://www.pradaxa.com/how-pradaxa-compares (last visited 10/7/2020).

## II. CLAIMS AND DEFENSES

In the Second Amended Complaint ("SAC"), Plaintiff Berta Marquez alleges that she was prescribed Pradaxa on or around March 2012, for treatment of AFib. The SAC further

2020 WL 6110909

alleges that on September 17, 2015, Marquez suffered a major bleed as a result of taking Pradaxa, which caused her to be hospitalized for six days. Marquez stopped taking Pradaxa at that point. ECF No. 18 ¶¶ 95-96. The SAC asserts four causes of action under state law: strict liability failure to warn (First Cause of Action), product liability failure to warn (Second Cause of Action), negligence (Third Cause of Action), and product liability breach of implied warranty (Fourth Cause of Action). All four claims allege the same factual basis: BI had a duty to warn Ms. Marquez that Pradaxa could cause severe bleeding and failed to give an adequate warning.[3] Her husband, Plaintiff Esteban Gorgoll, alleges loss of consortium damages (Fifth Cause of Action). ECF No. 18.

 **\*3** BI's Answer denies these allegations. ECF No. 22 ¶¶ 95-96. BI also asserts 42 affirmative defenses. ECF No. 22 at 22-33.

## III. LEGAL PRINCIPLES

 1. *Summary Judgment*
BI moves for summary judgment on all counts on the affirmative defense of impossibility preemption. ECF No. 53.[4] Separately, BI moves for summary judgment on the grounds that its warnings are adequate as a matter of law. *Id.; see* ECF No. 22 at 27.

Plaintiffs oppose both grounds in BI's Motion. They move for summary judgment in their favor "relating to the Defendant's failure to warn about plasma level testing as required by 21 C.F.R. § 201.57(c)(6)(iii) and the failure to update its label to reflect new information regarding the variability of the laboratory results attributable to different reagents and methods." ECF No. 63 at 42. They also "seek an affirmative ruling that BI's preemption defense fails as a matter of law." *Id.* at 43.

The legal standard on cross-motions for summary judgment does not differ from the standard applied when only one party files a summary judgment motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). That standard is well-settled:

> Summary judgment is authorized only when, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." *See* Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of meeting this exacting standard. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970). In applying this standard, the *Adickes* Court explained that when assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. *See Adickes*, 398 U.S. at 157.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

*Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693JB v. Capri of Palm Beach, Inc.*, 932 F. Supp. 1444, 1446 (S.D. Fla. 1996), *aff'd sub nom. Certain Underwriters v. Capri*, 128 F.3d 732 (11th Cir. 1997) (J. Moreno).

 **\*4** The moving party's burden on a motion for summary judgment "depend[s] on whether the legal issues ... are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "[F]or issues on which the movant would bear the burden of proof at trial, 'that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.' " *Id.* (emphasis in original) (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. In State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). "For issues, however, on which the non-movant would bear the burden of proof at trial, 'the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility.' " *Id.* (emphasis in original) (quoting *Four Parcels*, 941 F.2d at 1437–38). *Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2561364, at \*1 (S.D. Fla. May 20, 2020) (J. Singhal). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of*

*Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale,* 901 F.2d 989, 996 (11th Cir. 1990).

Federal Rule of Civil Procedure 56 and Local Rule 56.1 mandate the procedure for pleading (and responding to) a Motion for Summary Judgment. Rule 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Our Local Rule requires even greater specificity. Each asserted or disputed fact must be "supported by specific, pinpoint references" to particular parts of the record. S.D. Fla. L.R. 56.1(b)(1)(B), (b)(2) (A). "The pinpoint citations shall reference pages and line numbers, if appropriate, of exhibits, designate the number and title of each exhibit, and provide the ECF number of all previously filed materials used to support the Statement of Material Facts. When a material fact requires specific evidentiary support, a general citation to an exhibit without a page number or pincite (e.g., 'Smith Affidavit' or 'Jones Deposition' or 'Exhibit A') is non-compliant."

S.D. Fla. L.R. 56(b)(1)(B). The Court has discretion to disregard a factual assertion or dispute that is not properly supported. Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c), (d). The Court "need consider only the cited materials, but it may

consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**\*5** "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). A factual assertion that is not properly disputed may be deemed admitted "provided that: (i) the Court finds that the material fact is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. Fla. L.R. 56.1(c).

Against this framework, and to assist any reviewing Court, I first explain my methodology for discerning the undisputed material facts. To the extent a party has acknowledged that the opposing party's fact is "undisputed," the fact will be treated as undisputed for purposes of the pending motions. Where the response states that the fact is undisputed but not material, *see, e.g.*, Defendant's Reply to Plaintiff's Statement of Undisputed Material Facts, ECF No. 78 ¶ 32, I have conducted a separate materiality assessment.

Each party asserts that some of the opposing party's proposed facts are not properly supported by the evidence cited. Neither party has asked for leave under Fed. R. Civ. P. 56(e) to supplement its Statement of Undisputed Material Facts in response to these objections. Therefore, to the extent a party fails to cite record evidence in support of an alleged fact, that alleged fact will not be considered proven. *See, e.g.,* Plaintiff's Statement of Undisputed Material Facts ("PSOF"), ECF No. 64 ¶ 67.

Both sides' Statements of Undisputed Material Facts contain argument and characterizations of the facts. To the extent possible, I have extracted the underlying facts from the record and ignored these characterizations.

In their Responses to the Statements of Undisputed Material Fact, the parties assert additional facts to clarify, limit, or contextualize the other side's proposed facts. *See, e.g.,* PSOF ¶ 9 (facts are "undisputed but incomplete"); PSOF ¶ 11 (facts are "misleading"); PSOF ¶ 12 (not disputing facts but supplementing them "for clarity"); Defendant's Statement of Undisputed Material Facts ("DSOF"), ECF No. 64 ¶ 28 (Undisputed that quoted language appears in email, but disputed to the extent that Plaintiffs assert it is more than early exploratory analysis); DSOF ¶ 51 (not disputing but supplementing Plaintiffs' facts). These additional facts (even if supported by evidentiary citations) do not contradict or "genuinely dispute" the proposed fact. *See* Fed. R. Civ. P. 56(c)(1); *see also* S.D. Fla. L.R. 56.1(a)(2) (Opposition to Statement of Material Facts "shall clearly challenge any purportedly material fact asserted by the movant that the opponent contends is genuinely in dispute."). Also, because they are not set out in a separate section of the Statement of Material Facts, they need not be considered. S.D. Fla. L.R. 56.1(b)(2)(D) (requiring "additional facts that an opponent contends are material to the motion for summary judgment to be numbered and placed immediately after the opponent's response to the movant's Statement of Material Facts."); S.D. Fla. L.R. 56.1(d) (Court may strike a non-compliant Statement of Material Facts). Despite the parties' non-compliance with Local Rule 56.1, to the extent the additional facts are material and supported by evidence in the record, I consider them.

**\*6** Plaintiffs also have a number of citations to lengthy documents without the pincites required by Local Rule 56.1(b)(1)(B). *See, e.g.,* PSOF ¶ 33 (citing 47-page Exhibit 1 without pincite); *id.* ¶ 40 (citing 65-page Defense Ex. 40 without pincite); *id.* ¶ 49 (citing 84-page Exhibit G without pincite). These citations do not conform to Local Rule 56.1 and, unless otherwise noted, will not be considered.

Finally, after oral argument on the summary judgment motions, Plaintiffs submitted supplemental evidence in support of their motion. ECF No. 93-1, 93-2, 93-3. I decline to consider these materials. The explanation for why these materials were not timely filed is "lead counsel for Plaintiffs in this matter suffered a shoulder injury on July 3, 2020, for which he received surgery on July 29, 2020, and was in tremendous pain, and on powerful pain medication, during the preparation of the response in opposition and cross-motion for summary judgment." ECF No. 93 at 2. Plaintiffs filed their Response/Cross Motion and their Statement of Material Facts on June 27, 2020, which pre-dated counsel's

injury. Plaintiffs appended almost 100 exhibits to their pleadings; the Response/Cross Motion was 40 pages long. These pleadings do not cite nor discuss the supplemental materials. Plaintiffs filed their Reply on August 3, with no exhibits and no discussion of these materials. So, it is not a situation where counsel inadvertently forgot to file an exhibit that is referenced in a pleading.

Oral argument was held on August 26, two months after the Plaintiffs filed their pleadings. During that interim period, Plaintiffs did not seek leave to supplement the record. According to the docket sheet and the pleadings, Plaintiffs are represented by three law firms. Two lawyers ably participated in the oral argument on the Motion for Summary Judgment and appeared to be fully informed of the facts of the case. Neither appeared to be suffering from diminished mental capacity due to the effects of pain medication.

Federal Rule of Civil Procedure 6(b)(1)(B) states, "When an act may or must be done within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect."

> The determination of whether neglect is "excusable" is usually an "equitable [inquiry], taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). The relevant circumstances include "the danger of prejudice to the [non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.*

*Hurley v. Anderson,* No. 16-80102-CIV, 2017 WL 4304894, at \*2 (S.D. Fla. May 30, 2017) (J. Marra) (bracket in original). Plaintiffs have not shown excusable neglect for why these materials were not timely included with their Statement of Undisputed Material Facts nor why they did not seek leave to supplement the record prior to oral argument. These materials were not filed in accordance with Rule 56 and Local Rule 56.1, so BI is prejudiced by not having notice or the opportunity to respond to them in its moving papers. Additionally, this failure to comply with the rules and the Court's deadlines cannot be viewed in a vacuum. Plaintiff failed to timely file their Response/Cross Motion because of a misunderstanding about counsel's CM/ECF privileges. ECF Nos. 65, 68. As discussed above, Plaintiffs' pleadings fail to comply with the process and format mandated by Rule 56

and Local Rule 56.1. Although it would have been within the Court's discretion to strike the Response and the Statement of Undisputed Material Facts, or to otherwise disregard portions of them, the Court concluded that remedy was too harsh. Considering the totality of these circumstances, equity does not justify excusing Plaintiffs' failure to timely file the supplemental exhibits.

### 2. *FDA Labeling Requirements*

**\*7** When the FDA approves a pharmaceutical, it also approves the product's labeling. Federal regulations specify the information that must be included in the label. *See* 21 C.F.R. § 201.57. For example, the label is required to have sections about dosing, administration, contraindications, adverse reactions, warnings and precautions, monitoring and laboratory tests, and drug-drug interactions. *Id.*

Generally, a drug manufacturer cannot change the labeling without FDA approval. 21 C.F.R. § 314.70. As relevant here, there is a narrow exception to the ban on a manufacturer unilaterally changing the drug's label: the "Changes Before Effected" (CBE) regulations. 21 C.F.R. § 314.70(c)(6)(iii).[5] These regulations allow a drug manufacturer to modify the labeling without prior FDA approval if (after the drug and labeling are approved) the manufacturer obtains "newly acquired information" that is important to the safe use of the drug because it "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." *Id.* The information added through the CBE process must be the kind of information that otherwise could be included on the label. The FDA retains the power to reject the CBE label change.[6]

Under the CBE regulations, "newly acquired information" is defined as:

> data, analyses, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.

**\*8** 21 C.F.R. § 314.3(b).

A manufacturer must invoke the CBE regulations and revise a drug's label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(c)(vi). A clinically significant hazard is one that is potentially fatal, serious even if infrequent, or can be prevented through appropriate use of the drug; it includes safety hazards from drug interactions. ECF No. 63 at 30; *see id.*[7] Although the causal relationship need not be definitively established, it nevertheless must be scientifically reliable. A CBE change "cannot be rooted in conjecture or hypothesis. Rather, it must conclusively establish, by scientifically valid measurable and statistically significant data, that the different or increased risks are actual and real." Pradaxa Cases, No. CJC-16-004863, 2019 WL 6043513, at \*3 (Cal.Super. Nov. 08, 2019). "The FDA imposes this standard because it 'recognize[s] that exaggeration of risk, or *inclusion of speculative or hypothetical risks*, could discourage appropriate use of a beneficial drug ... or decrease the usefulness and accessibility of important information by diluting or obscuring it. Indeed, labeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to lose its significance.' " *McGrath v. Bayer HealthCare Pharm. Inc.*, 393 F. Supp. 3d 161, 167 (E.D.N.Y. 2019) (emphasis in original) (citing *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 659 (S.D.N.Y. 2017), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) (further citing Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 FR 2848, 2851, 73 FR 2848-01, 2851)). The overall goal is to ensure that "only scientifically justified information appears on the label." Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 FR 2848-01.

### 3. *Impossibility Preemption*

Impossibility preemption is a concept grounded in the Supremacy Clause of the Constitution. U.S. Const. art. VI, cl. 2. State law is preempted where "it is 'impossible for a private party to comply with both state and federal requirements.' " *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618, 131 S. Ct. 2567, 180 L. Ed. 2d 580 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995)). There must be an actual conflict between federal and state law; "a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S. Ct. 3294, 73 L. Ed. 2d 1042 (1982) *quoted and cited in Merck Sharp & Dohme*

*Corp. v. Albrecht*, 139 S. Ct. 1668, 1679, 203 L. Ed. 2d 822 (2019). "Impossibility pre-emption is a demanding defense," *Wyeth*, 555 U.S. at 573, but not an impossible one.

**\*9**  In the pharmaceutical context, impossibility preemption is an affirmative defense to state product liability claims "premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use." *Wyeth*, 555 U.S. at 563. Impossibility preemption arises when a drug manufacturer has a duty under state law to modify existing labeling (for example, to make additional disclosures related to the safe use of the product), but federal law prohibits that modification. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1678 ("The underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law."). More precisely, the preemption argument is that even if state law imposes a duty on the drug manufacturer to make additional disclosures about the possible dangers of a drug, federal law requires prior FDA approval of any label modification, which makes it impossible for the manufacturer to make the disclosures otherwise required by state law. The response to this argument is that the CBE regulations create an exception that allows a manufacturer in possession of "newly acquired information" to unilaterally add additional warnings to a drug's label; so, federal law does not prevent a drug manufacturer from complying with state law duties to warn about dangers associated with that "newly acquired information."

The Supreme Court has recognized an exception to the exception, however. Because the FDA retains the power to reject a unilateral label change, the drug manufacturer need not make a CBE change if there is "clear evidence" that the FDA will reject it. *Wyeth*, 555 U.S. at 571. The Court decides as a matter of law whether the FDA would reject an attempt to change the label. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679. The judge performs this duty by "simply ask[ing] himself or herself whether the relevant federal and state laws 'irreconcilably conflict[t].' " *Id.* at 1679 (citation omitted) (second bracket in original). Concepts of evidentiary burdens of proof do not apply. *Id.* at 1679, 1685 ("Standards of proof, such as preponderance of the evidence and clear and convincing evidence, have no place in the resolution of this question of law.") (Alito, J.) (concurring in judgment). This element can be satisfied even if the labeling change has not been presented to, and rejected by, the FDA. *Seufert v. Merck*

*Sharp & Dohme Corp.*, 187 F. Supp. 3d 1163, 1170 (S.D. Cal. 2016) (collecting cases).

In sum, impossibility preemption exists (because federal law makes it impossible to comply with state law) if (1) the manufacturer has no "newly acquired information" that would allow it to invoke the CBE regulations, or (2) attempting to modify the label to reflect this "newly acquired information" would be futile because there is clear evidence that the FDA would not approve the labeling change. *Wyeth*, 555 U.S. at 568. On the other hand, if the manufacturer has "newly acquired information" that allows it to invoke the CBE regulations, and there is no clear evidence that the FDA would disapprove a CBE modification, impossibility preemption does not exist.

### 4. *Adequacy of Warning Labels*

"Under Florida law, to succeed on a failure to warn claim a plaintiff must show (1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact suffered an injury from using the product." *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321–23 (11th Cir. 2017) (citing *Hoffmann-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. Dist. Ct. App. 2009)). BI seeks summary judgment on the first element – the adequacy of the product warnings.

In the pharmaceutical setting, the manufacturer's duty to warn runs to the treating physician, not to the patient:

> For medical products, "a ... manufacturer's duty to warn is satisfied if it gives an adequate warning to the physician who prescribes the drug" pursuant to Florida's learned intermediary doctrine. *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1367 (M.D. Fla. 2015) ("*Small I*"). "This is so because the prescribing physician, acting as a 'learned intermediary' between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the product to meet the patient's needs." *Wilson v. Danek Med., Inc.*, No. 96-2460-CIV-T-17B, 1999 WL 1062129, at \*3 (M.D. Fla. Mar. 29, 1999) (citation omitted); *see also Eghnayem*, 873 F.3d at 1321. "[W]hen a warning is designed to inform a 'learned intermediary,' it is somewhat easier to establish the adequacy of the warning because it will be read and considered by a trained expert." *Eghnayem*, 873 F.3d at 1321-22 (citation omitted).

**\*10**  ...

However, to provide adequate warnings, [a defendant] need only reasonably warn physicians of the injury alleged from failure to use the product in the prescribed manner, not the specific way(s) the alleged injury may occur. See *Farias v. Mr. Heater, Inc.*, 684 F.3d 1231, 1233 (11th Cir. 2012) ("To warn adequately, the product label must make apparent the potential harmful consequences."); *Small I*, 134 F. Supp. 3d at 1372 ("[M]anufacturers are only required to warn the prescribing physician of the possibility that the drug may cause the injury alleged by the plaintiff."); *Brito v. Cty. of Palm Beach*, 753 So. 2d 109, 112 (Fla. Dist. Ct. App. 1998) ("A warning should contain some wording directed to the significant dangers arising from failure to use the product in the prescribed manner, such as the risk of serious injury or death.").

*Pierre v. Intuitive Surgical, Inc.*, No. 18-CIV-60095-RAR, 2020 WL 1240420, at \*12 (S.D. Fla. Mar. 6, 2020) (J. Ruiz). Additionally, as the Eleventh Circuit has explained:

"While in many instances the adequacy of warnings ... is a question of fact," the Florida Supreme Court has held that "it can become a question of law where the warning is accurate, clear, and unambiguous." "[T]he adequacy or inadequacy of the warning to inform a physician must, except in the more obvious situations, be proved by expert testimony." "To warn adequately, the [warning] label must make apparent the potential harmful consequences." "Generally, "[t]he warning must be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger."

*Eghnayem*, 873 F.3d at 1321 (citations omitted).

### 5. *Loss of Consortium*

To prove a loss of consortium claim, a plaintiff must establish the loss of "the companionship and fellowship of husband and wife and the right of each to the company, cooperation and aid of the other in every conjugal relation. Consortium means much more than mere sexual relation and consists, also, of that affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance so necessary to a successful marriage." *Gates v. Foley*, 247 So. 2d 40, 43 (Fla. 1971)*quoted in Wills v. Snapper Creek Nursing Home, Inc.*, 465 So. 2d 562, 563–64 (Fla. Dist. Ct. App. 1985).

### 6. *Burden of Persuasion/Burden of Production*

Before turning to the merits of the preemption arguments, I must address the applicable burdens of persuasion (sometimes called the burden of proof). "[T]he burden of persuasion [is] the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose." *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 272, 114 S. Ct. 2251, 129 L. Ed. 2d 221 (1994).[8] The distinct, but related, concept of the "burden of production" refers to "a party's obligation to come forward with evidence to support its claim." *Id.*

### a. Impossibility Preemption

**\*11**  As discussed above, there are two alternative ways to establish the affirmative defense of impossibility preemption – (1) the absence of "newly acquired evidence" or (2) futility. Ordinarily, a defendant bears the burden of proving an affirmative defense. *Ramnarine v. CP RE Holdco 2009-1, LLC*, No. 12-61716-CIV, 2013 WL 1788503, at \*4 (S.D. Fla. Apr. 26, 2013) (J. Rosenbaum) (Eleventh Circuit has noted that the "[t]he party asserting an affirmative defense usually has the burden of proving it.") (quoting and citing *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) (citation and internal quotation marks omitted in original)). Here, the parties dispute who bears the burden of proving the first alternative – whether "newly acquired information" exists. Plaintiffs assert that BI "bears the burden of proving all elements of [the impossibility preemption] defense." ECF No. 63 at 44 (citing *Wyeth*, 555 U.S. at 573). BI responds, "[I]t is Plaintiffs who bear the burden of proving the existence of such newly acquired information." ECF No. 77 at 3 (internal citation omitted).

I agree with Plaintiffs that BI bears the burden of persuasion on the impossibility preemption defense. The Supreme Court opinions in *Wyeth* and *Merck* contain language suggesting that the defendant bears the burden of proving a label change was impossible. *Wyeth*, 555 U.S. at 572–73 ("On the record before us, *Wyeth has failed to demonstrate* that it was impossible for it to comply with both federal and state requirements.") (emphasis added); *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1678 ("The underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug

2020 WL 6110909

label that would satisfy state law. And, of course, in order to succeed with [the impossibility preemption] defense, *the manufacturer must show* that the answer to this question is yes.") (emphasis added). The Eleventh Circuit has not addressed this specific burden-allocation issue, so there is no binding appellate precedent diverging from the usual rule that a defendant bears the burden of proving its affirmative defense.

I acknowledge that cases cited by BI contain language suggesting that a plaintiff has the burden of producing evidence that a drug manufacturer acquired new information after drug approval *and* also has the burden of proving that this information would have justified a CBE modification. For example, the Connecticut court in a virtually identical Pradaxa case stated,

> First, the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulations without FDA approval ... In sum, if the plaintiff can point to the existence of 'newly acquired information' to support a labeling change under the CBE regulation, the burden then shifts to the manufacturer to show by 'clear evidence' that the FDA would not have approved the labeling change made on the basis of this newly acquired information.

*Roberto v. Boehringer Ingelheim Pharm., Inc.*, No. CPLHHDCV166068484S, 2019 WL 5068452, at *11 (Conn. Super. Ct. Sept. 11, 2019); *see Utts*, 251 F. Supp. 3d at 661 ("Post–FDA approval preemption analysis proceeds in two stages. First, the plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without FDA approval.... [A] manufacturer may still— even after the plaintiff has identified 'newly acquired information'—establish an impossibility preemption defense through 'clear evidence that the FDA would not have approved a change' to the label."), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) ("Thus, to state a claim for failure-to-warn that is not preempted by the FDCA, a plaintiff must plead 'a labeling deficiency that [Defendants] could have corrected using the CBE regulation.' If the plaintiff meets that standard, the burden shifts to the party asserting a preemption defense to demonstrate that there is 'clear evidence that the FDA would not have approved a change' to the [prescription drug's] label.' ") (citation omitted) (brackets in original); *Ridings v. Maurice*, 444 F. Supp. 3d 973 (W.D. Mo. 2020) ("(1) First, did Ridings show that "newly acquired information" existed such that Boehringer could have unilaterally changed its label for Pradaxa in accordance with the CBE regulation; and (2) If Ridings did establish the existence of such newly acquired information, did Boehringer establish an impossibility preemption defense by presenting "clear evidence" that the FDA would have rejected such labeling change."); *see also Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 2636, 204 L. Ed. 2d 282 (2019) (On a post-trial motion the court stated, "Plaintiff has failed to offer evidence that GSK acquired new information after 2007 ... that would have justified a change in the label and thus undermine GSK's preemption defense.").

**\*12** I respectfully part company with these cases to the extent they hold that the plaintiff must prove that the manufacturer obtained post-approval information *that would have made a CBE modification possible* (i.e., that the manufacturer had "newly acquired information" within the meaning of the CBE regulations). I believe this approach improperly shifts to the plaintiff the burden to disprove the impossibility preemption affirmative defense. Federal law prohibits a manufacturer from adding warnings to the drug label required by state law only if the manufacturer lacks "newly acquired information" that would allow it to invoke the CBE regulations. So, if the evidence is in equipoise (i.e., it cannot be determined whether "newly acquired information" exists), the manufacturer is not definitively prohibited from complying with its obligations under state law. Therefore, the defendant must bear the burden of persuasion on whether it had "newly acquired information."

Nevertheless, there are situations where the party that does not bear the ultimate burden of persuasion bears an initial burden of production. *See, e.g., Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1273 (11th Cir. 2006) (Title III of the ADA); *United States v. Isnadin*, 742 F.3d 1278, 1297 (11th Cir. 2014) (entrapment); *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017) (patent marking); *Ochran v. United States*, 117 F.3d 495, 504 (11th Cir. 1997) (Federal Tort Claims Act discretionary function exception). This case is one of those situations. I find that Plaintiffs should bear the initial burden of identifying the specific information that they assert BI acquired after the FDA approved Pradaxa and should have used to modify the Pradaxa label. Once Plaintiff points to this specific information, BI bears the burden of proving that it does not meet the definition of "newly acquired information" under the CBE regulation. This allocation of burdens avoids making

BI prove a negative – that it acquired no new information after Pradaxa was approved that would have justified a CBE modification. *See Arctic Cat Inc.*, 876 F.3d at 1368 ("Without some notice of what market products BRP believes required marking, Arctic Cat's universe of products for which it would have to establish compliance would be unbounded."). This approach also is faithful to the general rule that a defendant bears the ultimate burden of proving an affirmative defense. It also recognizes that a pharmaceutical defendant like BI will have the best information about what it knew about the drug and what it has submitted to the FDA.

So, to summarize, Plaintiffs bear the initial burden of identifying and producing facts *that they assert* were "newly acquired information" that would have allowed BI to invoke the CBE regulations. Once these facts are identified, BI bears the burden of proving by a preponderance of the evidence that these facts are not "newly acquired information" within the meaning of the CBE regulations.[9] Both parties agree that BI bears the burden of proving by clear evidence that the FDA would have rejected any attempt to modify the Pradaxa labeling.

How, then, do these burdens apply in the context of cross-motions for summary judgment on impossibility preemption? To prevail on its own motion, a party must first show that the relevant facts are undisputed. Then, the party with the burden of proof at trial must show that it is entitled to judgment as a matter of law, viewing the undisputed facts in the light most favorable to the non-moving party. *See Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693JB*, 932 F. Supp. at 1446. So, first, the moving party must establish that there are no genuinely disputed material facts. Then, because it has the burden of proof, BI is entitled to summary judgment on its own motion only if it proves that a preponderance of those undisputed material facts, viewed in the light most favorable to Plaintiffs, show either (1) that the information identified by Plaintiffs is not the kind of "newly acquired information" that could have been used to make a CBE change, or (2) that the FDA would have rejected any attempt to modify the Pradaxa label based on this information. To prevail on Plaintiffs' cross-motion, BI must make the same showing, but with the undisputed material facts viewed in the light most favorable to BI

**b. Adequacy of the Label Warnings**

**\*13** BI pleads as its Seventeenth Defense:|

Any warnings which BI[ ] gave were transmitted to the prescribing physicians and/or health care providers. BI[ ]'s only obligation is to warn the prescribing physician and/or health care provider an said obligation was fulfilled. Plaintiffs' claims are barred by the intervention of learned intermediary(ies) whose acts, omissions, or fault are the cause of Plaintiffs' injuries, damages, or losses, if any.

ECF No. 22 at 27. This defense denies two distinct elements of Plaintiffs' claims: (1) the warnings were inadequate and (2) causation. Plaintiffs bear the burden of proof at trial on both of these elements. BI's Motion for Summary Judgment only seeks a ruling on the adequacy of the warning, not on causation. As such, if BI shows there are no disputed material facts, Plaintiffs then bear the burden of showing the inadequacy of the warnings by a preponderance of the evidence viewed in the light most favorable to Plaintiffs.

Plaintiffs are entitled to summary judgment on the failure to warn claims only if (1) they show there are no undisputed material facts and (2) a preponderance of those facts, viewed in the light most favorable to BI, show an inadequate warning, proximate causation, and damages. *See generally* Florida Pattern Civil Jury Instructions 403.8 (strict liability failure to warn), 403.10 (negligent failure to warn).

**IV. UNDISPUTED MATERIAL FACTS**

*1. RE-LY Clinical Trial*

Pradaxa (dabigatran) is an oral anticoagulant approved by the FDA in October 2010 "to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation." ECF No. 54-2 at 2. It was approved based on the Randomized Evaluation of Long Term Anticoagulant Therapy ("RE-LY") clinical trial, in which patients taking a 150 mg dose of Pradaxa had a significantly lower stroke rate and a similar major bleeding rate as patients taking warfarin, ECF No. 54-7 at 14.

As part of the RE-LY trial, BI collected data about the amount of Pradaxa in a patient's blood (so-called "plasma concentration," or "exposure") at different points in the metabolic cycle of the drug. One relevant measurement is "trough plasma concentration," which is the amount of drug in the patient's blood immediately before the next dose is administered. *See* J. Murphy, *Clinical Pharmacokinetics*, 6th ed. (2017) (trough concentration is

"the concentration that occurs immediately before the next dose for drugs given intermittently in a multiple-dose fashion.") found at https://www.ashp.org/-/media/store-files/p5365-frontmatter.ashx. (last visited 10/7/2020); ECF No. 97 at 19-22. Plasma concentration evidence was collected from approximately 70% of the patients in the RE-LY study. DSOF ¶ 4; ECF No. 79-1 at 8-9. Among the participants in the RE-LY study whose blood was monitored, the trough plasma concentration level for people in the 90th percentile was over 5 times that of people in the 10th percentile (215 ng/mL vs. 39.8 ng/mL). ECF No. 64-39 at 4.

Several laboratory tests can be used to estimate the anti-coagulent effect (i.e., bleeding risk) caused by a blood thinner. These include the Activated Partial Thromboplastin Time test ("aPTT"), the Ecarin Clotting Time test ("ECT"), and the Diluted Thrombin Time test ("dTT"). *See generally* ECF 64-52 at pp 14-20. The aPTT test is "a screening test that helps evaluate a person's ability to appropriately form blood clots. It measures the number of seconds it takes for a clot to form." https://labtestsonline.org/tests/partial-thromboplastin-time-ptt-aptt; *see* ECF No. 64-52 at 11 (aPTT measures the time to clot formation). The ECT and dTT tests can be used to measure the plasma concentration in a patient's blood.[10] ECF No. 54-23 at 6-7 (Prescriber's guide); ECF No. 64-20 at 5. One commercial version of the dTT test is marketed as "Hemoclot" outside the United States. ECF No. 79-4 at 5-6. There are no commercial dTT tests available in the United States. ECF No. 64-52 at 18.

**\*14** Several different companies manufacture aPTT tests. These are calibrated and standardized for heparin (a different blood thinner), not for dabigatran. Because different aPTT tests use different reagents, there is "significant variability of aPTT results based on the reagent used." DSOF ¶ 44; ECF No. 64-64 at 3. Therefore, two patients with identical aPTT clotting times may have materially different plasma concentrations depending on the sensitivity of the respective tests. For the RE-LY study, BI used the most sensitive aPTT test, which used a reagent manufactured by Roche Diagnostics. PSOF ¶ 41; ECF No. 64-31.

In 2012, two BI scientists (Joachim Stangier and Martin Feuring) published a paper entitled, "Using the HEMOCLOT direct thrombin inhibitor assay to determine plasma concentrations of dabigatran." ECF No. 64-40. They studied whether a laboratory test for anticoagulant levels could be "valuable for selecting patients, such as those with severe or life threatening bleeding, who have overdosed or who require emergency surgery." *Id.* at 2. They identified several tests which "can be used to monitor the efficacy of anticoagulant drugs" including aPTT, ECT, and Hemoclot. *Id.* They noted, "However, not all assays are appropriate for use with all anticoagulant drugs." *Id.* They further noted, "the aPTT is a practical qualitative assay that may be helpful when alternative methods are not available and in determining excessive anticoagulant activity in patients who are bleeding," *Id.* They also noted that aPTT results can be "highly variable. The aPTT test is therefore not suitable for accurate qualitative assessments of dabigatran." *Id.* at 6. The paper concluded that the Hemoclot test "can be employed for the rapid assessment of dabigatran's anticoagulant activity." *Id.* at 7.

### 2. *Plaintiff Marquez's Bleed*

Berta Marquez was prescribed and took Pradaxa from March 2012, when she was 71 years old, until she experienced a gastrointestinal bleed in September 2015. DSOF ¶ 3. At the time of her bleed, she was taking carvedilol (a P-gp inhibitor) and had mild renal impairment. *Id.*[11] In some patients, carvedilol can cause the plasma concentration of Pradaxa to increase by 30-50%. PSOF ¶ 19; ECF No. 64-54 at 8-9.

### 3. *Pradaxa FDA Approval and Initial Label*

In seeking Pradaxa's approval, BI submitted to the FDA all of the RE-LY trial data. It also submitted analyses of the plasma concentration data. This data included "exposure-response analyses" of the relationship between plasma concentration and the patient's outcome (which could include stroke or bleeding). DSOF ¶5.[12] The data also included analyses of the relationship between plasma concentrations and various patient characteristics such as renal impairment, gender, age, and concomitant use of P-gp inhibitor medications. DSOF ¶ 5. BI did not specifically study the potential interaction between the drug "carvedilol" and Pradaxa, nor did the FDA require BI to do so. DSOF ¶ 7. BI's pre-approval analyses showed that as plasma concentrations increased, bleed risk increased and stroke risk decreased, but the reduction in stroke risk was weaker at higher plasma concentrations. DSOF ¶ 6; PSOF ¶ 57.

**\*15** Specifically, as part of the FDA's review of the Pradaxa NDA, on or about August 27, 2010, BI submitted a 168-page briefing document to the FDA Cardiovascular and Renal Drugs Advisory Committee ("FDA Advisory Committee")

which discussed and analyzed the RE-LY data. ECF No. 54-7. Among other things, the briefing document stated, "There is relatively little difference in stroke risk across a wide range of higher dabigatran trough concentrations, but age continues to influence stroke risk substantially." *Id.* at 54. It also said, "There was a strong relationship between trough dabigatran concentration and an increased probability of having a major bleed (Figure 4.6:3) consistent with the dabigatran dose-response relationship for bleeding in RE-LY." *Id.* at 55. It further stated, "Increasing plasma dabigatran concentrations lowers the stroke risk, although at concentrations above 50 ng/mL this effect is modest." *Id.* at 158.

Prior to approving Pradaxa, the FDA reviewed BI's submissions and conducted its own independent analyses. One independent analysis was "to explore potential relationships between dabigatran exposure and efficacy and safety events in RE-LY using a time to event analysis." ECF No. 54-6 at 59. Among its objectives was to try to "[e]stablish a relationship between dabigatran concentration and the probability of ischemic stroke [and] [e]stablish a relationship between dabigatran concentration and the probability of a life-threatening bleed." *Id.* "The exposure-efficacy analysis identified age, weight, history of stroke/TIA, diabetes mellitus and age ≥ 65 years and trough dabigatran concentration as significant risk factors. The parameter describing the relationship between dabigatran concentration and ischemic stroke was of marginal significance (p=0.056) but was included in the final model." *Id.* at 60.

Ultimately, the FDA concluded that increasing plasma concentrations were associated with an increased risk of bleeding and a lower risk of stroke, with the stroke relationship continuing, but being weaker, at higher concentrations. DSOF ¶ 8; PSOF ¶ 59. The FDA's review memoranda also addressed the impact of renal function, gender, age, and use of P-gp inhibitors on exposure and bleed risk. *Id.* The memorandum from the FDA's Division of Cardiovascular and Renal Products recommending approval of Pradaxa noted, "In RE-LY, both stroke prevention and bleeding are related to exposure ... [A]t some point the price paid in bleeding will not be worth the small incremental reduction in strokes. However, the RE-LY net benefit analysis suggests that the optimal dose is above 150 mg." ECF No. 54-15 at 1, 3.

The statistical regression models used by both the FDA and BI for pre-approval analysis of Pradaxa assumed that there was a "fixed effect" linear relationship between plasma

concentration and the risk of stroke or major bleeding. That is, the models assumed that as the plasma concentration went up, the risk of stroke or major bleeding continued to go down, no matter how high the plasma concentration. PSOF ¶ 27 (citing ECF No. 64-46 and ECF 64-47).[13]

In September 2010, the FDA and BI presented their exposure-response analyses to the FDA Advisory Committee. The topic of "therapeutic monitoring" (using a laboratory test to measure plasma concentration as a way to assess bleed risk) was specifically addressed. ECF No. 64-45 at 45-46. Dr. Kevin Krudys, the FDA's Pharmacometrics Reviewer for Pradaxa explained that the FDA saw no need for monitoring plasma concentrations given Pradaxa's favorable safety-efficacy profile across all subgroups. DSOF ¶ 9; ECF No. 64-45 at 45. As a follow up to this comment, Dr. Rajniknanth Madabushi, a team leader in the Cardiology and Renal Division of the FDA's Office of Clinical Pharmacology, noted that there was a wide variance in how different patients reacted to dabigatran but each patient's individual reaction did not vary much from dose to dose. ECF No. 64-45 at 46; *see id.* at 5 (full name and title). Darren McGuire, M.D., one of the FDA Advisory Committee members then suggested that perhaps a one-time blood test would be appropriate: "I think you've just made a very cogent argument to monitor. If you have a predictor for an individual subject, a dose has a wide variability, but within that subject a constant one, why not monitor [a patient a] single time at steady state to make sure you have the dose right in that one individual." *Id.*[14] Dr. Madabushi responded, "If one were to know what is an appropriate cut point, then one could actually derive a dose for that particular subgroup or for that particular type of patient, and forget about it. So that would be possible if we knew the appropriate cut point of something, and then we can. Based on the baseline factors which may affect his exposure, or her exposure one could have done that." *Id.*[15] There was no further follow-up.

**\*16** On or about September 27, 2010, BI proposed including the following statements in the "General Risk of Bleeding" subsection of the "Warnings and Precautions" section of the Pradaxa label:

> The aPTT test is widely available and provides an approximate indication of the anticoagulation intensity achieved with PRADAXA. In patients who are bleeding, the aPTT test maybe [sic] useful to assist in determining an excess of anticoagulant activity, despite its limited

sensitivity to dabigatran etexilate. An aPTT greater than 80 sec is associated with a higher risk of bleeding."

ECF No. 54-28 at 5 (§ 5.1). DSOF ¶ 14. In response to a request from the FDA for the supporting data for the 80 second metric, on September 28, 2010, BI sent an email to the FDA citing to a section of the Pradaxa New Drug Application. ECF No. 54-29 at 2. BI further stated, "From the data, 75-85 sec all result in the same bleeding risk and therefore would be appropriate cut-off points. We averaged this to the 80 sec presented." *Id.* On or about October 8, 2010, the FDA rejected the proposed label language. ECF No. 54-30, ECF No. 54-31 at 5.

On October 19, 2010, the FDA approved Pradaxa at a dose of 150 mg, without any requirement for monitoring plasma concentrations or adjusting treatment based on such measurements. DSOF ¶ 10. Since approval, the Pradaxa label has stated that it "can cause serious and, sometimes, fatal bleeding," and has specifically noted the increased risk of gastrointestinal bleeding from taking Pradaxa. The label has also warned that bleeding risk increases with age, that there is a risk of increased exposure to Pradaxa in patients also taking P-gp inhibitors and in those with reduced renal function, and about the importance of assessing a patient's renal function. DSOF ¶ 2; ECF Nos. 54-2, 54-3.

Though it did not contain any recommendation to monitor plasma concentrations, the label the FDA approved for Pradaxa in 2010 instructed that "[b]leeding risk can be assessed by the ecarin clotting time (ECT). This test is a better marker of the anticoagulant activity of dabigatran than activated partial thromboplastin time (aPTT), prothrombin time (PT)/INR, or thrombin time (TT). If ECT is not available, the aPTT test provides an approximation of PRADAXA's anticoagulant activity." ECF No. 54-2 at 3 (§ 2.4); DSOF 11. It further stated that "[m]easurement of aPTT or ECT [coagulation tests] may help guide therapy." DSOF ¶ 11. It also disclosed, "In the RE-LY trial, the median (10th to 90th percentile) trough aPTT in patients receiving the 150 mg dose was 52 (40 to 76) seconds." ECF No. 54-2 at 6 (§ 12.2).

The approved label also contained a section on "P-gp Inhibitors" that discussed drug-drug interactions with specific P-gp inhibitors. ECF No. 54-2 § 12.3. The label was later modified to add an additional named P-gp inhibitor and to add a chart showing the drug-drug interaction in more detail. *See* ECF No. 54-3 § 12.3, Figure 3.1. Covedilol has never been one of the listed P-gp inhibitors.

### 4. *Pradaxa European Approval*

#### a. European Label

In 2011, Pradaxa was approved for sale in Europe. The European Medicines Agency ("EMA") approved both the 150 mg and 110 mg doses of Pradaxa. It also approved a European label, called the Summary of Product Characteristics ("SmPC").

**\*17** Section 4.4 of the original SmPC for the 150 mg dose stated under "Haemorrhagic risk:"

> The measurement of dabigatran related anticoagulation may be helpful to avoid excessive high exposure to dabigatran in the presence of additional risk factors.

> The activated partial thromboplastin time (aPTT) test is widely available and provides an approximate indication of the anticoagulation intensity achieved with dabigatran. In patients who are bleeding or at risk of bleeding, the aPTT test may be useful to assist in determining an excess of anticoagulant activity. However, the aPTT test has limited sensitivity and is not suitable for precise quantification of anticoagulant effect, especially at high plasma concentrations of dabigatran. High aPTT values should be interpreted with caution.

> If required, more sensitive quantitative tests such as calibrated diluted Thrombin Time (dTT) should be performed (see section 5.1).

ECF No. 79-11 at 33, § 4.4. It identified age over 75, moderate renal impairment, and P-gp inhibitor co-medication as "factors which may increase the haemorrhagic risk." ECF No. 79-11 at 32. Section 5.1 (Pharmacodynamic properties) stated in relevant part, "If the dTT is used, dabigatran concentrations above 200 ng/mL measured at trough after 150 mg twice daily dosing (10-16 hours after the previous dose), are associated with an increased risk of bleeding." *Id.* at 42.

In 2012, the SmPC for the 150 mg dose was revised. *See* ECF No. 64-18 at 60; ECF No. 64-48 at 58. The revised label added a table (Table 2) in section 4.4 (Haemorrhagic risk) showing "coagulation test thresholds at trough [for ECT, dTT, and aPTT] that may be associated with an increased risk of bleeding." ECF No. 64-18 at 65. This table incorporated the information previously in Section 5.1 that for the dTT test the trough level associated with an increased risk of bleeding

was ">200" ng/mL. *Compare id. with* ECF No. 79-11 at 42. Section 4.4 further said, "Diluted thrombin time (dTT), ecarin clotting time (ECT) and activated partial thromboplastin time (aPTT) may provide useful information, but the tests are not standardised, and results should be interpreted with caution (see section 5.1)." *Id.* at 65. It added language stating, "Pradaxa does not in general require routine anticoagulant monitoring. *Id.* It retained the language, "However, the measurement of dabigatran related anticoagulation may be helpful to avoid excessive high exposure to dabigatran in the presence of additional risk factors." *Compare id.* with ECF No. 79-11 at 33.

Language previously in Section 4.4 was moved to Section 5.1 and modified to read:

> The aPTT test is widely available and provides an approximate indication of the anticoagulation intensity achieved with dabigatran. However, the aPTT test has limited sensitivity and is not suitable for precise quantification of anticoagulant effect, especially at high plasma concentrations of dabigatran. High aPTT values should be interpreted with caution.

> In general, it can be assumed that these measures of anti-coagulant activity may reflect dabigatran levels and can provide guidance for the assessment of bleeding risk, i.e. exceeding the 90th percentile of dabigatran trough levels or a coagulation assay such as aPTT measured at trough is considered to be associated with an increased risk of bleeding.

**\*18** *Id.* at 78. The same section stated, "For patients with [Non-valvular Atrial Fibrillation] treated for prevention of stroke and [Systemic Embolic Events] with 150 mg dabigatran etexilate twice daily, the 90th percentile of dabigatran plasma concentrations, measured at trough (10-16 hours after the previous dose) was about 200 ng/ML." *Id.* This 90th percentile threshold was identified based on the same underlying RE-LY data and analyses that BI submitted to the FDA prior to approval. DSOF ¶ 13.

Both of the versions of the SmPC note the following patient factors that can increase dabigatran plasma level: age over 75, moderate renal impairment, or P-gp inhibitor co-medication. ECF No. 64-18 at 31; ECF No. 79-11. BI provided the information in Table 2 to the FDA but did not ask the FDA to add this table to the U.S. label for Pradaxa. ECF No. 64-48 at 60.

**b. Clinical Overview Statement**

As a supplement to the SmPC, BI generated an eight-page "Pradaxa® Prescriber Guide for Stroke Prevention in Atrial Fibrillation." ECF No. 54-23 (updated as of January 2012). The document states, "This guide provides recommendation for the use of PRADAXA® (dabigatran etexilate) in order to minimize the risk of bleeding." *Id.* at 2 (referencing Indication, Dosing, Special patient populations, Coagulation tests and their interpretation, and Actions to take in overdosing situations.). In the section discussing "Coagulation tests and their interpretation," the Prescriber Guide says, "There is a close correlation between plasma dabigatran concentration and degree of anticoagulant effect. The [aPTT and ECT] tests may serve to assess the risk of bleeding." *Id.* at 5. It noted, however, the lack of consistency among aPTT tests, so it recommended that the Hemoclot test was more advisable. *Id.* at 6. It then said that a Hemoclot measurement "of > 200 ng/mL dabigatran plasma concentration (approximately >65 seconds) prior to the next drug intake after 150 mg twice-daily dosing (trough measure, i.e. 10-16 hours after the previous dose) is associated with a higher risk of bleeding." *Id.* (footnotes omitted).

To explain the information in the Prescriber Guide, BI prepared a document (internally called a Clinical Overview Statement ("COS")) titled "Pradaxa prescriber guide reference document – Derivation of limits in coagulation tests as given in Pradaxa prescriber guides for [Stroke Prevention in Atrial Fibrillation] and [Venous Thromboembolism Prophylaxis]." ECF No. 64-58 at 24-25; ECF No. 64-20 at 2. This document is dated July 15, 2011, which was after the FDA had approved Pradaxa for use in the United States. In the "Overview of Clinical Pharmacology" section, the document states, "In general, the observed values at the 90th percentile were used in support of any guidance to avoid an unnecessary risk of major bleeding events in patients treated with Pradaxa. In case of AF patients treated with dabigatran etexilate (DE) 150 mg BID, the risk of major bleeding events (MBE) would increase from 3.8% at the median trough concentration of 93.0 ng/mL to 7.5% and hence be almost doubled at 215 ng/mL, the 90th percentile of measured trough concentrations." ECF No. 64-20 at 4. It also stated, "Based on clotting times determined by the Hemoclot assay at concentrations of 215 ng/mL in the above mentioned studies, a diluted thrombin clotting time of >65 sec at trough (as given in the prescriber guide) is considered to represent a conservatively assessed cut-off value. As outlined above, an

assessment of the risk of bleeds in a given patient should be based on the actual dabigatran concentration as determined by the Hemoclot® assay rather than by determining thrombin time only." *Id.* at 5.

### 5. *Post-Approval Data Analyses*

#### a. Schumacher Modeling

**\*19**  Even after the FDA approved 75 mg and 150 mg doses of Pradaxa in October 2010, BI continued to work toward getting the 110 mg dose approved. On March 24, 2011, Dr. Paul Reilly, a Clinical Program Director at BI, sent an email to Dr. Sebastian Haertter, Dr. Thorsten Lehr, and Dr. Susan Wang, with copies to Dr. Helmut Schumacher, a senior scientist and statistician at BI, and others at BI. The email was part of a thread under the subject line "Special Pradaxa 110 mg Meeting. Dr. Reilly hypothesized that there might be an argument that a 110 mg dose would be better for patients at higher risk of stroke (as measured by the CHADS$_2$ scale) if the two doses provided the same benefit to those patients but the 110 mg dose had lower bleeding risk for them.[16] His email said:

> In discussions with Helmut Schumacher we were discussing the biological plausibility of results. The dabigatran low dose for high risk patients is counterintuitive. However for CHADS 3+ or 4+, my explanation is that most of these patients likely have high plasma concentrations and are therefore far to the right on the concentration response curves for bleeds and strokes. If true, the consequence, as you know from your logistic regression curves, is that there is little difference in stroke benefits between the 2 doses but a relevant benefit in bleeds because of the differences in the slopes of these two lines.
>
> This is a nice hypothesis but I have few facts. I note that the cohort is older (mean age 73 or 75 years for CHADS 3+ or 4+ vs 71 for those less than 3+ or 4+) and I hypothesize that the renal function is lower. I also know that mean trough concentration in patients age 75 or more are 68% higher than those <65 (peaks are 50% higher).

He then asked for follow-up data from Dr. Wang, Dr. Lehr, and Dr. Haertter. He concluded by saying, "If these hang together, I think we have a plausible and clinically meaningful argumentation for the benefits of [the 110 mg dose] in the CHADS 3+ or 4+ subgroups." ECF No 64-57 at 10.

In response, on March 28, 2011, Dr. Schumacher sent an email reporting that he had performed a re-analysis of the RE-LY data using a different statistical model that treated plasma concentration as a variable rather than as a fixed effect. Dr. Schumacher's analysis showed that the risk of stroke at a plasma concentration below 30 ng/mL is significantly higher than for plasma concentrations above 30 ng/mL. Above 30 ng/mL the risk of stroke remains the same, with the risk of major bleeding increasing dramatically at plasma concentrations above 150 ng/mL. Dr. Schumacher's email said:

> After some interactions with Thorsten I could repeat the pharmakokinetic [sic] models on the predictive effects of plasma level on ischemic stroke and life threatening bleeds. Nevertheless, I think the assumption that log(plasma level) is a linear predictor across the complete range of plasma levels is a very strong one, and I would rather prefer a model where plasma levels is inclused as a categorical variable. After some trial and error I came up with 3 categories: <30, 30-<150, >=150. The results with these categories are summarized in the attachment.
>
> **\*20**  Bottom line: For prevention of ischemic stroke a plasma level is too small, but no different between the othe [sic] 2 categories. In terms of bleeding, there is a clearly increased risk with plasma levels above 150, but no difference between the other 2 categories. Thus, a plasma level between 30 and 150 appears to [sic] optimal regarding both, prevention of ischemic strokes and prevention of bleeds.

PSOF ¶ 28; ECF No. 64-57 at 8.

Dr. Haertter replied to Dr. Schumacher on March 28:

> To be honest, I have to admit that I still don't know how we can get ahead - my understanding of the FDA statement was and still is that, in order to position the 110 mg, it must not only be better in the event of bleedings and equally good as the 150 mg BID when applied to a stroke, but also, even more important, must be better than 150 mg when applied to a stroke. In my opinion, a solution regarding this issue is almost impossible. I would be happy to discuss on the phone.

ECF No. 64-57 at 3.[17]

#### b. Lehr Titration Analysis

Between January and September 2012, Dr. Thorsten Lehr performed for BI a series of dose titration computer simulations to "explore whether exposure measurement ... might further improve the positive benefit-risk balance of dabigatran etexilate versus warfarin." ECF 54-33 at 68. One objective of the computer simulations was to investigate "how the clinical outcome in patients with atrial fibrillation would be affected by adjusting patients' dabigatran doses according to their individual exposure or renal function." *Id.* The other objective was "[t]o explore cut-off trough concentrations or cut-off renal function values for dose selection that would result in optimal clinical outcome." *Id.* Dr. Lehr described his work as "extensive and comprehensive clinical trial simulation analyses." ECF No. 64-14 at 18; PSOF ¶ 34. He concluded that a treatment protocol using only the 75mg and 150 mg doses was more desirable than using 75, 110 and 150 mg doses, and generated a significant reduction of major bleeding events of more than 20% while the protection against strokes was maintained. ECF No. 64-14 at 18; PSOF ¶ 34.

On June 24, 2012, Dr. Klaus Dugi circulated a document to two senior BI officials entitled "Potential Mid to Long Term Strategy for Pradaxa in SPAF." ECF No. 54-35, 54-36. It discussed the Lehr simulations. It suggested the simulation data might be a starting point to develop a "strategy of a one-time initial measurement (perhaps repeated annually and in some instances such as moderate renal impairment in shorter intervals) and titration of the Pradaxa dose to achieve an exposure in an individual patient that has been demonstrated in RE-LY to provide the best risk ratio of preventing ischemic strokes with as little increase in bleeding as possible." It also suggested that this strategy, coupled with a clinical trial, might help obtain FDA approval of the 110 mg dose of Pradaxa. ECF No. 54-36 at 3; ECF No. 54-35. It pointed out that this strategy could not be implemented until there were "(1) a certified lab test to measure Pradaxa exposure and (2) potentially a point of care testing device." ECF No. 54-36 at 3. The paper noted that these ideas were in early stages of discussion and "further data exploration would clearly be needed" before they could be implemented. ECF 54-35.

**\*21**  The next day, June 25, 2012, BI applied for a European patent for a method of administering dabigatran that relied in part on checking the patient's plasma concentration one time:

> A method for administering Dabigatran, optionally in the form of a pharmaceutically acceptable salt thereof, to a patient in need of an anticoagulant and/or antithrombotic medicament wherein the daily dose is determined by

the dosage regimen including one measurement of dabigatran plasma level.

ECF No. 54-37 at 2. Dr. Dugi and Dr. Lehr were two of the applicants on the patent. *Id.*

On November 28, 2012, BI conducted an internal "Challenge Meeting" to consider three options to try to move forward toward obtaining FDA approval for the 110 mg dose of Pradaxa. One of the options was "exposure monitoring" based on the titration analysis. ECF No. 64-62 at 3; ECF No. 64-26 at 2. The participants in the Challenge Meeting concluded that exposure monitoring was not a viable option because the underlying titration analysis model was "based on data that are not in line with the clinical data" and therefore could not be validated. ECF No. 64-62 at 4-6; *see also* ECF No. 64-26 at 2 ("The concept was not supported because of statistical reasons (PK dataset not fully representative for RE-LY results therefore selection bias cannot be excluded).") (emphasis in original). It additionally was rejected because "measurements in all patients would be necessary." ECF No. 64-62 at 3-4, 12.

Almost seven months after the Challenge Meeting, on or about June 21, 2013, BI applied for a U.S. Patent on the same method of administering Pradaxa for which it had applied for a European patent a year earlier. ECF No. 54-37 at 2.

### c. Reilly Paper

At least as early as July 2011, a BI group headed by Dr. Paul Reilly began studying the RE-LY data to try to model the effects of plasma concentration on risk of stroke and bleeding (a so-called "exposure-response analysis"). Building on this work, in February 2014, Dr. Reilly, other BI scientists, and independent scientists involved in the RE-LY trial published a paper entitled *The Effect of Dabigatran Plasma Concentrations and Patient Characteristics on the Frequency of Ischemic Stroke and Major Bleeding in Atrial Fibrillation Patients* (the "Reilly Paper"). ECF No. 64-39. In drafting and reviewing the Reilly paper, scientists inside and outside BI debated whether the exposure-response analysis suggested a therapeutic range -- *i.e.*, a specific plasma concentration range in which patients should be maintained to ensure the efficacy and safety of the medication -- and what that range might be. DSOF ¶ 16. Some people expressed concern that recognizing the existence of a therapeutic range could be viewed as inconsistent with BI's strategy of marketing Pradaxa as a drug that did not require ongoing blood monitoring (in contrast to warfarin). The published Reilly paper concluded that as

plasma concentrations increased, bleed risk increased and stroke risk decreased, with the reduction in stroke risk at higher plasma concentrations being of "limited variation" and "relatively constant." ECF No. 64-39 at 7-9. It concluded that above 35-50 ng/mL, there was no statistically significant increase in protection against strokes, but the risk of bleeding continued to rise. PSOF ¶ 65; ECF No. 64-54 at 5.

**\*22** The introduction to the Reilly Paper stated, "The rates of stroke and major bleeding in DE-treated patients have been investigated across a variety of patient subgroups, but correlations of stroke and bleeding risk with individual plasma concentrations have not been presented. The aims of this pharmacokinetic (PK) analysis of the RE-LY trial were to explore the association between plasma concentrations and efficacy and safety outcomes, and to identify factors affecting the variability of plasma concentrations of dabigatran and their impact on outcome events in AF patients with an indication for oral anticoagulation." ECF No. 64-39 at 3. Its conclusion stated,

> Both doses of DE in RE-LY were associated with a more than 5-fold variation in plasma concentrations, indicating a wide therapeutic range. Renal function was the predominant patient characteristic that determined plasma concentrations. Safety and efficacy outcomes were correlated with plasma concentrations of dabigatran, with age as the most important covariate. There is no single plasma concentration range that provides optimal benefit-risk for all patients. The balance between stroke risk and bleed risk varied with concentration, suggesting that there is a subset of AF patients who may improve their benefit-risk balance with DE by a tailoring of the dose in relation to patient characteristics.

*Id.* at 9.

The Reilly Paper also noted its own limitations. For example, in a section titled "Application of findings to clinical practice" it stated:

> In this RE-LY substudy, demographic characteristics played the strongest role in determining risk of clinical events. In patients at highest risk for events, such as the very elderly and/or those with poor renal function, an adjustment of DE dose to optimize exposure might improve the benefit-risk if they are at either extreme of the concentration range. However, an assay of dabigatran concentrations is not yet widely available, and at least in the United States, only the 150-mg bid

dose is available except for a 75-mg bid dose in patients with severe renal failure. This substudy, therefore, can only serve as a basis for future endeavors in this area. *Id.* at 8.

Prior to publication, the Reilly Paper was the subject of extensive discussion at BI. On July 27, 2011, a draft of the paper was circulated within BI. ECF No. 64-34; ECF No. 64-35. It stated, "Based on the concentration ranges achieved with the two doses of dabigatran in RE-LY, less than 20% of patients would be expected to be at the extremes of the plasma concentration distribution. Monitoring of plasma concentrations or antithrombic activity, e.g. aPTT, would be required to identify these patients. A dose adjustment could improve the benefit-risk ratio." *Id.* at 15. The draft paper concluded:

> In summary, both of the doses of dabigatran etexilate in RE-LY were associated with a more than 5-fold variation of plasma concentrations. Renal function was the predominant patient characteristic that determined exposure, in addition to bioavailability. There were no clinically relevant drug interactions with commonly used P-gp inhibitors. Safety and efficacy outcomes were observed to be dependent on plasma concentrations of dabigatran. At low concentrations there was a significant increase in risk of ischemic stroke and at high concentrations a significant risk of major bleeding. A range of concentrations between 35 and 300 ng/mL optimized the benefit-risk ratio. Up to 20% of patients treated with the 110 and 150 mg bid doses used in RELY may fall outside this range[ ] in the RE-LY trial. While a fixed dose of dabigatran has significant advantages in both safety and efficacy compared to warfarin, adjusting the dose at steady-state to attain an optimal plasma concentration range may further improve the benefit-risk ratio.

**\*23** *Id.* at 18.

On August 1, 2011, Dr. Reilly sent an email to a colleague, Dr. Martina Brueckmann, discussing the paper.[18] The email stated, "Of course, I am aware that the conclusions that appear to emerge from this paper are not the ones currently wished for by marketing (that dose adjustment will optimize therapy), let's just see where this paper ends up. I actually think that once we have a competitor out there that is as good as we are, we will be looking for ways to make our drug better. Obviously, if BI doesn't want to be associated with this message I recognize that BI authorship may not be possible."

Dr. Brueckmann replied, "fully agree, a target range is something we always wanted to avoid in the first place to get away from 'monitoring'. Maybe one has to clearly differentiate between initial dose assessment (with the help of a target range) and regular measurements, which are certainly not needed. In the heart valve area we are doing the same; dose assignment based on initial plasma level measurements with a target of >50 ng/ml. The time may be a bit too early to introduce a target plasma level range from a Marketing point of view, but if this could clearly demonstrate that additional benefits are obtained, this may be a path forward to differentiate ourselves from competitors." ECF No. 64-2 at 2-3.

Dr. Reilly circulated another draft on or about December 14, 2011. PSOF ¶ 70. The "Conclusions" section of the introduction stated, "Both safety and efficacy of dabigatran are related to plasma concentrations. An optimal balance between benefit and risk occurs in the range of concentrations between 40 and 215 ng/ml." ECF No. 64-24 at 5. Similar to the July draft, the concluding paragraph of the December draft stated:

> In summary, both of the doses of dabigatran etexilate in RE-LY were associated with a more than 5-fold variation of plasma concentrations. Safety and efficacy outcomes were observed to be dependent on plasma concentrations of dabigatran with age as the most important covariate. At low concentrations there was a significant increase in risk of ischemic stroke and at high concentrations a significant risk of major bleeding. A range of concentrations between 40 and 215 ng/mL appeared to be the best balance of benefit and risk. Renal function was the predominant patient characteristic that determined exposure. Up to 20% of patients treated with the 110 and 150 mg bid doses used in RE-LY may fall outside this range. in the RE-LY trial. While a fixed dose of dabigatran has significant advantages in both safety and efficacy compared to warfarin adjusting the dose at steady-state to attain an optimal plasma concentration range may further improve the benefit-risk ratio.

*Id.* at 18.

On December 18, 2011, Dr. Brueckmann emailed the current version of the Reilly Paper to Dr. Andreas Clemens, BI's Global Head of Pradaxa. Her cover email noted that there was no laboratory test available in the United States to measure a patient's plasma concentration. It said, in part, "The paper suggests something like a therapeutic range for dabigatran

based on risk of bleeding an [sic] stroke between the 10-90th percentile of plasma concentration. I am not sure if we are fully committed to go this route especially as we are lacking an assay to measure dabigatran in the U.S." PSOF ¶ 71; ECF No. 64-3 at 3.

**\*24** Dr. Clemens further forwarded the email to Dr. Janet Schnee. He said, "May be [sic] I am phobic, but I am not happy with the conclusion: An optimal balance between benefit and risk occurs in the range of concentrations between 40 and 215 ng/mL. Additionally I am not sure how physicians in US should evaluate the dabigatran plasma levels in practice as hemoclot is not available. Beside the conclusion above form [sic] my point of view the manuscript goes beyond what can be said regarding recommendations." ECF No. 64-3 at 2.

After circulating the December 2011 draft, Dr. Reilly spent approximately 6 months getting further information from Dr. Lehr and revising the paper. As he stated in an email to Dr. Clemens and others on June 4, 2012,

> I have been heavily pressed to revise and submit the manuscript. It has been 'on hold' for almost 6 months. I had to wait several weeks for some analyses from Thorsten, at his request. I have heavily revised it and was trying to finish it this weekend. I will distribute to all authors and internally by the end of the week. The basic message is that there is a very wide therapeutic range of concentrations for dabigatran but that a minority of patients may not be in range and would benefit from a dose adjustment. I think we just need to make the message clear.

ECF No. 64-23 at 2.

On June 15, Dr. Reilly circulated "a clean copy of the most recent draft of the exposure-response paper, which has undergone radical revisions and is now in its 7th version." ECF No.64-6 at 3.[19] Dr. Clemens replied, in part, "The conclusion is from my point of view not optimally worded. I would not name this 'therapeutic range'. This is near to the principle around vitamin K antagonists [such as warfarin]. What one could say possibly theat [sic] there is a big safety margin – but I doubt you wanted to say this." *Id.* at 2. On June 18, Dr. Jeffrey Friedman replied, "The manuscript is not acceptable in its present form. Should it proceed further without substantive revision, I would want all BI authors removed from the publication as it is not representative of the appropriate medical and scientific interpretations of these data." *Id.* at 2.[20]

In a series of emails between June 18 and July 16, Dr. Reilly and Dr. Lehr discussed Dr. Friedman's objections to the draft paper, particularly that "he did not like the cut offs and the concept of a therapeutic range." On or about July 12, Dr. Lehr met with Dr. Friedman. He reported to Dr. Reilly that he and Dr. Friedman "discussed the [exposure-response] analysis together with management. As management liked it (and also Jeff seemed to like it), I believe we have some tailwind." ECF No. 64-33.

Stuart Connolly, a BI consultant, a lead investigator on the RE-LY clinical trial and named author on numerous of its published papers, reviewed the June 2012 draft. On July 30, 2012, Dr. Connolly emailed Dr. Reilly, Dr. Brueckmann, and others with comments. Dr. Connolly said,

> Very nice paper and it will have an impact on thinking about dabigatran. The paper suffers from a lack of decisiveness about the obvious implication of these data which is that they point to a trough plasma concentration range for optimization of efficacy and safety in a range from 40-200 ng/ml. We need to say this more directly. Of course there is some uncertainty but the data are fairly clear. There is very good reason to never go above 200 ng/ml. It is less clear at the low end due to the paucity of events but somewhere around 40 -50 seems prudent for a lower boundary.

**\*25** ECF No. 64-9 at 3.

Dr. Reilly responded only to Dr. Connolly, "Stuart, I have been facing heavy resistance internally on this paper about the concept of a therapeutic range, at least stating it outright. Perhaps you can help me with solving this dilemma. I am working on a revision to deal with this and I will come back to you with it. I think they just don't want the message that one range fits all, it's patient specific." *Id.* at 2. Dr. Connolly responded, "I sort of know that. We can hopefully discuss this in London where this will be a potentially important part of solving the puzzle of the right dose for the rifht [sic] patients." *Id.*

On October 12, 2012, Dr. Reilly circulated an updated draft. ECF No. 64-29 at 4.[21] His cover email said that the draft "incorporated almost all the comments that have been sent since the last version (Lars, Stuart, John, Mike, Salim) including BI internal comments in an attempt to satisfy all the different points of view ... From my point of view, the paper is improved again and ready for submission." *Id.* On October

15, Dr. Clemens responded, "The conclusions taken now I can support." *Id.* at 3.

Dr. Brueckmann forwarded the October 12 email to Dr. Jutta Heinrich-Nols and Dr. Marc Desch, with a copy to Dr. Clemens. ECF No. 64-10 at 2.[22] On October 16, 2012, Dr. Heinrich-Nols sent an email to Dr. Brueckmann, Dr. Clemens, Dr. Desch, and Dr. Friedman with comments about the proposed paper. Dr. Heinrich-Nols wrote, "So what? this publication will more harm than be useful for us, neither in the market but be especially harmful in the discussions with regulatory bodies. Can't this be avoided?" ECF No. 64-10 at 2.

On October 23, Dr. Friedman emailed Dr. Clemens, with a copy to Dr. Heinrich-Nols and Dr. Dugi. He wrote,

> I have requested that Paul make some modifications. I believe this is essential because we have argued before multiple health authorities there is no single plasma level range which can be used for patients receiving Pradaxa and that I am not comfortable having any BI author on any paper that either directly or implies otherwise. The abstract will require modification especially the Conclusions section. In particular, I requested that: (1) one [sic] stress individual patient/physician assessments of bleeding and stroke risk should drive dose selection, (2) there is no specified target plasma level range to insure appropriate benefit/risk and that an outcome study is necessary to demonstrate a specified target plasma level range in a clearly identified population produces improved outcomes compared to the strategy currently in use or an alternative strategy (e.g., warfarin).

ECF No. 64-29.

On October 31, 2012, Dr. Clemens sent an email to Dr. Friedman stating,

> I have talked with Thorsten Lehr ho ist [sic] the "father" of this manuscript -- Paul took it over and changed it significantly. Thorsten wants to tailor the message according our ideas. I see value in this manuscript especially with regard to a manuscript which will in the next step focus on lab levels (aPTT) to give the physicians an understanding what they have to expect in specific situations regarding aPTT. The world is crying for this information – but the tricky part is that we have to tailor the message smart. Thorsten wants to do that – so I think it would be worth if you and I would attend a TelCon for alignment. This I see as a real opportunity to not have a bad manuscript. Would be the last try to

convince and guide Paul into an appropriate BI conform direction.

**\*26** ECF No. 64-11 at 2.

On January 22, 2013, Dr. Reilly sent an email to Dr. Desch, Dr. Friedman, and Dr. Clemens which appended a revised draft of the exposure-response manuscript.[23] Dr. Reilly said, "Can you please re-start the release process for the exposure-response manuscript, attached. The Discussion section has been substantially revised in collaboration with Jeff Friedman and should now be more compatible with the current vision. Simultaneously, I will be distributing this to the authors for final review." ECF No. 64-27 at 2.

On January 23, 2013, Dr. Reilly circulated an email to BI's RE-LY Operations Committee and his co-authors. The updated draft of the paper was attached. Dr. Reilly said,

> After prolonged discussions and revision, please find attached an updated draft of the exposure-response paper for your review. Since the last version in Oct. 2012, only the Discussion has undergone substantive revision. It now reflects the relative impact of patient characteristics, e.g. age, versus plasma concentrations in stroke and bleeding outcomes. Two supplementary tables summarizing the logistic regression models were added. I think there are still other aspects that one might modify or analyse but after such a long incubation phase I would be in favour of submitting it to a clinical journal and get some feedback.

ECF No. 64-12 at 2.

Dr. Brueckmann forwarded the email to Dr. Heinrich-Nols, who responded the next day. He wrote,

> I have received the request for approval, I will not approve it. This publication by a BI author asking for the definition of a therapeutic concentration range makes no sense to me in light of the development objectives of dabigatran and in light of our current response strategy to various health authorities; even if now the limitations of the study are outlined this kind of publication may cause much harm but not help and force us again into defensive position. This needs to be approved by other hierarchy levels.

ECF No. 64-12 at 2.

On February 4, Dr. Reilly emailed Dr. Desch to ask about the status of the paper. Dr. Desch forwarded the email to Dr. Heinrich-Nols. Dr. Heinrich-Nols forwarded the email to

Dr. Friedman, Dr. Brueckmann, Dr. Clemens, and Dr. Jeorg Kreuzer. He stated,

> [I]s it really wanted to publish this exposure-event paper of RELY? I cannot believe that for a decade a drug was developed with the clearly defined target of no monitoring needs, a prospective trial without plasma level monitoring was perfomed generating the RELY study results, that we promote 2 fixed doses without monitoring, defend continuously to Health Authorities that individual patient characteristics do not allow a dose titration based on plasma level only and then finally release a publication where exposure event relationships which was neither prospectively defined nor adequately conducted are described to define an effective and safe plasma level range. This will make any defense of no monitoring to HA extremely difficult (i.e. Health Canada, TGA) and undermine our efforts to compete with other NOACs. As I am not enpowered to release or stop any publications, I would like to ask you to check once again whether this is really wanted.

**\*27** ECF No. 64-13 at 2.

As noted above, in March 2013, the Reilly Paper was submitted to the Journal of the American College of Cardiology for publication. It was accepted for publication in July 2013, was published online in September 2013, and in hard-copy in February, 2014. PSOF ¶¶ 63, 85; ECF No. 64-39; https://pubmed.ncbi.nlm.nih.gov/24076487. It included Dr. Lehr, Dr. Haertter, Dr. Connolly, and Dr. Wang as co-authors.

On or about May 16, 2014, BI submitted a 635-page Periodic Safety Update Report to the FDA. As part of a section on "Other Clinical Trials," BI reported the results and conclusions from the Reilly paper. ECF No. 54-47 at 49-52.

6. *British Medical Journal Articles and Regulatory Follow-up*

**a. BMJ Articles**

On April 30, 2014, Deborah Cohen, an Assistant Editor from the British Medical Journal (BMJ) emailed BI and said that she was "writing about dabigatran for the BMJ" and proposed a number of questions, including (1) whether BI had "willfully or negligently failed to disclose [information about bleeding] to regulatory authorities in the United States and abroad;" (2) why, despite documents showing that BI had "used RE-LY trial data to calculate the optimal therapeutic

range ... of dabigatran," BI had not notified the EMA or FDA and had "omit[ted] the optimal therapeutic range for the final publication of the paper," and (3) why BI "continued to promote the 'no monitoring' claim for dabigatran despite [BI's] own analysis showing that it would improve outcomes." ECF No. 64-32.

On July 8, 2014, BI withdrew the U.S. patent application before any patent rights were granted. ECF No. 54-33 at 70; PSOF ¶ 39: ECF No. 64-28 at 2. According to Dr. Dugi, the lead applicant on the patent application, BI concluded that "the scientific data would not support such a concept," because when BI "compared what the modeling and simulation data would [predict] compared to what BI actually saw in RE-LY, ... the data were actually quite different from what the modeling had suggested." ECF No. 54-39 at 4-6 (Deposition of Klaus Dugi).

On July 23, 2014, the BMJ published several articles about Pradaxa. *See* ECF No. 54-33; 54-48. One of the articles was written by Deborah Cohen and was titled, "Dabigatran: how the drug company withheld important analyses." ECF No. 54-48 at 14. Another article by Ms. Cohen was titled "Concerns over data in key dabigatran trial." *Id.* at 10. The BMJ also published an editorial entitled, "The trouble with dabigatran." *Id.* at 8. One of Ms. Cohen's articles included excerpts of "previously confidential internal company documents released during litigation in the U.S." *Id.* at 14.[24] Among other things, the BMJ articles reported that a 2011 draft of the Reilly paper "suggested there was an optimal plasma concentration range," *id.* at 16, excerpted and summarized various emails (summarized *supra*) authored by BI and independent scientists discussing drafts of the Reilly paper and the possibility of a therapeutic range, *id.*, and quoted Dr. Dugi's June 2012 document "Potential mid to long term strategy for Pradaxa in SPAF." *Id.* at 18.

#### b. EMA

**\*28** On or about July 25, 2014, the EMA's Committee for Medicinal Products for Human Use (CHMP) initiated a formal inquiry. The CHMP described the origin and scope of the inquiry as:

> 1. On 23 July 2014, the BMJ published a number of articles about different topics related to Pradaxa. The main topic was the possible identification of a therapeutic concentration interval for dabigatran and

whether routine monitoring of dabigatran concentrations may provide increased benefits and less risks for patients. [BI] is invited to comment on all of these articles, but in particular on "Dabigatran: how the drug company withheld important analyses" by Deborah Cohen (BMJ 2014;349:g4670 doi: 10.1136/bmj.g4670).

> 2. [BI] is also asked to outline its current and planned activities with regard to investigating the relationship between dabigatran exposure and clinical efficacy and safety in the licensed indications, and the utility of monitoring dabigatran anticoagulant activity on a more regular basis.

ECF No. 79-13 at 9.

In August 2014, BI submitted a written response to the CHMP. ECF No. 54-33 at 2. The response included BI's explanation and analysis of the unsuccessful dose titration simulations. *Id.* at 5; *see* DSOF ¶ 20. It stated that the simulation analysis "was not based on a measurement of actual patient outcomes after monitoring-based dosing; rather, it was based on a complex computer simulation" using RE-LY trial data. ECF No. 54-33 at 5. It also stated, "These models were subject to some inherent imprecision and bias." *Id.* BI stated, "Due to the explorative character of these analyses and its limitations ... we did not share our conclusions with regulators." *Id.*

The CHMP subsequently asked for additional information about "the analyses, including the simulation analyses incorporating PK, PD and clinical outcome data, which led [BI] to conclude that routine monitoring of dabigatran anticoagulant activity would not result in an enhanced balance between benefits and bleeding risks when compared to the current posology as well as other recommendations in the approved SmPC." ECF No. 79-13 at 19.

The CHMP made a second supplemental request for information, which "agreed that current data do not justify a general recommendation of regular [therapeutic dose monitoring] in all patients treated with Pradaxa." Nevertheless, it asked that BI "further discuss if the use of [therapeutic dose monitoring] (regular monitoring, occasional monitoring, or "one-off" measurements) could improve the dose selection in patients at particular risk of under- or over-treatment." *Id.* at 38. It further noted,

> Information is already provided in section 4.4 of the SmPC regarding coagulation test thresholds above which the risk of bleeding may be increased. [BI]

should consider if it for some patients may be appropriate to measure the dabigatran anticoagulant activity/concentration once or a number of times soon after treatment start and use the aforementioned thresholds to check if the dose is appropriate or should be adjusted. In this context, [BI] should discuss whether a reference to section 4.4 should be inserted in section 4.2 to highlight the option of measuring dabigatran anticoagulant activity/concentration.

**\*29** *Id.*

The CHMP made a third request for supplemental information in June 2015. It stated in relevant part:

The CHMP still considers that there may be subgroups of patients where the risk of bleeding or of thromboembolic events may be reduced by limited testing soon after the start of therapy or in specific clinical situations.... At present, the SmPC for the AF indication lists 200 ng/ml as the threshold beyond which a patient is at increased risk of bleeding. Since the exposure-efficacy curve suggests that levels as low as e.g. 50 ng/ml are still efficacious, there are strong indications that there is scope for improving the benefit-risk through dose adjustment in at risk patients. [BI] is also invited to comment on the recent article by Douxfils et al (2015) and discuss what further research would be needed in order to validate pragmatic proposals to provide guidance for limited testing for high risk individuals.

*Id.* at 58.

In January 2016, the EMA issued its final report closing its investigation into the issues raised in the BMJ articles. ECF No. 79-12; 79-13 at 3. Among other findings, the EMA endorsed BI's conclusion that the Lehr dose titration simulations had limitations that rendered them unable to predict actual patient outcomes. DSOF ¶ 18; ECF 54-41 at 13 ("[BI] argues that the exposure response model itself is not inaccurate but that it cannot predict patient outcomes with the level of precision and accuracy necessary to confirm that dose adjustment would produce an improvement in the benefit-risk profile of dabigatran etexilate ... This is endorsed."). The EMA also endorsed BI's conclusion that "it is neither possible to define a therapeutic range generally applicable nor would clinically unproven concentration ranges for specific sub-groups be helpful. However, the measurement of aPTT can serve as an indicative value to guide physicians in the instance of few specific conditions such as requirement for surgery or occurrence of bleeding as described in the approved labels." ECF No. 54-41 at 21. The EMA also endorsed BI's position

that "internal documents discussing strategic considerations [concerning the Reilly Paper] were not followed up as reliable benefit for patients through monitoring of plasma concentration was not predictable." *Id.* at 13.

### c. FDA

On July 24, 2014, BI sent to the FDA copies of the BMJ articles, along with a BI press release responding to the articles. ECF No. 54-48. On August 18, 2014, in response to the FDA's request, BI sent the FDA a copy of the initial response to the EMA. ECF No. 54-33. These materials included a section called "Simulation Analysis and Validation" that discussed the Lehr Titration simulations. *Id.* at 68-75. On February 9, 2016, BI sent the FDA a copy of the EMA's final report. ECF No. 79-12 at 2. The FDA did not thereafter suggest to BI that therapeutic monitoring was necessary. ECF No. 54-50 at 3.

### 7. *Labeling History*

Since 2010, the FDA has approved Pradaxa's labeling on 19 separate occasions without requiring a warning regarding plasma monitoring. DSOF ¶ 23. BI has never used the CBE process to modify the Pradaxa label to include a warning regarding a plasma concentration cut-off or to inform doctors that a patient's bleeding risk can be assessed by measuring Pradaxa blood levels. ECF No. 64-48 at 11, 13. The FDA did not direct a label change after receiving the Reilly paper, BI's communications discussed in the BMJ, or the information concerning the dose titration simulations that BI performed. DSOF ¶ 21; ECF No. 54-3.

**\*30** At the time of approval, and at several points thereafter, the FDA rejected BI's request to approve a 110 mg dose and related labeling proposals that would guide physicians to use the 110 mg dose in certain situations, because "even in a population exposed to relatively high concentrations of dabigatran, the 150-mg dose had a superior benefit–risk profile" to the 110 mg dose. DSOF ¶ 12.

Approximately two years after Pradaxa was approved, in October 2012, BI proposed to add the following language to section 5.1 ("Risk of Bleeding") of the Pradaxa label: "With concomitant intake of antiplatelets or P-gp inhibitors in patients aged ≥ 75 years, the risk of major bleeding, including gastrointestinal bleeding, increases." The FDA rejected the change, saying, "The changes proposed are all independent

risk factors for bleeding and do not need to be called specifically in the label. Also, we do not want 5.1 to become too long to be useful." DSOF ¶ 19; ECF No. 54-42, 54-43, 54-44.

In September 2014, the FDA re-approved Pradaxa's label with the statement, "[g]enerally, the extent of anticoagulation does not need to be assessed." ECF No. 54-51 § 2.2.

By January 2015, § 12.2 of the Pradaxa label had been amended to read in relevant part:

> The aPTT test provides an approximation of PRADAXA's anticoagulant effect. The average time course for effects on aPTT, following approved dosing regimens in patients with various degrees of renal impairment is shown in Figure 2. The curves represent mean levels without confidence intervals; variations should be expected when measuring aPTT. While advice cannot be provided on the level of recovery of aPTT needed in any particular clinical setting, the curves can be used to estimate the time to get to a particular level of recovery, even when the time since the last dose of PRADAXA is not precisely known. In the RE-LY trial, the median (10th to 90th percentile) trough aPTT in patients receiving the 150 mg dose was 52 (40 to 76) seconds.

ECF No. 54-3 at 12. It also included a graph, designated as Figure 2, showing how patients with different levels of kidney function reacted to Pradaxa. The annotation to Figure 2 explained that it was based on data from the RE-LY study, which had used the Roche aPTT reagent. It then stated, "There may be quantitative differences between various established methods for aPTT assessment." *Id.* at 13.

On or about November 8, 2019, BI proposed to add the following language after Figure 3.1 on the Pradaxa label: "The concomitant use of PRADAXA with the fixed dose combination of the P-gp inhibitors glecaprevir/pibrentasvir has been shown to increase exposure to dabigatran (refer to the prescribing information for glecaprevir/pibrentasvir) [*see Warnings and Precautions (5.5)*]." ECF No. 54-45 at 18 (brackets in original). The FDA rejected the proposed change, in part because "[t]he [prescribing information] for dabigatran has adequate recommendations for the use of a P-gp inhibitor in the setting of renal impairment." *Id.*; ECF No. 54-46.

### 8. *Additional Publications*

On October 16, 2015, the Director of the FDA's Center for Drug Evaluation and Research's Office of Drug Evaluation I in the Office of New Drugs published an article stating "Pradaxa, Xarelto, Eliquis, and Savaysa have some additional advantages [over warfarin], including fewer interactions with food and other drugs, rapid onset, and freedom from the need to have periodic blood test monitoring." ECF No. 54-52 at 3.

**\*31** In 2018, following a series of think-tank meetings hosted by the Cardiac Safety Research Consortium ("CSRC") regarding Pradaxa and other novel oral anticoagulants ("NOAC"), four senior FDA scientists and others co-authored an article entitled, "Is there a role for pharmacokinetic/pharmacodynamic-guided dosing for novel oral anticoagulants?"[25] The article's last paragraph stated, "Several conclusions and consensus positions were reached during this meeting." Among them were:

> Second, the panel acknowledges that proper dose selection is critical for achieving the maximum benefit of the NOACs. Evidence from trials support dose adjustment based on clinical factors predisposing to overexposure or risk of bleeding (eg, age, renal failure, concomitant medications, and bleeding risk). Routine PK-PD measurements to guide NOAC dosing cannot currently be recommended because of the lack of reliable tests, lack of clinical evidence of benefit, and lack of data to guide appropriate dosing.... Third, the panel recognizes the potential of using a PK-PD-guided dosing to improve the risk-benefit trade-off of NOACs in selected patients and believes that this approach is worthy of further scientific investigations because there are significant unknowns.

DSOF ¶ 22; ECF No. 54-53 at 9.

## V. DISCUSSION

### 1. *Newly Acquired Information*

Plaintiffs assert BI had the following facts that meet the definition of "newly acquired information" and should have required a CBE modification:

> • There is a "cut off" point above which Pradaxa provides no statistically significant additional protection against strokes, but the risk of bleeding continues to increase. Therefore, the increased risk above the cut off point is unnecessary and excessive. ECF No. 63 at 7, 27-28.

- Doctors should use a patient's actual plasma concentration to assess bleeding risk (therapeutic monitoring). ECF No. 63 at 11-12.[26]

- aPTT test results vary widely depending on the reagent used for the test, so the result of an aPTT test is not an accurate indicator of plasma concentration. Also, ECT only an accurate indicator if properly calibrated. ECF No. 63 at 19.

- The P-gp inhibitor covedilol (brand name "Coreg") increases Pradaxa levels 30-50%.

BI argues that none of the materials cited by Plaintiffs are "newly acquired information" because either they do not reveal " 'risks of a different type or greater severity or frequency' associated with plasma concentration than was discussed with the FDA prior to approval," ECF No. 53 at 8, or they are not scientifically reliable. *Id.* at 5.

To recap, in order to qualify as "newly acquired information," facts must be data, analyses, or other information not previously submitted to the FDA (which can include new analyses of previously submitted data) that reveals "risks of a different type or greater severity or frequency than previously included in submissions to FDA." The facts must "add or strengthen a contraindication, warning, precaution, or adverse reaction [or] add or strengthen an instruction about dosage or administration that is intended to increase the safe use of the drug product." It must constitute sufficient, scientifically-reliable evidence of a causal association between the drug and a hazard that is potentially fatal, serious even if infrequent, or can be prevented through appropriate use of the drug.

**\*32** At the time of Plaintiff's bleed in September 2014, the Pradaxa label included the following information:

- Dabigatran "increases the risk of bleeding and can cause significant, and, sometimes, fatal bleeding."

- Bleeding risk increases with age.

- Bleeding risk increases for patients who have reduced kidney function or are taking P-gp inhibitors.

- Kidney function should be assessed before prescribing Pradaxa.

- To help guide treatment with Pradaxa, bleeding risk can be assessed by the ECT or aPTT test.

- Pradaxa had a higher rate of gastrointestinal bleeding than warfarin.

### a. "Cut-off" Point

Plaintiffs assert that the FDA and BI believed before Pradaxa was approved that there was a statistically significant increase in stroke protection at all plasma concentrations. They argue that after approval BI learned there was a "cut-off point," that is, a plasma concentration above which there is no statistically significant increase in stroke protection.[27] They allege, "When BI discovered that Pradaxa Levels over 30-50 ng/mL had no material benefit but only increased blood risk, the known risk of bleeding at high Pradaxa Levels became an excessive, unnecessary and avoidable risk [that should have been reflected in a label change]." ECF No. 63 at 28. As their factual basis, Plaintiffs point to (1) the Schumacher models, (2) the COS, (3) the Lehr titration analysis, and (4) the Reilly Paper. ECF No. 63 at 28.

The parties agree that the post-approval analyses concluded there was no statistically-significant increase in stroke protection above a certain plasma concentration level. *See, e.g.,* ECF Nos. 64-47 (Scharfstein Deposition); 64-54 at 4-5. BI contests the underlying factual premise that prior to approval it and the FDA believed there was a statistically significant marginal increase in stroke protection at all plasma concentrations. *E.g.,* ECF No. 77 at 5.

On the surface, it appears there is a genuine dispute of fact about what BI and the FDA believed prior to Pradaxa's approval. BI states, "Both BI and the FDA understood both pre- and post-approval that the effect of plasma concentrations on stroke risk is weaker at high plasma concentrations and does not meet a formal threshold for 'statistical significance.' " Reply to PSOF, ECF No. 78 ¶ 5. Plaintiffs say, "BI's corporate representative testified that prior to approval both BI and the FDA believed there was a statistically significant stroke reduction as Pradaxa levels increased along the entire range of concentrations creating a trade off of more bleed for fewer strokes." PSOF ¶ 8 and n. 8. Deeper analysis shows there is no genuine issue of material fact because the factual record does not substantiate Plaintiffs' claim.

**\*33** In support of their positions, both parties cite excerpts from BI representative Dr. Maureen Oakes's depositions.

ECF No. 64 ¶8, n.8 (citing ECF NO. 64-48); ECF No. 78, ¶ 8 (citing ECF No. 79-1 at 10-11). Dr. Oakes repeatedly testified that stroke risk continued to go down at all levels of plasma concentration. ECF 64-48 at 11-12; 18-19, 21, 27. She testified that at some point that stroke reduction becomes statistically insignificant. ECF No. 79-1 at 10. She also testified that the FDA was aware that stroke reduction is not statistically significant at all plasma levels. *Id.* She never testified that stroke reduction remained statistically significant at all plasma concentration levels, nor did she testify that the FDA believed it to be statistically significant at all levels. She also testified that a pharmaceutical can have a clinically significant effect even if it lacks statistical significance. ECF No. 79-1 at 8-11; *see also* ECF No. 79-3 at 15-16 (Plaintiffs' statistical expert, Dr. Wells, acknowledging difference between clinical significance and statistical significance).

Plaintiffs also quote the following language from the "Dosing" section of the expert report of Dr. Stanley Schneller, M.D: "Indeed, the FDA's model predicted that, in a sample patient, as dabigatran concentration increased from approx. 130 to 185 ng/mL, stroke risk decreased by eight percent. As concentration increased from approx. 185 to 250 ng/mL, stroke risk decreased by 15 percent. In patients at a high risk of a potentially fatal or debilitating embolic event, *such an improvement in stroke protection is significant.*" ECF No. 64-49 at 12 *cited in* ECF No. 64 ¶8, n.6 (emphasis added). Dr. Schneller is a cardiologist, not a statistician; his report does not include any statistical models or statistical analysis. His isolated use of the term "significant" cannot fairly be read to suggest *statistical* significance.

Finally, Plaintiffs cite the expert report of Paul Zei, M.D., PhD, which states, "The FDA itself has acknowledged that concentrations toward the upper end of the distribution can provide additional stroke protection." ECF No. 64-50 (citing Dr. Krudys' September 20, 2010, presentation to the FDA Advisory Committee, ECF No. 64-45). The cited evidence falls short of stating that this additional stroke protection is statistically significant.

Plaintiffs cite no other evidence in support of their claim that BI and the FDA had pre-approval information that there was a statistically significant reduction in strokes at higher plasma concentration levels. There is also undisputed evidence that at points where there is no statistically significant reduction in stroke risk and where bleed risk continues to increase, there may be clinically significant reduction in stroke risk

and/or there may be actual (albeit not statistically significant) reduction in stroke risk.

On the totality of the record before me, even viewed in the light most favorable to Plaintiffs, the facts establish that the FDA approved Pradaxa knowing it was inconclusive whether stroke risk continued to go down at higher levels of plasma concentration. Therefore, BI has met its burden of proving that the sources cited by Plaintiffs do not "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA," so they are not "newly acquired information." *Accord Adkins v. Boehringer Ingelheim Pharm., Inc.,* No. X03HHDCV1606065131S, 2020 WL 1890681, at *12 (Conn. Super. Ct. Mar. 13, 2020) (Post-approval evidence of no statistically significant stroke prevention benefit at higher doses does not differ from the FDA's pre-approval information, "which found only a 'gradual' or 'minimal' stroke reduction benefit at higher concentrations without finding statistical significance.).

### b. Therapeutic Monitoring

Plaintiffs assert that BI should have used the CBE regulations to modify the Pradaxa label to instruct treating physicians to conduct therapeutic monitoring:

> **The Court:** Basically, the doctor should be instructed if you're going to put a patient on this drug, at some point either when you start, or shortly after you put them on it, you should have them take a blood test and see how they individually are reacting and make sure they are in a safe range. And if they're not, you can act accordingly. And if they are, you can be somewhat comfortable that if nothing material changes, this is a pretty stable pharmaceutical and they will be good going forward. That's really what you want.

> **\*34 Plaintiffs' Counsel:** That is precisely it, Your Honor.

ECF No. 97 at 54. This argument is derivative of Plaintiffs' argument that a "cut-off point" exists, such that there is a plasma concentration level above which Pradaxa provides no marginal stroke reduction. The connection is: assuming there is a cut-off point, there is a therapeutic range, so it would increase the safe use of Pradaxa to require therapeutic monitoring of plasma concentrations to assess whether a patient is within the therapeutic range. As Dr. Madabushi explained to the FDA Advisory Committee, the converse

is also true – without a reliable cut-off point, therapeutic monitoring is not viable.

Plaintiffs argue that the Schumacher model, the Lehr Titration, and the Reilly Paper all concluded that a therapeutic range exists. ECF No. 63 at 28. They further assert, "Several laboratory tests exist that can accurately assess Pradaxa Levels [which] can be performed by virtually every laboratory in the country with their existing equipment. BI's Pradaxa labels, other than in the U.S., recommend using one of these laboratory tests, the dilute thrombin time test (dTT) (trade name 'Hemoclot'), for assessing Pradaxa Levels is [sic] to prevent overexposure to Pradaxa.... Knowing these tests are useful to physicians, BI was under a legal obligation to add such tests to its label." ECF No. 63 at 28-29. They also point to the COS as evidence that BI knew 200 ng/mL was a cut-off point. ECF No. 63 at 36.[28]

BI responds that none of these sources were "newly acquired information" because all of these sources were reanalysis of the RE-LY data that had been submitted to the FDA prior to approval, with no new conclusions. Additionally, BI argues the Lehr titration analysis was not "newly acquired information" because (1) it was preliminary and exploratory, (2) the results were not scientifically reliable (as confirmed by the EMA), and (3) the FDA was informed of this analysis in 2014 as part of BI's response to the BMJ articles. ECF No. 54 at 12-13. Similarly, it argues "Moreover, the Schumacher email cannot constitute newly acquired information because of its preliminary and tentative nature." ECF No. 77 at 10. BI also argues it unsuccessfully tried to include language in the original Pradaxa label in 2010 to reflect that "an aPTT greater than 80 sec is associated with a higher risk of bleeding."

As discussed above, the pre-approval and post-approval information known to BI and the FDA was inconclusive about whether a cut-off point (and therefore a therapeutic range) existed. Even assuming a cut-off point exists, the post-approval materials cited by Plaintiffs do not reach a conclusion of what therapeutic range should have been added to the Pradaxa label, even when viewed in the light most favorable to Plaintiffs. Schumacher concluded, "[A] plasma level between 30 and 150 appears to [sic] optimal regarding both, prevention of ischemic strokes and prevention of bleeds." The Reilly Paper concluded that stroke protection above 35-50 ng/mL was not statistically significant and that there is no single plasma concentration range that provides optimal benefit-risk for all patients. The Lehr simulations did not find a particular therapeutic range. The COS uses a 200

ng/mL number. Given the lack of any consensus, and the limited nature of each study, these materials do not establish a scientifically-reliable cut-off point.

**\*35** The COS does not conclude that a cut-off point exists. The Prescriber Guide states that an aPTT time of greater than 80 seconds or a Hemoclot plasma concentration above 200 ng/mL is "associated with a higher risk of bleeding." The COS is the back-up explanation for these statements. It explains that the guidance derived from the RE-LY data for patients taking 150 mg of Pradaxa twice a day: "In general, the observed values at the 90th percentile were used to support any guidance to avoid an unnecessary risk of major bleeding events in patients treated with Pradaxa. In the case of AF patients treated with dabigatran etexilate (DE) 150 BID, the risk of major bleeding events (MBE) would increase from 3.8% at the median trough concentration of 93.0 ng/mL to 7.5% and hence be almost doubled at 215 ng/mL, the 90th percentile of measured trough concentrations." ECF No. 64-20 at 4. The COS then separately discusses the Hemoclot test and the aPTT tests. The COS discussed the Hemoclot test as follows:

> Since the diluted TT assay (Hemoclot) is a quantitative test which will provide dabigatran plasma concentration, 215 ng/mL can be directly used to clinically qualify Hemoclot TT results. Back-calculation via the respective calibration curve according to U08-2155-01 would yield approximately 54 s Hemoclot TT. It must be taken into account that Hemoclot TT may vary across laboratories. In a recent, study the Hemoclot TT at 215 ng/mL derived from calibration curves was 71 sec (UI0-2570-01). It is therefore mandatory to run the Hemoclot assay with appropriate calibration standards for accurate determination of dabigatran concentrations. *Based on the clotting times determined by the Hemoclot assay at concentrations of 215 ng/mL in the above mentioned studies, a diluted thrombin clotting time of >65 sec at trough (as given in the prescriber guide) is considered to represent a conservatively assessed cut off value.* As outlined above, an assessment of the risk of bleeds in a given patient should be based on the actual dabigatran concentration as determined by the Hemoclot® assay rather than by determining thrombin time only.

ECF No. 64-20 at 5 (emphasis added). With regard to aPTT, it stated, "It seems, thus, justified to consider 80s as a boundary beyond which patients are exposed to an increased

risk of (major) bleeding exceeding the average probability of bleeding [from] warfarin." *Id.* at 7.

Read in context, and even viewing the evidence in the light most favorable to Plaintiffs, the one-time reference to 215 ng/mL being a "conservatively assessed cut-off value" is not describing a value above which there is no additional marginal stroke protection. Nor is it stating that Pradaxa should be discontinued if a patient has a plasma concentration above that amount. It is describing the plasma level above which there is a higher risk of major bleeding, using the 90th percentile measurements in the RE-LY study to define the dividing point. Put differently, it is describing the cut-off point between major bleeding and non-major bleeding. The COS is not "newly acquired information" of a previously-unknown therapeutic range. *Accord Ridings* at 17-18.

Even assuming they concluded that a cut-off point existed, several of these sources are not sufficiently scientifically reliable to constitute "newly acquired information." The BI Challenge Meeting, including Dr. Dugi, in November 2012 concluded that the titration analysis could not accurately predict actual patient outcomes. The EMA endorsed this conclusion. Dr. Dugi's briefing document for the Challenge Meeting noted that further data exploration "would clearly be needed." There is no evidence in the record that the Schumacher modeling was ever peer reviewed, corroborated, or replicated. Therefore, neither of these sources are sufficiently scientifically reliable. *Accord Adkins*, 2020 WL 1890681, at *9, *11 (Schumacher model and Lehr titrations not "newly acquired information"); *Ridings*, 444 F. Supp. 3d 973 at 997 (Lehr titrations not "newly acquired information").

**\*36** The Reilly Paper is scientifically reliable insofar as it is a peer-reviewed published article that reaches new conclusions based on the RE-LY data. But, "[b]ecause the Reilly paper does not identify any specific plasma concentration levels that pose 'risks of a different type or greater serverity or frequency than previously included in submissions to FDA,' the Reilly paper does not constitute newly acquired information." *Roberto*, at *16 *quoted in Ridings* at 997. Moreover, the Reilly Paper was submitted to the FDA in 2014 as part of BI's response to the BMJ articles, so thereafter it would not qualify as information not previously submitted to the FDA.

Plaintiffs argue that BI's decision to apply for patents in 2012 and 2013 based on the Lehr titrations analysis is inconsistent with its position that the concept was not then viable. They

suggest an inference that the patent applications show that BI knew therapeutic monitoring was viable, but that BI abandoned it because it was inconsistent with BI's marketing strategy for Pradaxa. BI responds that, if it were trying to hide the fact that therapeutic monitoring was viable, it would not have filed a public patent application. The *Ridings* Court addressed this issue eloquently and accurately:

> One of the difficulties in analyzing the concepts of "relevancy" and "reasonableness" in determining when "newly acquired evidence" has been established is the undeniable fact that scientific research does not advance in a progressively linear fashion. Ideas are hatched and then tested. Sometimes the ideas advance scientific progress, other times new ideas are found to be flawed non-starters. Nonetheless, the rejection of a bad idea is as important to the process as the confirmation and embracing of good ideas. Based on the evidence presented, the Court concludes that Boehringer's computer simulation testing was a bad idea that simply did not pan out. It does not constitute newly acquired evidence under the CBE regulation.

*Ridings,* at 995-96.

The idea of therapeutic monitoring is not new. It was discussed pre-approval by the FDA Advisory Committee but was not required in the Pradaxa label. At all relevant times, the Pradaxa label already warned that patients could suffer serious and sometimes fatal bleeding and the FDA was already aware that bleeding at high plasma concentrations created this kind of risk. The Pradaxa label advised physicians that monitoring plasma levels "may help guide therapy." In September 2014, after receiving BI's responses to the accusations in the BMJ, the FDA re-approved the label without requiring therapeutic monitoring. To justify a CBE modification, the information must demonstrate a risk of a different type or greater severity or frequency than previously disclosed to the FDA. The type of risk here – a major bleed – was already known by the FDA and included in the Pradaxa label. The label warned that a bleed could be fatal; there can be no risk of greater severity. None of the materials cited by Plaintiffs suggest a previously-unknown change in frequency of major bleeds. Therefore, I agree with and adopt the reasoning of the other courts that have concluded that BI did not have "newly acquired information" about a therapeutic range. *See Roberto* at *15-18, 20; *Ridings* at 997; *Adkins* at 10; *In Re Pradaxa Cases* at *3-4.[29]

### c. Plasma Concentration Laboratory Testing

**\*37** The Pradaxa label in effect in 2015 said that patients at the 90th percentile in plasma concentration in the RE-LY study had a corresponding aPTT result of 76 seconds. ECF No. 54-3 at 12 (§ 12.2). It also disclosed that the RE-LY study had used the Roche reagent for its aPTT tests and warned, "There may be quantitative differences between various established methods for aPTT assessment." It then explained that the ECT test "is a more specific measure of the effect of dabigatran than activated partial thromboplastin time (aPTT)." It did not mention dTT testing.

Plaintiffs argue that BI should have used the CBE regulations to add additional warnings about the accuracy of the tests available to measure plasma concentration. Relying on their expert's report, Plaintiffs argue that, depending on the reagent used, an aPTT measurement of 76 seconds could correspond to a dangerously-high plasma concentration between 439 and 684 ng/mL. ECF No. 64-52 at 51. PSOF ¶ 44. At oral argument, Plaintiffs' counsel argued that the label should tell treating physicians not to use the aPTT test because it is too variable, to only use the ECT test if it has been calibrated to dabigatran, or otherwise only to use dTT, ecarin chromogenic, or mass spectroscopy tests. ECF No. 97 at 56-57, 153-54. In their written pleadings, Plaintiffs asked that the Pradaxa label be modified to disclose the magnitude of the variation among aPTT tests: "[T]elling U.S. physicians to use a 76 second (or worse 80 seconds) aPTT cut-off to avoid anticoagulating above the ninetieth percentile seen in RE-LY is grossly negligent. This newly acquired information should also be included in the Pradaxa label by a CBE." ECF No. 63 at 34. They also argued, "Once BI identified [the Hemoclot]/dTT test and its utility assessing a patient's response to Pradaxa and, hence, his/her risk of bleeding, BI had an obligation to add the information to the U.S. Pradaxa label pursuant to [the CBE regulations.] It has not." ECF No. 63 at 42-43; *see id* at 20 ("Because it has been validated as being accurate and reliable to assess a patient's response to Pradaxa, BI is legally required to include dTT [Hemoclot] in its US label.").[30]

BI correctly responds that the information cited by Plaintiffs does not reveal a risk of a different type, greater severity, or frequency than previously submitted to the FDA. ECF 77 at 17-18, 21-22. The type of risk at issue is the risk of bleeding from a high blood plasma concentration. The Pradaxa label already warns of this risk. The Pradaxa label

also contains a warning about the severity of that risk – it can be fatal. The warnings Plaintiffs propose do not address the frequency of the risk of bleeding. Therefore, even assuming the information about the blood coagulation tests is new information that BI obtained after approval, it is not "newly acquired information" sufficient to invoke the CBE regulations.

Moreover, the label warns treating physicians of potential inaccuracies in the plasma concentration tests. By September 2015, the Pradaxa label stated:

**\*38** • "Generally, the extent of anticoagulation does not need to be assessed. When necessary, use aPTT or ECT, and not INR, to assess for anticoagulant activity in patients on PRADAXA [*see Warnings and Precautions (5.2) and Clinical Pharmacology (12.2) ].*" ECF No. 54-3 at 5 (§ 2.2 (Dosing Adjustments)) (brackets and italics in original).

• "The aPTT test provides an approximation of PRADAXA's anticoagulant effect. The average time course for effects on aPTT, following approved dosing regimens in patients with various degrees of renal impairment is shown in Figure 2. The curves represent mean levels without confidence intervals; variations should be expected when measuring aPTT. While advice cannot be provided on the level of recovery of aPTT needed in any particular clinical setting, the curves can be used to estimate the time to get to a particular level of recovery, even when the time since the last dose of PRADAXA is not precisely known. In the RE-LY trial, the median (10th to 90th percentile) trough aPTT in patients receiving the 150 mg dose was 52 (40 to 76) seconds."*Id.* at 12 (§ 12.2 (Pharmacodynamics)).

• "There may be quantitative differences between various established methods for aPTT assessment." *Id.* at 13.

• "The degree of anticoagulant activity can also be assessed by the ecarin clotting time (ECT). This test is a more specific measure of the effect of dabigatran than activated partial thromboplastin time (aPTT). In the RE-LY trial, the median (10th to 90th percentile) trough ECT in patients receiving the 150 mg dose was 63 (44 to 103) seconds." *Id.* at 13 (§ 12.2 (Pharmacodynamics)).

The label also included a graph showing how patients with different levels of kidney function reacted to Pradaxa. ECF No. 54-3 at 13 (§ 12.2, Figure 2). The annotation to the graph

explained that it was based on data from the RE-LY study, which had used the Roche aPTT reagent.

The fact that all of this information was included in the label conclusively shows that it was submitted to the FDA. Additionally, prior to approval, BI proposed including a warning that "the aPTT test is widely available and provides an approximate indication of the anticoagulation intensity achieved with PRADAXA [and that an] aPTT greater than 80 sec is associated with a higher risk of bleeding." ECF No. 54-28 at 5 (§ 5.1).

BI has met its burden of proving that the more-detailed blood testing information identified by Plaintiffs is not "newly acquired information."

### d. Specific Covedilol Warning

Plaintiffs argue that BI should have used the CBE regulations to add a specific drug-drug interaction warning that covedilol can cause a 30-50% increase in Pradaxa plasma concentration. ECF No. 97 at 59. This issue was not clearly raised in the Plaintiffs' Response/Cross-Motion for Summary Judgment and will not be considered. See Hall, 2020 WL 1536435, at *29. The portion of the pleading that discusses "newly acquired information" does not mention covedilol. ECF No. 63 at 26-29. Plaintiffs' pleading mentions covedilol/Coreg four times, all in responding to BI's argument that the FDA had rejected BI's efforts to modify the label to include additional warnings in the past. ECF No. 63 at 23-24. The Motion does not argue that BI should have used the CBE process to add a specific reference to covedilol to the label. At most, it states, "There is no evidence that the FDA ever informed BI that Coreg or any other P-gp frequently prescribed to Pradaxa patients could not be added to the label." Id. at 24.[31] This passing reference is not sufficient to preserve the argument that BI should have added covedilol to Figure 3.1 of the label. By not clearly raising this issue in their written motion, Plaintiffs also failed to meet their burden of identifying the asserted "newly acquired information."

### 2. Futility

**\*39** The FDA would have been legally required to reject the CBE modifications asserted by Plaintiffs because BI did not possess "newly acquired information," which is a necessary predicate for a CBE change. I need not, and do not, reach

the question of whether the FDA would have rejected a label change even if BI had "newly acquired information."

### 3. Adequacy of the Label Warnings

Alternatively, BI moves for summary judgment on the grounds that the label's warnings are adequate as a matter of law.[32]

BI has met its initial burden of showing that there are no genuine issues of material fact related to the warnings. It is undisputed that Ms. Marquez was prescribed and took Pradaxa from March 2012, when she was 71 years old, until she experienced a gastrointestinal bleed in September 2015. It is also undisputed that, at the time of her bleed, she was taking carvedilol (a P-gp inhibitor) and had mild renal impairment. The content of the Pradaxa label is not disputed.

Given the absence of any genuine issue of material facts, Plaintiffs bears the burden of making a sufficient showing to establish that the label was inadequate to warn a medical professional, which is an essential element on which they will bear the burden of proof at trial. See Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693JB, 932 F. Supp. at 1446. Specifically, Plaintiffs "must produce evidence, going beyond the pleadings, and by [their] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in [their] favor." Rubenstein v. Fla. Bar, 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom) (citations omitted).

Plaintiffs rely on the testimony of Dr. Laura Plunkett, an expert pharmacologist and toxicologist. See ECF No. 63 at 41; see also ECF Nos. 63-31 (Plunkett expert report); 64-67 (Plunkett Roberto trial testimony excerpt). Dr. Plunkett opines, "[W]hen patients are taking the recommended dose of Pradaxa, that too much Pradaxa can accumulate in the blood and put those patients at increased risk of things such as bleeding." ECF No. 64-67 at 5. She further opines that too much Pradaxa in the blood is dangerous because it "can actually lead to life threatening and sometimes even fatal bleeding. In other words, bleeding can be uncontrolled. And so this is something that is a serious patient concern." Id. at 6. She states that to address this risk the Pradaxa label should instruct treating physicians to measure plasma concentration levels. Id. at 7. In essence, Dr. Plunkett concludes that the Pradaxa label provides inadequate

warnings to treating physicians because it does not mandate therapeutic monitoring.

**\*40**  Notably, Dr. Plunkett is not an M.D. She does not, and presumably cannot, opine on how a treating physician would interpret and respond to the Pradaxa label. She therefore does not provide the kind of evidence necessary to meet Plaintiffs' burden of proof on a motion for summary judgment.

Regardless, Plaintiffs and Dr. Plunkett would impose obligations on BI that Florida law does not require. Plaintiffs assert, "The issue is not whether BI warned that Pradaxa could cause bleeding. The issue is should BI have informed physicians how to dose Pradaxa so as to convey maximum stroke protection and minimize bleeding risk." ECF No. 53 at 38. Specifically, Plaintiffs allege, "BI had the obligation to not only [sic] the mere existence of a risk but to (a) warn of the risk magnitude (i.e., no stroke benefit at high Pradaxa Levels and unnecessary bleeding risk) and (b) instruct physicians how to safely prescribe Pradaxa (or refrain from prescribing it) to avoid the bleeding by identifying both the importance of monitoring and how to monitor Pradaxa Levels." *Id.* at 41.

A drug manufacturer is "only required to warn the prescribing physician of the possibility that the drug may cause *the injury alleged by the plaintiff.*" *Small,* 134 F. Supp. 3d at 1367 (emphasis added). It need not warn about the specific manner in which the injury may occur. *Pierre,* 2020 WL 124020 at \*12. Ms. Marquez's injury was a serious gastrointestinal bleed. Even viewed in the light most favorable to Plaintiffs, the Pradaxa label contains accurate, clear, and unambiguous warnings to the treating physician that Pradaxa can cause fatal gastrointestinal bleeding. It also contains accurate, clear, and unambiguous warnings that therapeutic monitoring may help guide treatment, and that patients taking P-gp inhibitors with renal impairment are at higher risk of serious bleeding. It also notes that there are "quantitative differences" among different aPTT tests and that the ECT test "is a more specific measure of the effect of dabigatran" than aPTT. These warnings on their face, even when viewed in the light most favorable to Plaintiffs, were sufficient to educate a reasonable treating physician that Pradaxa presented a risk of serious gastrointestinal bleeding, and to allow that physician to accurately weigh the risks and benefits of having a particular patient take Pradaxa. Plaintiffs have failed to meet their burden of showing that the warning label was inadequate. *Accord Nunez,* 2020 WL 2561364, at \*4 (warning label adequate as a matter of law because it clearly and unambiguously warned of injury alleged by the plaintiff).

4. *Loss of Consortium*

Because all other causes of action fail, Plaintiffs' loss of consortium claim must also fail. *Pierre, supra,* at \*13.

## VI. RECOMMENDATION

BI has met its burden of proving that a preponderance of the undisputed material facts, viewed in the light most favorable to Plaintiffs, show that BI lacked "newly acquired information" that would have allowed it to invoke the CBE regulations. For that reason, federal law made it impossible for BI to comply with any duty to warn that may have existed under state law. Plaintiffs' failure to warn claims are preempted. On this basis, BI's motion for summary judgment [ECF No. 53] should be granted and judgment should be entered for BI on all counts.

**\*41**  Plaintiffs have not met their burden of showing that the undisputed material facts, viewed in the light most favorable to Plaintiffs, show that the Pradaxa label was inadequate to warn a treating physician of the injuries that Ms. Marquez suffered. For this independent reason, BI's motion for summary judgment [ECF No. 53] should be granted and judgment should be entered for BI on all counts.

Plaintiffs' motion for summary judgment [ECF No. 63] should be denied.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Rodolfo A. Ruiz, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers this 7th day of October, 2020, at West Palm Beach in the Southern District of Florida.

**All Citations**

Slip Copy, 2020 WL 6110909

Footnotes

1   Citations in this Report and Recommendation to pages of a pleading or exhibit reference the page numbers assigned by the CM/ECF system, not the author's page numbers or other numbering (such as Bates numbers) embedded in the document.

2   Periodic monitoring throughout the course of treatment is called "routine monitoring."

3   Plaintiffs' response to BI's motion states, "Plaintiff does not intend to pursue the Design Defect Claim." ECF No. 63 at 38. It does not identify whether it is referring to its Third Cause of Action, its Fourth Cause of Action, or both. Regardless, BI's Motion for Summary Judgment argued, "To the extent Plaintiffs allege some defect in the design of Pradaxa (apart from a failure to warn), that claim is preempted by federal law because BI could not redesign Pradaxa without prior FDA approval." ECF No. 53 at 20. Plaintiffs did not respond to this argument. "Where a plaintiff fails to respond to an argument in a motion for summary judgment, he waives the argument." *Grant v. Maiami-Dade Cty.*, No. 13-22008-CIV, 2014 WL 7928394, at *9 (S.D. Fla. Dec. 11, 2014), *aff'd sub nom. Grant v. Miami-Dade Cty. Water & Sewer Dep't*, 636 F. App'x 462 (11th Cir. 2015) (J. Scola) (citing *Mitchell v. ConAgra Foods, Inc.*, 448 F. App'x 911, 914 (11th Cir. 2011) (further citing *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 (11th Cir. 2001) n. 1 (11th Cir.2001)). Therefore, I address only BI's alleged failure to provide adequate warnings.

4   BI's 20th, 21st, and 23rd affirmative defenses assert different theories of preemption. ECF No. 22 at 28-29. At oral argument, BI clarified that it was moving for summary judgment on both the 20th and 21st Affirmative Defenses, although BI acknowledged that the 20th Affirmative Defense likely incorporated the 21st. Plaintiffs cross-move for summary judgment on the same affirmative defenses. ECF No. 97 at 4-6.

5   In pertinent part, the CBE regulations state:
    (6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved NDA may commence distribution of the drug product involved upon receipt by the agency of a supplement or the change. These changes include, but are not limited to:
    ...
    (iii) Changes in the labeling to reflect newly acquired information ... to accomplish any of the following:
    (A) To add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter; [or]
    ...
    (C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;
    21 C.F.R. § 314.70(c)(6)(iii)(A).

6   The Supreme Court in *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009) succinctly summarized the CBE process:
    The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label. *See* 21 U.S.C. § 355; 21 C.F.R. § 314.105(b) (2008). Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application. There is, however, an FDA regulation that permits a manufacturer to make certain changes to its label before receiving the agency's approval. Among other things, this "changes being effected" (CBE) regulation provides that if a manufacturer is changing a label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval.
    *Id.*, at 568 (citing §§ 314.70(c)(6)(iii)(A), (C)).

7   This standard is based on the CBE regulation's definition of "clinically significant adverse reaction." At oral argument, BI agreed that this standard applies to evaluating whether a "clinically significant hazard" exists. ECF No. 97 at 35.

8   The burden of proof plays a critical role in our adversarial system because it often drives the result. "In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome .... There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account." *Speiser v. Randall*, 357 U.S. 513, 525,

78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958). The burden of proof "allocate[s] the risk of error between the litigants" and, in so doing, "indicate[s] the relative importance attached to the ultimate decision." *Addington v. Texas,* 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

*Raulerson v. Warden,* 928 F.3d 987, 1012–13 (11th Cir. 2019), *cert. denied,* 140 S. Ct. 2568, 206 L. Ed. 2d 498 (2020) (ellipses and bracket in original).

9    The *Roberto* court ultimately adopted this same approach:

> In the present context, a hybrid approach seems in order. On the one hand, it would be virtually impossible for the defendants to prove a negative and negate the existence of newly acquired information without knowing exactly what newly acquired information the plaintiff relies upon. Therefore, it is fair to expect the plaintiff to come forward with the newly acquired information in question.... *From there, the burden can rest on the defendants to prove that the information identified by the plaintiff is not newly acquired.*

> *Roberto,* at *11, n. 19 (emphasis added).

10    "Ecarin is a highly purified metalloprotease isolated from the venom of the saw-scaled viper." https://www.practical-haemostasis.com/Miscellaneous/ecarin_ct.html (last visited 10/7/20).

11    P-glycoprotein ("P-gp") is a protein found in the cell membrane of human tissue. It "transports medications (often after they are metabolized) out of a cell (efflux) so that they can be eliminated from the body." https://www.straighthealthcare.com/p-glycoprotein.html (last visited 10/7/20). As its name suggests, a P-gp inhibitor blocks the action of the protein and may impede the removal of a medication from the body (a so-called "drug-drug interaction"). *Id.* So, the P-gp inhibitor can cause the level of the other drug in the body (here, Pradaxa) to increase.

12    *See* ECF No. 64-45 at 37 ("So by exposure I mean the concentration of the drug and by response I mean the outcome. It could be either safety or effectiveness.").

13    BI asserts that the facts in PSOF ¶ 27 are immaterial and are not supported by the cited portions of the record. ECF No. 78 ¶ 27. I reject these arguments.

14    Dr. McGuire was a voting member of the Advisory Committee and an Associate Professor of Cardiology at the University of Texas Southwestern Medical Center. ECF No. 64-45 at 3.

15    Plaintiffs incorrectly argue (at ECF No. 63 at 8-9):

> FDA, however, acknowledged there would be "a very cogent argument to monitor [Pradaxa] if one were to know what is an appropriate cut off ..." [citing Ex 5793 at 615-66]. FDA's acknowledgment at the time of approval that it lacked information on the Pradaxa Level at which Pradaxa's bleed risk becomes unnecessary (i.e., the "cut point") and might require Pradaxa Level monitoring is at the heart of this case. In fact, BI identified post-approval "a conservatively assessed cut-off value" (cut-point)," [citing PSOF ¶ ¶ 14 and 60], added this to its European label, but never attempted to add it to the U.S. label.

The phrase "cogent argument" came from a single Advisory Committee member**.** Likewise, the reference to a "cut point" came from a single FDA employee. There is no other evidence suggesting that these positions were endorsed or adopted by the FDA in its official institutional capacity.

16    CHADS$_2$ is "Cardiac Failure, Hypertension, Age, Diabetes, Stroke" ECF 54-7 at 11. The CHADS$_2$ score is meant to reflect an AFib patient's risk of ischemic stroke. The patient gets 1 point for each of (1) congestive heart failure., hypertension, age > 65, and diabetes. If the patient is over age 75, they get an additional point. Finally, a patient with a prior history of stroke or transient ischemic attack gets 2 points. https://www.healio.com/cardiology/learn-the-heart/cardiology-review/topic-reviews/chads-2-vasc-score (last visited 10/7/20). The RE-LY study included people across the CHADS$_2$ spectrum. ECF No. 54-7 at 21. According to the approved Pradaxa label, the mean CHADS$_2$ score in the RE-LY study was 2.1. ECF 54-2 at 7.

17    BID means twice a day. https://www.rxlist.com/script/main/art.asp?articlekey=5155 (b.i.d.. stands for "bis in die" (which means, in Latin, twice a day)) (last visited 10/7/20).

18    Dr. Brueckmann's email signature identifies her as being part of "Clinical Development and Medical Affairs, TA Cardiology." ECF No. 64-3 at 3.

19    A copy of this draft was not included in the record.

20    Dr. Friedman's email signature identifies him as BI's "Therapeutic Area Head, Cardiovascular."

21    A copy of this draft was not included in the record.

22    The record does not reflect Dr. Heinrich-Nols' or Dr. Desch's positions at BI.

23    A copy of this draft was not included in the record.

24    The Pradaxa MDL was initiated in 2012 in the Southern District of Illinois. *See, e.g.,* ECF No. 70-1.

25   Pharmacokinetic and/or pharmacodynamic effects (abbreviated as "PK/PD") refer, respectively, to the level of medication in the patient's system and the anticoagulant effects of that medication. *See* ECF No. 54-53 at 4.

26   Therapeutic monitoring is different from routine monitoring – which is what is done with Warfarin – repeated, periodic blood monitoring for all patients. Plaintiffs do not assert that routine monitoring is required for Pradaxa. Rather, they argue that plasma concentration should be measured at an appropriate point in the treatment cycle (e.g., once steady state is achieved) and only needs to be assessed again if there is a material change in the clinical situation, such as deterioration in kidney function, or commencement of a P-gp inhibitor. ECF No. 97 at 52.

27   At different points in their pleadings, Plaintiffs state that above the cut-off point (1) Pradaxa provides "no" increase in stroke protection, ECF No. 63 at 7, (2) "no material benefit," *id.* at 28, and (3) "no statistically significant stroke reduction." *Id.* at 27 (citing ECF No. 64-54 at 92:5-93). At oral argument, they clarified that their position is that post-approval analyses showed there was no statistically significant stroke reduction above the cut-off point. ECF No. 97 at 27-28.

28   Plaintiff argues that BI "updated its European label based on its 2011 newly acquired information which it included in its COS because it believed it to be accurate information about Pradaxa reflecting 200 ng/mL as the point at which Pradaxa Levels become excessive. Its obligation to likewise update its U.S. Pradaxa label was not fulfilled." ECF No. 63 at 31 & n. 160. BI correctly responds that the original SmPC contained this information. Reply to PSOF ¶ 30, ECF No. 78 at 9-10; *compare ECF* 64-18 at 65 *with* ECF No. 79-11 at 42.

29   At least as they apply to the Reilly Paper, I do not find these holdings to be inconsistent with the holding in *Knight v. Boehringer Ingelheim Pharm., Inc.*, No. CV 3:15-6424, 2019 WL 2144812 (S.D. W. Va. May 15, 2019). In *Knight*, BI argued that the Reilly Paper was not "newly acquired information" because it was based on RE-LY data that had been submitted to the FDA before approval. The *Knight* court correctly noted that new analysis of previously-submitted data can be "newly acquired information." *Id.* at *4. The K*night* Court did not address the issue of whether the Reilly Paper demonstrated a new or greater risk than previously disclosed. *Id.* at *4-5.

30   Plaintiffs' pleadings make no mention of ecarin chromogenic or mass spectroscopy testing, nor do they discuss the need to warn about properly calibrating the ECT test. Therefore, the claim that the label should include warnings about these tests is not properly preserved and will be rejected. *See Hall v. Sargeant*, No. 18-80748-CIV, 2020 WL 1536435, at *29 (S.D. Fla. Mar. 30, 2020) (J. Altman) ("[A] party cannot rely on arguments it made for the first time at oral argument" on a summary judgment motion.) *citing In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).

31   This reference to Coreg is part of a discussion of the FDA's rejection of BI's proposal to add a hepatitis C drug to § 12.3 of the Pradaxa label. Plaintiffs quote the FDA saying, "[T]he Agency would like to have a finite number of drug interactions reported in the dabigatran label, **the ones that are expected to be used more frequently in the target patient population**." ECF No. 63 at 18 (emphasis in original). Plaintiffs then assert, "Coreg is a blood pressure medication and it is VERY frequently prescribed with Pradaxa." *Id.* (citing PSOF ¶ 19). There is no citation to the factual record to support the assertion that Coreg is frequently prescribed with Pradaxa.

32   In their Response to Defendant's Motion for Summary Judgment, Plaintiffs argue, "Finally, ruling on the issue of learned intermediary is premature at this stage as substantial discovery has yet to occurred [sic] in this case – depositions of experts and fact witnesses have yet to occur." ECF No. 63 at 41. This argument is rejected because Plaintiffs did not file an affidavit or declaration under Federal Rule of Civil Procedure 56(d) or otherwise move for additional time to respond to Defendant's summary judgment motion. Moreover, by fully briefing the motion and participating in oral argument, Plaintiffs have waived this objection. *Burns v. Town of Palm Beach*, 343 F. Supp. 3d 1258, 1261–62 (S.D. Fla. 2018) (J. Bloom).

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.