1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3      ****************************************************************

4      IN RE:  TAXOTERE
       (DOCETAXEL) PRODUCTS
5      LIABILITY LITIGATION
                                 CIVIL ACTION NO. 16-MD-2740 "H"
6                                NEW ORLEANS, LOUISIANA
                                 TUESDAY, NOVEMBER 17, 2020, 9:30 A.M.
7

       THIS DOCUMENT RELATES TO:
8      ALL CASES

9      ****************************************************************

10
                  TRANSCRIPT OF TELEVIDEOCONFERENCE VIA ZOOM AND
11                    IN-PERSON ORAL ARGUMENT PROCEEDINGS
                  HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
12                       UNITED STATES DISTRICT JUDGE

13
       APPEARANCES:
14

15     FOR THE PLAINTIFFS:       GAINSBURGH BENJAMIN DAVID
       (IN PERSON)               MEUNIER & WARSHAUER
16                               BY:  M. PALMER LAMBERT, ESQ.
                                 1100 POYDRAS STREET, SUITE 2800
17                               NEW ORLEANS, LOUISIANA 70163

18

19     (VIA ZOOM)                GAINSBURGH BENJAMIN DAVID
                                 MEUNIER & WARSHAUER
20                               BY:  WALTER C. MORRISON, IV, ESQ.
                                 240 TRACE COLONY PARK DRIVE
21                               SUITE 100
                                 RIDGELAND, MISSISSIPPI 39157
22

23
       (IN PERSON)               PENDLEY BAUDIN & COFFIN
24                               BY:  CHRISTOPHER L. COFFIN, ESQ.
                                 1515 POYDRAS STREET, SUITE 1400
25                               NEW ORLEANS, LOUISIANA 70112

                          *OFFICIAL TRANSCRIPT*

```
 1    APPEARANCES CONTINUED:

 2

 3    (VIA ZOOM)                FEARS NACHAWTI
                                BY:  MISTY A. FARRIS, ESQ.
 4                              5473 BLAIR ROAD
                                DALLAS, TEXAS  75231
 5

 6
      FOR THE DEFENDANTS:       IRWIN FRITCHIE URQUHART & MOORE
 7    (IN PERSON)               BY:  DOUGLAS J. MOORE, ESQ.
                                400 POYDRAS STREET, SUITE 2700
 8                              NEW ORLEANS, LOUISIANA  70130

 9

10    (IN PERSON)               SHOOK, HARDY & BACON
                                BY:  HARLEY V. RATLIFF, ESQ.
11                              2555 GRAND BOULEVARD
                                KANSAS CITY, MISSOURI 64108
12

13
      (VIA ZOOM)                CHAFFE MCCALL
14                              BY:  JOHN F. OLINDE, ESQ.
                                2300 ENERGY CENTRE
15                              1100 POYDRAS STREET
                                NEW ORLEANS, LOUISIANA 70163
16

17

18    OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
                                CERTIFIED REALTIME REPORTER
19                              REGISTERED MERIT REPORTER
                                500 POYDRAS STREET, ROOM B-275
20                              NEW ORLEANS, LOUISIANA 70130
                                (504) 589-7779
21                              Cathy_Pepper@laed.uscourts.gov

22
      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
23    PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

24

25


                        *OFFICIAL TRANSCRIPT*
```

1                                **I N D E X**

2

3      ITEMS                                                    PAGE

4

5      BRENDA MIXON, CASE #18-6581, DOCKET NUMBER 10978,

6      MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF

7      BRENDA MIXON AND AN ENTRY ORDER TO SHOW CAUSE........   4

8      MR. RATLIFF.........................................    5

9      MS. FARRIS..........................................   14

10     MR. RATLIFF.........................................   24

11     MR. LAMBERT.........................................   26

12     JUANITA GREER, CASE #18-11728, DOCKET NUMBER 11010,

13     MOTION FOR JUDGMENT ON THE PLEADINGS BASED ON THE

14     STATUTE OF LIMITATIONS..............................   26

15     MR. MOORE...........................................   26

16     MR. MORRISON........................................   33

17     MR. MOORE...........................................   42

18

19

20

21

22

23

24

25

                            ***OFFICIAL TRANSCRIPT***

1                    **P-R-O-C-E-E-D-I-N-G-S**

2               TUESDAY, NOVEMBER 17, 2020

3             M O R N I N G   S E S S I O N

4               (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  All rise.

8          THE COURT:  Good morning.

9          VOICES:  Good morning, Your Honor.

10         THE COURT:  Please be seated.  I was just trying to see

11    where we are.  Okay.  Are we ready to proceed?

12              We have two arguments.  Two motions for the Court

13    to consider.  The first is a motion for summary judgment on the

14    claims of Brenda Mixon and an entry order to show cause.

15              I have the parties.  Please make their

16    appearances for the record.

17         MR. COFFIN:  Good morning, Your Honor.  Chris Coffin on

18    behalf of the PSC plaintiffs.

19         MR. LAMBERT:  Palmer Lambert, coliaison counsel for

20    plaintiffs, and arguing on this motion will be Misty Farris

21    from the Fears Nachawati Law Firm, who, I believe, is on the

22    Zoom.

23         THE COURT:  She is?

24              Mr. Moore?  Mr. Ratliff?  Somebody?

25         MR. RATLIFF:  Good morning, Your Honor.  Harley Ratliff

*OFFICIAL TRANSCRIPT*

1    on behalf of Sanofi.

2              THE COURT:  Okay.

3              MR. MOORE:  Good morning, Judge.  Douglas Moore on

4    behalf of Sanofi.  Mr. Ratliff will be taking up the Mixon

5    motion.  I'll be addressing the Greer motion, which is the

6    second one.

7              THE COURT:  Okay.  Thank you.

8                   All right.  Are we ready to proceed, Mr. Ratliff?

9              MS. FARRIS:  Misty Farris on behalf of the plaintiff,

10   Brenda Mixon.

11             THE COURT:  Thank you.

12                  Okay.  Mr. Ratliff, I think we have instructions

13   there that I think you have been --

14             MR. RATLIFF:  Apprised of.

15             THE COURT:  Yes.

16             MR. RATLIFF:  We did a little housekeeping.

17             THE COURT:  Very good.  You can take that off.

18             MR. RATLIFF:  All right.  Good morning, Your Honor.

19                  We are here today, Sanofi is asking for the

20   routine, straightforward application of the Michigan Product

21   Liability Act to the claims of Brenda Mixon.  She is a Michigan

22   resident, she was prescribed Taxotere in Michigan, and she took

23   Taxotere in Michigan.

24                  Courts around the country, Michigan state courts,

25   Michigan federal courts, federal district courts, federal

                        *OFFICIAL TRANSCRIPT*

1    circuit courts, mass tort courts, and MDL courts have routinely

2    taken up the Michigan Product Liability Act, evaluated it in

3    the context of pharmaceutical prescription, pharmaceutical

4    cases, and have universally found that when that act applies

5    the claims of those plaintiffs must be dismissed.  We think the

6    same relief is warranted here.

7            Now, Your Honor, here -- Your Honor, the

8    Michigan Product Liability Act offers broad immunity to

9    pharmaceutical companies, and two parameters must be met:  One,

10   was the drug approved for safety and efficacy by the FDA?

11        THE COURT:  I've got all of that.  Why don't we just

12   get to the exception that's at issue in this argument, which is

13   whether or not there was -- and I don't want to say fraud under

14   the manufacturing -- intentionally withholds from them and

15   misrepresents information to the FDA and the drug would not

16   have been approved.

17        MR. RATLIFF:  Sure, Your Honor.

18        THE COURT:  Let's just cut to the chase.

19        MR. RATLIFF:  Okay.  So, there are -- essentially,

20   there are two exceptions at play.  They are both fraud and the

21   FDA exceptions.  One, did Sanofi bribe the FDA to obtain or

22   secure approval.  That's not alleged.  There is no evidence of

23   that.

24            The exception I think Your Honor is interested is

25   did the defendant intentionally, it's important, intentionally

**OFFICIAL TRANSCRIPT**

1  withhold or misinform the FDA in order to secure or maintain

2  approval and would that have caused the FDA to revoke or the

3  withdraw the approval?

4          Your Honor, under *Buckman*, that is considered a

5  fraud on the FDA claim and it's considered preempted.  *Garcia*,

6  under the Sixth Circuit, took up that exception as well and

7  found that that is a classic fraud on the FDA ruling and,

8  therefore, that exception is unconstitutional and does not

9  apply.

10          So, Your Honor --

11          THE COURT:  How is this different, though, from the

12  Second Circuit opinion in *Desiano* -- is it *Desiano*?

13          MR. RATLIFF:  Sure.

14          THE COURT:  That case.

15          MR. RATLIFF:  Correct.  So, the Sixth Circuit found --

16          THE COURT:  Mr. Lambert?

17          MR. LAMBERT:  I'm sorry, Your Honor.  I didn't mean to

18  interrupt, but I heard from (inaudible) that they can barely

19  hear the audio.

20          THE COURT:  All right.  Let's try again.

21          MR. RATLIFF:  Yes, Your Honor.

22          To address your question about the

23  Second Circuit's ruling in *Desiano*, essentially you have the

24  Sixth Circuit in *Garcia* that says that exception is preempted

25  under *Buckman*.  You have the Fifth Circuit, which has also

*OFFICIAL TRANSCRIPT*

1    taken this up in the context of a similar provision in Texas,

2    and has found that that exception is also preempted.

3              The Second Circuit, when they took this up -- and

4    this is what the plaintiffs urge you to adopt is the

5    Second Circuit's ruling -- found that it was not preempted

6    because it made it distinguish between a cause of action and an

7    exception or affirmative defense, an exception under the

8    statute.

9              When the Fifth Circuit took this up in *Lofton,*

10   they looked at this issue, they looked at what the ruling was

11   in *Garcia* and the analysis in *Garcia*, and they looked at the

12   ruling in *Desiano*, and ultimately what the Fifth Circuit

13   determined was that ruling in *Garcia* was the more faithful

14   application of the Michigan law and the Michigan statute as it

15   related to that exception.

16             Now, I think that's critical, Your Honor, because

17   essentially what the plaintiffs are asking you to do is to

18   ignore *Garcia* under the Sixth Circuit, which encompasses

19   Michigan, and *Lofton* under the Fifth Circuit, which, obviously,

20   encompasses this court, Your Honor.

21             I would also say to this, Your Honor, on that

22   issue is -- and this is something that the Court in

23   *In re Risperdal* brought up in this context, and I think it's

24   applicable here -- is whether you say *Desiano* applies or

25   whether you say *Garcia* applies or whether you say the

**OFFICIAL TRANSCRIPT**

1    Fifth Circuit's ruling in *Lofton* applies, in some respects it's

2    immaterial because at the end of the day the plaintiffs have to

3    have affirmative evidence that there was an intentional

4    withholding by Sanofi of material information or an intentional

5    misrepresentation to the FDA, one prong -- that evidence is not

6    here, that allegations do not mean evidence -- but they have to

7    meet the second part of that, Your Honor, which is, they also

8    have to have evidence that based on that alleged material

9    misrepresentation, the FDA would have, therefore, not approved

10   Taxotere back in 1996 or withdrawn approval of Taxotere anytime

11   between 1996 and as we stand here today.  As Your Honor is

12   aware, Taxotere has never been -- the approval for Taxotere has

13   never been removed.  It's still approved today, still being

14   used today.

15          So, on that, Your Honor, I would say, one, the

16   Court should follow the Fifth Circuit, it should follow the

17   Sixth Circuit and the numerous other federal district courts

18   that have taken this up as opposed to following what the

19   plaintiffs implore on the Second Circuit.

20          Even if Your Honor is not inclined to -- not very

21   inclined to follow the Second Circuit, I would say under the

22   facts of this case and what has been alleged here and the

23   evidence that has been put forth here, it's immaterial.  The

24   result remains the same, which is dismissal of Ms. Mixon's

25   claims.

**OFFICIAL TRANSCRIPT**

1    This, under the MPLA, is considered an absolute

2 defense; so, it's a disposal of not just the failure-to-warn

3 claim, but it's a dismissal of all of the claims -- negligent

4 misrepresentation, fraud, et cetera; so, it would be a complete

5 dismissal of Ms. Mixon's claims.

6    Your Honor, the other thing, so on one, they say

7 follow the Second Circuit.  I think for the reasons I've

8 articulated, I think that's incorrect, in the very least

9 immaterial.

10    Barring that, Your Honor, plaintiffs pivot to a

11 number of different arguments.  One, they say the

12 fraud-on-the-FDA exception is not severable; so, you cannot

13 find it unconstitutional as *Garcia* did and sever it from the

14 Michigan Product Liability Act.

15    Two points on that, Your Honor:  One, the courts

16 that have addressed that issue, the issue of severability, so

17 that would be *Garcia*, that would be *Marsh* in the Sixth Circuit,

18 that would be *Kobar* in the District of Arizona, which took up the

19 severability issue in a similar provision in Arizona, have all

20 found that those provisions are severable.

21    What plaintiffs don't say, Your Honor, in their

22 brief but what they are asking for -- and it's an extraordinary

23 ask -- is they are asking for this court, in finding that that

24 provision is not severable, is for you, sitting here, to

25 invalidate or void a Michigan statute that has been on the

*OFFICIAL TRANSCRIPT*

1  books since 1995 and that has been upheld as constitutional by

2  the Michigan Supreme Court in *Taylor v. Smithkline Beecham*.

3  That's the ask and that would be the result, Your Honor, of

4  finding that this provision is not severable or that this

5  provision, yeah, this provision is not severable.

6          When *Garcia* looked at this, they took up this

7  issue and they asked a salient question on severability.  One,

8  they did the analysis of just general Michigan severability

9  law.  Two, they said, here is the question that we have to ask:

10  Would the Michigan legislature prefer immunity for

11  pharmaceutical manufacturers but without this provision or

12  would they prefer no immunity at all?

13          What *Garcia* reached was it was clearly the former

14  because in adopting this legislation, in adopting the MPLA,

15  Your Honor, the Michigan legislature had a rational reason for

16  doing it.  It may not be a reason you agree with, it may not be

17  a reason plaintiff's counsel agree with, but it is a rational

18  reason.

19          Their thought was that the threat of product

20  liability lawsuits, some of which may not be scientifically

21  grounded, could, one, rise drug prices for Michigan residents

22  and, two, prevent Michigan residents from having access to

23  potentially valuable or lifesaving medications.

24          It was under that rationale, Your Honor, that the

25  Court in *Garcia* found that the unconstitutional fraud on the

*OFFICIAL TRANSCRIPT*

FDA exception could be severed while maintaining the act as a whole; so, I think that argument, Your Honor, is without merit.

Two, Your Honor, plaintiffs say that this denies them access to the Court.  That issue has also been taken up routinely and rejected.  As the Court in *Cotton* said, "Immunity" -- "An immunity provision does not deny a plaintiff an access to court."

As the *Garcia* court said that what plaintiffs are really complaining about, Your Honor, what the real complaint is the immunity statute is too broad and the threshold for plaintiffs to prove too high.  That, however, doesn't get you over the threshold of proving up a denial of access to courts.

The other part of this is the equal protection aspect.  There, Your Honor, they say, well, on the equal protection point there, it gets back to the rational basis test.  Did the Michigan legislature have a rational basis in enacting this law?

Your Honor, as I just said, they clearly did and it's something the courts have found in examining this issue, which is, this wasn't just something that they put on the books.  This is something that they had a goal or an intention that was meant to protect Michigan residents and ensure they had access to valuable prescription drugs at reasonable prices. On that basis alone, Your Honor, the plaintiff's equal protection argument, too, fails.

*OFFICIAL TRANSCRIPT*

1         Finally, Your Honor, plaintiffs have put forward

2    that if you find, as the Fifth Circuit and the Sixth Circuit

3    did, that the exception is preempted, if you deny the

4    severability argument, if you deny the access to the Court

5    argument, which has been denied repeatedly, that you should

6    then certify this issue to the Michigan Supreme Court.

7         Your Honor, I think you're probably aware that

8    the issue of certifying a question of law to a state court

9    under the Fifth Circuit is something that is very much

10   cautioned against.  It should be used in only exceptional

11   circumstances.  It is something that requires the Court to find

12   a justification for sending this issue, which has been

13   addressed by Michigan courts repeatedly, Michigan courts of

14   appeals, obviously the Sixth Circuit as well, to the Michigan

15   Supreme Court.

16        On that, Your Honor, I would say, one, there is

17   no genuine dispute or unsettled matter of state law here.  It's

18   very clear.  You can look at all of the cases that we cite that

19   have addressed this issue.

20        Two, the Fifth Circuit has said, you do have to

21   look at the plaintiff's choice of forum.  It's not totally

22   dispositive, but when you choose to file in federal court,

23   maybe you have your reasons for filing in federal court versus

24   state court, the choice of a federal forum cautions against a

25   certification to a state court.

*OFFICIAL TRANSCRIPT*

1          Finally, Your Honor, the plaintiffs have to come

2     forward with a compelling reason, a compelling reason for you,

3     sitting here in the Eastern District, to certify these two

4     questions to the Michigan Supreme Court, a court that has

5     already deemed this act as constitutional and courts of appeal

6     in the state of Michigan that have adopted, even though they do

7     not have to, the rulings in *Garcia*.

8          For that reason, Your Honor, I would say that we

9     have met the prongs that give Sanofi immunity in this case,

10    plaintiff have not met those exceptions, their other arguments

11    fail, and on that, Ms. Mixon's claims, the entirety of her

12    lawsuit should be dismissed with prejudice.

13          Thank you, Your Honor.

14          THE COURT:  Okay.  Ms. Farris.

15          MS. FARRIS:  I was trying to unmute myself.

16          May it please the Court.  Good morning,

17    Your Honor.  I'm Misty Farris on behalf of the plaintiff,

18    Brenda Mixon.  I'll start by acknowledging that you find

19    *Garcia*, the plaintiff is in trouble.  In *Garcia* --

20          Can you hear me, Your Honor?

21          THE COURT:  I can.  I'm just having to move over and

22    closer to this.  Okay.

23          MS. FARRIS:  All right.  In *Garcia*, the Court did

24    consider many of the arguments that plaintiff is making here,

25    and -- except for the equal protection claim, which it didn't

**OFFICIAL TRANSCRIPT**

1    consider, and *Garcia* did rule against a number of these

2    arguments.  However, we aren't asking for a change in the law

3    as Sanofi suggests.  We're asking for a different

4    interpretation of the law, and the Sixth Circuit is not the

5    last word on the interpretation of Michigan law.

6              THE COURT:  Ms. Farris, let me ask you this question:

7    Is there any other Court, besides the Second Circuit, that has

8    ruled in favor of the plaintiff's argument?

9              MS. FARRIS:  When -- preemption to *Buckman*?

10             THE COURT:  Yes, ma'am.

11             MS. FARRIS:  Well, the Sixth Circuit and the

12   Second Circuit are the two that have dealt with the issue

13   directly.  The *Lofton* case in the Fifth Circuit did not deal

14   directly with the Michigan statute; although, there is a

15   significant amount of dicta about it, so there aren't -- there

16   aren't other cases that have dealt with this issue.

17             THE COURT:  Has any district court followed your

18   requested interpretation?

19             MS. FARRIS:  District courts that follow the

20   Second Circuit.

21             THE COURT:  Okay.

22             MS. FARRIS:  I mean, district courts follow their

23   circuit, but that has been the extent of it.  Most of the

24   courts that apply the -- most of the district courts that would

25   apply the Michigan PLA are in the Sixth Circuit; so, they

**OFFICIAL TRANSCRIPT**

1   generally will follow that, yes.

2           So, as we said, there are dicta from the

3   Fifth Circuit.  I understand that that would be persuasive to

4   the Court, but it is not binding at this point.

5           Would the Court like to discuss the

6   Second Circuit's opinion further?

7       THE COURT:  Sure.  I mean, I will have some questions

8   for you, but I want you to go ahead, begin with your argument,

9   and I may stop you and ask you a question.  Preliminarily, I

10  was wondering if there were any other courts beyond the

11  Second Circuit that have dealt with this issue that have

12  applied this same logic that the Second -- you know, I need to

13  get the case in front of me -- *Desiano* applies?

14          I understand those are in the Second Circuit, but

15  are there any other district court opinions outside of the

16  Sixth or Second that have followed the logic of the

17  Second Circuit?

18      MS. FARRIS:  Not that I'm aware of.  As far as I'm

19  aware of, *Garcia* and *Desiano* are the two views of that -- of

20  the issue.

21      THE COURT:  Okay.

22      MS. FARRIS:  The Second Circuit's position was that

23  this is, as opposing counsel pointed out, that fraud on the FDA

24  was not an element of the claim, that a state tort action was a

25  position that the states are normally regulating, especially

*OFFICIAL TRANSCRIPT*

1  health and safety, so that this was not an area that was new or

2  that the state was trying to impose itself into an area that

3  the federal agency was responsible for regulating.

4          But if the Court follows the dicta from *Lofton* or

5  follows *Garcia* and finds that *Buckman* does preempt the

6  exception, the next question is whether the exemption is

7  severable, and that's the point I would like to focus on the

8  most.

9          Michigan courts have never considered this issue.

10  They never adopted *Garcia* for this point or even cited this

11  section of *Garcia*.  While Sanofi argues that every court should

12  consider that it unanimously found that the exception is

13  severable, in fact, the only courts to have done so are the

14  Sixth Circuit in *Garcia* and one district court relying on

15  *Garcia*.  Plaintiff submits that *Garcia* was decided incorrectly,

16  at least on this point.

17          Now, Sanofi is arguing that the legislature's

18  goal was to provide immunity to drug manufacturers, and so,

19  even if Sub-subsection (a) is preempted, the legislature would

20  still want to provide drug manufacturers with immunity unless

21  the FDA itself found fraud.  The goal of the legislature was to

22  provide immunity.

23          Well, as we pointed out in our response, that's

24  not what the FDA has been doing.  They are not in the habit of

25  making findings that there has been fraud on the FDA.  We

*OFFICIAL TRANSCRIPT*

provided a quote that the FDA has not been involved in doing that.  Even if it were, the exception results under the capture of *wrongful conduct of which the FDA is unaware*.

Second, the legislature could have chosen blanket immunity for drug manufacturers and it didn't.  It decided that drug manufacturers should receive immunity only if they acted sufficiently reasonably.

As the Court said, in *Taylor*, "The statute represents a legislative determination as a matter of law of when a manufacturer or seller of a prescription drug has acted sufficiently reasonably to further the purpose of defining the limits of a cognizable products liability claim under Michigan law."

So, if the lengths of a drug manufacturer's immunity extends to all cases where the FDA has not actually found fraud, then we abandon the drug manufacturers' purpose of holding drug manufacturers liable when they don't act sufficiently reasonably.

If the withholding information exception in Sub-subsection (a) is preempted and the defendant cannot be held liable for its own wrongdoing, is misrepresenting to or concealing information from the FDA, then the balance drawn by the legislature in Subsection (5) of MPLA Section 600.2946 is undermined.  Drug manufacturers could do it with no consequences, the wrongdoing that the legislature explicitly

1    preserved liability for.

2            THE COURT:  What do I do with the direct language from

3    the statute that says, "and the drug would not have been

4    approved," when the FDA did review this in 2015, agreed with

5    language that was provided by the manufacturer?  What do I do

6    with this?

7                Because the question, it appears to me that the

8    FDA never considered removing the drug from the product.  Are

9    you just saying that they would not have approved the label?

10   Because the clear language of the statute says, "And the drug

11   would not have been approved."  Tell me what you mean.

12           MS. FARRIS:  Yes.  The statute refers to the labeling

13   section so that it would not have been approved as labeled is

14   included in the exception there.

15               So, when the FDA received all of the information,

16   it required the label, and Taxotere can no longer be sold

17   without the required label.  That is all that is required in

18   the exception.

19               So, it doesn't have to have been removed from the

20   market entirely.  It means that if it could not have been sold

21   as it was sold with the label it was sold with, that is enough

22   of an FDA action that would have met the exception.  Does that

23   make sense?

24           THE COURT:  Uh-huh (affirmative response).

25           MS. FARRIS:  Okay.

                        *OFFICIAL TRANSCRIPT*

1    THE COURT:  I guess I understand what you're saying,

2    but we know that the initial label was approved in 1996, and it

3    was changed in 2004 when the use was expanded to cover breast

4    cancer, and then it was ultimately changed in terms of warnings

5    in 2015; so, there is a question as to what information was

6    available between with 2004 and 2008.  I guess I'm just going

7    over this in my head as to is it a failure to request a change

8    as being an effective label change?

9    MS. FARRIS:  Well, what we're saying is that Sanofi

10   knew that significant numbers of women were experiencing

11   permanent hair loss and this wasn't reported.  They didn't

12   request this label change.  If the FDA had known what Sanofi

13   knew, they would have required that the label be changed before

14   the drug could continue to be sold, but that didn't happen

15   because the FDA didn't know what Sanofi knew.

16   THE COURT:  Okay.

17   MS. FARRIS:  Moreover, *Garcia's* dichotomy between the

18   heightened immunity and unlimited liability is inaccurate and

19   misleading.  Even if Subsection (5) is preempted, drug

20   manufacturers would be treated like other product

21   manufacturers, and product manufacturers are protected in

22   Michigan unless plaintiffs makes specific showings:

23        One, that the product was not reasonably safe

24   and, two, that there was a practical and feasible alternative

25   that would have prevented the harm without impairing the

**OFFICIAL TRANSCRIPT**

1    usefulness and desirability of the product and without there

2    being an equal or greater risk of harm.

3            A product manufacturer can also be held liable if

4    they had actual knowledge that the product was defective, that

5    there was a substantial likelihood that it would cause the

6    injury suffered by the plaintiff, but the defendant willfully

7    disregarded that knowledge.  So, it's no free-for-all liability

8    if the section is preempted.

9            Finally, Sanofi suggests that severing the

10   exemption leads to responsibility on the FDA as *Buckman*

11   directs.  *Buckman* addresses preemption as the exception.  It

12   has nothing to do with severability of the exception or the

13   proper shape of the state tort action outside of the limited

14   question of the certain type of preemption.

15           Again, the legislature intended for state courts

16   to have this role, not the FDA, and the legislature intended to

17   capture conduct that the FDA knew nothing about.  Sanofi even

18   suggested that *Taylor* direct, that the determinations direct

19   the FDA.

20           But *Taylor* also has nothing to do with

21   severability of the exception or with the exception at all.  It

22   was a case about whether there was a violation of the Michigan

23   Constitution's nondelegation clause to look at the FDA actions

24   as a standard in the tort action at all, not whether the FDA

25   should provide the only standard in such an action.

*OFFICIAL TRANSCRIPT*

1          So, the Michigan legislature never intended for

2     drug manufacturers to be able to hide and misrepresent defects

3     in their products from the FDA but maintain their immunity.

4     They were balancing concern from protecting the drug industry

5     with concern for policing the drug industry and protecting

6     injured Michigan citizens.

7          The subsection is incomplete and inconsistent

8     with the intent of the legislature without the withholding

9     information section, and the Court should find it's not

10    severable and that all of Subsection (5) is preempted.

11         We would also say that if the exception is

12    preempted and is found severable, then the plaintiff contends

13    that it constitutes a violation of Michigan's Equal Protection

14    Clause because there is no rational basis to bar Ms. Mixon from

15    recovery for her injuries when Sanofi had actual knowledge of

16    the defective nature of its product and the substantial

17    likelihood it would cause harm, which it did cause harm to

18    Ms. Mixon, but Sanofi acted with reckless disregard of its

19    knowledge.

20         Any other person hurt by its products under these

21    circumstances would be permitted to recover under MPLA

22    Section 600.2949a, but because Ms. Mixon was hurt by a drug

23    rather than another product, she cannot.  There is no rational

24    basis for this distinction.

25         Claims have included a long list of cases that

*OFFICIAL TRANSCRIPT*

1    have found equal protection violation in similar situations.

2    For example, in *Jeanne v. Hawkes Hosp. Of Mt. Carmel,* the Court

3    held that a statute protecting medical malpractice defendants

4    violated the Ohio Equal Protection Policy despite the state's

5    interest in reducing the cost of the defendant's medical

6    claims.

7            Indeed, the Michigan legislature didn't even

8    intend to draw such a stark distinction between drug

9    manufacturers and other product manufacturers.  Drug

10   manufacturers who had actual knowledge of defects in their

11   products and failed to inform the FDA when it would have made a

12   difference to the FDA were supposed to be subject to liability,

13   but if the exception was preempted and found severable, the

14   statute then draws an irrational distinction.

15           So, plaintiff asks that the Court rules in her

16   favor.  However, if the Court finds that a decision in her

17   favor is not clear, she would ask that the Court certify to the

18   Michigan Supreme Court the issues raised in this case, whether

19   the exception is found severable, and whether the

20   Subsection (5) violates Michigan's Equal Protection Clause.

21           The U. S. Supreme Court has encouraged

22   certification to save time, energy, and resources.  While

23   Sanofi argues that these are not unsettled issues of state law,

24   the question is whether these issues have been resolved by the

25   Michigan Supreme Court in their precedent, but they have been

**OFFICIAL TRANSCRIPT**

1   considered by no Michigan appellant court.

2           Unlike the Jefferson case cited by Sanofi, this

3   Court has no binding precedent on this issue.  There is no

4   state precedent on this issue, and there is no straight

5   forwarded application to be made on the severability statutes.

6   It's a question of state law to weigh the legislature's intent

7   and its impact on the statute.

8           As the U.S. Supreme Court said in *Arizonans*,

9   "Speculation by a federal court about the meaning or, in this

10  case, the validity of a state statute in the absence of prior

11  state court adjudication is particularly gratuitous when the

12  state courts stand willing to address questions of state law on

13  certification from federal court."  It's up to the Michigan

14  Supreme Court to have the final word on this issue.

15          Thank you, Your Honor.

16      THE COURT:  Thank you.

17      MR. RATLIFF:  Your Honor, I'll make this very quick.

18          I want to address three points:  One, you asked

19  whether there were any other district courts that have found

20  that what plaintiffs are suggesting other than *Desiano*.  I

21  looked through their briefs.  They cited none.  We're aware of

22  none.

23          By contrast, the Pennsylvania state court, which

24  is not in the Sixth Circuit, has adopted this approach.  The

25  Southern District of Illinois in *In re Depakote*, which is not

**OFFICIAL TRANSCRIPT**

1    in the Sixth Circuit, has adopted this approach as advocated by

2    Sanofi.  The District of Minnesota in *In re Baycol* has adopted

3    this approach, also not in the Sixth Circuit.

4              So, when you stack up which -- which federal

5    district courts have followed Sanofi and *Garcia* and *Lofton*,

6    there is a list of them.  When we you look at what's followed

7    *Desiano*, you have *Desiano* and it stands alone there.

8              Two, Your Honor, I think you made a good point,

9    as it relates to the express language of the statute, which

10   says, "And the drug administration would have withdrawn

11   approval for the drug if the information were accurately

12   submitted."

13             So, I appreciate that opposing counsel wants to

14   add a gloss on there that it is about a change in the label,

15   but that's not what the language of the statute itself says.

16             Finally, Your Honor, what I think is worth

17   looking at is, or at least considering, is the relief that the

18   plaintiffs are asking for in the Mixon case is relief that has

19   never been granted by a single court.

20             So, in the 20 years since this statute has been

21   passed, the Michigan Supreme Court has not invalidated it, the

22   Michigan legislature has not changed it, and Michigan courts of

23   appeals, which we have cited in our case, have adopted *Garcia*

24   as the approach that should be taken to the MPLA.  I think that

25   can't go without notice, Your Honor.

**OFFICIAL TRANSCRIPT**

1          On that, again, we renew our request that

2     Ms. Mixon's claims be dismissed with prejudice.

3               Thank you.

4          MR. LAMBERT:  Your Honor, the second part of the

5     defendant's argument in Mixon was for entry of the show cause

6     process.

7          THE COURT:  Yes.

8          MR. LAMBERT:  I would just add that the PSC stands by

9     what was in the pleadings.  We would like to talk to the Court

10    and defense counsel about that process, if the Court

11    requires (muffled audio).

12         THE COURT:  Thank you.

13              Okay.  The next motion is Docket Number 11010,

14    the motion for judgment on the pleadings based on the statute

15    of limitations.

16         MR. MOORE:  Good morning, Your Honor.  Douglas Moore on

17    behalf of Sanofi.

18              It has been eight months and six days since I

19    stood at this lectern, and I would be remiss to say if I didn't

20    say that it feels nice to be in a real courthouse making a real

21    argument on a motion.  We certainly appreciate the Court's

22    indulgence to allow us to come down here and do it safely.

23              (WHEREUPON, at this point in the proceedings, there was

24    an off-the-record discussion.)

25         MR. MOORE:  So, I'm going to spend a couple of minutes

**OFFICIAL TRANSCRIPT**

1    talking to the Court about the Mississippi statute of

2    limitations.  We have filed a motion to dismiss the claims of

3    Juanita Greer, who is one of the Mississippi bellwether

4    plaintiffs.  We have paused discovery in that case once we

5    filed this motion, and we filed as a Rule 12(c) motion because

6    we believe that on the face of the complaint that the case is

7    time barred and that there are no exceptions under Mississippi

8    law that would apply to save it.

9              So, here is the timeline:  Ms. Greer underwent

10   chemotherapy in September of 2009.  She completed at some time

11   in October of 2009, which means that she developed persisting

12   alopecia associated with her use of chemotherapy in April of

13   2010.  That is the definition in the master complaint from

14   their experts based on the scientific literature, and it is the

15   onset of the injury that has been established by this court

16   numerous times.

17             So, in Mississippi there is a three-year statute

18   of limitations which would require this case, for it to be

19   timely on its face, to have been filed prior to April of 2013.

20   It was not filed in 2013 or '14 or '15 or '16 or '17.  It was

21   filed in November of 2018.

22             So, what does that mean under the Mississippi

23   statute of limitations law?  Mississippi is more favorable to

24   plaintiffs in some respects and less favorable in others.  In

25   terms of the length of time, they have three years in

*OFFICIAL TRANSCRIPT*

1    Mississippi, a plaintiff does, to bring a law lawsuit; whereas,
2    here we only have one year.

3             But where Mississippi is less forgiving to
4    plaintiffs is while they extend that lengthy period of time to
5    bring a lawsuit, they do not have a discovery rule that applies
6    to injuries, unless they are latent injuries.  So, the
7    exceptions that might be employed by a plaintiff to save their
8    case when it's time barred on its face that they might argue in
9    Louisiana, those arguments are not available in Mississippi.

10            So, we have asserted in our motion that this case
11   is time barred.  It was filed more than three years after the
12   onset of the injury.  The discovery rule, as it's applied in
13   Mississippi, does not apply in this case because this is not a
14   latent injury.

15            So, in order to apply the discovery rule, it must
16   be a latent injury as defined by the Mississippi Supreme Court,
17   which is an injury that is unseen.  It's hidden.  What makes
18   PCIA an injury at all is that it is open, that it is obvious,
19   that you see it, that there is a stigma that goes along with
20   it.  The person sees it in the mirror every day and suffers the
21   emotional trauma for that.

22            So, in the plaintiff's opposition, what we saw
23   were very similar to arguments that have been advanced.  It
24   wasn't clear to me whether or not in the argument they were
25   advancing that these allegations established that this was a

1    latent injury, that it didn't happen until some point later in

2    time, or that it was a situation where they didn't know that

3    they had an injury; they didn't discover it until they saw a

4    lawyer advertisement.

5              But as it relates to those allegations,

6    Your Honor did not permit those allegations to be included in

7    the short form complaint.  You struck the generic allegations

8    and then you also struck the more specific ones on the grounds

9    that they were nothing more than an attempt to create a

10   favorable narrative for statute of limitations purposes,

11   ultimately attempting to change the definition that has been

12   established in this litigation through the master complaint.

13             So, what we're left with is, without a discovery

14   rule, the plaintiffs pivot to the doctrine of fraudulent

15   concealment that is another exception under Mississippi law in

16   order to toll the statute of limitations.  But what must be

17   alleged in a Mississippi case to toll the statute of

18   limitations is a fraudulent concealment that is distinct and

19   different from the fraudulent concealment cause of action that

20   you seek to impose liability for.

21             So, what the plaintiffs point out is that, well,

22   we checked the box on our short form complaint to the

23   fraudulent concealment cause of action in the master complaint.

24   That means we've alleged enough to proceed in the case.

25             What district courts, U.S. district courts,

**OFFICIAL TRANSCRIPT**

1  specifically the Southern District of Mississippi, has found

2  that at the motion to dismiss stage -- and this is in the

3  *Pfizer* case that we cited to the Court in our papers -- the

4  plaintiff's name was Tanner.  This involved a vasodilator

5  medicine that later became associated with melanoma.

6          There was an article that came out in the

7  *New England Journal of Medicine*, and the plaintiff then

8  developed melanoma and filed his lawsuit three years later, and

9  what he argued was that Pfizer hid the truth from FDA, didn't

10 disclose to the doctors and the medical community, and they had

11 these marketing plans.  The same sort of things that are

12 alleged as the cause of action for fraudulent concealment in

13 the master complaint for Taxotere.

14          What the Court found, consistently with the *Wyeth*

15 case that was affirmed by in the U.S. Fifth Circuit which

16 involved the medicine Prempro and the development of breast

17 cancer, was that you can't rely on your cause of action for

18 fraudulent concealment.  You must point to a separate,

19 distinct, active concealment that prevented the plaintiff

20 affirmatively from being able to bring their case.

21          There are no such allegations in this lawsuit; in

22 fact, the short form complaint that's the operative short form

23 complaint contains no allegations of fraudulent concealment.

24 It doesn't even contain the word *latent*.

25          So, we believe, Your Honor, that based on the

**OFFICIAL TRANSCRIPT**

1  operative pleadings in this case, that we are entitled to

2  judgment as a matter of law because the case is filed more than

3  three years after the onset of PCIA, and there is no exception

4  that applies.

5        THE COURT:  Let me just ask you quickly, yesterday I

6  received a supplemental pleading and it related to

7  Dr. Turegano --

8        MR. MOORE:  Turegano, like oregano, the spice.

9        THE COURT:  I reviewed it but my problem is I think it

10 was a lot about latent diagnosis versus latent injury.  I'm not

11 sure if it was a causation issue that it was, well, was it

12 caused by the chemotherapy or by the hormonal therapy that

13 occurred post chemotherapy, but would that have anything to do

14 with whether or not there was a latent injury?

15       MR. MOORE:  No, because in order to be a latent injury

16 in Mississippi, it must be hidden or unseen.  What I would

17 point out about the plaintiff's supplemental pleading, and we

18 filed an opposition to that.

19       THE COURT:  I didn't even see that.

20       MR. MOORE:  Yes.  I think we emailed it to Erin when we

21 filed it, I forget exactly when it may have been, late last

22 week or earlier this week.

23            What we point out in that opposition was really

24 two points:  Number 1, that on a judgment in the pleadings,

25 it's inappropriate to take testimony from a specific causation

*OFFICIAL TRANSCRIPT*

1  expert in a con case to attempt to offer that in, you know, a

2  Mississippi case.

3          But if you actually look at the witness'

4  testimony, and I think we point this out in our papers, a

5  lawyer's question is not testimony.  The witness' answer is the

6  testimony.

7          When Mr. Lambert asked her over and over and over

8  again about latent injury and it could be latent or a latent

9  diagnosis -- and this is cited in the papers, and we put it in

10  our opposition to their motion for leave -- Mr. Lambert asks,

11  "So, it could be a latent injury or a latent diagnosis, right?"

12  That's the home-run question.  There is a form objection

13  because it's compound.

14          Then she answers, "Oh, right, that wasn't my

15  answer.  That was me saying what the question -- what was the

16  question."  Then she goes on and says, "I don't see it being a

17  latent type of process because it would just be like persistent

18  hair loss that doesn't go away after six months, not like hair

19  regrows and then later on hair gets lost; so, no, I guess,

20  would be my answer."

21          So, the witness' actual testimony was not that it

22  was a latent injury.  The fact that the plaintiff to this -- up

23  until she saw Dr. Tosti never had a diagnosis of her injury

24  does not make the injury unseen or hidden, which is what the

25  Mississippi Supreme Court defines as a *latent injury*.

*OFFICIAL TRANSCRIPT*

1         If Your Honor has any more questions....

2       THE COURT:  No.  Thank you.

3         Mr. Morrison, can you hear me?

4       MR. MORRISON:  Yes, ma'am, I can.  Can you hear me,

5   Your Honor?

6       THE COURT:  I can.  Thank you.  Are you ready to

7   proceed?

8       MR. MORRISON:  Good morning, Your Honor.

9       THE COURT:  Good morning.

10      MR. MORRISON:  Yes, ma'am.  I appreciate you allowing

11  me to do this by Zoom.

12        As the Court is well aware, I have not before

13  made an appearance in this matter, but I was asked to do this

14  today by my partner, Mr. Lambert.  I'm with the

15  Gainsburgh Benjamin firm's Jackson, Mississippi office.

16        I wanted to go, Your Honor, directly to the

17  notion of the discovery ruling and the running of the statute

18  of limitations.  Given the fact that I am new to this game, I

19  started from the very beginning.

20        In looking at the defendant's pleadings in this

21  matter, particularly this motion, the statement was made that

22  all plaintiffs claim they sustained their injury six months

23  after they completed chemotherapy, and they cite to

24  paragraph 181 of the second amended master long form complaint.

25        I thought that was a very serious allegation, so

*OFFICIAL TRANSCRIPT*

1    I figured I'd better look at that.  I turned to page 181 of a

2    68-page complaint and noted that paragraph 181 falls within a

3    general medical discussion in which medical journal articles,

4    the Mayo Clinic, a Dr. Ralph Trube (spelled phonetically) is

5    cited where he is discussing and explaining the idea that

6    chemotherapy can cause hair loss.

7              In paragraph 181, a distinction is made, and this

8    is a medical distinction, made between when

9    chemotherapy-induced temporary hair loss is considered by the

10   medical community to become permanent hair loss, and that is a

11   six-month time frame.

12             So, the idea that the plaintiffs in this

13   litigation all claim that they sustained a permanent injury at

14   six months is, I think, an inferential conclusion that is made.

15   Nowhere in this, of particular importance here, does Ms. Greer

16   say that she knew she sustained permanent hair loss six months

17   after her chemotherapy ended in April of 2010 as defense

18   counsel suggested in his pleadings and in his PowerPoint.

19             They also referenced the short form complaint --

20   Document Number 1 -- where the document is asked at page 4,

21   Question Number 12, "Nature and extent of alleged injury,

22   including duration, approximate date of onset, if known, and

23   description of alleged injury."  There a lawyer wrote,

24   "Prominent hair loss approximately six months after

25   discontinued use of docetaxel to the present."

                        *OFFICIAL TRANSCRIPT*

1    Again, I thought to myself, Well, that's
2    interesting, but nowhere in this document does it say that
3    Ms. Greer knew or should have known at this point in time back
4    in 2009 or 2010 that she had sustain permanent hair loss.
5         THE COURT:  Mr. Morrison, do we know that she had
6    sustained permanent hair loss today?  Does she not have a
7    complaint?
8         MR. MORRISON:  We sure do, Your Honor.  I think that is
9    the exact point that I wanted to make.  This is retrospection.
10        Let me give you a good example, Your Honor.
11   Yesterday I was talking to my brother about the fact that none
12   of us in our family had developed the COVID virus.  None of us
13   had developed COVID.
14        My brother said, "You know, what Bubba, you
15   know," he, said, "I think I actually had COVID.  I think I had
16   COVID back in November of 2019."
17        I said, "Why do you think that?"
18        He said, "Well, you know, for about for two weeks
19   I lost my sense of taste and smell.  I had low-grade fever.  I
20   had body aches.  I didn't know anything about COVID in 2019,
21   but now, a year later, I recognize that it is likely that I
22   developed COVID a year ago."
23        Your Honor, that is exactly the same thing that
24   Ms. Greer faces today.  Her lawyers know now, because they have
25   had the opportunity to do discovery, they knew what the

*OFFICIAL TRANSCRIPT*

1    defendants knew back in 2008 and 2009, and they know that

2    today.  But what did Ms. Greer know?  Because that is what the

3    application of the discovery rule hinges upon directly.  What

4    did she know?

5            She knew that she was facing a life-threatening

6    breast cancer diagnosis.  She knew that she had been placed on

7    cocktail of various chemotherapy drugs.  She knew that her

8    doctors told her it is likely that you are going to sustain

9    temporary hair loss.  Nobody could have known; nobody could

10   have told her back in 2009 or 2010 that she was going to

11   sustain permanent hair loss.

12           So, if you look at the factual allegations in the

13   complaints that have been filed, you will see -- and,

14   Your Honor, the Court is at the stage now, there has been no

15   discovery per se in this case, it must accept the well-pled

16   allegations of the various complaints as being true.

17       THE COURT:  Mr. Morrison, are you telling me she has to

18   be told that she has a cause of action for the statute of

19   limitations to run?

20       MR. MORRISON:  What I'm telling you she has to know,

21   Your Honor, is that she has an injury that is not otherwise

22   leading to injury, and that's what I (speaking

23   simultaneously) --

24       THE COURT:  She's eight years post chemotherapy, and

25   she didn't realize it was permanent at that point?  Is that

*OFFICIAL TRANSCRIPT*

1   what you're telling me?

2       MR. MORRISON:  Your Honor, what I'm telling you is that

3   in the well-pled allegations of the complaint, she asked her

4   physicians whether or not she had sustained a permanent hair

5   loss, and they said no.

6           If you look, Your Honor, at page 11, of the short

7   form complaint, Document Number 1, she had not been diagnosed

8   by any medical professional as having permanent hair loss.  She

9   was told by her healthcare providers that her temporary hair

10  loss, that her hair would grow back.  She was told that her

11  hair would come back in numerous paragraphs here.  These

12  encouragements continued long after six months had elapsed.

13          So, Your Honor, how in the world can Ms. Greer be

14  charged with knowing something that, Number 1, her doctors

15  didn't know that would be directly contrary to what her doctors

16  were telling her?  Is she supposed to say, "Well, I don't

17  believe any of you.  I think my hair loss is now permanent and,

18  therefore, I must have some claim somewhere."?

19          You know, the Mississippi Supreme Court,

20  Your Honor, has dealt with issues of application of the

21  discovery rule, and it specifically says that in cases where

22  there is a dispute supporting application of the discovery

23  rule, the issue should be decided by the jury, and that's what

24  we have here, Your Honor.  We have a factual dispute.  The test

25  here is what did Ms. Greer know and when did she know it?

*OFFICIAL TRANSCRIPT*

1          Your Honor, you have the benefit and all of these

2     lawyers and everyone has the benefit in 2020 of retrospection,

3     but Ms. Greer didn't have that at any time.  She had no

4     benefit.  Just like my brother now knows he likely had COVID

5     last year, last year nobody knew anything about COVID.

6          So, Your Honor, I don't think we need to get down

7     the road past this.  The question is what did this lady know;

8     when did she know it?

9          THE COURT:  I guess what bothers me, you know, when

10    you're talking about your brother, he knew in November that he

11    was sick, he knew that he lost his sense of taste and smell,

12    and he knew that he had all of these symptoms.  What caused it

13    was a different matter and that required some explanation that

14    was not available to him at that time.  But this lady, this was

15    not a hidden injury.  I mean, hair loss is something that we

16    recognize.

17         I think that's what bothers me about this is.  We

18    all think of his meso when we think of latent injuries or those

19    sorts of illnesses that you cannot know you have, because you

20    don't even know you're a sick until you get this sort of

21    diagnosis, but hair loss is not a hidden injury.  Now, what

22    caused it is a different matter, and that's where the

23    exploration comes in.

24         I looked and, you know, she said, her usage of

25    vitamins and topical ointments to encourage hair growth, to me

*OFFICIAL TRANSCRIPT*

1   that says that I know my hair is not growing back.  It's there,

2   it's obvious that I know that, and then, you know, at some

3   point it's that -- at no point did they tell her her hair loss

4   was permanent or that they had any reason why it was not

5   growing back, but clearly she knew it was not growing back.

6           So, I guess that's where, and maybe, you need to

7   focus on what does it mean when I know I have no hair, and it's

8   now been some time, three years post chemotherapy and I still

9   have no hair.  How could that be a latent injury or is she

10  still expecting that, well, maybe in 10 years my hair is going

11  to grow back?  Is there any reasonableness that the Court

12  should look at into her belief?

13  MR. MORRISON:  Your Honor, I appreciate the Court's

14  question.  I think that the distinction here is what is the

15  injury?  If the Court finds as a matter of law or as a matter

16  of fact that the injury in these cases is hair loss, then this

17  case should be dismissed but that's not the claim.

18          The injury in this case is permanent hair loss.

19  The unseen or hidden aspect of these injuries to these ladies

20  is the permanent hair loss.  So, if one considers,

21  Your Honor -- put yourself in this lady's position.  She has

22  received chemotherapy for a life-threatening disease.  She's

23  been told that she's likely to have temporary hair loss.  She's

24  also been counseled by her physicians that her hair will grow

25  back, and not even her doctors know that this drug causes

*OFFICIAL TRANSCRIPT*

1    permanent hair loss; so, how in the world could they possibly

2    tell her?  There is no way that she could even know.

3                 So, that is hidden.  That is the hidden and

4    unforeseen aspect, is that the injury, the permanency is

5    hidden, not the outward manifestation that she has hair loss,

6    and that is the part, Your Honor, that requires application of

7    the discovery rule.

8                 It is not until anyone, particularly Ms. Greer,

9    could discover that her hair loss has gone from what she has

10   been told will be temporary to what has now become permanent,

11   and how in the world is this lady supposed to discern that if

12   her own doctors don't even know?  How in the world?

13           THE COURT:  So, is it the position that no case --

14   statute of limitations do not run on any of these cases because

15   there was no warning that was given to these patients that hair

16   loss might be permanent?  Let's just accept it that no patient

17   was warned that your hair loss might be permanent, that your

18   hair loss will be temporary.  So, is it then that -- and you

19   have to understand, I'm from Louisiana and I keep saying

20   *prescription*, so if I am I'm stuttering, it's hard for me to

21   get the right terminology out -- if the statute of limitations

22   does not run on any of these cases because no patient was told

23   that hair loss might be permanent, and, therefore, any failure

24   to warn case would never have limitations running, I don't know

25   if that --

                         ***OFFICIAL TRANSCRIPT***

1          MR. MORRISON:  Your Honor, I hesitate to comment on

2     every case because I've seen one.  However, as a general

3     academic legal concept, I think the Mississippi Supreme Court

4     says it best -- and I'm reading from the *Donald v. Amoco*

5     case -- and it's talking about application of the discovery

6     rule.

7               Here is what the Court says at page 168:  "This

8     court has applied the discovery exception where the plaintiff

9     will be precluded from discovery harm or injury because of the

10    secretive or inherently undiscoverable nature of the wrongdoing

11    in question," and then the Court goes on and says, "or the

12    discovery exception may be applied when it is unrealistic to

13    expect a layman to perceive the injury at the time of the

14    wrongful act."

15              Now, again, Your Honor, put yourself in this

16    lady's shoes.  She is a layperson who has been told to expect

17    hair loss.  Her doctors keep telling her, "Your hair is going

18    to grow back."  Why?  They didn't know any different either.

19              She sits there hoping that her hair is going to

20    grow back, and one day, for the first time, she hears something

21    out there that says, "Wait a second.  This drug might actually

22    cause permanent hair loss."  It is at that moment, Your Honor,

23    that she has an obligation, and the statute of limitations

24    begins to run.  How in the world can it begin to run beforehand

25    is beyond me.

*OFFICIAL TRANSCRIPT*

1          The Mississippi Supreme Court addressed this

2  issue in the *Donald v. Amoco* case.  The injury to this lady and

3  to these women is the latency issue.  The hidden part is the

4  permanency of the hair loss, not the hair loss itself.  So, I

5  don't see how this court can otherwise do anything other than

6  apply the discovery rule in this case.

7          Now, you know, at this stage of the proceedings

8  we haven't had the benefit of discovery, but if, in taking this

9  lady's deposition, testimony is elicited that she knew about

10  this long before the time set forth in May of 2016, that's a

11  horse of a different color.

12          But right now, what we know, based on the

13  pleadings that are filed in this case, is that there is no way

14  this poor lady could have known about this until May of 2016.

15  I think that not only did she not know about it, but her own

16  doctors couldn't have known about it.

17          So, Your Honor, the defendant's motion is not

18  well taken and should be denied, and we don't even have to get

19  further down the road.

20          I don't have anything else to add, Your Honor.

21  Again, thank you for letting me appear by Zoom today.

22          THE COURT:  Thank you.

23          MR. MOORE:  Just a couple of quick points, Your Honor.

24          So, a couple of points:  Mr. Morrison, I'm not

25  sure what short form complaint he was reading from because he

***OFFICIAL TRANSCRIPT***

1    said, I heard him say it a couple of times, that her doctors

2    kept telling her her hair was going to grow back.

3            I'm looking at the short form complaint.  What

4    she alleges -- this is Record Doc 10668-6 -- in paragraph D,

5    "Plaintiff recalls complaining to at least one, if not more,

6    male oncologists at Jefferson Medical Associates that her hair

7    was not growing back.  This conversation occurred some months

8    after she discontinued use of Taxotere/Docetaxel to present.

9    The male doctor did not give any reasons as to why plaintiff's

10   hair was not growing back."  I think Your Honor -- then she

11   also continued, excuse me, that she talked to her beautician

12   about it and made complaints to her family members about it.

13           When you look at the allegations that Your Honor

14   permitted to be included in the short form complaint, what it

15   actually establishes is that plaintiff was readily aware that

16   her hair did not grow back, and that is the issue that, I

17   think, is the correct inquiry because this is not a situation

18   where the plaintiff did not perceive her baldness.  She did not

19   perceive the disfigurement that she claims in her complaint.

20   It was not unhidden from her.  It was not unseen from her.  She

21   alleges in her complaint that she was complaining about it to

22   medical providers, to her beautician, to her family members.

23           The discussion about knowledge and what the

24   plaintiff knew and what the plaintiff discovered are inquiries

25   from the *Amoco* case that they cite for a latent injury case.

**OFFICIAL TRANSCRIPT**

1    There is no discovery rule unless the injury is hidden, unless

2    it is unseen, and the very nature of this injury, that her hair

3    did not come back, she was told it was going to be temporary,

4    the hair did not return, that's the claim in all of these

5    cases, and that happens at a particular point in time as

6    established by this Court.

7           Then even in cases with a latent injury, even in

8    circumstances where there is a latent injury, the discovery

9    rule in Mississippi, the statute of limitations commences on

10   discovery of the injury, not the injury and its cause, not the

11   injury and sufficient information to know that you're the

12   victim of a tort, or not even information about the extent of

13   your injury.  So, even in circumstances where the discovery

14   rule would apply, by her own allegations she was talking about

15   it to her doctors months after she completed chemotherapy.

16          So, we don't think that this discovery rule

17   exception applies, Your Honor; and, therefore, we would ask

18   that you grant the motion for judgment on the pleadings.

19          Thank you.

20       THE COURT:  Okay.  Thank you.  All right.  Thank you

21   all.

22       (WHEREUPON, at 10:40 a.m., the proceedings were

23   concluded.)

24               *   *   *

25

*OFFICIAL  TRANSCRIPT*

1                    REPORTER'S CERTIFICATE

2

3         I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11                              *s/Cathy Pepper*

12                         Cathy Pepper, CRR, RMR, CCR
                           Certified Realtime Reporter
13                         Registered Merit Reporter
                           Official Court Reporter
14                         United States District Court
                           Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                         *OFFICIAL  TRANSCRIPT*