## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | **MDL No. 2740** |
| | **Section: N(5)** |
| This Document Relates to: *Wanda Stewart v. Sandoz Inc.* Civil Case No. 2:17-cv-10817 | **JUDGE JANE TRICHE MILAZZO** |
| | **MAG. JUDGE NORTH** |

## SANDOZ INC.'S OPPOSITION TO MOTION TO EXCLUDE
## <u>TESTIMONY OF LAWRENCE FOOTE, M.D. AND SREEKANTH REDDY, M.D.</u>

**GREENBERG TRAURIG, LLP**
Lori G. Cohen
R. Clifton Merrell
Evan C. Holden
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100

*Counsel for Defendant Sandoz Inc.*

## <u>TABLE OF CONTENTS</u>

ARGUMENT .................................................................................................................... 3

I.      Drs. Foote and Reddy are Qualified to Offer the Opinions Expressed in
        Their Reports Concerning Medical Issues Common to Oncology Practice. .......... 4

        A.      Applicable Legal Standard ......................................................................... 4
        B.      Drs. Foote and Reddy Are Qualified to Testify to Their Own Observations
                of Hair Loss in Breast Cancer Patients. .................................................... 7
        C.      Drs. Foote and Reddy are Qualified to Testify Regarding the Labeling and
                Risk Information Conveyed to Oncologists by the Docetaxel Label. ...... 10

II.     Dr. Reddy's and Dr. Foote's Opinions About the Sufficiency of Evidence
        to Establish that Any Drug Causes PCIA is Appropriately Within their
        Expertise. ................................................................................................................ 12

        A.      Drs. Foote and Reddy Have Reviewed the Relevant Medical Literature
                and Thoroughly Explained the Bases for Their Opinions. ....................... 12
        B.      Plaintiff's Motion Misconstrues Defendants' Burden in Presenting
                Alternative Causation Hypotheses — Again. ........................................... 13

III.    Neither Dr. Foote Nor Dr. Reddy Will Offer Regulatory or Dermatological
        Opinions or *Affirmative* Specific Causation Opinions. ........................................ 17

CONCLUSION ............................................................................................................ 18

*ACTIVE 53905850v6*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Plambeck*,
    802 F.3d 665 (5th Cir. 2015) ............................................................5, 6

*Burst v. Shell Oil Co.*,
    No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015).....................15

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................................15

*Hall v. Elkins Sinn, Inc.*,
    102 F. App'x 846 (5th Cir. 2004) .........................................................11

*Holbrook v. Lykes Bros. S.S. Co.*,
    80 F.3d 777 (3d Cir. 1996).....................................................................6

*Houston-New Orleans, Inc. v. Page Eng'r Co.*,
    353 F. Supp. 890 (E.D. La. 1972).........................................................14

*Huss v. Gayden*,
    571 F.3d 442 (5th Cir. 2009) ...............................................................5, 6

*Joseph v. Bohn Ford, Inc.*,
    483 So.2d 934 (La. 1986) .....................................................................14

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ...............................................................15

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..............................................................................9

*Llewellyn v. Lookout Saddle Co.*,
    315 So. 2d 69 (La. App. 2d Cir. 1975) ................................................14

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ..............................................................9, 14

*Rando v. Anco Insulations, Inc.*,
    2008-1163, 16 So. 3d 1065 (La. 5/22/09).............................................14

*Stahl v. Novartis Pharms. Corp.*,
    283 F.3d 254 (5th Cir. 2002) ...............................................................11

*In re Taxotere*,
    No. 16-2740, 2019 WL 4007783 (E.D. La. Aug. 23, 2019)...................14

*ACTIVE 53905850v6*

*United States v. Roach,*
    644 F.3d 763 (8th Cir. 2011) ...................................................................................6

*United States v. Wen Chyu Liu,*
    716 F.3d 159 (5th Cir. 2013) ...................................................................................6

*Wagoner v. Exxon Mobil Corp.,*
    813 F. Supp. 2d 771 (E.D. La. 2011)...........................................................4, 5, 14

*Weber v. Fidelity & Cas. Ins.,*
    250 So. 2d 754 (La. 1971) .....................................................................................14

*Wheat v. Pfizer,*
    31 F.3d 340 (5th Cir. 1994) ...................................................................................15

*In re Xarelto (Rivaroxaban) Prod. Liab. Litig.,*
    No. MDL 2592, 2017 WL 1352860 (E.D. La. Apr. 13, 2017) .................................5

**Statutes**

La. Rev. Stat. § 9:2800.59.................................................................................................16

**Other Authorities**

Fed. R. Evid. 702 .......................................................................................................4, 5

Reddy Report, 16, ¶2 .......................................................................................................8

*ACTIVE 53905850v6*

**SANDOZ INC.'S OPPOSITION TO MOTION TO EXCLUDE
TESTIMONY OF LAWRENCE FOOTE, M.D. AND SREEKANTH REDDY, M.D.**

Drs. Lawrence Foote and Sreekanth Reddy both are practicing medical oncologists with 30 and 17 years of experience, respectively.  Each currently and regularly treats breast cancer patients, including by prescribing docetaxel and the other medications with which Plaintiff, Wanda Stewart was treated (and, as such, each deals with hair loss occurring during and after chemotherapy). They also stay current on medical literature relevant to their practice, including literature on chemotherapy medications, their risk and benefit profiles, and hair loss associated with chemotherapy.  The opinions that they have offered in their expert reports and deposition testimony and which they will offer at trial are perfectly within that expertise and consistent with their practice, experience, and training.  Plaintiff's motion to exclude their opinions is nothing more than a retread of arguments this Court already has rejected in connection with motions to exclude Dr. Glaspy's opinions to prevent MDL defendants from presenting alternative causation theories.  Those arguments are meritless, and this Court should deny Plaintiff's motion for several reasons.

First, Drs. Foote and Reddy are well qualified to opine about oncologists' treatment decision-making, chemotherapy medication risk and benefit profiles and how those risks and benefits are communicated in the medications' labeling, counseling discussions with patients (including counseling about hair loss), and patients' common concerns and questions, including observations of their own patients that they relay in those counseling discussions.  Unlike Plaintiff's proffered oncology experts, Drs. Foote and Reddy currently see and counsel breast cancer patients on a regular basis and relay risk and benefit information about numerous chemotherapy agents, including docetaxel and other medications used in Ms. Stewart's treatment. Even based solely on their many years of experience, each is well qualified to opine about: Ms.

Stewart's breast cancer presentation and prognosis, without treatment and under different treatment modalities; the appropriate breast cancer treatment plan for her; the risks and benefits of the various treatment options and modalities available to her; how oncologists counsel patients on the risks and benefits of those options, including their own experiences with hair loss in their patient population; the factors to consider in selecting the appropriate chemotherapy regimen to treat Ms. Stewart's breast cancer; and Ms. Stewart's response to her chemotherapy.   Plaintiff cannot, and does not, credibly challenge the foundation or expertise underlying any of those opinions.

Second, Drs. Foote and Reddy have the expertise to opine on the sufficiency of the evidence that exists to conclude that *any* medication causes permanent or persistent hair loss ("PCIA").   Each has reviewed the same medical literature as Plaintiff's proffered experts on the subject — and additional relevant literature — and has applied his wealth of experience and medical and scientific background to render the opinions offered.   The PSC does not and cannot credibly challenge the bases for those opinions, which are admissible for all the same reasons they were appropriate when offered by Dr. Glaspy in the *Earnest* trial.   Yet, here again, Plaintiff attempts to flip the burden of proof on causation on its head, by asserting that Drs. Foote and Reddy must undertake a formal Bradford Hill causation analysis before opining that 1) numerous chemotherapy medications have been associated in the medical literature with permanent hair loss, and 2) the evidence is insufficient to establish any one of them as the causal agent, particularly when given in combination.   That position is even more untenable in light of Plaintiff's own experts' prior testimony conceding that those other chemotherapy medications also could cause permanent hair loss.   Drs. Foote and Reddy's opinions — particularly given Plaintiffs' experts' concessions — are entirely appropriate.

2

*ACTIVE 53905850v6*

Third, and relatedly, rather than challenge either Dr. Foote's or Dr. Reddy's conclusions or methodologies, Plaintiff labors in vain to recast those opinions as "regulatory" or "dermatology" opinions, which they are not.  It is indisputable that a medical oncologist's daily experiences intersect with both pharmaceutical labeling and with hair loss; and, Drs. Foote and Reddy plainly are qualified to testify about the ways in which that intersection informs an oncologist's counseling and decision-making.  However, neither will offer any opinions that are solely "regulatory" or "dermatological."  Plaintiff's efforts to redefine their opinions are a red herring.  Again, their opinions are similar to those offered by Dr. Glaspy in the *Earnest* trial and Plaintiff has not offered any new rational why they should be excluded, here.

## ARGUMENT

Tellingly, Plaintiff has not challenged any of the core oncology opinions being offered in her case by Sandoz's well-qualified medical oncology experts, Drs. Foote and Reddy. Specifically, Plaintiff is not challenging the admissibility of their opinions that her docetaxel-containing chemotherapy regimen was the best regimen available for her treatment or that alternative regimens posed substantial side effect risks; nor is Plaintiff challenging any of their opinions regarding appropriate counseling practices for breast cancer patients considering chemotherapy options.  Instead, Plaintiff focuses her Motion on an effort to preclude Sandoz from presenting well-supported theories of alternative causation and/or testimony that the docetaxel labeling adequately conveyed *to a practicing oncologist*, the known risk of hair loss associated with docetaxel.  Those opinions are equally appropriate and admissible, and Plaintiff has not offered any cogent reason why they should be excluded.

I.      **Drs. Foote and Reddy are Qualified to Offer the Opinions Expressed in Their Reports Concerning Medical Issues Common to Oncology Practice.**

Plaintiff's Motion strains to recast Drs. Reddy's and Foote's opinions about the aspects of medical oncology germane to a patient like Ms. Stewart as opinions about "the different kinds of alopecia and their causes" and/or "the FDA drug approval and labelling process," because they have no basis to exclude the opinions actually being offered.  A review of each oncologist's Expert Report makes plain that neither is offering the opinions about which Plaintiff complains.  *See* Ex. A (Dr. Foote Expert Report) and Ex. B (Dr. Reddy Expert Report). Instead, each will offer testimony directly within their field of expertise and supported by their extensive experience and review of voluminous medical literature: opinions concerning the hair loss that can accompany various chemotherapy medications, how the risks of such hair loss are communicated to medical oncologists in the medications' labels, Dr. Reddy's and Dr. Foote's observations of such hair loss in their own patients, and how that lived experience informs the ways in which they counsel their patients about the risks and benefits of various chemotherapy medications the recommend to their patients.

A.      **Applicable Legal Standard**

Federal Rule of Evidence 702 provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may offer their opinions in a case if (i) their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (ii) "the testimony is based on sufficient facts or data"; (iii) "the testimony is the product of reliable principles and methods"; and (iv) "the expert has reliably applied the principles and methods to the facts of the case." Rule 702 "embodies a liberal policy towards qualification as an expert. . . . One can have the requisite qualifications to provide expert testimony by virtue of knowledge, skill experience, training or education." *Wagoner v.*

4

*Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011) (internal quotation marks omitted) (citations omitted); see also *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 678 (5th Cir. 2015) ("[A]n expert witness's testimony (and its reliability) may be based on his personal and professional experience and his own observation."). The remaining requirements under Rule 702 also must be applied with the same "'liberal thrust' of the Federal Rules of Evidence and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Wagoner*, 813 F. Supp. 2d at 803 (alterations omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993)). To be admissible, "the basic minimum is that there must be some scientific validation of the theory advanced by the expert." *Id.* (citing *Daubert*, 509 U.S. at 593).

Courts routinely allow experts to offer testimony about conditions they observe in their own medical practice, even where those conditions touch on specialties in which the physicians are not certified. *Huss v. Gayden*, 571 F.3d 442, 453-56 (5th Cir. 2009) (reversing trial court and holding physician without specific expertise should have been allowed to rebut plaintiff's expert's causation opinion); *In re Xarelto*, *(Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 1352860, at *5 (E.D. La. Apr. 13, 2017) (holding expert's reliance on clinical experience, peer-reviewed studies, and labeling was adequate to offer opinion on causation).

In *Huss v. Gayden*, the trial court excluded testimony of a defense expert that a physician's administration of Terbutaline did not cause the plaintiff's cardiomyopathy. *Huss*, 571 F.3d at 453-54. Plaintiff objected to the testimony on the grounds that the proffered expert was not a cardiologist or toxicologist. *Id.* Rather, he was a staff physician at a student health center, was certified in internal medicine who had treated patients with cardiomyopathy but had no specific expertise. *Id.* The defendants noted that the expert had reviewed the medical literature about the subject medication and intended to testify to its insufficiency to support a causation conclusion,

*ACTIVE 53905850v6*

and to testify about other studies that suggested a different conclusion. *Id.*, at 454.  In holding that limiting the expert's testimony was an abuse of discretion, the Fifth Circuit opined:

> Dr. Reddix's training and experience as a medical professional qualify him to tell the jury why the literature does not establish a causal link. Moreover, Dr. Reddix identified a study of over 9,000 people which tended to undermine the Husses' claims. In short, Dr. Reddix's education and knowledge allowed him to form a reliable opinion as to whether, as a general matter, Terbutaline causes cardiomyopathy.

*Id.*, at 455.

In so holding, the Fifth Circuit also expressly distinguished that case from *Tanner v. Westbrook*, on which Plaintiff relies in her Motion to Exclude.  Other courts considering similar situations have reached holdings consistent with *Huss*.  *See United States v. Roach*, 644 F.3d 763, 764 (8th Cir. 2011) (pediatrician who "lacked formal education or training in child psychology and child psychiatry" nonetheless qualified to testify about the "general characteristics of sexually abused children" based on his regular examination and evaluation of sexually abused children in his medical practice); *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 678 (5th Cir. 2015) (noting "an expert witness's testimony (and its reliability) may be based on his personal and professional experience and his own observation"); *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) ("[A]n expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight" (citations omitted); *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777 (3d Cir. 1996) ("in placing restrictions on [expert's] testimony because he did not possess the exact background the court deemed appropriate, it erred.")

Courts have consistently held that an expert physician may opine about areas outside of his or her certified specialty, so long as the expert has the medical background to support the opinions being offered and has reviewed relevant medical literature.

6

**B.**     **Drs. Foote and Reddy Are Qualified to Testify to Their Own Observations of Hair Loss in Breast Cancer Patients.**

A simple review of the passages of Drs. Foote and Reddy's expert reports that Plaintiff identifies as outside of their expertise makes plain that neither is offering "dermatology" opinions. *See* Mot. at fn. 2.  Rather, the opinions each has offered about "what may or may not cause alopecia" are based on 1) extensive medical literature associating hair loss with various chemotherapy medications, and 2) their own observations of patients in their practice who have had persistent hair loss and/or incomplete hair regrowth after chemotherapy with various agents, as well as how those observations inform their counseling practices.

Among the passages of Dr. Foote's Expert Report that Plaintiff identifies (see Plaintiff's Motion to Exclude at p. 6, fn. 2) as supposedly inappropriate "dermatology" opinions are the following:

- "In my 30-plus years of experience prescribing and treating patients who have been prescribed chemotherapy for breast cancer, I have witnessed firsthand that a majority of women who undergo chemotherapy, regardless of the medication(s) used, report some lasting change in the appearance, texture, or fullness of their hair." (Foote Report p. 15, ¶2).

- "there were reports in the medical literature, including many predating Ms. Stewart's diagnosis, of ongoing hair loss following chemotherapy with many common breast cancer agents, including the three… with which Ms. Stewart was treated."  (Foote Report p. 15, ¶3).

- "It is known that cyclophosphamide causes hair loss and that side effect has been well described… Adriamycin is well known to cause complete hair loss and that is reflected in its package insert."  (Foote Report p. 13, ¶¶ 5).

- "I do not believe it is possible for an oncologist to say to a reasonable degree of medical certainty that Ms. Stewart's inadequate hair regrowth, if any, was due specifically to Adriamycin, cyclophosphamide, docetaxel, letrozole or anastrozole."  (Foote Report p. 31, ¶¶ 4-5).

Likewise, Dr. Reddy's supposedly inappropriate "dermatology" opinions, include these passages, that similarly require no expertise in dermatology and are squarely within his expertise:

7

- "The other medications with which Ms. Stewart was treated — cyclophosphamide, Adriamycin, Femara and Arimidex – also are associated with a risk of hair loss. Based on my experience with my patients for whom I have prescribed these medications, when they are administered in combination it is not possible to say whether one of them, to the exclusion of the others, is responsible for any resultant hair loss or diminished hair regrowth." (Reddy Report, 16, ¶2)

- "Adriamycin… is known to cause hair loss in virtually all patients who receive it… Cases of permanent or long-term alopecia following treatment with Adriamycin also have been reported in the medical literature." (Reddy Report p. 16, ¶ 3).

- "I would estimate that 20% of my breast cancer patients report some lasting change in their hair following chemotherapy.  I have not observed… any increased incidence of significant or long-term hair loss in patients who have been treated with docetaxel-containing regimens as opposed to [others]." (Reddy Report p. 17).

Drs. Foote and Reddy are well-qualified to testify on those subjects and Plaintiff's efforts to depict these as "dermatology" opinions are unavailing.  Notably, none of those statements discusses the "different kinds of alopecia and their causes."  Plaintiff's Motion is premised on a strawman argument - designed to exclude opinions that are damaging to Plaintiff's case by blatantly misdescribing what those opinions are.

Indeed, Plaintiff absurdly argues that "since [Dr. Reddy/Dr. Foote] is neither a dermatologist nor an expert in dermatology… [he] cannot offer opinions as to which drugs may, or actually, cause permanent chemotherapy-induced alopecia." *See* Motion at pp. 6-7.  If that were the requirement, Plaintiff's own general causation expert, Dr. Feigal — also not a dermatologist or expert in dermatology — would have no basis to offer *any* of the opinions she purports to offer in this litigation, which are limited to general causation.

Considering the opinions Dr. Reddy and Foote actually intend to offer, it is plain that each is qualified and that the testimony is appropriately within their expertise and relevant to determining facts in issue in this litigation.  As the Fifth Circuit has said:

> "No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.  Accordingly, this Circuit has upheld the admission of expert testimony where it was based

8

> on the expert's specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the scientific community."

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

In preparing their opinions in this case, Drs. Foote and Reddy have each reviewed a virtually identical body of medical literature to that reviewed by Plaintiff's proffered oncology experts (Drs. Feigal and Bosserman) as well as additional medical literature, plaintiff's medical records and relevant deposition testimony. *Compare* Ex. A at Exhibit B (Dr. Foote Report – Reliance List) and Ex. B at Exhibit B (Dr. Reddy Report – Reliance List) *with* Ex. C (Dr. Bosserman Reliance List) and Ex. D (Dr. Feigal Reliance List). Unlike Plaintiff's experts, however, Drs. Foote and Reddy also have the additional knowledge base of their ongoing medical oncology practices in which they continue to prescribe the medications about which they will testify. *See* Ex. E (Feigal Dep.) at 85-87 (does not recall ever prescribing any taxane; has not prescribed any chemotherapy since 2004); Ex. F (Bosserman Dep.) at 38 (has not prescribed chemotherapy for breast cancer since 2017). Drs. Foote and Reddy also base their opinions on the cumulative knowledge acquired from their practical experience treating and counseling patients over decades and their continual review of medical literature. Reddy Report at pp. 11-12; Foote Report at pp. 10-11; Ex. G (Reddy Dep.) at 343-344; Ex. H (Foote Dep.) at 18-19.

Dr. Reddy has been a practicing medical oncologist for 17 years and has been certified in internal medicine since 2000. *See*, Ex. B at Exhibit A (Dr. Reddy Report – Curriculum Vitae). Dr. Foote has been a practicing medical oncologist for 30 years and has been certified in internal medicine since 1986. *See*, Ex. A at Exhibit A (Dr. Foote Report – Curriculum Vitae); Foote Dep at 44-45, 85-86. Each has treated hundreds or thousands of breast cancer patients over that time, including with all of the medications at issue in this case, such as docetaxel, Adriamycin, Cytoxan

9

and the aromatase inhibitors, letrozole and anastrozole.  *Id.; see also* Reddy Dep. at 151:15-152:9, 369:18-14; Foote Dep. at 251:3-17.  Each has testified to their extensive experience dealing with hair loss in their breast cancer patients, across various chemotherapy regimens and other medications.  *See* Reddy Dep. at 371-372, 95-96, 187-188, 268-271, 279-281; Foote Dep. at 100, 261-262. As set forth above, each has drawn conclusions after observing first-hand patients who have experienced lasting changes in their hair following treatment with various chemotherapy regimens, including non-docetaxel regimens.  And, they have counseled thousands of breast cancer patients about hair loss, based in part on those observations and conclusions.

Taken together, their practice experience, review of medical literature in practice, and review of medical records and literature specific to this case are more than sufficient bases for each of their opinions.  Those opinions are relevant to resolving important facts in issue in this case and, as such, there is no basis to exclude or limit their testimony.

### C. Drs. Foote and Reddy are Qualified to Testify Regarding the Labeling and Risk Information Conveyed to Oncologists by the Docetaxel Label.

Plaintiff's Motion likewise strains to cast Drs. Reddy's and Foote's opinions about the docetaxel label as "regulatory" opinions requiring FDA expertise, ignoring the truism that physicians who prescribe chemotherapy must be familiar with the medication label's warning and risk information.  Drs. Foote and Reddy are not offering "regulatory" opinions; instead, each has offered opinions about what the docetaxel label communicates to practicing medical oncologists such as themselves.  Those opinions are appropriate and perfectly within their expertise.

Drs. Foote and Reddy have offered opinions that Sandoz's docetaxel label adequately communicates to prescribers (i.e. learned intermediaries) that the drug is accompanied by a risk of hair loss.  Each also offer the related opinion that the warning of "alopecia" as set forth in the

*ACTIVE 53905850v6*

docetaxel package insert communicates to a prescribing oncologist a warning of hair loss that is not limited with respect to severity or duration.

Each is well-qualified to offer those opinions based on their decades of oncology practice and their familiarity with chemotherapy labeling and warnings information.  It is basic that a prescribing physician is responsible for interpreting pharmaceutical labeling information and conveying it to the patient — that is the foundation of the learned intermediary doctrine. *See Hall v. Elkins Sinn, Inc.*, 102 F. App'x 846, 849 (5th Cir. 2004) ("[A] manufacturer's duty to warn the enduser is discharged to the physician because of the expertise necessary to understand the warning labels adequately"); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267-68 (5th Cir. 2002) (whether a warning is adequate depends entirely on physician understanding of warning label).  As this Court already has held in this MDL, "adequacy in the context of prescription drugs is a function of whether the doctor, rather than the patient, would reasonably understand the risks." (Rec. Doc. No. 10464 [May 27, 2020 Order and Reasons granting MSJ re post-2015 treatment]).

Accordingly, Plaintiff's failure to warn claims are predicated on the notion that prescribing oncologists would read the docetaxel labeling and fail to appreciate a risk of persistent hair loss. Testimony from a prescribing oncologist about how he interprets the words of the docetaxel label and communicates that information to a patient will help a lay jury understand the significance of the labelling to learned intermediaries and the (lack of) merit to Plaintiff's claims.  Plaintiff's proffered oncology expert, Dr. Bosserman, has opined (without any stated basis) that prescribers and patients "expect" a warning of alopecia must refer to temporary alopecia and that long-term hair loss "is not the common expectation from chemotherapy."  Ex. I (Bosserman Dep.) at 315:8-24.  Dr. Reddy and Dr. Foote have opined that no such durational component is conveyed to an oncologist reading the plain language of the labeling, nor is one assumed when oncologists

11

communicate risk information to patients.  Foote Report at p. 12; Reddy Report at p. 15.  Rather, consistent with the counseling practices of Dr. McCanless, Plaintiff's prescribing oncologist, each has testified that they counsel patients that the warning means that a patient's hair is likely to fall out during chemotherapy and that the manner and extent of regrowth varies across patients.  *Id.*; Ex. J (McCanless Dep.) at 55:16-24.  These are not "regulatory" opinions requiring familiarity with FDA labeling requirements.  To the contrary, these are statements by practicing oncologists about what oncologists understand when they read terminology they routinely are called upon to interpret for their patients.  Such testimony will be helpful to a jury's understanding of why Plaintiff's oncologist counseled her in the way he testified in his deposition and what risk information was communicated to him, as the learned intermediary.

II.     **Dr. Reddy's and Dr. Foote's Opinions About the Sufficiency of Evidence to Establish that Any Drug Causes PCIA is Appropriately Within their Expertise.**

As the PSC did in *Earnest* and in *Kahn*, Plaintiff endeavors here to turn the law of alternate causation on its head, by seeking an order of this Court effectively precluding Defendants from presenting potential alternative causes of Plaintiff's claimed injuries that are fairly supported by medical literature.  As it has before, the Court should reject those efforts and deny Plaintiff's attempt to preclude Drs. Foote and Reddy from testifying about the relative strengths of the evidence of an association between hair loss and various chemotherapy medications.

A.     **Drs. Foote and Reddy Have Reviewed the Relevant Medical Literature and Thoroughly Explained the Bases for Their Opinions.**

Drs. Foote and Reddy have identified in detail the bases for their opinions about which medications cause hair loss, which have been associated in the medical literature with permanent hair loss, and which are reasonable potential alternative causes of Plaintiff's alleged persistent hair loss.  As they each have testified, both Dr. Reddy and Dr. Foote reviewed extensive medical literature and Plaintiff's medical records and relevant deposition testimony in forming their

*ACTIVE 53905850v6*

opinions, in addition to drawing on their wealth of clinical experience.  Ex. A at Exhibit B (Dr. Foote Report – Reliance List) and Ex. B at Exhibit B (Dr. Reddy Report – Reliance List); Reddy Dep. at 278-285, 354-357 (explaining methodology and "I tried to be as exhaustive as possible… I looked at everything"); Foote Dep. at 100, 251-253 (reviewed all medical records, listed depositions, and extensive literature on hair loss during chemotherapy).

Plaintiff does not appear to claim that Drs. Foote and Reddy have not considered the relevant sources of information or that they have failed to identify the bases for their opinions — nor could she.  As noted above, the medical literature on which Drs. Foote and Reddy have based their opinions includes – and is in fact more extensive than - the medical literature on which Plaintiff's own expert, Dr. Feigal, relied in rendering her general causation opinions. In addition to their lists of materials identified, both Dr. Foote and Dr. Reddy testified extensively in full-day depositions.  To the extent they were asked, they testified in those depositions about which materials they reviewed in formulating their opinions and how each was relevant to the opinions expressed in their reports. *See*, *e.g.*, Reddy Dep. at 164-168, 323-324, 405-407; Foote Dep. at 18-20, 38-39, 131-132, 154, 215-219.  In short, their opinions are amply supported and the bases for them have been plainly and comprehensively disclosed to Plaintiff.

**B.    Plaintiff's Motion Misconstrues Defendants' Burden in Presenting Alternative Causation Hypotheses — Again.**

The Court has already ruled in prior trials in this MDL that defense experts may testify about reasonable alternative causes of a plaintiff's hair loss.  As this Court has said:

> ***Plaintiff has the burden of proof.*** You have the burden of proof on causation and the defendants have to challenge that. Now, I think [defendants] have to have a good faith basis for the challenge[,] . . . but I think ***[defendants are] going to have to be able to question your experts about other chemotherapy drugs that were prescribed to [Plaintiff] and whether or not those caused permanent alopecia*** and ***I'm not going to preclude them from -- from challenging your causation experts.***

13

Ex. K [September 5, 2019 Hearing Trx.] at 34:8-40:19; *see also* Rec. Doc. 8201, at 2 [Order and Reasons re: MIL to Exclude Evidence of Unrelated Medical Conditions Familiar Medical History of Cancer, and Unrelated Medication Usage].

The Court's prior rulings are entirely consistent with the controlling case law, which permits Defendants' experts to identify reasonable alternative causes for Plaintiff's claimed injury (here, hair loss). *Weber v. Fidelity & Cas. Ins.*, 250 So. 2d 754, 757-58 (La. 1971). It is then Plaintiff's burden to **disprove** that each was an actual cause of her hair loss. *Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F. Supp. 890, 896 (E.D. La. 1972) ("circumstantial evidence [of causation] must exclude other reasonable hypotheses with a fair amount of certainty"); *Rando v. Anco Insulations, Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (same); *Llewellyn v. Lookout Saddle Co.*, 315 So. 2d 69, 71 (La. App. 2d Cir. 1975) (same); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 n.5 (5th Cir. 2002) ("[T]he plaintiff may prove causation by establishing 'with reasonable certainty that all other alternatives are impossible.'") (citing *Joseph v. Bohn Ford, Inc.*, 483 So.2d 934, 940 (La. 1986)); *see also In re Taxotere*, No. 16-2740, 2019 WL 4007783, at *2 (E.D. La. Aug. 23, 2019) (citing *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011) (specific causation typically assessed using a differential diagnosis; Bradford Hill or other general causation methodology is not required for including potential alternative causes in the differential).

Accordingly, Sandoz's experts should be permitted to opine about potential alternative causes of Plaintiff's persistent hair loss, so long as those alternatives are "reasonable hypotheses." *Weber v. Fidelity & Cas. Ins. Co. of NY*, 250 So. 2d 754, 757–58 (La. 1971) (possible alternative causes need only be "reasonable hypotheses" that are not "remote, conjectural, [or] speculative").

In fact, because it is Plaintiff's burden to prove causation and disprove potential alternatives, Courts routinely exclude expert testimony where the expert *failed to rule out* potential alternative causes of the claimed injury. *Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953 *1

14

(E.D. La. June 16, 2015); *Wheat v. Pfizer*, 31 F.3d 340, 342–43 (5th Cir. 1994) (summary judgment for defendant where plaintiff, alleging a particular drug caused her hepatitis, failed to rule out other possible causes); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that an expert's reliance on a study was misplaced when the subjects of the study "had been exposed to numerous potential carcinogens"); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 353 (5th Cir. 2007) (stating that a "study does not provide a reliable basis" where there are various potential causes).

Plaintiff cannot avoid her burden of disproving potential alternative causes of her hair loss by precluding Sandoz from presenting them at all.  Yet, that is precisely how the instant Motion attempts to shift Plaintiff's burden.  Further, it does so by mischaracterizing Drs. Foote's and Reddy's opinions.  Specifically, Plaintiff's motion falsely asserts that Drs. Foote and Reddy will offer affirmative opinions that docetaxel *does not* cause permanent hair loss and that other chemotherapy medications do.  To the contrary, in both their expert reports and deposition testimony, Drs. Foote and Reddy have opined that there is evidence associating numerous chemotherapy medications with cases of permanent hair loss and that any of those medications is a possible cause of permanent or persistent hair loss, but that the cumulative weight of the evidence is insufficient to conclusively state that any of them, including docetaxel, causes permanent hair loss.  They will further opine that, where there are numerous risk factors for permanent hair loss, including multiple potentially-causative medications given in combination or close sequence, it is impossible to opine to any degree of medical certainty, that docetaxel was a causative agent.  That is precisely the type of testimony that Courts will allow, as set forth above, and Plaintiff's attempt to exclude Drs. Reddy's and Foote's opinions is premised on a fundamental misapplication of the law — neither is required to conduct a formal Bradford Hill analysis before identifying reasonable

alternative causes or to outline a "methodology" for proving the negative: that the evidence Dr. Feigal relies upon is insufficient to support her conclusions.

Perhaps more importantly, Drs. Reddy's and Foote's opinions about other medications being potential alternative causes simply confirm what has been *conceded* by multiple plaintiff experts in this MDL, including Plaintiff's own general causation expert, Dr. Feigal, in her trial testimony in the *Earnest* case. Ex. L (Earnest Trial Tr. 1219:4–9) (Dr. Feigal testifying during the Earnest trial that there have been cases of permanent hair loss reported for both Cytoxan and Adriamycin); *see also* Rec. Doc. 10704, at 7 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59) ("Plaintiffs' own experts have acknowledged that [Adriamycin and Cytoxan] are associated with permanent hair loss."); Ex. M (Tosti Dep. 180:8-16; 313:24-314:8) (testifying there are reports of PCIA from Adriamycin and cyclophosphamide); Ex. N (Earnest Trial Tr. 478:10-18) (Dr. Kessler testifying during the Earnest trial that he has seen reports of PCIA associated with both Cytoxan and Adriamycin); Ex. O (Earnest Trial Tr. 861:7–10, 873:20-25) (Dr. Plunkett testifying during the Earnest trial that she identified permanent hair loss as a hazard associated with Adriamycin and Cytoxan); Ex. P (Earnest Trial Tr. 1057:17–24) (Dr. Tosti testifying "what I really think is that those drugs are, you know, sometimes occasionally causing the problem. I never said they never cause. It's just a question of, likely, frequency.").

Taken together, the prior testimony and the Court's rulings reflect the widespread agreement of experts in this MDL that multiple chemotherapy agents are reasonable potential causes of permanent hair loss. Plaintiff's claim that Sandoz's experts need to undertake a Bradford Hill analysis as to each one before offering them as reasonable alternative hypotheses is legally incorrect. It is also factually misplaced: their status as potential alternative causes is not

16

legitimately in dispute.  For these reasons, the Court should again reject PSC's arguments and allow Drs. Foote and Reddy to testify to their opinions about which medications cause hair loss, which have been associated with persistent alopecia, and the sufficiency of the evidence to make general causation conclusions as to any medication, including docetaxel.

## III.   Neither Dr. Foote Nor Dr. Reddy Will Offer Regulatory or Dermatological Opinions or *Affirmative* Specific Causation Opinions.

As the foregoing sections make clear, Drs. Foote and Reddy are not offering regulatory or dermatological opinions. They also are not offering *affirmative* opinions about what, specifically, caused any permanent hair loss alleged by Plaintiff.  Instead, each offer the opinions set forth in their respective expert reports, which all are well within their expertise and experience and are amply supported by medical literature and other data.

Throughout her Motion, Plaintiff conflates any opinion that a medication can cause hair loss or has been associated with persistent hair loss with a "dermatology" opinion.  Not only is that position absurd on its face, it is in direct conflict with Plaintiff's own presentation of experts. Plaintiff's proffered dermatology expert, Dr. Vesna Petronic-Rosic, has not been asked to opine that chemotherapy medications other than docetaxel do not cause persistent hair loss or that the risk of persistent hair loss is greater with docetaxel — Plaintiff has left that opinion to her purported oncology expert, Dr. Feigal.  It is completely inconsistent for Plaintiff to suggest that Dr. Feigal may offer such opinions but that when offered by Sandoz's practicing oncologists they become inappropriate "dermatology" opinions.

Likewise, Drs. Reddy and Dr. Foote are not offering "regulatory" opinions, as set forth above.  It is unsurprising that their opinions regarding the treatment of a breast cancer patient claiming deficient warnings would include their opinions on what is conveyed by the drug's labelling.  But, neither will opine on what FDA requires of pharmaceutical labelling or discuss the

17

FDA approval process or Sandoz's approval.  Rather, each will opine on what Sandoz's docetaxel label conveys to a medical oncologist who is prescribing the drug, how the label is appropriate from the perspective of a practicing oncologist, and how, armed with that information, it is appropriate to counsel a breast cancer patient about the risks.  Those are not "regulatory" opinions requiring FDA expertise.

Finally, neither Dr. Reddy nor Dr. Foote will offer an affirmative opinion about what, specifically, caused any persistent hair loss alleged by Plaintiff.  Instead, as set forth above, each will opine that it is not scientifically possible to reach such a conclusion based on the available data and medical literature and a review of Ms. Stewart's treatment and medical history, and that Plaintiff's expert's contentions to the contrary are flawed and without scientific merit.  Those are not "specific causation" opinions requiring an independent causation analysis and Plaintiff has identified no cogent reason to exclude them.

## CONCLUSION

The opinions offered by Drs. Foote and Reddy are amply supported by their Expert Reports and lists of materials reviewed.  They employ sound scientific methodology and their opinions are of precisely the type that courts routinely allow in these cases.  For all those reasons, this Court should deny Plaintiff's Motion to Exclude the Testimony of Lawrence Foote, M.D. and Sreekanth Reddy, M.D.

Dated: December 11, 2020                    Respectfully Submitted:

**GREENBERG TRAURIG, LLP**

/s/ *Lori G. Cohen*
Lori G. Cohen
R. Clifton Merrell
Evan C. Holden

18

Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100
(678) 553-2386 (facsimile)
CohenL@gtlaw.com
MerrellC@gtlaw.com
HoldenE@gtlaw.com

*Attorneys for Sandoz Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2020, a copy of the foregoing document was served on all counsel of record via CM/ECF.

/s/ *Lori G. Cohen*
Lori G. Cohen

20