# **EXHIBIT E**

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4    -----------------------------x
     IN RE:  TAXOTERE              )
5    (DOCETAXEL) PRODUCTS          ) MDL NO. 2740
     LIABILITY LITIGATION          )
6                                  )
     THIS DOCUMENT RELATES TO:     ) CIVIL CASE NO.
7    WANDA STEWART V. SANDOZ INC.  )
                                   ) 2:17-cv-10817
8                                  )
     -----------------------------x
9

10

11

12

13        VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

14                  ELLEN FEIGAL, M.D.

15              Tuesday, September 1, 2020

16

17

18

19

20

21

22

23   Reported By:

24   SUSAN A. SULLIVAN, CSR #3522, RPR, CRR

25   Job No. 183203

Page 2

```
1              September 1, 2020
2              8:05 a.m.
3
4   VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
5   ELLEN FEIGAL, M.D., taken by Defendant
6   Sandoz, Inc., before Susan A. Sullivan,
7   CSR, RPR, CRR, State of
8   California.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1           A P P E A R A N C E S :
2
3   MICELI LAW FIRM
4       Attorney for the Plaintiffs
5       PO Box 2519
6       Carrollton, Georgia 30112
7   BY:  DAVID MICELI, ESQ.
8
9   GREENBERG TRAURIG
10      Attorneys for the Defendant Sandoz, Inc.
11      One International Place
12      Boston, Massachusetts 02110
13  BY:  NICHOLAS INSOGNA, ESQ.
14       EVAN HOLDEN, ESQ.
15
16  TUCKER ELLIS
17      Attorneys for the Defendant Accord Healthcare
18      515 South Flower Street
19      Los Angeles, California 90071
20  BY:  MOLLIE BENEDICT, ESQ.
21       MADELINE DENNIS, ESQ.
22
23
24
25
```

Page 4

```
1   APPEARANCES OF COUNSEL (Continued):
2
3   SHOOK, HARDY & BACON
4       Attorneys for the Defendant Sanofi
5       2555 Grand Boulevard
6       Kansas City, Missouri 64108
7   BY:  HILLARY NICHOLAS, ESQ.
8        CONNOR SEARS, ESQ.
9
10  ULMER & BERNE
11       Attorneys for the Defendant Actavis LLC,
12       Actavis Pharma, Inc. and Sagent
13       Pharmaceuticals
14       600 Vine Street
15       Cincinnati, Ohio 45202
16  BY:  MICHAEL SUFFERN, ESQ.
17
18  HINSHAW & CULBERTSON
19       Attorneys for the Defendant Sun
20       Pharmaceutical Industries
21       53 State Street
22       Boston, Massachusetts 02109
23  BY:  GEOFFREY COAN, ESQ.
24
25
```

Page 5

```
1   APPEARANCES OF COUNSEL (Continued):
2
3   DECHERT
4       Attorneys for Defendants Hospira, Inc.
5       and Pfizer, Inc.:
6       1095 Avenue of the Americas
7       New York, New York 10036
8   BY:  LAUREN GUMEROVE, ESQ.
9
10
11  ALSO PRESENT:
12      DAWN PRATHER
13
14  VIDEOGRAPHER:
15      BRENT JORDAN
16
17
18
19
20
21
22
23
24
25
```

1                September 1, 2020
2                  8:05 a.m.
3                   --o0o--
4
5        THE VIDEOGRAPHER:  Good morning,
6  counselors.  My name is Brent Jordan.  I'm the
7  Certified Legal Videographer in association with
8  TSG Reporting, Inc.
9        Due to the severity of the COVID-19 and
10 following the practice of social distancing I will
11 not be in the same room with the witness, instead I
12 will record this videotaped deposition remotely.
13 The reporter, Sue Sullivan, also will not be in the
14 same room and will record this deposition remotely
15 and will swear the witness remotely.  Do all
16 parties stipulate to the validity of this video
17 recording and remote swearing and that it will be
18 admissible in the courtroom as if it had been taken
19 following Rule 30 of the Federal Rules of Civil
20 Procedures or the state's rules where this case is
21 pending?
22       MR. MICELI:  On behalf of the plaintiffs,
23 this is David Miceli, yes, we agree.
24       MR. INSOGNA:  On behalf of Sandoz, Inc.,
25 this is Nick Insogna, we agree.

1        THE VIDEOGRAPHER:  Thank you.
2        MS. BENEDICT:  And for Accord, Mollie
3  Benedict.  We agree as well.
4        THE VIDEOGRAPHER:  Thank you.
5        This is the start of DVD labeled No. 1 of
6  the videotaped deposition of Dr. Ellen Feigal taken
7  in the matter or In Re:  Taxotere Products
8  Liability Litigation filed in the United States
9  District Court, Eastern District of Louisiana, MDL
10 No. 2740.
11       This deposition is taken on September 1st,
12 2020, at approximately 8:07 a.m.  My name is Brent
13 Jordan.  I'm the legal video specialist from TSG
14 Reporting, Inc., headquartered at 228 East 45th
15 Street, New York, New York.  The court reporter is
16 Sue Sullivan in association with TSG.
17 Will counsel please identify themselves for the
18 record.
19       MR. MICELI:  David Miceli on behalf of the
20 PSC and plaintiffs.
21       MR. INSOGNA:  Nick Insogna, Greenberg
22 Traurig, on behalf of Defendant Sandoz, Inc.
23       MS. BENEDICT:  Mollie Benedict for Accord
24 Healthcare, Inc.
25       THE VIDEOGRAPHER:  Will the court

1  reporter --
2        DR. FEIGAL:  I'm sorry?
3        MR. MICELI:  I think there are some folks
4  who are from other firms who are attending, at
5  least they are in the -- when you hit icon of the
6  individuals up top, Connor, Hillary, if you guys
7  want to announce yourselves.
8        MR. HOLDEN:  Evan Holden from Greenberg
9  Traurig on behalf of Sandoz.
10       MR. SEARS:  Connor Sears for Sanofi.
11       MS. DENNIS:  Madeline Dennis for Accord.
12       MR. SUFFERN:  Good morning.  My name is
13 Michael Suffern.  I represent Activis Pharma, Inc.
14 Actavis, LLC, and Sagent Pharmaceutical, Inc.
15       MR. COAN:  Geoff Coan representing Sun
16 Pharmaceuticals.  Thank you.
17       MS. GUMEROVE:  Lauren Gumerove on behalf
18 of the Hospira and Pfizer defendants.
19       MR. MICELI:  I think that's everybody.
20       THE VIDEOGRAPHER:  Will the court reporter
21 please swear in the witness.
22 ///
23 ///
24 ///
25

1  ELLEN FEIGAL, M.D.,
2        called as a witness, having been duly sworn by
3        the court reporter, was examined and testified
4        as follows:
5
6  EXAMINATION
7  BY MR. INSOGNA:
8        Q   Good morning, Dr. Feigal.  I know we met
9  just made introductions a moment ago off the record
10 but my name is Nick Insogna.  I represent the
11 defendant Sandoz, Inc. in this litigation.  Nice to
12 meet you.  Thank you for joining us today.
13       You understand that you have been sworn in
14 by the court reporter now?
15       A   Yes.
16       Q   And that the oath you gave has the same
17 force and effect as if you were testifying in
18 court?
19       A   Yes.
20       Q   And that it obligates you to tell the
21 truth here today?
22       A   Yes.
23       Q   And you understand that if you fail to
24 tell the truth in any of your testimony that is
25 considered perjury under the law?

1    A   Yes.
2        MR. MICELI:  Object to the form.
3    Q   BY MR. INSOGNA:  And so you will agree to
4  provide me with truthful and accurate testimony
5  today?
6    A   Yes.
7    Q   To that end is there anything preventing
8  you from providing truthful or accurate testimony
9  today?
10   A   No.
11   Q   Any medication that you are taking or
12 memory problem that you have that might prevent you
13 from recalling important details?
14   A   No.
15   Q   And you have been deposed before several
16 times in this litigation, correct?
17   A   Yeah.
18   Q   Okay.  Other than depositions in
19 connection with the Taxotere litigation have you
20 ever been deposed?
21   A   No.
22   Q   And in this litigation I count you have
23 been deposed six times and I would like to mark
24 each of those transcripts for the record so that we
25 have them.  So I would like --

1    A   For some reason I have four times, this is
2  the fifth.  Do you have six?
3    Q   I will list them for you by date.
4    A   Okay.
5    Q   I think probably I'm talking about two
6  volumes of one session, if you will.
7    A   Oh, okay.
8        (Feigal Exhibit 1, Deposition of Ellen
9  Feigal, Volume 1, taken December 7, 2018, (Durden,
10 Francis, Earnest), marked for identification, of
11 this date.)
12   Q   BY MR. INSOGNA:  So Exhibit 1 will be the
13 December 7th, 2018, Volume I testimony in the
14 Durden, Francis and Earnest matters.  Do you recall
15 that?
16   A   Yes.
17   Q   And there's a second volume of that
18 deposition also.  I will mark that as Exhibit 2.
19       (Feigal Exhibit 2, Deposition Of Ellen
20 Feigal, Volume 2, taken December 7, 2018, (Durden,
21 Francis, Earnest), marked for identification, of
22 this date.)
23       THE WITNESS:  Did you want me to be
24 looking at that?
25   Q   BY MR. INSOGNA:  No, I just want to mark

1  them and if we need to refer them later I will call
2  them to your attention.
3    A   Thank you.
4    Q   And Dawn, our lovely paralegal in Atlanta,
5  is going to help me mark the exhibits so you will
6  see them on the screen and we can refer to them as
7  needed throughout the deposition.
8    A   Okay.  I think there was some errata like
9  the spelling of my name but you should have that as
10 well.
11   Q   Yes.  And if any of those become important
12 today please feel free to let me know.
13   A   Okay.
14       MR. INSOGNA:  Exhibit 3 will be your
15 testimony from January 11, 2019, in the Durden,
16 Francis and Earnest matters.
17       (Feigal Exhibit 3, Deposition of Ellen
18 Feigal, Volume 3, taken January 7, 2019, (Durden,
19 Francis, Earnest), marked for identification, of
20 this date.)
21       MR. INSOGNA:  Exhibit 4 will be your
22 testimony from April 30th, 2019, also in the
23 Durden, Francis and Earnest matters.
24       (Feigal Exhibit 4, Deposition of Ellen
25 Feigal, Volume 4, taken April 30, 2019, (Durden,

1  Francis, Earnest), marked for identification, of
2  this date.)
3        MR. INSOGNA:  Exhibit 5 --
4        THE WITNESS:  I think you mean April 10th.
5        MR. INSOGNA:  I have April 30th of 2019.
6  There's also April 10th of this year and I will get
7  to that one in a moment.
8        Exhibit 5 is November 21st, 2019, in the
9  Crayton and Thibodeaux matters.
10       (Feigal Exhibit 5, Deposition of Ellen
11 Feigal taken November 21, 2019, (Crayton,
12 Thibodeaux), marked for identification, of this
13 date.)
14       MR. INSOGNA:  And Exhibit 6 will be your
15 testimony from April 10th, 2020, in the Kahn
16 matter.
17       (Feigal Exhibit 6, Deposition of Ellen
18 Feigal taken April 10, 2020, marked for
19 identification, of this date.)
20   Q   BY MR. INSOGNA:  And you also testified in
21 the trial of the Barbara Earnest case, correct?
22   A   Correct.
23   Q   And I take it from the fact there are
24 errata to some of these that you've had an
25 opportunity to review all your prior testimony in

Page 14

1  this matter?
2      A   Correct.
3      Q   Is there anything that appeared to you on
4  review to need to be corrected in any of that prior
5  testimony?
6      MR. MICELI:  I object to form.
7      THE WITNESS:  There were erratas that were
8  provided.  I don't know if that's part of the
9  exhibits.
10     Q   BY MR. INSOGNA:  So let me say it this
11  way.  Outside of the errata that you have provided,
12  did you notice any other substantive corrections
13  that needed to be made to any of your prior
14  testimony?
15         I'm sorry, I didn't hear that.  Was that
16  no?
17     A   No.
18     Q   Was all of your prior testimony truthful
19  and accurate at the time you gave it?
20     MR. MICELI:  Hold on.  Did you ever get a
21  verbal answer?  Because I couldn't hear her.
22         If you are talking I can't hear you,
23  excuse me, Dr. Feigal.
24         Did you hear Dr. Feigal?
25     MR. INSOGNA:  I did on one of the noes.  I

Page 15

1  cannot anymore.
2      MR. MICELI:  Okay.  I want to make sure
3  because I have the visual issue, I want to make
4  sure we have audio correct, because I didn't hear
5  her and I don't want you asking questions as
6  followups to answers I don't hear.
7         Dr. Feigal, can you just, did somebody --
8  look at your watch, Nick, because I don't want this
9  to eat into your time but I can't hear Dr. Feigal
10  and she seems to be frozen on my screen.
11     Q   BY MR. INSOGNA:  Dr. Feigal, I cannot hear
12  you either.  You may need to try to dial back in,
13  take a moment off the record and you can dial back
14  in.
15     THE VIDEOGRAPHER:  Off video at 8:15 a.m.
16      (Recess taken)
17     THE VIDEOGRAPHER:  Back on video at 8:17
18  a.m.
19  BY MR. INSOGNA:
20     Q   Okay, Dr. Feigal, we had a bit of a
21  technical hiccup there for a moment and I'm sure
22  we'll have a few of those throughout the day.  I
23  know you have done this before as have I.  We will
24  all do our best here and go off the record when we
25  need to to save some time.

Page 16

1         So that we have a clean record, my last
2  question was was all of your prior testimony in
3  this litigation truthful and accurate at the time
4  that you gave it.
5      A   Yes.
6      Q   Is there any prior testimony that you have
7  given that is no longer accurate?
8      A   Not that I'm aware.
9      Q   Is there anything to which you testified
10  previously that you believe needs to be
11  supplemented in order to be fully accurate today?
12     MR. MICELI:  Object to the form.
13     THE WITNESS:  Probably.  Probably.
14     Q   BY MR. INSOGNA:  Sitting here in this
15  moment are you able to think of anything
16  specifically that you believe needs to be
17  supplemented for the prior answer to be accurate?
18     A   Not specifically.  The volume.
19     Q   Understood.  And I think we will cover
20  some of that today.
21         In any event, you stand by all the
22  testimony that you have previously given in this
23  litigation, correct?
24     A   I --
25     MR. MICELI:  Object to form.

Page 17

1      Q   BY MR. INSOGNA:  That includes the trial
2  testimony you gave in the Earnest case, correct?
3      A   I scanned it.
4      Q   I'm sorry, did you say you scanned it?
5      A   Correct.
6      Q   Okay.  Do you stand by that testimony?
7      MR. MICELI:  Object to the form.
8      THE WITNESS:  I gave truthful testimony.
9      Q   BY MR. INSOGNA:  So I will do my best
10  today not to go over questions that you have
11  already answered.  There are some things I think we
12  may need to talk about that are specific to my
13  client and I'm sure Ms. Benedict will do the same
14  for Accord, but I will do my best to focus on new
15  material today.  I will just ask that you do your
16  best to listen to my questions and stick to my
17  questions.  I think that will get us through more
18  quickly.
19         Can you state your full name for the
20  record, please.
21     A   My full name is Ellen Gwen Feigal.
22     Q   Your residential and business addresses
23  have not changed since your last deposition,
24  correct?
25     A   Correct.

Page 18

1    Q   Have you ever been convicted of a crime?
2    A   No.
3    Q   Have you ever filed for bankruptcy?
4    A   No.
5    Q   And I believe you said that other than
6  your testimony as an expert witness in this
7  litigation you have never testified in any capacity
8  before, correct?
9    A   Correct.
10   Q   Including as a witness, a percipient
11 witness in any matter.
12   A   I have not previously testified other than
13 for this litigation.
14   Q   Okay.  Have you ever been a party to a
15 lawsuit?
16   A   No.
17   Q   You understand that somebody can be sued
18 without a factual basis, correct?
19       MR. MICELI:  Object to the form.
20       THE WITNESS:  Correct.
21   Q   BY MR. INSOGNA:  In other words, the fact
22 that lawsuit has been filed does not mean that it
23 has merit, correct?
24   A   Correct.
25   Q   And that plenty of lawsuits are dismissed

Page 19

1  without any adverse finding for the defendant,
2  right?
3        MR. MICELI:  Object to the form.
4        THE WITNESS:  Some lawsuits are not
5  successful, that is correct.
6    Q   BY MR. INSOGNA:  And that could be true
7  where the defendant is a pharmaceutical
8  manufacturer, correct?
9        MR. MICELI:  Same objection.
10       THE REPORTER:  Was there an answer?
11       THE WITNESS:  My answer was yes.  Can you
12 hear me?
13       THE REPORTER:  Yes.
14       MR. INSOGNA:  Yes, I can, Dr. Feigal,
15 thank you.
16       You can still hear, correct?
17       MR. MICELI:  Yes, I can still hear.  Thank
18 you.
19       MR. INSOGNA:  I would like to mark as our
20 next exhibit in order the plaintiffs' Rule 26
21 disclosure of experts in this case.
22       Dawn, if you wouldn't mind pulling that up
23 for us.
24       (Feigal Exhibit 7, Plaintiffs' Disclosure
25 of Witnesses, June 8, 2020, marked for

Page 20

1  identification, as of this date.)
2        MR. MICELI:  Will this be No. 6?
3        MR. INSOGNA:  I have seven, Dave.
4        MR. MICELI:  Okay, thanks.
5    Q   BY MR. INSOGNA:  Dr. Feigal, have you seen
6  this document before?
7    A   No.
8    Q   Fair to say then that you did not provide
9  any assistance in the drafting of this document?
10   A   Correct.
11   Q   And this document identifies the expert
12 witnesses that the plaintiffs have identified in
13 this case, and by this case I mean Ms. Stewart's
14 case and also Ms. Hughes' case against Accord, and
15 I assume that you are familiar with who the
16 plaintiffs' experts in this litigation are?
17       MR. MICELI:  Object to the form.
18       THE WITNESS:  I would not know who all the
19 witnesses are, no.
20   Q   BY MR. INSOGNA:  Okay.  I will go through
21 some names with you.
22       I understand that you personally are
23 friends with Dr. Bosserman who is an expert in this
24 case, correct?
25   A   Dr. Bosserman is a colleague of mine, yes.

Page 21

1    Q   And so excluding any personal
2  communications you've had with her not about this
3  case, have you spoken with Dr. Bosserman about any
4  substantive issues pertaining to the litigation
5  between your last deposition and today?
6    A   I have had no conversation, personal or
7  otherwise, with Dr. Bosserman.
8    Q   Okay.  You've had no discussion with her
9  about the facts or substance of any of your
10 opinions that you are here to discuss today?
11   A   None.
12   Q   Okay.  Have you spoken with any of the
13 other plaintiff experts between your last
14 deposition and today?
15   A   No.
16   Q   Okay.  And I will go through the names
17 just to confirm.
18       Dr. David Madigan, you have not spoken
19 with him?
20   A   No.  Since the last deposition, no.
21   Q   And Dr. David Ross, you have not spoken
22 with him since your last deposition?
23   A   I don't recall ever speaking with Dr.
24 Ross.
25   Q   Dr. Plunkett?

1     A   Likewise.  I haven't spoken to Dr.
2  Plunkett.
3     Q   And Dr. Rosic?
4     A   I have never spoken to Dr. Rosic.
5     Q   Okay.  Have you spoken with any other
6  expert or consultant that you understood to be
7  working on behalf of plaintiffs in this litigation?
8     A   No.
9     Q   And I know in your report you identified
10  that you have read some of the other plaintiffs'
11  experts' written reports; is that right?
12     A   Correct.  And that's on my reliance
13  report.
14     Q   Yes.
15         And other than reading their expert
16  reports, did you confer with them for the purpose
17  of formulating your own opinions in this
18  litigation?
19     A   No.
20     Q   And that question includes prior your last
21  deposition.  At no time did you confer or consult
22  with them in formulating your opinions?
23     A   No.  I might have provided some terms to
24  Dr. Madigan at one point when I was doing a search,
25  he asked me to confirm some terms that he was

1  looking at.
2     Q   What sort of terms were those?
3     A   I believe they were terms for the
4  chemotherapy and terms for alopecia.
5     Q   And did you understand this to be in
6  connection with Dr. Madigan performing his own
7  search for relevant literature?
8     A   I don't know if it was for literature or
9  it was for the FAERS database.
10     Q   Do you recall --
11     A   I don't know -- no, not the specifics.  He
12  just wanted to know the relevant chem -- he just
13  wanted me to confirm the relevant chemo- therapies
14  for patients with breast cancer and whether or not
15  I agreed with the alopecia terms that he was using.
16     Q   Okay.  Let me take that in two parts.
17         When you say the terms for the
18  chemotherapy medications, in other words, you gave
19  him the name of chemotherapy medications that would
20  likely be used in the treatment of breast cancer;
21  is that right?
22         MR. MICELI:  Object to form.
23         THE WITNESS:  I think I was -- no, no.  I
24  think I was confirming names with him.  He had some
25  names that -- I was confirming them; if they were

1  correct or not correct names.
2     Q   BY MR. INSOGNA:  And what you were
3  confirming about those names is that they were
4  pharmaceuticals that could be used in the treatment
5  of breast cancer?
6     A   Early-stage breast cancer.
7     Q   Okay.  And then you said you also spoke
8  with him regarding pertinent alopecia terms; is
9  that right?
10     A   I think they were terms using --
11         MR. MICELI:  Object to form.
12         THE WITNESS:  Terms he was using for
13  alopecia.  I don't remember the specifics.  It was
14  quite awhile ago.
15     Q   BY MR. INSOGNA:  Okay.  When you say terms
16  he was using for alopecia, is that -- did you
17  understand him to be confirming search terms
18  related to alopecia that he was using?
19     A   Correct.
20     Q   Other than your conversation with Dr.
21  Madigan you don't recall conferring with any of the
22  other plaintiff experts for purposes of formulating
23  your opinions in this case?
24         MR. MICELI:  Object to the form.
25         THE WITNESS:  I just want -- I just want

1  to clarify.  Conferring, I think it was just
2  looking at an email, perhaps, or it wasn't a
3  discussion.  In terms of other witnesses, you are
4  asking since the last depo or at any time?  Just
5  clarify your question.
6         MR. INSOGNA:  Sure.
7     Q   At any time did you consult or confer or
8  discuss with any of the other plaintiffs' experts
9  theories of the case?
10     A   No.  The only other time I ever talked
11  with a -- I don't even think they're witnesses in
12  this case anymore -- was the night before Science
13  Day I had a phone conversation I believe with --
14         MR. MICELI:  You know what?  Hold on a
15  second.  Ellen, Ellen, hold on.
16         Judge Milazzo has entered an order stating
17  that Science Day is off limits for discovery and
18  you are not to go into that.  I will instruct you
19  not to answer anything about Science Day throughout
20  the course of this deposition and if we need to
21  take it up we can take it up with the court, but
22  there is a CMO that has been entered that restricts
23  any discovery about Science Day so I will leave it
24  at that.
25         THE WITNESS:  No other conversations.

1    Q   BY MR. INSOGNA:  Okay.  And leaving aside
2  whatever you did in connection with Science Day, in
3  advance of Science Day you spoke to another expert
4  about matters of --
5        MR. MICELI:  Object to the form.  Object
6  to the form and do not answer the question.  If it
7  is in relation to Science Day do not answer the
8  question on my instruction.
9    Q   BY MR. INSOGNA:  Dr. Feigal, do you recall
10  approximately when in time that conversation prior
11  to Science Day happened?
12    A   I'm following an instruction.
13    Q   This is a different question, Dr. Feigal.
14        Do you recall what roughly the date of
15  that conversation was in advance of Science Day?
16    A   Same answer.
17        MR. MICELI:  Nick, if you want to go off
18  the record or if you want Dr. Feigal to mute
19  herself or turn off her speaker I will tell you
20  exactly what I believe and you can confirm it and I
21  will let her answer the question because I think
22  she has already answer it for you.
23        MR. INSOGNA:  That's okay.  I think I can
24  move on to something and we can circle back to it
25  if we need to.

1        MR. MICELI:  Okay.  At a break if you want
2  to, it is a simple -- it is a simple answer, so go
3  ahead.
4        MR. INSOGNA:  Sure.
5    Q   Dr. Feigal, in your list of materials
6  reviewed you identified the expert reports of Drs.
7  Madigan, Glaspy, Chang, Freites-Martinez and Ross.
8  Is that a complete list of the expert reports that
9  you reviewed in this litigation?
10        MR. MICELI:  Object to the form.
11        THE WITNESS:  Yes, that is my recall of
12  the expert reports reviewed.
13    Q   BY MR. INSOGNA:  You can't recall any
14  others that you reviewed or considered that were
15  omitted from that list that I read?
16    A   No.
17    Q   Are any of the opinions that you are
18  offering based in any way on your review of any of
19  those experts' reports?
20    A   No.  I just cite relative sections of my
21  report for specific issues from their report.
22    Q   Did you have any of their reports in your
23  possession at the time that you authored your own
24  report?
25    A   In my possession, no.

1    Q   Now the report that you have issued in
2  this case, Ms. Stewart's case, is new to her case.
3  Am I correct in understanding that you had reviewed
4  expert reports from prior cases in this litigation
5  before drafting your report for this case?
6    A   No.  The only -- before drafting my report
7  for this case, no.  The only reports I cited were
8  footnoted in my report; Dr. Madigan for the
9  statistical causation association numbers and I
10  cited Dr. David Ross' in one section.  Otherwise no
11  other -- no other information is relevant to the
12  formation of my opinions.
13    Q   Okay.  And leaving aside what's relevant
14  to the formation of your opinions, what I'm getting
15  at is what information you had in your mind when
16  you were preparing this report in Ms. Stewart's
17  case.  So if I tell you that your expert report was
18  issued on June 8th in this case, prior to that date
19  had you reviewed Dr. Madigan's report or Dr. Ross'
20  report or any other expert's report?
21    A   I reviewed it for context where I cited
22  them.
23    Q   Okay.  And was anything that you reviewed
24  in any of those experts' reports foundational to
25  your opinions in this case?

1    A   The only -- I cited it in my report.  If
2  you would like to go through my report we can talk
3  about the specifics.
4    Q   And we certainly will do that.
5        Other than the citations that appear in
6  your report is it correct that there's nothing from
7  any other expert's report that you believe is
8  foundational for your opinions?
9    A   Not foundational.
10        MR. MICELI:  Object to form.
11        THE WITNESS:  Not foundational.  If I'm
12  interpreting your question correctly I would say my
13  report is formulated from the papers I reviewed,
14  from the pharmacovigilance I reviewed, you know,
15  randomized clinical trial reports I reviewed.
16  Those are foundational and helped provide the data
17  to inform my opinions.
18    Q   BY MR. INSOGNA:  Is there any portion of
19  any of your opinions in this case that you could
20  not support without identifying another expert's
21  report in this litigation?
22        MR. MICELI:  Object to the form.
23        THE WITNESS:  I don't believe so.  I don't
24  believe so, but I did have the bio- statistician
25  calculate the strength of association which is a

1  statistical tool.
2      Q   BY MR. INSOGNA:  And is that calculation
3  necessary for your causation opinions in this case?
4      A   I don't believe so, but it is supportive
5  and it is included in my report and I know that
6  foundational principles in terms of how it is
7  derived.
8      Q   Did you see anything in the expert reports
9  of any of plaintiffs' other experts with which you
10  disagreed?
11      A   Please repeat your question.
12      Q   Sure.
13          When you reviewed any of plaintiffs' other
14  experts' written reports did you see anything with
15  which you disagreed?
16          MR. MICELI:  Object to form.
17          THE WITNESS:  The plaintiffs' reports?
18          BY MR. INSOGNA:  Right.
19      A   I wasn't looking at it for that, I was
20  looking at it for the specific places I cited in my
21  report.  Offhand I don't have any -- any specific
22  critique of their reports.
23      Q   Okay.  And beyond specific critiques, do
24  you recall reading any fact or opinion or analysis
25  that you thought was incorrect?

1          MR. MICELI:  Object to the form.
2          THE WITNESS:  I wasn't reading it for
3  that.
4      Q   BY MR. INSOGNA:  I understand.  I'm not
5  asking whether that was your purpose in reading it.
6          While you were reading it did you note
7  anything that you thought was incorrect?
8          MR. MICELI:  I will object.
9          THE WITNESS:  I don't have any -- I have
10  no -- their opinions are their opinions and no, I
11  don't have any criticisms of their opinions.
12      Q   BY MR. INSOGNA:  And did you see any
13  inaccuracies in any plaintiffs' expert report?
14          MR. MICELI:  Same objection.
15          THE WITNESS:  It is such a broad question
16  but my answer is I have no -- I had no concerns
17  about the accuracy of their reports.
18      Q   BY MR. INSOGNA:  Okay.  And sitting here
19  today you cannot recall anything that you thought
20  was factually inaccurate in any of their reports?
21          MR. MICELI:  Object to the form.
22          THE WITNESS:  I -- as I said, I wasn't
23  reading it as an editor but no, I don't -- I didn't
24  see anything that was inaccurate.
25      Q   BY MR. INSOGNA:  Have you subsequently

1  reviewed any of the expert reports submitted by my
2  client's, Sandoz, experts in this case?
3      A   I believe that was submitted to you.  I
4  believe it was Dr. Reddy, Dr. Anderson and Dr.
5  Foote.
6      Q   Did the review of their expert reports
7  cause you to change or modify any of your opinions
8  in any way?
9      A   Not at all.
10      Q   And later we will talk about any
11  substantive critique you may have of any of
12  defendants' experts but can you answer simply for
13  me whether you intend to modify any of your
14  opinions in your written report in response to
15  anything you read in any defendants' expert report?
16      A   Nothing.  I don't intend to modify.  But I
17  reserve the right to but I don't intend to.
18      Q   Prior to your work on this litigation have
19  you worked with any of the attorneys that you
20  understand to be working for plaintiffs?
21      A   Could you repeat the question?
22      Q   Yes.  Prior to your involvement in the
23  Taxotere litigation have you worked in any capacity
24  with any attorneys you understand to be
25  representing plaintiffs in this litigation?

1      A   Not that I understand are representing
2  plaintiffs, no.  I only had worked on this
3  litigation with them.
4      Q   And my question included in a consulting
5  capacity or any other capacity.  The answer is
6  still the same?
7      A   I guess my question is I don't know
8  which -- I don't know specifically which ones are
9  still working on that, on the litigation.  I have
10  provided some advice not on a litigation but I have
11  provided some educational advice.
12      Q   To attorneys that you believe are involved
13  in this litigation; is that correct?
14      A   On a separate issue.
15      Q   And what was the nature of that separate
16  issue?
17          MR. MICELI:  Well, object to the form.
18          Hold on, hold on, Ellen.  Ellen, you've
19  got to let me make my objection, please.
20          I object to the form to the extent this
21  witness is serving in a consulting role in another
22  litigation, I don't believe that's discoverable.
23          MR. INSOGNA:  Dave, are you instructing
24  her not to answer?
25          MR. MICELI:  I'm going to instruct her not

Page 34

1  to answer.  If she is a consulting expert then yes,
2  I'm instructing her not to answer.
3      Q   BY MR. INSOGNA:  Dr. Feigal, any
4  educational advice you provided to one of the
5  attorneys, was that in a consulting expert
6  capacity?
7      A   It is a consulting capacity.  I'm not an
8  expert -- I'm not an expert witness.
9      Q   Are you consulting in connection with
10 litigation?
11     A   I don't -- I don't think actually in
12 connection with litigation, it is more educational
13 about some issues relevant to it.  I don't even
14 know if it is litigation.
15     Q   And have you been formally retained for
16 whatever work it is that you are providing that
17 advice?
18     A   Formally retained, no.
19     Q   Do you have an engagement agreement with
20 that attorney?
21     A   I'd have to check.
22     Q   Okay.  And maybe this wasn't clear from my
23 prior question.  Is your work in this capacity
24 we're discussing, whatever it is, does that predate
25 your involvement in the Taxotere litigation?

Page 35

1      A   I was working with attorneys in the
2  consulting capacity before I agreed to consult in
3  the -- as an expert witness if that's your
4  question.
5      Q   I believe it is.  Let me just re-ask to
6  confirm.
7          So this work that you were doing, this
8  what you called educational advice, is something
9  that you were involved in before you were contacted
10 by attorneys you understand were working on the
11 Taxotere litigation?
12     A   It is the same attorney.  I think --
13     MR. MICELI:  It may be the attorneys who
14 are on this telephone call with you.
15     MR. INSOGNA:  I understand, Dave.  Maybe
16 we will come back to it.
17     MR. MICELI:  Yeah.
18     Q   BY MR. INSOGNA:  Thinking back to when you
19 were first contacted about expert work for the
20 Taxotere litigation, how was that first contact, do
21 you recall?
22     A   Can you be a little more specific?
23     Q   Sure.
24          Can you tell me -- first what were you
25 told about the case when you were first asked to

Page 36

1  be --
2      MR. MICELI:  Object to the form.  Excuse
3  me.  Object to -- before you answer -- I will tell
4  you, let me get your whole question out and then I
5  will object and instruct her not to answer when you
6  are asking her questions about what attorneys told
7  her that led to her retention in this case, and we
8  should maybe create a list of things that we may
9  need to visit with Judge North about.
10     Q   BY MR. INSOGNA:  Dr. Feigal, I assume you
11 intend to follow your counsel's instruction?
12     A   Yes.
13     Q   Did you know at the time that you were
14 working for the plaintiffs in the litigation?
15     A   Yes.
16     Q   And did you know the plaintiffs' general
17 theories of the case before you started reviewing
18 materials?
19     MR. MICELI:  Object to the form.
20     Instruct you not to answer.
21     Q   BY MR. INSOGNA:  Were you provided
22 materials for your initial review?
23     MR. MICELI:  Object to the -- well, go
24 ahead, if you want -- you can answer that one.
25     THE WITNESS:  I think you are going to

Page 37

1  need to be a little more specific.  Before what?
2      Q   BY MR. INSOGNA:  When you -- prior writing
3  any written report in this case did Plaintiffs'
4  attorneys provide you materials to review?
5      A   I -- I asked the -- yes, I asked for
6  materials to be reviewed --
7      MR. MICELI:  Ellen, stop, please.  Do
8  not -- I'm instructing you, do not discuss what you
9  asked us and what we told you, period.  He asked if
10 you were provided materials, he didn't ask about a
11 discussion and you are not to discuss discussions
12 with counsel.
13          I apologize.
14     Q   BY MR. INSOGNA:  And, Doctor, to the
15 answer to the question were you provided materials,
16 that was yes, correct?
17     MR. MICELI:  Actually the question -- I
18 think I need to have the question read back because
19 that was not the only question I believe that you
20 said before authoring a report in this case.
21     MR. INSOGNA:  Yes.
22     Q   Prior to offering a written report in this
23 case Plaintiffs' attorneys provided you materials
24 for your review, correct?
25     A   Yes.

Page 38

1    Q   Independent of the materials that were
2  provided to you did you conduct additional
3  research?
4    A   Yes.
5    Q   The list of articles that you reference in
6  your expert report, were any of those provided to
7  you by Plaintiffs' counsel?
8    A   All of the articles I obtained, there may
9  have been one that they provided to me that I asked
10 them for.
11   Q   Did you ask for a specific article to be
12 provided to you?
13   A   Correct.
14       MR. MICELI:  Objection to the form,
15 instruct -- object to the form.
16       Do not discuss discussions with counsel.
17   Q   BY MR. INSOGNA:  Do you recall which
18 articles you did not obtain through your own
19 searches?
20   A   No, I don't recall.
21   Q   Do you recall that in earlier depositions
22 you were asked similarly if there were any articles
23 that you did not locate on your own?  Do you recall
24 those prior questions?
25   A   I do not.

Page 39

1    Q   Okay.  And subsequent to your earlier
2  testimony, between your last deposition and today
3  have you done anything to refresh your recollection
4  as to what articles you collected versus which were
5  provided to you?
6    A   There was only one at most.  Everything I
7  put into this paper I obtained.
8    Q   Do you recall which one that was?
9        MR. MICELI:  Same -- or object to the
10 form.
11       THE WITNESS:  I don't recall the specific
12 article.
13   Q   BY MR. INSOGNA:  Between your last
14 deposition and today did you update your literature
15 searches in any way?
16   A   I looked and there were no new additions.
17   Q   And when you say you looked, did you rerun
18 the search that you had previously run?
19   A   Correct.
20       I think in this -- I may have added an
21 additional drug in this report that wasn't in a
22 prior report.
23   Q   Do you know which drug that was?
24   A   Trastuzumab.
25   Q   Could you say that again?

Page 40

1    A   T-r-a-s-t-u-z-u-m-a-d.
2    Q   Got it.  Thank you.
3        So other than adding a search term for
4  trastuzumab, did you modify your prior search terms
5  in any way?
6    A   No.
7        MR. MICELI:  Object to the form.
8    Q   BY MR. INSOGNA:  Did you take any other
9  steps to expand upon your prior search?
10   A   Other than -- other than that additional
11 search term, no.  I used the same search terms.
12   Q   I don't believe I have ever seen in any of
13 your prior testimony a clear elucidation of what
14 exactly your search terms were.  Can you sitting
15 here today tell me exactly what terms you used to
16 search for literature?
17   A   Yes.  And it is included in this table and
18 I will turn to the table in my expert report.  It
19 very clearly identifies what the search terms were.
20       MR. INSOGNA:  Why don't we mark your June
21 8th report as our next exhibit in order so we can
22 look at that together.
23       Dawn, if you wouldn't mind.
24       THE WITNESS:  Sure.
25 ///

Page 41

1        (Feigal Exhibit 8, Expert Report of
2  Ellen G. Feigal, M.D., marked for identification,
3  as of this date.)
4        THE WITNESS:  So it is on Page 44 of my
5  report, I don't know what page it is on yours.  It
6  is footnote 84.
7        MR. INSOGNA:  I see that.  And Dawn will
8  pull that up for us so we can look at it together.
9    Q   I see a list of terms here.  What I'm not
10 able to glean from this is how you put those search
11 terms together.  Are you able to explain what
12 terms, connectors, Boolean terms otherwise you used
13 to construct that search?
14   A   It is in the footnote.  I used the terms
15 permanent, irreversible or persistent alopecia and
16 breast cancer, and I also used the term
17 chemotherapy or chemically-induced, and I used the
18 term for the chemotherapy commonly used in breast
19 cancer; the taxanes (Taxotere or docetaxel, Taxol
20 or paclitaxel).  The anthracyclines (doxorubicin,
21 Adriamycin).  Cyclophosphamides or Cytoxan.
22 Methotrexate and 5-Fluorouracil.  In addition, I
23 specifically searched for the additional term
24 trastuzumab.
25   Q   Thank you, Dr. Feigal.

1     And what I'm getting at is this is a
2 search you did in PubMed, correct?
3     A   PubMed and also End Note.
4     Q   And in PubMed and End Note can you use
5 connectors to specify how terms must relate to each
6 other?
7     A   Yes.  The breast cancer and the
8 chemotherapy and the alopecia had to connect.
9     Q   And connect how?
10     A   With an "and."
11     Q   So allow me to say what I think you are
12 saying and you tell me if I'm incorrect.
13     If an article had either permanent or
14 irreversible or persistent and alopecia and any of
15 those medications it would have come up in your
16 search; is that correct?
17     A   And breast cancer.
18     Q   So it needed to have permanent,
19 irreversible or persistent within some proximity to
20 alopecia; is that fair?  Or just those two --
21     A   Yes.
22     To be clear, what I was looking for were
23 articles that were relevant to the litigation and
24 in chemotherapy --
25     MR. MICELI:  Let her finish her answer.

1 Nick, she has not finished her answer and you are
2 interrupting her.
3     Dr. Feigal, please continue your answer.
4     MR. INSOGNA:  Dave, I just want to make
5 sure we're focused on what the question is so let
6 me break it down.
7     MR. MICELI:  Well, that's okay.  You asked
8 a question and she has a right to answer.  If you
9 think she is not focused on it you can follow up
10 but you cannot just cut her off in the middle of
11 her answer.
12     MR. INSOGNA:  Dave, I will withdraw that
13 question and break it down because I think we were
14 getting off track.
15     Q   So, Dr. --
16     MR. MICELI:  Well, I don't think we're off
17 track.  You asked a question.  I don't want to see
18 that question and her partial answer in a brief
19 some day and I think it is only fair to the witness
20 to allow her to give a complete answer.
21     Q   BY MR. INSOGNA:  Dr. Feigal, can you tell
22 me the connectors that were use between the terms
23 in this Footnote 84?
24     A   And/or.
25     Q   Okay.  So was there some modifier where

1 permanent or irreversible or persistent needed to
2 be within a certain number of words of alopecia?
3     A   Certain number of words, no, I didn't
4 clarify the number of spaces, but it had to be
5 somewhere in the article.
6     Q   Okay.  So permanent or irreversible or
7 persistent and alopecia and breast cancer and any
8 one of these medications listed had to appear in an
9 article for it to be responsive; is that correct?
10     A   Right.  Including Taxotere or docetaxel.
11     Q   Thank you.
12     Dr. Feigal, have you accepted as true any
13 fact from any other experts' report that you did
14 not independently research?
15     MR. MICELI:  Object to the form.
16     THE WITNESS:  Rephrase your question
17 again.
18     Q   BY MR. INSOGNA:  Sure.  You read
19 defendants' expert -- other defendants' expert
20 reports, correct?
21     A   Other defendants' expert report?
22     Q   Sorry.  Other plaintiff expert report.
23     A   Okay.  I read, yes, and they're listed,
24 yeah.
25     Q   Okay.  And is there any fact that you read

1 in any other plaintiff expert report that you
2 accepted as true for purpose of your opinions
3 without researching?
4     MR. MICELI:  Object to the form.
5     THE WITNESS:  Not without researching, no.
6     Q   BY MR. INSOGNA:  Have you discussed any
7 facts -- strike that.
8     Have you ever communicated with any
9 employee at Sandoz?
10     A   Never.
11     Q   Have you ever used any Sandoz product?
12     MR. MICELI:  Object to form.
13     THE WITNESS:  Have I personally used
14 any -- I haven't personally used any medical
15 products other than over the counter.
16     Q   BY MR. INSOGNA:  And to your knowledge
17 have you prescribed any Sandoz products?
18     MR. MICELI:  Object to the form.
19     THE WITNESS:  I may have at some point in
20 time.
21     Q   BY MR. INSOGNA:  Sitting here today --
22     A   I certainly don't keep count.
23     Q   Sitting here today you cannot recall
24 whether you prescribed any Sandoz product?
25     A   I said I may have at some point prescribed

Page 46

1  medications from a large number of pharmaceutical
2  companies including potentially the ones here
3  today, I just don't -- I just don't know.  It is
4  possible.  I don't keep track of that.
5       Q   Have you spoken with any of the
6  plaintiffs' treating physicians?
7       A   No.
8       Q   And that question is not limited to Ms.
9  Stewart or Ms. Hughes, any plaintiff in this
10  litigation's treating physicians.
11       A   No.
12       MR. MICELI:  Object to the form.
13       Q   BY MR. INSOGNA:  How often do you do legal
14  consulting?
15       A   This is the only litigation I'm involved
16  in.
17       Q   And your work in this litigation currently
18  is through NDA Partners, correct?
19       A   Correct.
20       Q   Do you do work outside of legal consulting
21  for NDA Partners?
22       A   Yes.
23       Q   Okay.  Briefly could you tell us what the
24  other roles you have are?
25       A   Yes.  I provide advice on medical product

Page 47

1  development to a large number of companies and
2  investigators in various stages of development.
3       Q   And in that role do you consult with FDA?
4       A   I interact with FDA.
5       Q   Describe the nature of it.
6       A   On behalf of the client.
7       Q   Like?  When you say you interact with FDA,
8  what do you mean?
9       A   I help -- I help in a broad variety of
10  ways with the strategy for the interaction, with
11  helping inform the contents of briefing packages,
12  with participating in the FDA meeting.
13       Q   Do you consult on FDA approval for
14  pharmaceutical products?
15       A   Can you be more specific about what you
16  are talking about?
17       Q   Do you consult on behalf of manufacturers
18  for how to secure approval from FDA for
19  pharmaceuticals?
20       MR. MICELI:  Object to form.
21       THE WITNESS:  I cover the spectrum.  I --
22  I cover the spectrum from IND filing all the way
23  through NDA or BLL approval or even device
24  approval.
25       Q   BY MR. INSOGNA:  Have you ever done any of

Page 48

1  that consulting work for Sandoz?
2       A   Not that I recall.
3       Q   For Novartis?
4       A   Not that I recall.  Most of my work is
5  with small companies.
6       Q   Are you in any database of experts that
7  you are aware of?
8       A   I -- you are going to have to be more
9  specific.  I don't know what you are talking about.
10       Q   Are you aware that there are public search
11  databases where a litigant could search for experts
12  in a certain field?
13       A   I'm certainly on the internet, so if
14  somebody was searching for qualifications like mine
15  they would be able find it but I'm not aware that
16  I'm on any special database for litigation
17  specifically.
18       Q   And do you advertise at all for your
19  litigation or consulting services?
20       A   Personally, no.
21       Q   It is the distinction that NDA Partners
22  does advertise?
23       A   I don't think they -- I don't think we
24  advertise, I think we just have a website that has
25  our services across the scope and then it was the

Page 49

1  -- listed the individual key experts and what we
2  do.  So I'm not aware that there's advertising, I'm
3  aware that we have a website.
4       Q   Okay.  And outside of the website that NDA
5  Partners maintains, are you aware of any other
6  advertising for your expert or consulting services?
7       A   I'm not aware of it but people may write
8  about it.
9       Q   Before you issue an expert opinion in
10  litigation you make sure that the opinion is
11  reliable, correct?
12       A   You are talking about my own expert
13  opinion?
14       Q   Correct.  Before you --
15       A   I'm responsible for my own.  Before I sign
16  it, correct.  I write it, I review it and then I
17  sign it.
18       Q   And it is important to you that it be
19  accurate, correct?
20       A   Correct.
21       Q   And before you sign an expert report you
22  make sure that you have reviewed all documents and
23  done all necessary research for your opinion to be
24  scientifically correct, right?
25       MR. MICELI:  Object to the form.

1       THE WITNESS:  I -- my report has the
2  references and relevant literature papers,
3  documents that I utilize to form my opinions and my
4  conclusions so that's what I have.
5       Q   BY MR. INSOGNA:  And your goal when you
6  identify the relevant material is to search the
7  universe that is comprehensive so that you have not
8  missed any relevant material, correct?
9       MR. MICELI:  Object to the form.
10      THE WITNESS:  My -- my goal is to make
11  sure I search for relevant information that informs
12  the questions I'm being asked to address.
13      Q   BY MR. INSOGNA:  And my question is your
14  goal is to search for all relevant information,
15  correct?
16      MR. MICELI:  Object to the form.
17      THE WITNESS:  I search for the information
18  that is relevant and pertinent to the -- to the
19  questions at hand.
20      Q   BY MR. INSOGNA:  And if that search
21  identified relevant information that you did not
22  have available to you you would take steps to
23  secure it, correct?
24      MR. MICELI:  Object to the form.
25      THE WITNESS:  If it is relevant to the

1  questions being posed, yes, I would -- I would
2  obtain relevant articles.
3       Q   BY MR. INSOGNA:  And if you identified
4  facts that were not available to you you would ask
5  your counsel to provide them, correct?
6       MR. MICELI:  Object to the form.
7       THE WITNESS:  I don't understand your
8  question.  I don't ask the counsel for any facts.
9       Q   BY MR. INSOGNA:  Well, if you believe that
10  there were facts that you needed for your opinions
11  that you understood were available to counsel would
12  you ask for those facts?
13      A   That situation hasn't come up.
14      Q   If it did.  If you were offering an
15  opinion and you thought that there were documents
16  or records that could provide you additional
17  information that you did not have would you ask for
18  those?
19      MR. MICELI:  Object to the form.
20      THE WITNESS:  If there were relevant
21  documents in a litigation such as this that I don't
22  personally have, yes, I would see if they were
23  available and I'd probably have to go through legal
24  to get them.  They're not going to be available to
25  me otherwise.

1       Q   BY MR. INSOGNA:  And in this case do you
2  feel you have been given a fair opportunity to get
3  all the relevant information you need for your
4  opinions?
5       A   Yes.
6       Q   Now in the Barbara Earnest trial the
7  opinions that you were permitted to offer were
8  limited in their scope, correct?
9       A   You know, I don't --
10      MR. MICELI:  Object to the form.
11      THE WITNESS:  I don't remember the case
12  but, you know, I'm not doing case-specific opinions
13  so you are going to have to be more specific about
14  the time and date.
15      Q   BY MR. INSOGNA:  Well, Dr. Feigal, you
16  recall that you gave trial testimony in an earlier
17  Taxotere trial, correct?
18      A   Right.  General causation.  I didn't do
19  case specific.
20      Q   And do you recall that Judge Milazzo
21  entered an order limiting the scope of the things
22  that you were allowed to talk about?
23      MR. MICELI:  Object to the form.
24      THE WITNESS:  I actually don't recall
25  being limited.

1       Q   BY MR. INSOGNA:  Okay.  And you don't
2  recall being made aware of any sort of order
3  pertaining to the scope of your testimony?
4       A   You can refresh my memory.  I'm just not
5  recalling what you are talking about so feel free
6  to refresh my memory.  I just don't want to guess.
7  If you want me to see something just show it to me.
8       Q   Sure.  I certainly will do that.
9       Do you know, Dr. Feigal, how much money
10  you have made over the course of your expert work
11  in this litigation?
12      A   The invoices were provided to you.  Yes,
13  I'm aware.
14      Q   Okay.  Do you know that number sitting
15  here today?
16      A   I don't know the specific number, no.
17      Q   Okay.  If I tell you that in your last
18  deposition you testified to roughly $230,000, does
19  that sound accurate?
20      A   Since 2017, over the past several years
21  that may be accurate.
22      Q   And could you estimate the additional
23  amount since that last deposition?
24      A   I think I gave you all the invoices for
25  that.

1     Q   And if I say that the total from inception
2  to date is roughly $250,000, does that sound
3  accurate?
4     A   Yeah.  I mean, I haven't done the math.
5  That could be accurate.  Since November -- 'til now
6  from November 2017 for the past almost three years.
7     Q   Do you have your expert report in front of
8  you, Dr. Feigal?
9     A   I do.
10     Q   Okay.  And you understood that when you
11  prepared this report your purpose was to identify
12  the opinions that you would be offering in this
13  case, correct?
14     A   Correct.
15        MR. MICELI:  Object to the form.
16     Q   BY MR. INSOGNA:  And also to provide the
17  bases for each of those opinions; is that right?
18     A   This report provides the bases for my
19  opinions, correct.
20     Q   And in your report did you identify all of
21  the grounds for each of the opinions that you are
22  offering?
23     A   I identify what I did, the result, my
24  interpretation and my opinions based on those
25  results.

1     Q   I understand.
2        And in what you identified in this report
3  are the grounds that you have provided
4  comprehensive?
5        MR. MICELI:  Object to the form.
6        THE WITNESS:  I believe so.
7     Q   BY MR. INSOGNA:  In other words, sitting
8  here today you cannot think of anything that you
9  would need to testify about at trial that is not
10  set forth in this report, correct?
11        MR. MICELI:  Object to the form.
12        THE WITNESS:  At this point in time I
13  think this report encompasses what I think will
14  cover the scope of what I would testify to.
15     Q   BY MR. INSOGNA:  And in connection with
16  this report you also provided a list of all the
17  materials that you reviewed in formulating your
18  opinions, correct?
19     A   I provided you a reliance document with
20  the documents I used.
21     Q   And just so that the --
22     A   In addition to the foot -- in addition to
23  the footnotes that are already included in the
24  expert report.
25     Q   Yes.

1        And the documents, the reliance list that
2  you are referring to, is that Exhibit B or Appendix
3  B to your expert report?
4     A   Yes, it is called Appendix B.
5     Q   And that document has a heading on it
6  "Ellen Feigal, M.D., Material Reviewed," is that
7  the document that you are referring to?
8     A   That's the reliance document.
9     Q   Okay.  And outside of the materials
10  identified on Appendix B and the footnotes in the
11  report itself, are you aware of any other source
12  material that you relied upon in formulating your
13  opinions?
14        MR. MICELI:  Object to form.
15        THE WITNESS:  Well, within my brain from
16  30 years' experience, but offhand I can't say there
17  are additional documents that I can think of at
18  this point in time.
19     Q   BY MR. INSOGNA:  Did you maintain any sort
20  of list of documents that you consulted while you
21  were preparing your opinions?
22     A   Yes.  And they're included in the
23  footnotes and in the reliance documents.
24     Q   Okay.  And there's no broader list than
25  what you have provided in Appendix B and in the

1  footnotes; is that right?
2        MR. MICELI:  Objection; form.
3        THE WITNESS:  I think it is -- I think
4  what you have is accurate.  I don't recall any.
5     Q   BY MR. INSOGNA:  Are you aware of any
6  document or information that is relevant to your
7  opinions that you declined to consider?
8     A   No.
9     Q   Okay.  And we'll go through your opinions
10  in some detail and each of the materials that you
11  considered.  First I want to talk about the
12  subjects that are not included within your opinions
13  in this case.
14        So you are not offering any criticism of
15  Ms. Stewart's oncologist, Dr. McCanless, correct?
16     A   I am offering -- the answer is no.
17     Q   It is not your opinion that Dr. McCanless
18  was wrong to recommend chemotherapy for Ms.
19  Stewart, correct?
20     A   I'm not offering any case-specific
21  questions.
22     Q   The answer to that specific question is
23  no, it is not your opinion that Dr. McCanless was
24  wrong to recommended chemotherapy for Ms. Stewart?
25     A   No, that be wouldn't be the correct way to

1  phrase it.  I haven't reviewed anything that is
2  case specific so I would have no basis to have an
3  opinion.  So it is not correct to say I don't think
4  they did anything right or wrong, I have no opinion
5  on it because I didn't review that material.
6      Q   And, likewise, you have no basis to offer
7  an opinion that Dr. McCanless erred in his decision
8  to prescribe a docetaxel-containing regimen for Ms.
9  Stewart, correct?
10          MR. MICELI:  Object to form.
11          THE WITNESS:  My answer is I have no
12  opinion because I haven't reviewed that material.
13  So I can't offer a specific no opinion, it is just
14  no opinion.  I haven't reviewed anything.
15      Q   BY MR. INSOGNA:  Okay.  And my question
16  was you have no basis to have an opinion so I think
17  we're in agreement there.
18          MR. MICELI:  Same objections.
19      Q   BY MR. INSOGNA:  Similarly you have no
20  basis to form an opinion that Dr. McCanless'
21  recommendation of a TAC regimen to treat Ms.
22  Stewart fell below the standard of care; is that
23  correct?
24          MR. MICELI:  Object to form.
25          THE WITNESS:  I have no case-specific

1  opinions.
2      Q   BY MR. INSOGNA:  And you have no opinions
3  with regard to the care offered by any of Ms.
4  Stewart's other medical providers, correct?
5      A   I have no case-specific opinions.
6      Q   Dr. Feigal, do you agree that an
7  oncologist who utilizes the regimens identified
8  within the NCCN guidelines is acting reasonably?
9          MR. MICELI:  Object to form.
10          THE WITNESS:  The NCCN guidelines are
11  guidelines.  The discussion between the patient and
12  the physician still needs to take place for those
13  case-specific decisions.  It is a reasonable -- it
14  is a reasonable set of guidelines for them to be
15  reviewing, absolutely.
16      Q   BY MR. INSOGNA:  And if an oncologist
17  recommends a regimen identified within the
18  guidelines he is acting within the standard of
19  care, correct?
20          MR. MICELI:  Object to the form.
21          THE WITNESS:  That's always given with the
22  caveat that an informed discussion needs to take
23  place with the patient and her physician.
24      Q   BY MR. INSOGNA:  And I'm not asking about
25  any discussion that needs to take place, I'm

1  just -- this question is focused specifically on
2  the oncologist's recommendation.  So if an
3  oncologist recommends a chemotherapy regimen
4  identified in the NCCN guidelines that
5  recommendation is within the standard of care,
6  correct?
7          MR. MICELI:  Object to the form.
8          THE WITNESS:  To be -- to be clear, the
9  NCCN guidelines is not a cookbook where you follow
10  a recipe so it is guidelines that have literature
11  supporting them and there's a discussion that takes
12  place.  It is not like baking a cake.  There's a
13  discussion that takes place with that patient to
14  determine what's appropriate for that individual.
15  It is reasonable to review.  I can't -- I can't
16  comment whether or not they did or did not make the
17  right selection for that patient.  I didn't talk to
18  that patient, I don't know, I wasn't in the room.
19      Q   BY MR. INSOGNA:  Dr. Feigal, I'm not
20  asking about any specific patient, I'm just asking
21  whether an oncologist who refers to the NCCN
22  guidelines in formulating his recommendations is
23  acting within the standard of care.
24          MR. MICELI:  Object to the form.
25          THE WITNESS:  That question -- that

1  question I can answer.  That's a reasonable
2  approach for that physician to take.
3      Q   BY MR. INSOGNA:  And in terms of the
4  appropriate course of treatment for Ms. Stewart, am
5  I correct that you will defer entirely to Dr.
6  Bosserman on those matters?
7      A   I would have to defer to Mr. Miceli who is
8  going to address those issues on case specifics.
9      Q   Okay.  You don't intend to offer any
10  opinions about the appropriate regimen for Ms.
11  Stewart, correct?
12      A   As I said, I'm offering no case-specific
13  opinions.
14          MR. MICELI:  And we will not attempt to
15  elicit a case-specific appropriate chemotherapy
16  opinion from Dr. Feigal.
17          MR. INSOGNA:  I understand that, Dave.
18  I'm just looking for answers to targeted questions.
19      Q   Dr. Feigal, you are not offering any
20  opinion that any side effects associated with a TAC
21  regimen would have made an alternate regimen a
22  better choice for any specific patient, correct?
23          MR. MICELI:  Object to the form.
24          THE WITNESS:  I'm not offering any case-
25  specific opinions.

1   Q   BY MR. INSOGNA:  I understand that and you
2   said that several times.  I'm wondering if you can
3   answer the specific question I'm asking which is
4   you're not offering any opinions that any side
5   effect associated with the TAC regimen would have
6   made an alternative regimen a better choice for Ms.
7   Stewart.
8        MR. MICELI:  Object to the form.
9        THE WITNESS:  The answer isn't a simple
10  yes or no.  There are other options that patients
11  can consider and that's a discussion that can be
12  had with the physician and a patient, that's not a
13  case-specific answer.  I'm just saying if that's an
14  important adverse event for a patient to consider
15  in their alternative regimen the physician can talk
16  to that patient about then it would be appropriate
17  to have those other options discussed.
18  Q   BY MR. INSOGNA:  Dr. Feigal, I'm not
19  asking about what discussions could have been had,
20  I'm asking very narrowly whether you intend to
21  offer any opinion at trial that any side effects
22  associated with the TAC regimen would have made an
23  alternative regimen a better choice for Ms.
24  Stewart.
25       MR. MICELI:  Objection; form.

1        THE WITNESS:  For that specific patient
2   I'm not offering any case-specific opinion.
3   Q   BY MR. INSOGNA:  Okay.  And so for the
4   specific patient of Ms. Stewart you also will not
5   offer any opinions regarding whether a docetaxel-
6   containing or paclitaxel-containing regimen would
7   have been a better option, correct?
8        MR. MICELI:  Object to the form.
9        THE WITNESS:  For that specific patient I
10  am not offering any case-specific opinion.
11  Q   BY MR. INSOGNA:  And other than your
12  opinions about alopecia, you will not offer any
13  opinions about the relative risks of other side
14  effects associated with any chemotherapy
15  medications, will you?
16  A   The scope of this litigation my
17  understanding is on alopecia so I -- my intent is
18  to focus on the question.
19  Q   Okay.  And if you could please focus on my
20  question, I'm asking whether you will offer any
21  opinions about the relative risk of different side
22  effects between various chemotherapy medications.
23       MR. MICELI:  Object to form.
24       THE WITNESS:  I don't -- I mean, I think
25  in my report I do talk about some of the other

1   risks of docetaxel and the relative risk of, the
2   relative frequency of those compared to the control
3   arm so in terms of talking about regimens there may
4   be some differences in the risk profile but I
5   intend to focus on the question I think is at hand
6   which is persistent or irreversible or permanent
7   alopecia, that's my attempt.  But I do have
8   language in my report about frequencies of other --
9   other side effects.
10  Q   What language are you referring to in your
11  report specifically?
12  A   I think I talk about febrile neutropenia,
13  FAEs, I think there's some relative comparisons
14  between the control arm and the Taxotere-containing
15  regimen.  I'm just saying it is in my report.  I
16  don't think I would be offering an opinion, I'm
17  just saying it is in my report.
18  Q   You are aware that paclitaxel carries risk
19  of certain side effects, correct?
20  A   Correct.
21  Q   It carries the risk of neutropenia?
22  A   Correct.
23  Q   And of neuropathy, correct?
24       MR. MICELI:  Object to the form.
25       THE WITNESS:  Correct.  As with Taxotere.

1   Q   BY MR. INSOGNA:  You know that each those
2   could be dose-limiting toxicities in Taxol
3   patients, correct?
4        MR. MICELI:  Object to form.
5        THE WITNESS:  As to Taxotere, correct.
6   Q   BY MR. INSOGNA:  And dose-limiting
7   toxicity means the patient's dose may need to be
8   reduced to avoid a complication from the side
9   effect; is that right?
10  A   It is true with Taxotere and any other
11  chemotherapy medications.
12  Q   My question is about Taxol.  It is correct
13  that the side effects of neutropenia and neuropathy
14  can require the physician to reduce the dose of
15  Taxol to avoid complications from those side
16  effects, correct?
17       MR. MICELI:  Object to the form.
18       THE WITNESS:  I don't get into -- I don't
19  get into the management of toxicities in my report
20  and I don't intend to do that in a trial situation
21  either.
22  Q   BY MR. INSOGNA:  You don't intend to offer
23  any opinions about how an oncologist should manage
24  toxicities with respect to any chemotherapy
25  medication; is that fair?

1     A   I don't think I would be asked something
2  like that.  I might offer -- yeah, I can't envision
3  that's a question that I would be asked.
4     Q   And sitting here today you formulated no
5  opinion for this litigation on that subject?
6     A   Well, I certainly have opinions on
7  mitigation of alopecia.
8         I can't hear you.  Do I have to dial in
9  again in?
10        MR. MICELI:  No, I can hear you, Dr.
11 Feigal.
12        Can you hear her, Nick?
13        THE WITNESS:  I can't hear, yeah.  I can't
14 hear Mr. Insogna.
15        MR. MICELI:  Insogna?
16        THE WITNESS:  How do you pronounce it?
17        MR. MICELI:  I think it is Insogna.
18 Insogna.
19        THE WITNESS:  I can't hear.
20        MR. MICELI:  Let's just sit still for a
21 second and maybe he will be dialing in.  It looks
22 like he is -- well, he can't see me so --
23        THE WITNESS:  Can you --
24        MR. MICELI:  I would -- I would point to
25 your ear, Doctor, just saying I can't hear you.

1         THE WITNESS:  I can't hear you.
2         MR. MICELI:  Can you hear me, Ellen?
3         THE WITNESS:  I can hear you, Dave.
4         MR. MICELI:  Okay.  It looks like he is
5  dialing in again.
6         THE WITNESS:  I can hear.  I can hear when
7  it is silent, I can't hear --
8         MR. MICELI:  You know what?  Why don't we
9  take a break so Nick is not burning time on hold.
10        Court reporter, can you take us off the
11 record?  If it is okay.
12        THE WITNESS:  Can she hear us?  Can the
13 court recorder hear us?
14        MR. MICELI:  Is anybody from Greenberg
15 Traurig on the line?
16        MR. HOLDEN:  Yeah, Dave, I'm here.  Yeah,
17 let's go off the record.
18        THE VIDEOGRAPHER:  Off video at 9:23 a.m.
19        (Recess taken)
20        THE VIDEOGRAPHER:  Back on video at 9:36
21 a.m.
22 BY MR. INSOGNA:
23    Q   All right, Dr. Feigal, just to reorient
24 you we were talking about opinions that you are not
25 offering in this case so I want to stay on that

1  subject for a moment.
2         You are not offering any opinion that
3  docetaxel is not an effective drug in the treatment
4  of breast cancer, are you?
5     A   I am not -- I am not offering opinions
6  that it is not an effective drug for some breast
7  cancer patients.
8     Q   And you are not offering any opinions
9  about the development of Sandoz's docetaxel with
10 respect to its safety or efficacy, are you?
11        MR. MICELI:  Object to the form.
12        THE WITNESS:  That's a pretty broad
13 question.  Obviously as it relates to alopecia I
14 will be opining.
15    Q   BY MR. INSOGNA:  And my question is a
16 little bit more limited.
17        Are you offering any opinions about
18 Sandoz's development of its docetaxel specifically?
19    A   I can't answer it because it is still such
20 a broad question.
21    Q   Okay.  Am I correct that you have no
22 opinions to offer criticizing the design of
23 Sandoz's docetaxel?
24    A   I will not be offering criticisms of its
25 formulation or its product if that --

1  manufacturing, is that what you are asking?  No.
2     Q   You are not offering any criticisms of
3  Sandoz as a company, are you?
4         MR. MICELI:  Object to the form.
5         THE WITNESS:  It is an awfully broad
6  question.
7     Q   BY MR. INSOGNA:  Sitting here today can
8  you think of any criticisms you have to offer of
9  Sandoz as a company?
10    A   Well, since the litigation is about
11 alopecia there may be some related questions about
12 that.
13    Q   Outside of any criticism you have with
14 respect to docetaxel and alopecia, do you have any
15 criticisms of Sandoz as company?
16    A   I do not have any criticisms specifically
17 about, in general about Sandoz as a company.
18    Q   And I assume you have no criticisms of any
19 individual Sandoz employee.
20    A   I don't know any individual Sandoz
21 employee so I can't comment on what kind of person
22 they are.
23    Q   You have not reviewed a deposition of Ms.
24 Stewart's prescribing oncologist, Dr. McCanless,
25 have you?

1      MR. MICELI:  Form.
2      THE WITNESS:  I have not.
3      Q   BY MR. INSOGNA:  And you have not reviewed
4  Ms. Stewart's deposition either; is that right?
5      A   I don't ever seeing it, no.
6      Q   Okay.  And you have no information
7  regarding what Dr. McCanless testified he knew
8  about the risks of docetaxel when treating Ms.
9  Stewart, do you?
10     MR. MICELI:  Object to the form.
11     THE WITNESS:  I do not know -- I don't
12  know the specific conversation he had with his
13  patient about the risks or benefits of the regimen
14  and what options he offered to her.
15     Q   BY MR. INSOGNA:  And you have not been
16  provided any information about the conversations
17  between Dr. McCanless and Ms. Stewart, correct?
18     A   I am not privy --
19     MR. MICELI:  Same objection.
20     THE WITNESS:  -- about the specific
21  conversation.
22     Q   BY MR. INSOGNA:  And you have no knowledge
23  regarding how Ms. Stewart was counseled about
24  docetaxel, do you?
25     A   I don't know of information about what

1  transpired between her and her physician about the
2  risks and benefits of the regimen or its options.
3      Q   And that answer includes anyone working on
4  behalf of her physician, correct?
5      A   I am not privy to those conversations.
6      Q   Okay.  And you have no information about
7  any warning information she received regarding
8  docetaxel other than what appears on the labeling,
9  correct?
10     A   I'm not privy to any conversations or
11  discussions that a specific patient has had with --
12  actually with anybody.
13     Q   And you are not aware of whether Ms.
14  Stewart received any documents pertaining to
15  docetaxel, are you?
16     A   I am not privy to anything specific to
17  that patient.
18     Q   Okay.  And so is it fair to assume that
19  you have no basis to offer any opinion that Sandoz
20  failed to warn Dr. McCanless about the risks of
21  docetaxel?
22     MR. MICELI:  Object to the form.
23     THE WITNESS:  I can offer an opinion about
24  what information should be provided to a physician
25  but I am not going to offer an opinion about a

1  specific case-specific physician or a specific
2  case-specific patient.
3      Q   BY MR. INSOGNA:  Right.  You have no idea
4  of what Dr. McCanless knew about the risks of
5  docetaxel; is that right?
6      A   I have no case-specific information.
7      Q   Included within that case-specific
8  information would be any information that Dr.
9  McCanless knew about the risks associated with
10  docetaxel; is that right?
11     MR. MICELI:  Object to the form.
12     THE WITNESS:  I do not know what specific
13  information that physician knew.
14     Q   BY MR. INSOGNA:  And you also don't know
15  what information Ms. Stewart knew about the risks
16  associated with docetaxel, correct?
17     A   I don't have any case-specific
18  information.
19     Q   The answer to that specific question is
20  that you do not have information about what Ms.
21  Stewart herself knew about the risks of docetaxel,
22  right?
23     MR. MICELI:  Same objection.
24     THE WITNESS:  I do not have any case-
25  specific information.

1      Q   BY MR. INSOGNA:  It is not your opinion
2  that a docetaxel-containing regimen is never the
3  right choice for a breast cancer patient, correct?
4      A   The issue about whether a regimen is
5  appropriate for the patient is a decision between
6  the patient and the physician after an informed
7  discussion.
8      Q   And for some patients a docetaxel regimen
9  may be the appropriate choice to treat their breast
10  cancer, correct?
11     A   Same answer.  It depends on the discussion
12  between the physician and the patient if the
13  information was adequately conveyed.
14     Q   And so if information was adequately
15  conveyed docetaxel may be an appropriate
16  chemotherapy medication to treat a patient's breast
17  cancer, correct?
18     A   I can't speculate, I'm just saying the
19  physician and the patient will have an informed
20  discussion and make a decision as to whether or not
21  the docetaxel-containing regimen is appropriate.
22     Q   I'm not asking you to speculate and I'm
23  not asking about any particular patient scenario.
24  What I'm asking is you will not offer any opinion
25  that docetaxel is never the right choice for a

1  chemotherapy regimen for a breast cancer patient,
2  correct?
3      A   I am not offering the opinion that any
4  specific regimen is the correct choice or not a
5  correct choice.
6      Q   And so if appropriate information is
7  conveyed to a patient a docetaxel-containing
8  regimen may be the appropriate choice to treat some
9  patients' breast cancer; is that correct?
10         MR. MICELI:  Object to the form.
11         THE WITNESS:  Let me repeat my answer.
12         Any regimen, if an informed discussion is
13  held with the patient and physician can be
14  considered appropriate an informed decision has
15  been held.  You are asking me to speculate and so
16  that's my answer.
17      Q   BY MR. INSOGNA:  Respectfully, Dr. Feigal,
18  I'm not asking for you to speculate, I'm asking
19  about in general whether a docetaxel-containing
20  regimen may be the right choice to treat certain
21  patients' breast cancer assume that the physician
22  has had an appropriate discussion with them about
23  that medication.
24         MR. MICELI:  Same objection.
25         THE WITNESS:  I think my answer -- I think

1  my answer answers it.  If there's an informed
2  discussion between the physician and the patient
3  and the decision was made that the risk/benefits
4  are appropriate for that particular regimen then it
5  sounds like it is appropriate, an appropriate
6  informed decision and informed discussion.
7      Q   BY MR. INSOGNA:  Have you reviewed Dr.
8  Bosserman's opinions specific to Ms. Stewart and
9  her treatment?
10     A   No.
11     Q   You have not reviewed Dr. Bosserman's
12  opinions in -- offered in the Wanda Stewart case
13  that we're discussing today?
14     A   No.
15         MR. MICELI:  Object to the form.
16     Q   BY MR. INSOGNA:  Okay.  And you have not
17  reviewed the expert report that she issued on June
18  8th?
19     A   No.
20     Q   Do you know what medications are currently
21  on the NCCN guidelines for HER2- breast cancer?
22     A   I haven't looked today but I do have
23  knowledge of what has been on it in the recent
24  past.
25     Q   Okay.  And what regimens have been on it

1  in the recent past?
2      A   Well, it is listed in my report for the
3  different regimens.  What HER2 -- you are talking
4  about ER/PR+, HER2-?
5      Q   Yes.
6      A   Is that what you are asking?
7      Yeah, it is listed in my report.  There's
8  quite a few pages of the different regimen.
9      Q   So your --
10     A   It looks like it -- I mean, I cite the
11  NCCN guidelines and talk about some of the regimens
12  on there.  I think it starts on Page 28.  29.  It
13  goes for quite a few number of pages.
14     Q   I agree with you.
15         And based on what's in your report then
16  you are aware that the guidelines continue to list
17  multiple docetaxel-containing regimens to treat
18  both HER2- and HER2+ breast cancer, correct?
19     A   I am aware that those regimens are among
20  the multiple regimens that are on the NCCN
21  guidelines.
22     Q   You are not a dermatologist, correct?
23     A   That is correct.
24     Q   And you have no particular expertises in
25  dermatology?

1      A   I have some knowledge in dermatology but
2  I'm not a card-carrying dermatologist.
3      Q   And you are also not a dermato-
4  pathologist, correct?
5      A   I am not a dermatopathologist.
6      Q   And for purposes of this litigation will
7  you defer to expert dermatologists and dermato-
8  pathologists to discuss those subject areas?
9      A   To discuss their subject areas, certainly.
10     Q   Have you reviewed the expert reports
11  offered by any of the dermatologists in this
12  litigation?
13     A   I have not reviewed the expert reports --
14  actually no, I don't recall reviewing the expert
15  reports from -- well, I have never reviewed an
16  expert report by Dr. Rosic.  I don't recall
17  reviewing an expert report by Thompson.  I don't
18  recall it at any rate.
19     Q   And you have not looked at any slides of
20  any tissue biopsied from Ms. Stewart, have you?
21     A   No.
22     Q   Or any other materials pertaining to a
23  dermatological examination of Ms. Stewart, correct?
24     A   I don't recall any case-specific
25  information.  At one point in time I may have been

Page 78

1  provided anagen-to-telogen ratio to document the
2  occurrence of chemotherapy-induced alopecia.  That
3  was quite awhile ago.  I don't have anything
4  recently and I don't -- I don't recall the specific
5  patient.
6      Q   When you say you were provided anagen-to-
7  telogen ratios, you don't recall if that was
8  specific to Ms. Stewart; is that right?
9          MR. MICELI:  Object to form.
10         THE WITNESS:  I do not recall.  I do not
11 recall.
12     Q   BY MR. INSOGNA:  None of the opinions that
13 you are offering in Ms. Stewart's case relate to
14 the anagen-to-telogen ratio in Ms. Stewart's hair,
15 do they?
16     A   I offer no case-specific opinion.
17     Q   And nothing about your general causation
18 opinion is informed by the anagen-to-telogen ratio
19 information that was conveyed to you, is it?
20     A   It is relevant only as it was contained in
21 some of the literature that I was reading in terms
22 the documents of chemotherapy-induced alopecia.
23     Q   The anagen-to-telogen information you were
24 given was specific to some patients, correct?
25         MR. MICELI:  Object to the form.

Page 79

1      Q   BY MR. INSOGNA:  You know what?  I can't,
2  I honestly can't recall.  There were -- there were
3  three and I honestly just don't recall.
4          Yes, they must have been taken from a
5  patient but I don't recall.
6          MR. MICELI:  Nick, I think you are getting
7  into an area that borders on the Science Day stuff
8  and if you want to table this until our next break
9  and you and I can have an off-the-record discussion
10 but I'm -- I will leave it at that.
11     Q   BY MR. INSOGNA:  Dr. Feigal, is any part
12 of your general causation opinion that is set forth
13 in your expert report informed by any anagen-to-
14 telogen ratio information that you have been
15 provided in the course of this litigation?
16     A   As I said, only as it relates to papers
17 I've read and their documentation of the endpoint
18 of interest.
19     Q   And what do you mean by that when you say
20 only as it relates to papers?
21     A   Literature.  Not -- not -- I have read
22 papers from -- written by dermatologists, dermato-
23 pathologists, and some of that is included in the
24 papers that I have read and it helps support the
25 endpoint outcome of interest.

Page 80

1      Q   Are you saying that in some of the papers
2  that you have reviewed the anagen-to-telogen ratio
3  is an important component of that paper?
4      A   It is, yes.
5          MR. MICELI:  Objection; form.
6          THE WITNESS:  It is a component of the
7  paper.
8      Q   BY MR. INSOGNA:  Okay.  And how did the
9  specific anagen-to-telogen ratio information that
10 you were provided inform your review of those
11 papers?
12         MR. MICELI:  Object to form.
13         THE WITNESS:  It was just an element of
14 their assessment of the outcome of interest, chemo-
15 therapy-induced alopecia.
16     Q   BY MR. INSOGNA:  You have not performed
17 any differential diagnosis to determine the cause
18 of Ms. Stewart's hair loss, if any, have you?
19     A   I offer no case-specific opinions.
20     Q   So the answer to my question is no, you
21 have not done a differential diagnosis on Ms.
22 Stewart?
23     A   I don't have any details about Ms. Stewart
24 so I would not be able to do a differential
25 diagnosis.

Page 81

1      Q   So you are not going to be able to offer
2  any opinion as to what hair loss Ms. Stewart
3  claims, correct?
4      A   I offer no case-specific opinions.
5      Q   And you are not offering any opinions
6  about whether certain lifestyle or biologic factors
7  can cause hair loss outside of medications,
8  correct?
9      A   Are you talking about Mrs. Stewart again?
10     Q   No, I'm talking generally will you offer
11 any opinions that certain biologic or lifestyle
12 factors are not capable of causing hair loss.
13         MR. MICELI:  Object to the form.
14         THE WITNESS:  Yeah, I must say I don't
15 understand your question.  The topic of interest is
16 chemotherapy-induced alopecia so there's
17 chemotherapy.  Are you -- so I'm not sure what your
18 question is.
19     Q   BY MR. INSOGNA:  And I understand that
20 your interest area is chemotherapy-induced alopecia
21 but part of determining whether hair loss is caused
22 by chemotherapy is ruling out alternative causes of
23 that hair loss, right?
24         MR. MICELI:  Object to the form.
25         THE WITNESS:  Right.  In some of the

1 papers confounders have been considered in the
2 randomized, controlled clinical trial in some of
3 the case I've read, so confounders have been looked
4 at.
5      Q   BY MR. INSOGNA:  Okay.  And are any of the
6 confounders that you have looked at related to an
7 individual's lifestyle or biology other than
8 medications that they have taken?
9      A   Some of the papers do look at confounders
10 of I think family history.  I'd have to go back,
11 but there are some confounders other than
12 medication that have been looked at in some of the
13 papers.
14      Q   So, for example, you are aware that
15 certain hairstyling practices can cause alopecia,
16 correct?
17          MR. MICELI:  Object to the form.
18          THE WITNESS:  Can you be a little more
19 specific?
20      Q   BY MR. INSOGNA:  Are you familiar with
21 traction alopecia?
22          MR. MICELI:  Object to the form.
23          THE WITNESS:  I'm familiar with -- I'm
24 familiar with the term, yeah.
25      Q   BY MR. INSOGNA:  And are you aware that

1 certain tight or pulling hairstyles can cause a
2 form of traction alopecia?
3          MR. MICELI:  Object to form.
4          THE WITNESS:  Look, as we started out with
5 I am not a dermatologist, I'm not going to be
6 talking about that type of other etiologies that
7 might be considered by a dermatologist.
8      Q   BY MR. INSOGNA:  Okay.  And so I think
9 that answer my question.
10         You are not going to talk about other hair
11 loss etiology that relates to personal lifestyle
12 factors, are you?
13         MR. MICELI:  Same objection.
14         THE WITNESS:  Personal lifestyle.  I guess
15 if you are talking about hairstyle, that's correct.
16 I'm not sure what other personal hair -- I'm not
17 sure what other personal lifestyle you are
18 referring to.
19      Q   BY MR. INSOGNA:  Okay.  And you are aware
20 that many women experience some hair loss as they
21 age, particularly through menopause, correct?
22      A   Correct.  That's different from
23 chemotherapy-induced alopecia, but yeah.  That's
24 been going on for decades.
25      Q   Okay.  And you are not going to offer any

1 opinions that Ms. Stewart's age or menopausal
2 status did not contribute to any hair loss she
3 claims, are you?
4      A   I am not going to offer any case-specific
5 opinions.
6      Q   And that includes whether any hair loss
7 Ms. Stewart is claiming is based on age or
8 menopausal status, correct?
9          MR. MICELI:  Object to form.
10         THE WITNESS:  I am not offering any case-
11 specific opinions.
12      Q   BY MR. INSOGNA:  So no opinions of any
13 kind about Ms. Stewart's hair loss specifically?
14         MR. MICELI:  Object to the form.
15         THE WITNESS:  I'm not offering any case-
16 specific opinions.
17      Q   BY MR. INSOGNA:  And you are not offering
18 any opinions about whether Ms. Stewart in fact
19 experienced any hair loss, are you?
20      A   I'm not offering any case-specific
21 opinions.
22      Q   Are you able to answer that question?  Are
23 you offering any opinion about whether Ms. Stewart
24 experienced hair loss?
25         MR. MICELI:  Object to the form.

1          THE WITNESS:  I am not offering any case-
2 specific opinions.
3          MR. INSOGNA.  The litigation -- there's a
4 litigation so I'm assuming there's a reason for it,
5 but I'm not offering any case-specific opinions.
6      Q   BY MR. INSOGNA:  Are you able to give a
7 yes-or-no answer to that question?  Are you
8 offering any opinion about whether Ms. Stewart has
9 experienced hair loss?
10     A   I don't have any information on Ms.
11 Stewart.  I'm not offering any case-specific
12 opinions.
13     Q   You are not currently practicing as a
14 medical oncologist, are you?
15     A   I use my knowledge as a medical oncologist
16 constantly but I don't have an individual patient
17 practice.
18     Q   And you don't currently prescribe
19 chemotherapy for any kind of cancer, correct?
20     A   No, but I work with companies where drugs
21 are a part of the clinical, part of the development
22 of their products.  I'm very familiar with what's
23 out there and how they're used.
24     Q   You have never prescribed a taxane in the
25 treatment of breast cancer, have you?

Page 86

1    A    That I don't recall.  I have prescribed a
2 taxane, I just don't recall if it was in the
3 context of breast cancer.
4    Q    And are you referring to some study that
5 you participated in that may have involved
6 paclitaxel?
7    A    I certainly have given a taxane in
8 settings, I just don't recall -- I don't just don't
9 recall the specific setting.  I don't have an
10 individual patient practice right now.
11    Q    When was the last time that you prescribed
12 chemotherapy of any kind?
13    A    Prescribed it to an individual patient or
14 as part of a clinical trial?
15    Q    To an individual patient.
16    A    Probably not since 2004.
17    Q    And when you say as a part of the clinical
18 trial, what are you referring to?
19    A    The clinical trial is the pre-specified
20 protocol where particular drugs are given.  A
21 clinical trial is a protocol that's followed for
22 patients.  It is not a -- it is not just standard
23 medical practice, it is -- well, it can be part of
24 standard medical practice but it is a clinical
25 trial to answer question so there's a specific

Page 87

1 regimen that patients received and are followed in
2 a very particular way to answer your question.
3    Q    I'm sorry, my question wasn't clear.
4       When you refer to having prescribed
5 chemotherapy in connection with a clinical trial,
6 did you prescribe chemotherapy to a patient as part
7 of the clinical trial?
8    A    I have done -- I have prescribed therapy
9 as part of the clinical trial, I've also prescribed
10 therapy directly for a patient, but I also am
11 involved in a lot of designs of clinical trials to
12 assess products as compared to standard of care
13 which may include a taxane or one of the taxanes.
14    Q    But outside of any clinical trial that you
15 were involved in designing you have not prescribed
16 a chemotherapy since 2004, correct?
17    A    No, that's correct.
18    Q    That is correct?
19    A    To an individual patient, that is correct.
20 For an individual patient that is correct.
21    Q    Thank you.
22       You are not an expert in FDA regulatory
23 matters, are you?
24    A    For the purposes of this litigation there
25 is another FDA regulatory expert.  I am very

Page 88

1 knowledgeable about FDA regulatory issues but I'm
2 not the FDA regulatory expert for this.
3    Q    You won't be offering any opinions on
4 regulatory issues in this litigation, right?
5    A    The opinions I offer are in my report
6 about how -- about the different regulatory
7 pathways and the responsibilities of companies in
8 those different regulatory pathways so I do have a
9 lot of knowledge about product development in
10 companies and the regulatory pathway they take and
11 what the expectations are.  Buy if you are asking
12 about -- let me leave it at that, see what your
13 followup question might be.
14    Q    I'm still with you, Dr. Feigal.  I'm just
15 looking at that answer.
16    A    Oh, okay.  You are seeing something that
17 I'm not.
18       MR. MICELI:  I'm still seeing nothing.
19       THE WITNESS:  Well, we don't see you
20 either.
21       MR. MICELI:  I shouldn't say I don't see
22 nothing.  I see you and that's enough.
23    Q    BY MR. INSOGNA:  Dr. Feigal, you are not
24 offering any opinions regarding the adequacy of
25 Sandoz's submissions to FDA, are you?

Page 89

1    A    I am not going to offer opinions about
2 their interactions with the FDA, that's correct.
3 There's a different regulatory expert.
4    Q    And you are not offering any opinion about
5 what FDA required of Sandoz's docetaxel label be in
6 2014, correct?
7    A    I'm knowledgeable about what the FDA
8 requirements are for NDA holders and so if that's
9 the question and it relates to Sandoz or Accord it
10 can be usable.  But I'm not going to be talking
11 about specific FDA interactions with Sandoz.
12    Q    You are not offering any opinion on the
13 adequacy of Sandoz's docetaxel label, are you?
14    A    I'm not going to be offering opinions
15 about what should have been on the label to be more
16 specific.
17    Q    Did you say you are not offering any
18 opinion about what should have been on their label?
19 Was that your answer, Dr. Feigal?
20    A    Yeah, yeah.  That would be something for
21 the regulatory expert to talk about specifically
22 for Sandoz.  I think I cite in my report David Ross
23 in terms of what they knew and when they knew it.
24    Q    You have not reviewed -- I'm sorry, when
25 you say you cite to Dr. Ross for what they knew and

1   when they knew it, do you mean you are referring to
2   Dr. Ross on all papers about Sandoz's knowledge
3   about a risk of alopecia?
4            MR. MICELI:  Object to form.
5            THE WITNESS:  I include it in my report
6   because I actually have reviewed quite a few
7   documents about what was available, but I would
8   refer to Dr. Ross for specific regulatory issues
9   about what should have been on a label and what
10  they should have done.
11       Q   BY MR. INSOGNA:  So, for example, a
12  question about whether Sandoz should have made a
13  revision to its label by a certain date you will
14  not offer opinions on?
15       A   The only thing I offer opinions on are
16  when that information was available.
17       Q   And do you mean when --
18       A   I was looking --
19       Q   When you say that information, you mean
20  information regarding a risk of permanent alopecia?
21       A   Yes, it is related to risk, when that risk
22  was identified.
23       Q   And when you say when that risk was
24  identified, identified to whom?
25       A   Identified to the company, Sandoz and

1   Accord, the two companies that are part of this
2   litigation.
3        Q   And when do you believe a risk of pCIA was
4   identified to Sandoz and Accord?
5        A   Well, if you look at Page 76 of my report
6   I cite the specific issue that the risk is known
7   but I don't get into specifics about what -- Dr.
8   Ross gets into specifics about the when.
9        Q   So you are not offering any opinions about
10  the when, correct?
11       A   I wouldn't -- no.
12           MR. MICELI:  Objection.  Excuse me.
13  Object to the form.
14           THE WITNESS:  In regards to when the when
15  was known.  There is places in my report including
16  even Madigan about when the signal was identified,
17  when the clinical trial data was known, and so that
18  is part of assessing when the risk was made
19  available.  The risk, the increased risk was made
20  available.
21       Q   BY MR. INSOGNA:  You have not read any of
22  Sandoz's internal documents concerning its label,
23  correct?
24       A   I have seen the depositions of quite a few
25  Sandoz deponents and the relevant exhibits for

1   them.
2        Q   Okay.  And other than what is set forth in
3   depositions of Sandoz employees and the exhibits to
4   those depositions, you have not reviewed any other
5   Sandoz documents, correct?
6        A   The only other Sandoz document I looked at
7   would be the summary basis of approval and the
8   label, some of the labels that are available on the
9   publicly-available website.
10       Q   Okay.
11       A   And that's what my reliance was on as
12  well.
13       Q   You are not offering any opinion that
14  Sandoz violated any of its internal policies
15  regarding its labeling, are you?
16       A   I am not offering an opinion about whether
17  they were compliant with their own policies.  I'm
18  not offering an opinion on their policies.
19       Q   And you are not offering any opinion that
20  Sandoz was deficient in its post-marketing
21  surveillance, are you?
22       A   I'm not offering any opinions on how they
23  did their surveillance.  I can't answer that
24  question, it is sort of broad.  I don't know all
25  the specifics perhaps of everything that they did.

1   I know what's available on the documents and what's
2   on available on the documents I have been able to
3   obtain publicly.
4        Q   You don't know how Sandoz conducted its
5   post-marketing surveillance, do you?
6        A   Other than what's in the -- what has been
7   disclosed and their description.
8        Q   And so you are not offering any opinions
9   regarding the adequacy of Sandoz's methods for
10  doing post-marketing surveillance?
11       A   I'm not going to get into whether they
12  were compliant with their own internal policies or
13  whether their internal policies were appropriate.
14       Q   And what is the distinction you are making
15  with that answer?
16       A   That I think that's more for Dr. Ross to
17  comment upon in terms of whether they were
18  following their -- whether the policies were
19  appropriate and they were following them
20  appropriately.
21           I know what the regulations are for NDA
22  holders and they were aware -- you know, I know
23  that they were made aware of what their
24  responsibilities should be.
25       Q   Are you offering any opinions that Sandoz

1  failed to fulfill its regulatory obligations with
2  regard to post-marketing surveillance?
3      A   I think that would be more Dr. Ross' forte
4  to decide, to opine on that.
5      Q   And so is the answer that you are not
6  offering those types of opinions?
7      A   Whether they were compliant with FDA
8  regulations or compliant with their own policies,
9  no, I would not be offering an opinion on that.
10     Q   You have never worked for EMA on
11 regulatory-related labeling issues, correct?
12     A   No, but I've worked with colleagues who
13 have been part of the EMA and CHMP so I am familiar
14 with the European process.
15     Q   You are not offering any opinions
16 regarding the difference between foreign regulatory
17 authorities and FDA's requirements, are you?
18     A   I would not be offering regulatory -- no,
19 I would not be offering regulatory opinions.
20     Q   You are aware that different jurisdiction
21 have different requirements for pharmaceutical
22 labeling?
23         MR. MICELI:  Object to the form.
24         THE WITNESS:  Which actually makes no
25 impact on my evaluation of risk.

1          MR. INSOGNA:  Understood.
2      Q   You are aware there are differences
3  between the jurisdictions, correct?
4      A   There are differences.  I am aware there
5  are differences in jurisdictions, yes.
6      Q   And you are aware those differences can
7  result in different labeling submissions in
8  different territories for the same medication,
9  right?
10         MR. MICELI:  Objection; form.
11         THE WITNESS:  I would not be offering
12 opinions on what labels in different countries need
13 to look like, no.  I would not be offering opinions
14 on what labels in other countries would look like,
15 that would be -- I don't even know if Dr. Ross is
16 going to be talking about that.
17     Q   BY MR. INSOGNA:  Have you ever made a
18 treatment decision for a U.S. patient based on
19 foreign labeling?
20     A   I make decisions based on U.S. labeling.
21 You are talking as a physician?  Yes, I would have
22 access to U.S. labeling.  I wouldn't have had
23 access to foreign labeling.
24     Q   Do you have any information or knowledge
25 whether Sandoz has done any analysis of a

1  relationship between docetaxel and permanent
2  alopecia?
3      A   What -- they have done whatever they have
4  done to a certain extent, you know, to a certain --
5  I don't know the details but they must have done
6  something because it is on the label in certain
7  countries so I would assume there's some work
8  that's been done in order for them to put it on a
9  label.
10     Q   I'm not asking about anything that you may
11 have assumed.  What I'm asking is have you ever
12 seen any analysis that Sandoz has done of a
13 relationship between docetaxel and permanent
14 alopecia.
15         MR. MICELI:  Object to the form.
16         THE WITNESS:  I can't recall.  If it was
17 there it would be -- I don't remember every line of
18 the -- of the deposition so if it was in there,
19 perhaps it was in there but I don't recall it.
20     Q   BY MR. INSOGNA:  Okay.  And in formulating
21 your opinions for this case you did not review any
22 Sandoz documents that contained an analysis of that
23 issue, did you?
24     A   It would be irrelevant if not -- it is not
25 relevant to my evaluation of risk/benefit.

1  Docetaxel is the active ingredient in all these
2  drugs.  There's plenty of information out there
3  about docetaxel.
4      Q   Okay.  My question, though, is if there is
5  a Sandoz analysis of a relationship between
6  docetaxel and permanent alopecia you have not seen
7  that; is that correct?
8      A   The only thing I -- the only thing I
9  recall seeing is they might have some articles in
10 there that are supportive but it doesn't really
11 matter whether they say it is yes or no, it is on
12 their label and I have done my own analysis of the
13 data that I was able to obtain.  So there would be
14 nothing -- nothing additional that I would need for
15 my -- for my opinion --
16     Q   Okay.
17     A   -- on general causation.
18     Q   Respectfully, Dr. Feigal, I'm not asking
19 about what you believe was important to your
20 opinion, I'm asking about what you have reviewed,
21 and so my question is whether you have reviewed any
22 such document and I believe the answer is no but
23 tell me if I am wrong.
24     A   You may be wrong.  I read all the depos,
25 if it is explained in there.  All I recall is they

Page 98

1   may have done some literature review.  I don't
2   recall that they did a FAERS analysis of the major
3   spontaneous importing system database.  If they did
4   I don't recall it.  They may have done a literature
5   search, they may have looked at their own art.  I
6   mean, I know they looked at their own Argus
7   database, I know that they did receive reports of
8   persistent alopecia, so I do know some of their
9   own -- their own pharmacovigilance.  I'm not aware
10  that they did a FAERS database analysis, they may
11  have done a paper analysis, but I think I saw
12  everything that was -- that was available.
13      Q   And Dr. Feigal, you referred in that
14  response to the Argus database.  You are aware that
15  Sandoz has produced its Argus database work related
16  to docetaxel and alopecia?
17      A   Yes.
18          MR. MICELI:  Object to the form.
19          THE WITNESS:  I am aware that they have
20  evaluated it and I think they included that in
21  their papers.
22      Q   BY MR. INSOGNA:  I'm sorry, Dr. Feigal,
23  not that they evaluated it.  My question is are you
24  aware that those documents have been produced in
25  this litigation.

Page 99

1          MR. MICELI:  We lost her.
2          THE WITNESS:  No, I'm here.  Can you hear
3   me?  Can you hear me?
4          MR. MICELI:  I saw your lips moving and I
5   didn't hear you so that's what my question was.
6          Did you hear her?
7          THE WITNESS:  Can you hear me now?
8          MR. INSOGNA:  We can hear you, Dr. Feigal.
9          THE WITNESS:  Okay, okay.  I don't -- I
10  don't recall seeing a formal pharmacovigilance
11  analysis of FAERS database of literature review,
12  sort of the common post-marketing surveillance
13  tool, so if it was in there I don't recall seeing
14  it.
15      Q   BY MR. INSOGNA:  But when you say if it
16  was in there, what there are you referring to?
17      A   The reliance documents that are on my
18  Appendix D; all of the deponents, the exhibits, I
19  don't -- I don't recall a full analysis looking at
20  all those different sorts of data.  My memory -- if
21  it is in there please show me but I just don't
22  recall it.
23      Q   No, I agree with you, Dr. Feigal, nowhere
24  on your reliance list do I see anything related to
25  Sandoz's Argus data or internal pharmacovigilance

Page 100

1   database so I'm trying to confirm that you did not
2   review those items in preparing your opinions.
3          MR. MICELI:  Object.
4          THE WITNESS:  Well, I don't think that's
5   clear because some of the deponents and some of the
6   exhibits I think did refer to the Argus database
7   and what they looked at so I think it might be
8   contained in there, I just don't have total recall
9   at this point in time and I never recall a FAERS
10  database analysis so if they did a FAERS database
11  analysis I haven't seen that so if you have
12  knowledge about that then the answer is no, I
13  haven't seen that.
14      Q   BY MR. INSOGNA:  And if they did an Argus
15  database analysis you have not seen the analysis
16  itself, correct?
17      A   I don't know if it is part of the exhibit
18  because there is a lot of reference to the Argus
19  database and I just don't have -- I apologize, I
20  don't have total recall of every piece of material
21  in this document.  It is certainly referred to.
22      Q   You are not an attorney, Dr. Feigal?  You
23  are not an attorney, correct?
24      A   I am not.
25      Q   Okay.  You are not offering any legal

Page 101

1   opinions, are you?
2      A   No.
3      Q   You don't intend to tell a jury how to
4   interpret the law, correct?
5          MR. MICELI:  Object to the form.
6          THE WITNESS:  I am -- I am going to -- am
7   I going -- well, first of all I never instruct the
8   jury so no, I wouldn't be instructing the jury on
9   anything.
10     Q   BY MR. INSOGNA:  Okay.  You have no reason
11  to disagree that Sandoz is a responsible company,
12  correct?
13         MR. MICELI:  Object to the form.
14         THE WITNESS:  I -- I have no personal
15  feelings about -- about Sandoz or the company or
16  their reputation.  I'm not offering an opinion
17  about their reputation.
18     Q   BY MR. INSOGNA:  And no reason to offer an
19  opinion about whether Sandoz is concerned about
20  patient safety, correct?
21         MR. MICELI:  Object to the form.
22         THE WITNESS:  I have no -- I intend to
23  offer no opinions about their -- their concerns
24  about patient safety.
25         MR. INSOGNA:  Correct.

1      It looks like we have been going for about
2  another hour and 15 minutes.  Do you want to take a
3  brief break?
4           MR. MICELI:  Yes.  Here on the -- well,
5  let's go off the record then we can chat, talk
6  about how much time you want to take because it is
7  1:20 here.  It is only 10:20 where she is.
8           MR. INSOGNA:  Okay.
9           THE VIDEOGRAPHER:  Off video at 10:21 a.m.
10          (Recess taken)
11          THE VIDEOGRAPHER:  Back on video at 10:33
12  a.m.
13          MR. INSOGNA:  Dr. Feigal, I would like to
14  mark as our next exhibit the C.V. that is appended
15  to your expert report in this case.  I assume you
16  also have a copy of that in front of you.
17          THE WITNESS:  I will get it in front of
18  me.
19          (Feigal Exhibit 9, Appendix 1 - Curriculum
20  Vitae, marked for identification, as of this date.)
21      Q   BY MR. INSOGNA:  And you may not need it.
22  You have already testified fairly extensively about
23  your educational and professional background in
24  this case, right?
25      A   Yes.

1      Q   And I assume all that prior testimony
2  remains true and accurate?
3      A   About my background?  Yes, it should.
4      Q   Okay.  Have you had any updates to your
5  C.V. since you served this report?
6      A   No.
7      Q   I know we spoke earlier about the last
8  time you prescribed chemotherapy generally.  The
9  last time that you have treated a breast cancer
10  patient was roughly around 1991, correct?
11     A   You know, what I said I think in prior
12  depo is it is possible I may have treated them in a
13  clinical trial and, you know, don't have direct
14  recall of that.  Because I was treating patients
15  through 2004, I just don't recall treating a breast
16  cancer patient with -- anyway, so I'm just a little
17  bit -- yeah, it may be not the fullest answer I
18  could have given but I just wanted you to be clear
19  that I was still seeing patients up through 2004.
20     Q   I understand.
21         Outside of the context of a clinical
22  trial, though, the last time you treated a breast
23  cancer patient would have been 1991, correct?
24     A   I, to the best of my recall unless I
25  treated them in a clinical trial as I said in 2004,

1  and of course I still continue to work on standard
2  of care as well as investigative projects including
3  in breast cancer to the present day.
4      Q   Dr. Feigal, one question about one item on
5  your C.V.
6          I see in your report you note that "...
7  80% of FDA-approved drugs, including taxanes, are
8  engaged with the NCI during some part of their
9  development."  Do you know what I'm referring to
10  there?
11     A   Yes, I am.  And that was accurate at the
12  time that was written when I was at the National
13  Cancer Institute.
14     Q   Okay.  What do you mean by the phrase
15  "engaged with the NCI"?
16     A   Well, we work on the -- you know, when I
17  was there we worked on the spectrum of product
18  development.  It might be on formulation, it might
19  be on pre-clinical, it might be in clinical trials,
20  so there's a section where the National Cancer
21  Institute might be involved.
22     Q   You personally did not have any
23  involvement in the development of the taxanes when
24  you were at NCI?
25     A   Well, I was head of the division so

1  certainly I had responsibility for development of
2  many of the products that went through during my
3  tenure there and taxanes were developed during my
4  tenure there.
5      Q   And what responsibility specifically did
6  you have with respect to development of the
7  taxanes?
8      A   Well, as part of the division we have
9  oversight of what goes on and in our offsite campus
10  in terms of a lot of the pre-clinical work,
11  discovery work, in vitro cell systems, we have
12  responsibility for the entire clinical trials
13  network across the country and internationally that
14  we sponsor.  We do protocols.  There's a lot of
15  responsibilities that the National Cancer Institute
16  has.  I don't specifically recall the exact details
17  of our -- all the different activities we may have
18  been involved in.
19     Q   Okay.  And so you don't specifically
20  recall any work that you personally did with
21  respect to taxanes at NCI, correct?
22     A   No.  I do recall because I actually wrote
23  a chapter in a book about taxanes and I think Susan
24  Arbuck was the editor and that's on my C.V. as one
25  of the textbooks that I contributed to.  And then I

1  think I probably contributed to taxanes in one of
2  my papers as well, so I personally did work on some
3  of these issues.
4      Q   You have never personally counseled a
5  patient on the risks and benefits of docetaxel,
6  have you?
7      A   I have personally counseled patients on
8  all the medications I've used so as I said, if I
9  did use them in context of a clinical trial I would
10 have counseled them on it.  I don't have specific
11 recall of it, sorry.
12     Q   Have you ever diagnosed a breast cancer
13 patient with permanent alopecia?
14     A   I have not had a patient with permanent
15 alopecia with breast cancer, no.
16     Q   Prior to your involvement in this
17 litigation, hair loss and chemotherapy was the
18 relationship between hair loss and chemotherapy was
19 not a particular research focus of yours, was it?
20     A   It is an extremely common topic in
21 pharmacology in terms of transient chemotherapy-
22 induced alopecia.  Permanent chemotherapy-induced
23 alopecia was not a topic of conversation.
24     Q   Okay.  The topic of chemotherapy-induced
25 alopecia is not one that you have ever published

1  on, is it?
2      A   Oh, specifically on the topic of transient
3  chemotherapy-induced alopecia?  Not that I recall
4  in my publication.
5      Q   And --
6      A   It is a very -- I mean, it is like 90% of
7  patients have it.  It is an extremely common
8  adverse event.
9      Q   And other than the expert reports you have
10 authored you have not published on the subject of
11 permanent chemotherapy-induced alopecia, have you?
12     A   That's correct.
13     Q   And it is not something that has been an
14 independent research focus of yours, has it?
15     A   No.  I did work at the, headed up research
16 and development with the stem cell agency for
17 several years in California so there were research
18 projects working on the topic of hair loss, not
19 specifically in breast cancer and permanent
20 chemotherapy-induced alopecia, but certain research
21 topics looking at hair loss and some of the issues
22 relating to that.
23     Q   Okay.  And so your knowledge with respect
24 to permanent chemotherapy-induced alopecia is all
25 knowledge that you have gained while formulating

1  your opinions for plaintiffs in this litigation,
2  correct?
3          MR. MICELI:  Object to the form.
4          THE WITNESS:  My knowledge on permanent
5  other than in kind of stem cell transplants and in
6  direct radiation to the brain, it is not -- it is
7  not a topic I had seen before in conventional
8  instances of chemotherapy that are provided to
9  patients with breast cancer, that's -- that's a --
10 it is a long answer but that would be a correct
11 response to your question.
12     Q   BY MR. INSOGNA:  Okay.  And so thank you
13 for that clarification.  Let me just ask the more
14 targeted question then.
15         The subject of permanent chemotherapy-
16 induced alopecia in breast cancer patients is
17 something you have learned about for purposes of
18 formulating your opinions for plaintiffs in this
19 litigation, correct?
20         MR. MICELI:  Object to the form.
21         THE WITNESS:  As I said, with conventional
22 doses that would be -- that would be, yes, a newer
23 topic on my end.
24     Q   BY MR. INSOGNA:  If you would, and I'm --
25 if you would look at your reliance report, your

1  list of materials reviewed -- Dawn, if you could
2  pull that up.  If we have not marked that yet
3  please do.
4      A   I have it pulled up.
5          (Feigal Exhibit 10, Appendix B - Ellen
6  Feigal, M.D., Materials Reviewed, marked for
7  identification, as of this date.)
8      Q   BY MR. INSOGNA:  And, Dr. Feigal, on the
9  last page of that document you identify Taxotere/
10 docetaxel labels, do you see that?
11     A   Yes.
12     Q   Which manufacture's labeling did you
13 review?
14     A   I reviewed -- well, Sanofi, Sandoz,
15 Hospira and Accord.
16     Q   And which years of labeling did you
17 review?
18     A   I reviewed multiple years.  I recall I
19 certainly looked at the original and then I think I
20 put it in my paper the Sanofi, some of the Sanofi
21 labels that I have looked at.  And then for the
22 Sandoz and Accord, the two companies relevant
23 today, I recall, you know, taking a look at
24 different years but I don't -- I think it was 2011
25 and it may have been 2013 and it may have been

Page 110

1  2019.  I just don't -- I did not write it down
2  because it was on the -- it was on line and so it
3  was just very easy to flip in between different
4  years for the label.
5      Q   I assume you are aware after 2016 both
6  Sanofi's and Sandoz's docetaxel labeling was
7  revised to include language regarding cases of
8  permanent alopecia, correct?
9      A   Yeah, I am --
10         MR. MICELI:  Objection.
11         THE WITNESS:  -- aware of that.  Yeah, I
12 am aware of that even though much earlier it was on
13 the foreign label.
14         MR. INSOGNA:  Move to strike the last
15 part.
16     Q   You are aware that the labels were revised
17 in 2016 to add language regarding cases of
18 permanent alopecia, correct?
19         MR. MICELI:  Object to the form.
20         THE WITNESS:  I gave you what I thought
21 was a full answer.
22         Yes, it was added in the United States
23 several years after it was already added in the
24 foreign label.
25     Q   BY MR. INSOGNA:  Are you aware that the

Page 111

1  court has held that Sanofi's updated labeling
2  language is sufficient as a matter of law to warn
3  of the risks of permanent alopecia?
4          MR. MICELI:  Object to the form.
5          THE WITNESS:  I don't -- I'm not aware of
6  the court's decision.
7      Q   BY MR. INSOGNA:  Okay.  You have not
8  reviewed any opinion of the court on that subject?
9          MR. MICELI:  Object to the form.
10         THE WITNESS:  I'm not aware of the
11 specific question you asked.  I'm not able to
12 respond to the specific question you asked me about
13 the court and its associated labeling.
14     Q   BY MR. INSOGNA:  Would you agree that if a
15 document is not identified either on your list of
16 reliance materials or in the footnote to your
17 report it is not something that you considered?
18     A   For forming my opinion that's probably
19 fairly correct, but there may be other things I
20 have knowledge of that would not be on a reliance
21 document so it is not comprehensive of what's in my
22 brain, no.
23     Q   And so are you aware even approximately of
24 the volume of documents that Sandoz has produced in
25 this case?

Page 112

1      A   Am I aware of the volume of documents
2  produced, no.  I would have no knowledge of the
3  volume of documents produced.
4      Q   And any Sandoz document that was not
5  marked as an exhibit at a Sandoz employee
6  deposition you have not reviewed, correct?
7      A   In terms of the Sandoz and Accord
8  document, you have what I reviewed.  I would not
9  know the denominator of what the lawyers have.
10     Q   Likewise, you have no idea the volume of
11 Ms. Stewart's medical records that have been
12 produced in the case, correct?
13     A   I do not have knowledge of what the
14 lawyers have, that is correct.
15     Q   All right.  And you have not reviewed any
16 of her medical records, correct?
17     A   Because I have no case-specific opinions.
18         MR. MICELI:  Form.
19         THE WITNESS:  I was never asked to provide
20 a -- I'm not providing case-specific opinions.
21 There's no reason to read them.
22     Q   BY MR. INSOGNA:  So likewise you have not
23 been provided with any medical chronology of Ms.
24 Stewart's care, correct?
25         MR. MICELI:  Objection; form.

Page 113

1          THE WITNESS:  Since I'm not providing any
2  case- specific opinions there's no reason for me to
3  look at that.
4      Q   BY MR. INSOGNA:  You have also not
5  reviewed any prescribing information or labeling
6  for other common chemotherapy medications, have
7  you?
8      A   Well, I do that all the time as part of my
9  work so yes, I look at labels all the time.
10     Q   In terms of what is identified on your
11 reliance list you do not have prescribing
12 information or labels for other chemotherapy
13 medication, do you?
14     A   Because I know what they are.  It
15 wasn't -- it wasn't pertinent to forming opinions.
16 I'm very well aware of what's on other labels but
17 no, I didn't put it here because it wasn't
18 pertinent to what I was providing for the expert
19 report.
20     Q   Did you review any of those labels when
21 you were formulating your opinions?
22     A   I know those labels.  I work with them all
23 the time.
24     Q   So is the answer to my question no, you
25 did not review them while you were putting together

1  your opinions?
2       A   I didn't need to.
3            MR. MICELI:  Object to form.
4            THE WITNESS:  I didn't need to because I'm
5  already knowledgeable about what's in them.
6       Q   BY MR. INSOGNA:  Okay.  Did you rely in
7  any way on your memory of what's in them in the
8  process of formulating your opinions?
9       A   Well, I used my brain and 30 years of
10  experience in formulating my opinion.  I don't
11  write everything down that I have read.  But these
12  are the pertinent documents that formed the opinion
13  for this expert report.
14       Q   BY MR. INSOGNA:  So was information that
15  you recall as contained within the prescribing
16  information for Adriamycin pertinent to your
17  report?
18       A   Yeah, I'm very well aware of --
19            MR. MICELI:  Object to form.
20            THE WITNESS:  I'm very well aware there's
21  no label that has permanent chemotherapy-induced
22  alopecia as part of its label.
23       Q   BY MR. INSOGNA:  Dr. Feigal, my question
24  is much narrower than that.  I'm asking whether you
25  relied in any way on your knowledge of what's in

1  the Adriamycin labeling when you were formulating
2  your opinions.
3       A   It wasn't needed, I just know it, I can't
4  get rid of data that's in my brain, but what I'm
5  trying to tell you is I looked at things that are
6  pertinent to inform my opinions about the question
7  at hand.  Taxotere/docetaxel is causally
8  associated, causally related to the development of
9  permanent, irreversible or persistent alopecia in
10  patients who receive the Taxotere regimen.  That
11  was the question that I was asked -- you know, I
12  looking at.  So I don't need to look at labels, I
13  don't need to look at other labels at this point in
14  time.  One, I already am aware of what's in the
15  labels and two, it wasn't pertinent to informing my
16  opinion for this case.  I have listed the articles
17  and the other things that I have looked at.
18       Q   Okay.  So the content of other
19  chemotherapy medications labels is not pertinent to
20  your opinions; is that correct?
21       A   I didn't say that.
22            MR. MICELI:  Object to the form.
23       Q   BY MR. INSOGNA:  Dr. Feigal, that's the
24  distinction I'm trying to draw.
25            You've said that you know in your mind

1  what's in those labels and that reviewing them was
2  not pertinent so what I'm trying to figure out is
3  did you rely on the knowledge in your mind in
4  formulating your opinions or did it not matter?
5            MR. MICELI:  Object to the form.
6       Q   BY MR. INSOGNA:  Are you able to answer
7  that?
8       A   Well, I can answer.  I can answer it, you
9  may not like my answer, but my answer continues to
10  be I've got a set of information I know about from
11  my experience and I've got the specific documents
12  that are relevant to causation, so the documents
13  relevant to causation are included as footnotes,
14  they're included in the underlying documents.  The
15  label -- the labels would not add for the other
16  products, won't add to the information base for
17  causation for Taxotere.
18       Q   Okay.  And the content of the labels for
19  other chemotherapy medications would not add to
20  your knowledge in formulating your opinions,
21  correct?
22            MR. MICELI:  Object to form.
23            THE WITNESS:  I didn't say that.  I didn't
24  say that.  I said I know that permanent alopecia is
25  not part of the labeling of these other

1  chemotherapy agents.  Is that pertinent?  I mean,
2  that's confirmatory of what I read in the
3  literature but, you know, so I think I have
4  answered the question as best I can.
5       Q   BY MR. INSOGNA:  Okay.  And other than
6  permanent alopecia, if there are other things
7  included in the labeling for other chemotherapy
8  medications, other aspects of the labeling, are
9  those relevant to your opinions in this case?
10            MR. MICELI:  Objection to form.
11            THE WITNESS:  That's a very general
12  question.
13       Q   BY MR. INSOGNA:  Well, you did not cite to
14  any other chemotherapy medications labeling on your
15  reliance list so I'm asking whether the content of
16  those documents is important to your opinions in
17  this case?
18            MR. MICELI:  Object to form.
19            THE WITNESS:  The issue at hand is
20  alopecia.  So if you are talking about information
21  relevant to alopecia there's nothing additional on
22  the labeling for these other drugs that I don't
23  already know that would need to be reviewed to
24  inform my opinions in this report.
25       Q   BY MR. INSOGNA:  But the language --

1      A   They're not needed.

2      Q   The language regarding alopecia in those
3  labels is important to your opinions, correct?

4          MR. MICELI:  Object to form.

5          THE WITNESS:  They were irrelevant because
6  I already got the data that I wanted, that I needed
7  to look at in terms of trying to dissect out and
8  determine the causation for Taxotere/docetaxel.
9  That is the question that I was asked to look at.
10 So we can go round and round but, I mean, my answer
11 is I'm aware of what's on the label.  I don't
12 consider what's on the label to be other chemo --
13 there's non-docetaxel, Taxotere and chemo -- to
14 re-review it and put it on a reliance list is not
15 necessary, no.

16     Q   BY MR. INSOGNA:  It was sufficient to rely
17 on your memory of what they say, correct?

18         MR. MICELI:  Object to the form.

19         THE WITNESS:  It didn't inform my opinion
20 what's on -- it didn't inform my opinion in terms
21 of causation.

22     Q   BY MR. INSOGNA:  You do agree that other
23 chemotherapy medications including Adriamycin,
24 cyclophosphamide and the aromatase inhibitors do
25 warn of alopecia as a side effect, correct?

1          MR. MICELI:  Object to form.

2          THE WITNESS:  Most chemotherapy agents
3  warn of alopecia as a side effect.  That's, you
4  know, a common side effect is transient, reversible
5  alopecia.  That's very common.

6      Q   BY MR. INSOGNA:  And those four that I
7  just named, Adriamycin, cyclophosphamide,
8  anastrozole and letrozole are associated in studies
9  cited in your report with cases of permanent
10 alopecia, correct?

11         MR. MICELI:  Object to form.

12         THE WITNESS:  I never -- I never said
13 anecdotal cases can't occur in other regimens, I
14 never said it had to be zero, but cases don't
15 equal -- cases don't equal causation so anecdotal
16 cases, I never said it can't occur.

17     Q   BY MR. INSOGNA:  Respectfully, Dr. Feigal,
18 my question is not that at all.  My question is are
19 those medications associated in studies cited in
20 your report with cases of permanent alopecia.

21         MR. MICELI:  Objection to the form.

22         THE WITNESS:  Taxotere -- let me just
23 answer your question.  Taxotere is given in
24 combination so you are correct.  Other drugs are
25 given in combination with Taxotere and there have

1  been some cases of persistent or permanent that
2  have occurred in the literature.  Cases.  There has
3  never been any literature showing an increased risk
4  with non-docetaxel agents.

5      Q   BY MR. INSOGNA:  And, Dr. Feigal, there
6  have been cases in the literature not in
7  combination with docetaxel associated with
8  permanent alopecia, correct?

9          MR. MICELI:  Object to the form.

10         THE WITNESS:  I think I said that, yes.
11 There have been anecdotal cases that have been
12 reported in the literature, yes.

13         MR. INSOGNA:  Okay.

14         THE WITNESS:  But as I said, none of the
15 cases reported in the literature have shown an
16 increased risk compared to docetaxel, none.

17     Q   BY MR. INSOGNA:  Dr. Feigal, have you
18 reviewed the expert reports offered by Drs. Reddy
19 and Foote?

20     A   Yes.

21     Q   And you saw that they disagreed with your
22 conclusion as to whether the Bradford Hill criteria
23 are established for docetaxel and permanent
24 alopecia, correct?

25     A   Yes.

1      Q   Do you have specific areas of disagreement
2  with either of those reports?

3      A   Yeah.

4          MR. MICELI:  Object to the form.

5      Q   BY MR. INSOGNA:  Would you agree that
6  whether docetaxel can cause permanent chemotherapy-
7  induced alopecia is a subject about which well-
8  qualified medical doctors could disagree?

9      A   In a litigation?

10         MR. MICELI:  Object to form.

11         THE WITNESS:  I would suspect that.

12     Q   BY MR. INSOGNA:  And you have no basis to
13 question Dr. Reddy or his qualifications, do you?

14     A   Well, there are many factual errors,
15 misrepresentation of data.  I disagree with their
16 assumptions and I agree with their citations and
17 they inaccurately cited references that don't show
18 what they purported to show because I know those
19 references.  So I -- I question their assumptions
20 and I question the factual basis of some of their
21 citations.

22     Q   Dr. Feigal, that was not my question so I
23 will move to strike the response.

24         My question is do you have any basis to
25 question their credentials of medical doctors.

1    A   Oh, as medical doctors?  I didn't realize
2  that was your question.  As medical doctors I don't
3  know these two individuals.  I have no basis.  I
4  assume -- well, I won't assume anything.
5  Presumably they were vetted and found to be
6  qualified as physicians and they hold licenses.
7    Q   And you have no basis to question their
8  qualifications to offer the opinions they have
9  offered, do you?
10       MR. MICELI:  Object to the form.
11       THE WITNESS:  Well, as I said, there are
12  errors, false representation of data, so to some
13  extent I question their qualifications to offer an
14  opinion on my report, yes.
15    Q   BY MR. INSOGNA:  So just so I'm clear on
16  your testimony, errors in the report are reason to
17  question the experts' qualifications to give those
18  opinions?
19       MR. MICELI:  Object to the form.
20       THE WITNESS:  Factual misrepresentation of
21  data and assumptions that aren't -- don't have a
22  valid reference or citation for those assumptions
23  I -- I don't know about those are errors but those
24  are questions that I have about -- to tell you the
25  truth, I don't know what's in their mind, you'd

1  have to, you know -- I can't -- I never talked to
2  them so I have no idea what they're thinking but
3  what they wrote appears to be false
4  misrepresentations.  May not be intentional but I'm
5  just saying it is not accurate and the assumptions
6  I don't think are valid.
7    Q   BY MR. INSOGNA:  And that causes you to
8  question the expert's ability to offer their
9  opinions, correct?
10       MR. MICELI:  Object to form.
11       THE WITNESS:  Experts are allowed to offer
12  their opinion whether they base it on valid methods
13  or inappropriate methods so I'm not questioning
14  their freedom of speech and ability to give an
15  opinion, no.
16    Q   BY MR. INSOGNA:  Prior to your reports in
17  this litigation have you ever done a Bradford Hill
18  causation analysis?
19    A   I did -- well, all the time in -- in
20  therapeutic development you are always doing
21  causation analysis as you consider whether or not a
22  side effect is impacted by the drug given a
23  patient.  It is sort of -- that's sort of a common
24  type of issue that you think about, the
25  temporality, biologic probability, other things the

1  patient may be on.  That's done all the time.
2    Q   Leaving aside what you may have thought
3  about over the course of your career, have you ever
4  written an analysis utilizing the Bradford Hill
5  factors to say that a certain medication caused an
6  effect?
7       MR. MICELI:  Object to the form.
8       THE WITNESS:  Specifically on calling out
9  explicit criteria, no.  It might be included in
10  some of the papers but not -- not a specific topic
11  paper on a single side effect.  I can't recall.
12    Q   BY MR. INSOGNA:  And have you ever seen
13  any peer-reviewed article where a Bradford Hill
14  analysis was done regarding whether a chemotherapy
15  drug causes permanent chemotherapy-induced
16  alopecia?
17    A   A Bradford Hill analysis on causation in
18  the published literature, is that what you are
19  asking?
20    Q   Yes.
21    A   In the published literature a Bradford
22  Hill analysis.  I know there's been a lot of --
23  there are papers suggesting causal -- causality for
24  Taxotere and permanent alopecia, Taxotere/
25  docetaxel.  I haven't seen the explicit going

1  through all the criteria.
2    Q   Okay.  And so you have never seen any
3  other physician or scientist conduct the same type
4  of analysis that you have conducted here applying
5  the Bradford Hill factors to docetaxel and pCIA; is
6  that right?
7       MR. MICELI:  Objection form.
8       THE WITNESS:  In the published literature
9  I think basically what they have done is talk about
10  what they had access to.  So I don't think anybody
11  has done what I have done because, you know, I have
12  access to clinical study reports, I have access to
13  pharmacovigilance and I have access to 19 different
14  papers and published literature.  I would assume,
15  unless it is coming from an industry writer, they
16  wouldn't have access to all of that information.
17    Q   BY MR. INSOGNA:  And so it is necessary
18  that someone have access to that information, the
19  clinical study reports, the pharmacovigilance
20  database, in order to do the analysis that you have
21  done, correct?
22       MR. MICELI:  Object to form.
23       THE WITNESS:  No, I mean you could -- you
24  know, the FAERS database is out there for anybody
25  to use for signal detection, the papers are out

Page 126

1  there for anybody to use to do a risk analysis or
2  report papers in there, I think it is Brown, Martin
3  and King that have competitors with cohort studies
4  where we can calculate odds ratios and confidence
5  intervals, so there are papers out there.  And
6  then -- you know, so they may not have access to
7  some of the company documents.  You asked about me
8  and so, you know, I said there's probably nobody
9  out there that have done what I have done but,
10  there certainly is what I mentioned as publicly-
11  available information that people could avail
12  themselves of.
13      Q   BY MR. INSOGNA:  So are you saying that
14  you could reach a conclusion that docetaxel causes
15  pCIA without having looked at Sanofi's pharmaco-
16  vigilance database and without having looked at
17  Sanofi company documents?
18          MR. MICELI:  Object to the form.
19          THE WITNESS:  Well, I don't have to name
20  that -- I don't have to name that tune in one note,
21  I have all that data.  I'm saying, I think I
22  explained to you I have the published papers, I
23  have the clinical study reports from the randomized
24  controlled clinical trials and I have the pharmaco-
25  vigilance database.  So I have that information, I

Page 127

1  don't need to go back and back up.  And, frankly,
2  the clinical study report data was available on the
3  label, you know, that was already out there on
4  labels and it is acknowledged because it obviously
5  was used on labels by Sandoz and Accord, so that
6  data was available so people could have looked at
7  that and looked at the information.
8      Q   BY MR. INSOGNA:  Dr. Feigal, again,
9  respectfully, I'm not asking what people could have
10  looked at or what you had available to you, I'm
11  asking if your conclusion can stand without
12  Sanofi's pharmacovigilance database or its internal
13  company documents.
14          MR. MICELI:  Objection; form.
15          THE WITNESS:  And I'm saying I can't
16  really answer the question because I have three
17  legs of the stool to look at, so I have a lot -- I
18  have that information to look at.  Could you make
19  it?  I don't need to make it with just the
20  published literature.  Could I?  I don't know, I
21  haven't thought about it.  I have everything else.
22      Q   BY MR. INSOGNA:  You have not given any
23  thought to whether your Bradford Hill analysis
24  would be fully supported without those items?
25          MR. MICELI:  Object to the form.

Page 128

1          THE WITNESS:  What I'm -- well, I mean
2  what I was telling you is that the -- the data on
3  the clinical study is available, that is publicly
4  available.  I know you are asking me can I name the
5  tune in a smaller number of notes but I'm just
6  saying that information is publicly available so
7  I'm not sure why you are asking me to back -- well,
8  I know why you are asking me to back it up but I
9  don't need to because that information is publicly
10  available.
11      Q   BY MR. INSOGNA:  Okay.  I'm not asking
12  whether you need to, though.  Are you able to
13  answer my question.  Can -- can you reach the same
14  causation opinion without Sanofi's pharmaco-
15  vigilance database or its internal company
16  documents?
17          MR. MICELI:  Object to the form.
18          THE WITNESS:  I just don't want to be
19  pinned down to that.  I have all this other
20  information available and that's what I'm using and
21  that's the basis for my opinion.
22      Q   BY MR. INSOGNA:  Dr. Feigal, you don't get
23  to choose whether you answer that question.  I'm
24  asking --
25      A   I am answering the question.  I am

Page 129

1  answering your question.  But go ahead again.
2      Q   You have not answered the question.
3          Are you able to conclude that docetaxel
4  causes pCIA without reviewing Sanofi's pharmaco-
5  vigilance database or its internal company
6  documents?
7          MR. MICELI:  Object to the form.
8          THE WITNESS:  I am saying -- I'm saying I
9  don't need to, that's my answer.  I have access to
10  data.  The data is there.
11      Q   BY MR. INSOGNA:  That answer is not --
12      A   Why would I draw on data?  I draw on data
13  that's available.
14          You are asking me to -- somebody has got
15  to [inaudible] and you are asking me can we throw
16  this out, can we throw this out.  No, I look at
17  the -- look, I used the scientific method, I looked
18  at the evidence available and I used it.  Do I try
19  and see if I throw this out and throw that out can
20  I come to the same conclusion?  No, I don't use
21  that in a scientific method.  I have used the
22  totality of data.
23      Q   Do you have any evidence, Dr. Feigal, that
24  Sanofi's pharmacovigilance database was available
25  to Sandoz?

1     A   I didn't say that Sanofi's pharmaco-
2  vigilance database was available but I do say the
3  FAERS database is always available and you can look
4  at them.
5     Q   Do you have any information one way or
6  another whether Sanofi's pharmacovigilance database
7  was available to my client Sandoz?
8     A   Oh, I -- I do not have knowledge about
9  what was available to Sanofi and I can't speculate.
10    Q   In the prior answer you said Sanofi.  You
11 mean Sandoz, correct, Dr. Feigal?
12    A   Restate your question.
13    Q   You don't have knowledge about what
14 information was available to Sandoz, correct?
15    A   I -- I do have --
16    MR. MICELI:  Object to the form.
17    THE WITNESS:  I do have information.  You
18 have to -- I do have information that Sandoz did
19 have knowledge of data from the clinical studies
20 and documented by what they put in the foreign
21 label and I do certainly know what they have
22 availability to publicly-available information.  If
23 you are asking do they have availability to
24 specific internal Sanofi pharmacovigilance data I
25 would say I'm not privy to that.  Unless they had

1  some sort of agreement, you know, I can't
2  speculate.  I don't know, I -- I haven't seen
3  anything to suggest that they had access to it.
4     Q   BY MR. INSOGNA:  And you have not seen
5  anything to suggest that Sandoz had access to
6  Sanofi's internal company documents related to
7  permanent alopecia, correct?
8     MR. MICELI:  Object to the form.
9     THE WITNESS:  The -- as I said before,
10 whether or not they had access to internal
11 documents, they had documents to publicly-available
12 labels because they put it on their bottle.
13    Q   BY MR. INSOGNA:  Are you able to answer
14 the question.  Do you have any information to
15 suggest Sandoz had access to Sanofi internal
16 documents?
17    MR. MICELI:  Same objection.
18    THE WITNESS:  I don't know.  I don't know
19 if they had any agreement with Sandoz in terms of
20 internal documents.
21    Q   BY MR. INSOGNA:  Okay.  And so if you had
22 not been able to review Sanofi's pharmacovigilance
23 database or its internal company documents could
24 you conclude with confidence to a reasonable degree
25 of medical certainty that docetaxel causes pCIA?

1     MR. MICELI:  Object to the form of the
2  question.
3     THE WITNESS:  It is irrelevant, it is not
4  pertinent.  I base my opinion on the totality of
5  data that was available.  So if -- and, again, I
6  kept on -- I don't know how many more times I can
7  say that.  I looked at the totality of data that
8  was available to me.  Did I throw out some pieces
9  of data?  I -- I don't need to do that.
10    Q   BY MR. INSOGNA:  My question is not what
11 you did, I'm asking you a hypothetical which I'm
12 entitled to do.
13        If you did not have Sanofi's pharmaco-
14 vigilance database or its company's internal
15 documents could you conclude to a reasonable degree
16 of medical certainty that docetaxel causes pCIA?
17    MR. MICELI:  Object to the form.
18    THE WITNESS:  I think it is a speculative
19 question I don't need to answer because the data on
20 the clinical trial is available.
21    Q   BY MR. INSOGNA:  You do need to answer my
22 question.  I'm entitled to ask it, it is a fair
23 question, I'm entitled to an answer.
24    A   I am answering you.
25    MR. MICELI:  Objection.

1     Hold on.  He is -- Ellen, he asked a
2  question.  You and he are having a conversation.
3  He asks a question, you give the answer, the best
4  answer you can give, he asks another question.  It
5  is not a discussion in a living room despite most
6  of us are sitting in living rooms.
7     THE WITNESS:  Well, I gave the best answer
8  that I could.
9     Q   BY MR. INSOGNA:  Are you refusing to
10 answer further whether you could reach the same
11 conclusion without those two data points?
12    A   The data --
13    MR. MICELI:  Object to the form.
14    THE WITNESS:  The data in the published
15 literature already has comparators where the odds
16 ratio is increased and it is [inaudible].  It is
17 causal association.
18    THE REPORTER:  I didn't hear the end of
19 your answer.
20    THE WITNESS:  Can you not hear me?
21    MR. INSOGNA:  I can hear you.
22    THE WITNESS:  Do you want me to start
23 over?
24    THE REPORTER:  Please.
25    Q   BY MR. INSOGNA:  I would like you to

1  answer the question if you are able to.

2      A  No, I -- I'm trying to figure out where

3  she is and what she didn't hear.

4          MR. MICELI:  Madam Court Reporter, can you

5  tell us what you heard.

6          THE WITNESS:  Tell me what you heard.

7          (Record read)

8          THE WITNESS:  What I said is that

9  publications have comparators where a strength of

10 association can be calculated and -- with odds

11 ratio and statistical tools applied to show

12 confidence intervals and p-values and so that's a

13 certain level of evidence and it strengthened by

14 the randomized controls clinical trials data which

15 is publicly available and supplemented by

16 information in the pharmacovigilance data so that's

17 my answer.

18     Q  BY MR. INSOGNA:  Okay.  So at trial, Dr.

19 Feigal, you will not offer an opinion that you

20 could reach the same conclusion if you had not

21 reviewed Sanofi's pharmacovigilance database or

22 internal company documents.  You will not offer

23 that opinion, correct?

24         MR. MICELI:  Object to the form.

25         THE WITNESS:  Yeah, I'm not going to

1  definitively state what I will say at testimony but

2  what I am saying is it is strengthened by the two

3  other legs of the stool.  So I do say -- I'm saying

4  what I say.  It does strengthen the association

5  that can be calculated from the published

6  literature and it is strengthened by the randomized

7  controls clinical trial and supplemented by the

8  pharmacovigilance data.

9      Q  BY MR. INSOGNA:  And so you won't tell me

10 if that is the full extent of your testimony at

11 trial or whether you will offer --

12         MR. MICELI:  That's --

13         MR. INSOGNA:  That's fine.  You know what?

14 We can take it to the judge if we need to.

15         THE WITNESS:  Okay.

16     Q  BY MR. INSOGNA:  You have not done any

17 Bradford Hill causation analysis of whether other

18 medication involved in Ms. Stewart's cancer

19 treatment causes permanent hair loss, have you?

20     A  BY MR. INSOGNA:  Not relevant to the

21 question again, that's correct.

22     Q  Okay.  So you have not assessed whether

23 Adriamycin or cyclophosphamide or aromatase

24 inhibitors can cause permanent hair loss, correct?

25     A  I did not do a separate Bradford Hill

1  causation analysis but I did look at comparators in

2  all the literature where there were non-Taxotere-

3  containing regimens and there was always an

4  increased risk in the comparative ones that I

5  mentioned to you between docetaxel, Taxotere and

6  the comparator arms which oftentimes did include A

7  and C.

8      Q  And, Dr. Feigal, my question is not about

9  increased risk.

10         Did you do a separate assessment of

11 whether those drugs are capable of causing

12 permanent hair loss, chemotherapy medications other

13 than docetaxel.

14     A  Did I do -- not relevant to what I was

15 asked to do, no.

16     Q  Okay.  So you are not in a position to

17 opine whether factors of the Bradford Hill analysis

18 that you applied to docetaxel could be satisfied

19 with respect to cyclophosphamide, correct?

20         MR. MICELI:  Object to form.

21         THE WITNESS:  No, that's not what I'm

22 saying.  There is no evidence for causality for any

23 of the other drugs in all the papers, the clinical

24 studies and information that I reviewed.  There's

25 nothing to suggest increased risk for those other

1  drugs.

2      Q  BY MR. INSOGNA:  So are you able to say

3  that a Bradford Hill analysis could not be

4  satisfied with respect to cyclophosphamides?

5      A  I didn't do that specific analysis.

6  There's no evidence in all of the things that I

7  have looked at for that.

8      Q  Okay.  And you have not done that analysis

9  with respect to Adriamycin either, have you?

10     A  For causation you look at risk and --

11     Q  Dr. Feigal, I'm not asking you what you --

12     A  -- strength of association and I looked at

13 that.

14         MR. MICELI:  You have to stop talking over

15 each other but -- hold on, please.

16         I understand, Nick, and I understand,

17 Ellen, you both want to get out what you want to

18 get out.  The court reporter has to get it down and

19 if we're talking over each other she is not going

20 to be able to do it.

21         THE WITNESS:  Sure.

22         MR. MICELI:  I just wanted to interject

23 because I'm not keeping up with you.

24         MR. INSOGNA:  Thank you.

25     Q  Dr. Feigal, I'm going to ask a very

1  specific question.  I would like to you to just
2  focus on that question, please.
3        So you have not done a causation analysis
4  using the Bradford Hill factors for Adriamycin,
5  correct?
6     A   That is correct.
7     Q   And you have not done it with respect to
8  Femara, correct?
9     A   That is correct.  Not relevant for what I
10 was asked to do.
11    Q   Now you have seen reports in literature
12 that you cite where aromatase inhibitors like
13 Femara have been associated with permanent hair
14 loss, correct?
15       MR. MICELI:  Object to the form.
16       THE WITNESS:  Most of what I have seen has
17 related to hair thinning and it is a much different
18 temporality.
19    Q   BY MR. INSOGNA:  You have seen reports
20 where Femara is associated with permanent hair
21 thinning, correct?
22       MR. MICELI:  Object to the form.
23       THE WITNESS:  I can't comment on the
24 permanent but I have certainly seen reports with
25 hair thinning.

1     Q   BY MR. INSOGNA:  And you have not done a
2  Bradford Hill causation analysis with hair loss and
3  paclitaxel or Taxol, correct?
4     A   No.  My causation analysis was done with
5  docetaxel and Taxotere which is the form of the
6  litigation.
7     Q   And you have seen reports in the
8  literature that you cite of cases of persistent
9  alopecia following treatment with paclitaxel,
10 correct?
11       MR. MICELI:  Object to the form.
12       THE WITNESS:  I have seen cases.  Cases
13 aren't causes.
14    Q   BY MR. INSOGNA:  You are not offering any
15 opinion that any of those medications does not
16 cause permanent hair loss, correct?
17    A   I'm not arguing that cases, not causes,
18 have been seen.
19    Q   The answer to my question, however, you
20 are not opining that those other medications do not
21 cause permanent hair loss, right?
22       MR. MICELI:  Object to the form.
23       THE WITNESS:  In the context -- it is an
24 irrelevant -- it is an irrelevant comment but I
25 know you want me to answer your question.

1        I have seen no evidence for causation for
2  any of these other agents in the literature I have
3  looked at.  I did not do a general causation
4  analysis so I think my previous answers are
5  accurate.  I'm saying I'm not going to offer an
6  opinion on something, something I can't say, other
7  than I don't have any evidence that it causes this.
8     Q   BY MR. INSOGNA:  Well, if you don't have
9  evidence whether it causes it or not you cannot
10 opine that it does not cause it; is that fair?
11       MR. MICELI:  Objection to form.
12       THE WITNESS:  I have seen evidence.
13 There's no evidence in what I have seen that it
14 causes it.  But I didn't do, as you said, a
15 Bradford Hill causation analysis for these other
16 products.
17    Q   BY MR. INSOGNA:  And let me approach it
18 this way.
19       Without having done a Bradford Hill
20 analysis is it fair to say that your expert report
21 does not stand for the proposition that Adriamycin
22 or cyclophosphamide or anastrozole or letrozole or
23 paclitaxel are not -- are not causally associated
24 with pCIA?
25       MR. MICELI:  Object to the form.

1        THE WITNESS:  There's a lot in that
2  question and I lost you so please restate that
3  question.
4     Q   BY MR. INSOGNA:  Would it be an
5  appropriate takeaway from reading your expert
6  report to say that Adriamycin, cyclophosphamide,
7  aromatase inhibitors or paclitaxel do not cause
8  pCIA?
9        MR. MICELI:  Object to the form.
10       THE WITNESS:  What you can say from my
11 report is about the causation of docetaxel/
12 Taxotere.  I'm not opining on other products that
13 aren't the topic for the litigation.
14    Q   BY MR. INSOGNA:  Okay.  So I think that
15 answered my question.  So --
16    A   Okay.
17    Q   -- you could not take away from reading
18 your report that those other medications do not
19 cause pCIA, correct?
20    A   I'm silent on that.
21       MR. MICELI:  Objection to the form.
22       THE WITNESS:  Yeah.  I mean, I'm talking
23 about risk and causal association of docetaxel/
24 Taxotere so, you know, I can't comment any further
25 than that.

1    Q   BY MR. INSOGNA:  Okay.  You have no
2 information about what percentage of patients
3 develop pCIA following an Adriamycin regimen,
4 correct?
5        MR. MICELI:  Object to the form.
6        THE WITNESS:  I just -- only in those for
7 which they're used as a comparator, I would have
8 that information because that would be the
9 denominator for the relative risk and it would be
10 the ratio for the observation.
11   Q   BY MR. INSOGNA:  Okay.  I'm not asking
12 about any one particular study, Dr. Feigal, I'm
13 saying are you able to tell me that roughly X
14 percentage of patients treated with Adriamycin will
15 develop pCIA.
16   A   I have -- no, I don't have data in general
17 about -- about that.  I have only seen cases.
18   Q   And you could not say that with respect to
19 cyclophosphamide either, could you?
20   A   About cases I've seen, is that what you
21 are asking?
22   Q   You could not offer a rate at which
23 patients treated with cyclophosphamide develop
24 pCIA, could you?
25   A   The only information I can offer is the

1 anecdotal cases.
2    Q   And you could not offer the rate at which
3 patients treated with aromatase inhibitors develop
4 permanent hair thinning or hair loss, can you?
5    A   No, I don't do that, that's right.
6    Q   Looking at Page 75 of your report in the
7 "Conclusions" section you say that "Reliable
8 scientific evidence," and I've ellipsied a few
9 words there, "consistently demonstrates a
10 significant increased risk of permanent
11 chemotherapy-induced alopecia with Taxotere/
12 docetaxel."
13   A   Uh-huh.
14   Q   The increased risk with docetaxel is
15 increased over what in that sentence?
16   A   Non-Taxotere-containing regimens.
17   Q   Okay.  And you have just testified that
18 you cannot tell me, correct, the rate at which pCIA
19 occurs with any of those non-Taxotere regimens; is
20 that right?
21   A   No, I -- I didn't tell you.
22        MR. MICELI:  Objection.
23        MR. MICELI:  Form.
24        THE WITNESS:  That in the comparison
25 studies the denominator is not -- the way you do

1 relative risk is those exposed to the agent under
2 discussion versus those not exposed and then you
3 look at the fraction that have the event versus
4 those that don't have the event and you divide.  So
5 in those studies I know it but you said not to use
6 those studies.  You said speak generally.
7    Q   BY MR. INSOGNA:  Well, for example, are
8 you saying that the rate in your studies is able to
9 be extrapolated to a broader rate than all the
10 population of patients who received that
11 medication?
12        MR. MICELI:  Object to the form.
13        THE WITNESS:  The scientific evidence is
14 where you try to control some variables.
15        The issue that I was trying to address is
16 Taxotere, Taxotere regimens as compared to non-
17 Taxotere chemotherapy in breast cancer patients.
18 So when that population -- I was looking at studies
19 that are relevant to that and when you compare you
20 get the relative risk or you get an odd; what's my
21 odds of getting permanent alopecia if I'm exposed
22 or not exposed or what's the relative risk if I'm
23 exposed or not exposed so I have that for those
24 studies.
25   Q   BY MR. INSOGNA:  So what are the odds are

1 developing pCIA if a patient is treated with a
2 Taxotere regimen?
3    A   Well, it is different in the different
4 study.
5    Q   You are not able to identify one
6 consistent odds, are you?
7    A   I don't have to.
8        MR. MICELI:  Object to the form.
9        THE WITNESS:  I just have to show -- I
10 just have to show it is increased.
11        Can I name the specific number?  I can
12 name that it is always increased but whether it is
13 two, four, eight or 54, it is different in the
14 different studies.
15   Q   BY MR. INSOGNA:  And so --
16   A   So it is not -- there's not one number and
17 it doesn't have to be one number.
18   Q   So, for example, in Dr. Palamaras' study
19 that you cite to in your report a dozen out of
20 8,430 patients developed pCIA, correct?
21        MR. MICELI:  Object to form.
22        THE WITNESS:  Tell me what page you are
23 on.  I've got a 72-page document.  Tell me what
24 page you are on.
25   Q   BY MR. INSOGNA:  I'm looking at the study

1  by Dr. Palamaras, do you have that?  I'm happy
2  to --
3      A   Well, I don't -- I don't have the article
4  but just tell me what page of my paper, of my
5  expert report it is on.
6          MR. MICELI:  Let him show you, please.
7          THE WITNESS:  Yes, you can show me.  You
8  can show me.
9          MR. INSOGNA:  Dawn, can you please pull up
10  our Document No. 37.
11          (Feigal Exhibit 11, Excerpt from J Am Acad
12  Dermatol, marked for identification, as of this
13  date.)
14      Q   BY MR. INSOGNA:  Dr. Feigal, can you see
15  at that document?
16      A   I can see the document and I'm also
17  looking at my report for the summary of the paper
18  because it looks actually like it was a little
19  blurry.  I will pull it up here.
20          MR. MICELI:  Similar to my own picture I
21  can't see the document yet so I would like to give
22  it time to load.
23          THE WITNESS:  Well, the font --
24          MR. MICELI:  There you go.  Thank you.
25  I've got it.  I've got it.

1      Q   BY MR. INSOGNA:  I can point you to
2  exactly -- I can point you to exactly what I would
3  like to you read.
4          If you look in the third paragraph --
5  Dawn, maybe you can make that larger so Dr. Feigal
6  can see it -- "We reviewed" --
7      A   I know this paper.  My memory has been
8  refreshed.
9      Q   Okay.
10      A   I'm ready to answer your question.
11      Q   Okay.  And so you are familiar with the
12  fact that in this paper after reviewing 8,433
13  records of patients Dr. Palamaras was able to
14  identify seven cases of permanent alopecia,
15  correct?
16      A   Well, your answer is correct but that's a
17  hair clinic where people are referred to a hair
18  clinic.  It is not people referred for
19  chemotherapy-induced alopecia, it is a dermatology
20  clinic, it is a hair clinic.  They have a lot of
21  people -- they have nothing to do with
22  chemotherapy, this is just -- you can't do
23  incidents on this.  This is a retrospective looking
24  for the events of alopecia.  This is not a
25  prospective cohort study, this is an outcome of

1  looking for permanent chemotherapy alopecia and the
2  records are a hair clinic.  You can't get anything
3  from that.
4      Q   So this document does not provide
5  information that would inform you as to the
6  incidence of permanent alopecia following any
7  particular chemotherapy; is that right?
8      A   This particular article if you are trying
9  to figure out incidents, you wouldn't be able to
10  figure it out because it is not looking at who was
11  exposed and who wasn't exposed, it is just saying
12  all these people came to my hair clinic and out of
13  the chart review I found certain seven who had X.
14  Yeah, it just tells you it occurred, it doesn't
15  tell you the incidence.
16      Q   So for that reason it is particularly
17  important to your opinions, right, that you
18  reviewed Phase III clinical trials with respect to
19  docetaxel, correct?
20          MR. MICELI:  Object to form.
21          THE WITNESS:  It is correct.  But if
22  you -- as I previously stated and I documented in
23  my expert report that I did look at studies where
24  there was a comparator, and I have stated that the
25  odds ratio which is a calculation of strength of

1  association was calculated and those studies were
2  Crown, Sedlacek, Martin and Kang.  And so you can
3  calculate odds ratios and with cohort studies can
4  you also calculate relative risk and usually
5  they're pretty similar.  And then in a randomized
6  controlled trial you can also calculate relative
7  risk and odds ratio.
8          But to answer your question, there were
9  other studies in that literature review that had
10  competitors -- not competitors, had comparators
11  where you could do that calculation appropriately.
12      Q   BY MR. INSOGNA:  Okay, Dr. Feigal, my
13  question was it was important to your causation
14  opinion that you were able to review Phase III
15  clinical trials for docetaxel, correct?
16          MR. MICELI:  Object to the form.
17          THE WITNESS:  Yes.  I included -- I
18  included it as a leg of the level of evidence, yes.
19  But as I also stated, I had four other studies with
20  strength of association documented.
21      Q   BY MR. INSOGNA:  And that leg, the Phase
22  III clinical trial leg, that's a necessary leg in
23  offering your opinions, correct?
24      A   It adds --
25          MR. MICELI:  Same objection.

Page 150

1      THE WITNESS:  It adds to the strength of
2  association.
3      Q   BY MR. INSOGNA:  Okay.  Are you able to
4  answer whether you could offer your causation
5  opinions without having reviewed a Phase III
6  clinical trial for docetaxel?
7      A   I think we have already been there.
8      Q   Dr. Feigal, we covered similar ground in a
9  different area and I don't think I got an answer
10  and I think it is an issue that we will bring to a
11  court so I will try again with respect to the Phase
12  III clinical trials.
13      Are you able to say whether you could
14  offer your causation opinion with respect to
15  docetaxel without having reviewed Phase III
16  clinical trials for docetaxel?
17      MR. MICELI:  Object to the form.
18      THE WITNESS:  I'm going to answer that I
19  do have causal association and strength with the
20  published literature which is greatly strengthened
21  by the randomized controlled trial.  That's my
22  answer.
23      Q   BY MR. INSOGNA:  And without that
24  strengthening could you reach the same conclusion?
25  Could you do it based on the comparator studies

Page 151

1  alone?
2      A   The causation strengthens with the
3  randomized controlled clinical trial.  That's the
4  answer that I can give you.
5      Q   And you are not willing to give me any
6  more detailed answer than that?
7      A   That's my answer.
8      Q   At Page 75 and continuing to 76, it's Item
9  No. 4 on your "Conclusion" section, you opine that
10  the risk of pCIA with docetaxel is substantially
11  higher than other comparison chemotherapy drugs.
12      A   Uh-huh.
13      Q   And for that you cite to Dr. Madigan's
14  expert report; is that right?
15      A   Uh-huh.
16      Q   Do you have any independent basis to offer
17  that opinion other than Dr. Madigan's calculation?
18      A   Yeah.  We have been through that.  I
19  talked about the published literature, the -- I
20  went through in my report about the criteria, I
21  talked about dose response, temporality, biologic
22  plausibility.  I mean, strength of association is
23  one of the criteria but it is not the only criteria
24  and so I talked about all the different issues
25  pointing to causality.

Page 152

1      Q   Dr. Feigal, your substantially higher
2  verbiage in that passage that we just looked at
3  that refers to a statistical analysis that Dr.
4  Madigan did, correct?
5      A   Yes.  Which includes the odds ratios for
6  the four studies that we just finished talking
7  about, in addition --
8      Q   You did not -- you did not do the
9  statistical analysis of the odd ratios yourself,
10  did you?
11      A   Oh, they're easy to do, I know how to --
12  yeah, I understand what's there but since he is a
13  statistician I used his numbers because he used
14  statistical tools to do the confidence intervals on
15  p-value.  But I know how to do them, it is pretty
16  simple, two-by-two calculation, and I did work
17  through the calculations and they're -- they're in
18  alignment with what Dr. Madigan provided.  I just
19  deferred to him because he is a statistician.
20      Q   You are saying you independently did the
21  statistical analysis of the comparator arm studies?
22      A   I -- they're two-by-two tables, it doesn't
23  take advanced math.  What he has, though, are
24  statistical tools to also look at confidence
25  intervals from p-values.  I didn't do any of that

Page 153

1  but just doing simple two-by-two tables, yeah, I
2  know how to do that.
3      Q   Okay.  So when you say that the
4  statistical analysis is not advanced math are you
5  saying that what Dr. Madigan provided is not
6  advanced math, it is nothing you couldn't do
7  yourself?
8      A   No.
9      MR. MICELI:  Object to the form.
10      THE WITNESS:  You're -- no.  Let's --
11  let's go -- I'm just saying even I, a non-
12  biostatistician, can do it, I'm not -- I'm just
13  saying you obviously have to know the principles of
14  how to do the calculations and do it correctly so
15  it is not like anybody can do it, but I'm just
16  saying it doesn't require statistical software.  I
17  don't have statistical software, he does, so I did
18  what I could do with my brain and a pencil and
19  piece of paper.  He has statistical software where
20  he can do calculations and do more sophisticated
21  analysis and he has years of experience obviously
22  as a biostatistician.  So no, I'm not dismissing
23  what he did at all.
24      Q   Could you set aside Dr. Madigan's
25  opinions, not review them and still reach your same

1 causation conclusions?
2        MR. MICELI:  Objection.
3        THE WITNESS:  Yeah.  I mean, I can still
4 do relative risk and odds ratio.  I think what Dr.
5 Madigan did with the software tools analysis for
6 the precision of the estimate with his confidence
7 intervals in his p-values, but I certainly know how
8 to calculate odds ratios and relative risk.
9        Q   BY MR. INSOGNA:  Okay.  And so if you did
10 not have Dr. Madigan's report you would have no
11 trouble reaching the same conclusions you reach in
12 your own report; is that right?
13        MR. MICELI:  Object to the form.
14        THE WITNESS:  No.  Dr. Madigan goes over
15 his entire -- he goes over the FAERS database, he
16 goes over his analysis of the clinical study and he
17 has access to the staff software.  He did -- he did
18 a much more in-depth analysis of several pieces of
19 evidence and information and he included that in
20 his -- in his expert report.  I only culled, you
21 know, this much from his report but he had more
22 extensive analysis that he had done that's
23 relevant.
24        Q   BY MR. INSOGNA:  And is the piece that you
25 culled from his report necessary to your

1 conclusion?
2        MR. MICELI:  Object to the form.
3        THE WITNESS:  It quantifies it in a
4 precise way.  I could quantify it in my way but I
5 don't use a statistical tool.  He does.
6        Q   BY MR. INSOGNA:  It is not your
7 understanding Dr. Madigan calculated an incidence
8 rate for pCIA, did he?
9        MR. MICELI:  Objection.
10        THE WITNESS:  It is my understanding with
11 the FAERS database that he calculated a
12 proportional reporting rate and that was to detect
13 the signal, that wasn't an incident rate.  When he
14 was calculating what was going on with the
15 randomized controlled trial he was looking at a
16 relative risk.  He was looking at those exposed
17 over those not exposed in calculating a relative
18 risk.  He could also have calculated an odds ratio
19 if you look at all those with the event divided by
20 all those who don't have the event to come to a --
21 to come to a quantitative number as well.  I don't
22 know the exact analysis he did to arrive at his
23 numbers, I'm just telling you with my simple method
24 I arrived at similar numbers but not with the
25 confidence intervals and not with the p-values.

1        Q   BY MR. INSOGNA:  Dr. Feigal, in that last
2 response I believe you indicated that you could --
3 that Dr. Madigan in looking at the FAERS database
4 could calculate the number of people who had the
5 event, meaning hair loss, against the number of
6 people who were exposed to docetaxel.  Is that your
7 understanding of what he did?
8        A   No.
9        MR. MICELI:  Object to the form.
10        THE WITNESS:  Well, first of all, I can't
11 speak for Dr. Madigan.  If you have specific
12 questions for him you should talk to the person who
13 performed the analysis.  He did a proportional
14 reporting ratio, he also did four other types of
15 analysis to detect signals.  I am not the person to
16 ask to go over the details of his analysis.
17        Q   BY MR. INSOGNA:  Okay.  Dr. Feigal, I'm
18 going to read to you because I know you don't have
19 it in front of you the exact words you used in your
20 prior answer, okay?  You said if you looked at all
21 those with the event divided by all those that
22 don't have the event to come to a quantitative
23 number as well, so what I'm asking you is do you
24 believe that Dr. Madigan was able to look at the
25 FAERS database and assess how many people treated

1 with docetaxel did not develop pCIA?
2        A   No.
3        MR. MICELI:  Objection; form.
4        THE WITNESS:  You are conflating my
5 answer.  I was describing to you a two-by-two table
6 for how to calculate relative risk or how to
7 calculate odds ratio, I was not talking about the
8 FAERS database when I gave you that answer.
9        Q   BY MR. INSOGNA:  Okay.  Because you
10 understand, right, the FAERS database cannot tell
11 you about the incidence rate of a particular side
12 effect, correct?
13        A   Correct.
14        Q   And the fact that there is a report of
15 persistent alopecia in the FAERS database does not
16 mean that docetaxel caused that person's alopecia,
17 correct?
18        A   The answer is that's not a causation
19 criteria.  He was looking at it for signal
20 detection to see when the signal started and when
21 it persisted and how that compared to all the other
22 drugs that a patient with breast cancer would
23 receive.  And as you know, he showed when that
24 threshold was reached and that it persisted to this
25 date and that it started in the early 2000s.  The

1 signal detection is what triggers a company to go
2 look at something because it looks like this is not
3 expected or more than what would be expected.
4      Q   Entries in a FAERS database cannot be used
5 to say that a drug actually caused the specific
6 side effect, correct?
7      A   I think I said that but yeah, I agree with
8 you.
9      Q   Okay.  And you are aware that FAERS data
10 can also have duplication, correct, where both the
11 sponsor and the patient reports the same side
12 effect?
13          MR. MICELI:  Objection; form.
14          THE WITNESS:  Well, if you read the
15 document the answer is yes and he deleted the
16 duplication.
17      Q   BY MR. INSOGNA:  And FAERS data does not
18 indicate what other medications the person took,
19 correct?
20          MR. MICELI:  Object to the form.
21          THE WITNESS:  The proportionality has what
22 is expected with a lot of other chemotherapy agents
23 in there and I think he lists -- I think he did
24 that analysis and showed you that analysis in his
25 report.  I don't have his report in front of me.

1 But he did those analyses and showed it compared to
2 all the other drugs.
3      Q   BY MR. INSOGNA:  Okay.  My question is
4 different, though, Dr. Feigal.
5          My question is an entry in the FAERS
6 database does not identify other medications the
7 patient took, correct?
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  It might.
10      Q   BY MR. INSOGNA:  Are you aware one way or
11 another?
12      A   Well, if there were --
13          MR. MICELI:  Same objection.
14          THE WITNESS:  There might be --
15          MR. MICELI:  Total silence.  Okay.
16          THE WITNESS:  Can you hear me now?
17          MR. INSOGNA:  We can hear you.
18          MR. MICELI:  I can hear you.  I apologize.
19          THE WITNESS:  Okay.  I believe Dr. Madigan
20 took that into account but I can't answer for him.
21      Q   BY MR. INSOGNA:  So you are not aware of
22 whether an individual report in the FAERS database
23 lists all the medications the patient was treated
24 with, correct?
25          MR. MICELI:  Same objection.

1          THE WITNESS:  I know for adverse event
2 recording concomitant medications can be included.
3 Whether it was included in that -- I think there's
4 a different line for other drugs so there's rows
5 and there's columns.
6      Q   BY MR. INSOGNA:  You agree that what the
7 FAERS database reflects is how frequently a report
8 is made about a particular side effect and the
9 drug, correct?
10      A   Correct.
11          MR. MICELI:  Object to the form.
12          THE WITNESS:  On continuous recording
13 systems, correct.
14      Q   BY MR. INSOGNA:  Your conclusion, your
15 general causation conclusion, right, is that
16 docetaxel is capable of causing pCIA.  The sources
17 that you rely upon to reach that conclusion are the
18 published materials cited in Table 2, the TAX 316
19 data, GEICAM 9805 data and Sanofi's pharmaco-
20 vigilance database; is that right?
21      A   Those are the key legs of the stool,
22 right.
23      Q   Is there anything else that I'm missing?
24      A   Those are the key pieces.
25      Q   And you say "key" so I have to try one

1 more time.
2          Are they necessary?  Is any one component
3 necessary?
4      A   Those -- those were the lines of evidence
5 that formed my opinion.
6      Q   And sitting here today you are not willing
7 to identify which lines of evidence were necessary
8 and which you could still form the opinion without;
9 is that fair?
10          MR. MICELI:  Object to the form.
11          THE WITNESS:  It is fair to say the
12 causation is strengthened by having all three lines
13 of evidence.  You can quote me on that.
14      Q   BY MR. INSOGNA:  Now when you talk about
15 TAX 316 data and statistical analysis you are
16 referring to proprietary data that Sanofi as the
17 sponsor of the trial had, correct?
18          MR. MICELI:  Object to the form.
19          THE WITNESS:  He did a relative -- well, I
20 am referring to the strength of the association
21 from the meta-analysis that Dr. Madigan performed.
22      Q   BY MR. INSOGNA:  And that meta-analysis
23 was on Sanofi internal data, correct?
24          MR. MICELI:  Object to the form.
25          THE WITNESS:  I don't know exactly how he

1  did his calculation so I can't -- I can't answer
2  for him.
3      Q   BY MR. INSOGNA:  Well, are you aware of
4  any published literature on TAX 316 that discusses
5  pCIA specifically?
6      A   The labels in every other country but the
7  United States.
8      Q   Dr. Feigal, my question is are you aware
9  of any published literature that discusses pCIA
10  based on TAX 316 data.
11     A   The labels are publicly available.
12     Q   Okay.  Anything other than foreign
13  labeling that you are aware of?
14     A   Only the 19 published papers that I
15  referred to.  They don't include -- I'm sorry, you
16  are asking specifically about TAX 316 and GEICAM
17  9805.  Other than the --
18     Q   My question is --
19     A   Other than the labels I'm not aware.
20  Yeah, other than the labels I'm not aware that the
21  company published their information on ongoing
22  alopecia on those two trials.
23     Q   You keep referring to the label.  Just so
24  that we're clear, the public information regarding
25  TAX 316 data that you are referring to comes from

1  Sanofi's European labeling, correct?
2      MR. MICELI:  Object to the form.
3      THE WITNESS:  I can't speak to the source
4  of where they looked to put it on their label.
5      Q   BY MR. INSOGNA:  You agree that there's no
6  reference to TAX 316 data in Sanofi's U.S. labeling
7  prior to 2014, is there?
8      A   I think that's the problem.
9      Q   Dr. Feigal, can you answer my question,
10  please?
11      Is there any TAX 316 data referenced in
12  Sanofi's U.S. labeling prior to 2014?
13      MR. MICELI:  Object to the form.
14      THE WITNESS:  In a U.S. label, no.  In the
15  foreign label, yes.  And the other companies have
16  access to them.
17      Q   BY MR. INSOGNA:  That information was not
18  in the U.S. labeling prior to December of 2015,
19  correct?
20      MR. MICELI:  Object to the form.
21      THE WITNESS:  Correct.  And I think that's
22  the issue; that physicians and patients would have
23  expected to have that information available to
24  them.
25      MR. INSOGNA:  Move to strike everything

1  after "correct" as not responsive.
2      Q   You have not reviewed any Sandoz core data
3  sheets in preparing your opinions, have you?
4      A   Actually in the deponents' depositions and
5  in some of their exhibits there may have been
6  reference to the Sandoz core data sheets so I think
7  it was in there, I just don't recall the exact
8  exhibit or document.
9      Q   Are you saying that you saw a Sandoz core
10  data sheet itself or you saw it discussed?
11     A   I may have seen -- I may have seen it, I'm
12  just -- I don't have total recall.  But it
13  certainly is something that they referred to and
14  cited.
15     Q   You are not an expert in core data sheets,
16  are you?
17     A   I am familiar with the reason for putting
18  together a core data sheet and knowledge about it.
19  I don't know what your definition of expert is.
20     MR. MICELI:  Nick, when you come to a
21  logical breaking point, we have been going about an
22  hour and 25 minutes.  I don't know about anybody
23  else.  I could use a break.
24     MR. INSOGNA:  Give me one minute, Dave.
25  Maybe we're at a good spot.  Let me look.

1      MR. MICELI:  Okay.
2      MR. INSOGNA:  Just a couple more
3  questions, Dave.
4      MR. MICELI:  Okay.
5      Q   BY MR. INSOGNA:  Dr. Feigal, we talked
6  earlier about how you constructed your searches
7  specifically for articles in this case.  Do you
8  have any sort of tracking or identification of the
9  articles that were responsive to your search terms
10  but that you did not review or consider in forming
11  your opinions?
12     A   No.  Everything that was relevant I
13  included.
14     Q   Okay.  And so if we ran a search in PubMed
15  the way that you described early in this deposition
16  you believe that the results that would come up are
17  the full list of results that you were able to look
18  at and consider?
19     A   No, I think you have to do more.
20     MR. MICELI:  Objection to form.
21     THE WITNESS:  I think you would have to
22  actually look at the references in some of the
23  articles to pick up additional articles that
24  weren't in the -- in the search.  So it wasn't --
25  it wasn't simple trying to find the data, I

Page 166

1  actually did have to look at the references as
2  well.
3      Q   BY MR. INSOGNA:  When you say look at the
4  references in the articles, are you talking about
5  the articles cited in your Table 2?
6      A   Well, the articles cited in my Table 2 are
7  what I found.  What I'm saying is when I did a
8  PubMed search some additional papers may have shown
9  up that didn't show up in the search but I found
10 them in the citations in the papers and then I
11 included them in my Table 2.
12     Q   And --
13     A   I read them.  I read them and then I
14 included them in my Table 2.
15     Q   Okay.  What I'm trying to figure out,
16 though, Dr. Feigal, is when you ran your PubMed
17 search there were more than just the articles in
18 Table 2 that came up, correct?
19     A   Yeah.  There were articles on breast
20 cancer.  You know, the search engine is not perfect
21 and so there's a lot of junk that shows up too
22 that's totally irrelevant.
23     Q   And you didn't review everything that came
24 up, correct?
25     A   I looked at everything that came up.

Page 167

1      Q   Okay.  And in the --
2      A   I may have looked --  I may have looked at
3  it more quickly depending on if it was junk or not.
4      Q   Okay.  And are you saying that in the
5  citations of things that may not have made their
6  way into Table 2 you found documents that did make
7  their way into Table 2?
8      MR. MICELI:  Object to the form.
9      THE WITNESS:  I think there were a couple
10 that I found on the list of references, it is --
11 you know, so it is -- I know I looked at the list.
12 I do that, you know, I do -- kind of a little more
13 than you asked for, but I do searches all the time
14 and sometimes searches aren't 100% perfect and
15 sometimes I found relevant references by looking at
16 the list of references in the paper.
17     Q   BY MR. INSOGNA:  And so sitting here today
18 are you able to identify at all which articles in
19 your Table 2 came up from your PubMed search and
20 which did not?
21     A   No, I didn't distinguish what -- what
22 separate from the End Note and PubMed.  If it came
23 up in the PubMed it was part of that.  I wouldn't
24 have found it if I didn't find the original paper
25 so no, I didn't do a separate.

Page 168

1      MR. INSOGNA:  Okay.  Dave, we can take a
2  break now.
3      MR. MICELI:  Okay.  Excellent.  Excellent.
4      THE VIDEOGRAPHER:  Off video at 11:58 a.m.
5      (Lunch recess taken at 11:58 a.m.)
6  ///
7  ///
8  ///
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169

1      (Deposition resumed at 1:03 p.m.)
2      THE VIDEOGRAPHER:  Back on video at 1:03
3  p.m.
4  BY MR. INSOGNA:
5      Q   All right, Dr. Feigal, welcome back.  I
6  hope you had a nice break.
7      A   Hi.  I did.  Thanks.
8      MR. INSOGNA:  All right.  So I would like
9  to mark as our next exhibit, Dawn, this is our No.
10 46 if you would, please.
11     (Feigal Exhibit 12, 2.5 Clinical Overview:
12 Docetaxel And Permanent Alopecia, Bates Nos.
13 Sanofi_00829529 to Sanofi_00829565, marked for
14 identification, as of this date.)
15     Q   BY MR. INSOGNA:  Dr. Feigal, this will be
16 the Clinical Overview:  Docetaxel And Permanent
17 Alopecia.  You are familiar with that document,
18 right?
19     A   Yes.
20     Q   And you understand that that's the Sanofi
21 internal document, correct?
22     A   Correct.
23     Q   And, in fact, you can see in the box on
24 the first page that it is branded as strictly
25 confidential; is that right?

1    A   I see it.

2    Q   Okay.  And you have no basis to suggest
3 that this document was publicly available prior to
4 2014, correct?

5    A   Correct.

6    Q   And you have no basis to suggest that it
7 was ever shared with my client Sandoz prior to the
8 litigation, correct?

9    A   I would not know what's shared between
10 lawyers, sorry.

11   Q   I'm sorry, Dr. Feigal, my question was
12 whether you have any information to suggest that
13 this document was shared with Sandoz itself prior
14 to 2014.

15   A   Oh, I have no knowledge one way or another
16 what was shared with Sandoz.

17   Q   Okay.  Thank you.

18       Dr. Feigal, you have mentioned earlier the
19 comparator arm studies that you are relying on for
20 your opinions and correct me if I'm wrong.  Those
21 studies are the ones authored by Crown, Kang,
22 Sedlacek and Martin, correct?

23   A   Correct.

24       MR. INSOGNA:  Okay.  Dawn, if you would
25 pull up our No. 22, please.

1        (Feigal Exhibit 13, Incidence of permanent
2 alopecia following adjuvant chemotherapy in women
3 with early stage breast cancer, marked for
4 identification, as of this date.)

5    Q   BY MR. INSOGNA:  And, Dr. Feigal, this is
6 the study authored by Dr. Crown, "Incidence of
7 permanent alopecia following adjuvant
8 chemotherapy."  You are familiar with this
9 document, correct?

10   A   Correct.  I'm just finding it on my own
11 but I will look at what you put up there.  If you
12 put it up that will be great.

13   Q   Absolutely.  It will be up momentarily.

14       Are you able to see that, Dr. Feigal?

15   A   Yeah.  I can't really read -- I can't
16 really read it but I can see it.

17       MR. INSOGNA:  Sure, sure.

18       Dawn, if you would expand or blow up the
19 results portion, sort of the bottom half the page,
20 that would be great.

21       Dr. Feigal cannot?

22       MR. HOLDEN:  Cannot.  The doctor can if
23 you see a magnifying glass.

24   Q   BY MR. INSOGNA:  Doctor, there's a little
25 magnifying glass icon if you need to blow it up.

1 You may not need to, you may be familiar with these
2 answers.

3        First, this paper that you cited is an
4 abstract of a retrospective study, correct?

5    A   Yes.  It is a retrospective cohort study
6 of 300 patients.

7    Q   And it is an abstract, correct?

8    A   Right.  It is an abstract.  You may have a
9 different abstract in my -- huh.  In mine I have
10 300 patients.  This says 295.

11   Q   Okay.  And I believe that you have seen
12 both of these in the past, Dr. Feigal, but this
13 abstract is not published or peer-reviewed,
14 correct?

15   A   No, that's not correct.

16       MR. MICELI:  Objection; form.

17   Q   BY MR. INSOGNA:  This abstract itself was
18 peer-reviewed?

19   A   Yes.  Abstracts are peer-reviewed.

20   Q   And this retrospective cohort study,
21 that's from the lowest tier on your hierarchy of
22 evidence, isn't it?

23       MR. MICELI:  Object to the form.

24       THE WITNESS:  No, it is not.

25   Q   BY MR. INSOGNA:  Remind me then what are

1 your tiers on the hierarchy of evidence?

2    A   So if you go to my table, let me just go
3 back to what I said in my report, so if you look at
4 Footnote 86, perspective study 1a are the
5 randomized controlled clinical trials, 1b are the
6 non-randomized controlled clinical trials, 1c are
7 the prospective cohort or case series.  2a are the
8 consecutive series, 2b is a case series or
9 individual case report.  So this is the
10 prospective -- let me see how I described it.

11   Q   Dr. Feigal, I would just like to make sure
12 that we're looking at the same report.

13       I see that you are talking about but in
14 the report that I have that you issued on June of
15 this year I have those numbered as one, two, three
16 and four and four has Romanettes (i) (ii).

17   A   No, I'm looking at Page -- I'm looking at
18 Footnote 86.

19   Q   I see.

20   A   We're looking at the same report.  You are
21 probably just looking at something else.

22   Q   Okay.  Back to the study, Dr. Feigal, the
23 authors here reviewed 295 patients who had been
24 treated across 12 different studies; is that right?

25   A   I'm just pulling up my -- in the abstract

1  you are showing me here it is 295.  In my report --
2  I think there's two abstracts of Crown, one has
3  300, one has 295 patients, so I have seen both.  I
4  have seen both.
5       Q   I believe you already testified, Dr.
6  Feigal, that they are different presentations of
7  the same underlying data; is that right?
8       A   There's just some additional patients that
9  were analyzed in the larger, in the 300 patients as
10  opposed to 295.
11      Q   Okay.  Now the purpose of this study was
12  not to establish which medication in a combination
13  regimen caused the hair loss, correct?
14      A   Well, this particular study was utilized
15  to look at relative risk and I believe to also look
16  at dose response.  So there was -- you know --
17      Q   Your answer, Dr. Feigal, is how you
18  utilized the study, correct?
19      A   Yes.  So I used data in the study,
20  correct.
21      Q   Right.  What the study authors did,
22  though, was look at the incidence of long-term hair
23  loss in various chemotherapy regimens, correct?
24      A   Correct.
25      Q   Okay.

1       A   They also looked at -- well, I just want
2  to be clear.  They also looked at dose response.
3       Q   Okay.  They were not controlling for
4  individual medications, correct, to see if one
5  caused hair loss and another didn't; is that fair?
6       A   They were looking at different regimens to
7  look at the fraction of patients who had long-term
8  hair loss and they also looked at those patients
9  who received more of the docetaxel/Taxotere to see
10  whether or not there was more severe or a higher
11  amount of long-term hair loss.  Actually I'm trying
12  to look at what their phrasing is.
13      Q   Dr. Feigal --
14      A   Anyway --
15      Q   My question I think is a little bit
16  narrower.  The -- because this is a retrospective
17  review the authors could not manipulate which
18  medications the patients received, of course.
19      A   It is not a -- right.  It is an
20  observational chart.
21      Q   Okay.  And so there was no ability to
22  control the medications to see whether one caused
23  permanent alopecia and another did not; is that
24  right?
25      A   Not exactly.  When you have cohorts of

1  patients who received a -- when you have cohorts of
2  exposed patients to the drug of interest versus the
3  drug of interest is not included, you can look
4  at -- well, you can look at relative risks and you
5  can look at odds ratios.
6       Q   Of the 295 patients included in the study,
7  among all docetaxel regimens the incidence of
8  persistent alopecia was 15%, correct?
9       A   That's -- yes, that's what it says.
10      Q   Okay.  And for the docetaxel plus
11  anthracycline regimen the incidence was 24%,
12  correct?
13      A   Correct.
14      Q   And for docetaxel non-anthracycline the
15  incidence was 13%?
16      A   That's true for that arm but relative risk
17  compares arms and you have to have the right
18  denominator so that's how we calculate relative
19  risk and odds ratio.
20      Q   Dr. Feigal, in the patients that were
21  reviewed in this study who had received a docetaxel
22  non-anthracycline regimen the incidence rate of
23  persistent alopecia was 13%, correct?
24      A   For the docetaxel non-anthracycline arm,
25  is that what you are asking?  Yes, I'm reading this

1  sentence.
2       Q   And the incidence rate there was 13%,
3  correct?
4       A   In that sentence, correct, for that arm.
5       Q   And for the anthracycline non-taxane
6  regimen the incident rate was 8%, correct?
7       A   For that arm of the patients who received
8  that, yeah.
9       Q   So just to be clear, in that arm there
10  were patients who received anthracycline with no
11  taxane and demonstrated persistent alopecia at the
12  rate of 8%.
13      A   Correct.
14      Q   Okay.  And for anthracycline plus
15  paclitaxel the incidence rate was 13%, correct?
16      A   Well, I'm looking at 24% also, right?  For
17  docetaxel plus anthracycline was 24%.
18      Q   Right.
19      A   The docetaxel non-anthracycline, yes, 13%.
20      Q   And my question was anthracycline plus
21  paclitaxel, that was also 13%, correct?
22      A   I'm looking down the abstract.  I see the
23  next sentence, yes.  Yes, I see that.  Yes, 13%, I
24  see it.
25      Q   So the incidence of permanent hair loss

1 over all was 15%, correct?

2     A   Yes, that's what the abstract says.

3     Q   Okay.  So the incidence any docetaxel
4 regimen was actually lower than the overall
5 incidences in this abstract?

6     A   Well, the -- the arms are very unequally
7 distributed in terms of number.  The non-taxane arm
8 is only 12 patients.

9     Q   Okay.  But fortunately here we have
10 percent so we can talk about rates, correct?  And I
11 believe that you said the docetaxel non-
12 anthracycline rate was 13%; is that right?

13     A   You're right.

14         MR. MICELI:  Object to the colloquy.

15         THE WITNESS:  That's not how you calculate
16 relative risk, that's just in that small
17 denominator of 12 patients that was the percentage,
18 correct.  But that's not going to calculate
19 relative risk.

20     Q   BY MR. INSOGNA:  Okay, and I did not ask
21 about relative risk, Dr. Feigal.

22     A   I know.  But that's what I did in my
23 analysis.

24     Q   Okay.  So --

25     A   Go ahead.  Go ahead.

1     Q   -- the only rate of alopecia in this study
2 that's higher than the overall rate is where
3 anthracycline is combined into the regimen,
4 correct?  That's the group that had a 24% incidence
5 rate?

6     A   You are asking whether in that arm there
7 is a higher percentage of alopecia?  Is that what
8 you are asking me?  The answer is yeah.

9     Q   Okay.  And the rate where anthracycline is
10 added to the docetaxel regimen is significantly
11 higher than the docetaxel alone, correct?

12     A   No, I wouldn't use the word
13 "significantly."  You have to -- you have to do
14 relative risk.  You have to look at the numerators
15 and denominators and divide.

16     Q   We can agree, though, that 24% is higher
17 than 15%, correct?

18     A   Well, a hundred percent of one is higher
19 than 50% of two, yeah.

20     Q   Now in the group who received paclitaxel
21 and anthracycline the rate of permanent alopecia
22 was the exact same as in the group that received
23 docetaxel and anthracycline, correct?

24     A   Well, for that arm there were 23 patients.
25 There were 260 patients on the Taxotere arm as I'm

1 looking at it, docetaxel.

2         I'm just saying just looking at
3 percentages alone without doing numerators and
4 denominators, you know, you are -- anyway, go
5 ahead, ask your question.

6     Q   You see also that there's 8% in the A
7 non-T, so just a little bit further down from where
8 you were before it says for A non-T 8%, so that's
9 for patients who received an anthracycline with no
10 taxane there was 8% persistent alopecia?

11     A   That's correct.

12     Q   Okay.  In those patients what caused the
13 permanent hair loss?

14         MR. MICELI:  Object to the form.

15         THE WITNESS:  This is not causation, you
16 are talking about cases.  Causation requires the
17 Bradford Hill analysis.  This is one study.  This
18 is a very -- I don't know how many patients are in
19 that particular denominator.  I can't say anything
20 about causation from this one study.

21     Q   BY MR. INSOGNA:  You agree that it can't
22 have been a taxane that caused permanent hair loss,
23 correct?

24     A   I wouldn't use the word "cause."  These
25 are cases.

1     Q   These cases are cases that you include in
2 your own causation analysis, correct?

3     A   These are articles where I've use the data
4 along with 18 other articles and the other evidence
5 I cited in my evaluation of causation.  I didn't
6 base it on one paper.

7     Q   I did not mean to suggest that you did, I
8 was just confirming that these are articles that
9 you have used.

10     A   Yes.  I just wouldn't conflate cases and
11 cases that might occur with the same word
12 "causation."  That's all I'm trying to
13 differentiate.

14     Q   I understand that that's the point you are
15 making, Dr. Feigal.

16     A   Okay.

17         MR. INSOGNA:  Dawn, can you do our 22A,
18 please.

19         MR. MICELI:  What exhibit are we up to
20 now, Nick?

21         THE WITNESS:  For some reason my image
22 prior to this is really -- it doesn't look good.
23 Okay.

24         MR. INSOGNA:  There we go.  14 to answer
25 your question.

1          MR. MICELI:  Thank you.
2          (Feigal Exhibit 14, Incidence of permanent
3   alopecia following adjuvant chemotherapy in women
4   with early stage breast cancer, marked for
5   identification, as of this date.)
6      Q   BY MR. INSOGNA:  Dr. Feigal, you are
7   familiar with there presentation of Crown data
8   also, correct?
9      A   Yeah, but I can't see it.  It looks like
10  the top is in the right-hand side is completely
11  cropped out.
12     Q   Okay.  And this one is a little difficult
13  to read, I will grant you that.  Are you able to
14  use the magnifying glass to blow it up a little?
15     A   Well, part of the problem is it is not
16  on -- it is not all on the page so only a part of
17  it is on the page.  I can't see -- I can't see the
18  whole abstract or the poster.  This looks like a
19  poster.
20     Q   Okay.  Are you able to see the
21  "Conclusions" section at the bottom right?
22     A   No.  Uh-uh.
23     Q   I believe you have the ability --
24         MR. MICELI:  Doctor, if you pull the
25  window to the left you might be able to drag it.

1          THE WITNESS:  I can drag it, okay.  Let me
2   see if I can drag it.  It is not dragable.  Am I
3   supposed to do something special?  Hello there.  If
4   somebody can just instruct me, it doesn't -- on my
5   own documents I know I can grab them and do things
6   with them.  In here it is just a restricted window
7   and I only see what you elected to show me, I can't
8   see the whole -- I can't see the whole thing.
9      Q   BY MR. INSOGNA:  I will read you the two
10  points that I have here and see if you can agree
11  with me without seeing the document itself.
12         MR. MICELI:  Let me ask you this before
13  you go.
14         Dr. Feigal, do you see at the bottom left
15  corner of the document there's a magnifying glass
16  with a plus sign in it?  Are you there?
17         THE WITNESS:  Well, I'm on the phone.  No,
18  I don't see a magnifying glass.  You said it is in
19  the bottom left?
20         MR. MICELI:  Bottom left of the side -- on
21  the side that has the document on it.
22         THE WITNESS:  No, I do not.
23         MR. MICELI:  Okay.
24         THE WITNESS:  There's no magnifying glass.
25  Am I supposed to do something different when I --

1   all I'm doing is I'm on my screen and I'm looking
2   and I see -- it is like looking through a keyhole.
3   I see part of the document but not the whole thing.
4          MR. INSOGNA:  Let's just try doing it
5   without the document, Dr. Feigal.  And if we need
6   to we will --
7          THE WITNESS:  Okay.
8      Q   BY MR. INSOGNA:  So in the "Conclusions"
9   section Crown and his group write, "Permanent
10  alopecia is a relatively common complications of
11  adjuvant chemotherapy."  Would you agree with that
12  statement?
13     A   Well, transient reversible alopecia is
14  very common, I agree with that.
15     Q   And the sentence was permanent alopecia.
16     A   No, I don't agree that it is common.  I
17  mean, common in terms of what?  What are you
18  saying?  One in ten, one in a hundred, one in -- I
19  don't know what his definition of common is.
20     Q   Okay.  And so you would disagree with that
21  statement as written in the document?
22     A   Well, to tell you the truth, I can't see
23  the document so I -- I don't know the concept of --
24  let me see if I -- I apologize but I just can't see
25  the document.

1      Q   Are you able to expand the bottom of your
2   window that you are doing the deposition in?  I
3   think that the icon may just be a little bit out of
4   your frame.
5      A   What happens when I scan is only left of
6   the poster shows.  You want me to try and expand
7   the window, is that what you are asking, can I do
8   that?  Hum.  Ah, you are right, okay.
9          So I do see a magnify -- magnify the image
10  now, it now shows up, so that's what you need me to
11  do?
12     Q   Sure.  If could you on the bottom right-
13  hand corner in the "Conclusions" section, please.
14     A   No.  When I expand it it goes out of the
15  window.
16     Q   Then are you able to click and drag that
17  around in your box there?
18     A   Well.  I mean, tell me what to click on
19  and I will try dragging it.  Do I click on the --
20  let me just see if I can make the actual size
21  bigger.
22         Well, I can't see the whole thing but I
23  can move the curser to look at a different part, I
24  can do that now, but it doesn't seem to want to let
25  me make the window bigger.

1    Q   Okay.  Well, if you could move the cursor
2  to look at the "conclusions" section, I think we
3  can be --
4    A   Okay.
5    Q   Okay.
6    A   Okay.  Let me move that.  I haven't gotten
7  there yet.  Okay.
8        "Conclusions."  It is saying
9  "Permanent" -- "Permanent" -- yes, I see the
10  conclusions.
11    Q   Okay.  It says, "The risk appears to be
12  highest in regimens which contain A and Tax, but
13  also seen in A + P and in A non-Tax," do you see
14  that?
15    A   Yeah.
16    Q   Okay.  So these authors concluded that
17  there's a risk of pCIA in Adriamycin plus
18  paclitaxel regimens, correct?
19        MR. MICELI:  Objection; form.
20        THE WITNESS:  No, I think -- no, I don't
21  think that's what it is saying, the taxane is I
22  think what it is saying, and I think it is
23  saying -- no, the abbreviation for paclitaxel is P
24  so no, I don't think it is saying that.
25    Q   BY MR. INSOGNA:  Right.

1        So, Dr. Feigal, in the second bullet you
2  see it says, "The risk appears to be highest in
3  regimens which contain A and Tax, but it is also
4  seen in A + P."  That's Adriamycin plus paclitaxel,
5  correct?
6    A   Right.  But it is highest in A plus Tax.
7    Q   Okay.  The authors wrote that --
8    A   Comma.  "... it is also seen in" -- cases
9  have also been seen in A + P and in A non-Tax, so
10  that's -- that's the sentence.  I see that.
11    Q   Okay.  It doesn't say cases have been
12  seen, right?  It says, "... it is also seen in A +
13  P and in A non-Tax," correct?
14    A   It is saying -- I don't know what you can
15  say about risk but it is seen, yes.
16    Q   Okay.  And at the bottom it says,
17  "Oncologists should warn patients undergoing
18  adjuvant therapy of the risk of permanent
19  alopecia."  Do you see that?
20    A   Yes, I see that.
21    Q   And that statement is without reference to
22  any particular medication, correct?
23    A   Well, I assume he is talking about
24  adjuvant therapy in breast cancer and regimens he's
25  looked at.

1    Q   Right.
2        Do you disagree with these authors that
3  patients receiving an anthracycline non-taxane
4  regimen should be warned of a risk of permanent
5  alopecia?
6        MR. MICELI:  Object to the form.
7        THE WITNESS:  No.  No, not necessarily.  I
8  don't think he showed reasonable evidence of
9  causation.
10    Q   BY MR. INSOGNA:  Okay.  My question, Dr.
11  Feigal, these authors say that patients undergoing
12  an anthracycline non-taxane regimen should be
13  warned of a risk of permanent alopecia, correct?
14        MR. MICELI:  Object to form.
15        THE WITNESS:  I'm reading the poster and
16  that's what the poster says.  I agree you are
17  reading that correctly.
18    Q   BY MR. INSOGNA:  Okay.  And you disagree
19  with their conclusion; is that right?
20    A   Correct.
21        MR. MICELI:  Object to the form.
22    Q   BY MR. INSOGNA:  And --
23    A   Well, I am -- go ahead.  Finish your
24  question.  I didn't mean to talk over you.
25    Q   You also disagree that patients receiving

1  an Adriamycin/paclitaxel regimen should be warned
2  of a risk of permanent alopecia?
3    A   I am based not just this one paper but
4  based on the cumulative evidence, I have reasonable
5  evidence to support causal association for a
6  taxane-containing regimen, yes.
7    Q   Okay.  My question was do you disagree
8  that patients receiving Adriamycin plus paclitaxel
9  should be warned of a risk of permanent alopecia.
10        MR. MICELI:  Object to the form.
11        THE WITNESS:  I -- I think on this one
12  poster I don't -- yeah, I don't think he has got
13  evidence to support that.
14    Q   BY MR. INSOGNA:  And so you think
15  oncologists should not give that warning; is that
16  right?
17        MR. MICELI:  Object to the form.
18        THE WITNESS:  I'm saying the evidence
19  doesn't support reasonable evidence of causation
20  which is what we're talking about for a litigation.
21  We're not -- you know, a poster presenter can say
22  whatever they want but I'm saying for evaluation of
23  evidence, I don't think it rises to the level of
24  evidence.
25    Q   BY MR. INSOGNA:  Now to be fair, the

1  evidence that you reviewed to come to your
2  conclusion with respect to docetaxel involved
3  pharmacovigilance data and it involved registration
4  trial data, correct?
5          MR. MICELI:  Object to the form.
6          THE WITNESS:  It includes 19 other
7  articles.
8      Q   BY MR. INSOGNA:  And also includes
9  registration trial data and pharmacovigilance data,
10  correct?
11     A   Correct.  But would you --
12     Q   You did not review -- you answered my
13  question.  Thank you.
14         You did not --
15         MR. MICELI:  No, no, no.  She is -- no,
16  no, no.  Object.
17         You cannot cut her off on an answer and
18  say I got what I want; you can't answer anymore.
19  If she is still answering you have to give her the
20  chance to answer.
21         MR. INSOGNA:  David, it was a yes-or-no
22  question.  She said yes.
23     Q   But, Dr. Feigal --
24         MR. MICELI:  No, she was explaining.
25         Dr. Feigal, if you need to explain,

1  explain anything you need to.
2          THE WITNESS:  Well, I would like -- I
3  don't want to talk over you.  I would like
4  permission to talk and give a fuller answer because
5  I did evaluate this particular paper and I did
6  calculate there is an odds ratio for it, it is
7  1.37, so it is not particularly strong but it does
8  have a higher odds of having permanent
9  chemotherapy-induced alopecia or the specific term
10  he is using -- yeah, he does use "permanent
11  alopecia" -- as compared to the other regimens.  So
12  there is an increased risk, it is not as strong as
13  some of the other papers, but there is an
14  increased -- there is an increased odd for that
15  particular arm and it is based on -- well, I will
16  just leave it at that.  But numbers matter, not
17  just -- you know, as I said, a hundred percent
18  of -- if you had one case, well, you can say a
19  hundred percent of one, but if you have 295
20  patients you take that into consideration a little
21  bit differently.
22     Q   BY MR. INSOGNA:  Dr. Feigal, my question
23  was the data that you reviewed to come to your
24  conclusion regarding docetaxel involved pharmaco-
25  vigilance database and registration trials for

1  docetaxel, correct?
2      A   And -- and 19 papers and the other
3  reliance documents and footnotes I have in my
4  report and I'm looking at general causation for
5  docetaxel and Taxol.  I have much more information
6  than one poster.
7      Q   Okay.  And you did not review pharmaco-
8  vigilance database or registration trials for
9  Adriamycin, did you?
10     A   Not relevant and no, I didn't.
11     Q   Okay.  And you did not review pharmaco-
12  vigilance database or registration trials for
13  paclitaxel; is that right?
14     A   Only if there was a pac -- only in the
15  context of Taxotere being involved in that regimen
16  in some way in that paper so when you say
17  registration, I think you are being overly broad.
18         I reviewed the published literature.  I
19  did not -- anyway, ask your question.  I don't want
20  to answer a question you haven't asked.
21     Q   You did not review pharmacovigilance
22  database or registration trials for
23  cyclophosphamide, did you?
24     A   I did not review pharmaco -- first, not
25  relevant, and no, I didn't review pharmacovigilance

1  database and in terms of whether or not a study was
2  registrational or not registrational, I can't
3  answer that question unless I know it I was not
4  involved in some of the papers that I looked at.
5  But -- I don't recall any -- I don't recall any of
6  them being -- when you say registration, I take it
7  you mean the studies that were required for
8  approval of those agents.  Is that what you are
9  referring to?
10     Q   Something -- something analogous TAX 316
11  that is specific to Adriamycin, cyclophosphamides,
12  aromatase inhibitors, you have not reviewed those
13  trials, correct?
14     A   I don't recall any of those if there
15  wasn't a docetaxel arm somewhere in there.  I did
16  not -- you are correct.  That's correct.
17     Q   Dr. Feigal, you are familiar with the
18  Martin study that you cite in your report, correct?
19     A   Correct.
20     Q   Okay.  The authors of that study note in
21  the study that they did not control for the
22  variable of aromatase inhibitors, correct?
23     A   Do you want to show me that paper?
24         MR. INSOGNA:  Absolutely.
25         Dawn, can you pull up our 24, please.

1       (Feigal Exhibit 15, Persistent major
2   alopecia following adjuvant docetaxel for breast
3   cancer: incidence, characteristics, and prevention
4   with scalp cooling, marked for identification, as
5   of this date.)
6           THE WITNESS:  Is that 2018?
7           MR. INSOGNA:  Yes, it is.
8           THE WITNESS:  It looks like it.  It looks
9   like it.
10      Q   BY MR. INSOGNA:  Do you have that in front
11  of you?
12      A   Well, I -- yeah, it is the same.  492
13  patients, okay, I've got that.
14      Q   Okay.  And you recall that the authors did
15  not control for aromatase inhibitors in this study,
16  correct?
17      A   No.  Actually on Page 62 of my report I
18  say that "The study also looked at patients
19  receiving endocrine therapy.  There were no
20  patients with grade 2 permanent alopecia who
21  received endocrine therapy without chemotherapy."
22          And then I do show the incidence, just
23  reading my report, Page 52, "The incidence of
24  docetaxel-induced grade 2 permanent alopecia was
25  similar in patients with (22/221, 9.96%) and

1   without endocrine therapy (14/137, 10.2%)."  So
2   that tells me it didn't make a difference.
3       Q   I understand that's your takeaway from it,
4   but you --
5       A   Well, that's the data, that's the data.  I
6   didn't make it up, that's the data from the paper.
7           MR. MICELI:  You have to let him --
8           THE WITNESS:  I'm sorry.  Go ahead.
9       Q   BY MR. INSOGNA:  Dr. Feigal, you agree
10  that there are participants in this study who were
11  treated with aromatase inhibitors, correct?
12      A   There are patients who were treated with
13  endocrine therapy.  I don't -- I can't see the
14  exact text right now to know what kind of endocrine
15  therapy but I can take your word for it.
16      Q   All right.
17      A   I can try to blow it up, see if I can do
18  that.
19          Yeah, it says patients and methods.  It
20  had a control group receiving only --
21      Q   There's no question pending, Dr. Feigal.
22      A   It is right in the paper that they
23  control.
24          Can you hear me?
25      Q   I can hear you just fine.

1       A   Okay.  Okay.
2       Q   Can you briefly, Dr. Feigal, explain for
3   me what it means for study results to be
4   statistically significant?
5       A   It means that there's less than a 5%
6   chance that if you repeat the study it would occur
7   again by chance alone.
8       Q   That's a meaning that --
9       A   Simple explanation.
10      Q   The flip side to that would be if results
11  are not statistically significant you could rerun
12  the study and get different results explainable by
13  chance alone, correct?
14          MR. MICELI:  Object to the form.
15          THE WITNESS:  No, I think -- no.  All you
16  can say with a p-value is if you repeat the study
17  and if the p-value is, you know, less than .05,
18  less than 5% of the time would you be able to
19  repeat the study and see if that happens by chance
20  alone.  I can't say anything if it is not a
21  significant study.  I mean, all I can say that's
22  what it means when a p-value is significant.
23      Q   BY MR. INSOGNA:  And if the p-value is not
24  significant that means you cannot state that the
25  results -- that if you have two arms in a study and

1   the difference between the two arms is not
2   statistically significant you cannot say that the
3   difference is not caused by chance alone, correct?
4           MR. MICELI:  Object to the form.
5           THE WITNESS:  I -- I'm going to have to
6   ask you to repeat your question.
7           MR. INSOGNA:  Sure.
8       Q   If you have two study arms --
9       A   Yeah.
10      Q   -- and you are looking at the different
11  rates of an effect as seen between those two arms
12  and your p-value is not statistically significant
13  that means that that effect could be just as easily
14  explained by chance alone, correct?
15          MR. MICELI:  Object to the form.
16          THE WITNESS:  The short answer is no.
17      Q   BY MR. INSOGNA:  Explain to me where I'm
18  wrong.
19      A   It depends on what the primary endpoint of
20  the study was and whether the study was powered to
21  see the effect.  So sometimes you don't see
22  something to be significant because it has -- the
23  sample size isn't big enough.  That's often what
24  happens in safety studies is you have to look at
25  more than one study because you need to see a lot

1  of patients to see the event.  So that's why I said
2  it depends.
3      Q   Dr. Feigal, in addressing the strength of
4  association of a product in the Bradford Hill
5  analysis you say taking TAX 316 and GEICAM 9805
6  together there's almost twice as much long-term
7  alopecia noted in the docetaxel arm as there was in
8  the control arm, correct?
9      A   I believe the exact number was 1.85 with a
10 p-value of .04.
11     Q   Okay.  And now TAX 316, that study
12 established that the TAC regimen is superior to the
13 TAC regimen in terms of efficacy, correct?
14     MR. MICELI:  Object to the form.
15     THE WITNESS:  I believe -- I believe the
16 results of that study which was powered to detect
17 the primary endpoint which was disease-free
18 survival was positive with a 25.7% risk reduction
19 for an absolute reduction in risk of about 7%.
20 That's what that study showed.
21     Q   BY MR. INSOGNA:  And so in very simple
22 terms for a jury that established that TAC was
23 superior to FAC or disease-free survival, correct?
24     MR. MICELI:  Object to the form.
25     THE WITNESS:  That was an adequate and

1  well-controlled trial for I believe an interim
2  analysis for, as a supplemental NDA for approval.
3  I will just stop there.
4      Q   BY MR. INSOGNA:  And following TAX 316,
5  the TAC regimen became a preferred regimen over the
6  FAC regimen, correct?
7      A   No.
8      MR. MICELI:  Object to the form.
9      Q   BY MR. INSOGNA:  No, that's not true?
10 Okay.
11     The consensus among oncologists was not
12 that TAC showed better efficacy than FAC following
13 TAX 316?
14     MR. MICELI:  Object to the form.
15     THE WITNESS:  Nobody is -- clinical trials
16 show results, the results get publicized, they get
17 put on NCCN guidelines and other places, and then
18 the physician would have a discussion with their
19 breast cancer patients about the options, the risks
20 and the benefits and make the appropriate selection
21 for that individual patient.
22     Q   BY MR. INSOGNA:  Okay.  What the data of
23 TAX 316 showed was superior efficacy in the TAC arm
24 versus the FAC arm, correct?
25     MR. MICELI:  Object as to form.

1      THE WITNESS:  In an adequate and well-
2  controlled trial it showed a risk reduction
3  compared to the control arm, that is correct.
4      Q   BY MR. INSOGNA:  Okay.  Now TAX 316 has no
5  discussion of a relative risk or risk ratio of
6  persistent or permanent alopecia, does it?
7      A   I think I used the term "almost doubled."
8      Q   Dr. Feigal, my question is the TAX 316
9  study does not discuss relative risk or risk ratio
10 of persistent alopecia, does it?
11     MR. MICELI:  Objection.
12     THE WITNESS:  It has no mention of ongoing
13 alopecia, you are correct.
14     Can you do -- can you do one favor for me?
15 Can somebody take off this exhibit if we're no
16 longer talking about it?  It is just obscuring my
17 view of the image.
18     MR. INSOGNA:  Sure, Dawn, you can pull
19 that down.  Thank you.
20     THE WITNESS:  Sure.  I will make mine a
21 little smaller.
22     Q   BY MR. INSOGNA:  GEICAM 9805 does not have
23 any discussion of the relative risk or risk ratio
24 of permanent or persistent alopecia, does it?
25     MR. MICELI:  Object to form.

1      THE WITNESS:  The publication does not.
2      Q   BY MR. INSOGNA:  And neither of those
3  studies was powered with alopecia as an endpoint,
4  correct?
5      MR. MICELI:  Objection.
6      THE WITNESS:  Ongoing alopecia was a
7  safety endpoint that was specifically noted to be
8  followed but it was not a primary endpoint, that is
9  correct.
10     Q   BY MR. INSOGNA:  Now the almost doubling
11 that you referred to a moment ago, that's a
12 comparison of the raw numbers of patients who are
13 identified as having persistent alopecia in the
14 study data, correct?
15     A   That's the relative risk.  It is dividing
16 those exposed over the denominator of those not
17 exposed in the fraction in each arm that have --
18 that had the events of interests of ongoing
19 alopecia.
20     Q   So, for example, in the TAX 316 data you
21 are comparing the 29 patients on the TAC arm who
22 are recorded as ongoing alopecia versus the 15 on
23 the FAC arm, correct?
24     A   And including the denominator for each of
25 those arms and then dividing.  So it is 28 over the

Page 202

1  denominator divided by 16 over the denominator.
2  Because the arms are relatively equal in size,
3  that's why it still comes out to about the same
4  number if you do 29 over 16.
5      Q   Okay.  And you yourself have not analyzed
6  whether that difference is statistically
7  significant, have you?
8      A   It is a doubling and -- right.  I did not
9  do the -- use statistical tools to identify the
10  p-value.
11      Q   Okay.  Now in your report you identify the
12  adverse events that were observed during TAX 316,
13  right?
14      A   I am so sorry, it must be late in the day.
15  Repeat your question again, please.
16      Q   Sure.
17          In your report you identify a series of
18  adverse events that were observed in the TAX 316
19  data, correct?
20      A   I'm not sure what you mean a series of
21  events.
22      Q   Okay.  Perhaps I misspoke.
23          If you look at Page 28 in your report,
24  please.
25      A   Okay, I'm on Page -- I'm on Page 28 of my

Page 203

1  report.
2      Q   Okay.  The first full paragraph from the
3  top that begins "Women receiving TAC," do you see
4  that?
5      A   Yes.
6      Q   Okay.  And that's an identified -- there
7  you are identifying adverse events that were
8  experienced by patients on the TAC arm, correct?
9      A   Both arms.  The most common adverse event
10  in both arms was reversible alopecia.
11      Q   And FDA was aware of all of those adverse
12  events based on the study reporting, correct?
13          MR. MICELI:  Object to form.
14          THE WITNESS:  I can't speak for the FDA
15  but presumably it was vetted.
16      Q   BY MR. INSOGNA:  And the FDA approved
17  docetaxel after reviewing the TAX 316 data,
18  correct?
19      A   And whatever other data went into the
20  summary basis for that approval.  They already had
21  a track record with some other studies so yeah, the
22  FDA approved it.  I can't -- I can't say it was
23  just on this study or if there were additional data
24  points that were involved.
25      Q   And do you know sitting here today whether

Page 204

1  the 29 patients on the TAC arm versus 16 on the
2  fact arm is a statistically-significant difference?
3      A   I know that the meta-analysis that
4  combined results from this study in GEICAM 9805 is
5  statistically significant.
6      Q   Okay.  I'm not asking about the
7  meta-analysis, though.
8          Are you aware whether the 29 versus the 16
9  is a statistically significant difference?
10      A   I'm not -- I'm not sure I do know, but I
11  do -- I do know the results of the meta-analysis.
12      Q   Okay.  So you are not aware sitting here
13  today whether it is statistically significant.
14          Now in the GEICAM study the difference
15  between the patients on the docetaxel and the
16  control arm with respect to persistent alopecia was
17  eight versus four, correct?
18          MR. MICELI:  Object to the form.
19          THE WITNESS:  Eight versus four.  Actually
20  I don't think I have those numbers.  Are you --
21  what data, what point in time are you referring to
22  that data?  I'm not sure I have that in my report.
23      Q   BY MR. INSOGNA:  Okay.  And so you don't
24  know what the raw numbers are in the GEICAM trial,
25  do you, of patients reporting persistent alopecia?

Page 205

1      A   I do.  I don't recall reporting eight and
2  four, I recall reporting different numbers in my
3  report.  Perhaps you have a different report that
4  you are looking at.  Let me pull up my report and
5  the GEICAM.
6          The numbers I seem to recall at the end of
7  the ten-year followup period were three and one.
8  I'm not sure I recall putting in my report eight
9  and four.  Perhaps that was an interim.
10      Q   Okay.  And I will take your three and one
11  that's on Page 45 of your report.
12      A   Okay.
13      Q   That's difference is not statistically
14  significant, is it?
15      A   I -- I didn't look for statistical
16  connections.
17          What page did you say it was on?
18      Q   That's okay.
19          Is the answer then that you don't know
20  whether the difference is statistically
21  significant?
22      A   I didn't conduct that analysis, I've only
23  looked at the meta-analysis.
24      Q   Okay.  And so sitting here today can you
25  identify any individual published study that was

1  designed to look at alopecia and found a
2  statistically-significant difference in permanent
3  alopecia comparing the docetaxel arm and the non-
4  docetaxel arm?
5     A  I believe there is a statistically-
6  significant difference in the Kang study.  I think
7  the odds ratio was eight with a p-value of .04 if
8  I'm not mistaken.  Let me just -- I have to --
9     Q  Which name did you say?  I missed the --
10    A  I thought it was the Kang study.  Let me
11 look.
12       So there were -- there were four studies
13 where odds ratios were conducted and -- so I
14 believe from Martin the odds ratio was about 3.64,
15 for Sedlacek I believe the odds ratio was 54.7, for
16 Crown it was 1.37 and for Kang it was 8.01.  I
17 think in the paper itself it had a positive p-value
18 for Kang, K-a-n-g.
19    Q  And, Dr. Feigal --
20    A  And --
21    Q  -- the Kang study is not a randomized
22 control study, correct?
23    A  You are asking for ran -- okay.  It was a
24 comparative study.  You are asking for randomized
25 controlled clinical studies?  Is that what you are

1  asking?
2     Q  New question.
3        Is the Kang study a randomized control
4  clinical study?
5     A  The Kang study is -- let me tell you what
6  the Kang study was.
7        So the Kang study was a prospective cohort
8  study of consecutive patients who were expected to
9  receive adjuvant chemotherapy.  So it was a
10 prospective cohort study.  So it was not a
11 randomized controlled study, it was a prospective
12 cohort study.
13    Q  And of the 61 subjects in that study 43
14 were treated with endocrine therapy, correct?
15    A  I -- I would actually have to look at that
16 paper, but once again --
17       MR. MICELI:  Your lips are moving but I
18 can't hear you.
19       THE WITNESS:  Well, I haven't said
20 anything, I was just mouthing.
21       MR. MICELI:  Okay.
22       THE WITNESS:  I'm looking.  Unfortunately
23 I don't have all the details right with me but they
24 looked at the -- I'm looking to see what they did
25 adjust for.

1        They adjusted for age, they adjusted for
2  what was going on at the time of diagnosis, they
3  excluded patients at baseline who had alopecia,
4  blah, blah, blah.  I do not recall if they
5  controlled for endocrine therapy.
6        MR. INSOGNA:  Dawn, would you mind pulling
7  up --
8        MR. MICELI:  Can we go off the record?  We
9  have -- Nick, Judge North is available for a call
10 right now so if we can go off the record.  And Nick
11 and Dave and Mollie, I sent a call-in number.
12       MR. INSOGNA:  Okay.  Let's go off the
13 record then.
14       THE WITNESS:  Should I -- should I hang
15 up?
16       THE VIDEOGRAPHER:  Off video at 1:57 p.m.
17       (Recess taken)
18       THE VIDEOGRAPHER:  Back on video at 2:23
19 p.m.
20 BY MR. INSOGNA:
21    Q  Okay, Doctor.  When we left off we were
22 taking about the Kang study and I would like to
23 take a quick look at that now if you would, please.
24       Dawn, that's our No. 25.
25 ///

1        (Feigal Exhibit 16, Permanent
2  Chemotherapy-Induced Alopecia in Patients with
3  Breast Cancer:  A 3-Year Prospective Cohort Study,
4  marked for identification, as of this date.)
5        THE WITNESS:  You want to put it on the
6  exhibit?
7        MR. INSOGNA:  She will.  She will pull it
8  up for you so you are able to see it, Doctor.
9        THE WITNESS:  Okay.
10       MR. INSOGNA:  And, Dawn, if you could take
11 us to Page 417 in that study, please.
12    Q  And, Dr. Feigal, the Kang study was not a
13 randomized control study, was it?
14    A  It was a prospective cohort study.
15    Q  Okay.  And so patients who received any
16 number of chemotherapy regimens were followed to
17 see whether they developed alopecia, correct?
18 That's the basic study design?
19    A  They received -- yes, they received
20 doxorubicin and cyclophosphamide.  They received
21 either a non-Taxotere or a Taxotere/docetaxel-
22 containing regimen, correct.
23    Q  Okay.  And do you recall that 43 of the 61
24 subjects were treated with hormonal therapy?
25    A  I don't, but I do know that they

1  controlled for a hormonal therapy and did a
2  logistical regression analysis for them.
3      Q    Okay.  And so this page that's on your
4  screen, you may need to zoom in a little bit, but I
5  want to point you to some specific language.  It is
6  on the bottom of the right column if you are able
7  to focus in on that.
8      A    The -- are you looking at the figure or
9  the text?
10     Q    The text.
11     A    The text, okay.
12          Okay.  I'm on page whatever page this is.
13 Page 412, okay.  Okay.
14     Q    Okay.  Sorry, you are on -- can you go to
15 Page 417.  That's where we are.
16     A    Well, okay.  I can't -- are you asking me
17 to try and do at that?  I don't think I can do
18 that.
19     Q    We have that page up on our -- you know
20 what?  Let me read you the sentence, okay, and you
21 tell me if you need to see it.
22          So the sentence --
23     A    Well -- oh, I'm sorry, it now says Page
24 417.  For some reason just a second ago it had a
25 different page number up there.  I see it.

1      Q    Okay.  And so in the bottom of the
2  right-hand column it says, "Further studies with
3  larger sample size should be conducted to obtain
4  more precise estimates of the effect of hormone
5  therapy as well as different chemotherapy regimens
6  on PCIA risk."  Do you see that language?
7      A    I do.
8      Q    Okay.  And so these authors are
9  acknowledging here that this study is limited in
10 that they could not fully control for how much
11 hormonal therapy impacted the risk of pCIA.  Is
12 that a fair characterization?
13     A    No.
14          MR. MICELI:  Object to the form.
15          Let me just -- take a breath so I can make
16 an objection so we can have a clean record.
17 Thanks.
18     Q    BY MR. INSOGNA:  And so you see -- okay.
19 Go to the top of that --
20     A    Did you hear my -- did you hear my answer?
21     Q    I did, Dr. Feigal.
22     A    Okay.
23     Q    If you go to the beginning of that same
24 paragraph it says, "The risk of CIA and the degree
25 of hair loss differ substantially between chemo-

1  therapeutic agents.  Alkalting agents
2  (cyclophosphamide, ifosfamide), cytotoxins
3  (doxorubicin, daunorubicin), antimicrotubule agents
4  (docetaxel, paclitaxel), and topoisomerase
5  inhibitors (etoposide) have frequent and severe
6  effects."
7          Do you see that?
8      A    I do.  But you probably saw my email where
9  I corresponded with the author in term of what
10 testing was in this study.
11     Q    Yes, I did, Dr. Feigal.
12          My question is these authors conclude that
13 each of those including cyclophosphamide and
14 Adriamycin have frequent and severe effects; is
15 that right?
16          MR. MICELI:  Object to the form.
17          THE WITNESS:  No.  I'm so sorry.
18     Q    BY MR. INSOGNA:  You disagree that that's
19 what these authors wrote here?
20     A    No.  I think what they wrote in that
21 paragraph is that the degree of hair loss differs
22 substantially between the chemotherapeutic agents.
23 The risk and the degree of hair loss differs
24 substantially between the different chemotherapy
25 risks and that there's a much higher risk -- if you

1  read the next sentence which you didn't highlight
2  there's a much higher risk of pCIA in the taxane
3  bag of chemotherapy compared with any of the other
4  regimens.
5      Q    And the sentence that I read to you
6  indicates that doxorubicin and cyclophosphamide
7  have frequent and severe effects, correct?
8          MR. MICELI:  Same objection.
9          THE WITNESS:  No.  It is not -- it is not
10 what it says.
11          MR. INSOGNA:  Okay.
12          THE WITNESS:  It says there's the risk and
13 the amount -- the degree of the hair loss differs
14 substantially between the different chemo-
15 therapeutic agents and in our study patients with
16 taxane-based chemotherapy had a much higher risk of
17 pCIA compared with patients with other regimens.
18 That's what it says.
19          MR. INSOGNA:  We don't need to disagree
20 about the sentence you skipped over there, it says
21 what it says, so I will move on.
22          THE WITNESS:  Okay.
23     Q    BY MR. INSOGNA:  Okay.  I would like to
24 just quickly run through some of the study names
25 that appear on your Table 2 and please tell me

Page 214

1  whether it is a case series, a case report or it
2  comes from some higher level on the hierarchy of
3  evidence, okay?
4         The Tallon paper?
5     A   Just tell me the page if you wouldn't
6  mind.
7     Q   The page -- so sitting here today you
8  don't recall whether --
9     A   No, I do, but I just want to be precise
10 because I put the type of trial directly into the
11 table by the code that I told you was under the
12 footnote so I just want to make sure I -- I need to
13 make this smaller.
14        I just want to make sure that I'm
15 accurately telling you the code I gave in the table
16 and what I tell you now, that's all.
17    Q   Okay.
18    A   So I can look up Tallon.  I know what it
19 was, I just want to make sure that it is the same.
20    Q   Tallon is a retrospective case report,
21 correct?
22    A   That's correct.  That's how I stated it.
23    Q   And that's from the lowest level of
24 evidence, correct?
25    A   A case report is the lowest level in terms

Page 215

1  of -- well, it is the lowest of the hierarchy I
2  gave you, that's correct.  You still get good
3  information from it but it is the lowest level.
4     Q   And Prevezas, that's also a retrospective
5  case report, correct?  That appears on Page 59 of
6  your report.
7     A   Thank you.
8         So Prevezas were retrospective case
9  reports and it was a letter to the editor and I
10 gleaned what I could out of that body of evidence.
11    Q   Okay.  And so -- but in addition to being
12 from the lowest level in the hierarchy of evidence
13 Prevezas is not a peer-reviewed paper, correct?  It
14 is a letter to the editor?
15    A   No.  Journals have processes for
16 publishing letters to the editor, they just don't
17 put anything in there, so there is some sort of
18 review before they publish it.
19    Q   It is not a scientific peer review
20 process, though, correct?
21    A   For that particular journal I don't know
22 what they did.  I would imagine since it includes
23 what -- I can't speculate.  I don't know what that
24 journal's process is for letters to the editor but
25 since it includes data I would assume it has some

Page 216

1  sort of peer review.
2     Q   Okay.  Tosti on that same page, that's a
3  retrospective case report, correct?
4     A   It is a letter to the editor retrospective
5  case report in patients with breast cancer, yes,
6  not previously been reported.
7     Q   Okay.  Kim appears on Page 49 of your
8  report.  That is a retrospective survey, correct?
9     A   It is a cross-sectional survey that
10 retrospectively identified breast cancer patients
11 who had non-randomly received exposure to either
12 Taxotere or non-Taxotere agents it looks like.  So
13 it was a -- it was ranked as -- it is a paper and
14 it was ranked as 2a.
15    Q   The lowest level on the hierarchy of
16 evidence, correct?
17    A   No, it is not.  It is lower -- I mean, I
18 have, you know, 1a, b, c, I have 2a, 2b, so no, it
19 is not on the lowest rung.
20    Q   Bourgeois, that is a retrospective
21 comparative review, correct, that begins on Page 50
22 of your report?
23    A   So yes.  So I characterized it as a
24 retrospective comparative review, so I
25 characterized it as a 2a.  It was a prospectively

Page 217

1  designed, though, case report forms and
2  questionnaire to assess for permanent alopecia.
3     Q   Now, Dr. Feigal, it is not your opinion
4  that Sandoz should have been aware of all of these
5  studies prior to Ms. Stewart's treatment, correct?
6     A   As I said, I don't know when Ms.
7  Stewart -- I don't have any ideas of Ms. Stewart, I
8  don't know when she was treated, so I don't -- I
9  don't know if this data was there or it wasn't
10 because I don't know when Ms. Stewart was treated.
11    Q   Okay.  And if I represent to you that Ms.
12 Stewart was treated in 2014 then we can at least
13 agree that studies that would not have been
14 available to Sandoz would have been Crown, Martin,
15 Kang, Freites-Martinez and Fonia, correct?
16    A   I would need to look at the dates when the
17 abstracts were available and I can't do that in a
18 second so I'd have to look to verify whether or not
19 what you said was correct.  Do you want me to take
20 the time to do that?
21    Q   How about this.  If they're published
22 after the date when Ms. Stewart completed her
23 treatment they can't have been something within
24 Sandoz's knowledge base, correct?
25    A   Not unless there were previous abstracts

1  that had already been reported and I didn't report
2  here because I don't put redundant patients in.  So
3  if I have a later abstract I don't include the
4  earlier ones because of overlap, so it just depends
5  on whether or not there might have been a more
6  preliminary amount of information available
7  earlier.
8       Q   You actually, you just touched on
9  something that I wanted to ask you about.
10      You mentioned redundant patients.  Are you
11  able to confirm that none of the patients
12  identified in your tabs in Table 2 are the same
13  individuals counted twice?
14      A   Yes, I can.  Because what I did is look
15  for whether or not there was any overlap and I
16  think you will see in one of the papers that I
17  presented as a narrative but not as a table entry
18  was Crown because I didn't know if some of those
19  patients in 2018 might have overlapped with the
20  patients in 2017.  So I did not -- I included it as
21  a narrative but I didn't include it in the table
22  and I believe I even made a footnote to that effect
23  for the Crown 2017 article.
24      Q   And so in both the Kang and Jung studies
25  the patients reported on were from the Samsung

1  Medical Center in Seoul, correct?
2       A   What was the -- I know Kang.  What was the
3  name of the other study you mentioned?
4       Q   Jung, J-u-n-g.
5       A   I don't see a Jung study.  Do you see a
6  Jung study?
7       Q   You know what?  It is possible that I have
8  confused that with Dr. Bosserman.  You may be right
9  about that one.
10      A   Oh, oh, I will tell you what, I tell
11  what.  Actually, tell you what.
12      It is not in my table but it is in the
13  narrative on Page 71 why -- I explain why I didn't
14  use it.  So in that discussion on Page 71 of my
15  report the reason why I didn't use it is there was
16  no attribution of the type of chemotherapy given
17  for the indication, there was no indication of the
18  extent of disease, whether it was metastatic or
19  localized, and since the chemotherapy on the table
20  of chemotherapies included stem cell
21  transplantation and it is already well know that
22  high-dose chemotherapy as well as radiation to the
23  scalp can cause permanent alopecia, I felt this
24  study was lacking in critical key information I
25  needed to assess it for patients with locally --

1  local non-metastatic breast cancer with standard
2  doses of conventional chemotherapy, the type of
3  patients that are in the MDL, so that's why I
4  didn't include it.  So no, I would anticipate
5  there's no overlap because I didn't include this.
6       Q   Okay.  And from the Fonia and Tallon
7  studies each refer to one patient from the
8  Department of Dermatology at Boston University.
9  Are you able to confirm that that's not the same
10  individual?
11      A   Yeah.  I think it is mentioned in the
12  report that it is not.
13      Q   In which report?
14      A   I'd have to --
15      Q   Your report?
16      A   No, theirs.
17      Tell me the two names again?  Please tell
18  me the two names.
19      Q   You think that the report itself
20  identifies that those are not the same patients?
21      A   I -- I don't have total recall, but I seem
22  to recall the only reason I included it is I felt
23  confident they were different patients.
24      Q   Okay.  You are not able to confirm whether
25  any of the patients counted in your Table 2 was

1  treated with Sandoz's docetaxel, correct?
2       A   Since my report is about general causation
3  my only concern was whether it was docetaxel.  I
4  did not differentiate by manufacturer.
5       Q   And that's because the medications are
6  bioequivalent, correct?  It doesn't matter to you
7  which manufacturers' medication it was?
8       A   It is because it is the identical active
9  ingredient, docetaxel.
10      Q   You would agree certainly that none of the
11  patients who are counted in your study or counted
12  in your Table 2 from studies predating 2011 could
13  have received Sandoz's docetaxel, correct?
14      A   Well, publications have a lag time so no,
15  I can't say they couldn't have received the
16  product.  Publications don't appear immediately,
17  they get written up, it is all set to come, so I
18  don't -- I have no idea.  And I guess -- I'm sorry,
19  let me take a step back.
20      You are asking if -- re-ask your question.
21  I misinterpreted it.
22      Q   You are aware that Sandoz's docetaxel came
23  to market in 2011, correct?
24      A   In the United States.
25      Q   Yes.

1        So if patients in your Table 2 received
2   docetaxel in a study published prior that you would
3   agree they did not receive Sandoz's docetaxel,
4   correct?
5       A   No.  Because the docetaxel for Sandoz, it
6   was approved much earlier in other countries and
7   some of these are international studies.  I'd have
8   to go through which ones but I'm just saying it
9   depends on when it was available in the country
10  where the study took place.
11       MR. INSOGNA:  Dawn, would you pull up our
12  No. 31, please.
13       And this the Bertrand paper, Dr. Feigal.
14  If you would like to turn to the narrative that
15  might help.
16       (Feigal Exhibit 17, Abstract P3-09-15:
17  Permanent chemotherapy induced alopecia in early
18  breast cancer patients after (neo)adjuvant
19  chemotherapy:  Long term follow up, marked for
20  identification, as of this date.)
21       THE WITNESS:  Okay.
22       Q   BY MR. INSOGNA:  This is an abstract only,
23  correct?
24       A   Is this 2013?
25       Q   Yes.

1       A   Okay.  Yes, it is an abstract.
2       Q   And it is a retrospective study?
3       A   No, it is a prospective clinical study.
4   That's probably why I graded it as a 1b.
5       Q   Every patient examined in this study was
6   treated with an FEC plus docetaxel regimen,
7   correct?
8       A   Correct.
9       Q   None received the TAC regimen that Ms.
10  Stewart received?
11       A   The patient received -- I don't -- as I
12  said, I have no information about what she received
13  so I can't really answer your question about that
14  specific question.
15       Q   Now because every patient in this abstract
16  received the same regimen this abstract itself does
17  not provide any basis for comparing the risk of
18  permanent alopecia in a docetaxel regimen versus
19  non-docetaxel regimen, right, this study data?
20       A   In this particular study that is correct.
21  All the patients received a docetaxel regimen.
22       Q   Okay.  And the authors of this study
23  theorized that risk factors for alopecia included
24  genetic predisposition, correct?
25       MR. MICELI:  Object to the form.

1       THE WITNESS:  Can you show me the -- you
2   have to show me the -- can you -- maybe I can do
3   it.  Let me see if I can just read it from here.
4       You are talking about the last sentence?
5       MR. INSOGNA:  Correct.
6       THE WITNESS:  Okay.  So yes, I read that.
7       Q   BY MR. INSOGNA:  The author's main
8   hypotheses are irreversible toxicity on stem cells,
9   endocrine disorders, the early onset of andro-
10  genetic alopecia in predisposed individuals; is
11  that correct?
12       A   Well, you didn't highlight the sentence,
13  the beginning part of the sentence, "There was no
14  significant difference in," right?
15       Q   I'm reading the following sentence which
16  begins "Main hypotheses are."  Do you see that
17  sentence?
18       A   Well, I do, but I'm also reading sentence
19  right above that where they say there were no
20  significant differences on personal history, there
21  are different drugs including hormonal therapy, and
22  I guess how they pluck their eyebrows.  So their
23  main hypothesis is that there's either irreversible
24  toxicity on the stem cells or -- I honestly don't
25  know how they're coming to that other conclusion

1   unless I'm missing something.
2       Q   Now nowhere in this abstract does it say
3   anything about the permanence of any patient's
4   alopecia, does it?
5       A   Well, yes.  It says the persistent, if you
6   look at the definition of it it has to be at least
7   six months after the end of chemotherapy, that is
8   defined as permanent alopecia.  So you have to
9   remember this is scalp cooling and scalp cooling --
10  well, sorry.  I won't answer a question you haven't
11  asked.  So yes, they do define what they mean by
12  permanent alopecia.
13       Q   And you previously testified that alopecia
14  can resolve later than six months after
15  chemotherapy, right?
16       A   The transient type of alopecia I think
17  what I fairly consistently say is that the six
18  months is the defining point that your hair should
19  be back.
20       Q   And if alopecia has persisted longer than
21  six months it will not return?
22       A   I just said it is not captured.  I didn't
23  say that, I'm just saying what the definition of
24  permanent alopecia is and most people agree it is
25  at least six months after the end of chemotherapy.

Page 226

1    Q   But it can grow back later than six months
2   after the end of chemotherapy, correct?
3        MR. MICELI:  Object to the form.
4        THE WITNESS:  I can't -- I can't answer
5   your question.  You know, I was looking at the
6   definition for causation for what the definition is
7   for permanent alopecia.
8    Q   BY MR. INSOGNA:  Okay.  So let me ask you
9   this then.
10       If a patient has alopecia for nine months
11  following chemotherapy and then it resolves did
12  they have pCIA?
13       MR. MICELI:  Objection to form.
14       THE WITNESS:  Well, they met the
15  definition of having not the traditional temporary
16  alopecia.  We have to agree on terms so that's the
17  term that we have agreed upon.  At least in many,
18  many scientific papers it is at least six months
19  after the end of chemotherapy.  Whether you call it
20  persistent, permanent, irreversible, I didn't pick
21  the term, but six months is the defining point that
22  people agree is -- is the one to look at.
23       Q   BY MR. INSOGNA:  And so what I'm wondering
24  is if a patient has alopecia that lasts longer than
25  six months but then resolves at a later date would

Page 227

1   you say that they had pCIA?
2    A   By definition they would have --
3        MR. MICELI:  Objection.
4        THE WITNESS:  By definition they would
5   have alopecia persisting more than six months, at
6   least six months after the end of chemotherapy.
7   I'm just saying for purposes of a scientific
8   evaluation of what's going on there's a predefined
9   definition and you stick to it.
10       Q   BY MR. INSOGNA:  So yes, you would count
11  that as a case of pCIA?
12       A   If pCIA --
13       MR. MICELI:  Object to form.
14       THE WITNESS:  If pCIA is described as at
15  least six months after the end of chemotherapy then
16  yes.
17       Q   BY MR. INSOGNA:  So that it is possible
18  that cases of pCIA can later resolve?
19       MR. MICELI:  Object to the form.
20       THE WITNESS:  You are asking me can that
21  happen?  Is that what you are asking?  Possibly,
22  but it doesn't change the predefined definition.
23       MR. INSOGNA:  Okay.  Dawn, look at our No.
24  33, please.
25       Dr. Feigal, this will be the Fonia paper.

Page 228

1        (Feigal Exhibit 18, Permanent alopecia in
2   patients with breast cancer after taxane
3   chemotherapy and adjuvant hormonal therapy:
4   Clinicopathologic findings in a cohort of 10
5   patients, marked for identification, as of this
6   date.)
7    Q   BY MR. INSOGNA:  Do you see that?
8    A   Uh-huh.  Yes.
9    Q   This is a retrospective study, correct?
10   A   This is the retrospective study, correct.
11   Q   Okay.  It involves only ten patients?
12   A   Uh-huh.
13   Q   And the authors acknowledge that the small
14  sample size is a limitation, correct?
15   A   If you show me -- can I scroll through
16  this to see where they said that?
17   Q   I believe you can, yeah.
18   A   Hum.  Could you highlight it for me?
19   Q   So right on the front page there you see
20  "Limitations:  The study was based on a small
21  sample size."  Are you able to read that?
22   A   Yes, yes.
23       It was based on a small sample size and
24  retrospective retrieval of clinical information and
25  histopathologic review.  Yes, I see that.  That was

Page 229

1   the limitation.
2        MR. INSOGNA:  Dawn, are you able to move
3   Dr. Feigal to Page 956 of this document.
4    Q   Dr. Feigal, you may need to zoom in if you
5   are able to do that.  I would like to look at the
6   beginning of the first full paragraph and then the
7   beginning of the following paragraph.
8    A   "We further hypothesize," is that what you
9   want me to read?
10   Q   Exactly.
11       And so that sentence says, "We further
12  hypothesize that hormonal antiestrogen adjuvant
13  therapy may represent the additional factor
14  sustaining the dystrophic catagen response pathway
15  initiated by chemotherapy."  Do you see that?
16   A   Yes, I see that.
17   Q   Okay.  And so the authors here are
18  hypothesizing first that chemotherapy can interrupt
19  this dystrophic catagen response pathway, right?
20  That's the mechanism that causes hair loss that
21  they're hypothesizing?
22       MR. MICELI:  Object to the form.
23       THE WITNESS:  Was there a question in
24  there?  I'm sorry, I didn't hear the question.
25   Q   BY MR. INSOGNA:  Yeah.  My question was do

1  you agree that these authors had hypothesized that
2  as a mechanism for how chemotherapy is initiating
3  hair loss.
4      A   Okay.
5          MR. MICELI:  Object to the form.
6          THE WITNESS:  I am reading that the
7  authors hypothesize what it says in this sentence.
8      Q   BY MR. INSOGNA:  Okay.  And so --
9      A   Yes, I'm reading it, yeah.
10     Q   Where they say that the hormonal
11 antiestrogen adjuvant therapy may sustain the
12 dystrophic catagen response pathway, they are
13 saying that the process initiated by the
14 chemotherapy is being maintained by the adjuvant
15 antiestrogen therapy, correct?
16         MR. MICELI:  Object to the form.
17         THE WITNESS:  Well, five of these ten had
18 no endocrine therapy at all and still had the
19 outcome.
20     Q   BY MR. INSOGNA:  Okay.  But you understand
21 that that's this hypothesis as set forth in this
22 paragraph, right, that the endocrine therapy is
23 continuing a mechanism initiated by the
24 chemotherapy.  That's what these authors are
25 saying, correct?

1          MR. MICELI:  Object to the form.
2          THE WITNESS:  The sentence is correctly
3  read.  I'm just saying their data shows that five
4  of the ten had no hormonal therapy at all.
5      Q   BY MR. INSOGNA:  Okay.  I would like you
6  to consider for me a hypothetical scenario, right?
7          If these authors' hypothesis is right that
8  the adjuvant antiestrogen therapy continues the
9  process started by the chemotherapy, if a patient
10 has chemotherapy with docetaxel and loses their
11 hair and then before six months have concluded they
12 begin an antiestrogen therapy that sustains that
13 same hair loss, are you able to ever say that that
14 patient had pCIA?
15         MR. MICELI:  Object to the form of the
16 question.
17         THE WITNESS:  Can I -- so to answer that
18 complicated question there's several ways I
19 could -- what I can say is the definition of pCIA,
20 permanent or persistent alopecia with a definition
21 of six months is the definition.  So if they had
22 chemotherapy and they're at least six months out
23 and their hair has not come back then that meets
24 the definition, that doesn't change the definition.
25         The point I was also trying to make to you

1  is that half of those patients never received any
2  endocrine therapy.
3          The third point is it is my understanding
4  that the changes in hair thinning that occur with
5  hormones doesn't happen right away, it takes at
6  least a year, so I don't think the timing is right
7  in terms of -- and the impact is supposed to be
8  thinning of hair, here it hasn't come back, so I
9  think -- you know, we're talking about different
10 things here.  So I understand that is what the
11 authors state, I'm just posing I have different
12 viewpoints based on this data and other things that
13 I have read.
14     Q   BY MR. INSOGNA:  Okay.  But if the
15 authors' hypothesis was correct that the anti-
16 estrogen therapy sustained the situation caused by
17 the chemotherapy, in that case it would not be
18 possible to diagnose pCIA, correct?
19         MR. MICELI:  Object to the form.
20         THE WITNESS:  No.
21     Q   BY MR. INSOGNA:  Simply because the
22 patient has hair loss persisting longer than six
23 months you put them in the pCIA category; is that
24 right?
25     A   Right.

1          MR. MICELI:  Object to the form.
2      Q   BY MR. INSOGNA:  Okay.  So if a patient
3  had metastatic breast cancer and were treated with
4  a docetaxel regimen and progressed and so then were
5  put on another regimen that also causes hair loss
6  you would not count them as having pCIA from
7  docetaxel, correct?
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  The definition of pCIA is
10 after the end of chemotherapy at least six months
11 out.  So I'm -- I mean, I'm having a little trouble
12 understanding what you are talking about.
13     Q   BY MR. INSOGNA:  Let me come at it this
14 way.
15         I believe you previously testified that
16 you do not consider studies in metastatic breast
17 cancer responsive to your searches; is that right?
18     A   I don't think I have any studies.  No, I
19 was trying to limit it to patients in the MDL.
20     Q   And --
21     A   It is my understanding these are primarily
22 non-metastatic breast cancer patients who received
23 adjuvant treatment.
24     Q   Okay.  And so your rejection of metastatic
25 breast cancer studies was not because they're on

1  multiple sequential regimens, any of which could
2  cause hair loss?
3          MR. MICELI:  Object to the form.
4          THE WITNESS:  I can't answer the question
5  as you phrased it.  I did not include patients with
6  metastatic disease because I did not think it was
7  relevant for the patient population in the MDL,
8  that's why.  Not because of anything else.
9      Q   BY MR. INSOGNA:  And what you believe made
10 it irrelevant is that you believe there are not
11 patients with metastatic breast cancer in the MDL;
12 is that correct?
13         MR. MICELI:  Object to the form.
14         THE WITNESS:  My report is focused on non-
15 metastatic breast cancer and the chemotherapies
16 commonly used treatment of that type of breast
17 cancer so my understanding was that the vast
18 majority of patients in the MDL were non-
19 metastatic.  That is my understanding.
20         MR. INSOGNA:  Dawn, could you pull up our
21 No. 28, please.
22         (Feigal Exhibit 19, Assessment of Quality
23 of Life and Treatment Outcomes of Patients With
24 Persistent Postchemotherapy Alopecia, marked for
25 identification, as of this date.)

1      Q   BY MR. INSOGNA:  Dr. Feigal, this is the
2  Freites-Martinez paper that I believe you are
3  familiar with.
4      A   Okay.
5      Q   Now this was not a source that you
6  included in earlier reports offered in this
7  litigation, correct?
8      A   Because it had not yet been published.
9      Q   Okay.  It was Sandoz's counsel who brought
10 this to your attention first, though, correct?
11     A   I don't think so.  I think I knew about
12 this paper.
13     Q   So you are aware that this paper includes
14 patients who had a diagnosis of either pCIA or
15 EIAC, correct?
16     A   Actually let me refresh myself.  I thought
17 he excluded patients who he thought were solely due
18 to endocrine.
19     Q   Okay.  So if you look under "Results" on
20 the first page you will see, "A total of 98 women
21 with pCIA ... and 94 women with EIAC ... were
22 included."  Do you see that?
23     A   Okay.
24     Q   Okay.  So you agree that it does include
25 patients who were diagnosed with EIAC, correct?

1      A   I am agreeing that's what it says.
2      Q   Okay.
3      A   So yes.
4      Q   EIAC they define as endocrine therapy-
5  induced alopecia; is that right?
6      A   Attributed solely to endocrine therapy.
7  Correct.
8      Q   Now these 98 and 94 women, we have no idea
9  what size of population they came from, correct?
10 We have no way of knowing how many patients were
11 exposed to either docetaxel or endocrine therapy to
12 get us to these numbers, right?
13     A   Right.  This is going backwards looking at
14 alopecia as the outcome of interest so it is
15 already self-selected for the outcome of interest.
16     Q   Right.
17         And, Dawn, if you would move us ahead to
18 726.
19         Are you able to see that, Dr. Feigal?
20     A   Yeah.
21     Q   So you see that of the patients who
22 received a taxane-based chemotherapy and have a
23 diagnosis of pCIA, do you see where that entry is
24 sort of in the middle of the left column there?
25     A   Yes.

1      Q   Okay.  And 47 of the 80 who received
2  taxanes received paclitaxel, correct?
3      A   Well, as we talked about before, you don't
4  know the denominator.  They excluded one hundred
5  ninety -- of the 385 they excluded 193 including --
6  yeah.  Including 82 received chemotherapy.  So I
7  don't -- I don't -- you can't really do anything
8  about it.  All you can do is look at the outcome,
9  you can't say anything about incidence here.
10     Q   Right.  This doesn't tell you anything
11 about incidence rate, I agree with you there.  But
12 47 of the 80 patients who received taxanes received
13 paclitaxel, correct?
14         MR. MICELI:  Objection; form.
15         THE WITNESS:  Yes.  After.
16     Q   BY MR. INSOGNA:  And 13 -- sorry, 31
17 received docetaxel?
18     A   You are reading that correctly.
19     Q   Okay.  And below that you see that 13
20 patients with a diagnosis of pCIA received a CMS
21 regimen, correct?
22     A   You are reading that correctly.
23     Q   In those patients I assume you have no
24 basis to opine as to what caused their alopecia,
25 correct?

1          MR. MICELI:  Object to the form.
2          THE WITNESS:  Once again, cases are not
3    equivalent to causation.  So there are cases that
4    are reported but that doesn't mean causation.
5     Q    BY MR. INSOGNA:  Okay.  Now if you move
6    over to the right column under "EIAC" you see that
7    there are 58 patients who received aromatase
8    inhibitors and had permanent hair loss attributable
9    solely to endocrine therapy?
10    A    Well, actually I want to look back at what
11   their definition of alopecia in the endocrine study
12   was.  So let me -- let me refresh my memory on
13   that.  I don't -- I don't remember seeing anything
14   in the definition of ECIA about the duration.
15   Apologies if it is in there.  You will have to
16   refresh my memory.  It may have been described
17   differently.
18          MR. MICELI:  If I can just ask that you
19   allow her to respond.  Thank you.
20          MR. INSOGNA:  Yeah.  That was inadvertent,
21   Dave.
22    Q    If you look on the front page of this --
23   Dawn, maybe you can flip us back two again -- in
24   "Design, Setting, and Participants," if you are
25   able to read that it says these 192 women received

1    a clinical diagnosis of persistent alopecia between
2    January 1, 2009, and January 13, 2017, do you see
3    that?
4     A    Yes, I see that.
5     Q    Okay.
6     A    But I'm also --
7     Q    The diagnosis was of persistent alopecia,
8    correct?
9          MR. MICELI:  Object to the form.
10          THE WITNESS:  You are reading that
11   correctly.
12          Can you go back to the page we were on in
13   the table?  I think there might -- well, I think
14   there was an item important for my answer to you
15   because it talks about the time since the treatment
16   so it was on that table.
17    Q    BY MR. INSOGNA:  Okay.  Let me just ask a
18   couple more data points on this page and then you
19   can point that out to us, okay?
20    A    Okay.
21    Q    The diagnoses here were between January
22   2009 and July 2017, correct?
23    A    They received a clinical diagnosis, yes,
24   that's what it says.
25    Q    Okay.  And the study was published in

1    2019, correct?
2     A    I believe that's correct.  I believe
3    that's correct.
4          MR. INSOGNA:  Okay.  Dawn, you can move us
5    again, please, to Page 726.
6          THE WITNESS:  Okay.
7          MR. MICELI:  Is that the page the doctor
8    wanted to go to?
9          MR. INSOGNA:  Yes, it is.
10          MR. MICELI:  Thank you.
11          THE WITNESS:  So I'm looking on the -- I
12   don't -- I can't really number rows but there's a
13   row that says time with alopecia after chemotherapy
14   completion for pCIA and then it says and after
15   initiation of endocrine therapy with EIAC, so there
16   are different definitions.  It looks like it is one
17   year after initiation for endocrine but it is X
18   amount of time after the end of chemotherapy
19   completion for pCIA.  So I'm just saying they're
20   very different definitions but what we're looking
21   at, it is a bit of apples and oranges, just
22   pointing that out to you.
23    Q    BY MR. INSOGNA:  Okay.  Look with me if
24   you would to the references to the right of the
25   table, b, do you see that?  "Patients with EIAC had

1    full hair regrowth after cytotoxic chemotherapy"?
2    Do you see that?
3     A    Yeah, I see that.  But -- and what I'm
4    saying is that with endocrine therapy -- yeah, so
5    they have full hair regrowth, right.  So good.  So
6    they had full hair regrowth before they started on
7    their endocrine therapy and then on the endocrine
8    therapy, while on the endocrine therapy and after
9    at least one year on the endocrine therapy.  I
10   guess that was the definition of EIAC.  But they're
11   very different definitions.
12    Q    Dr. Feigal -- I'm sorry, were you
13   finished?
14    A    Yes.
15    Q    Okay.  The one year for the EIAC patients,
16   if you look at the title of the table it says
17   "Baseline Characteristics," right?  So you
18   interpret as this is how the authors defined EIAC,
19   is it had to be one year after, or is it that is
20   the average amount of time before the diagnosis
21   occurred?  See, in parentheses you see "(0.1-5.3)."
22    A    Well --
23    Q    My interpretation, and tell me if I'm
24   wrong, is that patients were on endocrine therapy
25   anywhere from .1 years to 5.3 years and that the

Page 242

1    mean was one year before they received their
2    diagnosis.
3            MR. MICELI:  Object to the form.
4            THE WITNESS:  Well, I'm reading it, I'm
5    trying to figure out where you are going with this,
6    but it sounds like they had a full head of hair and
7    then had however they're defining it after at least
8    one -- I'm having a hard time believing somebody
9    had endocrine-induced significant hair loss after
10   what, less than a month.  I mean -- okay.  That's
11   unusual.
12       Q   BY MR. INSOGNA:  Okay.  But you will agree
13   that this data reflects that 32 women on letrozole
14   and 21 women on anastrozole were diagnosed with
15   EIAC in this study, correct?
16           MR. MICELI:  Object to the form.
17           THE WITNESS:  However EIAC is defined.
18   And I'm a little bit -- I'm assuming there's a --
19   well, never mind.  I'm answering your question.
20           Yes, they -- yes, they had different
21   definitions for what they're talking about,
22   different time periods and different -- anyway, go
23   ahead, though, with your question.
24           MR. INSOGNA:  I think you've answered it,
25   Dr. Feigal.

Page 243

1        Q   Now you --
2        A   Okay.
3        Q   You said earlier that you did not do any
4    updating of your searches or am I remembering that
5    incorrectly?
6        A   I think I updated it with -- well, I've
7    done a lot of versions of that report.  I've
8    updated the report over time.  The version you have
9    is updated in terms of the time of when I gave it
10   to you.
11       Q   Okay.  And when was the most recent date
12   when you reran your search terms to see if there
13   were additional or new articles?
14       A   Oh, I do that on a continuous basis.
15           MR. INSOGNA:  Okay.  Dawn, would you pull
16   up our No. 47, please.
17           (Feigal Exhibit 20, Hair disorders in
18   cancer survivors, marked for identification, as of
19   this date.)
20       Q   BY MR. INSOGNA:  Dr. Feigal, have you seen
21   this paper before?
22           MR. MICELI:  Which paper is this?  It is
23   not up on my screen yet and I may want to -- hold
24   on.
25           THE WITNESS:  It says "Hair" -- okay.

Page 244

1            MR. MICELI:  Hold on.
2            MR. INSOGNA:  Dave, the paper is entitled
3    "Hair disorders in cancer survivors."  It is
4    authored by Dr. Freites-Martinez, Jerry Shapiro and
5    a whole list of others.  It is published May 2019.
6        Q   Are you familiar with this, Dr. Feigal?
7        A   I have -- I don't -- I don't know if I
8    have seen this one.  It doesn't ring a bell
9    unless -- it doesn't ring a bell.
10       Q   Okay.
11       A   Since it just says "Hair disorders in
12   cancer survivors" and it is not specific to breast
13   cancer, adjuvant breast cancer or has specific data
14   on patients I'm not sure it would have come up on a
15   search.
16       Q   Okay.  And so when we talked about your
17   search terms at the beginning I believe if a paper
18   had the terms breast cancer and permanent or
19   persistent and alopecia that it would have come up
20   in response to your search terms; is that right?
21       A   Well, alopecia, yeah.  Alopecia with
22   permanent, persistent or -- it depends on how it is
23   coded in MEDLINE whether or not it will come up.
24   But no, this particular paper did not come up.  It
25   was published -- it was published when?  In May --

Page 245

1    when was it published?  May 2019 and the report was
2    what, June 8th?  No, I probably had already
3    finalized it.
4        Q   Your report in June 8th of 2020?
5        A   Oh, oh, I'm so sorry, this is 2019.
6            No, this -- I don't recall this.
7        Q   Okay.  Now a moment ago you mentioned
8    something about how it was coded in MEDLINE.  Is
9    that some other type of restriction on your
10   searches that I'm not aware of?
11       A   No, I'm just saying I used an algorithm to
12   find the papers so there's a certain way they're
13   coded in the database and if it includes all those
14   terms then, or some of those terms, then it will
15   pull it up.  So just looking at it, is breast
16   cancer in here anywhere?
17           MR. INSOGNA:  So, Dawn, if you could turn
18   us to Page 1200, the next page.
19       Q   You see at the top there's a heading that
20   says "Key Words"?  And, Dr. Feigal, if you could
21   just --
22       A   I don't see breast cancer anywhere in
23   there.
24       Q   You see the first keyword is alopecia,
25   correct?

1     A   No, I see that, but I don't see -- I don't
2  see breast cancer.
3     Q   Below that do you see persistent
4  chemotherapy-induced alopecia?
5     A   I see persistent alopecia but I don't see
6  breast cancer.
7     Q   Okay.  If you would look perhaps -- and
8  see the bolded bullets on the right side?
9     A   I see the bolded bullets on the right
10 side.
11    Q   And so the first bullet that is on that
12 right column there says, "Thirty of breast cancer
13 survivors treated with taxane (paclitaxel or
14 docetaxel) will develop persistent alopecia."  Do
15 you see that?
16    A   I see that statement.
17    Q   So this paper would have been responsive
18 to your searches, correct?
19        MR. MICELI:  Objection; form.
20        THE WITNESS:  Not unless -- not unless
21 there's data with attribution of what chemotherapy
22 people were on.  If you would like me to read this
23 paper I would be happy to do it, but I don't know
24 if this is just sort of a review and -- or if they
25 actually have data in here.

1     Q   BY MR. INSOGNA:  Okay.  So that raises an
2  interesting question for me.
3         If there were papers out there that had
4  statements like this without data saying 20% of
5  patients treated with Adriamycin will develop
6  persistent alopecia you would not have found that
7  in your searches, correct?
8         MR. MICELI:  Objection; form.
9         THE WITNESS:  I need attribution of the
10 therapy and the right disease so I can't
11 explicitly -- I'm happy to read this article, I
12 haven't read it, but I'm just telling you the type
13 of evidence I'm gathering is on patients who were
14 treated and if there's just a statement and there's
15 no data I can't use it.
16    Q   BY MR. INSOGNA:  Right.  And that's
17 exactly what I'm trying to confirm.
18        There could be a whole universe of papers
19 that discuss the rates of permanent alopecia with
20 various chemotherapy medications but if they're not
21 correlated to specific patient data you would not
22 have reviewed them for purposes of this report,
23 correct?
24        MR. MICELI:  Object to the form.
25        THE WITNESS:  To back out, I'm doing a

1  general causation where I'm looking at the relative
2  risk so I need to have numbers to do that.
3     Q   BY MR. INSOGNA:  Okay.  And so academic
4  literature divorced from specific patient numbers
5  is not relevant to you at all?
6         MR. MICELI:  Object to the form.
7         THE WITNESS:  In doing a general causation
8  analysis I need to know the regimen and I need to
9  know at least whether it was the Taxotere or
10 non- -- you know, docetaxel or non-docetaxel, and I
11 need to know the disease and I need to have
12 attribution of -- you know, I need to have numbers
13 for general causation.  I'm not saying articles
14 aren't interesting, but I'm saying in the context
15 of trying to do a general causation analysis I need
16 numbers.
17    Q   BY MR. INSOGNA:  And very simply if there
18 are a number of papers out there that don't meet
19 that criteria you would not have considered them
20 for these opinions?
21        MR. MICELI:  Object.
22        THE WITNESS:  If I have --
23    Q   BY MR. INSOGNA:  I'm sorry, Dr. Feigal, I
24 didn't hear your response.
25    A   You know, you are scrolling through pieces

1  of an article.  I haven't read it.  If you actually
2  want me to make an intelligent response I actually
3  need to read the article.  I don't -- I'm answering
4  questions in a vacuum.  I haven't read this
5  article.
6     Q   Okay.  But setting aside this specific
7  article my question is about the kinds of materials
8  that you would have considered, and I believe I am
9  understanding correctly from your testimony that if
10 there are papers discussing the rates of pCIA with
11 various chemotherapies but not containing patient
12 data that's not something that you would have
13 considered.
14        MR. MICELI:  Object to the form.
15        THE WITNESS:  I'm having a hard time
16 understanding how a paper can have rate without
17 data to substantiate what they're saying so I would
18 like to just qualify this with I haven't read this
19 paper.  Perhaps they're referencing papers I have
20 looked at and commented on.  I haven't seen this
21 paper, I haven't seen the references they're
22 referring to.  Maybe I do have all the papers, I
23 don't know.  But I'm just saying I haven't read
24 this and you are asking me questions about a paper
25 I haven't read.

1     Q   BY MR. INSOGNA:  Okay.  Well, let's move
2  to Page 1202, two pages forward.
3          And, Dawn, I don't know, are you able to
4  rotate this?  You are a step ahead of me as always.
5  Thank you.
6          So you see here --
7          MR. MICELI:  Can I ask, Nick, I hate to
8  interrupt you.  Can I get you to Evan email me this
9  article?  Because I can't move through it, I'm
10  lagging behind you and I would like to see it.  If
11  Evan can email it to me that would be helpful.
12          THE WITNESS:  Also email it to me if you
13  want me to be able to evaluate it.
14          MR. INSOGNA:  Okay.  We will provide it to
15  your counsel and you can certainly look at it.
16     Q   Focusing on the table, Dr. Feigal, you see
17  that the first line entry deals with pCIA and
18  cytotoxic chemotherapy.  You see that, right?
19     A   So go to the reference and I can see
20  whether or not it would have referenced -- wait.
21  That just says reported incident, reported cases
22  and incidents of, quote, taxane-based therapy of
23  30%.  Is there a -- is there a reference for where
24  they got that data from?
25     Q   Respectfully, Dr. Feigal, I'm just going

1  to ask my questions and if you are unable to answer
2  them that's fine, but I would just like to ask
3  these questions.
4          So you see that they're reporting 30%
5  incidence of taxane-based chemotherapy and 17.5%
6  incidence of cyclophosphamide-based chemotherapy.
7  Do you see those numbers?
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  I see what is on the page.
10  Once again, I haven't read it and I can't really
11  give you intelligent answers other than to say what
12  you're reading on the page is being correctly read.
13     Q   BY MR. INSOGNA:  That's -- that's fine.  I
14  will accept that.
15          You see the descriptions of the alopecia
16  in the right column?  In addition to diffuse
17  alopecia it describes a pattern similar to andro-
18  genetic alopecia, do you see that, in 46.2% of
19  cases?
20          MR. MICELI:  Object to form.
21          THE WITNESS:  I don't know what non-
22  scarring alopecia and lightening means, do you?
23  I'm sorry, I can't ask you a question.
24          I don't know what that means.
25     Q   BY MR. INSOGNA:  Do you know what a

1  pattern similar to androgenetic alopecia means?
2          MR. MICELI:  Object to the form.
3          THE WITNESS:  Honestly, I -- I see what
4  you are saying.  I don't know where the -- I don't
5  know some of these definitions, what they're
6  talking about, and I don't know the underlying data
7  for why they're making these table summaries.
8  Usually a table provides a reference, a citation
9  from where the data came from.  In most papers I've
10  read that is usually what happens with tables.
11     Q   BY MR. INSOGNA:  Okay.  And I'm not trying
12  to ask you questions that are outside of your
13  purview, I'm simply asking you to compare if you
14  would for me that description of patterns similar
15  to androgenetic alopecia is used to describe both
16  the hair loss in the "Cytotoxic chemotherapy" row
17  and the "Endocrine therapies" row.  Do you agree
18  with --
19          MR. MICELI:  Object to the form of the
20  question.  I'm sorry, you can finish.
21     Q   BY MR. INSOGNA:  Do you agree with me that
22  that's how these authors have described both types
23  of chemotherapy or of hair loss, a pattern similar
24  to androgenetic alopecia?
25     A   Right.

1          MR. MICELI:  Ellen, hold on.
2          I object to the form of the question and
3  particularly the colloquy explaining that this is
4  not outside of her purview.
5          THE WITNESS:  Actually that is exactly
6  what I was going to comment upon.  This is within
7  the purview of my expertise.  I'm just saying it is
8  like looking through a keyhole into a room and you
9  keep on changing pages and highlighting some
10  sentences and not others.  I don't know the
11  context, I need to read the paper.  If you would
12  like me to take some time to read it and then
13  answer your questions I'm happy to do it, but I
14  can't -- other than saying yes, you are reading
15  what's on a page correctly, you have good grammar,
16  you are reading it correctly, but I can't answer
17  anything else because I haven't read this.
18     Q   BY MR. INSOGNA:  Okay.  But in terms of
19  reading correctly you can agree that what I have
20  read to you correctly, I hope, is that these
21  authors have described the pattern of chemotherapy-
22  induced alopecia and endocrine-therapy induced
23  alopecia using the exact same verbiage, can you see
24  that that's on this page?
25          MR. MICELI:  Object to the form.  Object

1  to the form of the question.
2          THE WITNESS:  No, I can't agree.
3      Q   BY MR. INSOGNA:  You can't agree that
4  that's what the authors have put here?
5      A   That isn't the question you asked me.  The
6  first part of the question is have you read it
7  correctly.  I can say yes, you have read it
8  correctly.  Your interpretation of whether or not
9  they're identical definitions I can't agree with.
10     Q   Okay.  I would like to look just at one
11  more part of this on Page 1201.
12         Dr. Feigal, on the right column about
13  midway through the first paragraph there's a
14  sentence that begins "Breast cancer survivors."  Do
15  you see that?
16     A   Oh, in the second column, sorry.  So it is
17  under the column of "induced" -- "induced" --
18  "Endocrine therapy - induced alopecia and
19  hirsutism," so that's too much hair, okay.  Let me
20  see what you are saying here.
21     Q   At the very end of the first paragraph it
22  says, "... less than or equal to 8% of survivors
23  will discontinue therapy because of alopecia
24  related to adjuvant therapy with aromatase
25  inhibitors."  Do you see that language?

1      A   8% of what denominator?  I mean, it is a
2  pretty broad statement.
3      Q   Okay.  And so that's not something that
4  you have ever seen in the literature that breast
5  cancer survivors will discontinue their endocrine
6  therapy because of alopecia?
7          MR. MICELI:  Object to the form.
8          THE WITNESS:  As I have repeatedly said, I
9  haven't read this article.  There are some
10  references so it is possible that I have already
11  read these articles, but you are not allowing me to
12  read the articles so I can't answer your questions.
13     Q   BY MR. INSOGNA:  Okay.  And as we have
14  indicated we will provide this to your counsel so
15  you will have ample opportunity on your own time to
16  review any of the references that you would like.
17     A   That's fine.  Even if you gave me some
18  time --
19         MR. MICELI:  There's no question right
20  now, Ellen.  Ellen, there's not a question on the
21  table.
22         THE WITNESS:  Okay.  That's fine.
23         MR. MICELI:  Thank you.
24         MR. INSOGNA:  Can I ask our reporter or
25  videographer how much record time we have used at

1  this point.  I've lost track here.
2          MR. MICELI:  We have been going about an
3  hour and 20 minutes.
4          THE VIDEOGRAPHER:  Yeah, I have five hours
5  and 32 minutes.  5:32.
6          MR. INSOGNA:  Okay.  Can we take five
7  minutes off the record, Dave?
8          MR. MICELI:  Yeah.  Maybe a little bit
9  more than that because I have to run -- a short
10  break.  I will be back as quick as possible.
11         MR. INSOGNA:  Sure.  Ten minutes?
12         MR. MICELI:  Yep.  That will be good.
13  Thank you.
14         THE VIDEOGRAPHER:  Off video at 3:35 p.m.
15         (Recess taken)
16         THE VIDEOGRAPHER:  Back on video at 3:51
17  p.m.
18  BY MR. INSOGNA:
19     Q   Dr. Feigal, it is not your opinion that
20  there is a ten times higher risk of pCIA with
21  docetaxel, correct?
22     A   I don't give a specific number in my
23  report.
24     Q   Right.  That's not part of the opinions
25  that you are offering in this case?

1      A   I -- I do not give a specific number.
2      Q   And the articles you rely on don't support
3  that number, do they?
4          MR. MICELI:  Object to the form.
5          THE WITNESS:  I believe some of the
6  articles do.
7      Q   BY MR. INSOGNA:  Right.  But taking the
8  articles in their totality, you are not reaching
9  any conclusions that there's a ten times higher
10  risk of pCIA with docetaxel, are you?
11     A   I'm giving a range in my report that I
12  believe ranges from 1.85 to 54.7 and there may be
13  additional ranges in there but I'm not honing in on
14  one specific number, just that there's a
15  substantially increased risk.
16         MR. INSOGNA:  Dawn, let's pull up our No.
17  41, please.
18         (Feigal Exhibit 21, Highlights Of
19  Prescribing Information, Bates Nos. SANDOZ-TAXO-
20  Stewart, Wanda-000060 to SANDOZ-TAXO-Stewart,
21  Wanda-000119, marked for identification, as of this
22  date.)
23     Q   BY MR. INSOGNA:  Dr. Feigal, this is the
24  April 2014 USPI for Sandoz's docetaxel and you have
25  reviewed that?

1          MR. MICELI:  This is 21?

2          MR. INSOGNA:  It will be 21, that's right.

3     Q    Dr. Feigal, you have reviewed that

4   document before; is that right?

5     A    This is Sandoz's?

6     Q    That's correct.

7     A    I -- I believe I may have reviewed it.

8     Q    Okay.  Now your definition of alopecia in

9   your report is partial or complete absence of hair

10  from any area of the body where it normally grows;

11  is that right?

12    A    Just alopecia, the term without any

13  adjectives, that's correct.

14    Q    Correct.

15         And you would agree that that definition

16  does not provide any indication whether alopecia is

17  reversible or permanent, correct?

18    A    Standing alone it has no timing to it or

19  duration.

20    Q    Okay.  And you agree that this April 2014

21  USPI for Sandoz's docetaxel warns that the most

22  common reaction across all indications include

23  alopecia, correct?

24    A    I agree that they include the word

25  alopecia.

1     Q    And do you agree that under "Adverse

2   reactions," you can read along with me, it says,

3   "Most common adverse reactions across all docetaxel

4   indications are," and then towards the end of that

5   list alopecia is listed?

6     A    I see the word alopecia.

7          MR. MICELI:  Where are you reading from,

8   Nick, just so I'm clear?  I apologize.

9          MR. INSOGNA:  Yep.  It is under -- it is

10  the "Adverse Reaction" on the page.

11         MR. MICELI:  Thank you.

12    Q    BY MR. INSOGNA:  Okay.  And do you agree

13  that alopecia there is not limited as to time,

14  correct?

15    A    I agree that the word alopecia is on the

16  paper under "Adverse Reactions."

17    Q    And that it does not say temporary or

18  permanent, correct?

19    A    It says "alopecia."

20         MR. INSOGNA:  Okay.  And, Dawn, if you

21  wouldn't mind turning to the page with Bates label

22  ending with Wanda 116.  Actually let's do 115.

23    Q    So you see, Dr. Feigal, this is the

24  "Patient Information" section of the Sandoz

25  docetaxel USPI?

1     A    I can't see the whole document but I

2   see -- let me see what that -- I just see Exhibit

3   21.  Yes.  I see "Patient Information," yes.

4     Q    Okay.  And you see the paragraph beginning

5   under that that says, "Read this Patient

6   Information before you receive your first

7   treatment."  Do you see that language?

8     A    I -- yes.  It is on the page.  I see it.

9     Q    Okay.  So you would agree that this is

10  information that is targeted toward the patients

11  for their own education, correct?

12         MR. MICELI:  Object to the form.

13         THE WITNESS:  I see that it is titled

14  "Patient Information."

15    Q    BY MR. INSOGNA:  And based on the language

16  before you received your first treatment this is

17  written as if addressed to a patient, correct?

18         MR. MICELI:  Object to the form.

19         THE WITNESS:  Correct.

20    Q    BY MR. INSOGNA:  Okay.  And it is not your

21  opinion that patients have a presumption about

22  whether any side effect from chemotherapy is

23  temporary or permanent, right?

24         MR. MICELI:  Object to the form.

25         THE WITNESS:  No.

1          MR. INSOGNA:  Okay.

2          THE WITNESS:  Wait a minute.  I'm not sure

3   you understood.  I do not agree with your

4   statement.  That was a no.

5     Q    BY MR. INSOGNA:  But you believe that

6   patients have presumptions about which side effects

7   are temporary and which are permanent?

8     A    Yes.

9     Q    And that comes from their experience with

10  chemotherapy?

11         MR. MICELI:  Object to form.

12         THE WITNESS:  It comes from experience

13  that the vast majority of alopecia is transient and

14  temporary.

15    Q    BY MR. INSOGNA:  And you believe that

16  patients know that going into chemotherapy?

17    A    I think it would be in general, I think

18  that would be something that would be known to

19  patients that is temporary and your hair will come

20  back.

21         MR. INSOGNA:  And, Dawn, if you would move

22  forward two pages, please, to 117.

23    Q    Dr. Feigal, you see about two-thirds of

24  the way down it says, "The most common side effects

25  of Docetaxel Injection include"?  Do you see that?

1      A   Yes.

2      Q   Okay.  And listed there is "hair loss,"
3  correct?

4      A   Correct.

5      Q   Okay.  And you see below that it says,
6  "Tell your doctor if you have any side effect that
7  bothers you or does not go away"?

8      A   I see what's written on the page, yeah.

9      Q   Okay.  And so that implies, does it not,
10  that some of these listed side effects may not go
11  away?

12         MR. MICELI:  Object to the form.

13         THE WITNESS:  No, I wouldn't agree with
14  that statement.

15      Q   BY MR. INSOGNA:  So when it says tell your
16  doctor if any side effect doesn't go away, you
17  don't think that that suggests that some side
18  effects may not go away?

19         MR. MICELI:  Object to the form.

20         THE WITNESS:  It is a pretty vague
21  sentence, anything that bothers you or doesn't go
22  away.  No, I think it is pretty vague.

23      Q   BY MR. INSOGNA:  And so that sentence
24  doesn't mean anything to you, it doesn't convey
25  anything to a patient, it is just extraneous

1  verbiage?

2         MR. MICELI:  Object to the form.

3         THE WITNESS:  It doesn't have anything
4  specific about what we're talking about which is
5  alopecia.

6      Q   BY MR. INSOGNA:  And the fact that it
7  follows a list of side effects that includes hair
8  loss it also does not convey anything; is that
9  right?

10         MR. MICELI:  Object to the form.

11         THE WITNESS:  Yes.  It is a very vague
12  sentence.

13      Q   BY MR. INSOGNA:  To your knowledge was
14  there any chemotherapy labeling in 2011 or '14 that
15  had the words permanent or persistent associated
16  with alopecia?

17      A   In foreign labeling.  Yes, in foreign
18  labeling.

19      Q   Thank you.  I didn't hear that.  Okay.

20         In any U.S. labeling are you aware of any
21  chemotherapy product insert that warned of
22  permanent or persistent alopecia?

23         MR. MICELI:  Objection; form.

24         THE WITNESS:  In two thousand -- in what
25  year?

1      Q   BY MR. INSOGNA:  In 2014.  Prior to 2014.

2      A   I don't recall.  You could show me?
3  Certainly it wasn't on any Sandoz label in the
4  United States.

5      Q   And are you aware whether this language in
6  the Sandoz USPI is identical to the language in
7  Sanofi's USPI at the time?

8         MR. MICELI:  Object to form.

9         THE WITNESS:  Is it identical?  The
10  patient -- what are you asking me to compare, if
11  you could put it upside by side.  I do not have
12  total recall of every label I've ever read sentence
13  by sentence.

14      Q   BY MR. INSOGNA:  Are you aware of any
15  difference in the way that Sandoz's labeling warned
16  of alopecia compared against the way of Sanofi's
17  labeling in this April 2014 time period?

18         MR. MICELI:  Object to the form.

19         THE WITNESS:  I'm not aware.

20         MR. INSOGNA:  Dawn, will you pull up our
21  19, please.

22         I'm sorry, Dawn, I may have given you the
23  wrong number.  I'm looking for the chemocare.com
24  Adriamycin handout.

25  ///

1         (Feigal Exhibit 22, Chemocare.com handout
2  for doxorubicin, marked for identification, as of
3  this date.)

4         MR. INSOGNA:  And, Dawn, if could you flip
5  to the second page, please.

6      Q   Dr. Feigal, this is a --

7         MR. MICELI:  The document is not up yet,
8  I'm sorry.

9      Q   BY MR. INSOGNA:  Dr. Feigal, do you see
10  this document?

11      A   Yes, I see the document.

12      Q   Okay.  And this is a printout from
13  chemocare.com related to Adriamycin, do you see
14  that?  On the second page --

15      A   I see the -- I see the website, yeah.

16      Q   Okay.  On the second page towards the
17  bottom here you see it says "Hair loss" and this is
18  under the heading "Side Effects," do you see that?

19      A   Yes, I see it.

20      Q   Okay.  And the last sentence in this
21  discussion of hair loss says, "But your hair will
22  grow back after treatment is completed."  Do you
23  see that?

24      A   I see that.

25      Q   Okay.  You would agree that there are

Page 266

1 reports of permanent hair loss following treatment
2 with Adriamycin, correct?
3          MR. MICELI:  Object to the form.
4          THE WITNESS:  I agree that there are
5 anecdotal cases in the literature.
6     Q    BY MR. INSOGNA:  Okay.  So, I mean, that
7 statement "your hair will grow back" is not true in
8 all cases, correct?
9          MR. MICELI:  Object to the form.
10         THE WITNESS:  All I can say is I can -- I
11 read it and it implies your hair will grow back
12 after treatment is completed.
13         MR. INSOGNA:  Okay.  Dawn, could you pull
14 up the Chemocare for Taxotere, please.  I have it
15 as No. 18 but that could be off.
16         MR. MICELI:  Was that just Exhibit 22?
17         MR. INSOGNA:  I believe that's correct.
18         MR. MICELI:  Thank you.
19         (Feigal Exhibit 23, Chemocare.com handout
20 for Taxotere, marked for identification, as of this
21 date.)
22         THE WITNESS:  Just a heads up, my iPhone's
23 battery is going down.  I might need to plug it in
24 at some point soon.
25    Q    BY MR. INSOGNA:  Okay.  And you see that

Page 267

1 this is the same document but for Taxotere, right,
2 Chemocare information?
3     A    Correct.  I don't know the dates of when
4 these were pulled off.
5          MR. INSOGNA:  Okay.  And if you would go
6 to the second page, Dawn.
7     Q    You see there's a sentence that says, "The
8 following Taxotere side effects are common" sort of
9 the third of the way down the page?
10         MR. MICELI:  Again, the page just
11 disappeared.  Is this second or the third page?
12         MR. INSOGNA:  This is the second page.
13         MR. MICELI:  Okay.
14         THE WITNESS:  I see it.
15    Q    BY MR. INSOGNA:  Okay.  You see one of the
16 side effects it identifies is hair loss, correct?
17    A    I see that.
18    Q    And this document says nothing about your
19 hair will grow back after chemotherapy, right?
20         MR. MICELI:  Object to form.
21         THE WITNESS:  This particular document
22 from this website, yeah.  That's not a label,
23 that's just a website with information.
24    Q    BY MR. INSOGNA:  And so if a patient
25 received the handout you just looked at regarding

Page 268

1 Adriamycin and this handout regarding Taxotere,
2 that difference where Adriamycin says your hair
3 will grow back and Taxotere does not, that suggests
4 to a patient that hair loss with Taxotere may not
5 be temporary, correct?
6          MR. MICELI:  Object to the form.
7          THE WITNESS:  No.
8     Q    BY MR. INSOGNA:  So you don't think a
9 reasonable person reading those two documents would
10 identify that difference?
11         MR. MICELI:  Object to the form.
12         THE WITNESS:  No.  And I also don't
13 know -- I mean, this is a website with information
14 on it.  I don't know what importance to place on
15 it.
16    Q    BY MR. INSOGNA:  Regardless of what
17 importance you place on it, you see no significance
18 in the difference between those two documents?
19         MR. MICELI:  Object to the form.
20         THE WITNESS:  There are differences in the
21 documents.
22    Q    BY MR. INSOGNA:  Dr. Feigal, you agree
23 that you are here today to give unbiased opinions,
24 correct?
25    A    Correct.

Page 269

1     Q    Okay.  And that you are not -- you are not
2 to serve as an advocate for any party; is that
3 right?
4          MR. MICELI:  Object to the form.
5          THE WITNESS:  Correct.  I am an oncologist
6 with scientific training and I am here to present
7 what I reviewed, how I reviewed it, the results and
8 my opinions.
9     Q    BY MR. INSOGNA:  And do you believe that
10 in formulating those opinions you took an unbiased
11 approach to the information that's out there?
12    A    Absolutely.
13    Q    And that all the answers that you have
14 given today have been unbiased and not advocacy?
15    A    Absolutely.  This is the summary of my
16 opinions based on my own judgment of what I have
17 reviewed.
18    Q    And I know that you don't have any
19 information specific to Ms. Stewart or her
20 treatment or her condition.  Are you aware that she
21 is cancer-free today?
22         MR. MICELI:  Object to the form.
23         THE WITNESS:  I have -- I have no
24 information on case-specific issues.
25    Q    BY MR. INSOGNA:  Okay.  And if I represent

Page 270

1  to you that she is cancer-free and it is more than
2  five years after she completed her chemotherapy, do
3  you have any reason to disagree that her docetaxel-
4  including regimen saved her life?
5       MR. MICELI:  Object to the form.
6       THE WITNESS:  I would not use that term.
7    Q   BY MR. INSOGNA:  You would not use the
8  term "saved her life"?
9    A   Correct.
10   Q   And that's because you have no information
11 about the seriousness of her cancer or anything
12 like that, correct?
13      MR. MICELI:  Object to the form.
14      THE WITNESS:  No.
15   Q   BY MR. INSOGNA:  No, because you would
16 disagree that chemotherapy may save patients'
17 lives?
18      MR. MICELI:  Object to the form.
19      THE WITNESS:  I wouldn't characterize this
20 that way.  Would you like me to explain?
21   Q   BY MR. INSOGNA:  Does chemotherapy save
22 some patients' lives?
23      MR. MICELI:  Object to the form.
24      THE WITNESS:  Chemotherapy has a role in
25 the perhaps multi-modality treatments of patients

Page 271

1  with breast cancer.  There's surgery to remove the
2  cancer, there's radiation that may be involved to
3  decrease local recurrence, there's endocrine
4  therapy that may be given to decrease systemic
5  recurrence, and chemotherapy if it is indicated
6  should be a discussion between the patient and the
7  physician about the regimen that are options for
8  that patient.
9    Q   BY MR. INSOGNA:  And where is --
10   A   And I think --
11   Q   Sorry.
12   A   When I think -- I was going to say, when I
13 think of using the term "lifesaving" I'm thinking
14 of acute bacterial infections and somebody needs to
15 have the correct and appropriate antibiotic given
16 to them to save their life, somebody comes in with
17 a lethal cardiac arrhythmia and they need to have
18 immediate cardiac resuscitation to live, so I
19 usually use terms like that for different
20 circumstances.  I wouldn't use it in adjuvant
21 treatment of non-metastatic breast cancer, I would
22 use terms about its effectiveness and its potential
23 risks.
24   Q   Would you agree that in multi-modality
25 therapy where chemotherapy is indicated adjuvantly,

Page 272

1  neoadjuvantly, whatever, that without any one of
2  those modalities it is possible the patient could
3  die?
4       MR. MICELI:  Object to form.
5       THE WITNESS:  I can't answer that.  The
6  question is not answerable as you phrased it.
7  There are multiple aspects in a regimen for a
8  patient with early non-metastatic breast cancer and
9  chemotherapy can play a role and it can be helpful
10 and an effective regimen.  I wouldn't term it as
11 lifesaving.
12      MR. INSOGNA:  Can we go off the record for
13 five minutes?
14      MR. MICELI:  Sure.  Yeah.
15      THE VIDEOGRAPHER:  Off video at 4:13 p.m.
16      (Recess taken)
17      THE VIDEOGRAPHER:  Back on video at 4:28
18 p.m.
19      MR. INSOGNA:  Okay, Dr. Feigal, I just
20 have one more thing to do.
21      I would like to mark as our next exhibit
22 your notice of deposition for today's deposition.
23      (Feigal Exhibit 24, Notice of Videotaped
24 Deposition of Ellen G. Feigal, M.D., marked for
25 identification, as of this date.)

Page 273

1       MR. INSOGNA:  Dawn can pull that up for
2  us.
3    Q   Have you seen this document before?
4    A   Yes.
5    Q   Okay.  And you are familiar with the fact
6  that there are some document requests on the
7  Exhibit A that's attached?
8    A   Yes.
9    Q   Did you read through those requests when
10 you saw this document?
11   A   Yes.
12   Q   Okay.  Are you aware of documents
13 responsive to this Exhibit A that have not been
14 provided to your counsel to come to us?
15   A   I'm aware that, yes, not all the requests
16 were agreed to.
17   Q   That's right.  You objected to some,
18 right?
19   A   There are several that the -- Mr. Miceli
20 or somebody responded to about them.
21      MR. MICELI:  Just so we're clear on the
22 record, Nick, I would say that we provided all
23 responsive material as expressed in our objections
24 and responses and specifically held out anything
25 related to Science Day for the reasons stated

Page 274

1  previously in this deposition and we will be happy
2  to discuss that with you at any time.
3          MR. INSOGNA:  Okay.
4      Q   And, Dr. Feigal, the one thing I want to
5  focus on is No. 7 which asks for your complete and
6  entire file.
7          Other than documents related to Science
8  Day, do you believe that you've produced the
9  complete file of materials that you have reviewed
10  to prepare for your report and deposition today?
11     A   Yes.
12         MR. INSOGNA:  Okay.  With that, Dave, I'm
13  going to pass the rest of the time to Accord's
14  counsel but I mentioned to you earlier, if there's
15  remaining time and I have followup questions I will
16  reserve the right to ask those.
17         MR. MICELI:  Okay.  Are you going to
18  attach our objections to them, to the depo as well?
19  I haven't uploaded them to the system but I can
20  try.
21         MR. INSOGNA:  I have not either.  I wasn't
22  planning to attach them.
23         MR. MICELI:  Okay.  That's fine.  If -- I
24  will try to do it maybe while we're going forward.
25         THE WITNESS:  Thank you.

Page 275

1          MR. INSOGNA:  Thanks.
2          MR. MICELI:  Nick, so you have had a total
3  of 24 exhibits, correct?
4          MR. INSOGNA:  I believe that's right.
5          MR. MICELI:  Okay.  Thanks.  I thought it
6  was, I just wanted to make sure.  Thank you.  Sorry
7  about that.
8          MS. BENEDICT:  Are we ready to continue?
9  I am.
10         MR. MICELI:  Ready to proceed.
11
12  EXAMINATION
13  BY MS. BENEDICT:
14     Q   Good afternoon, Dr. Feigal.  My name is
15  Mollie Benedict and I'm counsel for Accord
16  Healthcare.  I will try not to repeat any questions
17  that have been asked earlier.  I may need to orient
18  you a bit to get back into a few areas, I may jump
19  around a little bit, but I will try not to recover
20  anything.
21         If you don't understand any of my
22  questions or I've jumped too much and you are not
23  sure what I'm talking about please just ask me,
24  okay?
25     A   Yes.

Page 276

1      Q   Thank you.
2          Dr. Feigal, do you know when Accord's
3  docetaxel was first available in the U.S.?
4      A   I believe it was 2011.
5      Q   I will represent to you that it was June
6  of 2011.
7          Have you ever prescribed Accord's
8  docetaxel to a patient?
9      A   Not that I'm aware of.
10     Q   And you haven't prescribed docetaxel at
11  all since 2011, correct?
12     A   Actually I think I gave the date of 2004
13  rather than 2011.  But no, I don't recall
14  prescribing Sandoz's docetaxel.
15     Q   I'm not asking about Sandoz's docetaxel.
16  Accord's docetaxel.
17     A   Accord's docetaxel, yeah.
18     Q   It was on the market in June of 2011 and
19  you haven't prescribe docetaxel since 2004 so you
20  have not prescribed Accord's docetaxel; is that
21  correct?
22     A   Yes.
23     Q   Thank you.
24         I would like to mark as an exhibit
25  Accord's notice for your deposition.  Let me pull

Page 277

1  that up.
2          (Feigal Exhibit 25, Defendant Accord
3  Healthcare, Inc.'s Cross Notice of Videotaped
4  Deposition of Ellen G. Feigal, M.D., marked for
5  identification, as of this date.)
6          MS. BENEDICT:  And I will start with the
7  witness while Madeline can pull that up for me.
8      Q   Dr. Feigal, have you reviewed Accord's
9  cross notice for your deposition today for the case
10  of Alice Hughes?
11     A   Yes.
12     Q   And did you bring any responsive documents
13  to the notice?
14     A   I believe Mr. Miceli responded with
15  responsive documents.
16     Q   If you go to Exhibit A to the notice and I
17  think we can flip to that, it specifically asks for
18  any materials you reviewed that pertain to Accord
19  in the course of developing your opinions.  Do you
20  have any documents responsive to that part of the
21  request?
22     A   Accord's documents, no.
23     Q   And what did you --
24     A   Other than -- other than the summary basis
25  of approval on Accord's product and some of the

Page 278

1  labels.
2      Q   And are those the documents you got from
3  the FDA website?
4      A   I believe the summary basis of approvals
5  and the labels from Accord were from the FDA
6  website.  I'm just checking my report to see if I
7  saw any foreign labels from Accord.  I don't think
8  I have those in my possession.  I'm just checking
9  to see.
10         So I cite the Accord company core data
11 sheet from Dr. Ross' expert report.
12     Q   And is that important to your opinions in
13 this case?
14     A   Not at all.
15     Q   Have you reviewed any documents specific
16 to the plaintiff in this case, Alice Hughes?
17     A   I have not reviewed any case-specific
18 documents.
19     Q   And by case specific, that might not be a
20 word that the jury understands.
21         You mean you haven't reviewed anything
22 specific to the plaintiff Alice Hughes, correct?
23     A   Correct.
24     Q   On Page 1 of your report you state, "I am
25 not offering regulatory opinions about FDA

Page 279

1  requirements."  Is that an accurate statement from
2  your report?
3      A   Well, in my report I talk about FDA
4  expectations and requirements for an NDA holder,
5  that is in my report.
6      Q   Can we pull up your report and mark that
7  as an exhibit, please.
8          (Feigal Exhibit 26, Expert Report of
9  Ellen G. Feigal, M.D., marked for identification,
10 as of this date.)
11         THE WITNESS:  To clarify, though, I don't
12 think that was your question.  Were you asking --
13 maybe can you re-ask your question.
14     Q   BY MS. BENEDICT:  Yeah.  My question is
15 you state on Page 1 of your report, and I'm happy
16 to put it in front of you --
17     A   I have it in front of me.
18     Q   Okay.  It states, "I am not offering
19 regulatory opinions about FDA requirements."  And
20 I'm asking if that's an accurate statement.
21     A   I'm just looking at my report.  I don't
22 think I have any FDA opinions in that report.  I
23 acknowledge FDA's requirements for NDA holders but
24 that's not an opinion, that's a fact.
25     Q   I think I understand.

Page 280

1          So while in your report you talk about
2  some FDA requirements you are not offering opinions
3  on that topic, correct?
4      A   Yeah.  None of my opinions are FDA
5  opinions, that's correct.
6      Q   So the discussion on Page 15 of your
7  report that discusses approval pathways, the
8  505(b)(2) pathway --
9      A   Yes.
10     Q   -- is that pertinent to any of your
11 opinions in this case?
12     A   Only that an NDA holder is responsible for
13 their own label and responsible for post-marketing
14 surveillance and reporting.
15     Q   You are not going to offer any opinions
16 about whether Accord met its regulatory
17 requirements, are you?
18     A   No.
19     Q   You never worked for the FDA, correct?
20     A   I have never worked within the FDA.  I
21 have worked in a non-regulated product.
22     Q   And you worked I saw on your C.V. for two
23 pharmaceutical companies, I think Insys from
24 2007-2008 and Amgen from 2008 to 2011; is that
25 correct?

Page 281

1      A   That is correct.
2      Q   Did I miss -- are there any other
3  pharmaceutical companies that you worked for?
4      A   Well, since -- I consult extensively with
5  hundreds of different pharmaceutical companies.
6      Q   Okay.  I understand and I will ask about
7  the consulting in a second but I mean just as an
8  employee --
9      A   I'm not an employee, no, no.
10         MR. MICELI:  Let her get her question out,
11 please.
12         THE WITNESS:  Sorry.
13     Q   BY MS. BENEDICT:  You have been employed
14 by two pharmaceutical companies and they're the
15 ones that I just stated, Insys in 2007-2008 and
16 Amgen 2008 to 2011, correct?
17     A   Correct.
18     Q   And at those companies were you
19 responsible for regulatory matters?
20     A   That's a broad question.  Everything we do
21 is related to regulatory in the company.  Can you
22 be a little more specific?
23     Q   Sure.
24         Did you have any interactions with the FDA
25 on behalf of your employers Insys or Amgen during

Page 282

1   your times there?
2       A   I participated in FDA interactions and
3   preparation of documents.
4       Q   And did you have responsibilities for
5   making sure that the companies met their regulatory
6   requirements?
7       A   No, I was not the point person for
8   regulatory compliance.
9       Q   But within the pharmaceutical company
10  almost everything is regulated, is that fair to
11  say?
12      A   Correct.
13      Q   So you pretty much can't work at a
14  pharmaceutical company and not be under some
15  regulation by the FDA, correct?
16          MR. MICELI:  Object to the form.
17          THE WITNESS:  It is -- that isn't what I
18  intended to communicate, your last statement.
19          What is regulated by the FDA are specifics
20  regarding the IND, the NDA, BLA, those types of
21  things.  Not everything that a company does is
22  regulated --
23      Q   BY MS. BENEDICT:  And what are the --
24      A   -- by the FDA.
25      Q   And what were your primary

Page 283

1   responsibilities during your time at Insys?
2       A   I was Chief Medical Officer.
3       Q   And how about at Amgen?  What were your
4   primary responsibilities during your time there?
5       A   I was Executive Medical Director
6   responsible for the development of our products.
7   My C.V. goes over some of the details of the
8   products.
9       Q   Were any of the products that you worked
10  in -- worked on while at Insys or Amgen 505(b)(2)
11  products?
12      A   Yes.
13      Q   And which ones were those?
14      A   A drug for pain control.
15      Q   What was the product?
16      A   Anthenol.
17      Q   And was it a therapeutic equivalent
18  505(b)(2)?
19      A   It was a different formulation in
20  combination with a device and clinical studies were
21  required.
22      Q   And you understand that the docetaxel
23  formulation that Accord has on the market is a
24  therapeutic equivalent of the brand name Taxotere,
25  correct?

Page 284

1           MR. MICELI:  Objection to the form.
2           THE WITNESS:  I believe that's correct.
3       Q   BY MS. BENEDICT:  And in your consulting
4   work for companies, the work that you do today,
5   have you worked on consulting with any companies
6   for 505(b)(2) products on their regulatory
7   approvals?
8       A   Yes.
9       Q   And what products are those?
10      A   Well, I can't talk about products that are
11  in development so it is confidential, but I've
12  worked on -- well, let me leave it at that and see
13  what other questions that you have.
14      Q   Have you also consulted with companies on
15  their pharmacovigilance requirements 505(b)(2)
16  products?
17      A   Only to the extent that they're
18  responsible for post-marketing surveillance and
19  reporting to the FDA.
20      Q   In this litigation the plaintiffs have a
21  different expert, not you, to talk about whether or
22  not Accord met its regulatory requirements of the
23  FDA, correct?
24      A   That is my understanding.
25      Q   And would you say that you are not the

Page 285

1   best person in this case to talk about whether or
2   not Accord met its regulatory requirements?
3       A   I would simply say it is not the scope of
4   what I was asked to do.
5       Q   So you have not looked at any of the data
6   or information about Accord's submission to the
7   FDA, correct?
8       A   Well, that's not the reason why, it is
9   just not within the scope of what I'm doing, so it
10  is sort of stated backwards.  I didn't look because
11  it wasn't helpful to what I was working on.
12      Q   In order to offer regulatory opinions you
13  would need to see Accord's submission to the FDA,
14  correct?
15          MR. MICELI:  Object to the form.
16          THE WITNESS:  To opine on whether or not
17  they met their regulatory obligations, yes, I think
18  it would be important to look at the regulatory
19  interactions of documents.
20      Q   BY MS. BENEDICT:  And the same with
21  opining whether or not they met their
22  pharmacovigilance requirements, you would see need
23  to see Accord's pharmacovigilance documents,
24  correct?
25          MR. MICELI:  Object to the form.

1      THE WITNESS:  Yes.  I'm not opining on
2  whether they met their requirements, I just
3  included in my report what the responsibilities are
4  and the regulations that apply to them.
5      Q   BY MS. BENEDICT:  Stated another way, you
6  are not going to opine that Accord didn't meet its
7  regulatory requirements, correct?
8      A   Only to the extent about the risk of
9  permanent or persistent alopecia and I cite Dr.
10  Ross' report regarding when information might have
11  been available regarding risk.
12      Q   What regulatory requirement did Accord
13  fail to meet regarding persistent alopecia?
14      MR. MICELI:  Object to form.
15      THE WITNESS:  I think as I previously
16  stated, I'm not offering the FDA regulatory
17  opinion, that's somebody else.
18      Q   BY MS. BENEDICT:  Okay.  It sounded a
19  little like you were saying you were going offer
20  some opinions around permanent alopecia and the
21  course of requirements with respect to the FDA but
22  I misunderstood that?
23      A   I was just acknowledging in my expert
24  report that I make reference to it.
25      Q   And that's when you refer to Dr. Ross'

1  opinions, correct?
2      A   Correct.
3      Q   In fact, to your knowledge Accord's
4  docetaxel was approved by the FDA, right?
5      A   Yes.  Docetaxel was approved by the FDA.
6      Q   And Accord's docetaxel's labeling was
7  approved by the FDA, correct?
8      MR. MICELI:  Object to form.
9      THE WITNESS:  The labeling is part of the
10  approval, yes.
11      Q   BY MS. BENEDICT:  And you know that Accord
12  as the maker of a therapeutic equivalent of
13  docetaxel did not have sales reps contacting
14  doctors or engaging in any other marketing efforts
15  directed to doctors, correct?
16      MR. MICELI:  Object to the form.
17      THE WITNESS:  I don't have any knowledge
18  of what Accord did regarding promotion or sales.
19      Q   BY MS. BENEDICT:  You would agree that the
20  primary way a pharmaceutical company communicates
21  with doctors is through its labeling, correct?
22      MR. MICELI:  Object to the form.
23      THE WITNESS:  It is one of the ways that
24  they can communicate with physicians.
25      Q   BY MS. BENEDICT:  And my question is, is

1  it the primary way that pharmaceutical companies
2  communicate with doctors about their products.
3      A   I think there are many ways allowable for
4  companies to communicate with physicians.  I don't
5  know the details of how Accord pursued it, but
6  there are multiple ways in addition to the label.
7      Q   What are the other ways?
8      A   Via letter to the healthcare physicians
9  that could be provided, there are promotional and
10  sales information that can be provided to educate,
11  there are meetings, there are presentations.  There
12  are a variety of ways in which information can be
13  communicated from a company.
14      Q   You are not going to tell the jury that a
15  505(b)(2) equivalent manufacturer controls its own
16  able, are you?
17      MR. MICELI:  Object to the form.
18      THE WITNESS:  In my expert report it is
19  accurate and a fact that 505(b)(2)s are in -- are
20  responsible for their own label.  Are you -- I'm
21  not sure what you are asking.
22      Q   BY MS. BENEDICT:  The 505(b)(2)s that
23  provide therapeutic equivalent products have to
24  submit their labeling to the FDA and are only
25  permitted to use labeling that's approved by the

1  FDA; is that correct?
2      MR. MICELI:  Object to the form.
3      THE WITNESS:  No.
4      Q   BY MS. BENEDICT:  And how is that
5  incorrect?
6      A   Well, an NDA holder has responsibilities
7  if there is a safe -- there are several ways that
8  they can change the label.  Sometimes they can
9  change it, change it being effective, I think I
10  described that in my expert report, if it is a
11  safety issue.  So there are -- but I think I'm
12  getting out of my lane here.  I think that I'm not
13  providing specifics about what -- about the
14  interactions with FDA.
15      Q   So you are not going to give an opinion
16  that Accord failed to properly incorporate a risk
17  into its label, correct?
18      A   I am not going to provide an FDA
19  regulatory opinion on that comment.
20      Q   Are you going to provide opinions that
21  Accord's labeling was inadequate?
22      A   The opinion that I give is already
23  captured in my expert report so in terms of when
24  risk was know, I'm not going to opine on when they
25  should have changed their label.

Page 290

1    Q    When did you first hear of the company
2  Accord Healthcare?
3    A    Oh, I've heard of the company.
4    Q    Do you know how long they have been in
5  business?
6    A    I don't.
7    Q    Do you know what their focus is?
8        MR. MICELI:  Objection; form.
9        THE WITNESS:  I don't have a lot of
10 details about the company other than I believe
11 generic drugs is one of those areas they pursue.
12   Q    BY MS. BENEDICT:  Are you aware that
13 Accord produced thousands of documents in this
14 litigation?
15   A    I would not be privy as to the amount of
16 material Accord produced for the lawyers.
17   Q    You haven't reviewed any of those
18 documents, correct?
19   A    I discussed whether or not to review with
20 Mr. Miceli given the amount of --
21       MR. MICELI:  Don't discuss our
22 discussions, please.
23       THE WITNESS:  Oh, I'm sorry.
24   Q    BY MS. BENEDICT:  I'm not trying to ask
25 about your conversations with counsel, I just want

Page 291

1  to know what you have reviewed.  Not what you
2  discussed with counsel.
3    A    Okay.  Given that the documents I reviewed
4  on the other company were not informative to the
5  primary issue of general causation, I did not feel
6  a need to review the Accord document.
7    Q    You didn't review any of Accord's internal
8  analysis, correct?
9    A    No.
10   Q    You didn't review the depositions of any
11 of Accord's employees, correct?
12   A    That is correct.  I was focused on
13 causation.
14   Q    And you are not going to offer any
15 opinions about when Accord knew that PCI should be
16 in their label, are you?
17   A    Once again, I just want to refer to my
18 expert report in citing Dr. Ross' timetable of
19 issues.
20   Q    And what are you going to tell the jury?
21 I mean, if you want to tell me from your report
22 that's fine, but what are you going to tell the
23 jury on -- on that question?
24       MR. MICELI:  Object to the form.
25       THE WITNESS:  I will just read you what's

Page 292

1  in my report.  It is No. 6 on Page 76.  It just
2  says, "... And Accord's company core data sheet
3  that predates the introduction of its docetaxel
4  products in the U.S., and afterwards, including
5  labeling in Europe."  So that's just the preamble
6  to the seventh -- to the sixth, is just the risk is
7  further evidenced by.  I think that's the only
8  reference I have to Accord.
9    Q    BY MS. BENEDICT:  And do you know the date
10 of that company core data sheet?
11   A    Not from recall, I do not.
12   Q    Do you have any reason to dispute that
13 Accord cares about patients' health and safety?
14       MR. MICELI:  Object to the form.
15       THE WITNESS:  Could you repeat your
16 question, please?  I'm not sure I heard it
17 correctly.
18   Q    BY MS. BENEDICT:  Yes.  Do you have any
19 reason to dispute that Accord cares about patients'
20 health and safety?
21       MR. MICELI:  Object to the form.
22       THE WITNESS:  I really don't have any
23 information relevant to that.  And -- yeah.  I will
24 leave it at that.
25   Q    BY MS. BENEDICT:  Do you agree that the

Page 293

1  505(b)(2) regulatory pathway is intended to
2  encourage innovation in drug development without
3  requiring duplication of previously-conducted
4  studies?
5        MR. MICELI:  Object to the form.
6        THE WITNESS:  I believe that is an
7  objective of that pathway.
8    Q    BY MS. BENEDICT:  And, in fact, that's
9  language that you quote in your report, correct?
10   A    Correct.
11   Q    Do you agree that the purpose is to expand
12 access by making drugs that have already been
13 approved more affordable for patients?
14   A    Given the cost of drugs I'm not sure I can
15 say that.
16       I think that generic drugs from the
17 Hatch-Waxman Act were -- that pathway was
18 considered important to try and reduce the price,
19 increase competition.  I don't know if the same
20 comment can be made for the 505(b)(2).
21   Q    Do you distinguish a therapeutic
22 equivalent 505(b)(2) from a generic?
23   A    Yes.
24       MR. MICELI:  Object to the form.
25   Q    BY MS. BENEDICT:  When a doctor prescribes

Page 294

1 docetaxel and a different therapeutic equivalent is
2 given, something other than the brand name, is the
3 doctor made aware of that change?
4       MR. MICELI:  Object to the form.
5       THE WITNESS:  It is whatever is in the
6 formulary for that agent, what the patient gets
7 provided.  If they just write docetaxel they will
8 get what is on the formulary.
9       Q   BY MS. BENEDICT:  Right.  And because the
10 docetaxel that we're talking about in this case,
11 Accord's docetaxel, is a therapeutic equivalent it
12 can be substituted anytime the doctor writes
13 docetaxel, correct?
14       MR. MICELI:  Object to the form.
15       THE WITNESS:  As I said, it depends on the
16 institution and what they have on their formulary
17 and their policies for that.  I'm really not --
18 can't opine further on it.
19       Q   BY MS. BENEDICT:  Okay.  Are you aware
20 that a 505(b)(2) manufacturer may rely on FDA
21 findings of safety and efficacy related to a
22 previously approved drug with the same
23 concentration of the active ingredients?
24       MR. MICELI:  Object to the form.
25       THE WITNESS:  Please re-ask your question.

Page 295

1 I'm not sure I heard all of that opinion.  I want
2 to make sure I respond to what you actually asked.
3       Q   BY MS. BENEDICT:  Are you aware that a
4 505(b)(2) manufacturer may rely on FDA findings of
5 safety and efficacy related to a previously
6 approved drug with the same concentration of active
7 ingredients?
8       MR. MICELI:  Objection.
9       THE WITNESS:  Yes.  Yes.
10      Q   BY MS. BENEDICT:  In fact, that's in the
11 FDA guidance for industry that you cite in your
12 report, correct?
13      A   Correct.
14      Q   You have no reason to dispute that the FDA
15 had all of Sanofi's, the brand name, clinical trial
16 information, post-marketing advertising and studies
17 when it approved Accord's docetaxel in June of
18 2011, correct?
19      MR. MICELI:  Object to the form.
20      THE WITNESS:  Yeah, I'm not here to
21 comment on what the FDA knew and when they knew it.
22      Q   BY MS. BENEDICT:  Right.
23      And so my question is do you have any
24 reason to dispute that the FDA had all of Sanofi's
25 information about their clinical trials when they

Page 296

1 approved Accord's therapeutic equivalent of
2 docetaxel.
3       MR. MICELI:  Same objection.
4       THE WITNESS:  As I said, I'm not here to
5 opine on what the FDA had and when they had it.
6       Q   BY MS. BENEDICT:  Does that mean you don't
7 know?
8       A   It is just not part of the scope of what I
9 am -- was asked to comment on.
10      Q   You have no reason to dispute it?
11      MR. MICELI:  Object to the form.
12      THE WITNESS:  I have no opinion on it
13 so -- one way or the other.
14      MS. BENEDICT:  Okay.
15      Q   On your report, Page 71, you say that --
16 if you want to look at it but I will read you the
17 sentence I'm asking about -- during the time these
18 studies were being published, the EMA had ongoing
19 iterative discussions with the company regarding
20 permanent chemotherapy-induced alopecia.  Do you
21 see that statement in your report?
22      A   Yes, I do.
23      Q   And my question is when you say the
24 company, you are talking about Sanofi, correct?
25      A   That is correct.

Page 297

1       Q   And regarding the Sanofi clinical trials
2 data, you agree that Accord didn't have access to
3 that data, correct?
4       MR. MICELI:  Object to the form.
5       THE WITNESS:  I have no knowledge of what
6 Accord had in terms of access to confidential
7 information.  They did have access to labels that
8 were outside the United States.
9       Q   BY MS. BENEDICT:  With any of your work on
10 505(b)(2) products have you received internal
11 company data on clinical trials from the brand name
12 drugs that the 505(b)(2) was based on?
13      MR. MICELI:  Object to the form.
14      THE WITNESS:  Have I received them?  I'm a
15 consultant so, no, I haven't received it.
16      Q   BY MS. BENEDICT:  Is that something that
17 companies normally share, that brand name companies
18 normally share with their competing generics coming
19 on the market?
20      MR. MICELI:  Object to the form.
21      THE WITNESS:  I don't really have a
22 comment on what companies share with each other.
23 That's not really the scope of what I'm here to
24 talk about.
25      Q   BY MS. BENEDICT:  Was that information

1  shared to your knowledge while you were working for
2  the two pharmaceuticals companies that you worked
3  for?
4      A   I -- I'm not sure I know everything that
5  the company had access to so I'm not -- I'm not
6  aware of that.
7      Q   That's not something that companies
8  normally share, correct?
9          MR. MICELI:  Object to the form.
10         THE WITNESS:  Yeah, I -- I really can't
11 comment on what specific companies may or may not
12 share.  That would be not something I deal with.
13     Q   BY MS. BENEDICT:  Are internal documents
14 on clinical trials and the data from those clinical
15 trials considered highly proprietary and
16 confidential inside a pharmaceutical company?
17         MR. MICELI:  Object to the form.
18         THE WITNESS:  Well, there's raw data,
19 there's patient identifiers, yeah, that should be
20 considered confidential information and presumably
21 proprietary.
22     Q   BY MS. BENEDICT:  All right.  Anything
23 beyond patient data, the company's analysis of
24 their clinical trials, the internal analysis is
25 something they do not share outside of the company,

1  correct?
2          MR. MICELI:  Object to the form.
3          THE WITNESS:  Yeah, you keep on asking me
4  questions about what companies do.  I'm really
5  Not -- not here to talk about that.
6      Q   BY MS. BENEDICT:  When you worked at a
7  pharmaceutical company did you have to sign
8  anything saying that you wouldn't share information
9  about the clinical trials that you were assisting
10 with?
11     A   I'm sure I signed some document,
12 confidential documents about confidentiality.  I
13 don't -- honestly I don't recall.  I'm sure every
14 company has those types of documents.
15     Q   And did you share outside the company any
16 of the information about the clinical trials that
17 you were working on when you were working at the
18 pharmaceutical companies?
19     A   No.
20         MR. MICELI:  Objection; form.
21     Q   BY MS. BENEDICT:  Similar questioning
22 about the pharmacovigilance data from Sanofi.  Do
23 you expect that Accord would have had Sanofi's
24 pharmacovigilance data?
25     A   As I said, I don't have any comments about

1  what the companies may or may not share, it is not
2  part of the scope of what I was working on, working
3  on general causation.
4      Q   But you consult with companies and you
5  worked for two pharmaceutical companies, correct?
6      A   Correct.
7      Q   And in your experience is it normal that
8  companies share their pharmacovigilance data with
9  each other?
10     A   For purposes of the trial, though, I am
11 not -- I am not prepared to discuss what companies
12 do or don't share.  Really not the scope of what
13 I'm here to talk about.
14     Q   Do you think that today the risk of pCIA
15 with docetaxel is a well-known risk?
16         MR. MICELI:  Object to the form.
17         MS. BENEDICT:  What's the objection to
18 that, form?  Maybe I could fix it.
19         MR. MICELI:  Read back the question and I
20 will give you the specific.
21         (Record read)
22         MR. MICELI:  Well known to whom?
23         MS. BENEDICT:  Good point.
24     Q   Do you think that the risk of pCIA with
25 docetaxel is well known to physicians?

1      A   Yeah, I -- I can't really comment how well
2  known it is.  I mean, I don't -- I don't have data
3  to comment on that.
4      Q   In your report on Page 76 you state that
5  "... docetaxel use can cause permanent
6  chemotherapy-induced alopecia.  Any 505(b)(2)
7  manufacturer of docetaxel that conducted the same
8  or similar analysis, would have reached the same
9  conclusion."
10         First is that an accurate -- did I
11 accurately read that in your report?
12     A   Yeah.  Just tell me which number you are
13 on.  Oh, No. 5.
14     Q   The last two sentences of No. 5.
15     A   I think the paragraph as written is
16 correct.
17     Q   And my question is what's your basis for
18 stating that a 505(b)(2) manufacturer would have
19 reached the same conclusion that you did.
20     A   Well, that applies to the -- the
21 regulatory requirement and some basis of evidence
22 for a causal relationship or reasonable evidence of
23 causal association.  It is an opinion --
24     Q   I understand that's your opinion and my
25 question is why -- what is the basis for the part

1  that you think a 502(b)(2) manufacturer would agree
2  with that.
3        A   Well, I think there's availability of a
4  lot of information regarding the occurrence of pCIA
5  in docetaxel-containing regimens, there's access to
6  publicly-available databases on docetaxel, and as
7  you said, if the company is doing their own
8  pharmacovigilance on docetaxel and scouring the
9  literature they have the ability to do this.
10       Q   And what was the known to Accord in
11 November in 2011?
12       MR. MICELI:  Object to the form.
13       THE WITNESS:  So -- so let me repeat.
14       I'm not here to talk about what Accord
15 knew and when they knew it and what -- whether or
16 not they complied with FDA regulations regarding
17 pharmacovigilance.  That's not something I'm here
18 to opine on.
19       Q   BY MS. BENEDICT:  Do you think that there
20 was enough data available publicly in November of
21 2011 for a company like Accord to come to this
22 conclusion that docetaxel use can cause permanent
23 chemotherapy-induced alopecia?
24       MR. MICELI:  Object to the form.
25       MS. BENEDICT:  I'm sorry, I cannot hear, I

1  don't know what happened.  Is it just me?
2        MR. MICELI:  I'm not hearing her.  I can
3  hear you, Mollie, I can't hear Ellen.
4        Q   Dr. Feigal, you can't hear anything?
5        MR. MICELI:  Do you want to take five
6  minutes and see what I can do?
7        MS. BENEDICT:  Yeah, take five.
8        MR. MICELI:  She is gesticulating.
9        THE VIDEOGRAPHER:  Off video at 5:15 p.m.
10       (Recess taken)
11       THE VIDEOGRAPHER:  Back on video at 5:28
12 p.m.
13       MR. MICELI:  How much time is remaining,
14 Mr. Court Reporter, or Mr. Videographer?
15       THE VIDEOGRAPHER:  Well, we have six hours
16 and 45 minutes on the record, so 6:45.
17       MR. MICELI:  All right.  We have plenty of
18 time.
19       Q   BY MS. BENEDICT:  All right.  Dr. Feigal,
20 what information do you think was publicly
21 available as of June 2011 that would allow a
22 502(b)(2) docetaxel manufacturer to come to the
23 conclusion that docetaxel cause permanent
24 chemotherapy-induced alopecia?
25       A   I am not here to comment on what Accord

1  could do.  That's really outside the scope of what
2  I have been asked to do.  I was asked to look at
3  the evidence supporting general causation.  That's
4  what my report is about.
5        Q   Yeah, and I'm trying to ask questions
6  around this conclusion in your report where you say
7  that docetaxel can cause pCIA and any 502(b)(2)
8  manufacturer conducted the same or similar analysis
9  would have reached the same conclusion.
10       I understand that that is your opinion as
11 of today and I'm wondering if that would have been
12 your opinion as of June of 2011.
13       A   Well, all I can say is you look at what is
14 available.  I can't go back in time on general
15 causation.  So I can look at data up to the present
16 so I can't really comment on -- it is certainly not
17 my place to comment on what Accord could have or
18 should have done.  I'm just saying based on the
19 analysis that I have done other individuals who
20 have looked at it, my opinion, might come to the
21 same conclusion, but I'm not here to comment on
22 what Accord should have or could have done.
23       Q   Well, you do say that a 502(b)(2)
24 manufacturer that conducted the same analysis would
25 have come to the same conclusion, right?

1        A   Right.  And I am talking about the data
2  that is available but I'm doing general causation
3  so I can -- I can look at data up to the present
4  time.  I can look at whatever existed at X point in
5  time, you know.  I can't comment on what Accord
6  could have or should have done.
7        Q   All right.  Is it fair to say that that
8  opinion is as of today, that as of today any
9  505(b)(2) manufacturer with the same analysis would
10 come to the same conclusion you believe?
11       MR. MICELI:  Object to the form.  I think
12 you meant the date of her report but it is six of
13 one, half a dozen of another.
14       THE WITNESS:  No.  I mean, the data --
15 yeah.  The data in my report is basically I have --
16 I have access to look at information for general
17 utilization and to talk about docetaxel.  There's
18 data that is available from different sources that
19 are available to an NDA holder in terms of looking
20 at pharmaco- vigilance.  I'm not here to say how,
21 you know, Accord could have or should have done it,
22 I'm just talking about the different sources of
23 data that are available and what could be done.
24       MS. BENEDICT:  Okay.
25       THE WITNESS:  I can't comment further.  I

Page 306

1  can't comment further than that.
2      Q   BY MS. BENEDICT:  Let's talk about as of
3  November 2011 so I have some questions to you.  Now
4  I'm going to talk about November 2011.
5      A   Uh-huh.
6      Q   As of November 2011 what information would
7  a 502(b)(2) manufacturer of docetaxel have
8  available in order to come to the conclusion or not
9  that docetaxel could cause pCIA?
10         MR. MICELI:  Object to the form.
11         THE WITNESS:  My comment is based on the
12  different layers of evidence that I looked at and
13  I'm not here to tell Accord what they could have
14  done at a certain point in time, I'm just saying
15  that there is data available on general causation
16  of docetaxel.
17     Q   BY MS. BENEDICT:  Right.  And I'm asking
18  you what is that data that you think was available
19  as of November 2011 to Accord.
20         MR. MICELI:  Objection.  Excuse me.
21  Object to the form.
22         MS. BENEDICT:  What's the objection?
23         MR. MICELI:  The objection is it has been
24  asked and answered.  I'm not going to explain it
25  but I don't want you to think I'm educating my

Page 307

1  witness but you asked this question as to 2011 and
2  you've now asked it twice as to 2014, that's all.
3         MS. BENEDICT:  She just referenced data
4  available and I'm trying to get at that, what data
5  she thinks was available.  I appreciate you not
6  giving speaking objections, it just if I want to --
7  if I can clean up my questions I would like to do
8  it.
9         MR. MICELI:  Okay.
10     Q   BY MS. BENEDICT:  So, Dr. Feigal, what
11  data would have been available to Accord in
12  November of 2011 regarding docetaxel and the risk
13  of permanent chemotherapy-induced alopecia?
14     A   Well, the short answer is I don't know.
15     Q   All of the studies published after
16  November 2011, those wouldn't be available,
17  correct?
18     A   Presumably, yeah, that's correct.
19     Q   So any study published before November
20  2011, that would go in the available column,
21  correct?
22     A   Before, correct.
23     Q   Accord in November 2011 would not have had
24  access to Sanofi's internal clinical study
25  information, though, correct?

Page 308

1         MR. MICELI:  Object to the form.
2         THE WITNESS:  As I said, I'm not here to
3  talk about what Accord may or may not have had
4  access to.  In terms of other publicly-available
5  documents there are labels in -- outside the United
6  States that they certainly had access to.
7      Q   BY MS. BENEDICT:  Okay.  So in the
8  available column would be labels inside and outside
9  the U.S., correct?
10     A   Correct.
11     Q   And in the unavailable to Accord as of
12  November 2011 would be clinical trial data from
13  Sanofi, correct?
14     A   Well, I'm not going to -- as I said
15  multiple times I'm not going to comment on what
16  they could or could not obtain from another
17  company, that's really outside the purview of what
18  I can talk about, I'm able to talk about.  I don't
19  have -- I don't have any of your internal
20  documents.  I can't comment on that.
21     Q   And I assume you would give me the same
22  answer for pharmacovigilance data.  Accord would
23  not have had Sanofi's pharmacovigilance data as of
24  November 2011, correct?
25     A   No.  But there's certainly an available

Page 309

1  database that they could have had access to at any
2  time.
3      Q   Have you reviewed any materials specific
4  to Plaintiff Alice Hughes?
5      A   No.
6      Q   Have you talked with her physicians?
7      A   No.
8      Q   Do you know her chemotherapy regimen,
9  dosage or schedule?
10     A   I don't know any details about that
11  patient.
12     Q   So you won't be offering any opinion on
13  the appropriateness of her chemotherapy regimen,
14  correct?
15     A   That is correct.
16     Q   And you have no opinions on the
17  appropriateness of the decision of prescribing
18  doctor, correct?
19     A   You -- your question was broken up on
20  my -- on my cell.  Could you please repeat the
21  question?
22     Q   Sure.
23         You are not going to offer any opinions on
24  the appropriateness of the prescribing doctor's
25  decisions for Alice Hughes, correct?

Page 310

1    A   Yeah, that's correct.  I'm not going to
2  offer any -- I guess you don't want me to use case-
3  specific opinion.  I'm not going to offer anything
4  specific about the patient or conversations with
5  her physician.
6    Q   And you don't know Ms. Hughes' medical
7  history, correct?
8    A   No, I do not.  I don't have any de-details
9  about that individual.
10   Q   And you don't know if Alice Hughes took or
11 continues to take hormone therapy, correct?
12   A   Once again, I have no details about that
13 patient.
14   Q   Do you have any opinion as to whether or
15 not Ms. Hughes has persistent or permanent
16 chemotherapy-induced alopecia?
17   A   I have no opinions about that patient.
18   Q   Do you know the severity of Ms. Hughes'
19 hair loss?
20   A   Once again, I have no details about that
21 individual.
22   Q   Do you know if Ms. Hughes attempted
23 treatment for her hair loss?
24   A   I have no details about that treatment,
25 about this patient.

Page 311

1    Q   Do you know what caused Ms. Hughes'
2  alopecia?
3    A   I'm sorry, repeat your question, please?
4    Q   Do you know what caused Ms. Hughes'
5  alopecia?
6    MR. MICELI:  Objection to form.
7    THE WITNESS:  I have no case specific
8  opinion about that particular patient.
9    Q   BY MS. BENEDICT:  All right.  Switching
10 topics a little bit, in your report on Pages 26 and
11 27 you refer to Sanofi's clinical trials that
12 compare disease-free overall survival rates with
13 TAC and FAC.  Do you remember that part of your
14 report?
15   A   Page 26, yes.
16   Q   And Sanofi's clinical trials demonstrated
17 longer disease-free survival and overall survival
18 in the arms that included docetaxel, correct?
19   A   Yes, that's correct.
20   Q   And then in your report on Page 37 you had
21 some discussion of the NCCN guidelines, do you
22 recall that?
23   A   Yes.  It is on Page 37?
24   Q   I think so.  You can check me on that.
25   A   I see it.  The second paragraph.

Page 312

1    MR. MICELI:  I think it is 37 of the PDF
2  if you are looking at it on line, it is 34 of the
3  actual report.
4    THE WITNESS:  Actually I think she is
5  referring to the second paragraph where NCCN is
6  mentioned.
7    Is that correct, is that what you are
8  referring to?  There's other places in the report
9  where NCCN is.
10   Q   BY MS. BENEDICT:  And my question is just
11 you're generally familiar with the NCCN guidelines
12 and how they're used by oncologists, correct?
13   A   Yes, that's correct.
14   Q   The NCCN guidelines today, current ones,
15 still include docetaxel among the preferred regimen
16 for adjuvant chemotherapy for breast cancer,
17 correct?
18   A   I -- I honestly haven't looked at today's
19 version so I can't comment on that, but in prior
20 versions docetaxel regimens have been included.
21   MS. BENEDICT:  Could we pull up those for
22 an exhibit and I will see if this refreshes your
23 recollection.
24   Q   So for HR2- patients I think there are
25 three total preferred regimens.

Page 313

1    A   I'm sorry, HR2?
2    Q   HER2-.  HER2-.
3    A   HR -- are you saying ERPR-?
4    Q   H --
5    A   Anyway, I will read it.  I will see if I
6  can figure this out.
7    Q   HER2-, is that what you are saying?
8    MR. MICELI:  HER2-.
9    THE WITNESS:  Okay.  Sorry, I missed -- I
10 misheard you.  I thought you were saying something
11 else.  Okay.
12   Q   BY MS. BENEDICT:  So for HER2-, this is
13 the current NCCN guidelines, correct?
14   A   This looks like it is from, yeah, Version
15 5 of 2020, and what I don't have is the stage but
16 go ahead.  I can see what's on the page.
17   MS. BENEDICT:  We will mark this as
18 Exhibit 27.
19   (Feigal Exhibit 27, NCCN Clinical Practice
20 Guidelines in Oncology Version 5.2020, marked for
21 identification, as of this date.)
22   Q   BY MS. BENEDICT:  So for HER2- patients
23 there are three preferred regimens and one of those
24 is docetaxel and cyclophosphamide, correct?
25   A   One of the regimens, yes.  You are reading

1 that correctly.
2     Q   And one of the regimens, or actually
3 docetaxel is in two out of the three other
4 recommended regimens, correct?
5     A   On this particular page of the NCCN
6 guidelines called Preoperative and Adjuvant, you
7 are reading that correctly.
8     Q   Adjuvant therapy for breast cancer,
9 correct?
10     A   It says "Preoperative/Adjuvant" is what
11 the title says.
12     Q   And then Footnote B says, "Randomized
13 clinical trials demonstrate that the addition of a
14 taxane to anthracycline-based chemotherapy provides
15 an approved outcome."
16         Have I read that correctly?
17     A   You have read the footnote correctly.
18     Q   And let's look at the HER2+ regimen.
19 There are four preferred and docetaxel is in one of
20 the included regimens, correct?
21     A   On this particular page --
22         MR. MICELI:  Objection.
23         THE WITNESS:  It popped up on mine.
24         MR. MICELI:  Okay.  I didn't see that.  I
25 apologize.

1         THE WITNESS:  Yeah.  On this particular
2 page of the NCCN guidelines you are reading that
3 correctly.
4     Q   BY MS. BENEDICT:  And docetaxel is
5 included in both of the other recommended regimens,
6 correct?
7     A   No.  The other recommended regimens are
8 paclitaxel.
9         Am I looking at --
10     Q   Other recommended --
11     A   I mean, I'm looking -- I'm looking at
12 your --
13         THE REPORTER:  One at a time.  Stop, stop.
14         THE WITNESS:  I thought you were talking
15 about -- yeah, you are correct.  It is in that
16 category.
17     Q   BY MS. BENEDICT:  Okay.  So let's look at
18 the 2011 -- well, yeah, let's look at 2011, the
19 NCCN guidelines, Version 2, if we could mark that
20 as an exhibit.
21         (Feigal Exhibit 28, NCCN Clinical Practice
22 Guidelines in Oncology Version 2.2011, marked for
23 identification, as of this date.)
24     Q   BY MS. BENEDICT:  Do you recall off the
25 top of your head if CMS is listed as the preferred

1 regimen in 2011?
2     A   No, I -- I have good recall but I don't
3 have perfect recall so I have to look at it to
4 refresh my memory.
5     Q   All right.  So now we have Exhibit 28.
6 Does this look like the 2011 NCCN guidelines?
7     A   Well, it looks like a single page from the
8 guidelines.
9     Q   Is there another page that you would like
10 to look at for adjuvant --
11     A   No.  This is a huge document so I can't --
12 I can't -- you know, right offhand I can't refresh
13 my memory of how many pages there are of adjuvant
14 but you read it correctly from that page.
15     Q   And then more than just reading correctly,
16 my point in looking at the 2020 one is that
17 docetaxel is still included in several of the
18 recommended regimens, right?
19     A   Yes, I agree.  It is still in there.
20     Q   All right.  So now we're looking at the
21 2011 and my question is, is the CMS listed as a
22 preferred regimen.
23     A   On this page --
24     Q   I don't think it is but if you see it.
25     A   No, I was just reading it on the yellow

1 highlight and I don't see it there.  I do see it in
2 other adjuvant regimens.  I'm looking to see.
3         MR. MICELI:  Mollie, the document is not
4 pulling up on my screen.  If you are going to be
5 spending any length of time can you email it to me
6 or whoever is handling your documents?
7         MS. BENEDICT:  Yeah.  I think we're about
8 done but we can do that in a second.
9         THE WITNESS:  Anyway, I agree.  CMS is
10 another adjuvant regimen.
11         MS. BENEDICT:  Okay.  You can take that
12 down, Madeline.
13     Q   Is it your opinion that today women
14 diagnosed with breast cancer have a good prognosis?
15         MR. MICELI:  Object to the form.
16         THE WITNESS:  Well, is it my opinion.  I
17 mean, there are data to suggest that early-stage
18 non-metastatic, there's different percentages where
19 the overall survival in general, yes, there's a
20 good prognosis, but I'm not speaking specifically
21 about a particular patient.
22     Q   BY MS. BENEDICT:  And do you agree that
23 this in part is due to early detection and
24 diagnosis development?
25     A   For detection of earlier stage to catch it

1  early, yeah, that's helpful.
2      Q   And is the positive, more positive
3  prognosis today also in part due to improvements in
4  the treatment options available today?
5      A   Yeah.  The improvements have been going
6  on, I think I have that in my report, probably
7  since at least 1989 improvements in the survival of
8  patients with breast cancer, so yeah.  It is in my
9  report about the decline over time.  It has been
10  pretty steady over several decades.
11      Q   Do you agree that breast cancer is a life-
12  threatening disease?
13      MR. MICELI:  Objection to form.
14      THE WITNESS:  I would say that early-stage
15  breast cancer is actually -- has a very good
16  prognosis so I probably wouldn't use that term.
17      Q   BY MS. BENEDICT:  In Paragraph 4 of your
18  report you referenced the American Cancer Society,
19  Breast Cancer Facts & Figures that say that there
20  will be an estimate of 42,260 breast cancer deaths
21  in the U.S. in 2019.  Is that correct?
22      A   That -- yes.  That is all breast cancer,
23  that's just not early stage.
24      Q   Do you agree that the goal of adjuvant
25  chemotherapy for breast cancer is to improve

1  survival rates by treating micrometastases?
2      A   That's the proposed way that it is
3  helping, at least for the -- for those who need
4  chemotherapy and are at higher risk of recurrence,
5  the issue is to try and decrease the risk of --
6  risk of recurrence.  That is correct.
7      Q   And decrease that risk by treating
8  micrometastases, correct?
9      A   Well, I mean for adjuvant, right.  These
10  are patients without evidence of disease, right?
11  So they've already had surgery to remove their
12  cancer so presumably -- yeah, cancer that wasn't
13  successfully removed by the surgery, in some
14  instances there's an issue about whether or not
15  there might be second primaries.  But at any rate,
16  yeah, that's the goal.
17      Q   So looking to treat the cancers that are
18  so little we can't see them, right?
19      A   They may not be able to be currently
20  detected, I don't know if it has to be visual, but
21  it might be a laboratory test or something.  As you
22  know, there's a lot of research to look at
23  circulating cells.
24      Q   Taxane has led to increased survival rates
25  for early breast cancer patients, correct?

1      MR. MICELI:  Object to the form.
2      THE WITNESS:  I wouldn't attribute it to a
3  single chemotherapy agent.  There is improved
4  surgery, there's improved radiation therapy, there
5  are a whole host of different chemotherapies.
6  There's targeted therapies, there's endocrine
7  therapy, so I don't -- no, I can't attribute to it
8  a single drug, no.
9      Q   BY MS. BENEDICT:  And taxane includes two
10  drugs, docetaxel and paclitaxel?
11      A   Are you saying -- yes, there are different
12  drugs in the taxane class.  Yes.
13      Q   Are you familiar with the Cochrane
14  Database of --
15      THE REPORTER:  Repeat, please.
16      MS. BENEDICT:  I am -- I'm sorry, go
17  ahead, I interrupted you.
18      THE REPORTER:  Can you repeat your
19  question, please.
20      MS. BENEDICT:  Yes.
21      Q   Are you familiar with the Cochrane,
22  C-o-c-h-r-a-n-e, Database of Systemic Reviews?
23      A   I am familiar.
24      And just to give us a heads -- to give you
25  a heads up I'm going to plug my phone in because it

1  is about ready to die.
2      Q   I'm going to try to --
3      A   There we go.  You are now on speakerphone.
4      Q   Okay.  Are you familiar with Cochrane
5  Database of Systemic Reviews?
6      A   Yes, I am familiar with that.
7      Q   Do you consider it a reliable authority?
8      A   It is a resource to go to, yes.  A
9  resource to go to to look for things.
10      MS. BENEDICT:  Could we pull up Cochrane
11  Database of Systemic Reviews, the database Taxanes
12  for adjuvant treatment of early breast cancer.
13      (Feigal Exhibit 29, Cochrane Database of
14  Systemic Reviews, marked for identification, as of
15  this date.)
16      MS. BENEDICT:  It might be smaller than
17  you would like but we will mark this as the next
18  exhibit, Exhibit 29.
19      Q   Do you see on Page 1 under "Main Results"
20  it included 29 studies, 41,911 randomized women?
21      A   I see what's up on the screen.  I have not
22  read this article.
23      Q   Have I accurately read that?  Do you want
24  to check me on that?
25      A   Check you on what?

1     Q   That this article is a review of 29
2  studies including 41,911 randomized women.
3     A   As I said, I haven't read this article
4  so -- but what you are reading on the page is
5  correct.
6     Q   And then if we could flip to Page 2, the
7  author's conclusion are that "This review of
8  studies supports the use of taxane-containing
9  adjuvant chemotherapy containing regimens, with
10  improvement in overall survival and disease-free
11  survival for women with operable early breast
12  cancer."
13        Do you agree with that statement?
14     A   I agree that this is -- let me just
15  restate.  I haven't read it so I can't -- I can't
16  intelligently answer your question, all I can say
17  is yes, you are reading the conclusions -- you are
18  reading the author's conclusions correctly.  I
19  myself haven't read it.  If you would like me to
20  read it I can do that at some time.  You can send
21  me the article and I'd be happy to read it.
22     Q   Let's move on.
23        Would you agree that breast cancer
24  patients value survival?
25        MR. MICELI:  Object to the form.

1        THE WITNESS:  You are breaking up.  Can
2  you repeat that question, please.
3        MS. BENEDICT:  Sure.
4     Q   Would you agree that breast cancer
5  patients value survival?
6        MR. MICELI:  Same objection.
7        THE WITNESS:  It is a very general
8  question but yes, I imagine people would rather be
9  alive than dead.
10        MS. BENEDICT:  Can we pull up the Hughes
11  article, please.  This is an article from Lancet
12  Oncology.
13        (Feigal Exhibit 30, What survival benefits
14  do premenopausal patients with early breast cancer
15  need to make endocrine therapy worthwhile?, marked
16  for identification, as of this date.)
17     Q   BY MS. BENEDICT:  Is that a reliable
18  authority?
19     A   I see it on the screen.
20     Q   Yeah.  My question is, is this a reliable
21  authority.  Not the particular article but the
22  journal.
23     A   The journal -- The Lancet?  The Lancet is
24  a fine journal.  I can't -- I mean, I don't
25  recall -- at any rate, yeah, I have no reason to

1  think it is not a good journal.
2     Q   And the article is entitled "What survival
3  benefits do premenopausal patients with early
4  breast cancer need to make endocrine therapy
5  worthwhile?" from 2005.
6        And I would like to point you on Page 581
7  to the last paragraph.  It says, "Despite differing
8  methods, all the studies assessing the preferences
9  of women with breast cancer found that most
10  patients judged small improvements in survival
11  sufficient to make adjuvant chemotherapy
12  worthwhile."
13        Do you agree with that statement?
14     A   Once again, I haven't read this paper.  It
15  looks like it was evaluating 100 patients who had
16  been diagnosed with early-stage breast cancer five
17  years -- up to five years previously.  So once
18  again, I don't have any basis to judge their
19  conclusions because I haven't read the paper.
20        MS. BENEDICT:  Can we put up the Simes
21  paper, please.
22        (Feigal Exhibit 31, Patient Preferences
23  for Adjuvant Chemotherapy of Early Breast Cancer:
24  How Much Benefit Is Needed?  Marked For
25  identification, as of this date.)

1        MS. BENEDICT:  Simes, S-i-m-e-s, from
2  2001, and this is an article entitled "Patient
3  Preferences for Adjuvant Chemotherapy of Early
4  Breast Cancer," and this will be Exhibit 31.
5     Q   This is from the Journal of National
6  Cancer Institute Monographs.  Are you familiar with
7  that authority?
8     A   Yes.  I used to work at the National
9  Cancer Institute.
10     Q   Is that a reliable authority?
11     A   They can have some good -- good
12  information available.  Once again, I haven't read
13  this article.
14     Q   All right.  I'm not asking right now about
15  this particular article, just the publication in
16  general.  Is it a reliable publication?
17     A   Well, a monograph?  What was the -- well,
18  at any rate, I haven't read it, I haven't looked at
19  the monograph so I can't make any comments about
20  the content of something I haven't read, but the
21  journal is -- the journal is fine.  I haven't read
22  this paper.
23     Q   Okay.  And do you see where it is
24  highlighted, it says, "Modest survival benefits are
25  sufficient to justify adjuvant cytotoxic

Page 326

1  chemotherapy for most women with early-stage breast
2  cancer"?  Have I read that correctly?
3      A   You have read that correctly.
4      Q   Do you agree with that statement?
5      A   Certainly not today.  We have many, many,
6  much research and a lot of articles looking at the
7  risk of recurrence, we have many diagnostic tools
8  to look at the risk of recurrence in specific
9  patients, and actually we find in early-stage
10 breast cancer patients who are HER- and have either
11 negative or low recurrence scores up to 85% of them
12 don't need chemotherapy.  So I think there's been a
13 lot of evolving research and science that has gone
14 into rethinking what we do with chemotherapy and
15 try to reserve it for those patients who are more
16 likely to benefit rather than a lot of people who
17 have very low chance to ever benefit and just
18 suffer side effects.
19     Q   All right.  And I understand that there
20 are additional diagnostic tools available today to
21 determine who will benefit from adjuvant
22 chemotherapy, but you wouldn't be critical of a
23 doctor that used those tools and then concluded
24 that the patient could still take adjuvant
25 chemotherapy today?

Page 327

1          MR. MICELI:  Object to the form.
2          THE WITNESS:  Yeah, I'm not sure what your
3  question is.  Are you saying even if they found to
4  be extremely at low risk or intermediate risk and
5  they were very early stage to still give them
6  chemotherapy?  Is that what you are asking?
7      Q   BY MS. BENEDICT:  I'm asking are there
8  situations where adjuvant chemotherapy still
9  improves survival because the cancer may have high-
10 grade features or something else the doctor
11 determines is still appropriate.
12     A   Well, it is always a -- I'm sorry, I
13 didn't wait.
14         So the answer to your question, the -- the
15 decision about what is appropriate for an
16 individual patient is the result of an informed
17 discussion between the patient and the physician
18 and what her options are and what's important to
19 her and then decide on the appropriate regimen.
20 So, you know, I can't talk about specific cases,
21 I'm just saying the science says research has
22 evolved probably at least since 2005 in terms of
23 what we know about risk of recurrence and the
24 changing strategy to try and be more targeted about
25 who we give cytoxic -- not just cytoxic, but who we

Page 328

1  give chemotherapy to.
2      Q   Let's go to talking about some of the
3  other complications with chemotherapy.  Are you
4  aware of studies showing a higher rate of
5  neuropathy with paclitaxel versus docetaxel?
6      A   I'm aware of studies showing peripheral
7  neuropathy as a side effect with both of the
8  taxanes depending -- depending on --
9      Q   Are you aware of studies showing a higher
10 rate of peripheral neuropathy with paclitaxel as
11 compared to docetaxel?
12     A   I am aware of studies and I'm also aware
13 of studies that don't show that.  So --
14         MS. BENEDICT:  Can you pull up Vasey.
15         THE WITNESS:  I'm sorry, say it again?
16         MS. BENEDICT:  I'm sorry.  I'm asking her
17 to pull up the next exhibit.  That wasn't a
18 question for you, Dr. Feigal.  Sorry.
19         (Feigal Exhibit 32, Phase III Randomized
20 Trial of Docetaxel-Carboplatin Versus Paclitaxel-
21 Carboplatin as First-line Chemotherapy for Ovarian
22 Carcinoma, marked for identification, as of this
23 date.)32.
24     Q   BY MS. BENEDICT:  This is a publication
25 from the Journal of the National Cancer Institute.

Page 329

1  That's a reliable authority, correct?
2          MR. MICELI:  Object to the form.
3          THE WITNESS:  I mean, you are asking is
4  this -- I can't even see it.  Let me look.
5      Q   BY MS. BENEDICT:  Yeah, and I'm asking
6  about the journal, not the specific article.
7      A   You are not asking about the specific
8  article?  Okay.
9      Q   I will get there.
10     A   Okay.  Well, I wondered why you needed an
11 exhibit then.
12         Yes, the journal is -- the journal is
13 fine.
14     Q   And are you familiar with the specific
15 article?  It is entitled "Phase III Randomized
16 Trial of Docetaxel-Carboplatin Versus Paclitaxel-
17 Carboplatin as First-line Chemotherapy for Ovarian
18 Cancer."
19     A   I may have read it at one point in time, I
20 don't -- I don't recall it right this instant.
21     Q   This is a randomized controlled clinical
22 trial, correct?  Can you tell that from glancing at
23 it?
24     A   Let me -- from the title it looks like a
25 randomized trial of these regimens in ovarian

1  cancer, yes.
2      Q   And I will represent to you that it was
3  over 1,000 patients, I think 1,077 patients.
4      A   Yeah.
5          Once again, I just want to preface that it
6  is hard to answer questions about articles I
7  haven't read so the most I can tell you is you are
8  receiving something correctly on the page but I
9  can't really tell you much else unless you want to
10 give me time to read the article and then answer
11 the question.
12     Q   And if you are not familiar with the
13 article and you can't answer my questions just tell
14 me that, that's fine.
15     A   Well, I certainly haven't read it
16 recently.
17     Q   So if you can zoom in and look at the
18 highlighted section, under the abstract it says,
19 "... docetaxel-carboplatin was associated with
20 substantially less overall and grade 2 or higher
21 neurotoxicity than paclitaxel-carboplatin."
22         Were you aware of that?
23     MR. MICELI:  Object to the form.
24     THE WITNESS:  I -- as I said, I'm aware of
25 articles in both ways in terms of the neurosensory

1  side effects.  I think that's outside the scope of
2  what we're talking about for alopecia so I can't
3  really opine on different side effects of these
4  agents, that's not what I do.
5      Q   BY MS. BENEDICT:  Are you --
6      MR. MICELI:  She has to be able to
7  complete her answer.  Excuse me.  She has to at
8  least be able to complete her answer before she is
9  asked another question.  I apologize for
10 interrupting but it has been continuing throughout
11 the day, this very long day, I might add.
12     Q   BY MS. BENEDICT:  I'm sorry if I have been
13 speaking over you.  There's quite a delay between
14 the phone and the video so I don't mean to -- if
15 you have something else.
16     A   Just -- just reiterating, I'm, as you
17 know, I'm here to talk about the causation of
18 docetaxel in a permanent or persistent alopecia in
19 patients with breast cancer who receive adjuvant
20 regimens that contain a Taxotere-containing regimen
21 so you are asking me a lot of questions that are
22 outside the scope of what I'm really here to really
23 talk about.
24     Q   And I think I heard you say a second ago
25 that you were aware of studies that showed the

1  reverse; that showed higher neurotoxicity with
2  docetaxel than paclitaxel, did I hear that
3  correctly?
4      A   What you heard is that -- once again we're
5  going beyond the scope of what I'm here to talk
6  about, but neurosensory changes do occur in -- in
7  both of these pathways and depending on what
8  articles you read you can come to a different
9  interpretation of this, that's all.  And this is in
10 ovarian cancer so not in the condition that we're
11 talking about today which is breast cancer.
12     Q   Are you aware of any randomized controlled
13 clinical trials that show a higher rate of
14 neurotoxicity with docetaxel as compared to
15 paclitaxel?
16     A   Yeah.  As I said -- I'm sorry, I came in
17 too soon.
18         So I'm sorry, Dave, were you about to say
19 something?
20     MR. MICELI:  No.  I just said I didn't
21 have an objection.  I was going to let you go on.
22     THE WITNESS:  Okay.  No, all I was going
23 to say is I'm not -- I'm not prepared today to talk
24 about other toxicities in other disease states,
25 that's not why I'm -- that's not why I'm here and,

1  anyway, just that's my response to you.
2      Q   BY MS. BENEDICT:  Is it your opinion that
3  the toxicities are different when the disease state
4  is different?
5      A   They may be.
6      Q   And is there any reason that neuropathy
7  would be different for an ovarian cancer patient as
8  opposed to a breast cancer patient?
9      MR. MICELI:  Object to the form.
10     THE WITNESS:  You know, toxicity can be
11 and efficacy can be different, toxicity can be
12 different, side effect profiles can be different.
13 That's why you do see different profiles according
14 to the disease indication and -- on labels.
15     Q   BY MS. BENEDICT:  Yeah, and I'm asking
16 specifically for neurotoxicity.  Is there a reason
17 that that would be different with ovarian cancer
18 patients as opposed to breast cancer patients?
19     A   I'm really not here -- I'm really not
20 prepared to talk about neurotoxicity.  I came here
21 to talk about alopecia.
22     Q   Would you agree that the impact of
23 neuropathy can be disabling?
24     A   The impact of any toxicity can be
25 disabling.

Page 334

1        MS. BENEDICT:  Can we pull up the Winters
2  articles from 2017.
3        (Feigal Exhibit 33, Falls, Functioning,
4  and Disability Among Women With Persistent Symptoms
5  of Chemotherapy-Induced Peripheral Neuropathy,
6  marked for identification, as of this date.)
7     Q   BY MS. BENEDICT:  This is the Journal of
8  Clinical Oncology.  My first question is, is that a
9  reliable authority generally.
10     A   It is journal is fine, yeah.
11     Q   This is an article entitled "Falls,
12  Functioning, and Disability Among Women With
13  Persistent Symptoms of Chemotherapy-Induced
14  Peripheral Neuropathy," 2017.  Are you familiar
15  with this article?
16     A   Once again, I'm not prepared to talk about
17  peripheral neuropathy today, that's not what I was
18  asked to provide an opinion on, I'm here to provide
19  an opinion about Taxotere and docetaxel and its
20  relationship to permanent or persistent
21  chemotherapy-induced alopecia in breasts cancer
22  patients.  So I'm really -- I'm not prepared to
23  talk to you about other toxicities.  There's a --
24  there's all kinds of other side effects we could
25  talk about, but the topic for the litigation was

Page 335

1  about alopecia.
2     Q   Yeah, and I think your report mentions
3  some other side effects for various treatments and
4  I'm wondering based on your experience if you are
5  familiar with the other, some of the other
6  considerations in the risk profiles for the
7  taxanes.
8     A   Yes, I am.
9        MR. MICELI:  Excuse me, Ellen, Ellen.
10        I object to the form.
11        THE WITNESS:  Just to be sure I heard your
12  question correctly could you repeat it?
13        MS. BENEDICT:  Could we have that read
14  back, please.
15        (Record read)
16        THE WITNESS:  It was -- I'm going to go
17  back to my earphones because you didn't come
18  through very clearly and my battery is up to 30% so
19  I should be okay.  Give me a second, plug this in.
20        I hate to do this to you but could you
21  just repeat the question one more time.
22        (Record read)
23     Q   BY MS. BENEDICT:  I think my question was
24  I believe your report does mention some of the
25  other risks for chemotherapy treatments and I'm

Page 336

1  wondering if you are familiar with some of the
2  other risks in the profile for taxane.
3     A   I am very familiar with a spectrum of
4  toxicities in the taxanes and many other
5  chemotherapeutic drugs.
6     Q   Thank you.
7        All right.  So picking up where we were
8  looking at this Wilson article from 2017, I think I
9  already asked you and you said you didn't recall
10  seeing this article, but --
11     A   I don't -- well --
12        MR. MICELI:  You said Wilson.  This is
13  Winter-Stone.  Are you referring to the one on the
14  screen, Mollie?
15        MS. BENEDICT:  The one on the screen, I'm
16  so sorry, let me try that again.  I'm sorry about
17  that.  Okay.
18     Q   This is an article marked as Exhibit 33,
19  Winters, from 2017.  Dr. Feigal, are you familiar
20  with this article?
21     A   I -- I don't recall if I have read this
22  one and -- but my point is I'm not here to talk
23  about other side effects other than alopecia.  I'm
24  doing a causation, doing general causation for
25  docetaxel and permanent or persistent alopecia,

Page 337

1  that's the topic.
2     Q   Yeah.  And you have some opinions about
3  what is appropriate for a doctor to warn about or
4  what information a doctor may have included in the
5  warning.  And including information in a warning
6  the doctor has to know the entire risk profile for
7  a medication, correct?
8        MR. MICELI:  Object to the form.
9        THE WITNESS:  If I could -- I'm trying to
10  answer your question but it is a little difficult.
11        I think what I said before is if it came
12  across that I only thought a physician needed to
13  talk to a patient about the alopecia side effects I
14  think you misunderstood what I meant about an
15  informed discussion between a physician and a
16  patient about what your therapeutic options are.
17  The physician and the patient discussion should be
18  an informed discussion about the risks and the
19  benefits and, of course, they first have to know
20  the risks before they can communicate it to a
21  patient so that is the key piece, is how is that
22  risk communicated to the physician who needs to
23  have an informed discussion with the patient about
24  what her options are.  So if you thought all I was
25  talking about was alopecia, I'm not.  I'm talking

Page 338

1  about the risks and benefits of the regimen and
2  what her options are, and I would hope if there was
3  a -- I mean, the -- the issue is if permanent
4  alopecia occurs at a much higher risk in the
5  Taxotere regimen, that information should be
6  communicated clearly to the physician who has to
7  have that conversation with the patient. But I
8  wasn't excluding having a conversation about other
9  side effects that could occur with that regimen
10 with the patient. Is that clear?
11     Q   BY MS. BENEDICT: You would agree -- you
12 would agree that there are many side effects that a
13 doctor must consider when discussing risks with a
14 patient for chemotherapy agents?
15     A   I would agree with that.
16         MR. MICELI: Hold on. I didn't hear if it
17 was correct. If that was a question I object to
18 the form.
19         MS. BENEDICT: Oh, my question was would
20 she agree that there are many risks that a doctor
21 must consider when consulting with a patient about
22 the risk of a chemotherapy agency.
23     Q   Correct?
24         MR. MICELI: Same objection.
25         THE WITNESS: I wasn't sure what the word

Page 339

1  was with the patient --
2      Q   BY MS. BENEDICT: There are many risks for
3  chemotherapy agents, not just alopecia, right?
4      A   I will agree with you on that point.
5  There are risks that need to be communicated in a
6  clear way with the patient so the patient can make
7  a decision. I am sure you know that loss of one's
8  hair on one's head for women is a major stigma and
9  can be quite psychologically traumatizing and you
10 haven't showed me any of those articles but there's
11 plenty of literature on that. And so presumably if
12 they're concerned about temporary alopecia, they're
13 even more concerned about alopecia where their hair
14 doesn't come back. So, at any rate, in answer to
15 your question and a commentary.
16         MS. BENEDICT: Yeah. I will move to
17 strike the commentary part is non-responsive.
18     Q   Is peripheral neuropathy one of risks that
19 the doctor must consider in consulting with a
20 patient on the use of taxane in an adjuvant
21 chemotherapy --
22         MR. MICELI: Object to the form. Object
23 to the form of the question.
24         THE WITNESS: I just want to be clear.
25 You say the physician must consider, but the risk

Page 340

1  has to be -- I'm not sure when you say a consider
2  considers, I'm not sure if you are implying that
3  they're filtering what they say to a patient. So I
4  am just saying if there are risks that can -- to be
5  clearly communicated to a patient, they should be
6  clearly communicated. If you have a risk where a
7  side effect is permanent and not temporary, that
8  seems quite a substantial difference in the side
9  effect and something that -- yeah, I would expect
10 the physician to share it with them, with the --
11 talk to the patient about it.
12     Q   BY MS. BENEDICT: Do you think a physician
13 should give their patient journal articles to
14 review?
15         MR. MICELI: Objection; form.
16         THE WITNESS: I mean, honestly, I mean,
17 just so you know, I used to have patients who would
18 bring me articles so it just depends on the
19 patients, how much they want to know, but -- but --
20     Q   BY MS. BENEDICT: Right.
21     A   Wait. I wasn't finished.
22         MR. MICELI: Hold on, hold on. We cannot
23 talk over each other, guys, we cannot talk over
24 each other. The court reporter can't get it, I
25 can't make an objection, we can't have a clear

Page 341

1  record. Please let her answer; please let Mollie
2  ask her question.
3          THE WITNESS: So the additional, what I
4  was going to say, particularly when it is known
5  that the loss of hair is very important to women
6  with breast cancer so that we see -- you know, I
7  just want to make sure you heard that.
8      Q   BY MS. BENEDICT: Do you think that a
9  physician should give their patient all of the
10 journal articles on all the risks associated with
11 the chemotherapy regimen they're recommending?
12         MR. MICELI: Object to the form.
13         THE WITNESS: I think that --
14     Q   BY MS. BENEDICT: I know the answer but
15 you may surprise me.
16     A   I think a physician should have an
17 informed discussion with the patient about the
18 potential risks and benefits of the regimen and
19 what her options are and answer her questions. If
20 the patient would like to see journal articles,
21 sure, the physician can provide them to you. I was
22 just saying sometimes I have patients who bring
23 binders of information for me to look at so I'm
24 just saying it just depends on the patient, the
25 depth of what they want to know. Sometimes they're

Page 342

1  happy with just the discussion, sometimes they want
2  to have more information.
3      Q   And back to the Winters article that we
4  still have up it says, "A persistent cancer
5  treatment-related symptom that may influence
6  physical function, fall risk, and quality of life
7  is chemotherapy-induced peripheral neuropathy."  Do
8  you agree with that statement?
9          THE WITNESS:  I'm just going to restate --
10          MR. MICELI:  Object to form.
11          THE WITNESS:  Yeah.  I'm really not here
12  to talk about other side effects other than
13  alopecia and that's really not the scope.  I'm an
14  oncologist, I know about a lot of stuff, but I'm
15  not here to talk about a lot of other stuff, I'm
16  here to talk about things that are pertinent to the
17  scope of what I was asked to do.
18      Q   BY MS. BENEDICT:  Yeah, and I appreciate
19  that, Doctor, but I'm trying to ask you questions
20  to put your opinions in context for the jury.
21          So I understand that you opine that
22  docetaxel can cause permanent chemotherapy-induced
23  alopecia and I am here to find out what you know
24  about what the other risks of chemotherapy agents
25  and compare those with docetaxel.

Page 343

1  Could you go, Madeline, to Page 2609 to
2  the "Discussion" section for Winters.
3          I think we have it highlighted, maybe not.
4  It says among our sizeable sample of 512 women
5  cancer survivors, we observed that nearly one half
6  still experienced sensory symptoms associated with
7  chemotherapy-induced peripheral neuropathy many
8  years after completing chemotherapy.  Women with
9  persistent CIPN symptoms performed worse on several
10  objective tests of physical function and reported
11  poorer functioning, more disability, and nearly
12  twice the rate of falls."
13          Are you aware that neuropathy can persist
14  following chemotherapy and be a permanent side
15  effect?
16          MR. MICELI:  Object to the form of the
17  question.
18          THE WITNESS:  I just want to say again I'm
19  an oncologist, I've got years of experience in a
20  lot of different areas, I'm here to talk about
21  alopecia.  I'm aware of a lot of things but I'm not
22  here to talk about other things.  I have already
23  said a physician should have an informed discussion
24  with the patient about the risk profile and the
25  potential benefits of the regimen that they offer

Page 344

1  to patients and I think it is -- my statement is
2  clear.
3      Q   BY MS. BENEDICT:  Your statement is clear;
4  however, it is non-responsive.  Can you answer my
5  question?
6          MR. MICELI:  Object to the form.  Object
7  to the colloquy and the instruction to the witness.
8  She answered your question.
9          MS. BENEDICT:  Yeah.  And -- no, she
10  didn't answer my question and if she is going to
11  burn time by refusing to answer the question and
12  continue to restate her affirmative statement that
13  it is completely non-responsive we're going to have
14  to call the judge again who is probably --
15          MR. MICELI:  That's fine.  I would -- I
16  would invite another conversation with the judge
17  about all of the questioning that has gone on
18  outside of the scope of this expert's report and
19  beyond any topic she is going to be testifying
20  about at trial.
21          MS. BENEDICT:  I'm not going to eat up my
22  time arguing on the record.  I mean, she has
23  discussion of other side effects in her report so
24  this is not beyond the scope of her report.
25          MR. MICELI:  It is, but we will agree to

Page 345

1  disagree.
2          MS. BENEDICT:  Yeah, we will.
3      Q   Dr. Feigal, can you answer my question?
4  Are you aware that neuropathy can proceed and be a
5  permanent side effect from chemotherapy?
6      A   I'm aware of many side effects including
7  peripheral neuropathy.  That doesn't have anything
8  to do with my topic which is the causation of
9  permanent chemotherapy-induced alopecia.  It has
10  nothing to do with that.
11      Q   And when you discuss in your report on
12  Pages 28 and 29 other regimens that would be
13  appropriate if a docetaxel regimen was not used,
14  wouldn't you agree that the doctor and the patient
15  would need to consider the risks of those other
16  regimens before making that decision?
17      A   Yes.  And I never implied otherwise.
18      Q   Okay.  Let's move on and we will look at
19  Accord docetaxel labels from 2011.
20          MR. MICELI:  Mollie, how much longer do
21  you have to go?  Because we have been going about
22  an hour, I could use a break, and I would like to
23  find out how much time we have remaining.
24          MS. BENEDICT:  Let's take a break.
25          MR. MICELI:  Okay.

1      MS. BENEDICT:  I'm switching topics.
2  Let's take a break and I would love also to know
3  how much time we have remaining.
4      THE VIDEOGRAPHER:  Off video at 6:32 p.m.
5      (Recess taken)
6      THE VIDEOGRAPHER:  Back on video at 6:45
7  p.m.
8  BY MS. BENEDICT:
9      Q   Dr. Feigal, I would like to ask you some
10  questions about Accord's docetaxel labeling.  These
11  questions may be familiar to you; you were asked
12  about Sandoz's labeling.  I need to ask you on
13  behalf of Accord so we're going to go through some
14  of them again.  Hopefully it will go quickly.
15      If we could pull up Accord's 2011 label as
16  the next exhibit, this will be Exhibit 34.
17      (Feigal Exhibit 34, Highlights Of
18  Prescribing Information, marked for identification,
19  as of this date.)
20      Q   BY MS. BENEDICT:  Is this one of the
21  labels you reviewed, Dr. Feigal?
22      A   This is the one at the time of -- is this
23  an Accord label?
24      Q   This is an Accord label from 2011.
25      A   Was this the -- just tell me one in 2011.

1  I looked at the initial 2011.
2      Q   I believe this is the initial label from
3  approval in June of 2011.
4      A   Okay.  Correct.
5      Q   Do you believe you reviewed this label?
6      A   I probably have if that's the right date.
7      Q   If you look at Section 6 under "Adverse
8  Reactions" it says the "Most common adverse
9  reactions across all docetaxel indications are,"
10  and it has a list that includes alopecia; is that
11  correct?
12      A   I see, yes, that's on the page.
13      Q   And using your definition of alopecia the
14  language in Accord's label does not contain any
15  conformed limitation, correct?
16      A   It just says alopecia.
17      Q   It does not guarantee hair regrowth,
18  correct?
19      A   It doesn't say anything, it just says --
20  oh, I'm sorry, go ahead.
21      MR. MICELI:  No, go ahead.
22      Q   BY MS. BENEDICT:  Does it guarantee hair
23  regrowth?
24      A   It doesn't say anything.  It just says
25  alopecia, it doesn't -- right.  It just says

1  alopecia.
2      Q   And you talked about before that you would
3  never make guarantees regarding outcomes with your
4  patients, correct?
5      MR. MICELI:  Object to the form.
6      THE WITNESS:  You are going to have to
7  tell me the full sentence or what it is you are
8  referring to.
9      MS. BENEDICT:  Sure.
10      Q   This is from your deposition on December
11  7, 2018.
12      The question was, "Do you agree that no
13  particular outcome can ever be guaranteed using
14  chemotherapy?"
15      And you answered, "I would never even use
16  that term.  I never guarantee.  It's not even a
17  term relevant when you are talking about
18  probabilities."
19      "Q  So you agree?
20      "A  When you are in medicine, I mean, if
21  your physician guarantees you something, you
22  probably need to get a new doctor."
23      A   Well, it is two years down the road and I
24  don't have that language right in front of me so
25  tell me what the question is again relating to what

1  I said earlier?  What is your question?  I just
2  wasn't sure of your question.
3      Q   We are talking about the label and the
4  label does not guarantee hair regrowth, it just
5  says alopecia, and I think you've agreed that
6  that's correct.
7      A   I agree that alopecia -- I agree that
8  alopecia is what it says here.
9      Q   And you testified that you would never
10  make guarantees regarding outcomes with your
11  patients, correct?
12      A   I would never guarantee outcomes to a
13  patient.  You mean was it in the context of talking
14  about a side effect?  I just don't have that depo
15  in front of me so I'm just trying to understand the
16  context while for why they were asking the
17  question.  Do you have that?  Do you have that part
18  of the depo available, you can just put it up as an
19  exhibit.
20      Q   I don't think we need it but it was
21  already marked as an exhibit.
22      When treating patients in 2011 would you
23  have guaranteed that their hair would regrow after
24  using a chemotherapy agent?
25      MR. MICELI:  Object to the form.

1      THE WITNESS:  Yeah, I just don't know if
2  that was the context for the question, I wasn't --
3  I am just not sure --
4      Q   BY MS. BENEDICT:  I'm asking --
5      A   I know, but you are quoting my response
6  back to me and I just am trying to understand the
7  context of what I was responding to, that's all.
8  And I don't know if it was guaranteeing somebody is
9  going to have a response and survive, I just -- I
10  don't recall what the context was for my answer.
11  But if it was about guaranteeing you are going
12  to -- this treatment is going to definitely improve
13  your survival, I think -- I thought, maybe I'm
14  recalling it wrong, but I thought it was in terms
15  of guaranteeing them an efficacy outcome.  I don't
16  think it was in the context of talking about a side
17  effect.
18      Q   Okay.
19      A   Anyway, I'm just trying to set the right
20  context, that's all.
21      Q   Sure.  So new question.
22          In 2011 would you have guaranteed a
23  patient you were treating with a chemotherapy agent
24  that said alopecia was a side effect, would you
25  have guaranteed them that their hair would regrow?

1      A   Well, guarantee is --
2      MR. MICELI:  Objection.
3      THE WITNESS:  Guarantee is not a word I
4  use with anybody because, you know, stuff happens.
5  But I think that up until that time alopecia
6  associated with standard chemotherapy in breast
7  cancer patients is transient and your hair comes
8  back.  So if the company actually has knowledge of
9  permanent hair loss, the hair goes and it never
10  comes back, that would -- I would not assume a
11  patient is thinking of that.
12          Anyway, I don't use the word "guarantee,"
13  that is correct, I -- in anything I talk about -- I
14  don't talk about guarantee, but certainly patients
15  during the timeframe and what's known about
16  standard chemotherapy doses in breast cancer
17  patients the alopecia is transient and the hair
18  comes back.
19      Q   BY MS. BENEDICT:  All right.  So I think
20  what you are saying is in 2011 you thought that
21  hair would come back after chemotherapy-induced
22  alopecia but you would not have guaranteed it.  Is
23  that a fair assessment?
24      MR. MICELI:  Object to form.
25      THE WITNESS:  No.  No.  I am saying the

1  context of alopecia in the setting of standard
2  doses of chemotherapy for breast cancer patients,
3  the general knowledge out there is it is transient
4  and it comes back.  I think patients would expect
5  that it comes back unless you tell them you have
6  evidence that it doesn't return because of X, Y or
7  Z data, that's what I'm saying.
8      Q   BY MS. BENEDICT:  So in two thousand --
9  I'm sorry, I did not mean to cut you off.
10      A   I was through.
11      Q   In 2011 the understanding was that
12  chemotherapy-induced alopecia was not permanent.
13  That was the general knowledge at that time, is
14  that your testimony?
15      A   That's what I would say for a patient and
16  that's usually what they were counseled, that your
17  hair will come back.
18      Q   And is that what was available in the
19  public information based on that, based on the
20  available information?
21      MR. MICELI:  Objection.  Objection; form.
22      THE WITNESS:  Well, I don't think most
23  physicians or patients would do a world's
24  literature search on -- on this topic.  I would --
25  the company is the one that was supposed to keep

1  apprised of data and transmit data that could be
2  important to a physician that they could have an
3  informed discussion with on consultation.  So if
4  there's information about it I would expect that to
5  be communicated and as I said earlier, if the label
6  says that outside the United States I would think
7  the patient and a physician would expect that that
8  kind of safety information for a woman with breast
9  cancer would have been made available to them.
10      Q   BY MS. BENEDICT:  You are aware --
11      A   That's my opinion.
12      Q   You are aware that there are different
13  regulatory requirements of what should be included
14  in a label in the U.S. versus outside the U.S.,
15  correct?
16      A   Correct.  But most companies have core
17  data shapes that talk about particularly safety
18  information that should be communicated globally.
19  So I would say if -- given the importance of
20  whether hair loss is -- given the importance that
21  women with breast cancer place on hair loss, I'm
22  not saying it is the only factor but it is a factor
23  that's important to them and some women will just
24  not take chemotherapy because of that side effect.
25  That they would distinguish between hair loss that

1   comes back in six months after the end of
2   chemotherapy and hair loss that doesn't come
3   back -- that hair loss that doesn't come back, and
4   I would think if that is already communicated
5   externally outside the United States, I have a hard
6   time understanding why you would think that U.S.
7   physicians and patients wouldn't be interested in
8   that information.  So yes, I do have a hard time
9   understanding that.
10      Q   If you look at the Accord docetaxel label,
11  I think it is on Page 60 of the patient
12  information, it includes a list of the most common
13  side effects and that includes hair loss with no
14  temporal requirement, correct?
15      A   Right.  It just says hair loss.
16      Q   No qualifiers.
17      A   No, no qualifiers at all, even on what
18  part of your body, there's nothing.  It just says
19  hair loss.
20      Q   And then at the bottom it says, "Tell your
21  doctor if you have any side effect that bothers you
22  or does not go away," correct?
23      A   I see that.
24          And just keeping in the spirit of you
25  didn't want to be repetitive, I think we went

1   through this already with the earlier questions,
2   just maybe you don't recall it, but this looks very
3   familiar.
4       Q   We went through it with Sandoz's label and
5   now I need to do it with Accord's label because I
6   can't use Sandoz's label as an exhibit in the case.
7       A   Okay.  It is identical, though, but go
8   ahead.
9       Q   Yes, it is.  You are correct on that.
10      A   Okay.
11      Q   So it says, "Tell your doctor if you have
12  any side effect that bothers you or does not go
13  away."
14          Do you agree that it would be reasonable
15  for a patient to interpret that language to mean
16  that the list of side effects might not go away?
17          MR. MICELI:  Objection to the form.
18          THE WITNESS:  No.
19      Q   BY MS. BENEDICT:  In your report on Page
20  37 you note that physicians learn from many sources
21  of information about treatment options.  Do you
22  recall that part of your opinion?
23      A   Yes, I see it on Page 37.
24      Q   Physicians learn information from the
25  label, correct?

1       A   Yeah.  I say prescribing information which
2   is on the label.
3       Q   They also learn from scientific and
4   medical publications, correct?
5       A   They certainly can.
6       Q   And from professional meetings?
7       A   You are asking about some -- just so I'm
8   clear, you are asking about some potential venues
9   where patients can be educated, Is that -- I mean,
10  where physicians can be educated?
11      Q   Yeah, I'm talking about sources of
12  information or physicians, chemotherapy drugs that
13  they may prescribe.
14      A   Yes.  In this day and age it is a little
15  more limited but yes, in general they have access
16  to meetings.  If they -- sometimes busy
17  practitioners don't go to meetings but, I mean,
18  these meetings exist, publications exist.  Whether
19  they read them is another matter, but there are
20  other sources of information that they can learn
21  from, that's correct.
22      Q   As well they also learn from their own
23  experience as well as those of their colleagues,
24  correct?
25      A   One would hope so.

1       Q   And physicians can access the FAERS
2   database, correct?
3           MR. MICELI:  Objection; form.
4           THE WITNESS:  Physicians?  I am quite
5   familiar with companies accessing that.  It is a
6   public database.  I don't know -- I'm not sure I
7   would expect them to look at something like that.
8   I would think somebody who is in an industry would
9   look at something like that or who has software
10  tools to evaluate that.  But it is -- it is indeed
11  a public database but I can't say physicians would
12  access that.
13      Q   BY MS. BENEDICT:  Do physicians read the
14  label for a drug each time they prescribe it?
15      A   Well, that's a general question.  I can't
16  answer that question.  I -- they should read the
17  label and be apprised if there's any notable
18  changes.  Hopefully the company would have sent an
19  update or a dear healthcare provider note if there
20  was any substantive change in safety, but I -- I
21  can't answer for the -- hopefully at some point in
22  time they read the label.
23      Q   If a physician is making a prescription
24  and a therapeutic equivalent is used would you
25  expect that physician first of all to even know

Page 358

1 that a therapeutic equivalent was being used
2 instead of the brand name product?
3     A   I -- I don't know.  Probably -- yeah, my
4 answer is I don't know.
5     Q   And if a therapeutic equivalent is used
6 instead of the brand name would you expect the
7 physician to refer to the label for the therapeutic
8 equivalent and review that label when they're
9 already familiar with the brand name label?
10     MR. MICELI:  Object to the form of the
11 question.
12     THE WITNESS:  I -- I don't know is the
13 simple answer.
14     MS. BENEDICT:  Could we mark as the next
15 exhibit the informed consent for the Louisiana
16 Disclosure Panel.
17     (Feigal Exhibit 35, Patient Consent to
18 Medical Treatment of Surgical Procedure and
19 Acknowledgement of Receipt of Medical Information,
20 Bates Nos. HUGHESA_PSR_00144 and HUGHESA_PSR_00143,
21 marked for identification, as of this date.)
22     THE WITNESS:  Are you talking about my
23 report or some other exhibit?
24     MS. BENEDICT:  I'm pulling up another
25 exhibit.

Page 359

1     THE WITNESS:  Okay.
2     Q   BY MS. BENEDICT:  This is one of the
3 consent documents for Ms. Hughes' treatment.  It is
4 a standard disclosure for the Louisiana Medical
5 Disclosure Panel that accompanied the warnings
6 related to docetaxel.
7     Are you aware of the Louisiana Medical
8 Disclosure Panel and its functions?
9     A   No, I am not.
10     Q   You don't know that the Louisiana Medical
11 Disclosure Panels describes certain risks that
12 should be communicated to a patient who is using
13 adjuvant chemotherapy?
14     MR. MICELI:  Object to the form.
15     THE WITNESS:  Just so I understand, you
16 are asking me if I am knowledgeable about -- just
17 re -- just restate your question.  I'm not sure I
18 am understanding it correctly.
19     Q   BY MS. BENEDICT:  Yeah.  Are you aware
20 that the Louisiana Medical Disclosure Panel has a
21 form of standard risks that physicians are to use
22 to communicate the risks to their patients for
23 adjuvant chemotherapy?
24     A   I need a little bit more information.
25 This is informed consent for chemotherapy, for this

Page 360

1 particular product?  Just give me a little more
2 information.  For just practice?  What are you --
3 what's the context of them?  I'm not sure what this
4 is.  Is this a review and approval process or is
5 this just guidance for --
6     MR. MICELI:  Objection.
7     MS. BENEDICT:  If you don't know that's
8 okay.
9     THE WITNESS:  No, I'm not -- I'm not
10 familiar with this specific group so the simple
11 answer is no.
12     Q   BY MS. BENEDICT:  And in 2011 I will just
13 represent to you that the Louisiana Medical
14 Disclosure Panel stated that the warnings that
15 should be given for docetaxel included hair loss
16 with no temporal requirements.  Do you think that
17 that was an error on behalf of the Louisiana
18 Medical Disclosure Panel?
19     MR. MICELI:  Object to the form.
20     THE WITNESS:  You know what?  I know
21 nothing about this group, I can't give you an
22 intelligent answer on the -- on an organization I'm
23 not familiar with, so I can't -- I just can't
24 comment on it.
25     Q   BY MS. BENEDICT:  Yeah.  Is there any

Page 361

1 reason to believe that the Louisiana Medical
2 Disclosure Panel would not have included a well-
3 known risk in their recommended disclosures?
4     MR. MICELI:  Object to the form.
5     THE WITNESS:  I -- one, I don't know this
6 group or how they make decisions.  Two, it is the
7 company that knows the most about their product in
8 a drug.  If it is not communicated then I wouldn't
9 expect anybody else to know about it if the company
10 isn't communicating about it.
11     Q   BY MS. BENEDICT:  I think you testified
12 you don't know what Accord had access to as of
13 November 2011 regarding permanent chemotherapy-
14 induced alopecia, correct?
15     MR. MICELI:  Objection; form.
16     THE WITNESS:  I, as I stated earlier, I
17 don't have access to any internal Accord documents.
18     Q   BY MS. BENEDICT:  You have defined for me,
19 earlier today you defined permanent chemotherapy-
20 induced alopecia as the absence of or incomplete
21 hair regrowth six months beyond the completion of
22 chemotherapy; is that correct?
23     MR. MICELI:  Object to the form.
24     THE WITNESS:  Yeah, let me -- that's not
25 what I said.  Well, yeah, let me -- I'm not sure

Page 362

1  that's fully correct.
2       At least six months from the end of
3  chemotherapy that -- that part is accurate.  That
4  part is accurate, at least six months, and extends
5  for years depends on the study that was evaluated.
6       Q   BY MS. BENEDICT:  Your report doesn't say
7  at least six months, on Page 40 you say,
8  "Permanent, irreversible hair loss due to
9  chemotherapy (PCIA) has been defined as an absence
10  of or incomplete hair regrowth 6 months beyond
11  completion of chemotherapy."  Is that still your
12  opinion?
13      A   Well, it is an accurate statement but
14  obviously the studies I've looked at, that's a
15  minimum of a timeline of six months.  And just to
16  be clear, I am not making the diagnosis of pCIA,
17  I'm not a dermatologist, but the time that has been
18  determined is at least six months from the end of
19  chemotherapy and many of the studies I looked at,
20  you know, had much, you know, longer followup.
21      I just want to be clear in case I wasn't
22  earlier, I'm not making the diagnosis of pCIA, that
23  has been defined by the dermatologists.  Yeah.
24      Q   This is the definition that you are
25  working with for pCIA, is that a better way to put

Page 363

1  it?
2       A   Well, this is -- the better way to put it
3  is -- well, this isn't a full definition, this is
4  just talking about the, you know, the timing,
5  but -- of at least six months, but -- after the end
6  of chemotherapy if the hair hasn't returned, but
7  the other aspects of it, I just want to make it
8  really clear, I'm not the one making the diagnosis,
9  it is the dermatologist or whoever is making the
10  decision about what -- what is pCIA.  So these
11  various studies have had its endpoint looked at so
12  that's obviously part of the definition but
13  there's -- but I'm not the one making -- I'm not
14  the one making the call.
15      Q   Sure.
16      And so in your studies some of those have
17  diagnoses by dermatologists and some of them don't,
18  is that fair to say?
19      A   There's -- there are parameters that they
20  have variously used and some of them have more
21  details than others about how that endpoint was
22  arrived at.
23      Q   Some of them are self-reports by the
24  patients, correct?
25      A   I think some of them, there are -- I'd

Page 364

1  have to go -- you know, there's a lot of questions
2  that were asked about it so I'd have to go back to
3  the studies to find out parameters for how the
4  decision was made.  But I think the point is
5  particularly for the cohort studies or other
6  studies where there's a comparison arm, the same
7  method was used for the Taxotere arm as -- the
8  docetaxel arm as was used in the -- in the other
9  part of the component.  So whatever evaluation was
10  done, it was done the same on -- on both sides of
11  the cohorts that we looked at.
12      Q   You didn't exclude studies that didn't
13  have a dermatologist confirming pCIA, correct?
14      A   In the studies, I'd have to go back and
15  look, the details may not have been listed.  I'd
16  have to go back and look at all the authors to see
17  whether there's a dermatologist on it or not, go
18  back and see what the reference was to how the
19  evaluation was made.  But my point is whatever
20  method was used -- no, it was not a search term
21  that required a dermatologist to be either included
22  in the article or included as, you know, full
23  details of that.  But I will just leave it at that.
24      Q   Yeah.  But is it --
25      A   I just want to make it clear it wasn't me

Page 365

1  making the diagnosis.
2       Q   All right.  I understand.
3       You didn't examine the patients that are
4  listed in your literature to confirm that they had
5  pCIA, you trusted the article and however it
6  defined that, is that fair to say?
7       A   Yes.
8       Q   Are you aware of medical literature that
9  says six months is not enough time to assess
10  whether hair loss is permanent?
11      A   Well, as I said, it is at least six months
12  after the end of chemotherapy when you can start,
13  you know, counting.  And yes, there's other people
14  with different opinions.  The general consensus of
15  the definition is that it is at least six months
16  after the end of chemotherapy.  That's a pretty
17  accepted definition.
18      I'm sorry, what?
19      MS. BENEDICT:  I'm asking if we can pull
20  up the next exhibit which will be an article by Kim
21  called chemotherapy-induced irreversible alopecia
22  in breast cancer patients from 2017?
23      A   Okay.
24      (Feigal Exhibit 36, Chemotherapy-induced
25  irreversible alopecia in early breast cancer

Page 366

1  patients, marked for identification, as of this
2  date.)
3      Q   BY MS. BENEDICT:  Are you familiar with
4  this publication?
5      A   Yeah, if it is the one that I have in my
6  table.
7      Q   It is in your table.
8      A    What's the date?  Yeah, what's the date?
9  2017?
10     Q   2017.
11     A   Yeah, yeah.
12     Q   And on Page 532 it says, "... about 60% of
13  patients needed 6-12 months period from the end of
14  chemotherapy to the recovery of current hair
15  regardless of CIIA," chemotherapy-induced
16  irreversible alopecia, "or not.  These findings
17  imply that the 6-month period may be short to
18  permanent alopecia."
19     A   I'm sorry, are you reading from my report
20  or are you reading from the paper?
21     Q   I'm reading from the paper and I think --
22     A   Okay.
23     Q   -- I can highlight it for you on Page 532
24  of the paper.
25     A   I agree that it is what is written in the

Page 367

1  paper.
2      Q   And this article also notes in the
3  introduction that CIIA, which is chemotherapy-
4  induced irreversible alopecia, has been barely
5  studied.  Would you agree with that statement?
6      A   Did you highlight that too?
7      Q   We can go back to it.  Yes.
8      A   It has been barely studied.  I -- it is
9  what he wrote and, I mean, it is what he wrote.
10  But there is, as you know, from my own report
11  there's -- I mean, I don't disagree that he wrote
12  this, I'm just saying there's a lot publications
13  out there.  If he is writing this in 2017 there's
14  quite a bit written about it in the published
15  literature that I found.
16         Let me look at --
17     Q   I don't have any other questions on that.
18  I didn't mean to cut you off.
19     A   Well, yeah, that's fine, that's fine.
20         MS. BENEDICT:  So the next article that
21  I'm pulling up is, the author is Sibaud,
22  S-i-b-a-u-d, called "Dermatological adverse events
23  with taxane chemotherapy," in the European Journal
24  of Dermatology.
25     Q   Is that a reliable authority in your

Page 368

1  opinion?
2      A   I'm trying to see the article.
3          MR. MICELI:  It hasn't been pulled up yet.
4          (Feigal Exhibit 37, Dermatological adverse
5  events with taxane chemotherapy, marked for
6  identification, as of this date.)
7          THE WITNESS:  It is not a journal that I
8  read so I can't comment on it.  It is a dermatology
9  journal and I don't believe I have read this
10  article so I would just like to preface if you are
11  going to ask me some questions you need to --
12  obviously it would be preferred if you let me read
13  the article before you ask me questions about the
14  article.
15     Q   BY MS. BENEDICT:  I just have one
16  question.
17         If we go to Page 10 it says, "... it is
18  important to note that there are no long-term
19  studies addressing the (final) outcome, and since
20  these terms may imply a grave prognosis to
21  patients, we suggest the usage of 'persistent'
22  instead of 'permanent.'"
23         Would you agree with that statement in
24  2016?
25         MR. MICELI:  I want to object to the

Page 369

1  question.  The witness has asked to see it and
2  apparently it has been refused and you highlighted
3  one section.
4          THE WITNESS:  Well, as you have done
5  multiple times, you flash up an article, I ask to
6  read it and you don't allow me to read it, so I
7  think the simplest answer is -- I can't answer
8  questions about an article I have not read and
9  apparently am not going to be allowed to read.
10         MS. BENEDICT:  I'm happy for you to read
11  the article, let's go off the record and give you a
12  minute to read it and we will come back, okay?
13         THE WITNESS:  Sure.  Sure.
14         MR. MICELI:  Okay.
15         THE VIDEOGRAPHER:  Off video at 7:19 p.m.
16         (Recess taken)
17         THE VIDEOGRAPHER:  Back on video at 7:35
18  p.m.
19  BY MS. BENEDICT:
20     Q   Dr. Feigal, have you had a chance to
21  review the Sibaud article?
22     A   I did.  Thank you.
23     Q   And my question is on Page 10 of the
24  article it states, "Here, it is important to note
25  that there are no long-term studies addressing the

1  (final) outcome, and since these terms may imply a
2  grave prognosis to patients, we suggest the usage
3  of 'persistent' instead of 'permanent.'"
4          My question to you is do you agree that
5  persistent chemotherapy-induced alopecia would be a
6  better terminology than permanent chemotherapy-
7  induced alopecia.
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  Is that the only question
10 you are asking me, whether or not the term should
11 be permanent or persistent?  Is that your question?
12 It is probably a decision for a dermatologist to
13 talk about.  I think -- I'm trying to see.  This is
14 in the Journal of Dermatology.  These are
15 dermatologists.  Dermatologists make the diagnosis
16 which is probably not in my wheelhouse to talk
17 about what the -- if the correct term is persistent
18 or permanent.
19     Q   BY MS. BENEDICT:  And you would agree that
20 sometimes the hair grows back more than six months
21 after the end of chemotherapy, correct?
22         MR. MICELI:  Object to the form.
23         THE WITNESS:  Yeah.  I'm not -- I am
24 not -- as I said, I am not the person making the
25 diagnosis so I would defer this, your question

1  whether it should be called persistent or
2  permanent, to the dermatologist.
3          In terms of my search terms, I think I let
4  you know I used the terms persistent, permanent or
5  irreversible, so any of those terms I utilized in
6  looking for articles.  So I would have found it
7  whether they called it permanent or they called it
8  persistent or they called it irreversible, it would
9  have showed up in my literature search.
10    Q   BY MS. BENEDICT:  And in the articles that
11 you rely on in your table, the articles you found
12 in your literature search, are you aware of whether
13 or not the patients reporting either persistent or
14 permanent alopecia in those articles had attempted
15 to treat that alopecia?
16    A   Well, I think some of them it is clear
17 from the article there might have been -- oh, to
18 treat the -- I think in Lacouture's article I think
19 some of those patients, if I recall, I could be
20 wrong, I have to go back and go look whether or not
21 minoxidil might have been tried and most of the
22 things that I looked that might have been part of
23 my studies were maybe to try to mitigate the
24 occurrence with alopecia with scalp cooling, so --
25    Q   And, in fact, minoxidil is effective for

1  treating alopecia more than six months after
2  chemotherapy, correct, in some patients?
3          MR. MICELI:  Object.  Object to form.
4          THE WITNESS:  I am not the -- yeah, I
5  wasn't looking at whether or not there is ways to
6  treat the side effects so that wasn't -- I'm
7  looking at causation, I didn't look at what people
8  are developing for therapeutic agents.  Hair loss
9  I'm sure is a major market for people developing
10 potential therapeutics.  I can't comment on that
11 aspect of it.
12    Q   BY MS. BENEDICT:  How much hair loss is
13 needed to fit within your definition of pCIA?
14         MR. MICELI:  Objection.
15         THE WITNESS:  It is not my definition --
16 it is not my definition of pCIA, it is from the
17 literature, and the grade of severity are toxicity
18 grades that are available out there.  So I didn't
19 decide on a criteria for grading and I didn't make
20 decisions about what the time point is for -- you
21 know, the minimum timeframe for it.  I'm going from
22 the literature.
23    Q   BY MS. BENEDICT:  So you didn't exclude
24 any articles talking about pCIA because of the
25 grade of pCIA, correct?

1    A   That's correct.
2    Q   If a patient's alopecia would resolve if
3  treated with topical minoxidil would you still
4  consider it permanent?
5          MR. MICELI:  Object to the form.
6          THE WITNESS:  It is not that -- it would
7  be determined by the -- whoever is evaluating the
8  patient, but generally I would say that's -- you
9  know, the definitions are defined by the
10 dermatologist.  I wouldn't -- yeah, I can't make
11 that decision.
12    Q   BY MS. BENEDICT:  In that Fonia article
13 which is cited in your Table 2 --
14    A   Uh-huh.
15    Q   -- on Page 951 it says one of the patients
16 assessed as have pCIA experienced slow but complete
17 hair regrowth within six months of starting topical
18 minoxidil.
19         Do you recall that from that article?
20    A   Fonia, did you say?
21    Q   Yes.
22    A   Yes, I recall reading that article.
23    Q   So that shows that in some patients who
24 have been diagnosed with pCIA could experience
25 complete hair regrowth with topical minoxidil

Page 374

1   treatment, correct?
2           MR. MICELI:  Object to the form.
3           THE WITNESS:  What I would say is the
4   diagnosis was determined as part of the study and I
5   really, you know, don't have a comment with
6   active -- you know, if there's different
7   therapeutic regimens that are tried and these are
8   anecdotes, I don't have any comment on that.
9       Q   BY MS. BENEDICT:  Do you have any reason
10  to dispute that it worked for that patient as
11  reported in the article?
12          MR. MICELI:  Objection to form.
13          THE WITNESS:  I don't have any -- I don't
14  have any -- it is outside the scope of what I'm
15  talking about.  It is -- you know, I'm working on
16  the causation and you are talking about people
17  developing therapeutics and I -- that's not what
18  I'm talking about.
19      Q   BY MS. BENEDICT:  All right.  I have a
20  couple of questions to just -- I'm cleaning up some
21  things from this morning.  I will ask you a few
22  questions.
23      A   Okay.
24      Q   Did you review the pharmacovigilance data
25  for carboplatin?

Page 375

1       A   Excuse me?
2           MR. MICELI:  Object to the form.
3           THE WITNESS:  What's your question?
4       Q   BY MS. BENEDICT:  Did you review pharmaco-
5   vigilance data for carboplatin and the risk of
6   pCIA?
7           MR. MICELI:  Objection.
8           THE WITNESS:  Totally irrelevant.  I have
9   no idea what -- no, it is not relevant to the scope
10  of what I'm looking at and the answer is no, I
11  haven't reviewed pharmacovigilance on carboplatin.
12  It is just not the drug I'm looking at, yeah.
13      Q   BY MS. BENEDICT:  Did you re-review
14  internal company clinical trials for carboplatin to
15  assess the risk of pCIA?
16          MR. MICELI:  Object to the form.
17          THE WITNESS:  Well, first of all, I don't
18  think I have presented any data on carboplatin in
19  alopecia but, at any rate, I -- no.  The topic that
20  I'm working on is Taxotere and the other drugs is
21  irrelevant to have access to that.  It is not -- it
22  is not informative of what I need to do for showing
23  causation.
24      Q   BY MS. BENEDICT:  Let's go back to your
25  report for a second on Page 23 when you are talking

Page 376

1   about endocrine therapy.  You acknowledged the
2   patients consider the risks and we talked about
3   some of the risks.
4           My first question is endocrine therapy
5   includes the AI inhibitor letrozole, correct?
6       A   There are a variety of different
7   chemotherapies, yes.
8       Q   Is letrozole one of the endocrine
9   therapies?
10      A   Yes.
11      Q   And you specifically list the risks.  You
12  say, "Adverse events that can occur acutely include
13  arthralgias, hot flashes, and gynecologic symptoms,
14  and a long-term adverse event is osteoporosis."
15          Have I read that correctly, the risks for
16  endocrine therapy?
17      A   Yes.  It is the same background
18  information about endocrine therapy.
19      Q   And you did not --
20      A   It is about acute -- well, because these
21  are acutely and a long-term adverse event is
22  osteoporosis so my understanding is it doesn't
23  occur acutely in endocrine therapy.
24      Q   So you did not include a risk of hair loss
25  in your discussion of risks for endocrine therapy,

Page 377

1   correct?
2       A   I included adverse events that can occur
3   acutely and I included the long-term adverse event
4   of osteoporosis.  It wasn't meant to be
5   comprehensive, it was just giving me some
6   background.
7       Q   Do you think a patient -- a physician
8   prescribing letrozole to discuss with their
9   patients including a risk of alopecia?
10          MR. MICELI:  Object to the form.
11          MS. BENEDICT:  It is a terrible question.
12  I'm going to try that one more time.
13          THE WITNESS:  Okay.
14      Q   BY MS. BENEDICT:  When discussing
15  letrozole with a patient do you think that
16  physician should include a discussion of alopecia
17  as a possible risk?
18          MR. MICELI:  Same objection.
19          THE WITNESS:  You know what?  I'd have to
20  look at what's on the label right now, but I would
21  anticipate -- yeah.  You want to just show me a
22  label for letrozole?
23      Q   BY MS. BENEDICT:  I will pull up the
24  prescribing information and it is Table 2 and it
25  will come up in a minute.  It lists adverse

Page 378

1  reactions and alopecia is listed.  I think we have
2  a highlighted one for you.
3       (Feigal Exhibit 38, Highlights of
4  Prescribing Information, marked for identification,
5  as of this date.)
6       THE WITNESS:  Just to sound like a
7  repetitive record, not relevant to what I'm looking
8  at which is chemotherapy-induced permanent or
9  persistent or irreversible alopecia due to
10  docetaxel, but okay.
11       So it just says -- I mean, the general
12  comment I would have is that they would look at the
13  label and they would look at having to describe the
14  issues involving hair, is it just -- is it --
15       Q   BY MS. BENEDICT:  Would you agree that --
16       A   I'm just saying this is not -- I'm just
17  saying this isn't really relevant to the scope of
18  what I was asked to talk about, what should a
19  physician tell a patient about another drug.  I
20  mean, they should tell them the potential risks and
21  the potential benefits in the context of what
22  they're treating the patient for.
23       Q   Would you agree that alopecia is a risk of
24  letrozole?
25       MR. MICELI:  Object to the form.

Page 379

1       THE WITNESS:  I don't have an opinion on
2  it because it is not relevant to the topic of
3  chemotherapy-induced alopecia.  I mean, it is sort
4  of what you are talking about with other adverse
5  events you want me to opine on.  You know, I'm not
6  going to opine on another drug that wasn't the
7  topic of my investigation.
8       Q   BY MS. BENEDICT:  So you included a list
9  of possible risks in your report and I'm showing
10  you the label that says alopecia for letrozole.  Do
11  you now have an opinion that alopecia is a
12  potential risk of letrozole?
13       MR. MICELI:  Object to the form.
14       THE WITNESS:  I'm just going to repeat
15  myself.
16       I'm talking about -- first of all,
17  background information in the report is not
18  comprehensive in a drug label and everything a
19  patient should say.  This is a -- this is a report
20  to establish the data for providing the evidence
21  for causation for a particular drug Taxotere and
22  docetaxel.  So you are asking me a lot of unrelated
23  questions about what should doctors tell patients
24  about other drugs and that's -- that's really not
25  the topic of what I was asked to do.

Page 380

1       Q   BY MS. BENEDICT:  Yeah, my last question
2  wasn't about what a doctor should tell patients so
3  I understand, I got your response to that question
4  and I will just focus on my --
5       A   Well, but -- no, you didn't.  You didn't
6  actually -- well, I'm sorry, I will let you finish
7  your sentence, but it wasn't that the doctor shouldn't
8  tell a patient about -- I said what I was
9  responding to is you are asking me about another
10  drug and what should a doctor tell a patient about
11  another -- another drug.  I think the patient -- I
12  think I have been pretty clear they should talk
13  about the risks and the benefits of the regimen
14  with their patient.  My report, however, was about
15  causation for permanent, persistent or irreversible
16  alopecia in a setting of a Taxotere regimen.
17       MS. BENEDICT:  Okay.  Move to strike as
18  non-responsive.
19       Q   My new question, can you agree that
20  alopecia is a risk of letrozole?
21       MR. MICELI:  Object to the form.
22       THE WITNESS:  I agree that alopecia is an
23  adverse event that occurs.
24       Q   BY MS. BENEDICT:  Okay.  And, in fact, in
25  the Freites-Martinez article which is cited in

Page 381

1  Table 2 of your report, the 2019 one --
2       A   Uh-huh.
3       Q   -- and I think we can pull that up if you
4  want to see the section I'm going to refer to, it
5  discusses that 55% of the patients taking letrozole
6  reported endocrine-induced alopecia.
7       A   You have to remember that the
8  retrospective case report, so the 55% means
9  nothing.  They're selecting for patients who have
10  the outcome, it is not a -- it is not prospectively
11  following patients and see who gets this, they're
12  selecting for people who have the outcome of
13  interest and then they're looking to see what drugs
14  did they take.  But, you know -- no, of course it
15  is a -- 55% means nothing.  It is just you don't
16  have a denominator, it is an outcome study.  They
17  looked at the -- they didn't look at exposure, they
18  looked at the outcome the alopecia and then they
19  went back and looked to see what they took so you
20  can't calculate an incidence to that.
21       Q   Okay.  So I -- they started with alopecia
22  but 55% of the patients included in this study who
23  all had the outcome of alopecia, 55% of the ones
24  that were taking letrozole reported endocrine-
25  induced alopecia.

1           MR. MICELI:  Object to the form.
2           THE WITNESS:  You are over-interpreting
3   the data.  This is a -- this is a -- I'm sorry, I
4   shouldn't have stated it like that.
5           The data is an evaluation of cases.  Of
6   course it is going to enrich for the outcome of
7   interest because that was the design, they want to
8   have alopecia in their -- that they identify.  And
9   then --
10          THE REPORTER:  One at a time.  Stop.
11          MR. MICELI:  Let her finish her answer
12  first.
13          MS. BENEDICT:  I don't think she is
14  answering my question anymore.
15          MR. MICELI:  It doesn't matter if you --
16  hold on.
17          Ellen, finish your answer, please.
18          MS. BENEDICT:  If it is in answer to the
19  question I would like to hear it, if it is not I'm
20  really not interested.
21          MR. MICELI:  Hold on a second.
22      Q   BY MS. BENEDICT:  Answer my question.
23          MR. MICELI:  This has been going on, this
24  deposition has been going on for 12 hours, 12
25  hours, and barely any questions about general

1   causation, the topic for this expert --
2           MS. BENEDICT:  I want to --
3           MR. MICELI:  -- and you are not letting
4   her answer.
5           MS. BENEDICT:  I've got questions to ask.
6   I'm sorry, I've got questions to ask and I'm not
7   burning up timing arguing about it.  Do you want to
8   go off the record and debate it?
9           MR. MICELI:  No, we don't have to go off
10  the record and debate it.
11          MS. BENEDICT:  All right.
12          MR. MICELI:  You are wasting time.
13          MS. BENEDICT:  You can stop the speaking
14  objections.
15      Q   Doctor, I have questions for you.  I do
16  not mean to interrupt but I would appreciate it if
17  you would answer my questions.
18          Do you think we should disregard all of
19  the retrospective or outcome studies that you
20  included in your table for the reason that you
21  stated?
22      A   No.  You -- you are misstating what my
23  concern was.  You look at 32 over 58 and think it
24  means something.  It doesn't.  It just -- because
25  what I'm trying to get across, and I'm sorry if you

1   think that's non-responsive, but the outcome is
2   letrozole -- I mean the outcome -- I'm sorry, it is
3   getting late.  The outcome you are looking at is
4   alopecia so you don't know the denominator of who
5   was exposed to letrozole so you can't calculate
6   incidence, that's all I'm trying to say.
7       Q   BY MS. BENEDICT:  I appreciate that and I
8   understand your point that you can't calculate --
9   you can't calculate a rate from this.  And I
10  will --
11      A   No.  Just --
12      Q   I understand.  I would just go to a new
13  topic.  Okay.
14          Of all the literature cited in your
15  report --
16      A   Uh-huh.
17      Q   -- I want to ask about which of those
18  studies include Accord's docetaxel.
19          So Accord's therapeutic equivalent version
20  that they manufactured and put on the market, which
21  of the patients in that table could have taken
22  Accord's docetaxel.  And since Accord docetaxel's
23  first came on the market in June of 2011, can we
24  agree that none of the studies that predate June
25  2011 included Accord's docetaxel?

1       A   So there --
2           MR. MICELI:  I suppose I should object
3   because I think you asked a question, made a
4   statement, asked a question so it could be compound
5   but which question?
6           THE WITNESS:  It is actually I -- oh,
7   yeah, you had several questions.
8       Q   BY MS. BENEDICT:  Yeah, I will try to -- I
9   was trying to bring in different facts to make it
10  go faster but my question is, could we agree that
11  Accord's docetaxel could not have been the
12  docetaxel used in any of the studies in your report
13  that were published before June 2011?
14      A   I thought I answered that, but the -- the
15  Accord -- not all my studies are conducted in the
16  United States, they're international, so the
17  statement that if it was before 2011 it couldn't
18  have been Accord is not accurate because it was
19  available in other countries before 2011.
20      Q   Okay.  And are you aware of any of your
21  studies, any of the studies cited in your report
22  that are outside the U.S. before 2011 that you
23  believe includes Accord's docetaxel?
24      A   I'm trying to figure out how to answer
25  your question.  I think the question you are asking

Page 386

1  is can I distinguish a manufacturer?  Is that what
2  you are asking?  So causation is about the active
3  ingredient docetaxel.  I don't need to distinguish
4  the manufacturer, it is the identical active
5  ingredient, and you just finished telling me
6  earlier it is therapeutically equivalent.  So the
7  point is for causation, I don't need to know the
8  manufacturer.
9      Q   Got it.
10         So it is not important to your analysis
11  which manufacturer of docetaxel the patients took
12  that are included in your report?
13     A   That's correct.
14     Q   And is it fair to say that you don't know
15  which of the manufacturers of docetaxel the
16  patients took for the literature cited in your
17  report?
18     A   Unless it is in the paper I would not have
19  alternative ways of knowing that.
20     Q   And so for the papers that are based on
21  Sanofi's clinical data, that would definitely not
22  be Accord's docetaxel, correct?
23     A   Causation doesn't depend on the
24  manufacturer, it is the identical active
25  ingredient.  Whether it is Sanofi's or Sandoz's or

Page 387

1  whatever, it is the same active ingredient.  It is
2  relevant for causation.
3      Q   I understand your opinion that those
4  studies are still relevant.  That's not my question
5  right now.
6         My question is literally does Sanofi's
7  clinical trial that resulted in the published
8  literature in the clinical trials include Accord's
9  docetaxel.  Obviously no, right?
10     A   No, I said those -- it includes
11  international studies and in those studies it is
12  possible it was before 2011.  I don't have -- yeah,
13  it is independent of the manufacturer, you know, so
14  for causation that's -- that's how you do it.
15     Q   I know it is getting late but my last
16  question was talking about specifically the
17  literature that is published based on Sanofi's
18  clinical trials.
19         Limited to those, the publications based
20  on Sanofi's clinical trials, is it fair to say that
21  they do not include docetaxel manufactured by
22  Accord?
23     A   It doesn't matter.  I do agree that -- may
24  I finish my sentence?
25     Q   Yes.

Page 388

1      A   For causation it is the active ingredient,
2  it doesn't matter who the manufacturer is, that's
3  the scope of what I am -- I don't mean to pound the
4  sand but that is what I am doing, is general
5  causation, and that -- those are totally valid
6  methods for determining does docetaxel cause
7  permanent, persistent or irreversible alopecia.
8  Those are standards measures.  You don't have to
9  dissect it out by the manufacturer.  It is the same
10  active ingredient.
11     Q   In the Bertrand article that was discussed
12  earlier today that in 2013 the authors described
13  the risk of permanent alopecia introduced by
14  anthracycline and docetaxel so it is a regimen
15  including both; is that correct?
16         MR. MICELI:  Object to the form.
17         THE WITNESS:  Bertrand, let me just look
18  it up real quick.  If you have the page number
19  that's great.
20     Q   BY MS. BENEDICT:  I think it is in the
21  abstract.  I can pull it up for you.
22     A   I remember it.
23         That's the prospective trial of scalp
24  cooling?  Anyway, I found it.  Sorry to interrupt
25  you.

Page 389

1      Q   The article was "Permanent chemotherapy
2  induced alopecia in early breast cancer patients
3  after (neo)adjuvant chemotherapy," Bertrand 2013.
4  This is one of the ones that was discussed earlier
5  today.
6         My question is since the authors discuss
7  the risk of permanent alopecia introduced by
8  anthracyclines and docetaxel-based chemotherapy,
9  for purposes of your chart that could have gone in
10  the anthracycline column, correct?
11         MR. MICELI:  Object to form.
12         THE WITNESS:  No.  The answer is this is a
13  single arm study of a Taxotere regimen.  Just to
14  repeat, I'm looking at Taxotere regimens.  This
15  particular study I can't look at really -- I can't
16  look at an odds ratio because I don't have a
17  comparator so I can't say anything about the other
18  complements of it, I can only talk about the
19  Taxotere regimen and that's it.  There's no
20  comparator.
21         THE REPORTER:  Repeat relate the question.
22         MR. MICELI:  Objection.
23         THE REPORTER:  I didn't get the question.
24         THE WITNESS:  You are asking --
25  answering -- you are asking me a question --

1          MR. MICELI:  The court reporter -- Ellen,
2   Ellen, Ellen, the court reporter didn't get the
3   question, I think.
4          THE REPORTER:  I didn't get the question.
5          MR. MICELI:  She is asking for the
6   question.
7          THE WITNESS:  Go ahead.
8     Q   BY MS. BENEDICT:  My question is, you
9   could just as well call this an anthracycline
10  regimen, correct?
11    A   No.
12    Q   All the patients received anthracycline
13  and docetaxel, correct?
14    A   All the patients receive docetaxel and
15  anthracycline, cyclophosphamides and fluorouracil.
16  They received four drugs.
17    Q   And you counted them as the docetaxel
18  regimen, correct?
19    A   As I said, the topic is Taxotere and
20  Taxotere regimen.  I did not -- to be clear, I
21  didn't interpret an odds ratio for this study or a
22  relative risk because I could not because I don't
23  have a separate arm without Taxotere.  So if
24  information mainly about -- for this it was really
25  about could you prevent.  If you could prevent

1   transient alopecia can you prevent the permanent,
2   persistent alopecia.  I'm not trying to over-read
3   it, I'm just telling you I didn't even -- I
4   couldn't do an odds ratio of relative risk because
5   I don't have a comparator for the time.
6     Q   All right.  All the patients took other
7   chemotherapy just in addition to docetaxel.
8     A   That's correct.
9     Q   Okay.  None of the literature in your
10  Table 2 involves patients who took a regimen of
11  docetaxel and carboplatin, correct?
12    A   Where is it.
13        Actually I believe the 2018 article by
14  Crown had carboplatin in it if I'm not incorrect.
15  Let me just review that Crown --
16    Q   My question was specifically carboplatin
17  in combination with docetaxel.
18    A   I know, and I'm answering.  I'm answering
19  the question.  So I'm just looking.
20    Q   Okay.
21    A   Crown, 2018.  Let me just -- I know
22  there's one in here.  I'm thinking it was one that
23  I was concerned about overlap so I may not have put
24  it in the table because I didn't know if the
25  patients might overlap.

1          So Crown, 2018, yes.  I was -- my recall
2   isn't totally deficient.  I have on Page 65 a
3   regimen with docetaxel, carboplatin, AUC 6 and
4   trastuzumab, and I believe that regimen had --
5   let's see.  Yeah, that was -- yeah.  I guess that
6   was just called, the abbreviation was DPH.  Yes, so
7   that regimen had carboplatin in it.
8     Q   Carboplatin and docetaxel alone?
9     A   Alone, no.  With trastuzumab.
10    Q   Okay.  When you ask --
11    A   I was trying to find you carboplatin,
12  yeah.
13    Q   I appreciate that.
14    A   Okay.
15    Q   Okay.  Switching gears one more time --
16    A   Okay.
17    Q   -- the basis for your opinion on biologic
18  probability would apply to any of the chemotherapy
19  agents that cause alopecia, correct?
20        MR. MICELI:  Object to form.
21        THE WITNESS:  No.
22    Q   BY MS. BENEDICT:  Your opinion is that --
23  well, I guess let me ask you why not.
24    A   Okay.  I was waiting for you to ask.
25        So my comment is the traditional cytotoxic

1   kills rapidly dividing cells, right?  And the hair
2   on your scalp is dividing so the chemotherapy gets
3   to the blood that feeds the scalp and, you know,
4   the hair can die but then it comes back.
5          What I was positing is that for permanent
6   chemotherapy-induced alopecia, and it is not me, it
7   is researchers looking at this, are positing that
8   the hair follicle has been destroyed and that there
9   may be a -- the signaling pathways to tell that
10  mother cells grow is no longer there.  And other
11  possibilities are that potentially there might be
12  not enough clearance of the particular drug from
13  the -- from the scalp and, you know, possibility it
14  acts as a poison to kill the hair follicle.  So,
15  anyway, the bottom line is for a permanent or
16  persistent it is thought that the hair follicles,
17  the mother cell, so to speak, is destroyed and
18  cannot replenish.
19    Q   And my question is isn't that true for all
20  of the chemotherapy agents that have permanent
21  chemotherapy-induced alopecia reported with them?
22        MR. MICELI:  Object to form.
23        THE WITNESS:  I'm really focused on
24  Taxotere.  Anything else, you know, for causation,
25  biologic plausibility is for causation.  I did not

Page 394

1  look into issues for cases or anecdotal cases which
2  in and of themselves don't constitute causation.
3  So biologic plausibility for a permanent -- I'm
4  just saying for permanent, I'm positing things
5  other than just it attacks rapidly dividing cells.
6      Q   BY MS. BENEDICT:  Right.  And I appreciate
7  that's your opinion on biologic plausibility.
8          And is it fair to say you have not done an
9  assessment of biologic plausibility for
10  chemotherapy agents other than docetaxel?
11     A   That's correct.
12     Q   Would you agree that it was not until the
13  Namini article in 2016 that any information was
14  published about Sanofi's TAX 316 regarding
15  permanent chemotherapy-induced alopecia with
16  docetaxel?
17     A   Apologies, but my phone battery is really
18  dying, it is and iPhone, so let me plug it in and
19  turn it to speaker so it doesn't go completely
20  dead.
21         THE REPORTER:  What article was that?
22         THE WITNESS:  Can you hear me?
23         MS. BENEDICT:  Namini, N-a-m-i-n-i.
24         THE WITNESS:  And I missed what you
25  were -- missed what you are spelling.

Page 395

1          MS. BENEDICT:  Sure.  I will try it again.
2      Q   Do you agree that it was not until the
3  Namini article was published in 2016 that Sanofi's
4  TAX 360 data on pCIA with docetaxel was publicly
5  available in the literature?
6      A   Who is the author of that again?
7      Q   Namini.  N-a-m-i-n-i.
8      A   Is that on my list?
9      Q   It is in your list of the clinical trials
10  published in the literature.
11     A   Can you just point me to the --
12     Q   I will withdraw it.
13         Are you aware of any published literature
14  on pCIA and docetaxel from TAX 316?
15     A   Is that your question?
16     Q   Yes.
17     A   Published literature, no.  It is in the
18  label.
19         MR. MICELI:  Mr. Videographer, how much
20  time is left in the nine hours?
21         THE VIDEOGRAPHER:  I'm right at nine
22  hours, sir.
23         MR. MICELI:  Okay.  Thank you.  We're
24  done.
25         MS. BENEDICT:  I've got I think three

Page 396

1  minutes if you would just give me that.  I'm not
2  intending to get into any big new areas.  Just give
3  me a minute to wrap up?
4          MR. MICELI:  I will give you a couple
5  minutes to wrap up if that's okay with Dr. Feigal.
6          THE WITNESS:  That's okay with me.
7          MS. BENEDICT:  I appreciate it and I know
8  it has been a very long day.
9      Q   I think you testified earlier that you had
10  no reason to believe that Accord had access to any
11  of Sanofi's clinical trials data other than what
12  was published, correct?
13     A   Is that a question to me?
14     Q   I'm just trying -- I think you answered it
15  but I'm trying to orient us.
16         MR. MICELI:  Object to form.
17         THE WITNESS:  I don't have access to --
18         MR. MICELI:  Go ahead.
19         THE WITNESS:  I don't have access to
20  Accord's internal documents so I can't comment one
21  way or the other is I thought what I said.
22     Q   BY MS. BENEDICT:  Okay.  But you would
23  agree that the FDA had access to Sanofi's clinical
24  data from their clinical trials, correct?
25         MR. MICELI:  Object to form.

Page 397

1          THE WITNESS:  I can't speak for the FDA,
2  I -- I mean, I think I answered this earlier.  You
3  know, I -- what did the FDA have access to, is that
4  what -- anyway, I think my answer stands.
5      Q   BY MS. BENEDICT:  Have you reviewed -- you
6  have reviewed Sanofi's internal data in this
7  litigation, correct, on their clinical trials?
8      A   I did not review internal -- I don't
9  recall reviewing internal correspondence with the
10  FDA between Sanofi so I don't -- I don't think I
11  could have commented on what FDA did or did not
12  have.
13     Q   Do you know from your experience --
14     A   Go ahead.
15     Q   I didn't mean to cut you off.  Okay.
16     A   Go ahead.
17     Q   Dr. Feigal, you know from your experience
18  both working at pharmaceutical companies and
19  consulting for pharmaceutical companies and their
20  interactions with FDA that they have to submit
21  their clinical trials data to the FDA in order to
22  get approval, correct?
23         MR. MICELI:  Object to the form.
24         THE WITNESS:  It is correct that companies
25  submit their data to the FDA including the

Page 398

1  obviously the registrational pivotal trial.
2      Q   BY MS. BENEDICT:  And the FDA reviews that
3  data in approving or not approving a particular
4  product for the market, correct?
5      MR. MICELI:  Object to the form.
6      THE WITNESS:  You are talking in general.
7  In general, yeah, data should be submitted to the
8  FDA and FDA makes the decision about approving --
9  if you are talking about an NDA, about approving an
10  NDA, yes, that's correct.
11      Q   BY MS. BENEDICT:  And in this case the FDA
12  decided to approve Sanofi's NDA with the brand name
13  Taxotere/ docetaxel on the market, correct?
14      MR. MICELI:  Object to the form.
15      THE WITNESS:  It is correct that -- I
16  guess now we're talking about Sanofi -- docetaxel,
17  Taxol, was approved by the FDA for the adjuvant
18  treatment of node-positive breast cancer patients.
19      Q   BY MS. BENEDICT:  Dr. Feigal, as you sit
20  here today are you aware that the plaintiff Alice
21  Hughes is cancer-free?
22      A   I didn't hear the first part.  Are you
23  asking me about a patient?
24      MR. MICELI:  Hold on.  Time out.  I just
25  ended up hanging up instead of turning off my

Page 399

1  alarm.
2      We have gone four minutes past the nine
3  hours and we're getting into a whole different
4  topic so we're going to close it down.
5      MS. BENEDICT:  This is a single question,
6  one question.
7      Q   Dr. Feigal, are you aware that the
8  plaintiff Alice Hughes is cancer-free?
9      MR. MICELI:  Object to the form.
10      THE WITNESS:  As I said multiple times, I
11  have no specific information about a -- I have no
12  information about a specific patient.
13      MS. BENEDICT:  Those are all my questions.
14  I appreciate your time today.
15      THE WITNESS:  Okay.  Thank you.
16      MR. MICELI:  Thank you, Dr. Feigal.
17  Nothing from Plaintiffs.
18      THE VIDEOGRAPHER:  This concludes today's
19  deposition.  Off video at 8:19 p.m.
20
21      _____
             ELLEN FEIGAL, M.D.
        Subscribed and sworn to
22      before me this    day
        of        20 .
23
24      _____
        (Notary Public)   MY COMMISSION EXPIRES: _____
25
26

Page 400

1          REPORTER'S CERTIFICATE
2
3      I, SUSAN A. SULLIVAN, CALIFORNIA CSR No.
4  3522, RPR, CRR, do hereby certify:
5      That prior to being examined ELLEN FEIGAL,
6  M.D., the witness named in the foregoing
7  deposition, was, before the commencement of the
8  deposition, duly administered an oath in accordance
9  with C.C.P. Section 2094;
10      That the said deposition was taken before
11  me at the time and place therein set forth, and was
12  taken down by me in shorthand and thereafter
13  transcribed into typewriting under my direction and
14  supervision; that the said deposition is a true and
15  correct record of the testimony given by the
16  witness;
17      I further certify that I am neither
18  counsel for, nor in any way related to any party to
19  said action, nor in any way interested in the
20  outcome thereof.
21      IN WITNESS WHEREOF, I have subscribed my
22  name on this 11th day of September, 2020.
23                   Susan A. Sullivan
24      _____
             SUSAN A. SULLIVAN, CSR
25

Page 401

1
2  -------------------I N D E X--------------------
3  WITNESS          EXAMINATION BY          PAGE
4  ELLEN FEIGAL, M.D.         Mr. Insogna       9
5                            Ms. Benedict     275
6
7  UNANSWERED QUESTIONS
8  Page   Line
9   33    15
    35    24
10   36    16
11  ----------------E X H I B I T S----------------
12                                           PAGE
13  Feigal Exhibit 1,                         11
14  Deposition of Ellen Feigal, Volume 1, taken
15  December 7, 2018, (Durden, Francis, Earnest)
16  Feigal Exhibit 2,                         11
17  Deposition Of Ellen Feigal, Volume 2, taken
18  December 7, 2018, (Durden, Francis, Earnest)
19  Feigal Exhibit 3,                         12
20  Deposition of Ellen Feigal, Volume 3, taken
21  January 7, 2019, (Durden, Francis, Earnest)
22  Feigal Exhibit 4,                         12
23  Deposition of Ellen Feigal, Volume 4, taken
24  April 30, 2019, (Durden, Francis, Earnest)
25

Page 402

|  |  | PAGE |
|---|---|---|
| 1 | (Continued) | |
| 2 | Feigal Exhibit 5, | 13 |
| 3 | Deposition of Ellen Feigal taken November | |
| 4 | 21, 2019, (Crayton, Thibodeaux) | |
| 5 | Feigal Exhibit 6, | 13 |
| 6 | Deposition of Ellen Feigal taken April 10, | |
| 7 | 2020 | |
| 8 | Feigal Exhibit 7, | 19 |
| 9 | Plaintiffs' Disclosure of Witnesses, June | |
| 10 | 8, 2020 | |
| 11 | Feigal Exhibit 8, | 41 |
| 12 | Expert Report of Ellen G. Feigal, M.D. | |
| 13 | Feigal Exhibit 9, | 102 |
| 14 | Appendix 1 - Curriculum Vitae | |
| 15 | Feigal Exhibit 10, | 109 |
| 16 | Appendix B - Ellen Feigal, M.D., Materials | |
| 17 | Reviewed | |
| 18 | Feigal Exhibit 11, | 146 |
| 19 | Excerpt from J Am Acad Dermatol | |
| 20 | Feigal Exhibit 12, | 169 |
| 21 | 2.5 Clinical Overview:  Docetaxel And Permanent | |
| 22 | Alopecia, Bates Nos. Sanofi_00829529 to | |
| 23 | Sanofi_00829565 | |

Page 403

|  |  | PAGE |
|---|---|---|
| 1 | (Continued) | |
| 2 | Feigal Exhibit 13, | 171 |
| 3 | Incidence of permanent alopecia following | |
| 4 | adjuvant chemotherapy in women with early | |
| 5 | stage breast cancer | |
| 6 | Feigal Exhibit 14, | 182 |
| 7 | Incidence of permanent alopecia following | |
| 8 | adjuvant chemotherapy in women with early | |
| 9 | stage breast cancer | |
| 10 | Feigal Exhibit 15, | 194 |
| 11 | Persistent major alopecia following adjuvant | |
| 12 | docetaxel for breast cancer: incidence, | |
| 13 | characteristics, and prevention with scalp | |
| 14 | cooling | |
| 15 | Feigal Exhibit 16, | 209 |
| 16 | Permanent Chemotherapy-Induced Alopecia in | |
| 17 | Patients with Breast Cancer:  A 3-Year | |
| 18 | Prospective Cohort Study | |
| 19 | Feigal Exhibit 17, | 222 |
| 20 | Abstract P3-09-15: Permanent chemotherapy | |
| 21 | induced alopecia in early breast cancer | |
| 22 | patients after (neo)adjuvant chemotherapy: | |
| 23 | Long term follow up | |

Page 404

|  |  | PAGE |
|---|---|---|
| 1 | (Continued) | |
| 2 | Feigal Exhibit 18, | 228 |
| 3 | Permanent alopecia in patients with breast | |
| 4 | cancer after taxane chemotherapy and adjuvant | |
| 5 | hormonal therapy:  Clinicopathologic findings | |
| 6 | in a cohort of 10 patients | |
| 7 | Feigal Exhibit 19, | 234 |
| 8 | Assessment of Quality of Life and Treatment | |
| 9 | Outcomes of Patients With Persistent | |
| 10 | Postchemotherapy Alopecia | |
| 11 | Feigal Exhibit 20, | 243 |
| 12 | Hair disorders in cancer survivors | |
| 13 | Feigal Exhibit 21, | 257 |
| 14 | Highlights Of Prescribing Information, Bates | |
| 15 | Nos. SANDOZ-TAXO- Stewart, Wanda-000060 to | |
| 16 | SANDOZ-TAXO-Stewart, Wanda-000119 | |
| 17 | Feigal Exhibit 22, | 265 |
| 18 | Chemocare.com handout for doxorubicin | |
| 19 | Feigal Exhibit 23, | 266 |
| 20 | Chemocare.com handout for Taxotere | |
| 21 | Feigal Exhibit 24, | 272 |
| 22 | Notice of Videotaped Deposition of Ellen G. | |
| 23 | Feigal, M.D. | |

Page 405

|  |  | PAGE |
|---|---|---|
| 1 | (Continued) | |
| 2 | Feigal Exhibit 25, | 277 |
| 3 | Defendant Accord Healthcare, Inc.'s Cross | |
| 4 | Notice of Videotaped Deposition of Ellen G. | |
| 5 | Feigal, M.D. | |
| 6 | Feigal Exhibit 26, | 279 |
| 7 | Expert Report of Ellen G. Feigal, M.D. | |
| 8 | Feigal Exhibit 27, | 313 |
| 9 | NCCN Clinical Practice Guidelines in | |
| 10 | Oncology Version 5.2020 | |
| 11 | Feigal Exhibit 28, | 315 |
| 12 | NCCN Clinical Practice Guidelines in | |
| 13 | Oncology Version 2.2011 | |
| 14 | Feigal Exhibit 29, | 321 |
| 15 | Cochrane Database of Systemic Reviews | |
| 16 | Feigal Exhibit 30, | 323 |
| 17 | What survival benefits do premenopausal | |
| 18 | patients with early breast cancer need to | |
| 19 | make endocrine therapy worthwile? | |
| 20 | Feigal Exhibit 31, | 324 |
| 21 | Patient Preferences for Adjuvant Chemotherapy | |
| 22 | of Early Breast Cancer:  How Much Benefit Is | |
| 23 | Needed? | |

Page 406

1   (Continued)                                          PAGE
2   Feigal Exhibit 32,                                   328
3   Phase III Randomized Trial of Docetaxel-
4   Carboplatin Versus Paclitaxel- Carboplatin as
5   First-line Chemotherapy for Ovarian Carcinoma
6   Feigal Exhibit 33,                                   334
7   Falls, Functioning, and Disability Among Women
8   With Persistent Symptoms of Chemotherapy-
9   Induced Peripheral Neuropathy
10  Feigal Exhibit 34,                                   346
11  Highlights Of Prescribing Information
12  Feigal Exhibit 35,          358
13  Patient Consent to Medical Treatment of
14  Surgical Procedure and Acknowledgement of
15  Receipt of Medical Information, Bates Nos.
16  HUGHESA_PSR_00144 and HUGHESA_PSR_00143
17  Feigal Exhibit 36,                                   365
18  Chemotherapy-induced irreversible alopecia
19  in early breast cancer patients
20  Feigal Exhibit 37,                                   368
21  Dermatological adverse events with taxane
22  chemotherapy
23  Feigal Exhibit 38,                                   378
24  Highlights of Prescribing Information
25

Page 407

1   ERRATA SHEET FOR THE TRANSCRIPT OF:
2   Case Name:  Taxotere vs. Sandoz
3   Deposition Date:  September 1, 2020
4   Witness:  ELLEN FEIGAL, M.D.
5                   CORRECTIONS:
6   Pg.  Ln.      Now Reads      Should Read    Reason
7   ___  ___   _____  _____  _____
8   ___  ___   _____  _____  _____
9   ___  ___   _____  _____  _____
10  ___  ___   _____  _____  _____
11  ___  ___   _____  _____  _____
12  ___  ___   _____  _____  _____
13  ___  ___   _____  _____  _____
14  ___  ___   _____  _____  _____
15  ___  ___   _____  _____  _____
16  ___  ___   _____  _____  _____
17  ___  ___   _____  _____  _____
18  ___  ___   _____  _____  _____
19  ___  ___   _____  _____  _____
20  ___  ___   _____  _____  _____
21                            _____
                                   ELLEN FEIGAL, M.D.
22  Subscribed and sworn to
    before me this    day
23  of            20 .
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES: _____

**$**

**$230,000** 53:18

**$250,000** 54:2

**(**

**(i)** 173:16

**(neo)adjuvant**
222:18 389:3 403:22

**-**

**--------------------I**
401:2

**------------------E**
401:11

**--o0o--** 6:3

**0**

**0.1-5.3** 241:21

**04** 198:10 206:7

**05** 196:17

**1**

**1** 6:1 7:5 11:8,9,12
102:19 239:2 241:25
278:24 279:15
321:19 401:13,14
402:14 407:3

**1,000** 330:3

**1,077** 330:3

**1.37** 191:7 206:16

**1.85** 198:9 257:12

**10** 13:18 109:5 228:4
368:17 369:23 402:6,
15 404:6

**10.2%** 195:1

**100** 324:15

**100%** 167:14

**102** 402:13

**109** 402:15

**10:20** 102:7

**10:21** 102:9

**10:33** 102:11

**10th** 13:4,6,15

**11** 12:15 146:11
401:13,16 402:18

**115** 259:22

**116** 259:22

**117** 261:22

**11:58** 168:4,5

**11th** 400:22

**12** 169:11 173:24
178:8,17 382:24
401:19,22 402:20

**1200** 245:18

**1201** 254:11

**1202** 250:2

**13** 171:1 237:16,19
239:2 402:2,5 403:2

**13%** 176:15,23 177:2,
15,19,21,23 178:12

**14** 181:24 182:2
263:14 403:6

**14/137** 195:1

**146** 402:18

**15** 102:2 194:1
201:22 280:6 401:9
403:10

**15%** 176:8 178:1
179:17

**16** 202:1,4 204:1,8
209:1 401:10 403:15

**169** 402:20

**17** 222:16 403:19

**17.5%** 251:5

**171** 403:2

**18** 181:4 228:1
266:15 404:2

**182** 403:6

**19** 125:13 162:14
190:6 192:2 234:22
264:21 402:8 404:7

**192** 238:25

**193** 237:5

**194** 403:10

**1989** 318:7

**1991** 103:10,23

**1:03** 169:1,2

**1:20** 102:7

**1:57** 208:16

**1a** 173:4 216:18

**1b** 173:5 223:4

**1c** 173:6

**1st** 7:11

**2**

**2** 11:18,19,20 160:18
166:5,6,11,14,18
167:6,7,19 194:20,24
213:25 218:12
220:25 221:12 222:1
315:19 322:6 330:20
373:13 377:24 381:1
391:10 401:16,17

**2.2011** 315:22 405:13

**2.5** 169:11 402:21

**20** 243:17 256:3
399:22 404:11
407:23

**20%** 247:4

**2000s** 157:25

**2001** 325:2

**2004** 86:16 87:16
103:15,19,25 276:12,
19

**2005** 324:5 327:22

**2007-2008** 280:24
281:15

**2008** 280:24 281:16

**2009** 239:2,22

**2011** 109:24 221:12,
23 263:14 276:4,6,
11,13,18 280:24
281:16 295:18
302:11,21 303:21
304:12 306:3,4,6,19
307:1,12,16,20,23
308:12,24 315:18
316:1,6,21 345:19
346:15,24,25 347:1,3
349:22 350:22
351:20 352:11
360:12 361:13
384:23,25 385:13,17,
19,22 387:12

**2013** 109:25 222:24
388:12 389:3

**2014** 89:6 163:7,12
170:4,14 217:12
257:24 258:20 264:1,
17 307:2

**2015** 163:18

**2016** 110:5,17 368:24
394:13 395:3

**2017** 53:20 54:6
218:20,23 239:2,22
334:2,14 336:8,19
365:22 366:9,10
367:13

**2018** 11:9,13,20
194:6 218:19 348:11
391:13,21 392:1
401:15,18

**2019** 12:15,18,22,25
13:5,8,11 110:1
240:1 244:5 245:1,5
318:21 381:1 401:21,
24 402:4

**2020** 6:1 7:12 13:15,
18 19:25 245:4
313:15 316:16
400:22 402:7,10
407:3

**209** 403:15

**2094** 400:9

**21** 13:11 242:14
257:18 258:1,2 260:3
402:4 404:13

**21st** 13:8

**22** 170:25 265:1
266:16 404:17

**22/221** 194:25

**222** 403:19

**228** 7:14 404:2

**22A** 181:17

**23** 179:24 266:19
375:25 404:19

**234** 404:7

**24** 193:25 272:23
275:3 401:9 404:21

**24%** 176:11 177:16,
17 179:4,16

**243** 404:11

**25** 164:22 208:24
277:2 405:2

**25.7%** 198:18

**257** 404:13

**26** 19:20 279:8
311:10,15 405:6

**260** 179:25

**2609** 343:1

**265** 404:17

**266** 404:19

**27** 311:11 313:18,19
405:8

**272** 404:21

**2740** 7:10

**275** 401:5

**277** 405:2

**279** 405:6

**28** 76:12 201:25
202:23,25 234:21
315:21 316:5 345:12
405:11

**29** 76:12 201:21
202:4 204:1,8
321:13,18,20 322:1
345:12 405:14

**295** 172:10 173:23
174:1,3,10 176:6
191:19

**2:23** 208:18

**2a** 173:7 216:14,18, 25

**2b** 173:8 216:18

**3**

**3** 12:14,17,18 401:19, 20

**3-year** 209:3 403:17

**3.64** 206:14

**30** 6:19 12:25 56:16 114:9 323:13 401:24 405:16

**30%** 250:23 251:4 335:18

**300** 172:6,10 174:3,9

**30th** 12:22 13:5

**31** 222:12 237:16 324:22 325:4 405:20

**313** 405:8

**315** 405:11

**316** 160:18 161:15 162:4,10,16,25 163:6,11 193:10 198:5,11 199:4,13,23 200:4,8 201:20 202:12,18 203:17 394:14 395:14

**32** 242:13 256:5 328:19 383:23 406:2

**321** 405:14

**323** 405:16

**324** 405:20

**328** 406:2

**33** 227:24 334:3 336:18 401:9 406:6

**334** 406:6

**34** 312:2 346:16,17 406:10

**346** 406:10

**35** 358:17 406:12

**3522** 400:4

**358** 406:12

**36** 365:24 401:10 406:17

**360** 395:4

**365** 406:17

**368** 406:20

**37** 146:10 311:20,23 312:1 355:20,23 368:4 406:20

**378** 406:23

**38** 378:3 406:23

**385** 237:5

**3:35** 256:14

**3:51** 256:16

**4**

**4** 12:21,24,25 151:9 318:17 401:22,23

**40** 362:7

**41** 257:17 402:11

**41,911** 321:20 322:2

**412** 210:13

**417** 209:11 210:15,24

**42,260** 318:20

**43** 207:13 209:23

**44** 41:4

**45** 205:11 303:16

**45th** 7:14

**46** 169:10

**46.2%** 251:18

**47** 237:1,12 243:16

**49** 216:7

**492** 194:12

**4:13** 272:15

**4:28** 272:17

**5**

**5** 13:3,8,10 301:13,14

313:15 402:2

**5%** 196:5,18

**5-fluorouracil** 41:22

**5.2020** 313:20 405:10

**5.3** 241:25

**50** 216:21

**50%** 179:19

**502(b)(2)** 302:1 303:22 304:7,23 306:7

**505(b)(2)** 280:8 283:10,18 284:6,15 288:15 293:1,20,22 294:20 295:4 297:10, 12 301:6,18 305:9

**505(b)(2)s** 288:19,22

**512** 343:4

**52** 194:23

**532** 366:12,23

**54** 145:13

**54.7** 206:15 257:12

**55%** 381:5,8,15,22,23

**58** 238:7 383:23

**581** 324:6

**59** 215:5

**5:15** 303:9

**5:28** 303:11

**5:32** 256:5

**6**

**6** 13:14,17 20:2 292:1 347:7 362:10 392:3 402:5

**6-12** 366:13

**6-month** 366:17

**60** 354:11

**60%** 366:12

**61** 207:13 209:23

**62** 194:17

**65** 392:2

**6:32** 346:4

**6:45** 303:16 346:6

**7**

**7** 11:9,20 12:18 19:24 274:5 348:11 401:15, 18,21 402:8

**7%** 198:19

**71** 219:13,14 296:15

**72-page** 145:23

**726** 236:18 240:5

**75** 143:6 151:8

**76** 91:5 151:8 292:1 301:4

**7:19** 369:15

**7:35** 369:17

**7th** 11:13

**8**

**8** 19:25 41:1 402:10, 11

**8%** 177:6,12 180:6,8, 10 254:22 255:1

**8,430** 145:20

**8,433** 147:12

**8.01** 206:16

**80** 237:1,12

**80%** 104:7

**82** 237:6

**84** 41:6 43:23

**85%** 326:11

**86** 173:4,18

**8:05** 6:2

**8:07** 7:12

**8:15** 15:15

**8:17** 15:17

**8:19** 399:19

**8th** 28:18 40:21 75:18 245:2,4

**9**

**9** 102:19 401:4 402:13

**9.96%** 194:25

**90%** 107:6

**94** 235:21 236:8

**951** 373:15

**956** 229:3

**98** 235:20 236:8

**9805** 160:19 162:17 198:5 200:22 204:4

**9:23** 67:18

**9:36** 67:20

**A**

**a.m.** 6:2 7:12 15:15, 18 67:18,21 102:9,12 168:4,5

**abbreviation** 186:23 392:6

**ability** 123:8,14 175:21 182:23 302:9

**absence** 258:9 361:20 362:9

**absolute** 198:19

**absolutely** 59:15 171:13 193:24 269:12,15

**abstract** 172:4,7,8,9, 13,17 173:25 177:22 178:2,5 182:18 218:3 222:16,22 223:1,15, 16 225:2 330:18 388:21 403:20

**abstracts** 172:19 174:2 217:17,25

**Acad** 146:11 402:19

**academic** 248:3

**accept** 251:14

**accepted** 44:12 45:2

365:17

**access** 95:22,23
125:10,12,13,16,18
126:6 129:9 131:3,5,
10,15 154:17 163:16
293:12 297:2,6,7
298:5 302:5 305:16
307:24 308:4,6 309:1
356:15 357:1,12
361:12,17 375:21
396:10,17,19,23
397:3

**accessing** 357:5

**accompanied** 359:5

**Accord** 7:2,23 8:11
17:14 20:14 89:9
91:1,4 109:15,22
112:7 127:5 275:15
277:2,18 278:5,7,10
280:16 283:23
284:22 285:2 286:6,
12 287:11,18 288:5
289:16 290:2,13,16
291:6,15 292:8,13,19
297:2,6 299:23
302:10,14,21 303:25
304:17,22 305:5,21
306:13,19 307:11,23
308:3,11,22 345:19
346:13,23,24 354:10
361:12,17 384:22
385:15,18 387:22
396:10 405:3

**Accord's** 274:13
276:2,7,16,17,20,25
277:8,22,25 285:6,
13,23 287:3,6 289:21
291:7,11 292:2
294:11 295:17 296:1
346:10,15 347:14
355:5 384:18,19,22,
25 385:11,23 386:22
387:8 396:20

**accordance** 400:8

**account** 159:20

**accuracy** 31:17

**accurate** 10:4,8
14:19 16:3,7,11,17
49:19 53:19,21 54:3,
5 57:4 103:2 104:11
123:5 140:5 279:1,20

**288:19** 301:10 362:3,
4,13 385:18

**accurately** 214:15
301:11 321:23

**acknowledge**
228:13 279:23

**acknowledged**
127:4 376:1

**Acknowledgement**
358:19 406:14

**acknowledging**
211:9 286:23

**Act** 293:17

**Actavis** 8:14

**acting** 59:8,18 60:23

**action** 400:19

**active** 97:1 221:8
294:23 295:6 374:6
386:2,4,24 387:1
388:1,10

**Activis** 8:13

**activities** 105:17

**acts** 393:14

**actual** 185:20 312:3

**acute** 271:14 376:20

**acutely** 376:12,21,23
377:3

**add** 110:17 116:15,
16,19 331:11

**added** 39:20 110:22,
23 179:10

**adding** 40:3

**addition** 41:22 55:22
152:7 215:11 251:16
288:6 314:13 391:7

**additional** 38:2
39:21 40:10 41:23
51:16 53:22 56:17
97:14 117:21 165:23
166:8 174:8 203:23
229:13 243:13
257:13 326:20 341:3

**additions** 39:16

**address** 50:12 61:8
144:15

**addressed** 260:17

**addresses** 17:22

**addressing** 198:3
368:19 369:25

**adds** 149:24 150:1

**adequacy** 88:24
89:13 93:9

**adequate** 198:25
200:1

**adequately** 73:13,14

**adjectives** 258:13

**adjust** 207:25

**adjusted** 208:1

**adjuvant** 171:2,7
182:3 184:11 187:18,
24 194:2 207:9 228:3
229:12 230:11,14
231:8 233:23 244:13
254:24 271:20
312:16 314:6,8
316:10,13 317:2,10
318:24 319:9 321:12
322:9 324:11,23
325:3,25 326:21,24
327:8 331:19 339:20
359:13,23 398:17
403:4,8,11 404:4
405:21

**adjuvantly** 271:25

**administered** 400:8

**admissible** 6:18

**Adriamycin** 41:21
114:16 115:1 118:23
119:7 135:23 137:9
138:4 140:21 141:6
142:3,14 186:17
187:4 189:8 192:9
193:11 212:14 247:5
264:24 265:13 266:2
268:1,2

**Adriamycin/
paclitaxel** 189:1

**advance** 26:3,15

**advanced** 152:23
153:4,6

**adverse** 19:1 62:14
107:8 160:1 202:12,
18 203:7,9,11 259:1,
3,10,16 347:7,8
367:22 368:4 376:12,
14,21 377:2,3,25
379:4 380:23 406:21

**advertise** 48:18,22,
24

**advertising** 49:2,6
295:16

**advice** 33:10,11
34:4,17 35:8 46:25

**advocacy** 269:14

**advocate** 269:2

**affirmative** 344:12

**affordable** 293:13

**afternoon** 275:14

**age** 83:21 84:1,7
208:1 356:14

**agency** 107:16
338:22

**agent** 144:1 294:6
320:3 349:24 350:23

**agents** 117:1 119:2
120:4 140:2 158:22
193:8 212:1,3,22
213:15 216:12 331:4
338:14 339:3 342:24
372:8 392:19 393:20
394:10

**agree** 6:23,25 7:3
10:3 59:6 76:14
99:23 111:14 118:22
121:5,16 158:7 160:6
163:5 179:16 180:21
183:10 184:11,14,16
188:16 195:9 217:13
221:10 222:3 225:24
226:16,22 230:1
235:24 237:11
242:12 252:17,21
253:19 254:2,3,9
258:15,20,24 259:1,
12,15 260:9 261:3
262:13 265:25 266:4
268:22 271:24
287:19 292:25
293:11 297:2 302:1

**316:19** 317:9,22
318:11,24 322:13,14,
23 323:4 324:13
326:4 333:22 338:11,
12,15,20 339:4 342:8
344:25 345:14
348:12,19 349:7
355:14 366:25 367:5
368:23 370:4,19
378:15,23 380:19,22
384:24 385:10
387:23 394:12 395:2
396:23

**agreed** 23:15 35:2
226:17 273:16 349:5

**agreeing** 236:1

**agreement** 34:19
58:17 131:1,19

**ahead** 27:3 36:24
129:1 178:25 180:5
188:23 195:8 236:17
242:23 250:4 313:16
320:17 347:20,21
355:8 390:7 396:18
397:14,16

**AI** 376:5

**alarm** 399:1

**algorithm** 245:11

**Alice** 277:10 278:16,
22 309:4,25 310:10
398:20 399:8

**alignment** 152:18

**alive** 323:9

**Alkalting** 212:1

**allowable** 288:3

**allowed** 52:22
123:11 369:9

**allowing** 255:11

**alopecia** 23:4,15
24:8,13,16,18 41:15
42:8,14,20 44:2,7
63:12,17 64:7 66:7
68:13 69:11,14 78:2,
22 80:15 81:16,20
82:15,21 83:2,23
90:3,20 96:2,14 97:6
98:8,16 106:13,15,
22,23,25 107:3,11,

20,24 108:16 110:8,
18 111:3 114:22
115:9 116:24 117:6,
20,21 118:2,25
119:3,5,10,20 120:8,
24 121:7 124:16,24
131:7 139:9 143:11
144:21 147:14,19,24
148:1,6 157:15,16
162:22 169:12,17
171:2,7 175:23
176:8,23 177:11
179:1,7,21 180:10
182:3 184:10,13,15
187:19 188:5,13
189:2,9 191:9,11
194:2,20,24 198:7
200:6,10,13,24
201:3,6,13,19,22
203:10 204:16,25
206:1,3 208:3 209:2,
17 217:2 219:23
222:17 223:18,23
224:10 225:4,8,12,
13,16,20,24 226:7,
10,16,24 227:5 228:1
231:20 234:24 236:5,
14 237:24 238:11
239:1,7 240:13
244:19,21 245:24
246:4,5,14 247:6,19
251:15,17,18,22
252:1,15,24 253:22,
23 254:18,23 255:6
258:8,12,16,23,25
259:5,6,13,15,19
261:13 263:5,16,22
264:16 286:9,13,20
296:20 301:6 302:23
303:24 307:13
310:16 311:2,5
331:2,18 333:21
334:21 335:1 336:23,
25 337:13,25 338:4
339:3,12,13 342:13,
23 343:21 345:9
347:10,13,16,25
348:1 349:5,7,8
350:24 351:5,17,22
352:1,12 361:14,20
365:21,25 366:16,18
367:4 370:5,7
371:14,15,24 372:1
373:2 375:19 377:9,
16 378:1,9,23 379:3,
10,11 380:16,20,22

**alternate** 61:21

**alternative** 62:6,15,
23 81:22 386:19

**American** 318:18

**Amgen** 280:24
281:16,25 283:3,10

**amount** 53:23
175:11 213:13 218:6
240:18 241:20
290:15,20

**ample** 255:15

**anagen-to-** 78:6
79:13

**anagen-to-telogen**
78:1,14,18,23 80:2,9

**analogous** 193:10

**analyses** 159:1

**analysis** 30:24 95:25
96:12,22 97:5,12
98:2,10,11 99:11,19
100:10,11,15 123:18,
21 124:4,14,17,22
125:4,20 126:1
127:23 135:17 136:1,
17 137:3,5,8 138:3
139:2,4 140:4,15,20
152:3,9,21 153:4,21
154:5,16,18,22
155:22 156:13,15,16
158:24 161:15
178:23 180:17 181:2
198:5 199:2 205:22
210:2 248:8,15 291:8
298:23,24 301:8
304:8,19,24 305:9
386:10

**analyzed** 174:9
202:5

**anastrozole** 119:8
140:22 242:14

**And/or** 43:24

**Anderson** 32:4

**andro-** 224:9 251:17

**androgenetic** 252:1,
15,24

**anecdotal** 119:13,15
120:11 143:1 266:5
394:1

**anecdotes** 374:8

**announce** 8:7

**answerable** 272:6

**answering** 128:25
129:1 132:24 190:19
242:19 249:3 382:14
389:25 391:18

**answers** 15:6 61:18
75:1 140:4 172:2
251:11 269:13

**Anthenol** 283:16

**anthracycline**
176:11 177:5,10,14,
17,20 178:12 179:3,
9,21,23 180:9 188:3,
12 388:14 389:10
390:9,12,15

**anthracycline-
based** 314:14

**anthracyclines**
41:20 389:8

**anti-** 232:15

**antibiotic** 271:15

**anticipate** 220:4
377:21

**antiestrogen** 229:12
230:11,15 231:8,12

**antimicrotubule**
212:3

**anymore** 15:1 25:12
190:18 382:14

**anytime** 294:12

**Apologies** 238:15
394:17

**apologize** 37:13
100:19 159:18
184:24 259:8 314:25
331:9

**apparently** 369:2,9

**appeared** 14:3

**appears** 71:8 123:3
186:11 187:2 215:5
216:7

**appended** 102:14

**Appendix** 56:2,4,10,
25 99:18 102:19
109:5 402:14,16

**apples** 240:21

**applied** 134:11
136:18

**applies** 301:20

**apply** 286:4 392:18

**applying** 125:4

**apprised** 353:1
357:17

**approach** 61:2
140:17 269:11

**appropriately** 93:20
149:11

**appropriateness**
309:13,17,24

**approval** 47:13,18,
23,24 92:7 193:8
199:2 203:20 277:25
280:7 287:10 347:3
360:4 397:22

**approvals** 278:4
284:7

**approve** 398:12

**approved** 203:16,22
222:6 287:4,5,7
288:25 293:13
294:22 295:6,17
296:1 314:15 398:17

**approving** 398:3,8,9

**approximately** 7:12
26:10 111:23

**April** 12:22,25 13:4,5,
6,15,18 257:24
258:20 264:17
401:24 402:6

**Arbuck** 105:24

**area** 79:7 81:20 150:9
258:10

**areas** 77:8,9 121:1
275:18 290:11
343:20 396:2

**arguing** 139:17
344:22 383:7

**Argus** 98:6,14,15
99:25 100:6,14,18

**arm** 64:3,14 152:21
170:19 176:16,24
177:4,7,9 178:7
179:6,24,25 191:15
193:15 198:7,8
199:23,24 200:3
201:17,21,23 203:8
204:1,2,16 206:3,4
364:6,7,8 389:13
390:23

**arms** 136:6 176:17
178:6 196:25 197:1,
8,11 201:25 202:2
203:9,10 311:18

**aromatase** 118:24
135:23 138:12 141:7
143:3 193:12,22
194:15 195:11 238:7
254:24

**arrhythmia** 271:17

**arrive** 155:22

**arrived** 155:24
363:22

**art** 98:5

**arthralgias** 376:13

**article** 38:11 39:12
42:13 44:5,9 124:13
146:3 148:8 218:23
247:11 249:1,3,5,7
250:9 255:9 321:22
322:1,3,21 323:11,21
324:2 325:2,13,15
329:6,8,15 330:10,13
334:11,15 336:8,10,
18,20 342:3 364:22
365:5,20 367:2,20
368:2,10,13,14
369:5,8,11,21,24
371:17,18 373:12,19,
22 374:11 380:25
388:11 389:1 391:13

**anastrozole** 119:8

**381:6,18,21,23,25**
382:8 384:4 388:7,13
389:2,7 391:1,2
392:19 393:6,21
394:15 402:22 403:3,
7,11,16,21 404:3,10
406:18

394:13,21 395:3

**articles** 38:5,8,18,22
39:4 42:23 51:2 97:9
115:16 165:7,9,23
166:4,5,6,17,19
167:18 181:3,4,8
190:7 243:13 248:13
255:11,12 257:2,6,8
326:6 330:6,25 332:8
334:2 339:10 340:13,
18 341:10,20 371:6,
10,11,14 372:24

**asks** 133:3,4 274:5
277:17

**aspect** 372:11

**aspects** 117:8 272:7
363:7

**assess** 87:12 156:25
217:2 219:25 365:9
375:15

**assessed** 135:22
373:16

**assessing** 91:18
324:8

**assessment** 80:14
136:10 234:22
351:23 394:9 404:8

**assistance** 20:9

**assisting** 299:9

**association** 6:7 7:16
28:9 29:25 133:17
134:10 135:4 137:12
141:23 149:1,20
150:2,19 151:22
161:20 189:5 198:4
301:23

**assume** 20:15 36:10
69:18 71:18 74:21
96:7 102:15 103:1
110:5 122:4 125:14
187:23 215:25
237:23 308:21
351:10

**assumed** 96:11

**assuming** 85:4
242:18

**assumptions**
121:16,19 122:21,22

**Atlanta** 12:4

**attach** 274:18,22

**attached** 273:7

**attacks** 394:5

**attempt** 61:14 64:7

**attempted** 310:22
371:14

**attending** 8:4

**attention** 12:2
235:10

**attorney** 34:20 35:12
100:22,23

**attorneys** 32:19,24
33:12 34:5 35:1,10,
13 36:6 37:4,23

**attributable** 238:8

**attribute** 320:2,7

**Attributed** 236:6

**attribution** 219:16
246:21 247:9 248:12

**AUC** 392:3

**audio** 15:4

**author** 212:9 367:21
395:6

**author's** 224:7
322:7,18

**authored** 27:23
107:10 170:21 171:6
244:4

**authoring** 37:20

**authorities** 94:17

**authority** 321:7
323:18,21 325:7,10
329:1 334:9 367:25

**authors** 173:23
174:21 175:17
186:16 187:7 188:2,
11 193:20 194:14
211:8 212:12,19
223:22 228:13
229:17 230:1,7,24
232:11 241:18
252:22 253:21 254:4

**authors'** 231:7
232:15

**avail** 126:11

**availability** 130:22,
23 302:3

**average** 241:20

**avoid** 65:8,15

**aware** 16:8 48:7,10,
15 49:2,3,5,7 53:2,13
56:11 57:5 64:18
71:13 76:16,19
82:14,25 83:19
93:22,23 94:20 95:2,
4,6 98:9,14,19,24
110:5,11,12,16,25
111:5,10,23 112:1
113:16 114:18,20
115:14 118:11
159:10,21 162:3,8,
13,19,20 203:11
204:8,12 217:4
221:22 235:13
245:10 263:20 264:5,
14,19 269:20 273:12,
15 276:9 290:12
294:3,19 295:3 298:6
328:4,6,9,12 330:22,
24 331:25 332:12
343:13,21 345:4,6
353:10,12 359:7,19
365:8 371:12 385:20
395:13 398:20 399:7

**awarethat** 158:9

**awhile** 24:14 78:3

**B**

**back** 15:12,13,17
26:24 35:16,18 37:18
67:20 82:10 102:11
127:1 128:7,8 169:2,
5 173:3,22 208:18
221:19 225:19 226:1
231:23 232:8 238:10,
23 239:12 247:25
256:10,16 261:20
265:22 266:7,11
267:19 268:3 272:17
275:18 300:19
303:11 304:14

**authors'** 231:7

**avail** 126:11

335:14,17 339:14
342:3 346:6 350:6
351:8,10,18,21
352:4,5,17 354:1,3
364:2,14,16,18 367:7
369:12,17 370:20
371:20 375:24
381:19 393:4

**background** 102:23
103:3 376:17 377:6
379:17

**backwards** 236:13
285:10

**bacterial** 271:14

**bag** 213:3

**baking** 60:12

**bankruptcy** 18:3

**Barbara** 13:21 52:6

**barely** 367:4,8
382:25

**base** 116:16 123:12
132:4 181:6 217:24

**based** 17:8 54:24
76:15 84:7 95:18,20
150:25 162:10 189:3,
4 191:15 203:12
228:20,23 232:12
260:15 269:16
297:12 304:18
306:11 335:4 352:19
386:20 387:17,19

**baseline** 208:3
241:17

**bases** 54:17,18

**basic** 209:18

**basically** 125:9
305:15

**basis** 18:18 58:2,6,
16,20 71:19 92:7
121:12,20,24 122:3,7
128:21 151:16 170:2,
6 203:20 223:17
237:24 243:14
277:24 278:4 301:17,
21,25 324:18 392:17

**Bates** 169:12 257:19
259:21 358:20
402:22 404:14

406:15

**battery** 266:23
335:18 394:17

**begin** 231:12

**beginning** 211:23
224:13 229:6,7
244:17 260:4

**begins** 203:3 216:21
224:16 254:14

**behalf** 6:22,24 7:19,
22 8:9,17 22:7 47:6,
17 71:4 281:25
346:13 360:17

**believing** 242:8

**bell** 244:8,9

**Benedict** 7:2,3,23
17:13 275:8,13,15
277:6 279:14 281:13
282:23 284:3 285:20
286:5,18 287:11,19,
25 288:22 289:4
290:12,24 292:9,18,
25 293:8,25 296:6,14
297:9,16,25 298:13,
22 299:6,21 300:17,
23 302:19,25 303:7,
19 305:24 306:2,17,
22 307:3,10 308:7
311:9 312:10,21
313:12,17,22 315:4,
17,24 317:7,11,22
318:17 320:9,16,20
321:10,16 323:3,10,
17 324:20 325:1
327:7 328:14,16,24
329:5 331:5,12
333:2,15 334:1,7
335:13,23 336:15
338:11,19 339:2,16
340:12,20 341:8,14
342:18 344:3,9,21
345:2,24 346:1,8,20
347:22 348:9 350:4
351:19 352:8 353:10
355:19 357:13
358:14,24 359:2,19
360:7,12,25 361:11,
18 362:6 365:19
366:3 367:20 368:15
369:10,19 370:19
371:10 372:12,23

373:12 374:9,19 375:4,13,24 377:11, 14,23 378:15 379:8 380:1,17,24 382:13, 18,22 383:2,5,11,13 384:7 385:8 388:20 390:8 392:22 394:6, 23 395:1,25 396:7,22 397:5 398:2,11,19 399:5,13 401:5

**benefit** 324:24 326:16,17,21 405:22

**benefits** 70:13 71:2 106:5 199:20 323:13 324:3 325:24 337:19 338:1 341:18 343:25 378:21 380:13 405:17

**Bertrand** 222:13 388:11,17 389:3

**big** 197:23 396:2

**bigger** 185:21,25

**binders** 341:23

**bio-** 29:24

**bioequivalent** 221:6

**biologic** 81:6,11 123:25 151:21 392:17 393:25 394:3, 7,9

**biology** 82:7

**biopsied** 77:20

**biostatistician** 153:12,22

**bit** 15:20 68:16 103:17 175:15 180:7 185:3 191:21 210:4 240:21 242:18 256:8 275:18,19 311:10 359:24 367:14

**BLA** 282:20

**blah** 208:4

**BLL** 47:23

**blood** 393:3

**blow** 171:18,25 182:14 195:17

**blurry** 146:19

**body** 215:10 258:10 354:18

**bolded** 246:8,9

**book** 105:23

**Boolean** 41:12

**borders** 79:7

**Bosserman** 20:23, 25 21:3,7 61:6 219:8

**Bosserman's** 75:8, 11

**Boston** 220:8

**bothers** 262:7,21 354:21 355:12

**bottle** 131:12

**bottom** 171:19 182:21 183:14,19,20 185:1,12 187:16 210:6 211:1 265:17 354:20 393:15

**Bourgeois** 216:20

**box** 169:23 185:17

**Bradford** 120:22 123:17 124:4,13,17, 21 125:5 127:23 135:17,25 136:17 137:3 138:4 139:2 140:15,19 180:17 198:4

**brain** 56:15 108:6 111:22 114:9 115:4 153:18

**brand** 283:24 294:2 295:15 297:11,17 358:2,6,9 398:12

**branded** 169:24

**break** 27:1 43:6,13 67:9 79:8 102:3 164:23 168:2 169:6 256:10 345:22,24 346:2

**breaking** 164:21 323:1

**breast** 23:14,20 24:5, 6 41:16,18 42:7,17 44:7 68:4,6 73:3,9,16 74:1,9,21 75:21

76:18 85:25 86:3 103:9,15,22 104:3 106:12,15 107:19 108:9,16 144:17 157:22 166:19 171:3 182:4 187:24 194:2 199:19 209:3 216:5, 10 220:1 222:18 228:2 233:3,16,22,25 234:11,15,16 244:12, 13,18 245:15,22 246:2,6,12 254:14 255:4 271:1,21 272:8 312:16 314:8 317:14 318:8,11,15,19,20, 22,25 319:25 321:12 322:11,23 323:4,14 324:4,9,16,23 325:4 326:1,10 331:19 332:11 333:8,18 341:6 351:6,16 352:2 353:8,21 365:22,25 389:2 398:18 403:5, 9,12,17,21 404:3 405:18,22 406:19

**breasts** 334:21

**breath** 211:15

**Brent** 6:6 7:12

**briefing** 47:11

**briefly** 46:23 196:2

**bring** 150:10 277:12 340:18 341:22 385:9

**broad** 31:15 47:9 68:12,20 69:5 92:24 192:17 255:2 281:20

**broader** 56:24 144:9

**broken** 309:19

**brought** 235:9

**Brown** 126:2

**bullet** 187:1 246:11

**bullets** 246:8,9

**burn** 344:11

**burning** 67:9 383:7

**business** 17:22 290:5

**busy** 356:16

**Buy** 88:11

─────────

**C**

**C-O-C-H-R-A-N-E** 320:22

**C.C.P.** 400:9

**C.V.** 102:14 103:5 104:5 105:24 280:22 283:7

**cake** 60:12

**calculate** 29:25 126:4 149:3,4,6 154:8 156:4 157:6,7 176:18 178:15,18 191:6 381:20 384:5, 8,9

**calculated** 134:10 135:5 149:1 155:7, 11,18

**calculating** 155:14, 17

**calculation** 30:2 148:25 149:11 151:17 152:16 162:1

**calculations** 152:17 153:14,20

**California** 107:17 400:3

**call** 12:1 35:14 208:9 226:19 344:14 363:14 390:9

**call-in** 208:11

**called** 9:2 35:8 56:4 314:6 365:21 367:22 371:1,7,8 392:6

**calling** 124:8

**campus** 105:9

**cancer** 23:14,20 24:5,6 41:16,19 42:7, 17 44:7 68:4,7 73:3, 10,17 74:1,9,21 75:21 76:18 85:19,25 86:3 103:9,16,23 104:3,13,20 105:15 106:12,15 107:19 108:9,16 135:18

144:17 157:22 166:20 171:3 182:4 187:24 194:3 199:19 209:3 216:5,10 220:1 222:18 228:2 233:3, 17,22,25 234:11,15, 17 243:18 244:3,12, 13,18 245:16,22 246:2,6,12 254:14 255:5 270:11 271:1, 2,21 272:8 312:16 314:8 317:14 318:8, 11,15,18,19,20,22,25 319:12,25 321:12 322:12,23 323:4,14 324:4,9,16,23 325:4, 6,9 326:2,10 327:9 328:25 329:18 330:1 331:19 332:10,11 333:7,8,17,18 334:21 341:6 342:4 343:5 351:7,16 352:2 353:9,21 365:22,25 389:2 398:18 403:5, 9,12,17,21 404:4,12 405:18,22 406:19

**cancer-free** 269:21 270:1 398:21 399:8

**cancers** 319:17

**capable** 81:12 136:11 160:16

**capacity** 18:7 32:23 33:5 34:6,7,23 35:2

**captured** 225:22 289:23

**carboplatin** 328:21 329:17 374:25 375:5, 11,14,18 391:11,14, 16 392:3,7,8,11 406:4

**Carcinoma** 328:22 406:5

**card-carrying** 77:2

**cardiac** 271:17,18

**care** 58:22 59:3,19 60:5,23 87:12 104:2 112:24

**career** 124:3

**cares** 292:13,19

**carries** 64:18,21

**case** 6:20 13:21 17:2
19:21 20:13,14,24
21:3 24:23 25:9,12
28:2,5,7,17,18,25
29:19 30:3 32:2
35:25 36:7,17 37:3,
20,23 52:1,11,19
54:13 57:13 58:2
61:8 67:25 75:12
78:13 82:3 96:21
102:15,24 111:25
112:12 115:16 117:9,
17 165:7 173:7,8,9
191:18 214:1,20,25
215:5,8 216:3,5
217:1 227:11 232:17
256:25 277:9 278:13,
16,19 280:11 285:1
294:10 311:7 355:6
362:21 381:8 398:11
407:2

**case-** 61:24 72:24
84:10,15 85:1 113:2
310:2

**case-specific** 52:12
57:20 58:25 59:5,13
61:12,15 62:13 63:2,
10 72:1,2,6,7,17
77:24 78:16 80:19
81:4 84:4,20 85:5,11
112:17,20 269:24
278:17

**cases** 28:4 110:7,17
119:9,13,14,15,16,20
120:1,2,6,11,15
139:8,12,17 142:17,
20 143:1 147:14
180:16,25 181:1,10,
11 187:8,11 227:18
238:2,3 250:21
251:19 266:5,8
327:20 382:5 394:1

**catagen** 229:14,19
230:12

**catch** 317:25

**category** 232:23
315:16

**causal** 124:23
133:17 141:23
150:19 189:5 301:22,
23

**causality** 124:23
136:22 151:25

**causally** 115:7,8
140:23

**causation** 28:9 30:3
52:18 78:17 79:12
97:17 116:12,13,17
118:8,21 119:15
123:18,21 124:17
128:14 135:17 136:1
137:10 138:3 139:2,4
140:1,3,15 141:11
149:13 150:4,14
151:2 154:1 157:18
160:15 161:12
180:15,16,20 181:2,
5,12 188:9 189:19
192:4 221:2 226:6
238:3,4 248:1,7,13,
15 291:5,13 300:3
304:3,15 305:2
306:15 331:17
336:24 345:8 372:7
374:16 375:23
379:21 380:15 383:1
386:2,7,23 387:2,14
388:1,5 393:24,25
394:2

**caused** 81:21 124:5
157:16 158:5 174:13
175:5,22 180:12,22
197:3 232:16 237:24
311:1,4

**causing** 81:12
136:11 160:16

**caveat** 59:22

**cell** 105:11 107:16
108:5 219:20 309:20
393:17

**cells** 224:8,24 319:23
393:1,10 394:5

**Center** 219:1

**certainty** 131:25
132:16

**CERTIFICATE**
400:1

**Certified** 6:7

**certify** 400:4,17

**chance** 190:20

**Chang** 27:7

**change** 32:7 227:22
231:24 289:8,9 294:3
357:20

**changed** 17:23
289:25

**changing** 253:9
327:24

**chapter** 105:23

**characteristics**
194:3 241:17 403:13

**characterization**
211:12

**characterize** 270:19

**characterized**
216:23,25

**chart** 148:13 175:20
389:9

**chat** 102:5

**check** 34:21 311:24
321:24,25

**checking** 278:6,8

**chem** 23:12

**chemically-induced**
41:17

**chemo** 118:12,13

**chemo-** 23:13 80:14
211:25 213:14

**Chemocare** 266:14
267:2

**chemocare.com**
264:23 265:1,13
266:19 404:18,20

**chemotherapeutic**
212:22 336:5

**chemotherapies**
219:20 234:15
249:11 320:5 376:7

**chemotherapy**
23:4,18,19 41:17,18
42:8,24 57:18,24
60:3 61:15 63:14,22

**chemotherapy-**
106:21 108:15 121:6
253:21 361:13,19
367:3 370:6 406:8

**chemotherapy-
induced** 78:2,22
81:16,20 83:23

196:6,7,13,19 197:3,
14 326:17 369:20

**Chang** 27:7

65:11,24 73:16 74:1
81:17,22 85:19 86:12
87:5,6,16 103:8
106:17,18 108:8
113:6,12 115:19
116:19 117:1,7,14
118:23 119:2 124:14
136:12 144:17
147:22 148:1,7
151:11 158:22 171:2,
8 174:23 182:3
184:11 194:21 207:9
209:16 211:5 212:24
213:3,16 219:16,19,
22 220:2 222:17,19
225:7,15,25 226:2,
11,19 227:6,15 228:3
229:15,18 230:2,14,
24 231:9,10,22
232:17 233:10
236:22 237:6 240:13,
18 241:1 246:21
247:20 250:18 251:5,
6 252:16,23 260:22
261:10,16 263:14,21
267:19 270:2,16,21,
24 271:5,25 272:9
309:8,13 312:16
314:14 318:25 319:4
320:3 322:9 324:11,
23 325:3 326:1,12,
14,22,25 327:6,8
328:1,3,21 329:17
335:25 338:14,22
339:3,21 341:11
342:24 343:8,14
345:5 348:14 349:24
350:23 351:6,16
352:2 353:24 354:2
356:12 359:13,23,25
361:22 362:3,9,11,19
363:6 365:12,16
366:14 367:23 368:5
370:21 372:2 389:1,
3,8 391:7 392:18
393:2,20 394:10
403:4,8,20,22 404:4
405:21 406:5,22

106:22,24 107:3,11,
20,24 114:21 124:15
143:11 147:19 191:9
209:2 246:4 296:20
301:6 302:23 303:24
307:13 310:16 334:5,
13,21 342:7,22 343:7
345:9 351:21 352:12
365:21,24 366:15
370:5 378:8 379:3
393:6,21 394:15
403:16 406:18

**Chief** 283:2

**CHMP** 94:13

**choice** 61:22 62:6,23
73:3,9,25 74:4,5,8,20

**choose** 128:23

**chronology** 112:23

**CIA** 211:24

**CIIA** 366:15 367:3

**CIPN** 343:9

**circle** 26:24

**circulating** 319:23

**circumstances**
271:20

**citation** 122:22 252:8

**citations** 29:5
121:16,21 166:10
167:5

**cite** 27:20 76:10
89:22,25 91:6 117:13
138:12 139:8 145:19
151:13 193:18
278:10 286:9 295:11

**cited** 28:7,10,21 29:1
30:20 119:9,19
121:17 160:18
164:14 166:5,6 172:3
181:5 373:13 380:25
384:14 385:21
386:16

**citing** 291:18

**Civil** 6:19

**claiming** 84:7

**claims** 81:3 84:3

**clarification** 108:13

**clarify** 25:1,5 44:4 279:11

**class** 320:12

**clean** 16:1 211:16 307:7

**cleaning** 374:20

**clear** 34:22 40:13 42:22 60:8 87:3 100:5 103:18 122:15 162:24 175:2 177:9 259:8 273:21 338:10 339:6,24 340:25 344:2,3 356:8 362:16,21 363:8 364:25 371:16 380:12 390:20

**clearance** 393:12

**click** 185:16,18,19

**client** 17:13 47:6 130:7 170:7

**client's** 32:2

**clinic** 147:17,18,20 148:2,12

**clinical** 29:15 82:2 85:21 86:14,17,19, 21,24 87:5,7,9,11,14 91:17 103:13,21,25 104:19 105:12 106:9 125:12,19 126:23,24 127:2 128:3 130:19 132:20 134:14 135:7 136:23 148:18 149:15,22 150:6,12, 16 151:3 154:16 169:11,16 173:5,6 199:15 206:25 207:4 223:3 228:24 239:1, 23 283:20 295:15,25 297:1,11 298:14,24 299:9,16 307:24 308:12 311:11,16 313:19 314:13 315:21 329:21 332:13 334:8 375:14 386:21 387:7,8,18,20 395:9 396:11,23,24 397:7,21 402:21 405:9,12

**Clinicopathologic** 228:4 404:5

**close** 399:4

**CMO** 25:22

**CMS** 237:20 315:25 316:21 317:9

**Coan** 8:15

**Cochrane** 320:13,21 321:4,10,13 405:15

**code** 214:11,15

**coded** 244:23 245:8, 13

**cohort** 126:3 147:25 149:3 172:5,20 173:7 207:7,10,12 209:3,14 228:4 364:5 403:18 404:6

**cohorts** 175:25 176:1 364:11

**colleague** 20:25

**colleagues** 94:12 356:23

**collected** 39:4

**colloquy** 178:14 253:3 344:7

**column** 210:6 211:2 236:24 238:6 246:12 251:16 254:12,16,17 307:20 308:8 389:10

**columns** 160:5

**combination** 119:24,25 120:7 174:12 283:20 391:17

**combined** 179:3 204:4

**Comma** 187:8

**commencement** 400:7

**comment** 60:16 69:21 93:17 138:23 139:24 141:24 253:6 289:19 293:20 295:21 296:9 297:22 298:11 301:1,3 303:25 304:16,17,21

**Clinicopathologic** 305:5,25 306:1,11 308:15,20 312:19 360:24 368:8 372:10 374:5,8 378:12 392:25 396:20

**commentary** 339:15,17

**commented** 249:20 397:11

**comments** 299:25 325:19

**COMMISSION** 399:24 407:24

**common** 99:12 106:20 107:7 113:6 119:4,5 123:23 184:10,14,16,17,19 203:9 258:22 259:3 261:24 267:8 347:8 354:12

**commonly** 41:18 234:16

**communicate** 282:18 287:24 288:2, 4 337:20 359:22

**communicated** 45:8 288:13 337:22 338:6 339:5 340:5,6 353:5, 18 354:4 359:12 361:8

**communicates** 287:20

**communicating** 361:10

**communications** 21:2

**companies** 46:2 47:1 48:5 85:20 88:7, 10 91:1 109:22 163:15 280:23 281:3, 5,14,18 282:5 284:4, 5,14 288:1,4 297:17, 22 298:2,7,11 299:4, 18 300:1,4,5,8,11 353:16 357:5 397:18, 19,24

**company** 69:3,9,15, 17 90:25 101:11,15 126:7,17 127:13

128:15 129:5 131:6, 23 134:22 158:1 162:21 278:10 281:21 282:9,14,21 287:20 288:13 290:1, 3,10 291:4 292:2,10 296:19,24 297:11 298:5,16,25 299:7, 14,15 302:7,21 308:17 351:8 352:25 357:18 361:7,9 375:14

**company's** 132:14 298:23

**comparative** 136:4 206:24 216:21,24

**comparator** 136:6 142:7 148:24 150:25 152:21 170:19 389:17,20 391:5

**comparators** 133:15 134:9 136:1 149:10

**compare** 144:19 252:13 264:10 311:12 342:25

**compared** 64:2 87:12 120:16 144:16 157:21 159:1 191:11 200:3 213:3,17 264:16 328:11 332:14

**compares** 176:17

**comparing** 201:21 206:3 223:17

**comparison** 143:24 151:11 201:12 364:6

**comparisons** 64:13

**competing** 297:18

**competition** 293:19

**competitors** 126:3 149:10

**complements** 389:18

**complete** 27:8 43:20 258:9 274:5,9 331:7, 8 373:16,25

**completed** 217:22 265:22 266:12 270:2

**completely** 182:10 344:13 394:19

**completing** 343:8

**completion** 240:14, 19 361:21 362:11

**compliance** 282:8

**compliant** 92:17 93:12 94:7,8

**complicated** 231:18

**complication** 65:8

**complications** 65:15 184:10 328:3

**complied** 302:16

**component** 80:3,6 161:2 364:9

**compound** 385:4

**comprehensive** 50:7 55:4 111:21 377:5 379:18

**concentration** 294:23 295:6

**concept** 184:23

**concern** 221:3 383:23

**concerned** 101:19 339:12,13 391:23

**concerns** 31:16 101:23

**conclude** 129:3 131:24 132:15 212:12

**concluded** 186:16 231:11 326:23

**concludes** 399:18

**conclusion** 120:22 126:14 127:11 129:20 133:11 134:20 150:24 151:9 155:1 160:14,15,17 188:19 190:2 191:24 224:25 301:9,19 302:22 303:23 304:6, 9,21,25 305:10 306:8 322:7

**conclusions** 50:4

143:7 154:1,11
182:21 184:8 185:13
186:2,8,10 257:9
322:17,18 324:19

**concomitant** 160:2

**condition** 269:20
332:10

**conduct** 38:2 125:3
205:22

**conducted** 93:4
125:4 206:13 211:3
301:7 304:8,24
385:15

**confer** 22:16,21 25:7

**conferring** 24:21
25:1

**confidence** 126:4
131:24 134:12
152:14,24 154:6
155:25

**confident** 220:23

**confidential** 169:25
284:11 297:6 298:16,
20 299:12

**confidentiality**
299:12

**confirm** 21:17 22:25
23:13 26:20 35:6
100:1 218:11 220:9,
24 247:17 365:4

**confirmatory** 117:2

**confirming** 23:24,25
24:3,17 181:8 364:13

**conflate** 181:10

**conflating** 157:4

**conformed** 347:15

**confounders** 82:1,3,
6,9,11

**confused** 219:8

**connect** 42:8,9

**connection** 10:19
23:6 26:2 34:9,12
55:15 87:5

**connections** 205:16

**connectors** 41:12
42:5 43:22

**Connor** 8:6,10

**consecutive** 173:8
207:8

**consensus** 199:11
365:14

**consent** 358:15,17
359:3,25 406:13

**consideration**
191:20

**considerations**
335:6

**considered** 9:25
27:14 57:11 74:14
82:1 83:7 111:17
248:19 249:8,13
293:18 298:15,20

**considers** 340:2

**consistent** 145:6

**consistently** 143:9
225:17

**constantly** 85:16

**constitute** 394:2

**construct** 41:13

**constructed** 165:6

**consult** 22:21 25:7
35:2 47:3,13,17
281:4 300:4

**consultant** 22:6
297:15

**consultation** 353:3

**consulted** 56:20
284:14

**consulting** 33:4,21
34:1,5,7,9 35:2
46:14,20 48:1,19
49:6 281:7 284:3,5
338:21 339:19
397:19

**contact** 35:20

**contacted** 35:9,19

**contacting** 287:13

**contained** 78:20
96:22 100:8 114:15

**content** 115:18
116:18 117:15
325:20

**contents** 47:11

**context** 28:21 86:3
103:21 106:9 139:23
192:15 248:14
253:11 342:20
349:13,16 350:2,7,
10,16,20 352:1 360:3
378:21

**continue** 43:3 76:16
104:1 275:8 344:12

**Continued** 402:1
403:1 404:1 405:1
406:1

**continues** 116:9
231:8 310:11

**continuing** 151:8
230:23 331:10

**continuous** 160:12
243:14

**contribute** 84:2

**contributed** 105:25
106:1

**control** 64:2,14
144:14 175:22
193:21 194:15
195:20,23 198:8
200:3 204:16 206:22
207:3 209:13 211:10
283:14

**controlled** 82:2
126:24 149:6 150:21
151:3 155:15 173:5,6
200:2 206:25 207:11
208:5 210:1 329:21
332:12

**controlling** 175:3

**controls** 134:14
135:7 288:15

**conventional** 108:7,
21 220:2

**conversation** 21:6
24:20 25:13 26:10,15
70:12,21 106:23

133:2 338:7,8 344:16

**conversations**
25:25 70:16 71:5,10
290:25 310:4

**convey** 262:24 263:8

**conveyed** 73:13,15
74:7 78:19

**convicted** 18:1

**cookbook** 60:9

**cooling** 194:4 225:9
371:24 388:24
403:14

**copy** 102:16

**core** 164:2,6,9,15,18
278:10 292:2,10
353:16

**corner** 183:15
185:13

**correct** 10:16 13:21,
22 14:2 15:4 16:23
17:2,5,24,25 18:8,9,
18,20,23,24 19:5,8,
16 20:10,24 22:12
24:1,19 28:3 29:6
33:13 37:16,24 38:13
39:19 42:2,16 44:9,
20 46:18,19 49:11,
14,16,19,20,24 50:8,
15,23 51:5 52:8,17
54:13,14,19 55:10,18
57:15,19,25 58:3,9,
23 59:4,19 60:6 61:5,
11,22 63:7 64:19,20,
22,23,25 65:3,5,12,
16 68:21 70:17 71:4,
9 72:16 73:3,10,17
74:2,4,5,9 76:18,22,
23 77:4,23 78:24
81:3,8 82:16 83:15,
21,22 84:8 85:19
87:16,17,18,19,20
89:2,6 91:10,23 92:5
94:11 95:3 97:7
100:16,23 101:4,12,
20,25 103:10,23
105:21 107:12 108:2,
10,19 110:8,18
111:19 112:6,12,14,
16,24 115:20 116:21
118:3,17,25 119:10,
24 120:8,24 123:9

125:21 130:11,14
131:7 134:23 135:21,
24 136:19 138:5,6,8,
9,14,21 139:3,10,16
141:19 142:4 143:18
145:20 147:15,16
148:19,21 149:15,23
152:4 157:12,13,17
158:6,10,19 159:7,24
160:9,10,13 161:17,
23 163:1,19,21 164:1
166:18,24 169:21,22
170:4,5,8,20,22,23
171:9,10 172:4,7,14,
15 174:13,18,20,23,
24 175:4 176:8,12,
13,23 177:3,4,6,13,
15,21 178:1,10,18
179:4,11,17,23
180:11,23 181:2
182:8 186:18 187:5,
13,22 188:13,20
190:4,10,11 192:1
193:13,16,18,19,22
194:16 195:11
196:13 197:3,14
198:8,13,23 199:6,24
200:3,13 201:4,9,14,
23 202:19 203:8,12,
18 204:17 206:22
207:14 209:17,22
213:7 214:21,22,24
215:2,5,13,20 216:3,
8,16,21 217:5,15,19,
24 219:1 221:1,6,13,
23 222:4,23 223:7,8,
20,24 224:5,11 226:2
228:9,10,14 230:15,
25 232:15,18 233:7
234:12 235:7,10,15,
25 236:7,9 237:2,13,
21,25 239:8,22
240:1,2,3 242:15
245:25 246:18 247:7,
23 256:21 258:6,13,
14,17,23 259:14,18
260:11,17,19 262:3,4
266:2,8,17 267:3,16
268:5,24,25 269:5
270:9,12 271:15
275:3 276:11,21
278:22,23 280:3,5,
19,25 281:1,16,17
282:12,15 283:25
284:2,23 285:7,14,24
286:7 287:1,2,7,15

289:1,17 290:18
291:8,11,12 293:9,10
294:13 295:12,13,18
296:24,25 297:3
298:8 299:1 300:5,6
301:16 307:17,18,21,
22,25 308:9,10,13,24
309:14,15,18,25
310:1,7,11 311:18,19
312:7,12,13,17
313:13,24 314:4,9,20
315:6,15 318:21
319:6,8,25 322:5
329:1,22 337:7
338:17,23 347:4,11,
15,18 348:4 349:6,11
351:13 353:15,16
354:14,22 355:9,25
356:4,21,24 357:2
361:14,22 362:1
363:24 364:13
370:17,21 372:2,25
373:1 374:1 376:5
377:1 386:13,22
388:15 389:10
390:10,13,18 391:8,
11 392:19 394:11
396:12,24 397:7,22,
24 398:4,10,13,15
400:15

corrected 14:4

corrections 14:12
407:5

correctly 29:12
153:14 188:17 231:2
237:18,22 239:11
249:9 251:12 253:15,
16,19,20 254:7,8
292:17 314:1,7,16,17
315:3 316:14,15
322:18 326:2,3 330:8
332:3 335:12 359:18
376:15

correlated 247:21

corresponded
212:9

correspondence
397:9

cost 293:14

counsel 7:17 37:12
38:7,16 51:5,8,11
235:9 250:15 255:14

273:14 274:14
275:15 290:25 291:2
400:18

counsel's 36:11

counseled 70:23
106:4,7,10 352:16

counselors 6:6

count 10:22 45:22
227:10 233:6

counted 218:13
220:25 221:11
390:17

counter 45:15

counting 365:13

countries 95:12,14
96:7 222:6 385:19

country 105:13
162:6 222:9

couple 165:2 167:9
239:18 374:20 396:4

court 7:9,15,25 8:20
9:3,14,18 25:21
67:10,13 111:1,8,13
134:4 137:18 150:11
303:14 340:24 390:1,
2

court's 111:6

courtroom 6:18

cover 16:19 47:21,22
55:14

covered 150:8

COVID-19 6:9

crayton 13:9,11
402:4

create 36:8

credentials 121:25

crime 18:1

criteria 120:22 124:9
125:1 151:20,23
157:19 248:19
372:19

critical 219:24
326:22

criticism 57:14
69:13

criticisms 31:11
68:24 69:2,8,15,16,
18

criticizing 68:22

critique 30:22 32:11

critiques 30:23

cropped 182:11

cross 277:3,9 405:3

cross-sectional
216:9

Crown 149:2 170:21
171:6 174:2 182:7
184:9 206:16 217:14
218:18,23 391:14,15,
21 392:1

CRR 400:4

CSR 400:3,24

culled 154:20,25

cumulative 189:4

current 312:14
313:13 366:14

Curriculum 102:19
402:14

curser 185:23 186:1

cut 43:10 190:17
352:9 367:18 397:15

cyclophosphamide
118:24 119:7 135:23
136:19 140:22 141:6
142:19,23 192:23
209:20 212:2,13
213:6 313:24

cyclophosphamide
-based 251:6

cyclophosphamide
s 41:21 137:4 193:11
390:15

cytotoxic 241:1
250:18 252:16
325:25 392:25

cytotoxins 212:2

Cytoxan 41:21

cytoxic 327:25

D

data 29:16 91:17
97:13 99:20,25 115:4
118:6 121:15 122:12,
21 126:21 127:2,6
128:2 129:10,12,22
130:19,24 132:5,7,9,
19 133:11,12,14
134:14,16 135:8
142:16 158:9,17
160:19 161:15,16,23
162:10,25 163:6,11
164:2,6,10,15,18
165:25 174:7,19
181:3 182:7 190:3,4,
9 191:23 195:5,6
199:22 201:14,20
202:19 203:17,19,23
204:21,22 215:25
217:9 223:19 231:3
232:12 239:18
242:13 244:13
246:21,25 247:4,15,
21 249:12,17 250:24
252:6,9 278:10 285:5
292:2,10 297:2,3,11
298:14,18,23 299:22,
24 300:8 301:2
302:20 304:15 305:1,
3,14,15,18,23
306:15,18 307:3,4,11
308:12,22,23 317:17
352:7 353:1,17
374:24 375:5,18
379:20 382:3,5
386:21 395:4 396:11,
24 397:6,21,25
398:3,7

database 23:9 48:6,
16 98:3,7,10,14,15
99:11 100:1,6,10,15,
19 125:20,24 126:16,
25 127:12 128:15
129:5,24 130:2,3,6
131:23 132:14
134:21 154:15
155:11 156:3,25
157:8,10,15 158:4
159:6,22 160:7,20
191:25 192:8,12,22
193:1 245:13 309:1
320:14,22 321:5,11,

13 357:2,6,11 405:15

databases 48:11
302:6

date 11:3,11,22 12:20
13:2,13,19 20:1
26:14 28:18 41:3
52:14 54:2 90:13
102:20 109:7 146:13
157:25 169:14 171:4
182:5 194:5 209:4
217:22 222:20
226:25 228:6 234:25
243:11,19 257:22
265:3 266:21 272:25
276:12 277:5 279:10
292:9 305:12 313:21
315:23 321:15
323:16 324:25 334:6
346:19 347:6 358:21
366:2,8 368:6 378:5
407:3

dates 217:16 267:3

daunorubicin 212:3

Dave 20:3 33:23
35:15 43:4,12 61:17
67:3,16 164:24 165:3
168:1 208:11 238:21
244:2 256:7 274:12
332:18

David 6:23 7:19
21:18,21 28:10 89:22
190:21

Dawn 12:4 19:22
40:23 41:7 109:1
146:9 147:5 169:9
170:24 171:18
181:17 193:25
200:18 208:6,24
209:10 222:11
227:23 229:2 234:20
236:17 238:23 240:4
243:15 245:17 250:3
257:16 259:20
261:21 264:20,22
265:4 266:13 267:6
273:1

day 15:22 25:13,17,
19,23 26:2,3,7,11,15
43:19 79:7 104:3
202:14 273:25 274:8
331:11 356:14 396:8
399:22 400:22

407:22

de-details 310:8

dead 323:9 394:20

deal 298:12

deals 250:17

dear 357:19

deaths 318:20

debate 383:8,10

decades 83:24 318:10

December 11:9,13, 20 163:18 348:10 401:15,18

decide 94:4 327:19 372:19

decided 398:12

decision 58:7 73:5, 20 74:14 75:3,6 95:18 111:6 309:17 327:15 339:7 345:16 363:10 364:4 370:12 373:11 398:8

decisions 59:13 95:20 309:25 361:6 372:20

decline 318:9

declined 57:7

decrease 271:3,4 319:5,7

defendant 7:22 9:11 19:1,7 277:2 405:3

defendants 8:18

defendants' 32:12, 15 44:19,21

defer 61:5,7 77:7 370:25

deferred 152:19

deficient 92:20 392:2

define 225:11 236:4

defined 225:8 241:18 242:17 361:18,19 362:9,23 365:6 373:9

defining 225:18 226:21 242:7

definition 164:19 184:19 225:6,23 226:6,15 227:2,4,9, 22 231:19,20,21,24 233:9 238:11,14 241:10 258:8,15 347:13 362:24 363:3, 12 365:15,17 372:13, 15,16

definitions 240:16, 20 241:11 242:21 252:5 254:9 373:9

definitively 135:1

degree 131:24 132:15 211:24 212:21,23 213:13

delay 331:13

deleted 158:15

demonstrate 314:13

demonstrated 177:11 311:16

demonstrates 143:9

Dennis 8:11

denominator 112:9 142:9 143:25 176:18 178:17 180:19 201:16,24 202:1 237:4 255:1 381:16 384:4

denominators 179:15 180:4

Department 220:8

depend 386:23

depending 167:3 328:8 332:7

depends 73:11 197:19 198:2 218:4 222:9 244:22 294:15 340:18 341:24 362:5

depo 25:4 103:12 274:18 349:14,18

deponents 91:25 99:18 100:5

deponents' 164:4

depos 97:24

deposed 10:15,20, 23

deposition 6:12,14 7:6,11 11:8,18,19 12:7,17,24 13:10,17 17:23 21:5,14,20,22 22:21 25:20 39:2,14 53:18,23 69:23 70:4 96:18 112:6 165:15 169:1 185:2 272:22, 24 274:1,10 276:25 277:4,9 348:10 382:24 399:19 400:7, 8,10,14 401:14,17, 20,23 402:3,6 404:22 405:4 407:3

depositions 10:18 38:21 91:24 92:3,4 164:4 291:10

depth 341:25

derived 30:7

dermato- 77:3,7 79:22

Dermatol 146:12 402:19

dermatological 77:23 367:22 368:4 406:21

dermatologist 76:22 77:2 83:5,7 362:17 363:9 364:13, 17,21 370:12 371:2 373:10

dermatologists 77:7,11 79:22 362:23 363:17 370:15

dermatology 76:25 77:1 147:19 220:8 367:24 368:8 370:14

dermatopathologist 77:5

describe 47:5 252:15 378:13

describes 251:17 359:11

describing 157:5

description 93:7 252:14

descriptions 251:15

design 68:22 209:18 238:24 382:7

designed 206:1 217:1

designing 87:15

designs 87:11

destroyed 393:8,17

detail 57:10

detailed 151:6

details 10:13 80:23 96:5 105:16 156:16 207:23 283:7 288:5 290:10 309:10 310:12,20,24 363:21 364:15,23

detect 155:12 156:15 198:16

detected 319:20

detection 125:25 157:20 158:1 317:23, 25

determine 60:14 80:17 118:8 326:21

determined 362:18 373:7 374:4

determines 327:11

determining 81:21 388:6

develop 142:3,15,23 143:3 157:1 246:14 247:5

developed 105:3 145:20 209:17

developing 145:1 277:19 372:8,9 374:17

development 47:1,2 68:9,18 85:21 88:9 104:9,18,23 105:1,6 107:16 115:8 123:20 283:6 284:11 293:2 317:24

device 47:23 283:20

diagnose 232:18

diagnosed 106:12 235:25 242:14 317:14 324:16 373:24

diagnoses 239:21 363:17

diagnosis 80:17,21, 25 208:2 235:14 236:23 237:20 239:1, 7,23 241:20 242:2 317:24 362:16,22 363:8 365:1 370:15, 25 374:4

diagnostic 326:7,20

dial 15:12,13 66:8

dialing 66:21 67:5

die 272:3 321:1 393:4

differ 211:25

difference 94:16 195:2 197:1,3 202:6 204:2,9,14 205:13,20 206:2,6 224:14 264:15 268:2,10,18 340:8

differences 64:4 95:2,4,5,6 224:20 268:20

differential 80:17, 21,24

differentiate 181:13 221:4

differently 191:21 238:17

differing 324:7

differs 212:21,23 213:13

difficult 182:12 337:10

diffuse 251:16

direct 103:13 108:6

directed 287:15

direction 400:13

**directly** 87:10 214:10

**Director** 283:5

**disability** 334:4,12 343:11 406:7

**disabling** 333:23,25

**disagree** 101:11 121:8,15 184:20 188:2,18,25 189:7 212:18 213:19 270:3, 16 345:1 367:11

**disagreed** 30:10,15 120:21

**disagreement** 121:1

**disappeared** 267:11

**disclosed** 93:7

**disclosure** 19:21,24 358:16 359:4,5,8,11, 20 360:14,18 361:2 402:9

**disclosures** 361:3

**discontinue** 254:23 255:5

**discoverable** 33:22

**discovery** 25:17,23 105:11

**discuss** 21:10 25:8 37:8,11 38:16 77:8,9 200:9 247:19 274:2 290:21 300:11 345:11 377:8 389:6

**discussed** 45:6 62:17 164:10 290:19 291:2 388:11 389:4

**discusses** 162:4,9 280:7 381:5

**discussing** 34:24 75:13 249:10 338:13 377:14

**discussion** 21:8 25:3 37:11 59:11,22, 25 60:11,13 62:11 73:7,11,20 74:12,22 75:2,6 79:9 133:5 144:2 199:18 200:5, 23 219:14 265:21 271:6 280:6 311:21 327:17 337:15,17,18,

23 341:17 342:1 343:2,23 344:23 353:3 376:25 377:16

**discussions** 37:11 38:16 62:19 71:11 290:22 296:19

**disease** 219:18 234:6 247:10 248:11 318:12 319:10 332:24 333:3,14

**disease-free** 198:17,23 311:12,17 322:10

**dismissed** 18:25

**dismissing** 153:22

**disorders** 224:9 243:17 244:3,11 404:12

**dispute** 292:12,19 295:14,24 296:10 374:10

**disregard** 383:18

**dissect** 118:7 388:9

**distancing** 6:10

**distinction** 48:21 93:14 115:24

**distinguish** 167:21 293:21 353:25 386:1, 3

**distributed** 178:7

**District** 7:9

**divide** 144:4 179:15

**divided** 155:19 156:21 202:1

**dividing** 201:15,25 393:1,2 394:5

**division** 104:25 105:8

**divorced** 248:4

**docetaxel** 41:19 44:10 64:1 68:3,9,18, 23 69:14 70:8,24 71:8,15,21 72:5,10, 16,21 73:8,15,25 89:5,13 96:1,13 97:1, 3,6 98:16 106:5

109:10 110:6 120:7, 16,23 121:6 124:25 125:5 126:14 129:3 131:25 132:16 136:5, 13,18 139:5 141:11, 23 143:12,14 148:19 149:15 150:6,15,16 151:10 156:6 157:1, 16 160:16 169:12,16 176:7,10,14,21,24 177:17,19 178:3,11 179:10,11,23 180:1 190:2 191:24 192:1,5 193:15 194:2 198:7 203:17 204:15 206:3, 4 212:4 221:1,3,9,13, 22 222:2,3,5 223:6, 18,21 231:10 233:4,7 236:11 237:17 246:14 248:10 256:21 257:10,24 258:21 259:3,25 261:25 276:3,8,10, 14,15,16,17,19,20 283:22 287:4,5,13 292:3 294:1,7,10,11, 13 295:17 296:2 300:15,25 301:5,7 302:6,8,22 303:22,23 304:7 305:17 306:7, 9,16 307:12 311:18 312:15,20 313:24 314:3,19 315:4 316:17 320:10 328:5, 11 331:18 332:2,14 334:19 336:25 342:22,25 345:13,19 346:10 347:9 354:10 359:6 360:15 364:8 378:10 379:22 384:18,22,25 385:11, 12,23 386:3,11,15,22 387:9,21 388:6,14 390:13,14,17 391:7, 11,17 392:3,8 394:10,16 395:4,14 398:13,16 402:21 403:12

**docetaxel's** 287:6 384:22

**docetaxel-** 63:5 270:3 406:3

**docetaxel-based** 389:8

**docetaxel-carboplatin** 328:20 329:16 330:19

**docetaxel-containing** 58:8 73:2,21 74:7,19 76:17 302:5

**docetaxel-induced** 194:24

**docetaxel/taxotere** 175:9

**doctor** 37:14 66:25 171:22,24 182:24 208:21 209:8 240:7 262:6,16 293:25 294:3,12 309:18 326:23 327:10 337:3, 4,6 338:13,20 339:19 342:19 345:14 348:22 354:21 355:11 380:2,7,10 383:15

**doctor's** 309:24

**doctors** 121:8,25 122:1,2 287:14,15,21 288:2 379:23

**document** 20:6,9,11 55:19 56:5,7,8 57:6 78:1 92:6 97:22 100:21 109:9 111:15, 21 112:4,8 145:23 146:10,15,16,21 148:4 158:15 164:8 169:17,21 170:3,13 171:9 183:11,15,21 184:3,5,21,23,25 229:3 258:4 260:1 265:7,10,11 267:1, 18,21 273:3,6,10 291:6 299:11 316:11 317:3

**documentation** 79:17

**documented** 130:20 148:22 149:20

**documents** 49:22 50:3 51:15,21 55:20 56:1,17,20,23 71:14 78:22 90:7 91:22 92:5 93:1,2 96:22 98:24 99:17 111:24

112:1,3 114:12 116:11,12,14 117:16 126:7,17 127:13 128:16 129:6 131:6, 11,16,20,23 132:15 134:22 167:6 183:5 192:3 268:9,18,21 273:12 274:7 277:12, 15,20,22 278:2,15,18 282:3 285:19,23 290:13,18 291:3 298:13 299:12,14 308:5,20 317:6 359:3 361:17 396:20

**dosage** 309:9

**dose** 65:7,14 151:21 174:16 175:2

**dose-limiting** 65:2,6

**doses** 108:22 220:2 351:16 352:2

**doubled** 200:7

**doubling** 201:10 202:8

**doxorubicin** 41:20 209:20 212:3 213:6 265:2 404:18

**dozen** 145:19 305:13

**DPH** 392:6

**drafting** 20:9 28:5,6

**drag** 182:25 183:1,2 185:16

**dragable** 183:2

**dragging** 185:19

**draw** 115:24 129:12

**Drs** 27:6 120:18

**drug** 39:21,23 68:3,6 123:22 124:15 158:5 160:9 176:2,3 283:14 293:2 294:22 295:6 320:8 357:14 361:8 375:12 378:19 379:6, 18,21 380:10,11 393:12

**drugs** 85:20 86:20 97:2 104:7 117:22 119:24 136:11,23 137:1 151:11 157:22

159:2 160:4 224:21
290:11 293:12,14,16
297:12 320:10,12
336:5 356:12 375:20
379:24 381:13
390:16

**due** 6:9 235:17
317:23 318:3 362:8
378:9

**duly** 9:2 400:8

**duplication** 158:10,
16 293:3

**duration** 238:14
258:19

**durden** 11:9,14,20
12:15,18,23,25
401:15,18,21,24

**DVD** 7:5

**dying** 394:18

**dystrophic** 229:14,
19 230:12

———————————

**E**

**ear** 66:25

**earlier** 38:21 39:1
52:16 103:7 110:12
165:6 170:18 218:4,7
222:6 235:6 243:3
274:14 275:17
317:25 349:1 353:5
355:1 361:16,19
362:22 386:6 388:12
389:4 396:9 397:2

**early** 157:25 165:15
171:3 182:4 222:17
224:9 272:8 317:23
318:1,23 319:25
321:12 322:11
323:14 324:3,23
325:3 327:5 365:25
389:2 403:4,8,21
405:18,22 406:19

**early-stage** 24:6
317:17 318:14
324:16 326:1,9

**Earnest** 11:10,14,21
12:16,19,23 13:1,21
17:2 52:6 401:15,18,

21,24

**earphones** 335:17

**easily** 197:13

**East** 7:14

**Eastern** 7:9

**easy** 110:3 152:11

**eat** 15:9 344:21

**ECIA** 238:14

**editor** 31:23 105:24
215:9,14,16,24 216:4

**educate** 288:10

**educated** 356:9,10

**educating** 306:25

**education** 260:11

**educational** 33:11
34:4,12 35:8 102:23

**effect** 9:17 62:5 65:9
118:25 119:3,4
123:22 124:6,11
157:12 158:6,12
160:8 197:11,13,21
211:4 218:22 260:22
262:6,16 328:7
333:12 340:7,9
343:15 345:5 349:14
350:17,24 353:24
354:21 355:12

**effective** 68:3,6
272:10 289:9 371:25

**effectiveness**
271:22

**effects** 61:20 62:21
63:14,22 64:9,19
65:13,16 212:6,14
213:7 261:6,24
262:10,18 263:7
265:18 267:8,16
326:18 331:1,3
334:24 335:3 336:23
337:13 338:9,12
342:12 344:23 345:6
354:13 355:16 372:6

**efficacy** 68:10
198:13 199:12,23
294:21 295:5 333:11
350:15

**efforts** 287:14

**EIAC** 235:15,21,25
236:4 238:6 240:15,
25 241:10,15,18
242:15,17

**elected** 183:7

**element** 80:13

**elicit** 61:15

**Ellen** 7:6 9:1 11:8,19
12:17,24 13:10,17
17:21 25:15 33:18
37:7 41:2 56:6 67:2
109:5 133:1 137:17
253:1 255:20 272:24
277:4 279:9 303:3
335:9 382:17 390:1,2
399:21 400:5 401:4,
14,17,20,23 402:3,6,
12,16 404:22 405:4,7
407:4,21

**ellipsied** 143:8

**elucidation** 40:13

**EMA** 94:10,13 296:18

**email** 25:2 212:8
250:8,11,12 317:5

**employed** 281:13

**employee** 45:9
69:19,21 112:5
281:8,9

**employees** 92:3
291:11

**employers** 281:25

**encompasses**
55:13

**encourage** 293:2

**end** 10:7 42:3,4
108:23 133:18
167:22 205:6 225:7,
25 226:2,19 227:6,15
233:10 240:18
254:21 259:4 354:1
362:2,18 363:5
365:12,16 366:13
370:21

**ended** 398:25

**ending** 259:22

**endocrine** 194:19,21
195:1,13,14 207:14
208:5 224:9 230:18,
22 232:2 235:18
236:4,6,11 238:9,11
240:15,17 241:4,7,8,
9,24 252:17 254:18
255:5 271:3 320:6
323:15 324:4 376:1,
4,8,16,18,23,25
405:19

**endocrine-** 381:24

**endocrine-induced**
242:9 381:6

**endocrine-therapy**
253:22

**endpoint** 79:17,25
197:19 198:17 201:3,
7,8 363:11,21

**engaged** 104:8,15

**engagement** 34:19

**engaging** 287:14

**engine** 166:20

**enrich** 382:6

**entered** 25:16,22
52:21

**entire** 105:12 154:15
274:6 337:6

**entitled** 132:12,22,23
244:2 324:2 325:2
329:15 334:11

**Entries** 158:4

**entry** 159:5 218:17
236:23 250:17

**envision** 66:2

**equal** 119:15 202:2
254:22

**equivalent** 238:3
283:17,24 287:12
288:15,23 293:22
294:1,11 296:1
357:24 358:1,5,8
384:19 386:6

**ER/PR+** 76:4

**ERPR-** 313:3

**endocrine** 194:19,21

**errata** 12:8 13:24
14:11 407:1

**erratas** 14:7

**erred** 58:7

**error** 360:17

**errors** 121:14
122:12,16,23

**establish** 174:12
379:20

**established** 120:23
198:12,22

**estimate** 53:22 154:6
318:20

**estimates** 211:4

**estrogen** 232:16

**etiologies** 83:6

**etiology** 83:11

**etoposide** 212:5

**Europe** 292:5

**European** 94:14
163:1 367:23

**evaluate** 191:5
250:13 357:10

**evaluated** 98:20,23
362:5

**evaluating** 324:15
373:7

**evaluation** 94:25
96:25 181:5 189:22
227:8 364:9,19 382:5

**Evan** 8:8 250:8,11

**event** 16:21 62:14
107:8 144:3,4
155:19,20 156:5,21,
22 160:1 198:1 203:9
376:14,21 377:3
380:23

**events** 147:24
201:18 202:12,18,21
203:7,12 367:22
368:5 376:12 377:2
379:5 406:21

**evidence** 129:18,23
134:13 136:22 137:6

140:1,7,9,12,13
143:8 144:13 149:18
154:19 161:4,7,13
172:22 173:1 181:4
188:8 189:4,5,13,18,
19,23,24 190:1
214:3,24 215:10,12
216:16 247:13
301:21,22 304:3
306:12 319:10 352:6
379:20

**evidenced** 292:7

**evolved** 327:22

**evolving** 326:13

**exact** 105:16 155:22
156:19 164:7 179:22
195:14 198:9 253:23

**examination** 9:6
77:23 275:12 401:3

**examine** 365:3

**examined** 9:3 223:5
400:5

**Excellent** 168:3

**Excerpt** 146:11
402:19

**exclude** 364:12
372:23

**excluded** 208:3
235:17 237:4,5

**excluding** 21:1
338:8

**excuse** 14:23 36:2
91:12 306:20 331:7
335:9 375:1

**Executive** 283:5

**exhibit** 11:8,12,18,19
12:14,17,21,24 13:3,
8,10,14,17 19:20,24
40:21 41:1 56:2
100:17 102:14,19
109:5 112:5 146:11
164:8 169:9,11 171:1
181:19 182:2 194:1
200:15 209:1,6
222:16 228:1 234:22
243:17 257:18 260:2
265:1 266:16,19
272:21,23 273:7,13

276:24 277:2,16
279:7,8 312:22
313:18,19 315:20,21
316:5 321:13,18
323:13 324:22 325:4
328:17,19 329:11
334:3 336:18 346:16,
17 349:19,21 355:6
358:15,17,23,25
365:20,24 368:4
378:3 401:13,16,19,
22 402:2,5,8,11,13,
15,18,20 403:2,6,10,
15,19 404:2,7,11,13,
17,19,21 405:2,6,8,
11,14,16,20 406:2,6,
10,12,17,20,23

**exhibits** 12:5 14:9
91:25 92:3 99:18
100:6 164:5 275:3

**exist** 356:18

**existed** 305:4

**expand** 40:9 171:18
185:1,6,14 293:11

**expect** 299:23 340:9
352:4 353:4,7 357:7,
25 358:6 361:9

**expectations** 88:11
279:4

**expected** 158:3,22
163:23 207:8

**experience** 56:16
83:20 114:10 116:11
153:21 261:9,12
300:7 335:4 343:19
356:23 373:24
397:13,17

**experienced** 84:19,
24 85:9 203:8 343:6
373:16

**expert** 18:6 20:11,23
22:6,15 26:3 27:6,8,
12 28:4,17 30:8
31:13 32:1,6,15 34:1,
5,8 35:3,19 38:6
40:18 41:1 44:19,21,
22 45:1 49:6,9,12,21
53:10 54:7 55:24
56:3 75:17 77:7,10,
13,14,16,17 79:13
87:22,25 88:2 89:3,

21 102:15 107:9
113:18 114:13
120:18 140:20 141:5
146:5 148:23 151:14
154:20 164:15,19
278:11 279:8 284:21
286:23 288:18
289:10,23 291:18
383:1 402:12 405:7

**expert's** 28:20 29:7,
20 123:8 344:18

**expertise** 253:7

**expertises** 76:24

**experts** 19:21 20:16
21:13 24:22 25:8
30:9 32:2,12 48:6,11
49:1 123:11

**experts'** 22:11 27:19
28:24 30:14 44:13
122:17

**EXPIRES** 399:24
407:24

**explain** 41:11 190:25
191:1 196:2 197:17
219:13 270:20
306:24

**explainable** 196:12

**explained** 97:25
126:22 197:14

**explaining** 190:24
253:3

**explanation** 196:9

**explicit** 124:9,25

**explicitly** 247:11

**exposed** 144:1,2,21,
22,23 148:11 155:16,
17 156:6 176:2
201:16,17 236:11
384:5

**exposure** 216:11
381:17

**expressed** 273:23

**extends** 362:4

**extensive** 154:22

**extensively** 102:22
281:4

**extent** 33:20 96:4
122:13 135:10
219:18 284:17 286:8

**externally** 354:5

**extraneous** 262:25

**extrapolated** 144:9

**extremely** 106:20
107:7 327:4

**eyebrows** 224:22

___

**F**

**FAC** 198:23 199:6,12,
24 201:23 311:13

**fact** 13:23 18:21
30:24 44:13,25 84:18
147:12 157:14
169:23 204:2 263:6
273:5 279:24 287:3
288:19 293:8 295:10
371:25 380:24

**factor** 229:13 353:22

**factors** 81:6,12
83:12 124:5 125:5
136:17 138:4 223:23

**facts** 21:9 45:7 51:4,
8,10,12 318:19 385:9

**factual** 18:18 121:14,
20 122:20

**factually** 31:20

**FAERS** 23:9 98:2,10
99:11 100:9,10
125:24 130:3 154:15
155:11 156:3,25
157:8,10,15 158:4,9,
17 159:5,22 160:7
357:1

**FAES** 64:13

**fail** 9:23 286:13

**failed** 71:20 94:1
289:16

**fair** 20:8 42:20 43:19
52:2 65:25 71:18
132:22 140:10,20
161:9,11 175:5
189:25 211:12
282:10 305:7 351:23

363:18 365:6 386:14
387:20 394:8

**fairly** 102:22 111:19
225:17

**fall** 342:6

**falls** 334:3,11 343:12
406:7

**false** 122:12 123:3

**familiar** 20:15 82:20,
23,24 85:22 94:13
147:11 164:17
169:17 171:8 172:1
182:7 193:17 235:3
244:6 273:5 312:11
320:13,21,23 321:4,6
325:6 329:14 330:12
334:14 335:5 336:1,
3,19 346:11 355:3
357:5 358:9 360:10,
23 366:3

**family** 82:10

**faster** 385:10

**favor** 200:14

**FDA** 47:3,4,7,12,13,
18 87:22,25 88:1,2,
25 89:2,5,7,11 94:7
203:11,14,16,22
278:3,5,25 279:3,19,
22 280:2,4,19,20
281:24 282:2,15,19,
24 284:19,23 285:7,
13 286:16,21 287:4,
5,7 288:24 289:1,14,
18 294:20 295:4,11,
14,21,24 296:5
302:16 396:23 397:1,
3,10,11,20,21,25
398:2,8,11,17

**FDA's** 94:17 279:23

**FDA-APPROVED**
104:7

**features** 327:10

**febrile** 64:12

**FEC** 223:6

**Federal** 6:19

**feeds** 393:3

**feel** 12:12 52:2 53:5

291:5

**feelings** 101:15

**feigal** 7:6 8:2 9:1,8
11:8,9,19,20 12:17,
18,24,25 13:10,11,
17,18 14:23,24 15:7,
9,11,20 17:21 19:14,
24 20:5 26:9,13,18
27:5 34:3 36:10 41:1,
2,25 43:3,21 44:12
52:15 53:9 54:8 56:6
59:6 60:19 61:16,19
62:18 66:11 67:23
74:17 79:11 88:14,23
89:19 97:18 98:13,22
99:8,23 100:22
102:13,19 104:4
109:5,6,8 114:23
115:23 119:17 120:5,
17 121:22 127:8
128:22 129:23
130:11 134:19 136:8
137:11,25 142:12
146:11,14 147:5
149:12 150:8 152:1
156:1,17 159:4 162:8
163:9 165:5 166:16
169:5,11,15 170:11,
18 171:1,5,14,21
172:12 173:11,22
174:6,17 175:13
176:20 178:21
181:15 182:2,6
183:14 184:5 187:1
188:11 190:23,25
191:22 193:17 194:1
195:9,21 196:2 198:3
200:8 206:19 209:1,
12 211:21 212:11
217:3 222:13,16
227:25 228:1 229:3,4
234:22 235:1 236:19
241:12 242:25
243:17,20 244:6
245:20 248:23
250:16,25 254:12
256:19 257:18,23
258:3 259:23 261:23
265:1,6,9 266:19
268:22 272:19,23,24
274:4 275:14 276:2
277:2,4,8 279:8,9
303:4,19 307:10
313:19 315:21
321:13 323:13

**fell** 58:22

**felt** 219:23 220:22

**Femara** 138:8,13,20

**field** 48:12

**figure** 116:2 134:2
148:9,10 166:15
210:8 242:5 313:6
385:24

**Figures** 318:19

**file** 274:6,9

**filed** 7:8 18:3,22

**filing** 47:22

**filtering** 340:3

**final** 368:19 370:1

**finalized** 245:3

**find** 48:15 165:25
167:24 245:12 326:9
342:23 345:23 364:3
392:11

**finding** 19:1 171:10

**findings** 228:4
294:21 295:4 366:16
404:5

**fine** 135:13 195:25
251:2,13 255:17,22
274:23 291:22
323:24 325:21
329:13 330:14
334:10 344:15
367:19

**finish** 42:25 188:23

324:22 328:18,19
334:3 336:19 345:3
346:9,17,21 358:17
365:24 368:4 369:20
378:3 396:5 397:17
398:19 399:7,16,21
400:5 401:4,13,14,
16,17,19,20,22,23
402:2,3,5,6,8,11,12,
13,15,16,18,20
403:2,6,10,15,19
404:2,7,11,13,17,19,
21,23 405:2,5,6,7,8,
11,14,16,20 406:2,6,
10,12,17,20,23
407:4,21

**finished** 43:1 152:6
241:13 340:21 386:5

**firms** 8:4

**First-line** 328:21
329:17 406:5

**fit** 372:13

**fix** 300:18

**flash** 369:5

**flashes** 376:13

**flip** 110:3 196:10
238:23 265:4 277:17
322:6

**fluorouracil** 390:15

**focus** 17:14 63:18,19
64:5 106:19 107:14
138:2 210:7 274:5
290:7 380:4

**focused** 43:5,9 60:1
234:14 291:12
393:23

**Focusing** 250:16

**folks** 8:3

**follicle** 393:8,14

**follicles** 393:16

**follow** 36:11 43:9
60:9 222:19 403:23

**followup** 88:13
205:7 274:15 362:20

**followups** 15:6

**Fonia** 217:15 220:6
227:25 373:12,20

**font** 146:23

**foot** 55:22

**Foote** 32:5 120:19

**footnote** 41:6,14
43:23 111:16 173:4,
18 214:12 218:22
314:12,17

**footnoted** 28:8

**footnotes** 55:23
56:10,23 57:1 116:13

252:20 380:6 382:11,
17 387:24

**finished** 43:1 152:6
241:13 340:21 386:5

192:3

**force** 9:17

**foregoing** 400:6

**foreign** 94:16 95:19,
23 110:13,24 130:20
162:12 163:15
263:17 278:7

**form** 10:2 14:6 16:12,
25 17:7 18:19 19:3
20:17 23:22 24:11,24
26:5,6 27:10 29:10,
22 30:16 31:1,21
33:17,20 36:2,19
38:14,15 39:10 40:7
44:15 45:4,12,18
46:12 47:20 49:25
50:3,9,16,24 51:6,19
52:10,23 54:15 55:5,
11 56:14 57:2 58:10,
20,24 59:9,20 60:7,
24 61:23 62:8,25
63:8,23 64:24 65:4,
17 68:11 69:4 70:1,
10 71:22 72:11 74:10
75:15 78:9,25 80:5,
12 81:13,24 82:17,22
83:2,3 84:9,14,25
90:4 91:13 94:23
95:10 96:15 98:18
101:5,13,21 108:3,20
110:19 111:4,9
112:18,25 114:3,19
115:22 116:5,22
117:10,18 118:4,18
119:1,11,21 120:9
121:4,10 122:10,19
123:10 124:7 125:7,
22 126:18 127:14,25
128:17 129:7 130:16
131:8 132:1,17
133:13 134:24
136:20 138:15,22
139:5,11,22 140:11,
25 141:9,21 142:5
143:23 144:12 145:8,
21 148:20 149:16
150:17 153:9 154:13
155:2 156:9 157:3
158:13,20 159:8
160:11 161:8,10,18,
24 163:2,13,20
165:20 167:8 172:16,
23 180:14 186:19
188:6,14,21 189:10,

17 190:5 196:14
197:4,15 198:14,24
199:8,14,25 200:25
203:13 204:18
211:14 212:16
223:25 226:3,13
227:13,19 229:22
230:5,16 231:1,15
232:19 233:1,8
234:3,13 237:14
238:1 239:9 242:3,16
246:19 247:8,24
248:6 249:14 251:8,
20 252:2,19 253:2,25
254:1 255:7 257:4
260:12,18,24 261:11
262:12,19 263:2,10,
23 264:8,18 266:3,9
267:20 268:6,11,19
269:4,22 270:5,13,
18,23 272:4 282:16
284:1 285:15,25
286:14 287:8,16,22
288:17 289:2 290:8
291:24 292:14,21
293:5,24 294:4,14,24
295:19 296:11 297:4,
13,20 298:9,17
299:2,20 300:16,18
302:12,24 305:11
306:10,21 308:1
311:6 317:15 318:13
320:1 322:25 327:1
329:2 330:23 333:9
335:10 337:8 338:18
339:22,23 340:15
341:12 342:10
343:16 344:6 348:5
349:25 351:24
352:21 355:17 357:3
358:10 359:14,21
360:19 361:4,15,23
370:8,22 372:3 373:5
374:2,12 375:2,16
377:10 378:25
379:13 380:21 382:1
388:16 389:11
392:20 393:22
396:16,25 397:23
398:5,14 399:9

**formal** 99:10

**formally** 34:15,18

**formation** 28:12,14

Index: formed..handout

**formed** 114:12 161:5

**forming** 111:18 113:15 165:10

**forms** 217:1

**formulary** 294:6,8, 16

**formulated** 29:13 66:4

**formulating** 22:17, 22 24:22 55:17 56:12 60:22 96:20 107:25 108:18 113:21 114:8, 10 115:1 116:4,20 269:10

**formulation** 68:25 104:18 283:19,23

**forte** 94:3

**fortunately** 178:9

**forward** 250:2 261:22 274:24

**found** 122:5 148:13 166:7,9 167:6,10,15, 24 206:1 247:6 324:9 327:3 367:15 371:6, 11 388:24

**foundational** 28:24 29:8,9,11,16 30:6

**fraction** 144:3 175:7 201:17

**frame** 185:4

**Francis** 11:10,14,21 12:16,19,23 13:1 401:15,18,21,24

**frankly** 127:1

**free** 12:12 53:5

**freedom** 123:14

**Freites-martinez** 27:7 217:15 235:2 244:4 380:25

**frequencies** 64:8

**frequency** 64:2

**frequent** 212:5,14 213:7

**frequently** 160:7

**friends** 20:23

**front** 54:7 102:16,17 156:19 158:25 194:10 228:19 238:22 279:16,17 348:24 349:15

**frozen** 15:10

**fulfill** 94:1

**full** 17:19,21 99:19 110:21 135:10 165:17 203:2 229:6 241:1,5,6 242:6 348:7 363:3 364:22

**fuller** 191:4

**fullest** 103:17

**fully** 16:11 127:24 211:10 362:1

**function** 342:6 343:10

**functioning** 334:3, 12 343:11 406:7

**functions** 359:8

---

**G**

**gained** 107:25

**gathering** 247:13

**gave** 9:16 14:19 16:4 17:2,8 23:18 52:16 53:24 110:20 133:7 157:8 214:15 215:2 243:9 255:17 276:12

**gears** 392:15

**GEICAM** 160:19 162:16 198:5 200:22 204:4,14,24 205:5

**general** 36:16 52:18 69:17 74:19 78:17 79:12 97:17 117:11 140:3 142:16 160:15 192:4 221:2 248:1,7, 13,15 261:17 291:5 300:3 304:3,14 305:2,16 306:15 317:19 323:7 325:16 336:24 352:3,13 356:15 357:15

**friends** 365:14 378:11 382:25 388:4 398:6,7

**generally** 81:10 103:8 144:6 312:11 334:9 373:8

**generic** 290:11 293:16,22

**generics** 297:18

**genetic** 223:24 224:10 251:18

**Geoff** 8:15

**gesticulating** 303:8

**give** 43:20 85:6 122:17 123:14 133:3, 4 146:21 151:4,5 164:24 189:15 190:19 191:4 251:11 256:22 257:1 268:23 289:15,22 300:20 308:21 320:24 327:5, 25 328:1 330:10 335:19 340:13 341:9 360:1,21 369:11 396:1,2,4

**giving** 257:11 307:6 377:5

**glancing** 329:22

**Glaspy** 27:7

**glass** 171:23,25 182:14 183:15,18,24

**glean** 41:10

**gleaned** 215:10

**globally** 353:18

**goal** 50:5,10,14 318:24 319:16

**good** 6:5 8:12 9:8 164:25 181:22 215:2 241:5 253:15 256:12 275:14 300:23 316:2 317:14,20 318:15 324:1 325:11

**grab** 183:5

**grade** 194:20,24 327:10 330:20 372:17,25

**graded** 223:4

**grades** 372:18

**grading** 372:19

**grammar** 253:15

**grant** 182:13

**grave** 368:20 370:2

**great** 171:12,20 388:19

**greatly** 150:20

**Greenberg** 7:21 8:8 67:14

**ground** 150:8

**grounds** 54:21 55:3

**group** 179:4,20,22 184:9 195:20 360:10, 21 361:6

**grow** 226:1 265:22 266:7,11 267:19 268:3 393:10

**grows** 258:10 370:20

**guarantee** 347:17,22 348:16 349:4,12 351:1,3,12,14

**guaranteed** 348:13 349:23 350:22,25 351:22

**guaranteeing** 350:8, 11,15

**guarantees** 348:3, 21 349:10

**guess** 33:7 53:6 83:14 221:18 224:22 241:10 310:2 392:5, 23 398:16

**guidance** 295:11 360:5

**guidelines** 59:8,10, 11,14,18 60:4,9,10, 22 75:21 76:11,16,21 199:17 311:21 312:11,14 313:13,20 314:6 315:2,19,22 316:6,8 405:9,12

**Gumerove** 8:17

**guys** 8:6 340:23

**Gwen** 17:21

**gynecologic** 376:13

---

**H**

**hair** 78:14 80:18 81:2,7,12,21,23 83:10,16,20 84:2,6, 13,19,24 85:9 106:17,18 107:18,21 135:19,24 136:12 138:13,17,20,25 139:2,16,21 143:4 147:17,20 148:2,12 156:5 174:13,22 175:5,8,11 177:25 180:13,22 211:25 212:21,23 213:13 225:18 229:20 230:3 231:11,13,23 232:4, 8,22 233:5 234:2 238:8 241:1,5,6 242:6,9 243:17,25 244:3,11 252:16,23 254:19 258:9 261:19 262:2 263:7 265:17, 21 266:1,7,11 267:16,19 268:2,4 310:19,23 339:8,13 341:5 347:17,22 349:4,23 350:25 351:7,9,17,21 352:17 353:20,21,25 354:2, 3,13,15,19 360:15 361:21 362:8,10 363:6 365:10 366:14 370:20 372:8,12 373:17,25 376:24 378:14 393:1,4,8,14, 16 404:12

**hairstyle** 83:15

**hairstyles** 83:1

**hairstyling** 82:15

**half** 171:19 232:1 305:13 343:5

**hand** 50:19 64:5 115:7 117:19 185:13

**handling** 317:6

**handout** 264:24 265:1 266:19 267:25 268:1 404:18,20

**hang** 208:14

**hanging** 398:25

**happen** 227:21 232:5

**happened** 26:11 303:1

**happy** 146:1 246:23 247:11 253:13 274:1 279:15 322:21 342:1 369:10

**hard** 242:8 249:15 330:6 354:5,8

**Hatch-waxman** 293:17

**hate** 250:7 335:20

**head** 104:25 242:6 315:25 339:8

**headed** 107:15

**heading** 56:5 245:19 265:18

**headquartered** 7:14

**heads** 266:22 320:24,25

**health** 292:13,20

**healthcare** 7:24 275:16 277:3 288:8 290:2 357:19 405:3

**hear** 14:15,21,22,24 15:4,6,9,11 19:12,16, 17 66:8,10,12,13,14, 19,25 67:1,2,3,6,7, 12,13 99:2,3,5,6,7,8 133:18,20,21 134:3 159:16,17,18 195:24, 25 207:18 211:20 229:24 248:24 263:19 290:1 302:25 303:3,4 332:2 338:16 382:19 394:22 398:22

**heard** 134:5,6 290:3 292:16 295:1 331:24 332:4 335:11 341:7

**hearing** 303:2

**held** 74:13,15 111:1 273:24

**helped** 29:16

**helpful** 250:11 272:9 285:11 318:1

**helping** 47:11 319:3

**helps** 79:24

**HER-** 326:10

**HER2** 76:3

**HER2+** 76:18 314:18

**HER2-** 75:21 76:4,18 313:2,7,8,12,22

**hiccup** 15:21

**hierarchy** 172:21 173:1 214:2 215:1,12 216:15

**high-** 327:9

**high-dose** 219:22

**higher** 151:11 152:1 175:10 179:2,7,11, 16,18 191:8 212:25 213:2,16 214:2 256:20 257:9 319:4 328:4,9 330:20 332:1,13 338:4

**highest** 186:12 187:2,6

**highlight** 213:1 224:12 228:18 317:1 366:23 367:6

**highlighted** 325:24 330:18 343:3 369:2 378:2

**highlighting** 253:9

**Highlights** 257:18 346:17 378:3 404:14 406:11,24

**highly** 298:15

**Hill** 120:22 123:17 124:4,13,17,22 125:5 127:23 135:17,25 136:17 137:3 138:4 139:2 140:15,19 180:17 198:4

**Hillary** 8:6

**hirsutism** 254:19

**histopathologic** 228:25

**history** 82:10 224:20 310:7

**hit** 8:5

**hold** 14:20 25:14,15 33:18 67:9 122:6 133:1 137:15 243:23 244:1 253:1 338:16 340:22 382:16,21 398:24

**Holden** 8:8 67:16 171:22

**holder** 279:4 280:12 289:6 305:19

**holders** 89:8 93:22 279:23

**honestly** 79:2,3 224:24 252:3 299:13 312:18 340:16

**honing** 257:13

**hope** 169:6 253:20 338:2 356:25

**hormonal** 209:24 210:1 211:11 224:21 228:3 229:12 230:10 231:4 404:5

**hormone** 211:4 310:11

**hormones** 232:5

**Hospira** 8:18 109:15

**host** 320:5

**hot** 376:13

**hour** 102:2 164:22 256:3 345:22

**hours** 256:4 303:15 382:24,25 395:20,22 399:3

**HR** 313:3

**HR2** 313:1

**HR2-** 312:24

**huge** 316:11

**Hughes** 46:9 277:10 278:16,22 309:4,25 310:10,15,22 323:10 398:21 399:8

**Hughes'** 20:14 310:6,18 311:1,4 359:3

**HUGHESA_PSR_ 00143** 358:20 406:16

**HUGHESA_PSR_ 00144** 358:20 406:16

**hundred** 179:18 184:18 191:17,19 237:4

**hundreds** 281:5

**hypotheses** 224:8, 16

**hypothesis** 224:23 230:21 231:7 232:15

**hypothesize** 229:8, 12 230:7

**hypothesized** 230:1

**hypothesizing** 229:18,21

**hypothetical** 132:11 231:6

**I**

**icon** 8:5 171:25 185:3

**idea** 72:3 112:10 123:2 221:18 236:8 375:9

**ideas** 217:7

**identical** 221:8 254:9 264:6,9 355:7 386:4, 24

**identification** 11:10, 21 12:19 13:1,12,19 20:1 41:2 102:20 109:7 146:12 165:8 169:14 171:4 182:5 194:4 209:4 222:20 228:5 234:25 243:18 257:21 265:2 266:20 272:25 277:5 279:9 313:21 315:23 321:14 323:16 324:25 328:22 334:6 346:18 358:21 366:1 368:6 378:4

**identified** 20:12 22:9 27:6 50:21 51:3 55:2 56:10 59:7,17 60:4 90:22,24,25 91:4,16 111:15 113:10 201:13 203:6 216:10 218:12

**identifiers** 298:19

**identifies** 20:11 40:19 220:20 267:16

**identify** 7:17 50:6 54:11,20,23 109:9 145:5 147:14 159:6 161:7 167:18 202:9, 11,17 205:25 268:10 382:8

**identifying** 29:20 203:7

**ifosfamide** 212:2

**ii** 173:16

**III** 148:18 149:14,22 150:5,12,15 328:19 329:15 406:3

**image** 181:21 185:9 200:17

**imagine** 215:22 323:8

**immediately** 221:16

**impact** 94:25 232:7 333:22,24

**impacted** 123:22 211:11

**implied** 345:17

**implies** 262:9 266:11

**imply** 366:17 368:20 370:1

**implying** 340:2

**importance** 268:14, 17 353:19,20

**important** 10:13 12:11 49:18 62:14 80:3 97:19 117:16 118:3 148:17 149:13 239:14 278:12 285:18 293:18 327:18 341:5 353:2, 23 368:18 369:24

386:10

**importing** 98:3

**improve** 318:25
350:12

**improved** 320:3,4

**improvement**
322:10

**improvements**
318:3,5,7 324:10

**improves** 327:9

**in-depth** 154:18

**inaccuracies** 31:13

**inaccurate** 31:20,24

**inaccurately** 121:17

**inadequate** 289:21

**inadvertent** 238:20

**inappropriate**
123:13

**inaudible** 129:15
133:16

**Inc.'s** 277:3 405:3

**inception** 54:1

**incidence** 148:6,15
155:7 157:11 171:1,6
174:22 176:7,11,15,
22 177:2,15,25 178:3
179:4 182:2 194:3,
22,23 237:9,11
251:5,6 381:20 384:6
403:3,7,12

**incidences** 178:5

**incident** 155:13
177:6 250:21

**incidents** 147:23
148:9 250:22

**include** 87:13 90:5
110:7 136:6 162:15
181:1 218:3,21
220:4,5 234:5 235:24
258:22,24 261:25
312:15 376:12,24
377:16 384:18 387:8,
21

**included** 30:5 33:4

40:17 55:23 56:22
57:12 72:7 79:23
98:20 116:13,14
117:7 124:9 149:17,
18 154:19 160:2,3
165:13 166:11,14
176:3,6 218:20
219:20 220:22
223:23 235:6,22
286:3 311:18 312:20
314:20 315:5 316:17
321:20 337:4 353:13
360:15 361:2 364:21,
22 377:2,3 379:8
381:22 383:20
384:25 386:12

**includes** 17:1 22:20
71:3 84:6 152:5
190:6,8 215:22,25
235:13 245:13 263:7
320:9 347:10 354:12,
13 376:5 385:23
387:10

**including** 18:10
44:10 46:2 91:15
104:2,7 118:23
201:24 212:13
224:21 237:5,6 270:4
292:4 322:2 337:5
345:6 377:9 388:15
397:25

**incomplete** 361:20
362:10

**incorporate** 289:16

**incorrect** 30:25 31:7
42:12 289:5 391:14

**incorrectly** 243:5

**increase** 293:19

**increased** 91:19
120:3,16 133:16
136:4,9,25 143:10,
14,15 145:10,12
191:12,14 257:15
319:24

**IND** 47:22 282:20

**independent** 38:1
107:14 151:16
387:13

**independently**
44:14 152:20

**indication** 219:17
258:16 333:14

**indications** 258:22
259:4 347:9

**individual** 49:1
60:14 69:19,20 85:16
86:10,13,15 87:19,20
159:22 173:9 175:4
199:21 205:25
220:10 310:9,21
327:16

**individual's** 82:7

**individuals** 8:6
122:3 218:13 224:10
304:19

**induced** 106:22
108:16 121:7 222:17
236:5 253:22 254:17,
18 361:14,20 367:4
370:7 381:25 389:2
403:21 406:9

**industry** 125:15
295:11 357:8

**infections** 271:14

**influence** 342:5

**inform** 29:17 47:11
80:10 115:6 117:24
118:19,20 148:5

**information** 28:11,
15 50:11,14,17,21
51:17 52:3 57:6 70:6,
16,25 71:6,7,24 72:6,
8,13,15,18,20,25
73:13,14 74:6 77:25
78:19,23 79:14 80:9
85:10 90:16,19,20
95:24 97:2 113:5,12
114:14,16 116:10,16
117:20 125:16,18
126:11,25 127:7,18
128:6,9,20 130:5,14,
17,18,22 131:14
134:16 136:24 142:2,
8,25 148:5 154:19
162:21,24 163:17,23
170:12 192:5 215:3
218:6 219:24 223:12
228:24 257:19
259:24 260:3,6,10,14
267:2,23 268:13
269:11,19,24 270:10

285:6 286:10 288:10,
12 292:23 295:16,25
297:7,25 298:20
299:8,16 302:4
303:20 305:16 306:6
307:25 325:12 337:4,
5 338:5 341:23 342:2
346:18 352:19,20
353:4,8,18 354:8,12
355:21,24 356:1,12,
20 358:19 359:24
360:2 376:18 377:24
378:4 379:17 390:24
394:13 399:11,12
404:14 406:11,15,24

**informative** 291:4
375:22

**informed** 59:22 73:6,
19 74:12,14 75:1,6
78:18 79:13 327:16
337:15,18,23 341:17
343:23 353:3 358:15
359:25

**informing** 115:15

**informs** 50:11

**ingredient** 97:1
221:9 386:3,5,25
387:1 388:1,10

**ingredients** 294:23
295:7

**inhibitor** 376:5

**inhibitors** 118:24
135:24 138:12 141:7
143:3 193:12,22
194:15 195:11 212:5
238:8 254:25

**initial** 36:22 347:1,2

**initiated** 229:15
230:13,23

**initiating** 230:2

**initiation** 240:15,17

**Injection** 261:25

**innovation** 293:2

**insert** 263:21

**inside** 298:16 308:8

**Insogna** 6:24,25
7:21 9:7,10 10:3

11:12,25 12:14,21
13:3,5,14,20 14:10,
25 15:11,19 16:14
17:1,9 18:21 19:6,14,
19 20:3,5,20 24:2,15
25:6 26:1,9,23 27:4,
13 29:18 30:2,18
31:4,12,18,25 33:23
34:3 35:15,18 36:10,
21 37:2,14,21 38:17
39:13 40:8,20 41:7
43:4,12,21 44:18
45:6,16,21 46:13
47:25 50:5,13,20
51:3,9 52:1,15 53:1
54:16 55:7,15 56:19
57:5 58:15,19 59:2,
16,24 60:19 61:3,17
62:1,18 63:3,11 65:1,
6,22 66:14,15,17,18
67:22 68:15 69:7
70:3,15,22 72:3,14
73:1 74:17 75:7,16
78:12 79:1,11 80:8,
16 81:19 82:5,20,25
83:8,19 84:12,17
85:3,6 88:23 90:11
91:21 95:1,17 96:20
98:22 99:8,15 100:14
101:10,18,25 102:8,
13,21 108:12,24
109:8 110:14,25
111:7,14 112:22
113:4 114:6,14,23
115:23 116:6 117:5,
13,25 118:16,22
119:6,17 120:5,13,17
121:5,12 122:15
123:7,16 124:12
125:17 126:13 127:8,
22 128:11,22 129:11
131:4,13,21 132:10,
21 133:9,21,25
134:18 135:9,13,16,
20 137:2,24 138:19
139:1,14 140:8,17
141:4,14 142:1,11
144:7,25 145:15,25
146:9,14 147:1
149:12,21 150:3,23
154:9,24 155:6
156:1,17 157:9
158:17 159:3,10,17,
21 160:6,14 161:14,
22 162:3 163:5,17,25
164:24 165:2,5 166:3

167:17 168:1 169:4, 8,15 170:24 171:5, 17,24 172:17,25 178:20 180:21 181:17,24 182:6 183:9 184:4,8 186:25 188:10,18,22 189:14, 25 190:8,21 191:22 193:24 194:7,10 195:9 196:23 197:7, 17 198:21 199:4,9,22 200:4,18,22 201:2,10 203:16 204:23 208:6, 12,20 209:7,10 211:18 212:18 213:11,19,23 222:11, 22 224:5,7 226:8,23 227:10,17,23 228:7 229:2,25 230:8,20 231:5 232:14,21 233:2,13 234:9,20 235:1 237:16 238:5, 20 239:17 240:4,9,23 242:12,24 243:15,20 244:2 245:17 247:1, 16 248:3,17,23 250:1,14 251:13,25 252:11,21 253:18 254:3 255:13,24 256:6,11,18 257:7, 16,23 258:2 259:9, 12,20 260:15,20 261:1,5,15,21 262:15,23 263:6,13 264:1,14,20 265:4,9 266:6,13,17,25 267:5,12,15,24 268:8,16,22 269:9,25 270:7,15,21 271:9 272:12,19 273:1 274:3,12,21 275:1,4 401:4

**instances** 108:8 319:14

**instant** 329:20

**Institute** 104:13,21 105:15 325:6,9 328:25

**institution** 294:16

**instruct** 25:18 33:25 36:5,20 38:15 101:7 183:4

**instructing** 33:23 34:2 37:8 101:8

**instruction** 26:8,12 36:11 344:7

**Insys** 280:23 281:15, 25 283:1,10

**intelligent** 249:2 251:11 360:22

**intelligently** 322:16

**intend** 32:13,16,17 36:11 61:9 62:20 64:5 65:20,22 101:3, 22

**intended** 282:18 293:1

**intending** 396:2

**intent** 63:17

**intentional** 123:4

**interact** 47:4,7

**interaction** 47:10

**interactions** 89:2,11 281:24 282:2 285:19 289:14 397:20

**interest** 79:18,25 80:14 81:15,20 176:2,3 236:14,15 381:13 382:7

**interested** 354:7 382:20 400:19

**interesting** 247:2 248:14

**interests** 201:18

**interim** 199:1 205:9

**interject** 137:22

**intermediate** 327:4

**internal** 91:22 92:14 93:12,13 99:25 127:12 128:15 129:5 130:24 131:6,10,15, 20,23 132:14 134:22 161:23 169:21 291:7 297:10 298:13,24 307:24 308:19 361:17 375:14 396:20 397:6,8,9

**international** 222:7 385:16 387:11

**internationally** 105:13

**internet** 48:13

**interpret** 101:4 241:18 355:15 390:21

**interpretation** 54:24 241:23 254:8 332:9

**interpreting** 29:12

**interrupt** 229:18 250:8 383:16 388:24

**interrupted** 320:17

**interrupting** 43:2 331:10

**intervals** 126:5 134:12 152:14,25 154:7 155:25

**introduced** 388:13 389:7

**introduction** 292:3 367:3

**introductions** 9:9

**investigation** 379:7

**investigative** 104:2

**investigators** 47:2

**invite** 344:16

**invoices** 53:12,24

**involved** 33:12 35:9 46:15 86:5 87:11,15 104:21 105:18 135:18 190:2,3 191:24 192:15 193:4 203:24 271:2

**involvement** 32:22 34:25 104:23 106:16

**involves** 228:11 391:10

**involving** 378:14

**iphone** 394:18

**iphone's** 266:22

**irrelevant** 96:24

118:5 132:3 139:24 166:22 234:10 375:8, 21

**irreversible** 41:15 42:14,19 44:1,6 64:6 115:9 224:8,23 226:20 362:8 365:21, 25 366:16 367:4 371:5,8 378:9 380:15 388:7 406:18

**issue** 15:3 33:14,16 49:9 73:4 91:6 96:23 117:19 123:24 144:15 150:10 163:22 289:11 291:5 319:5,14 338:3

**issued** 28:1,18 75:17 173:14

**issues** 21:4 27:21 34:13 61:8 88:1,4 90:8 94:11 106:3 107:21 151:24 269:24 291:19 378:14 394:1

**item** 104:4 151:8 239:14

**items** 100:2 127:24

**iterative** 296:19

**J**

**J-U-N-G** 219:4

**January** 12:15,18 239:2,21 401:21

**Jerry** 244:4

**joining** 9:12

**Jordan** 6:6 7:13

**journal** 215:21 323:22,23,24 324:1 325:5,21 328:25 329:6,12 334:7,10 340:13 341:10,20 367:23 368:7,9 370:14

**journal's** 215:24

**Journals** 215:15

**judge** 25:16 36:9

52:20 135:14 208:9 324:18 344:14,16

**judged** 324:10

**judgment** 269:16

**July** 239:22

**jump** 275:18

**jumped** 275:22

**June** 19:25 28:18 40:20 75:17 173:14 245:2,4 276:5,18 295:17 303:21 304:12 347:3 384:23, 24 385:13 402:9

**Jung** 218:24 219:4,5, 6

**junk** 166:21 167:3

**jurisdiction** 94:20

**jurisdictions** 95:3,5

**jury** 101:3,8 198:22 278:20 288:14 291:20,23 342:20

**justify** 325:25

**K**

**K-A-N-G** 206:18

**Kahn** 13:15

**Kang** 149:2 170:21 206:6,10,16,18,21 207:3,5,6,7 208:22 209:12 217:15 218:24 219:2

**keeping** 137:23 354:24

**key** 49:1 160:21,24, 25 219:24 245:20 337:21

**keyhole** 184:2 253:8

**keyword** 245:24

**kill** 393:14

**kills** 393:1

**Kim** 216:7 365:20

**kind** 69:21 84:13 85:19 86:12 108:5

167:12 195:14 353:8

**kinds** 249:7 334:24

**King** 126:3

**knew** 70:7 72:4,9,13,
15,21 89:23,25 90:1
235:11 291:15
295:21 302:15

**knowing** 236:10
386:19

**knowledge** 45:16
70:22 75:23 77:1
85:15 88:9 90:2
95:24 100:12 107:23,
25 108:4 111:20
112:2,13 114:25
116:3,20 130:8,13,19
164:18 170:15
217:24 263:13 287:3,
17 297:5 298:1 351:8
352:3,13

**knowledgeable**
88:1 89:7 114:5
359:16

**L**

**label** 89:5,13,15,18
90:9,13 91:22 92:8
96:6,9 97:12 110:4,
13,24 114:21,22
116:15 118:11,12
127:3 130:21 162:23
163:4,14,15 259:21
264:3,12 267:22
280:13 288:6,20
289:8,17,25 291:16
346:15,23,24 347:2,
5,14 349:3,4 353:5,
14 354:10 355:4,5,6,
25 356:2 357:14,17,
22 358:7,8,9 377:20,
22 378:13 379:10,18
395:18

**labeled** 7:5

**labeling** 71:8 92:15
94:11,22 95:7,19,20,
22,23 109:12,16
110:6 111:1,13 113:5
115:1 116:25 117:7,
8,14,22 162:13
163:1,6,12,18

263:14,17,18,20
264:15,17 287:6,9,21
288:24,25 289:21
292:5 346:10,12

**labels** 92:8 95:12,14
109:10,21 110:16
113:9,12,16,20,22
115:12,13,15,19
116:1,15,18 118:3
127:4,5 131:12
162:6,11,19,20
278:1,5,7 297:7
308:5,8 333:14
345:19 346:21

**laboratory** 319:21

**lacking** 219:24

**Lacouture's** 371:18

**lag** 221:14

**lagging** 250:10

**Lancet** 323:11,23

**lane** 289:12

**language** 64:8,10
110:7,17 111:2
117:25 118:2 210:5
211:6 254:25 260:7,
15 264:5,6 293:9
347:14 348:24
355:15

**large** 46:1 47:1

**larger** 147:5 174:9
211:3

**lasts** 226:24

**late** 202:14 384:3
387:15

**Lauren** 8:17

**law** 9:25 101:4 111:2

**lawsuit** 18:15,22

**lawsuits** 18:25 19:4

**lawyers** 112:9,14
170:10 290:16

**layers** 306:12

**learn** 355:20,24
356:3,20,22

**learned** 108:17

**leave** 25:23 79:10
88:12 191:16 284:12
292:24 364:23

**leaving** 26:1 28:13
124:2

**led** 36:7 319:24

**left** 182:25 183:14,19,
20 185:5 208:21
236:24 395:20

**leg** 149:18,21,22

**legal** 6:7 7:13 46:13,
20 51:23 100:25

**legs** 127:17 135:3
160:21

**length** 317:5

**lethal** 271:17

**letrozole** 119:8
140:22 242:13 376:5,
8 377:8,15,22 378:24
379:10,12 380:20
381:5,24 384:2,5

**letter** 215:9,14 216:4
288:8

**letters** 215:16,24

**letting** 383:3

**level** 134:13 149:18
189:23 214:2,23,25
215:3,12 216:15

**Liability** 7:8

**licenses** 122:6

**life** 234:23 270:4,8
271:16 342:6 404:8

**life-** 318:11

**lifesaving** 271:13
272:11

**lifestyle** 81:6,11 82:7
83:11,14,17

**lightening** 251:22

**likewise** 22:1 58:6
112:10,22

**limit** 233:19

**limitation** 228:14
229:1 347:15

**Limitations** 228:20

**limited** 46:8 52:8,25
68:16 211:9 259:13
356:15 387:19

**limiting** 52:21

**limits** 25:17

**lines** 161:4,7,12

**lips** 99:4 207:17

**list** 11:3 27:5,8,15
36:8 38:5 41:9 55:16
56:1,20,24 76:16
99:24 109:1 111:15
113:11 117:15
118:14 165:17
167:10,11,16 244:5
259:5 263:7 347:10
354:12 355:16
376:11 379:8 395:8,9

**listed** 44:8,23 49:1
76:2,7 115:16 259:5
262:2,10 315:25
316:21 364:15 365:4
378:1

**listen** 17:16

**lists** 158:23 159:23
377:25

**literally** 387:6

**literature** 23:7,8
39:14 40:16 50:2
60:10 78:21 79:21
98:1,4 99:11 117:3
120:2,3,6,12,15
124:18,21 125:8,14
127:20 133:15 135:6
136:2 138:11 139:8
140:2 149:9 150:20
151:19 162:4,9
192:18 248:4 255:4
266:5 302:9 339:11
352:24 365:4,8
367:15 371:9,12
372:17,22 384:14
386:16 387:8,17
391:9 395:5,10,13,17

**litigant** 48:11

**litigation** 7:8 9:11
10:16,19,22 16:3,23
18:7,13 20:16 21:4
22:7,18 27:9 28:4

29:21 32:18,23,25
33:3,9,10,13,22
34:10,12,14,25
35:11,20 36:14 42:23
46:15,17 48:16,19
49:10 51:21 53:11
63:16 66:5 69:10
77:6,12 79:15 85:3,4
87:24 88:4 91:2
98:25 106:17 108:1,
19 121:9 123:17
139:6 141:13 170:8
189:20 235:7 284:20
290:14 334:25 397:7

**litigation's** 46:10

**live** 271:18

**lives** 270:17,22

**living** 133:5,6

**LLC** 8:14

**Ln** 407:6

**load** 146:22

**local** 220:1 271:3

**localized** 219:19

**locally** 219:25

**locate** 38:23

**logical** 164:21

**logistical** 210:2

**long** 108:10 222:19
290:4 331:11 396:8
403:23

**long-term** 174:22
175:7,11 198:6
368:18 369:25
376:14,21 377:3

**longer** 16:7 200:16
225:20 226:24
232:22 311:17
345:20 362:20
393:10

**looked** 39:16,17
75:22 77:19 82:3,6,
12 92:6 98:5,6 100:7
109:19,21 115:5,17
126:15,16 127:6,7,10
129:17 132:7 137:7,
12 140:3 152:2
156:20 163:4 166:25

167:2,11 175:1,2,8
187:25 193:4 194:18
205:23 207:24
249:20 267:25 285:5
304:20 306:12
312:18 325:18 347:1
362:14,19 363:11
364:11 371:22
381:17,18,19

**loses** 231:10

**loss** 80:18 81:2,7,12,
21,23 83:11,20 84:2,
6,13,19,24 85:9
106:17,18 107:18,21
135:19,24 136:12
138:14 139:2,16,21
143:4 156:5 174:13,
23 175:5,8,11 177:25
180:13,22 211:25
212:21,23 213:13
229:20 230:3 231:13
232:22 233:5 234:2
238:8 242:9 252:16,
23 262:2 263:8
265:17,21 266:1
267:16 268:4 310:19,
23 339:7 341:5 351:9
353:20,21,25 354:2,
3,13,15,19 360:15
362:8 365:10 372:8,
12 376:24

**lost** 99:1 141:2 256:1

**lot** 87:11 88:9 100:18
105:10,14 124:22
127:17 141:1 147:20
158:22 166:21
197:25 243:7 290:9
302:4 319:22 326:6,
13,16 331:21 342:14,
15 343:20,21 364:1
367:12 379:22

**Louisiana** 7:9
358:15 359:4,7,10,20
360:13,17 361:1

**love** 346:2

**lovely** 12:4

**low** 326:11,17 327:4

**lower** 178:4 216:17

**lowest** 172:21
214:23,25 215:1,3,12
216:15,19

**lunch** 168:5

---

**M**

**M.D.** 9:1 41:2 56:6
109:6 272:24 277:4
279:9 399:21 400:6
401:4 402:12,16
404:23 405:5,7
407:4,21

**Madam** 134:4

**made** 9:9 14:13 53:2,
10 61:21 62:6,22
75:3 90:12 91:18,19
93:23 95:17 160:8
167:5 218:22 234:9
293:20 294:3 353:9
364:4,19 385:3

**Madeline** 8:11 277:7
317:12 343:1

**Madigan** 21:18 22:24
23:6 24:21 27:7 28:8
91:16 152:4,18 153:5
154:5,14 155:7
156:3,11,24 159:19
161:21

**Madigan's** 28:19
151:13,17 153:24
154:10

**magnify** 185:9

**magnifying** 171:23,
25 182:14 183:15,18,
24

**main** 224:7,16,23
321:19

**maintain** 56:19

**maintained** 230:14

**maintains** 49:5

**major** 98:2 194:1
339:8 372:9 403:11

**majority** 234:18
261:13

**make** 15:2,3 33:19
43:4 49:10,22 50:10
60:16 73:20 95:20
127:18,19 147:5
167:6 173:11 185:20,
25 195:2,6 199:20

**lunch** 168:5

**maker** 287:12

**makes** 94:24 398:8

**making** 93:14 181:15
252:7 282:5 293:12
345:16 357:23
362:16,22 363:8,9,
13,14 365:1 370:24

**manage** 65:23

**management** 65:19

**manipulate** 175:17

**manufacture's**
109:12

**manufactured**
384:20 387:21

**manufacturer** 19:8
221:4 288:15 294:20
295:4 301:7,18 302:1
303:22 304:8,24
305:9 306:7 386:1,4,
8,11,24 387:13
388:2,9

**manufacturers**
47:17 386:15

**manufacturers'**
221:7

**manufacturing** 69:1

**mark** 10:23 11:18,25
12:5 19:19 40:20
102:14 169:9 272:21
276:24 279:6 313:17
315:19 321:17
358:14

**marked** 11:10,21
12:19 13:1,12,18
19:25 41:2 102:20
109:2,6 112:5 146:12
169:13 171:3 182:4
194:4 209:4 222:19
228:5 234:24 243:18

**200:20 211:15**
214:12,13,14,19
231:25 249:2 275:6
286:24 295:2 323:15
324:4,11 325:19
339:6 340:25 341:7
348:3 349:10 361:6
363:7 364:25 370:15
372:19 373:10 385:9
405:19

**maker** 287:12

**makes** 94:24 398:8

**making** 93:14 181:15
252:7 282:5 293:12
345:16 357:23
362:16,22 363:8,9,
13,14 365:1 370:24

**manage** 65:23

**management** 65:19

**manipulate** 175:17

**manufacture's**
109:12

**manufactured**
384:20 387:21

**manufacturer** 19:8
221:4 288:15 294:20
295:4 301:7,18 302:1
303:22 304:8,24
305:9 306:7 386:1,4,
8,11,24 387:13
388:2,9

**manufacturers**
47:17 386:15

**manufacturers'**
221:7

**manufacturing** 69:1

**mark** 10:23 11:18,25
12:5 19:19 40:20
102:14 169:9 272:21
276:24 279:6 313:17
315:19 321:17
358:14

**marked** 11:10,21
12:19 13:1,12,18
19:25 41:2 102:20
109:2,6 112:5 146:12
169:13 171:3 182:4
194:4 209:4 222:19
228:5 234:24 243:18

**257:21 265:2 266:20**
272:24 277:4 279:9
313:20 315:22
321:14 323:15
324:24 328:22 334:6
336:18 346:18
349:21 358:21 366:1
368:5 378:4

**market** 221:23
276:18 283:23
297:19 372:9 384:20,
23 398:4,13

**marketing** 287:14

**Martin** 126:2 149:2
170:22 193:18
206:14 217:14

**material** 17:15 50:6,
8 56:6,12 58:5,12
100:20 273:23
290:16

**materials** 27:5
36:18,22 37:4,6,10,
15,23 38:1 55:17
56:9 57:10 77:22
109:1,6 111:16
160:18 249:7 274:9
277:18 309:3 402:16

**math** 54:4 152:23
153:4,6

**matter** 7:7 13:16 14:1
18:11 97:11 111:2
116:4 191:16 221:6
356:19 382:15
387:23 388:2

**matters** 11:14 12:16,
23 13:9 26:4 61:6
87:23 281:19

**Mccanless** 57:15,17,
23 58:7 69:24 70:7,
17 71:20 72:4,9

**Mccanless'** 58:20

**MDL** 7:9 220:3
233:19 234:7,11,18

**meaning** 156:5
196:8

**means** 65:7 196:3,5,
22,24 197:13 251:22,
24 252:1 381:8,15
383:24

**meant** 305:12 337:14
377:4

**measures** 388:8

**mechanism** 229:20
230:2,23

**medical** 45:14 46:25
59:4 85:14,15 86:23,
24 112:11,16,23
121:8,25 122:1,2
131:25 132:16 219:1
283:2,5 310:6 356:4
358:18,19 359:4,7,
10,20 360:13,18
361:1 365:8 406:13,
15

**medication** 10:11
65:25 73:16 74:23
82:12 95:8 113:13
124:5 135:18 144:11
174:12 187:22 221:7
337:7

**medications** 23:18,
19 42:15 44:8 46:1
63:15,22 65:11 75:20
81:7 82:8 106:8
113:6 115:19 116:19
117:8,14 118:23
119:19 136:12
139:15,20 141:18
158:18 159:6,23
160:2 175:4,18,22
221:5 247:20

**medicine** 348:20

**MEDLINE** 244:23
245:8

**meet** 9:12 248:18
286:6,13

**meeting** 47:12

**meetings** 288:11
356:6,16,17,18

**meets** 231:23

**memory** 10:12 53:4,
6 99:20 114:7 118:17
147:7 238:12,16
316:4,13

**menopausal** 84:1,8

**menopause** 83:21

**mention** 200:12

335:24

**mentioned** 126:10
136:5 170:18 218:10
219:3 220:11 245:7
274:14 312:6

**mentions** 335:2

**merit** 18:23

**met** 9:8 226:14
280:16 282:5 284:22
285:2,17,21 286:2

**meta-analysis**
161:21,22 204:3,7,11
205:23

**metastatic** 219:18
233:3,16,24 234:6,
11,15,19

**method** 129:17,21
155:23 364:7,20

**methods** 93:9
123:12,13 195:19
324:8 388:6

**Methotrexate** 41:22

**Miceli** 6:22,23 7:19
8:3,19 10:2 14:6,20
15:2 16:12,25 17:7
18:19 19:3,9,17 20:2,
4,17 23:22 24:11,24
25:14 26:5,17 27:1,
10 29:10,22 30:16
31:1,8,14,21 33:17,
25 35:13,17 36:2,19,
23 37:7,17 38:14
39:9 40:7 42:25 43:7,
16 44:15 45:4,12,18
46:12 47:20 49:25
50:9,16,24 51:6,19
52:10,23 54:15 55:5,
11 56:14 57:2 58:10,
18,24 59:9,20 60:7,
24 61:7,14,23 62:8,
25 63:8,23 64:24
65:4,17 66:10,15,17,
20,24 67:2,4,8,14
68:11 69:4 70:1,10,
19 71:22 72:11,23
74:10,24 75:15 78:9,
25 79:6 80:5,12
81:13,24 82:17,22
83:3,13 84:9,14,25
88:18,21 90:4 91:12
94:23 95:10 96:15

98:18 99:1,4 100:3
101:5,13,21 102:4
108:3,20 110:10,19
111:4,9 112:18,25
114:3,19 115:22
116:5,22 117:10,18
118:4,18 119:1,11,21
120:9 121:4,10
122:10,19 123:10
124:7 125:7,22
126:18 127:14,25
128:17 129:7 130:16
131:8,17 132:1,17,25
133:13 134:4,24
135:12 136:20
137:14,22 138:15,22
139:11,22 140:11,25
141:9,21 142:5
143:22,23 144:12
145:8,21 146:6,20,24
148:20 149:16,25
150:17 153:9 154:2,
13 155:2,9 156:9
157:3 158:13,20
159:8,13,15,18,25
160:11 161:10,18,24
163:2,13,20 164:20
165:1,4,20 167:8
168:3 172:16,23
178:14 180:14
181:19 182:1,24
183:12,20,23 186:19
188:6,14,21 189:10,
17 190:5,15,24 195:7
196:14 197:4,15
198:14,24 199:8,14,
25 200:11,25 201:5
203:13 204:18
207:17,21 208:8
211:14 212:16 213:8
223:25 226:3,13
227:3,13,19 229:22
230:5,16 231:1,15
232:19 233:1,8
234:3,13 237:14
238:1,18 239:9
240:7,10 242:3,16
243:22 244:1 246:19
247:8,24 248:6,21
249:14 250:7 251:8,
20 252:2,19 253:1,25
255:7,19,23 256:2,8,
12 257:4 258:1
259:7,11 260:12,18,
24 261:11 262:12,19
263:2,10,23 264:8,18

265:7 266:3,9,16,18
267:10,13,20 268:6,
11,19 269:4,22
270:5,13,18,23
272:4,14 273:19,21
274:17,23 275:2,5,10
277:14 281:10
282:16 284:1 285:15,
25 286:14 287:8,16,
22 288:17 289:2
290:8,20,21 291:24
292:14,21 293:5,24
294:4,14,24 295:8,19
296:3,11 297:4,13,20
298:9,17 299:2,20
300:16,19,22 302:12,
24 303:2,5,8,13,17
305:11 306:10,20,23
307:9 308:1 311:6
312:1 313:8 314:22,
24 317:3,15 318:13
320:1 322:25 323:6
327:1 329:2 330:23
331:6 332:20 333:9
335:9 336:12 337:8
338:16,24 339:22
340:15,22 341:12
342:10 343:16 344:6,
15,25 345:20,25
347:21 348:5 349:25
351:2,24 352:21
355:17 357:3 358:10
359:14 360:6,19
361:4,15,23 368:3,25
369:14 370:8,22
372:3,14 373:5
374:2,12 375:2,7,16
377:10,18 378:25
379:13 380:21 382:1,
11,15,21,23 383:3,9,
12 385:2 388:16
389:11,22 390:1,5
392:20 393:22
395:19,23 396:4,16,
18,25 397:23 398:5,
14,24 399:9,16

**Michael** 8:13

**micrometastases**
319:1,8

**middle** 43:10 236:24

**midway** 254:13

**Milazzo** 25:16 52:20

**mind** 19:22 28:15
40:23 115:25 116:3
122:25 208:6 214:6
242:19 259:21

**mine** 20:25 48:14
172:9 200:20 314:23

**minimum** 362:15
372:21

**minoxidil** 371:21,25
373:3,18,25

**minute** 164:24 261:2
369:12 377:25 396:3

**minutes** 102:2
164:22 256:3,5,7,11
272:13 303:6,16
396:1,5 399:2

**misheard** 313:10

**misinterpreted**
221:21

**misrepresentation**
121:15 122:20

**misrepresentations**
123:4

**missed** 50:8 206:9
313:9 394:24,25

**missing** 160:23
225:1

**misspoke** 202:22

**misstating** 383:22

**mistaken** 206:8

**misunderstood**
286:22 337:14

**mitigate** 371:23

**mitigation** 66:7

**modalities** 272:2

**Modest** 325:24

**modifier** 43:25

**modify** 32:7,13,16
40:4

**Mollie** 7:2,23 208:11
275:15 303:3 317:3
336:14 341:1 345:20

**moment** 9:9 13:7
15:13,21 16:15 68:1

201:11 245:7

**momentarily** 171:13

**money** 53:9

**monograph** 325:17,
19

**Monographs** 325:6

**month** 242:10

**months** 225:7,14,18,
21,25 226:11,16,18,
21,25 227:5,6,15
231:11,21,22 232:23
233:10 354:1 361:21
362:2,4,7,10,15,18
363:5 365:9,11,15
366:13 370:20 372:1
373:17

**morning** 6:5 8:12 9:8
374:21

**mother** 393:10,17

**mouthing** 207:20

**move** 26:24 110:14
121:23 163:25
185:23 186:1,6
213:21 229:2 236:17
238:5 240:4 250:1,9
261:21 322:22
339:16 345:18
380:17

**moving** 99:4 207:17

**multi-modality**
270:25 271:24

**multiple** 76:17,20
109:18 234:1 272:7
288:6 308:15 369:5
399:10

**mute** 26:18

---

**N**

---

**N-A-M-I-N-I** 394:23
395:7

**named** 119:7 400:6

**names** 20:21 21:16
23:24,25 24:1,3
213:24 220:17,18

**Namini** 394:13,23

395:3,7

**narrative** 218:17,21
219:13 222:14

**narrower** 114:24
175:16

**narrowly** 62:20

**National** 104:12,20
105:15 325:5,8
328:25

**nature** 33:15 47:5

**NCCN** 59:8,10 60:4,
9,21 75:21 76:11,20
199:17 311:21 312:5,
9,11,14 313:13,19
314:5 315:2,19,21
316:6 405:9,12

**NCI** 104:8,15,24
105:21

**NDA** 46:18,21 47:23
48:21 49:4 89:8
93:21 199:2 279:4,23
280:12 282:20 289:6
305:19 398:9,10,12

**necessarily** 188:7

**needed** 12:7 14:13
42:18 44:1 51:10
115:3 118:1,6 219:25
324:24 329:10
337:12 366:13
372:13 405:23

**negative** 326:11

**neoadjuvantly**
272:1

**network** 105:13

**neuropathy** 64:23
65:13 328:5,7,10
333:6,23 334:5,14,17
339:18 342:7 343:7,
13 345:4,7 406:9

**neurosensory**
330:25 332:6

**neurotoxicity**
330:21 332:1,14
333:16,20

**neutropenia** 64:12,
21 65:13

**newer** 108:22

**nice** 9:11 169:6

**Nick** 6:25 7:21 9:10
15:8 26:17 43:1
66:12 67:9 79:6
137:16 164:20
181:20 208:9,10
250:7 259:8 273:22
275:2

**night** 25:12

**ninety** 237:5

**node-positive**
398:18

**noes** 14:25

**non-** 144:16 153:11
178:11 206:3 234:14,
18 248:10 251:21

**non-anthracycline**
176:14,22,24 177:19

**non-docetaxel**
118:13 120:4 223:19
248:10

**non-metastatic**
220:1 233:22 271:21
272:8 317:18

**non-randomized**
173:6

**non-randomly**
216:11

**non-regulated**
280:21

**non-responsive**
339:17 344:4,13
380:18 384:1

**non-t** 180:7,8

**non-tax** 186:13
187:9,13

**non-taxane** 177:5
178:7 188:3,12

**non-taxotere** 143:19
209:21 216:12

**non-taxotere-** 136:2

**Non-taxotere-
containing** 143:16

**normal** 300:7

**North** 36:9 208:9

**Nos** 169:12 257:19
358:20 402:22
404:15 406:15

**notable** 357:17

**notary** 399:24 407:24

**note** 31:6 42:3,4
104:6 126:20 167:22
193:20 355:20
357:19 368:18
369:24

**noted** 198:7 201:7

**notes** 128:5 367:2

**notice** 14:12 272:22,
23 276:25 277:3,9,
13,16 404:22 405:4

**Novartis** 48:3

**November** 13:8,11
54:5,6 302:11,20
306:3,4,6,19 307:12,
16,19,23 308:12,24
361:13 402:3

**number** 44:2,3,4
46:1 47:1 53:14,16
76:13 128:5 145:11,
16,17 155:21 156:4,
5,23 178:7 198:9
202:4 208:11 209:16
210:25 240:12
248:18 256:22 257:1,
3,14 264:23 301:12
388:18

**numbered** 173:15

**numbers** 28:9
152:13 155:23,24
191:16 201:12
204:20,24 205:2,6
236:12 248:2,4,12,16
251:7

**numerators** 179:14
180:3

---

**O**

**oath** 9:16 400:8

**object** 10:2 14:6

16:12,25 17:7 18:19
19:3 20:17 23:22
24:11,24 26:5 27:10
29:10,22 30:16 31:1,
8,21 33:17,20 36:2,3,
5,19,23 38:15 39:9
40:7 44:15 45:4,12,
18 46:12 47:20 49:25
50:9,16,24 51:6,19
52:10,23 54:15 55:5,
11 56:14 58:10,24
59:9,20 60:7,24
61:23 62:8 63:8,23
64:24 65:4,17 68:11
69:4 70:10 71:22
72:11 74:10 75:15
78:9,25 80:12 81:13,
24 82:17,22 83:3
84:9,14,25 90:4
91:13 94:23 96:15
98:18 100:3 101:5,
13,21 108:3,20
110:19 111:4,9
114:3,19 115:22
116:5,22 117:18
118:4,18 119:1,11
120:9 121:4,10
122:10,19 123:10
124:7 125:22 126:18
127:25 128:17 129:7
130:16 131:8 132:1,
17 133:13 134:24
136:20 138:15,22
139:11,22 140:25
141:9 142:5 144:12
145:8,21 148:20
149:16 150:17 153:9
154:13 155:2 156:9
158:20 159:8 160:11
161:10,18,24 163:2,
13,20 167:8 172:23
178:14 180:14 188:6,
14,21 189:10,17
190:5,16 196:14
197:4,15 198:14,24
199:8,14,25 200:25
203:13 204:18
211:14 212:16
223:25 226:3 227:13,
19 229:22 230:5,16
231:1,15 232:19
233:1,8 234:3,13
238:1 239:9 242:3,16
247:24 248:6,21
249:14 251:8,20
252:2,19 253:2,25

255:7 257:4 260:12,
18,24 261:11 262:12,
19 263:2,10 264:8,18
266:3,9 267:20
268:6,11,19 269:4,22
270:5,13,18,23 272:4
282:16 285:15,25
286:14 287:8,16,22
288:17 289:2 291:24
292:14,21 293:5,24
294:4,14,24 295:19
296:11 297:4,13,20
298:9,17 299:2
300:16 302:12,24
305:11 306:10,21
308:1 317:15 320:1
322:25 327:1 329:2
330:23 333:9 335:10
337:8 338:17 339:22
341:12 342:10
343:16 344:6 348:5
349:25 351:24
358:10 359:14
360:19 361:4,23
368:25 370:8,22
372:3 373:5 374:2
375:2,16 377:10
378:25 379:13
380:21 382:1 385:2
388:16 389:11
392:20 393:22
396:16,25 397:23
398:5,14 399:9

**objected** 273:17

**objection** 19:9 31:14
33:19 38:14 57:2
62:25 70:19 72:23
74:24 80:5 83:13
91:12 95:10 110:10
112:25 117:10
119:21 125:7 127:14
131:17 132:25
140:11 141:21
143:22 149:25 154:2
155:9 157:3 158:13
159:13,25 165:20
172:16 186:19
200:11 201:5 211:16
213:8 226:13 227:3
237:14 246:19 247:8
263:23 284:1 290:8
295:8 296:3 299:20
300:17 306:20,22,23
311:6 314:22 318:13
323:6 332:21 338:24

340:15,25 351:2 352:21 355:17 357:3 360:6 361:15 372:14 374:12 375:7 377:18 389:22

**objections** 58:18 273:23 274:18 307:6 383:14

**objective** 293:7 343:10

**obligates** 9:20

**obligations** 94:1 285:17

**obscuring** 200:16

**observation** 142:10

**observational** 175:20

**observed** 202:12,18 343:5

**obtain** 38:18 51:2 93:3 97:13 211:3 308:16

**obtained** 38:8 39:7

**occur** 119:13,16 181:11 196:6 232:4 332:6 338:9 376:12, 23 377:2

**occurred** 120:2 148:14 241:21

**occurrence** 78:2 302:4 371:24

**occurs** 143:19 338:4 380:23

**odd** 144:20 152:9 191:14

**odds** 126:4 133:15 134:10 144:21,25 145:6 148:25 149:3,7 152:5 154:4,8 155:18 157:7 176:5,19 191:6,8 206:7,13,14, 15 389:16 390:21 391:4

**off-the-record** 79:9

**offer** 52:7 58:6,13 61:9 62:21 63:5,12, 20 65:22 66:2 68:22

69:8 71:19,23,25 73:24 78:16 80:19 81:1,4,10 83:25 84:4 88:5 89:1 90:14,15 101:18,23 122:8,13 123:8,11 134:19,22 135:11 140:5 142:22, 25 143:2 150:4,14 151:16 280:15 285:12 286:19 291:14 309:23 310:2, 3 343:25

**offered** 59:3 70:14 75:12 77:11 120:18 122:9 235:6

**offering** 27:18 37:22 51:14 54:12,22 57:14,16,20 61:12, 19,24 62:4 63:2,10 64:16 67:25 68:2,5,8, 17,24 69:2 74:3 78:13 81:5 84:10,15, 17,20,23 85:1,5,8,11 88:3,24 89:4,12,14, 17 91:9 92:13,16,18, 19,22 93:8,25 94:6,9, 15,18,19 95:11,13 100:25 101:16 139:14 149:23 256:25 278:25 279:18 280:2 286:16 309:12

**offhand** 30:21 56:16 316:12

**Officer** 283:2

**offsite** 105:9

**oftentimes** 136:6

**omitted** 27:15

**oncologist** 57:15 59:7,16 60:3,21 65:23 69:24 85:14,15 269:5 342:14 343:19

**oncologist's** 60:2

**oncologists** 187:17 189:15 199:11 312:12

**Oncology** 313:20 315:22 323:12 334:8 405:10,13

**one's** 339:7,8

**ongoing** 162:21 200:12 201:6,18,22 296:18

**onset** 224:9

**operable** 322:11

**opine** 94:4 136:17 140:10 151:9 237:24 285:16 286:6 289:24 294:18 296:5 302:18 331:3 342:21 379:5,6

**opining** 68:14 139:20 141:12 285:21 286:1

**opinion** 30:24 49:9, 10,13,23 51:15 57:17,23 58:3,4,7,12, 13,14,16,20 61:16,20 62:21 63:2,10 64:16 66:5 68:2 71:19,23, 25 73:1,24 74:3 78:16,18 79:12 81:2 84:23 85:8 89:4,12, 18 92:13,16,18,19 94:9 97:15,20 101:16,19 111:8,18 114:10,12 115:16 118:19,20 122:14 123:12,15 128:14,21 132:4 134:19,23 139:15 140:6 149:14 150:14 151:17 161:5, 8 217:3 256:19 260:21 279:24 286:17 289:15,19,22 295:1 296:12 301:23, 24 304:10,12,20 305:8 309:12 310:3, 14 311:8 317:13,16 333:2 334:18,19 353:11 355:22 362:12 368:1 379:1, 11 387:3 392:17,22 394:7

**opinions** 21:10 22:17,22 24:23 27:17 28:12,14,25 29:8,17, 19 30:3 31:10,11 32:7,14 45:2 50:3 51:10 52:4,7,12 54:12,17,19,21,24 55:18 56:13,21 57:7,

9,12 59:1,2,5 61:10, 13,25 62:4 63:5,12, 13,21 65:23 66:6 67:24 68:5,8,17,22 75:8,12 78:12 80:19 81:4,5,11 84:1,5,11, 12,16,18,21 85:2,5, 12 88:3,5,24 89:1,14 90:14,15 91:9 92:22 93:8,25 94:6,15,19 95:12,13 96:21 100:2 101:1,23 108:1,18 112:17,20 113:2,15, 21 114:1,8 115:2,6, 20 116:4,20 117:9, 16,24 118:3 122:8,18 123:9 148:17 149:23 150:5 153:25 164:3 165:11 170:20 248:20 256:24 268:23 269:8,10,16 277:19 278:12,25 279:19,22 280:2,4,5, 11,15 285:12 286:20 287:1 289:20 291:15 309:16,23 310:17 337:2 342:20 365:14

**opportunity** 13:25 52:2 255:15

**opposed** 174:10 333:8,18

**option** 63:7

**options** 62:10,17 70:14 71:2 199:19 271:7 318:4 327:18 337:16,24 338:2 341:19 355:21

**oranges** 240:21

**order** 16:11 19:20 25:16 40:21 52:21 53:2 96:8 125:20 285:12 306:8 397:21

**organization** 360:22

**orient** 275:17 396:15

**original** 109:19 167:24

**osteoporosis** 376:14,22 377:4

**outcome** 79:25 80:14 147:25 230:19

9,12 59:1,2,5 61:10, 13,25 62:4 63:5,12, 13,21 65:23 66:6 67:24 68:5,8,17,22 75:8,12 78:12 80:19 81:4,5,11 84:1,5,11, 12,16,18,21 85:2,5, 12 88:3,5,24 89:1,14 90:14,15 91:9 92:22 93:8,25 94:6,15,19 95:12,13 96:21 100:2 101:1,23 108:1,18 112:17,20 113:2,15, 21 114:1,8 115:2,6, 20 116:4,20 117:9, 16,24 118:3 122:8,18 123:9 148:17 149:23 150:5 153:25 164:3 165:11 170:20 248:20 256:24 268:23 269:8,10,16 277:19 278:12,25 279:19,22 280:2,4,5, 11,15 285:12 286:20 287:1 289:20 291:15 309:16,23 310:17 337:2 342:20 365:14

**outcomes** 234:23 348:3 349:10,12 404:9

**ovarian** 328:21 329:17,25 332:10 333:7,17 406:5

**over-interpreting** 382:2

**over-read** 391:2

**overlap** 218:4,15 220:5 391:23,25

**overlapped** 218:19

**overly** 192:17

**oversight** 105:9

**Overview** 169:11,16 402:21

---

**P**

**p-value** 152:15 196:16,17,22,23 197:12 198:10 202:10 206:7,17

**p-values** 134:12 152:25 154:7 155:25

**p.m.** 169:1,3 208:16, 19 256:14,17 272:15, 18 303:9,12 346:4,7 369:15,18 399:19

**P3-09-15** 222:16 403:20

**pac** 192:14

**pacitaxel-containing** 63:6

**packages** 47:11

**paclitaxel** 41:20 64:18 86:6 139:3,9 140:23 141:7 177:15, 21 179:20 186:18,23 187:4 189:8 192:13 212:4 237:2,13

246:13 315:8 320:10
328:5,10 332:2,15

**Paclitaxel-** 328:20
329:16 406:4

**paclitaxel-carboplatin** 330:21

**pages** 76:8,13 250:2
253:9 261:22 311:10
316:13 345:12

**pain** 283:14

**Palamaras** 146:1
147:13

**Palamaras'** 145:18

**Panel** 358:16 359:5,
8,20 360:14,18 361:2

**Panels** 359:11

**paper** 39:7 80:3,7
98:11 109:20 124:11
146:4,17 147:7,12
153:19 167:16,24
172:3 181:6 189:3
191:5 192:16 193:23
195:6,22 206:17
207:16 214:4 215:13
216:13 222:13
227:25 235:2,12,13
243:21,22 244:2,17,
24 246:17,23 249:16,
19,21,24 253:11
259:16 324:14,19,21
325:22 366:20,21,24
367:1 386:18

**papers** 29:13 50:2
79:16,20,22,24 80:1,
11 82:1,9,13 90:2
98:21 106:2 124:10,
23 125:14,25 126:2,
5,22 136:23 162:14
166:8,10 191:13
192:2 193:4 218:16
226:18 245:12 247:3,
18 248:18 249:10,19,
22 252:9 386:20

**paragraph** 147:4
203:2 211:24 212:21
229:6,7 230:22
254:13,21 260:4
301:15 311:25 312:5
318:17 324:7

**paralegal** 12:4

**parameters** 363:19
364:3

**parentheses** 241:21

**part** 14:8 79:11 81:21
85:21 86:14,17,23
87:6,9 91:1,18 94:13
100:17 104:8 105:8
110:15 113:8 114:22
116:25 167:23
182:15,16 184:3
185:23 224:13 254:6,
11 256:24 277:20
287:9 296:8 300:2
301:25 311:13
317:23 318:3 339:17
349:17 354:18
355:22 362:3,4
363:12 364:9 371:22
374:4 398:22

**partial** 43:18 258:9

**participants** 195:10
238:24

**participated** 86:5
282:2

**participating** 47:12

**parties** 6:16

**Partners** 46:18,21
48:21 49:5

**parts** 23:16

**party** 18:14 269:2
400:18

**pass** 274:13

**passage** 152:2

**past** 53:20 54:6 75:24
76:1 172:12 399:2

**pathologist** 77:4

**pathologists** 77:8
79:23

**pathway** 88:10
229:14,19 230:12
280:8 293:1,7,17

**pathways** 88:7,8
280:7 332:7 393:9

**patient** 59:11,23
60:13,17,18,20 61:22

62:12,14,16 63:1,4,9
70:13 71:11,17 72:2
73:3,5,6,12,19,23
74:1,7,13 75:2 78:5
79:5 85:16 86:10,13,
15 87:6,10,19,20
95:18 101:20,24
103:10,16,23 106:5,
13,14 123:23 124:1
145:1 157:22 158:11
159:7,23 199:21
220:7 223:5,11,15
226:10,24 231:9,14
232:22 233:2 234:7
247:21 248:4 249:11
259:24 260:3,5,14,17
262:25 264:10
267:24 268:4 271:6,8
272:2,8 276:8 294:6
298:19,23 309:11
310:4,13,17,25 311:8
317:21 324:22 325:2
326:24 327:16,17
333:7,8 337:13,16,
17,21,23 338:7,10,
14,21 339:1,6,20
340:3,5,11,13 341:9,
17,20,24 343:24
345:14 349:13
350:23 351:11
352:15 353:7 354:11
355:15 358:17
359:12 373:8 374:10
377:7,15 378:19,22
379:19 380:8,10,11,
14 398:23 399:12
405:21 406:13

**patient's** 65:7 73:16
225:3 373:2

**patients** 23:14 62:10
65:3 68:7 73:8 78:24
86:22 87:1 103:14,19
106:7 107:7 108:9,16
115:10 142:2,14,23
143:3 144:10,17
145:20 147:13
163:22 172:6,10
173:23 174:3,8,9
175:7,8,18 176:1,2,6,
20 177:7,10 178:8,17
179:24,25 180:9,12,
18 187:17 188:3,11,
25 189:8 191:20
194:13,18,20,25
195:12,19 198:1

199:19 201:12,21
203:8 204:1,15,25
207:8 208:3 209:2,15
213:15,17 216:5,10
218:2,10,11,19,20,25
219:25 220:3,20,23,
25 221:11 222:1,18
223:21 228:2,5,11
232:1 233:19,22
234:5,11,18,23
235:14,17,25 236:10,
21 237:12,20,23
238:7 240:25 241:15,
24 244:14 247:5,13
260:10,21 261:6,16,
19 270:25 293:13
312:24 313:22 318:8
319:10,25 322:24
323:5,14 324:3,10,15
326:9,10,15 330:3
331:19 333:18
334:22 340:17,19
341:22 344:1 348:4
349:11,22 351:7,14,
17 352:2,4,23 354:7
356:9 359:22 363:24
365:3,22 366:1,13
368:21 370:2 371:13,
19 372:2 373:15,23
376:2 377:9 379:23
380:2 381:5,9,11,22
384:21 386:11,16
389:2 390:12,14
391:6,10,25 398:18
403:17,22 404:3,6,9
405:18 406:19

**patients'** 74:9,21
270:16,22 292:13,19

**pattern** 251:17
252:1,23 253:21

**patterns** 252:14

**PCI** 291:15

**pcia** 91:3 125:5
126:15 129:4 131:25
132:16 140:24 141:8,
19 142:3,15,24
143:18 145:1,20
151:10 155:8 157:1
160:16 162:5,9
186:17 211:6,11
213:2,17 226:12
227:1,11,12,14,18
231:14,19 232:18,23

233:6,9 235:14,21
236:23 237:20
240:14,19 249:10
250:17 256:20
257:10 300:14,24
302:4 304:7 306:9
362:9,16,22,25
363:10 364:13 365:5
372:13,16,24,25
373:16,24 375:6,15
395:4,14

**PDF** 312:1

**peer** 215:19 216:1

**peer-reviewed**
124:13 172:13,18,19
215:13

**pencil** 153:18

**pending** 6:21 195:21

**people** 49:7 126:11
127:6,9 147:17,18,21
148:12 156:4,6,25
225:24 226:22
246:22 323:8 326:16
365:13 372:7,9
374:16 381:12

**percent** 178:10
179:18 191:17,19

**percentage** 142:2,
14 178:17 179:7

**percentages** 180:3
317:18

**percipient** 18:10

**perfect** 166:20
167:14 316:3

**performed** 80:16
156:13 161:21 343:9

**performing** 23:6

**period** 37:9 205:7
264:17 366:13,17

**periods** 242:22

**peripheral** 328:6,10
334:5,14,17 339:18
342:7 343:7 345:7
406:9

**perjury** 9:25

**permanence** 225:3

**permanent** 41:15
42:13,18 44:1,6 64:6
90:20 96:1,13 97:6
106:13,14,22 107:11,
19,24 108:4,15
110:8,18 111:3
114:21 115:9 116:24
117:6 119:9,20
120:1,8,23 121:6
124:15,24 131:7
135:19,24 136:12
138:13,20,24 139:16,
21 143:4,10 144:21
147:14 148:1,6
169:12,16 171:1,7
175:23 177:25
179:21 180:13,22
182:2 184:9,15 186:9
187:18 188:4,13
189:2,9 191:8,10
194:20,24 200:6,24
206:2 209:1 217:2
219:23 222:17
223:18 225:8,12,24
226:7,20 228:1
231:20 238:8 244:18,
22 247:19 258:17
259:18 260:23 261:7
263:15,22 266:1
286:9,20 296:20
301:5 302:22 303:23
307:13 310:15
331:18 334:20
336:25 338:3 340:7
342:22 343:14 345:5,
9 351:9 352:12
361:13,19 362:8
365:10 366:18 370:6,
11,18 371:2,4,7,14
373:4 378:8 380:15
388:7,13 389:1,7
391:1 393:5,15,20
394:3,4,15 402:21
403:3,7,16,20 404:3

**permanent.'** 368:22
370:3

**permission** 191:4

**permitted** 52:7
288:25

**persist** 343:13

**persisted** 157:21,24
225:20

**persistent** 41:15
42:14,19 44:1,7 64:6
98:8 115:9 120:1
139:8 157:15 176:8,
23 177:11 180:10
194:1 200:6,10,24
201:13 204:16,25
225:5 226:20 231:20
234:24 239:1,7
244:19,22 246:3,5,14
247:6 263:15,22
286:9,13 310:15
331:18 334:4,13,20
336:25 342:4 343:9
368:21 370:3,5,11,17
371:1,4,8,13 378:9
380:15 388:7 391:2
393:16 403:11 404:9
406:8

**persisting** 227:5
232:22

**person** 69:21
156:12,15 158:18
268:9 282:7 285:1
370:24

**person's** 157:16

**personal** 21:1,6
83:11,14,16,17
101:14 224:20

**personally** 20:22
45:13,14 48:20 51:22
104:22 105:20 106:2,
4,7

**perspective** 173:4

**pertain** 277:18

**pertaining** 21:4 53:3
71:14 77:22

**pertinent** 24:8 50:18
113:15,18 114:12,16
115:6,15,19 116:2
117:1 132:4 280:10
342:16

**Pfizer** 8:18

**Pg** 407:6

**Pharma** 8:13

**pharmaceutical**
8:14 19:7 46:1 47:14
94:21 280:23 281:3,
5,14 282:9,14 287:20

**288:1** 298:16 299:7,
18 300:5 397:18,19

**pharmaceuticals**
8:16 24:4 47:19
298:2

**pharmaco** 192:24

**pharmaco-** 126:15,
24 128:14 129:4
130:1 132:13 160:19
191:24 192:7,11
305:20 375:4

**pharmacology**
106:21

**pharmacovigilance**
29:14 98:9 99:10,25
125:13,19 127:12
129:24 130:6,24
131:22 134:16,21
135:8 190:3,9
192:21,25 284:15
285:22,23 299:22,24
300:8 302:8,17
308:22,23 374:24
375:11

**Phase** 148:18
149:14,21 150:5,11,
15 328:19 329:15
406:3

**phone** 25:13 183:17
320:25 331:14
394:17

**phrase** 58:1 104:14

**phrased** 234:5 272:6

**phrasing** 175:12

**physical** 342:6
343:10

**physician** 59:12,23
61:2 62:12,15 65:14
71:1,4,24 72:1,13
73:6,12,19 74:13,21
75:2 95:21 125:3
199:18 271:7 310:5
327:17 337:12,15,17,
22 338:6 339:25
340:10,12 341:9,16,
21 343:23 348:21
353:2,7 357:23,25
358:7 377:7,16
378:19

**physicians** 46:6,10
122:6 163:22 287:24
288:4,8 300:25 309:6
352:23 354:7 355:20,
24 356:10,12 357:1,
4,11,13 359:21

**pick** 165:23 226:20

**picking** 336:7

**picture** 146:20

**piece** 100:20 153:19
154:24 337:21

**pieces** 132:8 154:18
160:24 248:25

**pinned** 128:19

**pivotal** 398:1

**place** 59:12,23,25
60:12,13 222:10
268:14,17 304:17
353:21 400:11

**places** 30:20 91:15
199:17 312:8

**plaintiff** 21:13 24:22
44:22 45:1 46:9
278:16,22 309:4
398:20 399:8

**plaintiffs** 6:22 7:20
20:12 22:7 32:20,25
33:2 36:14 108:1,18
284:20 399:17

**plaintiffs'** 19:20,24
20:16 22:10 25:8
30:9,13,17 31:13
36:16 37:3,23 38:7
46:6 402:9

**planning** 274:22

**plausibility** 151:22
393:25 394:3,7,9

**play** 272:9

**plenty** 18:25 97:2
303:17 339:11

**pluck** 224:22

**plug** 266:23 320:25
335:19 394:18

**Plunkett** 21:25 22:2

**point** 22:24 45:19,25
55:12 56:18 66:24

**77:25** 100:9 115:13
147:1,2 164:21
181:14 204:21 210:5
225:18 226:21
231:25 232:3 239:19
256:1 266:24 282:7
300:23 305:4 306:14
316:16 324:6 329:19
336:22 339:4 357:21
364:4,19 372:20
384:8 386:7 395:11

**pointing** 151:25
240:22

**points** 133:11 183:10
203:24 239:18

**poison** 393:14

**policies** 92:14,17,18
93:12,13,18 94:8
294:17

**poorer** 343:11

**popped** 314:23

**population** 144:10,
18 234:7 236:9

**portion** 29:18 171:19

**posed** 51:1

**posing** 232:11

**positing** 393:5,7
394:4

**position** 136:16

**positive** 198:18
206:17 318:2

**possession** 27:23,
25 278:8

**possibilities** 393:11

**possibility** 393:13

**Possibly** 227:21

**post-marketing**
92:20 93:5,10 94:2
99:12 280:13 284:18
295:16

**Postchemotherapy**
234:24 404:10

**poster** 182:18,19
185:6 188:15,16
189:12,21 192:6

**potential** 271:22 341:18 343:25 356:8 372:10 378:20,21 379:12

**potentially** 46:2 393:11

**pound** 388:3

**powered** 197:20 198:16 201:3

**practice** 6:10 85:17 86:10,23,24 313:19 315:21 360:2 405:9, 12

**practices** 82:15

**practicing** 85:13

**practitioners** 356:17

**pre-clinical** 104:19 105:10

**pre-specified** 86:19

**preamble** 292:5

**precise** 155:4 211:4 214:9

**precision** 154:6

**predate** 34:24 384:24

**predates** 292:3

**predating** 221:12

**predefined** 227:8,22

**predisposed** 224:10

**predisposition** 223:24

**preface** 330:5 368:10

**preferences** 324:8, 22 325:3 405:21

**preferred** 199:5 312:15,25 313:23 314:19 315:25 316:22 368:12

**preliminary** 218:6

**premenopausal** 323:14 324:3 405:17

**Preoperative** 314:6

**Preoperative/ adjuvant** 314:10

**preparation** 282:3

**prepare** 274:10

**prepared** 54:11 300:11 332:23 333:20 334:16,22

**preparing** 28:16 56:21 100:2 164:3

**prescribe** 58:8 85:18 87:6 276:19 356:13 357:14

**prescribed** 45:17, 24,25 85:24 86:1,11, 13 87:4,8,9,15 103:8 276:7,10,20

**prescribes** 293:25

**prescribing** 69:24 113:5,11 114:15 257:19 276:14 309:17,24 346:18 356:1 377:8,24 378:4 404:14 406:11,24

**prescription** 357:23

**present** 104:3 269:6 304:15 305:3

**presentation** 182:7

**presentations** 174:6 288:11

**presented** 218:17 375:18

**presenter** 189:21

**presumption** 260:21

**presumptions** 261:6

**pretty** 68:12 149:5 152:15 255:2 262:20, 22 282:13 318:10 365:16 380:12

**prevent** 10:12 390:25 391:1

**preventing** 10:7

**prevention** 194:3 403:13

**Prevezas** 215:4,8,13

**previous** 140:4 217:25

**previously** 16:10,22 18:12 39:18 148:22 216:6 225:13 233:15 274:1 286:15 294:22 295:5 324:17

**previously-conducted** 293:3

**price** 293:18

**primaries** 319:15

**primarily** 233:21

**primary** 197:19 198:17 201:8 282:25 283:4 287:20 288:1 291:5

**principles** 30:6 153:13

**printout** 265:12

**prior** 13:25 14:4,13, 18 16:2,6,17 22:20 26:10 28:4,18 32:18, 22 34:23 37:2,22 38:24 39:22 40:4,9, 13 103:1,11 106:16 123:16 130:10 156:20 163:7,12,18 170:3,7,13 181:22 217:5 222:2 264:1 312:19 400:5

**privy** 70:18 71:5,10, 16 130:25 290:15

**probabilities** 348:18

**probability** 123:25 392:18

**problem** 10:12 163:8 182:15

**Procedure** 358:18 406:14

**Procedures** 6:20

**proceed** 275:10 345:4

**process** 94:14 114:8 215:20,24 230:13 231:9 360:4

**processes** 215:15

**produced** 98:15,24 111:24 112:2,3,12 274:8 290:13,16

**product** 45:11,24 46:25 68:25 88:9 104:17 198:4 221:16 263:21 277:25 280:21 283:15 358:2 360:1 361:7 398:4

**products** 7:7 45:15, 17 47:14 85:22 87:12 105:2 116:16 140:16 141:12 283:6,8,9,11 284:6,9,10,16 288:2, 23 292:4 297:10

**professional** 102:23 356:6

**profile** 64:4 336:2 337:6 343:24

**profiles** 333:12,13 335:6

**prognosis** 317:14, 20 318:3,16 368:20 370:2

**progressed** 233:4

**projects** 104:2 107:18

**promotion** 287:18

**promotional** 288:9

**pronounce** 66:16

**properly** 289:16

**proportional** 155:12 156:13

**proportionality** 158:21

**proposed** 319:2

**proposition** 140:21

**proprietary** 161:16 298:15,21

**prospective** 147:25 173:7,10 207:7,10,11 209:3,14 223:3 388:23 403:18

**prospectively** 216:25 381:10

**protocol** 86:20,21

**protocols** 105:14

**provide** 10:4 20:8 29:16 37:4 46:25 51:5,16 54:16 112:19 148:4 223:17 250:14 255:14 258:16 288:23 289:18,20 334:18 341:21

**provided** 14:8,11 22:23 33:10,11 34:4 36:21 37:10,15,23 38:2,6,9,12 39:5 53:12 55:3,16,19 56:25 70:16 71:24 78:1,6 79:15 80:10 108:8 112:23 152:18 153:5 273:14,22 288:9,10 294:7

**provider** 357:19

**providers** 59:4

**providing** 10:8 34:16 112:20 113:1,18 289:13 379:20

**proximity** 42:19

**PSC** 7:20

**psychologically** 339:9

**public** 48:10 162:24 352:19 357:6,11 399:24 407:24

**publication** 107:4 201:1 325:15,16 328:24 366:4

**publications** 134:9 221:14,16 356:4,18 367:12 387:19

**publicized** 199:16

**publicly** 93:3 128:3, 6,9 134:15 162:11 170:3 302:20 303:20 395:4

**publicly-** 126:10

**publicly-available** 92:9 130:22 131:11 302:6 308:4

**publish** 215:18

**published** 106:25
107:10 124:18,21
125:8,14 126:22
127:20 133:14 135:5
150:20 151:19
160:18 162:4,9,14,21
172:13 192:18
205:25 217:21 222:2
235:8 239:25 244:5,
25 245:1 296:18
307:15,19 367:14
385:13 387:7,17
394:14 395:3,10,13,
17 396:12

**publishing** 215:16

**Pubmed** 42:2,3,4
165:14 166:8,16
167:19,22,23

**pull** 41:8 109:2 146:9,
19 170:25 182:24
193:25 200:18 205:4
209:7 222:11 234:20
243:15 245:15
257:16 264:20
266:13 273:1 276:25
277:7 279:6 312:21
321:10 323:10
328:14,17 334:1
346:15 365:19
377:23 381:3 388:21

**pulled** 109:4 267:4
368:3

**pulling** 19:22 83:1
173:25 208:6 317:4
358:24 367:21

**purported** 121:18

**purpose** 22:16 31:5
45:2 54:11 174:11
293:11

**purposes** 24:22 77:6
87:24 108:17 227:7
247:22 300:10 389:9

**pursue** 290:11

**pursued** 288:5

**purview** 252:13
253:4,7 308:17

**put** 39:7 41:10 96:8
109:20 113:17
118:14 130:20
131:12 163:4 171:11,
12 199:17 209:5
214:10 215:17 218:2
232:23 233:5 254:4
264:11 279:16
324:20 342:20
349:18 362:25 363:2
384:20 391:23

**putting** 113:25
164:17 205:8

---

## Q

**qualifications** 48:14
121:13 122:8,13,17

**qualified** 121:8
122:6

**qualifiers** 354:16,17

**qualify** 249:18

**quality** 234:22 342:6
404:8

**quantifies** 155:3

**quantify** 155:4

**quantitative** 155:21
156:22

**question** 16:2 22:20
25:5 26:6,8,13,21
29:12 30:11 31:15
32:21 33:4,7 34:23
35:4 36:4 37:15,17,
18,19 43:5,8,13,17,
18 44:16 46:8 50:13
51:8 57:22 58:15
60:1,25 61:1 62:3
63:18,20 64:5 65:12
66:3 68:13,15,20
69:6 72:19 80:20
81:15,18 83:9 84:22
85:7 86:25 87:2,3
88:13 89:9 90:12
92:24 97:4,21 98:23
99:5 104:4 108:11,14
111:11,12 113:24
114:23 115:6,11
117:4,12 118:9
119:18,23 121:13,19,
20,22,24,25 122:2,7,
13,17 123:8 127:16
128:13,23,25 129:1,2
130:12 131:14 132:2,
10,19,22,23 133:2,3,
4 134:1 135:21 136:8
138:1,2 139:19,25
141:2,3,15 147:10
149:8,13 159:3,5
162:8,18 163:9
170:11 175:15
177:20 180:5 181:25
188:10,24 189:7
190:13,22 191:22
192:19,20 193:3
195:21 197:6 200:8
202:15 207:2 212:12
221:20 223:13,14
225:10 226:5 229:23,
24,25 231:16,18
234:4 242:19,23
247:2 249:7 251:23
252:20 253:2 254:1,
5,6 255:19,20 272:6
279:12,13,14 281:10,
20 287:25 291:23
292:16 294:25
295:23 296:23
300:19 301:17,25
307:1 309:19,21
311:3 312:10 316:21
320:19 322:16 323:2,
8,20 327:3,14 328:18
330:11 331:9 334:8
335:12,21,23 337:10
338:17,19 339:15,23
341:2 343:17 344:5,
8,10,11 345:3
348:12,25 349:1,2,17
350:2,21 357:15,16
358:11 359:17
368:16 369:1,23
370:4,9,11,25 375:3
376:4 377:11 380:1,
3,19 382:14,19,22
385:3,4,5,10,25
387:4,6,16 389:6,21,
23,25 390:3,4,6,8
391:16,19 393:19
395:15 396:13 399:5,
6

**questioning** 123:13
299:21 344:17

**questionnaire** 217:2

**questions** 15:5
17:10,16,17 36:6
38:24 50:12,19 51:1
57:21 61:18 69:11
122:24 156:12 165:3
249:4,24 251:1,3
252:12 253:13
255:12 274:15
275:16,22 284:13
299:4 304:5 306:3
307:7 330:6,13
331:21 341:19
342:19 346:10,11
355:1 364:1 367:17
368:11,13 369:8
374:20,22 379:23
382:25 383:5,6,15,17
385:7 399:13 401:7

**quick** 208:23 256:10
388:18

**quickly** 17:18 167:3
213:24 346:14

**quote** 161:13 250:22
293:9

**quoting** 350:5

---

## R

**radiation** 108:6
219:22 271:2 320:4

**raises** 247:1

**ran** 165:14 166:16
206:23

**randomized** 29:15
82:2 126:23 134:14
135:6 149:5 150:21
151:3 155:15 173:5
206:21,24 207:3,11
209:13 314:12
321:20 322:2 328:19
329:15,21,25 332:12
406:3

**range** 257:11

**ranges** 257:12,13

**ranked** 216:13,14

**rapidly** 393:1 394:5

**rate** 77:18 142:22
143:2,18 144:8,9
155:8,12,13 157:11
176:22 177:2,6,12,15
178:12 179:1,2,5,9,
21 237:11 249:16
319:15 323:25
325:18 328:4,10
332:13 339:14
343:12 375:19 384:9

**rates** 178:10 197:11
247:19 249:10
311:12 319:1,24

**ratio** 78:1,14,18
79:14 80:2,9 133:16
134:11 142:10
148:25 149:7 154:4
155:18 156:14 157:7
176:19 191:6 200:5,
9,23 206:7,14,15
389:16 390:21 391:4

**ratios** 78:7 126:4
149:3 152:5,9 154:8
176:5 206:13

**raw** 201:12 204:24
298:18

**re-ask** 35:5 221:20
279:13 294:25

**re-review** 118:14
375:13

**reach** 126:14 128:13
133:10 134:20
150:24 153:25
154:11 160:17

**reached** 157:24
301:8,19 304:9

**reaching** 154:11
257:8

**reaction** 258:22
259:10

**reactions** 259:2,3,16
347:8,9 378:1

**read** 22:10 27:15
32:15 37:18 44:18,
23,25 79:17,21,24
82:3 91:21 97:24
112:21 114:11 117:2
134:7 147:3 156:18
158:14 166:13
171:15,16 182:13
183:9 210:20 213:1,5
224:3,6 228:21 229:9
231:3 232:13 238:25
246:22 247:11,12
249:1,3,4,18,23,25
251:10,12 252:10
253:11,12,17,20
254:6,7 255:9,11,12
259:2 260:5 264:12

266:11 273:9 291:25
296:16 300:19,21
301:11 313:5 314:16,
17 316:14 321:22,23
322:3,15,19,20,21
324:14,19 325:12,18,
20,21 326:2,3 329:19
330:7,10,15 332:8
335:13,15,22 336:21
356:19 357:13,16,22
368:8,9,12 369:6,8,9,
10,12 376:15 407:6

**reading** 22:15 30:24
31:2,5,6,23 78:21
141:5,17 176:25
188:15,17 194:23
224:15,18 230:6,9
237:18,22 239:10
242:4 251:12 253:14,
16,19 259:7 268:9
313:25 314:7 315:2
316:15,25 322:4,17,
18 366:19,20,21
373:22

**Reads** 407:6

**ready** 147:10 275:8,
10 321:1

**real** 388:18

**realize** 122:1

**reason** 11:1 85:4
101:10,18 112:21
113:2 122:16 148:16
164:17 181:21
210:24 219:15
220:22 270:3 285:8
292:12,19 295:14,24
296:10 323:25 333:6,
16 361:1 374:9
383:20 396:10 407:6

**reasonable** 59:13,14
60:15 61:1 131:24
132:15 188:8 189:4,
19 268:9 301:22
355:14

**reasons** 273:25

**recall** 11:14 21:23
23:10 24:21 26:9,14
27:11,13 30:24 31:19
35:21 38:17,20,21,23
39:8,11 45:23 48:2,4
52:16,20,24 53:2

57:4 70:5 77:14,16,
18,24 78:4,7,10,11
79:2,3,5 86:1,2,8,9
96:16,19 97:9,25
98:2,4 99:10,13,19,
22 100:8,9,20
103:14,15,24 105:16,
20,22 106:11 107:3
109:18,23 114:15
124:11 164:7,12
193:5,14 194:14
205:1,2,6,8 208:4
209:23 214:8 220:21,
22 245:6 264:2,12
276:13 292:11
299:13 311:22
315:24 316:2,3
323:25 329:20 336:9,
21 350:10 355:2,22
371:19 373:19,22
392:1 397:9

**recalling** 10:13 53:5
350:14

**Receipt** 358:19
406:15

**receive** 98:7 115:10
157:23 207:9 222:3
260:6 331:19 390:14

**received** 71:7,14
87:1 144:10 175:9,18
176:1,21 177:7,10
179:20,22 180:9
194:21 209:15,19,20
216:11 221:13,15
222:1 223:9,10,11,
12,16,21 232:1
233:22 236:22 237:1,
2,6,12,17,20 238:7,
25 239:23 242:1
260:16 267:25
297:10,14,15 390:12,
16

**receiving** 188:3,25
189:8 194:19 195:20
203:3 330:8

**recent** 75:23 76:1
243:11

**recently** 78:4 330:16

**recess** 15:16 67:19
102:10 168:5 208:17
256:15 272:16
303:10 346:5 369:16

**recipe** 60:10

**recollection** 39:3
312:23

**recommend** 57:18

**recommendation**
58:21 60:2,5

**recommendations**
60:22

**recommended**
57:24 314:4 315:5,7,
10 316:18 361:3

**recommending**
341:11

**recommends** 59:17
60:3

**record** 6:12,14 7:18
9:9 10:24 15:13,24
16:1 17:20 26:18
67:11,17 102:5 134:7
203:21 208:8,10,13
211:16 255:25 256:7
272:12 273:22
300:21 303:16
335:15,22 341:1
344:22 369:11 378:7
383:8,10 400:15

**recorded** 201:22

**recorder** 67:13

**recording** 6:17
160:2,12

**records** 51:16
112:11,16 147:13
148:2

**recover** 275:19

**recovery** 366:14

**recurrence** 271:3,5
319:4,6 326:7,8,11
327:23

**Reddy** 32:4 120:18
121:13

**reduce** 65:14 293:18

**reduced** 65:8

**reduction** 198:18,19
200:2

**redundant** 218:2,10

**refer** 12:1,6 87:4 90:8
100:6 220:7 286:25
291:17 311:11 358:7
381:4

**reference** 38:5
100:18 122:22 163:6
164:6 187:21 250:19,
23 252:8 286:24
292:8 364:18

**referenced** 163:11
250:20 307:3 318:18

**references** 50:2
121:17,19 165:22
166:1,4 167:10,15,16
240:24 249:21
255:10,16

**referencing** 249:19

**referred** 98:13
100:21 147:17,18
162:15 164:13
201:11

**referring** 56:2,7
64:10 83:18 86:4,18
90:1 99:16 104:9
161:16,20 162:23,25
193:9 204:21 249:22
312:5,8 336:13 348:8

**refers** 60:21 152:3

**reflects** 160:7 242:13

**refresh** 39:3 53:4,6
235:16 238:12,16
316:4,12

**refreshed** 147:8

**refreshes** 312:22

**refused** 369:2

**refusing** 133:9
344:11

**regard** 59:3 94:2

**regimen** 58:8,21
59:17 60:3 61:10,21
62:5,6,15,22,23 63:6
64:15 70:13 71:2
73:2,4,8,21 74:1,4,8,
12,20 75:4 76:8 87:1
115:10 142:3 145:2
174:13 176:11,22
177:6 178:4 179:3,10
188:4,12 189:1,6

192:15 198:12,13
199:5,6 209:22
223:6,9,16,18,19,21
233:4,5 237:21 248:8
270:4 271:7 272:7,10
309:8,13 312:15
314:18 316:1,22
317:10 327:19
331:20 338:1,5,9
341:11,18 343:25
345:13 380:13,16
388:14 389:13,19
390:10,18,20 391:10
392:3,4,7

**regimens** 59:7 64:3
75:25 76:3,11,17,19,
20 119:13 136:3
143:16,19 144:16
174:23 175:6 176:7
186:12,18 187:3,24
191:11 209:16 211:5
213:4,17 234:1 302:5
312:20,25 313:23,25
314:2,4,20 315:5,7
316:18 317:2 322:9
329:25 331:20
345:12,16 374:7
389:14

**registration** 190:3,9
191:25 192:8,12,17,
22 193:6

**registrational** 193:2
398:1

**regression** 210:2

**regrow** 349:23
350:25

**regrowth** 241:1,5,6
347:17,23 349:4
361:21 362:10
373:17,25

**regulated** 282:10,19,
22

**regulation** 282:15

**regulations** 93:21
94:8 286:4 302:16

**regulatory** 87:22,25
88:1,2,4,6,8,10 89:3,
21 90:8 94:1,16,18,
19 278:25 279:19
280:16 281:19,21
282:5,8 284:6,22

285:2,12,17,18
286:7,12,16 289:19
293:1 301:21 353:13

**regulatory-related**
94:11

**reiterating** 331:16

**rejection** 233:24

**relate** 42:5 78:13
389:21

**related** 24:18 69:11
82:6 90:21 98:15
99:24 115:8 131:6
138:17 254:24
265:13 273:25 274:7
281:21 294:21 295:5
359:6 400:18

**relates** 68:13 79:16,
20 83:11 89:9

**relating** 107:22
348:25

**relation** 26:7

**relationship** 96:1,13
97:5 106:18 301:22
334:20

**relative** 27:20 63:13,
21 64:1,2,13 142:9
144:1,20,22 149:4,6
154:4,8 155:16,17
157:6 161:19 174:15
176:4,16,18 178:16,
19,21 179:14 200:5,
9,23 201:15 248:1
390:22 391:4

**relevant** 23:7,12,13
28:11,13 34:13 42:23
50:2,6,8,11,14,18,21,
25 51:2,20 52:3 57:6
78:20 91:25 96:25
109:22 116:12,13
117:9,21 135:20
136:14 138:9 144:19
154:23 165:12
167:15 192:10,25
234:7 248:5 292:23
348:17 375:9 378:7,
17 379:2 387:2,4

**reliable** 49:11 143:7
321:7 323:17,20
325:10,16 329:1
334:9 367:25

**reliance** 22:12 55:19
56:1,8,23 92:11
99:17,24 108:25
111:16,20 113:11
117:15 118:14 192:3

**relied** 56:12 114:25

**rely** 114:6 116:3
118:16 160:17 257:2
294:20 295:4 371:11

**relying** 170:19

**remaining** 274:15
303:13 345:23 346:3

**remains** 103:2

**remember** 24:13
52:11 96:17 225:9
238:13 311:13 381:7
388:22

**remembering** 243:4

**Remind** 172:25

**remote** 6:17

**remotely** 6:12,14,15

**remove** 271:1 319:11

**removed** 319:13

**reorient** 67:23

**repeat** 30:11 32:21
74:11 196:6,16,19
197:6 202:15 275:16
292:15 302:13
309:20 311:3 320:15,
18 323:2 335:12,21
379:14 389:14,21

**repeatedly** 255:8

**repetitive** 354:25
378:7

**Rephrase** 44:16

**replenish** 393:18

**report** 22:9,13 27:21,
24 28:1,5,6,8,16,17,
19,20 29:1,2,6,7,13,
21 30:5,21 31:13
32:14,15 37:3,20,22
38:6 39:21,22 40:18,
21 41:1,5 44:13,21,
22 45:1 49:21 50:1
54:7,11,18,20 55:2,
10,13,16,24 56:3,11

63:25 64:8,11,15,17
65:19 75:17 76:2,7,
15 77:16,17 79:13
88:5 89:22 90:5 91:5,
15 102:15 103:5
104:6 108:25 111:17
113:19 114:13,17
117:24 119:9,20
122:14,16 126:2
127:2 140:20 141:6,
11,18 143:6 145:19
146:5,17 148:23
151:14,20 154:10,12,
20,21,25 157:14
158:25 159:22 160:7
173:3,9,12,14,20
174:1 192:4 193:18
194:17,23 202:11,17,
23 203:1 204:22
205:3,4,8,11 214:1,
20,25 215:5,6 216:3,
5,8,22 217:1 218:1
219:15 220:12,13,15,
19 221:2 234:14
243:7,8 245:1,4
247:22 256:23
257:11 258:9 274:10
278:6,11,24 279:2,3,
5,6,8,15,21,22 280:1,
7 286:3,10,24 288:18
289:10,23 291:18,21
292:1 293:9 295:12
296:15,21 301:4,11
304:4,6 305:12,15
311:10,14,20 312:3,8
318:6,9,18 335:2,24
344:18,23,24 345:11
355:19 358:23 362:6
366:19 367:10
375:25 379:9,17,19
380:14 381:1,8
384:15 385:12,21
386:12,17 402:12
405:7

**reported** 120:12,15
216:6 218:1,25 238:4
250:21 343:10
374:11 381:6,24
393:21

**reporter** 6:13 7:15
8:1,20 9:3,14 19:10,
13 67:10 133:18,24
134:4 137:18 255:24
303:14 315:13
320:15,18 340:24

382:10 389:21,23
390:1,2,4 394:21

**REPORTER'S** 400:1

**reporting** 6:8 7:14
155:12 156:14
203:12 204:25 205:1,
2 251:4 280:14
284:19 371:13

**reports** 22:11,16
27:6,8,12,19,22 28:4,
7,24 29:15 30:8,14,
17,22 31:17,20 32:1,
6 44:20 77:10,13,15
98:7 107:9 120:18
121:2 123:16 125:12,
19 126:23 138:11,19,
24 139:7 158:11
215:9 235:6 266:1

**represent** 8:13 9:10
217:11 229:13
269:25 276:5 330:2
360:13

**representation**
122:12

**representing** 8:15
32:25 33:1

**reps** 287:13

**reputation** 101:16,
17

**request** 277:21

**requests** 273:6,9,15

**require** 65:14 153:16

**required** 89:5 193:7
283:21 364:21

**requirement** 286:12
301:21 354:14

**requirements** 89:8
94:17,21 279:1,4,19,
23 280:2,17 282:6
284:15,22 285:2,22
286:2,7,21 353:13
360:16

**requires** 180:16

**requiring** 293:3

**reran** 243:12

**rerun** 39:17 196:11

**research** 38:3 44:14
49:23 106:19 107:14,
15,17,20 319:22
326:6,13 327:21

**researchers** 393:7

**researching** 45:3,5

**reserve** 32:17 274:16
326:15

**residential** 17:22

**resolve** 225:14
227:18 373:2

**resolves** 226:11,25

**resource** 321:8,9

**respect** 65:24 68:10
69:14 105:6,21
107:23 136:19 137:4,
9 138:7 142:18
148:18 150:11,14
190:2 204:16 286:21

**respectfully** 74:17
97:18 119:17 127:9
250:25

**respond** 111:12
238:19 295:2

**responded** 273:20
277:14

**responding** 350:7
380:9

**response** 32:14
98:14 108:11 121:23
151:21 156:2 174:16
175:2 229:14,19
230:12 244:20
248:24 249:2 333:1
350:5,9 380:3

**responses** 273:24

**responsibilities**
88:7 93:24 105:15
282:4 283:1,4 286:3
289:6

**responsibility**
105:1,5,12

**responsible** 49:15
101:11 280:12,13
281:19 283:6 284:18
288:20

**responsive** 44:9 164:1 165:9 233:17 246:17 273:13,23 277:12,15,20

**rest** 274:13

**restate** 130:12 141:2 322:15 342:9 344:12 359:17

**restricted** 183:6

**restriction** 245:9

**restricts** 25:22

**result** 54:23 95:7 327:16

**resulted** 387:7

**results** 54:25 165:16, 17 171:19 196:3,10, 12,25 198:16 199:16 204:4,11 235:19 269:7 321:19

**resumed** 169:1

**resuscitation** 271:18

**retained** 34:15,18

**retention** 36:7

**rethinking** 326:14

**retrieval** 228:24

**retrospective** 147:23 172:4,5,20 175:16 214:20 215:4, 8 216:3,4,8,20,24 223:2 228:9,10,24 381:8 383:19

**retrospectively** 216:10

**return** 225:21 352:6

**returned** 363:6

**reverse** 332:1

**reversible** 119:4 184:13 203:10 258:17

**review** 13:25 14:4 27:18 32:6 36:22 37:4,24 49:16 58:5 60:15 80:10 96:21 98:1 99:11 100:2

109:13,17 113:20,25 131:22 148:13 149:9, 14 153:25 165:10 166:23 175:17 190:12 192:7,11,21, 24,25 215:18,19 216:1,21,24 228:25 246:24 255:16 290:19 291:6,7,10 322:1,7 340:14 358:8 360:4 369:21 374:24 375:4 391:15 397:8

**reviewed** 27:6,9,12, 14 28:3,19,21,23 29:13,14,15 30:13 32:1 37:6 49:22 55:17 56:6 58:1,12, 14 69:23 70:3 75:7, 11,17 77:10,13,15 80:2 89:24 90:6 92:4 97:20,21 109:1,6,14, 18 111:8 112:6,8,15 113:5 117:23 120:18 134:21 136:24 147:6 148:18 150:5,15 164:2 173:23 176:21 190:1 191:23 192:18 193:12 247:22 257:25 258:3,7 269:7,17 274:9 277:8,18 278:15,17, 21 290:17 291:1,3 309:3 346:21 347:5 375:11 397:5,6 402:17

**reviewing** 36:17 59:15 77:14,17 116:1 129:4 147:12 203:17 397:9

**reviews** 320:22 321:5,11,14 398:2 405:15

**revised** 110:7,16

**revision** 90:13

**rid** 115:4

**right-** 185:12

**right-hand** 182:10 211:2

**ring** 244:8,9

**rises** 189:23

**risk** 63:21 64:1,4,18, 21 90:3,20,21,23 91:3,6,18,19 94:25 120:3,16 126:1 136:4,9,25 137:10 141:23 142:9 143:10, 14 144:1,20,22 149:4,7 151:10 154:4,8 155:16,18 157:6 174:15 176:16, 19 178:16,19,21 179:14 186:11,17 187:2,15,18 188:4,13 189:2,9 191:12 198:18,19 200:2,5,9, 23 201:15 211:6,11, 24 212:23,25 213:2, 12,16 223:17,23 248:2 256:20 257:10, 15 286:8,11 289:16, 24 292:6 300:14,15, 24 307:12 319:4,5,6, 7 326:7,8 327:4,23 335:6 337:6,22 338:4,22 339:25 340:6 342:6 343:24 361:3 375:5,15 376:24 377:9,17 378:23 379:12 380:20 388:13 389:7 390:22 391:4

**risk/benefit** 96:25

**risk/benefits** 75:3

**risks** 63:13 64:1 70:8,13 71:2,20 72:4, 9,15,21 106:5 111:3 176:4 199:19 212:25 271:23 335:25 336:2 337:18,20 338:1,13, 20 339:2,5,18 340:4 341:10,18 342:24 345:15 359:11,21,22 376:2,3,11,15,25 378:20 379:9 380:13

**road** 348:23

**role** 33:21 47:3 270:24 272:9

**roles** 46:24

**Romanettes** 173:16

**room** 6:11,14 60:18 133:5 253:8

**rooms** 133:6

**Rosic** 22:3,4 77:16

**Ross** 21:21,24 27:7 89:22,25 90:2,8 91:8 93:16 95:15

**Ross'** 28:10,19 94:3 278:11 286:10,25 291:18

**rotate** 250:4

**roughly** 26:14 53:18 54:2 103:10 142:13

**round** 118:10

**row** 240:13 252:16,17

**rows** 160:4 240:12

**RPR** 400:4

**Rule** 6:19 19:20

**rules** 6:19,20

**ruling** 81:22

**run** 39:18 213:24 256:9

**rung** 216:19

---

**S**

**S-----------------** 401:11

**S-I-B-A-U-D** 367:22

**S-I-M-E-S** 325:1

**safe** 289:7

**safety** 68:10 101:20, 24 197:24 201:7 289:11 292:13,20 294:21 295:5 353:8, 17 357:20

**Sagent** 8:14

**sales** 287:13,18 288:10

**sample** 197:23 211:3 228:14,21,23 343:4

**Samsung** 218:25

**sand** 388:4

**Sandoz** 6:24 7:22 8:9 9:11 32:2 45:9,11,17,

24 48:1 69:3,9,15,17, 19,20 71:19 89:9,11, 22 90:12,25 91:4,25 92:3,5,6,14,20 93:4, 25 95:25 96:12,22 97:5 98:15 101:11, 15,19 109:14,22 111:24 112:4,5,7 127:5 129:25 130:7, 11,14,18 131:5,15,19 164:2,6,9 170:7,13, 16 217:4,14 222:5 259:24 264:3,6 407:2

**Sandoz's** 68:9,18,23 88:25 89:5,13 90:2 91:22 93:9 99:25 110:6 217:24 221:1, 13,22 222:3 235:9 257:24 258:5,21 264:15 276:14,15 346:12 355:4,6 386:25

**SANDOZ-TAXO-** 257:19 404:15

**SANDOZ-TAXO-STEWART** 257:20 404:16

**Sanofi** 8:10 109:14, 20 126:17 130:9,10, 24 131:15 161:16,23 169:20 296:24 297:1 299:22 308:13 397:10 398:16

**Sanofi's** 110:6 111:1 126:15 127:12 128:14 129:4,24 130:1,6 131:6,22 132:13 134:21 160:19 163:1,6,12 264:7,16 295:15,24 299:23 307:24 308:23 311:11,16 386:21,25 387:6,17, 20 394:14 395:3 396:11,23 397:6 398:12

**Sanofi_00829529** 169:13 402:22

**Sanofi_00829565** 169:13 402:23

**satisfied** 136:18 137:4

**save**  15:25 270:16,21 271:16

**saved**  270:4,8

**scalp**  194:4 219:23 225:9 371:24 388:23 393:2,3,13 403:13

**scan**  185:5

**scanned**  17:3,4

**scarring**  251:22

**scenario**  73:23 231:6

**schedule**  309:9

**science**  25:12,17,19, 23 26:2,3,7,11,15 79:7 273:25 274:7 326:13 327:21

**scientific**  129:17,21 143:8 144:13 215:19 226:18 227:7 269:6 356:3

**scientifically**  49:24

**scientist**  125:3

**scope**  48:25 52:8,21 53:3 55:14 63:16 285:3,9 296:8 297:23 300:2,12 304:1 331:1,22 332:5 342:13,17 344:18,24 374:14 375:9 378:17 388:3

**scores**  326:11

**scouring**  302:8

**screen**  12:6 15:10 184:1 210:4 243:23 317:4 321:21 323:19 336:14,15

**scroll**  228:15

**scrolling**  248:25

**search**  22:24 23:7 24:17 39:18 40:3,4,9, 11,14,16,19 41:10,13 42:2,16 48:10,11 50:6,11,14,17,20 98:5 165:9,14,24 166:8,9,17,20 167:19 243:12 244:15,17,20 352:24 364:20 371:3,

9,12

**searched**  41:23

**searches**  38:19 39:15 165:6 167:13, 14 233:17 243:4 245:10 246:18 247:7

**searching**  48:14

**Sears**  8:10

**section**  28:10 104:20 143:7 151:9 182:21 184:9 185:13 186:2 259:24 330:18 343:2 347:7 369:3 381:4 400:9

**sections**  27:20

**secure**  47:18 50:23

**Sedlacek**  149:2 170:22 206:15

**selecting**  381:9,12

**selection**  60:17 199:20

**self-reports**  363:23

**self-selected**  236:15

**send**  322:20

**sensory**  343:6

**sentence**  143:15 177:1,4,23 184:15 187:10 210:20,22 213:1,5,20 224:4,12, 13,15,17,18 229:11 230:7 231:2 254:14 262:21,23 263:12 264:12,13 265:20 267:7 296:17 348:7 380:7 387:24

**sentences**  253:10 301:14

**Seoul**  219:1

**separate**  33:14,15 135:25 136:10 167:22,25 390:23

**September**  6:1 7:11 400:22 407:3

**sequential**  234:1

**series**  173:7,8

202:17,20 214:1

**seriousness**  270:11

**serve**  269:2

**served**  103:5

**services**  48:19,25 49:6

**serving**  33:21

**session**  11:6

**set**  55:10 59:14 79:12 92:2 116:10 153:24 221:17 230:21 350:19 400:11

**setting**  86:9 238:24 249:6 352:1 380:16

**settings**  86:8

**seventh**  292:6

**severe**  175:10 212:5, 14 213:7

**severity**  6:9 310:18 372:17

**shapes**  353:17

**Shapiro**  244:4

**share**  297:17,18,22 298:8,12,25 299:8,15 300:1,8,12 340:10

**shared**  170:7,9,13,16 298:1

**sheet**  164:10,18 278:11 292:2,10 407:1

**sheets**  164:3,6,15

**short**  197:16 256:9 307:14 366:17

**shorthand**  400:12

**show**  53:7 99:21 121:17,18 134:11 145:9,10 146:6,7,8 166:9 183:7 193:23 194:22 199:16 224:1, 2 228:15 264:2 328:13 332:13 377:21

**showed**  157:23 158:24 159:1 188:8

198:20 199:12,23 200:2 331:25 332:1 339:10 371:9

**showing**  120:3 174:1 328:4,6,9 375:22 379:9

**shown**  120:15 166:8

**shows**  166:21 185:6, 10 231:3 373:23

**Sibaud**  367:21 369:21

**side**  61:20 62:4,21 63:13,21 64:9,19 65:8,13,15 118:25 119:3,4 123:22 124:11 157:11 158:6, 11 160:8 182:10 183:20,21 196:10 246:8,10 260:22 261:6,24 262:6,10, 16,17 263:7 264:11 265:18 267:8,16 326:18 328:7 331:1,3 333:12 334:24 335:3 336:23 337:13 338:9, 12 340:7,8 342:12 343:14 344:23 345:5, 6 349:14 350:16,24 353:24 354:13,21 355:12,16 372:6

**sides**  364:10

**sign**  49:15,17,21 183:16 299:7

**signal**  91:16 125:25 155:13 157:19,20 158:1

**signaling**  393:9

**signals**  156:15

**signed**  299:11

**significance**  268:17

**significant**  143:10 196:4,11,21,22,24 197:2,12,22 202:7 204:5,9,13 205:14,21 206:6 224:14,20 242:9

**significantly**  179:10,13

**silence**  159:15

**silent**  67:7 141:20

**Simes**  324:20 325:1

**similar**  146:20 149:5 150:8 155:24 194:25 251:17 252:1,14,23 299:21 301:8 304:8

**similarly**  38:22 58:19

**simple**  27:2 62:9 152:16 153:1 155:23 165:25 196:9 198:21 358:13 360:10

**simplest**  369:7

**simply**  32:12 232:21 248:17 252:13 285:3

**single**  124:11 316:7 320:3,8 389:13 399:5

**sir**  395:22

**sit**  66:20 398:19

**sitting**  16:14 31:18 40:14 45:21,23 53:14 55:7 66:4 69:7 133:6 161:6 167:17 203:25 204:12 205:24 214:7

**situation**  51:13 65:20 232:16

**situations**  327:8

**sixth**  292:6

**size**  185:20 197:23 202:2 211:3 228:14, 21,23 236:9

**sizeable**  343:4

**skipped**  213:20

**slides**  77:19

**slow**  373:16

**small**  48:5 178:16 228:13,20,23 324:10

**smaller**  128:5 200:21 214:13 321:16

**social**  6:10

**Society**  318:18

**software**  153:16,17, 19 154:5,17 357:9

**solely** 235:17 236:6
238:9

**sophisticated**
153:20

**sort** 23:2 53:2 56:19
92:24 99:12 123:23
131:1 165:8 171:19
215:17 216:1 236:24
246:24 267:8 285:10
379:3

**sorts** 99:20

**sound** 53:19 54:2
378:6

**sounded** 286:18

**sounds** 75:5 242:6

**source** 56:11 163:3
235:5

**sources** 160:16
305:18,22 355:20
356:11,20

**spaces** 44:4

**speak** 144:6 156:11
163:3 203:14 393:17
397:1

**speaker** 26:19
394:19

**speakerphone**
321:3

**speaking** 21:23
307:6 317:20 331:13
383:13

**special** 48:16 183:3

**specialist** 7:13

**specific** 17:12 27:21
30:20,21,23 35:22
37:1 38:11 39:11
47:15 48:9 52:13,19
53:16 57:22 58:2,13
60:20 61:22,25 62:3
63:1,4,9 70:12,20
71:11,16 72:1,12,19,
25 74:4 75:8 78:4,8,
24 80:9 82:19 84:11,
16 85:2 86:9,25
89:11,16 90:8 91:6
106:10 111:11,12
113:2 116:11 121:1
124:10 130:24 137:5

**specifically** 16:16,
18 33:8 41:23 48:17
60:1 64:11 68:18
69:16 84:13 89:21
105:5,16,19 107:2,19
124:8 162:5,16 165:7
201:7 273:24 277:17
317:20 333:16
376:11 387:16
391:16

**specifics** 23:11
24:13 29:3 61:8 91:7,
8 92:25 282:19
289:13

**spectrum** 47:21,22
104:17 336:3

**speculate** 73:18,22
74:15,18 130:9 131:2
215:23

**speculative** 132:18

**speech** 123:14

**spelling** 12:9 394:25

**spending** 317:5

**spirit** 354:24

**spoke** 24:7 26:3
103:7

**spoken** 21:3,12,18,
21 22:1,4,5 46:5

**sponsor** 105:14
158:11 161:17

**spontaneous** 98:3

**spot** 164:25

**staff** 154:17

**stage** 171:3 182:4
313:15 317:25
318:23 327:5 403:5,9

**stages** 47:2

**stand** 16:21 17:6
127:11 140:21

**standard** 58:22
59:18 60:5,23 86:22,
24 87:12 104:1 220:1
351:6,16 352:1
359:4,21

**standards** 388:8

**Standing** 258:18

**stands** 397:4

**start** 7:5 133:22
277:6 365:12

**started** 36:17 83:4
157:20,25 231:9
241:6 381:21

**starting** 373:17

**starts** 76:12

**state** 17:19 135:1
196:24 232:11
278:24 279:15 301:4
333:3

**state's** 6:20

**stated** 148:22,24
149:19 214:22
273:25 281:15
285:10 286:5,16
360:14 361:16 382:4
383:21

**statement** 184:12,21
187:21 246:16
247:14 255:2 261:4
262:14 266:7 279:1,
20 282:18 296:21
322:13 324:13 326:4
342:8 344:1,3,12
362:13 367:5 368:23
385:4,17

**statements** 247:4

**states** 7:8 110:22
162:7 221:24 264:4
279:18 297:8 308:6
332:24 353:6 354:5
369:24 385:16

**stating** 25:16 301:18

**statistical** 28:9 30:1
134:11 152:3,9,14,

21,24 153:4,16,17,19
155:5 161:15 202:9
205:15

**statistically** 196:4,
11 197:2,12 202:6
204:5,9,13 205:13,20

**statistically-** 206:5

**statistically-
significant** 204:2
206:2

**statistician** 29:24
152:13,19

**status** 84:2,8

**stay** 67:25

**steady** 318:10

**stem** 107:16 108:5
219:20 224:8,24

**step** 221:19 250:4

**steps** 40:9 50:22

**Stewart** 46:9 57:19,
24 58:9,22 61:4,11
62:7,24 63:4 70:9,17,
23 71:14 72:15,21
75:8,12 77:20,23
78:8 80:22,23 81:2,9
84:7,18,23 85:8,11
217:7,10,12,22
223:10 257:20
269:19 404:15

**Stewart's** 20:13
28:2,16 57:15 59:4
69:24 70:4 78:13,14
80:18 84:1,13
112:11,24 135:18
217:5

**stick** 17:16 227:9

**stigma** 339:8

**stipulate** 6:16

**stool** 127:17 135:3
160:21

**stop** 37:7 137:14
199:3 315:13 382:10
383:13

**strategy** 47:10
327:24

**Street** 7:15

**strength** 29:25 134:9
137:12 148:25
149:20 150:1,19
151:22 161:20 198:3

**strengthen** 135:4

**strengthened**
134:13 135:2,6
150:20 161:12

**strengthening**
150:24

**strengthens** 151:2

**strictly** 169:24

**strike** 45:7 110:14
121:23 163:25
339:17 380:17

**strong** 191:7,12

**studied** 367:5,8

**studies** 119:8,19
126:3 130:19 136:24
143:25 144:5,6,8,18,
24 145:14 148:23
149:1,3,9,19 150:25
152:6,21 170:19,21
173:24 193:7 197:24
201:3 203:21 206:12,
25 211:2 217:5,13
218:24 220:7 221:12
222:7 233:16,18,25
283:20 293:4 295:16
296:18 307:15
321:20 322:2,8 324:8
328:4,6,9,12,13
331:25 362:14,19
363:11,16 364:3,5,6,
12,14 368:19 369:25
371:23 383:19
384:18,24 385:12,15,
21 387:4,11

**study** 86:4 125:12,19
126:23 127:2 128:3
142:12 145:4,18,25
147:25 154:16 171:6
172:4,5,20 173:4,22
174:11,14,18,19,21
176:6,21 179:1
180:17,20 193:1,18,
20,21 194:15,18
195:10 196:3,6,12,
16,19,21,25 197:8,

20,25 198:11,16,20
200:9 201:14 203:12,
23 204:4,14 205:25
206:6,10,21,22,24
207:3,4,5,6,7,8,10,
11,12,13 208:22
209:3,11,12,13,14,18
211:9 212:10 213:15,
24 219:3,5,6,24
221:11 222:2,10
223:2,3,5,19,20,22
228:9,10,20 238:11
239:25 242:15
307:19,24 362:5
374:4 381:16,22
389:13,15 390:21
403:18

**stuff** 79:7 342:14,15
351:4

**subject** 66:5 68:1
77:8,9 107:10 108:15
111:8 121:7

**subjects** 57:12
207:13 209:24

**submission** 285:6,
13

**submissions** 88:25
95:7

**submit** 288:24
397:20,25

**submitted** 32:1,3
398:7

**subscribed** 399:21
400:21 407:22

**subsequent** 39:1

**subsequently** 31:25

**substance** 21:9

**substantial** 340:8

**substantially**
151:10 152:1 211:25
212:22,24 213:14
257:15 330:20

**substantiate** 249:17

**substantive** 14:12
21:4 32:11 357:20

**substituted** 294:12

**successful** 19:5

**successfully** 319:13

**Sue** 6:13 7:16

**sued** 18:17

**suffer** 326:18

**Suffern** 8:12,13

**sufficient** 111:2
118:16 324:11
325:25

**suggest** 131:3,5,15
136:25 170:2,6,12
181:7 317:17 368:21
370:2

**suggesting** 124:23

**suggests** 262:17
268:3

**Sullivan** 6:13 7:16
400:3,24

**summaries** 252:7

**summary** 92:7
146:17 203:20
269:15 277:24 278:4

**Sun** 8:15

**superior** 198:12,23
199:23

**supervision** 400:14

**supplemental** 199:2

**supplemented**
16:11,17 134:15
135:7

**support** 29:20 79:24
189:5,13,19 257:2

**supported** 127:24

**supporting** 60:11
304:3

**supportive** 30:4
97:10

**supports** 322:8

**suppose** 385:2

**supposed** 183:3,25
232:7 352:25

**surgery** 271:1
319:11,13 320:4

**Surgical** 358:18
406:14

**surprise** 341:15

**surveillance** 92:21,
23 93:5,10 94:2
99:12 280:14 284:18

**survey** 216:8,9

**survival** 198:18,23
311:12,17 317:19
318:7 319:1,24
322:10,11,24 323:5,
13 324:2,10 325:24
327:9 350:13 405:17

**survive** 350:9

**survivors** 243:18
244:3,12 246:13
254:14,22 255:5
343:5 404:12

**Susan** 105:23 400:3,
24

**suspect** 121:11

**sustain** 230:11

**sustained** 232:16

**sustaining** 229:14

**sustains** 231:12

**swear** 6:15 8:21

**swearing** 6:17

**switching** 311:9
346:1 392:15

**sworn** 9:2,13 399:21
407:22

**symptom** 342:5

**symptoms** 334:4,13
343:6,9 376:13 406:8

**system** 98:3 274:19

**systemic** 271:4
320:22 321:5,11,14
405:15

**systems** 105:11
160:13

**T**

**T-R-A-S-T-U-Z-U-M-
A-D** 40:1

**table** 40:17,18 79:8
157:5 160:18 166:5,
6,11,14,18 167:6,7,
19 173:2 213:25
214:11,15 218:12,17,
21 219:12,19 220:25
221:12 222:1 239:13,
16 240:25 241:16
250:16 252:7,8
255:21 366:6,7
371:11 373:13
377:24 381:1 383:20
384:21 391:10,24

**tables** 152:22 153:1
252:10

**tabs** 218:12

**TAC** 58:21 61:20
62:5,22 198:12,13,22
199:5,12,23 201:21
203:3,8 204:1 223:9
311:13

**takeaway** 141:5
195:3

**takes** 60:11,13 232:5

**taking** 10:11 109:23
198:5 208:22 257:7
381:5,24

**talk** 17:12 29:2 32:10
52:22 57:11 60:17
62:15 63:25 64:12
76:11 83:10 89:21
102:5 125:9 156:12
161:14 178:10
188:24 191:3,4 279:3
280:1 284:10,21
285:1 297:24 299:5
300:13 302:14
305:17 306:2,4
308:3,18 327:20
331:17,23 332:5,23
333:20,21 334:16,23,
25 336:22 337:13
340:11,23 342:12,15,
16 343:20,22 351:13,
14 353:17 370:13,16
378:18 380:12
389:18

**talked** 25:10 123:1
151:19,21,24 165:5
237:3 244:16 309:6
348:2 376:2

**talking** 11:5 14:22
47:16 48:9 49:12
53:5 64:3 67:24 76:3
81:9,10 83:6,15
89:10 95:16,21
117:20 137:14,19
141:22 152:6 157:7
166:4 173:13 180:16
187:23 189:20
200:16 224:4 232:9
233:12 242:21 252:6
263:4 275:23 294:10
296:24 305:1,22
315:14 328:2 331:2
332:11 337:25
348:17 349:3,13
350:16 356:11
358:22 363:4 372:24
374:15,16,18 375:25
379:4,16 387:16
398:6,9,16

**talks** 239:15

**Tallon** 214:4,18,20
220:6

**targeted** 61:18
108:14 260:10 320:6
327:24

**Tax** 160:18 161:15
162:4,10,16,25
163:6,11 186:12
187:3,6 193:10
198:5,11 199:4,13,23
200:4,8 201:20
202:12,18 203:17
394:14 395:4,14

**taxane** 85:24 86:2,7
87:13 177:11 180:10,
22 186:21 213:2
228:2 246:13 314:14
319:24 320:9,12
336:2 339:20 367:23
368:5 404:4 406:21

**taxane-based**
213:16 236:22
250:22 251:5

**taxane-containing**
189:6 322:8

**taxanes** 41:19 87:13 104:7,23 105:3,7,21, 23 106:1 237:2,12 321:11 328:8 335:7 336:4

**Taxol** 41:19 65:2,12, 15 139:3 192:5 398:17

**taxotere** 7:7 10:19 32:23 34:25 35:11,20 41:19 44:10 52:17 64:25 65:5,10 109:9 115:10 116:17 118:13 119:22,23,25 124:24 136:5 139:5 141:12,24 143:11 144:16,17 145:2 179:25 192:15 216:12 248:9 266:14, 20 267:1,8 268:1,3,4 283:24 334:19 338:5 364:7 375:20 379:21 380:16 389:13,14,19 390:19,20,23 393:24 398:13 404:20 407:2

**Taxotere-containing** 64:14 331:20

**Taxotere/docetaxel** 115:7 118:8

**Taxotere/docetaxel-** 209:21

**technical** 15:21

**telephone** 35:14

**telling** 128:2 155:23 214:15 247:12 386:5 391:3

**tells** 148:14 195:2

**telogen** 78:7 79:14

**temporal** 354:14 360:16

**temporality** 123:25 138:18 151:21

**temporary** 226:15 259:17 260:23 261:7, 14,19 268:5 339:12 340:7

**ten** 184:18 228:11 230:17 231:4 256:11,

20 257:9

**ten-year** 205:7

**tenure** 105:3,4

**term** 40:3,11 41:16, 18,23 82:24 191:9 200:7 212:9 222:19 226:17,21 258:12 270:6,8 271:13 272:10 318:16 348:16,17 364:20 370:10,17 403:23

**terminology** 370:6

**terms** 22:23,25 23:2, 3,4,15,17 24:8,10,12, 15,17 25:3 30:6 40:4, 14,15,19 41:9,11,12, 14 42:5 43:22 61:3 64:3 78:21 89:23 93:17 105:10 106:21 112:7 113:10 118:7, 20 131:19 165:9 178:7 184:17 193:1 198:13,22 214:25 226:16 232:7 243:9, 12 244:17,18,20 245:14 253:18 271:19,22 289:23 297:6 305:19 308:4 327:22 330:25 350:14 368:20 370:1 371:3,4,5

**terrible** 377:11

**territories** 95:8

**test** 319:21

**testified** 9:3 13:20 16:9 18:7,12 53:18 70:7 102:22 143:17 174:5 225:13 233:15 349:9 361:11 396:9

**testify** 55:9,14

**testifying** 9:17 344:19

**testimony** 9:24 10:4, 8 11:13 12:15,22 13:15,25 14:5,14,18 16:2,6,22 17:2,6,8 18:6 39:2 40:13 52:16 53:3 103:1 122:16 135:1,10 249:9 352:14 400:15

**testing** 212:10

**tests** 343:10

**text** 195:14 210:9,10, 11

**textbooks** 105:25

**theories** 25:9 36:17

**theorized** 223:23

**therapeutic** 123:20 212:1 213:15 283:17, 24 287:12 288:23 293:21 294:1,11 296:1 337:16 357:24 358:1,5,7 372:8 374:7 384:19

**therapeutically** 386:6

**therapeutics** 372:10 374:17

**therapies** 23:13 252:17 320:6 376:9

**therapy** 87:8,10 187:18,24 194:19,21 195:1,13,15 207:14 208:5 209:24 210:1 211:5,11 224:21 228:3 229:13 230:11, 15,18,22 231:4,8,12 232:2,16 236:6,11 238:9 240:15 241:4, 7,8,9,24 247:10 250:22 254:18,23,24 255:6 271:4,25 310:11 314:8 320:4,7 323:15 324:4 376:1, 4,16,18,23,25 404:5 405:19

**therapy-** 236:4

**therapy-induced** 80:15

**thereof** 400:20

**Thibodeaux** 13:9,12 402:4

**thing** 90:15 97:8 183:8 184:3 185:22 272:20 274:4

**things** 17:11 36:8 52:21 111:19 115:5, 17 117:6 123:25

137:6 167:5 183:5 232:10,12 282:21 321:9 342:16 343:21, 22 371:22 374:21 394:4

**thinking** 35:18 123:2 271:13 351:11 391:22

**thinks** 307:5

**thinning** 138:17,21, 25 143:4 232:4,8

**Thirty** 246:12

**Thompson** 77:17

**thought** 30:25 31:7, 19 51:15 110:20 124:2 127:21,23 206:10 235:16,17 275:5 313:10 315:14 337:12,24 350:13,14 351:20 385:14 393:16 396:21

**thousand** 263:24 352:8

**thousands** 290:13

**threatening** 318:12

**threshold** 157:24

**throw** 129:15,16,19 132:8

**tier** 172:21

**tiers** 173:1

**tight** 83:1

**til** 54:5

**time** 14:19 15:9,25 16:3 22:21 25:4,7,10 26:10 27:23 36:13 45:20 52:14 55:12 56:18 67:9 77:25 86:11 100:9 102:6 103:8,9,22 104:12 113:8,9,23 115:14 123:19 124:1 146:22 161:1 167:13 196:18 204:21 208:2 217:20 221:14 239:15 240:13,18 241:20 242:8,22 243:8,9 249:15 253:12 255:15,18,25 259:13

264:7,17 274:2,13,15 283:1,4 296:17 303:13,18 304:14 305:4,5 306:14 309:2 315:13 317:5 318:9 322:20 329:19 330:10 335:21 344:11,22 345:23 346:3,22 351:5 352:13 354:6,8 357:14,22 362:17 365:9 372:20 377:12 382:10 383:12 391:5 392:15 395:20 398:24 399:14 400:11

**timeframe** 351:15 372:21

**timeline** 362:15

**times** 10:16,23 11:1 62:3 132:6 256:20 257:9 282:1 308:15 369:5 399:10

**timetable** 291:18

**timing** 232:6 258:18 363:4 383:7

**tissue** 77:20

**title** 241:16 314:11 329:24

**titled** 260:13

**today** 9:12,21 10:5,9 12:12 16:11,20 17:10,15 21:5,10,14 31:19 39:2,14 40:15 45:21,23 46:3 53:15 55:8 66:4 69:7 75:13, 22 109:23 161:6 167:17 203:25 204:13 205:24 214:7 268:23 269:14,21 274:10 277:9 284:4 300:14 304:11 305:8 312:14 317:13 318:3, 4 326:5,20,25 332:11,23 334:17 361:19 388:12 389:5 398:20 399:14

**today's** 272:22 312:18 399:18

**told** 35:25 36:6 37:9

214:11

**tool** 30:1 99:13 155:5

**tools** 134:11 152:14, 24 154:5 202:9 326:7,20,23 357:10

**top** 8:6 182:10 203:3 211:19 245:19 315:25

**topic** 81:15 106:20, 23,24 107:2,18 108:7,23 124:10 141:13 280:3 334:25 337:1 344:19 345:8 352:24 375:19 379:2, 7,25 383:1 384:13 390:19 399:4

**topical** 373:3,17,25

**topics** 107:21 311:10 346:1

**topoisomerase** 212:4

**Tosti** 216:2

**total** 54:1 100:8,20 159:15 164:12 220:21 235:20 264:12 275:2 312:25

**totality** 129:22 132:4, 7 257:8

**totally** 166:22 375:8 388:5 392:2

**touched** 218:8

**toxicities** 65:2,19,24 332:24 333:3 334:23 336:4

**toxicity** 65:7 224:8, 24 333:10,11,24 372:17

**track** 43:14,17 46:4 203:21 256:1

**tracking** 165:8

**traction** 82:21 83:2

**traditional** 226:15 392:25

**training** 269:6

**transcribed** 400:13

**TRANSCRIPT** 407:1

**transcripts** 10:24

**transient** 106:21 107:2 119:4 184:13 225:16 261:13 351:7, 17 352:3 391:1

**transmit** 353:1

**transpired** 71:1

**transplantation** 219:21

**transplants** 108:5

**trastuzumab** 39:24 40:4 41:24 392:4,9

**traumatizing** 339:9

**Traurig** 7:22 8:9 67:15

**treat** 58:21 73:9,16 74:8,20 76:17 319:17 371:15,18 372:6

**treated** 103:9,12,22, 25 142:14,23 143:3 145:1 156:25 159:23 173:24 195:11,12 207:14 209:24 217:8, 10,12 221:1 223:6 233:3 246:13 247:5, 14 373:3

**treating** 46:6,10 70:8 103:14,15 319:1,7 349:22 350:23 372:1 378:22

**treatment** 23:20 24:4 61:4 68:3 75:9 85:25 95:18 135:19 139:9 217:5,23 233:23 234:16,23 239:15 260:7,16 265:22 266:1,12 269:20 271:21 310:23,24 318:4 321:12 350:12 355:21 358:18 359:3 374:1 398:18 404:8 406:13

**treatment-related** 342:5

**treatments** 270:25 335:3,25

**trial** 13:21 17:1 29:15 52:6,16,17 55:9 62:21 65:20 82:2 86:14,18,19,21,25 87:5,7,9,14 91:17 103:13,22,25 106:9 132:20 134:18 135:7, 11 149:6,22 150:6,21 151:3 155:15 161:17 190:4,9 199:1 200:2 204:24 214:10 295:15 300:10 308:12 328:20 329:16,22,25 344:20 387:7 388:23 398:1 406:3

**trials** 87:11 104:19 105:12 126:24 134:14 148:18 149:15 150:12,16 162:22 173:5,6 191:25 192:8,12,22 193:13 199:15 295:25 297:1,11 298:14,15,24 299:9, 16 311:11,16 314:13 332:13 375:14 387:8, 18,20 395:9 396:11, 24 397:7,21

**triggers** 158:1

**trouble** 154:11 233:11

**true** 19:6 44:12 45:2 65:10 103:2 176:16 199:9 266:7 393:19 400:14

**trusted** 365:5

**truth** 9:21,24 122:25 184:22

**truthful** 10:4,8 14:18 16:3 17:8

**TSG** 6:8 7:13,16

**tune** 126:20 128:5

**turn** 26:19 40:18 222:14 245:17 394:19

**turning** 259:21 398:25

**two-by-two** 152:16, 22 153:1 157:5

**two-thirds** 261:23

**type** 83:6 123:24 125:3 214:10 219:16 220:2 225:16 234:16 245:9 247:12

**types** 94:6 156:14 252:22 282:20 299:14

**typewriting** 400:13

---

**U**

**U.S.** 95:18,20,22 163:6,12,14,18 263:20 276:3 292:4 308:9 318:21 353:14 354:6 385:22

**Uh-huh** 143:13 151:12,15 228:8,12 306:5 373:14 381:2 384:16

**Uh-uh** 182:22

**unable** 251:1

**UNANSWERED** 401:7

**unavailable** 308:11

**unbiased** 268:23 269:10,14

**undergoing** 187:17 188:11

**underlying** 116:14 174:7 252:6

**understand** 9:13,23 18:17 20:22 23:5 24:17 31:4 32:20,24 33:1 35:10,15 51:7 55:1 61:17 62:1 81:15,19 103:20 137:16 152:12 157:10 169:20 181:14 195:3 230:20 232:10 275:21 279:25 281:6 283:22 301:24 304:10 326:19 342:21 349:15 350:6 359:15 365:2 380:3 384:8,12 387:3

**understanding** 28:3 63:17 155:7,10 156:7 232:3 233:12,21 234:17,19 249:9,16 284:24 352:11 354:6, 9 359:18 376:22

**understands** 278:20

**understood** 16:19 22:6 51:11 54:10 95:1 261:3

**unequally** 178:6

**United** 7:8 110:22 162:7 221:24 264:4 297:8 308:5 353:6 354:5 385:16

**universe** 50:7 247:18

**University** 220:8

**unrelated** 379:22

**unusual** 242:11

**update** 39:14 357:19

**updated** 111:1 243:6,8,9

**updates** 103:4

**updating** 243:4

**uploaded** 274:19

**upside** 264:11

**usable** 89:10

**usage** 368:21 370:2

**USPI** 257:24 258:21 259:25 264:6,7

**utilization** 305:17

**utilize** 50:3

**utilized** 174:14,18 371:5

**utilizes** 59:7

**utilizing** 124:4

---

**V**

**vacuum** 249:4

**vague** 262:20,22 263:11

Index: valid..zoom

**valid** 122:22 123:6,12 388:5

**validity** 6:16

**variable** 193:22

**variables** 144:14

**variety** 47:9 288:12 376:6

**variously** 363:20

**Vasey** 328:14

**vast** 234:17 261:13

**venues** 356:8

**verbal** 14:21

**verbiage** 152:2 253:23 263:1

**verify** 217:18

**version** 243:8 312:19 313:14,20 315:19,22 384:19 405:10,13

**versions** 243:7 312:20

**versus** 39:4 144:2,3 176:2 199:24 201:22 204:1,8,17,19 223:18 328:5,20 329:16 353:14 406:4

**vetted** 122:5 203:15

**video** 6:16 7:13 15:15,17 67:18,20 102:9,11 168:4 169:2 208:16,18 256:14,16 272:15,17 303:9,11 331:14 346:4,6 369:15,17 399:19

**view** 200:17

**viewpoints** 232:12

**vigilance** 126:16,25 128:15 129:5 130:2 132:14 160:20 191:25 192:8,12 305:20 375:5

**violated** 92:14

**visit** 36:9

**visual** 15:3 319:20

**Vitae** 102:20 402:14

**vitro** 105:11

**volume** 11:9,13,17, 20 12:18,25 16:18 111:24 112:1,3,10 401:14,17,20,23

**volumes** 11:6

---

### W

**wait** 250:20 261:2 327:13 340:21

**waiting** 392:24

**Wanda** 75:12 259:22

**Wanda-000060** 257:20 404:15

**Wanda-000119** 257:21 404:16

**wanted** 23:12,13 103:18 118:6 137:22 218:9 240:8 275:6

**warn** 71:20 111:2 118:25 119:3 187:17 337:3

**warned** 188:4,13 189:1,9 263:21 264:15

**warning** 71:7 189:15 337:5

**warnings** 359:5 360:14

**warns** 258:21

**wasting** 383:12

**watch** 15:8

**ways** 47:10 231:18 287:23 288:3,6,7,12 289:7 330:25 372:5 386:19

**website** 48:24 49:3,4 92:9 265:15 267:22, 23 268:13 278:3,6

**well-** 121:7 200:1 361:2

**well-controlled** 199:1

**well-known** 300:15

**wheelhouse** 370:16

**WHEREOF** 400:21

**Wilson** 336:8,12

**window** 182:25 183:6 185:2,7,15,25

**Winter-stone** 336:13

**Winters** 334:1 336:19 342:3 343:2

**withdraw** 43:12 395:12

**witnesses** 19:25 20:12,19 25:3,11 402:9

**woman** 353:8

**women** 83:20 171:2 182:3 203:3 235:20, 21 236:8 238:25 242:13,14 317:13 321:20 322:2,11 324:9 326:1 334:4,12 339:8 341:5 343:4,8 353:21,23 403:4,8 406:7

**wondered** 329:10

**wondering** 62:2 226:23 304:11 335:4 336:1

**word** 179:12 180:24 181:11 195:15 258:24 259:6,15 278:20 338:25 351:3, 12

**words** 18:21 23:18 44:2,3 55:7 143:9 156:19 245:20 263:15

**work** 32:18 34:16,23 35:7,19 46:17,20 48:1,4 53:10 85:20 96:7 98:15 104:1,16 105:10,11,20 106:2 107:15 113:9,22 152:16 282:13 284:4 297:9 325:8

**worked** 32:19,23 33:2 94:10,12 104:17

**280**:19,20,21,22 281:3 283:9,10 284:5,12 298:2 299:6 300:5 374:10

**working** 22:7 32:20 33:9 35:1,10 36:14 71:3 107:18 285:11 298:1 299:17 300:2 362:25 374:15 375:20 397:18

**world's** 352:23

**worse** 343:9

**worthwhile** 324:5,12

**worthwile** 323:15 405:19

**wrap** 396:3,5

**write** 49:7,16 110:1 114:11 184:9 294:7

**writer** 125:15

**writes** 294:12

**writing** 37:2 367:13

**written** 22:11 30:14 32:14 37:3,22 79:22 104:12 124:4 184:21 221:17 260:17 262:8 301:15 366:25 367:14

**wrong** 57:18,24 58:4 97:23,24 170:20 197:18 241:24 264:23 350:14 371:20

**wrote** 105:22 123:3 187:7 212:19,20 367:9,11

---

### X

**X----------------------** 401:2

---

### Y

**year** 13:6 173:15 232:6 240:17 241:9, 15,19 242:1 263:25

**years** 53:20 54:6

**107**:17 109:16,18,24 110:4,23 114:9 153:21 241:25 270:2 324:17 343:8,19 348:23 362:5

**years'** 56:16

**yellow** 316:25

**yes-or-no** 85:7 190:21

**York** 7:15

---

### Z

**zoom** 210:4 229:4 330:17