# EXHIBIT K

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

****************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                        Civil Action No. 16-MD-2740
                        Section "H"(5)
                        New Orleans, Louisiana
                        September 5, 2019

THIS DOCUMENT RELATES TO ALL CASES
****************************************************************


                TRANSCRIPT OF MOTION HEARING
        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:

               *DAWN BARRIOS*
               BARRIOS KINGSDORF & CASTEIX
               701 POYDRAS STREET
               SUITE 3650
               NEW ORLEANS, LA 70139

               *MATTHEW PALMER LAMBERT*
               GAINSBURGH BENJAMIN DAVID MEUNIER
               & WARSHAUER
               1100 POYDRAS STREET
               SUITE 2800
               NEW ORLEANS, LA 70163

               DARIN SCHANKER
               *BACHUS & SCHANKER*
               1899 WYNKOOP STREET
               SUITE 700
               DENVER, CO 80202

               *CHRISTOPHER COFFIN*
               PENDLEY BAUDIN & COFFIN
               1515 POYDRAS STREET
               NEW ORLEANS, LA 70112

*KAREN BARTH MENZIES*
GIBBS LAW GROUP
400 CONTINENTAL BOULEVARD
EL SUGUNDO, CA 90245

*DAVID F. MICELI*
SIMMONS HANLY CONROY
ONE COURT STREET
ALTON, IL 62002

*RAND NOLEN*
FLEMING NOLEN & JEZ
2800 POST OAK BOULEVARD
SUITE 4000
HOUSTON, TEXAS 77056

*ANDRE MURA*
GIBBS LAW GROUP, LLP
505 14TH STREET
SUITE 1110.
OAKLAND, CA 94612

APPEARANCES CONTINUED
FOR SANOFI S.A.:

*HARLEY V. RATLIFF*
SHOOK HARDY & BACON
2555 GRAND BOULEVARD
KANSAS CITY, MS 64108

*HILDE SASTRE*.
SHOOK HARDY & BACON
CITIGROUP CENTER
201 S. BISCAYNE BOULEVARD
SUITE 3200
MIAMI, FL 33131

*DOUGLAS MOORE*
IRWIN FRITCHIE URQUHART & MOORE
400 POYDRAS STREET
SUITE 2700
NEW ORLEANS, LA 70130

*JON STRONGMAN*
SHOOK, HARDY & BACON
1155 F STREET NW, SUITE 200
WASHINGTON, DC  20004

```
FOR HOSPIRA, INC., HOSPIRA WORLDWIDE, LLC,
FORMERLY DOING BUSINESS AS HOSPIRA WORLDWIDE, INC.,
AND PFIZER, INC.:

                    JOHN F. OLINDE
                    CHAFFE MCCALL
                    1100 POYDRAS STREET
                    SUITE 2300
                    NEW ORLEANS, LA 70163



Official Court Reporter:      Nichelle N. Drake, RPR, CRR
                              500 Poydras Street, B-275
                              New Orleans, Louisiana 70130
                                 (504) 589-7775


    Proceedings recorded by mechanical stenography,
transcript produced via computer.
```

1                      **P R O C E E D I N G S**

2                      (Call to order of the court.)

01:00:09PM   3          THE DEPUTY CLERK:  Court's in session.  You may be

01:00:10PM   4   seated.

01:00:11PM   5          THE COURT:  How are we going to do this?  Do you have

01:00:17PM   6   the list of who's arguing what?

01:00:19PM   7          MR. MOORE:  We're still working on that filling that

01:00:21PM   8   out.  It didn't exactly line up with our list.  We had them

01:00:23PM   9   listed differently.  So we're trying to pair the docket

01:00:29PM   10  numbers.

01:00:29PM   11         THE COURT:  All right.  Well, ya'll want to give me a

01:00:31PM   12  list of which order because I made them in this order in my

01:00:35PM   13  scribbly notes.

01:00:37PM   14         MR. MOORE:  We can take them in whatever order Your

01:00:41PM   15  Honor requests.  We had sent an e-mail to Sam that outlines

01:00:46PM   16  the ones that we wanted -- okay.  You have that?

01:00:47PM   17         THE COURT:  That's my order.

01:00:49PM   18         MR. MOORE:  That's our order as well.

01:00:55PM   19         MR. SCHANKER:  I'm not sure if -- and it probably

01:00:58PM   20  doesn't matter.  Excuse me.  Darin Schanker.  Nice to see

01:01:02PM   21  you.  I don't have a copy of that e-mail.  If you want us to

01:01:05PM   22  be kind of -- make sure that we have --

01:01:07PM   23         THE COURT:  Why don't you all get together, and I'll

01:01:10PM   24  let you get it together and then.

25         Erin, what do you have?

1          THE DEPUTY CLERK:  I just copied what's in CM/CEF,

2     docket numbers.  That's just in numerical order.  I tried to

3     get them each to put their name.

4          THE COURT:  This is pretty cool.  But some of them

5     are not being argued.

6          MR. MOORE:  That's what we're trying to navigate.

7          THE COURT:  Well, there aren't that many that are not

8     being argued, just so you know.

01:01:58PM   9          MR. MOORE:  16...

01:01:58PM  10          MR. SCHANKER:  So we do have the e-mail that you

01:02:01PM  11     have, Your Honor.  So I think we're ready whenever you are.

01:02:05PM  12          THE COURT:  All right.  I am -- so the first motion

01:02:11PM  13     *in limine* that we will take up is the Motion *in Limine* to

01:02:16PM  14     Preclude Any Comment or Argument that Dr. Carinder's

01:02:21PM  15     Responsible for Plaintiff's Condition.  That's Document No.

01:02:24PM  16     7653.  Mr. Schanker?

01:02:24PM  17          MR. SCHANKER:  Yes.  Good afternoon, Your Honor.

01:02:29PM  18          THE COURT:  Good afternoon.

01:02:29PM  19          MR. SCHANKER:  So very briefly, there's no evidence

01:02:32PM  20     that's been elicited that Dr. Carinder violated the standard

01:02:38PM  21     of care.

01:02:38PM  22          THE COURT:  But, Mr. Schanker, let me -- I'll tell

01:02:40PM  23     you what, my first note in here is a question mark.  I'm not

01:02:44PM  24     sure what you're requesting because as I read the response

01:02:47PM  25     from the defendants, they're not going to elicit testimony

01:02:50PM 1    that in any way Dr. Carinder violated the standard of care,

01:02:56PM 2    but as I appreciate it, they wanted to be able to discuss the

01:03:00PM 3    options that he felt were available to this plaintiff so that

01:03:05PM 4    he could talk about what they discussed and what would go to

01:03:08PM 5    his prescribing decision.  And is that an objection?  And I

01:03:13PM 6    think they have to do that.

01:03:16PM 7            MR. SCHANKER:  And I agree with you, Your Honor.

01:03:19PM 8    With regard to options available, certainly; but based upon

01:03:23PM 9    kind of reading between the lines and the concern in this is

01:03:26PM 10   dosage, because part of options are the dosage of Taxotere --

01:03:26PM 11           THE COURT:  Of course.

01:03:31PM 12           MR. SCHANKER:  -- that was available.  And any

01:03:33PM 13   attempt to infer that the dosage is what caused the permanent

01:03:39PM 14   hair loss is what we'd say would be improper.  Because we

01:03:45PM 15   have no -- there's no evidence presented by any expert in

01:03:50PM 16   this case on that, the causation that X milligrams versus Y

01:03:54PM 17   milligrams per meter squared which is how these are

01:03:58PM 18   determined that that's what caused it.  And what could be

01:04:01PM 19   reasonably inferred, misleadingly by a jury, because

01:04:07PM 20   Dr. Carinder did a dosage which is arguably off-label,

01:04:11PM 21   because he did a dosage that is off-label, that that is what

01:04:14PM 22   caused the permanent hair loss and, therefore, that

01:04:19PM 23   Dr. Carinder is at fault.  And there's -- so there's no

01:04:21PM 24   testimony that supports that, no allegation.  As a matter of

01:04:25PM 25   fact, Dr. Miletello, the defense expert, says totally within

01:04:31PM  **1**   the standard of care.  So that's what -- just kind of getting

01:04:33PM  **2**   down to it, that's what our concern is.

01:04:35PM  **3**          THE COURT:  Let me hear from the defendants.

01:04:39PM  **4**          MS. SASTRE:  May it please the court, good afternoon,

01:04:39PM  **5**   Your Honor.  Hildy Sastre with Shook Hardy.

01:04:41PM  **6**          Judge, what I would say in response is that what

01:04:41PM  **7**   counsel is describing is, these are just simply the facts of

01:04:45PM  **8**   this case.  The issues as Your Honor knows for the jury's

01:04:49PM  **9**   determination is, number one, whether the warning that was

01:04:51PM  **10**  given was adequate, and, number two, most importantly in the

01:04:54PM  **11**  context of this motion, is if an accurate warning had been

01:04:59PM  **12**  given, would the injury have not occurred.

01:04:59PM  **13**         THE COURT:  Right.

01:05:02PM  **14**         MS. SASTRE:  So at the heart of all of that, Your

01:05:04PM  **15**  Honor, is the informed consent conversation between

01:05:07PM  **16**  Dr. Carinder and his patient and all the prescribing

01:05:11PM  **17**  decisions that Dr. Carinder made in terms of his treatment.

01:05:14PM  **18**  And so when you look at Ms. Earnest's breast cancer and what

01:05:20PM  **19**  Dr. Carinder thought was the specific appropriate plan and

01:05:23PM  **20**  combination of medications, the dosing, the regimen, all of

01:05:28PM  **21**  it goes to her risk profile, the medications which he

01:05:31PM  **22**  believed were necessary in order to give her her best chance

01:05:35PM  **23**  to survive cancer.

01:05:37PM  **24**         THE COURT:  I guess the question -- I agree with you.

01:05:38PM  **25**  All of that's important and that's absolutely part of the

01:05:42PM   1   evidence that the jury is going to have to hear to make a

01:05:46PM   2   determination if -- if there was -- if a risk of permanent

01:05:51PM   3   alopecia was conveyed, which she had had a different

01:05:56PM   4   conversation with the doctors such that he would change his

01:05:59PM   5   prescribing --

01:06:02PM   6            MS. SASTRE:  Yes.

01:06:04PM   7            THE COURT:  -- treatment.

01:06:04PM   8        I believe what I've heard from Mr. Schanker is, are

01:06:06PM   9   you going to follow up with some sort of testimony or

01:06:09PM   10  inference that the dosage that she was given, in fact, caused

01:06:14PM   11  the alopecia.

01:06:18PM   12           MS. SASTRE:  Well, the fact is that Dr. Carinder did

01:06:21PM   13  prescribe an off-label dose.  That was the decision he made

01:06:24PM   14  and, you know, he can talk about why he did that and why he

01:06:27PM   15  thought that this was the best treatment option for her.

01:06:29PM   16       Look, plaintiff's contention in this case, as Your

01:06:31PM   17  Honor is well aware, is that it was the Taxotere, even though

01:06:35PM   18  she lost her hair before the Taxotere, it's the Taxotere to

01:06:35PM   19  the exclusion of other medications and other issues

01:06:41PM   20  Ms. Earnest has that caused her permanent hair loss; the fact

01:06:44PM   21  that Dr. Carinder prescribed something that was not preferred

01:06:48PM   22  still within the guidelines.  It's not as if --

01:06:50PM   23           THE COURT:  In the standard of care --

01:06:50PM   24           MS. SASTRE:  -- it's not in the guidelines.

01:06:51PM   25           THE COURT:  -- but off-label.

01:06:53PM **1**        MS. SASTRE:  And no question is it off-label, Your

01:06:56PM **2**   Honor and so --

01:06:56PM **3**        THE COURT:  Okay.  So I guess then the follow-up

01:06:58PM **4**   question is --

01:06:59PM **5**        MS. SASTRE:  Yes.

01:06:59PM **6**        THE COURT:  -- are you going to -- is there any

01:07:02PM **7**   testimony that the fact that it was off-label in some way

01:07:06PM **8**   caused the alopecia?

01:07:09PM **9**        MS. SASTRE:  We are not going to have a witness

01:07:13PM **10**  testify that the Taxotere regardless of the dosing was the

01:07:17PM **11**  substantial cause of her permanent hair loss.  So --

01:07:20PM **12**       THE COURT:  As I appreciate -- I'm just -- because I

01:07:21PM **13**  think everybody is kind of dancing around.  I just -- is

01:07:27PM **14**  there going to be evidence presented -- I think -- I will

01:07:33PM **15**  tell you, I think it's appropriate to say that this is

01:07:37PM **16**  off-label.  I think that's fine.  It's within the standard of

01:07:40PM **17**  care.  Is that where it's going to end or is there going to

01:07:43PM **18**  be some inference with no evidence to back it up that that's

01:07:47PM **19**  what caused alopecia?

01:07:50PM **20**       MS. SASTRE:  I mean, we don't have a witness who's

01:07:53PM **21**  going to testify and say that Taxotere was the cause of her

01:07:56PM **22**  hair loss, Your Honor.  Our contention is as I think the

01:07:58PM **23**  court and counsel's quite aware is --

01:07:58PM **24**       THE COURT:  I --

01:07:59PM **25**       MS. SASTRE:  -- it's quite to the contrary.

01:08:01PM   1      THE COURT:  So this is what I will allow you to ask

01:08:04PM   2   this witness because I'm not going to let you backdoor with

01:08:08PM   3   inferences with no evidence to back it up.  I think it's

01:08:11PM   4   appropriate for you to ask Dr. Carinder what options were

01:08:17PM   5   available, you saw those options, you had this discussion

01:08:20PM   6   with your patient, that you chose -- you recommended this

01:08:26PM   7   course of treatment which was -- which was followed.

01:08:32PM   8   Whatever.  I think you can ask him, "Is this off-label?"  But

01:08:35PM   9   it is within the standard of care, and then that's it.

01:08:40PM  10      MS. SASTRE:  Okay.

01:08:43PM  11      THE COURT:  You understand?  I don't think -- I don't

01:08:44PM  12   think you can make an argument with no evidence to back it up

01:08:47PM  13   because that's what -- what you've told me is, you've got no

01:08:52PM  14   witness to say that off-label somehow or another caused the

01:08:58PM  15   alopecia.

01:09:00PM  16      MS. SASTRE:  We don't have a witness, Your Honor,

01:09:02PM  17   who's going to say that the Taxotere caused the alopecia

01:09:08PM  18   regardless of the dosing, caused the permanent hair loss --

01:09:10PM  19      THE COURT:  Then what's the problem?

01:09:12PM  20      MS. SASTRE:  Right.  So I agree with that.  I just

01:09:15PM  21   want to make sure that's the only thing the Court is

01:09:18PM  22   excluding which is something we're not going to talk about

01:09:20PM  23   anyway.

01:09:21PM  24      THE COURT:  I think that's all they're asking for.

01:09:26PM  25   I'm not -- I guess I'm a little bit -- again, starting with

01:09:29PM **1**   question marks, I'm not sure what the plaintiff is requesting

01:09:32PM **2**   in this.  I think what I first read was a motion *in limine* to

01:09:40PM **3**   preclude you from saying that Dr. Carinder violated the

01:09:45PM **4**   standard of care, which I saw nothing that I can see in

01:09:52PM **5**   anything that would be an issue there.  And then the response

01:09:56PM **6**   was very different, the opposition was very different from

01:10:00PM **7**   the motion, so I was really struggling to determine what this

01:10:04PM **8**   is.  I think it's appropriate for you to ask Dr. Carinder

01:10:07PM **9**   what his options were, what recommendations he made to this

01:10:11PM **10**  -- this patient, why he made those recommendations, what he

01:10:13PM **11**  would have done had he been properly warned that this -- and

01:10:22PM **12**  when I say properly, just -- that's the allegation of the

01:10:25PM **13**  lawsuit, that he'd been warned that this medication runs a

01:10:29PM **14**  risk of permanent alopecia.  I would have told her, we would

01:10:32PM **15**  have had further conversation and the jury is going to make a

01:10:36PM **16**  determination much beyond that.  And I think -- I believe it

01:10:41PM **17**  to be appropriate for you to say, now, you were going to

01:10:46PM **18**  prescribe such and such and such and such, that's off-label,

01:10:49PM **19**  correct?  But I think it's fine for them to respond that's

01:10:53PM **20**  within the standard of care.  So it's not -- what I'm not

01:10:57PM **21**  going to allow is that inference that he prescribed off-label

01:11:04PM **22**  and somehow that was beyond the standard of care and that's

01:11:13PM **23**  what really caused all of this as opposed to that was within

01:11:15PM **24**  the standard of care.  I think it's fine for you to say it

01:11:18PM **25**  was off-label.

01:11:18PM  **1**        MS. SASTRE:  Sure.

01:11:19PM  **2**        THE COURT:  Lots of prescriptions are prescribed

01:11:21PM  **3**    off-label.  And it doesn't mean that that -- that there's

01:11:26PM  **4**    anything wrong with it.  I think they can follow up.  I'm not

01:11:30PM  **5**    hearing that you want any more than that.

01:11:35PM  **6**        MS. SASTRE:  Well, it's plaintiff's motion, Your

01:11:36PM  **7**    Honor, and I think that's in part where some of the

01:11:39PM  **8**    disconnect comes from.  Because there was what was written in

01:11:41PM  **9**    the motion and then there was what counsel articulated.  The

01:11:43PM  **10**   motion really asked for three things, Judge.  It said that --

01:11:46PM  **11**   it said that defendants should be precluded from arguing or

01:11:49PM  **12**   admitting evidence that Dr. Carinder's responsible in this

01:11:53PM  **13**   case, and on that I just sort of feel like, look, we're able

01:11:56PM  **14**   to use everyday normal words.  He was her doctor.  He was in

01:12:01PM  **15**   charge of her care and treatment.  I think that's an easy

01:12:04PM  **16**   one.

01:12:04PM  **17**        And the second things they mentioned, Judge, were

01:12:06PM  **18**   that it should be excluded from evidence, that he prescribed

01:12:09PM  **19**   off-label and that he did not prescribe a preferred regimen.

01:12:13PM  **20**   That's all that they asked for in the written papers --

01:12:13PM  **21**        THE COURT:  But what I'm telling you is --

01:12:17PM  **22**        MS. SASTRE:  -- and on that I believe the Court has

01:12:18PM  **23**   denied the motion.  That's the only thing in writing.  The

01:12:22PM  **24**   only specific things were that he prescribed off-label and

01:12:25PM  **25**   that he did not prescribe a preferred regimen.  And the

01:12:29PM  1   preferred regimen is simply within the guidelines, which I

01:12:33PM  2   believe, Your Honor, just articulated was an appropriate

01:12:37PM  3   area of inquiry along with --

01:12:37PM  4           THE COURT:  Right.

01:12:37PM  5           MS. SASTRE:  -- prescribing in a way --

01:12:37PM  6           THE COURT:  What my concern was and the way I read

01:12:39PM  7   the motion was that there was not going to be an allegation

01:12:43PM  8   that somehow or another that Dr. Carinder committed

01:12:47PM  9   malpractice.  That's very frankly how I read the motion, and

01:12:53PM 10   I don't think I read anything -- and you all have given me a

01:12:56PM 11   great deal to read -- that anybody says Dr. Carinder

01:12:59PM 12   committed any sort of malpractice.  You can ask him about

01:13:03PM 13   off-label and then I think it's appropriate for them to say

01:13:07PM 14   that that's an acceptable -- it's within the standard of

01:13:10PM 15   care.  I think that's fine.  And then be done with it.  I'm

01:13:12PM 16   not going to go -- I will not allow anybody to run down some

01:13:15PM 17   rabbit hole of malpractice.  It's not at issue in this case.

01:13:19PM 18   We've got enough to cover with the issues at hand.

01:13:25PM 19           MS. SASTRE:  Understood.

01:13:27PM 20           THE COURT:  Okay.  Any questions?

01:13:29PM 21           MR. SCHANKER:  Your Honor, just -- thank you, Your

01:13:31PM 22   Honor.  Just clarification.  It is a factual dispute as to

01:13:34PM 23   whether it was off-label or not off-label.

01:13:36PM 24           THE COURT:  I think you can ask him that.

01:13:38PM 25           MR. SCHANKER:  Thank you.

01:13:39PM  1          THE COURT:  You can ask him.  He can answer it.  But

01:13:45PM  2     I'm not going to run -- I'm not going to allow you to run

01:13:48PM  3     down that rabbit hole with some red herring about somebody

01:13:53PM  4     violating the standard of care.  So I would say that it is --

01:14:04PM  5     whew, goodness.  I think it was granted in part and denied in

01:14:08PM  6     part, and my reasons articulated are sufficient for you to

01:14:15PM  7     understand what you're allowed to do.

01:14:17PM  8          Okay.  Second motion is Motion *in Limine* to Preclude

01:14:21PM  9     Evidence of Unrelated Medical Conditions Familial Medical

01:14:27PM 10     History of Cancer and Unrelated Medication Usage.

01:14:31PM 11          MR. SCHANKER:  I'm sorry, Your Honor.  And you're

01:14:33PM 12     familiar obviously, you went through Fonseca, Dr. Fonseca, in

01:14:41PM 13     excluding him and without -- certainly Dr. Fonseca these --

01:14:43PM 14     what always were unrelated medical conditions are now clearly

01:14:48PM 15     unrelated medical conditions, whenever they may be, there is

01:14:52PM 16     no evidence, no testimony, no expert testimony to link any

01:14:55PM 17     health issues in this case to any allegation of permanent

01:15:00PM 18     hair loss whether it be weight, post-menopausal.

01:15:05PM 19          THE COURT:  I don't remember -- and you may have to

01:15:09PM 20     help me, because some of this is -- I don't remember having a

01:15:16PM 21     Daubert motion as to -- I'm assuming the defendants have a

01:15:20PM 22     hair loss expert?

01:15:21PM 23          MR. SCHANKER:  Yes, they do.

01:15:22PM 24          THE COURT:  Comparable to Dr. Tosti?

01:15:27PM 25          MR. SCHANKER:  Arguable whether comparable -- yes.

01:15:31PM  **1**   No.  I'm joking, Your Honor.  Kind of.

01:15:31PM  **2**        THE COURT:  That's a shocker.

01:15:37PM  **3**        MR. SCHANKER:  Yes, the defense has a dermatologist,

01:15:39PM  **4**   yes, you're correct, to talk about hair issues.  But they

01:15:42PM  **5**   also endorse Dr. Fonseca, an endocrinologist, who the Court

01:15:48PM  **6**   struck --

01:15:49PM  **7**        THE COURT:  I think they ultimately withdrew --

01:15:49PM  **8**        MR. SCHANKER:  Yes.

01:15:53PM  **9**        THE COURT:  -- after I -- the representations of my

01:15:58PM  **10**  attitude.

01:15:58PM  **11**       MR. SCHANKER:  So bottom line in this case is

01:16:00PM  **12**  that Dr. -- no Dr. Shapiro, nor Dr. Tosti, so focusing on the

01:16:07PM  **13**  experts in this case who could arguably offer opinions on

01:16:12PM  **14**  this, there is no specific opinion offered by Dr. Shapiro or

01:16:18PM  **15**  Dr. Tosti that any of these health issues that have been

01:16:19PM  **16**  brought up over and over in depositions of doctors, that any

01:16:22PM  **17**  of them in any way contribute in any way, shape, or form to

01:16:26PM  **18**  the plaintiff's alleged permanent hair loss.  There's no

01:16:30PM  **19**  evidence linking.  There's no causal link.  And so similar --

01:16:33PM  **20**  and similar with the medications that she takes and she takes

01:16:37PM  **21**  a handful of medications for a variety of different things,

01:16:40PM  **22**  but there is no expert testimony that specifically links

01:16:45PM  **23**  medication X to causing Barbara Earnest's alleged permanent

01:16:51PM  **24**  hair loss or temporary hair loss or whatever it is that she

01:16:53PM  **25**  has at this point in time.  And so plain and simple, simply

| | | |
|---|---|---|
| 01:16:55PM | 1 | there is no relevance and, obviously, it would be highly |
| 01:16:57PM | 2 | prejudicial and misleading to the jury. |
| 01:17:00PM | 3 | THE COURT:  Okay.  Thank you. |
| 01:17:01PM | 4 | Who's arguing? |
| 01:17:04PM | 5 | MS. SASTRE:  Your Honor. |
| 01:17:04PM | 6 | THE COURT:  Yes. |
| 01:17:06PM | 7 | MS. SASTRE:  So what I think that I just heard in |
| 01:17:08PM | 8 | combination with what I read is that the plaintiffs are |
| 01:17:11PM | 9 | asking for a blanket exclusion of medical evidence or history |
| 01:17:16PM | 10 | and in what is a personal injury case they deem to be |
| 01:17:21PM | 11 | unrelated without the defendant even having an opportunity to |
| 01:17:25PM | 12 | lay a foundation and connect the dots on why we're entitled |
| 01:17:28PM | 13 | to talk about -- |
| 01:17:29PM | 14 | THE COURT:  This would be my problem.  I have to tell |
| 01:17:31PM | 15 | you.  And this was part of when I read Dr. Fonseca's report |
| 01:17:38PM | 16 | and he said because of her weight, I think she's probably |
| 01:17:41PM | 17 | insulin resistant.  And what I'm not going to allow under any |
| 01:17:48PM | 18 | circumstance is any evidence that would -- certainly because |
| 01:17:51PM | 19 | she's this age and she weighs this much, she must be -- you |
| 01:17:54PM | 20 | know, there's no medical evidence of some of these things, |
| 01:17:59PM | 21 | you know, I think there's talk about fatty liver syndrome, |
| 01:18:07PM | 22 | certain vitamin deficiencies.  Do you all have any direct |
| 01:18:09PM | 23 | evidence of these? |
| 01:18:10PM | 24 | MS. SASTRE:  Yes, ma'am, we do.  Your Honor, I want |
| 01:18:12PM | 25 | to be very clear here.  These are issues that are highly |

01:18:15PM **1**    relevant to causation, to a number of issues that could be

01:18:17PM **2**    causing or contributing to Ms. Earnest's hair loss including

01:18:21PM **3**    -- and I want to be specific -- weight, potential insulin

01:18:23PM **4**    resistance, metabolic issues, menopause, and fatty liver

01:18:28PM **5**    issues.

01:18:28PM **6**         THE COURT:  Okay.  Let me --

01:18:28PM **7**         MS. SASTRE:  These conditions --

01:18:28PM **8**         THE COURT:  Let me --

01:18:28PM **9**         MS. SASTRE:  Yeah.

01:18:29PM **10**         THE COURT:  I want --

01:18:29PM **11**         MS. SASTRE:  Yes, go ahead.

01:18:29PM **12**         THE COURT:  -- to ask specifically.  Do you have

01:18:35PM **13**    evidence of insulin resistance on metabolic issues beyond the

01:18:43PM **14**    fact that she -- her age and weight, she probably has that?

01:18:43PM **15**         MS. SASTRE:  Yes.

01:18:46PM **16**         THE COURT:  Do you have --

01:18:46PM **17**         MS. SASTRE:  Yes.

01:18:47PM **18**         THE COURT:  -- medical testing?

01:18:49PM **19**         MS. SASTRE:  Well, you say testing.  So I know from

01:18:53PM **20**    my review of the medical records that there are numerous

01:18:57PM **21**    descriptions of Ms. Earnest being -- they call her

01:18:59PM **22**    prediabetic at multiple times and that is highly relevant not

01:19:02PM **23**    just to her medical history, Your Honor, and I would say,

01:19:04PM **24**    Judge, in any case like this, all of this would go to quality

01:19:08PM **25**    of life and we could talk about things, even if they didn't

| | | |
|---|---|---|
| 01:19:12PM | 1 | directly relate to causation because this is a case where |
| 01:19:17PM | 2 | they're asking, right, for money damages for quality of life |
| 01:19:18PM | 3 | issues.  And so I think you get to put all of that in |
| 01:19:21PM | 4 | perspective.  Right?  I mean, you get to put in how a |
| 01:19:25PM | 5 | plaintiff feels every day, what they do every day.  All of |
| 01:19:28PM | 6 | that goes to damages in a personal injury case like this, |
| 01:19:30PM | 7 | Your Honor.  So that is all still alive and well.  It also |
| 01:19:37PM | 8 | goes to prescribing decisions that were being made. |
| 01:19:42PM | 9 | So, for example, Dr. Carinder, the prescriber, |
| 01:19:42PM | 10 | testified that he gravitated more to Taxotere than taxol |
| 01:19:48PM | 11 | because of risk of neuropathy which is something -- |
| 01:19:51PM | 12 | THE COURT:  Oh, wait.  We have another motion on |
| 01:19:52PM | 13 | that.  So let's take neuropathy off the table. |
| 01:19:52PM | 14 | MS. SASTRE:  Okay.  Very good. |
| 01:19:58PM | 15 | THE COURT:  There's a separate motion dealing |
| 01:19:59PM | 16 | specifically with that, and I think that's a different issue. |
| 01:19:59PM | 17 | What has bothered me is, I see this list of things and lots |
| 01:20:09PM | 18 | of guessing that she likely has that because of the way she |
| 01:20:12PM | 19 | looks and -- and I'm not inclined to allow a doctor to opine |
| 01:20:21PM | 20 | she's probably got that because look at her. |
| 01:20:25PM | 21 | MS. SASTRE:  No one's saying that, Judge. |
| 01:20:29PM | 22 | THE COURT:  Well, that's -- so that's my concern. |
| 01:20:31PM | 23 | MS. SASTRE:  Yeah. |
| 01:20:33PM | 24 | THE COURT:  And I know, you know, some of what I read |
| 01:20:36PM | 25 | is, she's probably got some metabolic disorder.  She's |

01:20:40PM 1   probably got, you know, fatty liver syndrome, but I'd be

01:20:51PM 2   great if we had a test that says she has it --

01:20:51PM 3            MS. SASTRE:  I understand.

01:20:58PM 4            THE COURT:  -- as opposed to she probably does.

01:21:00PM 5   That's my concern.  And so I'm not going to allow anybody to

01:21:04PM 6   say I would think she's probably got that because she's --

01:21:08PM 7   she's this much overweight.  If there's a medical test

01:21:13PM 8   somewhere that says she's got this condition and your doctor

01:21:16PM 9   will say people with this condition -- has opined that people

01:21:21PM 10  with this condition also face a risk of hair loss, I think

01:21:25PM 11  that's got to come in.  But I'm not going to allow a laundry

01:21:29PM 12  list of things that you've got no diagnosis for and have the

01:21:34PM 13  jury think, well, certainly she must have a diagnosis of

01:21:39PM 14  fatty liver syndrome.  And that's just one of the notes I

01:21:42PM 15  wrote down here.

01:21:43PM 16           MS. SASTRE:  And I understand that and the good news

01:21:45PM 17  is that is not what's going to happen.  All of the things

01:21:47PM 18  that our experts have talked about and will talk about at

01:21:49PM 19  trial come directly from her medical records.  We are not

01:21:53PM 20  going to bring somebody in here and say, look, this lady is

01:21:56PM 21  overweight.  She must have X, Y, and Z.  The things that

01:22:00PM 22  we're talking about, Your Honor, vitamin D deficiency, liver

01:22:04PM 23  disease, hormonal issues, medications that she's taking which

01:22:08PM 24  may be playing a role here.  These are all things that go to

01:22:12PM 25  different types of alopecia.  You know that everyone in the

01:22:15PM  1   case has agreed that this can be a multifactorial condition

01:22:19PM  2   and our experts have testified and will testify that a number

01:22:21PM  3   of these conditions cannot be ruled out or causing -- as

01:22:24PM  4   causing or contributing to her hair loss and these conditions

01:22:26PM  5   come straight from her records.

01:22:29PM  6          Now, let me say importantly, Your Honor, I know you

01:22:30PM  7   told me to put the brakes on neuropathy, but let me tell you

01:22:34PM  8   why it's relevant to our conversation right now.  When it

01:22:36PM  9   comes to neuropathy, Your Honor, something that is in the

01:22:41PM  10  mind of a prescribing doctor and oncologist is whether

01:22:45PM  11  there's a family history of diabetes or whether that patient

01:22:47PM  12  is prediabetic because if they are like Ms. Earnest was and

01:22:52PM  13  like her family has a history of diabetes you have even a

01:22:55PM  14  much greater chance for the development of neuropathy which

01:22:58PM  15  is a serious significant painful and debilitating condition

01:22:58PM  16  --

01:22:58PM  17         THE COURT:  I know all about neuropathy.

01:23:06PM  18         MS. SASTRE:  -- which is -- yeah, Ms. Earnest had

01:23:07PM  19  familiarity with it and said, "You know what, neuropathy's

01:23:07PM  20  bad news and I didn't want any more of that stuff."  Now I

01:23:12PM  21  know neuropathy's a separate issue, but the diabetes relates

01:23:14PM  22  directly to it.

01:23:15PM  23         So, Your Honor, that's where we are on these medical

01:23:19PM  24  issues.  These are from her medical records.  This is from

01:23:23PM  25  our expert's review of her medical records.  These are

01:23:27PM  1   conditions which they believe either relate to potentially

01:23:30PM  2   causation, Your Honor, specific causation.  I would argue to

01:23:34PM  3   the Court these are things many of them can relate to simply

01:23:38PM  4   just sort of quality of life issues in a personal injury case

01:23:41PM  5   and then, finally, they go to what was the prescribing

01:23:44PM  6   decision that was being made, were there conditions like this

01:23:50PM  7   prediabetic condition that Dr. Carinder had to manage.

01:23:52PM  8          The conditions also relate finally, Your Honor, to

01:23:55PM  9   Ms. Earnest's risk tolerance if you will.  So one of the

01:23:59PM  10  medications that she's continued to stay on as Your Honor has

01:24:03PM  11  heard is Arimidex.

01:24:03PM  12         THE COURT:  Right.

01:24:05PM  13         MS. SASTRE:  And she's taken that for quite some

01:24:08PM  14  period of time, and she's had conversations with her doctor

01:24:11PM  15  that Arimidex exacerbating liver issues which she has, in

01:24:16PM  16  fact, been diagnosed with on multiple of cases by a number of

01:24:19PM  17  physicians and she said even in that context, you know what,

01:24:23PM  18  my desire to not have a reoccurrence of breast cancer is more

01:24:27PM  19  important to me than the risk that I'm accepting of

01:24:27PM  20  continuing to take Arimidex knowing that I have some liver

01:24:36PM  21  issues.  So for all of those reasons, Your Honor, in a

01:24:38PM  22  personal injury case like this where a foundation will be

01:24:41PM  23  laid as I described, for all of those reasons, we're entitled

01:24:45PM  24  to talk about plaintiff's medical history.

01:24:48PM  25         One thing that the motion also mentioned, I don't

01:24:50PM   1   know if you argued it, was the family history of cancer.  I

01:24:52PM   2   don't know if I need to address that or if you're not --

01:24:54PM   3            MR. SCHANKER:  Yes, we do need to address that now.

01:24:56PM   4   I would be happy to.

01:25:01PM   5            And, Your Honor, I think we're missing the boat a

01:25:07PM   6   little bit here with regard to comments that counsel made.

01:25:11PM   7   The defense experts in this case don't offer any opinion that

01:25:16PM   8   any of these unrelated medical conditions -- and they're

01:25:19PM   9   unrelated -- because they don't offer an opinion that any of

01:25:22PM   10  them has any cause -- causation basis that it caused her

01:25:28PM   11  permanent hair loss.  Those opinions are not offered.  If

01:25:31PM   12  they were, you would have seen a Daubert.  The only one who

01:25:35PM   13  offered that was Dr. Fonseca who you struck.

01:25:41PM   14           So what's misleading here, Your Honor, is -- to what

01:25:45PM   15  you hear from Dr. Shapiro, the defense expert, is that

01:25:52PM   16  vitamin D deficiency can cause hair loss.  Nobody's going to

01:25:57PM   17  say in this courtroom because it hasn't been offered that

01:25:59PM   18  vitamin D deficiency within a reasonable degree of medical

01:26:04PM   19  probability caused hair loss in Barbara Earnest.  No one is

01:26:06PM   20  going to say that any other condition other than chemotherapy

01:26:12PM   21  drugs caused her hair loss.  Cases have been reported is all

01:26:17PM   22  they're willing to say, which I'm presuming, Your Honor, is

01:26:21PM   23  part of the reason that you struck Fonseca.  But those other

01:26:24PM   24  experts don't even venture a specific causation opinion on

01:26:27PM   25  any of these other conditions or you would have seen a

| | | |
|---|---|---|
| 01:26:30PM | 1 | Daubert motion.  What we're seeing here is an effort to |
| 01:26:33PM | 2 | back-door this information in front of a jury and mislead a |
| 01:26:37PM | 3 | jury.  A million things might cause hair loss, but in Barbara |
| 01:26:41PM | 4 | Earnest's case, you're not going to hear a defense expert |
| 01:26:44PM | 5 | offer any opinions concerning any of those medical conditions |
| 01:26:48PM | 6 | as causing hair loss. |
| 01:26:50PM | 7 | And with regard to family history of cancer, the -- |
| 01:26:55PM | 8 | it has no bearing on whether Barbara Earnest -- we have no |
| 01:27:00PM | 9 | medical link that that has any bearing on whether Barbara |
| 01:27:02PM | 10 | Earnest -- on any -- on her hair loss in this particular case |
| 01:27:05PM | 11 | or any claim or defense that is made. |
| 01:27:09PM | 12 | THE COURT:  I think what I read in the opposition was |
| 01:27:11PM | 13 | that the family history of cancer gives a little bit of a |
| 01:27:19PM | 14 | background of Ms. Earnest and what -- what kind of |
| 01:27:27PM | 15 | conversation she may have had with her physician knowing what |
| 01:27:31PM | 16 | cancer means. |
| 01:27:33PM | 17 | MR. SCHANKER:  And with regard to Dr. Carinder's |
| 01:27:36PM | 18 | prescribing condition, there is no question and answer in his |
| 01:27:39PM | 19 | deposition or nothing on the record indicating that family |
| 01:27:43PM | 20 | history had any bearing on Dr. Carinder -- |
| 01:27:45PM | 21 | THE COURT:  Not on Dr. Carinder's prescribing -- I |
| 01:27:48PM | 22 | don't think -- I don't think anybody's going to say that. |
| 01:27:51PM | 23 | That's not how I read the opposition.  I read the opposition |
| 01:27:56PM | 24 | to say it might have a bearing on Ms. Earnest's attitude |
| 01:28:01PM | 25 | toward her chemotherapy plan.  What am I going to do?  I've |

01:28:06PM  1  seen these people in my family struggle with cancer.  Am I

01:28:10PM  2  willing to take -- to run this risk or not?  And I think -- I

01:28:15PM  3  got to tell you, I don't know how that's not relevant because

01:28:20PM  4  I think it is something that comes to bear and I have to tell

01:28:24PM  5  you, much of this is based on just my attitude, how it comes

01:28:29PM  6  to bear when you're in the oncologist office and he's

01:28:35PM  7  talking.  Well, I've seen these people die.  Now, I don't

01:28:38PM  8  want to get involved and go -- and I think that's a very

01:28:41PM  9  limited, very, very limited inquiry.  And I'm not going to

01:28:46PM  10  tell you the questions to ask or anybody else's questions to

01:28:49PM  11  ask, but I think that's very limited.  I think that

01:28:53PM  12  somebody's got to be -- if you got a family that's full of

01:28:57PM  13  cancer, I believe that you might have a different attitude.

01:29:01PM  14          MR. SCHANKER:  Fair enough, Your Honor.

01:29:03PM  15          THE COURT:  And I think that's -- I'll allow them to

01:29:06PM  16  explore, but I'm not going to allow you to run down that road

01:29:11PM  17  and stay there if that answers the question.

01:29:14PM  18          As to the other issue on -- do you need to talk about

01:29:18PM  19  family history?  I think I answered your question.

01:29:21PM  20          MS. SASTRE:  We do.  We're fine on the family

01:29:24PM  21  history.  I understand your ruling.

01:29:25PM  22          But there is a statement that I do feel like I need

01:29:27PM  23  to correct and it'll take me about ten seconds, Judge --

01:29:27PM  24          THE COURT:  All right.

01:29:31PM  25          MS. SASTRE:  -- concerning our experts going back --

| | | |
|---|---|---|
| 01:29:32PM | **1** | THE COURT:  I'll give you 11. |
| 01:29:34PM | **2** | MS. SASTRE:  You'll give me 11 seconds?  Okay.  I'll |
| 01:29:36PM | **3** | take that extra second.  Thank you, Your Honor. |
| 01:29:38PM | **4** | Your Honor, all I was going to say, perhaps I'm |
| 01:29:42PM | **5** | stating the obvious here, but it is critical and I want to be |
| 01:29:46PM | **6** | sure this is in the forefront of our minds.  We don't have to |
| 01:29:48PM | **7** | prove anything in this case and we certainly don't have to |
| 01:29:50PM | **8** | prove what is the cause of Ms. Earnest's hair loss.  The |
| 01:29:53PM | **9** | plaintiff has to prove that -- |
| 01:29:53PM | **10** | THE COURT:  Oh, I got that. |
| 01:29:54PM | **11** | MS. SASTRE:  -- and they have to prove it -- I'm |
| 01:29:57PM | **12** | sorry.  Go ahead, Your Honor. |
| 01:29:57PM | **13** | THE COURT:  I'm not going to allow just total |
| 01:30:01PM | **14** | speculation to be presented to a jury when there's no |
| 01:30:04PM | **15** | foundation for that -- for that speculation. |
| 01:30:08PM | **16** | MS. SASTRE:  And there will be and it won't be |
| 01:30:11PM | **17** | speculative.  And what I was going to say, Judge, is that |
| 01:30:14PM | **18** | what our experts will say and what they've already said, Your |
| 01:30:17PM | **19** | Honor, and what we put in our response here is that there are |
| 01:30:20PM | **20** | many aspects of plaintiff's medical history care and |
| 01:30:25PM | **21** | treatment that they cannot rule out as causing or |
| 01:30:27PM | **22** | contributing to her hair loss and that is entirely |
| 01:30:32PM | **23** | appropriate.  There will be a foundation laid.  It will come |
| 01:30:36PM | **24** | from the medical records. |
| 01:30:37PM | **25** | Thank you, Your Honor. |

| | |
|---|---|
| 01:30:38PM | **1** |
| 01:30:42PM | **2** |
| 01:30:44PM | **3** |
| 01:30:50PM | **4** |
| 01:30:50PM | **5** |
| 01:30:54PM | **6** |
| 01:30:58PM | **7** |
| 01:31:04PM | **8** |
| 01:31:08PM | **9** |
| 01:31:10PM | **10** |
| 01:31:12PM | **11** |
| 01:31:15PM | **12** |
| 01:31:21PM | **13** |
| 01:31:23PM | **14** |
| 01:31:29PM | **15** |
| 01:31:32PM | **16** |
| 01:31:36PM | **17** |
| 01:31:37PM | **18** |
| 01:31:43PM | **19** |
| 01:31:45PM | **20** |
| 01:31:49PM | **21** |
| 01:31:55PM | **22** |
| 01:31:59PM | **23** |
| 01:32:00PM | **24** |
| 01:32:01PM | **25** |

THE COURT:  I'm going to have -- you're going to have to just give me 24 hours on that one.

All right.  Permanent alopecia -- oh, wait.  Let me see.

7652, Motion in Limine to Preclude Testimony and Evidence Regarding Instances of Permanent Alopecia Among Those Prescribed Taxotere by Sanofi's Experts.  Mr. Nolen.

MR. NOLEN:  Yes, Rand Nolen for Barbara Earnest.

Your Honor, this is an extremely simple motion in limine.  It's just is designed to preclude the expert from coming in and essentially vouching for the drug and saying, "Well, in my clinical experience, I have treated a thousand patients with Taxotere and I've never seen even one instance of hair loss," which is exactly what Dr. Glaspy did in his deposition and Dr. Miletello says he has 33 --

THE COURT:  Did Dr. Miletello treat Ms. Earnest?

MR. NOLEN:  No.

In 33 years of treating patients, he's not seen a single case of permanent hair loss and yet in that same expert -- in his expert report, he identifies I think 11 chemotherapy drugs that induce in his view permanent hair loss and he lists them all out.  But apparently he's treated thousands and never seen it.

The problem is obvious, Your Honor, which is these are -- this is anecdotal-type evidence and anecdotal-type

| | | |
|---|---|---|
| 01:32:05PM | 1 | evidence -- |
| 01:32:05PM | 2 | THE COURT:  Let me ask this question -- |
| 01:32:05PM | 3 | MR. NOLEN:  Yes -- |
| 01:32:06PM | 4 | THE COURT:  -- because I agree it's anecdotal.  But I |
| 01:32:12PM | 5 | have to tell you, I think perhaps with Dr. Carinder it might |
| 01:32:16PM | 6 | be pertinent. |
| 01:32:19PM | 7 | MR. NOLEN:  Oh, I think it's very important with |
| 01:32:22PM | 8 | Dr. Carinder. |
| 01:32:22PM | 9 | THE COURT:  I think -- as I'm looking at it, I'm not |
| 01:32:25PM | 10 | inclined to allow anecdotal evidence by experts.  I think we |
| 01:32:29PM | 11 | have to look at scientific reports.  But I believe that when |
| 01:32:33PM | 12 | people are visiting with their doctor oftentimes they say, |
| 01:32:38PM | 13 | well, what about you?  Have you had patients with this when a |
| 01:32:41PM | 14 | risk is portrayed? |
| 01:32:44PM | 15 | MR. NOLEN:  Your Honor, in a failure-to-warn case and |
| 01:32:46PM | 16 | you have a treating physician, I think that the information |
| 01:32:49PM | 17 | available or known to the physician is going to be important |
| 01:32:53PM | 18 | regardless of what the experts have to say.  I think that |
| 01:32:56PM | 19 | that's directly relevant and we're not disputing that.  This |
| 01:33:00PM | 20 | is really aimed at the experts themselves. |
| 01:33:02PM | 21 | THE COURT:  Okay.  Let me hear from the defense. |
| 01:33:06PM | 22 | MR. RATLIFF:  Thank you, Your Honor.  Harley Ratliff |
| 01:33:10PM | 23 | on behalf of Sanofi. |
| 01:33:11PM | 24 | Your Honor, as it relates to Dr. Glaspy expert |
| 01:33:14PM | 25 | oncologist, Dr. Miletello, our expert oncologist, their |

01:33:18PM  1    clinical experience, their clinical experience, is exactly

01:33:20PM  2    the type of evidence that an expert can rely on in rendering

01:33:24PM  3    their opinion.  Those opinions were not challenged under

01:33:27PM  4    Daubert, under 702 or 703.  So that type of clinical

01:33:31PM  5    experience, as long as it's married with the data that they

01:33:34PM  6    have looked at and both of those experts looked at the exact

01:33:38PM  7    same type of data as plaintiff's expert, said that is

01:33:40PM  8    confirmatory.  This data is similar to what we have seen in

01:33:44PM  9    our experience over 30 years of treating breast cancer

01:33:47PM 10    patients.

01:33:49PM 11            And, Your Honor, the other part of that is this --

01:33:50PM 12    what they call anecdotal evidence --

01:33:51PM 13            THE COURT:  How is it not anecdotal evidence?

01:33:53PM 14            MR. RATLIFF:  It is part of their clinical experience

01:33:55PM 15    which underlies their opinions.  It's the same type of

01:33:59PM 16    clinical experience that plaintiff's experts, Dr. Bosserman,

01:34:02PM 17    who talked about the number of patients that she has seen

01:34:05PM 18    over 20, 25 years, who had what she considered permanent hair

01:34:09PM 19    loss; two, it's very similar to the type of clinical

01:34:13PM 20    experience that Dr. Tosti relied upon in rendering her

01:34:16PM 21    specific causation diagnosis as it related to Barbara Earnest

01:34:20PM 22    saying, "Well, I have treated patients before who have

01:34:23PM 23    permanent hair loss from chemotherapy, so I know it's

01:34:25PM 24    Taxotere."  So if -- that information as it relates to Glaspy

01:34:29PM 25    and Miletello who says, in my clinical experience, this is

01:34:32PM  1   what I see in the real world, this is how many times I

01:34:35PM  2   actually see this type of condition with my patients with

01:34:37PM  3   treating these types of patients, then that information goes

01:34:38PM  4   and certainly Dr. Tosti's clinical experience, her anecdotal

01:34:43PM  5   experience with her patients, the number of patients she's

01:34:47PM  6   treated with what she calls permanent hair loss due to

01:34:50PM  7   Taxotere, then that has to go as well.  So either it all goes

01:34:54PM  8   or it all comes in.

01:34:55PM  9        But, Your Honor, this is exactly the type of evidence

01:34:58PM  10  that experts rely on time and time again.  It's part of the

01:35:01PM  11  foundation for expert opinions for medical practitioners.

01:35:05PM  12  I'm surprised this is even an issue in dispute with their

01:35:09PM  13  motion *in limine*, particularly given the amount of quote

01:35:11PM  14  "anecdotal evidence" that is relied on by Dr. Bosserman,

01:35:17PM  15  Dr. Feigal, Dr. Tosti and Dr. Thompson.  So it is the same

01:35:18PM  16  type of information that their experts have said, "Well, this

01:35:21PM  17  is what I've seen in my experience; this supports my

01:35:25PM  18  opinion."  It's exactly what our experts are doing.  So

01:35:28PM  19  either it comes in or it does not -- or it goes out on either

01:35:30PM  20  side.

01:35:35PM  21       THE COURT:  I think my -- Dr. Tosti is not an

01:35:41PM  22  oncologist.

01:35:43PM  23       MR. RATLIFF:  Correct.  She is a dermatologist.

01:35:45PM  24       THE COURT:  Right, who treats hair conditions.

01:35:49PM  25       MR. RATLIFF:  And these are oncologists who treat

01:35:52PM  **1**  breast cancer patients and who prescribe it and see these

01:35:56PM  **2**  types of conditions in the real world every day just like

01:35:58PM  **3**  Dr. Tosti is going to say.

01:36:00PM  **4**      Your Honor, essentially, they want to have their cake

01:36:02PM  **5**  and eat it too.  They will say defendant's experts cannot

01:36:05PM  **6**  rely on their clinical experience to talk about that to a

01:36:08PM  **7**  jury, but our experts, Your Honor, our experts, get to rely

01:36:10PM  **8**  on our clinical experience.  It's very similar to most of

01:36:13PM  **9**  their motions in limine.  They say defendants don't get to

01:36:15PM  **10**  talk about this.  Our experts do get to talk about this.  So

01:36:17PM  **11**  there is a matter of kind of fairness in terms of --

01:36:21PM  **12**      THE COURT:  I'm trying to remember.  I don't remember

01:36:23PM  **13**  Dr. Feigal saying anything about in her experience -- because

01:36:27PM  **14**  there was a great deal of information provided that

01:36:30PM  **15**  Dr. Feigal didn't treat breast cancer patients.  So that's --

01:36:34PM  **16**  there was nothing about her clinical -- and I don't remember

01:36:37PM  **17**  Dr. Bosser --

01:36:39PM  **18**      MR. RATLIFF:  Dr. Bosserman, it is in her deposition,

01:36:41PM  **19**  Your Honor.  She talks about the fact that she has treated

01:36:43PM  **20**  thousands of breast cancer patients --

01:36:43PM  **21**      THE COURT:  But was that in a report?

01:36:45PM  **22**      MR. RATLIFF:  It's not in her report.  It was part of

01:36:46PM  **23**  a deposition.

01:36:47PM  **24**      THE COURT:  So it's not -- you can ask all kinds of

01:36:50PM  **25**  questions in a deposition.  It doesn't mean it's in the

01:36:53PM  1    report and it's coming in.  I have to tell you, I find it

01:36:58PM  2    problematic.  I think, you know, everybody else is relying on

01:37:02PM  3    the statistical information and one doctor may have this

01:37:07PM  4    experience, another doctor may have this experience and what

01:37:10PM  5    you're doing is you're gathering a broad array of statistical

01:37:17PM  6    data and from that, you form opinions.  Now, I have to tell

01:37:19PM  7    you, I think if Dr. Carinder said, listen, I've never -- and

01:37:21PM  8    he's having a conversation with this patient and he warns

01:37:24PM  9    about permanent alopecia and she says, well, tell me what's

01:37:27PM  10   your experience.  I think that's -- that's absolutely coming

01:37:31PM  11   in.

01:37:32PM  12          MR. RATLIFF:  Your Honor, what I would say though is

01:37:34PM  13   if these experts' entire opinion was based on simply in my

01:37:38PM  14   clinical X, therefore, my opinion is Y, that would be one

01:37:43PM  15   thing.  But Dr. Glaspy and Dr. Miletello's opinions are not

01:37:46PM  16   built entirely on a foundation of their clinical

01:37:47PM  17   experience which they --

01:37:47PM  18          THE COURT:  Unfortunately, I don't have their reports

01:37:50PM  19   so I don't know.

01:37:50PM  20          MR. RATLIFF:  -- which they can rely on.  The reason

01:37:51PM  21   you do not have their reports is because they didn't

01:37:53PM  22   challenge them under Daubert --

01:37:54PM  23          THE COURT:  I know and that's my question here.  Is

01:37:55PM  24   this a Daubert challenge?

01:37:57PM  25          MR. RATLIFF:  This is absolutely a Daubert challenge.

01:38:02PM **1**   If they said this is the type of information that these

01:38:03PM **2**   experts cannot rely upon, it's not a reliable methodology,

01:38:04PM **3**   it's not reliable data, and the reason, Your Honor, they did

01:38:07PM **4**   not do that is because they know they would have lost that

01:38:10PM **5**   Daubert challenge because this case after case after case

01:38:12PM **6**   says a doctor's clinical experience as long as it is married

01:38:16PM **7**   with the data and supported by the data, which it is, which

01:38:20PM **8**   both of our experts looked at the data in their clinical

01:38:24PM **9**   experience, it comes in.  They didn't challenge that under

01:38:26PM **10**   Daubert, Your Honor.  And we obviously had a lot of Daubert

01:38:30PM **11**   motions on both sides.  They left that to this one discrete

01:38:35PM **12**   two-page motion *in limine* that doesn't even cite a single

01:38:39PM **13**   case law.  And it basically says, "Well, if you let it come

01:38:42PM **14**   in, we at least want to challenge it on cross-examination."

01:38:46PM **15**   Sure.  Challenge it on cross-examination.  That's exactly

01:38:48PM **16**   what should be done.  They don't like that type of

01:38:52PM **17**   information.  If they thought it was unreliable --

01:38:53PM **18**          THE COURT:  Okay.  I got it.

01:38:53PM **19**          MR. RATLIFF:  Okay.

01:38:54PM **20**          THE COURT:  Thank you.

01:38:57PM **21**          Why wasn't this -- Mr. Nolen, why wasn't this a

01:39:04PM **22**   Daubert challenge?

01:39:07PM **23**          MR. NOLEN:  Your Honor, their experts don't say that

01:39:11PM **24**   this is part of the basis for an opinion.  What they do is

01:39:14PM **25**   they offer it as a fact.  This is just sort of a fact, a fact

01:39:20PM 1    of my -- of my work as an oncologist.  I treat these patients

01:39:24PM 2    and I've treated lots of patients and I've not seen it.  But

01:39:29PM 3    belying that fact is, of course, in Dr. Glaspy's case, he

01:39:35PM 4    says, "I've treated thousands of patients and I've not seen

01:39:39PM 5    it, but, oh, by the way, here's 11 drugs that cause permanent

01:39:44PM 6    alopecia, all of which I prescribe."  And so he doesn't say

01:39:49PM 7    the basis for my opinion or a basis for my opinion is my

01:39:52PM 8    clinical experience in terms of the opinion that Taxotere

01:39:55PM 9    doesn't cause permanent alopecia.  He says part of my general

01:39:59PM 10   training, experience, knowledge, comes from my clinical

01:40:02PM 11   practice, but he doesn't say the basis for my opinion on

01:40:05PM 12   Taxotere not being related to permanent alopecia is my own

01:40:11PM 13   personal experience.  And so we go down a -- literally we

01:40:13PM 14   talk about rabbit trails all the time in court.  We go down a

01:40:18PM 15   rabbit trail.  Because here is an area where we have not

01:40:21PM 16   reviewed his patient population.  We have not done discovery

01:40:25PM 17   in that regard.  We've not analyzed those files.  We've not

01:40:29PM 18   had any of them looked at to see, in fact, if some of his

01:40:34PM 19   patients do, in fact, have permanent alopecia and whether or

01:40:38PM 20   not it is arguably at least related to Taxotere.  So we just

01:40:42PM 21   don't even have the discovery on that, nor would we ever want

01:40:45PM 22   to go down that path.

01:40:46PM 23           THE COURT:  Okay.  Thank you.

01:40:47PM 24           All right.  Let's take the next one.  I will tell

01:40:49PM 25   you, I'm not inclined to allow it.  I'll look some more

01:40:55PM  1    because my thought is that that's not part of some study.

01:40:58PM  2    It's not part of some review.  It's anecdotal evidence.  I

01:41:02PM  3    believe it would be certainly pertinent with Dr. Carinder.

01:41:07PM  4         MR. RATLIFF:  Your Honor --

01:41:08PM  5         THE COURT:  I don't want any more argument.

01:41:08PM  6         MR. RATLIFF:  Okay.

01:41:10PM  7         THE COURT:  But I'll look at it.  Thank you.

01:41:13PM  8         7651, there is Motion *in Limine* to Preclude Testimony

01:41:22PM  9    and Evidence Regarding Other Chemotherapy Medications or

01:41:25PM  10   Medical Conditions That Purportedly Cause Permanent Hair

01:41:29PM  11   Loss.

01:41:29PM  12        Mr. Schanker.

01:41:31PM  13        MR. SCHANKER:  So, yes, Your Honor.  As you're well

01:41:33PM  14   aware, Barbara Earnest took Taxotere, also took A and C

01:41:38PM  15   Adriamycin and Cytoxan.  And the defense offers no expert

01:41:43PM  16   opinion in this case that A caused her permanent alopecia.

01:41:49PM  17   The defense offers no expert opinion in this case that C

01:41:53PM  18   caused Barbara Earnest's permanent alopecia.  And so simply

01:41:57PM  19   they should not be able to argue that in this case.

01:42:00PM  20        There was no Daubert motion filed on this because

01:42:02PM  21   there was no opinion elicited.  And the reason I'm presuming

01:42:06PM  22   there was no opinion elicited is because there's no

01:42:10PM  23   scientific foundation that A or C causes either from a

01:42:13PM  24   general standpoint or certainly not in a case-specific

01:42:16PM  25   standpoint here.  There are cases that have been reported,

01:42:20PM 1    cases of permanent alopecia --

01:42:23PM 2          THE COURT:  But that would certainly be fodder for

01:42:27PM 3    cross-examination for your expert.  This is what I'm

01:42:30PM 4    thinking.  This is what my notes say.  Plaintiff has the

01:42:33PM 5    burden of proof.  You have the burden of proof on causation

01:42:36PM 6    and the defendants have to challenge that.  Now, I think they

01:42:41PM 7    have to have a good faith basis for the challenge.  I

01:42:47PM 8    think -- you can't throw out just speculative questions on

01:42:54PM 9    cross-examination.  It's got to be a good faith basis for you

01:42:58PM 10   to question the expert, but I think they're going to have to

01:43:02PM 11   be able to question your experts about other chemotherapy

01:43:06PM 12   drugs that were prescribed to Ms. Earnest and whether or not

01:43:10PM 13   those caused permanent alopecia and I'm not going to preclude

01:43:15PM 14   them from -- from challenging your causation experts.

01:43:22PM 15         MR. SCHANKER:  And, Your Honor, I think specifically

01:43:25PM 16   we're thinking about whether it be in opening statement or at

01:43:27PM 17   other times at trial to try to infer that there is some sort

01:43:31PM 18   of causation analysis that's taking place when there

01:43:35PM 19   absolutely has not been.  There's no evidence in this case

01:43:37PM 20   that A or C, none presented by any expert, that A or C caused

01:43:42PM 21   it.  Certainly I understand what you're saying about

01:43:45PM 22   cross-examination and, obviously, it's different.  Did T

01:43:47PM 23   cause it?  Did Taxotere cause it?  But there does need to be

01:43:52PM 24   a good faith basis that A or C did and, obviously, we can

01:43:55PM 25   watch that closely on cross-examination.  But some sort of

```
01:43:59PM   1    statement in opening --

01:43:59PM   2        THE COURT:  You're thinking opening statement it's

01:44:02PM   3    appropriate that you're going to hear their experts are going

01:44:05PM   4    to have to admit this drug can cause permanent alopecia as

01:44:10PM   5    well.

01:44:10PM   6        MR. SCHANKER:  With regard to Taxotere?  That we as

01:44:13PM   7    plaintiffs?

01:44:13PM   8        THE COURT:  Yeah.  I forget the names of them.  But

01:44:16PM   9    on opening statement, if they're going to say you're going to

01:44:21PM  10    hear from their -- I don't need to give the opening

01:44:24PM  11    statement, but that you will hear from their experts and

01:44:27PM  12    their experts are going to have to admit this too.  You think

01:44:32PM  13    that's improper?

01:44:32PM  14        MR. SCHANKER:  Well, our expert doesn't admit that --

01:44:32PM  15        THE COURT:  Well --

01:44:36PM  16        MR. SCHANKER:  It admits that -- as you're well

01:44:37PM  17    aware, Your Honor, the difference between association and

01:44:38PM  18    causation.

01:44:38PM  19        THE COURT:  Right.  Right.  Okay.

01:44:39PM  20        MR. SCHANKER:  So that's really where we're drawing

01:44:40PM  21    the line, any inference that there's any evidence whatsoever

01:44:43PM  22    in this case with regard to A or C specifically causing and

01:44:47PM  23    there's another plank to our argument concerning other

01:44:52PM  24    chemotherapy drugs that plaintiff did not take --

01:44:56PM  25        THE COURT:  Well, that doesn't -- no.
```

01:44:57PM   1          MR. SCHANKER:  Right.  That there shouldn't be

01:45:00PM   2   evidence introduced with regard to all these other

01:45:03PM   3   chemotherapy drugs that might have -- might cause permanent

01:45:06PM   4   hair loss.  Those have not been put under the microscope so

01:45:10PM   5   to speak with any kind of causation analysis and are wholly

01:45:13PM   6   irrelevant in this case as to whether or not they can or

01:45:17PM   7   specifically do cause.  And that's really what our position

01:45:19PM   8   is that we're putting before you concerning other

01:45:20PM   9   chemotherapy drugs.

01:45:23PM  10          THE COURT:  Okay.  Thank you.  Mr. Ratliff.

01:45:26PM  11          MR. RATLIFF:  Your Honor, I can keep this short if

01:45:29PM  12   you intend to deny their motion, but would you like to hear

01:45:32PM  13   argument from me?

01:45:34PM  14          THE COURT:  You can keep it short.  But I think this

01:45:36PM  15   is -- I will tell you and maybe I don't think array of drugs

01:45:43PM  16   that are unrelated has anything to do with whether or not

01:45:46PM  17   this plaintiff was warned about this particular drug and I

01:45:49PM  18   will not allow that.  I would think as I indicated there has

01:45:54PM  19   to be a good faith basis for the question.  But I think we

01:45:59PM  20   all know the rules and that's -- you cannot just make up a

01:46:03PM  21   fact and throw it in in cross-examination to throw the stink

01:46:07PM  22   in a jury box.

01:46:09PM  23          MR. RATLIFF:  Absolutely, Your Honor.

01:46:09PM  24          So I'm going to take Mr. Schanker's argument in kind

01:46:12PM  25   of two parts.  One, our expert, our dermatology expert,

| | | |
|---|---|---|
| 01:46:17PM | 1 | Dr. Shapiro, he absolutely concludes that you cannot rule out |
| 01:46:17PM | 2 | Adriamycin or cyclophosphamide as potential causes or causes |
| 01:46:24PM | 3 | of Ms. Earnest's permanent hair loss. |
| 01:46:24PM | 4 | THE COURT:  Okay. |
| 01:46:26PM | 5 | MR. RATLIFF:  Likewise, he says you cannot rule out |
| 01:46:32PM | 6 | Arimidex, an aromatase inhibitor that she has been on for the |
| 01:46:33PM | 7 | last ten years.  He says you cannot rule that out.  Now, |
| 01:46:36PM | 8 | their expert, Dr. Tosti, says, "I did rule that out."  So, |
| 01:46:40PM | 9 | obviously, we get to -- that is fodder for our |
| 01:46:40PM | 10 | cross-examination as to whether her differential diagnosis is |
| 01:46:44PM | 11 | credible and it's certainly something that our expert, which |
| 01:46:47PM | 12 | they did not -- again, did not challenge our expert.  So all |
| 01:46:50PM | 13 | you're hearing is their characterization of his report in his |
| 01:46:52PM | 14 | deposition. |
| 01:46:54PM | 15 | THE COURT:  I think -- you need any more from me? |
| 01:46:56PM | 16 | MR. RATLIFF:  I guess the last thing I would say, |
| 01:46:57PM | 17 | Your Honor, that gave me a little bit of concern was when |
| 01:47:00PM | 18 | Mr. Schanker said, "Well, other medications that she did not |
| 01:47:03PM | 19 | take, other chemotherapy that she did not take, they should |
| 01:47:07PM | 20 | not be allowed to talk about those."  We absolutely have to |
| 01:47:10PM | 21 | be able to talk about those, Your Honor, because it goes to |
| 01:47:13PM | 22 | was there an alternative that was risk-free as it related to |
| 01:47:15PM | 23 | hair loss. |
| 01:47:15PM | 24 | THE COURT:  Well, if all -- that's a different |
| 01:47:18PM | 25 | matter.  But if you're on -- I'm not going to allow you to |

```
01:47:23PM   1    talk about drugs that have nothing to do with this case,
01:47:28PM   2    other chemotherapy drugs unrelated to Ms. Earnest are not --
01:47:35PM   3    you're not going to be able to talk about their risk of
01:47:39PM   4    permanent alopecia.  Now, if -- if Dr. Carinder in his
01:47:44PM   5    testimony says these were the options and if she had concern
01:47:49PM   6    about it, I would have recommended these things I think, of
01:47:53PM   7    course, then the risk of permanent alopecia as to those drugs
01:47:59PM   8    would be pertinent.  What do you not understand?
01:48:02PM   9            MR. RATLIFF:  Here is, I think, the fundamental
01:48:05PM   10   concern, Your Honor, and let's talk about just one of those
01:48:07PM   11   chemotherapies, taxol.  They're going to get up in opening
01:48:12PM   12   statements and say Ms. Earnest had another choice.  She had
01:48:16PM   13   another choice.  It was taxol.  And it was risk-free and it
01:48:19PM   14   didn't have the risk of permanent hair loss.  We absolutely
01:48:24PM   15   should be able to put in evidence that taxol also has a risk
01:48:26PM   16   of permanent hair loss, which every single one of their
01:48:28PM   17   experts, Dr. Plunkett, Dr. Thompson, and Dr. Tosti --
01:48:28PM   18           THE COURT:  Didn't I just say that?
01:48:30PM   19           MS. SASTRE:  She said we could.
01:48:34PM   20           MR. RATLIFF:  Okay.  Okay.
01:48:34PM   21           THE COURT:  I just said you could.  I don't know --
01:48:36PM   22   You're not listening to me.
01:48:36PM   23           MS. SASTRE:  He's like this sometimes.  Harley, sit
01:48:40PM   24   down.
01:48:41PM   25           MR. RATLIFF:  Okay.
```

01:48:41PM   1          THE COURT:  Sit down.

01:48:41PM   2          MS. SASTRE:  You did good.

01:48:41PM   3          THE COURT:  If it's relevant, it comes in.  If and

01:48:44PM   4   only if it's relevant.  How about that.  Okay.

01:48:53PM   5          So 7651, I don't know how to -- because I think I

01:48:57PM   6   granted it in part as to those chemotherapy drugs -- poor

01:49:05PM   7   Emmy is trying to figure this out -- as to those chemotherapy

01:49:07PM   8   drugs that are not related to the litigation in question.

01:49:11PM   9   But those drugs that Ms. Earnest is taking, has taken, that

01:49:19PM  10   they can explore, the risk, the permanent alopecia, and those

01:49:25PM  11   drugs that were presented as alternatives are certainly

01:49:30PM  12   appropriate.

01:49:32PM  13          MS. SASTRE:  Or would have been presented as an

01:49:34PM  14   alternative based upon Dr. Carinder's testimony.

01:49:37PM  15          THE COURT:  Right.

01:49:38PM  16          MS. SASTRE:  Understood.

01:49:39PM  17          THE COURT:  We're going to have to get in my view

01:49:43PM  18   into that room with Dr. Carinder and Ms. Earnest and what

01:49:50PM  19   that conversation would have looked like.

01:49:53PM  20          Okay.  7649, which is Taxol with enhanced neuropathy.

01:50:03PM  21   It is Motion *in Limine* to Exclude That Taxol Would Have

01:50:09PM  22   Enhanced the Severity of Plaintiff's Neuropathy.

01:50:13PM  23          Mr. Schanker:  Yes, Your Honor.  So Dr. Miletello,

01:50:16PM  24   the defense oncologist, clearly states in the deposition that

01:50:23PM  25   he has no idea when trying to look into a crystal ball if

01:50:29PM   1   Barbara Earnest had taken taxol, whether her -- she would

01:50:32PM   2   have neuropathy at all or whether she would have worse

01:50:37PM   3   neuropathy or the same neuropathy that she currently suffers

01:50:46PM   4   from.  And one of the things we've seen in several of the

01:50:47PM   5   defense depositions is this idea that taxol can cause

01:50:51PM   6   significant neuropathy.  Some folks get it.  Some folks

01:50:55PM   7   don't.  There's some studies --

01:50:56PM   8        THE COURT:  But wouldn't that have been part of the

01:50:58PM   9   conversation with Dr. Carinder and Ms. Earnest?  And I think

01:51:00PM  10   --

01:51:00PM  11        Mr. Schanker:  Absolutely.  That's absolutely --

01:51:02PM  12   sorry to interrupt, Your Honor.

01:51:04PM  13        THE COURT:  Well, I will tell you what my notes say.

01:51:08PM  14   I think Dr. Carinder may testify as his recommendation of

01:51:15PM  15   Docetaxel -- because I believe Dr. Carinder said that he

01:51:20PM  16   thought Docetaxel was better because of the risk of

01:51:25PM  17   neuropathy.  Now, Dr. Carinder, I don't think anybody can say

01:51:28PM  18   she would have had anything, but I believe that that was his

01:51:31PM  19   concern, the risk.  And so I don't know how that doesn't come

01:51:37PM  20   in with Dr. Carinder's concern.

01:51:42PM  21        Mr. Schanker:  Certainly, Your Honor, and we agree.

01:51:44PM  22   Risk of neuropathy is certainly a conversation that

01:51:47PM  23   Dr. Carinder had with Barbara Earnest, and so we're not

01:51:50PM  24   trying to excise the word "neuropathy" from this courtroom.

01:51:55PM  25   But any inference that she would have worse neuropathy today,

01:51:58PM  1    there's no medical expert that's coming in and saying, well

01:52:00PM  2    --

01:52:00PM  3          THE COURT:  Let me see if the defendants really want

01:52:04PM  4    to do that because that's not what I believe.

01:52:08PM  5          Mr. Moore?

01:52:08PM  6          Mr. MOORE:  Yes, Your Honor.  We've offered expert

01:52:11PM  7    opinions -- sorry, Douglas Moore on behalf of Sanofi --

01:52:15PM  8    expert opinions from Dr. Miletello and Dr. Glaspy indicating

01:52:19PM  9    that the risk of neuropathy is higher and that the neuropathy

01:52:23PM  10   that is experienced is debilitating.  Dr. Carinder himself

01:52:29PM  11   described it as daunting.  He testified that the risk of

01:52:32PM  12   neuropathy is greater with Paclitaxel than with Taxotere.

01:52:37PM  13   That's the evidence that we would be offering on the issue of

01:52:40PM  14   neuropathy.

01:52:41PM  15         Your Honor indicated in your learned-intermediary

01:52:45PM  16   ruling that that's what this jury has to decide, whether she

01:52:48PM  17   would have chosen to take this medicine despite her

01:52:51PM  18   neuropathy.  The fact that all of these -- their own treating

01:52:55PM  19   physician and these experts have opined that if there's a

01:52:57PM  20   greater risk and greater severity with taxol is certainly

01:53:00PM  21   relevant to what's happening in that room, as Your Honor put

01:53:03PM  22   it.

01:53:04PM  23         In terms of whether she would have had it, I think

01:53:07PM  24   what he's referring to is Dr. Miletello's testimony and

01:53:10PM  25   Dr. Glaspy talks about it as well and that is she experienced

01:53:14PM **1**   some neuropathy-type symptoms from Taxotere or she

01:53:18PM **2**   experienced it.  Whether it's caused by Taxotere, whether

01:53:20PM **3**   it's caused by her prediabetic state, whether it's just

01:53:24PM **4**   idiopathic, that was something she experienced.  And if that

01:53:27PM **5**   was caused or related to her use of Taxotere, the testimony

01:53:30PM **6**   of these experts is, she definitely would have had it from

01:53:35PM **7**   taxol, and it would have been worse.

01:53:39PM **8**        THE COURT:  Wait a minute.  I thought the issue in

01:53:41PM **9**   this case was what the prescribing decision would have been

01:53:46PM **10**  based upon their conversation and then for us to then

01:53:52PM **11**  determine -- well, because in the room, in the room, with

01:54:01PM **12**  Ms. Earnest and Dr. Carinder, those are the people in the

01:54:08PM **13**  room.  And then the prescribing decision is based upon what

01:54:11PM **14**  occurred in that room.  Does it matter if Taxotere caused

01:54:15PM **15**  neuropathy?  Now we know after the fact it would have been

01:54:18PM **16**  worse.  That doesn't -- I don't see how that's relevant.

01:54:24PM **17**       Mr. MOORE:  I think it's relevant to the question of

01:54:26PM **18**  what would have been in Dr. Carinder's mind, what would he

01:54:30PM **19**  have shared --

01:54:30PM **20**       THE COURT:  Well, he wouldn't have looked at what she

01:54:33PM **21**  had after Taxotere because that's --

01:54:35PM **22**       Mr. MOORE:  So if the options were taxol, which has a

01:54:38PM **23**  higher risk and that the neuropathy that you develop is more

01:54:42PM **24**  severe, that's certainly relevant to the decisionmaking at

01:54:45PM **25**  that point in time, the discussion he would have with her

01:54:48PM  1    regardless of what this label says as it relates to --

01:54:51PM  2         THE COURT:  I agree with you.

01:54:51PM  3         MR. MOORE:  -- hair loss.  Correct.

01:54:51PM  4         THE COURT:  What I don't agree with you is the fact

01:54:54PM  5    that she developed neuropathy post-Taxotere and so it

01:54:59PM  6    certainly would have been worse.  That to me is absolutely

01:55:02PM  7    irrelevant because it doesn't matter at that point.  The

01:55:05PM  8    decision has been made.

01:55:07PM  9         Mr. MOORE:  I think -- well, our position --

01:55:08PM  10        THE COURT:  I think what's important is if she had

01:55:14PM  11   known, if they had known during the conversation that there

01:55:19PM  12   was a risk of permanent alopecia with Taxotere and there's a

01:55:25PM  13   risk of significant neuropathy with taxol, what would the

01:55:34PM  14   prescribing decision have been post-informed conversation

01:55:38PM  15   with the patient?  That's the kicker.

01:55:38PM  16        MR. MOORE:  Right.

01:55:45PM  17        THE COURT:  And then -- and then the issue is whether

01:55:47PM  18   or not Taxotere ultimately caused permanent alopecia in this

01:55:52PM  19   lady.  Whether or not she developed neuropathy from Taxotere

01:55:58PM  20   and you can say uh-huh, I told you, it would have been worse,

01:56:01PM  21   that was not something she could have in her mind or

01:56:06PM  22   Dr. Carinder would have had in his mind at that very moment.

01:56:11PM  23   And it doesn't --

01:56:12PM  24        Mr. MOORE:  Right.  I'm not suggesting that we put in

01:56:14PM  25   the crystal ball evidence, what would have definitely

01:56:18PM  1   happened.  The point that we think is relevant, and I think

01:56:22PM  2   you're agreeing with me is that the risk-benefit decision

01:56:24PM  3   between these two medicines at that point in time in that

01:56:27PM  4   room involves the risk, a higher risk of neuropathy and more

01:56:32PM  5   severe neuropathy.  That's Carinder's testimony.  That's our

01:56:34PM  6   expert's testimony.

01:56:34PM  7          THE COURT:  I wish I would have read these expert

01:56:43PM  8   reports.

01:56:43PM  9          MR. MICELI:  Your Honor --

01:56:43PM 10          THE COURT:  And, unfortunately, I didn't.

01:56:46PM 11          MR. MICELI:  Can I ask you with regard to this

01:56:48PM 12   argument, if you can defer at least until later in the day

01:56:51PM 13   because I think this issue arises again in defendant's

01:56:54PM 14   motion, our response to defendant motions 21 and 23 and we'll

01:56:59PM 15   be shedding a little bit of different light on this.

01:57:02PM 16          Mr. MOORE:  I don't know what light could be shed on

01:57:04PM 17   the risk-benefit decision of the risk associated with --

01:57:09PM 18          THE COURT:  I will tell you this.  For right now --

01:57:14PM 19   and if there's something that light will be shed on something

01:57:18PM 20   later, but as to Dr. Carinder the Court will allow defendants

01:57:23PM 21   to elicit testimony from Dr. Carinder about the risk of

01:57:27PM 22   neuropathy associated with taxol, highly relevant.  As I see

01:57:32PM 23   it, to find proximate causation, the jury will have to find

01:57:36PM 24   that Dr. Carinder's prescribing decision would have changed

01:57:40PM 25   if he had known of Taxotere's risk of permanent alopecia.  As

01:57:44PM   1   I previously ruled, Carinder's prescribing decision would

01:57:48PM   2   have been influenced by his conversations with Ms. Earnest.

01:57:54PM   3   If Ms. Earnest refused the treatment, Dr. Carinder's

01:58:00PM   4   prescribing decision would necessarily have been affected.  I

01:58:02PM   5   think the testimony has been that Ms. Earnest had a

01:58:05PM   6   pre-existing neuropathy?

01:58:07PM   7            Mr. MOORE:  That's right.

01:58:09PM   8            THE COURT:  And Dr. Carinder testified in deciding on

01:58:13PM   9   a treatment plan, he considers whether the patient has

01:58:17PM  10   existing neuropathy.  He said you have to look at what's in

01:58:19PM  11   front of you.  The jury will have to consider how

01:58:23PM  12   Dr. Carinder and Ms. Earnest would have weighed the risk and

01:58:23PM  13   benefits of her treatment options, the risk of -- neuropathy

01:58:28PM  14   associated with Taxotere is undoubtedly relevant to this

01:58:33PM  15   analysis.

01:58:33PM  16            What I'm not sure about, because I have not seen the

01:58:37PM  17   reports of Dr. Miletello and Dr. Glaspy, and so I'm not sure

01:58:47PM  18   where they're coming in.  But in my mind, in my mind, the

01:58:52PM  19   relevance is Dr. Carinder and Ms. Earnest and what that

01:58:58PM  20   conversation would have looked like.  If she walked in with a

01:59:02PM  21   pre-existing neuropathy, clearly he had to have the

01:59:07PM  22   conversation.

01:59:07PM  23            Mr. MOORE:  And both sides offer experts on the risks

01:59:10PM  24   and benefits of this medicine, the treatment regimens, breast

01:59:14PM  25   cancer, and so forth.  And so the testimony from our experts

01:59:17PM **1**   on this subject -- subject matter would be -- would not be

01:59:21PM **2**   beyond the scope of what Your Honor just described.

01:59:25PM **3**        Thank you.

01:59:27PM **4**        Mr. Schanker:  Very briefly, Your Honor.

01:59:30PM **5**        THE COURT:  Okay.  I just don't know -- you know,

01:59:33PM **6**   this is -- I'm very grateful I didn't have any more Daubert

01:59:43PM **7**   motions.  More than you know.  But it's very difficult for me

01:59:46PM **8**   to say anything about -- I will tell you, in my mind,

01:59:50PM **9**   clearly, unequivocally, Dr. Carinder's assessment of risk and

01:59:57PM **10**  benefit is clearly -- it is relevant.  It is critical.  I

02:00:03PM **11**  think it's at the core of this case.

02:00:03PM **12**       MR. SCHANKER:  I just --

02:00:06PM **13**       THE COURT:  But I'm not sure -- and what becomes

02:00:11PM **14**  problematic is I'm not sure -- I'm not sure of Miletello and

02:00:25PM **15**  Glaspy's context, because, again, I don't even know if it

02:00:36PM **16**  matters because what matters in my mind is what happened in

02:00:41PM **17**  that room and what more information, if more information,

02:00:51PM **18**  would have changed that conversation and the ultimate

02:00:55PM **19**  prescribing decision.

02:00:57PM **20**       Now, what Dr. Miletello would have -- would have

02:00:59PM **21**  prescribed, I don't know if it matters.  What Dr. Glaspy

02:01:07PM **22**  would have ultimately recommended, I'm not sure what it

02:01:11PM **23**  mattered -- if it matters.  Because I think then we get into

02:01:17PM **24**  standard of care.  I can tell you all are about to jump out

02:01:23PM **25**  of your skin --

02:01:23PM **1**          Mr. Schanker:  Understood --

02:01:23PM **2**          THE COURT:  -- on the other side.

02:01:24PM **3**          MR. SCHANKER:  Understood, Your Honor.  And just a

02:01:25PM **4**    point of clarification, then a brief question of

02:01:27PM **5**    clarification on your ruling order.  I am not aware of any

02:01:33PM **6**    evidence of pre-existing neuropathy and there was

02:01:36PM **7**    conversation about pre-existing neuropathy --

02:01:40PM **8**          THE COURT:  I thought --

02:01:40PM **9**          MR. SCHANKER:  And I've --

02:01:41PM **10**         THE COURT:  And that was my recollection --

02:01:41PM **11**         MR. SCHANKER:  -- and I've gone through --

02:01:42PM **12**         THE COURT:  -- is that she had pre-existing

02:01:44PM **13**   neuropathy.

02:01:45PM **14**         Mr. Schanker:  I just want to clarify that for the

02:01:48PM **15**   Court and, again, I have gone --

02:01:48PM **16**         THE COURT:  Under any circumstance, I think if

02:01:53PM **17**   Dr. Carinder's in the room with her and they're talking about

02:01:56PM **18**   what are the risk and benefits and he talks about

02:02:04PM **19**   debilitating neuropathy, I thought -- I thought my

02:02:06PM **20**   recollection was that she had some form of neuropathy and --

02:02:06PM **21**         MR. SCHANKER:  And then just --

02:02:09PM **22**         THE COURT:  Perhaps I'm mistaken.

02:02:11PM **23**         MR. SCHANKER:  Yes, Your Honor.

02:02:12PM **24**         And just kind of a point of clarification, really on

02:02:15PM **25**   the essence of what we were interested in this case is, you

| | | |
|---|---|---|
| 02:02:19PM | 1 | agreed that the fact -- whatever her status of neuropathy is |
| 02:02:23PM | 2 | today is irrelevant, that that evidence is in no way |
| 02:02:29PM | 3 | relevant, we know that Dr. -- Dr. Miletello -- |
| 02:02:32PM | 4 | THE COURT:  I think I talked about that last time. |
| 02:02:38PM | 5 | Or did I talk about this last time? |
| 02:02:40PM | 6 | Mr. MOORE:  Seems like a long time ago. |
| 02:02:43PM | 7 | MR. SCHANKER:  Yes.  Only yesterday. |
| 02:02:43PM | 8 | THE COURT:  I'm glad we're taking two minutes per -- |
| 02:02:47PM | 9 | MR. SCHANKER:  Yes.  And just a point of |
| 02:02:48PM | 10 | clarification, Your Honor, just the natural extension of your |
| 02:02:51PM | 11 | order is that it's irrelevant, the fact or lack of the |
| 02:02:53PM | 12 | neuropathy that she suffers from today because that in no way |
| 02:02:57PM | 13 | goes to the prescribing decision that would have been made. |
| 02:03:00PM | 14 | THE COURT:  I think that's making hindsight calls. |
| 02:03:04PM | 15 | MS. SASTRE:  Well, that's what they do, Judge. |
| 02:03:06PM | 16 | That's what this whole -- |
| 02:03:06PM | 17 | THE COURT:  Well -- |
| 02:03:08PM | 18 | MS. SASTRE:  Their whole case is Monday morning |
| 02:03:09PM | 19 | quarterback.  Right?  Their experts are basically going to |
| 02:03:10PM | 20 | say, you know what, if she had taken taxol, she'd have a lot |
| 02:03:14PM | 21 | more hair today.  That's basically what this whole case is |
| 02:03:18PM | 22 | about.  And the whole case is Monday morning quarter back. |
| 02:03:19PM | 23 | If Dr. Carinder had known something that he supposedly didn't |
| 02:03:23PM | 24 | know, and if Ms. Earnest had known something that she |
| 02:03:24PM | 25 | supposedly did something that -- that she didn't know -- |

| | | |
|---|---|---|
| 02:03:25PM | 1 | THE COURT:  I think the issue is -- |
| 02:03:25PM | 2 | MS. SASTRE:  They would have done something different |
| 02:03:25PM | 3 | -- |
| 02:03:28PM | 4 | THE COURT:  I think the issue is -- I don't know how |
| 02:03:36PM | 5 | to make it clearer.  I'm really struggling with this.  I |
| 02:03:41PM | 6 | think it's any time it's a failure-to-warn case, and in this |
| 02:03:46PM | 7 | circumstance, it's got to be what information was known at |
| 02:03:50PM | 8 | that time.  If this information was known at that time, would |
| 02:03:54PM | 9 | changes have been made, and not having that information, she |
| 02:04:00PM | 10 | chose this path and did this path cause her hair loss. |
| 02:04:06PM | 11 | MS. SASTRE:  Sure.  I agree with that, Your Honor. |
| 02:04:07PM | 12 | The only clarification, the only reason I stood up was that |
| 02:04:10PM | 13 | plaintiff's experts are going to talk about at length for two |
| 02:04:12PM | 14 | weeks the risks of Taxotere compared to the risks of taxol. |
| 02:04:16PM | 15 | And as Your Honor had said, look, Ms. Earnest has been |
| 02:04:20PM | 16 | questioned about if she was presented with an alternative, |
| 02:04:24PM | 17 | she said, "Look, I'd have to know about that other drug, |
| 02:04:26PM | 18 | right?"  I understand what the ruling is, but our experts |
| 02:04:28PM | 19 | likewise, Judge, should be entitled to talk about the risks |
| 02:04:31PM | 20 | of these medications.  The whole case is not just about one |
| 02:04:34PM | 21 | risk.  These are medications with significant risks and we're |
| 02:04:37PM | 22 | talking about a doctor that's trying to save someone's life |
| 02:04:40PM | 23 | and make the right prescribing decision.  I understand the |
| 02:04:43PM | 24 | question is what he would do if he had supposedly some |
| 02:04:46PM | 25 | information he didn't know that he needed to tell her more, |

02:04:48PM  1   right?  And I guess, again, we'll have to see what their

02:04:51PM  2   conversation is.  And what she would have done if she had

02:04:54PM  3   that information.  But the rest of it, as you have said,

02:04:56PM  4   "Well, what else would he have told you about the

02:04:58PM  5   medication?"  Our experts can't be handcuffed and not able to

02:05:01PM  6   talk about any of the risks of taxol and we only talk about

02:05:05PM  7   taxol in the context of hair loss.

02:05:07PM  8         THE COURT:  What I'm not going to allow your expert

02:05:10PM  9   to say is she suffered neuropathy -- there is a significant

02:05:15PM  10  risk of neuropathy with taxol because she suffers from

02:05:19PM  11  neuropathy now after taking Taxotere certainly it would have

02:05:24PM  12  been worse.  I'm not going to -- because that's -- that's

02:05:28PM  13  taking a step that's not relevant to this case.  And you're

02:05:33PM  14  saying -- are you not understanding?

02:05:35PM  15        MS. SASTRE:  I do.  And I'm fine with your ruling --

02:05:38PM  16        THE COURT:  I don't know.  I don't know very frankly

02:05:41PM  17  and we're going to have to have this conversation when this

02:05:45PM  18  quick oral argument is done.  That's tongue in cheek.

02:05:50PM  19        MS. SASTRE:  I got it.  I was smiling.

02:05:52PM  20        THE COURT:  Good.  When this oral argument is done as

02:05:56PM  21  to what Miletello and Glaspy are going to say, I have not

02:06:01PM  22  seen those reports.  What I will not allow them to say is

02:06:06PM  23  that her neuropathy would have been so much worse because,

02:06:11PM  24  look, she has it with Taxotere because that's something

02:06:15PM  25  nobody would have had that conversation with.  They would

02:06:18PM 1    have talked about taxol.  Now, I think you need to table the

02:06:22PM 2    rest of your conversation because I think I'm going to have

02:06:25PM 3    to have -- to see the reports.

02:06:28PM 4         MS. SASTRE:  Sure.  I think what you're saying is

02:06:30PM 5    that it would be speculative for someone to say that and I

02:06:34PM 6    just have two things very quickly to say.  Our experts would

02:06:37PM 7    say that that would be based upon their training, their

02:06:38PM 8    experience, their education.  They have an ability to say,

02:06:40PM 9    listen, if this was a patient, I can't read the future.

02:06:43PM 10   Right?  No one in this case is a fortunate teller, but I can

02:06:46PM 11   tell you within a reasonable degree of medical certainty that

02:06:50PM 12   this condition with taxol would have been worse.

02:06:52PM 13        And let me give you the flip side --

02:06:52PM 14        THE COURT:  I'm not going to allow you to do that.

02:06:55PM 15        MS. SASTRE:  But the flip side of the coin, Your

02:06:56PM 16   Honor, is they're going to line up expert after expert and

02:06:58PM 17   they are going to say if she had taken taxol she would have

02:07:02PM 18   more hair than she has today.  You talk about reading the

02:07:06PM 19   future?  That's something that nobody should be allowed to

02:07:08PM 20   testify to and it's the exact flip side of this coin, Judge.

02:07:12PM 21   It's no different.  That is Monday morning quarter-backing,

02:07:15PM 22   just as much.  It should be goose-gander, Your Honor.

02:07:20PM 23        THE COURT:  7659, this is Motion *in Limine* Excluding

02:07:31PM 24   Improper Arguments or Suggestions Regarding FDA Approval.

02:07:44PM 25        MR. MURA:  Good afternoon, Andre Mura.

| | | |
|---|---|---|
| 02:07:48PM | 1 | The thrust of this motion is that Sanofi's witnesses |
| 02:07:51PM | 2 | should not be permitted to state or imply that the FDA would |
| 02:07:54PM | 3 | have prohibited or did prohibit Sanofi from using stronger |
| 02:07:59PM | 4 | language in Taxotere's label before Earnest's treatment in |
| 02:08:03PM | 5 | 2011 because that countermands this Court's preemption ruling |
| 02:08:08PM | 6 | and preemption is a question for the Court, not the jury. |
| 02:08:12PM | 7 | And so there are two ways in which we tried to |
| 02:08:14PM | 8 | identify some testimony for the Court that we believe crosses |
| 02:08:16PM | 9 | the line.  I'll just read one.  It's testimony from Gina |
| 02:08:16PM | 10 | Vestea. |
| 02:08:21PM | 11 | She was asked:  Did you understand FDA to have |
| 02:08:23PM | 12 | rejected the language proposed by Sanofi from persistent |
| 02:08:28PM | 13 | alopecia with Taxotere? |
| 02:08:30PM | 14 | She testifies yes. |
| 02:08:31PM | 15 | If that sort of testimony is presented to the jury, |
| 02:08:33PM | 16 | it gives the impression that the FDA would have prohibited or |
| 02:08:37PM | 17 | did prohibit Sanofi from providing a stronger warning.  And, |
| 02:08:42PM | 18 | again, that's directly contrary to the preemption ruling and |
| 02:08:48PM | 19 | the preemption ruling is a question for the Court. |
| 02:08:50PM | 20 | *Albrecht* is crystal clear that these questions are no |
| 02:08:54PM | 21 | longer submitted to the jury.  All the legal decisions that |
| 02:08:57PM | 22 | are cited in the opposition are pre-*Albrecht* cases where it's |
| 02:09:00PM | 23 | in that era these sorts of questions were presented to the |
| 02:09:03PM | 24 | jury if you made it past summary judgment.  The jury would |
| 02:09:06PM | 25 | consider whether the FDA would have prohibited whether there |

02:09:09PM   1   was clear evidence, for example, that the FDA wouldn't have

02:09:14PM   2   approved the label.

02:09:15PM   3       And here's an example from *Albrecht* itself, which I

02:09:19PM   4   think may help the Court understand the dividing line here.

02:09:22PM   5   So there the Court says:  In litigation between a drug

02:09:25PM   6   consumer and drug manufacturer, the litigants may dispute

02:09:29PM   7   whether the drug manufacturer submitted all the material

02:09:31PM   8   information to the FDA.  Right?

02:09:33PM   9       And you had that dispute here.  The parties were

02:09:35PM   10  arguing about whether did the FDA receive everything, did the

02:09:38PM   11  FDA understand --

02:09:39PM   12      THE COURT:  I remember.

02:09:40PM   13      MR. MURA:  Yes.  And so the Court said:  But we

02:09:42PM   14  consider these factual questions to be subsumed within a

02:09:46PM   15  tightly described legal analysis and we do not believe that

02:09:50PM   16  they weren't submissioned (sic) alone or together with the

02:09:53PM   17  larger preemption question to a jury.

02:09:56PM   18      So what the Court said is this has to be an issue

02:09:58PM   19  that's decided by the Court.  It's now law of the case.  And

02:10:01PM   20  so our objection or motion *in limine* is really targeted

02:10:07PM   21  towards any suggestions or statements by expert witnesses of

02:10:11PM   22  Sanofi that the FDA would not have allowed us to warn in this

02:10:15PM   23  way.  Of course, Sanofi can put on arguments that the label

02:10:19PM   24  was adequate, but it cannot say that it was adequate because

02:10:23PM   25  the federal regulations would not have allowed it to update

02:10:27PM   1    the label.

02:10:28PM   2           THE COURT:  Thank you.

02:10:28PM   3           MR. MURA:  Thank you.

02:10:29PM   4           THE COURT:  Mr. Moore?

02:10:30PM   5           Mr. MOORE:  Thank you, Judge.

02:10:34PM   6           Couple of points, first, *Albrecht* doesn't say what

02:10:38PM   7    evidence is or is not admissible under any state's products

02:10:43PM   8    liability law.  And I'm reminding my colleagues -- and Dawn

02:10:49PM   9    and Palmer probably have to do it once in a while as well --

02:10:53PM   10   and that is that we're a civil law jurisdiction and there's a

02:10:56PM   11   statute for everything, whether it's in the code or in the

02:10:58PM   12   ancillaries.  It's in a book.  And when all else fails --

02:11:00PM   13          THE COURT:  I think the question is whether or not

02:11:06PM   14   the defendants will be allowed to put on evidence that the

02:11:10PM   15   FDA would not allow them to change the label.

02:11:15PM   16          Mr. MOORE:  We are not going to argue preemption in

02:11:20PM   17   front of the jury.  We're not going to argue that it was

02:11:23PM   18   impossible for us to have made the label change that they are

02:11:25PM   19   claiming we should have made.  But what we are going to do is

02:11:29PM   20   we are going to argue based on evidence in the case, based on

02:11:33PM   21   the facts that happened.

02:11:35PM   22          Because at some point, what happened has to be told

02:11:37PM   23   to the jury and we are a regulated industry.  The jury has to

02:11:40PM   24   decide -- and I'm reading from the LPLA -- a product is

02:11:44PM   25   unreasonably dangerous because an -- because an adequate

02:11:47PM   1   warning about the product has not been given if the product

02:11:50PM   2   possessed a characteristic that may cause damage and the

02:11:53PM   3   manufacturer failed to use reasonable care to provide an

02:11:58PM   4   adequate warning.  So the jury has to hear what happened and

02:12:02PM   5   then decide whether we acted reasonably.  And if you look at

02:12:06PM   6   this motion, it's not totally about us arguing preemption in

02:12:13PM   7   front of the jury.  They want to take the FDA out of the

02:12:16PM   8   case.  And the testimony that they gave, they gave it

02:12:19PM   9   yesterday afternoon in a reply memorandum and they attached

02:12:19PM   10  various pieces of testimony.  They're asking you to exclude

02:12:26PM   11  -- I'll just read you from Dr. Palatinsky's:  To your

02:12:27PM   12  knowledge, Dr. Palatinsky, was all of the safety information

02:12:31PM   13  from TAX 316 including the safety information regarding

02:12:33PM   14  alopecia, was that submitted to the FDA?

02:12:35PM   15         Answer:  Yes, it was.

02:12:36PM   16         Next question:  Did FDA raise any concerns?  Did they

02:12:40PM   17  ask you for a label change?  Did they ask you for a

02:12:43PM   18  follow-up?

02:12:43PM   19         Answer:  No.

02:12:44PM   20         Those are facts in this case that are relevant to

02:12:46PM   21  whether or not we acted reasonably in not providing the

02:12:50PM   22  warning that they say we should have provided.  We're not

02:12:53PM   23  going to ask -- we're not going to argue it was impossible --

02:12:54PM   24         THE COURT:  The fact that -- the fact that the FDA --

02:12:56PM   25  but does it matter whether or not the FDA asked you to change

02:13:02PM  1   your label?  I mean, that doesn't -- the FDA's compliance

02:13:07PM  2   doesn't have anything to do with your state law obligations.

02:13:11PM  3   That's what Albrecht was all about.

02:13:11PM  4       MR. MOORE:  Albrecht was --

02:13:14PM  5       THE COURT:  There is -- your statement obligation --

02:13:15PM  6   there's no evidence -- I mean, you still had an obligation if

02:13:20PM  7   you deemed a certain warning was appropriate.  That's always

02:13:24PM  8   in the manufacturer's lap.

02:13:28PM  9       MR. MOORE:  It is, but the jury is going to

02:13:29PM  10  understand how a drug label is changed, what information --

02:13:33PM  11      THE COURT:  What I think is misleading is, well, the

02:13:33PM  12  FDA didn't want us to change it, so we shouldn't change it

02:13:38PM  13  and I don't think that's --

02:13:39PM  14      Mr. MOORE:  I don't think that's what we're going to

02:13:41PM  15  say.

02:13:41PM  16      THE COURT:  Well, I'm very concerned --

02:13:41PM  17      MR. MOORE:  We're just going to have --

02:13:42PM  18      THE COURT:  -- about misleading the jury because the

02:13:44PM  19  reality is, you were not precluded from changing your label

02:13:50PM  20  because you never tried the CBE --

02:13:53PM  21      Mr. MOORE:  We, Your Honor, the CBD (sic) --

02:13:53PM  22      THE COURT:  CBD --

02:13:56PM  23      MR. MOORE:  -- regulation, the jury will have to hear

02:13:59PM  24  how a label is changed, what information was provided, what

02:14:03PM  25  information we had, what did we give to FDA, what did FDA say

02:14:05PM **1**   back to us about that; not that it was impossible for us to

02:14:09PM **2**   do it, not that FDA made a decision that it shouldn't be

02:14:11PM **3**   there but in assessing the reasonableness of what we --

02:14:14PM **4**         THE COURT:  What concerns me, Mr. Moore, is it sounds

02:14:17PM **5**   like you're throwing your burden right in the lap of the FDA

02:14:17PM **6**   --

02:14:17PM **7**         MR. MOORE:  I think --

02:14:20PM **8**         THE COURT:  -- and that's not accurate.

02:14:21PM **9**         Mr. MOORE:  I think it would be -- we would not be

02:14:26PM **10**  telling the jury the facts of the case if we did not tell the

02:14:30PM **11**  jury what happened with this label from the time the medicine

02:14:34PM **12**  came on the market until the time that Dr. Carinder wrote the

02:14:38PM **13**  prescription.  And the jury has to hear the facts of the

02:14:43PM **14**  case.  We're not going to argue that we were precluded from

02:14:46PM **15**  doing what they say we should have done, but the facts of the

02:14:47PM **16**  case involve FDA, the facts of the case involve FDA

02:14:51PM **17**  regulations.

02:14:52PM **18**        THE COURT:  Well, I think the facts of the case

02:14:54PM **19**  involve FDA regulations, I think the jury needs to know what

02:14:58PM **20**  the regulations provide, that you need to warn -- I think

02:15:00PM **21**  they're going to have to make a decision, whether it's a

02:15:02PM **22**  warning, whether it's an adverse event, what information was

02:15:04PM **23**  coming in at this time.  But what my concern is, what my

02:15:09PM **24**  concern is, is that somehow you're going to shift this burden

02:15:14PM **25**  to the FDA and it's always the manufacturer's burden.

02:15:19PM   **1**          Mr. MOORE:  It is a responsibility, Your Honor, to

02:15:21PM   **2**   provide information about the adverse events to FDA.  We have

02:15:29PM   **3**   responsibilities to make label changes.  We can do that under

02:15:30PM   **4**   the CBA -- CBE regulation pursuant to --

02:15:34PM   **5**          THE COURT:  Without --

02:15:35PM   **6**          MR. MOORE:  -- FDA ultimate approval --

02:15:35PM   **7**          THE COURT:  Now, ultimately the FDA has to approve

02:15:39PM   **8**   the change --

02:15:39PM   **9**          MR. MOORE:  Right.  Sure.  And all of that --

02:15:40PM   **10**          THE COURT:  -- and I get that.

02:15:41PM   **11**          Mr. MOORE:  All of that is relevant.  But there is

02:15:43PM   **12**   another piece to this because there is a pharmacovigilant

02:15:47PM   **13**   responsibility.  We do provide all of our safety information

02:15:50PM   **14**   every year to FDA and periodic safety update reports.  We

02:15:54PM   **15**   provide all of the adverse event reporting through the

02:15:58PM   **16**   pharmacovigilance division of the company.  All of those

02:16:01PM   **17**   things bear on the reasonableness --

02:16:02PM   **18**          THE COURT:  But you can't wait --

02:16:02PM   **19**          MR. MOORE:  -- of our actions.

02:16:05PM   **20**          THE COURT:  -- until the FDA tells you you need to

02:16:08PM   **21**   change your label.

02:16:09PM   **22**          Mr. MOORE:  That's true.  But the fact that they did

02:16:12PM   **23**   not ask us to when they had the authority to do it is

02:16:15PM   **24**   relevant --

02:16:16PM   **25**          THE COURT:  There you go --

02:16:16PM **1**          MR. MOORE:  -- to whether we were reasonable.

02:16:17PM **2**          THE COURT:  -- you're pushing it on them and it's the

02:16:19PM **3**    manufacturer's responsibility.  Am I -- maybe I'm --

02:16:22PM **4**          Mr. MOORE:  It is, but is it not relevant that all of

02:16:25PM **5**    the information that they say we should have based this label

02:16:29PM **6**    change on, is it not relevant that we gave all of that

02:16:32PM **7**    information to FDA and FDA had the power to ask us to follow

02:16:37PM **8**    up.  They had the power to ask us to make a label change and

02:16:41PM **9**    they never did.  Is that not relevant to the reasonableness

02:16:44PM **10**   of our actions, because it is in every drug case that I have

02:16:47PM **11**   ever tried.  Every drug case I have been involved in involves

02:16:51PM **12**   the FDA.  It involves what information did you share.  What

02:16:54PM **13**   did FDA say in response to it.  It doesn't take away our

02:16:58PM **14**   ability to change the label, but it is relevant in assessing

02:17:01PM **15**   the reasonableness of what we did based on the information

02:17:03PM **16**   that was available at the time.  The FDA could have asked us

02:17:04PM **17**   to change this information.  They had all the same

02:17:07PM **18**   information that they're saying we should have changed the

02:17:10PM **19**   label on.  They didn't.  We think that's relevant to the

02:17:12PM **20**   question of reasonableness.

02:17:14PM **21**          THE COURT:  Thank you.

02:17:20PM **22**          MR. MURA:  Just very briefly, Your Honor.  I believe

02:17:25PM **23**   a lot of the facts that were raised -- I mean, I understand

02:17:29PM **24**   that that's Sanofi's position about what happened and what

02:17:31PM **25**   didn't happen, but those are facts that are subsumed by the

02:17:36PM 1    legal analysis that this Court undertook and *Albrecht* is

02:17:39PM 2    crystal clear that those questions are for the Courts; they

02:17:42PM 3    are not for the jury.

02:17:43PM 4         Let me just read one fact.  It's a heading in the

02:17:44PM 5    opposition brief.  It says:  The FDA did not approve an

02:17:47PM 6    alopecia-related label update in 2004 or 2010.  That's their,

02:17:53PM 7    quote, unquote, fact.  That's exactly what goes to

02:17:56PM 8    preemption.  I mean, these facts are subsumed by the legal

02:18:01PM 9    analysis that this Court undertook, and so I don't think that

02:18:03PM 10   it's appropriate to allow Sanofi to argue preemption to the

02:18:07PM 11   jury whether it's presented sort of a fact the FDA didn't let

02:18:10PM 12   us do this or we gave everything to the FDA and the FDA took

02:18:14PM 13   no action.

02:18:15PM 14        Thank you.

02:18:18PM 15        THE COURT:  Thank you.

02:18:20PM 16        Okay.  Let's go to Motion *in Limine* to Exclude

02:18:23PM 17   Testimony and Argument That Taxotere Has Saved Lives.

02:18:29PM 18        MR. NOLEN:  Your Honor, this motion *in limine* is

02:18:36PM 19   aimed at an issue that is not in dispute, and so that's why

02:18:44PM 20   we raise it because the argument will be that Sanofi's drug,

02:18:49PM 21   Taxotere, did save lives.  And we're not attacking and have

02:18:54PM 22   never attacked in this litigation, none of our doctors attack

02:18:58PM 23   the fact that Taxotere is an effective drug, that it was used

02:19:03PM 24   by Ms. Earnest, that has been used by other patients, that

02:19:08PM 25   doctors prescribe it, that the benefits outweigh the risks

02:19:13PM 1   according to the FDA because it's an approved drug and has

02:19:18PM 2   been since the mid '90s.  So those are not in dispute.  Where

02:19:24PM 3   we -- where we fall into a problem though is this argument

02:19:27PM 4   and here's the argument.

02:19:29PM 5        Ladies and gentlemen, Taxotere is a lifesaving

02:19:31PM 6   cancer-fighting drug that has saved hundreds of thousands of

02:19:36PM 7   people's lives, millions of people have taken this drug and

02:19:40PM 8   over the last 25 years this drug has been the drug that has

02:19:45PM 9   saved thousands and thousands of lives today, mothers,

02:19:50PM 10  sisters; mother, sisters, wives get to have Thanksgiving

02:19:55PM 11  dinner because our drug-fighting cancer-fighting -- our

02:19:59PM 12  cancer-fighting drug --

02:20:01PM 13       THE COURT:  Mr. Strongman's writing down his opening

02:20:06PM 14  statement.

02:20:08PM 15       MR. NOLEN:  -- saves lives.

02:20:10PM 16       And so the problem is, we have a problem refuting

02:20:13PM 17  that and it's very difficult because in all of these cases,

02:20:17PM 18  including Ms. Earnest's case, she underwent surgery.  Then

02:20:23PM 19  that was followed by chemotherapy.  In many cases, it's

02:20:27PM 20  followed by chemotherapy, radiation, and another round of

02:20:34PM 21  chemotherapy.  And so you have many variables there including

02:20:38PM 22  the fact that -- including in Ms. Earnest's case you had a

02:20:41PM 23  combination therapy with two other drugs.  And so to say that

02:20:45PM 24  Taxotere is responsible for saving lives generally or saving

02:20:49PM 25  her life is problematic because it is very difficult for us

| | | |
|---|---|---|
| 02:20:53PM | 1 | to rebut that.  And, in fact, we can.  It's highly |
| 02:20:57PM | 2 | prejudicial.  We don't even have evidence on how many women |
| 02:21:02PM | 3 | or people because Taxotere is used for many indications for |
| 02:21:05PM | 4 | cancer.  We don't even know how many people who you could |
| 02:21:10PM | 5 | actually say, well, this is the drug that saved their lives. |
| 02:21:15PM | 6 | So we want to preclude that type of argument because it's |
| 02:21:19PM | 7 | highly prejudicial, and, again, we would not be able to |
| 02:21:22PM | 8 | marshal evidence to rebut it in any way because there's no |
| 02:21:27PM | 9 | data.  There's no way to collect that data and know what the |
| 02:21:30PM | 10 | answer is.  Each case comes down to an individual case.  In |
| 02:21:33PM | 11 | this case, Dr. Carinder thought Taxotere was an |
| 02:21:36PM | 12 | appropriate medication for -- |
| 02:21:36PM | 13 | THE COURT:  So you're not -- |
| 02:21:36PM | 14 | MR. NOLEN:  -- Ms. Earnest. |
| 02:21:37PM | 15 | THE COURT:  -- objecting to risk-benefit presented |
| 02:21:40PM | 16 | by -- to the plaintiff by her doctor that I believe that this |
| 02:21:44PM | 17 | is the best drug for you for all of these reasons. |
| 02:21:47PM | 18 | MR. NOLEN:  That's exactly right but -- |
| 02:21:49PM | 19 | THE COURT:  And you have to know that a risk-benefit |
| 02:21:52PM | 20 | has got to be a part of this trial. |
| 02:21:54PM | 21 | MR. NOLEN:  Of course.  And we're not -- and we're |
| 02:21:56PM | 22 | not disputing that.  It's when you broaden it out to the |
| 02:22:00PM | 23 | population at large.  And we actually argue -- and we do it, |
| 02:22:03PM | 24 | you know, in almost a facetious way, but it's an important |
| 02:22:08PM | 25 | point is, if we're going to say it saved thousands of lives |

02:22:13PM  1    or hundreds of thousands or even millions of lives, then

02:22:16PM  2    there's 10,000 cases that have been filed in this Court and

02:22:20PM  3    of people who say it's hurt me.

02:22:22PM  4              THE COURT:  I get it.

02:22:22PM  5          All right.  We're going to have to start moving this

02:22:24PM  6    along.

02:22:25PM  7              Mr. MOORE:  I mean, if they want to introduce their

02:22:27PM  8    ten thousand plaintiffs, we can introduce pictures of some of

02:22:32PM  9    them.  I'm sure that would not go over well.

02:22:33PM  10         A few moments ago, we heard an argument that we

02:22:38PM  11   should not be able to introduce evidence of the side effects

02:22:40PM  12   of taxol and now we're being told we can't put in evidence of

02:22:43PM  13   the benefits of Taxotere.  The motion, which doesn't have any

02:22:46PM  14   cases from Louisiana, talks about efficacy being irrelevant.

02:22:53PM  15   Efficacy is irrelevant.  That's what the motion says that

02:22:57PM  16   they're asking you to exclude and clearly the efficacy of

02:22:59PM  17   this medicine, the benefit that's being provided by this

02:23:01PM  18   medicine is relevant.  So we think that this motion should be

02:23:05PM  19   denied.

02:23:11PM  20             THE COURT:  I think the risk-benefit analysis

02:23:14PM  21   particularly for this patient is absolutely relevant.  That

02:23:18PM  22   goes to the core of the decision between the plaintiff and

02:23:23PM  23   her physician, and at the end of the day, you have to show

02:23:25PM  24   that with an adequate warning she would not have used -- a

02:23:30PM  25   different prescribing decision would have been made.  The

02:23:32PM  1   rest is argument.  I don't think that there's going to be any

02:23:36PM  2   testimony about millions of people have had their lives saved

02:23:43PM  3   by Taxotere and that's not what I read.

02:23:47PM  4          Do y'all have testimony of that?  I guess I'm just --

02:23:54PM  5   I think the rest is argument that --

02:23:58PM  6          MR. STRONGMAN:  I don't know -- I guess I'm not

02:24:01PM  7   entirely sure of the differentiation we're trying to make

02:24:06PM  8   here.

02:24:06PM  9          THE COURT:  I think --

02:24:08PM  10  MR. STRONGMAN:  I mean, it's been used millions of

02:24:10PM  11  times.  I mean, that's true.

02:24:11PM  12          THE COURT:  But I think that the issue is --

02:24:12PM  13          MR. STRONGMAN:  It saves lives.  That's true.

02:24:16PM  14          THE COURT:  -- the risk-benefit analysis has got to

02:24:20PM  15  be in evidence.  It sounds to me like the rest of it is

02:24:24PM  16  argument and I don't know if that's -- you know, we'll cross

02:24:30PM  17  that bridge when we get to it, but I think whether or not

02:24:38PM  18  Taxotere, you know, the prescribing physician believes that

02:24:42PM  19  Taxotere is a very effective drug for the treatment of the

02:24:45PM  20  form of breast cancer that Ms. Earnest suffered and he

02:24:49PM  21  considered it, you know, a lifesaving drug when he entered

02:24:53PM  22  it.  It seems to me the rest is just argument.

02:24:56PM  23          MS. SASTRE:  Even now, Dr. Carinder says it's a good

02:24:59PM  24  drug.

02:24:59PM  25          MR. NOLEN:  Your Honor -- and we're not disputing

| | | |
|---|---|---|
| 02:25:01PM | 1 | that.  That's the -- |
| 02:25:02PM | 2 | THE COURT:  You want me to stop their opening |
| 02:25:05PM | 3 | statement? |
| 02:25:05PM | 4 | MR. NOLEN:  No, Your Honor.  It's improper argument. |
| 02:25:08PM | 5 | It's argument that expands out beyond this patient |
| 02:25:11PM | 6 | relationship that is not at issue in the case where we cannot |
| 02:25:15PM | 7 | refute that -- we cannot refute how effective or not |
| 02:25:20PM | 8 | effective it has been for millions of other people worldwide. |
| 02:25:24PM | 9 | And so it's to stop that type of improper argument. |
| 02:25:27PM | 10 | The argument about Dr. Carinder in his analysis about |
| 02:25:30PM | 11 | risk-benefit, his discussion about risk-benefit, clearly |
| 02:25:33PM | 12 | that's relevant.  That is not something we're seeking to |
| 02:25:36PM | 13 | exclude in any way.  It's just, when you expand that out to |
| 02:25:39PM | 14 | this has been a lifesaver for millions of patients worldwide |
| 02:25:46PM | 15 | and they're alive today because of this lifesaving drug, we |
| 02:25:49PM | 16 | can't refute that. |
| 02:25:49PM | 17 | THE COURT:  I'm not going to -- I don't believe I |
| 02:25:50PM | 18 | need to give a lecture on opening statements.  I believe you |
| 02:25:53PM | 19 | all know that opening statement is an opportunity to -- I |
| 02:26:03PM | 20 | wish I had the notes I had to read last time -- because it |
| 02:26:07PM | 21 | lays out the evidence that the jury will see, evidence that's |
| 02:26:11PM | 22 | even in dispute should not be presented to a jury.  A jury -- |
| 02:26:17PM | 23 | it should be the facts that will be presented in this case. |
| 02:26:22PM | 24 | I haven't seen and I don't anticipate that we'll hear |
| 02:26:26PM | 25 | about how many millions of people take Taxotere and that it |

| | | |
|---|---|---|
| 02:26:34PM | 1 | has saved hundreds and thousands of lives.  But I do believe |
| 02:26:34PM | 2 | we will hear and it is proper to say you're going to hear |
| 02:26:40PM | 3 | that this is a very effective drug and it was -- it was the |
| 02:26:42PM | 4 | number one choice of oncologists.  I think we're going to |
| 02:26:52PM | 5 | hear that.  And I don't think that's improper because I think |
| 02:26:54PM | 6 | the evidence is going to show that. |
| 02:26:56PM | 7 | Now, about women eating Thanksgiving with their |
| 02:27:00PM | 8 | family, you know, that might be a bit of a stretch. |
| 02:27:04PM | 9 | MR. NOLEN:  Thank you, Your Honor. |
| 02:27:05PM | 10 | THE COURT:  But I believe you all know the rules |
| 02:27:07PM | 11 | about opening statement.  And it's got to be based upon what |
| 02:27:11PM | 12 | evidence we know will be presented. |
| 02:27:18PM | 13 | Opening statements are not argument.  Maybe we'll |
| 02:27:21PM | 14 | have a lecture about closing argument at a later date. |
| 02:27:25PM | 15 | Okay.  So what I will say because it's so hard for me |
| 02:27:32PM | 16 | is -- Erin, I think -- I don't know if I denied that. |
| 02:27:42PM | 17 | I think I granted in part, denied in part, read my |
| 02:27:42PM | 18 | reasons. |
| 02:27:50PM | 19 | Okay.  We have got to move on.  Y'all have got to |
| 02:27:54PM | 20 | start moving faster. |
| 02:27:55PM | 21 | Motion *in Limine* to Exclude Evidence and Argument |
| 02:27:57PM | 22 | Regarding Evaluations of Plaintiff by Formally Retained |
| 02:28:00PM | 23 | Experts Who Will Not Testify at Trial. |
| 02:28:02PM | 24 | Okay.  I know what that is.  Make it quick.  She told |
| 02:28:06PM | 25 | somebody she thought somebody else -- some other drug caused |

02:28:09PM   1    her hair loss.

02:28:10PM   2           MR. COFFIN:  Not exactly, Your Honor.  Good

02:28:14PM   3    afternoon.  Chris Coffin --

02:28:15PM   4           THE COURT:  Good afternoon.

02:28:16PM   5           MR. COFFIN:  -- on behalf of the plaintiff

02:28:19PM   6    Ms. Barbara Earnest.

02:28:20PM   7           You do know that the plaintiffs --

02:28:22PM   8           THE COURT:  Withdrew Thompson --

02:28:25PM   9           MR. COFFIN:  Correct, we withdraw Thompson and

02:28:28PM  10    Bianchini and the fact of the matter is that by allowing the

02:28:31PM  11    defense to use any of the statements in any of the reports or

02:28:34PM  12    the deposition testimony of experts that have --

02:28:37PM  13           THE COURT:  Let me ask you, Mr. Coffin.  Yes.  If

02:28:39PM  14    they ask her, if they ask Ms. Earnest, you believe something

02:28:43PM  15    else caused your cancer --

02:28:47PM  16           MR. COFFIN:  Caused your hair loss.

02:28:49PM  17           THE COURT:  -- caused your hair loss --

02:28:49PM  18           MR. COFFIN:  Yes.

02:28:52PM  19           THE COURT:  And she says, "No, I always thought it

02:28:57PM  20    was Taxotere," you mean to tell me they can't present her

02:28:59PM  21    with the statements she made to Dr. Thompson or Bianchini?

02:29:02PM  22           MR. COFFIN:  Yes, I mean to tell you that because the

02:29:04PM  23    reason it will be prejudicial, so prejudicial to us, because

02:29:06PM  24    the statements were made in reports by Dr. Thompson or

02:29:12PM  25    Dr. Bianchini and they aren't going to be here to talk about

02:29:15PM  **1**  the context of those statements.  They aren't going to be

02:29:18PM  **2**  here to explain what they meant when they wrote down

02:29:23PM  **3**  Ms. Earnest's reports.  I mean, that's exactly the problem

02:29:26PM  **4**  here.  Confuse the jury?

02:29:27PM  **5**          The way they'll have to ask it, Judge, is, "Well,

02:29:31PM  **6**  Ms. Earnest, do you remember when you were talking to

02:29:34PM  **7**  Dr. Thompson or Dr." --

02:29:34PM  **8**          THE COURT:  No, that's not how you ask it.

02:29:34PM  **9**          MR. COFFIN:  -- what --

02:29:36PM  **10**         THE COURT:  Ms. Earnest, you believed at an earlier

02:29:38PM  **11** time that this hair loss was caused by such and such.

02:29:41PM  **12**         MR. COFFIN:  Oh, they could ask that question, but

02:29:43PM  **13** they can't then go the step further --

02:29:45PM  **14**         THE COURT:  Oh, I know.

02:29:45PM  **15**         MR. COFFIN:  -- and say, "Well, Dr." --

02:29:45PM  **16**         THE COURT:  And you don't say and you told that --

02:29:46PM  **17** no, that's not --

02:29:46PM  **18**         MR. COFFIN:  That's the problem.

02:29:47PM  **19**         THE COURT:  But if she says, "I never said that."

02:29:50PM  **20**         MR. COFFIN:  Well, that's -- the problem then becomes

02:29:54PM  **21** do they want to try to say, well, according to Dr. Thompson

02:29:58PM  **22** in his report or --

02:30:00PM  **23**         THE COURT:  I think he might show her the report --

02:30:05PM  **24**         MR. COFFIN:  Didn't you tell --

02:30:05PM  **25**         THE COURT:  I think --

02:30:05PM  1          MR. COFFIN:  That's a problem.  Because then what do

02:30:06PM  2  we -- we have to have the opportunity to say -- to bring

02:30:10PM  3  Dr. Thompson or Dr. Bianchini or the jury's going to be

02:30:14PM  4  confused for sure, at the very least, of who's --

02:30:15PM  5          THE COURT:  What I'm not going to allow, Mr. Coffin,

02:30:18PM  6  is her to say something on the stand that was contradicted by

02:30:23PM  7  an earlier statement and get away with it.

02:30:29PM  8          MR. COFFIN:  Well, that's understood and they can

02:30:32PM  9  cross-examine her, but the conundrum we're in here is, number

02:30:36PM 10  one, because --

02:30:36PM 11          THE COURT:  I don't think it comes in on its own, but

02:30:39PM 12  I think you have to ask the lady and if she denies it, then

02:30:42PM 13  we got a problem.

02:30:43PM 14          MR. COFFIN:  Well, it depends on -- it's not really a

02:30:47PM 15  problem because if it's a statement in the expert's report,

02:30:49PM 16  that doesn't necessarily mean that's exactly what she said.

02:30:53PM 17  That's just not accurate.  And we don't even have the expert

02:30:56PM 18  here to testify about what she said because the experts

02:30:59PM 19  aren't even in the case.  That's the problem.  It's

02:31:02PM 20  prejudicial and it's confusing because then -- and then we

02:31:04PM 21  have to use our time to explain who Dr. Thompson and

02:31:06PM 22  Bianchini are and then it becomes a radical --

02:31:08PM 23          THE COURT:  This might be your option.  This might be

02:31:11PM 24  your option, is then they can call Dr. Thompson and say,

02:31:18PM 25  "What did she tell you caused it?"  Limit it to that.

02:31:23PM 1        MR. COFFIN:  Maybe so.  But somehow Thompson and

02:31:26PM 2   Bianchini --

02:31:26PM 3        THE COURT:  I mean, that's absolutely because if she

02:31:28PM 4   said at an earlier date and she changes it, then I think

02:31:32PM 5   clearly, I mean, a statement --

02:31:36PM 6        MR. COFFIN:  I understand, but the issue is, did she

02:31:38PM 7   say that.  And the only -- the only thing they have is a

02:31:42PM 8   report from an expert who's not even in the courtroom who the

02:31:45PM 9   jury doesn't even know who is Dr. Bianchini and then we get

02:31:48PM 10  into, wait, she saw a psychiatrist or psychologist, is there

02:31:57PM 11  a diagnosis?  It's a rabbit hole that I think the Court

02:32:01PM 12  intended we don't go down when the suggestion was made that

02:32:02PM 13  we don't need Dr. Thompson --

02:32:04PM 14       THE COURT:  I will tell you this.  If she made a

02:32:06PM 15  statement at an earlier date that is contradicted by her

02:32:09PM 16  testimony, we're going to get to the bottom of it.

02:32:15PM 17       MR. COFFIN:  Understood.  And I think they should be

02:32:18PM 18  entitled to cross-examine.  I just don't think they should be

02:32:21PM 19  able to bring Dr. Thompson or Bianchini into the discussion

02:32:25PM 20  because they're not going to be here.

02:32:27PM 21       THE COURT:  Okay.  I'm going to hear from --

02:32:29PM 22       MR. COFFIN:  Thank you, Your Honor.

02:32:30PM 23       THE COURT:  Thank you.

02:32:30PM 24       Mr. MOORE:  Did we win this one?

02:32:32PM 25       THE COURT:  I think so.  What I'm not going to allow

02:32:34PM 1   is, you saw -- I think there is a way to do it without

02:32:41PM 2   getting into Dr. Thompson, Dr. Bianchini being a psychiatrist

02:32:51PM 3   and what she was there for, but I think if she said at an

02:32:56PM 4   earlier date to a doctor and then --

02:32:59PM 5          MS. SASTRE:  It's true through any medical records,

02:33:02PM 6   Your Honor, right?

02:33:02PM 7          MR. COFFIN:  No.  But that's the difference.  It's --

02:33:03PM 8   this is not a medical treatment record.  These are experts

02:33:07PM 9   who have been pulled from this trial.  That's the problem.

02:33:10PM 10         THE COURT:  Let me tell you something.  I think I

02:33:12PM 11  made it clear.

02:33:12PM 12         MR. COFFIN:  Understood.

02:33:13PM 13         THE COURT:  If she said a statement at an earlier

02:33:17PM 14  date, if we need to, Dr. Thompson or Dr. Bianchini, they

02:33:20PM 15  could -- we could subpoena them.

02:33:20PM 16         MR. COFFIN:  Correct, I got you.

02:33:21PM 17         THE COURT:  Put them right there.

02:33:21PM 18         MR. COFFIN:  I got you.

02:33:22PM 19         THE COURT:  "Ma'am, did she tell you that when she

02:33:24PM 20  saw you?"  And we don't need to say why she was there, what

02:33:27PM 21  she was there or what kind of doctor they are, but I'm not

02:33:31PM 22  going to let the jury be misled or testimony that was

02:33:40PM 23  different or statements made that were different in this

02:33:45PM 24  court.  So whether the report comes in, I don't know.  Seems

02:33:49PM 25  to me you might be able to refresh her memory at that time if

02:33:53PM  1    she doesn't remember, and if she says this is not what I

02:33:56PM  2    said, fine, then we put them on the stand and we're going to

02:33:59PM  3    find out what she said.

02:34:01PM  4         MR. COFFIN:  Well, we may have to cross them when we

02:34:03PM  5    come to that because there's also hearsay.

02:34:04PM  6         THE COURT:  I'm making the assumption that

02:34:07PM  7    Ms. Earnest's statements will be consistent.

02:34:10PM  8         MR. COFFIN:  Understood, Your Honor.

02:34:11PM  9         THE COURT:  And we're going to cross that bridge when

02:34:13PM  10   we get there.

02:34:13PM  11        MR. COFFIN:  Understood.

02:34:14PM  12        THE COURT:  But what I will not allow is an

02:34:17PM  13   inconsistent statement to just be left --

02:34:17PM  14        MR. COFFIN:  I understood -- I understand that.

02:34:23PM  15        THE COURT:  -- in the wind.

02:34:24PM  16        MR. COFFIN:  It's just, there's multiple layers to

02:34:30PM  17   this thing.

02:34:30PM  18        THE COURT:  Okay.  What I will say is your motion is

02:34:33PM  19   granted to the extent that this report does not come in or

02:34:37PM  20   the statements made to Bianchini and Thompson do not come in

02:34:50PM  21   except with impeachment.

02:34:57PM  22        MS. SASTRE:  Should we take a break?

02:34:59PM  23        THE COURT:  I need a glass of water.

02:35:02PM  24        All right.  On defendant's Motion *in limine*,

02:35:04PM  25   Defendant's Omnibus Number Five, Motion to Preclude -- this

02:35:09PM 1   is record document 7720, Motion to Preclude Evidence or

02:35:14PM 2   Argument Concerning Adverse Events Reports or Other

02:35:16PM 3   Complaints Involving Patients Other Than the Plaintiff.

02:35:21PM 4         MR. STRONGMAN:  And, Your Honor, Jon Strongman on

02:35:25PM 5   behalf of Sanofi, and I will try to move this along too.  So

02:35:26PM 6   these are obviously hearsay documents on top of the fact that

02:35:29PM 7   they're anecdotal information.  They don't go to causation.

02:35:32PM 8   Plaintiffs have argued that adverse event reports are

02:35:39PM 9   relevant to notice obviously is what they've argued and with

02:35:42PM 10  regard to --

02:35:43PM 11        THE COURT:  But the reports themselves would not come

02:35:46PM 12  in, but the --

02:35:46PM 13        MR. STRONGMAN:  Fair enough --

02:35:49PM 14        THE COURT:  -- statistical analysis that was

02:35:51PM 15  performed by or a review of those reports subject to

02:35:54PM 16  cross-examination by you is fair game, right?

02:35:58PM 17        MR. STRONGMAN:  I will live with that ruling, Your

02:36:01PM 18  Honor.

02:36:01PM 19        THE COURT:  Anybody got a response to that?

02:36:05PM 20        Those reports are not coming in.  But if you want to

02:36:12PM 21  talk about it, that's fine.

02:36:14PM 22        MR. MURA:  I was just going to address the hearsay

02:36:18PM 23  points.  I mean, we cite a case, the *Levaquin Product*

02:36:23PM 24  *Liability* case, it is well established that adverse event

02:36:24PM 25  reports generally constitute admissible nonhearsay on the

02:36:27PM 1   issue of a drug maker's notice.  Maybe there's no argument

02:36:31PM 2   about that.

02:36:31PM 3         THE COURT:  I don't think -- I don't think the actual

02:36:35PM 4   reports, the adverse event reports themselves are not coming

02:36:38PM 5   in.  Now, I believe Dr. Madigan, Dr. Kessler and all spoke to

02:36:45PM 6   the statistical analysis and what those reports meant.

02:36:52PM 7         MR. MURA:  We're fine with that, Your Honor.

02:36:52PM 8         THE COURT:  Okay.  Good.

02:36:54PM 9         MR. MURA:  I think the only time I have seen adverse

02:36:58PM 10  event reports, the courts have said it can't -- it's

02:36:59PM 11  sometimes inadmissible when it's the sole basis for a

02:37:01PM 12  causation, but the courts have pretty uniformly held that

02:37:05PM 13  it's relevant to corroborative evidence, particularly when

02:37:09PM 14  there's other evidence of causation as a peer-reviewed

02:37:12PM 15  epidemiological study in connection with the drug.  And

02:37:13PM 16  that's all that's been presented.

02:37:15PM 17        THE COURT:  I don't think -- I don't think -- okay.

02:37:18PM 18  But the reports themselves, they're not coming in.

02:37:22PM 19        MR. MURA:  Yes.

02:37:24PM 20        THE COURT:  But Madigan's going to talk about his

02:37:28PM 21  analysis and his statistical review and that they provided a

02:37:34PM 22  safety signal which forms a hypothesis and then --

02:37:40PM 23        MR. MURA:  Okay.

02:37:41PM 24        THE COURT:  Okay.  76 --

02:37:49PM 25        MR. MICELI:  We have a point of clarification.

02:37:52PM  **1**      MR. MURA:  We do have a question about Mr. Kopreski's

02:37:58PM  **2**  testimony because -- I'll just say if Mr. Schanker can

02:38:00PM  **3**  address the court.  Because he does reference specific

02:38:03PM  **4**  aspects of the reports.  And so there's just a question about

02:38:05PM  **5**  that.

02:38:05PM  **6**      MR. SCHANKER:  And I apologize, Your Honor.  Just

02:38:07PM  **7**  seeking clarification.  Dr. Kopreski is an employee of

02:38:11PM  **8**  Sanofi, and just by way of example, he is -- and there's been

02:38:15PM  **9**  testimony proffered, video deposition, he's asked about

02:38:20PM  **10**  specific adverse event reports taken through specific

02:38:24PM  **11**  clusters, and I just wanted to -- of reports in clusters when

02:38:28PM  **12**  a particular medical clinic reports, well, I've had five or

02:38:32PM  **13**  six women whose hair fell out and never came back and so

02:38:36PM  **14**  those are gone through with Dr. Kopreski in testimony.  And

02:38:42PM  **15**  so I wanted to just seek clarification --

02:38:45PM  **16**      THE COURT:  What's good for the goose is good for the

02:38:49PM  **17**  gander.

02:38:50PM  **18**      MR. STRONGMAN:  I have no interest in going through

02:38:57PM  **19**  report by report with Dr. Kopreski when the plaintiffs

02:39:00PM  **20**  aren't.  If they're not coming into evidence, they're not

02:39:02PM  **21**  coming into evidence.

02:39:05PM  **22**      MS. MENZIES:  I'm sorry, Your Honor.  My concern,

02:39:08PM  **23**  Your Honor, is that there is discussion about the contents of

02:39:11PM  **24**  the reports.  We don't intend to take that case report, ask

02:39:14PM  **25**  for it to be admitted, but there is specific discussion

02:39:17PM 1  because it goes to the notice.  For example, some of those

02:39:21PM 2  case reports, adverse event reports include investigators

02:39:26PM 3  from Sanofi's own trials reporting to the company in the form

02:39:30PM 4  of an adverse event report saying I'm seeing a patient with

02:39:34PM 5  persisting long ongoing hair loss, haven't seen this before,

02:39:38PM 6  that type of information was presented by our council to

02:39:42PM 7  Mr. Kopreski in his examination and going through that and

02:39:47PM 8  looking in accumulation of that type of notice to Sanofi over

02:39:51PM 9  time.  That's very important evidence to us.  Do we need to

02:39:54PM 10 hand that case report over and ask it to be -- go back to the

02:39:57PM 11 jury room?  No.  But we need to be able to talk about the

02:40:00PM 12 content of the information in those reports because it came

02:40:04PM 13 directly to Sanofi as notice.

02:40:11PM 14     THE COURT:  Mr. Strongman, you want to respond?

02:40:16PM 15     MR. STRONGMAN:  I don't need to respond unless Your

02:40:23PM 16 Honor wants to change her ruling.

02:40:23PM 17     THE COURT:  I'm not --

02:40:25PM 18     MR. STRONGMAN:  If the adverse event reports are not

02:40:28PM 19 coming in, they're not going to come in.  And Dr. Madigan and

02:40:32PM 20 Dr. Kessler can talk about the statistics as you said, that's

02:40:35PM 21 fine.

02:40:36PM 22     THE COURT:  But did Dr. Kopreski then go individually

02:40:42PM 23 through these reports?

02:40:43PM 24     MR. STRONGMAN:  And when I say he went through

02:40:45PM 25 them it was because those -- what the plaintiffs want to do.

02:40:47PM    1    They deposed Dr. Kopreski obviously.  We did not.  They

02:40:51PM    2    deposed him and they put one of these in front of him after

02:40:56PM    3    another for hours and hours and hours.  And that's what they

02:41:00PM    4    want to put into evidence.

02:41:00PM    5         THE COURT:  I think --

02:41:02PM    6         MR. STRONGMAN:  So to me that is putting these into

02:41:05PM    7    evidence which I think is inappropriate and whatever signal

02:41:09PM    8    analysis or notice the plaintiffs need to achieve, they've

02:41:13PM    9    done with their experts, with Dr. Madigan and Dr. Kessler, in

02:41:20PM   10    the analysis and statistics that they ran.

02:41:21PM   11         THE COURT:  I'm at a loss because what I'm not going

02:41:25PM   12    to do, what I don't think is appropriate is to enter these

02:41:31PM   13    multiple adverse event reports into evidence.  And I think

02:41:37PM   14    what's -- what I have seen is that we have people that have

02:41:43PM   15    looked at these adverse event reports and have said we see

02:41:50PM   16    these signals at this point.  We see signals of this

02:41:55PM   17    persistent problem with permanent alopecia.

02:42:00PM   18         MR. MICELI:  Your Honor, I think -- I think the Court

02:42:03PM   19    may be -- and I apologize.  But I think the Court may be

02:42:06PM   20    confusing the FAERS analysis that Dr. Madigan did with the

02:42:12PM   21    adverse event reports that were reported to Sanofi and what

02:42:15PM   22    he did with the clinical trial data.  What we're talking

02:42:20PM   23    about or what Dr. Kopreski did and see Dr. Kopreski has done

02:42:25PM   24    this and Dr. Kopreski --

02:42:25PM   25         THE COURT:  Okay.

02:42:26PM   1          MR. MICELI:  -- I'm certain won't see the light of

02:42:29PM   2     day in this courtroom.

02:42:30PM   3          THE COURT:  I was thinking of the FAERS analysis.

02:42:30PM   4          MR. MICELI:  Yes, Your Honor.  And so what --

02:42:32PM   5          THE COURT:  But what are we talking about here?

02:42:35PM   6          MR. MICELI:  We're not talking about admitting the

02:42:37PM   7     adverse event reports.

02:42:39PM   8          THE COURT:  Let me ask this question:  Is this from

02:42:42PM   9     the GEICAM study?

02:42:45PM  10          MR. MICELI:  It is from the 3 -- TAX 316 and it's

02:42:48PM  11     from other sources.  It's from Sanofi's internal database of

02:42:55PM  12     adverse event reports.  And what -- it's the building of the

02:42:57PM  13     snowball that's rolling downhill where notice after notice

02:42:58PM  14     after notice they should have seen the avalanche coming.

02:43:05PM  15          And Mr. Bachus has gone through a number of days with

02:43:08PM  16     Dr. Kopreski.  Dr. Kopreski then while being questioned by

02:43:15PM  17     Sanofi's lawyers picks out a small amount of incomplete

02:43:17PM  18     reports, case report forms, does a -- what they call a

02:43:19PM  19     reanalysis.  We'll have the opportunity to cross-examine

02:43:23PM  20     their experts as Your Honor instructs us in her order.  And

02:43:27PM  21     he then passes that analysis along to their experts.  So

02:43:30PM  22     their experts get to rely upon the portions of case reports

02:43:35PM  23     that they would like to rely upon or better yet that Sanofi's

02:43:39PM  24     lawyers --

02:43:40PM  25          THE COURT:  But, Mr. Miceli --

02:43:40PM   1               MR. MICELI:  Yes.

02:43:41PM   2               THE COURT:  -- my question is, do the individual

02:43:46PM   3       adverse event reports have to come in?

02:43:49PM   4               MR. MICELI:  No.  They do not, absolutely not.  The

02:43:52PM   5       testimony does.

02:43:53PM   6               THE COURT:  The testimony that you received 15

02:43:55PM   7       adverse event reports in 2008 and what did you do about it?

02:44:00PM   8       Nothing.  And you received 600 in 2009, and what did you do

02:44:05PM   9       about it?  Well, nothing.  Is that what you're --

02:44:09PM   10              MR. MICELI:  I think it's a little bit more than

02:44:10PM   11      that.  We do not want to take our bundle of --

02:44:10PM   12              THE COURT:  That's what I'm wondering.

02:44:14PM   13              MR. MICELI:  -- our box and hand them to the jury.

02:44:17PM   14      But what Mr. Bachus does is, he walks through series, what

02:44:22PM   15      the pharmacovigilance professional at Sanofi -- former

02:44:25PM   16      pharmacovigilance professional says is these are clusters and

02:44:29PM   17      it's important to walk through to show the similarity of

02:44:33PM   18      those because they are considered by the company to be

02:44:35PM   19      clusters or groups that have more significance than just

02:44:39PM   20      single reports.  So you just can't say here's 15, here's 20,

02:44:44PM   21      that's 35, here's 15 --

02:44:44PM   22              THE COURT:  But that's the clusters, aren't they?

02:44:47PM   23              MR. MICELI:  But the testimony is about the

02:44:49PM   24      individual receipt and going through those and how they

02:44:52PM   25      handle them.  And we have it honed down to the time that we

| | |
|---|---|
| 02:45:00PM | **1** |
| 02:45:03PM | **2** |
| 02:45:14PM | **3** |
| 02:45:16PM | **4** |
| 02:45:22PM | **5** |
| 02:45:26PM | **6** |
| 02:45:28PM | **7** |
| 02:45:30PM | **8** |
| 02:45:35PM | **9** |
| 02:45:37PM | **10** |
| 02:45:39PM | **11** |
| 02:45:41PM | **12** |
| 02:45:41PM | **13** |
| 02:45:45PM | **14** |
| 02:45:46PM | **15** |
| 02:45:48PM | **16** |
| 02:45:55PM | **17** |
| 02:45:59PM | **18** |
| 02:46:01PM | **19** |
| 02:46:01PM | **20** |
| 02:46:05PM | **21** |
| 02:46:07PM | **22** |
| 02:46:09PM | **23** |
| 02:46:11PM | **24** |
| 02:46:15PM | **25** |

feel of the 26 hours the Court has provided us with what we
think is necessary to get that point across.

            MR. STRONGMAN:  And, Your Honor, I would add that
Dr. Madigan did look at the internal database.  It's in his
analysis as well.  He has that analysis.  So you were right
the first time.

            MR. MICELI:  Your Honor, you agree with Mr. Strongman
so he will agree that you agree with him and that is proper.
I think if you agree with me I'll agree with you that it's
proper as well.

            THE COURT:  Wait.  You know what, this is getting out
of hand.  We can't have 15 people arguing --

            MR. MICELI:  I understand, Your Honor.

            THE COURT:  -- every motion and that's pretty much
what's happening.

            MR. MICELI:  Your Honor, perhaps the best thing to do
is wait to see how we try to bring it in and look at it.  I
don't think it's something -- we believe it's an
important series --

            THE COURT:  And this is -- and this is in a
deposition, so I will see it prior to trial?

            MR. MICELI:  Yes, Your Honor.

            THE COURT:  Maybe let me do that, because I have to
tell you, this is what I'm not inclined to do.  I'm not going
to have an expert just parrot testimony that's not

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 02:46:21PM | 1  | admissible.  That's not happening.  Facts that are not                    |
| 02:46:26PM | 2  | admissible I'm not going have an expert parrot those facts                |
| 02:46:31PM | 3  | that I've already said -- and I don't think -- I was thinking             |
| 02:46:33PM | 4  | about the FAERS analysis, but I'm still at a loss as to why               |
| 02:46:41PM | 5  | you need more than the fact that you received these clusters              |
| 02:46:46PM | 6  | on this particular time and how many were in the clusters and             |
| 02:46:51PM | 7  | what they showed -- I'm not sure what your -- what's                      |
| 02:46:59PM | 8  | different and -- no.  No.  No.  Y'all got to stop.                        |
| 02:47:07PM | 9  | MR. MICELI:  Part of it, Your Honor, is -- Mr. Nolen                      |
| 02:47:12PM | 10 | whispered in my ear -- is that they do a reanalysis of a                  |
| 02:47:15PM | 11 | number of these.  And that's important.  The other thing is              |
| 02:47:18PM | 12 | to show what they did, but more importantly, what they did               |
| 02:47:21PM | 13 | not do as this snowball was coming down the hill was building            |
| 02:47:25PM | 14 | up.                                                                       |
| 02:47:25PM | 15 | THE COURT:  That's different though.  If in a                            |
| 02:47:27PM | 16 | reanalysis you threw up --                                               |
| 02:47:34PM | 17 | MR. MICELI:  Your Honor, if I may, I answered a                          |
| 02:47:36PM | 18 | question that I probably really can't answer for you.  You               |
| 02:47:39PM | 19 | asked is this coming in through depositions.  We've asked                 |
| 02:47:43PM | 20 | Sanofi to identify for us for a couple days now which of                  |
| 02:47:47PM | 21 | their witnesses are going to be coming live and if                        |
| 02:47:49PM | 22 | Mr. Kopreski or Dr. Kopreski was coming live we would be able             |
| 02:47:53PM | 23 | to address this differently.  We don't know if we're going to            |
| 02:47:53PM | 24 | have to do it by deposition, but we have provided them with              |
| 02:47:56PM | 25 | our deposition --                                                        |

02:47:56PM   1          THE COURT:  Do we know if Dr. Kopreski is coming

02:47:59PM   2   live?

02:47:59PM   3          MR. STRONGMAN:  I don't believe Dr. Kopreski is

02:48:02PM   4   coming live.

02:48:03PM   5          THE COURT:  So this would be his deposition

02:48:05PM   6   testimony?

02:48:07PM   7          MR. STRONGMAN:  If the plaintiffs have designated

02:48:10PM   8   testimony from Dr. Kopreski, we have designated counters.  So

02:48:14PM   9   yes.  What the plaintiffs are looking to admit --

02:48:16PM   10         THE COURT:  Let me ask you this, Mr. Strongman.  Let

02:48:19PM   11  me cut to the chase.  Is this concern from Dr. Kopreski's

02:48:24PM   12  testimony, that's the basis of this motion *in limine*?

02:48:28PM   13         MR. STRONGMAN:  I believe that it's the vast majority

02:48:30PM   14  of the concern.  Yes.

02:48:31PM   15         MR. MICELI:  I think he's the only one that was

02:48:35PM   16  questioned on these, Your Honor.  Maybe there was a stray one

02:48:37PM   17  here or there with a witness, but predominantly,

02:48:40PM   18  overwhelmingly, it is Dr. Kopreski.  Sorry.

02:48:42PM   19         THE COURT:  But the actual report, nobody's asking

02:48:46PM   20  for the reports to come in?

02:48:48PM   21         MR. MICELI:  Correct.

02:48:50PM   22         THE COURT:  And what I believe I said is experts

02:48:53PM   23  could rely on the actual data from those reports.

02:48:53PM   24         MR. MICELI:  Right.

02:49:03PM   25         THE COURT:  And you're saying but there's more to the

02:49:07PM 1  story?

02:49:09PM 2       MR. MICELI:  There is more to the story with the

02:49:11PM 3  adverse event reports that the company received.  And

02:49:14PM 4  Dr. Kopreski had four depositions, one individual and three

02:49:18PM 5  30(b)(6); and they're from the 30(b)(6) deposition, the

02:49:23PM 6  deposition of the company that we've designated those --

02:49:27PM 7  those -- that testimony.

02:49:33PM 8       THE COURT:  I will tell you this, it becomes much

02:49:38PM 9  easier when it's a deposition.  I am inclined to say I don't

02:49:44PM 10 think it's coming in, but since it is in deposition and it

02:49:50PM 11 may perhaps be contextual, I will defer to my review of the

02:49:57PM 12 deposition.

02:49:58PM 13      MR. MICELI:  Thank you.

02:49:59PM 14      MR. STRONGMAN:  Thank you, Your Honor.

02:50:02PM 15      MS. SASTRE:  Would Your Honor like to proceed?  Keep

02:50:06PM 16 going?

02:50:06PM 17      THE COURT:  I don't think I have a choice.

02:50:06PM 18      MS. SASTRE:  Okay.

02:50:11PM 19      THE COURT:  There's so much I would say if we weren't

02:50:13PM 20 on the record.

02:50:14PM 21      MS. SASTRE:  I know.  I know.  I think I could make

02:50:16PM 22 some good jokes right now too, Judge, but I won't do that.

02:50:19PM 23      THE COURT:  Erin, just put this one's deferred.  I'm

02:50:22PM 24 going to look at the deposition.

02:50:25PM 25      Motion to Preclude Evidence or Argument Concerning

02:50:25PM **1** Sanofi's Promotional and/or Marketing Materials Not Possessed

02:50:27PM **2** or Relied on by Plaintiff or Her Prescribing Physician.

02:50:32PM **3**      MS. SASTRE:  Yes, Your Honor.  So there is some good

02:50:34PM **4** news and I think with the Court's permission I can combine

02:50:39PM **5** this with the next motion up, which is No. 20, which relates

02:50:42PM **6** to sales reps and in particular a witness by the name of

02:50:46PM **7** Avila, who we understand plaintiffs do intend to call in

02:50:49PM **8** their case.  And so I also think there's good news here, Your

02:50:54PM **9** Honor, because I believe the majority of this is really

02:50:57PM **10** agreed to.  There isn't much in dispute.  Let me just --

02:51:00PM **11**      THE COURT:  What I read was that the plaintiffs

02:51:03PM **12** wanted to use promotional materials as to what it said about

02:51:08PM **13** persistent promotion or persistent alopecia, handouts or

02:51:12PM **14** whatever.

02:51:13PM **15**      MS. SASTRE:  Yes, ma'am.  So the issue is in the --

02:51:16PM **16** in the motion and I'm just grabbing one of the documents,

02:51:19PM **17** Your Honor.  But the issue is that we're seeking to exclude

02:51:22PM **18** marketing materials that were not seen by, much less relied

02:51:27PM **19** upon, by plaintiff or Dr. Carinder.  And this is squarely a

02:51:33PM **20** 403 issue, no question that these are materials which

02:51:36PM **21** potentially could be highly prejudicial, Your Honor, and

02:51:40PM **22** there's virtually no probative value when there is -- as Your

02:51:43PM **23** Honor keeps saying, what happened in that room, right?  So

02:51:46PM **24** there's Ms. Earnest sitting there and Dr. Carinder is

02:51:50PM **25** consenting here.  So what happened in that room, all of what

02:51:53PM   1   we're talking about here has nothing to do with what happened

02:51:56PM   2   in that room.  And plaintiffs essentially concede that.  They

02:51:59PM   3   state that they do not intend to introduce marketing

02:52:01PM   4   materials especially since no one saw them, relied upon them,

02:52:04PM   5   again.  And Dr. Carinder said very clearly, Judge, that he

02:52:07PM   6   makes his own decisions, he uses his own judgment.  I can

02:52:11PM   7   tell you and we cited it that this sort of motion is

02:52:15PM   8   routinely granted in drug litigation.  In *Xarelto* in the

02:52:20PM   9   Eastern District of Louisiana.  We cited *Norplant;* this was

02:52:24PM   10  granted twice in the Fifth Circuit upheld and then *Viagra*

02:52:27PM   11  which was also in a district court but in Minnesota, Your

02:52:28PM   12  Honor.

02:52:29PM   13        So what plaintiffs have said -- and Your Honor was

02:52:32PM   14  correct -- is that they think that if we are going to stand

02:52:36PM   15  up and say and put on evidence of the fact that when the

02:52:40PM   16  label uses the word "alopecia" that if we say beyond that

02:52:45PM   17  that there's no other descriptive terms there, that it

02:52:50PM   18  doesn't say temporary.  It clearly doesn't say permanent.  It

02:52:54PM   19  doesn't say reversible.  It doesn't say irreversible.  It

02:52:58PM   20  says alopecia and alopecia means your hair is going to fall

02:53:02PM   21  out and it doesn't comment any further about what's going to

02:53:04PM   22  happen after you lose your hair.  That is just simply a

02:53:08PM   23  matter of fact.  And the jury candidly, Your Honor, can,

02:53:11PM   24  Judge, that label for themselves and that is in fact their

02:53:15PM   25  job in this case.  It says, what it is says and alopecia

02:53:20PM  1    means hair loss.

02:53:21PM  2         But plaintiffs have argued, Your Honor, that if we

02:53:25PM  3    make those sorts of statements that they think we are somehow

02:53:29PM  4    opening the door to marketing materials and they would like

02:53:34PM  5    to use a handout and I'll give a copy to counsel, Your Honor.

02:53:40PM  6    They think they are able to a handout, which they concede

02:53:42PM  7    Dr. Carinder never saw, plaintiff never saw, and they admit

02:53:46PM  8    in their response even a step further, Your Honor, that it's

02:53:49PM  9    unclear whether this document was ever used as a marketing

02:53:52PM  10   tool.  That's what plaintiffs say in their response.

02:53:55PM  11        Plaintiff's own experts, Your Honor, also admit that

02:53:59PM  12   the term "alopecia," this idea of our statement being somehow

02:54:05PM  13   controversial when the label says alopecia and nothing

02:54:08PM  14   further, well, their own experts admit that when it says that

02:54:12PM  15   that doesn't mean that your hair is going to grow back.  It

02:54:15PM  16   simply doesn't comment on it at all.  The document -- may I

02:54:17PM  17   hand it to the Court with Your Honor's permission.

02:54:19PM  18        THE COURT:  When you say common, you have temporary

02:54:23PM  19   side effects --

02:54:24PM  20        MS. SASTRE:  Yes, ma'am.  If you turn to the last

02:54:27PM  21   page of this document, which no one in this case ever saw it.

02:54:30PM  22   That's clear.  It's not a question of whether they saw it.

02:54:33PM  23   And it's also unclear whether it was even used as marketing

02:54:36PM  24   material.  But plaintiffs like what's on the left-hand side

02:54:40PM  25   which says what is alopecia and it gives -- there's two

02:54:43PM **1**   statements.  It says alopecia is another word for hair loss

02:54:46PM **2**   or thinning of the hair.  You'll see there's a footnote, Your

02:54:49PM **3**   Honor.  That is simply from the National Cancer Institute.

02:54:53PM **4**   Footnote 1.

02:54:54PM **5**        The next statement says:  It's common yet temporary

02:54:57PM **6**   side effects of some cancer medicines.  And you see two

02:55:02PM **7**   footnotes there, Your Honor, I believe, going to the American

02:55:06PM **8**   Cancer Society and I believe an NHI publication.  However,

02:55:11PM **9**   Judge, if you turned to the right-hand side of that same

02:55:14PM **10**  page, the very issue what is being determined in this case

02:55:22PM **11**  this idea of will my hair grow back just because you're

02:55:27PM **12**  telling me it's going to fall out, well, look at what the

02:55:30PM **13**  rest of the document.  It says:  If you lose your hair, it

02:55:34PM **14**  will usually grow back after treatments are over, right?

02:55:38PM **15**  Meaning not always.  Meaning your hair doesn't always grow

02:55:43PM **16**  back which is consistent within the label that Dr. Carinder

02:55:46PM **17**  read, that says hair generally grows back, which means not

02:55:48PM **18**  always.  I mean, these are just simply the definitions of

02:55:52PM **19**  words within the dictionary and we have to use normal

02:55:56PM **20**  everyday words to talk about the evidence in this case.

02:55:57PM **21**       The idea, Your Honor, of somehow because we say -- it

02:55:59PM **22**  says alopecia, nothing further, opening the door to a

02:56:02PM **23**  document which is completely extraneous to every fact witness

02:56:05PM **24**  in this case because they think that that word somehow shows

02:56:09PM **25**  what we knew --

| | | |
|---|---|---|
| 02:56:10PM | 1 | THE COURT:  Was this ever used with anybody? |
| 02:56:13PM | 2 | MS. SASTRE:  It's unclear, Your Honor, and |
| 02:56:16PM | 3 | plaintiffs, again, they put that in writing in their |
| 02:56:17PM | 4 | opposition that it was used.  There's no evidence or |
| 02:56:19PM | 5 | testimony that it was given to Dr. Carinder and, in fact, the |
| 02:56:22PM | 6 | sales rep and Dr. Carinder both clearly testified that even |
| 02:56:25PM | 7 | though that they had met on a number occasions, they both |
| 02:56:29PM | 8 | testified that as far as they could recall, they never even |
| 02:56:32PM | 9 | talked about hair loss associated with Taxotere.  That wasn't |
| 02:56:36PM | 10 | on their list of topics.  And so the idea of what Sanofi knew |
| 02:56:40PM | 11 | and when, I mean, obviously there's a pile of evidence on |
| 02:56:43PM | 12 | that.  There's lots that plaintiffs will have to talk about. |
| 02:56:46PM | 13 | This document is extraneous to the case.  It's prejudicial. |
| 02:56:51PM | 14 | And by simply stating what is obvious in the label that it |
| 02:56:54PM | 15 | only says alopecia and that doesn't mean X, Y, or Z, that |
| 02:56:57PM | 16 | doesn't open the door to an irrelevant document. |
| 02:57:02PM | 17 | I can argue very briefly while I'm here, Judge, just |
| 02:57:05PM | 18 | because it is related on Motion No. 20, which relates to the |
| 02:57:09PM | 19 | rep we're talking about, Ms. Avila who did meet with |
| 02:57:13PM | 20 | Dr. Carinder on a number of occasions, and I want to get |
| 02:57:14PM | 21 | these quotes on the record.  Dr. Carinder testified that he |
| 02:57:15PM | 22 | doesn't rely on sales rep in making treatment decisions.  He |
| 02:57:19PM | 23 | said he would never substitute their judgment for his and he |
| 02:57:23PM | 24 | said, quote, "all my decisions are evidence based.  I rely on |
| 02:57:25PM | 25 | my own decisions," end quote. |

02:57:28PM  1          He had zero recollection of whether he ever discussed

02:57:31PM  2     Taxotere with reps and there's zero evidence that even if he

02:57:35PM  3     did recall that, that he ever relied upon and considered such

02:57:38PM  4     information.  He also said that he did not recall Ms. Avila

02:57:42PM  5     giving him any hair loss materials.

02:57:44PM  6          Now, plaintiff is saying again that they think this

02:57:47PM  7     testimony from Ms. Avila ought to come in to talk about what

02:57:50PM  8     Sanofi knew, but as I mentioned earlier, that will come in

02:57:53PM  9     through other means.  And what I would say very specifically,

02:57:56PM  10    Your Honor, with regard to Ms. Avila's testimony entirely,

02:58:00PM  11    they need to lay a foundation before she can come into this

02:58:04PM  12    court and testify.  So Dr. Carinder would need to come here

02:58:08PM  13    first and candidly say something different than what he

02:58:11PM  14    already did.  Your Honor's focus repeatedly including many

02:58:15PM  15    times today has been to what happened in that room, what was

02:58:18PM  16    the prescribing decision, what did Carinder know and what did

02:58:21PM  17    Ms. Earnest know.  If this sales rep, Ms. Avila, and if this

02:58:25PM  18    document do not shed any light on those issues, then they are

02:58:29PM  19    simply going to confuse, potentially mislead the jury, and

02:58:32PM  20    they're highly prejudicial, Your Honor.  So we think that

02:58:35PM  21    they ought to be excluded.  Thank you.

02:58:44PM  22          MS. MENZIES:  Thank you, Your Honor.  Karen Menzies

02:58:49PM  23    for the plaintiff.

02:58:50PM  24          Let me just start out by saying for the record that

02:58:52PM  25    our position has been mischaracterized by the defendant, and

02:58:56PM  1    I would like to establish it here.  But I do appreciate that

02:58:59PM  2    counsel for Sanofi has set forth their argument that what

02:59:02PM  3    alopecia means, what generally -- what hair generally grows

02:59:07PM  4    back means, because that is precisely the issue for 17 on

02:59:12PM  5    this document that counsel has read to you, shows -- let me

02:59:16PM  6    put the promotion materials aside.  This is relevant to this

02:59:20PM  7    case because it shows the state of mind of Sanofi at the time

02:59:24PM  8    on a disputed issue.  They are saying that alopecia does not

02:59:28PM  9    mean temporary, yet in their promotional materials that they

02:59:32PM  10   use, they describe and define it as temporary.  That makes it

02:59:37PM  11   relevant and that makes it probative to our position that

02:59:42PM  12   when you say alopecia you meant temporary.  Everybody had an

02:59:46PM  13   expectation that it was temporary.  Nobody knew that it was

02:59:50PM  14   permanent.  That's one.

02:59:51PM  15        Two, the fact that whether this was ever used

02:59:53PM  16   anywhere, let's talk about that.  The evidence that we do

02:59:56PM  17   have in this case there are cases where there's no evidence

03:00:01PM  18   that there were ever sales reps in the offices of the doctors

03:00:05PM  19   and the promotional materials they weren't present, maybe the

03:00:09PM  20   doctor didn't see any sales reps.  In this case, we have call

03:00:12PM  21   notes from Sanofi that shows sales representatives for

03:00:17PM  22   Taxotere in Dr. Carinder's office between 2006 and 2010 at

03:00:23PM  23   least a hundred times.

03:00:26PM  24        Ms. Avila, who is the sales rep, testified that

03:00:31PM  25   90 percent of the time that she goes and visits with the

03:00:35PM  1    doctors and the nurses when she's promoting Taxotere she

03:00:39PM  2    brings and leaves materials for the doctors and patients, for

03:00:43PM  3    the nurses to use with the patients.  So this is a company

03:00:46PM  4    approved, if you look at the back page, you'll see the

03:00:51PM  5    copyright stamp.  It is a formal piece of promotional

03:00:56PM  6    material that Ms. Avila testifies to.

03:01:01PM  7            THE COURT:  She testified to this actual document?

03:01:04PM  8            MS. MENZIES:  Yes, ma'am.  Yes, on page 450 of her

03:01:08PM  9    deposition.  And these are questions from counsel for -- I'm

03:01:11PM  10   sorry.  Let me grab it here.  Yes.

03:01:15PM  11           So it was Exhibit Number 23 or 23A in her testimony

03:01:20PM  12   and she says -- she testifies that, yes, these are the type

03:01:28PM  13   of materials that I use.  She's talking about Exhibit 23.

03:01:32PM  14           She's asked the question:  The ones that we looked at

03:01:35PM  15   are both Sanofi pieces, right?

03:01:37PM  16           Correct.

03:01:38PM  17           And they are both pieces that you detailed on, used

03:01:41PM  18   in promotional efforts with the doctors?

03:01:44PM  19           Correct.

03:01:45PM  20           And then she's asked about what this means and she

03:01:50PM  21   says:  I read it as the patient's hair is going to grow back.

03:01:57PM  22           Because it says common yet temporary, correct?

03:02:01PM  23           Yes.

03:02:01PM  24           And then she answers a similar question, I think it

03:02:04PM  25   is referring to Taxotere.  I think that is what we were

03:02:07PM 1    talking about.  I think that is what the piece is for and I

03:02:11PM 2    think that was -- that's what we thought and what the nurses

03:02:17PM 3    thought and how we touted it.

03:02:22PM 4            And so at least as of the time when the promotional

03:02:24PM 5    material was used, Sanofi was telling patients and providers

03:02:28PM 6    that alopecia was a temporary side effect, correct?

03:02:30PM 7            I think that piece reflects that.  It was a temporary

03:02:35PM 8    side effect and the piece is one we used in the field.

03:02:40PM 9            So to say that this wasn't -- there is no evidence

03:02:43PM 10   that this was used or used in the promotion of Taxotere is

03:02:46PM 11   inaccurate and we do establish the foundation of this piece

03:02:50PM 12   as the state of mind of what Sanofi was saying out in the

03:02:55PM 13   field during this time period.

03:02:56PM 14           Now, let's look specifically at Dr. Carinder.

03:03:00PM 15   Counsel has taken the position that Dr. Carinder doesn't rely

03:03:04PM 16   on these people, that he makes his own decisions.  And I put

03:03:07PM 17   this to Your Honor.  I've been doing this a long time and I

03:03:10PM 18   think that I've never heard a doctor answer the question when

03:03:15PM 19   asked:  Do you rely on what the sales representatives tell

03:03:20PM 20   you when you make treatment decisions for your patients?

03:03:24PM 21   100 percent of the times, the doctors go no.  But do these

03:03:28PM 22   materials provide information?  Do they rely on information

03:03:30PM 23   given to them especially when they respect the sales rep?

03:03:34PM 24   Yes.

03:03:35PM 25           As I mentioned sales reps in Sanofi's office, at

03:03:38PM  1    least a hundred times -- excuse me, sales reps -- Sanofi

03:03:41PM  2    sales reps for Taxotere in Dr. Carinder's office at least a

03:03:46PM  3    hundred times.  And Dr. Carinder -- let's ask him.

03:03:49PM  4         Do you recall the name of the sales rep -- and these

03:03:52PM  5    are questions from defense counsel.

03:03:54PM  6              THE COURT:  I saw that.  I know.  And he liked her.

03:03:57PM  7              MS. MENZIES:  He liked her a lot.  And he said, well,

03:03:59PM  8    this is -- yes, he respected her and she is a nurse

03:04:05PM  9    practitioner and a nurse.  And so she understandably, you

03:04:09PM  10   know, developed a relationship with him over time.  We

03:04:11PM  11   understand she also developed a relationship with the nurse

03:04:15PM  12   oncologist who was involved in Ms. Earnest's care, Nurse

03:04:20PM  13   Reso.  So when asked specifically -- we know he relies on

03:04:23PM  14   her.  He likes her because she keeps --

03:04:23PM  15             THE COURT:  Tell me what he asks.  I got that.

03:04:25PM  16             MS. MENZIES:  Did Ruth Avila, the sales

03:04:29PM  17   representative from Sanofi, to your knowledge, ever advise

03:04:30PM  18   you or provide you with information concerning the potential

03:04:33PM  19   side effect of permanent hair loss in association with

03:04:36PM  20   Taxotere?

03:04:37PM  21        No.

03:04:37PM  22        And if she had provided you with that information and

03:04:40PM  23   you considered that information legitimate, is that

03:04:43PM  24   information you would have taken seriously?

03:04:45PM  25        Yes.

03:04:47PM  1      Is that information if you had received from Ruth

03:04:51PM  2  Avila or some sales representative from Sanofi and you

03:04:54PM  3  believed it was legitimate that you would have incorporated

03:04:57PM  4  in your advisory of your patients?

03:05:00PM  5      Answer:  Yes.

03:05:01PM  6      So we do have a direct connection between information

03:05:06PM  7  provided by Sanofi promotional efforts to Dr. Carinder that

03:05:11PM  8  he would have -- if been told about permanent hair loss, he

03:05:16PM  9  would have considered that and used it with his patients.  So

03:05:19PM 10  this is a very distinguishable case than the ones that have

03:05:22PM 11  been cited and we have given Your Honor some cases where

03:05:25PM 12  absolutely they do allow promotional materials to be used in

03:05:29PM 13  the litigation.  Thank you, Your Honor.

03:05:31PM 14      MS. SASTRE:  Your Honor, just very briefly and I have

03:05:33PM 15  plaintiff's opposition in my hand.  I'm going to read from it

03:05:33PM 16  because I do want the record to be clear.

03:05:36PM 17      Plaintiff states quote:  Plaintiff does not intend to

03:05:39PM 18  introduce Sanofi's promotional materials as evidence of

03:05:42PM 19  Sanofi's marketing efforts.  I think we just heard something.

03:05:46PM 20      Plaintiff goes on to state quote:  It is unclear if

03:05:49PM 21  Sanofi utilized this brochure -- referring to the document I

03:05:53PM 22  handed to Your Honor -- as a marketing tool.  And so what we

03:05:55PM 23  know in this case, Your Honor, is that no one has testified,

03:05:59PM 24  although believe me, the rep and Dr. Carinder were questioned

03:06:02PM 25  extensively about whether they ever discussed hair loss and

03:06:06PM  1   about whether she gave him any materials including this

03:06:09PM  2   document and the answer was no.  No one has a recollection of

03:06:13PM  3   having that conversation and no one left behind any hair loss

03:06:16PM  4   materials and no one -- no witness in this case saw this

03:06:19PM  5   document, which takes us back to, Your Honor, the -- the

03:06:24PM  6   carve out here, the way they're trying to get around that is

03:06:29PM  7   to say to you, well, it goes to what the company knew.  Your

03:06:31PM  8   Honor, we can't be handcuffed when we're trying this case.

03:06:34PM  9   We're going to talk about the label in a common sense way.

03:06:36PM  10  It says what it says.  And what it doesn't say, we can point

03:06:40PM  11  out too, just like they're going to do.  They're going to be

03:06:44PM  12  critical and say, well, it doesn't say permanent or

03:06:46PM  13  irreversible or who knows what they're going to say it

03:06:50PM  14  doesn't say.  And we're going to say it, well, you know what,

03:06:51PM  15  it doesn't say temporary either, because we take that

03:06:54PM  16  position, which is a truism.  That doesn't open the door to

03:06:57PM  17  some completely extraneous document or allow a sales rep to

03:07:01PM  18  come in here who said, "I never even discussed any of these

03:07:04PM  19  issues with Dr. Carinder.  I never gave him those documents,"

03:07:07PM  20  and for her to come in here without a foundation would be

03:07:10PM  21  inappropriate, Your Honor.  Thank you.

03:07:11PM  22          THE COURT:  I'm going to move past this one.  You're

03:07:16PM  23  going to hear from me.

03:07:17PM  24          7685 Motion *in Limine* to Preclude Evidence or

03:07:19PM  25  Argument Concerning Correspondence Between DDMAC and Sanofi

03:07:24PM   1   by the Defendant.  Mr. Ratliff.

03:07:25PM   2        MR. RATLIFF:  Yeah.  Thank you, Your Honor.

03:07:26PM   3        So the point that you made and that Ms. Sastre made

03:07:30PM   4   about this being a case about the prescribing decision that

03:07:32PM   5   took place in this room, we seek to exclude from trial

03:07:36PM   6   evidence related correspondence between DDMAC, the marketing

03:07:41PM   7   arm of FDA, to Sanofi that took place basically between 1999

03:07:46PM   8   and 2005.  And it's very specific to one particular issue

03:07:49PM   9   which was some promotional materials that Sanofi distributed

03:07:53PM   10  that were related to, one, metastatic lung cancer, not the

03:07:59PM   11  type of cancer that Ms. Earnest had; metastatic breast

03:08:01PM   12  cancer, also not the type of cancer that Ms. Earnest had, and

03:08:04PM   13  had nothing to do with any sort of promotional activity

03:08:08PM   14  related to hair loss whether to say it's not permanent, it is

03:08:13PM   15  permanent.  It had nothing to do with hair loss.  It related

03:08:16PM   16  to a study known as TAX 311 that compared taxol and Taxotere

03:08:22PM   17  as single agents for metastatic breast cancer.  Obviously,

03:08:26PM   18  Ms. Earnest here has adjuvant early stage breast cancer where

03:08:30PM   19  she was treated in combination.  So that is one part that

03:08:34PM   20  makes this a 401, just not relevant to the facts of this

03:08:34PM   21  case, Your Honor.

03:08:35PM   22        The second part of this is Dr. Carinder testified

03:08:39PM   23  that the promotional claims that plaintiffs seek to introduce

03:08:44PM   24  were things that he did not review or rely upon and they

03:08:48PM   25  certainly weren't promotional claims that he reviewed or

03:08:50PM  1   relied upon in making his determination to prescribe Taxotere

03:08:53PM  2   to Ms. Earnest.  All these documents are good for it, Your

03:08:58PM  3   Honor, as it relates to this particular case, as it relates

03:09:00PM  4   to Ms. Earnest's case, is to inflame the jury to say, look,

03:09:04PM  5   Sanofi is a bad actor, they were doing bad things.  Or as

03:09:08PM  6   plaintiffs put in their opposition that Sanofi promoted

03:09:13PM  7   Taxotere at all costs, irrespective of the lack of scientific

03:09:16PM  8   basis behind its promotions.

03:09:20PM  9        Now, Your Honor, that may be possibly something that

03:09:24PM  10  was relevant if we were talking about metastatic breast

03:09:27PM  11  cancer and we were talking about hair loss.  That is not the

03:09:31PM  12  case.  These are totally irrelevant communications that had

03:09:33PM  13  no bearing on what Dr. Carinder did.

03:09:36PM  14       Now, plaintiffs will say, well, we need it to refute

03:09:38PM  15  the idea that Taxotere is more efficacious than taxol if that

03:09:45PM  16  is the claim that the defendants intend to make.  It's not

03:09:50PM  17  why they claim to use that, but even if they were,

03:09:51PM  18  correspondence between FDA and Sanofi on these irrelevant

03:09:54PM  19  promotional activities has nothing to do with the efficacy of

03:10:01PM  20  Taxotere versus taxol particularly when used in a single

03:10:03PM  21  agent --

03:10:03PM  22       THE COURT:  I got it.

03:10:04PM  23       Mr. Miceli, make it quick.

03:10:06PM  24       MR. MICELI:  Yes, ma'am.  I will --

03:10:09PM  25       THE COURT:  How is this not a 403 issue?

03:10:11PM  1        MR. MICELI:  I can explain that.  First of all, when

03:10:13PM  2   we were here for the Daubert hearings, the protocol for TAX

03:10:19PM  3   316 reads the rationale for doing an adjuvant study is that

03:10:24PM  4   any promising combination must first prove its efficacy in

03:10:27PM  5   favorable toxicity profile in first line metastatic study

03:10:31PM  6   before seeking an adjuvant indication.

03:10:34PM  7        Secondly, the defendants in their -- in multiple

03:10:39PM  8   Daubert responses and their briefing continue to point

03:10:46PM  9   fingers at other agents.  Is it the A?  Is it the C?  Is it

03:10:51PM 10   tamoxifen?  Is it anything else but our drug.

03:10:53PM 11        As Mr. Ratliff just mentioned, TAX 311 is the only

03:10:59PM 12   single agent head-to-head study that Taxotere has done not

03:11:02PM 13   just against taxol, but against any other chemotherapy agent.

03:11:07PM 14   Also, in the course of this hearing today, Mr. Moore has said

03:11:10PM 15   they will present evidence about increased neuropathy and

03:11:13PM 16   superiority through Drs. Glaspy and Dr. Miletello.

03:11:18PM 17   Ms. Sastre stated -- just said that all drugs have a

03:11:21PM 18   multitude of risks and Mr. Moore said that Sanofi wants to

03:11:25PM 19   talk about saving lives.  And TAX 311 addresses those things.

03:11:31PM 20   It talks about the toxicity of those two drugs in a

03:11:36PM 21   head-to-head single-agent study.  Specifically, the authors

03:11:40PM 22   of that study point out that Taxotere is more toxic than

03:11:49PM 23   taxol.  They make that statement in a peer-reviewed

03:11:53PM 24   publication.  If their experts -- particularly Dr. Glaspy --

03:11:57PM 25   is going to talk about the superiority, general superiority,

03:11:59PM  1   of Taxotere in its combination therapies, with other -- four

03:12:03PM  2   other different combinations, says that at the bottom of

03:12:06PM  3   page 10 of his report, that's a general statement.  He

03:12:08PM  4   doesn't begin to talk about Ms. Earnest until page 42 of his

03:12:13PM  5   report.

03:12:13PM  6           So if they're going to come in and talk about

03:12:16PM  7   superiority and benefits from a toxicity standpoint, we have

03:12:19PM  8   to be allowed to cross-examine their experts.  And just to

03:12:24PM  9   give you a little information on the toxicity profile

03:12:27PM  10  concerning that neurotoxicity that we talked about just an

03:12:31PM  11  hour ago with Your Honor, Taxotere has twice as much

03:12:35PM  12  neurotoxicity.  Taxotere has five times as much peripheral

03:12:40PM  13  edema, five times as much neuromotor toxicity which is a

03:12:44PM  14  different level of neurotoxicity, asthenia or lethargy, three

03:12:51PM  15  times as much; have twice as many people withdraw -- withdrew

03:12:56PM  16  from TAX 311 because of problems with Taxotere than they did

03:13:00PM  17  with taxol.  And they talk about deaths and saving lives?

03:13:05PM  18  These are not percentages.  These are just raw numbers.  Four

03:13:09PM  19  people died on Taxotere.  Zero people died on taxol.

03:13:13PM  20          So if the defendants -- and it's clear through their

03:13:15PM  21  expert reports -- they're going to come in and talk about

03:13:16PM  22  general superiority, then we have to be able to cross-examine

03:13:20PM  23  them.  Why does that mean the DDMAC letter is important?

03:13:24PM  24  Because what DDMAC communicated to Sanofi was you cannot

03:13:29PM  25  prove that your drug is superior.  This study that you have

03:13:33PM   1   submitted or this report that you have submitted does not

03:13:36PM   2   prove superiority.  That's what FDA told Sanofi.

03:13:38PM   3          THE COURT:  But in those two -- in metastatic breast

03:13:43PM   4   cancer which is not here and I think it was lung cancer.

03:13:47PM   5          MR. MICELI:  No.  No.  TAX 311 is only metastatic

03:13:53PM   6   breast cancer.  It's a head-to-head study of metastatic

03:13:56PM   7   breast cancer patients only.  It did not follow alopecia long

03:13:59PM   8   term because as one of their other witnesses,

03:14:02PM   9   Philippe-Aussel, will tell us at trial people just

03:14:03PM  10   unfortunately don't live that long.  It's palliative care

03:14:06PM  11   just to keep them comfortable.

03:14:08PM  12          So the DDMAC tells Sanofi you must prove to us that

03:14:13PM  13   your drug is more effective.  If you're going to tout its

03:14:17PM  14   superiority against taxol and really anything, they couldn't

03:14:20PM  15   do that.  And they couldn't do that because they couldn't

03:14:22PM  16   find their analysis data.  And when we were trying to do our

03:14:27PM  17   discovery in this case, we wanted -- we said, show us your

03:14:30PM  18   analysis data.  We got an explanation within their own

03:14:34PM  19   witness.  Pierre Mancini refuted their explanation.  And we

03:14:39PM  20   need to put these things before the jury when we're

03:14:42PM  21   cross-examining their experts who say that Taxotere is

03:14:46PM  22   superior.

03:14:46PM  23          Well, what do they base that on?  Sanofi did not show

03:14:51PM  24   their experts the DDMAC letter.  Sanofi did not show all of

03:14:55PM  25   their experts the TAX 311 study report that demonstrates this

03:14:58PM   1    increased toxicity.  So if they want to talk about

03:15:02PM   2    superiority, if they want to talk about saving lives, if

03:15:05PM   3    they're going to do at trial what they attempt to do in their

03:15:08PM   4    reports, we have to have a fair opportunity to cross-examine

03:15:12PM   5    them and this is relevant evidence that we should be able to

03:15:15PM   6    use.  Thank you.

03:15:19PM   7         MR. RATLIFF:  Your Honor, very briefly, I'm not

03:15:21PM   8    entirely sure what motion Mr. Miceli was arguing.  This is

03:15:25PM   9    about the introduction of these DDMAC letters that dealt with

03:15:28PM  10    different cancer types that didn't deal with hair loss that

03:15:31PM  11    Dr. Carinder never reviewed, never relied upon.  This idea

03:15:34PM  12    about superiority or efficacy, taxol versus Taxotere, that

03:15:39PM  13    was one study in the metastatic breast cancer setting that

03:15:43PM  14    didn't even track hair loss.  They have all the Tax 11 data.

03:15:45PM  15    These discussions --

03:15:45PM  16         THE COURT:  I'm hearing -- but I did hear earlier,

03:15:48PM  17    Mr. Ratliff, the attempt to have your expert say, well, taxol

03:15:53PM  18    is -- Taxotere was better because of Taxol's issues with

03:15:59PM  19    neuropathy and we want to be able to show even in

03:16:02PM  20    hindsight that --

03:16:04PM  21         MR. RATLIFF:  And, Your Honor, that is a much more

03:16:07PM  22    nuanced discussion when you're comparing adjuvant combination

03:16:12PM  23    chemotherapies and how they interact with each other and this

03:16:15PM  24    regimen versus this regimen versus this regimen, whether

03:16:18PM  25    they're given weekly, whether they're given sequentially, as

```
03:16:21PM   1    opposed to the TAX 311 study, which was you're getting

03:16:24PM   2    Taxotere, you're getting taxol, we're going to treat you as

03:16:27PM   3    long as we can treat you and you may live three or

03:16:31PM   4    four months longer.  That's a totally different issue.  We're

03:16:34PM   5    not here to argue about metastatic breast cancer, much less

03:16:38PM   6    some DDMAC letters Dr. Carinder never reviewed or the

03:16:40PM   7    promotional things never reviewed --

03:16:40PM   8         THE COURT:  I got that.  I got that.  I don't think

03:16:42PM   9    it goes to Dr. Carinder.

03:16:44PM  10         MR. RATLIFF:  Okay.

03:16:45PM  11         THE COURT:  I need a break.  We'll be at recess until

03:16:52PM  12    I come back in.

03:16:53PM  13                        (Recess taken.)

03:25:00PM  14                        (In open court.)

03:25:01PM  15         THE COURT:  Mr. Strongman, this is No. 25, Motion in

03:25:17PM  16    Limine to Preclude Evidence and Argument That Ongoing

03:25:21PM  17    Alopecia --

03:25:22PM  18         MR. STRONGMAN:  This is 24.

03:25:25PM  19         THE COURT:  24.  Foreign Labeling and Regulatory

03:25:26PM  20    Actions, Document No. 7666.

03:25:29PM  21         MR. STRONGMAN:  Correct, Your Honor.  And our request

03:25:33PM  22    here is simply that foreign labels, what is in foreign

03:25:39PM  23    labels, what should or shouldn't be in foreign labels --

03:25:41PM  24         THE COURT:  Sure, but wouldn't that show defendants'

03:25:43PM  25    knowledge before plaintiff's treatment?
```

03:25:50PM   1          MR. STRONGMAN:  Your Honor, I would make one point on

03:25:52PM   2     that and that's that the European label change that is the

03:25:58PM   3     subject of most all of this conversation happened after the

03:26:00PM   4     plaintiff's treatment.  So starting with that.  The relevant

03:26:03PM   5     evidence that the plaintiffs have pointed to is post the

03:26:06PM   6     prescription to Ms. Earnest anyway.  So even assuming it

03:26:11PM   7     could be noticed, it just simply isn't relevant to this case.

03:26:15PM   8     And then on top of it, when you're dealing with the foreign

03:26:18PM   9     regulatory structures, it is confusing and irrelevant.  We've

03:26:21PM  10     got our own FDA structure that we're operating in.  So in

03:26:24PM  11     that regard --

03:26:25PM  12          THE COURT:  Well, I think the foreign regulations,

03:26:27PM  13     that's a different -- I don't see how that comes in.  My

03:26:31PM  14     concern would be what information -- and while that might

03:26:37PM  15     have occurred post was the information pre-label change --

03:26:43PM  16     pretreatment.

03:26:45PM  17          MR. STRONGMAN:  Your Honor, the information is the

03:26:47PM  18     same, so there is no differentiation there.  It's just simply

03:26:52PM  19     a matter of what a European regulatory agency may have a

03:26:56PM  20     conversation about how the label should be done as it relates

03:27:00PM  21     to their regulation versus the FDA have a conversation about

03:27:03PM  22     how the label should be done as it relates to their

03:27:07PM  23     regulation.  So, obviously, this is a case about United

03:27:10PM  24     States regulatory structure and scheme, and so that's why we

03:27:14PM  25     believe these foreign regulatory labels and actions are

03:27:18PM  1    irrelevant, prejudicial and would confuse the jury.

03:27:22PM  2         THE COURT:  Thank you.

03:27:23PM  3         Mr. Miceli?

03:27:23PM  4         MR. MICELI:  Yes, Your Honor.  We have some very good

03:27:29PM  5    news.  We don't want to admit any foreign labels.

03:27:29PM  6         THE COURT:  Good.

03:27:32PM  7         MR. MICELI:  But it is quite an artfully crafted

03:27:35PM  8    motion because regulatory action, the way I read and heard

03:27:39PM  9    some arguments and discussions in motions, means both labels,

03:27:42PM  10   discussions with the foreign regulatory agencies where

03:27:45PM  11   there's discourse from people from EMA and people from Sanofi

03:27:49PM  12   and then there's conversations and activities within Sanofi

03:27:53PM  13   itself where they're discussing something they may have to do

03:27:56PM  14   in a foreign country and in America with American employees.

03:28:01PM  15   And it's really that second -- the second two categories that

03:28:04PM  16   we're most interested in.  It is -- in addition, this is sort

03:28:08PM  17   of a side note, but there is something called harmonization

03:28:14PM  18   and their witness, their regulatory witness, Mr. Nijveldt

03:28:17PM  19   testified they try to make sure everything's done the same in

03:28:21PM  20   Europe, America, and Japan, just to make sure we're singing

03:28:28PM  21   out of the same hymnal.  And in this particular case, what

03:28:29PM  22   we're most concerned about is the discussions by Sanofi

03:28:34PM  23   employees with other Sanofi employees or with EMA employees

03:28:38PM  24   concerning the issue of permanent irreversible alopecia,

03:28:45PM  25   specifically a 2006 internal conversation where Sanofi is

03:28:49PM  1   discussing changing the European patient leaflet to describe

03:28:56PM  2   permanent alopecia separately from temporary alopecia.

03:29:01PM  3   That's very relevant to this case.  It's the same exact

03:29:05PM  4   injury, same exact use of Taxotere.

03:29:08PM  5       In 2013, in our Daubert hearings, we talked about

03:29:12PM  6   their submission to EMA where they described the 29

03:29:16PM  7   individuals in the TAC arm of TAX 316 as having alopecia that

03:29:22PM  8   was persisting at the end of follow-up.  That's not a

03:29:27PM  9   regulatory action.  That's a Sanofi action and that is

03:29:31PM  10  relevant to show their knowledge of the condition and how

03:29:32PM  11  they articulated what those 29 people had.  They didn't say

03:29:37PM  12  ongoing.  They said persisting.

03:29:39PM  13      And just to leave you with two of the cases that the

03:29:43PM  14  defendants cite, the *Xarelto* MDL decision, Judge Fallon

03:29:52PM  15  wrote:  Anything the defendants have said to anyone, even

03:29:56PM  16  foreign regulatory bodies, should be admissible.  That's

03:29:59PM  17  Westlaw 278 0760 at 6.  That's from May of 2017.  The Bay --

03:30:10PM  18  excuse me, the *Mirena* MDL, the Judge wrote:  To the extent

03:30:13PM  19  Bayer's interactions with German regulators casts light on

03:30:14PM  20  what Bayer knew and when it knew it, direct evidence of those

03:30:19PM  21  interactions may be introduced to the extent relevant.

03:30:21PM  22      They're directly relevant.  We're not going to try to

03:30:24PM  23  confuse the jury with foreign regulatory schemes or rules.

03:30:30PM  24  We just want to talk about the facts that Sanofi talked

03:30:34PM  25  about.

03:30:35PM   1          MR. MICELI:  Thank you.

03:30:36PM   2          THE COURT:  Thank you.

03:30:37PM   3          MR. STRONGMAN:  Your Honor, with regard to what

03:30:42PM   4   Mr. Miceli said, it sounds like what he's saying is that if

03:30:46PM   5   there's something in a communication, it's relevant to

03:30:49PM   6   notice; and if that's the case, then it needs to be pre the

03:30:53PM   7   date of the prescription for Ms. Earnest or relate to data.

03:30:57PM   8   I understand your ruling on that, your view on that, or

03:31:00PM   9   relate to data that's pre the prescription.  That's all I

03:31:03PM  10   have to say.

03:31:08PM  11          THE COURT:  Thank you.

03:31:14PM  12          Motion *in Limine* to Preclude Evidence and Argument

03:31:19PM  13   Regarding Shirley Ledlie and Any Taxotears or Other

03:31:22PM  14   Third-Party Advocacy or Communication Group or Group Members,

03:31:27PM  15   that's -- wait.  Are we there?  No.

03:31:29PM  16          MR. STRONGMAN:  I think we skipped -- we are on

03:31:32PM  17   Motion 25.

03:31:32PM  18          THE COURT:  Motion to Preclude Evidence and Argument

03:31:35PM  19   That Ongoing Alopecia Data Observed in TAX 316 and GEICAM

03:31:41PM  20   9805 Clinical Trials Presents Evidence of Persistent

03:31:45PM  21   Permanent or Irreversible Alopecia, record document 7668.

03:31:49PM  22          MR. RATLIFF:  Thank you, Your Honor.

03:31:51PM  23          Quickly on this, while the briefing on this

03:31:55PM  24   particular motion *in limine* is voluminous, I think the issue

03:31:58PM  25   as we look at it is fairly narrow, which is we're not trying

|  |  |
|---|---|
| 03:32:01PM | 1 |
| 03:32:08PM | 2 |
| 03:32:09PM | 3 |
| 03:32:12PM | 4 |
| 03:32:15PM | 5 |
| 03:32:15PM | 6 |
| 03:32:20PM | 7 |
| 03:32:22PM | 8 |
| 03:32:25PM | 9 |
| 03:32:29PM | 10 |
| 03:32:32PM | 11 |
| 03:32:35PM | 12 |
| 03:32:38PM | 13 |
| 03:32:42PM | 14 |
| 03:32:47PM | 15 |
| 03:32:51PM | 16 |
| 03:32:54PM | 17 |
| 03:33:00PM | 18 |
| 03:33:05PM | 19 |
| 03:33:07PM | 20 |
| 03:33:11PM | 21 |
| 03:33:14PM | 22 |
| 03:33:16PM | 23 |
| 03:33:20PM | 24 |
| 03:33:22PM | 25 |

to preclude the introduction of the TAX 316 data or the
GEICAM 9805 data.  What we're looking for is that the
characterization of that data as what I heard certainly
during all of the Daubert arguments was repeated reference by
plaintiff's counsel that this was permanent hair loss, that
all of the women in these two arms, TAC arm and the FAC arm
have permanent hair loss at the end of ten years, that they
all basically walked in the door on the tenth year, showed up
and had no hair.  That simply does not comport with what the
data is and it definitely does not comport with what the
testimony of the individuals at Sanofi who are directly
involved in that study and explained how that study worked
and the tracking of adverse events and how that is done.
Adverse events, alopecia, all the other adverse events were
tracked at the time of treatment, at chemotherapy, at the
beginning of the follow-up period.  So 31 days.  And then
ongoing would have been whatever the last visit was that that
individual person showed up at.  So if that showed up at the
four-month mark and they reported alopecia and they never
showed up again, they stayed on that list all the way to ten
years.  If they showed up at the sixth-month mark or the
eighth-month mark or the one-year mark and they reported
alopecia and never showed back up or just never said it
resolved, they stay on that list.  So let's call it what it
is, ongoing alopecia per the study protocol.  It is not

03:33:26PM  1    permanent alopecia.  None of these women were diagnosed with

03:33:30PM  2    permanent alopecia.  It's not irreversible alopecia.  None of

03:33:34PM  3    the women were diagnosed with that, much less treated for

03:33:38PM  4    hair loss.

03:33:38PM  5         And so what we're looking for, Your Honor, is that

03:33:40PM  6    the peer -- what is in the actual data, the truth matters.

03:33:45PM  7    Now, their experts certainly can talk about their

03:33:47PM  8    interpretation of it, what they think that data means, but to

03:33:51PM  9    have the repeated references and what we'll hear on opening,

03:33:55PM  10   Your Honor, is Sanofi had this data that showed there were

03:33:57PM  11   all these women that had permanent hair loss ten years after

03:34:02PM  12   taking Taxotere.  That is not what the study looks at and the

03:34:07PM  13   people who have knowledge of the study, who worked on the

03:34:08PM  14   study, who tracked the study, the biostatician for the study

03:34:11PM  15   who Mr. Miceli deposed said that's not what that data

03:34:15PM  16   represents.  It's just what adverse events were reported,

03:34:17PM  17   each person's last follow-up visit.  So a singular point in

03:34:21PM  18   time.  And they reported it then.  We never saw them again

03:34:25PM  19   for a whole multitude of reasons.  They stay on that list.

03:34:28PM  20   So the data is what the data is.

03:34:31PM  21        THE COURT:  No, I got it.  I got it.  Thank you.

03:34:32PM  22        Mr. Miceli.

03:34:34PM  23        MR. MICELI:  Yes, Your Honor.  I'm a little bit

03:34:41PM  24   confused because we were here two weeks ago when the

03:34:43PM  25   defendants, when Sanofi, argued their preemption motion and

03:34:48PM 1    they said they turned over information to FDA about

03:34:51PM 2    persisting alopecia.  And that was the 29 individuals in the

03:34:57PM 3    TAX 316 study but those same 29 are now ongoing again.

03:35:01PM 4    There's been various times where Sanofi has represented those

03:35:02PM 5    ongoing as persisting permanent irreversible.  In our

03:35:08PM 6    briefing, we mentioned that.  But I think the most important

03:35:12PM 7    thing, you look at what happened before this litigation

03:35:14PM 8    happened, before this litigation came about.  Mr. Strongman

03:35:17PM 9    stood up a moment ago and said, you have to look at what

03:35:20PM 10    happened before.  What Sanofi told the EMA in 2013 was the

03:35:25PM 11    communication of the 2009 or 2010 data, not the 2013 data.

03:35:30PM 12    There is no 2013 data.  But you look at what Amy Freedman

03:35:34PM 13    said in 2006.  Cases of irreversible alopecia are documented

03:35:39PM 14    in clinical trials.  You look at 2010 where Emanuel

03:35:44PM 15    Palatinsky says the current docetaxel company core data sheet

03:35:49PM 16    version 23 presents persistent alopecia.

03:35:51PM 17          THE COURT:  I got it.

03:35:52PM 18          MR. MICELI:  They say it over and over again, Your

03:35:55PM 19    Honor.  So it's not that the plaintiffs are coming to court

03:35:57PM 20    and trying to recharacterize.  We're using their words.  It's

03:36:02PM 21    just that the words they chose in that one report are

03:36:05PM 22    different.  Thank you.

03:36:06PM 23          THE COURT:  I will tell you as to this one, I'm going

03:36:08PM 24    to deny the motion.  You can argue that, that they have

03:36:13PM 25    mischaracterized it.  You can put your witnesses on to say

03:36:17PM 1   that they mischaracterized it.  I'm going to deny the motion.

03:36:25PM 2   They can say it and then I have no doubt that you will say

03:36:27PM 3   that their characterization is wrong.  It is denied.

03:36:30PM 4        Number 26, Motion in Limine to Preclude Evidence and

03:36:36PM 5   Argument Regarding Ms. Ledlie and Any Taxotears.  I should

03:36:40PM 6   let Judge North have this one.

03:36:40PM 7        MR. STRONGMAN:  Judge North has already spoken on

03:36:43PM 8   this one in so many ways.

03:36:44PM 9        THE COURT:  I know.

03:36:45PM 10       MR. STRONGMAN:  Many times.  And as you are aware

03:36:48PM 11  from those conferences as well as what we cited in our brief,

03:36:54PM 12  the plaintiffs have recognized any number of times that

03:36:57PM 13  Ms. Ledlie and the Taxotears are not relevant to

03:37:03PM 14  Ms. Earnest's case.

03:37:04PM 15       THE COURT:  The only thing I would think as to

03:37:07PM 16  perhaps a safety alert on notice, if you were getting these

03:37:10PM 17  reports from advocacy groups, would that -- what would that

03:37:16PM 18  be?  I don't know.  I thought as I read your motion that you

03:37:24PM 19  were concerned that they would speak to how you responded to

03:37:29PM 20  Facebook posts and how you responded to various items related

03:37:36PM 21  to the Taxotere group on social media.  And I'm wondering if

03:37:42PM 22  any of that becomes notice to Sanofi about the issue of

03:37:48PM 23  ongoing persistent irreversible, whatever we're going to --

03:37:55PM 24       MR. STRONGMAN:  And there's two avenues that I think

03:37:58PM 25  are relevant in this conversation or should be discussed in

03:38:01PM   1    this conversation.

03:38:01PM   2         THE COURT:  I'll tell you from the outset, my first

03:38:04PM   3    issue was, you know, the fact that I think there's some

03:38:09PM   4    testimony -- and, again, I'm getting -- that Sanofi shut out

03:38:15PM   5    some of these people from Facebook.  I think that's a 403

03:38:20PM   6    issue.  I don't know whether that has anything to do with it.

03:38:23PM   7    And it would be very, very prejudicial.

03:38:25PM   8         On the other hand, if advocacy groups were contacting

03:38:32PM   9    you with these reports, what do you do with it?

03:38:36PM   10        MR. STRONGMAN:  And, Your Honor, I think you're

03:38:37PM   11   exactly right.  The bulk of our motion deals with -- and it's

03:38:41PM   12   in the documents and it's in the deposition testimony, deals

03:38:44PM   13   with the fact, like you were saying about Ms. Ledlie posting

03:38:51PM   14   a bunch of negative posts about our company on a Facebook

03:38:56PM   15   page not designed for that purpose.  And so what was done

03:38:58PM   16   was, that was changed and there was a post put up that said

03:39:02PM   17   if you have a medical complaint, here is the

03:39:07PM   18   pharmacovigilance process you go through.  Please contact the

03:39:12PM   19   medical department, file a med watch form, et cetera.  So

03:39:18PM   20   with regard to notice, that all is a pharmacovigilance arm

03:39:22PM   21   and that -- that was done.  So all of this peripheral

03:39:26PM   22   stopping the voices and shutting them out, that is all

03:39:29PM   23   entirely irrelevant and a 403 issue, as Your Honor has said.

03:39:34PM   24   But whether or not we had notice of them in terms of the

03:39:38PM   25   pharmacovigilance piece, we did and there are adverse event

03:39:44PM  1   reports on that and that went through that system.  So that's

03:39:46PM  2   not in debate.  It's simply this Facebook, you're shutting

03:39:54PM  3   down voices type of thing that's going on and we feel 401 and

03:39:58PM  4   403.

03:40:00PM  5          THE COURT:  Thank you.

03:40:00PM  6          Ms. Menzies.

03:40:03PM  7          MS. MENZIES:  Thank you, Your Honor.  I might have

03:40:04PM  8   some good news for you.

03:40:05PM  9          THE COURT:  I am hoping against all hope.

03:40:08PM 10          MS. MENZIES:  We don't want to get into the details

03:40:11PM 11   of Ms. Ledlie.  We don't want to get into the details of

03:40:15PM 12   Taxotere -- the Taxotears.

03:40:15PM 13          THE COURT:  I think that's clearly 403.  That's any

03:40:19PM 14   probative value is outweighed by the prejudicial.

03:40:24PM 15          MS. MENZIES:  The problem, Your Honor, is that the

03:40:26PM 16   motion that they filed on these issues is very broad.  As you

03:40:28PM 17   note, they want to get rid of all the argument and evidence

03:40:31PM 18   related to Shirley Ledlie, fine.  Taxotears, fine.  The

03:40:35PM 19   problem is, is the fact that women were contacting the

03:40:39PM 20   company, whether it was Shirley Ledlie or --

03:40:41PM 21          THE COURT:  I think he's saying that's fine.

03:40:44PM 22          MS. MENZIES:  So we may have to take a name out.  We

03:40:47PM 23   may have to -- the fact that there were women contacting the

03:40:49PM 24   company --

03:40:49PM 25          THE COURT:  Are we going back to back-dooring adverse

03:40:54PM   1   event reports?

03:40:56PM   2          MR. STRONGMAN:  Yes.  Yes.

03:40:58PM   3          MS. MENZIES:  No.  No.  These are not adverse event

03:41:02PM   4   reports.  This is the point, Your Honor, is that women are

03:41:04PM   5   contacting the company about the fact that they felt they

03:41:05PM   6   were not warned as you said in advocacy efforts to try to get

03:41:08PM   7   the company to warn.  And let me tell you why it's relevant

03:41:12PM   8   in this case.  Not only notice, Your Honor, but we have --

03:41:14PM   9   we're obligated under Louisiana Revised Statute 2800.57 to

03:41:21PM   10  prove that Sanofi failed to use reasonable care to provide an

03:41:26PM   11  adequate warning of permanent irreversible hair loss to

03:41:31PM   12  physicians and patients who use Taxotere.  So not only do we

03:41:36PM   13  have people informing the company, women informing the

03:41:38PM   14  company that I felt what you claim was adequate warning

03:41:44PM   15  wasn't notice and we have to counteract the most important

03:41:47PM   16  thing and this is why I say it's not 403, Your Honor.  The

03:41:49PM   17  fact that they took these posts down and took them -- he just

03:41:54PM   18  answered -- they can defend themselves on cross just as

03:41:58PM   19  easily.  Mr. Strongman just said it in a matter of

03:42:02PM   20  30 seconds.  But the inference of the company saying patients

03:42:05PM   21  knew and we always told them about it and their doctors knew

03:42:08PM   22  and we always told them about it, and they're getting

03:42:11PM   23  information from patients saying my doctor didn't know and I

03:42:15PM   24  didn't know and what did Sanofi do about it?  They take it

03:42:19PM   25  down?  So there are --

03:42:19PM **1**      THE COURT:  No.  No.  No.  No.  We have seen ugly

03:42:23PM **2** posts on Facebook.

03:42:25PM **3**      MS. MENZIES:  Excuse me?

03:42:26PM **4**      THE COURT:  I have seen people abuse all sorts of

03:42:32PM **5** Facebook pages, and I have to tell you, sometimes I think, my

03:42:37PM **6** goodness, why must you be so ugly.  And I don't know what

03:42:42PM **7** these people put, but what I'm understanding is it was pretty

03:42:46PM **8** ugly.  I don't necessarily think and I think -- well, I'll

03:42:57PM **9** just tell you what.  I think -- I think if Ms. Ledlie or

03:43:00PM **10** anybody else was posting -- I'm trying to think of how I

03:43:08PM **11** would word it -- acerbic posts about Sanofi's failure to

03:43:17PM **12** provide a warning to her, I don't know what that gives us,

03:43:24PM **13** except we've got an angry lady that had this occur to her.

03:43:31PM **14** Now, I just don't know what that brings us and then the

03:43:37PM **15** fact -- well, wait a minute.

03:43:39PM **16**      And I think -- I don't think it's improper for Sanofi

03:43:44PM **17** to take it off its Facebook page.  Now, the fact that she

03:43:50PM **18** reported this event is what's relevant and if it's in these

03:43:54PM **19** adverse events reports, that's what matters, that's what

03:44:00PM **20** matters is that they were getting information from people

03:44:03PM **21** saying my hair didn't grow back.  The fact that they took

03:44:06PM **22** down a really ugly post, I don't think tells you anything

03:44:13PM **23** other than -- other than they wanted a clean Facebook page

03:44:23PM **24** and they were going to take whatever complaints she had.

03:44:27PM **25** That needs to go to the proper channels, not on Facebook.

03:44:31PM   1         MS. MENZIES:  And I appreciate that, Your Honor.  And

03:44:31PM   2    the posts themselves aren't what we're trying to present and

03:44:34PM   3    this may be another --

03:44:34PM   4         THE COURT:  Then what are you trying to present?

03:44:36PM   5    Because you want to say they took it down?

03:44:38PM   6         MS. MENZIES:  We want to show how they reacted to it.

03:44:41PM   7    Yes.  And this is proffered through evidence.  Let me just

03:44:43PM   8    give you a reason --

03:44:43PM   9         THE COURT:  Did they tell her she couldn't report it?

03:44:45PM  10         MS. MENZIES:  They blocked her from -- they tried to

03:44:48PM  11    get her off -- not just her.  It's a number of women.  Put

03:44:52PM  12    Shirley Ledlie aside.  We can take her out all you want.

03:44:54PM  13    It's a number of women and what they had is a third party

03:44:57PM  14    company come in, monitor it and then try to get them off of

03:45:01PM  15    Facebook completely, block them, like they violated Facebook

03:45:04PM  16    policy to get them off.  That's a pretty aggressive move

03:45:08PM  17    about women -- it would be different, Your Honor, if we were

03:45:11PM  18    talking about, oh, I really hate this company, or I got

03:45:13PM  19    fired, or I hate Taxotere.  We're talking about the very side

03:45:18PM  20    effects in this case.

03:45:19PM  21         And here's some testimony that we have to refute.

03:45:22PM  22    The head chief officer of medical affairs, which underneath

03:45:26PM  23    it is medical information services, we have three witnesses

03:45:30PM  24    that speak to this, he testifies in response to defendant's

03:45:36PM  25    questions:  But in the departments you would -- these weren't

03:45:40PM 1   just business people.  These were experts in their field and

03:45:44PM 2   very often people who have medical training, medical

03:45:46PM 3   background or medical degrees.

03:45:48PM 4        Mr. Chew's answer:  Yes, almost exclusively because

03:45:53PM 5   you had to be able to put yourself into the treating

03:45:58PM 6   physician and you also had to have empathy and understanding

03:46:01PM 7   of what patients need to know and what they need to -- make

03:46:04PM 8   sure that the labels are updated.

03:46:07PM 9        THE COURT:  Wait.  Is that talking about Facebook?

03:46:10PM 10       MS. MENZIES:  No, Your Honor.  What I'm saying is, is

03:46:12PM 11   part of Sanofi's actions when they take patients who are

03:46:15PM 12   concerned -- and the patient, their hair is gone.  The

03:46:18PM 13   concern that they're communicating is that -- and it's not --

03:46:22PM 14   it sounds -- like, we all have imaginations of what Facebook

03:46:26PM 15   looks like.  And we don't even have to show the posts.  But

03:46:29PM 16   we have spreadsheets that show where the third-party company

03:46:36PM 17   documents, this patient said, "I'm concerned you're not

03:46:37PM 18   telling doctors because I wasn't told.  I wasn't given an

03:46:39PM 19   informed choice."  And they take that all down, make sure

03:46:42PM 20   that it's not available.

03:46:43PM 21       Your Honor, has another MIL that's in front of you

03:46:46PM 22   where the defendants wants to keep arguing statute of

03:46:50PM 23   limitations should the plaintiff had known.  How they respond

03:46:54PM 24   to women who are trying get the word out is what's relevant

03:46:56PM 25   to us when they turn around and say, "We are a great company

03:47:01PM   1   and we have so much empathy for our patients and it's so

03:47:06PM   2   important that these patients have our information and our

03:47:09PM   3   labels updated."

03:47:10PM   4        So how do we counter that?  We can't talk about their

03:47:12PM   5   motive.  You're right.  We can't talk about the motive.  But

03:47:15PM   6   we can talk about it is relevant for us to refute that with

03:47:18PM   7   the deposition testimony to say, wait a minute, this is how

03:47:21PM   8   Sanofi reacts when they're being told by women that they

03:47:26PM   9   weren't told and their doctors weren't told; and on the flip

03:47:30PM   10  side, they want to say, oh no, not only did we tell

03:47:31PM   11  everybody, but we're empathic to the patients and their

03:47:35PM   12  concerns.  That's just not accurate and those are facts we

03:47:36PM   13  want to present.  We don't need to infer it when we present

03:47:40PM   14  those facts.

03:47:40PM   15       So what I would suggest Your Honor do -- and this is

03:47:43PM   16  another in context.  We have testimony from three of Sanofi's

03:47:47PM   17  witnesses, all three put together is less than two hours of

03:47:52PM   18  testimony.  And in that testimony, we have those designations

03:47:55PM   19  that would show you the facts that we want to get into.  It

03:48:00PM   20  is not, you know, a Facebook page with a woman and her bald

03:48:06PM   21  head.  I mean, there's that.  We're not trying to get that

03:48:08PM   22  in.  What we're trying to show is both that these women were

03:48:11PM   23  raising concerns.  There were multiple of them and what

03:48:14PM   24  Sanofi did -- to -- and to be honest with you, Your Honor,

03:48:17PM   25  it's not just that they just took the Facebook posts down for

03:48:20PM **1**   the Voices Facebook page.  It's more than that.  They had

03:48:24PM **2**   a -- they developed a -- what they called a rapid response

03:48:28PM **3**   team, damage control, outside companies and internally and

03:48:33PM **4**   then the people that were involved in this, Your Honor, at

03:48:36PM **5**   the company, it was a company-wide, not just in the US, but

03:48:41PM **6**   in France as well to directors, legal, other officers, the

03:48:45PM **7**   medical affairs department.  To say, oh, my God, people are

03:48:50PM **8**   saying bad stuff about Taxotere.  And, frankly, the prompting

03:48:53PM **9**   concern that they raised internally was the fact that there

03:48:56PM **10**  was a doctor who had commented in the media that he thought

03:49:00PM **11**  Taxotere caused permanent hair loss and he's now using taxol,

03:49:07PM **12**  which is less expensive because it's generic.

03:49:10PM **13**       So internally we need to show, you know, this is how

03:49:13PM **14**  Sanofi responds internally to this issue.  It's a PR problem

03:49:16PM **15**  for them.  It's not, oh, my gosh, we need to be empathic to

03:49:20PM **16**  these patients and make sure that they are informed properly

03:49:24PM **17**  that there's a possibility of permanent hair loss.

03:49:29PM **18**       THE COURT:  Okay.  Thank you.

03:49:32PM **19**       MS. MENZIES:  Thank you, Your Honor.

03:49:33PM **20**       THE COURT:  Mr. Strongman.

03:49:36PM **21**       MR. STRONGMAN:  Your Honor, there are no punitive

03:49:38PM **22**  damages in this case.  What we just heard has absolutely

03:49:41PM **23**  nothing to do with Dr. Carinder or Ms. Earnest.  It's

03:49:44PM **24**  irrelevant.  The adverse event reports that were submitted

03:49:47PM **25**  for each of these individual women is part of the analysis

03:49:51PM  1    that was done by Dr. Madigan and Dr. Kessler and that's where

03:49:55PM  2    it should stay.  Thank you.

03:50:14PM  3            THE COURT:  You know, I have to tell you, I'm not

03:50:17PM  4    inclined to admit this evidence.  I do think it's a 403

03:50:23PM  5    issue.  I think if we found out that they were not accepting

03:50:27PM  6    adverse event reports, that would be one thing, but what you

03:50:35PM  7    had is angry women posting on social media the fact that they

03:50:39PM  8    wanted them off of their Facebook page.

03:50:42PM  9            Now, it could be at some point become impeachment,

03:50:46PM  10   and if that's the issue, you know, then I'll deal with it.

03:50:47PM  11   If they say, you know -- that may be.  But out the box, I

03:50:56PM  12   just think it's a 403 issue.  If they refuse to accept

03:51:00PM  13   adverse event reports, that would be one thing, but that's

03:51:04PM  14   not what I heard.  What I heard is they tell them to make the

03:51:09PM  15   complaint in the proper way that we're going to assess it,

03:51:13PM  16   not on Facebook.

03:51:15PM  17           Now, we may find ourselves -- watch what you ask for,

03:51:22PM  18   you just might get it.  If you open the door, I don't allow

03:51:26PM  19   peeking in and shutting it real quick.  It's open and then

03:51:33PM  20   it's fair game.  Okay?

03:51:37PM  21           MS. MENZIES:  Thank you, Your Honor.

03:51:39PM  22           THE COURT:  All right.  2015 label change.

03:51:43PM  23           MR. STRONGMAN:  Yes, Your Honor.

03:51:44PM  24           We're to the last one on the to argue list, thank

03:51:48PM  25   goodness.  And this one is pretty straightforward in terms of

03:51:51PM  1   the substance at least.  So what we have asked to exclude are

03:51:55PM  2   the label changes and the related internal conduct

03:52:02PM  3   within that -- within that avenue, that postdates the

03:52:06PM  4   prescribing decision for Dr. Carinder.  We believe that it's

03:52:09PM  5   a classic 407 subsequent remedial measure and I think the

03:52:15PM  6   plaintiff's briefing makes it clear that's exactly how they

03:52:17PM  7   want to use it.  407 expressly includes a prohibition of

03:52:22PM  8   using such evidence for the need for a warning or

03:52:25PM  9   instruction.  So it's directly and squarely within 407.  On

03:52:30PM  10  top of that, it would be unduly prejudicial in light of the

03:52:34PM  11  timing.  And so with regard to the label change, we believe

03:52:38PM  12  it's both the 407, 401, and 403 issue and leave it at that.

03:52:47PM  13          THE COURT:  Thank you.

03:52:48PM  14          MR. MICELI:  Your Honor, I hope to be as quick as

03:52:50PM  15  Mr. Strongman.

03:52:53PM  16          Fifth Circuit law in the Eastern District of

03:52:55PM  17  Louisiana, law is very clear that the prohibition on

03:53:01PM  18  subsequent remedial measures is not quite as stated in the

03:53:05PM  19  briefing; it's allowed for impeachment purposes which is why

03:53:08PM  20  we want it.  Their motion seeks to exclude anything that

03:53:13PM  21  postdates 2011.  But they're not asking to exclude

03:53:17PM  22  Dr. Kopreski's analysis which occurred in the 60- to 90-day

03:53:22PM  23  window in late 2018 and then they're going to have three

03:53:26PM  24  experts rely upon a 2018 analysis of select -- hand-selected

03:53:30PM  25  data.  We have to have the opportunity to cross-examine

03:53:35PM   1    effectively.

03:53:36PM   2         Dr. Kopreski's analysis and the opinions that we're

03:53:38PM   3    going to hear from the three experts directly contradict the

03:53:41PM   4    representations that Sanofi is making to this day, to the

03:53:46PM   5    world through their label.  They had a label change in May of

03:53:51PM   6    2019 that still references the 29 individuals, and

03:53:54PM   7    Dr. Kopreski's analysis is still the little secret that's

03:53:56PM   8    being kept inside this courtroom.  We have to be able to

03:53:59PM   9    cross-examine on that.

03:54:00PM  10         Further, the 2015 label audit discusses how the

03:54:05PM  11    April 2011 failure to -- failure to include company core

03:54:11PM  12    safety information from being in the label in 2011.  So in

03:54:15PM  13    2015, they're saying 2011, this should have been in the

03:54:19PM  14    label.  Further the 2015 communications with FDA -- these are

03:54:23PM  15    Exhibits A through G of our brief -- our opposition.

03:54:30PM  16         The 2015 communication with FDA says that this

03:54:34PM  17    information, the safety information concerning permanent

03:54:38PM  18    persisting or ongoing, whichever word of theirs we'd like to

03:54:44PM  19    use, should have been in the label in 2011.  Your Honor's

03:54:47PM  20    rulings in some of the Daubert orders makes clear that even

03:54:51PM  21    though things happen in 2015, they relied upon information

03:54:54PM  22    from 2006, 2009, 2010.  That's exactly the case we're looking

03:54:59PM  23    at here.  But, again, I go back to Dr. Kopreski.  He does

03:55:03PM  24    something in 2018 that directly contradicts a multitude of

03:55:08PM  25    the evidence that we're going to be presenting in this case,

03:55:11PM 1   and the representations that Sanofi makes to the world

03:55:14PM 2   through its label.  We have to have the opportunity to

03:55:17PM 3   effectively cross-examine that witness.

03:55:22PM 4         THE COURT:  Thank you.  Do you have anything?

03:55:24PM 5         MR. STRONGMAN:  Your Honor, I have no idea what

03:55:26PM 6   Dr. Kopreski's analysis has to do with our motion for one.

03:55:30PM 7   We're seeking to exclude, as I said, label changes that

03:55:35PM 8   postdate as well as information that simply can't be relevant

03:55:39PM 9   to a failure-to-warn claim that postdate the prescription

03:55:42PM 10  because, obviously, things that happen past the prescription

03:55:46PM 11  cannot be noticed.  So it's a subsequent remedial measure and

03:55:48PM 12  it's the notice that postdates.  That's what we're seeking to

03:55:52PM 13  exclude.

03:55:52PM 14        THE COURT:  Thank you.

03:55:54PM 15        Okay.  I'll let you know on that one.  I'm going to

03:56:18PM 16  look more at that one.

03:56:20PM 17        MR. NOLEN:  I'm sorry, Your Honor.  I just had a

03:56:22PM 18  question if the Court is amenable to taking it.  It's about

03:56:27PM 19  your order on Dr. Kessler yesterday or I guess two days ago.

03:56:32PM 20  Talked about -- talking about 2009 and so we just have a

03:56:37PM 21  question about that, and since we're not asking for rehearing

03:56:40PM 22  or reconsideration, we haven't briefed anything --

03:56:45PM 23        THE COURT:  That may have been an error.  This is --

03:56:50PM 24        MR. NOLEN:  A 2011 case.  That was our question.

03:56:57PM 25        THE COURT:  That's -- I apologize.

| | | |
|---|---|---|
| 03:56:57PM | 1 | MR. STRONGMAN:  And, Your Honor, if I may address |
| 03:56:59PM | 2 | that briefly, one thing that is clear is that Dr. Kessler |
| 03:57:11PM | 3 | needs to stick to his report.  2009 is what he says in his |
| 03:57:15PM | 4 | report. |
| 03:57:15PM | 5 | THE COURT:  Maybe that's what it says in his report. |
| 03:57:16PM | 6 | MR. STRONGMAN:  So I think this is not a mistake. |
| 03:57:18PM | 7 | When you look at his report, 2009 is all over.  He says we |
| 03:57:22PM | 8 | should have warned by 2009. |
| 03:57:22PM | 9 | THE COURT:  By 2009. |
| 03:57:23PM | 10 | MR. STRONGMAN:  So I think Your Honor's order was not |
| 03:57:26PM | 11 | a mistake and, in fact, was -- |
| 03:57:28PM | 12 | THE COURT:  I don't remember.  You are asking |
| 03:57:31PM | 13 | me after -- I have to look at it.  I will look at it. |
| 03:57:35PM | 14 | MR. STRONGMAN:  It's what's in his report. |
| 03:57:44PM | 15 | THE COURT:  I don't remember. |
| 03:57:50PM | 16 | Okay.  Court's adjourned.  Meet me in my office. |
| | 17 | * * * * |
| | 18 | (WHEREUPON, the proceedings were adjourned at 2:50 p.m.) |
| | 19 | * * * * |
| | 20 | REPORTER'S CERTIFICATE |
| | 21 | I, Nichelle N. Drake, RPR, CRR, Official Court |
| | 22 | Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and |
| | 23 | correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter. |
| | 24 | |
| | 25 | ___/s/ Nichelle N. Drake___ |

Official Court Reporter
OFFICIAL TRANSCRIPT
Page 124

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25