# **EXHIBIT N**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  TAXOTERE (DOCETAXEL)      *
PRODUCTS LIABILITY LITIGATION     *     Docket No.: 16-MD-2740
                                  *     Section "H(5)"
                                  *     New Orleans, Louisiana
*Relates to:  Barbara Earnest*     *     September 17, 2019
*Case No.: 16-CV-17144*            *
* * * * * * * * * * * * * * * * *


DAY 2 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE JANE T. MILAZZO
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street
                             Suite 3650
                             New Orleans, Louisiana 70139



For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                               & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, Louisiana 70163



For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street
                             Suite 2505
                             New Orleans, Louisiana 70163


OFFICIAL TRANSCRIPT

APPEARANCES:

For the Plaintiffs:        Gibbs Law Group, LLP
                           BY:  KAREN BARTH MENZIES, ESQ.
                           6701 Center Drive West
                           Suite 1400
                           Los Angeles, California 90045


For the Plaintiffs:        Bachus & Schanker, LLC
                           BY:  J. KYLE BACHUS, ESQ.
                                DARIN L. SCHANKER, ESQ.
                           1899 Wynkoop Street
                           Suite 700
                           Denver, Colorado 80202


For the Plaintiffs:        Fleming Nolen & Jez, LLP
                           BY:  RAND P. NOLEN, ESQ.
                           2800 Post Oak Boulevard
                           Suite 4000
                           Houston, Texas 77056


For the Plaintiffs:        DAVID F. MICELI, LLC
                           BY:  DAVID F. MICELI, ESQ.
                           Post Office Box 2519
                           Carrollton, Georgia 30112


For the Plaintiffs:        Morgan & Morgan, P.A.
                           BY:  EMILY C. JEFFCOTT, ESQ.
                           700 S. Palafox Street
                           Suite 95
                           Pensacola, Florida 32502


For the Sanofi             Irwin Fritchie Urquhart
Defendants:                     & Moore, LLC
                           BY:  DOUGLAS J. MOORE, ESQ.
                           400 Poydras Street
                           Suite 2700
                           New Orleans, Louisiana 70130

OFFICIAL TRANSCRIPT

APPEARANCES:


For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                    BY:  HARLEY V. RATLIFF, ESQ.
                                    JON A. STRONGMAN, ESQ.
                               2555 Grand Boulevard
                               Kansas City, Missouri 64108



For the Sanofi                 Shook Hardy & Bacon, LLP
Defendants:                    BY:  HILDY M. SASTRE, ESQ.
                               201 Biscayne Boulevard, Suite 3200
                               Miami, Florida 33131



Official Court Reporter:       Jodi Simcox, RMR, FCRR
                               500 Poydras Street
                               Room HB-275
                               New Orleans, Louisiana 70130
                               (504) 589-7780



Proceedings recorded by mechanical stenography, transcript

produced by computer.

OFFICIAL TRANSCRIPT

<u>**I N D E X**</u>

<u>Page</u>

DAVID KESSLER
    Direct Examination By Mr. Nolen:        381
    Cross-Examination By Mr. Strongman:   388
    Redirect Examination By Mr. Nolen:    506

PROFFER
    Examination By Mr. Strongman:       528

PROFFER
    Examination By Mr. Miceli         534

OFFICIAL TRANSCRIPT

DAVID KESSLER – DIRECT

| | | |
|---|---|---|
| 12:37PM | 1 | **AFTERNOON SESSION** |
| 12:37PM | 2 | **(September 17, 2019)** |
| 12:37PM | 3 | ****** |
| 12:53PM | 4 | |
| 1:00PM | 5 | **THE DEPUTY CLERK:**  All rise. |
| 1:00PM | 6 | (WHEREUPON, the jury entered the courtroom.) |
| 1:01PM | 7 | **THE COURT:**  All jurors are present.  Court's back in |
| 1:01PM | 8 | session.  You may be seated. |
| 1:01PM | 9 | Dr. Kessler, I remind you again that you're |
| 1:01PM | 10 | still under oath. |
| 1:01PM | 11 | **THE WITNESS:**  Thank you, Your Honor. |
| 1:01PM | 12 | **THE COURT:**  Please proceed, Mr. Nolen. |
| 1:01PM | 13 | (WHEREUPON, **DAVID KESSLER**, having been previously |
| 1:01PM | 14 | duly sworn, testified as follows.) |
| 1:01PM | 15 | DIRECT EXAMINATION |
| 1:01PM | 16 | BY MR. NOLEN: |
| 1:01PM | 17 | **Q.**   Hi, Dr. Kessler. |
| 1:01PM | 18 | **A.**   Good afternoon. |
| 1:01PM | 19 | **Q.**   All right.  So I -- right before we took a break there, we |
| 1:01PM | 20 | had just talked about the statistical significance in the TAC |
| 1:01PM | 21 | arm of 316 versus the FAC arm; is that right? |
| 1:02PM | 22 | **A.**   Right. |
| 1:02PM | 23 | **Q.**   Now, you were looking, I believe, for causal association, |
| 1:02PM | 24 | from a regulatory standpoint, in your analysis and search. |
| 1:02PM | 25 | And so was -- did your analysis -- did your |

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

| | |
|---|---|
| 1:02PM | 1 | investigation stop at the clinical trial? |
| 1:02PM | 2 | **A.**   No, it did not. |
| 1:02PM | 3 | **Q.**   What else, if anything, did you review? |
| 1:02PM | 4 | **A.**   So a number of things, including -- there was another |
| 1:02PM | 5 | comparative study done by Dr. Sedlacek in 2006. |
| 1:02PM | 6 | **Q.**   Okay.  You mentioned that earlier in today's proceedings; |
| 1:02PM | 7 | right? |
| 1:02PM | 8 | **A.**   Correct. |
| 1:02PM | 9 | **Q.**   So is Sedlacek -- let's see, S-E-D-L-A-C-E-K. |
| 1:02PM | 10 |         So he did a comparison between what drugs? |
| 1:03PM | 11 | **A.**   So he looked at patients in his clinical practice over an |
| 1:03PM | 12 | 11-year period, and he divided them up into three groups.  The |
| 1:03PM | 13 | first group was Adriamycin without taxane, without Taxotere or |
| 1:03PM | 14 | Taxol.  So it was just the Adriamycin and other drug combos. |
| 1:03PM | 15 | So there was no taxane in that first group. |
| 1:03PM | 16 |         He had a second group that had Adriamycin and Taxol |
| 1:03PM | 17 | or also called the Taxol, and that was his second group.  So |
| 1:03PM | 18 | that did have a taxane, but it was Taxol, not Taxotere. |
| 1:03PM | 19 |         And he had a third group that included Adriamycin |
| 1:03PM | 20 | plus Taxotere. |
| 1:04PM | 21 | **Q.**   Okay.  So -- |
| 1:04PM | 22 |         **THE COURT:**  I'm sorry.  Dr. Kessler, was -- the first |
| 1:04PM | 23 | group was what? |
| 1:04PM | 24 |         **THE WITNESS:**  The first group, Your Honor, was |
| 1:04PM | 25 | Adriamycin without either of the Ts. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:04PM  1        **THE COURT:**  Okay.  Thank you.

1:04PM  2        **THE WITNESS:**  So no taxane, just Adriamycin, but a

1:04PM  3    number of different Adriamycin combinations, Your Honor.

1:04PM  4        **THE COURT:**  Thank you.

1:04PM  5    BY MR. NOLEN:

1:04PM  6    **Q.**   And so we have A, which is Adriamycin -- A and Taxol,

1:04PM  7    which is a different drug than Taxotere; right?

1:04PM  8    **A.**   Correct.  Also called paclitaxel.

1:04PM  9    **Q.**   And then we had A, which is Adriamycin, plus Taxotere?

1:04PM  10   **A.**   Correct.

1:04PM  11   **Q.**   And so what was important about Dr. Sedlacek's findings?

1:04PM  12   **A.**   So he studied his patients, it should be pointed out,

1:05PM  13   retrospectively.  He went back and looked at the data in his

1:05PM  14   charts, and he studied them.  And he reported something that he

1:05PM  15   called persistent significant alopecia.  And it was alopecia

1:05PM  16   that persisted and that was greater than 50 percent.

1:05PM  17             And what he reported, both in his abstract and at the

1:05PM  18   San Antonio breast conference in -- mid -- I think it was 2006,

1:05PM  19   if I'm right, if my memory serves right.  He reported that

1:05PM  20   there were zero cases of significant persistent alopecia in

1:05PM  21   that first group with Adriamycin alone.

1:05PM  22             There was zero in the Adriamycin plus Taxol group.

1:06PM  23   And there were seven cases of persistent significant alopecia

1:06PM  24   in the Adriamycin plus Taxotere.  And I think, if my memory

1:06PM  25   serves me, it was about 6 percent.

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

**Q.** So does that reach this level or this threshold of what you described earlier as statistically significant?

**A.** Yes. So if you do statistics on this, again, it just -- when you compare seven with a number of patients in that arm versus the zeros in the other arms, it comes out to be statistically significant.

**Q.** So these two things, Sedlacek and the clinical trial, those are statistically significant; is that right?

**A.** Correct.

**Q.** All right. So is that -- is that the total sum of what you've looked at in order to formulate your opinion regarding the causal association?

**A.** No. Well, again, cumulatively.

**Q.** Okay.

**A.** So it includes everything that we've talked about this morning. It's not just any one of these.

Plus I think we need to underscore again what I talked about with the jury a little earlier about biological plausibility. Just because you have a statistically significant result, I'm not willing to say there's reasonable evidence of a causal association, unless there's a possible mechanism definitively how the drug causes persistent hair loss. But I have to have a -- by a plausible biological rational.

And I think that everyone would agree, when it comes

DAVID KESSLER - DIRECT

1:07PM  1   to chemotherapy, there is at least a plausible mechanism.  So
1:08PM  2   you need that just to -- it's a check on making sure that, you
1:08PM  3   know, you just don't believe the statistics alone.  It's --
1:08PM  4   again, it's the totality.  So biological plausibility was also
1:08PM  5   an important factor.
1:08PM  6   Q.   Okay.  So applying the regulatory -- let me try to phrase
1:08PM  7   this appropriately.
1:08PM  8         Applying the regulatory criteria, did you determine
1:08PM  9   whether or not there is a causal association between Taxotere
1:08PM  10  and permanent hair loss?
1:08PM  11  A.   Yes.
1:08PM  12  Q.   And --
1:08PM  13  A.   So I think under -- under both standards, the standard for
1:08PM  14  the warning and the standard for adverse events that we saw
1:09PM  15  this morning, I think it's fair to say there's reasonable
1:09PM  16  evidence, not perfect evidence -- rarely is there perfect
1:09PM  17  evidence.  There's reasonable evidence of a causal association.
1:09PM  18  Q.   And you told us you were in the courtroom this morning for
1:09PM  19  Dr. Freedman's testimony.
1:09PM  20         Remember that?
1:09PM  21  A.   Correct.
1:09PM  22  Q.   The deposition testimony?
1:09PM  23  A.   I heard that, yes.
1:09PM  24  Q.   Did you hear in that testimony that there was an
1:09PM  25  association as early as 2006?

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:09PM 1          **MR. STRONGMAN:**  Objection.  Misstates the evidence.

1:09PM 2     Foundation.

1:09PM 3          **THE COURT:**  I think -- just rephrase your question.

1:09PM 4     BY MR. NOLEN:

1:09PM 5     Q.   Did anything Dr. Freedman testified to that you heard in

1:09PM 6     court today differ from any opinions that you've offered?

1:09PM 7          **MR. STRONGMAN:**  Objection.  Foundation.  Misstates

1:09PM 8     the evidence.

1:10PM 9          **THE COURT:**  I'm going to allow him to answer the

1:10PM 10    question.  I think I'll allow him to answer the question.

1:10PM 11         **THE WITNESS:**  Dr. Freedman's statement that Taxotere

1:10PM 12    caused permanent hair loss in 2006, her statement I would

1:10PM 13    corroborate.

1:10PM 14    BY MR. NOLEN:

1:10PM 15    Q.   Okay.  And so is it fair to say that -- that Sanofi should

1:10PM 16    have warned about permanent hair loss as early as '06?

1:10PM 17    A.   Yes.  Because in addition to the reasonable evidence of a

1:10PM 18    causal association, I think permanent hair loss is serious,

1:10PM 19    certainly a clinically significant hazard, that can be

1:10PM 20    life-changing.

1:10PM 21         So the two together, I think, meet the definition of

1:11PM 22    reasonable evidence of a causal association, as well as the

1:11PM 23    standard for an adverse event, which is reasonably associated

1:11PM 24    or some basis to believe.  Both standards, I believe, would be

1:11PM 25    met.

OFFICIAL TRANSCRIPT

DAVID KESSLER - DIRECT

1:11PM 1   **Q.**   And where were they supposed to warn?

1:11PM 2   **A.**   Clearly and prominently in the label.

1:11PM 3   **Q.**   And so -- and I want to go back, because I'm concerned

1:11PM 4   that there may be some confusion.

1:11PM 5              In 2007, we looked at, a moment ago, a warning

1:11PM 6   that -- about permanent hair loss that was in a clinical trial;

1:11PM 7   correct?

1:11PM 8   **A.**   It was a warning in a informed consent that was for just

1:11PM 9   the clinical trial, correct.

1:11PM 10   **Q.**   All right.  But that warning about permanent hair loss was

1:12PM 11   not appearing in labeling --

1:12PM 12   **A.**   Correct.

1:12PM 13   **Q.**   -- all the way through 2011?

1:12PM 14   **A.**   Correct.

1:12PM 15   **Q.**   Thank you.

1:12PM 16              **MR. NOLEN:**  I pass the witness.

1:12PM 17              **THE COURT:**  Mr. Strongman.

1:12PM 18              **MR. STRONGMAN:**  If I could take a moment just to set

1:12PM 19   up, Your Honor.

1:12PM 20              **THE COURT:**  Of course.

1:13PM 21              Can you all see the easel?

1:13PM 22              **A JUROR:**  Yes.

1:13PM 23              **THE COURT:**  Okay.  Thank you.

1:13PM 24              **MR. STRONGMAN:**  Dr. Kessler, can you see?

1:13PM 25              **THE WITNESS:**  Yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:13PM | 1 | **THE COURT:**  Please proceed. |
| 1:13PM | 2 | **MR. STRONGMAN:**  Good afternoon, ladies and gentlemen. |
| 1:13PM | 3 | **CROSS-EXAMINATION** |
| 1:13PM | 4 | BY MR. STRONGMAN: |
| 1:13PM | 5 | **Q.**   Good afternoon, Dr. Kessler.  How are you? |
| 1:13PM | 6 | **A.**   Good afternoon. |
| 1:13PM | 7 | **Q.**   So you and I have not had a chance to meet before, but you |
| 1:13PM | 8 | are no stranger to the courtroom; correct? |
| 1:13PM | 9 | **A.**   That's fair. |
| 1:13PM | 10 | **Q.**   I think you've testified more than 40 times; correct? |
| 1:14PM | 11 | **A.**   Approximately. |
| 1:14PM | 12 | **Q.**   And I thought I heard during your testimony that you said |
| 1:14PM | 13 | you like to review labels in your spare time. |
| 1:14PM | 14 | Do you remember that? |
| 1:14PM | 15 | **A.**   I think I said something to that effect. |
| 1:14PM | 16 | **Q.**   Right.  And the truth is you actually spend quite a bit of |
| 1:14PM | 17 | your spare time reviewing drug labels for plaintiffs' lawyers |
| 1:14PM | 18 | at $1,000 an hour; isn't that correct? |
| 1:14PM | 19 | **A.**   Absolutely. |
| 1:14PM | 20 | **Q.**   In fact, that's the role that you find yourself in here |
| 1:14PM | 21 | today; isn't that right? |
| 1:14PM | 22 | **A.**   I find myself testifying, absolutely. |
| 1:14PM | 23 | **Q.**   All right.  And you know how this process works. |
| 1:14PM | 24 | You create an expert report; isn't that correct? |
| 1:14PM | 25 | **A.**   Right here, sir, correct. |

DAVID KESSLER - CROSS

1:14PM   1   Q.   Very good.   And when you create an expert report, you have
1:14PM   2   to review data; isn't that right?
1:14PM   3   A.   Correct.
1:14PM   4   Q.   And you have to consider all the relevant information;
1:14PM   5   isn't that right?
1:14PM   6   A.   Correct.
1:14PM   7   Q.   You can't cherry-pick information; fair?
1:14PM   8   A.   Fair.
1:14PM   9   Q.   All right.
1:14PM   10   A.   There should be a footnote there.
1:14PM   11   Q.   You can footnote that?
1:14PM   12   A.   I can footnote that.
1:15PM   13   Q.   All right.   Well, certainly, when you're asked to get
1:15PM   14   involved in a case, you need to approach it neutrally; isn't
1:15PM   15   that right?
1:15PM   16   A.   Exactly.
1:15PM   17   Q.   Right.
1:15PM   18   A.   That's the way I do it.
1:15PM   19   Q.   And the reality is, in nearly every single case where you
1:15PM   20   have come into the courtroom to testify about whether or not a
1:15PM   21   drug label was adequate, in nearly every single one of those
1:15PM   22   cases, you have said the drug label is inadequate; correct?
1:15PM   23   A.   In those settings where that's an issue, yes.   I've also
1:15PM   24   testified that, in some instances, that a label would be
1:15PM   25   adequate.   But many times, when that's the question and I'm

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:15PM 1   testifying for plaintiffs, that's the ultimate.  You're
1:15PM 2   correct.
1:15PM 3   **Q.**   And, Doctor, wouldn't you agree that, when you consider
1:15PM 4   information and when you tell the jury information, you should
1:15PM 5   share the things that are both helpful to the plaintiff side
1:16PM 6   and the things that are helpful to the defense side; correct?
1:16PM 7   **A.**   Absolutely.  I love to do that.  But as you know, I'm sort
1:16PM 8   of restricted on answering questions.  When I stray to do that,
1:16PM 9   I get -- so I have to answer the questions, and happy to do
1:16PM 10  that.  I can't lecture here.
1:16PM 11  **Q.**   And the point being that you have to answer the questions
1:16PM 12  that plaintiff's lawyers asked you; right?
1:16PM 13  **A.**   Correct.
1:16PM 14  **Q.**   You're limited in what they asked you; true?
1:16PM 15  **A.**   Correct.
1:16PM 16  **Q.**   They didn't ask you, "Hey, what information is actually
1:16PM 17  helpful to Sanofi," did they?  They didn't ask that question,
1:16PM 18  did they?
1:16PM 19  **A.**   That was not one of the questions that came from
1:16PM 20  plaintiff's counsel.  You are correct.
1:16PM 21  **Q.**   And you've held up your report in this case, and it's big,
1:16PM 22  isn't it?  When you include all the appendixes and the
1:16PM 23  different attachments like the -- you have schedules, is what
1:16PM 24  you call them?
1:16PM 25  **A.**   That's fair.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:16PM | 1 | **Q.**  Okay. |
| 1:16PM | 2 | **A.**  Exactly. |
| 1:17PM | 3 | **Q.**  And it's long, isn't it? |
| 1:17PM | 4 | **A.**  Mine is double-sided, so yours is probably single-sided. |
| 1:17PM | 5 | **Q.**  Several hundred pages; right? |
| 1:17PM | 6 | **A.**  I haven't counted, but I wouldn't dispute that. |
| 1:17PM | 7 | **Q.**  Okay.  How long did it take you to write this report? |
| 1:17PM | 8 | Actual pen to paper, how long did it take you to write? |
| 1:17PM | 9 | **A.**  Oh, probably close to 100 hours. |
| 1:17PM | 10 | **Q.**  I want you to set aside the time reviewing documents. |
| 1:17PM | 11 |        How long did it actually take you to write? |
| 1:17PM | 12 | **A.**  I tend not to write.  I tend to dictate my reports.  You |
| 1:17PM | 13 | know, I'm not a great typist. |
| 1:17PM | 14 | **Q.**  How long did it take to you dictate your report, Doctor? |
| 1:17PM | 15 | **A.**  Oh, it took, certainly, several days -- |
| 1:17PM | 16 | **Q.**  Okay. |
| 1:17PM | 17 | **A.**  -- at least. |
| 1:17PM | 18 | **Q.**  Okay.  And you understand that, when you do a report like |
| 1:17PM | 19 | you did in this case, that you have it include all your |
| 1:17PM | 20 | opinions in it; correct? |
| 1:17PM | 21 | **A.**  Of course. |
| 1:17PM | 22 | **Q.**  And you have to include all of the things that you relied |
| 1:17PM | 23 | upon; correct? |
| 1:17PM | 24 | **A.**  Correct.  I tried to do that, absolutely.  Again, there's |
| 1:17PM | 25 | always a caveat to that in a footnote.  But essentially, yes. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:18PM  1   **Q.**   Okay.  Now I want to talk about a few things that you're
1:18PM  2   not offering opinions on.  Okay.
1:18PM  3   **A.**   Sure.  Happy do that.
1:18PM  4   **Q.**   All right.  Dr. Kessler, just so the record is clear, in
1:18PM  5   this case, you are not offering any opinions specifically about
1:18PM  6   Ms. Earnest; is that correct?
1:18PM  7   **A.**   I think that would be fair.
1:18PM  8   **Q.**   Okay.  You haven't reviewed her medical records; is that
1:18PM  9   correct?
1:18PM  10  **A.**   I think I looked -- for the purposes -- essentially,
1:18PM  11  you're correct.
1:18PM  12  **Q.**   Okay.
1:18PM  13  **A.**   I mean, I think I've reviewed, but I'm not testifying.
1:18PM  14  Others will testify.
1:18PM  15  **Q.**   You're not here to actually offer any testimony about what
1:18PM  16  happened to Ms. Earnest; correct?
1:18PM  17  **A.**   Well said.  That was not my job.  Others will testify.
1:19PM  18  **Q.**   And you were shown -- for example, you were shown an
1:19PM  19  informed consent earlier by Mr. Nolen.
1:19PM  20            Do you remember that?
1:19PM  21  **A.**   I certainly do.
1:19PM  22  **Q.**   Right.  Did Mr. Nolen show you Ms. Earnest's informed
1:19PM  23  consent?
1:19PM  24  **A.**   Not during this trial, no.
1:19PM  25  **Q.**   All right.  But you understand, certainly, what it means

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:19PM 1    to offer a case-specific opinion?  You understand what that
1:19PM 2    means in the context of litigation; correct?
1:19PM 3    A.   I did go to law school.  Yes, I think I understand that.
1:19PM 4    Q.   And so you're not here talking about Ms. Earnest today;
1:19PM 5    correct?
1:19PM 6    A.   Please, you're exactly correct, Counselor.  Others will
1:19PM 7    testify.  I'm here to talk about the framework for drug safety.
1:19PM 8    Q.   But you do know, Doctor, that Ms. Earnest is cancer-free
1:19PM 9    today?  You do know that; correct?
1:19PM 10   A.   Again, I'm under oath.
1:19PM 11   Q.   You don't know?
1:19PM 12   A.   I will leave it to her doctors to talk.
1:20PM 13   Q.   Nobody told you that?
1:20PM 14   A.   Again, I don't want to make any statements.  People have
1:20PM 15   told me.  I've looked at certain things.  But please have her
1:20PM 16   doctors please testify.  I just want to be very respectful and
1:20PM 17   stay within the areas that I have studied.
1:20PM 18   Q.   Right.  I understand that, Doctor.
1:20PM 19        But you don't you think it would have been important
1:20PM 20   to know that Ms. Earnest is cancer-free today?
1:20PM 21        Isn't that the kind of information you'd want to know
1:20PM 22   before you come into this courtroom and offer an opinion in
1:20PM 23   Ms. Earnest's case?
1:20PM 24   A.   So I did ask for all the medical records.  But I think, to
1:20PM 25   answer the question whether Sanofi should have warned, I think

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:20PM  1    that question is independent.

1:20PM  2    Q.   So it's not important to know whether Ms. Earnest is

1:20PM  3    cancer-free?  Just yes or no.

1:20PM  4         MR. NOLEN:  Objection.  Mischaracterizes the

1:20PM  5    testimony.

1:20PM  6         THE COURT:  Overruled.  I think he can answer the

1:20PM  7    question under cross-examination.

1:20PM  8         THE WITNESS:  There are a lot of things that are

1:20PM  9    important in this case, but they're beyond my testimony.

1:21PM  10   BY MR. STRONGMAN:

1:21PM  11   Q.   Okay.  Do you know who Dr. James Carinder is?

1:21PM  12   A.   I believe he is the oncologist, yes.

1:21PM  13   Q.   All right.  And so in this case, sitting here today,

1:21PM  14   you're also not offering any opinions about Dr. Carinder;

1:21PM  15   correct?

1:21PM  16   A.   That would be correct.  That's beyond the scope of my

1:21PM  17   expertise or my assignment.

1:21PM  18   Q.   But what we can say for sure is that you're not coming in

1:21PM  19   here offering any criticisms of Dr. Carinder for using

1:21PM  20   Taxotere; correct?

1:21PM  21   A.   I would not do that, no.

1:21PM  22   Q.   And do you know anything about the dose that Dr. Carinder

1:21PM  23   used when he treated Ms. Earnest?

1:21PM  24   A.   I have some information on that.  I've inquired, but

1:21PM  25   again --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:21PM  1  **Q.**   Not within the scope of your opinions?

1:21PM  2  **A.**   It depends on Your Honor -- everything is up to Your

1:22PM  3  Honor.

1:22PM  4  **Q.**   Okay.

1:22PM  5  **A.**   I mean, I would -- I'd respectfully stay away from that

1:22PM  6  and let others testify about, but I have some familiarity with

1:22PM  7  that.

1:22PM  8  **Q.**   Now, setting aside Dr. Carinder for a minute.

1:22PM  9       When a prescription drug like Taxotere is approved,

1:22PM  10  in the label -- and we saw the label -- there are dosages and

1:22PM  11  regimens specifically called out; is that correct?

1:22PM  12  **A.**   Correct.

1:22PM  13  **Q.**   And so when you're prescribing something on-label, so

1:22PM  14  that's within the four corners of that drug label, that's using

1:22PM  15  the dose that's set out in the label; correct?

1:22PM  16  **A.**   A little more complicated than that.

1:22PM  17  **Q.**   So let me just ask it this way:  In the adjuvant breast

1:22PM  18  cancer setting -- are you with me so far?

1:22PM  19  **A.**   I am.

1:22PM  20  **Q.**   Okay.  So adjuvant breast cancer, what we're dealing with

1:22PM  21  is chemotherapy treatment after there has been some sort of

1:22PM  22  intervention surgically, normally; is that correct?

1:23PM  23  **A.**   Correct.  That's the definition of "adjuvant."

1:23PM  24  **Q.**   And so we've we have a patient who's had surgery, and now

1:23PM  25  they're undergoing chemotherapy; is that correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:23PM 1   **A.**   Correct.

1:23PM 2   **Q.**   Okay.  And you understand that Taxotere has indication in

1:23PM 3   that setting; is that correct?

1:23PM 4   **A.**   Yes.  And that's generally where off-label attaches to.  I

1:23PM 5   mean, it's for a certain type of breast cancer.  That's usually

1:23PM 6   how I would use off-label.  You're using "off-label" with

1:23PM 7   regard to dose.

1:23PM 8   **Q.**   Very good.  But you know that, in the approval for

1:23PM 9   Taxotere, correct, that the regimen that was approved was T

1:23PM 10  with A with C all together; correct?

1:23PM 11  **A.**   Correct.

1:23PM 12  **Q.**   Okay.  And the dose of the T -- so that's the dose of the

1:23PM 13  Taxotere -- in that regimen was approved at 75 milligrams per

1:23PM 14  meter squared in the adjuvant setting; correct?

1:23PM 15  **A.**   That's not entirely correct.  Times how many doses?  So

1:24PM 16  that's what's key.

1:24PM 17  **Q.**   Yeah.

1:24PM 18  **A.**   Because you have to look at cumulative dose, right.  So it

1:24PM 19  gets a little more complicated than --

1:24PM 20  **Q.**   Understood.  Understood.

1:24PM 21  **A.**   It's the dose times the number of treatments that really

1:24PM 22  is key.  Oncology has its own complexities, I think it's fair

1:24PM 23  to say.

1:24PM 24  **Q.**   Very good.  But the dosage that was included in the

1:24PM 25  label -- and we're talking about a dose that's given how many

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:24PM  1    times in the label, Doctor?

1:24PM  2    A.   If you could pull up the label, just because I want to be

1:24PM  3    exactly sure.  Let's just be exact because -- it's the dose

1:24PM  4    times the number of treatments --

1:24PM  5    Q.   Okay.

1:24PM  6    A.   -- that I think is in the label.

1:24PM  7    Q.   And let me just ask it this way:  In your report, you're

1:24PM  8    not offering any opinions about whether a doctor should or

1:24PM  9    should not prescribe a chemotherapy regimen in a particular

1:24PM  10   way; correct?  That's not within the scope of your opinions?

1:25PM  11   A.   I've had many -- I've testified many times that an

1:25PM  12   individual physician may prescribe, in his or her judgment,

1:25PM  13   off-label.  I've testified about that repeatedly.

1:25PM  14   Q.   So in addition to no opinions on Dr. Carinder, you also,

1:25PM  15   in your report, offer no criticisms of doctors that use

1:25PM  16   Taxotere in the treatment of cancer; correct?

1:25PM  17   A.   No, absolutely not.

1:25PM  18   Q.   And I noticed right at the end of your questioning,

1:25PM  19   Mr. Nolen asked you several carefully worded questions

1:26PM  20   regarding -- in the regulatory framework causation.

1:26PM  21        Do you remember those?

1:26PM  22   A.   Sure.

1:26PM  23   Q.   Okay.  And you understand what general medical causation

1:26PM  24   is from your experience in litigation; is that correct?

1:26PM  25   A.   From -- from my torts class, I think.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:26PM | 1 | **Q.**   Very good. |
| 1:26PM | 2 | **A.**   You're bringing back memories. |
| 1:26PM | 3 | **Q.**   And just so the jury is clear, your focus in this case is |
| 1:26PM | 4 | not one of general medical causation; correct? |
| 1:26PM | 5 | **A.**   I will leave it to the Court to determine.  I'm here as a |
| 1:26PM | 6 | regulatory expert and, under a specific standard, how that |
| 1:26PM | 7 | interplays with general causation language.  It can be similar. |
| 1:26PM | 8 | I leave it to Your Honor. |
| 1:26PM | 9 | **Q.**   Well, Doctor, this question has been asked of you before. |
| 1:26PM | 10 | I'll ask it again and see if you can answer it. |
| 1:27PM | 11 | Your focus -- and it's not identified in your |
| 1:27PM | 12 | report -- is not one of a general medical causation expert? |
| 1:27PM | 13 | **A.**   You're correct.  I'm here as a regulatory expert on what |
| 1:27PM | 14 | should be in the label. |
| 1:27PM | 15 | **Q.**   So the rest of my exam with you, today, Doctor, is going |
| 1:27PM | 16 | to cover three broad areas.  The first is going to be some |
| 1:27PM | 17 | things I think we can agree about, or hopefully agree about. |
| 1:27PM | 18 | The next is I'm going to ask you some more questions |
| 1:27PM | 19 | about you, what you do with your time and your experience. |
| 1:27PM | 20 | Okay? |
| 1:27PM | 21 | And then we're going to end with your opinions that |
| 1:27PM | 22 | you have on Taxotere. |
| 1:27PM | 23 | Does that sound fair? |
| 1:28PM | 24 | **A.**   Sure. |
| 1:28PM | 25 | **Q.**   Okay.  I'm going to move this just a little bit so you can |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:28PM 1   see it better.

1:28PM 2            So I want to start with some agreements on the FDA.

1:28PM 3   Okay?

1:28PM 4   A.   Okay.

1:28PM 5   Q.   You like talking about the FDA?

1:28PM 6   A.   I love talking about the FDA.

1:28PM 7   Q.   And I think you made it clear at the very beginning of

1:28PM 8   your examination that you were not here speaking on behalf of

1:28PM 9   the FDA; is that correct?

1:28PM 10  A.   Please underline that.

1:28PM 11  Q.   These are purely your opinions, not the opinions of FDA;

1:28PM 12  correct?

1:28PM 13  A.   Correct.

1:28PM 14  Q.   And, Doctor, you would agree -- and I'm just -- just so

1:28PM 15  it's clear, I'm asking these questions about the FDA generally,

1:28PM 16  okay, not even within the context of Taxotere.

1:28PM 17            You with me?

1:28PM 18  A.   Sure.

1:28PM 19  Q.   Okay.  You would agree, Doctor, that the FDA is the most

1:28PM 20  important consumer protection agency in the world; correct?

1:28PM 21  A.   I think you're quoting me.

1:28PM 22  Q.   I am.

1:28PM 23  A.   Thank you.

1:28PM 24  Q.   Correct?  Am I correct?

1:28PM 25  A.   Yes.  That's an exact quote.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:29PM 1   Q.   You would -- you would agree that the FDA is full of many

1:29PM 2   dedicated professionals; correct?

1:29PM 3   A.   Absolutely.

1:29PM 4   Q.   And the FDA employees share a commitment to protect and

1:29PM 5   enhance public health; correct?

1:29PM 6   A.   Correct.  There's always footnotes to any of these, and I

1:29PM 7   think I've said that.  But, again, as a general thrust, well

1:29PM 8   said.  You're quoting me.

1:29PM 9   Q.   And you mentioned applications for new drugs; right?  We

1:29PM 10  call those an NDA; is that correct?

1:29PM 11  A.   Correct.

1:29PM 12  Q.   New drug application; fair?

1:29PM 13  A.   Correct.

1:29PM 14  Q.   Okay.  And the professionals at the FDA work on reviewing

1:29PM 15  each NDA; correct?

1:29PM 16  A.   Correct.

1:29PM 17  Q.   These dedicated professionals look at data for each trial;

1:29PM 18  correct?

1:29PM 19  A.   Yes and no.  All trials that are submitted to the agency,

1:29PM 20  I think, would be the correct way to say it.

1:29PM 21  Q.   Well, I'll make it clear.  The dedicated professionals at

1:30PM 22  the FDA look at all data for each trial submitted to the FDA;

1:30PM 23  correct?

1:30PM 24  A.   Well -- well said.

1:30PM 25  Q.   All right.  Very good.  And we can agree that there are

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:30PM  1    requirements that manufacturers submit certain documents from

1:30PM  2    time to time; correct?

1:30PM  3    A.   Correct.

1:30PM  4    Q.   And those would include regular -- we might call them

1:30PM  5    annual reports -- or PSURs are sometimes used in place of those

1:30PM  6    reports; is that correct?

1:30PM  7    A.   The annual reports in the American system is the PADER

1:30PM  8    system, but some companies ask to submit the international

1:30PM  9    document called the PSUR.

1:30PM  10   Q.   And, certainly, the FDA looks at or considers what the

1:30PM  11   manufacturer is submitting to them; correct?

1:30PM  12   A.   I would like to say yes, but I think you have to put a

1:30PM  13   caveat on that.  I don't believe that FDA can look at every

1:31PM  14   single page when millions of pages are submitted.  So I think

1:31PM  15   just within -- FDA tries to look at the salient features.

1:31PM  16   Q.   Well, Doctor, you've been asked this question before, too.

1:31PM  17        Certainly, the FDA looks at or considers what the

1:31PM  18   manufacturer is submitting to them; correct?

1:31PM  19   A.   If you're -- you mean in general, I would agree.  If

1:31PM  20   you're asking whether the FDA looks at every single page out of

1:31PM  21   millions of pages, that would not be realistic.  So just with

1:31PM  22   that caveat.

1:31PM  23   Q.   But you would also agree that these dedicated, highly

1:31PM  24   qualified professionals at the FDA don't just rely on what the

1:31PM  25   pharmaceutical companies tell them; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:31PM 1    A.   I think that's fair, in part.  They're only as good as

1:31PM 2    what the pharmaceutical manufacturers tell them, usually.

1:31PM 3    Q.   But they don't just rely on the conclusions of the

1:31PM 4    company; correct?

1:31PM 5    A.   They don't rely on just the conclusions of company, no.

1:31PM 6    That would be correct.

1:32PM 7    Q.   And at the end of the day, the FDA must determine, in

1:32PM 8    order for the medication to go out into the public, that it is

1:32PM 9    safe and effective under the FDA rules and regulations;

1:32PM 10   correct?

1:32PM 11   A.   Not to quibble, but it would be safe and effective for the

1:32PM 12   intended conditions of use.

1:32PM 13   Q.   Very good.  And you would certainly agree that FDA

1:32PM 14   approval is not a rubber stamp; correct?

1:32PM 15   A.   I think that's -- I think that's fair.  There are times

1:32PM 16   when FDA makes a mistake and does rubber stamp.  But I think

1:32PM 17   that, in general, you are correct.

1:32PM 18   Q.   And you would agree that the FDA has served the American

1:32PM 19   public well in ensuring the remarkable standard of product

1:32PM 20   safety; correct?

1:32PM 21   A.   I'm sure I've said something like that.  But you also have

1:32PM 22   to recognize sometimes FDA messes up, and that's just a

1:32PM 23   reality.

1:32PM 24   Q.   And, Doctor, maybe you said something exactly like that.

1:32PM 25        Maybe those are your words; fair?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:32PM 1    A.   I've said FDA is the most important consumer protection
1:33PM 2    agency, and I've also said FDA messes up.  So I've said both of
1:33PM 3    those and believe that that's the case.
1:33PM 4    Q.   And it is the gold standard across the world, the FDA's
1:33PM 5    review, when they decide that a product is safe and effective;
1:33PM 6    correct?
1:33PM 7    A.   Tends to be.  Again, with certain -- those are
1:33PM 8    generalities.  When FDA make a mistake, it's not the gold
1:33PM 9    standard, but it's looked to.  And, overall, I think the last
1:33PM 10   50 years have shown that FDA standards are very important for
1:33PM 11   the world.
1:33PM 12   Q.   And I also want to talk now a little bit about the
1:33PM 13   labeling component of it.
1:33PM 14        It when a manufacturer submits its new drug
1:33PM 15   application, it also involves proposed labeling; is that
1:33PM 16   correct?
1:33PM 17   A.   Correct.
1:33PM 18   Q.   And when the FDA approves the NDA and it finds the drug to
1:33PM 19   be safe and effective for its indicated use, it also approves
1:34PM 20   the labeling; correct?
1:34PM 21   A.   At that moment in time.
1:34PM 22   Q.   Very good.  Absolutely.  And what we know is that, once
1:34PM 23   the drug is on the market -- I think you talked about the CBE
1:34PM 24   process as one example; correct?
1:34PM 25   A.   Sure.  One process.

DAVID KESSLER - CROSS

1:34PM 1   **Q.**   So once the drug is on the market, the drug manufacturer

1:34PM 2   can propose changes to the FDA; is that correct?

1:34PM 3   **A.**   Certainly.

1:34PM 4   **Q.**   And the FDA, however, still has to approve the change in

1:34PM 5   the end; correct?

1:34PM 6   **A.**   Even under the --

1:34PM 7           **MR. NOLEN:**   Objection, Your Honor.  403.  Relevance.

1:34PM 8           **THE COURT:**   I think you need to rephrase your

1:34PM 9   question.

1:34PM 10  **BY MR. STRONGMAN:**

1:34PM 11  **Q.**   When you propose labeling to the FDA -- let's talk about

1:34PM 12  that.

1:34PM 13          The manufacturer proposes labeling to the FDA;

1:34PM 14  correct?

1:34PM 15  **A.**   "When you propose" -- I just want to -- when the

1:34PM 16  manufacturer does it?

1:34PM 17  **Q.**   Fair question.  Yes.

1:34PM 18  **A.**   Yeah, thanks.

1:34PM 19  **Q.**   When the manufacturer proposes labeling to the FDA in

1:34PM 20  order to get the drug approved, is there a negotiation with the

1:35PM 21  FDA about the label?

1:35PM 22  **A.**   Yes.

1:35PM 23  **Q.**   And there are times when the manufacturer will ask that

1:35PM 24  certain information be put in the label or taken out of the

1:35PM 25  label; is that fair?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:35PM 1    **A.**   There's a negotiation, fair.

1:35PM 2    **Q.**   And, at times, the FDA, as part of this negotiation, will

1:35PM 3    sometimes suggest additions or subtractions from the label;

1:35PM 4    correct?

1:35PM 5    **A.**   Yes.  FDA is -- it's a back-and-forth process.

1:35PM 6    **Q.**   And as a reasonable drug manufacturer, it's at least

1:35PM 7    reasonable to consider the negotiation?  It's reasonable to

1:35PM 8    consider what proposals the FDA makes; true?

1:35PM 9          **MR. NOLEN:**  Objection, Your Honor.  402, 403.

1:35PM 10         **THE COURT:**  I think you all need to approach.

1:35PM 11         (WHEREUPON, the following proceedings were held at

1:35PM 12   the bench.)

1:36PM 13         **THE COURT:**  How far are you going with this?  Because

1:36PM 14   I've got to tell you, I'm getting nervous.

1:36PM 15         **MR. STRONGMAN:**  Well, Your Honor, where we're going

1:36PM 16   is, if he answers those questions that it is reasonable to

1:36PM 17   consider, that's it.

1:36PM 18          I'm not in any way implying that it's not the

1:36PM 19   drug manufacturer's responsibility.  I'm not going to imply

1:36PM 20   that it's not our responsibility what's in the label, just that

1:36PM 21   it's part of the conversation.  That's where it ends.

1:36PM 22         **MR. NOLEN:**  To a large degree, Your Honor, just the

1:36PM 23   questions that he's already elicited that I did not object to

1:36PM 24   go pretty far along in implying that what Your Honor gave as an

1:36PM 25   instruction this morning is not correct, that it somehow is the

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:36PM 1    FDA.

1:36PM 2              Because I didn't know where he was going.  I
1:36PM 3    wanted to hear the question before I stood up and objected.  I
1:36PM 4    gave him a lot of wiggle room on that before I stood up and
1:37PM 5    made an objection.  And I think we clearly are headed down this
1:37PM 6    road.

1:37PM 7              MR. STRONGMAN:  Your Honor, it's certainly relevant
1:37PM 8    what we proposed.  I will preface any question with, "It's
1:37PM 9    still our responsibility -- even if the FDA says something
1:37PM 10   different, it's still our responsibility."  And I'm not going
1:37PM 11   to get into it.

1:37PM 12             THE COURT:  The problem I have is -- the problem I
1:37PM 13   have is that I have seen no evidence that they did not -- that
1:37PM 14   you were precluded from changing the label.  I know that there
1:37PM 15   was some conversation, but nobody ever said you cannot do that,
1:37PM 16   you cannot do that.  And I think that's relevant.

1:37PM 17             MR. STRONGMAN:  And, Your Honor, just for the record,
1:37PM 18   what the FDA said was in 2004 -- in 2004, the FDA proposed to
1:38PM 19   delete certain information, and that doesn't mean --

1:38PM 20             THE COURT:  Yeah, the clinical adverse reports.  Not
1:38PM 21   a warning, but signs of adverse events.

1:38PM 22             MR. STRONGMAN:  -- in the section that Dr. Kessler
1:38PM 23   just said we could have put information in.  Now, I'm not
1:38PM 24   saying we're precluded from telling FDA you were wrong in
1:38PM 25   deleting it or proposing a change.  It's just the fact that it

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:38PM  1   was a negotiation.  That's all.

1:38PM  2            MR. COFFIN:  Your Honor, this is exactly what we

1:38PM  3   talked about so much in this case, because it's the heart of

1:38PM  4   the case.  And *Albrecht* changes what the defense is entitled to

1:38PM  5   do, and they keep --

1:38PM  6            THE COURT:  Look, we're not tag-teaming.  We've

1:38PM  7   already had --

1:38PM  8            MR. COFFIN:  I understand.  The only reason I'm here

1:38PM  9   is because I've made these arguments multiples times, and I

1:38PM  10  apologize.

1:38PM  11           MR. STRONGMAN:  I can -- I mean, in terms of these

1:38PM  12  are general questions, I haven't gotten any specifics.  I can

1:38PM  13  move on for now as well.  I can move on.

1:38PM  14                 So -- but that's the issue is that as we move

1:39PM  15  down the road, the facts show that we made a proposal, the FDA

1:39PM  16  made proposed changes.  That's just a fact.  And it's just a

1:39PM  17  matter of whether it's reasonable or not for us --

1:39PM  18           THE COURT:  I'm going to allow you to ask him if

1:39PM  19  there are conversations that occur.  Because I did instruct the

1:39PM  20  jury this morning that in making those changes, they have to

1:39PM  21  comply with FDA regulations.  But you're skating on thin ice.

1:39PM  22           MR. STRONGMAN:  Understood.

1:39PM  23           THE COURT:  And I will stop you without an objection

1:39PM  24  if I feel like you've crossed the line.

1:39PM  25           MR. COFFIN:  Can I be clear on something?  If they're

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:39PM  1    talking about the 2004 strike-through, that's been ruled on.

1:39PM  2            THE COURT:  Will you stop.  This is his witness.  And

1:39PM  3    maybe that's something for us to do at a recess, but I'm not

1:39PM  4    going to have this tag-team every time we get up to the bench.

1:39PM  5            MR. COFFIN:  I apologize.

1:39PM  6            THE COURT:  Mr. Nolen is doing a fine job handling

1:39PM  7    himself.

1:39PM  8            MR. COFFIN:  I apologize.

1:39PM  9            MR. STRONGMAN:  It is our understanding that the 2004

1:40PM  10   situation has not been affirmatively ruled on.  It was an

1:40PM  11   objected-to document, so it wasn't in opening.  So that's where

1:40PM  12   we're at posture-wise.

1:40PM  13           THE COURT:  And that's something we need to talk at a

1:40PM  14   recess.

1:40PM  15           MR. STRONGMAN:  We can do that.  We'll deal with that

1:40PM  16   at a recess.

1:40PM  17           THE COURT:  Okay.

1:40PM  18           (WHEREUPON, the following proceedings were held in

1:40PM  19   open court.)

1:40PM  20   BY MR. STRONGMAN:

1:40PM  21   Q.   So, Doctor, we were talking about the FDA.

1:40PM  22   A.   Right.

1:40PM  23   Q.   And we were discussing that there is a negotiation,

1:40PM  24   there's a conversation; right?

1:40PM  25   A.   Generally, yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:40PM 1  **Q.**   Fair enough.  And you're proud of the work that you did at
1:40PM 2  the FDA; isn't that true?
1:41PM 3  **A.**   I think that would be fair.
1:41PM 4  **Q.**   And that also included the work of overseeing the
1:41PM 5  commission when Taxotere was approved in 1996; correct?
1:41PM 6  **A.**   It's not a commission, but that's okay.
1:41PM 7  **Q.**   The administration?
1:41PM 8  **A.**   Fair.  It's an agency, yes.
1:41PM 9  **Q.**   Very good.
1:41PM 10 **A.**   Yes.  And I stand behind what the agency did in 1996.
1:41PM 11 **Q.**   Very good.  Let's talk about another area I think we might
1:41PM 12 be able to agree on some things on.
1:41PM 13 **A.**   Sure.
1:41PM 14 **Q.**   And that's breast cancer.
1:41PM 15      All right.  So you understand, certainly, to
1:41PM 16 understand the risk profile of a drug, when you're talking
1:41PM 17 about the labeling, you have to also understand something about
1:41PM 18 the disease condition that you're treating; correct?
1:41PM 19 **A.**   For the risk -- for the overall risk-benefit equation of
1:41PM 20 whether you should approve a drug, you want to weigh the risks
1:41PM 21 versus the benefits.  For that ultimate question of whether a
1:42PM 22 drug is safe, it's really a risk-benefit question, correct.
1:42PM 23 **Q.**   And, Doctor, you understand that breast cancer is common
1:42PM 24 in the United States; correct?
1:42PM 25 **A.**   Regrettably so, yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:42PM  1  **Q.**   Yes.  And you understand that a woman living in the United

1:42PM  2  States has a 1-in-8 chance of being diagnosed with breast

1:42PM  3  cancer; correct?

1:42PM  4  **A.**   Yes.  And I also understand that oncologists will come --

1:42PM  5  and while I've done a good deal of oncology in taking care of a

1:42PM  6  lot of oncology patients, I think it's probably best to allow

1:42PM  7  the oncologists to testify on breast cancer specifically.  But

1:42PM  8  happy to answer your questions, sir.

1:42PM  9  **Q.**   Appreciate that.  And you also understand, obviously, that

1:42PM  10 breast cancer is a life-threatening disease; correct?

1:42PM  11 **A.**   It can be.  Not all -- again, let the oncologists talk

1:42PM  12 about that.  I wouldn't want to make any generalities.  I

1:42PM  13 wouldn't want to scare people.  There are also many treatable

1:42PM  14 forms of -- with very good outcomes.

1:43PM  15 **Q.**   And one thing I think -- as you were going through your

1:43PM  16 background, one of things that was mentioned is you had gotten

1:43PM  17 several awards.

1:43PM  18        Do you remember that?

1:43PM  19 **A.**   Yes.

1:43PM  20 **Q.**   And one of the things -- or awards that was mentioned was

1:43PM  21 that you got an award from the American Cancer Society, I think

1:43PM  22 you said; is that right?

1:43PM  23 **A.**   Correct.

1:43PM  24 **Q.**   And the American Cancer Society is a reliable

1:43PM  25 organization, isn't it?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:43PM   1   **A.**   Sure.  Just, again, let's get everything right.  Yes,
1:43PM   2   generally, that's a fair statement.
1:43PM   3   **Q.**   Sure.  And the American Cancer Society puts out
1:43PM   4   information for people on cancer statistics; correct?
1:43PM   5   **A.**   Fair.
1:43PM   6   **Q.**   And they put out some information that can be used for
1:43PM   7   doctors and patients also, just on basic risks and cancer
1:43PM   8   information; correct?
1:43PM   9   **A.**   Correct.  I just don't want to say that everything is
1:43PM  10   perfectly right.  But, yes, of course, it's good -- it's a very
1:43PM  11   good-intended organization that serves a very valuable
1:43PM  12   function.
1:43PM  13   **Q.**   And at the time of 2011, you understand that there were
1:44PM  14   nearly 3 million women living in the United States with breast
1:44PM  15   cancer; correct?
1:44PM  16   **A.**   I'll take your representation on exact numbers.
1:44PM  17   **Q.**   Very good.  And at that same time, you understood that
1:44PM  18   nearly 40,000 women would die from breast cancer annually as of
1:44PM  19   2011?
1:44PM  20   **A.**   Regrettably, there are forms that we've not made
1:44PM  21   advancements; there are forms we have made advancements.
1:44PM  22   **Q.**   And you also know that, when it comes to the treatment of
1:44PM  23   breast cancer, that every chemotherapy has risks; correct?
1:44PM  24   **A.**   Sure, as does every drug.  I would agree with that
1:44PM  25   statement.

DAVID KESSLER - CROSS

1:44PM  1   **Q.**   And, in fact, most chemotherapies have some very serious
1:44PM  2   side effects; correct?
1:44PM  3   **A.**   Yes.  That's -- when you use the term "chemotherapy."  But
1:44PM  4   there are other therapies, anticancer, that are not
1:44PM  5   chemotherapy that we're lucky to have today that don't have the
1:44PM  6   effects of chemo.  So, again, it's across the board.
1:44PM  7   **Q.**   And --
1:45PM  8           **MR. NOLEN:**  Objection.  Counsel's outside --
1:45PM  9   objection.  611.  Outside the scope.
1:45PM  10          **THE COURT:**  I'm going to allow him to go there.  This
1:45PM  11  is an expert.
1:45PM  12  **BY MR. STRONGMAN:**
1:45PM  13  **Q.**   And, Doctor, when it comes to treating breast cancer, it's
1:45PM  14  good to have multiple options for doctors and patients;
1:45PM  15  correct?
1:45PM  16  **A.**   I'll support that statement.
1:45PM  17  **Q.**   Okay.  Now, I want to talk a little bit about Taxotere.
1:45PM  18  Okay.
1:45PM  19          And as we mentioned, Taxotere was approved in 1996;
1:45PM  20  correct?
1:45PM  21  **A.**   Correct.
1:45PM  22  **Q.**   And that was for metastatic breast cancer?
1:45PM  23  **A.**   Correct.
1:45PM  24  **Q.**   Okay.  Now, when Taxotere came on the market in 1996,
1:45PM  25  there was another taxane that was also on the market as well,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:45PM 1  and it was called Taxol; correct?

1:45PM 2  A.   Correct.

1:45PM 3  Q.   Okay.

1:45PM 4  A.   Approved in 1992.

1:45PM 5  Q.   Very good.  And wouldn't you agree that both of those

1:45PM 6  drugs -- let me put it this way.

1:45PM 7         Both of those drugs are called taxanes; correct?

1:45PM 8  A.   Fair.

1:46PM 9  Q.   So that's a broad class; correct?

1:46PM 10 A.   Correct.

1:46PM 11 Q.   And wouldn't you agree that taxanes have revolutionized

1:46PM 12 the treatment of breast cancer?

1:46PM 13 A.   If I can be respectful, I'd leave that to the oncologist

1:46PM 14 in this case.

1:46PM 15 Q.   Very good.  And you just said that taxanes extend

1:46PM 16 survival?  Is that what you said?

1:46PM 17 A.   That was the basis for approval, yes.  So I certainly

1:46PM 18 support that statement.  But revolutionized, I think -- let the

1:46PM 19 oncologists testify.  They do this every day.

1:46PM 20 Q.   Very good.  But you would certainly agree with me that

1:46PM 21 Taxotere has extended survival; correct?

1:46PM 22 A.   It can.  In clinical trials, it can extend survival by

1:46PM 23 several months, yes.

1:46PM 24 Q.   And a couple of other things that I think we can agree on.

1:47PM 25 I think you said this during your examination as well.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:47PM 1    The risk of alopecia has always been included in the

1:47PM 2 Taxotere label; correct?

1:47PM 3 A. Correct.

1:47PM 4 Q. And after Taxotere was approved in 1996 for metastatic

1:47PM 5 breast cancer, it was then approved for several other types of

1:47PM 6 cancer as well; correct?

1:47PM 7 A. Exactly.

1:47PM 8 Q. Okay.  It was approved for adjuvant breast cancer;

1:47PM 9 correct?

1:47PM 10 A. Correct, in the node-positive situation.

1:47PM 11 Q. Very good.  And "node-positive" means that the cancer has

1:47PM 12 shown up in one of the nodes; correct?

1:47PM 13 A. Correct, or a high-risk, I think.  I'd have to look at the

1:47PM 14 indication, yes.

1:47PM 15 Q. And Taxotere has also been approved as an indication for

1:47PM 16 lung cancer; correct?

1:47PM 17 A. Non-small cell lung cancer, yes, a specific type of lung

1:47PM 18 cancer.

1:47PM 19 Q. Very good.  And Taxotere has also been approved for

1:48PM 20 prostate cancer; correct?

1:48PM 21 A. In combination for hormone refractary.  Unfortunately, the

1:48PM 22 results aren't great there.  And that's an end-stage prostate

1:48PM 23 cancer.

1:48PM 24 Q. And Taxotere has also be approved for gastric cancer?

1:48PM 25 A. Or head and neck, correct.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:48PM  1  **Q.**   Very good.  I want to talk a little bit about you.  Okay.
1:48PM  2  Next chapter.
1:48PM  3  **A.**   Sure.  I always prefer to talk about drug safety, but
1:48PM  4  happy to talk about me.
1:48PM  5  **Q.**   I think we established earlier that you've testified a
1:48PM  6  number of times; correct?
1:48PM  7  **A.**   I have.
1:48PM  8  **Q.**   Okay.  And if I were to count them up, I think you said,
1:48PM  9  you know, there's been a time when you testified for a coffee
1:48PM  10  manufacturer.
1:48PM  11       Do you remember that?
1:48PM  12  **A.**   Starbucks.
1:48PM  13  **Q.**   Very good.  But if I went and added them up and I created
1:48PM  14  a percentage, it would be more than 90 percent of the time that
1:48PM  15  you've testified for plaintiffs; correct?
1:48PM  16  **A.**   I haven't done it exactly that way, but I think you're
1:49PM  17  probably right.
1:49PM  18  **Q.**   And what we know is that, setting aside Taxotere, you're
1:49PM  19  also currently involved in a number of other litigations;
1:49PM  20  correct?
1:49PM  21  **A.**   I am.
1:49PM  22  **Q.**   Okay.  And just last year, you were asked how many.
1:49PM  23       And you didn't have even a number that you could
1:49PM  24  offer; correct?
1:49PM  25  **A.**   Currently involved?  You have a list of all my prior

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:49PM  1  testimonies.

1:49PM  2  Q.   Yeah.  How many litigations are you currently involved in,

1:49PM  3  Doctor?

1:49PM  4  A.   I'm involved in a handful of litigations.

1:49PM  5  Q.   Okay.  And for each one of those litigations, you get paid

1:49PM  6  $1,000 an hour; correct?

1:49PM  7  A.   That's correct.

1:50PM  8  Q.   And, Doctor, the fact of the matter is, isn't it true

1:50PM  9  that, right now, while you're in this courtroom testifying

1:50PM  10 today, you're also testifying in another case today in

1:50PM  11 Philadelphia by video?

1:50PM  12 A.   Oh.  You know, sometimes you can't control lawyers -- what

1:50PM  13 lawyers do.

1:50PM  14 Q.   That's true, though; correct?

1:50PM  15 A.   I have no idea.  That's the first time you've told me

1:50PM  16 that.

1:50PM  17 Q.   Two places at the same time?

1:50PM  18 A.   Hold on a second.  I had no idea.  I testified about five

1:50PM  19 years ago in a case about a drug that caused breasts in teenage

1:50PM  20 boys, and they taped it.  Now -- now, I'll take your

1:50PM  21 representation --

1:50PM  22 Q.   I'm just saying, do you know one way or another?

1:50PM  23 A.   I have no idea what lawyers are doing with that testimony,

1:50PM  24 but I can tell you --

1:50PM  25 Q.   Fair enough.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:50PM 1    A.    -- 100 percent, one thing I'm confident of, I'm here.  I
1:51PM 2    promise you.  I'm not in Philadelphia.
1:51PM 3    Q.    But when you did that deposition that they're playing, you
1:51PM 4    got paid $1,000 an hour for it; correct?
1:51PM 5    A.    No, I think that was a de bene esse to be specific.  And I
1:51PM 6    can tell you -- maybe you're right.  Maybe I should ask them to
1:51PM 7    get royalties on that tape.  I'm not getting anything from them
1:51PM 8    playing that tape.
1:51PM 9    Q.    Very good.  But over the course of your career at the FDA,
1:51PM 10   your salary was about $115,000; correct?
1:51PM 11   A.    Maybe a little less.
1:51PM 12   Q.    And after you left the FDA, you started doing consulting
1:51PM 13   work, at some point, for plaintiffs lawyers; correct?
1:51PM 14   A.    And writing books and doing other things, yes.
1:51PM 15   Q.    And, Doctor, isn't it true that doing the consulting work
1:51PM 16   that you've done for plaintiffs lawyers, you have made millions
1:52PM 17   and millions and millions of dollars?
1:52PM 18   A.    I'll take it on the millions once, correct.  Absolutely.
1:52PM 19   I will -- I agree with you 100 percent.  Over the last ten-year
1:52PM 20   period, you are correct.
1:52PM 21   Q.    How many millions?
1:52PM 22   A.    I don't know.
1:52PM 23   Q.    So, Doctor, can you estimate, a reasonable estimate?
1:52PM 24   A.    I have no idea.  My wife keeps all the books in the
1:52PM 25   family, and I have no idea.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 1:52PM | 1 | **Q.**   No idea? |
| 1:53PM | 2 | **A.**   No idea. |
| 1:53PM | 3 | **Q.**   A lot of money. |
| 1:53PM | 4 | **A.**   Oh, I will agree with you 100 percent.  That's a lot of |
| 1:53PM | 5 | money.  But exact number under oath, I have no idea. |
| 1:53PM | 6 | **Q.**   So sitting here today, you've made millions of dollars |
| 1:53PM | 7 | testifying for plaintiff's lawyers, and you cannot even |
| 1:53PM | 8 | estimate how many millions? |
| 1:53PM | 9 | **A.**   I have no idea.  I've never added it up.  It's over a |
| 1:53PM | 10 | ten-year period, and I don't know the answer to that question. |
| 1:53PM | 11 | **Q.**   With regard to Taxotere, I think you answered a few |
| 1:53PM | 12 | questions. |
| 1:53PM | 13 | And you said that you had spent about 100 hours -- I |
| 1:53PM | 14 | think was what you said? |
| 1:53PM | 15 | **A.**   On Mrs. Earnest's case. |
| 1:53PM | 16 | **Q.**   Correct, on Mrs. Earnest's case. |
| 1:53PM | 17 | **A.**   100-plus, that's right. |
| 1:53PM | 18 | **Q.**   And the report that you prepared that you brought in here |
| 1:53PM | 19 | today is for Ms. Earnest's case; correct? |
| 1:53PM | 20 | **A.**   I need to look at Your Honor to know how to answer that |
| 1:53PM | 21 | question. |
| 1:53PM | 22 | **Q.**   Let me ask it this way. |
| 1:53PM | 23 | **THE COURT:**  Be careful about opening doors. |
| 1:54PM | 24 | BY MR. STRONGMAN: |
| 1:54PM | 25 | **Q.**   Let me ask the question this way. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:54PM  1          You spent hundreds -- how many hours have you spent
1:54PM  2  on Ms. Earnest's case?
1:54PM  3  A.   I think I testified this morning 100-plus, but I want to
1:54PM  4  be specific.
1:54PM  5  Q.   Do you know how many plus 100, or is it just right in that
1:54PM  6  ballpark?
1:54PM  7  A.   It could be a little more, but it's in generally that
1:54PM  8  ballpark.  It's under 200, I mean, on Ms. Earnest's case.
1:54PM  9  Q.   Fair enough.  And I think you testified that you'd looked
1:54PM  10  at, I think, hundreds of thousands of pages of documents?
1:54PM  11  A.   Yes, I did.
1:54PM  12  Q.   Have you figured out what that superhuman rate of review
1:54PM  13  is?
1:54PM  14  A.   Yeah.  I'm happy to -- I'm looking at Your Honor because
1:54PM  15  there are complexities to litigation that involve a number of
1:54PM  16  different parts.
1:54PM  17          MR. STRONGMAN:  I'll withdraw the question and move
1:54PM  18  on, Your Honor.
1:54PM  19          THE WITNESS:  Again, I want to be exact.
1:55PM  20  BY MR. STRONGMAN:
1:55PM  21  Q.   Now, Doctor, you are currently a professor at the
1:55PM  22  University of San -- California, San Francisco; correct?
1:55PM  23  A.   University of California, San Francisco.
1:55PM  24  Q.   Yeah, that was a mouthful for me.  Thank you.
1:55PM  25          And you have been at the University of California,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1 San Francisco, since 2003; correct?

2 A.   Correct.

3 Q.   Okay.  And at one point, you were the dean of the medical

4 school; correct?

5 A.   Correct.

6 Q.   And you were terminated as the dean of the medical school;

7 correct?

8 A.   Correct.  I was a whistleblower at the medical school.

9 Q.   Well, Doctor, you understood that the chancellor concluded

10 that you could no longer effectively lead the School of

11 Medicine; correct?

12 A.   That was his view.  I'm a full professor there.  But the

13 record should show I reported certain financial irregularities.

14 Q.   We'll get there.

15 A.   Thank you very much.

16 Q.   Very good.  But you would certainly agree that the

17 chancellor determined that your leadership was ineffective.

18       That was the chancellor's determination?

19 A.   I think that's probably -- again, I don't want to testify

20 for him.  You would have to ask him.

21 Q.   And you also know that senior campus administrators

22 communicated to the chancellor that they had lost trust in you;

23 correct?

24 A.   After I reported certain financial irregularities, yeah.

25 Q.   And you also know that the clinical chairs at the medical

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:56PM 1   school reported that they believed there was serious problems
1:56PM 2   with the dean; correct?
1:56PM 3   A.   I'm not sure that that's exactly right.  I also know the
1:56PM 4   university apologized for its action.
1:56PM 5   Q.   And, Doctor, what you know is there was an administrative
1:56PM 6   proceeding; fair?
1:56PM 7   A.   And the university apologized.
1:56PM 8   Q.   I'm just asking, there was an administrative hearing?
1:56PM 9   A.   You're correct.  I was terminated.  But there's a letter
1:56PM 10  of apology from that chancellor.
1:56PM 11  Q.   Very good.  And you ultimately filed a lawsuit; correct?
1:56PM 12  A.   The Government Accountability Project filed the lawsuit on
1:56PM 13  my behalf because of these financial irregularities.
1:57PM 14  Q.   Well, Doctor, you filed a lawsuit against the chancellor;
1:57PM 15  correct?
1:57PM 16  A.   The actual filing was by the organization, the Government
1:57PM 17  Accountability Project, because I had reported certain
1:57PM 18  financial irregularities.  And they were interested in good
1:57PM 19  government, so they filed the lawsuit on my behalf.
1:57PM 20  Q.   And that lawsuit wasn't successful, was it?
1:57PM 21  A.   That was not for administrative reasons, not for the
1:57PM 22  merits.
1:57PM 23  Q.   Now, what we also know is that, at the University of
1:57PM 24  California, San Francisco, there's something called a
1:57PM 25  compensation plan; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:57PM 1  **A.**  Correct, for which I have an exemption.

1:57PM 2  **Q.**  We'll get there, too.  Okay.

1:57PM 3          But you will agree with me that, at the University of

1:57PM 4  the California, San Francisco, there is a plan that is set up

1:57PM 5  that is supposed to apply to faculty members, correct, unless

1:57PM 6  you have an exemption?

1:57PM 7  **A.**  And I have an exemption, yes.

1:57PM 8  **Q.**  And in that compensation plan, it talks about how much

1:57PM 9  money you should be able to earn doing outside professional

1:58PM 10  activities; correct?

1:58PM 11  **A.**  And that plan exists.  But there is a letter from the

1:58PM 12  president of the University of California for which there is an

1:58PM 13  exemption.

1:58PM 14  **Q.**  I understand, Doctor.

1:58PM 15          My question is there is a plan that exists that

1:58PM 16  limits how much money a faculty member can make doing outside

1:58PM 17  activities unless they had an exemption; correct?

1:58PM 18  **A.**  I think that's probably a fair statement.

1:58PM 19  **Q.**  And what the compensation plan actually says is that a

1:58PM 20  faculty member is limited to $40,000 or 40 percent of your

1:58PM 21  academic year base salary unless you have an exemption;

1:58PM 22  correct?

1:58PM 23          **MR. NOLEN:**  Objection, Your Honor.  402 and 403.

1:58PM 24          **THE COURT:**  Sustained.

25

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

1:58PM  1    BY MR. STRONGMAN:

1:58PM  2    Q.   Doctor, you got an exemption from the compensation plan;

1:58PM  3    correct?

1:58PM  4    A.   I was given an exemption the day I walked into the

1:59PM  5    University of California.  I didn't get anything.  That was

1:59PM  6    what the president decided.  That was their statement.  I was

1:59PM  7    exempt from it.

1:59PM  8    Q.   Very good.  But your exemption allows you to make millions

1:59PM  9    of dollars testifying as outside income when other faculty

1:59PM  10   members at the University of California, San Francisco, cannot;

1:59PM  11   correct?

1:59PM  12   A.   Others could get the exemption, and others can do other

1:59PM  13   things that are in the public service realm.

1:59PM  14   Q.   Doctor, I want to talk a little bit about your medical

1:59PM  15   background.  Okay?

1:59PM  16   A.   Sure.

1:59PM  17   Q.   Now, had you training in pediatrics; correct?

1:59PM  18   A.   Correct.

1:59PM  19   Q.   And I think you were board-certified in pediatrics?

1:59PM  20   A.   I was board-certified until I let it lapse a few years

1:59PM  21   ago, but I was board-certified for some 30 years.  I just have

1:59PM  22   not taken my maintenance certification.  One day, I'll do that.

2:00PM  23   But I'm still licensed.

2:00PM  24   Q.   Very good.  And I know, from time to time, you still -- I

2:00PM  25   know I've seen you, you'll treat a patient from time to time

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:00PM 1   when appropriate, but you don't have an active practice
2:00PM 2   currently; correct?
2:00PM 3   A.   If you collapse right now and Your Honor lets me, I'll
2:00PM 4   come take care of you.
2:00PM 5   Q.   Very good.  And I appreciate that.
2:00PM 6   A.   You're welcome.
2:00PM 7   Q.   Hopefully, I won't need it.  We'll see how to goes.
2:00PM 8          But you're not currently an attending physician at a
2:00PM 9   hospital; correct?
2:00PM 10  A.   I gave that up.  I spend my time writing my books and
2:00PM 11  doing my academic work.
2:00PM 12  Q.   And we went through -- Mr. Nolen showed that you have
2:00PM 13  written a couple of best sellers; right?
2:00PM 14  A.   He was very nice in that regard, yes.
2:00PM 15  Q.   And those books don't have anything to do with
2:00PM 16  chemotherapy, correct, the best sellers?
2:00PM 17  A.   Not chemotherapy.  But, obviously, there's an effect --
2:00PM 18  the most current one that I just turned in has an effect.  It
2:00PM 19  discusses metabolic syndrome in certain cancers and breast
2:01PM 20  cancers.  So there is a section on that in the current book,
2:01PM 21  but not on chemotherapy, per se.  I think that's fair.
2:01PM 22  Q.   Very good.  And what your books are about are obesity and
2:01PM 23  overeating; correct?
2:01PM 24  A.   Mental health, tobacco.  They're a range of public health
2:01PM 25  subjects that I have spent my career working with.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:01PM  1   **Q.**   Very good.  And the point being, none of your books that

2:01PM  2   Mr. Nolen asked you about are about Taxotere; correct?

2:01PM  3   **A.**   Oh, exactly correct.  I've not written a book about

2:01PM  4   Taxotere.

2:01PM  5   **Q.**   Now, Mr. Nolen also asked you some questions about your

2:01PM  6   experience on boards of directors.

2:01PM  7         Do you remember that?

2:01PM  8   **A.**   I do.

2:01PM  9   **Q.**   And I think you mentioned that you had been a board of

2:01PM  10  director at a handful of corporations; correct?

2:01PM  11  **A.**   Correct.

2:01PM  12  **Q.**   And I think you mentioned that one of the companies that

2:01PM  13  you were a board of director for developed a prostate cancer

2:02PM  14  drug; correct?

2:02PM  15  **A.**   It tried to.

2:02PM  16  **Q.**   Correct.  And you mentioned the prostate cancer drug

2:02PM  17  during your questioning with Mr. Nolen.

2:02PM  18        Do you remember that?

2:02PM  19  **A.**   Galeterone.

2:02PM  20  **Q.**   Very good.  So the name of company is Tokai; correct?

2:02PM  21  **A.**   Correct.

2:02PM  22  **Q.**   And Tokai was a company that was trying to develop -- can

2:02PM  23  you pronounce it for me?

2:02PM  24  **A.**   Galeterone.

2:02PM  25  **Q.**   And Galeterone was a medication that was going, hopefully,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:02PM  1    to be approved to treat prostate cancer; correct?

2:02PM  2    A.   Well, a certain form of prostate cancer.  And I think

2:02PM  3    you -- it's fair to say it was to be an alternative to

2:02PM  4    chemotherapy, but it was not in the space of terminal cancer.

2:02PM  5    Q.   Well -- and, Doctor, you know that, ultimately, what

2:02PM  6    happened was Tokai tried to finish their Phase 3, I think,

2:03PM  7    clinical trials and could not get enough patients to enroll.

2:03PM  8              Do you remember that?

2:03PM  9    A.   I certainly remember that.  That's a subject of, you know,

2:03PM  10   other issues, and I just -- I want to be careful about talking

2:03PM  11   about a company without the company being here, but happy to be

2:03PM  12   helpful.

2:03PM  13   Q.   All right.  Thank you.  And, Doctor, what happened was the

2:03PM  14   prostate drug that Tokai was trying to develop, in the end,

2:03PM  15   would have competed with Taxotere; correct?

2:03PM  16   A.   I checked on that last week.  I called the CEO of the

2:03PM  17   company because your colleague raised that in a deposition, and

2:03PM  18   I didn't have memory at that time.  So I called the CEO and I

2:03PM  19   said -- I anticipated you were going to ask that question.

2:03PM  20              I said, "Did we compete against Taxotere?"

2:03PM  21              And the answer was no, because Taxotere doesn't work

2:04PM  22   very well in prostate cancer, unfortunately, and that we really

2:04PM  23   competed against Zytiga and another drug from Janssen and

2:04PM  24   Medivation.

2:04PM  25              So maybe very early on in 2013, it was in some

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:04PM  1    document.  But this was because Taxotere is not very effective

2:04PM  2    in prostate, we were competing against drugs that were

2:04PM  3    effective both, Zytiga and Xtandi.

2:04PM  4    Q.   Well, let me ask the question this way:  You understand

2:04PM  5    that after Tokai had the clinical trials not work out, that

2:04PM  6    there was a lawsuit filed against the company and the board of

2:04PM  7    directors, including you personally; correct?

2:04PM  8    A.   As a shareholder derivative, whenever stock prices go

2:04PM  9    down, as you're familiar.

2:04PM  10   Q.   There was a lawsuit filed against you personally?

2:04PM  11   A.   It was a shareholder derivative case that is pending

2:05PM  12   because, after the drug failed, the stock price went down, and

2:05PM  13   investors sued.

2:05PM  14   Q.   And sued you personally; correct?

2:05PM  15   A.   As I was on the board, that's correct.

2:05PM  16   Q.   And you understand that the allegations in the lawsuit

2:05PM  17   specifically include that Tokai knew taxanes were a

2:05PM  18   significantly preferrable option to the drug that was being

2:05PM  19   developed; correct?

2:05PM  20        MR. NOLEN:  Objection, Your Honor.  403, not

2:05PM  21   relevant, and wasting time.

2:05PM  22        MR. STRONGMAN:  It goes to his bias.

2:05PM  23        THE COURT:  I'm going to allow it.

2:05PM  24        THE WITNESS:  It's completely frivolous.  Anyone who

2:05PM  25   knows anything about prostate cancer knows that Galeterone was

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:05PM | 1 | competing against Xtandi and Zytiga.  Any allegations that |
| 2:06PM | 2 | Taxotere played any role is incorrect. |
| 2:06PM | 3 | And, furthermore, any issue of bias -- this is |
| 2:06PM | 4 | years ago.  It has nothing to do with any testimony today. |
| 2:06PM | 5 | **BY MR. STRONGMAN:** |
| 2:06PM | 6 | **Q.**   So you would agree, Doctor, that there was a lawsuit |
| 2:06PM | 7 | filed, but you don't think it has merit; correct? |
| 2:06PM | 8 | **A.**   I'll let judges and juries and the process work, because I |
| 2:06PM | 9 | believe in that process. |
| 2:06PM | 10 | But I was proud to be involved in trying to find a |
| 2:06PM | 11 | drug for prostate cancer, and there's nothing I will tell |
| 2:06PM | 12 | you -- I mean, drugs fail, right?  I try to find something for |
| 2:06PM | 13 | prostate cancer.  It doesn't work, but then you go back and you |
| 2:06PM | 14 | try again. |
| 2:06PM | 15 | **Q.**   Doctor, I think my question was just simple. |
| 2:06PM | 16 | There was a lawsuit filed, but you don't think it has |
| 2:06PM | 17 | merit; fair?  And we can move on. |
| 2:07PM | 18 | **A.**   Happy to move on. |
| 2:07PM | 19 | **MR. NOLEN:**  Is that a question, Your Honor? |
| 2:07PM | 20 | Objection. |
| 2:07PM | 21 | **THE COURT:**  Sustained.  I think it's been asked and |
| 2:07PM | 22 | answered, and we need to move on. |
| 2:07PM | 23 | **BY MR. STRONGMAN:** |
| 2:07PM | 24 | **Q.**   Dr. Kessler, I want to talk about our next topic, and |
| 2:07PM | 25 | that's some of the opinions that you offered regarding the |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:07PM | 1 | Taxotere labeling.  Okay? |
| 2:07PM | 2 | A.   Happy to talk about this case. |
| 2:07PM | 3 | Q.   And one of the distinctions that was going on earlier was |
| 2:07PM | 4 | you were talking about alopecia and whether or not that covered |
| 2:07PM | 5 | temporary and permanent. |
| 2:07PM | 6 | Do you remember that? |
| 2:07PM | 7 | A.   I remember that very well, sir. |
| 2:07PM | 8 | Q.   Okay.  And I think, in your report, you actually talked |
| 2:07PM | 9 | about the phrase "irreversible alopecia." |
| 2:07PM | 10 | A.   Several times, yes. |
| 2:07PM | 11 | Q.   Yeah.  And you have a footnote that says these terms are |
| 2:07PM | 12 | kind of interchangeable, "irreversible," "permanent." |
| 2:07PM | 13 | A.   Yes.  I think that's fair. |
| 2:07PM | 14 | Q.   Very good.  And I want to make sure we're kind of talking |
| 2:07PM | 15 | on the same page here. |
| 2:08PM | 16 | All right.  So in your report, you actually offered |
| 2:08PM | 17 | up -- you have a section in your report called, I think, "Key |
| 2:08PM | 18 | Definitions." |
| 2:08PM | 19 | A.   I believe so. |
| 2:08PM | 20 | Q.   And in your -- |
| 2:08PM | 21 | A.   Would you like me to look -- turn to it? |
| 2:08PM | 22 | Q.   You certainly may. |
| 2:08PM | 23 | A.   Tell me what page. |
| 2:08PM | 24 | Q.   Paragraph 81. |
| 2:08PM | 25 | A.   Thank you, sir.  Very kind. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:09PM  1   **Q.**   Are you with me?

2:09PM  2   **A.**   I am, sir.  Thank you.

2:09PM  3   **Q.**   All right.  In your report, in paragraph 81, what you say

2:09PM  4   is "With respect to irreversible alopecia, the medical

2:09PM  5   literature has generally defined this condition as the complete

2:09PM  6   loss of growth or partial regrowth at least six months after

2:09PM  7   chemotherapy."  Correct?

2:09PM  8   **A.**   Correct.  And then I go on.

2:09PM  9            **MR. NOLEN:**  Your Honor, may we approach?

2:09PM  10           **THE COURT:**  Yes.

2:09PM  11           (WHEREUPON, the following proceedings were held at

2:09PM  12   the bench.)

2:10PM  13           **MR. NOLEN:**  Your Honor, Mr. Strongman is asking the

2:10PM  14   witness questions about what is in the witness's expert report,

2:10PM  15   and the report is not admitted into evidence.  It will never be

2:10PM  16   admitted into evidence.

2:10PM  17               The only thing the jury hears is what the jury

2:10PM  18   heard today in his direct testimony.  If he has questions that

2:10PM  19   he wants to ask to try to impeach Dr. Kessler's opinions about

2:10PM  20   the opinions he offered in this courtroom today, I think that's

2:10PM  21   appropriate.

2:10PM  22               I don't think -- they got to depose him after he

2:10PM  23   rendered his opinions.  I don't think going into an expert's

2:10PM  24   underlying report and what he did not offer in this courtroom

2:10PM  25   is appropriate.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:10PM | 1 | **MR. STRONGMAN:**  I don't see how me simply asking how |
| 2:10PM | 2 | he defined the condition that it is he's saying we should have |
| 2:10PM | 3 | put in our label and in his report is in any way improper. |
| 2:10PM | 4 | **MR. NOLEN:**  I simply don't know how far it's going to |
| 2:10PM | 5 | go. |
| 2:10PM | 6 | **THE COURT:**  Well, I will tell you this, and I |
| 2:10PM | 7 | think -- this is an expert -- |
| 2:11PM | 8 | **MR. NOLEN:**  I agree. |
| 2:11PM | 9 | **THE COURT:**  -- and I give a lot of latitude in |
| 2:11PM | 10 | cross-examination of experts.  I don't know where this is |
| 2:11PM | 11 | going. |
| 2:11PM | 12 | I think if he begins -- I think he can certainly |
| 2:11PM | 13 | ask him a question of how do you define the condition on which |
| 2:11PM | 14 | he's rendering his opinions.  I don't know if we need to |
| 2:11PM | 15 | reference the report.  It could be that you could just easily |
| 2:11PM | 16 | ask him, "Tell me what you think permanent alopecia is." |
| 2:11PM | 17 | **MR. STRONGMAN:**  I can do that, and I guess if he |
| 2:11PM | 18 | disagrees with me, that was part of why I didn't start with the |
| 2:11PM | 19 | report, to make it easier. |
| 2:11PM | 20 | **THE COURT:**  Of course.  Of course. |
| 2:11PM | 21 | **MR. STRONGMAN:**  Easy enough. |
| 2:11PM | 22 | **THE COURT:**  I think it's fair, and it's certainly an |
| 2:11PM | 23 | appropriate question. |
| 2:12PM | 24 | (WHEREUPON, the following proceedings were held in |
| 2:12PM | 25 | open court.) |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

BY MR. STRONGMAN:

2:12PM  1   BY MR. STRONGMAN:

2:12PM  2   Q.   Ready to proceed?

2:12PM  3   A.   I am.

2:12PM  4   Q.   Very good.  So, Doctor, you can agree with me that your

2:12PM  5   definition of "irreversible alopecia" is -- in the medical

2:12PM  6   literature, it was generally defined as six months with

2:12PM  7   complete loss of growth or partial regrowth; correct?

2:12PM  8   A.   I said the medical literature has generally defined it,

2:12PM  9   right, but do note some exceptions to that.

2:12PM  10  Q.   Very good.  So there are -- there are several other

2:12PM  11  definitions in the literature as well; correct?

2:12PM  12  A.   Fair.  Certainly within Sanofi, et cetera.  And different

2:13PM  13  doctors, different publications have different definitions.

2:13PM  14  Q.   And, for example, we've seen definitions that go out to

2:13PM  15  12 months or 24 months, things like that; correct?

2:13PM  16  A.   Correct.

2:13PM  17  Q.   Okay.  But you would agree with me that, most of the time

2:13PM  18  in the literature, it's six months.  That's the most common?

2:13PM  19  A.   I think that's a reasonable period of time.  There's no --

2:13PM  20  there's no magic to these numbers.

2:13PM  21  Q.   Okay.  And what we saw also in the literature is -- I

2:13PM  22  doubt you saw any definition for what you're calling

2:13PM  23  irreversible alopecia as being less than six months?

2:13PM  24  A.   I think that would be correct because, in general, you

2:13PM  25  know, before 2000, it was always expected, you know, that hair

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:13PM | 1 | would grow back.  But sometimes it would take three to six |
| 2:13PM | 2 | months for that to happen. |
| 2:14PM | 3 | Q.   Okay.  And with that kind of framework, we've kind of got |
| 2:14PM | 4 | some working definition here.  I want to talk a little bit |
| 2:14PM | 5 | about what is in the labeling.  Okay? |
| 2:14PM | 6 | A.   Sure. |
| 2:14PM | 7 | Q.   Okay.  And -- |
| 2:14PM | 8 | MR. STRONGMAN:  May I approach, Your Honor? |
| 2:14PM | 9 | THE COURT:  Yes, you may. |
| 2:14PM | 10 | THE WITNESS:  Thank you, Counsel. |
| 2:14PM | 11 | BY MR. STRONGMAN: |
| 2:14PM | 12 | Q.   Of course.  Doctor, what I've handed you has been marked |
| 2:14PM | 13 | as Defendants' Exhibit 215. |
| 2:14PM | 14 | And this is the 1996 approval letter from the FDA; |
| 2:15PM | 15 | correct? |
| 2:15PM | 16 | A.   Correct, signed by Dr. Temple. |
| 2:15PM | 17 | MR. STRONGMAN:  And Sanofi would move into evidence |
| 2:15PM | 18 | Defendants' Exhibit 215. |
| 2:15PM | 19 | THE COURT:  Any objection? |
| 2:15PM | 20 | MR. NOLEN:  No objection, Your Honor. |
| 2:15PM | 21 | THE COURT:  Let it be admitted. |
| 2:15PM | 22 | BY MR. STRONGMAN: |
| 2:15PM | 23 | Q.   Okay.  And, Doctor, with the approval letter that we've |
| 2:15PM | 24 | got here, Defendants' Exhibit 215, there's also the labeling |
| 2:15PM | 25 | attached; correct? |

DAVID KESSLER - CROSS

2:15PM   1   **A.**   Correct.

2:15PM   2   **Q.**   Okay.  And as we know, earlier when you were testifying

2:15PM   3   about time frames, I think you may have said something about

2:15PM   4   2009, maybe 2006, in terms of when a label should have been

2:15PM   5   changed.

2:15PM   6          Do you remember that?

2:15PM   7   **A.**   When there was evidence of a -- association or causal

2:16PM   8   association, yes.

2:16PM   9   **Q.**   But we can certainly agree that you're not offering any

2:16PM   10  opinions that there was an inadequacy with regard to any kind

2:16PM   11  of hair-loss warning in the 1996 label; correct?

2:16PM   12  **A.**   That would be correct, yes.

2:16PM   13          **MR. STRONGMAN:**  May I approach, Your Honor?

2:16PM   14          **THE COURT:**  Sure.

2:16PM   15  BY MR. STRONGMAN:

2:16PM   16  **Q.**   Doctor, I'm going to hand you what I've marked as Defense

2:16PM   17  Exhibit 317.  If you could take a look at that.

2:16PM   18  **A.**   Yes.

2:16PM   19  **Q.**   And this is the approval letter from the FDA for the 2004

2:17PM   20  Taxotere application; correct?

2:17PM   21  **A.**   Correct.

2:17PM   22  **Q.**   And included with the approval letter also is the

2:17PM   23  labeling; is that correct?

2:17PM   24  **A.**   Correct.

2:17PM   25          **MR. STRONGMAN:**  Defendants would move into evidence

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:17PM | 1 | Defense Exhibit 317. |
| 2:17PM | 2 | **THE COURT:**  Any objection? |
| 2:17PM | 3 | **MR. NOLEN:**  No objection, Your Honor. |
| 2:17PM | 4 | **THE COURT:**  Let it be admitted. |
| 2:17PM | 5 | **BY MR. STRONGMAN:** |
| 2:17PM | 6 | **Q.**   And, Doctor, we can also agree, based on what you said |
| 2:17PM | 7 | this morning, that you've not offered any opinions that the |
| 2:17PM | 8 | labeling for Taxotere, as it relates to hair loss, was |
| 2:17PM | 9 | inadequate in the 2004 labeling; correct? |
| 2:17PM | 10 | **A.**   That would be fair. |
| 2:17PM | 11 | **Q.**   And I asked you this already, but we can agree that the |
| 2:18PM | 12 | definition of "alopecia" -- you've been asked this -- it's hair |
| 2:18PM | 13 | loss; correct? |
| 2:18PM | 14 | **A.**   "Alopecia" means hair loss, correct. |
| 2:18PM | 15 | **Q.**   And we can agree that "alopecia" was always in the |
| 2:18PM | 16 | Taxotere label; correct? |
| 2:18PM | 17 | **A.**   "Alopecia" was in the Taxotere label. |
| 2:18PM | 18 | **Q.**   And if I take out Webster's dictionary and look up |
| 2:18PM | 19 | "alopecia," the definition will just be loss of hair; correct? |
| 2:18PM | 20 | **A.**   I'm sure that would be correct. |
| 2:18PM | 21 | **Q.**   And we talked about the American Cancer Society a little |
| 2:18PM | 22 | bit earlier. |
| 2:18PM | 23 |         Do you remember that? |
| 2:18PM | 24 | **A.**   Correct. |
| 2:18PM | 25 | **Q.**   And the American Cancer Society, we established, is a |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:18PM  1   reliable organization that puts out information into the

2:18PM  2   public; correct?

2:18PM  3   A.    Correct.

2:18PM  4   Q.    And they put out information about how terms are defined;

2:18PM  5   correct?

2:18PM  6   A.    They put -- a lot of organizations may have glossaries or

2:18PM  7   other things, yes.

2:19PM  8             MR. STRONGMAN:   May I approach?

2:19PM  9             THE COURT:   Yes, you may.

2:19PM  10  BY MR. STRONGMAN:

2:19PM  11  Q.    Doctor, what I've handed you is entitled "The American

2:19PM  12  Cancer Society Breast Cancer Dictionary."

2:19PM  13            Do you see that?

2:19PM  14  A.    Thank you very much.

2:19PM  15  Q.    Okay.  It has a date of 2006 on it; correct?

2:19PM  16  A.    I'll take you're representation.  I'm sure it's here

2:19PM  17  somewhere.  I'm just not seeing it, but I'll take your

2:19PM  18  representation.

2:19PM  19            MR. STRONGMAN:   Permission to publish, Your Honor?

2:19PM  20            THE COURT:   Is this in evidence?

2:19PM  21            MR. STRONGMAN:   This is a learned treatise.  It's a

2:19PM  22  reliable publication by a reliable organization.

2:20PM  23            THE COURT:   I think you're going to need to lay a

2:20PM  24  foundation that's it's a learned treatise.

        25

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:20PM  1    **BY MR. STRONGMAN:**

2:20PM  2    **Q.**   Dr. Kessler, we've established that the American Cancer

2:20PM  3    Society is a reliable organization; correct?

2:20PM  4    **A.**   A very well-respected organization.

2:20PM  5    **Q.**   And they put out --

2:20PM  6    **A.**   They asked me if I wanted to be president.

2:20PM  7    **Q.**   Very good.  And the American Cancer Society puts out

2:20PM  8    pamphlets and various materials that are relied on by people in

2:20PM  9    the field; correct?

2:20PM  10   **A.**   They -- I have no reason to dispute their good intention.

2:20PM  11   I don't know exactly -- this looks like it's meant for -- it

2:20PM  12   looks like a very useful document for the layperson.  I'm not

2:20PM  13   sure any breast oncologist would rely on this.

2:20PM  14   **Q.**   But you would agree it's a reliable pamphlet, correct, put

2:21PM  15   out by a society that asked you to be the president; correct?

2:21PM  16   **A.**   I'm -- I don't mean to quibble.  I don't mean to quibble,

2:21PM  17   but I haven't studied every definition.  But, you know, I'll --

2:21PM  18   sure, I mean, of course.

2:21PM  19          **MR. NOLEN:**  We object, Your Honor.  I don't know that

2:21PM  20   this is a learned treatise, and I'm not sure where it comes

2:21PM  21   from other than -- I'm not sure where it comes from or when --

2:21PM  22          **MR. STRONGMAN:**  The American Cancer Society?

2:21PM  23          **MR. NOLEN:**  Well, I know.

2:21PM  24          **THE COURT:**  You know what?  I'm the one person who

2:21PM  25   doesn't have it.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | |
|---|---|
| 2:21PM | 1 |
| 2:21PM | 2 |
| 2:22PM | 3 |
| 2:22PM | 4 |
| 2:22PM | 5 |

**MR. STRONGMAN:**  Your Honor, can I hand it up to you?

**THE COURT:**  Can I have a copy?

Members of the jury, this might be a good time for you to take your afternoon break.  Court will be at recess for 15 minutes.

**THE DEPUTY CLERK:**  All rise.

(WHEREUPON, the jury exited the courtroom.)

**THE COURT:**  I was just looking at rule, and I will tell you I looked at the rule last week, and I just -- because I have to tell you, I -- I just -- I'm listening.

**MR. STRONGMAN:**  Would you like me to go ahead and make my --

**THE COURT:**  Please.

**MR. STRONGMAN:**  Okay.  So what we've got here is Breast Cancer Dictionary by the American Cancer Society.  This, under 803(18), is a learned treatise, periodical, or pamphlet. It's clearly a statement called the attention -- I know Dr. Kessler is in here.  Is that fine?

**THE WITNESS:**  Do you want me to leave?

**THE COURT:**  Yes.  Would you stand in that little hallway, please, Dr. Kessler.

**THE WITNESS:**  Of course, Your Honor.

**MR. STRONGMAN:**  Thank you, Your Honor.  So what we've got is a document put out by the American Cancer Society called Breast Cancer Dictionary.  It is clearly a pamphlet under

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:24PM | 1 | 803(18) called to the attention of an expert witness on |
| 2:24PM | 2 | cross-examination.  We certainly would have an expert as well |
| 2:24PM | 3 | that would say it's a reliable authority. |
| 2:25PM | 4 | And I believe that it's not just some |
| 2:25PM | 5 | peer-reviewed publication.  It's a pamphlet put out by a |
| 2:25PM | 6 | reliable authority, which this is, under 803(18). |
| 2:25PM | 7 | MR. NOLEN:  Your Honor, a couple of things.  One, |
| 2:25PM | 8 | this is -- I don't know that this is a learned treatise.  I |
| 2:25PM | 9 | don't think if qualifies.  It's not peer-reviewed.  It doesn't |
| 2:25PM | 10 | appear in a peer-reviewed journal or publication.  So we have |
| 2:25PM | 11 | that. |
| 2:25PM | 12 | Two, Dr. Kessler doesn't say that he relies upon |
| 2:25PM | 13 | this for any reason.  He didn't say that he relies upon it.  He |
| 2:25PM | 14 | personally didn't say that he recognizes it, "it" being this |
| 2:25PM | 15 | particular document, this list of definitions from the American |
| 2:25PM | 16 | Cancer Society, as being authoritative on anything. |
| 2:25PM | 17 | What he did is vouch for the American Cancer |
| 2:25PM | 18 | Society by saying that he thinks it's a fine organization that |
| 2:26PM | 19 | actually once asked him to be their president. |
| 2:26PM | 20 | But aside from that, what this is, is something |
| 2:26PM | 21 | that's printed off the Internet that, apparently, goes to the |
| 2:26PM | 22 | lay public.  I think it's intended for the lay public.  I don't |
| 2:26PM | 23 | think that there's any foundation whatsoever for this being an |
| 2:26PM | 24 | actual learned treatise. |
| 2:26PM | 25 | MR. STRONGMAN:  The fact that Dr. Kessler didn't cite |

DAVID KESSLER - CROSS

2:26PM 1   to it is part of the reason that I want to bring it to his

2:26PM 2   attention.  And if I have an expert that will say --

2:26PM 3        THE COURT:  I'm sorry.  Can you speak up.  You know

2:26PM 4   what?  Just pull down the mic.  I think that's part of the

2:26PM 5   problem.  Thank you.

2:26PM 6        MR. STRONGMAN:  Very good.  So what I was saying is,

2:26PM 7   obviously, we have an expert who would say it's a reliable

2:26PM 8   authority, thanks to the American Cancer Society as well.

2:26PM 9        So the fact that Dr. Kessler hasn't cited it is

2:26PM 10  part of the reason I want to bring it to his attention.  I

2:26PM 11  think it's appropriate.  It's not going into evidence.  It's

2:26PM 12  going to be --

2:26PM 13       THE COURT:  No, I understand.

2:27PM 14       Well, it doesn't have to be relied upon by the

2:27PM 15  witness in his direct testimony.  It's something he can call to

2:27PM 16  his attention during cross-examination.

2:27PM 17       The question is whether or not it's established

2:27PM 18  as a reliable authority by the expert's admission or testimony,

2:27PM 19  by another expert's testimony, or by judicial notice.

2:27PM 20       I think -- I will tell you, I think Dr. Kessler

2:27PM 21  equivocated on that.  He was less than -- let me see --

2:27PM 22  unfortunately, I was over there.

2:27PM 23       And let me just say -- let me go back to his

2:27PM 24  exact testimony, what he said.  "I have no reason to dispute

2:27PM 25  their good intention.  I don't know exactly.  This looks like

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:27PM 1    it's meant for -- it looks like a very useful document for the

2:28PM 2    lay person.  I'm not sure any breast oncologist would rely on

2:28PM 3    this."

2:28PM 4              My guess is you're not asking him if a breast

2:28PM 5    oncologist would use this.

2:28PM 6              MR. STRONGMAN:  No, that's not my particular

2:28PM 7    question.

2:28PM 8              THE COURT:  I know what your particular is.  You know

2:28PM 9    what?  I've got that.

2:28PM 10             And then the question is what does this mean.

2:28PM 11   And then it goes right to what does the plaintiff mean when

2:28PM 12   they see it in the label.

2:28PM 13             And so I'm listening.  Because I think -- I am

2:28PM 14   quite certain that's where we're going as to what is the

2:28PM 15   definition of "alopecia."

2:28PM 16             MR. NOLEN:  So if we look at the comments to

2:28PM 17   Rule 803(18), it tells us, "The relevance of the use of

2:28PM 18   treatises on cross-examination is evident.  The use of

2:28PM 19   treatises has been the subject of varying views.  The most

2:29PM 20   restrictive position is that the witness must have stated

2:29PM 21   expressly on direct his reliance on upon the treatise.  A

2:29PM 22   slightly more liberal approach still insists upon reliance but

2:29PM 23   allows it to be developed on cross-examination."

2:29PM 24             We don't have that here, Your Honor.

2:29PM 25             THE COURT:  But I'm looking at the language of the

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:29PM 1   rule.  "The statement is called to the attention of an expert

2:29PM 2   on cross-examination or relied on by the expert on direct.  And

2:29PM 3   the publication is established as a reliable authority by the

2:29PM 4   expert's admission or testimony or by another expert's

2:29PM 5   admission."

2:29PM 6        MR. STRONGMAN:  Obviously, Dr. Kessler has been

2:29PM 7   through this a few times.  He can't control his cross.

2:29PM 8        THE COURT:  I'm sorry?

2:29PM 9        MR. STRONGMAN:  I said the witness shouldn't be able

2:29PM 10  to control their cross.

2:29PM 11        THE COURT:  Well, I think the rule says -- the rule

2:29PM 12  says he doesn't have to rely on it in his direct, but he's got

2:30PM 13  to acknowledge if as a learned -- as some authority.

2:30PM 14            And it's not -- you can't just put something in

2:30PM 15  front of him unless he says, "Yes, this is" because it says

2:30PM 16  "and" -- I'm a civilian, so we look at all of these books --

2:30PM 17  "the publication is established as a reliable authority by the

2:30PM 18  expert's admission or testimony or by another expert's

2:30PM 19  testimony or judicial notice."

2:30PM 20        MR. STRONGMAN:  Correct.

2:30PM 21        THE COURT:  So I think he's got to say this is --

2:30PM 22  this is reliable authority.

2:30PM 23            I'm trying to look at his language, because I

2:30PM 24  think that -- I think that, certainly, he doesn't have to rely

2:30PM 25  on it in direct, absolutely.  But he has -- and you can call it

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:30PM 1    to his attention on cross, but he's got to establish that this

2:30PM 2    is reliable authority.

2:30PM 3           MR. STRONGMAN:  I think under the rule, it says, "or

2:31PM 4    by another expert's testimony."  So that means another expert,

2:31PM 5    if they come in here, can testify that it is a reliable

2:31PM 6    authority.

2:31PM 7           THE COURT:  Oh, absolutely.

2:31PM 8           MR. STRONGMAN:  And so the point being that

2:31PM 9    Dr. Kessler shouldn't be able to control his cross-examination

2:31PM 10   just by saying, "I don't think that's reliable" when another

2:31PM 11   expert in the case could come in and say it is.  I think that's

2:31PM 12   the intent of this rule.

2:31PM 13          THE COURT:  I agree with you except that do I

2:31PM 14   anticipate -- am I supposed to anticipate whether another

2:31PM 15   expert's going to say that?

2:31PM 16          MR. STRONGMAN:  I think that's a fair thing to do.  I

2:31PM 17   think the Court could also take judicial notice of it.

2:31PM 18   Obviously, that's included as well.

2:31PM 19              We're talking about definitions from the

2:31PM 20   American Cancer Society, and it's totally -- it's totally fair

2:31PM 21   to just ask did he look for this, did he review it, does he

2:31PM 22   know what it says.

2:31PM 23              And if he says it's worthless, that's fine too,

2:31PM 24   in terms of "I've read it.  Here's what it says.  And I have an

2:32PM 25   opinion that it's not worth something."  But I think it's fair

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:32PM 1    to cross-examine him on it.

2:32PM 2              THE COURT:  Okay.  I'm listening.

2:32PM 3              MR. NOLEN:  Just -- again, I don't think there's any

2:32PM 4    evidence here that this is a peer-reviewed document.

2:32PM 5              THE COURT:  Oh, I don't think anybody's going to say

2:32PM 6    it's a peer-reviewed document.

2:32PM 7              MR. NOLEN:  And, therefore, it's not a learned

2:32PM 8    treatise, because it's not learned if it's not peer-reviewed.

2:32PM 9              THE COURT:  But it says "periodicals" or "pamphlets."

2:32PM 10             MR. NOLEN:  I think that they would have to come

2:32PM 11   under some scrutiny; otherwise, we could put The New York Times

2:32PM 12   in front of him.

2:32PM 13             THE COURT:  Well, we're not going to do that.

2:32PM 14                  I'm going to take my ten-minute break, and then

2:32PM 15   I'll be back.

2:32PM 16             THE DEPUTY CLERK:  All rise.

2:32PM 17             (WHEREUPON, the Court took a recess.)

2:39PM 18             THE COURT:  Please be seated.

2:39PM 19             MR. STRONGMAN:  Your Honor, if I could point one

2:39PM 20   other thing out.

2:39PM 21             THE WITNESS:  Do you want me out of here?

2:39PM 22             THE COURT:  Not the jury yet.

2:39PM 23             MR. STRONGMAN:  You're fine.

2:39PM 24                  I asked Dr. Kessler pretty directly:

2:39PM 25             "Q.  And the American Cancer Society, we established,

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:39PM | 1 | is a reliable organization that puts out information in |
| 2:39PM | 2 | the public; correct? |
| 2:39PM | 3 | "A.  Correct." |
| 2:39PM | 4 | And I think that alone is sufficient.  It |
| 2:39PM | 5 | doesn't have to be each and every individual piece of paper. |
| 2:39PM | 6 | The organization itself -- just like a peer-reviewed journal, |
| 2:39PM | 7 | it's the journal, it's not every single article in the journal. |
| 2:39PM | 8 | So I think that foundation even was laid. |
| 2:39PM | 9 | MR. NOLEN:  Your Honor, I do have a response to that. |
| 2:39PM | 10 | THE COURT:  Can you -- |
| 2:39PM | 11 | MR. NOLEN:  I do have a response to that, Your Honor. |
| 2:39PM | 12 | We spent some time over the break trying to |
| 2:39PM | 13 | figure out exactly which one of their experts had indicated |
| 2:39PM | 14 | they relied on the American Cancer Association's definitions. |
| 2:39PM | 15 | We didn't see that.  We were looking at the reliance materials |
| 2:40PM | 16 | from the experts that have been disclosed in this case. |
| 2:40PM | 17 | Dr. Kessler didn't indicate that he relies upon |
| 2:40PM | 18 | this definition for any purpose.  So I don't know how in the |
| 2:40PM | 19 | world this comes in as a learned treatise or as reliable given |
| 2:40PM | 20 | that I don't think, as best we could tell, none of their |
| 2:40PM | 21 | experts rely on it. |
| 2:40PM | 22 | THE COURT:  That's not the test.  I think it can be |
| 2:40PM | 23 | called to the attention of an expert on cross-examination if |
| 2:40PM | 24 | the publication is established as a reliable authority by the |
| 2:40PM | 25 | expert's admission or testimony by another expert -- by another |

DAVID KESSLER - CROSS

2:40PM  1   expert's testimony or by judicial notice.  That's the test.

2:40PM  2                   So it could be called to his attention without

2:40PM  3   another expert relying on it if he establishes it as reliable

2:40PM  4   authority -- the publication as reliable authority.

2:40PM  5                   MR. NOLEN:  Yes.  And Dr. Kessler didn't do that, and

2:41PM  6   we don't see where any of their experts, at least in their

2:41PM  7   reports -- we're going to hold them to the four corners -- ever

2:41PM  8   did.

2:41PM  9                   MR. STRONGMAN:  Certainly, Your Honor, I feel like I

2:41PM  10  should be able to just read the definition to him, and he can

2:41PM  11  say whether he agrees with it or he doesn't.

2:42PM  12                  THE COURT:  What Dr. Kessler said is that the

2:42PM  13  American Cancer Society is a very reliable organization.

2:42PM  14                  And then the question was:

2:42PM  15       "Q.  And puts out pamphlets and various materials

2:42PM  16       that are relied on by people in the field; correct?"

2:42PM  17                  And he said:

2:42PM  18       "A.  I have no reason to dispute their good

2:42PM  19       intention.  I don't know exactly -- this document looks

2:42PM  20       like it's meant for -- it looks like it's a very useful

2:42PM  21       document for the layperson.  I'm not sure a breast

2:42PM  22       oncologist would rely on this."

2:42PM  23                  And then the follow-up was:

2:42PM  24       "Q.  But it's a reliable pamphlet?"

2:42PM  25                  And he said:

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:42PM  1          "A.  I don't mean to quibble.  I don't mean to

2:42PM  2      quibble, but I haven't studied every definition.  But, you

2:42PM  3      know, I'll -- I mean, of course."

2:43PM  4               Gosh.  This is --

2:43PM  5          **MR. STRONGMAN:**  I think I should be able to read it

2:43PM  6  to him, and he can agree with it or disagree with it.  He has

2:43PM  7  agreed the American Cancer Society -- this is not

2:43PM  8  controversial.

2:43PM  9          **THE COURT:**  Oh, I understand it's not controversial.

2:43PM 10  I've seen learned treatises, and I've used learned treatises on

2:43PM 11  cross-examination.

2:43PM 12               I've never had a pamphlet that looks like this.

2:43PM 13  It's usually a peer-reviewed article from Journal of American

2:43PM 14  Medical Society or it's a textbook that everybody says, "Yes,

2:43PM 15  this is the information."

2:43PM 16               This is just very, very different.  I have to

2:43PM 17  tell you, I'm not inclined to allow it simply because it's -- I

2:44PM 18  believe -- it certainly wasn't relied on in his direct

2:44PM 19  examination.  It's appropriate to bring a learned treatise to

2:44PM 20  an expert witness on cross-examination, whether he's ever, you

2:44PM 21  know -- whether he's relied on it or not.

2:44PM 22               But it is -- don't you hate when you have people

2:44PM 23  in your ear?

2:44PM 24          **MS. SASTRE:**  I'm sorry.  I don't want to violate your

2:44PM 25  rule, but...

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:44PM   1          **THE COURT:**  I know.

2:44PM   2          **MR. STRONGMAN:**  Your Honor, I think I should at least

2:44PM   3   be able to just ask, "Would you agree that alopecia is defined

2:44PM   4   by the American Cancer Society as -- yes or no?  Do you agree

2:44PM   5   or disagree?"  I don't have to put it up on the screen.  I can

2:45PM   6   just ask that question.

2:45PM   7          **MR. NOLEN:**  Your Honor, the American Cancer Society

2:45PM   8   isn't here, and this is not an appropriate document to be

2:45PM   9   impeaching the witness with because it's not a scientific

2:45PM  10   document.

2:45PM  11          **THE COURT:**  Well, this is what I'm going to allow you

2:45PM  12   to do:  I think, at some point later in this trial, my guess is

2:45PM  13   somebody's going to say, "Look, this is what it is."

2:45PM  14          I think you can ask him if he would accept this

2:45PM  15   definition without referring to the American Cancer Society.

2:45PM  16   Let's see what he does.  And then at some point later, somebody

2:45PM  17   will probably come in and say what they have to say.

2:45PM  18          But I'm -- you know, it's very difficult for me

2:45PM  19   to say this is a learned treatise.

2:45PM  20          The objection's noted for the record.

2:45PM  21          **MR. STRONGMAN:**  Thank you.

2:45PM  22          **MR. NOLEN:**  Your Honor, can we ask the Court for an

2:45PM  23   instruction asking him to disregard -- asking the jury to

2:45PM  24   disregard the questioning related to the American Cancer

2:46PM  25   Society?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:46PM  1            **THE COURT:**  What are you asking me to say to

2:46PM  2   disregard?

2:46PM  3            **MR. NOLEN:**  Yeah, the jury should disregard the

2:46PM  4   question regarding the American Cancer Society.

2:46PM  5            **THE COURT:**  I'm not going to do that.  We're going to

2:46PM  6   call them.  The jury's going to -- I told them if I sustain an

2:46PM  7   objection, I sustain an objection, it's taken down.

2:46PM  8            I think if we go into that -- no, no.  I am

2:46PM  9   sustaining the objection.

2:46PM  10            **MR. NOLEN:**  Thank you, Your Honor.

2:46PM  11            While we're at this break, I do need to raise

2:46PM  12   one other issue, and that is the issue that came up that we

2:46PM  13   approached earlier on at the bench about the money issue with

2:47PM  14   Dr. Kessler.

2:47PM  15            There was this line of questioning that we got

2:47PM  16   here talking about Ms. Earnest and the report that he prepared.

2:47PM  17            **THE COURT:**  Wait.

2:47PM  18            I'm not talking to you.

2:47PM  19            Okay.  Go ahead.  I'm talking to the court

2:47PM  20   security officer, who I think was getting ready to bring in the

2:47PM  21   jury.

2:47PM  22            **MR. NOLEN:**  I see, Your Honor.

2:47PM  23            He says:

2:47PM  24            "Q.  And on the report you prepared for Ms. Earnest's

2:47PM  25      case; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:47PM  1          "A.  I need to look at Your Honor to know how to

2:47PM  2      answer that."

2:47PM  3              He was looking to you, the witness.

2:47PM  4              And then you talked about opening doors, and

2:47PM  5      then Mr. Strongman said:

2:47PM  6          "Q.  Let me ask the question this way.  You spend

2:47PM  7      hundreds of -- how many hours have you spent on

2:47PM  8      Ms. Earnest's case?

2:47PM  9          "A.  I think I testified this morning 100-plus.  I

2:47PM  10     want to be specific.

2:47PM  11         "Q.  Do you know how many" --

2:47PM  12         **THE COURT:**  What's the question?

2:47PM  13         **MR. NOLEN:**  I think --

2:47PM  14         "Q.  -- pages?  100 or is just right in that

2:47PM  15     ballpark?

2:47PM  16         "A.  It could be a little more than 2."

2:47PM  17             I think he meant hours.  I think it's a rough.

2:48PM  18         "A.  But it's in, generally, that ballpark.  It's

2:48PM  19     under 200 on Ms. Earnest's and many cases."

2:48PM  20             And then he called it:

2:48PM  21         "Q.  Have you figured out what that superhuman rate

2:48PM  22     of review is?"

2:48PM  23             What that does, Your Honor, is undermine

2:48PM  24  Dr. Kessler's credibility because Dr. Kessler testified that he

2:48PM  25  spent many, many hours reviewing hundreds of thousands of pages

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:48PM  1    of documents.

2:48PM  2            Then he testified that he spent 100 hours on

2:48PM  3    Ms. Earnest's case, approximately 100.  That goes right into

2:48PM  4    that area that we were having some difficulty with this

2:48PM  5    morning.

2:48PM  6            **THE COURT:**  Well, you might have read -- you know

2:48PM  7    what I heard?  This is -- this is how I took that line of

2:48PM  8    questioning.

2:48PM  9            What I heard was Dr. Kessler say, "I was

2:48PM  10   provided a gazillion pieces of paper."

2:48PM  11           And then how did you get through that?  And

2:48PM  12   Dr. Kessler, I think -- what I recall his testimony was, "I

2:49PM  13   didn't look at every piece of paper.  I could not look at every

2:49PM  14   piece of paper.  I looked at abstracts.  I looked at the

2:49PM  15   pertinent provisions.  I was provided all of these papers."

2:49PM  16           And then I think Mr. Strongman was trying to

2:49PM  17   make the point, "Oh, that superhuman rate of review."

2:49PM  18           But what I heard is "I didn't look at every

2:49PM  19   piece of paper.  I couldn't."

2:49PM  20           But what do you want me to do?

2:49PM  21           **MR. NOLEN:**  Well, Your Honor, what we believe is that

2:49PM  22   was knocking at and opening the door of allowing in that there

2:49PM  23   are many cases involved in this litigation and that his review

2:49PM  24   and work in this litigation includes more than just Barbara

2:49PM  25   Earnest.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:49PM | 1 | **THE COURT:**  I tell you, Mr. Nolen, I think he was |
| 2:49PM | 2 | getting ready to open the door.  And that's when I looked at |
| 2:49PM | 3 | him and said, "Do you really want to do that?" |
| 2:49PM | 4 | **MR. STRONGMAN:**  And I stopped. |
| 2:49PM | 5 | **THE COURT:**  And he stopped in his tracks because we |
| 2:49PM | 6 | were going to talk about the 11,000 other plaintiffs.  But I |
| 2:50PM | 7 | don't think he was able to do that. |
| 2:50PM | 8 | Now, I think the superhuman rate of review -- |
| 2:50PM | 9 | all I can tell you is what I heard.  I guess, if I dissected |
| 2:50PM | 10 | every sentence or every word, I would come up with a different |
| 2:50PM | 11 | thing.  But I thought it was related to the wealth of |
| 2:50PM | 12 | information that was provided to this man and that he clearly |
| 2:50PM | 13 | said, "I didn't look at it all because I could not." |
| 2:50PM | 14 | I don't think the door is open.  Look, he was |
| 2:50PM | 15 | trying. |
| 2:50PM | 16 | All right.  I think we can bring in the jury |
| 2:50PM | 17 | now. |
| 2:50PM | 18 | **THE DEPUTY CLERK:**  All rise. |
| 2:50PM | 19 | (WHEREUPON, the jury entered the courtroom.) |
| 2:51PM | 20 | **THE COURT:**  All jurors are present.  Court's back in |
| 2:51PM | 21 | session.  You may be seated. |
| 2:51PM | 22 | Mr. Strongman, please continue your questioning. |
| 2:51PM | 23 | **MR. STRONGMAN:**  Thank you, Your Honor. |
| 2:51PM | 24 | BY MR. STRONGMAN: |
| 2:51PM | 25 | **Q.**   Are you ready to proceed, Doctor? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:51PM 1    **A.**  I am.

2:51PM 2    **Q.**  Okay.  We were talking about alopecia definitions, and I

2:51PM 3    put some information up here.  And we were generally talking

2:51PM 4    about alopecia.

2:51PM 5            Do you remember that?

2:51PM 6    **A.**  Correct.

2:51PM 7    **Q.**  Okay.  Doctor, do you accept or reject this definition of

2:51PM 8    alopecia, "Hair loss, which may include eyebrows, eyelashes,

2:51PM 9    and even pubic hair.  This often happens as a result of

2:51PM 10   chemotherapy or from radiation therapy to the head.  In most

2:51PM 11   people, the hair grows back after treatment ends"?

2:52PM 12   **A.**  I would agree with the first part up, until the "most

2:52PM 13   people."  And then I think the rest of the sentence is vague

2:52PM 14   and not helpful.  I don't think it gives us a full story.

2:52PM 15   **Q.**  Did you do research?

2:52PM 16           So one of things that we've been talking about in

2:52PM 17   your labeling opinions is the fact that the label is

2:52PM 18   intended -- it has a patient counseling sheet in it.

2:52PM 19           Do you remember that?

2:52PM 20   **A.**  Correct.

2:52PM 21   **Q.**  And I think that you testified about how there were some

2:52PM 22   terms in there that were done in a way so that they were

2:52PM 23   understandable by patients; correct?

2:52PM 24   **A.**  The patient, and how we move the whole label to be that as

2:52PM 25   opposed to decades ago, yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:52PM  1    **Q.**   And in your -- let me put it this way:  Have you done

2:53PM  2    research on all the various lay definitions that are given to

2:53PM  3    patients as it relates to the definition of "alopecia"?

2:53PM  4    **A.**   I've looked at other labels in other drugs and statements

2:53PM  5    in other drugs and what's said in the patient counseling form.

2:53PM  6    I wouldn't want to represent that I've looked at every drug.

2:53PM  7    **Q.**   No.  And what I was asking was have you done any research

2:53PM  8    on what is in the public sphere for patients in terms of how

2:53PM  9    "alopecia" is defined for patients?

2:53PM  10   **A.**   Yes, I have done that research.

2:53PM  11   **Q.**   And the definition that I read to you, you reject part of

2:53PM  12   it or do you accept it?

2:53PM  13   **A.**   I reject a part of it because -- I rejected a part of it.

2:54PM  14   **Q.**   What part?

2:54PM  15   **A.**   I think the part that most times hair grows back, the end,

2:54PM  16   I think, is somewhat vague.  And it's sort of contradictory to

2:54PM  17   what, in fact, transpired.

2:54PM  18   **Q.**   Well, let's look -- let's look at the Taxotere label.

2:54PM  19   Okay?  Why don't we go there.

2:54PM  20   **A.**   Sure.

2:54PM  21   **Q.**   So we've talked about the 2004 label; correct?

2:54PM  22   **A.**   Yes, sir.

2:54PM  23   **Q.**   And I handed you the approval letter, and it's in

2:54PM  24   evidence.

2:54PM  25            **MR. STRONGMAN:**  If we could bring up the 2004 label.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 2:54PM | 1 | And if you could bring up the patient information paragraph. |
| 2:55PM | 2 | BY MR. STRONGMAN: |
| 2:55PM | 3 | Q.   All right.  Doctor, can you see your screen in front of |
| 2:55PM | 4 | you? |
| 2:55PM | 5 | A.   I can see it well. |
| 2:55PM | 6 | Q.   And what we've got is Exhibit -- Defendants' Exhibit 317; |
| 2:55PM | 7 | correct? |
| 2:55PM | 8 | A.   Correct. |
| 2:55PM | 9 | Q.   And this is the 2004 patient information in the Taxotere |
| 2:55PM | 10 | label; correct? |
| 2:55PM | 11 | A.   2004, in the -- you said the patient section? |
| 2:56PM | 12 | Q.   Correct. |
| 2:56PM | 13 | A.   Correct, sir. |
| 2:56PM | 14 | Q.   And what it says is "Loss of hair occurs in most patients |
| 2:56PM | 15 | taking Taxotere, including the hair on your head, underarm, |
| 2:56PM | 16 | pubic hair, eyebrows, and eyelashes."  Correct? |
| 2:56PM | 17 | A.   Correct. |
| 2:56PM | 18 | Q.   "Hair loss will begin after the first few treatments and |
| 2:56PM | 19 | varies from patient to patient." |
| 2:56PM | 20 |          Did I read that correctly? |
| 2:56PM | 21 | A.   Exactly, sir. |
| 2:56PM | 22 | Q.   And then it says, "Once you have completed all your |
| 2:56PM | 23 | treatments, hair generally grows back."  Correct? |
| 2:56PM | 24 | A.   That's what it says. |
| 2:56PM | 25 | Q.   And this exact same language was in the 1996 label that |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:56PM   1    was approved while you were the commissioner of the FDA;

2:56PM   2    correct?

2:56PM   3    A.   I believe so.  I have no reason to dispute that.

2:56PM   4    Q.   And we know that the word "generally" means most of the

2:56PM   5    time; correct?

2:57PM   6    A.   Yes.  It has to, obviously, be in context.  It's -- it

2:57PM   7    gets -- it's usually not helpful in labels.  And FDA, you know,

2:57PM   8    has moved to take the word "generally" out from those kind of

2:57PM   9    statements because it's not helpful.

2:57PM   10   Q.   Well, Doctor, we talked about "generally" just a minute

2:57PM   11   ago, didn't we?  "Generally," "most of the time," several

2:57PM   12   others.

2:57PM   13        Do you remember that conversation?

2:57PM   14   A.   Right.  But that's in a definition.  That's not in the

2:57PM   15   context of a warning.  Don't -- a warning shouldn't be

2:57PM   16   "generally."  We don't do back -- you know, you be clear and

2:57PM   17   direct with a warning.

2:57PM   18   Q.   Doctor, if you could listen to my question.

2:57PM   19        We talked about the definition of "generally";

2:57PM   20   correct?  Setting aside whether you think the word "generally"

2:57PM   21   should or shouldn't be in a label, okay, the definition of

2:57PM   22   "generally" means most of the time; correct?

2:58PM   23   A.   I think that would be a fair general statement.

2:58PM   24   Q.   Yes.  And it's a word that you used yourself; correct?

2:58PM   25   A.   Whatever my testimony, if I said it -- I certainly used

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | |
|---|---|
| 2:58PM | 1 |

the word "generally" to -- I use that word, of course.

**Q.**   And what that means is most of the time but not all the
time; correct?

**A.**   Well, yes.

**Q.**   "Yes"?

**A.**   Yes.  But that's not what this means necessarily.

**Q.**   Doctor, if you could just focus on my question.

**A.**   I am.

**Q.**   The definition of "generally" means most of the time but
not all the time; correct?

**A.**   Correct.  If you don't lose your hair, it doesn't have to
grow back.

       **MR. STRONGMAN:**  I move to strike after "correct."

       **THE COURT:**  Sustained.

**BY MR. STRONGMAN:**

**Q.**   And, Doctor, you don't have any knowledge -- let me
withdraw that and ask it a different way.

       Doctor, you're not offering any opinion about what
label version Dr. Carinder did or did not see?

**A.**   Absolutely not.  I don't know.  I've not investigated.
It's beyond the scope.

**Q.**   And I think you testified earlier that it was very
important to review labels as a doctor; correct?

**A.**   I think I said it as an aspirational goal, recognizing, I
think, that not all doctors read the entire label.  They may

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

2:59PM 1    hear it in different formats or hear about that information in

3:00PM 2    different forms.

3:00PM 3    Q.   But you would agree it's vitally important to understand

3:00PM 4    what's in the label for drugs that are prescribed by yourself,

3:00PM 5    as a doctor; correct?

3:00PM 6    A.   That's why we spend so much time working on the label.  I

3:00PM 7    don't disagree with that statement.

3:00PM 8    Q.   And I think you even said that your mother reads the label

3:00PM 9    for every medication that she receives?

3:00PM 10   A.   Until she recently died, yes, she would call me up about

3:00PM 11   those labels.

3:00PM 12   Q.   Do you know whether or not Ms. Earnest ever read the label

3:00PM 13   for Taxotere?

3:00PM 14   A.   I would -- the answer is no, and I would certainly not

3:00PM 15   expect or put the burden on a patient to know what's on the

3:00PM 16   label.  I think that would be unfair.

3:01PM 17   Q.   I want to talk about the different prongs of analysis that

3:01PM 18   you did.

3:01PM 19        You mentioned that you looked at the internal

3:01PM 20   database, I think, and looked at clinical trial data, and you

3:01PM 21   looked at literature.

3:01PM 22        Do you remember that?

3:01PM 23   A.   Correct.

3:01PM 24   Q.   And the first section that I want to address is the

3:01PM 25   analysis that you did on the internal database.  Okay?

DAVID KESSLER - CROSS

3:01PM 1    **A.**   Correct.

3:01PM 2    **Q.**   And what you did is you asked Dr. Madigan to perform an

3:01PM 3    analysis; correct?

3:01PM 4    **A.**   I asked him to pull data and perform an analysis, correct.

3:01PM 5    **Q.**   Now, with regard to the internal database work that was

3:01PM 6    done, the methodology consisted of Dr. Madigan looking for the

3:01PM 7    high-level term "alopecia"; correct?

3:01PM 8    **A.**   Correct.

3:01PM 9    **Q.**   And then searching for whether or not the report contained

3:01PM 10   one of various words; correct?

3:01PM 11   **A.**   Are you talking about in the FAERS database or in the

3:02PM 12   internal pharmacovigilance --

3:02PM 13   **Q.**   I'm talking --

3:02PM 14   **A.**   -- database?

3:02PM 15   **Q.**   Sorry.  I'm talking about the internal database that you

3:02PM 16   talked with Mr. Nolen about today.

3:02PM 17   **A.**   Sure.  Not the FAERS database?

3:02PM 18   **Q.**   Correct.

3:02PM 19   **A.**   Correct.

3:02PM 20   **Q.**   So what Dr. Madigan did was he searched for the high-level

3:02PM 21   term "alopecia," and then whether or not the report contained

3:02PM 22   one of any number of words; correct?

3:02PM 23   **A.**   After -- yes.

3:02PM 24   **Q.**   And so one of the words that Dr. Madigan searched for was

3:02PM 25   "chronic"; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:02PM 1    A.   I'd have to pull that, but I take your representation,

3:02PM 2    yes.

3:02PM 3    Q.   And what you know by looking at Dr. Madigan's information

3:02PM 4    and report is that the word "chronic" just had to be somewhere

3:02PM 5    in the report; correct?

3:02PM 6    A.   No, because Dr. Madigan wasn't given the reports.  I was

3:02PM 7    asked -- he was given the data.  But I asked for the CIOMS, but

3:03PM 8    they don't think they were produced.

3:03PM 9         So I looked for the reports themselves.  And I don't

3:03PM 10   think they were made available by the company, if I'm correct.

3:03PM 11   Q.   Doctor, listen to my question carefully for a minute.

3:03PM 12   A.   Sure.

3:03PM 13   Q.   So this is a report, and it has information in it;

3:03PM 14   correct?  Can we agree on that?

3:03PM 15   A.   There's data in the database format.

3:03PM 16        This is for Dr. Madigan?

3:03PM 17   Q.   Correct.

3:03PM 18   A.   Yeah.  I think it's probably best -- I think the jury will

3:03PM 19   hear from Dr. Madigan, and it's probably most reliable to

3:03PM 20   note -- to ask him exactly what he did as far as accessing from

3:03PM 21   the database so we don't confuse reports and database terms.

3:03PM 22   But I'm happy to --

3:03PM 23   Q.   Let me ask you this.  You asked Dr. Madigan to do this

3:03PM 24   analysis.

3:03PM 25        Did you go back and analyze his methodology?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:03PM 1   **A.**   Yes.  Not only did I look at his methodology, I took that

3:03PM 2   methodology against the company.  And the company found 142.

3:04PM 3   Dr. Madigan found 168.  And I think, as I testified, I'll take

3:04PM 4   the 142.  I think that's enough evidence.  And the company --

3:04PM 5   **Q.**   Doctor, if you could listen to my question.

3:04PM 6        Did you review Dr. Madigan's methodology?  Yes or no?

3:04PM 7   **A.**   I did.

3:04PM 8   **Q.**   And you know, therefore, that the way that Dr. Madigan

3:04PM 9   performed this analysis, you could have a report of alopecia

3:04PM 10  during chemotherapy along with a report of chronic back pain,

3:04PM 11  and it would generate a positive result in Dr. Madigan's

3:04PM 12  report; correct?

3:04PM 13  **A.**   In the FAERS analysis, I think you're correct.  I'm not

3:04PM 14  sure in the pharmacovigilance, you're correct.  I'd have to go

3:04PM 15  back and review it, but I did double-check.

3:04PM 16  **Q.**   So, Doctor, answer my question.

3:04PM 17       Do you know, sitting here today, whether or not that

3:04PM 18  kind of complaint would be in one of your 168?

3:05PM 19       **MR. NOLEN:**  Objection, Your Honor.  The witness

3:05PM 20  wasn't allowed to even finish his response.

3:05PM 21       **THE COURT:**  Okay.  Overruled.

3:05PM 22       I'm going let him answer the question, but I

3:05PM 23  think this --

3:05PM 24       **THE WITNESS:**  I know there were definitely 142 cases

3:05PM 25  where Sanofi had the CIOMS forms.  I don't believe those CIOMS

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:05PM  1   forms were made available to Dr. Madigan.

3:05PM  2            So I can assure you that there were 142 cases

3:05PM  3   where it was not chronic back pain but it was permanent

3:05PM  4   alopecia that had not been seen previously.

3:05PM  5   **BY MR. STRONGMAN:**

3:05PM  6   Q.   Well, Doctor, you talked about these forms; the forms are

3:05PM  7   where the actual data is?  Like there's a narrative in it;

3:05PM  8   correct?

3:05PM  9   A.   There can be, yes.

3:05PM  10  Q.   Okay.  And you -- we can let Dr. Madigan talk for himself.

3:06PM  11           But you don't know whether or not Dr. Madigan even

3:06PM  12  asked for those forms; correct?

3:06PM  13  A.   I asked for those forms.

3:06PM  14  Q.   Did you get them?

3:06PM  15  A.   No.  Because I was told they were not produced.

3:06PM  16  Q.   Do you know whether that's accurate?

3:06PM  17  A.   Sir, I could only ask questions.  You know -- I mean, I

3:06PM  18  asked for the CIOMS forms.  I asked for all the CIOMS forms so

3:06PM  19  I could look specifically at your questions.  And I was only

3:06PM  20  provided with certain CIOMS forms, not the entire database.

3:06PM  21  Q.   Okay.

3:06PM  22  A.   I'm not challenging -- I'm not challenging.  That's a

3:06PM  23  dispute between lawyers, and I leave it to all of you to figure

3:06PM  24  out.

3:06PM  25  Q.   And let me just ask the question this way:  The

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:06PM 1    information that you were provided to do this analysis came

3:06PM 2    from the plaintiff's lawyers; correct?

3:06PM 3    A.   No.  The information I had was Sanofi.  These 142 cases

3:06PM 4    are in your database.  Your company had that.

3:06PM 5    Q.   Well, my question, Doctor, is a little different.  You're

3:07PM 6    talking about these forms; right?  You call them the CIOMS

3:07PM 7    forms?

3:07PM 8    A.   There are CIOMS forms and a number of different forms.

3:07PM 9    Q.   My question is you asked for those forms?  Yes or no?

3:07PM 10   A.   I did ask for those forms.

3:07PM 11   Q.   And you did not get those forms?  Yes or no?

3:07PM 12   A.   I did not get the entire -- entire database of those forms

3:07PM 13   and, therefore, relied on the company's numbers of 142.

3:07PM 14   Q.   Well -- and, Doctor, let me ask you the question this way:

3:07PM 15   For every one of those 168 or 142, there's actually information

3:07PM 16   underneath that number; correct?

3:07PM 17          There's a narrative.  There's information about how

3:07PM 18   long the patient took the medication.  There's information

3:07PM 19   about what other medications the patient took.  There's

3:07PM 20   information about what other medical conditions they had,

3:07PM 21   whether they were taking a hormone therapy.

3:07PM 22          There's information like that included in that

3:08PM 23   underlying data; correct?

3:08PM 24   A.   Yes.

3:08PM 25   Q.   And sitting here today, you don't have the benefit of that

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:08PM  1  information; correct?

3:08PM  2  A.   I have the benefit of the information on the 142 cases,

3:08PM  3  because that was provided by Sanofi.  And I know there were

3:08PM  4  142 cases of permanent alopecia certainly by the time

3:08PM  5  Mrs. Earnest took her medicine.

3:08PM  6  Q.   So, Doctor, if you could listen to my question.

3:08PM  7          Did you look at the 142 -- let's use that number --

3:08PM  8  CIOMS reports?

3:08PM  9          MR. NOLEN:  Object to the form of that question in

3:08PM  10 that -- all of those questions that say "listen to my

3:08PM  11 question," because he answered the question that was asked.

3:08PM  12         THE COURT:  I don't think -- overruled.

3:08PM  13         Answer the question.

3:08PM  14         THE WITNESS:  I looked at the narratives of those

3:08PM  15 142, as provided in Sanofi documents.

3:09PM  16 BY MR. STRONGMAN:

3:09PM  17 Q.   Did you look at the narratives for the 168 that you told

3:09PM  18 the jury about today?

3:09PM  19 A.   There are not -- to my knowledge, those don't exist, as I

3:09PM  20 understand it.  I could not.  I tried.  I asked.

3:09PM  21 Q.   So the answer is no, you did not; correct?

3:09PM  22 A.   That's correct, for the 168.

3:09PM  23         MR. STRONGMAN:  May I approach the witness, Your

3:09PM  24 Honor?

3:09PM  25         THE COURT:  Yes, you may.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:09PM | 1 | BY MR. STRONGMAN: |
| 3:09PM | 2 | Q.    And, Doctor, I've handed you what's been marked as |
| 3:09PM | 3 | Defendants' Exhibit D-31. |
| 3:09PM | 4 |       Do you see it? |
| 3:09PM | 5 | A.    Yes. |
| 3:09PM | 6 | Q.    And this is entitled "Periodic Safety Update Report," and |
| 3:10PM | 7 | it has a date of report of 21 January 2011. |
| 3:10PM | 8 |       Do you see that? |
| 3:10PM | 9 | A.    Correct. |
| 3:10PM | 10 |       MR. STRONGMAN:  And, Your Honor, defendants would |
| 3:10PM | 11 | move into evidence Defendants' Exhibit 31. |
| 3:10PM | 12 |       THE COURT:  Any objection? |
| 3:10PM | 13 |       MR. NOLEN:  No objection. |
| 3:10PM | 14 |       THE COURT:  Let it be admitted. |
| 3:10PM | 15 |       Please proceed. |
| 3:10PM | 16 | BY MR. STRONGMAN: |
| 3:10PM | 17 | Q.    And, Dr. Kessler, if -- could we bring it up? |
| 3:10PM | 18 |       If we go to page 2 -- let me first do one thing. |
| 3:10PM | 19 | Let's talk about a little bit of context. |
| 3:10PM | 20 |       So we had mentioned periodic safety update reports |
| 3:10PM | 21 | earlier. |
| 3:10PM | 22 |       Do you remember that? |
| 3:10PM | 23 | A.    Correct. |
| 3:10PM | 24 | Q.    And this is a report that is prepared by the manufacturer; |
| 3:10PM | 25 | correct? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:10PM | 1 | **A.**   Correct. |
| 3:10PM | 2 | **Q.**   And then it's -- it's shared with various people; correct? |
| 3:11PM | 3 | **A.**   Correct. |
| 3:11PM | 4 | **Q.**   Okay.  And if we look at the executive summary, there's |
| 3:11PM | 5 | information in this executive summary about an estimated number |
| 3:11PM | 6 | of patients treated during a current period.  And if you could |
| 3:11PM | 7 | look -- it might be on your screen as well. |
| 3:11PM | 8 | Do you see that? |
| 3:11PM | 9 | **A.**   I see that. |
| 3:11PM | 10 | **Q.**   Okay.  And so this report covers about six months; |
| 3:11PM | 11 | correct? |
| 3:11PM | 12 | **A.**   Generally, that's correct. |
| 3:11PM | 13 | **Q.**   And we can see there, based on Defendants' Exhibit No. 31, |
| 3:11PM | 14 | that during this six-month period, 296,816 patients were |
| 3:11PM | 15 | treated with docetaxel; correct? |
| 3:11PM | 16 | **A.**   I've seen that number, yes. |
| 3:11PM | 17 | **Q.**   And that's the -- docetaxel is the molecular name for |
| 3:12PM | 18 | Taxotere; correct? |
| 3:12PM | 19 | **A.**   Correct. |
| 3:12PM | 20 | **Q.**   And we also can see up above that there were 95,083 |
| 3:12PM | 21 | patients worldwide enrolled in clinical studies at this time; |
| 3:12PM | 22 | correct? |
| 3:12PM | 23 | **A.**   That's of company-sponsored and unsponsored studies. |
| 3:12PM | 24 | **Q.**   Okay.  And so looking at this six-month period alone, we |
| 3:12PM | 25 | can tell that there was over 300,000 individuals treated with |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:12PM   1  Taxotere; correct --

3:12PM   2  **A.**    Correct.

3:12PM   3  **Q.**    -- in this period in 2011; correct?

3:12PM   4  **A.**    Correct.

3:12PM   5  **Q.**    And so Taxotere had been on the market since 1996;

3:12PM   6  correct?

3:12PM   7  **A.**    Correct.

3:12PM   8  **Q.**    And so we're talking about up -- until this report, we're

3:12PM   9  talking about from 1996 to the beginning of 2011; correct?

3:12PM  10  **A.**    Correct.

3:12PM  11  **Q.**    And certainly we can agree, if there's more than 300,000

3:12PM  12  patients in that one six-month period, that there was at least

3:13PM  13  2 million patients treated with Taxotere during the life of the

3:13PM  14  medication from 1996 to 2011; fair?

3:13PM  15  **A.**    Again, I asked for the sales data.  If you have sales

3:13PM  16  data -- because I've seen this number in this PSUR.  I think

3:13PM  17  it's probably best to put up real numbers, if you have it,

3:13PM  18  because I have not seen the total sales numbers.

3:13PM  19  **Q.**    Well, Doctor, can you assume with me that it's at least

3:13PM  20  2 million?  Just assume with me.

3:13PM  21  **A.**    I'm happy to assume any hypothetical you'd like.

3:13PM  22  **Q.**    Okay.  And I know we've been debating 168, 142 or -3, I

3:14PM  23  think you said.  And I'll give you the benefit with the 168.

3:14PM  24  Okay.

3:14PM  25          And if we assume -- again, I'm asking you to assume.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:14PM 1  And that's a fair assumption, being there was 300,000 in a

3:14PM 2  six-month period alone, but I'm asking you to assume.  Okay?

3:14PM 3  A.   It depends what the curve is.

3:14PM 4  Q.   Okay.  And if you do the math and you take 168 out of

3:14PM 5  2 million, you get -- do you trust my math that you would get

3:15PM 6  .0084 percent?

3:15PM 7  A.   I trust your math, but I don't know why you're doing that

3:15PM 8  number.  I don't know what your methodology is because that

3:15PM 9  methodology doesn't make sense to me.

3:15PM 10 Q.   Doctor, can we just agree that 168 out of over 2 million

3:15PM 11 is .0084 percent?

3:15PM 12 A.   Your math is perfect.

3:15PM 13 Q.   Thank you.  Just so it's clear, under my hypothetical,

3:16PM 14 based on your definition of your search and your search with

3:16PM 15 Dr. Madigan, you came up with 168 cases of what you considered

3:16PM 16 to be irreversible alopecia in the internal database; correct?

3:16PM 17 A.   In the internal database, correct.

3:16PM 18 Q.   And what we're talking about with the 2 million would be

3:16PM 19 the number of people who had used Taxotere; correct?  That's

3:16PM 20 what my hypothetical is; correct?

3:16PM 21 A.   How do you -- how do you relate the two?

3:16PM 22 Q.   Doctor, we talked about it.  I asked you to assume it.

3:16PM 23      We had $300,000 in a six-month period alone; correct?

3:16PM 24 A.   But that's not the way you look at a percentage.  You have

3:16PM 25 to have a defined population.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:16PM  1          So you follow X number of patients.  Sedlacek had

3:17PM  2   100 patients, and had a 7 percent.  In 316, you had a

3:17PM  3   4 percent.

3:17PM  4   Q.   Doctor, if you could...

3:17PM  5   A.   Sure.  But that's -- you're creating a false impression

3:17PM  6   there.

3:17PM  7   Q.   And, Doctor, this question, then:  You know that there is

3:17PM  8   a scale that sets out what's rare, very rare, et cetera.

3:17PM  9          Are you with me?

3:17PM  10  A.   I know it well.

3:17PM  11  Q.   Okay.  And the number for very rare is what?

3:17PM  12  A.   I'd have to look at it.  Why don't you pull it up.  I

3:17PM  13  don't want to do it.  I'm under oath.  I don't know if it's 1

3:17PM  14  in 10,000, 1 in 1,000.  I forget exactly.  It's a WHO

3:17PM  15  classification.

3:18PM  16  Q.   Doctor, would you agree with me that the WHO

3:18PM  17  classification for "very rare" is less than .01 percent?

3:18PM  18  A.   Whatever you have there, that's correct.

3:18PM  19  Q.   I next want to talk about some of the TAX 316 data that

3:18PM  20  you talked about.  Okay?

3:18PM  21  A.   Sure.

3:18PM  22  Q.   Okay.  Now, you talked about TAX 316, and you marked the

3:18PM  23  clinical study report; correct -- or counsel marked the

3:19PM  24  clinical study report and showed it to you; correct?

3:19PM  25  A.   That's correct.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:19PM  1  Q.   And let's start off with the efficacy question.  Okay?

3:19PM  2          So in the clinical study that they marked that we're

3:19PM  3  calling TAX 316, it showed that Taxotere was more effective

3:19PM  4  than the FAC arm in terms of overall survival and disease-free

3:19PM  5  survival; correct?

3:19PM  6  A.   I remember the disease-free survival.  You'd have to show

3:19PM  7  me the clinical study report.  I'll take your representation.

3:19PM  8  Q.   And those numbers were statistically significant; correct?

3:19PM  9  A.   On the efficacy side, yes.  And they supported the

3:19PM 10  indication.

3:19PM 11  Q.   Correct.  And when you say "they supported the

3:19PM 12  indication," they were the basis of the FDA approval in 2004.

3:20PM 13          That's what you mean by that; correct?

3:20PM 14  A.   In part.

3:20PM 15  Q.   In part, correct.

3:20PM 16          The five-year component of that was submitted in

3:20PM 17  2004; correct?

3:20PM 18  A.   Counsel marked the ten-year, the final report.  I based my

3:20PM 19  analysis off the final report, not the interterm report.

3:20PM 20  Q.   Very good.  But what we know is, at the end of final

3:20PM 21  report and in the interim report, Taxotere was working to treat

3:20PM 22  patients and help survival; correct?

3:20PM 23  A.   That's the reason why the agency approved the drug.

3:20PM 24  Q.   And you also talked about a study called -- I think

3:20PM 25  Mr. Nolen called it TAX 301.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:20PM 1          Do you remember that?

3:20PM 2  **A.**   I do.

3:20PM 3  **Q.**   And you talked about statistical significance, and you

3:20PM 4  said that Dr. Madigan had to pool the two studies together;

3:21PM 5  correct?

3:21PM 6  **A.**   Exactly.

3:21PM 7  **Q.**   Okay.  And you know that Dr. Madigan also did an analysis

3:21PM 8  on each of those studies individually; correct?

3:21PM 9  **A.**   Correct.

3:21PM 10 **Q.**   And the study, TAX 316, the analysis that Dr. Madigan did

3:21PM 11 actually showed that there was not a statistically significant

3:21PM 12 different result between the TAC arm -- the Taxotere,

3:21PM 13 Adriamycin, Cytoxan arm -- and the FAC arm in terms of ongoing

3:21PM 14 hair loss; correct?

3:21PM 15 **A.**   At certain points in time.

3:21PM 16 **Q.**   At the --

3:21PM 17 **A.**   I think it was .058, something like that.  I'd have to

3:21PM 18 refresh my memory.  It just missed it, if my memory serves me

3:21PM 19 right.  But Dr. Madigan, I'm sure, will testify as to that.

3:21PM 20 **Q.**   So my question is Dr. Madigan did an analysis of TAX 316,

3:21PM 21 ongoing hair loss data; correct?

3:21PM 22 **A.**   Correct.

3:21PM 23 **Q.**   Okay.  And Dr. Madigan concluded that, at the end of the

3:22PM 24 ten years, there was not, not a statistically significant

3:22PM 25 difference between the TAC arm and the FAC arm; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:22PM  1    A.   I think we should let Dr. Madigan testify on how he
3:22PM  2    interprets the data on 316.  I'm looking for it.  I think -- I
3:22PM  3    think you're right that, at certain points in time, it was not.
3:22PM  4    But, again, Dr. Madigan should testify.  But when pooled, it
3:22PM  5    was statistically significant.
3:22PM  6    Q.   And my question was, individually, neither TAX 316 or
3:22PM  7    TAX 301 had statistically significant results?  Yes or no?
3:22PM  8    A.   Again, I'd have to -- you'd have to pull up Dr. Madigan's
3:22PM  9    report to be absolutely sure.
3:22PM 10         If you want to take a minute, I have it.  And I'm
3:23PM 11    happy to have you, if you want to put it up --
3:23PM 12    Q.   So, Doctor, my question is --
3:23PM 13    A.   I have the specific results.
3:23PM 14    Q.   Listen to my question.
3:23PM 15    A.   Okay.
3:23PM 16    Q.   So there's a table in Dr. Madigan's report.  You're
3:23PM 17    looking at.
3:23PM 18    A.   I'm looking at it right now.
3:23PM 19    Q.   Okay.  And there's a table for TAX 316, and there's a
3:23PM 20    table for TAX 301 -- or we sometimes call it GEICAM.
3:23PM 21    A.   Correct.
3:23PM 22    Q.   Okay.  And at the table, at the end of study, there's a
3:23PM 23    ten-year cell, if you will, on Dr. Madigan's table.
3:23PM 24         Do you see that?
3:23PM 25    A.   I'm looking at that exactly.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:23PM | 1 | Q.   Okay.  And what we know is that, on the side of the table, |
| 3:23PM | 2 | there is what's called, I think, a P value; correct? |
| 3:23PM | 3 | A.   I love P values. |
| 3:23PM | 4 | Q.   All right.  And we know that a P value is how you're |
| 3:23PM | 5 | determining whether something is statistically significant. |
| 3:23PM | 6 | That's what you set out at the front of your study as |
| 3:23PM | 7 | the measure; correct? |
| 3:23PM | 8 | A.   P value is to determine whether there is statistical |
| 3:24PM | 9 | significance, correct. |
| 3:24PM | 10 | Q.   And in the scientific and medical community, what we know |
| 3:24PM | 11 | is that a normal P value is .05; correct?  Yes or no? |
| 3:24PM | 12 | A.   Yes.  And this is .053. |
| 3:24PM | 13 | Q.   So, Doctor, my question is, looking -- you got it right in |
| 3:24PM | 14 | front of you now. |
| 3:24PM | 15 | A.   I'm looking at all the cells, and you may want to show the |
| 3:24PM | 16 | jury all the cells. |
| 3:24PM | 17 | Q.   Doctor, listen to my question. |
| 3:24PM | 18 | THE COURT:  Wait, Doctor.  Answer the question. |
| 3:24PM | 19 | BY MR. STRONGMAN: |
| 3:24PM | 20 | Q.   At the end of the study, neither TAX 316 or TAX 301 were |
| 3:24PM | 21 | statistically significant with regard to ongoing hair loss; |
| 3:24PM | 22 | correct? |
| 3:24PM | 23 | A.   You're correct that it was not -- |
| 3:24PM | 24 | Q.   Thank you. |
| 3:24PM | 25 | A.   -- statistically significant -- |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:24PM 1   Q.   If you could --

3:24PM 2   A.   -- at 120 months.

3:24PM 3        MR. STRONGMAN:  Your Honor?

3:24PM 4        THE COURT:  Dr. Kessler, you have to answer the

3:24PM 5   question, and I think you've done that.

3:24PM 6        THE WITNESS:  I'm sorry.

3:24PM 7   BY MR. STRONGMAN:

3:24PM 8   Q.   Now, I also remember you were talking about -- you showed

3:25PM 9   the table.

3:25PM 10       Do you remember the table, and it had 29?

3:25PM 11  A.   And 16.

3:25PM 12  Q.   And 16.

3:25PM 13       Let's talk about the 16 for a minute.  Okay?

3:25PM 14  A.   Yeah.

3:25PM 15  Q.   So the 16 that -- by your definition, I think you said

3:25PM 16  these individuals had -- well, what did you call it?  Permanent

3:25PM 17  hair loss?

3:25PM 18  A.   It was on -- the report said "ongoing alopecia" at the end

3:25PM 19  of the study, is what I specifically said, after the ten-year

3:25PM 20  period.

3:25PM 21  Q.   Do you know what "ongoing" meant, as it was defined by the

3:25PM 22  study?

3:25PM 23  A.   Yes.

3:25PM 24  Q.   What?

3:25PM 25  A.   So "ongoing" meant, at the end of study, whether the

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:25PM  1   adverse event persisted and still was there.

3:25PM  2   Q.   Now, what happened if a patient dropped out of the study

3:25PM  3   after two months but, at their last visit, they reported the

3:25PM  4   side effect such as hair loss, would that --

3:25PM  5   A.   I --

3:25PM  6   Q.   Let me finish my question.

3:26PM  7        Under that circumstance, would that be ongoing or not

3:26PM  8   under the protocol?

3:26PM  9   A.   It would be ongoing for this specific data for how long

3:26PM  10  the patients were in there in 316.

3:26PM  11  Q.   Okay.  And so with regard to the 16 -- so this is patients

3:26PM  12  that received no FAC, no Taxotere; correct?

3:26PM  13  A.   Correct.

3:26PM  14  Q.   Under your definition, they had ongoing alopecia?

3:26PM  15  A.   No.  According to the company's definition.  It's not my

3:26PM  16  definition.

3:26PM  17  Q.   So, Doctor, do you know how -- let's talk about the fact

3:26PM  18  that -- in both arms, every patient received Adriamycin;

3:26PM  19  correct?

3:26PM  20  A.   Correct.

3:26PM  21  Q.   And you know that that drug is sometimes called "the red

3:26PM  22  devil"; correct?

3:26PM  23  A.   I would be careful, Counselor.  I've taken care of -- I've

3:26PM  24  given Adriamycin to children.  I pushed that drug.

3:26PM  25  Q.   Doctor, I understand your --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:26PM | 1 | **A.**   And I think one has to be -- |
| 3:27PM | 2 | **MR. STRONGMAN:**  Your Honor, I -- |
| 3:27PM | 3 | **THE COURT:**  Doctor, has it been called "the red |
| 3:27PM | 4 | devil"? |
| 3:27PM | 5 | **THE WITNESS:**  I would not call it "the red devil." |
| 3:27PM | 6 | It has saved -- it has saved people's lives.  There are |
| 3:27PM | 7 | children today that I've taken care of who are oral surgeons |
| 3:27PM | 8 | and mothers because of Adriamycin. |
| 3:27PM | 9 | **BY MR. STRONGMAN:** |
| 3:27PM | 10 | **Q.**   And, Doctor, there are people today that Taxotere has also |
| 3:27PM | 11 | saved their lives; correct? |
| 3:27PM | 12 | **A.**   And I'm not disputing that. |
| 3:27PM | 13 | **Q.**   Okay.  And so when we take a step back and we talk about |
| 3:27PM | 14 | this clinical trial data that you were talking about, every |
| 3:27PM | 15 | patient received Adriamycin; correct? |
| 3:27PM | 16 | **A.**   In both arms. |
| 3:27PM | 17 | **Q.**   Correct.  And every patient in both arms received Cytoxan; |
| 3:27PM | 18 | correct? |
| 3:27PM | 19 | **A.**   In both arms. |
| 3:27PM | 20 | **Q.**   And you know that there are reports of ongoing alopecia |
| 3:28PM | 21 | for both Adriamycin and Cytoxan; correct? |
| 3:28PM | 22 | **A.**   No, not in that study. |
| 3:28PM | 23 | **Q.**   I'm not asking about the study. |
| 3:28PM | 24 | In your research, did you see in the medical |
| 3:28PM | 25 | literature -- you talked about how you researched the medical |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:28PM  1    literature?

3:28PM  2    A.   I have.

3:28PM  3    Q.   Do you believe that there are reports in the medical

3:28PM  4    literature of ongoing or persistent hair loss with Adriamycin?

3:28PM  5    A.   There was zero cases with Adriamycin and Cytoxan -- with

3:28PM  6    Adriamycin, there were zero cases up to 2000 in the

3:28PM  7    pharmacovigilance database.  I think I see one or two patients

3:28PM  8    alone with Adriamycin, but it's exceptionally rare.

3:28PM  9    Q.   Doctor, I want you to focus on my question.

3:28PM  10   A.   Sure.

3:28PM  11   Q.   You searched the literature?

3:28PM  12   A.   I did.

3:28PM  13   Q.   Okay.  Did you see in your literature -- looking for

3:28PM  14   information from 2011 and before, did you see any reports of

3:29PM  15   persist or permanent or irreversible hair loss with Adriamycin?

3:29PM  16   Yes or no?

3:29PM  17   A.   I think I saw one case with Adriamycin alone, but I'd want

3:29PM  18   to check that.  It's -- I mean, I searched specifically for

3:29PM  19   that, and that was the best I could do.

3:29PM  20   Q.   Now, what about Cytoxan?  In your research, did you do

3:29PM  21   research to try to determine whether or not there were cases in

3:29PM  22   2011 and before of Cytoxan causing permanent hair loss?

3:29PM  23   A.   There are zero cases of Cytoxan.  If you look at the FDA

3:29PM  24   database of Cytoxan causing permanent alopecia, certainly,

3:29PM  25   through --

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:29PM | 1 | **Q.**   Doctor, I didn't ask about the FDA database.  I asked |
| 3:29PM | 2 | about the literature.  If you could answer my question. |
| 3:29PM | 3 | And if the answer is you didn't find any, that's |
| 3:30PM | 4 | fine.  I'm asking you, did you find any? |
| 3:30PM | 5 | **A.**   I saw no case of monotherapy Cytoxan where Cytoxan caused |
| 3:30PM | 6 | irreversible or permanent hair loss.  I did not see it any in |
| 3:30PM | 7 | the medical literature, and I searched. |
| 3:30PM | 8 | **Q.**   How about this?  Did you see any reports -- you slipped in |
| 3:30PM | 9 | the word "monotherapy" there. |
| 3:30PM | 10 | Did you see any reports in the medical literature |
| 3:30PM | 11 | where the regimen included Cytoxan and there was a report of |
| 3:30PM | 12 | permanent hair loss? |
| 3:30PM | 13 | **A.**   Sure, of course.  Because in the FAC arm, that includes |
| 3:30PM | 14 | Cytoxan.  So, of course, it included Cytoxan -- |
| 3:30PM | 15 | **Q.**   Okay. |
| 3:30PM | 16 | **A.**   -- in that arm. |
| 3:30PM | 17 | **Q.**   And the same thing for Adriamycin; correct? |
| 3:30PM | 18 | **A.**   Correct.  But they were controlled. |
| 3:30PM | 19 | **Q.**   So you can't say that there is no risk of any kind of |
| 3:30PM | 20 | persistent hair loss with the FAC arm; correct? |
| 3:30PM | 21 | **A.**   I certainly can, in a controlled trial.  You're missing |
| 3:30PM | 22 | the point.  When you compare TAC versus FAC, the only |
| 3:31PM | 23 | difference is the T; it's not the A and C. |
| 3:31PM | 24 | You're explaining away the risk.  It's the biggest |
| 3:31PM | 25 | mistake in drug safety.  You're explaining away the risk and |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:31PM  1   pointing to something else.

3:31PM  2   Q.   Let's go back to this real quick.  We talked about this

3:31PM  3   definition, "six months" was -- most of the time, was your most

3:31PM  4   common definition; correct?

3:31PM  5   A.   That was certainly one of the definitions.

3:31PM  6   Q.   Okay.  And you would have to agree with me that, in order

3:31PM  7   to know whether or not somebody actually had hair loss more

3:31PM  8   than six months after treatment, that patient would have to be

3:31PM  9   evaluated more than six months after treatment; correct?

3:31PM  10  A.   Exactly.

3:31PM  11  Q.   That's just logic; right?

3:31PM  12  A.   That's what 316 did.

3:32PM  13  Q.   Doctor, do you know -- in the work that you did reviewing

3:32PM  14  materials, looking at information in this case, do you know how

3:32PM  15  many of the 29 patients were actually evaluated more than six

3:32PM  16  months?

3:32PM  17  A.   That data is available.  It's not front of mind.  But it

3:32PM  18  is in the clinical study report, and I think you can -- at one

3:32PM  19  point, I did know the average follow-up period for that.

3:32PM  20  Q.   And I'm not talking about the average follow-up.

3:32PM  21       I'm talking about -- can you tell me how many people

3:32PM  22  of the 29 were actually followed up more than six months?

3:32PM  23  A.   It was a ten-year study.  We could pull that table.  It's

3:33PM  24  in your clinical study report.  You have it.

3:33PM  25       And I'm almost certain that -- certainly, in 316 --

DAVID KESSLER - CROSS

3:33PM 1    it was a ten-year study.  It went well beyond six months, the
3:33PM 2    follow-up.
3:33PM 3    Q.   So, Doctor, if you've looked at the data, you would know
3:33PM 4    that only 21 -- no.  Let me ask that again.
3:33PM 5              You would know if you looked at the data that 21 of
3:33PM 6    these patients were followed for six months or less; correct?
3:33PM 7    A.   After the initial period?
3:33PM 8    Q.   After the treatment.
3:33PM 9    A.   So the treatment was X number of weeks, and the six
3:33PM 10   months -- the clinical study report, if you pull the table, it
3:33PM 11   will tell you it was a ten-year study.
3:33PM 12   Q.   Let me just ask it this way:  Are you aware that 21 of
3:34PM 13   these 29 patients were never seen to determine whether or not
3:34PM 14   they have hair loss after six months after they finished their
3:34PM 15   treatment?  Do you know that?
3:34PM 16   A.   I don't know that.  I looked at the table.  If that's the
3:34PM 17   case, then there's a big problem with the study because it was
3:34PM 18   represented as a ten-year study.
3:34PM 19   Q.   Well, Doctor, if that's the case, setting aside whether
3:34PM 20   you think there's a big problem with the study, it would be a
3:34PM 21   big problem for you concluding that there were 29 cases of
3:34PM 22   permanent alopecia; correct?
3:34PM 23   A.   Not at all.  Because you have Sedlacek that found seven
3:34PM 24   cases in that arm and zero in the other arm.  So it's
3:34PM 25   replicable.  You don't even have to rely on 316.  There is

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:34PM  1   other data that supports the fact that Taxotere causes

3:34PM  2   permanent alopecia.

3:35PM  3   Q.   Doctor, do you remember looking, in all of the documents

3:35PM  4   that you looked at, at a table that included data on follow-up

3:35PM  5   duration?

3:35PM  6   A.   In 316.

3:35PM  7   Q.   Correct.  Sorry.  Thank you for the clarification.

3:35PM  8   A.   Great.

3:35PM  9   Q.   Do you remember looking at that patient by patient?

3:35PM  10  A.   I did -- I looked at many patients -- pulling out some of

3:35PM  11  the patient -- individual patient stuff here, I looked at some

3:35PM  12  of the patients.  But, again, the clinical study report is some

3:35PM  13  37,000 pages.  And I will represent that I did not look at

3:35PM  14  every single patient.

3:35PM  15  Q.   And I'm just saying, did you look at any data anywhere

3:35PM  16  that stratifies the follow-up duration for each one of these

3:35PM  17  29 patients and each one of these 16 patients?

3:35PM  18  A.   I did look.  And at one point in time, I had that in my

3:36PM  19  memory, and I'm -- I'm sure, if you have it, you can show it.

3:36PM  20       MR. STRONGMAN:  May I approach, Your Honor?

3:36PM  21       THE COURT:  Yes, you may.

3:36PM  22  BY MR. STRONGMAN:

3:36PM  23  Q.   Doctor, I just want you to look, I'm just going to ask you

3:36PM  24  a question.  Take your time and look at that table.

3:36PM  25  A.   I am looking at that table.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:36PM   1    Q.   And does this refresh your recollection as to how many of

3:36PM   2    these 29 patients that you said had permanent alopecia were

3:36PM   3    actually not even evaluated longer than six months?

3:36PM   4    A.   No, it does not.  Because the study's represented as a

3:37PM   5    ten-year follow-up.

3:37PM   6    Q.   So that does not refresh your recollection that, in fact,

3:37PM   7    what you told the jury this morning about these people, the 29,

3:37PM   8    being followed up at ten-year mark for hair loss is actually

3:37PM   9    not the case?  That doesn't refresh your recollection as to

3:37PM   10   that?

3:37PM   11   A.   It refreshes my recollection.  I'm very aware of this

3:37PM   12   data, but that 29 off Table 7 is your lock data -- it's the

3:37PM   13   company data that I took that 29 off of, ongoing after the

3:37PM   14   ten-year study.

3:37PM   15        So it's your data, not mine, where I got that 29.  If

3:37PM   16   that's not reliable, then you have a problem.  But it's the

3:37PM   17   company data that I used.  I didn't make up that 29.

3:37PM   18   Q.   Doctor, look at the table in front of you.

3:37PM   19   A.   I am looking at it.

3:37PM   20   Q.   Can you agree with this:  .5 years is six months?  Do you

3:38PM   21   agree with that?

3:38PM   22   A.   Correct.

3:38PM   23   Q.   Do you see on the right, the very right of the chart --

3:38PM   24   A.   I see that.

3:38PM   25   Q.   -- "Follow-up Duration"; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:38PM  1   A.   I'm not sure where I see .5.

3:38PM  2   Q.   I'm just saying do you see "Follow-up Duration"?

3:38PM  3   A.   Correct?

3:38PM  4   Q.   And it's listed as a decimal point.

3:38PM  5        Do you see that?

3:38PM  6   A.   I see some are saying 10.04.  Some are saying 2.96.  Some

3:38PM  7   are saying 0.14.

3:38PM  8   Q.   So, Doctor, what I'd like you to do is count up, of those

3:38PM  9   29, how many were followed up for a duration of .5 or more in

3:38PM  10  the TAC arm and the FAC arm.

3:38PM  11  A.   (Witness complies.)

3:38PM  12       I get five -- actually, that's not correct.  Let me

3:39PM  13  do it again.  Bear with me.

3:39PM  14       One, two, three, four, five, six -- I have about six.

3:39PM  15  Q.   What about -- what about the FAC arm?

3:39PM  16  A.   I haven't looked at that.  I'm happy do that.

3:39PM  17  Q.   How many in the FAC arm?

3:39PM  18  A.   That were greater than .05?  One, two, three -- I see

3:39PM  19  three in the FAC arm -- actually, hold on a second.  One, two,

3:40PM  20  three, four -- I see four.

3:40PM  21  Q.   Four?

3:40PM  22  A.   Yes.

3:40PM  23  Q.   A couple of very simply math questions, Doctor.

3:40PM  24       29 is different than 6; correct?

3:40PM  25       **MR. NOLEN:**  Objection, Your Honor.  I think the FAC

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:40PM | 1 | side is incorrect.  It's actually wrong. |
| 3:40PM | 2 | **THE COURT:**  The witness said four. |
| 3:40PM | 3 | **MR. NOLEN:**  No, the top number, 19. |
| 3:40PM | 4 | **MR. STRONGMAN:**  16.  Sorry.  Thanks.  Getting messy. |
| 3:40PM | 5 | Thank you.  I had the 9 wrong. |
| 3:41PM | 6 | BY MR. STRONGMAN: |
| 3:41PM | 7 | **Q.**  29 and 16, right. |
| 3:41PM | 8 | So, Doctor, would you agree with me, simple question, |
| 3:41PM | 9 | 29 is not 6; correct? |
| 3:41PM | 10 | **A.**  That, I'll agree with you. |
| 3:41PM | 11 | **Q.**  16 is not 4? |
| 3:41PM | 12 | **A.**  Correct. |
| 3:41PM | 13 | **Q.**  And here's my next question:  Have you done any |
| 3:41PM | 14 | statistical analysis or have you asked Dr. Madigan to do any |
| 3:41PM | 15 | statistical analysis using the number six for the TAC arm and |
| 3:41PM | 16 | the number four for the FAC arm?  Yes or no? |
| 3:41PM | 17 | **A.**  No. |
| 3:41PM | 18 | **MR. STRONGMAN:**  Your Honor, could I have that -- may |
| 3:41PM | 19 | I approach, Your Honor? |
| 3:41PM | 20 | **THE COURT:**  Yes, you may. |
| 3:41PM | 21 | BY MR. STRONGMAN: |
| 3:42PM | 22 | **Q.**  So the medical literature, I think that was the next |
| 3:42PM | 23 | category of stuff that you talked about; fair? |
| 3:42PM | 24 | **A.**  Yeah. |
| 3:42PM | 25 | **Q.**  And, Doctor, you also talked about the Sedlacek study. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:42PM 1           Do you remember that?

3:42PM 2    A.    I remember it well.

3:42PM 3    Q.    Okay.  And when you looked at the Sedlacek study, you

3:42PM 4    said, I think, that there were three groups, A, B, and C; is

3:42PM 5    that correct?

3:42PM 6    A.    I believe so.

3:42PM 7    Q.    Now, in the C group, that's the group that had various

3:43PM 8    patients that received Taxotere; correct?

3:43PM 9    A.    It was doxorubicin plus Taxotere.

3:43PM 10   Q.    Very good.  And you actually noted, in that C group, there

3:43PM 11   was a wide range of regimens that were actually used with

3:43PM 12   Taxotere; correct?

3:43PM 13   A.    That's correct.

3:43PM 14   Q.    Okay.  Are you looking for?

3:43PM 15   A.    I have certain notes that have the exactly --

3:43PM 16   Q.    If you have the notes, you can look at them.

3:43PM 17   A.    Can I look at them?

3:43PM 18   Q.    Yeah, please.  That's fine.

3:43PM 19   A.    Let me see if I can find my -- I have my notes on

3:43PM 20   Dr. Sedlacek.

3:43PM 21   Q.    Now, Dr. Sedlacek -- those are quite a set of notes.

3:43PM 22   A.    Yeah.

3:43PM 23   Q.    My gosh.

3:44PM 24   A.    Thank you for letting me look at them.

3:44PM 25   Q.    So Dr. Sedlacek reported, I think you said, seven

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:44PM 1   patients; is that correct?

3:44PM 2   A.   7 out of 112 in that group C.

3:44PM 3   Q.   Okay.  And when you look at group C, how many different

3:44PM 4   regimens involving Taxotere were actually included in that

3:44PM 5   group?

3:44PM 6   A.   So he had -- let me count them up, one, two, three, four,

3:44PM 7   five, six, seven -- I see eight.

3:44PM 8   Q.   So you're talking about eight different mixes of

3:44PM 9   chemotherapy drugs among those how many patients in that group,

3:44PM 10  100 and some?

3:44PM 11  A.   112.

3:44PM 12  Q.   Okay.  And so of that 112 patients, there was eight

3:44PM 13  different mixes and matches of medications in those patients,

3:44PM 14  but each one of those included a Taxotere piece; correct?

3:45PM 15  A.   Exactly.  Most of them are Adriamycin and Cytoxan.

3:45PM 16  There's some minor difference, but the majority is Adriamycin

3:45PM 17  and Cytoxan.

3:45PM 18  Q.   So what's interesting about Sedlacek, in fact, is that all

3:45PM 19  seven patients in that study actually -- or the seven patients

3:45PM 20  you're talking about -- right, you used seven as the number?

3:45PM 21  A.   Dr. Sedlacek used seven.

3:45PM 22  Q.   Fair enough.  All seven of the patients in that study that

3:45PM 23  you are talking about received the exact same regimen; correct?

3:45PM 24  A.   They received AC times four every three weeks followed by

3:45PM 25  docetaxel every three weeks.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:45PM | 1 | **Q.**   What was the dosage of the T? |
| 3:45PM | 2 | **A.**   It was 100 milligrams per meter squared q3 weeks. |
| 3:45PM | 3 | **Q.**   And what was the dosage of the Adriamycin? |
| 3:46PM | 4 | **A.**   6600. |
| 3:46PM | 5 | **Q.**   So that's 60 for the A? |
| 3:46PM | 6 | **A.**   60 for the A, I'm sorry, milligrams per meter squared. |
| 3:46PM | 7 | **Q.**   And 600 for the C? |
| 3:46PM | 8 | **A.**   That's correct. |
| 3:46PM | 9 | **Q.**   And what we know is that, in the Taxotere label, the |
| 3:46PM | 10 | regimen is TAC; is that correct? |
| 3:46PM | 11 | **A.**   Correct. |
| 3:46PM | 12 | **Q.**   And the dosage is 75 for Taxotere, 50 for Adriamycin, and |
| 3:47PM | 13 | 500 for Cytoxan; correct? |
| 3:47PM | 14 | **A.**   You're not complete. |
| 3:47PM | 15 | **Q.**   And I'll get there. |
| 3:47PM | 16 |        Because it depends on how many times you take it; |
| 3:47PM | 17 | right?  I'm going to get there. |
| 3:47PM | 18 | **A.**   Right.  So you've got a cumulative dose. |
| 3:47PM | 19 | **Q.**   Very good.  But you'll agree with me that, in the label, |
| 3:47PM | 20 | it's TAC at these doses every three weeks; correct? |
| 3:47PM | 21 | **A.**   Correct. |
| 3:47PM | 22 | **Q.**   And you do that six times; correct? |
| 3:47PM | 23 | **A.**   Correct. |
| 3:47PM | 24 | **Q.**   And what we know is that, in Dr. Sedlacek's study, every |
| 3:47PM | 25 | single Taxotere patient that took the medication on-label did |

DAVID KESSLER - CROSS

3:47PM  1   not get permanent hair loss as defined by Dr. Sedlacek;

3:47PM  2   correct?

3:47PM  3   A.   Only 6.3 percent got -- if I understand your question,

3:47PM  4   6.3 percent of group C got, as he defined, I think, greater

3:48PM  5   than a year of poor hair growth.

3:48PM  6   Q.   I want you to listen to my question carefully.  Okay.

3:48PM  7        So we discussed all seven received this regimen,

3:48PM  8   right, right here?

3:48PM  9   A.   Correct.

3:48PM  10  Q.   That is not the regimen set out in the Taxotere-approved

3:48PM  11  label; correct?

3:48PM  12  A.   It's the regimen.  It's just it's a different dose.

3:48PM  13  Q.   And it's a different sequence; correct?

3:48PM  14  A.   Yes.  I think, as oncologists do.

3:48PM  15  Q.   And I'm not being critical.  It's a specific point.

3:48PM  16        In the label, you get these three medications

3:48PM  17  together at the same time; correct?  Yes or no?

3:48PM  18  A.   Correct.  It can be, yes.

3:48PM  19  Q.   And you get them every three weeks; correct?

3:48PM  20  A.   Correct, per protocol.

3:48PM  21  Q.   Correct.  That's how it's set out in the study that was

3:49PM  22  the basis of the 2004 approval; correct?

3:49PM  23  A.   Sure.

3:49PM  24  Q.   Okay.  And what we know is that there wasn't one single

3:49PM  25  patient in the Sedlacek study that took the T, the A, and the C

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 3:49PM | 1 | together every three weeks six times and had what Dr. Sedlacek |
| 3:49PM | 2 | described as irreversible hair loss; correct? |
| 3:49PM | 3 | **A.**   There is a difference there, you're correct.  But it's not |
| 3:49PM | 4 | a meaningful one for the adverse event. |
| 3:49PM | 5 | **Q.**   Every single one was this regimen; correct? |
| 3:49PM | 6 | **A.**   No, that's not correct.  There are three groups.  You're |
| 3:49PM | 7 | missing the point of Sedlacek.  It's not all ACT.  He has other |
| 3:49PM | 8 | groups that, in essence, control for the AC, and you're not |
| 3:49PM | 9 | putting that up. |
| 3:50PM | 10 | **Q.**   I'm just -- I don't want to get too far in the weeds on |
| 3:50PM | 11 | this.  I think we actually agree and -- |
| 3:50PM | 12 | **THE COURT:**  He needs to answer the question. |
| 3:50PM | 13 | **BY MR. STRONGMAN:** |
| 3:50PM | 14 | **Q.**   Yeah, just answer the question. |
| 3:50PM | 15 | **MR. STRONGMAN:**  Can I approach, Your Honor? |
| 3:50PM | 16 | **THE COURT:**  Yes, you may. |
| 3:50PM | 17 | **BY MR. STRONGMAN:** |
| 3:50PM | 18 | **Q.**   What I've handed you is actually the abstract that is what |
| 3:50PM | 19 | we're calling Sedlacek paper; correct? |
| 3:50PM | 20 | **A.**   Correct. |
| 3:50PM | 21 | **Q.**   Okay.  And just a couple of things. |
| 3:50PM | 22 | It's an abstract; right?  That's means it's not a |
| 3:50PM | 23 | full publication? |
| 3:50PM | 24 | **A.**   Correct. |
| 3:50PM | 25 | **Q.**   And this was actually a poster presentation that was given |

DAVID KESSLER - CROSS

3:50PM 1    at a conference; correct?

3:50PM 2    A.   A San Antonio press conference.

3:50PM 3    Q.   And that's a well-attended, well-known conference;

3:51PM 4    correct?

3:51PM 5    A.   Correct.

3:51PM 6    Q.   Okay.  And this was 2006; correct?

3:51PM 7    A.   Correct.

3:51PM 8    Q.   And what Dr. Sedlacek says is all seven of these women

3:51PM 9    with PSA had received AC times 4, 6600 milligrams per meter

3:51PM 10   squared every three weeks followed by docetaxel, 100 milligrams

3:51PM 11   per meter squared every three weeks; correct?

3:51PM 12   A.   Right.  He says a number of things in this.  You're

3:51PM 13   reading one sentence.

3:51PM 14   Q.   I'm just asking did I read that correct?

3:51PM 15   A.   You read that sentence, but there are other sentences.

3:51PM 16   Q.   Did I read that sentence correct?

3:51PM 17   A.   Yes, sir.

3:51PM 18   Q.   And we know that the paper reported on seven patients,

3:51PM 19   correct, that actually had what he called permanent hair loss;

3:51PM 20   correct?

3:51PM 21   A.   The paper reported on over 500 patients.

3:51PM 22   Q.   Doctor, I understand what you're saying.

3:51PM 23        He said there are seven patients that had what he

3:52PM 24   defines as permanent hair loss; correct?

3:52PM 25   A.   In that group, correct.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:52PM 1  Q.   Correct.  And there were zero in any other group; correct?

3:52PM 2  A.   Zero out of 250, zero out of 126, seven out of 112.

3:52PM 3  Q.   We're talking on the same page now.  We got it.

3:52PM 4       So seven.  And they all were in this very specific

3:52PM 5  regimen?  Yes or no?

3:52PM 6  A.   Correct.

3:52PM 7  Q.   Okay.  And Dr. Sedlacek's presentation was given at, you

3:52PM 8  said, San Antonio breast conference -- is that what it's

3:52PM 9  called?

3:52PM 10 A.   Symposium.

3:52PM 11 Q.   Symposium.

3:52PM 12      And that's a very well-attended symposium; is that

3:52PM 13 correct?

3:52PM 14 A.   For breast oncologists.

3:52PM 15 Q.   Very good.  It's maybe the most well-regarded symposium

3:52PM 16 for that specialty; correct?

3:52PM 17 A.   The oncologists can testify to that.

3:52PM 18 Q.   Fair enough.  But it certainly was public; correct?

3:53PM 19 A.   Dr. Sedlacek presented it.  I wasn't there.  I have no

3:53PM 20 reason to dispute that.

3:53PM 21 Q.   Now, one other thing we know about abstracts is that

3:53PM 22 they're often turned into manuscripts and put -- and published

3:53PM 23 into the medical literature; correct?

3:53PM 24 A.   Correct.

3:53PM 25 Q.   And we know -- well, Dr. Sedlacek never published a paper

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:53PM  1    on this data; correct?

3:53PM  2    A.    I couldn't find one.

3:53PM  3    Q.    And you know that there are times -- when there's a

3:53PM  4    peer-review process for a paper, it's different than a

3:53PM  5    peer-review process for a poster presentation; correct?

3:53PM  6    A.    Fair.

3:53PM  7    Q.    And you would agree with me that there at least times --

3:53PM  8    we don't know what happened with Dr. Sedlacek.  Fair enough?

3:53PM  9    We don't know what happened with that report or whether he ever

3:53PM 10    wrote up a paper?  We don't know; correct?

3:53PM 11    A.    I haven't seen a paper.

3:53PM 12    Q.    Right.  We certainly know that, in peer-reviewed published

3:54PM 13    literature, Dr. Sedlacek was actually never successful in

3:54PM 14    getting a paper out; correct?

3:54PM 15    A.    I don't know if he tried or not.  I just don't have that

3:54PM 16    information.

3:54PM 17    Q.    But either way you slice it, Dr. Sedlacek's information

3:54PM 18    was presented to the public and open for anybody there or

3:54PM 19    anybody that wanted to know about it; true?

3:54PM 20    A.    If you were there, you heard about it.

3:54PM 21    Q.    I'm almost done, Doctor.

3:54PM 22          You put up with counsel a slide that had the various

3:55PM 23    studies listed.

3:55PM 24          Do you remember this?

3:55PM 25    A.    I do.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:55PM 1    Q.   You did not cite Nabholtz in your report, though, did you?

3:55PM 2    A.   I believe it's in some footnote or some material

3:55PM 3    somewhere.

3:55PM 4    Q.   If I did a control-F, find, and entered "Nabholtz," it

3:55PM 5    wouldn't come up with anybody in your report; correct?

3:55PM 6    A.   Just check the exhibit list too.  Maybe it's one the

3:55PM 7    exhibits.  I'd have to go back and check.

3:55PM 8    Q.   And you know that the Nabholtz paper was published in the

3:55PM 9    peer-reviewed literature; correct?

3:55PM 10   A.   Correct.

3:55PM 11   Q.   And you know that was a study that Sanofi actually

3:55PM 12   sponsored and -- having putting out there in the public sphere;

3:55PM 13   correct?

3:55PM 14   A.   When you publish a paper, that's correct.

3:55PM 15   Q.   And we know that all of the papers that you referenced are

3:55PM 16   public; correct?

3:55PM 17   A.   You can find them.  If you have access to them and you can

3:55PM 18   afford them, yes.

3:56PM 19   Q.   And we also know that doctors have many sources of

3:56PM 20   information when they practice medicine; correct?

3:56PM 21   A.   Correct.

3:56PM 22   Q.   And that includes what's in the literature; correct?

3:56PM 23   A.   Can be, if they're looking at the literature, yes.

3:56PM 24   Q.   And it can also include their own personal clinical

3:56PM 25   experience; correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

|   |   |
|---|---|
| 3:56PM | 1 |
| 3:56PM | 2 |
| 3:56PM | 3 |
| 3:56PM | 4 |
| 3:56PM | 5 |
| 3:56PM | 6 |
| 3:56PM | 7 |
| 3:56PM | 8 |
| 3:56PM | 9 |
| 3:56PM | 10 |
| 3:56PM | 11 |
| 3:56PM | 12 |
| 3:56PM | 13 |
| 3:56PM | 14 |
| 3:57PM | 15 |
| 3:57PM | 16 |
| 3:57PM | 17 |
| 3:57PM | 18 |
| 3:57PM | 19 |
| 3:57PM | 20 |
| 3:57PM | 21 |
| 3:57PM | 22 |
| 3:57PM | 23 |
| 3:57PM | 24 |
| 3:57PM | 25 |

**A.**   On adverse events?  Is that what you're saying?

**Q.**   I'm saying every single time that a doctor treats a
patient, that doctor brings with them the experience of what
has happened in their practice before; correct?

**A.**   Sure.  That's a truism.  But we don't rely on that for
safety information.  I'm just not sure I understand.

**Q.**   I'm just saying that when a doctor -- you're a doctor;
correct?

**A.**   Correct.

**Q.**   Right.  You've treated patients?

**A.**   Sure.

**Q.**   And when you are standing face to face with a patient, one
of the things that goes through your mind is all the experience
that you've had before in your medical career; correct?

**A.**   Sure.

**Q.**   Okay.  Now, one of the other articles that you cited was
the Tallon article that's on this chart; correct?

**A.**   Sure.  I wanted it for completeness sake, yes.

**Q.**   And in Tallon -- this is an article that you put up with
counsel -- it states, "Permanent CIA" -- and that's how this
article defines chemotherapy-induced alopecia; is that correct?

**A.**   Yes.

**Q.**   And feel free.  Why don't you get your --

**A.**   I brought a copy.

**Q.**   Let me know when you're there.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:57PM  1   **A.**   I have it.  Permanent chemotherapy-induced alopecia.  It's

3:57PM  2   a case report, correct.

3:57PM  3   **Q.**   And so what we know from the Tallon article that you put

3:57PM  4   up there, it states, "Permanent CIA has been described

3:58PM  5   following the use of busulfan, cyclophosphamide, thiotepa,

3:58PM  6   melphalan, etoposide -- did I pronounce that correctly?

3:58PM  7   **A.**   Yes.

3:58PM  8   **Q.**   -- carboplatin, docetaxel -- that's Taxotere; correct? --

3:58PM  9   and paclitaxel; correct?

3:58PM  10  **A.**   Correct.

3:58PM  11  **Q.**   And paclitaxel is Taxol; correct?

3:58PM  12  **A.**   Correct.

3:58PM  13  **Q.**   Now, counsel didn't read that paragraph out of Tallon to

3:58PM  14  you, did he?

3:58PM  15          **MR. NOLEN:**  Objection, Your Honor.  May we approach?

3:58PM  16          (WHEREUPON, the following proceedings were held at

3:58PM  17  the bench.)

3:58PM  18          **MR. NOLEN:**  Mr. Strongman has introduced a pile of

3:59PM  19  different drugs that aren't at issue, that she never took, that

3:59PM  20  are included in the studies.  And there are other drugs

3:59PM  21  included in the studies, but he's didn't ask to do that.

3:59PM  22          And what the next thing that's going to come is

3:59PM  23  is that all of those had some report of permanent hair loss,

3:59PM  24  I'm sure.

3:59PM  25          But the point of it is that Your Honor ruled

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

3:59PM  1   that drugs that Ms. Earnest did not take, was not exposed to

3:59PM  2   was not relevant.  Whether or not they caused permanent hair

3:59PM  3   loss or not makes no difference because we can't delve into

3:59PM  4   every one of those and unravel that, in terms of labeling,

3:59PM  5   whether they had the same data -- the same level of data that

3:59PM  6   Sanofi has that would warrant a label change.  We can't get

3:59PM  7   into all of that.  And so that's a violation of the Court's

4:00PM  8   ruling on that issue.

4:00PM  9          MR. STRONGMAN:  I was just reading the sentence that

4:00PM  10  says there's -- and several of those are ones she took

4:00PM  11  and/or -- or proposed to take.  I'm not going any further than

4:00PM  12  I read the sentence and I'm done.

4:00PM  13          And I would just say, in opening, counsel for

4:00PM  14  the plaintiff said, "Unlike other chemotherapies, Taxotere has

4:00PM  15  a risk of permanent hair loss."  I'm done.  I'm moving on.

4:00PM  16  I've read the line, and that's it.

4:00PM  17          MR. MICELI:  You ruled what happened, why in the

4:00PM  18  office with Dr. --

4:00PM  19          THE COURT:  Okay.  There's a question that I ruled on

4:00PM  20  a motion in limine, and all of these other chemotherapy drugs

4:00PM  21  would not be -- but because -- because Ms. Earnest was not

4:00PM  22  exposed to those drugs.  On the other hand, the problem you got

4:00PM  23  is you introduced -- you were the one that relied -- he was the

4:01PM  24  one that relied on this -- on this article.

4:01PM  25          Now, what I heard, and have heard, and

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:01PM  1  anticipate I will hear is that Ms. Earnest should have taken

4:01PM  2  Taxol.

4:01PM  3           MR. MICELI:  That's not what you'll only hear.

4:01PM  4           THE COURT:  I understand.  But I think it's

4:01PM  5  absolutely pertinent that there is this other study that your

4:01PM  6  expert relied on that said we have reports of

4:01PM  7  chemotherapy-induced alopecia associated with Taxol.

4:01PM  8           And I don't think Adriamycin was on the list,

4:01PM  9  but the other --

4:01PM  10           MR. STRONGMAN:  Cytoxan.

4:01PM  11           THE COURT:  -- Cytoxan was listed.

4:01PM  12           MR. MICELI:  I think what we're concerned about is

4:01PM  13  the thiotepa, busulfan, carboplatin, which were never part of

4:01PM  14  the discussion with -- between Dr. Carinder and Ms. Earnest,

4:01PM  15  and that's what Your Honor ruled on on plaintiff's motion in

4:02PM  16  limine No. 9, that that was not going to be coming in.

4:02PM  17           And the problem is that we've been having a lot

4:02PM  18  of conferences up here with you.  And I apologize for that.

4:02PM  19  But they bit off a lot in the opening.  Then they bit off some

4:02PM  20  more.  And the cookie is going to be gone because they nibble

4:02PM  21  around and they keep violating these MILs.  And by the end,

4:02PM  22  they have a full belly of what they want.  And what we then

4:02PM  23  have is there's nothing left in these MILs.

4:02PM  24           MR. STRONGMAN:  Your Honor, I'm happy to rephrase the

4:02PM  25  question and only focus on those two.  But in the opening

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:02PM   1    statement, the plaintiff's slide said, "Unlike other

4:02PM   2    chemotherapies."  And I'm not going to go into those other

4:02PM   3    drugs.  I just simply read --

4:02PM   4            **THE COURT:**  This is what I'm going to do.

4:02PM   5            **MR. STRONGMAN:**  Fair enough.

4:02PM   6            **THE COURT:**  I'm going to tell the jury that they

4:02PM   7    should disregard that last question.  Why don't you rephrase

4:02PM   8    the question to those drugs that are pertinent to this issue.

4:02PM   9            But let me tell you something, you know, what I

4:02PM  10    understand is Dr. Carinder's deposition was the only option he

4:03PM  11    had was Taxol.  I don't know if any of that's in his -- because

4:03PM  12    as I appreciate it now, there's a different story about what

4:03PM  13    Dr. Carinder is going to say was in his toolbox.

4:03PM  14            **MR. MICELI:**  Well, I think that when Dr. Carinder's

4:03PM  15    deposition was taken, what he said was in his toolbox is Taxol

4:03PM  16    and FEC, and FUC, and that's what we discussed with the Court

4:03PM  17    during the motions in limine.

4:03PM  18            **THE COURT:**  I understand that, Mr. Miceli.  But let

4:03PM  19    me back this train up because I was in the conferences with

4:03PM  20    counsel regarding slides associated with opening statements.

4:03PM  21    And it's like, well, now, there's six things he could

4:03PM  22    recommend.  Before it was just two or three.

4:03PM  23            So, you know, I don't want them to be limited.

4:03PM  24    If there -- if there is -- and you're going to tell me right

4:03PM  25    now if there's something else on that laundry list that

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:04PM  1   Mr. Strongman just went through that is going to be in

4:04PM  2   Dr. Carinder's toolbox.

4:04PM  3        MR. MICELI:  It's not going to be.  Particularly,

4:04PM  4   Your Honor, what Mr. Strongman has brought up were medicines

4:04PM  5   for bone marrow transplant preconditioning.

4:04PM  6        THE COURT:  Listen, we're going to fix it because

4:04PM  7   it -- I don't know if those are chemotherapy drugs.  I don't

4:04PM  8   know that.

4:04PM  9             But if this is related to bone marrow

4:04PM  10  transplants, it's not related and it would be totally

4:04PM  11  confusing.  I'm going to tell the jury they should disregard

4:04PM  12  that last question, and you rephrase it.  Just say --

4:04PM  13       MR. STRONGMAN:  Just the two.

4:04PM  14       THE COURT:  -- to include -- and use the drugs

4:04PM  15  associated as well as any drug that was in Dr. Carinder's

4:04PM  16  toolbox.

4:04PM  17       MR. MICELI:  For early-stage breast cancer.  And

4:04PM  18  that's all that was highlighted in the agreement in our slides.

4:04PM  19       THE COURT:  Fair enough.  Fair enough.

4:04PM  20       MR. STRONGMAN:  While we're up here, Rand --

4:04PM  21       THE COURT:  Yes.

4:04PM  22       MR. STRONGMAN:  One thing that we had talked about

4:04PM  23  was the 2004, and I wanted to -- I'm not interested in causing

4:04PM  24  a huge thing about that, a brouhaha about that.  But I guess I

4:05PM  25  feel like I have to ask the Court's guidance on whether I can

DAVID KESSLER - CROSS

4:05PM  1   ask about the FDA's strikeout of that language in the 2004

4:05PM  2   proposal or not.

4:05PM  3          THE COURT:  I think this is something that we're

4:05PM  4   going to have to have a more robust discussion that's going to

4:05PM  5   take more time than we have here.  So we're going to do this

4:05PM  6   after court today.

4:05PM  7              Unfortunately, I know Dr. Kessler is going to be

4:05PM  8   gone.

4:05PM  9          MR. STRONGMAN:  Right.

4:05PM  10         THE COURT:  But --

4:05PM  11         MR. MICELI:  There are other issues we'll need to

4:05PM  12  take up at that time, and I don't think we can waste the time

4:05PM  13  with the jury sitting here.

4:05PM  14         MR. STRONGMAN:  I'm just saying that I think -- you

4:05PM  15  understand that I think it's relevant.  I think Dr. Kessler is

4:05PM  16  the witness for me to cross-examine on it.  And if Your Honor

4:05PM  17  tells me I cannot, I won't.

4:05PM  18         THE COURT:  Then let's not.  But we will talk about.

4:05PM  19         MR. STRONGMAN:  Thank you.  Thank you.

4:06PM  20         (WHEREUPON, the following proceedings were held in

4:06PM  21  open court.)

4:06PM  22         THE COURT:  Members of the jury, you should disregard

4:06PM  23  that last question.

4:06PM  24              I'm now going to ask Mr. Strongman to rephrase

4:06PM  25  the question.

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:06PM | 1 | **BY MR. STRONGMAN:** |
| 4:06PM | 2 | **Q.**   Doctor, do you have Tallon in front of you? |
| 4:06PM | 3 | **A.**   I do, sir. |
| 4:06PM | 4 | **Q.**   All right.  Let's ask the question this way. |
| 4:06PM | 5 | Permanent CIA has been described following |
| 4:06PM | 6 | cyclophosphamide; correct? |
| 4:06PM | 7 | **A.**   If just give me the exact page that we're on and the |
| 4:06PM | 8 | column. |
| 4:06PM | 9 | **Q.**   334 on the right. |
| 4:07PM | 10 | **A.**   No, I have -- mine is numbered 234.  I'll find it, sir.  I |
| 4:07PM | 11 | have must have a different version. |
| 4:07PM | 12 | **Q.**   And I'm under the discussion. |
| 4:07PM | 13 | **A.**   Yes, I'm there.  Which paragraph, sir? |
| 4:07PM | 14 | **Q.**   Okay.  If we keep going on the discussion, there's a |
| 4:07PM | 15 | paragraph that starts, "Permanent CIA has been described." |
| 4:07PM | 16 | Are you with me? |
| 4:07PM | 17 | **A.**   I'm right there with you. |
| 4:07PM | 18 | **Q.**   Okay.  And in Tallon -- this is an article that you |
| 4:07PM | 19 | discussed with Mr. Nolen; correct? |
| 4:07PM | 20 | **A.**   Correct.  It was on the list. |
| 4:07PM | 21 | **Q.**   Okay.  And in this article, Tallon, it states that |
| 4:07PM | 22 | permanent CIA has been described following cyclophosphamide; |
| 4:07PM | 23 | correct? |
| 4:07PM | 24 | **A.**   Correct. |
| 4:07PM | 25 | **Q.**   And it also states that permanent CIA -- |

OFFICIAL TRANSCRIPT

502

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:07PM | 1 | **A.**   Sorry.  Just say that question again. |
| 4:07PM | 2 | **Q.**   Sure.  Permanent CIA has been described following the use |
| 4:07PM | 3 | of cyclophosphamide; correct? |
| 4:07PM | 4 | **A.**   I'm reading the paragraph, "Permanent CIA defined is an |
| 4:07PM | 5 | absence." |
| 4:07PM | 6 | Am I in the wrong paragraph? |
| 4:07PM | 7 | **MR. STRONGMAN:**  May I approach with him really quick? |
| 4:08PM | 8 | **THE WITNESS:**  I'm two paragraphs up from you, sir.  I |
| 4:08PM | 9 | apologize. |
| 4:08PM | 10 | BY MR. STRONGMAN: |
| 4:08PM | 11 | **Q.**   Do you see it? |
| 4:08PM | 12 | **A.**   Now I do. |
| 4:08PM | 13 | **Q.**   Very good.  So with me? |
| 4:08PM | 14 | **A.**   Yes, sir. |
| 4:08PM | 15 | **Q.**   So in Tallon, it states, "Permanent CIA has been described |
| 4:08PM | 16 | following the use of cyclophosphamide."  Correct? |
| 4:08PM | 17 | **A.**   That's what that says. |
| 4:08PM | 18 | **Q.**   And cyclophosphamide is also known as Cytoxan; correct? |
| 4:08PM | 19 | **A.**   Correct. |
| 4:08PM | 20 | **Q.**   Okay.  And Tallon also states that permanent CIA has been |
| 4:08PM | 21 | described following the use of paclitaxel; correct? |
| 4:08PM | 22 | **A.**   That's what that sentence says. |
| 4:08PM | 23 | **Q.**   Very good.  And paclitaxel is the chemical name for Taxol; |
| 4:08PM | 24 | correct? |
| 4:08PM | 25 | **A.**   Correct.  That's what that one sentence says. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:08PM | 1 | **Q.**   Fair enough.  Fair enough. |
| 4:08PM | 2 | And I have one last set of questions for you, and I'm |
| 4:08PM | 3 | done, Doctor. |
| 4:09PM | 4 | Doctor, had you mentioned earlier that you had |
| 4:09PM | 5 | actually used Adriamycin in your practice; correct? |
| 4:09PM | 6 | **A.**   I did. |
| 4:09PM | 7 | **Q.**   And when you prescribe Adriamycin, you knew it could cause |
| 4:09PM | 8 | hair loss; correct? |
| 4:09PM | 9 | **A.**   Reversible hair loss. |
| 4:09PM | 10 | **Q.**   Well, Doctor, you knew your Adriamycin that you prescribed |
| 4:09PM | 11 | could cause alopecia; correct? |
| 4:09PM | 12 | **A.**   Reversible hair loss. |
| 4:09PM | 13 | **THE COURT:**  I think you need to answer the question. |
| 4:09PM | 14 | **BY MR. STRONGMAN:** |
| 4:09PM | 15 | **Q.**   Answer my question, please. |
| 4:09PM | 16 | Yes or no?  You knew Adriamycin could cause alopecia |
| 4:09PM | 17 | when you prescribed it to your patients; correct? |
| 4:09PM | 18 | **THE COURT:**  You knew it could cause alopecia? |
| 4:09PM | 19 | **THE WITNESS:**  It could make hair fall out.  That's |
| 4:09PM | 20 | part of what I knew. |
| 4:09PM | 21 | **BY MR. STRONGMAN** |
| 4:09PM | 22 | **Q.**   And when you counseled your patients, you did not promise |
| 4:09PM | 23 | your patients that their hair would come back, did you? |
| 4:10PM | 24 | **A.**   I didn't promise one way or the other, because I don't |
| 4:10PM | 25 | make promises.  When I'm confronted with a child with Wildens |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

| | | |
|---|---|---|
| 4:10PM | 1 | tumor, all right, I wasn't making promises. |
| 4:10PM | 2 | Q.   And we can agree that, when you deal with chemotherapy, |
| 4:10PM | 3 | there are no guarantees; correct? |
| 4:10PM | 4 | A.   Well, I don't think -- I don't think it's that -- I can't |
| 4:10PM | 5 | promise you the efficacy and whether you'll respond, but I |
| 4:10PM | 6 | don't think it's quite as -- as maybe making it where -- there |
| 4:10PM | 7 | are very good therapies. |
| 4:10PM | 8 | Q.   No.  What I'm just saying is that, when you're dealing |
| 4:10PM | 9 | with a condition like cancer and you're dealing with |
| 4:11PM | 10 | chemotherapies, there are no guarantees you could make any |
| 4:11PM | 11 | patient about an outcome; correct? |
| 4:11PM | 12 | A.   I think that's correct, but we all were under the |
| 4:11PM | 13 | assumption that it grew back -- that hair grew back.  That was |
| 4:11PM | 14 | the way we practiced medicine. |
| 4:11PM | 15 | Q.   Doctor, there are no guarantees for survival; correct? |
| 4:11PM | 16 | Yes or no? |
| 4:11PM | 17 | A.   No guarantees for survival in life.  That's why I'm a |
| 4:11PM | 18 | doctor.  You do your best.  That's why you try to make sure the |
| 4:11PM | 19 | patients have information. |
| 4:11PM | 20 | Q.   But there are no guarantees; correct?  Yes or no? |
| 4:11PM | 21 | A.   No guarantees. |
| 4:11PM | 22 | Q.   This isn't hard. |
| 4:11PM | 23 | A.   But there are choices, and there is information the |
| 4:11PM | 24 | patient should have. |
| 4:11PM | 25 | Q.   Dr. Kessler, this is not a difficult question. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - CROSS

4:11PM  1          Yes or no?  When you're treating cancer, which you've
4:12PM  2   done, there are no guarantees for how a patient will respond or
4:12PM  3   what their outcome will be?  Yes or no?
4:12PM  4   A.   On efficacy, I think --
4:12PM  5   Q.   On anything.
4:12PM  6   A.   Well, that's not true.  We've advanced our science and our
4:12PM  7   medicine.  There are tumors today that I can sit and tell
4:12PM  8   people what to expect.
4:12PM  9          Maybe "guarantee" is not a word that I would use in
4:12PM 10   my vocabulary when it comes to medicine.  But there are real
4:12PM 11   advances and good outcomes that can be assured in certain types
4:12PM 12   of cancers.  I just don't like the word "guarantees."
4:12PM 13   Q.   How about this?  Because these are your words.  You don't
4:12PM 14   make promises; correct?  Those are your words.
4:12PM 15   A.   I know these are my words.  But I'll tell you, there's one
4:13PM 16   nine-year-old that I'm thinking about --
4:13PM 17   Q.   Doctor, if you could maker answer my question.
4:13PM 18   A.   -- who I made a promise to.  So sometimes I do make a
4:13PM 19   promise.
4:13PM 20   Q.   Doctor, this is not that hard of a question.  I just want
4:13PM 21   a yes-or-no answer.
4:13PM 22          When you deal with cancer and you deal with
4:13PM 23   chemotherapy, you can't make promises; correct?  Yes or no?
4:13PM 24   A.   You can make informed judgments and statements.
4:13PM 25          MR. STRONGMAN:  I don't have any other questions.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:14PM | 1 | **THE COURT:**  Mr. Nolen? |
| 4:14PM | 2 | Mr. Strongman, I know you're getting all your |
| 4:14PM | 3 | things.  If we can get somebody to come get that.  Thank you. |
| 4:14PM | 4 | **REDIRECT EXAMINATION** |
| 4:14PM | 5 | BY MR. NOLEN: |
| 4:14PM | 6 | **Q.**   Hi again, Dr. Kessler.  How are you? |
| 4:14PM | 7 | **A.**   Just chipper. |
| 4:14PM | 8 | **Q.**   Okay.  Doctor, on July 5th, 2007, did J. Michael Bishop, |
| 4:14PM | 9 | Chancellor of the University of the California, San Francisco, |
| 4:14PM | 10 | send a letter of apology to you? |
| 4:14PM | 11 | **A.**   He did. |
| 4:14PM | 12 | **Q.**   And was that in regard to these financial issues that had |
| 4:15PM | 13 | come up that you reported? |
| 4:15PM | 14 | **A.**   That's correct. |
| 4:15PM | 15 | **Q.**   And did you then return as a full professor to the |
| 4:15PM | 16 | University of California San Francisco? |
| 4:15PM | 17 | **A.**   Yes, that's correct. |
| 4:15PM | 18 | **Q.**   Now, a moment ago, we saw Defendants' 317, and it was |
| 4:15PM | 19 | admitted into evidence. |
| 4:15PM | 20 | I'll show the Court and the jury Defendants' |
| 4:15PM | 21 | Exhibit 317. |
| 4:15PM | 22 | Do you see that? |
| 4:15PM | 23 | **A.**   I do. |
| 4:15PM | 24 | **Q.**   And for your orientation, this is a document -- I think |
| 4:15PM | 25 | you may still have it up there -- that has do with a 2004 |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:15PM  1    approval for an indication for Taxotere; is that right?

4:16PM  2    **A.**   Correct.  By Dr. Pazdur through the company.

4:16PM  3    **Q.**   And included was a warning, as of 2004, regarding hair

4:16PM  4    loss.

4:16PM  5            Do you see that?  It's on page 2.

4:16PM  6    **A.**   Correct.

4:16PM  7    **Q.**   And it says, "Loss of hair occurs in most patients taking

4:16PM  8    Taxotere, including the hair on your head, underarm hair, pubic

4:16PM  9    hair, eyebrows, and eyelashes.  Hair loss will begin after the

4:16PM  10   first few treatments and varies from patient to patient.  Once

4:16PM  11   you have completed all your treatments, hair generally grows

4:16PM  12   back."

4:16PM  13           Do you see that?

4:16PM  14   **A.**   I do.

4:16PM  15   **Q.**   Now, Doctor, does that warn of permanent hair loss?

4:16PM  16   **A.**   No.

4:16PM  17   **Q.**   In the 2004 label, was there a warning regarding permanent

4:17PM  18   hair loss?

4:17PM  19   **A.**   No.

4:17PM  20           **THE COURT:**  I think Mr. Nolen, you better -- we might

4:17PM  21   need to approach.

4:17PM  22           **MR. NOLEN:**  You want to see me, Your Honor?

4:17PM  23           (WHEREUPON, the following proceedings were held at

4:17PM  24   the bench.)

4:17PM  25           **THE COURT:**  Was this the approval that resulted -- is

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:17PM | 1 | this the same approval with FDA scratched redlines? |
| 4:17PM | 2 | MR. NOLEN:  It doesn't have a redline. |
| 4:17PM | 3 | THE COURT:  No, no.  Maybe -- maybe I'm -- |
| 4:17PM | 4 | MR. NOLEN:  Your Honor, this is -- |
| 4:17PM | 5 | THE COURT:  I understand this is a 2004 approval.  I |
| 4:17PM | 6 | thought that was the one that you -- no, that was a different |
| 4:17PM | 7 | one.  I'm sorry.  I'm sorry. |
| 4:17PM | 8 | MR. NOLEN:  Okay.  Thank you. |
| 4:17PM | 9 | THE COURT:  This is my time. |
| 4:17PM | 10 | (WHEREUPON, the following proceedings were held in |
| 4:17PM | 11 | open court.) |
| 4:18PM | 12 | THE COURT:  Please proceed.  I apologize. |
| 4:18PM | 13 | BY MR. NOLEN: |
| 4:18PM | 14 | Q.  All right.  So we're clear, Doctor, from 1996, when |
| 4:18PM | 15 | Taxotere came on the market, through the time Ms. Earnest was |
| 4:18PM | 16 | administered the drug, was there any warning regarding |
| 4:18PM | 17 | permanent hair loss? |
| 4:18PM | 18 | A.  There was not. |
| 4:18PM | 19 | Q.  Now, earlier we talked about Plaintiff's Exhibit 396, |
| 4:18PM | 20 | which was the label.  You can see it right here.  It's already |
| 4:18PM | 21 | been admitted into evidence, and this is the Taxotere label. |
| 4:19PM | 22 | And we've highlighted May of 2010. |
| 4:19PM | 23 | Do you see that? |
| 4:19PM | 24 | A.  Yes. |
| 4:19PM | 25 | Q.  And you were asked about this by Mr. Strongman.  And, |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:19PM 1   specifically, you all talked about indications that it was
4:19PM 2   approved for -- that Taxotere was approved for.  And he went
4:19PM 3   through a number of them.  I don't think he put up the label,
4:19PM 4   but he said breast cancer, non-small cell lung cancer, prostate
4:19PM 5   cancer, gastric -- I can't even pronounce it.
4:19PM 6   A.   Adenocarcinoma.
4:19PM 7   Q.   Right.  That's another form of cancer.
4:19PM 8        Head and neck cancer; right?
4:19PM 9   A.   Right.
4:19PM 10  Q.   So with regard to all of those indications for Taxotere,
4:19PM 11  was there any warning about permanent hair loss?
4:19PM 12  A.   No.
4:19PM 13  Q.   So throughout this label, this 2010 label, if we look
4:20PM 14  through it -- if we look through every section, including the
4:20PM 15  sections that relate to other types of cancer, do we see a
4:20PM 16  warning about permanent hair loss?
4:20PM 17  A.   No.
4:20PM 18  Q.   And you were asked about dosing with this and -- about
4:20PM 19  dosage and administration and breast cancer.
4:20PM 20       Do you remember that testimony?
4:20PM 21  A.   I do.
4:20PM 22  Q.   And if we look at this -- and we didn't highlight this
4:20PM 23  earlier, but we'll go ahead and do it now.
4:20PM 24       If we look at No. 2 in the label, it talks about
4:20PM 25  dosage and administration.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:20PM   1          Do you see that?

4:20PM   2   A.   I do.

4:20PM   3   Q.   And if we look at breast cancer, being No. 1, that's the

4:20PM   4   first thing that comes up here; correct?

4:20PM   5   A.   Correct.

4:20PM   6   Q.   And we look at dosage and administration, and it tells you

4:20PM   7   to go to 2.7.

4:20PM   8   A.   Correct.

4:20PM   9   Q.   And if we flip back there, we see dosage adjustments

4:21PM   10  during treatment.

4:21PM   11          That's 2.7 right there; correct?

4:21PM   12  A.   Correct.

4:21PM   13  Q.   And the very first one is breast cancer.

4:21PM   14          Do you see that, sir?

4:21PM   15  A.   I do.

4:21PM   16  Q.   All right.  And can you read that first line for me.

4:21PM   17  A.   "Patients who are dosed initially at 100 milligrams per

4:21PM   18  meter squared and who experience either febrile neutropenia,

4:21PM   19  neutrophils less than 500 cells per cubic millimeter for more

4:21PM   20  than one week, or severe or cumulative cutaneous reactions

4:21PM   21  during Taxotere therapy should have their dosage adjusted from

4:21PM   22  100 milligrams per meter squared to 75 milligrams per meter

4:21PM   23  squared."

4:21PM   24  Q.   Does this indicate at all what the proper dosing for

4:21PM   25  Taxotere breast cancer is?

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:22PM 1          **MR. STRONGMAN:**  Objection.  Different indication.

4:22PM 2          **THE COURT:**  Is this the label?

4:22PM 3          **MR. NOLEN:**  Yes.

4:22PM 4          **THE COURT:**  Okay.  We might need to approach.

4:22PM 5          (WHEREUPON, the following proceedings were held at

4:22PM 6     the bench.)

4:22PM 7          **THE COURT:**  You might have to explain that.

4:22PM 8          **MR. STRONGMAN:**  Sure.  Thank you, Your Honor.

4:22PM 9               So when you look at dosage and administration,

4:22PM 10    there's a recommended dosage and administration for adjuvant

4:22PM 11    breast cancer, and that's what we've talked about which is 75,

4:22PM 12    500, 50.  Then there is a dosage for metastatic breast cancer,

4:22PM 13    a different indication, and it's 100.

4:22PM 14               So what Mr. Nolen is reading from is patients

4:22PM 15    who are dosed initially at 100, et cetera.  The implication is

4:23PM 16    that those are patients in the metastatic setting.  So that's

4:23PM 17    the objection.

4:23PM 18          **MR. NOLEN:**  Not what it says.  That's incorrect, Your

4:23PM 19    Honor.  So let me just say that is not what the labeling says.

4:23PM 20          **THE COURT:**  You know what -- what I would be curious

4:23PM 21    to see is what the dosage -- recommended dosage is for

4:23PM 22    metastatic breast cancer and adjuvant breast cancer and if this

4:23PM 23    is --

4:23PM 24          **MR. SCHANKER:**  That's a 2010.  That's not the one

4:23PM 25    he's talking about.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:23PM | 1 | **MR. NOLEN:**  No, that was the one. |
| 4:23PM | 2 | **MR. STRONGMAN:**  May I reach over and point?  Thank |
| 4:23PM | 3 | you, Your Honor.  So when you look at dosages, the BC adjuvant, |
| 4:24PM | 4 | it's right there.  And the one right above it, BC locally and |
| 4:24PM | 5 | advanced metastatic.  So those are the two bullets to look at. |
| 4:24PM | 6 | And one is 100. |
| 4:24PM | 7 | **THE COURT:**  So the recommended dosage for locally, |
| 4:24PM | 8 | advanced or metastatic is 60 to 100. |
| 4:24PM | 9 | **MR. NOLEN:**  Right. |
| 4:24PM | 10 | **THE COURT:**  For adjuvant care, it's 75 milligrams. |
| 4:24PM | 11 | It doesn't say -- no, you know, where are you? |
| 4:24PM | 12 | **MR. NOLEN:**  We're back in the actual section, which |
| 4:24PM | 13 | is 2.7. |
| 4:24PM | 14 | **THE COURT:**  Dosage adjustments during treatment. |
| 4:24PM | 15 | **MR. NOLEN:**  Yes. |
| 4:24PM | 16 | **THE COURT:**  But this is the recommended treatment. |
| 4:24PM | 17 | And this is treatment for metastatic breast cancer, right here. |
| 4:25PM | 18 | That's not the recommended dosage for adjuvant treatment.  And |
| 4:25PM | 19 | so this is talking about if you're giving this at |
| 4:25PM | 20 | 100 milligrams. |
| 4:25PM | 21 | **MR. NOLEN:**  Right. |
| 4:25PM | 22 | **THE COURT:**  Which would certainly would be related to |
| 4:25PM | 23 | the metastatic breast cancer. |
| 4:25PM | 24 | **MR. NOLEN:**  Yes.  And you'll hear from Dr. Carinder |
| 4:25PM | 25 | that the physician has an option about how they structure the |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:25PM 1   dosing on cancer treatments, including this one, that

4:25PM 2   100 milligrams --

4:25PM 3         **THE COURT:**  I think my problem is this:  Then maybe

4:25PM 4   Dr. Carinder needs to explain this, but not this witness.

4:25PM 5             Because I think it is -- I think what you've

4:25PM 6   done is taken apples and oranges, and we mentioned apples and

4:25PM 7   oranges and we're just -- and now we've -- and I think this

4:25PM 8   needs to be explained in the context what is the dosage that

4:25PM 9   was approved for metastatic breast cancer, which is not the

4:25PM 10   same dosage as approved in the adjuvant setting.

4:26PM 11         **MR. NOLEN:**  Well, if you'd like, I can ask

4:26PM 12   Dr. Kessler that.

4:26PM 13         **THE COURT:**  No, I think you're going to have to.

4:26PM 14   Because I think what you've done is he's given an apple and

4:26PM 15   you're saying, "Now, look at this orange."  And I'm not going

4:26PM 16   to allow that.

4:26PM 17             Now, he can say that -- well, I have to see what

4:26PM 18   he says.  But what I'm not going to do is allow him to do is to

4:26PM 19   say the label says that this is appropriate, because that's not

4:26PM 20   the setting that Ms. Earnest -- when he was prescribing for

4:26PM 21   Ms. Earnest, she did not have metastatic breast cancer or it

4:26PM 22   wasn't advanced.  We're all on the same page.

4:26PM 23         **MR. STRONGMAN:**  Okay.

4:26PM 24         **MR. NOLEN:**  Okay.  I'll ask.

4:26PM 25         **THE COURT:**  So I think you have to back up.  The

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:26PM | 1 | objection is sustained.  That's plaintiff. |
| 4:27PM | 2 | (WHEREUPON, the following proceedings were held in |
| 4:27PM | 3 | open court.) |
| 4:27PM | 4 | **THE COURT:**  Please proceed, Mr. Nolen. |
| 4:27PM | 5 | **BY MR. NOLEN:** |
| 4:27PM | 6 | **Q.**  All right.  Dr. Kessler, we were looking at the -- we were |
| 4:27PM | 7 | looking at the labeling.  So I wanted to ask you about dosage |
| 4:27PM | 8 | and administration. |
| 4:27PM | 9 | If we look at the first page, which has the summary |
| 4:27PM | 10 | information, which is where I am.  Do you see that? |
| 4:27PM | 11 | **A.**  I do see it. |
| 4:27PM | 12 | **Q.**  And we go down here, it talks about the administrator in a |
| 4:27PM | 13 | facility equipped to manage possible complications, and then it |
| 4:27PM | 14 | goes down and says, "Administer intravenously over one hour |
| 4:27PM | 15 | every three weeks.  PVC equipment is not recommended." |
| 4:28PM | 16 | And then it says "BC."  Is that breast cancer? |
| 4:28PM | 17 | **A.**  Correct. |
| 4:28PM | 18 | **Q.**  "Locally advanced or metastatic, 60 milligrams/m squared |
| 4:28PM | 19 | to 100 milligrams/m squared.  Single agent." |
| 4:28PM | 20 | Do you see that? |
| 4:28PM | 21 | **A.**  I do see that. |
| 4:28PM | 22 | **Q.**  And directly under that it says "BC adjuvant, |
| 4:28PM | 23 | 75 milligrams/m squared administered one hour after |
| 4:28PM | 24 | doxorubicin," and then it goes on. |
| 4:28PM | 25 | Do you see that? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:28PM  1    **A.**   I do.

4:28PM  2    **Q.**   And it says every three weeks for six cycles; correct?

4:28PM  3    **A.**   Correct.

4:28PM  4    **Q.**   Now, you were telling us, I believe, during

4:28PM  5    cross-examination about the total dose.  Do you recall that?

4:28PM  6    **A.**   Correct.

4:28PM  7    **Q.**   And I don't -- did not understand your testimony in that

4:28PM  8    regard.  Can you tell us what was meant by the total dose?

4:29PM  9    **A.**   When you're looking at chemotherapy and you're concerned

4:29PM  10   about toxicity and the build up of toxicity in the body, one of

4:29PM  11   the things you want to keep track of is not just the dose

4:29PM  12   you're giving at any one point in time, you want to have a

4:29PM  13   running total of how much you're giving.

4:29PM  14          So if you're giving -- sometimes you give a dose over

4:29PM  15   six weeks -- six cycles, let's say, and sometimes you give it

4:29PM  16   over three cycles.  And it looks like that's twice as much, but

4:29PM  17   that would be misleading.  You have to add up the total dose.

4:29PM  18          That's what I was referring to.  To see whether there

4:29PM  19   really is a difference in dose, make sure you look at the

4:29PM  20   cumulative dose of the total number of cycles times the dose as

4:30PM  21   well as the individual dose.  That was the only point I was

4:30PM  22   making.

4:30PM  23   **Q.**   Now, do doctors have to follow these dosing

4:30PM  24   recommendations exactly, or do you have a choice?

4:30PM  25   **A.**   A doctor, in his or her judgment, can make a decision on

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:30PM | 1 | the dose certainly taking into -- taking into consideration, |
| 4:30PM | 2 | you know, what the -- decide what the guidance, what the best |
| 4:30PM | 3 | practice is at the time. |
| 4:30PM | 4 | Doctors are allowed to deviate from the label, |
| 4:30PM | 5 | certainly, when it comes to dose. |
| 4:30PM | 6 | Q.   All right.  And, Doctor, you were shown in |
| 4:30PM | 7 | cross-examination a moment ago Defendants' Exhibit D-31, which |
| 4:31PM | 8 | was the periodic safety update for docetaxel, which is |
| 4:31PM | 9 | Taxotere; right? |
| 4:31PM | 10 | A.   Correct. |
| 4:31PM | 11 | Q.   And this was the document you saw; correct? |
| 4:31PM | 12 | A.   Correct. |
| 4:31PM | 13 | Q.   And you were shown this portion.  I actually highlighted |
| 4:31PM | 14 | it while it was being shown to you. |
| 4:31PM | 15 | It says "During the reporting period, the active |
| 4:31PM | 16 | docetaxel clinical trials company-sponsored and unsponsored |
| 4:31PM | 17 | studies including investigator-sponsored studies, had a |
| 4:31PM | 18 | cumulative enrollment of approximately 95,083." |
| 4:31PM | 19 | Do you see that? |
| 4:31PM | 20 | A.   I see that. |
| 4:31PM | 21 | Q.   And earlier when I talked with you, I showed you the Cross |
| 4:31PM | 22 | Cancer Institute document, which was a consent form, informed |
| 4:32PM | 23 | consent.  Do you recall that? |
| 4:32PM | 24 | A.   Correct. |
| 4:32PM | 25 | Q.   And in the informed consent, we saw permanent hair loss. |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:32PM  1    Remember?

4:32PM  2              THE COURT:  I think this is outside the scope.

4:32PM  3              MR. STRONGMAN:  I agree.

4:32PM  4              THE COURT:  Outside the scope of cross-examination.

4:32PM  5    BY MR. NOLEN:

4:32PM  6    Q.   Doctor, do you know whether or not these people, that were

4:32PM  7    95,083 patients worldwide, were being given a permanent hair

4:32PM  8    loss warning in these --

4:32PM  9              MR. STRONGMAN:  Same objection.  Outside the scope.

4:32PM  10             THE COURT:  Sustained.  This is outside the scope.

4:32PM  11             MR. NOLEN:  All right.

4:32PM  12   BY MR. NOLEN:

4:32PM  13   Q.   Doctor, do you know what warnings the folks in the

4:32PM  14   clinical trials in this were being given?

4:32PM  15             MR. STRONGMAN:  Objection.

4:32PM  16             MR. NOLEN:  It's his document, Your Honor.

4:32PM  17             THE COURT:  I understand that, but it's outside the

4:32PM  18   scope of cross-examination.  We -- this is outside the scope of

4:32PM  19   cross-examination.

4:32PM  20                  You may proceed.

4:32PM  21   BY MR. NOLEN:

4:32PM  22   Q.   Doctor, do we know -- do we know whether or not any of

4:33PM  23   these folks were being given warnings?

4:33PM  24             MR. STRONGMAN:  It's the same question, Your Honor.

4:33PM  25   Same objection.

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:33PM  1          THE COURT:  I think that issue was raised in his

4:33PM  2    direct examination.  It was not touched upon in his

4:33PM  3    cross-examination, and we're going to proceed.

4:33PM  4          MR. NOLEN:  All right.

4:33PM  5          THE COURT:  So that's sustained.

4:33PM  6    BY MR. NOLEN:

4:33PM  7    Q.   By 2010, June of 2010 through November of 2010, which is

4:33PM  8    the period for this document, was there a warning of permanent

4:33PM  9    hair loss in the Taxotere label?

4:33PM  10   A.   No.

4:33PM  11   Q.   Now, Doctor, you were shown that number of 296,816, which

4:34PM  12   comes from the Defense Exhibit 31.  And on the flip chart, the

4:34PM  13   numbers --

4:34PM  14         MR. STRONGMAN:  Your Honor, I'd object to this.  This

4:34PM  15   isn't an accurate representation of what he was shown at all.

4:34PM  16         MR. NOLEN:  It comes straight from the document.

4:34PM  17         MR. STRONGMAN:  I'm happy to approach and explain.

4:34PM  18   But, yeah, that's not what I showed.

4:34PM  19         (WHEREUPON, the following proceedings were held at

4:34PM  20   the bench.)

4:34PM  21         MR. STRONGMAN:  What I showed Dr. Kessler was 168

4:34PM  22   reports out of 2 million.  What Mr. Nolen has up there is 160

4:34PM  23   out of what is six-month data.  So he's implying that 160

4:34PM  24   reports as opposed to being over, whatever, 15 years well over

4:34PM  25   six months.  So that's my objection.

OFFICIAL TRANSCRIPT

4:35PM 1      THE COURT:  That is what he had.

4:35PM 2      MR. NOLEN:  He said million on his chart.  But he

4:35PM 3 also referenced this number straight out of this document,

4:35PM 4 296,816.

4:35PM 5      THE COURT:  Right, saying that was six months.

4:35PM 6      MR. STRONGMAN:  Six months.

4:35PM 7      THE COURT:  So he did his own extrapolation.

4:35PM 8      MR. NOLEN:  Yes.

4:35PM 9      THE COURT:  Tell me this, Mr. Nolen, but he said

4:35PM 10 that's not an accurate way to do this.  You can ask him, "Why

4:35PM 11 it is not accurate," but you can't re-create the -- do you

4:35PM 12 understand what I'm saying?

4:35PM 13      MR. NOLEN:  I was going to show the smaller number

4:35PM 14 still doesn't get you accurate.  And then extrapolate out to

4:35PM 15 what Jon wrote on the board.

4:35PM 16      MR. STRONGMAN:  I just don't understand what the

4:35PM 17 six-month data versus a number from 15 years.

4:35PM 18      THE COURT:  I think what you need to do is stay

4:35PM 19 within the confines of cross-examination.  This is what he

4:36PM 20 said.  You said that was not inaccurate.  You need to explain

4:36PM 21 how that calculation should have been done.

4:36PM 22           So that -- because I've got to tell you, FYI,

4:36PM 23 I'm going to hold you all tight because I don't think redirect

4:36PM 24 is an opportunity to go back in and redo your direct

4:36PM 25 examination.  You got one shot at that, and then you get to

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:36PM | 1 | poke holes in what he did.  And that's all. |
| 4:36PM | 2 | MR. NOLEN:  Your Honor, while I'm here, I've got a |
| 4:36PM | 3 | whole team of people who believe that there were multiple doors |
| 4:36PM | 4 | opened during cross-examination. |
| 4:36PM | 5 | THE COURT:  That's good.  They can take that up with |
| 4:36PM | 6 | me later.  But we're not doing this -- I know.  I see them, and |
| 4:36PM | 7 | they're all looking at me with just incredulous expressions. |
| 4:36PM | 8 | I'm telling you what you can do with that question. |
| 4:36PM | 9 | MR. NOLEN:  Your Honor, I've given you no |
| 4:36PM | 10 | incredulity. |
| 4:37PM | 11 | THE COURT:  Well, it hasn't been you. |
| 4:37PM | 12 | MR. NOLEN:  I know. |
| 4:37PM | 13 | THE COURT:  I see them. |
| 4:37PM | 14 | (WHEREUPON, the following proceedings were held in |
| 4:37PM | 15 | open court.) |
| 4:37PM | 16 | THE COURT:  Please proceed. |
| 4:37PM | 17 | BY MR. NOLEN: |
| 4:37PM | 18 | Q.  Dr. Kessler, earlier when you were working through the |
| 4:37PM | 19 | flip chart with Mr. Strongman, you were being asked about -- |
| 4:37PM | 20 | you were being asked about the nominator and the numerator for |
| 4:37PM | 21 | the total number of prescriptions for Taxotere. |
| 4:37PM | 22 | Do you recall that? |
| 4:37PM | 23 | A.  I do. |
| 4:37PM | 24 | Q.  And the number of reports that had been received in a |
| 4:37PM | 25 | division.  Do you recall that? |

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

4:37PM 1  **A.**   Correct.

4:37PM 2  **Q.**   Did you disagree with that?

4:37PM 3  **A.**   His math was correct, but I disagreed with any methodology

4:37PM 4  or any implications one could derive from that for

4:37PM 5  methodological reasons.

4:37PM 6  **Q.**   So if you would, Doctor, explain where the -- where the

4:37PM 7  discrepancy is on the methodology?

4:38PM 8  **A.**   So if you want a reliable rate, what's the percentage of

4:38PM 9  people who get Taxotere and that have permanent hair loss, you

4:38PM 10  really need to follow in some kind of study that group.

4:38PM 11  Because it's notorious underreporting in voluntary adverse

4:38PM 12  reaction -- when it ends up in the company's adverse reaction

4:38PM 13  database, that's going to be markedly underreported.  It's not

4:38PM 14  capturing it.  It's not mandatory for doctors and physicians or

4:38PM 15  patients to report.

4:38PM 16          So the way you do that is you do something like

4:38PM 17  Dr. Sedlacek did, even with the limitations, you follow 100

4:38PM 18  patients who got Taxotere-based therapies, and then you measure

4:39PM 19  over a defined period, you followed each one.  Then you can get

4:39PM 20  an incidence that you can have some confidence in.

4:39PM 21          You just can't take sales data that's extrapolated.

4:39PM 22  It's just not going to give you the degree of confidence that

4:39PM 23  you would see in a Dr. Sedlacek study or in a clinical trial

4:39PM 24  that's properly conducted.

4:39PM 25  **Q.**   Now, Doctor, we talked about the TAX 316 study on direct,

OFFICIAL TRANSCRIPT

DAVID KESSLER - REDIRECT

| | | |
|---|---|---|
| 4:39PM | 1 | and you were asked about it on cross.  Do you recall that? |
| 4:39PM | 2 | **A.**   I do. |
| 4:39PM | 3 | **Q.**   Before today, had you heard that the TAX 316 study, at |
| 4:39PM | 4 | least as to alopecia, was not a ten-year study? |
| 4:39PM | 5 | **MR. STRONGMAN:**  Objection.  Misstates the question. |
| 4:39PM | 6 | **THE COURT:**  I'm going to allow the question. |
| 4:39PM | 7 | Overruled. |
| 4:39PM | 8 | **THE WITNESS:**  I thought that -- I believe that there |
| 4:39PM | 9 | was a total follow-up for ten years, not of any individual |
| 4:40PM | 10 | patient but it was a ten-year follow-up study. |
| 4:40PM | 11 | BY MR. NOLEN: |
| 4:40PM | 12 | **Q.**   In any of the documentation or data that you have reviewed |
| 4:40PM | 13 | in this case, have you ever seen that TAX 316, the final |
| 4:40PM | 14 | results was withdrawn by Sanofi? |
| 4:40PM | 15 | **A.**   No, the final results were submitted by Sanofi. |
| 4:40PM | 16 | **Q.**   And have been resubmitted; is that correct? |
| 4:40PM | 17 | **A.**   Yes.  In multiple -- I believe that is correct.  There was |
| 4:40PM | 18 | more than one source relied on. |
| 4:40PM | 19 | **Q.**   Different indications, 316 -- |
| 4:40PM | 20 | **A.**   I would have to double-check that.  I don't want to -- I |
| 4:40PM | 21 | want to be sure.  It was certainly -- the final study report |
| 4:40PM | 22 | was certainly submitted as -- in that form that had the 29 and |
| 4:40PM | 23 | the 16. |
| 4:40PM | 24 | **MR. NOLEN:**  Thank you, Doctor. |
| 4:41PM | 25 | **THE COURT:**  Please call your next witness. |

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 4:41PM | 1 | **THE WITNESS:**  Could I have a minute to -- |
| 4:41PM | 2 | **MR. STRONGMAN:**  Your Honor, may we approach? |
| 4:41PM | 3 | (WHEREUPON, the following proceedings were held at |
| 4:41PM | 4 | the bench.) |
| 4:41PM | 5 | **MS. SASTRE:**  Before we get to the next witness, could |
| 4:41PM | 6 | we raise an issue with regard to Dr. Kessler before he's |
| 4:41PM | 7 | excused.  And it could be Mr. Strongman, if the Court would |
| 4:41PM | 8 | prefer. |
| 4:41PM | 9 | **THE COURT:**  Uh-huh.  That's fine.  That's fine. |
| 4:41PM | 10 | **MR. COFFIN:**  I missed the question. |
| 4:41PM | 11 | **MR. STRONGMAN:**  The issue is we've tiptoed the line |
| 4:41PM | 12 | on the 2004 label change, and I understand -- or the |
| 4:41PM | 13 | strike-through.  The strike-through. |
| 4:41PM | 14 | So we did not get into that after talking with |
| 4:41PM | 15 | Your Honor.  We believe it would at least be appropriate for |
| 4:41PM | 16 | Dr. Kessler, outside the presence of jury, at some point to |
| 4:42PM | 17 | proffer just on what his testimony would be on that. |
| 4:42PM | 18 | **THE COURT:**  That's fine. |
| 4:42PM | 19 | **MR. STRONGMAN:**  That's all. |
| 4:42PM | 20 | **MS. SASTRE:**  Thank you, Your Honor. |
| 4:42PM | 21 | **MR. COFFIN:**  What do you want to do about -- |
| 4:42PM | 22 | **THE COURT:**  How long -- do you have a video? |
| 4:42PM | 23 | **MS. MENZIES:**  We have a live witness.  She's 30 to 40 |
| 4:42PM | 24 | minutes with me. |
| 4:42PM | 25 | **THE COURT:**  Let me tell you, you all are going to run |

| | | |
|---|---|---|
| 4:42PM | 1 | out of time.  You all will be out of time limits. |
| 4:42PM | 2 | MS. MENZIES:  The witness is Ms. Avila, the sales |
| 4:42PM | 3 | rep. |
| 4:42PM | 4 | THE COURT:  I understand, but they're going to have |
| 4:42PM | 5 | time.  Do you want to take her and have her back for cross |
| 4:42PM | 6 | tomorrow morning? |
| 4:42PM | 7 | MS. SASTRE:  I think -- |
| 4:42PM | 8 | MR. COFFIN:  It's a quarter to 5:00.  So if we start |
| 4:42PM | 9 | now, she's going to have to come back tomorrow anyway. |
| 4:42PM | 10 | THE COURT:  I understand that.  I do.  I'm going to |
| 4:42PM | 11 | be here for the next month, so it doesn't matter to me.  But |
| 4:43PM | 12 | you guys wanted time.  You had me tell this jury it was two |
| 4:43PM | 13 | weeks. |
| 4:43PM | 14 | MR. COFFIN:  We're going to fit it within our time |
| 4:43PM | 15 | period.  We're going to do it because you told us to. |
| 4:43PM | 16 | THE COURT:  All right. |
| 4:43PM | 17 | MS. SASTRE:  Your Honor, can we make sure Dr. Kessler |
| 4:43PM | 18 | doesn't leave? |
| 4:43PM | 19 | (WHEREUPON, the following proceedings were held in |
| 4:43PM | 20 | open court.) |
| 4:43PM | 21 | THE COURT:  Dr. Kessler, could I get you to just sit |
| 4:43PM | 22 | tight, please.  Okay. |
| 4:43PM | 23 | (WHEREUPON, the following proceedings were held at |
| 4:43PM | 24 | the bench.) |
| 4:43PM | 25 | Okay.  I'm going to let him go early.  Okay. |

OFFICIAL TRANSCRIPT

4:43PM   1   I'm going to excuse the jury for the day.

4:43PM   2          MS. MENZIES:  The question is, I don't know how long

4:43PM   3   they're going to be with her.  If we could get her done by

4:43PM   4   5:30, I don't know if that's -- I can tell you she would rather

4:43PM   5   go, I just don't know how long.

4:43PM   6          THE COURT:  I understand.  But I was told yesterday

4:43PM   7   that if you're going to take half an hour, they're going to

4:43PM   8   take at least as much time.

4:43PM   9          MS. MENZIES:  Is that for her too?

4:43PM   10         THE COURT:  I wouldn't mind keeping the jury here

4:43PM   11  until 5:20, but if you're pushing 6:00, some of these people

4:43PM   12  are traveling.

4:43PM   13         MS. MENZIES:  I understand.

4:44PM   14         THE COURT:  Including one from Napoleonville.

4:44PM   15         MS. MENZIES:  So we'll have to put her up very first

4:44PM   16  thing.

4:44PM   17         THE COURT:  Okay.

4:44PM   18         MS. MENZIES:  Thank you, Your Honor.

4:44PM   19         (WHEREUPON, the following proceedings were held in

4:44PM   20  open court.)

4:44PM   21         THE COURT:  All right.  Members of the jury, we're

4:44PM   22  going to have to recess just a little bit early again today.

4:44PM   23         So court will be at recess until 8:30 a.m.

4:44PM   24  tomorrow morning.  Let me remind you, you should not discuss

4:44PM   25  this case amongst yourselves or with anyone else.  When you

OFFICIAL TRANSCRIPT

|   |   |
|---|---|
| 4:44PM | 1 |
| 4:44PM | 2 |
| 4:44PM | 3 |
| 4:44PM | 4 |
| 4:44PM | 5 |
| 4:44PM | 6 |
| 4:44PM | 7 |
| 4:44PM | 8 |
| 4:44PM | 9 |
| 4:44PM | 10 |
| 4:44PM | 11 |
| 4:45PM | 12 |
| 4:45PM | 13 |
| 4:45PM | 14 |
| 4:45PM | 15 |
| 4:45PM | 16 |
| 4:45PM | 17 |
| 4:45PM | 18 |
| 4:45PM | 19 |
| 4:45PM | 20 |
| 4:45PM | 21 |
| 4:45PM | 22 |
| 4:45PM | 23 |
| 4:45PM | 24 |
| 4:45PM | 25 |

1  arrive tomorrow morning, please go directly to the jury room.

2  I think Aaron's probably going to have coffee for you.

3            In any event, please leave your tablets on your

4  chairs.  They will not be disturbed and they will be maintained

5  by my staff.

6            With that, court's at recess until 8:30 tomorrow

7  morning.

8            MR. MOORE:  Your Honor, before you excuse the jury.

9            THE COURT:  Wait just a minute.

10            (WHEREUPON, the following proceedings were held at

11  the bench.)

12            MR. MOORE:  It was mentioned that the instruction is

13  to instruct the jurors not to do any research about --

14            THE COURT:  Oh, I told them that.

15            (WHEREUPON, the following proceedings were held in

16  open court.)

17            THE COURT:  As you know -- I'm going to admonish you

18  again that there should be no research at all on any topics

19  covered during the course of this trial.  I know I gave that

20  instruction to you when we started.  Please understand that

21  that should be a part of your instruction from the Court and

22  order from the Court during the pendency of this trial.

23            Thank you.  Court's at recess until 8:30

24  tomorrow morning.

25            THE DEPUTY CLERK:  All rise.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 4:45PM | 1 | (WHEREUPON, the jury exited the courtroom.) |
| 4:46PM | 2 | **THE COURT:**  Dr. Kessler, I believe that there is -- |
| 4:46PM | 3 | the Sanofi attorneys wish to make a proffer, and I'm going to |
| 4:46PM | 4 | allow that at this time.  And I probably need to meet with |
| 4:46PM | 5 | counsel in my chambers. |
| 4:46PM | 6 | How long is it going to be? |
| 4:46PM | 7 | **MR. STRONGMAN:**  I just really need to walk through |
| 4:46PM | 8 | three documents with him. |
| 4:46PM | 9 | **THE COURT:**  Okay.  That's fine. |
| 4:46PM | 10 | **MR. COFFIN:**  Your Honor, before Mr. Strongman starts. |
| 4:46PM | 11 | Do you want us to put on the record our objection to the strike |
| 4:46PM | 12 | through again, or do you want to just go forward with it? |
| 4:46PM | 13 | **THE COURT:**  I think I already sustained your |
| 4:46PM | 14 | objection.  I don't know how many times we need to do that. |
| 4:46PM | 15 | **MR. COFFIN:**  Thank you, Your Honor. |
| 4:46PM | 16 | **THE COURT:**  But, Mr. Strongman -- but I do want to |
| 4:46PM | 17 | have a conversation about some other things, but I know |
| 4:46PM | 18 | Mr. Strongman will want to be there.  So I'll go in my office |
| 4:46PM | 19 | when you all finish. |
| 4:47PM | 20 | **MR. COFFIN:**  Your Honor, one more thing we just were |
| 4:47PM | 21 | talking about.  They're going to proffer this.  Can we proffer |
| 4:47PM | 22 | some testimony on the submissions that have been made in 2019 |
| 4:47PM | 23 | and the labeling that's -- that currently exists? |
| 4:47PM | 24 | **MR. MICELI:**  Since 2011.  They've never changed the |
| 4:47PM | 25 | 29, and then they -- now put before the jury, Mr. Strongman |

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

| | | |
|---|---|---|
| 4:47PM | 1 | handwrote Dr. Kopreski's analysis for the jury.  And that's |
| 4:47PM | 2 | never been put before, never been submitted to the FDA.  And |
| 4:47PM | 3 | they've opened the door throughout Mr. Strongman's |
| 4:47PM | 4 | cross-examination.  We want to make a proffer of our own. |
| 4:47PM | 5 | THE COURT:  You can proffer whatever you want. |
| 4:47PM | 6 | MR. MICELI:  Thank you, Your Honor. |
| 4:47PM | 7 | THE COURT:  I'm not sitting in the courtroom.  I'm |
| 4:47PM | 8 | just -- do what you want, but I'm a little bit at a loss as to |
| 4:48PM | 9 | what your objection is.  But we can talk about that later. |
| 4:48PM | 10 | Make your proffer. |
| 4:48PM | 11 | MR. MICELI:  Thank you. |
| 10:32AM | 12 | PROFFER NO. 1 |
| 4:48PM | 13 | EXAMINATION |
| 4:48PM | 14 | BY MR. STRONGMAN: |
| 4:48PM | 15 | Q.   All right.  Dr. Kessler, we'll be quick.  I'm going to |
| 4:48PM | 16 | hand you Defendants' Exhibit 76.  And Defendants' Exhibit 76 is |
| 4:48PM | 17 | an e-mail from a Michael Rozycki to Ann Staten at the FDA; is |
| 4:48PM | 18 | that correct? |
| 4:48PM | 19 | A.   Correct. |
| 4:48PM | 20 | Q.   And included in the data -- this is June 23rd, 2004; is |
| 4:48PM | 21 | that correct? |
| 4:48PM | 22 | A.   Correct. |
| 4:48PM | 23 | Q.   And included with this e-mail is proposed labeling going |
| 4:49PM | 24 | from Sanofi to the FDA; correct? |
| 4:49PM | 25 | A.   Let me just -- let me just read this.  Proposed change |

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:49PM  1   in -- proposed change in text.

4:49PM  2   Q.   Yes.  So it's an e-mail from Mr. Rozycki to

4:49PM  3   Commander Staten at the FDA with a proposed label attached;

4:49PM  4   fair?

4:49PM  5   A.   Correct.

4:49PM  6   Q.   Okay.  And if you just could turn with me quick to page 29

4:49PM  7   of the label.  It has a number at the bottom, Sanofi 000355231.

4:49PM  8        Do you see that?

4:49PM  9   A.   Yes, I do.

4:49PM  10  Q.   Okay.  And on this page, there's a section entitled "Other

4:49PM  11  Persistent Reactions."  Do you see that?

4:49PM  12  A.   I see that.

4:49PM  13  Q.   And it states that "The following events were observed to

4:50PM  14  be ongoing in TAC-treated patients at the median follow-up time

4:50PM  15  of 55 months."  And it includes "alopecia (22 out of 687)."

4:50PM  16        Do you see that?

4:50PM  17  A.   I see that.

4:50PM  18  Q.   And then it includes various other adverse persistent

4:50PM  19  reactions as well; is that correct?

4:50PM  20  A.   Correct.

4:50PM  21  Q.   And that's Defense Exhibit 76.

4:50PM  22  A.   I see that.

4:50PM  23  Q.   And I'm going to also hand you Defense 102.  And this is

4:50PM  24  an e-mail back from Ann Staten, if I pronounced that right, on

4:50PM  25  August 11th, 2004.  Is that correct?

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

| | | |
|---|---|---|
| 4:50PM | 1 | **A.**   I see that. |
| 4:50PM | 2 | **Q.**   And so this is coming from the FDA, Commander Staten at |
| 4:50PM | 3 | the FDA; correct? |
| 4:50PM | 4 | **A.**   Correct. |
| 4:50PM | 5 | **Q.**   And in it, there are -- it says, "Here's the FDA draft of |
| 4:51PM | 6 | the package insert and labeling review comments." |
| 4:51PM | 7 | Do you see that? |
| 4:51PM | 8 | **A.**   Correct. |
| 4:51PM | 9 | **Q.**   And then if you'll turn to page 33 of the attached label, |
| 4:51PM | 10 | Sanofi Number 00548512.  Are you with me? |
| 4:51PM | 11 | **A.**   I see that. |
| 4:51PM | 12 | **Q.**   Okay.  And the "Other Persistent Reactions" section, do |
| 4:51PM | 13 | you see it there? |
| 4:51PM | 14 | **A.**   I see that. |
| 4:51PM | 15 | **Q.**   And you see that it is struck through? |
| 4:51PM | 16 | **A.**   I see that. |
| 4:51PM | 17 | **Q.**   And you understand how track changes work, that a strike |
| 4:51PM | 18 | through means it has been proposed to be deleted; is that |
| 4:51PM | 19 | correct? |
| 4:51PM | 20 | **A.**   There are caveats.  For example, you got to understand the |
| 4:51PM | 21 | context of this.  If you go to the last page, for example, it |
| 4:51PM | 22 | gives you also information.  So I become very nervous on track |
| 4:52PM | 23 | changes in black and white.  When I see it initialed, I'm |
| 4:52PM | 24 | very -- I'm much happier. |
| 4:52PM | 25 | So the answer is yes, I know how track changes work, |

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:52PM 1    to your question.

4:52PM 2    Q.   Very good.

4:52PM 3         And so you can just see a simple question in

4:52PM 4    Exhibit 102, the language was struck in that -- in that

4:52PM 5    document; correct?

4:52PM 6    A.   I see -- I see cross-outs in that document.

4:52PM 7    Q.   Fair enough.  I'm going to hand you Defendants'

4:52PM 8    Exhibit 272.

4:52PM 9    A.   Does yours have the answer in it?

4:53PM 10   Q.   So I hand you Defense Exhibit 272, which is a color

4:53PM 11   version of the track changes.  Do you see that it has color in

4:53PM 12   the document?

4:53PM 13   A.   I do.

4:53PM 14   Q.   Okay.  And if you will flip to page 30.

4:53PM 15   A.   Wait a second.  So this is -- just to orient me.  This is

4:53PM 16   the same document you're saying as the prior?

4:53PM 17   Q.   Correct.  But it has -- do you know what native format is?

4:53PM 18   A.   I do.

4:53PM 19   Q.   Yeah.  So that was in native, so you can see the color.

4:53PM 20   And you can see the actual changes and who made them.

4:53PM 21   A.   You can see initials next to it.

4:53PM 22   Q.   Correct.

4:53PM 23   A.   Okay.

4:53PM 24   Q.   And if you could turn to page 30 with me.

4:53PM 25   A.   Yes.

DAVID KESSLER - EXAMINATION

4:53PM   1   **Q.**   And you can see on the right-hand side, there's a bunch

4:53PM   2   of -- you know, there's a red and then the blues.  There's a

4:53PM   3   bunch of different changes there.

4:53PM   4         Do you see those?

4:53PM   5   **A.**   Under "Acute Myeloid Leukemia," is that what we're

4:53PM   6   reading?

4:53PM   7   **Q.**   I am just saying you can see that there's changes.  You

4:53PM   8   see on the right-hand side column.  You know how they kind of

4:53PM   9   show who did what over there?

4:53PM  10   **A.**   Good old Microsoft Word, right.

4:54PM  11   **Q.**   Yes.  So if you could just look with me at the bottom of

4:54PM  12   that right-hand column, there is a "Staten, A., deleted other

4:54PM  13   persistent reactions."  And then it shows the text of what was

4:54PM  14   deleted over there in that right-hand column.  I know it's

4:54PM  15   small, but can you see that?

4:54PM  16   **A.**   I can see that, sir.

4:54PM  17   **Q.**   Okay.  And so what you can tell from Exhibit No. 272 is

4:54PM  18   that who, in fact, deleted the other persistent reactions was

4:54PM  19   Staten, S-T-A-T-E-N-A; correct?

4:54PM  20   **A.**   The document says exactly what the document says.

4:54PM  21   **Q.**   Very good.

4:54PM  22         Doctor, you would agree that if the FDA offered

4:54PM  23   suggestions, it was at least reasonable for Sanofi to entertain

4:54PM  24   them in general?

4:54PM  25   **A.**   Your favorite words, "general."

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:54PM  1        No, I don't think that would be a fair representation

4:55PM  2   to -- if FDA did something for formatting, I think, and took

4:55PM  3   out an important -- important information, you would --

4:55PM  4   especially with the last footnote -- the footnote in the last

4:55PM  5   page, that it was done to be consistent with the lung cancer

4:55PM  6   indications, it would not be reasonable to leave that

4:55PM  7   information out and not raise it with the agency.

4:55PM  8   Q.   Okay.  And, Doctor, the last couple of questions.

4:55PM  9        So we can agree that Sanofi proposed to the FDA

4:55PM  10  language that included 55-month data on persistent reactions;

4:55PM  11  correct?

4:55PM  12  A.   Documents speak for themselves.

4:55PM  13  Q.   Very good.  And that based on the documents, there were

4:55PM  14  strikeouts that have Ann Staten's initials next to them;

4:55PM  15  correct?

4:55PM  16  A.   The document say what the documents say.

4:55PM  17  Q.   Thank you.  I appreciate your time, Doctor.

4:56PM  18       MR. STRONGMAN:  Doctor, may I approach and just get

4:56PM  19  those.  Thank you.

4:56PM  20       MR. NOLEN:  At this time, the plaintiffs are going to

4:56PM  21  make their own proffer regarding the Kopreski reanalysis.

4:56PM  22       MR. MICELI:  It will be a little more limited than

4:56PM  23  that.

        24

        25

DAVID KESSLER - EXAMINATION

<u>**PROFFER NO. 2**</u>

**EXAMINATION**

BY MR. MICELI

**Q.**   Dr. Kessler, David Miceli.  We met before.  And I just have a couple of questions.

You were questioned earlier today, this morning or this afternoon, I think, or perhaps both, about the 2010 label?

**A.**   I was.

**Q.**   And you were asked whether or not that label contained any warning language concerning permanent alopecia, were you?

**A.**   I was.

**Q.**   Okay.  I'm going to show you -- I'm going to have to mark this separately now because this is not an exhibit on the exhibit list, but we can mark it.

Page 24 is where we're going to go.

Dr. Kessler, I've handed you the 2019 -- or can you identify this for me?

**A.**   This is a revised label of June 2019 for Taxotere.

**Q.**   Okay.  Can you turn with me to pages 21 -- or excuse me, 23.  And you see there's a -- actually if you will flip back to page 21 just to identify the section we're in.  We're in the section concerning TAX 316.

And then on 23 --

**A.**   Hold on.  Let me -- I apologize, Counselor.  Just give me one second.

DAVID KESSLER - EXAMINATION

4:57PM 1        Where is the heading?  Just show me the heading.
4:58PM 2   Take me back.
4:58PM 3   **Q.**   Sure.  There's a table 6 on page 21.
4:58PM 4   **A.**   I see that.  I assume we are in Section 6; is that
4:58PM 5   correct?
4:58PM 6   **Q.**   Yes.
4:58PM 7   **A.**   We're in Section 6 of the label "In the Clinical Trial and
4:58PM 8   the Post-Marketing Surveillance."
4:58PM 9   **Q.**   Yes.
4:58PM 10        "Clinically Important Treatment-Emergent Adverse
4:58PM 11  Reactions Regardless of Causal Relationship in Patients
4:58PM 12  Receiving Taxotere in Combination with Doxorubicin and
4:58PM 13  Cyclophosphamide (TAX 316)."
4:58PM 14  **A.**   I see table 6.
4:58PM 15  **Q.**   Okay.  If you flip through to page 24, the first full
4:58PM 16  paragraph, do you see that just above the "Acute Myeloid
4:58PM 17  Leukemia"?
4:58PM 18  **A.**   Yes, sir.
4:58PM 19  **Q.**   Okay.  And the last sentence it says, "Referring to
4:58PM 20  TAX 316, at the end of the follow-up period, actual mean
4:58PM 21  follow-up time of eight years, asthenia was observed to be
4:58PM 22  ongoing in 29 patients" -- excuse me, that's the wrong section.
4:59PM 23  I'm looking at the -- I was right, on 23.
4:59PM 24        The -- at the -- under the "Skin and Subcutaneous
4:59PM 25  Reaction" section, sentence starts "At the end of the follow-up

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

4:59PM 1    period, actual median follow-up time of eight years, alopecia

4:59PM 2    was observed to be ongoing in 29 TAC patients, 3.9 percent, and

4:59PM 3    16 FAC patients, 2.2 percent."

4:59PM 4            Do you see that?

4:59PM 5    A.   Yes.

4:59PM 6    Q.   Now, is there any reason -- if that information was in the

4:59PM 7    possession -- well, let me strike that.

4:59PM 8            Does that address warning language concerning

4:59PM 9    alopecia that persists beyond either -- we can use any time,

4:59PM 10   six months to two years?

4:59PM 11   A.   Could you restate the question.  I apologize.

4:59PM 12   Q.   Sure.  Let me ask it differently.

4:59PM 13           Does the -- does the language on page 23 that we just

4:59PM 14   read together decrease the duration of alopecia, persisting

5:00PM 15   alopecia?

5:00PM 16   A.   It simply says, "At the end of follow-up period."  And the

5:00PM 17   follow-up median was eight years, median follow-up.

5:00PM 18   Q.   Okay.

5:00PM 19   A.   That's the information contained in that sentence.

5:00PM 20   Q.   And you looked at the clinical study report earlier today

5:00PM 21   where the follow-up period was a ten-year follow-up?

5:00PM 22   A.   Overall.

5:00PM 23   Q.   And this says a median follow-up period of eight years;

5:00PM 24   correct?

5:00PM 25   A.   That was a median for -- yes.

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

| | | |
|---|---|---|
| 5:00PM | 1 | **Q.**   And the clinical study report that you reviewed, do you |
| 5:00PM | 2 | recall what year it was completed? |
| 5:00PM | 3 | **A.**   2009.  Don't hold me to it exactly, but I think so. |
| 5:00PM | 4 | **Q.**   Okay.  Prior to 2011? |
| 5:00PM | 5 | **A.**   Correct. |
| 5:00PM | 6 | **Q.**   Do you have an opinion as to whether or not this |
| 5:00PM | 7 | information should have been included in a label as least -- at |
| 5:00PM | 8 | least as early as 2010? |
| 5:01PM | 9 | **A.**   It would make sense to do that. |
| 5:01PM | 10 |         MR. MICELI:  Thank you.  Excuse me, Doctor. |
| 5:01PM | 11 | **BY MR. MICELI:** |
| 5:01PM | 12 | **Q.**   And, Dr. Kessler, you were just asked momentarily -- a |
| 5:01PM | 13 | moment ago about some strike-throughs in e-mail in 2004. |
| 5:01PM | 14 |         Do you recall that? |
| 5:01PM | 15 | **A.**   I do. |
| 5:01PM | 16 | **Q.**   And is a strike-through of an e-mail the type of action |
| 5:01PM | 17 | that represents official final action of the FDA? |
| 5:01PM | 18 | **A.**   It calls for a legal conclusion. |
| 5:01PM | 19 |         I don't mean to be -- official agency action, is that |
| 5:01PM | 20 | what you're asking me? |
| 5:01PM | 21 | **Q.**   Well, final determination, is that how you -- the FDA -- |
| 5:01PM | 22 | excuse me. |
| 5:01PM | 23 |         Is that how the FDA communicates its final regulatory |
| 5:01PM | 24 | decision on a label change? |
| 5:02PM | 25 | **A.**   Let me see if I can -- |

OFFICIAL TRANSCRIPT

DAVID KESSLER - EXAMINATION

| | | |
|---|---|---|
| 5:02PM | 1 | **Q.**   Excuse me.  I withdraw the question. |
| 5:02PM | 2 | Is any -- is the approval of any label, initial |
| 5:02PM | 3 | approval of a label, approval for all purposes for all times |
| 5:02PM | 4 | including safety? |
| 5:02PM | 5 | **A.**   Of course not. |
| 5:02PM | 6 | **Q.**   And are supplemental labels that are approved, does that |
| 5:02PM | 7 | mean that they are for all purposes, including safety, and for |
| 5:02PM | 8 | all time going forward? |
| 5:02PM | 9 | **A.**   No, of course not. |
| 5:02PM | 10 | **Q.**   Okay. |
| 5:02PM | 11 | MR. MICELI:  That's all I have.  Thank you. |
| 5:02PM | 12 | THE WITNESS:  Am I excused? |
| 5:02PM | 13 | MR. NOLEN:  Yes, Dr. Kessler, you are. |
| 5:03PM | 14 | THE COURT:  Thank you. |
| 5:03PM | 15 | THE WITNESS:  Thank you, Your Honor. |
| 5:03PM | 16 | THE COURT:  All right.  Thank you. |
| 5:03PM | 17 | I figured while you were in here, I would clean |
| 5:03PM | 18 | up my spot, my work space, but I need to talk to counsel.  We |
| 5:03PM | 19 | can go -- I don't know how many of you that need -- necessarily |
| 5:03PM | 20 | there needs to be. |
| 5:04PM | 21 | I do want lead counsel, and I'm going to have a |
| 5:04PM | 22 | conversation with lead counsel.  But part of the problem is we |
| 5:04PM | 23 | got trial by committee on the plaintiff's side, and that's |
| 5:04PM | 24 | creating, in my humble opinion, an issue.  Because it's just |
| 5:04PM | 25 | too much and it's become problematic because I never know -- |

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 5:04PM | 1 | I'm not dealing with the person that's taking the witness. |
| 5:04PM | 2 | It's other people that are coming up.  And it's creating -- I |
| 5:04PM | 3 | mean, you can do what you want to do, but it's creating a |
| 5:04PM | 4 | problem. |
| 5:04PM | 5 | And I feel like I'm saying things and I am |
| 5:05PM | 6 | issuing -- I have a bench conference and I say something, and |
| 5:05PM | 7 | everybody else is involving themselves in a ruling that they |
| 5:05PM | 8 | weren't privy to.  And it's just -- so if there's a way to fix |
| 5:05PM | 9 | it, I think you all need to do that. |
| 5:05PM | 10 | MR. COFFIN:  We can do that. |
| 5:05PM | 11 | THE COURT:  Okay.  I think that's a really good idea. |
| 5:05PM | 12 | All right.  I'd like to speak to lead counsel. |
| 5:05PM | 13 | Let me see where we are.  And we can just do that in my office. |
| 5:06PM | 14 | (WHEREUPON, the proceedings were concluded.) |
| 5:06PM | 15 | ***** |
| 5:06PM | 16 | **CERTIFICATE** |
| 5:06PM | 17 | I, Jodi Simcox, RMR, FCRR, Official Court Reporter |
| 5:06PM | 18 | for the United States District Court, Eastern District of |
| 5:06PM | 19 | Louisiana, do hereby certify that the foregoing is a true and |
| 5:06PM | 20 | correct transcript, to the best of my ability and |
| 5:06PM | 21 | understanding, from the record of the proceedings in the |
| 5:06PM | 22 | above-entitled and numbered matter. |
| 5:06PM | 23 | |
| 5:06PM | | |
| 5:06PM | 24 | *s/Jodi Simcox, RMR, FCRR* |
| 5:06PM | | Jodi Simcox, RMR, FCRR |
| | | Official Court Reporter |
| | 25 | |

OFFICIAL TRANSCRIPT