# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL No. 2740 |
| | Section: N(5) |
| This Document Relates to: *Wanda Stewart v. Sandoz Inc.* Civil Case No. 17-cv-10817 | JUDGE JANE TRICHE MILAZZO |
| | MAG. JUDGE NORTH |

## DEFENDANT SANDOZ INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE SELECT OPINIONS OF DEFENSE EXPERTS EDWARD HEILMAN, M.D., NICOLE ROGERS, M.D., AND ELGIDA VOLPICELLI, M.D.

**GREENBERG TRAURIG, LLP**
Lori G. Cohen
R. Clifton Merrell
Evan C. Holden
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100

*Counsel for Defendant Sandoz Inc.*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................ 1

APPLICABLE LEGAL STANDARD .......................................................................... 2

ARGUMENT ............................................................................................................... 3

    I.     DR. HEILMAN IS WELL QUALIFIED AND APPLIED A RELIABLE METHODOLOGY. .......................................................................................... 3

          A.      Dr. Heilman Is Exceedingly Qualified to Opine on Specific Causation.................................................................................... 3
          B.      Dr. Heilman Applied a Reliable Methodology. ...................................... 10

    II.    DR. ROGERS IS WELL QUALIFIED AND APPLIED A RELIABLE METHODOLOGY. .......................................................................................... 12

          A.      Dr. Rogers Is Exceedingly Qualified to Opine on Specific Causation.................................................................................... 12
          B.      Dr. Rogers Applied a Reliable Methodology. .......................................... 16

    III.   DR. VOLPICELLI IS WELL QUALIFIED AND APPLIED A RELIABLE METHODOLOGY. .......................................................................................... 19

          A.      Dr. Volpicelli Is Exceedingly Qualified to Opine on Specific Causation.................................................................................... 19
          B.      Dr. Volpicelli Applied a Reliable Methodology...................................... 23

CONCLUSION............................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Plambeck*,
    802 F.3d 665 (5th Cir. 2015) ...................................................................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................................................3

*Houston-New Orleans, Inc. v. Page Eng'r Co.*,
    353 F. Supp. 890 (E.D. La. 1972)..........................................................................10

*Wagoner v. Exxon Mobil Corp.*,
    813 F. Supp. 2d 771 (E.D. La. 2011).......................................................3, 4, 7, 21

*Weber v. Fidelity & Cas. Ins.*,
    250 So. 2d 754 (La. 1971) .....................................................................................10

*In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*,
    No. MDL 2592, 2017 WL 1352860 (E.D. La. Apr. 13, 2017)...........................7, 21

**Other Authorities**

Fed. R. Evid. 702 .............................................................................................................2, 3

Defendant Sandoz Inc. ("Sandoz") submits this Opposition to Plaintiff's Motion to Exclude Select Opinions of Defense Experts Edward Heilman, M.D., Nicole Rogers, M.D., and Elgida Volpicelli, M.D. (Doc. No. 11569, the "Motion"). For the reasons set forth below, Plaintiff's Motion, which is entirely unsupported and accompanied only by a flimsy, ***8-page brief*** (Doc. No. 11569-1, "Pl.'s Br."), should be denied, and Sandoz's experts should be allowed to offer their opinions to help the jury decide the complex hair loss-related issues in this case.

## **BACKGROUND**

Sandoz has had three well-credentialed and experienced dermatologists and/or dermatopathologists, Drs. Edward Heilman, Nicole Rogers, and Elgida Volpicelli—each of whom specializes in the diagnosis of hair loss—review Plaintiff Wanda Stewart's ("Plaintiff") case. Each of these experts conducted a detailed analysis of this case, which included, among other things, analyzing all of the relevant medical and scientific literature, all of Plaintiff's medical records and photographs, transcripts of all depositions taken in this case, and the Plaintiff Fact Sheets and other written discovery responses and documents produced. Dr. Rogers also met in person with Plaintiff and conducted a thorough independent medical examination, and both Dr. Heilman and Dr. Volpicelli independently examined Plaintiff's biopsy specimens and performed additional cuts of the biopsy samples to ensure a complete and accurate assessment of her case. Each of these experts independently reached the same conclusion: Plaintiff's alleged hair loss was not caused by Sandoz's docetaxel and, instead, is a textbook example of Central Centrifugal Cicatricial Alopecia ("CCCA") combined with androgenetic alopecia (female pattern hair loss), and has features consistent with endocrine therapy-induced alopecia and traction alopecia as well.

Plaintiff now moves to exclude these experts' opinions on specific causation—i.e., what caused Plaintiff's alleged hair loss and whether it was caused by persistent chemotherapy-

1

induced alopecia (hereinafter, "PCIA"[1]) and, specifically, docetaxel. (*See* Pl.'s Br., p. 1.) But Plaintiff lacks any reasonable basis whatsoever for seeking to exclude their opinions. Plaintiff instead submits a paltry, disjointed, 8-page brief—with only roughly 1 page devoted to each expert—making vague and, at times, confusing assertions regarding these experts' qualifications and the methodologies they employed in reaching their opinions on PCIA. (*See id.* at pp. 3–8.) Plaintiff's Motion entirely ignores the detailed expert reports and deposition testimony of Drs. Heilman, Rogers, and Volpicelli describing their extensive education, training, and experience in the fields of dermatology and dermatopathology and, in particular, their focus on hair-related conditions, including PCIA. Instead, Plaintiff plucks out isolated statements from these experts' reports or testimony that she believes could suggest, when taken out of context, that these experts are not sufficiently familiar with PCIA to render an opinion, and she relies solely on those cherry-picked, misleading statements to support her entire Motion.

As set forth below, Drs. Heilman, Rogers, and Volpicelli are experts in hair loss dermatology and/or dermatopathology, and each relies on their education, research, training, and experience in forming their specific causation opinions regarding PCIA in Plaintiff's case. They are well qualified, their methodologies are sound and based on an abundance of data, and their opinions are reliable and will assist the jury. Plaintiff's half-baked attempt to exclude their specific causation opinions because they are damaging to her case should therefore be denied.

## APPLICABLE LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may offer their opinions in a case if (i) their

---

[1] Sandoz uses this term and the related abbreviation for ease of reference, as it is used in Plaintiff's Motion and was used by her counsel at the depositions of these experts; however, in doing so, Sandoz does not concede in any way that hair loss following chemotherapy is permanent or persistent or is necessarily caused by chemotherapy itself as opposed to some other factor.

"scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (ii) "the testimony is based on sufficient facts or data"; (iii) "the testimony is the product of reliable principles and methods"; and (iv) "the expert has reliably applied the principles and methods to the facts of the case." Rule 702 "embodies a liberal policy towards qualification as an expert. . . . One can have the requisite qualifications to provide expert testimony by virtue of knowledge, skill experience, training or education." *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011) (internal quotation marks omitted) (citations omitted); *see also Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 678 (5th Cir. 2015) ("[A]n expert witness's testimony (and its reliability) may be based on his personal and professional experience and his own observation."). The remaining requirements under Rule 702 also must be applied with the same "'liberal thrust' of the Federal Rules of Evidence and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Wagoner*, 813 F. Supp. 2d at 803 (alterations omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)). To be admissible, "the basic minimum is that there must be some scientific validation of the theory advanced by the expert." *Id.* (citing *Daubert*, 509 U.S. at 593).

## ARGUMENT

### I. DR. HEILMAN IS WELL QUALIFIED AND APPLIED A RELIABLE METHODOLOGY.

#### A. Dr. Heilman Is Exceedingly Qualified to Opine on Specific Causation.

Dr. Heilman is triple board certified in Dermatology, Dermatopathology, and Anatomic Pathology and has practiced medicine for roughly 46 years. (*See* Ex. A (Dr. Heilman Expert Report ("Heilman Rep.")), pp. 1–2 & Exhibit A (Curriculum Vitae).) After medical school, Dr. Heilman completed two residencies in Dermatology at SUNY Downstate Health Sciences University and New York University Medical Center/Bellevue Hospital Medical Center, as well

3

as residencies in Pathology and Anatomic Pathology. (*Id.*) Additionally, Dr. Heilman completed a specialized fellowship in Dermatopathology at New York University Medical Center under the supervision of Dr. A. Bernard Ackerman, "a renowned dermatopathologist who has been described as a 'founding figure of dermatopathology.'" (*Id.*)

Dr. Heilman currently serves as an Attending Physician in Dermatology and Pathology as well as Director of Dermatopathology at Kings County Hospital Center in Brooklyn, New York. (*Id.* at p. 2.) During his many years of practice, Dr. Heilman has developed expertise in diagnosing and treating hair loss of all types, including PCIA, as both a dermatologist in the clinical setting and as a dermatopathologist examining biopsy slides. (*See, e.g.*, Ex. B (Dr. Heilman Deposition Transcript ("Heilman Dep. Tr.")) at 170:9–14.) As Dr. Heilman stated at his deposition, his analysis in this case was informed by the following:

> 3 A. My background, my education, my
> 4 training, the fact that I have a fair amount
> 5 of experience taking care -- well, I really
> 6 have a lot of experience taking care of
> 7 patients with alopecia. I just want to make
> 8 sure that that's clear.
> 9 Because as I told you, I mean,
> 10 in the COVID situation I do see less patients
> 11 now. But pre-COVID, I mean, I would see --
> 12 every time I would have a session, whether it
> 13 was a private practice session or a session
> 14 at the Kings County Hospital where we see a
> 15 great deal of patients, before COVID I would
> 16 see five patients every session at least with
> 17 some kind of alopecia.

(*Id.* 115:3–17.)

In addition, Dr. Heilman serves as a Clinical Professor of Dermatology and Pathology at SUNY Downstate Health Sciences University. (Ex. A, Heilman Rep., p. 2.) He is also Chairman of the Department of Dermatology and Program Director of the Dermatopathology Fellowship

4

Training Program at SUNY Downstate Medical Center. (*Id.*) In these roles, Dr. Heilman routinely lectures fellows and residents on various forms of hair loss, including PCIA, as he explained:

> 16 And in my -- in the course of
> 17 my job and my duty and my mission, I have
> 18 given certain talks to the residents and my
> 19 dermatopathology fellow regarding all kinds
> 20 of alopecias. And obviously included in
> 21 those talks, although it wasn't the most
> 22 important element of my talks, I have
> 23 definitely given short courses on alopecia
> 24 and horizontal sectioning, and I've also
> 1 discussed all forms of alopecia, including
> 2 scarring alopecia and non-scarring alopecia,
> 3 and an issue I touched on the topic of PCIA.
> . . . .
> 20 A. Well, the essential piece is
> 21 that I am -- in my capacity as a clinician
> 22 and in my capacity as a dermatopathologist, I
> 23 both described some of the literature and
> 24 some of the published issues concerning PCIA,
> 1 and most specifically some of the histologic
> 2 criteria that have been also discussed in
> 3 many of the literature articles.

(Heilman Dep. Tr. 12:16–14:3.)

Dr. Heilman further described his experience diagnosing and treating hair loss, as well as teaching on a range of hair loss issues at his deposition:

> 19 [Q.]. . . Describe for
> 20 us, how much experience do you have with hair
> 21 loss and alopecia?
> 22 A. My whole life I've been dealing
> 23 with patients who have had hair loss and
> 24 alopecia, and it's part of my job to not only
> 1 deal with patients, it's part of my job to
> 2 teach everything there is to teach about hair
> 3 loss and alopecia because I'm responsible for
> 4 teaching residents, medical students, and
> 5 fellows.
> 6 And so -- plus, you know, I am

7 an expert in analyzing hair biopsies under
8 the microscope.
9 Q. In addition to that, do you
10 believe you're an expert in the clinical
11 treatment of hair loss and alopecia as well?
12 A. Yes, I am an expert in the
13 clinical diagnosis and treatment of hair
14 loss.
15 Q. And is it something that you
16 treat regularly both as a clinician as well
17 as looking at the pathology of it?
18 A. I see patients regularly in my
19 clinic and at Kings County Hospital clinic
20 that I supervise, and there's a good number
21 of patients who come in with alopecia
22 complaints. And from a histologic point of
23 view, it's stuff I do on a routine basis.
. . . .
17 Q. Thank you.
18 Again, there was some question
19 about how much hair biopsy analysis you do.
20 I just want to be clear, explain to the jury,
21 how much work do you do in the area of hair
22 biopsy analysis?
23 A. Well, nowadays our numbers are
24 quite diminished because of COVID. I would
1 say before COVID I was seeing maybe one or
2 two biopsies every two weeks.
3 Q. Something that you've done --
4 how many years have you been doing hair
5 biopsies?
6 A. 40 years.
7 Would you like to know how many
8 biopsies I've seen in 40 years?
9 Q. Do you have an estimate?
10 A. I have an estimate.
11 Q. And this is of hair loss or --
12 A. No, all biopsies from
13 everywhere.
14 Q. Okay.
15 A. Do you want to know?
16 Q. Sure. Yes.
17 A. 600,000.

(*Id.* 169:19–172:17.)

Dr. Heilman is well versed in the current research and literature on hair loss, including PCIA, and demonstrated his understanding of several key PCIA and hair loss articles at his deposition. (*See generally* Heilman Rep., pp. 20–33 & Ex. B; Heilman Dep. Tr. 17:9–14 (explaining his familiarity with the literature on PCIA); *id.* 88:13–15 (describing his "extensive amount of reading" on PCIA).)

While Plaintiff makes much of the fact that Dr. Heilman has not himself published on PCIA or hair loss (Pl.'s Br., p. 4), that is not required for him to be an expert in this field and does not undermine in his opinions in any way. Indeed, Plaintiff's own designated dermatology and dermatopathology expert, Dr. Vesna Petronic-Rosic, has not published on PCIA either, and stated that publications have nothing to do with experience in this area. (*See* Ex. C, Vesna Petronic-Rosic August 29, 2020 Deposition Transcript, "Rosic Dep. Tr. Vol. I," 91:4–99:9 (identifying no publications on PCIA); *id.* 97:17–20, 98:10–11 ("[Publishing] has nothing to do with my experience in that area. It just has to do with what I published about it. Those are two completely different things. . . . . What I am saying is that doesn't define my expertise.").) Rather, Dr. Heilman's extensive education and experience as a dermatologist and dermatopathologist specializing in the diagnosis of hair loss, and his research on PCIA and hair loss described above, render him more than qualified to offer testimony on whether PCIA is present in Ms. Stewart. *See, e.g.*, *In re Xarelto, (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 1352860, at *5 (E.D. La. Apr. 13, 2017) (expert's reliance on clinical experience, peer-reviewed studies, and labeling was adequate to offer opinion on causation); *Wagoner*, 813 F. Supp. 2d at 800 (expert was qualified based on "education and work experience").

Plaintiff also argues that Dr. Heilman has limited experience with PCIA, and therefore is not qualified, based on Dr. Heilman's testimony that he has diagnosed only one case of PCIA.

(Pl.'s Br., p. 4.) But Plaintiff overlooks the fact that PCIA is an *uncommon* phenomenon—a fact upon which all experts, including Plaintiff's own expert, Dr. Rosic, agree. (*See, e.g.*, Heilman Rep., p. 21 (describing PCIA as "rare"); Ex. D, Expert Report of Vesna Petronic-Rosic, "Rosic Rep.," p. 47 ("[P]ermanent alopecia is uncommon after standard-dose chemotherapy.").) In fact, ***Dr. Rosic herself testified that she could not recall ever including a diagnosis of persistent chemotherapy-induced alopecia or PCIA in a biopsy report at any point in her career***. (*See* Rosic Dep. Tr. Vol. I, 148:18–149:19.) Therefore, it is not surprising that Dr. Heilman has made this diagnosis on only one occasion in his long career diagnosing and treating patients with hair loss. Moreover, that Dr. Heilman has *diagnosed* PCIA only once does not in any way detract from his knowledge about, and experience with, this hair loss entity. Indeed, Dr. Heilman testified that PCIA is something he *regularly considers*, among other possible causes, in his normal review and evaluation of biopsy samples of hair loss patients, even though he has concluded that PCIA actually was present only in one case. (*See* Ex. B., Heilman Dep. Tr. 167:16–169:8.) Thus, Dr. Heilman has abundant experience evaluating patients and biopsies for features of PCIA, even though he has determined that PCIA was in fact present just once.

Plaintiff further attempts to undermine Dr. Heilman's expertise on PCIA by arguing that Dr. Heilman contradicted his mentor and renowned hair-loss dermatopathology expert, Dr. Leonard Sperling, with regard to whether PCIA involves a decrease in or retention of hair follicles. (Pl.'s Br., p. 4.) But Dr. Heilman's report and testimony are entirely consistent with Dr. Sperling's work. Like Dr. Sperling, Dr. Heilman's report lists "[d]ecreased total number of hair follicles" as the first histologic finding typically associated with PCIA. (Heilman Rep., p. 26; *see also id.* at p. 61 (including an image of Dr. Sperling's list of PCIA features); *cf.* Pl.'s Br., p. 4; Doc. No. 11569-5.) Dr. Heilman, however, also discusses in his report a photomicrograph taken

from Dr. Sperling's book, which shows "[a] normal or nearly normal total number of follicles" in a patient with PCIA following treatment with docetaxel. (Heilman Rep., p. 30.) Thus, as Dr. Heilman explained at his deposition, Dr. Sperling's work supports the conclusion, particularly in the setting of treatment with docetaxel, that PCIA is "notorious for having retention of *most* follicles," as Plaintiff cites in her brief (Pl.'s Br., p. 4 (emphasis added) (quoting Heilman Dep. Tr. 72:13–17); *see also* Heilman Dep. Tr. 145:23–146:16), and not the "markedly reduced" or "significantly decreased" number of follicles described by Dr. Rosic (Heilman Dep. Tr. 146:16–147:17; *cf.* Rosic Rep., pp. 50–51). Thus, there is no discrepancy between Dr. Heilman's and Dr. Sperling's explanations of hair follicle count with PCIA, and with docetaxel in particular, and Plaintiff's attempt to create an inconsistency by taking Dr. Heilman's words out of context is erroneous and should be disregarded.

Finally, Plaintiff asserts that "if Dr. Heilman does not believe Plaintiff has PCIA, then he is not qualified to later opine that a specific drug caused her PCIA." (Pl.'s Br., p. 5.) Plaintiff's argument demonstrates a fundamental misunderstanding of Dr. Heilman's opinions in this case. Presumably, the "later" opinion that Plaintiff is referring to here is the opinion cited elsewhere in Plaintiff's brief, in which Dr. Heilman stated:

> In the literature, cases of persistent alopecia have been reported with several other chemotherapy drugs that are frequently used with Taxotere/docetaxel, including Adriamycin (doxorubicin) and Cytoxan (cyclophosphamide), among others, as noted above. As in Ms. Stewart's case, when given in combination with Taxotere or docetaxel, those other drugs cannot be ruled out as the cause of any persistent alopecia that is present.

(*Id.* at pp. 3-4 (citing Heilman Rep., p. 22).) In this portion of his report, Dr. Heilman does not, as Plaintiff suggests, offer the opinion that doxorubicin, cyclophosphamide, or both in fact caused Plaintiff's alleged hair loss. To the contrary, as is laid out clearly in Dr. Heilman's report, Dr. Heilman has concluded based on his extensive review of Plaintiff's case that: (1) Plaintiff

9

does not have PCIA; and (2) even in a case where PCIA cannot be ruled out, it is "virtually impossible" to trace hair loss to docetaxel specifically as opposed to one of the other drugs in a multi-drug anti-cancer regimen. (Heilman Rep., pp. 40, 44, 66; *see also* Heilman Dep. Tr. 163:1–3.) Thus, Plaintiff's attempt to paint these opinions as contradictory and somehow undermining Dr. Heilman's credentials and credibility on the issue of PCIA and specific causation is unpersuasive. And, to the extent Plaintiff tries to flip the burden of proof on its head by suggesting that Dr. Heilman needs to *prove* that doxorubicin and cyclophosphamide are potential alternative causes of her alleged hair loss, that argument also fails because controlling case law permits defense experts to identify "reasonable" alternative causes for Plaintiff's alleged injury (i.e., her hair loss) and places the burden on Plaintiff to *disprove* that each was an actual cause of her hair loss. *See Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F. Supp. 890, 896 (E.D. La. 1972); *Weber v. Fidelity & Cas. Ins.*, 250 So. 2d 754, 757–58 (La. 1971).

**B.      Dr. Heilman Applied a Reliable Methodology.**

Dr. Heilman's report and deposition testimony in this case describe, in detail, his process for thoroughly reviewing, both from a clinical and histological perspective, Plaintiff Wanda Stewart's medical records, deposition testimony of Plaintiff and her family and treating physicians, photographs of Plaintiff from before and after chemotherapy, and other discovery documents and materials provided in this case, as well as the prevailing literature on PCIA and hair loss generally. (*See, e.g.*, Heilman Rep., pp. 40–68 & Ex. B.) Additionally, Dr. Heilman carefully examined two biopsy specimens taken from Plaintiff, which he "viewed . . . in the usual and customary manner by light microscopy," and took several photomicrographs documenting his histological findings at various levels, as he explained in painstaking detail in his report and attachments and at his deposition. (*See, e.g.*, *id.* at pp. 43–67 & Exs. C–D.) Dr. Heilman also reviewed additional biopsy slides from further cuts prepared by Dr. Volpicelli in her lab, and

confirmed that the additional slides only further supported his initial findings. (*Id.* at p. 68 & Exs. C–D.)

Dr. Heilman's report describes his process and bases for concluding that Plaintiff's claimed hair loss is not consistent with PCIA and instead is characteristic of other hair loss types, as follows:

> In determining the causes of Ms. Stewart's hair loss, I performed a differential diagnosis, which is a process of elimination used to rule out potential causes of a patient's condition to determine the most likely cause. This process meets the standard of care for determining the cause of a patient's clinical presentation and symptoms. I perform a differential diagnosis on a daily basis with my patients, and I used that same process and methodology in reaching my opinions in this case.

(*Id.* at p. 41.)

> My . . . opinions are based on a differential diagnosis (including Ms. Stewart's medical history and medications including chemotherapy medications and aromatase inhibitors, genetic, and lifestyle factors), my education, training, knowledge, and experience as a board-certified dermatologist, pathologist, and dermatopathologist, and the materials I've reviewed in this case, and are stated to a reasonable degree of medical probability and/or certainty.

(*Id.* at p. 66.)

Dr. Heilman further confirmed his thorough review and reliable methodology at his deposition:

> 22 Q. Okay. And you've talked today
> 23 quite a bit about your ruling out of PCIA in
> 24 Ms. Stewart. Did you consider her clinical
> 1 history or histopathology and also literature
> 2 in ruling that out?
> 3 A. Absolutely. All of those three
> 4 things were taken into serious consideration.

(Heilman Dep. Tr. 172:22–173:4.)

Although Plaintiff purports to challenge the methodology applied by Dr. Heilman in her Motion, she does not actually make any arguments in this regard. (*See* Pl.'s Br., pp. 3–5.) Nor

can she, because Dr. Heilman's methodology for reaching his specific causation opinions was entirely reliable and thoroughly described in his report and at his deposition.

Dr. Heilman is a leading practitioner and teacher in the fields of hair loss dermatology and dermatopathology, and his opinions on the presence of PCIA in Plaintiff's case are reliable and would assist the jury. Plaintiff's Motion to exclude should be denied.

## II. DR. ROGERS IS WELL QUALIFIED AND APPLIED A RELIABLE METHODOLOGY.

### A. Dr. Rogers Is Exceedingly Qualified to Opine on Specific Causation.

Dr. Rogers is board certified in Dermatology. (*See, e.g.*, Ex. E, "Rogers Rep.," p. 1 & Exhibit A (Curriculum Vitae).) Dr. Rogers has practiced medicine for over 17 years, during which she has specialized in the diagnosis and treatment of hair loss of all types. (*Id.* at p. 2 & Ex. A; *see also* Ex. F, "Rogers Dep. Tr." 211:19–212:7.) After receiving her undergraduate degree from Harvard University and her medical degree from Tulane University School of Medicine, Dr. Rogers completed a residency in Dermatology at Tulane University Health Sciences Center. (Rogers Rep., Ex. A.) She then completed a fellowship in Hair Transplantation and Laser Dermatology through the International Society of Hair Restoration Surgery. (*Id.*) Following her fellowship, Dr. Rogers went into private practice and currently owns and operates her own practice, Hair Restoration of the South, which is located in Metairie, Louisiana, and is "dedicated exclusively to the treatment of hair loss." (Rogers Dep. Tr. 9:15–23; *see also* Rogers Rep., p. 2 & Ex. A.) Dr. Rogers estimates that during her time in practice, she has seen "probably three to 4,000" hair-loss patients. (Rogers Dep. Tr. 212:8–13.)

In addition, Dr. Rogers serves as Assistant Clinical Professor of Dermatology at Tulane University School of Medicine, where she regularly lectures and publishes on alopecia, including its various types, causes, and treatments. (Rogers Rep., p. 2 & Ex. A.) Dr. Rogers also reviews

articles and summarizes literature for some of the leading dermatologic publications, and conducted an extensive review of the literature on hair loss, and specifically PCIA, in connection with her evaluation of this case. (*See id.* at pp. 2, 27–31 & nn. 44–63; Rogers Dep. Tr. 48:20–24, 61:17–22.) Dr. Rogers provided with her expert report an extensive list of the medical and scientific literature and other materials that she specifically considered and relied upon in forming her opinions in this case, including articles on PCIA and the chemotherapy agents associated with it, many of which are also cited and discussed in her report. (Rogers Rep., p. 1 & Ex. B; *see also id.* at pp. 27–31 & nn. 44–63.)

Plaintiff attempts to detract from Dr. Rogers' lengthy experience, research, and specialized practice in hair loss by emphasizing that Dr. Rogers has never diagnosed a patient as having PCIA. (Pl.'s Br., p. 5.) However, as Dr. Rogers explained at her deposition, she has not made a diagnosis of "PCIA" as counsel used that term at the deposition—which was in reference to "permanent" chemotherapy-induced alopecia—because Dr. Rogers has "never been able to make a diagnosis that was -- that the[] [patients'] hair was -- that their hair loss was permanent and that [she] could not improve upon it." (Rogers Dep. Tr. 52:15–18.) The fact that Dr. Rogers has not made a diagnosis of *permanent* chemotherapy-induced alopecia does not mean that she is not familiar with the features of *persistent* alopecia following chemotherapy, or PCIA as it is defined in this brief, from her training and experience and extensive review of the literature, or that she has not considered PCIA as a potential diagnosis in evaluating patients post-chemotherapy. Indeed, Dr. Rogers has, in fact, treated several patients with longstanding or persistent hair loss following chemotherapy. (*Id.* 106:25–107:7.) To the extent Plaintiff may argue these patients have not comprised the majority of Dr. Rogers' practice, that is to be expected given the low incidence of PCIA—indeed, as stated above, even Plaintiff's own expert,

Dr. Rosic, has not found PCIA in any biopsy at any point in her career (*see* Rosic Dep. Tr. Vol. I, 148:18–149:19)—and does not undermine in any way Dr. Rogers' knowledge regarding this potential diagnosis.

Furthermore, contrary to Plaintiff's representations (*see* Pl.'s Br., pp. 5–6), Dr. Rogers clearly identified, both in her report and at her deposition, the common characteristics of PCIA, thus further demonstrating her knowledge regarding and experience with this entity. (Rogers Rep., pp. 30–31 (listing common clinical features of PCIA in a section entitled "Diagnosing Persistent Alopecia Following Chemotherapy"); *id.* at pp. 71–72 (discussing histological features of PCIA; Rogers Dep. Tr. 43:1–4, 85:13–15, 135:19–136:4; *see also id.* 136:16–137:8 (describing sources Dr. Rogers considered for the common clinical and histopathological features of PCIA).) Plaintiff's Motion relies on one ambiguous question on this issue from Dr. Rogers' deposition, in which Dr. Rogers was asked about the "diagnostic criteria" of PCIA, and Dr. Rogers responded that she did not make that diagnosis. (Pl.'s Br., pp. 5–6 (quoting Rogers Dep. Tr. 65:21–25).) But this exchange is taken out of context and misleading, because "PCIA" as used there again referred to counsel's version of "PCIA," which included "permanent" chemotherapy-induced alopecia. In any event, Dr. Rogers discussed at length later in her deposition, as well as in her report, the features commonly associated with *persistent* chemotherapy-induced alopecia, and demonstrated a firm understanding of this entity and how it appears in a clinical setting, as described above.

Plaintiff also contends that Dr. Rogers is somehow unqualified to opine on specific causation because "she does not believe that it has been well established that any chemotherapy drug causes permanent or persistent alopecia[, and] . . . [i]f Dr. Rogers does not believe she can diagnose PCIA, then she cannot attribute anything to causing Ms. Stewart's PCIA." (Pl.'s Br., p.

6.) To be clear, Dr. Rogers opines that certain chemotherapy drugs, including doxorubicin, cyclophosphamide, and docetaxel, are *associated* with reports of persistent or longstanding alopecia in the literature, but that *causation* has not been established. (Rogers Rep., pp. 28–30, 58, 75; Rogers Dep. Tr. 61:17–22, 74:2–17, 151:22–152:17.) Dr. Rogers clarified her opinions on the relationship of these drugs and persistent hair loss at her deposition as follows:

> 13 . . . . [T]here are
> 14 instances where longstanding hair loss has
> 15 been reported following chemotherapy but . . .
> 16 it's impossible to say that the chemotherapy
> 17 is the cause for that longstanding hair loss
> 18 because so many other factors can be
> 19 implicated.

(Rogers Dep. Tr. 218:13–19.) Dr. Rogers further explained:

> 7 . . . . "[A] temporal
> 8 association does not imply causation, and,
> 9 you know, you have to rule out all the other
> 10 possible confounding factors.

(*Id.* 75:7–10.) Even Plaintiff's own expert, Dr. Rosic, acknowledges that the literature on docetaxel and PCIA does not establish causation, and thus agrees with Dr. Rogers on this point. (*See* Ex. G, Vesna Petronic-Rosic September 12, 2020 Deposition Transcript, "Rosic Dep. Tr. Vol. II," 176:15–17 ("[T]hese 22 articles in isolation do not prove causal association, but the analysis -- the meta-analysis [performed by Plaintiff's other expert, Dr. David Madigan] does.").)

Moreover, regardless of its exact cause, Dr. Rogers nevertheless acknowledges that PCIA is a hair-loss entity that exists, and confirmed that it is one that she considered as a possible cause in reaching her differential diagnosis in Plaintiff's case. (Rogers Rep., pp. 27–28, 72, 75; Rogers Dep. Tr. 217:3–9, 217:25–218:19, 219:11–220:12.) Dr. Rogers clearly identified in her report the clinical and histological characteristics commonly described with PCIA in the literature, and testified in detail regarding those characteristics at her deposition. (Rogers Rep.,

15

pp. 30–31, 71–72; Rogers Dep. Tr. 43:1–4, 85:13–15, 135:19–136:4.) Dr. Rogers also thoroughly described her process for considering and ***ruling out*** PCIA as a cause of hair loss in Plaintiff's case. (Rogers Rep., pp. 72, 75; *see also, e.g.*, Rogers Dep. Tr. 144:13–16, 147:19–22, 217:3–24.) Thus, Plaintiff is incorrect in asserting that "Dr. Rogers does not believe she can diagnose PCIA." (Pl.'s Br., p. 6.) Instead, Dr. Rogers affirmatively ruled out PCIA in Plaintiff's case and found that other hair loss types—primarily, CCCA and androgenetic alopecia—a are present in Plaintiff's case, and she provided robust explanation of and support for those opinions in her report and testimony. (Rogers Rep., pp. 72–75, 93–94; Rogers Dep. Tr. 139:6–151:20.)

**B.    Dr. Rogers Applied a Reliable Methodology.**

Dr. Rogers states in her report and explained at her deposition that her opinions regarding Plaintiff are informed by her education and experience as well as her thorough review of the literature and other materials identified in her reliance list, which include all of Plaintiff's medical records and pre- and post-chemotherapy photographs, transcripts of Plaintiff's and her family members' and treating physicians' depositions, and other discovery documents. (*See, e.g.*, Rogers Rep., pp. 1–2, 60–94 & Ex. B.) Dr. Rogers explained the significance of these materials to her opinions at her deposition:

> 16 Q. Now, you've looked at -- and we
> 17 didn't cover it too much today, but have you
> 18 looked at a significant number of medical
> 19 records on Ms. Stewart?
> 20 A. A lot.
> 21 Q. Have you also reviewed all the
> 22 depositions that are listed on Exhibit 3,
> 23 your reliance list?
> 24 A. Yes.
> 25 Q. And did you notice that
> 1 Dr. Rosic, whether she looked at any
> 2 depositions at all in this case?
> 3 A. I didn't get the impression
> 4 that she looked at any.
> 5 Q. Was it important to you to look

```
6 at deposition testimony?
7 A. Extremely.
8 Q. Why is that?
9 A. Well, it gave me a snapshot of
10 her entire history leading up to her
11 presentation in my office, how she had
12 presented to the other doctors.
```

(Rogers Dep. Tr. 214:16–215:12.)

Dr. Rogers also performed an independent medical examination of Plaintiff in June 2020,

and her detailed notes and clinical and dermatoscopic photographs documenting her findings are

included with and described in her report. (*See* Rogers Rep., pp. 76–92 & Exs. C–D.)

Dr. Rogers explained in her report her process for reaching her conclusions on specific

causation based on her review of those materials, as follows:

> In determining the cause(s) of Ms. Stewart's hair loss, I performed a differential
> diagnosis. A differential diagnosis is a process of elimination to rule out potential
> causes of a patient's condition to determine the most likely cause. This process
> meets the standard of care for determining the cause of a patient's clinical
> presentation and symptoms. I perform a differential diagnosis on a daily basis
> with my patients, and I used that same process and methodology in reaching my
> opinions in this case.

(*Id.* at p. 60.) Dr. Rogers again stated in her report that her conclusions that Plaintiff's hair loss

was not caused by docetaxel, and instead was caused primarily by CCCA and androgenetic

alopecia, among other factors, were "[b]ased on [her] differential diagnosis, [her] knowledge and

experience as a board certified dermatologist, [and] the materials and information reviewed

including Plaintiff's independent medical examination." (*Id.* at p. 93.) She further described her

process for reaching a differential diagnosis at her deposition:

```
25 Q. Did you conduct a differential
1 diagnosis in this case?
2 A. Yes.
3 Q. Did you consider PCIA, again,
4 to use Mr. Gomez's term, as part of your
5 differential diagnosis?
6 A. I did.
```

17

7 Q. Did you address that in various
8 spots in your report?
9 A. Oh, yes.
10 Q. And, for example, let's look at
11 page 75. I think that's where I'm looking.
12 Did you -- is there a section here, here and
13 other places, that covers your differential
14 diagnosis?
15 A. Sure. So in that second
16 paragraph, you know, I tried to basically
17 summarize everything I did consider,
18 chemotherapy and the use of Taxotere and
19 docetaxel in particular as a possible cause
20 of her hair loss; however, the presence of
21 scarring was not consistent with the
22 persistent alopecia following chemotherapy.
23 Thus it was easy for me to rule out
24 chemotherapy as a cause of her hair loss.

(Rogers Dep. Tr. 216:25–217:24.)

Plaintiff argues Dr. Rogers does not provide any methodology underlying her opinion that "Ms. Stewart lost her hair while taking docetaxel, doxorubicin, and cyclophosphamide. Doxorubicin and cyclophosphamide are cytotoxic agents associated with hair loss, including reports of persistent hair loss." (Pl.'s Br., p. 5 (quoting Rogers Rep., p. 75).) But, as described above, Dr. Rogers' report clearly states that her opinions are based on her education, training, and background, as well as the literature and materials she reviewed in this case. (*See also* Rogers Rep., p. 1 ("Each of the opinions I have offered . . . is based on the materials and literature I have reviewed in connection with this litigation, my knowledge of medical and scientific information reasonably relied upon by members of my profession, as well as my education, training, knowledge, and experience."); Rogers Dep. Tr. 51:22–52:2 ("A. You know, I have informed my opinions of this case from a number of different sources. Obviously, you know, my own training, my own education, and my experience treating, you know, thousands of patients with hair loss.").) Dr. Rogers' report even explains that "[c]itations to specific reference

material . . . are offered in th[e] report, where [she] believe[s] it necessary to cite a specific source; otherwise, [her] opinions are derived from a combination of reference sources, [her] own clinical experience, and general medical knowledge." (Rogers Rep., p. 1.)

Dr. Rogers is abundantly qualified to opine on specific causation given her training and experience treating hair loss of all types and her research on PCIA, and she reliably applied that background in reaching her opinion that PCIA is not present in Plaintiff's case. The Court should therefore deny Plaintiff's Motion seeking to exclude Dr. Rogers' opinion on specific causation.

## III.   DR. VOLPICELLI IS WELL QUALIFIED AND APPLIED A RELIABLE METHODOLOGY.

### A.   Dr. Volpicelli Is Exceedingly Qualified to Opine on Specific Causation.

Dr. Volpicelli is double board certified in Dermatopathology and Surgical Pathology. (Ex. H, "Volpicelli Rep.," p. 2 & Exhibit A (Curriculum Vitae).) After graduating Alpha Omega Alpha from medical school at Albert Einstein College of Medicine, she underwent a residency in Anatomic Pathology and fellowships in Surgical Pathology and Soft Tissue at Brigham and Women's Hospital/Dana-Farber Cancer Institute/Harvard Medical School. (*Id.*) Dr. Volpicelli then completed a fellowship in Dermatopathology at the prestigious Ackerman Academy of Dermatopathology in New York City. (*Id.*) Since her fellowship, Dr. Volpicelli has served as the Director of Dermatopathology and Surgical Pathology at Stamford Hospital in Stamford, Connecticut, which is a teaching affiliate of Columbia University. (*Id.*)

Dr. Volpicelli developed an interest in alopecia early in her career while completing her Dermatopathology fellowship at the Ackerman Academy of Dermatopathology. (*See id.*; *see also* Ex. I, "Volpicelli Dep. Tr." 13:4–16, 22:14–23.) Since then, she has stayed abreast of the literature on hair loss and has examined hair loss biopsies as part of her regular practice. (*See* Volpicelli Dep. Tr. 13:4–16, 22:14–23.) As Dr. Volpicelli described at her deposition:

6 Q. I think you said earlier that
7 you're doing at least one biopsy a week
8 addressing alopecia?
9 A. On average, yes. As a matter
10 of fact, just last Friday I had an alopecia
11 biopsy that I signed out that was consistent
12 with androgenetic alopecia, which fits with
13 the clinical, I had to look at over 20 levels
14 to get to that conclusion.

(Volpicelli Dep. Tr. 199:6–14.) Dr. Volpicelli also regularly lectures Columbia University

medical students and residents on dermatology and dermatopathology issues, including alopecia.

(Volpicelli Rep., p. 3.)

    Dr. Volpicelli further described her expertise in alopecia-related dermatopathology:

16 Q. Now, despite the fact that the
17 word alopecia or hair loss may not appear in
18 your curriculum vitae, do you consider
19 yourself an alopecia and/or hair loss
20 specialist within the dermatopathology
21 specialty?
22 A. I do. As a matter of fact, I
23 do.
24 Q. Why is that?
1 A. Taking into consideration the
2 extensive education, training that I've done,
3 to this extent, the extensive review of the
4 literature, the details that I know in terms
5 of the literature, and specifically as it
6 pertains to PCIA, I consider myself an expert
7 in this topic.
8 Q. Did you have this interest in
9 the subject area within dermatopathology
10 before we called on you to look at this case?
11 A. Yes, I did. And I think I
12 mentioned that when Mr. Gomez was asking as
13 well. Dermatopathology is an interest, I
14 developed it very early, since I was a
15 first-year resident.
16 And then alopecia specifically,
17 I was always interested in alopecia even
18 during my residency, but I think the person
19 that really fostered that was my former

20 mentor, Dr. Elston, at the academy.

(Volpicelli Dep. Tr. 202:16–203:20.)

Plaintiff asserts that Dr. Volpicelli has not published on PCIA and "does not recall ever discussing the condition with any of her colleagues." (Pl.'s Br., pp. 7–8.) But publishing—much less discussing with colleagues—are not required to have expertise in hair loss or PCIA. *See In re Xarelto*, *(Rivaroxaban) Prod. Liab. Litig.*, 2017 WL 1352860, at *5 (expert was qualified based on clinical experience and review of literature and labeling); *Wagoner*, 813 F. Supp. 2d at 800 (expert was qualified based on "education and work experience"). As mentioned above, Plaintiff's own designated expert, Dr. Rosic, has not published on PCIA (Rosic Dep. Tr. Vol. I, 91:4–99:9), and Dr. Rosic's familiarity with the literature on PCIA is far less extensive than that of Dr. Volpicelli (*see* Volpicelli Rep., pp. 26–46 & nn.19–45; *see also, e.g.*, Volpicelli Dep. Tr. 23:6–34:15, 48:18–50:3, 59:11–61:18; *cf., e.g.*, Rosic Dep. Tr. Vol. I, 263:9–12, 290:10–14). Rather, Dr. Volpicelli is an expert in dermatopathology of hair loss, which includes PCIA among other hair loss types, based on her years of specialized training and experience and research.

Plaintiff next argues that Dr. Volpicelli's statement that "there are no defined diagnostic clinical or histopathologic criteria for PCIA" is in conflict with Dr. Heilman's opinions and Dr. Sperling's work. (Pl.'s Br., p. 8 (quoting Volpicelli Dep. Tr. 47:18–20).) Plaintiff contends that statement renders Dr. Volpicelli unqualified to opine that Plaintiff "'does not exhibit any of the features' that would 'put her in the PCIA category,'" and/or that a specific drug caused Plaintiff's PCIA. (*Id.* (quoting Volpicelli Dep. Tr. 51:18–24).)

As an initial matter, Dr. Volpicelli does not opine "that a specific drug caused [Plaintiff's] PCIA." (*Id.*) Dr. Volpicelli conclusively states that Plaintiff does not have PCIA. (*See, e.g.*, Volpicelli Rep., p. 57.) In discussing PCIA generally, Dr. Volpicelli explains that

21

"[e]ven if ongoing or persisting alopecia could be attributed to chemotherapy" in a given case, "it would be impossible, through pathology or otherwise, to attribute the alopecia to any specific drug in a multi-drug regimen[;] [t]here is no clinical or pathological finding that would indicate that the hair loss was caused by one specific chemotherapy drug as opposed to another." (*Id.* at p. 45.) Additionally, Dr. Volpicelli acknowledges that the other chemotherapy drugs in Plaintiff's multidrug regimen, doxorubicin and cyclophosphamide, are drugs that have been associated with reports of ongoing alopecia, and, therefore, opines that those drugs (among a host of other medical conditions, medications, and causes) are risk factors for ongoing alopecia in Plaintiff's case. (*Id.* at pp. 45, 47–48; *see also* Volpicelli Dep. Tr. 47:1–12, 79:14–80:5.) Still, because Dr. Volpicelli ultimately concludes that Plaintiff does *not* have PCIA, Plaintiff's assertion that Dr. Volpicelli opines that "a specific drug caused [Plaintiff's] PCIA" (Pl.'s Br., p. 8) is incorrect and is a mischaracterization of Dr. Volpicelli's opinions.

Furthermore, Dr. Volpicelli's statement regarding the "diagnostic clinical or histopathologic criteria for PCIA" does not render her unqualified to offer this testimony, or to offer her opinion that Plaintiff does not exhibit any features of PCIA. Specifically, Dr. Volpicelli testified that there are "no defined *diagnostic*" criteria for PCIA. (Volpicelli Dep. Tr. 47:18–20 (emphasis added).) She nevertheless acknowledged there are various histopathologic features that are *commonly found* in cases of PCIA, though no single feature or set of criteria is by any means defined or diagnostic based on the current literature:

> A. So as I mentioned earlier, and
> 21 I would really like to reiterate that, there
> 22 are no diagnostic histopathologic features
> 23 for PCIA. However, referring back to the
> 24 literature, certain characteristics have been
> 1 described. A number of features have been
> 2 enumerated, and I know them at length, I feel
> 3 comfortable describing them, recognizing

> 4 them, so if they were to all be present, I
> 5 would be comfortable rendering that
> 6 diagnosis.
> . . . .
> 15 the features that have been described in
> 16 these collection of cases in the literature
> 17 are features that are not unique, they're not
> 18 diagnostic to PCIA, and they've been
> 19 described in other common alopecias. So it
> 20 is a diagnosis of exclusion.

(*Id.* 34:20–35:6, 35:15–20.)

Both in her report and at her deposition, Dr. Volpicelli discussed the common clinical and histopathological features of PCIA at length. (Volpicelli Rep., pp. 41–44; *see also, e.g.*, Volpicelli Dep. Tr. 50:4–51:24.) Dr. Volpicelli's opinions concerning the common features of PCIA are entirely consistent with those of Dr. Heilman (*compare* Volpicelli Rep., pp. 41–44, *with* Heilman Rep., p. 26), and Dr. Volpicelli specifically cites various publications, including that of Dr. Sperling, to support those opinions (*see, e.g.*, Volpicelli Rep., p. 43 (table on chemotherapy-induced alopecia taken from Dr. Sperling's Hair Atlas); Volpicelli Dep. Tr. 49:20–23). Thus, there is no conflict between Dr. Volpicelli's opinions concerning PCIA and the opinions of Dr. Heilman or the work of Dr. Sperling.

Furthermore, Dr. Volpicelli clearly discusses, both in her report and deposition testimony, each of those common features of PCIA as applied in Plaintiff's case, and Dr. Volpicelli concludes based on that assessment that Plaintiff "does not exhibit any of the features" that would "put her in the PCIA category." (Volpicelli Dep. Tr. 50:4–51:24, 98:23–101:6; *see also* Volpicelli Rep., pp. 49–56.) Dr. Volpicelli's detailed analysis of these features and application to Plaintiff's case are not lacking or unclear in any way.

**B.      Dr. Volpicelli Applied a Reliable Methodology.**

Dr. Volpicelli made clear in her report and at her deposition that her opinions in this case

23

are "based on the materials and literature [she] ha[s] reviewed in connection with this litigation, [her] knowledge of medical and scientific information reasonably relied upon by members of [her] profession, as well as [her] education, training, knowledge, and experience." (Volpicelli Rep., p. 1; *see also* Volpicelli Dep. Tr. 22:7–12.) Dr. Volpicelli also provided, as an exhibit to her report, an extensive list of materials that she reviewed and relied upon in forming her opinions, which includes scientific and medical literature as well as Plaintiff's medical records, photographs, biopsy specimen, deposition transcripts, discovery documents, and other materials pertaining to this case. (Volpicelli Rep., Ex. B.) Dr. Volpicelli examined two biopsy specimens from Plaintiff—and performed additional cuts of the biopsy samples in her laboratory to fully examine the hair shaft in the extracted tissue—and prepared detailed pathology reports and photomicrographs depicting the histological features she observed in the biopsies, which are also described in her report and deposition testimony. (*See, e.g.*, *id.* at pp. 48–56 & Exs. C–D.)

As Dr. Volpicelli described in her report, her process for considering those materials and reaching her case-specific opinions was as follows:

> In determining the etiology of Ms. Stewart's hair loss, I performed a differential diagnosis, which is based in part upon her medical history including chemotherapy medications and aromatase inhibitors, genetic and lifestyle factors, and other materials received in this case for review. A differential diagnosis is a process of elimination to rule out potential causes of a patient's condition to determine the most likely cause. The process meets the standard of care for determining the cause of a patient's symptoms. I perform a differential diagnosis on a daily basis with my patients and clinician colleagues, and I used that same process and methodology in reaching my opinions in this case.

(*Id.* at pp. 46–47.) Dr. Volpicelli further explained her methodology in her report:

> Based on a differential diagnosis, including Ms. Stewart's medical history including chemotherapy and aromatase inhibitors, genetic and lifestyle factors, as well as my education, training, knowledge, and experience as a board certified dermatopathologist and pathologist, and the materials I have reviewed in this case, to a reasonable degree of medical probability and/or certainty, it is my opinion that:

    1. Ms. Stewart's alopecia is attributable to CCCA and androgenetic alopecia.

    2. Ms. Stewart does not have persistent alopecia following chemotherapy.

    3. Ms. Stewart's hair loss was not caused by docetaxel.

(*Id.* at p. 57.)

Plaintiff argues that Dr. Volpicelli does not provide any methodology for her opinion that doxorubicin and cyclophosphamide are potential risk factors for Plaintiff's hair loss, and does not "provid[e] a single citation for support" of her statements regarding the chemotherapy drugs associated with reports of persistent alopecia and the inability to trace hair loss to a particular drug in a multi-drug chemotherapy regimen. (Pl.'s Br., p. 7 (citing Volpicelli Rep., pp. 45, 47–48).) But Dr. Volpicelli need not provide specific citations in support of every statement in her report, and her methodology and the materials she relied upon in forming her opinions are well described in her report and reliance list, as stated above. And, notably, Plaintiff does not contend that any of those sources are insufficient or otherwise challenge Dr. Volpicelli's methodology.

Dr. Volpicelli is well qualified based on her extensive education, research, and experience as a dermatopathologist, and her methodology and opinions related to specific causation are entirely clear and are consistent with her other opinions, Dr. Heilman's opinions, and the current medical literature. Plaintiff's meager attempts to create inconsistencies in her opinions where none exist in order to justify excluding her opinions should be denied.

## CONCLUSION

For the foregoing reasons, Sandoz respectfully requests that the Court deny Plaintiff's Motion in its entirety, and grant such further relief as the Court deems just and proper.

Dated: December 11, 2020          Respectfully submitted,

                                */s/ Lori G. Cohen*
                                Lori G. Cohen
                                R. Clifton Merrell
                                Evan C. Holden
                                **GREENBERG TRAURIG, LLP**

Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: (678) 553-2385
Facsimile:  (678) 553-2212
E-mail: cohenl@gtlaw.com
        merrellc@gtlaw.com
        holdene@gtlaw.com

***Counsel for Defendant Sandoz Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2020, a copy of the foregoing document was served on all counsel of record via CM/ECF.

<i>/s/ Lori G. Cohen</i>
Lori G. Cohen