Confidential - Pursuant to Protective Order

Page 94

1        (Clarification requested by the
2    stenographer.)
3        A.    -- are in the anagen phase, and
4    so, therefore, that's why patients undergoing
5    chemotherapy may lose their hair.  They may
6    have massive, copious amounts of hair
7    shedding two to three weeks after they start
8    the chemotherapy.
9    BY MR. GOMEZ:
10       Q.    All right.
11       A.    And this is different from
12   telogen effluvium, okay, which telogen
13   effluvium is the shedding of the hairs that
14   are in the resting phase, and so there's a
15   delay with telogen effluvium.  Usually hair
16   shedding doesn't occur until three to six
17   months after the offending agent.
18       Q.    Let me turn you to page 26 of
19   your report.
20       A.    Uh-huh.
21       Q.    And you reference a 1981 World
22   Health Organization classification of
23   alopecia after chemotherapy, correct?
24       A.    Right.
25       Q.    And we have grade 1, minimal

Page 95

1    hair loss; grade 2, moderate patchy hair
2    loss; and grade 3, complete but reversible
3    hair loss.
4        Do you agree that prior to the
5    release of docetaxel to the market that the
6    greater medical community believed that
7    chemotherapy would only cause reversible hair
8    loss; that is, hair would regrow following
9    the termination of chemotherapy?
10       MS. COHEN:  Objection to form.
11       A.    I don't agree because there are
12   cases as early as 1966 showing how certain
13   medications could cause more longstanding
14   hair loss.
15   BY MR. GOMEZ:
16       Q.    And what I'm focused on is
17   chemotherapy.
18       You believe that -- do you
19   believe that at the time of Ms. Stewart's
20   course of chemotherapy that the greater
21   medical community knew that some chemotherapy
22   drugs caused permanent hair loss?
23       MS. COHEN:  Objection to form.
24       A.    I think that -- I think that --
25   I think -- I think the greater medical

Page 96

1    community thought, based on the experience
2    overall, that most chemotherapeutic drugs,
3    you know, would not cause permanent hair
4    loss.
5        But I think based on the fact
6    that we have reports going back into
7    the '60s, they certainly knew that in some
8    situations that it was not a hundred percent
9    predictable what would happen with patients'
10   hair.
11   BY MR. GOMEZ:
12       Q.    Let's go to page 29 of your
13   report, and at the bottom under Taxotere and
14   Persistent Alopecia Following Chemotherapy,
15   you state:  In my opinion, to a reasonable
16   degree of medical certainty, it has not been
17   established that Taxotere/docetaxel actually
18   causes permanent or persistent alopecia.
19       That's your opinion, correct?
20       A.    That's correct.
21       Q.    You state:  Nor has it been
22   established that Taxotere causes permanent or
23   persistent alopecia at a higher rate than any
24   other -- than other chemotherapy drugs.
25       Is that your opinion?

Page 97

1        A.    That's correct.
2        Q.    Okay.  You believe that some
3    other chemotherapy drugs cause permanent or
4    persistent alopecia?
5        A.    I think that reports of
6    longstanding hair loss have been in the
7    medical literature for, you know, decades
8    now.
9        Q.    So you believe that some other
10   chemotherapy agents can cause permanent
11   alopecia?
12       A.    Well, I think there are reports
13   of these medications, and, you know, their --
14   their focus, you know, is -- the reports are
15   limited and they're like -- they're limited
16   to case reports and very small case series.
17       So we really cannot make large
18   conclusions about specific medications based
19   on the limited data.
20       Q.    Let me just kind of get
21   through.  Let's turn to page 39, please.
22       A.    Okay.
23       Q.    And do you see a reference to
24   Central Centrifugal Cicatricial Alopecia,
25   CCCA?

Page 98

1    A.    Yes.
2    Q.    And you state:  This condition
3 is seen exclusively in women patients of
4 African descent.
5          Can that condition sometimes,
6 not often, but sometimes also happen in men?
7    A.    Very rarely.  There are some
8 isolated reports, but it is seen -- it really
9 is seen almost exclusively in women of
10 African descent.
11   Q.    All right.
12   A.    And actually, you know, what's
13 ironic is that I really was not aware of
14 those patients who -- of men who had CCCA
15 until just subsequent to the writing of this
16 report, when I had a patient who we were
17 going to transplant, and it turned out he had
18 CCCA.
19          So, you know, it's -- this is
20 something that is not widely published in the
21 medical literature and -- but, you know, the
22 vast majority are women.
23   Q.    All right.  Let's turn you to
24 page 58 of your report, please.  And there's
25 a part there titled Taxotere-docetaxel

Page 99

1 Labeling.
2          Do you see that?
3    A.    I do.
4    Q.    And you state, among other
5 things:  In my opinion as a practicing
6 dermatologist and hair loss specialist,
7 Sandoz's docetaxel labeling and published
8 information make clear that alopecia, or hair
9 loss, is a potential side effect associated
10 with the medication.
11          And then in the last sentence
12 of there, that paragraph, you state:  A
13 warning of alopecia or hair loss is
14 understood by the medical community and
15 patients as encompassing both temporary
16 alopecia and persistent or permanent
17 alopecia.
18          Do you see that?
19   A.    Yes.
20   Q.    So you are certainly not an
21 oncologist, correct?
22   A.    I'm not board certified in
23 oncology, but I do have experience treating
24 patients who have undergone cancer treatment.
25   Q.    You've not prescribed

Page 100

1 chemotherapy to treat cancer, correct?
2    A.    To treat what?
3    Q.    Cancer.
4    A.    I have used things like 5-FU,
5 Efudex cream, to treat skin cancers in the
6 past.  There's another medicine called Aldara
7 or imiquimod, which I've prescribed, you
8 know, which works on skin cancers of the skin
9 as well.
10   Q.    You've never treated anyone for
11 breast cancer, correct?
12   A.    I've never been the primary
13 treating physician for breast cancer, no.
14   Q.    And you've never prescribed
15 chemotherapy, correct?
16   A.    I have not prescribed
17 chemotherapy for breast cancer.
18   Q.    And when you state a warning of
19 alopecia or hair loss is understood by the
20 medical community, you understand that the
21 medical community relevant here would be
22 doctors prescribing docetaxel for breast
23 cancer, correct?
24          MS. COHEN:  Objection to form.
25          THE WITNESS:  Can you repeat

Page 101

1 the question?
2          MR. GOMEZ:  Sure.
3 BY MR. GOMEZ:
4    Q.    Your statement:  A warning of
5 alopecia or hair loss is understood by the
6 medical community as encompassing both
7 temporary alopecia and persistent or
8 permanent alopecia, you understand that the
9 medical community relevant to the adequacy of
10 this label is oncologists prescribing
11 chemotherapy for breast cancer, right?
12          MS. COHEN:  Objection to form.
13   A.    I would think that that would
14 be the case, yes.
15 BY MR. GOMEZ:
16   Q.    And you're not an expert --
17 you're not a warnings expert, correct?
18          MS. COHEN:  Objection to form.
19   A.    You know, I discuss side
20 effects of medications with my patients on a
21 daily basis.  You know, every time I
22 prescribe a new medication, the first thing
23 they want to know is what are the side
24 effects.
25          So I have made it part of my

Page 102

1 practice to periodically just, you know,
2 check out the package inserts and, you know,
3 make sure that the information that I'm
4 giving to my patients is consistent with
5 whatever the drug manufacturers are -- are,
6 you know, including in their warnings.
7 BY MR. GOMEZ:
8     Q.    And so in your experience, it's
9 really important, in fact, the first thing
10 that they want to know -- for your patients
11 to know about the side effects of the drugs
12 that you may use with them, correct?
13     A.    Sure.
14     Q.    And you understand that they're
15 entitled to be fully and truthfully informed
16 when they choose what medication you give
17 them, correct?
18         MS. COHEN:  Objection to form.
19     A.    Yes, I -- you know, I don't
20 think there's a physician out there who would
21 intentionally hide, you know, potential side
22 effects from their patients.
23 BY MR. GOMEZ:
24     Q.    And you as a doctor want to be
25 fully and truthfully informed about potential

Page 103

1 side effects of the medications that you
2 prescribe?
3     A.    Yes.
4     Q.    You agree that women undergoing
5 chemotherapy for breast cancer would want to
6 know whether that chemotherapy caused
7 permanent hair loss?  That would be something
8 they would want to know, right?
9         MS. COHEN:  Objection to form.
10     A.    I don't think that it's -- I
11 mean, yes, in the incident case, I understand
12 your question, and I would agree with that.
13 But I'm not sure it's possible for doctors to
14 tell or advise their patients, you know, if
15 that is going to be a problem for them.
16         You know, alopecia is, you
17 know, such a varied presentation...
18         MR. GOMEZ:  All right, I'm
19     going to move to strike everything
20     after "I agree with that."
21 BY MR. GOMEZ:
22     Q.    But just to be clear, you don't
23 have any special training or experience and
24 you're not an expert in warnings, in the
25 adequacy of warnings, other than your

Page 104

1 clinical practice as a doctor, correct?
2         MS. COHEN:  And just to put on
3     the record, I would object -- making
4     just a noted objection to the motion
5     to strike.
6         But then you can answer.
7         THE WITNESS:  I already forgot
8     the question.
9         MS. COHEN:  Sorry, guys.
10         MR. GOMEZ:  That's fine.
11 BY MR. GOMEZ:
12     Q.    Doctor, other than the fact
13 that you discuss side effects of medications
14 that you prescribe to your patients as a
15 doctor, you're not an expert in the adequacy
16 of warnings, correct?
17     A.    I use a lot of analogies when
18 I'm talking with my patients, and I think
19 they appreciate that because whenever I can,
20 you know, make a relevant analogy, I like to
21 do that.
22         And I think it's helpful not
23 only in controlling their expectations in
24 terms of what they're going to see and
25 experience, but also in understanding what,

Page 105

1 you know, potential side effects or tradeoffs
2 they might have to make with the medications
3 that they're going to take.
4         So for instance, you know, when
5 I was talking with my hair patients, I tell
6 them it's sort of like driving a big ship
7 down the Mississippi River.  Everything we do
8 with hair, it takes a good six to 12 months
9 to see a difference.  And in many cases it
10 actually takes 36 months to achieve the hair
11 regrowth that they may be looking for.
12         You know, we can't go from zero
13 to 60 in a real short amount of time, you
14 know, and so it sort of takes us back to the
15 Mississippi River, which we have a view of
16 from up here, which is pretty neat.
17         MR. GOMEZ:  All right.  I'm
18     going to move to strike that answer as
19     nonresponsive, although, interesting,
20     thank you.
21 BY MR. GOMEZ:
22     Q.    My question is. --
23         MR. GOMEZ:  Did you want to
24     respond on the record to that?
25         MS. COHEN:  Yeah, just make an

Page 106

1    objection to that motion to strike.
2         MR. GOMEZ:  Okay.
3    BY MR. GOMEZ:
4    Q.    And so, Doctor, just other than
5    being a doctor, you're not an expert in the
6    adequacy of warnings, correct?
7         MS. COHEN:  Same objection.
8         Go ahead.
9    A.    I mean, have I been employed by
10   the FDA to review package inserts and package
11   labels, you know, no.
12   BY MR. GOMEZ:
13   Q.    And you don't have any other
14   special training as a human factors or
15   warnings expert?
16   A.    I do not.
17   Q.    You haven't conducted a survey
18   of oncologists to determine whether they
19   believe that the docetaxel label adequately
20   warned them that docetaxel could cause
21   permanent hair loss?
22   A.    I have not.
23   Q.    And you have not talked to --
24   well, let me ask you this.
25        You have treated some breast

Page 107

1    cancer survivors that were prescribed
2    chemotherapy and came to you with
3    longstanding hair loss, right?
4    A.    I mean, just a handful of
5    patients over many years.  It's not -- it's
6    not something I've seen a lot of.  Frankly, I
7    don't think there are many cases that exist.
8    Q.    And so you haven't conducted
9    any survey of patients to determine whether
10   they believe that docetaxel in particular
11   would cause either temporary or permanent
12   hair loss?
13        MS. COHEN:  Objection to form.
14   A.    That's correct.
15   BY MR. GOMEZ:
16   Q.    All right.  And so I wanted to
17   explore part of your report, page 59, and at
18   the last sentence in -- on that page.  Do you
19   see that?
20   A.    Yes.
21   Q.    You state:  In my experience
22   treating women who experience
23   chemotherapy-induced alopecia, they
24   understood that their chemotherapy treatment
25   carried a risk of both temporary alopecia as

Page 108

1    well as persistent alopecia.
2         And so I want to explore with
3    you the basis of that statement.  You've not
4    had those conversations with your patients,
5    correct?
6         MS. COHEN:  Objection to form.
7    A.    Let me just say that I've never
8    had a patient say to me "if only I didn't
9    take this medicine."
10        Any patient I saw for
11   longstanding hair loss was grateful, you
12   know, for their survival, and, you know,
13   while they may have been bothered by, you
14   know, whatever was going on with their hair,
15   I've never had a patient implicate a
16   particular medication as the cause of their
17   hair loss.
18        MR. GOMEZ:  I'm going to move
19   to strike that answer as
20   nonresponsive.
21        MS. COHEN:  Objection.
22   BY MR. GOMEZ:
23   Q.    You've never discussed with
24   your patients whether at the time they were
25   prescribed chemotherapy, they believed that

Page 109

1    their hair loss would be temporary or
2    permanent, correct?
3    A.    I am not involved in the early
4    stages of that decision-making process.  I
5    really can't answer that.
6    Q.    Let me ask it again.
7         You've never talked to your
8    patients while treating them for hair loss
9    and asked them whether, at the time they were
10   prescribed chemotherapy, they knew that
11   chemotherapy could cause their hair to be
12   gone forever?
13        MS. COHEN:  Objection to form.
14   A.    That is not a conversation I've
15   had with patients.
16   BY MR. GOMEZ:
17   Q.    And so your statement:  In my
18   experience treating women who experienced
19   chemotherapy-induced alopecia, they
20   understood that their chemotherapy treatment
21   carried a risk of both temporary alopecia as
22   well as persistent alopecia -- based upon
23   your testimony you've never discussed that
24   topic with them, what is the basis of that
25   statement in your report?

Page 110

1    A.    Based on the fact that when I
2  saw them, none of them were specifically
3  upset or angry about potentially having
4  short-term hair loss versus long-term hair
5  loss.
6    Q.    All right.  Let's turn to --
7  anything else?  Any other basis for that
8  statement in your report other than their
9  lack of anger?
10    MS. COHEN:  Objection to form.
11    A.    I think most -- most patients
12  were just happy to have survived their breast
13  cancer.
14    MR. GOMEZ:  You continue to say
15    that, and it's -- I'm going to strike
16    that as nonresponsive to my question.
17  BY MR. GOMEZ:
18    Q.    And so any other basis for the
19  statement at the bottom of --
20    MS. COHEN:  Objection to the
21    motion to strike.
22  BY MR. GOMEZ:
23    Q.    Any other basis for -- any
24  other basis for your statement at the bottom
25  of page 60?

Page 111

1    A.    No.
2    Q.    All right.  Thank you.
3    And so can I turn you to
4  page 61 of your report.
5    A.    Okay.
6    MR. GOMEZ:  Let me ask you guys
7    this.  I'll ask it to the witness and
8    I guess people around the country and
9    your counsel.  Like it's now -- where
10    you guys are, is it 11:00?
11    MS. COHEN:  Yes, it's 11:00.
12    MR. GOMEZ:  Okay.  And so as
13    noon approaches, do you want to eat
14    lunch?  Like what do you want to do?
15    You want to talk about it on a break?
16    MS. COHEN:  Yeah, maybe go for
17    another -- how long have we been
18    going?  We've been going about an
19    hour, but we'll probably keep going,
20    right?
21    MR. GOMEZ:  Let's go like 20
22    more minutes -- let's go to like half
23    past the hour and then you guys can
24    figure out what you want to do.  That
25    MS. COHEN:  All right.  That

Page 112

1  sounds good, John.
2    MR. GOMEZ:  All right.
3  BY MR. GOMEZ:
4    Q.    So let's turn you to page 61 of
5  your report, Doctor.  Do you have that in
6  front of you?
7    A.    Yes, I do.
8    Q.    Okay.  And so there are a
9  number of bullet points that go from 61 to
10  62.  Do you see those?
11    A.    Yes.
12    Q.    And so is it your opinion to a
13  medical degree of certainty that each of
14  those issues has caused Ms. Stewart's hair
15  condition as it exists today?
16    A.    I believe that they all played
17  a role in her hair loss, yes.
18    Q.    All right.  So you believe that
19  all of those things caused, in part, her hair
20  loss; is that right?
21    A.    Yes.
22    Q.    All right.  Let me turn you to
23  page 62.  Do you have that in front of you?
24    A.    Yes.
25    Q.    And so there's reference to

Page 113

1  Ms. Stewart's mother and her father.
2    Do you see that?
3    A.    Yes.
4    Q.    And so -- and then at the end
5  you say:  Therefore, Ms. Stewart could have
6  inherited hair loss from her mother and/or
7  father.
8    So let me ask you this:  Is it
9  your opinion to a medical degree of certainty
10  that Ms. Stewart inherited hair loss from her
11  mother?
12    A.    My opinion is that she
13  inherited hair loss from both her mother and
14  her father.  As we know, genetics are not
15  something that you can predict, and so, you
16  know, some patients will present to me with
17  androgenetic alopecia and they have no family
18  history whatsoever of hair loss, you know.
19    The fact that with the
20  plaintiff she had not one but two parents who
21  had hair loss, it's inconceivable to me that
22  she would not have inherited some component
23  of hair loss from one or both of them.
24    Q.    All right.  Let me just -- I'm
25  focusing on mom for now.  So is it your

Page 114

1 opinion to a medical degree of certainty that
2 Ms. Stewart inherited hair loss from her mom?
3        MS. COHEN: Objection to form.
4    A.   There's -- I think there's a
5 very good chance of that based on the fact
6 that CCCA has been shown to be inherited on
7 the maternal side of the family. Generally,
8 you know, it does seem to run in families,
9 and women do tend to be affected.
10       So yes, in my medical opinion,
11 I think it's very likely that Ms. Stewart
12 inherited hair loss from her mother.
13 BY MR. GOMEZ:
14   Q.   And you hold that opinion to a
15 medical degree of certainty?
16   A.   I do.
17   Q.   Is it your opinion to a medical
18 degree of certainty that Ms. Stewart also
19 inherited hair loss from her father?
20   A.   I -- I -- that is correct. I
21 think -- I believe she also inherited a
22 component of her hair loss from her father.
23   Q.   You next go on to discuss hair
24 practices underneath that last paragraph.
25 Are you there?

Page 115

1    A.   Yes.
2    Q.   And at the end, you state:
3 Relaxers, hot combs, curling irons, flat
4 irons, and color treatments can all
5 contribute to hair loss.
6        In this case, do you have a
7 degree to a -- I'm sorry.
8        In this case, do you have an
9 opinion to a medical degree of certainty that
10 relaxers caused Ms. Stewart's hair loss?
11   A.   I definitely think relaxers
12 played a role in her hair loss, given the
13 fact that she used them starting as a young
14 girl and into adulthood. I understood that
15 she had stopped using the relaxers after she
16 underwent chemotherapy, but by then, I think
17 the damage was probably already done.
18       You know, we know that
19 cumulative effects from damaging grooming
20 techniques, you know, can take many years to
21 manifest, and in the incident case, it wasn't
22 just hair relaxing. It was also using heat
23 in the form of curling irons and flat irons,
24 use of hot combs, use of braids, and
25 specifically the addition of heavy 14-inch

Page 116

1 extensions, which she reported to me during
2 the IME. And all of these take a toll on the
3 hair follicles.
4        So I think, in net, these have
5 all had a very strong effect on her hair.
6    Q.   Is it your opinion to a medical
7 degree of certainty that relaxers, hot combs,
8 curling irons, flat irons and color
9 treatments all caused Ms. Stewart's hair
10 loss?
11       MS. COHEN: Objection to form.
12   A.   It is my opinion to a certain
13 degree of medical certainty that, yes, she --
14 these all played a role in her hair loss.
15 BY MR. GOMEZ:
16   Q.   And to a 51% degree of
17 certainty?
18   A.   Definitely.
19   Q.   You cite -- you talk about the
20 use of sewn-in extensions. Is it your
21 opinion to a medical degree of certainty that
22 sewn-in extensions also caused Ms. Stewart's
23 hair loss?
24       MS. COHEN: Objection to form.
25   A.   I think, yes, I definitely do.

Page 117

1 BY MR. GOMEZ:
2    Q.   Let's turn your attention to
3 page 63 of your report.
4    A.   Okay.
5    Q.   And so I want to direct your
6 attention to the first paragraph where you're
7 talking about wearing wigs, and there's sworn
8 testimony by Ms. Stewart that she did not
9 wear a wig before chemotherapy other than the
10 occasional use of costume wigs for parties.
11       And so then you say: As
12 further described below, Ms. Stewart does
13 appear to be wearing some type of wig in
14 several of the photos that she has provided
15 from the time period before chemotherapy
16 treatment.
17       So can you help me identify
18 what photographs you're talking about and how
19 you can tell that she's wearing a wig?
20   A.   Sure.
21       MS. COHEN: John, are you
22 asking her to pull out all the
23 photographs? She has her report in
24 front of her. She doesn't have a
25 stack of all the photographs she has

Page 118

1 reviewed. You obviously can show them
2 to her, or she can pull them out or --
3 BY MR. GOMEZ:
4     Q.    Let me ask you this:  Are those
5 photographs contained in your report?
6     A.    Well, the 2013 photographs,
7 which is on page 65, has such an abundant
8 amount of hair, it's -- you know, it's
9 inconceivable to me that, based on this other
10 paragraph of 2012, you know, where her hair
11 was in a ponytail, and it basically looked
12 just like the photos that were taken by
13 Dr. Rosic, that she had to have had some
14 enhancement in that 2013 photograph.
15     Q.    Okay.  And so is the 2013
16 photograph on page 65 -- you believe that
17 she's wearing some type of wig?
18         MS. COHEN:  Objection to form.
19     A.    Some type of enhancement, some
20 type of sewn-in weaves or tracks, something
21 that added a significant amount of hair
22 volume to her hair.
23 BY MR. GOMEZ:
24     Q.    And that's based upon a
25 comparison with the May 2012 photograph?

Page 119

1     A.    Yes.
2     Q.    In terms of a wig in
3 particular --
4     A.    There are two -- there are two
5 2012 photographs, but yes, in comparison with
6 the May 2012 photograph.
7     Q.    Right.  In terms of a wig in
8 particular, do you believe she's wearing a
9 wig in the photograph on page 65 that's
10 labeled 2013?
11         MS. COHEN:  Objection to form.
12     A.    I believe so.
13 BY MR. GOMEZ:
14     Q.    All right.  Is that one of the
15 assumptions you made in coming to your
16 opinions?
17         MS. COHEN:  Objection to form.
18     A.    I don't like to use the term
19 "assumptions" because that assumes that I'm
20 correct, and I've learned to be humble.
21         It is an informed opinion that
22 I have, which is supported by the deposition
23 of Ms. Stewart's mother, who stated that she
24 would wear wigs and did use hair enhancements
25 up until the time that she had her

Page 120

1 chemotherapy.
2 BY MR. GOMEZ:
3     Q.    Let's turn you back to page 63,
4 please.
5     A.    Yes.
6     Q.    And so the second paragraph
7 talks about Ms. Stewart wearing a tight
8 ponytail.
9         Do you see that?
10     A.    Yes.
11     Q.    Is it your opinion to a medical
12 degree of certainty that her wearing a tight
13 ponytail caused her hair loss in part today?
14         MS. COHEN:  Objection to form.
15     A.    It is my opinion that her use
16 of a tight ponytail would have put additional
17 traction or pulling on those hair follicles,
18 which would have increased the risk of her
19 developing traction alopecia, and it would
20 contribute to what I believe is a component
21 of her hair loss today, traction alopecia.
22 BY MR. GOMEZ:
23     Q.    Let's go to the next paragraph,
24 and you talk about repeated plucking of the
25 eyebrows.  Is it your opinion to a medical

Page 121

1 degree of certainty that Ms. Stewart's
2 plucking of her eyebrows over the years
3 caused her thinning of her eyebrows over
4 time?
5     A.    Yes.
6     Q.    Let's go to the next paragraph,
7 and you talk about Ms. Stewart taking
8 vitamins for hair and nails for six months or
9 so before her chemotherapy treatment in 2014,
10 and you state:  This suggests that she's
11 already -- that she already had preexisting
12 hair loss that she was taking steps to
13 address even before her chemotherapy
14 treatment.
15         Have you known women that take
16 vitamins that have not suffered hair loss;
17 they just want fuller hair?
18     A.    Most patients who go to the
19 trouble of -- in my experience, most patients
20 who go to the trouble of taking hair and nail
21 vitamins are doing so because there's a
22 deficiency in their hair.
23     Q.    When you say most, some
24 patients -- some women you recognize take
25 vitamins for their hair that have not yet

Page 122

1 suffered hair loss, correct?
2         MS. COHEN:  Objection, form.
3     A.    I'm sure there are some people
4 who just have very fine, thin hair who don't
5 necessarily have androgenetic alopecia but
6 just have fine, thin hair who are hoping to
7 get results by taking hair vitamins, but I
8 don't recommend it and I have not found it to
9 be helpful.
10 BY MR. GOMEZ:
11     Q.    All right.  Let's turn you to
12 page 64, and the one, two, three, fourth
13 paragraph.  And you state:  She has not had
14 any blood work done related to her hair loss,
15 so we cannot rule out other potential causes
16 that may show up on lab work.
17         What type of lab work would you
18 need to determine whether there was some
19 other cause of her hair loss?
20     A.    The other labs that I would
21 have ordered were zinc level and a ferritin,
22 which is a measure of the iron stores.  I
23 would have ordered a TIBC and I would have
24 ordered iron levels.
25     Q.    So with regard to that blood

Page 123

1 work, what are all the things that you would
2 be looking for?
3     A.    I would have been looking for
4 iron deficiency, in which case she would have
5 had -- or low iron stores, which would have
6 been manifest by a low ferritin or a low iron
7 or an elevated TIBC.
8         I was also looking -- I would
9 have also been looking for low zinc levels.
10     Q.    All right.  And have you seen
11 anything in Ms. Stewart's remaining medical
12 history or upon examination that suggested
13 that she had iron deficiencies?
14     A.    Sorry, just give me a quick
15 minute here.
16         (Document review.)
17     A.    In the incident case, because
18 she was no longer menstruating, I would -- I
19 would probably not be as concerned about an
20 iron deficiency; however, given the fact that
21 she had had uterine fibroids, that can be a
22 considerable cause of blood loss, and if she
23 had an untreated anemia following those
24 uterine fibroids, then that definitely could
25 have played a role.

Page 124

1 BY MR. GOMEZ:
2     Q.    Without the actual lab work,
3 you can't say whether iron levels or zinc
4 levels or -- is it TIBC?
5     A.    Right.
6     Q.    -- any of those things played a
7 role, correct?
8         MS. COHEN:  Objection to form.
9     A.    You would need the actual lab
10 tests to tell you.
11 BY MR. GOMEZ:
12     Q.    All right.
13         MS. COHEN:  I'm sorry, can I
14 ask -- my realtime stopped working.
15         Is yours working, Dawn, still?
16         MS. BARRIOS:  Uh-huh.
17         MS. COHEN:  I may need to
18 reboot at the break.  Sorry, John.
19         MR. GOMEZ:  No problem.
20 BY MR. GOMEZ:
21     Q.    So you state that
22 Ms. Rheubottom is very well known for
23 treating hair loss right underneath that.
24         Do you see that?
25     A.    I'm sorry, what page are you

Page 125

1 on?
2     Q.    64, still.  And you're
3 discussing this woman, Tara Rheubottom, a
4 dermatology PA?
5     A.    Yes.
6     Q.    And you state she's very well
7 known for treating hair loss.  What's the
8 basis of that statement?
9     A.    I've shared a lot of patients
10 with her over the years.  You know, her --
11 she works with a dermatologist located in
12 Baton Rouge who is also very well respected,
13 and so I've -- I've shared some patients with
14 her over the years.
15     Q.    And who is the dermatologist in
16 Baton Rouge?
17     A.    Let's see.  I'm blanking on his
18 name right now.
19     Q.    All right.  And is he well
20 regarded for treating hair loss?
21     A.    No.  He's -- he's not known for
22 treating hair loss.  She is who is known for
23 treating hair loss.
24     Q.    She herself?
25     A.    Yes.

Page 126

1    Q.    And does she do so under the
2  supervision of this dermatologist?
3    A.    There's a group of them, and I
4  think there's two to four dermatologists and
5  I think they have one or two locations,
6  and -- I don't send patients to her.  Like I
7  consider myself still more of a, you know, a
8  hair specialist.
9      I would not refer patients to
10  her, but I can appreciate and respect her
11  expertise in the treatment of hair, and
12  everything that I've, you know, heard and
13  seen in terms of her prescribing has been
14  appropriate.
15    Q.    I think this next topic may
16  take a little while, so -- and I said 11:30,
17  so why don't we break now.  We can either
18  take a 15 or if you guys want to eat, you
19  guys can eat.  What do you want to do?
20      MS. COHEN:  Let's take -- if
21  that's okay, Dr. Rogers, let's take a
22  short break now.
23      THE WITNESS:  Okay.
24      MS. COHEN:  And then have
25  another session before we do lunch.

Page 127

1  But you're the person that matters.
2      THE WITNESS:  That's fine.
3  Sure.
4      MS. COHEN:  Is that okay with
5  everybody here?  That why we're not
6  going too early, and maybe -- so
7  11:30, take like 10 or 15 minutes and
8  then maybe break at 1:00 for lunch?
9  Does that work with everybody?  Okay.
10      THE WITNESS:  He probably likes
11  that better.
12      MR. GOMEZ:  It will be kind of
13  a brunch for me.
14      THE STENOGRAPHER:  Are we off
15  the record?
16      MR. GOMEZ:  Yeah, we are.
17      THE VIDEOGRAPHER:  Off the
18  record, 11:30 a.m.
19      (Recess taken, 11:30 a.m. to
20  11:47 a.m. CDT)
21      THE VIDEOGRAPHER:  On the
22  record, 11:47 a.m.
23  BY MR. GOMEZ:
24    Q.    All right.  Welcome back,
25  Dr. Rogers.

Page 128

1    A.    Welcome back too.
2    Q.    So I want to direct your
3  attention to the bottom of page 64, and you
4  talk about basically there are treatment
5  options that are available to Ms. Stewart.
6      And so I want to put you in the
7  position of Ms. Stewart coming to you and
8  saying, hey, what can I do to improve my hair
9  appearance.  What would you tell her to do?
10    A.    Well, the first thing I would
11  have done was to do a biopsy in a different
12  location.  I would have oriented it more in
13  the actual vertex of the scalp based on
14  Dr. Rosic's -- it was taken from the
15  occipital scalp by her.
16      I would have done it more right
17  in the middle, in the vertex, higher up.  And
18  I would have chosen an area that had more
19  discrete thinning basically.  The areas that
20  she chose was kind of down and away from
21  where the actual thinning was occurring.
22      And then, you know, the
23  interpretation of CCCA, like I said earlier,
24  I would have started her on medical therapy
25  to begin with using a combination of topical

Page 129

1  steroids and oral doxycycline.  I would have
2  also seen her back -- I would have done that
3  for the first three to six months, and then I
4  would have seen her back at three months to
5  assess how she was responding, how she felt
6  like she was tolerating the medicines.  I
7  would have offered her some steroid
8  injections at that point, and then depending
9  on how she was tolerating everything, I
10  probably would have transitioned her to some
11  medications for actual hair regrowth, like
12  topical or oral minoxidil.
13    Q.    And could Ms. Stewart undergo
14  that treatment today and have good results,
15  do you believe?
16    A.    I believe so.
17    Q.    And when you talk about the
18  biopsy, that's something you would do in your
19  clinical practice as a treater?
20    A.    Yes.
21    Q.    And remind us what the reason
22  for that would be.  How would that help you
23  make her hair come back a little better?
24    A.    So the point of a biopsy is to
25  characterize and quantify the degree of

Confidential - Pursuant to Protective Order

Page 130

1 inflammatory process in the setting of CCCA.
2 It helps us understand not only how much
3 inflammation is present but also what degree
4 of fibrosis has occurred and, you know,
5 how -- how well we're going to be able to
6 regrow the hair, you know.
7        Different patients will have
8 different degrees of fibrosis so if they're
9 further along in the process, that's going to
10 show up on the biopsy. Some women with very
11 late-stage CCCA, they may have significant
12 fibrosis, but the inflammation may be
13 somewhat burnt out, and so it's harder to get
14 the hair back for those women.
15        Earlier in the process, there's
16 more inflammation and less fibrosis, so
17 there's more room for prevention and
18 correction in the early stages of CCCA.
19    Q.   All right. Let's turn you to
20 page 66 of your report, please, and there's a
21 mention in the first paragraph of: In these
22 photographs it appears that Ms. Stewart is
23 wearing a wig or significant amount of
24 extensions.
25        And I believe the photographs

Page 131

1 you're referencing are the photographs on the
2 page prior that we talked about earlier?
3        MS. COHEN: I'm sorry. I'm
4    trying to find that. Is that on 66,
5    John?
6        MR. GOMEZ: The photographs are
7    on page 65. The reference is on
8    page 66.
9        MS. COHEN: Okay.
10    A.   They're -- let's see.
11        (Document review.)
12        THE WITNESS: What's your
13    question?
14 BY MR. GOMEZ:
15    Q.   The question is, you know, the
16 report states: In these photographs, plural,
17 it appears that Ms. Stewart is wearing a wig
18 or significant amount of extensions.
19        I believe we discussed the
20 photograph on page 65 at the bottom
21 right-hand side, but do you believe that
22 there are other photographs that suggest that
23 she's wearing a wig or extensions?
24    A.   Yes, there are numerous other
25 photographs.

Page 132

1    Q.   And on page 65, any of those
2 photographs?
3    A.   I mean, I think we discussed
4 this a few minutes ago, but the photo that --
5 among the photos on page 65, which I think is
6 most representative of her potentially
7 wearing a wig, is the one dated 2013.
8        Now, this is not the only
9 photograph, because she did provide a bunch
10 of photos to us, and so, you know, the
11 evaluation was based on all of those
12 together.
13    Q.   All right. And let me ask you
14 this: You know, I -- you earlier said you
15 were prohibited in this case from performing
16 an additional biopsy and that you would have
17 done a biopsy, I think you said at a
18 different area, if you were the treater.
19        And so the process that you
20 described in the area that you described for
21 the biopsy, is that what you would have liked
22 to have done in this case?
23    A.   Yes.
24    Q.   And tell us again what
25 additional information you believe that would

Page 133

1 have provided to you.
2    A.   There would have been more
3 evidence of the CCCA process. You know,
4 Dr. Rosic argues that, you know, it's only a
5 minor component. Now, our dermatopathologist
6 disagreed with that statement, and they found
7 CCCA to be very well represented even in the
8 specimens we've taken.
9        So, you know, do I think it's
10 necessary to do an additional biopsy in order
11 to prove that? No. I think there's
12 sufficient evidence of CCCA based on what's
13 available presently.
14    Q.   All right. Thank you.
15        Let's turn you, please, to
16 page 72. And you have a chart at the top of
17 the page there.
18        Do you see that?
19    A.   Yes.
20    Q.   And you have, I guess, checked
21 off various features of each of these one,
22 two, three, four, five, six different types
23 of hair loss.
24        And so if we go to like CCCA,
25 for example, and you have an X to the right

Confidential - Pursuant to Protective Order

Page 134

1  of perifollicular inflammation and fibrosis,
2  that means you find that that occurred in
3  Ms. Stewart, correct?
4      A.    Right.  So the features that
5  are listed in the first column were findings
6  reported by Dr. Rosic, and at the time I
7  created this table, I only had Dr. Rosic's
8  dermatopathology report available to me.
9      So if you look -- for instance,
10 I included trichomalacia; however, if you
11 look at Dr. Volpicelli and Dr. Heilman's
12 report, they found that she mistook a naked
13 hair shaft for trichomalacia, and they
14 contend that there is no trichomalacia on
15 that dermatopathology report.
16     Q.    I see.  Okay.  And so this is
17 essentially your summary of Dr. Rosic's
18 pathologic description?
19     A.    Right.  This is my listing all
20 the alopecia diagnoses which are associated
21 with the features that she listed.
22     Q.    All right.  And so when we get
23 to Medical Opinions Relating to Wanda
24 Stewart, you begin by:  It is my opinion, to
25 a reasonable degree of medical certainty,

Page 135

1  that Ms. Stewart's hair loss is not caused by
2  Taxotere/docetaxel or Sandoz.  Permanent
3  alopecia following chemotherapy is largely a
4  diagnosis of exclusion.
5      So I want to ask some questions
6  about that statement.  What is a diagnosis of
7  exclusion?
8      MS. COHEN:  John, I think you
9      just misread one of the words.  If I
10     heard you correctly, I think you said
11     permanent where it's persistent.  That
12     may not matter.  I just --
13     MR. GOMEZ:  Okay.  Thank you.
14     MS. COHEN:  Sure.
15     MR. GOMEZ:  I'll do it
16     correctly, then.  I'll read it -- if I
17     read it incorrectly.
18 BY MR. GOMEZ:
19     Q.    Persistent alopecia following
20 chemotherapy is largely a diagnosis of
21 exclusion.  Is that your opinion, Doctor?
22     A.    Yes.
23     Q.    So what is -- what does it mean
24 to say that it is a diagnosis of exclusion?
25     A.    It means that it doesn't have

Page 136

1  frank features of its own which can be
2  diagnosed.  It doesn't have specific features
3  under the microscope which are unique to
4  persistent chemo-induced alopecia.
5      Q.    And just because the features
6  are not unique, does that mean that they're
7  not caused in some cases by docetaxel?
8      A.    I don't think you can make any
9  analysis about cause based on the features
10 that you see under the microscope.  I mean,
11 in particular, as we've said numerous times
12 this morning, the features of androgenetic
13 alopecia are indistinguishable from the
14 features of persistent chemo-induced
15 alopecia.
16     Q.    And how do you know what the
17 features are of persistent
18 chemotherapy-induced alopecia?
19     A.    Where they have been described,
20 for instance, in Leonard Sperling's textbook
21 on dermatopathology of hair, he has an atlas,
22 looking at dermatopathology of hair.
23     Q.    So is that what you rely upon
24 in terms of the diagnostic indicators of
25 PCIA?

Page 137

1      A.    No, that's not the only thing
2  that I would rely upon, but in publications
3  where persistent chemo-induced alopecia has
4  been described in the medical literature,
5  even though they're small, you know, one- to
6  ten-person case studies and where the
7  histology has been analyzed, that is how it's
8  been described.
9      Q.    What about this?  Is there any
10 relevance to a temporal association between
11 the exposure to chemotherapy and the
12 beginning of hair loss?
13     MS. COHEN:  Objection to form.
14     A.    Well, as we discussed earlier,
15 anagen effluvium is something that's going to
16 present as a rapid copious hair shedding two
17 to three weeks after the initiation of the
18 chemotherapy --
19 BY MR. GOMEZ:
20     Q.    And under those -- go ahead.
21 Finish.
22     A.    Well, if you look at other
23 treatments like endocrine therapy, you'll see
24 that had an average onset of 16 months from
25 the initiation of chemotherapy, of treatment.

Page 138

1    Q.   Is it possible for a person's
2 hair loss to be caused by more than one
3 factor?
4        MS. COHEN:  Objection to form.
5    A.   It is possible and it is very
6 frequent for multiple hair loss diagnoses to
7 be implicated.  I don't feel in this case
8 that chemotherapy is one of those.  I feel
9 very strongly that her primary diagnosis is
10 CCCA and that she also has components of
11 androgenetic alopecia, which are very
12 important in her diagnosis, as well as
13 traction, as well as hormone-induced therapy.
14        (Clarification requested by the
15    stenographer.)
16    A.   Hormone-induced treatment and
17 hormone changes related to her surgical
18 menopause, related to her treatment with
19 endocrine therapy.  She's been on this drug
20 letrozole for five years now -- I'm sorry.
21 First she was on a different drug but it was
22 the same class of medicine.  She didn't
23 tolerate it, and then they switched her to
24 letrozole.
25        So, you know, she's had five

Page 139

1 years of, you know, exposure to a drug which
2 is well established now in the dermatologic
3 literature and the breast cancer literature
4 as causing hair loss.
5 BY MR. GOMEZ:
6    Q.   And so let's go through the
7 various causes that you believe actually
8 caused Ms. Stewart to lose her hair, and so
9 let's turn to page 73.
10        And you believe that
11 Ms. Stewart suffers from CCCA, correct?
12    A.   I do believe that.
13    Q.   And is that your primary
14 diagnosis?
15    A.   That is my primary diagnosis.
16    Q.   And there's a statement about a
17 hypertrophic scar.
18        Do you see that?
19    A.   Yeah, Dr. Theunissen?s medical
20 notes had described a history of hypertrophic
21 scarring around the umbilicus -- that's the
22 medical term for the belly button --
23 postoperatively.
24    Q.   Okay.  So did Ms. Stewart --
25 did you ask Ms. Stewart whether she had

Page 140

1 scarring there?
2    A.   I asked her -- let me look back
3 at my IME.  I just want to make sure I'm
4 reading it correctly.
5        (Document review.)
6 BY MR. GOMEZ:
7    Q.   If you look in your report -- I
8 don't know if this will help you, Doctor,
9 but:  Although Ms. Stewart denied such
10 history in her medical examination.  And I
11 think that's referring to the hypertrophic
12 scar.
13    A.   Yes, I incorporated that into
14 the discussion.
15    Q.   All right.  And so did you ask
16 Ms. Stewart to show you her belly button so
17 you could determine whether, in fact, she had
18 a hypertrophic scar there?
19    A.   I did not.
20    Q.   So you have CCCA fibroids.
21 What is fibroids?
22    A.   Uterine fibroids are -- they're
23 formations of scar tissue that form within
24 the uterine lining, and they're very common,
25 you know, in women in their forties and early

Page 141

1 fifties.
2        They're benign, but there was a
3 recent study published at Johns Hopkins
4 showing that there was a higher incidence of
5 CCCA among patients who had uterine fibroids
6 treated.
7    Q.   And Ms. Stewart suffers from
8 uterine fibroids?
9    A.   That's why she underwent a
10 hysterectomy in 2012.
11    Q.   All right.  Thank you.
12        So if Ms. Stewart does not, in
13 fact, have a hypertrophic scar, would that
14 change your opinion in any way?
15    A.   No.
16    Q.   You next say that Ms. Stewart
17 suffers from traction alopecia.
18        Is that right?
19    A.   Yes.
20    Q.   And that is your degree to a
21 medical -- I'm sorry.
22        That's your opinion to a
23 medical degree of certainty?
24    A.   Yes.
25    Q.   And that's essentially from

Page 142

1  basically wearing a ponytail, is that right,
2  and other braids --
3      A.    Usually --
4      Q.    Go ahead.
5      A.    Well, it usually is -- it's
6  hard to attribute one specific grooming
7  practice to the development of traction
8  alopecia.  In her case, there were so many,
9  right?  She had used relaxers, she'd used
10  flat irons, she'd used curling irons, heat,
11  you know, the braids with the extensions sewn
12  in, and wigs.
13      You know, ponytail -- tight
14  ponytail, which she had on presentation, you
15  know, with Dr. Rosic and then with myself is,
16  you know, just another sort of offending
17  agent to those hair follicles.
18      Q.    All right.  Is that -- so you
19  believe she had CCCA, traction alopecia.  And
20  then we go to page 74, and there's a
21  discussion of hormonal changes and hormonal
22  therapies.
23      Is it your opinion to a medical
24  degree of certainty that hormonal changes
25  caused Ms. Stewart to suffer hair loss?

Page 143

1      A.    Yes.
2      Q.    Then we go down to number 4,
3  androgenetic alopecia.  Is it your opinion to
4  a medical degree of certainty that she also
5  suffered from androgenetic alopecia?
6      A.    Yes.
7      Q.    And you say at the bottom of
8  that paragraph:  Although this diagnosis
9  alone would not explain the scarring seen on
10  her pathology, it can coexist with other
11  forms of hair loss such as the CCCA and
12  traction that are present.
13      And so let me ask you this:
14  Can PCIA coexist with other forms of hair
15  loss such as CCCA?
16      A.    You know, I think it's
17  impossible to make that leap when you have
18  evidence of androgenetic alopecia already.
19      Q.    And so what about generally
20  speaking, in the universe of cases, can PCIA
21  coexist with other forms of hair loss such as
22  CCCA?
23      MS. COHEN:  Objection to form.
24      A.    To the extent that CCCA is her
25  primary diagnosis, I find it very difficult

Page 144

1  to make a coexistent diagnosis of PCIA.  Like
2  there's just too many other -- there's just
3  too much evidence pointing to her having
4  other causes for her hair loss.
5      You know, we know from her
6  deposition, we know from depositions of her
7  family members, that she has been using, you
8  know, these damaging grooming techniques for
9  decades now.  We know that her father had
10  male pattern baldness.  We know that she had
11  itching.  She had a history of itching, which
12  also supports a diagnosis of CCCA.
13      And we know from her pathology
14  and we know from the culmination of all this
15  data that her hair loss is due to other
16  causes than PCIA.
17  BY MR. GOMEZ:
18      Q.    All right.  And so now we go
19  down to number 5, aging.  And you state:
20  Ms. Stewart was over 40 when she developed
21  hair loss.  We know from the literature that
22  women experience a rapid decrease in hair
23  density around this age.
24      So is it your opinion to a
25  medical degree of certainty that

Page 145

1  Ms. Stewart's age caused her hair loss?
2      A.    I definitely think her age
3  played a role.
4      Q.    So you believe her age was a
5  cause of her hair loss?
6      A.    Yes.
7      Q.    Let's go to page 75, and you
8  have there Medical Conditions and
9  Medications.  And is it your opinion to a
10  medical degree of certainty that some of
11  those medical conditions and medications
12  caused Ms. Stewart's hair loss?
13      A.    Yes.
14      Q.    And can you just identify any
15  of those under number 6 that you do not
16  believe were a cause, if there are any?
17      A.    I mean, they're all listed here
18  because they're all relevant in explaining
19  her hair loss.
20      Q.    All right.  And so let me ask
21  about nutritional factors, for example.
22      You state:  There's no evidence
23  that her ferritin, which is a measure of iron
24  stores, or zinc has been investigated and
25  that a deficiency of one or both of those can

Confidential - Pursuant to Protective Order

Page 146

1  contribute to ongoing hair loss.
2          As we discussed previously, we
3  don't have the labs yet, so at this point you
4  can't say that nutritional factors were a
5  cause, fair to say?
6          MS. COHEN: Objection, form.
7      A.   Nutritional factors...
8          It is unlikely that a low iron
9  level caused her CCCA; however, a low iron
10 could certainly have been a component in her
11 overall hair loss, and so that had not been
12 investigated.
13 BY MR. GOMEZ:
14     Q.   All right. You have surgical
15 procedures, mastectomy and two breast
16 reconstruction surgeries. How did those
17 things cause her to lose her hair?
18     A.   So, you know, we frequently
19 will see episodes of telogen effluvium, which
20 is like a shedding, from surgical procedures,
21 and the shedding in some cases, you know, it
22 can even be chronic; the hair loss can be
23 chronic.
24     Q.   All right. You believe that
25 happened in this case?

Page 147

1      A.   I think it's possible.
2      Q.   Can you opine to a medical
3  degree of certainty that it, in fact, caused
4  Ms. Stewart's hair loss in this case?
5          MS. COHEN: Objection to form.
6      A.   Do I think it has as
7  predominant of a role as the things that we
8  already discussed? No. But do I think it
9  can be ruled out as a cause? I don't think
10 it can be ruled out. I think we have to
11 include it as a possibility.
12 BY MR. GOMEZ:
13     Q.   Sure. And I'm not asking
14 whether we can rule it out. I'm just asking
15 whether you have sufficient evidence as you
16 sit here today to opine to a medical degree
17 of certainty that those procedures actually
18 caused her hair loss.
19     A.   I think that in order to arrive
20 at her having a diagnosis of PCIA, you would
21 have to rule out every single thing in this
22 report.
23     Q.   I guess my question is not
24 that. It's just whether you can opine to a
25 medical degree of certainty today that her

Page 148

1  mastectomy and breast reconstruction
2  surgeries caused her hair loss.
3      A.   I think it definitely -- I
4  think it definitely played a role.
5      Q.   What about high cholesterol?
6      A.   Based on the fact that there is
7  a publication in the medical literature
8  showing how hair loss can result from statin
9  intake, I think that also is a possibility.
10     Q.   What about the use of
11 gabapentin for nerve pain?
12     A.   Same thing.
13     Q.   And let me just say, you know,
14 possibility is different from probability.
15 And I know we can't rule these things out,
16 but can you say today that her high
17 cholesterol and use of Lipitor caused her
18 hair loss to a degree -- a reasonable degree
19 of medical certainty?
20     A.   Do I think that any of the
21 things listed in these bullet points played a
22 bigger role than CCCA or androgenetic
23 alopecia or traction alopecia? No.
24          I think all of the evidence
25 that is available to us presently points

Page 149

1  toward these other causes, but to the extent
2  that there could still be a 5 or a 10% chance
3  that these also exist? Absolutely.
4      Q.   You can't say to a 51% chance
5  that any of them exist, correct?
6      A.   There can be -- there could be
7  a 100% chance.
8      Q.   Sure.
9      A.   You know, physicians like, you
10 know, work for us, it's an N of 1, right? Is
11 it likely that I'm going to get pancreatic
12 cancer over the course of my life and die of
13 it? No. But if I get it, it's a hundred
14 percent.
15     Q.   So I just need -- there's a
16 reason I'm doing this and beating it into the
17 ground, I'm sorry.
18          But I think we've established
19 the things that you know to a reasonable
20 degree of medical certainty contributed to
21 her hair loss. We talked about all those.
22 And I just want to distinguish them from
23 possibilities that you can't rule out.
24          And so my question is: Can you
25 identify any of these medical conditions that

Confidential - Pursuant to Protective Order

Page 150

1 you can say today to a 51% medical degree of
2 probability caused Ms. Stewart's hair loss?
3     A.   I think these are less likely
4 to be the predominant cause of her hair loss.
5 How's that?
6     Q.   I get that part.
7       Can you say any of them to a
8 51% degree of medical probability caused
9 Ms. Stewart's hair loss? Can you say that,
10 yes or no, today?
11     A.   You know, I think of it as sort
12 of a Venn diagram, and I know you probably
13 think of this as like percentages, but I tend
14 to think of things as a Venn diagram. So as
15 I'm imagining her hair loss, we have, you
16 know, a big circle for CCCA and then we have
17 a big circle for androgenetic, and then we
18 have a third big circle for traction
19 alopecia, okay.
20       And then little circles that
21 are superimposed in the middle of the Venn
22 diagram which are maybe 5, 10, 20% each, are
23 each of these things, okay? But I don't
24 think they're outside of the Venn diagram. I
25 think they're inside the Venn diagram in the

Page 151

1 sense that they coexist with the other bigger
2 issues.
3       MR. GOMEZ: So I'm going to
4 move to strike everything after no as
5 nonresponsive. So object.
6       MS. COHEN: I'll make an
7 objection. Yes, thank you.
8       MR. GOMEZ: You'll raise your
9 eyebrows and be frustrated.
10 BY MR. GOMEZ:
11     Q.   And so I'm thinking about
12 percentages in terms of how certain you can
13 be today as a physician and expert that one
14 of these things actually caused Ms. Stewart's
15 hair loss, in part or in whole.
16       And so are you able to say that
17 every one of these things to a medical degree
18 of certainty caused Ms. Stewart's hair loss
19 in part or in whole?
20     A.   Yes.
21     Q.   Thank you.
22       At the bottom of page 75, you
23 state that doxorubicin and cyclophosphamide
24 are cytotoxic agents associated with hair
25 loss, including reports of persistent hair

Page 152

1 loss.
2       Do you believe that those
3 cytotoxic agents cause persistent hair loss?
4     A.   They have been included in
5 reports of persistent hair loss.
6     Q.   So do you believe they cause
7 persistent hair loss?
8       MS. COHEN: Objection to form.
9     A.   I don't -- I don't believe that
10 they alone can be proven responsible for
11 persistent hair loss.
12 BY MR. GOMEZ:
13     Q.   Okay. So you don't -- you --
14     A.   I'm sorry. Let me restate
15 that. I don't think that they alone have
16 been established as responsible for permanent
17 hair loss.
18     Q.   All right.
19     A.   -- (audio malfunction) --
20       (Clarification requested by the
21 stenographer.)
22     A.   Just I -- based on my review of
23 the medical literature and my experience.
24       MS. COHEN: She was talking
25 down.

Page 153

1       THE WITNESS: I was just saying
2 I do not believe that these
3 medications have been established to
4 cause persistent chemotherapy-induced
5 hair loss based on my experience and
6 my review of the medical literature.
7       THE STENOGRAPHER: Thank you.
8 BY MR. GOMEZ:
9     Q.   So you don't believe either
10 doxorubicin or cyclophosphamide actually
11 caused Ms. Stewart to suffer persistent hair
12 loss?
13     A.   I do not.
14     Q.   So let me talk to you about
15 your independent medical examination of
16 Ms. Stewart, if I can.
17       So do you remember Ms. Stewart?
18     A.   Yes, of course.
19     Q.   And was she a nice woman?
20     A.   She was.
21     Q.   Was she cooperative with you?
22     A.   She was.
23     Q.   Did she answer all your
24 questions?
25     A.   She answered my questions, yes.

Confidential - Pursuant to Protective Order

Page 154

1    Q.    Did you ever feel like she was
2   being dishonest with you in any way?
3    A.    I had a lot of information
4   about her going in to the IME.  Obviously, I
5   had read over her deposition.  I had read
6   over the depositions of her family members.
7         You know, I had seen treatment
8   records of her oncologist, of her, you know,
9   other treating physicians, of all the people
10  who treated her for the breast cancer.
11        And, you know, I found her
12  story to be fairly consistent except for when
13  I asked her about her family history of hair
14  loss.  I felt like she downplayed the fact
15  that her father had male pattern balding.
16   Q.    All right.  And so tell us
17  about that.  When you talked to her about her
18  dad, what did she tell you?
19   A.    She basically said that he
20  always wears a ball cap, and she hasn't seen
21  him in a long time.
22   Q.    Did you ask her whether he
23  suffered from baldness?
24   A.    I did not push her on the
25  issue.

Page 155

1    Q.    And so why did she bring up her
2   dad wearing a ball cap and she hadn't seen
3   him in a long time?  Was there something you
4   asked about that caused her to say that?
5    A.    Certainly.  I asked her about
6   her family history of hair loss.
7    Q.    Her response is my dad often
8   wore a ball cap or always wore a ball cap,
9   and I haven't seen him in a while?
10   A.    Right.
11   Q.    I gotcha.
12        And you felt that that was an
13  attempt by her to downplay his baldness?
14   A.    That is what I believed, yes.
15   Q.    All right.  And what about her
16  mom?  Did you talk to her about her mom?
17   A.    Yes.
18        (Document review.)
19   A.    Yeah, she -- she told me that
20  her mother's hair had gotten thinner with
21  age.
22  BY MR. GOMEZ:
23   Q.    All right.  And did you believe
24  that she was being honest and forthcoming
25  with you when she told you that?

Page 156

1    A.    Yes.
2    Q.    Did you ask her whether her
3   hair loss was apparent to her, whether she
4   noticed it?
5    A.    Whether her mother's hair loss
6   was apparent to her?
7    Q.    Let me rephrase that.
8         Did you ask Ms. Stewart whether
9   her own hair loss was apparent to her?
10        MS. COHEN:  Objection to form.
11   A.    Yeah.  When I first met with
12  her and introduced myself, you know, I asked
13  her, you know, what was her chief complaint,
14  as I do with all of my patients.  And she
15  said there's a bald spot on the top of my
16  head and it's likely a result from the chemo
17  treatment I had in 2014 from the breast
18  cancer.
19  BY MR. GOMEZ:
20   Q.    Okay.  And so she described it
21  as a bald spot?
22   A.    Yes.
23   Q.    Did you ask her whether it
24  bothered her?
25   A.    No, that was not my role.  I'm

Page 157

1   sure it bothered her, but we had a lot of
2   information to cover, so I was not trying to
3   gauge her, you know, opinion about it.
4    Q.    Sure.
5         Did you ask her why she had not
6   sought treatment for her condition?
7         MS. COHEN:  Objection to form.
8    A.    Again, I didn't want to make
9   her feel uncomfortable.  I didn't want to
10  make her -- put her on the spot.  But I found
11  it very odd that she had not sought
12  treatment.
13        You know, I -- I did ask her --
14  let's see.  Did I ask her -- hang on.
15        (Document review.)
16   A.    She did tell me she was too
17  embarrassed -- I think that's what she
18  said -- to seek treatment.
19  BY MR. GOMEZ:
20   Q.    Is that in your notes?
21   A.    It's on page 77, page -- the
22  first paragraph, she told me that she did not
23  contact any doctors and kept her insufficient
24  hair regrowth to herself until she saw an ad
25  about Taxotere and hair loss in 2016 and

Confidential - Pursuant to Protective Order

Page 158

1 contacted a law firm.
2     Q.    All right.  And do you also
3 recall her saying that she had not sought
4 treatment because she was too embarrassed?
5     A.    That's what I -- I remember her
6 telling me that, but it doesn't make sense to
7 me, and it didn't make sense to me at the
8 time because anyone who's truly bothered by
9 her hair loss would go and see a doctor.  If
10 you're that embarrassed, go see a doctor.
11    Q.    Have you heard of cases of
12 women that have not sought treatment for hair
13 loss out of embarrassment?
14    A.    Most of the patients that I'd
15 seen are very assertive in seeking treatment.
16 They want to -- you know, they want to
17 improve upon things.
18    Q.    Let me turn your attention
19 to -- I think you're already there.  I think
20 we're on 77.  But there's a discussion of
21 Ms. Stewart wearing braids while she was in
22 college.
23          Do you see that?
24    A.    Yes.
25    Q.    Did she report ever -- did she

Page 159

1 report ever having worn braids after college?
2     A.    Yeah, the braids that we
3 discussed that she wore in college I
4 understood to be cornrows, meaning tight
5 braids against the scalp with extensions,
6 right.  So then they were long braids that
7 came out from that, and they went down past
8 her shoulder.
9          And she said she only had them
10 in for three months, but I've seen plenty of
11 women who have those same type braids for a
12 very short time period, and they do permanent
13 damage to their scalps and to their hair
14 follicles, even just with a short time that
15 they have those braids in.
16    Q.    So in Ms. Stewart's case,
17 assuming that she had not had those braids in
18 since college, would that explain her hair
19 loss in her forties?
20    A.    To the extent that she probably
21 did insidious early damage to her hair at
22 that age, it would definitely take a toll
23 down the road.  It could definitely make it
24 harder for the hairs to come back.
25          And what she said to me was

Page 160

1 that she had continued to use sort of looser
2 braids, but then what she would do is she
3 would braid the hair and then attach these
4 extensions, and that those extensions were
5 sometimes 14 inches long.  And we know that
6 the weight of those extensions, you know,
7 that's also going to take a toll on the hair
8 follicles.
9          And depending on how they're
10 attached.  She actually told me she had to be
11 very careful to make sure the glue didn't go
12 onto the scalp.  So imagine you have glue
13 going onto the scalp.  Now that's even worse
14 to your hair follicles.
15    Q.    How so?
16    A.    You know, it's funny because
17 there's a lot of misinformation in the
18 African-American hair world.  You know, the
19 belief that tight hair braids is a protective
20 hairstyle is a widely held and, you know,
21 terrible -- terribly misinformed view.
22          But it's very common among
23 African-American women that it's a good thing
24 to put your hair in these tight braids.
25          You know, one of the things

Page 161

1 that I've seen women even do is what's called
2 a quick weave, where they basically put a
3 stocking cap on their head, they cover it all
4 with super glue, and then they attached a wig
5 to that.  So what do you think happens when
6 they take that whole thing off?  It rips
7 those follicles out by the roots.  It is so
8 damaging.
9          And, you know, with these
10 women -- with these African-American women,
11 they get started, they have a little bit of
12 hair loss in one area, and then they have to
13 cover it up, and so then it's almost like a
14 vicious circle.
15          They keep getting worse and
16 worse and worse, and so many of the women
17 that I transplant have longstanding hair loss
18 on the sides, in the traction alopecia
19 distribution that Ms. Stewart had, you know,
20 because they're so far gone that those
21 follicles never come back.  And so the only
22 way to bring them back is to actually
23 transplant them from another part of the
24 scalp.
25    Q.    And so let me ask you about

Confidential - Pursuant to Protective Order

Page 162

1  that.  Would Ms. Stewart be a candidate for a
2  transplant surgery?
3      A.    Not at this time.
4      Q.    Why?
5      A.    Because there's still evidence
6  of active inflammation, so, you know, if you
7  as her attorney approached me and said, you
8  know, she really wants the surgery, let's
9  make this happen.  I would say no, no, no.
10 She has to do medical therapy first.  She has
11 to control that inflammation.  You know, I
12 would strongly encourage her to do medical
13 regrowth therapy as well, like minoxidil.
14         I'm not saying I don't
15 transplant CCCA, but I only do it in
16 situations where the inflammation is totally
17 controlled and where we've already maximized
18 medical therapy, and we haven't been able to
19 achieve the results that the patient is
20 wanting.
21     Q.    And so you would, if you were
22 treating her, go through the medical
23 therapies that you described, and then once
24 the inflammation was controlled and she still
25 wanted some better results, you might

Page 163

1  consider a transplant for someone like her?
2      A.    I might consider it, but I
3  would probably not actively encourage it.
4      Q.    Okay.  And have you done
5  transplants for patients whose hair looks
6  like Ms. Stewart?
7      A.    Yes.
8      Q.    How many times, would you say?
9      A.    I mean, I can count them on one
10 hand.
11     Q.    Are there any potential risks
12 of any of the medical treatment that you
13 would recommend to Ms. Stewart if she came to
14 you?
15         MS. COHEN:  Objection to form.
16     A.    Are you asking me are there
17 side effects to the medications that I would
18 recommend to her?  Yes.  And I would discuss
19 them with her.
20 BY MR. GOMEZ:
21     Q.    And what would the potential
22 side effects be?  Just go through like what
23 you would recommend to her and what the side
24 effects would be.
25     A.    Okay.  Sure.

Page 164

1         MS. COHEN:  Objection to form.
2      A.    Well, topical steroids, that
3  would be the first thing that I would
4  recommend to cool off the inflammation in the
5  vertex.  Topical steroids can be associated
6  with steroid acne.  They can be associated
7  with skin atrophy.  They can develop
8  telangiectasias, which is like enlarged
9  capillaries.  Bruising.  Again, this would be
10 like with severe overuse of the steroids.
11         Doxycycline is an antibiotic;
12 like I said, it has antiinflammatory
13 properties.  If taken on an empty stomach it
14 can cause some stomach upset, so I usually
15 encourage my patients to take it with food.
16         If it were to get trapped in
17 the esophagus, like say a patient took it and
18 then laid down, it could cause an esophageal
19 burn, which would be very painful.
20         Doxycycline has also been
21 linked with photosensitivity, so I usually
22 tell my patients to take it late in the day
23 or with dinner, and then that way they're not
24 out in direct sunlight exposure.
25         I'm sure there are other side

Page 165

1  effects that are listed in the package
2  insert, but those are the ones that I spend
3  time reviewing with them during the visit.
4  BY MR. GOMEZ:
5      Q.    And knowing Ms. Stewart's
6  medical history and presentation, is she
7  particularly susceptible to any of those side
8  effects?
9      A.    I don't see any reason why she
10 would not be able to do it.
11     Q.    All right.  Let's turn to
12 page 92.  And you state:  I expect -- at the
13 end of the top paragraph -- I expect that
14 additional biopsies would further
15 substantiate and support my diagnosis.
16         Are you referring to the
17 biopsies that we discussed earlier?
18     A.    Right.  So, you know, doing an
19 additional biopsy more centered over the
20 vertex would help, you know, just give us
21 more information about, you know, the exact,
22 you know, quantity and location of that
23 lymphocytic inflammatory infiltrate and the
24 degree of fibrosis.
25         I think it would also be

Confidential - Pursuant to Protective Order

Page 166

1  helpful to do a biopsy in the temporal area.
2  Most of the women that I -- most of the women
3  of African descent that I treat for hair
4  loss, when they have hair thinning in both
5  areas, I'll actually perform two different
6  biopsies, one up in the sides, the temple,
7  and then one in the vertex.
8      Q.    And so what do you think that
9  additional biopsy would -- what information
10  would that provide you?
11      MS. COHEN: Objection to form.
12      A.    It would just give us more
13  information about why she's having the hair
14  thinning in the temples. You know, based on
15  my dermatoscopic exam, I could see that she
16  had a lot of miniaturized hairs in that area,
17  which is seen with traction alopecia. It's
18  also seen with androgenetic alopecia. It's
19  also seen with endocrine therapy-induced
20  alopecia.
21      You know, given that she's not
22  having complaints of itching up in the
23  temples, I doubt if she has a primary
24  inflammatory process going on up there, but I
25  do like doing a biopsy because sometimes

Page 167

1  there's inflammation in that area as well.
2  BY MR. GOMEZ:
3      Q.    All right. Let's go down to
4  the bottom of page 92, under Review of
5  Dr. Petronic-Rosic's report. Number 2, it
6  states that: Dr. Petronic-Rosic erroneously
7  states that plaintiff had normal hair prior
8  to chemotherapy.
9      How important to you is that
10  consideration --
11      MS. COHEN: Objection to form.
12  BY MR. GOMEZ:
13      Q.    -- whether or not --
14      MR. GOMEZ: I'm sorry?
15      MS. COHEN: I'm sorry, I
16  thought you were finished. I
17  apologize.
18      MR. GOMEZ: Yeah. Let me --
19  I'll say a cleaner question. Then you
20  can do an objection if it's still
21  warranted, and then we can go on.
22      MS. COHEN: Deal.
23  BY MR. GOMEZ:
24      Q.    But how important to you,
25  Doctor, is it as a factor whether or not

Page 168

1  Ms. Stewart had normal hair prior to
2  chemotherapy?
3      MS. COHEN: Objection to form.
4      A.    Well, in the sense that, you
5  know, I think where Dr. Rosic was coming
6  from, which is that, of course, she wanted to
7  believe the plaintiff. She wanted to rely on
8  the plaintiff's, you know, representation of
9  her hair. You know, I think that's fine.
10      But we know from the
11  literature -- the medical -- you know, I know
12  from my experience in just, you know, the
13  medical literature that frequently patients
14  have to develop up to 50% of their hair being
15  gone before it's even noticeable to them.
16      And so to the extent that, you
17  know, she -- you know, I believe that the
18  plaintiff was already thinning and she was
19  already losing her hair long before any of
20  this chemotherapy, you know, or mastectomy,
21  any of that really even happened.
22  BY MR. GOMEZ:
23      Q.    So when do you believe -- how
24  old would Ms. Stewart have been when she
25  began losing her hair, in your opinion?

Page 169

1      MS. COHEN: Objection to form.
2      A.    I mean, CCCA presents at all
3  ages.
4  BY MR. GOMEZ:
5      Q.    So in Ms. Stewart's case, do
6  you have an opinion about how long ago she
7  began to lose her hair, unrelated to
8  chemotherapy?
9      A.    I think her hair loss and her
10  hair thinning began even when she was a teen
11  and she was getting relaxers, you know. I
12  think the steady, you know, slow detrimental
13  effects of all of her hair grooming practices
14  have had a cumulative effect.
15      I think that it was further
16  potentiated by the withdrawal of estrogen
17  when she had her surgical, you know,
18  menopause, when they removed the ovaries
19  along with her uterus in 2012. When they
20  placed her on the letrozole, that further
21  blocked normal estrogen levels and it would
22  have unmasked circulating androgen so that
23  they were able to attack the hair follicles.
24      And to the extent that I think
25  she probably inherited male -- female pattern

Page 170

1  hair loss from her father, those hair
2  follicles would have been genetically more
3  susceptible to the circulating androgens,
4  which, again, they would have been
5  upregulated by virtue of her being on the
6  letrozole for all those years.
7          And then, you know, what I
8  mentioned, I haven't even gotten to CCCA,
9  which is the part that we probably have the
10  best data for in terms of her, you know,
11  diagnosis on the biopsy and the data we have
12  to support that.
13      Q.    Turn to page -- what time did
14  we say we were going to break?  I can't
15  recall.
16          MS. COHEN:  About 1:00 so we're
17  at 12:48 here, Louisiana time.
18          MR. GOMEZ:  Okay.  All right.
19  Thank you.
20          MS. COHEN:  But I don't want to
21  break if you're in a session.  We're
22  probably okay for a little bit.
23          MR. GOMEZ:  Yeah, that's good.
24  We'll just -- we'll keep going for
25  now.

Page 171

1  BY MR. GOMEZ:
2      Q.    On page 93, you state, under 3
3  and 4, you state:  The above list is not
4  exhaustive and there are many additional
5  areas of Dr. Petronic-Rosic's report that I
6  disagree with and which I reserve the right
7  to review and comment further after her
8  deposition.
9          So at this point, have you read
10  her deposition?
11      A.    I have.
12      Q.    Do you have additional
13  disagreements with Dr. Rosic that are not set
14  forth in your report or that we have not
15  talked about already?
16          MS. COHEN:  I'll just interpose
17  an objection to the form of that
18  question, but she can answer it.
19          THE WITNESS:  Okay.
20          MS. COHEN:  That's fine.
21      A.    I -- you know, she -- Dr. Rosic
22  stated that the plaintiff had no family
23  history of hair loss, which is incorrect.
24  She stated that she had no hair thinning or
25  hair loss prior to the chemotherapy, which is

Page 172

1  incorrect.
2          Dr. Rosic made conclusions from
3  the biopsy which I do not agree with.  You
4  know, she basically ignored the finding of
5  CCCA and jumped to this being a diagnosis of
6  PCIA.
7          You know, I was shocked when I
8  read the deposition to reveal that she had
9  plagiarized numerous sources.  That is the
10  kiss of death in medicine, and I really -- I
11  really question her credibility and her
12  character in reading that deposition.
13  BY MR. GOMEZ:
14      Q.    So what plagiarism are you
15  referring to?
16      A.    She listed whole sections of
17  the article by Ralf Paus, and she also copied
18  word for word sections from Dr. Tosti's
19  expert report.
20      Q.    You mean in her report?
21      A.    Yes.
22      Q.    Okay.  And so you say that's
23  the kiss of death in medicine.  What do you
24  mean by that?
25      A.    You lose all confidence and all

Page 173

1  respect from your peers when they find out
2  you've plagiarized.
3      Q.    And in terms of doing this type
4  of work, that is, kind of forensic work,
5  testifying as an expert witness, you don't
6  have any background or experience doing that,
7  correct, other than this case?
8          MS. COHEN:  Objection to form.
9      A.    Well, this is my first
10  experience as an expert witness.
11  BY MR. GOMEZ:
12      Q.    And so you said -- I think you
13  went on to say it made me question her
14  character and -- what else did you say?
15      A.    Her credibility.
16      Q.    And so tell us what you mean by
17  that.
18      A.    Well, I certainly wouldn't send
19  my family member to go see her.
20      Q.    Why is that?
21      A.    Because I would worry that she
22  would lie to make the diagnosis to fit
23  whatever attorney's agenda who had hired her.
24      Q.    And so is there any part of
25  your report that uses the same language as

Page 174

1 any of the other defense experts, or did you
2 write this entire report yourself?
3          MS. COHEN: Objection to form.
4     A.   This is my original content.
5 BY MR. GOMEZ:
6     Q.   All right. And so none of the
7 language in here borrows from or copies
8 language from any other expert in the case?
9          MS. COHEN: And I'll just make
10 an objection again on grounds of form.
11    A.   No. These -- you know, these
12 are my words. This is my review of the
13 literature. This is my review of her
14 materials, her deposition, the testimony by
15 the other treating physicians, and, you know,
16 these are all my original thoughts and
17 opinions about this case.
18 BY MR. GOMEZ:
19    Q.   All right. And you actually
20 wrote these words, correct?
21    A.   Yes.
22    Q.   You state that, you know, you
23 came to your opinions via the use of
24 something called a differential diagnosis; is
25 that right?

Page 175

1     A.   Yes.
2     Q.   So can you explain to us what
3 that means?
4     A.   Sure.
5          A differential diagnosis is an
6 attempt to create a list of all possible
7 explanations for a given clinical finding or
8 symptom or complaint.
9     Q.   All right. And how do you go
10 about doing that?
11    A.   We -- in medicine, we -- we
12 have things we call zebras and we have things
13 we call horses. And I'm sure you've probably
14 deposed enough doctors over the years, you
15 know what I mean.
16          The horses are your most common
17 things that you see a lot of. Those are, you
18 know, heart attack, hypertension, diabetes,
19 you know, asthma, right? The most common
20 things that you see.
21          But then, you know, you go
22 further down the list and so the longer your
23 differential diagnosis is, the harder you're
24 trying to include all possibilities,
25 including the zebras.

Page 176

1     Q.   And so in this case, is PCIA
2 after a woman takes a drug that's been
3 reported to cause PCIA a horse or a zebra?
4          MS. COHEN: Objection to form.
5     A.   It is -- to the extent that it
6 is a well-established cause of permanent hair
7 loss, it's a zebra.
8 BY MR. GOMEZ:
9     Q.   You mean because -- go ahead.
10    A.   Yeah. I would argue that it is
11 the least well described as an entity in and
12 of itself of all of the things that we've
13 discussed today.
14    Q.   And so I guess it goes -- when
15 you hear hoof beats, think horses, not
16 zebras?
17    A.   Uh-huh.
18    Q.   And so you put PCIA into the
19 zebra category because you feel it has not
20 been well established that docetaxel and
21 chemotherapy drugs cause permanent or
22 persistent alopecia?
23    A.   That is correct.
24    Q.   Okay. Why don't we -- let me
25 ask you this real quick and then we can break

Page 177

1 for lunch.
2          But on 94 of your report, which
3 is actually the last page, this last
4 paragraph you talk about things that you may
5 use at trial as exhibits or a summary.
6          Do you know within these
7 categories any of the things that you might
8 use? I know you have the things on your
9 materials considered list, but then number 2
10 is excerpts from scientific articles or
11 learned treatises.
12          Do you have anything in mind as
13 you sit here today?
14          MS. COHEN: I'll just make an
15 objection.
16    A.   I think that there's so many
17 things that are relevant to this case, you
18 know, articles on the dermatoscopy of CCCA,
19 you know, articles relating to the prevalence
20 of endocrine-induced therapies following
21 breast cancer, articles, you know, looking at
22 the role of traction alopecia contributing to
23 hair loss, you know, androgenetic alopecia
24 articles, you know, the pathology as
25 described in Sperling's atlas on

Confidential - Pursuant to Protective Order

Page 178

1 dermatopathology of hair.
2         I think there's a lot of very
3 relevant things that will definitely play a
4 role in this case going forward.
5 BY MR. GOMEZ:
6     Q.    If we went through your
7 reliance list, would you be in a position
8 today to identify those things that you
9 believe you would want to use at trial?
10        MS. COHEN:  Objection to form.
11     A.    Yes, I think so.
12 BY MR. GOMEZ:
13     Q.    Okay.  You talk about
14 demonstrative models.  Do you have any
15 demonstrative models in mind as you sit here
16 today?
17     A.    Sure.  Yes.
18     Q.    Like what?
19     A.    Well, there's a little model
20 that I use with my patients that has -- it
21 kind of looks like a birthday cake, but it
22 has hair follicles sticking out of it, and so
23 it basically shows sort of the
24 miniaturization process.
25        I use that every day with my

Page 179

1 patients, especially my new patients, because
2 I'm explaining, you know, the pathophysiology
3 of male and female pattern hair loss to them
4 with that model.
5     Q.    Anything else?
6        MS. COHEN:  Objection to form.
7     A.    I mean, probably the
8 photographs that I took, the dermatoscopic
9 photographs that I took of Ms. Stewart.
10        MR. GOMEZ:  Okay.  Let's take
11 our break.  How long do you guys want?
12        THE STENOGRAPHER:  You want to
13 go off the record to discuss?
14        MR. GOMEZ:  Let's go off the
15 record to discuss.
16        THE VIDEOGRAPHER:  Off record,
17 1:00 p.m.
18        (Recess taken, 1:00 p.m. to
19 1:59 p.m. CDT)
20        THE VIDEOGRAPHER:  On the
21 record, 1:59 p.m.
22 BY MR. GOMEZ:
23     Q.    Hi, Dr. Rogers, welcome back.
24     A.    Hello, Mr. Gomez.  How was your
25 brunch?

Page 180

1     Q.    Wonderful, terrific and
2 fantastic.  Thank you.
3        Other than what we've already
4 discussed, was there anything else in
5 Dr. Rosic's report -- I mean, her deposition
6 transcript that you disagreed with?
7        MS. COHEN:  I'll just make an
8 objection to form.  We're happy to
9 pull it out too, if you need it.
10        THE WITNESS:  Yeah, can I look
11 at her report?
12        MS. COHEN:  At the report or
13 depo?
14        THE WITNESS:  I'm sorry.  Are
15 you asking about her report or her
16 deposition?
17 BY MR. GOMEZ:
18     Q.    I intended to ask about her
19 deposition.  I think your report addresses
20 her report, and then you reviewed her
21 deposition after you wrote the report.
22        MS. COHEN:  If you want to just
23 ask -- I mean, I can give her the
24 report -- I mean, the depo, if you
25 want, to look at.  Are you asking her

Page 181

1 by memory at this time or how do you
2 want -- I mean, obviously it's up to
3 you.
4        MR. GOMEZ:  Sure.
5 BY MR. GOMEZ:
6     Q.    Just as you sit here today, are
7 you able to identify any other things in
8 Dr. Rosic's deposition that you disagree with
9 or you wish to comment on?
10        MS. COHEN:  I'll just give an
11 objection to that to form.
12     A.    I think we covered most of the
13 important ones, but I would like to just look
14 through it quickly.
15        MS. COHEN:  Okay.  There you
16 go.
17 BY MR. GOMEZ:
18     Q.    Did you annotate yours?
19     A.    No, actually I looked at a
20 computer version, so...
21        (Document review.)
22     A.    I did think it was unusual that
23 she took two biopsies right next to each
24 other.  You know, again, I would have taken
25 two different biopsies in two different

Page 182

1  areas.
2  BY MR. GOMEZ:
3      Q.    And can you indicate for the
4  camera again where you believe she took the
5  biopsies from?
6      A.    Both locations were taken from
7  the left occipital scalp (indicating).
8      Q.    All right.
9      A.    And I would have taken one from
10 the central vertex and then one from either
11 the right or the left temple.
12     Q.    Thank you.
13         (Document review.)
14     A.    I thought it was unusual that
15 she was referring -- she was depending so
16 much on the other experts for her own
17 opinion. You know, I think one of the
18 strengths of our case is obviously, you know,
19 that I have reviewed our patient
20 independently, I've looked at the data, but
21 then, you know, separately, and at the same
22 time, the other experts have come up with the
23 same conclusions.
24         And it's, you know, interesting
25 to me that everything in her case, she keeps

Page 183

1  going back to what the other experts are
2  saying.
3  BY MR. GOMEZ:
4      Q.    All right.
5         (Document review.)
6      A.    To the extent that she argues
7  that the patient has diffuse thinning, I
8  disagree with that.
9         (Document review.)
10     A.    You know, some of what she was
11 trying to say about the chemotherapy effect
12 on the hair follicle at the level of the stem
13 cell, I don't think we have enough data about
14 the exact mechanism of action in order to
15 conclude that stem cells play a role here.
16         In fact, you know, a lot of the
17 hair regeneration ability is actually located
18 in the bulge, which is at a -- it's at a
19 different place in the hair follicle from the
20 bulb.
21 BY MR. GOMEZ:
22     Q.    What page is that where she's
23 talking about that mechanism?
24         (Document review.)
25     A.    I guess I can refer to the

Page 184

1  index, can't I? I just realized.
2         (Document review.)
3      A.    Page -- I'm sorry. And part of
4  my recollection may be from her report. I'm
5  thinking it was touched upon in the
6  deposition.
7         (Document review.)
8      THE WITNESS: Does this index
9  go with the first --
10     MS. COHEN: I handed you two.
11 I'm just stating this on the record,
12 John. I'm not trying to --
13     MR. GOMEZ: Yeah.
14     MS. COHEN: I handed you two
15 transcripts, one from day one, one
16 from day two. So the index attached
17 to each should be the one that goes
18 with that transcript.
19     MR. GOMEZ: I didn't mean to
20 make you work this hard, Dr. Rogers.
21     MS. COHEN: Once she gets her
22 25th deposition as an expert, she'll
23 know what to say. No, I'm not going
24 to look at these transcripts.
25     THE WITNESS: I don't know.

Page 185

1         (Document review.)
2      A.    Yeah, it was -- so it was the
3  first page -- it goes left to right, right?
4  So it was page 230 to 233 --
5  BY MR. GOMEZ:
6      Q.    Thank you.
7      A.    -- talking about that on the
8  first deposition.
9      Q.    And if you see something that
10 you want to comment upon in the deposition
11 this time, you know, to save time, say on
12 page so and so she says this, here's my
13 comment. So I don't have to have you go
14 back.
15     A.    Sure.
16         I definitely disagree with her
17 in the sense that she tries to assert that
18 PCIA is a scarring alopecia. I strongly
19 disagree with that.
20     Q.    Strongly disagree that PCIA is
21 a form of alopecia?
22     A.    She asserts that PCIA is a
23 scarring form of alopecia.
24     Q.    Oh, I gotcha. Okay.
25         And you don't believe it

Confidential - Pursuant to Protective Order

Page 186

1  exists, right?
2       MS. COHEN:  Objection to form.
3    A.    You know, I believe that there
4  are certain cases following chemotherapy
5  where patients may present with longstanding
6  hair loss, but to use the term "PCIA" as
7  necessarily implying that the chemotherapy is
8  responsible, I don't agree with that.
9       (Document review.)
10   A.    I know there were some other
11  things that I disagreed with, but I just
12  don't have them in mind right now.
13  BY MR. GOMEZ:
14   Q.    All right.  We talked about all
15  the areas of disagreement that you're able to
16  identify from her deposition at this time,
17  correct?
18   A.    At this time.
19   Q.    And so have we now -- and
20  taking into account your written report as
21  well -- discussed all the opinions you intend
22  to render in this case?
23       MS. COHEN:  I'll just make an
24       objection to the form of that
25       question.

Page 187

1    A.    No.  I would reserve the right
2  to express more opinions as we go.
3  BY MR. GOMEZ:
4    Q.    Do you have additional opinions
5  that you are prepared to provide today other
6  than what we've discussed and what's in your
7  report?
8    A.    Yes.
9    Q.    Did you say something?  I'm
10  sorry.
11   A.    Yes.
12   Q.    Okay.  And what are those?  Oh,
13  we have -- my question was have we discussed,
14  correct?
15   A.    I think you were asking if I
16  had additional opinions, which I know I do.
17  I'm reserving the right to present them.
18   Q.    All right.  Let me --
19       MS. COHEN:  I'm not trying to
20       interfere.  I just think there may be
21       some confusion.  She's obviously
22       not --
23       MR. GOMEZ:  Sure.
24       MS. COHEN:  She hasn't done
25       this a lot.  I think maybe explain

Page 188

1  what -- you're intending to cover her
2  report in today's comments, right?
3       MR. GOMEZ:  Yes.
4       MS. COHEN:  I don't want to
5  butt in.  I just think the question
6  was a little confusing.
7       MR. GOMEZ:  Of course it was.
8  I didn't even remember what I'd asked.
9  I had to lean in.
10  BY MR. GOMEZ:
11   Q.    So if we take into account and
12  consider both your written report and your
13  testimony today, have you now provided all
14  the opinions that you're prepared to provide
15  in this case as of today?
16   A.    Yes, I would say the majority
17  of them have been thus far presented.
18   Q.    And when you say the majority
19  of them, are there any additional ones that
20  you are prepared to provide today?
21       MS. COHEN:  Objection to form.
22   A.    Yes, and I'm hoping when I get
23  asked the questions that I'll remember what
24  those opinions are.
25       ///

Page 189

1  BY MR. GOMEZ:
2    Q.    All right.  But as of now, as
3  you sit here, you've provided all your
4  opinions, correct, to take into account your
5  report as well?
6    A.    Yes.
7       MS. COHEN:  Objection, form.
8    A.    Yes.
9  BY MR. GOMEZ:
10   Q.    Okay.  And so have you charged
11  money in this case?
12   A.    Yes.
13   Q.    How much have you billed to
14  Sandoz so far?
15   A.    I have billed them for
16  approximately 120 hours of work.
17   Q.    And what is your hourly rate?
18   A.    500.
19   Q.    And so that comes out to
20  $60,000.  Does that sound right?
21   A.    Approximately.
22   Q.    I know we also have your
23  invoices, which we'll just mark as an
24  exhibit.
25       What is your hourly rate that

Confidential - Pursuant to Protective Order

Page 190

1 you charge when you're in clinic?
2     A.    Well, I don't charge an hourly
3 rate per se.  You know, our visits generally
4 are anywhere from 15 to 30 minutes.
5     Q.    And what does a visit cost?
6         MS. COHEN:  Objection to form.
7     A.    Well, it depends on if the
8 patient is paying with insurance or if
9 they're self-pay, but, you know, I would say
10 the time -- my compensation with Sandoz is
11 roughly comparable to what it would be in the
12 office.
13 BY MR. GOMEZ:
14     Q.    And if you're charging a
15 contracted rate with an insurance company,
16 what's your rate per visit?
17     A.    Oh, gosh.  I wish I could give
18 you an answer to that.  I know what we bill
19 the insurance company and I know what they
20 pay generally, you know, and then there's
21 usually some discrepancy, and some companies
22 pay differently than others.
23     Q.    What do you bill for a visit?
24     A.    So for a new patient, self-pay,
25 if they're -- if I'm not in network with

Page 191

1 their insurance, it would be anywhere from
2 190 to 250, depending on whether we did a
3 biopsy, a scalp biopsy.
4     Q.    All right.  And what about an
5 existing patient?
6     A.    Usually anywhere from 75 to 95,
7 depending on if we do scalp injections.
8     Q.    Have you evaluated any cases
9 other than Ms. Stewart for Sandoz or any
10 other manufacturer?
11     A.    I served as a -- I was deposed
12 as a treating physician in one of the Sanofi
13 patients.
14     Q.    Okay.  And so other than as a
15 treating physician, have you worked as an
16 expert witness on any other cases other than
17 Ms. Stewart's?
18         MS. COHEN:  I'll just make an
19     objection to form, to the extent
20     there's any that are attorney work
21     product, but obviously there's some
22     reference in the invoices you have.  I
23     think that's fair game.  That's why we
24     gave those to you, John.
25     A.    Right, yeah.  I have a couple

Page 192

1 of patients who are in litigation against
2 their hairdresser or -- either one or two
3 different hairdressers, and so I was
4 deposed -- it was nothing on the scale of
5 this.  But it was like a half-hour
6 deposition, and that was like a couple months
7 ago.
8 BY MR. GOMEZ:
9     Q.    All right.  And so a couple of
10 your patients sued their hairdresser; is that
11 right?
12     A.    I had two patients who suffered
13 scarring burns from chemical highlights that
14 were applied to their hair and scalp.
15     Q.    I gotcha.  Okay.
16         Have you -- have you evaluated
17 any other cases for Sandoz in this litigation
18 other than Ms. Stewart?
19     A.    No.  Oh, yes, I have.  For
20 Sandoz?
21     Q.    Right.
22     A.    Yes, I have.
23     Q.    And how many?
24     A.    Four.  Four other patients.
25     Q.    And have you physically seen

Page 193

1 those four patients yet?
2     A.    Have I physically seen those
3 four patients?  I have not yet seen those
4 four patients.
5     Q.    All right.  And with regards to
6 those four patients, what have you done so
7 far?
8     A.    Just reviewed over some
9 materials.
10     Q.    Medical records?
11     A.    I think so, as I recall.  I
12 could probably tell you from the invoices.
13 Yeah, just medical records.
14     Q.    Have you attempted to determine
15 whether any of those additional four women
16 suffered from PCIA?
17         MS. COHEN:  And I'm just going
18     to make an objection because again, I
19     think this will be work product and
20     attorney-client privilege.  Right now,
21     you can see the invoices.  They're not
22     far along yet.  So I'll make that
23     objection.
24     A.    Yeah, sorry, I'm not at liberty
25 to discuss.