UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>*Wanda Stewart v. Sandoz Inc.*<br>Civil Case No. 2:17-cv-10817 | MDL No. 2740<br><br>Section: N(5)<br><br>JUDGE JANE TRICHE MILAZZO<br><br>MAG. JUDGE NORTH |

**REPLY IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT
OPINIONS OF DR. DAVID MADIGAN**

**GREENBERG TRAURIG, LLP**
Lori G. Cohen
R. Clifton Merrell
Evan C. Holden
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100

*Counsel for Defendant Sandoz Inc.*

# **TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................1

I. PLAINTIFF FAILS TO REBUT DR. MADIGAN'S LACK OF QUALIFICATIONS TO RENDER OPINIONS IN THIS CASE DETAILED IN SANDOZ'S MOTION. .................................................................................................1

II. DR. MADIGAN'S FLAWED METHODOLOGY IS UNRELIABLE AND IRRELEVANT. ..................................................................................................2

    A. DR. MADIGAN'S GENERAL CAUSATION OPINIONS ARE BASED ON A FLAWED METHODOLOGY. ............................................................2

        1. DR. MADIGAN'S USE OF FAERS FAILS TO FOLLOW FDA GUIDANCE AND UTILIZES A FUNDAMENTALLY FLAWED ANALYSIS. .............................................................................................2

        2. PLAINTIFF FAILS TO DEMONSTRATE A RELIABLE METHODOLOGY IN DR. MADIGAN'S ANALYSIS OF THE SANOFI DATABASE OR THE RELEVANCE OF HIS OPINIONS REGARDING SANOFI TO SANDOZ'S ACTIONS IN THIS LITIGATION. .........................................................................7

        3. PLAINTIFF FAILS TO DEMONSTRATE THAT DR. MADIGAN'S ANALYSIS OF THE FOUR FLAWED OBSERVATIONAL STUDIES IS RELIABLE. .......................................8

        4. PLAINTIFF FAILS TO ADDRESS THE FLAWS IN DR. MADIGAN'S RELIANCE ON AND ANALYSIS OF TAX 316 AND TAX 301. ........................................................................................9

    B. PLAINTIFF CONCEDES THAT DR. MADIGAN DOES NOT OFFER ANY REGULATORY, MEDICAL CAUSATION, SANDOZ-SPECIFIC OR PLAINTIFF-SPECIFIC OPINIONS. ............................................................9

CONCLUSION ...........................................................................................................10

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................................................... 2

*DeLuca v. Merrell Dow Pharms., Inc.*,
   791 F. Supp. 1042 (D.N.J. 1992) ............................................................................................ 5

*Hall v. Baxter Healthcare Corp.*,
   947 F. Supp. 1387 (D. Or. 1996) ............................................................................................ 8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices, & Prods. Liab. Litig. (No. II)*,
   MDL 2502, 892 F.3d 624 (4th Cir. 2018) ........................................................................... 4, 5

*McClain v. Metabolise Intern., Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ........................................................................................... 5, 6

*Rhodes v. Bayer Healthcare Pharm., Inc.*,
   No. CIV.A. 10-1695, 2013 WL 1289050 (W.D. La. Mar. 26, 2013) ...................................... 5

*In re Roundup Prods. Liab. Litig.*,
   390 F. Supp. 3d 1102 (2018) .................................................................................................. 8

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) .................................... 6

*In re Vioxx Prod. Liab. Litig.*,
   No. MDL 1657, 2016 WL 8711273 (E.D. La. Sept. 16, 2016) ............................................... 2

*Wade-Greaux v. Whitehall Labs.*,
   874 F. Supp. 1441 (D.V.I. 1994) ............................................................................................ 5

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
   26 F. Supp. 3d 466 (E.D. Pa. 2014) .................................................................................... 6, 7

**REPLY IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT
OPINIONS OF DR. DAVID MADIGAN**

In Plaintiff's Opposition to Defendant Sandoz Inc.'s Motion to Exclude or Limit Opinions of Dr. David Madigan (the "Opposition" or "Opp."), Plaintiff limits the scope of Dr. Madigan's opinions stating that she will not "offer Dr. Madigan as an expert to address 505(b)(2) drug labeling regulation issues" and that Dr. Madigan is not "intend[ed] to offer Sandoz-specific nor Plaintiff-specific opinions at the trial in this matter." (Opp. at p. 1). Furthermore, Plaintiff concedes that Dr. Madigan will not be providing any general causation or medical caution opinions. (Opp. at pp. 3, 12). Instead, Plaintiff asserts that Dr. Madigan will opine only as to "statistical evidence that supports a causal association between docetaxel and permanent/irreversible alopecia." *Id*. But, as set forth in the Motion, Dr. Madigan is not qualified to opine in this litigation on general causation of irreversible alopecia with docetaxel, as he is not a medical doctor and does not have the training and experience necessary to offer such testimony. And, even if he were qualified, his opinions are based on flawed and unreliable support, as the studies upon which he relies offer the lowest forms of evidence, in that they are not peer reviewed or published. Accordingly, Dr. Madigan's opinions should be excluded or, at a minimum, limited in this litigation.

**ARGUMENT**

**I.    PLAINTIFF FAILS TO REBUT DR. MADIGAN'S LACK OF QUALIFICATIONS TO RENDER OPINIONS IN THIS CASE DETAILED IN SANDOZ'S MOTION.**

It is undisputed that this Court previously found Dr. Madigan qualified to testify only if he "appropriately limit[ed] his opinion to statistics and [did] not opine on medical causation." (Doc. 8094 at p. 6). In the Opposition, Plaintiff attempts to avoid this Court's prior ruling and characterizes Dr. Madigan's opinions as providing "statistical analyses in support of the general causation inquiry." (Opp. at p. 4). Dr. Madigan's own opinion—that "there is adequate statistical

1

evidence that docetaxel *causes* permanent/irreversible alopecia" (Mot. Ex. B (Madigan Expert Report) at p. 25) (emphasis added)—belies Plaintiff's assertion that these opinions are "clearly within the confines of the Court's prior determination on the admissibility of Dr. Madigan's opinions." (Mot. at p. 4).[1] This Court clearly ruled that Dr. Madigan only may testify about statistics—not that there is a correlation between docetaxel and permanent/irreversible alopecia. Nothing Plaintiff argues avoids that result. Similarly, Plaintiff does not even attempt to argue that Dr. Madigan engaged in the methodology necessary to establish general causation and concedes that Dr. Madigan did not "perform[] a Bradford Hill criteria analysis." (Opp. at pp. 3-4). This concession is fatal to Plaintiff's argument. Accordingly, Dr. Madigan's general causation opinions should be excluded.

## II. DR. MADIGAN'S FLAWED METHODOLOGY IS UNRELIABLE AND IRRELEVANT.

### A. DR. MADIGAN'S GENERAL CAUSATION OPINIONS ARE BASED ON A FLAWED METHODOLOGY.

#### 1. DR. MADIGAN'S USE OF FAERS FAILS TO FOLLOW FDA GUIDANCE AND UTILIZES A FUNDAMENTALLY FLAWED ANALYSIS.

Plaintiff does not deny the fact that Dr. Madigan failed to act in accordance with the FDA's Best Practices, but instead spends the majority of her Opposition arguing that "criticisms of Dr. Madigan's safety signal analysis of case reports located in the FAERS database are misplaced." (Opp. at p. 5; *see also* Opp. at pp. 5-9). Plaintiff asserts that Sandoz "confuses signal identification" which is set forth in Section 6 of the FDA's Best Practices, "with signal evaluation" which is set

---

[1] The decision in *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291 (N.D. Fla. 2018), which Plaintiff fails to address, is instructive as that court found Dr. Madigan to be "a man of statistics, not medicine" and accordingly, "lack[s] the medical knowledge and experience to offer a general causation opinion." *Id.* at 1361; *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2016 WL 8711273, at *4 (E.D. La. Sept. 16, 2016) ("Dr. Madigan should not offer opinions regarding Merck's interpretations of the test results or their significance" as "[s]uch testimony would be outside his field of expertise, and therefore inadmissible under the *Daubert* standard").

2

forth in Section 7 of the FDA's Best Practices. (*See* Mot. Ex. D (FDA Best Practices) at pp. 21-30). Specifically, per Plaintiff, "Section 7 of the FDA's new draft guidance does not guide Dr. Madigan's analysis" as "Dr. Madigan's analysis of case reports is related to safety signal identification corresponding to the methodology described in Section 6 of the FDA's draft guidance." (Opp. at p. 5).

This argument is without merit as Section 7—titled "Signal Evaluation and Documentation"—applies to the evaluation of safety signal analyses based on certain databases and literature, including FAERs, which would include three of the four analyses conducted by Dr. Madigan. (Mot. Ex. D (FDA Best Practices) at p. 30). Specifically, Section 7 sets forth "an integrated, comprehensive evaluation of the prioritized signal to determine whether and what regulatory action(s) are indicated." *Id*. Dr. Section 7 sets forth the appropriate standards for the analysis conducted by Dr. Madigan. Pertinent here, Section 7.1.2 states that "[r]eviews evaluate *individual* [individual case safety reports ("ICSRs")] for potential inclusion in a set of similar cases [] by using, as a point of reference a case definition for the event." *Id*. (emphasis added). Dr. Madigan failed to evaluate individual case reports in FAERS consistent with this requirement.

Similarly, Plaintiff's argument that "[r]eviewing individual, underlying case reports is not contemplated as part of the FAERS disproportionality analysis" (Opp. at p. 6), is incorrect. Section 6—titled "Safety Signal Identification: FAERS and VAERS"— upon which Plaintiff relies, recognizes that it is imperative to review the individual, underlying case report. Specifically, Section 6 states: "[i]t is critical that an ICSR be of high quality for optimal evaluation of the relationship between the product and AE" as the "most useful ICSRs contain *detailed descriptive information in the narrative section to describe the AE as it occurred in the patient*." *Id*. at § 6.1.1 (emphasis added). Further, Section 6 advises "[i]f an ICSR does not include sufficient information

3

to assess the suspected causal relationship between the product and event, the reviewer may follow up with the applicant or the report to obtain additional information necessary for case assessment. *Id.* The FDA Best Practices encourages reviewers "to learn more information about the event and how it resolved" and "attempt to get more information about the circumstances surrounding the [Adverse Event (hereinafter "AE"] and other possible contributing or counting factors." *Id*. Upon engaging in this analysis, "the reviewer may identify one or more AE(s) that may cause the review to read in detail all ICSRs for the AE(s)." *Id.* Simply put, Section 6 sets forth a strategy that requires review of the individual and the underlying case reports in order to conduct a fulsome and reliable analysis.

Moreover, even if Plaintiff was correct it is of no matter as Section 6 of the FDA's Best Practices directs the evaluator to Section 7 and states that "[f]or further details on assessment of ICSRs for causal association, see section 7.1.3" (Mot. Ex. D (FDA Best Practices) at p. 28). Accordingly, Plaintiff's attempt to invoke Section 6 and argue reliance on Section 7 is "misplaced", is without merit.

Plaintiff also argues that "[t]he same type of FAERS analysis Dr. Madigan performed in this case has been routinely admitted by other courts" (Opp. at p. 6), but without knowing the totality of the information looked at by the experts in those cases, that "other courts" have found such "data-mining" to be reliable is without merit. Here, despite admitting that "the FAERS database has well documented limitations" and "incomplete information" (*See* Mot. Ex. C (Madigan Dep.) at pp. 77, 81), Dr. Madigan did not review the actual case reports and did not exclude non-breast cancer cases or cases involving men. (*See* Mot. Ex. C (Madigan Dep.) at pp. 101-102, 111-112). By failing to follow these steps, he relied on case reports that are not applicable here and ignored confounding factors. *Mktg., Sales Practices & Prods. Liab. Litig.*, 174 F. Supp.

4

3d 911, 916 (D.S.C. 2016) (experts need to look for "alternative explanations for the associations, such as bias or confounding factors") (citation omitted); *Wade-Greaux v. Whitehall Labs.*, 874 F. Supp. 1441, 1475 (D.V.I. 1994) ("Looking behind [the experts'] conclusory statements, however, it is clear that there are other potential alternative causes that plaintiff's expert witnesses either have not excluded or cannot possibly exclude as a cause of [plaintiff's] birth defects.").

Further, Plaintiff's reliance on unrelated cases where FAERS data was found to be reliable is not persuasive — courts also routinely have excluded the "same type of FAERS analysis Dr. Madigan performed in this case." *E.g. In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices, & Prods. Liab. Litig. (No. II)*, MDL 2502, 892 F.3d 624, 633–34 (4th Cir. 2018); *DeLuca v. Merrell Dow Pharms., Inc.*, 791 F. Supp. 1042, 1051 (D.N.J. 1992) (stating that case reports are insufficient to establish causation); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1481 (D.V.I. 1994) (finding that anecdotal reports are not the type of data reasonably relied on by experts). For example, in *McClain*, the Eleventh Circuit found reliance on adverse events reports to be unimpressive, as such reports do not demonstrate the requisite degree of reliability required by *Daubert*:

> The FDA's adverse events reports ... and other consumer complaints ... provided another important source for [the expert's] opinions. But these FDA reports reflect complaints called in by product consumers without any medical controls or scientific assessment. Under the adverse events reporting system, consumers call in to describe medical problems that they think they are experiencing from taking a product. These complaints provide the basis for the AERs. [The expert] also considered the same type of complaints called into the "Metabolife health-line." Yet, [the expert] ... testified that such anecdotal reports do not prove causation.
>
> Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation.... It also shows that [the expert] relied on data that lacks the indicia of scientific reliability.

*Id.* at 1250; *accord Rhodes v. Bayer Healthcare Pharm., Inc.,* No. CIV.A. 10-1695, 2013 WL 1289050, at *6 (W.D. La. Mar. 26, 2013) (finding assessment of adverse event reports to be

5

"unreliable on multiple grounds"). As in *McClain*, Dr. Madigan's use of "[u]ncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation" as it simply "shows that [Dr. Madigan] relied on data that lacks the indicia of scientific reliability." *McClain*, 401 F.3d at 1250.

As to Sandoz's argument that Dr. Madigan improperly relies on Dr. Kessler's search terms because Dr. Kessler has not been designated as an expert in this case, Plaintiff argues that "Dr. Kessler's role in defining the outcome for [Dr. Madigan's] analysis" is "exaggerate[d]" and "Dr. Madigan did not blindly rely on Dr. Kessler's support to define the outcome." (Opp. at p. 8). But this argument does not address the fact that Dr. Madigan's flawed search terms discussed above are entirely based on Dr. Kessler's opinions, which cannot be cross-examined in this case. Moreover, Dr. Madigan admittedly did not independently review the search terms/method prescribed by Dr. Kessler, even if such terms were an "imperfect fit." The Federal Rules of Evidence do not allow Dr. Madigan to opine where he has failed to assess the validity of Dr. Kessler's opinions. *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (upholding district court's exclusion of expert who failed to assess validity of the opinions of the experts relied upon).

Whether this Court looks to the FDA's Best Practices Section 6 or 7, there is no question that Dr. Madigan's own testimony illustrates the lack of reliability for such data, and accordingly, the Court should exclude his analysis. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 466, 481 (E.D. Pa. 2014) (excluding plaintiffs' expert opinions that did not reflect the current state of the science).

### 2. PLAINTIFF FAILS TO DEMONSTRATE A RELIABLE METHODOLOGY IN DR. MADIGAN'S ANALYSIS OF THE SANOFI DATABASE OR THE RELEVANCE OF HIS OPINIONS REGARDING SANOFI TO SANDOZ'S ACTIONS IN THIS LITIGATION.

In her Opposition, Plaintiff does not address the fact that Dr. Madigan also failed to follow FDA Best Practices in his analysis of "hits" in the Sanofi database by applying the high-level search terms to locate documents that contained certain words but not reviewing the underlying case report, and he was not aware of the severity of alopecia, whether the alopecia resolved, or whether a doctor or dermatologist had actually diagnosed the individual with permanent alopecia related to chemotherapy. (*See* Mot. Ex. C (Madigan Dep.) at pp. 117, 118, 101-102). That lack of analysis to support Dr. Madigan's opinions alone warrants exclusion as set forth above. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d at 481.

As to Sandoz' argument that Dr. Madigan's testimony and reliance on *Sanofi*'s database is irrelevant as that internal adverse event database is *Sanofi*'s—and not Sandoz (*See* Mot. Ex. C (Madigan Dep.) at p. 115), Plaintiff essentially has no response as she concedes that "Dr. Madigan admitted that he does not know whether [Sandoz] had access to Sanofi's internal pharmacovigilance database." (Opp. at p. 10). Instead, in an obvious attempt to avoid the fact that Dr. Madigan's methodology contains a gaping hole, Plaintiff argues that "the FAERS database is publicly available" and could be used to "conduct a safety signal analysis[.]" (Opposition at 9). But this does not address the actual issue—Dr. Madigan did not evaluate Sandoz's database and instead forms his opinions based on a database to which he has no evidence that Sandoz had access. Furthermore, much of Dr. Madigan's evaluation of the Sanofi internal database included internal Sanofi analysis and memoranda that are not part of the FAERS database and would not be available to Sandoz. See Mot. at p. 12; *e.g.* Mot. Ex. C (Madigan Dep.) at pp. 120-121, 122 (relying on two

7

*Sanofi* employees' internal reports for support). This renders his methodology unreliable and the Sanofi database is irrelevant to the jury's decision here, and, therefore, inadmissible.

### 3. PLAINTIFF FAILS TO DEMONSTRATE THAT DR. MADIGAN'S ANALYSIS OF THE FOUR FLAWED OBSERVATIONAL STUDIES IS RELIABLE.

Plaintiff concedes that "Dr. Madigan has acknowledged that the meta-analysis of observations studies is only a supportive strand of evidence that is of lesser quality than randomized clinical trial evidence" (Opp. at pp. 10-11), but asserts, without any support, that "the evidence by no means should be dismissed in its entirety" arguing that this issue goes to "weight" and "not its admissibility." (Opp. at p. 11). But Plaintiff's argument ignores the fact that this Court must first decide the reliability of Dr. Madigan's opinions, which are determined by the quality of the underlying studies. *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1120 ("[t]he value of a meta-analysis, like the value of a pooled analysis, depends upon the quality of the underlying studies"). That likely is because Dr. Madigan's own deposition testimony calls into question the quality of these studies, including his concession that there were "several limitations" to one study and other concerns about "studies of this type." (*See* Mot. Ex. C (Madigan Dep.) at pp. 132-133).

Plaintiff also argues that it is a "red herring" that three of the four studies Dr. Madigan analyzed post-date Plaintiff's treatment (Opp. at p. 11), and fails to address how such studies could be relevant to Plaintiff's case. Further, Plaintiff does not address that two studies—Crown and Sedlacek—upon which Dr. Madigan relied are abstracts that were never turned into peer-reviewed, published papers. (*See* Mot. Ex. B (Madigan Expert Report) at pp. 21-22). *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1405 (D. Or. 1996) (excluding an expert's opinion that relied on an abstract because an "abstract is not yet published, nor is a full write-up of the study, including the supporting data, yet available."). These differences and quality issues affirm that Dr. Madigan's observational study analysis should be excluded.

8

**4.    PLAINTIFF FAILS TO ADDRESS THE FLAWS IN DR. MADIGAN'S RELIANCE ON AND ANALYSIS OF TAX 316 AND TAX 301.**

Failing to address this argument substantively, Plaintiff makes the blanket statement that "clinical trials are relevant to when a safety signal emerged and knowable to manufacturers like Sandoz." (Opp. at p. 9). And continues that, "although Dr. Madigan admitted that he does not know whether manufacturers like Sandoz had access to the raw data from Sanofi's TAX 316 or TAX 301 clinical trials, the results of those studies are publicly available in published literature and clinical study reports are publicly available through FOIA requests." (Opp. at p. 10). That Dr. Madigan did not know if Sandoz had access is the issue, though, as he cannot establish knowledge for causation purposes relying on TAX 316 and TAX 301.

The Opposition also fails to address two major flaws with the studies. First, neither of these studies had a "primary endpoint" of "looking at hair loss." (*See* Mot. Ex. C (Madigan Dep.) at p. 147). Second, Plaintiff fails to address the fact that statistical findings in the TAX 316 and TAX 301 studies were not statistically significant. (*See* Mot. Ex. C (Madigan Dep) at pp. 145-146, 148). That neither has actual value renders each study irrelevant and unreliable, thus warranting exclusion.

**B.    PLAINTIFF CONCEDES THAT DR. MADIGAN DOES NOT OFFER ANY REGULATORY, MEDICAL CAUSATION, SANDOZ-SPECIFIC OR PLAINTIFF-SPECIFIC OPINIONS.**

In the Opposition, Plaintiff states that "Dr. Madigan does not offer regulatory opinions, medical causation opinions, Sandoz-specific opinions, or Plaintiff-specific opinions." (Opp. at p. 12). Accordingly, Dr. Madigan should be precluded from offering regulatory opinions, including the labeling duties or requirements for a 505(b)(2) drug manufacturer; medical causation opinions; Sandoz-specific opinions; or Plaintiff-specific opinions.

9

## CONCLUSION

As discussed above, Dr. Madigan is not sufficiently qualified to provide his purported opinions regarding medical causation, signal detection, or regulatory requirements. Furthermore, he has failed to use a sufficiently reliable methodology to provide these opinions. His opinions are essentially a cut and paste set of opinions from the Sanofi trial set cases, that cannot be cut and paste, and in fact, lead to significant prejudice in analyzing data and documents wholly unrelated to Sandoz or anything it was aware of. For all the foregoing reasons, Sandoz respectfully requests that the Court exclude or limit opinions of Dr. Madigan as set forth above.

Dated: December 22, 2020

Respectfully Submitted:

**GREENBERG TRAURIG, LLP**

*/s/ Lori G. Cohen*
Lori G. Cohen
R. Clifton Merrell
Evan C. Holden
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100
(678) 553-2386 (facsimile)
CohenL@gtlaw.com
MerrellC@gtlaw.com
HoldenE@gtlaw.com

*Attorneys for Sandoz Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2020, a copy of the foregoing document was served on all counsel of record via CM/ECF.

                                                */s/ Lori G. Cohen*
                                                Lori G. Cohen