# **EXHIBIT B**

Page 384

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF CALIFORNIA

3

4    IN RE:  TAXOTERE (DOCETAXEL)    )
     PRODUCTS LIABILITY LITIGATION   )
5                                    )   MDL No. 2740
     This Document Relates To:       )
6                                    )   Section H
     Antoinette Durden,              )
7    Case No. 2:16-cv-17735;         )
     Tanya Francis,                  )
8    Case No. 2:16-cv-17410;         )
     Barbara Earnest,                )
9    Case No. 2:16-cv-17144          )
     _____)

10

11

12

13

14

15

16        VIDEOTAPED DEPOSITION OF ELLEN FEIGAL, M.D.

17               San Francisco, California

18               Friday, January 11, 2019

19                     Volume III

20

21

22   Reported by:
     CARLA SOARES
23   CSR No. 5908

24   Job No. 3189948

25   Pages 384 - 626

Page 385

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF CALIFORNIA
 3
 4 IN RE:  TAXOTERE (DOCETAXEL)  )
   PRODUCTS LIABILITY LITIGATION )
 5                          ) MDL No. 2740
   This Document Relates To:   )
 6                          ) Section H
   Antoinette Durden,        )
 7 Case No. 2:16-cv-17735;   )
   Tanya Francis,            )
 8 Case No. 2:16-cv-17410;   )
   Barbara Earnest,          )
 9 Case No. 2:16-cv-17144    )
   _____)
10
11
12
13
14
15
16        VIDEOTAPED DEPOSITION OF ELLEN FEIGAL,
17 M.D., Volume III, taken on behalf of Defendants, at
18 One Sansome Street, San Francisco, California,
19 beginning at 11:01 a.m., and ending at 6:00 p.m., on
20 Friday, January 11, 2019, before CARLA SOARES,
21 Certified Shorthand Reporter No. 5908.
22
23
24
25
```

Page 387

```
 1 TELEPHONIC APPEARANCES:
 2
 3 For Defendant Sandoze Inc.:
 4      GREENBERG TRAURIG, LLP
 5      BY:  STEPHEN T. FOWLER, Attorney at Law
 6      2101 L Street Northwest, Suite 1000
 7      Washington, DC 20037
 8      202.530.8587
 9      fowlerst@gtlaw.com
10
11
12 For Defendants Hospira and Pfizer:
13      DECHERT, LLP
14      BY:  MARA CUSKER GONZALEZ, Attorney at Law
15      Three Bryant Park
16      1095 Avenue of the Americas
17      New York, New York 10036
18      212.641.5665
19      mara.cuskergonzalez@dechert.com
20
21
22
23
24
25
```

Page 386

```
 1 APPEARANCES:
 2
 3 For the Plaintiffs:
 4      ANDREWS THORNTON
 5      BY:  JOHN C. THORNTON, Attorney at Law
 6      BY:  LAUREN R. DAVIS, Attorney at Law
 7      4701 Von Karman Avenue, Suite 300
 8      Newport Beach, California 92660
 9      949.748.1000
10      jct@andrewsthornton.com
11      ldavis@andrewsthornton.com
12
13
14 For Defendant Sanofi:
15      SHOOK, HARDY & BACON, LLP
16      BY:  CHRISTOPHER J. KAUFMAN, Attorney at
17        Law
18      BY:  JORDAN BAEHR, Attorney at Law
19      2555 Grand Boulevard
20      Kansas City, Missouri 64108
21      816.474.6550
22      ckaufman@shb.com
23      jbaehr@shb.com
24
25
```

Page 388

```
 1 TELEPHONIC APPEARANCES (Continued):
 2
 3 For Defendant Sun Pharmaceutical:
 4      HINSHAW & CULBERTSON, LLP
 5      BY:  GEOFFREY M. COAN, Attorney at Law
 6      53 State Street, 27th Floor
 7      Boston, Massachusetts 02109
 8      617.213.7045
 9      gcoan@hinshawlaw.com
10
11 For Defendant Accord Healthcare, Inc.:
12      TUCKER, ELLIS & WEST, LLP
13      BY:  JULIE A. CALLSEN, Attorney at Law
14      950 Main Avenue, Suite 1100
15      Cleveland, Ohio 44113
16      216.696.2286
17      julie.callsen@tuckerellis.com
18
19
20 ALSO PRESENT:  Cassia Leet, Video Operator
21
22           --o0o--
23
24
25
```

2 (Pages 385 - 388)

Page 389

```
 1              INDEX
 2 WITNESS
 3 ELLEN FEIGAL, M.D.              EXAMINATION
   Volume III
 4
 5      BY MR. KAUFMAN          394, 617
 6      BY MR. THORNTON          599
 7
 8          EXHIBITS
 9 NUMBER        DESCRIPTION        PAGE
10 Exhibit 16  Notice of Continued Videotaped   396
11      Deposition of Ellen Feigal, M.D.
12
13 Exhibit 17  Document entitled "Expert Report   396
14      of Ellen Feigal, M.D."
15
16 Exhibit 18  Document headed "Curriculum Vitae"  397
17
18 Exhibit 19  Document headed "Journal of     399
19      Clinical Oncology"
20
21 Exhibit 20  Document headed "Incidence of    400
22      permanent alopecia following
23      adjuvant chemotherapy in women
24      with early stage breast cancer"
25
```

Page 390

```
 1          EXHIBITS
 2 NUMBER         DESCRIPTION      PAGE
 3 Exhibit 21  NDA Partners LLC invoice      456
 4      dated 12-11-18
 5
 6 Exhibit 22  Document entitled "Expert Report   483
 7      of Ellen G. Feigal, M.D."
 8
 9 Exhibit 23  Document entitled "Expert Report   483
10      of David W. Feigal, Jr., M.D.,
11      M.P.H."
12
13 Exhibit 24  Document headed "Side Effects of   582
14      Adjuvant Chemotherapy:  Perceptions
15      of Node-Negative Breast Cancer
16      Patients"
17
18 Exhibit 25  Document headed "Center for Drug   589
19      Evaluation and Research"
20
21 Exhibit 26  Letter to Rhone-Poulenc Rorer   589
22      Pharmaceuticals, Inc. from Robert
23      Temple, M.D., dated 6-22-98
24
25          --o0o--
```

Page 391

```
 1      REFERENCED EXHIBITS
 2      (Not Attached)
 3      EXHIBIT    PAGE
 4        5      416
 5        4      422
 6        6      422
 7        7      422
 8        8      422
 9
10
11      INSTRUCTIONS NOT TO ANSWER
12        PAGE    LINE
13        (None)
14
15      --o0o--
16
17
18
19
20
21
22
23
24
25
```

Page 392

```
 1      San Francisco, California
 2      Friday, January 11, 2019
 3        11:01 a.m.
 4
 5      P R O C E E D I N G S
 6      THE VIDEO OPERATOR:  Good morning.  We are
 7 going on the record at 11:01 a.m. on January 11th,
 8 2019.
 9      Please note that the microphones are
10 sensitive and may pick up whispering, private
11 conversations, and cell phone interference.  Audio-
12 and video-recording will continue to take place
13 unless all parties agree to go off the record.
14      This is Volume III, Media Unit 1, of the
15 video-recorded deposition of Ellen Feigal, M.D.,
16 taken by counsel for defendants in the matter of In
17 Re: Taxotere (Docetaxel) Products Liability
18 Litigation relating to Antoinette Durden, Case
19 No. 2:16-cv-16635; Tanya Francis, Case
20 No. 2:16-cv-17410; and Barbara Earnest, Case
21 No. 2:16-cv-17144, in the United States District
22 Court, Eastern District of Louisiana, MDL No. 2740,
23 Section H.
24      This deposition is being held at Skikos
25 Crawford, located at One Sansome Street, Suite 2800,
```

3 (Pages 389 - 392)

Page 393

1 San Francisco, California 94104.
2       My name is Cassia Leet and I'm the
3 videographer here with the court reporter, Carla
4 Soares. We are from the firm Veritext Legal
5 Solutions.
6       I am not related to any party in this
7 action nor am I financially interested in the
8 outcome.
9       Would counsel and everyone attending
10 remotely please state your appearances and
11 affiliations for the record.
12       MR. THORNTON: I'll start. John Thornton
13 and Lauren Davis on behalf of PSE and the three
14 individual plaintiffs.
15       MR. KAUFMAN: Christopher Kaufman, from
16 Shook, Hardy & Bacon, on behalf of the defendant
17 Sanofi.
18       MR. BAEHR: Jordan Baehr, from Shook,
19 Hardy & Bacon, also on behalf of Sanofi.
20       THE WITNESS: Dr. Ellen Feigal here on
21 behalf of the plaintiff counsel.
22       THE VIDEO OPERATOR: Counsel on the phone?
23       MR. FOWLER: Stephen Fowler, with the firm
24 Greenberg Traurig, on behalf of Sandoze.
25       We reserve all rights to depose Dr. Feigal

Page 394

1 in future litigation matters. We're simply
2 attending by phone.
3       MS. GONZALEZ: This is Mara Cusker
4 Gonzalez, from Dechert, and we represent Pfizer and
5 Hospira.
6       And we, likewise, reserve our rights with
7 respect to Dr. Feigal. Thanks.
8       MR. COAN: This is Geoffrey Coan,
9 representing Sun Pharmaceutical, with the law firm
10 of Hinshaw & Culbertson.
11       And like Attorney Fowler and Ms. Gonzalez,
12 we reserve our rights as well with respect to
13 Dr. Feigal.
14       MS. CALLSEN: And this is Julie Callsen,
15 of Tucker, Ellis & West, representing Accord.
16       And again, we reserve our rights as the
17 other counsel did prior to me.
18       THE VIDEO OPERATOR: Okay. Would the
19 court reporter please swear in the witness.
20       ELLEN FEIGAL, M.D.,
21 having been administered an oath, was examined and
22 testified as follows:
23                 EXAMINATION
24 BY MR. KAUFMAN:
25       Q  Good morning, Dr. Feigal.

Page 395

1       A  Good morning.
2       Q  It's good to see you again.
3       A  Good to see you.
4       Q  How are you?
5       A  I'm good. Thank you.
6       Q  Good. You understand you're under oath,
7 same as last time?
8       A  Yes.
9       Q  Okay. And is there any reason why you
10 cannot testify truthfully and accurately today?
11       A  No.
12       Q  Okay. When we last met, you and I had a
13 tendency to anticipate what the other was going to
14 say.
15       And so I would just ask at the outset,
16 even if you have a sense for where I'm going with
17 the question, if you can let me state the entire
18 question before giving your response, I think that
19 would make things go a little bit faster. I won't
20 have to go back and reask it so that the record is
21 clear. Okay?
22       A  Sounds good.
23       Q  Okay. And if you don't understand a
24 question, just like last time, please let me know.
25 I will do my best to restate it or rephrase if

Page 396

1 needed. Understood?
2       A  Yes.
3       Q  Okay. And if you answer a question, I'm
4 going to assume that you did understand it. Okay?
5       A  Yes.
6       Q  Okay. And if you need a break, just let
7 me know. Happy to take breaks, just like last time.
8       A  Will do.
9       MR. KAUFMAN: Okay. I'm going to hand you
10 what I'm going to mark as Exhibit No. 16.
11       (Exhibit 16 was marked for identification
12       and is attached hereto.)
13 BY MR. KAUFMAN:
14       Q  I'll ask you if you've seen this document
15 before.
16       A  Yes.
17       Q  Okay. And this is the notice of your
18 continued deposition for today; is that right?
19       A  Yes.
20       MR. KAUFMAN: Okay. And then if you can
21 turn to the back page, there's a list of items that
22 we've asked for you to produce. And last night we
23 received a set of materials, and I'd like to go
24 ahead and mark those.
25       (Exhibit 17 was marked for identification

4 (Pages 393 - 396)

1     and is attached hereto.)
2   BY MR. KAUFMAN:
3     Q   So I'm handing you what's been marked as
4   Exhibit No. 17, which is one of the documents we
5   received last night.
6          Can you identify that?
7     A   Looks like my expert report, yes.
8     Q   And why did you provide us with another
9   copy of your expert report last night?  Is that the
10   redline version?
11     A   I have to look.
12          Yes, there are redlines in here.
13     Q   Okay.
14     A   Well, there's lines in here.
15          MR. KAUFMAN:  And we'll go through that,
16   and then I'm going do some housekeeping here.
17          I also received last night what I'm
18   handing you as Exhibit No. 18.
19          (Exhibit 18 was marked for identification
20          and is attached hereto.)
21          THE WITNESS:  Yes.
22   BY MR. KAUFMAN:
23     Q   What is Exhibit No. 18?
24     A   That is my curriculum vitae.
25     Q   Why did you provide us with another

1   version of your CV?
2     A   Because I had one entry to update.
3     Q   And which entry was that?
4     A   That was I now serve on a company board.
5     Q   Which company?
6     A   Xencor.
7     Q   Can you point me on your CV where that
8   change was made?
9     A   Page 4.  I created a new category,
10   "Service to Company Boards."
11     Q   Okay.
12     A   One more change.
13     Q   Okay.
14     A   On top under "Service to Professional
15   Organizations," I added the ending date of 2014.
16     Q   To the entry for Alliance for Regenerative
17   Medicine?
18     A   Correct.  For the committee.
19     Q   And that's also on page 4 of Exhibit 18?
20     A   Same page.
21     Q   Okay.  What is Xencor?
22     A   Xencor is a public company.
23     Q   What do they do?
24     A   They develop, by specific antibodies, for
25   development of products to treat a variety of

1   diseases.
2     Q   Is cancer one of them?
3     A   Cancer is one of them.
4     Q   Is breast cancer one of them?
5     A   No.
6          (Exhibit 19 was marked for identification
7          and is attached hereto.)
8   BY MR. KAUFMAN:
9     Q   I'm also handing you what's been marked as
10   Exhibit 19, another document we received last night.
11   Can you identify this?
12     A   This looks like an article -- oh,
13   actually, there are several articles here.  Let me
14   just see.
15          It is an abstract, it is a paper.  You
16   know, you've given me a couple of exhibits here.
17     Q   That is how it was produced to me.
18     A   Okay.  My understanding is they provided
19   you Exhibits 14 through 19 of what had been provided
20   to Dr. Tosti during her deposition, and they also --
21   I believe that's what this looks like.
22     Q   Okay.  So Exhibit No. 19 is a collection
23   of articles and literature that have been marked in
24   prior depositions?
25     A   Correct.

1     Q   Okay.  And we'll go through that in a
2   little bit more detail later.
3     A   That's fine.
4          MR. THORNTON:  Rest assured.
5          (Exhibit 20 was marked for identification
6          and is attached hereto.)
7   BY MR. KAUFMAN:
8     Q   I'm handing you what's been marked as
9   Exhibit No. 20.
10          Can you identify that?
11     A   Yes.  This looks like another exhibit that
12   was provided to another expert during their
13   deposition.
14     Q   Do you know which expert?
15     A   It says here Dr. Bosserman.
16     Q   Okay.  Turning back to Exhibit No. 16,
17   which is the deposition notice, I just want to, like
18   we did last time, walk through these and make sure
19   we understand what we have and what we don't have.
20   Okay?
21     A   Um-hum.
22          MR. THORNTON:  Do you have any problem
23   tracking the responses?
24          MR. KAUFMAN:  No.  That's fine.
25          When you say "responses," you're talking

5 (Pages 397 - 400)

1 about the objections that plaintiffs served?
2      MR. THORNTON:  Well, not so much the
3 objections, but just -- there's a request and then
4 there's a response to each.  And I think that's
5 actually the format that we sent it to her to
6 review.
7      MR. KAUFMAN:  Okay.
8      MR. THORNTON:  At least the most recent.
9      MR. KAUFMAN:  That works.
10     Q  So Request No. 1, we asked for a redline
11 version of your expert report that was served on
12 December 7th, 2018, the date of your deposition,
13 showing all amendments, additions, deletions, and/or
14 differences from the version that was served in
15 November of 2018 and track changes.
16        Is that what has been marked as
17 Exhibit 17?
18     A  That is what has been marked in your
19 Exhibit 17.
20     Q  Okay.  Thank you for providing that.
21        Request No. 2, we asked for any portion of
22 your file, however described or maintained, in
23 connection with plaintiffs and/or the Taxotere
24 litigation that has not been previously produced.
25        And in response, we received the updated

1 copy of your curriculum vitae?
2      A  Correct.
3      Q  Okay.  And that's been marked as
4 Exhibit 18, correct?
5      A  Yes.  Correct.
6      Q  Yeah.  And based on this response that we
7 received, it's your understanding that your entire
8 file for purposes of the Taxotere litigation has
9 been produced?
10     A  Correct.
11     Q  Okay.  No. 3, we asked for all documents,
12 literature, studies, publications, case reports,
13 surveys, and/or data that you reviewed, considered
14 and rejected for inclusion in Table 2 of your expert
15 report.
16        And the response provided was that there
17 were no responsive documents that have been -- that
18 have not been previously produced; is that right?
19     A  That is correct.
20     Q  Okay.  And are you aware of any materials
21 that -- strike that.
22        Are you aware of any literature, studies,
23 publications, case reports, surveys, or data that
24 you reviewed, considered, and rejected for inclusion
25 in Table 2 that have been produced?

1      A  No.
2      Q  Okay.  Is there a reason why you cannot
3 produce those materials?
4      A  I produced everything that I reviewed and
5 considered for the expert report.  I don't have -- I
6 mean, I provided you everything I have.
7      Q  So toward the end of our last deposition,
8 we had asked you some questions about a Korean
9 study.
10     A  Correct.
11     Q  And you had indicated that you had
12 reviewed that and ultimately chose not to include it
13 in Table 2.
14        Do you remember?
15     A  No.  I actually had not previously
16 reviewed that.  That was incorrect.
17     Q  Okay.  So you're --
18     A  I reviewed it at the time you showed it to
19 me.
20        What I remember saying is -- I questioned
21 whether or not there was a foreign language paper I
22 might have seen.  But in retrospect, after I was
23 provided an English translation -- you provided it
24 to me in Korean, which, of course, I can't read.
25 But I was provided an English translation, and no, I

1 had not previously read that.
2      Q  So you're changing your prior testimony
3 that you had previously read that?
4      A  I don't think it's changing my testimony.
5 I think I just queried, I wondered if I might have
6 seen it.
7      Q  Okay.  We can agree that your testimony is
8 what your testimony is at the last deposition.
9      A  My --
10     MR. THORNTON:  Objection.  Form.
11     THE WITNESS:  My recollection of my
12 testimony is that when I was presented it, I looked
13 quizzical and wondered if it might have been
14 something I had seen before.  But in retrospect,
15 after I got an English translation, it was not.
16 BY MR. KAUFMAN:
17     Q  I think at the last deposition, you also
18 testified that there were certain studies that you
19 reviewed that you did not consider to be relevant
20 for one reason or another, and therefore, did not
21 consider them for inclusion in Table 2; for example,
22 if it did not contain specific raw data of the
23 number of patients that experienced permanent or
24 persistent alopecia following the use of
25 chemotherapy.

6 (Pages 401 - 404)

1       Do you remember that testimony?
2     A   I remember that I had criteria for the
3 quality of the paper as to whether it was
4 interpretable.  I do recall that.
5     Q   Okay.  And were there studies that hit on
6 your search terms that did not meet that criteria?
7     A   There were some references and abstracts
8 that were clearly not -- did not meet my criteria.
9     Q   But they hit on the search terms?
10    A   I actually recall that everything that I
11 pulled, everything that I reviewed, is -- has been
12 provided to you.
13       I had criteria for my search.  I had
14 search terms.  I think I recall telling you the
15 names of the chemotherapy agents.  I even used the
16 broad term "chemically-induced" and "permanent,
17 persistent, or irreversible alopecia."  I might have
18 used a slight variation of those words, but it was
19 those words in combination with alopecia.
20       And then there were -- the focus was on
21 breast cancer, and the material had to be
22 interpretable.  So there had to be -- have
23 sufficient information that I could interpret it.
24    Q   What do you mean by "sufficient
25 information"?

1     A   They had to have attribution of the
2 chemotherapy regimen to the cancer, and there had to
3 be some indication of the numbers of patients.  It
4 was fairly standard criteria for doing a search.
5     Q   When you say "some indication of the
6 number of patients," if a study only included a
7 percentage of the number of patients as opposed to
8 the raw number --
9     A   I had to be able to figure out the
10 numbers.  I mean, the percent of ten is much
11 different than the percent of a thousand.  So I had
12 to have a sense of the scope of the project.
13    Q   So if I understand right, if there were
14 articles that met your criteria, with the exception
15 of the indication of the -- strike that.
16       If there were studies that hit on your
17 search terms that fell within the subject matter
18 that you were looking into, where percentages of the
19 number of patients who experienced permanent
20 alopecia with chemotherapy were stated but the
21 actual raw numbers of what those percentages were
22 made up were not stated, did you exclude those
23 studies?
24       MR. THORNTON:  Objection.  Form.
25       THE WITNESS:  Let me go back and explain

1 medical search.
2       What I've done, from 30 years of working
3 as a clinician, a product developer, working and
4 designing clinical trials, and from my education and
5 training over 30 years, I did a search of the
6 literature, which includes abstracts and papers, on
7 topics that were relevant to the topic that we're
8 discussing here today about Taxotere and
9 chemotherapy-induced permanent alopecia.  So those
10 are the terms I used.
11       I also had criteria for the quality of the
12 paper I needed to find.  It had to have information
13 that was usable.
14       So I didn't pull -- I didn't pull things
15 that were low quality.  But the bottom line is, I
16 looked for papers through my search terms and
17 criteria, and all of those had been provided to you.
18 BY MR. KAUFMAN:
19    Q   Is the criteria that you used to perform
20 the search set forth in your report?
21    A   I used standard methodology and the
22 scientific method which is inherent with my 30 years
23 of training as a clinician, a product developer and
24 a researcher, in terms of how to conduct medical
25 researchers.  I think -- in terms of how to conduct

1 medical research.
2       I didn't go step by step in terms of, you
3 know, how I do a PubMed search.
4     Q   Okay.  My specific question is, is the
5 criteria that you used for inclusion or exclusion of
6 a particular article in Table 2, is that criteria
7 stated in your expert report?
8     A   I think it's implicit throughout the whole
9 report what I was looking for.  And I said I did --
10 I did a review of the published literature.
11    Q   But you'd agree with me that the criteria
12 that you used for inclusion or exclusion of an
13 article in Table 2 is not expressly stated or listed
14 in your expert report?
15    A   I think it's implicit in doing -- based on
16 my scientific training, my experience as a
17 physician, a clinical researcher and product
18 developer, that I did explain throughout the report
19 how I did my -- how I found the articles.
20    Q   Dr. Feigal --
21    A   That's my response.
22    Q   -- can we agree that your criteria is not
23 expressly stated in your report?
24    A   I can state that I didn't go step by step
25 about how I do a PubMed search.  That's correct.

7 (Pages 405 - 408)

1    Q  So I would not be able to recreate the
2  exact search or searches that you performed; is that
3  right?
4    A  You could.  I've explained in quite detail
5  the search terms I've used and how I did it.  So you
6  could easily go and do a search.
7      These searches, as you know, change over
8  time.  So there's -- you know, papers keep on
9  getting added.  The PubMed database, as you know, is
10  handled by the National Library of Medicine.  It
11  includes all the relevant medical journals and
12  abstracts.  So those are constantly updated.
13      So no, I can't promise you you're going to
14  find the exact search if you did it today, but --
15  because, you know, it changes over time.
16    Q  Did you keep a record or did you track a
17  list of the studies that hit on your search terms
18  that you considered and ultimately rejected for
19  inclusion in Table 2?
20      MR. THORNTON:  Objection.  Form.
21      THE WITNESS:  I have provided you
22  everything that formed the basis of my report.  It
23  was an unbiased systematic standard methodology for
24  doing, you know, a worldwide search on the
25  literature for permanent, persistent, or

1  irreversible alopecia in patients who were receiving
2  Taxotere or other chemotherapy regimens that are
3  relevant in breast cancer.
4      MR. KAUFMAN:  I appreciate that.  That
5  actually wasn't quite my question.
6      Can you read back my question, please?
7      (Record read as follows:
8      "Question:  Did you keep a record or did
9      you track a list of the studies that hit on
10      your search terms that you considered and
11      ultimately rejected for inclusion in Table
12      2?")
13      THE WITNESS:  I did not keep drafts of
14  searches.
15  BY MR. KAUFMAN:
16    Q  And by "drafts of searches," is that -- do
17  you mean that you did not keep track or a written
18  record of the studies that hit on your search terms
19  but were not ultimately included in Table 2 of your
20  report?
21    A  I provided all the evidence that I used,
22  and that is truthful and accurate.  And I don't know
23  any other way to respond to your question.
24    Q  I guess more directly stated, I'm
25  interested in knowing what the body of material is

1  that you did not think was worthy of inclusion in
2  Table 2.  I'm just -- I'm looking for the stuff
3  that's not in your report.
4    A  There wasn't.  I mean, there wasn't -- I
5  didn't -- I did -- I used the search terms I used
6  and the criteria and pulled everything from that.
7      I'm not -- just so you're clear, I'm not
8  saying I found every single article in the world
9  that might be relevant.  I never claim that when I
10  do a search.  But I found a sound body of evidence,
11  and that's what I've provided to you.
12      Whether or not there's any other papers
13  that you found with your searches, I'd be more than
14  happy to review.
15      But those are the papers I found doing my
16  search and the criteria.
17    Q  So would you agree with me that the
18  articles that are listed in Table 2 do not represent
19  a comprehensive review of the literature regarding
20  breast cancer and permanent or persistent alopecia
21  involving chemotherapy?
22      MR. THORNTON:  Objection.  Form.
23      THE WITNESS:  They represent a
24  high-quality, scientifically -- scientifically
25  sound, systematically-produced, non-biased review of

1  the medical literature for Taxotere and
2  chemotherapy-induced permanent alopecia.
3  BY MR. KAUFMAN:
4    Q  But you'd agree with me that Table 2 does
5  not represent a comprehensive review of all of the
6  literature out there on that topic, correct?
7      MR. THORNTON:  Objection.  Form.
8      THE WITNESS:  No.  I am -- no, I am not
9  saying that.
10      What I am saying is, if you happen to find
11  another paper that I didn't find -- searches are not
12  100 percent perfect.  So there may be some search --
13  there may be some papers I haven't found.
14      Yes, I admit there might be something out
15  there, and I'm happy to look at it if you find
16  something that I haven't reviewed.
17  BY MR. KAUFMAN:
18    Q  Okay.  And just so the record is clear --
19  because I think we're in agreement here, but the
20  record may be a bit confusing -- can we agree that
21  Table 2 does not represent a comprehensive listing
22  of all literature available on the topic of
23  permanent or persistent alopecia involving
24  chemotherapy and breast cancer?
25      MR. THORNTON:  Objection.  Form.

8 (Pages 409 - 412)

1     THE WITNESS:  No, I don't think that's
2 accurate.
3         I did a scientific systematic review of
4 the literature for Taxotere and chemotherapy-induced
5 permanent alopecia.
6         What I am saying is the caveat, I don't
7 claim it's 100 percent.  You may find something, as
8 you have, that could potentially be relevant, and
9 I'm more than happy to review it.
10        So no, I'm not guaranteeing it's
11 100 percent of anything you might find.  I'm just
12 saying it's comprehensive, it's sound, it's
13 scientific.  But I'm also not claiming it's
14 100 percent of anything that might be out there.
15 BY MR. KAUFMAN:
16     Q   Doctor, is it your testimony that Table 2
17 includes a listing of all of the articles that hit
18 on your search terms that you found in your search?
19        MR. THORNTON:  Objection.  Form.
20        THE WITNESS:  Table 2 hits on all of the
21 articles for Taxotere, early-stage breast cancer,
22 permanent, persistent, or irreversible alopecia, and
23 permanent -- as I said, and those are the articles.
24 BY MR. KAUFMAN:
25     Q   And to the extent there are materials out

1 there that met that criteria, it's your testimony
2 that all of them that you found are listed in Table
3 2?
4     A   Correct.  And I am saying I'm not
5 guaranteeing 100 percent that there isn't another
6 article out there that I didn't pick up.  And if
7 there is, and you think it's relevant, I am more
8 than happy to review it.
9     Q   Okay.  Turning back to Exhibit 16, the
10 next item or request we made was for all documents,
11 literature, studies, publications, case reports,
12 surveys, and/or data you reviewed and considered.
13        MR. THORNTON:  I just want to make sure
14 we're tracking.  What number are we on?
15        MR. KAUFMAN:  4.
16        MR. THORNTON:  Thank you.
17 BY MR. KAUFMAN:
18     Q   So I'll state it again.
19        All documents, literature, studies,
20 publications, case reports, surveys, and/or data you
21 reviewed and considered between the date of your
22 initial deposition on December 7th, 2018, and your
23 deposition today.
24     A   That is correct.
25     Q   Okay.  And is that the set of materials

1 that have been provided in Exhibit No. 19?
2     A   Correct.  Plus I think you just handed me
3 another exhibit.
4     Q   Plus Exhibit 20?
5     A   Yes, 19 and 20.
6     Q   Have you reviewed any other materials
7 since the date of your last deposition that are not
8 included in Exhibits 19 or 20?
9     A   I think that -- well, it was my
10 understanding they did provide it, but I think I
11 also was provided the expert report of Dr. Fonseca.
12     Q   That is also listed here.  Thank you.
13     A   Oh, okay.
14     Q   Okay.  Other than the expert report of
15 Dr. Fonseca, what we've marked as Exhibit 19 to your
16 deposition and Exhibit 20 to your deposition, have
17 you reviewed any other materials since the date of
18 your last deposition?
19     A   No.  As you know, I reviewed the
20 transcripts.
21     Q   Which transcripts?
22     A   Of me.
23     Q   You reviewed your own deposition
24 testimony?
25     A   Correct.

1     Q   When did you do that?
2     A   I did that sometime within the last ten
3 days.
4     Q   The next item, Request No. 5, asks for all
5 communications between you and any third party,
6 including other plaintiff-retained experts,
7 plaintiffs' treating physicians, authors of any
8 medical, scientific or clinical studies that relate
9 in any way to your opinions, the development of your
10 opinions, and/or the Taxotere litigation.
11        Do you have any of those materials?
12     A   So you're saying since the last
13 deposition, is there anything new?  And the answer
14 is no.
15     Q   Okay.  Thank you.
16        Then there were three specific requests
17 that we made in some parts to Request No. 5.  The
18 first one, copies of all e-mails and communications
19 with breast cancer experts as noted on one of the
20 invoices that you provided to us that's been marked
21 as Exhibit No. 5, the entry dated January 31st,
22 2018.
23        Did you provide any e-mails or
24 communications you had with breast cancer experts?
25        MR. THORNTON:  I'm making the same

9 (Pages 413 - 416)

1 objection that I made in the original deposition.
2      The science day communication preparation
3 for Dr. Feigal's testimony requested by the court is
4 not to be produced. And I think otherwise, she may
5 testify. But that's the only exception, by order of
6 the court.
7      MR. KAUFMAN: Okay. And my understanding
8 of the timeline is that as of January 31st, 2018, a
9 science day that ultimately took place in June of
10 2018 had not yet been contemplated as Judge
11 Engelhardt was still overseeing the MDL proceedings.
12      MR. THORNTON: Right. Right. So you're
13 talking about --
14      MR. KAUFMAN: Request No. 5A.
15   Q  Doctor, do you have any of those
16 materials?
17   A  I think what --
18      May I speak?
19      MR. THORNTON: Sure.
20      THE WITNESS: So I think what this is is
21 about potential breast cancer expertise, additional
22 breast cancer expertise that plaintiff counsel may
23 have wanted.
24      And then I think there was also potential
25 alopecia expertise that plaintiff counsel may have

1 wanted. I think that's all that's referring to.
2      In terms of science day, I think what
3 we're stating is, I had not agreed to be an expert
4 witness prior to -- after science day. So anything
5 I did before that day was basically just --
6      MR. THORNTON: As a consultant?
7      THE WITNESS: -- just as a consultant.
8      MR. THORNTON: So we're not going to
9 produce materials that she may have used as a
10 consultant before deciding to become an expert in
11 the case.
12      THE WITNESS: And then the August 17th,
13 2018, date, which occurred after science day, would
14 have been in relation to a potential alopecia
15 expert.
16      And no, I don't have any documentation of
17 that. That actually wasn't -- I don't have any
18 record other than the fact that I know it had taken
19 place. That is the whole extent of those -- of that
20 interaction.
21      MR. KAUFMAN: Okay. Thank you.
22      Counsel, our position would be different
23 than that. And once Dr. Feigal became a testifying
24 expert, that anything that she had done prior to
25 that as a consulting expert would be fair game.

1      We can agree to disagree on that and take
2 it up at another time.
3      MR. THORNTON: All right. Perhaps we can
4 even discuss it further. Since we're on the record
5 now, I do want to discuss with you further, because
6 I think that that's -- you're not producing -- I
7 think turnabout is fair play. I don't think you're
8 producing materials of consulting that preceded any
9 expertise by various experts. But I could have that
10 wrong. We'll talk about it.
11      MR. KAUFMAN: I agree --
12      MR. THORNTON: I thought that was the
13 agreement. I thought that was --
14      MR. KAUFMAN: I'm not aware of any
15 agreement, but we can have further discussions.
16      MR. THORNTON: Okay.
17      THE WITNESS: Hopefully you won't
18 disagree, but I don't have any documents for the --
19 January 31st, either. That's just a recall on my
20 part about talking to a potential breast cancer
21 expert. I don't have any other documents relating
22 to that.
23 BY MR. KAUFMAN:
24   Q  Did you specifically search in the last
25 week for e-mails or communications with breast

1 cancer experts dated January 31st, 2018?
2   A  Say this again.
3   Q  Did you -- within the last week when we
4 sent this request, did you specifically look to see
5 if you had copies of any e-mail communication with
6 breast cancer experts dated January 31st, 2018?
7   A  Well, this is on my invoice, so there
8 would be documentation on my invoice that I had an
9 interaction with this individual. I don't have any
10 additional.
11      I mean, when I put my material together, I
12 send it to my business office, and they put together
13 the invoice. I have to have a -- in order to
14 charge, I have to have a descriptor.
15   Q  I appreciate that.
16   A  That was the descriptor.
17   Q  That's not quite my question.
18      My question is, within the last week, did
19 you look through your e-mail specifically to
20 determine whether or not there were e-mails or
21 communications in your e-mail with breast cancer
22 experts as noted on January 31st, 2018?
23   A  What I did is look on my calendar to see
24 if I had a telecon.
25   Q  Okay. So you did not specifically look to

1 see if you had an e-mail dated January 31st, 2018?
2     A   No, because I get rid of e-mails
3 periodically.  So it may or may not have happened.
4     Q   Okay.  So --
5     A   I get a lot of e-mails.  No, I didn't
6 have --
7     Q   Are you testifying that that e-mail has
8 been deleted?
9     A   No.  I'm saying that I looked on my
10 calendar.  I do recall this conversation.  It's not
11 that long ago.  I guess it is now.
12        But there's only one breast cancer expert
13 I've talked to, so I know who it is.
14     Q   And who is it?
15     A   It's Dr. Bosserman.
16     Q   So the entry from your invoice dated
17 January 31st, 2018, refers to Dr. Bosserman?
18     A   Correct.
19     Q   Okay.  And the quote -- and we can look at
20 the invoice in a second -- but the quote is "Breast
21 cancer experts," plural, suggesting more than one.
22     A   No, that's actually a mistake.  It should
23 have been singular.  That's the only person I talked
24 to.
25     Q   Is that a mistake on our request for the

1 material or is it a mistake in your invoice?
2     A   It's a mistake on the invoice.  At least
3 if you show me the invoice, I'll -- I can tell you
4 what the truth is.
5     Q   Yeah.  The invoice has actually been
6 previously marked as Exhibit No. 5 right in front of
7 you.
8     A   I'll look.
9        Actually, there's Exhibit 4 and Exhibit 6.
10 Let me see.  Is it Exhibit 6?  Exhibit 7?
11 Exhibit 8?  Where is Exhibit 5?  Maybe -- did it get
12 stapled to 4 maybe?
13     Q   It may have.
14     A   Let me look.  Yes.
15     Q   It did.
16     A   It did.
17     Q   Can we separate them?
18     A   Do you want to show me?
19     Q   They're actually just stuck together.
20     A   They were stuck together.  Okay.
21        January 31st?  Yeah, it does say plural.
22     Q   And your testimony is that's just a typo?
23     A   I know it's a typo.
24     Q   Okay.
25     A   I only talked to one person.  I don't know

1 if I told them wrong or they just wrote it on the
2 invoice wrong, but I only talked to one person.
3     Q   Okay.  And the second request is for
4 copies of all e-mails and communications with
5 potential alopecia expert as noted on August 17th,
6 2018, of your invoice marked Exhibit No. 5.
7        That August 17th, 2018, would be after
8 science day, correct?
9     A   Plaintiff counsel can answer that question
10 about when science day was.
11        MR. THORNTON:  I don't think it would have
12 been.
13        MR. KAUFMAN:  Yes, end of June 2018, I
14 believe, was science day.
15        MR. THORNTON:  Yes.
16 BY MR. KAUFMAN:
17     Q   Who was the potential alopecia expert that
18 you referred to in your invoice?
19        MR. THORNTON:  Let me make an objection,
20 but I'm not going to instruct her not to answer.  I
21 think it's irrelevant.
22        THE WITNESS:  I'm trying to -- let me just
23 find that August 17th.
24        It was a telecon, and it happened on
25 August 17th.  And actually, I recall the details is

1 the person who we were thinking about actually got a
2 research grant and became too busy to work with us,
3 so -- to work with them.
4 BY MR. KAUFMAN:
5     Q   The potential alopecia expert that you
6 communicated with on August 17th, 2018, is not one
7 of plaintiffs' current retained testifying experts?
8     A   I don't think that person was ever
9 retained for anything, not even consultation.
10     Q   You, I think, testified a few moments ago
11 that you have no documentation of the communications
12 with the potential alopecia expert on August 17th of
13 2018.  Did you -- is that what you said?
14     A   I believe it was a telecon.  Doesn't it
15 state it was a telecon?  Here, let me look at
16 August 17.  I'll read it.  I've got it right here.
17        It says, "Teleconference and follow-up
18 with potential alopecia expert."  So that was it.
19     Q   Okay.  And what was the follow-up?
20     A   Basically that that person couldn't do it.
21     Q   Okay.  So the follow-up was not in written
22 form?
23     A   It didn't lead to anything.  Yeah.
24     Q   It was not in written form?  The follow-up
25 was not in written form?

11 (Pages 421 - 424)

Page 425

1     A   No.  No.
2     Q   All right.  And then the last item on
3  Request No. 5 are copies of communications between
4  you and Dr. Bosserman regarding your opinions in the
5  Taxotere litigation, Dr. Bosserman's opinions in the
6  litigation, or any aspect of the Taxotere
7  litigation.
8         And have you provided copies of those
9  today?
10    A   Yeah.  Are you talking about after
11 December 7th?  There's been absolutely no
12 communication since December 7th on anything.
13    Q   Okay.
14    A   So no, nothing to provide.
15    Q   Request No. 6, consulting contracts,
16 retention letters, and/or documents memorializing or
17 communications memorializing your involvement in the
18 Taxotere litigation as a testifying expert witness
19 on behalf of plaintiffs.
20    A   I think we provided that last time.
21 There's nothing additional.
22    Q   And last time, we marked as Exhibit No. 4
23 your retention letter.
24    A   Okay.
25    Q   I believe the testimony shows that that

Page 426

1  was a document memorializing your agreement to serve
2  as a consulting expert.
3     A   For the purpose of consulting, and it's
4  broad enough that it could be expanded should the
5  decision change later to provide testimony.
6         But yes, it was consulting.
7     Q   Okay.  Did you go back and look to confirm
8  that there were no additional contracts or letters
9  or agreements between you or NDA Partners and
10 plaintiffs' counsel?
11    A   I'm not aware of any.
12        And you would have them if there were any.
13        I don't have any additional ones.
14    MR. THORNTON:  I'm not aware of any,
15 either, Counsel.
16    MR. KAUFMAN:  Thank you.
17    Q   And then the final request, No. 7, all
18 time sheets, time records, billing records,
19 expenses, and documents reflecting any time and
20 expenses that you spent in connection with your work
21 on the Taxotere litigation, and the amounts invoiced
22 or to be invoiced for that time, to the extent that
23 they have not yet been previously produced.
24    A   To my understanding, everything's been
25 produced and up to date.

Page 427

1     Q   Okay.  And we previously, at the last
2  deposition, marked Exhibits No. 5 and 6, which were
3  invoices, correct?
4     A   Does it go through November?
5     Q   My reading of the invoices indicates that
6  it goes through October 31st of 2018.
7     A   There's probably a November invoice.
8     MS. DAVIS:  Yes, and that, I believe, is
9  marked as Exhibit 6.
10    THE WITNESS:  Oh.  Well, this is -- I'm
11 sorry.  Am I not reading it correctly?  It says
12 October on Exhibit 6 here.
13    MS. DAVIS:  Oh.
14    THE WITNESS:  So to my understanding,
15 there may be a November invoice that I don't see
16 clearly here.  Let me just see if there's another --
17 if it's tacked onto another exhibit.
18        I know the December hasn't been sent.
19    MR. KAUFMAN:  Okay.  I have not seen a
20 November invoice.
21    MR. THORNTON:  We'll do our best to
22 procure that.  My mistake.
23    MR. KAUFMAN:  Thank you.
24    THE WITNESS:  I believe it was -- I
25 believe it has been sent.  Whether it's been paid is

Page 428

1  another question.  But I believe it has been sent.
2     MR. KAUFMAN:  Okay.  Can we go off the
3  record here?  I think there's an issue with the
4  phone connection.
5     MR. THORNTON:  Okay.
6     THE VIDEO OPERATOR:  Going off the record,
7  the time is 11:42.
8     (Recess, 11:42 a.m. - 11:53 a.m.)
9     THE VIDEO OPERATOR:  Back on the record.
10 The time is 11:53.
11 BY MR. KAUFMAN:
12    Q   Dr. Feigal, are you ready to continue?
13    A   I am.
14    Q   Tell me what you've done to prepare for
15 the second day of your deposition.
16    A   Well, I read my first deposition and
17 provided some corrections.
18        And then as noted, I reviewed the material
19 that plaintiff counsel provided to me since the last
20 deposition, which you have.
21        And then I had, I think, a two- to
22 three-hour meeting last week with Mr. Thornton, and
23 then I believe I had a very short phone call on
24 Wednesday of this week, maybe 20 minutes or so, with
25 a couple of the plaintiff counsel.  And that was it.

12 (Pages 425 - 428)

Page 429

1    Q   You mentioned that you read your first
2  depo and provided corrections.  What corrections did
3  you make?
4    A   I provided errata sheets, and they're all
5  clarifications.  And I provided it to plaintiff
6  counsel.  I don't know what plaintiff counsel has
7  done with it.
8      MR. KAUFMAN:  Okay.  Have those been
9  submitted?
10     MR. THORNTON:  Sure.
11     MR. KAUFMAN:  They have been?
12     MR. THORNTON:  Yeah.  If you don't have
13 them, there may have been a -- it goes to the court
14 reporter first, and then I thought that you've
15 already been served.
16     I think -- was he --
17     MS. DAVIS:  We had them FedExed to
18 Veritext for guaranteed delivery yesterday
19 afternoon.  And they tend to, as soon as they
20 receive them, scan and post them.
21     MR. THORNTON:  But we'll be glad to
22 provide those.
23     Can we print out a copy of those as well?
24     MS. DAVIS:  Sure.
25 ///

Page 430

1  BY MR. KAUFMAN:
2    Q   Dr. Feigal, off the top of your head, do
3  you recall just by -- the number of corrections you
4  made to your prior testimony?
5    A   It was primarily correcting misspellings
6  of names, like of authors, like of my name.  It was
7  correcting -- correcting the word to the correct
8  word because sometimes either I didn't enunciate it
9  clearly, or maybe the recorder just transcribed it
10 differently, in cases where it might have -- it just
11 made things clearer.
12     And then all of them were clarifications.
13 So I think on Volume I, which was the bulk, I
14 believe there were -- there are a lot of word usage
15 corrections.
16     Like, as I recall offhand, the word
17 "chearly" (phonetic), which isn't even a word, I
18 changed to "clearly," reading the context of the
19 sentence.  There was a word in there that made no
20 sense called "veeny" (phonetic).  I mean, I just --
21 you know, there were some words in there that just
22 made no sense.  And I couldn't conceive of what the
23 word might have been that could have been
24 substituted for it.  So those are the types of
25 things I did.

Page 431

1      But if you have any questions on it, once
2  you see it, of course, I'd be happy to answer it.
3    Q   You stated that you, in preparation for
4  the second day of your deposition, reviewed material
5  that plaintiffs provided you.
6      Is that the material that we've marked --
7    A   Correct.
8    Q   -- today as Exhibits 19 and 20?
9    A   That is correct.
10   Q   Okay.  And then you had a two- to
11 three-hour meeting with Mr. Thornton last week?
12   A   That is correct.
13   Q   And then you had a call with a couple of
14 the plaintiffs' counsel?
15   A   On Wednesday.
16   Q   On Wednesday?  Who was -- can you identify
17 the counsel that were members of that call?
18   A   The only people I remember from the call
19 are Mr. Thornton and Ms. Davis, and I honestly don't
20 know if anybody else was on the call.  I don't think
21 there was.
22     MR. THORNTON:  I don't think there was,
23 either.
24     THE WITNESS:  It was just a brief, you
25 know, "See you on Friday."

Page 432

1  BY MR. KAUFMAN:
2    Q   Have you spoken to anyone other than
3  plaintiffs' counsel about -- strike that.
4      Have you spoken to anyone other than
5  plaintiffs' counsel in preparation for your
6  deposition?
7    A   No.  Since December 7th.  Is that what
8  you're saying?
9    Q   Yeah.  I'll restate it.
10     Since December 7th, have you spoken to
11 anyone other than plaintiffs' counsel in preparation
12 for your deposition?
13   A   No.
14   Q   Since December 7th, have you spoken to
15 anyone other than plaintiffs' counsel with respect
16 to the Taxotere litigation generally?
17   A   No.
18   Q   Other than the materials that you
19 identified that you reviewed in preparation for your
20 deposition, since December 7th, have you reviewed
21 any other documents that pertain to your opinions or
22 the Taxotere litigation?
23   A   I reviewed my expert report again.
24   Q   Anything else?
25   A   Not that I recall.

13 (Pages 429 - 432)

Page 433

1    Q   Describe your relationship with
2 Dr. Bosserman.
3    A   Dr. Bosserman and I were in residency
4 together at Stanford many moons ago. So I've known
5 her and interacted with her on and off since
6 residency.
7    Q   And would you characterize her as a social
8 friend?
9    A   You know, she's a colleague. We don't --
10 our lives are pretty independent and separate, so we
11 just periodically meet. We're both extremely busy.
12 And so I would say it's professional and a
13 colleague. But I've known her for a very long time.
14    Q   Okay. Can you estimate the number of
15 years that you've known Dr. Bosserman?
16    A   Oh, probably since 1984. Long time.
17    Q   So over 30 years?
18    A   Yes.
19    Q   And you've stayed in touch with
20 Dr. Bosserman over the 30-year period?
21    A   Intermittently. I wouldn't say
22 frequently. Not even once a year.
23    Q   Did you have a role in Dr. Bosserman's
24 involvement as an expert in the Taxotere litigation?
25    A   I did contact her to see if she was

Page 434

1 interested in consulting.
2    Q   Why did you do that?
3    A   The legal group asked me if I -- if I knew
4 anybody that might be helpful to provide additional
5 breast cancer expertise who was a practicing
6 physician currently. So I said yes and offered to
7 contact her.
8    Q   So you thought of Dr. Bosserman as someone
9 who might fit that role?
10    A   Well, I suggested her name to counsel, and
11 they told me to go ahead. That sounded like a good
12 person to consider. She is an expert in the field,
13 so...
14    Q   Did you interact with Dr. Bosserman about
15 the Taxotere litigation before she was retained as
16 an expert for plaintiffs?
17    A   No.
18    Q   You told me at the first deposition that
19 you reviewed Dr. Bosserman's report; is that right?
20    A   I reviewed it after she finished.
21    Q   Okay. And that was -- that was going to
22 be my next question, is at what point did you review
23 Dr. Bosserman's report?
24    A   Probably it was sometime in November,
25 because I think they were due in November.

Page 435

1    Q   Did you review Dr. Bosserman's report
2 before they were due?
3    A   Before they were due? I don't know the
4 exact date, to tell you the truth. I just reviewed
5 it when it was finished. I don't know when it was
6 submitted.
7    Q   What was the purpose of your review of
8 Dr. Bosserman's report?
9    A   I think, as I said last time, she was
10 referring to sections of my testimony, and so I just
11 wanted to see where that was in the context. That's
12 it. I provided no input on her report other than
13 the fact that I knew she was referring to my report.
14    Q   Did you speak to Dr. Bosserman about the
15 opinions set forth in her expert report?
16    A   I did not.
17    Q   Did you disagree with anything in
18 Dr. Bosserman's report?
19    A   I have no opinion on Dr. Bosserman's
20 report.
21    Q   When we spoke last, you also had mentioned
22 that Dr. Bosserman may write an article.
23        Do you remember that?
24    A   Yeah. I think that was in the context of
25 you asking me, had I had any conversations with her

Page 436

1 before my deposition.
2        And I told you I had one conversation with
3 her, and the four things that were discussed, as I
4 recall, were that it was a great recorder, that it
5 was a smart lawyer, that she enjoyed the coffee, and
6 that she was -- she said she was exploring the
7 possibility of communicating the risk of Taxotere in
8 a publication.
9        She's a journal editor, so she's -- you
10 know, that's what she does. So those are the four
11 things I remember. But that's it.
12    Q   Do you know what the status of that
13 article may be?
14    A   No idea.
15    Q   Are you involved as a co-author?
16    A   No idea. No. No, I am not.
17    Q   Do you intend to be?
18    A   I don't intend to be.
19    Q   Do you know if --
20    A   But, you know -- no, not to my knowledge.
21        This is something she's thinking of. I
22 think she's just exploring it. I don't think it's a
23 commitment.
24        I think she's just -- Dr. Bosserman is
25 very active and engaged, as you can tell -- or maybe

14 (Pages 433 - 436)

1 you don't know -- but she's very active and engaged
2 in the professional societies with patient groups.
3        So she's very -- she's very much energized
4 and thinks it's incredibly important, as do many of
5 us, about being transparent in communications.  So
6 she just feels this is part of, you know, the
7 information that -- you know, to be transparent.
8        I'm sure she's not thinking about this any
9 time during the litigation.
10     Q   Why do you say that?
11     A   Well, I don't know that, so I can't say
12 that.  I don't know what she thinks.
13     Q   Has Dr. Bosserman asked you to co-author
14 an article on this topic?
15     A   No.
16     Q   Do you know if she's put pen to paper?
17     A   Excuse me?
18     Q   Do you know if she's actually started
19 writing?
20     A   You know what?  You'd have to ask
21 Dr. Bosserman.  I have no idea.  I haven't
22 communicated with her.  That was the only
23 conversation I had with Dr. Bosserman.
24     Q   Do you know what type of article she
25 intends to write?

1     A   I know nothing about the specifics of what
2 she's thinking.  You'd really have to talk to her.
3     Q   Do you know anything about the timing by
4 which she would like to author this article?
5     A   I can't speculate.
6     Q   Do you know where Dr. Bosserman intends to
7 seek the article to be published?
8     A   Honestly, I know nothing about what she's
9 thinking.  I told you the full extent of what I
10 know.
11     Q   I appreciate that.
12        Dr. Feigal, have you served as an expert
13 witness before?
14     A   I have never served as an expert witness
15 before.
16     Q   Your fee as an expert in this litigation
17 is $650?
18     A   That is correct.
19     Q   And that's a per-hour fee?
20     A   That's correct.
21     Q   Do you have a separate fee for deposition
22 testimony?
23     A   I have the standard fee for legal, which
24 is set by my company.  I don't set my own rate.
25     Q   Okay.  So $650 an hour for the deposition

1 today, for example?
2     A   That's the rate that NDA Partners works
3 with the legal groups.  That's standard across the
4 whole company.
5     Q   Okay.  And different folks have different
6 arrangements in different circumstances, so I just
7 want to make sure I understand.  Some folks have a
8 certain rate for deposition testimony and a certain
9 rate for trial testimony.
10        It's your testimony that the same rate of
11 $650 per hour applies to all service that you are
12 providing in your role or capacity as an expert
13 witness, right?
14     A   That's my understanding, yeah.  And I
15 think that's what's in the agreement.  And I think
16 that's standard practice for our company.
17     Q   Let's assume that you bill one hour for a
18 particular activity in your capacity as an expert in
19 the Taxotere litigation, okay?  So you've billed for
20 $650.
21        What percentage of that $650 goes to you
22 versus NDA Partners?
23     A   20 percent goes to NDA Partners.  That's
24 their operational expenses.  Because I don't handle
25 the business end of anything with -- with my work.

1 I just focus on the content.  They do all the legal
2 agreements, they do all the invoicing, they do --
3 they do all the business end of things that I don't
4 want to do.
5     Q   So do you personally receive 80 percent of
6 the $650?
7     A   Right, and then that's subject to taxes.
8     Q   Sure.
9     A   Yeah.
10     Q   You are a partner at NDA Partners, right?
11     A   I am a partner at NDA Partners.
12     Q   So when you bill one hour for $650, is
13 there a sharing of that fee among the partners at
14 NDA Partners?
15     A   No.
16     Q   So you keep -- you, Dr. Feigal, will keep
17 the 80 percent that's attributable to you, but you
18 do not otherwise share that with other partners at
19 NDA Partners?
20     A   No.  No, I do not.
21     Q   And the 20 percent that goes to NDA
22 Partners, is that shared among the partners?
23     A   No.  That's operational costs.  There's an
24 operational staff that has -- we have about 13, 14
25 partners and 140 consultants that we work with.  So

15 (Pages 437 - 440)

Page 441

1  they -- they manage all of that. They have an
2  office. They have to keep secure databases.
3  There's a lot of behind-the-scenes work they have to
4  do in terms of agreements and all. So that
5  20 percent goes to them.
6      Q  Dr. Bosserman has a consulting agreement
7  with NDA Partners; is that right?
8      A  She does.
9      Q  And that is in the scope of her work as an
10  expert for plaintiffs in the Taxotere litigation?
11     A  You'd have to ask Dr. Bosserman what her
12  agreement says. I don't have that.
13     Q  Well, you know that she's an expert for
14  plaintiffs in the Taxotere litigation?
15     A  I do know that.
16     Q  And do you know that her arrangement is
17  through NDA Partners?
18     A  Of course.
19     Q  And so Dr. Bosserman's fee, my
20  understanding, is also $650 an hour, same as yours?
21     A  Correct. That's what I -- I said it's
22  standard for our company.
23     Q  Okay. And so does she receive 80 percent
24  of that fee?
25     A  Correct.

Page 442

1      Q  And the other 20 percent goes to the
2  administrative overhead for NDA Partners?
3      A  To run the business.
4      Q  Do you receive any portion of the fees
5  that Dr. Bosserman generates?
6      A  Nothing.
7      Q  How did you come to be involved with the
8  Taxotere litigation?
9      A  I think I've known this group, this legal
10  group. I had interacted with them, not on being an
11  expert witness, but just providing some scientific
12  and medical consulting on some previous cases not
13  related to this at all. And actually, I don't
14  recall when that even started. I don't recall.
15     Q  And that relationship, is that with
16  Mr. Thornton and his firm?
17     A  Correct.
18     Q  At our last meeting, we spent some time
19  talking about your opinions on a lot of topics, but
20  specifically on the communication of risk
21  information to doctors.
22         Do you remember that?
23     A  Yes.
24     Q  Okay. And then we also spent some time
25  talking about your general opinion that Taxotere or

Page 443

1  docetaxel causes permanent or persistent alopecia.
2         Do you remember that?
3      A  I do. I think we were parsing over the
4  terms "causally related," "causally associated," and
5  "causation." And yes, I recall that conversation.
6      Q  Okay. Do you believe there's a difference
7  between the body of evidence needed to justify a
8  communication of risk information to doctors about
9  an adverse event and the body of evidence needed to
10  scientifically prove that a drug causes an adverse
11  event?
12         MR. THORNTON: Objection. Form.
13         THE WITNESS: Well, I think there's the
14  body of evidence that -- about communicating safety
15  information to patients where it just has to be --
16  it doesn't have to be proven. And actually, neither
17  does causation has to be proven.
18         It just has to be -- you know, we talked
19  about the criteria last time, about the timing of
20  the exposure to the event, about whether or not
21  there's a dose response, about whether or not
22  there's consistency across multiple different
23  studies of the exposure and the effect, and we
24  talked about biologic plausibility.
25         For companies, if it's treatment-emergent,

Page 444

1  regardless of whether it's proven, there's a
2  responsibility to communicate risks that occur in
3  the context of the treatment to physicians so that
4  physicians can have an informed discussion with
5  their patients.
6         So if you're talking about causally
7  associated, related, or causation, I do go through a
8  list of criteria that I look at to scientifically
9  evaluate the evidence and determine whether there's
10  causally associated -- causally-related association
11  with the exposure and with the event that's
12  occurring.
13         And in the case of this litigation, it's
14  all about, you know, cytotoxic
15  Taxotere-regimen-induced permanent alopecia.
16  BY MR. KAUFMAN:
17     Q  You indicated that you don't need to
18  scientifically prove that a drug causes an adverse
19  event; that's what you stated, right?
20     A  Well, what I said is for the company to
21  communicate risk, including safety risk to
22  physicians, they -- they don't have to prove that
23  it -- it's when you have sufficient evidence to
24  believe that it's related to the -- to the effect,
25  that you do have a responsibility to communicate

16 (Pages 441 - 444)

Page 445

1 that.
2     Q   Okay.  So the standard to communicate risk
3 information to doctors does not rise to the level of
4 proving causation, right?
5     A   Proving -- 100 percent proving, no, you
6 don't have to 100 percent prove.  You just go
7 through the criteria I mentioned earlier.
8     Q   Okay.  And the criteria that you used in
9 forming your opinions?
10     A   The criteria that I used in forming my
11 opinions really posed on the criteria we talked
12 about last time; the timing, that these patients did
13 not have the condition before the exposure; that
14 there was an exposure/effect relationship; that in
15 some of the publications that we talked about, there
16 was a dose response which strengthens the sense of
17 association; that is to say, increased exposure
18 could lead to either increased number or increased
19 severity of the alopecia.
20         We talked about the consistency of
21 exposure in event across different types of studies.
22         For example, we talked about the types of
23 studies that I looked at, which included controlled
24 clinical trials, they looked at prospective clinical
25 trials, they looked at prospective cohort studies,

Page 446

1 and I also looked at retrospective surveys and case
2 series and case studies.  So there's a spectrum of
3 material.
4         In addition to that, I looked at the
5 clinical study reports because some of this
6 information was not contained -- the permanent
7 alopecia information was not contained in the
8 published reports from those clinical studies that
9 were performed by Sanofi.
10         And I did look at information from
11 pharmacovigilance that was available only to the
12 company, and I did have access to that information
13 in the clinical overview.
14         So from those three separate sources of
15 information that had consistency across the
16 different types of studies, I was able to interpret
17 and come to my opinion that there is a -- whether
18 you want to call it causally associated or causally
19 related -- but there's that type of relationship
20 between Taxotere and the occurrence of permanent
21 alopecia.
22         I also told you I'm not doing specific
23 plaintiff cases, so we're talking about general.
24     Q   Understood.
25         If you were to -- strike that.

Page 447

1         I understand that you don't believe that
2 there needs to be scientific proof that Taxotere or
3 docetaxel causes permanent or persistent alopecia to
4 form your opinions.  But --
5     A   Wait a minute.  I didn't say that at all.
6 Of course I think there needs to be scientific
7 evidence to inform my opinions.
8     Q   I'm sorry if I stated it that way.  That
9 was not my intent, so I'll strike it.
10     A   Do you want to repeat what he just said?
11         I'm sorry.  Am I allowed --
12     Q   I'll just restate it.
13     A   Okay.
14     Q   I'll withdraw the question.
15     A   Okay.
16     Q   I understand that you don't believe that
17 you need to scientifically prove that Taxotere
18 causes -- or docetaxel causes permanent or
19 persistent alopecia to form your opinions in this
20 case; is that right?
21         MR. THORNTON:  Objection.  Form.
22         THE WITNESS:  I -- I don't like the word
23 "prove."
24         I think you have to have scientific
25 evidence, and it has to meet the criteria.  It

Page 448

1 doesn't have to meet 100 percent of the criteria,
2 but it has to have evidence to support the
3 scientific statement for causation.
4         So no, I don't think you can just state
5 it.  I think there needs to be scientific evidence.
6 BY MR. KAUFMAN:
7     Q   Why don't you like the word "prove"?
8     A   Because I think that's a -- I don't think
9 it has to be proved.  I think the word to use is
10 that you have sufficient and substantial scientific
11 information that's been gleaned from a systematic,
12 unbiased review of the evidence base.
13         And from my case, it involved looking at
14 the clinical study reports, it involved looking at
15 the published literature of abstracts and papers,
16 and it involved looking at the pharmacovigilance
17 data.
18         So I gleaned scientific evidence from all
19 of that that I believe was substantial and
20 sufficient.
21     Q   What would you need to do to
22 scientifically prove that Taxotere or docetaxel
23 causes permanent or persistent alopecia to the
24 exclusion of other potential causes such as other
25 chemo drugs in the same combination regimen?

17 (Pages 445 - 448)

1    A  Oh.  Well, if you're talking about ruling
2  out other alternative hypotheses of why they might
3  have it, I think that is reasonable to do.
4       I'm not doing the specific cases, so I
5  would say if I was doing the -- you know, the
6  specific cases, I would do a differential diagnosis
7  of why those patients presented with permanent
8  alopecia.
9       So I'd get a history, I'd do a physical
10  exam, I'd look at their head, I'd -- and evaluate
11  criteria similar to what we said before about time
12  from exposure to the occurrence of this, the fact
13  that they didn't have it before.
14       But anyway, if I was doing it for that
15  specific case, those are the types of things I'd do.
16       As you know, I'm also a clinician for many
17  years.  And whenever I saw a patient, they -- unless
18  it was just a routine follow-up visit, they may come
19  to me with a complaint or symptom.  And I'd take a
20  history, I'd find out more of the attributes of the
21  symptom, I may do some laboratory or imaging
22  studies, and then I come to an assessment and a
23  plan.
24       So I would say if I was doing a specific
25  case, I would have to look at all those different

1  factors.
2    Q  Outside of a specific case, if you just
3  want to scientifically prove that a drug can cause
4  an adverse event, what level of evidence would you
5  need to make that conclusion?
6    A  Well, I'm not going to parse with you on
7  use of the word "prove" because I'm not a lawyer,
8  okay?  So what I'm used to with doing scientific
9  studies is showing scientific evidence.
10       For example, there's scientific evidence
11  based on clinical studies that certain drugs are
12  safe and effective.  They're not proved, but there's
13  substantial scientific evidence that something is
14  safe and effective and can be used.
15       So I'm just pushing back on the use of the
16  word "proved."
17       There's a lot of things that we do that
18  are evidence-based and that are very important, but
19  I wouldn't necessarily say they are proved.
20       So maybe it's just my interpretation of
21  the word "prove," but that's why I'm going back to
22  substantial and significant scientific evidence
23  that's consistent across multiple types of studies
24  that provide that evidence.
25    Q  And is it your testimony that the body of

1  evidence you've reviewed in forming your opinions on
2  the issue of causation with respect to Taxotere and
3  permanent alopecia is sufficient to justify a
4  communication to doctors about the risk of permanent
5  alopecia with docetaxel?
6    A  Oh, I do.  Yes.  And that's based on,
7  also, my experience as a clinician communicating
8  benefit/risks in patients, working in product
9  development, designing clinical trials and informed
10  consents, and informing the type of information that
11  needs to go in there, evaluating and surveying.
12       I've been chief medical officer of
13  companies, I've worked in positions in industry;
14  knowing the types of things we need to communicate
15  to physicians about a study and how to communicate
16  things.  And also, you know, from a variety of
17  experience.
18       I also teach, as you know, ethics and the
19  law at Sandra Day O'Connor College of Law to law
20  students.
21       And so this issue of communication and
22  transparency is really a critical piece of the
23  relationship between a patient and a physician.
24       So yes, I think there certainly was
25  substantial evidence to -- and a responsibility to

1  let physicians know about this risk.
2    Q  I believe you testified last time that you
3  don't need to show statistically significant
4  associations to justify a communication to doctors
5  about a potential safety issue such as this.
6    A  That's correct.  I did say, though, if you
7  have it, that's great.  I'm just saying it's not
8  required.
9    Q  Okay.  And I believe that's -- strike
10  that.
11       And you also testified that you don't need
12  to rule out other potential causes, such as other
13  chemo drugs in the same regimen, to justify a
14  communication to doctors about a potential safety
15  issue; is that right?
16    A  Let me -- well, I don't know if that's
17  exactly what I said.  You'd have to show me the
18  context for that one sentence.
19       But what I was -- what I was saying is
20  that if there's sufficient evidence for Taxotere --
21  and I've looked at randomized controlled trials,
22  I've looked at pharmacovigilance, I've looked at a
23  variety of published studies, many of which contain
24  Taxotere but many of which don't contain Taxotere,
25  and there's a greatly increased incidence in number

18 (Pages 449 - 452)

Page 453

1 of what's been reported with the Taxotere-containing
2 regimens.
3      So I think what I was saying is, I'm not
4 ruling out that other things might potentially
5 exacerbate or cause it to a lesser degree.
6      I have not looked at that degree of
7 scientific evidence for everything else that's out
8 there in terms of being able to have access to
9 unpublished clinical study reports,
10 pharmacovigilance data, and going -- I did go
11 through the published literature, as I said earlier,
12 looking at chemotherapy-induced alopecia for those
13 drugs that are relevant for treating the patients in
14 this plaintiff case.
15      And I think you'll see from my table, I do
16 have Taxotere-containing regimens that are separated
17 by whether they're Taxotere or paclitaxel.  I do
18 have a taxane column to represent those studies
19 where the particular taxane wasn't specified nor
20 identified, and I do have non-taxane regimens.
21      So I did do the same methodology when I
22 did my search for looking for permanent alopecia in
23 all those different types of regimens.  So it wasn't
24 predestined or predetermined that Taxotere had to
25 rise to the increased incidence, but that is how the

Page 454

1 data sorted out.
2      So I -- you know, I did look, and I did
3 report what I found from my systematic survey of the
4 literature.
5      What I don't have is unpublished
6 information from companies on their
7 pharmacovigilance data, and I don't have the
8 unpublished clinical study reports.  So I don't have
9 that level of detail that I have for Taxotere.
10    Q  You don't have that level of detail for,
11 say, paclitaxel or Taxol, right?
12    A  I do not have unpublished information and
13 confidential company information.
14    Q  And you don't have that level of detail
15 for Geomycin?
16    A  I have the detailed level of information
17 for the topic that's under consideration here, and
18 that's Taxotere.
19      What I have for any other product is
20 what's available in the published literature, what's
21 available in the clinical studies.  And from what's
22 been reported, that's what I have.
23      I can't say in the future there may be
24 some other study or some other event that arises
25 that that evidence -- you know, I just don't have

Page 455

1 that level of evidence for any of those other
2 products.
3    Q  And by --
4    A  But I did look from what was available to
5 me.
6    Q  But "other products," that would include
7 paclitaxel, Adriamycin, and cyclophosphamide,
8 correct?
9    A  What I have is the published studies.  And
10 I did the same methodology across for those other
11 published studies.  And the data is what the data
12 is.  You saw the results of those studies.
13    Q  And when you say "those studies," that's
14 what you included in Table 2, correct?
15    A  That's right.
16    Q  And it's your opinion that the cumulative
17 weight of the evidence that you've reviewed was
18 sufficient to justify a communication to doctors
19 about warning of the potential risk of permanent
20 alopecia or persistent alopecia with the use of
21 docetaxel?
22    A  Based on my professional background and
23 interactions with patients and product development,
24 yes, I think there was a sufficient amount of
25 evidence to communicate the severity of what was

Page 456

1 thought to be a temporary or reversible side effect
2 to physicians, because it's also a side effect that
3 would be incredibly important to women, needing to
4 figure out their options for breast cancer
5 treatment.
6      I mean, if I could just put the shoe on
7 the other foot, if I had a male patient in my clinic
8 office who had prostate cancer, and I had a
9 treatment that I knew caused permanent impotence, I
10 know that it's not going to kill him, and he can
11 still go to work, but it would be inherent on me to
12 inform that patient about that potential side
13 effect.
14      So I'm just saying, yes, I consider
15 permanent alopecia on a woman's head to be something
16 that she would be critically interested in knowing
17 about.
18      MR. KAUFMAN:  I'm going to hand you what
19 I've been provided during the deposition, and I'm
20 marking it as Exhibit No. 21.
21      (Exhibit 21 was marked for identification
22      and is attached hereto.)
23      MR. KAUFMAN:  Do we have multiple copies
24 of this?
25      MR. BAEHR:  Yes.

19 (Pages 453 - 456)

Page 457

1 BY MR. KAUFMAN:
2    Q   What is Exhibit No. 21?
3    A   Exhibit 21 is a November invoice.
4    Q   Okay.  So what I'd like to do now is turn
5 to Exhibit No. 5, which was one of the invoices.  So
6 pull out 5, 6, and 21.
7    A   Okay.
8    Q   Okay.  Would you agree with me that the
9 first invoice in terms chronological order is dated
10 November 7th of 2017?
11    A   The first page on Exhibit 5 is November of
12 2017.
13    Q   Okay.  And with the inclusion of
14 Exhibit 21, we now have your time through
15 November 27th of 2018?
16    A   That is correct.
17    Q   So collectively, Exhibits 5, 6, and 21
18 cover just over a year's period of billable time --
19    A   Correct.
20    Q   -- that you have charged to plaintiffs'
21 counsel for your services in the Taxotere
22 litigation?
23    A   Correct.
24    Q   Have you gone through the exercise of
25 totaling up how much you and NDA Partners have made

Page 458

1 through your services consulting with plaintiffs'
2 counsel in the Taxotere litigation?
3    A   I haven't done the math, but I'd be happy
4 to do that.
5    Q   Okay.  We don't need to do that right now.
6 I went through the exercise.  And if we add what's
7 recently been provided as Exhibit 21, it, by my
8 rough estimate, it would be just under $150,000.
9        Does that sound right?
10    A   I haven't done the math, so honestly, I
11 can't -- I can't answer your question accurately
12 until I do the math.
13        If you want me to take time to do the
14 math, I'm happy to do so.
15    Q   Okay.  Why don't we take time during a
16 break --
17    A   Yeah, that's fine.
18    Q   -- in a little bit.
19    A   I mean, it's not that I don't trust your
20 math, but I'm a person who likes to do it myself,
21 and then confirm that it is indeed accurate.
22    Q   Okay.  And if we were to total the amount
23 of money that you and NDA Partners have made for
24 your work consulting with plaintiffs, using, I
25 guess, the first page of Exhibit 5, would you take

Page 459

1 the total listed at the bottom?  So in this exhibit,
2 it would be $1,500?
3    A   That's correct.  And I -- you know, as I
4 said, I don't get 100 percent of this.
5    Q   I understand.  I'm asking you and NDA
6 Partners collectively.
7    A   Yeah, I understand.
8    Q   Okay.  So if you would turn to the next
9 one and go to the total, and on page 2 it's $8,550?
10    A   Correct.
11    Q   So for each total on each invoice, you
12 would add those together, correct?
13    A   Correct.
14    Q   And that would total the amount that you
15 and NDA Partners have charged plaintiffs' counsel
16 for your work in the Taxotere litigation?
17    A   Right.  And then obviously we need to
18 check to see if the bills were paid.
19    Q   Sure.  That's the next step, right?
20    A   Well, that's the operations group's next
21 step, not mine.
22    Q   Okay.
23    A   But at any rate, these are the standard
24 legal fees.  So this isn't something unique to this
25 particular law firm.

Page 460

1    Q   And once we have the total, it's your
2 understanding that 80 percent of that total would
3 have or will be paid directly to you, correct?
4    A   It should be.
5    Q   Is there any time that you're aware of
6 that has not yet been submitted or billed to
7 plaintiffs' counsel?
8    A   No.
9    Q   So we have --
10    A   Well, the only thing is, I think there
11 were a couple of airline travel.  So I'd have look
12 to see.  But I think it was captured the last time
13 we went on the deposition.
14        I have not had any travel since the last
15 deposition, and I don't believe there's any -- I'd
16 have to check, but they would have received the
17 invoice if there's travel.
18    Q   Well, since November 27th, 2018, you've
19 performed consulting work for plaintiffs in the
20 Taxotere litigation, right?
21    A   That's correct.
22    Q   Okay.  And part of that would have been
23 preparing for your first deposition in December?
24    A   That's correct.
25    Q   And appearing at the deposition in

Page 461

1 December?
2    A   Correct.
3    Q   And the work that you've done reviewing
4 materials and speaking with counsel between the date
5 of your first deposition and today?
6    A   (Witness nods head.)
7    Q   And preparing for your deposition today?
8    A   That's correct.
9    Q   And sitting here at the deposition today,
10 correct?
11    A   Talking to you.  Yes.
12    Q   So those would all be activities that are
13 yet to have been billed to plaintiffs' counsel,
14 correct?
15    A   I don't believe a December invoice has
16 been sent yet.
17    Q   Do you intend to bill plaintiffs' counsel
18 for those activities?
19    A   My business, NDA Partners, certainly does.
20    Q   Okay.  Do you know what the standard
21 timing is for issuing of invoices by NDA Partners?
22    A   I think because of the holidays there
23 might have been a delay.  So I don't -- within --
24 you know, they usually try and send invoices out
25 within a few weeks after the end of the month.

Page 462

1    Q   Okay.  If we can look at Exhibit 5, just
2 on the first page --
3    A   Yes.
4    Q   -- there's a column for "Description."
5    A   I'm sorry.  What are you looking at?
6    Q   Exhibit 5.  There's a column in the middle
7 that says "Description."
8    A   Yes.
9    Q   Okay.  Who enters that description?  Is
10 that something that you enter or somebody else does?
11    A   I provide it to the business office.
12    Q   Okay.  And then they include what you
13 provide in the invoice?
14    A   Yeah.  I don't -- yeah.  And then I have
15 to review it before it goes out.
16    Q   Okay.  And so for any invoice that has
17 gone out to plaintiffs' counsel, that has been
18 reviewed by you?
19    A   It should have been.
20    Q   Are you aware of any that weren't reviewed
21 by you?
22    A   I am not aware of any that haven't been
23 reviewed by me.  That's usually the standard
24 practice, is I characterize the hours and the
25 description, and then the business office puts

Page 463

1 together the invoice, and then they send it to me
2 before they send it out.
3    Q   On Exhibit No. 5, if you can turn to the
4 back of the second page --
5    A   Back of the second page?  Okay.
6    Q   Mine is double-sided.
7    A   Okay.  Mine is double-sided, too.
8    Q   So the second piece of paper, the back of
9 it.  It's page 4.
10    A   Next page?
11    Q   Yeah.  There's an entry for February 26,
12 2018.
13       Do you see that?
14    A   I see that.
15    Q   Okay.  It says you reviewed papers and
16 that you had a teleconference with Andrews Thornton
17 and a biostatistician?
18    A   I don't recall who that was.  I'm not
19 arguing that it was probably accurate at the time it
20 was written, but I honestly don't recall that.
21    Q   Do you remember why you had a call with a
22 biostatistician?
23    A   I don't know if I had a study design
24 question.  I honestly don't know.  I don't recall,
25 you know.  This is almost a year ago.  I just don't

Page 464

1 recall.
2    Q   The next page, I'm interested in entries
3 from March 27th and 28th.
4    A   Okay.
5    Q   Do you see those?
6    A   Yes.
7    Q   It's for review documents and draft
8 report.
9    A   Um-hum.
10    Q   And do those entries reflect the drafting
11 of your expert report in this litigation?
12    A   No.  It represents -- I called it a report
13 because I didn't want to call it a slide deck, but I
14 presented at science day.
15    Q   So this was the -- a draft of your science
16 day slide deck?
17    A   This is a draft of, yeah, the material
18 getting ready for the science day.
19    Q   When were you asked to participate in the
20 science day?
21    A   I don't recall the -- I honestly don't
22 recall the exact date.  Maybe Mr. Thornton does.  I
23 don't recall.
24       MR. THORNTON:  I don't.
25 ///

21 (Pages 461 - 464)

1 BY MR. KAUFMAN:
2     Q   Are you aware that there was a change in
3 the judge who's overseeing the Taxotere litigation?
4     A   I'm aware of who the current judge is.  I
5 think her name is Judge Milazzo.
6     Q   Correct.
7     A   I am -- I think I do recall there was a
8 different judge before that one, but I don't know
9 the person's name.
10     Q   Do you know when Judge Milazzo began
11 overseeing the Taxotere litigation?
12     A   I do not know.
13     Q   Do you know why a science day at the end
14 of June was held?
15     A   The -- what I was told was to educate the
16 judge.  It was for the judge.
17     Q   Because the judge was relatively new to
18 the litigation?
19     A   All I was told -- as I said, I've never
20 done expert deposition testimony or science days.
21         So basically what I was told is this could
22 be a standard part of educating the judge.  It's an
23 opportunity for the judge to learn.  That's all I
24 know.
25     Q   If the change of judge had not occurred by

1 the end of March of 2018 and no science day had been
2 scheduled, what would it mean to draft report as
3 indicated on your invoices in Exhibit 5?
4     A   I can't comment.  I don't know if there
5 was an anticipated -- they wanted to have a science
6 day.  I can't answer that question.  I don't know.
7         All I know is I was -- I was asked to
8 participate in a potential -- maybe it was a
9 potential science day.  I don't know if it was on
10 the calendar yet.
11     Q   Is there a reason why you did not, in the
12 description for March 27th, 2018, and March 28th,
13 2018, you did not say "Prepare slide deck"?
14     A   I don't ever do that.
15         I mean, when I work -- even in working
16 with NDA Partners with multiple partners, a report
17 could be a slide deck.  So it's a generic term.  It
18 doesn't mean it's a narrative.  It just means that's
19 the deliverable that the client wanted.  So that's
20 just how I describe it.
21     Q   Are you absolutely certain that the
22 entries for draft report pertain to science day?
23     A   I believe that's what they're for.
24     Q   If we can turn to your entries dated April
25 10th and 12th of 2018.

1     A   Is that in this same exhibit?
2     Q   Yeah, Exhibit 5.
3     A   Okay.
4     Q   There are two entries here for literature
5 review?
6     A   Um-hum.
7     Q   And each for two hours?
8     A   Um-hum.
9     Q   So a total of four hours.
10         Do you see that?
11     A   Yes.
12     Q   And what was the literature review?
13     A   Presumably preparing for the science day.
14 I had to review -- review articles because for
15 science day -- as I said, I don't know the exact
16 date.  I don't know if it was a potential science
17 day.
18         But what I was told is there's a single
19 person that's allowed to talk, so it was covering a
20 broad range of things.  Not just cancer, but
21 alopecia, regular -- a variety of things that the
22 judge would want to know.
23         So it was -- you know, this wasn't looking
24 for published studies.  This was looking for a
25 variety of things that were relevant for getting

1 ready for that type of presentation.
2     Q   So the entries on April 10th and
3 April 12th of 2018 do not describe time spent
4 developing the body of evidence that ultimately made
5 its way into Table 2?
6     A   Oh, I can't -- I can't say that I didn't
7 recycle information that I used for science day for
8 expert testimony.  But in no way, shape or form did
9 I ever agree to be an expert witness until after
10 science day.
11     Q   Why is that?
12     A   Because I do -- I do things in two steps.
13 And so I like to -- you know, I'm medical and
14 science.  I've never given a deposition.  Most of my
15 time is spent on clinical and medical review,
16 providing strategic information on clinical study
17 designs, on product development, on working with
18 investigators.
19         So I was agreeable to doing the types of
20 things I've been used to doing, which is basically
21 educating and providing perspectives.
22         What I was told at that time is that's all
23 they wanted, was just somebody who could provide
24 that kind of expert -- maybe I won't use the word
25 "expert" -- but I'll use that kind of professional

22 (Pages 465 - 468)

1 background to help educate them on some of the
2 issues. That was my initial interaction, is they
3 wanted to understand the issues.
4     Q  If we can turn to the invoice page for
5 June of 2018.
6     A  Okay.
7     Q  Can we agree that there are several
8 entries here that pertain to science day
9 presentation?
10    A  Correct.
11    Q  Can we also agree that none of the prior
12 entries for any of the prior invoices reference
13 science day?
14    A  I don't usually do that. I don't -- I
15 don't put down -- most clients, even in invoices,
16 don't want specific issues in an invoice. And so I
17 just keep it accurate, but not to any other level of
18 detail.
19       For this one, I put "science day" because
20 it was clearly -- you know, it's a public -- I think
21 it was public.
22       Is that correct?
23       MR. THORNTON: I don't get to answer that.
24       THE WITNESS: Oh, I'm sorry.
25       At any rate, you know, it's a known

1 presentation. So I don't know if it's only open to
2 people who just happen to be part of the science day
3 or if other people can come in.
4 BY MR. KAUFMAN:
5     Q  Can we agree, Doctor, that the words
6 "science day" do not appear on any prior invoices
7 that you submitted to plaintiffs' counsel?
8     A  No, but that's perfectly consistent with
9 how I do all my invoices. I don't put -- I don't
10 put specific presentation reports on my invoice.
11    Q  I'm not asking if it's consistent with how
12 you do your prior invoices. I'm asking if the words
13 "science day" appear on any prior invoices that you
14 submitted to plaintiffs' counsel. Feel free to look
15 through to respond.
16    A  I'm sure I didn't because I never am
17 specific about the -- I just say "draft report
18 writing" or "report writing." I never put down the
19 name of the client or the specific conference I'm
20 going to. I never do that in any invoice.
21       So I think it's relevant because that
22 would be a change in behavior from how I do
23 invoices.
24    Q  And if you never do that, then why did you
25 do that 14 times on your exhibit for -- or your

1 invoice for June of 2018?
2     A  Because that's all about the science day
3 presentation, and that was -- from my understanding,
4 that was a public -- publicly noticeable event. So
5 that was my understanding, is there's nothing in
6 there that's confidential, so that's why I put down
7 the words "science day."
8       I'm not aware that science day is a
9 confidential meeting with the court, so that's why I
10 felt comfortable in just putting "science day."
11    Q  Is there anything that precluded you from
12 including "science day" on any science-day-related
13 activities that you conducted prior to June of 2018?
14    A  I -- it's just consistent with how I put
15 my invoices together. I don't put specifics in
16 terms of the specific conference or the specific
17 client that I'm writing it for in my invoice.
18    Q  Well, would you agree with me that your
19 invoice for June of 2018, which references science
20 day 14 times, is inconsistent with any prior
21 invoices for services that you claim were performed
22 with respect to science day?
23    A  I think you're really mischaracterizing
24 how I do invoices.
25       I do -- this is how I do invoices, so --

1 this is how I do them. I write -- if I'm drafting a
2 report, I'm drafting a report. If I'm actually at
3 an actual meeting that's a public meeting,
4 oftentimes I will put it down.
5     Q  And if you're doing something for science
6 day, you'll put down "science day"?
7     A  Well, science day is a day. I put down
8 the day I did science day, right?
9     Q  Well, you tell me.
10       MR. THORNTON: Objection. Form.
11       THE WITNESS: It looks like it was in the
12 immediate time right before science day. I don't
13 recall the date of science day.
14 BY MR. KAUFMAN:
15    Q  On the specific June 13th, 2018 entry --
16 are you with me? It states that the rate is $650
17 per hour, but right above that, and actually on all
18 prior invoices, it states that your rate was $600
19 per hour; is that right?
20    A  That's correct. And that was an
21 operational staffing mistake. They were not
22 providing the same standard legal rate that we get
23 with all -- all of our partners and all of our
24 experts.
25       So they discussed this, I believe, with

23 (Pages 469 - 472)

1 the attorneys and corrected the rate. And the
2 lawyers agreed to that correction.
3    Q  Okay. And it --
4    A  But it wasn't retroactive. It just
5 started on that date.
6        I noticed it because I started looking at
7 the hourly rate. And since I haven't done legal
8 cases, I didn't know what the rate was. And I was
9 informed of the correct rate, and then I asked them
10 to correct it. And they needed to talk with the
11 plaintiffs' attorney in order to correct the hourly
12 rate from that time forward.
13    Q  Can you turn to the August 8th, 2018,
14 entry?
15    A  Oh.
16    Q  This says, "Pull and review materials on
17 lasers."
18    A  Okay. Actually, this is an invoice that I
19 did discuss with Mr. Thornton here, and it is a
20 mistake on the invoice.
21    Q  What part of it is a mistake?
22    A  It shouldn't be on this invoice. It has
23 absolutely nothing do with the invoice. It should
24 have been on a different invoice.
25    Q  Got it. So the entry for August 8th,

1 2018, for one hour at $650 should come off?
2    A  It should be on a different invoice.
3    Q  It should not be charged to plaintiffs'
4 counsel in the Taxotere litigation?
5    A  Absolutely.
6    Q  Okay.
7    A  And I did point that out to Mr. Thornton.
8    Q  Just so that when we're adding it up
9 later, we know what we're adding and what we're not.
10    A  Yeah. I believe that was the only mistake
11 in all of these invoices, to my recollection.
12    Q  And then can you turn to the last page,
13 which is September 22nd and September 28th, 2018?
14        Here you indicate in the description
15 "Report writing."
16    A  Um-hum.
17    Q  What report were you writing for this?
18    A  In September, I was probably getting
19 ready -- I had been asked to do expert testimony by
20 that time.
21    Q  So this would be the drafting -- this
22 would represent time that you spent preparing or
23 drafting your expert report in this litigation?
24    A  That's correct.
25    Q  And you characterized that as report

1 writing, correct?
2    A  Document review and report writing.
3    Q  Okay. Exhibit No. 6, which reflects time
4 for October of 2018, can we agree that there are
5 three entries for report writing?
6    A  That's correct.
7    Q  Okay. And then --
8    A  And document review. So it's not
9 isolated.
10    Q  Sure. And then the last entry on
11 October 31st of 2018 notes, "Draft reports,"
12 correct?
13    A  Um-hum. Once again, a typo. There's one
14 report.
15    Q  You did not draft more than one report?
16    A  No, I did not.
17    Q  So the plural would be the typo?
18    A  The plural of "report" is a typo. There
19 are not multiple reports. There's one.
20    Q  Is there a reason that three times on this
21 invoice you use the phrase "report writing" and the
22 fourth time you use the phrase "draft reports"?
23    A  No, there isn't.
24        I think by the end of October, it was
25 getting close to the time that I needed to submit

1 it. So it was just -- it gives me a sense of, it's
2 getting into shape for submission.
3    Q  Was this the same time that you were
4 reviewing Dr. Bosserman's report?
5    A  No. I don't believe I saw hers until
6 November, right around the time it was submitted.
7    Q  At the top, October 2nd, 2018, there's an
8 entry for e-mail interactions and follow-up
9 regarding papers.
10    A  Tell me what -- are you still on
11 Exhibit 6?
12    Q  Yes, at the very top.
13    A  Yes, I see that.
14    Q  What is that referring to regarding
15 papers?
16    A  It's probably referring to some
17 questions -- oh, wait. I know what that is. That's
18 e-mailing the authors where I had questions about
19 their papers.
20        I think it was -- I provided you the
21 e-mail communications on October 2nd of this year --
22 of last year with three authors. I believe it was a
23 Dr. Sohn, a Dr. Masidonski, maybe, and a Dr. Kang,
24 maybe.
25        So there were three authors where I needed

24 (Pages 473 - 476)

Page 477

1 to get clarification of what taxane they were using
2 in their paper. So that specific entry may have
3 been getting their contact information, being able
4 to write them, seeing their response.
5     So I believe that's what those -- that
6 reference is about, contacting those three different
7 authors about their three different papers about
8 taxanes.
9     MR. KAUFMAN: Okay. Would now be a good
10 time to take a break?
11     MR. THORNTON: Sure.
12     THE VIDEO OPERATOR: This marks the end of
13 Volume III, Media No. 1, of the deposition of Ellen
14 Feigal. The time is 12:52 p.m. We're off the
15 record.
16     (Recess, 12:52 p.m. - 1:52 p.m.)
17     THE VIDEO OPERATOR: We are back on the
18 record at 1:52 p.m. This marks the beginning of
19 Volume III, Media No. 2, of the deposition of Ellen
20 Feigal, M.D.
21 BY MR. KAUFMAN:
22     Q   Dr. Feigal, if you could pull out
23 Exhibit 5 again. It's the invoice.
24     A   Yes.
25     Q   And I'd like for you to turn to the --

Page 478

1 there's an e-mail with a booking for United.
2     A   Could you just tell me what page?
3     Q   It's like the fourth or fifth page.
4     A   "Thanks for choosing United."
5     Q   Yeah. So it looks like an e-mail
6 confirming a booking. It's from United Airlines to
7 feigal_david@msn.com?
8     A   Correct.
9     Q   Okay. And who is David Feigal?
10     A   David Feigal is my husband.
11     Q   And if we go down, this look like a flight
12 booking for a trip from Los Angeles to Denver,
13 Colorado?
14     A   Correct.
15     Q   And it was booked for two adults?
16     A   That is correct.
17     Q   And the trip was Thursday, January 28th,
18 2018, correct?
19     A   Correct.
20     Q   Leaving at 5:48 in the morning and
21 returning the same day, leaving Denver at 6:55 p.m.,
22 correct?
23     A   Where do you see the time?
24     Q   It's on the next page.
25     A   It says, yeah, leaving Los Angeles

Page 479

1 5:48 a.m., leaving Denver at 6:55 p.m. Correct.
2     Q   And that was -- so it was a day trip to
3 Denver?
4     A   It was a day trip for a meeting to Denver.
5     Q   And you were in Denver for less than ten
6 hours?
7     A   Correct.
8     Q   And the travelers listed here are Ellen
9 Feigal -- that's you, right?
10     A   Correct.
11     Q   -- and David Feigal, your husband, right?
12     A   That is correct.
13     Q   And you said it was for a meeting. Who
14 were you meeting with?
15     A   That was probably a meeting -- I'd have to
16 look at my calendar, but it was probably a meeting
17 with plaintiff counsel if it was on this invoice.
18     Q   Okay. And why did your husband, David,
19 go?
20     A   Because my husband, David, has clients all
21 over the world, and he may have had an opportunity
22 to go see a client in Denver at that time.
23         It's not unusual for us to try and sync
24 our meetings so that we can see each other
25 occasionally.

Page 480

1     Q   Did your husband, David Feigal, attend the
2 meeting with plaintiffs' counsel?
3     A   Not at all. He's not involved with this
4 at all.
5     Q   Your husband is also a partner at NDA
6 Partners; is that right?
7     A   That's right.
8     Q   Okay. And in that capacity, he consults
9 on pharmaceutical and medical device issues?
10     A   Any of our experts can do so, including
11 the partners.
12     Q   Okay. Including your husband?
13     A   Including my husband.
14     Q   And in his consulting capacity, he has
15 consulted in litigation on behalf of pharmaceutical
16 and medical device companies; is that right?
17     A   All of -- I mean, people who do legal
18 consulting, yes, they can do that.
19     Q   Okay. And your husband does legal
20 consulting, too?
21     A   He does.
22     Q   And he's been doing it actually longer
23 than you have.
24     A   I'm sorry?
25     Q   He's been consulting in litigation longer

25 (Pages 477 - 480)

1 than you; is that right?
2     A  He's been doing it -- yes.  He has
3 experience doing it.  I do not.
4     Q  Because this is your first time?
5     A  Correct.
6     Q  In litigation?
7     A  That's correct.
8     Q  Yeah.  And he, in consulting in
9 litigation, consults on behalf of manufacturers of
10 pharmaceutical and medical device products; is that
11 right?
12     A  It's my understanding he can be on either
13 side depending on what the issue is.
14     Q  But he has consulted for the defendants or
15 the manufacturers of prescription products, right?
16     A  I'm sure he has.  I don't know the details
17 of what he consults on.
18     Q  Okay.
19     A  We have an operations office that checks
20 for all conflicts of interest to be sure that there
21 aren't any when we do our legal work, and we don't
22 share anything.
23     Q  What do you mean by that?
24     A  We don't share what we're working on
25 regarding legal issues.

1     Q  So you don't talk to your husband about
2 the consulting work that you do?
3     A  Not about legal issues and not about
4 things where I have confidential information.  We'd
5 lose our credibility if I shared confidential
6 information.  So no.
7         And by the way, confidentiality is nothing
8 new to me.  I worked for the federal government.  I
9 worked on highly confidential material from a
10 multitude of drug sponsors.  He worked on a
11 multitude of confidential information on products.
12        So no, we couldn't share information.
13     Q  Did your husband -- I think I know the
14 answer, but I'm going to go ahead and ask it anyway.
15        Did your husband have any role in the
16 preparation of your expert report?
17     A  Not at all.
18     Q  He did not review your expert report?
19     A  Not at all.
20     Q  Did you use or rely on any of his prior
21 expert reports in other litigation in preparing your
22 report?
23     A  No, I did not.
24     Q  I'm going to hand you -- do you consider
25 your expert report to be confidential?

1     A  Yes.
2        (Exhibit 22 was marked for identification
3        and is attached hereto.)
4 BY MR. KAUFMAN:
5     Q  I'm going to hand you a copy of what I've
6 marked as Exhibit No. 22.
7     A  Okay.
8     Q  And it's a copy of your expert report, and
9 it is the version that we were actually provided
10 last night, so it's got the redline track changes.
11 It should be the most current version.
12     A  Okay.
13     Q  And it's also got some highlighting in it,
14 which is why I've marked a new copy.
15     A  Yeah.
16     Q  And the highlighting was added by defense
17 counsel.
18     A  Yes.
19        (Exhibit 23 was marked for identification
20        and is attached hereto.)
21 BY MR. KAUFMAN:
22     Q  I'm also going to hand you a copy of
23 what's been marked as Exhibit No. 23.
24     A  Okay.
25     Q  Have you seen that document before?

1     A  No, I've never seen this document.
2        MR. THORNTON:  May I see Exhibit 22?
3        MR. KAUFMAN:  Sorry.
4        THE WITNESS:  He doesn't -- he doesn't
5 show me his expert reports.
6 BY MR. KAUFMAN:
7     Q  I'm going to direct you to pretty much
8 pages 5 through 16 of David Feigal's report, and
9 that's really the scope of what I'm going to ask you
10 about.
11     A  Okay.  I'm there.
12     Q  Okay.  Starting on page 5 of David
13 Feigal's report, can you see, there's the heading
14 number 1, and it should be highlighted.
15     A  Yeah, I see it.
16     Q  You see it?  Can you read the heading?
17     A  "These studies often involve several
18 hundred patients.  They are used to learn enough
19 about the drug to plan the larger trials in Phase 3
20 that will study the safety and effectiveness of the
21 drug for one or more indications."
22     Q  Actually, I was asking you just to read
23 the heading above.
24     A  "The Phases of Drug Development"?  Is that
25 what you're talking about?

26 (Pages 481 - 484)

1    Q   Yeah.  What does that say, the highlighted
2  portions?
3    A  It says, "Investigational New Drugs - The
4  Phases of Drug Development."
5    Q   Okay.  And turn to your report, the
6  highlighted one that I marked as Exhibit 22.
7    A  What do you want me to turn to?
8    Q   Page 13.  And there's a heading there.
9    A  Yeah.  "The Phases of Drug Development."
10 That's not a copyrighted sentence.  That's a very
11 generic title.
12    Q   Can you read exactly as it reads in your
13 report on page 13?
14    A  "Investigational New Drugs - The Phases of
15 Drug Development."
16       My section is called "Treatment
17 Development - The Drug Development Life-Cycle."
18       His section is called "The New Drug
19 Approval Process."
20    Q   Okay.  Now, if we go further down to the
21 bottom of page 5 in David Feigal's report -- are you
22 with me?
23    A  That's the one you wanted me to read, and
24 I've read it.
25    Q   Yeah.  Can you -- that's not the one I

1  actually intended you to read initially.  So can you
2  read that portion again, the highlighted portion?
3    A  Is it the same sentence I just read
4  previously?  The highlighted --
5    Q   It may be, but I wasn't following with you
6  because I was --
7    A  "These studies often involve several
8  hundred patients.  They're used to learn enough
9  about the drug to plan the larger trials in Phase 3
10 that will study the safety and effectiveness of a
11 drug for one or more indications."
12    Q   Okay.  Can you turn to page 15 of
13 Exhibit 22?
14    A  Um-hum.
15    Q   There's a highlighted portion at the top.
16 Can you read that?
17    A  It says, "Phase 2 studies often involve
18 several hundred patients.  They are used to learn
19 enough about the drug to plan the larger trials in
20 Phase 3 that will confirm the safety and
21 effectiveness of the drug for one or more
22 indications."
23    Q   Is that nearly identical to the sentence
24 you read from David Feigal's report?
25       MR. THORNTON:  Objection.  Form.

1       THE WITNESS:  Well, one, it is not.
2       And I think you need to know, also, I
3  teach an FDA drug course at the Sandra Day O'Connor
4  College of Law and develop all kinds of material for
5  drug development.  So I borrow extensively from the
6  material that I present to law students.
7       So it's not outside the realm of
8  possibility that very common phrases can be used.
9       But no, this is not an identical sentence.
10 And no, "the phases of drug development" is not an
11 uncommon term.  You can find that sentence in many,
12 many places.
13 BY MR. KAUFMAN:
14    Q   What part of the sentences that you read
15 from each report is not identical?
16    A  Well, he said, "These studies often
17 involve several hundred patients."
18       I said, "Phase 2 studies often involve
19 several hundred patients."
20       So I'm talking about Phase 2 studies.
21 Doesn't look like -- his sentence doesn't include
22 that.
23    Q   Are there any other differences?
24    A  Let's see.  Yeah.  He said, "to study the
25 safety and effectiveness of the drug," and I said,

1  "that will confirm the safety and effectiveness."
2       So Phase 3 -- you know, I teach product
3  development.  Phase 2 trials are part of learn, and
4  Phase 3 trials are confirm.  So that's a common term
5  that I use when I'm talking about Phase 3 trials.
6    Q   Can you turn to page 8 of David Feigal's
7  report?
8    A  Okay.
9    Q   That's a heading indicated by the
10 letter C.  Can you read that heading?
11    A  "Marketed Products:  Phase 4 and
12 Postmarketing Safety Surveillance."
13    Q   On page 15 of your report, can you read
14 the heading marked as item C?
15    A  Yeah.  "Marketed Products:  Phase 4 and
16 Postmarketing Studies."
17       These are common items that I use to teach
18 product development at the law school.
19    Q   In David Feigal's report, can you turn to
20 page 9 at the very top and read the first sentence?
21    A  "Spontaneous postmarketing adverse event
22 reports must identify at least," and then it has
23 four different issues."
24    Q   And what are those four different issues?
25    A  Well, those are spelled out by the FDA.  I

27 (Pages 485 - 488)

1 didn't fabricate the material. These come directly
2 from FDA.
3      "They must identify the adverse event, the
4 possible suspect drug, a specific patient, the
5 source of the report."
6      I mean, those are -- that's standard. I
7 can't -- I can't -- I don't make the criteria. The
8 FDA does.
9      Q   And on page 16 of your report --
10     A   Yes.
11     Q   -- can you read the highlighted section in
12 the second paragraph? Page 16 of your report.
13     A   Yeah. It's the same four criteria.
14     Q   Can you read it, please?
15     A   "Spontaneous postmarketing adverse event
16 reports, identify the following: The adverse event,
17 the possible suspect drug, the specific patient, and
18 the source of the report."
19         Those are the criteria.
20     Q   And at the bottom of page 9 of David
21 Feigal's report and onto page 10, there's a
22 highlighted portion. Can you read that?
23     A   "'Phase 4 Postmarketing Commitments' are
24 studies that the company agrees to conduct after
25 marketing to provide additional information about

1 specific issues that were identified in the NDA
2 review, but were not thought to be necessary to
3 conduct prior to NDA approval."
4      Q   On page 15 of your report at the bottom,
5 there's a highlighted portion. Can you please read
6 that into the record?
7      A   "Phase 4 Postmarketing Commitments or
8 study the company agrees to conduct after marketing
9 to provide additional information about specific
10 issues that were identified in the NDA review, but
11 were not necessary for NDA approval."
12     Q   Is that passage nearly identical to the
13 one that --
14     A   No, it isn't.
15     Q   -- appears in Dr. Feigal's report?
16     A   No. He says they were not necessary to
17 conduct prior to NDA approval. So no, it's not
18 identical.
19         I think what you're getting at is, the
20 language that we take to teach FDA drug law has very
21 specific language about what postmarketing
22 surveillance is, about what the phases of clinical
23 trials are.
24         So whether or not you find a sentence that
25 might be similar to another sentence when somebody

1 is talking about the phases of drug development is,
2 I think, almost to be expected.
3      Q   Can you turn to page 16 of David Feigal's
4 report?
5      A   Okay. Product labeling.
6      Q   There's a highlighted section in the
7 second paragraph. There's two tones. I'd just like
8 you to read the lighter highlighted tone from David
9 Feigal's report.
10         MR. THORNTON: Objection. Form.
11         THE WITNESS: I'm not sure what you want
12 me to read.
13 BY MR. KAUFMAN:
14     Q   In David Feigal's report, Exhibit 23.
15         MR. THORNTON: I think you highlighted it
16 in different colors, and she didn't have the colored
17 copy.
18 BY MR. KAUFMAN:
19     Q   Oh. The yellow.
20     A   The yellow label?
21     Q   Yes, the yellow, please.
22     A   "A label provides physicians with a clear
23 and concise summary of the information necessary for
24 the safe and effective use of the drug.
25 Prescription drug labeling is directed to healthcare

1 professionals and not to consumers. An FDA-approved
2 label is a summary of the essential scientific
3 information providing an evidence-based assessment
4 of risk and benefit for specific indications, to
5 assist a prescriber making decisions for individual
6 patients."
7      Q   And then on page 16 of your report at the
8 bottom, can you read the highlighted paragraph onto
9 page 17?
10     A   "The prescribing information" -- so I
11 don't use the word "label." And the whole topic is
12 labeled "Prescribing Information." It's not labeled
13 "Labeling."
14     Q   Dr. Feigal, if you may, I'm not asking you
15 to identify the differences. I'm just asking you to
16 read the paragraph on pages 16 to 17.
17     A   Sure. "Prescription drug information is
18 written for healthcare professionals who prescribe
19 drugs and not to consumers."
20         That was the highlighted portion.
21     Q   What I'd like you to do is read in one
22 full reading the entirety of the highlighted section
23 on page 16 that goes on to page 17.
24     A   "The prescribing information is a summary
25 of the essential scientific information providing an

28 (Pages 489 - 492)

1 evidence-based assessment of risk and benefit for
2 specific indications to assist a prescriber making
3 decisions for individual patients."
4 Q And --
5 A And I provide the reference for that.
6 Q And is the passages that you've read from
7 your report nearly identical to those contained in
8 David Feigal's report?
9 A That's because it's obtained from the Food
10 and Drug Administration file rule content and format
11 for labeling. I took the language from the FDA
12 guidance.
13 Q Is that a direct quote?
14 A It's not -- well, I have to look. I gave
15 the pages. I will look.
16 Q Did you quote it?
17 A I will have to look.
18 Q Did you quote it in your report? Were
19 there quotation marks?
20 A Did I put that quote in the report? No,
21 but I provided the reference.
22 Q Did David Feigal use quotation marks when
23 he used similar language?
24 A I don't think so. I don't see it.
25 Q And it's still your testimony that you did

1 not consult any version of any of David Feigal's
2 expert reports in prior litigation?
3 A It's absolutely true. I have never seen
4 this.
5 And as I said, we both teach FDA drug law
6 at the Sandra Day O'Connor College of Law, so there
7 may be material we each independently use in expert
8 reports.
9 But no, I have never read his expert
10 reports, and he has never read mine.
11 Q You said you independently teach where?
12 A Sandra Day O'Connor College of Law in
13 Phoenix, Arizona.
14 Q Did you consult any of the materials that
15 you use when you teach at the college of law in
16 Arizona when you prepared your expert report?
17 A Did I consult? No. I've actually taught
18 it for so many years that I don't need to go back
19 and look at it. I know -- I know what it says
20 because I teach every year.
21 Q So you did not draw from any specific
22 materials in forming your opinions or drafting your
23 report in the Taxotere litigation?
24 A I reference where I used citations for it.
25 Q What I meant by "materials" was materials

1 from the College of Law in Arizona.
2 A No, because I would never cite a slide
3 deck, first of all. I would go to the original
4 source.
5 Q Can you turn back to page 9 of David
6 Feigal's report?
7 A Sure.
8 Q The second sentence at the top is a
9 different tone of highlighting, I think.
10 A Yes.
11 Q It reads, "There are limitations to
12 spontaneous reports which must be taken into
13 account. For example, patients may have multiple
14 medical problems. They may have taken many
15 different medications, and the reports often have
16 incomplete information and lack follow-up
17 information."
18 Did I read that correctly?
19 A You read that correctly.
20 Q Do you agree with that in the context of
21 spontaneous postmarketing adverse event reports?
22 A Well, first of all, I don't know why
23 you're having me read expert testimony on an
24 unrelated case in confidential information.
25 But at any rate, I really have no comment

1 on his expert report.
2 Q I'm just asking if you agree or disagree
3 with that statement.
4 A I just have no opinion on his expert
5 report.
6 Q Turn to the next page, page 10.
7 There's -- in the middle of David Feigal's report,
8 it says that "It is important to note that FDA has
9 sources of information not available to any single
10 manufacturer. In addition to spontaneous reports
11 sent directly to FDA, drug development programs of
12 one manufacturer may contain detailed studies of
13 another manufacturer's drug used as a control
14 group."
15 MR. THORNTON: Objection. Form.
16 BY MR. KAUFMAN:
17 Q Did I read that correctly?
18 A I don't feel comfortable reading a
19 confidential report on a case I had nothing to do,
20 and you're picking specific sentences out and
21 asking, do I agree with that.
22 Q I didn't ask you that question.
23 A I don't feel comfortable with what you're
24 doing to me right now.
25 This is confidential information from an

29 (Pages 493 - 496)

Page 497

1 unrelated case that you're asking me to read, I
2 guess, because my husband is David Feigal. But we
3 don't share confidential information with each
4 other, and I don't feel comfortable reading his
5 report.
6    Q   Why don't you feel comfortable reading his
7 report?
8    A   Because it's confidential information that
9 is not related to anything that I'm doing and not
10 related to this case.
11       So no, I don't -- I don't feel -- I feel
12 like -- no, I don't feel comfortable with -- with
13 reading another expert's testimony on a case
14 completely unrelated to this case.
15    Q   Well, I think you testified a bit earlier,
16 these are general principles, correct, that apply
17 across --
18       MR. THORNTON: Objection. Form.
19 BY MR. KAUFMAN:
20    Q   -- across the industry?
21    A   You know what? You can ask me the
22 question, but I wouldn't do it in the context of
23 another expert testimony on an unrelated case with
24 confidential information that I really shouldn't be
25 reading.

Page 498

1    Q   What -- well, let me go back.
2       I read that passage. Did I read it
3 correctly?
4    A   I'm not going to answer questions about
5 his expert report. I don't feel comfortable doing
6 that. That is my response.
7    Q   How do you know that these portions of
8 David Feigal's expert report are confidential?
9 What's the basis for that position?
10    A   I'm not -- just so you know, we have
11 ethical principles at the company. And if a person
12 is not involved with a case, they do not read other
13 experts' expert reports. I'm assuming this is all
14 confidential.
15    Q   So I'm going to ask you one more time,
16 when I read the passage from page 10 of David
17 Feigal's report, did I read it correctly?
18    A   I am not going to answer any further
19 questions on this.
20       MR. THORNTON: Objection. Form.
21       THE WITNESS: I don't feel comfortable
22 reading an expert's report on an unrelated case, and
23 I feel like you're doing this just because he's my
24 husband.
25       But my ethics stand whether it's a husband

Page 499

1 or whether it's a professional colleague. I don't
2 read confidential information that I'm not involved
3 with, particularly on legal cases, because I don't
4 want to unintentionally conflict myself.
5       There may be a time in the future when I
6 am called to be involved in a particular case, and I
7 don't want to have to say, "I was privy to inside
8 information about the case."
9       So I'm just saying whether it's a husband
10 or whether it's a professional colleague, we do not
11 read each other's expert reports unless we're
12 involved with the case.
13 BY MR. KAUFMAN:
14    Q   Is it your position that you get to pick
15 and choose which of my questions you get to respond
16 to?
17       MR. THORNTON: Objection. Form.
18       THE WITNESS: I think it's -- I think I
19 have to stand up for my ethical principles. And if
20 I think I'm being taken down a path that I don't
21 feel comfortable with, I have a right to let you
22 know that.
23 BY MR. KAUFMAN:
24    Q   Okay. You've stated your position, and
25 now I'm asking you my questions. And I have an

Page 500

1 opportunity -- actually, this is my chance to ask
2 you questions and to get your answers.
3    A   I understand that.
4    Q   Okay. And so I'm asking you if I read
5 that passage correctly.
6       MR. THORNTON: Objection. Form.
7       THE WITNESS: I am -- I'm not going to
8 answer any of -- I don't know.
9       Is there a way I can say I'm not going to
10 answer that? Because I don't think it's ethically
11 appropriate.
12       MR. THORNTON: You've so testified. Your
13 ethical standards stand.
14       MR. KAUFMAN: Well, I'm entitled to get
15 answers to my questions, Counsel, and you know that
16 as well.
17       MR. THORNTON: She's taken her position.
18 I am listening.
19 BY MR. KAUFMAN:
20    Q   Okay.
21    A   Okay.
22    Q   Dr. Feigal, do you agree that FDA has
23 sources of information not available to any single
24 manufacturer?
25    A   I do agree that FDA does have information

30 (Pages 497 - 500)

Page 501

1 from a whole world of other products and their
2 companies. Absolutely.
3     Q  Do you agree with the statement that in
4 addition to spontaneous reports sent directly to
5 FDA, drug development programs of one manufacturer
6 may contain detailed studies of another
7 manufacturer's drug used as a control group?
8         MR. THORNTON: Objection. Form.
9         This is not a regulatory expert.
10        THE WITNESS: It's a rather long sentence.
11 Maybe you could reread the question. I got lost.
12 BY MR. KAUFMAN:
13    Q  In addition to spontaneous reports sent
14 directly to FDA, drug development programs of one
15 manufacturer may contain detailed studies of another
16 manufacturer's drug used as a control group.
17        MR. THORNTON: Objection. Form.
18        THE WITNESS: I don't -- honestly, yeah,
19 that's a question for Dr. Kessler, not a question
20 for me.
21 BY MR. KAUFMAN:
22    Q  So you take no position on that?
23    A  I'm not sure I even understand what your
24 question is.
25        I know the FDA has access to a wealth of

Page 502

1 information about products, including competitor
2 products that the sponsor of a particular product
3 may not have information on.
4     Q  Do you agree that the prescribing
5 information for a prescription drug is not intended
6 to be an encyclopedia of all possible information
7 and theories about the benefits and risks, or to
8 provide a textbook of medicine about a disease
9 treated or a particular adverse reaction?
10        MR. THORNTON: Objection. Form.
11        THE WITNESS: I really have no comment on
12 that statement.
13 BY MR. KAUFMAN:
14    Q  You don't agree or disagree with it?
15    A  I don't have a comment on that statement.
16    Q  Why not?
17        MR. THORNTON: Objection. Form.
18        THE WITNESS: Because I'm not the
19 regulatory expert. And you're asking a lot of
20 specifics about label and what does the FDA know. I
21 think that's more appropriate if you want to ask
22 that question of Dr. Kessler.
23 BY MR. KAUFMAN:
24    Q  Can you pull up Exhibit 17?
25    A  Sure. This is my expert report?

Page 503

1     Q  It's the redline version that I was
2 provided.
3     A  Okeydoke. I also have Exhibit 22 that is
4 also my expert report.
5     Q  I'm asking you for 17.
6     A  Okay.
7     Q  Okay. Between the time of -- strike that.
8         In November we were provided with a copy
9 of your report.
10    A  Correct.
11    Q  And then at the first deposition, we
12 received a modified version of that, correct?
13    A  You received, yeah, citations.
14    Q  So Exhibit 17 is a redline version of
15 those changes, correct?
16    A  Let me look.
17        Can you state when you received this?
18    Q  The redline copy? Last night.
19    A  Exhibit 17?
20    Q  Last night.
21    A  Last night?
22    Q  From plaintiffs' counsel.
23    A  Okay. It looks like a redline copy, yes.
24    Q  Okay. Walk me through what prompted you
25 to make changes to your report that we ultimately

Page 504

1 received the day of your first deposition.
2         MR. THORNTON: Objection. Form.
3         THE WITNESS: I was -- I made
4 modifications to add clarity to the report. It
5 provided the references.
6 BY MR. KAUFMAN:
7     Q  And when did you do that?
8     A  It was probably a week to ten days maybe.
9 I don't remember exactly. But it was -- it was
10 maybe a week or so before.
11        I think you had called for additional
12 information maybe that week. I don't recall if it
13 was a week or ten days. And that prompted me to
14 want to provide the additional references that did
15 go into the report and that I did look at.
16        So I think it was prompted by a question
17 from you about additional information.
18    Q  So we submitted a deposition notice and
19 asked for the production of certain materials.
20    A  Correct.
21    Q  And is it your testimony that it was that
22 request that motivated the changes to the report?
23    A  I believe that's true.
24    Q  Okay.
25        MR. THORNTON: Objection. Form.

31 (Pages 501 - 504)

Page 505

1  BY MR. KAUFMAN:
2      Q   And what was it about the request for the
3  production of materials that prompted you to make
4  changes to the report?
5          MR. THORNTON: Objection. Form.
6          THE WITNESS: Well, first of all, I didn't
7  make changes to the report other than to cite the
8  references from which the report was made.
9          I made absolutely no changes to the body
10  of the report other than a few typographical
11  changes.
12         So basically it was citing the references
13  from which my narrative was taken.
14  BY MR. KAUFMAN:
15     Q   Okay. So let's just quickly run through
16  some of the changes real quick, okay?
17     A   Sure.
18     Q   On the table of contents, that's where the
19  first changes occur, and it's just with respect to
20  pagination, right?
21         So on the table of contents, page 1 --
22     A   Yeah. I believe, as you know, with
23  putting a report together, the last thing to change
24  is the table of contents.
25     Q   So there were, in total, four pagination

Page 506

1  changes on the table of contents, correct?
2      A   One, two, three, four. Let's see. Did it
3  change the page number? Yeah, it looks like it
4  changed the page number.
5      Q   Okay. And then if you turn to page 22 of
6  your report, there's the addition of Footnote 31 and
7  Footnote 32, correct?
8      A   Correct.
9      Q   And Footnote 31 and 32 both cite to FDA
10  Taxotere approval letters, one for August 18, 2004,
11  and the other for June 22nd, 1998, correct?
12     A   And it also provides the FDA website,
13  which I also referenced in the footnote.
14     Q   Okay. But what I said was also correct?
15     A   What you said is correct.
16     Q   Okay. And I was going to get to the next
17  point about the website. And the website is a link
18  to the Taxotere approval letters that are described,
19  correct?
20     A   Yeah. But as you see in the first part,
21  the website is the FDA.gov website on AccessData,
22  because I also used that data to provide the other
23  dates for the subsequent approvals.
24     Q   Okay. But if one were to type in the
25  entirety of the address that you cite in Footnote 31

Page 507

1  and Footnote 32, one would be led directly to the
2  Taxotere approval letter, correct?
3      A   Just trying to make it easy.
4      Q   Okay. Thank you.
5          And if we can turn to page 24 --
6      A   24, not 23? Okay.
7      Q   -- I believe -- we can go back to 23.
8      A   I mean, whatever you want.
9      Q   My understanding of the changes to 23,
10  which are redlined here, were, because you added two
11  new footnotes, the pre-existing footnotes just
12  changed in number; is that not true?
13     A   It looks like -- well, yeah, they probably
14  would have had to change the sequencing. I use a
15  program that automatically changes the sequencing.
16     Q   Yeah. Okay. So on 24, in the
17  second-to-the-last paragraph, there is a deletion?
18     A   That's correct.
19     Q   And you testified about that deletion at
20  the first deposition, correct?
21     A   Right. The sentence -- that identical
22  sentence was replicated in the appropriate section
23  of the report, and I took it out of this particular
24  paragraph. But that same identical sentence is
25  still in the report. It's just not in the report

Page 508

1  twice.
2      Q   And where is the identical sentence that's
3  in your report?
4      A   I knew that was going to be your next
5  question.
6      Q   You previously directed me to --
7      A   I this it's on page --
8      Q   -- 31.
9      A   -- 34. So there you go.
10     Q   And which specific sentence?
11     A   Look at the first paragraph on page 34.
12  "At the end of the ten-year follow-up period, PCIA
13  was seeing" -- and that's --
14     Q   You can keep reading.
15     A   Well, I'm just looking. Slightly
16  different, but the stats are the same.
17     Q   Okay. So not identical?
18     A   Well, duplicative. And it didn't -- there
19  was no reason to have it in this place. It was a
20  formatting problem. I put it in this place
21  erroneously. It belonged on page 34 instead of on
22  page 24. But the data is identical. I just had
23  it -- page 34 is the appropriate place for it.
24     Q   Well, the data is not quite identical
25  because on page 24, you identify percentages, but

32 (Pages 505 - 508)

1 then on page 34, you give the percentage and then
2 also the raw number.
3     A  Yeah.  But, I mean, they're both --
4 they're both factual.
5     Q  But that would be another difference?
6     A  Sure.
7     Q  On page 29, there's a change here.
8     A  Yes.
9     Q  And you added the word "docetaxel" and
10 struck the word "paclitaxel."
11     A  Well, because the sentence didn't make any
12 sense.  I mean, docetaxel goes with Taxotere.
13          I mean, the regimen is ACT, and the "T" is
14 Taxotere.  And you can see from the sentence, it's
15 correct.  Taxotere/docetaxel.  It's just a typo.  It
16 was just to make the sentence make sense.
17     Q  Okay.
18     A  It didn't make sense as written.
19     Q  And your point here was to clarify and to
20 make sure your report was accurate?
21     A  It was accurate.  Yeah.
22     Q  Let's go to the next one on page 30.
23     A  Okay.
24     Q  What was the change made here?
25     A  Well, that's why you got a new copy today,

1 because it was not made in the right word.
2     Q  Okay.  So what does it currently say?
3     A  It says Taxol and paclitaxel so that it's
4 consistent with the sentence.
5     Q  Well, what's been marked as Exhibit No. --
6     A  Is this 22?  Is this the one you got
7 today?
8     Q  Exhibit -- no.  I'm talking about the one
9 I was given last night, Exhibit 17.
10     A  That's what I'm looking at.  The wrong
11 word was crossed out.
12          MR. THORNTON:  We brought a separate copy.
13 I thought that was discussed before.
14          THE WITNESS:  Did you not get the copy
15 today?
16          MR. KAUFMAN:  Yeah.  I was told about the
17 change, but the copy we were served with last night
18 was this copy.  And this is the redline changes, and
19 so I'm just asking based on what I was provided last
20 night, not --
21          THE WITNESS:  Just to be -- what you got
22 on -- is it December 7th when the first deposition
23 is?  I think I provided you my copy on December 7th,
24 which is correct.
25          And then in putting together this redline

1 copy, the wrong word got deleted.  So that's why you
2 were handed -- the only change between last night
3 and the one you received today is that the -- the
4 correct word is deleted instead of the incorrect
5 word.  It's a typo.
6 BY MR. KAUFMAN:
7     Q  Read what it currently says in this
8 exhibit, and then tell me what it should say.
9     A  What it currently says is, "ACT," with in
10 the parentheses, "T" being "Taxotere," in the last
11 sentence, it being "Taxol."
12          In the corrected version, the parentheses
13 says "Taxol/paclitaxel."  That's the only change
14 between what you got last night and what you got
15 today.
16          And actually what you got today is
17 consistent with the December 7th version I handed
18 you in person on December 7th.
19          MR. THORNTON:  It was a lawyer error,
20 actually.  We just submitted an erroneous draft last
21 night.
22          MR. KAUFMAN:  Okay.  I think the record
23 now clearly reflects what was intended.
24          THE WITNESS:  That's the only change.
25 That's the only change.

1 BY MR. KAUFMAN:
2     Q  And on page 33 --
3     A  Okay.  Which version do you want me to
4 look at now?
5     Q  The same version we've been using, 17.
6 Exhibit 17.
7     A  Okay.  Fine.
8     Q  Page 33, there's a redline to the last
9 paragraph above section B.  It used to say,
10 "87.7 percent."  It now says, "87.6 percent."
11     A  That's right.
12     Q  Do you view that to be a substantive
13 change?
14     A  No.
15     Q  Why not?
16     A  Going from 87.7 to 87.6, no.
17     Q  Do you think that's typographical?
18     A  Yeah.  And that -- by the way, that was on
19 your December 7th deposition version I gave to you.
20     Q  Okay.  And then on pages 33 and 34, can we
21 agree that several footnotes were added, Footnote
22 63 -- 62, 63, 66, 67, 68, and 69?
23     A  I think some of these are the same
24 reference but just different page numbers.  One is
25 the Tax 316 clinical study report.  It looks like

1  Sanofi 02645236, and it looks like that's the
2  reference for Footnote 66.
3       And then Footnote 67 is just referring to
4  Footnote 62, and Footnote 63 is just referring to
5  Footnote 66.
6       So it looks like there's -- the clinical
7  study report, 316, is a reference that has been
8  added. They're just different page numbers that are
9  being referenced. That's all.
10      Q  Okay. And then Footnote 72 was also added
11  on page 36, right?
12      A  Oh. Well, Footnote 72 I think had already
13  been referenced in an earlier part of the report, if
14  I'm not mistaken. I could be. But basically that's
15  just the --
16      Q  I'm just asking you if that was also
17  added.
18      A  All I'm saying is it might have already
19  been in the report, and it's just being -- as you
20  know, footnotes, it gives you a new footnote number
21  on every page. But that footnote was added.
22  Correct.
23      Q  Okay. And at the prior deposition in
24  December, you had initially told me that there were
25  three changes made to the report.

1       Do you remember that?
2       MR. THORNTON: Objection. Form.
3       THE WITNESS: I think the problem at the
4  other deposition is I didn't have a redline version
5  so I didn't have an easy way to go through the
6  corrections. I was using a non-redline version and
7  trying to remember what page number. So mea culpa.
8  Human error. I missed one.
9  BY MR. KAUFMAN:
10      Q  Well, you missed more than one, right?
11  Because you told me that there were three changes.
12  In fact, there's ten or more, right?
13      A  No. I think that there are -- I mean,
14  some of these are font changes, some of these are
15  typos.
16      There is nothing substantive that has
17  changed in this report.
18      Q  I'm not asking you about substantive
19  changes. I'm just asking you about the number of
20  changes.
21      A  I haven't counted.
22      Q  You mentioned changing the font size. Why
23  did you do that?
24      A  I'm a little anal-compulsive with reports.
25  And so it wasn't the right font size, so I changed

1  it.
2       Q  What is the right font size?
3       A  To be consistent with the other font sizes
4  in a report.
5       Q  So there was inconsistent font sizes
6  throughout the report?
7       A  There was one, and I corrected it.
8       Do you want me to show you the page? I
9  think it was just -- I think it was just page 5 is
10  the only font change.
11      Q  Got it.
12      We touched on your causation opinions a
13  little bit earlier.
14      A  Yes.
15      Q  And I just want to clarify a few more
16  things --
17      A  Sure.
18      Q  -- and then move on from the topic.
19      A  Okay.
20      Q  Okay?
21      A  Okay.
22      Q  The basis for your opinion, I just want to
23  make sure I understand what you used as the basis
24  for forming your general causation opinion.
25      Is it true that you considered the data

1  from two randomized control clinical trials, Tax 316
2  and Geicam 9805 --
3       A  I'm waiting to hear the rest of your
4  sentence.
5       Q  -- the 2015 clinical overview and the
6  information contained within it, and the studies and
7  literature cited in Table 2?
8       A  That is correct. That's the body of
9  evidence from those different studies.
10      Q  Okay. Is there anything else?
11      A  Well, I think the body of evidence is
12  contained in my report from, I think, pages 22 on.
13      So I have my own professional experience
14  and knowledge. I have my own experience and
15  knowledge in standards for transparency of
16  communication between a physician and a patient.
17      And I provided you the code of principles
18  that we talked about, but now you have the
19  references in terms of non-regulatory, but code of
20  ethics principles that companies utilize when they
21  communicate with physicians.
22      Q  But in terms of the materials that you
23  considered in forming a causation opinion about
24  whether docetaxel causes permanent or persistent
25  alopecia, you relied on the two randomized

34 (Pages 513 - 516)

1 controlled clinical trials, the 2015 clinical
2 overview, and the studies and literature cited in
3 Table 2, correct?
4      A   In combination with my knowledge about
5 these other areas with product development, my
6 knowledge of the issues in terms of showing
7 causation, with doing a systematic and
8 scientifically proven method for evaluating the
9 evidence for the data, and I think using a
10 systematic and reliable scientific method for
11 looking at those issues, based upon my 30 years of
12 training.
13      So yes, I evaluated it with that viewpoint
14 in terms of the -- how these studies need to be
15 evaluated based on my training and my education, as
16 well as looking at the quality of the information.
17      So if you encompass your statement with my
18 additional language, then I think that's correct.
19      Q   And I understand that your experience and
20 your knowledge and the application of the criteria
21 and methodology you used helped you form that
22 opinion.
23      But is it also true that you don't have
24 any experience or personal knowledge outside of the
25 materials you reviewed in this case upon which to

1 draw a conclusion that Taxotere causes permanent
2 alopecia?
3      A   Well, I have 30 years of experience of
4 taking care of cancer patients or being involved in
5 product development for cancer products, and
6 experience in the types of information that's useful
7 that I use to glean about what happens here.
8      I just want to say the principles of how
9 you do this evaluation is not unique to this
10 particular exposure and this type of event in terms
11 of how you use the methodology.
12      So I'm just saying my experience is pretty
13 broad and deep in terms of doing these types of
14 analyses.
15      Q   Let me see if I can get at it this way,
16 because I don't think we're all that far apart,
17 actually.
18      You reviewed the data from the two
19 randomized controlled clinical trials, Tax 316,
20 Geicam 9805 --
21      THE REPORTER:  Can you say that again?
22 Sorry.
23      MR. KAUFMAN:  I'll just start over.
24      Q   You reviewed data from the two randomized
25 controlled clinical trials, Tax 316 and Geicam 9805,

1 the 2015 clinical overview and the information
2 contained within it, and the studies and literature
3 cited in Table 2 of your report.
4      That's correct?
5      A   It's correct with the addition that I did
6 it with the criteria in mind in terms of what is
7 important for determining causation.
8      So I looked at timing and exposure, I
9 looked at dose response, I looked at biologic
10 plausibility, and I looked at reproducibility or
11 consisting [sic] of findings across all these
12 studies to help inform my opinion about causation.
13      Q   I'm not asking about your methodology.
14 I'm just asking for what eggs went in the basket, so
15 to speak; what data you looked at to then apply the
16 methodology to reach the conclusion.  I'm just
17 asking about what the inputs were from the data
18 perspective.
19      A   Yeah, and I guess I don't feel comfortable
20 segregating how you look at data from the actual
21 gathering of the data.
22      So part of the issue is interpretation.
23 It's not just, you know, throwing a bunch of papers
24 at you, but it's actually having the know-how to
25 know how to read the -- read the published papers

1 and abstracts and digest that and come to an
2 interpretation of what it says.
3      Q   Other than the materials that we've just
4 gone through, are there any other pieces of data
5 that you used to consider and form your causation
6 opinions?
7      A   The only other data that -- that I looked
8 at is what I know about what's available with the
9 other products in terms of published literature.
10      Did I need it to rely on for the report?
11 I didn't -- I didn't need to cite them, no, but I
12 certainly am knowledgeable about what's in the field
13 with these other types of products.
14      Q   So you're referring -- just so I'm clear,
15 are you referring to materials cited in Table 2, or
16 are you referring to materials that are not
17 disclosed in your report or your --
18      A   I just want to make it clear that my
19 report has a lot of citations and footnotes and
20 references and papers, and I read all of them.
21      So I'm just saying some of the footnotes
22 are relevant to the specific things you notice, but
23 then I have additional footnotes and citations.
24      So all of that material is relevant to my
25 expert testimony.

35 (Pages 517 - 520)

Page 521

1    Q  I'm not trying to draw a line as to what's
2  relevant to your expert testimony and what's not.  I
3  just want to know what the data points were that you
4  used to form your causation opinion.
5        Other than the two randomized controlled
6  clinical trials, the 2015 clinical overview, and the
7  studies and literature in Table 2, is there any
8  other piece of data that you considered?
9    A  Let me -- so that we can come to an
10  agreement, I did not use any other Taxotere data
11  other than what you've mentioned in terms of forming
12  my opinion.  I didn't have access to any other
13  confidential Taxotere information.
14    Q  Okay.  I think that's good.
15    A  I think -- okay.
16    Q  Is it also true that you didn't have --
17  consider any other docetaxel information?
18    A  I don't know what you mean by that.
19    Q  Well, to the extent that there's a
20  difference between Taxotere and docetaxel.
21        MR. THORNTON:  Objection.  Form.
22        THE WITNESS:  Your question doesn't make
23  sense to me.  Say it again, or maybe read it back.
24  BY MR. KAUFMAN:
25    Q  Well, you stated that you did not consider

Page 522

1  any other Taxotere-specific information, correct,
2  other than the items we just listed?
3    A  I know.  But what was your question?
4    Q  I'm wanting to know if you were drawing a
5  distinction between reviewing Taxotere-specific
6  information and docetaxel-specific information.
7    A  I looked at docetaxel as well as Taxotere
8  information.  If that is your question, I looked
9  at -- I looked at both, what was available.
10        Is that your question?  It would be
11  contained within the data that we've already talked
12  about.  I wasn't -- that's why I always put
13  "Taxotere/docetaxel" throughout, you know, many
14  parts of my report.  So I just want to make it
15  clear, when I'm talking about Taxotere, I'm also
16  talking about docetaxel.
17    Q  Okay.  That's helpful.
18    A  Okay.
19    Q  You talked about your methodology --
20    A  Yeah.
21    Q  -- and the criteria you used.
22        Where in the published peer-reviewed
23  medical literature can I find that methodology or
24  that criteria that you followed to establish that
25  Taxotere causes permanent or persistent alopecia?

Page 523

1    A  The scientific method, is that what you're
2  asking?
3    Q  I'm asking where in the published
4  peer-reviewed medical literature I can find the
5  methodology that you used to reach your causation
6  opinion.
7    A  Well, the criteria, if you want to go back
8  to a dinner speech by Bradford Hill in 1965, you
9  know, there he gave a speech about nine different
10  criteria that are important in assessing causation.
11        There, of course, he initially started
12  with emphysema and lung cancer and those types of
13  issues.  But it goes back decades in terms of
14  criteria.
15    Q  And is that criteria -- well, strike that.
16        I'm not sure you quite answered my
17  question about where in the published peer-reviewed
18  medical literature I can find that criteria.
19    A  Well, there's not --
20    Q  Can you point me to a source?
21    A  Well, if you're asking me a question, I
22  can go back and provide you resources, you know, an
23  errata sheet if you'd like.  But basically there's
24  multiple sources of using those type of criteria for
25  causation.

Page 524

1        I pointed you to the granddaddy of where
2  you can find some of the original discussion about
3  those criteria, and it actually was a dinner speech
4  that was written up and published and available on
5  the website.  And it was back in 1965, and then
6  there's been multiple permutations of that since
7  that time.
8        And then it's not like scientific
9  evaluation didn't exist before 1965.  There have
10  been a lot of obviously studies to look for
11  causation well before that.
12        But since -- I think at a prior
13  deposition, you wanted to know about the Bradford
14  Hill criteria, that's some of the original place
15  where you could find that.
16    Q  Did you apply the Bradford Hill criteria
17  in forming your opinions?
18    A  I used aspects of it.  I didn't name that
19  name because he's not the owner of those criteria,
20  and there's been a variety of different criteria,
21  you know, permutations of that over time to
22  establish causation.
23    Q  So in terms of the criteria you used and
24  the methodology you used specifically to reach your
25  causation opinion in this case, can you point me to

36 (Pages 521 - 524)

Page 525

1 a single authority or multiple authorities, but
2 specific authorities, that -- in the published
3 peer-reviewed medical literature that I can use to
4 follow along with the criteria and method you used?
5        MR. THORNTON:  Objection.  Form.
6        THE WITNESS:  There's multiple.  I can
7 provide those.  I can't provide them right this
8 instant, but I quoted one that you can probably
9 easily find on a website right now because it's so
10 famous.
11        But there's multiple sources for Bradford
12 Hill criteria and how to use permutations of that in
13 causation.  So they're -- it's not a checklist.
14 It's actually -- and even in his original talk, if
15 you read it, there's no requirement to go down each
16 of the nine criteria as a checklist, and he himself
17 says that.
18        So I'd be happy to provide that or any
19 subsequent references regarding that.
20 BY MR. KAUFMAN:
21    Q   Are you offering to provide it because you
22 don't cite to it in your report or reliance
23 materials?
24    A   I'm responding to your question.  You
25 asked, where is the reference?

Page 526

1    Q   Yeah.  And it's not in your report or your
2 reliance materials, correct?
3    A   My whole methodology uses that criteria,
4 but they're not copyrighted by Bradford Hill, as I'm
5 sure you know.
6        So there's permutations of the criteria
7 used throughout.  There's permutations that are used
8 by the FDA, by all kinds of agencies, in terms of
9 thinking about criteria for causation.
10    Q   And I'm asking if those sources are cited
11 in your report or your reliance list.
12    A   They're -- they're referenced throughout
13 my report, my methodology, and pages 22 through
14 whatever the last page of my report is for
15 conclusions goes through the methodology of it.
16    Q   Let's go through the report and you can
17 show me exactly where you're talking about.  So
18 let's pull out Exhibit 17.
19    A   Which exhibit -- do you want me to go back
20 to Exhibit 17, not 22?
21    Q   Sure.  Show me where your methodology is.
22    A   Pages 22 through 34.  It's implicit all
23 the way throughout this report.
24    Q   Is it express?
25    A   It's obvious all throughout the report.

Page 527

1    Q   And show me where it's obvious because I
2 want to make sure I can understand.
3    A   There's only so many times I can say pages
4 22 to 34.  That's my whole report.
5    Q   Well, your whole report is 1 through --
6    A   Well, if you --
7    Q   -- 44.
8    A   -- look at -- well, there's a lot to say.
9    Q   Okay.  So I'm looking at pages 22
10 through --
11    A   Well, on this version, let me see what
12 page it is.  It might have changed a page number.
13        Well, on page 22, it starts talking about
14 the issues about Taxotere and its use in early-stage
15 breast cancer.  I think it also talks about the
16 clinical trials and all those issues.
17        But, you know, I'm not going to go through
18 it sentence by sentence.  My whole report is a
19 causation report.
20    Q   I'm not -- strike that.
21        Where in your report specifically --
22 because you said it's obvious -- is your methodology
23 and the criteria you used to form your causation
24 opinion?
25    A   My whole report is a causation report.

Page 528

1    Q   Is your methodology and the criteria you
2 used to reach your causation opinion expressly
3 stated and set forth in your report?
4        MR. THORNTON:  Objection.  Form.
5        THE WITNESS:  It is -- the interpretation
6 and conclusions are stated throughout the report.
7        MR. KAUFMAN:  That's not --
8        Can you read back my question, please?
9        I move to strike that last response as
10 nonresponsive.
11        (Record read as follows:
12        "Question:  Is your methodology and the
13    criteria you used to reach your causation
14    opinion expressly stated and set forth in your
15    report?")
16        THE WITNESS:  I believe it is.
17 BY MR. KAUFMAN:
18    Q   Where?
19    A   It's throughout my report.
20    Q   You can't point me to a specific section
21 or paragraph or page?
22    A   I can't attach you to a specific sentence.
23    Q   And why is that?
24    A   Because the causation methodology is -- I
25 used a standard scientific approach.  I went through

37 (Pages 525 - 528)

Page 529

1 the different -- different types of issues that are
2 important: the timing, exposure, the dose, the
3 biologic plausibility, the consistency of results
4 across the multiple studies. And that is contained
5 within the report.
6    Q   And where in the report does it say that
7 you did those things?
8    A   I did those things throughout the report.
9 Those are the major issues that led me to come to my
10 interpretations about the issues.
11    Q   But where in your report does it say that
12 you did those things?
13    A   I think it's contained throughout the body
14 of the report.
15    Q   Can you point me to a page?
16    A   I'm -- it's the whole report.
17    Q   Can you identify a time when you used the
18 same criteria and methodology to conclude that a
19 drug causes a particular adverse event outside the
20 context of litigation?
21    A   Yeah. I do it all the time. I'm involved
22 in product development. I was involved in industry
23 as I think you know from my qualifications. I
24 worked in industry. I was involved in safety
25 surveillance. That was a part of what I did as

Page 530

1 working within the company.
2    So not only did I work at trying to find
3 more effective products, but I did also evaluate
4 safety issues all the time on a wide variety of
5 products.
6    MR. KAUFMAN:  Move to strike as
7 nonresponsive.
8    Can you please read that back?
9    (Record read as follows:
10    "Question: Can you identify a time when
11    you used the same criteria and methodology to
12    conclude that a drug causes a particular
13    adverse event outside the context of
14    litigation?")
15    THE WITNESS:  And the answer is yes. I
16 mean, for proprietary reasons, I can't tell you --
17 you know, name that drug.
18    But I certainly did it in terms of a lot
19 of the product development, and I work with -- as
20 you know, I'm a consultant to a multitude of
21 companies. So I am asked to evaluate their data and
22 look at safety and help determine attribution.
23    So, I mean, that's something I do as part
24 of my work activity, you know, for over 30 years.
25 ///

Page 531

1 BY MR. KAUFMAN:
2    Q   So you are refusing to give a specific
3 example of when you applied this criteria and
4 methodology in a specific case with a specific drug
5 that you concluded caused a particular adverse
6 event?
7    A   There's multiple drugs. I mean, I worked
8 at the National Cancer Institute for 12 years. I
9 mean, that was part of what I had to do with
10 development of multiple drugs.
11    You know, I worked with, you know, all
12 kinds of products at the National Cancer Institute.
13 Probably 80 percent of the cancer drugs that are
14 approved in the United States went through the
15 National Cancer Institute.
16    So there's all kinds of cytotoxic
17 chemotherapies, there's biologics therapies, there's
18 molecularly-based therapies.
19    So there's a very long list of products
20 where attribution of safety had to be made, and
21 using the appropriate scientific method and
22 criteria. So it's not just one drug. There's
23 multiple.
24    Q   I move to strike as nonresponsive.
25    Doctor, I'm just asking if you can give me

Page 532

1 a single example of a drug that you concluded caused
2 a particular adverse event using the criteria and
3 the methodology you used to form your opinions in
4 this case.
5    A   Erythropoietin.
6    Q   Okay. Tell me about that.
7    A   Well, it's rather famous, don't you think?
8    But the issue there was in terms of
9 whether or not there would be issues with
10 inadvertent tumor growth in patients who were very
11 early-stage cancer. And so actually that caused a
12 labeling change in terms of safety issues. So it
13 was a very prominent case.
14    Q   What was the body of evidence that you
15 used to reach the conclusion that that drug caused
16 that adverse event?
17    A   Well, there's pharmacovigilance data;
18 there's clinical trials. There's a variety of
19 information that came in that informed those issues.
20    Q   So pharmacovigilance and randomized
21 controlled trials?
22    A   There were quite a few randomized
23 controlled clinical trials, and there were also some
24 laboratory studies that were done to look at the
25 issue.

38 (Pages 529 - 532)

1    Q   And where can I go to read about that
2  work?
3    A   You can probably -- well, that's a
4  different question.  Are you asking did I publish?
5    Q   Well, did you publish?
6    A   Well, I published many things.
7        But I think the issue is, I've been
8  involved in product development with a multitude of
9  drugs that had safety issues and had to use criteria
10  to determine attribution.
11    Q   Have you published in the peer-reviewed
12  literature at any time on the issue of whether a
13  drug causes a particular adverse event?
14    A   I have certainly published papers on a
15  variety of different products that included safety
16  issues.  Was it specifically on safety issues?  No.
17        You have my bibliography.
18        MR. KAUFMAN:  Move to strike as
19  nonresponsive.
20        Can you please read that back?
21        (Record read as follows:
22        "Question:  Have you published in the
23        peer-reviewed literature at any time on the
24        issue of whether a drug causes a particular
25        adverse event?")

1        MR. THORNTON:  Objection.  Form.
2        THE WITNESS:  I think I've answered that
3  question.
4        MR. THORNTON:  Just for your information,
5  just because he moves to strike it doesn't mean it's
6  stricken.  It's just for the judge.  You understand
7  that?
8        THE WITNESS:  Okay.
9        MR. THORNTON:  Okay.
10        MR. KAUFMAN:  So can you read the question
11  again?
12        (Record read as follows:
13        "Question:  Have you published in the
14        peer-reviewed literature at any time on the
15        issue of whether a drug causes a particular
16        adverse event?")
17        THE WITNESS:  I have published multiple
18  times in the peer-reviewed literature about product
19  safety and efficacy including -- so yes, including
20  safety.
21  BY MR. KAUFMAN:
22    Q   Can you point me to a specific article or
23  publication that you authored discussing the
24  criteria or methodology that you used to reach your
25  causation conclusions?

1    A   You have my bibliography.  I even gave you
2  an updated one today through December 2018.  So you
3  have all my articles.  And you can -- you can see
4  which ones are relevant to product development.
5        So I think -- I think that's being
6  responsive --
7    Q   I'm asking you --
8    A   -- to your question.
9    Q   I'm asking you to point me to a specific
10  example.
11    A   I don't have my CV in front of me.
12    Q   It's -- actually, we marked your most
13  updated recent one earlier today.
14    A   Where is it?
15    Q   We marked it as Exhibit No. --
16        MR. THORNTON:  18.
17  BY MR. KAUFMAN:
18    Q   -- 18.
19    A   Okay.  Well, any of the references that
20  deal with products are in my CV.  And so you can --
21  you can look through them.  There's reference 4, it
22  looks like reference 8, 9, 10, 11, 12.
23        I mean, there's a long -- there's a long
24  list of references here that have to do with product
25  development.

1    Q   I'm not asking for studies involving
2  product development, Dr. Feigal.
3    A   Well, I'm giving you the articles that are
4  relevant that talk about safety and efficacy of
5  drugs.
6    Q   And I'm asking specifically for any
7  published -- any article that you have ever
8  published in the peer-reviewed literature on using
9  the criteria or methodology that you used in this
10  particular instance to form your causation theory.
11    A   I have utilized the principles involved in
12  causation theory and causation principles in 30
13  years of work as a clinician, as a clinical
14  researcher, and as a product developer.  And that's
15  my answer.
16    Q   Have you published on the methodology or
17  the criteria that you used on those principles?
18    A   I have published extensively on product
19  development and on safety and efficacy.
20    Q   I understand that.  My question is more
21  narrow than that.
22        Have you published in the peer-reviewed
23  medical literature on the methodology or the
24  criteria that you used in this case to form your
25  causation opinion?

39 (Pages 533 - 536)

Page 537

1    A   On this case?  I haven't published on this
2  case at all.
3    Q   And I'm asking specifically about the
4  methodology and the criteria you used in this case,
5  not whether you published your findings in this
6  case.
7        Do you understand the distinction?
8    A   Well, to answer your question, I haven't
9  published on the specific methodology I used in this
10  case.
11       I think that was your question, and that
12  is my answer.
13    Q   Okay.  When you were forming your
14  causation opinions in this case, did you start with
15  a hypothesis?
16    A   Well, I started with the issue at hand for
17  the litigation, which was, does Taxotere, Taxotere
18  regimens, cause permanent chemotherapy-induced
19  alopecia?  So that was the topic I was
20  investigating.
21    Q   Okay.  And do you know what a null
22  hypothesis is?
23    A   Yeah.
24    Q   What is a null hypothesis?
25    A   Well, to rule out whether or not something

Page 538

1  occurs -- you know, in a general sense, something
2  occurs by chance alone.
3    Q   Did you utilize a null hypothesis in this
4  case?
5    A   I did look for alternative reasons, and so
6  did consider them.
7        But as I said, what I've looked at is
8  timing, dosing, replication of the consistency of
9  the results and biologic plausibility.
10       And so when I looked at that and the facts
11  of the case, in terms of the -- none of these women
12  had permanent alopecia going into this litigation
13  before they got exposed to the chemotherapy.  So
14  there's a context in which I was doing the work.
15    Q   I'm not asking about the methodology.  I'm
16  just asking about the hypothesis and the null
17  hypothesis.
18       What was your null hypothesis?
19    A   Well, the issue here is a safety issue.
20  And the issue here is there's a claim that a certain
21  thing caused a safety issue.
22       And so the issue is, are there reasonable
23  things to rule out?  It's not a statistical test I
24  have to do.  And as I think I explained at the
25  previous deposition, you don't have to show

Page 539

1  statistical significance to show causation or to
2  show safety issues that are relevant to a drug and
3  relevant to causation.
4        There's nothing in the causation
5  principles or criteria that requires statistical
6  tests being done.  If you even go back and read the
7  1965 Bradford Hill speech, he opines quite
8  extensively on that topic.
9        So the point is I was looking for
10  substantial evidence that -- in terms of the timing
11  and the exposure, in terms of whether there was a
12  dose response, determining whether there was
13  replication across the various studies, and to
14  determine whether or not there was biologic
15  plausibility.
16       And I did that in a scientifically sound
17  and reliable, non-biased manner to look for that
18  data.
19    Q   Move to strike as nonresponsive.
20       Doctor, what was your null hypothesis in
21  this case?
22       MR. THORNTON:  Objection.  Form.
23       THE WITNESS:  As I said, I didn't have a
24  statistical -- you know, you're talking about
25  whether or not I'm doing a hypothesis testing.

Page 540

1        The testing is really, there's a safety
2  issue, and whether or not Taxotere was causative or
3  causally related or causally associated, whatever is
4  the appropriate term you want me to use.  But
5  basically, was it causative in some way for the
6  development of permanent alopecia?  That was the
7  topic I was looking at.
8        So I wasn't looking for a statistical test
9  of significance, which is what I think of with a
10  null hypothesis.
11       I was looking for the evidence which is
12  consistent with the principles of causation, to look
13  to see whether or not there's strong, substantial
14  and reliable and consistent evidence that's been
15  evaluated in a scientifically sound and reliable
16  way.
17  BY MR. KAUFMAN:
18    Q   Do you agree that when forming a general
19  causation opinion, a reliable methodology must
20  account for the possible role of chance, bias, and
21  confounding factors?
22    A   I am.
23    Q   And do you agree that your report does not
24  expressly contain a discussion or analysis of
25  chance, bias, or confounding factors?

40 (Pages 537 - 540)

1     A   Well, I think if you look at the facts,
2  the issue is that these women -- this is an issue of
3  general causation, not specific.
4         I think some of the issues you're talking
5  about are more relevant for specific causation and
6  going through the specific cases to see whether or
7  not there might have been other explanations for why
8  this particular product might have caused it in that
9  particular patient because of some confounder.
10        But I think in terms of general causation,
11  what I looked at is that the exposure occurred at
12  the -- exposure occurred before the onset of the
13  permanent alopecia, and it was rapid, occurring two
14  to three weeks, and it was extensive.
15        And that reversible alopecia, I know from
16  being an oncologist for 30 years, is reversible.
17  And that the changes that you get in your hair are,
18  when the hair comes back, is that you get a change
19  in texture, you get a change in color, you may get a
20  change from curly to straight or straight to curly,
21  but the hair comes back.
22        So the facts of the -- you know, it's like
23  doing a differential diagnosis on a patient.  You
24  look at the differential, not an extensive laundry
25  list of anything in the world that can happen, but

1  of the things that are relevant for the context for
2  that particular patient.
3         So if a patient comes in with a -- what I
4  call, you know, an allergic reaction and has just
5  taken a drug, I don't need to do a very long
6  differential diagnosis on the types of things that
7  can cause allergic reactions.  I don't look for bee
8  stings.
9         You know, there's a lot of things that can
10  cause a particular reaction.  But I look in my
11  differential for those things that are relevant for
12  that context.
13        So relevant for that context, I'm not
14  aware of any confounder for rapid and extensive hair
15  loss immediately after an exposure.
16        MR. KAUFMAN:  I move to strike as
17  nonresponsive.
18        Can you please read the question back?
19        (Record read as follows:
20        "Question:  And do you agree that your
21     report does not expressly contain a discussion
22     or analysis of chance, bias or confounding
23     factors?")
24        THE WITNESS:  And I was explaining that,
25  that I was looking.  I was giving you an example of

1  a differential diagnosis.
2         So I am going to explain this, because I
3  think what you're asking is, there's a lot of things
4  that can cause something.  But what we're trying to
5  do in this case is the context.
6         These are breast cancer patients, and
7  these are breast cancer patients who did not have a
8  history of permanent alopecia before they ever got
9  exposed to their cytotoxic chemotherapy.
10        So I was looking at this in the context of
11  the issue that we're discussing.  And the
12  differential diagnosis or what we can call
13  confounders for, you know, a higher level review of
14  this are those types of issues that you consider
15  that are relevant.
16        And being an oncologist, I know that
17  cytotoxic chemotherapy, it's not confounded with
18  anything else.
19        Cytotoxic chemotherapy causes rapid and
20  extensive hair loss.  And it's not confused with
21  diabetes, it's not confused with hypothyroidism,
22  it's not confused with endocrine therapy, and it's
23  not confused with somebody having a congenital
24  reason for why they may have hair loss.
25        So I'm saying yes, I am aware of other

1  things that could potentially cause hair loss, but I
2  have to think of the timing, the exposure, the
3  temporality, and the pharmacology of the inciting
4  agent.
5         So yes, I did consider all those things.
6         MR. KAUFMAN:  Move to strike as
7  nonresponsive.
8     Q   Dr. Feigal, where in your report do you
9  provide a discussion or an analysis of chance, bias,
10  or confounding factors?  Show me in your report.
11     A   I think my whole report is about a
12  causation report.
13     Q   Can you show me where in your report you
14  set forth a discussion or analysis of chance, bias,
15  or confounding factors?
16        MR. THORNTON:  Objection.  Form.
17        THE WITNESS:  I -- it's in my entire
18  report.
19        And as we talked at the last deposition,
20  the controlled clinical trial is a very good way to
21  control for content validity, internal validity, and
22  bias, control for bias.  And so that's a very good
23  way to control for bias.
24        Looking at published paper, prospective
25  protocols that clearly define in a pre-specified way

41 (Pages 541 - 544)

Page 545

1 what people are going to look at controls for bias.
2     So that's inherent in the criteria that I
3 looked at in the published literature.
4     So yes, I did look at that. You've seen
5 the way in which it was done and the types of papers
6 that I put in there.
7 BY MR. KAUFMAN:
8     Q   You can't point me to a single page where
9 you set forth a discussion of your analysis of
10 chance, bias, or confounding factors?
11     A   I think it's scattered throughout my
12 report.
13     Q   Is it implied throughout your report or is
14 it expressly stated?
15     A   I think it's clear throughout my report.
16     Q   Is it expressly stated in your report?
17     A   I think it's clear throughout my report.
18     MR. THORNTON: Objection. Form.
19 BY MR. KAUFMAN:
20     Q   But not expressly stated?
21     A   I think it's clear throughout my report.
22     Q   Why do you refuse to answer my question as
23 to whether it's expressly stated?
24     A   Because I think responding with the word
25 "clear" is self-explanatory.  It is clear.

Page 546

1     Q   Well, if the answer were "yes," you could
2 point me to the page, right?
3     A   I think the answer is it's clear
4 throughout my report.
5     If you read the report, it's clear that I
6 used sound scientific principles and methodologies
7 and looked for reproducibility results across
8 studies.
9     Q   But you didn't actually state that in your
10 report, right?
11     A   I'm restating for probably the fiftieth
12 time what I did to come to my conclusions in this
13 report.
14     Q   Can we agree that Tax 316 and the Geicam
15 9805 randomized controlled trials were not
16 randomized to control for confounding factors
17 relating to alopecia?
18     A   No.
19     Q   We can't agree?
20     A   No, we can't.
21     Randomization in and of itself is a very
22 important tool for limiting bias.  It's random.  So
23 patients get randomized randomly.
24     So there's no -- you know, if somebody has
25 medical conditions or somebody has a comorbid

Page 547

1 condition, it should be randomly distributed.
2     Q   What were the factors upon which -- were
3 used in Tax 316 and/or Geicam 9805 specific to
4 controlling for alopecia factors?
5     A   Randomization is the standard clinical
6 trial design used to control for bias.
7     I mean, there's additional things you
8 could do in terms of double-blinding and a variety
9 of things, but randomized controlled trials are a
10 standard way for controlling for bias across --
11 whether it's medical conditions, whether it's any
12 kind of comorbidity.
13     It's random.  There's no -- there's no
14 predetermination.  It's a randomized clinical trial.
15 Randomization is the best way to control for bias.
16     Q   And were the endpoints in either Tax 316
17 or Geicam 9805 looking at the issue of persistent or
18 permanent alopecia?
19     A   The objectives of clinical trials where
20 companies are wanting to pursue product development
21 are generally not focused -- they're powered to
22 determine an efficacy endpoint, not a safety
23 endpoint.
24     So the safety endpoint, which I've said
25 multiple times, is not powered on statistical

Page 548

1 significance.  You don't have to have a
2 statistically significant result to report a safety
3 issue.
4     But the clinical trials are most commonly
5 powered to look at efficacy endpoints, and that was
6 true -- looking at disease-free survival was the
7 efficacy endpoint, and that's how they powered the
8 study.
9     Q   You mentioned the Bradford Hill factors a
10 moment ago.  How did you weigh those factors in
11 forming your causation opinion?
12     A   Well, I think that the biggest one for me
13 is exposure in that the event occurs after the
14 exposure.  So I think that's a critical one.
15     I think that the biologic plausibility is
16 also an important one.  We know that Taxotere causes
17 hair loss.  We went through some of the specific
18 issues last time.
19     But regardless of what the biologic
20 plausibility is, there's certainly biologic
21 plausibility for Taxotere to cause hair loss.
22     There's also the consistency across
23 multiple types of studies.  So I looked at
24 prospectively designed randomized clinical trials, I
25 looked at prospective clinical studies, I looked at

42 (Pages 545 - 548)

Page 549

1 prospectively designed cohort studies, I looked at
2 retrospective studies, some of which did have some
3 predetermined protocols even though they were
4 looking at retrospective data, so -- and I also
5 looked at case studies.
6     So there's a hierarchy of evidence. But
7 what I looked for was consistency in what was found.
8     And then I also looked at whether or not
9 there was evidence of a dose response. So those are
10 some of the major criteria that I looked at.
11     Q   I guess I'm more specifically interested
12 in how you weighted those.
13     So would it be true that exposure received
14 the most weight because it was the strongest
15 evidence in your mind?
16     A   Well, I didn't do a mathematical
17 calculation. What I did is look at the
18 triangulation of issues across the controlled
19 clinical studies, the published papers and the
20 pharmacovigilance data.
21     Q   Of all the data you looked at, what was
22 the strongest evidence, standing alone and by
23 itself, of causation between docetaxel and permanent
24 or persistent alopecia?
25     A   Well, to tell you the truth, I was struck

Page 550

1 by the cumulative body of evidence.
2     Because, to me, the consistency across
3 multiple kinds of studies -- I think, to me, was one
4 of the strongest lines of evidence -- is that --
5 well, I'll just leave it at that. I mean, the
6 consistency across these different types of studies.
7     Q   And what -- of all the data you looked at,
8 what one piece was the strongest in your mind in
9 informing the opinion that you have that docetaxel
10 causes permanent or persistent alopecia?
11     MR. THORNTON: Objection. Form.
12     THE WITNESS: Yeah. Well, as I said, but
13 maybe I wasn't clear enough, it was the
14 triangulation of issues across the controlled
15 clinical trials, the pharmacovigilance data, and the
16 published data.
17     Because in order to determine consistency
18 of results, by definition, you have to look across
19 different studies to see if there's consistency.
20     So it was really that integration of those
21 different -- those different parts of evidence in
22 the body -- cumulative body of evidence that was
23 strong.
24 BY MR. KAUFMAN:
25     Q   So no one piece of evidence or data that

Page 551

1 you reviewed, standing alone, would be sufficient to
2 conclude that Taxotere or docetaxel causes permanent
3 or persistent alopecia?
4     MR. THORNTON: Objection. Form.
5     THE WITNESS: Well, I didn't address that
6 issue because I had access to all these other pieces
7 of information. So it's a bit of a rhetorical
8 question.
9     But I had access to the clinical study
10 results, to the published papers, and to the
11 unpublished pharmacovigilance data. So that's the
12 strong evidence I used to establish causation using
13 a systematic and reliable approach.
14 BY MR. KAUFMAN:
15     Q   So you cannot point to a single source or
16 data point that, standing alone, would be sufficient
17 to conclude that docetaxel causes permanent or
18 persistent alopecia?
19     MR. THORNTON: Objection. Form.
20     THE WITNESS: I think all three pieces of
21 information are important because, as I said,
22 showing consistency across studies is important.
23 And so by definition, you have to look across
24 different bodies of evidence. And so I think I'm
25 just repeating myself.

Page 552

1     MR. KAUFMAN: You are, but I don't believe
2 you're addressing my question.
3     And I going to ask the court reporter to
4 read it back, and I'm going to move to strike that
5 last response as nonresponsive.
6     (Record read as follows:
7     "Question: So you cannot point to a
8     single source or data point that standing
9     alone would be sufficient to conclude that
10     docetaxel causes permanent or persistent
11     alopecia?")
12     MR. THORNTON: Objection. Form.
13     THE WITNESS: I think the body of evidence
14 is what establishes the strong evidence. I think
15 there is evidence with the other pieces of
16 information, but I think they're strengthened by the
17 body of evidence that's available.
18     And as I said, you can't look at
19 consistency unless you look across the different
20 types of studies.
21     So since that is one of the criteria for
22 causation, I feel compelled that it's difficult to
23 answer your question because consistency requires
24 that you look across different studies.
25 ///

43 (Pages 549 - 552)

Page 553

1  BY MR. KAUFMAN:
2      Q   Consistency aside, is there a single
3  source of information that you considered that,
4  standing alone, in your mind, is sufficient to reach
5  the conclusion that Taxotere or docetaxel causes
6  permanent or persistent alopecia?
7      A   I think all three lines of evidence are
8  important, and so it's hard for me to work backwards
9  now to say, could you, you know, name that tune in
10 one note.
11         You know, I could have gone back and just
12 said -- I could have -- you know, I could have done
13 it with X instead of X, Y and Z.
14         And I think the issue is I've reviewed X,
15 Y and Z, and that's the body of evidence I have, and
16 that's the body of evidence that formed my opinion,
17 and that's what's in my expert report.
18         So I can't really go back and pretend I
19 didn't see these other areas of evidence.
20     Q   I'm not asking you to go back to pretend.
21 I'm just asking if one piece is strong enough on its
22 own merit to justify the conclusion that docetaxel
23 causes permanent or persistent alopecia.
24     A   I think my answer -- I'm just going to
25 repeat what I've said before.

Page 554

1         I think the strength of the evidence is
2  the different types of criteria that I met.  And so
3  I think there was good -- good evidence from dose
4  response from certain studies; there was strong
5  evidence with lack of bias on other studies; and
6  there's strong evidence from the pharmacovigilance
7  data on other parts of the criteria.
8         So I think as a body, I did want, for my
9  opinion, to use the three bodies of evidence.
10     Q   Can we agree that sitting here today,
11 you're not in a position to identify a single piece
12 of information or data point that, standing alone by
13 itself, is sufficient to reach a conclusion that
14 Taxotere or docetaxel causes permanent or persistent
15 alopecia?
16     A   I can identify three points of data that
17 are important in establishing causation.
18     Q   But can you identify one that, standing by
19 itself, is sufficient to warrant a conclusion that
20 docetaxel --
21     A   I can identify -- I'm sorry.  I talked
22 over you.
23     Q   -- that docetaxel causes permanent or
24 persistent alopecia?
25     A   I can identify three points of data that

Page 555

1  are important in establishing that, and that's what
2  I explained in my report and that's what I'm
3  explaining in the deposition.
4      Q   So the answer to my question is no, you
5  cannot identify a single one?
6      A   The answer to your question is I can
7  identify three points of data that I thought were
8  important.
9          MR. KAUFMAN:  Let's go off the record and
10 take a break real quick.
11         THE VIDEO OPERATOR:  This marks the end of
12 Volume III, Media No. 2, of the deposition of Ellen
13 Feigal, M.D.  The time is 3:21 p.m.  We're off the
14 record.
15         (Recess, 3:21 p.m. - 3:52 p.m.)
16         THE VIDEO OPERATOR:  We are back on the
17 record at 3:52 p.m.  This marks the beginning of
18 Volume III, Media No. 3, of the deposition of Ellen
19 Feigal, M.D.
20 BY MR. KAUFMAN:
21     Q   Dr. Feigal, do you know the background
22 rate of permanent or persistent alopecia in the
23 general U.S. population of women?
24     A   Off the top of my head, I don't remember.
25     Q   And is that cited in your report?

Page 556

1      A   In the general population?  Are you
2  talking about just alopecia?
3      Q   Do you know the background rate of
4  permanent or persistent alopecia in the general
5  U.S. population of women?
6      A   I don't -- I don't have a number --
7          MR. THORNTON:  Objection to form.
8          THE WITNESS:  I don't have a number for
9  that.  I certainly don't recall what that is.
10 BY MR. KAUFMAN:
11     Q   And it's not cited in your report,
12 correct?
13     A   Of alopecia in the general population?
14     Q   Yes.
15     A   No.
16     Q   Can we agree that permanent or persistent
17 chemotherapy-induced alopecia can occur in women who
18 never received Taxotere or docetaxel?
19     A   What I can tell you is that I don't have
20 the same level of evidence.  So it may occur
21 sporadically, and I do have that in my list of
22 published papers.
23     Q   What do you mean by it can occur
24 sporadically?
25     A   I don't have the same level of evidence.

44 (Pages 553 - 556)

1 I explained that to you earlier.  I just have what's
2 out there.  I don't have reports from -- I don't
3 have clinical study reports and I don't have
4 pharmacovigilance data.
5     Q   But you have seen, whether it's a case
6 report or an abstract or other publicly available
7 article or publication, that shows or at least
8 reports permanent or persistent chemotherapy-induced
9 alopecia in women who never received Taxotere or
10 docetaxel?
11    A   And I captured that in my Table 2 --
12    Q   Okay.
13    A   -- for early-stage breast cancer.
14    Q   Do any of the materials that you
15 considered to form your causation opinions discuss
16 or comment on the relevant risk or risk ratios
17 regarding docetaxel and permanent or persistent
18 alopecia?
19    A   I think the only place where I list
20 increased risk is in relationship to the controlled
21 clinical trials where I have -- I think I said it's
22 about double.
23    Q   Okay.  And the controlled clinical trials,
24 do they specifically discuss the relevant risk or
25 risk ratios regarding docetaxel and permanent or

1 persistent alopecia?
2     A   As you know, the published reports don't
3 provide any information about permanent
4 chemotherapy-induced alopecia other than what I was
5 able to read in the clinical overview based on the
6 surveillance data.
7     Q   And I'm asking about the randomized
8 controlled clinical trials.
9     A   The published papers don't say anything
10 about permanent alopecia.
11    Q   And specifically Tax 316 and Geicam 9805,
12 they don't contain any discussion or information on
13 the relevant risk ratios of docetaxel and permanent
14 or persistent alopecia?
15    A   Are you talking about the clinical study
16 reports?
17    Q   Yes.
18    A   Okay.  Because that's the only place where
19 there's any listing of permanent alopecia.
20        They do list the percentages and the
21 numbers, but they don't comment on the -- they don't
22 provide a statistical analysis of that.
23    Q   Have you, in forming your causation
24 opinions, reviewed or relied upon any statistical
25 analyses regarding the relationship between

1 docetaxel and permanent or persistent alopecia?
2        MR. THORNTON:  Objection.  Form.
3        THE WITNESS:  You're talking about in
4 terms of causation?
5        No, but we have a biostatistical expert, I
6 believe, Dr. Madigan, who your group will have the
7 ability to talk to.
8 BY MR. KAUFMAN:
9     Q   Okay.  And "we" means you and?
10    A   You will have the ability to talk to the
11 biostatistical expert, Dr. Madigan, or somebody will
12 from your group.
13    Q   You just used the term "we," and I'm just
14 making sure I understand who "we" is.
15    A   Well, I guess repeat the sentence.  What
16 did I say?
17        MR. KAUFMAN:  Can you read back her
18 testimony?
19        (Record read as follows:
20        "Answer:  You're talking about in terms
21 of causation?  No, but we have a
22 biostatistical expert, I believe,
23 Dr. Madigan, who your group will have the
24 ability to talk to.")
25        THE WITNESS:  Yeah.  So defense --

1 plaintiff counsel has a biostatistical expert who
2 the defense counsel will have the ability to talk
3 to.
4 BY MR. KAUFMAN:
5     Q   You and plaintiffs' counsel, right?
6     A   Excuse me?
7     Q   That would be "we"?
8        MR. THORNTON:  Objection.  Form.
9        THE WITNESS:  No.  You're -- maybe I
10 wasn't clear.
11        The plaintiff counsel has a biostatistical
12 expert.  And what I was trying to say -- and maybe I
13 didn't say it -- is that the defense counsel will
14 have the ability to talk to the biostatistical
15 expert.
16 BY MR. KAUFMAN:
17    Q   In your report, there's a brief discussion
18 about the Geicam 9805 study.
19    A   Um-hum.
20    Q   Do you have criticisms of that study?
21    A   I did.
22    Q   You did or do?
23    A   Well, the report was written, so --
24    Q   Okay.  I just want to -- I didn't know if
25 you changed them.

45 (Pages 557 - 560)

Page 561

1    A  No.
2    Q   Okay.  Tell me what criticisms you have of
3  Geicam 9805.
4    A   The criticism is really due to the lack of
5  follow-up of patients who had alopecia that was
6  persisting into the 31-day follow-up period, so as
7  opposed to Tax 316 where about -- I think it was
8  92-point-something percent, and I think that was the
9  number, where it's 87.6 percent of patients on the
10  control arm.
11       Anyway, both arms had persistent alopecia
12  31 days after the last dose of chemotherapy, and
13  then they were followed over that -- you know, as
14  long as they were alive, they were followed for that
15  ten-year period of time.
16       On the Geicam 9805, what was really
17  striking is that the follow-up, instead of being
18  92.3 and 87.6 percent, was about
19  9.2 percent.  So only a tenth of the patients were
20  followed for alopecia into the follow-up time.
21       So it stretches credulity to think that
22  all those patients resolved within 31 days after
23  their last dose of chemotherapy.  It's just not
24  possible.
25       So the point was I thought it was very

Page 562

1  poor follow-up.
2    Q   What do you mean by "stretches credulity"?
3    A   Oh, because hair doesn't reverse within 31
4  days.  I mean, they must have had alopecia that
5  persisted into the 31-day follow-up period.
6       It just wasn't believable that you have
7  one trial where 92.3 percent and 86.7 percent have
8  persisting alopecia 31 days after the last dose of
9  chemotherapy, and then you have this other trial
10  with exactly the same regimens, and, you know, a
11  similar population of patients, and only a tenth of
12  them have a follow-up into that 31-day reporting
13  period.
14       So that's the part I was commenting on.  I
15  thought it was extremely poor follow-up.
16    Q   So given the limitations of the study in
17  your mind, would you rely on Geicam 9805 by itself
18  to draw causation conclusions that docetaxel causes
19  permanent or persistent alopecia?
20       MR. THORNTON:  Objection.  Form.
21       THE WITNESS:  Well, now for the
22  fifty-first time, I think what I'll say is I
23  depended on three bodies of evidence:  The clinical
24  trials, the pharmacovigilance data, and the
25  published papers.

Page 563

1       So I think I made myself really clear that
2  it was those different bodies of evidence because
3  there's different sets of important information
4  that's gleaned in terms of causation from those
5  different sets of materials.
6       So I really think I've answered this about
7  50 other times.
8  BY MR. KAUFMAN:
9    Q   But I'm specifically asking about Geicam
10  9805.  And you have opinions that that study was
11  poorly done and that it stretches credulity, and
12  that it's unbelievable that the data reported
13  matches what was actually going on.
14       So I'm asking if that same dataset is
15  sufficient by itself to draw any conclusions on
16  whether docetaxel causes permanent or persistent
17  alopecia.
18    A   I think you misstated what I said.
19       I said it stretches credulity that only
20  9.2 percent of patients have persistent alopecia.  I
21  did not say the data wasn't usable.  The data is
22  still going in the same direction as the other
23  trials, the other published studies, the
24  pharmacovigilance data.
25       What I was saying was it stretches

Page 564

1  credulity that they captured everybody.  That's all
2  I was -- that's all I was saying.
3    Q   And so what is the significance of the
4  data from Geicam 9805 that contributes to your
5  conclusion that docetaxel causes permanent or
6  persistent alopecia?
7    A   Well, as I mentioned before,
8  reproducibility across studies is something that I
9  look for, and so it is still going in the same
10  trend.  It's just that the numbers are smaller.
11       So it's still -- it's still going with
12  double or triple the incidents.  It's just that it's
13  smaller numbers.
14       So all I'm saying is there were a lot more
15  patients that could have been followed.  But given
16  the data that we have, it's still usable data
17  because it's still a randomized controlled trial.  I
18  don't have reason to believe that missing data was
19  missing in some biased way, although, you know, I
20  can't ever guarantee that for any missing data.
21       But because it was a randomized clinical
22  trial, I still think it's usable data.  I just think
23  it could have been much better if they had followed
24  more of the patients.
25       It's going in the same trend as the other

46 (Pages 561 - 564)

1 trial in the other studies.
2    Q  Is there anything else specifically about
3 Geicam 9805 other than the trend and the consistency
4 with the other reports or the other information or
5 data you've reviewed that informs your opinion that
6 docetaxel causes permanent or persistent alopecia?
7 Anything else about Geicam 9805?
8    A  Well, the good part is it's a randomized
9 controlled trial, and so it does reduce bias because
10 it uses the total randomization.
11    So earlier you'd asked about confounders
12 or other things that it might be present in the
13 patient population, and so I think by reducing bias,
14 it's still usable -- usable information.
15    Q  If you can turn to your report.
16    A  Which version?
17    Q  There's several versions, but let's use 17
18 since it was the most recent version I was provided.
19    A  Actually, I thought 22 was the most recent
20 version.
21    Q  22 and 17 are the same other than the
22 highlighting.
23    A  Okay.
24    Q  As compared to your husband's report.  So
25 either one is fine.

1    THE WITNESS:  No, I thought 22 was the one
2 you gave him --
3    MR. KAUFMAN:  I did not mark the version
4 that she gave me.
5    MS. DAVIS:  I provided counsel with the
6 version --
7    THE WITNESS:  The one we're using today?
8    MS. DAVIS:  No.  I provided counsel with
9 the version with the typo corrected on page 30.
10    THE WITNESS:  And what exhibit number is
11 that?
12    MS. DAVIS:  He decided not to mark it as
13 an exhibit.
14    THE WITNESS:  Oh, okay.  So I'll just go
15 back to 17.
16    MR. THORNTON:  17 is our working --
17    THE WITNESS:  I'll go back to 17 then.
18 That's fine.  I just needed to know what version
19 we're talking about.  Let me find it.
20    You didn't happen to take it, did you?
21    MR. THORNTON:  I don't have the one with
22 the mark, but I'll give you one so you can follow.
23    THE WITNESS:  Let me make one more --
24 there it is.  Got it.
25 ///

1 BY MR. KAUFMAN:
2    Q  I want to talk about Table 2.  That's
3 page 36.
4    A  Okay.
5    Q  Can you tell me how many of the patients
6 listed in Table 2 received a regimen involving
7 Adriamycin?
8    A  Receiving what?
9    Q  Received a regimen involving Adriamycin.
10 Can you tell me --
11    A  The anthracycline?  I think -- yeah.  Let
12 me just look at the reports.
13    I think many of them had an anthracycline
14 and/or a cyclophosphamide.
15    Q  Can we agree that you did not document the
16 various regimens used for each of the patients
17 listed in Table 2 although they may be listed in the
18 summaries that follow up?
19    A  They're actually all listed in the
20 narrative.  The column is only so big.
21    Q  Okay.  In that same regard, does Table 2
22 inform us as to how many of the patients listed
23 received a regimen involving cyclophosphamide?
24    A  They would, but you'd have to combine it
25 with reading the narrative.

1    Q  So the table itself does not provide that
2 information?
3    A  The table with descriptions of each of the
4 16 studies would provide you that data.
5    Q  But the table itself would not?
6    A  Specifically about which ones got AC and
7 which ones got just cyclophosphamide, no, you'd have
8 to read it in conjunction with the narratives.
9    Q  Okay.  And then tally from there?
10    A  Excuse me?
11    Q  And then tally it all up?
12    A  Well, the tally doesn't change.  I mean,
13 the column is still correct.
14    What this is is a
15 Taxotere/docetaxel-containing regimen, a Taxol- or
16 paclitaxel-containing regimen, a Taxotere- or
17 Taxol-containing regimen, a taxane regimen, not
18 specified which taxane, and a non-taxane regimen.
19    That's what each of those columns means.
20 So the numbers don't change.
21    Q  For example, in the Nabholtz study listed
22 as number 4 -- I'm sorry, it's listed on the
23 "Taxotere/docetaxel" column; is that correct?
24    A  Yeah, but as I said, all -- every single
25 one of those columns, including the non-taxane, are

47 (Pages 565 - 568)

Page 569

1 regimens.
2    Q  Yes.  And so in terms of the number of
3 patients listed in the table on Table 2, it's not
4 documented which of those patients received an
5 anthracycline or doxorubicin in their regimen?
6       MR. THORNTON:  Objection.  Form.
7       THE WITNESS:  This is -- actually, for
8 Nabholtz, it's pretty clear.  Nabholtz was a study
9 of docetaxel, doxorubicin, and cyclophosphamide.
10       So the footnotes actually tried to explain
11 what the regimen was as well as the narrative.
12 BY MR. KAUFMAN:
13    Q  But the table itself does not?
14    A  The number in the table is the
15 Taxotere/docetaxel regimen, the Taxol/paclitaxel.
16 Those are all regimens.  I don't believe any of
17 those are monotherapy.
18    Q  Can we agree that a tabulation of all of
19 the reports of permanent or persistent chemotherapy
20 from Adriamycin, cyclophosphamide, AC, AC Taxol,
21 CMF, that was not within the scope of what you were
22 looking to do in terms of your report and Table 2?
23    A  Well, to explain the methodology, since
24 the topic is about Taxotere-containing regimens
25 versus non-Taxotere-containing regimens, that's

Page 570

1 exactly how I did the methodology.
2       So what I wanted to know is was there a
3 difference between the non-Taxotere- or
4 non-paclitaxel-containing regimens and the Taxol- or
5 Taxotere-containing regimens, and then I have one
6 where I don't know the attribution of the taxane.
7       So the point that's important
8 scientifically and methodologically is, is there a
9 difference between the non-taxane regimens and the
10 taxane regimens?
11       Other things, you know, with the types of
12 chemotherapy being given, I believe all, if not
13 100 percent, were combination therapies with agents
14 that are commonly given in early-stage breast
15 cancer.
16       The issue is just whether or not I could
17 detect a difference between non-taxane -- and that's
18 why I separated the docetaxel/Taxotere from the
19 Taxol/paclitaxel, because using the same
20 methodology, I wanted to see what number came up.
21       So I wasn't predetermining that the
22 increased number needed to be with Taxotere or
23 docetaxel.  You know, I was doing exactly the same
24 methodology across all these columns.
25    Q  Of the studies listed or the articles --

Page 571

1 strike that.
2       Of the studies or articles listed in Table
3 2, you have not tabulated the total number of
4 patients for each study that received an
5 anthracycline or a cyclophosphamide; is that
6 correct?
7    A  No.  The total number is the total number
8 that receives the taxane-containing regimen or the
9 non-taxane-containing regimen.
10       If you're asking -- I could easily do it.
11 But if you're asking -- you want to know the numbers
12 that were taxane and another combination
13 chemotherapy -- is that what you're asking?  The
14 number 4 contains the patients who all got
15 taxane-containing regimens.
16    Q  And taxane-containing regimens means in
17 most, if not all, of these instances they were
18 combination therapies, right?
19    A  I believe that is true.  I'd have to go
20 back and check.  I don't think there's any
21 monotherapy for early-stage breast cancer.
22       Also, the non-taxane regimens are also
23 combination regimens.  So the point I'm trying to
24 get about is there's a systematic methodology for
25 how I arrived at -- it wasn't arbitrary.

Page 572

1       There was a systematic method behind
2 trying to review the data.  And so the big issue
3 that we're talking about, is there a difference
4 between the taxane-containing regimens and the
5 non-taxane-containing regimens that are relevant for
6 early-stage breast cancer?
7       And then the second part that I thought
8 was important to distinguish is whether it was
9 Taxotere/docetaxel or Taxol/paclitaxel.
10    Q  Can you turn to Exhibit 19?
11    A  This one?  An abstract?
12    Q  It was the series of abstracts.
13    A  Oh, okay.  Is this what was provided to
14 you of what was provided to me?
15    Q  Yes.
16    A  Okay.
17    Q  And I had a chance to skim through this
18 this morning, and I identified eight different
19 articles that make up this compilation in
20 Exhibit 19.
21    A  I don't think there's eight here.  I don't
22 count eight.  There are -- let's see.
23       There's an abstract, and then this
24 other -- just so you know, Exhibit 20, which you
25 haven't mentioned, but it's almost identical to

48 (Pages 569 - 572)

Page 573

1 Exhibit 19. It's very similar data.
2       But at any rate -- so I count that as one
3 because it's completely overlapping.
4       And then Berglund is the article we
5 briefly talked about last time which you had
6 provided to me, and I looked at in realtime.
7       The next one -- the next thing I see is --
8 this is an abstract that was provided to Tosti from
9 the Korean Journal of Dermatology, and I believe --
10 is this the one you gave me in Korean during my
11 deposition on December 7th?  I think you gave this
12 to me --
13    Q   So the -- well --
14    A   -- as well as to Tosti.
15    Q   If we just go by author name, I think it
16 might be easier.
17       The first one is by Crown, right?
18    A   Yeah, and that's an abstract.
19       The second one is Berglund.
20    Q   Okay.
21    A   The third one is Jung.
22    Q   Do you see one by Jean Lemerle before
23 that?
24    A   No.  No.  That -- you know what?  That's
25 an incidental nothing.  It just happened to be on

Page 574

1 the same page as the last page of the previous
2 article.  That's all.
3    Q   Yeah.
4    A   It has nothing to do with anything.
5    Q   I miscounted.
6    A   Okay.  Okay.  That happens on some of the
7 other pages, too.  They're incidental tag-ons just
8 because they happen to be on the same page of the
9 relevant article.
10    Q   Okay.  And then Jung?
11    A   Yes.  That's the Korean article.
12       And then -- let's see -- I think the only
13 one here that's relevant is Kang, or "Kang," the
14 PS046.  That's the one you showed to Tosti.
15       And then the only other one I see is
16 Yeager, which is apparently another one you showed
17 to Tosti, which is a review article.
18    Q   Do you also have one by Yagata at the very
19 end?
20    A   There's an abstract by Yagata.
21    Q   Okay.  So if we -- by my count, there's --
22 one, two, three, four, five -- six.
23    A   That you provided to us.
24    Q   That make up Exhibit No. 19.
25    A   Right, that I think were shown to other

Page 575

1 expert witnesses, correct?
2       Two of them I think you showed to me in
3 realtime: the Korean abstract in English, and the
4 rest of the article in Korean; and the Berglund
5 article is the only one you showed to me at the
6 December 7th deposition, I believe.  And these other
7 ones I guess were shown to other experts.
8    Q   Okay.  And of the studies that make up the
9 compilation in Exhibit 19 -- Crown, Berglund, Jung,
10 Kang, Yeager, and Yagata -- can we agree that none
11 of those were cited in Table 2 of your report?
12    A   No, you're wrong on two counts.
13    Q   Okay.
14    A   So Kang, as you can see from my Table 2,
15 actually wrote a paper on the prospective cohort of
16 61 patients.
17       And he's -- if I recall correctly, he's
18 the one I did an e-mail correspondence on
19 October 2nd because there's a discrepancy between
20 what he wrote in the abstract and what was actually
21 published in a peer-reviewed paper.
22       And when I communicated with him on
23 October 2nd -- and I believe you have the e-mail
24 correspondence -- is that the one where -- let me
25 make sure I'm remembering correctly.  I thought he

Page 576

1 correctly -- he said the abstract was wrong.  They
2 used the wrong taxane.  The paper is correct, and
3 it's all Taxotere.
4       So he said he asked the publisher of the
5 abstract to change it, but it had already gone to
6 press.
7       So the paper is correct, and it's
8 Taxotere.  And yes, I do have the correct paper in
9 my table.
10    Q   Okay.  So Kang.  You said there was
11 another one that I was wrong on?
12    A   Yeager.  So Yeager is a review article,
13 and I have all those articles in my -- already in
14 Table 2.
15       And let me just see if I can find it.  She
16 has an incorrect attribution to one of the published
17 articles.
18       Yeah.  So if you go to page 438 of
19 Yeager's review article, she reviews -- she refers
20 to an article that I refer to by Masidonski and Mann
21 that reported over ten years at St. Louis
22 University's Medical Center.  And she wrongly
23 attributes the chemotherapy to Taxol.
24       What the paper actually said was AC
25 taxane, and that's another October 2nd e-mail

1 correspondence that I sent to you where I asked
2 the -- because -- not because I read this article,
3 but because I read the original Masidonski and Sohn
4 article, "Are you able to share what taxane you
5 used?"
6        And she said, "Yes.  11 of the 13 were
7 Taxotere."
8        So the bottom line is, I have all these
9 articles and I have them correctly.  Yeager actually
10 misstates the results of the Masidonski letter.
11    Q   I'm -- okay.  So Crown, Berglund, Jung,
12 Yeager and Yagata, those specific studies, the
13 papers that make up part of Exhibit 19, are not
14 cited in Exhibit -- in Table 2 of your report; can
15 we agree?
16    A   Say that again.
17    Q   Crown, Berglund, Jung, Yeager and Yagata.
18    A   Well, the reason this person isn't in
19 there is because --
20    Q   I'm not -- that's not my question.
21    A   I want to explain.
22    Q   That's not my question.
23    A   It's duplicative of -- she doesn't have
24 any new data.  It's a review article.  And I already
25 have all the original articles.  So there is -- no,

1 I don't have this in my table.  That's correct.
2    Q   Okay.  Can I just get the clean Q and A?
3        The articles written by Crown, Berglund,
4 Jung, Yeager and Yagata are not cited in Table 2 of
5 your report, correct?
6    A   That is correct.  But I'm also prepared to
7 go over each and every one of these articles because
8 I have read them.  They were provided to me
9 presumably because you thought they were relevant,
10 and so I did take the time to read them, and I did
11 carefully consider them, and I'm able to comment on
12 them.  So I'm happy to do that.
13    Q   When were you provided the materials that
14 make up Exhibit No. 19?
15    A   Yesterday, right?  I think you provided me
16 Berglund.
17        I mean, they provided these to me before
18 they sent them to you, and I think they were sent to
19 you yesterday.
20        But you had already provided to me -- you
21 had already provided to me the Berglund article on
22 December 7th.  You had only provided an English
23 abstract of the Korean article, so I obviously
24 couldn't read that.  But they provided me an English
25 translation, and so I did read that.

1    Q   Can you pull up Exhibit No. 20 that we
2 marked today?
3    A   Yes.
4    Q   Oh, you've got it right there.
5        And the title of this presentation is
6 "Incidents of permanent alopecia following adjuvant
7 chemotherapy in women with early-stage breast
8 cancer," correct?
9    A   That is correct.
10    Q   And the title of this presentation hit on
11 a couple of the search terms that you used in
12 searching for literature.
13    A   It did, but this did not pull up.  I can't
14 tell you why.
15        And just so you know, Exhibit 14 and
16 Exhibit 20 are almost identical.  It's the same
17 authors, the same patients.
18    Q   If we look at the results of this
19 presentation, in the middle, it says, "The overall
20 incidence of permanent alopecia for patients
21 receiving docetaxel was 15 percent," correct?
22    A   Yes, in 265 patients.  That is correct.
23    Q   Okay.  And 3 percent of the docetaxel
24 group experienced grade 2 alopecia, which, on the
25 left-hand side, is identified as severe or total

1 hair loss, correct?
2    A   That is correct.
3    Q   And then the next part down, the overall
4 incidence of permanent alopecia for patients
5 receiving anthracyclines was 19 percent, correct?
6    A   Right.
7    Q   And 6 percent of the anthracycline
8 patients experienced grade 2 alopecia, correct?
9    A   Right.  And just so --
10    Q   And the overall incidence of permanent
11 alopecia for patients receiving paclitaxel was
12 13 percent, correct?
13    A   I want to comment on --
14    Q   I'm not asking you to comment.
15    A   I know you're not asking me to comment.
16 But as a scientist, I must comment that the arms are
17 disproportionately incredibly different.
18        There's 265 patients on the docetaxel arm.
19 There's 12 patients on the anthracycline and
20 non-taxane arm, and there's 23 patients on the
21 anthracycline and paclitaxel arm.
22        So I'm just saying there's more than a
23 tenfold difference in the numbers of patients.  So I
24 want you to be aware of that.
25        MR. KAUFMAN:  Move to strike the witness's

1 comment.
2    Q   Doctor, the overall incidence of permanent
3 alopecia for patients receiving paclitaxel was
4 indicated as 13 percent, correct?
5    A   Right.
6    Q   And 9 percent of the paclitaxel patients
7 experienced grade 2 alopecia, correct?
8    A   So that represents one patient in three
9 patients.
10    Q   Is that correct?
11    A   Yeah, one patient in three patients is
12 correct.  And the docetaxel is about 39 patients.
13    Q   And based on the data presented by Crown,
14 the highest percentage of grade 2 alopecia is found
15 in the paclitaxel group, correct?
16    A   I don't divorce numbers from percentages.
17 And so to me, it is important how many patients
18 you're actually talking about.
19      So you're talking about -- when you're
20 talking about very small numbers, you're talking
21 about tiny numbers.  When you get to 9 percent of 12
22 patients, you know, you're basically talking about
23 one person.
24    Q   And based on the data presented by Crown,
25 the highest percentage of grade 2 alopecia in this

1 study is in the paclitaxel group, correct?
2    A   Sure, in a small number of patients.
3      So the other results --
4    Q   You've answered my question.  Thank you,
5 Dr. Feigal.
6    A   Well, I mean, the other important result
7 is this -- actually, this abstract is very
8 interesting because it has a dose response for
9 docetaxel.
10      And it shows that as you go to a higher
11 dose of docetaxel, you have a greater increase and a
12 greater severity of permanent alopecia at the
13 450-milligram-per-meter-squared cumulative dose as
14 compared to 300.
15      So if anything, what I would say is I'd be
16 happy to include this because I think it's very
17 supportive evidence for the increased incidence of
18 alopecia, permanent alopecia, in the
19 docetaxel-containing regimens.
20      MR. KAUFMAN:  Move to strike the
21 nonresponsive portion of the witness's commentary.
22      (Exhibit 24 was marked for identification
23      and is attached hereto.)
24 BY MR. KAUFMAN:
25    Q   I've handed you what's been marked as

1 Exhibit No. 24.
2    A   I don't think I've ever seen this one.
3    Q   Okay.  And this is by Analee Beisecker and
4 others.
5      Do you see that at the top?
6    A   I do.
7    Q   And the title is "Side Effects of Adjuvant
8 Chemotherapy Perceptions of Node-Negative Breast
9 Cancer in Patients," correct?
10    A   The title is correct.
11    Q   Okay.  And breast cancer was one of your
12 search terms, correct?
13    A   Well, in conjunction with "permanent,
14 persistent, or chronic alopecia."  So I wasn't just
15 looking at breast cancer.  The search terms were
16 "and permanent, persistent" or -- you know, the
17 long-term alopecia.
18    Q   Okay.  And in the summary portion at the
19 very beginning -- one, two, three, four -- five
20 lines down, there's a sentence that starts with
21 "Hair Loss."
22    A   I don't see the adjective "persistent,"
23 permanent," or "irreversible," but I do see a term,
24 "hair loss."
25    Q   Okay.  It says, "Hair loss, fatigue,

1 treatment-related problems, nausea and infections,
2 low blood counts were the most frequently described
3 problems during the first interviews.  Patients used
4 coping strategies suggested by physicians and
5 nurses.  Six months later, hair problems, fatigue,
6 weight gain, menopausal problems, emotional
7 problems, and nail problems were the most often
8 reported."
9      Did I read that correctly?
10    A   You did, but I don't see anything in here
11 about permanent, persistent or irreversible hair
12 loss.
13      MR. THORNTON:  Objection.  Form.
14      Do you want her to read this article so
15 she can --
16      THE WITNESS:  I mean, I've never seen this
17 article before.
18      MR. THORNTON:  -- comment about it?
19      MR. KAUFMAN:  Sure.  We'll go off the
20 record.
21      THE VIDEO OPERATOR:  Do you want to go
22 off?
23      MR. THORNTON:  Yes.
24      THE VIDEO OPERATOR:  Okay.  Going off the
25 record, the time is 4:26.

51 (Pages 581 - 584)

1      (Recess, 4:26 p.m. - 4:40 p.m.)
2          THE VIDEO OPERATOR:  Back on the record.
3 The time is 4:40.
4 BY MR. KAUFMAN:
5      Q   Dr. Feigal, we were talking about Exhibit
6 No. 24 when we went off the record, correct?
7      A   Correct.
8      Q   And you've had a chance to review it?
9      A   I now have briefly reviewed it.
10     Q   Okay.  And I'd like to point your
11 attention to Table 1 on page 3.  And at the bottom
12 of Table 1, it lists the chemotherapy regimens that
13 were given to the patients as part of this article.
14     A   Yes.
15     Q   Okay.  And those regimens are CMF, CAF,
16 and FuVMiC, correct?
17     A   Um-hum.
18     Q   And none of those involve taxanes; is that
19 right?
20     A   That is correct.
21     Q   The study did involve regimens involving
22 Cytoxan and Adriamycin; is that right?
23     A   Yes.  They gave the percentages of the 21
24 patients who received those.
25     Q   Okay.  And if we turn to Table 2 on

1 page 6 -- two pages later -- are you with me, Table
2 2?
3      A   Page 89.  Yeah.
4      Q   Table 2 is entitled "Side Effects Reported
5 in Order of Frequency," correct?
6      A   Um-hum.
7      Q   And the first one -- the first side effect
8 listed is "Hair loss/regrowth," correct?
9      A   Correct.  It's, slash, regrowth.
10     Q   And immediately post-chemotherapy group
11 had 21 patients that were considered, and the
12 frequency is shown as 20 of the 21 reported side
13 effects with respect to hair loss/regrowth, correct?
14     A   That is correct, and I think time one was
15 one month.
16     Q   Okay.  And then there's also a six-month
17 group right next to it, correct?
18     A   Right.  Time two is six months, and, yes,
19 the -- I see the frequency for hair loss and hair
20 regrowth.
21     Q   And there were 18 patients who reported
22 side effect issues with respect to hair loss and
23 regrowth out of all 18, correct?
24     A   Correct.  It's a combined term, hair loss
25 and hair regrowth.

1      Q   Okay.  And you would agree with me that
2 the Beisecker study is not listed in Table 2 of your
3 report, correct?
4      A   I report -- I agree, but I don't see the
5 terms "permanent," "irreversible," or -- I don't see
6 any of those terms in this paper.
7          And actually, if you look at the results
8 where it talks about side effects experienced on
9 page 88, it says, at time two, the side effects
10 associated with their hair, they talked about it
11 being a different color, a different texture.  It
12 was uneven.
13         So I don't see anything related to the
14 permanency and the lack of growth of their hair
15 anywhere in this article.
16     Q   Move to strike everything after "I agree"
17 as nonresponsive.
18         During a break, Dr. Feigal, you kindly
19 agreed to tally up some of the numbers from your
20 invoices.
21         Do you remember?
22     A   Yes.
23     Q   Okay.  And what was the total number that
24 you calculated that you and NDA Partners combined
25 have made from your role as an expert in the

1 Taxotere litigation?
2      A   Well, just to be clear, it's from November
3 of 2017 through November of 2018, and includes my
4 time before I became an expert and was a consultant
5 for a variety of educational issues.
6          But the total for NDA Partners and myself,
7 the total amount was 156,112.
8      Q   $156,112?
9      A   That's correct.
10     Q   Okay.
11     A   For the entire year.
12     Q   For November 2017 to November 2018?
13     A   Correct.  That's a year.
14     Q   And so that number does not include any
15 billings or invoices with respect to time that you
16 spent in December of 2018 for your first deposition
17 and today in January of 2019?
18     A   It does not include the December invoice.
19 That is correct.  And it's too early for a January
20 invoice.
21     Q   Okay.  And your testimony is that NDA
22 Partners receives 20 percent of your billings, and
23 you personally receive the other 80 percent?
24     A   Right, which are subject to taxes, as are
25 theirs.

1   Q   And so you also calculated what that
2   80 percent number would be, correct?
3   A   Yes.
4   Q   Okay.
5   A   For the entire year, it's 124,889.
6   Q   And when you say "the entire year," that's
7   November of 2017 to November of 2018?
8   A   Correct.  That's one year.
9       (Exhibit 25 and Exhibit 26 were marked for
10      identification and are attached hereto.)
11  BY MR. KAUFMAN:
12      Q   Okay.  I'm handing you what I've marked as
13  Exhibits 25 and 26 together, two separate documents,
14  two separate exhibits, but I'm handing them to you
15  at the same time.
16      A   Okay.
17      Q   Are these the sources that you added to
18  your report as Footnotes 31 and 32?
19      A   Well, let me look at it.  Let me look at
20  my expert report and see what references you're
21  referring to.
22      MS. DAVIS:  Do you have copies?
23      MR. BAEHR:  Yeah.
24      THE WITNESS:  Well, without checking the
25  website, it does look like an approval letter for

1   the adjuvant treatment of patients with
2   node-positive breast cancer.
3       What I don't know is if it's the exact
4   document because obviously I don't have that here.
5   BY MR. KAUFMAN:
6       Q   Okay.
7       A   I don't know if you do.
8       Q   Can we agree that the exact document would
9   be listed at the web address that you provided in
10  Footnotes 31 and 32 of your report?
11      A   Well, I can verify it as of the date that
12  I got it.  What I don't know is if web -- you know,
13  sometimes web addresses change.
14      So I can verify because I'm sure we
15  probably downloaded it, and I'm looking at Ms. Davis
16  for that.
17      But it looks similar if not identical to
18  an approval letter.
19      Q   Okay.
20      A   I think.
21      Q   So one of the approval letters,
22  Exhibit 25, is for --
23      A   This is adjuvant.
24      Q   I'm sorry?
25      A   Exhibit 25 is for adjuvant.  This is what

1   you gave me, Exhibit 25.  That's what you listed.
2   Maybe -- did you number it wrong?
3       MR. BAEHR:  I don't know what that page
4   is.
5       THE WITNESS:  And here's Exhibit 26.  I
6   haven't read it yet.  Just decide if this is what
7   you want me to have.
8   BY MR. KAUFMAN:
9       Q   Oh, yeah, yeah, yeah.
10      MR. BAEHR:  It's the same.  It's just the
11  next page.  It's that front page.  I don't know why.
12      MR. KAUFMAN:  Oh, I see.  Okay.
13      Q   I'm going to hand these two back to you.
14      Okay.  So Exhibit 26 is an approval letter
15  from 1998, correct?
16      A   This looks correct.  It looks like an
17  approval letter for metastatic breast cancer --
18      Q   And the other exhibit I handed you is an
19  approval letter from 2004 for the adjuvant --
20      A   That's correct.
21      Q   -- indication?
22      Okay.  You can put those to the side.
23      You have noted that you're not offering
24  any case-specific opinions, and I just want to make
25  clear that you also do not have any specific

1   opinions concerning treatment decisions made by any
2   of the plaintiffs' prescribing doctors.
3       A   Just to be perfectly clear, no plaintiff
4   cases, specific comments on the physicians or on the
5   patient cases.  I'm not providing any specific
6   information on what they did or what the patient
7   wanted.
8       Q   Okay.  And that would be no opinions
9   regarding Dr. Verghese, Dr. Karande, or
10  Dr. Jancich's care and treatment of any of the
11  plaintiffs in this case, correct?
12      A   Anything related to that would be by
13  Dr. Bosserman.
14      Q   Okay.  Thank you.
15      In your report, if you can, Exhibit 17, go
16  to the very last page.
17      A   Okay.  Right above my signature?
18      Q   Right above.  There's opinion number 6 or
19  conclusion number 6.  "Physicians would have
20  included had they known of the risk of permanent
21  chemotherapy-induced alopecia in their benefit/risk
22  discussion of treatment options with their patients
23  with early-stage breast cancer to allow for more
24  informed decisions.  This information may have
25  changed the treatment options discussed and the

Page 593

1 patient's choice."
2        Did I read that correctly?
3     A  You read that correctly, yes.
4     Q  Okay.  And so given that you're not
5 offering any plaintiff or case-specific opinions
6 regarding the treaters and the actual cases at
7 issue, is it fair that your opinion or conclusion as
8 stated in item number 6 here is what you believe a
9 reasonable or objective physician would do?
10    A  Correct.
11    Q  And on page 7 of your report --
12    A  Page 7?
13    Q  Um-hum.
14    A  Okay.
15    Q  -- Footnote 1 is to the American Cancer
16 Society.
17    A  Yes.
18    Q  Cancer facts and figures from 2018.
19    A  Correct.
20    Q  Can we agree that the American Cancer
21 Society is a reliable source of information for
22 facts about cancer generally, including statistics?
23    A  It's a useful resource for incidents and
24 mortality data so, I mean, it's excellent for some
25 things, not the source I'd go to for others.  But as

Page 594

1 it says, facts and figures.
2     Q  Okay.  And so for what you've cited here,
3 facts and figures, the American Cancer Society is a
4 reliable authority?
5     A  Correct.
6     Q  Okay.  And those statistics and facts and
7 figures can change from year to year; you'd agree
8 with me?
9     A  Yeah.  And as a matter of fact, they may
10 already be out, you know, from the time I wrote this
11 on November 6th.
12    Q  Okay.  Would the cancer facts and figures
13 issued by the American Cancer Society be a source
14 that you would go to to rely on for that type of
15 information?
16    A  About facts --
17       MR. THORNTON:  Objection.  Form.
18       THE WITNESS:  About facts and figures?  I
19 go to American Cancer Society, and I also go to
20 SEER data.
21 BY MR. KAUFMAN:
22    Q  Okay.  And so for any statistical
23 information regarding breast cancer prior to 2018,
24 and even for looking forward, cancer facts and
25 figures that have yet to be issued, you would agree

Page 595

1 that the American Cancer Society is a reliable
2 source for that information?
3       MR. THORNTON:  Objection.  Form.
4       THE WITNESS:  It was reliable for the
5 source of information I was looking for in my
6 report, yes.
7 BY MR. KAUFMAN:
8     Q  And do you have any reason to believe that
9 it was unreliable prior to 2018 or will be in the
10 future?
11    A  I can't -- I can't comment on that.  I
12 mean, I can comment on, you know, what I was looking
13 for at the time I was looking at it.  But I have
14 often gone to the American Cancer Society as well as
15 SEER data.
16       When I was at National Cancer Institute, I
17 worked with the SEER registries so I'm very familiar
18 with the credibility and robustness of the data.
19    Q  Do you believe that American Cancer
20 Society is a credible organization?
21    A  Yeah, I think they're a credible
22 organization.  SEER is actually the registries where
23 a lot of the data is culled and represented.
24       I think you'll see in my bibliography I
25 actually have a paper where I'm working with the

Page 596

1 SEER registry.
2     Q  Would you agree with me that there have
3 been cases of permanent hair loss reported with
4 Taxol?
5     A  Yes, and I think I have reported it in my
6 table.
7     Q  Would you agree with me that there are
8 cases of permanent hair loss reported with
9 cyclophosphamide?
10    A  I include that in my non-taxane
11 anthracycline cyclophosphamide regimen, yeah.
12       You're talking about breast cancer; is
13 that correct?
14    Q  Yes.
15    A  Or anything?
16    Q  Breast cancer.
17    A  In breast cancer, yes, and I think I've --
18 yes.
19    Q  Okay.
20    A  I would agree.
21    Q  Would you agree with me that there are
22 cases of permanent hair loss reported with
23 Adriamycin?
24    A  Yeah.  Now, what you're saying is cases
25 reported, yes.  I mean, anecdotal reports, yes, I

Page 597

1 agree.
2     Q   And there are cases reported of permanent
3 hair loss associated with the AC regimen?
4     A   There have been cases -- anecdotal cases
5 reported.
6     Q   And there have been cases reported of
7 permanent hair loss with the AC Taxol regimen,
8 correct?
9     A   I have captured that in my table.  Yes.
10     Q   So yes?
11     A   Yes.
12     Q   And there have been cases of permanent
13 hair loss reported with CMF, correct?
14     A   That I don't think I have a tabulation
15 for.
16     Q   You have not seen that?
17     A   I don't recall seeing that.
18     By the way, we didn't talk about it, but I
19 have major issues with the Berglund article, which
20 is about CMF.
21     Q   If Dr. Bosserman testified that there have
22 been cases of permanent hair loss reported with CMF,
23 would you have any reason to disagree with her?
24     MR. THORNTON:  Objection.  Form.
25     THE WITNESS:  I don't have any opinion on

Page 598

1 her testimony.
2 BY MR. KAUFMAN:
3     Q   So you'd have no reason to disagree?
4     MR. THORNTON:  Objection.  Form.
5     THE WITNESS:  I just don't -- I mean,
6 you're culling one sentence.  I haven't seen her
7 testimony at all.  So no, I don't have any opinion
8 on one sentence of what she may or may not have
9 said.
10     MR. KAUFMAN:  Okay.  Can we go off the
11 record real quick?
12     MR. THORNTON:  Sure.
13     MR. KAUFMAN:  I think we're close.
14     THE VIDEO OPERATOR:  Going off the record,
15 the time is 4:56.
16     (Recess, 4:56 p.m. - 5:15 p.m.)
17     THE VIDEO OPERATOR:  Back on the record.
18 The time is 5:15.
19     MR. KAUFMAN:  Doctor, I don't have
20 any more questions for you.
21     THE WITNESS:  Oh, okay.  Thank you.
22     MR. THORNTON:  I'm going to ask a few.
23     THE VIDEO OPERATOR:  Going off the record.
24 The time is 5:15.
25     (Recess, 5:15 p.m. - 5:16 p.m.)

Page 599

1     THE VIDEO OPERATOR:  Back on the record.
2 The time is 5:16.
3             EXAMINATION
4 BY MR. THORNTON:
5     Q   Yes, Dr. Feigal.  I'm going to ask you
6 questions about these articles that you have been
7 presented by counsel for Sanofi, just so you have a
8 chance to make your comments about them as they may
9 relate to your table.
10     What's your table referred to in your
11 report?  I think Table 2?
12     A   Table 2.
13     Q   I thought so.
14     First of all, as to Crown, what are your
15 observations about the Crown study as it relates to
16 the applicability of that study to Table 2?
17     A   Well, I actually think it's an interesting
18 abstract and poster, which I agree, I hadn't seen.
19     But upon reading it, I actually think it's
20 supportive of the docetaxel-based regimen inducing
21 permanent alopecia.  The largest amount of data is
22 on the docetaxel-based regimen of 265 patients.
23     There's also a dose response that's
24 present here where patients who received the higher
25 cumulative dose of 450 milligrams -- I presume

Page 600

1 that's per meter squared -- had a higher incidence
2 and also a higher degree of severity of their
3 permanent alopecia as compared to a lower dose of
4 the docetaxel-containing regimen.
5     I do agree that there are anecdotal
6 patients.  I believe it's one patient on one of the
7 regimens, and up to three patients on the other,
8 just very small numbers.  But basically I believe
9 there's about 39 patients when I did the math on the
10 265 patients.
11     So --
12     Q   39 -- so why don't you go over the
13 numbers -- the actual numbers of patients who are
14 reported in the Crown study as having permanent
15 chemotherapy-induced alopecia.
16     A   So in the Crown study, there's 265
17 patients who were on a docetaxel regimen, either
18 with or without an anthracycline.  There are 12
19 patients on an anthracycline non-taxane, and there
20 are 23 patients on an anthracycline and a
21 paclitaxel.
22     And there's approximately 15 percent
23 overall incidence of permanent alopecia for patients
24 receiving docetaxel, and I believe 15 percent of
25 265 -- I have to do the math, but I believe it was

55 (Pages 597 - 600)

1 around 39 patients.
2       There was --
3     Q   That would be 39 patients who have
4 permanent chemotherapy-induced alopecia on a
5 docetaxel regimen?
6     A   Yeah.
7     Q   Do you want to go ahead and do the math?
8     A   Yeah.  I don't want to say something
9 that's inaccurate.
10      Oh, I was right.  Okay.  39.75.  So you
11 can't take a quarter of a patient, though.  So I
12 said about 39 patients.
13      And then for the anthracycline plus
14 paclitaxel, it's about 13 percent.  So 13 percent of
15 23 is approximately three patients.
16      And then for the anthracyclines, I believe
17 it was about 8 percent.
18      And so my understanding of the data here
19 is about -- 8 percent of 12 patients is about one
20 person.
21      But I think the other part that I think is
22 helpful in terms of --
23    Q   Let me ask, is there any other way that
24 this Crown -- this is really an abstract.  It's not
25 a study.  I'm calling it a study.  It's an abstract,

1 correct?
2     A   Yeah.  It's actually -- they actually
3 provided me two versions of the same material.  One
4 is this Exhibit 14 from Tosti.  The other is an
5 Exhibit 20 for Dr. Bosserman.
6       I believe that the -- very similar data in
7 both of these.  I think one of them, the abstract,
8 had 295 patients.  This one, I believe, had 300
9 patients.  So it looks like this was an update of
10 five patients.
11      But basically it's the same author.  It
12 looks like eight of the ten authors are identical.
13    Q   What's -- Exhibit 20 is a poster
14 presentation?
15    A   Well, it doesn't tell me what conference
16 it was from, but it just gives me a poster number,
17 206P.
18      And then this one from the abstract, which
19 is written more as a narrative, but very similar
20 information, looks like it was an abstract.  And I
21 can't tell what conference it was from, but it looks
22 like it was an abstract.
23    Q   And it's your conclusion that based on the
24 data and the authors that this was the same data in
25 the poster and the abstract?

1     A   There are minor differences.  This looks
2 like there were 295 patients.  This looks like
3 there's 300 patients.  So there's five additional
4 patients on this one.
5       When I looked at the percentages, it looks
6 like they were very minor differences between the
7 two abstracts in terms of the information presented.
8     Q   And it is the same authors?
9     A   Eight of the ten authors are identical.
10 The abstract actually has ten authors.  The poster,
11 I believe, only has eight authors.  So there are a
12 couple of authors that got left off of the poster.
13    Q   All right.  Is that common for there to be
14 minor changes between data presented at a conference
15 as a poster presentation and data that finds its way
16 into an abstract?
17      MR. KAUFMAN:  Object to form.
18      THE WITNESS:  In fact -- I'm sorry.  Did
19 you say something?
20      MR. KAUFMAN:  I just objected.  That's
21 all.  Go ahead.
22      THE WITNESS:  You're on the other side.
23      Anyway, all I was going to say is
24 investigators are very interested in being able to
25 present at conferences.  So I'm not -- you're not

1 supposed to duplicate information in different
2 conferences.  At least it's frowned upon.  You'd
3 like to present updated information.  And it does
4 look like they had some -- five additional patients
5 in this poster as opposed to what was in this
6 abstract.
7       I don't know if there was an abstract and
8 the poster at the same conference or if these are
9 just two different conferences.
10 BY MR. THORNTON:
11    Q   But your conclusion is it's the same --
12    A   Very similar data.
13    Q   Your conclusion is that it appears to be
14 the same -- there's at least considerable overlap in
15 the data?
16      MR. KAUFMAN:  Object to form.
17      THE WITNESS:  There's tremendous overlap
18 in the data, yes.
19 BY MR. THORNTON:
20    Q   Any other observations about Crown?
21    A   No.  I think we've already gone over it
22 from the previous discussion.
23    Q   You had previously commented in your
24 initial deposition in December about the Berglund
25 article, which was presented to you for the first

56 (Pages 601 - 604)

Page 605

1  time at that deposition.
2       Have you had a chance to read and study it
3  in more depth since?
4    A  Yes, I have.  And --
5    Q  And do you have any observations about
6  whether it would fit into your Table 2?
7    A  I think that this really isn't relevant
8  for permanent, irreversible or, you know, persistent
9  alopecia.
10   Q  Why not?
11   A  Well, the -- the methodology is rather
12  challenging to dissect, but it appears that it's
13  looking at patients two to ten years out from their
14  treatment of breast cancer.  It was adjuvant breast
15  cancer.  But it looks like they asked them -- at the
16  time of the questionnaire, they just asked them
17  rather nonspecific questions about hair loss at the
18  time.
19       I don't see anywhere in this article
20  talking about permanent, irreversible, or persistent
21  alopecia from the time of their chemotherapy.
22       And there are 32 different symptoms, those
23  being asked.  There are all kinds of activity issues
24  that are being asked.  It looks like one of the main
25  conclusions is this issue about aversion to smells

Page 606

1  that they're focusing on.
2       I also think it's very problematic in
3  terms of looking at the data.  Some of it, I have a
4  hard time with biologic plausibility because it's
5  talking about hair loss in patients who just
6  received radiation therapy to the breast.  And local
7  radiation to the breast shouldn't cause loss of hair
8  on the top of your head.
9       So I don't really understand the
10  methodology for what we're doing, but I don't see
11  anything in this paper that's really relevant for
12  permanent, irreversible, or persistent alopecia.
13   Q  So --
14   Q  Is it clear, Doctor, that the hair loss
15  that is surveyed, whatever it was -- was it 15 years
16  later?
17   A  Up to ten years.
18   Q  -- up to ten years later even has
19  continuity from the time of the immediate treatment
20  period?
21   A  I don't see that in this article.  I think
22  what they're talking about, they use the term "late
23  effects."  And so I don't know if they're just
24  commenting on something that happens late after the
25  chemotherapy.  I don't see that it's talking about

Page 607

1  persistent or permanent from the time that they were
2  treated.
3       So at least from my read, I don't see that
4  in this article.
5    Q  All right.  So had you found the Berglund
6  study, would that data have gone into your Table 2?
7    A  I don't -- no.
8    Q  Let me go back on Crown.
9       Had you found the Crown study in your
10  medical search, would have the Crown data gone into
11  your table?
12   A  Well, I would have, because it is talking
13  about early-stage breast cancer.  It does quantitate
14  the numbers of patients on the various regimens.  It
15  does have the dose response.
16       So actually, if I had found it, I would
17  have included it.
18   Q  And where -- and how would that have
19  changed the tabulation of your table, looking on
20  Exhibit 17, which is your report with the table?
21   A  Well, it looks like what it would have
22  done is for -- the docetaxel-based regimens added
23  about 39 patients to the column for Taxotere-based
24  regimens, and for the non-taxane regimens, I believe
25  it would have added four.

Page 608

1    Q  Can we switch over to the Jung article
2  now?  Is that available to you?
3    A  The next one that I see in here is Jung,
4  and that's the Korean article where all I had was an
5  English abstract at the time of my deposition on
6  December 7th.  But I now have had the time to read
7  the English translation.
8    Q  All right.  So the Jung article that was
9  presented to you with an English abstract, but the
10  rest of the article in Korean in December, have you
11  since had an opportunity to read it in its full
12  English?
13   A  Yes.  And I do agree that it does have the
14  terms "permanent alopecia."
15   Q  Nonetheless, this was an article that
16  didn't come up in your search?
17   A  This was not -- this was not a term -- I'm
18  looking to see if there's any term about breast
19  cancer.
20       As you know, when you do PubMed searches,
21  each article and abstract is coded.  So it doesn't
22  do an entire article search for a word.
23   Q  Okay.
24   A  So it would have had to be coded in a
25  particular way to have it come up on a search term.

Page 609

1        MR. KAUFMAN:  I object to the last
2 question.
3 BY MR. THORNTON:
4     Q   Had you found the article, would have you
5 included the findings in your Table 2?
6     A   The problem I have with this article is
7 that there's no attribution of what chemotherapy the
8 patients with breast cancer received.
9        They do list 12 breast cancer patients.
10 There is no description of what chemotherapy they
11 received.  So I wouldn't have been able to attribute
12 what they received to their cancer indication.
13        The second thing that I don't know is
14 whether or not these were metastatic or early-stage
15 breast cancer and/or both.  There's absolutely no
16 description in this paper of what we're talking
17 about.
18        The reason why I brought it up is that
19 they talk about transplantation being given to about
20 15 percent of patients, and they talk about
21 radiation to the brain in another 18.5 percent.
22        So I really don't know if they're talking
23 about metastatic breast cancer patients.  There was
24 a period of time when bone marrow transplantation
25 was one of the treatments that was allowable for

Page 610

1 patients with metastatic breast cancer.
2     Q   Let me ask, has bone -- has bone marrow
3 transplants in the treatment of breast cancer long
4 been known to cause persistent or permanent
5 chemotherapy-induced alopecia?
6        MR. KAUFMAN:  Object to the form.
7        THE WITNESS:  What I can say is that
8 high-dose chemotherapy in the transplantation
9 setting is known to cause permanent alopecia, and
10 also, radiation to the head, which includes the
11 scalp, is known to cause permanent alopecia.
12        So there's -- when you talk about
13 confounders, there's some major confounders here as
14 I don't know the stage of the patients and I don't
15 know what regimens they received.
16 BY MR. THORNTON:
17     Q   All right.  So from your standpoint,
18 would -- can you determine from the data whether or
19 not these are what I'll call non-metastatic breast
20 cancer, early-stage breast cancer patients who have
21 received a regimen of chemotherapy that's comparable
22 to the other studies that you have included in
23 Table 2?
24     A   No.
25     Q   Would have you included that data in

Page 611

1 Table 2 had you found it?
2     A   I -- I can't interpret it.  No, I wouldn't
3 have included it.
4     Q   The Kang study, I believe, you've also --
5 you've already mentioned, it turns out was
6 misreported in the abstract as being permanent
7 chemotherapy-induced alopecia from Taxol when, in
8 fact, it was permanent chemotherapy-induced alopecia
9 from Taxotere.
10        Do I understand your testimony correctly?
11     A   That is correct.  The paper, which was
12 published correctly, attributed it to Taxotere.  And
13 actually, I do have that paper in my -- in my Table
14 2.
15        The abstract was -- which apparently was
16 published earlier, the author, when I did -- sent
17 him a personal communication by e-mail to try and
18 understand the discrepancy, stated that, "No, the
19 abstract was wrong.  I asked the publisher to change
20 it, but it was too late.  It had already been
21 published.  But the paper was correct, and it was
22 indeed Taxotere."
23     Q   So the Kang data was correctly reported in
24 your Table 2?
25     A   Yes.

Page 612

1     Q   All right.  Then Yeager, I believe you
2 already testified about that.
3        Is there any data in the Yeager review
4 article which was not included in your Table 2?
5     A   No.  Everything is included.  The only
6 thing I noted was that she misrepresented the data
7 from the Masidonski and Mann article, and that's
8 documented by my e-mail to the senior author, not
9 related to reviewing this article.
10        It's only related to the fact that her
11 published article only references a taxane.  It
12 doesn't comment whether it's Taxotere or paclitaxel.
13 And I sent her an e-mail to ask if she could clarify
14 it.
15     Q   And was Dr. Masidonski able to clarify it?
16     A   I believe it was the co-author, Dr. Mann,
17 that I provided to the defense counsel.  And yes,
18 she was able to clarify it.
19     Q   And what was the clarification?
20     A   I believe the clarification was that 11
21 of -- all the taxane regimens were Taxotere, and I
22 believe it was 11 of 13 that had Taxotere-induced
23 permanent alopecia.
24     Q   And is that data included in your Table 2?
25     A   That data is already in my Table 2.

58 (Pages 609 - 612)

Page 613

1   Q   Now if I may turn to the Yagata article.
2   A   Okay.
3   Q   Another article that you did not locate in
4 your search?
5   A   Correct.
6   Q   Do you have any observations about the
7 Yagata article as it relates to permanent
8 chemotherapy-induced alopecia?
9   A   I think the article is confusing about
10 what they are talking about with the hair loss.
11       They talk about texture, they talk about
12 unruliness, they talk about different
13 characteristics of the hair.
14       They do talk about volume recovery as, I
15 guess, a descriptor for hair coming back. I'm not
16 sure if it's hair coming back or if it's hair
17 thickening. But they talk about hair volume
18 recovery.
19       The other issue I have with the
20 questionnaire is there's no quantitation on who's on
21 the different regimens. It just says 1,478
22 questionnaires were ultimately analyzed.
23       There were Taxotere- and
24 non-Taxotere-containing regimens, there were Taxol-
25 and Taxotere-containing regimens, but there's

Page 614

1 absolutely no numbers of who's in those different
2 regimens.
3       So once again, it's not interpretable, but
4 even outside of that, it's not clear to me what
5 they're really measuring in their questionnaire
6 about hair.
7       So there's several problems with this.
8   Q   So had you located the Yagata article in
9 your search, would you have included that data in
10 your Table 2?
11   A   I wouldn't have been able to because I
12 wouldn't have any attribution data.
13   Q   And last but not least, the article that
14 you were handed today, the first article, at least,
15 is Beisecker, the last one is Selenke. I guess we
16 often find that the last author is the hardest -- is
17 the lead author.
18       But in any case, the one I think -- what
19 have we labeled this one?
20   A   It's -- on mine, it's labeled Exhibit 24.
21   Q   Yes, Exhibit 24.
22       And you were handed that today, and you
23 made a number of comments about that at the end of
24 the discussion. However, they were not actually in
25 response to a question, I observed.

Page 615

1       So do you have any comment about how this
2 article may pertain to your inquiry into
3 chemotherapy-induced alopecia?
4   A   Well, the issue I had is they combine hair
5 loss and hair regrowth when they talk about numbers.
6       I do agree this is in node-negative breast
7 cancer patients, so obviously I'm assuming all of
8 these are resectable non-metastatic patients, so I
9 agree the cancer indication is appropriate.
10       But I don't see any evidence that this is
11 about permanent, irreversible, or persistent
12 alopecia.
13       The questions that they appear to be
14 asking is about color, texture, unevenness. So --
15 and the time points they look at are one month and
16 six months after chemotherapy.
17       And since they're combining hair loss and
18 regrowth, and they're asking questions about sort of
19 the nature of the hair rather than the loss of the
20 hair, it doesn't, to me, from reading this --
21 granted I'm reading this in realtime, I'm not
22 reading this in the luxury of my office -- but
23 basically it doesn't look like it's relevant to
24 persistent, permanent, or irreversible alopecia.
25   Q   Based on your -- your opportunity thus far

Page 616

1 to review the article, do you believe that it would
2 have appropriately been included as data in Table 2?
3   A   I'm just looking to see if I even know
4 what therapy they received.
5       There were only 21 patients to start with,
6 and I think only 18 patients were in the second time
7 period of follow-up.
8       They mention adjuvant chemotherapy. I'm
9 trying to ascertain what they actually received.
10   Q   So it says what the group as a whole
11 received on Table 1, which you were shown.
12   A   I'm sorry. It does. It does. So it says
13 of the 21 patients, 57 percent received CMF,
14 24 percent -- thank you -- 24 percent received CAF,
15 and 19 percent received 5FU Velban and mitoxantrone.
16       But I think my bigger issue is it's not
17 clear to me this is about permanent, irreversible,
18 or persistent alopecia given the questions that they
19 provide in the narrative of this article.
20   Q   Would the data from this study, the
21 Beisecker study, as I'll call it, "Side Effects of
22 Adjuvant Chemotherapy, Perceptions of Node-Negative
23 Breast Cancer Patients," have been included in your
24 Table 2 had you located it?
25   A   Not based on the questions that they

59 (Pages 613 - 616)

Page 617

1 appear to be asking the patients.
2        MR. THORNTON: Thank you, Doctor.
3        MR. KAUFMAN: Nothing further from me,
4 either. Thank you.
5        MR. BAEHR: Let's talk.
6        THE VIDEO OPERATOR: Do you want to go off
7 the record?
8        MR. KAUFMAN: Yeah, we'll go off the
9 record.
10        THE VIDEO OPERATOR: Going off the record,
11 the time is 5:41.
12        (Recess, 5:41 p.m. - 5:50 p.m.)
13        THE VIDEO OPERATOR: Back on the record.
14 The time is 5:50.
15              FURTHER EXAMINATION
16 BY MR. KAUFMAN:
17    Q    Dr. Feigal, plaintiffs' counsel asked you
18 some questions about the Kang article.
19        Do you recall those, generally?
20    A    The 61-patient cohort? Is that the one?
21 The Kang article?
22    Q    Yes, Exhibit 19.
23    A    Let me go to it. Let me just pull it up.
24        MR. THORNTON: I think you've got the
25 abstract but you don't have the article.

Page 618

1 BY MR. KAUFMAN:
2    Q    I don't think you need the specific study
3 or article to answer my question.
4    A    I'm listening while I'm looking.
5    Q    You testified that there was an
6 inconsistency between the published version and the
7 abstract; is that right?
8    A    Let me find the article, if you don't
9 mind.
10    Q    Sure.
11    A    Correct. I found it. It's Exhibit 17.
12    Q    And you testified that the author told you
13 in an e-mail that the abstract was wrong?
14    A    The -- well, let me refer to the
15 October 2nd e-mail that I provided to you and that I
16 referenced in the Table 2. So let me just get it.
17        So would you like me to read what I wrote?
18 The abstract that I refer to may not have been this
19 abstract, but it was the same patients.
20        So what I referred to was the 2017 Kang,
21 et al., abstract at the World Congress for Hair
22 Research had incorrectly stated the 61-patient
23 cohort as paclitaxel rather than the drug that was
24 actually administered, Taxotere. The author
25 requested the abstract to be corrected but this was

Page 619

1 not done before publication of the abstract book.
2 The article on that 16-patient cohort was published
3 on the same study by the same author in 2018 and was
4 correctly provided the attribution to Taxotere.
5        So that is -- that was a personal
6 communication with the article.
7        So the content is -- it is an abstract. I
8 don't know where this one was presented.
9        The one I saw with 61 patients was
10 presented to the World Congress for Hair Research,
11 although he did note there was another abstract that
12 was also wrong. It's not captured in this e-mail.
13 But I only asked him about the World Congress for
14 Hair Research abstract.
15        And he does have a subsequent published
16 paper on the 61-patient cohort where the attribution
17 is Taxotere.
18    Q    Are you aware of whether there was ever a
19 correction published noting the -- what you call to
20 be an error in the abstract?
21    A    I said that he asked, but no, there was no
22 correction for the abstract. It had already been
23 published.
24        And since it was presumably an abstract or
25 a poster and not a paper, there's no -- there's no

Page 620

1 way to really go back and redact that.
2    Q    And so you're not aware of any -- any
3 publication where notice was provided that such an
4 error was made in the abstract version of the Kang
5 study?
6    A    The communication I have was the
7 discrepancy between the abstract on the identical
8 cohort and the paper. And so that was the basis for
9 my e-mail exchange with the senior author. And
10 those were his words that I captured in the
11 footnote. And you have the e-mail exchange.
12    Q    For several of the studies that
13 plaintiffs' counsel asked you about, you testified
14 that you would not have included the studies in
15 Table 2 for the reasons you stated, but one of those
16 reasons was because you were not able to determine
17 whether they pertained to persistent, permanent, or
18 irreversible alopecia; is that right?
19    A    That's correct. That's correct.
20    Q    Is it your testimony that a study or
21 article is not relevant for your purposes and
22 inclusion in Table 2 if the article does not include
23 the terms "persistent," "permanent," or
24 "irreversible" with respect to alopecia?
25    A    It certainly helps if there's a link to

1 chemotherapy that was received earlier and the
2 occurrence of alopecia that wasn't reversible, and
3 that continued over time.
4        And there was -- there was no evidence of
5 that link.  It just said the patients were treated,
6 and up to ten years later, we then went back and
7 asked questions about hair loss.
8        In the two examples I provided you, some
9 of it, as I said, didn't even make any sense, why
10 radiation to the breast would cause hair loss on the
11 head.  There's absolutely no evidence for that
12 occurring.
13        And the other was about -- given the type
14 of questions they were asking, it seemed like they
15 were asking questions about texture, change in
16 color.  Well, those things we know happened.  That's
17 not pertinent to the issue of do you have hair that
18 doesn't come back.
19    Q   If a study or article includes the terms
20 "persistent," "permanent," or "irreversible" with
21 respect to alopecia in the context of breast cancer,
22 does that, on its own, qualify for inclusion in the
23 Table 2?
24    A   It depends on if, you know, I had other
25 criteria, could I figure out the attribution of the

1 chemo regimen to the breast cancer patients?
2        And as we talked about, there was no
3 reference to the chemotherapy regimen.  The whole
4 point of the exercise is to figure out the
5 attribution.  And if they don't articulate it in the
6 article, I can't -- it's not really usable
7 information.
8    Q   So then you'd agree with me that the use
9 of the terms "persistent," "permanent," or
10 "irreversible" with respect to alopecia in the
11 context of breast cancer is not dispositive in and
12 of itself as to whether a study should be included
13 in Table 2 or not?
14    A   Well, there's additional -- you know, what
15 came up came up on my search.  I mean, some of these
16 did have relevant information.  The Crown one was
17 relevant.  It didn't come up in my search.  I can't
18 explain why, but it didn't.
19        So at any rate, what came up came up on
20 the search based on a very systematic,
21 scientifically sound search for terms for permanent
22 chemotherapy-induced alopecia that was relevant to
23 the chemotherapy that's given to early-stage breast
24 cancer.
25        So I put in the table what I could.  These

1 did not come up on my search, anyway.  So it's not
2 like I saw it and rejected it.  They did not come up
3 on my search.
4    Q   My question is simply whether the use of
5 the terms "persistent," "permanent", or
6 "irreversible" with respect to alopecia in the
7 context of breast cancer is dispositive in and of
8 itself for inclusion or exclusion in Table 2.
9    A   Could you please define the word?
10    Q   Which word?
11    A   "Dispositive."
12    Q   The determining factor.
13    A   Well, it was breast cancer, and it had to
14 have enough quality that you could actually -- you
15 actually had something to look at.  So that's part
16 of the quality of the article.
17        If the article doesn't even have
18 attribution of the chemotherapy, it's not -- it's
19 not usable data.
20        MR. KAUFMAN:  I think those are my
21 questions.  Thank you.
22        THE WITNESS:  Thank you.
23        MR. THORNTON:  Thank you.
24        THE VIDEO OPERATOR:  This concludes
25 today's deposition of Ellen Feigal, M.D.  The number

1 of media used was three and will be retained by
2 Veritext Legal Solutions.  The time is 6:00 p.m.
3 We're off the record.
4        (TIME NOTED:  6:00 p.m.)
5            --o0o--
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 625

1
2
3
4
5
6
7
8    I, ELLEN FEIGAL, M.D., do hereby declare
9 under penalty of perjury that I have read the
10 foregoing transcript; that I have made any
11 corrections as appear noted, in ink, initialed by
12 me, or attached hereto; that my testimony as
13 contained herein, as corrected, is true and correct.
14    EXECUTED this _____ day of _____,
15 2019, at _____, _____.
16    (City)    (State)
17
18
19    _____
20    ELLEN FEIGAL, M.D.
21
22
23
24
   Job No. NJ3189948
25

Page 627

1    ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS
2    800-567-8658
   ASSIGNMENT NO. CS3189948
3 CASE NAME: Durden, Antoinette v. Sanofi S.A.
   DATE OF DEPOSITION: 1/11/2019
4 WITNESS' NAME: Ellen Feigal
5 PAGE/LINE(S)/  CHANGE    REASON
6 ____/____/_____
7 ____/____/_____
8 ____/____/_____
9 ____/____/_____
10 ____/____/_____
11 ____/____/_____
12 ____/____/_____
13 ____/____/_____
14 ____/____/_____
15 ____/____/_____
16 ____/____/_____
17 ____/____/_____
18 ____/____/_____
19 ____/____/_____
20 _____
    Ellen Feigal
21 (Notary not required in California)
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____DAY
   OF_____, 2019.
23 _____
24 __ NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

Page 626

1    I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby
3 certify:
4    That the foregoing proceedings were taken
5 before me at the time and place herein set forth;
6 that any witnesses in the foregoing proceedings,
7 prior to testifying, were administered an oath; that
8 a record of the proceedings was made by me using
9 machine shorthand which was thereafter transcribed
10 under my direction; that the foregoing transcript is
11 a true record of the testimony given.
12    Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [x] was [ ] was not requested.
16    I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or any party to this action.
19    IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21
22 Dated: January 16, 2019
23
24
25    *Carla Soares*
    CARLA SOARES
    CSR No. 5908

Page 628

1    Veritext Legal Solutions
    290 W. Mt. Pleasant Ave. - Suite 3200
2    Livingston, New Jersey 07039
   Toll Free: 800-227-8440  Fax: 973-629-1287
3
4 January 16, 2019
5 To: Magan Ennis
6 Case Name: Durden, Antoinette v. Sanofi S.A.
7 Veritext Reference Number: 3189948
8 Witness: Ellen Feigal    Deposition Date: 1/11/2019
9
   Dear Sir/Madam:
10
   Enclosed please find a deposition transcript.  Please have the witness
11
   review the transcript and note any changes or corrections on the
12
   included errata sheet, indicating the page, line number, change, and
13
   the reason for the change.  Have the witness' signature at the bottom
14
   of the sheet notarized except in California where they are signing
15
   under penalty of perjury and forward the errata sheet back to us at
16
   the address shown above.
17
18
   If the jurat is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21
   Sincerely,
22
   Production Department
23
24 Encl.
25 Cc: Christopher J. Kaufman Esq.

62 (Pages 625 - 628)

**[& - 2018]**                                                                                          Page 1

| & |
| --- |
| **&**   386:15 388:4,12 393:16,19 394:10 394:15 |

| 0 |
| --- |
| **02109**   388:7 |
| **02645236**   513:1 |
| **07039**   628:2 |

| 1 |
| --- |
| **1**   392:14 401:10 477:13 484:14 505:21 527:5 585:11,12 593:15 616:11 |
| **1,478**   613:21 |
| **1,500**   459:2 |
| **1/11/2019**   627:3 628:8 |
| **10**   489:21 496:6 498:16 535:22 |
| **100**   412:12 413:7 413:11,14 414:5 445:5,6 448:1 459:4 570:13 |
| **1000**   387:6 |
| **10036**   387:17 |
| **1095**   387:16 |
| **10th**   466:25 468:2 |
| **11**   384:18 385:20 392:2 535:22 577:6 612:20,22 |
| **1100**   388:14 |
| **11:01**   385:19 392:3,7 |
| **11:42**   428:7,8 |
| **11:53**   428:8,10 |
| **11th**   392:7 |
| **12**   531:8 535:22 580:19 581:21 600:18 601:19 |

609:9
**12-11-18**   390:4
**124,889**   589:5
**12:52**   477:14,16
**12th**   466:25 468:3
**13**   440:24 485:8,13 577:6 580:12 581:4 601:14,14 612:22
**13th**   472:15
**14**   399:19 440:24 470:25 471:20 579:15 602:4
**140**   440:25
**15**   486:12 488:13 490:4 579:21 600:22,24 606:15 609:20
**150,000**   458:8
**156,112**   588:7,8
**16**   389:10 396:10 396:11 400:16 414:9 484:8 489:9 489:12 491:3 492:7,16,23 568:4 619:2 626:22 628:4
**16635**   392:19
**17**   389:13 396:25 397:4 401:17,19 424:16 492:9,16 492:23 502:24 503:5,14,19 510:9 512:5,6 526:18,20 565:17,21 566:15 566:16,17 592:15 607:20 618:11
**17144**   384:9 385:9 392:21
**17410**   384:8 385:8 392:20

**17735**   384:7 385:7
**17th**   418:12 423:5 423:7,23,25 424:6 424:12
**18**   389:16 397:18 397:19,23 398:19 402:4 506:10 535:16,18 586:21 586:23 616:6
**18.5**   609:21
**19**   389:18 399:6,10 399:19,22 415:1,5 415:8,15 431:8 572:10,20 573:1 574:24 575:9 577:13 578:14 580:5 616:15 617:22
**1965**   523:8 524:5,9 539:7
**1984**   433:16
**1998**   506:11 591:15
**1:52**   477:16,18

| 2 |
| --- |
| **2**   401:21 402:14,25 403:13 404:21 408:6,13 409:19 410:12,19 411:2 411:18 412:4,21 413:16,20 414:3 455:14 459:9 468:5 477:19 486:17 487:18,20 488:3 516:7 517:3 519:3 520:15 521:7 555:12 557:11 567:2,6,17 567:21 569:3,22 571:3 575:11,14 576:14 577:14 |

578:4 579:24
580:8 581:7,14,25
585:25 586:2,4
587:2 599:11,12
599:16 605:6
607:6 609:5
610:23 611:1,14
611:24 612:4,24
612:25 614:10
616:2,24 618:16
620:15,22 621:23
622:13 623:8
**20**   389:21 400:5,9 415:4,5,8,16 428:24 431:8 439:23 440:21 441:5 442:1 572:24 579:1,16 586:12 588:22 602:5,13
**20037**   387:7
**2004**   506:10 591:19
**2014**   398:15
**2015**   516:5 517:1 519:1 521:6
**2017**   457:10,12 588:3,12 589:7 618:20
**2018**   401:12,15 414:22 416:22 417:8,10 418:13 420:1,6,22 421:1 421:17 423:6,7,13 424:6,13 427:6 457:15 460:18 463:12 466:1,12 466:13,25 468:3 469:5 471:1,13,19 472:15 473:13 474:1,13 475:4,11

476:7 478:18
535:2 588:3,12,16
589:7 593:18
594:23 595:9
619:3
**2019**  384:18
385:20 392:2,8
588:17 625:15
626:22 627:22
628:4
**202.530.8587**
387:8
**206p**  602:17
**21**  390:3 456:20,21
457:2,3,6,14,17
458:7 585:23
586:11,12 616:5
616:13
**2101**  387:6
**212.641.5665**
387:18
**216.696.2286**
388:16
**22**  390:6 483:2,6
484:2 485:6
486:13 503:3
506:5 510:6
516:12 526:13,20
526:22 527:4,9,13
565:19,21 566:1
**22nd**  474:13
506:11
**23**  390:9 483:19,23
491:14 507:6,7,9
580:20 600:20
601:15
**24**  390:13 507:5,6
507:16 508:22,25
582:22 583:1
585:6 614:20,21
616:14,14

**25**  390:18 589:9,13
590:22,25 591:1
**2555**  386:19
**26**  390:21 463:11
589:9,13 591:5,14
**265**  579:22 580:18
599:22 600:10,16
600:25
**2740**  384:5 385:5
392:22
**27th**  388:6 457:15
460:18 464:3
466:12
**2800**  392:25
**28th**  464:3 466:12
474:13 478:17
**29**  509:7
**290**  628:1
**295**  602:8 603:2
**2:16**  384:7,8,9
385:7,8,9 392:19
392:20,21
**2nd**  476:7,21
575:19,23 576:25
618:15

**3**

**3**  402:11 484:19
486:9,20 488:2,4,5
555:18 579:23
585:11
**30**  407:2,5,22
433:17,20 509:22
517:11 518:3
530:24 536:12
541:16 566:9
**300**  386:7 582:14
602:8 603:3
**31**  506:6,9,25
508:8 561:6,12,22
562:3,5,8,12
589:18 590:10

**316**  512:25 513:7
516:1 518:19,25
546:14 547:3,16
558:11 561:7
**3189948**  384:24
628:7
**31st**  416:21 417:8
419:19 420:1,6,22
421:1,17 422:21
427:6 475:11
**32**  506:7,9 507:1
589:18 590:10
605:22
**3200**  628:1
**33**  512:2,8,20
**34**  508:9,11,21,23
509:1 512:20
526:22 527:4
**36**  513:11 567:3
**384**  384:25
**39**  581:12 600:9,12
601:1,3,12 607:23
**39.75.**  601:10
**394**  389:5
**396**  389:10,13
**397**  389:16
**399**  389:18
**3:21**  555:13,15
**3:52**  555:15,17

**4**

**4**  391:5 398:9,19
414:15 422:9,12
425:22 463:9
488:11,15 489:23
490:7 535:21
568:22 571:14
**400**  389:21
**416**  391:4
**422**  391:5,6,7,8
**438**  576:18

**44**  527:7
**44113**  388:15
**450**  582:13 599:25
**456**  390:3
**4701**  386:7
**483**  390:6,9
**4:26**  584:25 585:1
**4:40**  585:1,3
**4:56**  598:15,16

**5**

**5**  391:4 416:4,17
416:21 422:6,11
423:6 425:3 427:2
457:5,6,11,17
458:25 462:1,6
463:3 466:3 467:2
477:23 484:8,12
485:21 515:9
**50**  563:7
**53**  388:6
**57**  616:13
**582**  390:13
**589**  390:18,21
**5908**  384:23
385:21 626:25
**599**  389:6
**5:15**  598:16,18,24
598:25
**5:16**  598:25 599:2
**5:41**  617:11,12
**5:48**  478:20 479:1
**5:50**  617:12,14
**5a**  417:14
**5fu**  616:15

**6**

**6**  391:6 422:9,10
425:15 427:2,9,12
457:6,17 475:3
476:11 580:7
586:1 592:18,19

593:8
**6-22-98**   390:23
**600**   472:18
**61**   575:16 617:20
   618:22 619:9,16
**617**   389:5
**617.213.7045**
   388:8
**62**   512:22 513:4
**626**   384:25
**63**   512:22,22 513:4
**64108**   386:20
**650**   438:17,25
   439:11,20,21
   440:6,12 441:20
   472:16 474:1
**66**   512:22 513:2,5
**67**   512:22 513:3
**68**   512:22
**69**   512:22
**6:00**   385:19 624:2
   624:4
**6:55**   478:21 479:1
**6th**   594:11

**7**

**7**   391:7 422:10
   426:17 593:11,12
**72**   513:10,12
**7529**   626:24
**7th**   401:12 414:22
   425:11,12 432:7
   432:10,14,20
   457:10 510:22,23
   511:17,18 512:19
   573:11 575:6
   578:22 608:6

**8**

**8**   391:8 422:11
   488:6 535:22
   601:17,19

**8,550**   459:9
**80**   440:5,17 441:23
   460:2 531:13
   588:23 589:2
**800-227-8440**
   628:2
**800-567-8658**
   627:2
**816.474.6550**
   386:21
**86.7**   562:7
**87.6**   512:10,16
   561:9,18
**87.7**   512:10,16
**88**   587:9
**89**   586:3
**8th**   473:13,25

**9**

**9**   488:20 489:20
   495:5 535:22
   581:6,21
**9.2**   561:19 563:20
**92**   561:8
**92.3**   561:18 562:7
**92660**   386:8
**94104**   393:1
**949.748.1000**
   386:9
**950**   388:14
**973-629-1287**
   628:2
**9805**   516:2 518:20
   518:25 546:15
   547:3,17 558:11
   560:18 561:3,16
   562:17 563:10
   564:4 565:3,7

**a**

**a.m.**   385:19 392:3
   392:7 428:8,8

479:1
**ability**   559:7,10,24
   560:2,14
**able**   406:9 409:1
   446:16 453:8
   477:3 558:5 577:4
   578:11 603:24
   609:11 612:15,18
   614:11 620:16
**absolutely**   425:11
   466:21 473:23
   474:5 494:3 501:2
   505:9 609:15
   614:1 621:11
**abstract**   399:15
   557:6 572:11,23
   573:8,18 574:20
   575:3,20 576:1,5
   578:23 582:7
   599:18 601:24,25
   602:7,18,20,22,25
   603:10,16 604:6,7
   608:5,9,21 611:6
   611:15,19 617:25
   618:7,13,18,19,21
   618:25 619:1,7,11
   619:14,20,22,24
   620:4,7
**abstracts**   405:7
   407:6 409:12
   448:15 520:1
   572:12 603:7
**ac**   568:6 569:20,20
   576:24 597:3,7
**access**   446:12
   453:8 501:25
   521:12 551:6,9
**accessdata**   506:21
**accord**   388:11
   394:15

**account**   495:13
   540:20
**accurate**   410:22
   413:2 458:21
   463:19 469:17
   509:20,21
**accurately**   395:10
   458:11
**act**   509:13 511:9
**action**   393:7
   626:17,18
**active**   436:25
   437:1
**activities**   461:12
   461:18 471:13
**activity**   439:18
   530:24 605:23
**actual**   406:21
   472:3 519:20
   593:6 600:13
**add**   458:6 459:12
   504:4
**added**   398:15
   409:9 483:16
   507:10 509:9
   512:21 513:8,10
   513:17,21 589:17
   607:22,25
**adding**   474:8,9
**addition**   446:4
   496:10 501:4,13
   506:6 519:5
**additional**   417:21
   420:10 425:21
   426:8,13 434:4
   489:25 490:9
   504:11,14,17
   517:18 520:23
   547:7 603:3 604:4
   622:14

additions 401:13
address 506:25
  551:5 590:9
  628:16
addresses 590:13
addressing 552:2
adjective 583:22
adjuvant 389:23
  390:14 579:6
  583:7 590:1,23,25
  591:19 605:14
  616:8,22
administered
  394:11 618:24
  626:7
administration
  493:10
administrative
  442:2
admit 412:14
adriamycin 455:7
  567:7,9 569:20
  585:22 596:23
adults 478:15
adverse 443:9,10
  444:18 450:4
  488:21 489:3,15
  489:16 495:21
  502:9 529:19
  530:13 531:5
  532:2,16 533:13
  533:25 534:16
affiliations 393:11
afternoon 429:19
agencies 526:8
agent 544:4
agents 405:15
  570:13
ago 421:11 424:10
  433:4 463:25
  548:10

agree 392:13
  404:7 408:11,22
  411:17 412:4,20
  419:1,11 457:8
  468:9 469:7,11
  470:5 471:18
  475:4 495:20
  496:2,21 500:22
  500:25 501:3
  502:4,14 512:21
  540:18,23 542:20
  546:14,19 554:10
  556:16 567:15
  569:18 575:10
  577:15 587:1,4,16
  590:8 593:20
  594:7,25 596:2,7
  596:20,21 597:1
  599:18 600:5
  608:13 615:6,9
  622:8
agreeable 468:19
agreed 418:3
  473:2 587:19
agreement 412:19
  419:13,15 426:1
  439:15 441:6,12
  521:10
agreements 426:9
  440:2 441:4
agrees 489:24
  490:8
ahead 396:24
  434:11 482:14
  601:7 603:21
airline 460:11
airlines 478:6
al 618:21
alive 561:14
allergic 542:4,7

alliance 398:16
allow 592:23
allowable 609:25
allowed 447:11
  467:19
alopecia 389:22
  404:24 405:17,19
  406:20 407:9
  410:1 411:20
  412:2,23 413:5,22
  417:25 418:14
  423:5,17 424:5,12
  424:18 443:1
  444:15 445:19
  446:7,21 447:3,19
  448:23 449:8
  451:3,5 453:12,22
  455:20,20 456:15
  467:21 516:25
  518:2 522:25
  537:19 538:12
  540:6 541:13,15
  543:8 546:17
  547:4,18 549:24
  550:10 551:3,18
  552:11 553:6,23
  554:15,24 555:22
  556:2,4,13,17
  557:9,18 558:1,4
  558:10,14,19
  559:1 561:5,11,20
  562:4,8,19 563:17
  563:20 564:6
  565:6 579:6,20,24
  580:4,8,11 581:3,7
  581:14,25 582:12
  582:18,18 583:14
  583:17 592:21
  599:21 600:3,15
  600:23 601:4
  605:9,21 606:12

608:14 610:5,9,11
  611:7,8 612:23
  613:8 615:3,12,24
  616:18 620:18,24
  621:2,21 622:10
  622:22 623:6
alternative 449:2
  538:5
amendments
  401:13
american 593:15
  593:20 594:3,13
  594:19 595:1,14
  595:19
americas 387:16
amount 455:24
  458:22 459:14
  588:7 599:21
amounts 426:21
anal 514:24
analee 583:3
analyses 518:14
  558:25
analysis 540:24
  542:22 544:9,14
  545:9 558:22
analyzed 613:22
andrews 386:4
  463:16
andrewsthornto...
  386:10,11
anecdotal 596:25
  597:4 600:5
angeles 478:12,25
answer 391:11
  396:3 416:13
  423:9,20 431:2
  458:11 466:6
  469:23 482:14
  498:4,18 500:8,10
  530:15 536:15

[answer - associated]                                                                  Page 5

537:8,12 545:22
546:1,3 552:23
553:24 555:4,6
559:20 618:3
**answered** 523:16
534:2 563:6 582:4
**answers** 500:2,15
**anthracycline**
567:11,13 569:5
571:5 580:7,19,21
596:11 600:18,19
600:20 601:13
**anthracyclines**
580:5 601:16
**antibodies** 398:24
**anticipate** 395:13
**anticipated** 466:5
**antoinette** 384:6
385:6 392:18
627:3 628:6
**anybody** 431:20
434:4
**anyway** 449:14
482:14 561:11
603:23 623:1
**apart** 518:16
**apparently** 574:16
611:15
**appear** 470:6,13
615:13 617:1
625:11
**appearances**
386:1 387:1 388:1
393:10
**appearing** 460:25
**appears** 490:15
604:13 605:12
**applicability**
599:16
**application** 517:20

**applied** 531:3
**applies** 439:11
**apply** 497:16
519:15 524:16
**appreciate** 410:4
420:15 438:11
**approach** 528:25
551:13
**appropriate**
500:11 502:21
507:22 508:23
531:21 540:4
615:9
**appropriately**
616:2
**approval** 485:19
490:3,11,17
506:10,18 507:2
589:25 590:18,21
591:14,17,19
**approvals** 506:23
**approved** 492:1
531:14
**approximately**
600:22 601:15
**april** 466:24 468:2
468:3
**arbitrary** 571:25
**areas** 517:5
553:19
**arguing** 463:19
**arises** 454:24
**arizona** 494:13,16
495:1
**arm** 561:10
580:18,20,21
**arms** 561:11
580:16
**arrangement**
441:16

**arrangements**
439:6
**arrived** 571:25
**article** 399:12
408:6,13 411:8
414:6 435:22
436:13 437:14,24
438:4,7 534:22
536:7 557:7 573:4
574:2,9,11,17
575:4,5 576:12,19
576:20 577:2,4,24
578:21,23 584:14
584:17 585:13
587:15 597:19
604:25 605:19
606:21 607:4
608:1,4,8,10,15,21
608:22 609:4,6
612:4,7,9,11 613:1
613:3,7,9 614:8,13
614:14 615:2
616:1,19 617:18
617:21,25 618:3,8
619:2,6 620:21,22
621:19 622:6
623:16,17
**articles** 399:13,23
406:14 408:19
411:18 413:17,21
413:23 467:14
535:3 536:3
570:25 571:2
572:19 576:13,17
577:9,25 578:3,7
599:6
**articulate** 622:5
**ascertain** 616:9
**aside** 553:2
**asked** 396:22
401:10,21 402:11

403:8 434:3
437:13 464:19
466:7 473:9
474:19 504:19
525:25 530:21
565:11 576:4
577:1 605:15,16
605:23,24 611:19
617:17 619:13,21
620:13 621:7
**asking** 435:25
459:5 470:11,12
484:22 492:14,15
496:2,21 497:1
499:25 500:4
502:19 503:5
510:19 513:16
514:18,19 519:13
519:14,17 523:2,3
523:21 526:10
531:25 533:4
535:7,9 536:1,6
537:3 538:15,16
543:3 553:20,21
558:7 563:9,14
571:10,11,13
580:14,15 615:14
615:18 617:1
621:14,15
**asks** 416:4
**aspect** 425:6
**aspects** 524:18
**assessing** 523:10
**assessment** 449:22
492:3 493:1
**assignment** 627:2
**assist** 492:5 493:2
**associated** 443:4
444:7,10 446:18
540:3 587:10
597:3

**association** 444:10
445:17
**associations** 452:4
**assume** 396:4
439:17
**assuming** 498:13
615:7
**assured** 400:4
**attach** 528:22
**attached** 391:2
396:12 397:1,20
399:7 400:6
456:22 483:3,20
582:23 589:10
625:12
**attend** 480:1
**attending** 393:9
394:2
**attention** 585:11
**attorney** 386:5,6
386:16,18 387:5
387:14 388:5,13
394:11 473:11
626:18
**attorneys** 473:1
**attributable**
440:17
**attribute** 609:11
**attributed** 611:12
**attributes** 449:20
576:23
**attribution** 406:1
530:22 531:20
533:10 570:6
576:16 609:7
614:12 619:4,16
621:25 622:5
623:18
**audio** 392:11
**august** 418:12
423:5,7,23,25

424:6,12,16
473:13,25 506:10
**author** 436:15
437:13 438:4
573:15 602:11
611:16 612:8,16
614:16,17 618:12
618:24 619:3
620:9
**authored** 534:23
**authorities** 525:1
525:2
**authority** 525:1
594:4
**authors** 416:7
430:6 476:18,22
476:25 477:7
579:17 602:12,24
603:8,9,10,11,12
**automatically**
507:15
**available** 412:22
446:11 454:20,21
455:4 496:9
500:23 520:8
522:9 524:4
552:17 557:6
608:2
**ave** 628:1
**avenue** 386:7
387:16 388:14
**aversion** 605:25
**aware** 402:20,22
419:14 426:11,14
460:5 462:20,22
465:2,4 471:8
542:14 543:25
580:24 619:18
620:2

**b**

**b** 512:9
**back** 395:20
396:21 400:16
406:25 410:6
414:9 426:7 428:9
450:15,21 463:4,5
463:8 477:17
494:18 495:5
498:1 507:7
521:23 523:7,13
523:22 524:5
526:19 528:8
530:8 533:20
539:6 541:18,21
542:18 552:4
553:11,18,20
555:16 559:17
566:15,17 571:20
585:2 591:13
598:17 599:1
607:8 613:15,16
617:13 620:1
621:6,18 628:15
**background**
455:22 469:1
555:21 556:3
**backwards** 553:8
**bacon** 386:15
393:16,19
**baehr** 386:18
393:18,18 456:25
589:23 591:3,10
617:5
**barbara** 384:8
385:8 392:20
**base** 448:12
**based** 402:6
408:15 450:11,18
451:6 455:22
492:3 493:1

510:19 517:11,15
531:18 558:5
581:13,24 599:20
599:22 602:23
607:22,23 615:25
616:25 622:20
**basically** 418:5
424:20 465:21
468:20 505:12
513:14 523:23
540:5 581:22
600:8 602:11
615:23
**basis** 409:22 498:9
515:22,23 620:8
**basket** 519:14
**beach** 386:8
**bee** 542:7
**began** 465:10
**beginning** 385:19
477:18 555:17
583:19
**behalf** 385:17
393:13,16,19,21
393:24 425:19
480:15 481:9
**behavior** 470:22
**beisecker** 583:3
587:2 614:15
616:21
**believable** 562:6
**believe** 399:21
423:14 424:14
425:25 427:8,24
427:25 428:1,23
430:14 443:6
444:24 447:1,16
448:19 452:2,9
460:15 461:15
466:23 472:25
474:10 476:5,22

477:5 504:23
505:22 507:7
528:16 552:1
559:6,22 564:18
569:16 570:12
571:19 573:9
575:6,23 593:8
595:8,19 600:6,8
600:24,25 601:16
602:6,8 603:11
607:24 611:4
612:1,16,20,22
616:1
**belonged** 508:21
**benefit** 451:8
492:4 493:1
592:21
**benefits** 502:7
**berglund** 573:4,19
575:4,9 577:11,17
578:3,16,21
597:19 604:24
607:5
**best** 395:25 427:21
547:15
**better** 564:23
**bias** 540:20,25
542:22 544:9,14
544:22,22,23
545:1,10 546:22
547:6,10,15 554:5
565:9,13
**biased** 411:25
539:17 564:19
**bibliography**
533:17 535:1
595:24
**big** 567:20 572:2
**bigger** 616:16
**biggest** 548:12

**bill** 439:17 440:12
461:17
**billable** 457:18
**billed** 439:19
460:6 461:13
**billing** 426:18
**billings** 588:15,22
**bills** 459:18
**biologic** 443:24
519:9 529:3 538:9
539:14 548:15,19
548:20 606:4
**biologics** 531:17
**biostatistical**
559:5,11,22 560:1
560:11,14
**biostatistician**
463:17,22
**bit** 395:19 400:2
412:20 458:18
497:15 515:13
551:7
**blinding** 547:8
**blood** 584:2
**board** 398:4
**boards** 398:10
**bodies** 551:24
554:9 562:23
563:2
**body** 410:25
411:10 443:7,9,14
450:25 468:4
505:9 516:8,11
529:13 532:14
550:1,22,22
552:13,17 553:15
553:16 554:8
**bone** 609:24 610:2
610:2
**book** 619:1

**booked** 478:15
**booking** 478:1,6
478:12
**borrow** 487:5
**bosserman** 400:15
421:15,17 425:4
433:2,3,15,20
434:8,14 435:14
435:22 436:24
437:13,21,23
438:6 441:6,11
442:5 592:13
597:21 602:5
**bosserman's** 425:5
433:23 434:19,23
435:1,8,18,19
441:19 476:4
**boston** 388:7
**bottom** 407:15
459:1 485:21
489:20 490:4
492:8 577:8
585:11 628:13
**boulevard** 386:19
**bradford** 523:8
524:13,16 525:11
526:4 539:7 548:9
**brain** 609:21
**break** 396:6
458:16 477:10
555:10 587:18
**breaks** 396:7
**breast** 389:24
390:15 399:4
405:21 410:3
411:20 412:24
413:21 416:19,24
417:21,22 419:20
419:25 420:6,21
421:12,20 434:5
456:4 527:15

543:6,7 557:13
570:14 571:21
572:6 579:7 583:8
583:11,15 590:2
591:17 592:23
594:23 596:12,16
596:17 605:14,14
606:6,7 607:13
608:18 609:8,9,15
609:23 610:1,3,19
610:20 615:6
616:23 621:10,21
622:1,11,23 623:7
623:13
**brief** 431:24
560:17
**briefly** 573:5
585:9
**broad** 405:16
426:4 467:20
518:13
**brought** 510:12
609:18
**bryant** 387:15
**bulk** 430:13
**bunch** 519:23
**business** 420:12
439:25 440:3
442:3 461:19
462:11,25
**busy** 424:2 433:11

**c**

**c** 386:5 392:5
488:10,14
**caf** 585:15 616:14
**calculated** 587:24
589:1
**calculation** 549:17
**calendar** 420:23
421:10 466:10
479:16

**california** 384:2
384:17 385:2,18
386:8 392:1 393:1
626:2 627:21
628:14
**call** 428:23 431:13
431:17,18,20
446:18 463:21
464:13 542:4
543:12 610:19
616:21 619:19
**called** 430:20
464:12 485:16,18
499:6 504:11
**calling** 601:25
**callsen** 388:13
394:14,14
**cancer** 389:24
390:15 399:2,3,4
405:21 406:2
410:3 411:20
412:24 413:21
416:19,24 417:21
417:22 419:20
420:1,6,21 421:12
421:21 434:5
456:4,8 467:20
518:4,5 523:12
527:15 531:8,12
531:13,15 532:11
543:6,7 557:13
570:15 571:21
572:6 579:8 583:9
583:11,15 590:2
591:17 592:23
593:15,18,20,22
594:3,12,13,19,23
594:24 595:1,14
595:16,19 596:12
596:16,17 605:14
605:15 607:13

608:19 609:8,9,12
609:15,23 610:1,3
610:20,20 615:7,9
616:23 621:21
622:1,11,24 623:7
623:13
**capacity** 439:12
439:18 480:8,14
**captured** 460:12
557:11 564:1
597:9 619:12
620:10
**care** 518:4 592:10
**carefully** 578:11
**carla** 384:22
385:20 393:3
626:25
**case** 384:7,8,9
385:7,8,9 392:18
392:19,20 402:12
402:23 414:11,20
418:11 444:13
446:1,2 447:20
448:13 449:15,25
450:2 453:14
495:24 496:19
497:1,10,13,14,23
498:12,22 499:6,8
499:12 517:25
524:25 531:4
532:4,13 536:24
537:1,2,4,6,10,14
538:4,11 539:21
543:5 549:5 557:5
591:24 592:11
593:5 614:18
626:14 627:3
628:6
**cases** 430:10
442:12 446:23
449:4,6 473:8

499:3 541:6 592:4
592:5 593:6 596:3
596:8,22,24 597:2
597:4,4,6,12,22
**cassia** 388:20
393:2
**category** 398:9
**causally** 443:4,4
444:6,10,10
446:18,18 540:3,3
**causation** 443:5
443:17 444:7
445:4 448:3 451:2
515:12,24 516:23
517:7 519:7,12
520:5 521:4 523:5
523:10,25 524:11
524:22,25 525:13
526:9 527:19,23
527:25 528:2,13
528:24 534:25
536:10,12,12,25
537:14 539:1,3,4
540:12,19 541:3,5
541:10 544:12
548:11 549:23
551:12 552:22
554:17 557:15
558:23 559:4,21
562:18 563:4
**causative** 540:2,5
**cause** 450:3 453:5
537:18 542:7,10
543:4 544:1
548:21 606:7
610:4,9,11 621:10
**caused** 456:9
531:5 532:1,11,15
538:21 541:8
**causes** 443:1,10
444:18 447:3,18

447:18 448:23,24
452:12 516:24
518:1 522:25
529:19 530:12
533:13,24 534:15
543:19 548:16
550:10 551:2,17
552:10 553:5,23
554:14,23 562:18
563:16 564:5
565:6
**caveat** 413:6
**cc** 628:25
**cell** 392:11
**center** 390:18
576:22
**certain** 404:18
439:8,8 450:11
466:21 504:19
538:20 554:4
**certainly** 451:24
461:19 520:12
530:18 533:14
548:20 556:9
620:25
**certified** 385:21
626:1
**certify** 626:3,16
**challenging**
605:12
**chance** 500:1
538:2 540:20,25
542:22 544:9,14
545:10 572:17
585:8 599:8 605:2
**change** 398:8,12
409:7 426:5 465:2
465:25 470:22
505:23 506:3
507:14 509:7,24
510:17 511:2,13

511:24,25 512:13
515:10 532:12
541:18,19,20
568:12,20 576:5
590:13 594:7
611:19 621:15
627:5 628:12,13
**changed** 430:18
506:4 507:12
514:17,25 527:12
560:25 592:25
607:19
**changes** 401:15
409:15 483:10
503:15,25 504:22
505:4,7,9,11,16,19
506:1 507:9,15
510:18 513:25
514:11,14,19,20
541:17 603:14
628:11
**changing** 404:2,4
514:22
**characteristics**
613:13
**characterize** 433:7
462:24
**characterized**
474:25
**charge** 420:14
**charged** 457:20
459:15 474:3
**chearly** 430:17
**check** 459:18
460:16 571:20
**checking** 589:24
**checklist** 525:13
525:16
**checks** 481:19
**chemically** 405:16

**chemo** 448:25
452:13 622:1
**chemotherapies**
531:17
**chemotherapy**
389:23 390:14
404:25 405:15
406:2,20 407:9
410:2 411:21
412:2,24 413:4
453:12 537:18
538:13 543:9,17
543:19 556:17
557:8 558:4
561:12,23 562:9
569:19 570:12
571:13 576:23
579:7 583:8
585:12 586:10
592:21 600:15
601:4 605:21
606:25 609:7,10
610:5,8,21 611:7,8
613:8 615:3,16
616:8,22 621:1
622:3,22,23
623:18
**chief** 451:12
**choice** 593:1
**choose** 499:15
**choosing** 478:4
**chose** 403:12
**christopher**
386:16 393:15
628:25
**chronic** 583:14
**chronological**
457:9
**circumstances**
439:6

**citations** 494:24
503:13 520:19,23
**cite** 495:2 505:7
506:9,25 520:11
525:22
**cited** 516:7 517:2
519:3 520:15
526:10 555:25
556:11 575:11
577:14 578:4
594:2
**citing** 505:12
**city** 386:20 625:16
**ckaufman** 386:22
**claim** 411:9 413:7
471:21 538:20
**claiming** 413:13
**clarification** 477:1
612:19,20
**clarifications**
429:5 430:12
**clarify** 509:19
515:15 612:13,15
612:18
**clarity** 504:4
**clean** 578:2
**clear** 395:21 411:7
412:18 491:22
520:14,18 522:15
545:15,17,21,25
545:25 546:3,5
550:13 560:10
563:1 569:8 588:2
591:25 592:3
606:14 614:4
616:17
**clearer** 430:11
**clearly** 405:8
427:16 430:9,18
469:20 511:23
544:25

**cleveland** 388:15
**client** 466:19
470:19 471:17
479:22
**clients** 469:15
479:20
**clinic** 456:7
**clinical** 389:19
407:4 408:17
416:8 445:24,24
446:5,8,13 448:14
450:11 451:9
453:9 454:8,21
468:15,16 490:22
512:25 513:6
516:1,5 517:1,1
518:19,25 519:1
521:6,6 527:16
532:18,23 536:13
544:20 547:5,14
547:19 548:4,24
548:25 549:19
550:15 551:9
557:3,21,23 558:5
558:8,15 562:23
564:21
**clinician** 407:3,23
449:16 451:7
536:13
**close** 475:25
598:13
**cmf** 569:21 585:15
597:13,20,22
616:13
**coan** 388:5 394:8,8
**code** 516:17,19
**coded** 608:21,24
**coffee** 436:5
**cohort** 445:25
549:1 575:15
617:20 618:23

619:2,16 620:8
**colleague** 433:9,13
  499:1,10
**collection** 399:22
**collectively** 457:17
  459:6
**college** 451:19
  487:4 494:6,12,15
  495:1
**color** 541:19
  587:11 615:14
  621:16
**colorado** 478:13
**colored** 491:16
**colors** 491:16
**column** 453:18
  462:4,6 567:20
  568:13,23 607:23
**columns** 568:19
  568:25 570:24
**combination**
  405:19 448:25
  517:4 570:13
  571:12,18,23
**combine** 567:24
  615:4
**combined** 586:24
  587:24
**combining** 615:17
**come** 442:7 446:17
  449:18,22 470:3
  474:1 489:1 520:1
  521:9 529:9
  546:12 608:16,25
  621:18 622:17
  623:1,2
**comes** 541:18,21
  542:3
**comfortable**
  471:10 496:18,23
  497:4,6,12 498:5

**498**:21 499:21
  519:19
**coming** 613:15,16
**comment** 466:4
  495:25 502:11,15
  557:16 558:21
  578:11 580:13,14
  580:15,16 581:1
  584:18 595:11,12
  612:12 615:1
**commentary**
  582:21
**commented**
  604:23
**commenting**
  562:14 606:24
**comments** 592:4
  599:8 614:23
**commission**
  627:25
**commitment**
  436:23
**commitments**
  489:23 490:7
**committee** 398:18
**common** 487:8
  488:4,17 603:13
**commonly** 548:4
  570:14
**communicate**
  444:2,21,25 445:2
  451:14,15 455:25
  516:21
**communicated**
  424:6 437:22
  575:22
**communicating**
  436:7 443:14
  451:7
**communication**
  417:2 420:5

**425**:12 442:20
  443:8 451:4,21
  452:4,14 455:18
  516:16 611:17
  619:6 620:6
**communications**
  416:5,18,24
  419:25 420:21
  423:4 424:11
  425:3,17 437:5
  476:21
**comorbid** 546:25
**comorbidity**
  547:12
**companies** 443:25
  451:13 454:6
  480:16 501:2
  516:20 530:21
  547:20
**company** 398:4,5
  398:10,22 438:24
  439:4,16 441:22
  444:20 446:12
  454:13 489:24
  490:8 498:11
  530:1
**comparable**
  610:21
**compared** 565:24
  582:14 600:3
**compelled** 552:22
**competitor** 502:1
**compilation**
  572:19 575:9
**complaint** 449:19
**completely** 497:14
  573:3
**completion** 626:14
**comprehensive**
  411:19 412:5,21
  413:12

**compulsive** 514:24
**conceive** 430:22
**concerning** 592:1
**concise** 491:23
**conclude** 529:18
  530:12 551:2,17
  552:9
**concluded** 531:5
  532:1
**concludes** 623:24
**conclusion** 450:5
  518:1 519:16
  532:15 553:5,22
  554:13,19 564:5
  592:19 593:7
  602:23 604:11,13
**conclusions**
  526:15 528:6
  534:25 546:12
  562:18 563:15
  605:25
**condition** 445:13
  547:1
**conditions** 546:25
  547:11
**conduct** 407:24,25
  489:24 490:3,8,17
**conducted** 471:13
**conference** 470:19
  471:16 602:15,21
  603:14 604:8
**conferences**
  603:25 604:2,9
**confidential**
  454:13 471:6,9
  482:4,5,9,11,25
  495:24 496:19,25
  497:3,8,24 498:8
  498:14 499:2
  521:13

confidentiality
  482:7
confirm 426:7
  458:21 486:20
  488:1,4
confirming 478:6
conflict 499:4
conflicts 481:20
confounded
  543:17
confounder 541:9
  542:14
confounders
  543:13 565:11
  610:13,13
confounding
  540:21,25 542:22
  544:10,15 545:10
  546:16
confused 543:20
  543:21,22,23
confusing 412:20
  613:9
congenital 543:23
congress 618:21
  619:10,13
conjunction 568:8
  583:13
connection 401:23
  426:20 428:4
consents 451:10
consider 404:19
  404:21 434:12
  456:14 482:24
  520:5 521:17,25
  538:6 543:14
  544:5 578:11
considerable
  604:14
consideration
  454:17

considered 402:13
  402:24 403:5
  409:18 410:10
  414:12,21 515:25
  516:23 521:8
  553:3 557:15
  586:11
consistency
  443:22 445:20
  446:15 529:3
  538:8 548:22
  549:7 550:2,6,17
  550:19 551:22
  552:19,23 553:2
  565:3
consistent 450:23
  470:8,11 471:14
  510:4 511:17
  515:3 540:12,14
consisting 519:11
constantly 409:12
consult 494:1,14
  494:17
consultant 418:6,7
  418:10 530:20
  588:4
consultants
  440:25
consultation 424:9
consulted 480:15
  481:14
consulting 418:25
  419:8 425:15
  426:2,3,6 434:1
  441:6 442:12
  458:1,24 460:19
  480:14,18,20,25
  481:8 482:2
consults 480:8
  481:9,17

consumers 492:1
  492:19
contact 433:25
  434:7 477:3
contacting 477:6
contain 404:22
  452:23,24 496:12
  501:6,15 540:24
  542:21 558:12
contained 446:6,7
  493:7 516:6,12
  519:2 522:11
  529:4,13 625:13
containing 453:1
  453:16 568:15,16
  568:17 569:24,25
  570:4,5 571:8,9,15
  571:16 572:4,5
  582:19 600:4
  613:24,25
contains 571:14
contemplated
  417:10
content 440:1
  493:10 544:21
  619:7
contents 505:18
  505:21,24 506:1
context 430:18
  435:11,24 444:3
  452:18 495:20
  497:22 529:20
  530:13 538:14
  542:1,12,13 543:5
  543:10 621:21
  622:11 623:7
continue 392:12
  428:12
continued 388:1
  389:10 396:18
  621:3

continuity 606:19
contracts 425:15
  426:8
contributes 564:4
control 496:13
  501:7,16 516:1
  544:21,22,23
  546:16 547:6,15
  561:10
controlled 445:23
  452:21 517:1
  518:19,25 521:5
  532:21,23 544:20
  546:15 547:9
  549:18 550:14
  557:20,23 558:8
  564:17 565:9
controlling 547:4
  547:10
controls 545:1
conversation
  421:10 436:2
  437:23 443:5
conversations
  392:11 435:25
copies 416:18
  420:5 423:4 425:3
  425:8 456:23
  589:22
coping 584:4
copy 397:9 402:1
  429:23 483:5,8,14
  483:22 491:17
  503:8,18,23
  509:25 510:12,14
  510:17,18,23
  511:1
copyrighted
  485:10 526:4
correct 398:18
  399:25 402:2,4,5

[correct - cumulative]

402:10,19 403:10
408:25 412:6
414:4,24 415:2,25
421:18 423:8
427:3 430:7 431:7
431:9,12 438:18
438:20 441:21,25
442:17 452:6
455:8,14 457:16
457:19,23 459:3
459:10,12,13
460:3,21,24 461:2
461:8,10,14 465:6
469:10,22 472:20
473:9,10,11
474:24 475:1,6,12
478:8,14,16,18,19
478:22 479:1,7,10
479:12 481:5,7
497:16 503:10,12
503:15 504:20
506:1,7,8,11,14,15
506:19 507:2,18
507:20 509:15
510:24 511:4
513:22 516:8
517:3,18 519:4,5
522:1 526:2
556:12 568:13,23
571:6 575:1 576:2
576:7,8 578:1,5,6
579:8,9,21,22
580:1,2,5,8,12
581:4,7,10,12,15
582:1 583:9,10,12
585:6,7,16,20
586:5,8,9,13,14,17
586:23,24 587:3
588:9,13,19 589:2
589:8 591:15,16
591:20 592:11

593:10,19 594:5
596:13 597:8,13
602:1 611:11,21
613:5 618:11
620:19,19 625:13
**corrected** 473:1
511:12 515:7
566:9 618:25
625:13
**correcting** 430:5,7
430:7
**correction** 473:2
619:19,22
**corrections** 428:17
429:2,2 430:3,15
514:6 625:11
628:11
**correctly** 427:11
495:18,19 496:17
498:3,17 500:5
575:17,25 576:1
577:9 584:9 593:2
593:3 611:10,12
611:23 619:4
**correspondence**
575:18,24 577:1
**costs** 440:23
**counsel** 392:16
393:9,21,22
394:17 417:22,25
418:22 423:9
426:10,15 428:19
428:25 429:6,6
431:14,17 432:3,5
432:11,15 434:10
457:21 458:2
459:15 460:7
461:4,13,17
462:17 470:7,14
474:4 479:17
480:2 483:17

500:15 503:22
560:1,2,5,11,13
566:5,8 599:7
612:17 617:17
620:13
**count** 572:22
573:2 574:21
**counted** 514:21
**counts** 575:12
584:2
**couple** 399:16
428:25 431:13
460:11 579:11
603:12
**course** 403:24
431:2 441:18
447:6 487:3
523:11
**court** 384:1 385:1
392:22 393:3
394:19 417:3,6
429:13 471:9
552:3
**cover** 457:18
**covering** 467:19
**crawford** 392:25
**created** 398:9
**credibility** 482:5
595:18
**credible** 595:20,21
**credulity** 561:21
562:2 563:11,19
564:1
**criteria** 405:2,6,8
405:13 406:4,14
407:11,17,19
408:5,6,11,22
411:6,16 414:1
443:19 444:8
445:7,8,10,11
447:25 448:1

449:11 489:7,13
489:19 517:20
519:6 522:21,24
523:7,10,14,15,18
523:24 524:3,14
524:16,19,20,23
525:4,12,16 526:3
526:6,9 527:23
528:1,13 529:18
530:11 531:3,22
532:2 533:9
534:24 536:9,17
536:24 537:4
539:5 545:2
549:10 552:21
554:2,7 621:25
**critical** 451:22
548:14
**critically** 456:16
**criticism** 561:4
**criticisms** 560:20
561:2
**crossed** 510:11
**crown** 573:17
575:9 577:11,17
578:3 581:13,24
599:14,15 600:14
600:16 601:24
604:20 607:8,9,10
622:16
**cs3189948** 627:2
**csr** 384:23 626:25
**culbertson** 388:4
394:10
**culled** 595:23
**culling** 598:6
**culpa** 514:7
**cumulative** 455:16
550:1,22 582:13
599:25

curly 541:20,20
current 424:7
  465:4 483:11
currently 434:6
  510:2 511:7,9
curriculum
  389:16 397:24
  402:1
cusker 387:14
  394:3
cv 384:7,8,9 385:7
  385:8,9 392:19,20
  392:21 398:1,7
  535:11,20
cycle 485:17
cyclophosphami...
  455:7 567:14,23
  568:7 569:9,20
  571:5 596:9,11
cytotoxic 444:14
  531:16 543:9,17
  543:19
cytoxan 585:22

**d**

d 392:5
data 402:13,23
  404:22 414:12,20
  448:17 453:10
  454:1,7 455:11,11
  506:22 508:22,24
  515:25 517:9
  518:18,24 519:15
  519:17,20,21
  520:4,7 521:3,8,10
  522:11 530:21
  532:17 539:18
  549:4,20,21 550:7
  550:15,16,25
  551:11,16 552:8
  554:7,12,16,25
  555:7 557:4 558:6

562:24 563:12,21
563:21,24 564:4
564:16,16,18,20
564:22 565:5
568:4 572:2 573:1
577:24 581:13,24
593:24 594:20
595:15,18,23
599:21 601:18
602:6,24,24
603:14,15 604:12
604:15,18 606:3
607:6,10 610:18
610:25 611:23
612:3,6,24,25
614:9,12 616:2,20
623:19
database 409:9
databases 441:2
dataset 563:14
date 398:15
  401:12 414:21
  415:7,17 418:13
  426:25 435:4
  461:4 464:22
  467:16 472:13
  473:5 590:11
  626:19 627:3
  628:8
dated 390:4,23
  416:21 420:1,6
  421:1,16 457:9
  466:24 626:22
dates 506:23
david 390:10
  478:7,9,10 479:11
  479:18,20 480:1
  484:8,12 485:21
  486:24 488:6,19
  489:20 491:3,8,14
  493:8,22 494:1

495:5 496:7 497:2
  498:8,16
davis 386:6 393:13
  427:8,13 429:17
  429:24 431:19
  566:5,8,12 589:22
  590:15
day 417:2,9 418:2
  418:4,5,13 423:8
  423:10,14 428:15
  431:4 451:19
  464:14,16,18,20
  465:13 466:1,6,9
  466:22 467:13,15
  467:17 468:7,10
  469:8,13,19 470:2
  470:6,13 471:2,7,8
  471:10,12,12,20
  471:22 472:6,6,7,7
  472:8,8,12,13
  478:21 479:2,4
  487:3 494:6,12
  504:1 561:6 562:5
  562:12 625:14
  627:22
days 416:3 465:20
  504:8,13 561:12
  561:22 562:4,8
  628:18
dc 387:7
deal 535:20
dear 628:9
decades 523:13
december 401:12
  414:22 425:11,12
  427:18 432:7,10
  432:14,20 460:23
  461:1,15 510:22
  510:23 511:17,18
  512:19 513:24
  535:2 573:11

575:6 578:22
  588:16,18 604:24
  608:6,10
dechert 387:13
  394:4
dechert.com
  387:19
decide 591:6
decided 566:12
deciding 418:10
decision 426:5
decisions 492:5
  493:3 592:1,24
deck 464:13,16
  466:13,17 495:3
declare 625:8
deemed 628:19
deep 518:13
defendant 386:14
  387:3 388:3,11
  393:16
defendants 385:17
  387:12 392:16
  481:14
defense 483:16
  559:25 560:2,13
  612:17
define 544:25
  623:9
definition 550:18
  551:23
degree 453:5,6
  600:2
delay 461:23
deleted 421:8
  511:1,4
deletion 507:17,19
deletions 401:13
deliverable 466:19
delivery 429:18

**denver** 478:12,21
  479:1,3,4,5,22
**department**
  628:22
**depended** 562:23
**depending** 481:13
**depends** 621:24
**depo** 429:2
**depose** 393:25
**deposition** 384:16
  385:16 389:11
  392:15,24 396:18
  399:20 400:13,17
  401:12 403:7
  404:8,17 414:22
  414:23 415:7,16
  415:16,18,23
  416:13 417:1
  427:2 428:15,16
  428:20 431:4
  432:6,12,20
  434:18 436:1
  438:21,25 439:8
  456:19 460:13,15
  460:23,25 461:5,7
  461:9 465:20
  468:14 477:13,19
  503:11 504:1,18
  507:20 510:22
  512:19 513:23
  514:4 524:13
  538:25 544:19
  555:3,12,18
  573:11 575:6
  588:16 604:24
  605:1 608:5
  623:25 626:13
  627:3 628:8,10
**depositions** 399:24
**depth** 605:3

**dermatology**
  573:9
**describe** 433:1
  466:20 468:3
**described** 401:22
  506:18 584:2
**description** 389:9
  390:2 462:4,7,9,25
  466:12 474:14
  609:10,16
**descriptions** 568:3
**descriptor** 420:14
  420:16 613:15
**design** 463:23
  547:6
**designed** 548:24
  549:1
**designing** 407:4
  451:9
**designs** 468:17
**detail** 400:2 409:4
  454:9,10,14
  469:18
**detailed** 454:16
  496:12 501:6,15
**details** 423:25
  481:16
**detect** 570:17
**determine** 420:20
  444:9 530:22
  533:10 539:14
  547:22 550:17
  610:18 620:16
**determining** 519:7
  539:12 623:12
**develop** 398:24
  487:4
**developer** 407:3
  407:23 408:18
  536:14

**developing** 468:4
**development**
  398:25 416:9
  451:9 455:23
  468:17 484:24
  485:4,9,15,17,17
  487:5,10 488:3,18
  491:1 496:11
  501:5,14 517:5
  518:5 529:22
  530:19 531:10
  533:8 535:4,25
  536:2,19 540:6
  547:20
**device** 480:9,16
  481:10
**diabetes** 543:21
**diagnosis** 449:6
  541:23 542:6
  543:1,12
**difference** 443:6
  509:5 521:20
  570:3,9,17 572:3
  580:23
**differences** 401:14
  487:23 492:15
  603:1,6
**different** 406:11
  418:22 439:5,5,6
  443:22 445:21
  446:16 449:25
  453:23 465:8
  473:24 474:2
  477:6,7 488:23,24
  491:16 495:9,15
  508:16 512:24
  513:8 516:9 523:9
  524:20 529:1,1
  533:4,15 550:6,19
  550:21,21 551:24
  552:19,24 554:2

  563:2,3,5 572:18
  580:17 587:11,11
  604:1,9 605:22
  613:12,21 614:1
**differential** 449:6
  541:23,24 542:6
  542:11 543:1,12
**differently** 430:10
**difficult** 552:22
**digest** 520:1
**dinner** 523:8
  524:3
**direct** 484:7
  493:13
**directed** 491:25
  508:6
**direction** 563:22
  626:10
**directly** 410:24
  460:3 489:1
  496:11 501:4,14
  507:1
**disagree** 419:1,18
  435:17 496:2
  502:14 597:23
  598:3
**disclosed** 520:17
**discrepancy**
  575:19 611:18
  620:7
**discuss** 419:4,5
  473:19 557:15,24
**discussed** 436:3
  472:25 510:13
  592:25
**discussing** 407:8
  534:23 543:11
**discussion** 444:4
  524:2 540:24
  542:21 544:9,14
  545:9 558:12

560:17 592:22
604:22 614:24
**discussions** 419:15
**disease** 502:8
548:6
**diseases** 399:1
**dispositive** 622:11
623:7,11
**disproportionately**
580:17
**dissect** 605:12
**distinction** 522:5
537:7
**distinguish** 572:8
**distributed** 547:1
**district** 384:1,2
385:1,2 392:21,22
**divorce** 581:16
**docetaxel** 384:4
385:4 392:17
443:1 447:3,18
448:22 451:5
455:21 509:9,12
509:15 516:24
521:17,20 522:6,7
522:13,16 549:23
550:9 551:2,17
552:10 553:5,22
554:14,20,23
556:18 557:10,17
557:25 558:13
559:1 562:18
563:16 564:5
565:6 568:15,23
569:9,15 570:18
570:23 572:9
579:21,23 580:18
581:12 582:9,11
582:19 599:20,22
600:4,17,24 601:5
607:22

**doctor** 413:16
417:15 470:5
531:25 539:20
581:2 598:19
606:14 617:2
**doctors** 442:21
443:8 445:3 451:4
452:4,14 455:18
592:2
**document** 384:5
385:5 389:13,16
389:18,21 390:6,9
390:13,18 396:14
399:10 426:1
475:2,8 483:25
484:1 567:15
590:4,8
**documentation**
418:16 420:8
424:11
**documented** 569:4
612:8
**documents** 397:4
402:11,17 414:10
414:19 419:18,21
425:16 426:19
432:21 464:7
589:13
**doing** 406:4
408:15 409:24
411:15 446:22
449:4,5,14,24
450:8 468:19,20
472:5 480:22
481:2,3 496:24
497:9 498:5,23
517:7 518:13
538:14 539:25
541:23 570:23
606:10

**dose** 443:21
445:16 519:9
529:2 539:12
549:9 554:3
561:12,23 562:8
582:8,11,13
599:23,25 600:3
607:15 610:8
**dosing** 538:8
**double** 463:6,7
547:8 557:22
564:12
**downloaded**
590:15
**doxorubicin** 569:5
569:9
**dr** 393:20,25 394:7
394:13,25 399:20
400:15 408:20
415:11,15 417:3
418:23 421:15,17
425:4,5 428:12
430:2 433:2,3,15
433:20,23 434:8
434:14,19,23
435:1,8,14,18,19
435:22 436:24
437:13,21,23
438:6,12 440:16
441:6,11,19 442:5
476:4,23,23,23
477:22 490:15
492:14 500:22
501:19 502:22
536:2 544:8
555:21 559:6,11
559:23 582:5
585:5 587:18
592:9,9,10,13
597:21 599:5
602:5 612:15,16

617:17
**draft** 464:7,15,17
466:2,22 470:17
475:11,15,22
511:20
**drafting** 464:10
472:1,2 474:21,23
494:22
**drafts** 410:13,16
**draw** 494:21 518:1
521:1 562:18
563:15
**drawing** 522:4
**drug** 390:18
443:10 444:18
450:3 482:10
484:19,21,24
485:4,9,15,17,18
486:9,11,19,21
487:3,5,10,25
489:4,17 490:20
491:1,24,25
492:17 493:10
494:5 496:11,13
501:5,7,14,16
502:5 529:19
530:12,17 531:4
531:22 532:1,15
533:13,24 534:15
539:2 542:5
618:23
**drugs** 448:25
450:11 452:13
453:13 485:3,14
492:19 531:7,10
531:13 533:9
536:5
**due** 434:25 435:2
435:3 561:4
**duplicate** 604:1

**duplicative** 508:18
577:23
**durden** 384:6
385:6 392:18
627:3 628:6

**e**

**e** 392:5,5 416:18
416:23 419:25
420:5,19,20,21
421:1,2,5,7 423:4
476:8,18,21 478:1
478:5 575:18,23
576:25 611:17
612:8,13 618:13
618:15 619:12
620:9,11
**earlier** 445:7
453:11 497:15
513:13 515:13
535:13 557:1
565:11 611:16
621:1
**early** 389:24
413:21 527:14
532:11 557:13
570:14 571:21
572:6 579:7
588:19 592:23
607:13 609:14
610:20 622:23
**earnest** 384:8
385:8 392:20
**easier** 573:16
**easily** 409:6 525:9
571:10
**eastern** 384:2
385:2 392:22
**easy** 507:3 514:5
**editor** 436:9
**educate** 465:15
469:1

**educating** 465:22
468:21
**education** 407:4
517:15
**educational** 588:5
**effect** 443:23
444:24 445:14
456:1,2,13 586:7
586:22
**effective** 450:12
450:14 491:24
530:3
**effectiveness**
484:20 486:10,21
487:25 488:1
**effects** 390:13
583:7 586:4,13
587:8,9 606:23
616:21
**efficacy** 534:19
536:4,19 547:22
548:5,7
**eggs** 519:14
**eight** 572:18,21,22
602:12 603:9,11
**either** 419:19
426:15 430:8
431:23 445:18
481:12 547:16
565:25 600:17
617:4
**ellen** 384:16
385:16 389:3,11
389:14 390:7
392:15 393:20
394:20 477:13,19
479:8 555:12,18
623:25 625:8,20
627:4,20 628:8
**ellis** 388:12 394:15

**emergent** 443:25
**emotional** 584:6
**emphysema**
523:12
**employee** 626:17
**encl** 628:24
**enclosed** 628:10
**encompass** 517:17
**encyclopedia**
502:6
**endocrine** 543:22
**endpoint** 547:22
547:23,24 548:7
**endpoints** 547:16
548:5
**energized** 437:3
**engaged** 436:25
437:1
**engelhardt** 417:11
**english** 403:23,25
404:15 575:3
578:22,24 608:5,7
608:9,12
**enjoyed** 436:5
**ennis** 628:5
**enter** 462:10
**enters** 462:9
**entire** 395:17
402:7 544:17
588:11 589:5,6
608:22
**entirety** 492:22
506:25
**entitled** 389:13
390:6,9 500:14
586:4
**entries** 464:2,10
466:22,24 467:4
468:2 469:8,12
475:5

**entry** 398:2,3,16
416:21 421:16
463:11 472:15
473:14,25 475:10
476:8 477:2
**enunciate** 430:8
**errata** 429:4
523:23 627:1
628:12,15
**erroneous** 511:20
**erroneously**
508:21
**error** 511:19
514:8 619:20
620:4
**erythropoietin**
532:5
**esq** 628:25
**essential** 492:2,25
**establish** 522:24
524:22 551:12
**establishes** 552:14
**establishing**
554:17 555:1
**estimate** 433:14
458:8
**et** 618:21
**ethical** 498:11
499:19 500:13
**ethically** 500:10
**ethics** 451:18
498:25 516:20
**evaluate** 444:9
449:10 530:3,21
**evaluated** 517:13
517:15 540:15
**evaluating** 451:11
517:8
**evaluation** 390:19
518:9 524:9

| | | | |
|---|---|---|---|
| **event** 443:9,11,20 | 526:17 562:10 | 457:2,3,5,11,14 | **experienced** |
| 444:11,19 445:21 | 570:1,23 | 458:7,25 459:1 | 404:23 406:19 |
| 450:4 454:24 | **exam** 449:10 | 462:1,6 463:3 | 579:24 580:8 |
| 471:4 488:21 | **examination** 389:3 | 466:3 467:1,2 | 581:7 587:8 |
| 489:3,15,16 | 394:23 599:3 | 470:25 475:3 | **expert** 389:13 |
| 495:21 518:10 | 617:15 | 476:11 477:23 | 390:6,9 397:7,9 |
| 529:19 530:13 | **examined** 394:21 | 483:2,6,19,23 | 400:12,14 401:11 |
| 531:6 532:2,16 | **example** 404:21 | 484:2 485:6 | 402:14 403:5 |
| 533:13,25 534:16 | 439:1 445:22 | 486:13 491:14 | 408:7,14 415:11 |
| 548:13 | 450:10 495:13 | 502:24 503:3,14 | 415:14 418:3,10 |
| **everybody** 564:1 | 531:3 532:1 | 503:19 510:5,8,9 | 418:15,24,25 |
| **everything's** | 535:10 542:25 | 511:8 512:6 | 419:21 421:12 |
| 426:24 | 568:21 | 526:18,19,20 | 423:5,17 424:5,12 |
| **evidence** 410:21 | **examples** 621:8 | 535:15 566:10,13 | 424:18 425:18 |
| 411:10 443:7,9,14 | **excellent** 593:24 | 572:10,20,24 | 426:2 432:23 |
| 444:9,23 447:7,25 | **exception** 406:14 | 573:1 574:24 | 433:24 434:12,16 |
| 448:2,5,12,18 | 417:5 | 575:9 577:13,14 | 435:15 438:12,14 |
| 450:4,9,10,13,18 | **exchange** 620:9,11 | 578:14 579:1,15 | 438:16 439:12,18 |
| 450:22,24 451:1 | **exclude** 406:22 | 579:16 582:22 | 441:10,13 442:11 |
| 451:25 452:20 | **exclusion** 408:5,12 | 583:1 585:5 589:9 | 464:11 465:20 |
| 453:7 454:25 | 448:24 623:8 | 589:9 590:22,25 | 468:8,9,24,25 |
| 455:1,17,25 468:4 | **excuse** 437:17 | 591:1,5,14,18 | 474:19,23 482:16 |
| 492:3 493:1 516:9 | 560:6 568:10 | 592:15 602:4,5,13 | 482:18,21,25 |
| 516:11 517:9 | **executed** 625:14 | 607:20 614:20,21 | 483:8 484:5 494:2 |
| 532:14 539:10 | **exercise** 457:24 | 617:22 618:11 | 494:7,9,16 495:23 |
| 540:11,14 549:6,9 | 458:6 622:4 | **exhibits** 389:8 | 496:1,4 497:23 |
| 549:15,22 550:1,4 | **exhibit** 389:10,13 | 390:1 391:1 | 498:5,8,13 499:11 |
| 550:21,22,25 | 389:16,18,21 | 399:16,19 415:8 | 501:9 502:19,25 |
| 551:12,24 552:13 | 390:3,6,9,13,18,21 | 427:2 431:8 | 503:4 520:25 |
| 552:14,15,17 | 391:3 396:10,11 | 457:17 589:13,14 | 521:2 553:17 |
| 553:7,15,16,19 | 396:25 397:4,18 | **exist** 524:9 | 559:5,11,22 560:1 |
| 554:1,3,5,6,9 | 397:19,23 398:19 | **existing** 507:11 | 560:12,15 575:1 |
| 556:20,25 562:23 | 399:6,10,22 400:5 | **expanded** 426:4 | 587:25 588:4 |
| 563:2 582:17 | 400:9,11,16 | **expected** 491:2 | 589:20 |
| 615:10 621:4,11 | 401:17,19 402:4 | **expenses** 426:19 | **expert's** 497:13 |
| **exacerbate** 453:5 | 414:9 415:1,3,4,15 | 426:20 439:24 | 498:22 |
| **exact** 409:2,14 | 415:16 416:21 | **experience** 408:16 | **expertise** 417:21 |
| 435:4 464:22 | 422:6,9,9,10,10,11 | 451:7,17 481:3 | 417:22,25 419:9 |
| 467:15 590:3,8 | 422:11 423:6 | 516:13,14 517:19 | 434:5 |
| **exactly** 452:17 | 425:22 427:9,12 | 517:24 518:3,6,12 | **experts** 416:6,19 |
| 485:12 504:9 | 427:17 456:20,21 | | 416:24 419:9 |

420:1,6,22 421:21
424:7 472:24
480:10 498:13
575:7
**expires** 627:25
**explain** 406:25
408:18 543:2
569:10,23 577:21
622:18
**explained** 409:4
538:24 555:2
557:1
**explaining** 542:24
555:3
**explanations**
541:7
**explanatory**
545:25
**exploring** 436:6
436:22
**exposed** 538:13
543:9
**exposure** 443:20
443:23 444:11
445:13,14,17,21
449:12 518:10
519:8 529:2
539:11 541:11,12
542:15 544:2
548:13,14 549:13
**express** 526:24
**expressly** 408:13
408:23 528:2,14
540:24 542:21
545:14,16,20,23
**extensive** 541:14
541:24 542:14
543:20
**extensively** 487:5
536:18 539:8

**extent** 413:25
418:19 426:22
438:9 521:19
**extremely** 433:11
562:15

**f**

**fabricate** 489:1
**fact** 418:18 435:13
449:12 514:12
594:9 603:18
611:8 612:10
**factor** 623:12
**factors** 450:1
540:21,25 542:23
544:10,15 545:10
546:16 547:2,4
548:9,10
**facts** 538:10 541:1
541:22 593:18,22
594:1,3,6,12,16,18
594:24
**factual** 509:4
**fair** 418:25 419:7
593:7
**fairly** 406:4
**familiar** 595:17
**famous** 525:10
532:7
**far** 518:16 615:25
**faster** 395:19
**fatigue** 583:25
584:5
**fax** 628:2
**fda** 487:3 488:25
489:2,8 490:20
492:1 493:11
494:5 496:8,11
500:22,25 501:5
501:14,25 502:20
506:9,12 526:8

**fda.gov** 506:21
**february** 463:11
**federal** 482:8
626:13
**fedexed** 429:17
**fee** 438:16,19,21
438:23 440:13
441:19,24
**feel** 470:14 496:18
496:23 497:4,6,11
497:11,12 498:5
498:21,23 499:21
519:19 552:22
**feels** 437:6
**fees** 442:4 459:24
**feigal** 384:16
385:16 389:3,11
389:14 390:7,10
392:15 393:20,25
394:7,13,20,25
408:20 418:23
428:12 430:2
438:12 440:16
477:14,20,22
478:7,9,10 479:9
479:11 480:1
492:14 493:22
497:2 500:22
536:2 544:8
555:13,19,21
582:5 585:5
587:18 599:5
617:17 623:25
625:8,20 627:4,20
628:8
**feigal's** 417:3
484:8,13 485:21
486:24 488:6,19
489:21 490:15
491:3,9,14 493:8
494:1 495:6 496:7

498:8,17
**fell** 406:17
**felt** 471:10
**field** 434:12
520:12
**fifth** 478:3
**fiftieth** 546:11
**fifty** 562:22
**figure** 406:9 456:4
621:25 622:4
**figures** 593:18
594:1,3,7,12,18,25
**file** 401:22 402:8
493:10
**final** 426:17
**financially** 393:7
626:16
**find** 407:12 409:14
412:10,11,15
413:7,11 423:23
449:20 487:11
490:24 522:23
523:4,18 524:2,15
525:9 530:2
566:19 576:15
614:16 618:8
628:10
**findings** 519:11
537:5 609:5
**finds** 603:15
**fine** 400:3,24
458:17 512:7
565:25 566:18
**finished** 434:20
435:5
**firm** 393:4,23
394:9 442:16
459:25
**first** 416:18
428:16 429:1,14
434:18 457:9,11

458:25 460:23
461:5 462:2 481:4
488:20 495:3,22
503:11 504:1
505:6,19 506:20
507:20 508:11
510:22 562:22
573:17 584:3
586:7,7 588:16
599:14 604:25
614:14
**fit** 434:9 605:6
**five** 574:22 583:19
602:10 603:3
604:4
**flight** 478:11
**floor** 388:6
**focus** 405:20 440:1
**focused** 547:21
**focusing** 606:1
**folks** 439:5,7
**follow** 424:17,19
424:21,24 449:18
476:8 495:16
508:12 525:4
561:5,6,17,20
562:1,5,12,15
566:22 567:18
616:7
**followed** 522:24
561:13,14,20
564:15,23
**following** 389:22
404:24 486:5
489:16 579:6
**follows** 394:22
410:7 528:11
530:9 533:21
534:12 542:19
552:6 559:19

**fonseca** 415:11,15
**font** 514:14,22,25
515:2,3,5,10
**food** 493:9
**foot** 456:7
**footnote** 506:6,7,9
506:13,25 507:1
512:21 513:2,3,4,4
513:5,10,12,20,21
593:15 620:11
**footnotes** 507:11
507:11 512:21
513:20 520:19,21
520:23 569:10
589:18 590:10
**foregoing** 625:10
626:4,6,10,12
**foreign** 403:21
**form** 404:10
406:24 409:20
411:22 412:7,25
413:19 424:22,24
424:25 443:12
447:4,19,21 468:8
472:10 486:25
491:10 496:15
497:18 498:20
499:17 500:6
501:8,17 502:10
502:17 504:2,25
505:5 514:2
517:21 520:5
521:4,21 525:5
527:23 528:4
532:3 534:1
536:10,24 539:22
544:16 545:18
550:11 551:4,19
552:12 556:7
557:15 559:2
560:8 562:20

569:6 584:13
594:17 595:3
597:24 598:4
603:17 604:16
610:6
**format** 401:5
493:10
**formatting** 508:20
**formed** 409:22
553:16
**forming** 445:9,10
451:1 494:22
515:24 516:23
521:11 524:17
537:13 540:18
548:11 558:23
**forth** 407:20
435:15 528:3,14
544:14 545:9
626:5
**forward** 473:12
594:24 628:15
**found** 408:19
411:8,10,13,15
412:13 413:18
414:2 454:3 549:7
581:14 607:5,9,16
609:4 611:1
618:11
**four** 436:3,10
467:9 488:23,24
489:13 505:25
506:2 574:22
583:19 607:25
**fourth** 475:22
478:3
**fowler** 387:5
393:23,23 394:11
**fowlerst** 387:9
**francis** 384:7
385:7 392:19

**francisco** 384:17
385:18 392:1
393:1
**free** 470:14 548:6
628:2
**frequency** 586:5
586:12,19
**frequently** 433:22
584:2
**friday** 384:18
385:20 392:2
431:25
**friend** 433:8
**front** 422:6 535:11
591:11
**frowned** 604:2
**full** 438:9 492:22
608:11
**further** 419:4,5,15
485:20 498:18
617:3,15 626:12
626:16
**future** 394:1
454:23 499:5
595:10
**fuvmic** 585:16

**g**

**g** 390:7 392:5
**gain** 584:6
**game** 418:25
**gathering** 519:21
**gcoan** 388:9
**geicam** 516:2
518:20,25 546:14
547:3,17 558:11
560:18 561:3,16
562:17 563:9
564:4 565:3,7
**general** 442:25
446:23 497:16
515:24 538:1

540:18 541:3,10 555:23 556:1,4,13

**generally** 432:16 547:21 593:22 617:19

**generates** 442:5

**generic** 466:17 485:11

**geoffrey** 388:5 394:8

**geomycin** 454:15

**getting** 409:9 464:18 467:25 474:18 475:25 476:2 477:3 490:19

**give** 509:1 531:2 531:25 566:22

**given** 399:16 468:14 510:9 562:16 564:15 570:12,14 585:11 593:4 609:19 616:18 621:13 622:23 626:11

**gives** 476:1 513:20 602:16

**giving** 395:18 536:3 542:25

**glad** 429:21

**glean** 518:7

**gleaned** 448:11,18 563:4

**go** 392:13 395:19 395:20 396:23 397:15 400:1 406:25 408:2,24 409:6 426:7 427:4 428:2 434:11 444:7 445:6 451:11 453:10

456:11 459:9 478:11 479:19,22 482:14 485:20 494:18 495:3 498:1 504:15 507:7 508:9 509:22 514:5 523:7,22 525:15 526:16,19 527:17 533:1 539:6 553:18,20 555:9 566:14,17 571:19 573:15 576:18 578:7 582:10 584:19,21 592:15 593:25 594:14,19 594:19 598:10 600:12 601:7 603:21 607:8 617:6,8,23 620:1

**goes** 427:6 429:13 439:21,23 440:21 441:5 442:1 462:15 492:23 509:12 523:13 526:15

**going** 392:7 395:13,16 396:4,9 396:10 397:16 409:13 418:8 423:20 428:6 434:21 450:6,21 453:10 456:10,18 470:20 482:14,24 483:5,22 484:7,9 498:4,15,18 500:7 500:9 506:16 508:4 512:16 527:17 538:12 541:6 543:2 545:1 552:3,4 553:24

563:13,22 564:9 564:11,25 584:24 591:13 598:14,22 598:23 599:5 603:23 617:10

**gonzalez** 387:14 394:3,4,11

**good** 392:6 394:25 395:1,2,3,5,6,22 434:11 477:9 521:14 544:20,22 554:3,3 565:8

**government** 482:8

**grade** 579:24 580:8 581:7,14,25

**grand** 386:19

**granddaddy** 524:1

**grant** 424:2

**granted** 615:21

**great** 436:4 452:7

**greater** 582:11,12

**greatly** 452:25

**greenberg** 387:4 393:24

**group** 434:3 442:9 442:10 496:14 501:7,16 559:6,12 559:23 579:24 581:15 582:1 586:10,17 616:10

**group's** 459:20

**groups** 437:2 439:3

**growth** 532:10 587:14

**gtlaw.com** 387:9

**guarantee** 564:20

**guaranteed** 429:18

**guaranteeing** 413:10 414:5

**guess** 410:24 421:11 458:25 497:2 519:19 549:11 559:15 575:7 613:15 614:15

**guidance** 493:12

**h**

**h** 384:6 385:6 392:23

**hair** 541:17,18,21 542:14 543:20,24 544:1 548:17,21 562:3 580:1 583:21,24,25 584:5,11 586:8,13 586:19,19,22,24 586:25 587:10,14 596:3,8,22 597:3,7 597:13,22 605:17 606:5,7,14 613:10 613:13,15,16,16 613:17 614:6 615:4,5,17,19,20 618:21 619:10,14 621:7,10,17

**hand** 396:9 456:18 482:24 483:5,22 537:16 579:25 591:13

**handed** 415:2 511:2,17 582:25 591:18 614:14,22

**handing** 397:3,18 399:9 400:8 589:12,14

**handle** 439:24

**handled** 409:10

**happen** 412:10 470:2 541:25 566:20 574:8

happened   421:3
423:24 573:25
621:16
happens   518:7
574:6 606:24
happy   396:7
411:14 412:15
413:9 414:8 431:2
458:3,14 525:18
578:12 582:16
hard   553:8 606:4
hardest   614:16
hardy   386:15
393:16,19
head   430:2 449:10
456:15 461:6
555:24 606:8
610:10 621:11
headed   389:16,18
389:21 390:13,18
heading   484:13,16
484:23 485:8
488:9,10,14
healthcare   388:11
491:25 492:18
hear   516:3
held   392:24
465:14
help   469:1 519:12
530:22
helped   517:21
helpful   434:4
522:17 601:22
helps   620:25
hereto   396:12
397:1,20 399:7
400:6 456:22
483:3,20 582:23
589:10 625:12
hierarchy   549:6

high   411:24 610:8
higher   543:13
582:10 599:24
600:1,2
highest   581:14,25
highlighted
484:14 485:1,6
486:2,4,15 489:11
489:22 490:5
491:6,8,15 492:8
492:20,22
highlighting
483:13,16 495:9
565:22
highly   482:9
hill   523:8 524:14
524:16 525:12
526:4 539:7 548:9
hinshaw   388:4
394:10
hinshawlaw.com
388:9
history   449:9,20
543:8
hit   405:5,9 406:16
409:17 410:9,18
413:17 579:10
hits   413:20
holidays   461:22
honestly   431:19
438:8 458:10
463:20,24 464:21
501:18
hopefully   419:17
hospira   387:12
394:5
hour   428:22
431:11 438:19,25
439:11,17 440:12
441:20 472:17,19
474:1

hourly   473:7,11
hours   462:24
467:7,9 479:6
housekeeping
397:16
hum   400:21 464:9
467:6,8 474:16
475:13 486:14
560:19 585:17
586:6 593:13
human   514:8
hundred   484:18
486:8,18 487:17
487:19
husband   478:10
479:11,18,20
480:1,5,12,13,19
482:1,13,15 497:2
498:24,25 499:9
husband's   565:24
hypotheses   449:2
hypothesis   537:15
537:22,24 538:3
538:16,17,18
539:20,25 540:10
hypothyroidism
543:21

**i**

idea   436:14,16
437:21
identical   486:23
487:9,15 490:12
490:18 493:7
507:21,24 508:2
508:17,22,24
572:25 579:16
590:17 602:12
603:9 620:7
identification
396:11,25 397:19
399:6 400:5

456:21 483:2,19
582:22 589:10
identified   432:19
453:20 490:1,10
572:18 579:25
identify   397:6
399:11 400:10
431:16 488:22
489:3,16 492:15
508:25 529:17
530:10 554:11,16
554:18,21,25
555:5,7
iii   384:19 385:17
389:3 392:14
477:13,19 555:12
555:18
imaging   449:21
immediate   472:12
606:19
immediately
542:15 586:10
implicit   408:8,15
526:22
implied   545:13
important   437:4
450:18 456:3
496:8 519:7
523:10 529:2
546:22 548:16
551:21,22 553:8
554:17 555:1,8
563:3 570:7 572:8
581:17 582:6
impotence   456:9
inaccurate   601:9
inadvertent
532:10
incidence   389:21
452:25 453:25
579:20 580:4,10

581:2 582:17
600:1,23
**incidental**  573:25
574:7
**incidents**  564:12
579:6 593:23
**inciting**  544:3
**include**  403:12
455:6 462:12
487:21 582:16
588:14,18 596:10
620:22
**included**  406:6
410:19 415:8
445:23 455:14
533:15 592:20
607:17 609:5
610:22,25 611:3
612:4,5,24 614:9
616:2,23 620:14
622:12 628:12
**includes**  407:6
409:11 413:17
588:3 610:10
621:19
**including**  416:6
444:21 471:12
480:10,12,13
502:1 534:19,19
568:25 593:22
**inclusion**  402:14
402:24 404:21
408:5,12 409:19
410:11 411:1
457:13 620:22
621:22 623:8
**incomplete**  495:16
**inconsistency**
618:6
**inconsistent**
471:20 515:5

**incorrect**  403:16
511:4 576:16
**incorrectly**  618:22
**increase**  582:11
**increased**  445:17
445:18,18 452:25
453:25 557:20
570:22 582:17
**incredibly**  437:4
456:3 580:17
**independent**
433:10
**independently**
494:7,11
**index**  389:1
**indicate**  474:14
**indicated**  403:11
444:17 466:3
488:9 581:4
**indicates**  427:5
**indicating**  628:12
**indication**  406:3,5
406:15 591:21
609:12 615:9
**indications**  484:21
486:11,22 492:4
493:2
**individual**  393:14
420:9 492:5 493:3
**induced**  405:16
407:9 412:2 413:4
444:15 453:12
537:18 556:17
557:8 558:4
592:21 600:15
601:4 610:5 611:7
611:8 612:22
613:8 615:3
622:22
**inducing**  599:20

**industry**  451:13
497:20 529:22,24
**infections**  584:1
**inform**  447:7
456:12 519:12
567:22
**information**
405:23,25 407:12
437:7 442:21
443:8,15 445:3
446:6,7,10,12,15
448:11 451:10
454:6,12,13,16
468:7,16 477:3
482:4,6,11,12
489:25 490:9
491:23 492:3,10
492:12,17,24,25
495:16,17,24
496:9,25 497:3,8
497:24 499:2,8
500:23,25 502:1,3
502:5,6 504:12,17
516:6 517:16
518:6 519:1
521:13,17 522:1,6
522:6,8 532:19
534:4 551:7,21
552:16 553:3
554:12 558:3,12
563:3 565:4,14
568:2 592:6,24
593:21 594:15,23
595:2,5 602:20
603:7 604:1,3
622:7,16
**informed**  444:4
451:9 473:9
532:19 592:24
**informing**  451:10
550:9

**informs**  565:5
**inherent**  407:22
456:11 545:2
**initial**  414:22
469:2 604:24
**initialed**  625:11
**initially**  486:1
513:24 523:11
**ink**  625:11
**input**  435:12
**inputs**  519:17
**inquiry**  615:2
**inside**  499:7
**instance**  536:10
**instances**  571:17
**instant**  525:8
**institute**  531:8,12
531:15 595:16
**instruct**  423:20
**instructions**
391:11
**integration**  550:20
**intend**  436:17,18
461:17
**intended**  486:1
502:5 511:23
**intends**  437:25
438:6
**intent**  447:9
**interact**  434:14
**interacted**  433:5
442:10
**interaction**  418:20
420:9 469:2
**interactions**
455:23 476:8
**interest**  481:20
**interested**  393:7
410:25 434:1
456:16 464:2
549:11 603:24

626:17
**interesting** 582:8
599:17
**interference**
392:11
**intermittently**
433:21
**internal** 544:21
**interpret** 405:23
446:16 611:2
**interpretable**
405:4,22 614:3
**interpretation**
450:20 519:22
520:2 528:5
**interpretations**
529:10
**interviews** 584:3
**investigating**
537:20
**investigational**
485:3,14
**investigators**
468:18 603:24
**invoice** 390:3
420:7,8,13 421:16
421:20 422:1,2,3,5
423:2,6,18 427:7
427:15,20 457:3,9
459:11 460:17
461:15 462:13,16
463:1 469:4,16
470:10,20 471:1
471:17,19 473:18
473:20,22,23,24
474:2 475:21
477:23 479:17
588:18,20
**invoiced** 426:21
426:22

**invoices** 416:20
427:3,5 457:5
461:21,24 466:3
469:12,15 470:6,9
470:12,13,23
471:15,21,24,25
472:18 474:11
587:20 588:15
**invoicing** 440:2
**involve** 484:17
486:7,17 487:17
487:18 585:18,21
**involved** 436:15
442:7 448:13,14
448:16 480:3
498:12 499:2,6,12
518:4 529:21,22
529:24 533:8
536:11
**involvement**
425:17 433:24
**involving** 411:21
412:23 536:1
567:6,9,23 585:21
**irrelevant** 423:21
**irreversible**
405:17 410:1
413:22 583:23
584:11 587:5
605:8,20 606:12
615:11,24 616:17
620:18,24 621:20
622:10 623:6
**isolated** 475:9
**issue** 428:3 451:2
451:21 452:5,15
481:13 519:22
532:8,25 533:7,12
533:24 534:15
537:16 538:19,19
538:20,21,22

540:2 541:2,2
543:11 547:17
548:3 551:6
553:14 570:16
572:2 593:7
605:25 613:19
615:4 616:16
621:17
**issued** 594:13,25
**issues** 469:2,3,16
480:9 481:25
482:3 488:23,24
490:1,10 517:6,11
523:13 527:14,16
529:1,9,10 530:4
532:9,12,19 533:9
533:16,16 539:2
541:4 543:14
548:18 549:18
550:14 586:22
588:5 597:19
605:23
**issuing** 461:21
**item** 414:10 416:4
425:2 488:14
593:8
**items** 396:21
488:17 522:2

**j**

**j** 386:16 628:25
**jancich's** 592:10
**january** 384:18
385:20 392:2,7
416:21 417:8
419:19 420:1,6,22
421:1,17 422:21
478:17 588:17,19
626:22 628:4
**jbaehr** 386:23
**jct** 386:10

**jean** 573:22
**jersey** 628:2
**job** 384:24 625:24
**john** 386:5 393:12
**jordan** 386:18
393:18
**journal** 389:18
436:9 573:9
**journals** 409:11
**jr** 390:10
**judge** 417:10
465:3,4,5,8,10,16
465:16,17,22,23
465:25 467:22
534:6
**julie** 388:13
394:14
**julie.callsen**
388:17
**june** 417:9 423:13
465:14 469:5
471:1,13,19
472:15 506:11
**jung** 573:21
574:10 575:9
577:11,17 578:4
608:1,3,8
**jurat** 628:18
**justify** 443:7 451:3
452:4,13 455:18
553:22

**k**

**kang** 476:23
574:13,13 575:10
575:14 576:10
611:4,23 617:18
617:21 618:20
620:4
**kansas** 386:20
**karande** 592:9

**karman** 386:7
**kaufman** 386:16
389:5 393:15,15
394:24 396:9,13
396:20 397:2,15
397:22 399:8
400:7,24 401:7,9
404:16 407:18
410:4,15 412:3,17
413:15,24 414:15
414:17 417:7,14
418:21 419:11,14
419:23 423:13,16
424:4 426:16
427:19,23 428:2
428:11 429:8,11
430:1 432:1
444:16 448:6
456:18,23 457:1
465:1 470:4
472:14 477:9,21
483:4,21 484:3,6
487:13 491:13,18
496:16 497:19
499:13,23 500:14
500:19 501:12,21
502:13,23 504:6
505:1,14 510:16
511:6,22 512:1
514:9 518:23
521:24 525:20
528:7,17 530:6
531:1 533:18
534:10,21 535:17
540:17 542:16
544:6 545:7,19
550:24 551:14
552:1 553:1 555:9
555:20 556:10
559:8,17 560:4,16
563:8 566:3 567:1

569:12 580:25
582:20,24 584:19
585:4 589:11
590:5 591:8,12
594:21 595:7
598:2,10,13,19
603:17,20 604:16
609:1 610:6 617:3
617:8,16 618:1
623:20 628:25
**keep** 409:8,16
410:8,13,17
440:16,16 441:2
469:17 508:14
**kessler** 501:19
502:22
**kill** 456:10
**kind** 468:24,25
547:12
**kindly** 587:18
**kinds** 487:4 526:8
531:12,16 550:3
605:23
**knew** 434:3
435:13 456:9
508:4
**know** 395:24
396:7 399:16
400:14 408:3
409:7,8,9,15,24
410:22 415:19
418:18 421:13
422:23,25 427:18
429:6 430:21
431:20,25 433:9
435:3,5 436:10,12
436:19,20 437:1,6
437:7,11,12,16,18
437:20,24 438:1,3
438:6,8,10 441:13
441:15,16 443:18

444:14 449:5,16
451:16,18 452:1
452:16 454:2,25
456:10 459:3
461:20,24 463:23
463:24,25 465:8
465:10,12,13,24
466:4,6,7,9 467:15
467:16,22,23
468:13 469:20,25
470:1 473:8 474:9
476:17 481:16
482:13 487:2
488:2 494:19,19
495:22 497:21
498:7,10 499:22
500:8,15 501:25
502:20 505:22
513:20 519:23,24
519:25 520:8
521:3,18 522:3,4
522:13 523:9,22
524:13,21 526:5
527:17 529:23
530:17,20,24
531:11,11 537:21
538:1 539:24
541:15,22 542:4,9
543:13,16 546:24
548:16 553:9,11
553:12 555:21
556:3 558:2
560:24 561:13
562:10 564:19
566:18 570:2,6,11
570:23 571:11
572:24 573:24
579:15 580:15
581:22 583:16
590:3,7,12,12
591:3,11 594:10

595:12 604:7
605:8 606:23
608:20 609:13,22
610:14,15 616:3
619:8 621:16,24
622:14
**knowing** 410:25
451:14 456:16
**knowledge** 436:20
516:14,15 517:4,6
517:20,24
**knowledgeable**
520:12
**known** 433:4,13
433:15 442:9
469:25 592:20
610:4,9,11
**korean** 403:8,24
573:9,10 574:11
575:3,4 578:23
608:4,10

**l**

**l** 387:6
**label** 491:20,22
492:2,11 502:20
**labeled** 492:12,12
614:19,20
**labeling** 491:5,25
492:13 493:11
532:12
**laboratory** 449:21
532:24
**lack** 495:16 554:5
561:4 587:14
**language** 403:21
490:20,21 493:11
493:23 517:18
**larger** 484:19
486:9,19
**largest** 599:21

lasers  473:17
late  606:22,24
  611:20
laundry  541:24
lauren  386:6
  393:13
law  386:5,6,17,18
  387:5,14 388:5,13
  394:9 451:19,19
  451:19 459:25
  487:4,6 488:18
  490:20 494:5,6,12
  494:15 495:1
lawyer  436:5
  450:7 511:19
lawyers  473:2
ldavis  386:11
lead  424:23
  445:18 614:17
learn  465:23
  484:18 486:8,18
  488:3
leave  550:5
leaving  478:20,21
  478:25 479:1
led  507:1 529:9
leet  388:20 393:2
left  579:25 603:12
legal  393:4 434:3
  438:23 439:3
  440:1 442:9
  459:24 472:22
  473:7 480:17,19
  481:21,25 482:3
  499:3 624:2 627:1
  628:1
lemerle  573:22
lesser  453:5
letter  390:21
  425:23 488:10
  507:2 577:10

589:25 590:18
  591:14,17,19
  628:19
letters  425:16
  426:8 506:10,18
  590:21
level  445:3 450:4
  454:9,10,14,16
  455:1 469:17
  543:13 556:20,25
liability  384:4
  385:4 392:17
library  409:10
life  485:17
lighter  491:8
likes  458:20
likewise  394:6
limitations  495:11
  562:16
limiting  546:22
line  391:12 407:15
  521:1 577:8 627:5
  628:12
lines  397:14 550:4
  553:7 583:20
link  506:17 620:25
  621:5
list  396:21 409:17
  410:9 444:8
  526:11 531:19
  535:24 541:25
  556:21 557:19
  558:20 609:9
listed  408:13
  411:18 414:2
  415:12 459:1
  479:8 522:2 567:6
  567:17,17,19,22
  568:21,22 569:3
  570:25 571:2
  586:8 587:2 590:9

591:1
listening  500:18
  618:4
listing  412:21
  413:17 558:19
lists  585:12
literature  399:23
  402:12,22 407:6
  408:10 409:25
  411:19 412:1,6,22
  413:4 414:11,19
  448:15 453:11
  454:4,20 467:4,12
  516:7 517:2 519:2
  520:9 521:7
  522:23 523:4,18
  525:3 533:12,23
  534:14,18 536:8
  536:23 545:3
  579:12
litigation  384:4
  385:4 392:18
  394:1 401:24
  402:8 416:10
  425:5,6,7,18
  426:21 432:16,22
  433:24 434:15
  437:9 438:16
  439:19 441:10,14
  442:8 444:13
  457:22 458:2
  459:16 460:20
  464:11 465:3,11
  465:18 474:4,23
  480:15,25 481:6,9
  482:21 494:2,23
  529:20 530:14
  537:17 538:12
  588:1
little  395:19 400:2
  458:18 514:24

515:13
lives  433:10
livingston  628:2
llc  390:3
llp  386:15 387:4
  387:13 388:4,12
local  606:6
locate  613:3
located  392:25
  614:8 616:24
long  421:11
  433:13,16 501:10
  531:19 535:23,23
  542:5 561:14
  583:17 610:3
longer  480:22,25
look  397:11
  412:15 420:4,19
  420:23,25 421:19
  422:8,14 424:15
  426:7 444:8
  446:10 449:10,25
  454:2 455:4
  460:11 462:1
  470:14 478:11
  479:16 487:21
  493:14,15,17
  494:19 503:16
  504:15 508:11
  512:4 519:20
  524:10 527:8
  530:22 532:24
  535:21 538:5
  539:17 540:12
  541:1,24 542:7,10
  545:1,4 548:5
  549:17 550:18
  551:23 552:18,19
  552:24 564:9
  567:12 579:18
  587:7 589:19,19

589:25 604:4
615:15,23 623:15
**looked** 404:12
407:16 421:9
445:23,24,25
446:1,4 452:21,22
452:22 453:6
519:8,9,9,10,15
520:7 522:7,8,9
538:7,10 541:11
545:3 546:7
548:23,25,25
549:1,5,7,8,10,21
550:7 573:6 603:5
**looking** 406:18
408:9 411:2
448:13,14,16
453:12,22 462:5
467:23,24 473:6
508:15 510:10
517:11,16 527:9
539:9 540:7,8,11
542:25 543:10
544:24 547:17
548:6 549:4
569:22 583:15
590:15 594:24
595:5,12,13
605:13 606:3
607:19 608:18
616:3 618:4
**looks** 397:7 399:12
399:21 400:11
472:11 478:5
503:23 506:3
507:13 512:25
513:1,6 535:22
590:17 591:16,16
602:9,12,20,21
603:1,2,5 605:15
605:24 607:21

**los** 478:12,25
**lose** 482:5
**loss** 542:15 543:20
543:24 544:1
548:17,21 580:1
583:21,24,25
584:12 586:8,13
586:19,22,24
596:3,8,22 597:3,7
597:13,22 605:17
606:5,7,14 613:10
615:5,17,19 621:7
621:10
**lost** 501:11
**lot** 421:5 430:14
441:3 442:19
450:17 502:19
520:19 524:10
527:8 530:18
542:9 543:3
564:14 595:23
**louis** 576:21
**louisiana** 392:22
**low** 407:15 584:2
**lower** 600:3
**lung** 523:12
**luxury** 615:22

**m**

**m** 388:5
**m.d.** 384:16
385:17 389:3,11
389:14 390:7,10
390:23 392:15
394:20 477:20
555:13,19 623:25
625:8,20
**m.p.h.** 390:11
**machine** 626:9
**madam** 628:9
**madigan** 559:6,11
559:23

**magan** 628:5
**mail** 420:5,19,21
421:1,7 476:8,21
478:1,5 575:18,23
576:25 611:17
612:8,13 618:13
618:15 619:12
620:9,11
**mailing** 476:18
**mails** 416:18,23
419:25 420:20
421:2,5 423:4
**main** 388:14
605:24
**maintained**
401:22
**major** 529:9
549:10 597:19
610:13
**making** 416:25
492:5 493:2
559:14
**male** 456:7
**manage** 441:1
**mann** 576:20
612:7,16
**manner** 539:17
**manufacturer**
496:10,12 500:24
501:5,15
**manufacturer's**
496:13 501:7,16
**manufacturers**
481:9,15
**mara** 387:14
394:3
**mara.cuskergon...**
387:19
**march** 464:3
466:1,12,12

**mark** 396:10,24
566:3,12,22
**marked** 396:11,25
397:3,19 399:6,9
399:23 400:5,8
401:16,18 402:3
415:15 416:20
422:6 423:6
425:22 427:2,9
431:6 456:21
483:2,6,14,19,23
485:6 488:14
510:5 535:12,15
579:2 582:22,25
589:9,12
**marketed** 488:11
488:15
**marketing** 489:25
490:8
**marking** 456:20
**marks** 477:12,18
493:19,22 555:11
555:17
**marrow** 609:24
610:2
**masidonski**
476:23 576:20
577:3,10 612:7,15
**massachusetts**
388:7
**matches** 563:13
**material** 405:21
410:25 420:11
422:1 428:18
431:4,6 446:3
464:17 482:9
487:4,6 489:1
494:7 520:24
602:3
**materials** 396:23
402:20 403:3

413:25 414:25
415:6,17 416:11
417:16 418:9
419:8 432:18
461:4 473:16
494:14,22,25,25
504:19 505:3
516:22 517:25
520:3,15,16
525:23 526:2
557:14 563:5
578:13
**math** 458:3,10,12
458:14,20 600:9
600:25 601:7
**mathematical**
549:16
**matter** 392:16
406:17 594:9
**matters** 394:1
**mdl** 384:5 385:5
392:22 417:11
**mea** 514:7
**mean** 403:6
405:24 406:10
410:17 411:4
420:11 430:20
456:6 458:19
466:2,15,18
480:17 481:23
489:6 507:8 509:3
509:12,13 514:13
521:18 530:16,23
531:7,9 534:5
535:23 547:7
550:5 556:23
562:2,4 568:12
578:17 582:6
584:16 593:24
595:12 596:25
598:5 622:15

**means** 466:18
559:9 568:19
571:16
**meant** 494:25
**measuring** 614:5
**media** 392:14
477:13,19 555:12
555:18 624:1
**medical** 407:1,24
408:1 409:11
412:1 416:8
442:12 451:12
468:13,15 480:9
480:16 481:10
495:14 522:23
523:4,18 525:3
536:23 546:25
547:11 576:22
607:10
**medications**
495:15
**medicine** 398:17
409:10 502:8
**meet** 405:6,8
433:11 447:25
448:1
**meeting** 428:22
431:11 442:18
471:9 472:3,3
479:4,13,14,15,16
480:2
**meetings** 479:24
**members** 431:17
**memorializing**
425:16,17 426:1
**menopausal** 584:6
**mention** 616:8
**mentioned** 429:1
435:21 445:7
514:22 521:11
548:9 564:7

572:25 611:5
**merit** 553:22
**met** 395:12 406:14
414:1 554:2
**metastatic** 591:17
609:14,23 610:1
610:19 615:8
**meter** 582:13
600:1
**method** 407:22
517:8,10 523:1
525:4 531:21
572:1
**methodologically**
570:8
**methodologies**
546:6
**methodology**
407:21 409:23
453:21 455:10
517:21 518:11
519:13,16 522:19
522:23 523:5
524:24 526:3,13
526:15,21 527:22
528:1,12,24
529:18 530:11
531:4 532:3
534:24 536:9,16
536:23 537:4,9
538:15 540:19
569:23 570:1,20
570:24 571:24
605:11 606:10
**microphones**
392:9
**middle** 462:6
496:7 579:19
**milazzo** 465:5,10
**milligram** 582:13

**milligrams** 599:25
**mind** 519:6 549:15
550:8 553:4
562:17 618:9
**mine** 459:21 463:6
463:7 494:10
614:20
**minor** 603:1,6,14
**minute** 447:5
**minutes** 428:24
**mischaracterizing**
471:23
**miscounted** 574:5
**misreported** 611:6
**misrepresented**
612:6
**missed** 514:8,10
**missing** 564:18,19
564:20
**missouri** 386:20
**misspellings** 430:5
**misstated** 563:18
**misstates** 577:10
**mistake** 421:22,25
422:1,2 427:22
472:21 473:20,21
474:10
**mistaken** 513:14
**mitoxantrone**
616:15
**modifications**
504:4
**modified** 503:12
**molecularly**
531:18
**moment** 548:10
**moments** 424:10
**money** 458:23
**monotherapy**
569:17 571:21

month 461:25
586:15,16 615:15
months 584:5
586:18 615:16
moons 433:4
morning 392:6
394:25 395:1
478:20 572:18
mortality 593:24
motivated 504:22
move 515:18
528:9 530:6
531:24 533:18
539:19 542:16
544:6 552:4
580:25 582:20
587:16
moves 534:5
msn.com 478:7
mt 628:1
multiple 443:22
450:23 456:23
466:16 475:19
495:13 523:24
524:6 525:1,6,11
529:4 531:7,10,23
534:17 547:25
548:23 550:3
multitude 482:10
482:11 530:20
533:8

n

n 392:5
nabholtz 568:21
569:8,8
nail 584:7
name 393:2 430:6
434:10 465:5,9
470:19 524:18,19
530:17 553:9
573:15 626:20

627:3,4 628:6
names 405:15
430:6
narrative 466:18
505:13 567:20,25
569:11 602:19
616:19
narratives 568:8
narrow 536:21
national 409:10
531:8,12,15
595:16
nature 615:19
nausea 584:1
nda 390:3 426:9
439:2,22,23
440:10,11,14,19
440:21 441:7,17
442:2 457:25
458:23 459:5,15
461:19,21 466:16
480:5 490:1,3,10
490:11,17 587:24
588:6,21
nearly 486:23
490:12 493:7
necessarily 450:19
necessary 490:2
490:11,16 491:23
need 396:6 444:17
447:17 448:21
450:5 451:14
452:3,11 458:5
459:17 487:2
494:18 517:14
520:10,11 542:5
618:2
needed 396:1
407:12 443:7,9
473:10 475:25
476:25 566:18

570:22
needing 456:3
needs 447:2,6
448:5 451:11
negative 390:15
583:8 615:6
616:22
neither 443:16
626:16
never 411:9
438:14 465:19
468:14 470:16,18
470:20,24 484:1
494:3,9,10 495:2
556:18 557:9
584:16
new 387:17,17
398:9 416:13
465:17 482:8
483:14 485:3,14
485:18 507:11
509:25 513:20
577:24 628:2
newport 386:8
night 396:22 397:5
397:9,17 399:10
483:10 503:18,20
503:21 510:9,17
510:20 511:2,14
511:21
nine 523:9 525:16
nj3189948 625:24
node 390:15 583:8
590:2 615:6
616:22
nods 461:6
non 411:25 453:20
514:6 516:19
539:17 568:18,25
569:25 570:3,4,9
570:17 571:9,22

572:5 580:20
596:10 600:19
607:24 610:19
613:24 615:8
nonresponsive
528:10 530:7
531:24 533:19
539:19 542:17
544:7 552:5
582:21 587:17
nonspecific 605:17
northwest 387:6
notarized 628:14
notary 627:21,24
note 392:9 496:8
553:10 619:11
628:11
noted 416:19
420:22 423:5
428:18 591:23
612:6 624:4
625:11
notes 475:11
notice 389:10
396:17 400:17
504:18 520:22
620:3
noticeable 471:4
noticed 473:6
noting 619:19
november 401:15
427:4,7,15,20
434:24,25 457:3
457:10,11,15
460:18 476:6
503:8 588:2,3,12
588:12 589:7,7
594:11
null 537:21,24
538:3,16,18
539:20 540:10

**number** 389:9
390:2 404:23
406:6,7,8,19
414:14 430:3
433:14 445:18
452:25 484:14
506:3,4 507:12
509:2 513:20
514:7,19 527:12
556:6,8 561:9
566:10 568:22
569:2,14 570:20
570:22 571:3,7,7
571:14 582:2
587:23 588:14
589:2 591:2
592:18,19 593:8
602:16 614:23
623:25 628:7,12
**numbers** 406:3,10
406:21 512:24
513:8 558:21
564:10,13 568:20
571:11 580:23
581:16,20,21
587:19 600:8,13
600:13 607:14
614:1 615:5
**nurses** 584:5

**o**

**o** 392:5
**o'connor** 451:19
487:3 494:6,12
**o0o** 388:22 390:25
391:15 624:5
**oath** 394:21 395:6
626:7
**object** 603:17
604:16 609:1
610:6

**objected** 603:20
**objection** 404:10
406:24 409:20
411:22 412:7,25
413:19 417:1
423:19 443:12
447:21 472:10
486:25 491:10
496:15 497:18
498:20 499:17
500:6 501:8,17
502:10,17 504:2
504:25 505:5
514:2 521:21
525:5 528:4 534:1
539:22 544:16
545:18 550:11
551:4,19 552:12
556:7 559:2 560:8
562:20 569:6
584:13 594:17
595:3 597:24
598:4
**objections** 401:1,3
**objective** 593:9
**objectives** 547:19
**observations**
599:15 604:20
605:5 613:6
**observed** 614:25
**obtained** 493:9
**obvious** 526:25
527:1,22
**obviously** 459:17
524:10 578:23
590:4 615:7
**occasionally**
479:25
**occur** 444:2
505:19 556:17,20
556:23

**occurred** 418:13
465:25 541:11,12
**occurrence** 446:20
449:12 621:2
**occurring** 444:12
541:13 621:12
**occurs** 538:1,2
548:13
**october** 427:6,12
475:4,11,24 476:7
476:21 575:19,23
576:25 618:15
**offered** 434:6
**offering** 525:21
591:23 593:5
**offhand** 430:16
**office** 420:12
441:2 456:8
462:11,25 481:19
615:22
**officer** 451:12
**oftentimes** 472:4
**oh** 399:12 415:13
427:10,13 433:16
449:1 451:6 468:6
469:24 473:15
476:17 491:19
513:12 562:3
566:14 572:13
579:4 591:9,12
598:21 601:10
**ohio** 388:15
**okay** 394:18 395:9
395:12,21,23
396:3,4,6,9,17,20
397:13 398:11,13
398:21 399:18,22
400:1,16,20 401:7
401:20 402:3,11
402:20 403:2,17
404:7 405:5 408:4

412:18 414:9,25
415:13,14 416:15
417:7 418:21
419:16 420:25
421:4,19 422:20
422:24 423:3
424:19,21 425:13
425:24 426:7
427:1,19 428:2,5
429:8 431:10
433:14 434:21
438:25 439:5,19
441:23 442:24
443:6 445:2,8
447:13,15 450:8
452:9 457:4,7,8,13
458:5,15,22 459:8
459:22 460:22
461:20 462:1,9,12
462:16 463:5,7,15
464:4 467:3 469:6
473:3,18 474:6
475:3,7 477:9
478:9 479:18
480:8,12,19
481:18 483:7,12
483:24 484:11,12
485:5,20 486:12
488:8 491:5
499:24 500:4,20
500:21 503:6,7,23
503:24 504:24
505:15,16 506:5
506:14,16,24
507:4,6,16 508:17
509:17,23 510:2
511:22 512:3,7,20
513:10,23 515:19
515:20,21 516:10
521:14,15 522:17
522:18 527:9

532:6 534:8,9
535:19 537:13,21
557:12,23 558:18
559:9 560:24
561:2 565:23
566:14 567:4,21
568:9 572:13,16
573:20 574:6,6,10
574:21 575:8,13
576:10 577:11
578:2 579:23
583:3,11,18,25
584:24 585:10,15
585:25 586:16
587:1,23 588:10
588:21 589:4,12
589:16 590:6,19
591:12,14,22
592:8,14,17 593:4
593:14 594:2,6,12
594:22 596:19
598:10,21 601:10
608:23 613:2
**okeydoke**  503:3
**once**  418:23 431:1
433:22 460:1
475:13 614:3
**oncologist**  541:16
543:16
**oncology**  389:19
**ones**  426:13 535:4
568:6,7 575:7
**ons**  574:7
**onset**  541:12
**open**  470:1
**operational**
439:24 440:23,24
472:21
**operations**  459:20
481:19

**operator**  388:20
392:6 393:22
394:18 428:6,9
477:12,17 555:11
555:16 584:21,24
585:2 598:14,17
598:23 599:1
617:6,10,13
623:24
**opines**  539:7
**opinion**  435:19
442:25 446:17
455:16 496:4
515:22,24 516:23
517:22 519:12
521:4,12 523:6
524:25 527:24
528:2,14 536:25
540:19 548:11
550:9 553:16
554:9 565:5
592:18 593:7
597:25 598:7
**opinions**  416:9,10
425:4,5 432:21
435:15 442:19
445:9,11 447:4,7
447:19 451:1
494:22 515:12
520:6 524:17
532:3 537:14
557:15 558:24
563:10 591:24
592:1,8 593:5
**opportunity**
465:23 479:21
500:1 608:11
615:25
**opposed**  406:7
561:7 604:5

**options**  456:4
592:22,25
**order**  417:5
420:13 457:9
473:11 550:17
586:5
**organization**
595:20,22
**organizations**
398:15
**original**  417:1
495:3 524:2,14
525:14 577:3,25
626:13
**outcome**  393:8
**outset**  395:15
**outside**  450:2
487:7 517:24
529:19 530:13
614:4
**overall**  579:19
580:3,10 581:2
600:23
**overhead**  442:2
**overlap**  604:14,17
**overlapping**  573:3
**overseeing**  417:11
465:3,11
**overview**  446:13
516:5 517:2 519:1
521:6 558:5
**owner**  524:19

**p**

**p**  392:5
**p.m.**  385:19
477:14,16,16,18
478:21 479:1
555:13,15,15,17
585:1,1 598:16,16
598:25,25 617:12
617:12 624:2,4

**paclitaxel**  453:17
454:11 455:7
509:10 510:3
511:13 568:16
569:15 570:4,19
572:9 580:11,21
581:3,6,15 582:1
600:21 601:14
612:12 618:23
**page**  389:9 390:2
391:3,12 396:21
398:9,19,20
457:11 458:25
459:9 462:2 463:4
463:5,9,10 464:2
469:4 474:12
478:2,3,24 484:12
485:8,13,21
486:12 488:6,13
488:20 489:9,12
489:20,21 490:4
491:3 492:7,9,23
492:23 495:5
496:6,6 498:16
505:21 506:3,4,5
507:5 508:7,11,21
508:22,23,25
509:1,7,22 512:2,8
512:24 513:8,11
513:21 514:7
515:8,9 526:14
527:12,12,13
528:21 529:15
545:8 546:2 566:9
567:3 574:1,1,8
576:18 585:11
586:1,3 587:9
591:3,11,11
592:16 593:11,12
627:5 628:12

**pages** 384:25
484:8 492:16
493:15 512:20
516:12 526:13,22
527:3,9 574:7
586:1
**pagination** 505:20
505:25
**paid** 427:25
459:18 460:3
**paper** 399:15
403:21 405:3
407:12 412:11
437:16 463:8
477:2 544:24
575:15,21 576:2,7
576:8,24 587:6
595:25 606:11
609:16 611:11,13
611:21 619:16,25
620:8
**papers** 407:6,16
409:8 411:12,15
412:13 448:15
463:15 476:9,15
476:19 477:7
519:23,25 520:20
533:14 545:5
549:19 551:10
556:22 558:9
562:25 577:13
**paragraph** 489:12
491:7 492:8,16
507:17,24 508:11
512:9 528:21
**parentheses**
511:10,12
**park** 387:15
**parse** 450:6
**parsing** 443:3

**part** 419:20 437:6
460:22 465:22
470:2 473:21
487:14 488:3
506:20 513:13
519:22 529:25
530:23 531:9
562:14 565:8
572:7 577:13
580:3 585:13
601:21 623:15
**participate** 464:19
466:8
**particular** 408:6
439:18 453:19
459:25 499:6
502:2,9 507:23
518:10 529:19
530:12 531:5
532:2 533:13,24
534:15 536:10
541:8,9 542:2,10
608:25
**particularly** 499:3
**parties** 392:13
**partner** 440:10,11
480:5
**partners** 390:3
426:9 439:2,22,23
440:10,11,13,14
440:18,19,22,22
440:25 441:7,17
442:2 457:25
458:23 459:6,15
461:19,21 466:16
466:16 472:23
480:6,11 587:24
588:6,22
**parts** 416:17
522:14 550:21
554:7

**party** 393:6 416:5
626:18
**passage** 490:12
498:2,16 500:5
**passages** 493:6
**path** 499:20
**patient** 437:2
449:17 451:23
456:7,12 489:4,17
516:16 541:9,23
542:2,3 565:13
581:8,11 592:5,6
600:6 601:11
617:20 618:22
619:2,16
**patient's** 593:1
**patients** 390:16
404:23 406:3,6,7
406:19 410:1
443:15 444:5
445:12 449:7
451:8 453:13
455:23 484:18
486:8,18 487:17
487:19 492:6
493:3 495:13
518:4 532:10
543:6,7 546:23
561:5,9,19,22
562:11 563:20
564:15,24 567:5
567:16,22 569:3,4
571:4,14 575:16
579:17,20,22
580:4,8,11,18,19
580:20,23 581:3,6
581:9,11,12,17,22
582:2 583:9 584:3
585:13,24 586:11
586:21 590:1
592:22 599:22,24

**party** 393:6 416:5 600:6,7,9,10,13,17
600:19,20,23
601:1,3,12,15,19
602:8,9,10 603:2,3
603:4 604:4
605:13 606:5
607:14,23 609:8,9
609:20,23 610:1
610:14,20 615:7,8
616:5,6,13,23
617:1 618:19
619:9 621:5 622:1
**pcia** 508:12
**peer** 522:22 523:4
523:17 525:3
533:11,23 534:14
534:18 536:8,22
575:21
**pen** 437:16
**penalty** 625:9
628:15
**people** 431:18
470:2,3 480:17
545:1
**percent** 406:10,11
412:12 413:7,11
413:14 414:5
439:23 440:5,17
440:21 441:5,23
442:1 445:5,6
448:1 459:4 460:2
512:10,10 531:13
561:8,9,18,18,19
562:7,7 563:20
570:13 579:21,23
580:5,7,12 581:4,6
581:21 588:22,23
589:2 600:22,24
601:14,14,17,19
609:20,21 616:13
616:14,14,15

**percentage** 406:7
439:21 509:1
581:14,25
**percentages**
406:18,21 508:25
558:20 581:16
585:23 603:5
**perceptions**
390:14 583:8
616:22
**perfect** 412:12
**perfectly** 470:8
592:3
**perform** 407:19
**performed** 409:2
446:9 460:19
471:21
**period** 433:20
457:18 508:12
561:6,15 562:5,13
606:20 609:24
616:7
**periodically** 421:3
433:11
**perjury** 625:9
628:15
**permanency**
587:14
**permanent** 389:22
404:23 405:16
406:19 407:9
409:25 411:20
412:2,23 413:5,22
413:23 443:1
444:15 446:6,20
447:3,18 448:23
449:7 451:3,4
453:22 455:19
456:9,15 516:24
518:1 522:25
537:18 538:12

540:6 541:13
543:8 547:18
549:23 550:10
551:2,17 552:10
553:6,23 554:14
554:23 555:22
556:4,16 557:8,17
557:25 558:3,10
558:13,19 559:1
562:19 563:16
564:5 565:6
569:19 579:6,20
580:4,10 581:2
582:12,18 583:13
583:16,23 584:11
587:5 592:20
596:3,8,22 597:2,7
597:12,22 599:21
600:3,14,23 601:4
605:8,20 606:12
607:1 608:14
610:4,9,11 611:6,8
612:23 613:7
615:11,24 616:17
620:17,23 621:20
622:9,21 623:5
**permutations**
524:6,21 525:12
526:6,7
**persisted** 562:5
**persistent** 404:24
405:17 409:25
411:20 412:23
413:22 443:1
447:3,19 448:23
455:20 516:24
522:25 547:17
549:24 550:10
551:3,18 552:10
553:6,23 554:14
554:24 555:22

556:4,16 557:8,17
558:1,14 559:1
561:11 562:19
563:16,20 564:6
565:6 569:19
583:14,16,22
584:11 605:8,20
606:12 607:1
610:4 615:11,24
616:18 620:17,23
621:20 622:9
623:5
**persisting** 561:6
562:8
**person** 421:23
422:25 423:2
424:1,8,20 434:12
458:20 467:19
498:11 511:18
577:18 581:23
601:20
**person's** 465:9
**personal** 517:24
611:17 619:5
**personally** 440:5
588:23
**perspective**
519:18
**perspectives**
468:21
**pertain** 432:21
466:22 469:8
615:2
**pertained** 620:17
**pertains** 626:12
**pertinent** 621:17
**pfizer** 387:12
394:4
**pharmaceutical**
388:3 394:9 480:9
480:15 481:10

**pharmaceuticals**
390:22
**pharmacology**
544:3
**pharmacovigila...**
446:11 448:16
452:22 453:10
454:7 532:17,20
549:20 550:15
551:11 554:6
557:4 562:24
563:24
**phase** 484:19
486:9,17,20
487:18,20 488:2,3
488:4,5,11,15
489:23 490:7
**phases** 484:24
485:4,9,14 487:10
490:22 491:1
**phoenix** 494:13
**phone** 392:11
393:22 394:2
428:4,23
**phonetic** 430:17
430:20
**phrase** 475:21,22
**phrases** 487:8
**physical** 449:9
**physician** 408:17
434:6 451:23
516:16 593:9
**physicians** 416:7
444:3,4,22 451:15
452:1 456:2
491:22 516:21
584:4 592:4,19
**pick** 392:10 414:6
499:14
**picking** 496:20

**piece** 451:22 463:8 521:8 550:8,25 553:21 554:11
**pieces** 520:4 551:6 551:20 552:15
**place** 392:12 417:9 418:19 508:19,20 508:23 524:14 557:19 558:18 626:5
**places** 487:12
**plaintiff** 393:21 416:6 417:22,25 423:9 428:19,25 429:5,6 446:23 453:14 479:17 560:1,11 592:3 593:5
**plaintiffs** 386:3 393:14 401:1,23 416:7 424:7 425:19 426:10 431:5,14 432:3,5 432:11,15 434:16 441:10,14 457:20 458:1,24 459:15 460:7,19 461:13 461:17 462:17 470:7,14 473:11 474:3 480:2 503:22 560:5 592:2,11 617:17 620:13
**plan** 449:23 484:19 486:9,19
**plausibility** 443:24 519:10 529:3 538:9 539:15 548:15,20 548:21 606:4

**play** 419:7
**pleasant** 628:1
**please** 392:9 393:10 394:19 395:24 410:6 489:14 490:5 491:21 528:8 530:8 533:20 542:18 623:9 628:10,10
**plural** 421:21 422:21 475:17,18
**plus** 415:2,4 601:13
**point** 398:7 434:22 474:7 506:17 509:19 523:20 524:25 528:20 529:15 534:22 535:9 539:9 545:8 546:2 551:15,16 552:7,8 554:12 561:8,25 570:7 571:23 585:10 622:4
**pointed** 524:1
**points** 521:3 554:16,25 555:7 615:15
**poor** 562:1,15
**poorly** 563:11
**population** 555:23 556:1,5,13 562:11 565:13
**portion** 401:21 442:4 486:2,2,15 489:22 490:5 492:20 582:21 583:18
**portions** 485:2 498:7

**posed** 445:11
**position** 418:22 498:9 499:14,24 500:17 501:22 554:11
**positions** 451:13
**positive** 590:2
**possibility** 436:7 487:8
**possible** 489:4,17 502:6 540:20 561:24
**post** 429:20 586:10
**poster** 599:18 602:13,16,25 603:10,12,15 604:5,8 619:25
**postmarketing** 488:12,16,21 489:15,23 490:7 490:21 495:21
**potential** 417:21 417:24 418:14 419:20 423:5,17 424:5,12,18 448:24 452:5,12 452:14 455:19 456:12 466:8,9 467:16
**potentially** 413:8 453:4 544:1
**poulenc** 390:21
**powered** 547:21 547:25 548:5,7
**practice** 439:16 462:24
**practicing** 434:5
**pre** 507:11 544:25
**preceded** 419:8

**precluded** 471:11
**predestined** 453:24
**predetermination** 547:14
**predetermined** 453:24 549:3
**predetermining** 570:21
**preparation** 417:2 431:3 432:5,11,19 482:16
**prepare** 428:14 466:13
**prepared** 494:16 578:6
**preparing** 460:23 461:7 467:13 474:22 482:21
**prescribe** 492:18
**prescriber** 492:5 493:2
**prescribing** 492:10,12,24 502:4 592:2
**prescription** 481:15 491:25 492:17 502:5
**present** 388:20 487:6 565:12 599:24 603:25 604:3
**presentation** 468:1 469:9 470:1 470:10 471:3 579:5,10,19 602:14 603:15
**presented** 404:12 449:7 464:14 581:13,24 599:7 603:7,14 604:25

608:9 619:8,10
**press** 576:6
**presumably**
467:13 578:9
619:24
**presume** 599:25
**pretend** 553:18,20
**pretty** 433:10
484:7 518:12
569:8
**previous** 442:12
538:25 574:1
604:22
**previously** 401:24
402:18 403:15
404:1,3 422:6
426:23 427:1
486:4 508:6
604:23
**primarily** 430:5
**principles** 497:16
498:11 499:19
516:17,20 518:8
536:11,12,17
539:5 540:12
546:6
**print** 429:23
**prior** 394:17
399:24 402:2
418:4,24 430:4
469:11,12 470:6
470:12,13 471:13
471:20 472:18
482:20 490:3,17
494:2 513:23
524:12 594:23
595:9 626:7
**private** 392:10
**privy** 499:7
**probably** 427:7
433:16 434:24

463:19 474:18
476:16 479:15,16
504:8 507:13
525:8 531:13
533:3 546:11
590:15
**problem** 400:22
508:20 514:3
609:6
**problematic** 606:2
**problems** 495:14
584:1,3,5,6,7,7
614:7
**proceedings**
417:11 626:4,6,8
626:14
**process** 485:19
**procure** 427:22
**produce** 396:22
403:3 418:9
**produced** 399:17
401:24 402:9,18
402:25 403:4
411:25 417:4
426:23,25
**producing** 419:6,8
**product** 407:3,23
408:17 451:8
454:19 455:23
468:17 488:2,18
491:5 502:2 517:5
518:5 529:22
530:19 533:8
534:18 535:4,24
536:2,14,18 541:8
547:20
**production** 504:19
505:3 628:22
**products** 384:4
385:4 392:17
398:25 455:2,6

481:10,15 482:11
488:11,15 501:1
502:1,2 518:5
520:9,13 530:3,5
531:12,19 533:15
535:20
**professional**
398:14 433:12
437:2 455:22
468:25 499:1,10
516:13
**professionals**
492:1,18
**program** 507:15
**programs** 496:11
501:5,14
**project** 406:12
**prominent** 532:13
**promise** 409:13
**prompted** 503:24
504:13,16 505:3
**proof** 447:2
**proprietary**
530:16
**prospective**
445:24,25 544:24
548:25 575:15
**prospectively**
548:24 549:1
**prostate** 456:8
**protocols** 544:25
549:3
**prove** 443:10
444:18,22 445:6
447:17,23 448:7
448:22 450:3,7,21
**proved** 448:9
450:12,16,19
**proven** 443:16,17
444:1 517:8

**provide** 397:8,25
415:10 416:23
425:14 426:5
429:22 434:4
450:24 462:11,13
468:23 489:25
490:9 493:5 502:8
504:14 506:22
523:22 525:7,7,18
525:21 544:9
558:3,22 568:1,4
616:19
**provided** 399:18
399:19 400:12
402:16 403:6,23
403:23,25 405:12
407:17 409:21
410:21 411:11
415:1,11 416:20
425:8,20 428:17
428:19 429:2,4,5
431:5 435:12
456:19 458:7
476:20 483:9
493:21 503:2,8
504:5 510:19,23
516:17 565:18
566:5,8 572:13,14
573:6,8 574:23
578:8,13,15,17,20
578:21,22,24
590:9 602:3
612:17 618:15
619:4 620:3 621:8
**provides** 491:22
506:12
**providing** 401:20
439:12 442:11
468:16,21 472:22
492:3,25 592:5

proving 445:4,5,5
ps046 574:14
pse 393:13
public 398:22
  469:20,21 471:4
  472:3 627:24
publication 436:8
  534:23 557:7
  619:1 620:3
publications
  402:12,23 414:11
  414:20 445:15
publicly 471:4
  557:6
publish 533:4,5
published 408:10
  438:7 446:8
  448:15 452:23
  453:11 454:20
  455:9,11 467:24
  519:25 520:9
  522:22 523:3,17
  524:4 525:2 533:6
  533:11,14,22
  534:13,17 536:7,8
  536:16,18,22
  537:1,5,9 544:24
  545:3 549:19
  550:16 551:10
  556:22 558:2,9
  562:25 563:23
  575:21 576:16
  611:12,16,21
  612:11 618:6
  619:2,15,19,23
publisher 576:4
  611:19
pubmed 408:3,25
  409:9 608:20
pull 407:14,14
  457:6 473:16

477:22 502:24
  526:18 579:1,13
  617:23
pulled 405:11
  411:6
purpose 426:3
  435:7
purposes 402:8
  620:21
pursue 547:20
pushing 450:15
put 420:11,12
  437:16 456:6
  469:15,19 470:9
  470:10,18 471:6
  471:14,15 472:4,6
  472:7 493:20
  508:20 522:12
  545:6 591:22
  622:25
puts 462:25
putting 471:10
  505:23 510:25

**q**

qualifications
  529:23
qualify 621:22
quality 405:3
  407:11,15 411:24
  517:16 623:14,16
quantitate 607:13
quantitation
  613:20
quarter 601:11
queried 404:5
question 395:17
  395:18,24 396:3
  408:4 410:5,6,8,23
  420:17,18 423:9
  428:1 434:22
  447:14 458:11

463:24 466:6
  496:22 497:22
  501:11,19,19,24
  502:22 504:16
  508:5 521:22
  522:3,8,10 523:17
  523:21 525:24
  528:8,12 530:10
  533:4,22 534:3,10
  534:13 535:8
  536:20 537:8,11
  542:18,20 545:22
  551:8 552:2,7,23
  555:4,6 577:20,22
  582:4 609:2
  614:25 618:3
  623:4
questioned 403:20
questionnaire
  605:16 613:20
  614:5
questionnaires
  613:22
questions 403:8
  431:1 476:17,18
  498:4,19 499:15
  499:25 500:2,15
  598:20 599:6
  605:17 615:13,18
  616:18,25 617:18
  621:7,14,15
  623:21
quick 505:16
  555:10 598:11
quickly 505:15
quite 409:4 410:5
  420:17 508:24
  523:16 532:22
  539:7
quizzical 404:13

quotation 493:19
  493:22
quote 421:19,20
  493:13,16,18,20
quoted 525:8

**r**

r 386:6 392:5
radiation 606:6,7
  609:21 610:10
  621:10
random 546:22
  547:13
randomization
  546:21 547:5,15
  565:10
randomized
  452:21 516:1,25
  518:19,24 521:5
  532:20,22 546:15
  546:16,23 547:9
  547:14 548:24
  558:7 564:17,21
  565:8
randomly 546:23
  547:1
range 467:20
rapid 541:13
  542:14 543:19
rate 438:24 439:2
  439:8,9,10 459:23
  469:25 472:16,18
  472:22 473:1,7,8,9
  473:12 495:25
  555:22 556:3
  573:2 622:19
ratios 557:16,25
  558:13
raw 404:22 406:8
  406:21 509:2
reach 519:16
  523:5 524:24

528:2,13 532:15
534:24 553:4
554:13
**reaction** 502:9
542:4,10
**reactions** 542:7
**read** 403:24 404:1
404:3 410:6,7
424:16 428:16
429:1 484:16,22
485:12,23,24
486:1,2,3,16,24
487:14 488:10,13
488:20 489:11,14
489:22 490:5
491:8,12 492:8,16
492:21 493:6
494:9,10 495:18
495:19,23 496:17
497:1 498:2,2,12
498:16,17 499:2
499:11 500:4
511:7 519:25,25
520:20 521:23
525:15 528:8,11
530:8,9 533:1,20
533:21 534:10,12
539:6 542:18,19
546:5 552:4,6
558:5 559:17,19
568:8 577:2,3
578:8,10,24,25
584:9,14 591:6
593:2,3 605:2
607:3 608:6,11
618:17 625:9
**reading** 427:5,11
430:18 492:22
496:18 497:4,6,13
497:25 498:22
508:14 567:25

599:19 615:20,21
615:22 628:19
**reads** 485:12
495:11
**ready** 428:12
464:18 468:1
474:19
**real** 505:16 555:10
598:11
**really** 438:2
445:11 451:22
471:23 484:9
495:25 497:24
502:11 540:1
550:20 553:18
561:4,16 563:1,6
601:24 605:7
606:9,11 609:22
614:5 620:1 622:6
**realm** 487:7
**realtime** 573:6
575:3 615:21
**reask** 395:20
**reason** 395:9
403:2 404:20
466:11 475:20
508:19 543:24
564:18 577:18
595:8 597:23
598:3 609:18
627:5 628:13
**reasonable** 449:3
538:22 593:9
**reasons** 530:16
538:5 620:15,16
**recall** 405:4,10,14
419:19 421:10
423:25 430:3,16
432:25 436:4
442:14,14 443:5
463:18,20,24

464:1,21,22,23
465:7 472:13
504:12 556:9
575:17 597:17
617:19
**receipt** 628:18
**receive** 429:20
440:5 441:23
442:4 588:23
**received** 396:23
397:5,17 399:10
401:25 402:7
460:16 503:12,13
503:17 504:1
511:3 549:13
556:18 557:9
567:6,9,23 569:4
571:4 585:24
599:24 606:6
609:8,11,12
610:15,21 616:4,9
616:11,13,14,15
621:1
**receives** 571:8
588:22
**receiving** 410:1
567:8 579:21
580:5,11 581:3
600:24
**recess** 428:8
477:16 555:15
585:1 598:16,25
617:12
**recollection**
404:11 474:11
**record** 392:7,13
393:11 395:20
409:16 410:7,8,18
412:18,20 418:18
419:4 428:3,6,9
477:15,18 490:6

511:22 528:11
530:9 533:21
534:12 542:19
552:6 555:9,14,17
559:19 584:20,25
585:2,6 598:11,14
598:17,23 599:1
617:7,9,10,13
624:3 626:8,11
**recorded** 392:15
**recorder** 430:9
436:4
**recording** 392:12
**records** 426:18,18
**recovery** 613:14
613:18
**recreate** 409:1
**recycle** 468:7
**redact** 620:1
**redline** 397:10
401:10 483:10
503:1,14,18,23
510:18,25 512:8
514:4,6
**redlined** 507:10
**redlines** 397:12
**reduce** 565:9
**reducing** 565:13
**refer** 576:20
618:14,18
**reference** 469:12
477:6 493:5,21
494:24 512:24
513:2,7 525:25
535:21,22 622:3
628:7
**referenced** 391:1
506:13 513:9,13
526:12 618:16
**references** 405:7
471:19 504:5,14

505:8,12 516:19
520:20 525:19
535:19,24 589:20
612:11
**referred** 423:18
599:10 618:20
**referring** 418:1
435:10,13 476:14
476:16 513:3,4
520:14,15,16
589:21
**refers** 421:17
576:19
**reflect** 464:10
**reflecting** 426:19
**reflects** 475:3
511:23
**refuse** 545:22
**refusing** 531:2
**regard** 567:21
**regarding** 411:19
425:4 476:9,14
481:25 525:19
557:17,25 558:25
592:9 593:6
594:23
**regardless** 444:1
548:19
**regenerative**
398:16
**regimen** 406:2
444:15 448:25
452:13 509:13
567:6,9,23 568:15
568:16,17,17,18
569:5,11,15 571:8
571:9 596:11
597:3,7 599:20,22
600:4,17 601:5
610:21 622:1,3

**regimens** 410:2
453:2,16,20,23
537:18 562:10
567:16 569:1,16
569:24,25 570:4,5
570:9,10 571:15
571:16,22,23
572:4,5 582:19
585:12,15,21
600:7 607:14,22
607:24,24 610:15
612:21 613:21,24
613:25 614:2
**registries** 595:17
595:22
**registry** 596:1
**regrowth** 586:8,9
586:13,20,23,25
615:5,18
**regular** 467:21
**regulatory** 501:9
502:19 516:19
**rejected** 402:14,24
409:18 410:11
623:2
**relate** 416:8 599:9
**related** 393:6
442:13 443:4
444:7,10,24
446:19 471:12
497:9,10 540:3
584:1 587:13
592:12 612:9,10
**relates** 384:5
385:5 599:15
613:7
**relating** 392:18
419:21 546:17
**relation** 418:14
**relationship** 433:1
442:15 445:14

446:19 451:23
557:20 558:25
**relative** 626:17
**relatively** 465:17
**relevant** 404:19
407:7 409:11
410:3 411:9 413:8
414:7 453:13
467:25 470:21
520:22,24 521:2
535:4 536:4 539:2
539:3 541:5 542:1
542:11,13 543:15
557:16,24 558:13
572:5 574:9,13
578:9 605:7
606:11 615:23
620:21 622:16,17
622:22
**reliable** 517:10
539:17 540:14,15
540:19 551:13
593:21 594:4
595:1,4
**reliance** 525:22
526:2,11
**relied** 516:25
558:24
**rely** 482:20 520:10
562:17 594:14
**remember** 403:14
403:20 405:1,2
431:18 435:23
436:11 442:22
443:2 463:21
504:9 514:1,7
555:24 587:21
**remembering**
575:25
**remotely** 393:10

**repeat** 447:10
553:25 559:15
**repeating** 551:25
**rephrase** 395:25
**replicated** 507:22
**replication** 538:8
539:13
**report** 389:13
390:6,9 397:7,9
401:11 402:15
403:5 407:20
408:7,9,14,18,23
409:22 410:20
411:3 415:11,14
432:23 434:19,23
435:1,8,12,13,15
435:18,20 454:3
464:8,11,12 466:2
466:16,22 470:17
470:18 472:2,2
474:15,17,23,25
475:2,5,14,15,18
475:21 476:4
482:16,18,22,25
483:8 484:8,13
485:5,13,21
486:24 487:15
488:7,13,19 489:5
489:9,12,18,21
490:4,15 491:4,9
491:14 492:7
493:7,8,18,20
494:16,23 495:6
496:1,5,7,19 497:5
497:7 498:5,8,17
498:22 502:25
503:4,9,25 504:4
504:15,22 505:4,7
505:8,10,23 506:6
507:23,25,25
508:3 509:20

512:25 513:7,13
513:19,25 514:17
515:4,6 516:12
519:3 520:10,17
520:19 522:14
525:22 526:1,11
526:13,14,16,23
526:25 527:4,5,18
527:19,21,25,25
528:3,6,15,19
529:5,6,8,11,14,16
540:23 542:21
544:8,10,11,12,13
544:18 545:12,13
545:15,16,17,21
546:4,5,10,13
548:2 553:17
555:2,25 556:11
557:6 560:17,23
565:15,24 569:22
575:11 577:14
578:5 587:3,4
589:18,20 590:10
592:15 593:11
595:6 599:11
607:20
**reported** 384:22
453:1 454:22
563:12 576:21
584:8 586:4,12,21
596:3,5,8,22,25
597:2,5,6,13,22
600:14 611:23
**reporter** 385:21
393:3 394:19
429:14 518:21
552:3 626:2
**reporting** 562:12
**reports** 402:12,23
414:11,20 446:5,8
448:14 453:9

454:8 470:10
475:11,19,22
482:21 484:5
488:22 489:16
494:2,8,10 495:12
495:15,21 496:10
498:13 499:11
501:4,13 514:24
557:2,3,8 558:2,16
565:4 567:12
569:19 596:25
**represent** 394:4
411:18,23 412:5
412:21 453:18
474:22
**represented**
595:23
**representing**
394:9,15
**represents** 464:12
581:8
**reproducibility**
519:10 546:7
564:8
**request** 401:3,10
401:21 414:10
416:4,17 417:14
420:4 421:25
423:3 425:3,15
426:17 504:22
505:2
**requested** 417:3
618:25 626:15
**requests** 416:16
**required** 452:8
627:21
**requirement**
525:15
**requires** 539:5
552:23

**reread** 501:11
**research** 390:19
408:1,17 424:2
618:22 619:10,14
**researcher** 407:24
536:14
**researchers**
407:25
**resectable** 615:8
**reserve** 393:25
394:6,12,16
**residency** 433:3,6
**resolved** 561:22
**resource** 593:23
**resources** 523:22
**respect** 394:7,12
432:15 451:2
471:22 505:19
586:13,22 588:15
620:24 621:21
622:10 623:6
**respond** 410:23
470:15 499:15
**responding** 525:24
545:24
**response** 395:18
401:4,25 402:6,16
408:21 443:21
445:16 477:4
498:6 519:9 528:9
539:12 549:9
552:5 554:4 582:8
599:23 607:15
614:25
**responses** 400:23
400:25
**responsibility**
444:2,25 451:25
**responsive** 402:17
535:6

**rest** 400:4 516:3
575:4 608:10
**restate** 395:25
432:9 447:12
**restating** 546:11
**result** 548:2 582:6
**results** 455:12
529:3 538:9 546:7
550:18 551:10
577:10 579:18
582:3 587:7
**retained** 416:6
424:7,9 434:15
624:1
**retention** 425:16
425:23
**retroactive** 473:4
**retrospect** 403:22
404:14
**retrospective**
446:1 549:2,4
**returned** 628:18
**returning** 478:21
**reverse** 562:3
**reversible** 456:1
541:15,16 621:2
**review** 401:6
408:10 411:14,19
411:25 412:5
413:3,9 414:8
434:22 435:1,7
448:12 462:15
464:7 467:5,12,14
467:14 468:15
473:16 475:2,8
482:18 490:2,10
543:13 572:2
574:17 576:12,19
577:24 585:8
612:3 616:1
626:14 628:11

**reviewed** 402:13
402:24 403:4,12
403:16,18 404:19
405:11 412:16
414:12,21 415:6
415:17,19,23
428:18 431:4
432:19,20,23
434:19,20 435:4
451:1 455:17
462:18,20,23
463:15 517:25
518:18,24 522:22
523:4,17 525:3
533:11,23 534:14
534:18 536:8,22
551:1 553:14
558:24 565:5
575:21 585:9
**reviewing** 461:3
476:4 522:5 612:9
**reviews** 576:19
**rhetorical** 551:7
**rhone** 390:21
**rid** 421:2
**right** 396:18
402:18 406:13
409:3 417:12,12
419:3 422:6
424:16 425:2
434:19 439:13
440:7,10 441:7
444:19 445:4
447:20 452:15
454:11 455:15
458:5,9 459:17,19
460:20 472:8,12
472:17,19 476:6
479:9,11 480:6,7
480:16 481:1,11
481:15 496:24

499:21 505:20
507:21 510:1
512:11 513:11
514:10,12,25
515:2 525:7,9
546:2,10 560:5
571:18 573:17
574:25 578:15
579:4 580:6,9
581:5 585:19,22
586:17,18 588:24
592:17,18 601:10
603:13 607:5
608:8 610:17
612:1 618:7
620:18
**rights** 393:25
394:6,12,16
**rise** 445:3 453:25
**risk** 436:7 442:20
443:8 444:21,21
445:2 451:4 452:1
455:19 492:4
493:1 557:16,16
557:20,24,25
558:13 592:20,21
**risks** 444:2 451:8
502:7
**robert** 390:22
**robustness** 595:18
**role** 433:23 434:9
439:12 482:15
540:20 587:25
**rorer** 390:21
**rough** 458:8
**routine** 449:18
**rule** 452:12 493:10
537:25 538:23
**ruling** 449:1 453:4
**run** 442:3 505:15

**s**

**s** 392:5 627:5
**s.a.** 627:3 628:6
**safe** 450:12,14
491:24
**safety** 443:14
444:21 452:5,14
484:20 486:10,20
487:25 488:1,12
529:24 530:4,22
531:20 532:12
533:9,15,16
534:19,20 536:4
536:19 538:19,21
539:2 540:1
547:22,24 548:2
**san** 384:17 385:18
392:1 393:1
**sandoze** 387:3
393:24
**sandra** 451:19
487:3 494:6,12
**sanofi** 386:14
393:17,19 446:9
513:1 599:7 627:3
628:6
**sansome** 385:18
392:25
**saw** 449:17 455:12
476:5 619:9 623:2
**saying** 403:20
411:8 412:9,10
413:6,12 414:4
416:12 421:9
432:8 452:7,19
453:3 456:14
499:9 513:18
518:12 520:21
543:25 563:25
564:2,14 580:22
596:24

**says** 400:15
424:17 427:11
441:12 462:7
463:15 473:16
478:25 485:3
486:17 490:16
494:19 496:8
510:3 511:7,9,13
512:10 520:2
525:17 579:19
583:25 587:9
594:1 613:21
616:10,12
**scalp** 610:11
**scan** 429:20
**scattered** 545:11
**scenes** 441:3
**scheduled** 466:2
**school** 488:18
**science** 417:2,9
418:2,4,13 423:8
423:10,14 464:14
464:15,18,20
465:13,20 466:1,5
466:9,22 467:13
467:15,16 468:7
468:10,14 469:8
469:13,19 470:2,6
470:13 471:2,7,8
471:10,12,12,19
471:22 472:5,6,7,8
472:12,13
**scientific** 407:22
408:16 413:3,13
416:8 442:11
447:2,6,24 448:3,5
448:10,18 450:8,9
450:10,13,22
453:7 492:2,25
517:10 523:1
524:8 528:25

531:21 546:6
**scientifically**
  411:24,24 443:10
  444:8,18 447:17
  448:22 450:3
  517:8 539:16
  540:15 570:8
  622:21
**scientist** 580:16
**scope** 406:12
  441:9 484:9
  569:21
**search** 405:6,9,13
  405:14 406:4,17
  407:1,5,16,20
  408:3,25 409:2,5,6
  409:14,17,24
  410:10,18 411:5
  411:10,16 412:12
  413:18,18 419:24
  453:22 579:11
  583:12,15 607:10
  608:16,22,25
  613:4 614:9
  622:15,17,20,21
  623:1,3
**searches** 409:2,7
  410:14,16 411:13
  412:11 608:20
**searching** 579:12
**second** 421:20
  423:3 428:15
  431:4 463:4,5,8
  489:12 491:7
  495:8 507:17
  572:7 573:19
  609:13 616:6
**section** 384:6
  385:6 392:23
  485:16,18 489:11
  491:6 492:22

507:22 512:9
  528:20
**sections** 435:10
**secure** 441:2
**see** 395:2,3 399:14
  420:4,23 421:1
  422:10 427:15,16
  431:2,25 433:25
  435:11 453:15
  459:18 460:12
  463:13,14 464:5
  467:10 476:13
  478:23 479:22,24
  484:2,13,15,16
  487:24 493:24
  506:2,20 509:14
  518:15 527:11
  535:3 540:13
  541:6 550:19
  553:19 570:20
  572:22 573:7,22
  574:12,15 575:14
  576:15 583:5,22
  583:23 584:10
  586:19 587:4,5,13
  589:20 591:12
  595:24 605:19
  606:10,21,25
  607:3 608:3,18
  615:10 616:3
**seeing** 477:4
  508:13 597:17
**seek** 438:7
**seen** 396:14
  403:22 404:6,14
  427:19 483:25
  484:1 494:3 545:4
  557:5 583:2
  584:16 597:16
  598:6 599:18

**seer** 594:20 595:15
  595:17,22 596:1
**segregating**
  519:20
**selenke** 614:15
**self** 545:25
**send** 420:12
  461:24 463:1,2
**senior** 612:8 620:9
**sense** 395:16
  406:12 430:20,22
  445:16 476:1
  509:12,16,18
  521:23 538:1
  621:9
**sensitive** 392:10
**sent** 401:5 420:4
  427:18,25 428:1
  461:16 496:11
  501:4,13 577:1
  578:18,18 611:16
  612:13
**sentence** 430:19
  452:18 485:10
  486:3,23 487:9,11
  487:21 488:20
  490:24,25 495:8
  501:10 507:21,22
  507:24 508:2,10
  509:11,14,16
  510:4 511:11
  516:4 527:18,18
  528:22 559:15
  583:20 598:6,8
**sentences** 487:14
  496:20
**separate** 422:17
  433:10 438:21
  446:14 510:12
  589:13,14

**separated** 453:16
  570:18
**september** 474:13
  474:13,18
**sequencing** 507:14
  507:15
**series** 446:2
  572:12
**serve** 398:4 426:1
**served** 401:1,11,14
  429:15 438:12,14
  510:17
**service** 398:10,14
  439:11
**services** 457:21
  458:1 471:21
**set** 396:23 407:20
  414:25 435:15
  438:24,24 528:3
  528:14 544:14
  545:9 626:5
**sets** 563:3,5
**setting** 610:9
**severe** 579:25
**severity** 445:19
  455:25 582:12
  600:2
**shape** 468:8 476:2
**share** 440:18
  481:22,24 482:12
  497:3 577:4
**shared** 440:22
  482:5
**sharing** 440:13
**shb.com** 386:22,23
**sheet** 523:23 627:1
  628:12,14,15
**sheets** 426:18
  429:4
**shoe** 456:6

**shook** 386:15
393:16,18
**short** 428:23
**shorthand** 385:21
626:1,9
**show** 422:3,18
452:3,17 484:5
515:8 526:17,21
527:1 538:25
539:1,2 544:10,13
**showed** 403:18
574:14,16 575:2,5
**showing** 401:13
450:9 517:6
551:22
**shown** 574:25
575:7 586:12
616:11 628:16
**shows** 425:25
557:7 582:10
**sic** 519:11
**side** 390:13 456:1
456:2,12 481:13
579:25 583:7
586:4,7,12,22
587:8,9 591:22
603:22 616:21
**sided** 463:6,7
**signature** 592:17
626:24 628:13
**significance** 539:1
540:9 548:1 564:3
**significant** 450:22
452:3 548:2
**signing** 628:14,19
**similar** 449:11
490:25 493:23
562:11 573:1
590:17 602:6,19
604:12

**simply** 394:1
623:4
**sincerely** 628:21
**single** 411:8
467:18 496:9
500:23 525:1
532:1 545:8
551:15 552:8
553:2 554:11
555:5 568:24
**singular** 421:23
**sir** 628:9
**sitting** 461:9
554:10
**six** 574:22 584:5
586:16,18 615:16
**size** 514:22,25
515:2
**sizes** 515:3,5
**skikos** 392:24
**skim** 572:17
**slash** 586:9
**slide** 464:13,16
466:13,17 495:2
**slight** 405:18
**slightly** 508:15
**small** 581:20
582:2 600:8
**smaller** 564:10,13
**smart** 436:5
**smells** 605:25
**soares** 384:22
385:20 393:4
626:25
**social** 433:7
**societies** 437:2
**society** 593:16,21
594:3,13,19 595:1
595:14,20
**sohn** 476:23 577:3

**solutions** 393:5
624:2 627:1 628:1
**somebody** 462:10
468:23 490:25
543:23 546:24,25
559:11
**soon** 429:19
**sorry** 427:11
447:8,11 462:5
469:24 480:24
484:3 518:22
554:21 568:22
590:24 603:18
616:12
**sort** 615:18
**sorted** 454:1
**sound** 411:10,25
413:12 458:9
539:16 540:15
546:6 622:21
**sounded** 434:11
**sounds** 395:22
**source** 489:5,18
495:4 523:20
551:15 552:8
553:3 593:21,25
594:13 595:2,5
**sources** 446:14
496:9 500:23
523:24 525:11
526:10 589:17
**speak** 417:18
435:14 519:15
**speaking** 461:4
**specific** 398:24
404:22 408:4
416:16 446:22
449:4,6,15,24
450:2 469:16
470:10,17,19
471:16,16 472:15

477:2 489:4,17
490:1,9,21 492:4
493:2 494:21
496:20 508:10
520:22 522:1,5,6
525:2 528:20,22
531:2,4,4 534:22
535:9 537:9 541:3
541:5,6 547:3
548:17 577:12
591:24,25 592:4,5
593:5 618:2
**specifically** 419:24
420:4,19,25
442:20 524:24
527:21 533:16
536:6 537:3
549:11 557:24
558:11 563:9
565:2 568:6
**specifics** 438:1
471:15 502:20
**specified** 453:19
544:25 568:18
**spectrum** 446:2
**speculate** 438:5
**speech** 523:8,9
524:3 539:7
**spelled** 488:25
**spent** 426:20
442:18,24 468:3
468:15 474:22
588:16
**spoke** 435:21
**spoken** 432:2,4,10
432:14
**sponsor** 502:2
**sponsors** 482:10
**spontaneous**
488:21 489:15
495:12,21 496:10

501:4,13
**sporadically**
556:21,24
**squared** 582:13
600:1
**st** 576:21
**staff** 440:24
**staffing** 472:21
**stage** 389:24
413:21 527:14
532:11 557:13
570:14 571:21
572:6 579:7
592:23 607:13
609:14 610:14,20
622:23
**stand** 498:25
499:19 500:13
**standard** 406:4
407:21 409:23
438:23 439:3,16
441:22 445:2
459:23 461:20
462:23 465:22
472:22 489:6
528:25 547:5,10
**standards** 500:13
516:15
**standing** 549:22
551:1,16 552:8
553:4 554:12,18
**standpoint** 610:17
**stanford** 433:4
**stapled** 422:12
**start** 393:12
518:23 537:14
616:5
**started** 437:18
442:14 473:5,6
523:11 537:16

**starting** 484:12
**starts** 527:13
583:20
**state** 388:6 393:10
395:17 408:24
414:18 424:15
448:4 503:17
546:9 625:16
626:2
**stated** 406:20,22
408:7,13,23
410:24 431:3
444:19 447:8
499:24 521:25
528:3,6,14 545:14
545:16,20,23
593:8 611:18
618:22 620:15
**statement** 448:3
496:3 501:3
502:12,15 517:17
**states** 384:1 385:1
392:21 472:16,18
531:14
**stating** 418:3
**statistical** 538:23
539:1,5,24 540:8
547:25 558:22,24
594:22
**statistically** 452:3
548:2
**statistics** 593:22
594:6
**stats** 508:16
**status** 436:12
**stayed** 433:19
**step** 408:2,2,24,24
459:19,21
**stephen** 387:5
393:23

**steps** 468:12
**stings** 542:8
**straight** 541:20,20
**strategic** 468:16
**strategies** 584:4
**street** 385:18
387:6 388:6
392:25
**strength** 554:1
**strengthened**
552:16
**strengthens**
445:16
**stretches** 561:21
562:2 563:11,19
563:25
**stricken** 534:6
**strike** 402:21
406:15 432:3
446:25 447:9
452:9 503:7
523:15 527:20
528:9 530:6
531:24 533:18
534:5 539:19
542:16 544:6
552:4 571:1
580:25 582:20
587:16
**striking** 561:17
**strong** 540:13
550:23 551:12
552:14 553:21
554:4,6
**strongest** 549:14
549:22 550:4,8
**struck** 509:10
549:25
**stuck** 422:19,20
**students** 451:20
487:6

**studies** 402:12,22
404:18 405:5
406:16,23 409:17
410:9,18 414:11
414:19 416:8
443:23 445:21,23
445:25 446:2,8,16
449:22 450:9,11
450:23 452:23
453:18 454:21
455:9,11,12,13
467:24 484:17
486:7,17 487:16
487:18,20 488:16
489:24 496:12
501:6,15 516:6,9
517:2,14 519:2,12
521:7 524:10
529:4 532:24
536:1 539:13
546:8 548:23,25
549:1,2,5,19 550:3
550:6,19 551:22
552:20,24 554:4,5
563:23 564:8
565:1 568:4
570:25 571:2
575:8 577:12
610:22 620:12,14
**study** 403:9 406:6
446:5 448:14
451:15 453:9
454:8,24 463:23
468:16 484:20
486:10 487:24
490:8 512:25
513:7 548:8 551:9
557:3 558:15
560:18,20 562:16
563:10 568:21
569:8 571:4 582:1

585:21 587:2
599:15,16 600:14
600:16 601:25,25
605:2 607:6,9
611:4 616:20,21
618:2 619:3 620:5
620:20 621:19
622:12
**stuff** 411:2
**subject** 406:17
440:7 588:24
**submission** 476:2
**submit** 475:25
**submitted** 429:9
435:6 460:6 470:7
470:14 476:6
504:18 511:20
**subscribed** 626:20
627:21
**subsequent** 506:23
525:19 619:15
**substantial** 448:10
448:19 450:13,22
451:25 539:10
540:13
**substantive**
512:12 514:16,18
**substituted** 430:24
**sufficient** 405:23
405:24 444:23
448:10,20 451:3
452:20 455:18,24
551:1,16 552:9
553:4 554:13,19
563:15
**suggested** 434:10
584:4
**suggesting** 421:21
**suite** 386:7 387:6
388:14 392:25
628:1

**summaries** 567:18
**summary** 491:23
492:2,24 583:18
**sun** 388:3 394:9
**support** 448:2
**supportive** 582:17
599:20
**supposed** 604:1
**sure** 400:18
414:13 417:19
429:10,24 437:8
439:7 440:8
459:19 470:16
475:10 477:11
481:16,20 491:11
492:17 495:7
501:23 502:25
505:17 509:6,20
515:17,23 523:16
526:5 527:2
559:14 575:25
582:2 584:19
590:14 598:12
613:16 618:10
**surveillance**
488:12 490:22
529:25 558:6
**survey** 454:3
**surveyed** 606:15
**surveying** 451:11
**surveys** 402:13,23
414:12,20 446:1
**survival** 548:6
**suspect** 489:4,17
**swear** 394:19
**switch** 608:1
**sworn** 627:21
**symptom** 449:19
449:21
**symptoms** 605:22

**sync** 479:23
**systematic** 409:23
413:3 448:11
454:3 517:7,10
551:13 571:24
572:1 622:20
**systematically**
411:25

**t**

**t** 387:5 509:13
511:10
**table** 402:14,25
403:13 404:21
408:6,13 409:19
410:11,19 411:2
411:18 412:4,21
413:16,20 414:2
453:15 455:14
468:5 505:18,21
505:24 506:1
516:7 517:3 519:3
520:15 521:7
557:11 567:2,6,17
567:21 568:1,3,5
569:3,3,13,14,22
571:2 575:11,14
576:9,14 577:14
578:1,4 585:11,12
585:25 586:1,4
587:2 596:6 597:9
599:9,10,11,12,16
605:6 607:6,11,19
607:20 609:5
610:23 611:1,13
611:24 612:4,24
612:25 614:10
616:2,11,24
618:16 620:15,22
621:23 622:13,25
623:8

**tabulated** 571:3
**tabulation** 569:18
597:14 607:19
**tacked** 427:17
**tag** 574:7
**take** 392:12 396:7
419:1 449:19
458:13,15,25
477:10 490:20
501:22 555:10
566:20 578:10
601:11
**taken** 385:17
392:16 418:18
495:12,14 499:20
500:17 505:13
542:5 626:4
**talk** 419:10 438:2
467:19 473:10
482:1 525:14
536:4 559:7,10,24
560:2,14 567:2
597:18 609:19,20
610:12 613:11,11
613:12,14,17
615:5 617:5
**talked** 421:13,23
422:25 423:2
443:18,24 445:11
445:15,20,22
516:18 522:11,19
544:19 554:21
573:5 587:10
622:2
**talking** 400:25
417:13 419:20
425:10 442:19,25
444:6 446:23
449:1 461:11
484:25 487:20
488:5 491:1 510:8

522:15,16 526:17
527:13 539:24
541:4 556:2
558:15 559:3,20
566:19 572:3
581:18,19,20,20
581:22 585:5
596:12 605:20
606:5,22,25
607:12 609:16,22
613:10
**talks** 527:15 587:8
**tally** 568:9,11,12
587:19
**tanya** 384:7 385:7
392:19
**taught** 494:17
**tax** 512:25 516:1
518:19,25 546:14
547:3,16 558:11
561:7
**taxane** 453:18,19
453:20 477:1
568:17,18,18,25
570:6,9,10,17
571:8,9,12,15,16
571:22 572:4,5
576:2,25 577:4
580:20 596:10
600:19 607:24
612:11,21
**taxanes** 477:8
585:18
**taxes** 440:7 588:24
**taxol** 454:11 510:3
511:11,13 568:15
568:17 569:15,20
570:4,19 572:9
576:23 596:4
597:7 611:7
613:24

**taxotere** 384:4
385:4 392:17
401:23 402:8
407:8 410:2 412:1
413:4,21 416:10
425:5,6,18 426:21
432:16,22 433:24
434:15 436:7
439:19 441:10,14
442:8,25 444:15
446:20 447:2,17
448:22 451:2
452:20,24,24
453:1,16,17,24
454:9,18 457:21
458:2 459:16
460:20 465:3,11
474:4 494:23
506:10,18 507:2
509:12,14,15
511:10 518:1
521:10,13,20
522:1,5,7,13,15,25
527:14 537:17,17
540:2 548:16,21
551:2 553:5
554:14 556:18
557:9 568:15,16
568:23 569:15,24
569:25 570:3,5,18
570:22 572:9
576:3,8 577:7
588:1 607:23
611:9,12,22
612:12,21,22
613:23,24,25
618:24 619:4,17
**teach** 451:18
487:3 488:2,17
490:20 494:5,11
494:15,20

**telecon** 420:24
423:24 424:14,15
**teleconference**
424:17 463:16
**telephonic** 387:1
388:1
**tell** 422:3 428:14
435:4 436:25
472:9 476:10
478:2 511:8
530:16 532:6
549:25 556:19
561:2 567:5,10
579:14 602:15,21
**telling** 405:14
**temple** 390:23
**temporality** 544:3
**temporary** 456:1
**ten** 406:10 416:2
479:5 504:8,13
508:12 514:12
561:15 576:21
602:12 603:9,10
605:13 606:17,18
621:6
**tend** 429:19
**tendency** 395:13
**tenfold** 580:23
**tenth** 561:19
562:11
**term** 405:16
466:17 487:11
488:4 540:4
559:13 583:17,23
586:24 606:22
608:17,18,25
**terms** 405:6,9,14
406:17 407:10,16
407:24,25 408:2
409:5,17 410:10
410:18 411:5

413:18 418:2
441:4 443:4 453:8
457:9 471:16
516:19,22 517:6
517:14 518:10,13
519:6 520:9
521:11 523:13
524:23 526:8
530:18 532:8,12
538:11 539:10,11
541:10 547:8
559:4,20 563:4
569:2,22 579:11
583:12,15 587:5,6
601:22 603:7
606:3 608:14
620:23 621:19
622:9,21 623:5
**test** 538:23 540:8
**testified** 394:22
404:18 424:10
452:2,11 497:15
500:12 507:19
597:21 612:2
618:5,12 620:13
**testify** 395:10
417:5
**testifying** 418:23
421:7 424:7
425:18 626:7
**testimony** 404:2,4
404:7,8,12 405:1
413:16 414:1
415:24 417:3
422:22 425:25
426:5 430:4
435:10 438:22
439:8,9,10 450:25
465:20 468:8
474:19 493:25
495:23 497:13,23

504:21 520:25
521:2 559:18
588:21 598:1,7
611:10 620:20
625:12 626:11
**testing**  539:25
540:1
**tests**  539:6
**textbook**  502:8
**texture**  541:19
587:11 613:11
615:14 621:15
**thank**  395:5
401:20 414:16
415:12 416:15
418:21 426:16
427:23 507:4
582:4 592:14
598:21 616:14
617:2,4 623:21,22
623:23
**thanks**  394:7
478:4
**theirs**  588:25
**theories**  502:7
**theory**  536:10,12
**therapies**  531:17
531:18 570:13
571:18
**therapy**  543:22
606:6 616:4
**thickening**  613:17
**thing**  460:10
505:23 538:21
573:7 609:13
612:6
**things**  395:19
407:14 430:11,25
436:3,11 440:3
449:15 450:17
451:14,16 453:4

467:20,21,25
468:12,20 482:4
515:16 520:22
529:7,8,12 533:6
538:23 542:1,6,9
542:11 543:3
544:1,5 547:7,9
565:12 570:11
593:25 621:16
**think**  395:18
401:4 404:4,5,17
405:14 407:25
408:8,15 411:1
412:19 413:1
414:7 415:2,9,10
417:4,17,20,24
418:1,2 419:6,7,7
423:11,21 424:8
424:10 425:20
428:3,21 429:16
430:13 431:20,22
434:25 435:9,24
436:22,22,24
439:15,15 442:9
443:3,13 447:6,24
448:4,5,8,8,9
449:3 451:24
453:3,15 455:24
460:10,12 461:22
465:5,7 469:20
470:21 471:23
475:24 476:20
482:13 487:2
490:19 491:2,15
493:24 495:9
497:15 499:18,18
499:20 500:10
502:21 504:11,16
510:23 511:22
512:17,23 513:12
514:3,13 515:9,9

516:11,12 517:9
517:18 518:16
521:14,15 524:12
527:15 529:13,23
532:7 533:7 534:2
535:5,5 537:11
538:24 540:9
541:1,4,10 543:3
544:2,11 545:11
545:15,17,21,24
546:3 548:12,14
548:15 550:3
551:20,24 552:13
552:14,16 553:7
553:14,24 554:1,3
554:8 557:19,21
561:7,8,21 562:22
563:1,6,18 564:22
564:22 565:13
567:11,13 571:20
572:21 573:11,15
574:12,25 575:2
578:15,18 582:16
583:2 586:14
590:20 595:21,24
596:5,17 597:14
598:13 599:11,17
599:19 601:21,21
602:7 604:21
605:7 606:2,21
613:9 614:18
616:6,16 617:24
618:2 623:20
**thinking**  424:1
436:21 437:8
438:2,9 526:9
**thinks**  437:4,12
**third**  416:5 573:21
**thirty**  628:18
**thornton**  386:4,5
389:6 393:12,12

400:4,22 401:2,8
404:10 406:24
409:20 411:22
412:7,25 413:19
414:13,16 416:25
417:12,19 418:6,8
419:3,12,16
423:11,15,19
426:14 427:21
428:5,22 429:10
429:12,21 431:11
431:19,22 442:16
443:12 447:21
463:16 464:22,24
469:23 472:10
473:19 474:7
477:11 484:2
486:25 491:10,15
496:15 497:18
498:20 499:17
500:6,12,17 501:8
501:17 502:10,17
504:2,25 505:5
510:12 511:19
514:2 521:21
525:5 528:4 534:1
534:4,9 535:16
539:22 544:16
545:18 550:11
551:4,19 552:12
556:7 559:2 560:8
562:20 566:16,21
569:6 584:13,18
584:23 594:17
595:3 597:24
598:4,12,22 599:4
604:10,19 609:3
610:16 617:2,24
623:23
**thought**  419:12,13
429:14 434:8

456:1 490:2
510:13 555:7
561:25 562:15
565:19 566:1
572:7 575:25
578:9 599:13
**thousand** 406:11
**three** 387:15
393:13 416:16
428:22 431:11
446:14 475:5,20
476:22,25 477:6,7
506:2 513:25
514:11 541:14
551:20 553:7
554:9,16,25 555:7
562:23 574:22
581:8,11 583:19
600:7 601:15
624:1
**throwing** 519:23
**thursday** 478:17
**time** 395:7,24
396:7 400:18
403:18 409:8,15
419:2 425:20,22
426:18,18,19,22
428:7,10 433:13
433:16 435:9
437:9 442:18,24
443:19 445:12
449:11 452:2
457:14,18 458:13
458:15 460:5,12
463:19 468:3,15
468:22 472:12
473:12 474:20,22
475:3,22,25 476:3
476:6 477:10,14
478:23 479:22
481:4 498:15

499:5 503:7 524:7
524:21 529:17,21
530:4,10 533:12
533:23 534:14
546:12 548:18
555:13 561:15,20
562:22 573:5
578:10 584:25
585:3 586:14,18
587:9 588:4,15
589:15 594:10
595:13 598:15,18
598:24 599:2
605:1,16,18,21
606:4,19 607:1
608:5,6 609:24
615:15 616:6
617:11,14 621:3
624:2,4 626:5
**timeline** 417:8
**times** 470:25
471:20 475:20
527:3 534:18
547:25 563:7
**timing** 438:3
443:19 445:12
461:21 519:8
529:2 538:8
539:10 544:2
**tiny** 581:21
**title** 485:11 579:5
579:10 583:7,10
**today** 395:10
396:18 407:8
409:14 414:23
425:9 431:8 439:1
461:5,7,9 509:25
510:7,15 511:3,15
511:16 535:2,13
554:10 566:7
579:2 588:17

614:14,22
**today's** 623:25
**told** 423:1 434:11
434:18 436:2
438:9 446:22
465:15,19,21
467:18 468:22
510:16 513:24
514:11 618:12
**toll** 628:2
**tone** 491:8 495:9
**tones** 491:7
**tool** 546:22
**top** 398:14 430:2
476:7,12 486:15
488:20 495:8
555:24 583:5
606:8
**topic** 407:7 412:6
412:22 437:14
454:17 492:11
515:18 537:19
539:8 540:7
569:24
**topics** 407:7
442:19
**tosti** 399:20 573:8
573:14 574:14,17
602:4
**total** 458:22 459:1
459:9,11,14 460:1
460:2 467:9
505:25 565:10
571:3,7,7 579:25
587:23 588:6,7
**totaling** 457:25
**touch** 433:19
**touched** 515:12
**track** 401:15
409:16 410:9,17
483:10

**tracking** 400:23
414:14
**training** 407:5,23
408:16 517:12,15
**transcribed** 430:9
626:9
**transcript** 625:10
626:10,13,15
628:10,11
**transcripts** 415:20
415:21
**translation** 403:23
403:25 404:15
578:25 608:7
**transparency**
451:22 516:15
**transparent** 437:5
437:7
**transplantation**
609:19,24 610:8
**transplants** 610:3
**traurig** 387:4
393:24
**travel** 460:11,14
460:17
**travelers** 479:8
**treat** 398:25
**treated** 502:9
607:2 621:5
**treaters** 593:6
**treating** 416:7
453:13
**treatment** 443:25
444:3 456:5,9
485:16 584:1
590:1 592:1,10,22
592:25 605:14
606:19 610:3
**treatments** 609:25
**tremendous**
604:17

**trend** 564:10,25
  565:3
**trial** 439:9 544:20
  547:6,14 562:7,9
  564:17,22 565:1,9
**trials** 407:4 445:24
  445:25 451:9
  452:21 484:19
  486:9,19 488:3,4,5
  490:23 516:1
  517:1 518:19,25
  521:6 527:16
  532:18,21,23
  546:15 547:9,19
  548:4,24 550:15
  557:21,23 558:8
  562:24 563:23
**triangulation**
  549:18 550:14
**tried** 569:10
**trip** 478:12,17
  479:2,4
**triple** 564:12
**true** 494:3 504:23
  507:12 515:25
  517:23 521:16
  548:6 549:13
  571:19 625:13
  626:11
**trust** 458:19
**truth** 422:4 435:4
  549:25
**truthful** 410:22
**truthfully** 395:10
**try** 461:24 479:23
  611:17
**trying** 423:22
  507:3 514:7 521:1
  530:2 543:4
  560:12 571:23
  572:2 616:9

**tucker** 388:12
  394:15
**tuckerellis.com**
  388:17
**tumor** 532:10
**tune** 553:9
**turn** 396:21 457:4
  459:8 463:3
  466:24 469:4
  473:13 474:12
  477:25 485:5,7
  486:12 488:6,19
  491:3 495:5 496:6
  506:5 507:5
  565:15 572:10
  585:25 613:1
**turnabout** 419:7
**turning** 400:16
  414:9
**turns** 611:5
**twice** 508:1
**two** 428:21 431:10
  467:4,7 468:12
  478:15 491:7
  506:2 507:10
  516:1,25 518:18
  518:24 521:5
  541:13 574:22
  575:2,12 583:19
  586:1,18 587:9
  589:13,14 591:13
  602:3 603:7 604:9
  605:13 621:8
**type** 437:24
  446:19 451:10
  468:1 506:24
  518:10 523:24
  594:14 621:13
**types** 430:24
  445:21,22 446:16
  449:15 450:23

451:14 453:23
  468:19 518:6,13
  520:13 523:12
  529:1 542:6
  543:14 545:5
  548:23 550:6
  552:20 554:2
  570:11
**typo** 422:22,23
  475:13,17,18
  509:15 511:5
  566:9
**typographical**
  505:10 512:17
**typos** 514:15

**u**

**u.s.** 555:23 556:5
**ultimately** 403:12
  409:18 410:11,19
  417:9 468:4
  503:25 613:22
**um** 400:21 464:9
  467:6,8 474:16
  475:13 486:14
  560:19 585:17
  586:6 593:13
**unbelievable**
  563:12
**unbiased** 409:23
  448:12
**uncommon** 487:11
**undersigned** 626:1
**understand** 395:6
  395:23 396:4
  400:19 406:13
  439:7 447:1,16
  459:5,7 469:3
  500:3 501:23
  515:23 517:19
  527:2 534:6
  536:20 537:7

559:14 606:9
  611:10,18
**understanding**
  399:18 402:7
  415:10 417:7
  426:24 427:14
  439:14 441:20
  460:2 471:3,5
  481:12 507:9
  601:18
**understood** 396:1
  446:24
**uneven** 587:12
**unevenness**
  615:14
**unintentionally**
  499:4
**unique** 459:24
  518:9
**unit** 392:14
**united** 384:1 385:1
  392:21 478:1,4,6
  531:14
**university's**
  576:22
**unpublished** 453:9
  454:5,8,12 551:11
**unrelated** 495:24
  497:1,14,23
  498:22
**unreliable** 595:9
**unruliness** 613:12
**unusual** 479:23
**update** 398:2
  602:9
**updated** 401:25
  409:12 535:2,13
  604:3
**usable** 407:13
  563:21 564:16,22
  565:14,14 622:6

623:19
usage 430:14
use 404:24 448:9
  450:7,15 455:20
  468:24,25 475:21
  475:22 482:20
  488:5,17 491:24
  492:11 493:22
  494:7,15 507:14
  518:7,11 521:10
  525:3,12 527:14
  533:9 540:4 554:9
  565:17 606:22
  622:8 623:4
useful 518:6
  593:23
uses 526:3 565:10
usually 461:24
  462:23 469:14
utilize 516:20
  538:3
utilized 536:11

**v**

v 627:3 628:6
validity 544:21,21
variation 405:18
variety 398:25
  451:16 452:23
  467:21,25 524:20
  530:4 532:18
  533:15 547:8
  588:5
various 419:9
  539:13 567:16
  607:14
veeny 430:20
velban 616:15
verghese 592:9
verify 590:11,14
veritext 393:4
  429:18 624:2

627:1 628:1,7
version 397:10
  398:1 401:11,14
  483:9,11 494:1
  503:1,12,14
  511:12,17 512:3,5
  512:19 514:4,6
  527:11 565:16,18
  565:20 566:3,6,9
  566:18 618:6
  620:4
versions 565:17
  602:3
versus 439:22
  569:25
video 388:20
  392:6,12,15
  393:22 394:18
  428:6,9 477:12,17
  555:11,16 584:21
  584:24 585:2
  598:14,17,23
  599:1 617:6,10,13
  623:24
videographer
  393:3
videotaped 384:16
  385:16 389:10
view 512:12
viewpoint 517:13
visit 449:18
vitae 389:16
  397:24 402:1
volume 384:19
  385:17 389:3
  392:14 430:13
  477:13,19 555:12
  555:18 613:14,17
von 386:7

**w**

w 390:10 628:1
wait 447:5 476:17
waiting 516:3
waived 628:19
walk 400:18
  503:24
want 400:17
  414:13 419:5
  422:18 439:7
  440:4 446:18
  447:10 450:3
  458:13 464:13
  467:22 469:16
  485:7 491:11
  499:4,7 502:21
  504:14 507:8
  512:3 515:8,15,22
  518:8 520:18
  521:3 522:14
  523:7 526:19
  527:2 540:4 554:8
  560:24 567:2
  571:11 577:21
  580:13,24 584:14
  584:21 591:7,24
  601:7,8 617:6
wanted 417:23
  418:1 435:11
  466:5,19 468:23
  469:3 485:23
  524:13 570:2,20
  592:7
wanting 522:4
  547:20
warning 455:19
warrant 554:19
washington 387:7
way 410:23 416:9
  447:8 468:5,8
  482:7 500:9

512:18 514:5
518:15 526:23
540:5,16 544:20
544:23,25 545:5
547:10,15 564:19
597:18 601:23
603:15 608:25
620:1
we've 396:22
  415:15 431:6
  512:5 520:3
  522:11 604:21
wealth 501:25
web 590:9,12,13
website 506:12,17
  506:17,21,21
  524:5 525:9
  589:25
wednesday 428:24
  431:15,16
week 419:25 420:3
  420:18 428:22,24
  431:11 504:8,10
  504:12,13
weeks 461:25
  541:14
weigh 548:10
weight 455:17
  549:14 584:6
weighted 549:12
went 458:6 460:13
  519:14 528:25
  531:14 548:17
  585:6 621:6
west 388:12
  394:15
whereof 626:19
whispering 392:10
wide 530:4
withdraw 447:14

**witness** 389:2
393:20 394:19
397:21 404:11
406:25 409:21
410:13 411:23
412:8 413:1,20
417:20 418:4,7,12
419:17 423:22
425:18 427:10,14
427:24 431:24
438:13,14 439:13
442:11 443:13
447:22 461:6
468:9 469:24
472:11 484:4
487:1 491:11
498:21 499:18
500:7 501:10,18
502:11,18 504:3
505:6 510:14,21
511:24 514:3
521:22 525:6
528:5,16 530:15
534:2,8,17 539:23
542:24 544:17
550:12 551:5,20
552:13 556:8
559:3,25 560:9
562:21 566:1,7,10
566:14,17,23
569:7 584:16
589:24 591:5
594:18 595:4
597:25 598:5,21
603:18,22 604:17
610:7 623:22
626:19 627:4
628:8,10
**witness's** 580:25
582:21

**witnesses** 575:1
626:6
**witness'** 628:13
**woman's** 456:15
**women** 389:23
456:3 538:11
541:2 555:23
556:5,17 557:9
579:7
**wondered** 404:5
404:13
**word** 430:7,8,14
430:16,17,19,23
447:22 448:7,9
450:7,16,21
468:24 492:11
509:9,10 510:1,11
511:1,4,5 545:24
608:22 623:9,10
**words** 405:18,19
430:21 470:5,12
471:7 620:10
**work** 424:2,3
426:20 439:25
440:25 441:3,9
456:11 458:24
459:16 460:19
461:3 466:15
481:21 482:2
530:2,19,24 533:2
536:13 538:14
553:8
**worked** 451:13
482:8,9,10 529:24
531:7,11 595:17
**working** 407:2,3
451:8 466:15
468:17 481:24
530:1 566:16
595:25

**works** 401:9 439:2
**world** 411:8
479:21 501:1
541:25 618:21
619:10,13
**worldwide** 409:24
**worthy** 411:1
**write** 435:22
437:25 472:1
477:4
**writing** 437:19
470:18,18 471:17
474:15,17 475:1,2
475:5,21
**written** 410:17
424:21,24,25
463:20 492:18
509:18 524:4
560:23 578:3
602:19
**wrong** 419:10
423:1,2 510:10
511:1 575:12
576:1,2,11 591:2
611:19 618:13
619:12
**wrongly** 576:22
**wrote** 423:1
575:15,20 594:10
618:17

**x**

**x** 553:13,13,14
626:15
**xencor** 398:6,21
398:22

**y**

**y** 553:13,15
**yagata** 574:18,20
575:10 577:12,17
578:4 613:1,7

614:8
**yeager** 574:16
575:10 576:12,12
577:9,12,17 578:4
612:1,3
**yeager's** 576:19
**yeah** 402:6 422:5
422:21 424:23
425:10 429:12
432:9 435:24
439:14 440:9
458:17 459:7
462:14,14 463:11
464:17 467:2
474:10 478:5,25
481:8 483:15
484:15 485:1,9,25
487:24 488:15
489:13 501:18
503:13 505:22
506:3,20 507:13
507:16 509:3,21
510:16 512:18
519:19 522:20
526:1 529:21
537:23 550:12
559:25 567:11
568:24 573:18
574:3 576:18
581:11 586:3
589:23 591:9,9,9
594:9 595:21
596:11,24 601:6,8
602:2 617:8
**year** 433:20,22
463:25 476:21,22
494:20 508:12
561:15 588:11,13
589:5,6,8 594:7,7
**year's** 457:18

| |
|---|
| **years**   407:2,5,22<br>  433:15,17 449:17<br>  494:18 517:11<br>  518:3 530:24<br>  531:8 536:13<br>  541:16 576:21<br>  605:13 606:15,17<br>  606:18 621:6<br>**yellow**   491:19,20<br>  491:21<br>**yesterday**   429:18<br>  578:15,19<br>**york**   387:17,17 |
| **z** |
| **z**   553:13,15 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.