DR. AZAEL FREITES-MARTINEZ CHALLENGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                    Civil Action No. 16-MD-2740
                    Section "H"(5)
                    New Orleans, Louisiana
                    December 14, 2020

THIS DOCUMENT RELATES TO ALL CASES
*************************************************************

TRANSCRIPT OF PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DR.
          AZAEL FREITES-MARTINEZ (DOC. 11355)
     HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
              UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:

                *DAWN BARRIOS*
                BARRIOS KINGSDORF & CASTEIX
                701 POYDRAS STREET
                SUITE 3650
                NEW ORLEANS, LA 70139

                *MATTHEW PALMER LAMBERT*
                GAINSBURGH BENJAMIN DAVID MEUNIER
                & WARSHAUER
                1100 POYDRAS STREET
                SUITE 2800
                NEW ORLEANS, LA 70163

                *CHRISTOPHER COFFIN*
                PENDLEY BAUDIN & COFFIN
                1515 POYDRAS STREET
                NEW ORLEANS, LA 70112

                *KAREN BARTH MENZIES*
                GIBBS LAW GROUP
                400 CONTINENTAL BOULEVARD
                EL SUGUNDO, CA 90245

APPEARANCES CONTINUED

OFFICIAL TRANSCRIPT

*DARIN SCHANKER*
BACHUS & SCHANKER
1899 WYNKOOP STREET
SUITE 700
DENVER, CO 80202

*DAVID F. MICELI*
SIMMONS HANLY CONROY
ONE COURT STREET
ALTON, IL 62002

FOR SANOFI S.A.:

*HARLEY V. RATLIFF*
*TORREY PETERSON*
*JORDAN BAEHR.*
*CONNER J. SEARS*
SHOOK HARDY & BACON
2555 GRAND BOULEVARD
KANSAS CITY, MS 64108

*DOUGLAS MOORE*
*KELLY E. BRILLEAUX*
IRWIN FRITCHIE URQUHART & MOORE
400 POYDRAS STREET
SUITE 2700
NEW ORLEANS, LA 70130.

*JON STRONGMAN*
SHOOK, HARDY & BACON
1155 F STREET NW, SUITE 200
WASHINGTON, DC  20004

FOR HOSPIRA, INC., HOSPIRA WORLDWIDE, LLC,
FORMERLY DOING BUSINESS AS HOSPIRA WORLDWIDE, INC.,
AND PFIZER, INC.:

*JOHN F. OLINDE*
CHAFFE MCCALL
1100 POYDRAS STREET
SUITE 2300
NEW ORLEANS, LA 70163

FOR SANDOZ, A NOVARTIS DIVISION:

*NICHOLAS INSOGNA*
GREENBERG TRAURIG
3333 PIEDMONT ROAD NE
SUITE 2500
ATLANTA, GA 30305

APPEARANCES CONTINUED

FOR SANDOZ, A NOVARTIS DIVISION:

        *DEBORAH C. ROUEN*
        ADAMS & REESE
        701 POYDRAS STREET
        SUITE 4500
        NEW ORLEANS, LA 70139


FOR ACCORD HEALTHCARE, INC.:

        *BRENDA A. SWEET*
        *JULIE A. CALLSEN*
        TUCKER ELLIS
        950 MAIN AVENUE
        SUITE 1100
        CLEVELAND, OH 44113

FOR SUN PHARMACEUTICAL:

        *GEOFFREY M. COAN*
        HINSHAW & CULBERTSON, LLP
        28 STATE STREET
        FLOOR 24
        BOSTON, MA 02109



Official Court Reporter:    Nichelle N. Wheeler, RPR, CRR
                                  500 Poydras Street, B-275
                                  New Orleans, Louisiana 70130
                                  (504) 589-7775


    Proceedings recorded by mechanical stenography,
transcript produced via computer.

I N D E X

ORAL ARGUMENT                                        Page

    BY MR. MICELI                                        6
    BY MR. BAEHR                                        19
    BY MR. MICELI                                       28

1          **P R O C E E D I N G S**

10:07:01AM  2          (Call to order of the court.)

10:07:01AM  3          THE CASE MANAGER:  This is the matter of *Taxotere*,

10:07:07AM  4   MDL 16-2740, oral argument, and, counsel, I guess just who is

10:07:15AM  5   arguing, if you would like to make your appearance for the

10:07:17AM  6   record.

10:07:20AM  7          MR. BAEHR:  This is --

10:07:20AM  8          MR. MICELI:  Plaintiff's --

10:07:22AM  9          MR. BAEHR:  -- Jordan --

10:07:24AM  10          MR. MICELI:  I'm sorry.  Go ahead, Jordan.

10:07:26AM  11          MR. BAEHR:  Jordan Baehr on behalf of Sanofi.

10:07:29AM  12          MR. MICELI:  And this is going to be David Miceli on

10:07:32AM  13   behalf of the PSC and Ms. Kahn.

10:07:35AM  14          THE COURT:  Okay.  Mr. Miceli, are you ready to

10:07:37AM  15   proceed?

10:07:38AM  16          MR. MICELI:  I am ready to proceed, Your Honor.

10:07:40AM  17   Although right before we came on, I attempted to share my

10:07:44AM  18   screen so that I could put up my PowerPoint and it said that

10:07:47AM  19   the sharing screen had been disabled.

10:07:50AM  20          Oh, there we are.  I now have it, Your Honor, so I

10:07:53AM  21   can share my screen.  Can you see that?

10:07:57AM  22          THE COURT:  No.  Now you know why I hate doing

10:08:03AM  23   anything by Zoom.  Okay.  Let's see.

10:08:10AM  24          MR. MICELI:  It shows that I have shared it.

10:08:12AM  25          THE COURT:  I understand.  Let me just --

10:08:16AM 1     MR. MICELI:  How about now?

10:08:17AM 2     THE COURT:  All right.  Now I have it.  Okay.  Fine.

10:08:20AM 3     MR. MICELI:  Okay.  Excellent.

10:08:21AM 4     Well, you know what, it came in on Slide 4, and I

10:08:24AM 5 want to get to Slide 1.

10:08:25AM 6     Thank you, Your Honor.  I'm ready to proceed if you

10:08:27AM 7 are.

10:08:27AM 8     THE COURT:  Please.

10:08:28AM 9     MR. MICELI:  Okay.  Your Honor, David Miceli on

10:08:32AM 10 behalf of the PSC and Ms. Kahn.  We appreciate the

10:08:37AM 11 opportunity to be before Your Honor.

10:08:39AM 12     The plaintiff's move to exclude Dr. Freites-Martinez

10:08:45AM 13 for one very simple reason, and that is that he simply lacks

10:08:50AM 14 the qualifications.  It's not about age and it's not about

10:08:55AM 15 the fact that he is a foreign doctor as is set out in

10:08:59AM 16 Sanofi's opposition.  It's quite simple.  It's about the time

10:09:03AM 17 it takes to gain experience.  He just doesn't possess it, as

10:09:07AM 18 it says here on the screen, the necessary experience or

10:09:10AM 19 expertise to serve as an expert in this matter.  And I list

10:09:14AM 20 out objectively on this first screen the objective evidence

10:09:19AM 21 of Dr. Freites-Martinez's experience.

10:09:22AM 22     He did not complete a dermatology, general

10:09:26AM 23 dermatology residency, until 2016, and this is the first time

10:09:32AM 24 that Dr. Freites-Martinez admitted in his deposition that he

10:09:36AM 25 could have practiced as a dermatologist.  It's not as if he

10:09:41AM  1   could have chosen to do so before this time.  He completed

10:09:44AM  2   his four-year residency in Madrid, Spain, in 2016.  But after

10:09:51AM  3   he completed that residency, he did not begin to practice

10:09:56AM  4   medicine.

10:09:56AM  5          As it states in the second bullet point, he began a

10:09:59AM  6   two-year research fellowship.  This is a clinical research

10:10:04AM  7   fellowship.  This is not a clinical fellowship where he is in

10:10:07AM  8   a clinic treating patients.  He never held a license in the

10:10:12AM  9   United States, and he never had a clinical fellowship.  This

10:10:15AM  10  was a research fellowship for two years until July of 2018,

10:10:20AM  11  and that for the first time, just 30 months ago, not

10:10:26AM  12  30 years, but 30 months ago, he began to practice medicine as

10:10:30AM  13  a dermatologist.

10:10:32AM  14         Now, the other thing is, the point that we want to

10:10:35AM  15  make is, Dr. Freites-Martinez's experience, as it is

10:10:39AM  16  reflected in his curriculum vitae, is a little different than

10:10:44AM  17  it is explained in Sanofi's opposition.  Each and every

10:10:47AM  18  publication in the area of oncodermatology or dermatology

10:10:55AM  19  issues that are related to cancer treatment are a result of

10:10:58AM  20  his work with Dr. Lacouture.  Dr. Mario Lacouture is a Sloan

10:11:05AM  21  Kettering oncodermatologist and has a very specialized

10:11:10AM  22  practice.  It's a practice that Dr. Freites-Martinez would

10:11:13AM  23  like to emulate someday, but as he said in his deposition, it

10:11:18AM  24  takes years and years to develop that type of a practice.

10:11:21AM  25         So when throughout the opposition that you've

10:11:24AM 1  received -- and I'm sure you have read where they refer to

10:11:29AM 2  Dr. Freites-Martinez -- Dr. Freites-Martinez's work as,

10:11:33AM 3  quote, "his work", it is not his work, and Dr.

10:11:37AM 4  Freites-Martinez admits this.  He participated in some of Dr.

10:11:43AM 5  Lacouture's work and was allowed to put himself on as an

10:11:47AM 6  author.

10:11:49AM 7       The next thing I want to go through, there are six

10:11:53AM 8  key mischaracterizations in Sanofi's opposition that just

10:11:58AM 9  need to be cleared up because as Mr. Strongman noted I

10:12:03AM 10 think -- well, not I don't think, know, prior to the Earnest

10:12:08AM 11 trial at our Daubert hearing in your courtroom, on several

10:12:12AM 12 occasions, Mr. Strongman said the particulars matter.  And we

10:12:18AM 13 agree with him on that.  The particulars matter.  More

10:12:21AM 14 importantly, the truth matters.  And the six claims that

10:12:25AM 15 Sanofi makes and that we would like to dispel and bring to

10:12:30AM 16 the Court's attention are listed on the next few screens.

10:12:33AM 17      One is that Dr. Freites-Martinez is one of the

10:12:36AM 18 world's leading oncodermatologists.  As we just went over,

10:12:41AM 19 he's been practicing medicine for 30 months in the Canary

10:12:49AM 20 Islands.  He is not at a center where he treatments

10:12:54AM 21 oncodermatology issues.  He has worked in the past 30 months

10:12:58AM 22 at two separate at multi-disciplinary clinics that include

10:13:01AM 23 dermatology service, and in our brief, our papers, both our

10:13:06AM 24 reply and our initial memorandum, we note those two and --

10:13:09AM 25 and Dr. Freites-Martinez notes that he provides general

| | |
|---|---|
| 10:13:13AM 1 | dermatology services and he consults on some cancer issues, |
| 10:13:17AM 2 | but he is a general dermatologist. |
| 10:13:23AM 3 | In January of this year, for the very first time, he |
| 10:13:26AM 4 | began practicing in -- on a part-time basis in Madrid, Spain, |
| 10:13:35AM 5 | again, with a general dermatology practice where he is |
| 10:13:38AM 6 | attempting to begin to grow an oncodermatology arm of that |
| 10:13:46AM 7 | practice, but he's at the very front end.  And as we all |
| 10:13:51AM 8 | know, because we're sitting on this Zoom conference, there's |
| 10:13:53AM 9 | been a little thing that's happened in this world that's |
| 10:13:56AM 10 | derailed a lot of things, and that is the pandemic we're |
| 10:13:59AM 11 | having to deal with.  And so Dr. Freites-Martinez is at the |
| 10:14:01AM 12 | very beginning of his journey to become something that he |
| 10:14:05AM 13 | wants to become like Dr. Lacouture. |
| 10:14:07AM 14 | Secondly, as we've pointed out already, Sanofi |
| 10:14:11AM 15 | repeatedly refers to all publications as "his work", but Dr. |
| 10:14:18AM 16 | Freites-Martinez admits that the only reason he is on those |
| 10:14:21AM 17 | publications is because of Dr. Lacouture.  Our papers make |
| 10:14:27AM 18 | clear Dr. Lacouture's funding, Dr. Lacouture's research |
| 10:14:32AM 19 | grants, and Dr. Lacouture's position are the reason those |
| 10:14:36AM 20 | dermatology articles are written.  I think to state it |
| 10:14:40AM 21 | differently, if there were no Dr. Freites-Martinez, there |
| 10:14:44AM 22 | would still be a Dr. Lacouture and Dr. Lacouture's |
| 10:14:52AM 23 | publication.  Dr. Freites-Martinez is not the genesis of why |
| 10:14:55AM 24 | those publications are on his CV.  That is the credit that |
| 10:15:00AM 25 | goes to Dr. Lacouture. |

| | |
|---|---|
| 10:15:02AM 1 | Secondly, Sanofi states that Dr. Freites-Martinez is |
| 10:15:08AM 2 | one of the handful of people in the world currently running a |
| 10:15:12AM 3 | clinical trial regarding persistent hair loss and |
| 10:15:18AM 4 | chemotherapy, and they cite -- the only thing they cite here |
| 10:15:20AM 5 | is to his curriculum vitae.  And, again, that is another |
| 10:15:25AM 6 | piece of research that was credited to Dr. Lacouture, Dr. |
| 10:15:29AM 7 | Lacouture's funding, Dr. Lacouture's research.  There is |
| 10:15:33AM 8 | absolutely no evidence that Dr. Freites-Martinez provided in |
| 10:15:38AM 9 | his deposition or in his report that he is still currently |
| 10:15:44AM 10 | handling anything concerning a clinical trial regarding hair |
| 10:15:49AM 11 | loss and chemotherapy. |
| 10:15:52AM 12 | In fact, the references here on the right, on the |
| 10:15:55AM 13 | bottom of the right screen, Dr. Freites-Martinez handed off |
| 10:16:01AM 14 | that research to Dr. Lacouture's next research assistant, |
| 10:16:07AM 15 | Dr. Gregory Phillips.  That's clear from Dr. |
| 10:16:13AM 16 | Freites-Martinez's testimony. |
| 10:16:14AM 17 | The fifth -- or excuse me -- the fourth |
| 10:16:17AM 18 | representation that Sanofi makes is that Dr. Tosti recognizes |
| 10:16:22AM 19 | Dr. Freites-Martinez as one of the leading authorities in the |
| 10:16:26AM 20 | world, but when asked that very question by Sanofi's counsel |
| 10:16:31AM 21 | on December 12, 2019:  "Do you think he, Dr. |
| 10:16:38AM 22 | Freites-Martinez, what we're referring to here, is one of the |
| 10:16:40AM 23 | leading authorities in the world?" |
| 10:16:42AM 24 | And Dr. Tosti says, "No, I don't think so." |
| 10:16:45AM 25 | And if we go to the reference in the deposition, she |

10:16:48AM  1   goes on to point out that Dr. Lacouture is and she herself is

10:16:53AM  2   a leading authority in the world, but not Dr.

10:16:57AM  3   Freites-Martinez.

10:16:58AM  4        Fifth, Sanofi represents that the publications in Dr.

10:17:05AM  5   Freites-Martinez's CV reflect hundreds of examinations and

10:17:11AM  6   diagnoses by Dr. Freites-Martinez of patients with persistent

10:17:17AM  7   hair loss and cancer treatment, and they cite -- you see here

10:17:20AM  8   on page 5, footnote 10 -- involves three articles that are on

10:17:24AM  9   his CV.  One is the JAMA Dermatology article from 2019 that

10:17:30AM 10   we've all discussed because people have reviewed it and given

10:17:34AM 11   different meanings to it, and there were two CME review

10:17:39AM 12   articles -- literature review articles that Sanofi cites to.

10:17:43AM 13   Nowhere in those articles as we point out --

10:17:49AM 14        THE COURT:  I lost your --

10:17:52AM 15        MR. MICELI:  Are you -- can you hear me?

10:17:54AM 16        THE COURT:  I can hear you, but I lost your

10:17:57AM 17   PowerPoint.

10:17:59AM 18        MR. MICELI:  Is it up now?  It appears that I -- it

10:18:03AM 19   shows that I'm connected.  Can you still -- are you still

10:18:06AM 20   without it, Your Honor?

10:18:08AM 21        THE COURT:  Yeah.  Erin, do you have it?

10:18:22AM 22        MR. MICELI:  Your Honor, I can do whichever you'd

10:18:24AM 23   prefer.  It shows that I'm still connected to the meeting and

10:18:27AM 24   I can try to share a screen again.  It appears that I'm still

10:18:31AM 25   sharing --

10:18:32AM 1        THE COURT:  Why don't you try to share it again.  I

10:18:35AM 2    have no explanation.  I can hear you.  I can see you.  I can

10:18:40AM 3    see Mr. Baehr.  I cannot see the screen.  I think we're going

10:18:42AM 4    to -- there we go.

10:18:43AM 5        MR. MICELI:  Okay.  Okay.  There we go.  And I was on

10:18:46AM 6    the bottom half of this screen, Your Honor.

10:18:48AM 7        The publications that Sanofi represents reflect

10:18:52AM 8    multiple or hundreds of diagnoses by Dr. Freites-Martinez.

10:18:57AM 9    But as you can see on the right, Dr. Freites-Martinez himself

10:19:00AM 10   refutes these representations and explains that he and

10:19:03AM 11   medical students compiled cohort data by a review of medical

10:19:10AM 12   charts that date from 2009 to July of 2017.  And, obviously,

10:19:17AM 13   if Dr. Freites-Martinez does not come to Sloan Kettering to

10:19:23AM 14   study under Dr. Lacouture until the middle of 2016, he

10:19:27AM 15   certainly could not have seen patients in 2009 through 2016

10:19:31AM 16   when he arrived.  But more importantly, Dr.

10:19:38AM 17   Freites-Martinez's testimony, the pages reflected here,

10:19:42AM 18   demonstrate that no patient examinations were done by Dr.

10:19:45AM 19   Freites-Martinez for that publication, the JAMA publication.

10:19:49AM 20   The two CME articles, if you review the methods which we

10:19:53AM 21   point out in our papers, if you review the methods of those

10:19:56AM 22   papers, those are literature reviews.  No patients were seen

10:20:01AM 23   by any of the authors.  It's just simply a review of the

10:20:05AM 24   medical literature.  So this is a very critical

10:20:08AM 25   misrepresentation because it makes it sound as though Dr.

10:20:12AM 1 Freites-Martinez is conducting a study where he is seeing

10:20:15AM 2 patients, and that is absolutely not the case.  In fact,

10:20:18AM 3 that's why we did these side-by-side comparisons.

10:20:22AM 4      I'm going to go to the next screen -- excuse me --

10:20:28AM 5 screen and this is the sixth of the three -- of the six

10:20:33AM 6 points we wanted to make.  Sanofi describes in their papers

10:20:38AM 7 -- and you can see I reference pages 5 and 6 -- they

10:20:40AM 8 reference Dr. Freites-Martinez's or I should say the

10:20:45AM 9 JAMA publication, Dr. Lacouture's JAMA Dermatology

10:20:47AM 10 publication, as demonstrating cause, a cause and effect.

10:20:52AM 11 They put incidence rates in their papers, and their other

10:20:57AM 12 experts will be talking about Dr. Shapiro in a little bit.

10:21:01AM 13      Dr. Shapiro references the JAMA Dermatology article

10:21:06AM 14 that he was a co-author on and says you can calculate

10:21:10AM 15 incidence rates, but Dr. Freites-Martinez makes it abundantly

10:21:15AM 16 clear -- and this is his quote, his deposition, "You cannot

10:21:18AM 17 calculate an incidence rate" from the 2000 -- or '19 JAMA

10:21:23AM 18 Dermatology article, "We cannot calculate the incidence of

10:21:27AM 19 any drug or any chemotherapy regimen or any endocrine therapy

10:21:32AM 20 in this paper.  This was not an incidence paper."  Pardon me,

10:21:36AM 21 Your Honor.

10:21:37AM 22      The defendants had cited to the *Conrick* (phonetic)

10:21:40AM 23 case about experts who twist or misrepresent data.  The six

10:21:46AM 24 points that are set out in this PowerPoint are clear

10:21:50AM 25 misrepresentations of Dr. Freites-Martinez's either

10:21:56AM   1   qualifications to give testimony or the actual substance of

10:22:01AM   2   what they try to say he has done that demonstrates his

10:22:04AM   3   expertise and those simply are not true.  I put here the

10:22:10AM   4   truth matters.  You know, the particulars matter as

10:22:15AM   5   Mr. Strongman said the last time.  And what I have here is,

10:22:18AM   6   Sanofi doesn't let the truth get in the way of a good

10:22:21AM   7   argument, but the truth matters.

10:22:23AM   8        The Supreme Court in *Daubert* stated that scrutiny is

10:22:29AM   9   required because expert evidence can be powerful and quite

10:22:32AM  10   misleading because of the difficulty in evaluating it.  You

10:22:38AM  11   know, the misrepresentations that we reviewed -- we reviewed

10:22:42AM  12   here this morning demonstrate why scrutiny needs to be

10:22:48AM  13   applied, and I don't know if it's a misreading of the

10:22:51AM  14   articles or what that caused it, but it's clear from Dr.

10:22:56AM  15   Freites-Martinez's own testimony, he never saw patients.  You

10:22:59AM  16   can't calculate an incidence rate, we can't change his

10:23:03AM  17   experience of 30 months.  He's undoubtedly interested in

10:23:07AM  18   developing a practice like Dr. Lacouture's.  But he's just

10:23:11AM  19   not there yet.  He's the acorn.  He's not the oak tree.  He

10:23:18AM  20   admits as much through these intentional representations.

10:23:22AM  21        You know, I was trying to think of another example of

10:23:24AM  22   how we could explain where Dr. Freites-Martinez is in his

10:23:28AM  23   journey of what he seeks to be, and I thought of the Wizard

10:23:32AM  24   of Oz, Your Honor.  He's like Dorothy when she first puts her

10:23:36AM  25   foot on the yellow brick road trying to get to Oz.  She has

| | | |
|---|---|---|
| 10:23:41AM | 1 | the sight in her eyes, she can see it way off in the distance |
| 10:23:43AM | 2 | but she's just taking her first step.  And Dr. |
| 10:23:47AM | 3 | Freites-Martinez has just put his foot upon the path to |
| 10:23:50AM | 4 | become what he wants to be.  And he's just simply not there |
| 10:23:53AM | 5 | yet. |
| 10:23:53AM | 6 | THE COURT:  Let me ask you -- |
| 10:23:55AM | 7 | MR. MICELI:  The experience -- |
| 10:23:56AM | 8 | THE COURT:  -- has Dr. Freites-Martinez ever actually |
| 10:24:01AM | 9 | practiced?  Now, I'm not talking about being a research |
| 10:24:06AM | 10 | fellow or working on a research project with a practicing |
| 10:24:16AM | 11 | oncodermatologist, but has he ever practiced oncodermatology? |
| 10:24:22AM | 12 | And what I'm talking about is seeing patients, prescribing |
| 10:24:26AM | 13 | certain therapies to help them deal with the various problems |
| 10:24:31AM | 14 | associated with chemotherapy, whether it's alopecia, |
| 10:24:37AM | 15 | nailbeds, you know, all of those various things that affect a |
| 10:24:42AM | 16 | patient undergoing chemotherapy?  But has he ever practiced? |
| 10:24:46AM | 17 | MR. MICELI:  The best answer I can give is, no, Your |
| 10:24:50AM | 18 | Honor, he hasn't, and I will say that to give him any credit |
| 10:24:53AM | 19 | that he's due is that in January of this year he became |
| 10:24:58AM | 20 | affiliated with a general dermatology clinic in Madrid, |
| 10:25:07AM | 21 | Spain, where he says he is trying to develop such a practice, |
| 10:25:11AM | 22 | but he sees some patients for oncodermatology issues when |
| 10:25:18AM | 23 | they arise.  But he is a -- |
| 10:25:18AM | 24 | THE COURT REPORTER:  Your Honor -- |
| 10:25:18AM | 25 | MR. MICELI:  Give him the -- |

DR. AZAEL FREITES-MARTINEZ CHALLENGE

10:25:18AM  1          THE COURT REPORTER:  -- Mr. Miceli --

10:25:18AM  2          MR. MICELI:  Can you hear me?

10:25:30AM  3          THE COURT REPORTER:  -- this is the court reporter --

10:25:30AM  4          THE COURT:  Now I can.

10:25:31AM  5          Well, when he was with Dr. Lacouture -- I probably

10:25:36AM  6    misspelled that -- at that time, did he see any patients or

10:25:42AM  7    was his work solely -- and I understand research matters and

10:25:51AM  8    so research is very, very important.  But my question is, in

10:25:56AM  9    that context, his work with Dr. Lacouture, was he -- was

10:26:04AM  10   there any clinical setting where he actually performed tests

10:26:09AM  11   or actually examined hands-on patients, whether it's just a

10:26:16AM  12   review -- you know, a careful looking at the scalp, or was it

10:26:22AM  13   solely research -- and I don't want to sound like I'm

10:26:30AM  14   minimizing research at all.

10:26:30AM  15         MR. MICELI:  No.  No.  I --

10:26:31AM  16         THE COURT:  Was it research where you're just looking

10:26:33AM  17   at paper and photographs and various reviewing of test

10:26:37AM  18   results, or did he actually have an opportunity to clearly

10:26:41AM  19   look at a patient's scalp, if you will, or a nailbed, if you

10:26:47AM  20   will?

10:26:48AM  21         MR. MICELI:  Well, in his deposition, he stated that

10:26:51AM  22   he was able to see patients with Dr. Lacouture in the room

10:26:55AM  23   and that he was billed under Dr. Lacouture.  What we know is

10:27:00AM  24   that Dr. Freites-Martinez has never held a license in the

10:27:04AM  25   United States and has no interest in practicing --

DR. AZAEL FREITES-MARTINEZ CHALLENGE

10:27:09AM 1      THE COURT:  Let me be frank with you.  That doesn't

10:27:14AM 2  impress me, Mr. Miceli.

10:27:14AM 3      MR. MICELI:  Okay.

10:27:16AM 4      THE COURT:  You know, people practice all over the

10:27:18AM 5  world that are imminently qualified to testify before this

10:27:22AM 6  court with the appropriate credentials and expertise, so I'm

10:27:26AM 7  not worried about that.  But -- so he did see --

10:27:26AM 8      MR. MICELI:  If I can --

10:27:29AM 9      THE COURT:  -- patients, but in the presence of Dr.

10:27:35AM 10  Lacouture?

10:27:35AM 11      MR. MICELI:  Yes, Your Honor.  But just -- if I can

10:27:37AM 12  fall back on the not being licensed, I do not fault -- if

10:27:40AM 13  he's a foreign doctor, I'm not saying he's not qualified

10:27:43AM 14  because he's not licensed in the United States.  What I did

10:27:46AM 15  ask him is, was he able to see patients and bill for his

10:27:49AM 16  services, and the answer is, no, because he wasn't licensed

10:27:52AM 17  in the US.  That's why he had to be in the presence of Dr.

10:28:00AM 18  Lacouture.

10:28:00AM 19      There was -- if you look to the Slone Kettering

10:28:09AM 20  fellowships, there is a difference between research

10:28:11AM 21  fellowships and clinical fellowships.  He is a research

10:28:15AM 22  fellow, and his practice of medicine does not begin until

10:28:21AM 23  July of 2018.  So --

10:28:22AM 24      THE COURT:  Wouldn't he be in that context as a

10:28:26AM 25  research fellow -- so let's talk about it.  He makes some

10:28:30AM  1    statements that -- that it is difficult to diagnosis alopecia

10:28:37AM  2    and he talks about patterns of hair loss and he didn't see

10:28:40AM  3    the patient, I mean Ms. Kahn, which is fine, but wouldn't he

10:28:46AM  4    have had sufficient training during that research fellowship

10:28:50AM  5    where he could speak to the difficulties associated with

10:28:53AM  6    diagnosing alopecia and with pattern of hair loss they see in

10:29:01AM  7    this context versus with tamoxifen?

10:29:07AM  8             MR. MICELI:  Well, what I would say, Your Honor, is

10:29:09AM  9    whatever level of opportunity he had to be in the presence of

10:29:12AM  10   Dr. Lacouture while seeing patients, it's still just -- that

10:29:18AM  11   still puts him, to continue my metaphor, at the very

10:29:23AM  12   beginning of the yellow brick road to where he wants to get.

10:29:26AM  13   And more importantly, you have to -- I think we have to look

10:29:30AM  14   at Dr. -- or the representations that have been made to the

10:29:33AM  15   Court about Dr. Freites-Martinez.  He claims to be

10:29:37AM  16   responsible for 13 publications that should be credited

10:29:42AM  17   truthfully to Dr. Lacouture, but in spite of doing 13

10:29:47AM  18   publications and all the research that goes into doing those,

10:29:51AM  19   he also claims that he sees patients and learns to diagnose.

10:29:55AM  20   There's no evidence as to -- other than his testimony to say

10:29:59AM  21   that he would be in the presence of patients at times with

10:30:04AM  22   Dr. Lacouture.  But, again, even if that's the case, that's

10:30:10AM  23   part of putting him at the beginning of his journey to become

10:30:15AM  24   what he wants to ultimately become.  He had no experience in

10:30:19AM  25   it prior to coming to Sloan Kettering in July of 2016.  So

| | |
|---|---|
| 10:30:30AM | 1 |
| 10:30:36AM | 2 |
| 10:30:39AM | 3 |
| 10:30:41AM | 4 |
| 10:30:44AM | 5 |
| 10:30:47AM | 6 |
| 10:30:50AM | 7 |
| 10:30:53AM | 8 |
| 10:30:57AM | 9 |
| 10:31:05AM | 10 |
| 10:31:10AM | 11 |
| 10:31:24AM | 12 |
| 10:31:25AM | 13 |
| 10:31:27AM | 14 |
| 10:31:31AM | 15 |
| 10:31:36AM | 16 |
| 10:31:39AM | 17 |
| 10:31:42AM | 18 |
| 10:31:46AM | 19 |
| 10:31:51AM | 20 |
| 10:31:55AM | 21 |
| 10:31:59AM | 22 |
| 10:32:04AM | 23 |
| 10:32:10AM | 24 |
| 10:32:12AM | 25 |

1  whatever experience he received happened in that 24-month

2  period while he was doing 13 research papers and writing

3  grants with Dr. Lacouture.

4        THE COURT:  Okay.

5        MR. MICELI:  If I could reserve some time for

6  rebuttal, I think that's all I have at this time, Your Honor.

7        THE COURT:  Okay.  Thank you.  Mr. Baehr?

8        MR. BAEHR:  Hopefully I have a moment to pull up

9  slides here too.

10       Dave, you have to stop sharing your screen.

11       All right.  I'll try to share.

12       THE COURT:  Okay.

13       MR. BAEHR:  All right.  Great.

14       Your Honor, good morning.  May it please the Court,

15  plaintiff both in the briefing and today have made some

16  misstatements of facts, mischaracterizations of facts, but

17  setting those to the side for the moment, plaintiff's

18  arguments are not supported by law.  Plaintiff raises two

19  challenges to Dr. Freites-Martinez's qualifications, one,

20  that he has, quote, "minimal experience in the field of

21  oncodermatology" and the second one would be the licensure

22  challenge which was discussed briefly just now.

23       These challenges are not bases to exclude Dr.

24  Freites-Martinez's testimony or exclude him as an expert

25  under the law.  On the contrary, Rule 702 provides that an

| | | |
|---|---|---|
| 10:32:16AM | 1 | expert -- |
| 10:32:17AM | 2 | THE COURT:  You don't need to read through 702.  I've |
| 10:32:21AM | 3 | read it ad nauseam. |
| 10:32:23AM | 4 | MR. BAEHR:  So the point here is that the plaintiff's |
| 10:32:25AM | 5 | challenge goes only to Dr. Freites-Martinez's experience. |
| 10:32:28AM | 6 | They don't challenge his knowledge, his skill, his training, |
| 10:32:31AM | 7 | or his education, and as has just been discussed, there |
| 10:32:35AM | 8 | really isn't any challenge to be brought with respect to his |
| 10:32:39AM | 9 | training and education.  He has -- he has more training and |
| 10:32:41AM | 10 | education and knowledge in the specific sphere of |
| 10:32:44AM | 11 | oncodermatology certainly than Dr. Tosti, who has her -- has |
| 10:32:48AM | 12 | her qualifications no doubt, but not specifically in the |
| 10:32:52AM | 13 | sphere of oncodermatology and, indeed, has more |
| 10:32:55AM | 14 | qualifications and is more highly qualified than almost |
| 10:32:59AM | 15 | anyone in the world in this specific subspecialty of |
| 10:33:02AM | 16 | dermatology. |
| 10:33:02AM | 17 | THE COURT:  Except perhaps Dr. Lacouture. |
| 10:33:05AM | 18 | MR. BAEHR:  Except perhaps Dr. Lacouture.  And maybe |
| 10:33:07AM | 19 | not No. 1 in the world, but certainly up there.  And there is |
| 10:33:11AM | 20 | -- |
| 10:33:11AM | 21 | THE COURT:  Has he ever practiced in that field |
| 10:33:14AM | 22 | outside of the setting as a research fellow? |
| 10:33:17AM | 23 | MR. BAEHR:  Certainly, he's practicing in that field |
| 10:33:19AM | 24 | currently.  Yes. |
| 10:33:21AM | 25 | And to address some of the confusion about his role |

10:33:26AM   1   as a fellow, he certainly did see patients.  He testified

10:33:29AM   2   repeatedly that he saw patients.  He diagnosed patients.  He

10:33:34AM   3   did everything that a practicing dermatologist does except

10:33:38AM   4   for write prescriptions as he said and do paperwork, the

10:33:42AM   5   billing that Dr. -- or that Mr. Miceli alluded to.  But, yes,

10:33:46AM   6   the years of his fellowship cannot be discounted as

10:33:51AM   7   practiced.  He was regularly seeing patients, hundreds of

10:33:53AM   8   patients in that -- in that context.  And, again, the

10:33:57AM   9   plaintiff doesn't challenge Dr. Freites on four of the five

10:34:03AM   10   grounds of qualification under Rule 702, and for that reason

10:34:07AM   11   alone, their motion should fail.

10:34:09AM   12        But even turning to the experience, Dr. Freites

10:34:13AM   13   certainly does have exceptional experience in the field of

10:34:17AM   14   oncodermatology, and it's simply a case where the quality and

10:34:23AM   15   the high relevance of his experience really makes up for what

10:34:27AM   16   is admittedly a fewer number of years of practice than other

10:34:32AM   17   dermatologists in the world.  He is without dispute the

10:34:36AM   18   leading author on four leading articles on the issues,

10:34:41AM   19   specifically of hair loss related to cancer treatment, three

10:34:44AM   20   of those specifically about chemotherapy, and also two

10:34:48AM   21   textbook chapters.  Dr. Tosti is co-author on multiple of

10:34:53AM   22   these, but he's the lead author on all of these as well as

10:34:58AM   23   others.

10:34:59AM   24        And just to address the question of whose work is

10:35:02AM   25   whose and the lead authorship question, I think an

10:35:06AM  1   appropriate analogy for the relationship of authors in

10:35:10AM  2   medical literature like this would be the authoring judge of

10:35:14AM  3   a panel judge opinion.  Of course, there are multiple judges

10:35:18AM  4   who sign on.  There's input from different directions, but

10:35:21AM  5   one judge will pick up the pen and take the laboring oar.

10:35:25AM  6   There may indeed be a presiding judge or a chief judge who is

10:35:30AM  7   administratively responsible for the endeavor as a whole, but

10:35:34AM  8   that doesn't take anything away from the preeminent

10:35:38AM  9   contributions of the lead author whose name goes on it, and

10:35:42AM  10  that is Dr. Freites-Martinez with respect to these

10:35:45AM  11  publications that we're talking about.

10:35:47AM  12          In fact, I'll skip ahead here just to kind of address

10:35:51AM  13  it head on.  The subject of Dr. Martinez's involvement and

10:35:56AM  14  contributions to the JAMA Dermatology article which was

10:36:00AM  15  discussed at length in the Earnest trial was addressed very

10:36:03AM  16  explicitly at the Earnest trial by Mr. Miceli and plaintiff's

10:36:07AM  17  expert, Dr. Feigal.

10:36:08AM  18          He asked:  When you look at the list of all the

10:36:11AM  19  authors there, how do you identify the primary author?

10:36:14AM  20          Dr. Feigal says:  The first author.

10:36:17AM  21          And Miceli asks:  The lead author whose study or

10:36:20AM  22  whose article, that was Dr. Martinez?

10:36:23AM  23          And Dr. Feigal's answer was:  Yes.

10:36:27AM  24          It really is as simply as that.  And when you look at

10:36:30AM  25  the article, of course, he's listed in the -- in the byline

10:36:34AM 1    first, but the article itself goes very carefully through all

10:36:39AM 2    the different aspects of the research and drafting and

10:36:43AM 3    publication and even the administration, and Dr.

10:36:46AM 4    Freites-Martinez is listed first on every single -- every

10:36:48AM 5    single aspect.  And he's the only physician who's listed for

10:36:53AM 6    each element of the work that went into producing this

10:36:57AM 7    article.  And this is an article that Dr. Tosti herself not

10:37:00AM 8    only cited and discussed at trial, but referenced as one of

10:37:04AM 9    the bases for her qualification as an expert in chemotherapy

10:37:10AM 10   and hair loss.  In fact, it's the only article in the last

10:37:13AM 11   seven years that she's cited as a basis for her

10:37:18AM 12   qualifications as an expert in this area.  Certainly as the

10:37:22AM 13   lead author and someone whose work was reviewed by all the

10:37:26AM 14   other authors who, of course, signed off on him being listed

10:37:30AM 15   as the lead and credited author and peer-reviewed by the

10:37:34AM 16   journal itself, he can point to that qualification as a high

10:37:39AM 17   qualification for his expertise.

10:37:41AM 18        But it's not his only publication of course.  He

10:37:45AM 19   authored several continuing medical education articles which

10:37:50AM 20   were also cited by Dr. Tosti at trial and which really

10:37:57AM 21   consist of the type of work one would expect of an expert in

10:38:00AM 22   conducting a literature review except they've been

10:38:03AM 23   peer-reviewed and published by what Dr. Tosti described as a

10:38:07AM 24   very important journal for dermatology.  The idea that his

10:38:12AM 25   work would be good enough to be peer-reviewed and published

10:38:17AM 1    but somehow not qualify him to author those same type of

10:38:21AM 2    opinions on the same subject in this litigation just really

10:38:24AM 3    doesn't add up.

10:38:25AM 4        And, further, he -- his publications don't stop here.

10:38:30AM 5    He authored textbook chapters.  He was an author of a chapter

10:38:36AM 6    in Dr. Tosti's book that she invited him to draft, to author.

10:38:42AM 7    He was the author of another textbook chapter that was not

10:38:46AM 8    Dr. Tosti's, so it's not only her, but it certainly includes

10:38:49AM 9    her recognizing his knowledge and expertise in this -- in

10:38:52AM 10   this arena.

10:38:53AM 11       And the fact is that Dr. Tosti or I'm sorry Dr.

10:38:59AM 12   Freites-Martinez's knowledge and his qualifications are

10:39:01AM 13   recognized by his peers.  They're recognized by peer-reviewed

10:39:04AM 14   journals.  They're recognized and acknowledged by plaintiff's

10:39:09AM 15   experts.  The only person who really questions his

10:39:12AM 16   qualifications and his expertise is plaintiffs' counsel and

10:39:15AM 17   really only in the context of this motion again.  At trial

10:39:18AM 18   last year, they were ready to admit that he was the primary

10:39:22AM 19   and responsible author for the publications that bear his

10:39:25AM 20   name.

10:39:28AM 21       He has other -- other publications on hair loss

10:39:30AM 22   related to cancer treatments besides chemotherapy, but these

10:39:34AM 23   are treatments that Ms. Kahn received.  So, again, his

10:39:37AM 24   expertise, his opinions are highly relevant to the claims

10:39:41AM 25   that Ms. Kahn brings.  And he's also -- you know, plaintiff's

10:39:47AM  **1**  counsel has represented that he is hoping to establish an

10:39:53AM  **2**  oncodermatology practice.  I think that's a misstatement.  He

10:39:56AM  **3**  has a -- he is a practicing oncodermatologist.  What he's

10:40:00AM  **4**  hoping to establish is the field of oncodermatology more

10:40:03AM  **5**  broadly in Europe, and he is undisputedly a leader in that

10:40:08AM  **6**  regard.  He again has publications with and without Dr.

10:40:12AM  **7**  Lacouture in Europe.  His first publication related to

10:40:15AM  **8**  dermatological effects of chemotherapy treatment was in 2014

10:40:20AM  **9**  during his residency in dermatology before he even conducted

10:40:23AM  **10**  his fellowship.  And, of course, Dr. Lacouture wasn't

10:40:25AM  **11**  involved in that.  It was a publication related to nail

10:40:30AM  **12**  effects of paclitaxel, Taxol, in an earlier stage breast

10:40:35AM  **13**  cancer patient, something we're very familiar with.

10:40:35AM  **14**           THE COURT REPORTER:  Mr. Miceli -- before you

10:40:35AM  **15**  continue, Mr. Baehr, Mr. Miceli, can you put yourself on mute

10:40:35AM  **16**  for the page turning.

10:40:35AM  **17**           Continue, Mr. Baehr.  Thank you.

10:40:51AM  **18**           MR. BAEHR:  As Dr. -- or as Mr. Miceli alluded to,

10:40:53AM  **19**  Dr. Tosti did testify in her deposition about Dr.

10:40:57AM  **20**  Freites-Martinez, and while she did testify that he wasn't a

10:41:00AM  **21**  leading or the leading authority on this subject in the

10:41:03AM  **22**  world, that, of course, isn't the standard of Rule 702.  You

10:41:06AM  **23**  don't have to be the world's No. 1 scholar or expert in a

10:41:11AM  **24**  given field, and you don't have to be more qualified than the

10:41:16AM  **25**  other experts.  You just have to be an expert.  You have to

DR. AZAEL FREITES-MARTINEZ CHALLENGE

10:41:19AM 1    be qualified.

10:41:20AM 2        THE COURT:  Mr. Baehr, I think I've gotten enough

10:41:22AM 3    about the qualifications.

10:41:26AM 4        This morning I have three motions related to specific

10:41:34AM 5    causation opinions.  How are these not going to be

10:41:40AM 6    cumulative?

10:41:41AM 7        MR. BAEHR:  So the --

10:41:43AM 8        THE COURT:  I can tell you, we're not going to have

10:41:45AM 9    three people testify as to the same thing, and I know they

10:41:49AM 10   have slightly different bases.  So maybe you need to answer

10:41:54AM 11   that for me.

10:41:56AM 12       MR. BAEHR:  Certainly, Your Honor.  I would say as it

10:41:59AM 13   regards Dr. Freites-Martinez, his -- his opinions and the

10:42:04AM 14   basis of those opinions in his oncodermatology background are

10:42:08AM 15   unique, and it truly is the case that the subspecialty of

10:42:13AM 16   oncodermatology is expertise that he brings to the litigation

10:42:17AM 17   that really nobody else does.  So his perspective on -- it

10:42:21AM 18   was Dr. Tosti who testified with respect to his article, the

10:42:26AM 19   JAMA Dermatology article, she said I never said these other

10:42:29AM 20   drugs don't cause chemotherapy.  They do cause; it's just a

10:42:33AM 21   question of what the frequency is.  And so with respect to

10:42:36AM 22   Dr. Freites-Martinez, certainly, he is -- he is

10:42:39AM 23   well-positioned to offer the insight on that publication and

10:42:43AM 24   the research which forms the basis -- as even Dr. Tosti's

10:42:46AM 25   testimony that these other drugs can cause this issue.

| | | |
|---|---|---|
| 10:42:51AM | 1 | THE COURT:  And he can't testify in other areas -- I |
| 10:42:54AM | 2 | mean, I just -- you can see my concern here, three witnesses |
| 10:42:59AM | 3 | on specific causation, three dermatologists? |
| 10:43:08AM | 4 | MR. BAEHR:  Certainly, Your Honor.  And our position |
| 10:43:10AM | 5 | would be that all three are qualified to offer those |
| 10:43:13AM | 6 | opinions. |
| 10:43:13AM | 7 | THE COURT:  That's not the question.  The question -- |
| 10:43:16AM | 8 | I'm past qualifications now.  I'm just worried about |
| 10:43:20AM | 9 | cumulative testimony.  This is me asking the question. |
| 10:43:26AM | 10 | MR. BAEHR:  Understood, Your Honor.  And perhaps I |
| 10:43:28AM | 11 | didn't speak -- it's not our intention to offer cumulative |
| 10:43:32AM | 12 | testimony from all three of the -- of the experts.  That |
| 10:43:35AM | 13 | isn't going to happen.  That isn't the plan.  Any of the |
| 10:43:39AM | 14 | experts -- all of the experts have included it in their |
| 10:43:43AM | 15 | reports so that, of course, they will be able to address it |
| 10:43:47AM | 16 | appropriately should they be called on trial as the evidence |
| 10:43:50AM | 17 | comes in.  But it isn't our intention to have all three |
| 10:43:54AM | 18 | experts provide their specific causation opinions if that |
| 10:44:01AM | 19 | satisfies the court. |
| 10:44:03AM | 20 | If you don't have any other questions, Your Honor, I |
| 10:44:05AM | 21 | will see the floor. |
| 10:44:07AM | 22 | THE COURT:  Okay.  Thank you. |
| 10:44:09AM | 23 | Briefly, Mr. Miceli. |
| 10:44:17AM | 24 | Can't hear you.  This is just a nightmare. |
| 10:44:21AM | 25 | MR. MICELI:  How about now?  Can you hear me now? |

10:44:25AM  1          THE COURT:  I can hear you now.

10:44:26AM  2          MR. MICELI:  Okay.  Excellent.

10:44:28AM  3          I will only address the last couple of comments that

10:44:31AM  4   Mr. Baehr made.  One, concerning other drugs that can cause

10:44:39AM  5   this PCIA, I think it's important for the Court to remember

10:44:43AM  6   that the experts we're hearing from today, doctors we're

10:44:49AM  7   hearing about today, Dr. Freites-Martinez and Dr. Shapiro,

10:44:52AM  8   were just disclosed October 9th with the case specific

10:44:56AM  9   disclosures.  They are not general causation experts, and so,

10:45:01AM  10  therefore, they should not be offering any testimony about

10:45:04AM  11  what can cause PCIA.

10:45:08AM  12         THE COURT:  But wouldn't it be appropriate for -- I'm

10:45:12AM  13  just going to -- I'm going to take it a little bit off of

10:45:16AM  14  this and say I took Tylenol and I took Motrin last week and I

10:45:20AM  15  think it caused, I don't know, whatever.  And wouldn't it be

10:45:27AM  16  for a specific causation expert to say we cannot

10:45:30AM  17  differentiate between the two medications she took or for

10:45:33AM  18  these doctors to say this lady was exposed to this medication

10:45:37AM  19  and this medication and this medication, we can't

10:45:40AM  20  differentiate?

10:45:42AM  21         MR. MICELI:  Well, it's a little bit -- I think it's

10:45:44AM  22  a little bit different than that, Your Honor, because we're

10:45:46AM  23  not talking about a discussion just among people about what

10:45:49AM  24  we think may have caused something.  What we have here and as

10:45:52AM  25  the defendants cited in their papers, the *Burst* case, that if

| | | |
|---|---|---|
| 10:45:57AM | 1 | you're going to propose that a drug causes an injury, a |
| 10:46:01AM | 2 | specific injury -- and Your Honor cited this in your general |
| 10:46:07AM | 3 | causation Madigan, Feigal opinion in Earnest.  If a party is |
| 10:46:12AM | 4 | going to take the position that a drug can cause or does |
| 10:46:17AM | 5 | cause a particular injury, they have to prove both general |
| 10:46:23AM | 6 | and specific causation.  We have done that for Taxotere and |
| 10:46:27AM | 7 | our expert, Dr. Feigal, has already been addressed in a |
| 10:46:32AM | 8 | challenge -- |
| 10:46:33AM | 9 | THE COURT:  But you have the burden of proof. |
| 10:46:35AM | 10 | MR. MICELI:  We have the burden of proof, Your Honor, |
| 10:46:37AM | 11 | on Taxotere, but if an expert is going to come into court and |
| 10:46:45AM | 12 | say Taxotere didn't cause it or tamoxifen or A or C caused |
| 10:46:49AM | 13 | it, caused, and we have to -- we drew this distinction when |
| 10:46:53AM | 14 | we were with Your Honor in early October, the difference |
| 10:46:56AM | 15 | between association and causation.  You know, the |
| 10:47:00AM | 16 | different -- we used, I think, the rooster crows when the sun |
| 10:47:04AM | 17 | comes up; the rooster doesn't cause the sun to come up.  Or |
| 10:47:08AM | 18 | people who own ash trays tend to have more lung cancer than |
| 10:47:11AM | 19 | people who don't own ash trays, but ash trays don't cause |
| 10:47:16AM | 20 | lung cancer.  So we have to be very careful with the words we |
| 10:47:20AM | 21 | use when we say other drugs cause this.  If they are going to |
| 10:47:23AM | 22 | put an expert on the stand and tell a jury that another drug |
| 10:47:28AM | 23 | causes it, they bit that off and now they have to chew it. |
| 10:47:33AM | 24 | They have to prove that that drug causes it, not that it's |
| 10:47:37AM | 25 | associated with it. |

10:47:37AM   1      And, Your Honor, I think we're going to talk about

10:47:39AM   2   this more in the Shapiro challenge, but the reference manual

10:47:44AM   3   on scientific evidence between pages 597 and 606 address this

10:47:48AM   4   issue specifically that there's a difference between

10:47:52AM   5   association and a causal association.  First, you have to

10:47:55AM   6   prove a statistically significant association, and then there

10:47:59AM   7   has to be some additional evaluation.  In this case, we use

10:48:02AM   8   the Bradford Hill criteria, which the reference manual

10:48:06AM   9   endorses, to establish an actual causal association.  So if

10:48:11AM   10  Dr. Freites-Martinez or Dr. Shapiro or anybody is going to

10:48:15AM   11  say another drug can cause it, they have to be able to prove

10:48:20AM   12  it, and they have not done that.  And, in fact, they have

10:48:24AM   13  only been -- both Dr. Shapiro and Dr. Freites-Martinez have

10:48:28AM   14  only been produced as specific causation experts.

10:48:34AM   15      Now, the -- I could go on about this, but I think

10:48:42AM   16  we're going to revisit this again with the Dr. Shapiro

10:48:46AM   17  challenge, but the issue of causation and the burden of what

10:48:52AM   18  you have to prove is clearly on the plaintiff to demonstrate

10:48:56AM   19  general and specific causation as to Taxotere.  But, again,

10:49:02AM   20  if Sanofi is going to come into court and say another drug

10:49:06AM   21  "caused" this or "can cause", they have taken on the burden

10:49:11AM   22  and, in fact, in their affirmative defenses allege other

10:49:15AM   23  drugs could have caused or did cause it, and, therefore, they

10:49:18AM   24  have the burden of proof on those issues.

10:49:21AM   25      And Your Honor mentioned to us in October the

DR. AZAEL FREITES-MARTINEZ CHALLENGE

10:49:26AM  1  difference between true affirmative defenses and whether

10:49:29AM  2  they're just boilerplate, thrown into the answer.  Well,

10:49:32AM  3  here's where the rubber meets the road, where Mr. Baehr just

10:49:36AM  4  mentioned that their experts may come in and say other drugs

10:49:38AM  5  can cause it.  Well, if they want to allege that in

10:49:41AM  6  affirmative defense, they have the obligation to prove it and

10:49:44AM  7  no expert -- we addressed it with Glasby, we addressed it --

10:49:51AM  8  Dr. Glasby, with Dr. Chang, with Dr. L.J. Way (phonetic).  We

10:49:54AM  9  addressed that in our October hearings, and now we're hearing

10:49:59AM  10  it again from the defendants today, nobody proves general

10:50:02AM  11  causation and you don't get to jump over that hurdle and just

10:50:05AM  12  go to talk about specific causation if you have alleged and

10:50:11AM  13  taken on the burden of proving it.

10:50:14AM  14          Nothing further, Your Honor.

10:50:15AM  15          THE COURT:  Thank you.  Okay.

16                          * * * *

17          (WHEREUPON, the proceedings were adjourned.)

18                          * * * *

19                     REPORTER'S CERTIFICATE

20          I, Nichelle N. Wheeler, RPR, CRR, Official Court
    Reporter, United States District Court, Eastern District of
21  Louisiana, do hereby certify that the foregoing is a true and
    correct transcript, to the best of my ability and
22  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

23

24               /s/ Nichelle N. Wheeler
                 Official Court Reporter

25