──── MOTION TO EXCLUDE DR. SHAPIRO'S OPINIONS ────

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

      Civil Action No. 16-MD-2740
      Section "H"(5)
      New Orleans, Louisiana
      December 14, 2020

THIS DOCUMENT RELATES TO ALL CASES
*************************************************************

TRANSCRIPT OF PLAINTIFF'S MOTION TO EXCLUDE DR. SHAPIRO'S
OPINIONS (DOC. 11361)
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

      *DAWN BARRIOS*
      BARRIOS KINGSDORF & CASTEIX
      701 POYDRAS STREET
      SUITE 3650
      NEW ORLEANS, LA 70139

      *MATTHEW PALMER LAMBERT*
      GAINSBURGH BENJAMIN DAVID MEUNIER
      & WARSHAUER
      1100 POYDRAS STREET
      SUITE 2800
      NEW ORLEANS, LA 70163

      *CHRISTOPHER COFFIN*
      PENDLEY BAUDIN & COFFIN
      1515 POYDRAS STREET
      NEW ORLEANS, LA 70112

      *KAREN BARTH MENZIES*
      GIBBS LAW GROUP
      400 CONTINENTAL BOULEVARD
      EL SUGUNDO, CA 90245

APPEARANCES CONTINUED

──── OFFICIAL TRANSCRIPT ────

> *DARIN SCHANKER*
> BACHUS & SCHANKER
> 1899 WYNKOOP STREET
> SUITE 700
> DENVER, CO 80202
>
> *DAVID F. MICELI*
> SIMMONS HANLY CONROY
> ONE COURT STREET
> ALTON, IL 62002

FOR SANOFI S.A.:

> *HARLEY V. RATLIFF*
> *TORREY PETERSON*
> *JORDAN BAEHR.*
> *CONNER J. SEARS*
> SHOOK HARDY & BACON
> 2555 GRAND BOULEVARD
> KANSAS CITY, MS 64108
>
> *DOUGLAS MOORE*
> *KELLY E. BRILLEAUX*
> IRWIN FRITCHIE URQUHART & MOORE
> 400 POYDRAS STREET
> SUITE 2700
> NEW ORLEANS, LA 70130.
>
> *JON STRONGMAN*
> SHOOK, HARDY & BACON
> 1155 F STREET NW, SUITE 200
> WASHINGTON, DC  20004

FOR HOSPIRA, INC., HOSPIRA WORLDWIDE, LLC,
FORMERLY DOING BUSINESS AS HOSPIRA WORLDWIDE, INC.,
AND PFIZER, INC.:

> *JOHN F. OLINDE*
> CHAFFE MCCALL
> 1100 POYDRAS STREET
> SUITE 2300
> NEW ORLEANS, LA 70163

FOR SANDOZ, A NOVARTIS DIVISION:

> *NICHOLAS INSOGNA*
> GREENBERG TRAURIG
> 3333 PIEDMONT ROAD NE
> SUITE 2500
> ATLANTA, GA 30305

APPEARANCES CONTINUED

FOR SANDOZ, A NOVARTIS DIVISION:

                         *DEBORAH C. ROUEN*
                         ADAMS & REESE
                         701 POYDRAS STREET
                         SUITE 4500
                         NEW ORLEANS, LA 70139


FOR ACCORD HEALTHCARE, INC.:

                         *BRENDA A. SWEET*
                         *JULIE A. CALLSEN*
                         TUCKER ELLIS
                         950 MAIN AVENUE
                         SUITE 1100
                         CLEVELAND, OH 44113

FOR SUN PHARMACEUTICAL:

                         *GEOFFREY M. COAN*
                         HINSHAW & CULBERTSON, LLP
                         28 STATE STREET
                         FLOOR 24
                         BOSTON, MA 02109




Official Court Reporter:     Nichelle N. Wheeler, RPR, CRR
                             500 Poydras Street, B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7775


     Proceedings recorded by mechanical stenography,
transcript produced via computer.

I N D E X

ORAL ARGUMENT                                          Page

        BY MR. MICELI                                    5
        BY MR. SEARS                                    11
        BY MR. MICELI                                   16

1          **P R O C E E D I N G S**

2                    (Call to order of the court.)

11:21:26AM   3          THE COURT:  All right.  Let's do the third motion,

11:21:26AM   4   Mr. Shapiro.  I can pronounce his name.  We have Dr. Shapiro

11:21:37AM   5   and I have Mr. Miceli and Mr. Sears.

11:21:43AM   6          MR. MICELI:  Okay.  I'm trying to do my slide show.

11:21:47AM   7   I need to open this.

11:21:53AM   8          All righty.  Can you see the PowerPoint, Your Honor?

11:21:58AM   9          THE COURT:  Yes, sir, I can.

11:22:00AM  10          MR. MICELI:  Okay.  I will try not to rehash any of

11:22:04AM  11   the ground that we went over --

11:22:06AM  12          THE COURT:  Thank you.

11:22:08AM  13          MR. MICELI:  -- concerning general causation.

11:22:10AM  14          There's really two issues that we have to discuss

11:22:12AM  15   about Dr. Shapiro.  One is he doesn't make any

11:22:17AM  16   dermatopathology opinions after he defers to

11:22:23AM  17   dermatopathologists for those and then his general and

11:22:25AM  18   specific causation opinions for failing to set out and

11:22:28AM  19   admitting he did not set out or attempt to set out a

11:22:32AM  20   methodology for either to reach the opinions concerning

11:22:35AM  21   causation in this case.

11:22:39AM  22          I'm going to go through this very quickly, but I'm

11:22:41AM  23   going to jump ahead to skip a few things.  The -- Dr.

11:22:45AM  24   Shapiro's dermatopathology opinions can be found at

11:22:50AM  25   paragraphs 135 through 137 of his report, and this is the

11:22:56AM 1 recitation of 137, and there's a sentence in here that says:

11:22:59AM 2 Medical literature establishes that lower follicular density,

11:23:04AM 3 a shift in terminal vellus ratio, as well as a decreased

11:23:11AM 4 anagen to catagen telogen ratio are indicative of

11:23:14AM 5 androgenetic alopecia.

11:23:15AM 6      The problem is he does not cite anything in any of

11:23:19AM 7 his paragraphs, 135 through 139, to support any of his

11:23:23AM 8 dermatopathology opinions, and he does offer dermatopathology

11:23:29AM 9 opinions.  It's not that he is deferring to them and this is

11:23:33AM 10 not a case where we recognize actually the utility of

11:23:38AM 11 biopsies and having to interpret or incorporate a

11:23:46AM 12 dermatopathologist biopsy reading into a dermatologist's

11:23:52AM 13 findings, but when Dr. Shapiro, who admits he's not a

11:23:58AM 14 dermatopathologist, says that he does not agree -- that's

11:24:01AM 15 just above where I do not agree with this diagnosis, the

11:24:05AM 16 pathologic diagnosis he does not agree with.  And then he

11:24:09AM 17 says:  Medical literature establishes, and he goes on.  He

11:24:12AM 18 never gives a basis for his opinion.

11:24:14AM 19      And as we've gone over so many times before, what

11:24:18AM 20 Rule 26 requires, an expert has to set out their opinions and

11:24:21AM 21 he has to give the basis for them, and he simply does not

11:24:25AM 22 give a basis for any of his dermatopathologic opinions.

11:24:31AM 23      So if he doesn't -- if he admits he's not an expert

11:24:34AM 24 in that field, yet he challenges an expert in that field and

11:24:37AM 25 does not cite to anything in his report, that's the only way

11:24:40AM  1   we know what to cross-examine him on and he does not cite any

11:24:45AM  2   support for his opinion, it's due to be excluded because then

11:24:50AM  3   it is nothing more his speculation or his ipse dixit as to

11:24:54AM  4   giving what he believes without any scientific support.

11:24:58AM  5          So he says that he will -- and this is switching

11:25:03AM  6   gears a little bit because I don't want to rehash some of the

11:25:06AM  7   same arguments about what Rule 26 requires.  Stepping

11:25:11AM  8   forward, concerning general and specific causation, what Dr.

11:25:16AM  9   Shapiro says is he offers no methodology to support his

11:25:19AM  10  opinions, and he testified that he will give us his thoughts

11:25:24AM  11  on PCIA based on his experience.  Well, we do not challenge

11:25:30AM  12  that Dr. Shapiro is a licensed board-certified dermatologist.

11:25:34AM  13  His position -- he has a position at NYU and he runs a hair

11:25:39AM  14  loss clinic in New York City that he personally touts as the

11:25:45AM  15  busiest in the world.  We asked him in his deposition.  It's

11:25:49AM  16  just sort of a self-proclaimed I'm the world champion.  And

11:25:55AM  17  -- but when asked about his dermatology or dermatopathology

11:25:59AM  18  opinions and how you would perform a causation analysis on

11:26:02AM  19  other chemotherapy drugs or tamoxifen -- and this is sort of

11:26:07AM  20  the merging in the transition from issue No. 1 to issue

11:26:13AM  21  No. 2, Dr. Shapiro states when performing -- in performing a

11:26:15AM  22  causation analysis, that would need -- a person doing so

11:26:19AM  23  would need special expertise to do that.  And he admitted

11:26:23AM  24  that he does not have that expertise.

11:26:25AM  25          Again, we don't need to rehash what -- who carries

11:26:29AM 1    the burden on the plaintiff's claims versus the defendant's

11:26:34AM 2    affirmative defenses, but regardless of -- I should say

11:26:42AM 3    recognizing what the law requires there, he is not the person

11:26:45AM 4    to demonstrate what causes permanent chemotherapy-induced

11:26:51AM 5    alopecia because he said you would need special expertise

11:26:56AM 6    that he does not possess.

11:26:58AM 7         Additionally, I love this sentence at the bottom

11:27:00AM 8    here, he does not know what general causation is.  So

11:27:06AM 9    Sanofi's experts cannot come into court and offer opinions

11:27:10AM 10   about alternative causes without demonstrating that those

11:27:15AM 11   drugs can cause permanent chemotherapy-induced alopecia.  And

11:27:21AM 12   to the extent that Sanofi is going to argue, as they did in

11:27:25AM 13   their opposition, that Dr. Shapiro does not offer opinions

11:27:30AM 14   about general causation and whether or not tamoxifen can

11:27:36AM 15   cause alopecia, we cite you to six paragraphs in his report

11:27:39AM 16   where he specifically says that causation exists for

11:27:47AM 17   tamoxifen.

11:27:48AM 18        So, again, we've already gone over this, Your Honor,

11:27:51AM 19   earlier with the Freites-Martinez, but the proponent of an

11:27:56AM 20   expert's testimony must prove general and specific causation

11:27:59AM 21   if they're going to say a drug causes something.  Because --

11:28:03AM 22   and because Dr. Shapiro opines that tamoxifen causes or may

11:28:09AM 23   have caused Ms. Kahn's hair loss, he has to establish that

11:28:14AM 24   and he doesn't.  But not only does he not do it, neither does

11:28:16AM 25   any other expert and we mentioned this in October, that we

11:28:19AM  1   changed the way we took the depositions to make sure that if

11:28:22AM  2   Sanofi was going to come into court and insinuate causation

11:28:26AM  3   on another drug that we have their experts under oath saying

11:28:30AM  4   they did not do what it takes to establish general causation.

11:28:35AM  5   And as we know, under *Burst*, if you don't prove general

11:28:40AM  6   causation, you can't opine about specific causation.

11:28:43AM  7        So the Court should -- shouldn't consider whether or

11:28:51AM  8   not Dr. Shapiro applied an appropriate methodology to reach

11:28:55AM  9   his case specific opinions because nobody establishes general

11:28:58AM  10  causation for any drug other than Taxotere, and that's done

11:29:03AM  11  through Dr. Madigan and Dr. Feigal where plaintiff meets its

11:29:09AM  12  burden through those experts.  And, again, I cite the Court

11:29:12AM  13  to the manual and scientific evidence.  597 through 606 walks

11:29:17AM  14  through why it's important.

11:29:18AM  15       And, Your Honor, I'm going to use a little bit of an

11:29:21AM  16  example in the absurdum to demonstrate the difference between

11:29:25AM  17  causation and association.  You know, if we have a plaintiff

11:29:28AM  18  that we're trying to figure out what they ate that caused

11:29:31AM  19  them to die and we know they only ate three things in the day

11:29:35AM  20  before they died -- on the day that they died, one of them

11:29:38AM  21  was pudding, one of them was apples, and one of them was

11:29:43AM  22  Drano, we would know absent some strange abilities to eat

11:29:48AM  23  Drano, that Drano was the cause of the death.  That's an easy

11:29:50AM  24  call.  It's difficult when you have multiple drugs, and

11:29:56AM  25  that's why the court in *Burst* requires that two-step process

11:30:01AM  **1**  of first demonstrating a statistically significant

11:30:06AM  **2**  association, but that's not enough.  That's just an

11:30:09AM  **3**  association.  And then you have to do something else.  You

11:30:12AM  **4**  have to apply some recognized methodology to establish a true

11:30:19AM  **5**  causal association.  And you got to remember, it's not about

11:30:23AM  **6**  whether or not other drugs can cause it in some, you know,

11:30:27AM  **7**  unique circumstance.  It's about whether there's a

11:30:32AM  **8**  statistically significant increase and whether other

11:30:35AM  **9**  evidence, a full analysis, a causation analysis, demonstrates

11:30:38AM  **10**  a true causal relationship.  It's about an increased risk.

11:30:42AM  **11**  It's not about whether anything under the sun can happen and

11:30:46AM  **12**  that's where the rub is.

11:30:47AM  **13**       Association again is an ash tray and lung cancer

11:30:50AM  **14**  example I said before.  It's just not -- it's not what needs

11:30:56AM  **15**  to be proven.  What needs to be proven is that two-step

11:30:59AM  **16**  process in *Burst*.  So without the necessary steps in that

11:31:03AM  **17**  evidentiary process, all Sanofi can offer Dr. Shapiro to do

11:31:08AM  **18**  is offer his thoughts, and that's what he says in his

11:31:12AM  **19**  deposition and it's in our papers.  He's just going to tell

11:31:16AM  **20**  us what he thinks and give us his thoughts about permanent

11:31:19AM  **21**  chemotherapy-induced alopecia, but when somebody says they're

11:31:23AM  **22**  just going to give us our thoughts and admits they have done

11:31:27AM  **23**  absolutely nothing to determine whether or not a drug can

11:31:30AM  **24**  cause it and whether or not there's some analysis that is

11:31:34AM  **25**  done to demonstrate a true causal association, all you have

| | | |
|---|---|---|
| 11:31:38AM | 1 | is the ipse dixit of an expert and that is what is not |
| 11:31:44AM | 2 | permitted and that's why the Court has to exercise its |
| 11:31:47AM | 3 | gatekeeping role. |
| 11:31:49AM | 4 | Thank you, Your Honor. |
| 11:31:50AM | 5 | THE COURT:  Thank you.  Mr. Sears? |
| 11:31:53AM | 6 | MR. SEARS:  Good morning, Your Honor. |
| 11:31:54AM | 7 | THE COURT:  Good morning. |
| 11:31:55AM | 8 | MR. SEARS:  I'm trying to get my screen to share |
| 11:31:58AM | 9 | here. |
| 11:31:59AM | 10 | THE COURT:  Okay. |
| 11:32:02AM | 11 | MR. SEARS:  Your Honor, do you see the PowerPoint? |
| 11:32:05AM | 12 | THE COURT:  I can.  Thank you. |
| 11:32:07AM | 13 | MR. SEARS:  May it please the Court, I will try and |
| 11:32:10AM | 14 | be brief and not re-cover grounds that's already been argued, |
| 11:32:14AM | 15 | but Your Honor has made this point a few times so far today, |
| 11:32:18AM | 16 | that the burden is on the plaintiff to prove causation.  And |
| 11:32:21AM | 17 | in addition to their causation burden, they have the burden |
| 11:32:25AM | 18 | to rule out other reasonable alternative causes.  And here |
| 11:32:29AM | 19 | there are multiple other reasonable alternative causes for |
| 11:32:34AM | 20 | Ms. Kahn's hair loss, and we discussed some of them so far |
| 11:32:34AM | 21 | today. |
| 11:32:37AM | 22 | We talked about tamoxifen.  We talked about other |
| 11:32:41AM | 23 | chemotherapy drugs like Adriamycin or Cyclophosphamide, and |
| 11:32:43AM | 24 | those are reasonable alternative causes because as the |
| 11:32:47AM | 25 | literature has established and even plaintiff's own experts |

11:32:50AM 1  admit, tamoxifen can cause this.  Dr. Tosti admitted that in

11:32:54AM 2  her expert report.  She admitted that endocrine therapy can

11:32:58AM 3  cause alopecia that looks like chemo-pattern hair loss which

11:33:03AM 4  is androgenetic alopecia.

11:33:03AM 5       So Mr. Miceli is making the point that Dr. Shapiro

11:33:07AM 6  should have done some sort of Bradford Hill analysis.  He did

11:33:10AM 7  not do that, but we do have plaintiff's own expert admitting

11:33:12AM 8  that tamoxifen is the cause, which I think would be, you

11:33:16AM 9  know, more impactful for a jury and for the court to hear

11:33:19AM 10  than for Dr. Shapiro to say that he did his own independent

11:33:23AM 11  analysis on tamoxifen.  Dr. Tosti admits tamoxifen causes it

11:33:27AM 12  because the literature is very clear that tamoxifen is the

11:33:30AM 13  cause of ongoing alopecia.

11:33:32AM 14       In addition to tamoxifen, other reasonable

11:33:35AM 15  alternative causes are Adriamycin Cyclophosphamide.  And

11:33:38AM 16  Mr. Ratliff touched on this a little bit, but Dr. Shapiro's

11:33:41AM 17  opinion is similar to Dr. Turegano's opinion about the type

11:33:46AM 18  and cause of Ms. Kahn's hair loss.  Here Ms. Kahn's hair loss

11:33:50AM 19  is androgenetic alopecia that's exacerbated by her tamoxifen

11:33:56AM 20  use.  It is not Dr. Shapiro's opinion or Dr. Turegano's

11:34:00AM 21  opinion that chemotherapy played a role.  However, if

11:34:03AM 22  plaintiff is going to assert that chemotherapy did play a

11:34:08AM 23  role and that Taxotere is the cause, then Dr. Turegano and

11:34:11AM 24  Dr. Shapiro will both say, well, hold on a second, there's

11:34:14AM 25  other reasonable alternative causes if we're saying

11:34:17AM  1   chemotherapy played a role because Ms. Kahn --

11:34:18AM  2        THE COURT:  They're not cumulative witnesses?  That's

11:34:20AM  3   not cumulative testimony?  Because what I've heard is,

11:34:23AM  4   they're both going to say this, they're both going to say

11:34:26AM  5   this, and they're both going to say this.  I'm just

11:34:31AM  6   wondering.

11:34:31AM  7        MR. SEARS:  That is cumulative testimony.  If both of

11:34:34AM  8   those doctors got up there and said exactly the same thing,

11:34:37AM  9   that's cumulative testimony.  And I can tell you, Sanofi has

11:34:38AM  10  no intention of doing that.  You probably remember in Earnest

11:34:42AM  11  we called one witness.  I suspect to the extent that we're

11:34:45AM  12  going to offer dermatologist or dermatology opinions they

11:34:48AM  13  will offer very different opinions at trial or we will just

11:34:51AM  14  call one dermatologist.  But like Mr. Ratliff said, at this

11:34:54AM  15  point, we want to preserve our options because we have no

11:34:58AM  16  idea what's going to happen with COVID or who can get here at

11:35:01AM  17  this point.  So that's one of the reasons we listed Dr.

11:35:07AM  18  Shapiro in addition to Dr. Turegano because we just want to

11:35:08AM  19  preserve our options at this point.

11:35:10AM  20       As far as the methodology that Dr. Shapiro used, what

11:35:14AM  21  he did is similar to what he does in his everyday practice,

11:35:17AM  22  and if it's good enough for medical practice, it should be

11:35:21AM  23  good enough for the court.

11:35:22AM  24       Mr. Ratliff talked about this, but he applied the

11:35:24AM  25  differential diagnosis process.  He has reviewed all the

11:35:26AM   1   medical literature.  He's reviewed all the pathology.  He's

11:35:29AM   2   reviewed Dr. Tosti, Dr. Turegano's INE's (phonetic), he's

11:35:32AM   3   reviewed the deposition testimony, the photographs, and after

11:35:35AM   4   reviewing all of those things, it's very clear that Ms. Kahn

11:35:39AM   5   had hair loss that existed before chemotherapy, which is

11:35:44AM   6   consistent with androgenetic alopecia, that her hair regrew

11:35:49AM   7   after chemotherapy, which is inconsistent with PCIA and after

11:35:53AM   8   that point, she had progressive hair loss which is consistent

11:35:55AM   9   with both tamoxifen-induced alopecia and androgenetic

11:36:00AM   10   alopecia.  So he did apply a rival methodology to reach the

11:36:04AM   11   conclusions that he reached in this case.

11:36:08AM   12        As far as the pathology point, Your Honor heard this

11:36:13AM   13   a lot during the Earnest trial, but the way that

11:36:17AM   14   dermatologists and dermatopathologists work together, it's a

11:36:20AM   15   collaborative process.  The dermatologist comes in.  They see

11:36:23AM   16   the patient.  They get the clinical history.  They take the

11:36:26AM   17   punch biopsy.  Then they send that along with the requisition

11:36:30AM   18   form with some clinical information to the

11:36:32AM   19   dermatopathologist.  They review it pathologically, make

11:36:36AM   20   their findings, and send the report back to the

11:36:39AM   21   dermatopathologist.  And Dr. Tosti talked about this a little

11:36:42AM   22   bit in her deposition, but dermatologists and

11:36:45AM   23   dermatopathologists work together, and it's ultimately the

11:36:48AM   24   dermatologist's job to make that clinicopathological

11:36:53AM   25   correlation.  They want to make sure that the clinical

11:36:55AM  1   information fits with the pathological information.

11:36:58AM  2        So here Dr. Shapiro reviewed Dr. Thompson's

11:37:02AM  3   conclusions.  He reviewed Dr. Sparks' conclusions.  He

11:37:05AM  4   reviewed the medical literature that talks about the

11:37:07AM  5   pathological findings associated with PCIA.  And Dr. Sparks'

11:37:14AM  6   opinion is that androgenetic alopecia and PCIA are

11:37:17AM  7   indistinguishable pathologically.  Dr. Thompson's opinion is

11:37:20AM  8   a little bit different.  He says that you can see unique

11:37:24AM  9   pathological findings for PCIA and that is what Dr. Shapiro

11:37:28AM  10  and Dr. Spark disagree with.

11:37:30AM  11       And here I included some quotes from the literature,

11:37:31AM  12  but the medical literature on this point is very clear that

11:37:33AM  13  there are not unique pathological findings for PCIA, and that

11:37:37AM  14  the pathological findings for androgenetic alopecia and PCIA

11:37:41AM  15  look identical.  And Dr. Shapiro is not second-guessing what

11:37:45AM  16  the pathologists see.  He's doing what he does in his

11:37:48AM  17  30 years of practice where he's taking that pathology report

11:37:51AM  18  and applying to it the clinical picture to make sure that

11:37:54AM  19  he's arriving at the proper diagnosis.  That meets Daubert.

11:37:57AM  20  That meets Dr. Shapiro's scope of expertise.  His opinions

11:38:01AM  21  are valid.

11:38:03AM  22       To save the Court's time, that's all I have unless

11:38:06AM  23  you have any questions for me.

11:38:07AM  24       THE COURT:  No, I'm good.  Thank you.

11:38:07AM  25       MR. SEARS:  Thank you.

| | | |
|---|---|---|
| 11:38:11AM | 1 | THE COURT:  Briefly, Mr. Miceli. |
| 11:38:13AM | 2 | MR. MICELI:  I don't know which one is actually |
| 11:38:21AM | 3 | accurate, but I hope you can hear me now. |
| 11:38:24AM | 4 | THE COURT:  I can hear you. |
| 11:38:25AM | 5 | MR. MICELI:  The issue is not whether or not Dr. |
| 11:38:28AM | 6 | Shapiro can do a differential diagnosis.  He is a |
| 11:38:32AM | 7 | board-certified dermatologist.  The problem is when he makes |
| 11:38:35AM | 8 | comments and offers opinions that a drug causes or can cause |
| 11:38:41AM | 9 | a condition, and that's where the *Burst* holding says you have |
| 11:38:45AM | 10 | to prove general and specific and nobody establishes a |
| 11:38:48AM | 11 | statistically significant increased risk with any drug but |
| 11:38:52AM | 12 | Taxotere.  But Dr. Feigal did rule out others by way of |
| 11:38:58AM | 13 | interpreting Dr. Madigan's report. |
| 11:39:01AM | 14 | The starting point for any investigation -- and this |
| 11:39:04AM | 15 | is cited in her report and it goes to the -- to the guidance |
| 11:39:11AM | 16 | for industry, that a FAIRS (phonetic) analysis is the |
| 11:39:13AM | 17 | starting point for a signal.  If you see a signal, that's |
| 11:39:16AM | 18 | when you look further.  And the only consistent signal that |
| 11:39:21AM | 19 | is ever demonstrated for permanent chemotherapy-induced |
| 11:39:24AM | 20 | alopecia with the surrogates that Dr. Madigan used is |
| 11:39:29AM | 21 | Taxotere or docetaxel.  So in doing a differential diagnosis, |
| 11:39:36AM | 22 | it's incumbent for -- before we even get there and try to pin |
| 11:39:43AM | 23 | specific causation on a drug that we have general causation |
| 11:39:46AM | 24 | that demonstrates it.  And, again, this goes back to the -- |
| 11:39:51AM | 25 | who has the burden on the affirmative defenses. |

11:39:54AM    1        And good enough for Mr. Sears' argument that -- how

11:39:58AM    2    Dr. Shapiro does things in his medical practice is good

11:40:01AM    3    enough for the medical practice so it's good enough for

11:40:06AM    4    Daubert just doesn't hold water.  That's not the case.  The

11:40:08AM    5    standard is set out in *Burst*.

11:40:11AM    6        And with regard to a clinical correlation between

11:40:14AM    7    what is in a dermatopathologist report and what he finds, we

11:40:19AM    8    have to remember, Dr. Shapiro never clinically examined this

11:40:25AM    9    patient, never examined Ms. Kahn, so he can't do a clinical

11:40:28AM   10    correlation with anything and he doesn't simply take a report

11:40:35AM   11    and use it in making a diagnosis.  He disagrees with the

11:40:39AM   12    pathologic diagnosis itself, and he says that literature

11:40:45AM   13    maintains blank, but he never provides us with that

11:40:48AM   14    literature.

11:40:49AM   15        Rule 26 says you have to give your opinions, your

11:40:51AM   16    basis, and your reasons.  He gives an opinion.  He doesn't

11:40:54AM   17    give a basis or a reason and, therefore, he should be

11:40:57AM   18    excluded.

11:40:59AM   19        Finally, the problem -- I go back to the quote that I

11:41:06AM   20    used from the Daubert opinion earlier, and that is that once

11:41:10AM   21    we put an expert on a stand, the jury has to figure out if

11:41:16AM   22    he's believable or not.  But once the court says I accept him

11:41:21AM   23    as an expert, you know, the jury can't -- we're asking the

11:41:24AM   24    jury to unscramble the egg.  And the idea that we have to

11:41:29AM   25    have a court as a gatekeeper to protect the jury from hearing

| | | |
|---|---|---|
| 11:41:32AM | 1 | evidence about general and specific causation that does not |
| 11:41:35AM | 2 | meet the standard that the court sets out, the *Burst* opinion |
| 11:41:40AM | 3 | and the others, it's unfair and it's confusing -- |
| 11:41:42AM | 4 | THE COURT:  The *Burst* opinion -- that was the |
| 11:41:46AM | 5 | plaintiff -- |
| 11:41:48AM | 6 | MR. MICELI:  It was the plaintiff -- |
| 11:41:50AM | 7 | THE COURT:  It was the plaintiff.  And I understand |
| 11:41:52AM | 8 | your argument.  We really -- |
| 11:41:55AM | 9 | MR. MICELI:  Your Honor, if I could just say one |
| 11:41:57AM | 10 | other thing about -- |
| 11:41:58AM | 11 | THE COURT:  You got a minute, because, Mr. Miceli, I |
| 11:42:01AM | 12 | have two other arguments and they're going to expend a bunch |
| 11:42:02AM | 13 | of my time, and I got a one o'clock hearing in this case. |
| 11:42:05AM | 14 | MR. MICELI:  Your Honor, *Burst* dealt with benzene |
| 11:42:09AM | 15 | exposure -- |
| 11:42:09AM | 16 | THE COURT:  Right. |
| 11:42:09AM | 17 | MR. MICELI:  -- and they're talking about different |
| 11:42:11AM | 18 | exposures to different products that contain -- |
| 11:42:13AM | 19 | THE COURT:  Right. |
| 11:42:13AM | 20 | MR. MICELI:  Here we're talking about Taxotere, |
| 11:42:15AM | 21 | not -- not Taxotere in other forms.  What it was about was |
| 11:42:19AM | 22 | the -- was the proponent of the evidence has to establish |
| 11:42:23AM | 23 | general and specific, not -- not that the plaintiff has the |
| 11:42:28AM | 24 | burden of all -- we have the burden -- |
| 11:42:28AM | 25 | THE COURT:  Right. |

─── MOTION TO EXCLUDE DR. SHAPIRO'S OPINIONS ───

11:42:31AM   1          MR. MICELI:  -- to rule things out, and Dr. Feigal

11:42:33AM   2   does that.  And in the interest of time, I will stop here.

11:42:36AM   3          THE COURT:  Thank you.

11:42:37AM   4          All right.  We have now two other motions.  I need a

11:42:44AM   5   five-minute break, and then we'll be right back.  Give me

11:42:50AM   6   five minutes.

11:42:52AM   7

             8                              *  *  *  *

             9          (WHEREUPON, the proceedings were adjourned.)

            10                              *  *  *  *

            11                    REPORTER'S CERTIFICATE

            12          I, Nichelle N. Wheeler, RPR, CRR, Official Court
                 Reporter, United States District Court, Eastern District of
            13   Louisiana, do hereby certify that the foregoing is a true and
                 correct transcript, to the best of my ability and
            14   understanding, from the record of the proceedings in the
                 above-entitled and numbered matter.

            15

            16                    /s/ Nichelle N. Wheeler
                                 Official Court Reporter

            17

            18

            19

            20

            21

            22

            23

            24

            25

─── OFFICIAL TRANSCRIPT ───
Page 19