———— MOTION TO EXCLUDE TESTIMONY OF DR. MAMINA TUREGANO ————

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                Civil Action No. 16-MD-2740
                Section "H"(5)
                New Orleans, Louisiana
                December 14, 2020

THIS DOCUMENT RELATES TO ALL CASES
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DR.
MAMINA TUREGANO (DOC. 11357)
HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

        *DAWN BARRIOS*
        BARRIOS KINGSDORF & CASTEIX
        701 POYDRAS STREET
        SUITE 3650
        NEW ORLEANS, LA 70139

        *MATTHEW PALMER LAMBERT*
        GAINSBURGH BENJAMIN DAVID MEUNIER
        & WARSHAUER
        1100 POYDRAS STREET
        SUITE 2800
        NEW ORLEANS, LA 70163

        *CHRISTOPHER COFFIN*
        PENDLEY BAUDIN & COFFIN
        1515 POYDRAS STREET
        NEW ORLEANS, LA 70112

        *KAREN BARTH MENZIES*
        GIBBS LAW GROUP
        400 CONTINENTAL BOULEVARD
        EL SUGUNDO, CA 90245

APPEARANCES CONTINUED

*DARIN SCHANKER*
BACHUS & SCHANKER
1899 WYNKOOP STREET
SUITE 700
DENVER, CO 80202

*DAVID F. MICELI*
SIMMONS HANLY CONROY
ONE COURT STREET
ALTON, IL 62002

FOR SANOFI S.A.:

*HARLEY V. RATLIFF*
*TORREY PETERSON*
*JORDAN BAEHR.*
*CONNER J. SEARS*
SHOOK HARDY & BACON
2555 GRAND BOULEVARD
KANSAS CITY, MS 64108

*DOUGLAS MOORE*
*KELLY E. BRILLEAUX*
IRWIN FRITCHIE URQUHART & MOORE
400 POYDRAS STREET
SUITE 2700
NEW ORLEANS, LA 70130.

*JON STRONGMAN*
SHOOK, HARDY & BACON
1155 F STREET NW, SUITE 200
WASHINGTON, DC  20004

FOR HOSPIRA, INC., HOSPIRA WORLDWIDE, LLC,
FORMERLY DOING BUSINESS AS HOSPIRA WORLDWIDE, INC.,
AND PFIZER, INC.:

*JOHN F. OLINDE*
CHAFFE MCCALL
1100 POYDRAS STREET
SUITE 2300
NEW ORLEANS, LA 70163

FOR SANDOZ, A NOVARTIS DIVISION:

*NICHOLAS INSOGNA*
GREENBERG TRAURIG
3333 PIEDMONT ROAD NE
SUITE 2500
ATLANTA, GA 30305

APPEARANCES CONTINUED

FOR SANDOZ, A NOVARTIS DIVISION:

        *DEBORAH C. ROUEN*
        ADAMS & REESE
        701 POYDRAS STREET
        SUITE 4500
        NEW ORLEANS, LA 70139

FOR ACCORD HEALTHCARE, INC.:

        *BRENDA A. SWEET*
        *JULIE A. CALLSEN*
        TUCKER ELLIS
        950 MAIN AVENUE
        SUITE 1100
        CLEVELAND, OH 44113

FOR SUN PHARMACEUTICAL:

        *GEOFFREY M. COAN*
        HINSHAW & CULBERTSON, LLP
        28 STATE STREET
        FLOOR 24
        BOSTON, MA 02109

Official Court Reporter:    Nichelle N. Wheeler, RPR, CRR
                            500 Poydras Street, B-275
                            New Orleans, Louisiana 70130
                            (504) 589-7775

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

|  | Page |
|---|---|
| ORAL ARGUMENT | |
| BY MR. LAMBERT | 5 |
| BY MR. RATLIFF | 12 |
| BY MR. LAMBERT | 15 |

1          **P R O C E E D I N G S**

2                   (Call to order of the court.)

10:50:19AM   3          THE COURT:  This is -- the second motion we have

10:50:23AM   4   is -- this one is motion to exclude Dr. Mamina Turegano and

10:50:36AM   5   this is --

10:50:40AM   6          MR. LAMBERT:  That's me, Your Honor, Palmer Lambert

10:50:43AM   7   on behalf of Ms. Kahn and PSC.

10:50:47AM   8          THE COURT:  Right.  And I'm looking for Mr. Ratliff.

10:50:51AM   9   I don't see him on yet.

10:50:53AM   10         There we go.  All right.  All right.  We're ready to

10:51:00AM   11  proceed.

10:51:01AM   12         MR. LAMBERT:  Yes, Your Honor.  Good morning.  Again,

10:51:03AM   13  Palmer Lambert from Gainsburgh Benjamin on behalf of Ms. Kahn

10:51:09AM   14  and PSC.  I am going to share my screen here because I've got

10:51:14AM   15  a brief PowerPoint.  See if I can work it.

10:51:17AM   16         Can you see it?

10:51:19AM   17         THE COURT:  There we go.  I can.

10:51:22AM   18         MR. LAMBERT:  And, Mr. Ratliff, you can see it on

10:51:24AM   19  your end?  Okay.

10:51:27AM   20         Your Honor, for some of the reasons that were just

10:51:30AM   21  discussed with Mr. Miceli, there are a portion of Dr.

10:51:38AM   22  Turegano's opinions that also must be excluded.  Yes.  I

10:51:41AM   23  messed that up actually at the beginning of her deposition,

10:51:44AM   24  but it is Tu-reg-ano, not Tur-e-gano.

10:51:47AM   25         THE COURT:  Thank you.

10:51:51AM   1          MR. LAMBERT:  And what we did in our pleadings, as

10:51:53AM   2   you'll see, we did acknowledge that Dr. Turegano is

10:51:59AM   3   double-board certified.  She's been a dermatologist since

10:52:05AM   4   2014.  She's been a dermatopathologist since 2016.  She is

10:52:10AM   5   arguably qualified to perform a dermatology clinical

10:52:15AM   6   examination and to opine on the type of hair loss that

10:52:19AM   7   Ms. Kahn suffers from.  However, in -- and as we'll show in

10:52:24AM   8   the papers and in the PowerPoint, she lacks the expertise and

10:52:32AM   9   methodology to testify on causation between particular drugs

10:52:36AM   10  and PCIA.  She has admitted that she's not an expert in hair

10:52:43AM   11  loss disorders.  She's never diagnosed PCIA and recalls only

10:52:49AM   12  seeing one patient that had PCIA in a differential.  She has

10:52:57AM   13  practiced for six years, but only one of those years -- well,

10:53:01AM   14  one of those years was spent in her dermatopathology

10:53:06AM   15  fellowship, and this is her first time giving expert

10:53:09AM   16  testimony.

10:53:10AM   17         As Mr. Miceli just discussed, it's plaintiff's burden

10:53:15AM   18  to present general and specific causation testimony in

10:53:18AM   19  support of our claims, but as you'll see in the PowerPoint

10:53:24AM   20  here, Dr. Turegano is making a suggestion that reports of

10:53:31AM   21  persistent alopecia with Adriamycin and Cyclophosphamide

10:53:37AM   22  result in an ability of her as an expert to rule them out as

10:53:42AM   23  the cause.  And the problem with that, Your Honor, is that

10:53:46AM   24  she doesn't support that statement with any methodology.  I

10:53:52AM   25  asked her if she performed a Bradford Hill analysis.  She

10:53:56AM 1 said no.

10:53:56AM 2 THE COURT:  But didn't she do the same thing as Dr.

10:54:00AM 3 Tosti, she did a literature review?

10:54:03AM 4 MR. LAMBERT:  Well, not necessarily --

10:54:04AM 5 THE COURT:  And I saw that -- I'm seeing the -- Dr.

10:54:12AM 6 Tosti with Taxotere as I appreciate it and I probably need to

10:54:15AM 7 go back and read it, but she did a review and she said this

10:54:19AM 8 is -- it's more commonly reported, it's where we see this

10:54:24AM 9 happening, but there are cases reported on the other -- you

10:54:28AM 10 know, what she said was they're minimal, they're rare, those

10:54:32AM 11 sorts of terms, and so you would, of course, associate it

10:54:38AM 12 with Taxotere, but isn't that what Dr. Tosti did as well?

10:54:42AM 13 MR. LAMBERT:  Yes, Your Honor.  And we acknowledge

10:54:47AM 14 that she did testify there are case reports out there, but

10:54:50AM 15 the thing that she has that Dr. Turegano doesn't is she

10:54:55AM 16 relies on other experts in the case to support those

10:54:59AM 17 opinions.  And it's not just a literature search or a

10:55:04AM 18 comprehensive literature search; it's all of the pieces of

10:55:08AM 19 the puzzle that Dr. Feigal and Dr. Madigan testify about and

10:55:15AM 20 that the Court has already decided and determined are valid

10:55:19AM 21 in terms of reliance and support to be able to make the

10:55:24AM 22 conclusions in the differential that Dr. Tosti does.  And

10:55:29AM 23 Mr. Schanker will talk about the reasons why Dr. Tosti's

10:55:34AM 24 evaluation is a much more augmented and fulsome approach to

10:55:42AM 25 causation.

MOTION TO EXCLUDE TESTIMONY OF DR. MAMINA TUREGANO

10:55:46AM **1**   But as I was saying, the doctor does not support her

10:55:51AM **2** analysis with any statistical evidence.  She talks in her

10:55:57AM **3** expert report on pages 7 through 10 about different

10:56:02AM **4** chemotherapy drugs, and she does mention case reports or a --

10:56:06AM **5** or a study here and there.  But she doesn't evaluate or rely

10:56:16AM **6** on anyone else to evaluate the statistical significance of

10:56:20AM **7** any of those drugs.

10:56:22AM **8**   The next problem with her report -- and it's a

10:56:30AM **9** problem with making an expert opinion to a jury -- is she

10:56:36AM **10** says it's impossible to say that it's because of Taxotere,

10:56:41AM **11** and that's not an expert opinion.  That may be her opinion.

10:56:46AM **12** But she doesn't do epidemiology.  She doesn't do

10:56:53AM **13** pharmacovigilance.  She's not a pharmacologist.  There are

10:56:59AM **14** experts.  There are internal folks at drug companies who

10:57:03AM **15** isolate drugs all the time and look for safety signals and

10:57:07AM **16** use those safety signals to make updates to a drug's label or

10:57:11AM **17** a drug's warning and to advise doctors on how to handle those

10:57:15AM **18** things.  And so to allow Dr. Turegano to come into the

10:57:21AM **19** courtroom and give a, quote, "expert opinion" that it's

10:57:25AM **20** impossible to isolate Taxotere as a cause, it's just -- it's

10:57:29AM **21** too big of a risk of confusion of the issues and it's not

10:57:33AM **22** based on valid science.

10:57:39AM **23**   And I've talked about that here in the PowerPoint,

10:57:41AM **24** but in addition to that being a fundamental flaw, she does

10:57:48AM **25** not consider anything other than apparently monotherapy

10:57:56AM 1    treatment Taxotere and mechanism vaccine as the reason

10:58:03AM 2    underlying her conclusion there.  And as we all know, most of

10:58:07AM 3    the research and the science has to do with Taxotere as an

10:58:12AM 4    adjuvant drug in a multi-drug chemotherapy regimen.  So her

10:58:23AM 5    exclusion of that other evidence fundamentally flaws her

10:58:27AM 6    opinions along those lines.

10:58:28AM 7         I'm going to skip this slide because I think Mr.

10:58:39AM 8    Miceli already adequately covered our arguments regarding

10:58:44AM 9    requirement of general cause as a basis to underlie a

10:58:46AM 10   specific cause opinion.  And then --

10:58:47AM 11        THE COURT:  I'm going back to -- but the plaintiff

10:58:50AM 12   has the burden of proof on all of this, and then the

10:58:54AM 13   defendant, if there is a reason, can attack those opinions

10:58:58AM 14   and we're going back to where we were before.  Is the

10:59:03AM 15   Plaintiff Steering Committee taking the position that every

10:59:07AM 16   witness that testifies for the defendant that says, listen,

10:59:09AM 17   we see the reports, these other journal articles, that

10:59:14AM 18   indicate that -- that persistent alopecia is found in

10:59:21AM 19   patients that take these other drugs, which do not contain

10:59:25AM 20   Taxotere, do they have to do a Bradford Hill analysis on each

10:59:29AM 21   and every one of those to show or to attack plaintiff

10:59:35AM 22   evidence?  And I think that's -- you're warning them to

10:59:38AM 23   establish causation as well when that burden is always,

10:59:43AM 24   always, always on the plaintiff and the defendant attacks it.

10:59:48AM 25        MR. LAMBERT:  I think -- I think we're mixing apples

| | | |
|---|---|---|
| 10:59:51AM | 1 | and oranges -- |
| 10:59:52AM | 2 | THE COURT:  I hope so. |
| 10:59:53AM | 3 | MR. LAMBERT:  -- Ms. Sastri's analogy in the trial. |
| 11:00:02AM | 4 | I think the issue is some of these general causation experts |
| 11:00:05AM | 5 | can cross -- you know, they can give testimony that supports |
| 11:00:09AM | 6 | the cross-examination of our experts on general causation, so |
| 11:00:17AM | 7 | they can say, well, you know, Dr. Tosti -- excuse me, |
| 11:00:22AM | 8 | Dr. Feigal, her Bradford Hill analysis is flawed because X, |
| 11:00:27AM | 9 | Y, or Z, and they can say, you know, there's just -- the |
| 11:00:31AM | 10 | statistical evidence is not -- you know, not supported |
| 11:00:37AM | 11 | sufficiently because X, Y, or Z, and Dr. Madigan, you should |
| 11:00:44AM | 12 | not believe him, you should believe our expert, Dr. Way |
| 11:00:49AM | 13 | (phonetic).  But that's different than a dermatologist who in |
| 11:00:52AM | 14 | this case was a Rule 35 expert.  She examined Ms. Kahn, but |
| 11:00:57AM | 15 | she lacks any support for talking about specific drugs |
| 11:01:02AM | 16 | causing anything.  She -- her opinions in this case should be |
| 11:01:08AM | 17 | limited to what type of hair loss Ms. Kahn has from her |
| 11:01:14AM | 18 | clinical review and her review of the other dermatologists' |
| 11:01:22AM | 19 | reports in the case. |
| 11:01:23AM | 20 | THE COURT:  But doesn't Dr. Tosti say she -- I think |
| 11:01:25AM | 21 | this lady has chemotherapy-induced alopecia, permanent |
| 11:01:33AM | 22 | chemotherapy-induced alopecia and I attribute it to Taxotere |
| 11:01:38AM | 23 | because I've done all of this review and because Taxotere is |
| 11:01:41AM | 24 | widely associated or widely seen as the cause or the factor |
| 11:01:46AM | 25 | for permanent chemotherapy-induced alopecia.  These other -- |

11:01:52AM **1** these other drugs, while you've seen some of it, it's very

11:01:55AM **2** rare, it's seldom, so, you know --

11:02:02AM **3**          MR. LAMBERT:  I think --

11:02:03AM **4**          THE COURT:  Isn't that what she says?

11:02:05AM **5**          MR. LAMBERT:  Yeah.  And I think that, again, the

11:02:07AM **6** difference is that she adequately supports that with the

11:02:11AM **7** general causation testimony of other experts.  When Dr.

11:02:16AM **8** Turegano answered the questions, she didn't say, well, I

11:02:19AM **9** looked at what Glasby said, I looked at what L.J. Way

11:02:22AM **10** (phonetic) said and these other experts, and I believe that,

11:02:25AM **11** you know, because of their support, their scientific

11:02:31AM **12** methodology, their approach, whatever, that this is my

11:02:35AM **13** conclusion.  I just -- I think that when it comes to a -- an

11:02:43AM **14** affirmative defense just like we proposed in our motion for

11:02:47AM **15** summary judgment on affirmative defenses of alternative

11:02:51AM **16** cause, if -- if the defendants are going to come into court

11:02:55AM **17** and argue that something else causes, they have to support

11:02:59AM **18** that with general causation support or some type of

11:03:03AM **19** methodology that is within the general causation realm.

11:03:11AM **20**          And just lastly, this Up to Date article was

11:03:14AM **21** discussed in Dr. Turegano's deposition, and this is from an

11:03:22AM **22** Up to Date source which is what many doctors look to in terms

11:03:28AM **23** of providing them with updated information about how to

11:03:35AM **24** convey warnings and look at changes in the science, and I

11:03:40AM **25** asked her about these conclusions that there is now

11:03:46AM **1** convincing evidence of permanent or prolonged alopecia after

11:03:52AM **2** someone does therapy for breast cancer and I asked her to

11:03:54AM **3** look at the underlying studies that are cited in support of

11:03:59AM **4** these statements, and, you know, while she agrees that Up to

11:04:03AM **5** Date is a good source for doctors, she disagrees with the

11:04:08AM **6** conclusions.  But we don't have support, adequate support, in

11:04:14AM **7** our opinion for those disagreements.  And I'll reserve a

11:04:20AM **8** couple of minutes after Mr. Ratliff.

11:04:22AM **9**          THE COURT:  Thank you.

11:04:25AM **10**          Mr. Ratliff?  Can't hear you.  I can't hear you.

11:04:33AM **11**          MR. RATLIFF:  Sometimes that's better, Your Honor.

11:04:36AM **12**          THE COURT:  That's kind of what I was thinking, but

11:04:40AM **13** not on the record.

11:04:41AM **14**          MR. RATLIFF:  No.  No.  No.  I was waiting for --

11:04:43AM **15** there we go.

11:04:43AM **16**          THE COURT:  Seeing we're on the record, that was a

11:04:47AM **17** joke.

11:04:47AM **18**          MR. RATLIFF:  Yes.

11:04:48AM **19**          THE COURT:  Thank you.

11:04:49AM **20**          MR. RATLIFF:  Good morning, Your Honor.  Let me move

11:04:51AM **21** to a share screen.

11:04:52AM **22**          THE COURT:  Okay.

11:04:53AM **23**          MR. RATLIFF:  Give me a second here.

11:05:36AM **24**          Harley Ratliff for Sanofi.  So I'd like to respond

11:05:39AM **25** just briefly to one of Mr. Lambert's arguments which was in

11:05:41AM 1 passing about Dr. Turegano's qualifications and what he said

11:05:45AM 2 were her lack of hair loss expertise or how many patients

11:05:49AM 3 that she has seen related to hair loss and chemotherapy.

11:05:54AM 4 That is something that is not one of the bases that she has

11:05:57AM 5 moved on, Your Honor.  That was something that was

11:05:59AM 6 mentioned --

11:06:00AM 7         THE COURT:  I don't even know why it's on the screen

11:06:02AM 8 because we didn't spend any time talking about it.

11:06:05AM 9         MR. RATLIFF:  So what I would --

11:06:07AM 10         THE COURT:  Not that I'm aware of.

11:06:08AM 11         MR. RATLIFF:  What I would like to address, Your

11:06:10AM 12 Honor, are their bases for moving to exclude Dr. Turegano,

11:06:13AM 13 which is they want to exclude an opinion that she has not

11:06:16AM 14 given.  She has not given a general causation opinion.  She

11:06:19AM 15 does not intend to give a general causation opinion.  She is

11:06:23AM 16 here to give a specific causation opinion.

11:06:25AM 17         Second, they attack a methodology, a differential

11:06:28AM 18 diagnosis, that Your Honor in her rulings has held is the

11:06:31AM 19 standard for doing a specific causation analysis, as Dr.

11:06:34AM 20 Turegano has done here.  And then as you see in their moving

11:06:37AM 21 papers, they seek to exclude an opinion that they say is not

11:06:40AM 22 in her report, but is in her report on multiple pages.  So I

11:06:48AM 23 would like to take those in turn, Your Honor.

11:06:49AM 24         Dr. Turegano, in addition to giving what I would say

11:06:52AM 25 is just general opinions about hair loss and alopecia, how do

11:06:55AM 1    you assess it, how do you treat it, what are the types of it,

11:06:58AM 2    what are the risk factors for it, those are general opinions

11:07:02AM 3    about dermatology and about hair loss.  They're not

11:07:06AM 4    controversial and they're uncontroverted generally.  The

11:07:10AM 5    second part of what she is doing is to give a specific

11:07:14AM 6    causation opinion, and what she has done here is to do a

11:07:17AM 7    differential diagnosis.  And as Your Honor explained, that

11:07:20AM 8    means ruling in all of the scientifically plausible causes

11:07:24AM 9    and then ruling out the least plausible causes until the most

11:07:29AM 10   likely one remains.  In doing a differential diagnosis, Your

11:07:33AM 11   Honor, it doesn't require a Bradford Hill analysis or a

11:07:36AM 12   statistical significance analysis, every plausible cause.

11:07:41AM 13   It's taking all of the potential causes, the plausible

11:07:44AM 14   causes, putting them together, and then one by one, ruling

11:07:47AM 15   them out.  And that's what Dr. Turegano did here.

11:07:49AM 16         So what did she do?  She reviewed the medical

11:07:52AM 17   literature, Your Honor.  Not just on alopecia, which she's

11:07:55AM 18   familiar with, but on permanent chemotherapy-induced alopecia

11:07:58AM 19   of which there are three pages of her report dealing with

11:08:02AM 20   every single study or report or piece of literature that has

11:08:05AM 21   been done on that topic.  She reviewed the depositions and

11:08:08AM 22   the discovery just like plaintiff's experts, just like Dr.

11:08:11AM 23   Tosti.  She reviewed expert reports just like Dr. Tosti, and,

11:08:14AM 24   importantly, she reviewed Ms. Kahn's medical records.  She

11:08:17AM 25   then looked at the photographs of which there are ample for

11:08:21AM  **1**   Ms. Kahn, but before chemotherapy and after chemotherapy.

11:08:23AM  **2**   She reviewed the biopsy results, which she is certainly

11:08:28AM  **3**   required to do, and then she performed a clinical examination

11:08:30AM  **4**   of Ms. Kahn.  She met with Ms. Kahn in person.  At that

11:08:33AM  **5**   point, she began to conduct her differential diagnosis.

11:08:38AM  **6**         THE COURT:  I think that what I'm hearing from

11:08:41AM  **7**   Mr. Lambert is, where the problem is, is that she said I

11:08:47AM  **8**   can't determine which drug did it.  I think she thinks there

11:08:51AM  **9**   was a question as to whether or not she actually has

11:08:54AM  **10**  permanent chemotherapy-induced alopecia, which would be the

11:09:00AM  **11**  differential diagnosis, is it that or is it related to other

11:09:03AM  **12**  causes of hair loss.  But -- what I'm hearing from

11:09:06AM  **13**  Mr. Lambert, the big concern is that she says I can't tell if

11:09:10AM  **14**  it's Taxotere or some of these other chemotherapy drugs that

11:09:15AM  **15**  she took.

11:09:17AM  **16**        MR. LAMBERT:  Sure, Your Honor.  And I think that is

11:09:19AM  **17**  probably what Mr. Lambert is arguing, is really the

11:09:22AM  **18**  disconnect.  Because he is arguing something that is not

11:09:24AM  **19**  there and I'd like you to give me a little leeway to explain

11:09:27AM  **20**  that, Your Honor.

11:09:27AM  **21**        THE COURT:  Okay.

11:09:29AM  **22**        MR. RATLIFF:  Her differential diagnosis, she looked

11:09:32AM  **23**  at the androgenetic alopecia and was it chemotherapy, and she

11:09:36AM  **24**  looked at all of the various factors that are risk factors

11:09:39AM  **25**  for androgenetic alopecia of which there are a number, and

| | | |
|---|---|---|
| 11:09:42AM | 1 | then she looked at which one of those fall into Ms. Kahn's |
| 11:09:45AM | 2 | specific case, not just in the abstract, but how do they |
| 11:09:48AM | 3 | apply to Ms. Kahn.  She noticed through the photographs that |
| 11:09:51AM | 4 | her hair loss was progressive.  That's akin to androgenetic |
| 11:09:57AM | 5 | alopecia.  She noted that she had alopecia that predated |
| 11:10:00AM | 6 | chemotherapy and that her hair regrew after chemotherapy |
| 11:10:02AM | 7 | before starting to fall out.  That's something that is not in |
| 11:10:06AM | 8 | dispute.  She looked at her age, and her age lines up with |
| 11:10:10AM | 9 | when most women begin to develop androgenetic alopecia.  She |
| 11:10:15AM | 10 | looked at her menopausal state.  That is something that |
| 11:10:18AM | 11 | affects progressive hair loss.  She looked at where was Ms. |
| 11:10:21AM | 12 | Kahn's hair loss, largely in the androgen-dependent areas. |
| 11:10:24AM | 13 | Does she have a family history, which she certainly does of |
| 11:10:29AM | 14 | androgenetic alopecia.  Does she have underlying health |
| 11:10:33AM | 15 | issues that are related to hair loss?  Yes, she does.  Does |
| 11:10:36AM | 16 | she have a lengthy history of tamoxifen?  And all Dr. |
| 11:10:41AM | 17 | Turegano says about tamoxifen, which is consistent with what |
| 11:10:42AM | 18 | Dr. Tosti has said and frankly every single person who's been |
| 11:10:44AM | 19 | deposed on this topic, that it is an alopecia causing agent. |
| 11:10:47AM | 20 | And she says tamoxifen likely contributed to the hair loss, |
| 11:10:53AM | 21 | but she has androgenetic alopecia.  So as part of her |
| 11:10:57AM | 22 | differential diagnosis, Judge Milazzo, she didn't diagnose |
| 11:10:59AM | 23 | her with PCIA.  She diagnosed her with something that was |
| 11:11:02AM | 24 | unrelated to chemotherapy. |
| 11:11:04AM | 25 | THE COURT:  I understand that. |

MOTION TO EXCLUDE TESTIMONY OF DR. MAMINA TUREGANO

11:11:06AM **1**        MR. RATLIFF:  But in doing the differential

11:11:10AM **2**   diagnosis, Your Honor, she has to take into account

11:11:12AM **3**   chemotherapy.  And if we had been here and Dr. Turegano had

11:11:15AM **4**   not taken into account chemotherapy as part of her

11:11:18AM **5**   differential, I can assure you I would be arguing a motion

11:11:21AM **6**   presented by plaintiffs that she should be excluded because

11:11:24AM **7**   she did not consider chemotherapy.  So in her medical

11:11:27AM **8**   literature review, she noticed that there are reports of

11:11:30AM **9**   chemotherapy, studies of chemotherapy that are permanent hair

11:11:34AM **10**  loss and chemotherapy that list a variety of different types

11:11:37AM **11**  of chemotherapies.

11:11:38AM **12**       And then in terms of -- and from there she says,

11:11:42AM **13**  look, I think it is more likely in my differential diagnosis

11:11:47AM **14**  and my expert opinion, it is androgenetic alopecia, her hair

11:11:52AM **15**  loss, not related to chemotherapy.  But then she puts in "if

11:11:55AM **16**  it were", if it were related to chemotherapy, if it did play

11:11:58AM **17**  a role, what Dr. --

11:11:59AM **18**       THE COURT:  This is where I want to focus, right

11:12:01AM **19**  here, your next sentence.

11:12:03AM **20**       MR. RATLIFF:  It's impossible to -- it's impossible

11:12:05AM **21**  to rule out the other drugs.

11:12:05AM **22**       THE COURT:  Gotcha.

11:12:07AM **23**       MR. RATLIFF:  And so these are the bases of why she

11:12:11AM **24**  comes to that conclusion.  One, not in dispute, PCIA has been

11:12:17AM **25**  independently associated with numerous chemotherapies.  Two,

11:12:19AM 1    there is no literature that establishes that Taxotere alone

11:12:23AM 2    is a cause of PCIA.  That is something you will see Dr. Tosti

11:12:26AM 3    has testified to.  Three, there are no physical markers that

11:12:29AM 4    you would look at on somebody's scalp and, say, I'm looking

11:12:33AM 5    at this, they've taken a multi-drug regimen, I can tell this

11:12:38AM 6    hair loss here is Taxotere, this hair loss over here is

11:12:41AM 7    Adriamycin or Cyclophosphamide.  So there is no way to

11:12:44AM 8    distinguish that.  Likewise -- and this is not in dispute,

11:12:46AM 9    there is no unique pathological presentation of PCIA.  You

11:12:50AM 10   look at a biopsy result -- and I think Dr. Tosti says this as

11:12:53AM 11   well -- it can look at what I think is PCIA or it can look at

11:12:58AM 12   androgenetic alopecia.  And then on top of that, Your Honor,

11:13:00AM 13   she says if you look at the medical literature and there is a

11:13:02AM 14   lot of medical literature, it largely consists of small

11:13:06AM 15   retrospective studies often with questionable data in terms

11:13:11AM 16   of questionnaires, et cetera.  And so taking all of those

11:13:14AM 17   into account, as a dermatologist, she says it's impossible

11:13:18AM 18   for me to tease out -- tease out and say, if she does have

11:13:23AM 19   PCIA like plaintiffs say, there is no way based on these

11:13:29AM 20   factors that I could say it's Taxotere.  I could rule out the

11:13:31AM 21   other drugs or rule in Taxotere, they're all ruled in and

11:13:35AM 22   none can be ruled out.  And I think that is the part that

11:13:38AM 23   she's imminently qualified to do, and it's certainly not a

11:13:42AM 24   general causation opinion, Your Honor.  And this is -- go

11:13:46AM 25   ahead, Your Honor.

| | | |
|---|---|---|
| 11:13:46AM | 1 | THE COURT:  No, that's fine. |
| 11:13:48AM | 2 | MR. RATLIFF:  And this is what she said, because of |
| 11:13:51AM | 3 | multi-drug regimens and the confounding factors, it is |
| 11:13:54AM | 4 | impossible to conclude that if a woman has ongoing alopecia |
| 11:13:57AM | 5 | after the completion of chemotherapy that Taxotere caused it, |
| 11:14:00AM | 6 | not that permanent -- not that chemotherapy caused it, but |
| 11:14:03AM | 7 | that Taxotere alone was the cause based on all the factors |
| 11:14:07AM | 8 | that I just walked you through. |
| 11:14:08AM | 9 | THE COURT:  And let me ask this question:  If, |
| 11:14:11AM | 10 | indeed, the case reports indicate that there is a greater -- |
| 11:14:23AM | 11 | not case reports, the literature that there is a -- maybe |
| 11:14:30AM | 12 | this is a question for the later motions.  But if the |
| 11:14:35AM | 13 | literature finds permanent chemotherapy-induced alopecia on a |
| 11:14:42AM | 14 | much more -- on a more significant level in patients taking |
| 11:14:49AM | 15 | Taxotere as opposed to other chemotherapy regimes, wouldn't |
| 11:14:56AM | 16 | that be something the doctor would determine in determining |
| 11:15:00AM | 17 | what is the cause? |
| 11:15:02AM | 18 | For example, people can get lung cancer without |
| 11:15:08AM | 19 | smoking, but if you smoke, they probably -- you know, they |
| 11:15:11AM | 20 | will assume it is attributable to it. |
| 11:15:13AM | 21 | MR. RATLIFF:  Well, Your Honor, I think I would |
| 11:15:15AM | 22 | answer that in probably two ways, which is, if that |
| 11:15:18AM | 23 | literature existed, then possibly, but I think what you have |
| 11:15:22AM | 24 | here and what Dr. Turegano testified to is, the literature |
| 11:15:26AM | 25 | and the studies that are available are largely small, |

11:15:30AM   **1**   retrospective and in her opinion not really the type of

11:15:35AM   **2**   medical literature or studies that allow anyone to accurately

11:15:40AM   **3**   do a Bradford Hill analysis.

11:15:41AM   **4**         I think the second part of that, Your Honor, as it

11:15:43AM   **5**   relates to the medical literature and I do not want to stray

11:15:46AM   **6**   us into where we were in Earnest trial, but I think it gets

11:15:50AM   **7**   into how people get into counting what reports go with what

11:15:55AM   **8**   drug.  So if it's Taxotere, Adriamycin and Cyclophosphamide,

11:15:58AM   **9**   we know Dr. Feigal counts that as Taxotere, but not as the

11:16:02AM   **10**   other two.  So in terms of whether the -- I would say the

11:16:04AM   **11**   medical literature is at best mixed on the prevalence and

11:16:11AM   **12**   propensity of these chemotherapies being associated with

11:16:13AM   **13**   permanent hair loss, whether it's Taxotere, Adriamycin,

11:16:16AM   **14**   Cyclophosphamide or Taxol.

11:16:19AM   **15**         But -- and I think this is important, Your Honor,

11:16:20AM   **16**   because I think it clarifies the point that Dr. Turegano is

11:16:23AM   **17**   making -- and Mr. Lambert asked her about this at her

11:16:27AM   **18**   deposition and was actually cited in their papers -- she

11:16:30AM   **19**   says, "I do believe that PCIA exists and part of the

11:16:35AM   **20**   definition is it must be induced by chemotherapy."

11:16:38AM   **21**         Mr. Lambert says, "Fair enough.  So it's not

11:16:40AM   **22**   impossible to say that Taxotere containing regimens may have

11:16:42AM   **23**   caused it?"

11:16:43AM   **24**         She said, "Nor is it possible to say that it does."

11:16:47AM   **25**         He said, "I thought you testified that it was

MOTION TO EXCLUDE TESTIMONY OF DR. MAMINA TUREGANO

11:16:48AM 1    impossible."

11:16:49AM 2         She said, I "said it's possible, but it's also

11:16:51AM 3    impossible to say it's because of the Taxotere."  Sorry --

11:16:55AM 4         THE COURT:  Let me ask this question -- I got it.

11:16:59AM 5    Let me ask this question:  How is this not cumulative?

11:17:02AM 6         MR. RATLIFF:  Absolutely.

11:17:03AM 7         THE COURT:  How many of these -- how many of these

11:17:06AM 8    specific causation defense experts do you intend to put up

11:17:11AM 9    because this seems a little bit much for me.

11:17:15AM 10        MR. RATLIFF:  Understood, Your Honor.  I would say

11:17:17AM 11   two parts to that.  One, I would say Dr. Turegano, Dr.

11:17:22AM 12   Freites-Martinez, and Dr. Shapiro bring complementary, not

11:17:28AM 13   cumulative, background and expertise.  I would say, for

11:17:33AM 14   example, Dr. Freites-Martinez, he comes in with the

11:17:36AM 15   experience of having done -- published the articles, done a

11:17:39AM 16   lot of the research, Shapiro as well.  We've already heard

11:17:44AM 17   Mr. Lambert attack in some part the qualifications of Dr.

11:17:48AM 18   Turegano, but she is the one who actually saw this particular

11:17:50AM 19   patient.  She met with her in New Orleans.  She reviewed the

11:17:52AM 20   medical records, and so I would say, one, they're

11:17:55AM 21   complementary.  Two, I would say I think that's a

11:17:57AM 22   determination for trial, and I would say, Your Honor, I don't

11:18:00AM 23   think our expectation is all three would be called for the

11:18:03AM 24   jury, but we certainly would like to have that ability and we

11:18:05AM 25   do think they bring different things to the table based on

MOTION TO EXCLUDE TESTIMONY OF DR. MAMINA TUREGANO

11:18:09AM 1   their experience and what they have to say about specific

11:18:11AM 2   causation and PCIA and the literature and studies that have

11:18:16AM 3   been done to date.

11:18:18AM 4          THE COURT:  Okay.  Thank you.

11:18:23AM 5          MR. RATLIFF:  And so, Your Honor, that concludes it,

11:18:26AM 6   and I will see the floor to Mr. Lambert.

11:18:28AM 7          THE COURT:  Mr. Lambert, briefly.

11:18:30AM 8          MR. LAMBERT:  Okay.  Yes, Your Honor, briefly.

11:18:33AM 9          I think Mr. Ratliff is still -- there we go --

11:18:38AM 10  sharing his screen.

11:18:39AM 11         So, what I would say, Your Honor, is that I think you

11:18:47AM 12  hit the nail on the head.  What Mr. Ratliff said was not in

11:18:53AM 13  there is in there.  It's in the last paragraph of her

11:18:56AM 14  conclusion.  And she, Dr. Turegano, is suggesting that these

11:19:03AM 15  other drugs can cause PCIA.  And the problem is, as we've

11:19:11AM 16  discussed, she cannot be allowed to offer testimony that a

11:19:15AM 17  drug can cause or generally causes without adequate general

11:19:21AM 18  causation support for such an opinion.  She can talk about

11:19:24AM 19  risk factors.  She can talk about case reports that are

11:19:30AM 20  suggested of an association.  She agrees that case reports

11:19:35AM 21  are not conclusive evidence of a causal relationship, but we

11:19:42AM 22  believe that's an important distinction and allowing it to go

11:19:47AM 23  in otherwise is going to risk confusion of the issues with

11:19:53AM 24  the jury.

11:19:54AM 25         And then the second point, Your Honor, would be that

11:19:59AM  1   -- you know, it's interesting.  We've spent probably 50 hours

11:20:06AM  2   or more deposing specific causation experts in this case with

11:20:10AM  3   Sanofi and two Daubert hearings on the complexity of these

11:20:14AM  4   issues and diagnoses, and I just want to mention the reason

11:20:20AM  5   why we attached her testimony as a supplemental pleading on

11:20:24AM  6   the *Grier* motion was because her testimony about

11:20:29AM  7   impossibility for dermatology and dermatopathology experts

11:20:36AM  8   and the bullet points that, you know, Mr. Ratliff went

11:20:38AM  9   through in terms of this is why you can't -- why she can say

11:20:42AM  10  it's quote "impossible to make that determination" and yet

11:20:47AM  11  you know on the pleadings or from a lay person's standpoint

11:20:54AM  12  these women in this case were supposed to figure it out.

11:20:58AM  13  Those are completely inconsistent positions and, you know,

11:21:02AM  14  maybe we'll be addressing that at the motions in limine

11:21:06AM  15  stage, but it seems pretty problematic to us.  Thank you.

11:21:12AM  16          THE COURT:  Thank you.

17                          * * * *

18          (WHEREUPON, the proceedings were adjourned.)

19                          * * * *

20                  REPORTER'S CERTIFICATE

21          I, Nichelle N. Wheeler, RPR, CRR, Official Court
        Reporter, United States District Court, Eastern District of
22      Louisiana, do hereby certify that the foregoing is a true and
        correct transcript, to the best of my ability and
23      understanding, from the record of the proceedings in the
        above-entitled and numbered matter.

24

25                  /s/ Nichelle N. Wheeler
                Official Court Reporter