UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)           MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                       SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Cindy Smith, Case No. 2:18-cv-7702.

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT ON WARNINGS CAUSATION

Sanofi is entitled to summary judgment because Plaintiff Cindy Smith cannot establish warnings causation under either Mississippi law or this Court's four-part framework.

First, under Mississippi law, Ms. Smith cannot establish warnings causation because she has no evidence that her doctor's prescribing decision would have changed if provided a different warning. In 2014, Dr. Elizabeth Herrington prescribed a chemotherapy regimen of Taxotere and Carboplatin to treat Ms. Smith's "aggressive" Stage IIIb, triple-negative breast cancer. Dr. Herrington unequivocally stands by that decision. Dr. Herrington testified that a Taxotere-containing regimen was Ms. Smith's *only* option and that she would prescribe it to Ms. Smith again, knowing what she knows today.

Second, Ms. Smith cannot satisfy this Court's four-part framework because, even if Dr. Herrington warned Ms. Smith of a risk of permanent hair loss associated with Taxotere in 2014, such warning would not have changed her ultimate chemotherapy decision. Dr. Herrington identified two chemotherapy regimens appropriate to treat Ms. Smith: (1) Taxotere and Carboplatin or (2) Taxotere and Cytoxan. Dr. Herrington would not have prescribed any other regimen, nor would Ms. Smith have asked for one. Ms. Smith, even now, has failed to identify a different, available regimen she would have taken in 2014. There is no dispute that Ms. Smith—

or any reasonable plaintiff in her position—would have accepted a Taxotere-containing chemotherapy. As Ms. Smith testified, her primary goal was survival, and she trusted her doctors to give her the best treatment. Because Ms. Smith cannot establish warnings causation, the Court should enter summary judgment in Sanofi's favor.

## STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

## ARGUMENT

### I. MS. SMITH CANNOT ESTABLISH WARNINGS CAUSATION UNDER MISSISSIPPI LAW.

Mississippi recognizes the learned-intermediary doctrine. *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 811 (5th Cir. 1992) (applying Mississippi law); Miss. Code Ann. § 11-1-63(c)(ii) (codifying doctrine). "Under this doctrine, the manufacturer's failure to warn the patient of the product's risks does not render the product defective or unreasonably dangerous so long as the manufacturer adequately warns the learned intermediary." *Thomas*, 949 F.2d at 811. Put another way, a drug manufacturer has a duty to provide an adequate warning to the physician, not the plaintiff. *See Johnson v. Parke-Davis*, 114 F. Supp. 2d 522, 525 (S.D. Miss. 2000).

Even assuming the manufacturer's warning was allegedly inadequate, however, the plaintiff must still prove *warnings causation*—i.e., a causal connection between the allegedly

inadequate warning, the prescriber's ultimate decision to prescribe, and the plaintiff's ultimate injury.  *Thomas*, 949 F.2d at 814.

Warnings causation has two requirements.  First, a plaintiff must establish "that an adequate warning would have prevented the treating physician from administering the drug."  *Id.*  Specifically, a plaintiff must "demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff."  *Id.*; *see also Smith v. Johnson & Johnson, Inc.*, 483 F. App'x 909, 914 (5th Cir. 2012) (requiring plaintiff to show "that the undisclosed risk was high enough that, if disclosed, would have changed the treating physician's decision to prescribe the product for the plaintiff").  Second, a plaintiff must also establish "that the injury would not have occurred had the drug not been administered."  *Thomas*, 949 F.2d at 814; *accord Bennett v. Madakasira*, 821 So. 2d 794, 807 (Miss. 2002), *abrogated on other grounds by Hutzel v. City of Jackson*, 33 So. 3d 1116, 1118 (Miss. 2010); *Smith v. Johnson & Johnson*, 2011 WL 3876997, at *11 (S.D. Miss. Aug. 31, 2011).

Ms. Smith cannot present a triable issue under the first prong of warnings causation, so the Court should grant summary judgment.  Ms. Smith claims Sanofi failed to warn her treating physician that permanent hair loss is a potential side effect of Taxotere.[1]  To prove warnings causation, Ms. Smith must identify a *quantifiable* risk of permanent alopecia associated with Taxotere not otherwise known to Dr. Herrington, her treating physician, and show such risk was so great that it would have changed her decision to prescribe Taxotere.  Ms. Smith cannot make this showing.  Dr. Herrington testified that she would not change her decision to prescribe Taxotere to Ms. Smith knowing what she knows now about the association of Taxotere with permanent hair loss:

---

[1]  *See generally* Second Am. Master Long Form Compl. ¶¶ 221–31; 240–47.

3

> Q. And is it correct that information that you have today about the association of Taxotere with permanent hair loss would not have factored into your decision making process to prescribe Taxotere and carboplatin to Ms. Smith?
>
> A. That's correct.
>
> Q. Okay. Knowing what you know today, you still would have prescribed Taxotere and carboplatin; correct?
>
> A. Yes.[2]

Dr. Herrington reached this conclusion because a Taxotere-containing regimen was Ms. Smith's *only* chemotherapy option:

> Q. Dr. Herrington, given the stage and triple-negative type of cancer that Ms. Smith had, it was your opinion that she absolutely needed chemotherapy; correct?
>
> A. Yes.
>
> Q. And if Ms. Smith would have refused to take Taxotere due to a risk of permanent hair loss, would you have referred her to a different oncologist because, in your professional judgment, she needed chemotherapy and she needed a Taxotere-containing regimen?
>
> A. Yes.
>
> Q. And a Taxotere-containing regimen was her only option; correct?
>
> A. Yes.[3]

On this record, it is undisputed that more information (i.e., a stronger warning) about the risk of permanent alopecia (i.e., "Cases of permanent alopecia have been reported") would not have changed Dr. Herrington's decision to prescribe Taxotere to Ms. Smith. Dr. Herrington's own

---

[2] Defs.' Statement of Facts ("DSOF") ¶ 41.

[3] *Id.* ¶ 39 (objection omitted).

unequivocal testimony shows that Taxotere was Ms. Smith's only chemotherapy option.[4] On these undisputed facts, Ms. Smith cannot establish warnings causation and therefore summary judgment is warranted. *See Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 211–12 (5th Cir. 2008) (affirming summary judgment based on prescriber's testimony that he would have prescribed drug to plaintiff even if he had received plaintiff's proposed stronger warning).

## II. MS. SMITH ALSO CANNOT ESTABLISH WARNINGS CAUSATION UNDER THE COURT'S FOUR-PART FRAMEWORK.

Summary judgment also is warranted under this Court's four-part framework to analyze warnings causation in cases involving chemotherapy:

> The question is not simply "what would the doctor have prescribed" but *[1] whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere, [2] whether the patient would have inquired about other options, [3] what the doctor would have recommended, and [4] what decision the plaintiff would have ultimately made.* The Court will consider these questions with the goal being to assess what the doctor and the patient would have decided together. While a doctor may testify that his or her recommendation would not have changed, the issue is whether the plaintiff's ultimate decision would have changed.[5]

Ms. Smith cannot satisfy her burden under this framework.

Under the first element, even if Dr. Herrington had warned Ms. Smith that cases of permanent alopecia had been reported with Taxotere, Dr. Herrington and Ms. Smith still would have picked a regimen containing Taxotere because it was the *only* chemotherapy regimen available to Ms. Smith.[6]

---

[4]   *Id.*

[5]   Rec. Doc. 7571 at 16 (Order and Reasons on Six Mots. for Summ. J.) (emphasis and numerals added).

[6]   DSOF ¶ 39.

As to the second element, there is no evidence that Ms. Smith would have inquired about other treatment options. Ms. Smith "thought all chemo was the same," and she did not ask about which regimen she would receive.[7] Instead, Ms. Smith relied on her doctors to prescribe the most effective treatment because she was not prepared to determine an appropriate treatment.[8]

The third element is satisfied because it is also undisputed that Dr. Herrington would have only recommended a Taxotere-containing regimen to Ms. Smith. Ms. Smith had Stage IIIb, HER2-negative breast cancer.[9] Dr. Herrington relied on the 2014 NCCN guidelines to treat Ms. Smith.[10] The NCCN guidelines included three "Preferred regimens" and ten "Other regimens" for HER2-negative breast cancer.[11] The Taxotere-containing regimens were the only preferred regimens that did not contain an anthracycline.[12]

Dr. Herrington explained that she could not use most of the other regimens for Ms. Smith because they included an anthracyclines, such as doxorubicin/Adriamycin or epirubicin.[13] Anthracyclines carry a risk of heart failure.[14] The risk is higher for patients with preexisting risk factors for heart disease.[15] Ms. Smith had several risk factors for heart disease, including hypertension, hyperlipidemia, a long-term history of smoking, and obesity.[16] Ms. Smith also

---

[7]  *Id.* ¶ 16.

[8]  *Id.* ¶ 17.

[9]  *Id.* ¶ 6.

[10] *Id.* ¶ 25.

[11] *Id.* ¶ 26.

[12] *Id.* ¶ 27.

[13] *Id.* ¶ 28.

[14] *Id.* ¶ 29.

[15] *Id.*

[16] *Id.* ¶ 30.

received an echocardiogram before her second appointment with Dr. Herrington.[17]  The echocardiogram revealed Ms. Smith had an ejection fraction ("how strong the heart pumps") of 45 percent, which Dr. Herrington characterized as "low."[18]  The echocardiogram also revealed Ms. Smith had a grade one diastolic dysfunction ("a dysfunction in the way her heart relaxes").[19]  Because of Ms. Smith's underlying heart dysfunction, Dr. Herrington concluded that Ms. Smith could not receive an anthracycline in her chemotherapy regimen.[20]  Last, Dr. Herrington would not have prescribed CMF (Cyclophosphamide, Methotrexate, Fluorouracil) to Ms. Smith because it was "less aggressive" and Ms. Smith "would not have had much of a fair chance" on this regimen.[21]

Dr. Herrington "definitely wanted to use Taxotere" to treat Ms. Smith.[22]  The only question then was whether Dr. Herrington would pair Taxotere with Carboplatin or with Cytoxan.[23]  For Ms. Smith, Dr. Herrington relied on her training, experience, and understanding of the literature to select Carboplatin in place of Cytoxan.[24]  If Dr. Herrington had not selected Taxotere and Carboplatin, however, Dr. Herrington would have selected Taxotere and Cytoxan.[25]

---

[17]  *Id.* ¶ 31.

[18]  *Id.* ¶ 32.

[19]  *Id.* ¶ 33.

[20]  *Id.* ¶ 34.

[21]  *Id.* ¶ 35.

[22]  *Id.* ¶ 36.

[23]  *Id.* ¶ 37.

[24]  *Id.*

[25]  *Id.* ¶ 38.

If Ms. Smith had insisted on anything but a Taxotere-containing regimen because of the alleged risk of permanent hair loss, Dr. Herrington <u>would have refused</u> and referred Ms. Smith to a different oncologist.[26]  Dr. Herrington was clear that she would not deviate from those choices, even if Ms. Smith had asked:

> Q. How often do you encourage your patients to be an active participant in deciding what regimen, what chemotherapy they will receive?
>
> A. You know, if they have that option, that's wonderful, but with all due respect, **it is not like a McDonald's menu where you can just go and pick and choose which ones you want**.[27]

Ms. Smith had two options, and both contained Taxotere.[28]  Had Ms. Smith tried to pick a different regimen, Dr. Herrington would not have prescribed it.[29]  Under the third element, Dr. Herrington would have recommended a Taxotere-containing regimen in 2014, and she would recommend the regimen to Ms. Smith today.[30]  *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2020 WL 1819665, at *2 ("Dr. Sonnier testified that there were no adequate alternative options for Plaintiff Phillips, who had an aggressive cancer.").

The fourth element likewise points only in Sanofi's favor.  Mississippi, like Louisiana, applies a "reasonable patient" standard, which asks "whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment." *Dunn v. Yager*, 58 So. 3d 1171, 1201 n.27 (Miss. 2011) (quoting *Jamison v. Kilgore*, 903 So. 2d 45, 49 (Miss. 2005)); *see also Reikes v. Martin*, 471 So. 2d 385, 392–93 (Miss. 1985) (rejecting subjective

---

[26]  *Id.* ¶ 39.

[27]  *Id.* ¶ 40.

[28]  *Id.* ¶ 37.

[29]  *Id.* ¶ 39.

[30]  *Id.* ¶¶ 41–42.

test: "[s]ince at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment." (quoting *Cobbs v. Grant*, 502 P.2d 1, 11 (Cal. 1972))).

A reasonably prudent patient in Ms. Smith's position, fully advised of the risks, would have consented to a Taxotere-based chemotherapy. A reasonable patient facing an "aggressive" Stage IIIb, triple-negative breast cancer would choose the treatment plan giving her the best chance at survival.[31] Ms. Smith already had a "poor prognosis" because of the type of cancer and how aggressively it was growing:[32]



Ex. J, Smith Dep. Ex. 4, Ms. Smith's Diagnosis and Prognosis.

In Dr. Herrington's opinion, there was no question a patient with this diagnosis would require chemotherapy.[33] A reasonable patient in Ms. Smith's position also would need to avoid chemotherapy regimens containing anthracyclines due to poor systolic function and a low ejection fraction.[34] Given the 2014 NCCN Guidelines, the only available option for a patient in Ms. Smith's position would be a Taxotere-containing regimen. No reasonable patient, when faced with an

---

[31]   *Id.* ¶¶ 6, 8.

[32]   *Id.* ¶ 15.

[33]   *Id.* ¶ 39.

[34]   *Id.* ¶¶ 28–34.

9

aggressive cancer and poor prognosis, would reject Dr. Herrington's decision to prescribe a Taxotere-containing regimen.

Ms. Smith's subjective testimony, even if considered, is consistent.  Ms. Smith understood her tumor was about the size of a peach, and she put her chances of survival at 50-50.[35]  Ms. Smith decided that she would do whatever she could to beat cancer and survive:[36]

> Q. …[Y]ou were willing, though, to consent to whatever treatment it took to make sure that your cancer would not come back?
>
> A. Yeah. Yes.[37]

Indeed, Ms. Smith wanted to take *all* preventative measures to make sure there was no chance the cancer would come back.[38]

Further, Ms. Smith did not ask about other treatment or options.[39]  *See In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2020 WL 1819665, at *3 ("[T]he evidence suggests that she never inquired about other options but instead trusted Dr. Sonnier and heeded his advice.").  Ms. Smith instead relied on her doctors to prescribe the most effective treatment because she was not prepared to determine an appropriate treatment.[40]  *Id*.  And she never considered declining treatment.[41]  Although Ms. Smith now asserts she might have selected a different regimen, Ms. Smith concedes she is unaware of any replacement available in 2014 for her Taxotere-containing regimen.[42]  To

---

[35] *Id.* ¶ 7.

[36] *Id.* ¶ 10.

[37] *Id.* ¶ 11.

[38] *Id.* ¶ 12.

[39] *Id.* ¶ 13.

[40] *Id.* ¶ 17.

[41] *Id.* ¶ 14.

[42] *Id.* ¶ 22.

10

that end, Ms. Smith could not say whether she would have chosen a hypothetical alternative regimen that would have lowered her chances of survival,[43] which tracks her decision to do whatever she could do to beat cancer and survive.[44]

Just as this Court held in *Phillips*, Ms. Smith cannot establish warnings causation because Dr. Herrington and a reasonable patient in the same position (or even Ms. Smith herself) would still ultimately choose a Taxotere-containing regimen. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2020 WL 1819665, at *3; *see also Hunt v. McNeil Consumer Healthcare*, 2014 WL 1779471, at *3 (E.D. La. May 5, 2014) (granting defendant's motion for judgment as a matter of law where plaintiff failed to prove "that a different warning label would have changed her decision to administer Children's Motrin to [her child]").

## **CONCLUSION**

For these reasons, the Court should grant Sanofi's motion for summary judgment on Ms. Smith's claims.

Respectfully submitted,

| | |
|---|---|
| */s/ Douglas J. Moore*<br>Douglas J. Moore (Bar No. 27706)<br>**IRWIN FRITCHIE URQUHART & MOORE LLC**<br>400 Poydras Street, Suite 2700<br>New Orleans, LA 70130<br>Telephone: 504-310-2100<br>Facsimile: 504-310-2120<br>dmoore@irwinllc.com | Harley V. Ratliff<br>Jon Strongman<br>Adrienne L. Byard<br>**SHOOK, HARDY & BACON L.L.P.**<br>2555 Grand Boulevard<br>Kansas City, Missouri 64108<br>Telephone: 816-474-6550<br>Facsimile: 816-421-5547<br>hratliff@shb.com<br>jstrongman@shb.com<br>abyard@shb.com<br>***Counsel for sanofi-aventis U.S. LLC and Sanofi US Services Inc.*** |

---

[43] *Id.* ¶ 23.

[44] *Id.* ¶ 10.

11

**CERTIFICATE OF SERVICE**

    I hereby certify that on February 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

    */s/ Douglas J. Moore*