# EXHIBIT C

1         UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
2
3
     CINDY L. SMITH                              PLAINTIFF
4
     VS.                       CASE NO. 2:18-cv-07702
5
     SANOFI US SERVICES,                         DEFENDANT
6    INC. F/K/A
     SANOFI-AVENTIS U.S.,
7    INC., SANOFI-AVENTIS
     U.S. LLC, ET AL.
8
9
     ****************************************************
10      VIDEO DEPOSITION OF ELIZABETH HERRINGTON, M.D.
     ****************************************************
11
        Taken at the instance of the Defendants via Zoom,
12                 on October 14, 2020
          beginning at approximately 1:00 p.m.
13
14
15
                  (APPEARANCES NOTED HEREIN)
16
17
18
19
20
21
22                    * * * * * * * *
23                     Reported by:
                    Julie Brown, CCR 1587
24
25


Page 38

1  Q.  Can you see that, this exhibit, at the
2  top, it says "Dose Recordings"?
3  A.  Yes.
4      MR. JOHNSON:  Just so you know, every
5  time you put something up, if we've got it, I'm
6  giving her the hard copy to look at too.
7      THE WITNESS:  I appreciate that.  Thank
8  you.
9  BY MR. STRINGER:
10  Q.  Do you recognize this document?
11  A.  Yes.
12  Q.  And I can represent to you this is --
13  well, I won't represent it.  The name there, can you
14  see where it says "Name:  Cindy Smith"?
15  A.  Yes.
16  Q.  "Smith, Cindy."  And "Birth Date:
17  January 10, 1960"?
18  A.  Yes.
19  Q.  I'm going to backtrack a little bit.  I
20  should have done this at the start.
21      Do you understand that Cindy Smith is part
22  of a lawsuit involving the manufacturer of Taxotere?
23  Do you understand that?
24  A.  Yes.
25  Q.  And do you have any independent

Page 39

1  recollection outside of the records that you've
2  reviewed of Ms. Smith?
3  A.  Can you ask that again?
4  Q.  Do you want me to restate that?
5  A.  Yes, please.
6  Q.  If you were to see Ms. -- if you were to
7  see Cindy Smith, the plaintiff, on the street, would
8  you recognize her?
9  A.  Yes.
10  Q.  When was the last time that you saw her?
11  Do you recall?
12  A.  Probably it had to have been around, I
13  would say, 2014 or 2015.
14  Q.  Okay.  You have a good memory.  So you
15  believe you would recognize her if you saw her on
16  the street?
17  A.  Yes.
18  Q.  Okay.  Back to this exhibit, Exhibit 4.
19  Can you tell me what this is?
20  A.  That is a recording of administration of
21  chemotherapy.
22  Q.  Okay.
23  A.  And premedications.
24  Q.  Okay.  Do you recall how many doses of
25  docetaxel she received?

Page 40

1  A.  Yes.
2  Q.  How many was that?
3  A.  Six.
4  Q.  And can you tell me about the particular
5  regimen that she received?
6  A.  Yes.  So for her, she had stage 3B
7  triple-negative breast cancer.  And so,
8  unfortunately, her risk of recurrence was high.
9  Triple-negative breast cancer tends to be more
10  aggressive.  Generally our first line of treatment
11  recommendation would include an anthracycline.
12  However, I did not feel like it was safe to give
13  that to her due to underlying heart dysfunction.
14  And so I looked at -- I did, with my training
15  experience and understanding of the literature, I
16  chose Taxotere and carboplatin for her.
17  Q.  Can you go into a little bit more detail
18  on that about that choice that you made?
19  A.  Sure.  For her, I definitely wanted to
20  use Taxotere.  If you look at the guidelines at that
21  time, Cytoxan usually -- that NCCN is the preferred
22  regimen with that.  However, there was literature
23  reviews and it was being postulated at that time
24  that those women, that that subset of population,
25  that their tumor type may behave more similar to --

Page 41

1  well, phenotypically or molecular as BRCA1
2  mutations.  So they would get some benefit out of
3  the platinum, and so that was part of my reasoning
4  for choosing that for her.
5  Q.  Okay.  Do you recall discussing the
6  regimen with Ms. Smith specifically?
7  A.  Yes.  I don't recall the details of it,
8  but out of habit and practice, before I give anyone
9  chemotherapy, I always sit down with them and have a
10  detailed discussion about their diagnosis, stage and
11  the risks and benefits of chemotherapy and our goals
12  of treatment.
13  Q.  Okay.
14      MR. STRINGER:  Because you just mentioned
15  it, I'm going to pull up the NCCN guidelines as
16  Exhibit 5.
17      (Exhibit 5 marked for identification.)
18  BY MR. STRINGER:
19  Q.  Can you see that you there, the first
20  page of this exhibit?
21  A.  Yes.
22  Q.  Can you tell me what the NCCN is?
23  A.  It's basically National Comprehensive
24  Cancer Network panel.
25  Q.  How do you use this, these guidelines?

Page 42

1    A.   I actually use them in practice but I
2  also -- not everybody, unfortunately, fits into a
3  nice little category, and so when that happens in
4  practice, you have to rely on your training,
5  education, understanding of the literature to
6  formulate the best plan that you think for that
7  individual patient.
8    Q.   Okay.  All right.  So it sounds like this
9  is one reference point as you determine a regimen
10 for a particular patient?
11   A.   Right.
12   Q.   Okay.  Are the -- I'm going to move down
13 to page 46.  Actually, before I do, can you see it
14 says "Breast Cancer" in the large type in the
15 middle, and then down below, it says version -- I
16 don't know if it's I or 1?
17   A.   Yeah.
18   Q.   1.2014, 2014?
19   A.   Right.
20   Q.   Would this be the version that you would
21 have referred to at the time of Ms. Smiths's
22 treatment?
23   A.   Yes.
24   Q.   Okay.  So I moved down to page 46 of
25 exhibit PDF.  Down on the bottom right corner, it

Page 43

1  says "BINV-K 1 of 7."  Do you see that?
2    A.   Yes.
3    Q.   Okay.  Can you explain what this page is
4  and what it shows?
5    A.   Yes.  So basically what it shows are
6  regimens, and on the left side of the column, those
7  are regimens for what we call HER2-negative disease
8  and the right column, it's HER2-positive disease.
9    Q.   Would this have been a reference point as
10 you determined Ms. Smiths's regimen for
11 chemotherapy?
12   A.   Yes.
13   Q.   Looking at this page, can you break down
14 how you came to the conclusion of what regimen to
15 use for Ms. Smith?
16   A.   Sure.  So under the preferred regimens,
17 you see dose-dense AC, dose-dense AC, so I couldn't
18 use that with her.  And so for the next regimen, the
19 docetaxel and Cytoxan, I chose the docetaxel and
20 carboplatin.
21   Q.   Okay.
22   A.   Given carboplatin's -- the data on that
23 triple-negative breast cancer.
24   Q.   Okay.  And you mentioned there was some
25 you couldn't use.  Could you explain why?

Page 44

1    A.   So the anthracycline, really, when it
2  comes to breast cancer, the anthracyclines and
3  taxanes are very active drugs for breast cancer.
4  Usually, if you have an advanced breast cancer, if
5  you can use the anthracycline, that's our typical
6  first-line therapy.
7    Q.   Okay.  But you felt that wasn't
8  appropriate in Ms. Smith's situation.
9    A.   That's right.  So one of the side effects
10 of an anthracycline is it can cause heart failure,
11 and she already had an underlying poor systolic
12 function, basically her heart wasn't pumping as
13 strongly as it should.  So I didn't want to give her
14 an anthracycline and cause worsening or lead to
15 worsening heart failure.
16   Q.   Okay.  All right.  So just to backtrack a
17 little bit, is it the regimens on the left side that
18 would be applicable, with the exception of the
19 underlying condition you just mentioned, would we be
20 looking at the left side for her potential
21 treatments?
22   A.   Yes, because she was HER2-negative.
23   Q.   Okay.  And so it was your opinion at the
24 time that the dose that -- I'm looking at the top,
25 under "Preferred regimens," that the dose-dense AC

Page 45

1  was not appropriate; is that correct?
2    A.   That's correct.
3    Q.   And the next one down as well, the
4  dose-dense AC.
5    A.   That's correct.
6    Q.   And then the third one down, the TC is
7  what was actually prescribed; correct?
8    A.   Yes, that's correct.
9    Q.   Okay.  Under "Other regimens" just below
10 that, are there other regimens listed there that
11 would have been appropriate for Ms. Smith, even with
12 her underlying condition?
13          MS. SCHULTZ:  Object to the form.
14          THE WITNESS:  No.
15 BY MR. STRINGER:
16   Q.   Is the third one down under "Other
17 regimens," the FEC/CEF, would that have been an
18 appropriate regimen for Ms. Smith?
19   A.   No, it would not because the epirubicin
20 is also an anthracycline.
21   Q.   Okay.  And same question for the CMF, the
22 next one down?
23   A.   I don't think she would have had much of
24 a fair chance in her situation with a CMF.
25   Q.   Do you recall why?

12 (Pages 42 - 45)

Page 46

1  A.  It's a less aggressive regimen.
2  Q.  Okay. All right. And then the next two
3 down, I believe because it includes the
4 anthracycline, correct, those wouldn't be
5 appropriate?
6  A.  That's exactly right.
7  Q.  Okay. And EC, would that have been an
8 appropriate regimen for Ms. Smith?
9  A.  No.
10  Q.  Why is that?
11  A.  Because of the anthracycline.
12  Q.  Okay. Around then, finally, the next one
13 down, FEC/CEF, is that different from the FEC/CEF
14 above?
15  A.  It still has the anthracycline in it so I
16 wouldn't have wanted to use that for her.
17  Q.  Okay. So we're about an hour in. Are
18 you okay? Do you want to keep moving forward or
19 would you like to take a break?
20  A.  I'm okay. Thank you.
21  Q.  At the time that you treated Ms. Smith,
22 how was patient education handled in your office as
23 they were preparing for the adjuvant chemotherapy?
24  A.  Yeah. So I presume that -- well, first
25 of all, as a physician, like I said earlier, before

Page 47

1 I prescribe chemotherapy, I always want to have that
2 discussion with them and get their verbal consent.
3 And I presume at that time as well that there was
4 also a written consent in place as well and then
5 there was also some education, some further
6 education regarding chemotherapy.
7  Q.  Okay. Do you typically spend more time
8 discussing side effects with adjuvant chemotherapy
9 than you would with other drugs you may prescribe?
10  A.  No, if I'm giving them medications, I
11 like to go over that with them.
12  Q.  Okay. How important do you believe it is
13 to communicate any and all potential permanent risks
14 associated with the drug?
15  A.  I do think that the patient, you know,
16 needs to know that in order to know what to expect,
17 but depending on it, a lot of times, as an
18 oncologist, we're focused on saving their life. And
19 so that's the main focus. A lot of times it can be
20 information overload, and so we try to go over all
21 the side effects with them but mainly focus on those
22 ones that are -- that could be life-threatening.
23  Q.  Okay.
24      MR. STRINGER:  All right. I'm going to
25 share again.

Page 48

1      (Exhibit 6 marked for identification.)
2      MR. STRINGER:  So this will be, I
3 believe, Exhibit 6. So this, I will represent to
4 you, was provided by Ms. Smith.
5 BY MR. STRINGER:
6  Q.  Do you recognize what it is?
7  A.  I do not. I presume that this was a
8 handout maybe given in chemo class.
9  Q.  Okay. Do you ever participate in the
10 chemo class?
11  A.  No.
12  Q.  Okay. Who runs the chemo class?
13  A.  I think that's the chemotherapy nurses.
14  Q.  So have you seen this before, then?
15  A.  I have not seen this before.
16  Q.  Okay.
17  A.  Or if I have, I don't remember seeing it.
18  Q.  Sure. Do you know who would have
19 compiled this, it appears to be a PowerPoint of some
20 kind?
21  A.  I would think one of the chemotherapy
22 nurses.
23  Q.  And do you know where they would obtain
24 information to put together a document like this?
25      MS. SCHULTZ:  Object to the form.

Page 49

1      THE WITNESS:  I do not.
2 BY MR. STRINGER:
3  Q.  I'm just going to scroll down. So
4 there's several slides, I guess you would call them,
5 regarding side effects. So I'm going down to what's
6 marked page 8 of the exhibit. Do you see the bottom
7 slide here where it's titled "Hair Loss"?
8  A.  Yes.
9  Q.  So the top bullet point says "Damage to
10 hair follicles by chemo." Did I read that
11 correctly?
12  A.  I see that.
13  Q.  Okay. And the sub-bullet point
14 underneath that statement says "Hair will regrow
15 after chemo is completed." Did I read that
16 correctly?
17  A.  Yes.
18  Q.  Okay. So is it your testimony that you
19 don't know where they would have -- you don't know
20 where whoever compiled this document would have
21 obtained information?
22  A.  I don't. I can't speak for them.
23  Q.  Okay. Do you agree with that statement
24 where it says "Hair will regrow after chemo is
25 completed"?

Page 50

1  A. Most of the time, it does. However, we
2 now know that there is the possibly side effect of
3 permanent hair loss.
4  Q. How much time do you typically devote to
5 discussing temporary hair loss with your patients
6 prior to chemotherapy?
7  A. I will discuss it as a possible side
8 effect. But I'm more worried, again, about their
9 life than a cosmetic outcome. So I tend to focus
10 our discussion on their tumor biology, either stage,
11 and what we prioritize as, you know, the more
12 important side effects.
13  Q. Okay. Based on your experience, are
14 patients concerned about hair loss associated with
15 chemotherapy?
16  A. No, it seems like pretty much all of them
17 know that chemotherapy causes hair loss.
18  Q. Okay. So, generally, would you say,
19 then, that temporary alopecia, temporary hair loss
20 is an expected and anticipated side effect of
21 chemotherapy?
22  A. Yes.
23  Q. Would you say that permanent alopecia is
24 an expected and anticipated side effect of
25 chemotherapy?

Page 51

1  A. No, it's not something we usually expect.
2  Q. How often do you encourage your patients
3 to be an active participant in deciding what
4 regimen, what chemotherapy they will receive?
5  A. You know, if they have that option,
6 that's wonderful, but with all due respect, it is
7 not like a McDonald's menu where you can just go and
8 pick and choose which ones you want.
9     A lot of times, the regimens, there's, you
10 know, data to support that, and especially in any
11 given clinical situation, with that patient, if
12 there's one that we highly recommend that we feel
13 like that is the best regimen for them, we tell them
14 that.
15     But, of course, you know, if we do feel
16 like that, "Hey, these are two regimens that are
17 available. Here's the side effects of this. Here's
18 the side effects." You know, if there's that
19 option, that's great. But a lot of times, as a
20 physician, that's what we are trained to do is
21 choose the best for them.
22     MR. JOHNSON: Hang on just a minute. I'm
23 sorry. This conference room is right next to our
24 reception area.
25     MR. STRINGER: No problem. I think we

Page 52

1 are all used to dog barks and those kind of things.
2     MR. JOHNSON: Those are not Mississippi
3 State fans so we won't call them dog barks.
4 BY MR. STRINGER:
5  Q. So would you say it's important for you
6 to provide information about any permanent risk
7 association with a drug that you're aware of?
8  A. Yes.
9  Q. Do you feel you play a major role in
10 counseling a patient about medications?
11  A. Yes.
12  Q. And in doing that, is it important that
13 you have truthful and accurate information
14 concerning the risks or adverse events associated
15 with a pharmaceutical?
16  A. Yes.
17  Q. Okay. Have you ever had a patient refuse
18 to follow the recommendation you've made regarding
19 chemotherapy treatment?
20  A. Yes.
21  Q. Can you provide me with an example of
22 when that's happened?
23  A. Sometimes patients just have an already
24 preformed opinion about chemotherapy and sometimes
25 they'll just say, "I just don't want it, period."

Page 53

1  Q. Okay. And what was your --
2  A. And I don't have that happen frequently.
3  Q. I'm sorry. I started talking over you.
4  A. That's okay. We don't -- I personally
5 don't have that to happen often because patients
6 want to live most of the time, you know.
7  Q. Okay. What do you -- either if you can
8 think of a specific example of that, can you recall
9 what you did in that situation?
10  A. Well, in those situations, I think it's
11 very important to counsel them and just really spend
12 time with them, make sure that they are
13 understanding what kind of cancer they have, the
14 consequences of their choices and to answer any
15 questions they may have or also just try to
16 understand what their reasoning is behind that.
17  Q. Okay.
18  A. And then if they still don't want it,
19 then, you know, we're not going to force somebody,
20 you know, it's their decision. But as long as they
21 have all of the information to make that decision.
22  Q. Okay. And at the time and looking at
23 Ms. Smith situation and when she was treated, at
24 that time, when you prescribed Taxotere to her, did
25 you assume that in doing so that you had been

| | |
|---|---|
| Page 74<br>1  Q.  "Some types of chemotherapy damage the<br>2  cells that cause hair growth.  Hair loss often<br>3  starts two to three weeks after chemotherapy begins.<br>4  The scalp may hurt at first.  Then you may lose your<br>5  hair, either a little at a time or in clumps.  It<br>6  talks about one week for all of your hair to fall<br>7  out."<br>8       Do you agree with that statement?<br>9  A.  Yes, generally.<br>10  Q.  Okay.  Then the next line says "Almost<br>11  always, your hair will grow back two to three months<br>12  after chemotherapy is over."<br>13       Do you agree with that statement?<br>14  A.  Yes, generally, for the most part.<br>15  Q.  So almost always, but not always, your<br>16  hair is going to grow book after chemotherapy is<br>17  over; correct?<br>18  A.  Correct.<br>19  Q.  And that was information provided to<br>20  Ms. Smith in this booklet; agree?<br>21  A.  I don't have the information on that.<br>22  I'll have to take your word.<br>23  Q.  Do you know if -- and this language in<br>24  here that says "Almost always, your hair will grow<br>25  back."  Do you see that phrase? | Page 76<br>1  A.  Yes.<br>2  Q.  And you said that you provide this<br>3  written information to them so that they can take it<br>4  home with them and review it; correct?<br>5  A.  Correct.<br>6  Q.  And if you'll turn with me to page 2.<br>7  Then do you agree with me that, currently, you're<br>8  informing patients that hair loss is a side effect<br>9  of Taxotere?<br>10  A.  Correct.<br>11  Q.  And that it is almost always reversible<br>12  and will go away after treatment is complete?<br>13  A.  Generally, yes.<br>14  Q.  And that's the information that you're<br>15  sending home with your patients; agree?<br>16  A.  Yes.<br>17  Q.  All right.  Now, let's switch back to the<br>18  NCI booklet again.  Sorry about that.<br>19       Let's go down to the third paragraph.  It<br>20  says "Your hair will be very fine when it starts<br>21  growing back.  Also, your new hair may not look or<br>22  feel the same as it did before.  For instance, your<br>23  hair may be thin instead of thick, curly instead of<br>24  the straight, or darker or lighter in color."<br>25       Do you agree with that? |
| Page 75<br>1  A.  Yes.<br>2  Q.  That's very similar to the language that<br>3  you use in your current drug information materials<br>4  for Taxotere; correct?<br>5  A.  Yes.<br>6  Q.  And the current materials that you<br>7  provide to patients about Taxotere includes hair<br>8  loss as a side effect; correct?<br>9  A.  That's correct.<br>10  Q.  And then it says that "The side effects<br>11  are almost always reversible and will go away after<br>12  treatment is complete"; correct?<br>13  A.  Correct.<br>14  Q.  So, then, in terms of this --<br>15       MS. SCHULTZ:  What exhibit was this?  The<br>16  Jackson oncology.  Number 3?  All right.<br>17<br>18  BY MS. SCHULTZ:<br>19  Q.  You know what.  Let's just pull up<br>20  Number 3 again.  I don't want you to have to answer<br>21  questions without this in front of you.  This was<br>22  previously marked as Deposition Exhibit 3.  And is<br>23  it correct that this is the current written<br>24  information you give to your patients about<br>25  docetaxel or Taxotere? | Page 77<br>1  A.  Yes.<br>2  Q.  And that's the case for chemotherapy in<br>3  general; correct?  This isn't talking about one<br>4  particular drug; correct?<br>5  A.  Correct.<br>6  Q.  And you've always known that when it<br>7  grows back after chemo, that it may grow back thin<br>8  instead of thick; correct?<br>9  A.  Correct.<br>10       Mr. Stringer:  Object to the form.<br>11  BY MS. SCHULTZ:<br>12  Q.  And so if Ms. Smith is claiming in this<br>13  litigation that her hair grew back thin instead of<br>14  thick, you were aware of that possibility when you<br>15  prescribed Taxotere and carboplatin to Ms. Smith in<br>16  2014.  Do you agree?<br>17  A.  Yes.<br>18  Q.  And you continue to prescribe Taxotere<br>19  for your patients today?<br>20  A.  Yes.<br>21  Q.  Can you estimate, currently,<br>22  approximately what percent of the regimens that you<br>23  prescribe for breast cancer include Taxotere?<br>24  A.  Percentage is difficult.  I can tell you<br>25  that it is a very common drug that we use for the |

Page 78

1  treatment of breast cancer.
2      Q.   And it's a very common drug that you use
3  for the treatment of breast cancer today?
4      A.   Exactly.
5      Q.   And do you agree that it's also a very
6  effective drug for the treatment of --
7      A.   Absolutely.
8      Q.   All right.  Going back to a brief
9  discussion we had about you learning of a potential
10 association between Taxotere and permanent hair
11 loss.  You said that you first saw it in lawsuit
12 commercials; correct?
13     A.   Yes.
14     Q.   And then you said that you did some
15 reading, but is it correct that you can't recall
16 what it is that you read about any --
17     A.   Right.  And then, in my experience, I
18 just haven't seen -- that hasn't really been an
19 issue, you know.
20     Q.   And do you tell patients that, that in
21 your experience, you really haven't seen permanent
22 hair loss from Taxotere?
23     A.   I will say that, again, I'm not really
24 focused on hair when I see these patients, unless
25 it's a concern of theirs that they mention or bring

Page 79

1  up.  And so, to my knowledge, I can't think of a
2  case where this was an issue.
3      Q.   So if a patient today that you're -- if
4  you're recommending a regimen with Taxotere and the
5  patient does not bring up hair loss as a concern of
6  theirs, what do you say to the patient about
7  Taxotere and hair loss?
8      A.   I do think it's important that they know
9  the side effects.  So, again, I'll say, you know,
10 the side effect of hair loss and -- what was the
11 question?  I'm sorry.
12     Q.   If a patient is not focused on hair loss
13 as a concern, what do you say today to patients
14 about hair loss?
15     A.   Really, that it's a potential side
16 effect.  That it's a side effect.  That I don't go
17 into -- there are other, I feel, more important
18 things to discuss unless they have questions about
19 it or it's a real issue for them.
20     Q.   So your general practice today is to
21 simply state that hair loss is a potential side
22 effect, and that's all, unless the patient asks more
23 questions for it and says it's really a concern for
24 them; is that correct?
25     A.   Right, or with Taxotere, that there's the

Page 80

1  possibility of permanent hair loss.
2      Q.   So if the patient raises that hair loss
3  is a concern for them, is that when you might warn a
4  patient about a potential for permanent hair loss?
5      A.   No, if I'm giving the drug and I'm aware
6  that there have been cases with permanent hair loss,
7  I will go ahead and disclose that then.
8      Q.   When you say if you're aware that there
9  have been cases with permanent hair loss, what do
10 you mean?
11     A.   Like right now.  Like the ongoing issues
12 with women, you know, claiming that they've had
13 permanent hair loss from Taxotere.
14     Q.   So when you're saying aware of cases,
15 you're talk can about the lawsuits; is that right?
16     A.   Yes.
17     Q.   So you are letting patients know that
18 there have been lawsuits sited concerning permanent
19 hair loss with Taxotere; is that correct?
20     A.   I don't know if I bring up lawsuits
21 associated with it.  Again, it's not something that
22 I just spend a lot of time on, unless they want to
23 know.  But I'll just mention, yes, that there is a
24 possibility of permanent hair loss, from my
25 understanding.

Page 81

1      We really, in my practice, I haven't seen
2  that as an issue from my patients.  They are happy
3  to be alive.
4      Q.   So when you have told your patients about
5  a potential for permanent hair loss, that has not
6  been a problem for your patients.  Is that what
7  you're saying?
8      A.   That is correct.
9      Q.   Because your patients are focused on
10 surviving; correct?
11     A.   Exactly.
12         Mr. Stringer:  Object to the form.
13 BY MS. SCHULTZ:
14     Q.   Do you know what the information sheet
15 that you have for Taxol that you currently use says
16 about hair loss?
17     A.   I think it just lists it as a side
18 effect.
19     Q.   And does it also say that the side
20 effects are almost always reversible and will go
21 away after treatment is complete?
22     A.   I don't know off the top of my head.
23     Q.   Okay.
24     A.   What that sheet specifically says.
25     Q.   Do you warn patient to whom you're

Page 86
1  your Zoom, if you see, on view options.
2  BY MS. SCHULTZ:
3     Q.   All right.  So if we look under
4  background here, in this study, if you look at the
5  last sentence under "Background," it says "Patients
6  who were enrolled in clinical trials involving Tax
7  (either docetaxel or paclitaxel) and/or
8  anthracycline were included."  All right.
9         And this gets a little confusing, but if
10 you look down with me under "Results."
11        Oh, up above "Results," you'll see that
12 "Ongoing alopecia was graded as 0, which would be
13 full hair recovery; 1, mild hair loss; and, 2,
14 severe or total."  Do you see that?
15    A.   Yes, I see that.
16    Q.   And then, under "Results," if you will go
17 down with me where it says "For all D the incidence
18 was 15 percent."  Do you see that?  Under results?
19    A.   Yes.
20    Q.   Okay.  So for all the docetaxel regimens,
21 the result was 15 percent with only 3 percent that
22 had grade 2 alopecia; correct?
23    A.   Yes.
24    Q.   And then if you look at the very -- go
25 down to where you'll see "For A non T."  "For A non

Page 87
1  T, 8 percent"?
2     A.   Okay.
3     Q.   Okay.  So for Anthracycline regimens that
4  did not have a taxane, the grade 2 alopecia was
5  8 percent; correct?
6     A.   Yes.
7     Q.   And the very next thing, it says "For
8  PA," so for the paclitaxel regimen, 13 percent, and
9  the grade 2 alopecia was 9 percent; correct?
10    A.   Yes.
11    Q.   And then in a conclusion, it says that
12 "Permanent alopecia is a common complication of
13 adjuvant chemotherapy.  The risk appears to be
14 highest in regimens which contain A and Tax, but it
15 is also seen in AP and in A non-Tax"; correct?
16    A.   Yes.
17    Q.   And so this is reporting that cases of
18 permanent alopecia with Taxotere, Taxol and
19 anthracyclines; correct?
20    A.   Yes.
21        MS. SCHULTZ:  I tell you what, let's go
22 ahead and mark the packet of medical records.  I
23 don't know if it's really going to -- let me try to
24 ask a question just to --
25 BY MS. SCHULTZ:

Page 88
1     Q.   Dr. Herrington, it is my understanding
2  that you reviewed the packet of medical records
3  pertaining to your treatment of Ms. Smith; is that
4  correct?
5     A.   Yes.
6         MS. SCHULTZ:  And we're going to mark
7  that packet of medical records as Exhibit 12 in this
8  case.
9         (Exhibit 12 marked for identification.)
10 BY MS. SCHULTZ:
11    Q.   All right?
12    A.   Okay.
13    Q.   And the medical records you reviewed,
14 were they prepared in the ordinary course of your
15 medical practice?  Were they prepared in the
16 ordinary course of your medical practice?
17    A.   Yes.
18    Q.   Were and they made at or near the time of
19 your treatment of Ms. Smith?
20    A.   Yes.
21    Q.   I'm going to -- I tell you what.  Let's
22 go to page 4723.  While she's looking at that, I'm
23 just going to go ahead and start asking you some
24 questions.
25        Actually, let's hold off on pulling it up.

Page 89
1  I may not need to use the record.
2         I believe you said earlier that Ms. Smith's
3  cancer was a T4b; is that correct?
4     A.   I believe she was a 3b.  She was a T4,
5  and I'll have to look at her records to see the
6  subtype of the T4.
7     Q.   I tell you what, let's pull up the 4723.
8  Can you see on this record, it says "pT4b pN0"?
9     A.   0.  Stage 3b.
10    Q.   Stage 3b.  Okay.  And so what does the
11 "T" mean or the T4b?
12    A.   Sure.  So that is, basically, T is the
13 size of the tumor.  So the larger the size, the
14 higher the number that goes behind that letter.
15    Q.   And was her tumor 6.5 centimeters?
16    A.   Yes.
17    Q.   That's a very large tumor.  Do you agree?
18    A.   It is.
19    Q.   I believe that 7 centimeters would be
20 about the size of a peach.  Would you agree with
21 that?
22    A.   Yes.
23    Q.   Okay.  And then stage 3b, what does that
24 mean?
25    A.   So basically, how we group stages is

Page 90
1  depending on the TNM (unintelligible). So N stand
2  for if any lymph nodes are involved. M stands for
3  metastases. The higher the stage, the poorer the
4  prognosis. Stage 4 is the highest. And basically,
5  depending on what numbers are behind those letters
6  of T, N, M, that's how we come up with the stage.
7     Q.  And when you say stage 4 is the highest,
8  stage 4 is metastatic breast cancer?
9     A.  That's correct.
10    Q.  All right. So does stage 3 mean that the
11 breast cancer has extended beyond the immediate
12 region of the tumor?
13    A.  Usually, with stage 3, it's locally
14 advanced.
15    Q.  And when you say stage 3, what is the
16 difference between stage 3a and stage 3b, for
17 example?
18    A.  That, again, just depends on the size and
19 what all -- mainly the size or how invasive the
20 primary tumor is to that local area.
21    Q.  Okay. And then she was triple-negative;
22 correct?
23    A.  That's correct.
24    Q.  And on that little sheet we were looking
25 at, it says -- it said triple-negative, and then

Page 91
1  there was a little -- I don't know if that's an
2  arrow or equal sign -- poor prog?
3     A.  Yes.
4     Q.  Okay. Does that mean poor prognosis?
5     A.  Yes.
6     Q.  So triple-negative breast cancer, I think
7  you said, is more aggressive; correct?
8     A.  Correct.
9     Q.  And its more likely to spread and to
10 reoccur; correct?
11    A.  That's correct. It can -- and usually,
12 if it does, it's in those first five years,
13 specifically the first three years. And if it
14 recurs, it can recur, unfortunately, anywhere,
15 meaning not just locally but to the visceral organs,
16 such as lung, liver or brain, which can be
17 devastating.
18    Q.  And so the good news for Ms. Smith is
19 that she's now out six years without recurrence;
20 correct?
21    A.  Awesome.
22    Q.  And so poor prognosis, what did that mean
23 at the time for Ms. Smith's chances of survival?
24    A.  So usually that's, like I said, stage for
25 stage. And so stage for stage, the higher the

Page 92
1  stage, the higher the risk. The risk of recurrence.
2  The mortality risks. And so that's basically what
3  that means.
4     Q.  Well, and if -- but if you combine the
5  stage 3b with the fact that it's a triple-negative
6  cancer, do you have any estimation of chances of
7  survival under those circumstances?
8     A.  So without the chemotherapy, it would be
9  poor. And like I said, we would really worry about
10 those first three years it recurring. And it's hard
11 to predict necessarily where it would recur to. In
12 some patients, it can recur locally and lymph nodes,
13 and others, it can recur distantly.
14    Q.  And so there was no question in your mind
15 that Ms. Smith needed to have chemotherapy?
16    A.  That's correct.
17    Q.  All right. I'm going to -- you know
18 what, it's let's go ahead and go to page 861. I was
19 going to try to skip a section there but I need to
20 cover one area.
21        And so this is in Exhibit 12, and this is
22 the first appointment that you had with Ms. Smith.
23 And you'll see that because these are electronic
24 records, as we page through this page and the next
25 page, you'll see that things have been updated, but

Page 93
1  that wasn't information you were putting in,
2  obviously, back at the time because some of the
3  dates are beyond your time.
4        Let's go to page 863. All right. Now I've
5  got to move over again.
6        Under "History of Present Illness," do you
7  see where it says "Ms. Smith is a very pleasant
8  50-year-old woman with a history of anxiety,
9  depression, hyperlipidemia, hypertension,
10 osteoporosis and rheumatoid arthritis"; correct?
11    A.  Yes.
12    Q.  All right. And then if we move on down,
13 you'll see "Past Medical History." And that
14 essentially provides us the same information about
15 her past medical history; correct?
16    A.  Correct.
17    Q.  And then under "Social History," do you
18 see it says that she is an active smoker who has
19 smoked for 19 years; correct?
20    A.  Yes.
21    Q.  All right. And then let's go down to
22 page 866, and if you look under "Physical
23 Examination" there?
24    A.  Okay.
25    Q.  Do you see where it shows the height and

Page 94

 1  weight and she had a BMI of 34.18; correct?
 2      A.   Correct.
 3      Q.   And that would be categorized as obese;
 4  correct?
 5      A.   That is a high BMI.
 6      Q.   Do you know whether that's deemed to be
 7  obese?
 8      A.   There are certain numbers.  I know that's
 9  pretty high.  I think it may be.  I think it
10  actually may be.
11      Q.   Okay.  So in terms of Ms. Smith's risk
12  factors for heart disease, she had hypertension,
13  hyperlipidemia, she was a long-time smoker, she was
14  obese; correct?
15      A.   Yes.
16      Q.   And those are all risk factors for heart
17  disease; correct?
18      A.   Correct.
19      Q.   And what about anxiety and depression?
20  Are those risk factors for heart disease?
21      A.   I guess, yes.
22      Q.   And if she had been diagnosed with COPD
23  in 2005, that would also be a risk factor for heart
24  disease; correct?
25           MR. JOHNSON:  If it's outside your area,

Page 95

 1  just tell them.
 2           THE WITNESS:  That's really not my
 3  specialty.
 4  BY MS. SCHULTZ:
 5      Q.   That's fine.  The reason I'm asking you
 6  these questions is, when you are considering
 7  prescribing an anthracycline to a patient, I know
 8  you do an echo to determine the baseline
 9  functioning; correct?
10      A.   Correct.
11      Q.   But don't you also take into
12  consideration their past medical history in terms of
13  their risk factors for heart disease?
14      A.   The main thing I focus on are their
15  medical conditions, their preexisting or diagnosed
16  medical conditions.
17      Q.   Okay.  Because in terms of the risk of
18  heart failure with anthracyclines, do you agree that
19  the risk is -- well, the risk exists whether or not
20  someone has any risk factors for heart disease;
21  correct?
22      A.   That's correct.
23      Q.   And the risk exists even if someone has
24  an echo and ejection fraction and everything else
25  looks fine; correct?

Page 96

 1      A.   Correct.
 2      Q.   But that basic risk is even higher for
 3  those patients that have preexisting risk factors
 4  for heart disease.  Do you agree?
 5      A.   Yes.
 6      Q.   All right.  Then if we look down on
 7  page 869, under "Plan."
 8           All right.  And if you look about two
 9  sentences down, it says "I discussed that she will
10  overall need chemotherapy followed by radiation,
11  given her stage as well as tumor size"; correct?
12      A.   Correct.
13      Q.   And she did, in fact, have radiation
14  after she completed her chemotherapy; correct?
15      A.   Yes.
16      Q.   And then it says "Also discussed possible
17  use of Adriamycin and would like to get a
18  transthoracic echocardiogram for baseline EF";
19  correct?
20      A.   Correct.
21      Q.   So at this first appointment, do you know
22  whether you had any discussion with Ms. Smith about
23  any particular chemotherapy drugs?
24      A.   Not that I -- not that I recall.
25      Q.   All right.  And when you do prescribe

Page 97

 1  Adriamycin, you warn patients of the risk of heart
 2  failure with the Adriamycin; correct?
 3      A.   That's correct.
 4      Q.   Okay.  Let's go to page 1044.  So this is
 5  the second appointment, it's June 5, 2014.  And
 6  under -- let's see -- under "History of Present
 7  Illness," you see at the bottom of that paragraph,
 8  it says "Echocardiogram in preparation for
 9  anthracycline use on June 3, 2014, revealed an
10  ejection fraction of 45 percent with mild local
11  hypokinesis as well as grade one diastolic
12  dysfunction"; correct?
13      A.   Correct.
14      Q.   And are those three different things
15  then?
16      A.   Basically, so the ejection fraction is
17  basically a percentage of how strong the heart
18  pumps.  And so hers was low.  And then basically --
19  and then the grade one diastolic dysfunction is also
20  a dysfunction in the way her heart relaxes.
21      Q.   And those test results meant that you
22  could not use an anthracycline in her treatment
23  regimen; correct?
24      A.   That's correct.
25      Q.   All right.  I'll follow up with questions

Page 98

1  about the regimens.
2      All right. Mr. Stringer showed you a page
3  from the NCCN guidelines for invasive breast cancer
4  and was asking you questions about the regimens for
5  HER2-negative diseases; correct?
6      A.  Correct.
7      Q.  Now, are there any specific guidelines or
8  -- in 2014, were there any specific guidelines for
9  triple-negative breast cancers?
10     A.  You know, unfortunately, for those
11 patients, there was no targeted therapy. And so
12 basically for them, it's just been cytotoxic
13 chemotherapy, and so for patients with
14 triple-negative breast cancer, it's cytotoxic
15 chemotherapy. Those were the recommendations.
16     Q.  All right. And you were asked about
17 regimens that were on the left-hand side of the
18 guidelines. And the first section was preferred
19 regimens. What are preferred regimens?
20     A.  So the preferred regimens, those are
21 preferred by the NCCN guideline panel. And the
22 Category 1 just means that there's a high level of
23 evidence to support using those regimens.
24     Q.  Okay. And the preferred regimens mean
25 that there are randomized clinical studies that

Page 99

1  support those three regimens that are listed here as
2  preferred regimens; correct?
3      A.  Yes, that's correct.
4      Q.  And then I believe you said that you
5  could not use two of those, that -- the first two,
6  which both have dose-dense AC; correct?
7      A.  That's correct.
8      Q.  And that was because of Ms. Smith's heart
9  functioning; correct?
10     A.  Correct.
11     Q.  And so the only other preferred regimen
12 was TC?
13     A.  That's correct.
14     Q.  And that's docetaxel and
15 cyclophosphamide; correct?
16     A.  Correct.
17     Q.  And then you said you chose the
18 carboplatin instead of the Cytoxan based on the
19 studies and literature; correct?
20     A.  Correct.
21     Q.  Can you tell us a little more about what
22 you're referring to when you're talking about the
23 studies and literature?
24     A.  Sure. Sure. Again, there had been, with
25 triple-negative breast cancer, some data looking at

Page 100

1  their activity. The activity of the platins in
2  triple-negative breast cancer.
3      Q.  Okay. And were those studies showing
4  that a regimen of Taxotere and carboplatin was an
5  effective treatment for triple-negative breast
6  cancers?
7      A.  Yes.
8      Q.  And you said that you definitely wanted
9  to use Taxotere; correct?
10     A.  Correct.
11     Q.  All right. And so then the only question
12 was whether or not you used the carboplatin or the
13 Cytoxan?
14     A.  That's exactly right.
15     Q.  And so the only potential options, then,
16 would have been Taxotere and carboplatin or Taxotere
17 and Cytoxan; correct?
18     A.  Right.
19     Q.  And is it correct that information that
20 you have today about the association of Taxotere
21 with permanent hair loss would not have factored
22 into your decisionmaking process to prescribe
23 Taxotere and carboplatin to Ms. Smith?
24     A.  That's correct.
25     Q.  Okay. Knowing what you know today, you

Page 101

1  still would have prescribed Taxotere and
2  carboplatin; correct?
3      A.  Yes.
4          MS. SCHULTZ: I tell you what, can we
5  take a short break? I want to -- can we go off the
6  record?
7          THE VIDEOGRAPHER: We are now off the
8  record. The time is 3:46.
9          (Off the record.)
10         THE VIDEOGRAPHER: All right. The time
11 is now 3:56. We are back on the record.
12 BY MS. SCHULTZ:
13     Q.  Dr. Herrington, given the stage and
14 triple-negative type of cancer that Ms. Smith had,
15 it was your opinion that she absolutely needed
16 chemotherapy; correct?
17     A.  Yes.
18     Q.  And if Ms. Smith would have refused to
19 take Taxotere due to a risk of permanent hair loss,
20 would you have referred her to a different
21 oncologist because, in your professional judgment,
22 she needed chemotherapy and she needed a
23 Taxotere-containing regimen?
24         Mr. Stringer: Object to the form.
25         THE WITNESS: Yes.

Page 102

1  BY MS. SCHULTZ:
2    Q.   And a Taxotere-containing regimen was her
3  only option; correct?
4    A.   Yes.
5    Q.   Is a doctor -- I'm not sure how to
6  pronounce it -- it's Q-U, in your practice with you?
7    A.   Yes.
8    Q.   Can you say -- how do you pronounce that?
9    A.   Dr. Qu.
10   Q.   Qu.  Okay.  Have you ever talked with
11 Dr. Qu about permanent hair loss from chemotherapy
12 drugs other than Taxotere?
13   A.   No.
14   Q.   If Dr. Qu believes that permanent hair
15 loss is associated with many chemotherapy drugs, is
16 that something you'd be interested in discussing
17 with him?
18   A.   Sure.
19   Q.   I want to ask you just about a couple
20 more medical records.  Let's turn to Page 5534 in
21 Exhibit 12.  This is a medical record from April 6,
22 2015.  That would have been about seven months after
23 her last chemotherapy treatment; correct?
24   A.   Yes.
25   Q.   And if you look down under "Interval

Page 103

1  History," is that a section where you get an update
2  about any problems the patient is having?
3    A.   That would be basically when they come
4  back to visit that day.  That clinic visit, rather.
5    Q.   All right.  When they are coming to visit
6  you in the clinic, you want to find out about any
7  problems Ms. Smith is having; correct?
8    A.   That's correct.
9    Q.   And you also want to find out if she's
10 still having any side effects from her chemotherapy
11 treatment; correct?
12   A.   That's correct.
13   Q.   All right.  And it looks like she reports
14 to you that she had some numbness and tingling in
15 her fingertips and toes, the right worse than the
16 left; correct?
17   A.   Yes, ma'am.
18   Q.   And she also notes that she thinks she
19 has chemo brain because, at times, she has trouble
20 recalling names.  Is that something she reported to
21 you?
22   A.   Yes.
23   Q.   And she also reported that she was having
24 occasional swelling in her -- is that --
25   A.   Lower extremity -- bilateral lower

Page 104

1  extremities.
2    Q.   All right.  But she said she was not
3  having any of that today; is that correct?
4    A.   That's correct.
5    Q.   All right.  And Ms. Smith made no
6  complaint to you at this appointment, seven months
7  post-chemo, about any abnormal hair regrowth or hair
8  thinning?
9    A.   No.
10   Q.   And if she had talked to you about
11 concerns of hair thinning or abnormal regrowth,
12 would you have noted that in your records?
13   A.   Yes.
14   Q.   And you've had an opportunity to review
15 your medical records reflecting your treatment of
16 Ms. Smith; correct?
17   A.   Yes.
18   Q.   And as of the date of your last treatment
19 in October 2015, she would have been more than two
20 years post-chemo; correct?
21   A.   Yes.
22   Q.   And in reviewing your records, did you
23 ever note in the records any observed hair thinning
24 or abnormal regrowth?
25   A.   Not that I recall.

Page 105

1    Q.   And based on your review of your records,
2  did Ms. Smith ever complain to you about her hair
3  regrowth?
4    A.   No, not that I remember and not that's
5  what's reflected in the records.
6    Q.   You were asked some questions earlier
7  about -- well, it was first referred to as a label
8  and then package insert; is that correct?
9    A.   Yes.
10   Q.   You said you would sometimes look at the
11 package insert and also at UpToDate; correct?
12   A.   That's correct.
13   Q.   When did you last read the docetaxel
14 package insert?
15   A.   I don't remember.
16   Q.   First of all, have you ever read the
17 entire package insert for docetaxel, from front to
18 back?
19   A.   No.
20   Q.   When you first started prescribing
21 Taxotere -- well, first of all, what year would you
22 first have used Taxotere?
23   A.   That would have been in fellowship in
24 anywhere from 2010 to 2013.
25   Q.   When you first started using docetaxel,

27 (Pages 102 - 105)