UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO:

Emma Willie, Case No. 2:18-cv-3857.

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON WARNINGS CAUSATION

Sanofi is entitled to summary judgment because Plaintiff Emma Willie cannot establish warnings causation under either Mississippi law or this Court's four-part framework.

First, under Mississippi law, Ms. Willie cannot establish warnings causation because she has no evidence that her treating physician's prescribing decision would have changed if provided a different warning about hair loss. In 2014, Dr. Sadanand Patil prescribed a chemotherapy regimen of Taxotere and Cyclophosphamide ("TC") to treat Ms. Willie's early stage, HER2-negative breast cancer. Dr. Patil stands by that decision today. Dr. Patil testified unequivocally that the hair-loss warning in the current Taxotere label would not have altered his risk-benefit assessment when deciding to prescribe Taxotere to Ms. Willie. If Ms. Willie came to Dr. Patil today with the same diagnosis, Dr. Patil testified he would still recommend TC.

Second, Ms. Willie cannot satisfy this Court's four-part framework because, even if Dr. Patil had warned Ms. Willie of a risk of permanent hair loss associated with Taxotere in 2014, such warning would not have changed the ultimate chemotherapy decision. By her own testimony, any warning about a risk of hair loss would not have affected Ms. Willie's decision because she placed a higher value on living and being cancer free: "[O]nce again, hair loss or lose your life. I mean, I'm not saying that would have changed my mind, no."

Ms. Willie's testimony shows that her only choice was a TC regimen because the alternative, a regimen containing Adriamycin, posed an unacceptable risk of permanent heart failure. Dr. Patil also would not have considered a regimen containing Adriamycin unless Ms. Willie received an echocardiogram *and* the results showed her heart was strong enough to handle the drug. Ms. Willie, however, did not receive an echocardiogram. Dr. Patil would not have prescribed any of the "Other regimens" under the 2014 NCCN Guidelines.

On this record, Ms. Willie cannot establish warnings causation. The Court should enter summary judgment in Sanofi's favor.

## STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute of fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

## ARGUMENT

**I.    MS. WILLIE CANNOT ESTABLISH WARNINGS CAUSATION UNDER MISSISSIPPI LAW.**

Mississippi recognizes the learned-intermediary doctrine. *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 811 (5th Cir. 1992) (applying Mississippi law); Miss. Code Ann. § 11-1-63(c)(ii) (codifying doctrine). "Under this doctrine, the manufacturer's failure to warn the patient of the product's risks does not render the product defective or unreasonably dangerous so long as the manufacturer adequately warns the learned intermediary." *Thomas*, 949 F.2d at 811. Put

another way, a drug manufacturer has a duty to provide an adequate warning to the physician, not the plaintiff. *See Johnson v. Parke-Davis*, 114 F. Supp. 2d 522, 525 (S.D. Miss. 2000).

Even assuming the manufacturer's warning was allegedly inadequate, however, the plaintiff must still prove *warnings causation*—i.e., a causal connection between the allegedly inadequate warning, the prescriber's ultimate decision to prescribe, and the plaintiff's ultimate injury. *Thomas*, 949 F.2d at 814.

Warnings causation has two requirements. First, a plaintiff must establish "that an adequate warning would have prevented the treating physician from administering the drug." *Id.* Specifically, a plaintiff must "demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Id.*; *see also Smith v. Johnson & Johnson, Inc.*, 483 F. App'x 909, 914 (5th Cir. 2012) (requiring plaintiff to show "that the undisclosed risk was high enough that, if disclosed, would have changed the treating physician's decision to prescribe the product for the plaintiff"). Second, a plaintiff must also establish "that the injury would not have occurred had the drug not been administered." *Thomas*, 949 F.2d at 814; *accord Bennett v. Madakasira*, 821 So. 2d 794, 807 (Miss. 2002), *abrogated on other grounds by Hutzel v. City of Jackson*, 33 So. 3d 1116, 1118 (Miss. 2010); *Smith v. Johnson & Johnson*, 2011 WL 3876997, at *11 (S.D. Miss. Aug. 31, 2011). Ms. Willie has no evidence to create a triable issue on either requirement.

    **A.**    **Ms. Willie has no evidence of an additional, non-disclosed risk that, if disclosed, would have changed Dr. Patil's prescribing decision.**

Ms. Willie claims Sanofi failed to warn her treating physician that permanent hair loss is a potential side effect of Taxotere.[1] To prove warnings causation, Ms. Willie must identify a *quantifiable* risk of permanent alopecia associated with Taxotere not otherwise known to Dr. Patil,

---

[1] *See generally* Second Am. Master Long Form Compl. ¶¶ 221–31; 240–47.

3

her prescribing physician, and show such risk was so great that it would have changed his decision to prescribe Taxotere. Ms. Willie cannot make this showing. Dr. Patil testified that the current Taxotere warning—"In most cases normal hair growth should return, in some cases (frequency not known) permanent hair loss has been observed"—would not materially alter Dr. Patil's risk-benefit assessment of Taxotere as a treatment option today.[2] To that end, if Ms. Willie came to Dr. Patil with the same diagnosis now, Dr. Patil would still recommend TC:

> Q. . . . And if Ms. Willie came in to you today with exactly the same diagnosis, would you have -- would your recommendation be the same, TC?
>
> A. If she needed chemotherapy, it would be the same regimen.
>
> \*\*\*
>
> Q. Today, with all this information about other therapies and risks and benefits, TC remains your -- would be your recommendation for her today?
>
> A. Yes.[3]

On this record, it is undisputed that more information (i.e., a stronger warning) about the risk of permanent alopecia (i.e., "Cases of permanent alopecia have been reported") would not have changed Dr. Patil's decision to prescribe Taxotere to Ms. Willie. *See Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 211–12 (5th Cir. 2008) (affirming summary judgment based on prescriber's testimony that he would have prescribed drug to plaintiff even if he had received plaintiff's proposed stronger warning).

---

[2] Defs.' Statement of Facts ("DSOF") ¶ 37.

[3] *Id.* ¶ 40.

### B. Ms. Willie has failed to show she would have avoided her permanent hair loss if Dr. Patil had prescribed a non-Taxotere alternative.

Even if a stronger warning would have caused Dr. Patil to prescribe a chemotherapy regimen without Taxotere, Ms. Willie must still prove the second prong of warnings causation—i.e., "the injury would not have occurred had the drug not been administered." *Thomas*, 949 F.2d at 812; *see also* Jury Instructions, *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)*, No. 16-cv-17144, Rec. Doc. 8283 at 10 (defining "proximate cause" as "the cause without which the injury would not have occurred").

Here, there is no evidence that Ms. Willie would have avoided her permanent hair loss if Dr. Patil had prescribed a non-Taxotere alternative. Ms. Willie never considered rejecting chemotherapy, and she understood chemotherapy would lower the risk of cancer recurrence.[4] According to Dr. Patil, "[a]ll the treatment options for early stage breast cancer cause alopecia. There are no treatment options available which do not cause alopecia in early stage breast cancers."[5] Dr. Patil agreed that the term "alopecia" is a clinical description that does not describe the length of time or the prospect of hair returning.[6] Nor can Ms. Willie identify a chemotherapy regimen that does not have a risk of permanent hair loss.[7] Ms. Willie has not—and cannot—meet her burden because she has failed to identify a chemotherapy regimen with no risk of permanent hair loss. On these facts, no triable issue on the second prong exists. *See Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098–99 (5th Cir. 1991) (granting summary judgment to defendant where

---

[4]  *Id.* ¶ 20.

[5]  *Id.* ¶ 38.

[6]  *Id.* ¶ 39.

[7]  *Id.* ¶ 29.

plaintiff failed to prove that an adequate warning would have affected her decision to proceed with surgery).

## II. MS. WILLIE ALSO CANNOT ESTABLISH WARNINGS CAUSATION UNDER THE COURT'S FOUR-PART FRAMEWORK.

Summary judgment also is warranted under this Court's four-part framework to analyze warnings causation in cases involving chemotherapy:

> The question is not simply "what would the doctor have prescribed" but *[1] whether and how the doctor would have advised the patient of the risk of permanent alopecia associated with Taxotere, [2] whether the patient would have inquired about other options, [3] what the doctor would have recommended, and [4] what decision the plaintiff would have ultimately made.* The Court will consider these questions with the goal being to assess what the doctor and the patient would have decided together. While a doctor may testify that his or her recommendation would not have changed, the issue is whether the plaintiff's ultimate decision would have changed.[8]

Ms. Willie cannot satisfy her burden under this framework.

First, even if Dr. Patil had warned Ms. Willie that cases of permanent alopecia had been reported with Taxotere, Dr. Patil and Ms. Willie still would have picked a regimen containing Taxotere. A Taxotere regimen was the only available option for Ms. Willie in 2014, and she testified she would still select it, even today.[9]

As to the second element, Ms. Willie did not inquire about other treatment options in 2014.[10] Nor did Ms. Willie testify that she *would have* inquired about other options even if she had received a different warning. Ms. Willie, instead, relied completely on Dr. Patil's prescribing

---

[8] Rec. Doc. 7571 at 16 (Order and Reasons on Six Mots. for Summ. J.) (emphasis and numerals added).

[9] DSOF ¶¶ 26–30, 41–50.

[10] *Id.* ¶¶ 23–25.

6

decision. Ms. Willie trusted Dr. Patil to make the right chemotherapy recommendation.[11] After Dr. Patil recommended TC, Ms. Willie did not seek a second opinion or speak with anyone other than Dr. Patil about chemotherapy regimens.[12] Ms. Willie chose TC because "if Dr. Patil recommended it, then [she] was going to follow it because that's what he recommended."[13] Regardless of side effects, Ms. Willie "wanted to follow what [Dr. Patil] said because [she] wanted to be cancer-free."[14] Even in hindsight, Ms. Willie's unequivocal testimony is that she would have followed Dr. Patil's recommendation.

The third element also falls in Sanofi's favor because Dr. Patil still would have recommended the TC regimen to Ms. Willie in 2014. Ms. Willie was diagnosed with early stage breast cancer, which was HER2-negative.[15] Dr. Patil refers to the NCCN Guidelines every time a patient is starting a new chemotherapy regimen.[16] Dr. Patil explained that there are two major options for treating early stage breast cancer: (1) Adriamycin and Cyclophosphamide followed by Taxol ("AC+T") or (2) TC.[17] Of the two options, Dr. Patil explained that AC+T is much more toxic and has the potential for cardiotoxicity.[18] Dr. Patil generally reserves AC+T to patients with

---

[11]   *Id.* ¶ 19.

[12]   *Id.* ¶ 25.

[13]   *Id.* ¶ 26.

[14]   *Id.*

[15]   *Id.* ¶¶ 6–7.

[16]   *Id.* ¶ 31.

[17]   *Id.* ¶ 33.

[18]   *Id.* ¶ 34.

7

HER2-positive breast cancer.[19] For HER2-negative patients, like Ms. Willie, Dr. Patil uses TC to treat early stage breast cancer.[20] Dr. Patil stands by that decision today.[21]

Dr. Patil encourages patients to be active participants in deciding which adjuvant chemotherapy regimen to use "**when there are choices[.]**"[22] In Ms. Willie's case, the evidence supports TC as the only choice. Both non-Taxotere "Preferred regimens" in the 2014 NCCN Guidelines contained Adriamycin.[23] Adriamycin is cardiotoxic, meaning it can weaken a patient's heart muscles and cause congestive heart failure.[24] Had Ms. Willie requested AC+T, Dr. Patil would not have prescribed that regimen without further assessment.[25] Dr. Patil would not have given Ms. Willie a dose-dense AC regimen until she had an echocardiogram.[26] If the additional evaluation showed that Adriamycin would adversely affect Ms. Willie's cardiac health, Dr. Patil would not have prescribed dose-dense AC: "If her heart does not have the strength to take the medicine, I would not give that medicine."[27] Dr. Patil would not have honored Ms. Willie's request for AC+T without additional facts—facts that are absent from the summary judgment record.[28] *Thomas*, 949 F.2d at 814 (plaintiff's burden to establish warnings causation).

---

[19]  *Id.* ¶ 35.

[20]  *Id.* ¶ 36.

[21]  *Id.* ¶ 40.

[22]  *Id.* ¶ 41.

[23]  *Id.* ¶ 44.

[24]  *Id.* ¶ 45.

[25]  *Id.* ¶ 46.

[26]  *Id.*

[27]  *Id.* ¶ 47.

[28]  *Id.* Although the NCCN Guidelines includes "Other regimens," Dr. Patil would only use those regimens on patients who were not capable of getting full strength chemotherapy because of certain medical issues or age. For Ms. Willie, Dr. Patil chose from the preferred regimens. *Id.* ¶ 48.

Ultimately, Ms. Willie would have chosen to accept the TC regimen, which satisfies the fourth element. Mississippi, like Louisiana, applies a "reasonable patient" standard, which asks "whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment." *Dunn v. Yager*, 58 So. 3d 1171, 1201 n.27 (Miss. 2011) (quoting *Jamison v. Kilgore*, 903 So. 2d 45, 49 (Miss. 2005)); *see also Reikes v. Martin*, 471 So. 2d 385, 392–93 (Miss. 1985) (rejecting subjective test: "[s]ince at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment." (quoting *Cobbs v. Grant*, 502 P.2d 1, 11 (Cal. 1972))).

A reasonably prudent patient in Ms. Willie's position, fully advised of the risks, would have accepted the TC regimen. The reasonable patient's early stage HER2-negative breast cancer could be treated by two chemotherapy regimens: TC or AC+T.[29] Dr. Patil would have explained that AC+T is much more toxic and that he prescribes it for HER2-positive patients.[30] Because the reasonable patient would have HER2-negative breast cancer, however, Dr. Patil would have recommended TC.[31] And the reasonable patient would accept it. Indeed, Dr. Patil has never had a patient with Ms. Willie's diagnosis turn down his recommendation of TC.[32]

Ms. Willie would also act like the reasonably prudent patient if she had been fully advised of the alleged risk. Ms. Willie testified that she accepted TC—regardless of side effects—because

---

[29] *Id.* ¶¶ 33, 44.

[30] *Id.* ¶¶ 34–35.

[31] *Id.* ¶ 36.

[32] *Id.* ¶ 49.

9

Dr. Patil recommended it.[33]  Ms. Willie would have accepted Dr. Patil's recommendation no matter the side effect because no risk outweighed the benefit of being cancer-free:

> [H]e's a doctor; this is what he recommended.  And the only thing that I was looking for was . . . getting rid of the cancer.  So, sure, I mean, the risks and side effects are always important, but then I guess I was thinking risks or the side effects or whatever over cancer.  So I guess I was saying I can -- I can deal with the side effects as long as I was, you know, cancer-free.[34]

And no hair loss conversation would have changed Ms. Willie's decision:

> Like I say, hair loss or live.  I'm not -- no, I'm not going to say it would have changed my decision, no.  But if it had been other regimens that I could have taken that maybe wouldn't have resulted in permanent hair loss, then maybe I would have took those -- those regimens.  But, you know, like I say, hair loss or live?  I mean, who wouldn't take the living over hair loss, I mean?[35]

Ms. Willie received two chemotherapy drugs:  Taxotere and Cyclophosphamide.  If Ms. Willie had been aware that cases of permanent hair loss had been reported following treatment with Cyclophosphamide, Ms. Willie still would have accepted the TC regimen:  "**[O]nce again, hair loss or lose your life.  I mean, I'm not saying that would have changed my mind, no.**"[36]  Ms. Willie also testified that she would not have selected a regimen with a risk of permanent heart failure, such as AC+T, over a regimen with a risk of permanent hair loss.[37]  Ms. Willie, if aware of the risk of permanent hair loss in her chemotherapy regimen, unequivocally testified that she would have accepted the regimen.  Because Ms. Willie's ultimate treatment decision would not

---

[33]  *Id.* ¶ 26.

[34]  *Id.* ¶ 27.

[35]  *Id.* ¶ 28.

[36]  *Id.* ¶ 30.

[37]  *Id.* ¶ 43.

have changed, Ms. Willie cannot establish warnings causation under this Court's four-part framework. *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2020 WL 1819665, at *3 (E.D. La. Apr. 7, 2020); *see also Hunt v. McNeil Consumer Healthcare*, 2014 WL 1779471, at *3 (E.D. La. May 5, 2014) (granting defendant's motion for judgment as a matter of law where plaintiff failed to prove "that a different warning label would have changed her decision to administer Children's Motrin to [her child]").

## CONCLUSION

For these reasons, the Court should grant Sanofi's motion for summary judgment on Ms. Willie's claims.


Respectfully submitted,

| | |
|---|---|
| */s/ Douglas J. Moore* | Harley V. Ratliff |
| Douglas J. Moore (Bar No. 27706) | Jon Strongman |
| **IRWIN FRITCHIE URQUHART & MOORE LLC** | Adrienne L. Byard |
| 400 Poydras Street, Suite 2700 | **SHOOK, HARDY & BACON L.L.P.** |
| New Orleans, LA 70130 | 2555 Grand Boulevard |
| Telephone: 504-310-2100 | Kansas City, Missouri 64108 |
| Facsimile: 504-310-2120 | Telephone: 816-474-6550 |
| dmoore@irwinllc.com | Facsimile: 816-421-5547 |
| | hratliff@shb.com |
| | jstrongman@shb.com |
| | abyard@shb.com |
| | ***Counsel for sanofi-aventis U.S. LLC and Sanofi US Services Inc.*** |

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*