# EXHIBIT C

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF LOUISIANA
3
4
5
6    EMMA R. WILLIE, et al.,
          Plaintiffs,
7
8    VERSUS                        CASE NO: 2:18-cv-03857
9
     SANOFI-AVENTIS U.S., LLC,
10        Defendant.
11
12
13
14
         VIDEO DEPOSITION OF SANDANAND PATIL, M.D.
15
16       Taken via Zoom Videoconference, on Friday,
17       November 13, 2020, beginning at 9:59 a.m.
18
19
20
21
22
23
24
25

Page 14

1  A. It is a very effective medicine.
2  Q. How would you describe it in terms of a
3  side effect profile?
4  A. It has side effect profiles which are
5  comparable to other cancer treatments which are
6  available for these cancers. Especially Taxotere
7  has some -- with Taxotere, we normally expect a
8  few side effects, including allergic reactions,
9  fluid retention, dropping blood counts, hair loss,
10 which are the common side effects we see with
11 Taxotere.
12 Q. What about relative -- Taxotere in terms
13 of risk of neuropathy relative to --
14 A. Paclitaxel?
15 Q. Yes.
16 A. It has less neuropathy compared to
17 paclitaxel.
18 Q. And what is neuropathy, and how can it
19 affect a patient's activities of daily life?
20 A. Neuropathy is basically inflammation of
21 the nerves which causes damage to the nerves. It
22 usually affects the long nerves in the body, so it
23 starts with tingling and numbness in the hands and
24 feet. And if it progresses, it can become -- they
25 lose sensation in their hands and feet, and it can

Page 15

1  affect how they -- the body requires sensation
2  from the feet to figure out what the position of
3  the body is; and if you don't have sensation, it
4  could affect your balance, it could affect -- you
5  could get infections or injuries without noticing
6  them because you're not feeling your hands and
7  feet.
8  Q. And in your experience, have you had
9  patients with neuropathy have -- I mean,
10 describe the -- if you had a patient with severe
11 neuropathy, can that be a significant impairment?
12 A. Yes.
13 Q. All right. Let's talk a little bit
14 about -- and I'm going to get into Ms. Willie's
15 case in just little bit. I'm sorry. My e-mail
16 is -- let me get out of my e-mail so you don't
17 have to keep hearing that noise.
18     Okay. There we go. Broadly with
19 respect to the category of all the oncology drugs
20 that you use to treat your patients that have
21 early stage breast cancer, how would you describe
22 the side effect of alopecia that's seen with that
23 broad family of drugs?
24 A. All the treatment options for early
25 stage breast cancer cause alopecia. There are no

Page 16

1  treatment options available which do not cause
2  alopecia in early stage breast cancers.
3  Q. Thank you. How would you describe
4  patient-to-patient variability as it relates to
5  hair loss with any of the oncology drugs used to
6  treat early stage breast cancer?
7  A. I mean, any of the oncology drugs --
8  there are many oncology drugs which do not cause
9  hair loss, but they're not the ones used in breast
10 cancer treatment.
11 Q. Thank you. In terms of the range of
12 drugs that would be most successful in saving that
13 patient's life, you're going to see a very common
14 risk of hair loss. Am I saying that correctly?
15 A. Yes, that's correct.
16 Q. Would there ever be a patient who's
17 taking a chemotherapy regimen that would be
18 effective in saving their life that you would make
19 any guarantees about the state of their hair
20 returning after chemotherapy?
21 A. It is not part of our discussion. We
22 only discuss that it can cause hair loss.
23 Q. Okay. Very good. With respect to the
24 side effect profile, Doctor -- and we'll talk
25 about Ms. Willie's care in just a moment -- is

Page 17

1  your focus primarily on the side effects that you
2  described, neuropathy -- or just describe, big
3  picture, where you normally focus in terms of a
4  side effect profile with a patient with early
5  stage breast cancer who wants a regimen that's
6  going to save her life.
7  A. We try to describe as fully as possible
8  all the common side effects, including neuropathy,
9  heart defects, potential for reactions, potential
10 for fluid buildup in addition to hair loss.
11 Q. Okay. Okay. All right. And then I
12 want to focus specifically on the therapy of TC.
13 And without getting into the specifics of
14 Ms. Willie's case -- as you know, she had a
15 therapy of TC -- describe for the jury what TC is,
16 and, also, if you would, describe more broadly
17 what your clinical experience has been with TC as
18 a therapy to effectively kill cancer cells in
19 patients with early stage breast cancer.
20 A. It's a combination of two medicines,
21 Docetaxel and Cytoxan, and it is used very
22 commonly in early stage breast cancers.
23     There are certain -- there are basically
24 two major options for treating early stage breast
25 cancer. One is a combination of -- called AC

5 (Pages 14 - 17)

|  | Page 18 |  | Page 20 |
|---|---|---|---|
| 1 | times four followed by taxol times four, and the | 1 | away the stimulus for the breast cancer cells to |
| 2 | other one is TC. The other option is much more | 2 | grow and multiply. |
| 3 | toxic and has the potential for cardiac toxicity, | 3 | Q. And, Doctor, what is your clinical |
| 4 | and we only -- we generally reserve it for | 4 | experience in terms of what effect anti-hormonals |
| 5 | patients who have a certain kind of breast cancer | 5 | have on hair returning to the scalp? Do you have |
| 6 | called HER2-positive breast cancers where that is | 6 | experience with that? |
| 7 | more effective. Otherwise, everybody else I use | 7 | A. We -- I do not know of any specific |
| 8 | the TC combination. | 8 | effect the anti-hormonal medicines would have on |
| 9 | Q. Thank you. So with respect to her | 9 | hair. |
| 10 | specific category of early stage breast cancer, | 10 | Q. Okay. And in your experience have |
| 11 | your clinical experience has been to use TC? | 11 | you -- so you would not, in your experience, have |
| 12 | A. That's correct. | 12 | seen cases where anti-hormonals have inhibited |
| 13 | Q. Okay. And I know you used the term | 13 | hair or full hair regrowth? |
| 14 | toxic, but -- you said "cardiotoxicity." Just for | 14 | A. Not when they're used alone, we do not |
| 15 | the jury's benefit, just explain what that means. | 15 | see any specific effect on hair with that |
| 16 | A. It makes the heart muscle weak. It can | 16 | anti-hormonals. |
| 17 | cause something called congestive heart failure, | 17 | Q. All right. Very good. Long syllabus |
| 18 | that is the other -- the other medicine called | 18 | category of your broad clinical experience, |
| 19 | Adriamycin, which is another option for treatment | 19 | Doctor, no matter what the oncology drug is, |
| 20 | of early stage breast cancer. | 20 | whether it's Taxol or Taxotere or Adriamycin, did |
| 21 | Q. And, Doctor, if a particular | 21 | you ever have a patient who was concerned about |
| 22 | patient -- and for the purposes of this question, | 22 | their hair regrowth such that you referred them to |
| 23 | I'm asking a hypothetical. If a particular | 23 | a specialist in that area of dermatology? |
| 24 | patient had a history of cardiac failure or had a | 24 | A. I have not, not in my experience. |
| 25 | risk -- had risk factors which included | 25 | Q. Very good. And to put a further point |

|  | Page 19 |  | Page 21 |
|---|---|---|---|
| 1 | hypertension, for example, would that -- those be | 1 | on it, did you ever have a patient come to you and |
| 2 | additional reasons why you would counsel against | 2 | complain about their hair not regrowing after |
| 3 | Adriamycin? | 3 | chemotherapy? |
| 4 | A. We'd check the echocardiogram at the | 4 | A. I've not had that discussion with any of |
| 5 | beginning of the treatment, and we would make a | 5 | my patients. Many of them wear wigs after the |
| 6 | decision based on that. | 6 | chemotherapy, anyways, and nobody has specifically |
| 7 | Q. Okay. Okay. But even in the absence of | 7 | complained to me that their hair has not regrown. |
| 8 | an echocardiogram, your default is TC? | 8 | Q. Yeah. In fact -- and, again, I'm |
| 9 | A. Unless the patients have the | 9 | dipping into the water on Ms. Willie's care, but |
| 10 | HER2-positive kind of breast cancer, the default | 10 | at no time in the time -- in all of the records |
| 11 | is TC. | 11 | that you have provided were there any notations of |
| 12 | Q. Okay. Let me ask one final topic, and | 12 | Ms. Willie complaining of her hair not returning; |
| 13 | then we'll get into Ms. Willie's records. The | 13 | true? |
| 14 | role -- describe for the jury the role of a class | 14 | A. Not to my recollection. |
| 15 | of drugs called anti-hormonals. Ms. Willie | 15 | Q. Even as recently as August 2020, there's |
| 16 | received an anti-hormonal. Explain to the jury | 16 | no notation in the records where she was |
| 17 | why that is an accepted part of a chemotherapy | 17 | complaining of her hair not returning? |
| 18 | regimen for a woman who has early stage breast | 18 | A. Not to my recollection. She would |
| 19 | cancer? | 19 | normally discuss that with a dermatologist, not |
| 20 | A. It is not a chemotherapy medication, but | 20 | with me. |
| 21 | it basically -- breast cancers require the female | 21 | Q. Okay. But had she complained of that, |
| 22 | hormone to proliferate and grow, especially the | 22 | you would have recorded that in the notes? |
| 23 | ones which have the estrogen receptor positive. | 23 | A. I would have recorded that and referred |
| 24 | Breast cancers, by blocking the estrogen receptors | 24 | her to a dermatologist. |
| 25 | by anti-hormonal medication, we basically take | 25 | Q. Okay. Very good. And just to wrap up |

Page 26

1  Emma Willie you spent about an hour with her
2  talking about the path that she had ahead of her.
3  And we're going to get into those records in just
4  a moment; but if you could, just describe for the
5  jury globally what is your standard course with a
6  patient of yours who has a positive diagnosis of
7  early stage breast cancer.
8      A.  We first discuss the diagnosis, that
9  they have a breast cancer which requires a
10 significant amount of counseling and consoling.
11 Usually following that we discuss what the stage
12 is, what the grade of the tumor is and what are
13 the risk factors, and then I discuss the treatment
14 options for that, including surgery, chemotherapy,
15 radiation and hormonal treatments.  And at
16 different times during the clinical visits we
17 discuss each of those treatment options as they're
18 appropriate at the time.
19     Q.  Thank you.  So let's go down to the
20 paragraph here on common side effects.  And I'm
21 going to read this, and then I want to ask you
22 some questions about it.  So it reads, common side
23 effects of the medication include -- and let me
24 pause.  The medication as described above is
25 Cytoxan and Taxotere; correct?

Page 27

1      A.  Right.  This is a general chemotherapy
2  consent form.  It does not specifically relate to
3  those medicines, but it's for all chemotherapy
4  regimens.
5      Q.  All right.  In any event, you're
6  conveying to Ms. Willie that these are the range
7  of risks that she may be experiencing by taking
8  these?
9      A.  Yes.  Yes.
10     Q.  Okay.  So common side effects of the
11 medication include nausea, vomiting, hair
12 loss -- although many people lose their hair, it
13 usually grows back -- mouth and skin changes,
14 chemotherapy affects cells that divide quickly,
15 including healthy mouth and throat cells, so you
16 may develop mouth or throat sores or skin problems
17 such as dryness or redness.
18         Let's go back and focus specifically on
19 common side effects, including -- although many
20 people lose their hair, it usually grows back.
21 You see where I read there, Doctor?
22     A.  Yes.
23     Q.  And what are you conveying there by
24 that?
25     A.  That in many patients their hair does

Page 28

1  grow back.
2      Q.  Do you mean to convey in that that it
3  may not always grow back?
4      A.  I don't think that's the intention.
5      Q.  Well, when it says it usually grows
6  back, does usually mean always?
7      A.  No.
8      Q.  And are you conveying, then, that there
9  could be wide variability in how the hair would
10 return?
11     A.  The sentence probably conveys that, but
12 we do not specifically get into those
13 discussions --
14     Q.  Okay.  All right.
15     A.  -- unless the patient is eager to know.
16     Q.  Unless the patient is what?
17     A.  Unless the patient specifically asks
18 those questions, we would not get into those
19 discussions.
20     Q.  All right.  Do you mean to convey that
21 it may grow back thinner?
22     A.  No.
23     Q.  Okay.  What do you mean to convey, then?
24 That it usually grows back, but not always?
25     A.  Yes.

Page 29

1      Q.  Okay.  All right.  In the additions at
2  the bottom of that, allergic reactions, bladder
3  irritation, were those specific -- were those
4  normally -- are those the kinds of things that
5  would be added for all patients, or was there
6  something about Ms. Willie that made her more
7  susceptible?
8      A.  The medicine she is getting, the other
9  medicine called Cytoxan, that can cause bladder
10 irritation, and the Docetaxel, the Taxotere can
11 cause allergic reactions.
12     Q.  Okay.  Very good.  Going to the next
13 page, other treatment options that may be
14 available to me are, do you see that, and that's
15 blank?
16     A.  Yes.
17     Q.  Would you have explained to Ms. Willie
18 other treatment options that would have been
19 available to her if she did not elect to take TC?
20     A.  If she had refused to take TC, yes, but
21 this would be my first recommendation.  She was
22 not HER2-positive, so this would be my
23 recommendation, so we did not offer her other
24 options.
25     Q.  Okay.  Very good.  And if Ms. Willie

8 (Pages 26 - 29)

|  | Page 30 |  | Page 32 |
|---|---|---|---|
| 1 | came in to you today with exactly the same | 1 | BY MR. KEENAN: |
| 2 | diagnosis, would you have -- would your | 2 | Q. Doctor, for the record and for the |
| 3 | recommendation be the same, TC? | 3 | benefit of plaintiff's counsel, this is not a |
| 4 | A. If she needed chemotherapy, it would be | 4 | document that was part of her chart; correct? |
| 5 | the same regimen. | 5 | A. No, it is not. |
| 6 | Q. Let's drop down to the bottom of this | 6 | Q. Okay. |
| 7 | document. So she signs it on December 18th, 2014. | 7 | A. And this is the current one. I don't |
| 8 | And then who is Corrine? | 8 | know what the changes have been since we gave her |
| 9 | A. It's a nurse, a chemotherapy nurse. | 9 | a copy. |
| 10 | Q. Is she still employed with you? | 10 | Q. Yes. And so this, as you said, at the |
| 11 | A. Yes, she is. Yes, she is. | 11 | top it says, 2020; right? |
| 12 | Q. And is she there also to guide her | 12 | A. Yes. This is the correct one. |
| 13 | through this document? | 13 | Q. And going to Page 3 of 7 -- Hillary, if |
| 14 | A. Yes. And she also does -- provides the | 14 | you could focus on that -- hair loss is common |
| 15 | patient with the medication side effects profile | 15 | with this drug. Most of the time normal hair |
| 16 | and the patient information sheet on the | 16 | growth has come back. Sometimes hair growth has |
| 17 | medications. | 17 | not come back to normal. Talk with the doctor. |
| 18 | Q. Okay. And you signed this; correct? | 18 | Do you see where I read that? |
| 19 | A. Yes, I did. | 19 | A. Yes, sir. |
| 20 | Q. Okay. And you signed it the same date; | 20 | Q. Can we agree that that language here in |
| 21 | correct? | 21 | this 2020 UpToDate is remarkably similar to the |
| 22 | A. Yes. Yes. | 22 | language that was contained in your consent form |
| 23 | Q. And so had Ms. Willie had questions | 23 | in 2014 that we just discussed? |
| 24 | about anything on this document, you would have | 24 | A. Yes. |
| 25 | then been there ready, willing and able to answer | 25 | Q. Okay. All right. Very good. So now I |

|  | Page 31 |  | Page 33 |
|---|---|---|---|
| 1 | those questions or expand on any of this? | 1 | want to talk about the records, and I want to |
| 2 | A. Yes, I was there. | 2 | start with, Doctor, the very first occasion that |
| 3 | Q. Okay. And it's not unusual for you to | 3 | you had to interact with Ms. Willie. And I |
| 4 | have patients who do just that? | 4 | believe that is October 28th, 2014. And before I |
| 5 | A. Yes, they do. | 5 | go through these records, I think it's -- I've got |
| 6 | Q. Obviously this is a time of a lot | 6 | to ask a couple of legal questions, Doctor. |
| 7 | of -- you know, patients are anxious. It's not | 7 | Your medical records that we're going to |
| 8 | unusual for patients to have a number of questions | 8 | discuss were kept in the normal course of your |
| 9 | about this form, about what it means or what the | 9 | clinic? |
| 10 | risks are? | 10 | A. They are on -- they're on the Baptist |
| 11 | A. I didn't get your question. | 11 | One Care computer system. |
| 12 | Q. Well, this, I believe -- well, we'll | 12 | Q. Yeah. And the entries that would be |
| 13 | talk about the records, but this is one of several | 13 | made here would be at or about the time that you |
| 14 | times where you counseled her before she's | 14 | recorded that information? |
| 15 | actually received the TC; correct? | 15 | A. Yes. |
| 16 | A. Yes. | 16 | Q. Okay. Very good. So let's talk a |
| 17 | MR. KEENAN: Okay. All right. Okay. | 17 | little bit about -- and I say a "little bit." I |
| 18 | Very good. And if I could pull up the next | 18 | do mean a little bit. Let's talk a little bit |
| 19 | exhibit number. I believe it's the UpToDate | 19 | about the entry on October 28th, 2014. And for |
| 20 | that you brought with you. I think | 20 | the jury's benefit, I'm going back in time a |
| 21 | that's -- | 21 | little bit. We talked about this form that was |
| 22 | Hillary, what exhibit number is that; | 22 | dated December 18th, 2014. So we're turning the |
| 23 | Exhibit 6? | 23 | clock back a little bit. |
| 24 | MS. NICHOLAS: Six. | 24 | And I've already asked you a little bit |
| 25 | MR. KEENAN: Can you pull that up? | 25 | about what the initial consultation is like for a |

9 (Pages 30 - 33)

Page 34

1  patient with early stage breast cancer. I don't
2  want to be unnecessarily duplicative of what we've
3  already discussed, but with a specific focus on
4  her record here, Doctor, and the notation of
5  impression, walk me through your impression here
6  and what was on your mind and what you were
7  conveying to Ms. Willie at this time.
8      A.  That she had an infiltrating ductal
9  carcinoma in her right breast in the upper
10 quadrant. And on the CT scan, it looked like the
11 stage was T2N0, and the receptors to this were
12 positive for estrogen and progesterone. And I
13 discussed with her the diagnosis, the pathology
14 and the natural history of the disease and
15 available treatment options.
16     Q.  All right. At this time would you have
17 discussed with her that your preferred regimen
18 would have been TC?
19     A.  I would have discussed with her about
20 the treatment choices she had, that she would need
21 chemotherapy, that she would need surgery, that
22 she would need radiation, but I probably would not
23 have discussed the specific chemotherapy regimen
24 at this time.
25     Q.  Okay. Very good.

Page 35

1      A.  At this time I was not anticipating that
2  she may even require chemotherapy depending on the
3  pathology.
4      Q.  Okay. Very good. At that time it was
5  your hope that she would not have had lymph node
6  involvement?
7      A.  Yes.
8      Q.  And then, Doctor, if you could go to the
9  record dated November 25th, 2014.
10        And do you have that, Hillary?
11        Doctor, at this time, now you have the
12 results of the pathology?
13     A.  Yes.
14     Q.  All right. Describe for the jury how
15 your viewpoint of Ms. Willie's cancer prognosis
16 changed from your very first visit in October to
17 this visit now that you have the surgeon's report
18 of the tumor and the lymph node involvement?
19     A.  Lymph node involvement significantly
20 increases the risk of the cancer coming back. And
21 at this time I decided it was appropriate to
22 reduce the risk of recurrence using chemotherapy.
23     Q.  Okay. And the medical record describes
24 it as a macroscopic metastasis in one sentinel
25 lymph node. Did I --

Page 36

1      A.  Yes.
2      Q.  Okay. And for the jury, just walk the
3  jury through that. Macroscopic metas --
4      A.  Metastasis.
5      Q.  Yeah, in one sentinel lymph node, what
6  does that mean?
7      A.  It means the tumor metastasis was big
8  enough to be seen by the naked eye and did not
9  require microscopic -- it was not microscopic,
10 meaning it could not be seen by the naked eye but
11 only by the microscope.
12     Q.  And because this was macroscopic, you
13 could see it with the naked eye?
14     A.  Yes.
15     Q.  Meaning the size?
16     A.  Yeah, the size, it was big enough to be
17 seen by the naked eye.
18     Q.  At the risk of belaboring the obvious,
19 Doctor, just indulge me here for a couple of other
20 follow-up questions. So the lymph node, it
21 changed your approach in that she was at a higher
22 risk?
23     A.  That's correct.
24     Q.  And if Ms. Willie's cancer metastasized
25 in the future, then it's no longer early stage,

Page 37

1  but it's metastatic?
2      A.  That's correct.
3      Q.  And if it's metastatic, what do the
4  statistics tell us about life expectancy?
5      A.  It cannot be curable and average life
6  expectancy is about three years.
7      Q.  How did that make it important, then, to
8  treat the metastasis aggressively?
9      A.  The lymph node metastasis had to be
10 treated to prevent it from spreading to the rest
11 of the body.
12     Q.  Okay. In fact, your therapy, your
13 regimen ultimately was successful?
14     A.  It was.
15     Q.  Okay. I'm going to ask you about three
16 more questions about lymph node involvement, and
17 then we'll move on. We'll skip through the
18 records and go to the most recent record.
19        Doctor, I'm going to ask you if you are
20 in agreement -- I'm going to read a couple of
21 sentences here from a cancer journal and ask if
22 these statements are ones that you agree with.
23        Lymph node involvement has long been
24 recognized as an important prognostic factor in
25 breast cancer; agree?

Page 50

1  terms of sources of information for you in making
2  clinical judgements about a particular patient or
3  let's say you have a patient like Ms. Willie come
4  in, where does your own clinical experience with
5  that drug fall in terms of importance relative to
6  something like the package insert? Is that more
7  important or less important?
8      A. My experience is more important.
9      Q. Okay. And going back to the experience
10 you had with -- in 2014, you had had a number of
11 years' experience with Taxotere?
12     A. Yes.
13     Q. All right. Very good. So sitting here
14 today, you can't recall -- this is going to be an
15 unfair question. With respect to when Ms. Willie
16 came in your office and you interacted with her in
17 October of 2014, you're not in a position, really,
18 to say when you would have reviewed the package
19 insert relative to that date?
20     A. I would not be able to recall that.
21     Q. Okay. Okay. And my e-mail is popping
22 up again.
23         All right. So, Hillary, if you could
24 pull up the package insert that I've marked as
25 Exhibit Number 10, I believe.

Page 51

1          Doctor, this is a package insert that
2  was applicable prior to your encountering Ms.
3  Willie. And there's a statement here on Page 56
4  under Hair Loss. Are you with me, Doctor?
5      A. Yes, I can see that.
6      Q. Okay. Hair Loss -- loss of hair occurs
7  in most patients taking Taxotere, including the
8  hair on your head, underarm hair, pubic hair,
9  eyebrows, eyelashes. Hair loss will begin after
10 the first few treatments and varies from patient
11 to patient. Once you have completed all of your
12 treatments, hair generally grows back. You see
13 where I read that, Doctor?
14     A. Yes, I can.
15     Q. Can we agree that that language is in
16 harmony with the consent form that we previously
17 marked that you used with Ms. Willie in
18 January -- I mean, in December of 2014?
19     A. It sounds similar.
20     Q. Yeah. Okay. And, in fact, that
21 statement would be consistent with your own
22 clinical experience as it relates to the use of
23 Taxotere and regimens containing Taxotere?
24     A. Yes.
25         MR. KEENAN: And then, Hillary, if you

Page 52

1  could -- if you could -- the package insert
2  that was used after Ms. Willie --
3  BY MR. KEENAN:
4      Q. So this, Doctor, would have been the
5  package insert not during the time you cared for
6  her, but after, and I want to ask you about it.
7  In particular, there's two statements here about
8  alopecia.
9          Go to Page 33, Hillary, particularly
10 this statement on cutaneous. See at the bottom of
11 Page 33, cases of permanent alopecia have been
12 reported? Are you with me, Doctor?
13     A. Yes, I can see that.
14     Q. So, for the record, this would have been
15 several years -- this would have been in the time
16 period after you cared for Ms. Willie. So I want
17 to read that. Cases of permanent alopecia have
18 been reported. And then there's a similar
19 statement on Page 62. This is a long question,
20 just bear with me.
21         Hillary, if you go to Hair Loss.
22         In most cases normal hair growth should
23 return, in some cases (frequency not known)
24 permanent hair loss has been observed. Do you see
25 where I read that?

Page 53

1      A. Yes, I can.
2      Q. Does this information materially alter
3  your risk, benefit and assessment of Taxotere
4  today?
5      A. Not in terms of treatment options. Now
6  that I know it, I would probably tell the patient
7  that.
8      Q. Is permanent hair loss -- the statement
9  permanent hair loss had been reported, is that
10 consistent with the statement that hair generally
11 grows back?
12         MR. GRIFFIN: Object to the form.
13     A. I didn't get what you meant.
14 BY MR. KEENAN:
15     Q. Excuse me?
16     A. I didn't get what you meant with the
17 question. Can you repeat that again?
18     Q. Yes. The statement, cases of permanent
19 hair loss have been reported, is that consistent
20 overall with the statement that hair generally
21 grows back?
22         MR. GRIFFIN: Object to the form.
23     A. Hair generally grows back, yes.
24 BY MR. KEENAN:
25     Q. All right. Let me ask some wrap-up

14 (Pages 50 - 53)

Page 54

1  questions, and then I will be done and I'll pass
2  you to plaintiff's counsel.
3      Today, in 2020, can we agree that your
4  choice of TC, Taxotere, Cytoxan, was the
5  appropriate choice for Ms. Willie in 2014/2015?
6      A.  Yes.
7      Q.  It achieved your goal and achieved her
8  goal of making her cancer free?
9      A.  Yes.
10     Q.  When you saw her in August, there was no
11 evidence that she was unhappy or displeased with
12 your care or the outcome that she received from
13 your chemotherapy?
14     A.  Yes.
15     Q.  Yes?
16     A.  Yes.
17     Q.  Today, with all this information about
18 other therapies and risks and benefits, TC remains
19 your -- would be your recommendation for her
20 today?
21     A.  Yes.
22     Q.  And the informed consent that we
23 identified and marked is a fair summary of the
24 risks that she faced with chemotherapy even today?
25     A.  Yes.  The exact wording must have

Page 55

1  changed in the latest one, but it is appropriate.
2      Q.  Yes.  Yes.  Even today your patients --
3  the consent form may have changed, but even today
4  you're not in a position to make any guarantees
5  about what patients will see in terms of hair
6  regrowth, how their hair will return with their
7  chemotherapy regimen?
8      A.  We don't make any guarantees.
9      MR. KEENAN:  All right.  I think I'll
10 pass the witness.
11          - - -
12       EXAMINATION
13 BY MR. STRINGER:
14     Q.  Thank you.  Thanks for your time today,
15 Doctor.  I will say it might feel like I'm jumping
16 around a bit; because I have my list of questions,
17 and Mr. Keenan here has hit on a bunch of those.
18 So I'm just going to be going through.  And as he
19 has done, I'll try to be quick.
20     First there's a question about what kind
21 of background do you have with Taxotere and taxine
22 in general.  Have you ever given or attended any
23 lectures on the use of taxines such as Taxotere or
24 taxol?
25     A.  Not specifically, but I've heard many

Page 56

1  lectures about treatment of breast cancer
2  including taxol and Taxotere.
3      Q.  Okay.  Have you ever published in any
4  scientific research papers regarding Taxotere?
5      A.  I have not.
6      Q.  And you've touched on this some.  And I
7  apologize, that might happen here and there as I
8  ask these questions, but what do you do to learn
9  about a chemotherapy drug prior to prescribing it
10 for the first time to one of your patients?
11     A.  I pull it up on the -- on whatever the
12 resources I have available online.  Usually
13 UpToDate gives me most of the information I need.
14     Q.  Do you recall doing that with Taxotere
15 specifically?
16     A.  I still do that with Taxotere.  I've
17 done that many times.  Almost every time with a
18 new patient, I'll pull it up.
19     Q.  Aside from what you've already told us
20 about looking at UpToDate, what do you do to
21 ensure you're up to date on any adverse events or
22 risks associated with a drug that you typically
23 prescribe?
24     A.  Other than what I hear in meetings and
25 talks, nothing specifically to look at Taxotere.

Page 57

1      Q.  Okay.  And can you explain what a drug
2  company's general practice is for providing you
3  information about drugs, whether it's a new one or
4  one that you've been using?
5      A.  Before the COVID, they had drug
6  representatives come in that provide us
7  information on the medication -- on any new
8  medication and the indications thereof.  Since
9  COVID, there is no interaction with the
10 drug -- with the pharmaceutical companies
11 directly.
12     Q.  Do you recall a visit specifically from
13 Sanofi about Taxotere?
14     A.  I don't specifically recall.  We see
15 many drug representatives, so --
16     Q.  Have you ever attended any sponsored
17 presentations on Taxotere or Docetaxel?
18     A.  If I did, it was more than 10, 15 years
19 back, and I don't recall.  But I do a lot of
20 sponsored meetings on new medications; and maybe
21 when Taxotere was new, it's possible that I did,
22 but I don't recall offhand.
23     Q.  Okay.  You can't recall any specific
24 instances of a presentation on Taxotere?
25     A.  Not specifically, no.

Page 58

1  Q. Have you ever been asked to participate
2  in sponsored clinical research for Taxotere?
3  A. No.
4  Q. Again, you've touched on this some, I
5  believe. At the time you treated Ms. Willie, how
6  was patient education handled in your office when
7  a patient was preparing to be treated with
8  adjuvant chemotherapy?
9  A. We have a process on how to do that.
10 When I first discuss the treatment options with
11 the patient, I describe to them what to expect
12 from the medicines. And then the patient goes to
13 the chemotherapy nurse, who discusses each
14 medicine and the details specifically. And then
15 we provide the patient with the consent form, and
16 we provide the patient with the UpToDate on the
17 patient information to take home and to study it
18 and to come back with any questions.
19 Q. Thank you. For a typical patient, how
20 much time do you specifically, Doctor, devote to
21 discussing temporary hair loss with the patient?
22 A. Nothing other than mentioning it. It's
23 one of the many side effects I discuss with the
24 patient, but not -- maybe less than a minute.
25 Q. Okay. Based on your experience, are

Page 59

1  patients concerned about hair loss associated with
2  chemotherapy?
3  A. Most of the patients who come for
4  chemotherapy expect it, so they are not -- they
5  don't express any concern to me.
6  Q. Would you say the same about permanent
7  hair loss, permanent alopecia? Would that be
8  something that would be concerning to your
9  patients?
10 A. I had no knowledge of permanent hair
11 loss until this case was filed. In my experience,
12 patients lose their hair and they get it back
13 after the chemo. And I do not use that in my
14 discussion with the patient at all.
15 Q. Knowing now as you read on the
16 label -- I believe it was Exhibit 11 -- knowing
17 that now, does that change your conversation with
18 the patients in the future?
19 A. I would probably tell them that there is
20 a chance that their hair might not come back.
21 Q. Okay. And just referring back to I
22 believe it was Exhibit Number 5, your general
23 consent form, is it fair to say that that form is
24 generally used for all chemotherapy drugs?
25 A. Yes. There are different -- there are

Page 60

1  different types of chemotherapy drugs. Like
2  hormonal therapies we have a different form. For
3  Cytoxan chemotherapy, this is the standard.
4  Q. Okay. And then there was the area below
5  where some side effects were listed where there
6  was some specific handwritten side effects. Am I
7  remembering that correctly on the consent form?
8  A. Yes. When we have specific side effects
9  which would be -- which are not part of the
10 general list, we add them on.
11 Q. Okay. And going forward, do you believe
12 that writing permanent hair loss or permanent
13 alopecia when you're using Taxotere, would that be
14 something you would write in that in the future?
15    MR. KEENAN: Object to the form.
16 A. We do not have a specific chemotherapy
17 consent for Taxotere alone, so I believe we would
18 just -- my discussion with the patient.
19 BY MR. STRINGER:
20 Q. Okay. Thank you. Do you recall at any
21 time since you began prescribing Taxotere up to
22 today, has anyone from Sanofi or any other company
23 ever warned you about the risk of permanent or
24 persistent alopecia?
25 A. No.

Page 61

1  Q. And since December of 2015, have you
2  received any information from Sanofi concerning
3  permanent hair loss in patients taking Taxotere?
4  A. No.
5  Q. Are you aware that Sanofi was instructed
6  by the FDA to update its U.S. label in December of
7  2015 to include information regarding permanent
8  alopecia?
9  A. I'm not. I was not aware, no.
10 Q. I'm going to shift gears a little bit
11 here. What role does patient choice have in your
12 treatment of cancer patients?
13 A. They have all the choice. They make the
14 choice of getting treatment, the options of
15 treatment. They make all the choices.
16 Q. Okay. And do you encourage your patient
17 to be an active participant in deciding which
18 adjuvant chemotherapy regimen to use?
19 A. When there are choices, yes.
20 Q. Do you feel it's important to provide
21 information about any permanent risks associated
22 with each of these different options of
23 chemotherapy regimens?
24 A. When there are choices, we discuss all
25 the side effects of the choices.

Page 62

1     Q.  And do you feel in doing so it's
2 important that you have truthful and accurate
3 information regarding those risks associated with
4 the various chemotherapy regimens?
5     A.  To the best of my knowledge, yes.
6     Q.  Have you ever had a patient refuse to
7 follow one of your recommendations that you've
8 made for chemotherapy treatment?
9     A.  Yes, many times.
10     Q.  Many times.  Okay.  Can you provide an
11 example of when that's happened?
12     A.  Many patients decide not to do
13 chemotherapy at all and take the chance that the
14 cancer comes back.
15     Q.  Okay.  When a patient comes to you with
16 that decision, what is generally your reaction?
17 What do you do in that situation?
18     A.  I tell them what are the probabilities
19 of the cancer coming back and how chemotherapy
20 will decrease that risk and leave it up to the
21 patient to make the final decision.
22     Q.  Okay.  You previously mentioned the NCCN
23 Guidelines.  Can you describe a little bit more
24 about what they are and how you use them?
25     A.  They are guidelines based on -- there is

Page 63

1 a committee of experts in each cancer who get
2 together frequently and write guidelines on how
3 each cancer at every stage should be treated with
4 the most current information available.  And
5 that's the standard of care for most oncologists
6 to use on a regular basis.
7           - - -
8       (Exhibit 12 was marked.)
9 BY MR. STRINGER:
10     Q.  All right.  So I am going to share my
11 screen, and I believe it will be Exhibit 12.
12       Can you see that, Doctor?
13     A.  Yes, I can.
14     Q.  All right.  So here it's noted NCCN
15 Clinical Practice Guidelines in Oncology, Breast
16 Cancer, Version 3.2015.  Doctor, would this have
17 been the version you would have referred to to
18 treat Ms. Willie?
19     A.  I would have to check on the version.
20 I'm not sure what the version is.  Let me look.  I
21 have it open here.
22       MR. GRIFFIN:  If y'all can hear me, for
23     clarification of the question, because I'm
24     not sure he understood it, are you asking him
25     if that's what he would have referred to when

Page 64

1 he saw her back in 2014, or are you asking
2 him if that's what he would refer to if he
3 was seeing her today?
4     MR. STRINGER:  At the time of her
5 treatment.
6     A.  Probably, depending on what the date
7 was -- the current version is Version 6.2020, and
8 what was the date I started her -- I did the chemo
9 therapy discussion, that would be the current
10 version at that time.
11 BY MR. STRINGER:
12     Q.  Okay.  So -- okay.  So I'm going
13 to -- all right.  So I moved down to Page 45.  All
14 right.  So, Doctor, this -- as I said, this is
15 Page 45 of the exhibit.  At the bottom right
16 corner, it's labeled BINV-K, 1 of 7, and at the
17 top, invasive breast cancer.  Do you recognize
18 this page, Doctor?
19     A.  Yes.  Yes.
20     Q.  Can you explain what this page is
21 showing to us?
22     A.  It describes the treatment options for
23 neoadjuvant/adjuvant chemotherapy in early stage
24 breast cancer, and it gives us choices for
25 different kinds of chemotherapy regimens based on

Page 65

1 presence or absence of HER2 receptors.
2     Q.  Thank you.  It's my understanding that
3 Ms. Willie was HER2-negative; is that correct?
4     A.  That's correct.
5     Q.  So does that mean we would be looking at
6 the column on the left-hand side of this page?
7     A.  That's correct.
8     Q.  And in that column, I see under
9 Preferred Regimens, the third one down is listed
10 TC (docetaxel and cyclophosphamide); is that
11 correct?
12     A.  Yes.
13     Q.  Is it fair to state, based on your
14 testimony, then, that's your preferred treatment
15 for HER2-negative patients with breast cancer?
16     A.  Correct.
17     Q.  And I see that there are other regimens
18 listed there; correct?
19     A.  That is correct.
20     Q.  And so under Preferred Regimens, there
21 are actually three, and that includes TC.  At the
22 top it says, dose-dense AC, and the second one
23 down is dose-dense AC, as well.  I think the only
24 difference between those two is the frequency of
25 the paclitaxel treatment; is that correct?

17 (Pages 62 - 65)

Page 66

1  A. And the dose density of -- the
2  difference between those two, that's correct.
3  It's the weekly paclitaxel versus once every two
4  weeks.
5      Q. Okay. Have you ever used either of
6  those treatments in patients with breast cancer
7  that are HER2-negative?
8      A. Yes, I have.
9      Q. Are they also effective in adjuvant
10 chemotherapy treatment of breast cancer?
11     A. Yes, they are.
12     Q. If a patient prefers not to use TC for
13 whatever reason, would you then recommend one of
14 those two regimens?
15     A. Yes, I would.
16     Q. And then underneath other regimens,
17 there are a number of other treatments listed.
18 Would Ms. Willie have been a candidate for those
19 other -- any of those other treatments, as well?
20     A. Other treatments I would use on patients
21 who are not fully capable of getting full strength
22 chemotherapy because of certain medical issues or
23 age. So I would choose among the preferred
24 regimens.
25     Q. Okay. And how often do you refer to the

Page 67

1  NCCN Guidelines in your treatment of adjuvant
2  chemotherapy in breast cancer?
3      A. Every new patient -- Every time I'm
4  starting a patient on a new chemotherapy regimen,
5  I look at NCCN.
6      Q. Okay. And at the time you prescribed
7  Taxotere to Ms. Willie, did you assume that you
8  had been provided with true and accurate
9  information regarding permanent alopecia as a
10 potential side effect?
11     A. I do not recall any information about
12 permanent alopecia at the time or even until
13 recently.
14     Q. And would you have warned Plaintiff that
15 Taxotere or Docetaxel was associated with the risk
16 of permanent hair loss if you would have known?
17         MR. GRIFFIN: Object to the form. You
18     can answer.
19         THE WITNESS: I can?
20         MR. GRIFFIN: Yeah. I'm objecting to
21     the form of the question, but you can answer.
22     A. I would tell the patient that there is a
23 risk of permanent alopecia going on forward.
24 BY MR. STRINGER:
25     Q. And after presenting your patient with

Page 68

1  that information about the risks of permanent
2  alopecia that come with Taxotere, would you honor
3  your patient's decision not to use it if that was
4  their decision?
5          MR. GRIFFIN: Objection.
6      A. Yes. I would always honor my patient's
7  decision.
8  BY MR. STRINGER:
9      Q. Would you agree that a patient cannot
10 make an informed decision if she is not made aware
11 of the true risks of a chemotherapy drug?
12         MR. GRIFFIN: Object to the form.
13         MR. KEENAN: Objection to form.
14         THE WITNESS: Do I answer that?
15         MR. GRIFFIN: Yeah, you can.
16     A. Yes. Yes, whatever the information is
17 available. I don't know how complete of
18 information any patient can get.
19 BY MR. STRINGER:
20     Q. Right. And you agree that if it's not
21 available to you, then it's not going to be
22 available to your patient; right?
23     A. That's correct.
24         MR. STRINGER: All right. That's all
25     the questions I have. Thank you, Doctor.

Page 69

1          THE WITNESS: Thank you.
2          MR. KEENAN: Aaron, could you put the
3      NCCN back up, if you would?
4          MR. STRINGER: Sure. And I will get
5      this over to you right after, as well.
6          MR. KEENAN: Sure. No problem.
7              - - -
8          FURTHER EXAMINATION
9  BY MR. KEENAN:
10     Q. Doctor, I know you've been very patient
11 with us, and I only have about five more minutes
12 of questions here. But going back to the NCCN
13 Guidelines in 2015, we talked a little bit about
14 the preferred regimens you have there in front of
15 you. You see them, Doctor?
16     A. Yes, I do.
17     Q. Okay. I want to just take a few minutes
18 to talk about this a little bit. When you and I
19 were speaking about an hour ago, you described for
20 me certain risks that were inherent in the A of
21 the A and C combination that are identified here.
22 Do you recall that?
23     A. Yes, I do.
24     Q. Okay. And just to refresh the jury's
25 recollection, what are the risks that come with

Page 70

1  that drug called A that you don't have with the
2  drug that we've described as T, Taxotere,
3  specifically cardiac risks?
4      A.  That's correct.  It causes
5  cardiotoxicity, resulting in a drop in ejection
6  fraction and cardiomyopathy.
7      Q.  And cardiomyopathy is something that can
8  cost you your life?
9      A.  Yes.
10     Q.  And isn't it also true that A of the A
11 and C also has a deleterious effect on the heart
12 that runs long after the drug has already been
13 administered; correct?
14     A.  In terms of -- what do you mean by "long
15 after"?
16     Q.  Yeah, good question.  Yes, thank you.
17 Its deleterious effect on the heart may not be
18 fully evaluated for weeks or months after the drug
19 has already been administered?
20     A.  Yes.  We normally administer it every
21 three cycles of the treatment.
22     Q.  Yes.  And had -- speaking in this
23 hypothetical situation where Ms. Willie says to
24 you, I don't want Taxotere and she informs you she
25 wants the A and C option, you would have been

Page 71

1  obligated under your standard of care to actually
2  have her evaluated by a cardiologist to see if she
3  would be an appropriate candidate; true?
4      A.  True.
5      Q.  Okay.  And just for the jury's benefit,
6  why do you do that?  Why do you send your patients
7  to a cardiologist before you even consider giving
8  them the A and the C?
9      A.  We don't actually send them to a
10 cardiologist.  The cardiologist does the
11 echocardiogram, and we look at the report of the
12 echocardiogram.
13     Q.  Okay.  Very good.  And so had Ms. Willie
14 said, I don't want T, I want the A and C, you
15 would not have necessarily given her the A and C
16 until she had additional evaluation done; true?
17     A.  Yes, I would not have given it to her.
18     Q.  Okay.  And if that additional evaluation
19 had been adverse to her cardiac health, would you
20 have nevertheless continued to give her the A and
21 C?
22     A.  No.
23     Q.  Okay.  So that would not have been a
24 case where you would have simply honored her
25 choice; correct?

Page 72

1      A.  Yes.  If her heart does not have the
2  strength to take the medicine, I would not give
3  that medicine.
4      Q.  Okay.  Well, I want you to assume some
5  additional facts about Ms. Willie's cardiovascular
6  health.  And just for the ease of moving things
7  along, I will just ask you to assume the following
8  facts about her cardiovascular health, that she
9  had hypertension, that she has high cholesterol,
10 that she's medically considered to be obese, that
11 her mother, father, brother and sister were all
12 diagnosed with diabetes and that Willie's mother
13 died of a stroke.  You with me so far?
14     A.  Yes.
15     Q.  If you assume those facts to be true,
16 would that make the need for her cardiac
17 evaluation to be even more important before you
18 would consider giving her the A and C?
19     A.  Regardless of those facts, I would do a
20 cardiac evaluation.
21     Q.  Okay.  You don't have to worry about any
22 heart function if you go with the T and the C;
23 correct?
24     A.  That's correct.
25     Q.  Okay.  So ultimately as a cardiologist

Page 73

1  (sic), your job is to evaluate all of the risks
2  that she presents and interface those with the
3  risks the drugs present and make an informed
4  recommendation to her; true?
5      A.  As an oncologist, that's correct.  You
6  said "cardiologist."
7      Q.  And that's what you did in her case;
8  right?
9      A.  That's correct.
10     Q.  And I think, at the risk of repeating
11 myself, she's never told you that she was upset
12 that you chose T and C and was not given an
13 alternative therapy?
14     A.  No, sir.
15     Q.  Okay.  All right.  And, in fact, Doctor,
16 have you seen literature in the last 10 years that
17 has done head-to-head comparisons of TC and AC and
18 identified that TC was superior to standard AC?
19     A.  It is superior to standard AC alone, but
20 not comparing that with AC followed by taxol.
21     Q.  Okay.  I'm focusing on the regimen here
22 AC versus TC.  There is peer-reviewed literature
23 in the cardiology journals that have described TC
24 as being superior to standard AC; correct?
25     A.  I do not have that access to the cardiac

19 (Pages 70 - 73)

|   | Page 74 |   | Page 76 |
|---|---|---|---|
| 1 | journals, but in the medical journals, AC alone, | 1 | A.  I see hair loss, yes. |
| 2 | which is a move down from the other regimen, is | 2 | Q.  Okay.  That's an accurate description of |
| 3 | inferior to TC. | 3 | what you see with Taxotere? |
| 4 | MR. KEENAN:  Okay.  All right.  Hillary, | 4 | A.  That's correct. |
| 5 | would you pull up the 2016 package insert? | 5 | Q.  Okay.  I just have a couple of other |
| 6 | MR. STRINGER:  You want me to go ahead | 6 | wrap-up questions.  Doctor, the 2016 package |
| 7 | and pull this down then? | 7 | insert that we previously discussed -- and I will |
| 8 | MR. KEENAN:  Yeah.  Hillary, I tell you | 8 | ask you to assume that this was the package insert |
| 9 | what, why don't you pull up the 2014, 2015 | 9 | in 2016, so after you began prescribing Taxotere |
| 10 | package insert. | 10 | to Ms. Willie. |
| 11 | BY MR. KEENAN: | 11 | Hillary, can you pull that up? |
| 12 | Q.  Doctor, just bear with me.  We talked | 12 | So, Doctor, we talked about this before, |
| 13 | about two of the package inserts.  I want to | 13 | but we can agree, can we not, that in this package |
| 14 | identify one more, and this was the package insert | 14 | insert, it does, in fact, describe permanent hair |
| 15 | that was between the hair generally grows back and | 15 | loss as observed; correct? |
| 16 | the more recent one that says, cases of permanent | 16 | A.  That's correct. |
| 17 | alopecia were reported.  And this is the one that | 17 | Q.  Right? |
| 18 | was applicable in 2014, and it uses different | 18 | A.  Yes. |
| 19 | language. | 19 | Q.  Yes.  So Counsel was earlier asking you |
| 20 | Hillary, if you can just pull up the | 20 | if you knew of a risk of permanent hair loss in |
| 21 | language that describes alopecia. | 21 | the time after you cared for Ms. Willie.  Can we |
| 22 | MS. NICHOLAS:  I'm not totally sure of | 22 | agree that, in fact, this was information in the |
| 23 | that page number.  I'll have to pull it up in | 23 | packaging; correct? |
| 24 | PDF first. | 24 | MR. GRIFFIN:  Object to form. |
| 25 | BY MR. KEENAN: | 25 | A.  It was information in the package |

|   | Page 75 |   | Page 77 |
|---|---|---|---|
| 1 | Q.  Let me see if I can, Doctor.  Doctor, if | 1 | insert, but not that I was aware of it. |
| 2 | you assume, while she looks for that, that the | 2 | BY MR. KEENAN: |
| 3 | warning in 2014 described alopecia as a side | 3 | Q.  But if you routinely check the package |
| 4 | effect, as we've already discussed, alopecia is | 4 | insert, this would have been in there? |
| 5 | hair loss; right? | 5 | A.  I only looked at the UpToDate history of |
| 6 | A.  Yes. | 6 | it.  If it's in there, yes, maybe I would. |
| 7 | Q.  Alopecia does not in and of itself | 7 | Q.  Okay.  The UpToDate we've already talked |
| 8 | describe or make any representations about the | 8 | about.  The UpToDate says that hair loss is common |
| 9 | hair returning; correct? | 9 | with this drug.  Most of the time normal hair |
| 10 | A.  Yes. | 10 | growth has come back.  Sometimes hair growth has |
| 11 | Q.  Okay.  And the term "alopecia" in and of | 11 | not come back to normal.  Talk with the doctor. |
| 12 | itself is a clinical description of -- without | 12 | That's what the current UpToDate says, and you |
| 13 | regard to describing the length or the prospect of | 13 | would agree that that is a description that's |
| 14 | the hair returning; true? | 14 | consistent with the one you give? |
| 15 | A.  True. | 15 | A.  Yes. |
| 16 | Q.  Okay.  And with respect to that | 16 | Q.  Okay.  All right.  And in all of your |
| 17 | description, you have no criticisms of that | 17 | years of practice, Doctor, have you had a patient |
| 18 | language; true? | 18 | who you recommended receive TC -- so with a |
| 19 | A.  What language? | 19 | diagnosis no different than Ms. Willie, in all of |
| 20 | MR. KEENAN:  Hillary, could you pull it | 20 | your years, have you had a patient tell you I |
| 21 | up here, Hillary? | 21 | don't want TC, I want an alternative therapy? |
| 22 | MS. NICHOLAS:  It's Page 59. | 22 | A.  No. |
| 23 | A.  I see hair loss. | 23 | Q.  And right now in your clinic you have |
| 24 | BY MR. KEENAN: | 24 | patients who are probably receiving TC that are |
| 25 | Q.  You see it? | 25 | HER2-negative.  Yes? |

20 (Pages 74 - 77)

Page 78

1  A. Yes.
2  Q. And your experience continues to be
3  quite favorable in terms of efficacy and side
4  effects?
5  A. Yes.
6     MR. KEENAN: Okay. That's all I have.
7     MR. STRINGER: I don't have any
8  follow-up.
9     MR. GRIFFIN: I just have one real quick
10 one. I'm not going to get on camera so we
11 can remain social distancing. So if that's
12 okay, you're not going to see my face.
13           - - -
14        EXAMINATION
15 BY MR. GRIFFIN:
16 Q. Dr. Patil, you've been shown today some
17 NCCN Guidelines, some package inserts and some
18 things from all various number of different years,
19 2015, 2016; is that correct? Do you recall being
20 shown those things?
21 A. That is correct.
22 Q. At the time you treated Ms. Willie, the
23 information you would have had to go on when you
24 guys made a decision to give her Taxotere would
25 have been whatever those package inserts, UpToDate

Page 79

1  and those guidelines said at that time; correct?
2  A. That's correct.
3  Q. You don't have the benefit of knowing
4  what they're going to say two, three years down
5  the road when you're taking care of Ms. Willie;
6  correct?
7  A. That's correct.
8     MR. GRIFFIN: I don't have anything
9  further.
10    MR. KEENAN: Nothing further. Thank
11 you, Doctor.
12    THE VIDEOGRAPHER: End time is
13 11:59 a.m. We're off the record.
14          - - -
15 (Deposition concluded at 11:59 a.m.)

Page 80

1  CERTIFICATE OF COURT REPORTER
2     I, NATALIE R. SEYMOUR, Court Reporter and
3  Notary Public, in and for the County of Harrison,
4  State of Mississippi, hereby certify that the
5  foregoing pages, and including this page, contain a
6  true and correct transcript of the testimony of the
7  witness, as taken by me at the time and place
8  heretofore stated, and later reduced to typewritten
9  form by computer-aided transcription under my
10 supervision, to the best of my skill and ability.
11    I further certify that I placed the witness
12 under oath to truthfully answer all questions in
13 this matter under the authority vested in me by the
14 State of Mississippi.
15    I further certify that I am not in the employ
16 of, or related to, any counsel or party in this
17 matter, and have no interest, monetary or
18 otherwise, in the final outcome of the proceedings.
19    Witness my signature and seal, this the 2nd
20 day of December, 2020.
21
22
23    _____
      Natalie R. Seymour, CSR #1637
24    My Commission Expires 6/12/2022.
25

Page 81

1  JEFFREY L. GRIFFIN, ESQUIRE
2  jgriffin@harrisshelton.com
3           December 2, 2020
4  RE: Willie, Emma R., Et Al v. Sanofi-Aventis U.S. L.L.C.
5     11/13/2020, Sandanand Patil, M.D. (#4336582)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-nj@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25