# EXHIBIT A

Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

3

   CINDY L. SMITH                          PLAINTIFF
4

   VS.                      CASE NO. 2:18-cv-07702
5

   SANOFI US SERVICES,                     DEFENDANT
6  INC. F/K/A
   SANOFI-AVENTIS U.S.,
7  INC., SANOFI-AVENTIS
   U.S. LLC, ET AL.

8

9

   ****************************************************
10   VIDEO DEPOSITION OF ELIZABETH HERRINGTON, M.D.
   ****************************************************
11

     Taken at the instance of the Defendants via Zoom,
12                on October 14, 2020
        beginning at approximately 1:00 p.m.
13

14

15

                  (APPEARANCES NOTED HEREIN)
16

17

18

19

20

21

22              *  *  *  *  *  *  *  *
23                 Reported by:
                Julie Brown, CCR 1587
24

25

1      A.    Yes, my volunteer experience with Hope

2    Conference.  And I also updated my current

3    employment.

4      Q.    Thank you.  Do you believe, at this time,

5    this is the most current, as far as your education,

6    your occupational background, the most current CV

7    that you have?

8      A.    Yes.

9      Q.    Okay.  So that's going to hopefully help

10   us skip a few of my questions because we'll just

11   get -- now that that's part of the record.

12          Where are you -- what states are you

13   currently licensed in?

14     A.    Mississippi.

15     Q.    Okay.  Any other state?

16     A.    No.

17     Q.    And what board certifications do you have

18   there in Mississippi?

19     A.    Internal medicine and medical oncology.

20     Q.    Okay.  Do those require recertifications

21   from time to time?

22     A.    They do, every ten years.

23     Q.    And when was the most recent

24   recertification that you went through?

25     A.    So basically it's not time for

1      A.    Yeah.  So it's been around and widely

2   recognized as very effective in treating breast

3   cancer.

4      Q.    What would you use to determine your

5   decision about whether to prescribe Taxotere or

6   Taxol for a particular patient?

7      A.    I think, again, it just depending on the

8   situation such as their tumor time and their past

9   medical history and what I understood in the

10  literature.

11     Q.    Okay.  And, actually, that brings up a

12  good segue to my next question here.  What do you

13  typically do to learn about a chemotherapy drug

14  prior to prescribing it for the first time to one of

15  your patients?

16     A.    Yeah.  Basically, look at the drug, look

17  at the side effects, look at the mechanism of

18  action, look at how well it works, the duration of

19  response.

20     Q.    Okay.  You listed earlier some of the

21  different journals that you subscribe to.  Do you

22  often review to those journals for information about

23  chemotherapy drugs?

24     A.    Not -- no, I don't.

25     Q.    Okay.  Do you ever read the label of a

1    chemotherapy drug prior to prescribing it?

2         A.    The label?

3         Q.    Right.

4         A.    Yes.

5         Q.    Okay.

6              MR. JOHNSON:  Are you referring to the

7    package insert?

8              MR. STRINGER:  Packing insert or -- well,

9    I guess there's a couple different things there.

10   There is the package insert.  They do have -- I

11   guess, yes, let me rephrase the question.

12             MR. JOHNSON:  Yeah.  I think the word

13   "label" is throwing her.  I see some confusion in

14   her eyes by exactly what you mean.

15             MR. STRINGER:  That's a good point.

16   Thank you.

17   BY MR. STRINGER:

18        Q.    Do you refer to the package insert that

19   comes with the drug -- or the chemotherapy drug

20   before prescribing it to a patient?

21             MS. SCHULTZ:  Object to the form.

22             THE WITNESS:  The package insert?

23   Sometimes.

24             MR. JOHNSON:  What he's trying to find

25   out is exactly what do you look at to familiarize

Page 25

```
 1    yourself with the medication before you prescribe
 2    it.
 3              THE WITNESS:  Okay.  Okay.
 4              MR. JOHNSON:  That's what he's getting
 5    at.
 6              THE WITNESS:  Yeah.  I will look at that
 7    as well as UpToDate is a good source to look at the,
 8    you know, it shows the mechanism the action, the
 9    adverse reactions.
10    BY MR. STRINGER:
11         Q.   Okay.
12         A.   Yeah.  I'm sorry.  I didn't understand
13    it.
14         Q.   Again, my questions sometimes go off the
15    rails.
16              MR. JOHNSON:  You are from Utah.  I think
17    that's what's throwing us poor little Mississippi
18    people.
19              MR. STRINGER:  I have the funny accent;
20    right?
21    BY MR. STRINGER:
22         Q.   All right.  So I'm going to make sure I
23    understood you right.  You said you referred to
24    UpToDates?
25         A.   Right.
```

```
 1   updating?  Isn't that your question?
 2              MR. STRINGER:  Yes.
 3   BY MR. STRINGER:
 4       Q.    What I'm getting at is have you
 5   specifically, through that service, found new
 6   information from about Taxotere?
 7       A.    No.
 8       Q.    Okay.  Your answer is no then?
 9       A.    That's correct.
10       Q.    What do you do to ensure that you are
11   up-to-date on any adverse events or risks associated
12   with drugs that you typically prescribe?
13       A.    A lot of times, if they are in that, when
14   it comes to life-threatening side effects, it will
15   definitely be in there with a percentage, but
16   basically reviewing literature and studies where the
17   drug was approved and basically just reading about
18   it.
19       Q.    Okay.  Have you ever, in the past,
20   changed your prescribing habits based on reviewing
21   or finding such information?
22              MS. SCHULTZ:  Object to the form.
23              THE WITNESS:  That depends on the patient
24   and, again, if he or she has contraindications to
25   that drug or I feel like it's not going to be safe
```

Page 29

1   for them.  But it depends on the information, if

2   that makes sense.  My priority is their life.  So if

3   it's going to be life-threatening, if they have an

4   underlying condition in which that drug would

5   possibly harm them, then I would look at something

6   else.

7   BY MR. STRINGER:

8       Q.    Okay.  Whether life-threatening or not,

9   can you think of any time when you changed your

10  prescribing habits based on something that you

11  learned?

12          MS. SCHULTZ:  Object to the form.

13          THE WITNESS:  Yes.  Really, we have to do

14  that every day in practice.  Because in terms of

15  because every individual is different.  And so if I

16  have a lady, like in this case, you know, with a

17  high stage tumor that can't get -- but I don't think

18  an anthracycline is right for her, due to underlying

19  heart failure, then I'll change to something else.

20  BY MR. STRINGER:

21      Q.    Okay.  Have you ever received information

22  directly from a pharmaceutical company regarding new

23  warnings or side effects?

24      A.    Not to my knowledge.

25      Q.    Okay.  Do you ever receive -- strike

Page 36

1          And you can see it in the middle column
2     there, the third one down, it says "hair loss";
3     correct?
4          A.     Yes.
5          Q.     And did I read that paragraph above
6     correctly?
7          A.     Yes.
8          Q.     Okay.  Anything in that paragraph, as far
9     as -- anything in that paragraph that you disagree
10    with?
11         A.     I mean, a lot of those, like example for
12    the hair loss, of course it's going to be more than
13    a few hours.
14         Q.     Would you agree that part of what it
15    says, what I read, it says "They are almost always
16    reversible and will go away after treatment is
17    complete," would that apply to most of those side
18    effects that are listed?
19         A.     Generally, yes.
20         Q.     Okay.  So would you say that, generally,
21    hair loss, as one of those symptoms that's listed,
22    is almost always reversible and will go away after
23    treatment is complete?
24         A.     Well, it depends.  We are now telling
25    patients that there's a possibility of permanent

Page 37

1    hair loss.

2         Q.    Why are you telling them that now?

3         A.    Just basically to prepare them so that

4    they will know what to expect.

5         Q.    Okay.  Do you recall when you started

6    telling your patients that it might be permanent?

7         A.    I can't remember exactly but I think it

8    may have been a year or two ago.

9         Q.    Do you recall what brought about that

10   change?

11              MS. SCHULTZ:  Object to the form.

12              THE WITNESS:  I basically just remember

13   seeing the commercial on TV.

14   BY MR. STRINGER:

15        Q.    Okay.  Are you referring to the lawsuit

16   commercials?

17        A.    Yes.

18        Q.    Okay.

19              MR. STRINGER:  So I'm going to now

20   introduce what I believe is Exhibit 4.

21              (Exhibit 4 marked for identification.)

22              MR. JOHNSON:  I'm just going to move this

23   and get that up for you.

24              THE WITNESS:  Okay.  Thank you.

25   BY MR. STRINGER:

1      A.    Yes.

2      Q.    How many was that?

3      A.    Six.

4      Q.    And can you tell me about the particular

5  regimen that she received?

6      A.    Yes.  So for her, she had stage 3B

7  triple-negative breast cancer.  And so,

8  unfortunately, her risk of recurrence was high.

9  Triple-negative breast cancer tends to be more

10  aggressive.  Generally our first line of treatment

11  recommendation would include an anthracycline.

12  However, I did not feel like it was safe to give

13  that to her due to underlying heart dysfunction.

14  And so I looked at -- I did, with my training

15  experience and understanding of the literature, I

16  chose Taxotere and carboplatin for her.

17      Q.    Can you go into a little bit more detail

18  on that about that choice that you made?

19      A.    Sure.  For her, I definitely wanted to

20  use Taxotere.  If you look at the guidelines at that

21  time, Cytoxan usually -- that NCCN is the preferred

22  regimen with that.  However, there was literature

23  reviews and it was being postulated at that time

24  that those women, that that subset of population,

25  that their tumor type may behave more similar to --

Page 41

1  well, phenotypically or molecular as BRCA1

2  mutations.  So they would get some benefit out of

3  the platinum, and so that was part of my reasoning

4  for choosing that for her.

5       Q.    Okay.  Do you recall discussing the

6  regimen with Ms. Smith specifically?

7       A.    Yes.  I don't recall the details of it,

8  but out of habit and practice, before I give anyone

9  chemotherapy, I always sit down with them and have a

10  detailed discussion about their diagnosis, stage and

11  the risks and benefits of chemotherapy and our goals

12  of treatment.

13       Q.    Okay.

14            MR. STRINGER:  Because you just mentioned

15  it, I'm going to pull up the NCCN guidelines as

16  Exhibit 5.

17        (Exhibit 5 marked for identification.)

18  BY MR. STRINGER:

19       Q.    Can you see that you there, the first

20  page of this exhibit?

21       A.    Yes.

22       Q.    Can you tell me what the NCCN is?

23       A.     It's basically National Comprehensive

24  Cancer Network panel.

25       Q.    How do you use this, these guidelines?

1      A.    I actually use them in practice but I

2  also -- not everybody, unfortunately, fits into a

3  nice little category, and so when that happens in

4  practice, you have to rely on your training,

5  education, understanding of the literature to

6  formulate the best plan that you think for that

7  individual patient.

8      Q.    Okay.  All right.  So it sounds like this

9  is one reference point as you determine a regimen

10 for a particular patient?

11     A.    Right.

12     Q.    Okay.  Are the -- I'm going to move down

13 to page 46.  Actually, before I do, can you see it

14 says "Breast Cancer" in the large type in the

15 middle, and then down below, it says version -- I

16 don't know if it's I or 1?

17     A.    Yeah.

18     Q.    1.2014, 2014?

19     A.    Right.

20     Q.    Would this be the version that you would

21 have referred to at the time of Ms. Smiths's

22 treatment?

23     A.    Yes.

24     Q.    Okay.  So I moved down to page 46 of

25 exhibit PDF.  Down on the bottom right corner, it

1      A.     So the anthracycline, really, when it

2   comes to breast cancer, the anthracyclines and

3   taxanes are very active drugs for breast cancer.

4   Usually, if you have an advanced breast cancer, if

5   you can use the anthracycline, that's our typical

6   first-line therapy.

7      Q.     Okay.  But you felt that wasn't

8   appropriate in Ms. Smith's situation.

9      A.     That's right.  So one of the side effects

10  of an anthracycline is it can cause heart failure,

11  and she already had an underlying poor systolic

12  function, basically her heart wasn't pumping as

13  strongly as it should.  So I didn't want to give her

14  an anthracycline and cause worsening or lead to

15  worsening heart failure.

16     Q.     Okay.  All right.  So just to backtrack a

17  little bit, is it the regimens on the left side that

18  would be applicable, with the exception of the

19  underlying condition you just mentioned, would we be

20  looking at the left side for her potential

21  treatments?

22     A.     Yes, because she was HER2-negative.

23     Q.     Okay.  And so it was your opinion at the

24  time that the dose that -- I'm looking at the top,

25  under "Preferred regimens," that the dose-dense AC

Page 46

1      A.    It's a less aggressive regimen.

2      Q.    Okay.  All right.  And then the next two

3  down, I believe because it includes the

4  anthracycline, correct, those wouldn't be

5  appropriate?

6      A.    That's exactly right.

7      Q.    Okay.  And EC, would that have been an

8  appropriate regimen for Ms. Smith?

9      A.    No.

10      Q.    Why is that?

11      A.    Because of the anthracycline.

12      Q.    Okay.  Around then, finally, the next one

13  down, FEC/CEF, is that different from the FEC/CEF

14  above?

15      A.    It still has the anthracycline in it so I

16  wouldn't have wanted to use that for her.

17      Q.    Okay.  So we're about an hour in.  Are

18  you okay?  Do you want to keep moving forward or

19  would you like to take a break?

20      A.    I'm okay.  Thank you.

21      Q.    At the time that you treated Ms. Smith,

22  how was patient education handled in your office as

23  they were preparing for the adjuvant chemotherapy?

24      A.    Yeah.  So I presume that -- well, first

25  of all, as a physician, like I said earlier, before

Page 47

1    I prescribe chemotherapy, I always want to have that

2    discussion with them and get their verbal consent.

3    And I presume at that time as well that there was

4    also a written consent in place as well and then

5    there was also some education, some further

6    education regarding chemotherapy.

7        Q.    Okay.  Do you typically spend more time

8    discussing side effects with adjuvant chemotherapy

9    than you would with other drugs you may prescribe?

10       A.    No, if I'm giving them medications, I

11   like to go over that with them.

12       Q.    Okay.  How important do you believe it is

13   to communicate any and all potential permanent risks

14   associated with the drug?

15       A.    I do think that the patient, you know,

16   needs to know that in order to know what to expect,

17   but depending on it, a lot of times, as an

18   oncologist, we're focused on saving their life.  And

19   so that's the main focus.  A lot of times it can be

20   information overload, and so we try to go over all

21   the side effects with them but mainly focus on those

22   ones that are -- that could be life-threatening.

23       Q.    Okay.

24            MR. STRINGER:  All right.  I'm going to

25   share again.

1      A.    Most of the time, it does.  However, we

2   now know that there is the possibly side effect of

3   permanent hair loss.

4      Q.    How much time do you typically devote to

5   discussing temporary hair loss with your patients

6   prior to chemotherapy?

7      A.    I will discuss it as a possible side

8   effect.  But I'm more worried, again, about their

9   life than a cosmetic outcome.  So I tend to focus

10  our discussion on their tumor biology, either stage,

11  and what we prioritize as, you know, the more

12  important side effects.

13     Q.    Okay.  Based on your experience, are

14  patients concerned about hair loss associated with

15  chemotherapy?

16     A.    No, it seems like pretty much all of them

17  know that chemotherapy causes hair loss.

18     Q.    Okay.  So, generally, would you say,

19  then, that temporary alopecia, temporary hair loss

20  is an expected and anticipated side effect of

21  chemotherapy?

22     A.    Yes.

23     Q.    Would you say that permanent alopecia is

24  an expected and anticipated side effect of

25  chemotherapy?

1      A.     No, it's not something we usually expect.

2      Q.     How often do you encourage your patients

3   to be an active participant in deciding what

4   regimen, what chemotherapy they will receive?

5      A.     You know, if they have that option,

6   that's wonderful, but with all due respect, it is

7   not like a McDonald's menu where you can just go and

8   pick and choose which ones you want.

9          A lot of times, the regimens, there's, you

10   know, data to support that, and especially in any

11   given clinical situation, with that patient, if

12   there's one that we highly recommend that we feel

13   like that is the best regimen for them, we tell them

14   that.

15          But, of course, you know, if we do feel

16   like that, "Hey, these are two regimens that are

17   available.  Here's the side effects of this.  Here's

18   the side effects."  You know, if there's that

19   option, that's great.  But a lot of times, as a

20   physician, that's what we are trained to do is

21   choose the best for them.

22          MR. JOHNSON:  Hang on just a minute.  I'm

23   sorry.  This conference room is right next to our

24   reception area.

25          MR. STRINGER:  No problem.  I think we

1   are all used to dog barks and those kind of things.

2           MR. JOHNSON:   Those are not Mississippi

3   State fans so we won't call them dog barks.

4   BY MR. STRINGER:

5       Q.    So would you say it's important for you

6   to provide information about any permanent risk

7   association with a drug that you're aware of?

8       A.    Yes.

9       Q.    Do you feel you play a major role in

10  counseling a patient about medications?

11      A.    Yes.

12      Q.    And in doing that, is it important that

13  you have truthful and accurate information

14  concerning the risks or adverse events associated

15  with a pharmaceutical?

16      A.    Yes.

17      Q.    Okay.  Have you ever had a patient refuse

18  to follow the recommendation you've made regarding

19  chemotherapy treatment?

20      A.    Yes.

21      Q.    Can you provide me with an example of

22  when that's happened?

23      A.    Sometimes patients just have an already

24  preformed opinion about chemotherapy and sometimes

25  they'll just say, "I just don't want it, period."

Page 53

1      Q.    Okay.  And what was your --

2      A.    And I don't have that happen frequently.

3      Q.    I'm sorry.  I started talking over you.

4      A.    That's okay.  We don't -- I personally

5  don't have that to happen often because patients

6  want to live most of the time, you know.

7      Q.    Okay.  What do you -- either if you can

8  think of a specific example of that, can you recall

9  what you did in that situation?

10     A.    Well, in those situations, I think it's

11  very important to counsel them and just really spend

12  time with them, make sure that they are

13  understanding what kind of cancer they have, the

14  consequences of their choices and to answer any

15  questions they may have or also just try to

16  understand what their reasoning is behind that.

17     Q.    Okay.

18     A.    And then if they still don't want it,

19  then, you know, we're not going to force somebody,

20  you know, it's their decision.  But as long as they

21  have all of the information to make that decision.

22     Q.    Okay.  And at the time and looking at

23  Ms. Smith situation and when she was treated, at

24  that time, when you prescribed Taxotere to her, did

25  you assume that in doing so that you had been

Page 54

1    provided with true and accurate information

2    regarding side effects of Taxotere?

3        A.    Yes.

4        Q.    And at the time that you prescribed

5    Taxotere to Ms. Smith, you were not aware of the

6    potential risk of permanent hair loss; correct?

7        A.    That's correct.

8        Q.    Had you been made aware of that risk of

9    permanent alopecia at the time of her treatment,

10   would this information have factored into your

11   decisionmaking process?

12           MS. SCHULTZ:  Object to the form.

13           THE WITNESS:  No.

14   BY MR. STRINGER:

15       Q.    Would you have warned the patient that

16   Taxotere was associated with permanent hair loss?

17       A.    Yes.

18       Q.    So after presenting your patient with

19   accurate information about the risks associated with

20   Taxotere, would you honor a patient's decision to

21   not use it if they had concerns about the risk of

22   permanent alopecia?

23           MS. SCHULTZ:  Object to the form.

24           THE WITNESS:  Yes.  I mean, that's part

25   of informed consent.  I'm not going to force someone

1   to take a drug.  It may be that that patient, you

2   know, needed to see another doctor if there's a

3   trust issue regarding that.

4   BY MR. STRINGER:

5        Q.    Okay.  And would you agree that the

6   decision on the ultimate use of a chemotherapy drug

7   or regimen is a decision for the patient to make?

8        A.    Yes.  In terms of if they want the

9   treatment or not, is that the question?

10       Q.    Yes.

11       A.    Okay.  Yes.

12       Q.    So assuming they are fully informed of

13  the potential for permanent hair loss.

14       A.    Right.

15       Q.    Okay.

16            MR. STRINGER:  I actually think that I am

17  at a point where I am done for now.  So I don't know

18  if we want to take a short break and come back in

19  and turn it over to you.

20            MS. SCHULTZ:  Yeah, let's do that.  Why

21  don't we take about ten minutes and I'll get my

22  exhibits and things pulled together.  All right?

23            MR. STRINGER:  Okay.  So back just a

24  little bit after 1:30 maybe?

25            THE VIDEOGRAPHER:  The time is 2:22.  We

Page 58

```
 1    Mr. Stringer today about permanent alopecia and
 2    permanent hair loss; correct?
 3         A.    Yes.
 4         Q.    And you said that you had heard about it
 5    or learned about it, did you say about a year or two
 6    ago?
 7         A.    Maybe around that time.  I don't remember
 8    the exact date.
 9         Q.    All right.  And you said that the way you
10    learned about it was basically through seeing the
11    lawsuit commercials; is that right?
12         A.    Yes, that's correct.
13         Q.    And tell me what you recall about those
14    lawsuit commercials.
15         A.    Just basically they would come on and say
16    that if you've experienced permanent hair loss or
17    something to that effect.
18         Q.    And those advertisements were specific to
19    Taxotere and docetaxel?
20         A.    Yes.
21         Q.    Did they show any type of a picture of a
22    patient in those advertisements, do you recall?
23         A.    Not that I remember.
24         Q.    And so what was it about the seeing the
25    lawsuit commercials that then made you decide that
```

Page 59

1    you should start talking to patients?

2         A.    Yeah.  Well, actually, I just looked into

3    it.  Looked into the permanent hair loss, and so

4    that was more of it.  Regarding that information

5    changing my recommendations, it has not really

6    played a role in that.  However, I mainly discuss it

7    with them now just so that they are aware of the

8    possibility of what could happen.

9         Q.    When you say you just looked into it,

10   what do you mean by that?

11        A.    Well, just read about it.

12        Q.    And when you say you read about it, what

13   is it you were reading?

14        A.    I don't remember.

15        Q.    Do you know if there's any clinical data

16   supporting an association between Taxotere and

17   permanent hair loss?

18        A.    Would you ask that again, please?

19        Q.    Well, do you know if there's any data,

20   whether through credible studies or other

21   literature, that supports an association between

22   Taxotere and permanent hair loss?

23        A.    Not to my knowledge.

24        Q.    Have you talked with any of your

25   colleagues about any association between Taxotere

Page 69

1    more severe side effects of chemotherapy; correct?

2        A.    Correct.

3        Q.    And when you're talking to your patients

4    about the side effects of chemotherapy, are you

5    talking with them in terms of chemotherapy in

6    general or do you discuss it with each specific

7    drug?

8        A.    Really, each specific drug.  Because each

9    specific drug has some different side effects.  You

10   know, there's some chemotherapy drugs that are not

11   highly emetogenic, whereas, you know, others are

12   less.  So I try to explain those to them.

13       Q.    Based on your regular practice in 2014,

14   what would you likely have told Ms. Smith about side

15   effects from docetaxel and carboplatin?

16       A.    Those that I listed previously.  And with

17   carboplatin, really, you know, if you read side

18   effects on carboplatin, you see -- really, for any

19   medication, there's tons of side effects listed.

20   But in practice, you recognize the ones that are

21   most common and that you need to look out for.

22            So with carboplatin, again, it's main

23   effect, it can cause that bone marrow suppression to

24   where the white cell count can go down, then they

25   require transfusions.  So it's important, you know,

1  up.  And so, to my knowledge, I can't think of a

2  case where this was an issue.

3      Q.    So if a patient today that you're -- if

4  you're recommending a regimen with Taxotere and the

5  patient does not bring up hair loss as a concern of

6  theirs, what do you say to the patient about

7  Taxotere and hair loss?

8      A.    I do think it's important that they know

9  the side effects.  So, again, I'll say, you know,

10  the side effect of hair loss and -- what was the

11  question?  I'm sorry.

12      Q.    If a patient is not focused on hair loss

13  as a concern, what do you say today to patients

14  about hair loss?

15      A.    Really, that it's a potential side

16  effect.  That it's a side effect.  That I don't go

17  into -- there are other, I feel, more important

18  things to discuss unless they have questions about

19  it or it's a real issue for them.

20      Q.    So your general practice today is to

21  simply state that hair loss is a potential side

22  effect, and that's all, unless the patient asks more

23  questions for it and says it's really a concern for

24  them; is that correct?

25      A.    Right, or with Taxotere, that there's the

Page 80

1    possibility of permanent hair loss.

2        Q.    So if the patient raises that hair loss

3    is a concern for them, is that when you might warn a

4    patient about a potential for permanent hair loss?

5        A.    No, if I'm giving the drug and I'm aware

6    that there have been cases with permanent hair loss,

7    I will go ahead and disclose that then.

8        Q.    When you say if you're aware that there

9    have been cases with permanent hair loss, what do

10   you mean?

11       A.    Like right now.  Like the ongoing issues

12   with women, you know, claiming that they've had

13   permanent hair loss from Taxotere.

14       Q.    So when you're saying aware of cases,

15   you're talk can about the lawsuits; is that right?

16       A.    Yes.

17       Q.    So you are letting patients know that

18   there have been lawsuits sited concerning permanent

19   hair loss with Taxotere; is that correct?

20       A.    I don't know if I bring up lawsuits

21   associated with it.  Again, it's not something that

22   I just spend a lot of time on, unless they want to

23   know.  But I'll just mention, yes, that there is a

24   possibility of permanent hair loss, from my

25   understanding.

Page 101

1    still would have prescribed Taxotere and

2    carboplatin; correct?

3         A.    Yes.

4              MS. SCHULTZ:  I tell you what, can we

5    take a short break?  I want to -- can we go off the

6    record?

7              THE VIDEOGRAPHER:  We are now off the

8    record.  The time is 3:46.

9                   (Off the record.)

10             THE VIDEOGRAPHER:  All right.  The time

11   is now 3:56.  We are back on the record.

12   BY MS. SCHULTZ:

13        Q.    Dr. Herrington, given the stage and

14   triple-negative type of cancer that Ms. Smith had,

15   it was your opinion that she absolutely needed

16   chemotherapy; correct?

17        A.    Yes.

18        Q.    And if Ms. Smith would have refused to

19   take Taxotere due to a risk of permanent hair loss,

20   would you have referred her to a different

21   oncologist because, in your professional judgment,

22   she needed chemotherapy and she needed a

23   Taxotere-containing regimen?

24             Mr. Stringer:  Object to the form.

25             THE WITNESS:  Yes.

Page 102

1    BY MS. SCHULTZ:

2        Q.    And a Taxotere-containing regimen was her

3    only option; correct?

4        A.    Yes.

5        Q.    Is a doctor -- I'm not sure how to

6    pronounce it -- it's Q-U, in your practice with you?

7        A.    Yes.

8        Q.    Can you say -- how do you pronounce that?

9        A.    Dr. Qu.

10       Q.    Qu.  Okay.  Have you ever talked with

11   Dr. Qu about permanent hair loss from chemotherapy

12   drugs other than Taxotere?

13       A.    No.

14       Q.    If Dr. Qu believes that permanent hair

15   loss is associated with many chemotherapy drugs, is

16   that something you'd be interested in discussing

17   with him?

18       A.    Sure.

19       Q.    I want to ask you just about a couple

20   more medical records.  Let's turn to Page 5534 in

21   Exhibit 12.  This is a medical record from April 6,

22   2015.  That would have been about seven months after

23   her last chemotherapy treatment; correct?

24       A.    Yes.

25       Q.    And if you look down under "Interval

Page 103

1    History," is that a section where you get an update

2    about any problems the patient is having?

3         A.    That would be basically when they come

4    back to visit that day.  That clinic visit, rather.

5         Q.    All right.  When they are coming to visit

6    you in the clinic, you want to find out about any

7    problems Ms. Smith is having; correct?

8         A.    That's correct.

9         Q.    And you also want to find out if she's

10   still having any side effects from her chemotherapy

11   treatment; correct?

12        A.    That's correct.

13        Q.    All right.  And it looks like she reports

14   to you that she had some numbness and tingling in

15   her fingertips and toes, the right worse than the

16   left; correct?

17        A.    Yes, ma'am.

18        Q.    And she also notes that she thinks she

19   has chemo brain because, at times, she has trouble

20   recalling names.  Is that something she reported to

21   you?

22        A.    Yes.

23        Q.    And she also reported that she was having

24   occasional swelling in her -- is that --

25        A.    Lower extremity -- bilateral lower