```
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA


*******************************************************************
IN RE: TAXOTERE (DOCETAXEL)          MDL NO. 16-2740
PRODUCTS LIABILITY LITIGATION        SECTION "H" (5)
                                     February 10, 2021
This document relates to:
All cases
*******************************************************************



       TRANSCRIPT OF ORAL ARGUMENTS ON MOTIONS VIA VIDEO CONFERENCE
          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                   UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR PLAINTIFFS:                   Dawn M. Barrios, Esquire
                                  BARRIOS, KINGSDORF & CASTEIX
                                  701 Poydras Street, Suite 3650
                                  New Orleans, LA 70139



                                  Andre M. Mura, Esquire
                                  GIBBS LAW GROUP
                                  6701 Center Drive West
                                  Suite 1400
                                  Los Angeles, CA 90045



FOR DEFENDANTS:                   Douglas J. Moore, Esquire
                                  IRWIN, FRITCHIE, URQUHART & MOORE
                                  400 Poydras Street, Suite 2700
                                  New Orleans, LA 70130




                        OFFICIAL TRANSCRIPT
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR DEFENDANTS:                John F. Olinde, Esquire
                                    CHAFFE MCCALL
 4                                  1100 Poydras Street, Suite 2300
                                    New Orleans, LA 70163
 5

 6
                                    Julie A. Callsen, Esquire
 7                                  Michael J. Ruttinger, Esquire
                                    TUCKER ELLIS
 8                                  950 Main Avenue, Suite 1100
                                    Cleveland, OH 44113
 9

10
                                    Lori G. Cohen, Esquire
11                                  GREENBERG TRAURIG
                                    Terminus 200
12                                  3333 Piedmont Road, NE
                                    Suite 2500
13                                  Atlanta, GA 30305

14

15                                  Gregory E. Ostfeld, Esquire
                                    GREENBERG TRAURIG
16                                  77 West Wacker Drive
                                    Suite 3100
17                                  Chicago, IL 60601

18

19

20   Official Court Reporter:       Alexis A. Vice, RPR, CRR
                                    500 Poydras Street, HB-275
21                                  New Orleans, LA 70130
                                    (504) 589-7777
22                                  Alexis_Vice@laed.uscourts.gov

23

24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
25   PRODUCED BY COMPUTER.


                         OFFICIAL TRANSCRIPT
```

INDEX

PAGE

Accord's Motion for Summary Judgment on Preemption          5

Sandoz's Motion for Summary Judgment on Preemption         23

Sandoz's Motion to Exclude Dr. David Ross                   40

Accord's Motion to Exclude Dr. David Ross                   61

OFFICIAL TRANSCRIPT

1                    P-R-O-C-E-E-D-I-N-G-S

2                     **FEBRUARY 10, 2021**

3                    **(MOTION PROCEEDINGS)**

4

5              (The Court was called to order.)

6          **DEPUTY CLERK:** MDL 16-2740.  Counsel, please make your

7   appearances for the record.

8          **MR. MURA:** Good morning, Your Honor, Andre Mura for

9   the plaintiffs.

10         **MS. COHEN:** Good morning, Your Honor, Lori Cohen of

11  Greenberg Traurig on behalf of Sandoz.

12         **MR. OSTFELD:** Good morning, Your Honor, Greg Ostfeld

13  also on behalf of Sandoz.

14         **MS. CALLSEN:** Good morning, Your Honor, Julie Callsen

15  on behalf of Accord Healthcare.

16         **THE COURT:** Ms. Callsen, wait, you're frozen.

17         **MS. CALLSEN:** I'm frozen?

18         **DEPUTY CLERK:** Yes, there's no picture.

19         **MR. OSTFELD:** It's showing live here.

20         **DEPUTY CLERK:** There's no picture on your screen.

21         **MR. OSTFELD:** Your Honor, I see Ms. Callsen on a

22  different window labeled Tucker Ellis, and then there's a

23  separate window with her name.

24         **THE COURT:** Okay, thank you very much because that's

25  where -- okay, I see you now.


                         OFFICIAL TRANSCRIPT

1          **MS. CALLSEN:** I should have clarified, yeah, Tucker

2    Ellis.  And Mike Ruttinger is --

3          **MR. RUTTINGER:** Mike Ruttinger, Your Honor, also for

4    Accord Healthcare.

5          **THE COURT:** Okay, thank you.  All right, are we ready

6    to proceed?

7          I believe the first motion is Accord's motion for

8    summary judgment on preemption.  That's what I have.

9          **MR. RUTTINGER:** Yes, we're ready to proceed when you

10   are, Your Honor.

11         **THE COURT:** Let's go, okay.

12         **MR. RUTTINGER:** Before we begin, Your Honor, might I

13   reserve about two minutes for rebuttal after plaintiff has had

14   their response?

15         **THE COURT:** Of course.

16         **MR. RUTTINGER:** Thank you.  Good morning, Your Honor.

17   As I said, my name is Mike Ruttinger.  I represent Accord

18   Healthcare, Incorporated, and I'll be speaking to Accord's

19   motion for summary judgment based on federal preemption in the

20   *Hughes* case.

21         Now I realize this Court is familiar with the

22   standard for impossibility preemption from the *Earnest* and *Kahn*

23   cases.  But I want to be clear, though, because this is the

24   first time this Court has addressed preemption in the context

25   of the 505(b)(2) regulatory pathway.  Accord's regulatory

OFFICIAL TRANSCRIPT

1  record requires a different analysis than in *Earnest* or *Kahn*.

2          The fact that Accord Docetaxel was approved by the

3  505(b)(2) pathway alters the analysis in two ways.  First, it

4  changes the impossibility analysis.  Discovery into Accord's

5  regulatory record confirmed that Docetaxel approval under

6  505(b)(2) was conditioned on its equivalence to Taxotere in

7  every significant respect, including, labeling.  Thus, the

8  record shows it would have been impossible for Accord,

9  independently and without the FDA's cooperation, to update its

10  label to add a permanent alopecia warning before --

11          **THE COURT:** Let me ask this question really quick.  Is

12  the CBE process available to a 505(b)(2) manufacturer?

13          **MR. RUTTINGER:** So Your Honor, the CBE process is

14  available, but that sort of indicates why impossibility

15  preemption is driven by Accord's record.  The fact that Accord

16  is a 505(b)(2) manufacturer could in theory have submitted a

17  CBE does not mean in this case that it could actually have

18  independently updated its labeling because of the conditions

19  placed on it as a therapeutic equivalence during its approval

20  under 505(b)(2).  And that's because at every stage of Accord's

21  regulatory preapproval process, the FDA indicated that its

22  approval would be conditioned on maintaining the same labeling

23  as Taxotere.

24          That's shown in paragraphs 9 and 20 of our statement

25  of facts which include both the pre-IND meeting notes where FDA

1 and Accord agreed that Accord's Docetaxel would be so similar
2 to Taxotere as to warrant an A rating from the Office of
3 Generic Drugs for substitutability and as part of the approval
4 package, which is Exhibit F to our motion, in which the
5 Division of Drug Marketing, Advertising, and Communications
6 recommended as part of its internal consult that Accord revise
7 its proposed label and connect the Taxotere label.

8       The record, Your Honor, also shows that the
9 expectation of equivalence is post-approval as well as
10 preapproval.  Part of that can be seen from the fact, Your
11 Honor, that Accord's Docetaxel is listed in the *Orange Book*
12 which in its preface makes clear that its therapeutic
13 equivalence rating is assigned so long as the product meets the
14 requirements of its approved applications which, again,
15 conditioned it on equivalence.

16       And in paragraph 30 of our statement of facts, you
17 can see, Your Honor, where we refer to the fact that when
18 Accord did update its labeling to include the same warning
19 about alopecia as Sanofi, the FDA actually instructed Accord to
20 delete additional warnings regarding different risks that were
21 not yet in the Taxotere label.

22       All of this evidence, Your Honor, of the preapproval
23 process is effectively undisputed.  The preapproval process for
24 Accord's Docetaxel spanned three years before Accord's
25 application was actually approved.  Plaintiff does not discuss

OFFICIAL TRANSCRIPT

1  in their opposition, Dr. Ross does not discuss in his expert

2  report any of that.  And in fact, Dr. Ross actually clarified

3  during his deposition that he had no criticisms of Accord's

4  preapproval process.  He didn't even examine any of that.  So

5  in effect, all of that record evidence is effectively

6  undisputed.

7       Now the 505(b)(2) pathway, Your Honor, also dictates

8  a second way in which this case is different from *Kahn* and

9  *Earnest*, and that's in the different time frame it poses for

10  the question of newly acquired information.  Even if Accord

11  could have gone it alone, let's say hypothetically that Accord

12  could have used its CBE process to update its labeling, even if

13  it could have done that independently, which we don't agree

14  that it could, plaintiff's allegations present a remarkably

15  narrow five-month time period between FDA approval in June of

16  2011 and the start of Plaintiff Hughes's chemotherapy treatment

17  in November of 2011.  There is nothing in the record during

18  that narrow period to show newly acquired information as a

19  matter of law which Accord detailed in its motion for summary

20  judgment.

21       In response, plaintiff did not actually provide any

22  analysis as to whether any of the material referenced in their

23  opposition brief meets the definition of newly acquired

24  information in 21 CFR 314.3(b) which contains the definition

25  and dictates that to be newly acquired information, the

OFFICIAL TRANSCRIPT

1  predicate for a CBE labeling update, it must indicate
2  information about a greater risk, frequency, or severity.
3       Plaintiff provides no analysis as to whether any of
4  the information referenced in their opposition meets one of
5  those three requirements.  For example, they refer to journal
6  articles and case reports that are effectively additive or
7  cumulative, but there's no testimony or evidence in the record
8  that they present information about a greater risk, severity,
9  or frequency of permanent alopecia.
10      Similarly, they don't do anything to respond to the
11 fact that Accord received no adverse event reports concerning
12 hair loss in that five-month time frame.  In fact, Dr. Ross's
13 report that plaintiff put forward which theoretically details
14 the information, I believe he refers to new safety information,
15 contains no analysis or allegation that any of these meet the
16 regulatory definition of newly acquired information.
17      The focus of that report, Your Honor, is, in fact, on
18 a foreign labeling submission to the EU Medical Agency that
19 Dr. Ross himself testified during his deposition that he
20 doesn't know what information was contained or what information
21 drove that labeling update.  He simply believes the fact that
22 the labeling update itself could constitute new safety
23 information; even though plaintiff must concede that that
24 labeling update was made to an agency that operates under a
25 different set of regulations and a different set of --

OFFICIAL TRANSCRIPT

1      **THE COURT:** And I appreciate that.  I think what might

2  be pertinent in terms of what's happening in a foreign

3  regulatory process would be the fact that what information was

4  provided.  It's the information.  It's not the fact that the

5  label was ultimately changed in the European market, but what

6  information did you have in hand and was that newly acquired

7  information.

8      **MR. RUTTINGER:** Correct, Your Honor, that's absolutely

9  right.  And what Dr. Ross actually said in his deposition, the

10 only information they could point to was that it was

11 information that regarded the summary of clinical trial

12 information related to Sanofi's TAX316 study.  He admitted that

13 that was information that would have already been provided to

14 the FDA which under the 314.3 definition would indicate that it

15 cannot necessarily satisfy the definition of newly acquired

16 information.

17     And plaintiff has put forward no basis by which they

18 can actually say Accord, which has no right of reference to

19 Sanofi's clinical trial information, could have analyzed that

20 TAX316 data in any meaningful way that would have allowed it to

21 determine whether there was a greater severity, risk, or

22 frequency.

23     Now the gravamen of this five-month time frame, Your

24 Honor, is this.  We know that in June 2011 the FDA was

25 satisfied that Accord's Docetaxel warnings were adequate, or

OFFICIAL TRANSCRIPT

1  else they would not have approved it for market as a

2  therapeutic equivalent to Taxotere.   Dr. Ross himself testified

3  that he has no criticism of that preapproval process or

4  criticism of Accord's being approved as a therapeutic

5  equivalent as of June 2011.

6        So the question ultimately for this Court to

7  determine is whether there was anything in those ensuing

8  five months that demonstrated a greater risk, severity, or

9  frequency of permanent alopecia.   The record here, as Accord

10  detailed in its motion for summary judgment, shows that there

11  was no meaningful new information in that timeline.   In fact,

12  Your Honor, it's hard to imagine how there could have been with

13  a condition that is typified, permanent alopecia, as lasting

14  six months or more in a five-month time frame between approval

15  and the actual date in which plaintiff's chemotherapy treatment

16  started.

17        Further -- and we provided this in supplemental

18  authority, Your Honor, to this Court.  The Fourth Circuit

19  recently decided a case called *Knight versus Boehringer*

20  *Ingelheim* which is instructive in that it found one of the

21  following things; and it details the fact that when looking at

22  the newly acquired information analysis, it is relevant to

23  consider subsequent approvals of other products with the same

24  labeling.  In this case, several different 505(b)(2) products

25  were approved with the exact same permanent alopecia labeling

OFFICIAL TRANSCRIPT

1   that Accord had in June 2011 as recently as March 2014, years
2   after Plaintiff Hughes's chemotherapy treatment commenced.  So
3   we believe that simply underscores the fact that there was no
4   meaningful newly acquired information that plaintiff could show
5   in that five-month time period.

6           So Your Honor, because the undisputed record confirms
7   that Accord could not have updated its label to include a
8   warning about permanent alopecia, both in terms of the FDA's
9   expectations of therapeutic equivalence pre- and post-approval
10  and in terms of the lack of any newly acquired information in
11  those five-month periods, we ask this Court to hold that
12  plaintiff's only remaining warnings claim is preempted and
13  grant summary judgment in Accord's favor.  Thank you, Your
14  Honor.

15           **THE COURT:** Thank you.  Mr. Mura.

16           **MR. MURA:** Thank you, Your Honor, and good morning.

17           Let me begin with defendant's, the thrust of their
18  argument is that a 505(b)(2) is essentially a generic that has
19  to follow the label at all times, and that is false.  And the
20  FDA itself has rejected that argument several times, and the
21  FDA's positions here are binding unless clearly erroneous.  The
22  Court defers to them.  And there's no basis to disregard what
23  the FDA has said about the 505(b)(2)'s regulatory
24  responsibilities.

25           A 505(b)(2) is an NDA holder.  It is not an ANDA

OFFICIAL TRANSCRIPT

1   which is a generic drug.  And the 505(b)(2) NDA holder's
2   responsibilities are the same as those for the 505(b)(1).
3   Importantly, a 505(b)(2) NDA holder's regulatory
4   responsibilities are independent of those held by a 505(b)(1).
5   So regardless of the extent to which 505(b)(2) relies on
6   505(b)(1) for evidence of safety and effectiveness when it's
7   initially getting approved, it has independent responsibilities
8   for post-marketing surveillance, pharmacovigilance, and safety
9   and reporting to the FDA.  And this is all established.
10          There are two critical points that we made in our
11  brief that the defendants have never addressed.  One is that
12  under CBE, if you look at the language of CBE, it explicitly
13  authorizes the holder of an approved NDA to unilaterally make a
14  label change.  It does not distinguish between types of NDAs.
15  It applies to all NDAs.
16          **THE COURT:** Well, and Mr. Mura, I believe that they
17  conceded that, yes, CBE is available to 505(b)(2)s.  My
18  question, though, is there was no criticism by Dr. Ross of the
19  initial label and that process, but there has to be newly
20  acquired information.
21          And I know in the *Kahn* case, when I dealt with
22  preemption in that matter, I basically said that you cannot sit
23  on your hands with cumulating data.  It's not enough to say,
24  "Well, we don't have a new analysis; so it's not newly acquired
25  information."  You have to look at it, and you have to

OFFICIAL TRANSCRIPT

1    continually analyze it.  That's how I viewed it.

2            What newly acquired information do we have that would

3    have provided Accord the ability to use the CBE process to

4    update the label to include this additional warning?

5            **MR. MURA:** Yes, Your Honor.  Well, as Your Honor

6    recognized in your rulings, newly acquired information can

7    include the accumulation of data.  So data looks differently

8    over time, and the Court has recognized that.  *Levine*

9    recognizes that.  So you're not looking at what happens on Day

10   1 with complete blinders, blind to everything that's publicly

11   available before 2010, 2011, whatever the year may be.  That's

12   not how you examine newly acquired information.

13           But even just looking at that period, there is newly

14   acquired information, and that information includes medical

15   literature, an article by Palamaras that was published in March

16   2011 while Accord's NDA was pending.  And the article not only

17   discusses additional patients with permanent alopecia, but it

18   also reviews prior articles examining the association between

19   the drug and permanent hair loss.

20           You also have the Miteva article.  That was before

21   Ms. Hughes's administration of the drug.  And that was an

22   article published in the American Journal of Dermatopathology,

23   and it discussed the histological features of ten cases of

24   permanent alopecia after using docetaxel.  So that's, you know,

25   that's very powerful evidence.


                          OFFICIAL TRANSCRIPT

1          To the extent the defendants are saying there's

2     nothing, that's completely incorrect.  There are published

3     articles coming out that are building upon the many articles

4     that were available before and are clearly providing enough for

5     the very low threshold to present the CBE change to the adverse

6     reaction section.

7          So in addition, Your Honor mentioned the European

8     labeling, and we completely agree that that's relevant to

9     notice.  We're not saying that the fact that the Europeans

10    changed the label per se means that you have to change the U.S.

11    label, but it's evidence of notice.  And that labeling was

12    referring to Sanofi's TAX316 clinical trial data.  Some of

13    which was public.  So Accord clearly was aware of that.

14         **THE COURT:** So Mr. Mura, are you saying, just because

15    I have to tell you this has been a little -- this is different,

16    but the same.  How you like that for clear?

17         But what we have is a label that was approved

18    six months later.  So you're saying within -- because you have

19    no objection to the initial approval, the initial language in

20    the label, but within those five months that they were supposed

21    to change the label, there was something so significant that

22    would have caused them to change the label within five months?

23         **MR. MURA:** They had plenty of information --

24         **THE COURT:** And I guess I see it different from Sanofi

25    because Sanofi had this wealth of information in their

OFFICIAL TRANSCRIPT

1  pharmacovigilance area of their manufacturing, whatever, their

2  offices.  Was that available to Accord, or is Accord starting

3  over?

4            **MR. MURA:** It's not starting over, Your Honor, because

5  there's a lot of publications.  But there is also, just look

6  at -- Dr. Ross does discuss this.  Look at Accord's application

7  to the European Union which was submitted 14 days after

8  Accord's U.S. approval, 14 days.  That application contained

9  the ten-year follow-up data from Sanofi's TAX316 clinical

10  trials demonstrating the risks of PCIA.  So for Accord to say,

11  "We just didn't know this information, there's nothing new,"

12  that's absolutely false.  And obviously, Accord was well aware

13  of the ten-year follow-up data for TAX316.

14            And if you look at the European label, what is said

15  was in the study TAX316 alopecia persisting into follow-up

16  period after the end of chemotherapy.  It reports the

17  information.  And moreover, Accord's 2012 label said cases of

18  persisting alopecia have been reported.  So none of that is --

19  Accord does nothing to include that in the label.  And what

20  *Merck against Albrecht* says is courts should not get into

21  hypotheticals about, well, what would have happened if a drug

22  company had tried to change the label during a certain period

23  of time.

24            The question is:  Was the FDA fully informed, and did

25  a fully informed FDA reject a label change?  And that did not

1   happen here.  Accord did nothing during that period to try to

2   change the label.

3          I think we'd be, you know, whether we'd be in a

4   different position if Accord had tried to do something and it

5   hadn't made it in time or something like that, that's all

6   hypothetical, and that's not sufficient under *Albrecht* to

7   establish an actual and irreconcilable conflict which requires

8   agency decision-making when the agency is fully informed.  So

9   you don't have that here.

10          I understand it's a short period of time.  But I will

11  say that if we're talking about that, we're talking about the

12  right questions because the first argument of Accord is you

13  should not even be -- under Accord's theory, it doesn't matter

14  whether it was five months or five years because under Accord's

15  theory they have to have the same label as Sanofi at all times.

16          And I agree with you.  I also heard a concession that

17  they could use -- 505(b)(2) could use CBE, but then I also

18  heard arguments that they have to have a duplicate label

19  because the initial launch label was the same so they have to

20  continue.  And that's just false.  It's an independent drug

21  with independent responsibilities.

22          And you know that also because when a 505(b)(1) is

23  removed from the market, under the federal regulations, the

24  generic has to be removed from the market automatically.  And

25  the FDA has said that is not true of 505(b)(2)s.  They are

1  independent.  And the FDA also -- we cite the Woodcock letter,

2  and we cite to the Guidance which explicitly says that there is

3  not a sameness requirement for 505(b)(2)s.

4          So the only question here is just a straight-up

5  application of *Albrecht* to the facts of this case, and we

6  believe that there is sufficient information to show that

7  Accord could have used CBE.  There's no regulatory reason why

8  it couldn't have used CBE; and clearly, there was enough

9  evidence in the forms of publications, in the forms of public

10  TAX316 data which Accord itself was promoting to the European

11  commission.  It did nothing here during the relevant time

12  period to alert the FDA, and so it should not be allowed --

13  granted immunity in Ms. Hughes's case.

14          I'm happy to answer any other questions the Court may

15  have, or I can stop there.  I know I'll get another preemption

16  argument.  Thank you, Your Honor.

17          **THE COURT:** Okay, thank you.  Okay, Mr. Ruttinger.

18          **MR. RUTTINGER:** Just a couple quick points in

19  response, Your Honor.

20          First, let me be clear about this point about the CBE

21  pathway of Accord because I heard plaintiff's counsel suggest

22  here that, you know, I think they describe it in our briefing

23  as a category error and that they're suggesting we're arguing

24  that 505(b)(2) requires some sort of per se preemption rule.

25  That's not our position, Your Honor.

OFFICIAL TRANSCRIPT

1          Our position is that Accord has a unique regulatory

2    record that shows it could not have used the CBE process to

3    independently change its label which is the standard for

4    determining impossibility under preemption.

5          **THE COURT:** Why not?  Why not?

6          **MR. RUTTINGER:** Because, Your Honor, the FDA's

7    conditioning of Accord's Docetaxel as a therapeutically

8    equivalent product so much so that it is in the *Orange Book*

9    which in the FDA's own guidelines prefacing the *Orange Book*

10   state that that substitutability can only be maintained so long

11   as it follows the initial conditions of the approval.

12         Here, the initial conditions of the approval show

13   that the FDA expected equivalence, not only in terms of

14   Accord's doses, active ingredients, methodology of dispensal,

15   but also, in terms of its labeling.  So had Accord submitted a

16   CBE update, as it could have under the regulation, it would

17   have required a back and forth with the FDA at that time to

18   determine whether different labeling was appropriate at a time

19   that Sanofi had not included itself for the Taxotere.

20         We don't know what the ultimate outcome of that

21   discussion would have been.  But Your Honor, the Supreme Court

22   addressed that very point in the *Menseng* case when it says --

23         **THE COURT:** But that was a 505(j) company.

24         **MR. RUTTINGER:** *Menseng* was a 505(j) case, Your Honor,

25   but that fact does not drive the actual preemption holding in

OFFICIAL TRANSCRIPT

1 *Menseng*.  So when the Supreme Court talks about preemption, the

2 rules it uses to determine impossibility are for all

3 situations, not just for drugs.  Thus in *Wyeth versus Levine*,

4 the Supreme Court discussed brand drugs.  In *Menseng*, they

5 discussed 505(j) generic drugs.  In *Merck*, they discussed a

6 different posture entirely which is when the case is actually

7 on summary judgment versus a motion to dismiss.

8 　　　　But the test for impossibility is the same at every

9 stage, and it's to determine whether or not the defendant, the

10 drug manufacturer, could have done what state law requires

11 independently on its own without the cooperation or assistance

12 of the FDA.  If it cannot do that independently, that's when

13 the Supreme Court instructs any state law claims to be

14 preempted.  So our position is that Accord's --

15 　　　　**THE COURT:** The first question I asked you was whether

16 or not the CBE regulation was available to your 505(b)(2), and

17 I believe you said yes.  But now I'm hearing no.

18 　　　　**MR. RUTTINGER:** No, Your Honor.  We are saying yes,

19 and I stand by that.

20 　　　　But the fact that the CBE regulation was available to

21 Accord does not, Your Honor, mean that Accord could

22 independently have changed that label.  It means that it could

23 have submitted a CBE.  But based on Accord's regulatory

24 history, we don't know what the outcome of that would have

25 been.  We don't know that the label could have been changed

OFFICIAL TRANSCRIPT

1  independently because --

2          **THE COURT:** But isn't that the question on preemption,

3  that you could not have?  So you're saying, "We could have

4  submitted it.  We just don't know what the answer would have

5  been."

6          **MR. RUTTINGER:** Exactly, Your Honor.

7          **THE COURT:** Isn't that impossibility preemption is,

8  "We know the answer because they told us no"?

9          **MR. RUTTINGER:** Your Honor, the answer to that

10  question --

11          **THE COURT:** Maybe I'm -- okay, go ahead, I'm sorry.

12          **MR. RUTTINGER:** If it would be helpful, Your Honor,

13  let me actually quote from *Menseng* where they discuss this

14  because the plaintiffs in *Menseng* advanced this exact same kind

15  of argument where they said, well, maybe the 505(j) in that

16  instance could have done something, maybe it could have reached

17  out to the FDA, and we don't know what would have happened.

18          And the Supreme Court said, "We can often imagine

19  that a third party or the federal government might do something

20  that makes it lawful for a private party to accomplish under

21  federal law what state law requires of it," but it rejected

22  that argument.  "If these conjectures suffice to prevent

23  federal and state law from conflicting for Supremacy Clause

24  purposes, it's unclear whenever, outside of express preemption,

25  the Supremacy Clause would have any force."

OFFICIAL TRANSCRIPT

1          So the possibility of maybe the manufacturer could
2   have independently or could have changed its label with the
3   FDA's help is not enough to evade an impossibility defense
4   under the Supreme Court's precedent.
5          Your Honor, I want to address just one more quick
6   point about newly acquired information here, and that's that,
7   you know, plaintiff has referenced the Miteva article and I
8   think it's the Palamaras, sorry if I mispronounce that article.
9   What these articles show, Your Honor, in the opposition is that
10  they reference case reports.  In one of the instances, they
11  reference, I think, six case reports about permanent alopecia.
12          What plaintiffs have not done, Your Honor, is detail
13  anything to show how those case reports offer information of a
14  greater severity, risk, or frequency than the same information
15  that had already been submitted previously.  At that point,
16  this information might be cumulative, it might be additive.
17  You know, we understand Your Honor's rule under *Earnest* and
18  *Kahn* that cumulative information might potentially constitute
19  newly acquired information, but plaintiff needs to do something
20  to show how that actually shows a greater risk, severity, or
21  frequency.  We don't think they've done it here.
22          Similarly, with the EU labeling submission, you know,
23  they've said, well, the EU label submission goes to notice and
24  that it was submitted 14 days after Accord's approval.  What
25  they haven't shown is that it actually was driven by any

                        OFFICIAL TRANSCRIPT

 1  different or new information.  In fact, Your Honor, when
 2  Dr. Ross was asked about that label, he specifically testified,
 3  you know, "No, I don't know whether the EU was given
 4  information different than the FDA."

 5          And based on what plaintiff has shown about the EU
 6  label, there's nothing in the record to suggest that it
 7  contained anything new or different from a data perspective
 8  that was different than what the FDA already had.  So we do not
 9  believe that can constitute newly acquired information as a
10  matter of law.  Thank you very much, Your Honor.

11          **THE COURT:** Okay, thank you.  Just give me a second
12  before we go to the next one.  My
13  whatever-you-call-these-things are not working properly.

14          All right, now we have Sandoz's motion for summary
15  judgment on preemption.  Ms. Cohen, are you making that
16  argument?

17          **MS. COHEN:** I was going to just take a moment to
18  introduce Mr. Greg Ostfeld because he's not been part of our
19  core team and hasn't met you before, but it's my pleasure to
20  introduce Greg.  He's with our Chicago office and has
21  experience in the space of pharmaceutical preemption.  He told
22  me not to overplay his experience, but I did want to mention
23  we're proud to have him here presenting for us, and I just
24  wanted to give you a chance to meet him.

25          **MR. OSTFELD:** Thank you, Your Honor.

OFFICIAL TRANSCRIPT

1          **THE COURT:** Welcome.

2          **MR. OSTFELD:** Thank you.  I specifically asked

3    Ms. Cohen to describe me as mediocre so that I could only

4    perform on the upside.  It's a pleasure to be here.

5          And Your Honor, if it pleases the Court, I'd also

6    request to reserve two minutes for rebuttal time.

7          **THE COURT:** Of course.

8          **MR. OSTFELD:** Thank you, Your Honor.  Greg Ostfeld on

9    behalf of Sandoz, Inc.  Your Honor, our motion for summary

10   judgment truly is a single issue motion on an issue that this

11   Court has not yet considered.  But Your Honor used a phrase

12   that I think is really good which is different, but the same.

13   I think that's exactly right.

14          This issue is the same in the sense that it is a

15   newly acquired information analysis which Your Honor has

16   undertaken twice before, but it is different in the sense that

17   you are dealing with a different manufacturer, a different

18   version of docetaxel with a different approval date for its

19   label, and access to different information.  So it is really a

20   very different context that changes the entire context of the

21   analysis from what you looked at in the *Earnest* and *Kahn* cases.

22          And the question here is really:  Was there any newly

23   acquired information after the approval of Sandoz's label in

24   June 2011 to support a label change under the CBE regulation?

25   And we respectfully submit that there was not.  The record here

OFFICIAL TRANSCRIPT

1  establishes that Sandoz could not change its label without

2  violating federal law, and plaintiff's claims as to Sandoz are,

3  therefore, preempted.

4          I'd like to begin with a time frame point because I

5  do think that's an important one.  It matters a lot when the

6  label was approved.  The CBE regulation allows changes in the

7  labeling to reflect newly acquired information to add or

8  strengthen a warning.  Because the regulation is addressed to a

9  label change, the starting point has to be the date of label

10 approval.  You cannot have a change to a label until you have a

11 label of record.  And for Sandoz, that was in June of 2011 was

12 when we had our label of record.

13         So whereas in *Earnest* and *Kahn*, Your Honor was

14 starting at 1996 and was looking at the accumulation of data by

15 the brand manufacturer from 1996 until the endpoints of those

16 two cases which were 2011 for *Earnest* and 2008 for *Kahn*, here,

17 your starting point is June 2011 when the Sandoz label was

18 approved, and the endpoint is September 2014 when the plaintiff

19 completed her treatment.  Within that time frame, you're

20 looking at a very different record.

21         Bearing in mind, and I agree with my colleague on

22 this one, newly acquired information is information not

23 previously submitted to FDA that reveals risks of a different

24 type or greater severity or frequency than was previously

25 included in the submissions to the FDA.  Here, if you're

OFFICIAL TRANSCRIPT

1  looking at the post-June 2011 time frame, that completely
2  shifts the analysis from what Your Honor was looking at in the
3  two previous cases.  In fact, Your Honor's analysis in the two
4  previous cases illustrates how much the question is different.

5      As Your Honor noted in *Earnest* and *Kahn*, by 2011, the
6  FDA had a lot of information that plaintiffs had, in fact,
7  pointed to in those cases and that plaintiff in this case has
8  pointed to as reflecting the permanent alopecia risk.  You have
9  the TAX316 results, both the interim and the final results.
10 You have the GEICAM 9805 study.  You had the Nabholtz article.
11 You had the Sjostrum article.  All of which Your Honor
12 discussed in either the *Earnest* case or the *Kahn* case or both.

13     You also have plaintiff's own submissions in this
14 case pointing to the large body of public information that was
15 already before the FDA prior to June 2011.  They cite to six
16 articles.  They identify at least three FAERS safety signals,
17 including, they say in 2010, a safety signal that simply
18 remained the same and showed up again in 2012.  And they point
19 to foreign labels that were based on the TAX316 results.

20     I agree with Your Honor that the foreign label change
21 itself is of no import, but the data that was the basis for the
22 label change could matter whether it was newly acquired
23 information.  Here, based on their own statement of material
24 facts, the data that was before the European agencies was the
25 TAX316 results which were the same results that were before the

1   FDA well before June 2011.  So the FDA had all of this
2   information in June 2011 when it approved Sandoz's label.  And
3   there's nothing in the record that discloses any newly acquired
4   information after June 2011, meaning, information revealing
5   risks of a different type or greater severity or frequency.

6            Plaintiff spends a lot of time refuting arguments we
7   didn't raise in our brief, but they do spend several pages on
8   what they identify as the newly acquired information.  They
9   don't do any work to identify how it is newly acquired.  I
10  heard plaintiff's counsel state in the previous argument that
11  accumulating data matters, and it can matter.  But I think the
12  point is also quite relevant, it cannot be that every time a
13  new study is published we have to run to the FDA and say,
14  "There's been a new study.  Can we now change our label?"  Then
15  there's another study, and we run again to the FDA.

16           The data that is accumulating has to disclose
17  something of a different type or greater severity or frequency.
18  It cannot just be more of the same.  And plaintiff, there's no
19  evidence here in the record that there was anything other than
20  more of the same between June 2011 and September of 2014.

21           The plaintiff cites seven additional articles which
22  are essentially more observational studies or a speech or a
23  literature review simply additive to, but not revealing
24  anything new or different from the pre-June 2011 literature.
25  They point to a 2012 FAERS safety signal which according to

OFFICIAL TRANSCRIPT

1  their own statement of material facts was simply duplicative of
2  the 2010 safety signal.  They point to the foreign label
3  updates identifying that there were foreign label updates both
4  prior to June 2011 and post-June 2011.  All of which were based
5  on the TAX316 study.

6          And then they point to a grand total of two adverse
7  event reports from Sandoz's global safety database which they
8  do not identify anything to show that these adverse reports
9  were anything different or worse than earlier adverse event
10  reports.  Indeed, neither is even a permanent alopecia adverse
11  event.  One was a report of unrecovered alopecia, and the other
12  was a report of male pattern baldness.  Neither of which they
13  can identify as pointing to a safety signal much less as
14  something new or different post-June 2011 to support a label
15  change.  So these do not qualify as newly acquired information,
16  just additional iterations of the pre-June 2011 data that the
17  FDA already had.

18          The last point I'd like to address, Your Honor, is
19  you identified the question for preemption purposes as, "We
20  know the answer because they told us no."  So the question is:
21  Did we have to go to the FDA and have them tell us no before we
22  can make this preemption argument?  And I would respectfully
23  submit that under the circumstances here, the answer to that
24  question is no, because you can't go to the FDA and get an
25  answer until you have a question that you are permitted to ask.

OFFICIAL TRANSCRIPT

1  Under the federal regulations --

2        **THE COURT:** I agree.  I mean I think that's the second

3  question that you have to -- we have to get past the first one.

4  So I agree with you.  I agree with you.

5        And that's only after you had the newly acquired

6  information, and it could be a review of accumulating data.

7  You know, if you have more case reports and you're starting to

8  see more frequency with this adverse event or -- and that has

9  been my concern is are you looking at the data, are you

10  analyzing the data such that you realize, "Well, this is new

11  information."

12        And I believe that's what I, you know, that was the

13  point I tried to make in the *Kahn* case that you cannot just

14  ignore it and say, "Well, we have no analysis."

15        **MR. OSTFELD:** Fair enough, Your Honor, and -- sorry.

16        **THE COURT:** No, please proceed.

17        **MR. OSTFELD:** All right.  And respectfully, Your

18  Honor, all I would submit here is we went through the data, all

19  of the data that Dr. Ross cites in his report, and we

20  demonstrated that it did not point to any risks of a different

21  type or greater severity or frequency than was already there

22  prior to June of 2011.  So the accumulating data analysis,

23  there's just no evidence to support -- the fact that there were

24  additional studies of a much smaller scale than the already

25  existing TAX316, the fact that there were two new adverse event

OFFICIAL TRANSCRIPT

1   reports in the context of a large patient population that is

2   still receiving new treatments from docetaxel, none of that

3   indicates a signal of greater severity or frequency of

4   permanent alopecia.  It just means that there were additional

5   cases which you would expect simply with the passage of time.

6          And even under Dr. Madigan, their own expert's

7   analysis, he says the 2012 FAERS safety signal was simply a

8   perpetuation of the 2010 signal, not greater frequency, not

9   greater severity, more of the same.

10          So under these circumstances, Your Honor, I

11   respectfully submit we didn't have the newly acquired

12   information necessary to ask the question to the FDA;

13   therefore, we could not make the CBE submission without

14   violating federal law.  Under those circumstances, Sandoz could

15   not simultaneously comply with its labeling obligations under

16   federal law and the obligations that plaintiff is claiming we

17   had under state law, and plaintiff's claims are, therefore,

18   preempted.

19          **THE COURT:** Thank you.  Mr. Mura.

20          **MR. MURA:** Thank you, Your Honor.  I won't retread new

21   ground unless the Court has more questions about the

22   differences between 505(b)(2)s and 505(b)(1)s and generics.

23          **THE COURT:** I don't think Sandoz raised those same

24   arguments.  I think they focused on whether or not there was

25   newly acquired information so that they could proceed under the

OFFICIAL TRANSCRIPT

1    CBE process.

2              **MR. MURA:** Right.

3              **THE COURT:** And that's the thing that, I think, last

4    time I told you that troubles me because we had an approved

5    label in 2011.  And so I think we have to look from there

6    forward as opposed to what we did in Sanofi which was a

7    label -- at least speaking to this issue -- from the 1990s.

8              **MR. MURA:** Your Honor, I think you look at that

9    information, but you don't look at it in a vacuum because it's

10   not information that just exists and they can put blinders on

11   and ignore everything that happened before.  That information

12   all -- even the medical literature is all building on

13   literature that exists, and so it's taking on a new character.

14             And that's what *Levine* says.  Maybe one adverse event

15   report doesn't tell you much, but two, three, four.  At a

16   certain point, the drug company is on notice.  And because it's

17   the primary responsibility of the drug company to make sure its

18   label is accurate, it has to take action.  And *Albrecht* is very

19   clear.  If you don't take that action, if you don't ask and get

20   a no, you're not entitled to preemption.  That's why preemption

21   is a demanding defense.

22             So I think -- I was glad to hear that Sandoz thinks

23   there was plenty of evidence for Sanofi to update its labels,

24   and they pretty much endorsed all your rulings and all those

25   analyses, but somehow Sandoz thinks --

                        OFFICIAL TRANSCRIPT

1       **THE COURT:** I wouldn't go that far.

2       **MR. MURA:** I liked what I heard, and I think it was
3  complimentary of your ruling.  I don't mean to put words in
4  Mr. Ostfeld's mouth.  I did think they were quite complimentary
5  and supportive of the idea that Sanofi could have updated its
6  label, but somehow Sandoz thinks it had no basis to update its
7  label.

8       But we're talking about a label update that would
9  have happened as late as 2014.  I mean it's quite a stretch in
10 this context when the FDA approved the CBE update in 2015 to
11 say that Sandoz couldn't have gone to the FDA one year earlier.

12      And we do cite quite a bit of information that
13 occurred between 2011 and 2015.  I mean this is quite a record.
14 You have the medical literature that we've discussed before,
15 and I won't go over that again.  But you also have an analysis
16 of the FDA's Adverse Event database.  And we have Dr. Madigan's
17 regression analysis which showed evidence of increased
18 reporting rate of docetaxel for all other drugs.  So you have
19 this evidence.

20      And *Levine* itself said, again, that multiple adverse
21 event reports could, in fact, provide a basis to update the
22 label, and you have that here.  You absolutely have that.

23      And finally, Sandoz internally updated its Company
24 Core Data Sheet for Docetaxel on November 11, 2013.  That's the
25 document that houses information about warnings for the drug.

OFFICIAL TRANSCRIPT

1    And so based on this evidence, Sandoz went ahead and updated
2    its labeling in many other countries, but it didn't update its
3    labeling in the U.S.  And this was as early as 2013.  So for
4    Sandoz to say, you know, we just had no indication, no basis to
5    even go ask the FDA to provide an increased warning of adverse
6    reactions, which is a very low threshold, adverse reactions,
7    it's simply counterfactual especially when the FDA one year
8    later approved the CBE change.

9            So if Sandoz's position is, yes, we could have
10   submitted a CBE because nothing prevents us from doing so and
11   the only question is did we have some basis to do so, well,
12   obviously, they did because there's a lot of evidence occurring
13   before 2014.  So we don't think this is a close question.

14           And that's even just looking at the evidence in 2011
15   to 2015 with blinders on based on what the company knew.  But
16   you know, we don't think it's appropriate to just look at that
17   evidence with blinders on.  Clearly, if nothing had happened in
18   the intervening years, then yes, obviously, that previous
19   information would be static.  But quite a bit happened, and it
20   built on that information, and we know the answer of what the
21   FDA did.  The FDA updated the label.

22           And Your Honor, I'll just mention we are not sort
23   of -- you're not on an island here, I mean, to the extent that
24   this is new to the litigation.  I mean none of this sort of
25   analysis is new.  If the Court follows the logic of its

OFFICIAL TRANSCRIPT

previous analysis and considers the same evidence, the same
evidence is present here.

And we're not aware of any court to have granted
preemption to a 505(b)(2) based on some theory that its
responsibilities are different from a brand name drug.  And the
only case out there is the *Carter* case which we cited which is
fully supportive of our position that you treat 505(b)(2)s just
like brand name drugs because they are a brand name drug.
They're an NDA holder.

So if you just apply the *Albrecht* analysis, we don't
think they can meet the first prong of *Albrecht*, but clearly,
they can't meet the second because they never asked and the FDA
never said no.  And so this whole idea of, "We don't know what
the FDA would have said in 2014," that is absolutely dead on
arrival after *Albrecht* because that was what *Albrecht* was
saying.

**THE COURT:** I have to tell you, I'm not, I'm not --
that's not where I am troubled --

**MR. MURA:** Okay.

**THE COURT:** -- about this entire analysis.  I am
troubled about the newly acquired information requirement in
the CBE process.  That's what I'm troubled about.

And what is difficult in my analysis, you know, in my
review of the briefing in my analysis is we had a label
change -- a label that was approved by the FDA in 2011.  And so

OFFICIAL TRANSCRIPT

1  something -- I think you cannot then reach back unless, you
2  know, it's accumulating data that you have.  I think it's got
3  to be something that occurred between 2011 and 2014.

4       We didn't have that in Sanofi, you know.  The label
5  as to this stayed the same from the beginning.  But here we
6  have an approved label in 2011, and then in 2014, this lady
7  received treatment.  And so it was what changed between that
8  period of time.

9       **MR. MURA:** Right.

10      **THE COURT:** And that's what my concern is.

11      **MR. MURA:** Yeah, and I'm happy to review that evidence
12 again, but I think I've gone over some of that evidence.  And
13 most powerfully, it's the updating of the Company Core Data
14 Sheet in 2013.  It's the adverse event reports.  It's changing
15 the European labels.  Clearly, there was notice on this record,
16 and we're talking about a year's difference between 2014 and
17 2015 when the label was updated.

18      So clearly, you know, defendants here could have gone
19 to the FDA and asked, and I think we all know what the answer
20 would have been; although that's not the question.  The
21 question is not hypothetically what the FDA would have done,
22 but I think it's pretty obvious here what the FDA would have
23 done.

24      And I will say that when the FDA is approving the
25 505(b)(2)s, they're not doing an entire new review in the way

OFFICIAL TRANSCRIPT

1   that they do with a brand new drug, right, and so I think

2   that's an important consideration.  Because it's a bit unfair

3   to put it on the FDA and say, "Well, you approved this in 2011;

4   so we can't even think about the evidence before."  That's sort

5   of treating the FDA's decision as something that it's not.

6          This is a streamlined procedure where the FDA says,

7   "We have limited resources; so Congress is going to give us

8   this streamlined procedure where we allow new entries to the

9   market.  You're responsible for your drug, but we'll allow them

10  to come onto the market in this streamlined process because the

11  drug has already been on the market."

12         And it's quite something to suggest that Sanofi --

13  the Court has said many times Sanofi cannot just inundate the

14  FDA with information and then say preemption.  Sanofi has to

15  take some action based on the information to alert the FDA for

16  CBE.  Well, if that's the case -- and we absolutely agree with

17  that, and that's *Levine* and that's *Albrecht*.  That's very clear

18  on the law -- then it makes no sense to say, well, the FDA

19  approved in 2011 this label.  Even though Sanofi is just

20  inundating it with information, we're going to give a 505(b)(2)

21  preemption.  That's completely contrary to the way the

22  framework works.

23         They're allowing this drug on the market because it's

24  been on the market because they haven't heard from Sanofi that

25  there's a problem.  There's no basis if there's new

OFFICIAL TRANSCRIPT

1   information, which there is here that's building upon earlier
2   information, to grant preemption to a company on these sets of
3   facts in 2014 when they knew quite a bit about the drug.
4          **THE COURT:** But Mr. Mura, do you have any law that
5   tells me I can reach back into the original manufacturer's
6   frame of knowledge to -- do you have any law that says that you
7   have to consider what the original manufacturer knew or what
8   analysis or failure to analyze should have done to impute that
9   knowledge to a 505(b)(2)?  I don't know if that question --
10   anyway.
11          **MR. MURA:** Yeah, and let me be clear.  We're not
12   saying you don't need to look at anything post-approval.  Just
13   do this based on Sedlacek, for example, that is not our
14   argument.  So we are not saying that.
15          But just the definition of newly acquired information
16   itself and *Levine* interpreting what that regulation means is
17   that that regulation means it's information that accumulates
18   over time.  So we are pointing to information that has
19   accumulated over time post-2011.  I think that information is
20   more than enough to support a label change.  It's supported --
21   I mean to provide notice.  I mean the company notified all
22   sorts of countries in Europe and did nothing to notify the FDA.
23          And again, this is a one-year difference between the
24   label and 2015, the update that the FDA approved of, and 2014.
25   So this, to us, is not a close call on this record.  If the

OFFICIAL TRANSCRIPT

1   Court's question is, is there information for you to go to the
2   FDA, there absolutely was on this record.
3               **THE COURT:** Thank you.  Mr. Ostfeld.
4               **MR. OSTFELD:** Thank you, Your Honor.  I think I can be
5   fairly brief.  First, at the risk of disappointing Mr. Mura, I
6   feel like I should probably confirm that we're not endorsing
7   plaintiff's theory of liability.  What we are saying here is
8   that consistency matters.
9               If you accept plaintiff's premise that there was
10  enough information prior to June 2011 to support the label
11  change, then the question you have to ask in the context of
12  Sandoz is what changed after Sandoz's label was approved in
13  June 2011.  What happened post-June 2011 that didn't exist
14  pre-June 2011 that would constitute newly acquired information
15  to support a label change?  And I don't think Mr. Mura got
16  there in terms of identifying what that was.
17              He pointed to the Core Data Sheet and the foreign
18  labels.  But as we previously discussed, that was all based on
19  the Sanofi side on the TAX316 study which it's undisputed the
20  FDA had all of that in front of it before June 2011.  So the
21  fact that certain foreign labels prior to June 2011 contained
22  permanent alopecia information and that certain labels
23  post-June 2011 were updated to include permanent alopecia
24  information doesn't alter the fact that all of that was based
25  on a study that was in front of the FDA prior to June 2011.

OFFICIAL TRANSCRIPT

1   And in Sandoz's case, its foreign labels updated because
2   Sanofi's foreign labels updated.  So there's nothing to suggest
3   that Sandoz had newly acquired information that led to the
4   update of its labels.

5         I think the other point that is worth addressing is
6   the question of what changed in 2015.  Mr. Mura said over and
7   over again it's just one year later, one year later the label
8   changed.  Well, something awfully significant happened between
9   2014 and 2015 as Your Honor knows from the submissions from
10  your prior cases and from the undisputed factual record which
11  is the FDA went to Sanofi and asked them to do an updated
12  analysis of permanent alopecia which Sanofi did from, I believe
13  it was, February to October of 2015, months after the plaintiff
14  in this case concluded her treatment.  And then through that
15  analysis, they came across sufficient data to persuade the FDA
16  that the time had come to add that one sentence addition to the
17  label.

18        **THE COURT:** I think the FDA said, "You're going to
19  have to do something."  That's my recollection is the FDA
20  precipitated all of this.

21        **MR. OSTFELD:** Right, correct.  They precipitated the
22  updated analysis by Sanofi, and they updated the label change.
23  And that is when the label change happened based on a new
24  analysis, and then that is where the newly acquired information
25  kicks in was 2015 based on the updated Sanofi analysis.  And

OFFICIAL TRANSCRIPT

1   then you do have Sandoz promptly following Sanofi's label

2   change and undertaking that label change.  All of this was well

3   after the September 2014 endpoint for your analysis in this

4   case.

5          So on that basis, Your Honor, there was no newly

6   acquired information.  There wasn't an accumulation that

7   revealed threats or risks of a new or different type or greater

8   severity or frequency.  We didn't have the data we needed to

9   ask the question of the FDA.  Therefore, we couldn't ask the

10  FDA to provide us with an answer because we didn't meet the

11  threshold under federal law to go in and propose a label

12  change.  And under those circumstances, preemption applies.

13          **THE COURT:** Thank you.

14          **MR. OSTFELD:** Thank you, Your Honor.

15          **THE COURT:** I believe the next motion to be argued is

16  Sandoz's motion to exclude Dr. Ross.

17          **MS. COHEN:** That is correct, Your Honor.  I just

18  wanted to check, can you-all hear me okay soundwise?

19          **THE COURT:** I can.

20          **MS. COHEN:** I know Your Honor has heard scores of

21  *Daubert* motions already in this litigation, and so I'm going to

22  try obviously not to rehash anything or cover things like the

23  legal standard.  I know that's ingrained in your head and

24  everyone else's.

25          I do think that this motion, you know, this is

OFFICIAL TRANSCRIPT

1   obviously our FDA regulatory day today.  I would much rather,
2   and I know you would much rather, have us all there in person
3   to do this live; and we hope next month with all of the
4   remaining ones we'll be there with you, or we'll talk about
5   that at another time.  We're trying to at least move things
6   along here.  And with this motion in particular, given the
7   preemption arguments, we thought, you know, it was a good time
8   to at least argue this because there is, you know, a good
9   interplay.

10          And while I'm not going to have a cat filter or
11  anything like that, with Your Honor's permission, I would like
12  to at least use a PowerPoint if that's okay.  We emailed it to
13  counsel.

14          **THE COURT:** That's fine, Ms. Cohen.  The problem I
15  have -- and Cherie, you might need to assist me -- I have, I
16  think, 20 screens open.  So you're about this big, and I think
17  I would have difficulty seeing your PowerPoint.

18          **MS. COHEN:** Should we try it?  I think we did a test
19  with Ms. Stouder earlier.  Again, if it's not going to distract
20  or bother the Court, we can at least pop it up and see what you
21  think.  I think it showed up large screen.  And it might just
22  be helpful here, again, just to change things up a bit, and
23  also, because some of the issues we're going to argue, again,
24  not rehashing anything in the past.

25          **THE COURT:** You can try.  My problem -- Cherie, how do

                    OFFICIAL TRANSCRIPT

 1  I get rid of some of these people that are on my screen?

 2       **DEPUTY CLERK:** Maybe if we can change -- in the upper

 3  right corner, does it say "view"?

 4       **THE COURT:** Wait, let me put my mask on and get Sam

 5  over here.

 6       **MS. COHEN:** I'm sorry to take the time.

 7       **THE COURT:** No, no, no.

 8       See, Sam, this is my problem.  She's about this big,

 9  and I don't think it would help me at all to --

10       **DEPUTY CLERK:** Sam, can you change the view to maybe

11  speaker view?  I think it's probably on gallery view.

12       **THE COURT:** It is.  Oh, there we go.

13       **DEPUTY CLERK:** Is that better?

14       **MS. COHEN:** I'm larger now?

15       **THE COURT:** Okay, I wish I would have known this last

16  time because that's why I kept taking my glasses on and off.  I

17  couldn't see.

18       **MS. COHEN:** I'm a little frightened to know how large

19  I am on your screen now.

20       **THE COURT:** You're still smaller in size on the screen

21  than you are in person.

22       **MS. COHEN:** Okay.  So we're going to pop this up, Your

23  Honor.  Again, I'm happy to obviously answer questions and have

24  a hot bench as much as you want.  I don't want this to be a

25  distraction.  But I thought given that the arguments are,

OFFICIAL TRANSCRIPT

1  again, we're trying to make some new arguments here just about,
2  really about Dr. Ross's qualifications and methodology.
3          And can you see this now on the screen?  Is that
4  working?
5          **THE COURT:** Yes, I can.
6          **MS. COHEN:** Okay, great.  And so again, you know, I
7  think plaintiffs, in their opposition, say that we filed a
8  scattershot motion to rehash arguments.  That is not our point
9  here.  Our point is, I think to quote you, obviously, it's the
10 same, but different.  The same being it is another FDA
11 regulatory expert that we're moving to exclude, and we're
12 moving in the entirety, not just parts of Dr. Ross.  I'll break
13 it up in my argument.
14         But he's a very new witness in terms of he's
15 obviously never been before Your Honor.  He's not Dr. Kessler
16 in a number of very significant ways that I'll get to.  You're
17 going to be seeing him as a replacement for Dr. Kessler.  I
18 know in the *Kahn* case as well he has been proffered.  So I
19 think this is an important motion that goes to a number of
20 issues.
21         Again, this is a picture of Dr. Ross from his
22 deposition.  He was deposed by Sandoz and Accord, and you'll be
23 hearing from Ms. Callsen shortly as well on their points which
24 are similar in some respects as well.  Mainly, he's being
25 proffered, again, as a 505(b)(2) regulatory expert to talk

OFFICIAL TRANSCRIPT

1   about regulatory obligations under the 505(b)(2) section and
2   whether Sandoz met those obligations.  There are other
3   extraneous issues which I'll get to if time permits.  But
4   that's the heart of what he's being proffered for, and that's
5   what he was announced to us as.

6            Now in contrast, and I only mention this briefly, we
7   have a 505(b)(2) expert, Dr. Williams, Roger Williams, who is
8   not being challenged by the plaintiffs, and there are reasons
9   for that.  And it goes to qualifications and methodology which
10  is the heart of our objection to him that I want to cover
11  today.

12           Again, his proffered opinions are on the 505(b)(2)
13  regulatory obligations.  Going back to his FDA experience, this
14  really goes to his qualifications which is Point 1, he was
15  there for 10 years, yes.  His time at the FDA ended 15 years
16  ago.  He did one year only in oncology.  His focus was on
17  anti-infective drugs, and he's not really recognized as a
18  505(b)(2) expert.  Now plaintiffs make much in their opposition
19  saying he went to Yale, he's qualified, he should be able to
20  testify, why are you even raising qualifications.  And I'll
21  say, Your Honor, the reason is he's not qualified in this case,
22  and I'll get to that point.

23           So it's not just is he a smart guy, is he qualified
24  on regulations.  He's not qualified in this case as being the
25  505(b)(2), you know, as the heart of the case, and we look at

1   his concessions in his various deposition testimony.  This is
2   in our briefing, Your Honor, and I know it's a busy slide, but
3   I'll point out a couple of them.  He basically says when he was
4   at the FDA, he doesn't recall having anything to do with
5   revisions to any regulations regarding 505(b)(2).

6          He doesn't recall signing off on any 505(b)(2)s.  He
7   doesn't recall how much time he spent -- there were relatively
8   few in that era when he was there.  He doesn't remember
9   specific NDAs, and nor could he say were any of them related to
10  505(b)(2)s because it was a long time ago.  At most, he was a
11  secondary or tertiary level reviewer for oncology NDA.
12  Further, on qualifications, he didn't know whether he was ever
13  involved --

14         **THE COURT:**  Does it matter?  Does it matter that he
15  was not a reviewer in oncology or chemotherapy?  Isn't this a
16  regulatory issue?

17         **MS. COHEN:**  Yes, that point is sort of an extra point.
18  Again, the constellation of all of these concessions, if you
19  will, when it comes to the 505(b)(2), that's, perhaps, the
20  biggest issue and why we're even addressing qualifications in
21  this case which is that he doesn't have the 505(b)(2)
22  experience.

23         In his report, they weave in a few things, but if you
24  look at his curriculum vitae, he's not a 505(b)(2) expert.  He
25  can barely remember if he ever reviewed an NDA.  So that's why

OFFICIAL TRANSCRIPT

1   we raised qualifications here where we don't in every instance

2   in every of our *Daubert*, you know, arguments.

3          Now moving more to methodology, I would say this is

4   our more significant argument, Your Honor, and you probably

5   noticed this in our briefing.  We obviously had lack of

6   qualifications, but let me move to methodology.  I would say

7   looking at all of the experts the plaintiffs have proffered in

8   this litigation against Sanofi, against Sandoz, against Accord,

9   this was shockingly unreliable, shockingly scarce, shockingly a

10  dearth of information.

11          It's not mine.

12          **THE COURT:** No, I think it's Cherie.

13          **DEPUTY CLERK:** Sorry.

14          **MS. COHEN:** I didn't want you to think I had a dog.

15          So again, I think one thing to consider is, look, his

16  reliance list -- and plaintiffs will say, "Well, that was like

17  a mistaken list," and we'll get to that.  His reliance list, he

18  received 47 pages of the Sandoz produced documents.  And I will

19  just, in contrast, Dr. Williams, who is our FDA regulatory

20  expert which plaintiff did not move on *Daubert* to exclude in

21  any which way, reviewed over 270,000 pages to have a full,

22  thorough, reliable methodological review.

23          And notably -- and it's obviously not just the size

24  or the numbers.  It's also the specifics.  Notably, what he did

25  not receive and review, he didn't look at the NDA submission or

OFFICIAL TRANSCRIPT

1  the supporting documents.  He didn't look at the information
2  reviewed by the FDA when it determined Sandoz had established
3  safety and efficacy.  He didn't look at any testing or credible
4  studies by Sandoz.  He didn't look at the correspondence
5  between FDA and Sandoz.  There was, perhaps, one response by
6  FDA in that small 47 pages that he looked at.  That was it.  He
7  didn't look at any correspondence between the FDA and Sandoz
8  other than that one document.

9           He didn't look at correspondence between the FDA and
10  Sandoz regarding labeling.  He didn't look at internal
11  correspondence.  And you may be thinking, "Well, why is
12  Ms. Cohen making such a big deal about this?"  It is very
13  important because his opinions are very generalized, and he
14  doesn't have the necessary underlying reliable methodology that
15  you saw in other experts that we'll talk about again hopefully
16  next month in other experts.  It was very scant.  It was very,
17  you know, topline, if you will.

18           He looked at the FDA -- the foreign items that you
19  heard mentioned in the preemption argument.  But when it comes
20  down, he has reviewed this case, and we've attached, I believe
21  it's Exhibit B to our motion and then attached as Exhibit B, in
22  the last little part of that to his report, there's a page and
23  a half of his material reliance list.  And there's a little
24  Section 5 that says FDA documents, and that's where we get the
25  47 pages.

OFFICIAL TRANSCRIPT

1          Now plaintiffs will come back and say, "Well, there

2     was a mistake in the list.  He gave a supplemental list later."

3     Okay, that's fine.  But when we look at his deposition

4     testimony, he still concedes that he didn't look at all of the

5     things that I had on the prior page, and that's very important.

6     I'll get to some of that.  But he cannot be giving these

7     opinions and talking about the heart and core of his opinion,

8     which is regulatory process of 505(b)(2) and did Sandoz meet

9     it, without looking at all of this.  It's impossible for him to

10    have had a sound reliable methodology without looking at all of

11    these documents.

12          And if you look at, again, what he looked at, he

13    looked at the labeling document, that was the 42 pages, and one

14    document with the FDA.  How can he possibly offer to the

15    Court -- and it's the plaintiff's burden of proof -- or a jury,

16    you know, a methodology in terms of whether Sandoz complied

17    with this 505(b)(2) without these documents?  It's just pure

18    speculation and pure fiction, I might add.  So I'll circle back

19    to that in just a moment.

20          But just in general terms, there were certain areas

21    that our motion covered, I'm sure Your Honor saw, and the

22    plaintiff's opposition concede these.  So these should be

23    granted by their concession, medical causation.  But then we

24    circle back around to that, as I know you've heard before and

25    saw in our briefing later, because they try to kind of, I would

OFFICIAL TRANSCRIPT

1 say, skirt that and evade that and get sort of a backdoor
2 causation opinion in.  And that's a concern we have, and I'll
3 come to that in just a moment.

4           The challenged opinions, again, are these, and there
5 are seven of them.  And this is kind of where our brief gets --
6 I won't spend much time on all of them.  But on the first two
7 which is the heart of his opinion and what he wants to get in
8 front of the jury and say is one of the 505(b)(2) regulatory
9 obligations, including, post-market surveillance and labeling
10 and did Sandoz comply with it.  And we say, A, he's not
11 qualified.  But if Your Honor is not impressed with that
12 argument entirely, certainly, on the methodology and what I
13 went through and his lack of consideration of the core evidence
14 on these very important 505(b)(2) issues, he cannot satisfy the
15 *Daubert* challenge on reliability and methodology.

16           And again, there's other parts of our argument, the
17 five that are listed here below which is, again, this Sandoz
18 alleged knowledge of the risk of PCIA prior to 2014.  That
19 really is a general causation or a backdoor way of getting that
20 before the jury.  We would object to that by their concession
21 on causation, also his lack of methodology and qualifications.
22 And again, on the general causation as to docetaxel and
23 permanent hair loss, that too is a general causation piece that
24 they're trying to kind of skirt around his concession that he's
25 not a general causation expert.

1         The opinions parroting other experts without
2    independent analysis, now plaintiffs would say, and I'm sure
3    Mr. Mura will say, well, Your Honor already ruled on that about
4    Kessler in the *Earnest* case.  We'll show you here that he did
5    not do as much as Your Honor said in your opinion that is
6    required to avoid parroting law on that.  And I'll circle back
7    to that as well.

8         The foreign labeling, of course, Your Honor has
9    already ruled on that.  That should not be admissible, and so
10   we -- again, his reliance on it is one thing in terms of
11   preemption.  But again, that should be out by Your Honor's
12   prior ruling, and we cite to that.

13        And the legal opinions, they will say, well, they're
14   not really legal opinions, they're regulatory opinions.  But if
15   you look at his report, it is chock-full of all of these cites
16   and laws and statutes, and we want to make sure that he is held
17   to not getting into legal opinions.  So that's the -- this is
18   the challenged areas of his opinions to be excluded.

19        But really, the top two kind of are key.  The other
20   ones I can go through, you know, pretty quickly, Your Honor, on
21   that.  But I'll just jump to this again.  On the reliability,
22   the methodology piece, this is, again, Your Honor, what I said
23   already.  He has just failed to consider the critical evidence
24   reaching his conclusions.  He didn't look at the FDA related
25   docetaxel documents.  He didn't look at the internal

OFFICIAL TRANSCRIPT

1   information on all of this which is again critical to his

2   opinion.  He didn't review the submissions.  He didn't review

3   the communications.

4           And this is his testimony.  If Mr. Mura, you know,

5   responds and says, "Well, you know, if we look at the later

6   reliance list, it clarifies things," the answer to that is no.

7   What was his opinion, his methodology and his opinion when he

8   reached his opinions initially when he did his report, that's

9   the question before the Court.  And what did he say in his

10  deposition?  I will also tell Your Honor that he did not do an

11  errata sheet or change anything.  So this is the testimony that

12  stands.

13          He said, "I never looked at the approval letter.  I

14  never looked at Sandoz's testing or clinical studies.  I never

15  looked at FDA correspondence, but for that one single document.

16  I never looked at correspondence back and forth between the FDA

17  about labeling.  I never looked at adverse events as well."  We

18  cite all this in our motion, Your Honor, so not to belabor it.

19          Also, on the newly acquired information, to pick up

20  on the discussion you-all had, how will he be able to talk

21  about what is newly acquired if he didn't know what the

22  information was at the time this was approved?  That's a point

23  we make.  How can you know what's newly acquired if you don't

24  know what already existed?

25          The only labeling he looked at, at all as you can see

OFFICIAL TRANSCRIPT

1  on his reliance list which was, again, part of Exhibit B, one
2  and a half pages, is the approved label, the market launch
3  label.  That's all he looked at.  So all the back and forth,
4  the discussions, the post-market information, he didn't look at
5  any of that.  So again, we would say this witness more than,
6  perhaps, many others that you have considered, Your Honor, in
7  this litigation and others we'll talk about, his evidence he
8  reviewed, his methodology is woefully inadequate.

9        And I used the word "shockingly" before because to
10  get an FDA regulatory expert with this little information as
11  the information for their reliance is pretty surprising.  And
12  if you compare it even to our witnesses on the defense side as
13  well as Dr. Kessler, not to jump back to that argument, totally
14  different scenario in terms of the vast information considered.

15        Pharmacovigilance and information obtained
16  post-market, I won't spend a lot of time on this.  But suffice
17  it to say, he admits repeatedly in his deposition that he did
18  not consider it.  He just said, "Well, it wouldn't have changed
19  my opinion."  He didn't look at the operating procedures on
20  pharmacovigilance.  He didn't look at any internal
21  correspondence on this 505(b)(2) regulation and compliance that
22  he says, you know, that they're proffering him to cover.  So
23  that's very important there.

24        Plaintiff's response, and you'll hear some of this
25  that as we say they unpersuasively argue, "Well, this is

OFFICIAL TRANSCRIPT

1  cross-examination, Ms. Cohen and Sandoz.  You can do it there."
2  That's not the law.
3          "His background is enough.  He went to Yale.  He
4  worked at the FDA 10 years some 15 years ago."  Well, no, that
5  doesn't help them on reliance and methodology, the second prong
6  of *Daubert*, when he fails to review the key critical evidence.
7          And then they say, "Well, there's an incomplete
8  reliance list.  We had him redo part of his deposition."  Yes,
9  but at his deposition, he still admitted, even putting that
10  aside, that he didn't review these key items.  They can't get
11  around that even with a second updated later in fact reliance
12  list.
13          And again, in terms of newly acquired information, I
14  would just go back to what we said in our briefing and what I
15  said earlier is that how can they, as the proponent of him as
16  an expert, talk about him having reliable methodology on this
17  point when he doesn't know what the original information was.
18  He didn't look at the original files and file materials.  So
19  how can he do a proper methodological review of newly acquired
20  information when he doesn't know what Sandoz had in their files
21  or what they looked at or what their labels looked at?
22          So there are big flaws here with Dr. Ross, and he's
23  not just sort of a new Dr. Kessler, you know.  He certainly
24  didn't look at the same amount of material.
25          I find it interesting, and Your Honor may have seen

OFFICIAL TRANSCRIPT

1    this in plaintiff's opposition, they say, well, look at the

2    *Dolin* case, a Northern District of Illinois case where the

3    federal court there allowed Dr. Ross to testify, and they point

4    to that.  And I thought that was really interesting.  And when

5    I sat down and studied that opinion which I have in front of

6    me, I thought, well, that completely supports our position in

7    this case, and here's why.

8         No. 1, that was a branded pharmaceutical case, not a

9    505(b)(2) case.  So that goes to his qualifications certainly

10   dealt more with the branded pharmaceutical.  But moving to the

11   methodology which is probably more of interest, in this case,

12   the court ruled that he was allowed to testify because of his,

13   you know, substantial review of evidence, substantial review of

14   information, and therefore, making his methodology reliable.

15   He was allowed to testify because he reviewed the regulatory

16   submissions and correspondence of GSK, the defendant in that

17   case.  He reviewed internal GSK documents and analysis.  He

18   reviewed FDA studies.  He reviewed different iterations of

19   labeling.

20        So if you look at that opinion, the court there goes

21   through the laundry list of things he reviewed as part of why

22   his methodology was substantial and adequate to support him

23   under *Daubert*.  Here, in sharp contrast, he didn't review any

24   of this.  We go back to the 47 pages.

25        So actually, the *Dolin* case supports Sandoz as to why

OFFICIAL TRANSCRIPT

1  he should be excluded based on his, I would say, flimsy and not

2  reliable methodology.  So that's the methodology piece, Your

3  Honor.

4        I know I'm probably taking up too much of my allowed

5  seven minutes, but I'll make a few points on these other

6  issues.  On the parroting point, Your Honor, I've --

7        **THE COURT:** I think what concerns me and what I want

8  to hear from Mr. Mura is his failure to review the record that

9  was presented to the FDA.

10        **MS. COHEN:** Okay, thank you, Your Honor.  So I'll

11  stand on our briefing on these other points.  I think you

12  probably know what our arguments are, and I appreciate very

13  much the time.

14        **THE COURT:** Thank you.  Where is Mr. Mura?

15        **MS. COHEN:** I see him on the bottom right on my

16  screen.

17        **THE COURT:** Okay.  I think, Mr. Mura, you have to

18  speak --

19        **MR. MURA:** Sure.

20        **THE COURT:** -- and then I will see you.  There you

21  are.  That's how it works.

22        I can cut to the chase.  I'm not concerned about his

23  qualifications.  What bothers me is his failure to review the

24  record before the FDA at the time of their approval in 2011,

25  and that's -- because then we have to consider what did they

OFFICIAL TRANSCRIPT

1   look at and how can he then find newly acquired information

2   when we don't know what they were presented with.

3          **MR. MURA:** Yes, Your Honor.  I think part of the

4   argument that's being made is just sort of a snapshot in time.

5   I mean he supplemented his reliance list, and so I would just

6   ask that you look at Exhibit C to the Ross Expert Report.

7          We don't agree with the representations being made

8   about that Dr. Ross simply didn't review relevant information.

9   He reviewed or relied on numerous relevant Sandoz documents,

10  including, the U.S. and foreign docetaxel labels, the PSURs,

11  the PADERS, the NDA documents, meeting summaries, transcripts

12  and exhibits.  So a lot of that is in the updated reliance

13  list.  I think that will give the Court comfort that Dr. Ross

14  did review sufficient information to provide an opinion.

15         And to the extent that Sandoz or even Accord thinks

16  that Dr. Ross should have looked more carefully at one document

17  or another, that's typical fodder for cross-examination.  But

18  he reviewed a significant amount of information, and he based

19  his opinion based partly on that review and based on his

20  experience working for quite a long time at the FDA.  And so I

21  don't think there's any real material -- I don't think there's

22  any daylight between the type of information that he reviewed

23  and the type of information that Dr. Kessler reviewed.  The

24  team that was providing him the information assembled the same

25  information and provided it to him just as they did for

OFFICIAL TRANSCRIPT

1  Dr. Kessler.

2          So a lot of these arguments are, with all due

3  respect, exaggerating, I think, the record; and the record is

4  quite clear that he reviewed a significant amount of

5  information in coming to his opinions.  And those opinions are

6  not either a legal conclusion, nor are they sort of treading or

7  crossing the line in terms of causation.  I think these are all

8  arguments the Court heard previously with Dr. Kessler and

9  provided guidance for Dr. Kessler.  I think the same thing

10 holds for Dr. Ross.

11         He's not going to opine on the law to the extent that

12 he's not going to opine on causation.  He's opining on

13 regulatory standards.  I heard many times the argument that,

14 "Well, he's no Dr. Kessler."  You know, Dr. Kessler is not the

15 *Daubert* standard.  Ross is an incredibly accomplished

16 individual who worked at the FDA and does say in his expert

17 report that he was familiar with and 505(b)(2) issues did come

18 across his desk.  So it's incorrect to say he just has no

19 experience as if he were --

20         **THE COURT:** I'm not worried about that.  I'm not

21 worried about that.  I am telling you what I'm worried about.

22         **MR. MURA:** Okay.

23         **THE COURT:** I can't be clearer.  If he did not

24 carefully review the initial record that was presented to the

25 FDA at the time of Sandoz's application and approval, then I am

1   concerned as to whether or not he can speak to what they should

2   have done post-approval with newly acquired information because

3   he's got to have known what was in that initial packet to see

4   whether or not the FDA was provided this information.

5          And that's my concern because there's a period in

6   time where we have to make that determination.  That's my

7   concern.

8          **MR. MURA:** Yes, Your Honor.  He did review just a ton

9   of information that was provided to him relevant to the drug

10  label.  I mean that's just a fact, and it's discussed in his

11  report.  It's discussed in the supplemental reliance list.

12          I think some of the confusion is he's trying to say,

13  "I'm not attacking the initial launch label."

14          **THE COURT:** That's correct.

15          **MR. MURA:** And so to the extent the focus of his

16  report is on post label launch, I don't think it's fair to sort

17  of take that focus and his, you know, discussion of that just

18  to say that he just has no idea about anything about the

19  initial label launch.  That's not correct.  He was not offering

20  an opinion that the initial label launch was somehow -- that

21  the FDA shouldn't have authorized that.  So he's not sort of

22  delving into the information for that purpose, but he certainly

23  has enough information to offer an opinion about whether the

24  adverse reaction section could have been updated after the

25  initial label launch.

OFFICIAL TRANSCRIPT

1          He knows what the initial label says.  The initial

2    label launch, again, in the context of a 505(b)(2), is not

3    going to have the type of information that you have with a

4    label launch for a 505(b)(1).  That's precisely the point of a

5    505(b)(2) label change.  You're not supposed to submit a ton of

6    this information.  You're allowed to rely on it.  And to say

7    that, "Well, he didn't review something," the drug company is

8    not even submitting a lot of this information.  They're using a

9    streamlined process to get label approval.

10          And so I do think that, you know, you can take

11   snippets of his deposition and read them out of context and

12   make Dr. Ross look bad.  But in reality, Dr. Ross did rely on a

13   lot on this information, did review it, came to his analysis.

14   And to the extent, again, that the defendants disagree, this is

15   all typical grounds for cross-examination.

16          I mean it would be quite extraordinary to exclude

17   Dr. Ross given his qualifications, given the work he did, given

18   his lengthy report, given his lengthy reliance list which I

19   understand was supplemented, but even just looking at the

20   supplementation, I think this is well within the bounds of

21   *Daubert*.  And really, it cannot be said to be in a totally

22   different category from what Dr. Kessler did.

23          So unless the Court has any more questions, thank

24   you, Your Honor.

25          **THE COURT:**  No, I think that's it.  Thank you.


                        OFFICIAL TRANSCRIPT

1          **MS. COHEN:** Your Honor, may I respond briefly, or have

2    you heard enough?

3          **THE COURT:** Briefly.

4          **MS. COHEN:** Thank you, Your Honor.  Again, my role

5    here today, and I hope I didn't show otherwise, is not to

6    exaggerate about Dr. Ross.  I don't need to exaggerate about

7    him.

8          I think if Your Honor looks at his report which is

9    filed as Exhibit B to our motion and goes to Exhibit C, the

10   materials reviewed, you'll see that it's, again, it has very,

11   very few FDA or Sandoz documents there.  You'll see that for

12   yourself.  I'm not pulling out snippets of the deposition

13   testimony.  He said clearly he did not look at the NDA

14   submission.  He did not look at the FDA back and forth.  And

15   that's clear.  That's not disputed at all.

16         And also, the plaintiffs, as you well know, Your

17   Honor, plaintiffs have the burden of establishing under *Daubert*

18   that their witness, that Dr. Ross used an appropriate and

19   reliable methodology.  They did not do that here.  If you look

20   at their opposition, they have a section talking about, "Well,

21   he looked at a lot of information," as Mr. Mura said.  That's

22   not sufficient to get over the hurdle.

23         And I know that Mr. Mura said, you know, he's no

24   different from other FDA regulatory experts.  I would wholly

25   disagree with that.  I've been doing this a long time.  I hate

OFFICIAL TRANSCRIPT

1   to say how many years, but I've been doing this quite a long

2   time.  I'm looking at the number of materials he reviewed, and

3   more importantly, what he did not review.  Given where he's

4   being proffered for is, again, not in keeping with *Daubert*

5   under the second prong of methodology.  It's just not.

6          Even if he supplemented a later reliance list, all

7   Your Honor has to do is look at the original reliance list at

8   the time he gave his report, plus his testimony and his

9   concessions about what he did and did not review, and that will

10  make it very clear to Your Honor that he does not meet the

11  standard, not even by a stretch.  Thank you, Your Honor.

12          **THE COURT:** Thank you.  Then we have Ms. Callsen.

13          **MS. CALLSEN:** I think it's my turn.  I'm on the Tucker

14  Ellis screen.  Hopefully, when I talk, you'll find me.

15          Well, Your Honor, I've argued many things in front of

16  you over the years, but never a *Daubert* motion.  So this is my

17  first, and this is the 505(b)(2) Accord's first at arguing

18  their challenge to this regulatory expert.  Obviously, I heard

19  what went on earlier with Sandoz and with plaintiff's counsel,

20  and so what I'm going to focus on as well is Dr. Ross's

21  methodology and how it is not reliable.

22          Dr. Ross did work at the FDA.  We didn't challenge

23  opinion -- his qualifications, but what we challenged was he

24  didn't apply his work at the FDA to the task at hand of

25  reviewing Accord's regulatory record.  So he didn't apply the

1  same rigor that he would have if he'd worked at the FDA, and
2  that is shown by his lack of review of the preapproval
3  documents.

4        Now even if he did review some smattering of
5  documents, which we've, you know, there was some confusion with
6  his reliance list.  We acknowledge that.  He didn't focus on
7  that in his opinion.  He testified at his deposition, and I
8  have quotes outlined on page 7, 8, and 9 of our brief, that his
9  opinions concern post-approval action, that he did not -- he
10  wouldn't be able to tell us what the FDA did or did not have.
11  As you've recognized yourself, if you don't know what the FDA
12  already has, how can you then identify whether it is new.

13        Further, his failure to review Accord's regulatory
14  record is important because Accord submitted its NDA under
15  Section 505(b)(2) which is an abbreviated pathway available to
16  it, and it's a unique, new pathway.  And it's actually not been
17  addressed in this litigation in the past; and therefore, his
18  analysis would be helpful to a jury if he'd done it.  So his
19  job is to help a jury understand, in the context of Accord's
20  505(b)(2) pursuit for approval of this product, what its
21  obligations are.

22        And if he's not reviewing the regulatory record which
23  starts with the pre-IND meeting in 2008 that Accord personnel
24  had with the FDA and completed in June of 2011 with the
25  approval, that's three years, if he's not reviewing that record

OFFICIAL TRANSCRIPT

1 and if he's not then taking that into his opinion, then how can
2 he help the jury understand the obligations of a 505(b)(2) and
3 whether it lived up to those obligations and can change the
4 label.  That's what renders his opinion not reliable.

5 He just has a subjective belief that Accord's label
6 should have said X, and because Accord's label didn't say X, it
7 therefore failed.  But that's not enough under *Daubert*.  And we
8 outline how the regulatory record would have played into his
9 opinions had he reviewed it.

10 We also address the foreign regulatory evidence
11 which, again, I'm not going to go into.  But it's just, again,
12 that's not something that he would have relied upon if he was
13 working for the FDA in assessing an obligation of a
14 manufacturer.

15 But I also just want to touch on his reliance on
16 other experts' opinions in this litigation, specifically, Drs.
17 Plunkett, Madigan, and Feigal.  Plaintiffs argue that just as
18 he did when he was working with the FDA, he would have relied
19 upon other experts in the fields of biostatistics,
20 epidemiology, oncology, etcetera, in order to render opinions.
21 However, he didn't do that here.  Here, he said he just relied
22 on their reports and conclusions.

23 And notably, Drs. Plunkett, Madigan, and Feigal
24 reviewed nothing specific to Accord, nothing.  So everything
25 that they reviewed and took into account was based on Sanofi's

OFFICIAL TRANSCRIPT

1  internal data, if any.  So it wasn't the same degree of

2  intellectual rigor that he would have applied during his term

3  with the FDA, and that is what he needed to do here.

4       I just want to wrap up and say that, you know, with a

5  505(b)(2) product it is especially important to a jury.  I mean

6  you can't -- 505(b)(2) is a unique pathway.  It's an

7  abbreviated pathway.  We need to help the jury understand

8  Accord's obligations under that pathway.  We can't do it

9  without the analysis of an expert who fails to take that into

10 account in rendering his opinions.

11      **THE COURT:** Thank you.  Mr. Mura.

12      **MR. MURA:** Thank you, Your Honor.  I mean these are

13 largely the same arguments except for the attack on

14 qualifications.  I think I'll just repeat again what I said

15 before, if you look at the supplemental reliance list, if you

16 look at his discussion of what he looked at and the reasons

17 why.

18      I think some of the arguments here are simply

19 contorting the fact that he was saying that he was offering an

20 opinion about post-approval labeling.  That doesn't mean he was

21 sort of blind about what the FDA did when it used an

22 abbreviated process to approve the initial label.  He did look

23 at materials.  The materials are listed in the reliance list.

24 He looked at, you know, frankly comparatively, a lot more than

25 some other FDA regulatory experts in this MDL itself if you

1  just compare it to what Arrowsmith looked at.  But I think he
2  certainly did look at it enough to meet the *Daubert* threshold.

3       And so the question becomes, you know, these are
4  arguments that can be made through cross-examination.  That's
5  the traditional crucible for these types of arguments.

6       To the extent that he relied on or looked at
7  information from a biostatistician or an oncologist, Kessler is
8  not an oncologist either.  There was really no concern that a
9  regulatory expert can't also rely under 703 on another expert's
10 information.  He's not parroting that information.  He relied
11 on it.  He looked at it.  In some ways, defendants are trying
12 to have it both ways.  They don't want him to look at certain
13 information.  But then when he does and he doesn't look at
14 other information, they say he should have looked at more.  But
15 he did look comprehensively at much of the information.

16      But I think the supplemental reliance list and if you
17 look at the testimony itself and his answers which were very
18 candid which was, "I'm offering an opinion about the ability to
19 provide a label change and whether they met the regulatory
20 standard," that's why his focus in some of his testimony is
21 about post-approval.  So I don't think it's fair to
22 characterize that as somehow he just had no idea what the FDA
23 was doing with respect to the initial launch through an
24 abbreviated process.

25      So unless the Court has any questions, thank you very

OFFICIAL TRANSCRIPT

1   much, Your Honor.

2           **THE COURT:** Good, thank you, Mr. Mura.

3           **MS. CALLSEN:** I just have one point, Your Honor.  I am

4   not quibbling with the sources and the basis of his opinion, he

5   reviewed this, he should have reviewed that, he shouldn't have

6   reviewed that.

7           What I'm quibbling with, what we're quibbling with is

8   he failed to apply a methodology that he would have employed at

9   the FDA when he analyzed the data if he analyzed the data.

10  That's the focus which can't be cured through

11  cross-examination.  Thank you.

12          **THE COURT:** Thank you.

13          All right, I think that's it.  Thank you-all.  You

14  will be hearing from me in due course.  Court's adjourned.

15                  (Whereupon this concludes the proceedings.)

16

17

18

19

20

21

22

23

24

25

                        OFFICIAL TRANSCRIPT

1  **<u>CERTIFICATE</u>**

2

3     I, Alexis A. Vice, RPR, CRR, Official Court Reporter for

4  the United States District Court, Eastern District of

5  Louisiana, do hereby certify that the foregoing is a true and

6  correct transcript, to the best of my ability and

7  understanding, from the record of the proceedings in the

8  above-entitled and numbered matter.

9

10                              */s/Alexis A. Vice, RPR, CRR*
                              Alexis A. Vice, RPR, CRR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT