1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4   IN RE:  TAXOTERE (DOCETAXEL)      *
    PRODUCTS LIABILITY LITIGATION     *       16-MD-2740
5                                     *
                                      *       Section H
6   Relates to:   17-CV-10817         *
                  17-CV-11769         *       March 18, 2021
7                                     *
    *  *  *  *  *  *  *  *  *  *  *  *  *

8

9                   ORAL ARGUMENT BEFORE
10            THE HONORABLE JANE T. MILAZZO
               UNITED STATES DISTRICT JUDGE
11

12  Appearances:

13

14  For the Plaintiffs:        Gainsburgh Benjamin David Meunier
                                  & Warshauer, LLC
15                             BY:  M. PALMER LAMBERT, ESQ.
                               1100 Poydras Street, Suite 2800
16                             New Orleans, Louisiana 70163

17  For the Plaintiffs:        Lemmon Law Firm, LLC
                               BY:  ANDREW LEMMON, ESQ.
18                             15058 River Road
                               Hahnville, Louisiana 70057
19

20  For the Plaintiffs:        Pendley Baudin & Coffin, LLP
                               BY:  LAUREN R. DAVIS, ESQ.
21                             1100 Poydras Street, Suite 2505
                               New Orleans, Louisiana 70163

22

23  For Sandoz, Inc.:          Greenberg Traurig, LLP
                               BY:  LORI G. COHEN, ESQ.
24                                  R. CLIFTON MERRELL, ESQ.
                               3333 Piedmont Road NE, Suite 2500
25                             Atlanta, Georgia 30305

1    <u>Appearances</u>:

2

3    For Accord Healthcare,        Tucker Ellis, LLP
     Inc.:                         BY:  JULIE A. CALLSEN, ESQ.
                                        MICHAEL J. RUTTINGER, ESQ.
4                                  950 Main Avenue, Suite 1100
                                   Cleveland, Ohio 44113

5

6    Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room B-275
7                                  New Orleans, Louisiana 70130
                                   (504) 589-7778

8

9

10
     Proceedings recorded by mechanical stenography using
11   computer-aided transcription software.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>INDEX</u>**

|                                   | <u>Page</u> |
|-----------------------------------|------|
| Oral Argument                     |      |
| Lori G. Cohen, Esq.               | 5    |
| M. Palmer Lambert, Esq.           | 22   |
| Lori G. Cohen, Esq.               | 31   |
| Oral Argument                     |      |
| Julie A. Callsen, Esq.            | 36   |
| M. Palmer Lambert, Esq.           | 42   |
| Julie A. Callsen, Esq.            | 47   |
| Lori G. Cohen, Esq.               | 48   |
| M. Palmer Lambert, Esq.           | 51   |
| Oral Argument                     |      |
| Andrew Lemmon, Esq.               | 55   |
| R. Clifton Merrell, Esq.          | 59   |
| Michael J. Ruttinger, Esq.        | 66   |
| Andrew Lemmon, Esq.               | 69   |
| R. Clifton Merrell, Esq.          | 73   |
| Oral Argument                     |      |
| Lauren R. Davis, Esq.             | 75   |
| Julie A. Callsen, Esq.            | 79   |
| Lauren R. Davis, Esq.             | 83   |

<u>**MORNING SESSION**</u>

**(March 18, 2021)**

THE COURT:  Good morning.  Please be seated.

As I appreciate it, we have several members of liaison counsel that are -- is Mr. Moore on?

THE DEPUTY CLERK:  No, he is not on.

THE COURT:  Okay.  I would like to speak to liaison counsel at the conclusion of oral argument this morning.  I'm going to ask you to stay on Zoom and ask Mr. Lambert to stay. We will see if we can get hold of Mr. Moore.  I'm sure we can. Thank you.

Are we ready to proceed, Ms. Cohen?

MS. COHEN:  Yes, Your Honor, we are.  Is it okay if I take my mask off?

THE COURT:  We have very clear instructions up there. You can take your mask off once you are there.  I'm going to ask you to sanitize your hands because when you conclude, then we are going to ask you to take off the little mic covers and throw them away.  Then, Mr. Lambert, you will have to put them on.  We have instructions there if you look down.  I'm sorry, but COVID.

MS. COHEN:  That's great.  Your Honor, I have passed up to Your Honor a PowerPoint and provided, I think, copies.  I don't know if anybody else needs more copies of that.  I gave copies to plaintiffs' counsel as well.  I think we are all set

10:34

1  on that.

2          THE COURT:  All right.  Please proceed.

3          MS. COHEN:  May it please the Court.  So, Your Honor,

4  today is a day we have waited a long time for in that today we

5  are arguing about Dr. Petronic-Rosic, and I will just say

6  "Rosic."  She is plaintiffs' only case-specific expert.

7  Tomorrow morning, on behalf of Sandoz, I will be arguing our

8  motion for summary judgment.  One of the arguments will relate

9  to the plaintiffs not being able to satisfy causation.

10          So it is a major day for us, I would say.  We

11  have waited, as you know, a number of years, as a 505(b)(2)

12  defendant, somewhat impatiently -- I was about to say

13  patiently -- *to* get here.  We are set for trial in this case in

14  August, the *Stewart* case.  This is a case that we picked and

15  plaintiffs picked, so it should be a very representative case

16  in that regard.

17          I'm not sure there's any other case that falls

18  in that category, and because of that we have focused on

19  Dr. Rosic.  We have focused on her testimony.  We went into her

20  deposition expecting a lot, expecting someone who was going to

21  be coming forward and presenting plaintiffs' best argument.  So

22  with that, we take this very seriously, this motion today.

23  Frankly, we were surprised by what we found in her testimony.

24  We were surprised by the day of deposition.  We were surprised

25  that she didn't seem to give more respect to the rules of

10:35

1    court, to Rule 26(a)(2) and to the rules that were required of

2    her expert report.  So I wanted to start by saying that, that

3    we came in expecting a lot, and we found that she was wholly

4    deficient in many regards.

5                I think kind of as I argued the Ross motion to

6    exclude and *Daubert* motion, I focused on the lack of reliable

7    methodology, and the same is true here.  I can quibble about

8    qualifications and quibble about what relevance, but it is

9    about her lack of reliable methodology.  Frankly, there are

10   multiple grounds where she fails, and Your Honor really should

11   grant this motion.

12                Then, likewise, when we get to tomorrow --

13   although we have other arguments, not just on lack of

14   causation -- you are going to find that without Rosic there is

15   nobody left to support plaintiffs' case in the *Stewart* case.

16   While I would love to come to court in August and be here to

17   try this case, I don't think they have the expert support,

18   because of Dr. Rosic and her deficiencies, to get there.

19                I will try to go through some of these slides

20   because I tried to organize them in a way that I thought made

21   sense.  Again, she is the new dermatology/dermatopathology

22   expert.  She replaces Tosti, if you will, who was there for the

23   Sanofi cases.  She does not consider hair loss to be one of her

24   areas of expertise, but we are not moving on qualifications.

25   The first ground is not where we are focused on.

10:37

1          She attempts to give general causation and
2     specific causation.  As I said, she is the only case-specific
3     expert, she is the only specific causation expert, and the
4     plaintiffs' entire case will fail without her.  There is nobody
5     left to support them on specific causation.  That's why she is
6     so utterly important to their case.
7          THE COURT:  Okay.  We can talk about the plagiarism.
8     I went through Dr. Rosic's report again this morning.  It looks
9     like you get to page 35 or thereabouts before it's, as far as
10    I'm concerned, the real nuts and bolts of this particular case.
11    A lot of it is what I would consider what you might get in a
12    high school biology class about hair.
13          MS. COHEN:  Yes.
14          THE COURT:  This is the kind of hair, this is how it
15    works, this is why it's there, and that sort of thing.  I think
16    a lot of your complaint was plagiarism in that portion.  I
17    think there was one sentence that you said, "Well, this looks
18    like it's copied from Dr." -- "The studies I have analyzed in
19    the aggregate demonstrate that Taxotere/docetaxel is far more
20    commonly," that one sentence, but beyond that it looks like the
21    plagiarism, if you will, the purported plagiarism, occurs in
22    those first 25 pages.  I understand that it can be troubling,
23    but is it critical to the methodology in this case?
24          MS. COHEN:  It is, Your Honor, and that's a fair
25    question.  I don't know if you had a chance to read the whole

10:38

1    deposition.  We also sent you as one of our exhibits in the

2    reply -- because they took shots at me and accused me of being

3    too aggressive with her.  We actually sent you the video so you

4    could listen to my tone, listen to everything I asked.  I stand

5    by all of it.

6                     It is important because it actually covers

7    13 pages of the PCIA part, of the general causation part that

8    is the underpinning to her methodology, so it's very important.

9    If Your Honor were to say, "I'm going to cut that section out,"

10   those 13 pages -- basically, you can see on Exhibit F, which we

11   have left up there as well, that's kind of our highlighted

12   "compared to Tosti" section.

13             **THE COURT:**  Oh, I saw that.

14             **MS. COHEN:**  On that, if you took this whole section

15   out, there would be no explanation, no grounding, no basis for

16   her methodology on causation.  So it is very important both on

17   general causation, then in order to bootstrap the specific

18   causation.

19                     Does it fall within the one paragraph -- and,

20   again, there is one paragraph where she gets to specific

21   causation.  That's another complaint we have, one paragraph on

22   that.  It's not in that part, but there's other problems with

23   that.  It also is the buildup to that.  It gives her the basis

24   for getting there.  Without it, without her doing the

25   research -- and I know the plaintiffs argue it's background;

10:40

1  it's no big deal.  It is a big deal in our view.  I will be

2  happy to get to that as we go.

3          THE COURT:  Okay.

4          MS. COHEN:  It is a huge deal.  Again, as we say

5  here -- I say plagiarism.  I'm not going to repeat that word

6  over and over again.  I know that bothers the plaintiffs'

7  counsel.

8          THE COURT:  Yes.

9          MS. COHEN:  It's plagiarism per the case law, and

10 that's why we started using that word.  We saw the case law

11 when I noticed this was a problem, but really there's more to

12 it here.  It's not just that I had a great cross and I'm

13 excited to go to trial and cross-examine her on this.  No, it

14 is that it is part of her methodology, and without it she has

15 nothing to hang her hat on, so to speak.

16         She had a whole -- we will get to that part, but

17 beyond that she had a wholly deficient review of the materials

18 in this case, and that is another major problem.  Your Honor

19 could rule simply on that, on what she didn't look at in this

20 case.  That is a big, big deal.

21         She did not do a differential diagnosis.  That's

22 another, obviously, huge issue.  When we get to general

23 causation, she parrots the opinions of Drs. Madigan and Feigal,

24 and we will get to that at the end.  If I run out of time, I

25 may pass that part to Ms. Callsen, who has a similar motion.

10:41

1              The problem, too, is that she refused to admit
2      the truth under oath, and that is a troublesome part.  As you
3      said, perhaps that part is for cross-examination.  Again, the
4      other things leading up to that, the copying verbatim of the
5      methodology and the backup of it, the wholly deficient review
6      of materials, and the no differential diagnosis gives you
7      enough to grant this motion as to her.
8              Again, we are moving to exclude all of her
9      opinions in this case, general and specific causation.  These
10     are some of her opinions in her report.  We move to dismiss all
11     of them.  The underlying basis also should be dismissed.
12             So what is our argument?  Again, as I said, we
13     are moving to exclude not just because of the copying, I will
14     call it, the extensive copying, but because of the deficient
15     review, the lack of differential diagnosis, so her specific
16     causation opinions should be excluded.  They are unreliable.
17     They are irrelevant.  They contain improper legal opinions.
18     Her general causation opinions are not supported by sound
19     methodology.  She has issues there as well, again, copying
20     verbatim and mirroring and parroting that.
21             **THE COURT:**  I think we need to get to the meat of the
22     argument because we are running out of time.
23             **THE DEPUTY CLERK:**  You are at six minutes too.
24             **MS. COHEN:**  Okay.  So again here, when you look at
25     the comparison of Dr. Rosic and Dr. Tosti, you can see there's

10:42

1  no question that the pages are copied.  The 13 pages that fall

2  within her specific PCIA section -- so this is not background

3  where she talks about where she went to school, where she got

4  her training.  This is an important part of her report.  I'm

5  happy to hand up the report.  This is her section talking about

6  what she knows about the disorder, for what she says happened

7  here, so it could not be more relevant on that.

8         So again you go through all these pages and

9  again the entire section of PCIA and general causation is

10  copied almost verbatim, other than a few little things here and

11  there.  She refused to admit that.  There's no citation at all

12  to Dr. Tosti.  Now, it would be a different situation if she

13  had cited to Dr. Tosti.

14         Plaintiffs will tell Your Honor that she had

15  Dr. Tosti's report on her reliance list.  That isn't enough for

16  us to figure out what she has there.  That's not enough for us

17  to figure out that this section came from Dr. Tosti.  It was

18  because I looked at it and I compared it and I said, "I think

19  this looks familiar to me."  I looked at it and figured it out.

20  She wasn't even ready to admit that in the deposition.

21         The same with the Paus article, we have a second

22  part where again she basically inserts the entire article

23  almost verbatim, parts of it there, the highlighted parts, but

24  doesn't cite to it, doesn't give an attribution as she would in

25  doing a journal article.

10:43

 1            So is it a big issue?  It is because it goes to
 2    the key issues of PCIA.  It goes to general causation.  It goes
 3    to her learnings.  It goes to the underpinnings of these
 4    opinions.
 5            Again, if you look at the quotations from her,
 6    she understood the importance of her expert report.  She said,
 7    "I did my own report."  She said, "I did not copy verbatim."
 8    She wouldn't agree that these sections were the same.  When I
 9    put them up to her on the screen, she said they are not the
10    same, there's indentations here, there's headers here, and all
11    that.  She said it's not peer review literature.
12            Later, when you get to the plaintiffs'
13    opposition, they actually admit that it was copied, so it's a
14    different situation.  We point that out, Your Honor, in our
15    exhibit to our reply brief, Exhibit C, which you will have,
16    which again shows all the excuses that were made instead of
17    admitting that she, in fact, copied this part.  That's very
18    important.
19            You can see here that plaintiffs now admit to
20    copying.  This in their opposition brief, but they say this is
21    an MDL; it's efficient to do copying.  There's no rule like
22    that.  This wasn't the background reference material.  No, it
23    was in the PCIA general causation material.  She said that she
24    conducted her own review of the literature, examined the
25    plaintiff, and drafted that section, but there's no proof of

1    that.  Again, that's a big issue.

2              Let me get to the case law on this.  There's

3    cases in this very Court that go in our direction.  We were

4    surprised.  We looked at this issue.

5              The *Moore* case talks about expert opinions were

6    inadmissible when the expert copied substantial portions of his

7    report from another expert's report and testified that his

8    report was his own original drafting.  That's exactly what

9    happened here.  This is the *Moore* case, 2012.

10             In *Hunt*, another case here, the expert was

11   excluded for extensive copying of another source.

12             In the *Legier* case -- now, this is a case the

13   plaintiffs rely on in their opposition.  They say that's

14   exactly what we have here.  In that case the report copied a

15   small paragraph in a chart and that was it.  You can see,

16   Your Honor, why this is not that situation, why this is wholly

17   different, why this falls within the *Moore* line of cases.

18             In the *Spiral Direct* case -- this is a Florida

19   case, but it says:

20             "The expert did not show a willingness to reveal

21   her plagiarism to anyone in this case until counsel confronted

22   her about it at the end of her deposition.  Absent counsel's

23   diligent research and confrontation during the deposition, the

24   court could have been led to believe that the expert's report

25   was entirely her original work.  Due to her attempt to

10:45

10:46

1    appropriate the opinions of the other expert and play them off
2    as her own, her report is unreliable and must be excluded."
3                 That could not be closer to what happened here.
4    It was my confrontation that brought this out.  She was not
5    ready to admit it.  Even when I confronted her, she wasn't.
6                 *Raymo* again, in that case, copied a large
7    portion of another expert report word for word.  When asked
8    questions about how his report was prepared, the answers were
9    deliberately misleading.  That is exactly what we have here,
10   Your Honor.
11                I don't think there's any question that the case
12   law, even in this Court, supports excluding her entire opinion
13   based on this.  This is not one paragraph.  This does not fall
14   within the *Legier* issue at all.  I think just that alone would
15   be enough, but let's go on and talk about what else we have
16   here.
17                So, in addition, she looked at a cherry-picked
18   little collection of documents.  This is Exhibit J and we get
19   to this part.  She looked at -- this is what was attached to
20   her report.  This is what she had at the time of the
21   deposition: three pages of screenshots of lab reports; 13 pages
22   of medical records; no depositions, no testimony, none of the
23   important things to understand the medical history, nothing to
24   allow her to give a differential diagnosis.
25                You can look here -- and this is all in the

10:47

1    record.  We have kind of outlined on specific causation the
2    different flaws, Your Honor.
3                Number one, she started off by being told it was
4    chemotherapy-induced alopecia.  She was given the end result.
5    She was told the answer to start with.  That's her starting
6    point.  This is part of her file.
7                Then when we look at her materials, this is
8    where -- again, a deficient set of materials, could not
9    possibly have done a reliable methodology.  Her methodological
10   review -- focus on the right side -- 13 pages of medical
11   records.  Our experts, to see the contrast, looked at over
12   2,000 pages of medical records.  That was important for them to
13   give the appropriate differential diagnosis.
14               No testimony.  No deposition transcripts.  How
15   are they going to discern her medical history, the family's
16   history?  Our experts read every transcript.  How is she going
17   to read the treating doctors, the treating physician, the
18   prescribing oncologist to get the full history?  She had none
19   of that, no information or testimony.  It's impossible for her
20   to have done an appropriate methodological review without
21   having that.  No discovery and pleadings, I'm not that worried
22   about that.
23          THE COURT:  I'm just wondering.  Ms. Stewart presents
24   to a doctor's office.  I understand that the question was:
25   Tell me if this lady has chemotherapy-induced alopecia.  I

10:49

1   understand what her job was.  She has the patient there and she

2   questions the patient.  Is that insufficient to determine the

3   history?

4           **MS. COHEN:**  Oh, it is, Your Honor.

5           **THE COURT:**  Okay.  Let's talk about that.

6           **MS. COHEN:**  It is because when she came up there to

7   have her punch biopsy, the information that was given to her

8   wasn't truthful -- not "truthful."  Wasn't full and complete,

9   wasn't accurate.  So absolutely, as an expert in a case, she is

10  obliged to doing a methodological review that's reliable under

11  *Daubert*, in giving it a full differential diagnosis, to look at

12  the medical records and to see what the history was.

13          I'm not saying that Ms. Stewart is not being

14  honest.  I think in the heat of the moment of going up to see a

15  doctor, an expert, to have a punch biopsy, she is not going to

16  have the nerves of steel and be able to recount all of her

17  history.  I don't know, but I don't want to accuse her of not

18  being honest as a plaintiff.

19          **THE COURT:**  Right.  Right.

20          **MS. COHEN:**  I don't at all.  I think the obligation

21  is on plaintiffs' counsel to get the right records and the

22  right materials to their expert.  If they are going to put her

23  up as the one savior of this case, as the person who is going

24  to support specific causation, as the one who is going to get

25  them beyond this day, our day in court, and get them to trial,

10:50

1    they have an obligation to give the materials and not
2    cherry-pick and not hold them back.
3                    She has an obligation, getting paid what she is
4    getting paid, to ask for them.  I don't think it's fair for
5    them to say, "I'm going to have my blinders on and basically
6    look at only this and reach my opinion."  That is not a
7    sufficient methodical review.  That is not a differential
8    diagnosis that holds up in court, in this Court or any court.
9                    If I sound a little offended, I am, because we
10   have spent so many years and so much money and resources on
11   behalf of our client to get here.  We expect them to comply
12   with the rules.  I think that the rules include giving her the
13   full array of records.
14                    She said she had the conversation with her, but
15   here's what she missed.  We know that she didn't have the right
16   information because she said plaintiff did not have a family
17   history of hair loss.  That was incorrect when her mother at
18   her deposition, which she hadn't read, said she had hair loss
19   and was wearing a wig.  Plaintiff testified her father had male
20   pattern baldness.  There's one example, just one of many, that
21   I highlight for you that she didn't know.
22                    She was not aware that the plaintiff had taken
23   hair supplements for six months or more before chemotherapy.
24   Of course, she didn't know that because she wasn't given the
25   materials.  She also didn't ask for them.  She should have

1    known she only had a small array of records.  She should have

2    known she didn't have depositions.

3              I don't know where the blame falls here, but if

4    the blame falls somewhere between -- I'm not going to call the

5    plaintiff out.  Somewhere between plaintiffs' counsel and

6    Dr. Rosic, they did not get the records.

7              She was not aware she wore hair extensions

8    before chemotherapy.  Those are important factors.  When she

9    says to me in the deposition she has no history of hair loss,

10   those are important misses.

11             The law I don't have to recite here.  Obviously,

12   having a full history is important, having a pertinent medical

13   history.  You cannot do a differential diagnosis that meets the

14   *Daubert* standards if you don't have this history.  To deprive

15   her or for her to not look at the depositions is astonishing.

16   It's astonishing.  It's shockingly deficient, as we say.

17             When we look at her physical examination, that

18   part of it was -- again, we point this out in our briefing --

19   flawed.  She starts with persistent chemotherapy-induced

20   alopecia.  That was her starting point.  Then when I questioned

21   her, "Tell me about your standard approach to differential

22   diagnosis," because I wanted to see if she qualifies even under

23   her standard approach, she didn't.  She said her standard

24   approach involves examining the patient, taking their history,

25   discussing their potential diagnosis, looking at the history,

10:52

1   getting medical records.  She didn't have all of that.  She

2   didn't meet a differential diagnosis nor did she meet her own

3   standard differential diagnosis.  She didn't even meet her own.

4          Then we look at her report, and I thought this

5   was very interesting, Your Honor.  In our case there's the

6   medical report, which we have marked as Exhibit N, and there's

7   the legal report.  What was really interesting here -- and we

8   highlight a couple of these on the slide -- is punch biopsy,

9   that's a pretty important day in the plaintiffs' case.  They

10  want to have this punch biopsy be taken.  Well, in the medical

11  report the location is in the occipital region.  Then we get

12  the legal report and she says it's in the vertex region.  Okay.

13  That's a pretty big mistake to say the wrong place.

14          Second -- this is even more astonishing -- on

15  the medical report she says PCIA is nonscarring.  Then in the

16  legal report she says it's scarring, which is contradicted by

17  all the literature, every expert in the case.  You have

18  probably heard this countless times, but yet she calls it

19  scarring.  She is internally inconsistent.  She is getting this

20  wrong.  Then in the medical report she has no differential

21  diagnosis.  In the legal report, of course, she has a

22  differential diagnosis.

23          So this just underlies all of her testimony and

24  shows that she didn't know what was going on here, that she

25  didn't do an appropriate differential diagnosis, that she

10:54

1  didn't have the appropriate methodology.  These are just some

2  small samples here of it.

3          So again the other piece of it on specific

4  causation is she did not rule in or out endocrine therapy-

5  induced alopecia.  She did not rule out traction alopecia.  The

6  CCCA, this is going to be a unique case because obviously she

7  has that.  She admits that she has CCCA, she couldn't tell us

8  what percentage, and she said PCIA is predominant.

9          We tried to ask her what's the basis for that.

10  Of course, that's that whole section that we say is copied from

11  Dr. Tosti, should be taken out.  "What's your basis of that?"

12  She can't answer it.  So again there's so many flaws in her

13  opinions.  All of them relate to her methodologic flaws and

14  deficiencies.

15          Again, failure to rule in and out potential

16  alternative causes is fatal to specific causation.  You can

17  pick any one of these problems to basically grant this motion

18  and exclude her.  You have your pick, if you will.

19          Also, there's legal conclusions.  In her legal

20  report she includes a section on substantially contributing

21  factor.  This is a minor point, a lesser point.

22      **THE COURT:**  I'm not interested.  That doesn't bother

23  me.

24      **MS. COHEN:**  So that's sort of specific causation.  I

25  think you understand where I'm coming from there.  It is a big

10:55

1    deal.  Plaintiffs will say, A, the defense experts have parts

2    of their reports that copy other ones.  Not so.  I think what

3    they are talking about is Rule 26(a), at the very top paragraph

4    and the last paragraph, but there's no sections that copy whole

5    cloth like 13 pages of PCIA general causation.

6              They will say, "Well, she can have her day on

7    cross-examination."  That's not what we are asking for,

8    Your Honor.  Certainly we will come to that point and we will

9    ask to be able to do that, but the important thing is she does

10   not meet the standard under *Daubert*.  She does not meet the

11   methodologic reliability that's required.  She doesn't even

12   come close.

13             There's so many grounds for this.  I'm actually

14   pretty surprised that this is who they are putting up as their

15   expert in our first 505(b)(2) case.  She was not either given

16   the appropriate tools nor did she ask for them.  Either way,

17   this motion should be granted, Your Honor.  I think I will

18   defer the general causation part to Ms. Callsen, if that's

19   okay.

20             **THE COURT:**  That's fine.  Thank you.  All right.  I

21   need you to remove the little --

22             **MS. COHEN:**  Remove these and replace them.

23             **THE COURT:**  Throw them away.

24             **THE DEPUTY CLERK:**  Don't replace them.  Palmer will

25   do that.

1    **MS. COHEN:**  Don't replace them.  Put my mask back on.

2    **THE COURT:**  Yes.

3    **MS. COHEN:**  Thank you very much.

4    **THE COURT:**  Thank you.

5    **MR. LAMBERT:**  Good to see you again, Your Honor.  I'm

6    glad to be back in court arguing.  I'm a little bit

7    disappointed that this is how we have to start again.

8           Good morning.  Palmer Lambert on behalf of

9    Ms. Stewart.  I first would like to say that I had a conferral

10   with counsel, and this particular argument we would like to

11   maintain a seal on the transcript.  We have an agreement with

12   counsel that the pleadings should be sealed for this particular

13   issue because of the gravity of the issues and the claims that

14   have been levied against our expert.

15   **THE COURT:**  We are going to have to talk about that.

16   As a matter of fact, that's part of the conversation I want to

17   have with liaison counsel.  I'm sure you are aware of the

18   recent Fifth Circuit opinion that admonished the Court just

19   because people agree on sealing documents, that's insufficient.

20   Maybe we can hold this at this point and discuss it afterwards.

21   **MS. COHEN:**  Your Honor, if I may, we didn't actually

22   have a conversation and I didn't actually agree to that.  I'm

23   happy to discuss what you think is the best solution.  He may

24   have talked with Ms. Callsen.  Again, my client has been in

25   this case accused of many, many things.  That's all public

10:59

1    record.  People at Sandoz have been accused of things.  I don't

2    see why this merits being under seal.

3            MS. CALLSEN:  We agreed that the pleadings, I just

4    want to make --

5            MR. LAMBERT:  The pleadings, that's what I said.

6            MS. CALLSEN:  The pleadings were under seal.  We did

7    agree to file the pleadings under seal.

8            THE COURT:  Okay.  What I think I just said is we

9    will talk about this later.

10           MS. CALLSEN:  We will talk about it later.  I got it.

11           THE COURT:  Right now I have this on my plate, but it

12   is of concern to me because a lot of the documents in this case

13   have been filed under seal.  I understand medical records, but

14   that's a conversation I intend to have with liaison counsel.  I

15   don't want to debate this in this forum at this moment.

16           MR. LAMBERT:  That sounds good.  We understand.

17           THE COURT:  Let's start with the argument on this

18   document.

19           MR. LAMBERT:  Okay.  I will try to be brief here and

20   stick to my seven minutes.  We are extremely concerned -- and

21   our expert is too -- about the gravity of the claims.  Frankly,

22   she feels targeted and harassed by the questioning.  I don't

23   know if Your Honor has had a chance to look at the video --

24           THE COURT:  I have not.

25           MR. LAMBERT:  -- or the 1,100 pages that were

11:00

1   attached by the defendants to their briefing, but the

2   questioning was clearly intended to get under our expert's

3   skin.  It was the use of, in particular, the oncology

4   organization of which she is a member to attempt to show that

5   she was breaching rules of her professional organization.  In

6   doing that it highlights an issue that is somewhat unique to

7   MDLs because we can't unsee what's happened in the last

8   four years in this case.

9            Dr. Tosti is an expert who has passed *Daubert*

10  and whose report was cited as reliance in Dr. Rosic's expert

11  report.  Now, perhaps her paraphrasing and her citations are

12  not perfect.  She is not a legal writer.  She didn't follow

13  *The Bluebook*.  There are the exact same types of copying across

14  defendants' expert reports.  In their reports it happens in the

15  conclusions, in the opinion section, not in the background

16  sections about different types of hair and different types of

17  hair loss.

18          **THE COURT:**  I will tell you, Mr. Lambert, I was not

19  particularly -- and I think I indicated to Ms. Cohen that in

20  the first 20 pages or so, I felt like I was reading a high

21  school biology textbook where a chapter might be hair because

22  there was nothing particularly profound about it.  It was what

23  I would expect to be background information.  I was not

24  excited.

25            Some of it was troubling because it appears that

11:02

1    it's cut and pasted, but I don't think there was a great deal

2    dealing with her methodology.  It was what I would call a

3    primer on hair and the types of hair, what it looks like, the

4    growth cycle, those sorts of things.  I was not particularly

5    excited about that.  Then we get into the methodology.  That's

6    where I think the focus should be.

7             Now, it was troubling that some of the

8    paragraphs were exact.  I was not as troubled about that.  I

9    might be troubled when she used the sentence -- and I believe I

10    read the sentence:  "The studies I have analyzed in the

11    aggregate demonstrate that Taxotere/docetaxel is far more

12    commonly reported as being associated with PCIA than any other

13    chemotherapy regimen."  That comes out of Tosti's report, and

14    that's getting into what I would call the meat of the matter

15    where my interest is piqued, if that helps.

16       **MR. LAMBERT:**  I think, Your Honor, we would agree

17    with that.  In the defendants' own papers, they agree that a

18    certain number of pages are dedicated to background and these

19    other pages starting, I think, in the pages around 49 and 50

20    relate to Ms. Stewart.  In this case the conduct that Sandoz

21    seeks to convince the Court happened just simply doesn't rise

22    to the level of the *Legier* case or any of the other cases

23    cited, frankly, because there is attribution.

24             It's not perfect, but it is not like she didn't

25    cite Dr. Tosti's report.  Counsel has been at every one of

1   Dr. Tosti's depositions.  They have copies of all of that

2   material.  It really is nonsensical to think that somehow some

3   revelation was revealed about this in her deposition.

4            In addition, this is not the opinions.  This is

5   not the foundation of her opinions either.  Dr. Rosic --

6            THE COURT:  Well, let's talk about that because I

7   will be honest with you.  That's where I would like to focus.

8   What about her differential diagnosis and why was she not

9   provided sufficient background medical information?  That's

10  what's important to me.

11           MR. LAMBERT:  Well, Dr. Rosic followed the normal

12  standard of care guidelines that she always uses when she

13  evaluates a patient for hair loss.  You are damned if you do

14  and you are damned if you don't.  So if you follow your normal

15  rules and you don't look at hundreds of pages of depositions

16  and --

17           THE COURT:  I'm not worried about depositions.

18  Medical records.

19           MR. LAMBERT:  And medical records.

20           THE COURT:  Did she get a complete medical history

21  from this lady?

22           MR. LAMBERT:  She did get a complete medical history

23  as part of her normal standard of care discussions in her

24  clinical exam.  She couldn't have gotten that from Dr. Tosti.

25  Dr. Tosti has never met Ms. Stewart.  She did her exam based on

11:05

1    that.  She also did her biopsies and did contemporaneous

2    medical records which, as we have discussed with Your Honor

3    before, the Court has equated that to a Rule 35 exam.  Those

4    records have to be produced earlier than the actual expert

5    report, so it makes sense that the expert report is going to

6    have more information in it than the medical report.

7              Then she is also a dermatopathologist, so she

8    followed her normal standard of care way based on her years and

9    years of experience in these two fields, as a board-certified

10   dermatologist and dermatopathologist, to come to her

11   conclusions.

12             She explains her differential in her deposition.

13   She perhaps is a little bit less detailed than we would like in

14   her report about what she excluded and how, but she explains

15   that in her deposition and she is asked about that.

16   Unfortunately, counsel spent a lot of time on information not

17   related to her opinions in her deposition.  We have some very

18   good direct exam questions from Ms. Perez Reynolds about her

19   actual opinions and what they are based on.  I think it's very

20   clear, if you look at pages 220 or so to the end of the

21   deposition, about what Dr. Rosic actually did and how she came

22   to her conclusions.  It's all within exactly what the Court has

23   allowed before with Dr. Tosti and her differential.

24             She excludes various things based on both

25   dermatology and the clinical exam, the pull test.  She also

11:07

1    goes through the slides and what the cells show her in terms of

2    the lower count of hair follicles, preserved sebaceous glands,

3    things that dermatologists/dermatopathologists do.  She came to

4    her conclusions well within the standard of care and well

5    within the framework that this Court applied to Dr. Tosti and

6    Dr. Thompson before.

7                    In addition, she relies on the same general

8    cause information that Dr. Tosti and Dr. Thompson did, and that

9    is perfectly fine.  There's not one expert in this case thus

10   far, in the past four years, that has done a full general cause

11   analysis in support of their specific cause dermatology

12   analysis, and that's not required.

13                   At this point I think we have learned a lot in

14   this litigation, and it's just nonsensical to think that the

15   lawyers are not involved in helping their experts get their

16   reports together.  It's clear when you compare the defense

17   experts, three of them in the field of dermatology and

18   dermatopathology, that there are shared sentences.  There are

19   verbatim sentences across them.  They are not their own words.

20   That really is a red herring.  We should be focusing on --

21            **THE COURT:**  I'm concerned about the lack of medical

22   records.  Did she have sufficient medical records and what was

23   the process by which the medical records were provided to her?

24   If she walks in with 13 pages provided from plaintiffs' counsel

25   as opposed to a complete picture of this patient or this

11:09

1    woman's alleged PCIA, how can she form those specific opinions

2    without a complete history, or is Dr. Rosic relying on the

3    history provided by the patient when she presents?

4              MR. LAMBERT:  That is her normal, standard practice,

5    to rely on the clinical history that she takes from the patient

6    when she meets with the patient.

7              THE COURT:  Is that sufficient in this context to be

8    a specific causation expert?

9              MR. LAMBERT:  It is, Your Honor.  That is fodder for

10   cross-examination at trial, to look at that and to say, "Hey,

11   wait a minute.  Didn't the plaintiff testify differently?

12   Would that have changed your opinion?"  I think that's fine.

13   That's appropriate cross-examination.  I think we have a

14   fundamental, I think, misunderstanding.

15             The defendants claim today that she was only

16   provided with 13 pages of medical records.  That's not true.

17   There are emails that are attached to our opposition that show

18   that there was an error there.  In her original reliance list,

19   there was a listing for medical records.  Defense counsel

20   appropriately within CMO 14 asked for us to produce those

21   materials and to let them know what they are.

22             Dr. Rosic was provided access to all of the

23   medical records that are on MDL Centrality for Ms. Stewart and

24   for Ms. Hughes, so she had all of them.  She reviewed much more

25   than just the 13 pages that were uploaded to them --

11:11

1  incorrectly, unfortunately -- and then that error was

2  corrected.  There's email conversations that are attached to

3  our opposition and cited in the footnotes that correct that.

4          That really is a disconnect.  Even if we assume

5  that she just took a history from the plaintiff, it still would

6  be sufficient because that's her methodology.  That's the way

7  she sees patients.  That's the way she evaluates patients for

8  hair loss.

9          I would submit that, finally, Dr. Rosic does

10  respect this process.  She very much takes this seriously.

11  She's the head of the Georgetown dermatology department.  She

12  takes these allegations very seriously.  It was very upsetting

13  to her when she was examined in the way that she was.  We would

14  submit that she is absolutely qualified.  She is more qualified

15  than some of the other defendant experts in this case, not for

16  Sandoz but other experts that have appeared and passed *Daubert*

17  in front of this Court.  Unless Your Honor has --

18      **THE COURT:**  Well, I think we are going to talk about

19  general causation later because I do have some questions there.

20      **MR. LAMBERT:**  Yes, Your Honor.  Just to shortcut

21  that, she is not a general causation expert.  She is our

22  specific causation expert.

23      **THE COURT:**  While I know that she is not going to be

24  testifying solely for general causation, she has to have a

25  basis upon which she ties docetaxel to her diagnosis of PCIA

11:12

1    with this specific patient.  So it can't be, "Well, she has

2    PCIA, so I'm pulling docetaxel out of the air."  We can agree

3    that she has to have some basis for linking that specific drug

4    to the lady's condition.

5              **MR. LAMBERT:**  She cites our other experts who handle

6    general causation as well as numerous studies in the literature

7    and based on her own independent review.  Thank you,

8    Your Honor.

9              **THE COURT:**  Thank you.

10             Ms. Cohen.

11             **MS. COHEN:**  Thank you, Your Honor.

12             **THE COURT:**  Things don't move quite as quickly or as

13   smoothly as they did in February 2020.  The reality is it's

14   better than where we were three months ago.

15             **MS. COHEN:**  We appreciate being here in person.  It

16   is much better.  I will be very quick.  I just want to address

17   some of these points that were made.

18             First of all -- and I don't know if I have to

19   belabor this part.  Obviously, on the defense experts, we

20   disagree that there's any copying.  I think that was sort of an

21   excuse, "Well, your people copied some things too."  There's no

22   evidence of that.  I don't want to belabor that.

23             In terms of my treatment of her, again we stand

24   by that.  I presented you with the video so you could watch it.

25   I think at this point in my career I know how to treat someone

respectfully with her qualifications.  Frankly, we were
surprised by that, but when we get to the specifics of it --

                    Gerard, can you pull up this.

                    I want to show Your Honor.  This is actually
Exhibit J.  This is the document that had her reliance
materials.  This is where we got this.  When I asked her in her
deposition, "Is this everything you have reviewed in terms of
medical reports?" her answer was yes.  The emails that
Mr. Lambert is talking about with new things and new materials
came much later.  The question is what did an expert look at at
the time he or she formulated their opinions, what did they
look at at the time they did the report, and she admitted this
is it.

                    Now, in terms of whether she met her own
standard, when I questioned her on her approach and her
standard approach to differential diagnosis, she said she
typically would meet with a patient, take a history, and then
go on to do the biopsy.  She didn't do that here.  She did the
biopsy first and then she talked to her afterwards about a few
things.

                    First of all, the sequence was not the way she
described her standard approach, which is important, so she
would know where to take it from, so she would know where to do
the biopsy from, and she would get the history.  That didn't
happen here, and why is that important?  Well, I showed you the

11:15

1   slide about her medical report and her legal report.  One of

2   them is wrong.  One of them is wrong in terms of where she did

3   the biopsy, so there's a little confusion there.

4           The more important thing is having a

5   conversation after the biopsy with a patient where she says to

6   her, "Let me ask you a few questions," is not sufficient.  It

7   is not a substitute for not getting the medical records.  It is

8   not a substitute for not getting the testimony.  I know

9   Your Honor said you weren't that bothered by that part, but in

10  this case, in this litigation even, where the hair loss is such

11  an important part of the differential diagnosis -- what it

12  looked like, what the sequence was, when it happened, whether

13  it preceded chemotherapy -- here the testimony is important.

14  Also, I think I'm correct that if you look at --

15          THE COURT:  Wait.  What was I not bothered by?  I was

16  not bothered by the initial what I call "Introduction to Hair

17  101."

18          MS. COHEN:  Oh, okay.  I thought you were not

19  bothered by, in terms of the methodology, her not getting the

20  deposition testimony because I do think that's --

21          THE COURT:  Well, I think deposition testimony of --

22  I don't know.  I was not bothered by -- I don't know if she

23  needs the deposition testimony of everybody involved in this

24  case when she is examining this one particular person.

25          MS. COHEN:  We would say, respectfully, that getting

11:17

1    her deposition testimony to know the history of her hair loss,

2    getting her mother's family history, getting the oncologist was

3    important.

4              Also, we have a witness here she was actually --

5    I can't remember exactly where it was in Louisiana.  She was

6    actually seeing a dermatologist who is a hair loss expert.  She

7    wasn't given her deposition, which that was before.  We will

8    talk about it some more tomorrow.  That was before.  There was

9    a hair loss witness who she didn't have her testimony.

10             There was a lot of gaps, a lot that's missing.

11   Again, with them trying to send her medical records after her

12   deposition to shore this up, that's not sufficient in terms of

13   the differential diagnosis.  Again, the case law is very

14   specific that, in terms of a differential diagnosis, an expert

15   must be aware of the plaintiff's pertinent medical history --

16   this is a Fifth Circuit case -- in order to reliably conduct a

17   differential diagnosis.  The proposed expert's testimony was

18   not proper -- this is the *McNabney v. Lab* decision.

19             We can pull up page 21, if we can, Gerard.

20             Again, this is just the standard law, but it's

21   important in the context here of -- there it is.  "The proposed

22   expert's testimony was not proper.  It was excluded because the

23   expert lacked an awareness of the plaintiff's medical history

24   and failed to consider and exclude other possible causes of her

25   claimed injury."

11:18

1         The *Viterbo v. Dow* case, rejecting the testimony

2  where the medical expert lacked reliability because it was

3  incomplete in critical areas of awareness of her medical

4  history, here we have again not aware of her hair loss history,

5  of her having seen a dermatologist, of the dermatologist not

6  being consulted for hair loss after the fact.  There's a lot

7  here that was missing.

8         Also, I would say Dr. McCanless, who is the

9  oncologist, if we go back to the medical records in terms of

10  those pages, she didn't get those records either.  So it's not

11  just, like, "I didn't see her OB-GYN records," "I didn't see

12  her broken leg records."  There are some instances like that

13  where you might say to me, "Come on, Ms. Cohen.  Did she need

14  to have two boxes of" -- these are critical, critical records.

15  These are critical testimony.  This is not going far afield.

16  She didn't have the right method, the right materials to do a

17  differential diagnosis here.  Frankly, we were very surprised.

18         So with that, again, I would just reiterate that

19  there's no specific causation.  She cannot carry what is needed

20  here.  She should be excluded.  Ultimately, tomorrow I will

21  come back and ask for our summary judgment to be granted on

22  that.

23         **THE COURT:**  Thank you.

24         **MS. COHEN:**  Thank you.

25         **THE COURT:**  Ms. Callsen.

11:20

1          **MS. CALLSEN:**  It's my first time up here, so give me

2     a second to get acclimated.  Good morning.

3          **THE COURT:**  Good morning.

4          **MS. CALLSEN:**  It's nice to see you, Your Honor.

5     Julie Callsen on behalf of Accord.

6               I'm going to circle back and first address the

7     general causation topics that we have touched on.  First of

8     all, we take issue with plaintiffs' claim that since

9     Drs. Madigan, Plunkett, and Feigal passed *Daubert*, they

10    automatically can apply wholesale to cases throughout the MDL.

11    Each case in an MDL retains its individual character, each

12    defendant particularly.

13               I think especially with respect to the 505(b)(2)

14    defendants, these general experts relied largely on information

15    that was not even available to them, meaning to the 505(b)(2)

16    defendants.  The 505(b)(2) defendants used a different

17    regulatory pathway consistent with that status.  We relied on

18    the FDA's findings of safety and efficacy with respect to the

19    innovators clinical program, and we have no right of reference

20    over those clinical studies.  Those were the studies that

21    Drs. Madigan, Feigal, and to some degree Plunkett relied upon.

22               So we obviously have filed *Daubert* motions

23    challenging their opinions.  They are outlined in their

24    individual.  My point was just to say that we take issue with

25    plaintiffs' claim that just because they pass *Daubert*, boom,

11:21   1   Accord should just sit down and be quiet with respect to these
        2   opinions.  Specific to Dr. Rosic --
        3                   You're looking puzzled.
        4               THE COURT:  I am.
        5               MS. CALLSEN:  Okay.
        6               THE COURT:  I am.
        7               MS. CALLSEN:  Why don't I stop and let you ask the
        8   question.
        9               THE COURT:  Are you saying that if a prior
       10   determination was made that these people could testify that
       11   docetaxel -- and I'm very careful how I word this.  When we are
       12   talking about general causation, in my mind the question is
       13   whether or not there's sufficient evidence to determine that
       14   this drug causes this side effect.  There is sufficient
       15   information presented by these experts that that causes it.
       16   How is it different for a 505(b)(2) to say that docetaxel
       17   causes this?  You went into the FDA regulation, which I think
       18   is a regulatory issue, completely different.
       19               MS. CALLSEN:  Correct.
       20               THE COURT:  We had a preemption argument and I said
       21   it's different, but it's the same, and it's very difficult to
       22   navigate that journey.
       23               MS. CALLSEN:  Yes.
       24               THE COURT:  With causation in my mind -- and perhaps
       25   you need to explain that to me -- I'm having difficulty seeing

11:23

1  the difference because the question is is there sufficient

2  information to show that docetaxel causes permanent alopecia.

3       **MS. CALLSEN:**  It depends on how it's applied.  Okay.

4  In this particular case -- I don't want to get into the

5  arguments we made for those other three experts.

6       **THE COURT:**  Right.

7       **MS. CALLSEN:**  With respect to this particular case,

8  Dr. Rosic just adopted those opinions.  She did not perform an

9  independent analysis.

10       **THE COURT:**  Okay.  That's not what you said earlier.

11  Okay.  Okay.

12       **MS. CALLSEN:**  I agree.  When I was preparing for this

13  argument, I had to take a step back and really think through

14  it, but I think you need to look -- the rationale and how it

15  applies in this case is specifically to this particular expert.

16  It may apply differently to the other experts.

17       **THE COURT:**  Okay.  Okay.

18       **MS. CALLSEN:**  It is a difficult issue.

19       **THE COURT:**  Because you said, "Well, wait a minute.

20  The FDA," and I thought, wait, that's not the issue, in my

21  view, on general causation.

22       **MS. CALLSEN:**  I see.

23       **THE COURT:**  The question is does this cause this, and

24  the FDA regulatory process is a completely different question.

25       **MS. CALLSEN:**  It is a different question.  When it

11:24

1  forms the basis that is adopted and then piggy-backed onto the

2  specific causation analysis, that's where it comes into play

3  with respect to Dr. Rosic.

4          **THE COURT:**  Okay.

5          **MS. CALLSEN:**  Dr. Rosic did not do any independent

6  review or analysis of the opinions which she uses to bolster

7  her opinion.  Specifically, with respect to Drs. Feigal and

8  Madigan, she claimed that they performed a causation analysis

9  with respect to nondocetaxel regimens, which is not true.  They

10 did not do that, and they both testified otherwise.

11          Then with respect to Dr. Madigan, she did not

12 understand the meta-analysis that he performed.  She claimed he

13 performed a meta-analysis of all literature which was important

14 to her, where in reality he performed a meta-analysis of

15 observational studies which this Court has since excluded as

16 lacking intellectual rigor.  Then the other analysis he

17 performed, that's where we get into the clinical studies over

18 which Accord had no right of reference.  It just goes to the

19 unreliability and the lack of methodology that Dr. Rosic

20 employs overall with her opinions.

21          I want to just now circle back to the specific

22 causation.  Her differential diagnosis is key in the specific

23 causation.  I know Your Honor has already discussed with

24 counsel some of the concerns.  Our concern is that she did not

25 apply the same clinical practice that she would have followed.

1                    First of all, specifically with respect to

2      Ms. Hughes, she claimed that the moment she laid eyes on her

3      from 20 feet away, she knew she had PCIA.  This was before the

4      biopsy.  Putting that comment aside, she did not review her

5      complete medical history.  She only reviewed a subset of the

6      medical records.  She didn't review her deposition testimony,

7      which did not allow her to take into account certain hair care

8      practices, history of significant stressors which she

9      acknowledged could cause an impact on hair loss.

10             **THE COURT:**  In her report didn't she say that

11     Ms. Hughes had these stressors in her life?  She talked about

12     Katrina, and was there a house fire --

13             **MS. CALLSEN:**  She referred to -- I'm sorry.  I didn't

14     mean to interrupt.

15             **THE COURT:**  No, no, no.

16             **MS. CALLSEN:**  She referred to stressors in 2004 and

17     2005, but she did not refer to the stressors in 2011.  The

18     stressor that temporally was related directly to her hair loss

19     was her brother-in-law dying in a tragic accident, the impact

20     of some issues with her son, and also just the impact of her

21     breast cancer diagnosis.  Those were in 2011.  The stressors

22     that Dr. Rosic referred to were years earlier.  She

23     acknowledged that in her clinical practice these were issues

24     that she would have considered.  So that's where the disconnect

25     comes in, and also her hair care practices.

11:28

1        Further, the important factor in her clinical

2   history, in her medical history, was the endocrine therapy.

3   She didn't take that into account.  She didn't even realize she

4   was still on it despite admitting that the use of endocrine

5   therapy can cause hair loss.  She cited a whole bunch of

6   articles, 22 articles.  Those articles support that hair loss

7   can be caused by endocrine therapy, which the plaintiff remains

8   on to this day, and she totally did not know that, ignored it.

9        So our point was she couldn't even take those

10  factors into account because they were unknown.  This

11  distinguishes it, her analysis, from the analysis done with

12  Dr. Tosti, which this Court is urged to just accept.  I think

13  we can accept the rationale that Your Honor did apply, that

14  this Court applied in looking through Dr. Tosti's, but that

15  just highlights how Dr. Rosic did not apply that same

16  methodology to her differential and how it is deficient.

17       Plaintiffs, in their opposition, they go through

18  the work.  They take, as has been described, the biological

19  textbook and they apply it in their opposition to point out to

20  the Court how Dr. Rosic ruled out certain conditions, but she

21  did not do that work.  That's the work she has to do, not

22  plaintiffs in their opposition.

23       She took a lot of shortcuts.  She claims these

24  are the procedural efficiencies inherent in an MDL, but that

25  all just highlights the lack of reasoning that this expert

11:29

1  employed.  I didn't even touch on the P-word.  I'm not going to

2  touch on that.  Our argument was backed up by law, and it goes

3  to her lack of methodology and the lack of reliability on her

4  opinion.

5              Now what do I have to do?

6         **THE COURT:**  Put your mask back on.  Take off the

7  covers.  You will be a pro by tomorrow and then forget when you

8  come back.

9         **MR. LAMBERT:**  I forgot to take mine off, so I thank

10  Ms. Cohen for covering up my mistake there.

11              Your Honor, Palmer Lambert on behalf of

12  Ms. Hughes.  Since we are sort of treating these as overlapping

13  arguments, I'm going to address some things with respect to

14  Ms. Hughes and some with respect to Ms. Stewart.

15              I think Your Honor asked the appropriate

16  question.  General causation is the question whether docetaxel,

17  the substance, can cause PCIA.  I think we have shown that

18  through Dr. Madigan, Dr. Feigal, buttressed by Dr. Plunkett's

19  review of literature, and attached the UpToDate article, which

20  Dr. Rosic specifically addressed in her deposition, which now

21  directs physicians to specifically warn patients of the risk of

22  permanent alopecia with docetaxel, and also the cite in

23  Dr. Rosic's deposition testimony where she testifies that the

24  literature is overwhelming in support of a causal relationship

25  between docetaxel and permanent chemotherapy-induced alopecia.

11:32

1          THE COURT:  What happens, though, with Dr. Rosic, the

2    absence of some of the history?  I remember in a report -- and

3    it's not before me, but that she talks about Ms. Hughes tying

4    her hair back and that can be a problem.  What she didn't have

5    was that she used certain chemical products in her hair that

6    can be a problem.  She didn't know certain hair practices of

7    hers that could cause this, nor did she seem to understand that

8    Ms. Hughes was on hormone therapy after this treatment.  How do

9    you get to specific causation without knowing some of these

10   very basic facts?

11          Now, I know sometimes patients walk in and they

12   will forget something, and it's why the doctor has to keep

13   asking.  She was not just going to see her as a treating

14   physician.  She was sent as a specific causation expert.  It

15   seems like some critical information was missing.

16          MR. LAMBERT:  Respectfully, Your Honor, I think

17   that's not correct.  I think she addresses it in the specific

18   causation portions of her expert report, and I think she

19   adequately explains it in her deposition.

20          Ms. Hughes' hair loss is profound.  I don't know

21   if you have seen a picture of her.  I hesitate to make a

22   comparison right now standing up, but it is profound.  The

23   statement that Dr. Rosic did make in her deposition about

24   thinking that she might have it right away on seeing her is

25   true.

11:34

1      Dermatologists look at hair differently than you

2 and me.  When they see somebody that doesn't have any hair

3 anywhere and it's not in a pattern, androgen-dependent pattern

4 like female pattern hair loss, then that probably does jump

5 immediately in their internal brain to that being the top of

6 the differential.  Some doctors are better than others about

7 explaining those steps that happen in their brain, but

8 Dr. Rosic did put that at the top of her differential and did

9 talk about those methodologies and the background information

10 of her clinical history and her family history in both her

11 deposition and in the medical records.

12      In addition, when we talk about Dr. Rosic, her

13 opinions are that Ms. Hughes more likely than not has PCIA,

14 based on all of the things that she reviewed, and that it was

15 caused by docetaxel.  Ms. Hughes had a regimen of docetaxel and

16 carboplatin.  Ms. Davis will talk about that later when she

17 addresses our motion with respect to defendants' experts Honda

18 and Durden, but there are no early-stage breast cancer reports

19 of carboplatin causing PCIA.

20      When she goes through and sees a mountain of

21 evidence in support of Taxane/docetaxel causing PCIA and sees

22 basically nothing with carboplatin, that doesn't seem like a

23 stretch to me in terms of the evidence in support of that

24 opinion and the methodology used there to look at the

25 independent medical literature view in support.

11:35

1           I'm going to go back just for a second.  There
2    were some comments about how astonishing the medical report
3    versus the legal report, and one of those examples by Ms. Cohen
4    was that the scalp area was described differently on one of the
5    biopsies.  Dr. Rosic explained that in her deposition.  She
6    explained how some of the areas of the scalp cross over in
7    terms of naming and that there perhaps could be an error in
8    dictation or whatever in terms of the medical record that's
9    created versus her actual expert report.  Then the scarring
10   versus nonscarring thing, that is also very well explained in
11   her deposition testimony.

12          Traditionally, PCIA is characterized by
13   dermatologists in the field as nonscarring, but the component
14   of scarring alopecia is permanency.  Nonscarring alopecias are
15   not considered to be permanent.  She explains all of that in
16   her deposition very well and at length in response to questions
17   from counsel.

18          Even though her feeling that this is more like a
19   scarring alopecia is correct based on the fact that it's
20   permanent and irreversible, that's not consistent with the
21   general dermatology feelings about PCIA and how it's
22   characterized, but that really doesn't matter.  It's a
23   distinction without a difference.  It has characteristics, and
24   the characteristics are why she explains how she characterizes
25   it in terms of scarring or nonscarring.

11:37

1        Then as far as your question about endocrine
2   therapy, I would say, Your Honor, that she explains again in
3   her deposition why endocrine therapy was ruled out.  It would
4   create the same type of a pattern effect in the androgen-
5   dependent areas of the scalp.
6        Finally, I would say here we are again.  We are
7   here where, in the *Stewart* case, we have four dermatology
8   experts-- three on the defense side and one on the plaintiff
9   side -- all agreeing that Ms. Stewart has a component of CCCA,
10   central centrifugal cicatricial alopecia.  They all came to the
11   same conclusion there.  They just disagree about the component
12   that their side says is either endocrine or androgenetic and
13   our expert says is PCIA.  Those are the hallmark of a
14   disagreement over conclusions that should be evaluated by a
15   jury.
16        On top of that, we have talked about statute of
17   limitations multiple times.  I'm not here to talk about that
18   because that's a different motion that we don't have oral
19   argument on.  If this is so complicated that a double
20   board-certified dermatologist and dermatopathologist supposedly
21   can't figure it out, then how is it that Ms. Hughes should have
22   figured it out years ago?  I still don't get it.
23        The fact is that these doctors in the field back
24   in the 2000s and 2010s didn't know about this because it was
25   being concealed.  We have talked about that in our briefing.

11:39

1    When the doctors don't know about it and can't warn about it,

2    the plaintiff shouldn't be held to a higher standard that we

3    have argued ad nauseam between all these experts how difficult

4    it is to evaluate whether something is androgenetic or

5    endocrine or PCIA.

6                I would ask, Your Honor, that there be a

7    specific finding in this particular challenge to Dr. Rosic that

8    she has not plagiarized any opinions and that her methodology

9    is sound and consistent with the methodologies applied by

10   Dr. Thompson and Dr. Tosti.

11               **THE COURT:**  Thank you.

12               **MR. LAMBERT:**  Thank you.

13               **THE COURT:**  Ms. Callsen.

14               **MS. CALLSEN:**  Your Honor, I was looking at Ms. Cohen

15   as some of Mr. Lambert's arguments went to *Stewart*, some went

16   to *Hughes*, some went to a motion not before you, so I was a tad

17   confused.

18               **THE COURT:**  I'm not worried about the motion before

19   me.  I think that's a frustration argument --

20               **MS. CALLSEN:**  Okay.  All right.  Understood.

21               **THE COURT:**  -- by plaintiffs' counsel.  I think there

22   was an agreement between you that you would handle general

23   causation.

24               **MS. CALLSEN:**  Correct.  I was just going to say with

25   respect to the general causation, again, our argument specific

11:41

1    to this motion is the way it was used by Dr. Petronic-Rosic and

2    that plaintiffs' opposition argues that because it has passed

3    *Daubert* muster in another case with respect to another

4    defendant, with respect to another plaintiff, it automatically

5    should apply here.  I think the rationale needs to be examined

6    in light of this particular case with this particular

7    defendant.  That's what I would urge the Court to do.

8            Also, Mr. Lambert referred to a 2020 UpToDate,

9    which UpToDate is a review of articles.  It's a compendium of

10   articles published in 2020.  The plaintiff that I am

11   representing Accord with respect to is in 2011.  I believe

12   Stewart was 2013 or 2014.  So with that, Your Honor, what we

13   both focus on is the methodology, the lack of reliability, and

14   how the opinions just simply do not meet Rule 702.  Thank you.

15           **THE COURT:**  Thank you.

16           **MS. COHEN:**  Your Honor, I don't know if you need to

17   hear from me again.  There were some specific causation points

18   that were made.

19           **THE COURT:**  If you feel like you need it, I will give

20   you two minutes max.

21           **MS. COHEN:**  Okay.  Thank you, Your Honor, just to

22   clarify the part at the end when he started talking about

23   scarring and nonscarring.  I will be very, very brief on this,

24   Your Honor, as you said.  I think Mr. Lambert -- and I got lost

25   on that last part because he was sort of covering general

1    causation, was covering --

2              THE COURT:  Well, he is fighting a tag team.

3              MS. COHEN:  Yes.  So again I'm going to leave that

4    alone, but I will say that on this issue that we raise about

5    the punch biopsy being in the wrong place and two different

6    versions of it and the scarring versus nonscarring, the

7    important thing there -- and maybe we could bring up page 23

8    again if we have that handy -- is that scarring again is CCCA.

9    So when she has that, that tells you that her methodology does

10   not establish -- that tells you that actually the scarring,

11   again, is CCCA.

12             I think that Mr. Lambert made the point at the

13   end, "Well, there are four different medical experts."  We, in

14   fact, have three.  We have two -- we have Dr. Heilman and

15   Dr. Volpicelli -- who are both dermatopathologists.  We have

16   Dr. Rogers, who is down the road here, who is our dermatology

17   expert.  You will hear perhaps about them tomorrow or maybe

18   that will be later on.  I think that his point was, "Well,

19   nobody agrees.  This is just what experts do."  That is not the

20   case here.  I will tell you and I will give you this teaser, if

21   you will, about our three experts.  The evidence is clear they

22   each looked at these things independently.  Nobody copied each

23   other's report.

24             THE COURT:  It's very difficult sometimes for lawyers

25   in these cases to not go afield and then now start arguing a

11:44

1  *Daubert* motion that may be coming on these other experts.  What

2  I'm interested in is Dr. Rosic.

3          **MS. COHEN:**  Yes.

4          **THE COURT:**  I think there was an issue with whether

5  or not in the medical it spoke of nonscarring and in the legal

6  it spoke of scarring.  I think that's where we should focus,

7  not on --

8          **MS. COHEN:**  Yes.  I think the point that he was

9  making was everybody has a disagreement.  That's exactly what I

10  was going to say.  That's not the point here.  The point here

11  is her methodology, whether she did the right approach.  I

12  think the fact that she on the one hand, on general causation,

13  kind of bootstrapped and copied other people shows that she did

14  not have the right background and methodology on that.  Then on

15  the specific causation, she was wholly deficient in terms of

16  what she reviewed.

17          By, again, not following either the standard for

18  differential diagnosis or her own standard for differential

19  diagnosis, by having a quick conversation with Ms. Stewart on

20  the day of a punch biopsy is not a substitute and cannot make

21  up for the fact that she wasn't given the appropriate

22  information upon which to base her opinion.  I think the case

23  law is very clear on that.

24          Again, Your Honor, we would ask that you grant

25  this motion on any one of the multiple grounds, whether it's

11:45

1   that she did, in fact, copy a report that she didn't cite to,

2   that she doesn't have the right information, that she was

3   deficient, and that she didn't have the appropriate

4   methodology.

5          THE COURT:  Thank you.

6          MS. COHEN:  Thank you.

7          MR. LAMBERT:  Your Honor, I'm sorry, but it was a tag

8   team.  It's been represented twice now that I've not told the

9   truth about the use of the same words across the defendant

10  expert reports.  May I just put them up on the screen just for

11  a second?

12         THE COURT:  Sure.

13         MR. LAMBERT:  I'm sorry to do this, but I think I

14  have to.  This is from Dr. Heilman's report.

15         MS. CALLSEN:  Doctor who?

16         MR. LAMBERT:  Heilman.

17         MS. COHEN:  Your Honor, I would just say their

18  *Daubert* challenge is coming later, as you know.  This was not

19  part of their argument.

20         MR. LAMBERT:  I'm just reading these two together and

21  the words are exactly the same:

22              "There was no failure to warn or deficient

23  labeling that caused Ms. Stewart's hair loss."

24              "There was no failure to warn or deficient

25  labeling that caused Ms. Stewart's hair loss."

11:47

1          Then if you read the introduction part of that
2     section, the words that are highlighted here -- it's hard to
3     see on the screen -- the words are almost exactly the same.
4     "Based on the listing," which is the same exact listing, "I
5     come to these conclusions."  The words are the same in theirs
6     too.
7          We are all professionals.  We work with our
8     experts to get our reports done, but there are shared
9     information across them.  We help our experts edit just like
10    they help their experts edit.  As you can tell from my tone,
11    it's very --
12          **THE COURT:**  Mr. Lambert, let me stop you right there.
13          **MR. LAMBERT:**  Thank you.
14          **THE COURT:**  I've had you in court for -- I don't
15    know.  It seems like eternity.  You have always been
16    professional and upfront and honest.  If there was an
17    accusation that you in any way behaved unprofessionally, I
18    reject it.
19          **MR. LAMBERT:**  Thank you.
20          **THE COURT:**  Now, I think everybody is a strong
21    advocate and sometimes we put blinders on, but I don't have
22    those blinders on.  I think everybody in this room and
23    everybody that I've confronted with this litigation and in this
24    capacity have been honest, ferocious advocates.  Sometimes I
25    want to say we can take it down a notch, but I have never felt

11:49

1    that anyone has in any way intentionally misled this Court or

2    behaved in any way that I consider unethical.

3               Now, have you been a strong advocate?  Yes.

4    Have some of you sometimes gotten under my skin?  Yes.  I have

5    never felt that in any way anyone involved in this litigation

6    has been dishonest or unethical or unprofessional.  I hope that

7    allays your fears.

8          MR. LAMBERT:  I appreciate that, Your Honor.  I do

9    respect Ms. Cohen.

10         THE COURT:  I know you do.

11         MR. LAMBERT:  I think she is a great advocate and I

12   think she has done her job.

13         THE COURT:  I know you do.  I know sometimes she gets

14   under your skin.

15         MR. LAMBERT:  Yes.  Okay.

16         THE COURT:  I can promise you, you get under hers,

17   but that's okay.  It is the work you do.  Let's leave it at

18   that.

19         MR. LAMBERT:  Okay.  Thank you, Your Honor.

20         THE COURT:  I don't think we should make any more

21   disparaging comments.  It serves no purpose.  I'm more

22   interested in this.  Okay.

23               Before we leave, I want to introduce Bridget

24   Gregory.  Erin is going to be leaving to have a baby and

25   Bridget, who works with Judge Africk, has scooted down to work

11:50

1    with me.  Bridget will be filling in, and she will have an
2    opportunity to meet everyone else.
3                I did ask for liaison counsel --
4              **THE DEPUTY CLERK:**  Doug is on.
5              **THE COURT:**  Doug is on?  Everybody else, we are at
6    recess.
7              **THE DEPUTY CLERK:**  If we could just ask anybody
8    that's on the Zoom now that's not liaison counsel, if you could
9    leave the meeting and then just join back at 1:00 for the next
10   argument.
11             **THE COURT:**  Why don't you give me until 1:15.  Court
12   will be at recess until 1:15.
13             (Lunch recess.)
14                                * * *
15
16
17
18
19
20
21
22
23
24
25

1      **AFTERNOON SESSION**

2      **(March 18, 2021)**

3          **THE COURT:**   The next motion is Hughes and Stewart's

4      motion for summary judgment on third-party fault, docket 11460.

5      Would the arguing parties please make their appearances.

6          **MR. LEMMON:**   Good afternoon, Your Honor.   It's

7      Andrew Lemmon on behalf of the plaintiffs.

8          **MR. MERRELL:**   Your Honor, Cliff Merrell on behalf of

9      Sandoz.

10         **MR. RUTTINGER:**   Your Honor, Mike Ruttinger on behalf

11     of Accord.

12         **THE COURT:**   Thank you.

13             Mr. Lemmon, are you ready to proceed?

14         **MR. LEMMON:**   Yes, Your Honor.   May it please the

15     Court.   This motion for summary judgment is filed to refine the

16     issues that are going to be tried to the jury based on the

17     pleadings, based on the discovery, and based on the facts that

18     are in dispute.

19             Both Sandoz and Accord have known that this

20     motion was coming since before discovery ended.   I told them it

21     was coming.   Judge North told them it was coming.   I asked

22     specifically during discovery about third-party fault and

23     whether they were going to try to blame anybody or to say that

24     somebody else should have done something with respect to them

25     changing or not changing their label.   I asked them at a time

01:26

1    that would have allowed me to conduct discovery against any

2    third party that they wanted to blame.  I asked them both in

3    the written discovery and discussed it with Judge North.

4          Judge North recognized my discovery for what it

5    was, typical tort discovery to find out what they are going to

6    present at the trial and to allow me to do discovery about

7    whatever their case is about.  The responses to the discovery,

8    even after I told them what I was specifically looking for, was

9    still that they were not going to blame any third party.

10         THE COURT:  Let me ask you, Mr. Lemmon, how is this

11   different from the motion that was filed in the *Kahn* case or is

12   it the same motion just filed in these cases?

13         MR. LEMMON:  I was not involved with the *Kahn* case,

14   but I think the *Kahn* case dealt with alternative causation, and

15   this is not necessarily about causation.  This is about

16   responsibility to change the label.  This is something that was

17   discovery that was unique to the 505(b)(2) defendants, and so

18   the discovery requests were somewhat different and specifically

19   related and aimed at this very issue.  It's summarized on

20   page 2 of our brief, but in the argument I said specifically:

21         "But if you are going to blame Sanofi, for

22   example, or if they are going to blame the FDA, or if they are

23   going to blame their own third-party contractor, or if they are

24   going to blame, you know, one of their own foreign entities, I

25   need to know that so that we can take discovery of those

01:28

1    entities during the discovery period."

2               They answered the discovery by saying they were

3    not going to blame anybody else, but on page 5 of the brief --

4    I'm particularly looking at Sandoz's brief -- it says:

5               "Sandoz certainly will present evidence that

6    (i) the FDA also jointly held responsibility with respect to

7    updating the Sandoz labeling, (ii) Sanofi was responsible for

8    updating its own labeling, and (iii) Sandoz was reliant on both

9    FDA and Sanofi with respect to Sandoz's label."

10              That is exactly what I asked.  Exactly.  I even

11   said FDA, I even said Sanofi, and they said, "We are not going

12   to blame any third party."  Yet now in their briefing they say,

13   "Well, we do intend to blame them.  We do intend to present

14   evidenced that they had responsibility with respect to updating

15   the label that affected us updating our label."  Well, that's

16   not what they said in response to discovery, and it's not fair

17   to the plaintiffs for them to at this point, after discovery is

18   closed, try to reopen those issues for the presentation to the

19   jury.

20              On page 3 and 4 of Sandoz's brief, it talks

21   about the things that they were going to wait until expert

22   reports to reveal what they specifically were blaming.  So

23   things like the plaintiffs' hair loss being unrelated to

24   docetaxel, or endocrine therapy and other chemotherapy agents

25   caused hair loss, or hair treatment products, or failure to

01:30

1    seek treatment for hair loss, those things are fair game

2    because that was not part of what we specifically asked about

3    who else they were blaming.

4         **THE COURT:**  So you differentiate between parties in

5    other causes?

6         **MR. LEMMON:**  That's correct and specifically

7    differentiated to them in both my written papers as well as in

8    the argument in front of Judge North.

9              The same as with the medical providers, the same

10   holds true.  We asked about anybody who had any other

11   responsibility.  The facts are, from their experts, that they

12   are not blaming the doctors.  So when we get to trial, they

13   should not be allowed to blame the doctors.  The Court should

14   enter summary judgment saying that the doctors are not at

15   fault, that Sanofi is not at fault, that the FDA is not at

16   fault.  They are not blaming them.  It's not part of their

17   case.

18             Now, this isn't a motion in limine.  I'm not

19   asking the Court at this point to make rulings on what specific

20   evidence is admissible.  This is their defense and so we have

21   filed this motion for summary judgment based on their defense.

22   The motions in limine will come later, once the Court decides

23   what is fair game for the jury, but at this point we are asking

24   for summary judgment to narrow the issues that are going to be

25   tried, to define what is specifically before the Court to

01:32

1  inform the motions in limine that we will have to file later,

2  and then at trial to inform the Court's rulings on the trial

3  objections.

4          So we believe that we gave them ample time while

5  discovery was open to answer the question "We are going to

6  blame FDA," "We are going to blame Sanofi," "We are going to

7  blame a doctor."  They said none of that.  When I asked who

8  they were going to blame, they said no one.

9          **THE COURT:**  Thank you.

10         **MR. LEMMON:**  Thank you.

11         **THE COURT:**  Mr. Merrell.

12         **MR. MERRELL:**  Yes, Your Honor.  I do have a

13  PowerPoint I would like to be able to share.  Cliff Merrell on

14  behalf of Sandoz.

15         Your Honor, plaintiff seeks summary judgment as

16  to Sandoz's affirmative defenses 6, 7, 10, and 16, and in our

17  view plaintiff has not met that burden.  To be clear because I

18  think this is sort of the core of what Mr. Lemmon argued in his

19  motion and I think it is the core of their motion for summary

20  judgment, but our issue is that the result could be much

21  broader than what he explained in his argument.

22         Sandoz does not intend to invoke third-party

23  fault as to plaintiffs' positions or Sanofi, and that appears

24  to be the focus of plaintiffs' motion.  We have said that very

25  clearly in our opposition, that we are not here to blame Sanofi

01:35

1    or the FDA.  It's sort of an issue of facts versus fault.  We

2    are not here to argue fault, but there are a lot of facts that

3    we need to bring in that will go to issues in our case.

4            We are going to, for example, introduce evidence

5    of plaintiff's failure to seek treatment for her hair loss,

6    numerous alternative causes, and potentially superseding and

7    intervening causes for her hair loss, including her hair

8    practices, CCCA, endocrine therapy, and other chemotherapy

9    agents.

10            **THE COURT:**  But that wouldn't be a party.  I think

11   what I'm hearing from Mr. Lemmon and what I read was, "We are

12   concerned about parties."  When I think of a party, I think of

13   your physician.

14            **MR. MERRELL:**  Right.

15            **THE COURT:**  It's his fault.  If he hadn't prescribed

16   it, then you would not be in this position.  If Sanofi had done

17   this, this would not have happened.  I don't think endocrine

18   therapy you can call a party or her hair practices a party.

19            **MR. MERRELL:**  Right.  Understand.

20            Could you go to the next slide, Gerard.  That

21   can help explain it.

22            Our affirmative defenses 6, 7, 10, and 16 go to

23   a number of different issues, and they are seeking summary

24   judgment as to all four of these.  We think that that is the

25   part that's improper; so, for example, intervening and

01:36

1    superseding cause, acts or omissions of plaintiffs or third

2    parties, whether a plaintiff exercised ordinary care.

3              In answer to your question, no, we are not

4    blaming doctors.  We are not blaming any of the treating

5    physicians.  We don't quibble with that fact in the motion.  We

6    are not going to blame Sanofi or the FDA that they should have

7    updated the labeling.  That is not what we are arguing.  The

8    concern we have is that by granting this motion --

9              THE COURT:  Could I grant this motion in part?

10             MR. MERRELL:  You could grant this in part on that

11   narrow issue, but the key component that I think is important

12   is that we are able to explain to the jury these facts and what

13   the treating physicians said --

14             THE COURT:  Sure.

15             MR. MERRELL:  -- and what the alternative causes are.

16   I just have some concern, based on how broad some of our

17   affirmative defenses are and how broad the motion is, that an

18   order could potentially be overly broad and prevent us from

19   presenting this evidence.

20             Can you go to the next one, Gerard.

21             I know Mr. Lemmon expressed that he is not here

22   to limit evidence, but we just want to make sure that the

23   order -- consistent with what happened in *Kahn* when were at the

24   motion for summary judgment, that the order not somehow prevent

25   us from introducing evidence.  It shouldn't be an evidentiary

01:37

1    order.

2              THE COURT:  No.

3              MR. MERRELL:  It should be simply related to these

4    specific issues related to the treating physicians and not

5    blaming them and not blaming Sanofi as well.

6              The other thing with respect to Sanofi and the

7    FDA is that we do need to talk about and present to the jury

8    evidence regarding our reliance on the original Sanofi-approved

9    labeling, the approval of the FDA of that labeling, and all the

10   information that we have with respect to that, to present that

11   as evidence to the jury so they have an understanding of the

12   reasonableness of our conduct.

13             Can you go to the next one, Gerard.

14             Just briefly to talk about these four

15   affirmative defenses just to get an idea that some of the

16   evidence we are presenting does touch on those, so I wouldn't

17   want those particular affirmative defenses dismissed, and that

18   is, for example, Sandoz's experts intend to offer opinions that

19   plaintiff's hair loss is unrelated to her use of docetaxel and,

20   in fact, it's due to CCCA and androgenetic alopecia,

21   chemotherapy agents that she also used and endocrine therapy,

22   and also present evidence about the hair treatment that

23   plaintiff had.

24             That is our concern is that, if viewed broadly

25   enough, this motion could prevent that sort of evidence, and we

01:38

1    think that's critically important to present to the jury.  We

2    are presenting facts, not fault, to the jury with respect to

3    what happened with her treatment and with respect to her

4    medical history, as well as with respect to Sanofi's labeling

5    and the FDA as well.

6         THE COURT:  When I think of third-party fault, to be

7    honest, my thought is if they have a place on the jury form.

8    Is this person at fault?  Is it their responsibility that this

9    occurred?  Third-party fault, then, is something that you have

10   to show the jury and then there's an apportionment of fault at

11   the end.  You're telling me, "We have no intention of saying

12   that the treating physicians or Sanofi is to blame for this

13   event, but it could be that her hair practices are problematic.

14   Endocrine therapy could be problematic."  It seems to me that

15   you are saying the same thing.

16        MR. MERRELL:  I think that's correct, Your Honor.  I

17   don't think we anticipate putting anyone on the jury form.  As

18   we said and we have already conceded in our opposition, we are

19   not blaming physicians and we are not blaming Sanofi.  The

20   issue of what happened before Judge North, that was a very

21   narrow issue.

22             Can you go to the next slide, Gerard.

23        THE COURT:  Well, I understand that, but there was a

24   question --

25        MR. MERRELL:  Right.

01:39

1    **THE COURT:**  -- so that we can explore these areas of

2    fault.  Okay.

3    **MR. MERRELL:**  Right.  Judge North was very clear

4    because it was initially brought up to his attention, you know,

5    make sure -- the plaintiffs argued that they wanted information

6    on any third parties that we would blame.  Judge North,

7    ultimately what he said was that it would be narrowed to are we

8    blaming Sanofi or somebody else for not updating the labeling.

9    **THE COURT:**  Right.

10   **MR. MERRELL:**  That was the very narrow decision he

11   made.  We ultimately supplemented our discovery to note that we

12   could not identify anybody on that point.  That goes exactly to

13   our opposition here, which says that we don't intend to blame

14   Sanofi or the FDA.

15       Our view on Sanofi and the FDA and the evidence

16   at this point is that our company, the original labeling was

17   based on that Sanofi labeling.  It was based on the clinical

18   trials that Sanofi had conducted.  Safety and efficacy had been

19   determined by the FDA.  That's a very important story for us to

20   present to the jury to give context of the reasonableness of

21   Sandoz's decisions; for example, that Sandoz essentially would

22   look for any changes in the labeling that Sanofi made, and then

23   they would update the labeling if that was approved by the FDA.

24   We need to make sure that there's not a result from this motion

25   that would preclude us from entering that in.  I think

01:41

1    Your Honor's decision in *Kahn* was pretty clear that this sort

2    of motion for partial summary judgment does not lead to an

3    evidentiary restriction.

4         **THE COURT:**  Right.  It was a little different in

5    *Kahn*.  The request was a little different.

6         **MR. MERRELL:**  That's right.  The facts weren't the

7    same because it didn't deal with --

8         **THE COURT:**  Sometimes it's the same, but it's

9    different.

10        **MR. MERRELL:**  Right.  It was a little different

11   because it didn't deal with the labeling issues and it dealt

12   more with some alternative cause issues.  Ultimately, the

13   result was that there was no restriction on the evidence that

14   was going to be presented.  Here we just want to make sure --

15   and I don't know that I needed to argue much more.  We just

16   want to make sure that there's not going to be a concern that

17   we can't present certain evidence, because we certainly want to

18   present evidence of treating physicians and evidence related to

19   Sanofi and the FDA regulatory story, and the relationship

20   between FDA and Sandoz and putting together the labeling.  Does

21   that make sense, Your Honor?

22        **THE COURT:**  Uh-huh.

23        **MR. MERRELL:**  Okay.  Unless you have anything else, I

24   think I can cut my PowerPoint short.

25        **THE COURT:**  Yes.

01:42

1      **MR. MERRELL:**  Thank you, Your Honor.

2      **THE COURT:**  Thank you very much.

3          We have Mr. Ruttinger.

4      **MR. RUTTINGER:**  Good afternoon, Your Honor.  I'm

5  Mike Ruttinger for Accord.  I just want to thank you briefly,

6  too, for allowing us to appear virtually today.  Hopefully we

7  will be able to join you in person in a couple of months as we

8  move forward in these cases.

9          I want to just briefly address the argument

10  Mr. Lemmon made on plaintiffs' behalf today because I think

11  there's a little bit of confusion between the argument today

12  and the argument in his briefs.  The argument we heard today is

13  really not the one that was briefed by the parties here.  In

14  fact, if you actually look at the affirmative defenses

15  identified by plaintiff against Accord -- 24, 25, and 31 --

16  none of those were third-party fault defenses or involved the

17  actual labelings.  They actually had to do in many instances --

18  for example, 24 -- with proximate cause.  25 actually had to do

19  with whether Accord would be defending third parties in

20  allegations by plaintiffs.  The 31st one has to do with drug

21  allegations issues that could have been something like an

22  intervening cause issue.

23          Respectfully, Your Honor, these are the same

24  issues or very similar to the ones decided by this Court in

25  *Kahn*, where it said these are proximate cause or

01:43

1   causation-related issues, they are not affirmative defenses

2   under Louisiana law, and so granting a motion for summary

3   judgment is inappropriate at this time.

4              Now, if we briefed the same issue that

5   Mr. Lemmon described today about is Accord going to blame

6   someone for failing to update its labeling, this would have

7   been a narrower issue.  Frankly, it would have been a moot one

8   because the response to Judge North's directions, when he asked

9   Accord and Sandoz to respond to this particular issue, was no,

10  Accord won't be blaming anyone for failing to update its own

11  labeling.

12             Our concern here with this motion and with any

13  order potentially granting it is because it seems to be

14  untethered from any actual affirmative defenses that plaintiff

15  has --

16        THE COURT:  Isn't that affirmative defense 24,

17  "Accord states that the sole proximate cause of the injuries

18  and/or damages alleged by plaintiffs were the actions,

19  omissions, or negligence of a person or persons other than

20  Accord"?

21        MR. RUTTINGER:  Your Honor, we don't think that's a

22  true third-party defense in the sense that it's going to

23  specific causation and proximate cause --

24        THE COURT:  Okay.

25        MR. RUTTINGER:  -- which is part of plaintiffs'

01:44

1    burden of proof.  [Zoom audio distortion] Accord respond to the

2    issue Mr. Lemmon is raising about whether Accord is going to

3    point the finger at somebody else for failing to update its

4    labeling, which Accord said in its discovery that it would not.

5                 **THE COURT:**  Okay.

6                 **MR. RUTTINGER:**  I think had this issue been raised,

7    it probably would have been moot.  My concern here is that if

8    this Court were to enter an order granting plaintiffs' motion

9    when it's untethered from the record and affirmative defenses

10   that that can be misused, intentionally or inadvertently, to

11   preclude key parts of the regulatory narrative here.

12               Accord is a 505(b)(2) company that relied on, to

13   a heavy extent, the FDA's consideration and approval of

14   Sanofi's clinical trial documents, which you heard Ms. Callsen

15   say earlier today Accord does have a right of reference to.

16   It's impossible to tell Accord's regulatory story without

17   talking about Sanofi and what Sanofi did and what Sanofi

18   studied and what the FDA didn't study.

19               That's not the same as blaming Sanofi for

20   Accord's failure to update its labeling.  That's not the

21   argument we are making.  An order that is untethered from the

22   actual record here and the discovery responses threatens to be

23   overbroad, cause confusion, cause confusion at the time of

24   trial, and lead to us having to argue these same sort of

25   in limine related issues again at the time that we actually

01:46

1    have a trial on any of these cases.

2            That's why we think this motion is really

3    premature.  To the extent it has to do with an affirmative

4    defense related to third-party fault for updating the label, we

5    think it's moot and believe that plaintiffs' motion should be

6    denied at this time for those reasons.

7            **THE COURT:**  Thank you.

8            **MR. RUTTINGER:**  Thank you, Your Honor.

9            **THE COURT:**  Mr. Lemmon.

10           **MR. LEMMON:**  Yes, Your Honor.  Thank you.  I'll be

11   very quick.

12           I think the argument is more nuanced than

13   counsel has discussed.  Looking at again Sandoz, in particular,

14   page 5 of what they intend to do sheds some light on it.  There

15   are two issues here.  You have the issue first of what they did

16   and who they relied on prior to coming to market.  I get that,

17   and that's going to be the story that they are going to tell.

18   They are going to say, "Sanofi did its research and made its

19   presentation and had its drug, the FDA approved it, and we

20   relied on that and we came to market."  Okay.  That story is

21   fine, but the story doesn't end there based on the papers that

22   they filed.

23           They say that they are going to present evidence

24   that FDA jointly held responsibility with respect to updating

25   the label.  If that's what they are going to do, that is the

01:47

1    exact third-party fault that I was asking for during discovery
2    so I could do some further discovery about that particular
3    issue.
4                It's not what happened before; it's the update
5    part that concerns me.  It's the update part that I
6    specifically asked about and it's the update part that both
7    parties responded to say, "We are not going to present evidence
8    of anybody else's fault for our failure or our not" --
9           **THE COURT:**  Mr. Lemmon, why could I not do this
10   further down the road through a motion in limine?  Some of this
11   is rather nuanced and sometimes you have to look -- from my
12   perspective I think it's, I dare say, easy to say that no one
13   is going to attribute fault to the prescribing physician for
14   this injury.
15          **MR. LEMMON:**  Okay.
16          **THE COURT:**  Let's take that one off the table, but
17   some of this regarding the interplay between FDA, Sanofi, and
18   these 505(b)(2)s is a little more difficult.  Maybe the more
19   prudent course of action would be to delay and then look at the
20   specific evidence that's to be excluded and handle that through
21   motions in limine considering what the responses were during
22   the discovery phase of these cases.
23          **MR. LEMMON:**  I think it's a two-step process and
24   that's why we brought this motion, first off, to clarify what
25   is before the Court and what evidence they intend or would like

01:49

1   to present.  Because they denied that they were going to try to

2   cast fault on anybody else and now in their papers admit that

3   that's exactly what they are going to try to do, I think it

4   highlights the need for this motion.

5          Then based on the finding of [Zoom audio

6   distortion], if there is no third-party fault that's going to

7   be presented against FDA or against Sanofi or against the

8   treating physicians, then we would have our motions in limine

9   based on more specific evidence.  This is broader and it was

10  intentionally broader.  The reason why I propounded the

11  discovery in the first place was so that I could do discovery

12  of, you know, whatever it is that they are going to try to say

13  that FDA didn't do with FDA's, quote/unquote, jointly held

14  responsibility.

15      **THE COURT:**  Mr. Lemmon, you don't mean to tell me

16  that you didn't do discovery between the interplay of these

17  505(b)(2)s, Sanofi, and FDA?  I think that's the concern, is

18  that this motion would preclude evidence as to that interplay,

19  which has got to be a part of this case, it seems to me, but

20  maybe I'm missing something.

21      **MR. LEMMON:**  Well, we didn't do discovery on, for

22  example, what they think Sanofi was supposed to have done that

23  led to them not updating the label or that FDA was supposed --

24  we did not do that because specifically they said they are not

25  part of this.  We had our hands tied because we had to look for

01:51

1  our discovery based on what they said they were trying to

2  prove.  If they would have said Sanofi should have done X, Y,

3  and Z, then --

4      THE COURT:  Maybe I'm missing it because I don't

5  think that's what I'm hearing that they said is that Sanofi --

6      MR. LEMMON:  You're right, Your Honor.

7      THE COURT:  It is pretty nuanced and that's why I am

8  concerned about an overbroad judgment.  I am familiar with what

9  the responses were and what your concerns are and I understand

10  that, but I think we could find ourselves with a broad ruling

11  that precludes them from presenting the evidence of that

12  interplay, which I think would necessarily be a significant

13  part of this case.

14      MR. LEMMON:  Fortunately, Your Honor, we have the

15  same fact finder who will be making the later decision on that.

16  I just can't reconcile them saying that FDA also had joint

17  responsibility with respect to updating the label with their

18  answers to discovery that they are not going to blame anybody

19  else for them not updating their label.  It can't be

20  reconciled.  Now, if they are going to withdraw that paragraph

21  of their papers, then --

22      THE COURT:  I think you could easily say, "Listen, we

23  don't think Sanofi did anything wrong.  Sanofi didn't have to,

24  but we were limited because we could not do certain things."

25      MR. LEMMON:  I think that they needed to tell us that

01:53   1   in discovery.

2           THE COURT:  Okay.

3           MR. LEMMON:  That's the point.  If they told us that

4   in discovery, then I could have explored that.  I could have

5   taken a Sanofi deposition about whatever that issue is, and

6   Sanofi could have defended itself and said, "No, we weren't

7   responsible to do that," that was Sandoz's responsibility or

8   Accord's responsibility.  That's exactly what I was trying to

9   figure out when I propounded this discovery in the first place.

10          THE COURT:  I think part of that is we are back to

11  the preemption argument too, just so you know, and my head is

12  about to explode.

13          MR. MERRELL:  Your Honor, may I just respond?

14          THE COURT:  Okay.  Thank you.  I understand your

15  argument, Mr. Lemmon.  I think Mr. Merrell is about to --

16          MR. MERRELL:  May I just respond briefly?

17          THE COURT:  Briefly --

18          MR. MERRELL:  Okay.  Very briefly.

19          THE COURT:  -- because it's not your motion.  Very

20  briefly.

21          MR. MERRELL:  Very briefly.  The one thing I would

22  say on the point about the FDA is all that actually was

23  disclosed in discovery through the depositions of the company

24  witnesses that work with the FDA that are in regulatory as well

25  as our FDA expert, Roger Williams.  What we said in the brief

1    about our position about the FDA having joint responsibility,

2    that was disclosed in discovery.

3              I think, at the end of the day, Mr. Lemmon in a

4    way makes my point, which is we are sort of going down the

5    evidentiary road, which is the concern we raised in response to

6    this motion, is that it could be restrictive, and those were

7    the pointed questions you asked.  We are not here to put the

8    FDA on the verdict form, but it is part of the context and

9    explanation to the jury about the reasonableness of Sandoz's

10   decisions.

11             **THE COURT:**  Thank you.

12             **MR. MERRELL:**  Thank you, Your Honor.

13             **THE COURT:**  The final motion that we are going to

14   argue today is plaintiffs' motion to exclude Kord Honda and

15   Faith Durden.  If I can have counsel who is arguing these cases

16   make their appearances.

17             **MS. CALLSEN:**  Julie Callsen for Accord in the

18   courtroom.

19             **THE COURT:**  Okay.  Ms. Davis, are you on?

20             **MR. LAMBERT:**  Lauren, we can't hear you.

21             **MS. DAVIS:**  Can you hear me?

22             **MR. LAMBERT:**  Yes.

23             **THE COURT:**  Yes, ma'am.

24             **MS. DAVIS:**  Good afternoon, Your Honor.  Lauren Davis

25   on behalf of plaintiff.

01:56

1    THE COURT:  Are you ready to proceed, Ms. Davis?

2    MS. DAVIS:  I am.

3    THE COURT:  Okay.

4    MS. DAVIS:  Thank you so much for letting me appear

5    remotely.  I, likewise, look forward to being able to appear in

6    person before you [Zoom audio distortion].

7    THE COURT:  Ma'am, you are breaking up really badly.

8    MS. DAVIS:  Okay.  How is it now?

9    THE COURT:  Better.  Much better.  Thank you.

10   MS. DAVIS:  Okay.  Great.  I just wanted to say I

11   really appreciate the opportunity to appear remotely, and I

12   look forward to hopefully very soon be able to appear in

13   person.

14         May it please the Court.  [Zoom audio

15   distortion] is limited in scope.  Plaintiff does not challenge

16   the ability of Dr. Kord Honda, who is a board-certified

17   dermatologist and board-certified dermatopathologist, to

18   testify regarding dermatopathology or dermatology in general.

19   Likewise, plaintiff does not challenge the ability of Dr. Faith

20   Durden, a board-certified dermatologist, to testify regarding

21   dermatology.  The challenge is specific to the ability of the

22   experts, Dr. Faith Durden and Dr. Kord Honda, to testify

23   regarding carboplatin as the cause of permanent chemotherapy-

24   induced alopecia.

25         Drs. Honda and Durden have not performed an

01:57

1  analysis of carboplatin as a cause of permanent chemotherapy-

2  induced alopecia.  Dr. Honda performed "a brief literature

3  search" regarding permanent chemotherapy-induced alopecia, but

4  does not provide any information on any specific chemotherapy

5  agent, including docetaxel and carboplatin, in his expert

6  report.  In his deposition Dr. Honda admitted that he is not an

7  expert on carboplatin and alopecia.  Finally, Dr. Honda

8  admitted in his deposition that he has not performed any

9  causation analysis or any robust literature search to

10  support --

11          THE COURT:  Isn't this the plaintiffs' burden of

12  proof?  I know you didn't argue this in the *Kahn* case, but we

13  had this same argument that these people had not done a

14  Bradford Hill analysis or hadn't done an analysis as to

15  causation, but found that this is the plaintiffs' burden of

16  proof, and they can certainly present evidence of other causal

17  factors, whether or not that's carboplatin.  How is this

18  different from the ruling in Glaspy, Miletello, and I'm sure

19  I'm missing one of the other experts that was in *Kahn*?

20          MS. DAVIS:  Plaintiffs still have our burden of

21  proof.  We have to prove to the Court that docetaxel causes

22  permanent chemotherapy-induced alopecia and that the other

23  causes can be excluded.  The issue here is that defendants have

24  not given any reliable evidence, not even a scintilla of

25  reliable evidence that carboplatin causes permanent

02:00

1   chemotherapy-induced alopecia.  That's really the issue at

2   hand.

3         Ultimately, defendants point to really two

4   pieces of evidence, two articles.  The first is an article that

5   was published in the *Korean Journal of Dermatology*, and that

6   was a single case of permanent chemotherapy-induced alopecia in

7   the context of carboplatin.  However, this article contains no

8   information regarding the dosage of carboplatin or even the

9   type of cancer that was being treated.

10        The only other article that defendants are able

11  to point to is published in the journal of *Bone Marrow*

12  *Transplantation*, and that case involves administration of very

13  high dosage of carboplatin as well as high-dosage

14  cyclophosphamide and high-dosage thiotepa.  I hope I pronounced

15  it correctly.  That's in the context of bone marrow

16  transplantation in metastatic cancer.

17        I want to note that the dosage of carboplatin in

18  this case was 400 milligrams per meter squared.  The dosage

19  that Ms. Hughes was administered was 75 milligrams per meter

20  squared.  In addition, she was administered a significantly

21  lower dosage in a very different context, in the adjuvant

22  treatment of early-stage breast cancer.

23        So the defendants offer two articles that seem

24  to have no relevance to support that carboplatin causes PCIA.

25  For this reason, for this very specific issue, plaintiff moves

02:02

1    to exclude the testimony of experts Dr. Honda and Dr. Durden

2    regarding carboplatin causing permanent chemotherapy-induced

3    alopecia.

4         **THE COURT:**  Let me ask this question real quick,

5    Ms. Davis.  Could that be something that's just handled through

6    vigorous cross-examination when the doctor says it could be

7    carboplatin, and then you challenge him with little evidence --

8    what you said is not a scintilla of evidence -- challenge him

9    with the absence of evidence of any real showing of correlation

10   between carboplatin and permanent chemotherapy-induced

11   alopecia?

12        **MS. DAVIS:**  I'm concerned that this could cause undue

13   confusion.  We only have one article that says anything about

14   the actual dosage and context in which carboplatin and other

15   chemotherapy agents were used, not docetaxel, and permanent

16   chemotherapy-induced alopecia resulted, one article where we

17   know the dosage and we know the context.  Even there, we are

18   talking about five times the amount of carboplatin being used

19   and with two other drugs that Ms. Hughes was not administered.

20        In addition to that, it's in the context of bone

21   marrow transplantation, which has its own risk of permanent

22   chemotherapy-induced alopecia due to host versus graft disease.

23   It's such a different scenario that I'm concerned of undue

24   confusion, and I feel like cross-examination might not be

25   sufficient to remedy this concern.

1           **THE COURT:**  Thank you.

2                 Ms. Callsen.

3           **MS. CALLSEN:**  Julie Callsen on behalf of Accord.

4  First of all, I want to start by stating that the premise of

5  this motion is faulty.  Neither Dr. Honda nor Dr. Durden said

6  that carboplatin was the cause of Ms. Hughes' PCIA.  Neither of

7  them actually used PCIA.  Dr. Durden testified that "PCIA" is

8  not a medical term she is used to using.  Further, since

9  Ms. Hughes remains on aromatase therapy and hasn't attempted

10  any treatment, you can't label her alopecia as permanent in the

11  first place.  So I just want to set that record straight.

12           Second of all, as this Court has recognized,

13  plaintiffs flip the burden.  They claim that they can't stay

14  that.

15           **THE COURT:**  Is there a difference, Ms. Callsen,

16  between -- and I think you read my earlier decision.

17           **MS. CALLSEN:**  Correct.

18           **THE COURT:**  Bradford Hill doesn't apply to the

19  defendants.  There should be some evidence before a witness can

20  say this is known to cause or is known to be associated with

21  permanent alopecia.  If we have one case, which was very

22  different, and then one other publication about a single case,

23  at some point --

24           **MS. CALLSEN:**  As rebuttal experts, that's their job

25  to come in and look at the evidence and to put forth evidence

02:06

1    that they have evaluated as to alternative causes.  One case is

2    one case.  Ms. Hughes could be the one case.

3              As Dr. Durden testified, there were cases of

4    alopecia that have been reported with carboplatin.  Ironically,

5    that's the same language that the FDA adopted in 2015.  Cases

6    of alopecia have been reported with docetaxel.  Dr. Durden

7    honestly said docetaxel could have been associated with it as

8    well.  Aromatase therapy could have been associated with it as

9    well.  She went through a whole host of factors.

10              Dr. Honda, he's a dermatopathologist.  He

11    reviewed the pathology literature.  He reviewed the literature

12    associated with pathology slides, and that's where he came up

13    with his opinions that it's possible.  That's their job as

14    rebuttal experts --

15              **THE COURT:**  Oh, I understand.

16              **MS. CALLSEN:**  -- to evaluate.

17              **THE COURT:**  I understand.

18              **MS. CALLSEN:**  Right.

19              **THE COURT:**  I'm not expecting anybody to perform a

20    Bradford Hill test.

21              **MS. CALLSEN:**  Carboplatin is the other chemotherapy

22    that she used.

23              **THE COURT:**  I understand.  I understand, but do we

24    have any standard that they have to apply?

25              **MS. CALLSEN:**  The same standard that they apply in

02:08

1   their practice, so that's what they went through.  Dr. Honda

2   went through what he considers in his pathology practice when

3   reviewing hair biopsy slides, which he does regularly -- how

4   does he consider it, what does he consider, what does he think

5   about -- and that's where his opinion came from.

6            He also looked at the opinion like a second

7   opinion, in essence.  He was looking at a consult, an opinion

8   rendered by another expert.  He took it:  Is it reasonable that

9   this is the opinion?  So that's exactly the methodology he

10  employed in rendering his opinion.  The same with Dr. Durden,

11  she looked at how does she go about it in her clinical

12  practice.

13           So that's the methodology that should be

14  examined here, did they employ the same methodology that they

15  would do in their clinical practice.  Both of them walked

16  through that.  They pointed out how they would look at the

17  evidence presented by plaintiffs' expert and then how they

18  would take it into context, and their opinions were rendered on

19  that basis.

20           Plaintiff again flips the burden from general --

21  and I understand you don't need me to get into that, but it

22  does --

23           THE COURT:  No, I don't.  I'm pretty clear on that --

24           MS. CALLSEN:  Okay.

25           THE COURT:  -- but I think there's got to be some

02:09

1    basis --

2              MS. CALLSEN:  Correct.

3              THE COURT:  -- for you to say this could have been

4    other than -- there's got to be some basis.  It can't be just,

5    well, it could have been this.

6              MS. CALLSEN:  The basis is the same type of

7    intellectual rigor that they would apply in their own clinical

8    practices.  Both testified as to the process they would go

9    through in their clinical practice in evaluating the evidence,

10   and that's what their opinions are based on.  I think the

11   alternative causes that they set forth for plaintiffs --

12             THE COURT:  I don't think there's any objection to

13   the alternative causes other than the carboplatin because it

14   seems to be there's basically one case.

15             MS. CALLSEN:  One case.  We only have one case in

16   front of you, as well, Your Honor.  Our conclusion is that --

17             THE COURT:  No, I think --

18             MS. CALLSEN:  Well, we have one case in front of you.

19   You may have more than one, but both -- oh, I see.

20             THE COURT:  One reported case in the medical

21   literature --

22             MS. CALLSEN:  Gotcha.

23             THE COURT:  -- that may be remotely like this one.  I

24   think you have to take the bone marrow transplant -- that's

25   different, but then you have one other case study.

02:10

1          **MS. CALLSEN:**  I'm not sure that it was just one case

2     study for carboplatin.  For one thing, Dr. Durden wrote a

3     chapter in a book on oncology, and she points to more than one

4     case in that chapter.  Carboplatin was associated with

5     persistent hair loss after chemotherapy.  It wasn't just one

6     article or one case she based it on.  Her literature search and

7     her references are more than just one article.  Plaintiffs

8     maybe pointed to one article in their motion, but that was not

9     the only evidence that she based it on in rendering her

10    opinion, and neither was Dr. Honda.

11          Anyway, in conclusion, we believe that they are

12    able to testify as to alternative causes for the persistent

13    alopecia based on their role as rebuttal witnesses.

14          **THE COURT:**  Thank you.

15          Ms. Davis, any reply?

16          **THE DEPUTY CLERK:**  We can't hear you.

17          **MS. DAVIS:**  My apologies.  Can you hear me now?

18          **THE COURT:**  Yes.

19          **MS. DAVIS:**  Just a couple of quick points.  First,

20    the chapter in Dr. Durden's book points to the article that I

21    referenced earlier that was in the *Korean Journal of*

22    *Dermatology*, and that's the article that referenced a single

23    case of permanent chemotherapy-induced alopecia in the context

24    of carboplatin that neither identifies dosage nor the context

25    or type of cancer that was being treated.

02:12   1        I just want to conclude by saying that

2   plaintiffs are not requiring defendants to specifically perform

3   a Bradford Hill analysis regarding permanent chemotherapy-

4   induced alopecia in carboplatin.  Plaintiffs are simply

5   pointing out, importantly, that no analysis has been performed

6   by defendant experts.  There must be some reliable evidence

7   that is relevant to the drugs at issue.  Thank you.

8        **THE COURT:**  Thank you all.  Court is at recess until

9   9:00 tomorrow morning.

10        (Proceedings adjourned.)

11                              * * *

12                          <u>**CERTIFICATE**</u>

13        I, Toni Doyle Tusa, CCR, FCRR, Official Court

14   Reporter for the United States District Court, Eastern District

15   of Louisiana, certify that the foregoing is a true and correct

16   transcript, to the best of my ability and understanding, from

17   the record of proceedings in the above-entitled matter.

18

19

20                    <u>*/s/ Toni Doyle Tusa*</u>
                     Toni Doyle Tusa, CCR, FCRR
21                    Official Court Reporter

22

23

24

25