1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2

3    ****************************************************************

4    IN RE: TAXOTERE
     (DOCETAXEL) PRODUCTS
5    LIABILITY LITIGATION

6                              CIVIL ACTION NO. 16-MD-2740 "H"
                               NEW ORLEANS, LOUISIANA
7                              FRIDAY, MARCH 19, 2021, 9:00 A.M.

8
     THIS DOCUMENT RELATES TO:
9
     *WANDA STEWART V. SANDOZ, INC.,*
10   CIVIL ACTION NO. 2:17-CV-10817

11   *ALICE D. HUGHES V. ACCORD
     HEALTHCARE, INC.,*
12   CIVIL ACTION NO. 2:17-CV-11769

13   ****************************************************************

14
               TRANSCRIPT OF MOTION HEARING PROCEEDINGS
15         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                 UNITED STATES DISTRICT JUDGE
16

17   APPEARANCES:

18   FOR THE PLAINTIFFS:        GAINSBURGH BENJAMIN DAVID
                                MEUNIER & WARSHAUER
19                              BY:  M. PALMER, LAMBERT, ESQ.
                                     CLAIRE E. BERG, ESQ.
20                              2800 ENERGY CENTRE
                                1100 POYDRAS STREET
21                              NEW ORLEANS, LOUISIANA 70163

22

23                              PENDLEY, BAUDIN & COFFIN
                                BY:  CHRISTOPHER L. COFFIN, ESQ.
24                              1100 POYDRAS STREET, SUITE 2505
                                NEW ORLEANS LOUISIANA 70163
25

                          ***OFFICIAL TRANSCRIPT***

1    APPEARANCES CONTINUED:

2

3                                    DAVID F. MICELI
                                     ATTORNEY AT LAW
4                                    P.O. BOX 2519
                                     CARROLLTON, GEORGIA 30112
5

6
                                     THE GOMEZ LAW FIRM
7                                    BY:  JOHN GOMEZ, ESQ. (VIA ZOOM)
                                     655 WEST BROADWAY, SUITE 1700
8                                    SAN DIEGO, CALIFORNIA 92101

9

10   FOR SANDOZ, INC:                GREENBERG TRAURIG
                                     BY:  LORI G. COHEN, ESQ.
11                                        R. CLIFTON MERRELL, ESQ.
                                          EVAN C. HOLDEN, ESQ.
12                                   TERMINUS 200
                                     3333 PIEDMONT ROAD, N.E.
13                                   SUITE 2500
                                     ATLANTA, GEORGIA 30305
14

15
     FOR ACCORD HEALTHCARE,
16   INC.:                           TUCKER ELLIS
                                     BY:  JULIE A. CALLSEN, ESQ.
17                                        MICHAEL J. RUTTINGER, ESQ.
                                          (VIA ZOOM)
18                                   950 MAIN AVENUE, SUITE 1100
                                     CLEVELAND, OHIO 44113
19

20
     OFFICIAL COURT REPORTER:        CATHY PEPPER, CRR, RMR, CCR
21                                   CERTIFIED REALTIME REPORTER
                                     REGISTERED MERIT REPORTER
22                                   500 POYDRAS STREET, ROOM B-275
                                     NEW ORLEANS, LOUISIANA 70130
23                                   (504) 589-7779
                                     Cathy_Pepper@laed.uscourts.gov
24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

                          *OFFICIAL TRANSCRIPT*

1                              I N D E X

2

3      ITEMS                                              PAGE

4

5      DOCKET NO. 11473, SANDOZ'S MOTION FOR SUMMARY

6      JUDGMENT; DOCKET NO. 11538, MOTION TO EXCLUDE

7      TESTIMONY OF LAWRENCE FOOTE AND SREEKANTH REDDY......    5

8      MS. COHEN.............................................    6

9      MR. GOMEZ............................................   17

10     MS. COHEN............................................   24

11     MR. MICELI..........................................   25

12     MR. HOLDEN..........................................   39

13     MR. MICELI..........................................   48

14     MR. HOLDEN..........................................   51

15     MR. MICELI..........................................   52

16     DOCKET NO. 11567, MOTION TO EXCLUDE CERTAIN

17     TESTIMONY OF DR. MAURIE MARKMAN.....................   53

18     MR. LAMBERT.........................................   53

19     MS. CALLSEN.........................................   55

20     MR. LAMBERT.........................................   62

21     MS. CALLSEN.........................................   65

22     DOCKET NO. 11531, ACCORD'S MOTION TO EXCLUDE EXPERT

23     TESTIMONY OF DR. MADIGAN............................   66

24     DOCKET NO. 11462, SANDOZ'S MOTION TO EXCLUDE OR

25     LIMIT OPINIONS OF DAVID MADIGAN.....................   66

                         *OFFICIAL TRANSCRIPT*

1   MR. RUTTINGER........................................   66

2   MR. MERRELL.........................................   73

3   MS. BERG............................................   81

4   MR. RUTTINGER.......................................   86

5   MR. MERRELL.........................................   89

6   MS. BERG............................................   90

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

FRIDAY, MARCH 19, 2021

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning.

VOICES:  Good morning, Your Honor.

THE COURT:  Okay.  Call the docket, please, Erin.

THE DEPUTY CLERK:  Good morning.  This is MDL 2740.
The first motion on the docket is Sandoz's motion for summary
judgment.  If counsel arguing could make their appearance.

MS. COHEN:  Good morning, Your Honor.  Lori Cohen, from
Greenberg Traurig, on behalf of Sandoz.

THE COURT:  Thank you.

MR. GOMEZ:  Good morning, Your Honor.  John Gomez
appearing by way of Zoom.  I'll be arguing for the plaintiffs.

THE COURT:  Okay.  Thank you.

Ms. Cohen, are you ready to proceed?

MS. COHEN:  Yes, Your Honor.

I just want to inquire.  I know that we have a
seven-minute rule.  Because this is a summary judgment motion,
I don't know if we have any more leeway in terms of time?

THE COURT:  Let me see if I'm interested in anything

***OFFICIAL TRANSCRIPT***

09:02:13 1    else you have to say.

09:02:13 2              MS. COHEN:  Okay.  Thank you.

09:02:20 3              THE COURT:  I told Erin, I said, warn at five minutes.

09:02:20 4    If she turns around, and I say, no, give them a couple more

09:02:21 5    minutes, that's fine.  But I think sometimes we need to quit

09:02:24 6    wasting time on this long, drawn-out introduction that I don't

09:02:27 7    need.  Okay?

09:02:29 8              MS. COHEN:  May it please the Court.

09:02:32 9              THE COURT:  Thank you.

09:02:32 10             MS. COHEN:  I'm disrobing now.

09:02:44 11                  Good morning, again, Your Honor, and may it

09:02:47 12   please the Court.  I would like to proceed with arguing our --

09:02:49 13   Sandoz's motion for summary judgment.

09:02:50 14                  As you may know, that on the summary judgment, we

09:02:53 15   already had our preemption summary judgment, so that's

09:02:57 16   obviously been argued separately.  I'm not rehashing any of

09:02:59 17   that.

09:02:59 18                  This summary judgment motion relates to two

09:03:01 19   distinct legal arguments.  One is the learned intermediary

09:03:04 20   doctrine, which I'll focus on today.  The second, if we have

09:03:07 21   time, I'll touch on just the law related to the lack of

09:03:10 22   causation, which ties into our argument yesterday on Dr. Rosic.

09:03:14 23   So that is the focus of this.

09:03:14 24             THE COURT:  That's fine.

09:03:16 25             MS. COHEN:  And, again, as I said, I'm going to spend

**OFFICIAL TRANSCRIPT**

09:03:18  1    my time this morning focusing on the learned intermediary

09:03:18  2    doctrine --

09:03:23  3              THE COURT:  That's where my interest is.

09:03:23  4              MS. COHEN:  Okay.  Thank you, Your Honor.

09:03:24  5              Dr. McCanless is the prescribing physician that

09:03:24  6    we're focusing on this morning.

09:03:31  7              You know some of the background already.

09:03:34  8    Ms. Stewart, obviously, is the plaintiff in this case.  This is

09:03:36  9    the case, as I mentioned yesterday, that both sides picked.

09:03:38 10    And I won't waste any more time on the background of this

09:03:42 11    because I think you have that in the briefs.

09:03:46 12              So the one remaining claim is the failure to

09:03:48 13    warn.  And, again, under the learned intermediary doctrine,

09:03:51 14    plaintiffs must prove that another warning would have changed

09:03:54 15    the prescribing decision, and the evidence in this case is the

09:03:57 16    opposite, that is, the prescriber here -- and this is really

09:03:59 17    important -- never read the label.  And that's unequivocal.

09:04:02 18              THE COURT:  Let me ask this question, because I read

09:04:05 19    his deposition carefully, and I read the plaintiff's deposition

09:04:08 20    carefully.  And I think both contained some significant

09:04:13 21    information.

09:04:13 22              MS. COHEN:  Yes.

09:04:13 23              THE COURT:  But he said, I never read the Sandoz label

09:04:17 24    because I relied on the Sanofi label because I considered it a

09:04:22 25    generic.  And then there is the response, well, these other

*OFFICIAL TRANSCRIPT*

09:04:27 1    entities provide updates to the physician.  And does it matter

09:04:34 2    that he didn't actually read the label but relied on those

09:04:40 3    UpToDates after that first review of the label?

09:04:43 4        MS. COHEN:  Great question.  So, first of all, our

09:04:45 5    position is he must read our label.  This case is about our

09:04:48 6    label, whether it's the same or different, and he must read our

09:04:51 7    label under the learned intermediary doctrine.  There is no

09:04:55 8    question about that.

09:04:56 9            On the UpToDates and other information, he never

09:04:58 10   read any of that stuff either, "that stuff" not being a very

09:05:01 11   formal term for a court today, but he never read any of that

09:05:04 12   either.  So when he talks about to the UpToDates and other

09:05:07 13   information, that's very speculative.  That's part of our

09:05:09 14   argument.  He never read that either.

09:05:10 15           So, in other words, we have here plaintiffs

09:05:12 16   saying, you know, he read the other label, that should be

09:05:15 17   enough.  And we say, no, that's a flaw.  That's a flawed

09:05:18 18   argument under the law.

09:05:19 19           And, number two, that he should have -- that he

09:05:21 20   might have read this other UpToDate information, but we know

09:05:25 21   from his testimony that would have been related to Sanofi, not

09:05:29 22   Sandoz.  So, again, he's left without having read any of the

09:05:32 23   information related to ours.

09:05:35 24           So I think that's a great point, and one that we

09:05:37 25   point to.  And, again, it's the plaintiffs' burden to show that

*OFFICIAL TRANSCRIPT*

09:05:40  1    the different warning that they say should have been given

09:05:43  2    would have changed the decision, and they cannot do so.

09:05:46  3            So, getting into the meat of it, if you will,

09:05:50  4    under learned intermediary -- and I know you know this law,

09:05:54  5    you've looked at it several times -- ad nauseam.

09:05:54  6            THE COURT:  Ad nauseam.

09:05:56  7            MS. COHEN:  Yes, exactly that phrase.

09:05:57  8            And, again, I think that when we look at the

09:05:59  9    law -- and we also looked very carefully at your rulings in the

09:06:02 10    prior cases, and there's several of them I'm going to point

09:06:06 11    to -- why this one fits into the ones where you granted summary

09:06:11 12    judgment is important here even more so, I think, in this case,

09:06:13 13    because we have a doctor here, and I'm not sure if any of the

09:06:15 14    other cases had this exact scenario, where he says, "I never

09:06:18 15    read it."

09:06:19 16            How could there possibly be causation under the

09:06:22 17    law or under your rulings if he never read it?  And this seems

09:06:26 18    like a very clear-cut, as I always think, you know, open and

09:06:31 19    shut case because of his testimony in this case.

09:06:33 20            The two-part prong test that the plaintiffs must

09:06:38 21    show is that the defendant failed to warn or inadequately

09:06:42 22    warned the physician of a risk associated with a product that

09:06:45 23    was not otherwise known to the physician; and, second, that the

09:06:47 24    plaintiff must show that this failure to warn the physician was

09:06:51 25    a cause-in-fact and proximate cause.

                        *OFFICIAL TRANSCRIPT*

09:06:52 1          They can't possibly do that if he didn't look at

09:06:55 2  it, if he didn't look at anything, if he didn't look at

09:06:57 3  anything related to Sandoz.  I think the law is very clear on

09:07:01 4  that, including under your analysis that you've provided in the

09:07:05 5  prior cases.

09:07:05 6          So, again, they have to show that the proper

09:07:07 7  warning would have changed the decision of the treating

09:07:10 8  physician.  He gives pretty unequivocal testimony on that.  I

09:07:14 9  thought, you know, compared to even the other cases, his

09:07:15 10  testimony was beyond reproach, if you will, on that point.

09:07:19 11          And so let's look at what -- again, this is the

09:07:24 12  law.  And there is a lot of law out there, not just in

09:07:29 13  Taxotere, but other cases, where the physician has never read

09:07:32 14  the warning, then the law is that they cannot establish

09:07:37 15  causation, that the warning that they say should have been

09:07:39 16  given can't possibly be the cause-in-fact or proximate cause.

09:07:44 17  And that's what we have here.

09:07:45 18          Again, we cite all these cases in our briefing,

09:07:48 19  the different cases that have come out talking about how the

09:07:52 20  plaintiffs cannot establish the causation prong where the

09:07:56 21  doctor says, I've never reviewed it.  We have that exact

09:08:00 22  scenario here.  So without wanting to, you know, kind of go

09:08:03 23  over all this law, that's what the law is.  It says it very

09:08:03 24  clearly.

09:08:05 25          We've cited Fifth Circuit decisions here.  I've

*OFFICIAL TRANSCRIPT*

09:08:09  1    put some of these -- I think I left a copy of the PowerPoint

09:08:12  2    with you.  But here, like the *Dykes* case is one where the

09:08:17  3    Eastern District of Louisiana in 2011 granted summary judgment

09:08:19  4    because a physician never read the warning, and the warning

09:08:23  5    played no role in the events.

09:08:26  6              *Porterfield*, summary judgment was proper because

09:08:28  7    the prescribing physician testified at no time had he read the

09:08:31  8    warning, and so on.

09:08:32  9              There is a lot of cases in pharmaceutical law

09:08:34  10   about this all over the country.  We've focused, for your

09:08:37  11   benefit, you know, in this PowerPoint and today on the

09:08:40  12   Fifth Circuit and the Louisiana cases, as well as your own,

09:08:42  13   which we'll get to.

09:08:43  14             But here is Dr. McCanless.  And so we can see

09:08:46  15   very clearly -- this is in the brief, of course -- what was

09:08:49  16   said.  The question was, you know, are you familiar with the

09:08:53  17   risks on the Taxotere label?  He says yes.

09:08:57  18             But every time you prescribe the drug, do you

09:09:01  19   need to consult the label?  And he says, no.

09:09:03  20             If you're familiar with the Taxotere label, would

09:09:06  21   you have also reviewed the docetaxel label, or the generic form

09:09:09  22   of it?  No.

09:09:10  23             Do you recall ever reviewing that label?

09:09:12  24             He says no.

09:09:13  25             That's really enough to grant summary judgment.

*OFFICIAL TRANSCRIPT*

09:09:16 1    He says no.  That should be the end of the inquiry.

09:09:19 2             But, then again, there is more here, because the

09:09:19 3    questioning goes on to say, the brand label drug Taxotere is

09:09:24 4    the label you reviewed?  Yes.

09:09:26 5             And docetaxel is the generic form made by my

09:09:26 6    client, Sandoz.  Okay.

09:09:30 7             Then the question is, since you reviewed the

09:09:32 8    label of Taxotere, have you also reviewed the generic label?

09:09:35 9    And, again, he says no, I didn't know there would be a

09:09:38 10   difference between the two.  I've not gone back and looked at

09:09:38 11   it.

09:09:40 12            So, you know, here, it's very clear.  And I think

09:09:43 13   there is some confusion in the brief, if you looked at the

09:09:45 14   plaintiffs' opposition, where they kind of put in the words

09:09:48 15   "Sandoz label," and that wasn't what he was talking about.  He

09:09:52 16   was talking about the Taxotere label.

09:09:53 17            So, again, I'm not trying to ascribe bad motives

09:09:57 18   on that.  I'm just saying that there was a definite confusion

09:09:59 19   in the briefing of plaintiffs on that, but it's clear two or

09:10:04 20   three different times in his testimony -- and, you know,

09:10:07 21   counsel for Sandoz came back in the end to it -- that he said,

09:10:10 22   no, I never read it.

09:10:10 23            THE DEPUTY CLERK:  You have five about minutes.

09:10:10 24            MS. COHEN:  Thank you.

09:10:15 25            Okay.  So, again, here are some of the arguments

                              *OFFICIAL TRANSCRIPT*

09:10:18  1    the plaintiffs make.

09:10:19  2                First of all, they misquote Dr. McCanless.  I

09:10:22  3    think we clarified that in our reply brief and came back to

09:10:25  4    that.

09:10:26  5                They sort of put in brackets somehow the Sandoz

09:10:31  6    label.  That was in error.  That's all I'll say about that.  It

09:10:32  7    is undisputed that he never read the label.

09:10:34  8                Number two, again, on the issue of whether he

09:10:38  9    read UpToDate and the other issues that are raised, as you

09:10:41  10   mentioned, Your Honor, and he says, but he never looked at it

09:10:44  11   related to Sandoz.

09:10:46  12               So, again, he's looking at just the Sanofi label

09:10:49  13   in the UpToDate.  And so, again, there, it's speculative.

09:10:53  14               So, here, where you have the actual doctor giving

09:10:56  15   his or her testimony describing what he did or did not read,

09:10:59  16   you don't have to look at what he might have read or what he

09:11:01  17   could have read or what was available.  That's of no moment, if

09:11:01  18   you will.

09:11:07  19               Then, the other part of our argument is, would

09:11:09  20   his prescribing decision have changed?  This is another, you

09:11:12  21   know, I would say, bonanza that we have here.  On top of not

09:11:18  22   having read it, we have very clear testimony here that he said,

09:11:20  23   it wouldn't have made a difference.  I would have still

09:11:24  24   prescribed exactly what I did.  That is on top of having him

09:11:27  25   say, I never read it.

                                    *OFFICIAL TRANSCRIPT*

09:11:28  1          So, here again, you know the law on this.  You've

09:11:30  2     written the law on Taxotere on this, where it's the -- the

09:11:32  3     court must consider not only whether an oncologist would have

09:11:38  4     warned his or her patient of the risk of permanent alopecia and

09:11:42  5     how a patient's choice would have steered the conversation and

09:11:44  6     the ultimate prescribing decision.

09:11:46  7          So, then we look at, you know, what he said.  He

09:11:48  8     said, yeah, it wouldn't have changed my decision.

09:11:49  9          Now, we looked at the different courts' prior

09:11:52  10    rulings and why this falls clearly into the *Gahan*, if I'm

09:11:56  11    saying it right, and *Phillips*.  And here, in the *Gahan*, where

09:12:00  12    we have on the top left, you know, the prescriber testified

09:12:04  13    that even if there had been a warning of permanent alopecia in

09:12:08  14    the Taxotere label, she still would have prescribed it.  That's

09:12:11  15    what we have here, and in that instance, you granted it.

09:12:14  16          In *Phillips*, the prescriber testified there was

09:12:17  17    no adequate alternatives to Taxotere.  A different warning

09:12:22  18    wouldn't have changed his decision.  There, you granted summary

09:12:26  19    judgment.  The same issue as here.

09:12:26  20          The ones that were denied are wholly inapposite

09:12:29  21    to what we have here, where he said, yeah, I would have changed

09:12:34  22    my counseling prescriptions in time.  I would have presented

09:12:35  23    the plaintiff with other decisions.  The plaintiff would have

09:12:36  24    chosen another regimen.  That was a much, much different

09:12:39  25    decision and different analysis than we have here.  That

*OFFICIAL TRANSCRIPT*

09:12:42  1    doesn't apply.  And *Durden*, the same.

09:12:45  2              So, again, we think that this falls squarely

09:12:48  3    within your rulings in *Gahan* and *Phillips*, and does not fall

09:12:51  4    within *Kahn* and *Durden*.

09:12:53  5              And here, Dr. McCanless testified -- and we have

09:12:59  6    the pages cited, both in the PowerPoint as well as in the

09:13:01  7    briefing -- he would not have changed his decisions.  He said

09:13:04  8    that there was no adequate alternative to docetaxel for

09:13:07  9    plaintiff's treatment, that this was the very best treatment

09:13:09 10    available.

09:13:09 11              So, again, it's really undisputed here that

09:13:13 12    Dr. McCanless testified that his decision would not have

09:13:16 13    changed.

09:13:17 14              It is said again, here, unlike in *Kahn* and

09:13:22 15    *Durden*, Dr. McCanless testified that he still gives the

09:13:23 16    patients the same warnings.  Having heard about this, having

09:13:28 17    been deposed, having read about this, he would have not have

09:13:30 18    advised the plaintiff, as he said in his testimony, of the

09:13:33 19    risks of permanent alopecia.  That, again -- so, again, there

09:13:36 20    can be no causation here.

09:13:38 21              And under your rulings, as well as the law, it is

09:13:40 22    clear cut here that summary judgment should be granted based on

09:13:45 23    learned intermediary.

09:13:45 24              And, then, what about the plaintiff?  Because I

09:13:48 25    know plaintiffs, in their response, come back and say, well,

*OFFICIAL TRANSCRIPT*

09:13:51  1   what about the plaintiff?  Either you have to consider her

09:13:53  2   reaction and what she would have done.

09:13:55  3            So here, we have testimony, unlike in *Khan* and

09:14:00  4   unlike even in *Phillips*, that she would not have chosen a

09:14:03  5   different treatment regimen if she had been advised.

09:14:05  6            And the plaintiff's mother testified that an

09:14:08  7   oncology nurse talked with the plaintiff.  That was part of

09:14:11  8   what we presented.  But the plaintiff also admitted -- and here

09:14:14  9   are some of the quotes -- that she would have undergone

09:14:17 10   whatever treatment regimen Dr. McCanless recommended if it

09:14:21 11   meant saving or prolonging her life.  And he says he would have

09:14:25 12   not changed -- even if he knew about this, he wouldn't have

09:14:26 13   given her a different recommendation, so since she would have

09:14:29 14   followed that.

09:14:30 15            She trusted him to find the best regimen for her

09:14:33 16   and followed his recommendation.  That was the testimony, much

09:14:35 17   like in *Phillips*, that there was no source she would have

09:14:39 18   considered to reject Dr. McCanless's advice, and that she

09:14:42 19   didn't consider alternative, you know, treatment options.

09:14:45 20            So, I think that's very clear, that he wouldn't

09:14:48 21   have changed his recommendations, he wouldn't have steered her

09:14:52 22   in a different direction.  Even with knowing about the

09:14:55 23   permanent alopecia, he wouldn't have added that to his

09:14:57 24   discussion, and then she would have followed his direction.

09:14:59 25            THE COURT:  Got it.  Thank you, Ms. Cohen.

*OFFICIAL TRANSCRIPT*

09:15:07  1                    Let's see.  How do we get this --

09:15:08  2             MS. COHEN:  Thanks, Your Honor, very much.

09:15:10  3             THE COURT:  How do we -- here we go.

09:15:21  4                    Mr. Gomez.

09:15:22  5             MR. GOMEZ:  Thank you so much, Your Honor.

09:15:23  6                    You know, I think the Court has read

09:15:25  7     Dr. McCanless' deposition and Ms. Stewart's deposition.  I

09:15:25  8     think everything that the Court needs to deny summary judgment

09:15:33  9     is there.

09:15:33 10             THE COURT:  What do we do with a doctor that hasn't

09:15:38 11     read that particular warning, that doesn't get the UpToDate

09:15:42 12     from this manufacturer?

09:15:45 13                    We went through this, the concern about -- this

09:15:48 14     is not a 505(j).  It's a 505(b)(2), so they are treated

09:15:54 15     distinctly, and their obligations are distinct from 505(j).  So

09:15:59 16     what do we do with a doctor that says, listen, I don't even

09:16:03 17     look at the generic because I rely on Sanofi?

09:16:12 18             MR. GOMEZ:  Thank you, Your Honor.

09:16:13 19                    I think, you know, for one, we can do away with

09:16:15 20     the problem of him not looking at the deeper label.  You know,

09:16:20 21     I think that --

09:16:21 22             THE COURT:  I'm not worried about that, but he's not

09:16:24 23     saying that he follows the generic warning.

09:16:24 24             MR. GOMEZ:  Yes.

09:16:30 25             THE COURT:  He always looks to, you know, Sanofi.

**_OFFICIAL  TRANSCRIPT_**

09:16:35  1        MR. GOMEZ:  Well, if you look carefully at the

09:16:37  2    testimony, he's not really questioned in particular about that.

09:16:43  3    He gives kind of a narrative.  And we know by Dr. Bosserman,

09:16:49  4    our expert, that docetaxel generally is called out in UpToDates

09:16:54  5    in other sources.  So we know the information is there.

09:16:59  6        Dr. McCanless kind of gives a narrative about how

09:17:02  7    he remembers the last thing that popped up on Taxotere or

09:17:07  8    Sanofi's product, but he never says, I did not look at

09:17:13  9    docetaxel generally.  And he never is asked whether he is

09:17:17 10    aware, based upon UpToDates, that docetaxel generally can now

09:17:23 11    cause permanent alopecia.

09:17:25 12        So I think there is an enough to create a triable

09:17:28 13    issue of fact.  If you look at the inferences and resolve the

09:17:34 14    inferences in the light most favorable to the nonmoving party,

09:17:38 15    that is, Ms. Stewart, there is enough there for a reasonable

09:17:44 16    jury to find that the information would have made itself to

09:17:47 17    Dr. McCanless in time for him to alter his prescribing.

09:17:51 18        THE COURT:  Even if we get past that, what do I do with

09:17:55 19    his testimony where he indicates -- you know, and I've got a

09:17:58 20    couple of pages marked in both of these depositions -- because

09:18:05 21    I think, right now, for this argument, we're in the room with

09:18:07 22    the doctor and the patient and what that conversation looked

09:18:11 23    like.

09:18:12 24        So now, he says, I give the same warning; even

09:18:16 25    though I've seen it, I haven't changed a thing.  So, he got the

*OFFICIAL TRANSCRIPT*

09:18:24  1    warning, nothing would change about the way he warns the

09:18:28  2    patient, then how do I say that, well, then, Ms. Stewart would

09:18:32  3    have made a different decision?

09:18:34  4         MR. GOMEZ:  The doctor testified to both A and B.  He

09:18:42  5    testified as to what you just said, and he also testifies:

09:18:44  6              "QUESTION:  If the label contained some warning

09:18:47  7    as to permanent hair loss, that would be something you'd

09:18:51  8    counsel your patients to, correct?"

09:18:52  9              And he says, yes.

09:18:54  10             So you have a disputed issue of fact.  You have

09:18:59  11   inferences that you would draw both ways.

09:18:59  12             And then he's asked:  "And if Ms. Stewart had

09:19:03  13   voiced an opinion as to whether or not to use the docetaxel

09:19:07  14   based on a risk of permanent hair loss, would you have

09:19:10  15   respected that opinion?"

09:19:11  16             And he says yes.

09:19:13  17             And so, yes, he does say, my counseling --

09:19:18  18   generally, my counseling practices have not changed, but he's

09:19:23  19   never asked, he's never asked, there is no drill-down, he's

09:19:26  20   never asked, well, do you tell patients now that docetaxel can

09:19:31  21   cause permanent hair loss?  And, in fact, his testimony is that

09:19:33  22   he tells patients today that, with Taxotere, hair usually comes

09:19:39  23   back.

09:19:40  24             And so there is at least enough in the record to

09:19:44  25   draw the conclusion that at trial a jury would conclude that he

*OFFICIAL TRANSCRIPT*

09:19:48  1    would have altered his prescribing.

09:19:50  2        THE COURT:  But I have to tell you -- I'm reading his

09:19:53  3    deposition, you know.  And this is a young lady with a pretty

09:19:58  4    aggressive cancer.  And he said -- he goes through some of the

09:20:06  5    alternatives.  And he says, I would not have recommended it

09:20:07  6    because of this, I would have not recommended it because of

09:20:11  7    this, because of this lady, the way she presented.  He thought,

09:20:15  8    hands down -- I mean, it's clear, and these are not -- I'm

09:20:18  9    paraphrasing -- hands down, this was the best option to save

09:20:22 10    this patient's life.

09:20:23 11        And then she testifies, if he would have offered

09:20:30 12    another option without permanent hair loss and with the same

09:20:37 13    result, I probably would have went the other option, but he

09:20:41 14    says there is no other option that would provide this same

09:20:45 15    result.

09:20:45 16        So, how do I get past that?  Because she's

09:20:50 17    saying, listen, equal efficacy, I'll take the one with no risk

09:20:57 18    of permanent hair loss.  That was important to me.  But he's

09:21:02 19    saying there is nothing in his mind with equal efficacy.

09:21:06 20        I know you're going to present, well, look at

09:21:09 21    these other guidelines, but he was the one that was

09:21:11 22    prescribing.  And he felt like, regardless of the other

09:21:16 23    guidelines, this is the one, in my view, for this lady, that

09:21:20 24    was most important -- or most effective in saving her life.

09:21:30 25        MR. GOMEZ:  Right.  I think that, you know, the Court

*OFFICIAL TRANSCRIPT*

09:21:32  1  previously decided a case called *Phillips*, where the doctor was

09:21:37  2  very clear.  He was even asked, like, look, if you knew this,

09:21:41  3  would you have changed?  He says, no, you know, I would have

09:21:44  4  told her, you know, this is it, you know.

09:21:45  5          And that testimony is not apparent in

09:21:48  6  Dr. McCanless's deposition.  He said, this is the one of my

09:21:52  7  preferred alternatives for these reasons.  She has an

09:21:55  8  aggressive cancer.  I need to hit it fast.  This is the

09:21:58  9  regimen.  This top regimen is what I use.

09:22:03 10          But he never precludes, and he never says that

09:22:05 11  there is not an alternative that is as efficacious.  He says,

09:22:10 12  yes, this is what I like to do.  And he says -- actually, if

09:22:12 13  you read his testimony closely, he says, this is one of, one

09:22:17 14  of, the ways that I treat this.

09:22:21 15          So I think -- you know, obviously, there are a

09:22:23 16  lot of close calls here --

09:22:24 17      THE COURT:  But I think he talks about other -- and

09:22:26 18  maybe -- I'm going to read it again, but he talks about other

09:22:29 19  regimes, but not in the context of Ms. Stewart.  He wanted

09:22:34 20  her -- he said, Taxol is absolutely off the table.  The others

09:22:40 21  were less effective.  But for her, in her condition, knowing

09:22:45 22  that I've got to shrink this tumor before we do anything

09:22:50 23  surgically.

09:22:56 24      MR. GOMEZ:  Sure, Your Honor, but he also testifies:

09:22:58 25  If Ms. Stewart had voiced an opinion as to whether or not to

*OFFICIAL TRANSCRIPT*

09:22:58  1   use docetaxel based on permanent hair loss, would you have

09:23:02  2   respected that opinion?

09:23:02  3          He says yes.

09:23:03  4          So, yes, you have testimony over here, but you

09:23:07  5   also have testimony over here.  And if you look at the

09:23:10  6   testimony, basically, with a fine-toothed comb, and say, look,

09:23:14  7   I'm going to conclude every, every inference in the favor of

09:23:18  8   the plaintiff, there is enough there to go to a jury.

09:23:23  9      THE COURT:  What I'm stuck on, I'll be honest with you,

09:23:34 10   what troubles me in your argument is she said, yes, if he had

09:23:39 11   said, these alternatives -- you know, there are two options,

09:23:46 12   one -- close, but they are equal and provide the same level of

09:23:53 13   effectiveness, I would pick the one without the risk of

09:23:57 14   permanent hair loss.  But I guess what I read from him was he

09:24:01 15   didn't think there was anything.

09:24:05 16          So, I think, in the abstract, he says, yes, if

09:24:12 17   she said she didn't want it, then I would respect her opinion.

09:24:15 18   But she's pretty clear that things are moving quickly.  She

09:24:19 19   trusted him.  She -- you know, he didn't get into much -- she

09:24:26 20   says he didn't get into much with the side effects.  He said,

09:24:29 21   this is what you have to have.

09:24:34 22      MR. GOMEZ:  On that issue, I'll just correct the Court.

09:24:34 23      THE COURT:  Please.

09:24:37 24      MR. GOMEZ:  Paragraph 13 of Ms. Stewart's declaration,

09:24:41 25   which was not challenged by Sandoz, in which she clearly

*OFFICIAL TRANSCRIPT*

09:24:47  1   affirms under oath that she would have chosen and asked for

09:24:52  2   another regimen -- another effective regimen; not another

09:24:55  3   equally effective regimen, another effective regimen.

09:25:02  4        THE COURT:  Okay.  But that's not what she said in her

09:25:08  5   deposition.

09:25:08  6        MR. GOMEZ:  Effectively.  I mean, she's not a doctor,

09:25:13  7   but she said it.

09:25:13  8        THE COURT:  Oh, no, but I'm talking about in her

09:25:16  9   deposition, that's not what she said.

09:25:19 10        MR. GOMEZ:  In her deposition, she said --

09:25:21 11        THE COURT:  She said, and if he would have offered

09:25:24 12   another option without the permanent hair loss and with the

09:25:29 13   same result, I probably would have went with the other option.

09:25:33 14        I have to tell you, reading her deposition, she

09:25:40 15   was such a sincere plaintiff.  I thought it was clear in

09:25:45 16   reading the pages, without meeting this woman, that what those

09:25:50 17   days were like, she clearly conveyed.  It was apparent, the

09:25:58 18   trauma of those days.

09:25:59 19        That's why -- you know.

09:26:06 20        MR. GOMEZ:  I agree.  I think Ms. Stewart is an honest

09:26:09 21   person.

09:26:09 22        THE COURT:  Oh, absolutely, absolutely.

09:26:10 23        MR. GOMEZ:  I think there is a triable issue of fact on

09:26:16 24   all of these issues.

09:26:17 25        I appreciate the Court's time and attention.

*OFFICIAL TRANSCRIPT*

09:26:21  1          THE COURT:  Thank you, Mr. Gomez.

09:26:27  2              Ms. Cohen, you've got about a second.

09:26:36  3          MS. COHEN:  Okay.  Thank you, Your Honor.

09:26:36  4              Here is what I would say about this:  I know you

09:26:36  5      say you're going to --   Do I get time to do my -- I should

09:26:36  6      have left them on there.

09:26:48  7              Okay.  Just to go very quickly on this, I think

09:26:50  8      Your Honor is right to look at Dr. McCanless' deposition.  I

09:26:53  9      think it will be very clear.  Even in our PowerPoint, on

09:26:57 10      page 19, we talk about his testimony that there was no better

09:26:59 11      alternative to this, that he was going to prescribe this no

09:27:02 12      matter what.  I think you honed in right on that.

09:27:05 13              Plaintiff's counsel says, well, he was never

09:27:08 14      asked the follow-up questions.  Nobody ever drilled down.  The

09:27:13 15      burden is on the plaintiff to drill down on that and to try and

09:27:15 16      change his mind or try to get more information.  That's not our

09:27:18 17      burden.  We established that, that this was what he

09:27:20 18      recommended, that he didn't read the label, that it wouldn't

09:27:22 19      have changed his prescribing information.  And if they wanted

09:27:25 20      to elicit more than that, they should have.

09:27:27 21              And I think, also, on this post motion for

09:27:29 22      summary judgment affidavit from her, you have to look at her

09:27:32 23      actual initial testimony.  Plaintiffs really can't point to

09:27:36 24      anything from Dr. McCanless that changes, you know, the fact of

09:27:40 25      the argument.

**_OFFICIAL TRANSCRIPT_**

| | | |
|---|---|---|
| 09:27:40 | 1 | And, again, we don't have to look for inferences. |
| 09:27:43 | 2 | We have his actual testimony.  We can look at his unequivocal |
| 09:27:48 | 3 | testimony that he hasn't changed anything about it. |
| 09:27:51 | 4 | THE COURT:  Ms. Cohen, your minute is about up. |
| 09:27:54 | 5 | MS. COHEN:  Okay. |
| 09:27:54 | 6 | THE COURT:  Thank you. |
| 09:27:54 | 7 | MS. COHEN:  So, the last thing I would want to say is |
| 09:27:56 | 8 | just, also, Your Honor, we're also moving for summary judgment |
| 09:27:57 | 9 | on the lack of specific causation tied to yesterday's argument. |
| 09:28:01 | 10 | THE COURT:  Thank you. |
| 09:28:02 | 11 | MS. COHEN:  Thank you very much. |
| 09:28:06 | 12 | THE COURT:  I'm moving along. |
| 09:28:14 | 13 | MR. MICELI:  You're moving quicker this morning. |
| 09:28:16 | 14 | THE COURT:  I'm trying.  It's so hard because even when |
| 09:28:16 | 15 | I say, "You've got two minutes left," and then blah, blah, |
| 09:28:16 | 16 | blah, blah, let me see if I can sneak two minutes in there. |
| 09:29:35 | 17 | I'm sorry, I wasn't listening. |
| 09:29:35 | 18 | MR. MICELI:  I apologize, Your Honor.  I had the |
| 09:29:38 | 19 | PowerPoint emailed to Erin, but I failed to email it to the |
| 09:29:44 | 20 | defendants.  And I want to give them a copy of this.  I'm going |
| 09:29:44 | 21 | to lay it on my -- |
| 09:29:44 | 22 | THE COURT:  Okay. |
| 09:30:16 | 23 | MR. MICELI:  If I may, Your Honor, just have a moment |
| 09:30:20 | 24 | to publish this. |
| 09:30:42 | 25 | Your Honor, I wasn't here yesterday.  It is good |

*OFFICIAL TRANSCRIPT*

09:30:45 1    to be back in front of you.  I have my microphone covers.  I've

09:30:51 2    gelled up.

09:30:51 3                    Are we ready to go?

09:30:54 4         THE COURT:  Please proceed.

09:31:00 5         MR. MICELI:  All right.  Thank you, Your Honor.

09:31:00 6         THE COURT:  Everything just takes so much longer.

09:31:00 7         MR. MICELI:  Yes.

09:31:00 8                    May it please the Court.  There are three items

09:31:05 9    we want to discuss concerning the testimony of Drs. Reddy and

09:31:11 10   Dr. Foote.  I'm going to explain plaintiffs' basis for seeking

09:31:15 11   to exclude three opinions:  Regulatory opinions, dermatology

09:31:21 12   opinions, and alternate cause opinions.  I'm going to meld the

09:31:25 13   last two together in the interest of time.  And I will address

09:31:29 14   the regulatory opinions in a consolidated fashion because the

09:31:32 15   experts give the same exact opinions -- the label is adequate,

09:31:37 16   and it was not defective.

09:31:39 17                    Now, Sandoz's argument --

09:31:39 18        THE COURT:  Is this a Glaspy and Miletello redux?

09:31:39 19        MR. MICELI:  Excuse me?

09:31:45 20        THE COURT:  Is this just a rerun of Glaspy and

09:31:49 21   Miletello?

09:31:49 22        MR. MICELI:  No, I think it's very different because

09:31:50 23   Dr. Glaspy -- I can't address Miletello.  Dr. Glaspy did a

09:31:55 24   little bit more than what these experts have done.

09:31:58 25        THE COURT:  Oh, I understand, but it's --

                              *OFFICIAL TRANSCRIPT*

09:31:58  1          MR. MICELI:  It's very similar because they are the

09:32:01  2   oncologist experts who seek to testify outside of oncology.

09:32:01  3          THE COURT:  Right.

09:32:06  4          MR. MICELI:  Okay.  Sandoz argues in its opposition

09:32:07  5   that these doctors do not offer regulatory opinions, and that's

09:32:11  6   simply not the case.  They offer identical opinions concerning

09:32:17  7   the adequacy and the nondefectiveness of the label.

09:32:23  8          The adequacy of the label, including its

09:32:26  9   warnings, is very much a regulatory question.  And what the

09:32:28 10   label must include, what level evidence is necessary, what is

09:32:31 11   the standard for changing the label or including warnings or

09:32:35 12   adverse events in the label, what -- how an unexpected adverse

09:32:40 13   event is defined for labeling purposes, are all defined by the

09:32:45 14   Code of Federal Regulations.

09:32:46 15          Both doctors, Dr. Foote and Dr. Reddy, candidly

09:32:51 16   admit that they have absolutely no familiarity with the Code of

09:32:55 17   Federal Regulations.  They admit no knowledge of what is

09:32:58 18   required in a label or for a label change.

09:33:02 19          I want to ask the Court to recall Ms. Cohen's

09:33:06 20   argument yesterday where she stressed the utter importance of

09:33:09 21   methodology.  Neither Dr. Foote nor Dr. Reddy understand the

09:33:17 22   standard for labeling or a label change; and, so, therefore,

09:33:21 23   they cannot begin to address what is adequate in a label or

09:33:25 24   what is adequate for a label change.

09:33:28 25          More importantly, neither doctor cites to a

*OFFICIAL  TRANSCRIPT*

09:33:33  1  single document other than the label as a basis for making a

09:33:37  2  claim that the label was adequate.  It is simple ipse dixit.  I

09:33:43  3  read the label.  Yeah, it's adequate.  No knowledge about

09:33:46  4  standard, no application of evidence to that standard.  It's

09:33:49  5  simply not there.

09:33:50  6          When Dr. Foote makes the statement in his report

09:33:53  7  that FDA's chosen nomenclature is not to include a modifier for

09:34:00  8  alopecia such as permanent or persistent, I pressed him for his

09:34:04  9  basis.  And I quote, at page 206 of his deposition, "I don't

09:34:07 10  have a basis for that comment.  I just presume that -- that

09:34:12 11  their -- FDA's -- that's their, FDA's preference.  I'm just

09:34:16 12  commenting on what they did."

09:34:17 13          Then he admits that he did not review a single

09:34:21 14  document to make that opinion other than the label.

09:34:23 15          Now, when asked about what it takes to include

09:34:27 16  information about severity and duration, he had no idea.  He

09:34:31 17  didn't look at anything.  He only looked at the label.  And his

09:34:34 18  opinion runs directly contrary to the Code of Federal

09:34:39 19  Regulations on what is included as an adverse event.  That

09:34:44 20  section, 21 CFR 314.80, includes events that may be

09:34:52 21  symptomatically and pathophysiologically related to a listed

09:34:57 22  event in the label, but differ from the event because of

09:35:01 23  greater severity or specificity.  That's describing, defining

09:35:05 24  what an unexpected adverse event is.

09:35:07 25          An expert's unsupported presumption is nothing

*OFFICIAL TRANSCRIPT*

09:35:10 1   more than a guesstimate, and guesses are not methodology.

09:35:14 2          Dr. Foote's guess directly contradicts what is

09:35:21 3   defined as an unexpected adverse event.  The opinion is

09:35:26 4   fundamentally unsupported, as that is described in the *Viterbo*

09:35:32 5   *versus Dow Chemical*, Fifth Circuit opinion that we cite in our

09:35:33 6   brief, states that, "If an opinion is fundamentally

09:35:36 7   unsupported, then it offers no expert assistance to the jury.

09:35:41 8   It lacks reliable support and may be rendered more prejudicial

09:35:47 9   than probative."  That is precisely what we're talking about

09:35:47 10  here.

09:35:49 11         When I asked Dr. Reddy for any support or basis

09:35:52 12  about what the Code of Federal Regulation requires for labeling

09:35:57 13  or label changes, he stated, and I quote, at 294 to 295 of his

09:36:02 14  deposition, "This is something I would not be able to describe

09:36:05 15  for you.  I would refer you to a regulatory expert."  If he

09:36:10 16  were a regulatory expert, he wouldn't need to refer me to one,

09:36:14 17  Your Honor.

09:36:15 18         They admit that they reviewed nothing.  They

09:36:18 19  don't understand the standard.  They cannot, cannot, cannot

09:36:21 20  give an opinion on whether the label was adequate.

09:36:23 21         Once Sandoz puts a witness on the stand and asks

09:36:32 22  Your Honor to place the badge on their lapel that they are an

09:36:35 23  expert, the jury is going to lean forward and listen to what

09:36:41 24  they have to say.  And it's not appropriate for the jury to

09:36:44 25  have to sift through the wheat and the chafe to determine what

09:36:48 1   this person is actually an expert in and what they are just

09:36:49 2   giving their thoughts or off-the-cuff opinions about.

09:36:54 3          Regulatory requirements for drug labeling are an

09:36:57 4   area for expert testimony, and, stated quite simply, these

09:37:00 5   gentlemen are not experts.

09:37:02 6          With regard to dermatology and alternate cause,

09:37:06 7   I'm just going to focus on one part of the *Daubert* inquiry,

09:37:10 8   whether these experts apply the same level of rigor and apply

09:37:14 9   the same level of their professional -- I'm going to say

09:37:19 10  expertise, in air quotes -- to what they do outside the

09:37:22 11  courtroom.

09:37:23 12         They both admit in their depositions and their

09:37:26 13  citations in our papers that when they have dermatology issues,

09:37:30 14  they refer to a dermatologist.  But, in this courtroom, Sandoz

09:37:35 15  wants to put them on the stand, again, place the badge of

09:37:38 16  expert on their lapel, and have them tell the jury about

09:37:42 17  dermatology.  It's simply not appropriate.

09:37:44 18         But that dovetails into the alternate cause

09:37:48 19  argument.  We've all heard a lot about alternate cause

09:37:53 20  yesterday, and I think Your Honor has heard a lot about it in

09:37:55 21  prior hearings.  This is not about burden shifting.  This is

09:37:58 22  about what Sandoz seeks to establish through their experts.

09:38:02 23  This is an issue about whether or not they give opinions that

09:38:04 24  have proper bases under Rule 26, before we get to 702; and,

09:38:09 25  when we get to 702, what is reliable evidence?  What

*OFFICIAL TRANSCRIPT*

09:38:13 1    constitutes, as Your Honor has stated in prior orders, reliable

09:38:17 2    evidence to challenge our experts?

09:38:19 3               And we're not talking about challenging our

09:38:21 4    experts about their opinions of docetaxel.  What is reliable

09:38:26 5    evidence about the alternate causes?

09:38:29 6               Sandoz's experts make critical admissions about

09:38:33 7    what the evidence that they have reviewed demonstrates.  And

09:38:36 8    what that demonstrates to this Court -- or should demonstrate

09:38:41 9    to this Court is lack of reliable evidence on alternate cause.

09:38:44 10              Specifically --

09:38:44 11        THE DEPUTY CLERK:  You're at about six minutes.

09:38:48 12        MR. MICELI:  I'm at six.  I'll do my best to rush.

09:38:51 13        THE COURT:  He can have a little bit more.  I'll tell

09:38:54 14   you when I'm tired.

09:38:57 15        MR. MICELI:  All of the experts in this case agree that

09:39:01 16   association does not infer causation.  They are not the same

09:39:04 17   thing.  This is very, very different, and this is a critical,

09:39:08 18   critical point for this decision.

09:39:10 19              We have discussed -- both Dr. Foote and Dr. Reddy

09:39:14 20   admit in their depositions -- again, the citations are in our

09:39:17 21   papers, and I have them here for you -- that you have to do

09:39:19 22   more than show just a simple association between a drug and an

09:39:25 23   adverse event to demonstrate or infer causation.

09:39:28 24              Yet, what they -- what they state in their

09:39:32 25   depositions is that an association is just two events that

**OFFICIAL TRANSCRIPT**

09:39:36  1   happen close in time to one another.  They may have nothing

09:39:39  2   relational to do with each other.  You have to do more to infer

09:39:43  3   causation.

09:39:44  4         Every expert agrees to that.  Dr. Foote agrees to

09:39:48  5   it at 269 of his deposition.  Dr. Reddy agrees to it at 274 of

09:39:53  6   his deposition.

09:39:54  7         The example we used in the depositions with these

09:39:58  8   experts, a rooster crows when the sun rises.  Does the rooster

09:40:03  9   crowing have anything to do with the sun rising?  Absolutely

09:40:05 10   not.

09:40:06 11         Dr. Foote said people that have ashtrays tend to

09:40:10 12   have more cancer, lung cancer.  Do ashtrays cause lung cancer?

09:40:15 13   No.  You have to do more; and, where more is demanded, these

09:40:22 14   experts did less.

09:40:23 15         Dr. Reddy admits that he did not look beyond

09:40:26 16   associations because he was not asked to do so.  Here is the

09:40:29 17   citations.

09:40:30 18         Dr. Foote admits that he did not attempt to go

09:40:33 19   beyond finding associations with any drug.

09:40:37 20         Sandoz argues at page 15 of its opposition that

09:40:42 21   any medication for which there is an association is a possible

09:40:46 22   the cause of PCIA.  That is fundamentally unsupported as the

09:40:54 23   *Viterbo* opinion describes.

09:40:56 24         They simply -- I've scoured their depositions.

09:41:00 25   You have their depositions and their reports.  If you do an

**OFFICIAL TRANSCRIPT**

09:41:04  1    electronic search and search for that opinion, the keywords to

09:41:07  2    that opinion, that any association for which -- the medications

09:41:11  3    for which there is an association is a possible cause of PCIA,

09:41:16  4    no expert for Sandoz says that.  Absolutely nobody.

09:41:22  5            Dr. Foote doesn't say it in his report, Dr. Reddy

09:41:24  6    doesn't say it in his report, and neither testified to it in

09:41:28  7    their deposition.

09:41:28  8            This is simply artful drafting of an aggressive

09:41:33  9    brief writer.  There is no support for that.

09:41:36 10            On page 15 of their opposition, they do not cite

09:41:40 11    Your Honor to anything that supports that statement.

09:41:45 12            So if association does not equal causation, and

09:41:49 13    all Sandoz's experts demonstrate -- or testify that the

09:41:54 14    evidence demonstrated to them was an association, that cannot

09:42:00 15    be the basis for standing in front of the jury and arguing to

09:42:04 16    them to find that another drug caused it.

09:42:08 17            Their own experts dispute that.  Their own

09:42:11 18    experts say, association simply isn't enough.  You need to do

09:42:15 19    more, but they did less.

09:42:18 20            And so they are asking the jury to find something

09:42:20 21    that they have not given prima facie evidence to establish.

09:42:28 22    If --

09:42:28 23            THE COURT:  I guess -- sometimes maybe I just need --

09:42:39 24    are you arguing that it's improper for them to place an

09:42:44 25    oncologist on the stand and say she was also given this drug,

*OFFICIAL TRANSCRIPT*

09:42:51  1    which can be associated with hair loss --

09:42:51  2          MR. MICELI:  Well --

09:42:53  3          THE COURT:  -- and then, in that way, then the jury has

09:42:54  4    to make a determination.  If she was given five drugs, all of

09:42:58  5    which are associated with hair loss, that that is a way of

09:43:02  6    nibbling, you know, at yours, without saying, well, her

09:43:06  7    hair loss was caused by the Adriamycin.

09:43:06  8          MR. MICELI:  Your Honor --

09:43:10  9          THE COURT:  I mean, that's completely different.

09:43:12  10         MR. MICELI:  -- it's actually completely different.

09:43:14  11   It's completely different than what I'm arguing.

09:43:16  12         If Sandoz wants to put somebody on the stand and

09:43:19  13   say, cases have been reported, if they want to put these

09:43:23  14   doctors on the stand and say, cases have been reported.  What

09:43:26  15   these doctors have said is that cases have been reported, case

09:43:28  16   reports show associations, and associations don't establish --

09:43:33  17   don't infer causation.

09:43:35  18         Then what they are asking the jury to do -- and

09:43:37  19   Your Honor said this to us before the first trial on this

09:43:40  20   MDL -- you're not going to allow us to just throw information

09:43:43  21   into the jury box and let them figure it out.

09:43:45  22         If the Sandoz experts cannot say that association

09:43:49  23   infers causation, then that is precisely what they are trying

09:43:56  24   to do.  They're saying it's an association.  It happens.  The

09:44:00  25   rooster crows, and the sun comes up, and we want you to find

**OFFICIAL TRANSCRIPT**

09:44:04  1   that the sun rose because that rooster crowed.  They just can't

09:44:08  2   do that.

09:44:08  3            Their experts agreed that you have to do more.

09:44:11  4   And when questioned, they described that they didn't do more to

09:44:14  5   infer causation.  It's critically important.

09:44:17  6            This is a case about whether or not a drug

09:44:20  7   causes, and we have the burden.  And we have put forth

09:44:23  8   Dr. Feigal, Dr. Madigan, Dr. Plunkett, Dr. Bosserman, and we

09:44:30  9   explain all those things.  If these doctors want to say that on

09:44:33 10   the stand, they can, but Your Honor cannot allow argument to

09:44:38 11   be -- excuse me -- they should not be allowed because it can

09:44:41 12   only serve to confuse the jury.

09:44:43 13            Then, when defense counsel gets up and argues to

09:44:46 14   the jury that some other drug caused it, when there has been

09:44:50 15   absolutely no evidence of that, nothing to infer it, and the

09:44:54 16   only evidence they've put forward --

09:44:56 17        THE COURT:  So, you would argue that they should not be

09:44:59 18   allowed to say that, for example, Adriamycin has been

09:45:04 19   associated with permanent hair loss?

09:45:07 20        MR. MICELI:  I would say they cannot say that and infer

09:45:10 21   causation, yes.  I would say --

09:45:11 22        THE COURT:  So they should be precluded from saying

09:45:11 23   that --

09:45:11 24        MR. MICELI:  Yes.

09:45:14 25        THE COURT:  -- it's been associated with that?

*OFFICIAL TRANSCRIPT*

09:45:15 1     MR. MICELI:  Because we have to prove a drug causes

09:45:18 2  something.

09:45:18 3     THE COURT:  Right.

09:45:19 4     MR. MICELI:  If there is evidence that another drug

09:45:22 5  causes it, bring it forward, but they didn't.

09:45:25 6          If they want --

09:45:26 7     THE COURT:  So, are you requiring a Bradford Hill

09:45:30 8  analysis?

09:45:31 9     MR. MICELI:  No.

09:45:31 10    THE COURT:  Are we going back to where we were before,

09:45:35 11 and I said, this is not appropriate because the burden always

09:45:36 12 stays with the plaintiff?

09:45:37 13    MR. MICELI:  Right.  We agree with you.  You were

09:45:40 14 absolutely correct.

09:45:40 15    THE COURT:  Thank you.

09:45:41 16    MR. MICELI:  The burden is ours to prove that Taxotere

09:45:44 17 causes this, causes the injury we're alleging.

09:45:48 18         I'm not saying that they have to do a

09:45:50 19 Bradford Hill.  I'm not saying they have to do any analysis.

09:45:54 20         What their experts agree with me on is that you

09:45:58 21 have to take at least one step beyond the case report to say

09:46:03 22 there is some evidence, there's some inference of causation.

09:46:06 23    THE COURT:  So, okay.  Let's get past.

09:46:06 24    MR. MICELI:  Right.

09:46:08 25    THE COURT:  The expert gets up and says, yeah, I saw a

*OFFICIAL TRANSCRIPT*

09:46:12 1   couple of case reports that would indicate that it's associated

09:46:15 2   with it, and, also, there is this journal article that was

09:46:20 3   peer-reviewed that shows that, that it has been clearly

09:46:24 4   associated -- strongly associated.  Or is it -- that's not

09:46:27 5   enough?  Then, what is enough?

09:46:30 6          MR. MICELI:  Well, Your Honor, I would say that one

09:46:32 7   step beyond what they have done is enough.  But there is not,

09:46:37 8   there is not a journal article that says that another drug is

09:46:44 9   strongly related with permanent alopecia.

09:46:47 10          One of the articles -- I believe it was

09:46:50 11  Dr. Foote -- now I'm operating off memory, and not off my

09:46:53 12  outline -- it's the Masidonski, et al. article, and that is

09:46:58 13  from two oncology nurses in St. Louis who work at a WashU

09:47:02 14  affiliated clinic, cancer clinic.  They note all of these

09:47:06 15  reports, but they don't draw any conclusion about a strength of

09:47:11 16  association.  There is no strength of association.

09:47:13 17          And I don't want to get into a Bradford Hill

09:47:16 18  discussion or the *Burst* case that says you have to establish

09:47:21 19  some statistical association.  They have done nothing.

09:47:23 20          They cite one other case, the *DeJong*, did that

09:47:27 21  Ms.  Davis --

09:47:28 22          THE COURT:  Was this the one that --

09:47:30 23          MR. MICELI:  That's not the Korean.  That's *Jung*.

09:47:36 24  There's *Jung*, and there's *DeJong*.

09:47:36 25          THE COURT:  I was thinking of the one that had to do

*OFFICIAL TRANSCRIPT*

1   with bone marrow.

2          MR. MICELI:  Yeah.  That's the bone marrow

3   preconditioning.  That was with metastatic breast cancer, but

4   they are doing bone marrow preconditioning for it.  That's

5   Thiotepa, Carboplatin, and cyclophosphamide.

6          But in that very article that Sandoz experts cite

7   to show that there is as association with the cyclophosphamide,

8   the authors of that study say cyclophosphamide does not cause

9   permanent alopecia -- or persistent alopecia.  So the authors

10  disclaim the involvement of cyclophosphamide.  Sandoz experts

11  say, we show an association with it.

12         So that's the problem.  When all you do is throw

13  the spaghetti against the refrigerator to see what sticks up

14  there by saying association, it all slides down.  There is

15  nothing further.  There is absolutely nothing further.

16         So Rule 26 demands that if a party offers an

17  expert to support a proposition they want to put before the

18  jury, they have to tell us what they are opinions are, and they

19  have to show their bases for them.  And then 702 says there has

20  to be some methodology.

21         Well, when the defense experts agree that what

22  they have done does not demonstrate causation or infer

23  causation, that's not reliable evidence.  That is not

24  scientific methodology to conclude some inference of causation.

25  That's where the rub is, Your Honor.  They have to do something

09:49:03 1    more, and they haven't.

09:49:05 2              THE COURT:  Thank you.

09:49:05 3              MR. MICELI:  Thank you.

09:49:10 4              THE COURT:  Mr. Holden.

09:49:06 5              MR. HOLDEN:  Good morning, Your Honor.  It's nice to be

09:50:30 6    up here finally.

09:50:31 7              May it please the Court.  Evan Holden on behalf

09:50:34 8    of Sandoz, Inc.

09:50:36 9              Your Honor, I wanted to start by giving you some

09:50:43 10   brief background introduction of who Drs. Foote and Reddy are.

09:50:48 11             THE COURT:  I've looked at that.  I mean, I think those

09:50:50 12   are probably very competent, qualified oncologists.

09:51:03 13             MR. HOLDEN:  Agreed, Your Honor.

09:51:04 14             I will note, the plaintiff is not addressing the

09:51:07 15   bulk of their oncology opinions here --

09:51:07 16             THE COURT:  Right, right.

09:51:10 17             MR. HOLDEN:  -- about cancer, Ms. Stewart, what's

09:51:12 18   perfect for her.  They don't touch any of those core opinions.

09:51:15 19   I just want to note that.

09:51:16 20             I also want to note that Ms. Stewart in this case

09:51:21 21   received the TAC regimen, as you know from the depositions.

09:51:24 22   So, it's Taxotere, Adriamycin, antitoxin, as well as endocrine

09:51:29 23   therapy.  So all of those are in play.

09:51:31 24             Their basis of these opinions, extensive

09:51:36 25   education and experience.

**OFFICIAL TRANSCRIPT**

09:51:38  1          THE COURT:  Let's talk about the regulatory opinion.  I

09:51:41  2     mean, I have to tell you, when I'm reading it, I put all my

09:51:44  3     little sticky notes.  Like every now and then, it's like a bit

09:51:49  4     much.

09:51:49  5          But he said that, it's my opinion that Sandoz

09:51:53  6     labeling is adequate and not defective in any way.  But it

09:52:01  7     seemed to me, you have to have a basis for saying that.

09:52:06  8     Perhaps he feels like, as an oncologist, when I read it, I

09:52:13  9     understand; but, to make that opinion, you have to have some

09:52:17 10     basis in fact.

09:52:19 11          FDA has people that are hired, and this is all

09:52:23 12     they do, because they have criteria to determine whether or not

09:52:28 13     it's appropriate.

09:52:28 14          While he might say, I felt comfortable with it, I

09:52:34 15     don't think he can say it's adequate and not defective in any

09:52:37 16     way.

09:52:37 17          MR. HOLDEN:  Your Honor, I think they qualify those by

09:52:39 18     saying, from the perspective of prescribing medical

09:52:43 19     oncologists, the labeling was not defective in any way,

09:52:45 20     inadequate.

09:52:46 21          THE COURT:  But doesn't that -- isn't that exactly what

09:52:51 22     the jury needs to decide, and is he qualified to render that

09:52:54 23     opinion, whether or not it complies with the State law and FDA

09:52:59 24     regulations?

09:53:00 25          This is a very complicated process.  We've been

*OFFICIAL  TRANSCRIPT*

09:53:03  1   fighting it for several years now, that interplay.  I just

09:53:08  2   think, you know, it might be nice -- I could -- and maybe the

09:53:13  3   problem is his wording.  Because I think we went through this,

09:53:17  4   and my guess is that you've read my opinions regarding Glaspy

09:53:22  5   and Miletello, and that they can speak from their perspective

09:53:27  6   as a prescribing oncologist.

09:53:29  7           But to say it's not defective in any way, I

09:53:33  8   think, goes into that area where, you know, we would need FDA

09:53:37  9   regulatory experts to talk about the adequacy in the label.

09:53:43  10          MR. HOLDEN:  Well, Your Honor, I think, first off, they

09:53:44  11  have extensive experience in reviewing labeling for docetaxel,

09:53:50  12  for Taxotere, the brand name, for other chemotherapy

09:53:54  13  medications, and also experience interpreting that label,

09:53:56  14  talking to patients about the label and the risks on it.

09:54:02  15          I heard Mr. Miceli, I think he said it was

09:54:05  16  fundamentally unsupported to say that, from their perspective,

09:54:08  17  it was not defective.  That is simply not true.  They have a

09:54:10  18  great deal of experience reviewing these labels, talking to the

09:54:14  19  patients about these labels.

09:54:15  20          They are aware that labels are reviewed and

09:54:22  21  approved by FDA.  They know that.  They reviewed the iterations

09:54:29  22  of the label, from the Sanofi's label, and then to Sandoz's

09:54:31  23  label, and the changes over time.  So they viewed those.

09:54:35  24          THE COURT:  Was he aware of the CVE process and how

09:54:39  25  that works?  So, you know, for him to say the FDA approves the

*OFFICIAL TRANSCRIPT*

09:54:45 1   label, sure, but...

09:54:50 2        MR. HOLDEN:  He understood that FDA can mandate

09:54:54 3   different labeling if they choose.

09:54:54 4        THE COURT:  Sure.

09:54:57 5        MR. HOLDEN:  But, Your Honor, the key here, their

09:55:00 6   opinions about the -- that the warnings about alopecia and

09:55:07 7   hair loss were sufficient to them, as prescribing oncologists,

09:55:11 8   and that those key warnings were not defective, that was

09:55:14 9   appropriate, that appropriately warned them of the risk.

09:55:18 10        It's important, Your Honor, because plaintiff's

09:55:20 11   experts, Dr. Feigal and Dr. Bosserman, opined that, without

09:55:24 12   really any real basis -- they are not practicing oncologists,

09:55:29 13   like Dr. Foote and Dr. Reddy -- and they say that, to them, the

09:55:36 14   word "alopecia" always signifies temporary alopecia.

09:55:40 15        That's why Dr. Foote and Dr. Reddy's opinions

09:55:43 16   about the labeling are very important, to help the jury

09:55:46 17   understand that from that prescribing oncologist's standpoint,

09:55:51 18   that the labeling of the warnings about hair loss were

09:55:53 19   appropriate, were not defective, were not improper in any way,

09:55:59 20   from their perspective as prescribing oncologists.

09:56:03 21        Really, they are uniquely positioned in this case

09:56:07 22   to be able to talk about sort of the interplay between the

09:56:11 23   label and the discussion with the plaintiff, which is a key

09:56:15 24   issue, obviously, in the case.

09:56:17 25        I think this is consistent with your rulings in

**OFFICIAL TRANSCRIPT**

09:56:20  1    *Khan* on Glaspy, I mean, those held -- that these, you know,

09:56:24  2    prescribing oncologists with decades of experience are allowed

09:56:29  3    to talk about the label from their perspective as a clinical

09:56:33  4    oncologist.

09:56:38  5            I'll move on to the alternative cause now, which

09:56:47  6    Mr. Miceli spent a fair bit of time on.  You know, I think --

09:56:49  7    we were here yesterday, Your Honor.  We heard what you said.

09:56:52  8    You reiterated, again, that it is the plaintiff's burden to

09:56:57  9    show causation, and that it is not the defendants' burden.

09:57:01  10           Then you said, you know, there must be some basis

09:57:04  11   for an expert to talk about a potential alternative cause.

09:57:09  12           I went back last night and this morning and read

09:57:11  13   some of the other decisions, in other cases and yours, and the

09:57:16  14   word that keeps coming up is "reasonable."  Is there a

09:57:19  15   reasonable basis for these alternative causes to tell a jury

09:57:22  16   about?  I think, here, clearly, Dr. Foote and Dr. Reddy have

09:57:27  17   more than a reasonable basis to talk about the potential

09:57:30  18   alternative causes.

09:57:32  19           So just to -- to look at what their actual

09:57:51  20   opinions are, they're not giving -- neither Dr. Foote nor Reddy

09:57:55  21   are giving a specific causation affirmative opinion, but what

09:57:59  22   they are saying is that it's impossible to ascribe causation to

09:58:03  23   one medication when there's a combination chemotherapy regimen

09:58:07  24   like Ms. Stewart received.

09:58:08  25           Then, on general causation, they opined that --

**OFFICIAL TRANSCRIPT**

09:58:12 1    they did a very thorough review of extensive literature,

09:58:16 2    everything that Dr. Feigal reviewed, as well as additional

09:58:20 3    articles out there.  Really, everything under the sun, we sent

09:58:25 4    them, and they reviewed that.  They also drew on their own

09:58:28 5    experience from decades of reading literature, prescribing to

09:58:32 6    patients, and their opinions that there are various

09:58:39 7    chemotherapies associated with persistent hair loss.

09:58:43 8            There is absolutely a very reasonable basis for

09:58:47 9    all of the medications that they talk about:  Adriamycin,

09:58:50 10   Cytoxan, you know, extensive literature that they reviewed and

09:58:52 11   discussed in their reports and deposition to support those

09:58:56 12   alternative causes.

09:58:57 13           We've talked about a Bradford Hill analysis, and

09:59:07 14   I think it's clear --

09:59:07 15           THE COURT:  It doesn't apply.

09:59:08 16           MR. HOLDEN:  Not required.  But if you look at the

09:59:10 17   depositions and at the reports, they come very close.  They say

09:59:15 18   they, in essence, did that.  They reviewed all the literature.

09:59:18 19   They applied the same factors of a Bradford Hill.  They didn't

09:59:23 20   do it in a formal fashion, but they did a very thorough

09:59:26 21   analysis.

09:59:27 22           They also critiqued in great detail, over several

09:59:34 23   pages, Dr. Feigal's analysis.  What they said is that, based on

09:59:38 24   their review and their experience, that you can't reach that

09:59:42 25   same opinion that Dr. Feigal did based on the evidence.

***OFFICIAL TRANSCRIPT***

10:00:02  1            I'll just note again -- obviously, you addressed
10:00:05  2   this in *Kahn*, with Dr. Glaspy and Miletello, that is, you
10:00:11  3   rejected the idea that they have to do a Bradford Hill.
10:00:11  4            THE COURT:  That's not an issue.  Let me ask you
10:00:11  5   about --
10:00:15  6            MR. HOLDEN:  As long as there is some reasonable basis
10:00:17  7   for these alternative causes, they are allowed to talk about
10:00:20  8   some of them.
10:00:22  9            THE COURT:  What about, you know, these two
10:00:25 10   witnesses -- there is just a lot of information that overlaps,
10:00:30 11   and it seems to me that it might be cumulative.
10:00:33 12            I'm not interested in having ten doctors saying
10:00:37 13   the same thing, and I think the jury is not, and I'm not going
10:00:40 14   to allow it.  So --
10:00:42 15            MR. HOLDEN:  Of course.  We don't anticipate bringing
10:00:45 16   both necessarily.  I think, you know, in any case, I know
10:00:49 17   Sanofi has multiple experts.  Plaintiffs have multiple experts
10:00:52 18   in the same areas.  We want to have them available.  Who knows,
10:00:56 19   you know, when the trial goes forward, what the situation is
10:00:58 20   with COVID or whatever.  So we certainly don't anticipate
10:01:04 21   putting forth any duplicative or cumulative testimony.
10:01:11 22            THE COURT:  All right.  I have one of my sticky notes,
10:01:13 23   and this where I have a bit much.  It's a paragraph.  It's
10:01:15 24   actually one long sentence.  But he just says, from my 32 years
10:01:19 25   of experience prescribing chemotherapy drugs, including

*OFFICIAL TRANSCRIPT*

docetaxel, and my observations of my patients, I do not believe

that docetaxel is associated with an increased risk of

hair loss over other chemotherapies in general.

        We don't have a footnote.  We don't have

anything, but it's like, from my observations for 32 years, I

haven't seen that.

        Now, I guess -- and perhaps it's the way it's

worded.  I can understand him saying, listen, I haven't

experienced this, I haven't had patients do this, but it seems

like that's a pretty strong statement, without any footnote to

say, I've done a study, but, you know, just I experienced it,

and so I don't think it's an increased risk.

        There are other studies that -- actual studies

that have been presented that show different.

    MR. HOLDEN:  Well, I think, Your Honor, first off, it's

based on his literature review over the years.  He reviews

literature all the time as far as his job and in connection

with this case, so that's part of it, but it's just -- that's

his opinion from his being in the trenches treating patients

over those decades and following up with patients and actually

seeing --

    THE COURT:  But I guess we're back to -- and I'm not

requiring a Bradford Hill at all, but, you know, is there a

reasonable -- perhaps it's just semantics, that, you know, in

my practice, I haven't seen it.  That's one thing.  But to say

*OFFICIAL TRANSCRIPT*

10:03:05 1   it is not associated -- it's my opinion that it's not

10:03:10 2   associated with an increased risk of hair loss, it seems that

10:03:13 3   you need more than --

10:03:16 4   MR. HOLDEN:  Well, I think, Your Honor, the essence of

10:03:19 5   that can be -- can go to the weight of the evidence.  But there

10:03:22 6   is case law out there, which we've cited in our brief, that

10:03:26 7   says that treating physicians who are -- expert treating

10:03:32 8   physicians can talk about their experiences over the years, and

10:03:34 9   that's what that is.

10:03:35 10   THE COURT:  Oh, I agree.  He could say, I didn't see

10:03:38 11   it.  I have never seen it.  That's one thing.  But to say,

10:03:43 12   because I've been practicing 32 years, it is not.

10:03:48 13   MR. HOLDEN:  Maybe it's a semantics issue, but I think

10:03:50 14   that that is based on a wealth of experience, personal

10:03:55 15   experience as well as -- I think he talked about in the

10:03:58 16   deposition -- talking to colleagues, going to conferences,

10:04:03 17   reading literature, based on everything on his reliance list,

10:04:08 18   the extensive literature that's sent him.  So it's not just

10:04:08 19   based on his own personal experience, which is extensive, but

10:04:12 20   it's all those other factors as well.

10:04:13 21   Again, like I said, they did -- you know, they

10:04:16 22   both talk about they didn't do a formal Bradford Hill, but they

10:04:21 23   applied all those factors, they looked at the literature, they

10:04:23 24   did a very in-depth analysis of Dr. Feigal and critique of

10:04:28 25   Dr. Feigal, of what she looked at, and they concluded that you

*OFFICIAL TRANSCRIPT*

10:04:31  1      cannot draw the conclusion that she did from that evidence.

10:04:34  2              THE COURT:  Thank you.

10:04:40  3                  Mr. Miceli, you've got a minute.

10:04:42  4              MR. MICELI:  Okay, Your Honor, thank you.

10:05:07  5                  Your Honor, I'm going to show on the screen what

10:05:12  6      evidence they looked at beyond what they claim does not infer

10:05:16  7      causation.  They show absolutely nothing beyond case reports

10:05:20  8      and associations that prove nothing.

10:05:22  9                  You mentioned that Dr. Foote states that he has

10:05:26 10      over 32 -- or Mr. Holden stated that he has over 32 years of

10:05:31 11      experience, but he simply does not set out a methodology.  I

10:05:35 12      asked each one of them specifically.  They did not do it.

10:05:38 13                  We use the -- they claim that they looked at the

10:05:41 14      same information as our experts.  In our reply memorandum, we

10:05:45 15      used the example of baking a cake.  You can have all of the

10:05:51 16      ingredients, but if you don't follow the instructions in the

10:05:57 17      proper order, you don't end up with a cake.  You just end up

10:06:00 18      with stuff sitting on a counter.  That's what their experts

10:06:02 19      have.

10:06:03 20                  Mr. Holden argued that these practicing

10:06:05 21      oncologists can discuss the interplay between the label and the

10:06:08 22      patient and what happens in that room.  Your Honor precluded us

10:06:11 23      from doing that in the last trial.  They are trying to insert

10:06:14 24      that doctor into the room with the patient.  That's something

10:06:17 25      that you've already determined, in Dr. Bosserman, you ordered

*OFFICIAL TRANSCRIPT*

10:06:21 1     regarding Dr. Bosserman in the *Earnest* matter, can't be done.

10:06:25 2     That's what they are saying is their methodology.

10:06:28 3            Also, Mr. Holden said Your Honor used the word

10:06:33 4     "reasonable."  That is simply incorrect.  Your order with

10:06:37 5     regard to alternative cause went to -- the blue box here is

10:06:49 6     part of the language in your order, and the word is "sound and

10:06:53 7     reliable."  Reliable evidence, not reasonable evidence.

10:06:58 8            What the defense experts argue is only -- or not

10:07:03 9     argue, but set out is that they only looked at associations.

10:07:06 10     They say that that is not reliable evidence of an inference of

10:07:10 11     causation.  It's simply, they put something forth that they

10:07:13 12     agree is not enough, and then their attorneys want to argue or

10:07:17 13     the party wants to argue that it is enough.  They agree

10:07:20 14     scientifically it's meaningless.

10:07:23 15            The other thing about, these are practicing

10:07:27 16     oncologists, and they can talk about what should be in a label,

10:07:31 17     the FDA has professionals, as Your Honor just pointed out, that

10:07:34 18     go through rigorous standards for what should be in a label,

10:07:37 19     what a company must include in its label; not the FDA's label,

10:07:41 20     the company's label.

10:07:42 21            The FDA does not take a survey of oncologists to

10:07:47 22     determine what should go in a label.  The vote of two

10:07:50 23     oncologists that are identified as experts should not be

10:07:54 24     allowed to be put before the jury as what is appropriate, what

10:07:58 25     is adequate and what is nondefective in a label.  That's what

*OFFICIAL TRANSCRIPT*

10:08:03 1     they are asking to be done.

10:08:04 2             It's interesting that they are making this

10:08:06 3     argument because Ms. Cohen just argued this morning that it's

10:08:09 4     not appropriate to argue about what reasonable people should

10:08:13 5     do.  It's a hard standard.  It is that a jury should not hear

10:08:17 6     about what reasonable oncologists think ought to be in a label.

10:08:21 7     That's not the standard for what makes a label appropriate or

10:08:24 8     adequate.

10:08:25 9             Prescribers -- when a prescriber is -- excuse

10:08:32 10    me -- we are asking the Court to preclude the defense experts

10:08:36 11    from testifying or inferring that alternate causes exist

10:08:40 12    because they admit that all of the evidence they've looked at

10:08:44 13    does not infer or speak to causation.  It's only an

10:08:48 14    association.

10:08:48 15            The expert should not be permitted to state that

10:08:52 16    any drug can cause PCIA without some reliable evidence, to use

10:09:00 17    Your Honor's words, related to cause.  No amount of

10:09:03 18    cross-examination or curative instruction or jury instruction

10:09:07 19    can correct this.

10:09:08 20            You know, I've heard two people today for Sandoz

10:09:12 21    say that this is the best regimen for Ms. Stewart.  At the time

10:09:18 22    that Ms. Stewart received her TAC regimen, the regimen TAC had

10:09:26 23    been removed from the NCCN guidelines as a preferred regimen.

10:09:31 24    It was and other one.

10:09:31 25            We talked about this with experts, Foote and

*OFFICIAL TRANSCRIPT*

10:09:35  1   Reddy.  The reason the NCCN gives for removing -- or having

10:09:39  2   preferred and other regimens is safety and efficacy.  So, if

10:09:46  3   this is the best regimen, why is it not preferred?  Their

10:09:52  4   experts couldn't address that.

10:09:54  5        So reading and understanding literature is very

10:09:57  6   different.  They don't get a vote on what is adequate, period.

10:10:00  7        It's hard to craft -- I already hit that.  I'm

10:10:04  8   sorry, Your Honor, I'm taking up too much of your time.

10:10:08  9        Thank you.

10:10:08 10        MR. HOLDEN:  Just one minute, Your Honor.

10:10:10 11        THE COURT:  Thirty seconds.  I'm going to have you

10:10:11 12   start initialling those things.

10:10:11 13        MR. HOLDEN:  Your Honor, just to briefly respond.

10:10:35 14   Mr. Miceli has his saying, there is no basis for these

10:10:39 15   opinions.  Both of our experts have extensive reliances that

10:10:43 16   were attached to their reports and to the briefing, which I'm

10:10:45 17   sure you've seen, listing out dozens, hundreds of articles

10:10:49 18   that -- scientific articles which they reviewed, some as part

10:10:52 19   of their normal practice, some in connection with this case.

10:10:55 20   Those support the bases for their opinions about these

10:10:58 21   alternative causes.

10:10:59 22        We can lay a foundation for any opinions that you

10:11:03 23   have concerns about.  You know, to the extent they've raised

10:11:07 24   issues, that can be dealt on cross-exam of these experts, so

10:11:11 25   it's not a reason for -- a basis for exclusion under *Daubert*.

**OFFICIAL TRANSCRIPT**

10:11:13  1              Also, Mr. Miceli briefly talked about the FDA

10:11:19  2     process for label changes.  I want to note that the FDA does

10:11:22  3     include oncologists in that process because it is, of course,

10:11:26  4     crucial to have the actual doctors who will be using that label

10:11:29  5     and talking to the patients about that label involved in the

10:11:32  6     process.

10:11:33  7              THE COURT:  That doesn't make him an expert on FDA

10:11:35  8     regulations.

10:11:39  9              MR. HOLDEN:  It goes to the fact that he -- they are --

10:11:41 10     they have crucial experience on the labeling issues, and

10:11:44 11     from -- they are -- from the perspective of an oncologist, they

10:11:48 12     are best suited to talk about whether a label is appropriate.

10:11:52 13              THE COURT:  Thank you.

10:11:52 14              MR. MICELI:  Your Honor, in giving the last word, if I

10:11:58 15     can just say one thing from here, they just don't set out a

10:12:01 16     methodology.  From what Mr. Holden just explained, they didn't

10:12:07 17     bake the cake.

10:12:08 18              THE COURT:  Thank you.

10:12:08 19              MR. LAMBERT:  Your Honor, may we take a five-minute

10:12:14 20     break?

10:12:14 21              THE COURT:  We can take a ten-minute break.

10:12:18 22              Court is at recess for ten minutes.

10:22:41 23              (WHEREUPON, at 10:22 a.m., the court took a

10:22:55 24     recess.)

10:22:55 25              THE DEPUTY CLERK:  Court is in session.  You may be

**OFFICIAL TRANSCRIPT**

10:22:57 1    seated.

10:22:58 2         THE COURT:  This is Docket No. 11567, Motion to Exclude

10:23:11 3    Testimony of Dr. Markman.

10:23:21 4              Mr. Lambert.

10:23:21 5              Before we get started arguing, let me just say

10:23:32 6    something.  It really doesn't matter to me who gets the last

10:23:36 7    word.  I think there is always a concern that, wait a minute,

10:23:37 8    she might have forgotten, so let me rush back so I can tell her

10:23:37 9    one more time, so they're the last one speaking.

10:23:40 10             You don't need to worry about that as much as you

10:23:43 11   think you perhaps do.  Okay?

10:23:46 12        MR. LAMBERT:  Sounds good, Your Honor.  Sometimes we

10:23:49 13   think of something important that we always, in hindsight, want

10:23:54 14   to say.

10:23:57 15        THE COURT:  I didn't see that coming.  Okay.

10:24:02 16        MR. LAMBERT:  Good morning, again, Your Honor.

10:24:03 17   Palmer Lambert here on behalf of Ms. Hughes.  May it please the

10:24:09 18   Court.

10:24:09 19             Your Honor, plaintiff brings this very

10:24:11 20   straightforward motion to do two things:  One, to limit

10:24:18 21   Dr. Markman to testifying within his field of expertise, as he

10:24:21 22   testified he would do in his deposition; and, two, to disallow

10:24:27 23   the conclusory statements about causation without use or

10:24:33 24   implementation of any reliable methodology.

10:24:35 25             So, number one, Dr. Markman admits in his

                              ***OFFICIAL TRANSCRIPT***

10:24:38 1    deposition that he is not a dermatologist, dermatopathologist,

10:24:45 2    psychiatrist, or FDA warnings expert.  He confirmed his

10:24:49 3    opinions are limited to oncology.  Dr. Markman, though, in his

10:24:56 4    expert report and in his deposition, intends to clearly go

10:25:02 5    beyond those admitted limitations.

10:25:10 6             He appropriately testifies that Dr. Veith's

10:25:14 7    prescription of docetaxel was within the standard of care, and

10:25:19 8    that it was appropriate for Ms. Hughes.  But then he goes on to

10:25:23 9    testify about some other things, like hindsight bias, which, in

10:25:32 10   our opinion, is an impermissible attempt to enter into the

10:25:37 11   learned intermediary room.

10:25:38 12            Likewise, he intends to offer testimony about the

10:25:42 13   adequacy of the label, which, as Your Honor just discussed in

10:25:46 14   the last argument, requires some level of understanding and

10:25:51 15   expertise in the area of FDA regulatory, of which Dr. Markman

10:25:57 16   admitted he is not qualified to testify about.

10:26:01 17            Furthermore, once again, that is getting into the

10:26:05 18   room and impermissibly talking about things that the jury

10:26:11 19   should hear from Dr. Veith.

10:26:15 20            Finally, Dr. Markman spends a good amount of his

10:26:18 21   expert report on dermatologic conditions and dermatology

10:26:26 22   opinions, again, which he admits he's not qualified to talk

10:26:29 23   about, and he's not going to talk about in front of the jury.

10:26:32 24   Yet, on leading direct, he is asked to confirm and agree with

10:26:39 25   counsel that certain drugs are, quote, reasonably likely to be

*OFFICIAL TRANSCRIPT*

10:26:44  1    associated with persistent alopecia.

10:26:49  2             When I got to ask him some additional questions

10:26:52  3    after that leading direct, he said, "Most of those drugs that

10:26:56  4    were listed had nothing to do with this particular case."

10:27:01  5             He also couldn't tell me any methodology or what

10:27:05  6    actual level of evidence is needed for him to conclude that

10:27:09  7    there is a "reasonably likely association."

10:27:13  8             For those reasons, Your Honor, we would ask for

10:27:15  9    the particular limitations requested in our briefs.

10:27:21 10             Thank you.

10:27:24 11        THE COURT:  Ms. Callsen.

10:27:25 12        MS. CALLSEN:  Good morning.  Julie Callsen representing

10:27:56 13    Accord.

10:27:57 14             Dr. Markman and their challenge to his testimony

10:28:00 15    is a redo of Dr. Glaspy and Dr. Miletello is the first thing

10:28:05 16    I'm going to start out with.

10:28:07 17             First of all, his opinions on the label are

10:28:10 18    very -- are limited to his perspective as an oncologist and how

10:28:15 19    he reads the label.

10:28:17 20        THE COURT:  I understand, but, you know, he just says,

10:28:21 21    it's my understanding when submitting for approval Accord

10:28:24 22    advised they intended to rely on previous FDA findings and

10:28:29 23    efficacy.

10:28:32 24             I think he's trying to swim a little bit in that

10:28:37 25    regulatory water, those regulatory waters.  It's one thing to

*OFFICIAL TRANSCRIPT*

10:28:41 1  say, this is what I do in my practice, and this is how I review

10:28:45 2  this in determining treatment -- standard treatments of

10:28:49 3  patients.  It's another thing to say, well, this is in

10:28:51 4  compliance with FDA regulations.

10:28:55 5        MS. CALLSEN:  In that testimony, Your Honor, I see the

10:28:57 6  confusion.  That testimony, actually, that was in his report --

10:29:00 7  or maybe it was in his report --

10:29:02 8        THE COURT:  No, it's in his report.

10:29:04 9        MS. CALLSEN:  -- it's in his report, that was specific

10:29:05 10 to Accord.  Okay.  So he was trying to understand where Accord

10:29:09 11 fit into the regulatory scheme.

10:29:12 12       They're a 505(b)(2), and so that is what his

10:29:16 13 explanation of where Accord fits in.  It's not a brand name

10:29:20 14 drug.  It's a generic.  It's a generic who obtained its

10:29:25 15 approval under 505(b)(2).

10:29:27 16       So that was just saying, I represent Accord.

10:29:29 17 This is how they obtained approval.  It was just background.

10:29:33 18 He's not going to be testifying as to whether it was -- you

10:29:36 19 know, I mean, that's a decision that was made.  That's a fact.

10:29:38 20 That's just a fact that he knew.  He's not going to be

10:29:41 21 rendering regulatory opinions.  Rather, his opinions are going

10:29:45 22 to be on what the label says to me as a prescribing physician.

10:29:49 23       I do want to point out, the label, the

10:29:52 24 FDA-approved label, it starts out by saying, prescribing

10:29:56 25 information.  That's the heading.  I mean, the prescribing

*OFFICIAL TRANSCRIPT*

10:30:00  1    information is for the prescriber.

10:30:00  2            THE COURT:  Sure.

10:30:03  3            MS. CALLSEN:  He's taking and saying, I read this

10:30:05  4    label, and this is how I interpret it.

10:30:08  5            So that -- it's very similar to the analysis

10:30:11  6    applied with Dr. Glaspy and the rationale.  He's going to

10:30:15  7    testify with respect to his oncologist perspective, and that's

10:30:19  8    it, on the label.

10:30:20  9            With respect to the derm conditions, again, he

10:30:26 10    has been an oncologist for 40 years, and he's been focusing on

10:30:30 11    cancer treatment with women.  He has seen alopecia.  He has

10:30:33 12    seen numerous different types of alopecia.  He's seen

10:30:37 13    various -- meaning grades of alopecia.  He's not going to say

10:30:43 14    it's androgenic, it's this type, it's scarring.  That's not

10:30:48 15    what he's going to do; but, he has observed it in his practice,

10:30:52 16    and that's where he's coming at the alopecia opinion is whether

10:30:55 17    it's persistent or what he has actually seen in his practice

10:30:58 18    and what he's studied in his medical journals.

10:31:01 19            What he says is there is no medically reliable

10:31:04 20    way.  So it's from his perspective as a medical doctor.  It's

10:31:09 21    not as a statistician.  It's not from any other perspective

10:31:14 22    than his perspective as a medical doctor.

10:31:17 23            Again, very similar to the rationale applied with

10:31:22 24    Dr. Glaspy.  In his role as a rebuttal opinion, he can point

10:31:26 25    out alternative possibilities.  That's what he does.  He points

*OFFICIAL TRANSCRIPT*

10:31:31 1   out alternative possibilities based on what he sees.

10:31:35 2           Now, Mr. -- make sure I say Mr. Lambert this

10:31:41 3   time -- talked about other drugs.  I mean, Dr. Markman rendered

10:31:45 4   a general opinion and then case specific opinions.  Other

10:31:48 5   drugs, that would be appropriate to seek a *Motion in Limine*

10:31:52 6   that he can't discuss any other drugs other than the ones that

10:31:58 7   Ms. Hughes used.  That's been a ruling, or that's been sought

10:32:02 8   in others.  If they want to do that, that's fine, but that's

10:32:04 9   not a basis for actually excluding his opinion.

10:32:08 10          THE COURT:  What about this opinion on -- let me see

10:32:10 11  where my notes are in that -- hindsight bias.

10:32:15 12          MS. CALLSEN:  Yes.

10:32:16 13          THE COURT:  You know, he read one article out of a

10:32:20 14  journal.  I have to tell you --

10:32:23 15          MS. CALLSEN:  Now, this is a phenomenon that he raised

10:32:25 16  with us that he sees in his practice.

10:32:28 17          By the way, he is not entering the room.  He is

10:32:31 18  putting in perspective the patient's reflections after the

10:32:37 19  fact, if only I had known about this, if only I had known about

10:32:42 20  that.  What he says is patients, when they are given --

10:32:48 21          THE COURT:  Oh, I read what he said.

10:32:50 22          MS. CALLSEN:  Pardon me?

10:32:51 23          THE COURT:  I read what he said.  I just --

10:32:58 24          MS. CALLSEN:  It's from -- it's from his perspective in

10:33:01 25  working with patients, and then it developed.  He also read

*OFFICIAL  TRANSCRIPT*

10:33:05 1   medical research.

10:33:06 2           THE COURT:  He read an article.

10:33:07 3           MS. CALLSEN:  He read two articles, and they both in

10:33:12 4   oncology journals.  He read them -- they're cited in -- I don't

10:33:15 5   know if they are cited in the brief.

10:33:17 6           THE COURT:  I'm looking at the footnote in the report.

10:33:20 7   "Hindsight is Not Equal to Foresight," *Journal of Experimental*

10:33:29 8   *Psychology.*

10:33:30 9           You know, he's not a psychologist.

10:33:31 10          MS. CALLSEN:  He is not a psychologist, and he's not

10:33:34 11  testifying from a psychologist.  By the way, those articles are

10:33:42 12  in oncology journals.  It's oncologists looking back --

10:33:42 13          I'm sorry, Your Honor.  Where are you --

10:33:44 14          THE COURT:  Bottom of page 32 of his report.  A 1975

10:33:50 15  article, a 1978 article.

10:33:53 16          MS. CALLSEN:  1975?  Okay.  The articles that I'm

10:33:57 17  referring to were in oncology journals.

10:33:59 18          THE COURT:  All right.  Well, that's not what he cited

10:34:01 19  in his report.

10:34:06 20          MS. CALLSEN:  Well, that's what --

10:34:10 21          THE COURT:  It's footnote 56.

10:34:18 22          MS. CALLSEN:  Okay.  Well, I'm sorry, I don't have all

10:34:21 23  of his reliance list in front of me.

10:34:24 24          THE COURT:  It's on page 32 of his report.

10:34:26 25          MS. CALLSEN:  But I do know that he cited to oncology

*OFFICIAL TRANSCRIPT*

journals.  He cited, also, to his practice, to his experience with treating women and what they've said to him afterwards.

His focus on -- is that, you know, when you're first diagnosis with cancer, your focus is on survival.  You review -- side effects are reviewed with the patients.  Again, the patients are focusing on survival.

Then, after the fact, sometimes they say, well, if only I had known this, if only I had known this.  So he is putting it in perspective from his vantage point of being an oncologist who has been treating people with cancer for 40 years.

He takes that into account when he counsels patients.  So he's helping the jury put testimony in perspective, reflecting back on what they should have done or if only they would have known.  This is a phenomenon that he has observed, that he has looked into.

He does cite oncology journals.  I don't have them right in front me, but I do know that his basis is citing an oncology journal, a study out of Duke University that he cites.  We refer to it in -- at page 30 to 31 of his report.

I know, in his reliance list, there are at least two or three -- there are least two articles that come out of oncology journals to support the statements that, again, grew out of his experience in treating patients as a clinician, which --

*OFFICIAL TRANSCRIPT*

10:36:13 1       THE COURT:  So what he's saying is all of these cases

10:36:16 2  are nonsense?

10:36:17 3       MS. CALLSEN:  I don't think that's what he says.  I

10:36:24 4  mean, I don't think that's what he says.  But what he does say

10:36:29 5  is that you need to look at it under the perspective of women

10:36:33 6  who have been faced with decisions, survival or --

10:36:37 7       THE COURT:  Oh, and I think that that's a critical

10:36:40 8  question to ask every plaintiff --

10:36:40 9       MS. CALLSEN:  Right.

10:36:42 10       THE COURT:  -- at that time.  That's why I continue to

10:36:44 11  say what's in the room?  It's not enough to say, well, I don't

10:36:47 12  know what I would have done.  I think, for causation, we have

10:36:50 13  to have evidence that, even at that time, that's what she would

10:36:56 14  have done.  That's a very difficult thing to do.

10:37:00 15       But I think this testimony from this oncologist,

10:37:06 16  to say that -- I am concerned that he's leaving his level of

10:37:14 17  expertise, which is the treatment -- I mean, I think he can say

10:37:18 18  there are occasions where people come in and they regret what

10:37:21 19  they did.  That's hindsight.

10:37:25 20       MS. CALLSEN:  But it was developed from his oncology

10:37:29 21  practice.  It is something that he has seen and experienced, so

10:37:32 22  he did do research on it.  He takes that into account in his

10:37:37 23  discussions with his patients and helping them through their

10:37:39 24  decisionmaking and, also, counseling with them afterwards.

10:37:43 25       I mean, an oncologist doesn't cease treating a

10:37:46  1    patient just because the treatment is over.  He continues to

10:37:48  2    treat them and continues to deal with -- you know.

10:37:52  3              THE COURT:  The sequela.

10:37:53  4              MS. CALLSEN:  Exactly.  He continues to deal with

10:37:56  5    statements said from them or -- and he continues to counsel

10:37:59  6    them on decisions, oh, maybe I should have done this, or I

10:38:00  7    should have done that.  I mean, so he continues to do that.

10:38:03  8                   So that is the basis, that is the groundwork that

10:38:07  9    was done to establish those opinions.  That's where that comes

10:38:11 10    from.  It's his experience.  It will only be from that

10:38:14 11    perspective.  He's said he's not a psychologist.  He's not

10:38:18 12    coming from that perspective.

10:38:21 13                   Thank you, Your Honor.

10:38:23 14              THE COURT:  Thank you, Counselor.

10:38:26 15                   Mr. Lambert.

10:38:27 16              MR. LAMBERT:  Your Honor, in the interest of saving

10:38:30 17    little covers.

10:38:31 18              THE COURT:  You can talk from right there.

10:38:33 19              MR. LAMBERT:  I'll be very brief, Your Honor.

         20              THE COURT:  Then Ms. Callsen is going to jump up

         21    because she's going to want the last word, then you're going to

         22    jump up.

         23              MS. CALLSEN:  I'm going to stay right here -- But you

         24    can't hear me, though.

10:38:36 25              THE COURT:  Mr. Lambert.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:38:36 1 | MR. LAMBERT:  Thank you, Your Honor. |
| 10:38:50 2 | So if you read Dr. Markman's conclusion, the two |
| 10:38:54 3 | paragraphs, and you exclude the last sentence of the first |
| 10:38:59 4 | paragraph and the second paragraph, I think that's exactly what |
| 10:39:03 5 | Dr. Markman should be limited to. |
| 10:39:06 6 | When Ms. Callsen says that he's saying there is |
| 10:39:10 7 | no reliable way to attribute persistent alopecia to docetaxel |
| 10:39:17 8 | alone, first of all, there is a reliable way to do that.  There |
| 10:39:23 9 | is scientific methodology through Bradford Hill and otherwise. |
| 10:39:26 10 | So that statement is just -- unfortunately, it's |
| 10:39:28 11 | just not true, and it's not based in any science or |
| 10:39:32 12 | methodology. |
| 10:39:33 13 | In addition -- |
| 10:39:37 14 | THE COURT:  Are you telling me that he cannot say, |
| 10:39:40 15 | listen, some of these other drugs have been associated with |
| 10:39:44 16 | this, so how do we make the determination? |
| 10:39:46 17 | MR. LAMBERT:  Well, in order to make a scientific |
| 10:39:49 18 | statement, like Mr. Miceli said, with the expert hat on, you |
| 10:39:54 19 | have to say things that are based on science.  You just can't |
| 10:39:58 20 | say, well, it's really hard.  There is all these other issues. |
| 10:40:01 21 | You have to actually have employed or attempted to employ |
| 10:40:06 22 | Bradford Hill.  He admitted in his deposition that he didn't do |
| 10:40:09 23 | that. |
| 10:40:10 24 | In addition, when he talks about associated with |
| 10:40:14 25 | persistent alopecia, but then he can't tell you what type of |

**OFFICIAL TRANSCRIPT**

10:40:18  1    alopecia it's associated with, again, it's a problem of

10:40:22  2    confusing the issues in front of the jury.  It's the same

10:40:25  3    problem that Ms. Davis talked with Your Honor about.

10:40:29  4         THE COURT:  Are you telling me he can't say that

10:40:34  5    letrozole is known to cause alopecia?

10:40:37  6         MR. LAMBERT:  Well, I think it's a problem, Your Honor,

10:40:39  7    because he's not a dermatologist.

10:40:42  8         THE COURT:  Well, I know, but he prescribes, and he has

10:40:45  9    got to be looking at the warnings and adverse events.

10:40:49 10         MR. LAMBERT:  That's fair enough, but the issue is, is

10:40:52 11    that letrozole doesn't cause PCIA.  He doesn't know the

10:40:55 12    difference -- because he's not a dermatologist, he can't tell

10:40:59 13    you what, from the skin or from a cellular level, the

10:41:05 14    difference is, but letrozole is known to cause alopecia while

10:41:09 15    you're taking it.  It's not -- and it's a different type of

10:41:14 16    alopecia.  It's more of an androgen-dependent female pattern

10:41:20 17    hair loss type of alopecia.  But that's where the problem is.

10:41:21 18    It's that he's giving an opinion about something that he's not

10:41:26 19    qualified to do.

10:41:28 20         Lastly, Your Honor, I would just point out that

10:41:32 21    on the psychology issue, we talked about psychology experts in

10:41:40 22    advance of the first trial.  Your Honor found that -- well,

10:41:46 23    discussed with us that those types of experts are not necessary

10:41:50 24    in this type of a case.

10:41:51 25         They can absolutely cross-examine Ms. Hughes

*OFFICIAL TRANSCRIPT*

10:41:58  1    about her decisionmaking and about what is required under the

10:42:02  2    learned intermediary doctrine in terms of would you have done

10:42:07  3    something differently; but, to have a doctor come in and say,

10:42:10  4    from his perspective, the fact that he's diagnosing hindsight

10:42:15  5    bias, that's just not appropriate in this trial.  I think it's

10:42:19  6    very clear that he's not qualified to give that opinion.  He

10:42:22  7    didn't do the things that would have to be done to make that

10:42:25  8    opinion.

10:42:26  9              As far as reasonable doctor goes, you know,

10:42:31 10    that's goose/gander.  Again, like Mr. Miceli said, you know, if

10:42:38 11    we are going to be talking about what reasonable doctors would

10:42:42 12    do if given different warning language, then our experts need

10:42:46 13    to be able to talk about that just as much as their experts

10:42:49 14    would.

10:42:49 15              THE COURT:  Thank you.

10:42:50 16              MR. LAMBERT:  Thank you, Your Honor.

10:42:59 17              MS. CALLSEN:  Much of what Mr. Lambert just spoke about

10:43:06 18    was not what he covered initially, but I believe our brief

10:43:09 19    adequately covers it.

10:43:10 20              THE COURT:  The briefs have.

10:43:15 21              MR. LAMBERT:  If Your Honor would like, Ms. Berg is

10:43:20 22    here.  I know counsel arguing the Madigan motion is here.  If

10:43:25 23    you want to take a little break, and we can get it done before

10:43:28 24    lunch?

10:43:28 25              THE COURT:  Oh, that would be great.

**OFFICIAL TRANSCRIPT**

10:43:33   1              Give me a few minutes.  I've got to make an

10:43:40   2    adjustment.

10:44:53   3             (WHEREUPON, at 10:44 a.m., the Court took a recess.)

10:57:09   4             THE DEPUTY CLERK:  All rise.

10:57:11   5             THE COURT:  Court is back in session.  You may be

10:57:14   6    seated.

10:57:24   7              We're going to begin with two motions that we're

10:57:27   8    going to take up at the same time, that is Motion to Exclude

10:57:31   9    Expert Testimony of Dr. Madigan filed by Accord,

10:57:36  10    Document 11531; and, then we have the Motion to Exclude or

10:57:39  11    Limit Opinions of David Madigan filed by Sandoz,

10:57:44  12    Document 11462.  The parties have agreed to consolidate those

10:57:48  13    arguments because we're going to be treading over the same

10:57:53  14    ground.

10:57:54  15             I believe -- have you all decided who is going to

10:57:59  16    go first?

10:58:00  17            Mr. Ruttinger is going to go first on behalf of

10:58:04  18    the Accord.

10:58:05  19            Mr. Ruttinger.

10:58:14  20       MR. RUTTINGER:  Good morning, Your Honor.  Yes, we're

10:58:15  21    going to try very hard not to retread any ground.  I know the

10:58:15  22    Court has dealt with Dr. Madigan in the *Earnest* and *Kahn* cases,

10:58:19  23    so we'll keep this relatively abbreviated.

10:58:19  24            I do want to hone in on two areas here.  The

10:58:22  25    first is opinions stated by Dr. Madigan, which we believe to be

*OFFICIAL TRANSCRIPT*

10:58:26  1    limited in light of this Court's order in *Khan*, which actually

10:58:29  2    postdated all of the briefing here.

10:58:31  3              The second area are opinions stated by

10:58:33  4    Dr. Madigan that we think need to be viewed through a different

10:58:38  5    lens due to significant differences between the *Earnest* and

10:58:40  6    *Khan* cases and this one.

10:58:44  7              So, I think I (indiscernible) it very briefly

10:58:44  8    through the *Khan* issue.  In that order, this Court limited

10:58:48  9    Dr. Madigan from stepping into the realm of general causation,

10:58:53 10    having determined that his opinions went a little further than

10:58:58 11    they did in the *Earnest* case, and that he didn't conduct the

10:59:02 12    Bradford Hill analysis that would have supported the second

10:59:04 13    prong of the general causation inquiry.

10:59:06 14              The opinions he offered in *Khan* is the exact same

10:59:09 15    opinion, the exact same language here, where he says there is

10:59:11 16    adequate statistical evidence that docetaxel causes

10:59:16 17    permanent/irreversible alopecia.  We think that he would be

10:59:20 18    limited for the same reasons as in *Khan*.

10:59:22 19              The second area is meta-analysis of observational

10:59:25 20    studies that this Court also limited in *Khan*.  I know that

10:59:27 21    there is a reconsideration motion pending in *Khan* on that.  I'm

10:59:30 22    not planning to address that here unless this Court has

10:59:34 23    questions about it, but we believe the same outcome should

10:59:38 24    drive the decisions here.

10:59:39 25              In the areas that are new in this case from the

*OFFICIAL TRANSCRIPT*

10:59:43 1  *Earnest* and *Kahn* cases, there are two significant differences.

10:59:48 2  The first of those is the absence of doctors (audio distortion)

10:59:51 3  to transfer in *Earnest* and *Kahn*.

10:59:52 4       THE COURT:  Wait.  I can't -- would you back up just a

10:59:56 5  minute.  Okay.  I think you said we're going to cover new

11:00:04 6  ground, and I would like you to begin there, because you cut

11:00:08 7  out just briefly.

11:00:11 8       MR. RUTTINGER:  Okay.  So, the new ground.  The first

11:00:13 9  new ground here, the first major difference, is the absence of

11:00:18 10 Dr. Kessler, who was a key part of Dr. Madigan's background

11:00:21 11 analysis and part of his methodology in the *Earnest* and *Kahn*

11:00:24 12 cases, and is not an expert and not presenting testimony in

11:00:26 13 this case.

11:00:27 14      The second is the different regulatory schemes.

11:00:31 15 I know that we've talked to death about the fact that this is a

11:00:33 16 505(b)(2) manufacturer, as opposed to Sanofi, but that does

11:00:37 17 have important differences for how does Dr. Madigan's analysis

11:00:39 18 of the safety signal (indiscernible) particularly applies to

11:00:45 19 Accord and to Sandoz.

11:00:46 20      So let's talk first about Dr. Kessler.  You know,

11:00:49 21 I think, in our brief, I think it's page 15 of our motion, we

11:00:52 22 laid out quite a few of the different conceptions here, where

11:00:55 23 he says, you know, he borrowed key search terms from

11:01:00 24 Dr. Kessler.  The way that Dr. Madigan explained Dr. Kessler's

11:01:05 25 interplay with his own opinions and the safety signal

**OFFICIAL TRANSCRIPT**

11:01:11 1     identification methodology was, well, we asked him about the

11:01:13 2     search terms, and he said, you know, that sounds like a good

11:01:17 3     question for Dr. Kessler.

11:01:18 4            If this case comes to trial before a jury, I

11:01:21 5     don't understand how Accord is supposed to cross-examine

11:01:24 6     Dr. Madigan if his response is going to be, that sounds like a

11:01:27 7     good question for Dr. Kessler.

11:01:29 8            Without Dr. Kessler in this case, Dr. Madigan

11:01:31 9     needs to be able to validate and explain the methodology that

11:01:35 10     went into his search terms.  It's the key underpinning of his

11:01:39 11     safety signal opinion.  If the jury is forced to look at a

11:01:43 12     black box saying, we don't know who Dr. Kessler is, he's not in

11:01:47 13     this case, he's not offering any testimony, then Dr. Madigan

11:01:50 14     has to be able to fill in that information on his own.  There

11:01:53 15     has never been anywhere in his expert report or testimony where

11:01:56 16     he does that.

11:01:56 17            So, without Dr. Kessler, we do not think he can

11:02:00 18     provide an adequate or reliable methodology to support his

11:02:05 19     safety signal opinion as to Accord and as to Sandoz.

11:02:09 20            The other key aspect that is related to that,

11:02:12 21     Your Honor, is he offered, you know, opinions about adverse

11:02:18 22     event reports as part of support of his signal.  He identified

11:02:22 23     31 adverse event reports that were partly, you know, provided

11:02:30 24     to him and consulted on by Dr. Kessler as well.

11:02:33 25            He acknowledges that, sure, it's possible that

*OFFICIAL TRANSCRIPT*

11:02:36 1   adverse event reports could lead to false positives; but, when

11:02:39 2   we asked him that during his deposition, he again deferred to

11:02:43 3   Dr. Kessler, saying, well, this is a reasonable analysis to do.

11:02:46 4          The problem is, without Dr. Kessler there -- and,

11:02:49 5   by the way, when asked and pressed on that during his

11:02:53 6   deposition, part of his answer to the false positive question

11:02:56 7   was his explanation that said, well, Dr. Kessler didn't come up

11:03:00 8   with a better endpoint for the analysis.

11:03:04 9          Respectfully, Your Honor, we don't think pointing

11:03:06 10  to Dr. Kessler as a reason why his methodology might be

11:03:10 11  imperfect is going to be an acceptable answer to a jury when

11:03:14 12  asked about that, because, again, they don't have the context

11:03:17 13  for who Dr. Kessler is, and Accord has no ability to

11:03:20 14  cross-examine Dr. Kessler.

11:03:21 15         So we don't believe Dr. Madigan can punt a

11:03:25 16  question to a witness who is not present in this case, and, as

11:03:29 17  a result, Accord is not going to be unable to adequately

11:03:31 18  cross-examine him on these questions about his search terms and

11:03:34 19  about the adverse event report.

11:03:41 20       THE COURT:  Isn't Dr. Madigan allowed to reasonably

11:03:46 21  rely on information from other experts that people in his field

11:03:49 22  use?  I mean, could it fall into that area?

11:03:57 23       MR. RUTTINGER:  That's a reasonable question,

11:03:57 24  Your Honor.

11:03:58 25         Under Rule 703, entitled "Acceptable Bases for

**OFFICIAL TRANSCRIPT**

Expert Testimony," an expert can rely on principles, (indiscernible), things like that reasonably relied on by an expert in the field.  But, ultimately for the question of admissibility, he also has to be able to substantiate to the jury that his methodology is reliable.

So, that's where we get to this Catch 22 here, is if his answer to why his methodology is reliable is, I relied on Dr. Kessler, and that's something an expert in my field would reasonably rely on, that's going to risk confusing the jury, which is another evidentiary problem, because the jury is going to say, well, okay, who is Dr. Kessler?

It's not going to be the same jury in *Earnest*. They are not going to have heard that testimony.  Accord is not going to have any ability to effectively cross-examine him if the answer, well, ask Dr. Kessler.

It's akin to if, you know, someone were to ask an expert, well, what's the basis for your opinion, and the response was, well, I learned it from a reasonable source. Trust me.  In this case, we can't dig into or validate the reasonable source that he claims to have relied on.

We know that this is actually potentially a real problem in these cases because Dr. Madigan didn't dig into or verify any of these adverse event reports.  And when you get into this issue with respect to Accord, in a 505(b)(2) manufacturer, Dr. Madigan actually admitted he doesn't even

*OFFICIAL TRANSCRIPT*

11:05:26  1    know if 505(b)(2) manufacturers have access to Sanofi's adverse

11:05:32  2    event events.

11:05:33  3              So, without being able to validate what those

11:05:35  4    adverse events he's allegedly relying on are, Accord can't even

11:05:39  5    necessarily determine what those are, and Dr. Madigan hasn't

11:05:41  6    laid a foundation for even believing that Accord would have

11:05:46  7    reasonably been on notice to those adverse events.

11:05:49  8              Now, this kind of blends into my last point here,

11:05:52  9    which is, you know, Dr. Madigan does offer some opinions about

11:05:56 10    Accord's knowledge, another 505(b)(2) manufacturer's knowledge,

11:06:01 11    about PCIA.

11:06:02 12              Now, plaintiff has conceded that Dr. Madigan is

11:06:05 13    not going to offer any regulatory opinions; but, when we get

11:06:09 14    into the issue of notice and what 505(b)(2) manufacturers were

11:06:14 15    on notice of, we're getting dangerously close to that

11:06:17 16    line because -- and I'm not going to bring up the other keyword

11:06:21 17    "preemption," other than to say it just one time, but we know,

11:06:25 18    from having discussed it and having briefed these issues, what

11:06:26 19    a 505(b)(2) manufacturer knows and when they know it is

11:06:31 20    critically important to the question of whether and when they

11:06:34 21    may reasonably should have updated their label.

11:06:36 22              So, you know, the reality is Dr. Madigan conceded

11:06:42 23    repeatedly he doesn't actually know what information

11:06:45 24    505(b)(2)'s had and when they had it.  He admitted that he

11:06:48 25    didn't rely on any Accord specific documents to verify his

*OFFICIAL TRANSCRIPT*

opinion.  He admitted that he doesn't know whether Sanofi's clinical trial data about ongoing alopecia would have been publicly reported.  He actually conceded that he had no reason to believe that Accord had access to Sanofi's clinical trial data at any point in time.

While plaintiffs in their brief speculate that, well, maybe Accord, in fact, could have gotten this information through a Freedom of Information Act request or something like that, Dr. Madigan was asked about that, and he admitted that, while he speculates that, he doesn't actually know, and he didn't, himself, attempt to replicate that to determine whether Accord could have received those documents.

So, without that, we don't think that there is a reliable foundation for Dr. Madigan to say that Accord actually had notice of the safety signals he's allegedly finding, which is, ultimately, the only thing that would have been relevant to whether a 505(b)(2) manufacturer is subject to this under his opinions.

If you don't have any questions, Your Honor, I'll hand it over to Mr. Merrell to present the Sandoz side.  Thank you.

THE COURT:  Thank you.  Mr. Merrell.

MR. MERRELL:  Thank you, Your Honor.  Cliff Merrell on behalf of Sandoz, Your Honor.  I think we can skip through a good bit of this.  I'm sure you'll be happy to hear that.

*OFFICIAL TRANSCRIPT*

11:08:38 1          THE COURT:  I'm delighted.

11:08:40 2          MR. MERRELL:  As my counsel has covered, really, many

11:08:42 3     of these issues, we did try to streamline this.

11:08:45 4          So I just want to focus on a couple of things.

11:08:50 5     First, you know about Dr. Madigan is, there are two points on

11:08:54 6     here I just want to reiterate.  That is that Dr. Madigan has

11:08:57 7     not looked at any Sandoz specific documents.  This goes a

11:09:00 8     little bit to the point, I think, that counsel just discussed

11:09:03 9     as well.  He has not looked at any Sandoz specific document.

11:09:06 10    His opinions really are a kind of a cut and paste -- they are a

11:09:09 11    cut and paste of the opinions that he had as to Sanofi.

11:09:12 12         I'm not going to go over *Khan* again.  I think

11:09:16 13    this has been addressed.  But for the same reasons, we believe

11:09:19 14    the opinions on general causation and the meta-analysis of the

11:09:25 15    observational studies should be excluded.

11:09:29 16         So, all the talk about the FAERS analysis.  A

11:09:33 17    couple of points on it.  First, the issue -- I know it's been

11:09:34 18    raised before, but I do think it's important -- the issue that

11:09:36 19    the terms he used, basically, were Taxotere, alopecia, and

11:09:42 20    disability or permanent damage, without actually tying whether

11:09:44 21    or not the disability or permanent damage had any relationship

11:09:47 22    to alopecia.

11:09:48 23         So you could have an adverse event with multiple

11:09:49 24    events, including alopecia, and he didn't do any analysis to

11:09:53 25    determine whether or not the permanent damage was actually

*OFFICIAL TRANSCRIPT*

related to alopecia, to determine if there was actually
permanent hair loss.

That goes to the point that he didn't look at the
underlying narratives of the adverse events he found to
evaluate whether or not they actually were cases of permanent
alopecia.  This goes, again, to the -- I know this was raised
previously, but to the point that he didn't utilize the
guidance by the FDA on this issue.

I know that the plaintiff's counsel has made the
point that the section 7 goes to the issue of evaluation rather
than signal detection.  I would just point out that
section 6.1.1 on page 22, which we quoted in our opposition, it
does go to signal detection, and it does state, using the
information in the narrative in other sections of the ICSR --
that's the case safety report -- the reviewers attempt to
establish a temporal relationship between administration of the
product and occurrence of the AE to determine if there is
sufficient support for further evaluation of the potential
safety signal.

So I don't think there is quite as much of a
bright line that, looking at the narrative, only goes to the
evaluation after the safety signal.  I think it's actually a
component of the signal detection itself.  So I just wanted to
point that out to Your Honor.

And then, of course, Dr. Madigan has acknowledged

*OFFICIAL TRANSCRIPT*

11:11:16  1   the limitations of the FAERS database, including that it does

11:11:21  2   not confirm a causal relationship between docetaxel and the

11:11:23  3   reported adverse event, and it can be incomplete, inaccurate,

11:11:25  4   and untimely.

11:11:26  5            I did also want to point out one other thing,

11:11:29  6   which I think counsel also discussed, which is that Dr. Madigan

11:11:32  7   didn't provide us the actual underlying control numbers and the

11:11:36  8   copies of the case reports of the hits he has.

11:11:38  9            So he says there is 31 hits, but I'm not able to

11:11:42 10   cross-examine him as to contents of those, where I usually

11:11:44 11   would look at those and say, well, if you look at the

11:11:46 12   narratives here, this isn't actually permanent hair loss.  We

11:11:49 13   don't have the ability to do that.  That wasn't provided to us

11:11:52 14   by counsel.

11:11:53 15            I've presented witnesses like Dr. Madigan in the

11:11:55 16   past, and I always provide those as part of the reliance list

11:11:58 17   and a flash drive of it, because I would be concerned that his

11:12:01 18   opinions would be excluded if I did not provide those, because

11:12:04 19   there is no way to cross-examine that information.

11:12:06 20            We've tried to replicate the search, and we're

11:12:09 21   not able to replicate the exact results.  Being able to have

11:12:13 22   the control numbers or the --

11:12:13 23            THE COURT:  Did you specifically request that?

11:12:16 24            MR. MERRELL:  We did in the deposition.  We asked for

11:12:19 25   that, and he said he didn't have it -- or he didn't have them

*OFFICIAL TRANSCRIPT*

11:12:22 1   with him -- or he didn't provide them.  This was an issue that

11:12:26 2   came up with Sanofi, and I think it was discussed, as well,

11:12:28 3   with Your Honor, and it's just never been provided.

11:12:31 4          The other issue I want to point out is the

11:12:35 5   Dr. Kessler issue.  I think we can probably -- it's probably

11:12:38 6   been addressed enough, so I'll move on from that one.

11:12:40 7          Then, the issue that is similar is that,

11:12:44 8   ultimately, in his analysis of Sanofi's internal database as to

11:12:49 9   their adverse event, he never looked at Sandoz's internal

11:12:53 10  database.

11:12:54 11         The concern here is that there is an element of

11:12:55 12  this which goes to looking at the statistical association, but

11:12:59 13  we also have the notice issue.  And we're deeply concerned

11:13:03 14  about using as your methodology looking at the Sanofi internal

11:13:10 15  adverse event database, but not looking at Sandoz's, and not

11:13:13 16  even looking at Sandoz's to see if they are aware of any of

11:13:15 17  this information.

11:13:15 18         He conceded he didn't know if Sandoz would have

11:13:19 19  had access to this database, but he doubted it, or whether they

11:13:20 20  would have had access to any of this information.  The concern

11:13:21 21  I have is, ultimately, Dr. Ross, who is the FDA regulatory

11:13:25 22  expert for plaintiffs, he ultimately relies in part --

11:13:29 23         THE COURT:  You know, Dr. Madigan, I think, in terms of

11:13:36 24  Sandoz and Accord, is a little different.  These cases are

11:13:42 25  different, but the same.

**OFFICIAL TRANSCRIPT**

11:13:43  1          I think, you know, Dr. Madigan, in my view, is

11:13:46  2     certainly -- I think, serves two purposes.  One is general

11:13:49  3     causation, you know, and he provides at least one piece of that

11:13:54  4     puzzle, the statistical analysis, whether or not this

11:13:59  5     medication causes this event.  That's a general causation.

11:14:03  6          So that would be pertinent for that issue; but,

11:14:09  7     then there is the secondary issue, the notice.  So, just so

11:14:16  8     that I'm clear, your complaints, at least here, are all with

11:14:23  9     the notice.  I know you're going to challenge his methodology

11:14:28  10    on the general causation.  But I think, for my purposes --

11:14:38  11          MR. MERRELL:  I think that's accurate, Your Honor.  It

11:14:40  12    is ultimately something we likely will move in limine at some

11:14:45  13    point with respect to, as well, which is the issue of we have

11:14:46  14    all of this data and analysis of things like Sanofi's internal

11:14:51  15    pharmacovigilance databases.  We actually have -- he references

11:14:53  16    the causation determinations internally by Sanofi.  Obviously,

11:14:57  17    Sandoz would have had no knowledge of that whatsoever.

11:15:00  18          If I could just point out, Your Honor, that the

11:15:02  19    number of times that the name "Sandoz" and "Sanofi" will

11:15:05  20    inadvertently be switched by any number of counsel in this room

11:15:10  21    during trial is probably going to be many times.

11:15:14  22          It is a concern on the notice issue and utilizing

11:15:16  23    it as causation.  It's a concern that there is going to be

11:15:19  24    confusion about, well, Sanofi knew this.  They had all this

11:15:23  25    information.  From our perspective, that would clearly not be

**OFFICIAL TRANSCRIPT**

11:15:26  1  relevant as to Sandoz's notice.

11:15:28  2  THE COURT:  Well, it would be irrelevant as to

11:15:29  3  causation.

11:15:30  4  MR. MERRELL:  Potentially, yes.  But of concerns,

11:15:33  5  though, that the two go so close together that it's concerning

11:15:36  6  that the -- as a way to present it to the jury that it doesn't

11:15:41  7  cause issues or problems with the jury inferring,

11:15:45  8  inadvertently, that Sandoz had knowledge of these issues.  I

11:15:48  9  think that's the primary concern we had that we wanted to point

11:15:51 10  out.

11:15:51 11  We also, obviously, the company would not have

11:15:53 12  had access to this to be able to analyze it.  So that's our

11:15:57 13  primary concern.  Again, he didn't look at the Sandoz

11:16:00 14  documents, so he can't say what they knew.

11:16:02 15  And then, ultimately, many of these opinions,

11:16:04 16  Dr. Ross relies on them and then comes up with an FDA

11:16:07 17  regulatory opinion and say, well, Sandoz should have changed

11:16:10 18  their labeling at an earlier time.  So it feeds into it, and

11:16:13 19  that is the concern we have with Dr. Madigan's opinions on

11:16:18 20  these issues with related documents that Sandoz would not have

11:16:22 21  had.

11:16:23 22  I think I've covered these points.  He conceded

11:16:30 23  that Sandoz would not have -- he did not know if they had

11:16:32 24  access, and multiple times he said they probably would not have

11:16:36 25  had access to the documents.

*OFFICIAL TRANSCRIPT*

He did speculate, well, some of this information could have been publicly available, but then he conceded he didn't know.  So he can't base it on that speculative opinion.

I'll not cover the meta-analysis point of the observational studies.  I think that's been addressed by Your Honor.

Then, just briefly, on TAX 316 and TAX 301, I did want to reiterate a couple of things.  I know these arguments have been made before, but just for the record, and it's in our motion, that ultimately the primary endpoint was not hair loss.  That is the key issue in the case.  It was looking at ongoing alopecia.

There is a lot of testimony from Sanofi about what that means.  Obviously, that's completely external to Sandoz.  So that is one concern we have with him utilizing these studies.

Again, no statistical -- there's not a statistically significant difference, if you look at each study, between the TAC group and the FAC group, so we would raise that as an issue.

Then, once again, going to the notice issue, because this is going to be a large part --

THE COURT:  That was in the label, you know, the findings of these studies have been -- so are you telling me you didn't have access to that data?

*OFFICIAL TRANSCRIPT*

11:17:47 1          MR. MERRELL:  Not obviously -- only when -- when the

11:17:48 2     labeling came out, that was the only information that Sandoz

11:17:52 3     would have access to, and the only windows that those labels

11:17:55 4     were actually approved, which in this case would have been

11:17:58 5     after Ms. Stewart's treatment.  They would only have had that

11:18:01 6     information, no -- no -- not the deeper details of the clinical

11:18:06 7     studies.  They didn't have access to that.

11:18:08 8          There was the point raised, could they make a

11:18:11 9     FOIA request, but, you know, our experts have said -- and the

11:18:12 10    witnesses, the company witnesses, have said that would not have

11:18:15 11    been possible because it's copyrighted -- or it's protected.

11:18:19 12    It's confidential.  So perhaps you could get some of it from

11:18:23 13    the FDA, but, in large part, no, because it's considered

11:18:25 14    confidential.  So, yes, only the label, but after Ms. Stewart

11:18:27 15    would have utilized it.

11:18:29 16         So, Your Honor, I think I'm finished.  Unless you

11:18:32 17    have any questions, those are -- I think, with Mr. Ruttinger's

11:18:35 18    argument, I think that states our point.

11:18:37 19         THE COURT:  Thank you.

11:18:40 20         MR. MERRELL:  Thank you, Your Honor.

11:18:45 21         THE COURT:  Ms. Berg.

11:18:46 22         MS. BERG:  Good morning, Your Honor.

11:18:59 23         THE COURT:  Good morning.

11:19:00 24         MS. BERG:  May it please the Court.  Claire Berg, from

11:19:07 25    Gainsburgh Benjamin, on behalf of plaintiffs.  I'm just so

**OFFICIAL TRANSCRIPT**

11:19:09  1    pleased to be back in your courtroom, even with all these

11:19:13  2    various precautions that are needed.  I'm just happy that we're

11:19:15  3    back.

11:19:16  4            I'm going to first address the general causation

11:19:18  5    issue.  Since the parties filed their motions for these Trial 3

11:19:22  6    cases, Your Honor came out with the *Khan* order, which affects

11:19:29  7    Dr. Madigan's final concluding statement.  Your Honor has found

11:19:35  8    that it encroached on the second prong of general causation.

11:19:39  9            While Dr. Madigan came to the same conclusion

11:19:41 10    here in relation to Ms. Hughes' and Ms. Stewart's cases, he's

11:19:45 11    prepared to limit his opinions in accordance with Your Honor's

11:19:49 12    latest order.  He only intends to testify on the first prong of

11:19:54 13    general causation, the statistically significant association

11:19:57 14    between docetaxel and permanent hair loss.  Other experts are

11:20:04 15    designated to discuss the second prong of general causation.

11:20:07 16            The other topic that is affected by Your Honor's

11:20:13 17    order in *Khan* is the meta-analysis of the observational studies

11:20:17 18    that Dr. Madigan performed.  Your Honor is aware that plaintiff

11:20:22 19    Ms. *Khan* has filed a motion for reconsideration on that topic

11:20:26 20    that you excluded.  That is because Dr. Madigan, himself, never

11:20:32 21    admitted that the heterogeneity between the studies was past

11:20:41 22    the threshold of concern.

11:20:43 23            He calculated an I-square statistic to quantify

11:20:46 24    inconsistency among the observational studies.  That, he did in

11:20:52 25    accordance with the *Cochrane Handbook for Systematic Reviews of*

**OFFICIAL TRANSCRIPT**

11:20:55  1    *Interventions*, which is an authority on the best practices in

11:20:59  2    meta-analysis used by biostatisticians like Dr. Madigan.

11:21:02  3              The Cochrane Handbook states that uncertainty in

11:21:08  4    the value of the I-squared is substantial in a number of

11:21:13  5    studies this small.  Here, as Your Honor is aware, Dr. Madigan

11:21:14  6    is running that statistic on just four studies, four

11:21:17  7    observational studies.  But, regardless, the result,

11:21:20  8    62.9 percent, that value falls below the Cochrane Handbook's

11:21:27  9    threshold of 75 percent for considerable heterogeneity.

11:21:29 10              Dr. Madigan testified as such, that it was below

11:21:31 11    his threshold of concern.  He did -- he also limited the

11:21:37 12    effects of the heterogeneity by running a random effects

11:21:44 13    meta-analysis, as opposed to a fixed effects meta-analysis.  He

11:21:45 14    observed that there was no variation in the direction of the

11:21:48 15    effects of the studies.

11:21:50 16              I also want to point out that three of

11:21:54 17    observational studies on their own are independently

11:21:57 18    statistically significant.

11:21:58 19              So, for those reasons, plaintiff --

11:22:02 20         THE COURT:  Let me ask a couple of questions, Ms. Berg.

11:22:04 21    What do we do?  Because, you know, I've just spoke about this

11:22:09 22    with Mr. Merrell.  Dr. Madigan serves two roles here.  One,

11:22:14 23    he's going to speak to a statistical analysis that goes

11:22:20 24    directly to general causation.  Does this medication can cause

11:22:23 25    this event, period?  But then he speaks to notice.

*OFFICIAL TRANSCRIPT*

11:22:33  1          Certainly, he cannot go into Sanofi's database

11:22:40  2    without evidence that Sandoz and Accord had access to that

11:22:44  3    information.  So, I have concerns about, one, the confusion,

11:22:52  4    and a jury says, well, you see, all of this became known

11:22:57  5    whenever, but these defendants, what did they actually have

11:23:05  6    access to?

11:23:06  7          So I think you need to speak to that.

11:23:09  8          MS. BERG:  Yes, Your Honor.

11:23:12  9          So general causation is not defendant specific.

11:23:15 10          THE COURT:  I'm fine with general causation.  Put it on

11:23:17 11    the side.  I just don't want this to become -- I don't think --

11:23:26 12    I have a great deal of concern about confusion to the jury

11:23:30 13    about when they knew these certain things.  So I think we need

11:23:37 14    to speak to notice, because I'm sure Dr. Madigan is going to

11:23:41 15    speak to notice in these cases.

11:23:43 16          MS. BERG:  So Dr. Madigan says that, by 2011, much of

11:23:47 17    this information was publicly available.

11:23:52 18          THE COURT:  Is he saying they should have made FOIA

11:23:56 19    requests to get access to this?

11:24:00 20          MS. BERG:  He says that they could have been made FOIA

11:24:02 21    requests -- part of that information could have been made

11:24:05 22    through a FOIA request, yes, but the observational studies are

11:24:09 23    publicly available.  The FAERS database, that's publicly

11:24:11 24    available.  He is more than qualified to testify that the

11:24:14 25    evidence he looked at is publicly available because he simply

*OFFICIAL TRANSCRIPT*

85

11:24:17  1    just has to observe that fact.

11:24:19  2             Now, whether Accord or Sandoz actually accessed

11:24:23  3    that publicly available information, Dr. Madigan doesn't know

11:24:26  4    that because he didn't look at Accord specific, Sandoz specific

11:24:30  5    documents; but, what a manufacturer could have known is

11:24:35  6    relevant under Louisiana law.  Could they have looked into the

11:24:39  7    public domain and found this information?  Plaintiff thinks

11:24:43  8    that's important to let the jury know that it was available to

11:24:46  9    them, whether they actually looked into it or not.

11:24:50 10             THE COURT:  Okay.

11:25:00 11             MS. BERG:  I don't want to address issues with the

11:25:05 12    FAERS database that have been decided by this court in *Earnest*

11:25:11 13    and in *Kahn*, but I do want to address the issue of Dr. Kessler

11:25:13 14    not being designated in this case before Your Honor.

11:25:18 15             As Your Honor noted, and noted in a similar

11:25:19 16    argument made by Sanofi regarding Dr. Madigan using terms

11:25:25 17    defined by Dr. Tosti, Rule 703 allows for an expert like

11:25:31 18    Dr. Madigan to rely on another expert's terms or things like

11:25:35 19    that, if he reasonably would in his area of practice.

11:25:39 20             But, I mean, just generally, plaintiff believes

11:25:42 21    that defendants are exaggerating Dr. Kessler's role in those

11:25:48 22    terms.  It was Dr. Madigan's methodology.  He explained it

11:25:52 23    fully in his report and deposition.  In fact, defense counsel,

11:25:57 24    in the deposition, stated, I'm not going to question you so

11:26:01 25    much on this because it's been so thoroughly discussed with

                              ***OFFICIAL TRANSCRIPT***

11:26:01  1     you.

11:26:05  2             So he stands behind his methodology, and there is

11:26:08  3     no prejudice if Dr. Kessler is not designated in this case.

11:26:12  4             Now, Dr. Madigan, during the beginning part of

11:26:17  5     the transcript, the deposition, he wasn't aware that

11:26:21  6     Dr. Kessler wasn't designated in this specific case.  If he is

11:26:25  7     aware now, he can be instructed not to mention Dr. Kessler at

11:26:29  8     trial, and that should avoid any jury confusion.

11:26:35  9             THE COURT:  So what would he say?

11:26:37 10         MS. BERG:  He would stand behind the terms that he

11:26:40 11     selected and that he -- I think he testified that he selected

11:26:43 12     them based on two decades of experience doing these kind of

11:26:47 13     searches.

11:26:48 14             When you look at Dr. Kessler's testimony in

11:26:51 15     Sanofi's case and earlier cases, he basically said, yeah, I

11:26:56 16     became aware of Dr. Madigan's methodology, and it seems pretty

11:27:00 17     normal for what you would do to compare drugs in the FAERS

11:27:04 18     database.

11:27:05 19             I don't think that defendants here are missing

11:27:08 20     out on anything because Dr. Kessler hasn't been designated.

11:27:12 21             So, with that, Your Honor, unless you have any

11:27:13 22     other questions, I'll rest.  Thank you.

11:27:15 23         THE COURT:  Mr. Ruttinger, any follow-up?

11:27:29 24         MR. RUTTINGER:  Just a couple of very brief points,

11:27:29 25     Your Honor.

*OFFICIAL TRANSCRIPT*

11:27:30  1          I kind of think you got this exactly right when

11:27:32  2   you said Dr. Madigan here can be divided into sort of two

11:27:35  3   different camps.  We're not really addressing to any great

11:27:40  4   extent the general causation issue here.

11:27:41  5          What this feels like to me, Your Honor, is that

11:27:43  6   when plaintiffs were sitting down and preparing for these cases

11:27:45  7   against the 505(b)(2) defendants, they realized, we need to

11:27:50  8   address that question of what these manufacturers knew and

11:27:54  9   when.  It feels like they tacked on these notice opinions to

11:27:58 10   Dr. Madigan's opinions.

11:28:00 11          I just don't think that Dr. Madigan is a good fit

11:28:01 12   for fitting that role on this case and addressing these notice

11:28:07 13   issues when it really wasn't part of his underlying methodology

11:28:09 14   to look at Accord or Sandoz specific documents or determine

11:28:13 15   what they actually knew.

11:28:14 16          Another quick point, Your Honor, you know,

11:28:19 17   plaintiff counsel just talked a little bit about saying, well,

11:28:23 18   Dr. Madigan did this sort of analysis.  It kind of sounded to

11:28:27 19   me like what they are saying what Accord should have done here

11:28:30 20   is said, well, Accord could have done, or nothing stopped

11:28:34 21   Accord from doing the exact same analysis that Dr. Madigan did,

11:28:38 22   but two there two key differences there.

11:28:41 23          First off, while Dr. Madigan is talking about

11:28:42 24   what Accord was allegedly on notice of in 2011, Dr. Madigan did

11:28:48 25   this for-litigation analysis years after the fact.  We can't

*OFFICIAL TRANSCRIPT*

11:28:48  1    replicate exactly the circumstances of 2011 in terms of

11:28:57  2    telling -- using Dr. Madigan's methodology to determine what

11:28:59  3    Accord would know when, especially when he conceded on numerous

11:29:05  4    occasions that there are aspects of that underlying

11:29:08  5    information, like those reviews of the adverse event reports

11:29:10  6    that Accord may or may not have had access to, and he admitted

11:29:14  7    he didn't know whether they would have prevented Accord from

11:29:17  8    having done exactly the same kind of analysis that Dr. Madigan

11:29:20  9    did for this litigation.

11:29:21 10            The last point, Your Honor, plaintiff's counsel

11:29:24 11    said that Dr. Madigan really did all of this search term

11:29:30 12    validation himself, and that if he's asked about this at trial,

11:29:36 13    he can be instructed, well, just not to mention Dr. Kessler's

11:29:38 14    name.

11:29:38 15            Respectfully, we think this is a little bit of a

11:29:41 16    revisionist history of Dr. Madigan's role in this case.  We

11:29:44 17    think his testimony speaks for itself in terms of the areas in

11:29:48 18    which he relied on Dr. Kessler and the areas in which he

11:29:50 19    actually pointed to Dr. Kessler as the reason why there is an

11:29:53 20    imperfect endpoint for certain parts of his analysis, for

11:29:56 21    example.

11:29:59 22            I think you asked exactly the right question.  If

11:30:00 23    he's testifying to a jury, and he is asked that exact same

11:30:04 24    question, he can't tell the jury, well, that sounds like a good

11:30:08 25    question for Dr. Kessler.  He's going to have to be able to

*OFFICIAL TRANSCRIPT*

11:30:11  1    stand before them and explain his methodology on his own; and,

11:30:15  2    to date, we don't know what he would say.

11:30:18  3              As a result, we don't have a basis for believing

11:30:20  4    that his methodological explanation is going to pass the

11:30:20  5    reliability threshold under Rule 702.

11:30:27  6              Thank you.

11:30:28  7         THE COURT:  Mr. Merrell.

11:30:34  8         MR. MERRELL:  Thank you, Your Honor.

11:30:38  9              Just to address briefly the issue of this

11:30:43 10    information being publicly available, FAERS, for example, and

11:30:48 11    some of the TAX 316 cites, fundamentally, if you're going to

11:30:53 12    present evidence on the issue of what a company knew or what

11:30:55 13    notice they may have had, if you did not look at any of their

11:30:59 14    documents, how in the world could that possibly be a reliable

11:31:02 15    methodology to say, well, some of these things were available.

11:31:05 16              He didn't look at a deposition of a single

11:31:08 17    witness to see if it's something they had considered.  He

11:31:08 18    didn't look at a single document.

11:31:11 19              The Sanofi pharmacovigilance database in

11:31:15 20    particular is really concerning, but he didn't even look at

11:31:18 21    Sandoz's pharmacovigilance database.  If you were to ask any

11:31:21 22    expert to give an opinion on what Sandoz knew or any company

11:31:25 23    knew, certainly you would tell them to look at the

11:31:27 24    pharmacovigilance database of the actual company, and not a

11:31:30 25    different company.

                              *OFFICIAL TRANSCRIPT*

11:31:30  1            In terms of the FAERS being publicly available,

11:31:35  2   or, you know, some of this information being available, like

11:31:36  3   FOIA, he didn't really establish that in his report or in his

11:31:40  4   deposition.  I mean, there are some things you might be able to

11:31:43  5   obtain by FOIA; but, again, he didn't look at any of the

11:31:46  6   documents or testimony of Sandoz to see what they could have

11:31:49  7   had available or what they knew, to be able to speak to that

11:31:51  8   point.

11:31:52  9            Then it's interesting that -- I won't go into

11:31:54 10   preemption, but I find it interesting that the testimony is

11:31:57 11   basically you could have known all of this by 2011.

11:32:00 12            I'll end there.  Thank you.  Your Honor.

11:32:02 13       THE COURT:  Thank you.

11:32:06 14       MS. BERG:  Your Honor, may I stand up real quick?

11:32:06 15       THE COURT:  Yes.

11:32:06 16       MS. BERG:  I'll just do it from here.

11:32:06 17       THE REPORTER:  I can't hear you from there.

11:32:19 18       MS. BERG:  I just wanted to say that the document that

11:32:21 19   can be used on the issue of notice, that could be addressed

11:32:25 20   during the *Motion in Limine* process at a later date.

11:32:29 21            I also just wanted to bring to the Court's

11:32:32 22   attention about an exhibit that was attached to plaintiff's

11:32:37 23   motion.  It was actually the incorrect transcript.  There was a

11:32:40 24   revised transcript.

11:32:44 25            So, I don't know how the Court would like us to

***OFFICIAL  TRANSCRIPT***

11:32:48  1   remedy that situation, if the Court just wants to look at the

11:32:52  2   revised transcript -- or the unrevised transcript for the

11:32:57  3   citations that plaintiff cited in their motion?

11:33:01  4            THE COURT:  Wait.  So, there are two transcripts?

11:33:03  5            MS. BERG:  There are two transcripts, an unrevised and

11:33:06  6   a revised.  The only thing that changed between the two was the

11:33:09  7   title, but it pushes all the lines off.

11:33:13  8                 So what we cited to in our motion, they don't

11:33:18  9   match up with the revised.

11:33:21 10            THE COURT:  So how big an issue is that?  I don't care

11:33:27 11   how you do it.  You can either give me those pages, the new

11:33:33 12   pages with the proper page number and line number, or you can

11:33:40 13   just revise it.  It might be easier to just send the new pages.

11:33:46 14            MS. BERG:  Okay.  We can do that.

11:33:55 15            MR. MERRELL:  No objection.

11:33:56 16            MS. BERG:  Sandoz attached the entire deposition

11:33:56 17   transcript --

11:33:56 18            THE COURT:  Of course, they did.

11:33:59 19            MS. BERG:  -- so you could just refer to that one.

11:34:01 20            THE COURT:  That's fine.  That's fine.  No more pages.

11:34:06 21                 Okay.  Anything further?

11:34:08 22            MS. BERG:  No, Your Honor.

11:34:09 23            MR. MERRELL:  No, Your Honor.

11:34:15 24            MS. COHEN:  Your Honor, I just have a scheduling

11:34:17 25   question, if you have a few moments.  Can I do it right here?

*OFFICIAL TRANSCRIPT*

11:34:17  1           THE COURT:  Wait, can we be adjourned and then just

11:34:20  2      visit?

11:34:20  3           MS. COHEN:  Yes.

11:34:20  4           THE COURT:  Court is adjourned so that we can get off

11:34:23  5      the record.

11:34:23  6           MS. COHEN:  Thank you.

       7           (WHEREUPON, at 11:34 a.m., the proceedings were

       8      concluded.)

       9                              *   *   *

      10

      11                      REPORTER'S CERTIFICATE

      12

      13           I, Cathy Pepper, Certified Realtime Reporter, Registered

      14      Merit Reporter, Certified Court Reporter in and for the State

      15      of Louisiana, Official Court Reporter for the United States

      16      District Court, Eastern District of Louisiana, do hereby

      17      certify that the foregoing is a true and correct transcript to

      18      the best of my ability and understanding from the record of the

      19      proceedings in the above-entitled and numbered matter.

      20

      21                              _s/Cathy Pepper_____

      22                              Cathy Pepper, CRR, RMR, CCR
                                      Certified Realtime Reporter
      23                              Registered Merit Reporter
                                      Official Court Reporter
      24                              United States District Court
                                      Cathy_Pepper@laed.uscourts.gov
      25

                              *OFFICIAL  TRANSCRIPT*