UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Clare Guilbault, Case No. 2:16-cv-17061 |

**HOSPIRA'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT BASED ON THE
<u>STATUTE OF LIMITATIONS</u>**

Plaintiff Clare Guilbault's claims are prescribed by the one-year Louisiana statute of limitations.

*First*, Ms. Guilbault's claims are untimely on their face because she filed her lawsuit more than two years after she allegedly sustained her injury. Louisiana's one-year prescription period begins to run on the date of injury. Ms. Guilbault alleges that she suffered her injury of permanent hair loss by August 2014—six months after she completed chemotherapy in February 2014. Yet Ms. Guilbault did not file her initial complaint until December 9, 2016—more than two years later. Ms. Guilbault's claims are therefore untimely on their face.

*Second*, the doctrine of *contra non valentem* does not save Ms. Guilbault's claims. The undisputed evidence demonstrates that Ms. Guilbault knew or should have known of a possible causal relationship between her Docetaxel use and alleged permanent hair loss since the time of her injury. Indeed, she believed from the start that her hair loss was caused by her chemotherapy; she was aware that it had not grown back as she expected; she tried various remedies (including Rogaine, biotin, and special shampoos) that she deemed unsuccessful (*i.e.*, she knew her alleged injury had not resolved). By October 2015, it had been more than *18 months* after Ms. Guilbault's

chemotherapy had ended, and her hair *still* had not grown back, despite having attempted multiple hair loss treatments.  By then (October 2015, 16 months before she first filed suit), Ms. Guilbault's oncologist, Dr. Theodossiou, testified he was aware of a risk of permanent alopecia associated with Docetaxel at that time because he believed it was "common knowledge"; thus, he would have told her, had she asked.  Indeed, he believes he likely did discuss with Ms. Guilbault the role of Docetaxel as a cause of her permanent alopecia.  Thus, there is no genuine dispute that the prescription period was running by October 2015, at the latest.  Yet Ms. Guilbault did not undertake any further investigation of her claims, as is required by Louisiana law.  Instead, she waited until December 2016, more than a year later, to file her claim after she saw a lawyer advertisement.  Thus, her claims are prescribed and should be dismissed.

## BACKGROUND

### A. Ms. Guilbault's Cancer Diagnosis and Treatment.

In July 2013, Ms. Guilbault's treating physicians diagnosed her with advanced cancer in her left breast.  Hospira's Statement of Undisputed Material Facts ("SOF") ¶¶ 3-7.  At the time of her diagnosis, Ms. Guilbault showed a possible metastasis on the T12 vertebra of her spine, which suggested stage IV cancer.  *Id.* ¶¶ 8-9.  Because the T12 lesion could not be safely biopsied at the time based on its location, Ms. Guilbault's physicians could not definitively confirm whether her cancer was stage III or stage IV.  *Id.* ¶ 10.  Her physicians therefore recommended pre-operative chemotherapy followed by surgery.  *Id.* ¶¶ 11-12.  Ms. Guilbault followed her doctors' recommendations.  *Id.* ¶¶ 13-15.

In September 2013, Ms. Guilbault's oncologist, Dr. Chris Theodossiou, prescribed a sequential chemotherapy regimen of four cycles of Adriamycin (doxorubicin) and Cytoxan (cyclophosphamide), followed by four cycles of Docetaxel, over the course of five months.  SOF ¶¶ 16, 23-24.  Ms. Guilbault agreed to the regimen and twice signed a consent form that included

information about numerous side effects of chemotherapy, including hair loss. *Id.* ¶¶ 17-19. Ms. Guilbault also received chemotherapy education materials from a nurse when she started treatment that discussed side effects including hair loss. *Id.* ¶ 20. Neither Dr. Theodossiou nor his nurse ever guaranteed to Ms. Guilbault that her hair would grow back, and Ms. Guilbault did not expect her hair to grow back "exactly the same" as before. *Id.* ¶ 22; Ex. 2 (Guilbault Dep) at 185:10-24.

Ms. Guilbault first experienced hair loss on October 11, 2013, during her first phase of chemotherapy treatment with Adriamycin and Cytoxan. SOF ¶ 30. Two days later, a friend cut her hair and styled her wig. *Id.* ¶ 31. Ms. Guilbault received four infusions of a combination of Adriamycin with Cytoxan, on September 27, 2013, October 21, 2013, November 11, 2013, and December 2, 2013. *Id.* ¶ 23. In the second phase of Ms. Guilbault's chemotherapy treatment, Ms. Guilbault received Docetaxel on December 26, 2013, January 1, 2014, February 6, 2014, and February 27, 2014. *Id.* ¶ 24. During her treatment with Docetaxel in January 2014, Ms. Guilbault experienced some hair regrowth, which she documented in her planner as "fuzzy on scalp," and later described as "sparse." *Id.* ¶ 33; Ex. 12 (Guilbault Personal Rec., Guilbault Dep. Ex. 2) at -03119; Ex. 3 (Guilbault Dep.) at 215:2-23. After Ms. Guilbault's final cycle of chemotherapy, she underwent a lumpectomy, radiation, and treatment with Arimidex, an aromatase inhibitor, to prevent cancer regrowth. SOF ¶¶ 25-28.

Accordingly, Ms. Guilbault's last chemotherapy treatment, and last treatment involving Docetaxel, was on February 27, 2014. Ms. Guilbault's breast-cancer treatment was successful, despite a high risk of recurrence; as of November 2020, she is "disease-free" and has "done very, very well" according to Dr. Theodossiou. SOF ¶ 29; Ex. 3 (Theodossiou Dep.) at 149:24-150:9.

B.   **Ms. Guilbault's Alleged Injury and Notice of Claim.**

Ms. Guilbault contends she began experiencing permanent alopecia in August 2014, six months after completing chemotherapy. *See* Ex. 17, 2d Am. Master Compl. ("AMC") ¶ 181, ECF

3

No. 4407 (defining as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy."); Ex. 18, Guilbault Amended Short-Form Complaint ("ASFC") at 1 (adopting allegations of Master Complaint).

Ms. Guilbault testified that, despite her belief that her hair would grow back fully after chemotherapy, that did not happen. She did not experience an "improvement in regrowth of [her] hair after chemotherapy." SOF ¶ 34; Ex. 2 (Guilbault Dep.) at 251:13-19. She had limited hair on her legs, armpits, eyebrows, and eyelashes, SOF ¶ 35, and she began to wear a wig "all the time." *Id.* ¶ 36; Ex. 2 (Guilbault Dep.) at 248:23-249:2.

In April 2014, approximately two months after her chemotherapy ended, Ms. Guilbault asked her oncologist, Dr. Theodossiou, when her hair would return, and she was instructed that it would likely start growing back within a month. SOF ¶ 37. At a follow-up visit with Dr. Theodossiou in December 2014, Ms. Guilbault complained that her hair stopped growing. Based on Ms. Guilbault's notes of the visit, Dr. Theodossiou told her to "give [it] time" and "take [a] multivitamin." *Id.* ¶ 38; Ex. 12 (Guilbault Personal Rec., Guilbault Dep. Ex. 2) at -03245.

Several times in 2015, Ms. Guilbault discussed her hair loss with Julie Miller, a friend of Ms. Guilbault's sister. Like Ms. Guilbault, Ms. Miller is a breast cancer survivor who lost her hair during chemotherapy treatment. SOF ¶ 40. Ms. Guilbault testified that Ms. Miller's hair loss was "temporary," and her hair grew back "thick and curly." *Id.* ¶ 41; Ex. 2 (Guilbault Dep.) at 92:7-19. In January 2015, Ms. Miller recommended to Ms. Guilbault that she take biotin and use a special shampoo, Nioxin, to encourage hair regrowth. SOF ¶¶ 41-43. In March 2015, Ms. Guilbault told Ms. Miller she started Nioxin and Nizoral, another shampoo, in addition to biotin, and asked Ms. Miller for other suggestions, because she was still "[d]esperately hoping for hair, What I have is pitiful." SOF ¶ 44; Ex. 13 (Guilbault Personal Rec., Guilbault Dep. Ex. 19) at -

4

01114.  In April 2015, Ms. Guilbault again texted Ms. Miller that her hair regrowth was "disappointingly slow! And thin," and told her that she had not yet "tried rogaine but [was] ready to."  SOF ¶ 45; Ex. 13 (Guilbault Personal Rec., Guilbault Dep. Ex. 19) at -01115.  In July 2015, Ms. Miller texted Ms. Guilbault to ask how she was doing and about her hair.  SOF ¶ 46.  Ms. Guilbault responded: "Hair … hmmm… Some is there but sparse and fine.  Still need wig.  Started rogaine a week ago.  We shall see."  *Id.*; Ex. 13 (Guilbault Personal Rec., Guilbault Dep. Ex. 19) at -01118.

In April 2015, Ms. Guilbault again had a follow-up appointment with her oncologist, Dr. Theodossiou.  SOF ¶¶ 47-49.  She inquired again about her hair regrowth, saying that the "multivitamin [was] not doing much," and he suggested that she consult with a dermatologist, though he did not refer her to a specific one.  *Id.* ¶ 48; Ex. 2 (Guilbault Dep.) at 161:24-164:7.

In May 2015, Ms. Guilbault saw a dermatologist, Dr. Hooper, at a free skin cancer screening.  SOF ¶ 50.  Ms. Guilbault testified that she told Dr. Hooper that she "was suffering permanent hair loss":

> Q. Have you seen any other dermatologists for your moles or skin condition?
>
> A. Well, I did -- I don't remember the year or the date, but my husband and I both went for a --what they call a cancer -- skin cancer screening.  And that was Dr. Hooper. I did not know her. You don't know who you're going to get. You just sign up, and they assign you to someone to do a head to toe check.
>
> Q. Was that like a public health fair or something of that nature?
>
> A. It wasn't a big thing. It was at – it took place at Touro Imaging on Napoleon and Claiborne, I believe.
>
> Q. Was that a free check?
>
> A. Yes. And at that time when she checked --when the doctor came in and when she asked to check my scalp, I had to remove my wig. *And I told her that I was suffering permanent hair loss*. And she said: Well, have you tried Rogaine? And I said, no. She said: Oh, it absolutely -- it will work. Try it. And I did try it, and I did not see any changes, any improvement.

5

*Id.* ¶ 51; Ex. 2 (Guilbault Dep.) at 103:12-104:17 (emphasis added); *see also id.* at 235:12-15 (confirming she saw Dr. Hooper in May 2015). Later during her deposition, after a break, Ms. Guilbault attempted to amend her testimony, stating that she "said hair loss to [Dr. Hooper]," rather than "permanent hair loss." *Id.* ¶ 52; Ex. 2 (Guilbault Dep.) at 115:2-14. Regardless, Ms. Guilbault told Dr. Hooper that her hair loss was "from chemotherapy." *Id.*

In June 2015, Ms. Guilbault saw another dermatologist, Dr. Tia Terezakis, to inquire about available treatments to promote hair regrowth. SOF ¶ 54. Ms. Guilbault told Dr. Terezakis's intake staff she had gone through chemotherapy. *Id.* ¶ 55. At Dr. Terezakis's recommendation, Ms. Guilbault used Dr. Terazkis's special hair loss treatment, a blend of minoxidil and retin-A. *Id.* ¶ 56. Ms. Guilbault testified that upon using Dr. Terezakis's treatment, she saw "no significant change. No change at all, really." *Id.* ¶ 57; Ex. 2 (Guilbault Dep.) at 161:24-164:7.

On October 2, 2015, Ms. Guilbault again had a follow-up oncology visit with Dr. Theodossiou. SOF ¶ 58. Dr. Theodossiou's records of the visit include a notation that Ms. Guilbault "still has mild alopecia on her vertex." *Id.* ¶ 59; Ex. 16 (Ochsner Med. Rec., Theodossiou Dep. Ex. 18) at -01551. Dr. Theodossiou testified at his deposition that he believes he discussed the role of Docetaxel in Ms. Guilbault's lack of hair growth with her then because he believed it was "common knowledge" at that time:

> Q. Sure. And going back to the medical record of -- that we're looking at now, the October [2nd], 2015, medical record where you indicated for the first time that she still has mild alopecia on her vertex, having made that documentation into the record, would you have had a discussion with her with regard to the possible causes of that alopecia?
>
> A. I do --
>
> MS. REYNOLDS: Objection to form.
>
> THE WITNESS: -- not recall. But by that time -- we're looking at 2015 now -- it was, you know, common knowledge that you do get those based on the Docetaxel,

6

the hair --lack of hair growth. So I suspect that I had the discussion about the role of Docetaxel.

SOF ¶ 60; Ex. 3 (Theodossiou Dep.) at 117:21-118:11.[1]

### C. Ms. Guilbault's Failure to Investigate Her Alleged Injury.

Although her hair had not regrown, despite all her efforts to promote regrowth, Ms. Guilbault took no action to investigate her potential claim until May 2016, when her husband saw a television advertisement for a lawsuit against the manufacturers of Taxotere and Docetaxel. SOF ¶ 65. Ms. Guilbault called the phone number in the advertisement, which put her in touch with Allen Berger and Associates. *Id.* ¶ 66. She thereafter decided to hire her current counsel, whom her personal lawyer recommended. *Id.* ¶ 67.

Ms. Guilbault initially filed suit against Sanofi, the maker of brand-name Taxotere, on December 9, 2016. *Id.* ¶ 68. She named Hospira as a defendant in an amended complaint dated May 4, 2017. *Id.* ¶ 69.

### LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

---

[1] Ms. Guilbault was not asked about the October 2015 appointment with Dr. Theodossiou specifically in her deposition. She testified that she did recall removing her wig in a visit with him, though she could not recall when or what Dr. Theodossiou said about the state of her hair regrowth. SOF ¶¶ 61-62.

7

# ARGUMENT

## I. Hospira Is Entitled to Summary Judgment.

Ms. Guilbault's claims are untimely on the face of the pleadings, and because she failed to investigate her claim after she was on notice of her alleged injury, *contra non valentem* does not save her claims. This Court therefore should enter judgment in favor of Hospira and dismiss Ms. Guilbault's claims.

### A. Ms. Guilbault's Claims Are Barred on Their Face by Louisiana's One-Year Statute of Limitations.

Louisiana's one-year statute of limitations begins "to run from the day injury or damage is sustained." *Asbestos v. Bordelon, Inc.*, 726 So. 2d 926, 974 (La. App. 4th Cir. 1998) (quoting La. Civ. Code Ann. art. 3492). This Court has recognized that, on the basis of the allegations in the Second Amended Master Complaint, a plaintiff's hair loss becomes permanent six months after completing chemotherapy. *In re Taxotere (Docetaxel) Prods. Liab. Litig. ("Thibodeaux")*, ECF No. 9110, at 4; *In re Taxotere (Docetaxel) Prod. Liab. Litig. ("Francis/Johnson")*, 2019 WL 2995897, at *2 n.12 (E.D. La. July 9, 2019), *reconsideration denied*, 2020 WL 375597 (E.D. La. Jan. 23, 2020); *In re Taxotere (Docetaxel) Prod. Liab. Litig. ("Sanford")*, 2020 WL 4038971, at *2 (E.D. La. July 17, 2020). Ms. Guilbault's pleadings adopt the Second Amended Master Complaint's definition of her alleged injury. *See* SFC at 1. As such, Ms. Guilbault sustained her alleged injury (*i.e.*, began experiencing permanent alopecia) no later than August 2014, six months after completing chemotherapy treatment in February 2014. *See* AMC ¶ 181. Because Ms. Guilbault first filed her lawsuit on December 9, 2016, over two years after her alleged injury, her claims are barred on their face. *Thibodeaux,* ECF No. 9110, at 4; *Francis/Johnson*, 2019 WL 2995897, at *2 n.12; *Sanford*, 2020 WL 4038971, at *2.

### B. Ms. Guilbault Cannot Establish Any Exception to Louisiana's One-Year Statute of Limitations.

Where, as here, "the face of the petition shows that the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred." *Francis/Johnson*, 2019 WL 2995897, at *2 (quoting *Hoerner v. Wesley-Jensen*, 684 So. 2d 508, 510 (La. App. 4th Cir. 1996)); *Thibodeaux*, ECF No. 9110, at 3. As explained above, Ms. Guilbault's complaint is prescribed on its face. Ms. Guilbault therefore bears the burden of proof of demonstrating that an exception applies. *See Francis/Johnson*, 2019 WL 2995897, at *2; *Thibodeaux*, ECF No. 9110, at 5.

One method of tolling prescription, which applies only in "exceptional circumstances," is the doctrine of *contra non valentem*. *Renfroe v. Louisiana ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002) (quoting La. Civ. Code art. 3467, cmt. d). Under that doctrine, Ms. Guilbault must have filed her claims within a year of having "actual or constructive knowledge of a causal relationship between the object or product and the injury." *Francis/Johnson*, 2019 WL 2995897, at *2 (quoting *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. 15-4790, 2017 WL 4517287, at *2 (E.D. La. Oct. 10, 2017)). Prescription begins "when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." *Id.* (quoting *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999)). Louisiana law does not require "that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run." *Id.* (quoting *Xarelto*, 2017 WL 4517287, at *2). Instead, "[a]n injured party has constructive notice when he or she possesses information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry, and includes knowledge or notice of everything to which that inquiry might lead." *Bartucci v. Jackson*,

9

246 Fed. Appx. 254, 258 (5th Cir. 2007) (quoting *Babineaux v. State ex rel. Dep't of Transp. & Dev.*, 927 So.2d 1121, 1123 (La. App. 1st Cir. 2005)).

As this Court has repeatedly recognized, "to toll prescription, a plaintiff who suspects that something is wrong must act reasonably to discover the cause of the problem; otherwise, *contra non valentem* will not apply." *Thibodeaux*, ECF No. 9110, at 4 (citing *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 894 (5th Cir. 2010)); *see Sanford*, 2020 WL 4038971, at *3; *Francis/Johnson*, 2019 WL 2995897, at *2. "The ultimate issue is the reasonableness of the plaintiff's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Thibodeaux*, ECF No. 9110, at 4 (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002)).

### 1. Ms. Guilbault Was On Notice in August 2014, the Date of Her Injury.

The undisputed evidence demonstrates that Ms. Guilbault knew or should have known of a possible causal connection between Docetaxel and her alleged injury in August 2014, when her hair did not grow back within six months after her chemotherapy as she expected. There is no dispute that Ms. Guilbault believed her hair loss was caused by her chemotherapy. Ms. Guilbault's doctors informed her of the risk of hair loss before she started chemotherapy in October 2013. SOF ¶¶ 17-22. Ms. Guilbault knew, as of the time of chemotherapy, that her treatment carried the risk of hair loss, but she expected it to regrow sometime after chemotherapy. *Id.* ¶ 21. However, her hair did not grow back as she expected, and since 2013 she has worn a wig daily. *Id.* ¶¶ 34, 36. These facts are sufficient to place Ms. Guilbault on notice that her injury was caused by Docetaxel. *See Francis/Johnson*, 2019 WL 2995897, at *4 (when Plaintiff "recognized the severity of her symptoms and … attributed her hair loss to her chemotherapy[, t]his should have prompted her to investigate").

10

Ms. Guilbault's alleged conversations with doctors (Dr. Theodossiou, Dr. Hooper, and Dr. Terezakis) in which they recommended various hair loss treatments do not suspend the prescription period. In *Earnest*, this Court found tolling based on Ms. Earnest's conversations with her oncologist, who told her six months after completing chemotherapy that her hair was "going to come back" and "[i]t just takes time." *Francis/Johnson*, 2019 WL 2995897, at *3.[2] On that basis, this Court concluded that her doctors "led [her] to believe she had no actionable injury." *Id.* Here, by contrast, Ms. Guilbault's doctors never led her to believe that she had no actionable injury. To the contrary, Ms. Guilbault believed she *had* been injured because she had lost her hair "from chemotherapy" and it was *not* going to grow back without treatment. SOF ¶¶ 52, 55. That is "actual and appreciable damage" sufficient to start the prescription period. *Harvey v. Dixie Graphics, Inc.*, 593 So.2d 351, 354 (La. 1992) ("[P]rescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, … even though [she] may thereafter come to a more precise realization of the damages she has already incurred or incur further damage as a result of the completed tortious act."). Ms. Guilbault's conversations with her doctors were not focused on determining the cause of her injury (she always believed it was "from chemotherapy," SOF ¶¶ 52, 55), but rather how to treat it. Her doctors' suggestions of treatment for her injury, and even expressing optimism that treatment may work, are not equivalent to leading a plaintiff "to believe she ha[s] no actionable injury." *Francis/Johnson*, 2019 WL 2995897, at *3. Thus, *Earnest* does not support tolling here.

---

[2] In April 2014, Dr. Theodossiou reassured Ms. Guilbault that she needed to be patient, SOF ¶ 37, but that was just two months after Ms. Guilbault completed chemotherapy—four months *before* the alleged date of her injury. Thus, this conversation is not the basis for any tolling.

11

Likewise, in *Hoerner v. Wesley-Jensen*, 684 So. 2d 508 (La. App. 4th Cir. 1996), the court applied *contra non valentem* because the plaintiff's doctor told her that her eye injury—which she alleged came from wearing contact lenses—was the result of a "bug" she caught. *Id.* at 514. Here, by contrast, Ms. Guilbault consistently told doctors that she believed her hair loss was "from chemotherapy." SOF ¶¶ 52, 55; Ex. 2 (Guilbault Dep.) at 115:2-14. Thus, *Hoerner* is inapposite.[3]

### 2. Ms. Guilbault Was On Notice by October 2015 at the Latest.

The undisputed evidence demonstrates that Ms. Guilbault knew or should have known of a possible causal connection between Docetaxel and her alleged injury by October 2015. By then, she had tried various treatments to treat her hair loss, but none of them had worked. Moreover, her physician, Dr. Theodossiou, testified that by then, he believed reports of permanent hair loss from Docetaxel were "common knowledge" and that he likely discussed this risk with Ms. Guilbault. SOF ¶ 60; Ex. 3 (Theodossiou Dep.) at 117:21-118:11. Thus, at that point she knew or should have known that Docetaxel was a possible cause of her injury, and the prescription period was running. Yet she did not file her complaint until more than one year later.

#### a. Ms. Guilbault's Failed Hair Loss Treatments.

Prior to October 2015, Ms. Guilbault tried several different treatments to promote hair regrowth, all to no avail. In December 2014, she told her oncologist, Dr. Theodossiou, that her hair was "not growing back fully as [she] expected." SOF ¶ 38; Ex. 2 (Guilbault Dep.) at 162:15-21. He suggested a multivitamin, which she tried. SOF ¶¶ 39, 48. At her next visit with him in April 2015, she complained that the multivitamin was "not doing much" and asked for "other

---

[3] In any case, any tolling from conversations would have expired, at the latest, by October 2015, for the reasons explained below.

suggestions." SOF ¶ 48; Ex. 2 (Guilbault Dep.) at 161:24-164:7. Dr. Theodossiou encouraged Ms. Guilbault to visit a dermatologist, SOF ¶¶ 48-49, which she did two separate times in 2015.

*First*, in March 2015, Ms. Guilbault consulted with Dr. Hooper at a skin cancer screening. SOF ¶ 50. When she had to remove her wig for Dr. Hooper to check her scalp, she told Dr. Hooper she was suffering from hair loss "from chemotherapy," and Dr. Hooper suggested Ms. Guilbault try Rogaine. *Id.* ¶¶ 51-52; Ex. 2 (Guilbault Dep.) at 115:2-14.[4] She tried Rogaine at Dr. Hooper's suggestion "unsuccessfully." SOF ¶ 53; Ex. 2 (Guilbault Dep.) at 161:24-164:7.

*Second*, in June 2015, Ms. Guilbault consulted with another dermatologist, Dr. Terezakis, about available treatments to promote hair regrowth. SOF ¶ 54. Dr. Terezakis suggested Ms. Guilbault try a special blend of minoxidil and retin-A. *Id.* ¶ 56. Ms. Guilbault tried the mixture and saw "no significant change. No change at all, really." *Id.* ¶ 57; Ex. 2 (Guilbault Dep.) at 161:24-164:7.

Ms. Guilbault also attempted to promote hair regrowth using home remedies she learned about from friends. At her friend Ms. Miller's suggestion, Ms. Guilbault tried taking biotin, as well as washing her hair with special shampoos, Nioxin and Nizoral. SOF ¶¶ 41-44. There is no evidence that any of those treatments made a difference in Ms. Guilbault's hair regrowth. *Id.* ¶ 64.

Thus, by October 2015, Ms. Guilbault had already tried using Rogaine; Dr. Terezakis's custom combination of minoxidil and retin-A; biotin; Nioxin; and Nizoral. None of those treatments had worked, and Ms. Guilbault was still wearing a wig. Although Ms. Guilbault may

---

[4] Ms. Guilbault also testified initially that she told Dr. Hooper she "was suffering from permanent hair loss," though after a break in the deposition, Ms. Guilbault stated she had "said hair loss." SOF ¶¶ 51-52; Ex. 2 (Guilbault Dep.) at 103:12-104:17; 115:2-14. If Ms. Guilbault did indeed say "permanent hair loss," this fact alone would be sufficient to demonstrate Ms. Guilbault had actual knowledge of her injury by March 2015—a full year and nine months before she initially filed suit.

13

have continued to hope her hair would return, she knew by October 2015—more than 18 months after her chemotherapy treatment had ended—that it was not regrowing, and that none of the treatments she tried at the suggestion of friends or dermatologists were working for her.  At this point, she had more than sufficient information to "incite her curiosity" and "excite her attention" that she may have suffered permanent hair loss as a result of taking Docetaxel. *Bartucci*, 246 Fed. Appx. at 254.

### b. October 2015 Visit With Dr. Theodossiou.

On October 2, 2015, Ms. Guilbault visited Dr. Theodossiou.  SOF ¶ 58.  When asked about that visit, Dr. Theodossiou testified: "[B]y that time—we're looking at 2015 now—it was, you know, common knowledge that you do get those based on the Docetaxel, the hair—lack of hair growth.  So I suspect that I had the discussion about the role of Docetaxel" with Ms. Guilbault. SOF ¶ 60; Ex. 3 (Theodossiou Dep.) at 117:21-118:11.  Dr. Theodossiou's testimony is significant for two reasons.

*First*, if Dr. Theodossiou discussed the role of Docetaxel in Ms. Guilault's permanent hair loss with her, as he believes he did, that put her on actual notice of her potential claims.  This fact alone is dispositive because Ms. Guilbault did not file suit until 14 months later. *See Robert v. Robert Mgmt. Co., LLC*, 164 So.3d 922, 934 (La. App. 4th Cir. 2015) ("Clearly, prescription begins to run when a plaintiff has actual knowledge that a damaging act has occurred."); *accord Campo*, 828 So.2d at 510 (La. 2002) ("Prescription commences when a plaintiff obtains *actual or constructive* knowledge of facts indicating to a reasonable person that he or she is the victim of a tort.") (emphasis added).

*Second*, regardless of whether this conversation occurred (he could not recall for sure), Dr. Theodossiou's testimony establishes conclusively that had Ms. Guilbault undertaken a reasonable investigation in October 2015, she would have discovered her potential claims – *i.e.,* he would

14

have told her, had she asked. Dr. Theodossiou testified that it was "common knowledge" by that point in time that cases of permanent alopecia had been reported with Docetaxel use. Under Louisiana law, a plaintiff put on notice of her claim "will be deemed to know what [s]he could have learned through reasonable diligence." *Babineaux*, 927 So.2d at 1124 (citing *Renfroe*, 809 So.2d at 953). A reasonable investigation includes, at a minimum, asking one's doctor about the potential cause of one's injury. *See, e.g.*, *Lennie v. Exxon Mobil Corp.*, 251 So.3d 637, 647-48 & n.6 (La. App. 5th Cir. 2018) (Plaintiffs had not made a reasonable inquiry where they did not ask the injured individual's treating oncologist about the cause of his lung cancer). Had Ms. Guilbault asked Dr. Theodossiou, she could have found out that she had a potential claim arising from her use of Docetaxel. Based on these facts, there was ample information available to Ms. Guilbault by October 2015 to place her on notice of a possible "causal relationship between the … product and the injury." *See Franics/Johnson*, 2019 WL 2995897, at *2 (quoting *Xarelto*, 2017 WL 4517287, at *2).

        **c.**        **Ms. Guilbault's Failure to Investigate Her Claim.**

Once Ms. Guilbault was on notice in October 2015, Ms. Guilbault did not undertake any further investigation of her claim. Instead, she reached out to a lawyer in May 2016 after seeing a television ad. As this court has recognized, if a plaintiff fails to "act reasonably to discover the problem," then "*contra non valentem* will not apply." *Thibodeaux*, ECF No. 9110, at 4. Thus, there is no basis to toll the prescription period after October 2015.

Ms. Guilbault filed her lawsuit on December 9, 2016—a full 14 months after the October 2015 visit to Dr. Theodossiou. SOF ¶ 68. Furthermore, she did not name Hospira, the manufacturer of the Docetaxel product she took, as a defendant until May 4, 2017—19 months later. *Id.* ¶ 69. Thus, Ms. Guilbault did not file her claims within Louisiana's one-year prescriptive period, and her claims are time-barred.

15

## CONCLUSION

For the foregoing reasons, the Court should dismiss Ms. Guilbault's claims.

Date: April 2, 2021

Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Phone: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 2, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

      /s/ *Heidi K. Hubbard*