# Exhibit 3

1 UNITED STATES DISTRICT COURT
2 EASTERN DISTRICT OF LOUISIANA
3 * * * * * * * * * * * * * * * * * * * * *
4 IN RE: TAXOTERE (DOCETAXEL)   MDL NO. 2740
  PRODUCT LIABILITY LITIGATION
5
6 This Document Relates to:
7
  Clare Guilbault vs. Hospira, et
8 al.,
  No. 2:16-cv-17061
9
10 * * * * * * * * * * * * * * * * * * * * *
11
12          VIDEOTAPED DEPOSITION
13                   OF
14        CHRIS THEODOSSIOU, M.D.,
15   Taken on Wednesday, November 11, 2020
16        Commencing at 1:25 p.m.
17                Via Zoom
18
19
20
21
22
23
24
25

Page 46

1  you've satisfied yourself that the benefits outweigh
2  the risks with that potential patient?
3     A.  The risk/benefit analysis takes every place
4  every single time we see a patient and every single
5  visit.
6     Q.  Doctor, I want to probably turn now to
7  Ms. Guilbault specifically.  So if you have the
8  notebook handy, close to you, you may want to get it
9  close to you because we are going to be referring to
10 some things, or if you want to use your electronic
11 records, I'll give you enough information,
12 hopefully, that you can do that quickly.
13    A.  Okay.
14    Q.  But the notebook that was -- it's a --
15    A.  I have it here.
16    Q.  Okay.  It's just medical records that we,
17 basically, in order to speed this along, put in
18 chronological order to -- because that's the way I
19 think, Doctor, is chronologically.  Okay?
20    A.  That's fine.
21    Q.  And you will notice the records all have,
22 like, what we lawyers call a Bates stamp on the
23 bottom, and you will note most of them have Ochsner
24 on them, indicating that we got them from Ochsner,
25 and it also has a page number.

Page 47

1     A.  Okay.
2     Q.  Let's turn first --
3     A.  You want me --
4     Q.  -- to --
5     A.  You want me to open the box here?
6     Q.  Oh, yes, please, Doctor.
7        MR. ROTOLO:  And, Jessica, did you get the
8     notebook as well?
9        MS. REYNOLDS:  I did, right at lunch.  So
10    they brought it up, and then I went and ate.
11    But I have it.  It's very hefty.
12       MR. ROTOLO:  As I said, we're not going
13    through it all.  I just want to be prepared.
14    I didn't want to be accused of leaving
15    anything out, let's just put it that way.
16       MS. REYNOLDS:  I definitely won't make that
17    accusation.
18       THE WITNESS:  My goodness.
19 BY MR. ROTOLO:
20    Q.  You'll get your workout, Doctor.  We're not
21 going through all of these, by the way.  I'm just,
22 like I said, I didn't want to be accused of leaving
23 any record out that we might have needed --
24    A.  My wife is a lawyer, so...
25    Q.  Okay.  You know how we work, then.

Page 48

1       MS. REYNOLDS:  Who wins the arguments at
2     home?
3       THE WITNESS:  Well, she works it two ways,
4     so I do have to work.
5  BY MR. ROTOLO:
6     Q.  Were you able to extract the massive weight
7  out of the box?
8     A.  Yes, I have it.
9     Q.  Okay.  If we could turn first to Tab 9.
10       MR. ROTOLO:  And I'm -- Jessica and
11    everybody, so we're not confused, I'm going
12    to refer to the tab, but that's not going to
13    be the exhibit number.  We'll say that's
14    Exhibit 1.
15       MS. REYNOLDS:  Okay.  Very good.
16       (Whereupon Exhibit No. 1 was marked for
17    identification.)
18       THE WITNESS:  There are several pages here
19    on the Tab 9, and I'm looking at my notes.
20 BY MR. ROTOLO:
21    Q.  Doctor, on Tab 9, just for the record, what
22 I have as the first page is a medical record that
23 has "Guilbault Ochsner MR" at the bottom with Bates
24 page Number 194.
25    A.  Yes, sir.

Page 49

1     Q.  Dated 9/17/13?
2     A.  Yes.
3     Q.  And it looks like the first three pages may
4  be just -- it had "Appointment set is cancelled,"
5  but if you would go to page 197 at the bottom.
6     A.  I'm there.
7     Q.  You see at the top where it has "Clare L.
8  Guilbault 9/17/2013," and it has "Encounter
9  information, initial consult"?
10    A.  I see it.
11    Q.  Doctor, does this appear to be the medical
12 record from your first visit with Ms. Guilbault?
13    A.  I would assume so.
14    Q.  Okay.  And, Doctor, if you will turn with me
15 to Bates Number page 203.
16    A.  I'm looking at it.
17    Q.  I'm looking under a section that's entitled,
18 "Progress Notes."
19    A.  Yeah.  That's my initial consultation, the
20 first time I saw her.
21    Q.  Okay.  Great.
22       And, Doctor, if you look at the Bates Number
23 page 203 under progress notes, it appears that
24 Ms. Guilbault was referred to you by Dr. Stolier?
25    A.  Correct.

13 (Pages 46 - 49)

Page 50
1  Q. And is Dr. Stolier a surgeon?
2  A. He is a surgeon. He no longer practices,
3 but he is a very well-respected surgeon in the
4 New Orleans community.
5  Q. And the reason for referral was recent
6 diagnosis of breast cancer. Do you see that?
7  A. Correct.
8  Q. Okay. And at the time of this referral,
9 Ms. Guilbault was 61 years old?
10  A. Yes, sir.
11  Q. And her -- you indicate that she had had a
12 biopsy performed before she came to see you and that
13 she had infiltrating ductal carcinoma that was ER
14 strongly positive, PR strongly positive, and HER2
15 negative?
16  A. Correct.
17  Q. And are those factors that would -- that you
18 would consider in determining her treatment options?
19  A. Yes. Those are the three elements that I
20 was talking about earlier: The estrogen receptors,
21 the progesterone receptors, and the HER2 receptor.
22  Q. And I note you had involvement of multiple
23 lymph nodes that were suspected?
24  A. Yes. And she also had a biopsy of a
25 palpable axillary lymph node that was positive.

Page 51
1  Q. And then, Doctor, did she have what showed
2 up on scans as a potential body on her T12 of her
3 spine?
4  A. You know, I didn't remember that. Now that
5 I see my note, I vaguely remember that she had
6 something which I think that we may have biopsied at
7 some point to make sure this wasn't cancer.
8  Q. Well, Doctor, do you remember -- we're going
9 to go through the records -- but do you remember
10 that it was not biopsied before her chemotherapy
11 treatment?
12  A. I don't remember.
13  Q. Okay. Well, we'll go through it, Doctor.
14 We're going to go through it.
15  A. Yeah.
16  Q. I don't want you to say something you
17 don't --
18  A. I'm looking at my plan, page 28. So we did
19 recommend a CD-guided biopsy.
20  Q. Okay. Well, Doctor, let's -- if you don't
21 mind going back with me --
22  A. Uh-huh.
23  Q. -- to Bates Number page 203 --
24  A. Yes.
25  Q. -- at the bottom where there's the

Page 52
1 discussion of the small area of the body of T12 that
2 had increased uptake.
3  A. I see it.
4  Q. It indicates that that was felt to be highly
5 suspicious for bony metastatic disease.
6    Do you see that?
7  A. Yes, I see that.
8  Q. And what would indicate that that was highly
9 suspicious for metastatic cancer?
10  A. There was -- there was uptake on the PET
11 scan.
12  Q. And, Doctor, if you turn to the next page,
13 which is 204, under your review of symptoms in the
14 middle of the page, do you see that?
15  A. I see it.
16  Q. You say, "Overall she feels well. She is
17 upset and anxious with the recent developments."
18    Doctor, is that -- would it be fair to say
19 that that is a common description of the women that
20 have come to see you who have been diagnosed with
21 breast cancer?
22  A. For the first visit, yes, that's quite
23 prevalent.
24  Q. Now, Doctor, if you could turn to page
25 205 -- page Number 205 of Exhibit 1 under your plan,

Page 53
1 it says you had an hour long discussion with
2 Ms. Guilbault and her husband.
3    Is that about the normal time you would
4 spend on an initial consult talking to a patient?
5  A. For someone going through chemotherapy, it's
6 usually an hour or longer for the initial visit.
7  Q. Right. And you indicated that you had
8 reviewed her scans and that there was a lesion with
9 the extremely high SUV in the interior portion of
10 T12.
11    "I've explained to Mr. And Ms. Guilbault the
12 significance of these findings."
13    Do you remember what you indicated was the
14 significance of those findings?
15  A. Whenever we see a patient, we -- the first
16 thing we need to determine is whether this is a
17 curable cancer or an incurable cancer. If there is
18 a bone metastases -- even one -- this is no longer
19 considered curable. That's why it was a significant
20 finding and that's why I recommended a biopsy.
21  Q. Okay. So you recommended a biopsy. And
22 then a couple sentences later you say, "I have
23 explained to her that if she does have bone
24 metastasis, this will not be curable stage.
25 However, she would be treated initially with

14 (Pages 50 - 53)

Page 54

1  hormonal treatments and "Denosum"?
2     A.  Denosumab, yes, sir.
3     Q.  So if that lesion on T12 was cancer, then
4  she would not need chemotherapy; correct?
5     A.  Correct.  Correct.
6     Q.  Because that would mean her cancer was not
7  curable?
8     A.  Let me -- let me rephrase that.  She would
9  not need to start with chemotherapy.  Eventually she
10 would have received chemotherapy, but typically we
11 start with hormonal agents.  We sequence the
12 patients through three or four hormonal agents, and
13 once we exhaust the endocrine options, we go to
14 chemotherapy.
15    Q.  And then you said, "The rationale for the
16 above approach was explained to her.  At her
17 request, I also discussed the life expectancy
18 associated with stage 4 breast cancer with bone only
19 metastasis."
20        And, Doctor, what would that discussion be
21 on the life expectancy --
22    A.  Well --
23    Q.  -- in this situation?
24    A.  -- again, this was 2013.  So back then the
25 generic survival for a stage 4 patient was

Page 55

1  24 months.  But if you have bone-only metastases, no
2  visceral metastases, what we call the median
3  survival was 30 months.  So I'm sure I had this
4  discussion with her.
5     Q.  So, in the case, if that was a single bone
6  metastasis, the median would have been a 30-month
7  survival?
8     A.  Correct.  And the way I usually phrase it to
9  the patients is that if I have 10 patients like you
10 diagnosed today, in 30 months I'm going to be down
11 to 5.  And if you double that and you go to
12 60 months, I will still have 2 patients, except I
13 have no idea at the very beginning who those 2 will
14 be out of the initial 10.  That's the discussion
15 that takes place.
16    Q.  And, Doctor, on this visit on September 17th
17 of 2013, I do not see that you made a recommendation
18 for chemotherapy; is that correct?
19    A.  Correct.  Because we don't if she's a stage
20 3 or a stage 4.
21    Q.  Okay.
22    A.  And if she were a stage 4, she wouldn't go
23 through chemotherapy initially.
24    Q.  And as you left it at this visit, you
25 were -- there was going to be potentially a biopsy

Page 56

1  of the T12?
2     A.  Correct.
3     Q.  Doctor, do you know how large
4  Ms. Guilbault's tumor was?
5     A.  I don't recall.
6     Q.  If it may help, if you can turn to Tab --
7     A.  I'm looking at my note that says, "There was
8  an ill-defined mass in the left breast.  She had
9  palpable lymph nodes."
10        But I'm sure there's an ultrasound somewhere
11 that, you know, gives us the measurements.
12    Q.  If you look at Tab 6, I think there's the
13 MRI of the breast.  Would that be helpful?
14    A.  Yes.
15    Q.  Tab 6 is from Touro Imaging Center of
16 Ms. Guilbault of an MRI that was performed on
17 September 9th of 2013.
18        MR. ROTOLO:  We'll mark that as Exhibit 2.
19        (Whereupon Exhibit No. 2 was marked for
20        identification.)
21 BY MR. ROTOLO:
22    Q.  Can you tell from the report of the MRI the
23 size of her tumor?
24    A.  Yeah, they say that it measures 2.2 by 1.9
25 by 1.8 centimeters, and then there's a satellite

Page 57

1  lesion 1.1 by 1.9.
2     Q.  Would that have been the lymph nodes or
3  another lesion?
4     A.  No.  That's a satellite lesion in the
5  breast, not the lymph nodes.
6     Q.  Doctor, that record that we just -- your
7  initial visit with Ms. Guilbault was on
8  September 17th of 2013, if you remember what we just
9  looked at.
10    A.  Yes, sir.
11    Q.  Can you turn to Tab 10(b).
12    A.  Yes, sir.
13    Q.  Doctor, this is a note labeled, "Encounter
14 Information:  Telephone" that was contained in
15 Ms. Guilbault's medical records from Ochsner dated
16 the next day, September 18th of 2013.
17        Do you see that, at the top of Tab 10(b)?
18    A.  I see that.
19    Q.  Are you there, Doctor?
20    A.  Yes.  I see it.
21    Q.  Okay.  If you could turn to Bates Number
22 page 224 of that record.
23    A.  Yes.
24    Q.  It appears to be notes between -- e-mails
25 between you and your nurse.

Page 62

1  regime when you cannot rule out a stage 4, are you
2  balancing the need to cure them if they're stage 3
3  and to slow progression if they're stage 4?
4      MS. REYNOLDS:  Object to form.
5      THE WITNESS:  When we cannot rule out stage
6      4, we treat them aggressively for a
7      presumptive curable cancer.
8  BY MR. ROTOLO:
9   Q.  And, Doctor, the date on the report of the
10 multidisciplinary breast cancer conference that we
11 just looked at of -- looks like the form is dated
12 September 19th.
13      Would that be the date that it was presented
14 to the conference?
15  A.  Yes, sir.
16  Q.  So if you could turn to Tab 13, which is
17 going to be Exhibit Number 4.
18      (Whereupon Exhibit No. 4 was marked for
19      identification.)
20 BY MR. ROTOLO:
21  Q.  It begins with page Number 273.
22      Do you see that, Doctor?
23  A.  I have it.
24  Q.  And it looks like a telephone encounter.
25 And then if you look at Bates Number page 275, it

Page 63

1  looks like it's a message from Ms. Guilbault to --
2  or Ms. Wendt sending an e-mail saying:
3      "Patient wanted to push back her medical" --
4  "M.D. appointment and chemo start date to either
5  Thursday or Friday of next week.  She has concerns
6  about her job because she's already taken a lot of
7  time off.  I've passed the message on to
8  Robin Jackson, R.N., to call patient on Monday."
9      How did Ms. Guilbault learn that she was
10 going to undergo chemotherapy?
11  A.  It may have been a conversation that's not
12 documented.  I don't recall.  I'm sure there was a
13 radiologic study done in between.  Maybe the MRI
14 didn't show any bone destruction.
15  Q.  And, Doctor, would it be a standard practice
16 if a patient is undergoing chemotherapy to send them
17 for a cardiac evaluation?
18  A.  That's standard operating procedure.
19  Q.  Is that for all types of chemotherapy
20 medications or just certain ones?
21  A.  Just for the regimens that contain
22 Adriamycin.  In her case the Adriamycin --
23  Q.  Did --
24  A.  -- is what triggered the cardiac workup.
25  Q.  So if you look at Tab 15, which we'll mark

Page 64

1  as Exhibit 5.
2      (Whereupon Exhibit No. 5 was marked for
3      identification.)
4  BY MR. ROTOLO:
5   Q.  That is a consult with -- I think it was
6  Dr. Polin in cardiology.  And that would have been
7  ordered by you because you were contemplating giving
8  her Adriamycin?
9   A.  Correct.  I'm pretty sure that I ordered an
10 echocardiogram at some point.
11  Q.  Okay.  If you go to Tab 15, which is
12 Exhibit 5, Bates Number page 268.
13  A.  Yes, sir.
14  Q.  And you see that this is Dr. Polin's
15 progress note where she indicates:  "She was
16 recently diagnosed with left-sided breast cancer
17 with positive lymph nodes and possible thoracic
18 spine metastasis.  She is meeting with
19 Dr. Theodossiou next week to discuss her
20 chemotherapy regime.  She will likely be receiving
21 XRT also.  She has a longstanding hypertension,
22 which has been reasonably controlled."
23      And then -- so you would not have had a
24 discussion about chemotherapy with her before you
25 sent her for the cardiac consult?

Page 65

1   A.  I don't recall the specifics.  You know,
2  there was a time that any patient given potentially
3  cardiotoxic medication, we would automatically send
4  them to Dr. Polin.
5   Q.  Did Ms. Guilbault's hypertension -- long
6  history of hypertension have any effect on the
7  chemotherapy regimen that you were prescribing?
8   A.  Only if there was heart failure.  And I'm
9  sure there was an echocardiogram ordered, and I'm
10 sure it was normal; otherwise, I wouldn't have
11 treated her the way I did.  Yeah, it says her echo
12 was normal.  I'm looking at Dr. Polin's note, so...
13  Q.  What about a family -- I'm sorry.  Go ahead.
14  A.  Yeah.  What we call the left ventricular
15 ejection fraction was calculated to be 60 percent,
16 which is -- you know, that clears her to go for
17 chemotherapy.
18  Q.  Would there be any concern with the family
19 history of cardiac disease?
20  A.  No, sir.
21  Q.  Doctor, you indicated that you had sent her
22 for another MRI?
23  A.  My note indicates that she was going to get
24 an MRI of the thoracic spine.
25      MR. ROTOLO:  Okay.  If you look at Tab 17,

17 (Pages 62 - 65)

Page 66

1  which we'll mark as Exhibit 6.
2      (Whereupon Exhibit No. 6 was marked for
3      identification.)
4  BY MR. ROTOLO:
5    Q. And, specifically, at Bates Number page 280.
6       Would that be the MRI report that you had
7  ordered for her, that it looks like it occurred on
8  September 23rd of 2013?
9    A. Yes, sir.
10   Q. What was the finding of the MRI that you had
11 ordered?
12   A. I'll read it. "Enhancing lesion within the
13 anterior column of the T12 vertebral body which
14 corresponds to the area of increased FDG uptake on
15 recent PET scan, highly concerning for metastatic
16 disease in this patient with a reported history of
17 breast cancer."
18   Q. And so what was the significance of the MRI
19 finding?
20   A. We look for bone destruction. If you see
21 bone destruction, you know that this is cancer, and
22 sometimes you can forgo the biopsy. This, again,
23 looks highly suspicious for metastatic disease.
24   Q. Doctor, if you could turn to Tab 21, which
25 we'll mark as Exhibit 7.

Page 67

1      (Whereupon Exhibit No. 7 was marked for
2      identification.)
3  BY MR. ROTOLO:
4    Q. At the top of that Tab 21, Exhibit 7, it
5  says, "Encounter information: Office visit,
6  Ms. Guilbault," dated September 25th of 2013.
7       Do you see that?
8    A. Yeah, I see that.
9    Q. If you move forward to your progress note,
10 which begins on the bottom of page 335.
11   A. Yeah. I wonder. Was there a biopsy? I
12 mean the only --
13   Q. Doctor --
14   A. The only reason not to do a biopsy would be
15 if the radiologist felt that it wasn't amenable to a
16 biopsy.
17   Q. Doctor, we'll get there, but I will -- if we
18 can move ahead to page 337.
19   A. Yes, sir.
20   Q. Your plan. It says, "I had a long
21 discussion with Ms. Guilbault and her husband. I've
22 discussed her case with Dr. Stolier. It's possible
23 that she may have stage 4 disease with a solitary
24 bone metastasis. However, due to the location of
25 the suspicious lesion anteriorly on the bottom

Page 68

1  of" -- "body of T12, it is not safe to obtain a
2  biopsy to confirm the stage."
3       Do you have a recollection that the T12
4  lesion could not be biopsied before treatment?
5    A. I have to go by my notes. I mean that's
6  probably the discussion that took place with the --
7  in direction of radiologist. Again, when we have a
8  lesion that's not amenable to a biopsy, you always
9  give the patient the benefit of the doubt. And
10 instead of, you know, saying that we're not going to
11 try to cure you, we will treat her for a presumptive
12 stage 3, which is curable.
13   Q. Given the -- what you looked at on the MRI
14 of the breast and the staging, would Ms. Guilbault's
15 cancer be considered invasive carcinoma?
16   A. It is invasive, based on the biopsy.
17   Q. Based on this information that you had at
18 this time, would Ms. Guilbault's cancer be
19 considered early stage breast cancer?
20      MS. REYNOLDS: Object to form.
21      THE WITNESS: It wasn't early stage. I
22      mean, she -- you know, she was at least a
23      stage 2, maybe a stage 3, or a stage 4. But
24      she wasn't an early stage. The reason I'm
25      saying she's at least a stage 2 is that

Page 69

1       there has been a lymph node biopsy that
2       showed cancer. So she's not a stage 1,
3       period.
4  BY MR. ROTOLO:
5    Q. And you continue on in your note, "I think
6  that a reasonable approach would be for her to
7  proceed with neoadjuvant chemotherapy, followed by
8  resection. Upon completion of her resection, we can
9  offer radiation to T12 area and hormonal therapy
10 with aromatase inhibitors."
11      So that was the plan going forward?
12   A. That was the plan going forward, due to the
13 fact that the lesion was not amenable to a biopsy.
14   Q. So, Doctor, when that occurs, you are
15 treating her hoping that the bony metastasis is not
16 cancer?
17   A. Correct.
18   Q. But if it is cancer, you haven't done any
19 harm to Ms. Guilbault?
20   A. You haven't done any harm. But, you know,
21 if I flip the argument: If she turns out to be a
22 stage 3 and you treat her as a stage 4, you did do
23 her harm.
24   Q. Correct. So you would do what you can to
25 give her the best chance should it turn out to be

18 (Pages 66 - 69)

Page 98

1  Q. Would you go over those written -- that
2 written information with the patient?
3  A. No. It wasn't -- this was something the
4 nurse would do or the navigator would do, not the
5 physician. I would have this -- the discussion at
6 some point. Usually when they sign the consent
7 form, I would have the chemotherapy discussion. I
8 would tell them the specific side effects from
9 specific drugs. But then they would probably have a
10 more-detailed discussion with the chemo nurse or the
11 navigator.
12  Q. And Ms. Guilbault successfully completed all
13 of her eight infusions of chemotherapy?
14  A. She did.
15  Q. I notice from the medical records that two
16 of the AC cycles were delayed due to low A and C.
17  A. Okay.
18  Q. Is that a side effect of the AC regimen?
19  A. It's a side effect of the Adriamycin and
20 Cyclophosphamide, yes. They do lower the white
21 cells, and sometimes it takes longer to recover.
22  Q. And I think you had indicated that you told
23 Ms. Guilbault that she would lose her hair -- I
24 think you said -- what? -- three weeks after her
25 first --

Page 99

1  A. Typically, with Adriamycin, I tell them
2 around the third to the fourth week, you will lose
3 your hair. By the time you come back for your
4 second -- for your third round of chemotherapy,
5 which is six weeks, there is not going to be any
6 hair left.
7  Q. Do you typically tell them how long their
8 hair will take to grow back?
9  A. I tell them that it will start to grow about
10 three months from the last round of chemotherapy.
11  Q. Ms. Guilbault testified at her deposition,
12 and it's also contained in her calendars, that she
13 had initial hair regrowth during the time she was
14 getting infused with Docetaxel. Is that uncommon?
15  A. It's not --
16     MS. REYNOLDS: Object to --
17     (Simultaneous crosstalk.)
18     THE WITNESS: -- really --
19     MS. REYNOLDS: -- form.
20     THE WITNESS: -- hair. We call it fuzz.
21     You know, it's baby hair that grows, but
22     this is not the permanent hair that
23     ultimately grows back. I don't recall the
24     specifics in her case, but having been
25     through this with many patients, I tell them

Page 100

1 that this is not the permanent hair.
2 BY MR. ROTOLO:
3  Q. Why did you recommend that Ms. Guilbault
4 take an aromatase inhibitor after chemotherapy?
5  A. She had an estrogen-driven cancer, based on
6 the positive estrogen receptors. So that's the
7 standard of care.
8  Q. And you chose to prescribe Arimidex?
9  A. Yes, sir. I could have given her Letrozole,
10 but we're all creatures of habit. So I prescribed
11 Anastrozole rather than Letrozole. They're
12 equivalent.
13  Q. Have you -- you prescribed Arimidex because
14 you had experience with that medication?
15  A. I have experience with both, and -- but I
16 have chosen to give the Arimidex in the adjuvant
17 setting rather than the Letrozole.
18  Q. How do those medications work?
19  A. First of all, they only work in
20 postmenopausal patients. You've got to be
21 absolutely certain that the ovaries are not
22 producing estrogen. So the way they work, there are
23 two little glands called the adrenal glands that sit
24 under your kidneys.
25     So the adrenal glands make male hormones.

Page 101

1 The male hormones will circulate. They'll go to the
2 fatty cell, that will be converted to female
3 hormones by an enzyme called the aromatase. So the
4 aromatase inhibitors basically block the conversion
5 of the adrenaline derived androgens to estrogens.
6  Q. And when you prescribe medication such as
7 Arimidex, do you discuss with the patient the risk
8 and benefits of that medication?
9  A. Yes, sir.
10  Q. And what would you have told Ms. Guilbault
11 about the risk and benefits of taking Arimidex?
12  A. So, typically, there are five side effects
13 where you see statistically significant differences
14 from placebos. Those are the hot flashes, so I tell
15 them there's a 30-percent chance of hot flashes.
16 There's a 30-percent chance of achy joints and
17 muscle aches and pains. There is a 1-percent risk
18 of thrombosis. There's a tendency to develop
19 osteoporosis, and there is sexual dysfunction from
20 vaginal dryness. Those are the side effects I
21 typically discuss.
22  Q. And Ms. Guilbault understood those risks and
23 accepted them?
24  A. I don't recall the discussion, but this is
25 the discussion that I'm having multiple times every

Page 102

1 week, and I'm sure I had this discussion with her.
2    Q. And how long did you recommend that
3 Ms. Guilbault take Arimidex?
4    A. At that time, the standard of care was five
5 years. It's subsequently changed. So I sus- --
6       (Simultaneous crosstalk.)
7 BY MR. ROTOLO:
8    Q. Is it --
9    A. On my initial note when I started, I told
10 her five years.
11    Q. And then I noted some discussion about
12 increasing that to ten. Is that now the standard?
13    A. Yes, sir. Well, there is -- you've got the
14 option of five, seven and ten.
15    Q. Given Ms. Guilbault's cancer and the fact
16 that she had seven nodes that were positive, would
17 her recommendation be ten?
18    A. Yes, sir. I would recommend she go to ten.
19    Q. And I think I noted on the last visit that
20 Ms. Guilbault is still on Arimidex; is that correct?
21    A. She should be until 2023, '24.
22    Q. Has Ms. Guilbault complained to you about
23 any side effects in taking Arimidex?
24    A. I do not recall. If she did, it would be
25 under review of systems of the notes. I suspect

Page 103

1 that she did. Most of the patients do have side
2 effects, but it should be in the notes if she did.
3    Q. Is hair thinning one of the potential side
4 effects reported with Arimidex?
5    A. Yes.
6       MS. REYNOLDS: Objection to form.
7       THE WITNESS: But I tell the patients, you
8    know: Can you gain weight? Yes. But
9    you're just as likely to gain weight with a
10    placebo. Can you break into hives? Yes.
11    But you're just as likely to break into
12    hives with a placebo. Can you have hair
13    thinning? Yes. But you're just as likely
14    to have hair thinning with a placebo.
15       So that's a discussion that takes place
16    when the complaint of something other than
17    the five side effects where we do see
18    statistically significant differences from
19    placebo.
20 BY MR. ROTOLO:
21    Q. Have you had patients who have experienced
22 hair thinning while taking Arimidex?
23    A. Yes, sir. Every --
24    Q. What type --
25       (Simultaneous crosstalk.)

Page 104

1    THE WITNESS: -- doctor has had those
2    patients.
3 BY MR. ROTOLO:
4    Q. What type of hair presentation do those
5 patients present with?
6       MS. REYNOLDS: Object to form.
7       THE WITNESS: It's -- it's different from
8    the alopecia. It's a generalized hair
9    thinning that -- you know, a lot of the -- a
10    lot of the times I don't even see it, but
11    the patient will complain of hair thinning.
12    And I explain to them that, you know, it may
13    be from the Arimidex, but I could have given
14    her a dummy pill, and she would have been
15    just as likely to experience the same
16    symptom.
17 BY MR. ROTOLO:
18    Q. Your answer brings up another question for
19 me.
20       On the patients that you -- I know we talked
21 about the one patient that you talked about that had
22 no hair regrowth, and then you talked about several
23 other patients who had lack of hair regrowth.
24       In those patients that you are attributing
25 their lack of hair regrowth to Docetaxel, what was

Page 105

1 their hair presentation?
2       MS. REYNOLDS: Object to form.
3       THE WITNESS: It varies. I have patients
4    who have alopecia, like alopecia areata,
5    which is you get a -- you know, a round area
6    where the hair doesn't grow. I have other
7    patients where there's generalized, you
8    know, very thin hair growth. There is not
9    one single pattern of alopecia.
10 BY MR. ROTOLO:
11    Q. Doctor, Ms. Guilbault also underwent
12 radiation therapy?
13    A. Yes. She should have gotten radiation with
14 some positive lymph nodes.
15    Q. Doctor, if you could turn to --
16       On the patients that you just talked about
17 with the -- that you attributed their hair loss to
18 Docetaxel, did you do any sort of blood work or
19 history to determine whether they had thyroid
20 dysfunction or autoimmune disease?
21    A. Typically we don't. It's not part of the
22 standard of care for breast cancer.
23    Q. Doctor, if you could turn to Tab 73. I'll
24 mark that as Number 12, Exhibit 12.
25       (Whereupon Exhibit No. 12 was marked for

27 (Pages 102 - 105)

Page 106

1    identification.)
2        THE WITNESS: Yes, sir.
3  BY MR. ROTOLO:
4    Q. Doctor, I'll represent to you that is the
5  pathology report following Ms. Guilbault's
6  lumpectomy that she had done in March of 2014.
7    A. Yes, sir.
8    Q. And am I correct that the residual tumor in
9  Ms. Guilbault's left breast was 1.5 centimeters?
10   A. I see that.
11   Q. And then that she had 7 of 17 positive lymph
12 nodes?
13   A. I see that.
14   Q. Does that finding post-chemo and surgery,
15 does that tell you anything?
16   A. That's a terrible prognostic factor. I mean
17 that tells me that the risk of recurrence is really,
18 really high.
19   Q. Do you know what percentage risk of
20 reoccurrence is for someone who has a 1.5 residual
21 tumor and 7 of 17 positive nodes?
22   A. It's not the 1.5 centimeter residual tumor.
23 It's the seven lymph nodes. And I'll quote a study
24 from MD Anderson where if you went through the
25 chemotherapy with anthracyclines and Taxanes and you

Page 107

1  had more than four positive nodes, your chance of
2  recurrence was more than 90 percent.
3    Q. And is that over a particular number of
4  years?
5    A. Yes. You're looking over a ten-year period
6  usually. I mean, make no mistake, Ms. Guilbault is
7  still at a very high risk of recurrence, even though
8  she's seven years out.
9    Q. So would her risk still be at 90 percent
10 currently?
11   A. No. No. And I'll explain to you why.
12 Let's say that the risk of recurrence was
13 90 percent, you expect that two-thirds of those
14 recurrences will recur within the first five years.
15 So the fact that she is seven years out and she has
16 not recurred works in her favor. So I would
17 guesstimate her chance to have a cure at this point
18 at about 70 to 80 percent, something in that range,
19 being seven years out.
20   Q. Doctor, can estrogen receptor positive --
21 strongly estrogen receptor positive cancer occur
22 later --
23   A. Yes.
24   Q. -- ten years?
25   A. That's -- with the estrogen positive

Page 108

1  cancers, I never tell the patient that she is cured.
2  I tell them that if I see you 20 years down the road
3  and you're still in remission, I tell you at that
4  point that you have a 98-percent chance of a cure,
5  and you maxed out there.
6        As opposed to the triple-negative breast
7  cancers, where you know that if someone is destined
8  to recur, they're going to do so within five years.
9  So, in this respect, if I have a triple-negative and
10 the patient is six, seven, eight years out, I can
11 tell her that she's cured. I can never say that to
12 an estrogen positive cancer.
13   Q. Doctor, if you could turn to Tab 74.
14   A. Yes, sir.
15       MR. ROTOLO: We'll mark that as Exhibit 13.
16       (Whereupon Exhibit No. 13 was marked for
17       identification.)
18 BY MR. ROTOLO:
19   Q. That is a record of an office visit with you
20 on April 16th of 2014.
21   A. Okay.
22   Q. And if you'll look at page 1047 Bates
23 Number.
24   A. Yes, sir.
25   Q. And also your note.

Page 109

1        Is there any indication there that
2  Ms. Guilbault discussed with you her hair?
3    A. No, there isn't.
4    Q. Do you have a recollection of Ms. Guilbault
5  asking you at this visit when her hair would regrow?
6    A. I do not recall.
7    Q. Do you recall if that question would have
8  been asked, you would have told her, "In about a
9  month"?
10   A. I would have told her that typically the
11 hair growth is noted three months from the last
12 round of chemotherapy. That's my answer.
13   Q. Okay. Let me ask you to go to Tab 81, which
14 I'll mark as Exhibit 14.
15       (Whereupon Exhibit 14 was marked for
16       identification.)
17       THE WITNESS: Yes, sir.
18 BY MR. ROTOLO:
19   Q. And, Doctor, if you'll look at the page 1419
20 and 1420.
21   A. I'm sorry. That was --
22   Q. Is there any --
23   A. -- Exhibit 81?
24   Q. Yes.
25   A. 419 and 20. Yes, sir.

28 (Pages 106 - 109)

Page 110

1  Q. Looking at your examination and your notes
2  for this visit, is there any notations in that
3  record of Ms. Guilbault complaining about her hair?
4      A. There isn't. Now, you know, she may have
5  mentioned something that I didn't document, but if
6  there had been a discussion specifically about that,
7  I probably would have mentioned something.
8      Q. If Ms. Guilbault noted in her -- in some
9  responses and in her deposition that she asked you
10 at this meeting -- or told you in this meeting that
11 her hair stopped growing out and that you told her
12 to give it time and take a multivitamin, is that
13 something that would be consistent with what you
14 would counsel?
15     A. I'm not sure about the multivitamins. I'm
16 not a firm believer in vitamins. I don't recall
17 that part, but I -- it's possible that I told her
18 give it more time.
19     Q. Would part of your answer to that discussion
20 be that the lack of hair regrowth was caused by her
21 chemotherapy regime?
22         MS. REYNOLDS: Object to form.
23         THE WITNESS: I don't recall the discussion.
24     Could it have been part of the discussion?
25     Maybe. I don't remember.

Page 111

1  BY MR. ROTOLO:
2      Q. Look at the next tab, Doctor, which is
3  Tab 82, which I'll mark as Exhibit 15.
4          (Whereupon Exhibit No. 15 was marked for
5          identification.)
6          THE WITNESS: Yes, sir.
7  BY MR. ROTOLO:
8      Q. I will represent that this is a visit with
9  you on April 23rd of 2015.
10         If you will look at your notes, Doctor.
11     A. Can I have a page number, please?
12     Q. Which is on page 1498 and 1499. Is there
13 any notations in there with regard to Ms. Guilbault
14 complaining to you about her hair?
15     A. No, sir, there isn't.
16     Q. If Ms. Guilbault had testified and indicated
17 in documents that at this visit she asked you about
18 her hair and you suggested she consult with a
19 dermatologist, is that something you would normally
20 recommend?
21     A. It wouldn't be unusual for me to recommend a
22 referral just to make sure that other causes of
23 alopecia had been ruled out, and it wouldn't have
24 been unusual that I hadn't documented the
25 discussion. I mean this is the oncology clinic, and

Page 112

1  I'm focused primarily in the oncologic care.
2      Q. Generally, when you had that discussion,
3  would you have a discussion as to the reason for
4  consulting a dermatologist?
5      A. Would I have a discussion? Yes. Typically,
6  if I initiate a referral to a dermatologist, I will
7  put a little addendum to the notes or just add one
8  sentence saying that she's being referred.
9  Typically, I will initiate the referral.
10     Q. Doctor, if we could go to Tab 84, which I'll
11 mark as Exhibit 16.
12         (Whereupon Exhibit No. 16 was marked for
13         identification.)
14 BY MR. ROTOLO:
15     Q. This is a June 25th, 2015, office visit with
16 you.
17         If you look at pages 1523 and 1524, do you
18 see any mention of complaints of hair loss in the
19 record?
20     A. No. No.
21     Q. Doctor, do --
22     A. I will say this: She used to wear a wig,
23 and it was only once or twice that I asked her to
24 take off the wig so I could see what was going on.
25 I didn't do a scalp examination on every single

Page 113

1  visit.
2      Q. Doctor, were you aware that Ms. Guilbault
3  saw a dermatologist on the same date that she saw
4  you on June 25th of 2015?
5      A. I don't recall that.
6      Q. Do you remember if you looked at
7  Ms. Guilbault's hair on this visit without her wig
8  on?
9      A. No, sir. But, again, it was -- the majority
10 of the visits she would have a wig on, and I
11 wouldn't have her take it off. It was maybe two to
12 three times that I looked at the hair growth.
13     Q. Doctor, I'm going to mark as Exhibit 17 --
14 and they're not in your notebooks because they're
15 not your medical records.
16         (Whereupon Exhibit No. 17 was marked for
17         identification.)
18         MR. ROTOLO: Can you please pull up the
19         photographs from Dr. Terezakis from
20         June 25th, 2015, please.
21         MS. MCINTIRE: June --
22         MR. ROTOLO: It's D.1.
23         THE WITNESS: I'm sorry. Are you talking to
24     me?
25 BY MR. ROTOLO:

Page 114
1  Q. No. I'm talking to my assistant --
2  A. Okay.
3  Q. -- who is pulling it up. These are not in
4  your notebook because they're not your records,
5  Doctor.
6  A. Okay.
7      MS. REYNOLDS: You should be able to see
8      them on the screen, I think is what's going
9      to happen, Doctor.
10 BY MR. ROTOLO:
11 Q. Yeah. We are going to probably screenshare
12 them, Doctor.
13 A. Okay.
14 Q. Something I don't know how to do, and that's
15 why I have an assistant here sitting next to me,
16 much younger and more technologically sophisticated.
17     Doctor, we're showing you on the screen --
18     MR. ROTOLO: Can you rotate that?
19 Q. We're showing you on the screen photographs
20 of Ms. Guilbault's hair that were taken by a
21 dermatologist on the same day of this visit that we
22 just discussed, June 25th of 2015.
23     Does this presentation look like what you
24 remembered Ms. Guilbault's hair looking like when
25 you saw it?

Page 115
1  A. Yes, sir. That's what she looked like.
2  And, again, for the majority of the visits, she
3  always had the wig. And I didn't want to embarrass
4  her and, you know, look at the hair. I relied on
5  what she was telling me that, you know, there was an
6  issue.
7      I looked at it every once in a while, but
8  not -- I mean she would get a breast examination
9  every visit; I wouldn't check the scalp on every
10 visit.
11     MR. ROTOLO: Can you show the next picture
12     in Exhibit 17.
13 Q. Doctor, again, the same: Is that what you
14 remember her hair looking like?
15 A. Yes, sir.
16     MR. ROTOLO: Next picture, please.
17 Q. Same with that picture?
18 A. Yes, sir.
19 Q. Doctor, those were taken, just for the
20 record, on June 25th of 2015.
21 A. Yes.
22 Q. Does this hair presentation look like the
23 alopecia that resulted in you switching from
24 Taxotere to Taxol?
25 A. No. The --

Page 116
1      MS. REYNOLDS: Objection.
2      THE WITNESS: The one that made me switch,
3      the poor lady looked like she was still on
4      chemotherapy, and she was, like, three years
5      out. The pattern of alopecia you're showing
6      me here I've seen before. Sometimes it's
7      patchy, sometimes it's generalized. But
8      this is pretty much what I recall seeing of
9      Ms. Guilbault.
10 BY MR. ROTOLO:
11 Q. Doctor, could you turn to Tab 85?
12 A. Yes, sir.
13     MR. ROTOLO: And we're going to mark that as
14     Exhibit 18.
15     (Whereupon Exhibit No. 18 was marked for
16     identification.)
17 BY MR. ROTOLO:
18 Q. It's an office visit with you on
19 October 2nd, 2015.
20 A. Yes, sir.
21 Q. If you'll look at Bates Number page 1551.
22 A. That was the date that I looked at the
23 scalp, obviously.
24 Q. Okay. And you noted in your physical exam
25 she still has mild alopecia on her vertex?

Page 117
1  A. Yes.
2  Q. Can you describe to us what that -- what you
3  mean by that statement and what you're referring to
4  as the vertex?
5  A. Let's say the front part of the scalp.
6  Q. And can you explain to us what you meant by
7  "mild alopecia"?
8  A. Consistent with the pictures that you showed
9  me.
10 Q. Doctor, without going through a number of
11 other medical records, but you saw her on
12 February 1st of 2016, July 13th of 2016, and 11/16
13 of 2016, and it has that same description.
14     Would you have looked at her head every
15 time, or would that be just carried over from that
16 medical record?
17 A. It could have been carried over. I'm
18 telling you, I would look -- I'd -- I looked at her
19 scalp maybe once every six months or so. I didn't
20 want to embarrass her.
21 Q. Sure. And going back to the medical record
22 of -- that we're looking at now, the October 22nd,
23 2015, medical record where you indicated for the
24 first time that she still has mild alopecia on her
25 vertex, having made that documentation into the

Page 118

 1  record, would you have had a discussion with her
 2  with regard to the possible causes of that alopecia?
 3      A. I do --
 4         MS. REYNOLDS: Objection to form.
 5         THE WITNESS: -- not recall. But by that
 6      time -- we're looking at 2015 now -- it was,
 7      you know, common knowledge that you do get
 8      those based on the Docetaxel, the hair --
 9      lack of hair growth. So I suspect that I
10      had the discussion about the role of
11      Docetaxel.
12  BY MR. ROTOLO:
13      Q. Doctor, I'm trying to hurry to get through
14  this. I know you have a long day, probably.
15      A. No, it's okay. I'm used to it.
16      Q. So am I, but it doesn't make it any easier.
17         Can you turn to Tab 91.
18         MR. ROTOLO: And I will mark that as
19      Exhibit 19.
20         (Whereupon Exhibit No. 19 was marked for
21      identification.)
22         THE WITNESS: Yes, sir.
23  BY MR. ROTOLO:
24      Q. This is an office visit for July 18th of
25  2017.

Page 119

 1         And if you'll go to Bates Number page 1829.
 2      A. Yes, sir.
 3      Q. You indicate as Number 3, "Alopecia
 4  secondary to Docetaxel"?
 5      A. Yes, sir. I see that.
 6      Q. This is the date after which Ms. Guilbault
 7  had filed her lawsuit. Did she have a discussion
 8  with you on that date about her Docetaxel lawsuit?
 9      A. At some point she did mention that she had
10  joined a class action. Was it at the point of that
11  visit? I don't really know. But looking at my
12  physical exam, the wording is different. This isn't
13  something that was carried over. So I suspect that
14  I looked at her scalp that day.
15      Q. Okay. You'll notice, if you look at the
16  page before, on Bates Number page 1828 --
17      A. Yes.
18      Q. -- it now says, "Still has alopecia on her
19  vertex," rather than "the mild alopecia on her
20  vertex" you had indicated in your previous records.
21      A. Yes, sir.
22      Q. Do you know why there was a change there?
23      A. I probably dictated that note. And I -- you
24  know, I didn't quantitate the alopecia. I just
25  mentioned that she still has alopecia.

Page 120

 1      Q. Okay. Doctor, if you can turn to Tabb 99.
 2      A. Yes, sir.
 3      Q. This is an office visit on August 9th of
 4  2019.
 5         MR. ROTOLO: And I'll mark that as
 6      Exhibit 20.
 7         (Whereupon Exhibit No. 20 was marked for
 8      identification.)
 9  BY MR. ROTOLO:
10      Q. If you can turn to Bates Number page 3108.
11      A. Yes, sir.
12      Q. If you look at those, it indicates,
13  "Ms. Guilbault had a lot of questions about the
14  alopecia from Taxotere. Apparently, she's involved
15  in the class action, and her case will be heard in
16  court sometime in the next few months. She informed
17  me that I will most likely be deposed."
18      A. Yeah.
19      Q. Do you remember what questions she had for
20  you on that visit?
21      A. No. I do remember that -- you know,
22  obviously, with this visit she told me that there
23  was a chance I'm going to get deposed, and that's
24  why I documented that.
25         And, just looking at my exam, it says she

Page 121

 1  still has alopecia. So that was probably one of the
 2  days that I looked at the scalp; otherwise, I
 3  wouldn't have, you know, wrote that much about the
 4  alopecia.
 5      Q. Doctor, do you have a recollection of what
 6  Ms. Guilbault's hair looked like on August 5th of
 7  2020?
 8      A. No, sir. I don't even know when was the
 9  last time I actually looked at the hair. Is it --
10  was that the last time I saw her, August 2020?
11      Q. Yes. August 5th of 2020.
12      A. Yeah. No, I do not recall.
13      Q. Okay. Let me show you --
14      A. Okay. Personally, I wouldn't expect the
15  hair growth to look any different. You're talking
16  six, seven years after the chemotherapy. At that
17  point, whatever you're seeing is no longer
18  reversible. I don't expect that the hair will get
19  any better.
20      Q. And, Doctor, is that from any -- based on
21  any literature or any --
22      A. No. It's based -- you know, following these
23  patients over years. And, again, I would have told
24  her, if she had asked me that, I don't expect it to
25  get any better. I don't recall that she asked me

Page 146

1    Was that after the litigation and TV
2 advertisements started occurring?
3    A. Yes, sir. And, you know, when I say
4 campus-wide changes, I'm referring to the
5 New Orleans campus. I don't know what they do in
6 Baton Rouge or North Shore or the other Ochsner
7 facilities. There are three medical oncologists
8 that treat breast cancer at this campus, and we've
9 pretty much decided that we will switch from
10 Taxotere to Taxol.
11    Q. And that's you, Doctor, and is that
12 Dr. Larned?
13    A. Dr. Larned, Dr. Cole, and Dr. Xiao, who left
14 last week. So we're the ones seeing the majority of
15 the breast cancer here.
16    Q. Okay. And, Doctor, do I understand your
17 testimony that you testified that the only
18 alternative you would have considered and
19 recommended for Ms. Guilbault would have been to
20 substitute Docetaxel with Taxol; correct?
21    A. Yes, sir. It's not evidence-based, but this
22 is based on clinical judgment and based on studies
23 of the postoperative chemotherapy setting to show
24 that there was equivalency between the two.
25

Page 147

1    Q. Doctor, those studies that were done, were
2 those studies done before September of 2013?
3    A. Oh, yes. I'm talking about studies from the
4 '90s and early 2000s. So these are studies that are
5 at least 15, 20 years old.
6    Q. But, Doctor, were there some studies
7 specifically, like, in 20 -- 2006, that indicated
8 there was a difference in efficacy between Docetaxel
9 and Paclitaxel?
10    A. I think that was the stage 4 patients. In
11 the adjuvant setting, which is postoperative, there
12 was essentially -- there was a study that looked at
13 different doses of Taxol and Taxotere. They looked
14 at the weekly Taxol, weekly Taxotere; two, three
15 week Taxol; two, three week Taxotere. Basically,
16 there was no difference in the efficacy.
17    Q. Is that the Jones Study that you're
18 referring to?
19    A. I don't recall the name, but it's -- you
20 know, this is an old study from probably the late
21 1990s. It was a four-arm regimen.
22    Q. You testified when Ms. Perez was asking you
23 some questions that, typically, if there was an
24 issue with hair, you would order blood work and then
25 you would send the patient to a dermatologist.

Page 148

1    A. I typically -- I rarely order the blood work
2 myself. I tell them that, you know, this is a
3 primary care issue. Your primary care physician
4 should do that. If I were your primary care
5 physician, those are the things I would check.
6       Now, for the occasional patient who does not
7 have a primary care physician, I may have ordered
8 this myself just to facilitate the care. But I
9 don't want to be doing primary care in this clinic.
10    Q. Do you know if Ms. Guilbault had a primary
11 care physician?
12    A. I do not.
13    Q. And, Doctor, I just want to be clear because
14 you said something when Ms. Perez was questioning
15 you.
16       You said you were -- and we've talked about
17 this, but I just want to make sure I understand --
18 you said you were swayed to change from Docetaxel to
19 Paclitaxel by the one patient who had no hair; is
20 that correct?
21    A. Correct.
22    Q. And, Doctor, finally, you indicated that
23 your current -- after the TV ads and things, your
24 current warning that you give to patients that you
25 are giving Docetaxel to is that the risk of

Page 149

1 permanent hair loss is rare, but it happens; is that
2 correct?
3    A. Correct. And, again, there are still
4 certain cohorts of patients that using Taxotere is
5 the right thing to do, such as HER2 positive
6 patients, both in the pre and postoperative setting,
7 and no negative -- HER2 negative patients in the
8 postoperative setting.
9       So for those patients we still give
10 Docetaxel, but I tell them that, "Look, this is the
11 drug that you may have seen the advertisements on TV
12 about permanent hair loss, but I would still
13 recommend you take it." And if they refuse, that's
14 where I use the CMF regimen that I mentioned
15 earlier.
16    Q. And, Doctor, with regard to Ms. Guilbault
17 specifically, her treatment that consisted of
18 surgery, radiation, aromatase inhibitor therapy, and
19 a chemotherapy regime with AC plus Docetaxel, that
20 has resulted in her, at this date, being cancer
21 free?
22       MS. REYNOLDS: Object to form.
23 BY MR. ROTOLO:
24    Q. Or not having a recurrence of cancer?
25    A. Yes. I mean part of it is, obviously, the

Page 150

1  biology. Part of it is the treatment that she
2  received and the fact that she's still being
3  treated, even though she's more than five years out.
4      Honestly, if you had asked me six years ago
5  when I started the Anastrozole would I have thought
6  that she would be disease-free in 2020, I would tell
7  you she would have been more likely to have had a
8  recurrence by now. So she's done very, very well,
9  but I do not consider her being cured.
10  Q. Okay. Thank you, Doctor. That's all the
11  questions I have.
12      MS. REYNOLDS: Thank you very much.
13      THE WITNESS: You're welcome.
14      THE VIDEOGRAPHER: We are going off the
15      record at 4:58 p.m., and this concludes
16      today's testimony given by Dr. Theodossiou.
17      The total number of media units used was two
18      and will be retained by Veritext Legal
19      Solutions.
20      Thank you.
21
22      (Deposition adjourned at 4:58 p.m.)
23
24
25

Page 151

1      C E R T I F I C A T E
2
3      Certification is valid only for a transcript
4  accompanied by my original signature and
5  Original required seal on this page.
6
7      I, Noelle C. Krawiec, Certified Court
8  Reporter in and for the State of Louisiana, and
9  Registered Professional Reporter, as the officer
10  before whom this testimony was taken, do hereby
11  certify that CHRIS THEODOSSIOU, M.D., after having
12  been duly sworn by me upon authority of R.S.
13  37:2554, did testify as hereinbefore set forth in
14  the foregoing 146 pages; that this testimony was
15  reported by me in the stenotype reporting method,
16  was prepared and transcribed by me or under my
17  personal direction and supervision, and is a true
18  and correct transcript to the best of my ability and
19  understanding; that the transcript has been prepared
20  in compliance with transcript format guidelines
21  required by statute or by rules of the board, and
22  that I am informed about the complete arrangement,
23  financial or otherwise, with the person or entity
24  making arrangements for deposition services; that I
25  have acted in compliance with the prohibition on

Page 152

1  contractual relationships, as defined by Louisiana
2  Code of Civil Procedure Article 1434 and in rules
3  and advisory opinions of the board; that I have no
4  actual knowledge of any prohibited employment or
5  contractual relationship, direct or indirect,
6  between a court reporting firm and any party
7  litigant in this matter nor is there any such
8  relationship between myself and a party litigant in
9  this matter. I am not related to counsel or to the
10  parties herein, nor am I otherwise interested in the
11  outcome of this matter.
12
13
    This the 8th day of December, 2020.
14
15
16
17
18      _____
    NOELLE C. KRAWIEC, CCR
19
20
21
22
23
24
25