1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

IN RE:   TAXOTERE (DOCETAXEL)        *
5         PRODUCTS LIABILITY           *    Docket No.: 16-MD-2740
          LITIGATION                   *    Section "H(5)"
6                                      *    April 14, 2021
_This Document Relates To_:           *    New Orleans, Louisiana
7  _Emma Willie, Case No.:  18-CV-3857_  *
   * * * * * * * * * * * * * * * * * *

8          TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
9     HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
             UNITED STATES DISTRICT JUDGE
10

11  <u>APPEARANCES</u>:

12  For the Plaintiffs:          Bachus & Schanker, LLC
                                 BY:  DARIN L. SCHANKER, ESQ.
13                               1899 Wynkoop Street
                                 Suite 700
14                               Denver, Colorado 80202

15

16  For the Plaintiffs:          Gibbs Law Group, LLP
                                 BY:  ANDRE M. MURA, ESQ.
17                               6701 Center Drive West
                                 Suite 1400
18                               Los Angeles, California 90045

19

20  For the Sanofi
    Defendants:                  Irwin Fritchie Urquhart
21                                 & Moore, LLC
                                 BY:  DOUGLAS J. MOORE, ESQ.
22                               400 Poydras Street, Suite 2700
                                 New Orleans, Louisiana 70130

23

24

25

OFFICIAL  TRANSCRIPT

1    APPEARANCES:

2

3    For the Sanofi
     Defendants:                    Shook Hardy & Bcon, LLP
                                    BY:   HARLEY RATLIFF, ESQ.
4                                   2555 Grand Boulevard
                                    Kansas City, Missouri 64108
5

6
     Official Court Reporter:       Jodi Simcox, RMR, FCRR
7                                   500 Poydras Street
                                    Room B-406
8                                   New Orleans, Louisiana 70130
                                    (504) 589-7780
9

10   Proceedings recorded by mechanical stenography, transcript

11   produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         OFFICIAL   TRANSCRIPT

1                          <u>I N D E X</u>

2                                                          <u>Page</u>

3

ORAL ARGUMENT ON  RECORD DOC. 12202                    4

ORAL ARGUMENT ON RECORD DOC. 12201                    25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL  TRANSCRIPT

1          <u>**PROCEEDINGS**</u>

2          **(April 14, 2021)**

3                    **\*\*\*\*\*\*\***

4

5     (COURT CALLED TO ORDER)

6          **THE COURT:**  Court's in session.  Please be seated.

7               Mr. Moore.  Ready?

8               Erin, would you call the docket?

9          **THE DEPUTY CLERK:**  This is oral argument in MDL-2740.

10              Counsel, please make your appearance for the

11    record if you're arguing.

12         **MR. MOORE:**  Douglas Moore on behalf of Sanofi.

13         **MR. SCHANKER:**  Your Honor, I thought you said on

14    behalf of when you're arguing, and I wasn't arguing, but I'm

15    Darin Schanker on behalf of Ms. Willie as well as the MDL.

16         **THE COURT:**  Okay.  Please proceed.

17         **MR. MOORE:**  Thank you, Your Honor.

18              May it please the Court.  We are here on

19    Sanofi's motion for summary judgment on warnings causation in

20    the Emma Willie case.  And as I was reading some of the

21    paperwork, particularly the opposition, it seemed to me that

22    there was a presumption that the Court's framework that you

23    established when considering these sorts of motions in

24    Louisiana cases would automatically apply in Mississippi.

25              And given that this is a Mississippi plaintiff,

OFFICIAL  TRANSCRIPT

1   and this is the first time the Court is required to analyze

2   this issue under Mississippi law, we think the threshold issue

3   for the Court to determine is whether the framework that Your

4   Honor applied in Louisiana is one that would apply under

5   Mississippi law.

6               And so I don't want to belabor the point,

7   because I don't think it's dispositive.  I think we prevail

8   under however we analyze this issue, but there is some

9   jurisprudence in Mississippi that talks about what it means in

10  the learned intermediary doctrine to alter the doctor's

11  conduct.

12              And I put up here on the screen a quote from the

13  *Cross* case.  This was a case that involved Lexapro, which is an

14  SSRI.  And the plaintiff in that case committed suicide after

15  taking the medicine.  There was actually a suicidality warning

16  added two days after that person was prescribed the medicine.

17              And one of the arguments addressed in the case

18  was whether or not the labeling -- well, the learned

19  intermediary doctrine should consider whether or not the

20  different warning would have caused the doctor to give some

21  different information, some instructions to the plaintiff that

22  would have been -- prevented their injury.

23              And in that case, a judge in the Northern

24  District of Mississippi, you know, had to make an *Erie* guess to

25  what -- whether Mississippi law would extend the learned

```
 1   intermediary doctrine when talking about altering the doctor's
 2   conduct to something beyond the decision to prescribe or not
 3   prescribe.  And what the judge found was that there was no
 4   support for that in Mississippi law and confined the inquiry to
 5   whether or not the doctor would prescribe the medicine.
 6            And if you look at the plaintiff's opposition, they
 7   cite the same law that we do --
 8            THE COURT:  Right.
 9            MR. MOORE:  -- under Mississippi law.  And what it
10   talks about is whether an adequate warning would have prevented
11   the treating physician from administering the drug, not whether
12   something the plaintiff says would have prevented the doctor
13   from administering the drug.
14               So one of the things I think that Your Honor is
15   going to have to analyze is whether or not the framework of
16   considering the plaintiff's consent discussion and the change
17   there will fit under Mississippi --
18            THE COURT:  I guess -- you know, sometimes I feel
19   like I'm in -- is it -- and I read the deposition of Dr. --
20            MR. MOORE:  Patil.
21            THE COURT:  What's his name?
22            MR. MOORE:  Patil.
23            THE COURT:  -- Patil.
24               Thank you.  Too many doctors, too many names.
25               I read Dr. Patil's deposition carefully.  And he
```

OFFICIAL   TRANSCRIPT

1    talks about what he does in the chemotherapy context, and
2    that's what -- it's his prescribing decision.  And he said it's
3    made in consultation with my patients --
4              **MR. MOORE:**  Correct.
5              **THE COURT:**  -- but he ultimately has to prescribe.
6    And I think sometimes even -- I think sometimes in these cases
7    every time I feel like I'm explaining myself again, and I
8    think -- I think sometimes the plaintiffs continue to try to
9    write the doctor out of the equation, and he is absolutely
10   smack right in the middle of that equation.  You cannot write
11   him out, and I agree with you.
12              But even Dr. Patil was careful in saying, but,
13   you know, we have to have these conversations with the
14   plaintiff.
15             **MR. MOORE:**  That's right.
16             **THE COURT:**  And so I think -- I think you were
17   getting ready to say, "So, Judge, do not write the doctor out,"
18   and he has never been written out in any of these cases that I
19   have evaluated.
20             **MR. MOORE:**  Right.  And I'm not so much urging you
21   not to write the doctor out because I know that you have not.
22   What I'm suggesting is that it's going to require analysis of
23   Mississippi law as to whether you can write the plaintiff in.
24             **THE COURT:**  Right.
25             **MR. MOORE:**  And we think that the --

OFFICIAL  TRANSCRIPT

1          **THE COURT:**  But what do I do with Dr. Patil who says,

2     "I would not prescribe if she said -- if that was the

3     conversation we had"?  Now, I'm not saying that he said that in

4     this case.  He talked -- he spoke in generalities, and there

5     was lots of questions about how he generally faces these cases.

6     And then he spoke to Ms. Willie and what that conversation was

7     and what his concerns were, and then we went to Ms. Willie and

8     what her conversation was.

9          **MR. MOORE:**  So to answer your question, what do you

10     do with that?  Those are the facts.  Those are the facts of the

11     case that he provided in his testimony.

12          **THE COURT:**  Right.

13          **MR. MOORE:**  The question I'm asking is:  Is that the

14     law?  Is that the law in Mississippi to consider the

15     plaintiff's input into a discussion, in this case, a

16     hypothetical discussion?

17          **THE COURT:**  So it always -- is it always just an

18     objective standard and never subjectively --

19          **MR. MOORE:**  No.  No.  No.  No.  I think that's a

20     separate issue.  I think the question --

21          **THE COURT:**  Well, then what do we do with a doctor

22     that says -- if it's not objective and it's subjective and the

23     doctor says, "This is what I do, and it entails this"?

24          **MR. MOORE:**  I think that -- and there's some empty

25     pieces to what we're sort of discussing.  If that doctor says

1  that the risk benefit -- "My risk benefit decision for this
2  patient" --
3         **THE COURT:**  Right.
4         **MR. MOORE:**  -- "is unchanged by this new warnings
5  information and that this is still the medicine that I'm going
6  to prescribe for this patient, that's the judgment I make, that
7  is the decision I make," if Mississippi law does not allow the
8  inquiry to go beyond that, then the case is over.
9         But as I said before, even in this case, if
10  we're to look beyond the consent discussion, if we were to look
11  at the hypothetical situation of, "Well, had you been warned or
12  had you had a different consent discussion, and had the
13  plaintiff then asked for a different option, what would have
14  happened," I don't think this question is dispositive because I
15  think we win under the framework that the Court adopted in the
16  *Earnest* case as well.
17         The only point I wanted to make -- and I have up
18  here a slide from a Florida case -- is that the inquiry is not
19  going to be the same in every jurisdiction, and this was --
20         **THE COURT:**  Oh, right.  Right.
21         **MR. MOORE:**  Right.  And that was the point I wanted
22  to make.  And we think that there's some jurisprudence there
23  that supports --
24         **THE COURT:**  I guess what bothers me about it is when
25  I look at the Louisiana -- at the Mississippi law, whether the

1  warning would have prevented him from administering the drug.

2  And so then we have to look at, "What does it require for you

3  to administer that drug?"  Because he's saying I won't unless.

4       MR. MOORE:  I don't read his testimony that way.  I

5  think his testimony was in generalities.

6       THE COURT:  That was in general.  That was in

7  general.  And I will tell you, I think -- I guess -- I guess --

8  and perhaps we need to get with specifics as to Ms. Willie.

9  Because I think in generalities where I'm troubled, to be

10  honest, with your argument is Mississippi law vis-à-vis his

11  comments in general.

12            And then we get to what happened in this case

13  because I think Ms. Willie had some pretty stark comments to

14  make about what was important to her.

15       MR. MOORE:  Right.  Yes.  And I have those on the

16  slide.

17       THE COURT:  I don't need that on a slide.  I read

18  that.

19       MR. MOORE:  Okay.  All right.  I'll flip past it when

20  we get there.

21            But my point is that the question of whether or

22  not her -- every prescription is a recommendation.

23       THE COURT:  Right.

24       MR. MOORE:  And every doctor's going to say, "Yeah, I

25  can't make them take it.  It's their choice.  It's their

OFFICIAL  TRANSCRIPT

1   decision to proceed with treatment."

2           THE COURT:  Exactly.  And that's where I come out to

3   chemotherapy is different.  It is not like, are you getting

4   Bactrim or Amoxicillin?  You get your prescription and they

5   might say, "Are you allergic to penicillin?"  And if you say

6   no, "Okay.  This is what you're getting."

7           MR. MOORE:  And it's still just a recommendation, but

8   I understand -- I understand the Court's -- and we appreciate

9   your -- your struggle with this.

10          THE COURT:  Because you don't get an informed consent

11  when you walk out with a prescription with Amoxicillin.  You

12  don't have to sign an informed consent.  I mean, it's different

13  with chemotherapy.  And every oncologist said that.

14          MR. MOORE:  Right.  So I guess the first question

15  that we tried to pose in our papers -- and we focused more on

16  replies -- does Louisiana -- or does Mississippi even allow the

17  consideration of these other things in terms of the legal

18  framework in that state?

19          THE COURT:  Right.  Right.  Fair enough.

20          MR. MOORE:  But, again, as I indicated, I think we

21  prevail either way.  One of the points that we also wanted to

22  make is that we're not asking the Court to become the fact

23  finder here.  Our motion seeks to demonstrate that the evidence

24  that was obtained negates an essential element of their claim.

25                  And there's also an absence of evidence for an

OFFICIAL  TRANSCRIPT

1    essential element of their claim.  And so getting to the

2    testimony, this is Dr. Patil, Ms. Willie or Wylie (phonetic) --

3    I'm not sure if I'm pronouncing it right -- was diagnosed with

4    HER2 negative hormone receptor positive disease.  It was node

5    positive disease, and it was macroscopic, meaning --

6              **THE COURT:**  Right.  You could see it.

7              **MR. MOORE:**  -- you could see it without the necessary

8    microscope.

9              **THE COURT:**  I told you I read his deposition.

10             **MR. MOORE:**  And so as a consequence, Dr. Patil

11   recommended chemotherapy.  His testimony is -- whoops.  I got

12   ahead of myself -- that he reviews the NCCN guidelines for each

13   patient.  He follows the preferred regimens unless that patient

14   is medically unable to take any of the preferred regimens.  And

15   his preferred regimen for Ms. Willie was Taxotere and

16   cyclophosphamide in HER2 negative adjuvant chemotherapy.

17             And so when we talk about what were the options

18   that he would use -- these are the NCCN guidelines that are

19   attached an exhibit to our motion -- and there are basically

20   three of them:  Dose dense AC followed by taxol; dose dense AC

21   followed by weekly taxol, as opposed to every two weeks; and

22   then Taxotere and Cytoxan administered together.

23             And then these other regimens are regimens that

24   he said he would not use unless it was medically impossible to

25   use the preferred regimens with the patient.

1          And so what did he talk about in terms of

2     whether or not this warning would have changed his risk benefit

3     decision?  He testified twice very clearly that if she came in

4     today, same diagnosis, it would be the same.  And he was even

5     asked more pointedly:  "Even with all the information today

6     about all of the other therapies, risks, and benefits, TC

7     remains your recommendation?"

8          And so in the -- oh.  And so we also asked the

9     question, "Well, what about the other options?  The other

10    options of the preferred regimen?"  He indicated that he would

11    not prescribe those unless he sent her for a cardiac

12    evaluation.  And, of course, he said if she hadn't passed the

13    cardiac evaluation, he would not give the medicine.  So there's

14    a gap --

15          **THE COURT:**  Right.  Right.

16          **MR. MOORE:**  -- in the testimony that would be

17    necessary to establish the framework that the Court has

18    established.

19          Now, in the opposition, they make this what we

20    refer to as sort of a sweeping statement, that if Ms. Willie

21    had been informed of the risk of permanent alopecia, she would

22    have chosen another chemotherapy regimen with a lower risk.

23    Her desire to survive and to avoid potentially disfiguring side

24    effects were not mutually exclusive.  And they cite the

25    deposition pages there.

OFFICIAL  TRANSCRIPT

1                    I thought it would be useful to actually look at

2     the testimony.  The question that was posed was:  "Are you

3     pleased with the treatment that you received from your

4     doctors?"  And she made a statement in the middle.  It's almost

5     like, "Well, of course.  You know, if I could have taken

6     something that wouldn't have taken my hair out and saved me, I

7     would have preferred that," because she has the benefit of

8     hindsight.

9                    She's not asked what this other regimen would

10    be, what the side effects of that other regimen are, and

11    whether she would go forward with that having a new consent

12    discussion at that time comparing risks, not comparing

13    outcomes.

14                    And it's the same thing in the other testimony.

15    The other citation was basically the same question, and she

16    gave the answer basically the same, which is, "Looking back, if

17    I could have had something that didn't do this, then I would

18    have rather had that."

19                    But that's not establishing testimony that meets

20    the requirements of her being able to say, "This is the other

21    regimen that I would have been offered" -- because Dr. Patil

22    never says that -- "and this is the side effects of that

23    regimen, and I would have taken it."

24                    And so we asked her the question.  I think this

25    is the part you were referring to where she says, "I wouldn't

1    take it.  I wouldn't take the Adriamycin because of the cardiac

2    risks.  I would just lose -- I would take the one with the hair

3    loss risk because at least I'll be alive."

4              And so when we look at the framework that Your

5    Honor has developed, there are significant parts missing.  You

6    know, there's no testimony that the plaintiff would have

7    underdone the cardiac testing, that she would have passed the

8    cardiac testing, that Dr. Patil would have prescribed

9    Adriamycin and cyclophosphamide if she passed the testing, or

10   that plaintiff would have even agreed to take it.  She

11   testified that she wouldn't.

12             And there's no testimony about any other

13   chemotherapy regimens.  He said he wouldn't -- he doesn't use

14   those.  And so at the end of the day, there's no testimony also

15   from Ms. Willie that she would have used this other unknown

16   chemotherapy regimen.

17             And so we think for those reasons, they have

18   failed to come forward with evidence under the Court's

19   framework.

20             And I'll just say very briefly on the last point

21   that was made, there was some suggestion in the opposition that

22   under Mississippi law there can be the evaluation of objective

23   evidence.  And we go into great lengths in our reply memo to

24   explain why we don't think that's a correct statement of

25   Mississippi law.  But even if it is, they haven't produced what

1  this countervailing objective evidence is, whoever will come in

2  and say, "Ignore what Dr. Patil said.  This is what he would

3  have done with this different information."

4            And there's no case in Mississippi that actually

5  allow -- has actually allowed the introduction of objective

6  evidence to overcome the subjective and precise testimony of

7  the treating doctor.

8            So we -- and we think that the fact that they

9  pivoted there is sort of an admission that they don't have the

10  testimony from Dr. Patil and from the plaintiff to establish a

11  material issue of fact.  And this was a framework that Your

12  Honor established quite a while ago.  This deposition was taken

13  after that, and so the time to ask the questions and get the

14  testimony was then.  And it's at this point, to come forward

15  with it, and they haven't.  So we ask that the case be

16  dismissed.

17            **THE COURT:**  Thank you.

18            Mr. Schanker.

19       **MR. SCHANKER:**  Good afternoon, Your Honor.

20            Obviously, at this point in time, we're clear

21  that a recommendation by a doctor is much different than the

22  actual prescription, and so the analysis in this case focuses

23  on that.  Because we know that Dr. Patil makes clear, he is not

24  going to force Ms. Willie to take a particular treatment

25  regimen.

1       As you've made clear, your interpretation, which

2   is supported by Fifth Circuit as well as Mississippi law, it's

3   that joint decision.  We are in no way -- we are in no way

4   trying to write the doctor out of the equation in this.

5       But I think the record is clear that when you

6   take into account the doctor, Dr. Patil, and what was

7   established in his deposition, as well as what was established

8   in the deposition of Ms. Willie, in the light most favorable to

9   the plaintiff, that learned intermediary --

10      **THE COURT:**  You know what, I have to tell you,

11  Mr. Schanker, when I read -- I read Dr. Patil's deposition

12  carefully.  And I think Mr. Moore and I kind of got on this

13  tangent about what he says generally how he handles his

14  chemotherapy conversations with his plaintiffs and that, you

15  know, at the end of the day, he has to get buy-in from them

16  because they have to understand.  So he says that.

17      And he says, "In these cases, this is my choice,

18  TC regimen."  Then he said, "And my other option is Adriamycin

19  with taxol.  It's not my favorite.  Not what I like.  I think

20  the risk for cardiac disease are too significant.  Before I

21  would even consider it, she would do an echocardiogram and all

22  of these things that I have concerns about."  And he said, "So

23  that's not what I would do.  That's not what I would do."

24      And then you read Ms. Willie's deposition and

25  she's pretty clear, "Given the choice, I'm choosing life."  And

1   she trusted Dr. Patil.  She was going to do what he

2   recommended.  And he was -- I thought he was -- I'll be honest

3   with you, I thought he was a little wishy washy about whether

4   or not his conversation would change much at all with the new

5   warning, and that he would give AC if it was something, but it

6   would almost have to be just --

7                  I guess, I'm not -- I didn't read Ms. Willie as

8   saying much at all except that, "Yeah, you know, if I could do

9   it and I thought they were -- if he told me they were equal, I

10  guess I would do that."  But he doesn't say they're equal at

11  all.

12                 And so what do I do with that when we have to

13  reconstruct that conversation with new information that she

14  didn't have at the time and he's saying, "I might say

15  something, but it's really not a focus of my conversation, and

16  I will not change any recommendation one iota"?

17         MR. SCHANKER:  Certainly.  And, Your Honor, I think

18  obviously when we're reconstructing this because Dr. Patil

19  didn't know.

20         THE COURT:  Right.

21         MR. SCHANKER:  And so there's always going to be --

22  it's not ever going to be absolute black-and-white under that

23  situation because he didn't know at the time, and he's looking

24  back five years, four years at the time of this deposition.

25                 But he is specifically asked, as you recall, and

OFFICIAL  TRANSCRIPT

1    you read Dr. Patil's deposition:  "And would you have warned

2    the plaintiff that Taxotere or docetaxel was associated with

3    the risk of permanent hair loss if you would have known?"  He

4    responds:  "I would tell the patient that there was a risk of

5    permanent alopecia going on forward."  So he does say that he

6    would advise the patient of that.  So he would certainly pass

7    that on.

8                    And Dr. Patil --

9         **THE COURT:**  You know what's interesting, though, he

10   still doesn't do it.  Even though now he knows, he says he

11   doesn't.

12        **MR. SCHANKER:**  Right.  And --

13        **THE COURT:**  So.

14        **MR. SCHANKER:**  But he says he -- I mean, again,

15   looking at the light most favorable to the plaintiff and what

16   the black-and-white of the record says, he says he would have

17   passed that information on.

18                He then says that -- he clearly indicates that

19   he appreciates that the patients make the ultimate decision.

20   He's crystal clear on that.  As you know, in the deposition, he

21   said, "They all have choices."  He's referring to the patient.

22   "They make the choice of getting the treatment and the options

23   of treatment.  They make all the choices."  So your joint

24   decision is acknowledged by Dr. Patil.

25                And he indicates that his preference for the TC,

1   that what he -- with regard to the Adriamycin and testing that

2   may need to be done for that.  And obviously Ms. Willie hasn't

3   been put through that testing at this point in time in order to

4   establish.

5         And the reality of why we don't have any of that

6   information is obviously because Dr. Patil wasn't informed

7   about it.  So we don't know exactly what he would have done.

8   What we have is what he says he would have done, and we have

9   what Ms. Willie says when asked specifically about what she

10   would do with this information.

11         And as Mr. Moore put up on the screen, and I'll

12   read it again, Ms. Willie says:  "If I had" -- "if it had been

13   some other type of treatment that wouldn't have taken my hair

14   or whatever, you know, I probably would have gone with that or

15   whatever."

16         Now, taken in the light most favorable to the

17   plaintiff, she's indicating at that point that when she's

18   trying to look back what would she have done.  And, again,

19   it's -- I think a false choice is being put before her of her

20   hair or her life.  And that's not what this is because there

21   are other options that are available as you are aware,

22   Your Honor.

23        **THE COURT:**  But Dr. Patil only said he considered

24   two.

25        **MR. SCHANKER:**  He only considered two, but that --

1          THE COURT:  But that's her treating -- that's her

2     prescribing physician.  So he wasn't going to give her a list

3     of ten.

4          MR. SCHANKER:  Now, just to be clear, I don't believe

5     that the record is slam dunk at all, Your Honor, that those are

6     the only two options in the world of treatment that Dr. Patil

7     would have considered.  If a more robust conversation is being

8     had at this point in time, I don't believe that Dr. Patil's

9     record forecloses any of the other options on the NCCN

10    guidelines.

11          And there are other options that aside -- that

12    do not contain the anthracycline, the Adriamycin in particular.

13    And so there are other options available that are on the NCCN

14    guidelines.  And we get into this issue of subjective versus

15    objective.

16          THE COURT:  But, you see, that's where -- that's

17    what's bothering me because I think now you're entering into

18    objective, "Well, this is what he could have done."  But he

19    never says -- he says, "I go to this."  And he said, in his

20    mind, there were two options.  And he recommended the Taxotere

21    option, clearly.  And then he said, "My other option would have

22    been Adriamycin."  But he doesn't extend beyond that that I

23    read in his deposition, and maybe I'm missing it.

24          MR. SCHANKER:  Well, I'm happy to engage on that

25    further as far as Dr. Patil.

OFFICIAL  TRANSCRIPT

1              Just to the point, when we talked about

2    objective versus subjective.  On that issue, Your Honor,

3    Mr. Moore indicated that the train had left the station with

4    regard to objective information coming in.  And from our

5    standpoint, Your Honor, this is an early motion with regard to

6    Willie.

7              Obviously, by that I mean, you understand that

8    expert designations have not been put forth or exchanged by the

9    parties in this case.  And Dr. Bosserman presumably will be the

10   expert oncologist that --

11        **THE COURT:**  But the only people in the room were

12   Ms. Willie and Dr. Patil -- well, and her husband and her

13   sister.

14        **MR. SCHANKER:**  Sure.

15        **THE COURT:**  But Dr. Patil and Ms. Willie, the

16   decision makers, were in the room.

17        **MR. SCHANKER:**  With regard to the subjective --

18   subjective standard.

19        **THE COURT:**  Are you telling me there's an objective

20   standard that some other doctor -- we allow some other doctor

21   to say what would have happened in that room?

22        **MR. SCHANKER:**  Well, yes, as a matter of fact, I

23   believe that Mississippi law does allow for an objective

24   standard.  I don't think we have to go there, but if we do, I

25   think that, you know, that opportunity will be provided and

1   that information will be provided to the Court in the form of

2   the other options that are available to her.  But I don't think

3   we even need to go there.

4                From a subjective standpoint, I think that

5   Dr. Patil indicating that even if we stick with the taxol

6   regimen, okay, now, we don't know exactly what would have

7   happened.  We don't know for sure if she would have ended up

8   making that choice with regard to taxol.  But all that was

9   taken away from her because the warning didn't come and

10  Dr. Patil didn't have that conversation.

11               And so to shift the burden -- because defendants

12  failed to warn in this case, to shift the burden and say that,

13  therefore, somehow they're excused because Adriamycin, the

14  anthracycline in this case, may cause some condition.  And we

15  don't know exactly what would have happened and whether she

16  would have taken it or not.  The record indicates that Patil

17  would have discussed that option -- the doctor would have

18  discussed that option with Willie and Willie certainly would

19  have considered that option.

20               And if her determination was at that point in

21  time, and if that's the information that the jury receives and

22  decides, that she certainly would have made a different

23  decision, then what we have here is, indeed, that failure to

24  warn leads to this, and that she'd be here alive today with her

25  hair.

1          THE COURT:  Okay.

2          MR. SCHANKER:  Any other questions, Your Honor?

3          THE COURT:  No.

4          MR. SCHANKER:  Thank you.

5          THE COURT:  Thank you, Mr. Schanker.

6               Mr. Moore, any rebuttal?

7          MR. MOORE:  Very briefly, Your Honor.

8               So I heard -- I heard Mr. Schanker say a couple

9     of times, "We don't know what Dr. Patil would have done or what

10    the plaintiff would have done."  That's in many ways the point

11    of our motion.  Because it's their responsibility when we

12    demonstrate a lack of evidence to come forward with evidence.

13    And, "I don't know, we don't know," is not creating a material

14    issue of fact.

15               And I think that in terms of the relevance of

16    Dr. Bosserman, the only other thing I would add to that is,

17    who's going to be the expert for -- to take the place of

18    Ms. Willie's testimony?  Because her testimony ends with, "I

19    would have just taken the one that gives me the risk of hair

20    loss."

21               If you look at those other regimens in the NCCN

22    guidelines, all of them have either Adriamycin, or epirubicin,

23    which is another anthracycline that also has cardiac risks.

24    The only one that doesn't is CMF, which has lower efficacy.

25    But where is the testimony that she would have taken one that's

OFFICIAL   TRANSCRIPT

1    not going to give her the same chance to live?  It's just not

2    there.  And "we don't know" doesn't create an issue of fact,

3    and so for that reason, Your Honor, we'd ask that the motion be

4    granted.

5                 THE COURT:  Thank you.

6                              *  *  *  *  *

7                              *  *  *  *  *

8                 MR. COFFIN:  Your Honor, before we get started, is

9    Mr. Mura on?

10                THE DEPUTY CLERK:  He is.

11                MR. COFFIN:  There he is.

12                THE COURT:  There he is.

13                MR. MURA:  Good morning -- or good afternoon.

14                THE COURT:  Good afternoon.

15                Okay.  We're now going to take up the motion for

16   summary judgment.

17                What's the docket number?

18                THE DEPUTY CLERK:  12201.

19                THE COURT:  Okay.  Thank you.

20                MR. RATLIFF:  Your Honor, Harley Ratliff on behalf of

21   Sanofi.

22                I don't know, Erin, if you'd like Mr. Mura to

23   enter his appearance now as well before I get started.

24                THE COURT:  Mr. Mura?

25                THE DEPUTY CLERK:  Counsel, you can make your

OFFICIAL  TRANSCRIPT

| | |
|---|---|
| 1 | appearance for the record.  I think you're still on mute. |
| 2 | **MR. MURA:**  My apologies.  Andre Mura for the |
| 3 | plaintiffs. |
| 4 | **THE COURT:**  Thank you. |
| 5 | **MR. RATLIFF:**  All right.  Good afternoon, Your Honor. |
| 6 | Harley Ratliff on behalf of Sanofi.  We're here on Sanofi's |
| 7 | motion for summary judgments as it relates to judicial estoppel |
| 8 | in the Willie case. |
| 9 | As Your Honor's probably aware, in the Fifth |
| 10 | Circuit, there's a very clear framework for how to determine |
| 11 | how to analyze judicial estoppel.  It's a three-prong process: |
| 12 | One, did the plaintiff or debtor in this case |
| 13 | take a plainly inconsistent position in the bankruptcy court |
| 14 | and prosecuting this case; |
| 15 | Two, did the bankruptcy court accept the prior |
| 16 | position; |
| 17 | And, three, did the party act inadvertently. |
| 18 | And, Your Honor, one, we believe all three of |
| 19 | these prongs are clearly met in this case.  And I think also |
| 20 | what is important is that every Fifth Circuit decision to take |
| 21 | up cases like this, not just cases that are analogous, Your |
| 22 | Honor, but cases that are nearly identical to this case in |
| 23 | terms of the fact pattern, in each one of those cases -- cases |
| 24 | cited by Sanofi, cases cited by the plaintiff -- every single |
| 25 | time, whether it's Chapter 7 or Chapter 13, the Fifth Circuit |

OFFICIAL   TRANSCRIPT

1  has found that the plaintiff's claims are judicially estopped.

2  Every single one of those cases.

3          THE COURT:  What about -- is Ms. Willie able to

4  convert her bankruptcy from a Chapter 13 to a Chapter 7 and

5  then allow the trustee to substitute?

6          MR. RATLIFF:  I apologize, Your Honor, did you say,

7  is she allowed to convert from a Chapter 13 to a Chapter 7?

8          THE COURT:  Yes, and then allow the trustee --

9          MR. RATLIFF:  So, Your Honor, yeah, to take that up.

10  One, in a Chapter 13, the trustee cannot come in.

11          THE COURT:  Right.

12          MR. RATLIFF:  So that is -- that is something that

13  the plaintiff's assert, but that is not accurate.

14          THE COURT:  No, but I'm talking about conversion.

15          MR. RATLIFF:  So one option that courts have done in

16  the Eastern District of Louisiana and in the Western District

17  of Louisiana -- I believe it's cited at the very tail end of

18  our reply brief -- is they have dismissed the case without

19  prejudice, sent it back to make a determination if the trustee

20  and if the plaintiff want to try to convert from a Chapter 13

21  to a Chapter 7, allow the trustee to then proceed in that

22  format.

23          There are two issues there that I would raise

24  there, Your Honor.  One, that does not alter whether

25  Ms. Willie's claims are judicially estopped.  That would just

OFFICIAL  TRANSCRIPT

1    allow the innocent trustee to pursue them on behalf of the
2    creditors.  So that would still leave the consideration of what
3    happens if there was a recovery to the surplus monies that
4    might be recovered in that instance.  Ms. Willie certainly
5    would not be the beneficiary of that under the judicial
6    estoppel rule.

7              I think the other element, Your Honor, to
8    consider there is Chapter 7 and Chapter 13 are very different.
9    Chapter 13 is a reorganization and a repayment of your debts.
10   Chapter 7 is a liquidation of your property to satisfy those
11   debts.  So that would have to be a determination if that's
12   something that Ms. Willie would want to do and whether she
13   would be willing to take on a liquidation of her property for a
14   claim to which has been judicially estopped as to her for the
15   innocent trustee to pursue the $12,000 on behalf of the
16   unsecured creditors whose claims were discharged.

17             It's a long-winded way of saying, yes, that
18   could happen, but it doesn't change the fact that Ms. Willie is
19   judicially estopped.  And it doesn't change the fact that the
20   Chapter 7 bankruptcy is a fundamentally different apparatus
21   that would have different consequences for that particular
22   plaintiff.

23             So, getting back to the three prongs.  One, Your
24   Honor, prong No. 1 is clearly met.  She did not disclose the
25   bankruptcy.  She continued to file this particular lawsuit.

1    That's not challenged by the plaintiffs.  She has an ongoing
2    and continuous duty to make that disclosure.
3                    Two, the bankruptcy court clearly adopted her
4    statements that she had no contingent claim.  They set up a
5    bankruptcy plan.  They discharged the unsecured creditors, the
6    debts.
7                    And, three, they ultimately closed the
8    bankruptcy without her ever once disclosing that she had this
9    contingent asset.
10                   Now, the plaintiffs do make some speculation in
11   their opposition that maybe this really wouldn't have mattered
12   to the bankruptcy court.  Your Honor, that's nothing more than
13   speculation because, at the same time, they also say this case
14   is very important to the creditors.  So the facts are what they
15   are.  There was no disclosure, and the bankruptcy proceeded as
16   is.
17                   And I think the time line here is important,
18   Your Honor.  So she files the bankruptcy in 2013.  In 2016, she
19   meets with her attorneys.  In 2018, she files this lawsuit.  In
20   2019, the bankruptcy debt is discharged and the case is closed.
21   At no point is this case, this Taxotere case, ever disclosed to
22   the bankruptcy.
23                   January of 2020, Ms.  Willie is nominated as a
24   bellwether plaintiff.  Shortly thereafter, we raise the issue
25   of the bankruptcy with plaintiff's counsel, with the

1  Plaintiffs' Steering Committee.  Three months later, they open

2  up the bankruptcy and they say, we have discovered this

3  contingent asset.

4           One thing I want to point out there because

5  there's two important parts.  One, the bankruptcy was only

6  reopened after we raised the concern, and that's something

7  that's material in terms of what the Fifth Circuit has said.

8           Two, the reopening of the bankruptcy is

9  irrelevant.  The Fifth Circuit says you cannot get around

10 judicial estoppel by simply, when challenged on your failure to

11 disclose, coming back in and opening up the bankruptcy.  That

12 won't solve your problem because, otherwise, the incentive

13 would be, never disclose until challenged.

14           Finally, Your Honor, the third prong,

15 nondisclosure was not inadvertent.  One, did the plaintiff lack

16 knowledge of the undisclosed claims?  Clearly, that's not the

17 case here.  Ms. Willie was aware of her claims.  She had filed

18 this lawsuit in 2018 during the pendency of her bankruptcy.

19           Plaintiffs make a number of arguments that have

20 been rejected time and time again by the Fifth Circuit.  She

21 didn't realize that she had a duty to disclose; irrelevant.

22 She relied on her attorneys; irrelevant.  She's not

23 sophisticated or a sophisticated litigant.  The Fifth Circuit

24 has said, irrelevant.  All she needs to know is did she know

25 the basis of her claims.  Clearly, she did.

1    Finally, did she have a motive for concealment?
2  The plaintiffs say she had no motive.  But in the Fifth
3  Circuit, Your Honor, they have said that it's self-evident --
4  motivation is self-evident when there's a financial benefit
5  resulting from the nondisclosure.  Clearly, there was here, to
6  the tune of $12,000.
7    In fact, the Fifth Circuit in *Jethroe versus*
8  *Omnova*, in a case that involved far less money -- the only
9  thing involved was $7,000 -- said that $7,000 that was
10  discharged as to the unsecured creditors satisfies the
11  motivation element.
12    So prong one, prong two, prong three, they are
13  all met in this case.
14    So what are plaintiff's arguments?  Well, we've
15  talked about the first one, that she was unaware of her
16  statutory obligations.  That is inconsequential.  They say
17  plaintiff would receive no windfall, but Sanofi would.  I would
18  like to address those in order, Your Honor.
19    The windfall analysis as it relates to
20  Ms. Willie, the debtor, the plaintiff, takes place at the time
21  she fails to make the disclosure.  So back in 2018, when she
22  failed to make that disclosure and those debts were discharged,
23  that's when the windfall analysis happens to her.  It doesn't
24  happen right now.
25    Two, as it relates to Sanofi, would they get

OFFICIAL   TRANSCRIPT

 1   some sort of benefit out of that?  Your Honor, judicial
 2   estoppel is designed to protect the integrity of the legal
 3   system, not the litigants.  Sanofi need not show that they
 4   relied on any sort of detriment or that they got some sort of
 5   unjust benefit from that.  Otherwise, judicial estoppel simply
 6   would have no bearing.
 7            Now, plaintiffs cite a case called *In re:*
 8   *Flugence* to suggest that the windfall analysis as it relates to
 9   Sanofi somehow is important.  I would encourage Your Honor to
10   read that case because that was a decision that was taken up
11   only on a very discrete issue as to whether the trustee could
12   pursue more than just the discharged amounts.
13            And the Fifth Circuit said, yes, of course, you
14   can pursue more than just the discharged amounts, and did
15   mention something about windfall, but there was certainly no
16   blanket that Sanofi, or a company in Sanofi's position, just
17   because some benefit would inure to them that judicial estoppel
18   is somehow inappropriate.
19            Finally, Your Honor, and I think we already
20   talked on this, so I'll try and move through it very quickly,
21   which is they say, one, Ms. Willie can basically, as a
22   Chapter 13 bankruptcy, she can be the innocent trustee herself.
23   Incorrect, Your Honor.  Incorrect.  That exact issue was taken
24   up in *Love* by the Fifth Circuit, and they say that a dishonest
25   debtor cannot serve as an innocent trustee.

1        In which case, they also say that she could --
2  the trustee could substitute in, in a Chapter 13 bankruptcy.
3  That's also incorrect, Your Honor.  That was a decision that
4  was taken up by the Eastern District in a case called *Lymon*.
5  They looked at it and said that that was beyond the
6  congressional authority of a Chapter 13 trustee and only a
7  Chapter 7 could address that.
8        The case that they cite also *In re:  Flugence*
9  did involve a Chapter 13 trustee, but that issue of whether a
10 Chapter 13 trustee could substitute in to a judicially estopped
11 case was not an issue taken up before the Fifth Circuit,
12 something that the Eastern District made clear in their
13 decision in *Lymon*.
14       So, Your Honor, for all of those reasons, we
15 have clearly met the prongs for judicial estoppel.  We believe
16 Ms. Willie's case should be estopped.  Obviously, it's an
17 equitable remedy, so Your Honor can craft whatever remedy you
18 feel like is appropriate.  But as to Ms. Willie, her claims
19 cannot go forward in her individual capacity.
20       Thank you, Your Honor.
21     **THE COURT:**  Thank you.
22       Mr. Mura.
23     **MR. MURA:**  Thank you, Your Honor.
24       Let me start with where Mr. Ratliff started,
25 which was discussing the purposes and the considerations that

OFFICIAL   TRANSCRIPT

1   underlies judicial estoppel.  You heard one of them, which was
2   to deter dishonest debtors whose failure to honestly disclose
3   all of their assets undermines the integrity of the bankruptcy
4   system.
5           I'll explain why that hasn't happened here, but
6   let me first say that there's another critically important core
7   value of judicial estoppel, and that's protecting the rights of
8   creditors to an equitable distribution of the assets of the
9   debtor's estate.  And that's why courts say that you just don't
10  have a rote application of the three elements of judicial
11  estoppel.  It's a flexible doctrine that must be applied to
12  achieve substantial justice.
13          And so here in *In re: Flugence* and *Love* and the
14  other courts do consider whether the creditors would be harmed
15  by a particular application of judicial estoppel, and that's
16  precisely what would happen here.  The bankruptcy has been
17  reopened.  I'll get to the authority of the Chapter 13 trustee,
18  but the bankruptcy judge himself reopened and understood that
19  the asset in question is an asset related to a lawsuit that was
20  not disclosed.
21          And so if the bankruptcy court and the trustee
22  thought it was not possible for them to act in Chapter 13 to
23  liquidate the claim, then all of those actions -- they would
24  not have taken those actions.  So it's quite obvious that
25  there's a disagreement within the bankruptcy system itself

OFFICIAL  TRANSCRIPT

1    about what actions the Chapter 13 trustee can undertake.

2              They have appointed counsel to liquidate the

3    claims.  They filed a notice of interest.  Mr. Ratliff did not

4    mention any of that.  But all of that is evidence of how the

5    bankruptcy courts are seeing that, and that's not consistent

6    with Chapter 13.  There was a post-petition undisclosed claim

7    here.  It's an asset of the estate under Section 1306, which is

8    very broadly worded.

9              The trustee has the right to liquidate that

10   claim.  It does not have to become a party in interest to

11   liquidate the claim.  The assets can be liquidated.  The asset

12   was unknown to the trustee, so it could not have revested

13   Ms. Willie under her confirmation plan.

14             And, in fact, the confirmation plan, I believe,

15   preceded some of this, you know, even Ms. Willie's knowledge of

16   her claim and the time in which she filed her lawsuit.  And so

17   Section 350 does allow the reopening and the taking of the

18   asset by the trustee.  And, again, if the trustee wasn't in her

19   right to do all this, I don't believe Judge Woodard, the

20   bankruptcy judge, would have allowed her to do exactly that.

21             And there was a discussion before -- I know

22   Sanofi has taken the position that in Chapter 7, the trustee

23   can come in and stand in the shoes, but under Chapter 13, the

24   trustee cannot.  I did want to point you to their case *In re:*

25   *Lymon*, and I would ask that you read Footnote 5 of that case,

1    Your Honor.  I'll just read the first sentence.

2                  It says:  "Two bankruptcy courts in this circuit

3    have interpreted the Fifth Circuit's opinion in *In re: Flugence*

4    to hold that Chapter 13 trustees may stand in the shoes of a

5    dishonest debtor, control property of the estate, and reduce

6    money property of the estate just as a Chapter 7 trustee is

7    statutorily authorized to do."

8                  So *Lymon* is recognizing that there are some

9    bankruptcy decisions out there that have recognized that the

10   trustee can do this under Chapter 13 based on *In re: Flugence*,

11   which was a Chapter 13 case.

12                 And so those courts felt that they were bound by

13   the Fifth Circuit's interpretation of Chapter 13.  So there is

14   a disagreement in the case law.  It's not correct.  We think

15   that the *Roberts* court and the *Aycock* court, which are

16   referenced in that footnote, are correct.  *Lymon* obviously

17   disagreed.

18                 We don't think you have to go that far and

19   decide that the trustee can stand in the shoes because here all

20   the trustee would be doing was if there is a recovery, then the

21   trustee would be allowed to liquidate that claim and send the

22   money to the creditors, consistent with Chapter 13 duties that

23   exist.

24                 I want to pause there, Your Honor, and see if

25   you have any questions.  If not, I do want to address the

OFFICIAL   TRANSCRIPT

1   question of whether Ms. Willie herself is a dishonest debtor

2   who should be equitably estopped from receiving any surplus

3   from the claim.

4           **THE COURT:**  Mr. Mura, what are you asking me to do

5   with this case?  To have the trustee appointed to handle

6   Ms. Willie's claim?  To just allow Ms. Willie to proceed?  What

7   are you asking of this Court?

8           **MR. MURA:**  What we're asking of this Court is that

9   the Court not -- postpone its decision about whether Ms. Willie

10  should be estopped, allow Ms. Willie to proceed with her claim.

11  If Ms. Willie obtains a recovery against Sanofi, then

12  Ms. Willie -- Ms. Willie's creditors can be paid, and they can

13  likely be made whole, which is very important.  They can be

14  paid in full on the debt.

15          The trustee has already -- you know, the

16  bankruptcy proceeding has been reopened.  The trustee would

17  have the authority to liquidate that claim.  I don't think

18  there's any question about that, especially since Judge Woodard

19  allowed the bankruptcy proceeding to be reopened precisely for

20  that.

21          And so at that point, let's say -- let's say

22  Ms. Willie recovers -- I'll just make up some numbers for easy

23  math, but let's say she recovers $100,000 in a judgment and her

24  debt is $50,000.  And so the question then would be:  Is she

25  entitled to the surplus of $50,000?  And we think at that

1  point, the Court could engage in a judicial estoppel analysis
2  as to her.
3              Right now, it's premature and unnecessary to
4  engage in that analysis.  And, in fact, some of the Fifth
5  Circuit cases recognize that if you engage in that analysis
6  early, then you may take away any incentive that the litigant
7  might have to pursue the claim on behalf of the creditors.  And
8  we've cited some cases along those lines.
9       **THE COURT:**  But why -- but how is this different from
10 the prior case, *Kinderdine*, that we had?  How is this
11 different?
12      **MR. MURA:**  I think the main difference there is
13 partly the statutory difference between Chapter 7 and the way
14 in which the Court there allowed the trustee to step inside the
15 shoes.  And so that's why I mentioned that there are two cases
16 out there that do recognize that under Chapter 13, the trustee
17 can do that.  So that would be one avenue available, we think,
18 under both those cases.
19             Obviously, *Lymon* disagrees, but there are other
20 courts that do agree with our position on that.  But, you know,
21 the other avenue is simply to postpone a decision on judicial
22 estoppel and to allow her to pursue the claim, recognizing that
23 the bankruptcy proceedings have already been reopened.  There
24 has been -- you know, there would be an entitlement.  The
25 trustee would be able to liquidate that asset if there is a

1    recovery.

2            And we cite *Love v. Tyson*.  And other cases

3    recognize that if the district court rules on judicial

4    estoppel, it could essentially remove the incentive of the

5    plaintiff, which is why we're asking the Court, you know, to

6    postpone a decision on that.

7            And then I would like to say a few words about

8    whether, you know, ultimately, she should be estopped because

9    Sanofi has brought those arguments.

10           I think Sanofi, in its reply brief, said that

11   we've only argued one of the elements of judicial estoppel.  I

12   don't think that's an accurate representation of our arguments.

13   We've essentially made two arguments.

14           One is that we've argued that the bankruptcy

15   court did not rely on her representations that she had no

16   contingent claim.  And so as a purely equitable consideration,

17   it is important that when Ms. Willie had filed her claim, you

18   know, she was acting in a particular capacity with duties, and

19   all her assets already belonged in the bankruptcy.  So it's not

20   apparent that the bankruptcy court made any decision in relying

21   on Ms. Willie's omission.

22           And, in fact, her tort claim for monetary

23   damages was unliquidated.  And the last day to extend her plan

24   was just after she had filed against Sanofi.  So it's highly

25   unlikely that anything would have happened.  And the bankruptcy

1    took no action.  And now it's been reopened and the bankruptcy

2    court would be able to liquidate that asset.  So that's one

3    argument we've made.

4               The other element we've addressed is

5    inadvertence or mistake.  And so whether a debtor's failure to

6    disclose claims was inadvertent is typically a question of fact

7    because it goes into Ms. Willie's motivations.  Now, all they

8    have said is the fact -- the mere fact that she has not

9    disclosed establishes their burden.  But we've pointed out that

10   Ms. Willie's omission was inadvertent, and she, in fact, had no

11   motive to conceal because when she filed her suit against

12   Sanofi, that asset belonged to the estate.

13              If she had been trying to conceal, she would

14   have more intelligently waited until after the bankruptcy was

15   completely closed because then it wouldn't have been an asset

16   to the estate.  But what she did was she filed suit against

17   Sanofi when the asset belonged to the estate.  And she was not

18   trying to conceal that asset from the bankruptcy court.  And so

19   the courts have said that a mere mistake like that is not

20   enough to establish judicial estoppel, and in particular the

21   element of a motivation to conceal.

22              And so, ultimately, I think on this record in

23   the face of that response, and that timing, and the fact that

24   when she did file she was acting in the role -- in a particular

25   role, Sanofi hasn't presented any proof that Ms. Willie

1  intended to convince the bankruptcy court that it had no claims
2  against Sanofi.  I mean, it was just an omission, and that
3  omission is consistent with inadvertence.
4          And so, ultimately, we would ask the Court to
5  proceed along those lines, to defer ruling on the motion of
6  judicial estoppel, allow Ms. Willie to proceed with her claim.
7  The bankruptcy court is already opened.  The Court does not
8  have to engage the argument about whether Chapter 13 trustees
9  can stand in the shoes.  Although we think if the Court does
10 confront that, we would urge the Court to follow the two cases
11 that have found that that's okay.
12         And, ultimately, if there is a recovery, that
13 recovery would go to the creditors.  And I think that's an
14 important point that Mr. Ratliff has just eliding because
15 protecting the rights of creditors to an equitable
16 distribution, it's highly important.
17         And if you look at *In re: Flugence*, that was the
18 concern of the Fifth Circuit.  I mean, the Fifth Circuit was
19 concerned with the fact that the creditors would be hurt, and
20 they would be here too because Sanofi has been alleged to
21 have -- be a tortfeasor.
22         So Sanofi is not -- if this suit does not move
23 forward against Sanofi, the results will be a windfall for
24 Sanofi at the expense of the creditors.  And that's true even
25 if -- even if you believe that Ms. Willie was dishonest and had

1    a motive to conceal and the bankruptcy court relied on her, all
2    things that we think are not true.  But even if you thought
3    that, what the courts are clear is it does not matter if you
4    meet all the elements of judicial estoppel, you still have to
5    do substantial justice.
6              It's a flexible doctrine, and so you still have
7    to think about the creditors.  And here, obviously the
8    creditors would be hurt because they have not been made whole.
9    There's an entire bankruptcy proceeding that's been reopened.
10   The trustee has been appointed.  Counsel has been hired.  So it
11   would be very extreme at this point to cut those creditors off
12   from a potential liquidation of an asset.
13             **THE COURT:**  Thank you.
14             **MR. MURA:**  Thank you very much, Your Honor.
15             **THE COURT:**  Mr. Ratliff.
16             **MR. RATLIFF:**  Thank you, Your Honor.
17             Just a few quick points.  Mr. Mura gave a number
18   of arguments as to why judicial estoppel was not satisfied
19   under prong one and prong two.  Every argument Mr. Mura made on
20   behalf of Ms. Willie was made in every single one of these
21   cases.  The exact arguments, Your Honor.  And in every single
22   one of these cases before the Fifth Circuit, they came to the
23   exact same conclusion that the debtor was judicially estopped
24   from proceeding with the claim.  So while those arguments as he
25   says may have some sort of facial appeal, the Fifth Circuit has

1  said no to them repeatedly.

2          Two, Mr. Mura has talked about deferring all of

3  these decisions:  Deferring judicial estoppel; deferring

4  whether Ms. Willie would ever be entitled to any part of a

5  surplus, which no court decided in their papers has allowed.

6  But what he's really saying is, let's continue to spend money,

7  let's continue to do work, let's take this all the way up to

8  trial, and then let's deal with these hard decisions on the

9  back end, Your Honor.

10          The time to deal with this is now.  And the case

11  that he talked about in terms of why deferral was appropriate

12  was the *Love* case.  The *Love v. Tyson Foods* case, Your Honor.

13  And in *Love v. Tyson Foods*, the Fifth Circuit found that the

14  claim was judicially estopped from the debtor and that the

15  underlying claim had zero value as it related to the creditors.

16          Finally, Your Honor, absolutely there is a

17  weighing -- an equitable weighing of the interests of the

18  creditors when you deal with this type of issue.  But,

19  ultimately, Your Honor, it is -- what is paramount above all of

20  it is protecting the integrity of the judicial system and not

21  rewarding the dishonest creditor who failed to disclose the

22  contingent claim.

23          And so there are ways for you to craft

24  solutions.  But at the very minimum, Your Honor, Ms. Willie's

25  claims are clearly judicially estopped under binding Fifth

OFFICIAL  TRANSCRIPT

1    Circuit precedent.

2              Thank you.

3         **THE COURT:**  Thank you.

4         (WHEREUPON, the oral argument proceedings were

5    concluded.)

6                        *******

7                    <u>**CERTIFICATE**</u>

8         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

9    for the United States District Court, Eastern District of

10   Louisiana, do hereby certify that the foregoing is a true and

11   correct transcript, to the best of my ability and

12   understanding, from the record of the proceedings in the

13   above-entitled and numbered matter.

14

15

16                    <u>*s/Jodi Simcox, RMR, FCRR*</u>
                       Jodi Simcox, RMR, FCRR
17                     Official Court Reporter

18

19

20

21

22

23

24

25

                    OFFICIAL  TRANSCRIPT