# EXHIBIT A

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
April 21, 2021
Lyle W. Cayce
Clerk

No. 20-30104

_____

In re: Taxotere (Docetaxel) Products Liability Litigation

_____

Cynthia Thibodeaux,

*Plaintiff—Appellant,*

*versus*

Sanofi U.S. Services, Incorporated, *formerly known as* Sanofi-Aventis U.S., Incorporated; Sanofi-Aventis, U.S., L.L.C.,

*Defendants—Appellees,*

consolidated with

_____

No. 20-30107

_____

In re: Taxotere (Docetaxel) Products Liability Litigation

_____

No. 20-30104

Deborah Johnson,

*Plaintiff—Appellant*,

*versus*

Sanofi U.S. Services, Incorporated, *formerly known as* Sanofi-Aventis U.S., Incorporated; Sanofi-Aventis, U.S., L.L.C.,

*Defendants—Appellees*,

_____

Tanya Francis

*Plaintiff—Appellant*,

*versus*

Sanofi U.S. Services, Incorporated, *formerly known as* Sanofi-Aventis U.S., Incorporated; Sanofi-Aventis, U.S., L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-MD-2740
USDC No. 2:16-CV-15859
USDC No. 2:16-CV-15607
USDC No. 2:16-CV-17410

2

No. 20-30104

Before JOLLY, SOUTHWICK, and COSTA, *Circuit Judges*.
LESLIE H. SOUTHWICK, *Circuit Judge*:

This appeal concerns the timeliness of the complaints of three women who suffered persistent hair loss after chemotherapy treatments. They sued as a part of a multidistrict litigation ("MDL") against distributors of the drug Taxotere (docetaxel) for permanent chemotherapy-induced hair loss, asserting a failure-to-warn claim. The district court held that each of their claims was facially prescribed and that Louisiana's equitable-tolling doctrine of *contra non valentem* did not save the claims. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

Sanofi U.S. Services, Inc. and Sanofi-Aventis U.S., L.L.C. (together, "Sanofi") label and distribute Taxotere (docetaxel), a drug used for treatment of certain cancers, including breast cancer. The Food and Drug Administration ("FDA") first approved the drug in 1996. In December 2015, the FDA approved changes to Taxotere's label, including adding that "cases of permanent hair loss have been reported."

In October 2016, the Judicial Panel of Multidistrict Litigation consolidated and transferred to the Eastern District of Louisiana a number of cases filed by women who claimed to have suffered permanent chemotherapy-induced hair loss after being treated with Taxotere. The district court ordered plaintiffs to file a master complaint collectively and to file short-form complaints individually. The master complaint, which the three Appellants here adopted, alleges that Taxotere causes permanent, chemotherapy-induced alopecia, which it defines as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." The master complaint contains allegations common to all

3

plaintiffs, and individual facts are set out in plaintiffs' separate, short-form complaints.

Appellants are three women who were diagnosed with breast cancer between 2008 and 2010. Each was treated with chemotherapy that included Taxotere, and their treatments ended between 2009 and 2010. Each filed in 2016 a short-form complaint and adopted the master complaint, alleging failure to warn of the risk of permanent hair loss. In December 2015, Sanofi changed its label to include a warning that "cases of permanent hair loss have been reported."

Appellant Deborah Johnson was diagnosed with breast cancer in May 2010. She was not warned prior to her chemotherapy treatment of the risk of permanent hair loss. All of her hair fell out following her first round of chemotherapy, but she expected that it would eventually grow back fully. She completed chemotherapy on November 30, 2010. Her hair did not grow back. She did not seek treatment or investigate her hair loss until she saw a law firm's commercial about Taxotere in the summer of 2016. She filed a complaint against Sanofi on October 14, 2016.

Appellant Tanya Francis was diagnosed with breast cancer in March 2009 and had a left-side mastectomy in April 2009. She underwent chemotherapy with Taxotere from July to October 20, 2009. Francis knew that chemotherapy could cause temporary hair loss based on information her healthcare providers gave her. Her hair began to regrow in April or May 2010, but it was thinner and shorter than before. She learned that Taxotere may cause permanent hair loss from a Facebook advertisement in 2016. She filed her complaint against Sanofi on December 14, 2016.

Finally, Appellant Cynthia Thibodeaux was diagnosed with breast cancer in January 2008. She agreed to participate in a clinical trial to evaluate how the combination of experimental drugs with docetaxel might improve

the effectiveness of docetaxel alone. "Hair loss" was listed as one of the most common side effects of medicines used in the study, without any indication of whether the loss was temporary or permanent. About side effects generally, participants were warned that "side effects may be very serious, long-lasting, or may never go away." She underwent chemotherapy from February 2008 to June 2009.[1] Her hair began to fall out within the first two or three weeks of her first chemotherapy cycle. She expected her hair to grow back, and though it initially did, her regrowth stopped by the beginning of 2010. Thibodeaux learned about the potential connection between Taxotere and permanent hair loss from an attorney advertisement in 2016. She filed her complaint on October 26, 2016.

In May 2017, Sanofi filed a motion to dismiss as time-barred many of the MDL plaintiffs' claims, including the Appellants'. The district court denied Sanofi's motion, holding that "such motion would be ripe for this Court's consideration after the first scheduled bellwether trial in this MDL." Then, Sanofi filed motions for summary judgment against Appellants, again arguing that their claims were time-barred.

The district court accepted the master complaint's definition that hair loss that persists six months after the completion of chemotherapy is permanent. The court, applying Louisiana law's one-year prescription period, first held that the claims were facially prescribed. It then determined that the doctrine of *contra non valentem* did not save Appellants' claims because each Appellant had enough information to begin an inquiry six months after her completion of chemotherapy. Consequently, it granted

---

[1] Thibodeaux's chemotherapy treatment with Taxotere ended in April 2008, but she continued non-Taxotere chemotherapy treatment until 2009. Sanofi and the district court used this later date for summary-judgment purposes.

Sanofi's motions for summary judgment. Appellants filed two separate appeals, which were then consolidated.

DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 207 (5th Cir. 2008). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view the evidence in the light most favorable to Appellants, and we make all reasonable inferences in their favor. *See Ackermann*, 526 F.3d at 207. Because of *de novo* review, we may affirm summary judgment on any basis supported by the record even if not reached by the district court. *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

Louisiana law provides a one-year liberative prescription period for products-liability cases. LA. CIV. CODE art. 3492 (establishing one-year prescription period for "[d]elictual actions"); *Stewart Interior Contractors, L.L.C. v. MetalPro Indus., L.L.C.*, 130 So. 3d 485, 489 (La. Ct. App. 2014) (confirming that Article 3492 applies to products-liability claims). "This prescription commences to run from the day injury or damage is sustained." LA. CIV. CODE art. 3492. "The burden of proof is normally on the party pleading prescription; however, if on the face of the petition it appears that prescription has run, . . . the burden shifts to the plaintiff to prove a suspension or interruption of the prescriptive period" based on the equitable doctrine of *contra non valentem*. *Younger v. Marshall Indus. Inc.*, 618 So. 2d 866, 869 (La. 1993).

There is some question as to whether this burden-shifting rule applies at a motion for summary judgment. *See Trahan v. BP Am. Prod. Co.*, 209 So.

3d 166, 170 (La. Ct. App. 2016). We leave the question unanswered because no party argued in the district court or here that, if the claims were facially prescribed, the burden remained with the defendant. In the district court and here, both sides appear to assume the applicability of the burden-shifting framework and that the Appellants had the burden to establish *contra non valentem*. Summary judgment is inappropriate where reasonable minds could differ as to the applicability of *contra non valentem*. *See M.R. Pittman Grp., L.L.C. v. Plaquemines Par. Gov't*, 182 So. 3d 312, 324 (La. Ct. App. 2015).

Johnson and Thibodeaux filed their complaints in October 2016, and Francis in December 2016. For their claims to be timely, then, the prescription period must have begun on or been tolled until October 2015 and December 2015, respectively.[2]

The only question on appeal is whether these three complaints were timely filed. Our analysis proceeds in two parts. We must first determine whether Appellants' claims were facially prescribed. Because they were, we then must decide whether there is a genuine dispute of material fact as to whether *contra non valentem* tolled the prescription period until the suits were filed.

I.     *Are Appellants' claims facially prescribed?*

Appellants argue that their injury was not sustained, and thus the prescription period did not begin to run, until they learned of their injury and its cause. Further, each Appellant claims they did not learn of their injury or that Taxotere caused it until years after their final chemotherapy treatments.

---

[2] Specifically, Johnson filed on October 14, 2016, Thibodeaux on October 26, 2016, and Francis on December 14, 2016. For their claims to be timely, then, the latest date on which each Appellant's prescription period could have begun is October 15, 2015, October 27, 2015, and December 15, 2015, respectively. We note that 2016 was a leap year.

Sanofi counters, and the district court agreed, that by their own definition, their injuries were sustained six months after the last chemotherapy treatment. The master complaint defined permanent, chemotherapy-induced alopecia as "an absence of or incomplete hair regrowth *six months beyond the completion of chemotherapy*."

"Damage is considered to have been sustained, within the meaning of [Article 3492], only when it has manifested itself with sufficient certainty to support accrual of a cause of action." *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993). It is important that Article 3492's prescription provision does not incorporate equitable-tolling principles as do some other Louisiana prescriptive statutes. For example, for medical-malpractice and property-damage cases, Louisiana statutes explicitly incorporate equity-based principles into the text that delay the beginning of the prescription period. *See Campo v. Correa*, 828 So. 2d 502, 508 (La. 2002) (applying La. Stat. Ann. § 9:5628); *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 244–45 (La. 2010) (applying La. Civ. Code art. 3493). Those statutes explicitly delay commencement of prescription until "the date of discovery" or when the owner "acquired, or should have acquired, knowledge of the damage," respectively. La. Stat. Ann. § 9:5628; La. Civ. Code art. 3493. There is no similar text in Article 3492.

The distinction matters. Regardless of the prescriptive statute's language, *contra non valentem* may toll prescription, but it is to be applied only in "exceptional circumstances." *Renfroe v. State ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002) (quoting La. Civ. Code art. 3467, Official Revision Comment (d)). On the other hand, a prescriptive statute itself "is strictly construed against prescription and in favor of the obligation sought to be extinguished." *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994). Thus, "[w]hile the *contra non valentem* 'discovery rule' is only to be applied in extreme circumstances, and prescriptive statutes are to be

interpreted broadly in favor of maintaining a party's claim, the substantive analysis is the same under both [statutes incorporating the discovery rule] and . . . *contra non valentem*." *Marin*, 48 So. 3d at 245.

Without a "date of discovery" provision in the prescriptive statute, we look to when the injury was sustained to determine when the prescription period began to run. As a matter of law, the injury of "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy" is sustained when, six months after the completion of chemotherapy, a person has an absence of or incomplete hair regrowth. Here, six months after the completion of chemotherapy, Appellants knew their hair loss had persisted for that length of time. "Ignorance or misunderstanding of the probable extent or duration of injuries materially differs from ignorance of actionable harm which delays the commencement of prescription." *Fontenot v. ABC Ins. Co.*, 674 So. 2d 960, 964 (La. 1996). We agree with the district court that Appellants' claims are facially prescribed.

The next and dispositive issue is whether the claims are nonetheless timely because of the doctrine of *contra non valentem*.

II. *Does* contra non valentem *toll the prescription period?*

Under Louisiana law, there is a firmly rooted equitable-tolling doctrine known as *contra non valentem agere non currit praescriptio*, which means "[n]o prescription runs against a person unable to bring an action." *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776, 786 (5th Cir. 1963). The doctrine tolls prescription only in these four "exceptional circumstances":

> (1) where there was some legal cause which prevented the courts or their officers from acting or taking cognizance of the plaintiff's action; (2) where there was some condition or matter coupled with the contract or connected with the proceedings

which prevented the plaintiff from availing himself of his cause of action; (3) where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant.

*Morgan v. Entergy New Orleans, Inc.*, 234 So. 3d 113, 116, 120 (La. Ct. App. 2017). Appellants insist their claims fall within the final two scenarios.

When the relevant facts are genuinely disputed, the factfinder must answer whether *contra non valentem* (the usual shortform for the doctrine) applies. *See M.R. Pittman Grp., L.L.C.*, 182 So. 3d at 323–24. For example, when a defendant's interfering with a plaintiff's ability to bring a claim is at issue (as it is here), the suspending of "the effects of an otherwise prescribed claim depends upon the weighing of evidence, the characterization, *vel non*, of a defendant's actions as improper or fraudulent, and the making of a credibility determination as to whether a claimant's inactions are reasonable." *Id.* at 323.

We begin with the fourth category, often named the "discovery rule." *Oil Ins. Ltd. v. Dow Chem. Co.*, 977 So. 2d 18, 22 (La. Ct. App. 2007). The doctrine "applies only when such ignorance is not willful and does not result from negligence." *Cartwright v. Chrysler Corp.*, 232 So. 2d 285, 287 (La. 1970). Actual knowledge is not required; constructive notice suffices:

> Whatever is notice enough to excite attention and put the [plaintiff] on his guard and call for inquiry is tantamount to knowledge or notice of every[]thing to which inquiry may lead[,] and such information or knowledge as ought to reasonably put the [plaintiff] on inquiry is sufficient to start the running of prescription.

*Id.* That means prescription runs "from the time there is notice enough to call for *inquiry* about a claim, not from the time when the inquiry reveals facts

or evidence sufficient to *prove* the claim." *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. Ct. App. 1997) (emphasis added). It "does not necessarily wait for the pronouncement of a victim's physician or of an expert." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999). This requirement of notice was "'refined' to focus on the reasonableness of [the plaintiff's] action or inaction." *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) (quoting *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987)). A plaintiff has "an obligation to further investigate the facts in order to pursue his claim before the one-year prescriptive period []lapse[s]." *Rozas v. Dep't of Health & Hum. Res.*, 522 So. 2d 1195, 1197 (La. Ct. App. 1988).

Louisiana law strikes a balance: plaintiffs who believe they may have been damaged should not rush to file against everyone who may be involved, but "a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury." *Jordan*, 509 So. 2d at 423. Any other result would allow plaintiffs to say they became aware of the information needed to file suit within the prescription period, and "[n]o one could dispute [their] subjective state of awareness. Such a result is untenable." *Neyrey v. Lebrun*, 309 So. 2d 722, 724 (La. Ct. App. 1975).

One Louisiana opinion is particularly helpful in understanding how much knowledge an injured person needs before the prescription period begins. In that case, the plaintiff was injured when the brakes of his truck failed. *Bennett v. Gen. Motors Corp.*, 420 So. 2d 531, 532 (La. Ct. App. 1982). Before the plaintiff purchased the truck, its first owner had taken the truck to a dealership for repairs due to a recall campaign for defective brakes. *Id.* at 533. Though unclear, it appears that the dealer never completed the repair because an employee erroneously determined that this truck was not subject to the recall. *Id.* The plaintiff later purchased the truck from that initial owner, and thereafter the defective brakes caused an accident. *Id.* There was

11

evidence that the plaintiff had learned of the defective brakes just before the accident occurred. *Id.*

Plaintiff sued the manufacturer only days before the end of the prescription period and added the dealer as a defendant almost a year later. *Id.* at 534. After a trial, the jury reached a verdict for plaintiff against the dealer only. *Id.* Post-trial, though, the court held that the cause of action against the dealer was prescribed. *Id.* On appeal, plaintiff argued his cause of action was not prescribed: because he did not learn of the dealer's fault until discovery, *contra non valentem* tolled prescription. *Id.* The court of appeal disagreed, distinguishing between knowledge that someone had failed to repair the vehicle's brakes and knowledge of who that someone was:

> [T]he real crux of plaintiff's argument is that he was unable to determine *who* was involved in the repair or the failure to repair the defect in the brake system . . . . In other words, he did not know *whom to sue*. However, plaintiff's position is unpersuasive because the law is clear that mere failure on the part of a plaintiff to ascertain whom to sue within a year does not toll the running of prescription. There must be reasonable diligence on the part of the plaintiff to ascertain the identity of the party injuring him, and the means of knowledge are the same in effect as knowledge itself.

*Id.* at 537–38. It was enough to run the prescription that the plaintiff knew the brake failure caused the accident, rather than requiring "actual knowledge of the *particular cause* of the defect." *Id.* at 537 (emphasis added).

Plaintiffs are not entitled to wait to sue until they are certain of what and/or who caused their injury. "While evidentiary confirmation of a cause would be advantageous at a trial on the merits, that level of certitude is not a prerequisite to the commencement of prescription." *Oil Ins. Ltd.*, 977 So. 2d at 24. In the case from which we drew that quote, the plaintiff was injured when natural gas seeped out of a well. *Id.* at 20. The plaintiff argued that

*contra non valentem* had tolled prescription because an expert was not "confident" that the eventual defendant, a welding company, was the one responsible for the cracks in the well. *Id.* at 21. The court of appeal rejected that argument, holding that the prescription period could be tolled until a plaintiff had "[c]onstructive knowledge[,] consist[ing] of the facts sufficient to incite curiosity, to excite attention, or to put a reasonably minded person on guard and call for an inquiry." *Id.* at 22. "[M]ere apprehension that something *may* be wrong is insufficient . . . unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by" tort. *Id.* Not relevant is the point at which the expert gained confidence of the cause, but tolling did extend until the welder's actions were "considered as a potential root cause of the seepage." *Id.* at 23. That date was before confidence was gained, though further inquiry thereafter would have strengthened the evidence that the welder was the cause. *Id.* 23–24.

As we have discussed, Appellants' injuries were sustained six months after chemotherapy ended. Each injury should have caused an inquiry within a reasonable time thereafter. *See Cartwright*, 232 So. 2d at 287. The duty to act requires an investigation of the injury. *See Jordan*, 509 So. 2d at 423–24; *Rozas*, 522 So. 2d at 1197. Appellants argue that they lacked the necessary "baseline knowledge" to excite their attention that they might be victims of a tort. *See Lennie v. Exxon Mobil Corp.*, 251 So. 3d 637, 646 (La. Ct. App. 2018). That argument draws from the principle that mere availability of information somewhere, such as on the internet, is not enough; consideration must be given to the plaintiff's "education, intelligence, and the nature of the defendant's conduct." *Id.* at 645.

In summary, we interpret Louisiana law to require that once hair loss persisted after six months, *contra non valentem* tolled the prescription period until the point when a prospective plaintiff through the exercise of reasonable

diligence should have "considered [Taxotere] as a potential root cause of" her injury. *Oil Ins. Ltd.*, 977 So. 2d at 23. We examine the record for the degree of clarity as to when such a point in time was reached.

Each Appellant testified at her deposition that she attributed her initial hair loss to her chemotherapy treatment. There was no explicit testimony from Appellants about what cause they attributed to their *persistent* hair loss. Still, we consider the standard of "knew or should have known," *Oil Ins. Ltd.*, 977 So. 2d at 22, to mean they needed to investigate Taxotere as a potential cause. Thibodeaux testified that she "[n]ever talked to a doctor . . . [o]f any kind" about her hair loss. Francis never asked her oncologist about her persistent hair loss, but she asked her oncologist's nurse practitioner if he could prescribe her something to treat her hair. The nurse practitioner directed her to her primary-care physician, who eventually referred her to a dermatologist. She testified at her deposition in December 2017 that she saw the dermatologist for the first time "this year." She asked her dermatologist to give her something to make her hair regrow, but she did not inquire into the cause of the hair loss or its persistence. Johnson similarly testified that by 2011 she figured she was "the unlucky one" whose hair would not come back, but that she never tried to determine which of her chemotherapy drugs had caused her hair loss. None of the Appellants inquired with her doctor into the cause of the persistence of hair loss.

A reasonable inquiry into the cause of one's persistent hair loss would likely include consultation with doctors, but a plaintiff with persistent hair loss might instead search for the cause herself. Appellants have never argued that they inquired about the cause of their persistent hair loss, only that there is a dispute as to what an inquiry would have revealed. The master complaint helps us determine what a reasonable inquiry would have uncovered. Appellants are charged with whatever information that is. *See Cartwright*, 232 So. 2d at 287.

We find the following evidence relevant to what a reasonable inquiry by Appellants would have uncovered. In 2006, women who called themselves "Taxotears" formed a group with an online presence, arguing and purporting that Taxotere caused their permanent hair loss. In 2010, *The Globe and Mail*, a Canadian newspaper, published an online article entitled, "Women who took chemo drug say they weren't warned of permanent hair loss." That article cited a study and explicitly referenced Taxotere as the chemotherapy drug taken by women who suffered permanent alopecia. Also in 2010, just two days after *The Globe and Mail* article, CBS News published an online article entitled, "Sanofi's Latest Challenge: Women Who Say Its Chemotherapy Left Them Permanently Bald," which cited other studies that noted permanent hair loss after taking Taxotere and also referenced the Taxotears group.

While we heed the Supreme Court of Louisiana's guidance that reasonableness is assessed "in light of [the plaintiffs'] education [and] intelligence," *Campo*, 828 So. 2d at 511, we conclude that medical literature linking Taxotere to permanent hair loss is relevant insofar as Appellants' reasonable inquiry would have uncovered it. To the extent what was discovered was difficult to understand, the patient's consulting her oncologist, dermatologist, or other treating physician as to the meaning of the information would be part of diligence.

We repeat key information from Appellants' master complaint. In 2006, Dr. Scot Sedlacek presented a study entitled, "Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer." According to his study, 6.3% of patients who received docetaxel experienced persistent significant alopecia, while none of the women in the groups without docetaxel did. In 2009, 2011, and 2012, articles were published in the *British Journal of Dermatology*, the *American Journal of*

Case: 20-30104    Document: 00515884269    Page: 16    Date Filed: 04/21/2021
Case 2:16-md-02740    Document 15158-1    Filed 04/26/22    Page 17 of 18

No. 20-30104

*Dermatopathology*, and the *Annals of Oncology* respectively, that linked permanent hair loss with breast cancer patients who received docetaxel chemotherapy. In 2010, Ben Tallon, MBChB and others published an article online called, "Permanent chemotherapy-induced alopecia: Case report and review of the literature." At the Clatterbridge Cancer Centre in the United Kingdom in 2013, several doctors presented "Long Term Hair Loss in Patients with Early Breast Cancer Receiving Docetaxel Chemotherapy." That study was also published at the 2014 San Antonio Breast Cancer symposium.

Based on this review, we find that Taxotere as a possible cause of the persistent hair loss was not an obscure possibility. Indeed, each Appellant acknowledges that she had been warned that a shorter-term injury just like this could result from the drug. Yes, the potential inadequacy of warnings about the risk of persistent as compared to short-term hair loss is the point of this litigation. Nonetheless, insofar as we are concerned with evaluating each Appellants' effort to seek the cause of her injury, diligence required that Taxotere be explored as a possible explanation.

With respect for those being treated for an exceedingly alarming disease, we must apply controlling Louisiana law and hold that even they must display diligence in discovering the cause of unexpected injuries arising from their treatment. A reasonable inquiry would have uncovered at least some information that linked Taxotere to persistent alopecia. Appellants made no inquiry, and they are charged with knowledge of all that a reasonable inquiry would have revealed. *Cartwright*, 232 So. 2d at 287. They have not raised a genuine dispute of material fact that a reasonable inquiry would have left them without knowledge — if not certainty — of whom to sue by 2015. All Appellants have presented to raise a factual dispute is that they did not know Sanofi caused their permanent alopecia until they saw advertisements in 2016 and that "there is no evidence that Appellants' healthcare providers

knew Taxotere could cause permanent hair loss prior to th[is] litigation."³ When these parties actually knew that Sanofi was a potential cause of their injury is not the question. They did not act reasonably in light of their injuries, and their causes of action were "reasonably knowable in excess of one year prior to [their] filing" suit. *Fontenot*, 674 So. 2d at 965.

The third *contra non valentem* scenario, *i.e.*, where the defendant prevented the plaintiff from availing herself of her cause of action, is inapplicable because of our holding that Appellants here were not prevented from availing themselves of their causes of action; a reasonable inquiry would have led to the information needed.   AFFIRMED.

---

³ The deposition testimony of Appellants' oncology doctors is not particularly helpful on this point. Their deposition testimony is insufficient to raise a genuine dispute of material fact as to whether an inquiry into the cause of the persistent hair loss would have been futile. Francis's oncologist was asked whether she would have told a patient that her hair loss would be temporary or permanent. She responded, "I don't know. I mean — I don't know. I don't know if I had told her that it would grow back or that there was a chance it wouldn't. I mean, I'm not sure; I can't remember. I don't know."

Johnson's oncologist testified that he was not aware of Sanofi's 2005 European label change that reported persistent hair loss. After he learned of the potential risk of permanent hair loss, he began to counsel patients on that risk, and, though he would not have advised Johnson outright of the risk of permanent hair loss, he testified, "[I]f they ask me whether their hair loss is going to be permanent, then I tell them, even though there aren't — I'm not going to take a chance on that, and that's where [advising them to get] the wig comes in." He also mentioned seeing "commercials for this on TV."

Thibodeaux's first oncologist testified that permanent hair loss was at most "not . . . common[]." He also testified he had not seen literature on the relationship between any chemotherapy drug and permanent hair loss during the time he was practicing. The second oncologist testified that "[r]ecently . . . [w]ithin the last year" he began warning of permanent hair loss.