# EXHIBIT C

**SUPPLEMENTAL REPORT**
**Dr. Laura M. Plunkett, Ph.D., DABT**
**February 7, 2021**

This supplemental report was prepared at the request of Plaintiff's counsel and provides additional opinions that I have formed based on my training and experience as well as my review of publicly available documents, documents produced during litigation by Sanofi Aventis (hereafter referred to as Sanofi) as part of a discovery process, deposition testimony and exhibits to depositions of company representatives and other experts in the litigation, the expert reports of Dr. Madigan, an expert for Plaintiff in the case. My opinions relate to the use of Taxotere in the adjuvant care of early-stage breast cancer.

The opinions I have formed relate to the pharmacology and toxicology of Taxotere and how, when viewed in the context of other evidence, the toxicity of Taxotere demonstrates "some basis to believe there is a causal relationship" between Taxotere and the occurrence of permanent-chemotherapy-induced alopecia, and the need to provide physicians and their patients with accurate adverse event information in the Taxotere label. These additional opinions were developed because the regulatory expert for Plaintiff, Dr. David Kessler, is currently unable to continue to serve as an expert in this case after taking a new position to head up the vaccine development and distribution efforts in the Biden-Harris administration. Dr. Kessler provided testimony about the addition of information related to toxic adverse effects of Taxotere, specifically adding the risk of persistent or irreversible alopecia associated with Taxotere use, to the adverse reactions section (Section 6) of Taxotere's prescription drug labeling. Although I had earlier testified that I was not providing regulatory opinions, Dr. Kessler's withdrawal from the case has changed the situation, and counsel asked that I review additional material and offer an opinion on whether the toxic effects of Taxotere demonstrate a basis to believe that a causal association exists between the drug and permanent chemotherapy-induced alopecia (PCIA). The following is a discussion of my additional opinions and the basis and support for those opinions. I incorporate by reference my initial report in this case dated March 13, 2020 (hereafter referred to as the "March Report"). All opinions expressed are based on my review of all materials referenced in my March Report (including the appendices to that report), my review of additional materials as listed in Appendix A to this report, my knowledge and experience as a pharmacologist and

toxicologist, and my prior work as a consultant to industry and my prior litigation work[1]; all opinions expressed are stated to a reasonable degree of scientific certainty.

## IX.    Additional Information on Qualifications and Training

65.    My March Report includes a description of my qualifications and training (paragraphs 1 thorough 8). I would like to provide additional discussion of my experience and training in the area of FDA regulations for human prescription drug products and the role of a manufacturer with respect to ensuring that physicians and their patients are timely provided with up-to-date information about the risks and benefits of their products. My work as a toxicologist includes, significantly, investigating the adverse effects of drug products.

66.    I am a pharmacologist, toxicologist, and patent agent that specializes in regulation of products by the United States Food and Drug Administration (FDA). I am a partner in a company known as BioPolicy Solutions LLC (BPS). BPS was formed just after I completed my March Report and has offices in Houston, TX, and Ventura, CA. It is a boutique consulting firm that focuses on emerging technologies and their use in the development of consumer products. Consultants at BPS work at the interface of biological science, regulatory affairs, and business decisions to provide its clients with science-based solutions to issues associated with development and marketing of products. Before BPS was formed in June of 2020, I was a principal in the consulting firm known as Integrative Biostrategies, LLC (2001 to May 2020) and head of a consulting firm known as Plunkett & Associates (1997 to 2001).

67.    I am board-certified as a Diplomate of the American Board of Toxicology (DABT). I also am a registered patent agent (USPTO Registration No. 45,015). I am a member of several professional organizations and have authored or co-authored numerous scientific publications, including a book chapter on pharmacovigilance practices in the United States, one on the regulation of food additives, and another related to drug injuries related to the prescription drug ketorolac (listed in Appendix B). I have over thirty years of experience in the areas of

---

[1] My litigation work has included cases in the Eastern District of Louisiana including the Xarelto litigation and the Vioxx litigation, as well as cases in Louisiana state court such as my work on behalf of the Attorney General for the State of Louisiana in the Risperdal litigation.

pharmacology and toxicology and have worked in both government and academic research. I have taught pharmacology and toxicology at the undergraduate and postgraduate levels.

68.     My experience over the last thirty years (starting in 1989 at ENVIRON Corporation) has included a great deal of work concerning products regulated by the FDA, including human prescription drugs. I have acted as a resource to my clients for projects dealing with many different aspects of the FDA regulations that relate to human prescription drugs during all parts of the lifecycle of a drug product. In every project I apply my skills in pharmacology, toxicology and human health risk assessment. I have advised my clients on regulatory issues and strategies for their products (relating to both Canadian and American regulations), designed preclinical and clinical studies for both efficacy and safety, advised clients on issues related to statements regarding efficacy and warnings for their products based on the current labeling regulations and generally acted as a regulatory affairs staff for small companies in their early stages of product development. This work began in 1989 when I joined ENVIRON Corporation. At ENVIRON, our clients were mainly large companies that were developing products regulated by the FDA or attorneys representing such clients. At ENVIRON between 1989 and 1997, I worked on projects for most of the large pharmaceutical companies that did business in the US in the 1990's including Johnson & Johnson, Schering Plough, Merck, Abbott, Eli Lilly, Glaxo Welcome, *etc*. When I left ENVIRON in 1997, I continued to work on projects related to human drug development and FDA regulation of drugs. Over the years since 1997, my work has been focused more on smaller companies or start-ups, often as a result of my work with inventors and their desire to move their inventions from the laboratory to the marketplace. The work in the area of FDA regulation of drugs from 1989 through 2021 (non-litigation projects) has included projects where I have drafted parts of FDA submissions (*e.g.,* INDs, NDAs, sNDAs), designed and monitored preclinical and clinical studies that were planned for use as part of an FDA drug approval process, advised clients on regulatory strategies for new products, including products that would be sold as drugs, advised clients on the type of information that would be need to be collected in order to populate a drug label, assisted in developing standards for safety signal detection, and generally assisted clients with understanding their responsibilities under the FDA regulations.

3

69.     As I stated in my March Report, with respect to my experience that is directly relevant to the issues in this case, I have done a great deal of work on projects that has required me to examine the risks associated with exposure to drugs of all types, as demonstrated through their pharmacologic activity and demonstrated toxicities, including drugs to treat cancer. I have worked on many projects involving mechanisms of action of drugs, as well as mechanisms that underlie the ways that drugs and chemicals produce their toxic effects in humans in animals. I have assisted clients in obtaining patent protection for inventions related to anti-cancer drug products or treatments. In addition to training in FDA regulations that was a result of my work with former FDA officials (at ENVIRON) and with the regulated community, I received training from the Food, Drug and Law Institute (FDLI) on the regulation of FDA products, including courses that focused on human prescription drug products. In addition to attendance of courses early in my consulting career that focused on overviews of FDA regulation of drugs, medical devices and foods, I continue to stay current in my education on changes to the Food Drug & Cosmetic Act (FDCA) as they occur to ensure that I am familiar with the current FDA regulations and the impacts such changes may have on my clients. I have lectured to graduate students, law students and pharmacy students on FDA regulations, including the regulations that apply specifically to human prescription drugs, both general overview lectures on the development, labeling and marketing of prescription drugs in the US and lectures specifically discussing strategies for reducing adverse reactions related to prescription drug products.

70.     I have testified in both state and federal courts on the FDA regulations that apply to prescription drugs in the US, including the labeling of human drugs. Pharmacology and toxicology data are critical to the information conveyed to physicians in FDA human prescription drug labeling, including but not limited to the warnings, precautions and adverse reactions sections of drug labels, and it is the pharmacology and toxicology of a drug product that forms the basis for the risk-benefit assessments that are required before a drug product is approved for use in humans. As part of my work in litigation, and based on my training and experience, I have addressed the general pharmacology and toxicology of drug products, the importance of pharmacokinetics and drug metabolism information to understanding the risks and benefits posed by certain drug products, standards for establishing safety and efficacy of human drugs, safety signal detection methods and analyses for marketed drugs, labeling requirements for human drugs, labeling

4

changes necessitated by new toxicity information that is identified after drug approval, the scientific standards that apply to inclusion of toxicity information in different sections of a drug label, and the importance of postmarket surveillance activities to ensuring patient safety.

## X.      Taxotere Toxicity and Labeling

71.      In my March Report, I provided detailed discussion of the pharmacology and toxicology of taxanes, with a focus on Taxotere. This basic science discussion was provided as support for the specific opinions I had developed that Taxotere/ docetaxel is more toxic than Taxol/ paclitaxel when used to treat breast cancer, that irreversible alopecia (CIPAL/ PCIA) is not the same as drug-induced (reversible) alopecia, a condition that is commonly seen with anti-neoplastic drug use, that Taxotere/ docetaxel use is associated with a greater risk of CIPAL/ PCIA as compared to some other anti-neoplastic drug products, including Taxol/ paclitaxel, that it is biologically plausible that Taxotere/ docetaxel exposure can cause CIPAL/ PCIA, that Taxotere/ docetaxel carries an independent risk of CIPAL/ PCIA, and that, when used in combination, Taxotere/ docetaxel has been a substantial contributing factor to CIPAL/ PCIA. Since I am providing opinions in this supplemental report that focus on the regulatory aspects of communicating demonstrated toxicities to physicians and patients, concerning CIPAL/ PCIA associated with Taxotere use, it is important to begin with a brief overview of the applicable FDA regulations.

72.      The manufacturing and marketing of all prescription drug products are regulated by the FDA; these regulations are found at 21 CFR § 200 through 499 (in particular). FDA regulations pertain to the approval of new drug products, as well as the continued marketing of drugs once approved for human use. This includes a company's obligation to update its product label to accurately reflect the toxicities and adverse effects associated with product use. Sanofi Aventis (hereafter referred to as Sanofi), through its predecessor Rhone-Poulenc Rorer, was the company that submitted the Taxotere NDA to the FDA. As a result, Sanofi is responsible for ensuring that their drug product is both safe and effective, as well as ensuring that its label accurately reflects Taxotere's adverse effects profile.

5

73.     With respect to development of human prescription drug products, the FDA does no testing itself. This means that the FDA does not conduct or monitor clinical trials, nor does the FDA choose the investigators involved in the clinical trials or the sites where the study is conducted. Instead, the FDA relies on drug companies to conduct all testing, both preclinical and clinical, and to provide the agency with the results of testing that are accurate and reliable, show that the drug has therapeutic activity, and show that the drug is safe for use in humans. The FDA makes its decisions about drug approval and labeling based on the information provided by the applicant in its New Drug Application, or NDA.

74.     The data companies develop also includes preclinical (*i.e.,* non-human) data that examines the pharmacology of the active ingredient, as well as the toxicology of the active ingredient and the formulated drug product. The toxicology studies that companies sponsor or perform typically are animal studies that use common mammalian species such as rats, mice, and dogs.  In some cases, studies may be performed using non-human primates, pigs, guinea pigs and rabbits. These preclinical studies form the basis of the submission to the FDA referred to as the Investigational New Drug (IND) application. Also submitted with the IND application is a proposed clinical testing plan. Once the FDA has reviewed and approved the IND application, clinical testing can begin. Clinical studies for human prescription drugs typically include three phases (*i.e.,* Phase I, Phase II and Phase III).

75.     Phase I clinical studies typically are performed in healthy adults and are designed to investigate the pharmacokinetics of the drug product under development and to identify safe doses for human testing. Phase II clinical studies typically are performed in patients, and are the first studies of human efficacy, but also include measures of human safety. Phase III clinical studies are often referred to as "pivotal" clinical studies because they are the studies upon which the FDA bases its final determination of whether the drug is safe and effective for use in humans for the indication that will be on the drug's label. Phase III studies are large (usually thousands of patients), complex and expensive to perform. As a result, Phase III clinical studies should be carefully designed in terms of the characteristics of the patients included (*e.g.,* inclusion versus exclusion criteria are applied), the number of patients studied, and the endpoints used to determine both efficacy and safety.

76.     A fourth type of clinical study that may be performed after a drug is marketed, or approved for marketing by FDA, is a Phase IV study. Phase IV studies typically are ones designed to answer a specific safety question that needs to be addressed; in some FDA approval decisions they may mention that there is a "Phase IV commitment" that is part of the approval decision, meaning a manufacturer is expected to perform the study immediately in the initial phase of marketing. Phase IV studies may be clinical studies, observational studies (epidemiological investigations), or even animal studies.

77.     As mentioned above, the FDA does no clinical testing itself. Thus, the FDA, physicians and their patients must rely on drug manufacturers to properly design and conduct the clinical trials that are used by the FDA in their NDA approval decisions, *i.e.,* when the Agency determines whether a drug is safe and effective for its indicated use. Additionally, the FDA, physicians and their patients rely on drug manufacturers to provide full and adequate reporting and disclosure of all clinical data and analyses performed. It also is important to realize that before drug approval by the FDA, a drug has only been tested in a relatively small population of patients that were selected to be as homogeneous as possible in terms of the characteristics of the patients; the population was selected to control for inter-individual differences that might affect drug response. As a result, the clinical testing done pre-approval often is incapable of detecting infrequent or rare adverse events, events that may have a long latency, or events that affect types of patients not included or inadequately represented in the pre-approval testing (Strom, B.L. 2006. What is pharmacoepidemiology? In: *Textbook of Pharmacoepidemiology*, Strom and Kimmel (eds.), John Wiley & Sons, Ltd.: Hoboken, NJ, chapter 1). It has been estimated that a study would need to have more than 600,000 subjects in order to have 95% chance of detecting adverse events that may affect one to two patients per 1000 subjects tested (Lasagna, 1983. *JAMA* 249:2224-2225). This is one reason why postmarket surveillance and proactive identification of drug-related safety concerns are such important obligations for the company in the FDA regulatory process.

78.     Labeling for a human drug product is written by the manufacturer, not the FDA. In the case of the initial labeling for a human prescription drug product, there is a negotiation process that occurs between the company and the FDA that results in an agreement being reached about

the initial product labeling language. After a drug has been marketed, it is the NDA holder (in this case Sanofi) that is responsible for drafting changes to labeling and ensuring that the product's label remains an accurate reflection of the safety and efficacy of the drug during the post market period. The term labeling includes all advertising and promotional materials, as well as the package insert and any patient information materials, including materials such as a Medication Guide; the Medication Guide is labeling intended for distribution directly to patients. In addition, letters or communications described in 21 CFR § 200.5, commonly referred to as "Dear Doctor Letters" or "Dear Healthcare Provider Letters" are regulated by the FDA, and the agency asks that companies consult with them before disseminating such information in order to make sure that the letters are fair and balanced, just like all other forms of communication with physicians.

79.     Federal regulations require the manufacturer/ NDA holder to include in the labeling of its products complete and accurate information about health risks, adequate instructions regarding use of the drug product, and adequate warnings to ensure that patient health is protected (*e.g.,* 21 CFR § 201.57; 21 CFR § 314.70; 21 CFR § 314.80). The manufacturer has the responsibility for drafting the initial labeling for their product and for ensuring that the labeling continues to reflect current knowledge concerning risks posed by the drug (see 21 CFR § 314.80 entitled *"Postmarketing Reporting of Adverse Drug Experiences"*). In the text of 21 CFR § 314.80, it is stated: *"Each applicant having an approved application under § 314.50 or, in the case of a 505(b)(2) application, an effective approved application, must promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, postmarketing clinical investigations, postmarketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers."* Thus, there are a variety of sources of information that Sanofi is, and was, at all times responsible for monitoring. As a result of information identified as part of these duties under 21 CFR § 314.80, the manufacturer can make changes to its labeling by obtaining prior approval of a supplemental NDA submission (sNDA; 21 CFR § 314.70(c)), or, alternatively, without first obtaining FDA agreement and submitting a supplement to its NDA, if the change is to *"add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under 201.57(c)"* (21 CFR § 314.70(c)(6)(iii)(A)).

80.     All prescription drug products marketed in the US are required to have a label (sometimes also referred to as a package insert) setting forth, among other things, the identity of the product, its manufacturer, and directions for use (see, *e.g.,* 21 CFR § 201.1 through § 201.26). Also included in the label is information on the most serious health risks associated with use of a drug.

81.     Drug labeling is regulated in terms of what information must be included in the label, as well as how that information is presented (21 CFR § 201.57 entitled *"Specific requirements on content and format of labeling for human prescription drug and biological products described in § 201.56(b)(1)"*). This provision requires that a drug's labeling contain *"adequate directions for use"* (including a statement of all conditions, purposes, and uses for which the drug is intended) and *"adequate warnings against use."* This latter provision becomes important when taking or administering the drug can be dangerous, posing a risk to human health. All human prescription drug products pose some risk to human health that require addition of safety/ toxicity information to product labeling. A label lacks adequate directions for use and adequate warnings against use when it fails to disclose harmful side effects of taking the drug. There are several sections within FDA human prescription drug labeling where physicians and their patients are provided with warnings against use, or safety information, including the Contraindications section, the Warnings section, the Precautions section[2], and the Adverse Reactions section. In this report, I have formed opinions about the need to provide physicians and their patients with information about the association of Taxotere use with CIPAL/ PCIA in the "Adverse Reactions" section of the Taxotere labeling.

82.     In the period before drug approval by the FDA, the premarket period, the adequacy of a drug's label is assessed as part of the normal drug approval process for a NDA or a Supplemental New Drug Application (sNDA); the proposed drug labeling is submitted by the manufacturer as part of the NDA or sNDA. Thus, the drug approval process includes FDA approval of the drug's proposed labeling. In the post-marketing period for human prescription drug

---

[2] It is discussed in this report how the Warnings and the Precautions sections have been merged into one label section as a result of the Physician Labeling Rule (the PLR) that was made Final in 2006.

products, the FDA enforces this part of the regulations when they become aware of information, through either the drug manufacturer or through other sources, showing that the risk profile of the drug has changed, or that the use patterns of the drug have changed.

83.     FDA regulations also require that a manufacturer or NDA holder update its labeling for a drug *"when new information becomes available that causes labeling to become inaccurate, false, or misleading"* (https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources). FDA decisions about whether a drug's label is false or misleading thus can depend on a manufacturer providing the agency with complete, accurate and timely information that they are aware exists and would impact the safety and/or efficacy of its drug. Apart from the actual drug product label, a Medication Guide is considered to be part of FDA drug product labeling (21 CFR § 208), as is advertising and promotional materials for prescription drug products (21 CFR § 202.1) and these materials also are subject to similar standards.

84.     The FDA human prescription drug regulations make clear that information regarding harmful side effects of the drug must be disclosed immediately. FDA allows a drug company to strengthen a warning for a drug without prior approval by the FDA (see 21 CFR § 201 and 202; Federal Register Volume 44, No. 124, June 26, 1979, Final Rule: Labeling and Prescription Drug Advertising: Content and Format for Human Prescription Drugs).  In particular, the Final Rule states:

> *"The Commissioner also advises that these labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., "Dear Doctor" letters containing such information) is not prohibited by these regulations. As stated above, the act and FDA regulations require a warning in drug labeling as soon as a hazard is associated with the use of a drug.  In the case of a drug subject to an approved NDA, 314.8(d) (21 CFR § 314.8(d)) permits the addition to the drug's labeling or advertising of information about a*

10

*hazard without advance approval of the supplemental application by FDA." [see page 37447 at 44 FR 124]*

85.     In 2008, the FDA published an update to the 1979 labeling rule (August 22, 2008 Fed. Reg. Volume 73, No. 164 pp. 49603-49610). Again, the FDA confirmed that drug manufacturers have the ability to update their labeling to strengthen warnings to physicians and patients without prior FDA approval. Therefore, drug manufacturers, such as Sanofi, always have the ability under the FDA regulations to update labeling to strengthen warnings to physicians and patients. Thus, when a manufacturer has identified a safety signal for their drug product, they have the responsibility to investigate that signal (see 21 CFR § 314.80(b)) and to consider strengthening their labeling even if the evidence is still developing as it pertains to cause and effect (see 21 CFR § 201.57). These responsibilities of companies that develop and market human prescription drug products have been recognized by the companies themselves and the industry generally (*e.g.,* Allan, M.C. 1992a. *J. Pharm Technol* 8:162-167; Allan, M.C. 1992b. *J. Pharm. Technol.* 8:198-202.; Allan, M.C. 1992c. *J. Pharm. Technol*. 8:259-273; Gibson *et al.* 2008. *Pharmacoepidemiol. Drug Saf.* 17:110–114).

87.     With respect to patient safety information that is included in prescription drug labeling, the regulations provide specific direction as to where information is to be listed and the distinctions between the types of safety information that appear on a drug label. Before implementation of the Physician Labeling Rule (PLR) in 2006, the content of human prescription drug labeling contained four major sections that related directly to patient safety and warnings to physicians about these safety issues; these sections were required in labeling and described in 21 CFR § 201.57 (2006) sections (d) through (g). Since Taxotere was developed and marketed before implementation of this rule and is still marketed today, both the regulations in place before January 2006 (*i.e.,* referred to herein as pre-PLR regulations) and those after 2006 (*i.e.,* PLR regulations) are relevant.

88.     Pre-PLR, the major patient safety sections of a human prescription drug label included "Contraindications," "Warnings," "Precautions" and "Adverse Reactions." The pre-PLR regulations stated that the "Contraindications" section of the labeling *"shall describe those*

11

situations in which the drug should not be used because the risk of use clearly outweighs any possible benefit." (21 CFR § 201.57(d)(5)). The regulations stated also that the "Warnings" section of the label "shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur." (21 CFR § 201.57(e)). The regulations stated that the "Precautions" section must contain a description of special care instructions to be exercised for safe and effective use of a given drug product. Typically, the "Precautions" section has information relating to, for example, laboratory tests, drug interactions, pregnancy information, and geriatric use (21 CFR § 201.57(f)). The "Adverse Reactions" section of the label is a section where undesirable effects, *i.e.,* "adverse reactions", are listed (21 CFR § 201.57(g)). The standard applied pre-PLR for adding a Warning statement (21 CFR § 201.57(e)) was "as soon as there is reasonable evidence of an association of a serious hazard with a drug; **a causal relationship need not have been proved**" *[emphasis added].* The standard applied pre-PLR for adding a toxic effect to the "Adverse Reactions" section also was not definitive proof of causation but instead was "an adverse reaction is an undesirable effect, reasonably associated with the use of the drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence" (21 CFR 201.57(g)). The pre-PLR regulations also included provisions for listing the frequency with which adverse reactions have occurred (pre-PLR provision 21 CFR § 210.57(g)(2)). It is important to note that the fact that the FDA labeling regulations do not require proof of causation before toxicity information is added into a drug label is an opinion held by the former FDA Commissioner, Dr. David Kessler[3], and also was agreed to by Sanofi's regulatory expert, Dr. Arrowsmith[4]. Thus, there is no controversy surrounding the standard that applies to FDA drug labeling in terms of not requiring proof of a cause-and-effect relationship in order to add a toxic reaction, or adverse reaction, into a drug's labeling.

89.     Therefore, while I am not offering causation opinions in this case, it is important to note that the standard for drug labeling was less than the standard of a full causation analysis as is undertaken when scientists are assessing the weight-of-the-evidence when applying Bradford Hill considerations for general causation in litigation.

---

[3] See expert report of Dr. David Kessler at pages 2-4 (Supplemental Report dated October 21, 2019).

[4] See the deposition testimony of Dr. Arrowsmith at pages 57 and 165.

90.     On January 24, 2006, the FDA published the Final Rule that amended the requirements for the content and format of labeling for human prescription drug and biological products (PLR); the PLR has been discussed in recent guidance.[5] The PLR was developed to make the information found in prescription drug labeling easier for health care practitioners to access, read, and use. Under the PLR, labeling now includes three sections: Highlights of Prescribing Information (Highlights), a Table of Contents (Contents), and the Full Prescribing Information (FPI). Even with these format changes as part of the PLR, however, the standards for drug labeling have remained the same in terms of the types of information required to be presented and the obligation of the manufacturer to continually update the labeling when new safety information is identified.  It should be noted that the Final Rule states that the adverse reactions section is to be used as follows:

> *"This section must describe the overall adverse reaction profile of the drug based on the entire safety database. For purposes of prescription drug labeling, an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence. This definition does not include all adverse events observed during use of a drug, **only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event**." [**emphasis** added] [see PLR Final Rule at Fed. Reg. 71, No. 15, January 24, 2006 at 3990]*

Thus, the standard in terms of when to include information in a drug's label is not a causation standard but, instead, the fact that some information exists such there is a reason to believe that the drug and the reaction are related to one another. Interestingly, and as mentioned above, Dr. Janet Arrowsmith M.D., Sanofi's regulatory expert, agrees that 21 CFR 201.57(c)(7) establishes the standard that applies for including an adverse reaction in Section 6 of a drug label (see deposition testimony of Dr. Arrowsmith at page 57). In addition to the discussion of the standard for adverse reactions and labeling, the Final Rule also discusses events that occur in clinical trials. The agency states:

---

[5] https://www.fda.gov/downloads/drugs/guidances/ucm075082.pdf (last viewed 15 December 2019).

> *"For adverse reactions with significant clinical implications, the listings must be supplemented with additional detail about the nature, frequency, and severity of the adverse reaction and the relationship of the adverse reaction to drug dose and demographic characteristics, if data are available and important." [see PLR Final Rule 2006 at 71 Fed. Reg. 3922-3997 at 3990-3991]*

Thus, severity and duration information also must be included, if available (FDA, 2006; 21 CFR § 201.57(c)(7)(ii)(A). Although I am not a physician, as a pharmacologist and toxicologist I am often asked to assess clinical data and to identify toxic reactions, or adverse reactions, that would be important patient safety concerns, *i.e.,* have implications for clinical use. Thus, in this case, I have applied my training and experience in pharmacology, toxicology, human physiology, and FDA regulations when forming my opinions related to the need to update Taxotere's labeling in the Adverse Reactions section (Section 6), including the need to convey information on CIPAL/ PCIA frequency and severity with Taxotere use. I would also point out that evidence in this case shows that: 1) Sanofi's global safety officer Dr. Emanuel Palatinsky reviewed consent language for a 2007 clinical trial involving Taxotere and indicated that "permanent" hair loss was "sufficient once" in the warnings of adverse events (see deposition testimony of Dr. Palatinsky dated August 9, 2018 at page 343-350 and referenced Exhibit 19 of deposition); 2) Sanofi recognized that permanent or irreversible alopecia (CIPAL/ PCIA) was a serious and significant adverse reaction for patients, in particular women (see deposition testimony of Dr. Palatinsky dated August 9, 2018 at page 180; see deposition testimony of Dr. Sunil Gupta dated April 10, 2018 at pages 103-104); and 3) regulatory authorities in Europe and the US described permanent or irreversible alopecia (CIPAL/ PCIA) as a serious and/or significant adverse reaction (Sanofi_04864365; Sanofi_02540992; FDA, 2018. Voice of the Patient: Alopecia Areata. March[6]).

91.     Given that it is the Adverse Reactions section of the Taxotere label that is applicable in this case, it also is important to note that FDA has issued guidance for manufacturers of human drugs on the format and content of the adverse reactions section of the label (January 2006[7]). In that guidance, the agency discusses how to determine what types of information to include in the

---

[6] https://www.fda.gov/files/about%20fda/published/Alopecia-Areata--The-Voice-of-the-Patient.pdf

[7] Guidance entitled *"Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products: Content and Format"*.

14

Adverse Reactions section of a drug label as well as who to present the information. With respect to the process of choosing adverse events for inclusion in labeling, the guidance states:

> *"Decisions on whether there is some basis to believe there is a causal relationship are a matter of judgment and are based on factors such as: (1) the frequency of reporting, (2) whether the adverse event rate for the drug exceeds the placebo rate, (3) the extent of dose-response, (4) the extent to which the adverse event is consistent with the pharmacology of the drug, (5) the timing of the event relative to the time of drug exposure, (6) existence of challenge and dechallenge experience, and (7) whether the adverse event is known to be caused by related drugs."[FDA, 2006 at page 8]*

Then, with respect to information on adverse reactions that might be found in clinical trial data, the agency states:

> *"The presentation of adverse reactions identified from clinical trials is the major component of the ADVERSE REACTIONS section. The ADVERSE REACTIONS section must include a listing of all such reactions that occurred at or above a specified rate that is appropriate to the drug's safety database (see III.B.3), a separate listing of those adverse reactions that occurred below the specified rate, but for which there is some basis to believe there is a causal relationship between the drug and the event (see III.B.4), and, to the extent information is available and relevant, additional detail about the nature, frequency, severity, duration, dose-response, and demographic characteristics of those adverse reactions with significant clinical implications" (21 CFR § 201.57(c)(7)(ii)(A))."*

The FDA guidance provides important context for how the agency expects decisions to be made by a company.

92.     Before focusing on the need to add the CIPAL/ PCIA to the Taxotere labeling, I would like to provide a discussion of the new information that are part of the basis of my opinion. In addition to the evidence discussed in my March Report, I now have reviewed Dr. Madigan's report and his analyses of adverse event reporting data (both FDA data and Sanofi data) as well as a meta-analysis of Sanofi's clinical trial data.

93.     Dr. Madigan describes an analysis of the FDA's Adverse Event Reporting System database known as "FAERS" (see the report of Dr. David Madigan dated March 23, 2020) as well

15

as an analysis of Sanofi's own internal pharmacovigilance database, and a meta-analysis of the TAX 316 and TAX 301 clinical trials, combining the studies and examining the adverse event rate for irreversible alopecia. Dr. Madigan describes his analysis and mentions on page 20 that he confirmed the list of search terms used in his analysis of Sanofi's global pharmacovigilance database. Based on my training and experience in FDA postmarket surveillance regulations and FDA's approach to drug safety signal detection, Dr. Madigan's analysis is of the type that is performed by FDA themselves within their pharmacovigilance group (see FDA, 2012; https://www.fda.gov/files/drugs/published/Advances-in-FDA%27s-Safety-Program-for-Marketed-Drugs-%28PDF---188KB%29.pdf). As discussed by FDA in their 2012 Drug Safety report, the Division of Biometrics VII (DBVII), focuses on full-cycle drug safety evaluation using methods such as evaluation of randomized trials designed primarily to evaluate safety, design and analysis of observational studies (including propensity score and marginal structural models expertise), meta-analyses, signal detection, survey methodology, Bayesian methods in drug safety, data-mining techniques, time series analysis, graphical and computational methods for quantitative safety evaluation, and analyses of registry and health care databases (FDA, 2012). The methods used by Dr. Madigan fit within this overall approach to safety signal detection and drug safety evaluation that is used by FDA themselves.

94.     Based on my review of Dr. Madigan's report, it is clear that the Taxotere FAERS adverse event reports provided a clear and constant safety signal for a relationship between Taxotere use and irreversible/ permanent alopecia (CIPAL/ PCIA) at least by 2000; the signal was consistently detectable from 2000 to 2017. Additionally, Sanofi's pharmacovigilance database contained adverse event reports as far back as 1999 that provide additional support for the safety signal identified by Dr. Madigan based on the FAERS database. Both of these analyses by Dr. Madigan provide a basis for my opinion regarding when Sanofi had some basis to suspect a causal association between Taxotere and CIPAL/ PCIA. The meta-analysis of Taxotere clinical trial data performed by Dr. Madigan provides additional support for opinions expressed in my March Report and also provide a basis for when information on the severity, duration and frequency of CIPAL/ PCIA should have been added to the Adverse Reactions section of the Taxotere label.

16

95.     With the background regarding FDA regulations of human drug labeling and the clear and constant signal demonstrated in Dr. Madigan's FAERS disproportionality analysis, and other evidence, including the Sedlacek findings and Sanofi's internal pharmacovigilance database, I have formed opinions about the toxicities that should be included in the Taxotere labeling regarding CIPAL/ PCIA. It is my opinion to a reasonable degree of scientific certainty that there is some basis to believe that there is a causal relationship between Taxotere use and CIPAL/ PCIA in patients taking Taxotere as an adjuvant treatment for early-stage breast cancer, the standard for including safety information in the Adverse Reactions section of a human prescription drug label in the US (both pre-PLR and post-PLR). As discussed in my March Report, when the published literature relevant to the relationship between docetaxel exposure and CIPAL/ PCIA is considered as a whole, in conjunction with Taxotere clinical trial data, the weight-of-the-evidence indicates that it is biologically plausible that Taxotere/ docetaxel can cause CIPAL/ PCIA when the drug is used as an adjuvant to treat early stage breast cancer, that the risk of permanent, irreversible alopecia is not rare, that Taxotere/ docetaxel use carries an independent risk of CIPAL/ PCIA, and that Taxotere/ docetaxel use is associated with an increased risk of CIPAL/ PCIA as compared to other drugs used in breast cancer treatment. Thus, the evidence discussed in my March Report provides important support for my new opinion that there is a basis in the Taxotere database, importantly including clinical trial evidence, *"to believe there is a causal relationship between the drug and the occurrence of the adverse event"* (the adverse event standard cited above in paragraph 90; see the Final Rule dated January 24, 2006). Again, as discussed above, the standard I have applied for adding CIPAL/ PCIA to the Adverse Reactions section of the Taxotere labeling is the standard that FDA, Dr. Kessler and Dr. Arrowsmith recognize as being some basis to believe that Taxotere is associated with permanent/ irreversible alopecia (CIPAL/ PCIA).

96.     With respect to the timing of addition of a statement in the Adverse Reactions section of the Taxotere labeling that Taxotere was associated with CIPAL/ PCIA in women undergoing treatment for early-stage breast cancer, the standard is some basis for a causal association. As mentioned above, Dr. Madigan's analysis of FAERS and Sanofi's pharmacovigilance databases indicate that a safety signal for CIPAL/ PCIA and Taxotere use appears at least by 2000. In my March Report (see paragraphs 34 and 35), I discussed two publicly available documents, one a paper from the peer-reviewed literature (Nabholtz *et al.* 2001. *J. Clin.*

17

*Oncol.* 19:314-321) and the other a presentation at the 2006 San Antonio Breast Cancer Symposium (Sedlacek, S.M. 2006). The 2001 report is important because Dr. Nabholtz was an investigator that was participating in a Taxotere clinical trial.  Patients had been enrolled in a Phase II clinical study and the authors reported that the "most common treatment-related chronic non-hematologic toxicity was alopecia (87%) with long-lasting (longer than 2 years) partial alopecia in four patients" (see Nabholtz paper page 318; Sanofi_00217670). The percentage of patients at two years with irreversible alopecia was 4/54 or 7.4%. As I pointed out in my March Report, the fact that Dr. Nabholtz was an investigator for Sanofi (see page 331 of Gustavson deposition) made this paper of particular importance in terms of Defendant's knowledge over time.  The second published dataset is from a presentation at a clinical meeting in 2006 where clinical experience in treating breast cancer is discussed based on a retrospective review of patient data in Dr. Sedlacek's clinical practice, data that was available to Sanofi prior to the clinical meeting in December 2006[8]. This report could be described as a "case series" and is one type of epidemiological investigation. As discussed in my March Report, alopecia associated with Taxotere therapy as an adjuvant to doxorubicin/cyclophosphamide chemotherapy was irreversible in some patients (he called the condition "persistent significant alopecia" and abbreviated it as "PSA"). PSA rates were investigated and reported for the three different treatment groups in Dr. Sedlacek's study; 6.3% in women administered doxorubicin plus Taxotere (AC/Tax; ATax; ACTax, AC/TaxXeloda; AC/TaxHerceptin; ATax/CAF; CAF/Tax), 0% in women administered doxorubicin plus Taxol (AC/T; AT/T; AC/T dose dense; ATC; AC/THerceptin), and 0% in women administered doxorubicin without a taxane (AC; FAC; A/CMF). The comparison of Taxotere experience with and without doxorubicin allowed for consideration of the contribution of each drug independently to the risk in the patients. Taxotere use was associated with an increased risk of permanent, irreversible alopecia, a risk that was not seen with use of doxorubicin alone or with doxorubicin combined with Taxol use. Therefore, Taxotere (docetaxel) carried an independent risk of CIPAL/ PCIA in this case series and was a substantial contributing factor to the condition in the women studied. Considering these two papers, in conjunction with Dr. Madigan's analyses of the FAERS database and Sanofi's pharmacovigilance database, Sanofi had some basis to believe a causal

---

[8] Oncology Field Coaching Report of Christine Muhlenhaupt by Perry Monaco, Aug. 15 &17, 2006 (Sanofi_04633925).

relationship between Taxotere use and CIPAL/ PCIA existed at least by 2006. As a result, it is my opinion to a reasonable degree of scientific certainty that the standard for adding a statement in the Adverse Reactions section of the Taxotere labeling about the relationship between Taxotere and CIPAL/ PCIA was met as early as 2006.

97.     As discussed in my March Report, Sanofi has identified a causal association between docetaxel and irreversible alopecia (Sanofi_01101022; Sanofi_00829788; Sanofi_01827599; Sanofi_04876339; Sanofi_01268143[9]). The company stated based on their own review that: *"The cumulative weighted evidence **is sufficient to support a causal association between Docetaxel and Permanent/Irreversible alopecia in patients who receive docetaxel."*** [***emphasis** added*] Notably, the information reviewed by Sanofi included their pharmacovigilance database (adverse events reported to the company), two literature articles (Kluger *et al.* 2012 and Miteva *et al.* 2011) and two Taxotere clinical studies (TAX316 and TAX301). Importantly, their identification of a causal association means that the level of evidence would meet the regulatory standard for adding information into the "Adverse Reactions" section of the label for a human prescription drug product[10].

98.     Yet, it was not until December 2015 that Sanofi added permanent or irreversible alopecia to the Adverse Reactions section (Section 6) of its US label, even though evidence existed before 2006 that Sanofi should have known about based on the fact that their own pharmacovigilance database contained adverse event reports before 2006 (see report by Dr. Madigan), that one of their own investigators had published a paper on permanent alopecia in association with Taxotere use (Nabholtz *et al.* 2001), and that long-term interim data from TAX316, data  that was available in 2004, contained evidence of Taxotere-induced alopecia that had not resolved at the five-year interim analysis time point (Interim TAX 316 Data, summarized by Dr. Madigan in Table 9 of his March 23, 2020 Report). It also is important to note that Sanofi themselves had recognized the existence of permanent or irreversible alopecia in documents that were submitted to the FDA starting in at least 2010 (Exhibit 16 to Dr. Palatinsky's deposition dated

---

[9] Exhibit 6 to the Hangai deposition of February 1, 2018 (page 192)

[10] See the guidance from FDA regarding data to support an Adverse Reactions statement (https://www.fda.gov/media/72139/download).

August 8-9, 2018; Exhibit 33 to Dr. Palatinsky's deposition dated August 8-9, 2018) and again in 2013 in their response to regulators in Europe where the European regulators were investigating a safety signal for permanent alopecia (Exhibit 37 to Dr. Mancini's deposition dated March 23, 2018). Thus, Sanofi should have been aware that there was some basis for a causal association between Taxotere use as an adjuvant treatment in patients with early-stage breast cancer at least by 2006 and before the 2015 label change was made by Sanofi to add permanent or irreversible alopecia to the Adverse Reactions section of Taxotere's label.

99.     With respect to the issues of Taxotere's toxic effects on hair regrowth, permanent alopecia is hair loss that is characterized by a lack of regrowth (see paragraph 30 of my March Report), I noted in my review of Dr. Arrowsmith's deposition and her report that she has opined that the term "alopecia" in the Taxotere labeling is meant to subsume all forms of alopecia[11], both temporary drug-induced alopecia that is common to most chemotherapeutic drug products, including Taxotere, and the irreversible or permanent alopecia forms that physicians and scientists refer to as CIPAL/ PCIA. Yet, evidence in this case shows that at least by 2006, Sanofi recognized that Taxotere use was associated with permanent or irreversible alopecia and that it was a different adverse event than temporary or typical drug-induced alopecia (see Exhibits 22 through 25 of the of Isabelle Richard-Cassin's May 4, 2018 deposition, and pages 126-149 of the deposition). Yet, there is no evidence to suggest that Sanofi communicated their understanding to the FDA in 2006. This is important given that the FDA regulations require that physicians and their patients be provided with accurate and complete information about the risks and benefits of a drug. In my experience, regulators such as those at the FDA that were involved in the oversight and review of Taxotere's submissions can only make decisions and recommendations based on the information they have available for review, *i.e.,* based on what they know.  Evidence in this case shows that my experience and understanding is consistent with what Sanofi's employees understood as well (see deposition testimony of Gerrit-Jan Nijveldt, global regulatory affairs, dated February 15, 2018 at pages 61-80). Additionally, I noted in my review of Dr. Arrowsmith's report and deposition that she appears to believe that since MedDRA did not include a listing for temporary alopecia or

---

[11] For example, pages 61 and 164 of Dr. Arrowsmith's deposition dated July 29, 2020 and paragraphs 67-68 of her December 9, 2019 report.

persistent alopecia, that labeling for Taxotere could not be changed to use the adjectives in conjunction with "alopecia" (see pages 61-70 of Dr. Arrowsmith's deposition dated July 29, 2020 and paragraph 68 of her December 9, 2019 report). This is not true based on a discussion of this issue in a recent paper (Wu *et al.* 2019 at page 135 of 149): *"Of note, MedDRA is used as the adverse event reporting terminology by many drug regulatory authorities and the pharmaceutical industry worldwide but is not required for FDA-approved drug labeling."* Additionally, evidence in this case related to the 2015 label changes by Sanofi shows that the term "permanent alopecia" was included in the Taxotere label (see 2015 Taxotere label at the website "drugs@FDA").

100.    Finally, in my March Report, I addressed the issue of other drugs used in chemotherapy regimens with Taxotere and the difference in the level of evidence that exists for a causal association between use of drugs other than Taxotere and CIPAL/ PCIA (see paragraphs 33 and 45-48). The opinion expressed in my March Report relates to the fact that Taxotere/ docetaxel use carries an independent risk of CIPAL/ PCIA. Moreover, as stated in paragraph 45 of my March Report, careful review of the literature shows that the level of evidence that exists to support a causal association between CIPAL/ PCIA and any particular chemotherapeutic drug used in early-stage breast cancer treatment other than Taxotere is not the same type of evidence that exists for Taxotere/ docetaxel. I pointed as well to the fact that the majority of the peer-reviewed, published medical/scientific literature that attempts to attribute a cause for CIPAL/ PCIA attribute the condition to docetaxel.  With the review of Dr. Madigan's report, I would now point to his FAERS disproportionality analysis (discussed above) that demonstrates that Taxotere's signal for permanent or irreversible alopecia within FAERS was continual, *i.e.,* a permanent signal exists, while the signal for other drugs examined by Dr. Madigan did not exhibit a continual signal. This analysis provides additional evidence that Taxotere carries an independent risk of CIPAL/ PCIA, and that available scientific information, including FAERS data and Dr. Madigan's analysis, clearly show that other drugs used in treatment of early-stage breast cancer do not carry the level of risk of CIPAL/ PCIA that is posed by Taxotere.

**XI.**    **Compensation**

101.    My compensation by plaintiff's attorneys in this matter is at the rate of $300.00 per hour.


_____

Laura M. Plunkett, Ph.D., DABT

## References Cited

Allan, M. C.  1992a.  A primer of drug safety surveillance: an industry perspective. Part I: Information flow, new drug development, and federal regulations.  *J Pharm.Technol.* 8(4):162-167.

Allan, M. C.  1992b.  A primer of drug safety surveillance: an industry perspective. Part II: Product labeling and product knowledge.  *J Pharm.Technol.*  8(5):198-202.

Allan, M. C.  1992c.  A primer of drug safety surveillance: an industry perspective. Part III: Managing adverse-event data.  *J Pharm.Technol.*  8(6):259-273.

Gibson, B. R., R. Suh, and H. Tilson.  2008.  The US drug safety system: role of the pharmaceutical industry.  *Pharmacoepidemiol.Drug Saf*  17(2):110-114.

Lasagna, L.  1983.  Discovering adverse drug reactions.  *JAMA*  249(16):2224-2225.

Nabholtz, J.M.  2001.  Steroidal side effects of exemestane.  *J Clin Oncol.*  19(7):2107-2108.

Sedlacek, S.M.   2006.   Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophophamide (AC) chemotherapy in women with breast cancer. ABSTRACT.  *Breast Cancer Res. Treat.*  100((Suppl 1)):S116-S116.

Strom, B.L. 2006. What is pharmacoepidemiology? In: *Textbook of Pharmacoepidemiology*, Strom and Kimmel (eds.), John Wiley & Sons, Ltd.: Hoboken, NJ, chapter 1.

U.S. Food and Drug Administration (FDA). 2006. *Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products: Content and Format*. Guidance. January.

U.S. Food and Drug Administration (FDA). 2012. *Advances in FDA's Safety Program for Marketed Drugs: Establishing Premarket Safety Review and Marketed Drug Safety as Equal Priorities at FDA's Center for Drug Evaluation and Research*. April. https://www.fda.gov/files/drugs/published/Advances-in-FDA%27s-Safety-Program-for-Marketed-Drugs-%28PDF---188KB%29.pdf

Wu, L. *et al.* 2019. Study of serious adverse drug reactions using FDA-approved drug labeling and MedDRA. *Bioinformatics* 20(Suppl 2):97.