# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ELIZABETH KAHN,

 Plaintiff,

 v.                           CASE NO. 2:16-cv-17039

SANOFI-AVENTIS U.S.
L.L.C. AND SANOFI US
SERVICES, INC.,

 Defendants.


******************************************

ORAL DEPOSITION OF

LAURA PLUNKETT, PH.D.

APRIL 7, 2021

(Reported Remotely)

******************************************

   ORAL DEPOSITION of LAURA PLUNKETT, PH.D.,
produced as a witness at the instance of the
DEFENDANTS, and duly sworn, was taken in the
above-styled and numbered cause on APRIL 7, 2021, from
9:35 a.m. to 3:55 p.m., before Stephanie M. Harper,
RPR, CSR in and for the State of Texas, recorded by
machine shorthand, at 13923 Carriage Walk Lane,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure 30 and 45, the First Emergency Order
Regarding the COVID-19 State of Disaster, and the
provisions stated on the record or attached hereto;
that the deposition shall be read and signed before any
notary public.


JOB NO. 704971



Page 114

1  evaluating what steps to take?
2      A.  If you're asking me can they do that, yes.
3  Do they do that, I have seen that done, yes.  That's
4  exactly right.  But I've also seen companies ignore
5  those kinds of things, not even bother to look at
6  things that others then put into the published
7  literature, but yet it's things that if they had
8  done that analysis internally, they could have found
9  out on their own.  So there are examples like that.
10         That is not something I have formed a
11 specific opinion on in this particular case at this
12 time.
13     Q.  But in terms of the regulations that
14 require a pharmaceutical manufacturer to make a
15 labeling change for a marketed product, you would
16 agree that first there has to be newly acquired
17 information, number one, and then, number two, that
18 newly acquired information has to meet the standard
19 for inclusion in the labeling.  And in this case
20 that standard is some evidence of a causal
21 association between the product and the adverse
22 event, right?
23     A.  Again, if you're limited to the sections
24 that deal with safety, yes.  But, you know, so there
25 are some other issues that might come up for other

Page 115

1  sections of the labeling but, yes, I would agree --
2  I would agree -- I would agree to that.  Yes.
3      Q.  Okay.  All right.
4          MR. MOORE:  Great.  Let's -- it's
5  12:09.  Can we come back on at 12:45, is that enough
6  time for everybody to grab some sustenance and then
7  we'll just start plowing through the meat of it?
8  Does that work for everyone, Palmer?
9          MR. LAMBERT:  That's okay with me.
10 Dr. Plunkett, okay with you?
11         THE WITNESS:  Yeah, that'll be --
12 that'll be fine.
13         MR. MOORE:  Okay.  We'll see everybody
14 in about 30 minutes, 35 minutes.
15         (Break from 12:10 p.m. to 12:47 p.m.)
16     Q.  (BY MR. MOORE)  Okay.  Dr. Plunkett,
17 before the lunch break we were on Page 13 of your
18 report.  And at the bottom of that paragraph -- at
19 the bottom of that page, there's a paragraph where
20 you talk about the distinction between the standard
21 for including information in a drug's label not
22 being the standard for causation in a legal case.
23     A.  Yes.  And I'm talking about adverse
24 reaction section.  That's correct.
25     Q.  Right.  Right.  And so you had told us

Page 116

1  previously that you were not rendering a causation
2  opinion in your March 3 report, correct?
3      A.  Yes.
4      Q.  And you're not rendering a causation
5  opinion in your supplemental report either, correct?
6      A.  I am not.
7      Q.  All right.  But the -- but your opinion
8  is, though, that the demonstrated toxicities that
9  you determined in your March report are toxicities
10 that meet the standard for disclosure in the
11 Taxotere labeling in Section 6?
12     A.  Yes.  Some of the specific evidence that I
13 discuss in here, that's exactly right.
14     Q.  Okay.  All right.  And if we look on
15 Page 14 of your report in the first full paragraph
16 after discussing some more information about the
17 standard for adverse events -- adverse -- adverse
18 reaction section of the labeling, you say "Thus in
19 this case I applied my training and expertise in
20 pharmacology, toxicology, human physiology, and FDA
21 regulations when forming my opinions related to the
22 need to update Taxotere's labeling and the adverse
23 reactions section, Section 6, including the need to
24 convey information on CIPAL/PCIA frequency and
25 severity with Taxotere."

Page 117

1          My question to you is what do you
2  believe the Taxotere labeling should have said in
3  the adverse reaction section as it relates to PCIA
4  beginning in 2006?
5      A.  I have --
6          MR. LAMBERT:  Object to form.
7      A.  I have not attempted to write, as it was
8  my understanding that wasn't required in this case,
9  so I have not done so.  So I haven't drafted a
10 specific language that is the ultimate language, in
11 my opinion, that should be used.
12         And as I've often stated in cases I
13 work on, there are multiple ways you can describe
14 things that may be acceptable to anyone, but again,
15 that isn't something that I have done in this case.
16 I haven't attempted to -- to redraft or to draft
17 a -- one specific statement that is the ultimate
18 statement.
19     Q.  (BY MR. MOORE)  Okay.  So you're not going
20 to offer an opinion in this case that the Taxotere
21 labeling should have included any specific language
22 in Section 6?
23         MR. LAMBERT:  Object to form.
24     A.  I -- no.  I don't know that that's correct
25 because it is my opinion that it needed to describe



Page 126

1  being done in the spring of 2006 by the company and
2  some proposed labeling language, I believe, for the
3  European label, distinguishing the difference
4  between temporary versus permanent alopecia.
5           And also I think I cite to a
6  document -- let me look for it.  I think it's in
7  relation to my Paragraph 99.  I'm sorry.  96 I cite
8  to a document showing that in August of '06 Sanofi
9  was a -- had available to it the Sedlacek data.
10      Q.   (BY MR. MOORE)  Right.  I listed Sedlacek.
11      A.   Right.  Right.  I just -- but since you
12  were -- you didn't talk about the internal company
13  documents.  So I cite to some of that as well as
14  evidence in the case about what the company was
15  aware of and knew and what they -- and what they
16  thought or were doing at that time period.  And then
17  we can --
18      Q.   Okay.  And those are the things --
19      A.   -- go forward in time.
20      Q.   Those are the things that are listed in
21  paragraph -- I think you said 96 of your report.  Is
22  that what you're referring to?
23      A.   Paragraph 96 I talk about the Sedlacek and
24  the one internal company document that talks about
25  what -- what they knew.  But then the -- I'm looking

Page 127

1  for the -- the -- I think there's a paragraph on the
2  issue of the difference between permanent and
3  temporary in the label changes.
4      Q.   Okay.  You referred to a company analysis
5  done in 2006.  Where is that referenced in your --
6      A.   Back -- okay.  Paragraph 99, starting with
7  the -- the sentence "Yet, evidence in this case
8  shows that at least by 2006, Sanofi recognized that
9  Taxotere use was associated with permanent or
10  irreversible alopecia and that it was a different
11  adverse event than temporary or typical drug-induced
12  alopecia."
13           And I cite to the deposition of
14  Isabelle Richard-Cassin and Exhibits 22 through 25
15  of her deposition.
16      Q.   Okay.  All right.  But in terms of
17  external information -- well, let me back up for a
18  second.  Let's not get away from Dr. Madigan.
19      A.   Madigan.
20      Q.   In Dr. Madigan's report he performs an
21  analysis of observational studies.
22           Do you recall reading that?
23      A.   Yes.  But I'm not doing causation, so I
24  did not look at that part of his report.
25      Q.   Okay.  So that's not something that's

Page 128

1  informing your opinions in the supplement, correct?
2      A.   Because I'm not a causation expert, that's
3  correct.
4      Q.   Okay.  And Dr. Madigan, he performed his
5  analysis and prepared his report before you were
6  retained to offer any labeling opinions in this
7  case, correct?
8      A.   Yes, that's correct.
9      Q.   And so the analysis that he did, he
10  undertook that analysis on his own and it was not
11  something that you directed him to do, correct?
12      A.   That is correct.
13      Q.   Okay.  Did you have any input into any of
14  the analyses that Dr. Madigan performed prior to the
15  issuance of his report in this litigation?
16      A.   No.
17      Q.   Okay.  And since receiving his report,
18  have you made any effort to review the underlying
19  data or verify any of the conclusions?
20      A.   No.
21           MR. LAMBERT:  Object to form.
22      A.   I did -- I did not reanalyze Dr. Madigan's
23  analysis.  I relied upon his analysis because in my
24  view having looked at what he describes and being
25  familiar with these kind of analysis generally even

Page 129

1  though I don't do them, I rely on this kind of
2  information.  Sometimes it's in the published
3  medical literature.  FDA's drug safety group does
4  similar things.
5           So I -- I -- I judged what I saw based
6  on my training and expertise and felt that the
7  analysis appeared to be something that I could rely
8  upon in terms of the findings that he provides.
9      Q.   (BY MR. MOORE)  Do you still feel that way
10  today?
11      A.   Yes, I do.
12      Q.   Was there anything that you read in
13  Dr. Ross's deposition that caused you to question
14  the reliability of any of the analyses that
15  Dr. Madigan performed?
16      A.   No.
17           MR. LAMBERT:  Object to form.
18      A.   Because like Dr. Ross, I believe there was
19  some questions posed about some individual documents
20  that I don't believe are something that you would do
21  when you do the overall FAERS analysis.
22           So I think there was some
23  apples-and-oranges comparison going on based on some
24  of those questions.  So no, I did not -- I would --
25  I'm aware of some of the exhibits and I saw the

