UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION | MDL NO. 2740 |
| | SECTION "H" (5) |

THIS DOCUMENT RELATES TO:

*Kahn v. Sanofi-Aventis*, *et al.*, Case No. 2:16-cv-17039.

---

**MEMORANDUM IN SUPPORT OF SANOFI DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID B. ROSS, M.D., PH.D., M.B.I.**

---

In light of Dr. Kessler's recent departure from this litigation, Plaintiffs offer Dr. David Ross as their regulatory expert for the *Kahn* trial. Dr. Ross, relying heavily on Dr. Madigan, opines that Sanofi should have updated the Adverse Reaction portion of the Taxotere label to include permanent alopecia. This opinion should be excluded due to systemic problems with Dr. Ross's methodology. At the very least, Dr. Ross's testimony should be limited in light of these issues.

First, Dr. Ross did not use a reliable methodology. Dr. Ross is largely unable or unwilling to identify the specific sources upon which he relied; he vaguely asserts that he reviewed the "relevant" materials (but fails to explain what the relevant materials were and how he determined relevancy in his review); and he defers all specific questions about the data underlying his claims to Plaintiff's other experts. This methodologic flaw is not new. It has persisted across all of the opinions Dr. Ross has offered in this litigation, regardless of the defendant.[1]

---

[1] *See, e.g.*, Rec. Doc. 11468 (Def. Sandoz Inc.'s Mot. to Exclude or Limit Opinions of Dr. David B. Ross); Rec. Doc. 11446 (Def. Accord Healthcare, Inc.'s Mot. to Exclude Expert Testimony of David Ross, M.D., Ph.D., M.B.I.).

Second, Dr. Ross relies heavily on Dr. Madigan's FAERS analysis to reach his conclusion. This FAERS analysis, however, is incomplete for the purpose of Dr. Ross's regulatory opinions. To rely upon spontaneous reporting system ("SRS") case reports, Dr. Ross admits *both* signal identification and signal evaluation are necessary. As this Court recognized in its prior ruling, however, Dr. Madigan's FAERS analysis only involved signal identification. Yet, Dr. Ross admits that he did not do any signal evaluation with regard to Dr. Madigan's FAERS analysis. Moreover, when shown the six underlying individual reports identified by Dr. Madigan's FAERS analysis for the relevant time period, Dr. Ross admitted that none of them demonstrated an unexpected adverse event of permanent alopecia. Offering a labeling opinion based on signal identification without signal evaluation is unreliable and should be excluded.

Because Dr. Ross cannot confirm that he reviewed materials cited in his report, and because he did not evaluate whether permanent alopecia was actually present in any of the safety reports upon which he relied, Dr. Ross's regulatory opinions are unreliable and should be excluded from trial.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, courts "must act as [gate-keepers] to ensure the proffered expert testimony is 'both reliable and relevant.'" *Gaddy v. Taylor Seidenbach, Inc.*, 446 F. Supp. 3d 140, 157 (E.D. La. 2020) (quoting *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010)); *see also Chan v. Coggins*, 294 F. App'x 934, 937 (5th Cir. 2008) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)). The Court's gatekeeping function not only requires the expert to establish that his opinions will assist the trier of fact, but also that the expert's testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods." Fed. R. Evid. 702.

The "reliability analysis applies to *all aspects* of an expert's testimony," including "the methodology, the *facts underlying the expert's opinion*, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (emphasis added). Importantly, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id*. Speculative testimony, or expert testimony that lacks scientific validity, should be excluded from trial. *Collett v. Weyerhaeuser*, Civ. Act. No. 19-11144 C/W 19-12252, 2021 WL 76396, at *2 (E.D. La. Jan. 8, 2021).

As to relevance, "[s]cientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue." *Daubert,* 509 U.S. at 591 (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). The "fit" between data and opinion is a key component of admissibility. *Chan*, 294 F. App'x at 937 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Indeed, an expert's reasoning and methodology must "[fit] the facts of the case" and "assist the trier of fact to understand the evidence." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015). If an expert's analysis is not reasonably connected to the facts of the case, or if there is "too great an analytical gap between the data and the opinion proffered, such testimony is inadmissible. *Collett*, 2021 WL 76396, at *3 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

**ARGUMENT**

I. **DR. ROSS'S REGULATORY OPINIONS ARE INADMISSIBLE.**

   A. **Dr. Ross Is Unwilling Or Unable To Identify The Facts And Data That Provide The Foundation For His Opinions.**

Dr. Ross opines that Sanofi failed to comply with its post-marketing surveillance and pharmacovigilance obligations. Despite proffering a 49-page expert report—which relies on more

3

than 200,000 pages of documents—Dr. Ross cannot identify the methodology, facts, or data that he actually reviewed in forming his opinions.[2]

For example, when asked whether he reviewed the depositions cited in his reliance list, Dr. Ross could not identify specifically the materials he actually reviewed.  He vaguely responded that he "reviewed depositions and exhibits that were relevant to the opinions [he] was asked to . . . weigh in on or the topics that [he] was asked to provide opinions on."[3]  When asked to identify the specific depositions he deemed relevant for review, Dr. Ross pontificated about the various "mechanisms" he *could have used* (e.g., reviewing deposition indexes, advanced search functions, "list[s] of all of the occurrences of sort of issues that [he] was asked to opine on," etc.)[4] to locate "relevant" portions of the depositions cited in his Reliance List.  However, he was unable to identify what materials were deemed relevant.[5]

When pressed to explain how he specifically sorted and reviewed these documents for relevance, Dr. Ross was unable to answer and instead provided a series of lengthy non-answers before eventually referring back to Paragraph 30 of his expert report:

> Q. Can you articulate for me the precise methodology that you used to determine whether a document was relevant?
>
> A. Can I articulate the precise methodology?  So again, let me refer back to how this would be handled by an FDA reviewer who is reviewing an NDA with clinical study reports, animal toxicology reports and other sections that comprise not tens of thousands or hundreds of thousands, but millions of pages of data.  So that's a broader review than what I'm talking about here.  If a medical officer is going to be concerned, for example, with is this drug – as a response – response shown by all tests reasonably applicable, that

---

[2] **Ex. A**, Feb. 8, 2021 Ross Rpt. Exhibit C (Materials Relied Upon).

[3] **Ex. B**, Mar. 4, 2021 Ross Dep. 19:4−11.

[4] *Id.* at 21:5−15.

[5] *Id.* at 24:5−25:15.

4

> the sponsor has demonstrated the drug is safe and is there substantial evidence of efficacy. It would be impossible certainly, if you have a priority review and this was done for Taxotere, for a medical officer to look at every single page. It simply cannot be done. So they're going to rely on reviewers, scientists and other disciplines to do that.
>
> As I outlined in my report, that's what I did here with regard to Drs. Madigan, [Feigal] and Plunkett. Now that's part of the methodology. But when you say "precise," this is not an engineering problem. This is not like, you know, did you use a laser at such and such a wavelength to determine whatever metric. It is not a physics problem. My review was, basically, I would say the methodology that I would have used at the FDA. And again, it is not like the National Bureau of Standards, if you will. So I would say methodology for any regulatory problem, is going to be based on the regulatory standard. That is the key issue. And then, what are the relevant data. And there is no one-size-fits all to that. There just isn't.[6]

When asked again about his personal methodology for determining whether a specific document was relevant to be reviewed in order to form his opinions, Dr. Ross again stated that it was "*not possible to answer*."[7]

Beyond his inability to explain which documents he reviewed or deemed relevant when preparing his report, Dr. Ross admitted that he was unable to say under oath that he actually read one of the central pieces of evidence that he relied on in his report.[8] More specifically, Dr. Ross cites "Nabholtz, et al. (2001)" as evidence that Sanofi had sufficient data to "inform and support a

---

[6] *Id.* at 31:4−33:15.

[7] *Id.* at 34:9−23 ("Q. What did you do to determine whether that specific document was relevant to be reviewed by you or not? A. So, I don't know what document – I mean honestly, that's not possible to answer. I mean let me just say this: You know, again, going back to the FDA – I described the methodology here. I have never seen an FDA reviewer say here's how many pages I reviewed, here's what percentage of pages I reviewed. They have access to all of it. But I have never seen that because that's not what's done. And again, I would refer you back to – I describe this in terms of methodology under "Good Review Practices." So again, it's the same. I mean I've identified methodology there.") (emphasis added).

[8] *Id.* at 242:12−17.

5

§ 6 (Adverse Reactions) label change."[9] During his deposition, however, Dr. Ross testified that he did not remember how he found the Nabholtz article.[10] Moreover, Dr. Ross was "not willing" to confirm whether he *actually read* the Nabholtz study.[11] Instead, Dr. Ross pivoted to explain that, somehow, it is an acceptable scientific practice to cite and rely on materials that you have never read or analyzed:

> I feel strongly that I need to provide some context here. It is an accepted practice in science, in medicine, that if you have a piece of evidence that supports your conclusion to cite it, [it] does not necessarily mean – and this is not unique to me – that you've analyzed it.[12]

In fact, Dr. Ross could not even agree that it was his job as an expert to review the relevant data before forming his opinion in this case.[13] While relying on evidence he never read or analyzed may be acceptable in Dr. Ross's private practice, it is not an acceptable methodology recognized in federal courts. *Amorgianos v. Nat'l RR Passenger Corp.*, 137 F.Supp.2d 147, 159, (E.D.N.Y 2001), *aff'd*, 303 F.3d 256 (2d 2002) (holding that expert testimony was appropriately excluded,

---

[9] **Ex. A**, Feb. 8, 2021 Ross Rpt., at ¶ 88.

[10] **Ex. B**, Mar. 4, 2021 Ross Dep. 238:12−16 ("Q. Where did you first come across the Nabholtz study? A. So I do not remember, okay. . . .").

[11] *Id.* at 242:12−17 ("Q. Doctor, you know, for the Nabholtz study I wasn't asking you to quote it from memory. I was simply asking you to confirm that you've read it. . . . A. So again, I've said I looked at a lot of documents. And I said I'm not willing to do that."); *Id.* at 237:22−25 ("Q. Did you read the Nabholtz study? A. I may have. . . .").

[12] *Id.* at 239:11−241:8.

[13] *Id.* at 36:11−37:7 ("Q. And doctor, you would agree that it was your job to identify and review the relevant data before you formed your opinions in this case, correct? . . . A. I'm not sure I would say my 'job.' It's just sound methodology if you're going to be – you know, you don't want to reach the conclusion first. There's a phenomenon in health care called analysis paralysis. Where you just don't reach conclusions because you say I bet there's one more piece of data out there. You can't find it because its not there. So within, I think, reasonable limits, the methodology that I had 10 years experience using, that's what I did here. Uh, again, and I'm just saying, for example, I reviewed Dr. Arrowsmith's report and if there was a point there that I had missed, certainly I would say that I needed to rethink my opinion. But that didn't happen. So if there's something relevant and you say Dr. Ross doesn't address it here, I'm happy to look at it.").

in part, because the witness admitted that he only "read some of the abstracts" for articles cited in his report).

Further, Dr. Ross's refusal to identify whether or to what extent he considered various documents on his Reliance List (or to explain the methodology he used to select and weight the information in those documents) is indicative of an unreliable, cherry-picked approach routinely excluded by this Court and others. *See Burst v. Shell Oil Co.*, No. 14-cv-109, 2015 U.S. Dist. LEXIS 77751, 2015 WL 3755953, at *13 (E.D. La. June 16, 2015), *aff'd,* 650 F. App'x 170 (5th Cir. 2016) (excluding expert's opinion because, inter alia, he "cherry-picks data from studies in several significant instances and fails to explain contrary results in a manner that belies the reliability of his methodology"); *Konrick v. Exxon Mobil Corp.,* No. 14-cv-524, 2016 WL 439361, 2016 U.S. Dist. LEXIS 13478, at *32−45 (E.D. La. Feb. 4, 2016) (court excluded two experts' methodology as unreliable where they cherry-picked data); *Perry v. U.S.*, 755 F.2d 888, 892 (11th Cir. 1985) ("A scientist who has a formed opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable scientific results."); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502–03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."); *accord Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) ("[I]t is readily apparent that Dr. Keegan all but 'cherry picked' the data he wanted to use, providing the court with another strong reason to conclude that the witness utilized an unreliable methodology."); *In re Bextra and Celebrex Mktg. Sales Practices and Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding the expert who "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that

support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion.").

### B. Dr. Madigan's FAERS Analysis Does Not Provide An Adequate Foundation For Dr. Ross's Regulatory Opinions.

Dr. Ross relies on Dr. Madigan's FAERS analysis as critical support for his opinion that Sanofi had knowledge of some causal relationship between Taxotere and irreversible hair loss.[14] This reliance is improper. Complete safety-signal analysis requires both signal *identification* and *evaluation*.[15] As this Court noted, however, Dr. Madigan has only completed the signal *identification* aspect of the safety-signal analysis.[16] Because Dr. Ross has not, himself, conducted a signal evaluation of Dr. Madigan's FAERS data, a reliable safety-signal analysis has not been completed.

Pursuant to FDA best practices, once individual case safety reports have been collected from a FAERS (or similar database) search, reviewers should "*evaluate ICSRs* for potential inclusion in a set of similar cases" by applying a predetermined case definition.[17] More specifically, FDA best practices explain that each ICSR should be reviewed to ensure it actually meets the definition for the relevant disease being searched. Then:

> [a]fter retrieving the cases, applying the case definition, and accounting for duplicate reports, reviewers assess the ICSRs for causality and assemble a case series built upon those meeting all criteria. *The review document includes a summary of the*

---

[14] **Ex. A**, Feb. 8, 2021 Ross Rpt. at ¶¶ 51, 57, 60, 71.

[15] *Id.*

[16] Rec. Doc. 12098 at 13−14 (Order and Reasons re: Defs.' Mot. to Exclude Expert Testimony of Dr. David Madigan).

[17] **Ex. C**, *FDA Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff*, Nov. 6, 2019, at § 7.1.2 (emphasis added). The FDA defines "case definition" as "a set of uniformly applied criteria for determining whether a person should be identified as having a particular disease, injury, or other health condition . . . based on information from the medical literature and current expert clinical practice guidelines. A case definition comprises a specific combination of signs, symptoms, and test results." *Id.* at § 7.1.2.

> *considerations or rationale for inclusion of the ICSRs in the case series*, as well as descriptive clinical information that characterizes the case series, such as patterns and trends of the [adverse event] across the cases.[18]

Dr. Ross's total reliance on Dr. Madigan's FAERS search and safety signal identification fails to account for the missing *signal evaluation*.[19] Although Dr. Ross acknowledged the importance of signal evaluation, he did not review Dr. Madigan's FAERS search to determine whether each case was properly classified as permanent alopecia.[20] Consequently, Dr. Madigan has also not conducted this analysis.[21] In fact, none of Plaintiff's experts have evaluated the relevant ICSRs to confirm they represent actual cases of permanent hair loss.

Failure to conduct signal evaluation is problematic. As this Court has recognized, the case reports identified by Dr. Madigan "present confounding factors" including: (1) the patients in the reports are administered other drugs along with Taxotere; and (2) the patients suffer from other health conditions associated with hair loss unrelated to chemotherapy.[22] *See also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (Mirena II)*, 341 F. Supp. 3d 213, 262 (S.D.N.Y. 2018) (excluding Dr. Plunkett's opinions because she did "not control[] for important confounding factors", in part); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 916 (D.S.C. 2016) (experts need to look for "alternative explanations for the associations, such as bias or confounding factors") (quoting R.M.S.E. at 598–

---

[18] *Id.* at § 7.1.4 (emphasis added).

[19] Rec. Doc. 12098 at 13–14 (Order and Reasons re: Defs.' Mot. to Exclude Expert Testimony of Dr. David Madigan) ("Dr. Madigan, being a statistician, focused on signal identification, which would be governed by Section 6 of the FDA document, which is titled 'Safety Signal Identification.'").

[20] **Ex. B**, Mar. 4, 2021 Ross Dep. 152:12–15, 156:10–18.

[21] **Ex. D**, Nov. 14, 2019 Madigan Dep. 137:16–138:16.

[22] Rec. Doc. 10704 at 8–9 (Order and Reasons re Pls.' Mot. for Partial Summ. J. on Affirmative Defenses Under La. Rev. Stat. § 9:2800.59).

600); *Wade-Greaux v. Whitehall Labs.*, 874 F. Supp. 1441, 1475 (D.V.I. 1994) ("Looking behind [the experts'] conclusory statements, however, it is clear that there are other potential alternative causes that plaintiff's expert witnesses either have not excluded or cannot possibly exclude as a cause as a cause of [plaintiff's] birth defects."). Dr. Madigan, himself, admitted that it was "possible" that the ICSRs identified in his search may contain false hits.[23]

With concern for the "possibility" of false hits, Sanofi identified the six[24] individual FAERS reports upon which Dr. Madigan FAERS analysis was based.[25] Dr. Ross was confronted with these six reports during his deposition.[26] Looking at them for the first time, Dr. Ross conceded that none of the six reports could be identified on their face as an "unexpected" adverse event of permanent alopecia.[27] Instead, these reports involved a host other serious conditions with only passing reference to alopecia (and often only referencing alopecia occurring during chemotherapy treatment).[28] In essence, these six reports say nothing about a potential unexpected risk of permanent alopecia.[29]

When asked to justify his methodology in the face of these irrelevant reports, Dr. Ross stated that evaluating individual safety signals is "not something [he] would do," and deferred that

---

[23] **Ex. E**, Sept. 18, 2019 Earnest Trial Tr. 685:10–687:16.

[24] Dr. Madigan's search yielded 31 ICSRs from 2000 to 2017, but only six of these reports occurred before Ms. Kahn's treatment in 2008. *See*; **Ex. D**, Nov. 14, 2019 Madigan Dep. 137:16–23.

[25] **Ex. F**, Apr. 26, 2021 Chang Supp. Rpt. at p. 4–7.

[26] **Ex. B**, Mar. 4, 2021 Ross Dep. 82:23−102:11, 197:21−202:2.

[27] *Id.*

[28] *Id.* at 82:23−87:19, 88:21−91:15, 92:2−93:5, 93:21−97:13, 98:18−102:11, 197:21−202:2; **Ex. G**, Mar. 4, 2021 Ross Dep. Exhibits 6−10, 21.

[29] **Ex. B**, Mar. 4, 2021 Ross Dep. 82:23−102:11, 197:21−202:2; *see also* **Ex. F**, Apr. 26, 2021 Chang Supp. Rpt.

analysis back to Dr. Madigan.[30]  This Court, however, has already recognized that Dr. Madigan's analysis is "limited" because he *did not* complete a signal evaluation.[31]  Accordingly, because Dr. Ross does not perform any signal evaluation on Dr. Madigan's FAERS analysis, his regulatory opinions are flawed.

Dr. Ross's failure to take the additional steps outlined under FDA's latest guidance to properly conclude that potential safety signals warranted a product label change significantly undermines his opinions.  Indeed, Dr. Ross's failure to review the ICSRs identified by Dr. Madigan makes clear that he did not assess these reports for causal association.  Without performing a fulsome safety signal evaluation, Dr. Ross can neither conclude that these reports support any causal association between Taxotere and irreversible alopecia nor opine that Sanofi should have relied on these reports as a basis for amending the Taxotere label.  These failures reveal a gross disparity between Dr. Ross's methodology and current FDA best practices, and render his opinions unreliable.  *See In re In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 466, 481 (E.D. Pa. 2014) (excluding plaintiffs' expert opinions that did not reflect "the current state of the science").

## CONCLUSION

For all the reasons stated above, the Court should exclude the expert opinions of Dr. Ross under Federal Rule of Evidence 702.

---

[30]  **Ex. B**, Mar. 4, 2021 Ross Dep. 154:19−156:9; *Id.* at 159:4−11 ("Q. My question was simply: "Did you review the individual ICSR's that Dr. Madigan identified in his signal analysis in the FAERS database, yes or no? A. Oh. And again, I think it's critical not just to get a single word answer, but to say that it is not a relevant part of the methodology.  It's not what I do, so no.  There you go.").

[31]  Rec. Doc. 12098 at 13–14 (Order and Reasons re: Defs.' Mot. to Exclude Expert Testimony of Dr. David Madigan).

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

12