# EXHIBIT A

In re: Taxotere (Docetaxel) Products Liability Litigation
MDL No. 2740
Report of David Ross, M.D., Ph.D., M.B.I.

# I.  INTRODUCTION

## A.  Consultation questions

1. I have been retained by the Plaintiffs' Steering Committee to serve as an expert witness in In Re: TAXOTERE (DOCETAXEL), MDL 2740 litigation, in the US District Court for the Eastern District of Louisiana.[1] I was previously identified as an expert witness in this Multi-District Litigation to offer opinions in cases pending against certain defendants with products approved through the 505(b)(2) regulatory pathway. Following Dr. David Kessler's appointment by President Biden to head up the administration's vaccine initiative, I was asked to review additional materials and offer opinions in this matter as to Sanofi, the 505(b)(1) New Drug Application (NDA) holder for Taxotere®/docetaxel (Taxotere).  Specifically, I have been asked to provide opinions regarding the regulatory obligations of drug manufacturers for products approved under Section 505(b) of the Food, Drug, and Cosmetic Act

---

[1] I understand that my testimony will be offered in the case of Elizabeth Kahn, however I am offering regulatory opinions and have not reviewed Ms. Kahn's medical records, or any case-specific depositions. I am aware that Ms. Kahn's first use of Sanofi's Taxotere product took place on May 29, 2008. I do not intend to offer any case-specific opinions in this matter.  I reserve the right to supplement this report should additional documents or information be made available.

(FDCA) with respect to pharmacovigilance and labeling obligations, particularly with respect to safety and label updates to § 6 of the Taxotere product label (Adverse Reactions). My opinions are based on my regulatory, medical, scientific, and clinical education, training, knowledge, and experience in reviewing and evaluating drug labels, and compliance with the applicable regulations, specifically as they relate to label amendments to add warnings and adverse reactions to the label.

## B.  Professional background and qualifications

2.  I am a physician whose medical career, research, and publications have centered on public health and patient safety. I served as a medical officer at the FDA from 1996 to 2006 in various positions of increasing responsibility, as more fully outlined in my attached curriculum vitae. My duties as a medical officer with FDA included determining whether products regulated by the FDA that were marketed or proposed for marketing in the United States met the regulatory standards required for marketing. They also included recommending, and in some cases deciding on regulatory action and enforcement based on my determinations.

3. I have lectured, written, and presented extensively regarding the approval of new drugs, regulatory issues related to safety and effectiveness, clinical trial

**CONFIDENTIAL**

design, conduct, analysis and interpretation, safety and effectiveness, and risk/benefit analysis. I have also testified before the U.S. Congress on these issues.

4. I began my tenure as a medical officer at the FDA in 1996, serving as a primary medical reviewer in the Division of Anti-Infective Drug Products (DAIDP) within FDA's Center for Drug Evaluation and Research (CDER). I subsequently advanced to the position of Senior Medical Reviewer in DAIDP, and then was promoted in 2000 to Medical Team Leader in DAIDP, while continuing to hold the title of Senior Medical Reviewer. In 2004, I became Deputy Director of the Office of Drug Evaluation VI (ODE VI) in CDER. In this role, I became a member of the Senior Leadership Team within the Office of New Drugs (OND) within CDER. Following the planned decommissioning of ODE VI in 2005, I served as the Associate Director for Regulatory Science in CDER's Office of Oncology Drug Products (OODP).

5. As a primary medical reviewer, my major duties and responsibilities focused on clinical review of Investigational New Drug Applications (INDs) and New Drug Applications (NDAs), as well as supplemental NDAs (sNDAs). Such reviews included the review of the initial documents submitted to the FDA as part of a regulatory docket, and subsequent filings. With respect to NDAs, such filings included prior approval sNDAs seeking approval for a new indication or changes to the approved labeling, as well as Changes Being

**CONFIDENTIAL**

Effected (CBE) sNDAs, which most often concerned changes implemented by the holder of an NDA to safety-related information in the approved label prior to formal FDA review.

6.  My responsibilities included regulation of approved, marketed drug products, a major component of my responsibilities included reviewing post-marketing surveillance of adverse events. These responsibilities included review of reports required of NDA holders, such as annual NDA reports, periodic safety update reports, initial and follow-up reports of serious and unexpected adverse events, and clinical study reports. They also included analysis of data in FDA's Adverse Event Reporting System (FAERS), which I performed on my own as well as in collaboration with pharmacoepidemiologists and other scientists in CDER.

7.  As Medical Team Leader and Senior Medical Reviewer in DAIDP, Deputy Director of ODE VI, and Associate Director for Regulatory Science in OODP, my responsibilities broadened to include secondary, and in some instances tertiary, reviews of findings, conclusions, and recommendations from primary reviewers regarding NDAs, Biologics Licensing Applications (BLAs), and supplements to such applications. I was also responsible for synthesizing findings from the primary multi-disciplinary review team into an integrated written summary of the basis for the regulatory action taken. Both as a primary

**CONFIDENTIAL**

medical reviewer and a more senior review official, I was responsible for understanding and incorporating non-clinical review findings and recommendations into my reviews, including reviews in the disciplines of chemistry, manufacturing, and controls; microbiology; toxicology; clinical pharmacology; and statistics, after receiving input from subject matter experts.

8. My regulatory experience and expertise are based on my FDA training and extensive experience in applying regulatory concepts to a broad range of drug regulatory situations, and contributions to regulatory science. As a primary medical reviewer, I received extensive didactic training covering the spectrum of products regulated by FDA, as well as mentorship by more experienced primary and senior reviewers. My practical training involved detailed discussions with senior FDA officials during reviews of specific products to ensure that I was applying regulatory principles correctly, as well as consultation with reviewers in other disciplines. Such discussions frequently involved FDA staff with experience specific to a particular regulatory issue. My written reviews were considered by a supervisory reviewer, with unresolved differences in opinion regarding regulatory and scientific issues generally addressed through a written secondary regulatory review. This

**CONFIDENTIAL**

training and experience also involved participating in discussions and debates regarding applications being reviewed by other FDA staff.

9. As a more senior review official, I became recognized within FDA as an expert on regulatory matters responsible for providing regulatory and scientific guidance to reviewers whom I was now supervising. As a medical team leader, I routinely gave tutorials to my review staff on a range of regulatory topics, covering topics such as the regulatory requirements for NDA approval and electronic labeling. As a practical matter, I was also responsible for secondary review of NDAs and sNDAs, including sNDAs proposing safety-related changes to the labeling of approved drugs. In such situations, I was responsible for providing guidance to the primary review team. This included giving guidance to my direct reports and offering secondary reviews on evaluating information and data submitted and based upon post-marketing experience, involving sNDAs.

10. With respect to sNDAs proposing safety-related updates to the labels, I performed primary and secondary reviews on over a hundred sNDAs during my 10 years at FDA, and provided guidance in hundreds of others. The vast majority of these were CBE supplements, and included sNDAs submitted both

prior to and following the 2006 publication of the Physician Labeling Rule (PLR) being enacted.[2]

11. I acquired additional regulatory expertise by leading development of FDA guidance in areas such as antimicrobial resistance and medical countermeasures against diseases such as anthrax. My duties within CDER also required presentations at FDA Advisory Committee meetings, including both closed and open sessions, to solicit advice and recommendations from outside scientific experts.

12. My ability to execute these duties and responsibilities was based on my clinical and scientific training and experience prior to and during my tenure at FDA; the extensive didactic and pragmatic training and experience acquired during my time at FDA, as described above; progressive increases in both training and responsibilities during my tenure at FDA, including the complexity of regulatory submissions assigned to me; and as discussed above, experience in supervising and mentoring less experienced FDA scientists.

13. I continue to focus on public health and patient safety as the Director of HIV, Hepatitis, and Related Conditions Programs for the United States Department of Veterans Affairs (VA), a position I have held since leaving the FDA in

---

[2] The Physician Labeling Rule will be discussed later in this report.

**CONFIDENTIAL**

2006.[3] I supervise the VA's National Human Immunodeficiency Virus (HIV) program and its National Viral Hepatitis program, the two largest clinical programs in the United States for individuals living with or at risk of these disorders. My duties and responsibilities continue to involve recommendations and decisions regarding drug safety and effectiveness. They also involve close coordination and collaboration in the area of clinical pharmacy. In addition, I provide guidance on policy programs and products related to issues involving clinical public health, that is, public health matters that are relevant to clinical providers within the VA.

14. Since moving from the FDA to my current position, I have maintained my knowledge and other qualifications related to regulation of drugs, biologics, and other products under the FDA's jurisdiction. Doing so has been motivated in part by the repeated need to address such regulatory issues in my current position. I have remained current on such issues through researching and reviewing specific regulatory issues; membership in relevant professional societies; and through work done as part of my forensic consulting practice.

15. I have been a faculty member at the George Washington University School of Medicine and Health Sciences since 2000, holding the rank of Associate

---

[3] This report was prepared in my personal capacity and does not necessarily represent the views of the U.S. Department of Veterans Affairs.

Clinical Professor of Medicine since 2008. I also continue working as an active clinician; since 1998, I have served as an attending physician at the Washington D.C. Veterans Affairs Medical Center, regularly delivering primary and specialty care to Veterans enrolled in care there. I am a Diplomate of the American Board of Internal Medicine in Infectious Diseases.

16. I received a Bachelor of Science in Molecular Biophysics and Biochemistry from Yale University in 1980. I received Master of Science and Doctor of Philosophy degrees in Biochemistry from New York University in 1985 and 1988, respectively. In 1988, I received a Doctor of Medicine degree from New York University School of Medicine. I completed a categorical internal medicine residency at New York University Medical Center from 1988 to 1991, and subsequently completed an infectious disease fellowship at Yale University from 1991 to 1994, which included clinical training in both adult and pediatric infectious disease. I subsequently served on the medical staffs of Yale-New Haven Hospital and the West Haven, CT Department of Veterans Affairs Medical Center, before joining the FDA in 1996. In 2012, I received a Master's degree in Biomedical Informatics from Oregon Health and Sciences University.

**CONFIDENTIAL**

17. A copy of my curriculum vitae is attached as Exhibit A to this report. It contains more information relating to my professional background and qualifications.

18. A list of cases in which I have testified as an expert in the last four years is attached as Exhibit B.

19. The materials I considered in reaching the opinions and conclusions set forth below are cited in this report and listed in Exhibit C. This list includes, among other things, relevant scientific literature, FDA guidance documents, and published standards. My review also included depositions and documents/exhibits provided to me, labels of Sanofi's Taxotere/docetaxel product, and the reports of expert witnesses identified and listed in Exhibit C. Finally, the report cites relevant statutes, regulations, and guidance documents considered and relied upon.

20. My opinions represent regulatory conclusions but not conclusions of law

21. I am being compensated for time spent working on this matter at a rate of $550 per hour. My compensation is not related to the outcome of this litigation.

22. I reserve the right to offer rebuttal testimony to any evidence or argument advanced by Defendants, to comment on any expert reports submitted by

Defendants, and to supplement this report as appropriate or necessary. Further, this report is based upon evidence that is currently available. I reserve the right to amend my opinions and bases as further information and evidence become available.

## C. Summary of opinions

23.   As the NDA holder for Taxotere, Sanofi's regulatory obligations included surveillance and analysis of post-marketing data, including but not limited to adverse event reports and published studies, reports and case series available in the worldwide medical literature, and its own pharmacovigilance database(s), clinical trial data, as well as other sources, and investigating potential signals, including through the FDA Adverse Event Reporting System (FAERS). Sanofi is obligated to provide a label that is not false or misleading, which renders the drug misbranded. 21 USC 352(a)(1); 21 USC 331.

24. Sanofi's regulatory obligations included surveillance and analysis of post-marketing data, including but not limited to adverse event reports available in the worldwide scientific literature and its own pharmacovigilance database(s), as well as other sources, and investigating potential signals in through the FDA Adverse Event Reporting System (FAERS). 21 CFR 314.80(b).

25. Sanofi's    obligations    included    employing    scientifically    accepted

pharmacovigilance methods to detect signals indicating potential associations between exposure to Taxotere and unexpected adverse events, i.e., AEs not included in the Taxotere label. Unexpected AEs include "events that may be symptomatically and pathophysiologically related to an event listed in the labeling, but differ from the event because of greater severity or specificity." 21 CFR 314.80(a).

26. Sanofi's obligations included submitting a Changes Being Effected (CBE) or a Prior Approval Supplement (PAS) labeling supplement to update the Taxotere label when its pharmacovigilance obligations reveal an unexpected adverse event (AE) meeting the criteria for being listed as an Adverse Reaction in the Taxotere label. 21 CFR 201.57(c)(7).

27. Had Sanofi complied with its pharmacovigilance obligations, including appropriate surveillance and analysis of the available data (including but not limited to FAERS signal data, its own internal data, worldwide medical literature, clinical trial data, and other data available to the company), Sanofi should have deduced by 2006 that some basis to believe that a causal relationship exists between Taxotere or Taxotere-containing regimens and permanent chemotherapy induced alopecia (PCIA).

28. Had Sanofi complied with these obligations and discovered the basis for suspecting the potential causal relationship, it could have met its regulatory

obligations by updating the Taxotere label to inform physicians and patients about the adverse reaction of PCIA no later than April 2006.

29. However, Sanofi failed to comply with its obligations regarding post-marketing surveillance and pharmacovigilance with respect to Taxotere and the risk of PCIA. It did not update the Taxotere label with regard to permanent alopecia until 2015, and then only after breast cancer advocates contacted the FDA asking it to investigate this side-effect of Taxotere.[4]

## II.  METHODS

30. In analyzing FDA regulatory issues to offer opinions in this matter, I take the same approach that I employed as an FDA reviewer charged with making recommendations regarding a regulatory decision in my review of NDAs and sNDAs. This approach is based on documented best practices within CDER, which are formally referred to as Good Review Practices (GRPs). GRPs, which were introduced during my tenure at the FDA, are published as sections of CDER's Manual of Policy and Procedures (MAPP), and are publicly available.[5] As explained in MAPP 6025.1, *Good Review Practices,* GRPs

---

[4]  Taxotere-FOIA-005251, p. 77.

[5]  "CDER Manual of Policies & Procedures (MAPP)," *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research/cder-manual-policies-procedures-mapp.

**CONFIDENTIAL**

"improve efficiency, clarity, and transparency of the review process and review management."[6]

31. Unless otherwise indicated, the terms "regulation" and "regulatory" refer to the FDA, as opposed to another Executive Branch agency. The terms "drug" and "new drug" are used as defined in the Food, Drug, and Cosmetic Act (FDCA) at 21 USC 321(g) and 21 USC 321(p); they do not necessarily refer to a particular product that is the subject of an NDA or BLA.

32. Regulatory analyses in this report generally rely on FDA Guidance, the default regulatory and technical standards used by FDA reviewers.[7,8] Draft and Final Guidance published in the *Federal Register* under FDA's Good Guidance Practices regulation[9] reflect the FDA's current thinking at a given point in time on a particular regulatory or technical issue. Guidance publications represent a safe harbor for FDCA compliance, and manufacturers who choose an approach different from that described in a relevant Guidance must still comply with the FDCA and justify its position.[10]   Guidance

---

[6] CDER MAPP 6025.1: *Good Review Practices* (February 2017), *available at* https://www.fda.gov/media/72747/download.

[7] 21 CFR 10.115(d)(3).

[8] 21 CFR 10.115(b)(1).

[9] 21 CFR 10.115.

[10] 21 CFR 10.115(d)(2).

**CONFIDENTIAL**

publications are of sufficient importance in clarifying FDA's current thinking that Congress has frequently directed the FDA, through appropriate legislation, to develop Guidance on specific topics.[11]

33. The methodology used in this report for regulatory analyses is based upon my education, training, and experience as an FDA medical officer applying the appropriate and relevant regulations.

## III. REGULATION OF DRUG MARKETING IN THE U.S.

### A. Historical perspective

34. Drugs are meant to help people live longer, better, or both. In addition to potential benefits, however, all drugs have risks. No drug is completely safe, and for some drugs (*e.g.*, agents used in cancer, like chemotherapy), virtually all patients receiving the drug will suffer unwanted side effects, also known as adverse events or adverse reactions. Thus, in assessing benefits and risks, a drug should do more good than harm. From a regulatory perspective, whether a drug is considered "safe" is tied inextricably to the benefit provided by the drug. Even when associated with severe toxicities, a drug may be considered "safe" if it provides a substantial clinical benefit. Conversely, a drug that has less benefit, especially when compared to other treatments or to

---

[11] E.g., Food and Drug Amendments Act of 2007 § 911, 21 USC 360a.

**CONFIDENTIAL**

other drugs for the same condition, must have little if any significant toxicity to be considered safe.

35. In addition, information about the relative balance between drug benefits and harms is critical not only for health care providers choosing between different options for patients, but also for patients themselves, who make decisions about which medications to take in consultation with their physician. It is a bedrock principle of medical ethics that patients cannot provide meaningful consent to a treatment offered to them by a provider unless they have sufficient information to make a truly informed decision, weighing the known/expected risks with the predicted benefits.

36. Additionally, in adjuvant care of early-stage breast cancer, the patient population has a high likelihood of living beyond their disease, so long-lasting adverse reactions are important to consider from a labeling standpoint.

## B. The Food, Drug, and Cosmetic Act

### 1. General provisions

37. The United States has a sophisticated system for regulating drug development and marketing, based primarily on the Food, Drug, and Cosmetic Act of 1938, as amended (FDCA; 21 USC 301 *et seq.*) and its implementing regulations in Title 21 of the Code of Federal Regulations (CFR). The FDCA defines a

**CONFIDENTIAL**

"drug" as an article recognized in two official drug compendia, the United States Pharmacopeia (USP) and the National Formulary (NF). 21 USC 321(g). The United States Pharmacopeial Convention, a private non-profit organization, publishes these two references in combination annually as the USP-NF. Outside of drugs contained in the USP and NF, the FDCA's definition of a drug also includes "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" and "non-food articles intended to affect the structure or any function of the body of man or other animals." 21 USC 321(g)(1).[12]

38. A drug that is not generally recognized as safe and effective (GRASE) is referred to as a "new drug." 21 USC 321(p)(1). Marketing new drugs requires FDA approval, as discussed below.

39. The FDCA is enforced by the U.S. Food and Drug Administration, an Executive Branch agency located within the U.S. Department of Health and Human Services. The FDA's regulatory authority and responsibilities cover a broad range of medical products, including human drugs, veterinary drugs, vaccines, blood products, medical devices. The FDA is organized into several

---

[12] The FDCA also defines a drug as any article contained in the Homoeopathic Pharmacopoeia of the United States, or National Formulary, or any supplement to these official compendia, or any article intended for use as a component of another article meeting these various definitions of a drug. 21 USC 321(g).

**CONFIDENTIAL**

centers, which have responsibility for individual aspects of the agency's mission. The largest of these is the Center for Drug Evaluation and Research (CDER), which regulates human drugs. I worked in the CDER with significant responsibility for reviewing INDs, NDAs, and sNDAs.

40. Throughout most of the 20th century, FDA's activities were funded almost entirely through Congressional appropriations. Over time that changed. In 1992, the Prescription Drug User Fee Act (PDUFA; PL 102-571) authorized FDA to collect fees from drug manufacturers submitting NDAs, and in return the FDA committed to significantly reduce the time to review and act on NDAs. FDA receives significant funding through user fees. In 2021, the user fee for an application requiring review of clinical data is approximately $2.8M.

### 2.   New Drug Applications

41. To market a new drug in the United States, a company must obtain FDA approval of a New Drug Application (NDA) containing relevant data on the chemistry, manufacturing processes, toxicology, clinical pharmacology, clinical effectiveness, and risks connected with the drug. The data contained in an NDA are generally obtained from studies conducted under an Investigational New Drug Application (IND). The IND holder is generally referred to as a *sponsor*.

**CONFIDENTIAL**

42. When submitting an NDA to market a drug in the US., a sponsor must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 USC 505(b)(1). FDA approval of an NDA requires that these "full reports" demonstrate that the drug described in the NDA is safe and effective for its proposed use. 21 USC 355(d); 21 CFR 314.125. Failure to include such "full reports" in an NDA can result in the FDA summarily rejecting the application through a refuse-to-file action. 21 CFR 314.101(d)(3).

43. An NDA under § 505(b)(1) must include detailed reports on the subject drug's chemistry and manufacturing; results of animal studies; results of pharmacokinetic studies in humans; and results from controlled studies in humans, along with other clinical data collected during the drug development program, including adverse reactions. To garner FDA approval, the data in the NDA must demonstrate   the drug's safety and effectiveness.[13]

44. When discussing what a sponsor like Sanofi must include in its New Drug Application, or in the post marketing period through supplements, it is important to note that FDA only reviews material, studies and publications submitted by the sponsor. FDA reviewers do not conduct independent studies

---

[13] 21 CFR 314.50(c)

**CONFIDENTIAL**

of their own; it is the obligation of the sponsor to submit information for the medical officer to review. In the case of Taxotere, Sanofi submitted its NDA for priority review, which included paying a fee, and as a result FDA was to give the Taxotere NDA a priority review.   This applies to sNDAs as well.

### 3.   Demonstrating safety

45. The sponsor of an NDA has the burden of demonstrating safety. Under 21 USC 355(d)(1), it is not enough for the sponsor to find an absence of risk; the sponsor must affirmatively demonstrate the safety of a drug. In practical terms, this means excluding the occurrence of particular drug risks at frequencies greater than a threshold level that would impact the balance of the magnitude of a drug's benefit compared to its risks.

46. FDA issued a Guidance on Pre-Market Risk Assessment in March 2005. The guidance notes that:

a. "Even large clinical development programs cannot reasonably be expected to identify all risks associated with a product. Therefore, it is expected that, even for a product that is rigorously tested preapproval, some risks will become apparent only after approval, when the product is used in tens of thousands or even millions of patients in the general population."

CONFIDENTIAL

b. After approval, the NDA holder has continuing regulatory responsibilities. The NDA holder must develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing adverse events to the FDA; continuously execute these procedures; and, when indicated by discovery of new information, update the drug label to provide adequate directions for use. 21 CFR 314.80(b).

47. These activities are collectively referred to as *pharmacovigilance.* An NDA holder's pharmacovigilance obligations begin as soon as its product receives FDA approval, as evidenced by the standard language used in NDA approval letters issued by the FDA.

48. Effective pharmacovigilance allows a drug manufacturer to meet its obligation under the FDCA to ensure that the drug's label remains accurate and is not false or misleading to physicians or patients. 21 CFR 314.80; 21 CFR 314.81; 21 CFR 201.57.

49. Following approval, the sponsor has a continuing duty to monitor the following data sources for post-approval risk profile:

a. Data from randomized controlled studies

b. Meta-analyses of randomized controlled studies

c. Observational studies

d.  Meta-analyses of observational studies

e.  Published case reports

f.  Published case series

g.  Published pharmacoepidemiology studies

h.  Follow-up data from clinical trials

i.  Spontaneous adverse event reports

j.  Signal detection and analyses

### 4.   Assessing whether there is "some basis to believe there is a causal relationship between" Taxotere and PCIA

50. To understand the scientific evidence available to Sanofi, I reviewed the various data sources that were available to the company as the NDA holder before and after the approval of Taxotere:

a.  The publicly available worldwide medical literature;

b.  Dr. Madigan's disproportionality analysis (PRR) reporting based upon data from the FDA's Adverse Event Reporting Database ("FAERS") (focusing on years 2000 – 2008, quarter 1);

c.  Information from Sanofi's worldwide pharmacovigilance database concerning reported cases of permanent/irreversible alopecia;

**CONFIDENTIAL**

    d.  Clinical trial data from TAX 316 55-month, and the analysis performed by Dr. Madigan to determine statistical significance;

    e.  Sanofi's Taxotere (docetaxel) labeling;

    f.  Internal Sanofi documents;

    g.  Deposition testimony of Sanofi employees, with exhibits.

    h.  Other sources of data and information as set out in this report.

51. For purposes of this case, my understanding and opinions are supported by the analyses and opinions of Plaintiffs' expert witnesses Dr. Ellen Feigal, Dr. David Madigan, and Dr. Laura Plunkett. I have reviewed their expert reports, and I accept and consider their assessments valid. Any reliance upon these expert reports is limited to the information set out that pre-dates May 29, 2008.

52. From 1979 to 2006, the regulatory standards for including adverse events in a drug label required that an AE be "an undesirable effect, reasonably associated with the use of the drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." (2005 CFR, 21 CFR 201.57(g)).

53. In January 2006, FDA published a major revision of the requirements for the format and content of drug labeling, frequently referred to as the *Physician Labeling Rule* (PLR). 71 FR 3921-3997 (2006).

**CONFIDENTIAL**

23

54. The PLR significantly tightened the standard for inclusion of AEs in drug labels by the following qualification:

> "This definition does not include all adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." 71 FR 3921 3990.

55. The required content of the ADVERSE REACTIONS section of the label, provides that this section "must describe the overall adverse reaction profile of the drug based on the entire safety database." And it limits the content to "only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." 21 CFR 201.57(c)(7) 21 CFR 201.57(c)(7)(ii)(A) further describes that:

> "[f]or adverse reactions with significant clinical implications, the listings must be supplemented with additional detail about the nature, frequency, and severity of the adverse reaction and the relationship of the adverse reaction to drug dose and demographic characteristics, if data are available and important."

56. FDA's Guidance for Industry on the ADVERSE REACTIONS section explains that "Serious, low-frequency adverse events generally will be listed

**CONFIDENTIAL**

when there is reason to suspect that the drug may have caused the event. Typical reasons to suspect causality for an event include (1) timing of onset or termination with respect to drug use, (2) plausibility in light of the drug's known pharmacology, (3) occurrence at a frequency above that expected in the treated population, and (4) occurrence of an event typical of drug-induced adverse reactions (e.g., liver necrosis, agranulocytosis, Stevens-Johnson syndrome). For serious events that are typical of drug-induced adverse reactions, the occurrence of even a single event could be a basis for inclusion in the list."[14]

57. For purposes of assessing whether there was "some basis to believe a causal association exists between Taxotere and PCIA, Dr. Madigan's disproportionality analysis demonstrates that a consistent safety signal for PCIA is present from 2000 through 2017, while no other chemotherapy drug analyzed demonstrated a consistent and ongoing signal. In addition to Dr. Madigan's PRR/FAERS analysis, there were at least 32 adverse events received by Sanofi's pharmacovigilance department prior to 2008.[15] In August 2006 Sanofi became aware of the study performed by Dr. Sedlacek, and his

---

[14]  Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products - Content and Format (January 2006), available at https:// www.fda.gov/ media/72139/download.

[15] Sanofi_02994797.

finding that Taxotere containing regimens alone demonstrated an increased incidence of PCIA.[16] This study demonstrated a statistically significant risk of PCIA in with Taxotere-containing regimens versus non-Taxotere containing regimens.[17] Sanofi's own interim data from its randomized study, TAX316, demonstrated a statistically significant increase in the incidence of PCIA in the TAC group compared to the FAC group in the study.[18] And, finally, in April 2006, Sanofi recognized the distinction between temporary alopecia and alopecia that does not resolve, as evidenced by drafts of labeling in the EU discussed among Sanofi employees in the United States and France.[19]

58. The causal relationship between Taxotere and PCIA has been further elucidated in several studies published after 2008 that provide evidence of a causal relationship between Taxotere and docetaxel-containing regimens and PCIA; these studies are set out more fully in the report of Dr. Ellen Feigal. This evidence confirms that the basis for the belief that a causal relationship

---

[16] Sanofi_04633925.

[17] Madigan Report, June 7, 2020, pp. 221-24, Table 8.

[18] *See* Interim (55-month follow-up) Clinical Study Report, TAX316, January 21, 2004, demonstrating 4.2% (31/744) of patients in the TAC arm and 2.2% (16/736) in the FAC arm (rr: 1.92); *See also,* Madigan report, table 8, calculating statistical significance at dates prior to 2008.

[19] *See* I. Richard-Cassin, dep. May 4, 2018, pp. 115 -147; exhibits 22-25. Also see G. Nijveldt dep., Feb. 15, 2018, pp. 80:15 – 89:22; exhibit 7, GSOP, Implementation Process for Corp orate Labeling, explaining Sanofi's policy is to harmonizing labels worldwide.

**CONFIDENTIAL**

existed prior to 2008 has ultimately been confirmed.[20]  This evidence includes a retrospective study published in March 2011 reviewing records of 8,430 patients who attended a hair clinic during the previous 7 years with non-scarring alopecia, which identified seven cases of PCIA, 5 of which occurred after administration of docetaxel-containing regimens.[21]   A retrospective clinicopathological study published in June 2011 found that 6 of 10 cases of post-chemotherapy PCIA cases occurred in breast cancer patients treated with docetaxel-containing regimens.[22]   A retrospective study published in May 2012 described 20 breast cancer patients suffering PCIA after receiving docetaxel-containing regimens.[23]

59. Other available information regarding PCIA after treatment with a docetaxel-containing regimen include PCIA case reports in 2009 and 2010.[24]

---

[20] Report of Ellen Feigal, at § VIII(D), Table 2, notes; § IX; UpToDate, Alopecia Related to Systemic Cancer Therapy, 2020, https://www.uptodate.com/contents/ alopecia-related-to-systemic-cancer-therapy/print; Chan J., et al, "Permanent hair loss associated with taxane chemotherapy use in breast cancer: A retrospective survey at two tertiary UK cancer centers," Eur J Cancer Care, 2020:e13395.

[21] Palamaras I, et al., "Permanent chemotherapy-induced alopecia: a review." J Am Acad Dermatol. 2011 Mar; 64(3): 604-606.

[22] Miteva M, et al. "Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases." Am J Dermatopathol. 2011 Jun; 33(4):345-50.

[23] Kluger N, et al. "Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients." Ann Oncol. 2012 Nov; 23(11):2879-84.

[24] Prevezas C, et al. "Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer." Br J Dermatol. 2009 Apr; 160(4):883-5; Tallon B, et al. "Permanent chemotherapy-induced alopecia: case report and review of the literature." J Am Acad Dermatol. 2010 Aug; 63(2):333-6; Masidonski P, Mahon SM. "Permanent alopecia in women being treated for breast cancer." Clin J Oncol Nurs. 2009 Feb;13(1):13-4.

**CONFIDENTIAL**

60. With respect to the FAERS database, as Dr. Madigan noted in his report, there was a proportional reporting rate (PRR) signal for docetaxel from as early as 2000. The FAERS data are publicly available for download, and were available to Sanofi throughout Taxotere's market authorization.

### 5.   Post-approval NDA regulatory obligations

61. After NDA approval, the sponsor of the application (the NDA holder) has continuing regulatory responsibilities. For purposes of this report, a critically important responsibility is the evaluation and reporting of available safety information to the FDA, and ensuring that the product's label remains accurate by incorporating newly acquired information regarding the drug that has become available to the NDA holder. 21 CFR 314.70(c)(6)(iii).

62. "Newly acquired information is data, analyses, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 CFR 314.3.

63. An NDA holder's post-marketing regulatory responsibilities focus in large part on serious adverse events (SAEs) and unexpected AEs. The FDA

**CONFIDENTIAL**

28

classifies an AE as serious if it results in death, a life-threatening AE, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect. However, the governing regulation at 21 CFR 314.80(a) explains that an AE can be considered serious even if it does not result in one of these outcomes.

64. An "unexpected AE" is one that is not listed in the current labeling for the drug. The governing regulation at 21 CFR 314.80(a) explains that the definition of an "Unexpected adverse drug experience" includes listed AEs, that present differently due to greater severity or specificity.

    a. "Any adverse drug experience that is not listed in the current labeling for the drug product. This includes events that may be symptomatically and pathophysiologically related to an event listed in the labeling, but differ from the event because of greater severity or specificity." *Id.*

65. One of an NDA holder's most important post-approval regulatory obligations is the detection and assessment of unexpected AEs, i.e., those not listed in the current drug label. An NDA holder is required to report all SAEs to the FDA within 15 calendar days after receipt, investigate them, and provide follow-up information.

**CONFIDENTIAL**

66. More generally, an NDA holder is required to promptly review all AEs, evaluate them, and report the results of its analyses to the FDA, both in periodic safety update reports and annual reports. These activities are collectively referred to as *pharmacovigilance*. The PSURs and Annual Reports are reporting requirements, and not the accepted method for alerting FDA to new safety information that justifies a label update. Label updates are submitted through the sNDA process, either through a CBE or a PAS. Pharmacovigilence and label updates are the sponsor's obligation.

67. An NDA holder's pharmacovigilance obligations begin as soon as its product receives FDA approval, as evidenced by the standard language used in NDA approval letters issued by the FDA.

68. Based on my knowledge, training, and experience, just as NDA applicants have manufacturing facilities and operations in place allowing them to begin producing a drug as soon as possible after FDA approval, in a manner compliant with regulatory requirements and FDA's Good Manufacturing Practices guidance, they must also have pharmacovigilance capabilities and procedures in place allowing them to initiate post-marketing pharmacovigilance as soon as possible after FDA approval, in a manner compliant with regulatory requirements and FDA's pharmacovigilance guidances.

**CONFIDENTIAL**

69. Pharmacovigilance activities represent a critical post-marketing regulatory obligation for NDA holders. Pharmacovigilance plays an essential role in monitoring drug safety post-marketing because of the enormous difference between the limited power of pre-approval clinical trials to detect adverse events, particularly SAEs, and the number of patients in the real world who may be exposed to a drug once it enters the marketplace.[25]

70. Collecting, evaluating, reporting, and acting on available safety information (including label updates) through a scientifically sound, well-designed, and well-executed pharmacovigilance program allows a drug manufacturer to comply with its obligation under the FDCA to ensure that the drug's label remains accurate and is not false or misleading to physicians or patients. 21 CFR 314.80; 21 CFR 314.81; 21 CFR 201.57.

71. Because of the broad range of pharmacoepidemiologic data sources and methods developed over the last quarter-century, an NDA holder that passively counts up adverse events and dutifully transmits tallies to the FDA cannot be regarded as meaningful review or "evaluation" of AEs as required under 21 CFR 314.80(b). The statistical power of large adverse event datasets, combined with sophisticated analytic techniques and increased computing

---

[25] 2005 Pharmacovigilance guidance in fn 27 - Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (March 2005), available at https://www.fda.gov/media/71546/download.

**CONFIDENTIAL**

capabilities, allow for the identification of safety signals requiring further exploration and analysis. I have read the report of Dr. Madigan, and his findings regarding signal detection demonstrate a clear and continuous safety signal for Taxotere, demonstrated in the PRR calculation, from 2000 – 2017. Further, Dr. Madigan's calculations using the same terms and search parameters do not demonstrate a safety signal for Adriamycin, Cyclophosphamide, 5-FU, Paclitaxel, Xeloda and Avastin.

72. Two decades ago, the limitations of passive voluntary surveillance databases, such as incomplete information in individual reports and population-level under-reporting of adverse events, had been regarded as barriers to meaningful use of these datasets as a source of new safety information. However, the introduction of techniques such as Bayesian data mining (e.g., disproportionality analysis of an excess of adverse events occurring in reports for a particular drug than would be expected by chance alone), in combination with the very large number of individual reports available, have made FAERS and similar data sources flexible, powerful tools for pharmacovigilance. For example, data mining of adverse event databases has been used to predict in advance addition of new safety information to drug labels.[26]

---

[26] Gurulingappa H, *et al*. Automatic detection of adverse events to predict drug label changes using text and data mining techniques. Pharmacoepidemiol Drug Saf. 2013 Nov;22(11):1189-94.

**CONFIDENTIAL**

73. The details and application of such methods are explained at greater length in Dr. David Madigan's report, which I refer to and rely upon in offering my regulatory opinions. Reliance upon a statistician in this regard is precisely what I did while performing and supervising the review of NDAs an sNDAs as a medical officer at FDA. I did not personally calculate PRRs or perform other analytics, and would rely upon calculations performed by others in performing medical officer reviews.

74. The FDA has issued multiple detailed Guidances to Industry on how drug manufacturers can meet their pharmacovigilance obligations with respect to surveillance of drug AEs; analyzing aggregated AE data and identifying potential safety signals; analyzing and evaluating such signals; and taking appropriate actions.

75. For example, a 2005 Pharmacovigilance Guidance issued by FDA[27] provides recommendations to NDA holders on good pharmacovigilance practices, such as prospectively constructing a pharmacovigilance plan for a drug; use of a standardized controlled terminology for AEs, such as the Medical Dictionary for Regulatory Activities (MedDRA); use of active and passive AE

---

[27] Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (March 2005), *available at* https://www.fda.gov/media/71546/download.

**CONFIDENTIAL**

surveillance; and data mining of large AE datasets, such as the FDA's Adverse Event Reporting System (FAERS), to identify safety signals, including PRR.

76. Pharmacovigilance is a critical foundation for another major post-marketing regulatory obligation of NDA holders, ensuring that the label for a marketed drug is at all times accurate, and is not false or misleading in any particular. 21 CFR 314.125(b)(6). Maintaining the accuracy and completeness of the safety information in a drug's label is an essential component for meeting this obligation, particularly since a drug's toxicity profile may, and often times will, change as more patients are exposed to it in the post market period.

77. As discussed above, it is the NDA holder's responsibility to ensure that a drug's label is not false and misleading, and the sponsor's responsibility to monitor and maintain accurate safety information in its label at all times. An NDA holder can propose a change in a drug's label by submitting a supplemental NDA. Many labeling changes (e.g., adding a new indication to the label) require prior approval by the FDA. However, an NDA holder can change a label without prior FDA approval if it will "add or strengthen a contraindication, warning, precaution, or adverse reaction," based on new safety information that meets a regulatory threshold. Such a change can be implemented immediately by submitting a *Changes Being Effected (CBE)* supplement (sometimes referred to as a *labeling supplement*) to the FDA. If

the sponsor decides to not utilize the CBE process it may seek to update its label through a Prior Approval Supplement (PAS).

78. If the sponsor chooses to submit a CBE, the FDA reviews the supplement after the NDA holder has implemented the changes in the label, and in theory, has the authority to retroactively reject them. However, this rarely, if ever, occurs.

*79.* FDA's perspective on CBE supplements was well-expressed by Dr. Robert Temple, the former Office of Medical Policy at CDER/FDA (Excerpts from Deposition of Robert Temple, M.D. 2004). When asked if the FDA would regard a drug as being misbranded if the sponsor added language to strengthen a warning even without a scientific basis, Dr. Temple, stated that *"I mean, the fact is that the company strongly wants labeling . . . . Even if we think it's a little flimsy, we would probably defer. We would have to be quite persuaded to that it really was, uh, **without merit.**"*[28]

---

[28] Deposition of Robert Temple, MD. In Re Paxil Products Liability Litigation CV 01-07937 MRP. 7 December 2004.

**CONFIDENTIAL**

## IV. Regulatory and Scientific Facts

### A. Pre-approval regulatory history

80. The FDA's approval of the original Taxotere NDA was made under the accelerated approval regulations (21 CFR 314.500), which allowed provisional approval on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity.[29]

81. Accelerated approval requires, among other things, that the sponsor submit post-marketing data to describe and verify the benefit of the drug. The sponsor submitted the required data as a sNDA, which was approved on June 22, 1998, converting the accelerated approval for metastatic breast cancer to a traditional approval.

82.    Taxotere received approval for the adjuvant care of early stage breast cancer, in combination with doxorubicin and cyclophosphamide, on August 18, 2004.[30]

---

[29] https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20449S004_Taxotere.pdf

[30] Sanofi_02489593, p. 57.

**CONFIDENTIAL**

83. Sanofi submitted subsequent sNDAs for indications for advanced gastric adenocarcinoma, squamous cell carcinoma of the head and neck (SCCHN), and to add language related to pediatric safety, among other later sNDAs.[31]

84. I have reviewed the Taxotere labels from 1999 to the present, and note that prior to May 29, 2008, the Taxotere label did not include listing for the unexpected adverse reaction of permanent, irreversible or persistent alopecia. Sanofi's Taxotere label did not include any information about duration or severity of alopecia until 2015, when it included "cases of permanent alopecia have been reported" with Taxotere use.

**B. Scientific information regarding Taxotere and permanent alopecia**

85. Against the background of the previously discussed regulatory framework I was asked to evaluate an offer opinion on whether or not sufficient evidence existed prior to May 29, 2008, that warranted a label change to § 6 (Adverse Reactions) of the Taxotere label, and if so to identify the evidence that demonstrated and justified a change. This analysis is fairly straightforward and requires understanding the following:

   a. What is the standard for making a § 6 (Adverse Reactions) label change or amendment?

---

[31] Sanofi_02489593, pp. 69, 87 and 83, respectively.

**CONFIDENTIAL**

b.  What relevant evidence was available to Sanofi prior to May 29, 2008, and what knowledge did the company possess that speaks to the relevant standard for making a § 6 (Adverse Reactions) label change or amendment?

c.  What, if any, evidence exists that demonstrates Sanofi performed necessary pharmacovigilance and analyses over time to assess and evaluate information that would impact and inform a § 6 label amendment?

d.  What, if any, action did Sanofi take in light of the available evidence and its regulatory/labeling obligations? Did Sanofi ever seek to update § 6 of its Taxotere label prior to May 29, 2008, to include an adverse reaction that described the nature, severity and duration of PCIA.

86. The standard for a § 6 label change is dictated by the relevant regulations that govern labeling. As set out and explained previously in this report, 21 USC § 201.57(c)(7) states:

a.  "For purposes of prescription drug labeling, an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence. This definition does not include all

adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."

87. And 21 USC § 314.80(a) sets out the definition of an "Unexpected adverse drug experience," as follows:

   a. "Any adverse drug experience that is not listed in the current labeling for the drug product. This includes events that may be symptomatically and pathophysiologically related to an event listed in the labeling, but differ from the event because of greater severity or specificity." *Id.*

88. The evidence available to Sanofi prior to May 29, 2008, that would inform and support a § 6 (Adverse Reactions) label change, included at least the following:

   a. The consistent and growing safety signal for Taxotere and PCIA as demonstrated in Dr. Madigan's increased PRR for Taxotere and PCIA from 2000 – 2008 (and in fact through 2017, the last year for which Dr. Madigan provides his FAERS analysis), and the lack of any consistent increased PRR for any of the other drugs analyzed (Adriamycin, Cyclophosphamide, 5-FU, Paclitaxel, Xeloda and Avastin). *See* Dr. Madigan's expert report for Kahn.

**CONFIDENTIAL**

39

b. Nabholtz, et al.,(2001) documenting cases of PCIA in a Sanofi-sponsored study.

c. Sanofi's internal pharmacovigilance database. The two Clinical Overviews conducted in 2011 and 2015 reflect that Sanofi received numerous reports of permanent/irreversible alopecia that predate, 2008, and should be considered in assessing a label change prior to this date. Interestingly, although recognizing the presence of over 140 AEs for permanent/irreversible alopecia by 2011, rather than inspiring further investigation – including a FAERs analysis for signal detection, among other potential actions – Sanofi's employee Emanuel Palatinsky simply explained the events away stating "available evidence does not show that irreversible alopecia is caused by docetaxel alone." E. Palatinsky deposition, Ex. 16, p. 44.

d. Sanofi's TAX316 55-month interim analysis comparing a TAC (Taxotere, Adriamycin and Cyclophosphamide) regimen with a FAC (5-FU, Adriamycin and Cyclophosphamide) regimen, demonstrating a statistically significant increased incidence of PCIA.[32] When requested by the European Medical Agency (the European equivalent of the FDA)

---

[32] *See* Madigan Report, Table 8, p. 24 and Sanofi_05097326.

**CONFIDENTIAL**

to provide information and rates of permanent alopecia, Sanofi provided its data from TAX316 and GEICAM 9801, and thus the data from those studies should be looked to at the 55-month period for instruction on regulatory questions.

e.  Dr. Madigan's analysis of Safety Update Reports compiled by Sanofi as part of its ongoing regulatory obligations in Europe; Dr. Madigan documents the number of reported cases of irreversible alopecia from TAX 316 that Sanofi reported to EMA from 2004 – 2009.[33]

f.  Sedlacek (2006) was an retrospective study performed on clinical experience between January 1994 and December 2004 and demonstrated PCIA only in the treatment group treated with Taxotere-containing regimens, and not in groups receiving regimens that included paclitaxel or no taxane at all. As discussed below, there is evidence that demonstrates Sanofi had knowledge of Dr. Sedlacek's study findings before he presented them at the San Antonio Breast Cancer Symposium in December 2006.

---

[33] Madigan Report June 7, 2020, at 23-26; Sanofi_01294774 (2005 Safety Update Report); Sanofi_05956179 (2006 Safety Update Report).; Sanofi_04014414 (2007 Safety Update Report); Sanofi_03929385 (2008 Safety Update Report).' Sanofi_03935020 (2009 Safety Update Report); Sanofi_01294924 (2006 Rapporteur Assessment Report).

**CONFIDENTIAL**

89. I have reviewed the documents cited in this report and listed on Exhibit B, as well as the depositions listed and referenced in this report, and I have not seen any evidence that Sanofi performed the necessary pharmacovigilance to evaluate and assess the AE of PCIA prior to May 29, 2008, despite multiple pieces of evidence demonstrating Sanofi's knowledge of or, at a minimum, some basis to believe a causal association existed between the use of Taxotere and PCIA. These include:

a. Sanofi employees discussing Dr. Sedlacek's study findings prior to its publication at the San Antonio Breast Cancer Symposium in December 2006.[34]

b. Exhibits 22-25 to the deposition of Isabelle Richard-Cassin. Ms. Richard-Cassin was the Regulatory Manager, EU Oncology, for Sanofi, and exhibits 22 – 25 to her deposition document discussions on a teleconference that occurred on April 25, 2006, wherein Sanofi employees in France and the United States were discussing separately listing temporary alopecia and alopecia that does not resolve (PCIA), and including these AEs separately in the EMA label. This is important and relevant to labeling in the United States because of Sanofi's policy

---

[34] Sanofi_04633925

for harmonizing its labels worldwide. Specifically, Sanofi QSOP-000775 (February 1, 2006), requires international harmonization to "ensure the highest possible degree of international consistency intended for use by healthcare professionals and/or consumers."[35] This purpose of harmonization within Sanofi worldwide was confirmed by Garret Nijveldt, Sanofi's Senior Director of Global Regulatory Affairs, Labeling.[36]  Mr. Nijveldt is a United States based employee of Sanofi. Regardless of the differences that may exist between labeling requirements in the Europe and the United States, these documents demonstrate Sanofi's knowledge of the potential relationship between Taxotere and PCIA, and demonstrate, along with other evidence, some basis to believe a causal association existed between Taxotere and PCIA prior to May 29, 2008.

c. Sanofi's employee Amy Freeman at 195:20 – 196:21 of her October 18, 2018 deposition, stated that "by 2006 Sanofi knew its product could cause irreversible alopecia in patients" and that "Sanofi was aware." This, along with other evidence, demonstrate, some basis to believe a

---

[35] Sanofi_00722655.

[36] Nijveldt depo, 80:15 - 89:22.

**CONFIDENTIAL**

causal association existed between Taxotere and PCIA prior to May 29, 2008.

d.  Sanofi's representations to EMA in response to questions posed in November 2012, and answered in January 2013, concerning permanent chemotherapy induced alopecia related to Taxotere were answered by reference to Sanofi's data from its TAX316 and GEICAM9805 studies.[37] Statistically significant interim data from these studies was available to Sanofi prior to May 29, 2008, and should have – when considered with other evidence available to the company as set out in this report – contributed to its analysis and discovery of some basis to believe a causal relationship existed between Taxotere and PCIA.

e.  Instead of finding evidence of diligent investigation and pharmacovigilance, there is a troubling lack of evidence documenting any analysis or assessment of the risk of PCIA at all prior to the 2011 Clinical Overview, which was prompted by inquiry from outside the company. I did not find any evidence of proactive pharmacovigilance concerning the risk of PCIA that predates May 29, 2008.

---

[37] Mancini 37, P. Mancini deposition, March 23, 2018.

**CONFIDENTIAL**

90. Applying the evidence described in this report, and the documents and depositions reviewed and considered, against the standard set out in 21 CFR §§ 201.57 and 314.80, as described in this report, it is my opinion to a reasonable degree of regulatory and scientific certainty that sufficient evidence existed to support some basis to believe a causal association existed between Taxotere and PCIA, at least as early as the April 25, 2006 telephone conference/meeting documented in Richard-Cassin exhibits 22, 24 and 25.[38] This was followed closely by Sanofi's awareness of Dr. Sedlacek's study findings, and then by his presentation and publication of his findings at the San Antonio Breast Cancer Symposium in December 2006. As the manufacturer and marketer of Taxotere, Sanofi had an ongoing obligation to update its label to include accurate information, including the adverse reaction of PCIA. Further, while I recognize that the word "alopecia" appears in § 6 (Adverse Reactions) of the Taxotere label in effect in May 2008, the inclusion of only alopecia without descriptive language of duration and severity as required by 21 USC §§ 201.57 and 314.80 is insufficient to apprise physicians and patients of the risk of PCIA known, or knowable, to Sanofi.

---

[38] Based on the Court's direction I am not offering an opinion a date earlier than 2006, but offer my opinion based on my review of the available evidence, and within the constraints that time allowed.

**CONFIDENTIAL**

91. Beyond the regulations, the FDA made clear in its Final Rule published in the Federal Register, vol. 71, no. 15, January 24, 2006, "Requirements on Content and Format of Labeling for Human Prescription Drug and Biologic Products, that:

    a. "The agency also clarified that if data are available and important for adverse reactions with significant clinical implications, details about the nature, frequency, and severity of the reaction must be included. This provision makes clear that, in many cases, in addition to lists of adverse reactions, descriptive information is appropriate for inclusion in the ''Adverse Reactions'' section." *Id. at 30.*

    b. "For adverse reactions with significant clinical implications, the listings must be supplemented with additional detail about the nature, frequency, and severity of the adverse reaction and the relationship of the adverse reaction to drug dose and demographic characteristics, if data are available and important." *Id. at 70-71.*

92. I have reviewed the deposition and report of Sanofi's regulatory expert, Dr. Janet Arrowsmith, and provide the following comments on points advanced by Sanofi's expert. Dr. Arrowsmith left FDA before the Final Physician Labeling Rule was enacted. This includes the Final Rule providing the standard for which *unexpected adverse drug experiences* (AEs), and their

**CONFIDENTIAL**

duration and severity, need to be included in § 6 of the drug label. As a result, her conclusion that the word "alopecia" is sufficient fails to consider the mandates of the new rule set out in 21 CFR §§ 201.57(c)(7) and 314.80(a), and explained in 71 FR 3921, and therefore is incorrect.

I disagree with Dr. Arrowsmith's position that Sanofi could not amend its label to include a descriptor such as permanent or irreversible due to restrictions of the MedDRA dictionary. Dr. Arrowsmith makes this conclusion despite the fact that there is no such requirement in the regulations governing drug labels that restricts language concerning AEs to the MedDRA dictionary terms.[39] Arrowsmith dep. 7/29/2020, 63:1 -65:17. This is made even clearer by Dr. Arrowsmith's own testimony where she notes Sanofi's 2015 § 6 label change to include the words "cases of permanent alopecia have been reported," to include a descriptive term for alopecia was made without any change to the MedDRA dictionary terms; she confirmed that she did not see any documentation that Sanofi discussed deviating from MedDRA terminology with FDA prior to the 2015 label change. Arrowsmith depo., 7/29/2020, 67:1 – 70:3. While Dr. Arrowsmith recognizes the standard in §§ 201.57 and 314.80, she fails to apply the appropriate standards to the evidence.

---

[39] Wu L., et al., Study of Serious adverse drug reactions using FDA-approved drug labeling and MedDRA (2019), 20(Suppl 2):97; https://doi.org/10.1186/s12859-019-2628-5

**CONFIDENTIAL**

In December 2015 Sanofi and FDA agreed to a negotiated label update through the CBE process, implementing the label change prior to receiving FDA approval.[40]  Sanofi later submitted another sNDA, on April 11, 2018, to include the TAX316 clinical trial data concerning the adverse events that persisted to the end of the follow-up period, including alopecia.[41] Concerning both of these subsequent label changes, Dr. Arrowsmith appears to offer the opinion that Sanofi could not do prior to May 29, 2008, precisely what it did in 2015 and 2018, relying, at least in part, upon its TAX316 data for the label updates. Dr, Arrowsmith does concede however that temporary and permanent have different meanings. Arrowsmith dep, 7/29/2020, 65:1-5.  This is a point that Sanofi ultimately agrees with as well, as demonstrated by its 2015 and 2018 label updates.

---

[40] Sanofi_03333249.

[41] FDA Approval Letter to Sanofi-Aventis U.S. LLC dated October 5, 2018, at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/020449Orig1s079ltr.pdf.

**CONFIDENTIAL**

I state all of the opinions expressed in this report to a reasonable degree of regulatory and scientific certainty.

February 8, 2021

_____

**David B. Ross, M.D., Ph.D., M.B.I.**

## Exhibit A-Curriculum Vitae of David B. Ross, M.D., Ph.D., M.B.I.

### Personal data

Citizenship: United States

Telephone:  (301) 500-8557

E-mail:      rossmdpharmaexpert@gmail.com

### Education

| | |
|---|---|
| 1980 | B.S. cum laude (Molecular Biophysics and Biochemistry), Yale UniversiExhibitty |
| 1985 | M.S. (Biochemistry), New York University |
| 1988 | Ph.D. (Biochemistry), New York University. Thesis advisor: Edward Ziff, Ph.D. Thesis title: "Defective processing of human adenovirus 2 messenger RNAs during abortive infections in monkey cells." |
| 1988 | M.D., New York University School of Medicine |
| 2008 | Graduate Certificate in Biomedical Informatics, Oregon Health and Sciences University |
| 2012 | Master of Biomedical Informatics Oregon Health and Sciences University. Advisor: Judy Logan, M.D. Capstone title: "An antibiogram data model and implementation schema." |

### Post-doctoral training

| | |
|---|---|
| 1988-1991 | Resident, Internal Medicine, NYU Medical Center/Manhattan VAMC |
| 1991-1994 | Fellow, Infectious Disease Section, Department of Internal Medicine, Yale University School of Medicine |
| 1992-1994 | Research Fellow, Division of Infectious Diseases, Department of Pediatrics, Yale University School of Medicine |

### FDA Training

| | |
|---|---|
| 1996 | CDER Regulatory Science Course; CDER New Reviewer's Workshop |
| 1997 | CBER Clinical Trials Course |

### FDA Training (cont.)

| | |
|---|---|
| 1998 | CDER Basic Statistical Methods Course; JMP Training |
| 2003 | FDA Pharmacogenomics in Drug Development Workshop |

A-1

2005            FDA Transcriptional Microarrays Course

**Professional Experience**

2006-           Director, HIV, Hepatitis, and Related Conditions Programs, Office of Specialty Care Services, Veterans Health Administration

2005-2006       Associate Director for Regulatory Science, Office of Oncology Drug Products, Center for Drug Evaluation and Research, U. S. Food and Drug Administration

2004-2005       Deputy Director, Office of Drug Evaluation VI, Center for Drug Evaluation and Research, U.S. Food and Drug Administration

2000-2004       Medical Team Leader, Division of Anti-Infective Drug Products, Center for Drug Evaluation and Research, U. S. Food and Drug Administration

2000-2004       Senior Medical Reviewer, Division of Anti-Infective Drug Products, Center for Drug Evaluation and Research, U. S. Food and Drug Administration

1999            Acting Medical Team Leader, Division of Anti-Infective Drug Products, Center for Drug Evaluation and Research, U. S. Food and Drug Administration

1998-           Staff Physician, Infectious Disease Section, Washington, DC
Present         VAMC

1996-2004       Medical Officer, Division of Anti-Infective Drug Products, Center for Drug Evaluation and Research, U. S. Food and Drug Administration

1995-1996       Associate Physician, Department of Pediatrics, Yale-New Haven Hospital; Attending Physician, Pediatric AIDS Clinic, Yale-New Haven Hospital

1994-1996       Staff Physician, Infectious Disease Section, West Haven, Connecticut VAMC

1993-1997       Infectious Disease Consultant, HIV-in-Prisons Program, Yale University School of Medicine

1991-1993       Emergency Room Attending (Medical Officer of the Day), Manhattan VAMC

**Academic Positions**

2008-           Associate Clinical Professor of Medicine, George Washington

| Present | University School of Medicine and Health Sciences |
|---|---|
| 2000-2008 | Assistant Clinical Professor of Medicine, George Washington University School of Medicine and Health Sciences |
| 1995-1996 | Instructor, Department of Pediatrics (Infectious Diseases), Yale University School of Medicine |
| 1992-1995 | Lecturer, Department of Molecular Biophysics and Biochemistry, Yale University |
| 1989-1991 | Teaching Assistant, Department of Medicine, NYU School of Medicine |

## Honors and awards

| 2006 | CDER Excellence in Communication Award (OODP) |
|---|---|
| 2005 | CDER Excellence in Leadership Award (ODE VI) |
| 2004 | CDER Team Excellence Award (Ketek Review Team) |
| 2003 | CDER Team Excellence Award (CDER TOPOFF 2 Exercise Team) |
| 2002 | FDA Award of Merit (CDER Counter-Terrorism Response Team) |
| 2000 | FDA Commendable Service Award (Linezolid Review Team) |
| 1999 | CDER Group Recognition Award (Inter-Divisional Working Group on Antibiotic Resistance) |
| 1997 | CDER Team Excellence Award (Maxipime® Review Team) |
| 1997 | CDER Excellence in Communication Award (ODE IV/PhRMA Working Group) |
| 1994-1996 | Pediatric AIDS Foundation Scholar |
| 1992-1994 | Patrick and Catherine Weldon Donaghue Medical Research Foundation Fellow |
| 1980-1987 | National Institutes of Health Medical Scientist Training Fellow |
| 1976 | U.S. Presidential Scholar |

## Licenses and Certification

| | |
|---|---|
| 1989 | Diplomate, National Board of Medical Examiners |
| 1989 | Licensed, New York State Board for Medicine (inactive) |
| 1992 | Diplomate in Internal Medicine, American Board of Internal Medicine |
| 1993 | Licensed, State of Connecticut Department of Health Services (inactive) |
| 1994 | Diplomate in Infectious Diseases, American Board of Internal Medicine |
| 1998 | Licensed, State of Maryland Board of Physician Quality Assurance (current) |
| 2002 | Recertification in Internal Medicine, American Board of Internal Medicine |
| 2004 | Recertification in Infectious Diseases, American Board of Internal Medicine |
| 2015 | Recertification in Infectious Diseases, American Board of Internal Medicine |

## Membership in Professional Societies

American College of Physicians

Infectious Diseases Society of America

- Antimicrobial Use and Clinical Trials Committee (2001 – 2003)
- Antimicrobial Availability Task Force (2003 – 2005)

## FDA Advisory Committee and Workshop Presentations

| | |
|---|---|
| March 2006 | Oncology Drugs Advisory Committee Presenter (Nonclinical Studies for Initiating Phase 1 Studies in Oncology: Small Molecules vs. Biologics) |
| June 2004 | Public Workshop on Strategies for Developing Therapeutics that Directly Target Anthrax and its Toxins (Clinical Safety Testing in Healthy Volunteers) |
| April 2004 | Public Workshop on Antimicrobial Drug Development (Bacteremia as an Indication) |
| October 2003 | Anti-Infective Drug Products Advisory Committee Presenter (Diabetic Foot Infections) |

A-4

**FDA Advisory Committee and Workshop Presentations (cont.)**

| | |
|---|---|
| February 2002 | Anti-Infective Drug Products Advisory Committee Presenter (Developing Drugs for Resistant Pathogens) |
| April 2001 | Anti-Infective Drug Products Advisory Committee Presenter (Ketek (telithromycin)) |
| March 2000 | Anti-Infective Drug Products Advisory Committee Presenter (Zyvox (linezolid)) |
| October 1999 | Anti-Infective Drug Products Advisory Committee Presenter (Guidance for Industry. Catheter-related bloodstream infections: Developing antimicrobials for treatment) |
| July 1999 | Federal interagency meeting – Development of a Public Health Action Plan to Combat Antimicrobial Resistance |
| October 1998 | Anti-Infective Drug Products Advisory Committee Presenter (Bacteremia as an Indication) |
| July 1998 | FDA-Industry Workshop on Anti-Infectives for Resistant Bacteria |
| February 1998 | Anti-Infective Drug Products Advisory Committee Presenter (Guidance for Industry. Empiric therapy of febrile neutropenia: Developing antimicrobials for treatment) |
| March 1997 | Anti-Infective Drug Products Advisory Committee Presenter (Maxipime (cefepime) for empiric therapy of febrile neutropenia) |
| November 1996 | Anti-Infective Drug Products Advisory Committee Presenter (Closed meeting) |

**FDA Special Assignments**

| | |
|---|---|
| 2004 – 2005 | Anthrax Toxin Therapeutics Guidance Working Group (chair) |
| 2004 – 2006 | Subpart D Working Group |
| 2004 – 2006 | Lead in Drug Products Working Group |
| 1999 – 2002 | Committee for the Advancement of FDA Science |
| 1999 | Catheter-related Bloodstream Infections Guidance Working Group (chair) |
| 1997 – 1999 | CDER ODE IV Evaluability Criteria Working Group |
| 1997 | CDER ODE IV Working Group on Drugs of Last Resort (chair) |

**FDA Special Assignments (cont.)**

| | |
|---|---|
| 1997 | CDER ODE IV Task Force on Human Antibiotic Use in Animals |
| 1997 | CDER ORM Information Technology Working Group |
| 1997 | CDER ODE IV/PhRMA Working Group on Targeted Package Inserts |
| | CDER Office of Information Technology Coordinating Committee |

**Presentations**

Hepatitis C in the Department of Veterans Affairs. American Correctional Association All-Health Authority Training Symposium, November 15, 2018.

Ending the Epidemic: Veterans Administration Strategy for Hepatitis Care. Kentucky 4th Annual Viral Hepatitis Conference, July 27, 2017.

HIV in VA – Where are we? Albany Medical College, World AIDS Day Conference, December 4, 2015.

Hepatitis C in VA. U.S. Department of Health and Human Services. World Hepatitis Day Conference. July 28, 2015.

Hepatitis C Drug Costs. Testimony at Hearing before Senate Veteran Affairs Committee. 113th Congress, Second Session. December 3, 2014.

Hepatitis C in VA. National Association of State Medicaid Directors. November 6, 2014.

HIV Testing in the U.S. Department of Veterans Affairs. Pennsylvania Department of Public Health Conference on HIV surveillance. October 30, 2014.

Hepatitis C and Cirrhosis. VHA National Transplant Conference. April 23, 2014.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 6, 2013.

VHA's National Hepatitis C Program. Briefing for House and Senate Veterans Affairs Committee staff. October 11, 2013.

Hepatitis C in the Department of Veterans Affairs. Hospital of the University of Pennsylvania Grand Rounds. September 18, 2013.

Restructuring the VHA's Field-Based HCV Program. Presentation to the VHA National Leadership Council. August 20, 2013

Viral Structure and Replication. George Washington University School of

**<u>Presentations (cont.)</u>**

Medicine and Health Sciences, Infection and Immunity course, March 20, 2013.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. October 31, 2012.

VHA's National HIV Program. Briefing for staff in office of Representative Barbara Lee (9th Congressional District, California). March 15, 2012

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. October 26, 2011.

HIV Testing in VA. Indian Health Service HIV/STD Workshop, Scottsdale, AZ, June 2, 2011.

HCV in the VA in 2011: Where are we? VISN 16 Pharmacy Benefits Management Strategic Planning Meeting, Ridgeland, MS, March 9, 2011.

Viral Structure and Replication. George Washington University School of Medicine and Health Sciences, Infection and Immunity course, February 8, 2011.

HIV and HCV: Rating Disabilities in Veterans with Service-Connected HIV or HCV. Veterans Benefit Administration Service-Connected Rating Disability Forum, Scottsdale, AZ, January 31, 2011.

HCV in the VA in 2010: Where are we? Infectious Disease Grand Rounds, Durham Veterans Affairs Medical Center, December 13, 2010.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. October 28, 2010.

HCV in the U.S. Department of Veterans Affairs. Professor pro tem Lecture, University of Mississippi Medical Center, September 22, 2010.

Hepatitis C Overview. Liver Disease for VA Primary Care Providers meeting, New Orleans, June 16, 2010.

HIV in the VA in 2010: Where are we? Grand Rounds, Temple (TX)

Veterans Affairs Medical Center, June 10, 2010.

HCV in the VA in 2010: Where are we? Grand Rounds, Dallas Veterans Affairs Medical Center, January 27, 2010.

HCV in the VA in 2009: Where are we? Grand Rounds, Orlando Veterans Affairs Medical Center, December 2, 2009.

**Presentations (cont.)**

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. October 29, 2009.

Impact of Comorbidities on the Management and Prognosis of Chronic Liver Disease. Presented at The Dawn of a New Era: Transforming our Domestic Response to Hepatitis B & C, September 14, 2009.

HCV in the VA in 2009: Where are we? Grand Rounds, Bay Pines Veterans Affairs Medical Center, September 2, 2009.

HIV Care in the Department of Veterans Affairs. Grand Rounds, University of Mississippi Medical Center, July 21, 2009.

HCV in the VA in 2009: Where are we? Grand Rounds, Pensacola, Florida Joint Ambulatory Care Center, June 25, 2009.

HIV in the VA in 2009: Where are we? Grand Rounds, Salem, Virginia Veterans Affairs Medical Center, March 13, 2009.

HIV in the VA in 2009: Where are we? Grand Rounds, Gulf Coast Veterans Healthcare System. March 12, 2009.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 7, 2008.

Ketek: Lessons Learned. Clinical Operations Retreat, May 8, 2008.

Pharmacogenomics: A Guide for the Perplexed. Grand Rounds, Sinai Hospital (Baltimore, MD). March 27, 2008.

Ketek Clinical Study Fraud: What did Aventis Know? Testimony at Hearing Before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce. 110th Congress, Second Session. February 13, 2008.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 2, 2007.

FDA: Inside the Black Box. George Washington University School of Public Health and Health Services. October 29, 2007.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 3, 2006.

## Presentations (cont.)

The Good, the Bad, and the Unbelievable: Interpreting Clinical Trials. Grand Rounds, Washington, D.C. Veteran's Affairs Medical Center. October 25, 2006.

Oncology Biomarkers for Safety and Efficacy. 2006 International Conference on Drug Development. February 15, 2006

Pharmacogenomics: A Guide for the Perplexed. Grand Rounds, Washington, D.C. Veteran's Affairs Medical Center. January 18, 2006.

Issues in accelerated approval. 12th Biomedical Applied Statistics Symposium. November 9, 2005.

FDA's Critical Path Initiative. 2005 Annual Meeting of the Association of Clinical Research Professionals. November 4, 2005

Natalizumab: A case study in classic risk-benefit analysis. Biotechnology Industry Organization annual meeting. June 21, 2005.

Therapeutic Biologics. Pharmaceutical Education and Research Institute course on "Biologics Drug Development." April 11, 2005

Therapeutic Biologics. University of Maryland, Baltimore course on "Drug Development Processes and Regulatory Approaches." March 23, 2005.

FDA's Critical Path Initiative. Association of Clinical Research Professionals (Connecticut chapter). March 9, 2005.

Bone and Joint Infections. GWUMC/Washington DC VAMC Fellows Lecture program. December 23, 2004.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 5, 2004.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 3, 2003.

Bone and Joint Infections. GWUMC/Washington DC VAMC Fellows Lecture program. June 26, 2003.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 4, 2002.

Bone and Joint Infections. GWUMC/Washington DC VAMC Fellows Lecture program. May 23, 2002.

A-9

### Presentations (cont.)

The Role of Antibiotics in Upper Respiratory Tract Infections. Grand Rounds, Washington, D.C. Veteran's Affairs Medical Center. February 6, 2002.

Clinical Trials – the FDA perspective. 41st Interscience Conference on Antimicrobial Agents and Chemotherapy. December 18, 2001.

Catheter-related Bloodstream Infections: Developing Antimicrobial Drugs for Treatment. 41st Interscience Conference on Antimicrobial Agents and Chemotherapy. December 16, 2001.

Geriatric Drug Development. American College of Toxicology, 22nd Annual Meeting. November 6, 2001.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 2, 2001.

Don't Let Your Patients Push You to Prescribe: Managing the Use of Antibiotics. Maryland State Medical Association 2001 Convention. September 8, 2001.

Cotrimoxazole and Lactation. CDER Scientific Rounds. April 19, 2001

Treatment of Gram-positive Infections in the New Millennium. Washington, D.C. Veteran's Affairs Medical Center. February 8, 2001.

Viral Structure, Genetics, and Pathogenesis. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 1, 2000.

Comparators in Clinical Trials. 38th Infectious Diseases Society of America Annual Meeting. September 7, 2000.

New Antimicrobials for Drug-Resistant Gram-Positive Organisms. Washington, D.C. Veteran's Affairs Medical Center. May 26, 2000.

Bone and Joint Infections. GWUMC/DC VAMC Fellows Lecture program. May 18, 2000.

Viral Structure and Genetics. George Washington University School of Medicine and Health Sciences, Medical Microbiology course. November 16, 1999.

Clinical Trials: The FDA Perspective. George Washington University Medical Center, Clinical Trials course. October 1, 1999.

Use of alternative definitions of clinical response in trials of empiric anti-bacterial

therapy of febrile episodes in neutropenic patients. 39th Interscience Conference on Antimicrobial Agents and Chemotherapy. September 27, 1999.

**Presentations (cont.)**

Skin and Soft Tissue Infections. Washington Hospital Center/Washington VAMC Fellows Lecture program. December 17, 1998.

Computer-Assisted New Drug Applications. FDA Office of the Commissioner's Administrative Conference. December 6, 1996.

FDA: Inside the Black Box. Yale University, Department of Molecular Biophysics and Biochemistry, November 12, 1996.

**Publications**

Books and Book Chapters

1. **Ross D**, ed. Primary Care of Veterans with HIV, revised edition. (Washington, DC: US Department of Veterans Affairs), 2019.

2. **Ross D**, ed. Primary Care of Veterans with HIV edition. (Washington, DC: US Department of Veterans Affairs), 2009.

3. **Ross D** and Trevino S. Bacteremia and sepsis. In Textbook of Diagnostic Microbiology, 3rd edition (New York: W.B. Saunders), 2007. Eds. C. Mahon and G. Manuselis.

Published Articles

1. Rogal SS, Yakovchenko V, Morgan T, Bajaj JS, Gonzalez R, Park A, Beste L, Miech EJ, Lamorte C, Neely B, Gibson S, Malone PS, Chartier M, Taddei T, Garcia-Tsao G, Powell BJ, Dominitz JA, **Ross D**, Chinman MJ. Getting to implementation: a protocol for a Hybrid III stepped wedge cluster randomized evaluation of using data-driven implementation strategies to improve cirrhosis care for Veterans. Implement Sci. 2020 Oct 21;15(1):92.

2. Beste LA, Maier MM, Borgerding J, Lowy E, Hauser RG, Van Epps P, Ohl M, **Ross D**, Chartier M. Testing practices and incidence of chlamydial and gonococcal infection in the Veterans Health Administration, 2009-2019. Clin Infect Dis. 2020 Sep 25: ciaa1454. doi: 10.1093/cid/ciaa1454. Epub ahead of print. PMID: 32975293.

3. Rogal SS, Yakovchenko V, Gonzalez R, Park A, Lamorte C, Gibson SP, Chartier M, **Ross D**, Comstock E, Bajaj JS, Morgan TR. Char-acterizing

patient-reported outcomes in veterans with cirrhosis. PLoS One. 2020 Sep 11; 15(9): e0238712.

**Publications (cont.)**

4. Yakovchenko V, Miech EJ, Chinman MJ, Chartier M, Gonzalez R, Kirchner JE, Morgan TR, Park A, Powell BJ, Proctor EK, **Ross D**, Waltz TJ, Rogal SS. Strategy Configurations Directly Linked to Higher Hepatitis C Virus Treatment Starts: An Applied Use of Configurational Comparative Methods. Med Care. 2020; 58(5):e31-e38.

5. Rogal SS, Yakovchenko V, Waltz TJ, Powell BJ, Gonzalez R, Park A, Chartier M, **Ross D**, Morgan TR, Kirchner JE, Proctor EK, Chinman MJ. Longitudinal assessment of hepatitis C treatment: Year 2. Implement Sci. 2019 Apr 8;14(1):36.

6. Butt AA, Yan P, Lo Re V, Shaikh OS, **Ross DB**. Trends in Treatment Uptake and Provider Specialty for Hepatitis C Virus (HCV) Infection in the Veterans Affairs Healthcare System: Results from the Electronically Retrieved Cohort of HCV-Infected Veterans (ERCHIVES). Clin Infect Dis. 2019 Feb 15; 68(5):857-859.

7. Belperio PS, Chartier M, Gonzalez RI, Park AM, **Ross DB**, Morgan TR, Backus LI. Hepatitis C Care in the Department of Veterans Affairs: Building a Foundation for Success. Infect Dis Clin North Am. 2018 Jun; 32(2):281-292.

8. Bajaj JS, **Ross D**. Concise Commentary: Remaining Outside the Hospital Is a Golden State in Cirrhosis-Lessons from California. Dig Dis Sci. 2018 Sep; 63(9):2275-6.

9. Belperio PS, Chartier M, **Ross DB**. After Curing Hepatitis C Infection. Ann Intern Med 2018; 168(9):682-3.

10. Park A, Gonzalez R, Chartier M, Rogal S, Yakovchenko V, **Ross D**, Morgan TR. Screening and Treating Hepatitis C in the VA: Achieving Excellence Using Lean and System Redesign. Fed Pract. 2018 Jul; 35(7):24-29.

11. Chartier M, Maier MM, Morgan TR, Lowy E, Hoffman-Högg L, **Ross D**, Beste LA. Achieving Excellence in Hepatitis B Virus Care for Veterans in

the Veterans Health Administration. Fed Pract. 2018 Mar; 35(Suppl 2): S49-S53.

12. Belperio PS, Chartier M, **Ross DB**, Alaigh P, Shulkin D. Curing Hepatitis C Virus Infection: Best Practices fom the U.S. Department of Veterans Affairs. Ann Intern Med 2017 Oct 3; 167(7):499-504.

## **Publications (cont.)**

13. Rogal SS, Yakovchenko V, Waltz TJ, Powell BJ, Kirchner JE, Proctor EK, Gonzalez R, Park A, **Ross D**, Morgan TR, Chartier M, Chinman MJ. The association between implementation strategy use and the uptake of hepatitis C treatment in a national sample. Implement Sci 2017 May 11; 12(1):60.

14. Beste LA, Glorioso TJ, Ho PM, Au DH, Kirsh SR, Todd-Stenberg J, Chang MF, Dominitz JA, Barón AE, **Ross D**. Telemedicine Specialty Support Promotes Hepatitis C Treatment by Primary Care Providers in the Department of Veterans Affairs. Am J Med 2017; 130(4):432-8.

15. **Ross DB**, Belperio PS, Chartier M, Backus LI. Hepatitis C Testing in U.S. Veterans Born 1945-1965: An Update. J Hepatol 2017; 66(1):237-8.

16. Maier MM, **Ross DB**, Chartier M, Belperio PS, Backus LI. Cascade of Care for Hepatitis C Virus Infection Within the US Veterans Health Administration. Am J Public Health 2016 Feb; 106(2):353-8.

17. Beste LA, Leipertz SL, Green PK, Dominitz JA, **Ross D**, Ioannou GN. Trends in Burden of Cirrhosis and Hepatocellular Carcinoma by Underlying Liver Disease in US Veterans, 2001-2013. Gastroenterology. 2015 Nov; 149(6):1471-1482.

18. Backus L, Czarnogorski M, Yip G, Thomas BP, Torres M, Bell T, **Ross D**. HIV Care Continuum Applied to the US Department of Veterans Affairs: HIV Virologic Outcomes in an Integrated Health Care System. J Acquir Immune Defic Syndr. 2015 Aug 1; 69(4):474-80.

19. Chartier M, Blais R, Steinberg T, Catella S, Dehon S, **Ross D**, Zeiss R. A Postdoctoral Psychology Fellowship in Integrated HIV and Hepatitis C Clinical Care: Rationale, Progress, and Future Directions. Training and Education in Professional Psychology 2015 May; 9(2):77-84.

20. Beste LA, Ionnou GN, Yang Y, Chang M, **Ross D**, Dominitz J. Improved Surveillance for Hepatocellular Carcinoma with a Primary Care-Oriented Clinical Reminder. Clin Gastroenterol Hepatol. 2015 Jan; 13(1):172-9.

21. Midboe AM, Elwy AR, Durfee JM, Gifford AL, Yakovchenko V, Martinello RA, **Ross D**, Czarnogorski M, Goetz MB, Asch SM. Building Strong Research Partnerships Between Public Health and Researchers: A VA Case Study. J Gen Intern Med. 2014 Dec; 29 Suppl 4:831-4.

22. Atkins D, **Ross D**, Kelley M. Acting in the Face of Uncertainty. Ann Intern Med 2014; 161(4):300-1.


**Publications (cont.)**

23. Belperio P, Backus L, **Ross D**, Neuhauser M, Mole L. A Population Approach to Disease Management: Hepatitis C Direct Acting Antiviral Use in a Large Healthcare System. J Managed Care Pharm 2014 Jun; 20(6):533-40.

24. Czarnogorski M, Halloran J, Pedati C, Dursa EK, Durfee J, Martinello R, Davey V, **Ross D**. Expanded HIV testing in the US Department of Veterans Affairs, 2009-2011. Am J Public Health 2013 Dec; 103(12): e40-5.

25. **Ross D**. Treatment of veterans with hepatitis C in the United States Department of Veterans Affairs. J Hepatol 2013 Jul; 59(1):196.

26. Yee HS, Chang MF, Pocha C, Lim J, **Ross D**, Morgan TR, Monto A. Update on the Management and Treatment of Hepatitis C Virus Infection: Recommendations from the Department of Veterans Affairs Hepatitis C Resource Center Program and the National Hepatitis C Program Office. Am J Gastroenterol 2012; 107(5):669-89.

27. Halloran J, Czarnogorski M, Dursa E, Volpp B, Durfee J, Valdiserri R, Davey V, **Ross D**. HIV Testing in the US Department of Veterans Affairs: 2009-2010. Arch Int Med 2012 Jan 9; 172(1):61-2.

28. McInnes DK, Solomon JL, Bokhour BG, Asch SM, **Ross D**, Nazi KM, Gifford AL. Use of electronic personal health record systems to encourage HIV screening: an exploratory study of patient and provider perspectives. BMC Res Notes 2011 Aug 15; 4:295.

29. Peters MG, Perrillo RP, Jacobson IM, **Ross DB**, Doo EC, Murray JS, Wong JB. Entering the new era of therapy for HBV and HCV infections. J Fam Pract 2010 Apr; 59(4) Suppl): S51-8.

30. Valdiserri RO, Nazi K, McInnes DK, **Ross D**, Kinsinger L. Need to improve routine HIV testing of U.S. Veterans in care: Results of an Internet survey. J Community Health 2010; 35(3):215-9.

31. Garcia-Tsao G, Lim JK; Monto A, Yee H, Durfee J, Dieperink E, Dominitz J, **Ross D**, Valdiserri R. Management and treatment of patients with cirrhosis and portal hypertension: recommendations from the Department of Veterans Affairs Hepatitis C Resource Center Program and the National Hepatitis C Program. Am J Gastroenterol 2009 Jul; 104(7):1802-29.


**Publications (cont.)**

32. Modak R, Ross D, Kan V. Macrolide and Clindamycin Resistance in Staphylococcus aureus Isolates. Infect Control Hosp Epidemiol 2008; 29:180-2.

33. **Ross D**. Review of "Overdose: How excessive government regulation stifles pharmaceutical innovation." J Clin Invest 2007; 117:3598-3598

34. **Ross D**. The FDA and the case of Ketek. New Engl J Med 2007; 356:1601-1604.

35. Powers JH, Lin D, **Ross D**. FDA evaluation of antimicrobials: subgroup analysis. Chest 2005; 127: 2298-9.

36. Powers JH, Cooper CK, Lin D, **Ross DB.** Sample size and the ethics of non-inferiority trials. Lancet. 2005; 366:24-5.

37. Powers JH, **Ross DB**, Lin D. Letter to the Editor: Linezolid and Vancomycin for Methicillin-Resistant Staphylococcus aureus Nosocomial Pneumonia: The Subtleties of Subgroup Analyses. Chest 2004; 126:314-315.

38. Powers JH, **Ross DB**, Brittain E, Albrecht R, and Goldberger MJ. The United States Food and Drug Administration and Noninferiority Margins in Clinical Trials of Antimicrobial Agents. Clin Inf Dis 2002; 34:879-881.

39. Qunibi W, Al-Furayh O, Almeshari K, Lin S-F, Sun R, Heston L, **Ross D**, Rigsby M, and Miller G. Serologic association of human herpesvirus eight

with posttransplant Kaposi's sarcoma in Saudi Arabia. Transplantation 1998; 65:583-585.

40. **<u>Ross DB</u>** and Ziff EB. Differential production of human adenovirus late transcription unit mRNAs during abortive infections in monkey cells. Virology 1994; 202:107-115.

41. **<u>Ross DB</u>** and Ziff EB. Defective synthesis of early region 4 mRNAs during abortive human adenovirus infections in monkey cells. J Virol 1992; 66:3110-3117.

**Exhibit B – David Ross Case List**

David B. Ross, M.D., Ph.D., M.B.I.                                                              MDL 2740

Exhibit B - Expert Witness Deposition and Trial Testimony in the Last 4 Years

| Caption | Venue | Case number |
|---|---|---|
| Dolin *v.* GlaxoSmithKline, *et al.* | US District Court<br>Northern District of Illinois | 1:12-CV-06403 |
| Annis *v.* Medical University of South Carolina | Court of Common Pleas<br>Charleston, South Carolina | 2017CP1002337 |
| West v. Bayer Health Care Pharmaceuticals, *et al.* | US District Court<br>District of Columbia | 1:11-CV-0206 |
| Cynthia Idzik-Starr *v.* Lawrence B. Hunter, *et al.* | Superior Court<br>New Britain, Connecticut | HHB-CV15-6029961-S |
| Eli Lilly & Co. *v.* Sandoz, Inc. | US Patent Trial and Appeal Board | IPR2016-00318 |
| Aran v. Arkhe Pharmaceutical Corporation, *et al*. | JAMS | Unknown |
| Sandra Rogers *v.* Bristol-Myers Squibb Company | 13th Judicial District Court,<br>Yellowstone County, Montana | DV-15-1204 |
| Shabsis *v.* Regents, *et al.* | Superior Court<br>Los Angeles County, California | BC567668 |
| Ghorley *v.* Baxter, *et al.* | US District Court<br>Northern District of Georgia | 1:17-CV-03091 |
| Biocryst *v.* Seqirus | International Chamber of Commerce | 23989 |
| Allergan USA *v.* Imprimis Pharmaceuticals | US District Court<br>Central District of California | 8:17-CV-01551 |
| SRS *v.* Shire | Delaware Court of Chancery | CA 2017-0863 |
| Cline *v.* Gerrard | Superior Court<br>Catawba County, North Carolina | 19-CVS-87 |

**Exhibit C – Materials relied upon**

**David Ross, MD, PhD, MBI**
**Exhibit C - LIST OF DOCUMENTS REVIEWED**

I.      **All references in the content and footnotes of my report.**

II.     **Expert Reports**

- Ellen G. Feigal, M.D., March 23, 2020
- David A. Kessler, M.D., November 6, 2018
- David A. Kessler, M.D., Supplemental Report, October 21, 2019
- David Madigan, M.D., March 23, 2020
- Laura M. Plunkett, Ph.D., DABT, March 13, 2020
- Janet Arrowsmith, M.D., December 9, 2019

III.    **Depositions and Exhibits**

- Janet Arrowsmith, M.D., July 29, 2020
- Jean Phillipe Aussel
- Kim Bassi
- Amy Freedman
- Vanina Groult
- Sunil Gupta
- Linda Gustavson
- Nanae Hangai
- Michael S. Kopreski M.D.
- Pierre Mancini
- Gerrit Nijveldt
- Emanuel Palatinsky (Vol. 1 & 2)
- Frances Polizzano
- Isabelle Richard-Cassin
- Gina Vestea

IV.     **Sanofi Documents**

| | | | | |
|---|---|---|---|---|
| Sanofi_00193549 | Sanofi_00260841 | Sanofi_00261412 | Sanofi_00262467 | Sanofi_00265619 |
| Sanofi_00792534 | Sanofi_00265621 | Sanofi_00354859 | Sanofi_00355202 | Sanofi_00356704 |
| Sanofi_00792535 | Sanofi_00377402 | Sanofi_00377460 | Sanofi_00377534 | Sanofi_00377610 |
| Sanofi_01019994 | Sanofi_00377628 | Sanofi_00378386 | Sanofi_00378483 | Sanofi_00378516 |
| Sanofi_01294774 | Sanofi_00378556 | Sanofi_00378671 | Sanofi_00379020 | Sanofi_00379104 |
| Sanofi_01294924 | Sanofi_00379158 | Sanofi_00379163 | Sanofi_00385012 | Sanofi_00387684 |
| Sanofi_01902063 | Sanofi_00423681 | Sanofi_00423835 | Sanofi_00423875 | Sanofi_00548387 |
| Sanofi_01954872 | Sanofi_00548432 | Sanofi_00548479 | Sanofi_00548527 | Sanofi_00548608 |
| Sanofi_02649521 | Sanofi_00548613 | Sanofi_00549915 | Sanofi_00553474 | Sanofi_00559177 |
| Sanofi_03847507 | Sanofi_00559178 | Sanofi_00559182 | Sanofi_00559223 | Sanofi_00574334 |

| | | | | |
|---|---|---|---|---|
| Sanofi_03929385 | Sanofi_00723830 | Sanofi_00724262 | Sanofi_00724344 | Sanofi_00724381 |
| Sanofi_03935020 | Sanofi_00739320 | Sanofi_00739370 | Sanofi_00739377 | Sanofi_00740326 |
| Sanofi_04014414 | Sanofi_00740432 | Sanofi_00741049 | Sanofi_00742162 | Sanofi_00742213 |
| Sanofi_04196129 | Sanofi_00742920 | Sanofi_00743074 | Sanofi_00743140 | Sanofi_00743171 |
| Sanofi_04353203 | Sanofi_00743431 | Sanofi_00743637 | Sanofi_00744351 | Sanofi_00744433 |
| Sanofi_05273484 | Sanofi_00745133 | Sanofi_00747973 | Sanofi_00748227 | Sanofi_00748267 |
| Sanofi_05319538 | Sanofi_00748626 | Sanofi_00748735 | Sanofi_00748738 | Sanofi_00748741 |
| Sanofi_05935025 | Sanofi_00748780 | Sanofi_00749022 | Sanofi_00749233 | Sanofi_00749236 |
| Sanofi_05956179 | Sanofi_00749249 | Sanofi_00749317 | Sanofi_00749772 | Sanofi_00749850 |
| Sanofi_05969184 | Sanofi_00749905 | Sanofi_00749997 | Sanofi_00750033 | Sanofi_00772857 |
| Sanofi_05969189 | Sanofi_00791228 | Sanofi_00791306 | Sanofi_00791311 | Sanofi_00791480 |
| Sanofi_05969194 | Sanofi_00791486 | Sanofi_00791553 | Sanofi_00792335 | Sanofi_00792534 |
| Sanofi_05969205 | Sanofi_00792535 | Sanofi_00795081 | Sanofi_00795425 | Sanofi_00800098 |
| Sanofi_05969209 | Sanofi_00800102 | Sanofi_01030475 | Sanofi_01031668 | Sanofi_01035459 |
| Sanofi_02368838 | Sanofi_01036095 | Sanofi_01038470 | Sanofi_01038956 | Sanofi_01039911 |
| Sanofi_01009835 | Sanofi_01039954 | Sanofi_01039963 | Sanofi_01040010 | Sanofi_01040067 |
| Sanofi_01029968 | Sanofi_01040110 | Sanofi_01040511 | Sanofi_01040521 | Sanofi_01040633 |
| Sanofi_03049281 | Sanofi_01041391 | Sanofi_01042731 | Sanofi_01045285 | Sanofi_01045286 |
| Sanofi_05251292 | Sanofi_01045383 | Sanofi_01061749 | Sanofi_01061758 | Sanofi_01062191 |
| Sanofi_02833623 | Sanofi_01062463 | Sanofi_01065794 | Sanofi_01065799 | Sanofi_01067558 |
| Sanofi_00002949 | Sanofi_01086042 | Sanofi_01086045 | Sanofi_01091522 | Sanofi_01101022 |
| Sanofi_00010820 | Sanofi_01102046 | Sanofi_01112867 | Sanofi_01115456 | Sanofi_01192189 |
| Sanofi_00012443 | Sanofi_01233019 | Sanofi_01234159 | Sanofi_01234391 | Sanofi_01246527 |
| Sanofi_00012568 | Sanofi_01246596 | Sanofi_01246597 | Sanofi_01259408 | Sanofi_01268143 |
| Sanofi_00060898 | Sanofi_01268180 | Sanofi_01280958 | Sanofi_01293003 | Sanofi_01295037 |
| Sanofi_00063576 | Sanofi_01296736 | Sanofi_01296737 | Sanofi_01299071 | Sanofi_01299072 |
| Sanofi_00110998 | Sanofi_01299161 | Sanofi_01302842 | Sanofi_01315435 | Sanofi_01330786 |
| Sanofi_00111059 | Sanofi_01336880 | Sanofi_01343874 | Sanofi_01343875 | Sanofi_01349956 |
| Sanofi_00111164 | Sanofi_01363709 | Sanofi_01363974 | Sanofi_01383369 | Sanofi_01383493 |
| Sanofi_00111212 | Sanofi_01397018 | Sanofi_01434354 | Sanofi_01500984 | Sanofi_01550903 |
| Sanofi_00136563 | Sanofi_01573469 | Sanofi_01590762 | Sanofi_01594206 | Sanofi_01622327 |
| Sanofi_00168863 | Sanofi_01694853 | Sanofi_01704444 | Sanofi_01718843 | Sanofi_01736469 |
| Sanofi_00180262 | Sanofi_01738277 | Sanofi_01762959 | Sanofi_01771877 | Sanofi_01773761 |
| Sanofi_00197757 | Sanofi_01774800 | Sanofi_01780168 | Sanofi_01827598 | Sanofi_01827599 |
| Sanofi_00207523 | Sanofi_01827600 | Sanofi_01827615 | Sanofi_01827616 | Sanofi_01827617 |
| Sanofi_00207658 | Sanofi_01843199 | Sanofi_01845590 | Sanofi_01845607 | Sanofi_02012589 |
| Sanofi_00800585 | Sanofi_02415352 | Sanofi_01019193 | Sanofi_01021777 | Sanofi_01026382 |
| Sanofi_00805192 | Sanofi_01026479 | Sanofi_01026734 | Sanofi_01027709 | Sanofi_01028829 |
| Sanofi_00805353 | Sanofi_01029269 | Sanofi_01029318 | Sanofi_01029474 | Sanofi_02438226 |
| Sanofi_00806479 | Sanofi_02441042 | Sanofi_02489593 | Sanofi_02540992 | Sanofi_02544368 |
| Sanofi_00811958 | Sanofi_02546388 | Sanofi_02589772 | Sanofi_02635100 | Sanofi_02640580 |
| Sanofi_00812060 | Sanofi_02645200 | Sanofi_02664951 | Sanofi_02678216 | Sanofi_02681765 |
| Sanofi_00812349 | Sanofi_02705871 | Sanofi_02725955 | Sanofi_02833652 | Sanofi_02835508 |
| Sanofi_00814048 | Sanofi_02844717 | Sanofi_02979423 | Sanofi_02983317 | Sanofi_02983325 |
| Sanofi_00814793 | Sanofi_02983328 | Sanofi_03152018 | Sanofi_03213169 | Sanofi_03284091 |
| Sanofi_00816348 | Sanofi_03287106 | Sanofi_03287115 | Sanofi_03333249 | Sanofi_03336646 |

| | | | | |
|---|---|---|---|---|
| Sanofi_00816749 | Sanofi_03336649 | Sanofi_03336652 | Sanofi_03343523 | Sanofi_03353197 |
| Sanofi_00819004 | Sanofi_03403513 | Sanofi_03406859 | Sanofi_03426146 | Sanofi_03497270 |
| Sanofi_00828912 | Sanofi_03643994 | Sanofi_03928809 | Sanofi_03942772 | Sanofi_03943317 |
| Sanofi_00829566 | Sanofi_04153677 | Sanofi_04154773 | Sanofi_0435320 | Sanofi_04430668 |
| Sanofi_00829725 | Sanofi_04439621 | Sanofi_04451595 | Sanofi_04453510 | Sanofi_04460197 |
| Sanofi_00829788 | Sanofi_04469884 | Sanofi_04484826 | Sanofi_04490670 | Sanofi_04508007 |
| Sanofi_00831625 | Sanofi_04508281 | Sanofi_04508889 | Sanofi_04512616 | Sanofi_04534603 |
| Sanofi_00831626 | Sanofi_04535983 | Sanofi_04611056 | Sanofi_04611811 | Sanofi_04613689 |
| Sanofi_00831693 | Sanofi_04613712 | Sanofi_04614439 | Sanofi_04614662 | Sanofi_04614726 |
| Sanofi_00831696 | Sanofi_04614727 | Sanofi_04617443 | Sanofi_04617919 | Sanofi_04622380 |
| Sanofi_00832334 | Sanofi_04623507 | Sanofi_04623815 | Sanofi_04627324 | Sanofi_04627432 |
| Sanofi_00837648 | Sanofi_04627986 | Sanofi_04628199 | Sanofi_04628609 | Sanofi_04628610 |
| Sanofi_00837649 | Sanofi_04628611 | Sanofi_04629431 | Sanofi_04629734 | Sanofi_04629825 |
| Sanofi_00837654 | Sanofi_04630477 | Sanofi_04632873 | Sanofi_04632931 | Sanofi_04633925 |
| Sanofi_00837661 | Sanofi_04633935 | Sanofi_04634621 | Sanofi_04634907 | Sanofi_04635928 |
| Sanofi_00837663 | Sanofi_04666990 | Sanofi_04691723 | Sanofi_04691789 | Sanofi_04691790 |
| Sanofi_00837665 | Sanofi_04691845 | Sanofi_04720678 | Sanofi_04725297 | Sanofi_04727359 |
| Sanofi_00837717 | Sanofi_04731188 | Sanofi_04738179 | Sanofi_04740213 | Sanofi_04743810 |
| Sanofi_00837809 | Sanofi_04745211 | Sanofi_04746009 | Sanofi_04746748 | Sanofi_04748570 |
| Sanofi_00838148 | Sanofi_04752742 | Sanofi_04756909 | Sanofi_04756910 | Sanofi_04761947 |
| Sanofi_00956551 | Sanofi_04810916 | Sanofi_04815573 | Sanofi_04816552 | Sanofi_04817016 |
| Sanofi_00966555 | Sanofi_04817118 | Sanofi_04817130 | Sanofi_04818699 | Sanofi_04819697 |
| Sanofi_00966605 | Sanofi_04833024 | Sanofi_04835618 | Sanofi_04836071 | Sanofi_04836545 |
| Sanofi_00966846 | Sanofi_04841734 | Sanofi_04850129 | Sanofi_04856272 | Sanofi_04864365 |
| Sanofi_00968736 | Sanofi_04864389 | Sanofi_04870250 | Sanofi_04876332 | Sanofi_04876344 |
| Sanofi_00974332 | Sanofi_04876549 | Sanofi_04876794 | Sanofi_04878450 | Sanofi_04898855 |
| | Sanofi_04915545 | Sanofi_04915551 | Sanofi_04977753 | Sanofi_05059732 |
| | Sanofi_05059757 | Sanofi_0506126 | Sanofi_01113658 | Sanofi_05061309 |
| | Sanofi_05061390 | Sanofi_05061402 | Sanofi_05061406 | Sanofi_05070433 |
| | Sanofi_05072412 | Sanofi_05072486 | Sanofi_05072540 | Sanofi_05073810 |
| | Sanofi_05073839 | Sanofi_05074000 | Sanofi_05074733 | Sanofi_05075741 |
| | Sanofi_05076030 | Sanofi_05076067 | Sanofi_05077504 | Sanofi_05077564 |
| | Sanofi_05078200 | Sanofi_05078296 | Sanofi_05078408 | Sanofi_05175940 |
| | Sanofi_05186533 | Sanofi_05187973 | Sanofi_05207927 | Sanofi_05250957 |
| | Sanofi_05252078 | Sanofi_05254685 | Sanofi_05270512 | Sanofi_05277377 |
| | Sanofi_05289714 | Sanofi_05338593 | Sanofi_05429052 | Sanofi_05430925 |
| | Sanofi_05435035 | Sanofi_05446745 | Sanofi_05446835 | Sanofi_05458759 |
| | Sanofi_05617796 | Sanofi_05656087 | Sanofi_05665386 | Sanofi_05932643 |
| | Sanofi_06236975 | | | |

## V.   **FDA Documents**

07.30.1992 - 020262 Approval Ltr
07.23.1993 - 020262 s002 Approval Ltr
04.13.1994 - 020262 s004 Approval Ltr

08.16.1994 - 020262 s003 s004 Approval Ltr 0
4.01.1996 - 020262 s012 Approval Ltr
04.02.1998 - 020262 s022 Approval Ltr
05.14.1996 - 020449 Approval Package
01.06.1998 - 020449 s004 Approval Package
01.06.1998 - 020449 s004 Approval Ltr
06.22.1998 - 020449_S005 Approval Package
06.22.1998 - 020449_S005_ADMINDOCS
06.22.1998 - 020449_S005_APPROV
06.22.1998 - 020449_S005_BIOPHARM
06.22.1998 - 020449_S005_CHEMR
06.22.1998 - 020449_S005_CORRES
06.22.1998 - 020449_S005_FONSI
06.22.1998 - 020449_S005_MEDR
06.22.1998 - 020449_S005_STATR
01.22.1998 - 020449_S006 Approval Package
01.22.1998 - 020449_S006_ADMINDOCS
01.22.1998 - 020449_S006_APPROV
01.22.1998 - 020449_S006_BIOPHARM
01.22.1998 - 020449_S006_CHEMR
01.22.1998 - 020449_S006_CORRES
01.22.1998 - 020449_S006_FONSI
01.22.1998 - 020449_S006_MEDR
01.22.1998 - 020449_S006_STATR
12.23.1999 - 020449_S011 Approval Package
12.23.1999 - 020449_S011_ADMINDOCS
12.23.1999 - 020449_S011_APPROV
12.23.1999 - 020449_S011_BIOPHARMR
12.23.1999 - 020449_S011_CHEMR
12.23.1999 - 020449_S011_CORRES
12.23.1999 - 020449_S011_MEDR
12.23.1999 - 020449_S011_PRNTLBL
12.23.1999 - 020449_S011_STATR
04.24.2003 - 020449_S016 Approval Package
04.24.2003 - 020449_S016_ADMINDOCS
04.24.2003 - 020449_S016_APPROV
04.24.2003 - 020449_S016_CHEMR
04.24.2003 - 020449_S016_PRNTLBL
07.09.2002 - 020449_S017_ADMINDOCS
07.09.2002 - 020449_S017_APPROV
07.09.2002 - 020449_S017_PRNTLBL
07.09.2002 - 020449_S017_S019_S022 Approval Package 1
1.27.2002 - 020449_S018 Approval Package
11.27.2002 - 020449_S018_ADMINDOCS
11.27.2002 - 020449_S018_APPROV
11.27.2002 - 020449_S018_BIOPHARM

11.27.2002 - 020449_S018_CHEMR
11.27.2002 - 020449_S018_CORRES
11.27.2002 - 020449_S018_MEDR
11.27.2002 - 020449_S018_PRNTLBL
11.27.2002 - 020449_S018_STATR
07.30.2002 - 020449_S017_S019_S022 Approval Package
07.30.2002 - 020449slr017,019,022ltr
07.30.2002 - 020449slr022_taxotere_lbl
01.30.2003 - 020449_S017_S019_S022 Approval Package
01.30.2003 - 020449slr017,019,022ltr
01.30.2003 - 020449slr022_taxotere_lbl
05.19.2004 - 020449_S028 Approval Package
05.19.2004 - 020449_S028_ADMIN
05.19.2004 - 020449_S028_APPROV
05.19.2004 - 020449_S028_BIOPHARMR
05.19.2004 - 020449_S028_CHEMR
05.19.2004 - 020449_S028_MEDR
05.19.2004 - 020449_S028_PRNTLBL
08.18.2004 - 020449 _S029_PRNTLBL
08.18.2004 - 020449_S029_ADMINCORRES
08.18.2004 - 020449_S029_APPROV (adjuvant/ESBC indication)
08.18.2004 - 020449_S029_BIOPHARMR
08.18.2004 - 020449_S029_CHEMR
08.18.2004 - 020449_S029_MEDR
08.18.2004 - 020449_S029_STATR
08.18.2004 - 020449_S029 Approval Package
01.06.2005 - 020449s031ltr
08.11.2005 - 020449s033lbl
08.11.2005 - 020449s033ltr
11.05.2005 - 020449s034ltr
03.22.2006 - 020449Orig1s035
03.22.2006 - 020449S035lbl
03.22.2006 - 020449S035ltr
03.22.2006 - 020449Orig1s035 Approval Package
06.07.2006 - 020449s036lbl
06.07.2006 - 020449s036LTR
10.17.2006 - 020449_S039_Admin
10.17.2006 - 020449_S039_Approval_Package [Full]
10.17.2006 - 020449_S039_Clinical_Review
10.17.2006 - 020449_S039_Labeling
10.17.2006 - 020449_S039_Medical_Reviews
10.17.2006 - 020449_S039_Other_Reviews
10.17.2006 - 020449_S039_Statistical_Reviews
10.17.2006 - 020449_S039_Summary_Review
10.17.2006 - 020449_S039 Approval Package
06.03.2010 - 020449Orig1s043

06.03.2010 - 020449_S043 Approval Package
04.20.2010 - 020449s044lbl
04.20.2010 - 020449s044,020449s053ltr
09.28.2007 - 020449s045lbl
09.28.2007 - 020449s045ltr
09.28.2007 - 020449_S045 Approval Package
04.20.2010 - 020449s044,020449s053ltr
04.20.2010 - 020449s053lbl
08.02.2010 - 020449Orig1s054
08.02.2010 - 020449_S054 Approval Package
05.13.2010 - 020449s059lbl
05.13.2010 - 020449s059ltr
04.13.2012 - 020449s063lbl
09.07.2011 - 020449s064lbl
09.07.2011 - 020449s064ltr
12.15.2011 - 020449s065lbl
12.15.2011 - 020449s065ltr
06.26.2013 - 020449Orig1s069ltr
06.26.2013 - 020449s069lbl
12.13.2013 - 020449Orig1s071ltr
12.13.2013 - 020449s071lbl
12.13.2014 - 020449Orig1s073ltr
12.13.2014 - 020449s073lbl
12.11.2015 - 020449Orig1s075
12.11.2015 - 020449Orig1s075ltr
12.11.2015 - 020449s075lbl
12.11.2015 - 020499Orig1s075 Approval Package
10.05.2018 - 020449Orig1s079ltr
10.05.2018 - 020449s079lbl

**VI.** **Additional FDA Documents**
- DOCETAXEL injection, for intravenous use, Initial U.S. Approval 1996, NDA 020449
- Relevant FDA Approved Labeling for the following:
  - o  Taxotere
  - o  Adriamycin
  - o  Cyclophosphamide
  - o  Paclitaxel
  - o  5-Fluorouracil
  - o  Xeloda
  - o  Avastin

**VII.** **Code of Federal Regulations**
- Title 21: Food and Drugs, Parts 200-299, Revised April 1, 2019
- Title 21: Food and Drugs, Parts 300-499, Revised April 1, 2019

VIII.   <u>**Miscellaneous**</u>

- House of Representatives, 98th Congress, 2d Session, Rept. 98-857, Part 2, *Drug Price Competition and Patent Term Restoration Act of 1984*, August 1, 1984
- Public Law 87-781, October 10, 1962
- Medical Dictionary for Regulatory Activities Terminology (MedDRA) – Alopecia – Classes (http://bioportal.bioontology.org/ontologies/MEDDRA?p=classes&conceptid=10001760)
- National Library of Medicine: ICD10PCS https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/ICD10PCS/stats.html