# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * *

ELIZABETH KAHN,
Plaintiff,

CASE NO.
2:16-cv-15397

v.

SANOFI S.A.,
SANOFI-AVENTIS U.S.,
L.L.C., SANOFI US
SERVICE, INC.,
Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED
EXPERT DEPOSITION
OF
DAVID ROSS, M.D.
taken on Thursday, March 4, 2021
Commencing at 9:11 a.m.
at
Zoom
Baltimore, Maryland

A. Okay. Just...
Q. Tell me when you're to Exhibit C in the printed copy that you have.
(Witness peruses document.)
A. So Exhibit C, "Materials Relied Upon", and okay, I have it.
Q. Very good.
And at the top of Page No. 1 it says, "Exhibit C, List of Documents Reviewed", and it has your name; is that correct?
(Witness peruses document.)
A. Yes.
Q. And it lists first, "I, All References in the Content and Footnotes of My Report"; is that correct?
(Witness peruses document.)
A. Yes.
Q. And then in II it identifies expert reports that you reviewed in this case, correct?
A. Yes.
Q. Did you review any expert reports other than those listed here on Exhibit C in preparation of your report in this case?
A. Not that I can recall.
Q. Okay.

And in III it's entitled, "Depositions and Exhibits", correct?
A. Yes.
Q. And did you review all of the depositions and exhibits for the individuals listed under that III on Exhibit C?
A. So was supplied with all of these, I reviewed depositions and exhibits that were relevant to the opinions that I was asked to -- uhmm, uhmm, weigh in on or the topics that I was asked to provide opinions on.
Q. So let's break that down. You were provided each of the depositions and exhibits that are included under III, correct?
A. Correct.
Q. Did you review the entire deposition for each of the individuals in the list under III on Exhibit C?
A. So I reviewed materials under that that were relevant. So in terms of individuals, you know, the question is if there's not -- if there's nothing that is relevant or there's material or sections that are not relevant, given the time constraints and the need to focus on a narrow regulatory question, I look at relevant portions of

these documents.
Q. Can you identify for me what depositions you reviewed and what depositions you deemed not relevant.
A. So certainly anything that is in these depositions that's cited in my report, either directly or in a footnote, I would have looked at. I think beyond that, it's not possible -- I mean these are thousands of pages, obviously, of depositions and exhibits. So it's not possible for me to say just looking at this. You know, yes, I reviewed all of this or no, I didn't review this. It's not possible for me to say.
Q. But you would agree that you did not review all of the thousands of pages included in the depositions identified under III on Exhibit No. 3 to your report, correct?
A. So as I said, I reviewed those portions that were relevant. So portions that were not relevant did not fall in that category.
Q. And my question was, doctor: You did not review every page of every deposition identified for the individuals under III in Exhibit C to your expert report, correct?
A. I put it a little differently. I would

say that I determined whether there was any relevant material in there in this entire set. And if there was, I would look at it. If there wasn't, then no, I would not look at that.
Q. How did you determine whether there was relevant material present in a deposition?
A. Sure. So, you know, there is a number of mechanisms. These are electronic documents. And as is standard for depositions, they all have indexes prepared. So it's actually fairly straightforward. They're using -- for example, if it's in PDF, they use, uhmm, you know, advanced find or another feature like that. A little list of all of the occurrences of sort of issues that I was asked to opine on.
Q. And so using that find feature you would have to type in a term to search for, correct?
A. I would say that it would be more -- it would be more like a concept, I think would be a better way to put it. From an informatic point of view, a regulatory informatic point of view.
Q. But you would have to type in a word into the find feature and hit enter and see what comes up, correct?
A. Not necessarily. If, for example, I

Page 22

could tell that there was -- I mean I'm giving that as an example of one mechanism that could be used. But it's not something that I needed to use on every single deposition. You know, if there was a deposition where that wasn't necessary, then I wouldn't need to do that.

Q. Can you tell me what percentage of the pages of the depositions listed on Exhibit C you read?

A. I honestly -- I would not -- I would not be able to make a guess. It's not -- I would not want -- I would not want to guess, but I don't believe that I could say that with any reasonable degree of confidence.

Q. You couldn't say that you reviewed one percent of the pages of the deposition transcripts or 90 percent of the pages of the deposition transcripts that you list on Exhibit C; fair?

A. I apologize. I thought this was off. That was just an alarm.

So I know that it wasn't 100 percent and I know that it wasn't zero percent, obviously. If you said what percent, I can figure out the denominator fairly easily. The numerator I -- you

Page 23

know, it's just not something -- again, it was very little time to do this. It was. I feel confident that I identified relevant portions of the documents.

And this is extremely similar to the kind of challenges that I would face and other reviewers would face at the FDA. For example, looking at clinical study report for TAX316, well -- together that is 47,000 pages. So if you were asking -- I -- actually, I don't even have the case report forms -- case report tabulations, I believe. Those weren't even necessary for that. But that is an extremely common situation as an FDA reviewer. And if somebody said have you reviewed every page of this clinical study report as an FDA reviewer, the answer would be no. So I would honestly give the same answers if I was looking at this as an FDA reviewer.

Q. And doctor, the best that you can give me is that you reviewed more than zero percent, but less than 99 percent of the pages of the depositions that you were provided, correct?

MR. MICELI: Objection.

A. I'm sorry, I didn't mean to interrupt.

I'm sorry, Mr. Strongman, if you were

Page 24

going to say something or Mr. Miceli was.

Q. Mr. Miceli objected. I'll ask my question again.

A. I'm sorry.

Q. So the best you can give me is that you reviewed more than zero percent, but less than 100 percent of the pages of the deposition transcripts that you were provided in this case, correct?

MR. MICELI: Object to the form.

A. So what I would say is that the relevant concept -- the metric is what percentage of the relevant pages did I review? And I feel confident and -- excuse me. I reviewed 100 percent of those.

Q. If you never looked at a page, how do you know if it's relevant?

A. So this was a focused review on alopecia from the regulatory perspective. So I don't need to look at, for example, pages dealing with Aminotransferases or increased Aminotransferases to know that is not relevant, sorry.

Q. But you'd have to look at the page to know that it's talking about Aminotransferases or whatever the word you used is, correct?

A. I'm simply giving that as an example.

Page 25

If -- the point is that there's -- alopecia is the relevant concept, so...

Q. So what percentage of these deposition transcripts that you were provided did not deal with alopecia?

MR. MICELI: Object to the form.

A. I can't -- I am not able to say. I mean it's very -- you know, if something does not have alopecia in it -- I'm not saying that's the only -- necessarily the only basis for determining if something is relevant. But again, let me just say this is the -- there is material in there that -- that is believed that is relevant, you know, I'm happy to look at it and say oh, I didn't consider that. But I don't believe there is such material.

Q. And doctor, you understand that you were hired to review material and offer an opinion in this case, correct?

A. Hired?

MR. MICELI: Object to the form.

BY MR. STRONGMAN:

Q. Let me ask the question again.

A. Sure.

Q. Doctor, you would agree that you were retained by plaintiffs' counsel to review

Page 30

identified as one of the depositions that you reviewed in this case on Exhibit C?

(Witness peruses document.)

A. It's not. If it's not, I did not review it. I'm sorry, I stand corrected again. It's hundreds or thousands of pages of documents as I said, so...

Q. And did you review -- let me strike that.

On Exhibit C, there's IV, do you see that?

(Witness peruses document.)

A. Yes.

Q. And it lists a bunch of Sanofi documents by number, correct?

A. Yes.

Q. And did you review all of the Sanofi documents identified under IV?

(Witness peruses document.)

A. I again, would go back to my previous answer. That if there's items in there that -- if it was relevant, you can then yes. When I say "relevant", again I'm talking about a narrow question of as I said in my paragraph No. 1 of my report, adding the adverse event or adverse reaction

Page 31

to section No. 6. So if it's relevant, I would have. If it determined -- if it's not, I do not believe that I would have reviewed it.

Q. Can you articulate for me the precise methodology that you used to determine whether a document was relevant.

A. Can I articulate the precise methodology? So again, let me refer back to how this would be handled by an FDA reviewer who is reviewing an NDA with clinical study reports, animal toxicology reports and other sections that comprise not tens of thousands or hundreds of thousands, but millions of pages of data. So that's a broader review than what I'm talking about here. If a medical officer is going to be concerned, for example, with is this drug -- as a response -- response shown by all tests reasonably applicable, that the sponsor has demonstrated the drug is safe and is there substantial evidence of efficacy. It would be impossible certainly, if you have a priority review and this was done for Taxotere, for a medical officer to look at every single page. It simply cannot be done. So they're going to rely on reviewers, scientists and other disciplines to do that.

Page 32

As I've outlined in my report, that's what I did here with regard to Drs. Madigan, Feingold and Plunkett. Now that's part of the methodology. But when you say "precise", this is not an engineering problem. This is not like, you know, did you use a laser at such and such a wavelength to determine whatever metric. It is not a physics problem. My review was, basically, I would say the methodology that I would have used at the FDA. And again, it's not like the National Bureau of Standards, if you will. So I would say methodology for any regulatory problem, is going to be based on the regulatory standard. That is the key issue. And then, what are the relevant data. And there is no one-size-fits-all answer to that. There just isn't.

Q. And doctor, I understand what you're trying to articulate is what a medical reviewer would do at the FDA, correct?

A. What I'm trying to articulate? I just described it. I'm not -- I don't know if I'm trying to articulate. But please, go ahead.

Q. My question was not about what someone at the FDA might do. My question is precisely what you did to determine whether a particular document

Page 33

was relevant for review or not in this case.

(Witness peruses document.)

MR. MICELI: Object to the form to the extent that was a question.

A. So if I may, I'm going to refer back to Paragraph No. 30 of my report and let me just read this. So this is under "Methods": "In analyzing FDA regulatory issues to offer opinions in this matter, I take the same approach that I employed as an FDA reviewer charged with making recommendations regarding a regulatory decision in my review of NDA's and SNDA's. "

So that, I think, states how I approached it and that would apply to your question regarding relevancy.

Q. Doctor, can you tell me how many pages of documents are included under the Sanofi document section of Exhibit C in your expert report?

A. Not off the top of my head, no.

Q. It's voluminous, right?

A. That is correct.

Q. Were you provided those documents in paper form or electronically?

A. Electronically.

Q. And let's take the very first document

on the list there under IV.
A. Uh-huh.
Q. Do you have Exhibit C in front of you?
A. Yes.
Q. The very first one listed is a document numbered Sanofi 00193549; do you see that?
(Witness peruses document.)
A. I do.
Q. What did you do to determine whether that specific document was relevant to be reviewed by you or not?
A. So, I don't know what document -- I mean honestly, that's not possible to answer. I mean let me just say this: You know, again, going back to the FDA -- I described the methodology here. I have never seen an FDA reviewer say here's how many pages I reviewed, here's what percentage of pages I reviewed. They have access to all of it. But I have never seen that because that's not what's done. And again, I would refer you back to -- I describe this in terms of methodology under "Good Review Practices". So again, it's the same. I mean I've identified methodology there.
Q. Doctor, did you do any electronic searches of the Sanofi documents you were provided?

A. Did I do any electronic searches? On some of them I'm sure I did.
Q. And what electronic searches did you perform on the Sanofi documents that you were provided?
A. So, you know, just as an example, if you're talking about the periodic safety update reports from, you know, around 2005 or something, you know, I would have said okay, I want to -- please show me all occurrences of the term alopecia in there. That would be one example. But I guess that is an example of what I would say.
Q. Can you think of any other specific examples of electronic searches that you performed in the Sanofi documents that you were provided?
A. I mean it is one tool that I use. It's not something, as I said, that I would do with -- perform on all documents. Again, if somebody said you didn't identify a relevant document here, you missed this key data point here, I'm -- as I said in my report, or -- I'm going to Paragraph No. 22. At the end of that, I state: "I reserve the right to amend my opinions and bases as further information and evidence becomes available."
So I had a very limited period of time

to do this. And if -- this is not unique to this particular enterprise. If I reach a scientific conclusion or medical conclusion, and someone says well, here's something that you should know about, it goes to what you said about being fair and impartial. I don't -- things can always be revisited. But I have to actually see some data, not some hypothetical -- well, there might be something out there. If there is, I'm more than willing to look at it.
Q. And doctor, you would agree that it was your job to identify and review the relevant data before you formed your opinions in this case, correct?
MR. MICELI: Object to the form.
A. I'm not sure I would say my "job". It's just sound methodology if you're going to be -- you know, you don't want to reach the conclusion first. There's a phenomenon in healthcare called analysis paralysis. Where you just don't reach conclusions because you say I bet there's one more piece of data out there. You can't find it because it's not there.
So within, I think, reasonable limits, the methodology that I had 10 years experience

using, that's what I did here. Uh, again, and I'm just saying, for example, I reviewed Dr. Arrowsmith's report and if there was a point there that I had missed, certainly I would say that I need to rethink my opinion. But that didn't happen. So if there's something relevant and you say Dr. Ross doesn't address it here, I'm happy to look at it.
Q. Were the documents that you reviewed and the depositions that you reviewed and the expert reports that you reviewed in forming your opinions in this case provided to you by plaintiff's counsel?
MR. MICELI: Dr. Ross, I would instruct you to answer that question, but you're not allowed to discuss any discussions that you had with counsel. He's asking did we provide you with information.
(Witness peruses document.)
MR. MICELI: Jon, subject to that, if you want to re-ask the question. I don't want to re-characterize your question for you.
BY MR. STRONGMAN:
Q. Doctor, the expert reports that you identify on Exhibit C were provided to you by

Page 82

chemotherapy, correct?
A. Yes.
Q. Okay.
I want to look at a couple of documents with you. What I want to do, doctor, is apply the methodology that you used when you were at the FDA to look at a couple of specific events to make sure that I understand what you would be doing. Does that make sense?
MR. MICELI: Object to the form.
BY MR. STRONGMAN:
Q. All right, doctor, I have uploaded what has been marked as Deposition Exhibit No. 6 and let me know when you can view that exhibit.
(Whereupon Exhibit No. 6 was marked for Identification.)
(Witness peruses document.)
A. Good. Because I want to try and stay within the videographer's -- I'm just trying to -- here we are. I just want to -- okay.
Q. Do you have Exhibit No. 6 up?
A. I do.
Q. What Exhibit No. 6 is, is a follow-up adverse event report, correct?
(Witness peruses document.)

Page 83

A. I believe so, yes.
Q. And there is a cover letter on Exhibit No. 6 with the date of February 11th, 1999; is that correct?
A. Yes.
Q. And this is a cover letter from Rhone Blanc to the FDA, correct?
A. Yes.
Q. And it is submitting a follow-up report with a manufacturer's report number FR90-11740.
Do you see that?
(Witness peruses document.)
A. Yes.
Q. And if you could look at the actual MedWatch Report and let me know when I'm there.
A. I'm there.
Q. Okay.
And this MedWatch Report is involving a 47-year old female patient with breast cancer, correct?
(Witness peruses document.)
A. Correct.
Q. And it indicates that this patient received docetaxel treatment from August 28th to December 17th, 1998, correct?

Page 84

A. Yes -- actually, Mr. Strongman, I'm sorry. I'm just looking at box No. 3 and I want to make sure that I'm answering this correctly. This says November 5th, '98 to November 5th of '98. So your narrative may be different than that, but I just wanted to make sure that I'm....
Q. Okay.
You can see -- and do you see the narrative in box No. 5?
A. I do.
Q. And it states: "This 47-year old female patient with breast cancer received treatment with docetaxel from August 28th to December 17th, 1998. "
Did I read that correctly?
(Witness peruses document.)
A. Yes.
Q. Then when you look down under that date, it says: "The patient experienced decreased sharpness of vision after infusion. Date unknown. Now the patient can see contours. Investigator considers event as possibly related to study drug."
Do you see that?
(Witness peruses document.)
A. Sorry, I'm just trying to find the possibly related. Okay. Yes, I do see that.

Page 85

Report No. 1.
Q. And then there is a follow-up report No. 1 with a date of December 28th, 1998.
Do you see that?
(Witness peruses document.)
A. Yes.
Q. And you would agree with me that December 28th, 1998 is 11 days after December 17th, 1998, correct?
(Witness peruses document.)
A. I'm sorry, give me the dates again. I'm sorry.
Q. You would agree with me --
A. Yes.
Q. -- that December 28th, 1998, is 11 days after December 17th, 1998, correct?
A. Correct.
Q. And in this follow-up report of December 28th, 1998, there is a paragraph that says: "The patient also experienced mild paraesthesia, alopecia, bone pain and neurological pain. The patient was in complete response for the cancer two weeks ago."
Did I read that correctly?
(Witness peruses document.)

Page 86

A. Yes.
Q. And so you would agree, doctor, that this report of a patient experiencing alopecia 11 days after completing docetaxel treatment would not be unexpected, correct?
(Witness peruses document.)
A. I'm sorry, I am just looking at the Med Alert Report. Well, first off, you may need to help me out here. I'm actually looking in box B, adverse event or product problem. And it doesn't list the adverse event being reported here. So I mean the narrative -- you know, I don't know if this was reported as -- you know, as decreased vision and alopecia, whatever. But leaving that aside, let's assume what alopecia, was. Uhmm, this is 11 days later. That does not mean that we know what happened three months or six months or nine months later. So I don't think I can draw any conclusions about this.
The other thing though, and this is the most important point, this is not the methodology that would be used in terms of going through individual reports. And certainly looking at a single report. If you look at the typical labeling reviews, it's very unusual -- I shouldn't say "very

Page 87

unusual", but the norm is not to like go through each report one by one. It's to describe the population in terms of various aspects like demographics, duration of exposure, latency of the adverse event and duration. So aggregate.
Doing things one at a time, does not help you with this. It doesn't -- it can on occasions. I certainly have labeling supplements that work based on a few case reports. But this is -- just to be clear, this is not the methodology to like, painstakingly go through an individual report.
Q. Okay.
And doctor, my question was just: The fact that a patient reports alopecia 11 days after completing treatment with docetaxel is nothing unexpected based on that information alone, correct?
A. You've just carved that out. I don't have any other, you know, information. It does not -- by itself that is not unexpected. By itself.
Q. Right, understood.
I will be uploading Exhibit No. 7 here momentarily, doctor. And if you could let me know.
MR. MICELI: Jon, just for the limited nature of my screen space because I'm out of town and operating only on a laptop,

Page 88

when you're concluding with exhibits, is it your intent that you will be coming back to this particular report?
MR. STRONGMAN: Not necessarily, no.
MR. MICELI: I just want to know what I can delete to save some space. Thank you.
(Whereupon Exhibit No. 7 was marked for Identification.)
BY MR. STRONGMAN:
Q. Doctor, do you have Exhibit No. 7 in front of you?
(Witness peruses document.)
A. I do.
Q. And Exhibit No. 7 is another follow-up adverse event report, correct?
A. Let me just -- yes.
Q. This has a cover letter dated February 4th, 1998, correct?
A. Correct.
Q. And this is a follow-up report involving the adverse event with a main contractual control number of FR90-09442, correct?
(Witness peruses document.)
A. Correct.

Page 89

Q. Okay.
And if you can flip over and look at the MedWatch form and let me know when you're there.
(Witness peruses document.)
A. Okay.
Q. And this involves a report of a 68-year old man with non-small cell lung cancer; is that correct?
A. That's what it says, yes.
Q. And it indicates that this patient received his third course of docetaxel on December 16th, 1997, and experienced blurring of vision and hearing loss.
Do you see that?
(Witness peruses document.)
A. Yes.
Q. And then there's a Follow-Up No. 1, Follow-Up No. 2 and a Follow-Up No. 3. Do you see that?
(Witness peruses document.)
A. Yes.
Q. And it states under Follow-Up No. 3 that: "On August 26th, 1997, he received his second course of docetaxel, post-infusion he experienced vomiting, alopecia, fatigue, pain, cough, poor

Page 90

appetite and weight loss."

Did I read that correctly?

(Witness peruses document.)

A. Yes.

Q. And then it indicates that the next cycle, 3, was administered on September 16th, 1997, correct?

(Witness peruses document.)

A. Yes.

Q. And then it indicates that the patient died on January 11th, 1998 of progressive disease, correct?

(Witness peruses document.)

A. Yes.

Q. And based on the information provided in this adverse event report, Exhibit No. 7, alone, the patients's report of alopecia during his second course of docetaxel would not be unexpected, correct?

MR. MICELI: Object to the form.

(Witness peruses document.)

A. Uhmm, I guess if you want to look at this by -- in terms of this individual report, so that's what you want, just no other information, so I guess I'd reach three conclusions just based on

Page 91

this report. One, Taxotere is not effective in the treatment of non-small cell lung CA. This patient died of progressive disease.

Two, it causes permanent or nonresolving maybe I should say, visual disturbances, unlike the first patient. With regard to alopecia, I don't think you can draw any conclusions one way or the other. Because of the limited data.

Q. Based on the limited data provided in the adverse event report marked as Exhibit No. 7, you cannot conclude that the alopecia reported was unexpected, correct?

A. Again, I can't characterize it one way or the other. Again, I gave conclusions that you could draw if you just take this by itself.

Q. Fair enough.

And doctor, I'm going to upload another exhibit, Exhibit No. 8 and let me know when that shows up.

(Whereupon Exhibit No. 8 was marked for Identification.)

(Witness peruses document.)

A. Okay.

Q. And doctor, do you have Exhibit No. 8 in front of you?

Page 92

A. I do.

Q. And this is an adverse event report with a manufacturer report No. JP01-01616, correct?

(Witness peruses document.)

A. Correct.

Q. This is a report involving a 54-year old female patient with non-small cell lung cancer who received her first course of docetaxel on December 7th, 1998.

Do you see that?

(Witness peruses document.)

A. Yes.

Q. And the narrative indicates that on December 14th, 1998 she experienced hearing decreased in the left ear, vertigo, liver dysfunction, fever, alopecia and leukopenia."

Did I read that correctly?

(Witness peruses document.)

A. Yes.

Q. And doctor, based solely on the information contained in Deposition Exhibit No. 8, you would agree that the patient reporting alopecia seven days after her first course of docetaxel would not be unexpected, correct?

MR. MICELI: Objection to form.

Page 93

A. So with the understanding, and I explain this in Paragraph No. 71 of my report, that this tallying up of individual events does not represent Pharmacovigilance. I can't draw a conclusion one way or the other if this is all that I look at.

Q. My computer is slow here for a second, just give me a little latitude there. All right.

I have introduced what I've marked as Deposition Exhibit No. 9. Let me know when that shows up.

(Whereupon Exhibit No. 9 was marked for Identification.)

(Witness peruses document.)

A. I'm sorry, I have 8 here. Hang on and let me refresh.

Q. Do you see Exhibit No. 9 yet, doctor?

A. I do.

Q. And do you have Exhibit No. 9 pulled up?

A. I do.

Q. Okay.

And this is an adverse event report form with a manufacturer report No. 2002-21684 U.S., correct?

(Witness peruses document.)

A. Yes.

Page 94

Q. And this, if you looked down in the box, indicates that this is an initial report, correct?
A. Yes.
Q. And when you look at box No. 5 alopecia is one of the events listed amongst many others.
Do you see that?
(Witness peruses document.)
A. Yes.
Q. And then if you would turn forward and let me know when you're there to the narrative portion of the report, you can --
A. So this is just box No. 7, is that it?
Q. I think it's a continuation of box B5, if I'm not mistaken, that I'm pointing you to.
A. Okay. So I'm on the -- it's Page 4 of 6; is that what it is?
Q. Correct.
A. Okay.
Q. Are you with me?
(Witness peruses document.)
A. Yes.
Q. Okay.
And the narrative indicates that this spontaneous post-marketing case received from a physician involved a female of unknown age who

Page 95

received Taxotere/docetaxel therapy on, I believe, the 2nd of October, 2002 and the 30th of October, 2002.
Do you see that?
(Witness peruses document.)
A. I do.
Q. And then, if you look down at the bottom of the narrative, it indicates that she also received docetaxel on the 4th of December, 2002 and the 11th of December, 2002.
Do you see that?
A. Yes.
Q. Okay.
And it indicates that the patient died due to lung cancer, correct?
A. Yes.
Q. And when you look back at Page No. 16, Exhibit No. 9, there is a box for outcomes for deaths.
Do you see that?
(Witness peruses document.)
A. Yes.
Q. And while the specific date is unknown, it indicates that the patient died in 2002, correct?
A. Correct.

Page 96

Q. And when you look at the narrative back on Page No. 4 -- let me know when you get there.
(Witness peruses document.)
A. I'm there.
Q. Okay.
And in the narrative on Page No. 4 it indicates that the patient was seen on the 20th of November, 2002, and the patient states that she was feeling better and was having less dyspnea on exertion, but still had tachycardia with physical activity. She also stated Rofecoxib -- I can't say that. How would you pronounce that, doctor?
A. Well, I'm not sure I'm going to do a whole lot better, but Rofecoxib. See? The drug has not been around in a while.
MR. MICELI: It's Vioxx.
THE WITNESS: That's -- I was going to say that, but you beat me to it.
Rofecoxib, yes okay.
BY MR. STRONGMAN:
Q. And it's R-o-f-e-c-o-x-i-b, correct, doctor?
A. Yes, and that's one major advantage I will say, of brand names.
Q. And it indicates that that medication

Page 97

was helping her temporomandibular joint discomfort, correct?
A. Yes.
Q. And it indicates on that 20th of November 2002 visit, alopecia was noted and the patient was wearing a wig, correct?
(Witness peruses document.)
A. Correct.
Q. And again, the fact that a patient is reporting alopecia in the middle of her Taxotere therapy, based on that information alone, that would not be an unexpected adverse event, correct?
A. Okay. I'd agree with that.
Q. Okay.
I think I only have one more, doctor.
MR. MICELI: I hate to interrupt you. You said you have one more. I'm assuming one more AER report. I have a call that I have to make at 12:15 Central Time. Just I wanted you to keep that in mind. One of my -- well, it's something for a family member.
MR. STRONGMAN: Okay. I will be -- I will turn -- I will give you that break at 12:15.

MR. MICELI: Thank you, sir.

THE WITNESS: I'll try to answer in something under 1,000 words.

BY MR. STRONGMAN:

Q. You're doing good, doctor, I appreciate it.

A. Okay.

Q. Doctor, I've marked as Deposition Exhibit No. 10, one more adverse event report. Let me know when you have that in front of you.

(Whereupon Exhibit No. 10 was marked for Identification.)

(Witness peruses document.)

A. I'm there.

Q. And what we marked as Deposition Exhibit No. 10 is another initial report; is that correct?

A. Yes.

Q. And the manufacturer number for this initial report is 2002-22311 U.S., correct?

A. Yes.

Q. And under box No. 5 under the event hair problems or hair loss is noted; is that correct?

(Witness peruses document.)

A. Yes.

Q. And then I want to look at the

narrative, if you can, on the next page with me, doctor.

(Witness peruses document.)

A. Okay. I'm there.

Q. And this indicates that this was a patient who received adriamycin and Cyclophosphamide followed by therapy with Taxotere for adjuvant breast cancer beginning on the 24th of May, 2002; is that correct?

(Witness peruses document.)

A. Yes.

Q. And it goes on to say that, according to the reporter: "The patient developed hyperlacrimation on the 21st of June, 2002 while receiving weekly docetaxel therapy. Docetaxel therapy was discontinued the 22nd of August, 2002, but the patient's condition did not improve."

Did I read that correctly?

(Witness peruses document.)

A. Yes.

Q. And then it goes on. If you look at the addendum, it goes on to say that: "Additional concomitant medications included Taxol, which the patient started on the 19th of July, 2002."

Is that correct?

(Witness peruses document.)

A. Yes.

Q. And then it goes to say that: "It's unknown whether she completed all of the Taxol therapy."

Correct?

A. Correct.

Q. But the patient had Taxotere held on the 14th of June, 2002 and resumed on the 21st of June, 2002 to complete all 12 cycles on the 22nd of August, 2002, correct?

(Witness peruses document.)

A. Yes.

Q. Okay.

And if you look at the next page, the patient was seen at a visit on the 14th of October, 2002.

Do you see that?

(Witness peruses document.)

A. Is this Page No. 3 of 4? I'm sorry.

Q. Correct.

A. Okay.

Q. Did you see there is a sentence that starts "according to the visit from 14th, October, 2002"?

(Witness peruses document.)

A. Yes.

Q. And it says that: "The patient was seen regarding her hyperlacrimation. The patient's opthamologist stated she had bilateral Papilledema and scarring of her lateral ducts with complete obstruction. And it was also noted that the patient did not grow any hair back for a long time."

Did I read that correctly?

(Witness peruses document.)

A. You did.

Q. And you would agree with me that the 14th of October of 2002 is less than two months after August 22nd, 2002, correct?

A. Yes.

Q. And the fact that the patient's hair was still growing back less than two months after completing chemotherapy with Taxotere would not be an unexpected adverse event, correct?

MR. MICELI: Objection to the form.

A. I would agree that it would not be unexpected for it not to have grown back two months after the last dose of Taxotere. Is that it?

Q. Yes, that's correct, based on the information in this report alone.

A. Honestly, I don't think I can say. I just -- it would -- I can't say just because I don't know what the distribution of the times of resolution are. And that's the reason that I'm saying that.

Q. And you would agree that the definitions for permanent alopecia set forth by Dr. Feigal and other Plaintiffs' experts include lack of hair regrowth, six months or more after completion of chemotherapy, correct?

A. Correct.

MR. STRONGMAN: Hey, Dave, I think we can take your break and get you on your call. I'll be ready to go whenever you're ready to go.

MR. MICELI: It's 12:15 here and I know my call will probably go at least 30 minutes. I'm hoping that it will go a little bit less. You know, we don't need to be on the video for this. We can go off the video. I don't mind talking to you, but I don't know that I need to talk about Josh's stuff in front of everybody.

MR. STRONGMAN: I agree.

THE VIDEOGRAPHER: The time is

12:13 p.m. and we are off the record.

(Luncheon recess.)

THE VIDEOGRAPHER: We are back on the record and the time is 12:59 p.m.

BY MR. STRONGMAN:

Q. Are you ready to proceed, doctor?

A. I am.

Q. Very good.

Doctor, would you agree to garner FDA approval the data in the new drug applications must demonstrate the drug's safety and effectiveness?

A. So without quoting from the exact language of the statutes of the regulations, those are part of the requirements.

Q. And doctor, do you have your expert report in front of you, Exhibit No. 3?

A. I do.

Q. Okay.

If you look at Paragraph No. 43 of your expert report, tell me when you're there.

(Witness peruses document.)

A. Yes.

Q. And NDA stands for New Drug Application, correct?

A. Correct.

Q. And in your report you state: "To garner FDA approval, the data in the NDA must demonstrate the drug's safety and effectiveness."

Correct?

(Witness peruses document.)

A. With the understanding that the preceding paragraph provides the context for that, lists other data that has to be provided.

Q. And those are the words that you chose in your report, correct?

A. So again, just to be clear, my answer to your previous question, and here just clarifying that, "safety and effectiveness must be demonstrated". I did not state in here those are the only things that have to be demonstrated.

Is that clear?

Q. Yes.

And my point is I just read a sentence straight out of your report, correct?

A. You did not identify it as such. I don't have any every sentence memorized. So if you had said are you saying only -- I did not know off the top of my head that was a direct quote. If I should, then I apologize. But I just wanted to clarify. And since you took that out of context,

just clarify that that's a true statement. But I wanted to clarify in response to what you said, that that's not the only thing. So I don't think we're saying anything different.

Again, I provided that context earlier, which you did not. You took that one statement or part of that one statement and cherry picked from my report. So I was just adding that context, the same context that is there in Paragraph No. 43.

Q. In Paragraph No. 43 you list information that an NDA under section 505B1 must include, correct?

A. Among other things, yes.

Q. So you list detailed reports on the drug's chemistry and manufacturing, correct?

A. Correct.

Q. You list results of animal studies and pharmacokinetic studies in humans, correct?

A. Correct.

Q. You list results from controlled studies in humans along with other clinical data collected during the drug development program, correct?

A. Correct.

Q. And you also included adverse reactions, correct?

Page 150

front of you?

A. I do.

Q. This is a document entitled: "Best Practices in Drug and Biological Products, Post Market Safety Surveillance For FDA Staff Draft".

Do you see that?

(Witness peruses document.)

A. I do.

Q. And it has a date of November 2019 on it; is that correct?

A. That is correct.

Q. And have you reviewed this document before?

A. I've seen it. I have not actually reviewed it.

Q. So it's fair to say that you didn't review this best practices document in order to prepare your opinions in this case?

A. With the understanding that I'm looking at a time period of 11 or more years prior to this, no, this guidance was not issued at any time relevant to what I'm talking about.

Q. So the simple answer to my question, doctor, is you did not review this document in preparing your report in this case, correct?

Page 151

A. Again, it was not issued during the relevant time periods, so no. That's correct.

Q. All right, doctor, a couple of questions about this document.

A. Uh-huh.

Q. If you look at the table of contents, there's a series of sections.

Do you see that?

(Witness peruses document.)

A. Yes.

Q. And there is a section No. 6 called "Safety Signal Identification".

Do you see that?

(Witness peruses document.)

A. Yes.

Q. And then there's a sub-part of that on FAERS and VAERS, if I've got that correctly.

Do you see that?

(Witness peruses document.)

A. Yes.

Q. Okay.

And then if you look at the table of contents and move forward, there is a section No. 7 entitled "Signal Evaluation and Documentation".

Do you see that?

Page 152

(Witness peruses document.)

A. Uhmm, give me a second here. Yes.

Q. And would you agree with me that signals identification is a separate task from signal evaluation?

MR. MICELI: Object to the form.

A. Well, obviously, there are -- they are not the same process. They are related in the sense that they are both dealing with post-marketing surveillance. But they're distinct parts of that process, I would agree with that.

Q. And would you agree with me, if a signal is identified, it's important to then evaluate that signal, correct?

A. Yeah.

Q. Doctor, if you could turn to Page No. 27 of Exhibit No. 13, I would appreciate it. And this is where section No. 7 starts.

A. Uh-huh.

Q. Are you there?

(Witness peruses document.)

A. I am.

Q. And section No. 7 is entitled, "Signal Evaluation and Documentation"; correct?

A. Uhmm, yes.

Page 153

Q. What it says is that: "A multidisciplinary team conducts an integrated top management evaluation of the prioritized signal to determine whether and what regulatory actions are indicated."

Correct?

A. Yes.

Q. And it goes on to say that: "The team gathers information from available resources including ICSR's submitted to FAERS."

Is that correct?

(Witness peruses document.)

A. Yes.

Q. What are ICSR's?

A. I'm sorry, I didn't study this report. I have to go back to the beginning and see if I can get the abbreviations. Like I said, I have not had a chance to really review this. If you want, I can go back and see what it stands for. SR is obviously safety report. So that's the best that I can do. I don't want to guess. No.

Individual case safety reports.

Q. Very good.

In this document it indicates once a signal is identified, the ICSR's are retrieved and

reviewed, correct?

MR. MICELI: Object to the form.

A. Correct.

Q. And then there is a case definition that's used and applied to the individual case safety reports, correct?

MR. MICELI: Same objection.

A. Yes.

Q. And specifically, the best practices state down towards the bottom -- do you see the last paragraph on Page No. 27, the sentence starting "Reviewers"? Do you see that?

(Witness peruses document.)

A. Hang on.

Q. Let me back up. Look at the first paragraph -- strike that. Look at the last paragraph on Page No. 27 in Exhibit No. 13.

A. Okay.

Q. And it states that: "The use of a case definition in the comprehensive evaluation of a post-marketing safety signal is often necessary when the signal is generated from spontaneous adverse event reports."

Correct?

MR. MICELI: Object to the form.

A. Yes, that's what it says.

Q. And you understand that Dr. Madigan identified what he termed as a signal from looking at the FAERS database, correct?

A. Yes.

Q. Did you apply a case definition to the reports that Dr. Madigan identified in his report from the FAERS database?

MR. MICELI: Object to the form.

A. So that is -- something that I would defer to Dr. Madigan who did -- from his report is limited obviously by the defects in data collection that he writes about in his report. But that's not something that I would do. I think the big picture here is that this is not the first time that discussions of safety signals appeared in reference to the 2005 Pharmacovigilance guidance.

I mean the key point is that you can't do any of this if you don't examine and try to identify a safety signal in the first place. That is the key point. Sanofi didn't even do this. And you can say well, there's the following defect in the signal. But if you don't even try and do it, then there's nothing to evaluate.

MR. STRONGMAN: I am going to move to

strike as nonresponsive.

BY MR. STRONGMAN:

Q. Doctor, do you believe that Dr. Madigan did a signal evaluation in this case?

MR. MICELI: Objection to the form.

A. Do I believe? I'm just going to say I would defer to Dr. Madigan to discuss the details of exactly what he did. I would again say that I would accept it if it was valid.

Q. Did you personally do a signal evaluation in this case?

A. That was not something that was part of what my task was in evaluating it. And again -- I'll say again, as I would have at the FDA, if I'm hearing from the office of drug safety or OSE, I'm not the person who would do that.

Q. Okay.

A. So no.

Q. Okay.

If you're looking at that same last paragraph in this Exhibit No. 13 on Page No. 27, the next sentence says: "Reviewers evaluate individual ICSR's for potential inclusion in a set of similar cases by using it as a point of reference a case definition for the event."

Did I read that correctly?

MR. MICELI: Objection to the form.

I'm not sure I'm following where you are.

You said last paragraph?

BY MR. STRONGMAN:

Q. Did I read that correctly, doctor?

A. So this is Paragraph 841?

Q. Yes.

(Witness peruses document.)

A. "Reviewers evaluate individual ICSR's for potential inclusion in a set of similar cases by using as a point of reference a case definition for the event."

Q. Did I read that correctly?

A. I believe so.

Q. Okay.

Do you know whether or not Dr. Madigan evaluated individual ICSR's in evaluating the signal that he identified in this case?

A. So again, I'm going to provide the same context that I did before. Not -- not this particular guidance was not something that would have been available to Sanofi. So it's not something that I would consider here. I mean...

Q. Setting the document aside, doctor, do

Page 158

you know whether or not Dr. Madigan evaluated the individual ICSR's that were identified in the FAERS database by his signal analysis?

MR. MICELI: Object to the form.

A. So again, I did not go into that level of detail. And it was not necessary for me to do so.

Q. You did not review the individual ICSR's that Dr. Madigan identified in his FAERS signal analysis, correct?

MR. MICELI: Object to the form.

A. So again, I'm sorry. Just bear with me. I'll be succinct. In terms of making regulatory decisions, and I'm not talking about -- I'm talking about decisions, not signal identification and analysis. As you know, I explained and this was true for all adverse event reports going through them one by one, that is not something that is part of the regulatory decision process. It's not necessary. And as I pointed out, you know, it's true for every single adverse event report that you've shown.

Q. Doctor, I think you're answering a question as to why you didn't feel like you needed to review certain things, but my question was not

Page 159

why.

Okay?

A. I understand.

Q. My question was simply: Did you review the individual ICSR's that Dr. Madigan identified in his signal analysis in the FAERS database, yes or no?

A. Oh. And again, I think it's critical not just to get a single word answer, but to say that is not a relevant part of the methodology. It's not what I do, so no. There you go.

Q. And do you know whether or not Dr. Madigan reviewed individual ICSR's for the reports that he identified in his signal analysis in the FAERS database?

MR. MICELI: Object to the form.

A. Again, given the same context, it's not necessary for me to know that. It really isn't.

Q. Okay.

And I know you think it's not necessary, but you don't know one way or another whether he did, correct?

A. Again, it's not necessary for me to know. I don't know. But it's not -- whether he did or not would not make a difference in terms of my

Page 160

opinion.

MR. STRONGMAN: Dave, I think we're at a good point. We are done with that document and we are at a good point to take a five-minute break or whatnot, if that's okay?

MR. MICELI: Yes, very good.

THE VIDEOGRAPHER: The time is 2:33 p.m. and we are off the record.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:46 p.m.

BY MR. STRONGMAN:

Q. Are you ready to proceed, doctor?

A. I am. Let me -- just bear with me. I don't know where that coaster went. Okay, there it is. I'm set.

Q. Ready to go?

A. Yes.

Q. Okay.

If you could turn to Paragraph No. 50 of your expert report. Are you ready?

(Witness peruses document.)

A. Yes.

Q. In Paragraph No. 50 of your expert

Page 161

report you set out various data sources that you reviewed that in your opinion were available to Sanofi; is that correct?

A. You're saying before or after the approval of Taxotere? Yes, that's correct.

Q. And it says: "I reviewed the various data sources." And then it lists several of the data sources and sub parts that you reviewed in this case, correct?

A. Correct.

Q. And one of them is Dr. Madigan's disproportionality analysis, PRR reporting based upon data from the FDA's adverse event reporting database, correct?

A. Correct.

Q. And that's called the FAERS database, correct?

A. Yes.

MR. STRONGMAN: And that's F-A-E-R-S for the court reporter.

BY MR. STRONGMAN:

Q. Is that correct?

A. Yes.

Q. And you focused on the years 2000 to 2008, Quarter No. 1, correct?

Page 194

A. Correct.
Q. Taxotere is one of the drugs listed, correct?
A. Correct.
Q. And the manufacturer number is JP01-01616, correct?
A. Correct.
Q. Is that correct?
A. Yes. That's what I read here, yes.
Q. And the manufacturer report number JP01-01616 is the adverse event that we went over and marked as Exhibit No. 8 earlier, correct?
MR. MICELI: Object to the form.
A. So same kind of caveat as before. Subject to confirmation, same thing for the previous two, I'll accept that for right now.
Q. All right, doctor, if you could now pull up Exhibit No. 19.
(Whereupon Exhibit No. 19 was marked for Identification.)
(Witness peruses document.)
A. Okay.
Q. Let me know when it's up.
(Witness peruses document.)
A. I'm pulling it up. It's up.

Page 195

Q. This is an initial report, do you see that, it has an "I" there?
A. Yes.
Q. And it's 2003, Quarter No. 3, correct?
(Witness peruses document.)
A. That's what it says here, yes.
Q. And it's coded as an adverse reaction, one of them being alopecia, correct?
A. Yes.
Q. And disability is coded as one of the outcomes, correct?
A. Correct.
Q. And Taxotere is identified as one of the drugs, correct?
(Witness peruses document.)
A. Sorry. Just a minute. Yes.
Q. And if you look, the manufacturer number is 200221684 U.S., correct?
A. Yes.
Q. And manufacturer report No. 200221684 U.S. is the adverse event report that we went over and that I marked as Exhibit No. 9 earlier, correct?
MR. MICELI: Object to the form.
A. So again, subject to confirmation, I'll accept that for now.

Page 196

Q. All right.
I've introduced Exhibit No. 20 and if you can look at that when it's up.
(Whereupon Exhibit No. 20 was marked for Identification.)
(Witness peruses document.)
A. All right, it's up.
Q. What we marked as Exhibit No. 20 has an "I" for initial follow-up, correct?
(Witness peruses document.)
A. So in the row that's labeled initial follow-up, there's an "I".
Q. Okay.
And it's 2003, Quarter No. 3, correct?
A. The file name, that's what it says.
Q. And alopecia is one of the reactions coded, correct?
A. Excuse me. Yes.
Q. And disability is coded as an outcome, correct?
A. Yes.
Q. And going on to page No. 2, Taxotere is identified as one of the drugs, correct?
A. Correct.
Q. And the manufacturer number for Exhibit

Page 197

No. 20 is 20222311 U.S., correct?
(Witness peruses document.)
A. That is the number listed.
Q. And manufacture report No. 20022311 U.S. is the adverse event report that I marked as Exhibit No. 10 and that we discussed earlier, correct?
MR. MICELI: Objection to the form.
A. So again subject to confirmation, I'll accept that for now.
Q. All right, doctor, I've marked as Exhibit No. 21 another adverse event. Let me know when that's up.
(Whereupon Exhibit No. 21 was marked for Identification.)
(Witness peruses document.)
A. Okay.
Q. And do you see it?
A. Yes.
Q. In my haste to get Dave his files this morning, I forgot to pull this one up.
So what I marked as Exhibit No. 21 is another MedWatch form, correct?
(Witness peruses document.)
A. Yes.
Q. And Exhibit No. 21 has a manufacturer

Page 198

report number of 20041760 U.S., correct?

A. Yes.

Q. And this indicates that this was: "A spontaneous post-marketing case received from a consumer, involved a 50-year old female who initiated therapy with weekly Taxotere in January 2004 for breast cancer. She received six cycles and received her last dose on the six of February, 2004."

Do you see that?

(Witness peruses document.)

A. Yes.

Q. And this is identified as an initial report, correct?

A. Correct.

Q. And the narrative goes on to identify various experiences that the patient has had since the beginning of therapy, correct?

(Witness peruses document.)

A. I forgot to increase the size here. Yes.

Q. And if you go down on the narrative, she is also experiencing -- do you see that sentence, towards the bottom of that paragraph?

(Witness peruses document.)

Page 199

A. The one that says she is also experiencing hair loss, nail changes and feeling cold all the time?

Q. Yes.

In Deposition Exhibit No. 21 in the narrative it states: "She is also experiencing hair loss, nail changes and feeling cold all the time."

Did I read that correctly?

(Witness peruses document.)

A. You did.

Q. And then it goes on to say that: "This case has not been substantiated by a healthcare professional."

Correct?

(Witness peruses document.)

A. That's what it says.

Q. And based on the information provided in Exhibit No. 21 alone, you cannot conclude that the report of alopecia is an unexpected adverse event, correct?

A. So again, repeating what I said before, this is not the methodology that's used to make decisions about labeling in addition to section No. 6. So again, I just -- that applies to every other case that we've discussed. This is not the

Page 200

methodology that I used to reach my conclusions or what I have used at generally -- generally when at the FDA. Because just from this alone, this one case with reference to nothing else, it's not the appropriate tool. It's not the methodology that I'd use.

Q. And right, that's because based on the information provided in Exhibit No. 21 alone, there is nothing indicating that a patient experiencing hair loss after chemotherapy is an unexpected adverse event, correct?

MR. MICELI: Object to the form.

A. So again, I'm just going to give the context -- let me actually give the big context caveat, which is absence of evidence is not evidence of absence. The fact that you can't conclude something from this is not any -- is not evidence that this is not an issue. This simply does not represent demonstration of safety.

In addition, as I've said, it's signal identification. Signal identification does not involve going through each report. That's -- that is essentially what Sanofi did, rather than what, you know, the FDA would do. But -- so I take that the question is not relevant. It's not relevant.

Page 201

It's like saying can I hear someone's sound on the other side of the world with the stethoscope here? It's a mis-sound. It's not the right methodology. That's all that I can say.

Q. And doctor, I appreciate that you have caveats. Right? You have caveats and concerns that you expressed in your answer, correct?

MR. MICELI: Objection to the form.

A. Well, just it's a matter of not wanting to get an answer that sounds like it applies to every situation or all situations or is even relevant here. So I just want to be clear about that. You know, it's -- you know, this is just not the appropriate methodology for reaching conclusions about labeling.

Q. And doctor, I appreciate that's your opinion, but I just want you to answer my question. And my question is based on the information provided in Exhibit No. 21. Alone. With nothing else. There's nothing here indicating that a patient experienced an unexpected adverse event of alopecia from taking Taxotere, correct?

MR. MICELI: Object to the form.

A. So I'm going to answer your question and I'll be succinct. It's like saying aside from that

Page 202

Mrs. Lincoln, how did you enjoy the play? The answer is no, you can't conclude that.

Q. And now if you look at what I've marked Exhibit No. 22.

(Whereupon Exhibit No. 22 was marked for Identification.)

(Witness peruses document.)

A. I'm sorry, I can't -- so I've got actually a sticker that says 21 and also 22. So is that a new exhibit?

Q. Correct. I've just marked Exhibit No. 22. If you can bring it up.

(Witness peruses document.)

A. I'm refreshing it and reloading the browser. Okay.

Q. You have Exhibit No. 22 in front of you?

A. I do.

Q. And this also has an "I" in the column for initial or follow-up.

Do you see that?

(Witness peruses document.)

A. Yes.

Q. And this is 2004, Quarter No. 4 in the file name.

Do you see that?

Page 203

(Witness peruses document.)

A. I do.

Q. And it's -- strike that.

Alopecia is coded as one of the reactions in Exhibit No. 22, correct?

A. That's correct.

Q. And one of the outcomes coded is disability, correct?

(Witness peruses document.)

A. That's correct.

Q. And one of the drugs is Taxotere, correct?

A. Correct.

Q. And the manufacturer number on Exhibit No. 22 is 200417602 U.S., correct?

(Witness peruses document.)

A. Yes, that's correct.

Q. And manufacturer report No. 200417602 U.S. is the adverse event report that I marked as Exhibit No. 21 and just discussed with you, correct?

(Witness peruses document.)

A. In this case I do have them side by side, so it does appear to be the same. Again, I'm not going to take the time to go through and match every element. But the report number is the same.

Page 204

Q. Okay.

MR. STRONGMAN: And Dave, do you mind if we take just a five-minute break and move on to the next topic?

MR. MICELI: That's fine.

MR. STRONGMAN: How long were you on, Jason?

THE VIDEOGRAPHER: One hour and nine minutes.

MR. STRONGMAN: So we're at five hours and 13 minutes?

MR. MICELI: Five hours and 20 is what I have.

THE VIDEOGRAPHER: Five hours and 20 minutes.

MR. STRONGMAN: Very good.

THE VIDEOGRAPHER: And we are off the record and the time is 3:55 p.m. and we are off the record.

(Recess.)

THE VIDEOGRAPHER: We are back on the record and the time is 4:09 p.m.

BY MR. STRONGMAN:

Q. Doctor, are you ready to proceed and hopefully finish this out?

Page 205

A. Yes, let's.

Q. Doctor, did you do an evaluation to determine whether or not the Paclitaxel labeling should have included a risk of permanent alopecia in the adverse reaction section as of Quarter No. 1, 2008?

A. So, as I said previously, that was not an area that I was asked to opine on, so no.

Q. And the same would be true for adriamycin and Cyclophosphamide, correct?

A. Correct.

Q. Doctor, you said that you did review the charts of the medical literature in Dr. Feigal's expert report, correct?

A. You mean the -- well, the summary tables that she had -- not summary tables, but the tables where she listed the papers and relevant information, yes.

Q. And doctor, you understand that there have been cases of permanent alopecia reported with Paclitaxel, correct?

A. Again, I was not asked to look at Paclitaxel, so I'm not offering an opinion on that.

Q. Did you see anywhere in Dr. Feigal's chart that there were cases of permanent alopecia

Page 234

be interested in this information. It's the women who are going to be hopefully surviving for a prolonged period of time.

So they're not dying two months after.

Q. Doctor, that's not my question.

A. It's not the relevant population who we are --

MR. STRONGMAN: I move to strike as nonresponsive again.

BY MR. STRONGMAN:

Q. Doctor, my question was simple. If a patient died two months after completing chemotherapy, and the last time that they were evaluated before they died they had alopecia, do you know whether -- under the study guidelines whether or not that patient would be considered as having ongoing alopecia all the way up to the end of the study?

MR. MICELI: Object to the form.

A. So with the caveat as I explained, that from -- again, from a regulatory perspective, that's not really relevant. I'd have to go back and look at protocol, so I don't know. But again, not a relevant question here. That's not the patient population who we're thinking would be interested in

Page 235

permanent alopecia. It would be women who don't die.

Q. How many people who fit that hypothetical are included in the 29 ongoing cases in the TAC arm?

MR. MICELI: I'm sorry, I thought you were done, Jon. Object to the form.

A. Which hypothetical? I'm sorry, I'm not sure. Which hypothetical?

Q. How many patients in the TAC arm in TAX316 were considered to have ongoing alopecia into the ongoing period died less than six months after completing chemotherapy?

MR. MICELI: Object to the form.

A. Well, this is going to be a little bit longer answer. I'm going to say --

Q. That you don't know?

A. Well, I would say if this is their last follow-up, but you don't know if they're alive or not after that, there is a problem in terms of follow-up for vital status. So I don't know, but if the company is unable to say well, they weren't followed for more than a month or so, how do you know whether they survived or not? That's one of the basic things about a protocol like this. You

Page 236

want to follow-up times to survival.

Q. And my question is, doctor, what if protocol for the study actually says if you die, but the last evaluation showed alopecia, you are still counted as having ongoing alopecia? Do you understand my question?

A. No. I just -- are you saying died after? When is the death in relation to last observed -- last follow-up visit?

Q. After. But they are aware of the death. But because there was alopecia noted at the last visit, it is forever counted as ongoing under the study.

Do you know that to be true?

A. So again, this is a question I'm going to keep coming back to it, and I'm sorry to sound like a broken record, to Drs. Feigal and Madigan. I mean I'm honestly, you know, I'm -- did not look at it in this level of detail. Just as if a statistician did a timed-survival analysis and/or a time-to-event analysis, as a medical officer, you're going to go over that. But, you know, those are the people to go talk to on this, not me.

Q. Do you know whether Dr. Madigan or Dr. Feigal looked at it in this level of detail, that

Page 237

being TAX316?

A. You could have to talk to them.

Q. You could have read their depositions to find out, right?

A. Uhmm, I was not -- it was not for my purposes a relevant question. Okay? I can just put it that simply. Again, I was looking at the very focused question is -- was the threshold met. Did Sanofi do something about it? It was that simple.

Q. Doctor, in Paragraph No. 88 of your report, sub-part A, you talk about Dr. Madigan's FAERS analysis, correct?

A. Yes.

Q. And we've talked about that today, quite a bit, correct?

A. Yes.

Q. And then in sub-part B you reference a Nabholtz article of 2001.

Do you see that?

(Witness peruses document.)

A. I do.

Q. Did you read the Nabholtz study?

A. I may have. I have to -- again, I would want to go back and look at it to say -- to jog my memory.

Page 238

Q. Sitting here today, under oath, can you tell me that you read the Nabholtz study?

A. As I just said, I have to go back and look at it. So I don't want to guess.

Q. You don't provide a citation to the study, do you?

(Witness peruses document.)

A. Uhmm, that's a citation. And if you're saying, well, it misses -- it doesn't have -- that's a citation. It's got the author first -- author's name and year of publication.

Q. Where did you first come across the Nabholtz study?

A. So I do not remember, okay? I do know that I thought that it was an important piece of evidence. But...

Q. But you don't know if you read it?

A. That is not what I said. That is not what I said.

Q. I asked you do you know that you read the Nabholtz study and you said that you couldn't tell me.

MR. MICELI: Object to the form.

A. So again, I am saying here and emphasized under oath, but with you I'm going to

Page 239

emphasize that I don't have that document in front of me right now. Okay? And you're asking well, where did you see it? I have referenced Dr. Feigal's report and Dr. Madigan's report. And also I mentioned Dr. Plunkett's report. So I'm citing that as evidence underlying that. That doesn't change. It doesn't matter honestly, to my mind, where I saw it.

If it may matter from your purposes, but it doesn't change whether or not it's supportive.

Q. Doctor, if you're going to call out in a specific way in a sub-part like you did here the Nabholtz study in your report, wouldn't you agree that it's pretty darn important that you actually read the study?

MR. MICELI: Object to the form.

A. Uhmm, well, I know this is going to sound irradical (sic), but that is frequently done if you know what the contents of the study are. And that is, if you look at any FDA review, they are going to cite articles, again, that are no -- you know, have been used to support various scientific concepts. It does not mean that they've gone through and read them. Okay?

Q. Do you know whether or not --

Page 240

MR. MICELI: He's not finished, Jon. You can't just cut him off.

MR. STRONGMAN: I thought he was done. I am -- go ahead. I'm going to object after this because he's answered my question. But if you need to go on, why don't you go on.

THE WITNESS: I feel strongly that I need to provide some context here.

It is an accepted practice in science, in medicine, that if you have a piece of evidence that supports your conclusion to cite it, does not necessarily mean -- and this is not unique to me -- that you've analyzed it. Certainly that happens with foundational papers. If this was the only thing that I was citing, you could say that. But, for example, you know, if I cite a paper by -- I don't know -- Robert Poe from the 19th century in an article about bacteria, does that mean that I went back and I read that paper? No. So that's not something nefarious.

If you were to look at any journal and you look at the papers, there are people

Page 241

who have cited my papers. They haven't read them, but they know from the abstract and other summaries what they say. If somebody says, well, that's not really on point, okay, you can go and do that. But there is nothing wrong with doing that. Nothing. I can't say that more strongly.

BY MR. STRONGMAN:

Q. Are you done with your answer, doctor?

A. Yes.

Q. What are the contents of the Nabholtz study?

A. You know, I am not going to quote from memory. And I'm not going to be bullied into trying to quote from memory. I'm just not. If you want to, you can pull it up. And I can probably get it off the Internet in two seconds. But just because I don't have a photographic memory, is not a sin.

Q. Did you review the Sedlachek study?

A. Yes.

Q. Is it a published article or is it an abstract?

A. Sedlachek presented his work as an abstract. Again, I would have to look at my notes

-- not notes, but what's on Dr. Feigal's report. So that's an important piece of evidence.

Q. Do you know whether or not Dr. Sedlachek ever published his abstract as a manuscript?

A. No. Again, I do not want to answer from memory. If this is a memory contest, then I would have prepared much differently. I understand that I need to describe the bases for my opinion. I have never had someone tell me you must be able to quote them from memory. If that's the rule, that's fine. But I need to know it going forward.

Q. Doctor, you know, for the Nabholtz study I wasn't asking you to quote it from memory. I was simply asking you to confirm that you've read it.

MR. MICELI: Object to the form.

A. So again, I've said I looked at a lot of documents. And I said I'm not willing to do that.

Q. Okay.

And doctor, Dr. Sedlachek's abstract was publicly available, correct?

A. Sanofi knew about it, which is the operative issue here.

Q. My question was, doctor: The abstract that Dr. -- strike that.

The abstract that Dr. Sedlachek wrote

was publicly available, correct?

A. He presented them at the San Antonio Breast Cancer Symposium in September of 2006.

Q. Do you know whether the Sedlachek abstract was ever sent to the FDA?

A. By whom?

Q. Anyone.

A. Who? Well, to send -- the -- so I do not know exactly what Sanofi might have sent to the FDA about Sedlachek or in what form.

Q. Do you know what Sanofi submitted to the FDA about Dr. Nabholtz's study?

A. So again, I'm sorry, I'm going to insist on doing this. I don't off the top of my head. But that's not relevant. What's relevant is did they look at it and say, you know, we should submit a supplemental NDA? It's that simple.

The FDA enforces the law with regard to labeling. Sanofi is the one responsible for the label.

Q. Doctor, I didn't ask you who was -- are you done answering?

A. Yes.

Q. I didn't mean to cut you off. I didn't ask you who was responsible for the label. I didn't

ask you whether you thought that it mattered, did I?

MR. MICELI: Object to the form. Argumentative.

BY MR. STRONGMAN:

Q. The question that I asked was what do you know about whether or not the Nabholtz data was sent to the FDA by Sanofi?

A. So I think what I was trying to say, Mr. Strongman, it's irrelevant. I don't know off the top of my head. But it's -- frankly, it's irrelevant. It was null-able to them. That is the key point.

Q. You also talk in your report about the 2011 and 2015 clinical overviews in Paragraph No. 88, sub-part C.

Do you see that?

(Witness peruses document.)

A. Yes.

Q. Do you know whether or not the 2011 clinical overview was ever submitted to the FDA?

A. Again, for my purposes of the opinions that I was asked to provide, and I don't mean the content that I was asked, but the subject, it's irrelevant. I don't know off the top of my head, but it doesn't matter one way or the other. What

I'm saying is what's important is the supplemental NDA be submitted.

Q. Do you know whether or not any of the patients that Dr. Sedlachek reported on in terms of persistent alopecia received Taxotere according to the FDA-approved regimen or an off-label regimen?

A. I'm going to defer to Dr. Feigal and Dr. Madigan on those questions.

Q. That's not something that you know sitting here; fair?

A. It's not something that I needed to know. No, I don't know.

Q. Do you know anything about any conversations that Sanofi had with the FDA regarding Dr. Sedlachek and his patients?

A. Nothing comes to mind.

Q. Doctor, when you discuss your background in your expert report, you highlight the experience that you had while at the FDA; is that true?

A. That's one of the areas that I describe, yes.

Q. And would you agree that FDA personnel or FDA medical reviewers are uniquely qualified to render opinions on FDA regulatory or labeling matters?