# EXHIBIT D

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
                                    )
 3    IN RE:  TAXOTERE              ) MDL No. 2740
      (DOCETAXEL) PRODUCTS          )
 4    LIABILITY LITIGATION          ) SECTION:  H
                                    )
 5    THE DOCUMENT RELATES TO:      )
      SHEILA CRAYTON,               )
 6    CASE NO. 2:17-CV-05923;       )
      CYNTHIA THIBODEAUX,           )
 7    CASE NO. 2:16-CV-15859        )
 8    *******************************************************
 9            ORAL AND VIDEOTAPED DEPOSITION OF
10                   DAVID MADIGAN, Ph.D.
11                    November 14, 2019
12    *******************************************************
13        ORAL AND VIDEOTAPED DEPOSITION OF DAVID MADIGAN,
14    Ph.D., produced as a witness at the instance of the
15    DEFENDANTS SANOFI-AVENTIS U.S. LLC AND SANOFI US
16    SERVICES, INC., and duly sworn, was taken in the
17    above-styled and numbered cause on the 14th of
18    November, 2019, from 8:09 a.m. to 3:16 p.m., before
19    Tamara Vinson, CSR in and for the State of Texas,
20    reported by machine shorthand, at Williams Hart
21    Boundas & Easterby, 8441 Gulf Freeway, Suite 600,
22    Houston, Texas, 77017, pursuant to the Federal Rules
23    of Civil Procedure and the provisions stated on the
24    record or attached hereto.
25
```

|  | Page 134 |  | Page 136 |
|---|---|---|---|
| 1 | that in your peer reviewed published scientific work? | 1 | outcome. Sorry. The target drug comparators and |
| 2 | A. I don't -- I don't think so. In consulting | 2 | outcome. So I define those entities and then I |
| 3 | projects I've certainly analyzed -- done metaanalysis | 3 | conduct an analysis. |
| 4 | of interim data. | 4 | Q. Okay. And you -- as part of your analysis, |
| 5 | Q. Okay. But just so it's clear, you've never | 5 | then, you ident -- the target drug was Taxotere? |
| 6 | actually done that in your published peer reviewed | 6 | A. Taxotere for one analysis, then Paclitaxel |
| 7 | scientific work? | 7 | for another one, et cetera, et cetera. |
| 8 |     MR. MICELI: Object to the form. | 8 | Q. Understood. And in those analyses, how did |
| 9 | A. I don't -- I don't believe so. | 9 | you make sure you were actually, in Taxotere's |
| 10 | Q. (By Mr. McRae) Okay. Thank you. | 10 | example, catching or identifying Taxotere cases? |
| 11 | A. There are many things I haven't done in the | 11 | A. So what I do is -- is my normal practice is I |
| 12 | peer-reviewed literature. | 12 | use a product called DrugLogic, which is a platform |
| 13 | Q. Doctor, I'm not exactly sure what question | 13 | for conducting these kinds of analysis. And that |
| 14 | you're answering now. | 14 | platform provides a list of -- for any given drug it |
| 15 |     (Reporter interruption.) | 15 | provides a list of brand names and generic names. |
| 16 | A. It was an addendum to my last answer. | 16 | Q. Okay. And then you're -- what you're trying |
| 17 | Q. (By Mr. McRae) All right. Doctor, let's | 17 | to identify here -- and, again, this is just at a high |
| 18 | switch gears a little bit and talk about your FAERS, | 18 | level so we can have a conversation about it -- you |
| 19 | F-A-E-R-S, database analysis. All right? | 19 | were trying to identify cases that included the |
| 20 | A. Okay. | 20 | high-level term alopecias. Right? |
| 21 | Q. And I don't want to belabor this too much, | 21 | A. Yes. |
| 22 | but I do want to see if we can agree on a few things. | 22 | Q. Okay. |
| 23 | For this time in your FAERS analysis you added in some | 23 | A. That's the outcome, so I need a definition of |
| 24 | new medications. Right? | 24 | the outcome. The outcome is alopecias plus something |
| 25 | A. Yes, I was asked to. | 25 | else, yes. |
|  | Page 135 |  | Page 137 |
| 1 | Q. Okay. And other than that, did your | 1 | Q. Understood. And for -- in the case of |
| 2 | methodology change in any way? | 2 | Taxotere, it would be Taxotere plus high-level term |
| 3 | A. A little bit. So the FAERS analysis in -- | 3 | alopecias. Right? |
| 4 | represented in the figures didn't change. | 4 | A. No, no. That's not what I meant. |
| 5 | Q. Okay. | 5 | Q. Oh, I'm sorry. |
| 6 | A. The FAERS analysis in Table 3 didn't change, | 6 | A. I meant -- so is target is a drug and the |
| 7 | but then I added two extra, if you will, analyses in | 7 | outcome is defined -- this analysis is defined as |
| 8 | Tables 4 and 5. | 8 | higher level term alopecias plus permanent or |
| 9 | Q. Okay. Did the underlying methodology by | 9 | disabled. |
| 10 | which you performed your FAERS analysis, did that | 10 | Q. Okay. I understand. Okay. I'm with you. |
| 11 | change in any way? | 11 | Now, if we -- I can't remember. What did we mark |
| 12 | A. With the exception of Tables 4 and 5, no. | 12 | appendix 4 as to your report? |
| 13 | Q. Okay. Perfect. Thank you. And so just so | 13 | A. Oh, boy. |
| 14 | -- just so we have it for the record and it's clear, | 14 | Q. I think that's Exhibit 6. |
| 15 | when you were trying to identify the cases to include | 15 | A. Yes. |
| 16 | in your FAERS analysis, the first thing you did was | 16 | Q. So with respect to Taxotere, if we're looking |
| 17 | you searched for Taxotere as one of the drugs. Right? | 17 | at Exhibit 4, which I am handing Mr. Miceli right now, |
| 18 | A. So -- | 18 | how many cases did this analysis identify with respect |
| 19 | Q. Is "search" not the right -- | 19 | to Taxotere by the first quarter of 2008? |
| 20 | A. Yeah, right. So there's kind a language | 20 | A. Eight. |
| 21 | issue here that I'm going to have problems with. | 21 | Q. By the first quarter of 2008? |
| 22 | Q. Fair enough. | 22 | A. I beg your pardon. Sorry. I'm looking at |
| 23 | A. I need to define -- for these kinds of | 23 | the wrong thing. Six. |
| 24 | analysis you need to define a target drug, you need to | 24 | Q. Six. Okay. Did you look at any of those six |
| 25 | define the comparators and you need to define the | 25 | reports? |

35 (Pages 134 - 137)

|   | Page 138 |   | Page 140 |
|---|---|---|---|
| 1 | A. What do you mean? | 1 | Q. Okay. |
| 2 | Q. Did you look at any of those six reports? | 2 | A. That's how I interpret it. And I also |
| 3 | A. I mean, are you referring to the underlying | 3 | discuss the use of that with Dr. Kessler. |
| 4 | MedWatch forms? | 4 | Q. And what does -- what does permanent damage |
| 5 | Q. Correct. | 5 | mean as an outcome? |
| 6 | A. I don't have them. | 6 | A. It means it's permanent, you know, that the |
| 7 | Q. Okay. Fair to say, then, you didn't review | 7 | event being reported is not -- does not appear to be |
| 8 | the underlying MedWatch forms? | 8 | going away. |
| 9 | A. Nor would I. So for a disproportionality | 9 | Q. Okay. And you -- did you also discuss that |
| 10 | analysis, you'd have to review all six million of | 10 | with Dr. Kessler? |
| 11 | them. | 11 | A. So it's a little more indirect than that. So |
| 12 | Q. I understand. I'm just trying to establish | 12 | I asked through counsel please ask Dr. Kessler if he |
| 13 | that you didn't actually look at them. | 13 | thinks this is an appropriate -- given the task at |
| 14 | A. Right, but if I simply say no to be construed | 14 | hand, is this an appropriate end point to use and he |
| 15 | as something I -- you know -- I should have done and, | 15 | opined that it was. |
| 16 | no, I didn't. It's not the nature of my work here. | 16 | Q. Okay. If the outcome had just said permanent |
| 17 | Q. Okay. And I think you mentioned that the way | 17 | damage, would you still have conducted your analysis |
| 18 | -- one of the ways you performed your search or the | 18 | in the same way? |
| 19 | way you performed it was you had to identify an | 19 | A. Probably. I'd ask Dr. Kessler. |
| 20 | outcome of -- is it disability or permanent damage? | 20 | Q. Okay. And if the outcome had just said |
| 21 | A. Yes. | 21 | disability, would you still have conducted your |
| 22 | Q. Is that right? | 22 | analysis in the same way? |
| 23 | A. Yes. | 23 | A. Probably. Same answer, I'd run it by |
| 24 | Q. Okay. And so on the actual MedWatch form, if | 24 | Dr. Kessler. |
| 25 | you were to look at one, there's actually an outcome | 25 | Q. Okay. And would you then, in turn, defer to |

|   | Page 139 |   | Page 141 |
|---|---|---|---|
| 1 | box. Right? | 1 | Dr. Kessler's opinion on that matter? |
| 2 | A. Yes. | 2 | A. Yes. |
| 3 | Q. Okay. And one of the options there, at least | 3 | Q. Okay. Dr. Madigan, are you aware that in |
| 4 | now, is disability or permanent damage? | 4 | 2005 and prior the outcome on the MedWatch form was |
| 5 | A. Yes. | 5 | only disability? |
| 6 | Q. And so that box would need to be checked in | 6 | MR. MICELI: Object to the form. |
| 7 | order for one of the cases to kind of meet the | 7 | A. So I'm aware that there are multiple forms |
| 8 | criteria you've laid out here to identify those cases. | 8 | over the years and even now there are two forms that |
| 9 | Right? | 9 | are commonly used. |
| 10 | A. That's right. | 10 | (Reporter interruption.) |
| 11 | Q. Okay. Now, as I understand it, the outcome | 11 | A. Two forms that are commonly used. The -- but |
| 12 | on this MedWatch form, it says disability or permanent | 12 | the -- they've all been mapped to the same term on the |
| 13 | damage. Right? | 13 | FDA's website. When you download the data, it's all |
| 14 | A. That's right. | 14 | mapped to a single term. |
| 15 | Q. Okay. Does your methodology distinguish | 15 | Q. (By Mr. McRae) How do you know that? |
| 16 | between disability or permanent damage? | 16 | A. I looked at it. |
| 17 | A. No. | 17 | Q. Okay. Well, were you aware that in 2005 and |
| 18 | Q. Okay. What does disability mean as an | 18 | prior the outcome on the MedWatch form only said |
| 19 | outcome? | 19 | disability? |
| 20 | A. So as -- | 20 | MR. MICELI: Object to the form. |
| 21 | MR. MICELI: Excuse me. Object to the | 21 | A. I think I knew that and I think you saw that |
| 22 | form. Go ahead. | 22 | at some point. I know there are multiple versions and |
| 23 | A. As I understand it, it indicates sort of | 23 | the wording has changed. |
| 24 | permanency, that it's -- it's a disablement that isn't | 24 | MR. McRAE: All right. Ma'am, if you |
| 25 | -- isn't -- you know -- is persistent. | 25 | could mark that as the next exhibit, please. |

Veritext Legal Solutions
800-227-8440                                                                                                                973-410-4040