**PREVIOUSLY DESIGNATED AS CONFIDENTIAL**

# EXHIBIT 7

**EXCERPTS OF THE DEPOSITION OF ELLEN CHANG, ScD
MAY 4, 2021**

# EXHIBIT 7

Ellen T. Chang, Sc.D.

Page 175

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - -

IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION,

                                           MDL No. 2740
                                           SECTION: "H"
This Document Relates to:    Judge Milazzo
ALL CASES,                              Mag. Judge North
_____/

- - -

Tuesday, May 4, 2021

- - -

      Remote Videotaped Stenographic Deposition of ELLEN T. CHANG, Sc.D., Volume II, held with the witness located in Menlo Park, California, commencing at 10:04 a.m., before Gina V. Carbone, a Registered Merit Reporter, California Certified Realtime Reporter, California Certified Shorthand Reporter State License No. 8249.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 971.591.5672 fax
deps@golkow.com

Page 200

1  shown comprised all of the cases in Dr. Madigan's
2  signal detection analysis as of that date.
3       It -- from the -- from the questioning and
4  answering, it seemed to me that these were six
5  reports that might have been in that analysis, but
6  it was not clear that it was potentially the six.
7       Q. Okay. Prior to March of this year, when
8  you -- and I'm assuming because of your invoices,
9  you invoiced for March and for April. But is
10 March -- is March when you began your work on your
11 supplemental report?
12      A. No. I began working on this supplemental
13 report in April.
14      Q. Okay. Is March when you began to review
15 information to put your report together?
16      A. I think that's right. It was -- it would
17 have been whenever I received Dr. Ross' report, I
18 believe.
19      Q. Okay. All right. Where -- if you were
20 confused about whether or not the six reports that
21 Mr. McRae showed to Dr. Madigan in November of 2019
22 were, in fact, the same six reports that were
23 demonstrated as positive responses to Dr. Madigan's
24 FAERS signal detection through the means of a PRR,
25 what, prior to March of 2021, prevented you from

Page 201

1  matching those two things up?
2       A. What prevented me from matching them up was
3  realizing that there were only six cases listed by
4  Dr. Madigan in his Appendix 4 as of that date --
5       Q. Okay.
6       A. -- and coming to the realization that six
7  cases were shown to him in 2019.
8       Q. You first gave a report in this MDL in
9  2019, correct?
10      A. Correct.
11      Q. And you reviewed Dr. Madigan's reports from
12 late 2018, 2019, and 2020, all of which included his
13 FAERS analysis, correct?
14      A. That's correct.
15      Q. Okay. And all of Dr. Madigan's reports
16 have included his Exhibit 4 that demonstrates six
17 events that met his query in the FAERS database
18 while searching for a PRR using surrogates for
19 permanent chemotherapy-induced alopecia, correct?
20      A. I -- the way you characterized that as
21 surrogates for permanent chemotherapy-induced
22 alopecia, I don't agree that the criteria that he
23 used are surrogates for permanent or irreversible
24 alopecia.
25           But sort of addressing the broader

Page 202

1  question, I agree that his Appendix 4 showing six
2  matches or six hits to his search criteria was
3  included in his -- in all of his prior reports.
4       Q. Right. I mean, I understand you disagree
5  with his choice of how he searched the FAERS. But
6  using whatever terms he used for the purposes he
7  did, he -- his report has consistently demonstrated
8  six positive hits as of the first quarter of 2008,
9  correct?
10      A. That's right.
11      Q. And that's been true for over two and a
12 half years and through all of the reports he's
13 provided that you have reviewed, correct?
14      A. That's true. I think that Dr. Ross'
15 opinion, which relies on Dr. Madigan's signal
16 detection analysis is new. And then Dr. Plunkett's
17 new reliance on Dr. Madigan's signal detection
18 analysis is also something that's new since the
19 spring of 2021.
20      Q. Well, sure. We're going to get to talk
21 about those. I'm not worried about what Dr. Ross
22 and Dr. Plunkett have done yet. I'm just trying to
23 get some basic information that in every report that
24 you have seen that Dr. Madigan has provided for this
25 litigation, which dates back to late 2018, have

Page 203

1  always included a FAERS analysis that demonstrated
2  six positive hits representing events while
3  conducting a signal detection by means of a PRR,
4  correct?
5       A. That's correct.
6       Q. All right. And at least as early as
7  November of 2019, November 14th of 2019, when
8  Mr. Chris McRae deposed Dr. Madigan, Sanofi has used
9  as exhibits with Dr. Madigan the six individual
10 MedWatch reports that you have included in Table 1,
11 of your -- summary of the information in Table 1 of
12 your supplemental report, right?
13      A. Yes.
14      Q. And prior to giving your last report, you
15 had reviewed -- actually, prior to giving your last
16 two reports, dating back to December of 2019, you
17 have been aware of both Dr. Madigan's FAERS analysis
18 and what it demonstrates or includes and Sanofi's
19 use of the six reports retrieved from FAERS as of
20 the first quarter of 2018, correct?
21      A. Yes. I was aware of this.
22      Q. Okay. And prior to giving your April 17,
23 2020 report, you did not attempt to do the level of
24 detail of review of those six reports retrieved from
25 FAERS that you offer in your supplemental report,

Ellen T. Chang, Sc.D.

Page 204

1   correct?
2       A. That's correct.
3       Q. Okay. But there's nothing that would have
4   prevented you from doing exactly what you've set out
5   in your supplemental report prior to issuing your
6   April 17, 2020 report because you had all of the
7   same information, correct?
8       A. I agree that, in theory, I could have
9   retrieved these six reports from FAERS prior to
10  then. I didn't know that the six -- again, as I
11  said before, I didn't realize that the six comprised
12  the entirety of the cases identified to Dr. Madigan
13  at that time. So it was the knowledge of that
14  matchup, or that link, that -- it didn't prevent me
15  from doing it, but there was no motivation to do it
16  prior to recently.
17      Q. Sure. What was the motivation? Was it the
18  review of the recent reports from Ross and
19  Dr. Plunkett?
20      A. It was the deposition of Dr. Ross.
21      Q. Right. Okay. But you didn't really have
22  to retrieve those because they were included as
23  exhibits in Dr. Madigan's November 14th, 2019
24  deposition that was taken by Sanofi's counsel,
25  Mr. McRae, right?

Page 205

1       A. I had to retrieve the cases from FAERS
2   myself. Those MedWatch reports were shown to
3   Dr. Madigan in 2019, but I had to go to the FAERS
4   database to identify the manufacturer IDs
5   separately.
6       Q. Are you saying that the reports are -- that
7   were used as exhibits with Dr. Madigan in November
8   of 2019 did not include the manufacturer's report
9   number?
10      A. No. I'm saying that what was shown to
11  Dr. Madigan in 2019 during his deposition was six
12  MedWatch forms. Actually, he was shown a number of
13  other -- I think he was also shown some CIOMS forms,
14  some adverse event reports.
15          So he was shown a number of different
16  adverse event forms. But to retrieve -- to match up
17  the data in Dr. Madigan's report -- excuse me, in
18  his Appendix 4, to match up those six individuals
19  with the MedWatch forms, I had to go into FAERS
20  to -- where the manufacturer control IDs are listed,
21  and then I matched those up with the exhibit
22  numbers.
23      Q. Okay. Is it -- is it your testimony -- or
24  do you recall, maybe is the way I should ask this.
25  Let me strike it. I'll start all over again.

Page 206

1       Do you recall whether or not Mr. McRae
2   walked through with Dr. Madigan precisely how you
3   follow the manufacturer report number with the FAERS
4   database?
5       A. What I remember from Dr. Madigan's
6   deposition is that Mr. McRae showed the six MedWatch
7   forms at issue to Dr. Madigan and identified the
8   manufacturer control ID numbers and asked -- I
9   believe he asked Dr. Madigan if these six cases were
10  in his FAERS analysis.
11          By the way, I don't know if this is clear,
12  FAERS is capital F-A-E-R-S.
13          And Dr. Madigan at the time said he had not
14  retained the manufacturer control numbers or the
15  FAERS case numbers in his analysis, so he could not
16  link them up.
17      Q. Okay. My question was, did Mr. McRae walk
18  through how a person could take the manufacturer
19  control number off of the MedWatch form and
20  backtrack it through to the FAERS database?
21      A. I don't remember. I don't recall his doing
22  that.
23      Q. Okay. How did you go about finding the
24  manufacturer control number in the FAERS database?
25      A. It's described in my supplemental report,

Page 207

1   starting on page 2.
2       Q. Yep. You -- let me see if I can summarize
3   this.
4           You used Dr. Madigan's methodology for the
5   terms he utilized in the search for "permanent" or
6   "irreversible" -- or, excuse me, "permanent" or
7   "disability," and you found the six hits, and then
8   you located the manufacturer control ID numbers,
9   correct?
10      A. That's almost correct.
11          When you search the FAERS database, it's
12  not identified as "permanent" or "disability." The
13  flag actually is identified only as "disability."
14          I know that in some of the MedWatch forms
15  over time, that check box has been defined as
16  "disability" or it's been defined as "permanent" or
17  "disability." But over time it has changed.
18          So currently, when you search in the FAERS
19  database, the flag is defined as "disability."
20      Q. Okay.
21      A. But, yes, using Dr. Madigan's search
22  criteria, or described in his report, I retrieved
23  this -- these six reports, and then FAERS produces
24  the manufacturer control IDs.
25      Q. Okay. I'm going to switch gears a little

Ellen T. Chang, Sc.D.

Page 220

1    A. Correct.
2    Q. You're not a regulatory expert, right?
3    A. I'm not a regulatory expert. That's right.
4 I have expertise in -- or I have familiarity with
5 regulatory issues, but really not in this context.
6 Not in the pharmaceutical context.
7    Q. You're not familiar with the regulatory
8 requirements for label changes, right?
9    A. Correct.
10   Q. Okay. If I asked you to give me the Code
11 of Federal Regulations cites for what it takes that
12 sets out either the standard or the evidentiary
13 burden for making a label change, you wouldn't be --
14 you're not the expert to give me that, right?
15   A. Correct.
16   Q. Okay. And have you talked to or read
17 Dr. Aerosmith's deposition to see if she either
18 agrees with us or agrees with plaintiffs' experts or
19 disagrees with them concerning what the evidentiary
20 burden is for a label change?
21   A. I don't remember. I've seen something from
22 Dr. Aerosmith. I thought it was -- I think I've
23 only seen a report rather than deposition, but I
24 really -- listed in -- whatever I've seen from
25 Dr. Aerosmith is listed in my April 2020 report.

Page 221

1    Q. Okay. You don't know Dr. Hangai, do you?
2    A. Correct. I don't.
3    Q. Have you ever talked to her?
4    A. No.
5    Q. Okay. Do you know what her educational
6 background is?
7    A. I think her degree might be listed in
8 the -- after her name in this report, M -- M.D.
9 Maybe M.D., Ph.D. -- but I don't think it says. You
10 know, M.D. is just medical doctor. I don't think it
11 says for her Ph.D.
12   Q. Okay. I'm going to go ahead and go to the
13 first page of this for us and see if we can identify
14 that. Nanae Hangai, you're correct, Ph.D., M.D. --
15 or M.D., Ph.D. I'm going to go ahead and stop
16 sharing the screen so we can go back to this view.
17       You have not investigated the work that
18 Dr. Hangai did to identify her cases that she
19 identified as permanent alopecia, correct?
20   A. It says in the report -- or it says in this
21 clinical overview, I think, that these cases were
22 retrieved from Sanofi's global pharmacovigilance
23 database, I believe. So I think she outlined the
24 methods here. I didn't attempt -- you know, I
25 didn't have access to that database, so I didn't

Page 222

1 attempt to replicate it.
2    Q. When you say you didn't have access to that
3 database, you weren't provided with the case reports
4 and the narratives the way you were with the six
5 that you did review?
6    A. I mean, again, I was provided with the --
7 the MedWatch forms or the adverse event reports as
8 exhibits to a deposition, as exhibits to my
9 deposition, which actually is in the same way that I
10 was provided the MedWatch forms for the six
11 individuals identified by Dr. Madigan. Again, those
12 were attached as exhibits to a deposition.
13   Q. Okay. Well, let me back up a little bit.
14      You were not provided by counsel who
15 retained you with the case report narratives for the
16 individuals that Nanae Hangai identified as having
17 permanent alopecia in her 2015 clinical overview,
18 correct?
19   A. That's correct.
20   Q. Okay. So you were not given the
21 opportunity by counsel to either confirm or refute
22 the findings of Dr. Hangai?
23   A. The opportunity -- I mean, I didn't -- I
24 didn't -- it was not part of -- it was not relevant
25 to my opinion. I had no reason to confirm or refute

Page 223

1 these cases.
2       And so it's true that I didn't have, I
3 guess, the basis for doing so, but it's not that I
4 asked to do so or that my opinions were influenced
5 in any way by these cases.
6    Q. You were not asked by counsel to review the
7 individual case reports that Nanae Hangai identified
8 as meeting her criteria for permanent alopecia,
9 correct?
10   A. Correct.
11   Q. Okay. And do you know whether or not
12 Dr. Hangai and/or her team of colleagues considered
13 other definitions for permanent alopecia with a
14 different threshold for whether or not they went
15 without hair? Like, instead of two years, it was
16 only one year?
17   A. I have not seen a threshold for duration.
18 So when you say -- when you ask whether she
19 considered another threshold, I don't -- it's not
20 quite clear to me -- I guess they -- I think they
21 used -- yeah. She defines it as more than two
22 years. I don't know anything else about any
23 durations that were considered.
24   Q. Okay. You don't know whether or not she
25 considered using duration greater than one year as

13 (Pages 220 to 223)

Ellen T. Chang, Sc.D.

Page 224

1  opposed to duration greater than two years?
2      A. That's correct. I don't know.
3      Q. And so, therefore, you don't know what
4  effect it would have if the threshold were lowered
5  from two years to one year, right?
6      A. I'm looking. I don't know if that would
7  make a difference. It's also unclear if she applied
8  any sort of -- if she applied a two-year threshold
9  to these cases. For example, for the case at the
10 bottom of page 14, manufacturer control
11 No. 200517220US, in the comments it says, "Permanent
12 hair loss for 1.5 years." And that person is listed
13 here.
14     Likewise, near the bottom of the next page,
15 the last 2006 case, manufacturer control ID
16 No. 200613510FR, that patient is described as having
17 alopecia for more than one year, but not -- it
18 doesn't say for at least two years.
19     So it's not clear to me that a two-year
20 threshold was applied for inclusion in this table.
21     Q. Okay. If you assume that a two-year
22 threshold was applied to Dr. Hangai's analyses, you
23 have no basis for -- well, do you have a basis for
24 believing that the number would do anything but grow
25 if you lowered the threshold from two years to one

Page 225

1  year or to six months?
2      A. So if -- I would say, counter to the
3  evidence that's given in this table, that she did
4  include cases that had persisted for less than two
5  years.
6      If, theoretically, there were a threshold
7  that were lowered in terms of duration, I -- I have
8  no basis for knowing what would happen to the case
9  count. There's no basis for saying that it would
10 decrease, certainly. I don't know if it would
11 increase.
12     Q. Okay. And you haven't reviewed any
13 documents, Sanofi documents, that reflect the --
14 what they anticipated if -- what the company
15 anticipated if they lowered the threshold from two
16 years to one year?
17     A. That's correct. I have not reviewed any
18 such documents.
19     MR. MICELI: Okay. We've been going for
20 about an hour and 20 minutes, hour and 15 minutes
21 anyhow, and why don't we take a break, about a five-
22 or ten-minute break and come back, and we'll
23 probably have about another session this long, and
24 we may be done.
25     THE VIDEOGRAPHER: We are now going off the

Page 226

1  record. The time is approximately 11:18 a.m.
2      (Recess taken.)
3      THE VIDEOGRAPHER: We are now going back on
4  the record. The time is approximately 11:32 a.m.
5  BY MR. MICELI:
6      Q. All righty. Ready to continue, Dr. Chang?
7      A. Yes. Thank you.
8      Q. Thank you.
9      All right. I think I confirmed with you a
10 moment ago, and I want to make sure it was clearly
11 stated on the record, you're not a regulatory
12 expert, correct?
13     A. That's right. I'm not, again, putting
14 myself forward as a regulatory expert. Again, I
15 have some familiarity and expertise in regulatory
16 issues, but I'm not testifying on that topic.
17     Q. And you've never been qualified as an
18 expert in FDA regulations, have you?
19     A. Correct. I have not.
20     Q. Okay. And your supplemental report doesn't
21 identify any regulatory labeling opinions, correct?
22     A. Correct.
23     Q. Okay. And you do not attempt to apply any
24 facts to a regulatory standard to reach a conclusion
25 about the appropriateness or inappropriateness of

Page 227

1  Sanofi's Taxotere label, correct?
2      A. That's correct.
3      Q. And you don't attempt to directly address
4  the regulatory opinions of Dr. Ross or Dr. Plunkett
5  that were offered, correct?
6      A. That's correct, except as they rely on
7  Dr. Madigan's analysis.
8      Q. Well, I understand that you -- that you
9  offer some opinions about the reliance upon
10 Dr. Madigan's FAERS analysis, correct?
11     A. That's right.
12     Q. Have you been made aware of how the Court
13 has ruled on Sanofi's motion to exclude
14 Dr. Madigan's FAERS analysis?
15     A. No, I haven't.
16     Your video is frozen. I don't know if
17 that -- oh, it's okay now.
18     Q. Okay.
19     A. I'm not aware of any Court rulings on
20 Dr. Madigan's FAERS analysis.
21     Q. So you're not familiar with or aware of any
22 ruling whatsoever about what the Court has said
23 concerning Sanofi's challenges to Dr. Madigan's
24 FAERS analysis, right?
25     A. That's right.

14 (Pages 224 to 227)

Ellen T. Chang, Sc.D.

Page 228

1  Q. Would it be a fair statement to say that
2  you are unfamiliar with regulatory requirements as
3  they relate to labeling standards?
4  A. Yes.
5  Q. Okay. And so to the extent that a
6  regulatory expert who is qualified to offer
7  regulatory opinions relies upon information from
8  Dr. Madigan's report, you would not be able to say
9  whether or not, from a regulatory standpoint, that
10  is appropriate?
11  A. That's right. From a regulatory
12  standpoint, I would not have an opinion.
13  Q. Okay. And you do not have -- and I may
14  have asked this a different way, but because I wrote
15  it, I'm going to ask it.
16     You do not address regulatory requirements
17  for labeling in your supplemental report?
18  A. Correct.
19  Q. And that includes what it takes to make a
20  label change -- excuse me.
21     And that includes the evidence -- the
22  evidence necessary to justify a label change to the
23  warnings and precautions and/or the adverse events
24  section of the label, correct?
25  A. That's correct.

Page 229

1  Q. Okay. All righty.
2     I want to go back to your supplemental
3  report and really go right to the statement just
4  above your signature. If we can go there together.
5     Now, I'm going to put this up, and I'm
6  going to just -- this right here. This comment
7  right here. The last statement you make in your
8  report just above your signature is, "Overall, the
9  [sic] six reports" -- and when you say the "six
10  reports," you are referring to the ones identified
11  as the reports generated -- that generated positive
12  hits in Dr. Madigan's PRR disproportionality
13  analysis of the FAERS database, which are also
14  included in Table 1 on the next two pages of your
15  report, right?
16  A. Right. It says "these six reports." And,
17  yes, those are the reports that I'm referring to.
18  Q. Okay. Just so we know when we're talking
19  about this which six reports we're talking about,
20  you say, "Overall, these six reports provide no
21  evidence to support a causal effect of docetaxel on
22  permanent or irreversible alopecia."
23     Those are your words, correct?
24  A. Yes.
25  Q. Okay. And that's part of your -- that's

Page 230

1  one of your opinions, right?
2  A. Yes.
3  Q. I mean, at the end -- it's at the end of
4  the report, so I assume that's just -- that's your
5  ultimate opinion in this case, is that these six
6  events -- or these six reports provide no evidence
7  of a causal effect of docetaxel on permanent or
8  irreversible alopecia, right?
9     MR. KEENAN: Object to form.
10     THE WITNESS: So the way you expressed
11  that, they provide no evidence of a causal effect,
12  I -- I agree. They do not provide any evidence of a
13  causal effect.
14     They also don't provide any evidence to
15  support a causal effect. So in and of themselves,
16  they don't show a causal effect, and they don't
17  provide support of evidence.
18  BY MR. MICELI:
19  Q. Okay. Well, because you started that off
20  with a reference to my statement, I want to make
21  sure we're clear.
22     This sentence, it's right above your
23  signature, is not my statement. This is your
24  opinion, correct? This is your statement of an
25  opinion?

Page 231

1  A. That's correct. The way you had asked the
2  question was -- we could ask, perhaps, the court
3  reporter to read it back. But I think the phrasing
4  that you used was that these six cases provide no
5  evidence of a causal effect.
6     And I wanted to clarify that that's
7  correct, but that's not quite what I say, which is
8  that they provide no evidence to support a causal
9  effect.
10  Q. Okay. Let's make sure that we have it,
11  just -- so the quote is, "Overall, these six reports
12  provide no evidence to support a causal effect of
13  docetaxel on permanent or irreversible alopecia."
14     Right?
15  A. Right.
16  Q. Okay. And that's your ultimate opinion?
17  A. That is -- yeah. I mean, in this
18  supplemental report, yes, that is my --
19  Q. Okay. Yeah.
20  A. -- my ultimate opinion, I guess, or my --
21  my final opinion.
22  Q. Okay. Let's look at page 3 of your report,
23  and I'm going to share my screen. I thought I'd
24  shared it before and I hadn't, so I'm going to share
25  it now.

Ellen T. Chang, Sc.D.

Page 236

1  something that you reviewed before providing your
2  initial opinions back in April of last year,
3  correct?
4      A. That's correct.
5      Q. Okay. This should be opening.
6      A. I'm looking.
7      Q. I'm trying to open it from my end, and I'm
8  having trouble, so bear with me, Doctor.
9          All righty. Now let me do my share screen
10  again so we can get to the right place.
11          This is Dr. Madigan's report from the Kahn
12  matter. I want -- if you have a -- if you have it
13  up on your screen separately, can you turn to
14  page 19, paragraph 48?
15      A. Yes.
16      Q. Okay. Are you there with me?
17      A. Yes.
18      Q. Okay. And paragraph 48 of Dr. Madigan's
19  report in the Kahn matter states that "Both the FDA
20  and pharmaceutical manufacturers routinely look to
21  the FAERS database to provide context for specific
22  drug safety concerns. The nature of the database
23  does not permit definitive causal inferences but the
24  evidence therein nonetheless forms an important
25  component of any drug safety investigation."

Page 237

1      Did I read that correctly?
2      A. Yes, I think so.
3      Q. And then it says, "Concerning docetaxel and
4  irreversible alopecia and depending on the metric,
5  my analysis of FAERS shows the emergence of a safety
6  signal at various times dating back to as early as
7  2000."
8      Did I read the rest of that paragraph
9  correctly?
10      A. Yes. I think so.
11      Q. Okay. So it's clear from Dr. Madigan's
12  report, particularly this paragraph 48, that he is
13  utilizing the FAERS analysis to demonstrate the
14  emergence of a safety signal at various points in
15  time dating back to as early as 2000, correct?
16      A. Yes. I believe that's what he is doing.
17      Q. Okay. He's not attempting to demonstrate
18  causation with the FAERS analysis, right?
19      A. He's not attempting to provide definitive
20  causal evidence or permit definitive causal
21  inference, according to his words.
22      Q. Right. And he doesn't offer causal
23  inference based on FAERS alone, correct?
24      A. That's correct. Based on his FAERS
25  analysis alone, he does not make a causal

Page 238

1  conclusion.
2      Q. In fact, you haven't reviewed any expert --
3  any of plaintiffs' experts' reports or depositions
4  that draw causal inferences based upon FAERS
5  analyses alone, correct?
6      A. I agree that no one that I've seen in this
7  litigation is relying exclusively on Dr. Madigan's
8  FAERS analysis to conclude that causality and
9  establish -- that's not the point that I'm trying to
10  make, that this analysis alone is not sufficient to
11  establish causation.
12          The point that I'm trying to make is that
13  it's -- basically, it's completely irrelevant
14  because it does not address permanent or
15  irreversible alopecia, so it shouldn't be relied on,
16  really, for anything in this litigation.
17      Q. And is that because of the terms utilized
18  by Dr. Madigan that you disagree with?
19      A. It's not because of the terms that he uses.
20  It's because when we examine the cases that are
21  included in his analysis, it becomes apparent that
22  at least five of them, at least five out of those
23  six are not permanent or irreversible alopecia.
24  They don't meet the definition of permanent or
25  irreversible alopecia.

Page 239

1          And, therefore, where Dr. Madigan says, on
2  page 19, concerning docetaxel and irreversible
3  alopecia, and depending on the metric, my analysis
4  of FAERS shows the emergence of a safety signal.
5          My point is that it -- his analysis does
6  not concern irreversible alopecia. It concerns
7  other end points, but not that end point.
8      Q. Okay. Other than the six hits -- positive
9  hits in Dr. Madigan's FAERS analysis, what other
10  MedWatch reports did you review from the background
11  of 8 or 9 million cases in the FAERS database to
12  determine those that were missed in his analysis
13  that were actually permanent alopecia?
14      A. The --
15      Q. I'm not talking about the deposition from
16  January. I want to know what you proactively did,
17  Doctor.
18      A. I have reviewed what's in FAERS for dozens
19  of other individuals.
20          So in addition to trying to reproduce
21  Dr. Madigan's analysis, I also ran some additional
22  FAERS analyses just to see what I could pull up; for
23  example, looking for alopecia as an adverse event
24  with the check box of disability in breast cancer
25  patients in general. I also looked at what might be

17 (Pages 236 to 239)