**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to<br>Elizabeth Kahn, Case No. 2:16-cv-17039 | MDL No. 2740<br><br>SECTION "H" (5) |

**Plaintiff's Brief Opposing**
**Defendants' Second Motion to Reconsider**
**This Court's Order Denying Summary Judgment**
**Based on Prescription**

Dated: May 11, 2021

## Table of Contents

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 2

III. ARGUMENT ................................................................................................ 4

    A. Like this Court, the Fifth Circuit found that Ms. Francis, Ms. Johnson, and Ms. Thibodeaux unreasonably did nothing at all to investigate their hair loss ................. 4

    B. The Fifth Circuit did not hold that constructive knowledge is imputed to reasonable plaintiffs. ........................................................................................................ 6

    C. The *Thibodeaux* Court did not decide whether the movant carries the summary judgment burden. ................................................................................................... 7

        1. Under federal law, the movant has the summary judgment burden. .................... 8

        2. Ms. Kahn has a right to a trial by jury. .................................................................... 9

        3. Movants have the summary judgment burden in Louisiana courts. ..................... 9

        4. The movant has the burden as to the discovery rule and fraudulent concealment. ........................................................................................................ 11

    D. This Court correctly held that there is a material dispute of fact as to the discovery rule. ............................................................................................................... 11

        1. Ms. Kahn asked three doctors about the fact that her hair did not return to its full thickness. ............................................................................................................ 11

        2. Ms. Kahn did not inquire too early. ...................................................................... 13

        3. Because Ms. Kahn reasonably inquired with three different doctors, a jury could determine that she reasonably did not make further inquiries. ........................ 14

        4. Further inquiry from Ms. Kahn's doctors would have been futile. ..................... 16

        5. Sanofi's causation defense shows Ms. Kahn's reasonableness. ......................... 18

        6. Ms. Kahn reasonably did not know whether other chemotherapy drugs prevented her hair from coming back. .................................................................................. 18

    E. There is a material dispute of fact as to fraudulent concealment .............................. 21

IV. CONCLUSION ............................................................................................ 25

**Table of Authorities**

**Cases**

*Allstate v. Cmty. Health Ctr.,* 605 F. App'x 269 (5th Cir. 2015)...................................................9

*Bailey v. Khoury*, 891 So.2d 1268 (La. 2005) ...........................................................................10

*Body By Cook v. Ingersoll-Rand*, 39 F.Supp.3d 827, 837-840 (E.D. La. 2014)...........................9

*Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002) ....................................................................10

*Carter v. Matrixx Initiatives,* 391 F.App'x 343 (5th Cir. 2010) ...................................................11

*Chevron v. Aker Mar.*, 604 F.3d 888 (5th Cir. 2010) ........................................................7, 19, 20

*Cimino v. Raymark Indus.,* 151 F.3d 297 (5th Cir. 1998).............................................................9

*Cole v. Celotex*, 620 So.2d 1154 (La. 1993) .............................................................................15

*Crochet v. Bristol-Myers Squibb Co.*, 804 F.App'x 249 (5th Cir. 2020).......................................8

*Ducre v. Mine Safety Appliances*, 963 F.2d 757 (5th Cir. 1992)............................... 7, 8, 9, 15, 16

*Guitreau v. Kucharchuk*, 763 So.2d 575 (La. 2000)...................................................................10

*Hoerner v. Wesley–Jensen*, 684 So.2d 508 (La. App. 4th Cir. 1996 ..........................................15

*Hogg v. Chevron*, 45 So.3d 991, 998 (La. 2010)........................................................................10

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, -- F.3d --, 2021 WL 1560724 (5th Cir. Apr. 21, 2021)
.................................................................................... 5, 6, 7, 8, 9, 11, 13, 15

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2019 WL 2995897 (E.D. La. July 9, 2019). 4, 5, 25

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 1815854 (E.D. La. Apr. 7, 2020) .. 12, 13

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 2473772 (E.D. La. May 13, 2020).. 4, 13

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 375597 (E.D. La. Jan. 23, 2020) ...........5

*In re Taxotere (Docetaxel) Prod. Liab. Litig.,* 2020 WL 8257755 (E.D. La. Jan. 23, 2020) .........5

*Jordan v. Emp. Transfer*, 499 So.2d 454 (La. App. 2d Cir. 1986) ........................................19, 20

*Jordan v. Emp. Transfer*, 509 So. 2d 420 (La. 1987) ..........................................................6, 7, 19, 20

*Knaps v. B & B Chem. Co.*, 828 F.2d 1138 (5th Cir. 1987) ...............................................7, 19, 20

*Knaps v. B & B Chem.*, 1987 WL 14350 (E.D. La. July 16, 1987) .............................................20

*Labbe Serv. Garage v. LBM Distributors,* 650 So.2d 824 (La. App. 3 Cir. 1995).....................10

*Lloyd v. Lawrence*, 472 F.2d 313 (5th Cir. 1973)........................................................................8

*Marin v. Exxon Mobil*, 48 So.3d 234 (La. 2010) .......................................................................10

*Morgan v. Entergy New Orleans*, 234 So. 3d 113 (La. App. 4th Cir. 2017) ...............................21

*Nunez v. Superior Oil*, 572 F.2d 1119 (5th Cir. 1978) .............................................................8, 9

*Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir. 1986)......................................................8

*Sadler v. Midboe*, 723 So.2d 1076 (La. App. 1st Cir. 1998) ......................................................10

*Sharkey v. Sterling Drug*, 600 So.2d 701 (La. App. 1 Cir. 1992).........................................7, 18

*Simler v. Conner*, 372 U.S. 221 (1963).....................................................................................9

*Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission*, 290 F.3d 303 (5th Cir. 2002) ...........7

*Trahan v. BP*, 209 So. 3d 166 (La. App. 2016) .....................................................................7, 11

**Rules**

La. Code Civ. Proc. Ann. art. 891.............................................................................................10

La. Code Civ. Proc. Ann. art. 927.............................................................................................10

La. Code Civ. Proc. Ann. art. 929.............................................................................................10

La. Code Civ. Proc. Ann. art. 931.............................................................................................10

La. Code Civ. Proc. Ann. art. 934.............................................................................................10

FRCP 56(a) ............................................................................................................................8, 9

## I.   INTRODUCTION

For the second time, Sanofi asks this Court to reconsider its decision to deny summary judgment against Ms. Kahn on prescription. This Court has previously held that, viewing the evidence in the light most favorable to Ms. Kahn, a jury could find that she reasonably asked her doctors why her hair did not grow back to its original thickness.

Now, Sanofi argues that this Court was wrong because the Fifth Circuit has affirmed three other decisions by this Court. Before ruling on Ms. Kahn's case, this Court had held that Plaintiffs Johnson, Francis, and Thibodeaux were unreasonable because they failed to inquire with any doctors. On appeal, the Fifth Circuit agreed. Unlike those cases, this is not a no-inquiry case. Ms. Kahn asked three doctors about the fact that her hair had not regrown as thick as before. One doctor misdiagnosed her condition as age-related; two others refrained from any diagnosis. After striking out, Ms. Kahn reasonably did not self-diagnose her condition.

Sanofi, however, argues that Ms. Kahn inquired with one doctor two weeks *too early* on April 9, 2009. Sanofi claims that no inquiries count unless they are six months after Ms. Kahn completed toxic chemotherapy on October 23, 2008. Accordingly, the argument goes, Ms. Kahn's inquiry on April 9, 2009 is barely irrelevant. Sanofi is wrong. *First*, Ms. Kahn's promptness is a virtue, not a vice. It is more diligent to do something sooner than later. *Second*, April 9, 2009, was more than nine months after Ms. Kahn's last Taxotere treatment on July 31, 2008. *Third,* Ms. Kahn consulted with two other doctors: one in 2009 or 2010 and another in July 2009; so Ms. Kahn is reasonable even under Sanofi's six-month cut-off.

Sanofi further argues that Ms. Kahn is unreasonable because she did not ask her doctors whether Taxotere prevented her hair from regrowing to its previous thickness. As Ms. Kahn's doctors either misdiagnosed or failed to diagnose her condition, she is not unreasonable for failing to ask the more complicated question of who caused the undiagnosed or misdiagnosed condition.

Indeed, the misdiagnosis Ms. Kahn received pointed to another cause (her age), and none of Ms. Kahn's doctors knew that Taxotere could cause permanent hair loss. Viewing the evidence in the light most favorable to Ms. Kahn, she acted reasonably under the circumstances.

## II.   STATEMENT OF FACTS

In 2008, Plaintiff Elizabeth Kahn was diagnosed with breast cancer and agreed to participate in a clinical study.[1] Ms. Kahn's treatment involved Taxotere, Adriamycin, and Cyclophosphamide—all toxic chemotherapy agents known at the time to cause temporary hair loss.[2] Ms. Kahn's oncologist, Dr. Kardinal, and her nurse told her that she would have temporary hair loss.[3] Dr. Kardinal did not know that Taxotere could cause permanent hair loss.[4]  The consent form also did not warn Taxotere could cause permanent hair loss, and the chemotherapy education materials explained that hair loss from chemotherapy would be temporary.[5]

Ms. Kahn began toxic chemotherapy in May 2008, and the hair on her head, eyebrows, and eyelashes fell out in June 2008.[6] After Ms. Kahn completed toxic chemotherapy in October 2008, Ms. Kahn underwent breast surgery to remove her tumor followed by post-surgery treatment that involved a drug called Avastin (bevacizumab).[7] Hair loss is not associated with the use of Avastin, which is not toxic chemotherapy.[8]

---

[1] Sanofi's Statement of Facts (Sanofi's Facts), Doc. 9295-1 at ¶ 2-3; Ms. Kahn's Response to Sanofi's Statement of Facts (Kahn's Facts), Doc. 9418-1 at ¶2-3.
[2] Kahn's Ex. A, Kahn NSABP Clinical Trial Consent Form at 000027. Exhibits A-V were provided in response to Sanofi's original summary judgment motion. Ms. Kahn adds Exhibits W-GG hereto.
[3] Kahn's Ex. P, Kahn Dep. at 254:20-255:4. *See id.* at 205:21-206:19; Ex. V, Thomas Dep. at 68:09-14, 69:09-13, 178:20-179:17.
[4] Kahn's Ex. U, Kardinal Dep. at 175:9-17, 87:2-22.
[5] Kahn's Ex. A and Ex. BB, Kahn's Chemotherapy Education Materials
[6] Sanofi's Facts, Doc. 9295-1 at ¶7-9; Ms. Kahn's Facts, Doc. 9418-1 at ¶7-9.
[7] Sanofi's Ex. A p. 10-11; Kahn's Ex. A, Kahn NSABP Clinical Trial Consent Form at 000027
[8] Kahn's Ex. A, Clinical Trial Consent Form at 000022, 000036-000038; Kahn's Ex. B and Kahn's Ex. C, Avastin prescribing information; Kahn's Ex. P, Kahn Dep. at 177:17-178:3, 229:11-230:15.

During her post-surgery treatment, Ms. Kahn's hair grew back thinner on her head, but her eyebrows never grew back.[9] Although Ms. Kahn believed that Taxotere initially caused her hair to fall out, she did not know whether any of the other toxic chemotherapy drugs had prevented her hair from growing back to its full thickness:

> Q. Do you think that the changes to your hair since 2008, are due solely to Taxotere?
>
> A. I can't say that because I lost my hair and I had several cocktails of chemotherapy drugs. So my initial loss of hair was Taxotere, because that was one of the first drugs I took. And then, in the second phase, I took different drugs. My hair didn't grow back. So I don't know what -- you know, it was a cocktail of drugs.
>
> Q. So your hair loss might be contributed to by some of the other chemotherapy drugs that you took? …
>
> A. Well, several of the drugs that I took say it had temporary hair loss as a side effect.[10]

In April 2009, Ms. Kahn asked her gynecologist, Dr. Margaret Roberie, why her hair had not fully grown back to its full thickness, and Dr. Roberie told Ms. Kahn that her hair might be thinning due to her age.[11] Sometime in 2009 or 2010, Ms. Kahn asked her treating oncologist, Dr. Zoe Larned, when her hair would return to its original thickness, but Dr. Larned could not provide her with a specific timeframe.[12] In fact, only as a result of this litigation has Dr. Larned started warning about the potential risk of permanent hair loss with Taxotere.[13] In addition, a dermatologist advised Ms. Kahn in July of 2009 to try taking Biotin to encourage faster regrowth.[14]

---

[9] Sanofi's Facts, Doc. 9295-1 at ¶ 22-24; Ms. Kahn's Facts, Doc. 9418-1 at ¶22-24.
[10] Kahn's Ex. P, Kahn Dep. at 269:1-23.
[11] Kahn's Ex. P, Kahn Dep. at 257:9-258:5. *See also* Kahn's Ex. Q, Roberie Dep. at 139:3-13.
[12] Kahn's Ex. P, Kahn Dep. at 255:8-258:5. *See also* Kahn's Ex. P, Kahn Dep. at 229:11 – 230:15.
[13] Kahn's Ex. S, Larned Dep. at 109:12- 110:05.
[14] Kahn's Ex. R, Kahn Dep. II at 44:9-45:21.

Ms. Kahn's doctors never suggested that she had a permanent condition.[15] Ms. Kahn held out hope that her hair eventually would fully regrow.[16] Ms. Kahn did not attribute the lack of regrowth to Taxotere until 2016.[17] In December 2016, Ms. Kahn filed suit.[18]

## III.   ARGUMENT

### A.   Like this Court, the Fifth Circuit found that Ms. Francis, Ms. Johnson, and Ms. Thibodeaux unreasonably did nothing at all to investigate their hair loss.

Like this Court, the Fifth Circuit held that Ms. Francis, Ms. Johnson, and Ms. Thibodeaux should have asked their doctors about their permanent hair loss. Reconsideration in the instant case is unnecessary because this Court had already reached the same conclusion.

This Court has explained its discretion to grant or deny reconsideration:

> [T]he trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law. Rule 54(b), however, does not give the Court unlimited power to consider new arguments. Any position is supportable by boundless arguments, but judicial economy counsels against reconsidering an issue each time someone presents a new argument. When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted.

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 2473772 at *1 (E.D. La. May 13, 2020).

In this case, Sanofi's second reconsideration motion cites a new ruling, but on familiar facts. As this Court is aware, this Court ruled on multiple summary judgment motions before Sanofi's summary judgment motion as to Ms. Kahn. Of relevance here, this Court granted Sanofi's summary judgment motions as to Ms. Francis, Ms. Johnson, and Ms. Thibodeaux. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2019 WL 2995897 (E.D. La. July 9, 2019), reconsideration denied,

---

[15] Kahn's Ex. P, Kahn Dep. at 318:4-15.
[16] Kahn's Ex. P, Kahn Dep. at 255:2-257:9.
[17] Kahn's Ex. P, Kahn Dep. at 259:1-260:14.
[18] Sanofi's Facts, Doc. 9295-1 at ¶ 28; Ms. Kahn's Facts, Doc. 9418-1 at ¶ 28.

2020 WL 375597 (Jan. 23, 2020); *In re Taxotere (Docetaxel) Prod. Liab. Litig.,* 2020 WL 8257755 (E.D. La. Jan. 23, 2020).

Unlike Ms. Kahn, this Court found that these three Plaintiffs were unreasonable as a matter of law because they "did nothing to investigate" their permanent hair loss. 2019 WL 2995897, at *3 (Johnson has presented no evidence demonstrating that she investigated her injury. …Johnson had a duty to investigate and failed to do so…"); *id.* at *4 ("…Francis made no effort to investigate her injury or to identify which drug and which manufacturer was responsible for her injury. …Francis had a duty to investigate and failed to do so…"); 2020 WL 8257755, at *3 ("Thibodeaux … did nothing to investigate… [S]he did not act to discover the cause of the problem. She never inquired with her doctors…").

On appeal, the Fifth Circuit agreed with this Court. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, -- F.3d --, 2021 WL 1560724 (5th Cir. Apr. 21, 2021) ("*Thibodeaux*"). Like this Court, the Fifth Circuit found Ms. Francis, Ms. Johnson, and Ms. Thibodeaux unreasonable because they did nothing to investigate their permanent hair loss:

> Thibodeaux … "[n]ever talked to a doctor ... [o]f any kind" about her hair loss. Francis never asked her oncologist about her persistent hair loss, but she asked her oncologist's nurse practitioner if he could prescribe her something to treat her hair. The nurse practitioner directed her to her primary-care physician, who eventually referred her to a dermatologist. She testified at her deposition in December 2017 that she saw the dermatologist for the first time "this year." She asked her dermatologist to give her something to make her hair regrow, but she did not inquire into the cause of the hair loss or its persistence. Johnson similarly testified that by 2011 she figured she was "the unlucky one" whose hair would not come back, but that she never tried to determine which of her chemotherapy drugs had caused her hair loss. None of the Appellants inquired with her doctor into the cause of the persistence of hair loss.

*Id.* at *6. The Fifth Circuit reiterated: "Appellants made no inquiry, and they are charged with knowledge of all that a reasonable inquiry would have revealed." *Id*. at *7.

This Court should deny reconsideration because the Fifth Circuit's opinion applied the same reasoning as this Court as to Ms. Francis, Ms. Johnson, and Ms. Thibodeaux.

**B.    The Fifth Circuit did not hold that constructive knowledge is imputed to reasonable plaintiffs.**

Sanofi appears to argue—as a separate basis for reconsideration—that Ms. Kahn is charged with all information even if she acted reasonably.[19] However, the *Thibodeaux* Court did not hold that a *reasonable* plaintiff is charged with constructive notice. The *Thibodeaux* Court only imputed constructive knowledge to those Plaintiffs *because* it found—like this Court—that they acted unreasonably by doing nothing to investigate their permanent hair loss.

Like this Court, the Fifth Circuit held that the focus is on a plaintiff's reasonableness: "This requirement of notice was 'refined to focus on the reasonableness of [the plaintiff's] action or inaction.'" 2021 WL 1560724 at *4 (quoting *Jordan v. Emp. Transfer*, 509 So. 2d 420, 423 (La. 1987)). The Fifth Circuit held that a plaintiff's reasonableness—or lack thereof—determines whether the plaintiff is charged with constructive-notice:

> "[M]ere apprehension that something may be wrong is insufficient ... unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem *may* have been caused by" tort.

*Id.* at *5 (quoting *Oil Ins. v. Dow Chem.*, 977 So. 2d 18, 22 (La. App. 1st Cir. 2007) (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002) (emphasis by *Oil Ins.* Court)). As a result, courts cannot impute knowledge to plaintiffs who are *reasonably* unaware of their injury or its cause.

Under *Jordan*, the Fifth Circuit has repeatedly rejected a standard that would impose constructive notice on *reasonable* plaintiffs: "This rule would seemingly start prescription as soon

---

[19] Doc. 12542-1 p. 2 ("<u>Second,</u> the Fifth Circuit made clear that Ms. Kahn is charged with all information a reasonable inquiry might uncover, that Ms. Kahn's claims were 'reasonably knowable' to her during the prescriptive period, and that the discovery rule accordingly cannot apply.").

as a potential plaintiff suspected something was wrong. But that is not the law." *Chevron v. Aker Mar.*, 604 F.3d 888, 894 (5th Cir. 2010). Rather, "[w]hen a plaintiff acts reasonably to discover the cause of a problem, 'the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant.'" *Id.* (quoting *Jordan*, 509 So.2d at 424 ). *See also Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission*, 290 F.3d 303, 320, 322-23, n. 60, & n. 71 (5th Cir. 2002) (reversing because District Court applied wrong standard); *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 761 (5th Cir. 1992); *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1139-40 (5th Cir. 1987) (reversing for District Court to apply "*Jordan*'s new standard").

Likewise, the Court in *Sharkey v. Sterling Drug,* 600 So.2d 701 (La. App. 1 Cir. 1992), held that the plaintiff reasonably ignored articles for years that she had cut out of newspapers:

> Mrs. Sharkey was questioned about a file she had kept over the years in which she kept newspaper and magazine clippings regarding Reye's Syndrome. She stated that she had tried to keep up with the literature regarding Reye's Syndrome in order that she might learn more about the disease and how she could help Sherry overcome her disabilities. Although she did keep the news clippings, she testified that she merely had time to cut them out and file them away, as she was too busy trying to care for her grandchildren and did not have time to read.

*Id.* at 714-15.

As in these cases, and under the Fifth Circuit's holding in *Thibodeaux,* this Court correctly did not impute knowledge to Ms. Kahn because *she acted reasonably.*

### C. The *Thibodeaux* Court did not decide whether the movant carries the summary judgment burden.

Even though the *Thibodeaux* Court used similar reasoning to this Court, the Fifth Circuit did not decide whether the movant carries the summary judgment burden in federal court:

> There is some question as to whether this burden-shifting rule applies at a motion for summary judgment. *See Trahan v. BP*, 209 So. 3d 166, 170 (La. App. 2016). *We leave the question unanswered* because no party argued in the district court or here that, if the claims were facially prescribed, the burden remained with the defendant. In the district court and here, *both sides appear to assume* the

applicability of the burden-shifting framework and *that the Appellants had the burden to establish contra non valentem.*

2021 WL 1560724, at *2 (emphasis added). The *Thibodeaux* holding is not binding to the extent it assumed without deciding that non-moving parties must "establish" their reasonableness.

### 1.    Under federal law, the movant has the summary judgment burden.

FRCP 56(a) squarely places the summary judgment burden on the movant, and Louisiana law does not override the federal summary judgment standard. The Fifth Circuit has long held in diversity cases that "[t]he [summary judgment] standard to be applied is, of course, a federal one." *Nunez v. Superior Oil*, 572 F.2d 1119, 1123 n.5 (5th Cir. 1978) (citing *Hanna v. Plumer*, 380 U.S. 460 (1965)). The *Nunez* Court held that federal law, not Louisiana law, governed the summary judgment standard in diversity cases. *Id. See also Ducre*, 963 F.2d at 760 ("[T]he defendant's burden was to demonstrate the absence of a genuine issue of material fact.").[20]

In federal court, a non-movant with the burden at trial need only demonstrate a material dispute of fact. For example, a plaintiff opposing summary judgment on liability does not need to "establish" liability to get to trial. Indeed, "[e]ven thin contrary evidence" can suffice. *Crochet v. Bristol-Myers Squibb Co.*, 804 F.App'x 249, 254-55 (5th Cir. 2020) (unpublished). Unlike the *Thibodeaux* Court's assumption that non-moving parties have the federal summary judgment

---

[20] *See also Lloyd v. Lawrence*, 472 F.2d 313, 316 (5th Cir. 1973) ("Defendant's claims under Texas summary judgment practice are likewise ineffectual as the sufficiency of a complaint or the adequacy of proof for summary judgment under Rules 8 and 56, F.R.C. P., respectively, are determined by recourse to federal law."); *Reid v. Sears, Roebuck & Co*., 790 F.2d 453, 459 (6th Cir. 1986) ("Summary judgment is a procedural device for deciding a case without the necessity of a full-blown trial. When there is a motion for summary judgment in a diversity case, the provisions of Rule 56 control its determination.")

burden to "establish" their reasonableness, this Court should apply the familiar federal summary judgment standard in FRCP 56(a).

### 2. Ms. Kahn has a right to a trial by jury.

The *Thibodeaux* Court's assumption—that Ms. Kahn must "establish" her reasonableness to avoid summary judgment—may be premised on the fact that Louisiana courts may sometimes hold bench trials to decide prescription. But "the right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions." *Simler v. Conner*, 372 U.S. 221, 222 (1963). Accordingly, "where federal rules would entitle litigants to a jury determination of a particular issue, the court will not yield to a state practice to the contrary." *Nunez*, 572 F.2d at 1125. *See Cimino v. Raymark Indus.*, 151 F.3d 297, 311 (5th Cir. 1998) ("The Seventh Amendment applies notwithstanding that these are diversity cases.").

The Fifth Circuit has long held that a jury should determine a party's reasonableness, *Nunez*, 572 F.2d at 1127, and specifically held that prescription "must be left to the jury." *Ducre*, 963 F.2d at 762. *See also Allstate v. Cmty. Health Ctr.*, 605 F. App'x 269, 271-72 (5th Cir. 2015) (district court violated "right to a trial by jury" by holding bench trial on prescription); *Body By Cook v. Ingersoll-Rand*, 39 F.Supp.3d 827, 837-840 (E.D. La. 2014) (rejecting request for bench trial on prescription). Because Ms. Kahn has a federal right to a jury trial, this Court should not assume—like the *Thibodeaux* Court—that she must "establish" her reasonableness *before trial*.

### 3. Movants have the summary judgment burden in Louisiana courts.

Even if this case were in state court, the movant would bear the summary judgment burden:

> This traditional allocation of the burden of proof is altered somewhat when prescription is raised through a motion for summary judgment rather than through the peremptory exception. In such a case, the movant is required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon

which the plaintiffs acquired actual or constructive knowledge of the damage
sufficient to commence the running of prescription.

*Hogg v. Chevron*, 45 So.3d 991, 998 (La. 2010) (emphasis added) (internal citations omitted). *See*

*Labbe Serv. Garage v. LBM Distributors,* 650 So.2d 824, 829 (La. App. 3 Cir. 1995).

Louisiana does, however, use a burden-shifting framework for another procedural device
under state law called "exceptions." [21] There is no federal equivalent to an exception. Unlike
summary judgment, Louisiana courts hold evidentiary hearings on exceptions to make fact and
credibility findings,[22] which "may not be reversed absent manifest error or unless clearly wrong."
*Guitreau v. Kucharchuk*, 763 So.2d 575, 580–81 (La. 2000).

Also unlike summary judgment, exceptions test pleadings. The defendant has the burden
at the hearing if the plaintiff pled the discovery rule. *See Bailey v. Khoury*, 891 So.2d 1268, 1275
(La. 2005); *Campo*, 828 So.2d at 509. In addition, the defendant has the burden "unless the face
of her petition reveals that she had knowledge of the damage and its cause at a time beyond the
prescription period." *Sadler v. Midboe*, 723 So.2d 1076, 1082 (La. App. 1st Cir. 1998). Unlike
summary judgment, a plaintiff can amend their pleading to prevent burden-shifting before the
hearing, or even amend after a hearing to avoid prescription.[23]

Because summary judgment prevents both trial and amendment, Louisiana courts—like
federal courts—place the summary judgment burden on the movant. In addition, as the pleadings
do not disprove the discovery rule, Sanofi would have the burden even at an exception hearing.

---

[21] La. Code Civ. Proc. Ann. art. 891, 927(A)(1).
[22] La. Code Civ. Proc. Ann. art. 929, 931; *Marin v. Exxon Mobil*, 48 So.3d 234, 261 (La. 2010).
[23] La. Code Civ. Proc. Ann. art. 934.

4. **The movant has the burden as to the discovery rule and fraudulent concealment.**

The Fifth Circuit assumed without deciding that Louisiana courts place the summary judgment burden on the movant in discovery rule and fraudulent concealment cases. As explained above, this inquiry is irrelevant because federal law dictates the summary judgment burden in diversity cases.

In any event, the movant retains the summary judgment burden in discovery rule cases:

> [T]he general premise of BP's motion for summary judgment was that… the burden of proof shifted to Plaintiffs to prove that prescription was suspended by the application of *contra non valentum*. That premise is fundamentally flawed. Because BP chose to file a motion for summary judgment based on prescription rather than an exception of prescription, no such shifting of the burden of proof to the non-movant occurred.

*Trahan*, 209 So.3d at 172.

The Fifth Circuit has previously reached the same conclusion:

> When a plaintiff alleges the affirmative defense of *contra non valentem*, the defendant must show "that the plaintiff had actual or constructive notice of the tortious act, the resulting injury, and the causal connection between the two…"

*Carter v. Matrixx Initiatives,* 391 F.App'x 343, 345 (5th Cir. 2010) (unpublished) (citing *Sharkey v. Sterling Drug,* 600 So.2d 701 (La. App. 1st Cir. 1992)).

In this case, this Court should not assume—like the *Thibodeaux* Court—that the non-moving party has the burden to "establish" their reasonableness at the summary judgment stage.

D. <u>**This Court correctly held that there is a material dispute of fact as to the discovery rule.**</u>

1. **Ms. Kahn asked three doctors about the fact that her hair did not return to its full thickness.**

This Court previously denied Sanofi's summary judgment motion on prescription, and held that a jury should determine whether Ms. Kahn acted reasonably. *See In re Taxotere (Docetaxel)*

*Prod. Liab. Litig.*, 2020 WL 1815854 (E.D. La. Apr. 7, 2020). In that case, this Court explained

that, after chemotherapy, Ms. Kahn asked *three* doctors about her hair loss:

> She finished with this chemotherapy regimen in October 2008. She testified that in April 2009, she made her first inquiry with a doctor, her gynecologist, about her persisting hair loss. She further testified that sometime in 2009 or 2010, she asked her oncologist when her hair would fully regrow, and in July 2009, she spoke to her dermatologist about her hair.

*Id.* at *1.

As this Court noted, in April of 2009, Ms. Kahn initially asked her gynecologist, Dr.

Roberie, why her hair had not fully re-grown, and Dr. Roberie opined that it might be age-related.[24]

Based upon this conversation, this Court held that a jury could find that Ms. Kahn acted reasonably:

> Plaintiff Kahn may have had reason to believe that something other than Defendants' conduct caused her injury. Dr. Roberie, for example, told Kahn that her hair loss may be due to her age. Kahn testified as follows:
>
> Q: Have you ever asked any health care provider why they thought your hair is thinner than it was before chemotherapy?
>
> A: I talked once to my gynecologist, and her comments were back -- her comment to me was, Well, as you age, your hair gets thinner.
>
> Q: And which gynecologist was this?
>
> A: Dr. Roberie.
>
> Q: So have you considered whether the current condition of your hair is affected by the aging process?
>
> A: I was 50 at the time, and most 50-year-old's hair do not thin. You know, 80, maybe, but not 50. So when she told me that, I was a little taken aback, but -- so I dropped it.
>
> Based on the evidence, the Court finds that there is an issue of fact on whether *contra non valentem* applies to toll prescription for Plaintiff. A jury will have to consider whether Plaintiff was reasonable in relying on such statements from her doctors and whether Plaintiff was reasonable in failing to attribute her injury to

---

[24] Kahn's Ex. P, Kahn Dep. at 257:9-258:5.

Taxotere until she learned of the attorney advertisement years after she sustained her injury.

*Id.* at *3 (citing Doc. 9418-17 (Kahn's Ex. P) (pp. 257–58 of deposition)). *See also* 2020 WL 2473772 at *2 ("[T]he evidence shows that Kahn had conversations with her doctors about her injury. Kahn investigated her injury to some extent.").

In addition, Ms. Kahn asked her treating oncologist, Dr. Larned, in 2009 or 2010 when her hair would fully grow back, but Dr. Larned could not provide her with a specific timeframe.[25] She also asked her dermatologist in July of 2009 about her hair thinness, and her dermatologist recommended Biotin to encourage faster regrowth.[26] After three doctors could not diagnose her condition, Ms. Kahn reasonably did not know that she had permanent hair loss.[27]

## 2.    Ms. Kahn did not inquire too early.

Sanofi argues that Ms. Kahn unreasonably inquired about her permanent hair thinness *too early*.[28] To the contrary, Ms. Kahn is reasonable precisely because she *promptly* sought information when her hair did not fully regrow to its original thickness.

Citing the *Thibodeaux* decision, Sanofi claims that Ms. Kahn could not reasonably inquire until April 23, 2009 (six-months after her final toxic chemotherapy treatment), and that Ms. Kahn is unreasonable because she inquired fourteen days earlier at her annual medical check-up on April 9, 2009. Sanofi's logic is hard to follow. Under Sanofi's reasoning, Ms. Kahn should have, instead, sought a follow-up in two weeks to get the same answer to the same question. A juror could reject such reasoning with relative ease.

---

[25] Kahn's Ex. P, Kahn Dep. at 255:8-258:5. *See also* Ex. P, Kahn Dep. at 229:11 – 230:15.
[26] Kahn's Ex. R, Kahn Dep. II at 44:9-45:21.
[27] Kahn's Ex. P, Kahn Dep. at 255:2-257:9.
[28] Doc. 12542-1 p. 2.

Sanofi's argument also ignores the fact that Ms. Kahn consulted with two other doctors: her oncologist in 2009 or 2010[29] and her dermatologist in July of 2009.[30] Moreover, Ms. Kahn took last took Taxotere in July 2008.[31] As a result, Sanofi's six-month clock on Taxotere ran out months before the doctor appointment in April 2009. Even under Sanofi's you-must-sit-on-your-rights-for-six-months framework, Ms. Kahn is reasonable.

Sanofi also cites this Court's *Hughes* decision. However, this Court held that Ms. Hughes could not solely rely upon a pre-treatment conversation with her doctor.[32] Unlike that case, Ms. Kahn consulted with three doctors well after completing toxic chemotherapy to inquire about the fact that her hair did not fully grow back in as thick as before. When no doctor could or would diagnose her condition, a jury could find that she reasonably did not self-diagnose it.

### 3. Because Ms. Kahn reasonably inquired with three different doctors, a jury could determine that she reasonably did not make further inquiries.

Sanofi admits that Ms. Kahn "followed-up routinely with her doctors and raised questions and concerns about her hair loss."[33] Nevertheless, Sanofi argues that no juror could find her reasonable because Ms. Kahn did not further ask the doctors whether Taxotere caused the permanent condition that she reasonably did not know she had. Because Ms. Kahn's doctors either misdiagnosed her condition, as age related hair loss, or refrained from diagnosing her condition, she reasonably did not ask them for the root cause of the misdiagnosed or undiagnosed condition that she—and her three doctors—did not understand.

---

[29] Kahn's Ex. P, Kahn Dep. at 255:8-258:5. *See also* Ex. P, Kahn Dep. at 229:11 – 230:15.
[30] Kahn's Ex. R, Kahn Dep. II at 44:9-45:21.
[31] Sanofi's Facts, Doc. 9295-1 at ¶ 7; Ms. Kahn's Facts, Doc. 9418-1 at ¶ 7.
[32] Doc. 12532 p. 6 ("Instead, Plaintiff's testimony relates to her conversations with Dr. Veith *before* beginning any treatment.") (emphasis by Court)
[33] Doc. 12542-1 at 11.

Ms. Kahn's actions do not resemble the no-inquiry facts in *Thibodeaux*. This case is more like *Hoerner, Cole*, and *Ducre*. In *Hoerner v. Wesley–Jensen*, 684 So.2d 508 (La. App. 4th Cir. 1996), the plaintiff developed a severe eye infection as a result of an extended-wear contact lens. More than two years after developing the eye infection, the plaintiff reviewed a magazine article regarding the connection between the use of extended-wear lenses and the significantly increased risk of eye infections. The defendants argued that the causal relationship between contact lenses and ulcerative keratitis was widely evident prior to the plaintiff's eye infection, and that common knowledge should have been construed as constructive knowledge on the part of the plaintiff. The Court rejected those arguments, holding that "the knowledge that contact lens use in general could cause infection is not sufficient to put [the plaintiff] on notice that her infection and ensuing injury resulted from wearing the extended-wear contact lenses." *Id*.

The Louisiana Supreme Court's decision in *Cole v. Celotex*, 620 So.2d 1154 (La. 1993) (unanimous) is also informative. In *Cole*, the Court held that prescription did not begin when the plaintiff was diagnosed with pneumonia in 1955, placed on asbestos monitoring in 1979, advised in 1983 "that the plaque on his lungs… could be due to several causes besides asbestosis," or told in 1984 that he "had evidence of asbestos-related lung disease." *Id.* at 1157. The Court held that prescription began instead when the plaintiff was diagnosed with asbestosis in 1985, and thus the trial court committed "manifest error" by ruling otherwise. *Id*.

Similarly, in *Ducre*, the Fifth Circuit rejected an argument that prescription began when Bartholomew learned of "sand in his lungs" and "evidence of silicosis" in 1981 because the diagnosis was not definitive, Bartholomew did not connect their injury to the use of a sand-blaster, and Bartholomew did not understand what silicosis is. 963 F.2d at 760-61. The Fifth Circuit held

15

that the jury should decide whether Bartholomew reasonably waited *nine years* to file suit until 1990. *Id*. at 758, 761-62.

As in these cases, Ms. Kahn reasonably did not know—based upon inquiries with *three* doctors—that her hair would *never* return to its original thickness; neither did her physicians. Viewing the evidence in the light most favorable to Ms. Kahn, a jury could find that she was reasonable.

### 4.    Further inquiry from Ms. Kahn's doctors would have been futile.

Viewing the evidence in the light most favorable to Ms. Kahn, even with further inquiries, her doctors would not have told her that her hair would never return to its original thickness or that Taxotere caused her condition. Initially, none of her doctors said either of these things when Ms. Kahn asked about her condition. One doctor misdiagnosed her condition as age-related; two other doctors made no diagnosis. In fact, many doctors and dermatologist are unaware of the existence of permanent chemotherapy induced alopecia (PCIA) and misdiagnose PCIA as age related, androgenetic, hair loss because PCIA involves androgen dependent areas of the scalp.[34]  No doctor ever suggested there was any permanent condition caused by her use of Taxotere and/or chemotherapy.[35]  In fact, even Ms. Kahn's oncologists did not know Taxotere could cause permanent hair loss.[36]

Moreover, even if Ms. Kahn had independently researched medical literature—at Sanofi's proposed sixth-month deadline on April 23, 2009—to decipher the difference between "temporary," "permanent," and "persistent" hair loss, she would not have discovered the answer

---

[34]  Kahn's Ex. CC, Tosti Dep. at pp.306:5-307:5.
[35] Kahn's Ex. P, Kahn Dep. at 318:4-15.
[36] Kahn's Ex. U, Kardinal Dep. at 175:9-17, 87:2-22; Kahn's Ex. S, Larned Dep. at 109:12- 110:05

as there was no clear definition to find.[37] Furthermore, Ms. Kahn may have been unable to successfully search the medical literature as she did not have access to such medical journals and no evidence has been presented as to the date such information became or ever did become publicly available on the internet without access to paywalls or subscription services.[38] Indeed, Sanofi's expert epidemiologist, Dr. Ellen Chang, agrees that there is no single definition despite Sanofi's insistence (in the courtroom) otherwise:

> I consider terms such as "irreversible alopecia," "permanent alopecia," "nonreversible alopecia," "persistent alopecia," and "persisting alopecia" to refer to the same concept, that is, hair loss that continues over an extended duration of time, without subsequent resolution. There is no universal or authoritative clinical definition of this condition, and various scientists and clinicians may define it differently, for example, based on the duration of persistence or the degree of hair regrowth.[39]

In fact, some authors evaluated permanence at six months, but others used longer periods like three and a half years or five years.[40] Sanofi itself even admitted in 2010 and 2018 that hair loss is permanent after four years, but they said in 2015 that hair loss is permanent after two.[41] Obviously, then, any research would not have informed Ms. Kahn in April 2009 that her hair loss was permanent after six months, after 3.5 years, after 4 years or after 5 years. Viewing the evidence in

---

[37] Ex. W, Expert Report of Ellen G. Feigal, M.D. ("Feigal Report") at pp.41—66 (summarizing published articles on irreversible alopecia including endpoints).

[38] *Scientific Research Shouldn't Sit behind a Paywall*, Scientific American (June 20, 2019) (https://blogs.scientificamerican.com/observations/scientific-research-shouldnt-sit-behind-a-paywall/) ("Most of the scientific research conducted in the U.S. and abroad is supported by federal government funds — that is to say, by taxpayer dollars. Yet much of the information that results from such funding is not publicly available outside of research institutions that can afford expensive scientific journal subscriptions.")

[39] Ex. T, Report of Ellen Chang, Sc.D. at 4

[40] *See, e.g., id.* p. 55 Nabholz (2001) defining "long-lasting" as more than 2 years; Bertrand (2013) evaluating permanent hair loss as five years after chemotherapy; Kang (2018) evaluating permanent hair loss after three years); Second Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 4407 ¶¶ 157; 160.

[41] Ex. X, Expert Report of David A. Kessler, M.D. ("Kessler Report") at p. 21

the light most favorable to Ms. Kahn, a jury could determine that further inquiry would have been futile.

### 5. Sanofi's causation defense shows Ms. Kahn's reasonableness.

Sanofi continues to argue that Taxotere did not cause permanent hair loss. For example, in the *Durden* appeal, Sanofi recently wrote in no uncertain terms:

> Sanofi disputes plaintiffs' claims that Taxotere causes permanent hair loss, in particular because cancer treatment involves numerous medicines with which cases of permanent hair loss have also been reported. In fact, the parties tried the first bellwether case in September 2019, which resulted in a defense verdict on medical causation.[42]

Notably, in *Sharkey*, the Court found that such a causation defense supports the discovery rule:

> …Sterling's contention that this action has prescribed is greatly undermined by its own contention that the cause of Reye's Syndrome is unknown. If the cause is unknown for purposes of Sterling's liability, then Sterling can hardly argue that the cause was known to the Sharkeys more than one year prior to their filing this action.

600 So.2d at 714. As in *Sharkey*, Sanofi's own causation defense (that it *does not* cause permanent hair loss) negates its simultaneous and contradictory claim that every reasonable person on earth knew at least six years ago that Taxotere *does* cause permanent hair loss. At a minimum, Sanofi's causation defense creates a factual dispute as to what a reasonable person would have known.

### 6. Ms. Kahn reasonably did not know whether other chemotherapy drugs prevented her hair from coming back.

Viewing the facts in the light most favorable to Ms. Kahn, she was reasonably unaware that Taxotere—as opposed to other toxic chemotherapy medications—prevented her hair from growing back. In addition to Taxotere, Ms. Kahn took three other toxic chemotherapy drugs (Adriamycin, and Cyclophosphamide), which were also known to cause temporary hair loss.[43]

---

[42] *Durden* Appellees Br. p. 1 n.1
[43] Kahn's Ex. A, Kahn NSABP Clinical Trial Consent Form at 000027.

Although Ms. Kahn believed that Taxotere initially caused her hair to fall out due to timing, she did not know whether any of the other simultaneous or subsequent toxic chemotherapy drugs prevented her hair from growing back to its full thickness:

> Q. Do you think that the changes to your hair since 2008, are due solely to Taxotere?
>
> A. I can't say that because I lost my hair and I had several cocktails of chemotherapy drugs. So my initial loss of hair was Taxotere, because that was one of the first drugs I took. And then, in the second phase, I took different drugs. My hair didn't grow back. So I don't know what -- you know, it was a cocktail of drugs.
>
> Q. So your hair loss might be contributed to by some of the other chemotherapy drugs that you took? …
>
> A. Well, several of the drugs that I took say it had temporary hair loss as a side effect.[44]

A juror could easily conclude that Ms. Kahn reasonably did not know which toxic chemotherapy drug prevented her hair form growing back to its original thickness.

Given the reasonable difficulty in determining which medication prevented her hair from returning, this case is like *Jordan*, *Knaps*, and *Aker Maritime*. The *Jordan* Court held that prescription did not begin to run until the Jordans' den flooded a second time, ruling out alternative causes. 509 So.2d at 421-24. The Louisiana Second Circuit charged the Jordans with constructive notice from the date of the first flood because "[t]he Jordans did not contact anyone to determine the cause of the flooding." *Jordan v. Emp. Transfer*, 499 So.2d 454, 456 (La. App. 2d Cir. 1986). The Louisiana Supreme Court rejected this standard and held that "prescription did not begin to run until they had a reasonable basis to pursue a claim against a specific defendant." *Jordan*, 509 So.2d at 424.

---

[44] Kahn's Ex. P, Kahn Dep. at 269:1-23. *See also* Kahn's Ex. P, Kahn Dep. at 259:1-260:14

The Fifth Circuit first followed *Jordan* in *Knaps*. In that case, Knaps had an adverse reaction to the defendant's soap in 1982, but no doctor diagnosed soap as the cause until 1986. 828 F.2d at 1139. Like the panel's reasoning in this case, the district court found that prescription began to run in 1982 because Knaps believed that the soap caused his injury. *Knaps v. B & B Chem.*, 1987 WL 14350, at *2 (E.D. La. July 16, 1987). Accordingly, the district court held that Knaps was "on notice that he needed to inquire further…" *Id*. The Fifth Circuit reversed because the district court applied a standard that *Jordan* had rejected and noted that the District Court's result would have been correct before *Jordan* changed the standard:

> Were this the standard we would have no problem with the district court's ruling. The immediacy of Knaps' reaction to the soap and Knaps' own efforts to inquire about causation indicate that Knaps' attention was excited.

*Knaps*, 828 F.2d at 1139. *See also Aker Maritime*, 604 F.3d at 894 (prescription did not begin after manufacturer's first bolt broke in 2001 or after more bolts broke in July 2002 because the plaintiff could also suspect improper use as a cause)

As in these cases, Ms. Kahn reasonably did not know that Taxotere prevented her hair from returning to its original thickness. She took multiple other chemotherapy drugs known to cause temporary hair loss, and none of her doctors could diagnose her condition—much less identify the culprit. Furthermore, following the end of her chemotherapy treatments, Ms. Kahn also took hormone therapy for approximately nine years.  Sanofi's own experts assert that Ms. Kahn's use of hormone therapies is one of the causes of her hair loss in addition to the age-related, androgenetic, hair loss.[45]  Viewing the facts in the light most favorable to her, a jury could find that she reasonably did not know her injury or its cause.

---

[45] Ex. DD, Report of Dr. Shapiro p. 45, 49; Ex. EE, Report of Dr. Toregano p. 24-25.

### E.      There is a material dispute of fact as to fraudulent concealment.

Viewing the facts in the light most favorable to Ms. Kahn, Sanofi intentionally misrepresented the risk in the label and their actions prevented Ms. Kahn and her doctors from learning either that her hair would not return or that Taxotere caused her permanent condition.  The doctrine of *contra non valentem* provides an exception to Louisiana's one-year liberative prescription also in cases "where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action." *Morgan v. Entergy New Orleans*, 234 So. 3d 113, 116 (La. App. 4th Cir. 2017). Sanofi fraudulently concealed the risk of permanent hair loss because it had knowledge of the actual potential harm (permanent hair loss) and nonetheless made a material misstatement of the risk (warning only of temporary hair loss).

There is substantial evidence that Sanofi knew of the causal relationship between Taxotere and permanent hair loss for more than a decade before electing to update the Taxotere label in December 2015.[46] For example, in the pivotal clinical trial (referred to as "TAX 316") used by Sanofi to support approval of Taxotere for the treatment of adjuvant breast cancer (early stage), subjects taking Taxotere reported an increased incidence of permanent hair loss compared to subjects who received treatment without Taxotere.[47] In 2005, a different Sanofi clinical trial (referred to as "GEICAM 9805" or "TAX 301") confirmed that subjects receiving Taxotere had a higher incidence of permanent hair loss than those who received treatment without Taxotere.[48]

---

[46] Kahn's Ex. X, Kessler Report at pp. 39-63 (summarizing evidence available to Sanofi regarding Taxotere's risk of permanent hair loss); Kahn's Ex. Y, Supplemental Expert Report of David A. Kessler, M.D. ("Kessler Supplemental Report" at p. 1 ( "Sanofi should have warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label by as early as 2006, and certainly by 2008."); *id.* at pp.20-21 (summarizing testimony by Sanofi employees regarding knowledge of causal relationship between Taxotere and permanent hair loss).
[47] Kahn's Ex. X, Kessler Report at pp. 31; 42; 45-47.
[48] Kahn's Ex. X, Kessler Report at pp. 31; 42; 45-47.

Sanofi also received adverse event reports from clinicians whose patients reported permanent hair loss with Taxotere.[49] Defendants' Global Safety Officer for Taxotere, Dr. Amy Freedman, acknowledged that irreversible hair loss had been documented in Sanofi's clinical trials for Taxotere as early as 2006,[50] but advised the recipients "NOT" to do a literature search on the topic because the medical literature might contain additional reports of irreversible alopecia associated with Taxotere.[51]

In 2007, Sanofi approved a warning of "permanent" hair loss in a Canadian consent form.[52] In fact, the Canadian consent form was reviewed by Sanofi's Regional Site Manager for *US* Medical Affairs, Penny Kegg, who forwarded the forms in January 2007 to Dr. Emanuel Palantisky for review.[53] Dr. Palantinsky responded that the separate "hair loss" warning was repetitive given the warning for "permanent hair loss."[54]

In 2010, Sanofi completed its analysis of the ten-year follow-up results for TAX 316, the clinical trial used to support the adjuvant breast cancer indication.[55] This analysis found that 4.2% of TAX 316 patients reported persisting hair loss at the end of the ten-year follow-up.[56] This represented an increase in the incidence of persistent alopecia from approximately 3% to 4.2%. Sanofi had previously decided in 2009 to submit to the FDA only the Final Clinical Study Report for TAX 316, which is over a thousand pages long, without submitting a labeling change.[57] Further,

---

[49] *See id.* p. 44; Kahn's Ex. Y, Kessler Supplemental Report p. 1; Kahn's Ex. E, Sanofi_01035459.
[50] Kahn's Ex. Y, Kessler Supplemental Report at 21; Kahn's Ex. E, Sanofi_01035459.
[51] Kahn's Ex. E, at p. 1 (Sanofi_01035459)
[52] See Kahn's Ex. D, Docetaxel-L-00713 Consent Form.
[53] See Kahn's Ex. D, Docetaxel-L-00713 Consent Form.
[54] See Kahn's Ex. D, Docetaxel-L-00713 Consent Form.
[55] Kahn's Ex. G, Sanofi_02645200
[56] Kahn's Ex. G, Sanofi_02645200, at 37.
[57] Kahn's Ex. H, Sanofi_03336652

by 2010, Sanofi had received reports from hundreds of women describing the failure of their hair to regrow following treatment with Taxotere.[58]

As usage of Taxotere increased, published reports of permanent[59] hair loss associated with Taxotere appeared in the medical literature.[60] For instance, a study published in 2001 that evaluated Taxotere in the treatment of metastatic breast cancer noted four patients who experienced partial alopecia lasting "longer than 2 years."[61] As reports grew in the published scientific literature of permanent hair loss associated with Taxotere, Sanofi took affirmative steps to eliminate reports from a much more accessible platform: social media. In 2010, Sanofi began to actively remove negative public posts made on its Facebook page by women, including women who were members of the Taxotears group, who took Taxotere and suffered permanent hair loss.[62] Even if Ms. Kahn would have conducted a search for Taxotere and permanent hair loss, a juror could find—taking all inferences in Ms. Kahn's favor—that she would not have found any pertinent information *because* Sanofi actively removed such information from its public platforms.

That same year, French authorities requested that Sanofi analyze cases of permanent hair loss reported with Taxotere.[63] The resulting report issued by Sanofi and submitted in January 2011 concluded there was insufficient evidence to determine whether Taxotere caused permanent

---

[58] Kahn's Ex. X, Kessler Report at pp. 59—60; Kahn's Ex. F, Sanofi_00792534.

[59] "Permanent" hair loss is also referred to as "persisting," or "irreversible" hair loss in the medical literature, *see, e.g.,* Second Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 4407 ¶¶at ¶¶ 149-162, and for purposes of this brief, a reference to "permanent" hair loss encompasses these other terms.

[60] Kahn's Ex. W, Feigal Report pp. 41-66 (summarizing articles on irreversible alopecia).

[61] Kahn's Ex. Z, Expert Report of Laura M. Plunkett, Ph.D., DABT ("Plunkett Report") at p. 15. *See also* Kahn's Ex. AA, at p. 2 (Sanofi_05252079); Ex. X, Kessler Report at p. 21

[62] *See, e.g.,* Kahn's Ex. AA, at p. 5 (Sanofi_05252082), Ex. FF, marked as Ex. 4 to the Goyer Deposition and Ex. GG, marked as Ex. 5 to the Goyer deposition.

[63] Kahn's Ex. X, Kessler Report at pp. 59—60; Kahn's Ex. L, Sanofi_04864365; Kahn's Ex. M, Sanofi_01112867 at 7.

alopecia.[64] These European authorities rejected Sanofi's conclusion, finding that patients and healthcare providers needed to be provided information about the risk of permanent alopecia "given the serious psychological consequences of this adverse effect."[65] The European Medicines Agency adopted this same conclusion in June 2011, informing the Sanofi that the label for Taxotere needed to be updated to inform patients of the risk of permanent alopecia.[66] However, Sanofi did not update the United States label with this information at that time.[67]

Meanwhile, in April 2011, Sanofi's Compliance Department issued an internal audit of drug labeling for various drug products, including Taxotere, to evaluate the accuracy and completeness of the safety data presented in the drug labeling.[68] For Taxotere, the audit revealed that the labeling failed to include the incidence rate of persistent alopecia from TAX 316. Sanofi did not add this information to the United States label for Taxotere until 2018.[69]

In an internal audit conducted on March 5, 2015, Sanofi again confirmed that the U.S. label lacked required safety information, including information on permanent alopecia.[70] Shortly thereafter, the FDA requested information from Sanofi on reports of Taxotere associated with permanent hair loss.[71] Sanofi subsequently acknowledged a causal relationship between Taxotere and permanent alopecia and that they had failed to update the United States label for Taxotere with information about this risk, stating "[t]his is going to be fun submitting >4 year old labeling

---

[64] Kahn's Ex. I p. 7-8 (Sanofi_04353204, Sanofi_04353247); Kahn's Ex. X, Kessler Report p. 60.
[65] Kahn's Ex. X, Kessler Report at pp. 59—60; Kahn's Ex. J, Sanofi_02540992 at 4.
[66] Kahn's Ex. X, Kessler Report at pp. 59—60.
[67] Kahn's Ex. X, Kessler Report at p. 61.
[68] Kahn's Ex. K, Sanofi_02983328.
[69] Kahn's Ex. K, Sanofi_02983328 at 7
[70] Kahn's Ex. X, Kessler Report at p. 61 n. 219 (describing 2015 US affiliate audit that identified information missing from Taxotere's product insert); Kahn's Ex. N, Sanofi_00837648.
[71] Kahn's Ex. X, Kessler Report p. 61; Kahn's Ex. N, Sanofi_00837648.

changes to the FDA now."[72] On November 24, 2015, Sanofi submitted a revised label to the FDA adding language about permanent hair loss in the adverse events section,[73] which was finalized by the FDA on December 11, 2015.[74]

Viewing this evidence in the light most favorable to Ms. Kahn, Sanofi knew of the risk of permanent hair loss and yet withheld that information during the same period of time in which Sanofi claims Ms. Kahn and her doctors should have realized that Taxotere caused permanent hair loss. This Court has found that such concealment was sufficient to allow a fraud claim for Plaintiff Jacqueline Mills to proceed under Georgia law, because Sanofi failed to include any reference to permanent hair loss in its label until 2015:

> Defendants made express statements to Dr. Shah through Taxotere's label. In their Motion, Defendants admit that while the Taxotere label has since its inception warned of hair loss, it did not warn of permanent hair loss until December of 2015. Further, Dr. Shah's testimony provides evidence tending to show that she did rely on Defendants' representation. In reliance on the Taxotere/docetaxel label, she did not warn her patient, Ms. Mills, of permanent hair loss. Accordingly, Plaintiffs have created an issue of fact on their fraud-based claims.

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2019 WL 2995897, at *8 (E.D. La. July 9, 2019) (footnote omitted). Here too, the portion of the Louisiana Supreme Court's test for application of *contra non valentem* based on the same conduct by Sanofi strongly weighs in favor of finding Ms. Kahn's claims are timely. These disputed material facts regarding concealment preclude a finding that this case is prescribed as a matter of law.

## IV.   CONCLUSION

This Court should deny reconsideration.

---

[72] Kahn's Ex. O, at p. 11 (Sanofi_05207927).

[73] Ex. X, Kessler Report p. 62. Sanofi used the Changes Being Effected regulation that permits manufacturers to change labels without prior FDA approval. 21 C.F.R. 314.70(c).

[74] Kahn's Ex. X, Kessler Report at p. 62.

Dated: May 11, 2021

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS