**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to**<br><br>**Clare Guilbault**<br>**Case No. 2:16-cv-17061** | **MDL No. 2740** |
| --- | --- |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO HOSPIRA'S MOTION FOR SUMMARY JUDGMENT BASED ON THE LEARNED INTERMEDIARY DOCTRINE**

Dated: May 11, 2021

## Table of Contents

**I. INTRODUCTION** .......... 1

**II. STATEMENT OF FACTS** .......... 2

A. After treatment with Hospira-manufactured docetaxel, Plaintiff Clare Guilbault suffers from permanent alopecia .......... 2

B. If Dr. Theodossiou had been aware of docetaxel's risk of permanent hair loss, he would have prescribed her an equally effective substitute. .......... 3

C. Dr. Theodossiou had a practice of reading warning labels for all drugs he prescribed, including docetaxel. .......... 3

D. Ms. Guilbault conducted independent research on the side effects of the medications she was prescribed and had conversations with her medical care providers about side effects, specifically including those associated with docetaxel. .......... 6

**III. LEGAL STANDARD** .......... 7

**IV. ARGUMENT** .......... 8

A. A plaintiff establishes causation under the learned intermediary doctrine by showing that a warning would have changed a doctor's decision to prescribe the injury-causing drug. .......... 8

B. The facts in this case put it in line with this Court's past decisions denying summary judgment on causation. .......... 9

C. The facts in this case are distinguishable from those cases Hospira cites. .......... 11

**V. CONCLUSION** .......... 15

# Table of Authorities

## Cases

*Ackermann v. Wyeth Pharm.*, 526 F.3d 203 (5th Cir. 2008)........................................................ 11
*Anderson v. Liberty Lobby*, Inc. 477 U.S. 242 (1986) .................................................................. 8
*Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071 (S.D. Tex. Mar. 23, 2021)............. 12
*Campo v. Correa*, 828 So. 2d 502 (La. 2002)................................................................................ 14
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................................ 7
*Crawford v. Formosa Plastics Corp., Louisiana*, 234 F.3d 899 (5th Cir. 2000)........................... 8
*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395 (5th Cir. 2008)......... 7
*Frischertz v. SmithKline Beecham Corp.*, 2012 WL 2952427 (E.D. La. July 19, 2012) 2, 8, 13, 14
*Gauthier v. McDonough Power Equip., Inc.*, 608 So. 2d 1086 (La.App. 3d Cir.1992) ................. 9
*Hall v. Sinn, Inc.*, 102 F. App'x 846 (5th Cir. 2004)...................................................................... 12
*In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Stewart*"), 2021 WL 1534481 (E.D. La. Apr. 19, 2021) ......................................................................................................................... 12, 13
*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 1819668 (E.D. La. Apr. 7, 2020) ... 1, 10, 13
*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 4228387 (E.D. La. July 23, 2020). 10, 13
*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2021 WL 1560724 (5th Cir. Apr. 21, 2021)........ 14
*In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, 2017 WL 1393480 (E.D. La. Apr. 17, 2017) 9, 14
*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ................................................................ 7
*McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410 (E.D. La. 1999) ............................................ 9
*Pustejovsky v. Pliva, Inc.*, 623 F.3d 271 (5th Cir. 2010) ....................................................... 11, 12
*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254 (5th Cir. 2002)...................................................... 9

## Statutes

La. R.S. § 9:2800.53 ........................................................................................................................ 8

## Other Authorities

RESTATEMENT (SECOND) OF TORTS § 402A, Comment j ................................................ 11
RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 .................................... 11

## Rules

Fed. R. Civ. P. 56(a) ......................................................................................................................... 7

## I. INTRODUCTION

Hospira has moved for summary judgment on causation under the learned intermediary doctrine arguing that there is no reasonable dispute that a change to its label would have affected the decision of Clare Guilbault's doctor to prescribe her docetaxel. Hospira's motion fails because: (1) her doctor testified that, had he known of docetaxel's risk of causing permanent hair loss, he would have prescribed her an equally effective substitute; (2) he testified that he regularly reviews FDA-approved labelling and other available information of drugs he prescribes, including docetaxel, and demonstrated knowledge of the known risks at the time of Ms. Guilbault's treatment; and (3) before and throughout Ms. Guilbault's breast cancer treatment, Ms. Guilbault also researched the side effects of her chemotherapy medications, including docetaxel.

The testimony of Ms. Guilbault's oncologist, Dr. Chris Theodossiou, was clear and unwavering that if he had been aware of the risk of permanent hair loss when he treated Ms. Guilbault, he would have replaced docetaxel with a viable alternative he knew to be equally effective as a substitute.[1] While he was never asked whether he had reviewed Hospira-specific information (aside from whether he recalls reviewing it in connection with Ms. Guilbault's treatment), he testified that it is his practice to check the warning labels and other information accessible to him for each drug he prescribes.[2] Further, as this Court has acknowledged and was the case with Ms. Guilbault, the treatment of breast cancer is a patient-driven process, involving detailed discussions between a patient and her oncologist about the various treatment options and a patient's consideration of the attending risks and benefits. *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Kahn*"), 2020 WL 1819668, at *1 (E.D. La. Apr. 7, 2020). Ms. Guilbault also conducted

---

[1] Ex. A, Deposition of Chris Theodossiou (November 11, 2020) ("Theodossiou Dep.") at 17:9-18:16; 89:23-90:5; 135:12-16; 136:25-137:19.
[2] *Id.* at 44:22-45:15; 85:7-86:13.

her own research on the known side effects of her chemotherapy medications and discussed side effects she should expect with her medical team.[3]

The evidence here establishes that a warning "would have changed the doctor's actions and avoided or lessened Plaintiffs' injuries," *Frischertz v. SmithKline Beecham Corp.*, 2012 WL 2952427, at *2-3 (E.D. La. July 19, 2012), or at the very least, viewing the facts in a light most favorable to Ms. Guilbault, presents a triable issue on this question.

## II. STATEMENT OF FACTS

### A. After treatment with Hospira-manufactured docetaxel, Plaintiff Clare Guilbault suffers from permanent alopecia.

In August of 2013, Plaintiff Clare Guilbault had a mammogram that detected breast cancer.[4] A biopsy showed the cancer to be ER-strongly positive, PR-strongly positive, and HER2-negative.[5] Her treatment consisted of eight rounds of chemotherapy, which included four treatments of Adriamycin and Cytoxan and four treatments of docetaxel, and then a lumpectomy to remove the reduced cancerous mass.[6] At the time, neither she nor her doctor was aware that docetaxel carried a risk of permanent hair loss.[7]

After she lost her hair during chemotherapy, the medical professionals she consulted advised her that it would grow back in time.[8] Despite trying various treatments and seeing multiple dermatologists, Ms. Guilbault continues to experience significant alopecia.[9]

---

[3] Ex. B, Deposition of Clare Guilbault (November 4, 2020) ("Guilbault Dep.") at 67:18-68:5; 134:13-23; 172:3-173:1.
[4] Ex. B, Guilbault Dep. at 118:6-16; Ex. A, Theodossiou Dep. at 14:12-25.
[5] Ex. B, Guilbault Dep. at 122:19-22; 138:3-7.
[6] *Id.* at 187:9-16; 197:20-25; Ex. A, Theodossiou Dep. 16:10-19.
[7] Ex. B, Guilbault Dep. at 217:17-22; Ex. A, Theodossiou Dep. at 137:4-12.
[8] Ex. B, Guilbault Dep. at 162:10-18.
[9] *Id.* at 162:19-163:20.

**B. If Dr. Theodossiou had been aware of docetaxel's risk of permanent hair loss, he would have prescribed her an equally effective substitute.**

Dr. Theodossiou discontinued treating patients like Ms. Guilbault with docetaxel when he learned of its association with permanent hair loss and replaced it with an equally effective alternative taxane that carries no such risk.[10] At his deposition, Dr. Theodossiou was asked: "Under the same circumstances and without being able to predict what would happen in the future, would you make the same decision to prescribe that chemotherapy regime that you did prescribe to Ms. Guilbault?" to which he responded: "No. I have switched to the other Taxane in the preoperative setting."[11] He repeated this answer throughout his testimony: "[I]f I were seeing Ms. Guilbault for the first time now, knowing what I know, I would have offered four cycles of AC and then Taxol, rather than Taxotere."[12] The sole reason he switched from docetaxel was its risk, unknown to him when he was treating Ms. Guilbault, of causing permanent alopecia.[13] He testified that the switch brought with it no change in treatment efficacy, which he knew at the time of her treatment.[14]

**C. Dr. Theodossiou had a practice of reading warning labels for all drugs he prescribed, including docetaxel.**

At his deposition, Dr. Theodossiou described his deliberative process in making treatment decisions for each of his patients, which included a review of the relevant FDA-warning labels:

> Q. Does the information you analyze when determining what regimen or drug to prescribe include the FDA-approved labeling for the drug?
>
> A. Typically, yes.
>
> Q. Does the information you consider include, like, discussions you've had with colleagues with regard to specific regimens or chemotherapy medications?

---

[10] Ex. A, Theodossiou Dep. at 17:9-18:16; 89:23-90:5; 136:25-137:19.
[11] *Id.* at 89:23-90:5.
[12] *Id.* at 136:25-137:3.
[13] *Id.* at 91:13-17; Ex. B, Guilbault Dep. at 217:17-22.
[14] *Id.*

> A. It includes discussions I've had with colleagues and what has been published in the peer-reviewed literature.
>
> Q. That was my next question. Do you consider the published peer-reviewed literature?
>
> A. Absolutely.
>
> Q. Do you consider information that you have obtained from seminars and conferences on breast cancer or other cancer?
>
> A. Yes. But, you know, peer-reviewed literature is one of the most important factors.[15]

He emphasized that the "risk/benefit analysis" takes place "every single time we see a patient and every single visit."[16]

Hospira claims that Dr. Theodossiou never read the Hospira label because when he wrote her prescription, he did not know which manufacturer would fill the order. He was, however, never asked that question, he was asked only if he remembered reviewing the Hospira label specifically with respect to Ms. Guilbault's treatment.[17] Dr. Theodossiou described his practice of reviewing the relevant labelling information for each drug he routinely prescribes:

> Q. Doctor, before you prescribed the Docetaxel for the first time, did you review the prescribing information on the label.
>
> A. I don't recall, sir. It's been a long time I probably told her that, you know, there are certain side effects specific to Docetaxel. I mean, we do see leg swelling. They have to take premeds for the Docetaxel. So I probably had this discussion. I do not recall whether I had a discussion specifically pertaining to the risk of permanent alopecia. I just don't remember.
>
> Q. Thank you Doctor, and my question may not have been clear. But when you first started practicing medicine and Docetaxel became an option, did you review the prescribing information for Docetaxel before you prescribed it the first time?

---

[15] Ex. A, Theodossiou Dep. at 44:22-45:15.
[16] *Id.* at 46:3-5.
[17] *Id.* at 86:14-16.

> A. I'm sure I did.
>
> Q. And that would have been reviewing the prescribing information that's contained on the FDA approved label?
>
> A. You can pull up the label from different online links. So I typically, you know, pull up the link and read on it.[18]

Dr. Theodossiou went on to say that he could not recall what his review process was in relation to Ms. Guilbault.[19] Hospira combines this testimony with his later statement that he had not reviewed the *current* docetaxel label and speculates that Dr. Theodossiou never reviewed Hospira's warning label, which, again, he never said. Moreover, as Hospira acknowledges, "[a]fter treating Plaintiff, Dr. Theodossiou stopped prescribing Taxotere/docetaxel."[20] His treatment practices changed before Hospira's 2017 label change,[21] and his knowledge of docetaxel's current labelling does not reflect on his awareness of docetaxel's labelling at the time when he was routinely prescribing it.

Further, Dr. Theodossiou estimated that between 75 and 80% of his current patients are breast cancer patients, and 50 to 75% of his patients were breast cancer patients at the time he treated Ms. Guilbault.[22] Throughout his testimony, he demonstrated knowledge of the known side effects of chemotherapy medications he routinely prescribed and their likelihood of occurrence.[23] And while he testified that when he treated Ms. Guilbault, he did not think he "was aware of the

---

[18] *Id.* at 85:7-86:5. Hospira's docetaxel injection label is available for reference and download at: https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=a0ec4bcc-93ea-4c41-a4b6-95ec19491807.

[19] *Id.* at 86:14-23.

[20] Hospira's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment Based on the Learned Intermediary Doctrine ⁋ 13. (citing Theodossiou Dep. at 17:6-8; 19:13-22).

[21] Ex. A, Theodossiou Dep. at 128:6-13. Dr. Theodossiou could not recall exactly when his treatment practices changed. He estimates it at between four and five years prior to his November 11, 2020 deposition, which would place it before the 2017 label change.

[22] Ex. A, Theodossiou Dep. at 33:12-20; 34:13-15.

[23] *See, e.g., Id.* at 101:10-21.

magnitude of the problem" of docetaxel-induced permanent alopecia,[24] he "[a]bsolutely" would have at least informed her of the risk had he known.[25] He did start warning patients when it became an "issue in the medical community",[26] and ultimately stopped using it altogether for patients like Ms. Guilbault.[27]

**D. Ms. Guilbault conducted independent research on the side effects of the medications she was prescribed and had conversations with her medical care providers about side effects, specifically including those associated with docetaxel.**

Throughout her treatment, Ms. Guilbault also conducted independent research on everything from which medical institution she should attend to the medications she would be taking.[28] She specifically stated that with regard to her chemotherapy medications, she looked at the reported side effects.

> Q. Would you agree that all the medications that you take have some potential side effects?
>
> MR. COFFIN: Object to the form.
>
> A. Potential?
>
> Q. Yes.
>
> A. I would say so, yeah.
>
> Q. But you take them anyway; correct?
>
> A. I think what you do is weigh the risks. You balance the risk and the potential benefit. It depends on how serious the risks are.
>
> Q. And how great the benefits are; right?
>
> A. And how great the benefits are.

---

[24] *Id.* at 130:23-131:2.
[25] *Id.* at 131:10.
[26] *Id.* at 129:24-25.
[27] *Id.* at 89:23-90:5.
[28] Ex. B, Guilbault Dep. at 134:13-23; 172:3-173:1.

> Q. And do you rely on your doctors to help you make that determination?
>
> A. I actually read some of the side effects. My personal opinion is sometimes doctors don't want to tell you the side effects because then you psychologically experience them. Not me personally, but I have heard that before. You know, well, if I put it in your head, you're going to say you have it. Not – again, not directed to me. But I do read the side effects.
>
> Q. Do you recall what's the most serious side effect you've experienced from a medication?
>
> A. Yes, it's permanent hair loss.[29]

She discussed side effects with her medical team, including specifically those side effects to be expected from the docetaxel infusions.[30] No one on the medical team ever discussed or warned of permanent hair loss. Dr. Theodossiou relatedly emphasized the importance of a patient's treatment plan being the product of a joint decision between doctor and patient.[31]

## III. LEGAL STANDARD

Summary judgment is only appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

The party seeking summary judgment bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party may not

---

[29] *Id.* at 67:18-68:5.
[30] *Id.* at 160:7-21; 188:17-189:5.
[31] Ex. A, Theodossiou Dep. at 37:18-25; 38:10-18; 43:20-22.

rest upon the pleadings. *Id.* at 325. Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial. *Id.* All reasonable inferences are drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby*, Inc. 477 U.S. 242, 255 (1986); *Crawford v. Formosa Plastics Corp., Louisiana*, 234 F.3d 899, 902 (5th Cir. 2000). Ultimately, this Court's concern is to ascertain "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## IV. ARGUMENT

### A. A plaintiff establishes causation under the learned intermediary doctrine by showing that a warning would have changed a doctor's decision to prescribe the injury-causing drug.

This Court, when applying Louisiana law, has denied summary judgment motions based on the learned intermediary doctrine where there is evidence that a warning "would have changed the doctor's actions and avoided or lessened Plaintiffs' injuries." *Frischertz v. SmithKline Beecham Corp.*, 2012 WL 2952427, at *2-3 (E.D. La. July 19, 2012); *In Re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 1393480, at *3 (E.D. La. April 17, 2017). The Louisiana Products Liability Act (the "LPLA") defines an adequate warning:

> "Adequate warning" means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.

La. R.S. § 9:2800.53.

The learned intermediary doctrine permits a drug manufacturer to discharge its duty to warn consumers by adequately warning the plaintiff's physician. "The premise underlying a

failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the treating physician." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 268 (5th Cir. 2002) (original emphasis). Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient." *Id.* at 267 (quoting *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999)). There is a two-prong test in the Fifth Circuit governing inadequate warning claims under the LPLA when the learned intermediary doctrine is applicable:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.
>
> Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.

*Id.* at 265–66 (internal citation omitted). Louisiana further recognizes the read-and-heed presumption that "when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions." *Gauthier v. McDonough Power Equip., Inc.*, 608 So. 2d 1086, 1089 (La.App. 3d Cir.1992). The presumption applies in prescription drug cases. *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, 2017 WL 1393480, at *3 (E.D. La. Apr. 17, 2017). A defendant can defeat the presumption by "persuad[ing] the trier of fact that an adequate warning or instruction would have been futile under the circumstances." *Gauthier* at 608 So. 2d at 1089.

**B. The facts in this case put it in line with this Court's past decisions denying summary judgment on causation.**

Hospira argues that Ms. Guilbault cannot make a showing under the second prong. However, the facts in this case put it squarely in line with this Court's past rulings denying

summary judgment on causation. *See In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Kahn*"), 2020 WL 1819668, at *1 (E.D. La. Apr. 7, 2020) (holding there was a triable issue of fact on causation where the treating physician had only read the label once because he sometimes reviewed or referred back to drug labels); *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Durden*"), 2020 WL 4228387, at *2 (E.D. La. July 23, 2020) (holding that there was a triable issue of fact on causation where the treating physician was generally familiar with the prescribing information for docetaxel and changed her treatment protocol after learning of the risk of permanent hair loss). In *Kahn*, for example, the Court rejected summary judgment where the defendant argued that the plaintiff's oncologist could not recall reviewing the warning label with respect to her specific treatment. The fact pattern here and that in *Kahn* are similar in the following ways:

First, in *Kahn*, much like in the present case, the treating doctor testified that his treatment would have been different had he known of the risk of permanent alopecia. *Kahn,* 2020 WL 1819668, at *2. Second, the doctor in *Kahn* testified that there existed an adequate alternative to docetaxel in terms of its efficacy. *Id.* Third, while the doctor in *Kahn* testified that he only read the label once in the late 1990s, the Court ultimately found that a jury should decide the question because the doctor testified as well that he occasionally reviewed drug labels and demonstrated a general knowledge of them in his testimony. *Id**Error! Bookmark not defined.***. Given that throughout his career Dr. Theodossiou has treated more than a thousand cancer patients,[32] he was not able to recall certain events in Ms. Guilbault's treatment, including individual appointments,[33] specific treatment discussions,[34] and, at the crux of Defendant's Motion for Summary Judgment, if he had reviewed Hospira's warning label when deciding on Ms. Guilbault's cancer treatment

---

[32] *Id.* at 34:3-6.
[33] *Id.* at 13:11-18.
[34] *Id.* at 75:10-15.

regimen.[35] Throughout his testimony, he relied on his medical records and his general practice in his answers about, for example, conversations he was "sure" he had had with Ms. Guilbault but could not "remember when exactly."[36] Similarly, regarding his practice of reviewing warning labels, Dr. Theodossiou testified that he was "sure" he had reviewed the prescribing information for docetaxel,[37] that he "typically" would analyze FDA-approved labeling for drugs he prescribed,[38] and "typically" would "pull up the label from different online links".[39] While he also testified that he "probably had" reviewed the labeling for Taxotere,[40] these other testimonial excerpts were with regard to docetaxel warnings in general and not specific to the warnings produced by the brand-name manufacturer.

**C. The facts in this case are distinguishable from those cases Hospira cites.**

Hospira rests its argument on a set of cases involving fact patterns where treating physicians testified that they did not recall *ever* having read the prescribed drug's warning label and/or that they would have still chosen to prescribe the drug even had they known at the time of treatment of the risk.

In *Pustejovsky*, plaintiff brought a failure-to-warn claim under Texas law, where the court did not need to recognize the read-and-heed presumption.[41] The doctor "did not recall ever reading

---

[35] *Id.* at 86:14:23.
[36] *Id.* at 26:23-24.
[37] *Id.* at 85:20-24.
[38] *Id.* at 44:22-25.
[39] *Id.* at 85:25-86:5.
[40] *Id.* at 86:6-13.
[41] Texas, unlike Louisiana, does not recognize the heeding presumption in cases involving prescription medical products. *Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 212-13 (5th Cir. 2008). ("But neither Texas nor federal courts applying Texas law have applied the read-and-heed presumption to pharmaceutical cases involving learned intermediaries. In fact, Texas has explicitly rejected the RESTATEMENT (SECOND) OF TORTS § 402A, Comment j's "read-and-heed" presumption for policy reasons and because it has been superseded by RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2.").

the package insert for the drug or consulting the Physician's Desk reference." *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010). In *Hall v. Sinn, Inc.*, the Fifth Circuit likewise held that because the doctor's "affidavit acknowledge[d] that he never read the warning and that he was aware of the risks of the drug", a warning label incorporating information of which he was already aware would not change his decision to prescribe the drug. *Hall v. Sinn, Inc.*, 102 F. App'x 846, 849 (5th Cir. 2004). There is a significant difference between physician testimony indicating: (1) lack of recall of *ever* having read a warning label (as was the case in *Pustejovsky* and *Hall*); (2) definitive recall of having *not* reviewed a particular warning label; and (3) lack of recall of having read and relied on a warning label before making treatment decisions for an individual patient. *See Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071, at *3 (S.D. Tex. Mar. 23, 2021) (denying a motion for summary judgment on causation and discussing this difference). As noted, Dr. Theodossiou's testimony only fits into the third category. He was not able to remember reviewing the Hospira label when he treated Ms. Guilbault.[42]

This Court recently cited *Pustejosvsky* in granting summary judgment for a Taxotere plaintiff on causation. *In re Taxotere (Docetaxel) Prod. Liab. Litig.* ("*Stewart*"), 2021 WL 1534481 (E.D. La. Apr. 19, 2021). In *Stewart*, the treating physician did not recall ever having seen the docetaxel label and testified that he was certain that he had not recently reviewed it, and that "because he was familiar with the Taxotere label, he would not have reviewed the Sandoz label or docetaxel." *Stewart* at *3. He further testified that he "counsels patients on hair loss the same way he did" when he treated the plaintiff, and that "he still would have presented the docetaxel regimen as Plaintiff's 'best chance.'" *Id.* at *4. This Court also relied on the plaintiff's testimony in *Stewart* that "she would not have chosen a less effective chemotherapy for the sake

[42] Ex. A, Theodossiou Dep. at 86:14-23.

of avoiding permanent hair loss." *Id.* *5. Based on these considerations, this Court concluded that the plaintiff could not establish proximate causation. *Id.*

Plaintiff's case differs from *Stewart* in critical respects. First, as in *Kahn* and *Durden*, Dr. Theodossiou changed his treatment recommendations once he became aware of the very risk that Hospira would later include in their warnings.[43] Second, at the time of Ms. Guilbault's treatment, there was a taxane substitute available that Dr. Theodossiou believed at the time to be equally effective that he would have prescribed to Ms. Guilbault.[44] Third, he described his practice of reviewing FDA-labeling and emphasized that the risk/benefit analysis takes place "every single time we see a patient and every single visit."[45] Fourth, Dr. Theodossiou was never asked whether he had seen the Hospira label but whether he recalled reviewing it in relation to Ms. Guilbault's treatment. In past decisions ruling against motions for summary judgment on causation under the learned intermediary doctrine, the Court has relied on a doctor's general practices without requiring specific recall of conversations or actions taken with respect to an individual patient. *See Frischertz* 2012 WL 2952427 at *3 (ruling against a summary judgment motion where, although the doctor could not recall specific conversations with plaintiff, had "described his discussions with patients 'in general'" in ascertaining what warnings he would have conveyed to plaintiff). Fifth, Dr. Theodossiou testified about how, in addition to reviewing FDA-approved labeling for each drug he prescribes, additional knowledge came from peer-reviewed literature, attendance at educational seminars, and discussions with colleagues.[46] He demonstrated knowledge contemporaneous with Ms. Guilbault's treatment of the known side effects of docetaxel.[47]

---

[43] *Id.* at 17:9-18:16; 89:23-90:5; 136:25-137:19.
[44] *Id.* at 91:13-17; 89:23-90:5; 136:25-137:3.
[45] *Id.* at 44:22-25; 46:3-5.
[46] *Id.* at 45:1-15.
[47] *Id.* at 85:7-13; Ex. B, Guilbault Dep. at 160:15-21.

With or without Louisiana's heeding presumption that a warning "will be read and heeded", Dr. Theodossiou's testimony that he would have replaced docetaxel in Ms. Guilbault's cancer treatment had he known of the risk of permanent hair loss and his deliberative routine in determining an individual patient's treatment, which included review of FDA-approved labels, presents a triable issue of fact and defeats summary judgment on causation.

The Fifth Circuit recently held in this multidistrict litigation that while "the Supreme Court of Louisiana's guidance that reasonableness is assessed 'in light of [the plaintiffs'] education [and] intelligence,'" the court could impute knowledge of "the medical literature linking Taxotere to permanent hair loss" to plaintiffs in order to determine their reasonable date of discovery under Louisiana law. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2021 WL 1560724, at *7 (5th Cir. Apr. 21, 2021) (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002)). If breast cancer survivors suffering from permanent hair loss can be charged with knowledge of the medical literature potentially implicating one of their chemotherapy medications, there is—at a minimum—a reasonable inference that a doctor whose career mostly concerns treatment of breast cancer and who was in the practice of regularly prescribing docetaxel and reviewing FDA-approved labels would have noticed a label change from one of the principal manufacturers.

On these facts and viewed in the light most favorable to Ms. Guilbault, there is a material dispute that Dr. Theodossiou would have seen an update to Hospira's warning label for a drug that was a staple of a treatment regimen he routinely prescribed. The totality of the evidence in Ms. Guilbault's case establishes that a warning "would have changed the doctor's actions and avoided or lessened Plaintiffs' injuries," and, pursuant to *In Re: Xarelto* and *Frischertz*, more than sufficient evidence exists to deny Hospira's Motion for Summary Judgment.

## V. CONCLUSION

For these reasons, Hospira has failed to meet its burden for summary judgment based on warnings causation. Accordingly, summary judgment should be denied.

Dated: May 12, 2021

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS