**<u>EXHIBIT A</u>**

CHRIS THEODOSSIOU, M.D. DEPOSITION EXCERPTS

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3     * * * * * * * * * * * * * * * * * * * * * *

4     IN RE: TAXOTERE (DOCETAXEL)     MDL NO. 2740

      PRODUCT LIABILITY LITIGATION

5

6     This Document Relates to:

7

      Clare Guilbault vs. Hospira, et

8     al.,

      No. 2:16-cv-17061

9

10    * * * * * * * * * * * * * * * * * * * * * *

11

12              VIDEOTAPED DEPOSITION

13                    OF

14           CHRIS THEODOSSIOU, M.D.,

15      Taken on Wednesday, November 11, 2020

16            Commencing at 1:25 p.m.

17                  Via Zoom

18

19

20

21

22

23

24

25

1 where you're physically located today?
2     A. I am located at Ochsner on Jefferson Highway
3 in New Orleans.
4     Q. And are you in your office?
5     A. I'm on the 4th floor of the Benson Cancer
6 Center in the office.
7     Q. Okay. Is there anyone there with you right
8 now?
9     A. No. I'm the sole occupant.
10     Q. Okay. Do you understand that you're here
11 today to give a deposition in a lawsuit that was
12 filed by Clare Guilbault, a patient of you?
13     A. Yes, sir.
14     Q. And you understand that she has filed a
15 lawsuit against my client Hospira?
16     A. She told me.
17     Q. And when did she tell you that?
18     A. I don't remember. It was probably a year
19 ago, maybe longer. I was aware of the issue with
20 the lack of hair growth.
21     Q. And how were you aware of that issue?
22     A. She -- you know, her hair didn't grow back.
23 So, you know, I've been seeing her, so I was aware.
24     Q. Okay. So you were aware of the issue with
25 her lack of hair regrowth?

1     A. Correct. But, peripherally, I've been aware
2 of the issue with the medication that I used in
3 general.
4     Q. And were you familiar with the litigation
5 that was ongoing?
6     A. I knew there was litigation, but I wasn't
7 familiar.
8     Q. And you understand that you're here today to
9 testify about your care and treatment of
10 Ms. Guilbault?
11     A. Correct. Although I don't have her chart in
12 front of me, but I do remember, you know, most of
13 the details.
14     Q. Okay. And she's a current patient of yours;
15 is that correct?
16     A. She is. I'm seeing her probably three times
17 a year for follow-up at this point.
18     Q. And I think you kind of answered this
19 question, but sitting here now, do you have an
20 independent recollection of Ms. Guilbault and her
21 treatment history?
22     A. I do, but I don't have all the details. I
23 don't have access to her chart as we speak.
24     Q. And in order to testify to her treatment,
25 you'll need to look at her medical records?

1     A. Most likely, yes. I mean I remember more or
2 less how I treated her, but it will be helpful if I
3 could access the medical record, and I may be able
4 to do it from my computer. I'm trying to see while
5 we -- while we're talking. Yeah, I should be able
6 to do that.
7     Q. Okay. And the notebook I have provided I
8 will represent contains only medical records and the
9 majority, if not 99 percent, are your medical
10 records, other than some other medical records that
11 may have been in the Ochsner file from other
12 physicians. And I can point you to particular tabs
13 as we talk about --
14     A. Oh --
15     Q. -- them, if that would help.
16     A. I'm pulling up her chart online as we speak.
17     Q. Okay. Is there any reason today that you're
18 unable to give accurate, complete, and truthful
19 testimony?
20     A. No, sir.
21     Q. Our records indicate -- well, the Ochsner
22 records indicate that you began treating
23 Ms. Guilbault for breast cancer in September of
24 2013.
25        Does that sound correct?

1     A. That sounds about right.
2     Q. And you have continued to treat her through
3 follow-up visits since then; is that correct?
4     A. Correct. She went through preoperative
5 chemotherapy. So, initially, there were a lot of
6 visits, and then she had an operation. She got
7 radiation. And then, you know, we space out the
8 visits once they're done with the chemotherapy. So
9 at this point, I think I'm seeing her maybe three
10 times a year.
11     Q. Okay. And from the records that I've seen
12 that Ochsner provided, it looked like the last time
13 she was seen in your office was on August 5th of
14 2020.
15        Does that sound correct?
16     A. I don't recall the visit, but it's -- you
17 know, if you tell me that this is what the record
18 reflects, I have to go along with it.
19     Q. And I will tell you, I think she may not
20 have seen you on August 5th. Is it common for a
21 patient to see maybe your nurse practitioner when
22 they come in?
23     A. It happens. You know, the follow-up
24 patients occasionally will get seen by the nurse
25 practitioners.

Page 14

1    Q.  When was the last time you spoke with
2  Ms. Guilbault?
3    A.  Probably the last time I saw her physically,
4  and I'm not sure when that would be.  You probably
5  have access to the records.  I -- I don't, and I'm
6  still trying to get, you know, to the chart.
7    Q.  Okay.  Well, let me ask this question:  Is
8  the last time you would have spoken with her be the
9  last time that you physically saw her in a follow-up
10  visit in your office?
11    A.  Yes, sir.
12    Q.  Based upon your care and treatment, how is
13  Ms. Guilbault doing currently with regard to her
14  breast cancer?
15    A.  She is in remission.  But, that being said,
16  she was a stage 3, which means she is at a higher
17  risk for recurrence.
18    Q.  Was she a stage 3A, 3B?
19    A.  I can't answer.
20    Q.  Do you --
21    A.  I know she's a stage 3, based on the number
22  of lymph nodes, but I don't have the chart in front
23  of me to tell you.  She's a stage 3.  And, you know,
24  in regards to the treatment, it doesn't make a
25  difference if she's a 3A or a 3B.

Page 15

1    Q.  And it's now been, I guess, more than six
2  years since she completed her chemotherapy from
3  breast cancer; correct?
4    A.  Correct.
5    Q.  And she completed her chemotherapy under
6  your care; is that right?
7    A.  Yes, sir.
8    Q.  And so she's been without the recurrence of
9  cancer for more than six years --
10    A.  Correct.
11    Q.  -- right?
12    A.  Uh-huh.
13    Q.  Is that significant?
14    A.  It is significant, but she's not out of the
15  woods.  She can still recur, and she will be in risk
16  for recurrence for the rest of her life.  The risk
17  will diminish over time, but it will never go down
18  to zero.
19    Q.  And do you credit her lack of recurrence at
20  this point to the treatment regime that you've
21  prescribed for her?
22    A.  I --
23       MS. REYNOLDS:  Object to form.
24  BY MR. ROTOLO:
25    Q.  It was just an objection by opposing

Page 16

1  counsel.
2    A.  Oh, okay.
3    Q.  You can answer.
4       MS. REYNOLDS:  Sorry.
5       THE WITNESS:  Well, I would attribute that
6       to two things:  Number one, the biology of
7       her cancer; and number two, the treatment
8       that she received.
9  BY MR. ROTOLO:
10    Q.  And is part of that treatment she received
11  from chemotherapy?
12    A.  Initially, she received eight rounds of
13  chemotherapy, and then she had an operation.
14    Q.  And the chemotherapy that you prescribed for
15  her was Adriamycin and Cytoxan, followed by
16  Docetaxel?
17    A.  This was the standard preoperative regimen
18  back then.  Since then I have switched, but that is
19  what I gave her.
20    Q.  When you say that was the standard
21  preoperative regimen in 2013, what do you mean by
22  that?
23    A.  The standard preoperative regimen is four
24  cycles of an Adriamycin-containing regimen and then
25  four cycles of a Taxane.  There are two Taxanes.

Page 17

1  There was Taxotere and there was Taxol.  The
2  nationwide studies that were done in the
3  preoperative setting used Taxotere or Docetaxel
4  rather than Taxol.  So I was trying to emulate the
5  studies in using Taxotere.
6       But I had several cases with the issue of
7  alopecia, so we made the decision systemwide to
8  switch from Taxotere to Taxol.
9    Q.  Does Ochsner not use Taxotere at all
10  anymore?
11    A.  No.  No.  No.  We still use it.  But in the
12  preoperative setting, the medical oncologists that
13  treat breast cancer, we have pretty much abandoned
14  Taxotere or Docetaxel and switched to Paclitaxel or
15  Taxol.
16    Q.  And when did that occur?
17    A.  It's on an individual basis.  The straw that
18  broke my back was when I saw a patient that I had
19  treated several years ago, and then her hair never
20  grew back.  She looked like she was still under
21  chemotherapy.  And that's when I decided that, you
22  know, it's okay to switch to Taxol.  There's no
23  evidence that we're compromising the care by doing
24  that.
25       So, currently, my preoperative regimen is

5 (Pages 14 - 17)

1 the four cycles of Adriamycin Cyclophosphamide and
2 four cycles of Paclitaxel, rather than Docetaxel.
3 But, again, the initial preoperative studies
4 utilized Docetaxel rather than Paclitaxel.
5     Q.  Were there studies at the time that
6 indicated that Docetaxel was more effective in that
7 regime than Paclitaxel?
8     MS. REYNOLDS:  Objection to form.
9     THE WITNESS:  No.  There have never been --
10     you know, studies in the preoperative
11     setting, but we know that in the
12     postoperative setting you can use those
13     agents and get pretty much the efficacy.  So
14     we kind of extrapolate it in order to avoid
15     the alopecia, you know, hurdle, we have
16     switched to Taxol.
17 BY MR. ROTOLO:
18     Q.  You said you had one patient whose hair did
19 not grow back.
20     Do you know what regime they were taking?
21     A.  She had received the four cycles of
22 Adriamycin Cyclophosphamide and four cycles of
23 Docetaxel.  And then I saw her probably three years
24 down the road, and she looked like she was still in
25 chemotherapy.  And that's when I decided, you know,

1 it's not worth taking that risk when there is no
2 evidence that switching to Taxol is inferior, so I
3 switched to Taxol.
4     Q.  Do you know how many years ago that was?
5     A.  I don't remember.  Probably three or
6 four years ago, sir.
7     Q.  Do you remember if it was before or after
8 this litigation began?
9     A.  During -- you mean this specific litigation
10 with Ms. Guilbault?
11     Q.  No.  The litigation over Taxotere and
12 Docetaxel.
13     A.  It was -- I had heard about the litigation,
14 and I had several patients.  I recall at least four
15 or five patients, but it was that particular patient
16 that made me switch.
17     Q.  For those four or five patients, did they
18 have limited hair regrowth or total lack of
19 regrowth?
20     A.  No.  They have -- most of the patients that
21 I have had with issues, was limited, except for
22 that one patient that was total.
23     Q.  And were all of those patients on the
24 Adriamycin Cytoxan, plus Docetaxel or Taxotere
25 regime?

1     A.  Yes, sir.  That was our standard
2 preoperative regimen.  And still is at a lot of
3 institutions, by the way.
4     Q.  Are there physicians at Ochsner that still
5 use that regime?
6     A.  I don't think so.  I mean, you know, we're
7 three medical oncologists that are treating
8 primarily breast cancer, and I know that, you know,
9 we all use it.  Now, I'm not going to say that this
10 happened systemwide because, you know, we've got
11 oncologists in Baton Rouge and Lake Charles, the
12 North Shore.  I don't really know how they treat
13 their patients, but at the Jefferson Highway campus,
14 we're not using the Docetaxel in the preoperative
15 setting.  We have switched to the Paclitaxel.
16     (Mr. Goldberg entered and exited the Zoom
17     deposition.)
18     THE WITNESS:  Now, we still use Docetaxel in
19     other, you know, situations with breast
20     cancer patients.
21 BY MR. ROTOLO:
22     Q.  In what situations would that be?
23     A.  There's specifically two types of breast
24 cancer patients where we use it.  One is some of the
25 patients express a protein called HER2, and for

1 those patients when we treat them preoperatively, we
2 use Docetaxel.  The other cohort of patients are
3 patients who have been operated, and their lymph
4 nodes were clean; and then we used Docetaxel with
5 Cytoxan because this is the regimen with the best
6 survival data.
7     Q.  And when using in those regimes, have you
8 had patients who, as you described, had lack of hair
9 regrowth?
10     A.  I don't recall specific patients.  I think
11 that most of my patients where having encountered
12 the alopecia were treated in the preoperative
13 setting.
14     Q.  And did you do any sort of causation
15 analysis to determine which of the three drugs
16 that -- chemotherapy drugs they received was the
17 cause of their alopecia?
18     A.  There is plenty of data with Adriamycin.
19 First of all, with Adriamycin everybody loses their
20 hair.  It is for granted.  But it does grow back.
21 And there's a lot of experience with probably
22 hundreds of thousands of patients with Adriamycin,
23 and this has not been an issue.  And it's not an
24 issue with the cyclophosphamide either.  So, by the
25 process of elimination, it comes down to the

Page 26

1    A. I'm here to give you -- to answer the
2  questions about her medical care, basically, as it
3  pertains to her oncologic issue.
4    Q. Does that include what caused her hair loss?
5       MS. REYNOLDS: Object to form.
6       THE WITNESS: It includes everything you
7       asked me about her treatment; and, you know,
8       the hair loss was a result of her treatment.
9  BY MR. ROTOLO:
10   Q. Did you tell Ms. Guilbault that her hair
11  loss was the result of her receiving chemotherapy
12  and, in particular, Docetaxel?
13   A. I don't recall the discussions, but I know
14  how I operate. So every patient going through
15  chemotherapy, I will sit them down and have a
16  discussion about the alopecia. I tell them that
17  typically it occurs within three weeks from the
18  first round of chemotherapy and that the hair will
19  start growing back after -- three to four months
20  after the last round of chemotherapy. This is the
21  standard discussion that I'm having with every
22  single patient.
23      I'm sure I had the same discussion with
24  Ms. Guilbault, but I don't remember when exactly.
25  Probably around the time that she got the first

Page 27

1  round of chemotherapy. I do not recall whether I
2  specifically discussed the small risk with the
3  Taxotere of permanent alopecia.
4    Q. And at the time you had the discussion with
5  Ms. Guilbault, when she was about to undergo
6  chemotherapy about hair loss, is it your testimony
7  that you knew that there was a small risk the hair
8  wouldn't regrow, but you don't remember whether you
9  told her or not?
10      MS. REYNOLDS: Object to form.
11      THE WITNESS: I don't recall the specifics
12      of the discussion. I can tell you that
13      sometime about seven, eight years ago I
14      started including that part in the
15      discussion, that with the Taxotere there was
16      a small risk of permanent alopecia. But I
17      do not recall whether I had that specific
18      discussion with Ms. Guilbault. I know that
19      I had the discussion about alopecia in
20      general.
21  BY MR. ROTOLO:
22   Q. And that would have been your general
23  discussion that you would have with most patients?
24   A. Correct.
25      Now, again, at some point several years ago,

Page 28

1  I started telling the patients that, you know, there
2  was a risk of a permanent alopecia and patchy hair
3  growth with the Taxotere. I cannot recall exactly
4  when I started having these discussions, though.
5  Probably around the time that, you know, I treated
6  her, or maybe a little bit before or a little bit
7  after.
8    Q. At the time in September of 2013 that you
9  prescribed Ms. Guilbault her chemotherapy regimen,
10  at that point, were you aware of reports of
11  incomplete hair growth or persistent alopecia
12  occurring in patients taking Taxotere or Docetaxel?
13   A. I do not recall. You know, it's been a long
14  time since I treated her, so I cannot testify as to
15  whether I was aware of those specific reports or
16  not.
17   Q. And do you remember whether you had seen any
18  patients that had occurred in before you gave her
19  the prescription for her chemotherapy regime?
20   A. I do not remember.
21   Q. Would your standard discussions of the risks
22  and benefits of chemotherapy include the risk of
23  alopecia?
24   A. Absolutely.
25      MS. REYNOLDS: Object to form.

Page 29

1  BY MR. ROTOLO:
2    Q. And would that discussion with regard to
3  alopecia in patients you are prescribing
4  chemotherapy to include patients that were going to
5  be given Taxotere or Docetaxel?
6       MS. REYNOLDS: Object to form.
7       THE WITNESS: I always have this discussion
8       when I treat patients with Taxanes or with
9       anthracyclines. I mean this is a standard
10      part of the prechemotherapy discussion.
11  BY MR. ROTOLO:
12   Q. And, Doctor, do you guarantee them that
13  their hair will regrow?
14      MS. REYNOLDS: Object to form.
15      THE WITNESS: I started -- the ones that
16      don't get Taxotere, I tell them that, you
17      know, the overwhelming majority, the hair
18      will grow back within three to four months
19      from the completion of chemotherapy.
20      Over the last few years -- and I cannot
21      tell you exactly when I started adding this
22      to the conversation -- the ones that I have
23      to treat with Taxotere, I tell them that
24      there is a nationwide class action, and this
25      is a risk they're going to have to take if

8 (Pages 26 - 29)

Page 30

1    we're going to treat them with that specific
2    regimen.
3  BY MR. ROTOLO:
4    Q.  So did you change your discussions that you
5  had with the patients as a result of the litigation
6  that has occurred?
7    A.  Correct.  But I cannot recall exactly when I
8  added that part of the discussion.  Now, again, you
9  have to understand that this preoperative regimen
10  has been around for more than 15 years.
11    Q.  And during the 15 -- how long have you been
12  practicing, Doctor?
13    A.  I finished my oncology training in 1995.  So
14  25 years as an oncologist.
15    Q.  And in your 25 years as a practicing
16  oncologist, during that entire period have you
17  prescribed Taxotere and Docetaxel in the adjuvant
18  setting?
19    A.  No.  The adjuvant setting, the data became
20  available about 2007 or 2008.  I don't remember
21  exactly when.  That a the pivotal trial.  The
22  standard of care used to be four cycles of
23  Adriamycin and Cyclophosphamide.
24    And then there was a study that came out
25  that compared the four cycles of AC with four cycles

Page 31

1  of TC, and the survival was better.  I believe it
2  was 2007 or 2008, and then within a year it became
3  the new standard of care in the U.S.
4    Q.  In between your prescribing the regime in
5  2008, say, to the end of 2013, had you seen any
6  patients that had incomplete hair growth on that
7  regimen?
8    MS. REYNOLDS:  Object to form.
9    THE WITNESS:  I do not recall specific
10    patients.  I have several patients that I
11    can think of, but I -- I think that most of
12    them were treated in the preoperative
13    setting.
14    MR. ROTOLO:  Jessica, are you still there?
15    You flashed off.
16    THE WITNESS:  I'm here.
17    MS. REYNOLDS:  Yeah, I'm here.  I apologize.
18    Yeah.  It's not optimal, but we're going to
19    make it work.
20    MR. ROTOLO:  Okay.
21    Q.  Have you met or spoken or corresponded with
22  Ms. Guilbault's lawyers in this case?
23    A.  No, sir.
24    Q.  Have you communicated with anyone about
25  Ms. Guilbault's care and treatment since you last

Page 32

1  saw her?
2    A.  I don't think so, no.
3    Q.  Do you know anyone in Ms. Guilbault's family
4  other than through your visits with her in your
5  clinic?
6    A.  I remember that her husband came a few times
7  while she was getting chemotherapy, but that's the
8  only other family member that I recall meeting.
9    Q.  Have you discussed her case recently with
10  her other doctors, including her surgeon
11  Dr. Stolier?
12    A.  No, sir.
13    Q.  You said you became a medical oncologist in
14  1995.  When did you begin working at Ochsner?
15    A.  2004.
16    Q.  And do you hold any type of position there
17  at Ochsner --
18    A.  Can you repeat the --
19    Q.  -- a title or committee or things of that
20  nature, professorship or...
21    A.  Can you repeat the question, please?
22    Q.  Sure.
23    At Ochsner do you hold any sort of
24  administrative position or --
25    A.  No.

Page 33

1    Q.  -- do you just see patients?
2    A.  I just see patients.
3    Q.  Do you do any sort of research?
4    A.  We do clinical research, all the clinicians
5  here.
6    Q.  Have you been involved in any clinical
7  studies with regard to Taxotere or Docetaxel?
8    A.  Not that I recall.
9    Q.  Have you written any articles in
10  peer-reviewed literature on Docetaxel or Taxotere?
11    A.  No, sir.
12    Q.  How many of your patients do you see are --
13  that are breast cancer patients?
14    A.  Probably a good 75 to 80 percent of my
15  patients are breast cancer patients.
16    Q.  Was that the case back in 2013, when you saw
17  Ms. Guilbault?
18    A.  Yes, sir.  Maybe a lower percentage back
19  then, but I came here specifically for a breast
20  medical oncology position.
21    Q.  Over the course that you have been treating
22  as a medical oncologist, how many patients would you
23  say that you've treated over the course of your
24  career that had breast cancer?
25    A.  Hundreds.  I see about --

9 (Pages 30 - 33)

Page 34

1    Q. Do you see patients --
2    A. I'm sorry.
3       I see about three to four new patients a
4  week. That's about -- let's say about a hundred a
5  year, times 15 years that I've been at Ochsner,
6  18 years. Probably more than a thousand.
7    Q. And do you see patients in clinic every day?
8    A. Yes, sir.
9    Q. And during the September 2013 timeframe,
10 did -- was that the same? Did you see patients in
11 clinic every day?
12   A. Yes, sir.
13   Q. And 2013, was about 75 percent of your
14 practice breast cancer as well?
15   A. Between 50 and 75, probably.
16   Q. And in your practice, does the patient first
17 see the nurse or the PA before they see you on the
18 visit?
19   A. No. Typically they see the physician. I
20 try to see all my patients every single time they
21 get chemotherapy, except when I'm not available.
22 And then for the follow-up visits, I will delegate
23 some of those visits to the nurse practitioners and
24 will alternate the visits. So someone who comes in
25 for three months will see me in January, will see

Page 35

1  the nurse practitioner in April, will see me in
2  July.
3    Q. But even when you see a patient yourself,
4  does the nurse come in and take the information from
5  the patient before you go in to see the patient?
6    A. Well, that's a -- there is a nurse that will
7  come in and take the vitals, do the medication
8  reconciliation, but that's the not the same person
9  as the nurse practitioner that will substitute for
10 my visit occasionally.
11   Q. Sure. And in your regular practice, do you
12 maintain a complete set of medical records on the
13 patient's treatment?
14   A. Yes, sir.
15   Q. And do you note in those medical records
16 anything you think of that is important in the care
17 and treatment of your patients?
18   A. Yes, sir.
19   Q. And do you make sure that the information
20 contained in the medical records is accurate to
21 allow you to properly treat the patient?
22   A. Yes, to the extent that it's feasible.
23 There's --
24   Q. Do --
25   A. There's always that focus of the cancer.

Page 36

1    Q. And is it your usual practice to record the
2  information in the medical records at the time of
3  the visit, or do you do it after the visit?
4    A. I try to finish the note before I move on to
5  the next patient because, you know, otherwise you
6  forget things. So I try to write the note within
7  15 minutes from the visit.
8    Q. And would you agree that the information
9  that you put in a patient's records contains the
10 information that you deem relevant to their care and
11 treatment?
12   A. Yes.
13      MS. REYNOLDS: Object to form.
14 BY MR. ROTOLO:
15   Q. And the procedure -- the procedure that you
16 just described, was that your procedure back in 2013
17 and 2014?
18   A. Yes.
19   Q. Do nurses document any patient information
20 in the medical records?
21   A. They do --
22   Q. What --
23   A. -- separately.
24   Q. -- type of -- I'm sorry.
25   A. They will interview the patient, so they

Page 37

1  will -- you know, there is documentation on their
2  part. They will do the medication reconciliation,
3  they will check this vitals.
4    Q. Doctor, when you treat a breast cancer
5  patient, are you usually the physician that has
6  diagnosed the cancer?
7    A. No. Typically there is a surgeon. There is
8  a radiologist that does the biopsy, and there's a
9  pathologist that reads the biopsy. And there may be
10 a radiation oncologist as well. Now, all the
11 patients will be prospectively presented and
12 discussed. We meet once a week, and all the
13 patients are formally presented.
14   Q. And if I recall the records of
15 Ms. Guilbault, she had already been diagnosed the
16 first time she saw you with breast cancer?
17   A. Correct.
18   Q. In general, how do you go about deciding
19 what treatment to give a breast cancer patient?
20   A. It's always a joint decision. The first
21 question that I have when I see a patient is: "Is
22 this a curable cancer or an incurable cancer?" So a
23 lot of times there will be radiologic studies that I
24 will request to make sure this is curable. Stages
25 1, 2, and 3 are curable. Stage 4 is not curable.

10 (Pages 34 - 37)

Page 38

1 It is treatable but not curable. So that's the
2 first question that goes through my mind.
3      Then on the biopsy there are three
4 components that we pay attention to. The first one
5 is what we call the estrogen receptors, the second
6 one is what we call the progesterone receptors, and
7 the third component is what we call the HER2/neu
8 receptor. So we base decisions on the receptor
9 status.
10      Now, other factors we take into
11 consideration is the patient's wishes. I mean do
12 they want to have a lumpectomy and save the breast?
13 Do they care about going through a mastectomy? Do
14 they want to do double mastectomy? Are they fit
15 enough to go through a big operation? Do they want
16 reconstruction? So there are a lot of questions
17 that, you know, every single physician has to answer
18 in the first visit.
19      Q. Does the involvement of lymph nodes affect
20 your -- affect the way you treat a patient?
21      A. Yes, sir. Because it's part of the staging.
22      Q. What about the medical history of the
23 patient? Does that affect your decision on how to
24 treat a patient?
25      A. It does. But not as much as the lymph node

Page 39

1 status. You know, the patients have to be fit
2 enough to go through chemotherapy. So you're going
3 to treat a 75-year-old patient with cancer different
4 from a 55-year-old with the exact same cancer.
5      Q. Does your experience with other patients
6 come into play in determining how to treat a
7 patient?
8      A. Yes, sir.
9      Q. If you decide to prescribe chemotherapy for
10 a patient, in general, how do you go about deciding
11 which drug or regime that you're going to use?
12      A. Well, the first decision is do we treat with
13 preoperative chemotherapy, or do we do surgery up
14 front. And that's where, you know, you base your
15 decision on the three parameters I mentioned: The
16 ER, PR, HER2, the lymph node involvement and the
17 patient's wishes.
18      For example, if you have a woman with a
19 large tumor that insists on having a lumpectomy, you
20 try to shrink the tumor up front so that, you know,
21 we can have a lumpectomy at the end. If you have a
22 tumor that's probably inoperable because it's
23 advanced, you try to shrink it and render it
24 operable.
25      So that's the first decision: Am I going to

Page 40

1 treat preoperatively or postoperatively? When I
2 treat preoperatively, there are two or three
3 regimens only that we use. When you treat
4 postoperatively, it depends on the three parameters
5 I mentioned, the size of the tumor, and the status
6 of the lymph nodes.
7      Q. Do you refer to the NCCN guidelines when
8 determining what chemotherapy drugs or regime you
9 may prescribe?
10      A. Always.
11      Q. And those guidelines for provide
12 recommendations based on the best evidence available
13 at the time?
14      A. Yes, sir. But those are recommendations.
15 They're not mandated.
16      Q. Right. But that was my next question,
17 Doctor: You can't go to NCCN guidelines, just
18 choose one, and say, "I'm done"?
19      A. No. This isn't cookie-cutter.
20      Q. What is the difference between a preferred
21 regime and another regime under the guidelines, the
22 NCCN guidelines?
23      A. It --
24      MS. REYNOLDS: Objection to form.
25      THE WITNESS: It depends on the level of

Page 41

1      evidence. And, you know, sometimes you have
2      consensus between the NCCN members,
3      sometimes you don't have consensus. They
4      feel that the evidence is strong or not very
5      strong. But, you know, for certain
6      situations, there's what we call Level 1
7      evidence, that that's the way to go.
8 BY MR. ROTOLO:
9      Q. Is it important when coming up with the
10 chemotherapy regime that you're going to use, to
11 make sure that it is appropriate and specific to the
12 particular patient?
13      A. Yes, sir.
14      Q. Would you agree that one chemotherapy regime
15 may be right for one patient and not be right for
16 another patient?
17      A. I would agree.
18      Q. Would you agree that, in general,
19 chemotherapy agents are not interchangeable?
20      MS. REYNOLDS: Object to form.
21      THE WITNESS: I would agree.
22 BY MR. ROTOLO:
23      Q. Would you agree that they each have
24 different efficacy and risk profiles?
25      A. Yes.

11 (Pages 38 - 41)

Page 42

1    Q. Doctor, is the number one goal in
2  prescribing chemotherapy to try to eliminate the
3  cancer?
4    A. The number one goal is to cure.
5    Q. Prior to making a chem- --
6    A. Well --
7    Q. Go ahead. I'm sorry.
8    A. I'm sorry.
9       So, yes, the number one goal is to cure.
10  With chemotherapy we're trying to maximize the
11  chance of a cure.
12    Q. And prior to making a chemotherapy
13  recommendation, do you perform a risk/benefit
14  analysis that's specific to that individual patient?
15    A. Always.
16       MS. REYNOLDS: Objection.
17       THE WITNESS: The first thing you try to do
18          when you have a patient is estimate the risk
19          of recurrence just with surgery alone, and
20          then you take it from there. We know, for
21          example, let's say that you have a patient
22          where you estimate the risk of recurrence at
23          20 percent.
24          We know that with chemotherapy you will
25          reduce that risk of recurrence by a quarter.

Page 43

1          And with hormonal therapy, you're going to
2          reduce it by a quarter to almost 50 percent.
3          So once you know what the risk of recurrence
4          is, you can pretty much narrow it down to
5          percentage benefit of chemotherapy.
6  BY MR. ROTOLO:
7    Q. What information do you consider when
8  deciding whether to prescribe a chemotherapy drug?
9    A. Number one, I consider whether the patient
10  is fit enough to go through chemotherapy. I'll look
11  at the age. I mean, every physician has an age
12  limit beyond which we don't like to give
13  chemotherapy.
14       Then we look at the characteristics of the
15  cancer. We take into consideration the patient's
16  desires as well. You get patients who say that
17  "Under no circumstances do I want to go through
18  chemotherapy," or "Under no circumstances do I want
19  to experience the hair loss."
20       So we kind of tailor the recommendations to
21  the patient's wishes, and we tell them this is the
22  plan A and this is the plan B.
23    Q. Have you had patients that have refused
24  chemotherapy --
25    A. All the time.

Page 44

1    Q. -- before here?
2    A. All the time. And we also get patients who
3  say, "If I'm going to lose my hair, I'm not going to
4  go through chemotherapy." And for those patients,
5  typically, there is this plan B.
6    Q. And what, typically, would be the plan B of
7  a chemotherapy agent that would not cause hair loss?
8    A. There is an older regimen called CMF. It
9  has been around since I was in high school. It's
10  not as good as the, you know, 2020 regimens, but
11  there's no hair loss. So you tell the patient that,
12  you know, if you get the 2020 regimen, you're going
13  to increase your chance of a cure, let's say, by 6
14  percentage points. If you get the CMF, you get to
15  keep your hair, but you're not going to realize the
16  6-percent benefit. You're going to realize a 4- or
17  maybe 5-percent benefit.
18    Q. So you tell them that's it's not as
19  effective as what you could have given them as your
20  A regimen?
21    A. Correct.
22    Q. Does the information you analyze when
23  determining what regimen or drug to prescribe
24  include the FDA-approved labeling for the drug?
25    A. Typically, yes.

Page 45

1    Q. Does the information that you consider
2  include, like, discussions you've had with
3  colleagues with regard to specific regimens or
4  chemotherapy medications?
5    A. It includes discussions I've had with
6  colleagues and what has been published in the
7  peer-reviewed literature.
8    Q. That was my next question. Do you consider
9  the published peer-reviewed literature?
10    A. Absolutely.
11    Q. Do you consider information that you have
12  obtained from seminars and conferences on breast
13  cancer or other cancer?
14    A. Yes. But, you know, peer-reviewed
15  literature is one of the most important factors.
16    Q. I think you already told me you consider
17  your own experience with the medication.
18    A. Correct.
19    Q. And I would -- and I think you already said
20  this. But the prescription of a chemotherapy
21  medication also takes into account your knowledge
22  about that particular patient?
23    A. Absolutely.
24    Q. And would it be a fair statement that you
25  only prescribe a treatment for a patient after

12 (Pages 42 - 45)

Page 46

1 you've satisfied yourself that the benefits outweigh
2 the risks with that potential patient?
3    A. The risk/benefit analysis takes every place
4 every single time we see a patient and every single
5 visit.
6    Q. Doctor, I want to probably turn now to
7 Ms. Guilbault specifically. So if you have the
8 notebook handy, close to you, you may want to get it
9 close to you because we are going to be referring to
10 some things, or if you want to use your electronic
11 records, I'll give you enough information,
12 hopefully, that you can do that quickly.
13    A. Okay.
14    Q. But the notebook that was -- it's a --
15    A. I have it here.
16    Q. Okay. It's just medical records that we,
17 basically, in order to speed this along, put in
18 chronological order to -- because that's the way I
19 think, Doctor, is chronologically. Okay?
20    A. That's fine.
21    Q. And you will notice the records all have,
22 like, what we lawyers call a Bates stamp on the
23 bottom, and you will note most of them have Ochsner
24 on them, indicating that we got them from Ochsner,
25 and it also has a page number.

Page 47

1    A. Okay.
2    Q. Let's turn first --
3    A. You want me --
4    Q. -- to --
5    A. You want me to open the box here?
6    Q. Oh, yes, please, Doctor.
7       MR. ROTOLO: And, Jessica, did you get the
8       notebook as well?
9       MS. REYNOLDS: I did, right at lunch. So
10      they brought it up, and then I went and ate.
11      But I have it. It's very hefty.
12      MR. ROTOLO: As I said, we're not going
13      through it all. I just want to be prepared.
14      I didn't want to be accused of leaving
15      anything out, let's just put it that way.
16      MS. REYNOLDS: I definitely won't make that
17      accusation.
18      THE WITNESS: My goodness.
19 BY MR. ROTOLO:
20    Q. You'll get your workout, Doctor. We're not
21 going through all of these, by the way. I'm just,
22 like I said, I didn't want to be accused of leaving
23 any record out that we might have needed --
24    A. My wife is a lawyer, so...
25    Q. Okay. You know how we work, then.

Page 48

1       MS. REYNOLDS: Who wins the arguments at
2       home?
3       THE WITNESS: Well, she works it two ways,
4       so I do have to work.
5 BY MR. ROTOLO:
6    Q. Were you able to extract the massive weight
7 out of the box?
8    A. Yes, I have it.
9    Q. Okay. If we could turn first to Tab 9.
10      MR. ROTOLO: And I'm -- Jessica and
11      everybody, we're not confused, I'm going
12      to refer to the tab, but that's not going to
13      be the exhibit number. We'll say that's
14      Exhibit 1.
15      MS. REYNOLDS: Okay. Very good.
16      (Whereupon Exhibit No. 1 was marked for
17      identification.)
18      THE WITNESS: There are several pages here
19      on the Tab 9, and I'm looking at my notes.
20 BY MR. ROTOLO:
21    Q. Doctor, on Tab 9, just for the record, what
22 I have as the first page is a medical record that
23 has "Guilbault Ochsner MR" at the bottom with Bates
24 page Number 194.
25    A. Yes, sir.

Page 49

1    Q. Dated 9/17/13?
2    A. Yes.
3    Q. And it looks like the first three pages may
4 be just -- it had "Appointment set is cancelled,"
5 but if you would go to page 197 at the bottom.
6    A. I'm there.
7    Q. You see at the top where it has "Clare L.
8 Guilbault 9/17/2013," and it has "Encounter
9 information, initial consult"?
10    A. I see it.
11    Q. Doctor, does this appear to be the medical
12 record from your first visit with Ms. Guilbault?
13    A. I would assume so.
14    Q. Okay. And, Doctor, if you will turn with me
15 to Bates Number page 203.
16    A. I'm looking at it.
17    Q. I'm looking under a section that's entitled,
18 "Progress Notes."
19    A. Yeah. That's my initial consultation, the
20 first time I saw her.
21    Q. Okay. Great.
22       And, Doctor, if you look at the Bates Number
23 page 203 under progress notes, it appears that
24 Ms. Guilbault was referred to you by Dr. Stolier?
25    A. Correct.

13 (Pages 46 - 49)

1   Q.  And is Dr. Stolier a surgeon?
2   A.  He is a surgeon.  He no longer practices,
3   but he is a very well-respected surgeon in the
4   New Orleans community.
5   Q.  And the reason for referral was recent
6   diagnosis of breast cancer.  Do you see that?
7   A.  Correct.
8   Q.  Okay.  And at the time of this referral,
9   Ms. Guilbault was 61 years old?
10  A.  Yes, sir.
11  Q.  And her -- you indicate that she had had a
12  biopsy performed before she came to see you and that
13  she had infiltrating ductal carcinoma that was ER
14  strongly positive, PR strongly positive, and HER2
15  negative?
16  A.  Correct.
17  Q.  And are those factors that would -- that you
18  would consider in determining her treatment options?
19  A.  Yes.  Those are the three elements that I
20  was talking about earlier:  The estrogen receptors,
21  the progesterone receptors, and the HER2 receptor.
22  Q.  And I note you had involvement of multiple
23  lymph nodes that were suspected?
24  A.  Yes.  And she also had a biopsy of a
25  palpable axillary lymph node that was positive.

1   Q.  And then, Doctor, did she have what showed
2   up on scans as a potential body on her T12 of her
3   spine?
4   A.  You know, I didn't remember that.  Now that
5   I see my note, I vaguely remember that she had
6   something which I think that we may have biopsied at
7   some point to make sure this wasn't cancer.
8   Q.  Well, Doctor, do you remember -- we're going
9   to go through the records -- but do you remember
10  that it was not biopsied before her chemotherapy
11  treatment?
12  A.  I don't remember.
13  Q.  Okay.  Well, we'll go through it, Doctor.
14  We're going to go through it.
15  A.  Yeah.
16  Q.  I don't want you to say something you
17  don't --
18  A.  I'm looking at my plan, page 28.  So we did
19  recommend a CD-guided biopsy.
20  Q.  Okay.  Well, Doctor, let's -- if you don't
21  mind going back with me --
22  A.  Uh-huh.
23  Q.  -- to Bates Number page 203 --
24  A.  Yes.
25  Q.  -- at the bottom where there's the

1   discussion of the small area of the body of T12 that
2   had increased uptake.
3   A.  I see it.
4   Q.  It indicates that that was felt to be highly
5   suspicious for bony metastatic disease.
6   Do you see that?
7   A.  Yes, I see that.
8   Q.  And what would indicate that that was highly
9   suspicious for metastatic cancer?
10  A.  There was -- there was uptake on the PET
11  scan.
12  Q.  And, Doctor, if you turn to the next page,
13  which is 204, under your review of symptoms in the
14  middle of the page, do you see that?
15  A.  I see it.
16  Q.  You say, "Overall she feels well.  She is
17  upset and anxious with the recent developments."
18  Doctor, is that -- would it be fair to say
19  that that is a common description of the women that
20  have come to see you who have been diagnosed with
21  breast cancer?
22  A.  For the first visit, yes, that's quite
23  prevalent.
24  Q.  Now, Doctor, if you could turn to page
25  205 -- page Number 205 of Exhibit 1 under your plan,

1   it says you had an hour long discussion with
2   Ms. Guilbault and her husband.
3   Is that about the normal time you would
4   spend on an initial consult talking to a patient?
5   A.  For someone going through chemotherapy, it's
6   usually an hour or longer for the initial visit.
7   Q.  Right.  And you indicated that you had
8   reviewed her scans and that there was a lesion with
9   the extremely high SUV in the interior portion of
10  T12.
11  "I've explained to Mr. And Ms. Guilbault the
12  significance of these findings."
13  Do you remember what you indicated was the
14  significance of those findings?
15  A.  Whenever we see a patient, we -- the first
16  thing we need to determine is whether this is a
17  curable cancer or an incurable cancer.  If there is
18  a bone metastases -- even one -- this is no longer
19  considered curable.  That's why it was a significant
20  finding and that's why I recommended a biopsy.
21  Q.  Okay.  So you recommended a biopsy.  And
22  then a couple sentences later you say, "I have
23  explained to her that if she does have bone
24  metastasis, this will not be curable stage.
25  However, she would be treated initially with

1 regime when you cannot rule out a stage 4, are you
2 balancing the need to cure them if they're stage 3
3 and to slow progression if they're stage 4?
4       MS. REYNOLDS:  Object to form.
5       THE WITNESS:  When we cannot rule out stage
6       4, we treat them aggressively for a
7       presumptive curable cancer.
8 BY MR. ROTOLO:
9    Q.  And, Doctor, the date on the report of the
10 multidisciplinary breast cancer conference that we
11 just looked at of -- looks like the form is dated
12 September 19th.
13       Would that be the date that it was presented
14 to the conference?
15    A.  Yes, sir.
16    Q.  So if you could turn to Tab 13, which is
17 going to be Exhibit Number 4.
18       (Whereupon Exhibit No. 4 was marked for
19       identification.)
20 BY MR. ROTOLO:
21    Q.  It begins with page Number 273.
22       Do you see that, Doctor?
23    A.  I have it.
24    Q.  And it looks like a telephone encounter.
25 And then if you look at Bates Number page 275, it

1 looks like it's a message from Ms. Guilbault to --
2 or Ms. Wendt sending an e-mail saying:
3       "Patient wanted to push back her medical" --
4 "M.D. appointment and chemo start date to either
5 Thursday or Friday of next week.  She has concerns
6 about her job because she's already taken a lot of
7 time off.  I've passed the message on to
8 Robin Jackson, R.N., to call patient on Monday."
9       How did Ms. Guilbault learn that she was
10 going to undergo chemotherapy?
11    A.  It may have been a conversation that's not
12 documented.  I don't recall.  I'm sure there was a
13 radiologic study done in between.  Maybe the MRI
14 didn't show any bone destruction.
15    Q.  And, Doctor, would it be a standard practice
16 if a patient is undergoing chemotherapy to send them
17 for a cardiac evaluation?
18    A.  That's standard operating procedure.
19    Q.  Is that for all types of chemotherapy
20 medications or just certain ones?
21    A.  Just for the regimens that contain
22 Adriamycin.  In her case the Adriamycin --
23    Q.  Did --
24    A.  -- is what triggered the cardiac workup.
25    Q.  So if you look at Tab 15, which we'll mark

1 as Exhibit 5.
2       (Whereupon Exhibit No. 5 was marked for
3       identification.)
4 BY MR. ROTOLO:
5    Q.  That is a consult with -- I think it was
6 Dr. Polin in cardiology.  And that would have been
7 ordered by you because you were contemplating giving
8 her Adriamycin?
9    A.  Correct.  I'm pretty sure that I ordered an
10 echocardiogram at some point.
11    Q.  Okay.  If you go to Tab 15, which is
12 Exhibit 5, Bates Number page 268.
13    A.  Yes, sir.
14    Q.  And you see that this is Dr. Polin's
15 progress note where she indicates:  "She was
16 recently diagnosed with left-sided breast cancer
17 with positive lymph nodes and possible thoracic
18 spine metastasis.  She is meeting with
19 Dr. Theodossiou next week to discuss her
20 chemotherapy regime.  She will likely be receiving
21 XRT also.  She has a longstanding hypertension,
22 which has been reasonably controlled."
23       And then -- so you would not have had a
24 discussion about chemotherapy with her before you
25 sent her for the cardiac consult?

1    A.  I don't recall the specifics.  You know,
2 there was a time that any patient given potentially
3 cardiotoxic medication, we would automatically send
4 them to Dr. Polin.
5    Q.  Did Ms. Guilbault's hypertension -- long
6 history of hypertension have any effect on the
7 chemotherapy regimen that you were prescribing?
8    A.  Only if there was heart failure.  And I'm
9 sure there was an echocardiogram ordered, and I'm
10 sure it was normal; otherwise, I wouldn't have
11 treated her the way I did.  Yeah, it says her echo
12 was normal.  I'm looking at Dr. Polin's note, so...
13    Q.  What about a family -- I'm sorry.  Go ahead.
14    A.  Yeah.  What we call the left ventricular
15 ejection fraction was calculated to be 60 percent,
16 which is -- you know, that clears her to go for
17 chemotherapy.
18    Q.  Would there be any concern with the family
19 history of cardiac disease?
20    A.  No, sir.
21    Q.  Doctor, you indicated that you had sent her
22 for another MRI?
23    A.  My note indicates that she was going to get
24 an MRI of the thoracic spine.
25       MR. ROTOLO:  Okay.  If you look at Tab 17,

17 (Pages 62 - 65)

1 the better of the options?

2    A.  Correct.

3    Q.  So the pros and cons of such an approach

4 were explained to her in detail.  What, generally,

5 would you have discussed with Mr. and Mrs. Guilbault

6 at this office visit when you came up -- when you

7 discussed with them your treatment plan?

8    A.  See, it's kind of counterintuitive, but

9 stage 3 is treated more aggressively than stage 4.

10 So a stage 4 cancer will not be treated with

11 chemotherapy up front because we're not shooting for

12 a cure.  A stage 3, on the other hand, we treat them

13 aggressively, hoping to cure them.

14    So I probably had this discussion with them

15 and told them that, you know, "I'm giving you the

16 benefit of the doubt.  Let's hope that the bone

17 lesion is not cancer related, and let's just treat

18 you as a stage 2 or stage 3."

19    Q.  You said, "Her multiple questions were

20 answered to her satisfaction."

21    Do you remember what questions Ms. Guilbault

22 and her husband had with your approach?

23    A.  I do not recall.

24    Q.  Okay.  Then you say, "Of note, her case was

25 discuss at the tumor board, and those were the exact

1 recommendations."

2    A.  Yes.

3    Q.  Do you see that, Doctor?

4    A.  Yeah, I see it.

5    Q.  Would the tumor board -- would you present

6 to the tumor board the chemotherapy regime that you

7 had chosen?

8    A.  No.  Once you make a decision to treat with

9 preoperative chemotherapy, for HER2 negative

10 patients there aren't too many options.  It's

11 Adriamycin with Cyclophosphamide followed by

12 Taxanes.

13    Q.  Did you consult with any other physician

14 about your treatment plan of Ms. Guilbault as

15 described in your record of September 25th, 2013?

16    A.  I do not recall specifically, but typically

17 at the tumor board there two or three medical

18 oncologists.

19    Q.  At this meeting, Doctor, at this office

20 visit of September 25th of 2013, would you have told

21 Mr. and Mrs. Guilbault what the chemotherapy regime

22 was that she was going to be undertaking?

23    A.  Either that meeting or the following

24 meeting.  We always have the discussion of "Welcome

25 to the regimen" at the time they're about to receive

1 the first cycle.

2    Q.  So your typical practice is to have that

3 discussion with them at the time they're getting --

4 that they arrive to have their first cycle of

5 chemotherapy?

6    A.  Yeah.  Or when they signed the consent form,

7 which was signed on that visit.  So it's probable

8 that I had the discussion on that date.  Because

9 when you go through the consent form, you go through

10 the specific chemotherapy agents that are listed in

11 there.

12    MR. ROTOLO:  And if we could turn to Tab 22,

13    which I'll mark as Exhibit 8.

14    (Whereupon Exhibit No. 8 was marked for

15    identification.)

16 BY MR. ROTOLO:

17    Q.  Is that the consent form that Ms. Guilbault

18 signed to consent to her treatment with

19 chemotherapy?

20    A.  Yes, sir.  That's what the consent form

21 looked like back then.

22    Q.  And how, Doctor, would you generally go

23 about reviewing the consent form with a patient such

24 as Ms. Guilbault, or if you remember going through

25 it with her?

1    A.  Well, I don't remember specifically with

2 her.  But, you know, there are certain side effects

3 that she will experience for sure, like the fatigue,

4 the nausea, the lowering of the white cells, the

5 risk for infection, the neuropathy, the heart

6 damage, the bone marrow damage, the alopecia.  Those

7 are discussed.

8    Now, do I discuss liver damage?  No, I don't

9 because it -- it's extremely rare.  Hearing loss?

10 No, not with this regimen.

11    Q.  Do you discuss mouth sores with this

12 regimen?

13    A.  I don't recall if I did with her.  Sometimes

14 I do, sometimes I don't.  That the mouth sores will

15 typically appear when the white cells really

16 plummet.  I tell them that if your white cells drop

17 precipitously you may get mouth sores, but I don't

18 further elaborate usually.

19    Q.  What about skin and nail darkening?

20    A.  I'm sorry.  Skin and --

21    Q.  The darkening of the nail.

22    A.  No.  But when it happens, we have this

23 discussion.

24    Q.  But you're aware that she --

25    A.  I'm sorry.  This is not part of the

19 (Pages 70 - 73)

Page 74

1 original -- the initial discussion for this specific
2 regimen.
3     Q.  Are there some risks that you don't discuss
4 with them, depending on the regimen?
5     A.  I typically discuss the risks that are
6 specific for the regimen.  So for the AC followed by
7 Taxotere, the typical discussion will revolve around
8 the nausea, the alopecia, the neuropathy, the heart
9 damage, bone marrow damage, and lowering of the
10 white cells and the alopecia; and also the risks
11 associated with the port.  That's part of the
12 discussion.
13     Q.  And, Doctor, with the -- looking now at the
14 consent form that Ms. Guilbault signed and agreed
15 to, with this regimen and this consent form, what
16 discussion would you have had with her with regard
17 to alopecia?
18     MS. REYNOLDS:  Object to form.
19     THE WITNESS:  I probably had the typical
20         discussion that I have with the patients.  I
21         tell them that within three weeks from the
22         first -- from the first cycle of Adriamycin,
23         you will lose your hair.  And the hair is
24         not going to grow back until three months
25         from the last round of chemotherapy.  That's

Page 75

1         the typical discussion.
2             Well, that was the typical discussion
3         back then.  Nowadays we've got the cooling
4         caps that they can use, and it mitigates the
5         risk of alopecia.
6 BY MR. ROTOLO:
7     Q.  Were the cooling caps available back in
8 2013?
9     A.  No.  No, they weren't available.
10     Q.  As we discussed earlier, did you indicate to
11 Ms. Guilbault that in most cases the hair will grow
12 back?
13     A.  I don't recall the specifics of the
14 discussion, but knowing -- having had this
15 discussion many times, I probably did.
16     Q.  Given your history with the other patients
17 that you indicated some may be -- may have occurred
18 before Ms. Guilbault's prescription, did you tell
19 her that there were instances where the hair did not
20 fully grow back?
21     A.  I do not --
22     MS. REYNOLDS:  Object to form.
23     THE WITNESS:  I do not recall.
24 BY MR. ROTOLO:
25     Q.  Is that something that you could have told

Page 76

1 her?
2     MS. REYNOLDS:  Object to form.
3     THE WITNESS:  I may have mentioned that, but
4         I cannot vouch that I did.
5 BY MR. ROTOLO:
6     Q.  Doctor, at the time that you prescribed this
7 to her, you were aware that there were patients of
8 yours that had lack of hair regrowth after taking
9 this regimen; correct?
10     MS. REYNOLDS:  Object to form.
11     THE WITNESS:  It was around that time that,
12         you know, this became an issue.  And, you
13         know, sometimes the patient would bring it
14         up.  You know, it was mentioned on TV
15         advertisements.  I don't remember exactly
16         seven years ago, you know, what the state of
17         this issue was.  I mean I may have had some
18         patients previously.  I don't recall.
19 BY MR. ROTOLO:
20     Q.  Doctor, if you could turn to Tab 24, which
21 I'll mark as Exhibit 9.
22     (Whereupon Exhibit No. 9 was marked for
23         identification.)
24 BY MR. ROTOLO:
25     Q.  Do you know why Ms. Guilbault executed two

Page 77

1 informed consents, one on the 25th of September of
2 2013 and --
3     A.  Uh-huh.
4     Q.  -- one on September 27th of 2013?
5     A.  My suspicion is that she showed up for
6 chemotherapy and they couldn't locate the initial
7 one, and they had her sign the second one.  But I'm
8 speculating.
9     Q.  And would whoever had her sign the second
10 one gone through the informed consent with her
11 again?
12     A.  I don't recall what happened.  I don't think
13 I would have had this discussion twice because, you
14 know, probably what happened:  She showed up for
15 chemotherapy.  They couldn't find the consent form
16 because maybe it wasn't scanned in, and they had
17 her -- they asked me to fill out a second consent
18 form.
19         This happens.
20     Q.  When determining what chemotherapy regime to
21 provide to Ms. Guilbault, did you do any literature
22 search or peer-reviewed articles?
23     A.  I know the literature.  This is the standard
24 NSABP trial, NSABP 31, I believe.  So I'm intimately
25 familiar with the trial.

20 (Pages 74 - 77)

Page 82

1 there are two doses for Taxotere.  There is 75 per
2 square meter; there's a hundred per square meter.
3 And the dose, when you treat with curative intent,
4 is always a hundred.
5      Yes, we do see more myelosuppression.  Yes,
6 the risk of ending up in the hospital with an
7 infection is higher, but that's the dose that was
8 studied on the NSABP trial that was quoted.  So
9 that's the dose we use for preoperative chemo.
10 Q.  Did Ms. Guilbault ask you for alternative
11 chemotherapy regimes for her treatment?
12 A.  I don't recall.  But even she did -- if she
13 did, I would have told her that based on the
14 evidence available at that time, this was the best
15 regimen; because, as I mentioned, you go from the
16 12-percent complete remission rate to 24.6-percent
17 complete remission rate.
18 Q.  Did you -- if I'm understanding your
19 testimony, the only way that Ms. Guilbault would not
20 be getting chemotherapy would be if you had
21 determined she was stage 4?
22      MS. REYNOLDS:  Object to form.
23      THE WITNESS:  The only way she would not be
24      given chemotherapy initially would have been
25      if we had determined that she was stage 4;

Page 83

1      correct.
2 BY MR. ROTOLO:
3 Q.  Did you consider the potential risk of hair
4 loss when developing her treatment plan, her
5 chemotherapy treatment plan?
6      MS. REYNOLDS:  Object to form.
7      THE WITNESS:  I don't -- I don't recall the
8      details, but, you know, you're trying to
9      cure someone.  So you will go with the best
10      regimen available; and, again, at -- there
11      was evidence that the patient where you
12      achieve a complete remission are the ones
13      with the highest chance of a cure.
14      So if I have to pick between two
15      regimens, one of them with a 12-percent
16      complete remission rate versus 24.6 percent,
17      obviously, I'm going to try to go for the
18      one with the highest remission rate.  And I
19      tell them that, you know, it is longer.  You
20      will be getting eight runs of chemotherapy
21      rather than four, but you double the
22      complete remission rate.
23 BY MR. ROTOLO:
24 Q.  Did she raise any objections to the
25 chemotherapy regime that you recommended for her?

Page 84

1 A.  I don't recall, but I don't think that she
2 did.
3 Q.  And is it your practice to let your patients
4 know that they can contact you if they have concerns
5 or questions as they begin their course of
6 treatment?
7 A.  Of course.
8 Q.  Did Ms. Guilbault express concerns to you
9 about her chemotherapy regime while she was
10 undergoing treatment?
11 A.  I don't recall any specific complaints or
12 concerns, but it's --
13 Q.  What was your understanding of why she
14 wanted to proceed with chemotherapy?
15      MS. REYNOLDS:  Object to form.
16      THE WITNESS:  It was based on a
17      recommendation.  You know, she trusted the
18      team, and she went with whatever we
19      recommended.
20 BY MR. ROTOLO:
21 Q.  Was it your understanding that Ms. Guilbault
22 wanted to pursue all available treatment options to
23 try to cure her cancer?
24 A.  Correct.
25      MS. REYNOLDS:  Object to form.

Page 85

1 BY MR. ROTOLO:
2 Q.  In addition to chemotherapy, your treatment
3 plan for Ms. Guilbault also included surgery,
4 radiation, and aromatase inhibitor treatment with
5 Arimidex; is that right?
6 A.  Correct.
7 Q.  Doctor, before you prescribed the Docetaxel
8 for the first time, did you review the prescribing
9 information on the label?
10 A.  I don't recall, sir.  It's been a long time.
11 I probably told her that, you know, there are
12 certain side effects specific to Docetaxel.  I mean,
13 we do see leg swelling.  They have to take premeds
14 for the Docetaxel.  So I probably had this
15 discussion.  I do not recall whether I had a
16 discussion specifically pertaining to the risk of
17 permanent alopecia.  I just don't remember.
18 Q.  Thank you, Doctor, and my question may have
19 not been clear.
20      But when you first started practicing
21 medicine and Docetaxel became an option, did you
22 review the prescribing information for Docetaxel
23 before you prescribed it the first time?
24 A.  I'm sure I did.
25 Q.  And that would have been reviewing the

22 (Pages 82 - 85)

Page 86

1 prescribing information that's contained on the FDA
2 approved label?
3    A.  You can pull up the label from different
4 online links.  So I typically, you know, pull up the
5 link and read on it.
6    Q.  And you're aware that Taxotere is the brand
7 name for Docetaxel; correct?
8    A.  Correct.
9    Q.  And at the time you prescribed Docetaxel to
10 Ms. Guilbault in September of 2013, would you have
11 reviewed at some point before then the labeling for
12 Taxotere, the branded product?
13    A.  I probably had at some point.
14    Q.  Did you review the Hospira Docetaxel label
15 before prescribing Docetaxel for Ms. Guilbault?
16    A.  I don't recall.
17    MS. REYNOLDS:  Objection to form.
18    THE WITNESS:  I can't answer that question.
19 BY MR. ROTOLO:
20    Q.  So you don't recall whether you relied upon
21 any information in the Hospira label before
22 prescribing Docetaxel to Ms. Guilbault?
23    A.  No, sir, I do not recall.
24    Q.  Did you prescribe Hospira's Docetaxel as the
25 Docetaxel product that you wanted Ms. Guilbault to

Page 87

1 receive?
2    A.  I prescribed Docetaxel, and it's up to the
3 pharmacy to determine where they're going to procure
4 it for them.  I don't prescribe a specific company's
5 product.
6    Q.  So, if I'm hearing you right, when you
7 prescribe Docetaxel, you don't know which
8 manufacturer's product will be administered to the
9 patient?
10    A.  Correct.  The chemotherapy order that I
11 write says Docetaxel, but I have no idea where the
12 Docetaxel is coming from.
13    Q.  Does your prescription go to the pharmacy
14 and then get filled, whichever Docetaxel the
15 infusion pharmacy has in stock?
16    A.  Yes, sir.
17    Q.  So the patient may receive a version made by
18 Sanofi, the brand name, or a version made by another
19 company, like Hospira?
20    A.  Correct.
21    Q.  And that was the case with Ms. Guilbault?
22 You didn't know which manufacturers of Docetaxel she
23 had received during her treatment?
24    A.  No, sir.  I don't know where the product is
25 coming from.

Page 88

1    Q.  Doctor, would you agree that sometimes a
2 patient can experience an adverse event from a
3 medication that is nobody's fault?
4    A.  Yes.
5    MS. REYNOLDS:  Object to form.
6    THE WITNESS:  Yes.
7 BY MR. ROTOLO:
8    Q.  Have you ever prescribed a chemotherapy
9 agent for a patient and that -- other than what
10 we've talked about today, and that patient has
11 experienced an adverse event?
12    A.  Many times.
13    Q.  Did that mean that your initial decision to
14 use that product was improper?
15    A.  No.  The decision to use the regimen is
16 based on evidence.  And the evidence here was the
17 NSABP trial.
18    Q.  And would you agree that hindsight isn't the
19 best way to analyze a decision to use a product?
20    A.  Correct.
21    Q.  At the time you recommended treatment for
22 breast cancer with Docetaxel in September of 2003,
23 was that your best judgment of what was right for
24 Ms. Guilbault at the time?
25    MS. REYNOLDS:  Object to form.

Page 89

1    THE WITNESS:  It was based on the NSABP
2    trial that showed that there was a
3    24.6-percent complete remission rate, which
4    is the highest ever reported.
5 BY MR. ROTOLO:
6    Q.  And you stand behind your decision to
7 prescribe AC plus Docetaxel to Ms. Guilbault?
8    A.  Absolutely.
9    MS. REYNOLDS:  Object to form.
10 BY MR. ROTOLO:
11    Q.  Under the same circumstances, and without
12 being able to predict what goes on in the future,
13 would you make the same decision to prescribe that
14 chemotherapy regime to Ms. Guilbault?
15    MS. REYNOLDS:  Object to form.
16    THE WITNESS:  You mean now?
17 BY MR. ROTOLO:
18    Q.  That --
19    (Simultaneous crosstalk.)
20    THE WITNESS:  I have -- I'm sorry.  Say that
21    again, please.
22 BY MR. ROTOLO:
23    Q.  Under the same circumstances and without
24 being able to predict what would happen in the
25 future, would you make the same decision to

23 (Pages 86 - 89)

Page 90

1 prescribe that chemotherapy regime that you did
2 prescribe to Ms. Guilbault?
3 MS. REYNOLDS:  Objection to form.
4 THE WITNESS:  No.  I have switched to the
5 other Taxane in the preoperative setting.
6 THE VIDEOGRAPHER:  Mr. Rotolo, I'm sorry to
7 interrupt.  We've been going just about two
8 hours, and I need to break the media unit
9 when you have a moment.
10 MR. ROTOLO:  Sure.  We can go off the record
11 for a break.
12 THE VIDEOGRAPHER:  Thank you.
13 MR. ROTOLO:  Doctor, do you need a restroom
14 break?
15 THE WITNESS:  No, I'm good.
16 THE VIDEOGRAPHER:  We are off the record at
17 3:31, and this marks the end of media unit
18 Number 1.
19 (Recess.)
20 THE VIDEOGRAPHER:  We are back on the record
21 at 3:36.  This marks the beginning of media
22 unit Number 2.
23 BY MR. ROTOLO:
24 Q.  Doctor, when we broke you had indicated that
25 you currently now use Paclitaxel instead of

Page 91

1 Docetaxel --
2 A.  Correct.
3 Q.  -- in the regimen you gave Ms. Guilbault;
4 correct?
5 A.  Correct.
6 Q.  And I think you said that part of that
7 reason that you're now using Paclitaxel has to do
8 with the possibility of permanent hair loss?
9 A.  Correct.  I've had several patients.  But,
10 as I said earlier, it was that patient of mine that
11 I saw years later -- and she had absolutely no
12 hair -- that made me switch.
13 Q.  Is there any other reason that you have
14 switched from Docetaxel to Paclitaxel?
15 A.  No.  I have no reason to think that by
16 switching I'm compromising the efficacy.  So why run
17 the risk of alopecia?  So I switched.
18 Q.  Can you say with certainty that
19 Ms. Guilbault if she had received Paclitaxel would
20 be alive today?
21 MS. REYNOLDS:  Object to form.
22 THE WITNESS:  Can I say something like that
23 with a hundred percent certainty?  No.  But
24 I have no reason to think that the outcome
25 would have been any different had I given

Page 92

1 her Paclitaxel.
2 BY MR. ROTOLO:
3 Q.  Can you say with certainty that
4 Ms. Guilbault's hair would be at the same level of
5 fullness that it is today if she had had Paclitaxel?
6 MS. REYNOLDS:  Object to form.
7 THE WITNESS:  I don't want to speculate.
8 BY MR. ROTOLO:
9 Q.  So you don't know?
10 A.  I don't know.
11 Q.  Do you agree with me that while Docetaxel
12 and Paclitaxel are structurally similar, they're not
13 the same drug?
14 A.  Correct.  Now, I will say this:  I have
15 treated hundreds of patients with Paclitaxel and
16 hundreds of patients with Docetaxel.  I've yet to
17 see someone with permanent alopecia with Paclitaxel.
18 Q.  Do you know if there's cases of permanent
19 alopecia associated with -- case reports of
20 permanent alopecia associated with Paclitaxel in the
21 medical literature?
22 A.  I suspect --
23 (Simultaneous crosstalk.)
24 THE WITNESS:  -- that there aren't.
25 MS. REYNOLDS:  Objection to form.

Page 93

1 BY MR. ROTOLO:
2 Q.  Do Docetaxel and Paclitaxel carry different
3 risk and benefits?
4 A.  The side effect profile is different.  The
5 efficacy is about the same.
6 Q.  And do you agree that one has been
7 associated with more cardiotoxicity than the other?
8 MS. REYNOLDS:  Object to form.
9 THE WITNESS:  There is very little
10 cardiotoxicity.  We do see arrhythmias
11 occasionally with the Paclitaxel.  But I
12 don't recall the last time, other than when
13 I was in training, that we had issues with
14 that.  Cardiotoxicity is not a big issue
15 with the Taxanes.
16 BY MR. ROTOLO:
17 Q.  And would you agree that one has been
18 associated with the neuropathy more than the other?
19 A.  Correct.
20 Q.  Which one is that?
21 A.  Paclitaxel.
22 Q.  Did Ms. Guilbault experience neuropathy
23 during her treatment?
24 A.  I do not recall.  If she mentioned
25 something, it would have been in my notes.

24 (Pages 90 - 93)

1    Q.  Would you go over those written -- that
2  written information with the patient?
3    A.  No.  It wasn't -- this was something the
4  nurse would do or the navigator would do, not the
5  physician.  I would have this -- the discussion at
6  some point.  Usually when they sign the consent
7  form, I would have the chemotherapy discussion.  I
8  would tell them the specific side effects from
9  specific drugs.  But then they would probably have a
10  more-detailed discussion with the chemo nurse or the
11  navigator.
12    Q.  And Ms. Guilbault successfully completed all
13  of her eight infusions of chemotherapy?
14    A.  She did.
15    Q.  I notice from the medical records that two
16  of the AC cycles were delayed due to low A and C.
17    A.  Okay.
18    Q.  Is that a side effect of the AC regimen?
19    A.  It's a side effect of the Adriamycin and
20  Cyclophosphamide, yes.  They do lower the white
21  cells, and sometimes it takes longer to recover.
22    Q.  And I think you had indicated that you told
23  Ms. Guilbault that she would lose her hair -- I
24  think you said -- what? -- three weeks after her
25  first --

1    A.  Typically, with Adriamycin, I tell them
2  around the third to the fourth week, you will lose
3  your hair.  By the time you come back for your
4  second -- for your third round of chemotherapy,
5  which is six weeks, there is not going to be any
6  hair left.
7    Q.  Do you typically tell them how long their
8  hair will take to grow back?
9    A.  I tell them that it will start to grow about
10  three months from the last round of chemotherapy.
11    Q.  Ms. Guilbault testified at her deposition,
12  and it's also contained in her calendars, that she
13  had initial hair regrowth during the time she was
14  getting infused with Docetaxel.  Is that uncommon?
15    A.  It's not --
16    MS. REYNOLDS:  Object to --
17    (Simultaneous crosstalk.)
18    THE WITNESS:  -- really --
19    MS. REYNOLDS:  -- form.
20    THE WITNESS:  -- hair.  We call it fuzz.
21    You know, it's baby hair that grows, but
22    this is not the permanent hair that
23    ultimately grows back.  I don't recall the
24    specifics in her case, but having been
25    through this with many patients, I tell them

1  that this is not the permanent hair.
2  BY MR. ROTOLO:
3    Q.  Why did you recommend that Ms. Guilbault
4  take an aromatase inhibitor after chemotherapy?
5    A.  She had an estrogen-driven cancer, based on
6  the positive estrogen receptors.  So that's the
7  standard of care.
8    Q.  And you chose to prescribe Arimidex?
9    A.  Yes, sir.  I could have given her Letrozole,
10  but we're all creatures of habit.  So I prescribed
11  Anastrozole rather than Letrozole.  They're
12  equivalent.
13    Q.  Have you -- you prescribed Arimidex because
14  you had experience with that medication?
15    A.  I have experience with both, and -- but I
16  have chosen to give the Arimidex in the adjuvant
17  setting rather than the Letrozole.
18    Q.  How do those medications work?
19    A.  First of all, they only work in
20  postmenopausal patients.  You've got to be
21  absolutely certain that the ovaries are not
22  producing estrogen.  So the way they work, there are
23  two little glands called the adrenal glands that sit
24  under your kidneys.
25    So the adrenal glands make male hormones.

1  The male hormones will circulate.  They'll go to the
2  fatty cell, that will be converted to female
3  hormones by an enzyme called the aromatase.  So the
4  aromatase inhibitors basically block the conversion
5  of the adrenaline derived androgens to estrogens.
6    Q.  And when you prescribe medication such as
7  Arimidex, do you discuss with the patient the risk
8  and benefits of that medication?
9    A.  Yes, sir.
10    Q.  And what would you have told Ms. Guilbault
11  about the risk and benefits of taking Arimidex?
12    A.  So, typically, there are five side effects
13  where you see statistically significant differences
14  from placebos.  Those are the hot flashes, so I tell
15  them there's a 30-percent chance of hot flashes.
16  There's a 30-percent chance of achy joints and
17  muscle aches and pains.  There is a 1-percent risk
18  of thrombosis.  There's a tendency to develop
19  osteoporosis, and there is sexual dysfunction from
20  vaginal dryness.  Those are the side effects I
21  typically discuss.
22    Q.  And Ms. Guilbault understood those risks and
23  accepted them?
24    A.  I don't recall the discussion, but this is
25  the discussion that I'm having multiple times every

26 (Pages 98 - 101)

1 record, would you have had a discussion with her
2 with regard to the possible causes of that alopecia?
3    A. I do --
4        MS. REYNOLDS: Objection to form.
5        THE WITNESS: -- not recall. But by that
6        time -- we're looking at 2015 now -- it was,
7        you know, common knowledge that you do get
8        those based on the Docetaxel, the hair --
9        lack of hair growth. So I suspect that I
10       had the discussion about the role of
11       Docetaxel.
12 BY MR. ROTOLO:
13    Q. Doctor, I'm trying to hurry to get through
14 this. I know you have a long day, probably.
15    A. No, it's okay. I'm used to it.
16    Q. So am I, but it doesn't make it any easier.
17       Can you turn to Tab 91.
18       MR. ROTOLO: And I will mark that as
19       Exhibit 19.
20       (Whereupon Exhibit No. 19 was marked for
21       identification.)
22       THE WITNESS: Yes, sir.
23 BY MR. ROTOLO:
24    Q. This is an office visit for July 18th of
25 2017.

1        And if you'll go to Bates Number page 1829.
2    A. Yes, sir.
3    Q. You indicate as Number 3, "Alopecia
4 secondary to Docetaxel"?
5    A. Yes, sir. I see that.
6    Q. This is the date after which Ms. Guilbault
7 had filed her lawsuit. Did she have a discussion
8 with you on that date about her Docetaxel lawsuit?
9    A. At some point she did mention that she had
10 joined a class action. Was it at the time of that
11 visit? I don't really know. But looking at my
12 physical exam, the wording is different. This isn't
13 something that was carried over. So I suspect that
14 I looked at her scalp that day.
15    Q. Okay. You'll notice, if you look at the
16 page before, on Bates Number page 1828 --
17    A. Yes.
18    Q. -- it now says, "Still has alopecia on her
19 vertex," rather than "the mild alopecia on her
20 vertex" you had indicated in your previous records.
21    A. Yes, sir.
22    Q. Do you know why there was a change there?
23    A. I probably dictated that note. And I -- you
24 know, I didn't quantitate the alopecia. I just
25 mentioned that she still has alopecia.

1    Q. Okay. Doctor, if you can turn to Tabb 99.
2    A. Yes, sir.
3    Q. This is an office visit on August 9th of
4 2019.
5        MR. ROTOLO: And I'll mark that as
6        Exhibit 20.
7        (Whereupon Exhibit No. 20 was marked for
8        identification.)
9 BY MR. ROTOLO:
10    Q. If you can turn to Bates Number page 3108.
11    A. Yes, sir.
12    Q. If you look at those, it indicates,
13 "Ms. Guilbault had a lot of questions about the
14 alopecia from Taxotere. Apparently, she's involved
15 in the class action, and her case will be heard in
16 court sometime in the next few months. She informed
17 me that I will most likely be deposed."
18    A. Yeah.
19    Q. Do you remember what questions she had for
20 you on that visit?
21    A. No. I do remember that -- you know,
22 obviously, with this visit she told me that there
23 was a chance I'm going to get deposed, and that's
24 why I documented that.
25        And, just looking at my exam, it says she

1 still has alopecia. So that was probably one of the
2 days that I looked at the scalp; otherwise, I
3 wouldn't have, you know, wrote that much about the
4 alopecia.
5    Q. Doctor, do you have a recollection of what
6 Ms. Guilbault's hair looked like on August 5th of
7 2020?
8    A. No, sir. I don't even know when was the
9 last time I actually looked at the hair. Is it --
10 was that the last time I saw her, August 2020?
11    Q. Yes. August 5th of 2020.
12    A. Yeah. No, I do not recall.
13    Q. Okay. Let me show you --
14    A. Okay. Personally, I wouldn't expect the
15 hair growth to look any different. You're talking
16 six, seven years after the chemotherapy. At that
17 point, whatever you're seeing is no longer
18 reversible. I don't expect that the hair will get
19 any better.
20    Q. And, Doctor, is that from any -- based on
21 any literature or any --
22    A. No. It's based -- you know, following these
23 patients over years. And, again, I would have told
24 her, if she had asked me that, I don't expect it to
25 get any better. I don't recall that she asked me

31 (Pages 118 - 121)

Page 122

1 that. She probably didn't, but that would been my
2 answer had she asked me.
3   Q. Let me have my assistant pull up some
4 pictures that were provided by Ms. Guilbault in
5 January of 2020, which would have been about five
6 years after the other ones that we've looked at and
7 about six or seven months before this last visit
8 that you had with her. And we'll mark those as
9 Exhibit 21.
10     (Whereupon Exhibit 21 was marked for
11     identification.)
12 BY MR. ROTOLO:
13   Q. And those will be shown on the screen. You
14 don't have them in your notebook.
15     Do you see those -- are you able to see
16 those pictures on your screen, Doctor?
17   A. Yes, sir. I see the first one.
18   MR. ROTOLO: And can you show him the second
19     one. There's one more, I think.
20   Q. And, Doctor, do those pictures look like
21 what you remember seeing of Ms. Guilbault's hair the
22 last time you examined her scalp?
23   A. Yes, sir. Pretty much that's what she looks
24 like.
25   Q. Do you see any difference between the

Page 123

1 pictures that we looked at in June of 2015 and these
2 from January of 2020?
3   MS. REYNOLDS: Object to form.
4   THE WITNESS: You know, it's hard for me to
5     tell without looking at them side-by-side,
6     but I wouldn't with the vertex. I'm not
7     going to say that it's any better.
8 BY MR. ROTOLO:
9   Q. Does it look like it's gotten worse?
10   MS. REYNOLDS: Object to form.
11   THE WITNESS: I can't really tell. Clearly,
12     it hasn't gotten better.
13 BY MR. ROTOLO:
14   Q. Doctor, would it be fair to say that you
15 would leave that determination up to a
16 dermatologist, and someone more experienced in
17 alopecia?
18   A. That would be fair.
19   MR. ROTOLO: If you could take those down,
20     please.
21   Q. Doctor, what is the difference between --
22     Oh. Doctor, the photographs that we looked
23 at, both from 2015 and 2020, can you say with any
24 degree of certainty, medical certainty, that the
25 hair loss that we saw was caused by Docetaxel?

Page 124

1   MS. REYNOLDS: Object to form.
2   THE WITNESS: I think that it is more likely
3     than not that this is a toxicity of
4     Docetaxel. It is consistent with a pattern
5     that I have seen previously with Docetaxel.
6 BY MR. ROTOLO:
7   Q. Can you rule out a family history of female
8 pattern baldness?
9   MS. REYNOLDS: Object to form.
10   THE WITNESS: I cannot rule out, but it
11     would be unlikely -- way less likely than
12     Docetaxel.
13 BY MR. ROTOLO:
14   Q. Can you rule out Arimidex that was started
15 while her hair was regrowing?
16   MS. REYNOLDS: Object to form.
17   THE WITNESS: It would be very, very, very
18     unusual for that pattern to be with the --
19     associated with the Anastrozole.
20 BY MR. ROTOLO:
21   Q. Doctor, what's the difference between a
22 clinical trial and a case report?
23   A. A case report is an anecdotal case or a
24 series of anecdotal cases. A clinical trial,
25 typically, there is randomization; not always, but

Page 125

1 for a phase 3 clinical trial, there is
2 randomization.
3   Q. Do you agree with me that a case report does
4 not equate to causation?
5   A. Correct.
6   Q. Doctor, are you familiar with what the
7 current Docetaxel label states with regard to
8 alopecia?
9   A. I haven't read it.
10   Q. Doctor, is the current language -- the
11 current FDA-approved language in the Hospira
12 Docetaxel label refers only to cases of permanent
13 hair loss have been reported.
14     Do you know if that's what it says?
15   MS. REYNOLDS: Object to form.
16   THE WITNESS: I haven't read the specific,
17     you know, package insert from Hospira.
18 BY MR. ROTOLO:
19   Q. Well, would you agree that if it only -- if
20 the FDA-approved labels says that cases of permanent
21 alopecia have been reported, that that does not say
22 that Docetaxel causes permanent hair loss?
23   MS. REYNOLDS: Object to form.
24   THE WITNESS: Again, between the two
25     Taxanes, that's the only Taxane where we

32 (Pages 122 - 125)

Page 126

1    have seen those anecdotal cases.  So that's
2    as far as one can go.
3  BY MR. ROTOLO:
4    Q.  Doctor, you testified earlier that case
5  reports were not causation; correct?
6    A.  Correct.
7    Q.  And if the label says that cases of
8  permanent alopecia have been reported, would you
9  agree with me that those case reports do not equate
10 to causation?
11   MS. REYNOLDS:  Objection to form.
12   THE WITNESS:  These reports are not
13   hypothesis-generated.  You know, they always
14   raise a red flag, and when you see a lot of
15   those, you wonder.
16 BY MR. ROTOLO:
17   Q.  You wonder, but it doesn't establish
18 causation, does it, Doctor?
19   A.  It doesn't establish --
20   MS. REYNOLDS:  Objection to form.
21   THE WITNESS:  It doesn't establish, but it's
22   enough to sway us to change the pattern of
23   treatment.
24 BY MR. ROTOLO:
25   Q.  Doctor, I'm going to look through my notes,

Page 127

1  but instead of delaying things, I'm going to turn
2  you over to Jessica in case she has any questions
3  for you while I do that.
4    A.  Okay.
5    MS. REYNOLDS:  Just a moment.  Let's see.
6  EXAMINATION
7  BY MS. REYNOLDS:
8    Q.  Thank you so much for being here with us
9  today, Dr. Theodossiou.  I greatly appreciate it,
10 and I would like to just apologize formally for my
11 technological glitch earlier.
12   I do have some questions or some issues that
13 I'd like to discuss with you, if that's okay.
14   A.  Yes, ma'am.
15   Q.  One of the primary ones being:  I want to
16 make sure that I fully understand the best that I
17 can when you learned that there was an association
18 between Docetaxel or Taxotere and this risk for
19 permanent alopecia.
20   How did you first learn that there was a
21 risk of permanent alopecia with the use of Taxotere?
22   MR. ROTOLO:  Object to form.
23   THE WITNESS:  I cannot give you an exact
24   time.  Again, Taxotere has been used in the
25   preoperative setting since 2002, 2003.  So

Page 128

1    it was a few years after that that those
2    cases started popping up.  My guess is it
3    was in the early part of the last decade
4    that we realized that we were seeing those
5    patients.
6      And then, you know, I have only seen one
7    patient with total alopecia, and that was
8    about four years ago, maybe five years ago,
9    and that's when I changed my pattern.  Most
10   of the patients I have seen and I have -- I
11   can recall at least four or five patients
12   with the similar alopecia pattern as
13   Ms. Guilbault.
14 BY MS. REYNOLDS:
15   Q.  You had mentioned earlier something about a
16 TV advertisement in regards to permanent alopecia in
17 Taxotere.
18   Can you tell me what you were referring to?
19   A.  I've seen it every once in a while -- they
20 still play it -- that if you received Taxotere for
21 breast cancer and your hair didn't grow back, call
22 so and so.  I started seeing that advertisement -- I
23 don't know -- it's been around for about eight,
24 nine years, maybe.
25   Q.  Would you have any reason to disagree with

Page 129

1  me if I told you that the first case that was filed
2  was filed roughly sometime around 2015, in terms of
3  Taxotere lawsuits?
4    A.  No.  I have no reason to disagree with you,
5  if you say so.
6    Q.  Sure.
7      So is it possible that any television
8  advertisements that you saw related to that may have
9  actually occurred earlier than -- or excuse me --
10 later than that time period you just gave me?
11 Sometime, say, 2015 or after?
12   A.  Honestly, I cannot recall when I started
13 seeing those advertisements.  I know it was within
14 the last decade, but I cannot narrow it down.
15   Q.  Sure.  And that's fair enough.
16   A.  But I will say this:  When I started seeing
17 those advertisements, what I started telling the
18 patients, that there is a small risk that the
19 alopecia will be more of an issue.
20   Q.  Prior to seeing those advertisements, did
21 you routinely inform your patients that if they
22 elected to use Taxotere, there was a risk that they
23 could have permanent hair loss?
24   A.  I don't recall.  I think that it became an
25 issue in the medical community sometime within the

33 (Pages 126 - 129)

Page 130

1 last ten years. And when it became an issue is when
2 I started mentioning that, you know, there is a
3 small minority of patients, two to three percent,
4 that have issues with hair growth.
5    Q. Well, would it be fair to say -- and I know
6 it's a little difficult to come up with a specific
7 timeline, so maybe we could discuss it in a
8 different manner.
9    But is it fair to say that once you learned
10 of this risk between Taxotere and permanent hair
11 loss, that you began warning your patients of the
12 potential for this risk?
13    A. It is fair.
14    MR. ROTOLO: Object to form.
15 BY MS. REYNOLDS:
16    Q. And if Ms. Guilbault had testified that
17 when -- that she was not warned that Taxotere might
18 have a risk for permanent alopecia, would that lead
19 you to believe that perhaps at the time you
20 initially treated her that you were not aware of
21 that risk?
22    MR. ROTOLO: Object to form.
23    THE WITNESS: Honestly, I don't think I was
24    aware of the magnitude of the problem back
25    then, but I cannot tell you exactly when I

Page 131

1    saw my first patient with alopecia issues
2    post-Taxotere.
3 BY MS. REYNOLDS:
4    Q. Sure. And, just in your general practice,
5 if you would have known of the risk of permanent
6 alopecia at the time -- associated with Taxotere at
7 the time you treated Ms. Guilbault, is that
8 something you believe you would have shared with
9 her?
10    A. Absolutely.
11    Q. And if she would have expressed at that time
12 that she was not comfortable moving forward with the
13 use of Taxotere in her chemotherapy treatment, would
14 you have offered her another recommendation for
15 treatment?
16    A. I would have offered Taxol and told her that
17 there is -- this is a regimen that has not been
18 tried in the preoperative setting, but I had no
19 reason to suspect it was inferior.
20    Q. And I wanted to ask you about that as well.
21 But it was my understanding from your earlier
22 testimony that you're not offering any type of
23 opinion that Taxotere is more efficacious than
24 Taxol; correct?
25    A. No. The reason everybody was using Taxotere

Page 132

1 is --
2    MR. ROTOLO: Object to form.
3    THE WITNESS: -- the fact that the NSABP
4    study was done with Taxotere. So you don't
5    want to be improvising. You use the
6    right -- you try to emulate the regimen that
7    was used during a clinical trial.
8 BY MS. REYNOLDS:
9    Q. You said you believe that once you learned
10 of the risk of the association of permanent alopecia
11 with Taxotere, that that's when you began warning
12 your patients that there may be a potential for
13 development of permanent alopecia; is that correct?
14    A. Yes, that is correct.
15    MR. ROTOLO: Objection to form.
16    THE WITNESS: And then at some point I
17    talked to the other breast medical
18    oncologists here. We all have those cases.
19    We don't have a lot of cases, but we all
20    have those cases.
21 BY MS. REYNOLDS:
22    Q. It's just --
23    A. And I --
24    Q. I'm sorry. I didn't mean to interrupt you.
25 Go ahead.

Page 133

1    A. I'm sorry. Go ahead.
2    Q. No. No. No. You go ahead. It's hard
3 sometimes on Zoom to...
4    A. Yeah. At some point we decided that as a
5 system and more or less on this campus, we're not
6 going to use the Taxotere preoperatively.
7    Q. And that was, in part, due to another
8 patient you had in which you observed that she had
9 almost --
10    A. Correct. Correct.
11    Q. -- total hair loss permanently?
12    MR. ROTOLO: Object to form.
13 BY MS. REYNOLDS:
14    Q. And you mentioned earlier that you had
15 experiences with some of your patients where the
16 risk of even temporary hair loss is a factor that
17 makes them unwilling to move forward with
18 chemotherapy; is that correct?
19    A. That is correct.
20    Q. And I believe you said that in those
21 situations you may potentially prescribe a CMF
22 regimen; is that fair?
23    A. Yeah. Right. Right. This is only in the
24 postoperative setting. The reason --
25    Q. I see.

34 (Pages 130 - 133)

Page 134

1    A. -- we don't use that in the preoperative
2 setting, it would have been malpractice to offer
3 that as the number one regimen.
4    Q. So in terms of Ms. Guilbault's situation
5 when she was under your care, that would not have
6 been a regimen that you would have suggested to her
7 if she would have asked for a --
8    A. No. There is no data using that regimen in
9 the preoperative setting, and it is clearly inferior
10 compared to, you know, the current standard of care
11 in the preoperative setting. I wouldn't have used
12 that.
13    Q. In terms of the other alternatives that you
14 may have offered her, I know you said that you would
15 have offered Taxol, along with an anthracycline and
16 Cyclophosphamide.
17    Are there any other regimens that you would
18 have been willing to consider if she would have
19 sought a different regimen at that time?
20    A. Let me -- let me phrase it this way:
21 Whatever decisions were made were made in the
22 context of the patient's age and the goals of the
23 treatment. Here I had a relatively young patient,
24 and we were trying to treat a curable illness. So I
25 wouldn't want to compromise the efficacy.

Page 135

1    Q. But you would have still been willing to
2 offer her Taxol at that time; correct?
3    A. Yes. But I don't think I'm compromising the
4 efficacy by switching from Taxotere to Taxol. There
5 is --
6    Q. This --
7    A. There is data in the postoperative setting
8 that they're equivalent. Now, I'm extrapolating
9 from the postoperative chemotherapy setting to the
10 preoperative chemo setting, but I have no reason to
11 suspect that it's inferior.
12    Q. If you would have known then what you know
13 now, about the risk of Taxotere causing permanent
14 alopecia, would you have still recommended Taxotere
15 as a treatment to Ms. Guilbault?
16    A. No. I'm --
17    MR. ROTOLO: Objection to form.
18    THE WITNESS: -- telling you we switched,
19    and we no longer use Taxotere in this
20    setting.
21    Now, there are different patients where
22    we still use Taxotere in the preop setting,
23    but those are primarily the HER2 positive
24    patients. For a HER2 negative patient, who
25    needs preop chemo, we don't use Taxotere.

Page 136

1    We automatically go to Taxol.
2 BY MS. REYNOLDS:
3    Q. Okay. And I have to confess, my
4 understanding of the NCCN certainly is rudimentary
5 in comparison to yours, but my basic understanding
6 is that the treatment options are different, in
7 part, based on the HER2 status; is that correct?
8    A. Correct. But for the HER2 positive
9 patients, the standard of care is still a
10 Taxotere-based regimen.
11    Q. But, in this case, Ms. Guilbault's case, she
12 was HER2 negative?
13    A. Correct. Correct.
14    I was just trying to make the point that
15 despite what we know, we still use it in the
16 preoperative setting in the right -- under the right
17 circumstances.
18    Q. Sure. And that would be based on each
19 individual patient's --
20    A. Correct.
21    (Simultaneous crosstalk.)
22 BY MS. REYNOLDS:
23    Q. -- chemo responsiveness or hormone status;
24 correct?
25    A. If I were -- if I were seeing Ms. Guilbault

Page 137

1 for the first time now, knowing what I know, I would
2 have offered four cycles of AC and then Taxol,
3 rather than Taxotere.
4    Q. Is it fair to say that when you treated
5 Ms. Guilbault back in 2013, you did not know then
6 what you know now about the risk of permanent
7 alopecia associated with Taxotere?
8    MR. ROTOLO: Objection to form.
9    THE WITNESS: It's fair to say that.
10 BY MS. REYNOLDS:
11    Q. You can answer. Go ahead.
12    A. I said, yes, it is fair to say that.
13    Q. Thank you.
14    And I believe, just to make sure that it's
15 consistent, that you had stated earlier that if you
16 had been aware of that risk at the time, that is
17 information that you would have given to
18 Ms. Guilbault; correct?
19    A. Correct.
20    MR. ROTOLO: Object to form.
21 BY MS. REYNOLDS:
22    Q. Do you believe as an oncologist that it's
23 important to warn patients of potentially permanent
24 side effects?
25    A. We always do if we're aware of the side

35 (Pages 134 - 137)

Page 146

1       Was that after the litigation and TV
2  advertisements started occurring?
3       A. Yes, sir. And, you know, when I say
4  campus-wide changes, I'm referring to the
5  New Orleans campus. I don't know what they do in
6  Baton Rouge or North Shore or the other Ochsner
7  facilities. There are three medical oncologists
8  that treat breast cancer at this campus, and we've
9  pretty much decided that we will switch from
10 Taxotere to Taxol.
11      Q. And that's you, Doctor, and is that
12 Dr. Larned?
13      A. Dr. Larned, Dr. Cole, and Dr. Xiao, who left
14 last week. So we're the ones seeing the majority of
15 the breast cancer here.
16      Q. Okay. And, Doctor, do I understand your
17 testimony that you testified that the only
18 alternative you would have considered and
19 recommended for Ms. Guilbault would have been to
20 substitute Docetaxel with Taxol; correct?
21      A. Yes, sir. It's not evidence-based, but this
22 is based on clinical judgment and based on studies
23 of the postoperative chemotherapy setting to show
24 that there was equivalency between the two.
25

Page 147

1       Q. Doctor, those studies that were done, were
2  those studies done before September of 2013?
3       A. Oh, yes. I'm talking about studies from the
4  '90s and early 2000s. So these are studies that are
5  at least 15, 20 years old.
6       Q. But, Doctor, were there some studies
7  specifically, like, in 20 -- 2006, that indicated
8  there was a difference in efficacy between Docetaxel
9  and Paclitaxel?
10      A. I think that was the stage 4 patients. In
11 the adjuvant setting, which is postoperative, there
12 was essentially -- there was a study that looked at
13 different doses of Taxol and Taxotere. They looked
14 at the weekly Taxol; weekly Taxotere; two, three
15 week Taxol; two, three week Taxotere. Basically,
16 there was no difference in the efficacy.
17      Q. Is that the Jones Study that you're
18 referring to?
19      A. I don't recall the name, but it's -- you
20 know, this is an old study from probably the late
21 1990s. It was a four-arm regimen.
22      Q. You testified when Ms. Perez was asking you
23 some questions that, typically, if there was an
24 issue with hair, you would order blood work and then
25 you would send the patient to a dermatologist.

Page 148

1       A. I typically -- I rarely order the blood work
2  myself. I tell them that, you know, this is a
3  primary care issue. Your primary care physician
4  should do that. If I were your primary care
5  physician, those are the things I would check.
6       Now, for the occasional patient who does not
7  have a primary care physician, I may have ordered
8  this myself just to facilitate the care. But I
9  don't want to be doing primary care in this clinic.
10      Q. Do you know if Ms. Guilbault had a primary
11 care physician?
12      A. I do not.
13      Q. And, Doctor, I just want to be clear because
14 you said something when Ms. Perez was questioning
15 you.
16      You said you were -- and we've talked about
17 this, but I just want to make sure I understand --
18 you said you were swayed to change from Docetaxel to
19 Paclitaxel by the one patient who had no hair; is
20 that correct?
21      A. Correct.
22      Q. And, Doctor, finally, you indicated that
23 your current -- after the TV ads and things, your
24 current warning that you give to patients that you
25 are giving Docetaxel to is that the risk of

Page 149

1  permanent hair loss is rare, but it happens; is that
2  correct?
3       A. Correct. And, again, there are still
4  certain cohorts of patients that using Taxotere is
5  the right thing to do, such as HER2 positive
6  patients, both in the pre and postoperative setting,
7  and no negative -- HER2 negative patients in the
8  postoperative setting.
9       So for those patients we still give
10 Docetaxel, but I tell them that, "Look, this is the
11 drug that you may have seen the advertisements on TV
12 about permanent hair loss, but I would still
13 recommend you take it." And if they refuse, that's
14 where I use the CMF regimen that I mentioned
15 earlier.
16      Q. And, Doctor, with regard to Ms. Guilbault
17 specifically, her treatment that consisted of
18 surgery, radiation, aromatase inhibitor therapy, and
19 a chemotherapy regime with AC plus Docetaxel, that
20 has resulted in her, at this date, being cancer
21 free?
22      MS. REYNOLDS: Object to form.
23 BY MR. ROTOLO:
24      Q. Or not having a recurrence of cancer?
25      A. Yes. I mean part of it is, obviously, the

38 (Pages 146 - 149)

Page 150

1  biology.  Part of it is the treatment that she
2  received and the fact that she's still being
3  treated, even though she's more than five years out.
4        Honestly, if you had asked me six years ago
5  when I started the Anastrozole would I have thought
6  that she would be disease-free in 2020, I would tell
7  you she would have been more likely to have had a
8  recurrence by now.  So she's done very, very well,
9  but I do not consider her being cured.
10  Q.  Okay.  Thank you, Doctor.  That's all the
11  questions I have.
12      MS. REYNOLDS:  Thank you very much.
13      THE WITNESS:  You're welcome.
14      THE VIDEOGRAPHER:  We are going off the
15      record at 4:58 p.m., and this concludes
16      today's testimony given by Dr. Theodossiou.
17      The total number of media units used was two
18      and will be retained by Veritext Legal
19      Solutions.
20        Thank you.
21
22      (Deposition adjourned at 4:58 p.m.)
23
24
25

Page 152

1  contractual relationships, as defined by Louisiana
2  Code of Civil Procedure Article 1434 and in rules
3  and advisory opinions of the board; that I have no
4  actual knowledge of any prohibited employment or
5  contractual relationship, direct or indirect,
6  between a court reporting firm and any party
7  litigant in this matter nor is there any such
8  relationship between myself and a party litigant in
9  this matter.  I am not related to counsel or to the
10  parties herein, nor am I otherwise interested in the
11  outcome of this matter.
12
13
          This the 8th day of December, 2020.
14
15
16
17
18      _____
          NOELLE C. KRAWIEC, CCR
19
20
21
22
23
24
25

Page 151

1      C E R T I F I C A T E
2
3      Certification is valid only for a transcript
4  accompanied by my original signature and
5  Original required seal on this page.
6
7      I, Noelle C. Krawiec, Certified Court
8  Reporter in and for the State of Louisiana, and
9  Registered Professional Reporter, as the officer
10  before whom this testimony was taken, do hereby
11  certify that CHRIS THEODOSSIOU, M.D., after having
12  been duly sworn by me upon authority of R.S.
13  37:2554, did testify as hereinbefore set forth in
14  the foregoing 146 pages; that this testimony was
15  reported by me in the stenotype reporting method,
16  was prepared and transcribed by me or under my
17  personal direction and supervision, and is a true
18  and correct transcript to the best of my ability and
19  understanding; that the transcript has been prepared
20  in compliance with transcript format guidelines
21  required by statute or by rules of the board, and
22  that I am informed about the complete arrangement,
23  financial or otherwise, with the person or entity
24  making arrangements for deposition services; that I
25  have acted in compliance with the prohibition on

39 (Pages 150 - 152)