UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

MDL NO. 16-2740

*This document relates to:*
Clare Guilbault, Case No. 2:16-cv-17061

## HOSPIRA'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

Plaintiff's claim is prescribed because she sustained her alleged injury in August 2014, six months after her chemotherapy, yet did not file her complaint until December 2016—more than two years later. Plaintiff contends that prescription was tolled based on Ms. Guilbault's conversations with her doctors in 2014 and 2015. As confirmed by recent opinions from the Fifth Circuit and this Court, however, these conversations do not toll prescription.

*First,* Ms. Guilbault's conversations with her doctors seeking *treatment* for her hair loss were not a reasonable investigation into its *cause*. Indeed, the Fifth Circuit recently held that a plaintiff did not conduct a reasonable investigation where, like Ms. Guilbault, she "asked her dermatologist to give her something to make her hair regrow, but she did not inquire into the cause of the hair loss or its persistence." *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Thibodeaux/Francis/Johnson),* 2021 WL 1560724, at *6 (5th Cir. Apr. 21, 2021) ("*Thibodeaux*"). Moreover, although one of her dermatologists testified that she informed Ms. Guilbault that she had androgenetic alopecia, there is no evidence that Ms. Guilbault relied on that opinion. Rather, she testified that she believed her hair loss was caused by her chemotherapy, and there is no evidence that this conversation, or any other conversation, led her to believe otherwise or to change her conduct. In addition, her conversation with her dermatologists would not suspend prescription for long enough to save her claim in any event.

*Second*, Ms. Guilbault's conversations with her doctors do not toll prescription because a reasonable inquiry includes not only "consultation with doctors," but also the plaintiff's "search

for the cause herself." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, slip op. at 7 (E.D. La. Apr. 28, 2021), ECF No. 12532 ("*Hughes*") (quoting *Thibodeaux* at *6). The Fifth Circuit and this Court have held that the publicly available information on the risk of permanent alopecia was sufficient to put plaintiffs on notice of their claims, and plaintiffs are "charged with knowledge" of that information. *Thibodeaux* at *7; *Hughes* at 8. The same is true here. Had Ms. Guilbault done her own reasonable investigation into the cause of her permanent hair loss, she would have found the information that linked docetaxel to persistent alopecia.

*Third,* Plaintiff's Opposition has *no answer* to the undisputed evidence showing that any tolling would have ended by October 2015 at the latest, when (i) none of her attempted hair loss treatments had worked and (ii) even according to her own treating oncologist, Dr. Theodossiou, the risk of permanent hair loss from docetaxel was "common knowledge." Hospira's Mem. Supp. Mot. Summ. J. ("Br.") at 12-15, ECF No. 12386-1; Ex. 3 (Theodossiou Dep.) at 117:21-118:11. Not only did Ms. Guilbault have information on the risk of permanent hair loss available to her from public sources, but it was available from her *own doctor*. There is no dispute that, by this point, "through the exercise of reasonable diligence [Ms. Guilbault] should have considered [docetaxel] as a potential root cause of her injury," *Thibodeaux* at *7 (quotation marks and citation omitted), yet she waited more than a year to file her claim.

Thus, Ms. Guilbault's action is prescribed, and the Court should grant summary judgment.

**I.     Ms. Guilbault's Claims Are Prescribed on their Face.**

Plaintiff's Opposition states that Hospira's position is a "misreading" of the Master Complaint, Pl.'s Mem. Opp. Hospira's Mot. Summ. J. ("Opp.") at 2, ECF No. 12511, but the Fifth Circuit and this Court have held otherwise. The Fifth Circuit affirmed that "[a]s a matter of law, the injury of 'an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy' is sustained when, six months after the completion of chemotherapy, a person has an absence of or incomplete hair regrowth." *Thibodeaux* at *4; *see Hughes* at 3-4. Ms. Guilbault completed chemotherapy in February 2014. *See* Pl.'s Resp. to Hospira's Statement of Undisputed Material Facts ("PSOF") ¶ 37, ECF No. 12511-1. Thus, Ms. Guilbault's alleged injury was

sustained in August 2014, "when, six months after the completion of chemotherapy, [she] ha[d] an absence of or incomplete hair regrowth." *Thibodeaux* at *4. Because she filed her lawsuit on December 9, 2016, more than two years after her alleged injury, Ms. Guilbault's claims are prescribed on their face.

**II.     The Doctrine of *Contra Non Valentem* Does Not Rescue Ms. Guilbault's Claims.**

   **A.     Ms. Guilbault's Conversations with Her Doctors Do Not Toll Prescription.**

Ms. Guilbault's conversations with doctors in 2014 and 2015 do not save her claims from prescription for three reasons:

1.     Her conversations with her doctors were focused on *treatments* for her hair loss, and there is no evidence that she "inquire[d] into the *cause* of the hair loss or its persistence," which is what a reasonable investigation requires. *Thibodeaux* at *6 (emphasis added). The Fifth Circuit considers "the standard of knew or should have known, to mean [plaintiff] needed to investigate [docetaxel] as a potential cause." *Id.* (internal quotation marks and citation omitted). Plaintiff's Opposition mischaracterizes the evidence by stating, without any citation to the record, that Ms. Guilbault "inquired about the cause of her ongoing lack of hair regrowth," Opp. at 7-8 (citing PSOF ¶ 38); *see* PSOF ¶ 38 (providing no record citation for this proposition). The testimony shows only that Ms. Guilbault consulted with her doctors about *treatment* options to encourage hair regrowth:

**Conversations with Dr. Theodossiou.**   Ms. Guilbault had conversations with her oncologist, Dr. Theodossiou, but she never asked him whether docetaxel caused her persistent hair loss.  She asked Dr. Theodossiou in April 2014 when her hair would return, but there is no evidence that she asked him *why* it had not yet returned.  Hospira's Statement of Undisputed Material Facts ("SOF") ¶ 37, ECF No. 12386-2.  In any event, this conversation does not toll prescription because it was *before* her August 2014 injury. *Hughes* at 6; *Thibodeaux* at *6.  Ms. Guilbault complained to Dr. Theodossiou in December 2014 that her hair had stopped regrowing, prompting him to suggest she give it time and try a multivitamin.  *Id.* ¶ 38.  But there is no evidence that she asked him *why* her hair had not grown back or whether her persistent hair loss was from

3

her use of docetaxel. In April 2015, she told Dr. Theodossiou the multivitamin was "not doing much," and he suggested she consult with a dermatologist; again, however, there is no indication that Ms. Guilbault asked Dr. Theodossiou *why* her hair loss persisted or the role of docetaxel. *Id.* ¶¶ 47-49.

*Conversations with Dermatologists.* Ms. Guilbault consulted with two dermatologists, Dr. Hooper and Dr. Terezakis, to treat her hair loss that she believed was caused by chemotherapy. When Ms. Guilbault saw Dr. Hooper at a skin cancer screening in May 2015, not only did she fail to ask about her lack of hair regrowth; *she told* Dr. Hooper that she had permanent hair loss "from chemotherapy." *Id.* ¶¶ 51-52; *see* Br. 5-6. In June 2015, Dr. Terezakis told Ms. Guilbault that she was suffering from androgenetic alopecia, but Ms. Guilbault did not testify that the purpose of her visit with Dr. Terezakis was to inquire into the cause of her hair loss or that she asked while she was there. To the contrary, Ms. Guilbault testified she made the appointment to see Dr. Terezakis because her daughter-in-law "heard that she had some sort of *treatment*," and during the appointment, Ms. Guilbault told Dr. Terezakis's intake staff that she "had had chemotherapy and that this was the state of my hair." Ex. 2 (Guilbault Dep.) at 235:20-236:12 (emphasis added); SOF ¶¶ 54-55.

Thus, Ms. Guilbault's conversations with doctors were not focused on investigating the cause of her injury. Rather, as Ms. Guilbault testified, she had already concluded that her chemotherapy had caused her persistent hair loss, and she was looking for a method to treat it. Ms. Guilbault's situation is therefore like *Thibodeaux*, where one of the plaintiffs (Ms. Francis) asked her oncologist's nurse practitioner "if he could prescribe her something to treat her hair"; consulted about treatment with her primary-care physician, who referred her to a dermatologist; then asked the dermatologist "to give her something to make her hair regrow." *Thibodeaux* at *6. *Contra non valentem* nonetheless did not toll prescription in Ms. Francis's case because "she did not inquire into the *cause* of the hair loss or its persistence." *Id.* (emphasis added). The Fifth Circuit's decision compels the same result here.

2. Ms. Guilbault cites no evidence that she *relied* on any conversation with her doctors to believe her hair loss was caused by anything other than her chemotherapy. She cites Dr. Terezakis's testimony that she told Ms. Guilbault she had androgenetic alopecia and Dr. Hooper's prescription of Rogaine for her. Opp. at 8. But she presents no evidence that these conversations led her to believe her hair loss was caused by anything other than chemotherapy or altered her conduct in any way. Rather, Ms. Guilbault's own uncontroverted testimony is that she believed her hair loss was "from chemotherapy." SOF ¶¶ 51-52. When she went to see Dr. Hooper and Dr. Terezakis, she sought *treatment* for hair loss that she believed was due to chemotherapy. SOF ¶¶ 51-55. She does not allege that Dr. Hooper told her anything about what caused her hair loss. And she did not testify that she *believed* Dr. Terezakis or that she relied on that opinion to suspend her investigation of what caused her hair loss. Indeed, while she recalls Dr. Terezakis telling her that her hair loss was "not from chemotherapy," she does not even recall Dr. Terezakis informing her that she had androgenetic alopecia. Ex.2, Guilbault Dep. at 236:18-23. Accordingly, there are no facts to support a claim that Plaintiff relied on any statements from Dr. Terezakis (or any other doctor) to believe that her hair loss was caused by anything other than her chemotherapy.

In addition, Plaintiff offers no valid response to Hospira's argument that these facts distinguish this case from previous decisions finding *contra non valentem* applied. *See id.* Plaintiff does not mention *In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 2019 WL 2995897 (E.D. La. July 9, 2019) ("*Earnest*"), at all, much less argue that it applies here. Plaintiff cites *Hoerner v. Wesley-Jensen*, 684 So. 2d 508 (La. Ct. App. 1996), but fails to rebut the key distinction: the plaintiff in that case "believed" her injury was *not* caused by her extended wear contact lenses, *id.* at 510, whereas the opposite is true here: Ms. Guilbault believed her hair loss was "from chemotherapy." SOF ¶¶ 52, 55.

3. Finally, the Opposition's focus on Ms. Guilbault's conversations with her dermatologists is a red herring: they could not have suspended prescription long enough to matter. Ms. Guilbault's injury accrued, and prescription began to run, in August 2014, *see* SOF ¶ 24, nearly nine months before Ms. Guilbault saw Dr. Hooper in May 2015 and ten months before she

5

saw Dr. Terezakis in June 2015, *id.* ¶ 54. Under Louisiana law, "the time which preceded the suspension is added to the time which follows it to compose the necessary period; *only the period of the suspension is deducted.*" *Shannon v. Vannoy*, 251 So. 3d 442, 448 (La. Ct. App. 2018) (emphasis added) (citing *LeBreton v. Rabito*, 714 So.2d 1226, 1229 (La. 1998)). Prescription indisputably was running in May 2016, when Ms. Guilbault admits she saw an attorney advertisement for "permanent hair loss related to Taxotere." PSOF ¶ 65. But Ms. Guilbault waited seven more months before filing suit in December 2016. *Id.* ¶ 68. Thus, even if her conversations with Dr. Hooper and Dr. Terezakis tolled prescription from May 2015 until May 2016, her claim is still prescribed because the prescription period was running for a total of at least 16 months.

      **B.**      **The Publicly Available Information Put Ms. Guilbault on Notice.**

Regardless of her conversations with her doctors, it is undisputed that Ms. Guilbault did not conduct a reasonable investigation into public sources of information, which would have put her on notice of a potential claim. Ms. Guilbault not only should have asked her doctors about the cause of her hair loss, but she also should have "search[ed] for the cause herself." *Hughes* at 7 (quoting *Thibodeaux* at *6). Under Louisiana law, she is "charged with knowledge of all that a reasonable inquiry would have revealed." *Thibodeaux* at *7. Plaintiffs' own allegations in the Master Complaint show that a plaintiff who conducted a reasonable investigation would be left with "knowledge—if not certainty—of whom to sue by 2015." *Id.* The Fifth Circuit held Plaintiffs' allegations that publicly available Facebook groups and newspaper articles associated docetaxel with permanent hair loss in 2006 and 2010 were "relevant to what a reasonable inquiry by [plaintiffs] would have uncovered." *Id.* at *6. In addition, given medical literature linking docetaxel to permanent hair loss was available in 2006, 2009, 2011, 2012, 2013, and 2014, the Fifth Circuit concluded that "[t]o the extent what was discovered was difficult to understand, the patient's consulting her oncologist, dermatologist, or other treating physician as to the meaning of the information would be part of diligence." *Id.* at *7. In *Hughes*, this Court applied the same analysis to hold that a plaintiff who completed treatment two years before Ms. Guilbault should have known within a year of her August 2012 injury whom she should sue. *Hughes* at 8.

This analysis applies with equal force to Ms. Guilbault. She does not allege that she performed any of her own research into the cause of her persistent hair loss when her hair had not grown back as expected. If she had, Ms. Guilbault would have discovered the same publicly available articles and medical literature. Thus, there is no basis for tolling because "[a] reasonable inquiry would have uncovered at least some information that linked [docetaxel] to persistent alopecia." *Id.* at 8 (quoting *Thibodeaux/Francis* at *7).

Indeed, all the cases cited by Plaintiff are inapposite because those courts found that the plaintiffs could *not* have discovered sufficient information had they investigated. *See Hoerner*, 684 So. 2d at 508 (insufficient information on the risk of a product defect available in the medical community); *Cortez v. Depuy Orthopaedics, Inc.*, 2016 WL 633665, at *3 (E.D. La. Feb. 17, 2016) (plaintiff "had no way of knowing who, if anyone, to blame"); *Guillot v. Daimlerchrysler Corp.*, 50 So. 3d 173, 182 (La. App. Ct. 2010) (plaintiffs "had no reason to suspect anything other than an unfortunate mistake"). Here, the Fifth Circuit and this Court have found the opposite is true with respect to Ms. Guilbault's alleged injury.

### C. Ms. Guilbault Was on Notice By October 2015 at the Latest.

Even if Ms. Guilbault's conversations with doctors had triggered tolling, that tolling would have expired by October 2015 at the latest. *Contra non valentem* does not toll prescription indefinitely; tolling lasts "*only until* the point when a prospective plaintiff through the exercise of reasonable diligence should have considered Taxotere or docetaxel as a potential root cause of her injury." *Hughes* at 5 (emphasis added) (quotation marks and citation omitted).

The undisputed evidence shows that Ms. Guilbault was on notice by October 2015 at the latest—more than a year before she filed suit. *See* Br. at 12-15. By then—*twenty months* after Ms. Guilbault's last chemotherapy treatment—Ms. Guilbault's hair had not regrown, despite her hopes that it would, and after she had tried an assortment of possible remedies to no avail. *Id.* at 11-14; SOF ¶¶ 52, 55. On October 2, 2015, Ms. Guilbault saw her oncologist, Dr. Theodossiou, for a follow-up visit during which he noted she still had alopecia on her head. PSOF ¶ 59. Dr. Theodossiou testified that at this point he considered it "common knowledge" that docetaxel was

7

associated with lack of hair regrowth, and he "suspect[s] that [he] had the discussion about the role of docetaxel" with Ms. Guilbault. Ex. 3 (Theodossiou Dep. at 117:21-118:11); *see* Br. 14-15.

Accordingly, at the October 2, 2015 visit, one of two things happened: Either Dr. Theodossiou told Ms. Guilbault that her persisting hair loss could have been caused by docetaxel—thereby putting her on actual notice—or Ms. Guilbault did not ask Dr. Theodossiou what caused her injury. Regardless, the undisputed evidence establishes that Ms. Guilbault was on constructive notice. By October 2015, Ms. Guilbault "realized that she had persistent hair loss" and that her repeated treatments had not worked; in those circumstances, it would be "unreasonable" for her to not ask her oncologist "to explain the cause of her unexpected hair loss." *Hughes* at 6-7. Dr. Theodossiou's testimony conclusively establishes that he would have told her about "the role of Docetaxel." Br. at 14-15; SOF ¶ 60; Ex. 3 (Theodossiou Dep. at 117:21-118:11). Thus, this evidence confirms that, by October 2015, "through the exercise of reasonable diligence [she] should have considered [docetaxel] as a potential root cause of her injury." *Hughes* at 5 (quoting *Thibodeaux/Francis* at *5).

Plaintiff does not even *attempt* to rebut this evidence. Plaintiff's Opposition does not even *mention* the October 2015 visit with Dr. Theodossiou at all, much less attempt to explain why she was not on notice then. That silence speaks volumes.

Finally, Plaintiff argues that prescription did not begin "until she saw an attorney advertisement in 2016 regarding litigation about Docetaxel," Opp. at 5, but "[t]he Fifth Circuit has addressed this argument" and rejected it, "h[olding] that such evidence fails to create an issue of fact on prescription." *Hughes* at 9 (citing *Thibodeaux* at *7).

D. **Plaintiff Has the Burden of Proving *Contra Non Valentem*.**

Plaintiff bears the burden of proof on her claim that *contra non valentem* applies. "The burden of proof is normally on the party pleading prescription; however, if on the face of the petition it appears that prescription has run, . . . the burden shifts to the plaintiff to prove a suspension or interruption of the prescriptive period based on the equitable doctrine of *contra non valentem*." *Hughes* at 3 (quoting *Thibodeaux* at 2) (alteration in original). Plaintiff argues that

8

this burden-shifting rule does not apply at the summary judgment stage and that Hospira instead bears the burden. Opp. at 3-4. Plaintiff is incorrect.

Plaintiff's argument is based on a misinterpretation of *Trahan v. BP Am. Prod. Co.*, 209 So. 3d 166 (La. 2016). In *Trahan*, plaintiffs brought their claim under Article 3493, which delays commencement of prescription until the date the plaintiff "acquired, or should have acquired, knowledge of the damages." *Id.* at 170 (quoting La. Civ. Code art. 3493). Thus, the "discovery rule" is part of the initial determination of whether the prescriptive period begins to run, separate and apart from any tolling. *Thibodeaux* at *3 (explaining that Article 3493 "explicitly incorporate[s] equity-based principles into the text that delay the beginning of the prescription period"). Accordingly, in *Trahan* the court held that the movant on summary judgment had the burden of showing "that there is no genuine material factual issue in dispute regarding the date upon which plaintiffs acquired actual or constructive knowledge of damage"—*i.e.*, that the prescriptive period had started to run. 209 So. 3d at 172.

Here, by contrast, Ms. Guilbault brings her claims under Article 3492, under which "prescription commences to run from the day the injury or damages is sustained." La. Civ. Code art. 3492. Because Article 3492 "does not incorporate equitable-tolling principles . . . that delay the beginning of the prescription period," the Court first determines the date of injury, which starts prescription, and then separately inquires whether *contra non valentem* tolls prescription. *Thibodeaux* at *3-4. Hospira is not required to prove when Ms. Guilbault had actual or constructive knowledge of her injury in the first step of the analysis; it need only present evidence of when she was injured. Because Ms. Guilbault was injured in August 2014 "[a]s a matter of law," the burden then shifts to Plaintiff to prove that *contra non valentem* should apply. *See Hughes* at 3-4 (quoting *Thibodeaux* at *2).

In any case, the issue is immaterial here. The Fifth Circuit left unanswered the question of whether the burden-shifting rule applies at the summary judgment stage, *Thibodeaux* at *2, because its holding did not depend on which party had the burden. Rather, as explained above, its reasoning was based on evidence put forward by the defendant as the moving party, including the

9

Master Complaint and deposition testimony from plaintiffs and their doctors. The same is true here. The undisputed evidence presented by Hospira shows that there is no genuine dispute that Ms. Guilbault knew or should have known of her potential claim more than a year before she filed suit. Thus, regardless of who has the burden, Ms. Guilbault's claims are prescribed and *contra non valentem* does not apply.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Ms. Guilbault's claims.

Date: May 6, 2021

Respectfully submitted,

*/s/ Heidi K. Hubbard*

Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Phone: (202) 434-5000
Fax: (202) 434-5029
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 858-7000
Fax: (504) 585-7075
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc.*

## CERTIFICATE OF SERVICE

  I hereby certify that on May 6, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                /s/ *Heidi K. Hubbard*