## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** <br><br> **This Document Relates to** <br><br> **Melissa Roach** <br> **Case No. 2:17-cv-07918** | **MDL No. 2740** <br><br> **SECTION "H" (5)** |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON STATUTE OF LIMITATIONS

Dated: March 8, 2021

## Table of Contents

I.    INTRODUCTION ............................................................................................ 1

II.    STATEMENT OF FACTS ............................................................................. 1

III.    ARGUMENT .................................................................................................. 3

    A.   Defendants misstate the summary judgment standard. ................................ 3

    B.   Ms. Roach exercised reasonable diligence and did not discover her injury. ................. 4

        1.   Ms. Roach reasonably did not know before that her hair loss might be permanent before August 16, 2014. ............................................................. 6

        2.   Ms. Roach reasonably did not know that she had an actionable injury. ................. 11

        3.   Taxotere's label substantiated the oncologist's opinion that Ms. Roach's hair loss was temporary. ............................................................................... 13

    C.   Defendants' fraudulent concealment prevented Ms. Roach and her doctor from discovering that her hair would not grow back. ................................................. 14

IV.    CONCLUSION ............................................................................................ 19

# Table of Authorities

**Cases**

*Angle v. Koppers, Inc.*, 42 So.3d 1 (Miss.2010) ............................................................... 9

*Austin v. Bayer Pharm. Corp.*, No. 5:13-CV-28-KS-MTP, 2013 WL 5406589 (S.D. Miss. Sept. 25, 2013)................................................................................................................... 10

*Brown v. Credit Center, Inc.*, 444 So.2d 358 (Miss.1983) .................................................. 4

*Bryant v. 3M Co.*, No. 2:13-CV-104-KS-MTP, 2014 WL 2761553 (S.D. Miss. June 18, 2014)  10

*Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367 (5th Cir.2011) ............................................. 4

*Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808 (5th Cir.2010) .................................... 3

*Daniels v. City of Arlington, Tex.*, 246 F.3d 500 (5th Cir.2001) ....................................... 3

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir.2009) ........................................................... 3

*Donald v. Amoco Prod. Co.*, 735 So.2d 161 (Miss.1999) ................................................. 5

*Illinois Cent. R. Co. v. Guy*, 682 F.3d 381 (5th Cir. 2012) .............................................. 11

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir.1991)................................... 4

*Mississippi Valley Silica Co., Inc. v. Barnett*, 227 So. 3d 1102 (Miss. App. 2016) .................. 10

*Phillips 66 Co. v. Lofton*, 94 So.3d 1051 (Miss.2012)............................................... 4, 13

*Ridgeway Lane & Associates, Inc. v. Watson*, 189 So.3d 626 (Miss.2016) ........................ 12, 13

*Robinson v. Cobb*, 763 So. 2d 883 (Miss. 2000) ............................................................ 14

*Sarris v. Smith*, 782 So. 2d 721 (Miss. 2001) ................................................................. 6

*Schiro v. Am. Tobacco Co.*, 611 So. 2d 962 (Miss. 1992)........................................ 7, 8, 9, 11, 13

*Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134 (5th Cir.2010) .............. 3, 4

*Smith v. Sanders*, 485 So.2d 1051 (Miss.1986) .............................................................. 11

*Smith v. Sneed*, 638 So.2d 1252 (Miss.1994) .................................................................. 5

*Staheli v. Smith*, 548 So.2d 1299 (Miss.1989) ................................................................ 5

*Stephens v. Equitable Life Assur. Soc'y of U.S.*, 850 So. 2d 78 (Miss. 2003).......................... 14

*Sutherland v. Estate of Ritter*, 959 So.2d 1004 (Miss. 2007) ............................................ 5

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir.2007)................................. 3

*Weathers v. Metro. Life Ins. Co.*, 14 So.3d 688 (Miss.2009) ............................................ 4

*Wright v. Quesnel*, 876 So.2d 362 (Miss.2004) .............................................................. 11

**Statutes**

21 C.F.R. § 314.70(c)...................................................................................................... 18

MISS. CODE ANN. § 15–1–49(1)...................................................................................... 4

MISS. CODE ANN. § 15–1–49(2)...................................................................................... 5

MISS. CODE ANN. § 15-1-67 .......................................................................................... 14

**Rules**

Fed. R. Civ. P. 56......................................................................................................... 3

## I.    INTRODUCTION

Plaintiff Melissa Roach ("Ms. Roach" or "Plaintiff") filed her Short Form Complaint ("SFC") on August 16, 2017.[1] Ms. Roach identifies her injury in her SFC as "[d]isfiguring permanent Alopecia beginning sometime after treatment with Taxotere (Docetaxel) and continuing to present."[2]

Mississippi has a three-year statute of limitations for product liability matters. Defendants Sanofi-Aventis U.S., LLC and Sanofi US Services, Inc. ("Defendants") claim that Ms. Roach's claim accrued in March 2010, six months after completing chemotherapy. However, Ms. Roach reasonably did not know before August 16, 2014 (three years before she filed suit), that her hair loss was permanent. In fact, some of Plaintiff's hair grew back and she reasonably believed it would continue to do so. At the very time Defendants claim Ms. Roach should have known that her hair loss was permanent, her treating oncologist was congratulating her on its regrowth. As her doctor was unaware that any chemotherapy drugs could even cause permanent hair loss, Ms. Roach was encouraged to believe that she would continue to recover. It was not until mid-2016 that she realized her injury, and she promptly filed suit.

## II.    STATEMENT OF FACTS

In early June 2009, at the age of forty-two, Ms. Roach found a lump in her breast during a self-examination.[3] She was diagnosed with HER2 positive stage two breast cancer.[4] Ms. Roach relied on her oncologist, Dr. Wail Alnas, to describe her chemotherapy options and inform her of the side effects she was likely to experience.[5] Dr. Alnas discussed two possible regimens and the

---

[1] Dkt. 2:17-cv-07918-JTM-MBN, Rec. Doc. 1.
[2] *Id.* at ¶ 12.
[3] Ex. A, Roach Dep. 185.
[4] *Id.* 187:14—25.
[5] *Id.* 218; 220—21.

potential side effects of each.[6] But her doctor did not disclose the risk of permanent hair loss, as he did not know that this was a possible consequence of the treatment.[7]

Ms. Roach took Taxotere from July 2009 through November 2009.[8] She experienced hair loss during her chemotherapy, as her doctor had told her to expect, but understood it would grow back and eventually return to normal at some point after she had finished treatment.[9] Her oncologist explained that her hair regrowth might be a different texture or color,[10] but the oncologist never informed Ms. Roach, and she did not believe, that her hair loss would be long-term or permanent.[11] In follow-up appointments with her oncologist in 2010, between six and twelve months after she had finished chemotherapy, her doctor commented that he was happy to see that her hair was growing back.[12]

But her hair never fully grew back. Ms. Roach considered over-the-counter products to stimulate hair regrowth, but they were prohibitively expensive, and after her ordeal with cancer, she was worried about putting "any more chemicals on [her] scalp. . . [She'd] already had enough chemicals pumped through and on [her] body."[13] Ms. Roach continued to believe what her oncologist told her—that her hair would come back.[14] In May 2016, Ms. Roach came across a Facebook advertisement regarding a lawsuit that linked use of a cancer drug she had taken to permanent hair loss, which made her believe that her hair loss may be permanent. As she told her husband:

---

[6] Ex. B, Alnas Dep. 27:1—5; 29.
[7] *Id.* 34:10—25; 35:17—25. *See* also Ex. C, Anthony Dep. 106—107.
[8] Dkt. 2:17-cv-07918-JTM-MBN, Rec. Doc. 1 ¶¶ 9—10; Ex. A, Roach Dep. 250
[9] Ex. A, Roach Dep. 222:1—4; 249:17—25; 250:1—6; 251:1—7.
[10] *Id.* 243:8—12; Alnas Dep. 69:1—6.
[11] Ex. A, Roach Dep. 247:19—21.
[12] *Id.* 304:16—307:3.
[13] *Id.* 272—4.
[14] *Id.* 83:8—10; 84:1—25; 104:10—14; 222:1—4; 243:8—12.

2

I remember telling him that I had run across something that might pertain to my situation and the chemotherapy drug that I had taken, and that it looked like the hair loss that I was experiencing was not temporary; it could be permanent.[15]

Ms. Roach filed her lawsuit on August 16, 2017, fifteen months after she discovered the possibility of a cause of action accruing.

## III.   ARGUMENT

### A.   Defendants misstate the summary judgment standard.

As the party moving for summary judgment on an affirmative defense, Defendants bear the burden of establishing each element of that defense.[16] Defendants claims that, "[P]laintiff bears the burden to prove that either [the discovery rule or fraudulent concealment] exception applies", but this grossly misstates the summary judgment burden. Ms. Roach's burden is simply to show that there is at least one material fact in dispute. Nothing more, nothing less.

It is hornbook law that a party moving for summary judgment must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation omitted). "An issue is material if its resolution could affect the outcome of the action.' *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)).

Under this standard, a Court cannot make credibility determinations or weigh the evidence. *Deville v. Marcantel,* 567 F.3d 156, 164 (5th Cir.2009) (citing *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir.2007)). When deciding whether a genuine fact issue exists, "the

---

[15] *Id.* 60:14—20.
[16] *Citigroup Inc. v. Fed. Ins. Co.,* 649 F.3d 367, 371 (5th Cir. 2011)

court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.,* 627 F.3d at 138. *See Pac. Ins. Co. v. Louisiana Auto. Dealers Ass'n*, 273 F.3d 392 (5th Cir. 2001) (table) ("[T]he court must be vigilant to draw *every* reasonable inference from the evidence in the record in a light most flattering to the nonmoving party.") (*quoting Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir.1991) (emphasis by Court) (citation omitted). *See also Brown v. Credit Center, Inc.*, 444 So.2d 358, 363 (Miss.1983) ("If there should be error, it should be denying the Summary Judgment in favor of a full live trial.").

Contrary to Defendants' argument, they retain the burden when they move for summary judgment on the statute of limitations: "When a party seeks summary judgment pursuant to an affirmative defense, such as a statute of limitation, the movant must establish all of the elements of the defense." *Citigroup Inc. v. Fed. Ins. Co.,* 649 F.3d 367, 371 (5th Cir.2011) (citation omitted). *See also Miss. Valley Silica Co. Inc. v. Barnett*, 227 So. 3d 1102, 1119 (Miss. App. 2016) (discovery rule is a jury question).[17] As explained below, viewing the facts in the light most favorable to Ms. Roach and taking all inferences in her favor, she reasonably thought before August 16, 2014 (three years before she filed suit), that her hair would grow back, and, in fact, it started to—although it only regrew to a limited degree.

**B. <u>Ms. Roach exercised reasonable diligence and did not discover her injury.</u>**

As Defendants note, "[a]ll actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." MISS. CODE ANN. § 15–1–49(1). In this case, Ms. Roach filed her lawsuit on August 16, 2017,

---

[17] Mississippi courts apply a similar standard. *Phillips 66 Co. v. Lofton*, 94 So.3d 1051, 1059 (Miss.2012) ("Discovery of an injury 'is an issue of fact to be decided by a jury when there is a genuine dispute.") (quoting *Weathers v. Metro. Life Ins. Co.*, 14 So.3d 688, 692 (Miss.2009)).

so the question is whether she needed to file suit before August 16, 2014 (three years before the filing date). As explained below, Ms. Roach timely filed suit because Mississippi's statutory discovery rule applies.

Under Mississippi's statutory discovery rule, "[i]n actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." MISS. CODE ANN. § 15–1–49(2). "[A] latent injury is an injury which is hidden or unseen." *Sutherland v. Estate of Ritter*, 959 So.2d 1004, 1008 (Miss. 2007). The Mississippi Supreme Court defines a latent injury as one where either the "plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question . . . [or] when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act." *Donald v. Amoco Prod. Co.*, 735 So.2d 161, 168 (Miss.1999) (*citing Staheli v. Smith*, 548 So.2d 1299, 1303 (Miss.1989); *Smith v. Sneed*, 638 So.2d 1252, 1257 (Miss.1994)).

In this case, Ms. Roach reasonably believed before at least August 16, 2014, that her hair would grow back—a belief that was supported by her doctors and a belief that appeared to be confirmed when her hair initially started to return. In arguing otherwise, Defendants repeatedly confuse presentation of a symptom with diagnosis of a long-term condition. Based upon this error, Defendants argue that the statute of limitations begins to run upon presentation of any symptom related to a long-term condition. To this end, they argue that given how "[t]he heart of each Plaintiff's case in this MDL is that the injury suffered was so apparent it stigmatized all Plaintiffs, their body image, and their social relationship," such an "injury was not hidden or unseen." This is one of Defendants' several straw man arguments. Permanent hair loss is a "hidden or unseen"

symptom, but mere hair loss is not the *injury* here. The injury is *permanent* hair loss. Under the discovery rule, the latency of a condition directly relates to the ability to diagnose its longevity.

1. **Ms. Roach reasonably did not know before that her hair loss might be permanent before August 16, 2014.**

Defendants argue that because the Master Complaint defines Permanent Chemotherapy-Induced Alopecia ("PCIA") as hair loss lasting longer than six months, Ms. Roach must have known within 180 days after chemotherapy that her hair loss was permanent. However, the Second Amended Master Complaint includes merely a generalized medical statement about alopecia. The six-month period of time in that paragraph in no way implies that *temporary* alopecia is magically morphed into *permanent* chemotherapy-induced alopecia at that six-month mark. In fact, the Defendants' own experts have testified, as the literature has stated, that there are several opinions on when a dermatologist specializing in disorders of the hair would determine that alopecia is "permanent"—even up to five years.

Defendants conflate infliction of injury with knowledge of it. Because Ms. Roach reasonably believed that her hair would return, *and it started to*, Defendants' argument lacks merit. "Application of the discovery rule is a fact intensive process." *Sarris v. Smith*, 782 So. 2d 721, 725 (Miss. 2001). Accordingly, this Court must take into account the specific circumstances and case history for each individual plaintiff. Here, at Defendants' proposed six-month deadline in May 2010, Ms. Roach could not have read the yet-to-be-drafted pleadings or reports by lawyers or opinions of experts that had not occurred. Such evidence is not dispositive (or even informative) on when Ms. Roach should have discovered that her hair would not return. The facts specific to Ms. Roach are both more important and real: her hair started to grow back. At the very time that Defendants claim Plaintiff knew that her hair loss was permanent, her oncologist was

congratulating her on her hair regrowth.[18] This was the same doctor who set her expectations that regrowth would be a lengthy process, and that it would come in differently than the hair she used to have, although it would eventually all return.[19]

Even if Ms. Roach had independently researched medical literature—at Defendants' proposed sixth-month deadline in May 2010—to decipher the difference between "temporary," "permanent," and "persistent" hair loss, she wouldn't have discovered the answer as there was no clear definition to find.[20] Some authors evaluated permanence at six months, but others used longer periods like three and a half years or five years.[21] Defendants even admitted in 2010 that hair loss is permanent after four years, but they said in 2015 that hair loss is permanent after two.[22] Obviously, then, any research would not have informed Ms. Roach that her hair loss was permanent after six months, after 3.5 years, after 4 years or after 5 years.

Under Mississippi law, Ms. Roach reasonably did not discover her injury before August 16, 2014, even though she had a symptom (hair loss) for a short time before it began to re-grow to some extent, not the condition of permanent chemotherapy-induced alopecia. The Mississippi Supreme Court, in *Schiro v. American Tobacco Co.* is particularly instructive on the distinction between symptom presentation and discovering the underlying, long-term condition.[23] The

---

[18] Ex. A, Roach Dep. 304:16—25.

[19] *Id.* 243:8—12; 247:19—21; 249:17—25; 250:1—6.

[20] Ex. G, Expert Report of Ellen G. Feigal, M.D. ("Feigal Report") at pp.41—66 (summarizing published articles on irreversible alopecia including endpoints).

[21] *See, e.g.,* p. 55 Nabholz (2001) defining "long-lasting" as longer than 2 years; Bertrand (2013) evaluating permanent hair loss five years after completion of chemotherapy; Kang (2018) evaluating permanent hair loss after following patients for three years); Second Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 4407 ¶¶ 157; 160.

[22] Ex. D, Expert Report of David A. Kessler, M.D. ("Kessler Report") at p. 21 *See also* Third Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 8334-4, ¶ 197.

[23] *Schiro v. Am. Tobacco Co.*, 611 So. 2d 962, 962 (Miss. 1992).

plaintiff in *Schiro* was a smoker from approximately 1943 to 1977. Over the years, doctors repeatedly told her to quit.[24]

Starting in the 1960s, she developed a variety of health problems (which are now known to be caused by her smoking). In April 1981, she began coughing up blood.[25] She thought that she may have cancer, but her doctor said that it wasn't cancer.[26] She coughed up blood again in November 1981, and tomograms in December 1981 revealed a small mass and surrounding lung disease in her chest.[27] She was admitted to the hospital on January 24, 1982, and the mass was diagnosed as malignant.[28] On January 22, 1988, she filed suit against multiple cigarette manufacturers to recover damages sustained from her lung cancer.[29]

The defendants in *Schiro* argued that the then applicable six-year statute of limitations began to run before 1982 when: (1) plaintiff stopped smoking in 1977, (2) she coughed up blood in April and November 1981, (3) she thought she had cancer in April 1981; or (4) doctors identified the mass in December 1981 (but before they diagnosed the mass as malignant).[30] Lower courts ruled that her claim was time-barred, and the issue on appeal before the Mississippi Supreme Court was whether or not the discovery rule tolled the statute in a products liability case involving a latent injury.[31]

The Mississippi Supreme Court reversed the lower courts' grant of summary judgment, holding that the plaintiff had not yet suffered a cognizable injury when she stopped smoking,

---

[24] *Id.* at 963.
[25] *Id.*
[26] *Id.* The applicable statute of limitations at the time was six years.
[27] *Id.* at 963.
[28] *Id.*
[29] *Id.*
[30] *Id*. at 964.
[31] *Id.*

coughed up blood, or thought she had cancer.[32] The court further held that the discovery rule tolled the statute of limitations beyond the date that doctors discovered the mass, reasoning that while plaintiff "was aware and, in fact, knew that she had sustained an injury[,] . . . [she] did not actually know that she had cancer. . . . [and] [t]here were affidavits from [plaintiff's] doctors and two family members that [she] did not have knowledge of the cancer until January 26, 1982."[33] The court concluded that "the statute commences upon discovery of an injury and that discovery is an issue of fact to be decided by a jury where there is a genuine dispute."[34]

The court in *Schiro* correctly recognized the distinction between the presentation of a symptom (the identification of the mass, and the bouts of coughing up blood) and the discovery of the injury (the diagnosis that the mass was malignant). Since the injury at issue was lung cancer, "the cause of action accrued on January 26, 1982, when the doctor diagnosed that the mass was cancerous."[35]

---

[32] *Id.* at 965.

[33] *Id.*

[34] *Id.* at 962.

[35] *Id.* at 965. In *Angle v. Koppers, Inc.*, 42 So.3d 1, ¶ 12 (Miss.2010), the Mississippi Supreme Court altered one aspect in its *Schiro* decision that is not at issue here, but left untouched the court's holding on the distinction between symptom (statute of limitations doesn't run) and knowledge of underlying condition (statute of limitations begins to run).

Specifically, the Court in *Schiro* appeared to state as an alternative basis that the statute of limitations also would not run—after diagnosis—until the plaintiff realized the cause for the diagnosed condition. The *Angle* Court held that this language in *Schiro* was error and that the statute ran from the date that *Schiro* learned of the underlying condition (diagnosis):

> "[I]n ***Schiro,*** we confused the issue by proceeding in dictum to analyze the defendants' argument that the plaintiff should have filed suit within six years of 1981, when the plaintiff discovered a 'mass.' The Court stated that, in 1981, the plaintiff **"did not actually know that she had cancer, *an injury connected with smoking*. Thus, even if she had brought suit at this point, the claim would have been premature." *Id.*** (emphasis added). We note that the proper inquiry under the statute should have been the plaintiff's discovery of the injury or disease, i.e., a <u>diagnosis of cancer</u>, not the discovery of a causative relationship between smoking and the <u>cancer</u>."

This case is like *Schiro*. Temporary hair loss is like a benign tumor. In *Schiro*, the malignancy diagnosis is what alerted the plaintiff to the underlying condition, not the discovery of the mass, because malignancy was the injury. Similarly here, temporary hair loss is *not* an injury, but an expected condition that will resolve on its own. *Permanent* hair loss is the injury.

The facts in this case as detailed above fit more easily within the discovery rule than the facts in *Schriro*. In that case, the plaintiff even thought she had cancer and knew of the mass, but the statute did not run until medical providers confirmed her fear that the mass was malignant. When doctors treat a person with symptoms and cannot identify the underlying condition or some salient feature of it (e.g., its permanence), Mississippi courts do not expect the layperson to know more than her doctors. *See Mississippi Valley Silica Co., Inc. v. Barnett*, 227 So. 3d 1102, 1121 (Miss. App. 2016) ("Under Mississippi law, notes in Howard's medical records suggesting the possibility of silicosis are insufficient to trigger the statute of limitations as a matter of law, and Dr. Julian Rose testified that he was first able to diagnose Howard with silicosis less than three years prior to the commencement of this lawsuit."); *Bryant v. 3M Co.*, No. 2:13-CV-104-KS-MTP, 2014 WL 2761553, at *2 (S.D. Miss. June 18, 2014) ("[A] plaintiff's cause of action may not accrue until he receives a diagnosis, despite previously receiving treatment for symptoms.") (internal citation removed); *Austin v. Bayer Pharm. Corp.*, No. 5:13-CV-28-KS-MTP, 2013 WL 5406589, at *2–3 (S.D. Miss. Sept. 25, 2013) (discovery rule tolled statute of limitations from date of symptom onset until diagnosis of condition). In this case, Ms. Roach reasonably trusted her doctors before August 16, 2014, that her hair would return.

---

In this case, Ms. Roach's doctors could not diagnose her permanent hair loss before August 16, 2014, so the *Angle*-clarification is irrelevant.

Much like the plaintiff in *Schiro*, Ms. Roach discussed with her oncologist a symptom,[36] but her doctor could not provide her with a diagnosis that would reveal the injury for which she would later bring suit. At the very time Defendants argue Ms. Roach was aware that her hair loss was permanent, her doctor commented to her that he was "pleased that he could see [her] hair coming back."[37] Her injury was obscured by the blessing that some of it grew back despite her Taxotere use, although to a limited degree. As she describes her hair loss at present:

> My hairline, my forehead. My entire hairline has receded, but it's particularly bad on the sides. I have a large place going down the back of my head where the hair is gone in pretty much a straight line. The hairline at the nape of my neck is receded as well. It's much higher than it used to be. Hair at my temples has receded. My hair is much, much thinner overall. It's just – I don't have nearly as much hair as I used to have.[38]

As some of her hair returned after chemotherapy, it was more difficult for her to discover her injury, and—as Ms. Roach testified—no doctor diagnosed her with permanent hair loss.[39]

### 2.  Ms. Roach reasonably did not know that she had an actionable injury.

Under Mississippi law, a claim cannot accrue until plaintiff has knowledge of an *actionable* injury.[40] An injury is "actionable" under Mississippi law "when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested."[41] Accordingly, equivocal evidence *suggestive* of an injury does not trigger the statute of limitations. In this case, Ms. Roach

---

[36] Ex. B, Alnas Dep. 15—9.
[37] Ex. A, Roach Dep. 304:20—22.
[38] *Id.* 61:15—24.
[39] *Id.* 94:20—22, 96:17-20.
[40] The Mississippi Supreme Court has explained that in latent injury analysis, the "focus is on the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that  he probably has  an  actionable  injury." *Wright  v.  Quesnel,* 876  So.2d 362,  366 (Miss.2004) (quoting *Smith v. Sanders,* 485 So.2d 1051, 1052 (Miss. 1986); *see also Illinois Cent. R. Co. v. Guy,* 682 F.3d 381, 393 (5th Cir. 2012).
[41] *Schiro*, 611 So. 2d at 965 (citation omitted).

reasonably believed before August 16, 2014 (three years before filing suit), that her hair regrowth was part of a natural recovery process that was, at worst, progressing slowly for her.

This case is similar to *Ridgeway Lane & Associates, Inc. v. Watson* ("*Watson*"), where Plaintiff Marcus Byrd brought suit after he contracted bronchiectasis due to long-term mold exposure.[42] Beginning in 2004, Mr. Byrd was aware of water damage to his building and notified the property manager.[43] Mr. Byrd developed breathing problems that by 2006 had progressed to sneezing attacks and coughing fits.[44] On January 21, 2008, radiological testing of Mr. Byrd's chest revealed "scarring or atelectasis" and "possibly accompanying traction bronchiectasis."[45] In June 2010, his medical records indicated "major symptomatic problems are related to his bronchiectasis."[46] Mr. Byrd filed suit on April 21, 2011,[47] and defendant moved for summary judgment arguing that plaintiff's claims were time-barred.[48]

The issue before the Mississippi Supreme Court in *Watson* was whether Mr. Byrd first had actual or constructive knowledge of his injury on January 21, 2008 (time-barred) or June 2010 (timely). The Court determined that while his earlier x-ray may have been "*suggestive* of bronchiectasis", the plaintiff's reasonableness was a question for the jury.[49] The Court's consideration follows its earlier holding in *Schiro* that the statute of limitations did not begin when the plaintiff had symptoms or even when the doctors discovered the mass, but rather when the doctors could diagnose the mass as malignant. *See also Phillips 66 Co. v. Lofton,* 94 So.3d 1051,

---

[42] *Ridgeway Lane & Associates, Inc. v. Watson*, 189 So.3d 626, 626 (Miss. 2016).
[43] *Id.* at 627.
[44] *Id.* at 629.
[45] *Id.* at 628.
[46] *Id.*
[47] *Id.*
[48] *Id.* at 627.
[49] *Id.* at 632 (emphasis added).

1059 (Miss.2012) (holding that a worker could not reasonably have discovered his injury from asbestosis, despite experiencing symptoms, until he was diagnosed with pulmonary fibrosis); *Bryant*, 2014 WL 2761553, at *2-4 (applying *Lofton*). Similarly here, Ms. Roach's oncologist was unaware that her hair loss was permanent.[50] Even if temporary hair loss is "suggestive" of permanent hair loss (which is wrong when viewing the facts in the light most favorable to Ms. Roach), Mississippi law does not start the clock on the statute of limitations based upon a vague diagnosis and especially not based upon a misdiagnosis.

Under *Schiro* and *Watson*, Mississippi courts do not require that a party file suit before she knows that she suffered an actionable injury. Applying these decisions and viewing the evidence in the light most favorable to her, Ms. Roach reasonably did not know before August 16, 2014 (three years before filing suit), that her condition was an actionable injury or anything other than a normal and reversible consequence of her chemotherapy treatment. This case comes to this Court on a summary judgment record, which reveals disputes of material facts showing that Ms. Roach's oncologist told her that her hair loss was temporary, and her hair initially started to slowly return after she finished chemotherapy, as was noticed by her oncologist. Given these facts, Ms. Roach reasonably did not know before August 16, 2014, that her hair loss was permanent.[51]

### 3. Taxotere's label substantiated the oncologist's opinion that Ms. Roach's hair loss was temporary.

Taxotere's warning was the authority physicians used to discuss and advise their patients about hair loss after Taxotere, as well as what conclusions patients would draw from those discussions at all times after Taxotere infusions. Taxotere's label identified alopecia as a "common yet temporary" side effect, which obfuscated a critical feature of the injury, i.e., the permanence

---

[50] Ex. B, Alnas Depo. 34:10—25; 35:17—25.
[51] Ex. A, Roach Dep. 60:14—20.

13

of the condition. From the advice of her oncologist, Ms. Roach believed that her hair would eventually grow back.[52] The Taxotere warning did not make her oncologist or Ms. Roach aware that she risked permanent hair loss.[53] Instead, the faulty risk warnings reinforced Ms. Roach's reasonable belief that her hair loss was temporary.

### C. __Defendants' fraudulent concealment prevented Ms. Roach and her doctor from discovering that her hair would not grow back.__

Alternatively, Ms. Roach could not have reasonably thought before August 16, 2014, that her hair would return because of Defendants' fraudulent concealment. Mississippi has adopted the doctrine of fraudulent concealment by statute: "[i]f a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered." MISS. CODE ANN. § 15-1-67. The Mississippi Supreme Court has held that a plaintiff seeking to avail herself of the doctrine of fraudulent concealment has "a two-fold obligation to demonstrate that (1) some affirmative act or conduct was done and prevented discovery of a claim," which act was designed to prevent the discovery of the claim, and "(2) due diligence was performed on [her] part to discover it." *Stephens v. Equitable Life Assur. Soc'y of U.S.*, 850 So. 2d 78, 83 (Miss. 2003). The fraudulent concealment doctrine "applies to any cause of action." *Robinson v. Cobb*, 763 So. 2d 883, 887 (Miss. 2000). Viewing the facts in the light most favorable to Ms. Roach, Defendants intentionally misrepresented the risk in the label and their actions prevented Ms. Roach and her oncologist from learning that her hair would not return.

---

[52] *Id.* 249:17—25; 250:1—6; 251:1—7.
[53] *Id.* at 161.

Because Taxotere's label only warned that it may cause "temporary" hair loss, Ms. Roach's oncologist believed the hair loss was temporary and advised Ms. Roach accordingly.[54] As previously explained, this advice reinforced Ms. Roach's belief that her hair loss was temporary. In addition, Defendants' false warning constitutes fraudulent concealment under Mississippi law because they had knowledge of the actual potential harm (permanent hair loss) and nonetheless made a material misstatement of the risk (warning only of temporary hair loss), and continued to misrepresent the risks of Taxotere. These misstatements did not end when Ms. Roach completed chemotherapy, but continued and prevented her and her oncologist from discovering the true nature of her condition.

Plaintiff and her counsel in the MDL have found substantial evidence to support the contention that Defendants knew of the causal relationship between Taxotere and permanent hair loss for more than a decade before electing to update the Taxotere label in December 2015.[55] For example, in the pivotal clinical trial (referred to as "TAX 316") used by Defendants to support approval of Taxotere for the treatment of adjuvant breast cancer (early stage), subjects taking Taxotere reported an increased incidence of permanent hair loss compared to subjects who received treatment without Taxotere.[56] In 2005, a different Sanofi clinical trial (referred to as "GEICAM 9805" or "TAX 301") confirmed that subjects receiving Taxotere had a higher incidence of permanent hair loss than those who received treatment without Taxotere.[57]

---

[54] Ex. B, Alnas Dep. 33; 34:1.
[55] Ex. D, Kessler Report at pp. 39—63 (summarizing evidence available to Sanofi regarding Taxotere's risk of permanent hair loss); Ex. E, Supplemental Expert Report of David A. Kessler, M.D. ("Kessler Supplemental Report" at p. 1 (containing opinion that "Sanofi should have warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label by as early as 2006, and certainly by 2008."); *id.* at pp.20—1 (summarizing testimony by Sanofi employees regarding knowledge of causal relationship between Taxotere and permanent hair loss).
[56] Ex. D, Kessler Report at pp. 31; 42; 45—7.
[57] *Id.*

Defendants also received adverse event reports from clinicians whose patients reported permanent hair loss with Taxotere.[58] Defendants' Global Safety Officer for Taxotere, Dr. Amy Freedman, acknowledged that irreversible hair loss had been documented in Sanofi's clinical trials for Taxotere as early as 2006,[59] but advised the recipients "NOT" to do a literature search on the topic because the medical literature might contain additional reports of irreversible alopecia associated with Taxotere.[60] By 2010, Sanofi had received reports from hundreds of women describing the failure of their hair to regrow following treatment with Taxotere.[61]

As usage of Taxotere increased, published reports of permanent[62] hair loss associated with Taxotere appeared in the medical literature.[63] For instance, a study published in 2001 that evaluated Taxotere in the treatment of metastatic breast cancer noted four patients who experienced partial alopecia lasting "longer than 2 years."[64] As reports grew in the published scientific literature of permanent hair loss associated with Taxotere, Defendants took affirmative steps to eliminate reports from a much more accessible platform: social media. In 2010, Sanofi began to remove negative public posts made on its Facebook page by women who took Taxotere and suffered permanent hair loss.[65]

---

[58] *See id.* at p. 44; Ex. E, Kessler Supplemental Report at p. 13.
[59] Ex. E, Kessler Supplemental Report at 21.
[60] Ex. I, at p. 1 (Sanofi_01035459)
[61] Ex. D, Kessler Report at pp. 59—60.
[62] "Permanent" hair loss is also referred to as "persisting," or "irreversible" hair loss in the medical literature, *see, e.g.,* Second Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 4407 ¶¶at ¶¶ 149-162, and for purposes of this brief, a reference to "permanent" hair loss encompasses these other terms.
[63] Ex. G, Feigal Report at pp.41—66 (summarizing published articles on irreversible alopecia).
[64] Ex. F, Expert Report of Laura M. Plunkett, Ph.D., DABT ("Plunkett Report") at p. 15. *See also* Ex. H, at p. 2 (Sanofi_05252079); Ex. D, Kessler Report at p. 21
[65] *See, e.g.,* Ex. H, at p. 5 (Sanofi_05252082).

That same year, French authorities requested that Defendants analyze cases of permanent hair loss reported with Taxotere.[66] The resulting report issued by Defendants and submitted in January 2011 concluded there was insufficient evidence to determine whether Taxotere caused permanent alopecia.[67] These European authorities rejected Defendants' conclusion, finding that patients and healthcare providers needed to be provided information about the risk of permanent alopecia "given the serious psychological consequences of this adverse effect."[68] The European Medicines Agency adopted this same conclusion in June 2011, informing the Defendants that the label for Taxotere needed to be updated to inform patients of the risk of permanent alopecia.[69] However, Defendants did not update the United States label with this information at that time.[70]

In an internal audit conducted on March 5, 2015, Defendants again confirmed that the U.S. label lacked required safety information, including information on permanent alopecia.[71] Shortly thereafter, the FDA requested information from Defendants on reports of Taxotere associated with permanent hair loss.[72] Defendants subsequently acknowledged a causal relationship between Taxotere and permanent alopecia and that they had failed to update the United States label for Taxotere with information about this risk, stating "[t]his is going to be fun submitting >4 year old labeling changes to the FDA now."[73] On November 24, 2015, Sanofi submitted a revised label to

---

[66] Ex. D, Kessler Report at pp. 59—60.
[67] Ex. H, at pp. 7-8 (Sanofi_04353204 & Sanofi_04353247); Ex. D, Kessler Report at p. 60.
[68] *Id.* at pp. 59—60.
[69] *Id.*
[70] *Id.* at p. 61.
[71] *Id.* Report at p. 61 n. 219 (describing 2015 US affiliate audit that identified information missing from Taxotere's product insert).
[72] *Id.* p. 61.
[73] Ex. H, at p. 11 (Sanofi_05207927).

the FDA adding language about permanent hair loss in the adverse events section,[74] which was finalized by the FDA on December 11, 2015.[75]

Viewing the evidence in the light most favorable to Ms. Roach and taking all inferences in her favor, there is—at a minimum—a dispute of material fact as to whether the Defendants fraudulently concealed the permanence by intentionally downplaying the risk as "temporary". Between Ms. Roach's chemotherapy that ended in November 2009 and August 16, 2014 (three years before she filed suit), Defendants continued to misrepresent that their product only caused temporary hair loss, and not until December 11, 2015, did Taxotere carry a warning of permanent hair loss.[76]

Each new misrepresentation and failure to report the risk of permanent hair loss as required by federal law constituted a separate act of fraudulent concealment that continued to mislead both Ms. Roach's oncologist and herself. *See Alexander v. Wyeth*, 897 F. Supp. 2d 489, 493 (S.D. Miss. 2012) ("Acts of concealment which post-dated her injury are not a basis of her fraud cause of action but rather of her assertion of fraudulent concealment as a basis for tolling the statute of limitation."). Each new script for Taxotere by Ms. Roach's oncologist to another patient involved pamphlets and labels that downplayed and misrepresented the hair loss risk as only "temporary." And, the oncologist was also treating Ms. Roach at this time. Each passing month that Defendants denied the risk of permanent hair loss was a month that Defendants misled the medical community, including Ms. Roach's oncologist. Viewing the evidence in the light most favorable to Plaintiff,

---

[74] Ex. D, Kessler Report at p. 62. Sanofi submitted the label change through the "Changes Being Effected" or CBE regulation that permits manufacturers to make changes to labeling without prior FDA approval. *See* 21 C.F.R. § 314.70(c).
[75] Ex. D, Kessler Report at p. 62.
[76] Second Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 4407 ¶¶ 166—171.

Ms. Roach and her oncologist would have discovered the permanence of her condition had Defendants stopped misrepresenting the risks associated with Taxotere between November 2009 (end of chemotherapy), and August 16, 2014 (three years before she filed suit).

## IV.   CONCLUSION

For the foregoing reasons, Sanofi's Motion for Summary Judgment Based on the Statute of Limitations should be denied.


Dated: March 8, 2021                          Respectfully submitted,


*/s/ Christopher L. Coffin*                     */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)                Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.              GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225               6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163                  Los Angeles, California 90045
Phone: (504) 355-0086                         Telephone: 510-350-9700
Fax: (504) 355-0089                           Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                        kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*                  *Plaintiffs' Co-Lead Counsel*


*/s/M. Palmer Lambert*                          */s/Dawn M. Barrios*
M. Palmer Lambert (#33228)                    Dawn M. Barrios (#2821)
GAINSBURGH BENJAMIN DAVID                     BARRIOS, KINGSDORF & CASTEIX, LLP
MEUNIER & WARSHAUER, LLC                      701 Poydras Street, Suite 3650
2800 Energy Centre, 1100 Poydras Street       New Orleans, LA 70139
New Orleans, LA 70163-2800                    Phone: 504-524-3300
Phone: 504-522-2304                           Fax: 504-524-3313
Fax: 504-528-9973                             barrios@bkc-law.com
plambert@gainsben.com

                                              *Plaintiffs' Co-Liaison Counsel*
*Plaintiffs' Co-Liaison Counsel*

19

**PLAINTIFFS' STEERING COMMITTEE**

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Dawn M. Barrios*
DAWN M. BARRIOS