# EXHIBIT B

1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

   MELISSA S. ROACH & BILLY
3  E. ROACH,
4          Plaintiffs,
5  v.                              CASE NO. 2:17-cv-07918
6  SANOFI U.S. SERVICES, INC.
   F/K/A, SANOFI-AVENTIS U.S.,
7  INC., SANOFI-AVENTIS, LLC.,
8          Defendants.
9
   ****************************************************
10      VIDEOTAPED DEPOSITION BY VIDEOCONFERENCE
                OF WAIL ALNAS, M.D.
11 ****************************************************
12
          Taken at the instance of the Defendants via
13       Videoconference on October 7, 2020
            beginning at approximately 1:40 p.m.
14
15
16
                 (APPEARANCES NOTED HEREIN)
17
18
19
20
21
                        * * * * * * * *
22
23                      Reported by:
                  Julie Brown, RPR-CCR 1587
24
25

Page 2

1  APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE:
2  For the Plaintiffs:
3     EVAN P. FONTENOT, ESQ.
   Pendley, Baudin & Coffin, L.L.P.
4     1515 Poydras Street, Suite 1400
   New Orleans, Louisiana 70112
5     (504) 335-0086
   E-mail: efontenot@pbclawfirm.com
6
7
  For the Defendants:
8
9     LORI R. SCHULTZ, ESQ.
   BRADLEY S. THOMAS, ESQ.
10     Shook, Hardy & Bacon, L.L.P.
   2555 Grand Boulevard
11     Kansas City, Missouri 64108
   (816) 474-6550
12     E-mail: lschultz@shb.com
   E-mail: bsthomas@shb.com
13
14
  For Wail Alnas, M.D.
15
   SHARON F. BRIDGES, ESQ.
16     Baptist Memorial Health Care Corp.
   P.O. Box 2780
17     Jackson, Mississippi 39207-2780
   (601) 968-6143
18     E-mail: sharon.bridges@bmhcc.org
19
  Videographer: Mark Cadena
20
21
22
23
24
25

Page 3

1         I N D E X    Page
2
3  Appearances                  2
4  Stipulation                    5
5  Certificate of Court Reporter  141
6
     E X A M I N A T I O N   Page
7
  Examination By Mr. Fontenot
8                           6
9  Examination By Ms. Schultz     47
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      E X H I B I T    Page
2  P-1  Amended Notice of Videotaped     6
3      Deposition of Wail Alnas, M.D.
4  P-2  BMHGolden Triangle Records (611-624)     6
5  P-3  Document from Sanofi-Aventis titled     6
6      "Partnering With Your Patients Along
7      Their Journey"
8  P-4  European Label for Sanofi in 2005     6
9  D-1  Photograph     6
10  D-2  JAMA Dermatology Brief Report     6
11      "Assessment of Quality of Life and
12      Treatment Outcomes of Patients with
13      Persistent Postchemotherapy
14      Alopecia"
15  D-3  Baptist Memorial Hospital Cancer     6
16      Center General Consent (518-519)
17  D-4  Taxotere Label & Patient Insert 2007     6
18  D-5  BMHGolden Triangle (562-583)     6
19  D-6  BMHGolden Triangle (335-455)     6
20  D-7  Baptist Memorial Hospital Cancer     6
21      Center (345-346, 482)
22
23
24
25

Page 5

1       S T I P U L A T I O N
2
3      It is hereby stipulated and agreed by
4  and between the parties hereto, through their
5  respective attorneys of record, and in accordance
6  with the Supreme Court of Mississippi's Emergency
7  Administrative Order 6, that this deposition may be
8  taken at the time and place, with the use of
9  audio-visual communications, by JULIE BROWN, Court
10  Reporter and Notary Public, pursuant to the Rules;
11      That the formality of READING AND
12  SIGNING is specifically NOT WAIVED;
13      That all objections, except as to the
14  form of the questions and the responsiveness of the
15  answers, are reserved until such time as the
16  deposition, or any part thereof, may be used or
17  sought to be used in evidence.
18          - - -
19
20
21
22
23
24
25

Page 14

1  A. Currently only Mississippi.
2  Q. Have you ever been licensed in other
3  states?
4  A. Yes. Like I said, I practiced in
5  Kentucky. I practice -- in Chicago it was a
6  training license, so I don't know if that counts.
7  And, of course, my training was in New York, but
8  again, that's a training license.
9      I think I licensed at one point with
10 internal medicine I was doing like locum and I
11 worked in the VA and I pursued a license of a
12 Western state. I had never visited, just to work in
13 the VA. I can't remember now which state.
14     Q. Are you required to take any continuing
15 education class for your Mississippi license?
16     A. Yes, absolutely.
17     Q. How many hours do you have to receive per
18 year?
19     A. I don't remember, but I always exceeded
20 by double, you know. So I do 60 or 70 hours every
21 year minimum.
22     Q. And when you say you exceeded it by
23 double, is that just because of your interest in the
24 classes?
25     A. Right, right. It's always -- I don't pay

Page 15

1  attention to them, requirement because I'm always
2  exceeding.
3      Q. Got you.
4          Do you recall when the last time it was
5  that you took a class related to breast cancer?
6      A. I think it's, was probably at Post ASCO
7  meeting last year. That puts a lot of -- there was
8  a -- I think it was in Birmingham last year or the
9  year before.
10     Q. And what was the name of that meeting
11 again?
12     A. It was a review of the American Society
13 of Clinical Oncology meeting to discuss the latest
14 advancements.
15     Q. Okay. Who is your current employer?
16     A. It's Baptist Medical Group.
17     Q. And what is your current title?
18     A. I'm a oncologist, a medical oncologist,
19 hematologist/oncologist.
20     Q. What type of teaching responsibilities,
21 if any, do you have as your current job?
22     A. It's -- the hospital I'm practicing in is
23 the Baptist Memorial Hospital and has an internal
24 medicine residency program. But I am involved
25 indirectly by patient care, so I keep track of the

Page 16

1  residents as they care for my patients.
2      Q. Do you ever give lectures to your
3  fellows?
4      A. I do. I did a few lectures, but mostly
5  through the community. I have not given a lecture
6  for a long -- for medical oncologist.
7      Q. Okay.
8      A. I did a few years for internal medicine,
9  but nowadays nobody want to take lectures because
10 everything is online.
11     Q. As we can see right now.
12        Have you ever published any scientific
13 research papers regarding breast cancer?
14     A. I do -- in my training, there was one
15 hematology paper. I can't recall, but I'm not
16 extensively published.
17     Q. What medical journals, if any, do you
18 subscribe to?
19     A. I get New England Journal of Medicine and
20 American Society of Clinical Oncology. I don't get
21 Blood, but I follow them on the app and updates.
22     Q. Okay. Have you ever served as a key
23 opinion leader or a consultant for a pharmaceutical
24 company?
25     A. As I -- I think it's a few, usually do

Page 17

1  one or twice a year where we do a expert opinion of
2  publishing and things.
3      Q. Do you recall the pharmaceutical company
4  or companies that you gave those opinions for?
5      A. I am not -- I usually go through some
6  companies that do that for multiple companies at a
7  time. But I sometimes do -- I think I did for
8  AstraZeneca this year not too long ago.
9      Q. Okay. What was the opinion that you gave
10 for AstraZeneca?
11     A. It was on lung cancer.
12     Q. Lung cancer. Okay.
13        So I understand that you testified
14 previously that you've seen many breast cancer
15 patients in your career?
16     A. That's right.
17     Q. Do you have any estimate for how many
18 you've treated throughout the entirety of your
19 career?
20     A. Throughout my career?
21     Q. Yes, sir.
22     A. I mean, I see a lot. And, like I said,
23 at one point I was seeing even more. I mean, I
24 would tell you about average definitely, but I don't
25 want to -- that's a tough question.

Page 26

1 side effects, getting her approval and documenting
2 in my note that the patient understands and agrees.
3    Q.   Do you recall whether you would have
4 discussed any potential or general side effects of
5 chemotherapy with Ms. Roach at your initial
6 consultation prior to recommending a treatment plan?
7    A.   I don't specifically recall, but I am
8 absolutely confident that I -- I mean, that's why we
9 do the patient meet something.
10    Q.   And looking at your screen right now,
11 this is containing your medical records that we got
12 during this litigation.  This would be the consent
13 form that Ms. Roach would have signed; is that
14 correct?
15    A.   I don't -- I don't recall from ten years
16 ago, but later on we -- okay.  She did sign
17 something.  Later on we had a better, small
18 streamlined form.
19    Q.   What side effects of Ms. Roach's
20 chemotherapy regimen would you have discussed with
21 her at her initial consultation?
22    A.   Well, she had a regimen of -- again, I
23 don't have the -- I just reviewed the most recent,
24 but I think it was carbo/Taxotere Herceptin
25 (unintelligible).  And probably talked about nausea,

Page 27

1 vomiting, fatigue, blood counts decreased, cardiac
2 function, (unintelligible), hair loss, obviously.
3 That's always a big question for all patients and
4 obviously has been discussed with her before --
5 nuclear labs, skin rash, you know, with Taxotere.
6       And usually I think even at that time we do
7 give them a printout.  I remember -- I've been doing
8 it since I started here in Columbia 16 years ago, so
9 I remember every patient got also a printout about
10 the drugs.
11    Q.   And when you say a printout of the drugs,
12 would that be labelling or what would that be?
13    A.   It's a printout of the side effects.  I
14 can't remember which website we used, but we always
15 used that nationally recognized website.  I don't
16 know if it was cancer.net, but it depends -- it
17 changes depending on what we like, what we find more
18 accessible to the patient.
19    Q.   You mentioned earlier the NCCN
20 guidelines.  That is something you would have
21 consulted prior to recommending a regimen for
22 Ms. Roach; is that correct?
23    A.   Yes.
24    Q.   So you consider those recommendations to
25 be reliable?

Page 28

1    A.   Absolutely.
2    Q.   The guidelines, sorry.
3    A.   Yes.  Again, like I said, a physician has
4 the ultimate decision.  And these are just
5 suggestions.  Every situation is more complicated,
6 so it's not like -- it's not as easy as just looking
7 at the guidelines and side effects.  It's more
8 complex than that.
9       But they usually gives you the consensus
10 for any controversial new treatments and stuff.  So
11 I find it very helpful when I'm consulting on all of
12 my patients.  And, in general, I would say
13 99 percent of my patients' treatments are
14 NCCN-guideline compliant.
15    Q.   Can you walk me through how you use those
16 guidelines in a doctor-to-patient setting with a
17 patient for someone like Ms. Roach?
18    A.   Well, I usually tell them the consensus
19 because a lot of patients -- I offer my patients
20 more that want to go for a second opinion.  And when
21 that is consensus on the comprehensive cancer
22 symptoms I tell them that what I'm offering you is a
23 consensus treatment.  And that usually reassures
24 them that I'm not giving them anything controversial
25 or, you know -- and I usually help them decide if

Page 29

1 they want to get a second opinion or not.
2    Q.   Do you recall whether you discussed with
3 Ms. Roach the possibility of using either Taxol or
4 Taxotere in her chemotherapy regimen?
5    A.   I don't recall.  I know that the other
6 option would be like Adriamycin, Cytoxan, Taxol or
7 Herceptin and -- but we never had any evidence of
8 any one or the other have any advantage.
9       And Adriamycin have a cardiac risk and I
10 try to avoid it if possible, especially in patients
11 with heart problem.  In her case, she was young
12 probably, but that's still a question about late
13 cardiac complication.  So I always try to avoid
14 Adriamycin if possible.
15    Q.   Okay.  So --
16    A.   I don't recall if I give her that option,
17 to be honest with you.
18    Q.   I understand.
19       So, correct me if I'm wrong, but you're
20 saying that there were two different chemotherapy
21 regimens that Ms. Roach could have taken at the
22 time?
23    A.   Yes.
24       MS. SCHULTZ:  Object to the form.
25 BY MR. FONTENOT:

Page 30

1  Q. Doctor, did you perform a risk/benefit
2  analysis prior to prescribing the Taxotere regimen
3  to Ms. Roach?
4  A. Yes.
5  Q. Okay. At the time you and your office
6  treated Ms. Roach, how was patient education handled
7  in your office when a patient is preparing for
8  adjuvant chemotherapy?
9  A. Like I said, I would have discussed a
10 regimen with the patient, all the side effects. I
11 would have had the nurse give her the printed names
12 and information and answer any questions.
13 Q. Do you use a nurse educator at your
14 clinic?
15 A. At that point I was -- I always had
16 terrific oncology experienced nurses that do a
17 terrific job. And we did not have a Navigator
18 system, but it was actually better. We had very
19 experienced terrific oncology nurses from day one.
20 And, you know, they would have answered any
21 questions.
22 Q. So do you handle all or part of the
23 patient education process or is it divided between
24 you and your nurses?
25 A. It is currently divided, but at that time

Page 31

1  I remember it was -- I was doing more. Now, with
2  the Navigator system, we're trying to save more of
3  the physician's time, but at that time I would have
4  done most of it. Like I said, the nurses also are
5  always available with the printed information and
6  with answering questions.
7  Q. You mentioned some of the side effects
8  that you discussed with your patients prior to
9  starting adjuvant chemotherapy. How much time do
10 you devote to discussing hair loss with your
11 patients?
12 A. It's -- I promise you it's one of the
13 first things most patients ask about and -- so it's
14 discussed in every single patient.
15 Q. Okay. So patients are concerned about
16 hair loss prior to starting chemotherapy?
17 A. Yes. They always ask. Absolutely.
18 Q. Would you say that temporary alopecia is
19 an expected and anticipated side effect of chemo?
20 A. Yes. Not all chemo, specific chemo.
21 Q. But the chemotherapy regimen that Ms.
22 Roach took, temporary alopecia would be an expected
23 side effect?
24 A. Absolutely, yeah.
25 Q. I'm going to share my screen again for

Page 32

1  Exhibit 3. Let me pull it up. Make sure I'm doing
2  this correctly.
3      I am sharing my screen and introducing
4  Exhibit 3.
5      Doctor, this is a document that was
6  produced in this litigation by Sanofi, the
7  pharmaceutical company. It's a lengthy document,
8  but I will only show you or ask you questions about
9  one or two paragraphs of it.
10     As you can see, it's titled, "Partnering
11 With Your Patients Along Their Journey." I'm going
12 to scroll down to the next couple of pages. That
13 one is blank. All right.
14     So, in the top right, you can see where it
15 says, Sanofi-Aventis, Doctor; is that correct?
16 A. Okay.
17 Q. And the date on the document in the top
18 left of this letter is October 2006; is that
19 correct?
20 A. Correct.
21 Q. Okay. And the letter starts with, "Dear
22 Oncology Nursing Professional;" is that correct?
23 A. Yes.
24 Q. Okay. So, in your opinion, does this
25 look like something Sanofi-Aventis is sending to

Page 33

1  oncologists and oncology clinics?
2      MS. SCHULTZ: Object to the form.
3  BY MR. FONTENOT:
4  Q. You can answer, Doctor, after you've had
5  time to review the document.
6  A. Yes. That's -- looks, looks reasonable
7  to me.
8  Q. Okay. I'm going to continue scrolling
9  down.
10     All right. Do you see this page of the
11 document where it says, "Coping with the Side
12 Effects of Chemotherapy"?
13 A. Yes.
14 Q. And the first section says, "What is
15 alopecia?" And I'm going to read it into the
16 record, and you can tell me if that's accurate.
17     "Alopecia is another word for hair loss or
18 thinning of the hair. It is a common, yet
19 temporary, side effect of some cancer medicines."
20     Did I read that correctly?
21 A. Yes.
22 Q. Doctor, is this statement that alopecia
23 "is a common, yet temporary, side effect of some
24 cancer medicines" consistent with your understanding
25 of the temporary nature of the risk of hair loss?

9 (Pages 30 - 33)

Page 34

1  A. Yes.
2      MS. SCHULTZ: Objection.
3  BY MR. FONTENOT:
4  Q. Do you recall whether you discussed the
5  risk of temporary hair loss with Ms. Roach?
6  A. I don't recall specifically, but I'm a
7  hundred percent sure I did.
8  Q. You would have discussed that, Doctor?
9  A. Yes.
10 Q. Okay. What about permanent hair loss?
11 At the time that Ms. Roach treated with you, would
12 you have discussed permanent hair loss with her?
13 A. I don't think so.
14 Q. And why is that?
15 A. I wasn't actually -- at that time, 2010,
16 I don't think I was, you know, aware that it was a
17 problem.
18 Q. So, Doctor, at the time that you
19 prescribed Taxotere and the chemotherapy regimen to
20 Ms. Roach, you were not aware of permanent hair loss
21 as a potential side effect of that regimen?
22 A. That's fair to say, yes.
23 Q. If you need to take that call, let me
24 know.
25 A. Let me -- yes. Let me --

Page 35

1      THE VIDEOGRAPHER: Do you want to go off
2  the record?
3      MR. FONTENOT: Yes. We can go off the
4  record briefly.
5      THE VIDEOGRAPHER: We're off the record
6  at 2:12.
7      (Off the record.)
8      THE VIDEOGRAPHER: We're on the record at
9  2:13.
10 BY MR. FONTENOT:
11 Q. Doctor, before the break, we were talking
12 about temporary hair loss and permanent hair loss
13 associated with Taxotere. At the time you
14 prescribed Taxotere to Ms. Roach, were you aware
15 that Taxotere was associated with a risk of
16 permanent hair loss?
17 A. I don't think so. That's something I'm
18 aware of recently, not 2010.
19 Q. And when you say recently, would that be
20 five years ago or --
21 A. Something like that, a few years back.
22 Q. So have you ever received any
23 notification or warnings from Sanofi that Taxotere
24 is associated with permanent alopecia?
25 A. I don't recall. Like I said, Taxotere

Page 36

1  has been generic for a long time. It's been always
2  generic.
3      MR. FONTENOT: Okay. I'd like to turn to
4  Exhibit 4. I'm going to share my screen again.
5  EXAMINATION BY MR. FONTENOT:
6  Q. And here you should see Exhibit 4. I'll
7  represent to you that this is the European label for
8  Sanofi in 2005.
9      Now, as you understand, the labels are many
10 pages, so I've simplified this to only three pages.
11 I'm going to scroll down. As you can see, it says,
12 "SUMMARY OF PRODUCT CHARACTERISTICS." Taxotere as
13 the name of the medicinal product.
14     And the third page is what I'd like to
15 focus on, "Skin and subcutaneous tissue disorders."
16 So, as I said, this would be the European label for
17 Taxotere different than the United States label,
18 obviously.
19     Were you ever made aware by Sanofi that the
20 pharmaceutical company had changed its label in
21 Europe in 2005 to include reported adverse events of
22 persistent alopecia?
23     MS. SCHULTZ: Object to the form.
24 A. I don't recall.
25 BY MR. FONTENOT:

Page 37

1  Q. Okay. Are you aware of any other
2  adjuvant chemotherapy drugs that are associated with
3  permanent hair loss rather than temporary hair loss?
4  A. I can't think of any, actually.
5  Q. Okay.
6  A. I'm not sure.
7  Q. All right. I'd like to look at the --
8      THE VIDEOGRAPHER: Counselor --
9      MR. FONTENOT: Yes, sir.
10     THE VIDEOGRAPHER: I'm sorry. I need to
11 go off the record for just a moment.
12     MR. FONTENOT: Okay.
13     (Off the record.)
14     THE VIDEOGRAPHER: Can we go off the
15 record really quick?
16     MS. SCHULTZ: Why don't we go ahead and
17 take a ten-minute break. Is that all right?
18     MR. FONTENOT: Yes. We might as well.
19     THE VIDEOGRAPHER: We're off the record
20 at 2:16.
21     (Off the record.)
22     THE VIDEOGRAPHER: We're on the record at
23 2:37.
24 BY MS. SCHULTZ:
25 Q. All right, Dr. Alnas. As you recall

10 (Pages 34 - 37)

Page 38

1  before we took a break, we were discussing the
2  European label from 2005 for Taxotere.  Do you
3  recall that?
4     A.   Yes.
5     Q.   And I wanted to turn your attention to
6  the section called, "Skin and subcutaneous tissue
7  disorders."
8     A.   Yes.
9     Q.   I'd like you to take a moment to read
10 those two paragraphs about TAX316 and GEICAM 9805.
11 I'll read it into the record, as well.
12      The document states, "In the study TAX316,
13 alopecia persisting into the follow-up period after
14 the end of chemotherapy was reported in 687 of 744
15 TAC patients and 645 of 736 FAC patients.  At the
16 end of the follow-up period"..."alopecia was
17 observed to be ongoing in 29 TAX patients" or
18 3.9 percent "and 16 FAC patients, (2.2%)."
19      And then the next paragraph, "In GEICAM
20 9805 study, alopecia persisted into the follow-up
21 period"..."and was observed to be ongoing in 49
22 patients" or 9.2 percent "in TAC arm and 35
23 patients" or 6.7 percent "in FAC arm.  Alopecia
24 related to study drug started or worsened during the
25 follow-up period in 42 patients (7.9%) in TAC arm

Page 39

1  and 30 patients (5.8%) in FAC arm."
2      Did you have an opportunity to read that,
3  Doctor, along with me?
4     A.   Yes.
5     Q.   Okay.  So, in this European label, Sanofi
6  is warning about persisting or persistent alopecia;
7  is that correct?
8     A.   Yes.
9       MS. SCHULTZ:  Object to the form.
10 BY MS. SCHULTZ:
11    Q.   I'm going to stop my screen share.  One
12 second.  You had mentioned that approximately five
13 years ago is when you first learned that Taxotere
14 was associated with permanent or persisting
15 alopecia; is that correct?
16    A.   A few years back.  Yes,
17 I (unintelligible).
18    Q.   So that would have been around 2015 or
19 so?
20    A.   Maybe, yes.
21    Q.   Okay.  At any time since you began
22 prescribing Taxotere to the present date, has anyone
23 from Sanofi ever warned you about the risk of
24 permanent alopecia?
25    A.   I don't recall.  I don't recall any --

Page 40

1    Q.   Okay.
2    A.   I don't think -- well, I don't recall
3  any.
4    Q.   Any other pharmaceutical companies
5  besides Sanofi, have you discussed permanent hair
6  loss with those companies?
7    A.   I don't recall that.
8    Q.   Okay.  Are you aware that, in December of
9  2015, the FDA instructed Sanofi to include
10 information about permanent alopecia in its
11 labelling?
12      MS. SCHULTZ:  Object to the form.
13    A.   I'm vaguely aware, let's put it this way.
14 BY MS. SCHULTZ:
15    Q.   Okay.  And you testified earlier that you
16 never received a "Dear Doctor" letter -- I'm sorry.
17 There's an ambulance behind me.
18      You testified earlier that you either did
19 not know or did not receive a "Dear Doctor" letter
20 from Sanofi.  What was your testimony?
21    A.   I don't -- yeah.  I don't recall.  You
22 asked me -- I do not know what you meant, but I
23 receive "Dear Doctor" letters from different
24 companies all the time with update information.
25      So I don't recall specifically from Sanofi,

Page 41

1  but I mean, I misunderstood your question about
2  what's "Dear Doctor" letter.  I didn't know what you
3  meant by that.
4    Q.   I see.
5    A.   I receive Dear Doctor letters from
6  companies, you know, periodically.  I don't recall
7  specifically from Sanofi.
8    Q.   Okay.  I'd like to talk about the role of
9  patient choice and the treatment of your cancer
10 patients like Ms. Roach.  How often do you encourage
11 your patients to be an active participant in
12 deciding which adjuvant chemotherapy they will
13 receive?
14      MS. SCHULTZ:  Object to form.
15    A.   Yeah.  It happens.  I don't want to give
16 a -- but it's, you know, let's say majority of the
17 time I come up with my preference and what's the
18 best for the patient.  Occasionally, it will be --
19 the regimens will be so similar or -- in benefits
20 and side effects and, you know, ratios that I would
21 depend on the patient's preference.  So I guess
22 occasionally I do that.
23 BY MS. SCHULTZ:
24    Q.   Okay.  Is it important for you to provide
25 information about any permanent risk associated with

| Page 42 | Page 44 |
|---|---|
| 1  the drug?<br>2     A.   Yes.<br>3     Q.   Okay.  And at the time you prescribed<br>4  Taxotere to Ms. Roach, what were the permanent side<br>5  effects that you were aware of?<br>6     A.   I think we discussed neuropathy, we<br>7  discussed low blood counts.  Any chemotherapy<br>8  sometimes have some risk of long-term malignancy.<br>9  Sometimes I -- it's a study low risk, so I'm not<br>10 sure if I even mentioned it, so.<br>11    Q.   Okay.  And you learned about those risks<br>12 through the drug labelling for Taxotere; is that<br>13 correct?<br>14        MS. SCHULTZ:  Objection.<br>15    A.   I guess, yes, yes and my general<br>16 knowledge of the regimen.  Now, remember, every<br>17 regimen is together in a multiple treatment,<br>18 multiple drugs.<br>19 BY MS. SCHULTZ:<br>20    Q.   So, in informing patients about side<br>21 effects of drugs, is it important that you have<br>22 truthful and accurate information concerning the<br>23 risks of those adverse events associated with the<br>24 drug?<br>25    A.   Yes. | 1  that patient's decision to not go forward with the<br>2  regimen that you recommended?<br>3     A.   Yes.  After making sure they understand<br>4  the risk of not going through the treatment.<br>5     Q.   Okay.  Let's see.  At the time that you<br>6  prescribed the chemotherapy regimen to Ms. Roach,<br>7  which included Taxotere, did you assume in<br>8  prescribing that drug, Taxotere, that you had<br>9  provided truthful and accurate information regarding<br>10 alopecia?<br>11    A.   Yes.  Well, again, I don't have a<br>12 specific recollection of our discussion.  But I feel<br>13 I do that to all my patients.<br>14    Q.   Okay.  And you testified earlier that,<br>15 when you prescribed Taxotere to Ms. Roach in either<br>16 late 2009 or 2010, that you weren't aware of<br>17 permanent hair loss as a potential side effect?<br>18    A.   I think that's true.<br>19    Q.   Okay.  Had you been made aware of that<br>20 risk of permanent hair loss when you were selecting<br>21 a potential treatment regimen for Ms. Roach, would<br>22 this information have factored into your<br>23 decision-making process?<br>24        MS. SCHULTZ:  Object to form.<br>25    A.   I don't think so.  I mean, it's very |
| Page 43 | Page 45 |
| 1     Q.   Have you ever had a patient refuse to<br>2  follow a recommendation that you had made for their<br>3  chemotherapy treatment?<br>4        And you don't have to give me names or<br>5  anything like that.  I'm just trying to --<br>6     A.   I understand that, but the way you're --<br>7     Q.   So let's say you make a recommendation to<br>8  a patient for a particular chemotherapy regimen.<br>9  Have you ever had a patient that decided against<br>10 following your recommendation?<br>11    A.   Yes.  I would say yes.<br>12    Q.   Okay.  And what --<br>13    A.   Not very common, but yes.<br>14    Q.   And what would you do in situations like<br>15 those where a patient does not wish to follow your<br>16 recommendation?<br>17    A.   Usually the most common situation is the<br>18 patient doesn't want to pursue the chemotherapy.<br>19 Now, I don't recall a patient just selecting which<br>20 regimen he wants depends on the minutia of the side<br>21 effects.  Now, I mean, like I said, these are common<br>22 standard regimens.  And so the most common situation<br>23 is some patients, once they hear about the side<br>24 effects, they decline.<br>25    Q.   Okay.  So ultimately, would you respect | 1  difficult to put yourself back ten years, but I<br>2  don't think so.<br>3  BY MS. SCHULTZ:<br>4     Q.   Would it have been information -- and<br>5  when I say information I'm talking about the risk of<br>6  permanent hair loss -- would it have been<br>7  information that you would have relayed to Ms. Roach<br>8  during your discussions with her?<br>9     A.   Yes.<br>10    Q.   Okay.  Have you ever had a patient or<br>11 currently treat a patient who has experienced<br>12 permanent or persisting hair loss?<br>13        MS. SCHULTZ:  Object to form.<br>14    A.   I don't know if I should answer that, but<br>15 I have only one patient, and she has hair thinning<br>16 and I treated many, many, so it's not very common.<br>17 I was surprised with these European percentages, but<br>18 those are different regimens.  TAC is different<br>19 regimen we don't use here in this country.  Well, I<br>20 use it maybe rarely, one time.<br>21        So, in my experience, it's not very common.<br>22 I would say I have one patient with thinning,<br>23 permanent thinning of the hair that I can recall.<br>24 There may be more, but --<br>25 EXAMINATION BY MR. FONTENOT: |

Page 46

1  Q. And that is a situation where the hair
2 did not completely regrow to its original form?
3  A. That's right.
4  Q. Okay. Let's assume that you were indeed
5 aware of the risk of permanent hair loss at the time
6 you prescribed Taxotere to Ms. Roach. If Ms. Roach
7 had told you at the time that she did not want to
8 take Taxotere because of the risk of permanent
9 alopecia, would you have respected her decision?
10       MS. SCHULTZ: Object to the form.
11  A. I would have told her that the other
12 option would have a risk of cardiac toxicity. And I
13 would have encouraged her to still take the same
14 regimen.
15 EXAMINATION BY MR. FONTENOT:
16  Q. Okay. Ultimately, though, you would have
17 left the ultimate decision up to the patient?
18  A. I mean, yes. I don't force patients to
19 take any specific treatment. That's her ultimate
20 decision.
21       MR. FONTENOT: Okay. Doctor, that is all
22 the questions and exhibits that I wanted to show to
23 you today. I will turn the deposition over to
24 Ms. Lori, who represents Sanofi in this matter. If
25 she wants to take a brief pause, we can. It's up to

Page 47

1 her.
2       MS. SCHULTZ: Yes. Let's do that. Let's
3 take a break so that we can get our exhibits ready.
4 And I'll go through this outline, figure out what we
5 have and what we haven't covered, all right.
6       So, Dr. Alnas, if you want to take a
7 break, if you want to go use the rest room, get
8 coffee.
9       THE WITNESS: How long?
10       MS. SCHULTZ: How about ten minutes?
11       THE WITNESS: Ten minutes. Good.
12       THE VIDEOGRAPHER: We're off the record
13 at 2:49.
14       (Off the record.)
15       THE VIDEOGRAPHER: We're on the record at
16 2:59.
17         E X A M I N A T I O N
18 EXAMINATION BY MS. SCHULTZ :
19  Q. Good afternoon, Doctor. My name is Lori
20 Schultz and I'm an attorney and I represent Sanofi.
21 I've got some questions for you, as well today.
22       As a preliminary matter, we've never met or
23 spoken before today, correct?
24  A. That's correct.
25  Q. And I'm going to do my best not to

Page 48

1 re-cover ground that's already been covered, but I
2 may get into some of those topics to make sure I
3 understand your testimony and I might ask some
4 additional questions. And then I've got some
5 additional areas I want to cover with you.
6       My intent is to be respectful of your time.
7 I have a large outline here, but I'm going to try to
8 page through and skip over a lot of it. So if you
9 see me paging through these documents it's because
10 I'm trying to move things along and skip over to
11 another area, all right.
12  A. All right.
13  Q. Now, you said that you reviewed
14 Ms. Roach's medical records prior to your deposition
15 today, correct?
16  A. Correct.
17  Q. And Ms. Roach is cancer free today,
18 correct?
19  A. Correct. As of my last visit, yes.
20  Q. And your last visit was last year in
21 2019?
22  A. Yes, something like that. I don't recall
23 the exact date, but it's yearly now.
24  Q. And she has been cancer free since she
25 finished her treatment in 2009, correct?

Page 49

1  A. Yes. As of my last visit.
2  Q. So that's over 11 years now, correct?
3  A. Correct.
4  Q. And so her treatment regimen worked; do
5 you agree?
6  A. I agree.
7  Q. Both you and Ms. Roach's counsel today
8 have used the phrase "permanent hair loss." What
9 does permanent hair loss mean to you?
10  A. I mean, after chemotherapy -- a lot of
11 chemotherapy causes hair loss, but the hair grows
12 back in four to five months, usually earlier, but --
13 and that means the hair does not grow back.
14  Q. So, in your mind, does permanent
15 chemotherapy mean that the individual remains bald
16 permanently?
17  A. Yeah. Or, like I said, other than
18 Ms. Roach, I have one more patient that she had just
19 thinning for a long time. I don't know if you'd
20 call it permanent hair loss or not.
21  Q. And you did testify earlier that you had
22 one patient that has had hair thinning since
23 chemotherapy, correct?
24  A. That's my experience. That's not
25 scientific. That's my experience looking back.

13 (Pages 46 - 49)

Page 58

1  Q. So you depend on medical journals and
2  then also I assume your clinical experience with
3  Taxotere?
4  A. Yes. No. And I depend on, you know,
5  updates from medical societies, you know.
6  Q. So, to inform yourself about ongoing
7  information --
8  A. Changes, label changes. So label
9  changes, but I don't check the label every time I
10 prescribe. That's not a good use of my time. But
11 usually we are aware when there's label change
12 through news or American Society of Clinical
13 Oncology or through the NCCN guidelines and website
14 or Medscape or --
15 Q. When did you last read the Taxotere
16 label?
17 A. Oh, I don't recall. I mean, that's --
18 should be probably years.
19 Q. Was it more than five years ago?
20 A. I can't recall. Probably yes.
21 Q. More than ten years ago?
22 A. I can't recall.
23 Q. Have you ever read the December 2015
24 label that counsel for Ms. Roach referred to earlier
25 today?

Page 59

1  A. I'm not sure what label you're talking
2  about, the European label that he mentioned the
3  percentages of hair loss?
4  Q. No. He asked if you were aware of a
5  label change with Taxotere regarding permanent hair
6  loss in 2015. Do you recall that?
7  A. I recall that. I thought that was in
8  Europe or some sort of European --
9  Q. Okay. So do you know whether or not
10 there's been any change in the Taxotere label at any
11 time pertaining to hair loss?
12     MS. SCHULTZ: Objection to form.
13 A. I'm not sure, but -- I'm not sure, but we
14 were all aware of that problem a few years back.
15 Probably five years back, I guess. We were all
16 aware of this problem, but I'm not actually sure
17 what the label change was in the United States.
18 BY MS. SCHULTZ:
19 Q. And so --
20 A. We were aware of the problem.
21 Q. All right. And when you say you were
22 aware of the problem, what is the problem?
23 A. Permanent hair loss. We have to -- we
24 have to mention it with the patients.
25 Q. When you say you have to mention it with

Page 60

1  the patients, what do you mean?
2  A. Well, nowadays when I mention hair loss
3  usually I tell them the hair will grow back and now
4  I say, rarely it may not.
5  Q. So now you tell people hair will grow
6  back, but very rarely it might not?
7  A. That's correct.
8  Q. When did you start telling patients that?
9     When did you start telling patients that?
10 A. As soon as I was aware of the problem,
11 which was a few years back.
12 Q. And I'm a little unclear, when you refer
13 to as soon as I was aware of the problem and we were
14 all aware of that problem, where you got that
15 information and how it was that you came to rely on
16 that information?
17 A. Again, it was -- again, I -- there was a
18 lot of publicity a few years back. And I don't
19 recall where I read the article if it's online or in
20 print, but I was aware of the problem a few years
21 back that, you know, some patients' hair didn't grow
22 back, which wasn't my experience, by the way.
23 Q. So, having patients that took Taxotere
24 not have their hair grow back was not consistent
25 with your experience in prescribing Taxotere all of

Page 61

1  these decades, correct?
2  A. Again, like I said, I wasn't aware of
3  that possibility before, so I may have missed
4  somebody. But, yes, I was -- it was not my
5  experience.
6  Q. You said that there was a lot of
7  publicity about it. Are you referring to lawsuits
8  that were filed pertaining to Taxotere and
9  permanent --
10 A. I'm aware of the lawsuit, but I don't
11 know which was first, but maybe at the same time
12 that would cause the publicity. I'm not sure.
13 Q. So you may have become aware of the
14 lawsuit at about the same time as you became aware
15 of the problem you've referred to?
16 A. I'm not sure how that came about, but I'm
17 aware of it. There was a lot of publicities for
18 sure. What triggered it I cannot tell you.
19 Q. And so just the fact that there was
20 publicity, whether it was based on the lawsuits or
21 not, is that enough for you to change the manner in
22 which you warn your patients about hair loss?
23 A. Yes. It was enough because I went back
24 and looked and I knew it's rare, but I think the
25 patient deserves to know.

Page 66

1  A.  That's correct.
2  Q.  And autoimmune conditions can cause hair
3  thinning, correct?
4  A.  I agree.
5  Q.  And do you agree that you're not an
6  expert in dermatology in the sense of determining
7  the cause of someone's hair loss?
8  A.  I agree with that, but I do -- I am
9  responsible for the side effects for the drugs that
10 I prescribe.  So I am on top of whatever my drugs
11 can cause.
12 Q.  And if you treat a patient and a patient
13 is having a side effect from what you believe to be
14 a drug that you prescribed, that's something
15 important to you, correct?
16 A.  Yes.
17 Q.  And that would be something that you
18 would record in your records, correct?
19     MR. FONTENOT:  Object to form.
20 A.  Again, it depends.
21 BY MS. SCHULTZ:
22 Q.  Depends on?
23 A.  The severity of.
24 Q.  If you saw an unusual side effect that
25 you believe was from a drug that you prescribed,

Page 67

1  what would you do?
2  A.  Well, I deal with it.  If we can withdraw
3  the drug, we can try to withdraw it.  If there's,
4  you know, remedies, we can prescribe treatment.
5  Q.  Do you ever submit adverse event reports?
6  A.  Yes.  Of course, but that's usually
7  related to unexpected or allergic reactions.
8  Expected side effects in the drug label, the one I
9  reported, is expected to happen.
10 Q.  Now, you've always known that, after
11 chemotherapy, patients' hair may come back with a
12 different texture, correct?
13 A.  Yes.  Different colors sometimes.
14 Q.  Sometimes a different color, correct?
15 A.  Yes.
16 Q.  And when you say "different texture,"
17 patients' hair can come back a lot finer and
18 thinner, correct?
19 A.  I don't know if I can say that.  It's
20 just different.  Sometimes it's better and healthier
21 and sometimes it's not.
22 Q.  What do you mean by "different texture"?
23 A.  Sometimes more shiny.  Sometimes thinner,
24 sometimes thicker.  So it's different.  It looks
25 different.  Different color.

Page 68

1  Q.  All right.  So you've always been aware
2  that, after chemotherapy, patients' hair may come
3  back a different color, sometimes thinner, sometimes
4  thicker, correct?
5  A.  That's kind of true, yes.  It's not --
6  you know, it's not black or white like that.  And so
7  I don't -- we don't tell the patient all these
8  details of thicker and thinner and different colors,
9  so it depends.
10 Q.  But that was information you were aware
11 of at the time you prescribed chemotherapy in
12 Ms. Roach in 2009, right, based on your clinical
13 experience?
14 A.  Yes.  I did, but I was not aware of the
15 permanent alopecia, hair loss issue.
16 Q.  And I'm just asking you now about how the
17 hair changes when hair grows back after
18 chemotherapy?
19 A.  I was aware of that with my experience,
20 yes.
21 Q.  And did you, as a general rule, inform
22 your patients that, when hair does grow back, it may
23 grow back in a different color or different texture?
24 A.  Sometimes I mention that, but it's not
25 very important.  But sometimes I mention that,

Page 69

1  actually.  Most of the time.  But I sometimes tell
2  it in an encouraging way to encourage them to -- not
3  to be too upset with the temporary alopecia.  But
4  that's how I approach it.  Usually tell them, your
5  hair will grow back, may be a different color, but
6  it will grow back.
7  Q.  All right.  Now, I believe you said that
8  you believe you may have a personal recollection of
9  Ms. Roach, but you're not for sure?
10 A.  Yes.
11 Q.  Is that correct?
12 A.  Yes.
13 Q.  All right.  As you sit here today, do you
14 have any understanding as to the nature or extent of
15 Ms. Roach's claimed hair loss?
16 A.  No.
17     MS. SCHULTZ:  Let's go ahead and pull up
18 a photograph of Ms. Roach.
19 BY MS. SCHULTZ:
20 Q.  Doctor, Bradley is going to pull up this
21 photograph for me.  It's a photograph that -- Ms.
22 Roach's deposition was taken and, during her
23 deposition, she testified that this photo of her was
24 taken in 2015.  So it was taken about six years
25 after she had completed her chemotherapy treatment,

18 (Pages 66 - 69)

Page 70

1  all right.
2      A.   Okay.
3      Q.   All right.  Can you see that photograph
4  on your screen?
5      A.   I do.
6      Q.   All right.  Seeing that photograph, does
7  that cause you to recall who Ms. Roach is?
8      A.   Yes.
9      Q.   All right.  And is this photograph
10 consistent with your memory of Ms. Roach?
11     A.   Yes.
12     Q.   All right.  Based on your viewing of this
13 photograph, is it fair to say that this is not what
14 you would consider to be permanent alopecia or
15 severe hair thinning?
16         MR. FONTENOT:  Object to form.
17     A.   Not complete -- not permanent complete
18 alopecia for sure, but this hair thinning, that
19 looks hair thinning to me.
20     Q.   I'm sorry.  You said you think it looks
21 like what?
22     A.   That looks thinning of the hair.  You
23 can -- I can tell that's -- her hair is thin.
24     Q.   Okay.  And where is it that you say you
25 can tell that her hair is thin?

Page 71

1      A.   I think it's -- that's just my
2  impression.  But I don't know -- I don't recall what
3  it was before chemotherapy, to be honest with you.
4  But, just by looking at the -- I would describe it
5  as a woman with thin hair.
6      Q.   And are you saying that, based on the
7  hair that she has coming forward over her --
8      A.   I don't remember what she was before the
9  chemotherapy, to be honest.
10     Q.   So you don't know if her hair looks the
11 same now as it did before chemotherapy?  Or you
12 don't know if the hair in this picture looks the
13 same as it did before chemotherapy, correct?
14     A.   I don't recall before chemotherapy.
15     Q.   Okay.  And when you say the picture looks
16 like there is thin hair --
17     A.   Yes.
18     Q.   -- what part of the hair do you think
19 looks thin in this photograph?
20     A.   Just that's my impression of this
21 picture.  I'm sorry I can't be more specific.
22     Q.   All right.  So you're not talking about
23 any specific part of Ms. Roach's scalp, you're just
24 saying the overall --
25     A.   I guess maybe the hairline receding got

Page 72

1  me or just that the way the hair is thin.  I mean,
2  I'm just saying.  But just like looking at this,
3  this is a woman with thinned hair.  Maybe the
4  hairline you see there is what made me think that.
5  Maybe the way the hair is not very thick.
6      Q.   All right.  And do you know whether or
7  not Ms. Roach had a receding hairline prior to
8  chemotherapy?
9      A.   I don't recall.
10     Q.   Now, do you have any knowledge as to
11 whether Ms. Roach is claiming that her hair grew
12 back thin after chemotherapy or whether her hair
13 grew back and then she has been losing hair over
14 time?
15     A.   I don't know that.  I don't know the
16 answer to that.
17     Q.   Well, let me represent to you that, in
18 Ms. Roach's deposition, she said that her hair grew
19 back and then, a couple years after that, after
20 chemotherapy was complete, she noticed that it was
21 starting to fall out at a higher rate than normal,
22 okay.
23         MR. FONTENOT:  Object to form.
24 BY MS. SCHULTZ:
25     Q.   And let me also represent to you that she

Page 73

1  says that her hair has gotten progressively thinner
2  since 2011, okay.  Is that what you would tend to
3  see with someone who was taking Arimidex,
4  progressive thinning of their hair?
5      A.   I'm not sure to make that, you know,
6  definitive statement.  It's a very -- like you
7  alluded, there's not a lot of studies, you know,
8  documenting how the hair loss, so I wouldn't make
9  any judgment.  I don't know.
10     Q.   Well, when you referred today to an
11 association between Taxotere and permanent hair
12 loss, you're referring to hair loss that is apparent
13 at the time the hair grows back in from
14 chemotherapy, correct?
15     A.   Correct.  That's usually -- we'll be
16 aware of the problem usually about six months, eight
17 months to a year when we expect the hair to be back
18 to normal.  So that's the point when we can say
19 this.
20     Q.   And so someone whose hair grew back and
21 then progressively started to thin and lose hair
22 over time is not what you would consider to be a
23 persistent or permanent hair loss from chemotherapy,
24 correct?
25         MR. FONTENOT:  Object to form.

19 (Pages 70 - 73)

|  | Page 86 |  | Page 88 |
|---|---|---|---|
| 1 | Q. -- are important, correct? | 1 | Q. Cyclophosphamide comes with a risk of |
| 2 | A. Yes, absolutely. | 2 | alopecia, correct? |
| 3 | Q. But you agree that, even patients without | 3 | A. Yes. |
| 4 | any cardiac risk factors, can suffer from cardiac | 4 | Q. And are you aware of the studies showing |
| 5 | toxicity, correct? | 5 | that patients who have taken cyclophosphamide have |
| 6 | A. Yes. And we worry about late | 6 | permanent or persistent alopecia following |
| 7 | (unintelligible) too, so all this -- down the road | 7 | chemotherapy? |
| 8 | even in the younger patients, so. | 8 | A. I actually have not seen those. |
| 9 | Q. And if you were a younger patient, there | 9 | Q. Is that something like Taxol that you |
| 10 | is a risk of heart failure even decades down the | 10 | will look into after this deposition perhaps? |
| 11 | road, correct? | 11 | A. Yes. I think that, that Taxotere data |
| 12 | A. It's a very low risk for younger | 12 | now opened up that avenue of research and, you know, |
| 13 | patients, healthy patients, but it's not zero. | 13 | search for these patients. |
| 14 | Q. And when we refer to cardiac risk | 14 | Q. And so now studies are being done to see |
| 15 | factors, would that include hypertension? | 15 | if -- |
| 16 | A. Yes. Diabetes, hypertension, | 16 | A. If other agents could do the same. |
| 17 | cholesterol. | 17 | MR. FONTENOT: Object to form. |
| 18 | Q. High cholesterol? | 18 | BY MS. SCHULTZ: |
| 19 | A. Yeah. | 19 | Q. Studies are being done to see if other |
| 20 | Q. What about smoking? | 20 | chemotherapy drugs cause the same result or have an |
| 21 | A. Yes. | 21 | association with persistent alopecia, correct? |
| 22 | Q. And what about a family history of heart | 22 | A. I think we all are more aware now with |
| 23 | disease? | 23 | this problem. |
| 24 | A. That counts, too. | 24 | Q. Do you agree that no one can say with |
| 25 | Q. And obesity? | 25 | certainty that Ms. Roach would have had the same |

|  | Page 87 |  | Page 89 |
|---|---|---|---|
| 1 | A. Yes. | 1 | outcome had she received a chemotherapy regimen that |
| 2 | Q. Are you aware of any data reflecting the | 2 | did not include Taxotere? |
| 3 | differences in the rates of cardiotoxicity between | 3 | A. I can't answer this question. I can't |
| 4 | the regimen of TCH and a regimen of AC followed by | 4 | say. I mean, who knows. |
| 5 | TH? | 5 | Q. Exactly. |
| 6 | A. Okay. I can't point you to a specific | 6 | And you can't say that if she had received |
| 7 | study, but I know Adriamycin will have much | 7 | a different regimen that her hair would be any |
| 8 | higher -- | 8 | better or any worse than it is today; do you agree? |
| 9 | Q. You know what? | 9 | A. I don't like the way it's put. I mean, |
| 10 | A. Adriamycin-containing regimen will have | 10 | the patient should have known that Taxotere can |
| 11 | higher risk of cardiac toxicity than Herceptin-only | 11 | cause permanent hair loss, so. It's not the same, |
| 12 | regimens. | 12 | let's put it this way. You have data on Taxotere, |
| 13 | Q. And can you give me an idea of how many | 13 | you don't have data on (unintelligible). |
| 14 | times higher of a risk that is? | 14 | Q. And I'm not -- |
| 15 | A. It's significantly higher. I don't want | 15 | A. So my point it's not fair to say all |
| 16 | to give a percentage because I may be wrong, but | 16 | chemos do it. I mean, I'm not ready to say that. |
| 17 | it's significantly higher. | 17 | And that may be misleading. |
| 18 | Q. Do you know if -- | 18 | Q. And if my question came out that way, it |
| 19 | A. I can look it up, though. | 19 | wasn't supposed to come out that way. |
| 20 | Q. Okay. Do you know if it's eight times | 20 | First of all, have you told me about -- |
| 21 | higher of a risk of cardiac toxicity? | 21 | when you say there's more data on Taxotere, have |
| 22 | A. I would think not. That makes sense. | 22 | you, in your testimony today, told me everything |
| 23 | Q. Okay. Cyclophosphamide -- is it | 23 | that you know about this data that you're referring |
| 24 | cyclophosphamide or meed? | 24 | to? |
| 25 | A. Phosphamide. | 25 | A. I don't -- like I said, I'm not an |

|  Page 90 | Page 92 |
|---|---|

Page 90
1  expert. I have not studied and -- but I have
2  read -- and the percentages, it's in the low, single
3  digits percentages. I'm aware of that now. I mean,
4  I'm aware of that, so. But I have not -- I mean,
5  it's not -- I deal with so much toxicities and
6  problems. This is not my area of interest.
7     Q.  And if Ms. Roach suffers from any hair
8  loss, is it correct that you don't know what the
9  cause of that hair loss is?
10    A.  She did lose her hair with Taxotere. And
11 so -- and she says it did not come back the way it
12 was. I think that's reasonable. But that's all I
13 can tell you, that she had Taxotere and she lost her
14 hair.
15        I actually -- you know, I remember that she
16 did mention at some point that her hair had thinned.
17 And I may have not documented, but I think she did
18 mention it to me one time or once, to be honest with
19 you. Now I remember from seeing the picture.
20    Q.  All right. Let me unpack that all a
21 moment. First of all, when you say that she did
22 lose her hair with Taxotere, she lost her hair when
23 she was going through chemotherapy with Taxotere,
24 carboplatin and Herceptin, correct?
25        All three drugs, correct?

Page 91
1     A.  (Nods head affirmatively.)
2     Q.  And they were all administered at the
3  same time, correct?
4     A.  (Nonverbal response.)
5     Q.  Is that a yes?
6     A.  Yes.
7     Q.  And then you said, "And she says it did
8  not come back the way it was."
9     A.  Uh-huh (affirmative response).
10    Q.  What are you basing that statement on?
11    A.  That's what -- the information I received
12 before this deposition. That's what she's
13 contending.
14    Q.  What information did you receive before
15 the deposition?
16    A.  I was just briefed by the Baptist
17 attorney.
18    Q.  Briefed by what?
19    A.  Baptist attorney.
20    Q.  Oh, your own counsel?
21    A.  Yes.
22    Q.  Okay. So your counsel told you just
23 about the nature of the lawsuit, correct?
24    A.  Correct.
25    Q.  Have you ever had any communication with

Page 92
1  counsel for Ms. Roach?
2     A.  No.
3     Q.  So you don't actually know whether or not
4  Ms. Roach's hair came back fully after chemo,
5  correct?
6         MR. FONTENOT: Object to form.
7     A.  Yeah. I don't know that. Yes, that's
8  correct.
9  BY MS. SCHULTZ:
10    Q.  And you don't know anything about the
11 hair loss Ms. Roach claims she's experienced since
12 her hair came back after chemo, correct?
13        MR. FONTENOT: Object to form.
14    A.  Correct. I wish I documented all the
15 hair, but that's not something we document every
16 time.
17 BY MS. SCHULTZ:
18    Q.  Well, I'll represent to you that
19 Ms. Roach testified that she did not have any
20 communication with you about her hair loss after it
21 had regrown, okay.
22        MR. FONTENOT: Object to form.
23    A.  I distinctly -- many years, I distinctly
24 remember, maybe I'm wrong, that she mentioned her
25 hair. Maybe six, seven, eight years ago, something

Page 93
1  like that.
2  BY MS. SCHULTZ:
3     Q.  You think she may have mentioned her hair
4  six, seven or eight years ago?
5     A.  Uh-huh (affirmative response).
6     Q.  And that's just a recollection you think
7  you have today?
8     A.  I may be wrong, so okay. Strike that.
9  But just by when I looked at her picture I remember
10 she complained once. I remember -- maybe I'm
11 mistaken.
12    Q.  So --
13    A.  I don't know if I documented anything, so
14 if it's not documented it probably didn't happen.
15    Q.  Bottom line, you don't have any personal
16 information about Ms. Roach's hair regrowth during
17 the year after chemo, correct?
18    A.  No.
19        MR. FONTENOT: Object to form.
20 BY MS. SCHULTZ:
21    Q.  Is that correct?
22    A.  That's correct. I don't.
23    Q.  And is it also correct that you don't
24 personally have any information about Ms. Roach's
25 hair growth or loss over the past 10 years, correct?

24 (Pages 90 - 93)

Page 138

1  MS. SCHULTZ: No. We're going off the
2  record.
3  THE VIDEOGRAPHER: Okay. I'm sorry about
4  that. It's 5:37. We're off the record.
5  (Whereupon the above-entitled deposition
6  was concluded at 5:42 p.m.)

Page 139

1  CERTIFICATE OF COURT REPORTER
2  I, Julie Brown, Court Reporter and Notary
3  Public, in and for the State of Mississippi, do
4  hereby certify that the above and foregoing 138
5  pages, including this page, contain a true and
6  accurate transcription of the testimony of DR. WAIL
7  ALNAS contain a full, true and correct transcript of
8  the proceedings had in the aforenamed case at the
9  time and place indicated, which proceedings were
10 recorded by me to the best of my skill and ability,
11 remotely via videoconference.
12 I also certify that I placed the witness
13 under oath to tell the truth and that all answers
14 were given under that oath.
15 I certify that the witness has chosen his
16 right to the reading and signing of the deposition.
17 I certify that I have no interest, monetary
18 or otherwise, in the outcome of this case.
19 Witness my signature and seal this day,
20 October 21, 2020.
21
22
23       *Julie Brown*
24       JULIE BROWN, CCR, RPR #8606
   My Commission Expires:
25 April 6, 2024

Page 140

1  SHARON F. BRIDGES, ESQ.
2  sharon.bridges@bmhcc.org
3       October 21, 2020
4  RE: Roach, Melissa And Billy v. Sanofi US Service, Inc. Et Al.
5    10/7/2020, Wail Alnas, MD (#4288155)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-nj@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 141

1  Roach, Melissa And Billy v. Sanofi US Service, Inc. Et Al.
2  Wail Alnas, MD (#4288155)
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____    _____
24 Wail Alnas, MD                   Date
25

```
                                                              Page 142
 1  Roach, Melissa And Billy v. Sanofi US Service, Inc. Et Al.
 2  Wail Alnas, MD (#4288155)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4     I, Wail Alnas, MD, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  Wail Alnas, MD              Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

37 (Page 142)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.