# EXHIBIT 4

Ellen T. Chang, Sc.D.

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3                         - - -
 4
 5   IN RE:  TAXOTERE (DOCETAXEL)
     PRODUCTS LIABILITY LITIGATION,
 6
 7                                          MDL No. 2740
                                            SECTION: "H"
 8   This Document Relates to:              Judge Milazzo
     ALL CASES,                             Mag. Judge North
 9   _____/
10                         - - -
11               Tuesday, May 4, 2021
12                         - - -
13        Remote Videotaped Stenographic Deposition
14   of ELLEN T. CHANG, Sc.D., Volume II, held with the
15   witness located in Menlo Park, California,
16   commencing at 10:04 a.m., before Gina V. Carbone, a
17   Registered Merit Reporter, California Certified
18   Realtime Reporter, California Certified Shorthand
19   Reporter State License No. 8249.
20                         - - -
21
22            GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 971.591.5672 fax
23                  deps@golkow.com
24
25
```

```
 1   forward as a pharmacovigilance expert.
 2        Q.  Right.
 3            Every deposition you've given in this
 4   litigation, you've had the opportunity to review it
 5   and to make sure it accurately states what you want
 6   it to state, correct?
 7        A.  That's right.
 8        Q.  Okay.
 9        A.  I did notice, actually, when I was
10   reviewing -- I don't know if it matters -- there's
11   one part in, I think, the deposition where I failed
12   to make this correction before.  It should be
13   obvious.  I think Dr. -- I think Mr. Abramson asked
14   a question like, "Six is more than 30, correct?"  It
15   says in the transcript.  And I say, "Yes."
16            And he must have asked, "Six is more than
17   three."  But, anyway, so I didn't make that
18   correction.  Otherwise, yes, I have had a chance to
19   review and make corrections to my deposition
20   transcript.
21        Q.  I just wanted to confirm, you're not -- you
22   don't hold yourself out as an expert in
23   pharmacovigilance.  I think you confirmed that for
24   me.  You said there's some overlap, but you don't
25   hold yourself out as an expert, right?
```

```
 1        A.   Correct.
 2        Q.   You're not a regulatory expert, right?
 3        A.   I'm not a regulatory expert.  That's right.
 4   I have expertise in -- or I have familiarity with
 5   regulatory issues, but really not in this context.
 6   Not in the pharmaceutical context.
 7        Q.   You're not familiar with the regulatory
 8   requirements for label changes, right?
 9        A.   Correct.
10        Q.   Okay.  If I asked you to give me the Code
11   of Federal Regulations cites for what it takes that
12   sets out either the standard or the evidentiary
13   burden for making a label change, you wouldn't be --
14   you're not the expert to give me that, right?
15        A.   Correct.
16        Q.   Okay.  And have you talked to or read
17   Dr. Aerosmith's deposition to see if she either
18   agrees with us or agrees with plaintiffs' experts or
19   disagrees with them concerning what the evidentiary
20   burden is for a label change?
21        A.   I don't remember.  I've seen something from
22   Dr. Aerosmith.  I thought it was -- I think I've
23   only seen a report rather than deposition, but I
24   really -- listed in -- whatever I've seen from
25   Dr. Aerosmith is listed in my April 2020 report.
```

```
 1   alopecia, correct?
 2        A.   Yes.
 3        Q.   Okay.  They both use the same words,
 4   "irreversible alopecia," but they are using those
 5   words in two different contexts; one, to determine
 6   whether there is an outcome; and, two, in the other,
 7   to determine whether there is a signal, correct?
 8        A.   I think for your -- regarding your
 9   question, the first one was not regarding an
10   outcome, it was regarding causality or regarding
11   whether there's causal effect.  And then the second
12   one was regarding whether there's a safety signal.
13             I agree that there are -- these are two
14   different contexts, looking --
15        Q.   Okay.
16        A.   -- for causation versus looking for a
17   safety signal.
18        Q.   Right.
19        A.   But I don't agree that the definition of
20   "permanent or irreversible alopecia," that that
21   health outcome necessarily differs between the two
22   contexts.
23        Q.   Well, you don't do signal detection
24   yourself, right?
25        A.   That's correct.  I don't do signal
```

```
 1   detection.  I do causation analysis.  I do look at
 2   outcome classification, in general, as an
 3   epidemiologist.
 4            I look at, when a case of cancer, for
 5   instance, is classified as a case, and then I look
 6   at the underlying data to see whether that case has
 7   been correctly classified or correctly identified.
 8            And so that is one commonality between
 9   causation analysis and signal analysis.  It's just
10   looking at the quality of the -- the underlying data
11   or looking at the correctness of that outcome
12   classification.
13       Q.  Well, let me ask a question and see if I
14   can get just a simple answer to my simple question.
15            You do not do signal detection analyses,
16   correct?
17       A.  Correct.
18       Q.  You don't regularly utilize the FAERS
19   database to do signal detection analyses, correct?
20       A.  That's correct.
21       Q.  Okay.  So to the extent that there is
22   similarity between two types of analyses, one that
23   you do and one that you do not do, you are not
24   qualified to -- would you agree with me that you are
25   not qualified to describe what is necessary for a
```

 1  signal detection analysis that you do not routinely
 2  perform?
 3      A.  I'd agree that I do not routinely
 4  perform -- or ever perform signal detection or
 5  signal detection analysis.
 6          I do not agree that I'm -- I am unqualified
 7  or that I have no basis to talk about the accuracy
 8  of the underlying data or the validity of the
 9  underlying data for any data analysis.
10          I think, as an epidemiologist, I am
11  qualified to talk about whether a patient who's
12  classified as having a certain outcome on the basis
13  of -- on the basis of certain data is or is not
14  correct.  I don't know if I -- I don't know if I
15  phrased that well.
16          What I mean is that I do routinely look at
17  case definitions or outcome classifications and
18  determine, as an epidemiologist, whether that is
19  correct.
20          And for signal detection, I have no opinion
21  on the method of signal detection or signal
22  analysis.  I'm not talking about the statistics;
23  here, I'm only talking about the underlying data.
24          And, I mean, just in general, as a data
25  scientist, this is an opinion that any person who

 1   Drs. Madigan, Ross, or Plunkett to the effect that
 2   the FAERS analysis provides evidence or support for
 3   a causal effect of docetaxel on permanent or
 4   irreversible alopecia, correct?
 5        A.   I do quote from Dr. Ross and from
 6   Dr. Plunkett where both of them say that they rely,
 7   in part, on Dr. Madigan's analysis of the FAERS
 8   database.  And in the sections of their reports that
 9   I have quoted from, I think that they are listing
10   their sources for the statement that there is some
11   basis -- I think that's the phrase that's used,
12   "some basis" -- to support a causal effect or some
13   basis for causation.
14            So the parts that I have quoted on page 1
15   of my supplemental report do respond to specific
16   statements from Dr. Ross and Dr. Plunkett.  I've not
17   quoted from Dr. Madigan.
18        Q.   Okay.  The statements that you quote on
19   page 1 under Summary of Opinions concerning
20   Dr. Plunkett and Dr. Ross, do you conclude -- do you
21   include a full recitation of everything that they
22   reviewed from Dr. Madigan, or do you refer only to
23   the FAERS analysis?
24        A.   Here I'm referring only to the FAERS
25   analysis because that's the only topic of my

```
 1   supplemental report.
 2        Q.  Okay.  So your supplemental report is
 3   focused only on the FAERS analysis, but you don't
 4   mean for the statement above your signature line to
 5   mean that that's in reference to Dr. Ross or
 6   Dr. Plunkett's overall opinion and the entirety of
 7   the bases for their opinions, correct?
 8        A.  My statement above my signature in my
 9   supplemental report pertains specifically to
10   Dr. Madigan's FAERS analysis.
11        Q.  Very good.  Okay.  That's -- and only to
12   Dr. Madigan's FAERS analysis, right?
13        A.  Yes.  And any reliance on Dr. Madigan's
14   FAERS analysis.  But, yes, the six reports refer
15   specifically only to the FAERS analysis.
16        Q.  And you don't refer to -- you don't even
17   address the other evidence from other experts like
18   the analysis that Dr. Feigal performed, you don't
19   address that in your supplemental report, right?
20        A.  Correct.  That's in my 2020 report.
21        Q.  Right.  We've already -- you've already
22   been deposed on those topics.  And you don't mention
23   anything about any other expert whose reports and
24   information Dr. Madigan -- or, excuse me, Dr. Ross
25   and Dr. Plunkett reviewed, correct?  You're limited
```

1  only to Dr. Madigan's FAERS analysis?
2       A.  In this supplemental report, that's right.
3  I'm not addressing the other sources, including
4  other doctors' analyses that are relied on by
5  Dr. Ross and Dr. Plunkett.  I'm addressing only
6  Dr. Madigan's FAERS analysis.
7       Q.  Okay.  And your -- and then as we sit here
8  today, you're unaware that the Court has found that
9  Dr. Madigan's methodology is sufficiently reliable
10  and that cross-examination by Sanofi is the
11  appropriate method to challenge it, correct?
12       A.  I have no opinion or I guess -- yeah.  I --
13       Q.  You're not here to tell the judge she's
14  wrong, are you?
15       A.  No.  I'm not here to say that.
16            MR. MICELI:  Okay.  Let's take a quick
17  break, and I may be done.  I just want to talk to my
18  co-counsel.
19            But I want to know from Gina and Nicole
20  what I need to do to not screw up my audio.
21            THE VIDEOGRAPHER:  We are now going off the
22  record.  The time is approximately 12:20 p.m.
23            (Recess taken.)
24            THE VIDEOGRAPHER:  We are now going back on
25  the record.  The time is approximately 12:28 p.m.