```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************

     IN RE:  TAXOTERE (DOCETAXEL)        Docket No. 16-MD-2740
 4   PRODUCTS LIABILITY LITIGATION       Section H
                                         New Orleans, LA
 5   Relates to:  Elizabeth Kahn         Wednesday, October 7, 2020
                  16-CV-17039
 6

 7   ****************************************************************

 7                  TRANSCRIPT OF MOTION PROCEEDINGS
 8          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11   FOR THE PLAINTIFF:            PENDLEY BAUDIN & COFFIN
                                   BY:  CHRISTOPHER L. COFFIN, ESQ.
12                                 2505 Energy Centre
                                   1100 Poydras St.
13                                 New Orleans, LA 70163

14                                 DAVID F. MICELI, LLC
                                   BY:  DAVID F. MICELI, ESQ.
15                                 P.O. Box 2519
                                   Carrollton, GA 30112-0046
16
                                   MURRAY LAW FIRM
17                                 BY:  ROBIN MYERS PRIMEAU, ESQ.
                                   650 Poydras St., Suite 2150
18                                 New Orleans, LA 70130

19                                 GIBBS LAW GROUP, LLP
                                   BY:  ANDRE MURA, ESQ.
20                                 505 14th Street, Suite 1110
                                   Oakland, CA 94612
21
                                   BACHUS & SCHANKER, LLC
22                                 BY:  J. KYLE BACHUS, ESQ.
                                   1899 Wynkoop St., Suite 700
23                                 Denver, CO 80202

24                                 BARRIOS KINGSDORF & CASTEIX
                                   BY:  DAWN M. BARRIOS, ESQ.
25                                 701Poydras St., Suite 3650
                                   New Orleans, LA 70139
```

```
 1
     FOR THE DEFENDANT:              SHOOK HARDY & BACON
 2                                   BY:  HARLEY V. RATLIFF, ESQ.
                                          JON A. STRONGMAN, ESQ.
 3                                        MATT DePAZ, ESQ.
                                          CONNOR J. SEARS, ESQ.
 4                                        TORREY PETERSON, ESQ.
                                          CHRIS McRAE, ESQ.
 5                                   2555 Grand Blvd.
                                     Kansas City, MO 64108
 6
                                     IRWIN FRITCHIE URQUHART & MOORE
 7                                   BY:  DOUGLAS J. MOORE, ESQ.
                                     400 Poydras St., Suite 2700
 8                                   New Orleans, LA 70130

 9
     Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR, RMR
10                                   500 Poydras Street, B-275
                                     New Orleans, Louisiana 70130
11                                   (504) 589-7776

12
        Proceedings recorded by mechanical stenography, transcript
13   produced by computer.

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

PAGE/LINE:

PLAINTIFF'S MOTION TO EXCLUDE THE CAUSATION TESTIMONY OF DR. GERALD MILETELLO

By Mr. Coffin                                    4/13
By Mr. DePaz                                     13/8
By Mr. Coffin                                    16/25

DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF ELLEN FEIGAL

By Mr. Sears                                     19/10
By Mr. Miceli                                    27/7

DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. LAURA PLUNKETT

By Ms. Peterson                                  36/24
By Ms. Myers                                     46/20
By Ms. Peterson                                  54/22

PLAINTIFF'S MOTION TO EXCLUDE CERTAIN OPINIONS OF ELLEN T. CHANG

By Mr. Miceli                                    57/5
By Mr. McRae                                     66/14
By Mr. Miceli                                    73/23

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED ON PREEMPTION

By Mr. Ratliff                                   76/23
By Mr. Mura                                      91/3
By Mr. Ratliff                                   98/23

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CAUSATION

By Mr. Coffin                                    101/23
By Mr. Strongman                                 109/15
By Mr. Coffin                                    113/8

PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF MICHAEL KOPRESKI

By Mr. Bachus                                    115/3
By Mr. Ratliff                                   126/18
By Mr. Bachus                                    137/1

<u>P R O C E E D I N G S</u>

(WEDNESDAY, OCTOBER 7, 2020)


10:04:44     (OPEN COURT.)

10:04:44     THE DEPUTY CLERK:  Good morning.  It's October 7th, this
10:04:51 is Taxotere MDL-2740.  This is day two of oral arguments.

10:04:58     THE COURT:  Okay.  Thank you all.  First argument we are
10:05:02 going to address this morning is the motion filed by plaintiffs to
10:05:11 exclude the expert testimony of Dr. Miletello.  This is Document
10:05:16 No. 10919.  Chris Coffin will argue on behalf of the plaintiff and
10:05:23 Matt DePaz on behalf of the defendant.

10:05:25     Mr. Coffin, are you ready to proceed?

10:05:27     MR. COFFIN:  Yes, your Honor.

10:05:38     Good morning, your Honor.  Chris Coffin with Pendley,
10:05:43 Baudin & Coffin on behalf of plaintiff Ms. Kahn, and co-lead
10:05:46 counsel for PSC.  I very much appreciate you accommodating us here.
10:05:51 And Mr. Moore and his firm for accommodating us in such unusual
10:05:51 circumstances.

10:05:56     We're here to argue plaintiff's motion to exclude the
10:05:57 causation testimony of Dr. Gerald Miletello, which recognizes from
10:06:02 the start, your Honor, is that many of the arguments contained here
10:06:06 echo arguments by Mr. Miceli related to Dr. Glaspy.  As the Court
10:06:13 recognized, Dr. Glaspy is an oncologist, Dr. Miletello is an
10:06:17 oncologist, and some of the arguments are very similar because the
10:06:20 testimony overlaps.

10:06:21  1        I am going to focus on two main exclusions that are

10:06:28  2  included in our briefing.  There are some that is not going to be

10:06:32  3  included in my discussion today.  But the two main categories of

10:06:36  4  exclusion focus on the fact that Dr. Miletello should be precluded

10:06:40  5  from testifying directly or indirectly about these two things:

10:06:45  6  No. 1, general and specific causation between any drug and

10:06:48  7  persistent, permanent, or irreversible hair loss; No. 2, any

10:06:53  8  suggestion of causation by referring to case studies or reports of

10:06:57  9  persistent, permanent, or irreversible hair loss in connection with

10:07:01  10  any drug or condition.

10:07:02  11        I am going to talk briefly about both of these.  No. 1 is

10:07:10  12  very clear based on both the report from Dr. Miletello and

10:07:13  13  Dr. Miletello's testimony.  In his report he offers no opinions on

10:07:17  14  causation between any drug and persistent, permanent, or

10:07:23  15  irreversible hair loss.  Now to be clear, this is a major

10:07:27  16  distinction here, Dr. Miletello does talk about reports of

10:07:30  17  permanent hair loss associated with certain drugs or with certain

10:07:34  18  conditions.  What he did not offer are opinions on causation.

10:07:39  19        That's a very important distinction that I'll get in the

10:07:42  20  weeds about in a minute.  But for the purposes of this point No. 1,

10:07:46  21  it's not in his report; if it's not in his report, he should not be

10:07:51  22  able to opine on it.

10:07:52  23        Second of all, in his testimony, he offers no opinions --

10:07:56  24  he states that he is going to offer no opinions as to the drugs

10:08:00  25  that are asked about.  He will not offer opinions about specific

10:08:04  1    drugs and whether they can or cannot cause persistent, permanent,

10:08:08  2    or irreversible hair loss.  I've given the Court some examples

10:08:12  3    here.

10:08:12  4              But as Mr. Miceli noted, in these depositions following

10:08:16  5    the *Earnest* trial, we were very pointed in the questions that we

10:08:20  6    asked these experts because we wanted to insure that we understood

10:08:23  7    what their intention was as far as opinions that they would offer,

10:08:27  8    specifically with regard to potential alternative, quote unquote,

10:08:32  9    causes.

10:08:32  10             So I just wrote some examples there that the Court can

10:08:37  11   reference, but they are throughout Dr. Miletello's deposition.

10:08:41  12             And the third point goes to any references to potential

10:08:47  13   causes of Ms. Kahn's hair loss.  Really this is more broader

10:08:52  14   focusing on not just drugs, as his testimony No. 2 does, but any

10:08:56  15   conditions.  And he specifically states that he is not offering any

10:08:59  16   opinions on the potential causes of Ms. Kahn's hair loss.  And that

10:09:05  17   he would, in fact, refer to a qualified dermatologist, and that's

10:09:08  18   on pages 85 and 86 of his deposition, which is attached as an

10:09:14  19   exhibit.

10:09:14  20             Perhaps the most important, and perhaps I should have

10:09:16  21   started with this, is the defendant recognizes in their opposition

10:09:18  22   memo that Dr. Miletello is not offering opinions on general or

10:09:22  23   specific causation.  So pretty open and shut here, your Honor,

10:09:26  24   based on the report, the testimony, and clearly what the defense

10:09:30  25   says.

10:09:32  1          So moving on to the second prong, which is the exclusion

10:09:35  2   of any suggestion of causation by referring to case studies or

10:09:40  3   reports of persistent, permanent, or irreversible hair loss.  Your

10:09:44  4   Honor had some discussions with I think Mr. Lambert about this on

10:09:49  5   the alternative cause motion and perhaps Mr. Miceli on Glaspy, and

10:09:54  6   I would like to dig into that a little bit more.  What's very clear

10:09:56  7   is that all of the experts agree that case reports alone do not

10:10:00  8   equal general causation.  Super important distinction here.

10:10:04  9   Dr. Miletello's report, as I mentioned, refers to reports, cases

10:10:09 10   have been reported, there have been reports of.  Can find this

10:10:14 11   mostly on pages 9 and 10 of his report.

10:10:17 12          But any testimony regarding case studies or reports

10:10:20 13   alone, alone, outside of reliable causation methodology, they

10:10:25 14   aren't relevant.

10:10:26 15          And I don't think we got to this point in discussion with

10:10:28 16   your Honor yet, but the real issue is what is the relevance of case

10:10:34 17   reports if they're not being offered to prove causation.

10:10:40 18          As you well know --

10:10:41 19          THE COURT:  Would it be to just hold you to your burden

10:10:46 20   of causation?  That you would use these alternate reports to say is

10:10:54 21   this in an effort to at least attack and hold you to your burden

10:10:59 22   since you have the burden of proof on general causation?

10:11:01 23          MR. COFFIN:  I think you're absolutely right, your Honor.

10:11:03 24   I think you're absolutely right, and you hit on this distinction,

10:11:06 25   which I'll talk about in a minute, the distinction between an

10:11:10  1  expert affirmatively using reports for their opinion and then

10:11:15  2  expert -- challenging the plaintiff's expert on their opinions.  We

10:11:19  3  do not dispute that the defendants can use reports of persistent

10:11:25  4  hair loss, permanent hair loss from other drugs when challenging

10:11:28  5  our experts.  The problem is --

10:11:30  6       THE COURT:  Is the position that you can only use this in

10:11:33  7  cross-examination --

10:11:34  8       MR. COFFIN:  Correct.

10:11:35  9       THE COURT:  -- as opposed to bring in an expert to say, I

10:11:37 10  am not making a finding, but there are all of these reports out

10:11:41 11  there that show that could be indicative that other drugs cause

10:11:48 12  permanent alopecia?

10:11:49 13       MR. COFFIN:  That's absolutely our position, your Honor.

10:11:50 14  Because reports alone without some other support, some statistical

10:11:55 15  analysis of clinical trials or some statistical analysis of

10:11:59 16  pharmacovigilance database.  But reports and literature --

10:12:04 17       THE COURT:  No, I understand, because we heard a great

10:12:07 18  deal about that at the last trial and of course in all of the

10:12:10 19  motions then and now about the different levels and how you weigh

10:12:14 20  that evidence.

10:12:16 21       I guess what's troubling to me is, are we saying that

10:12:25 22  defendants can present no evidence of alternate causes without a

10:12:31 23  Bradford Hill analysis?  And so the only way, the only way they can

10:12:39 24  hold you to your burden is through cross-examination, they're not

10:12:44 25  allowed to present any evidence?  And that's pretty much what

10:12:47  1   you're saying.

10:12:48  2            MR. COFFIN:  That's correct.  That's correct, unless,

10:12:50  3   unless their experts want to do the work and follow the standard

10:12:53  4   that this Court has set out; step one being show that there's

10:12:57  5   statistical significance.

10:12:58  6            THE COURT:  Right.

10:12:59  7            MR. COFFIN:  Step two, then show through Bradford Hill

10:13:02  8   that there's a causal relationship.  If they can't do that, then

10:13:05  9   the question becomes, what's the purpose?  Because if it's not

10:13:11 10   relevant -- and I'll cover that in a second.

10:13:13 11            THE COURT:  Couldn't you not handle that through

10:13:15 12   cross-examination in just challenging the testimony that, you know,

10:13:19 13   you're saying that there are these reports, but, Doctor, you and I

10:13:24 14   both know that those reports are basically meaningless?

10:13:26 15            MR. COFFIN:  Here is why that doesn't work, your Honor.

10:13:29 16            THE COURT:  Tell me.

10:13:30 17            MR. COFFIN:  Because, No. 1, it doesn't comport with Rule

10:13:33 18   702, which I'll talk about in a second.

10:13:35 19            But most importantly, it's confusing to the jury, and it

10:13:38 20   becomes very prejudicial to the plaintiffs because the jury is

10:13:41 21   hearing, well, you've heard 50 reports of this and 100 reports of

10:13:45 22   this.  And for a lay jury hearing that there are reports of this,

10:13:49 23   they're thinking, oh, well, if there are reports with Adriamycin,

10:13:53 24   then it must happen with Adriamycin.

10:13:55 25            Because the scientific standards are set out in 702 and

10:14:00 1   in *Daubert* because we want to avoid that type of confusion, which

10:14:04 2   is exactly what happens with lay people.  They don't understand

10:14:07 3   that difference.  And as good of lawyers as we might be to try to

10:14:12 4   explain and put the toothpaste back in the tube that reports don't

10:14:16 5   really meet causation, it's too confusing.  It, quite frankly, it's

10:14:20 6   pretty confusing to lawyers who don't even practice in this area.

10:14:25 7       It really shouldn't be permitted at all because it'll

10:14:28 8   confuse the jury and it's prejudicial.

10:14:30 9       Rule 702 specifically states that expert's opinion must

10:14:34 10  assist the trier of fact to understand the evidence or determine

10:14:38 11  the fact in issue.  When I read this, the question I have is, what

10:14:43 12  fact are we helping the jury to understand by talking about

10:14:51 13  reports, two reports, ten reports, 1,000 reports, that don't have

10:14:54 14  any scientific reliability?  And all of the experts agree, the

10:14:58 15  answer is none, we're not assisting them to determine anything.

10:15:02 16  And allowing references to the case reports with nothing more will

10:15:06 17  only serve to confuse the jury, the point I just went over.

10:15:09 18      I think the case that's most instructive on this, your

10:15:11 19  Honor, is the *Pipetone* case, *Pipetone v. Biomatrix,* which is a

10:15:17 20  Fifth Circuit case from 2002.  I've given you the pincites of pages

10:15:23 21  244 to 45 that specifically talk about if the evidence is not

10:15:29 22  offered for a specific purpose of causation, there's no scientific

10:15:34 23  reliability behind it, it's not relevant.  If it's not relevant, it

10:15:38 24  shouldn't be admitted into evidence.

10:15:40 25      And as I said, the prejudicial effect outweighs the

10:15:44  1   probative value.

10:15:45  2         If I could, your Honor, just read briefly, give you a

10:15:49  3   quick summary. *Pipetone* was a case involving the injection of

10:15:55  4   synthetic synovial fluid into a knee. And the plaintiff's argument

10:15:58  5   was that he contracted salmonella, salmonella from the injection of

10:16:04  6   the synthetic synovial fluid into the knee. The plaintiff's expert

10:16:09  7   who came to say, hey, you know, my opinion is that this synovial

10:16:14  8   fluid caused the salmonella. He said, I don't have any really

10:16:19  9   scientifically based support for it, okay. And when he said that,

10:16:22 10   he said it could or could not have been caused, I don't have any

10:16:27 11   real methodology and basis to support that.

10:16:29 12         And the Court said, "A perfectly equivocal opinion does

10:16:34 13   not make any fact more or less probable and is irrelevant under the

10:16:39 14   Federal Rules of Evidence. Therefore, the district court did not

10:16:42 15   abuse its discretion in excluding Dr. Millet's testimony."

10:16:46 16         THE COURT: Okay. But that was plaintiff's expert.

10:16:52 17         MR. COFFIN: Right.

10:16:52 18         THE COURT: And the plaintiff had the burden of proof in

10:16:53 19   that case.

10:16:54 20         MR. COFFIN: That's right.

10:16:55 21         THE COURT: And the plaintiff has the burden of proof in

10:16:57 22   this -- I guess, I am still back to -- I am in that vortex about is

10:17:01 23   this a true affirmative offense or not a true affirmative offense,

10:17:06 24   and I really thought that would not be a hard question, but I have

10:17:10 25   to tell you for me it is.

10:17:12   1          So I am just wondering, anyway.  So I see that as a

10:17:17   2   distinguishing factor.

10:17:18   3          MR. COFFIN:  I hear your concern.  But what's not

10:17:21   4   distinguishable is that the evidence that's offered has to be

10:17:25   5   relevant for a purpose --

10:17:26   6          THE COURT:  Right.

10:17:26   7          MR. COFFIN:  -- and I cannot figure any other purpose for

10:17:28   8   talking about reports related to an alternative drug, other than to

10:17:31   9   say this drug can cause it.

10:17:35 10          As I mentioned the prejudicial effect -- and these are

10:17:39 11   just the last couple of bullet points I think that are bottom line.

10:17:43 12          Dr. Miletello has not done the work to establish that any

10:17:46 13   drugs or conditions caused persistent, permanent, or irreversible

10:17:50 14   alopecia.  Case reports don't get him there, and if you don't

10:17:57 15   follow, you know, a finding of statistical significance and then a

10:17:59 16   Bradford Hill criteria, he can't get to causation.  And the

10:18:03 17   suggestion that reports could equal causation, it's just not

10:18:07 18   relevant and it's prejudicial.

10:18:08 19          And I think this is the point that your Honor brought up,

10:18:12 20   in a previous argument, and that is there's a big difference

10:18:15 21   between an affirmative expert testimony relying on case reports and

10:18:20 22   challenging the plaintiff's expert using case reports.

10:18:23 23          Big distinction.  Quite frankly, we don't have any

10:18:26 24   problem with B, it's A that we have a problem with.  And for those

10:18:30 25   reasons, your Honor, we would ask that the Court exclude

10:18:33  1    Dr. Miletello's causation opinions and any suggestions of causation

10:18:37  2    by referring to case reports.  Thank you.

10:18:40  3              THE COURT:  Thank you.  Mr. DePaz.

10:19:23  4              MR. DePAZ:  Good morning, your Honor.

10:19:32  5              THE COURT:  Mr. DePaz.

10:19:33  6              MR. DePAZ:  Good morning, your Honor.

10:19:33  7              THE COURT:  Good morning.

10:19:34  8              MR. DePAZ:  Your Honor, you hit the nail on the head when

10:19:36  9    you asked Mr. Coffin if plaintiffs are trying to exclude all of our

10:19:42 10    rebuttal evidence with respect to causation.  The fact is

10:19:48 11    defendants do not carry the burden of proof with respect to

10:19:51 12    causation.  I think Mr. Moore covered this at length yesterday,

10:19:55 13    we're allowed to put forward reasonable hypotheses that challenge

10:19:58 14    plaintiff's conclusions, and that's exactly what we're doing here.

10:20:03 15              With respect --

10:20:05 16              THE COURT:  But do case reports do that?  Is it just

10:20:07 17    these random, antidotal case reports?  And that's what I am -- I am

10:20:17 18    just exploring this.

10:20:20 19              MR. DePAZ:  Sure.

10:20:20 20              THE COURT:  Do we have any reports in medical journals

10:20:23 21    that look through multiple case reports and consider the

10:20:29 22    statistical significance and so that there's some really reliable

10:20:33 23    evidence here as opposed to, you know, Dr. Miletello's in Baton

10:20:36 24    Rouge saying, oh, by the way, I had this one patient that didn't

10:20:39 25    get her hair back.  This antidotal case report.

10:20:46  1           MR. DePAZ:  Sure.  And, your Honor, I think our point is

10:20:48  2  at end of the day, I know that the plaintiffs combined TAX 316 and

10:20:55  3  GEICAM 9805 and they do other things and our experts opine were all

10:21:01  4  unreliable, and so at the end of the day what you're left with is

10:21:03  5  case reports from Taxotere.  And our experts come in and say,

10:21:07  6  you're left with case reports for Taxotere, you're also left with

10:21:08  7  case reports for other drugs.  And so none of them are significant

10:21:14  8  enough to conclude that one drug over another drug establishes an

10:21:20  9  association.

10:21:21  10          Your Honor, Mr. Coffin also raised -- I'll skip through

10:21:25  11  some of my slides here because I think a lot of this has already

10:21:29  12  been addressed by Mr. Moore.

10:21:31  13          But Mr. Coffin raised how could case reports be relevant

10:21:39  14  if not used to address the causation issues.  And this issue was

10:21:44  15  addressed, well not the case report portion, but it was addressed

10:21:47  16  with respect in *Xarelto*.  In *Xarelto*, what plaintiff's experts were

10:21:53  17  doing was they were putting forth safer alternative options, and

10:21:58  18  what we're allowed to do here is rebut that opinion.  So we can do

10:22:02  19  that by saying there's also case reports with these other drugs.

10:22:07  20  And as your Honor saw with the evidence at trial, plaintiff's

10:22:10  21  experts even concede that these other drugs cause permanent

10:22:16  22  alopecia.

10:22:17  23          For example, when cross-examined, Dr. Feigal said when

10:22:22  24  asked what caused permanent alopecia in the background, Dr. Feigal

10:22:27  25  said it was either the Adriamycin or Cytoxan.  Those are two of the

10:22:31  1    potential alternative options here.  Taxol, another alternative

10:22:34  2    option, Dr. Tosti published a paper on it, its association with

10:22:40  3    permanent alopecia.  So our expert should be allowed to put forward

10:22:45  4    that evidence.

10:22:45  5         They should also be allowed to put forward evidence that

10:22:48  6    Taxotere was an appropriate drug.  And by demonstrating that this

10:22:53  7    risk is the same level of risk and same level of evidence with the

10:22:58  8    risk is there for all of the chemotherapies it supports that

10:23:04  9    opinion.

10:23:04 10         THE COURT:  Let me ask you, Mr. DePaz.  And I talked

10:23:08 11    about this yesterday.  What's the difference between Dr. Miletello

10:23:15 12    and Dr. Glaspy, save geography?

10:23:20 13         MR. DePAZ:  Sure, your Honor.  And I think Jon was right

10:23:22 14    when he said there's a lot of overlap there.  But Dr. --

10:23:26 15         THE COURT:  I think there's a great deal of overlap

10:23:28 16    there.  I am just trying to figure out what's different.

10:23:31 17         MR. DePAZ:  Dr. Glaspy does have more expansive opinions,

10:23:35 18    and I think Mr. Strongman also addressed that we would not take

10:23:38 19    both, bring both to just give duplicative testimony.

10:23:44 20         One other point I wanted to make with respect to why

10:23:48 21    would case reports of persistent alopecia with other chemotherapies

10:23:51 22    be relevant to Dr. Miletello's opinions is because Dr. Miletello

10:23:56 23    gives opinions on the informed consent process.  And as your Honor

10:24:00 24    is familiar, when discussing risks associated with chemotherapy

10:24:04 25    drugs, you do not need to prove definitive causation.  You rely on

10:24:09   1    your experience with that medicine, you also rely on the medical

10:24:12   2    literature.  And what Dr. Miletello says is that if you update --

10:24:18   3    if you warn a patient of a risk or that case reports exist with

10:24:22   4    Taxotere, you would do the same thing with the other

10:24:25   5    chemotherapies.

10:24:26   6              So, your Honor, I think that's another distinction.

10:24:33   7              And, your Honor, the other arguments I had to address

10:24:36   8    were not raised by Mr. Coffin, but I will just briefly state that

10:24:41   9    Dr. Miletello's not giving a superiority opinion.

10:24:45  10              THE COURT:  Okay.

10:24:46  11              MR. DePAZ:  I think that was pretty clear in our

10:24:49  12    briefing.  He is saying taxanes are superior to non-taxane

10:24:53  13    chemotherapy, and then he applies a methodology for determining

10:24:56  14    what risks are associated with each drug and which drugs would be

10:24:59  15    appropriate.

10:25:04  16              And finally, your Honor, plaintiffs challenge

10:25:08  17    Dr. Miletello's opinion on alopecia.  This is based on his clinical

10:25:14  18    understanding of alopecia, it's based on his experience and

10:25:17  19    familiarity with chemotherapy labelling, and it's also consistent

10:25:22  20    with the testimony that was admitted in the *Earnest* trial with

10:25:25  21    respect to Dr. Glaspy.

10:25:32  22              That's all I have unless you have anymore questions, your

10:25:35  23    Honor.

10:25:35  24              THE COURT:  I'm good.  Thank you.  Mr. Coffin.

10:26:16  25              MR. COFFIN:  Your Honor, first the last point that

10:26:21  1   Mr. DePaz mentioned about Dr. Miletello's ability to offer opinions

10:26:26  2   about alopecia.  Clearly he is not a dermatologist, and as I said

10:26:31  3   in his deposition testimony, he specifically said he would defer to

10:26:35  4   a dermatologist because he is not an expert in those areas.

10:26:38  5          THE COURT:  The impression I got from Dr. Miletello's, my

10:26:43  6   appreciation -- and I have to tell you, it's 16 of these motions so

10:26:50  7   there will be some time to delve more deeply into it, very

10:26:54  8   frankly -- but said he was not going into this thing trying to

10:27:03  9   challenge Dr. Tosti, it was more that -- I would think every

10:27:07 10   oncologist is aware of alopecia.  And I guess I didn't read his

10:27:14 11   report to be that he's going to challenge Dr. Tosti about the

10:27:18 12   mechanism of alopecia and those sorts of things.

10:27:23 13          So maybe I am misreading it, but I just didn't see that.

10:27:30 14          MR. COFFIN:  And we agree with you, your Honor.

10:27:31 15          THE COURT:  Okay.

10:27:32 16          MR. COFFIN:  We just want to be clear that that's not

10:27:35 17   what's happening here.  Because I just heard Mr. DePaz say, well,

10:27:38 18   he should be able to testify about alopecia.  Can he testify in his

10:27:41 19   practice that he's seen people with alopecia, fine --

10:27:43 20          THE COURT:  I would think every day.

10:27:45 21          MR. COFFIN:  That's right.  -- but there's a line that's

10:27:47 22   crossed because we're talking about permanent alopecia here, and we

10:27:50 23   just want to make sure that that distinction is clear.

10:27:52 24          The other thing, the other issue that Mr. DePaz brought

10:27:55 25   up is whether or not Dr. Miletello can testify about the

10:28:00 1  superiority of taxanes or Taxol.  Quite frankly, whether he's

10:28:05 2  offering opinion on taxane's superiority or Taxotere's superiority

10:28:11 3  doesn't really matter, he has to have a scientific basis to support

10:28:14 4  that and he does not; he does not offer that in his opinions or in

10:28:18 5  his testimony.  And that's a simple rule under *Daubert* that he has

10:28:24 6  to have reliable scientific support.

10:28:28 7       Your Honor, we've heard from Mr. DePaz, and we heard

10:28:32 8  earlier from Mr. Strongman yesterday, this idea that the defendants

10:28:38 9  can present a reliable hypothesis to challenge the plaintiffs,

10:28:45 10 plaintiff's experts.  Again, first of all, a reliable hypothesis

10:28:50 11 would mean that they haven't come to a conclusion yet, and all of

10:28:53 12 these experts will admit that reports don't equal a conclusion of

10:28:57 13 causation.  So what's the reliable hypothesis for?  It's only

10:29:01 14 reliable if it's an active hypothesis.

10:29:05 15      But when the experts testify, the reports themselves do

10:29:11 16 not equal causation, then there is no reliable hypothesis.  So it

10:29:14 17 sounds good to say, well, we get to challenge with this reliable

10:29:18 18 hypothesis; it's not reliable per their own experts' admission.

10:29:24 19      And second of all, I heard nothing from Mr. DePaz and

10:29:27 20 we've seen nothing in the defendant's oppositions to our motion to

10:29:31 21 exclude Dr. Miletello that explains how the reports of permanent

10:29:38 22 hair loss or irreversible hair loss from any other drugs or

10:29:41 23 conditions are relevant whatsoever, because they're not relevant

10:29:46 24 unless they're trying to prove causation.

10:29:49 25      For that reason, our motion should be granted and

10:29:52  1    Dr. Miletello should be excluded from offering such opinions, your

10:29:55  2    Honor.  Thank you.

10:29:56  3          THE COURT:  Thank you.

10:30:07  4          The next motion is the motion to exclude the expert

10:30:10  5    testimony of Dr. Ellen Feigal.  And this motion was filed by the

10:30:16  6    defendants.  Mr. Sears is going to argue the motion on behalf of

10:30:20  7    the defendants and Mr. Miceli on behalf of the plaintiffs.

10:30:33  8    Mr. Sears.

10:30:51  9          Mr. Sears, I am ready when you are.

10:31:32 10          MR. SEARS:  So I am arguing Dr. -- our motion to exclude

10:31:36 11    certain portions of Dr. Feigal's testimony.  I think I am going to

10:31:40 12    start with the general causation piece.

10:31:42 13          We cited *Burst*.  *Burst* is a really interesting case, it

10:31:48 14    deals with a person who developed cancer and they claimed that it

10:31:54 15    was from benzene exposure through gasoline.  And plaintiff had an

10:31:58 16    expert epidemiologist in that case who failed to account for other

10:32:04 17    causative agents, and because of that --

10:32:06 18          THE COURT:  Could you speak up a little bit?

10:32:08 19          MR. SEARS:  I'm sorry.  The epidemiologist in that case

10:32:11 20    failed to account for possible other multiple exposures and

10:32:16 21    causative agents, and because the expert in that case failed to do

10:32:19 22    that, the Court found that it was not a reliable methodology to

10:32:26 23    establish causation and they excluded the expert's opinion.  The

10:32:29 24    same thing is happening here with Dr. Feigal, and that's become

10:32:32 25    very clear after listening to her testimony in *Earnest* and as well

10:32:36  1   as her deposition in *Kahn*.

10:32:38  2          There's really three main things from *Burst* that I think

10:32:42  3   the court laid out that we should consider when analyzing what

10:32:46  4   Dr. Feigal has done here.

10:32:48  5          The court said a factor to consider is whether the expert

10:32:52  6   developed their opinion solely for litigation; Dr. Feigal did that

10:32:56  7   here.

10:32:56  8          The court said it's very important to look at the

10:32:59  9   underlying data upon which the expert relies.  And specifically,

10:33:03 10   the court said you should look to see if there's statistical

10:33:07 11   significance, and the court said that case reports alone do not

10:33:10 12   establish causation.

10:33:12 13          And third, and most importantly for our purposes, the

10:33:15 14   court said that you need to consider whether the expert has

10:33:18 15   adequately accounted for obvious alternative explanations and that

10:33:23 16   confounding factors must be considered.

10:33:30 17          So let's start by talking about what Dr. Feigal's relying

10:33:34 18   on for her underlying data.  You can see that laid out very well in

10:33:38 19   Table 2 to her expert report.  And the first two things that she

10:33:42 20   has are TAX 316 and GEICAM, which are the two clinical trials.

10:33:49 21   What's interesting about the clinical trials is that I asked her if

10:33:54 22   she knew whether the trials independently showed a statistically

10:34:00 23   significant increased rate of persistent alopecia in the Taxotere

10:34:03 24   arm versus the non-Taxotere arm, and she had no idea.

10:34:07 25          And what's really important about that is Dr. Feigal

10:34:09 1    admits that controlled randomized clinical trials are the peak of

10:34:14 2    the evidence, that's where you have to go to look for causation.

10:34:17 3    And here we have two controlled clinical trials that show there's

10:34:21 4    not statistical significance, and she didn't know that when forming

10:34:26 5    her opinions about general causation.

10:34:28 6         THE COURT:  And I know there was a great deal of

10:34:31 7    testimony of Dr. Madigan's reports because they were both dealing

10:34:36 8    with an FAC arm and TAC arm and he combined them and found

10:34:41 9    statistical significance.  So we just throw that out?  Maybe that's

10:34:50 10   what I am asking you, do we just disregard what Dr. Madigan did

10:34:54 11   because it's improper?

10:34:56 12        MR. SEARS:  I think we need to look at the methodology

10:34:59 13   that Dr. Madigan used.  And admittedly I am not a great

10:35:03 14   statistician.

10:35:04 15        THE COURT:  Thank God.

10:35:06 16        MR. SEARS:  I do know there are problems in aggregating

10:35:08 17   data especially when the end point of the study is not what you're

10:35:11 18   studying.  And the end point for both TAX 316 and GEICAM was not

10:35:15 19   persistent alopecia, instead it was overall survival.  So there are

10:35:19 20   a lot of issues when you combine data --

10:35:21 21        THE COURT:  You know, but this is very difficult because

10:35:23 22   this is not a case where you can have a control arm that's not

10:35:27 23   getting chemotherapy because of the very nature of the disease.

10:35:34 24   It's not like I have the flu and we're going to give you a shot and

10:35:37 25   we're going to give you a placebo and let's see who catches the

10:35:42  1    flu.  You don't do that with cancer.

10:35:44  2            But I would think with TAC versus FAC that's probably as

10:35:50  3    good as you would get, don't you think?

10:35:52  4            MR. SEARS:  I agree.  You can't have a trial where you're

10:35:56  5    isolating Taxotere, that doesn't exist, and you can't do that.  I

10:35:59  6    agree your best data does come from TAX 316 and GEICAM.  I

10:36:05  7    understand what Dr. Madigan did, but I do think --

10:36:08  8            THE COURT:  And I understand that there was a great deal

10:36:10  9    of controversy related to that, so I get that.

10:36:15  10           MR. SEARS:  What's also interesting about the TAX 316 and

10:36:19  11   the GEICAM trials are, I asked her some more questions about that

10:36:23  12   in her deposition, and we heard from Mr. DePaz that Dr. Feigal

10:36:27  13   admitted during the *Earnest* trial that it was probably Adriamycin

10:36:29  14   or cyclophosphamide causing the alopecia in the FAC arm.  So I

10:36:33  15   asked her more about that during her deposition, and she's

10:36:36  16   basically disregarding that, she is just saying that's background

10:36:40  17   noise.

10:36:40  18           And I think that's important because another factor that

10:36:43  19   *Burst* looked at is whether the expert is cherry-picking data.  And

10:36:47  20   by excluding the best data we have from TAX 316 and GEICAM, that's

10:36:51  21   exactly what Dr. Feigal is doing.  She is saying this the pinnacle,

10:36:54  22   the most reliable data that we have, and she is just throwing it

10:36:57  23   out for purposes of her opinion.

10:37:09  24           I'll move on and talk about accounting for obvious

10:37:12  25   alternative explanations.

10:37:14  1        So I spent the first half of her deposition talking about

10:37:19  2    epidemiology, confounding factors, why it's important to control

10:37:22  3    her confounding factors.  She agrees you have to look at

10:37:25  4    confounding factors, you got a control for them, theoretically you

10:37:28  5    should isolate the exposure that you're looking at to establish

10:37:31  6    causation.

10:37:31  7        So then I asked her some more questions about, well, what

10:37:34  8    did you do here to do that?  And, you know, all of these reports,

10:37:40  9    the case reports, the clinical trial data, they're all from

10:37:44  10   multiple drug regimens.  And so I asked her in this Table 2 that

10:37:48  11   she has, well, how many of those patients received Adriamycin or

10:37:52  12   cyclophosphamide?  She admitted that probably most, if not all, of

10:37:54  13   them did.  Then I also asked her about endocrine therapy, whether

10:37:59  14   it's an aromatase inhibitor or Tamoxifen, well, how many of those

10:38:01  15   patients received Tamoxifen or an aromatase inhibitor?  She said,

10:38:04  16   well, probably a lot of them did.  But she did not have the data to

10:38:08  17   know how many of them did or what drugs they received.

10:38:10  18        So then I asked her, okay.  So what did you do to control

10:38:12  19   for Adriamycin or cyclophosphamide?  And here is her testimony.  I

10:38:19  20   asked her:  "Well, in these multi-drug regimens, is it important

10:38:23  21   for you to know whether the other drugs in the regimens are capable

10:38:25  22   of causing persistent chemotherapy induced alopecia?"  And she said

10:38:28  23   no.  So by her own admission, she said in the *Ernest* trial that

10:38:34  24   Adriamycin and cyclophosphamide can cause persistent chemotherapy

10:38:37  25   induced alopecia, yet for purposes of her general causation opinion

10:38:41 1    here, she is doing nothing to isolate Taxotere and she is basically

10:38:45 2    trying out that data and not even considering it in forming her

10:38:48 3    general causation opinion.

10:38:49 4         And it's not a reliable methodology and it's exactly what

10:38:54 5    the *Burst* report says that experts cannot do.  You have to look at

10:38:57 6    all of the causes, the reasonable explanations for what can be

10:39:00 7    going on and then isolate the data, which she hasn't done.

10:39:08 8         That's clear when you look at the verbiage that she has

10:39:12 9    on her report.  She has Taxotere regimens, Taxol regimens, and she

10:39:17 10   is calling them regimens because they all involve multiple drugs.

10:39:20 11   She made absolutely no effort to break it out by drug.

10:39:24 12        So I asked her, well, why didn't you break it out by

10:39:26 13   drug, why didn't you have a category for Taxotere and a category

10:39:29 14   for Adriamycin and a category for cyclophosphamide so we would

10:39:33 15   actually know what the numbers look like, and she completely

10:39:36 16   dismissed that as being a crazy idea.  It's something that she

10:39:39 17   didn't do in forming her opinions, and it's something that I think

10:39:42 18   she should have done.

10:39:43 19        I'll spend less time talking about the last two

10:39:50 20   categories of testimony that we're seeking to exclude in the

10:39:53 21   motion.  But one of them is informed consent and the other one is

10:39:57 22   dissemination of risk information.  Mr. Miceli and I talked about

10:40:05 23   that a little bit during her deposition, and I am not entirely sure

10:40:08 24   if we're all on the same page about what Dr. Feigal may talk about

10:40:12 25   or what Dr. Feigal may not talk about, so just so we're clear I

10:40:16  1    wanted to bring it up and talk about it a little bit today.

10:40:20  2          So for informed consent, I just want to make sure I am

10:40:24  3    reading it correctly what she is saying.  Plaintiff says in their

10:40:30  4    motion that they want to have Dr. Feigal offer opinions about what

10:40:34  5    a reasonable physician would do, and they cite to the *Thomas v.*

10:40:39  6    *Hoffman-LaRoche* case for that saying that the expert talked about

10:40:42  7    objective data.  As far as the *Thomas v. Hoffman-LaRoche* case,

10:40:47  8    that's a Mississippi case, it doesn't consider Louisiana law so

10:40:50  9    it's not binding on this court.

10:40:52  10         And I read the entire case and even in that case the

10:40:54  11   court was very clear that the inquiry is what the treating

10:40:59  12   physician would do.  And that's what the law is in Louisiana.

10:41:03  13   Under the Louisiana Products Liability Act, we cited a couple of

10:41:06  14   cases, we cited *Stahl*, we cited *Willett* --

10:41:09  15         THE COURT:  Oh, I agree.  I agree.  So my question is,

10:41:12  16   we're not going to worry about that with Dr. Miletello either

10:41:15  17   about, you know, informed consent?  Because I think we had it with

10:41:20  18   the *Earnest* trial, which was, wait a minute.  You're going to have

10:41:23  19   the treating physician here, he is going to tell you what he does.

10:41:27  20   And I think that's it.

10:41:30  21         MR. SEARS:  I agree, your Honor.  I think both sides

10:41:32  22   should play by the same rules.

10:41:33  23         THE COURT:  I think so, too.

10:41:35  24         MR. SEARS:  If we're on the same page, I'll stop talking

10:41:38  25   about informed consent.

10:41:42  1          The last category is a little bit different,

10:41:45  2  dissemination of risk issue.  Really what Dr. Feigal is saying is

10:41:51  3  that Sanofi needed to provide a different warning, and that if a

10:41:54  4  different warning was given, it would have impacted the discussion

10:41:57  5  that a physician would have had with the patient which might have

10:42:00  6  impacted either the regimen that was offered or the patient's

10:42:04  7  decision.

10:42:05  8          I reread Dr. Feigal's expert report last night, and

10:42:09  9  there's absolutely no methodology at all in her report for her

10:42:12 10  coming to that conclusion.  Because there's no methodology, it

10:42:15 11  doesn't meet *Daubert*.

10:42:16 12          Beyond that, it comes back to this whole treating

10:42:19 13  physician issue.  And any testimony that Dr. Feigal might offer

10:42:23 14  about what Sanofi should have done or when they should have done it

10:42:27 15  is really irrelevant because it's the treating physicians'

10:42:29 16  testimony about what they would have done and we have that

10:42:32 17  information from both Dr. Kardinal and Dr. Larned.

10:42:34 18          Unless you have any questions for me, I'll stop talking.

10:42:37 19          THE COURT:  Let me ask just this question.  As to her

10:42:44 20  general causation testimony, is there anything that's really big

10:42:47 21  and different from the *Earnest* trial?  Other than regimes instead

10:42:54 22  of Taxotere.

10:42:56 23          MR. SEARS:  That and we had her concession that

10:42:58 24  Adriamycin and cyclophosphamide can cause this, which I haven't

10:43:01 25  read the deposition again from *Earnest*, but I don't think she

10:43:04   1   admitted that during her *Earnest* depositions.  I think that's

10:43:07   2   something that just came out during the trial.  So that's the main

10:43:10   3   reason we're filing this motion is because she admits it can cause

10:43:14   4   it but she is doing nothing to control for it now in reaching her

10:43:19   5   general causation opinions.

10:43:20   6           THE COURT:  Thank you.  Mr. Miceli.

10:43:43   7           MR. MICELI:  Yes, your Honor.  Thank you.  Good to be

10:43:46   8   here again, two days in a row after six months of layoff.

10:43:52   9           I want to address -- I came planing to address three

10:43:58  10   issues.  It sounds like the first two have been either agreed to

10:44:07  11   "play by the same rules" I think is the term that Mr. Sears

10:44:11  12   utilized or used in his argument.

10:44:14  13           But with regard to the dissemination of information, it's

10:44:17  14   a little bit different.  I am going to flip through quickly to

10:44:21  15   those, these are the three points.  Again, one and two seem to have

10:44:26  16   been pushed aside to focus on the third.

10:44:28  17           But with the second one, the dissemination of

10:44:32  18   information, Dr. Feigal's report does not address the actual

10:44:35  19   dissemination.  But what she does do is she has to be able to talk

10:44:40  20   about what was available, what was knowable, and what was available

10:44:44  21   to Sanofi to communicate.  And that is part of what her testimony

10:44:48  22   will be because she goes through a number of lines of evidence.

10:44:51  23           But more importantly, she doesn't talk about the

10:44:54  24   dissemination of information specifically to physicians.  But we're

10:44:59  25   in a little bit of a pickle when we're in a deposition because

10:45:03  1    Dr. Feigal can't control the questions she's asked.  The rules that

10:45:07  2    we play by here in the Eastern District of Louisiana say you have

10:45:11  3    to only say object to the form.  I can't say to Mr. Sears, if he is

10:45:14  4    taking the deposition, "that's not part of her report, please move

10:45:17  5    on."

10:45:17  6         So if she says something in her report, if she is asked a

10:45:21  7    question in response, that is not an adoption or a recreation or an

10:45:26  8    initial creation of a new opinion that they can come in and then

10:45:30  9    try to exclude saying she's offered an opinion on disseminating

10:45:34  10   information to doctors and then get an order that excludes an

10:45:38  11   opinion that she does not include in her report.

10:45:41  12        So I want to focus on what she includes in her report and

10:45:44  13   the dissemination of particular information to physicians is not

10:45:48  14   part of it.

10:45:49  15        So let's focus on the third.  Dr. Feigal testified in the

10:45:57  16   *Earnest* trial.  Her methodology is solid.  She passed *Daubert*

10:46:05  17   before and Sanofi does not challenge anything that she did or

10:46:09  18   failed to do in the present report.  She provides a detailed report

10:46:14  19   that sets out every opinion she is going to offer, she walks

10:46:18  20   through how she does it.  She does it exactly the way she explains.

10:46:22  21        In the next -- she doesn't offer case specific opinions,

10:46:27  22   but this is really where I want to come to.  Dr. Feigal's opinions

10:46:32  23   and methodology on general causation are sound.  They don't address

10:46:35  24   it.  Sanofi does not address it.  She calls her shots.  She says I

10:46:40  25   am going to use the Bradford Hill criteria.  She does have

10:46:45  1   Dr. Madigan's report that has the meta-analysis of the two

10:46:48  2   randomized controlled trials and it is entirely appropriate.  It is

10:46:51  3   not only entirely appropriate, it is supported by the Reference

10:46:55  4   Manual on Scientific Evidence.

10:46:57  5        And as an example, your Honor, when you do a clinical

10:47:00  6   study to prove efficacy and you expect to show it's going to be

10:47:04  7   effective in 30 percent or -- between 30 and 40 percent of the

10:47:07  8   people that take the drug, you only need X number of people to

10:47:11  9   demonstrate it's effective.

10:47:14 10        Dr. Glaspy agrees with me on this.  This was not part of

10:47:18 11   the initial argument, but listening to Mr. Sears, I felt like it

10:47:21 12   had to be said.  If you're going to have -- if you're going to do a

10:47:25 13   study that demonstrates an effect between 30 and 40 percent of the

10:47:28 14   people who take the drug, you only need five, six, 700 people in

10:47:33 15   each arm.  If you're going to do a study to find out whether the

10:47:38 16   drug effects positively or negatively five percent of the people,

10:47:42 17   six percent of the people, you're going to need three times as many

10:47:46 18   people in the study.  You need a much larger study.  That's called

10:47:50 19   statistical power.  Dr. Madigan addressed it in his report and in

10:47:54 20   his multiple depositions.  Dr. Feigal addressed it in hers.

10:47:59 21        Dr. Glaspy agrees, if you're going to look for a smaller

10:48:02 22   percentage of effect, you need more people in the study.  That's

10:48:05 23   mathematics.  That's not -- that's not methodology of an expert.

10:48:10 24        When you have underpowered studies to show a desired

10:48:15 25   effect or to show an observed effect, it's appropriate to combine

10:48:18  1    in a meta-analysis.  The argument that we heard earlier this

10:48:22  2    morning about Taxol versus Taxotere, Dr. Glaspy cites to one

10:48:28  3    meta-analysis to demonstrate that taxanes are better than using

10:48:32  4    non-taxanes, that's *Wilson, et al*, the *Cochran* collaborative that's

10:48:36  5    been cited in multiple briefs and in multiple reports.

10:48:40  6         So they get to use meta-analyses or their expert wants to

10:48:45  7    use a meta-analysis to demonstrate that taxanes are better than

10:48:49  8    non-taxanes, but they don't want us to use a meta-analysis to

10:48:54  9    demonstrate that their product causes permanent chemotherapy

10:48:56 10    induced alopecia.  We just want to play by the same rules.  If

10:49:01 11    meta-analysis are good, they're good.  But the Reference Manual

10:49:04 12    says it's appropriate to use them, and so that's why Dr. Madigan

10:49:08 13    did so.

10:49:10 14         Dr. Feigal sets out precisely how she will address

10:49:15 15    general causation, whether Taxotere can cause permanent

10:49:19 16    chemotherapy induced alopecia.  Your Honor will probably remember

10:49:22 17    part of my argument yesterday where we discussed terminology and

10:49:27 18    the particulars.  "Can cause" is a term of art, it means general

10:49:31 19    causation.

10:49:33 20         And Dr. Feigal sets out precisely how she does that:  She

10:49:37 21    explains what she is going to do; she goes through each individual

10:49:41 22    criteria of the Bradford Hill analysis; she sets out each article,

10:49:47 23    goes through each article; she creates a chart for your Honor; she

10:49:54 24    describes which criteria Bradford Hill applies to each piece of

10:50:00 25    evidence; she looks at multiple strands of evidence; she looks at

10:50:04 1   randomized controlled trials, the meta-analysis; she looks at

10:50:09 2   Dr. Madigan's FAERS analysis, which is really the beginning point.

10:50:12 3          You've asked some questions of others, but you haven't

10:50:15 4   asked it of me, about whether or not we have to disprove something,

10:50:20 5   causation.  The answer is Dr. Feigal does it, Dr. Madigan helps do

10:50:25 6   it.  The starting point for trying to determine whether a drug has

10:50:29 7   an effect is the FAERS analysis.  Is there a signal -- that's the

10:50:34 8   first red flag that goes up the flag pole -- is there a signal, a

10:50:38 9   consistent demonstrated signal that there's an increase in reports

10:50:43 10  of a certain event.

10:50:46 11         Granted you've heard -- you've read Dr. Madigan's

10:50:50 12  reports, you've seen his testimony, or you've heard his testimony,

10:50:55 13  and he uses a marker of permanent alopecia because that's not in

10:51:01 14  the MedDRA terms.

10:51:02 15         THE COURT:  Right, right.

10:51:04 16         MR. MICELI:  But he uses it consistently across all of

10:51:07 17  the drugs he examined, Taxol, Adriamycin, cyclophosphamide, 5-FU,

10:51:12 18  epirubicin, Tamoxifen, there's not a demonstrated signal.  So if

10:51:17 19  you're in the starting blocks and saying we're going to investigate

10:51:22 20  whether permanent alopecia is related to a drug, you're coming to

10:51:24 21  the starting line.  The starting line is first out of the gates is

10:51:28 22  there a consistent signal.  There is no consistent signal with any

10:51:32 23  other drug other than Taxotere, any other drug that Ms. Kahn took

10:51:38 24  or could have taken for her condition.

10:51:41 25         So that's the starting point.  Dr. Feigal looked at the

10:51:45  1   literature, did not see any documentation or reporting of

10:51:54  2   randomized controlled trials establishing a possible causal link.

10:51:59  3           So you don't even get to the Bradford Hill analysis

10:52:02  4   because first out is a signal, second out is you look to the

10:52:05  5   randomized controlled data, or meta-analyses randomized controlled

10:52:10  6   data; and if it's not there, you don't go forward with the Bradford

10:52:15  7   Hill criteria.  She did so with Taxotere and she did so

10:52:18  8   painstakingly.  She went through every study, she set out and

10:52:24  9   summarized it for them.  If we want to compare the experts, we

10:52:26  10  stood up here yesterday and said there's no methodology, Dr. Glaspy

10:52:30  11  says I will discuss, I will discuss.  And then he doesn't do

10:52:34  12  anything.

10:52:35  13          This is the discussion we were referring to.  Dr. Feigal

10:52:38  14  sets out the methodology and she step-by-step walks them through

10:52:42  15  it, which is why they have the opportunity to depose her on that.

10:52:45  16  And she's done that consistently.

10:52:52  17          Additionally, when there was any misunderstanding of data

10:52:57  18  that gets reported, Dr. Feigal reached out to three of the

10:53:01  19  published study authors to get clarification.  She includes that in

10:53:05  20  her report.  This is the work that the defendants don't do.

10:53:10  21  Mr. Coffin mentioned earlier about this reasonable hypothesis, they

10:53:15  22  can throw it against the wall to see if it sticks.  But when their

10:53:19  23  experts say that your reasonable hypothesis does not equal

10:53:24  24  causation, it loses its reasonableness.

10:53:28  25          They have -- if they're going to insinuate or say to a

10:53:31   1   jury that another drug caused this and their experts say the

10:53:35   2   evidence that they looked at does not cause it, and in fact one of

10:53:40   3   the cases, we mentioned it yesterday, *DeJean*, when one of the cases

10:53:45   4   says cyclophosphamide has never been shown to cause permanent

10:53:49   5   alopecia, it's unreasonable to say it could have been

10:53:52   6   cyclophosphamide.

10:53:54   7          They state -- they cited today or they mischaracterized,

10:53:58   8   I believe, the testimony of Dr. Feigal.  She doesn't say Adriamycin

10:54:03   9   and cyclophosphamide caused it.  She says it could have been.  We

10:54:09  10   don't know because it's not our responsibility to prove that

10:54:14  11   Taxotere causes permanent alopecia -- I am not going to say

10:54:21  12   permanent chemotherapy alopecia here, induced alopecia, but

10:54:24  13   permanent alopecia to the exclusion of everything under the sun.

10:54:28  14   We have to demonstrate that it involves an increased risk for which

10:54:32  15   our client should have been warned.  Whether that's compared to a

10:54:37  16   background rate, whether that's compared to other drugs.  It is not

10:54:41  17   whether or not it causes it to the exclusion of everything else it

10:54:44  18   could possibly happen in the world.  It's about increased risk.

10:54:48  19   That's what the reasonable evidence of a causal association is that

10:54:52  20   demands, under the testimony of other experts, that demands that a

10:54:57  21   label be changed.

10:54:59  22          So we have to be very careful about how we look at what

10:55:03  23   both Dr. Feigal said and what our obligation is.  She has gone

10:55:07  24   through the painstaking process of a Bradford Hill criteria after a

10:55:11  25   signal is demonstrated and after a statistically significant

10:55:15  1    increased risk was demonstrated through -- statistically through

10:55:20  2    Dr. Madigan's meta-analysis.  And that is why her methodology is

10:55:27  3    sound, her opinions remain unchanged from her previous testimony.

10:55:32  4              Unless you have any other questions, your Honor.

10:55:33  5              THE COURT:  I want to make sure that I understand.  What

10:55:35  6    you're telling me is that you do not intend to offer any evidence

10:55:39  7    through Dr. Feigal that the Taxotere warning was inadequate?  I

10:55:46  8    mean, it is just going to be through my analysis Taxotere can cause

10:55:55  9    permanent alopecia?

10:55:57 10              MR. MICELI:  I would say that the scientific evidence

10:56:00 11    demonstrates --

10:56:01 12              THE COURT:  Right, right.

10:56:01 13              MR. MICELI:  -- that it can cause, not that she is just

10:56:04 14    pulling a rabbit out of a hat here.

10:56:06 15              THE COURT:  No, I get that.  I get that.  But it's not

10:56:08 16    going to be on the labelling -- because there were lots of things

10:56:12 17    that I have in my outline that I think you came out and said we

10:56:15 18    don't intend to do that about informed consent or alternative

10:56:20 19    treatments for Ms. Kahn.

10:56:24 20              MR. MICELI:  Dr. Feigal's report includes background

10:56:28 21    information on what regimens, the regimens that are used for breast

10:56:33 22    cancer, it talks about the informed consent, shared decision-making

10:56:36 23    process.  But she is not the person that offered it in *Earnest* and

10:56:40 24    she is not going to be --

10:56:42 25              THE COURT:  Well, I didn't think so.  And so I thought,

10:56:44  1    well, what happened here.

10:56:46  2            MR. MICELI:  I don't think anything happened.  You heard

10:56:49  3    her testimony at trial, we didn't try to offer that through her

10:56:52  4    then and we're not going to offer it through her now.

10:56:55  5            Again, starting or going back to where I started, she

10:57:01  6    does talk about what is available.  When you look at building of

10:57:04  7    the evidence, you know, you have the Nabholtz -- all through the

10:57:08  8    years.

10:57:09  9            THE COURT:  There's a great deal of background that needs

10:57:12 10    to come out and I understand that.  But I am concerned about

10:57:16 11    opinion testimony --

10:57:17 12            MR. MICELI:  Certainly.

10:57:19 13            THE COURT:  -- that if she is not going to issue an

10:57:22 14    opinion as to what Dr. -- I mean Ms. Kahn's oncologist should have,

10:57:32 15    what the conversation between those two should have been.

10:57:36 16            MR. MICELI:  I agree with you, your Honor.  I don't think

10:57:37 17    she is going to be going there.  I think she will go to what was

10:57:42 18    available to be included.  I think the individual expert who talks

10:57:46 19    about the interactions, boots on the ground kind of relationships

10:57:50 20    with patients, is Dr. Bosserman, but they didn't request a hearing

10:57:56 21    on Dr. Bosserman.  That's fully briefed.

10:57:59 22            THE COURT:  Okay.

10:57:59 23            MR. MICELI:  What I would say, though, is that isolation

10:58:02 24    of Taxotere has been done through the meta-analysis and it's

10:58:04 25    appropriate under the Reference Manual.  It would not be ethical --

10:58:09 1          THE COURT:  Well, you cannot --

10:58:10 2          MR. MICELI:  You can't do a study to test whether you can

10:58:14 3  harm someone.  And because you need a larger number, a

10:58:17 4  meta-analysis is the appropriate statistical tool, epidemiological

10:58:22 5  tool to investigate that.  All epidemiology is it's a science of

10:58:27 6  disease detectives - how does it effect, how does a drug effect

10:58:32 7  outcome, what outcomes happen.  And one of the tools that's

10:58:36 8  available to people who are investigating that is a meta-analysis.

10:58:39 9  Nobody challenges that.  Sanofi's experts rely upon them.  We play

10:58:44 10 by the same rules.

10:58:46 11         THE COURT:  Thank you.

10:58:57 12         MR. SEARS:  Unless your Honor has questions, I have

10:59:00 13 nothing further.

10:59:00 14         THE COURT:  I think I have nothing.  Thank you,

10:59:02 15 Mr. Sears.

10:59:08 16      I need a break.  Court will be at recess for five minutes

10:59:10 17 or so.

10:59:11 18    (WHEREUPON, A RECESS WAS TAKEN.)

11:08:10 19    (OPEN COURT.)

11:08:10 20         THE COURT:  The next motion is the motion to exclude the

11:08:13 21 expert testimony of Dr. Laura Plunkett.  And arguing that case will

11:08:20 22 be Ms. Torrey Peterson on behalf of defendants and Robin Myers on

11:08:24 23 behalf of plaintiff.  This is defendant's motion.  Yes, ma'am.

11:08:28 24         MS. PETERSON:  Good morning, your Honor.  Torrey Peterson

11:08:29 25 on behalf of Sanofi.  May it please the Court.

11:08:32  1              In *Earnest* where plaintiff's toxicologist and

11:08:37  2    pharmacologist Dr. Laura Plunkett gave two main opinions, for

11:08:42  3    Ms. Kahn's case she now has six.

11:08:44  4              Before we get into the new opinions that Dr. Plunkett

11:08:48  5    has, I want to briefly discuss Dr. Plunkett's first original

11:08:51  6    opinion that Taxotere is more toxic than Taxol.  This was an

11:08:55  7    opinion that your Honor previously excluded.  Coming in to the *Kahn*

11:09:00  8    case, we asked her at her deposition:  Are you relying on new

11:09:03  9    evidence?  No.  Are you doing any sort of different methodology?

11:09:06 10    No.  Is your conclusion in any way different?  No.

11:09:10 11              So because there's nothing that has been changed about

11:09:12 12    this opinion or what Dr. Plunkett did to get there, we just

11:09:16 13    respectfully request that this opinion again be excluded because it

11:09:20 14    does not fit the facts of this case.

11:09:23 15              THE COURT:  Okay.

11:09:27 16              MS. PETERSON:  So now her new opinions.  Dr. Plunkett has

11:09:31 17    repeatedly testified.  I have been at every single deposition, I

11:09:35 18    was at trial when she was testifying; and every single time she has

11:09:39 19    spoken, she says I am not providing a causation opinion.  I am not

11:09:42 20    doing a specific causation, I am not doing a general causation, I

11:09:46 21    haven't done that analysis, and I haven't made that determination.

11:09:49 22              But new to her *Kahn* report, Dr. Plunkett has come with

11:09:54 23    new causation opinions.  And the first one is that when used in

11:09:58 24    combination, Taxotere has been a substantial contributing factor in

11:10:04 25    patients who develop permanent chemotherapy induced alopecia.  But

11:10:08  1   to conclude something is a substantial contributing factor, you

11:10:12  2   have to first conclude that the drug causes the alleged injury.

11:10:19  3        And as your Honor is well aware, substantial contributing

11:10:22  4   factor is a legal term of art and it's the causation standard in

11:10:25  5   Louisiana.  And we don't need to look any further than the jury

11:10:30  6   instructions at the *Earnest* trial, where you told the jury

11:10:34  7   plaintiffs must show the defendant's conduct was a substantial

11:10:38  8   contributing factor in bringing about the result.

11:10:41  9        In plaintiff's closing argument, they argued to the jury

11:10:45 10   that Taxotere was that substantial contributing factor.  And one

11:10:50 11   month after that closing argument, Dr. Plunkett issued her new

11:10:54 12   report where one of her new opinions is that when used in

11:10:57 13   combination, Taxotere is a substantial contributing factor.

11:11:05 14        At her deposition we asked her what does substantial

11:11:08 15   contributing factor mean to her, and she gave us a variety of

11:11:13 16   testimony.  This included more likely than not, included more than

11:11:17 17   50 percent of the time, included increased risk.  She says I know

11:11:21 18   it's a legal standard, I know that it's used in the legal context.

11:11:24 19   She gave us all of these different descriptions and definitions of

11:11:27 20   them, but what's important is never once did that description that

11:11:31 21   she gave us match your instructions in the *Earnest* trial.

11:11:35 22        So if Dr. Plunkett is -- not only should she not be

11:11:38 23   giving this opinion period, but if she does come into court and

11:11:42 24   give an opinion that when used in combination, Taxotere is a

11:11:46 25   substantial contributing factor and she is defining that

11:11:48  1   differently than your Honor is, when the jury goes back to

11:11:53  2   deliberate that's confusing to them because it's a different

11:11:56  3   standard and she is setting it out differently.  And she shouldn't

11:11:59  4   be able to do that.

11:12:00  5        This just dovetails into her next causation opinion,

11:12:08  6   which is that Taxotere carries an independent risk of permanent

11:12:13  7   alopecia.  One of the ways we asked her is what does substantial

11:12:17  8   contributing factor mean to me, and she says, "so it's my opinion

11:12:20  9   about carrying an independent risk that these two opinions are

11:12:23  10   basically tied together.  The substantial contributing factor means

11:12:27  11   independent risk or independent risk means substantial contributing

11:12:30  12   factor."

11:12:31  13        But either way, for her to conclude that Taxotere is an

11:12:35  14   independent risk just like substantial contributing factor, she

11:12:38  15   first has to conclude the drug causes the injury.  And she's told

11:12:42  16   us over and over and over again she hasn't done that work.

11:12:46  17        So while Dr. Plunkett is trying to back door in these

11:12:50  18   causation opinions, she is also saying at the same time she hasn't

11:12:54  19   done the work to get there.  And so for these reasons, those two

11:12:57  20   opinions should be excluded.

11:13:00  21        Next.  Dr. Plunkett has expanded this new opinion for her

11:13:11  22   *Kahn* report about DIA versus PCIA, something she calls drug induced

11:13:16  23   alopecia and permanent chemotherapy induced alopecia.  She

11:13:21  24   testifies both that these are separate medical conditions but

11:13:24  25   they're also on some sort of spectrum that you can have a patient

11:13:28  1    get DIA but it develops into PCIA.  So we just asked her, what

11:13:31  2    exactly do you mean by that, when does one turn into the other,

11:13:34  3    when can you tell they're separate medical conditions?  And she

11:13:41  4    says, I can't answer that.  I can't answer what the difference is

11:13:45  5    in my opinions.  I can't tell you that if you do a scalp biopsy at

11:13:52  6    three months after chemotherapy you can tell whether it's DIA or

11:13:56  7    PCIA.  She says, I just know these two separate conditions exist

11:13:59  8    but I can't tell you what they mean.

11:14:00  9        If Dr. Plunkett can't tell us at a deposition what her

11:14:04  10   opinion means, she certainly shouldn't be able to walk into a

11:14:07  11   courtroom and give this opinion to a jury without having properly

11:14:12  12   explained it.

11:14:12  13       And the reason that she can't do it is because she is not

11:14:16  14   qualified to do it.  She has many different qualifications, she is

11:14:19  15   a toxicologist, a pharmacologist, and her opinions can still be

11:14:23  16   relevant without being a dermatologist or an oncologist, but this

11:14:26  17   is just an opinion that is outside of her wheelhouse and she

11:14:29  18   acknowledges it.

11:14:37  19       The final point is Dr. Plunkett's weight-of-the-evidence

11:14:40  20   methodology.  And one of the reasons that we raised this in our

11:14:45  21   *Kahn* briefing is because when Dr. Plunkett came into trial, she was

11:14:48  22   talking to the jury about her weight-of-the-evidence methodology.

11:14:52  23   She was explaining the different pieces of evidence she looked at,

11:14:55  24   she said some evidence is apples, some is oranges, some is

11:14:59  25   grapefruits and you can put it in the baskets and you can see which

11:15:03   1   is basically heavier.  But nowhere in her report or any of her

11:15:07   2   testimony has she ever explained what evidence is what, what is an

11:15:12   3   apple, what is a grapefruit, and how she actually weighted those

11:15:17   4   different pieces of evidence.

11:15:18   5          And in the MDL setting in particular, the authority is

11:15:22   6   clear that for an expert to rely on a weight-of-the-evidence

11:15:26   7   methodology, they have to follow three pretty clear steps.  The

11:15:29   8   first is they have to describe how they gathered and assessed their

11:15:32   9   data; two, they have rigorously explain each piece of their

11:15:36  10   evidence and how they are weighting it; and then third, they have

11:15:39  11   to demonstrate that how they're weighting it is scientifically

11:15:42  12   reliable.

11:15:44  13          Now, while Dr. Plunkett was required to do all three, she

11:15:47  14   just failed to do so.  And this failure makes her methodology

11:15:54  15   virtually standardless and unacceptably manipulable.  This is

11:16:00  16   particularly important here where versus the *Earnest* case she has

11:16:03  17   four brand new opinions.

11:16:05  18          Now, Dr. Plunkett didn't adjust her reliance list, she

11:16:11  19   wasn't adding in new evidence that she was relying on, looking at

11:16:15  20   new data, she didn't walk us through how she was able to conclude

11:16:19  21   all of a sudden that Taxotere is a substantial contributing factor.

11:16:23  22   None of this is explained through her weight-of-the-evidence

11:16:26  23   methodology, her conclusion has just changed to add in four new

11:16:29  24   opinions without adjusting what she did, adjusting her methodology,

11:16:33  25   explaining her methodology and how she got here.  And because she

11:16:38  1    didn't explain it, we know that the scientific reliability, based

11:16:44  2    on the case law, that there's issues with it.

11:16:46  3            THE COURT:  But I excluded that last time, that Taxotere

11:16:49  4    is more toxic.

11:16:52  5            MS. PETERSON:  Yes, your Honor.

11:16:53  6            THE COURT:  I did, okay.

11:16:56  7            MS. PETERSON:  So the first one you excluded last time.

11:16:58  8            THE COURT:  And I allowed the second one.

11:17:01  9            MS. PETERSON:  You've allowed the second one.  The third

11:17:03  10   one, the biological plausibility, that's new in her report, she

11:17:07  11   touched on it at the *Earnest* trial; candidly, that's in

11:17:10  12   Dr. Plunkett's wheelhouse, that's what she does.  But the new

11:17:13  13   opinions down below, I mean, that Taxotere carries an independent

11:17:16  14   risk to substantial contributing factor, those are causation

11:17:19  15   opinions, and she told us she is not doing that here.  And then

11:17:22  16   with the 612, the DIA is different and the PCIA, I mean, her own

11:17:26  17   testimony says I can't explain really what that difference is.

11:17:30  18            So that's why we're moving on these new ones.

11:17:33  19            Her weight of the evidence methodology applies to all six

11:17:36  20   of her opinions, but we think it's particularly important to

11:17:39  21   re-evaluate her methodology where she was able to conclude these

11:17:45  22   brand new opinions but she didn't rely on any new data, she didn't

11:17:49  23   readjust it, she didn't walk through her report and say even though

11:17:52  24   I am relying on the same data, I am going to explain how I got to

11:17:56  25   these brand new conclusions here.  And because she didn't explain

11:17:59  1    it, we can't really challenge her on if it was correct, if it was

11:18:03  2    scientifically reliable.

11:18:04  3        And while Sanofi could have certainly spent seven hours

11:18:08  4    of a deposition walking through each piece of evidence she relied

11:18:11  5    on asking her how she considered it, how it went into her

11:18:14  6    methodology, it's not Sanofi's burden to do that.  It's

11:18:17  7    Dr. Plunkett's burden to outline that in her report.

11:18:29  8        THE COURT:  I guess -- I am not sure how I even want to

11:18:41  9    word this question.  But we have drug induced alopecia and

11:18:47 10    permanent chemotherapy induced alopecia, and I remember Dr. Tosti's

11:18:54 11    deposition just independently and her explaining that.

11:18:58 12        MS. PETERSON:  Sure.

11:18:59 13        THE COURT:  Does Dr. Plunkett have to do some real or is

11:19:06 14    it just -- can she just say that we believe drug induced alopecia

11:19:14 15    is virtually what I am going to guess up here -- even though I am

11:19:18 16    afraid because it's going to be in the record and you're going to

11:19:20 17    say you said this, you held this, and I didn't hold anything -- but

11:19:24 18    off the top of my head, I would say 98 percent of the people have

11:19:28 19    drug induced alopecia that undergo chemotherapy.  The question is

11:19:34 20    whether or not it grows back.

11:19:35 21        And does she need to say more than that?  And that's what

11:19:38 22    we're talking about when we say Taxotere has a greater risk of

11:19:42 23    permanent alopecia; that is, that it does not grow back?  I mean,

11:19:46 24    does she have to do some analysis to explain what that means?

11:19:49 25        MS. PETERSON:  Your Honor, I think yes.  But to your

11:19:53 1   point, plaintiffs have other experts that are providing that

11:19:56 2   opinion, such as Dr. Tosti.

11:19:58 3            THE COURT:  Isn't it just a definition?  This is what we

11:20:01 4   mean, drug induced alopecia is what happens to virtually everybody,

11:20:07 5   your hair falls out when you take chemotherapy.  Permanent alopecia

11:20:11 6   is when it doesn't grow back.

11:20:13 7            MS. PETERSON:  Sure.

11:20:14 8            THE COURT:  And she needs to do some sort of study to

11:20:17 9   just define this is what it means?

11:20:19 10           MS. PETERSON:  Well, when we asked her about it, she said

11:20:23 11  she didn't know what the difference was.  I mean, we asked her, you

11:20:27 12  know, so when is it one and when is it the other, and she says I

11:20:31 13  can't answer that for you.  And so --

11:20:32 14           THE COURT:  I can tell you it's been described in the

11:20:34 15  literature and what I've relied upon.  So when I say permanent

11:20:38 16  chemotherapy induced alopecia, I am relying on what it says in the

11:20:41 17  literature.  I guess --

11:20:59 18           MS. PETERSON:  Your Honor, I take your point that these

11:21:01 19  are two different concepts and they could be just two different

11:21:05 20  definitions in the literature.

11:21:06 21           THE COURT:  I don't think that requires some -- I guess I

11:21:10 22  am just wondering, do you really need some big particularized

11:21:16 23  background to understand that concept?  And I am just thinking for

11:21:22 24  myself.  When I have friends that undergo chemotherapy, I

11:21:27 25  absolutely knew their hair was falling out.  You anticipated it

11:21:32  1   would grow back.  And that's a clear -- those are two things that

11:21:38  2   are different, and if she says, look, I am talking about the

11:21:41  3   literature reports for those that suffer permanent chemotherapy

11:21:45  4   induced alopecia and that's what those two mean, I am not making a

11:21:50  5   diagnosis -- maybe I am oversimplifying it.

11:21:54  6        MS. PETERSON:  I guess, your Honor, I think the biggest

11:21:57  7   issue that we have with this is that Dr. Plunkett with her various

11:22:00  8   degrees and, you know, trial they spent about 20 minutes talking

11:22:04  9   about all of her qualifications and how much she has done.  And she

11:22:07 10   comes into trial with all of this introduction and she's sitting

11:22:11 11   there telling the jury, so there is something called DIA and

11:22:15 12   something called PCIA and Taxotere causes PCIA or it's an increased

11:22:20 13   risk or substantial contributing factor with PCIA, and these other

11:22:24 14   drugs only relate to DIA.  But if she is going to come in and give

11:22:29 15   that type of testimony and explain that there's these two different

11:22:34 16   conditions, I respectfully think that she should be able to explain

11:22:37 17   what those mean aside from just regurgitating something that she

11:22:41 18   found in the medical literature.  She has to be able to explain,

11:22:44 19   well, why are you giving this opinion, what are those differences.

11:22:46 20        And when this, especially because this opinion is

11:22:49 21   duplicative of other plaintiff's experts, I think that there's just

11:22:53 22   more qualified individuals who can provide this testimony and that

11:22:57 23   Dr. Plunkett is just wading into territory that just isn't in her

11:23:03 24   wheelhouse.  And I think that if she is giving that testimony --

11:23:06 25        THE COURT:  So if Dr. Tosti testifies first and says this

11:23:09 1   is what drug induced alopecia is and permanent chemotherapy induced

11:23:16 2   alopecia, these are the definitions and I am the expert in the

11:23:18 3   field so I can tell you that, then Dr. Plunkett can come behind and

11:23:22 4   say you've heard from Dr. Tosti that this is what it is and that is

11:23:26 5   what the research says, does that fix the problem?

11:23:29 6          MS. PETERSON:  I am not sure why she would need to do

11:23:31 7   that then.

11:23:31 8          THE COURT:  Because she has to tell you what the research

11:23:33 9   is, that it's associated with a greater risk.

11:23:39 10         And perhaps it is cumulative.  That's a different issue,

11:23:44 11  that's a different issue.

11:23:46 12         But if you're saying that's in her wheelhouse whether or

11:23:50 13  not it's associated with a greater risk -- okay.  I think I'm done.

11:24:00 14         MS. PETERSON:  If you have any other questions, your

11:24:02 15  Honor, at this time.

11:24:03 16         THE COURT:  No.  And let me hear from the plaintiffs

11:24:04 17  first and then we'll go back.

11:24:06 18         MS. PETERSON:  That sounds good.

11:24:07 19         THE COURT:  Thank you, ma'am.  Ms. Myers.  Yes, ma'am.

11:25:02 20         MS. MYERS:  Good morning, your Honor.  Before I begin, I

11:25:04 21  would like to thank the Court for affording me the opportunity to

11:25:07 22  speak before you today.  I really don't get out much, so having

11:25:10 23  said that, may it please the Court.

11:25:13 24         THE COURT:  Nobody gets out much since about March.

11:25:16 25         MS. MYERS:  That is true.

11:25:17  1          Sanofi has asserted basically four different challenges

11:25:19  2     to Dr. Plunkett's testimony.  I believe it makes most sense to

11:25:22  3     start with Sanofi's argument about the methodology used by

11:25:26  4     Dr. Plunkett in rendering her expert opinions in this case.

11:25:29  5          THE COURT:  Let me ask you something.  Why would I allow

11:25:32  6     her to say that Taxotere is more toxic than Taxol when I didn't

11:25:36  7     last time?

11:25:40  8          MS. MYERS:  We can do that.  We can actually address an

11:25:43  9     actual opinion being offered by Dr. Plunkett.  So Sanofi takes

11:25:47 10     issue with Dr. Plunkett's opinion that Taxotere is generally more

11:25:50 11     toxic than Taxol claiming that it's generalized comparison without

11:25:54 12     a methodology and not relevant to the case and is confusing because

11:25:57 13     it draws a link between toxicity and PCIA.  As discussed -- well,

11:26:03 14     it would have been discussed, Dr. Plunkett's opinion, including

11:26:07 15     this opinion, that Taxotere is more toxic than Taxol is based on

11:26:10 16     sufficient facts and data in the product of a scientifically valid

11:26:14 17     methodology previously addressed, which would have been the

11:26:16 18     weight-of-the-evidence methodology.

11:26:18 19          The facts of the case have changed and this opinion does

11:26:22 20     actually fit this case.  The medical literature reviewed in

11:26:25 21     reaching this opinion included Sanofi's own studies which indicated

11:26:29 22     an increased general toxicity for Taxotere over Taxol.  Moreover,

11:26:34 23     in contrary to Sanofi's assertions, her analysis includes toxicity

11:26:40 24     before -- or beyond permanent alopecia.

11:26:41 25          So using the generally accepted weight-of-the-evidence

11:26:44 1  methodology, Dr. Plunkett performed a comparison of the scientific

11:26:48 2  literature in Sanofi's clinical trial results to reach the

11:26:52 3  conclusion at issue, and that conclusion is the same that all of

11:26:55 4  the literature has actually reached as well.

11:26:58 5        Specifically, Sanofi's own study TAX311 supports this

11:27:02 6  opinion, as well as testimony from Sanofi's own expert Dr. John

11:27:06 7  Glaspy, who is also a medical oncologist who treats patients like

11:27:09 8  Mrs. Kahn.  He agreed that there was a ten-fold increase in the

11:27:12 9  toxicity of Taxotere over Taxol and discussed how he uses this type

11:27:17 10  of information in his treatment of patients.  This is further proof

11:27:20 11  that this opinion is relevant to the risk-benefit analysis that

11:27:24 12  plaintiffs treating physicians use to determine whether that

11:27:29 13  risk-benefit analysis would change with this specific information

11:27:33 14  and is pertinent to plaintiff's burden of proof at trial.

11:27:36 15        This fact is evident from the depositions that were taken

11:27:40 16  of the treating physicians in this case where Sanofi pushed the

11:27:44 17  issue of certain toxicities of Taxol and of Taxotere and asked

11:27:49 18  calculated questions to get sound bites from these physicians on

11:27:53 19  certain toxicities and whether or not that treating physician would

11:27:58 20  consider those when making their recommendations to the patient.

11:28:03 21  So it stands to reason that if these certain toxicities are

11:28:07 22  important, like neuropathy, then it should also be discussed with

11:28:11 23  treating physicians why the overall toxicity should be discussed or

11:28:15 24  can be discussed by an expert in her area of expertise.

11:28:19 25        As someone said in the briefing, what's good for the

11:28:23 1   goose is good for the gander.

11:28:24 2          And finally, as to the discussion of admitting the

11:28:29 3   testimony because it would draw a link between toxicities and PCIA,

11:28:33 4   Dr. Plunkett's report does not make that connection at all.  Sanofi

11:28:37 5   in my opinion is asking the Court to make a giant leap to make that

11:28:42 6   connection, and a leap that reminds me of when my slightly

11:28:45 7   overweight border collie-corgi-pit bull tries to jump on to my bed,

11:28:51 8   unbelievable and rarely successful.

11:28:59 9          As to the argument about Dr. Plunkett's methodology, she

11:29:06 10  did describe the data and the study that she reviewed in her expert

11:29:10 11  report, that's on page 3.  And she actually says that she has a

11:29:13 12  list that she attaches to her report that outlines all of the data

11:29:18 13  in the studies that she reviewed.  The data includes studies by

11:29:21 14  Nabholtz, Sedlacek, a few clinical studies performed by Sanofi

11:29:26 15  which were TAX 316, TAX 311 and GEICAM, it included Sanofi's

11:29:31 16  documents that included a review of -- cumulative review of the

11:29:35 17  evidence and core data sheets.  There's also medical literature on

11:29:38 18  Taxotere and permanent alopecia that she reviewed, regulatory

11:29:41 19  submissions, and other documents produced in this litigation as

11:29:44 20  well as depositions.  The steps taken to gather the data are clear.

11:29:48 21         The second step for explaining.  Dr. Plunkett does

11:29:51 22  explain how she weighted the evidence.  In her deposition she

11:29:54 23  stated that she looked at the case studies, the clinical trial

11:29:57 24  information which she deemed, quote, an important piece of the

11:30:00 25  puzzle.  She also looked at human data from those clinical studies,

11:30:04  1   which she noted to be of particular concern in the hierarchy of

11:30:09  2   evidence.  And she also looked at pharmacokinetic data from other

11:30:12  3   studies and the labels.

11:30:14  4        She even put that evidence in weighted order.  If you go

11:30:17  5   to page 14 of plaintiff's response in opposition, and it's

11:30:22  6   Exhibit 2 to Plunkett's depo on page 196, line 3 to 23 from 2018.

11:30:31  7   She was asked:  "Did you somehow put them in order as to what was

11:30:35  8   the most important to your opinions to the least important?

11:30:40  9        Answer:  To some extent, yes.  I do do that in any of my

11:30:44 10   weight of evidence analysis.  So, for example, if I am looking at

11:30:47 11   something like this, permanent alopecia, which is something that I

11:30:50 12   wouldn't be able to say that specific end point demonstrated in

11:30:53 13   animal studies, instead I would be relying -- I would be looking

11:30:57 14   for human data in human experience.  Absolutely.  That information

11:31:00 15   would be of importance to forming that opinion with permanent

11:31:03 16   alopecia."

11:31:05 17        Finally, Dr. Plunkett doesn't have to weigh or explain

11:31:09 18   that the weighting methodology was scientifically reliable.

11:31:13 19        THE COURT:  Wait, I'm sorry.  What did you say?

11:31:15 20        MS. MYERS:  Dr. Plunkett does not have to explain that

11:31:17 21   the weighting methodology was scientifically reliable.  The rule is

11:31:20 22   that the assessment or weighing of evidence must not be arbitrary,

11:31:23 23   but must itself be based on methods of science.  And that's from

11:31:27 24   Zoloft, 858 F.3d at 796.  So Dr. Plunkett's weighting is based upon

11:31:33 25   a widely accepted and recognized principles of pharmacology and

11:31:37 1    toxicology and a methodology used is included in the Reference

11:31:41 2    Manual on Scientific Evidence as a tool commonly used by experts in

11:31:45 3    providing opinions on bodies of data or studies which was done in

11:31:49 4    this case.

11:31:49 5         Indeed the same method was used by Dr. Plunkett in

11:31:53 6    forming her opinions in the *Tylenol Products Liability*.  And in

11:31:57 7    that case, it was also found to be reliable.

11:31:59 8         Moreover, this Court has previously accepted Dr. Plunkett

11:32:02 9    as an expert in pharmacology and toxicology in the *Earnest* trial

11:32:07 10   and Dr. Plunkett's report and conclusions from that trial were

11:32:09 11   based upon the same methodology that Sanofi is continuing to assert

11:32:13 12   as unreliable.

11:32:15 13        Sanofi might not like Dr. Plunkett's conclusions but that

11:32:19 14   doesn't make them unreliable.

11:32:23 15        THE COURT:  There was argument that Dr. Plunkett has to

11:32:34 16   perform some analysis to differentiate between drug induced

11:32:41 17   alopecia and permanent chemotherapy induced alopecia.  Could you

11:32:46 18   just briefly address that?

11:32:48 19        MS. MYERS:  Yes, your Honor.  And you are correct, it is

11:32:50 20   just a definition.  So Dr. Plunkett's expert report does include an

11:32:55 21   expanded discussion with a summarization of PCIA and DIA

11:33:00 22   definitions.  But the discussion is merely an inclusion of

11:33:03 23   definitions of PCIA and DIA taken from her review of the data and

11:33:08 24   the medical literature and the descriptions that were in those

11:33:11 25   materials.  So she doesn't create her own definition.  Further,

11:33:18  1   these are different types of toxicity and are certainly within

11:33:21  2   Dr. Plunkett's expertise to discuss, but she doesn't create this

11:33:24  3   definition on her own and she doesn't provide a causation opinion

11:33:27  4   on either of these types of toxicity.  She just states that the

11:33:31  5   medical literature says this is what they are.

11:33:34  6        Most importantly, Sanofi asserted the same argument in

11:33:40  7   *Earnest* and the Court rejected it.

11:33:42  8        But with that said, the test is whether the information

11:33:42  9   is helpful to the trier of fact, and plaintiffs contend that this

11:33:46 10   information is.  The toxicities are clearly defined, and actually

11:33:50 11   Dr. Plunkett had no problem providing a distinction between the two

11:33:53 12   toxicities as discussed in the medical literature.  She discussed

11:33:57 13   the distinction at her deposition, and that is on page 9 of

11:34:02 14   plaintiff's opposition where it says:

11:34:07 15        "Q. Can you define for me drug induced alopecia?

11:34:11 16        A. I am not a clinician or physician that diagnoses.  However,

11:34:15 17        certainly being a toxicologist and pharmacologist, I see drug

11:34:19 18        induced alopecia as hair loss; whereas the issue of permanent

11:34:23 19        or persistent alopecia irreversibility is a different injury,

11:34:27 20        it's the inability to regrow.  So to me, as a toxicologist,

11:34:31 21        they are two different things.

11:34:33 22        Q. Would you define for me permanent chemotherapy induced

11:34:36 23        alopecia?

11:34:37 24        A.  I defined it in my report as being reported by clinicians

11:34:40 25        as alopecia that is something that's seen more than six months

11:34:45 1      after treatment with the drug.  I am not a clinician, I am not

11:34:48 2      redefining it.  I am using it the way that the clinical

11:34:51 3      literature describes it and how I read that as a

11:34:54 4      pharmacologist and toxicologist."

11:34:57 5           Your Honor, at the end of the day, these terms are not

11:35:00 6      opinions and are relevant to the issue of permanent hair loss and

11:35:04 7      within the toxicology of Taxotere.  This is simply Sanofi's

11:35:08 8      disagreement with the language that is not of Dr. Plunkett's

11:35:11 9      creation and goes to weight or credibility at the end of the day

11:35:14 10     and not admissibility.

11:35:17 11          THE COURT:  Thank you.

11:35:20 12          MS. MYERS:  I just wanted to address the fourth factor

11:35:23 13     that was discussed about whether or not there are actually two new

11:35:28 14     causation opinions in this case.

11:35:30 15          THE COURT:  Oh, yeah.

11:35:33 16          MS. MYERS:  Okay.  Saying something is a causation

11:35:36 17     opinion does not make it so.  First, Dr. Plunkett's opinions in

11:35:40 18     this case are and will be limited to pharmacology and toxicology of

11:35:44 19     Taxotere and other chemotherapy drugs.  Dr. Plunkett's statement

11:35:47 20     that Taxotere carries an independent risk of PCIA, which is not

11:35:51 21     rare, and the statement that Taxotere has been found to be a

11:35:54 22     substantial contributing factor in PCIA are just that, statements.

11:35:58 23     Those are not medical causation opinions.  Both of those statements

11:36:01 24     were made after Dr. Plunkett reviewed the data that indicated that

11:36:06 25     Taxotere has been associated with irreversible hair loss, which is

11:36:09  1   toxicity, to a greater extent than other chemotherapy drugs and was

11:36:14  2   not rare based on the evidence from that data review.

11:36:17  3        Moreover, these statements are not legal conclusions.

11:36:19  4   Dr. Plunkett explained in her deposition that these statements were

11:36:22  5   made to describe what the data showed when identifying something in

11:36:25  6   a combination therapy that has, one, an independent risk; and two,

11:36:29  7   that that risk contributed to that particular experience.  And in

11:36:34  8   this case it's PCIA.

11:36:35  9        So, for example, if you go to page 7 of the opposition,

11:36:44  10  Dr. Plunkett cites:  "I am talking about it as a toxicologist.  In

11:36:50  11  other words, when something can be seen independently, I believe

11:36:53  12  that that independent risk based on then the experience in the

11:36:56  13  published literature about the fact that Taxotere was one of the

11:36:59  14  more commonly reported drugs, commonly reported drugs that's linked

11:37:03  15  to that."  That's to the point and entirely different from a legal

11:37:07  16  standard that the court uses.

11:37:08  17       There's nothing confusing about that statement.  And

11:37:10  18  again, the Court has accepted Dr. Plunkett as an expert in

11:37:13  19  pharmacology and toxicology and should allow this testimony.  Thank

11:37:19  20  you.

11:37:20  21       THE COURT:  Thank you.  Ms. Peterson.

11:37:44  22       MS. PETERSON:  Three brief points, hopefully.  So first I

11:37:52  23  just want to briefly touch back on the more toxic opinion.  Your

11:37:57  24  Honor asked Ms. Myers, you know, what's different, why should I

11:38:00  25  include it this time where I didn't last time.  And I think what

11:38:04  1   she was trying -- or I believe this is what her response related

11:38:06  2   to, that Dr. Glaspy, that in his clinical practice that he talks

11:38:12  3   about toxicities.

11:38:13  4        But I think that there's a very clear difference about

11:38:15  5   when an oncologist is talking about treatment choices with a

11:38:19  6   patient and discussing side effects and side effects that are seen

11:38:22  7   with drugs over the other, versus Dr. Plunkett who is giving one

11:38:27  8   generalized conclusion and just a blanket statement that this one

11:38:30  9   is more toxic than this one.  And I think as your Honor already

11:38:33 10   pointed out in your last order, that this generalized comparison

11:38:37 11   just doesn't fit the facts of the case.  But if you're going to

11:38:41 12   talk about individual toxicity or individual side effects per drug

11:38:45 13   and honestly weighing what is most important to a patient, that's

11:38:47 14   just two different ball parks that we're going in here.

11:38:51 15        The second is moving onto the weight of the evidence.

11:38:56 16   Ms. Myers, again, she explained that Dr. Plunkett has done a proper

11:39:01 17   weight-of-the-evidence methodology because she attached to her

11:39:03 18   report her reliance material that is required by the Federal Rules

11:39:08 19   of Evidence.  But attaching a list of materials that the expert has

11:39:11 20   reviewed isn't the same as walking through and saying which one of

11:39:16 21   these are important, which one of them are less important, and how

11:39:20 22   I distinguished between the two.

11:39:22 23        I know we've heard a lot of talk today about, for

11:39:25 24   example, the clinical trial data, that you have reports in the FAC

11:39:28 25   arm and in the TAC arm and that when you look at just TAX 316, it's

11:39:33  1    not statistically significant.  But Dr. Plunkett has to explain how

11:39:38  2    she was able to weigh that and make her determinations, and she

11:39:41  3    just didn't do that here.

11:39:43  4         And I think that that is a very important distinction

11:39:46  5    that just because she lists everything she reviewed, that doesn't

11:39:49  6    mean that she explained how she weighted it.

11:39:52  7         Finally, just to the causation statement.  Ms. Myers said

11:39:58  8    that her substantial contributing factor doesn't equate to a legal

11:40:01  9    standard in Louisiana because Dr. Plunkett is allowed to say that

11:40:05 10    Taxotere is associated with permanent alopecia.  And that circles

11:40:10 11    back to about eight arguments that have already been done where you

11:40:13 12    have expert after expert coming in and saying that Adriamycin is

11:40:17 13    associated with permanent hair loss.  Cytoxan associated with

11:40:22 14    permanent hair loss.  I mean, it's the representation now that the

11:40:24 15    defense can stand up and say, Adriamycin has been a substantial

11:40:28 16    contributing factor to permanent hair loss because it's associated

11:40:32 17    with it?  That's not what this is.  I mean, it's clear that this is

11:40:36 18    a causation opinion and that same just because you can conclude

11:40:41 19    because it's associated that you can then jump to say that it's the

11:40:45 20    substantial contributing factor, those are just, you know, just way

11:40:50 21    different.

11:40:50 22         And for that reason, I would ask that you respectfully

11:40:53 23    grant Sanofi's motion to exclude the specific testimony that we've

11:40:57 24    moved in our papers for Dr. Plunkett.  Thank you for your time,

11:41:00 25    your Honor.

11:41:00  1          THE COURT:  Thank you.

11:41:08  2          The final one this morning is the motion to exclude the

11:41:11  3     testimony of Dr. Ellen Chang by defendants.  Mr. McRae, Chris McRae

11:41:20  4     is going to argue that and Mr. Miceli.

11:41:23  5          MR. MICELI:  Thank you, your Honor.

11:46:00  6          May it please the court.  I can give you good news, this

11:46:04  7     will be my last argument.  I am here to discuss the motion to

11:46:09  8     exclude Dr. Ellen Chang.

11:46:13  9          Your Honor, the Court should exclude Dr. Chang's three

11:46:17 10     opinions.  Dr. Chang attempts to revisit the findings of the final

11:46:22 11     TAX 316 clinical study, the findings that demonstrate a 4.2 percent

11:46:30 12     rate of ongoing alopecia stating is unreliable and not based on

11:46:35 13     Dr. Chang's own methodology.  Dr. Chang cannot offer general

11:46:41 14     causation opinions as to any other drug other than Taxotere and

11:46:46 15     PCIA, and we'll get to an admission on that one in a just a moment,

11:46:49 16     and Dr. Chang is unqualified to offer opinions about the different

11:46:54 17     types of alopecia, risk factors, and frequency of diagnoses simply

11:46:56 18     because she is not a doctor.

11:46:59 19          Dr. Chang's assignment in this case was very simple, it's

11:47:03 20     at the beginning of her report:  I have been asked by counsel for

11:47:07 21     Sanofi to evaluate the available scientific evidence on the

11:47:12 22     occurrence of irreversible or permanent alopecia among breast

11:47:17 23     cancer patients using chemotherapeutic regimens containing

11:47:22 24     docetaxel/Taxotere, and to use the science of epidemiology to

11:47:25 25     address whether a causal relationship has been established between

11:47:29 1  docetaxel and irreversible permanent alopecia.

11:47:34 2         Then her methodology, her stated methodology that she

11:47:38 3  uses, not just in this case, but always, for purposes of giving an

11:47:43 4  expert opinion, Dr. Chang's methodology is to do a full and

11:47:46 5  complete systematic literature search to assess causality.  She

11:47:51 6  also states that this includes reviewing all of the available

11:47:55 7  scientific evidence.

11:47:58 8         She didn't follow that chosen methodology.  She was not

11:48:01 9  given the opportunity to evaluate all of the scientific evidence.

11:48:06 10  She was never provided with critical evidence or simply ignored it.

11:48:11 11  We'll go over what she ignored.

11:48:13 12         And I am going to have to apologize, I didn't proofread

11:48:15 13  very well, I think there's a couple of statements in here that may

11:48:19 14  not make some sense.

11:48:20 15         But Dr. Chang acknowledges that TAX 316 demonstrates the

11:48:25 16  29 patients in the TAC arm and 16 in the FAC arm at the end of the

11:48:30 17  ten year follow-up period are demonstrated as having ongoing

11:48:34 18  alopecia.

11:48:35 19         Now, she also agreed with me that in the design of that

11:48:39 20  study, that when you have TAC versus FAC, you're controlling for

11:48:43 21  the A and the C and that you're focussing on the T versus the F.

11:48:49 22  That is the isolation of Taxotere.  But she was only provided --

11:48:54 23  instead of looking at the TAX 316 study data, she was only provided

11:48:59 24  with a compilation of some of the case report forms, interim case

11:49:04 25  report forms for some of the study participants of that 29.  Not

11:49:09 1   even of the 29 and the 16 and certainly not the 1,408 or 1,491 that

11:49:15 2   began the TAX 316 study.  She was provided with 13 of the 29 TAC

11:49:22 3   patients.  For those individuals, she was provided with a partial

11:49:27 4   compilation of interim case report forms.

11:49:30 5           She did not review data on the entire clinical study

11:49:34 6   population.  She agreed with me at 6823 to 6923, but she was not

11:49:40 7   provided with the final data by counsel.

11:49:44 8           She was provided all information that she reviewed

11:49:49 9   concerning Taxotere and TAX 316 came from Sanofi's counsel.

11:49:58 10          She ignored critical evidence.  She says that she wants

11:50:02 11  to review and to give an expert opinion on all available scientific

11:50:06 12  evidence.  But she didn't receive that because counsel did not

11:50:10 13  provide her with all scientific -- available scientific evidence.

11:50:15 14  Without it, she can't follow her own methodology.

11:50:18 15          Dr. Chang stated that she was aware from reviewing some

11:50:22 16  of the data, some of the documents that Sanofi stored its clinical

11:50:26 17  data on a SAS database.

11:50:28 18          THE COURT:  Did she look at the FAC arm, FAC arm?

11:50:32 19          MR. MICELI:  Well, it's hard to tell your Honor, because

11:50:34 20  she lists a lot of stuff -- and we'll get to that.  Because her

11:50:37 21  first report -- well, the report that led to the January 2020

11:50:41 22  deposition included only information on the 29, and she was

11:50:47 23  provided with the 16 from the FAC arm or some information from the

11:50:50 24  16 on the FAC arm, but she doesn't set out an analysis of that side

11:50:56 25  of the study.

11:50:57 1    What we do know is that she was never provided with all,

11:51:01 2 ever, she was never provided with all of the clinical trial data

11:51:04 3 available, scientific evidence available.  She lists -- when I say

11:51:11 4 she, Dr. Chang lists Pierre Mancini -- Mancini's deposition.

11:51:16 5 Mr. Mancini is the global head of biostatistics.  He was deposed

11:51:19 6 back in March of 2018.  And he describes where precisely Sanofi

11:51:25 7 keeps its final validated clinical study data.  And he says that

11:51:31 8 after a study is over with --

11:51:33 9    And you can tell this is from the TAX 316 study report

11:51:36 10 from the day it was completed from patient care to when it was

11:51:40 11 actually finalized as a report is about a year's time.  They go

11:51:44 12 through an arduous process of validating data.  And the final

11:51:48 13 validated data is maintained in the WISE database.

11:51:52 14    And what we know is Sanofi never provided the final data

11:51:56 15 out of the WISE database to Dr. Chang.  She ignores Dr. -- or

11:52:02 16 Mr. Mancini's testimony where the head of biostatistics for

11:52:07 17 oncology for Sanofi states the company would know from the data,

11:52:11 18 the final validated data, if a patient's alopecia was still there

11:52:15 19 at the end of the follow-up.

11:52:17 20    That testimony was nowhere and the recognition of that

11:52:20 21 testimony is nowhere in Dr. Chang's report.  Sanofi never made her

11:52:27 22 aware of that final clinical study data.

11:52:32 23    But more importantly, Sanofi had already answered the

11:52:35 24 question that they asked Dr. Chang to investigate and answer

11:52:38 25 herself.

11:52:38 1          Sanofi answered the question in January of 2013, and

11:52:44 2    Pierre Mancini had a hand in making or providing that answer.  That

11:52:49 3    answer was provided to the European Medical Agency and they asked

11:52:55 4    this question -- I am going skip to the middle of the page or

11:52:58 5    middle of the first block -- could you please clarify the

11:53:02 6    number/percentage of patients with long-term permanent alopecia

11:53:07 7    from the pivotal breast cancer studies?  That's what a regulatory

11:53:12 8    agency asked of Sanofi.

11:53:15 9          The answer that Pierre Mancini led in fulfilling to that

11:53:19 10   question was TAX 316.  In the TAC group 728, 97.8 percent of

11:53:27 11   patients, experienced alopecia during the treatment period.  Among

11:53:32 12   those patients, alopecia persisted into the post treatment period

11:53:35 13   in 687 patients, 92.3 percent.  By the end of the follow-up period,

11:53:44 14   29 TAC patients, 4.2 percent still had persistent alopecia.

11:53:51 15   Twenty-nine patients still had persistent alopecia.  As Mr. Mancini

11:53:56 16   stated, the data would tell them what the answer to that question

11:54:00 17   is.  It has the FAC arm, too, 2.5 percent.

11:54:09 18          But what I want to focus on because I can anticipate

11:54:11 19   hearing from Sanofi's counsel when they discuss their opposition,

11:54:14 20   they're going to say, this is a different regulatory agency, this

11:54:16 21   is Europe, it's a different regulatory scheme.  But let's give all

11:54:20 22   regulatory agencies the benefit of the doubt that when they ask a

11:54:23 23   question of a company they expect a truthful answer.  Your Honor

11:54:27 24   allowed us to bring in at trial and cross-examination the

11:54:30 25   statements of Sanofi; you ruled on the motion in limine to keep

11:54:36  1    those out, you allowed those to come in and they did.  This

11:54:40  2    demonstrates a direct factual question about what the data from

11:54:44  3    TAX 316 demonstrates.  And what --

11:54:48  4            THE COURT:  Are we really just going back to Kopreski?

11:54:53  5            MR. MICELI:  Yes and no, your Honor.  Yes, in that what

11:54:57  6    Sanofi wants to do is hide from its data, and they used -- and they

11:55:01  7    use Dr. Kopreski -- and Mr. Bachus will discuss that later today --

11:55:05  8    in order to reconfigure what that data shows, by looking at some

11:55:10  9    interim data and trying to go outside of the protocols.

11:55:14 10            Same thing that Dr. Chang tries to legitimize in what she

11:55:19 11    does because she really -- in her opinion, in her second report,

11:55:22 12    the report that she serves in April 17 of this year, she lists an

11:55:28 13    additional 700 or so -- excuse me, 600 or so case report forms or

11:55:34 14    case report form summaries.  But she doesn't look at the entire

11:55:39 15    clinical study trial data.  It's all in her information, it's only

11:55:43 16    partial.  And there's been no demonstration of how either the

11:55:46 17    limited view of the 29, or rather 13 of the 29 she reviewed and was

11:55:51 18    deposed on in January of this year, or how the roughly 49 percent

11:55:57 19    of some forms on some patients can be extrapolated to the full

11:56:03 20    population of the study or how they can use it to impeach their own

11:56:07 21    findings.

11:56:08 22            And what's ironic here is that the study started in 1997

11:56:14 23    with the recruitment of patients and the design and all of the --

11:56:18 24    you know, Sanofi puts on its website they have over 20,000

11:56:22 25    employees.  And they go through all of this process of developing a

11:56:25 1  clinical study and then they treat people and then they follow them

11:56:27 2  for ten years.  And then they come up with an answer to a question

11:56:31 3  that a regulatory agency directly asks them, and they say, 4.2

11:56:38 4  percent still had persistent alopecia at the end of the follow-up

11:56:42 5  period.

11:56:42 6      And then what they do is they bring in Dr. Kopreski, who

11:56:45 7  in a matter of weeks finds the answer, or as Ms. Sastre liked to

11:56:51 8  say at trial, pop the hood to go behind 13 years of the work of the

11:56:56 9  company who used this study to get a product on the market.  This

11:56:59 10 was a registration study, that's what their experts will tell us.

11:57:03 11     But they were asked a direct question and gave a direct

11:57:07 12 factual answer, and that is what they provided.

11:57:15 13     Dr. Chang's general causation opinions regarding

11:57:21 14 non-Taxotere drugs have to be excluded as well.  She says this in

11:57:25 15 her report at page 4 -- I apologize it's not up there, another

11:57:30 16 typo -- "I did not directly assess whether a causal relationship

11:57:35 17 has been established between use of any other specific chemotherapy

11:57:40 18 agent and irreversible or permanent alopecia.  I also did not

11:57:44 19 directly investigate the incidence with other chemotherapy agents."

11:57:48 20 This is a crystal clear statement from the pen of Dr. Chang herself

11:57:52 21 that she did not investigate any relationship for any non-Taxotere

11:57:58 22 drug; yet in their opposition to this motion, Sanofi argues she

11:58:02 23 should be allowed to testify on this topic.

11:58:08 24     Despite that clear statement, this is what Dr. Chang's

11:58:12 25 report says, "many medications, including several types of cancer

11:58:16   1   chemotherapy, can cause alopecia."  That "can cause" is important.

11:58:20   2   We confirmed that with her, that means general causation.  She says

11:58:24   3   she didn't investigate yet she offers this opinion.  When

11:58:27   4   challenged, she said, oh, I am only referring to reversible,

11:58:33   5   temporary alopecia.  But that's not what her report says.  And if

11:58:36   6   it goes unchallenged in a hearing like this and tested under the

11:58:38   7   scrutiny of 702, she can come into court and say I am talking about

11:58:42   8   permanent alopecia, and that's not what we want her to do.  She

11:58:45   9   admits she did not do a systematic literature search, she admits

11:58:49   10  that she did not look at all of the available scientific evidence

11:58:52   11  on the non-Taxotere drugs, specifically Tamoxifen, and so she

11:58:58   12  should not be allowed to offer such opinions.

11:59:05   13          Next, Dr. Chang has a Doctor of Science.  She is an

11:59:08   14  English -- American and British literature major and then she went

11:59:11   15  and got a Doctorate of Science, an Sc.D.  Not a Ph.D., an Sc.D.  I

11:59:17   16  mean that's Harvard's version of it, but.

11:59:20   17          Dr. Chang offers, tries to offer, intimates she is going

11:59:25   18  to offer medical opinions.  She is not a medical doctor, she does

11:59:28   19  not treat or diagnose.  She even discusses histopathology of the

11:59:32   20  hair follicle.  She has absolutely no qualifications to do that.

11:59:36   21  She can't give those opinions.

11:59:38   22          And this is what she says at the bottom:  She

11:59:40   23  investigates causation by performing comprehensive literature

11:59:43   24  searches to demonstrate statistical incidence of events.  She does

11:59:50   25  not render clinical diagnostic patient care, so she should not be

11:59:54  1    able to give clinical diagnostic patient opinions.

11:59:59  2         I want to close here with two additional slides.

12:00:02  3    Sanofi's brief simply misrepresents Dr. Chang's work.  They state

12:00:09  4    at page 3 of their opposition Dr. Chang analyzed adverse event data

12:00:13  5    for all 1,480 study participants.  This is simply not true.

12:00:21  6    Dr. Chang did not receive information on all study participants.

12:00:24  7    She received 633 compilations of interim case report forms, interim

12:00:32  8    case report forms, not the validating clinical trial data that they

12:00:35  9    decided not to give her, and 100 summaries of unknown origin.  She

12:00:40 10    was never provided or informed that Sanofi had the final clinical

12:00:45 11    trial data and provide it to her.

12:00:47 12         So the defendants want -- Sanofi wants to talk about

12:00:52 13    cherry-picking when they argue against our experts testifying.

12:00:58 14    Sanofi picks the cherries for its experts.  Dr. Chang recognized

12:01:03 15    that the SAS data is available but never requested it.  She

12:01:09 16    supposedly read Mr. Mancini's deposition that specifically states

12:01:15 17    where it is stored.  Go to the WISE database, that's what he said

12:01:19 18    in his deposition, go to the WISE database and get it.  But she

12:01:23 19    never requested it, instead she states that she reviewed all

12:01:27 20    available scientific evidence.

12:01:28 21         But it's clear she didn't.  She didn't follow her own

12:01:31 22    methodology.  Sanofi's counsel is certainly aware of the existence

12:01:36 23    of their final clinical study trial data.  We fought about it in

12:01:40 24    this litigation to get our hands on it, the PSC's hands on it.

12:01:44 25    They know where it's located yet they decided not to provide it to

12:01:49 1     their expert to review.  Instead they picked the cherries of what

12:01:54 2     she would see and ask her to render an opinion.

12:01:58 3           In the end, she just fails to apply her own methodology

12:02:01 4     because she couldn't; she didn't ask for it and she wasn't provided

12:02:07 5     it.

12:02:07 6           If we assume that her methodology is even an appropriate

12:02:11 7     methodology, we know that she didn't apply it because she was

12:02:15 8     prevented from doing so by what she asked for and by what she was

12:02:20 9     actually provided.

12:02:22 10           So unless you have questions, your Honor.

12:02:24 11           THE COURT:  Not now.

12:02:25 12           MR. MICELI:  Thank you.

12:02:26 13           THE COURT:  Thank you.  Mr. McRae.

12:03:00 14           MR. McRAE:  I think it's now good afternoon, your Honor.

12:03:03 15     Chris McRae on behalf of Sanofi.

12:03:06 16           And there is a lot to unpack here, so I hope you'll bear

12:03:09 17     with me in that respect.

12:03:10 18           So this is Dr. Ellen Chang, Sanofi's expert

12:03:14 19     epidemiologist.  I would only note here, she is the only expert in

12:03:18 20     this litigation who actually has a degree in epidemiology and she

12:03:21 21     is the only expert in this litigation who spent her career actually

12:03:25 22     practicing epidemiology.

12:03:26 23           Now, plaintiff's challenge -- Dr. Chang offers numerous

12:03:32 24     opinions in her report; plaintiffs only challenge a couple of

12:03:35 25     those.  I am going to turn to those now.

12:03:37   1          At the outset I think it's important to understand that

12:03:40   2   Dr. Chang performed the most rigorous analysis of TAX 316 clinical

12:03:46   3   trial data of any expert in this litigation.  She received,

12:03:49   4   contrary to Mr. Miceli's representations, adverse event data for

12:03:53   5   all study participants.  And the way she received that was by

12:03:57   6   receiving the 47,000 page final TAX 316 clinical study report.

12:04:03   7   That 47,000-page document includes a narrative description of the

12:04:10   8   study, but it also includes thousands of pages of adverse event

12:04:16   9   tables that Sanofi provided to FDA.  Dr. Chang reviewed all of that

12:04:21  10   and contained in there is adverse event data for every single

12:04:24  11   participant.

12:04:25  12          She also reviewed approximately 96,000 pages of case

12:04:29  13   report forms related to TAX 316.  And case report forms are forms

12:04:33  14   filled out by clinical trial study investigators that track adverse

12:04:38  15   events patients in the study experienced.

12:04:40  16          And I want to pause on this TAX 316 clinical study report

12:04:45  17   point just for a second, because plaintiff's say something in their

12:04:48  18   motion, and I've put it up here, Sanofi never provided Dr. Chang

12:04:52  19   with the final TAX 316 clinical study report.  Your Honor, that is

12:04:57  20   simply false.  Even a cursory review of Dr. Chang's report would

12:05:01  21   show that she received and considered the following case specific

12:05:06  22   materials, including the clinical study report ten year follow-up

12:05:11  23   study number TAX 316.

12:05:14  24          So to the extent that plaintiff's motion rests on their

12:05:16  25   representation that Dr. Chang did not review or consider the final

12:05:20 1    TAX 316 clinical study report, it has to be denied.

12:05:25 2            Now, why did Dr. Chang undertake her review of the

12:05:30 3    TAX 316 study?  Well, she looked at plaintiff's reports and she

12:05:33 4    realized that what plaintiffs were doing is that they were saying

12:05:37 5    TAX 316 actually provides evidence of permanent or irreversible

12:05:41 6    alopecia.  That's simply not true.  TAX 316 looked at ongoing

12:05:46 7    alopecia.  And when Dr. Chang looked at the TAX 316 study, she

12:05:50 8    realized that ongoing does not equate to irreversible, permanent,

12:05:55 9    or even long-lasting alopecia in many case.  You actually have to

12:05:58 10   look at the individual data in order to make that determination.

12:06:02 11           And that's exactly what Dr. Chang did.  She looked at,

12:06:07 12   again, a comprehensive set of adverse event data, and she concluded

12:06:11 13   that only nine patients in the TAX 316 study could reasonably have

12:06:16 14   said to have irreversible alopecia; six in the TAC arm and three in

12:06:22 15   the FAC arm.

12:06:23 16           She then went on to explain how she came to that

12:06:26 17   conclusion.  By looking at the actual clinical trial data, she

12:06:29 18   concluded that most patients per study protocol simply weren't

12:06:34 19   followed for very long for their alopecia for a host of reasons;

12:06:38 20   maybe the patient received additional anti-cancer therapy and at

12:06:43 21   that time they were no longer followed for their adverse events;

12:06:46 22   maybe the patient experienced a breast cancer relapse, and, again,

12:06:49 23   at that point were no longer followed for the adverse events with

12:06:53 24   alopecia; maybe the participates withdraw from the study early on.

12:06:57 25   And this is --

12:06:57  1          THE COURT:  What about those people that, perhaps, were

12:07:00  2    followed for five years with ongoing alopecia and then had

12:07:04  3    recurrence of breast cancer, would those have been considered

12:07:10  4    permanent alopecia?

12:07:12  5          MR. McRAE:  I suppose, your Honor, it would depend on

12:07:15  6    whether the patient had a notation in her case report from having

12:07:19  7    her alopecia resolved or not.  And if it's noted in her records --

12:07:24  8    and this is exactly what Dr. Chang looked at -- that at each

12:07:28  9    follow-up visit that she had alopecia for that entire five-year

12:07:30 10    period before having her recurrence, then she would meet -- she

12:07:34 11    would be one of the nine patients that Dr. Chang identifies here.

12:07:38 12          I mean, Dr. Chang's purpose is not to distort or

12:07:41 13    misrepresent the TAX 316 study, it's actually to look at the study

12:07:44 14    and let's see if we can actually figure out how many of these women

12:07:48 15    actually did have permanent or irreversible alopecia since that's

12:07:53 16    not what the study looked at initially.

12:07:56 17          And, your Honor, we don't have to take Dr. Chang's

12:08:00 18    findings in a vacuum, they're perfectly consistent with what

12:08:04 19    Dr. Kopreski found.  They looked at the same underlying data and

12:08:06 20    both of these people concluded, yeah, when you actually look at

12:08:09 21    this underlying data, a lot of these women weren't followed very

12:08:14 22    long for their alopecia so it's impossible to say that they have

12:08:18 23    permanent or irreversible alopecia.

12:08:20 24          Now, Mr. Miceli showed a response to the EMA that Sanofi

12:08:25 25    provided.

12:08:25 1          THE COURT:  I guess the thing that bothers me with that,

12:08:30 2 and I understand what she is doing here, but is it -- it's removed

12:08:34 3 if it's considered resolved?

12:08:37 4          MR. McRAE:  Correct.

12:08:38 5          THE COURT:  So the patient would have to say "my alopecia

12:08:40 6 is resolved"?

12:08:44 7          MR. McRAE:  Or the clinical trial investigator would have

12:08:46 8 to observe that, yes, your Honor.

12:08:47 9          THE COURT:  Then why were they not found resolved during

12:08:51 10 the study?  I am just curious.

12:08:53 11          MR. McRAE:  Well, there are a couple of explanations as

12:08:55 12 to why.  I think the most likely one, and Dr. Chang goes into this

12:08:58 13 in her report in some detail, is that for these women they're

12:09:03 14 followed for a very long time.  So for some of them, they had

12:09:07 15 alopecia right after their TAC treatment; six months later, a year

12:09:12 16 later it resolves.  At that point in time they're on tamoxifen and

12:09:16 17 they're still being seen.  And if two years after their hair loss

12:09:20 18 resolves she walks in to her doctor's office or the clinical trial

12:09:23 19 study investigator and she's got hair thinning or hair loss again,

12:09:28 20 they're going to note that in the chart.  So at that point she has

12:09:31 21 ongoing alopecia.

12:09:33 22          But no reasonable person can say that's due to Taxotere.

12:09:36 23 Her hair loss resolved, she continued in the study, and her hair

12:09:41 24 loss happened again but she didn't take Taxotere in that interim

12:09:44 25 period.  So that's one of the ways Dr. Chang explains how that very

12:09:48  1    thing can happen.

12:09:53  2          Now, regarding Dr. Chang's opinions on other medications.

12:09:56  3    I have to confess, I think I am a little confused as to what

12:09:58  4    exactly plaintiffs are saying here.  What I think they're doing is

12:10:03  5    seeking to exclude an opinion Dr. Chang is not offering.

12:10:06  6    Dr. Chang's not going to come into this courtroom, your Honor, and

12:10:09  7    say, Adriamycin causes PCIA.  She is not going to come into this

12:10:14  8    courtroom and say cyclophosphamide causes PCIA.  But what she is

12:10:17  9    going to do and what she should be allowed to do is say, I looked

12:10:22 10    at -- I read the full text of more than 300 scientific articles

12:10:25 11    looking at this issue.  And time and time again, what I saw is that

12:10:31 12    there were cases of permanent alopecia involving other

12:10:35 13    chemotherapies and other anti-cancer agents other than docetaxel.

12:10:40 14    And this again, pulled right from her report, she cites to 13

12:10:43 15    different articles just in this part of her report for that

12:10:47 16    proposition.

12:10:47 17          And the reason this is important to Dr. Chang's opinions

12:10:51 18    and the reason it is relevant, your Honor, is that it goes to a

12:10:54 19    fundamental epidemiological concept known as confounding.  And

12:10:58 20    basically what that is -- and Dr. Chang's opinion of that since

12:11:03 21    most of these women don't receive Taxotere alone, they receive

12:11:06 22    Taxotere in combination with other medications, and since we have

12:11:10 23    in the literature reports that those other medications are

12:11:13 24    associated with permanent hair loss, there is a very good chance

12:11:17 25    that those other medications are confounding or distorting the

12:11:21  1    relationship between Taxotere and PCIA.

12:11:25  2            And Dr. Chang's point as an epidemiologist is simply when

12:11:29  3    I look at these observational studies that exist in the medical

12:11:32  4    literature, I know that confounding is an issue.  I need to look at

12:11:36  5    these studies to see if they controlled for it, to see if they

12:11:39  6    somehow account for it; because if they don't, they may lack the

12:11:43  7    scientific credibility that you would need to rely upon them.

12:11:46  8            And she says here, and I wish I had highlighted it, but

12:11:47  9    the last sentence here -- and again, this is straight from

12:11:49  10   Dr. Chang's report, your Honor -- "A confounder is an alternative

12:11:52  11   risk factor, but not necessarily a cause, that can create spurious

12:11:57  12   associations between an exposure and an outcome if not measured in

12:12:00  13   an adequate detail and sufficiently controlled by statistical

12:12:04  14   adjustment or study design restrictions."

12:12:07  15           That is why other cases with other medicines of permanent

12:12:11  16   alopecia are relevant to Dr. Chang.  It's not that she can offer

12:12:15  17   causation opinion about them, but it's so that she can explain that

12:12:18  18   what we see in the literature with respect to Taxotere and PCIA may

12:12:22  19   be impacted by these other medicines since all of these patients

12:12:26  20   are receiving numerous chemotherapies.

12:12:29  21           On the very last point about her opinions on alopecia.

12:12:34  22   These again are laid out in her report.  And I threw this quote up

12:12:37  23   here mostly for the point that an epidemiologist --

12:12:41  24           THE COURT:  I understand what an epidemiologist does.

12:12:45  25           MR. McRAE:  And so when she got her task in this case,

12:12:47  1   she did her own research on alopecia.  She looked at review

12:12:51  2   articles on alopecia to learn about the types of alopecia, the

12:12:53  3   rates of alopecia, the different risk factors for it.  Again, this

12:12:57  4   is all set out in her report when she discusses alopecia, and she

12:13:01  5   provides the sites to all of the review articles she looked at.

12:13:05  6   There is not a single unsubstantiated representation about alopecia

12:13:09  7   in her entire report.  But that's what an epidemiologist does, she

12:13:16  8   looks at the disease condition at issue here, alopecia or PCIA, and

12:13:20  9   then she can talk about it because she reviewed the medical

12:13:23  10  literature.

12:13:23  11         There's simply -- I would also note the opinions she

12:13:28  12  offers in her report, they're not controversial, they're

12:13:31  13  uncontested.  There is simply no reason why she shouldn't be able

12:13:35  14  to come to court and talk about this very simple topic.

12:13:38  15         THE COURT:  Is it like DIA versus PCIA being pretty

12:13:42  16  uncontroversial and direct?

12:13:44  17         MR. McRAE:  I have to confess, your Honor, the DIA/PCIA

12:13:48  18  distinction confuses me a little, but I think we have a simpler

12:13:51  19  situation here.

12:13:53  20         For all of these reasons, your Honor, plaintiff's motion

12:13:56  21  should be denied in its entirety.  Thank you.

12:13:59  22         THE COURT:  Thank you.

12:14:24  23         MR. MICELI:  Very briefly, your Honor -- oh, I walk up to

12:14:28  24  the podium and you put your head down.

12:14:30  25         THE COURT:  I've been like this since March of 2020.

12:14:34  1          MR. MICELI:  So I don't have to take that personally.

12:14:36  2          THE COURT:  Do not take it personally.  It could be the

12:14:38  3    hurricanes, it could be just whatever.

12:14:40  4          MR. MICELI:  I appreciate that, your Honor.

12:14:42  5          One thing that Sanofi never addresses is the fact that

12:14:49  6    they answered the question they asked Dr. Chang to answer.  And

12:14:55  7    Dr. -- Mr. -- I keep wanting to turn this man into a doctor --

12:15:01  8    Mr. Mancini clearly states that Sanofi would have known if the

12:15:04  9    alopecia was still there from the data.  He did the analysis on a

12:15:09 10    simple -- maybe not so simple, but a straightforward factual

12:15:13 11    request, and he gave a straightforward factual answer that at the

12:15:18 12    end of the follow-up period, 29 people in the TAC arm still had

12:15:23 13    persistent alopecia.

12:15:24 14          We didn't make up that word.  Plaintiffs did not make up

12:15:29 15    that word.  Plaintiffs did not write the protocols.  Plaintiffs did

12:15:32 16    not write the statistical analysis plan that allowed Sanofi to

12:15:36 17    answer that question.  That was Sanofi.  That was Sanofi before

12:15:39 18    they had to come up with a defense strategy in this MDL.  They

12:15:43 19    answered the question.  That's why that is so critical.

12:15:46 20          The issue about confounding.  I could go back to several

12:15:53 21    of our experts, Dr. Feigal addresses confounding, she talks about

12:15:57 22    other issues.  Dr. Madigan talks about his lasso logistic

12:16:02 23    regression; talk about giving yourself a headache, all of those

12:16:06 24    logistic regressions are used to control for those confounding

12:16:10 25    factors.  That doesn't change the fact that Dr. Chang ignores

12:16:17  1   relevant critical evidence.

12:16:20  2         But more importantly, she claims that she looked at all

12:16:23  3   available scientific evidence when the evidence clearly just is not

12:16:27  4   so.  And she did not do that because counsel decided not to provide

12:16:34  5   that to her.  It is crystal clear what she did do, what she was

12:16:38  6   asked to do.  She was asked to assess one drug and one drug only -

12:16:42  7   Taxotere.  That's not -- we know we're going to have to

12:16:45  8   cross-examine her on that point, if your Honor finds that reviewing

12:16:49  9   29 or close to half of the interim report forms is sufficient

12:16:56 10   methodology for drawing a conclusion as to the whole.

12:16:59 11         But her words, "I did not directly investigate the

12:17:04 12   incidence of PCIA with any chemotherapy agent other than Taxotere."

12:17:10 13   She can't run from that.  She didn't do the work, she didn't do the

12:17:15 14   analysis, she can't give the opinion.

12:17:22 15         She clearly states what she did and she clearly states

12:17:26 16   what she didn't do.  But Sanofi continues to try to drive a square

12:17:31 17   peg through a round hole and get her to go beyond the analysis she

12:17:36 18   was asked to do, what she actually did do, and what she actually

12:17:40 19   reviewed.  Thank you.

12:17:42 20         THE COURT:  Thank you.  Okay.  We'll be at recess until

12:17:50 21   1:30.

13:21:01 22         (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

13:21:03 23         (OPEN COURT.)

13:21:03 24

13:21:03 25                   P R O C E E D I N G S

13:21:03  1                     (AFTERNOON SESSION)

13:21:03  2

13:35:21  3        (OPEN COURT.)

13:35:21  4             THE COURT:  Court's in session.  Erin, are you there?

13:35:29  5             MR. MOORE:  I think our microphone might be off, Judge,

13:35:32  6   let me just check here.

13:35:37  7             THE COURT:  Erin, are you there?

13:35:40  8             THE DEPUTY CLERK:  I'm here.

13:35:42  9             THE COURT:  Well, I just opened court.

13:35:50 10             MS. BARRIOS:  Your Honor, I just wanted to see if Andre

13:35:54 11   got the PowerPoint.  Andre, did you receive the PowerPoint?

13:37:30 12             THE COURT:  Mr. Mura, did you receive it, do you have it?

13:37:34 13             MR. MURA:  Yes, I have it, it says preemption on the

13:37:37 14   first slide.

13:37:38 15             THE COURT:  Oh, all right.  I was waiting for you to get

13:37:41 16   situated.

13:37:42 17             MR. MURA:  Oh, I'm sorry.

13:37:42 18             THE COURT:  No, no, don't worry about it.

13:37:44 19             The next motion we have for hearing is Docket No. 10935,

13:37:49 20   it's a motion on preemption filed by defendants and will be argued

13:37:55 21   by Harley Ratliff on behalf of the defendants and Andre Mura on

13:37:59 22   behalf of the plaintiffs.  We're ready to proceed?

13:38:02 23             MR. RATLIFF:  Good afternoon, your Honor.  Harley Ratliff

13:38:11 24   on behalf of Sanofi.

13:38:14 25             In a prescription drug case, your Honor, preemption turns

13:38:18  1   essentially on one question:  Could the manufacturer have changed

13:38:22  2   the label, should the manufacturer have changed the label.  The

13:38:29  3   analysis of this follows a well understood framework, the

13:38:33  4   preemption framework; and it fundamentally takes two steps, the

13:38:37  5   first step being has the plaintiff come forward with newly acquired

13:38:42  6   information that would allow a manufacturer like Sanofi to make a

13:38:47  7   unilateral change to the label.

13:38:48  8           Now, your Honor, we agree.  The manufacturer bears the

13:38:52  9   ultimate responsibility for the label.  That said and as the

13:38:57 10   *McGrath* court articulated, they are constricted or must follow or

13:39:03 11   limited by the CBE regulations.  They must follow those.  And

13:39:09 12   that's really, your Honor, the predicate question, was there newly

13:39:14 13   acquired information that would allow Sanofi to unilaterally change

13:39:18 14   the label or update the label prior to Ms. Kahn's treatment.

13:39:22 15           If that answer -- if that question is answered, there is

13:39:27 16   such thing as newly acquired information, then you take it to the

13:39:29 17   second step.  This was the step that was addressed in *Albrecht* and

13:39:33 18   this is the step that was addressed in your Honor's ruling in

13:39:35 19   *Earnest* on page 8, which is newly acquired information was

13:39:39 20   available can Sanofi show that there was clear evidence of an FDA

13:39:45 21   rejection.  No. 1, did they fully inform FDA of the risk; and two,

13:39:49 22   did FDA reject the label that was proposed by Sanofi.

13:39:52 23           Here, your Honor, we have moved for full preemption on

13:39:57 24   the first prong and partial preemption on the second prong.

13:40:00 25           As the Northern District of Georgia recently articulated,

13:40:03 1   this first step is an important step.  The plaintiff must show that

13:40:08 2   there existed newly acquired information such that the defendant

13:40:12 3   could unilaterally change the label pursuant to the CBE

13:40:17 4   regulations.  Absent that showing, your Honor, plaintiff's claims

13:40:21 5   must be preempted.  That is the case here.

13:40:23 6        Now, I know the PSC has said the only test is the clear

13:40:28 7   evidence test, and they say that *Albrecht* stands for that

13:40:32 8   proposition that only the clear evidence test whether Sanofi

13:40:35 9   submitted the label, whether the FDA rejected the label is what

13:40:39 10  *Albrecht* stands for.  That's incorrect, your Honor.

13:40:43 11       As courts have found in analyzing *Wyeth* and *Albrecht*,

13:40:48 12  they have come to the uniform conclusion that neither *Wyeth* nor

13:40:54 13  *Albrecht* stands to the contrary.  Preemption, full preemption can

13:40:58 14  be granted on the first prong alone, the newly acquired information

13:41:02 15  prong.

13:41:02 16       And why is that?  Why is that?  Why is what the PSC has

13:41:07 17  told you about *Albrecht* incorrect?  First, your Honor, in *Albrecht*,

13:41:11 18  newly acquired information was not at issue, only clear evidence.

13:41:15 19  That's because unlike here, the defendant Merck had conceded that

13:41:20 20  newly acquired information existed, they could have done the CBE

13:41:25 21  process, but clear evidence demonstrated otherwise.  The Supreme

13:41:28 22  Court rejected them on that second argument.

13:41:30 23       Likewise, in *Wyeth*, another case the PSC cites for the

13:41:35 24  proposition that there can only be clear evidence to grant

13:41:38 25  preemption.  Courts have found that *Wyeth* at the trial court

13:41:42  1    forfeited that defense.  Such is not the case here.

13:41:46  2         And even in *Wyeth*, your Honor, *Wyeth* went beyond that and

13:41:51  3    looked at newly acquired information and found that *Wyeth* had that

13:41:54  4    information that would have allowed them to use the CBE process.

13:41:57  5         And your Honor, you don't have to take my word for it,

13:42:01  6    this is what the Supreme Court said when addressing the concept of

13:42:04  7    newly acquired information.  Merck had conceded, the defendant had

13:42:08  8    conceded that they could have used the process.  Sanofi here makes

13:42:12  9    no such concession.

13:42:15 10         So what is newly acquired information, your Honor.  This

13:42:18 11    is an important concept.  It's going to be the key concept of this

13:42:21 12    argument.  It is something that's been set out in federal

13:42:24 13    regulations and then further clarified by courts that have looked

13:42:28 14    into it.

13:42:28 15         The first step, your Honor, is the information must be

13:42:33 16    new.  What that means is not previously submitted to the FDA.

13:42:39 17    That's the clear language of the CBE regulations.  Now, courts have

13:42:44 18    interpreted that as what is called a straightforward submission

13:42:47 19    analysis; that's not the context in which it was submitted, it's

13:42:51 20    whether it was submitted at all.  It's not the gloss over, it's did

13:42:55 21    Sanofi submit the information to FDA, did the manufacturer submit

13:42:59 22    the information to FDA.

13:43:01 23         And it can't just be new, your Honor, it has to be

13:43:04 24    information that was meaningfully different than what the FDA

13:43:08 25    already had in its possession and had been provided by the

13:43:11  1   manufacturer.  Did it reveal a risk that was greater than in

13:43:17  2   frequency or severity than what had already been submitted to the

13:43:20  3   FDA.  That prong has to be met for newly acquired information.

13:43:25  4        And finally, your Honor, as courts have articulated and

13:43:29  5   as the CBE sets forth, it must show, the newly acquired information

13:43:34  6   must show reasonable reliable information of the causal

13:43:38  7   association.  It must conclusively establish that there is a causal

13:43:42  8   association of a different increased risk, whether it's actual or

13:43:47  9   real.  So while Sanofi can make a change under the CBE, they can

13:43:54 10   only do so, your Honor, if the information that was available meets

13:43:58 11   this federal regulation definition.

13:44:00 12        Your Honor, in our moving papers and in our reply, our

13:44:04 13   position is that information does not exist between 2004 and 2008.

13:44:10 14        And I want to be clear, your Honor.  While court after

13:44:13 15   court after court have said that it is the plaintiff who has the

13:44:17 16   burden of presenting the newly acquired information, it is the

13:44:21 17   plaintiff who has to make this showing.  Here it makes no

13:44:24 18   difference, your Honor.  Whether plaintiff had the burden, they

13:44:28 19   have not come forward with that information; whether Sanofi had the

13:44:31 20   burden, which is contrary to what courts have said, we have made

13:44:34 21   the affirmative showing that there is no newly acquired

13:44:38 22   information.  Plaintiffs have put all of their chips in on the

13:44:42 23   second prong of the preemption test, the one that we are not

13:44:46 24   arguing, your Honor.

13:44:47 25        Now, what courts have said about newly acquired

13:44:51  1    information is that it must comply with the federal regulations, it

13:44:54  2    can't simply be uncorroborated trial balloons.  That is a term you

13:45:00  3    will see in case after case after case where plaintiffs throw up a

13:45:04  4    menagerie of different information and say this is newly acquired

13:45:08  5    information.  That doesn't cut it.  It has to meet the CBE

13:45:11  6    regulations.

13:45:12  7         Here, plaintiffs, and what I will say is a mystery to me,

13:45:16  8    came forward with no newly acquired information and made no real

13:45:20  9    attempt to rebut Sanofi's argument.  But giving them the benefit of

13:45:24  10   the doubt, your Honor, we're going to walk through that

13:45:27  11   information.

13:45:27  12        From 2004 -- this is the regulatory history that's at

13:45:30  13   play here.  2004 to support the approval of the adjuvant

13:45:36  14   indication, the indication that is at issue here, Sanofi, among

13:45:39  15   many other things, provided to the FDA the Nabholtz article

13:45:45  16   TAX 702, which we've heard plaintiff's experts and plaintiffs say

13:45:48  17   demonstrate that there is a seven percent risk of permanent

13:45:52  18   alopecia when using Taxotere in combination with Adriamycin and

13:45:56  19   cyclophosphamide.  They provided the results of another clinical

13:45:58  20   study, the Sjöström article, which also detailed a percentage of

13:46:03  21   permanent alopecia, Grade 4 alopecia in both the Taxotere arm as

13:46:09  22   well as the methotrexate arm.  They provided the information

13:46:13  23   that -- interim information from TAX 316 and also the interim

13:46:17  24   information from GEICAM 9805, another study the plaintiff and

13:46:21  25   plaintiff's expert say demonstrate a nine percent risk of permanent

13:46:25  1   alopecia in the Taxotere arm.  That information was provided to

13:46:28  2   FDA, a proposed label update was made by Sanofi, it was rejected by

13:46:32  3   the FDA.

13:46:33  4           So what happens after 2004, your Honor?  Well,

13:46:38  5   January 2006 Sanofi submits Periodic Safety Update Reports 15

13:46:43  6   through 17.  What are PSURs?  Your Honor, this is an approved

13:46:48  7   regulatory mechanism by which the FDA allows manufacturers like

13:46:52  8   Sanofi to submit new safety information, different safety

13:46:58  9   information, or cumulative safety information to the agency.

13:47:01 10   Sanofi submits that for multiple cases of permanent alopecia after

13:47:07 11   combination chemotherapy treatment.

13:47:08 12           Your Honor, they do the same three months later, PSUR 17

13:47:13 13   through 18.  January 25, 2007, they submit their next round of

13:47:19 14   PSURs 19 through 20.  And, your Honor, in reading back through your

13:47:24 15   order previously, you faulted Sanofi, you faulted the attorney's

13:47:28 16   argument for Sanofi that all we have relied on was simply

13:47:31 17   information provided as part of a new approval.  These PSURs, your

13:47:36 18   Honor, have nothing to do with the new approval.  This is the

13:47:38 19   communication, the formal communication by Sanofi through a safety

13:47:42 20   update to the agency.

13:47:45 21           September of 2007 FDA approves the label that's at issue

13:47:51 22   for Ms. Kahn, or the operative Taxotere label prior to Ms. Kahn's

13:47:57 23   treatment.  That approval alone, your Honor, has preemptive effect.

13:48:00 24           Now, what do plaintiffs cite to?  Well, most of what they

13:48:03 25   cite to falls after Ms. Kahn's treatment.  They cite to a Canadian

13:48:08  1  newspaper in 2010.  Your Honor, court after court after court has

13:48:11  2  been clear that if it falls after the injury date, it by definition

13:48:17  3  cannot be newly acquired information.

13:48:20  4          They talk about the final GEICAM results, that's in 2009,

13:48:24  5  that too is after Ms. Kahn's treatment.  They talk about a cluster

13:48:27  6  of adverse events in 2010, that too goes by the wayside.  And then

13:48:31  7  they put most of their emphasis on Dr. Madigan's analysis.

13:48:35  8          So, your Honor, while they don't do much to articulate

13:48:39  9  this in their brief besides just listing them all out, I would like

13:48:43  10  to take them in order.

13:48:44  11          Let's talk about the Madigan analysis, your Honor.  The

13:48:46  12  plaintiffs say, well, Dr. Madigan did these different tests, he did

13:48:50  13  a lasso regression, statistical analyses, that must be newly

13:48:54  14  acquired information.  And then they fault Sanofi and they say,

13:48:57  15  well, Sanofi could have done these types of analyses and that too

13:49:02  16  must be newly acquired information.  Your Honor, those arguments

13:49:07  17  have been rejected time and time again by courts.  They also

13:49:11  18  mention adverse events, and finally I'll get to the Sedlacek

13:49:14  19  abstract.

13:49:15  20          Let's talk about the Madigan analysis.  Here is what the

13:49:19  21  courts have said.  The concept that a plaintiff can come forward

13:49:22  22  and say, well, here are some tests that the defendant did not do.

13:49:26  23  Here is the lasso regression that Sanofi did not do.  Courts have

13:49:30  24  rejected that squarely, your Honor.  Under plaintiff's theory, any

13:49:34  25  litigant could circumvent the framework by merely alleging the

13:49:38  1  manufacturer should have created newly acquired information.  It's

13:49:40  2  not what Sanofi could have done, it's what existed during that time

13:49:45  3  period.

13:49:45  4          Likewise, your Honor, the concept that Dr. Madigan did an

13:49:49  5  analysis has, too, been rejected by the courts.  In the *Lipitor*

13:49:53  6  decision, neither plaintiff nor their experts have identified any

13:49:57  7  such new analyses.  The only new analyses of data mentioned by

13:50:01  8  plaintiff's experts is Dr. Wells' analysis, plaintiff's expert,

13:50:05  9  which was conducted as part of the litigation.  The concept is

13:50:08 10  simple, your Honor, that if a plaintiff can hire someone ten years

13:50:12 11  later after the injury to do a bunch of analyses and say it's newly

13:50:17 12  acquired information, then it would swallow preemption whole.

13:50:21 13          So those two arguments have been groundly rejected by

13:50:24 14  courts.

13:50:24 15          But even if your Honor looked at Dr. Madigan's analyses,

13:50:29 16  they don't meet that definition of being something that

13:50:31 17  demonstrates something that's meaningfully different, a new risk, a

13:50:35 18  more severe risk, a greater frequency risk.  In fact, if you look

13:50:39 19  at Madigan's analyses in the details in our reply, your Honor, he

13:50:42 20  actually shows a single detection rate from 2002 goes down over

13:50:46 21  time, down during the period of time that we're interested in.  If

13:50:50 22  you look at his statistical significance analysis, it's

13:50:53 23  fundamentally no different in 2003 than it was in 2008.  That

13:50:57 24  doesn't meet the second prong of newly acquired information, which

13:51:01 25  is it must reveal something new or different, something meaningful.

13:51:06  1          What about adverse event reports, your Honor?  Can those

13:51:11  2     be considered newly acquired information?  Court after court has

13:51:15  3     rejected that as well.  In *Gayle v. Pfizer*, the Southern District

13:51:18  4     of New York took this issue head on where the plaintiffs allege

13:51:22  5     that Pfizer was in possession of more than 6,000 adverse events and

13:51:28  6     that that gargantuan number alone constituted newly acquired

13:51:35  7     information.  The Southern District of New York rejected that

13:51:38  8     argument as well.

13:51:40  9          An adverse event, as I think your Honor has rightly

13:51:45 10     noted, doesn't tell us anything about causation, all it does is say

13:51:49 11     this person had this injury and they were on these different types

13:51:53 12     of drugs.  So the adverse event information, your Honor, that too

13:51:56 13     goes by the wayside.

13:51:58 14          So what are we left with, your Honor?  We're left with

13:52:02 15     Dr. Sedlacek's abstract.  Three paragraph, non-peer reviewed

13:52:08 16     abstract.  And I was listening to Mr. Lambert yesterday give his

13:52:13 17     argument on the motion for reconsideration, and he said, your

13:52:16 18     Honor, we actually could move that date back because Sanofi

13:52:20 19     actually reached out to Dr. Sedlacek and they collected that

13:52:24 20     information and they reported that information.  Mr. Lambert is

13:52:26 21     correct, that's exactly what Sanofi did.  They got the information

13:52:29 22     from Dr. Sedlacek's office, they reported those adverse events for

13:52:33 23     all of Dr. Sedlacek's findings to the FDA.  That cannot be newly

13:52:39 24     acquired information because it was previously submitted to FDA.

13:52:43 25          But I think there are some other parts about the Sedlacek

13:52:47  1    abstract that we should take into account:  One, it was on a

13:52:52  2    multi-chemotherapy regimen, on a particular regimen AC followed by

13:52:56  3    T, Taxotere, hundred milligrams per square.  So it was one regimen,

13:53:01  4    a combination regimen, and you have acknowledged that Dr. Sedlacek

13:53:06  5    had limitations to his findings, and that those other drugs, A and

13:53:10  6    C, as your Honor has correctly noted, plaintiff's experts have all

13:53:14  7    conceded are associated with permanent alopecia.

13:53:17  8             That's one part of it.

13:53:18  9             The other part, your Honor, is it's not enough for it to

13:53:25 10    be just an article.  It has to be more than that.  It has to be

13:53:28 11    conclusive data.  What does Sedlacek say?  He says, we've always

13:53:34 12    told our patients, don't worry your hair will come back.  That last

13:53:37 13    statement may not be true.  He goes in discussion, he says it

13:53:42 14    appears from this data set Taxotere/docetaxel is administered after

13:53:46 15    four doses of AC, there is a possibility of poor hair growth.  That

13:53:52 16    does not get them over the hurdle.

13:53:54 17             Courts that have looked at this exact issue have said,

13:53:58 18    the author here draws only a tentative, at best, suggestion of a

13:54:03 19    causal relationship between the brain signals and gadolinium

13:54:07 20    retention.  As such, it is not newly acquired information.  The

13:54:10 21    *Ridings* court out of the Western District of Missouri says studies

13:54:13 22    that say it remains unknown or further studies are required, that,

13:54:17 23    too, doesn't rise to the level of clinically significant adverse

13:54:22 24    effects under the CBE regulation.

13:54:24 25             And even if you took Sedlacek at its face, your Honor, I

13:54:28  1  believe he reported that not one arm with 6.3 percent of his

13:54:32  2  patients who had developed incomplete hair regrowth.  That's no

13:54:37  3  different, your Honor, than the Nabholtz study that Sanofi had

13:54:41  4  submitted in 2004, which plaintiffs will tell you in deposition and

13:54:44  5  at trial through their experts demonstrated a seven percent risk

13:54:48  6  with those same three drugs.  So it has to be something that is

13:54:51  7  different, your Honor.  Sedlacek is not that.

13:54:56  8        So let's talk about plaintiff's case law, where they rest

13:54:59  9  their hat on the case law.  Most of the heavy lifting they say

13:55:04 10  comes from *Albrecht*, your Honor.  *Albrecht* does not stand for the

13:55:08 11  proposition that newly acquired information, or the lack thereof,

13:55:11 12  does not have full preemptive effect, it was not addressed by

13:55:15 13  *Albrecht* the courts; afterward *Albrecht* progeny have clarified that

13:55:20 14  that issue was not before the courts.  And the first prong remains

13:55:23 15  a standalone predicate prong for granting full preemption.

13:55:28 16        They also cite to the *Avandia* court which does admittedly

13:55:35 17  have a lengthy discussion about the clear evidence standard.  What

13:55:36 18  is left out of plaintiff's opposition though, your Honor, is

13:55:39 19  *Avandia* also addresses the newly acquired information section.  And

13:55:43 20  there the *Avandia* court found that GSK, the defendant, had an

13:55:47 21  internal study to show a higher risk of ischemic stroke that had

13:55:53 22  not been submitted to the FDA, and, therefore, under the newly

13:55:56 23  acquired information prong, the predicate prong, GSK had failed on

13:56:01 24  that as well.

13:56:02 25        Finally they cite *Crockett* for the same standard.  Your

13:56:04  1    Honor, what is missing from plaintiff's brief is this, is that

13:56:08  2    dealt with pre-approval preemption; meaning there could be no newly

13:56:11  3    acquired information, that was all pre-approval.  So the only

13:56:15  4    argument the defendants made in the *Crockett* and the only argument

13:56:19  5    the court took up was the clear evidence standard.

13:56:21  6         I have no quibble, we have no quibble with *Crocket's*

13:56:25  7    conclusion because it has no bearing or relevance to the arguments

13:56:28  8    that we are making here, your Honor.

13:56:35  9         Finally, I would say on all of those grounds, your Honor,

13:56:38  10   they have failed to come forward and we have affirmatively come

13:56:41  11   forward that during this crucial time period, which is I want to

13:56:45  12   remind the court different from the time period in *Earnest* where

13:56:48  13   she was -- her injury was alleged in 2011, we're talking about

13:56:53  14   2008, a much earlier time period.  For all of those reasons, this

13:56:57  15   case should be fully preemptive.

13:56:59  16        But if your Honor is going to find something different, I

13:57:02  17   will also tell you it's partially preempted.  And that's because of

13:57:05  18   this:  In 2015, your Honor, as you well know, FDA took up the issue

13:57:10  19   of whether a warning about permanent alopecia should be included in

13:57:15  20   the Taxotere label.  They did a full analysis of the data, the

13:57:19  21   adverse events, the medical literature, the clinical studies, and

13:57:23  22   through that they made a formal request to Sanofi, that's formal

13:57:29  23   agency action as part of a congressionally delegated authority,

13:57:33  24   they requested Sanofi to make a change to the label.

13:57:36  25        FDA then did a fully informed review, and in their

13:57:40  1    medical review they said, 2015, we agree that there is a potential

13:57:47  2    causal association.  Even FDA didn't say it never found there to be

13:57:51  3    definitive causal association, which you would need for newly

13:57:54  4    acquired information.

13:57:55  5         And then finally, as part of their congressionally

13:57:57  6    delegated authority as *Albrecht* has made clear, they approved the

13:58:02  7    label.  They approved the label in terms of the language and they

13:58:05  8    approved the label in terms of the placement.  And if you look at

13:58:07  9    their formal request, your Honor, it was FDA through their formal

13:58:11 10    agency action that requested the label be changed in a particular

13:58:15 11    section.

13:58:15 12         Your Honor, that alone should preempt plaintiff's claims

13:58:21 13    in part.  Plaintiff's experts should be preempted from coming in to

13:58:25 14    this court and saying that 2008 or 2007 before Ms. Kahn took

13:58:31 15    Taxotere that the label should have been anything different,

13:58:36 16    anything different than that was approved in 2015 based on a

13:58:40 17    significantly larger body of data.  Cases have addressed this exact

13:58:45 18    issue.

13:58:47 19         There is a series of cases, I'll call them the gadolinium

13:58:51 20    cases, that we have cited in our brief, your Honor, where the

13:58:54 21    plaintiff said 2015 there should have been a warning about the risk

13:58:58 22    of gadolinium retention and the injuries or the dangers that it

13:59:02 23    could cause.  2017 FDA took up that issue and they made a ruling.

13:59:07 24    They made a label change, which was there was going to be a

13:59:11 25    reference to gadolinium retention but there would not be the type

13:59:15 1   of warning the plaintiffs had asked for.  Those courts uniformly

13:59:19 2   have found that that preempts, that later agency action preempts

13:59:25 3   the idea that a plaintiff could ask for a stronger warning or

13:59:28 4   suggest to a jury that a stronger, more detailed or different

13:59:32 5   warning should have been in the label.

13:59:34 6         Now, Mr. Mura is going to tell you that this has no

13:59:40 7   bearing, your Honor.  *Albrecht* says, it's so easy, it has clear

13:59:46 8   evidence can only come in one manner, the manufacturer has to

13:59:49 9   submit a label, the FDA has to reject it.  Your Honor, *Albrecht*

13:59:53 10  made clear they did not take up the disapproval method.  It's right

13:59:57 11  there.  They said the disapproval method only need come from FDA's

14:00:01 12  congressionally delegated authority.

14:00:03 13        And here, I know last time your Honor there was a lot of

14:00:07 14  discussion about e-mails and internal FDA e-mails and the e-mail,

14:00:12 15  we cite to none of that here, rely on none of that here.  What we

14:00:16 16  are relying on here is FDA's formal agency action, a formal request

14:00:20 17  for a label change, a formal review of the data, and a formal

14:00:26 18  approval of the label change.

14:00:27 19        So, your Honor, in conclusion, our position is that

14:00:29 20  plaintiffs have failed to meet their burden to come forward with

14:00:32 21  newly acquired information.

14:00:34 22        But even if you can find that, which I do not think you

14:00:38 23  should, their claims are preempted in part and their experts

14:00:41 24  shouldn't be able to make no statement further than in 2007 the

14:00:46 25  label could have said cases have been reported.  Your Honor, thank

14:00:49  1    you.

14:00:52  2                THE COURT:  Thank you.  Mr. Mura.

14:00:56  3                MR. MURA:  Good day, your Honor.  Thank you very much.

14:00:59  4                If you're having a case of deja vu, so am I because when

14:01:03  5    I pulled up the *Earnest* briefing, on the very first page is the

14:01:06  6    statement that Sanofi's entitled to preemption because at no time

14:01:10  7    after 2004 was there any newly acquired information.  That's the

14:01:16  8    exact argument that Sanofi presented in *Earnest*, and the Court

14:01:21  9    rejected it correctly applying binding Supreme Court precedent and

14:01:27 10    it is now law of the case.

14:01:29 11                Sanofi does not even attempt once to satisfy the Supreme

14:01:32 12    Court's demanding two-part test for impossibility preemption, which

14:01:36 13    this court faithfully applied in *Earnest* and which should be

14:01:41 14    applied here.  Instead, Sanofi is proposing to shift the burden,

14:01:44 15    just as it did in *Earnest*, it's proposing a four-part test that

14:01:48 16    *Albrecht* never adopted with four shifting burdens that places the

14:01:52 17    onus of disproving preemption on plaintiff, even though there is a

14:01:56 18    presumption against preemption.  That is not the law.

14:01:59 19                And what this court said in *Earnest* was, like the

14:02:02 20    manufacturer in *Levine*, Sanofi misapprehends both the federal drug

14:02:07 21    regulatory scheme and its burden in establishing a preemption

14:02:11 22    defense.  And that's exactly right.  Sanofi has to show an actual

14:02:16 23    conflict between federal and state law in order to establish

14:02:20 24    immunity.  This is a high bar.  It has to demonstrate both that it

14:02:24 25    fully informed the FDA of the justifications of the warning

14:02:29  1   required by state law, and it has to show that the FDA in turn

14:02:34  2   informed the drug manufacturer that the FDA would not approve

14:02:38  3   changing the drug's label to include that warning.

14:02:41  4        So it is not enough for Sanofi to argue that if it had

14:02:45  5   submitted a new label with additional warnings, the FDA would have

14:02:50  6   rejected it.

14:02:51  7        Mr. Ratliff started with the question is could the

14:02:55  8   manufacturer change the label?  Should it change the label?

14:03:00  9   *Albrecht* rejects that.  *Albrecht* says the possibility of

14:03:04  10  impossibility is not enough to establish an actual complex.

14:03:08  11       Preemption is further limited, the courts have concluded,

14:03:11  12  including *Crockett* and *Avandia*, that it's limited to where the FDA

14:03:16  13  has actually rejected a proposed labelling change through action

14:03:20  14  taken pursuant to FDA's congressionally delegated authority.

14:03:24  15       Now, Mr. Ratliff said, well, in *Albrecht* the court didn't

14:03:28  16  get to the question of which disapproval method is going to be

14:03:32  17  recognized.  But that's because in *Albrecht* there was actually a

14:03:37  18  letter from the FDA rejecting a label.  And so the question was,

14:03:41  19  was that enough.  You don't even have any letter from the FDA here

14:03:45  20  rejecting any proposed label.  So the fact that *Albrecht* didn't

14:03:49  21  reach that specific question is of no help to Sanofi.

14:03:53  22       And so in *Earnest*, as here, Sanofi sought to place the

14:03:58  23  burden on plaintiff to show new data, and the Court faulted Sanofi

14:04:02  24  for misapprehending its burden on preemption.  And the Court's

14:04:06  25  ruling in *Earnest* is entirely consistent with federal decisions

14:04:09  1    post *Albrecht*.  The statement by Mr. Ratliff that the courts are

14:04:14  2    uniformly rejecting essentially the *Albrecht* two-part test and

14:04:18  3    interposing an entirely new test is just false.  *Avandia* squarely

14:04:23  4    placed the burden on the drug manufacturer to prove both parts of

14:04:27  5    *Albrecht*'s two part preemption test.

14:04:29  6           And the plaintiff -- and the defendant in *Crockett* as

14:04:33  7    well argued that the plaintiff had to show newly acquired evidence

14:04:38  8    before you even got to preemption.  And *Crockett* explicitly

14:04:44  9    rejected that.  They said defendants, having failed to meet their

14:04:48 10    burden, attempt to shift it to plaintiff suggesting that plaintiff

14:04:51 11    has shown no facts suggesting that the FDA lacked any knowledge

14:04:55 12    about the label change.  And what the court said is preemption is

14:04:59 13    an affirmative defense and it's defendant's burden, not

14:05:03 14    plaintiff's, to demonstrate that it applies.

14:05:05 15           And Mr. Ratliff did not discuss our recent authority,

14:05:09 16    which we submitted to the court last week, *Evans v. Gilead*

14:05:15 17    *Sciences*.  This is another case where the court considered whose

14:05:18 18    burden it is to establish preemption.  And just like this court in

14:05:22 19    *Earnest*, the federal district court in *Evans v. Gilead Sciences*

14:05:26 20    said that the defendants have misapprehended their burden in

14:05:29 21    establishing preemption defense when they argued that plaintiff had

14:05:33 22    to show that there was newly acquired evidence that could have

14:05:38 23    supported a label change.

14:05:40 24           What the court said is that that's the wrong test.  You

14:05:43 25    have to ask, as the Supreme Court did in *Albrecht*, whether there

14:05:47  1   was clear evidence that shows that the drug manufacturer fully

14:05:49  2   informed the FDA and that the FDA in turn actually rejected that

14:05:54  3   proposed -- that label change.

14:05:56  4         And then the court said that the drug manufacturer has

14:05:59  5   not offered such evidence.  It has not shown that it filed a

14:06:03  6   supplemental application to change its label to warn of the

14:06:07  7   injuries and that the FDA later rejected.

14:06:09  8         And here is the point that I want to quote for the Court

14:06:12  9   because it directly refutes what Mr. Ratliff was saying.  The court

14:06:16 10   wrote, the notion that perhaps there was not sufficient newly

14:06:19 11   acquired information or evidence of a causal association between

14:06:24 12   the drug and the risk of injuries are merely two of any number of

14:06:30 13   reasons for the FDA to reject the label change, but federal law did

14:06:35 14   not preclude the drug company from making a label change in the

14:06:39 15   interim.  That case squarely rejects, squarely rejects the entire

14:06:45 16   argument that Mr. Ratliff is making.  And Mr. Ratliff made no

14:06:49 17   arguments trying to show to the Court that Sanofi could even

14:06:53 18   establish the clear evidence tests that the Supreme Court outlined.

14:06:59 19         So just a few other points, your Honor.  It's no answer

14:07:02 20   for Sanofi to say that plaintiffs have to show causation before

14:07:06 21   2008.  That's not the standard to update the precautions language

14:07:09 22   and it's not the standard to update the adverse reactions language.

14:07:18 23   And, in fact, this Court explicitly noted that in *Earnest*.  You

14:07:20 24   don't have to have a causal relationship definitively established.

14:07:23 25         So all of Sanofi's arguments they fall to all of the

14:07:26   1    evidence we put forth because they say it doesn't establish

14:07:29   2    causation.  Well, causation is not required under the regulations

14:07:33   3    to establish -- to update a label.

14:07:35   4          And, in fact, for adverse reactions, the standard for a

14:07:39   5    label update is very low.  You have to show an adverse reaction,

14:07:43   6    which is an undesirable effect reasonably associated with the use

14:07:48   7    of the drug.  It's an even lesser standard.  You just have to have

14:07:51   8    some reason to believe there is an untoward or undesired effect.

14:07:56   9    And Dr. Kessler discussed this at trial at length.

14:07:59  10          It's also no answer for Sanofi to say that plaintiff must

14:08:04  11    point entirely to new data.  This Court rejected that in *Earnest*.

14:08:09  12    Here is what the Court wrote.  The Court explained that newly

14:08:12  13    acquired information is not limited to new data but also

14:08:17  14    encompasses new analyses of previously submitted data.

14:08:21  15          So for the PSURs, it's no answer for Sanofi to say that

14:08:25  16    it provided the FDA with stacks of documents reflecting any

14:08:30  17    information that would have supported a label change and the FDA

14:08:34  18    didn't itself request a stronger label or did nothing.  This is

14:08:38  19    what the Court wrote in *Earnest*, this argument is a misapplication

14:08:42  20    of the law and the Court cited *Levine*.  It said, as the *Levine*

14:08:47  21    court wrote, the duty is on the manufacturer, not the FDA, to draft

14:08:52  22    an adequate label.  The duty was on Sanofi to alert the FDA about

14:08:57  23    an uptick in reports, and it's of no moment, the Court wrote, that

14:09:01  24    Sanofi inundated the FDA with study reports.  This falls short of

14:09:04  25    fully informing the FDA of the justifications for a stronger label.

14:09:07  1          Another point that Mr. Ratliff made.  He said that, well,

14:09:14  2  adverse drug experiences are not going to provide substantiation

14:09:18  3  necessary to justify a label.  Well, that's absolutely wrong.  And

14:09:21  4  *Levine* itself rejected that.  In *Levine* the court concluded that

14:09:25  5  multiple adverse event reports could, in fact, provide a basis to

14:09:31  6  update the label, notwithstanding that such reports were given to

14:09:35  7  the FDA at regular intervals.

14:09:38  8          And, in fact, when Sanofi argued that Madigan's analysis

14:09:41  9  must have happened before the injury date to be newly acquired,

14:09:46 10  *Levine* rejects that as well.  In *Levine* the court wrote, the drug

14:09:50 11  manufacturer here could have analyzed the accumulating data and

14:09:53 12  added a stronger warning.  It hadn't analyzed the data.

14:09:58 13          So as long as -- I mean, Sanofi's argument boils down to

14:10:03 14  as long as it doesn't perform adequate pharmacovigilance and

14:10:06 15  analyze the accumulating data, that it has immunity because it just

14:10:09 16  didn't know.  That's not the standard.  They have a duty to keep

14:10:13 17  analyzing the data.  And in *Levine* what the court said was there

14:10:17 18  were adverse event reports and the drug manufacturer could have

14:10:20 19  analyzed the data.  Certainly Sanofi could have analyzed the data

14:10:24 20  just as Dr. Madigan had and it could have updated the label based

14:10:29 21  on the low threshold, the low threshold that the regulations based

14:10:33 22  for an update for precautions and adverse reactions.

14:10:37 23          But again, that's not really the question.  The question

14:10:40 24  is the question posed by *Albrecht* to establish impossibility

14:10:46 25  preemption, and Sanofi cannot meet either showing.

14:10:48 1        Now, with respect to Mr. Ratliff's argument that we are

14:10:52 2  post 2008 data, that is not accurate.  All of the data we pointed

14:10:56 3  to, some of it became public after 2008 but this evidence was known

14:11:00 4  to the company.  And so it's not correct to say -- and a lot of the

14:11:04 5  evidence, even the reports that came out in 2010, were looking at

14:11:09 6  pre-2008 data.

14:11:11 7        In any event, I'll move on to the argument for partial

14:11:16 8  summary judgment, which the Court also faced in *Earnest*.  That was

14:11:19 9  the same argument that Sanofi made in *Earnest* and the Court didn't

14:11:24 10  accept it.

14:11:25 11        Sanofi there requested partial summary judgment saying

14:11:28 12  that *Earnest*'s failure to warn claim should be limited by

14:11:32 13  Taxotere's 2015 label.  This Court didn't grant that request.  It

14:11:37 14  recognized that the 2015 label was not at issue in a pre-2015 case

14:11:42 15  and it deferred a ruling.

14:11:44 16        And any ruling on the 2015 label would be advisory and

14:11:49 17  courts don't issue advisory opinions.  The Court should, again,

14:11:54 18  simply decline to consider that argument.

14:11:55 19        Even if the Court were to entertain it, Sanofi still

14:11:58 20  would not be entitled to preemption based on 2015 labelling.  And

14:12:02 21  that's so for two reasons:  One, Sanofi's preemption argument is

14:12:07 22  entirely based on speculation that the FDA would have rejected a

14:12:10 23  hypothetical label change to the precaution section.  But it never

14:12:15 24  submitted a label change to the precaution section.  Just as before

14:12:20 25  2015, it never submitted a label change to any aspect of the label.

14:12:25  1            And so the fact that Sanofi has never asked and the FDA

14:12:28  2     has never informed Sanofi for formal agency action, it would

14:12:33  3     disapprove such a label, means that there is no basis for even

14:12:36  4     limited preemption based on the 2015 labelling.

14:12:40  5            Also, this entire preemption argument fundamentally

14:12:44  6     misunderstands what the LPLA requires of a plaintiff.  Under the

14:12:48  7     LPLA, a claimant at a minimum must mention the specific risks that

14:12:54  8     were not disclosed.  Here that risk is permanent hair loss.  And

14:12:59  9     for plaintiff Kahn, just as for plaintiff Earnest, it was not

14:13:02 10     disclosed anywhere on Taxotere's labelling.  So plaintiff has to

14:13:07 11     mention the specific risks that were not disclosed.  The plaintiff

14:13:11 12     does not have to show what the label could have said.  And Sanofi's

14:13:15 13     insistence that plaintiff's failure to warn claim and hence

14:13:19 14     preemption turns on where an adequate warning can appear on the

14:13:24 15     labelling is simply incorrect and provides no basis, even for a

14:13:27 16     limited form of preemption.

14:13:29 17            So for all of these reasons and the reasons this Court

14:13:32 18     addressed fully in *Earnest* addressing all of these points,

14:13:35 19     considering all of this evidence, the Court should deny Sanofi's

14:13:40 20     motion for summary judgment based on preemption in full and the

14:13:42 21     case should proceed to trial.

14:13:43 22            THE COURT:  Thank you.  Mr. Ratliff.

14:13:47 23            MR. RATLIFF:  Thank you, your Honor.  I want to make just

14:13:50 24     a few quick statements.  One, what I heard from Mr. Mura was no

14:13:54 25     addressing of actually Sanofi's argument but regurgitating the

14:13:58  1    second prong of the preemption framework, which court after court

14:14:02  2    said it's just one prong, that the first prong needed to be --

14:14:05  3         THE COURT:  Let me ask this question because this was on

14:14:07  4    the tip of my tongue when you were arguing from the beginning.  Is

14:14:13  5    it okay for Sanofi to just sit on its hands?  And what I mean by

14:14:17  6    that is, if you are getting these reports from various outlets, is

14:14:27  7    it appropriate for you not to perform the appropriate analysis that

14:14:30  8    you could have?  I mean, is it okay for you to just sit on your

14:14:34  9    hands and say, oh, gosh, we didn't do that analysis so we didn't

14:14:38 10    know?

14:14:39 11         MR. RATLIFF:  Your Honor, to address that, that's sort of

14:14:41 12    a hypothetical question there --

14:14:44 13         THE COURT:  I think we get to what you were talking about

14:14:47 14    with Dr. Madigan being a post review.  And I understand that.  I am

14:14:55 15    just trying to --

14:14:56 16         MR. RATLIFF:  Your Honor, whether they could or whether

14:14:59 17    they should have done some sort of analysis is an interesting

14:15:03 18    question, it's just not relevant here under the CBE --

14:15:07 19         THE COURT:  Well, did they have the information that they

14:15:09 20    could have performed the analysis?

14:15:10 21         MR. RATLIFF:  And that information under the CBE

14:15:12 22    regulations was submitted to FDA.  So once it is submitted, that

14:15:19 23    clears that hurdle.  There is nothing in the CBE, there's nothing

14:15:23 24    in the regulations that rests preemption on whether a manufacturer

14:15:28 25    should have made some sort of an analysis of the data.

14:15:30 1           Although to address your question, your Honor, if we want
14:15:33 2  to move outside of that time frame, Sanofi did address this data in
14:15:38 3  2011 and submitted it to FDA.  And you reviewed that data and
14:15:43 4  commented on that data at some length in your denial of plaintiff's
14:15:47 5  summary judgment motion, which is in 2011 Dr. Kopreski's
14:15:52 6  pharmacovigilance team did a complete analysis of the persistent
14:15:56 7  and permanent alopecia, looking at clinical trials including
14:16:01 8  TAX 316 and adverse event reports.  And what did they conclude?
14:16:05 9  That there's no causal relationship.  And if there is no causal
14:16:08 10  relationship, your Honor, they cannot move forward under the CBE.
14:16:11 11  In fact, what courts have found in some of the cases that we cited,
14:16:14 12  that is to move forward on a CBE without meeting the CBE's
14:16:20 13  requirements would frankly be against law because you would be
14:16:23 14  putting something in there that's not allowed by the federal
14:16:26 15  regulations.

14:16:26 16           So if you want to look at what Sanofi did do, they did
14:16:30 17  that analysis and they came to that conclusion.  So what is to
14:16:33 18  suggest in this hypothetical world that had they had done that
14:16:37 19  analysis in 2007 that the result would be any different than it was
14:16:40 20  in 2011.

14:16:41 21           The only other point I want to make here, your Honor, is
14:16:45 22  as it relates to the *Earnest* ruling.  The issue of newly acquired
14:16:50 23  information and that predicate prong has to be answered first was
14:16:53 24  simply not addressed by your Honor in your Honor's ruling.  Your
14:16:57 25  Honor focused on the clear evidence prong.

14:16:58  1        Two, the idea that the 2015 label could have preemptive

14:17:04  2   effect to previous labels, or at least partially preempted, also

14:17:08  3   was absent from your order.  In fact, I think Mr. Mura said was

14:17:12  4   deferred.  So those issues are still ripe before your Honor.

14:17:16  5        And I guess the last thing I would say, your Honor, is

14:17:19  6   Mr. Mura made a big deal about causation and causation you can make

14:17:23  7   all kinds of label changes -- you don't need causation to make

14:17:28  8   label changes.  But under the CBE, your Honor, both under the terms

14:17:31  9   and the regulations and *Albrecht* itself, causation or reliable

14:17:35 10   evidence of causation is required to make a unilateral change under

14:17:38 11   that regulation, and that's the key to the preemption argument, can

14:17:43 12   they make a unilateral change if that complied with state and

14:17:47 13   federal law.  If they cannot, then there is a conflict and there is

14:17:50 14   an impossibility preemption.  Thank you, your Honor.

14:17:56 15        THE COURT:  Thank you.

14:18:03 16        The next argument is motion for summary judgment on

14:18:24 17   general causation filed by plaintiffs.  This is Docket No. 10936.

14:18:33 18   Arguing for plaintiff is Mr. Chris Coffin and for the defendant is

14:18:39 19   Mr. Jon Strongman.  Are we ready to proceed?

14:18:41 20        MR. COFFIN:  Your Honor, we need to work on the

14:18:43 21   PowerPoint.

14:18:44 22        THE COURT:  That's fine.  Take a few minutes.

14:22:30 23        MR. COFFIN:  Good afternoon, your Honor.  Chris Coffin

14:22:33 24   with Pendley, Baudin & Coffin on behalf of Ms. Kahn and the PSC.  I

14:22:38 25   will be arguing plaintiff's motion for summary judgment regarding

14:22:42  1    general causation.

14:22:43  2           As the Fifth Circuit has laid out in *Knight v. Kirby*

14:22:46  3    *Inland*, general causation is whether a substance is capable of

14:22:51  4    causing a particular injury or condition in the general population.

14:22:55  5           By the way, that PowerPoint I am going to refer to

14:22:58  6    towards the end of my discussions, I am sparing you the

14:23:02  7    slide-by-slide PowerPoint.

14:23:03  8           This Court has found that there's a two-prong test, I

14:23:07  9    discussed that earlier, you've heard that a few times throughout

14:23:11 10    these oral arguments.  The first prong being whether the evidence

14:23:13 11    shows that there is statistically significant association between

14:23:16 12    the agent, in this case Taxotere, and the disease, in this case

14:23:21 13    permanent alopecia.

14:23:22 14           Second prong being that the evidence demonstrating --

14:23:26 15    that there's evidence demonstrating that a true causal relationship

14:23:30 16    exists.  That has been displayed in this particular litigation

14:23:33 17    through Bradford Hill analysis that both Dr. Kessler and Dr. Feigal

14:23:39 18    have performed after Dr. Madigan's initial statistical analysis.

14:23:45 19           So I'm first going to go through prong one.  Both prongs

14:23:49 20    are met here.  I'm going to talk about the genuine issues of

14:23:51 21    material fact that do not exist with regard to the data that has

14:23:55 22    been analyzed and why summary judgment is appropriate.

14:23:58 23           First with prong one.  As you're well aware, Dr. Madigan

14:24:03 24    conducted a statistical analysis using data from TAX 316 and

14:24:07 25    TAX 301.  What is not in dispute is that TAX 316 and 301 were

14:24:14  1    studies that were conducted by Sanofi, the data was gathered by

14:24:19  2    Sanofi, the data was locked eventually by Sanofi.  The data from

14:24:25  3    these two studies specific to Taxotere and women who have breast

14:24:30  4    cancer, and there is data in that data set that relates to ongoing,

14:24:36  5    persistent, permanent alopecia.  That's the data that Sanofi

14:24:41  6    obtained from their own clinical trials and that's the exact same

14:24:46  7    data that Dr. Madigan uses in his analysis.

14:24:49  8         Perhaps most importantly with regard to that, Sanofi has

14:24:53  9    used that data, relied on that data in TAX 316 and TAX 301 in

14:25:01 10    obtaining approvals and attempting to obtain approvals for further

14:25:05 11    indications for Taxotere.

14:25:07 12         THE COURT:  Does this mean, though, I have to ignore the

14:25:10 13    testimony of Dr. Wei and Mr. Kopreski and Dr. Chang?

14:25:18 14         MR. COFFIN:  The answer is, your Honor, if this Court

14:25:21 15    determines that Dr. Kopreski's re-analysis is appropriate to go in

14:25:26 16    evidence in this case, then the defendant has rebuttal evidence

14:25:32 17    that the Court is allowing and summary judgment is not appropriate.

14:25:35 18    You are correct, your Honor.

14:25:36 19         This motion falls, admittedly, if this court believes

14:25:42 20    that Dr. Kopreski's re-analysis of the locked data after the fact

14:25:47 21    from a former employee should be admitted in evidence, that is

14:25:52 22    correct.

14:25:52 23         I am assuming in this argument that Dr. Kopreski's

14:25:56 24    analysis is not scientifically valid because it's a re-analysis

14:26:00 25    after the fact.  I am going to let Mr. Bachus handle that in the

next argument that deals specifically with Dr. Kopreski; but the

answer is, yes, you're correct, this motion does not succeed then.

THE COURT:  What about Dr. Wei?

MR. COFFIN:  Well, any of the experts that the defense

bring rely on Dr. Kopreski's analysis, or in Dr. Chang's case she

conducts an analysis that she says is similar to what Dr. Kopreski

had conducted.

THE COURT:  I guess I am recalling from the *Earnest* trial

that there were -- it was a great deal of cross-examination

unrelated to Kopreski's, whatever we call that, I am just not -- I

don't know what the word is that's not going to make somebody's

hair catch on fire -- what Kopreski did and it was related to the

methodology used by Dr. Madigan, and so do I have to accept

Dr. Madigan's analysis to grant this motion and say --

MR. COFFIN:  Yes.  You have to accept Dr. Madigan's

analysis of the data, which is not in dispute that comes from

Sanofi's trials, that's the point that I am trying to make.  But,

yes, you do have to accept Dr. Madigan's analysis.

THE COURT:  So the fact that there were challenges to

that and to his methodology -- and I am really -- in *Earnest* his

opinions were attacked under *Daubert* and I overruled that objection

and I am now facing new ones.

MR. COFFIN:  Correct.

THE COURT:  But there was, I would say, a very robust

cross-examination that was present with Dr. Madigan so that the

14:27:50  1    jury may have accepted or rejected it based upon just on the

14:27:56  2    cross-examination because there were questions as to the

14:27:58  3    methodology.

14:27:59  4            MR. COFFIN:  Well, the question regarding methodology and

14:28:02  5    whether or not Dr. Madigan's opinion should be excluded were

14:28:06  6    primarily based on the meta-analysis that he performed.

14:28:10  7            THE COURT:  Right.

14:28:11  8            MR. COFFIN:  And if you reject that -- you accepted that

14:28:13  9    in the *Earnest* trial and allowed him --

14:28:15  10           THE COURT:  I did.  But I am talking about -- but even --

14:28:19  11   I guess what you're asking me to do is take out of the province of

14:28:25  12   the jury whether to accept or reject an expert's opinion.

14:28:29  13           MR. COFFIN:  No.  What I am asking you -- well, maybe.

14:28:35  14   What I am saying is, yes, you have to accept Dr. Madigan's

14:28:39  15   methodology.  There's no question about the data that he used, and

14:28:44  16   you're looking at the methodology which has been challenged and you

14:28:48  17   already approved, and you approve that then the statistical

14:28:51  18   analysis prong of the general causation test is met, because the

14:28:56  19   defendants do not have any scientific basis to dispute that other

14:29:02  20   than Dr. Kopreski's re-analysis or what -- Dr. Kopreski's analysis

14:29:07  21   they've given to their experts and their experts haven't

14:29:10  22   independently verified.

14:29:11  23           So, yes, admittedly, you have to -- if you follow what

14:29:15  24   you did with Dr. Madigan and if you reject the I'll call it

14:29:20  25   re-analysis of Dr. Kopreski, then this motion is proper.

14:29:26  1          The second prong -- by the way, let me mention one other

14:29:32  2     thing about Dr. Madigan.  As you know, Judge, the statistical

14:29:36  3     analysis on TAX 316 and 301, but then he bolsters that analysis to

14:29:41  4     find a causal association, bolsters it with the same

14:29:46  5     pharmacovigilance database that Sanofi used when Sanofi determined

14:29:50  6     that there is a causal association.  Now, Sanofi will say, well,

14:29:53  7     wait, wait, wait.  Causal association doesn't equal causation.  But

14:29:57  8     causal association does equal causal association and it supports

14:30:02  9     Dr. Madigan's finding, their own research with the same data

14:30:06 10     supports Dr. Madigan's data that prong one has actually been met.

14:30:10 11          So then we move to prong two, which is the evidence

14:30:14 12     demonstrates that a true causal relationship exists.  That is done

14:30:18 13     through a Bradford Hill analysis.  Dr. Kessler and Dr. Feigal have

14:30:25 14     both done those.  You do not see the experts from the defendants

14:30:28 15     providing some kind of Bradford Hill analysis that has been done on

14:30:32 16     the data that they have analyzed from Dr. Kopreski.  And so there's

14:30:38 17     no -- there's nothing that should be -- the defendants should not

14:30:42 18     be allowed now to come in and second guess what their own experts

14:30:46 19     have not done themselves.

14:30:50 20          And I think that the defendants -- I understand that they

14:30:52 21     have their arguments why Dr. Kopreski's analysis is appropriate and

14:30:57 22     why Dr. Chang's analysis is appropriate.  Admittedly, your Honor,

14:31:01 23     if the Court accepts that, this motion falls.

14:31:06 24          I think maybe perhaps most importantly that was not

14:31:10 25     highlighted so much in our briefing, and it's really important, and

14:31:14 1   this issue of whether or not Taxotere can cause, could it cause

14:31:21 2   permanent alopecia in some people who take the drug, is the

14:31:25 3   admissions by Sanofi's own people.  And I highlight those here.

14:31:31 4   This is the testimony of Dr. Nanae Hangai, who is a Sanofi global

14:31:37 5   safety officer.  Dr. Hangai was the person who was the lead author

14:31:43 6   of the clinical overview that included the pharmacovigilance

14:31:48 7   database information we talked about quite a bit.  Here is the

14:31:52 8   question:  "And also one of the side effects you monitor related to

14:31:56 9   Taxotere is permanent hair loss, correct?"  Dr. Hangai, "yes."  "Q.

14:32:03 10  And you believe that Taxotere is causally associated with permanent

14:32:07 11  hair loss, correct?"

14:32:08 12          There was an objection, and then the answer was:

14:32:15 13  "Docetaxel/Taxotere may cause permanent hair loss but, it's case by

14:32:21 14  case."

14:32:21 15          I am not sure how much clearer a Sanofi global safety

14:32:25 16  officer whose responsibility it is to monitor the pharmacovigilance

14:32:30 17  of Taxotere, I don't know how much clearer it could be.

14:32:33 18  Docetaxel/Taxotere may cause permanent hair loss.  If you look at

14:32:37 19  the language in the LPLA, that's specifically what plaintiffs have

14:32:40 20  to show, that the product may cause the specific injury.  So

14:32:43 21  there's one example.

14:32:47 22          Oh, I apologize, your Honor, she went on.  The question

14:32:50 23  next is:  "And it's your understanding and belief that Taxotere may

14:32:53 24  cause permanent hair loss in some patients who take Taxotere,

14:32:57 25  correct?"  The answer, "yes."

14:33:00  1        I've cited the transcripts there.  Dr. Hangai's

14:33:04  2   transcript is attached to our briefing.

14:33:06  3        I don't know that it gets much clearer unless you look at

14:33:09  4   the transcript of Amy Freedman, who was also a Sanofi global safety

14:33:15  5   officer in 2006.  I remind you, your Honor, this was actually

14:33:19  6   testimony your Honor admitted in the *Earnest* trial.  "Q.  Just

14:33:23  7   going back.  My question was, to make sure I have the question

14:33:27  8   actually answered on the record, based upon your knowledge at

14:33:35  9   Sanofi in 2006, Sanofi knew that Taxotere could cause irreversible

14:33:40 10   alopecia in 2006, correct?  A.  Yes."

14:33:44 11        Those two admissions are enough to show that the company

14:33:49 12   believed and their global safety officers believed that Taxotere

14:33:55 13   can cause permanent alopecia.

14:34:00 14        Now, of course the defense wants to go back and rewrite

14:34:03 15   history and have re-analysis, which again, we'll cover, Mr. Bachus

14:34:07 16   will cover in Dr. Kopreski's analysis, but this is clear as it can

14:34:12 17   be.  And then you add Dr. Madigan's analysis, the Court's two-prong

14:34:15 18   step, Dr. Madigan's statistical analysis and the Bradford Hill

14:34:21 19   criteria of Dr. Feigal and Dr. Kessler, it's very clear that the

14:34:25 20   drug can cause it and the people in the company, in Sanofi admit

14:34:30 21   that it can.

14:34:31 22        The last point that I'll make is that Sanofi throughout

14:34:34 23   this litigation has consistently argued that the warning about

14:34:41 24   permanent hair loss, permanent alopecia has always been in the

14:34:46 25   label.  In countless depositions.  And I've asked these questions

14:34:51  1   and my colleagues have asked these questions:  Are you stating that

14:34:54  2   the term alopecia means temporary and permanent?  And they say,

14:35:01  3   yes, that's what it means, it's always been in the label.  Well,

14:35:04  4   they can't have it both ways, Judge.  If that's actually what they

14:35:09  5   have said in the label, that alopecia means permanent alopecia,

14:35:15  6   too, they're now going to come in here and get the opportunity in

14:35:17  7   court to argue that it doesn't actually cause permanent alopecia?

14:35:23  8           Your Honor, they can't have it both ways.  The evidence

14:35:25  9   is very clear that Taxotere can cause permanent alopecia in some

14:35:31 10   people who take it, and summary judgment on this issue should be

14:35:33 11   granted.

14:35:34 12           THE COURT:  Thank you.

14:35:35 13           MR. COFFIN:  Thank you, your Honor.

14:35:36 14           THE COURT:  Mr. Strongman.

14:36:11 15           MR. STRONGMAN:  Good afternoon, your Honor.  Jon

14:36:13 16   Strongman on behalf of Sanofi.

14:36:16 17           And, your Honor, the plaintiff's theme in their motions

14:36:20 18   on causation over these two days has been consistent and clear.

14:36:25 19   The plaintiffs want to entirely flip the burden of proof in this

14:36:28 20   case and place it all on Sanofi, they want to prevent Sanofi from

14:36:32 21   defending itself, they want to prevent Sanofi from meaningfully

14:36:36 22   cross-examining their experts, and they essentially are asking this

14:36:41 23   court to change and reverse numerous evidentiary rulings that it

14:36:45 24   made in *Earnest*.  They want the *Kahn* case tried in no way like the

14:36:50 25   *Earnest* case.  And this motion is no exception.

14:36:52  1          As your Honor pointed out, and I think in some of the

14:36:59  2  questions Mr. Coffin is aware, the defendants moved to exclude all

14:37:04  3  of plaintiff's expert on general causation in the *Earnest* case.

14:37:07  4  And in the Court's ruling on that, your Honor noted that there were

14:37:11  5  many limitations, there were things that Sanofi had pointed out

14:37:15  6  that might be weaknesses or discrepancies across the data, but

14:37:19  7  those were items that were best served for cross-examination.

14:37:23  8          And as your Honor noted, we did cross-examine the

14:37:27  9  plaintiff's experts on causation in *Earnest*, and plaintiff's motion

14:37:32 10  here wants to take every one of those issues off the table and

14:37:35 11  wants to prevent Sanofi from even cross-examining, even

14:37:40 12  cross-examining their own experts on the methodology that they used

14:37:43 13  to reach their opinions.

14:37:45 14          A genuine issue of material fact is this:  The plaintiffs

14:37:50 15  here are moving for summary judgment and a genuine issue of

14:37:54 16  material fact exists.

14:37:55 17          To grant the plaintiff's motion would require this Court

14:37:59 18  to accept all of the plaintiff's experts' conclusions at face value

14:38:04 19  without allowing cross-examination.  This would not just include

14:38:10 20  Dr. Madigan, it would be accepting Dr. Feigal's and Dr. Kessler's

14:38:13 21  opinions at face value with no cross-examination.

14:38:18 22          Plaintiff's argument would also require the Court to

14:38:21 23  reject all of Sanofi's challenges to those experts.  And it would

14:38:26 24  also require this Court to grant all of the plaintiff's challenges

14:38:30 25  to Sanofi's experts.  And this isn't just Dr. Kopreski.

14:38:35  1    Dr. Kopreski is not an expert but that's a separate issue.  It

14:38:38  2    would require this Court to reject all of the testimony of

14:38:41  3    Dr. Chang, Dr. Wei, Dr. Glaspy, all of it.

14:38:47  4         The bottom line is that the jury has a right to hear the

14:38:51  5    evidence, the jury has a right to hear vigorous cross-examination

14:38:56  6    on the issues, and the jury has the right to reject plaintiff's

14:39:00  7    experts' opinions.  And we know that that is what happened in the

14:39:06  8    *Earnest* case.

14:39:07  9         The plaintiff's in their briefs say no reasonable jury

14:39:11  10   could reject the plaintiff's argument on causation, but a jury did

14:39:15  11   reject the plaintiff's argument on causation.  The plaintiffs just

14:39:21  12   must not think the *Earnest* jury is reasonable.  They rejected

14:39:25  13   causation in *Earnest*.

14:39:27  14        And we know that the plaintiff's general causation has

14:39:31  15   holes.  There is no epidemiological study on point, there is

14:39:35  16   nothing that actually looks at an end point of what the plaintiffs

14:39:39  17   are calling PCIA.  The plaintiff's presentation through

14:39:45  18   Dr. Madigan, through Dr. Kessler, through Dr. Feigal requires what

14:39:50  19   we believe is misinterpretation of ongoing in TAX 316.  But we know

14:39:57  20   that not only does TAX 316 have the ongoing misinterpretation, but

14:40:03  21   TAX 316 is not statistically significant, even when you look at

14:40:07  22   the, quote unquote, ongoing.  So Dr. Madigan then has to pool both

14:40:12  23   of those studies together to get anything.

14:40:14  24        So Mr. Coffin was talking about Dr. Kopreski a lot.  But

14:40:17  25   this goes beyond Dr. Kopreski, because Dr. Kopreski is just looking

14:40:23  1   at TAX 316.  It wasn't even statistically significant assuming the

14:40:28  2   plaintiff's own arguments.  Dr. Madigan then had to do this, what

14:40:33  3   we believe is an improper meta-analysis that should be subject to

14:40:36  4   cross-examination.  That has nothing to do with Dr. Kopreski, it

14:40:40  5   has to do with the fact that Dr. Madigan had to look at two studies

14:40:44  6   that weren't statistically significant and jam them together to be

14:40:48  7   able to even make a case.  All of that method, all of that should

14:40:53  8   be cross-examination material at trial.

14:40:56  9         So we know that the plaintiff's case has limitations and

14:41:00  10   the jury should be able to consider those limitations and reject

14:41:04  11   them.

14:41:04  12         We also know that Sanofi has put forward evidence, these

14:41:07  13   are our experts.  We've put forward evidence that creates an issue

14:41:13  14   of fact; it creates an issue of fact on the state of the clinical

14:41:17  15   trials, it creates an issue of fact on what's in the medical

14:41:20  16   literature, and it creates an issue of fact on what conclusions can

14:41:25  17   reliably be drawn based on the data.

14:41:29  18         Again, when you're talking about summary judgment, all

14:41:32  19   that we need is an issue of fact, material fact.  And we have it.

14:41:37  20   Our own experts dispute what the plaintiff's experts say, that

14:41:43  21   alone requires this Court to deny the summary judgment motion like

14:41:46  22   the plaintiffs have filed here.

14:41:48  23         And I'll just end with this.  If you step back and you

14:41:55  24   think about what the plaintiffs are asking here, in the MDL context

14:41:59  25   like this, even setting aside the MDL context, in any context like

14:42:04  1   this, the plaintiffs are asking this Court to grant the plaintiff a

14:42:09  2   summary judgment on the issue of causation, which is hotly

14:42:14  3   disputed.  There isn't one ruling anywhere in any MDL court

14:42:21  4   granting a plaintiff's motion on general causation.  It's an issue

14:42:24  5   of fact, it's an issue the jury should consider, and plaintiff's

14:42:28  6   motion should be denied.

14:42:29  7            THE COURT:  Thank you.  Mr. Coffin.

14:43:01  8            MR. COFFIN:  Your Honor, Mr. Strongman states that the

14:43:07  9   plaintiffs want Sanofi to be precluded from defending itself.  It's

14:43:12 10   not the case.  What we don't want is for the defendants to talk out

14:43:17 11   of both sides of their mouths, it's got to be one way or the other.

14:43:21 12   It's got to be either --

14:43:23 13            THE COURT:  Mr. Coffin, that happens all the time.  We

14:43:26 14   didn't do it, but if we did we were okay, it was all right if we

14:43:30 15   did it.

14:43:32 16            MR. COFFIN:  Well, I think it's totally inappropriate.

14:43:34 17   And specifically in this case the plaintiffs have been held to some

14:43:39 18   standards such as the thousands of women were supposed to know that

14:43:44 19   they experienced permanent alopecia within six months post chemo,

14:43:50 20   yet the defendant stands here in court and gets to say, oh, no, our

14:43:54 21   drug doesn't cause it.  It's a double standard, Judge.  So it's

14:43:58 22   very frustrating for us to sit here and listen, especially when the

14:44:02 23   data that our experts are using is the data that Sanofi has put

14:44:05 24   together.

14:44:06 25            And so the plaintiffs are held to a standard of knowing

14:44:10  1  that a drug could cause permanent alopecia, yet the defendants come

14:44:16  2  in here and argue absolutely not.  It doesn't cause it.  And by the

14:44:20  3  way, they analyze their own pharmacovigilance database using a

14:44:26  4  two-year period, two-year period to define what permanent alopecia

14:44:30  5  is.  Why did they not use a lesser period as they admit in their

14:44:34  6  papers on this motion.  They know that if they would have used a

14:44:38  7  lesser period, like a year or six months, there would have been

14:44:42  8  more cases, which probably, not probably, would have increased the

14:44:47  9  percentage of women in their pharmacovigilance database who had

14:44:54 10  permanent alopecia.

14:44:55 11       So I understand the defendants want to defend themselves.

14:45:00 12  They should not be entitled to defend themselves without addressing

14:45:05 13  their own data, without wordsmithing things, without gymnastics

14:45:11 14  that puts these plaintiffs in a position that they aren't even

14:45:15 15  willing to take.  That is why we have brought this motion.

14:45:22 16       Their own people say, yes, we knew it caused permanent

14:45:24 17  alopecia as early as 2006 by Ms. Freedman, yet they deny it here

14:45:30 18  today in this court.  And they continue.  There's no other place

14:45:34 19  where Sanofi has stated that Dr. Kopreski's analysis is correct and

14:45:39 20  valid and legitimate outside of this court, and that's a problem

14:45:43 21  and this Court should not allow them to run away from their own

14:45:47 22  data.  Thank you, your Honor.

14:45:49 23       THE COURT:  Thank you.

14:45:57 24       Our final motion is Docket No. 10938, plaintiff's motion

14:46:13 25  to exclude the testimony of Dr. Michael Kopreski.  And Mr. Kyle

14:46:20  1  Bachus will argue that on behalf of the plaintiff and Mr. Harley

14:46:24  2  Ratliff on behalf of the defendant.

14:46:29  3       MR. BACHUS:  Good afternoon, your Honor.  Kyle Bachus

14:46:34  4  from Bachus & Schanker on behalf of the PSC and the plaintiff

14:46:38  5  Ms. Kahn.

14:46:39  6       The good news is you've reached the end of the train.

14:46:43  7       THE COURT:  You have no idea.

14:46:45  8       MR. BACHUS:  Well, your Honor, there are two focal points

14:46:51  9  of this motion; the first is that Dr. Kopreski has not been

14:46:58 10  endorsed by Sanofi to offer any expert opinions in the Kahn trial

14:47:05 11  pursuant to requirements of 702.

14:47:10 12       The second focal point is given the first, what is the

14:47:16 13  scope of lay opinion testimony that can be offered by Dr. Kopreski

14:47:22 14  at trial under 701.

14:47:26 15       So with respect to the first focal point, I think we can

14:47:31 16  dispense with this immediately.  Kopreski is not endorsed as an

14:47:35 17  expert, there is no report, there is no disclosure.  As the Court

14:47:37 18  has said repeatedly, if it's not in the report, it's not coming in.

14:47:42 19  So as a preliminary matter, we ask for the Court to enter an order

14:47:48 20  excluding Dr. Kopreski from offering any expert opinions at the

14:47:53 21  *Kahn* trial.  We would like a specific order that states that.

14:47:57 22       The second piece of this is a little bit more nuanced.

14:48:03 23  So outside of the 702 worthy expert opinion, there does exist a

14:48:09 24  very narrow path for employees or former employees to offer very

14:48:16 25  limited in scope lay opinion testimony in this setting.

14:48:25  1          However, the path, as I will explain to the Court, is not

14:48:31  2  available to Dr. Kopreski for numerous reasons.  So, first of all,

14:48:38  3  the constraints are very heavy on the utilization of lay opinion

14:48:45  4  testimony and for a very good reason.  In fact, as the advisory

14:48:50  5  committee to the rules noted with respect to this lay opinion

14:48:54  6  testimony, judges must eliminate the risk that the reliability

14:48:58  7  requirements in 702 will be evaded through the simple, expedient of

14:49:04  8  proffering an expert in lay witness clothing.  That's from the

14:49:09  9  committee.

14:49:12 10          So what is the scope?  Well, in this setting, lay opinion

14:49:17 11  testimony under 701 is limited to a witness giving testimony about

14:49:23 12  their own business policies, business practices, business

14:49:29 13  procedures.  An example would be the courts have allowed a business

14:49:34 14  owner to testify about the value of his business.  They say you

14:49:39 15  don't need to be an expert, you lived your business, you can

14:49:43 16  testify about the value of your business.

14:49:45 17          There are two cases that are cited by the defense.  Both

14:49:50 18  of those cases, first is the *Kerley* case, and that's a Sixth

14:49:55 19  Circuit case.  In that case it was a business policy testimony, and

14:49:57 20  that was a mortgage underwriter is allowed to testify that the

14:50:02 21  lender has a policy that forbids approving loan applications that

14:50:07 22  are fraudulent, that was the policy.  If you submit materially

14:50:11 23  false statements in your loan application, it doesn't get approved.

14:50:14 24  That is the scope of what the court permitted, an employee who

14:50:18 25  worked in their department, who worked there as an underwriter to

14:50:22  1   testify.  That was the business policy.

14:50:24  2        *Valencia* is a Fifth Circuit case that talked about the

14:50:28  3   admissibility of business practice.  And this business practice was

14:50:32  4   a security trading house, the risk manager was able to go into a

14:50:37  5   database and testify about trades listed in the database.  That's

14:50:44  6   what the business practice was.  They had a locked-in system, an

14:50:50  7   AREL, it's in the case that describes the database, this person did

14:50:55  8   this every day in their work and was able to testify here are the

14:50:59  9   trades that were posted.  And then the prosecution was able to

14:51:02 10   compare that to what really happened.

14:51:04 11        But beyond that scope, there's a further limitation to

14:51:10 12   try to insure the integrity of this lay opinion testimony, and that

14:51:15 13   is that even where lay opinion testimony in those policies and

14:51:20 14   practices and procedures may be permitted, it can only come from a

14:51:25 15   witness who is testifying about work that they actually do at the

14:51:34 16   business.  So you wouldn't have allowed the underwriter to come in

14:51:39 17   and testify about what they do in the sales department, for

14:51:42 18   instance, even if it's in the same business.  You have to actually

14:51:45 19   work -- work that they actually do.  And the courts go to great

14:51:51 20   lengths to explain that requirement.

14:51:54 21        In the *Valencia* case, for example, in the Fifth Circuit,

14:51:59 22   the court specifically finds that the lay witness testified about

14:52:03 23   doing exactly what he did while he was on the job at the company.

14:52:07 24   And they go on and quote, clearly this is what he previously did

14:52:11 25   during his day at work.  And that's the Fifth Circuit.

14:52:16  1          In *Kerley*, the court said that the witness who was

14:52:20  2   testifying this policy of denying loans by applicants who make

14:52:25  3   false statements, says he engaged in precisely the analysis that he

14:52:28  4   regularly performed at work each day as a risk officer.

14:52:33  5          THE COURT:  How did Dr. Kopreski end up -- I know Sanofi

14:52:38  6   put Dr. Kopreski up as its 30(b)(6) witness.  Was this not the work

14:52:44  7   that he did in Sanofi?  I mean, maybe not for this test, but isn't

14:52:50  8   this the type of work that he did?

14:52:52  9          MR. BACHUS:  The answer, the straight up answer is, no,

14:52:55 10   that's not the work that he did with respect to TAX 316.  And we'll

14:52:59 11   talk about that in a moment.  As your Honor is aware, under

14:53:02 12   30(b)(6) a company can appoint whomever --

14:53:05 13          THE COURT:  They pick one person.

14:53:07 14          MR. BACHUS:  -- whoever they want to testify.

14:53:10 15          But what actually happened here is that the defense took

14:53:14 16   the opportunity to kind of highjack that proceeding, and on their

14:53:18 17   direct, not subject to any questioning that I did, but on their

14:53:24 18   direct examination they put this whole re-analysis up for the first

14:53:30 19   time through this witness because they made a strategic decision

14:53:34 20   that that's how they were going to inject this in the case, and I

14:53:37 21   can explain to you why that occurred.

14:53:38 22          But, so Dr. Kopreski's re-analysis of TAX 316 does not

14:53:44 23   fit in to these tight constraints at all, and it's important for

14:53:49 24   the Court to understand this.  With TAX 316, it's a clinical trial,

14:53:54 25   Sanofi does not do its own clinical trials.  Sanofi hires

14:53:58  1  third-party companies -- and I am not critical of that, that's what

14:54:02  2  happens, they hire a third-party company to conduct a clinical

14:54:06  3  trial.  And that's what they did with TAX 316, they hired a company

14:54:10  4  called the Breast Cancer Research Investigation Group.  They

14:54:13  5  started their work on this more than five years before Kopreski

14:54:17  6  ever worked there and they completed 13 years of work on this and

14:54:20  7  they locked in their final clinical data 13 years later.

14:54:25  8       And it is that data that is locked in through this

14:54:29  9  independent clinical trial, that's what Sanofi reports to the FDA,

14:54:38 10  have consistently reported to the FDA, and to this day when they

14:54:41 11  talk about the results of TAX 316 with respect to alopecia, it's

14:54:45 12  what they utilize in their reports to the FDA.

14:54:48 13       So Sanofi's pharmacovigilance department, which is where

14:54:53 14  Dr. Kopreski worked, okay, was not involved in any way in the

14:55:01 15  TAX 316 clinical trial or in the analysis of the TAX 316 clinical

14:55:06 16  trial data.  They were not involved.  And, in fact, in the

14:55:10 17  deposition after their direct examination where they started

14:55:17 18  talking about all of these things, I asked Dr. Kopreski, and I have

14:55:20 19  up here for the Court Dr. Kopreski's testimony.  And this is,

14:55:24 20  unfortunately, kind of a light copy of the transcript, but I asked

14:55:28 21  Dr. Kopreski specifically:  "As part of the data analysis for

14:55:34 22  TAX 316, you personally --" because he was offering these opinions,

14:55:39 23  personally offering these opinions, he did this re-analysis, it

14:55:44 24  wasn't part of any of the 30(b)(6) -- I mean, there was no request

14:55:46 25  for this analysis in the 30(b)(6) -- "as part of the data analysis

14:55:50   1    you personally, you weren't part of the data analysis effort as it

14:55:54   2    relates to TAX 316; is that true?  A.  I was not doing the data

14:56:01   3    analysis for TAX 316."  He was not doing it.

14:56:14   4         So I asked him more questions about it:  "The analysis

14:56:17   5    that you testified about during the course of your 30(b)(6)

14:56:21   6    deposition was not done as part of any regulatory submission, but

14:56:26   7    instead was done during this litigation at the request of the

14:56:30   8    attorneys from Shook, Hardy & Bacon, correct?"  Answer was, "That's

14:56:36   9    correct."

14:56:36   10        "All right.  And everything that you looked at regarding

14:56:42   11   TAX 316 was given to you by Sanofi's attorneys in this litigation,

14:56:45   12   correct?  That's correct.  And you're not in a position to attest

14:56:51   13   to the completeness in any way of the documentation that was

14:56:54   14   provided to you by the attorneys for Sanofi, correct?  To testify

14:56:59   15   about -- I can only testify in terms of what was given to me."

14:57:07   16        "All right.  Of the 700 plus participants in TAX 316 --"

14:57:13   17   in the TAC line is what I am referring to -- "you looked at

14:57:16   18   incomplete documentation regarding 29 --"  and there's an objection

14:57:21   19   and I say correct.  And then the witness, Dr. Kopreski says, "I

14:57:27   20   don't know if the documentation of those 29 was incomplete.  I did

14:57:31   21   not look at all 744 participants."

14:57:39   22        So Dr. Kopreski didn't work on TAX 316, was certainly not

14:57:49   23   part of his regular course of business to be examining TAX 316

14:57:54   24   data.  This was not done in any of the way that you would regularly

14:57:57   25   conduct business.  I mean, Matt Keenan who works for Shook Hardy,

14:58:03  1   he doesn't work at Sanofi, he doesn't work at the pharmacovigilance
14:58:08  2   department.  I mean, in the day-to-day operations, he wasn't
14:58:11  3   walking in to Dr. Kopreski's office and handing him pieces or parts
14:58:13  4   of clinical trial studies and asking for the doctor to analyze
14:58:17  5   that.  That was not part of his regular business activities.
14:58:23  6         It's also important for the Court to understand that not
14:58:26  7   only was there incomplete data, this was completely litigation
14:58:30  8   driven.  And that's fine, it's a good strategy --
14:58:33  9         THE COURT:  Did he look at the FAC arm as well?  I just
14:58:38 10   don't remember.
14:58:39 11         MR. BACHUS:  Well, he did look at the FAC arm with the
14:58:42 12   information provided in a limited fashion by Shook Hardy, he did.
14:58:53 13         In no way was his clinical trial re-analysis a
14:58:57 14   continuation of any of his duties, he simply had no such duties.
14:59:03 15         And really what happened here, your Honor, with this
14:59:08 16   analysis is that Sanofi's lawyers understood that they could not,
14:59:16 17   they could not provide complete data from these underlying trials
14:59:22 18   to their own witnesses and have them come up with a reliable 702
14:59:28 19   worthy opinion.  They couldn't do it.  702 reliability requires
14:59:33 20   that there's, as the Court knows, there's a methodology, there are
14:59:39 21   controls, there are standards, there's a scientific theory, it can
14:59:45 22   be duplicated.  Well, if Matt Keenan just goes into a closet and
14:59:49 23   grabs parts of a file that he believes are important, regardless of
14:59:52 24   whether they're complete or incomplete, which they are not
14:59:56 25   complete, and hands that to a witness and says, here is the

15:00:02 1   conclusion that I want you to draw and the witness draws that

15:00:06 2   conclusion, that is not a scientific analysis.

15:00:09 3          And you know how you can be assured of that, your Honor?

15:00:12 4   You saw a few minutes ago all of these witnesses that Sanofi has.

15:00:18 5   Do you know how many of those witnesses that they have, these

15:00:23 6   expert -- actual expert witnesses, how many of those have actually

15:00:27 7   recreated the analysis done by Dr. Kopreski?  Zero.  Do you know

15:00:31 8   why zero?  Because all of them know and understand that if they had

15:00:33 9   done so, they cannot come before this Court and withstand the

15:00:39 10  scrutiny under 702 that would get those conclusions in front of the

15:00:42 11  jury.

15:00:42 12         So what did Sanofi do instead?  They did a bootstrapping,

15:00:47 13  right, and that's -- oh, by the way, I should also mention, there

15:00:53 14  is a biostatistics department at Sanofi that is responsible for

15:01:00 15  analyzing clinic trial data, but Dr. Kopreski doesn't work in that

15:01:04 16  department, he works in pharmacovigilance.

15:01:11 17         But the bootstrapping, your Honor, is this:  They got

15:01:12 18  Matt Keenan to hand limited information to Dr. Kopreski; they then

15:01:24 19  don't endorse Dr. Kopreski as an actual expert because he would

15:01:35 20  have to go under 702 scrutiny, he then provides this analysis which

15:02:21 21  they at Sanofi then hand that analysis, the conclusions of

15:02:21 22  Dr. Kopreski to actual real 702 witnesses.  And they instead of

15:02:21 23  doing a re-analysis, they rely upon the conclusions reached by

15:02:21 24  Dr. Kopreski as the basis for their expert opinions.

15:02:21 25         That is a house of cards is what's been done here.  And

15:02:21  1    it's not accidental.  I mean, give them credit, that's really

15:02:21  2    creative stuff, it's just not what we're supposed to allow in a

15:02:21  3    courtroom.  And it's not that your Honor -- and I saw in their

15:02:21  4    pleadings it says this is rehashed, it's not rehashed.  The problem

15:02:54  5    may have been, frankly, the way that we chose to defend against it.

15:02:54  6    We didn't bring this motion before you --

15:02:54  7                 THE COURT:  I know.

15:02:54  8                 MR. BACHUS:  -- previously.  You only ruled on --

15:02:54  9                 THE COURT:  Arrowsmith.

15:02:54 10                 MR. BACHUS:  And you ruled on some objections where we

15:02:54 11    had a limited amount of time to make an objection and you're ruling

15:02:54 12    on the objection as its presented in the course of a deposition.

15:03:19 13    You were never presented with the opportunity to examine this for

15:03:19 14    what it really is, and what it really is is impermissible testimony

15:03:19 15    under 701 because he is not qualified to meet the requirements that

15:03:19 16    would allow for lay opinion testimony under 701.  They refused to

15:03:19 17    endorse him as a 702 witness because they know for sure you're not

15:03:24 18    going to let that in.

15:03:24 19                 I will tell you that we looked, and you may ask

15:03:24 20    Mr. Ratliff the same question, there is no MDL, there is no product

15:03:24 21    case, there is no precedence whatsoever that would say it's okay

15:03:24 22    for somebody sitting in pharmacovigilance to be handed information

15:03:24 23    from a law firm in the midst of litigation to examine that in a

15:03:29 24    limited fashion and call that permissible 701 lay opinion

15:03:35 25    testimony.  It doesn't exist.  I mean, if it exists, Harley found

15:03:40 1  it today maybe, but I haven't found it and we looked for it.

15:03:44 2  So I just wanted to show the Court one other thing

15:03:48 3  because it comes up in their discussions here.  This is invited,

15:03:53 4  the plaintiffs invited, that's not true either.  This is the

15:03:57 5  portion of the 30(b)(6) notice that led to, from their perspective,

15:04:06 6  was the in route for this information.  I want the Court to note

15:04:12 7  that what is asked here is that -- well, there are these tables, so

15:04:17 8  this is Table 2, and what we had is we had identified through

15:04:20 9  Sanofi's records various adverse event reports.  And there's a

15:04:25 10  reference number and there -- and these are to protect patient

15:04:30 11  confidentiality.

15:04:31 12  So one of the things we wanted to do, as we did different

15:04:34 13  time frames, the magistrate judge said, okay.  You can do 2004 to

15:04:38 14  2010, whatever the time frame is.  So we listed out by patient

15:04:42 15  reference number a table in the 30(b)(6) notice itself.  Here are

15:04:47 16  the adverse events we want to talk about.  Well, then we weren't

15:04:51 17  sure, for instance, in TAX 316 whether we had captured all of the

15:04:56 18  identified patients in our table.  So this basically just said,

15:05:00 19  hey, we want you to look at the clinical study report from 2010

15:05:04 20  regarding TAX 316, and we want you to let us know whether every

15:05:12 21  patient that was listed in the TAX 316 clinical study report

15:05:18 22  whether we've included them in Table 2.  That's what we asked them

15:05:21 23  to do.

15:05:22 24  We didn't ask them to do an analysis or re-analysis of

15:05:29 25  TAX 316 at all.  And in fact, I asked Dr. Kopreski, do you agree,

15:05:35  1   in his deposition, do you agree that your testimony with respect to

15:05:38  2   the TAX 316 study has gone far beyond the scope of what is

15:05:43  3   designated under No 12?  Object to the form.  This is beyond -- I

15:05:51  4   said beyond the identifying of patients and whether they were

15:05:53  5   included in Table 2.  Dr. Kopreski, I've raised during my testimony

15:06:01  6   questions as to whether certain testimony goes beyond the scope.

15:06:04  7   In raising those questions, I have deferred to the opinion of the

15:06:07  8   attorney whether they go beyond the scope.

15:06:09  9          This is what was asked for.  Bring up a 2010 -- and by

15:06:13 10   the way, you know they went beyond the scope because Dr. Kopreski

15:06:16 11   when Matt Keenan handed him documents only handed him stuff up to

15:06:23 12   2002.  By his own acknowledgment he didn't even look at the last

15:06:28 13   five years of data.  So we were asking about a clinical study

15:06:29 14   performed in 2010 solely so we could make sure that we were

15:06:32 15   matching up the reference numbers with the adverse event reports

15:06:36 16   that existed.

15:06:37 17          Also I would let you know that if you want to know how on

15:06:44 18   the direct examination when Mr. Keenan started, here is how he

15:06:51 19   started, state your name, you're a medical doctor.  And then he

15:06:56 20   asked him to describe his education, his training, and his

15:06:59 21   experience as a clinician, where he went to medical school, where

15:07:05 22   he did his follow-up.  This is their 30(b)(6) witness.  Okay.  This

15:07:10 23   is right before they go into the TAX 316 analysis.  This is an

15:07:15 24   attempt to lay a foundation for him to be an expert in the case.

15:07:19 25          THE COURT:  Okay.

15:07:20   1          MR. BACHUS:  You're an oncologist.  Tell us about cancer.

15:07:24   2    And he goes on to describe in great detail cancer.

15:07:27   3          So we're asking that you, your Honor, first of all, grant

15:07:34   4    us a motion indicating that Dr. Kopreski cannot provide any expert

15:07:39   5    testimony, No. 1.  And then No. 2 -- and by the way, there's this

15:07:45   6    Kopreski analysis.  While it's the most important, it's not the

15:07:48   7    only time that Dr. Kopreski oversteps his bounds with respect to

15:07:53   8    lay opinion testimony -- but with specific reference to this

15:07:56   9    re-analysis issue that is so important to the defense's case, we

15:08:04  10    would ask you to make a ruling, that, No. 1, no foundation has been

15:08:09  11    laid by the defense which would allow this to be permissible; and

15:08:13  12    No. 2, that there is -- that based upon the evidence that does

15:08:19  13    exist in the case and the testimony by Dr. Kopreski himself, that

15:08:25  14    this re-analysis does not qualify as lay opinion testimony that can

15:08:31  15    be delivered to the jury through the mouth of Dr. Kopreski.  Thank

15:08:36  16    you.

15:08:36  17          THE COURT:  Thank you.  Mr. Ratliff.

15:08:59  18          MR. RATLIFF:  One second, your Honor.

15:09:20  19          Thank you, your Honor.  I would like to respond to what

15:09:23  20    Mr. Bachus said on a number of different points.

15:09:25  21          Your Honor, at a high level, what the PSC is trying to do

15:09:29  22    and Mr. Bachus is trying to do is specifically undo a problem of

15:09:33  23    their own making.  They requested this testimony, they requested

15:09:37  24    through a 30(b)(6) the identity of TAX 316 patients with persistent

15:09:42  25    alopecia using a definition that the plaintiff put forward, and,

15:09:46   1   Judge, Magistrate Judge Michael North endorsed as the scope of the

15:09:50   2   testimony.

15:09:51   3           Now, your Honor, you have addressed this five different

15:09:55   4   times:  First on a motion to exclude the expert testimony of Glaspy

15:10:00   5   and Arrowsmith; you did it on depo designations on 702 and 703

15:10:06   6   grounds; you did it on the trial testimony when Mr. Coffin objected

15:10:10   7   at trial, you overruled that; when Mr. Coffin moved for a motion on

15:10:14   8   mistrial on the same issue, you denied that; and when they moved

15:10:17   9   for a motion for new trial, which Mr. Lambert argued, you denied

15:10:20  10   that.  So to grant their motion, your Honor, would be to walk back

15:10:24  11   all of your previous decisions when this same issue is currently

15:10:28  12   across the street before the Fifth Circuit.  This exact same issue

15:10:31  13   is currently on appeal.

15:10:32  14           And I think it's worth going through a few of these

15:10:36  15   briefly, your Honor, when they moved to exclude.  You said

15:10:39  16   Dr. Arrowsmith, for example, has examined the patient data for

15:10:42  17   TAX 316 patients, she's reached the same conclusion as

15:10:46  18   Dr. Kopreski; her reliance passes muster.

15:10:48  19           When you did the depo designations.  Your Honor, there

15:10:52  20   were 10,000 lines of Kopreski testimony that you had to review and

15:10:56  21   make rulings on.  You made 113 rulings on plaintiff designations,

15:11:02  22   246 on defense designations.  And, your Honor, you did not just

15:11:07  23   address this just once, but on the second Saturday of trial, we sat

15:11:10  24   in this exact office, you, Mr. Lambert, Mr. Markoff, me and my

15:11:15  25   shorts and penny loafers going over this exact same argument.

15:11:20  1          THE COURT:  Don't remind me.

15:11:21  2          MR. RATLIFF:  In fact, they made these same arguments,

15:11:25  3    they reiterated these 702 and 703 arguments on the exact same

15:11:28  4    testimony and you denied that.

15:11:29  5          At trial when Mr. Coffin raised it, you overruled it and

15:11:33  6    said I will instruct the jury that he is not an expert nor is he

15:11:37  7    proffered as an expert.

15:11:38  8          When you denied their mistrial, you said the Court gave

15:11:40  9    Mr. Miceli wide latitude in cross-examining Dr. Glaspy relating to

15:11:45 10    his testimony of Dr. Kopreski.  I think he was fully vetted for the

15:11:48 11    jury.  Your words, your Honor, not mine.

15:11:51 12          The denial of the new trial, you talked about what

15:11:55 13    Kopreski did that he explained that some patients would have been

15:11:57 14    on new treatments, therefore, they would go off.  Some patients may

15:12:00 15    have died, therefore, they would have been listed as ongoing.  You

15:12:04 16    said the jury had a full picture of Dr. Kopreski's re-analysis.

15:12:07 17    Ruling after ruling after ruling, your Honor, that would require

15:12:12 18    granting their motion to walk back all of them.

15:12:15 19          And so, your Honor, I think what we need to get to is a

15:12:18 20    little bit of clarification as to what Mr. Bachus said.

15:12:21 21    Plaintiff's 30(b)(6) request of Sanofi:  The identity of each

15:12:26 22    patient by reference number who reportedly experienced persistent

15:12:29 23    alopecia while enrolled as a participant in TAX 316.  Sanofi

15:12:34 24    identified all of the patients in TAX 316 that had persistent

15:12:38 25    alopecia so we can determine if they're in our table so we can ask

15:12:42  1    you more questions about them.  We didn't choose this; in fact, we

15:12:46  2    fought this before Judge North repeatedly.  This is what they asked

15:12:49  3    us to provide testimony on, your Honor.

15:12:52  4         And when I was reading their brief in preparation for

15:12:55  5    this, I saw repeated references that the definition of persistent

15:12:59  6    alopecia was something that was crafted whole cloth by Sanofi or

15:13:02  7    Sanofi's attorneys or Mr. Ratliff.  Incorrect, your Honor.

15:13:06  8    Mr. Bachus and I stood in Judge North's courtroom when this issue

15:13:10  9    was raised, what would be the definition, what would be the

15:13:14  10   definition for this litigation.  Not the definition that's in

15:13:18  11   TAX 316, not the definition that's in literature, what would govern

15:13:23  12   this.  A new, previously undefined case definition.

15:13:26  13        Judge North was clear, alopecia six months after

15:13:30  14   chemotherapy ended without subsequent resolution.  That's going to

15:13:33  15   be my order, that's what's going to pertain to the 30(b)(6).

15:13:38  16   Mr. Bachus was there, I was there, we argued those motions.  So to

15:13:42  17   say this definition was Sanofi's is incorrect, your Honor.

15:13:45  18        And I think what's important about that definition, your

15:13:48  19   Honor, is this:  That definition, that definition of persistent or

15:13:52  20   permanent alopecia being six months without subsequent resolution,

15:13:56  21   that's not a definition that's in TAX 316, that's not an injury or

15:14:01  22   side effect of TAX 316 was designed to study.  And we can look at

15:14:05  23   all, all of the records on TAX 316 that have been before your Honor

15:14:08  24   and you will not find a definition of permanent alopecia or

15:14:12  25   persistent alopecia.

15:14:14  1          Here is why.  This is Dr. Mancini, who I know you've

15:14:18  2   heard Dave Miceli talk about at length.  Dave Miceli will tell you

15:14:25  3   Mr. Mancini, who he deposed in London, was the head of the TAX 316

15:14:27  4   biostats and data mining operations.  When Mr. Miceli asked him

15:14:31  5   about this, he says that's not the way the TAX 316 statistical

15:14:36  6   analysis plan and the reports, you know, analyze that.  We don't

15:14:38  7   have this definition of long-term or permanent alopecia as an end

15:14:42  8   point in this study.  I mean, the study is not designed to assess

15:14:46  9   the permanent nature of alopecia.

15:14:48 10          So we're talking about two different things.  There's

15:14:51 11   TAX 316.  We agree there's a statistical analysis plan.  We agree

15:14:55 12   it reports on ongoing alopecia.  But what's fundamental is what

15:14:59 13   Dr. Kopreski was asked to give testimony on was something that is

15:15:04 14   newly defined for this litigation and adopted by the Court.

15:15:09 15          And I think it's also important that Dr. Kopreski doesn't

15:15:14 16   stand alone, your Honor.  Numerous witnesses were asked about what

15:15:17 17   did ongoing mean in the course of this litigation, Mr. Miceli asked

15:15:21 18   Mancini about ongoing, we have this database with 29 patients, but

15:15:25 19   you cannot say for sure that the 29 still ongoing, you may have

15:15:29 20   some that had been lost to follow-up, you have some patients moving

15:15:31 21   to other therapies.

15:15:32 22          Mr. Markoff, he deposed Sunil Gupta, an oncologist and

15:15:36 23   head of Sanofi's regulatory department on this issue.  Dr. Gupta

15:15:41 24   was clear, just with the numbers, that at some point in time these

15:15:44 25   women had alopecia; but without the time frame, it's difficult to

15:15:50 1  say how long that is.  You can't just say ongoing equals the

15:15:55 2  definition that this Court ordered and is being advanced by the

15:15:58 3  plaintiffs.

15:15:59 4          Kopreski, he was asked this question, said the same

15:16:02 5  thing.  It means the last time there was documentation that they

15:16:06 6  had alopecia, which is consistent with the statistical analysis

15:16:09 7  plan for TAX 316, the plaintiffs rest much of their motion on, your

15:16:13 8  Honor.

15:16:13 9          That's why the definition is so important.  That's why

15:16:16 10 it's not a re-analysis of data, your Honor.  That is why he is

15:16:21 11 asked to give testimony on the identity of these patients based on

15:16:25 12 the definition adopted by the Court.

15:16:26 13         So what did Dr. Kopreski do?  He factually relayed what

15:16:31 14 he found.  He looked at the case report forms or whatever data he

15:16:35 15 could get.  He said these people had alopecia six months after

15:16:39 16 chemotherapy; okay, yes.  If so, was there evidence of resolution.

15:16:44 17 If it returned, it would not be permanent under the Court's

15:16:47 18 definition.  If the hair did not return, then it would be permanent

15:16:50 19 under the Court's definition and under what the plaintiff's asked

15:16:54 20 in their 30(b)(6) request.

15:16:56 21         Similar to the witness in *Valencia*, essentially was a

15:17:00 22 penny up/penny down, true/false, long/short analysis.  What do the

15:17:06 23 records say.  He is not saying Taxotere caused it, Taxotere did not

15:17:10 24 cause it; he is just saying I looked at the data, and at this end

15:17:14 25 point, at this end point, here is my conclusion, this is what I've

15:17:18  1    been asked to give as a corporate representative.

15:17:20  2            And frankly, Dr. Kopreski complied an overinclusive

15:17:25  3    interpretation because he said I consider that patient to have

15:17:27  4    persistent alopecia regardless of whether they were on tamoxifen,

15:17:31  5    which many of the patients in TAX 316 were on.  And as plaintiff's

15:17:36  6    own experts, including Dr. Tosti their specific causation expert

15:17:39  7    has said, tamoxifen is a hair loss causing agent that these women

15:17:42  8    were on for a long time.  So that's the analysis that Dr. Kopreski

15:17:46  9    performed.

15:17:47 10            I think it's important to understand, too, your Honor,

15:17:49 11    who is Dr. Kopreski.  He was not pulled off the street.  He is not

15:17:53 12    some low person at Sanofi; for 15 years he was the head of Sanofi's

15:17:57 13    pharmacovigilance and epidemiology.  His whole job for 15 years was

15:18:04 14    at the top, the buck stopped with him as it related to the review

15:18:07 15    and analysis of adverse event reports for Sanofi's oncology

15:18:12 16    products, your Honor.  And in that role, he led comprehensive

15:18:15 17    safety reviews and analyses of adverse event data, the exact same

15:18:19 18    thing he did for this 30(b)(6), including on permanent alopecia,

15:18:22 19    your Honor.  Who was in charge of this department and signed off on

15:18:25 20    Dr. Palatinsky's 2011 review of permanent alopecia that used a one

15:18:31 21    year time frame?  Dr. Kopreski.

15:18:33 22            And what's interesting about that, your Honor, is if you

15:18:35 23    look at the 2011 clinical overview using a one-year definition,

15:18:39 24    they found only three cases of permanent alopecia that met that

15:18:44 25    definition that are in the clinical review that was provided to

15:18:47 1   FDA.

15:18:48 2          Dr. Hangai, which Mr. Coffin cited to, when she prepared

15:18:53 3   her clinical overview about permanent alopecia using a two-year

15:18:56 4   definition, who was her boss, who signed off on it, who reviewed

15:19:00 5   it?  Dr. Kopreski.

15:19:01 6          So to say that Dr. Kopreski was not involved in the

15:19:04 7   analysis of adverse events, including a permanent alopecia on two

15:19:10 8   different stages doing the exact same type of analysis just at

15:19:14 9   different time points, is simply incorrect.

15:19:16 10         I think what's important about this, your Honor, is what

15:19:19 11  does FDA say pharmacovigilance is?  It's the detection, assessment,

15:19:23 12  and understanding of adverse events.  These activities are

15:19:27 13  undertaken with the goal of identifying adverse events,

15:19:30 14  understanding them, to the extent possible, their nature,

15:19:33 15  frequency, and potential risk factors.  That is what Dr. Kopreski

15:19:36 16  was in charge of at Sanofi for 15 years for Taxotere.

15:19:42 17         They make a big fuss about the fact that he was not the

15:19:45 18  person who designed TAX 316.  We admit that.  Dr. Kopreski didn't

15:19:52 19  design TAX 316, he was not one of the inventors on TAX 316.  But

15:19:56 20  certainly what he did here is right in line with what the binding

15:20:01 21  Fifth Circuit precedent is in *Valencia*, he engaged in precisely the

15:20:06 22  kind of analysis that he performed; that he drew particular

15:20:08 23  opinions and projections for this case does not make him an expert

15:20:10 24  within the meaning of the Rule 702.

15:20:13 25         And *Valencia* is instructive, your Honor, because there it

15:20:16 1   was a risk officer who regularly reviewed loans, he left the

15:20:20 2   company, the government asked him to look at new documents, new

15:20:26 3   loans, and make determinations of whether these were fraudulent

15:20:29 4   loans.  So these were not loans he looked at before, these were new

15:20:33 5   loans, and he said I just did a true/false, penny up/penny down,

15:20:38 6   long/short analysis.  This is factual, this is what these say.

15:20:42 7   This is what the determination would be.  That's almost identical

15:20:43 8   to what Dr. Kopreski would have done here, and the challenges the

15:20:47 9   plaintiffs are making as to Dr. Kopreski are no different than the

15:20:50 10   challenges that were made in *Valencia*.

15:20:54 11       Likewise, the Fifth Circuit has said that someone's

15:20:57 12   position in the company has to be taken into account, and the

15:21:01 13   further up they are, the broader latitude they are able to give

15:21:06 14   fact testimony like Dr. Kopreski.  That is Fifth Circuit clarifying

15:21:11 15   the holdings in *Valencia*.

15:21:13 16       And then as it relates to the *Kerley* case, which

15:21:16 17   Mr. Bachus touched on, a Sixth Circuit case.  They analyzed

15:21:20 18   *Valencia*, they came to the same conclusion.  And here, your Honor,

15:21:23 19   and I think this is what's important, they say, well, Dr. Kopreski

15:21:27 20   wasn't involved in TAX 316 so it doesn't derive from his business

15:21:31 21   activities.  *Kerley* rejects that squarely.  Both of the individuals

15:21:35 22   there who the Sixth Circuit found were fact witnesses were not

15:21:39 23   involved in any of the underlying loans at issue, but they were

15:21:43 24   familiar with some trusts the defendants -- or the plaintiffs

15:21:47 25   general loan process.  So just because they weren't involved in the

15:21:51  1   specific loan, had no personal knowledge of that loan, their

15:21:54  2   knowledge derived from their business activities allowed them to

15:21:59  3   testify as a fact witness.

15:22:00  4              THE COURT:  Okay.

15:22:03  5              MR RATLIFF:  Your Honor, I would like to address two more

15:22:04  6   points, and I know we're getting late in the day.

15:22:04  7              THE COURT:  Yes, we're getting really late.

15:22:07  8              MR. RATLIFF:  They make a big deal about the fact that

15:22:09  9   our experts have relied on Kopreski.  Plaintiff's experts also rely

15:22:15 10   on Dr. Kopreski - Dr. Feigal, Dr. Madigan, Dr. Kessler - and yet

15:22:19 11   not one has explained why his conclusion is wrong.  Plaintiffs have

15:22:23 12   moved to exclude Dr. Kopreski's TAX 316 testimony, yet at the

15:22:27 13   *Earnest* trial they played more than an hour of his testimony in

15:22:30 14   their case in chief in which he analyzed adverse event reports and

15:22:36 15   signal protection, your Honor.  So when it's good for them when

15:22:39 16   they like his testimony, fact testimony they get to play; when it's

15:22:42 17   testimony they don't like, it's magically transformed into expert

15:22:47 18   testimony in their minds.

15:22:48 19              And they argue, finally, your Honor, that Dr. Kopreski

15:22:51 20   offers some sort of back door opinion.  He gave the testimony on

15:22:55 21   the TAX 316 data December 12th, 2018.  Look how long Mr. Bachus

15:23:02 22   deposed Dr. Kopreski, more than 32 hours and eight minutes, and

15:23:06 23   that's not even including his personal deposition which was another

15:23:09 24   seven hours.  And during this cross-examination, Mr. Bachus had

15:23:13 25   ample latitude to depose and question, try to undermine what

15:23:18   1    Dr. Kopreski had testified to at the request of the PSC.

15:23:23   2              Your Honor, Dr. Chang went through those case report

15:23:30   3    forms, and as you heard earlier and you can see in her report, she

15:23:34   4    said, what I found matches up with Dr. Kopreski.  Same with

15:23:39   5    Dr. Wei, same with Dr. Arrowsmith that you acknowledged, same with

15:23:43   6    Dr. Glaspy who was involved with TAX 316.

15:23:45   7              So I guess I would end on this point, your Honor, which

15:23:49   8    is this.  We all remember at trial when Dave Miceli deposed or

15:23:55   9    cross-examined Dr. Glaspy.  Dr. Glaspy said something, I am

15:23:59  10    paraphrasing, if Dr. Kopreski is wrong then I am wrong.  And we

15:24:03  11    waited with bated breath, your Honor, for Mr. Miceli to put

15:24:06  12    something in front of Dr. Glaspy to show that what Dr. Kopreski had

15:24:09  13    done was incorrect.  He didn't because he couldn't, your Honor.

15:24:13  14              And we waded through two rounds of experts in *Thibodeaux*

15:24:18  15    and *Kahn* for the plaintiffs to come forward with something other

15:24:22  16    than just saying Dr. Kopreski, what he did was unreliable.  We've

15:24:26  17    waited.  Come forward and show us, do the same thing, tell us it's

15:24:30  18    wrong.

15:24:31  19              They haven't because they can't, your Honor.

15:24:34  20    Dr. Kopreski has given clear fact testimony that's factual based,

15:24:39  21    it's consistent with your previous rulings, and we ask your Honor

15:24:43  22    to stick with your previous five rulings on this issue and deny

15:24:48  23    plaintiff's motion.

15:24:50  24              THE COURT:  Thank you.  Mr. Bachus, about like 30 seconds

15:24:55  25    because you went way over your seven minutes.

15:25:10  1          MR. BACHUS:  Thank you, your Honor.  Very briefly.

15:25:14  2          No. 1, the data is hand picked and is incomplete.  You

15:25:22  3     can't, nor can any other 702 worthy witness, re-examine or

15:25:28  4     duplicate it because the data is not complete.  The data that they

15:25:32  5     gave the doctor, the data that they produced in the case is

15:25:34  6     incomplete.  It doesn't have all of the information that the third

15:25:38  7     party entity had when they locked the data up.  No. 1.

15:25:43  8          Therefore, it's a strong thing to say that we're supposed

15:25:51  9     to challenge what was given and hand picked by Matt Keenan to the

15:25:58 10     expert.  It has to be a continuation of Dr. Kopreski's work that he

15:26:03 11     was doing at his company in the regular course of business, and

15:26:06 12     when you take it out of that confine and you allow a doctor to come

15:26:11 13     in and offer lay testimony based on partial data that he did not

15:26:14 14     review in the regular course -- he didn't go back to some database

15:26:19 15     what he was used to looking at.  He didn't go back and do his was

15:26:23 16     work that he was doing.  He only did what was handed to him, which

15:26:27 17     was outside of his normal course of work.  Those are the

15:26:29 18     protections that the case law puts in place.

15:26:29 19          Finally, I just want to clarify.  I think that

15:26:32 20     Mr. Ratliff misstated.  The *Valencia* case is not a case about

15:26:36 21     mortgage, that's about the trading house risk manager who did the

15:26:40 22     trades.

15:26:40 23          THE COURT:  Right.

15:26:41 24          MR. BACHUS:  And I am happy to answer any questions that

15:26:44 25     you have.  We really want the Court to examine and to consider why

15:26:50  1   is it that this important testimony has never been subjected to 702

15:26:58  2   analysis.

15:26:59  3         THE COURT:  Well, the question is, the threshold question

15:27:03  4   is whether or not it's an expert or lay testimony.  Period.  Not

15:27:08  5   even if it's -- I mean, the question is just is it lay testimony,

15:27:14  6   fact testimony, or is it expert testimony.  And that's what I've

15:27:18  7   been struggling with.

15:27:20  8         MR. BACHUS:  We would argue --

15:27:21  9         THE COURT:  I know what you're going to argue.

15:27:23  10        MR. BACHUS:  In the first instance, expert testimony; in

15:27:25  11  the second instance, it's not permissible lay testimony for the

15:27:29  12  reasons that we've described and we would again urge the Court to

15:27:33  13  grant the motion.

15:27:33  14        THE COURT:  But the threshold issue to me is that --

15:27:40  15  okay.

15:27:40  16        MR. BACHUS:  Thank you, your Honor.  And thank you for

15:27:42  17  your patience with us over the last two days and thank you for your

15:27:45  18  accommodation of us over the last two days, we really, really

15:27:48  19  appreciate it.

15:27:48  20        THE COURT:  You're welcome.  Court's adjourned --

15:27:53  21        MS. BARRIOS:  Excuse me, your Honor.  We didn't put this

15:27:55  22  on the record that we're waiving oral argument in the last motion,

15:28:00  23  the Wei motion.

15:28:01  24        THE COURT:  Thank you.  And that's Docket No. 10940,

15:28:07  25  Dr. Wei.  Thank you.

15:28:12    1        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

            2

            3                           * * * * * *

            4

            5

            6                      REPORTER'S CERTIFICATE

            7

            8        I, Karen A. Ibos, CCR, Official Court Reporter, United

            9   States District Court, Eastern District of Louisiana, do hereby

           10   certify that the foregoing is a true and correct transcript, to the

           11   best of my ability and understanding, from the record of the

           12   proceedings in the above-entitled and numbered matter.

           13

           14

           15                    /s/ Karen A. Ibos

           16                Karen A. Ibos, CCR, RPR, CRR, RMR

           17                Official Court Reporter

           18

           19

           20

           21

           22

           23

           24

           25