1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4
    IN RE:   TAXOTERE (DOCETAXEL)      *
5             PRODUCTS LIABILITY        *   Docket No.: 16-MD-2740
              LITIGATION                *   Section "H(5)"
6                                       *   August 8, 2019
    *Relates To 16-CV-17144*            *   New Orleans, Louisiana
7    * * * * * * * * * * * * * * * * * *

8
                    TRANSCRIPT OF ORAL ARGUMENT
9        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
10

11
    APPEARANCES:
12
    For the Plaintiffs:          Barrios, Kingsdorf & Casteix, LLP
13                                BY:  DAWN BARRIOS, ESQ.
                                  701 Poydras Street
14                                Suite 3650
                                  New Orleans, Louisiana 70139
15

16
                                  Gainsburgh, Benjamin, David,
17                                  Meunier & Warshauer, LLC
                                  BY:  PALMER LAMBERT, ESQ.
18                                2800 Energy Centre
                                  1100 Poydras Street
19                                New Orleans, Louisiana 70163-2800

20

21

22

23

24

25

                    OFFICIAL TRANSCRIPT

1   APPEARANCES:

2   For Plaintiffs:                    Simmons Hanly Conroy
                                       BY: DAVID F. MICELI, ESQ.
3                                      One Court Street
                                       Alton, Illinois 62002
4

5
                                       Gibbs Law Group, LLP
6                                      BY:  KAREN BARTH MENZIES, ESQ.
                                       400 Continental Boulevard
7                                      6th Floor
                                       El Segundo, California 90245
8

9
                                       Gibbs Law Group, LLP
10                                     BY:  ANDRE MURA, ESQ.
                                       505 14th Street, Suite 1110
11                                     Oakland, CA 94612

12

13                                     Morgan & Morgan, P.A.
                                       BY: EMILY C. JEFFCOTT, ESQ.
14                                     700 S. Palafox Street
                                       Suite 95
15                                     Pensacola, Florida 32502

16

17                                     Williams Hart Boundas Easterby,
                                       BY: BRIAN A. ABRAMSON, ESQ.
18                                     8441 Gulf Freeway, Suite 600
                                       Houston, Texas 77017
19

20
                                       Bachus & Schanker, LLC
21                                     BY: DARIN SCHANKER, ESQ.
                                       1800 Wynkoop Street
22                                     Suite 700
                                       Denver, Colorado 80202
23

24

25

OFFICIAL TRANSCRIPT

1    <u>APPEARANCES</u>:

2

3    For Sanofi S.A.:              Irwin Fritchie Urquhart
                                     & Moore, LLC
                                   BY:  DOUGLAS J. MOORE, ESQ.
4                                  400 Poydras Street, Suite 2700
                                   New Orleans, Louisiana 70130
5

6
                                   Shook Hardy & Bacon, LLP
7                                  ADRIENNE L. BYARD, ESQ.
                                   JON STRONGMAN, ESQ.
8                                  TORREY M. PETERSON, ESQ.
                                   2555 Grand Boulevard
9                                  Kansas City, Missouri 64108

10

11   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
12                                 Room B-406
                                   New Orleans, Louisiana 70130
13                                 (504) 589-7780

14

15
     Proceedings recorded by mechanical stenography, transcript
16   produced by computer.

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

1                              **I N D E X**

2                                                              <u>Page</u>

3        GENERAL CAUSATION                                      6

4        SPECIFIC CAUSATION                                     55

5        PREEMPTION                                             79

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

1     **<u>PROCEEDINGS</u>**

2     **(August 8, 2019)**

3     **\*\*\*\*\*\***

4

5           (COURT CALLED TO ORDER)

6           **THE COURT:**  Good afternoon, everyone.  Erin told me

7     that I was supposed to give you an idea about time limits

8     before we came out, and so she said, "Now you're making a liar

9     out of me."  But, anyway, I'll give you what time you need,

10    knowing that at some point I'm going to say enough already, and

11    then we'll proceed from that way.

12           I want to thank you all for agreeing to come

13    back under the circumstances.  Things are good now.  And, very

14    frankly, at our last meeting, I was -- I think I missed a lot

15    of what was said on the issue of general causation, and I

16    wanted to have an opportunity to revisit those issues to make

17    sure that you had an opportunity to be heard, and that I had

18    had an opportunity to make sure that I understand the issues.

19           I am going to do this just a little bit

20    different today.  I think running through the motions last time

21    was difficult.  As I know, I think there are different teams on

22    every motion, but there's only one me.  So I think what we will

23    do is I'm going to take a brief recess after each of these so

24    that I have an opportunity to shift gears, if you will, and

25    prepare myself.

OFFICIAL TRANSCRIPT

1          So the first thing I'd like to take up is

2    general causation, and we'll start from there.  So I think

3    that's Mr. Strongman and Mr. Miceli.

4          Thank you.

5          **MR. STRONGMAN:**  Are you ready to proceed?

6          **THE COURT:**  Please proceed.

7          **MR. STRONGMAN:**  Jon Strongman on behalf of sanofi.

8          And, Your Honor, I know you have indicated that

9    we have an opportunity to come back and make sure that we

10   address any questions that you have.  And what I want to do at

11   the outset is go through, in a high level, the arguments that I

12   made last time, as well as address I think some of the things

13   that I could have said more clearly to you, and perhaps provide

14   a couple of tangible examples to you of why we believe that

15   this motion has merit and should be granted.

16         So I'm going to start at the same place I

17   started last time, and that's that when you are on a case like

18   this, general causation cannot be taken for granted.  It cannot

19   be presumed; it has to be proven.  And that proof has to come

20   in the form of expert witnesses.  And those expert witnesses

21   have to put forward opinions that are reliable in terms of the

22   methodology in which they were formed.  And they have to be set

23   out in the reports.

24         And what we know here is that when you look at

25   the Fifth Circuit case law, and you look at the Eastern

OFFICIAL TRANSCRIPT

```
 1   District of Louisiana case law, there are two components to
 2   general causation.
 3              One is, can you establish -- the first step, can
 4   you establish a statistically significant association between
 5   the condition that we're here talking about and exposure to the
 6   product.  That's number one.
 7              The second step is, have you done a reliable
 8   methodology, like the Bradford Hill criteria, to apply that
 9   methodology to the statistically significant association to
10   show that it's more than just an association, but that there's
11   a causal effect.
12              And what we know is that in this case, not one
13   expert on the plaintiffs' side did either step.  Not one.
14              So we have two experts, and we talked about this
15   a little bit last time.  We have Dr. Madigan, and we have
16   Dr. Feigal.  And I talked a little bit about why we approached
17   our motions the way we did.  But at the end of the day, the
18   reason that we had separate motions on Dr. Madigan and
19   Dr. Feigal outside of the general causation motion is because
20   both of those witnesses were hired for other reasons.
21              So Dr. Madigan was hired to offer an opinion on
22   what he would call a safety signal.  So that's looking at the
23   data and saying, "Okay.  When I do my statistical analysis, a
24   blip hits in terms of whether something's out of the norm.  And
25   so should you go and look and see whether you should update
```

1    your warning."  That's a safety signal.  It is not general

2    causation.  But that's what Dr. Madigan was hired for.  And he

3    was asked:

4                    "Were you hired to look at general causation?

5                    "Not specifically."

6                    So that's Dr. Madigan.

7                    Dr. Feigal was hired to offer general oncology

8    opinions.  Opinions about where cancer drugs come from, how

9    they get to the market, and the informed consent process

10   between a patient and a doctor.  She was essentially the same

11   witness as Dr. Bosserman except Dr. Bosserman offered case

12   specific opinions too.  Dr. Feigal did not offer, in her

13   report, a general causation opinion.

14           THE COURT:  But didn't Dr. Feigal in her

15   conclusions -- she said, "I was hired" -- gosh, let me see,

16   and, of course, I don't have her report in front of me.  It's

17   all marked up.  But she said, "I was offered to consider

18   epidemiology."  And then she says at the end of the conclusion,

19   "Based upon my studies that there is" -- you know, "that

20   Taxotere causes permanent alopecia."

21           MR. STRONGMAN:  So let me --

22           THE COURT:  I thought I had the report in front of

23   me --

24           MR. STRONGMAN:  Let me talk about what Dr. --

25           THE COURT:  -- and, of course, it's on my desk.

OFFICIAL TRANSCRIPT

 1              **MR. STRONGMAN:**  Let me talk about what -- let me talk
 2   about what Dr. Feigal did, and this is important.  And we can
 3   jump ahead to this.  So Dr. Feigal was asked:
 4              "Did you offer a general causation opinion?"
 5              Her testimony was:  "Well, it's implied."
 6              Well, and --
 7         **THE COURT:**  Right.
 8         **MR. STRONGMAN:**  -- I told you last time, implications
 9   and implied is not enough.
10         **THE COURT:**  Right.
11         **MR. STRONGMAN:**  So what she did was she did cite some
12   literature, but she admitted that the literature isn't enough
13   on general causation.
14         **THE COURT:**  Right.
15         **MR. STRONGMAN:**  She then talked about GEICAM and
16   TAX316.  We've talked about those studies.  And I'm going to
17   talk a little bit more about those with you today as well.
18              But she said, "I don't know if those are
19   statistically significant or not."  She wasn't prepared to talk
20   about those, and certainly cannot rely on them for general
21   causation.
22              So what she did talk about in her report, and
23   the specific section that you're referring to here is a
24   discussion of the 2015 clinical overview that was done by
25   sanofi.  And in that overview, the context is, you've heard a

1   little bit about this with Dr. Kessler, but that 2015 clinical

2   overview was done to analyze whether or not there needed to be

3   a label change, an FDA regulatory question.

4           And so at the end of the conclusion of that 2015

5   clinical overview, there is a statement that says that there's

6   a potential for a reasonable association, a reasonable causal

7   association, within the regulatory context.  Okay.  And what

8   Dr. Feigal says is, "I agree with that."  Okay.

9           But what you have to understand is that the

10   entirety of what Dr. Feigal was talking about, and the entirety

11   of the 2015 clinical overview, comes into place through the

12   labeling regulations.  And what we know from the Fifth Circuit,

13   and what we know from the *Burst* case -- as Mr. Miceli called

14   it, my unicycle last time -- what we know about the *Burst* case

15   is that a regulatory body applies a lower threshold of proof

16   for determining issues of causation than is appropriate in tort

17   law.

18           And how do we know that?  We know that in this

19   case because, first of all, this is Dr. Kessler.  Dr. Kessler

20   was asked about these issues too.  And if you will recall,

21   Dr. Kessler's testimony is about whether or not this regulatory

22   threshold is met to change the label, and you'll hear a lot

23   more about that in preemption today.  But that's the scope of

24   Dr. Kessler's opinion.

25           And he even said, "Are you going to offer a

1    general causation opinion?"  And he says, "No."  And what he

2    says is, "Some people confuse the standard, reasonable

3    possibility of a causal association, some people confuse that

4    with causation."  And that's exactly what the plaintiffs are

5    trying to do here.  So you have a regulatory standard that is

6    different than what is required under tort law.

7                    We know that the FDA agrees with that.  Because

8    when they took our 2015 clinical overview, there are two

9    things, the FDA specifically -- and we have these documents.

10                   The FDA took our 2015 clinical overview, they

11   looked at it, and what they said was that when you look at all

12   the data in that document, which just so we're totally clear,

13   that is the document that Dr. Feigal is relying on, when you

14   look at the totality of the data, 70 percent of the cases had

15   patients that received docetaxel or Taxotere as part of a

16   combination therapy.  So it is impossible to determine whether

17   the permanence of alopecia is due to docetaxel.  So this is the

18   FDA's determination:  It is impossible to determine causation

19   in light of all of the confounding factors.

20                   The regulatory standard is lower than the

21   standard of tort law.  And we also know that in the medical

22   review -- so this quote comes from Dr. Prowell at the FDA, and

23   Dr. Prowell is also the clinical reviewer, and there is a

24   document that's part of the FDA findings when they ultimately

25   address the label change.

1      It goes on to specifically state that all of
2  these cases are confounded because of the 70 percent on other
3  drugs, as well as all of the other causes of alopecia, and that
4  because of that -- here I'll read it specifically.  This is
5  Dr. Prowell:
6      "In 70 percent of the cases, patients had
7  received docetaxel as part of a combination therapy regimen
8  that included one or more other agents also known to cause
9  alopecia, and many others had received endocrine therapies that
10  may cause alopecia, significantly confounding the determination
11  of causality."
12      So what the FDA goes on to say is, "There is
13  potentials and there are possibilities.  The potentials and
14  possibilities are a standard that simply is too low for tort
15  law," which is what the Fifth Circuit said, and that's what
16  Judge Vance said.  So that's where we're at.
17      The FDA looked at this exact same information
18  for a regulatory standard, and what they said was it is
19  impossible to determine the causal role of docetaxel, and they
20  are too confounding.  There's possibilities, there's
21  potentials, and that simply doesn't cut it under the law and
22  under the Fifth Circuit requirements.
23      And I wanted to back up and talk a little bit
24  about GEICAM and TAX316 as well.  And we had a conversation the
25  last time I was here about what the data showed in these two

OFFICIAL TRANSCRIPT

1    studies.

2              When you look at the general causation motion --

3    and I'm going to back up one more.  When you look at the

4    general causation motion, there's really three main pieces of

5    evidence that were looked at, the FAERS database, which is an

6    FDA database, sanofi's database, their pharmacovigilance

7    information, and all of the experts recognized that both of

8    those things are insufficient to prove causation.  They are

9    case reports.

10             **THE COURT:**  Right.  Right.

11             **MR. STRONGMAN:**  And we talked about case reports.

12             **THE COURT:**  Right.  And that's the lowest standard --

13             **MR. STRONGMAN:**  It's the lowest standard.

14             **THE COURT:**  -- but it alerts you that there may be

15    something here, and then from there, then further studies may

16    warrant study.

17             **MR. STRONGMAN:**  Right.

18             **THE COURT:**  So then we bring ourselves to the actual

19    randomized -- the clinical studies that were performed by

20    sanofi.

21             **MR. STRONGMAN:**  Very good.  Very good.  So you're

22    exactly right.  The case reports are what they would call

23    hypothesis generators.

24             **THE COURT:**  Right.

25             **MR. STRONGMAN:**  Right.

1    **THE COURT:**  We're starting to see problems here.

2    **MR. STRONGMAN:**  They ask questions; they don't answer

3  questions.

4    **THE COURT:**  Right.

5    **MR. STRONGMAN:**  So let's talk about TAX316 and

6  GEICAM, which are the two clinical trials, two pieces of

7  epidemiological evidence that the plaintiffs put all of their

8  eggs in.  Their eggs are in this basket, and here is what those

9  two studies show.

10    Number one -- we had this conversation last

11  time, and I think I want to give you another analogy to try to

12  make it a little more concrete.  But what both of those studies

13  reported on, in addition to efficacy, which is that's what the

14  study was looking at, right, setting that aside, they had data

15  on adverse events that were ongoing into the follow-up period.

16  That's the phrase, "ongoing into the follow-up period."

17    One of the adverse events that was reported on

18  in that way was alopecia.  And then you had a conversation last

19  time with Ms. Byard about how clearly there are some patients

20  by the way "ongoing" is defined that don't have what the

21  plaintiffs are here today talking about as permanent alopecia.

22    So the analogy I have here is that if I go to

23  the grocery store and I buy a bunch of food and it's in a bag,

24  okay, I've got a big brown bag, and I've got a list of what's

25  in my bag, and in the bag it says I've got seven vegetables,

OFFICIAL TRANSCRIPT

1    I've got 29 pieces of fruit, and I've got one loaf of bread.
2    The plaintiffs can't come in here and say, "Aha, you've got 29
3    apples."  They can't.
4                What we know is that there's 29 pieces of fruit.
5    And the only way to know whether what we've got in that bag is
6    apples, is what?  You have to open the bag and look.  You have
7    to actually look at the patients and see, do they qualify for
8    the condition that the plaintiffs have defined here as
9    persistent or permanent alopecia, and not one expert on the
10   plaintiffs' side has done that.  Not one has looked at the
11   data.
12               Dr. Madigan didn't, and do you know why?
13   Because he is not qualified to do so.  He admitted as much.  He
14   said he's not a doctor; he can't diagnosis alopecia.  He can't
15   look at the data of a clinical trial and say, "Well, that's a
16   person with persistent alopecia."  He's not qualified to do it.
17   Dr. Feigal did not do it either.
18               So what we have here is a situation where the
19   plaintiffs are trying to convince this Court that there's 29
20   apples when all the study says is that there's fruit.  You have
21   to do the work.  Because the study wasn't looking at permanent
22   alopecia at all.
23          **THE COURT:**  But the study reported ongoing alopecia.
24          **MR. STRONGMAN:**  They reported on ongoing adverse
25   events, which included examples of things like --

OFFICIAL TRANSCRIPT

1        **THE COURT:**  Oh, I --

2        **MR. STRONGMAN:**  Exactly.

3        **THE COURT:**  Neuropathies.  There was anemia.  There

4    were all sorts of adverse events.  But one of the baskets that

5    was identified by sanofi was alopecia.

6        **MR. STRONGMAN:**  Correct.  But the way that the

7    adverse events were calculated, is that you were followed.  So

8    let's say on January 1st, you stopped your chemotherapy.  Okay.

9    So you then entered the follow-up period.  On January 2nd,

10   there would certainly be an expectation that someone would have

11   alopecia after taking a multi-chemotherapy regimen.

12       **THE COURT:**  Sure.

13       **MR. STRONGMAN:**  So if they're examined on

14   January 2nd, they're noted as having alopecia into the

15   follow-up period.  If that patient passes away on January 3rd,

16   they are forever counted as ongoing alopecia into the follow-up

17   period.  They shouldn't be counted as permanent alopecia for

18   the purposes of this lawsuit.  And the way that you figure that

19   out is you go look at the data.  You open the grocery bag and

20   you say, "Is this a banana or is it an apple?"  And nobody on

21   the plaintiffs' side did it.  Nobody.

22            Sanofi did do it.  Dr. Kopreski did it.  And the

23   plaintiffs want to exclude that data.  You've got to look in

24   the bag.  The particulars matter, the details matter, and the

25   plaintiffs cannot come in here and create a medical condition

OFFICIAL TRANSCRIPT

1  that they say was studied in TAX316 and GEICAM when it wasn't,
2  and they never looked at the data.
3          So at the end of the day, as I mentioned at the
4  beginning, you have -- well, let me also say this -- I think
5  this is a very important point, too -- is that when you look at
6  TAX316 and GEICAM, so the clinical trials that all of their
7  eggs are in that basket, they are not statistically
8  significant.  Okay.  That is undisputed.  Nobody is disputing
9  that.
10          Dr. Madigan did the analysis.  It's in his
11  report.  Neither of those studies are statistically
12  significant.  What we know from Fifth Circuit law is that if
13  you have a study that is not statistically significant, it may
14  not provide reliable foundation for an epidemiologist's general
15  causation opinion.  Okay.  So that's what we know.
16          They don't have the evidence that qualifies.
17  Under Fifth Circuit law, under the law of this district, they
18  simply don't have what's required.  They took it for granted,
19  to be honest.
20          **THE COURT:**  Let's talk about that, and I'm going to
21  ask you to explain to me, frankly, the statistical analysis,
22  because I have to tell you, you know, I've gone through the
23  reports several times, and I would appreciate it.
24          **MR. STRONGMAN:**  So the statistical analysis on TAX316
25  and GEICAM specifically?

OFFICIAL TRANSCRIPT

1          THE COURT:  Uh-huh.

2          MR. STRONGMAN:  Okay.  So what Dr. Madigan did,

3   because, of course, when you look at TAX316 and GEICAM, there

4   is what's called an end point to the study.  There's a purpose

5   of the study --

6          THE COURT:  Right.

7          MR. STRONGMAN:  -- and the studies report on that

8   report.

9          THE COURT:  But Madigan's end point was given to him

10  by the medical experts.

11         MR. STRONGMAN:  Well, let me -- I'll get there.  I

12  can help you on that.

13         THE COURT:  Okay.

14         MR. STRONGMAN:  So let's talk about -- what the

15  actual TAX316 and GEICAM data reported on was whether the drugs

16  work.  Okay.  That's what it was powered to do, and that's what

17  it did.  It has these peripheral reports on adverse events.

18  There isn't statistics tied to them, other than numbers.  But

19  Dr. Madigan comes in, and he does his magic, like he always

20  does, and he says, "Boo, boo, boop, here's my number for

21  TAX316.  It's not statistically significant."

22              Okay.  When you compare the TAC arm, so the

23  Taxotere, Adriamycin, cyclophosphamide arm, and the

24  fluorouracil, Adriamycin, cyclophosphamide, when you compare

25  those two arms for this ongoing into the follow-up period

OFFICIAL TRANSCRIPT

1  adverse event of alopecia, they're not statistically
2  significant differences.
3           What that means is, in the scientific community,
4  there's not enough confidence to believe that the difference
5  you're seeing in the results is not just chance.  Okay.  So
6  that's what that's saying.  It's not acceptable in the
7  scientific community that this isn't just due to chance.  So
8  that's what he did with TAX316.  He did the same numbers with
9  GEICAM; the same result.  At the end of those studies, neither
10 were statistically significant.
11          So what he then did was he combined the two
12 studies, and he did a pooled analysis.  And he said, "Aha.  I
13 got myself just barely over the line by combining these two
14 studies," doing something that neither study did, by putting
15 this data together.
16          And what we know is that when you look into the
17 law, you are not going to find one example where an expert was
18 allowed to take one statistically insignificant study, combine
19 it with another statistically insignificant study, and all of a
20 sudden get a reliable statistical result.  That just isn't
21 allowed.  It isn't scientifically reliable.
22          And when you look at the *Burst* case, when you
23 combine data -- this is in one of the footnotes in the *Burst*
24 case.  When you combine data to get a result for your purposes
25 in the litigation, data that doesn't otherwise show what you're

1    looking for, what you've done is manipulated a scientific

2    process, and you've done it in an unreliable way.

3                So Dr. Madigan did not in any way find the

4    evidence he needed to find, setting aside the fact that he is

5    not even a general causation expert in the first place.

6           **THE COURT:**  Set aside that fact.  But, you know, I

7    read Dr. Madigan's explanation for the combination.  And as I

8    appreciate it, he said, I could -- because both of the studies

9    were looking for something else.  They were not considering at

10   that time -- this was not a study about alopecia.  Certainly, a

11   study about efficacy.

12               And my appreciation is the difference between

13   the studies was one was node positive and one was node

14   negative.  But for purposes of alopecia, he said, there really

15   was no difference because in both of those studies, the

16   different arms, and I'm going to go back to FAC and TAC, he

17   said they were considered the same medication, the same

18   process, same dosage, and these were -- what do they call

19   them -- treatment emergent adverse events.

20               So why is it that under those circumstances,

21   it's improper for him to combine the two and come up -- get a

22   greater pool, and from that be able to just look at adverse --

23   this adverse event as opposed to the efficacy of this treatment

24   in breast cancer?

25          **MR. STRONGMAN:**  So, first of all, you're not allowed

OFFICIAL TRANSCRIPT

1   to do results-oriented science, for one.  But, two, Dr. Madigan
2   had -- let's talk about --
3           **THE COURT:**  And, listen, if I have something confused
4   about, wait a minute, that's not exactly what happened, I'm
5   really okay with you correcting me.
6           **MR. STRONGMAN:**  So Dr. -- what he has done is take
7   two studies and just take this emergent adverse event data and
8   jam it together to get something he couldn't otherwise get.
9   You're right about that, but that's not scientifically reliable
10  because he doesn't have -- to be able to put two studies
11  together -- two epidemiological studies together, you have to
12  have a method for doing it.  Both studies have to be reliable
13  for the purposes you're putting them together for.  Okay.
14          So if you're putting them together on the end
15  point of the study, so the efficacy, let's say, maybe that's
16  one thing.  Putting them together for the peripheral emergent
17  adverse data is another, when that's not what the studies were
18  powered to look at.  That's another -- you have to have a
19  methodology.  How do you do this?  Why do you do it?  It has to
20  be set out.  Dr. Madigan didn't do it.
21          But there's this too, Dr. Madigan was extremely
22  critical of the GEICAM study.  So when you look at his report,
23  and you look at -- it's on paragraph 50 of his report --
24  Dr. Madigan basically said the follow-up that was done wasn't
25  adequate, this study doesn't have the right characteristics to

1  be a reliable study, and he can't have it both ways.
2  Dr. Madigan can't say GEICAM is unreliable on the one hand, and
3  then take it and say, but I'm going to put it together with
4  TAX316 over here on the other.  He can't do that.
5            And what's happened before, and I pointed this
6  out, and I know it's a lot to digest, but this is not
7  Dr. Madigan's first rodeo.  Dr. Madigan has been in litigation
8  a lot of times.  And Dr. Madigan has had opportunities to
9  either put data together or not put data together a number of
10  times.  And it's not going to shock you that when he chooses to
11  put it together or when he chooses not to depends on the result
12  that he wants to achieve.
13            So in the *Accutane* litigation, which this quote
14  is about, he said, "Well, I can't do a meta-analysis of the
15  studies because when you do so, you bring the inherent flaws,
16  biases, and structural problems of the studies from one into
17  the meta-analysis."
18            This is what he said in *Accutane*.  And that's
19  why he said, "Oh, I reject other meta-analysis.  I won't do one
20  here."  Well, in Taxotere, he had to because the statistical
21  significance of the data he had didn't meet the standard.  And
22  that's the kind of results-oriented expert on a mission.  And,
23  again, this was affirmed by the New Jersey Supreme Court, and
24  this is exactly what happened here.
25            Dr. Madigan is a hired gun, and he will make the

1   numbers say whatever he needs them to say without a methodology
2   to do so, and that's what he did.
3          Another piece of this, though, to think about is
4   that there's two steps.  We talked about -- I talked about that
5   at the very beginning, the association, and then whether or not
6   that association is causal.  Dr. Madigan admits he did not do
7   anything on the -- let's just assume that the TAX316/GEICAM
8   meta-analysis shows an association that's reliable -- it does
9   not, but assume it does -- he didn't do anything on the second
10  step.  He applied no Bradford Hill criteria to it, and he would
11  admit he can't.  I mean, this is not what Dr. Madigan does.
12          **THE COURT:**  No, that would --
13          **MR. STRONGMAN:**  It's not what he does.  And that's
14  why Dr. Madigan has been excluded as a general causation expert
15  before.  Because, normally, what he does is comes in and gives
16  the stats, and other people take those stats and do something
17  with them.  But here they're trying to say that Dr. Madigan is
18  a general causation expert.  He's not qualified to do that.
19  He's not qualified as a man -- as it says, he is a man of
20  statistics, not medicine.
21          And so at most -- at most -- what you have is
22  Dr. Madigan having a meta-analysis that's unreliable.  That
23  does not get you over the general causation hurdle.  So then
24  you move over, is there anybody else?  Did somebody else do the
25  Bradford Hill criteria?  Did somebody else -- no.  The answer

1  to that is no.

2            And do you want to know -- what's interesting is

3  that Dr. Feigal didn't even look at Dr. Madigan's data.  So

4  it's not like Dr. Feigal took Dr. Madigan's data and did

5  something with it.  She didn't.  So she doesn't have any idea

6  about the statistical significance of GEICAM, of TAX316, of any

7  pooled analysis.  She simply doesn't know.  So Dr. Feigal can't

8  fill that gap either.

9            And so what we we're left with is, as I've said,

10  we're in a situation here where the plaintiffs took general

11  causation for granted.  In most MDLs, you would have expert

12  after expert who offer clear, defined opinions on general

13  causation, opinions that when you look at the scope of their

14  report will say, "I am offering an opinion on general

15  causation."  We do not have one.  Not one.  And when you don't

16  have that work done, the law requires you to not be able to

17  move forward in the particular case.  You simply can't take it

18  for granted.

19            **THE COURT:**  Let's talk a little bit about Dr. Feigal.

20  I think you mentioned Dr. Feigal just briefly in your opening

21  remarks, but I will concede that her report is less than

22  illuminating.

23            **MR. STRONGMAN:**  I agree.

24            **THE COURT:**  Then I've gone through her deposition

25  testimony and --

OFFICIAL TRANSCRIPT

1        **MR. STRONGMAN:**  Not easy to follow what she's saying,

2   is it?

3        **THE COURT:**  But I -- it appears to me in the

4   deposition testimony she addresses some of the Bradford Hill

5   criteria, not all of them, but, you know, speaks to the

6   temporal relationship certainly, which I think is, very

7   frankly, from my perspective an easy one.  Because I think

8   these are treatment emergent, and I know -- you know, we spoke

9   last time and we said, you know, you'd have to consider this

10  against the general population.

11       **MR. STRONGMAN:**  Correct.

12       **THE COURT:**  And I thought, well, except that

13  everybody can't -- everybody -- 97 percent of the people

14  started with -- during the course of the treatment had

15  alopecia, and it's those that -- the stragglers that didn't

16  recover from that adverse event.

17            And then she did talk about the dose response

18  because there were some studies about that.  And then she

19  talked about -- I'm trying to -- I think I had -- but she

20  didn't go through the entire Bradford Hill analysis that I

21  could see.  But is it -- is it something that each and every

22  criteria identified in Bradford Hill, is that something that

23  the Court's expected to check off, well, wait a minute, she

24  missed, you know, No. 6 or No. 7, or is it something that when

25  you look at the context that you just --

OFFICIAL TRANSCRIPT

1          **MR. STRONGMAN:**  I understand your question, and I
2    want to address a couple pieces of the substance, and then I'm
3    going to back up and address the more methodological question
4    that you ended up with there.
5               So on temporal relationship -- well, if you look
6    at Dr. Feigal's report, you're not going to get any explanation
7    of the Bradford Hill criteria.  Right?  Okay.  So what she said
8    was when she was asked questions whether she -- you don't have
9    these in your report, well, she'll spout off some.  Okay.
10              Whether that meets the requirements of *Daubert*,
11   whether that meets the requirements of Rule 26 disclosure is
12   another question.  But on temporal association, you also have
13   to remember that if you're going to say there's a temporal
14   association with Taxotere, there's also a temporal association
15   with Adriamycin, there's also a temporal association with
16   cyclophosphamide, also chemotherapies that are received in the
17   same regimen.
18          **THE COURT:**  Right.
19          **MR. STRONGMAN:**  Okay.  So there's that.
20          **THE COURT:**  But those are -- and I think we talked
21   about it last time.  It was TAC versus FAC.  And the only
22   change in the two arms was whether or not it was docetaxel
23   and --
24          **MR. STRONGMAN:**  Correct.
25          **THE COURT:**  -- the other.

1          **MR. STRONGMAN:**  Correct.  But the point being is that
2    when you do the Bradford Hill criteria, what is required is not
3    that every single one of the criteria supports your opinion.
4    So what you're saying is if there's eight boxes, you don't have
5    to mark eight yeses necessarily.  But what you have to do is
6    you have to go through the process.  You have to have a
7    methodology, you have to set out that methodology, and you have
8    to apply it to the facts of your case.

9          So did Dr. Feigal say, "Okay.  The Bradford Hill
10   criteria are 1, or 2, or 3, or 4.  I'm analyzing 1 here,
11   temporal association," let's say, "here's my result.  Okay.
12   I'm analyzing 2, here's my result.  Here's 3," et cetera.  No,
13   she didn't.  She came up with it on the fly in a deposition,
14   not in a report.  There was no methodology for how she did what
15   she did.

16         And what we also know is that one of the big
17   Bradford Hill criteria is whether or not there's a biological
18   mechanism.  Okay.  And we know that the plaintiffs understood
19   this to a gigantic hole in their case.  Because the only
20   plausible biological mechanism that they had working at the
21   time was, "Well, chemotherapy drugs attack rapidly dividing
22   cells, so hair is a rapidly dividing cell; therefore, it can
23   cause it to fall out," which is the same, of course, as every
24   other chemotherapy drug.

25         So what the plaintiffs needed was something

1    unique for Taxotere.  They don't have it.  So they went about,

2    as you're well aware -- and I won't get in too deep into it --

3              THE COURT:  Please.

4              MR. STRONGMAN:  -- but they went to go try to create

5    that biological mechanism through a stem cell study, and it

6    didn't work out.

7              And you asked some questions about the stem cell

8    study before with Mr. Sears, and the highest takeaway from that

9    to me is whether or not a patient has permanent or not

10   permanent alopecia isn't the point of those stem cell studies.

11   It's the plaintiffs' thought:  We need a biological mechanism.

12   The biological mechanism is going to be that it damages stem

13   cells.  We do the test we can come up with, and it didn't show

14   damage to the stem cells.

15             So the result is that you have data that's

16   contrary to the only idea the plaintiffs have put forward,

17   which is why the methodology is not reliable.  And that's why

18   we're in a place today where you're left with possibilities,

19   you're left with potentialities, and that just is not enough in

20   a court of law to get past general causation.

21             And that's why I say, and I've said it, the

22   plaintiffs took it for granted.  They just assumed they weren't

23   really going to have to prove it, but they do.  The law

24   requires it, and they simply can't meet their burden.

25             THE COURT:  Thank you.

1              Mr. Miceli.

2         MR. MICELI:  Your Honor, we've been going for about

3   35 to 40 minutes.  Do you want to take a break now, or do you

4   want me to just roll right into it?

5         THE COURT:  No.  I want to go into general causation,

6   and then we're going to take a break.

7         MR. MICELI:  Thank you.  Okay.

8              It's going to take me a little while to set up

9   because I heard a little more than I was anticipating.

10        THE COURT:  Well, there's a lot to cover here.

11        MR. MICELI:  Well, I agree in part and disagree in

12  part, Your Honor, because I think that a lot of what we talked

13  about, I feel like as if I'm going to be arguing both the

14  Madigan motion over again, the Plunkett motion, in addition to

15  the general causation motion.  But I want to hit a couple of

16  points quickly before I get into --

17        THE COURT:  Do you need some time to get situated?

18        MR. MICELI:  I think I'm set up right now, Your

19  Honor.  The last time we were together, I gave you a binder.  I

20  didn't see you bring yours in.  Can I hand mine up to you?

21        THE COURT:  Please.

22        MR. MICELI:  Thank you.

23             And if you'll look behind tab No. 1, there are

24  just some factual inaccuracies that have been argued.  And this

25  is the second page under tab 1 is the TAX316 final treatment

```
1   emergent adverse events.  And we went over this at the end of
2   my presentation last time, and before I get into my PowerPoint,
3   I want to address these points.
4           You see that N equals 744.  That's the number of
5   TAC patients that were involved in the study.  We're going to
6   talk about that study and the importance -- and not only the
7   importance, but the specificity of the randomization that was
8   done in this case -- in this study.  If you go to the right of
9   that, there's going to be a number, 732.  That's the number of
10  individuals that had alopecia during the treatment period.  You
11  go one more column to the right -- I'm going to let you get
12  there with me.
13          THE COURT:  Okay.
14          MR. MICELI:  You go one more column to the right,
15  Your Honor, and there's a number, 687.  That's the number of
16  individuals that entered the follow-up period with alopecia.
17  That's last treatment, plus 30 days, 687 people, not the 29
18  that Mr. Strongman answered -- or gave to you.
19          If you go a couple of columns further to the
20  right, you'll see 29, and that's the number of individuals that
21  had ongoing alopecia as it was defined by sanofi long before
22  this litigation ever started, long before these defense lawyers
23  started trying to put a story together.
24          They defined how they would count permanent or
25  ongoing irreversible alopecia.  They came to the number 29.
```

OFFICIAL TRANSCRIPT

1  Now, what I heard Mr. Strongman complain about, and this is the
2  rearguing of the Madigan motion, is our quantitative expert did
3  not do a qualitative review.
4              In our briefing -- in our initial briefing to
5  Your Honor, we cite to Mr. Mancini's deposition, the global
6  head of biostatistics and data mining for sanofi.  I asked him
7  if they do that.
8              "Do you go behind your quantitative analysis and
9  look at a quality review?"
10             He said:  "Why would I?  I'm a statistician."
11  He said it with a French accent, and it took him a little
12  longer, but that's what he said.
13             Now, what I'm going to hand up to you next, Your
14  Honor, is what is an excerpt from Exhibit 39 to the Kopreski
15  deposition, which is what I told you last time we were
16  together -- or referenced you to the last time we were together
17  that was so important.  Now, if you look at this, on the first
18  page you'll see the word "alopecia" on the left-hand margin.
19  Then you see the subject ID numbers for the TAC people, and
20  that goes over onto the second page about three-quarters of the
21  way down where the FAC picks up.
22             And if you look to the far right, the follow-up
23  duration, 10 years, 6 1/2 years, .3 years, 10.5 years, 9.5
24  years, over 10 years for the next 5, over 10 years, over 5
25  years, over 9 years, over 10 years, 2.83 years, 6 years, 6

OFFICIAL TRANSCRIPT

1    years, and on, Your Honor.

2              This is not people that had it for 31 days, as

3    you've been told a little earlier.  These are people, the

4    majority of them, the midpoint, if you lined up those 29 people

5    14 to the right and 14 to the left, you're going to have 10

6    years on all 14 of the ones to the right.  And you're going to

7    have some lower ones, but the average is over eight years.  So

8    that's one thing that we need to keep in mind.  It is not as

9    has been represented to you.

10             The reference to a manipulation of data is

11   offensive to the plaintiffs.  We referenced last time, Your

12   Honor, and I'm going to go to the second slide here.  We put

13   this up last time.

14             "Meta-analysis is most appropriate when used in

15   pooling randomized experimental trials because the studies

16   included in the meta-analysis share the most significant

17   methodological characteristics, in particular, use of

18   randomized assignment of subjects to different exposure

19   groups."  That is exactly what happened here, and we're going

20   to go over that a little more in my presentation.

21             But what's important is for nearly the complete

22   30 minutes that I heard Mr. Strongman talking, he was

23   criticizing a meta-analysis.  If you go to L.J. Wei's report --

24   L.J. Wei is sanofi's expert biostatistician, who also spends a

25   lot of time in litigation.  I've been involved in litigation

OFFICIAL TRANSCRIPT

1  where we've deposed him three different times.  And Dr. Wei

2  does not criticize the use of a meta-analysis.

3              Dr. Strongman -- excuse me, Mr. Strongman

4  criticizes the use of a meta-analysis and calls it

5  manipulation.  Last time, the defendants referenced to Strom

6  and Kimmel, a pharmacoepidemiology textbook.  At page 354 of

7  that textbook, you can read about the appropriateness of the

8  use of meta-analyses.  They support it; the reference manual

9  supports it.  And, Your Honor, since this litigation had been

10  going on, Dr. Wei has written a letter to *JAMA Oncology*

11  commenting on a randomized -- random effects meta-analysis.

12              Here's the actual article.  Dr. Wei really only

13  offers two criticisms of Dr. Madigan.  One is that you have to

14  have -- make sure you have non-heterogeneous studies that

15  you're pooling together.  In this case -- and we're going to

16  talk about it further in this presentation.  You've already

17  mentioned it, TAX301 and TAX316 are virtually identical.

18  That's not what Dr. Madigan says.  He recognizes that.  That's

19  what Kimberly Bassi says.  She is the clinical trial manager

20  for TAX316, and was since the year 2000.

21              She then became the clinical trials manager for

22  TAX301.  I said:

23              "Aside from node-positive and node-negative, are

24  they essentially identical?"

25              "Yes."

OFFICIAL TRANSCRIPT

1          So we're not saying that; our expert isn't
2    saying that; their employee is saying that.
3          And a random effects meta-analysis has not been
4    criticized by any expert in this case other than
5    Mr. Strongman's explanation.  Dr. Madigan did not -- and,
6    again, I'm not here to reargue his -- the motion against him,
7    but he doesn't say that TAX301 is unreliable.  He says,
8    "Follow-up wasn't optimal," and it wasn't optimal.
9          Only 12 of 55 study centers reported alopecia
10   adverse events in spite of over 500 people entering follow-up
11   with alopecia.  And Ms. Bassi explained in her deposition, and
12   it's cited in our papers, that every adverse event has to be
13   followed to resolution.
14         So, yes, study -- study investigators did not
15   document enough or adequately enough.  But that didn't mean the
16   ones that did should not have those patients counted.  They
17   published this.  Dr. Martinez published it in the New England
18   Journal of Medicine.  It survived peer review.  It's certainly
19   sufficient evidence for Dr. Madigan to rely upon.
20         Now, he also -- Mr. Strongman also talked about
21   Mr. Kopreski -- Dr. Kopreski's very hard work that he did in a
22   matter of weeks, when the study took 12 years to complete and
23   do the follow-up on.  That has never been shown to anybody
24   outside of this courtroom.  We received a production this week,
25   Monday evening, of a new label that was submitted to FDA in

1    May.  And what do they include in this new label?  Do they
2    include Dr. Kopreski's hard work?  No, Your Honor, they include
3    the 29 women from TAX316.  They do not include the Kopreski
4    analysis because, as we're going to see later, it's still their
5    little secret.
6                    The reason that Taxotere -- the effect with
7    Taxotere is unique is because of randomization.  And now, Your
8    Honor, after much waiting, I'm going to move on with my
9    presentation.
10                   The plaintiffs' experts have presented
11   sufficient evidence to establish general causation.  We've
12   heard a lot about the Bradford Hill criteria, and I'm going to
13   jump ahead just a little bit, and I'm going to cite you to
14   *Wagner versus ExxonMobil*.  It's a decision that Judge Fallon
15   authored.  And what --
16           **THE COURT:**  Well, I have to tell you --
17           **MR. MICELI:**  Yes.
18           **THE COURT:**  -- if you all are citing from Judge Vance
19   and Judge Fallon, I think that's pretty good authority.
20           **MR. MICELI:**  Okay.  Judge Fallon states that the
21   Bradford Hill criteria are factors.  They're guidelines.
22           **THE COURT:**  Well, that's -- maybe that's -- that was
23   the question I asked, and maybe we need to get there.  Because
24   as I read Dr. --
25           **MR. MICELI:**  Sure.

1      **THE COURT:**  -- and I'm cutting you off --

2      **MR. MICELI:**  No, no, no.  You're fine.

3      **THE COURT:**  -- and I know you had something brilliant

4      to tell me.

5      **MR. MICELI:**  No, no.

6      **THE COURT:**  But, you know, I read Dr. Feigal's

7      report, and, frankly, and I will tell you, I thought it was

8      less than exact.  But as I made my way through the deposition,

9      there was something -- you know, there was more there, and we

10     needed to ferret out what her opinions were and how she got

11     there.

12     **MR. MICELI:**  Certainly.

13     **THE COURT:**  So let's talk about the Bradford Hill

14     criteria because I think that's critical.

15     **MR. MICELI:**  Well, it is critical -- it's possibly

16     critical, let me say.  Because the way Mr. Strongman explained

17     it, we have to have a check in every box.

18     **THE COURT:**  No, no -- and that's the question I had.

19     **MR. MICELI:**  Well, what Judge Fallon wrote was that,

20     "The factors are viewed as guidelines, and each factor need not

21     be fulfilled in order for a researcher to proclaim causation.

22     Relying on the *In Re:  Viagra Products Liability* MDL, in the

23     context of general causation -- in the context of a general

24     causation challenge, failure to satisfy Bradford Hill criteria

25     does not doom admission under *Daubert*."

OFFICIAL TRANSCRIPT

1                    So in the Fifth Circuit, indeed, in this

2       courthouse, Judge Fallon has recognized that the Bradford Hill

3       criteria is not a must.  In fact, a meta-analysis to the extent

4       that it is flawed -- and, again, there's only two complaints

5       that Dr. Wei raises about the meta-analysis that was done.

6       Again, all of the other criticisms you've heard are unsupported

7       by any expert or any testimony in this case.  It's simply

8       attorney argument.

9                    Dr. Wei's report only criticized -- only

10      criticizes whether or not the populations were heterogeneous or

11      homogeneous.  They're clearly identical, with the exception of

12      the node involvement.

13                    **THE COURT:**  Right.

14                    **MR. MICELI:**  So heterogeneity is not an issue.  We

15      can set that aside.  The other criticism he has, which is --

16      and I've read all of the articles he cites to -- it's 22, 23,

17      24, and 25 in his report, say that you have to have a -- you

18      have to do a random selection of studies to do a meta-analysis

19      from a super population of other studies.

20                    Okay.  Well, first of all, that's not in any of

21      the articles that they cite.  That's Dr. Wei's opinion.  Now,

22      maybe he's gleaning that from a mixture of those articles, and

23      they're very technical that I probably don't have the noggin to

24      quite understand.  But in this case, all we have are two

25      studies.  That's all we have.

1           So what I handed up is the random effects
2    meta-analysis that was published in *JAMA* that Dr. Wei and
3    Dr. Uno, and I can't remember the third doctor, offered some
4    criticisms on.  That random effects meta-analysis was five
5    studies that were selected because of the drug they used, much
6    like two were in this case because that's all we have.
7           When he cites his two criticisms in his letter
8    to the editor of *JAMA*, he doesn't say, "We have to check for
9    heterogeneity, and we have to make sure it's random selection
10   out of a super population of studies."  He doesn't make those
11   criticisms in the published literature that he comments upon
12   outside of the context of this litigation.  He made that in the
13   context of this litigation in paragraph 55 of 56 in his report.
14          So let's go to the Bradford Hill criteria.  I'm
15   going to click through this quickly.  Sanofi incorrectly states
16   or implies to the Court that we must have a single expert to
17   prove general causation.  There's no law, there's no case, no
18   authority, that supports that.  Rarely, if ever, would any
19   expert possess the breadth of expertise in order to cover the
20   entire waterfront, and they don't in this case.
21          Now, you look at the experience of other MDLs in
22   this courthouse, *Vioxx* and *Xarelto*, that's exactly what they
23   did.  If you look at the *Plunkett* -- Plunkett being the
24   plaintiff -- *versus Merck*, one of the first two trials to go --
25   cases to go to trial in the *Vioxx* MDL, I think there were nine

1   experts or seven experts, and they covered the waterfront.
2   *Abilify* was cited by the defense in their --
3           THE COURT:  I have to tell you, I'm not worried about
4   that.
5           MR. MICELI:  Okay.  Thank you.  Then we'll just move
6   on.  Let's go to the Bradford --
7           THE COURT:  I'm more worried about the analysis that
8   Dr. Feigal did.  I'll be frank with you, that's the focus.
9           MR. MICELI:  Certainly.  Certainly, Your Honor.  You
10  know, when I read and I listen to what they say, what
11  Mr. Strongman says, what sanofi says, challenging us, it sounds
12  more like a motion for summary judgment.  They're saying we
13  don't have sufficient evidence.
14          THE COURT:  Right.
15          MR. MICELI:  But they don't file a motion for summary
16  judgment.  They select two of several experts and say, these
17  are all we have.  Now, that's just simply not the case.  We
18  have several experts that touch upon the Bradford Hill
19  criteria.  Do they use the exact words, "Here's a heading,
20  temporality.  Here we are.  Let's put the button on biologic
21  plausibility.  Here we are."  We have many.  In fact, Your
22  Honor, there were four of them that touch upon it, Dr. Feigal,
23  Dr. Madigan, Dr. Plunkett, and Dr. Tosti.
24              Really, temporal relationship, what we're
25  relying upon here is the bundle of evidence that we're using.

OFFICIAL TRANSCRIPT

1   The clinical trials dictate what we use.  We know temporal
2   relationship is there.  As you pointed out, treatment emergent
3   adverse events.
4              The worldwide safety database from sanofi, they
5   control that.  They review that when it comes in.  So we have
6   temporality there as well.  The published -- peer-reviewed
7   published literature on Taxotere, it's peer-reviewed, it's
8   published, it addresses temporality.  You go through all of
9   these, biologic plausibility, Dr. Feigal goes through that.
10  Dr. Feigal -- and I have the pages of her report that touch
11  upon these.
12             I didn't want to stand here and read her report,
13  but if you read pages 236 through 237, 515 through 520, and 540
14  through 544, you will see the multiple times she goes through,
15  in substance --
16             THE COURT:  In her report?
17             MR. MICELI:  Not in her report.  Excuse me.
18             THE COURT:  I was going to say, well, I have the
19  condensed version.
20             MR. MICELI:  Right.
21             THE COURT:  I'm stopping at page 43.
22             MR. MICELI:  Yes, Your Honor.  You're right.  In her
23  depositions.  She sat for four depositions.
24             THE COURT:  Well, I know there was a lot of the same
25  questions.

1          **MR. MICELI:**  In this case -- you know, I should say

2     in the cases that are cited by defense that say we need to have

3     it in the report so we can go take their deposition.  And this

4     particular case is very unique.  Because when the defendants

5     wanted to ask another question or another series of questions,

6     another topic, they went to Judge North, and Judge North said,

7     "I'm going to let you do it."

8               We obliged.  We showed up.  They took her

9     deposition on four occasions.  There is nothing that they have

10    not asked Dr. Feigal that they want to know.  And those are the

11    pages where it can be found.

12              Each of these -- now, this is eight of the

13    nine -- no, eight of the nine are checked.  Cessation of

14    exposure, that's what's commonly referred to as a

15    dechallenge/rechallenge, and that's not -- that's not something

16    that's applicable to a cancer treatment case.  You don't stop

17    treating your cancer patient, wait to see if their hair grows

18    back, and then see if you can make it fall out again.

19              So we do cover the waterfront.  We do.  They

20    don't mention Dr. Plunkett in their general causation.

21    Dr. Plunkett is a toxicologist and a pharmacologist.  Her job

22    is mechanism of action.

23              Yes, the science has not progressed to the point

24    where anybody can say stem cell -- this particular stem cell

25    damage is what causes permanent alopecia -- permanent

1    irreversible hair loss.

2               What's interesting here, and it's really

3    uncommon, is that every expert that has been deposed on the

4    stem cell, quote/unquote, theory on these slides that were done

5    agrees, there is no science that can say the stem cells in the

6    bulge are what are damaged.

7               They used cytokeratin-15 that stains stem cells.

8    Their experts, Dr. Love, who was a specific, but also gave a

9    general report in this litigation.  She was specific in Tanya

10   Francis' case, but she also gave a general report.

11              Dr. Smart -- well, Dr. Shapiro doesn't even

12   address these.  He said, "I gave a report" -- "somebody gave

13   you a report, but I'm deferring to the dermatopathology."  He

14   backs up -- he runs away from the report.  He doesn't back down

15   from it.

16              But when we questioned Dr. Smart and Dr. Love,

17   they both agree, there are multiple sources of stem cells on a

18   scalp.  When cytokeratin-15 stains one, it doesn't mean it's in

19   the bulge.  Ki-67, all that means is cells are growing.  You

20   can put it on a leaf of a plant, and if the plant had cells

21   that are growing, it's going to stain.  That's not from the

22   experts.  That's just what I've read.  But the experts said,

23   all it does is stain cells that grow.  So all of these are

24   covered.

25              Sanofi's own employees admit general causation.

1    We heard that we can't take it for granted, and we don't.  We

2    have produced a stable of experts that cover the waterfront on

3    the factors of the Bradford Hill criteria even though the

4    *Wagner* case supports that it's not absolutely necessary to do

5    so.

6                    But we have a sampling of the employees from

7    sanofi that admit to general causation.  Where are we?  Amy

8    Friedman, who is a medical doctor and a global safety officer.

9                    "Based on your knowledge in 2006, sanofi knew

10   Taxotere could cause irreversible alopecia in 2006; correct?

11                   "Yes."

12                   There's the reference.

13                   Well, wait a second here.  There we are.  Lesley

14   Fierro, the sanofi head of medical information services.  She's

15   the one that's responsible for communicating medical

16   information, Your Honor.

17                   "Let me ask you as a pharmacist, do you

18   understand today that Taxotere can cause permanent hair loss?

19                   "Correct, yes."

20                   Again, the reference.

21                   Nanae Hangai, she's both an MD and a PhD.

22   "Docetaxel (Taxotere) may cause permanent hair loss, but it's

23   case-by-case."

24                   See the reference there.

25                   And, Your Honor, you remember the last time we

OFFICIAL TRANSCRIPT

```
 1    were together we talked about the statistical analysis plan,
 2    and my questioning of Mr. Mancini?  You wouldn't -- you would
 3    not study reversibility of alopecia unless it was a concern.
 4    He agreed with that.  And there are other employees of sanofi
 5    that say the same thing, we just didn't put them up here.
 6              Let's talk about the randomized control trials.
 7    Why are they important?  Randomized clinical trials, we've
 8    heard, are the highest, best form of evidence.  TAX316 and
 9    TAX301 are sanofi's own randomized trials.  I want to talk
10    about how they randomized.  Excuse me?
11              THE COURT:  I think -- I don't want to stop you --
12              MR. MICELI:  Yes, ma'am.
13              THE COURT:  -- but, you know -- and I have to tell
14    you, this bothered me.  And maybe this was a better question
15    for Mr. Strongman, but I've read your submission in full, which
16    was light reading with all the attached exhibits, and there
17    were a lot of exhibits dealing with the sort of information
18    that we just rushed through, which were statements from -- or
19    excerpts from deposition testimony --
20              MR. MICELI:  Yes, Your Honor.
21              THE COURT:  -- of sanofi's employees, other experts.
22              And I have to be perfectly frank with you, as I
23    read this, and I thought, but that's not the question before
24    me.  The question is whether or not these witnesses should be
25    here.  But then again -- it almost seems that this motion has
```

OFFICIAL TRANSCRIPT

1  come to me in a strange way.

2          MR. MICELI:  I agree with you.

3          THE COURT:  And I thought as I was going through it,

4  and you mentioned this is summary judgment, and I, very

5  frankly, in reading the response, I thought, this isn't a

6  summary judgment.  This is attacking these two witnesses,

7  but...

8          MR. MICELI:  Well, what they do, Your Honor, is they

9  attack what the witnesses did, and particularly with regard to

10  the meta-analysis, they act as though what the expert did was

11  not sufficient.  And sufficiency of evidence is really -- if

12  we're not meeting our burden, it's a summary judgment motion.

13  That's why I say it seems like a summary judgment motion.

14              But if I can go through still the TAX316

15  protocol, and I'm only doing it with TAX316, but it's an

16  identical protocol.

17              But the last point I wanted to make -- I'm a

18  little bit out of time.

19          THE COURT:  But isn't that what Dr. Madigan said

20  that -- okay.  Go ahead.

21          MR. MICELI:  Okay.

22          THE COURT:  I'm interrupting you.

23          MR. MICELI:  Certainly.  What's important is when you

24  look at TAX316 -- and I have the -- I should have had a second

25  blowout for you, Your Honor, but I failed myself.  At the very

OFFICIAL TRANSCRIPT

```
 1    top under 2.5, the rationale for going into Phase 3 adjuvant
 2    setting, the last sentence reads:
 3              "Any promising new combination must first prove
 4    its efficacy and favorable toxicity profile in first line
 5    metastatic setting before testing in the adjuvant setting."
 6              And that's important to set the stage because
 7    this is the first time that sanofi is going to test the -- this
 8    drug, Taxotere, in a setting where you're going to have the
 9    opportunity for long-term follow-up.
10              They then describe how they're going to do it.
11    Then they say the advantage of that is that we are reducing --
12    you have a randomized design of FAC versus TAC, comparing two
13    different regimens with the same dose of Adriamycin and
14    cyclophosphamide.  You hit on this last time, and you did it
15    again today.  A and C are the same for every person in this
16    study, TAC and FAC.  So Taxotere and fluorouracil are the only
17    two differing factors.
18              Simplicity of design with one appropriate
19    question, and I would submit to Your Honor, Taxotere versus
20    fluorouracil is the essence of good adjuvant trials.  So they
21    isolated themselves.
22              We heard about tamoxifen.  Well, let's look
23    at -- let's look at how they did this.  The TAC arm, everybody
24    had Adriamycin, cyclophosphamide, and tamoxifen.  TAC arm,
25    everybody had A, C, and T, Adriamycin, cyclophosphamide, and
```

1   tamoxifen.  301 is exactly the same.

2                   So they went to great pains to make sure that

3   they were looking at a very particular question, and that is,

4   one drug versus another drug.  Ethically, that's the only way

5   you can do a cancer study.  You don't give a cancer patient a

6   placebo.

7           **THE COURT:**  Right.

8           **MR. MICELI:**  Right.  So we have that.

9                   The other question goes to the general, is it --

10  are we testing against the general events and the public.

11                  Again, the very -- the very text --

12  pharmacoepidemiology text that they cite and the reference

13  manual points out on epidemiology that the end statistics that

14  the essence of a randomized trial is those general

15  characteristics of patients are evenly distributed between both

16  sides.  So it's not -- it's really a hollow argument to say,

17  "Well, they didn't compare against the general."  Yes, the

18  general is distributed between the two -- two different arms,

19  the FAC and the TAC.  So that's where we are.

20                  The *Burst* case we heard about last time.  I

21  think Mr. Strongman said it was his favorite, and I can see why

22  it would be.  I have a new favorite in *Wagner*.  The *Burst* case

23  fails to save sanofi, and here's why.  Here are the differences

24  between *Burst* and Taxotere:

25                  Admissions of company witnesses about general

1  causation.  *Burst* didn't have that; we do.

2          Randomized controlled trials that distribute

3  those general characteristics and isolate what you're looking

4  at, Taxotere versus 5-FU.  *Burst* doesn't have a randomized

5  trial; Taxotere has two.

6          And the appropriateness of the meta-analysis is

7  set out in our last presentation in our brief.  It's supported

8  by the Reference Manual on Scientific Evidence, and it's

9  supported by the epidemiology text that the defendants cite to.

10  Meta-analysis, we have it; they don't.

11          Published peer-reviewed medical literature

12  isolating exposure to chemical and the specific injury.  We

13  have that.  The Court noted in *Burst* they did not.

14          Worldwide database of sanofi's choosing, not

15  ours.  They tracked these.  We have it; *Burst* case did not.

16          Your Honor, basically, the majority of our

17  evidence is sourced from sanofi.  They did the clinical trials.

18  That was their reality from day one.  They created these

19  trials.  They designed these trials.  They conducted them to

20  their protocols.

21          And their study investigators published a paper

22  in 2013, again, that said it was prospectively designed and

23  prospectively defined in the study protocol, and that because

24  they had few patients drop out -- we heard about dropout rates

25  last time.  That's not an issue for the study authors.  That's

1  not an issue for sanofi when they're publishing in *The Lancet*
2  *Oncology* in 2013, but it's an issue here, and it allows for an
3  unbiased comparison of both efficacy and safety.
4          Your Honor, in conclusion, this case is no
5  different than *Vioxx* or *Xarelto*, which have been decided right
6  here in this courthouse.  Multiple experts addressed the
7  various aspects of general causation.  We have admissions from
8  multiple, multiple sanofi witnesses, and these aren't the
9  people in the mail room.  These are two global safety officers
10  and the person charged with communicating the medical
11  information for sanofi.
12          We have their clinical trials that they used,
13  and they used as recently -- or at least they produced to us as
14  recently as this week that they're representing to the world,
15  and every doctor that's going to prescribe this drug, that the
16  events of alopecia at the end of the ten-year follow-up, and
17  you can see with what I handed up there, the majority of them
18  are over ten years of follow-up.  That's the data our experts
19  rely upon in part and all of the medical literature that they
20  go through.
21          The meta-analysis, which we've already said and
22  shown to the Court, is approved by the Reference Manual on
23  Scientific Evidence, the text that they cite to.  You know, in
24  the *Burst* case, it's just simply inapplicable, but the *Wagner*
25  case isn't.

1            The *Wagner*, I'm going to go back to Judge

2    Fallon's comments, when somebody like Dr. Wei, who does not

3    have, and I cannot emphasize this enough, does not have the

4    same criticisms of the meta-analysis that Mr. Strongman stood

5    here -- and he is not evidence, what he says is not evidence.

6            Dr. Wei has two criticisms, and they go to how

7    the meta-analysis was performed.  He doesn't say meta-analyses

8    or pooled analysis and they're junk, we can't do those.  That's

9    not what he says because he can't.  Because he's a legitimate

10   biostatistician, and he can't do that.

11            What he does is he criticizes some of the

12   particulars.  One of them we've already noted is really not an

13   issue at all, heterogeneity is not an issue.  But when the

14   defense -- when Exxon questioned the way in which the

15   meta-analysis was performed in the *Wagner* case, what Judge

16   Fallon said was, "This is a battle of the experts, and the

17   Court need not determine that the general causation opinions of

18   plaintiffs' experts are, in fact, correct."

19            That they may have a study that has some

20   weaknesses -- and we don't believe that we do, but if -- this

21   is what he says in *Wagner*, "If the defendants believe the study

22   has some weakness in rendering their opinion -- in basis for

23   rendering their opinion, they can appropriately be raised

24   through cross-examination and the presentation of adverse

25   evidence."

```
1                 And that's what we're talking about.  Everything
2        they're complaining about with regard to Dr. Feigal, who goes
3        through -- and I gave you the page numbers, Your Honor -- who
4        goes through carefully the factors.  She doesn't put road signs
5        up for them, but she certainly discusses them.  And when they
6        wanted to ask her more questions, they went back three
7        additional times to do so.
8                 We have Dr. Plunkett, who handles pharmacology
9        and mechanism of action, and we have the statistical analysis
10       that is the starting point.
11                And I want to -- just one last thing about
12       Dr. Madigan.  He didn't just do Taxotere to see if there's a
13       signal and say, "Ah, we have it.  We can move on now."  He
14       looked at tamoxifen; he looked at cyclophosphamide; and he
15       looked at Adriamycin.  He did look at the alternative causes,
16       as did --
17                THE COURT:  I saw that.  I saw that.
18                MR. MICELI:  -- as did Dr. Feigal.
19                So thank you, Your Honor.  If you don't have any
20       further questions.
21                THE COURT:  All right.  Two minutes.
22                MR. STRONGMAN:  Your Honor, I want to start by
23       addressing the question that you had that you said, "Well,
24       maybe I should have asked Jon this question."  This is an odd
25       motion, and I'll tell you why.
```

1      **THE COURT:**  It really is.

2      **MR. STRONGMAN:**  I'll tell you why.  Because when you

3  have a mass tort like this, what you have in almost every case

4  is a set of experts that work together, including an

5  epidemiologist.  There is not one epidemiologist in this case.

6  Dr. Madigan is a statistician.

7      **THE COURT:**  Right.

8      **MR. STRONGMAN:**  He is a statistician alone.  He is

9  not an epidemiologist.

10     So you can go back and you can look at the

11  causation opinions that are in other MDLs, and what you have is

12  an expert who takes these pieces -- and I'm not saying you have

13  to only have a single expert, but you have to have at least an

14  expert on general causation.  They don't.  They just don't.

15     And we know that the way the rule works, under

16  Rule 26, the plaintiffs have to put out an expert report.  They

17  have to say in their expert report what their opinions are, and

18  we don't have one single expert in this case who says, "I am

19  addressing general causation.  Here's the methodology by which

20  I am doing it, and here are the results."

21     So when you are the defendant in a situation

22  like this, where you don't have an epidemiologist, you don't

23  have someone bringing the pieces together, you're left with the

24  pitches that you've been thrown to hit.  And those to me are,

25  we are left going to their experts.  So we mentioned -- and we

OFFICIAL TRANSCRIPT

1  have Footnote 8 in our brief.  We went to their experts,

2  Dr. Plunkett.  Her quote was, "I am not doing a causation

3  analysis."  So Mr. Miceli can't come in and say, "Oh, look at

4  Dr. Plunkett."

5          THE COURT:  But I'm looking at the conclusion of

6  Dr. Feigal, and, you know, "Permanent chemotherapy-induced

7  alopecia is a known adverse event."  And then she said, "The

8  company's own analysis led them to the conclusion that

9  permanent chemotherapy-induced alopecia is causally related to

10 Taxotere."

11         MR. STRONGMAN:  What we're left with is the reality

12 that what Dr. Feigal is talking about is the same regulatory

13 analysis, the same regulatory standard that we've talked about

14 earlier.  It is not a tort law causation analysis.  And so I

15 agree with you, what we've got here is an odd circumstance

16 because the plaintiffs didn't do their work.

17         THE COURT:  It really is.

18         MR. STRONGMAN:  So we are left to try to piece

19 together what it is they're doing, and to present it to you in

20 a way to say, "They haven't done what they needed to do."  So

21 what is important for sanofi is to take a step back and to

22 simply say, "Have the plaintiffs put forward experts that have

23 done what the law requires?"

24         And Mr. Miceli can distinguish *Burst* if he

25 wants, that's fine.  Look at the standards that Judge Vance set

OFFICIAL TRANSCRIPT

1  out.  That's what I'm interested in.  Do you have a

2  statistically significant association?  We don't.  Do you have

3  Bradford Hill criteria?  We have someone in a deposition

4  saying, "I'm happy to talk about it."

5          **THE COURT:**  Mr. Strongman, wind up.

6          **MR. STRONGMAN:**  But that's where we're at.  So the

7  plaintiffs simply can't meet their burden.  They don't have a

8  statistically significant association, and they haven't done

9  their work.

10          Thank you.

11          **THE COURT:**  Thank you.

12          **MR. MICELI:**  Your Honor, may I make one comment from

13  here.

14          **THE COURT:**  From right there.

15          **MR. MICELI:**  Yes, ma'am.  Yes, Your Honor.

16          We have not put forth any regulatory statements.

17  The comments and the quotes that are in that PowerPoint are

18  sanofi's.  They're not the EPA's; they're not the FDA's;

19  they're not any agency's; they are sanofi's.

20          Thank you.

21          **THE COURT:**  Thank you.

22          All right.  I'm going to take a five-minute

23  break.

24                    * * * * *

25          (WHEREUPON, the Court took a recess.)

OFFICIAL TRANSCRIPT

1              * * * * *

2         THE COURT:  Let me just make a little quick

3    announcement.  Everybody's here that needs to be here.  I let

4    you have a lot of time on general -- you all can sit down --

5    general causation because it's hard.  Well, all of this is

6    hard, but I thought that's one I needed more time with.  I'm

7    going to give you all 10, 15 minutes on specific causation

8    because, I got to tell you, I don't think it's nearly, from my

9    perspective -- I know it's hard, but from my perspective, it

10   was not as challenging as the review of general causation.

11             Okay.  So I think 10 to 15 minutes should be

12   fine.  All right.  Okay.  Go ahead.

13        MR. STRONGMAN:  Thank you, Your Honor.  I would be

14   remiss without at least pointing out, as any defense lawyer

15   must, plaintiffs have to prove general causation before we even

16   talk about specific causation.

17        THE COURT:  I got that.

18        MR. STRONGMAN:  We got it.  I have to say it.

19             But there are two experts that we're going to

20   talk about today, Dr. Tosti and Dr. Thompson.  And there have

21   always been two -- and maybe this is why it's a little more

22   straightforward issue.  But there's always been two major

23   hurdles in this litigation on specific causation.  The first

24   is, can you rule out other chemotherapy drugs?  And the second

25   is, can you rule out all of the other types and causes of

1  alopecia?

2  **THE COURT:**  Right.

3  **MR. STRONGMAN:**  I want to start with not my words,

4  but I want to start with Dr. Tosti's words.  Because at times

5  you can get kind of bogged down when you read a transcript,

6  when I put a Q-and-A up there, as I know you've said, you know,

7  sometimes you don't have the context.  Right?  I get that.  But

8  I want to provide a little bit of a background, and I want to

9  play about 25 seconds of Dr. Tosti's testimony, with the

10 Court's permission.

11 But Dr. Tosti offered expert opinions on three

12 plaintiffs, Ms. Francis, Ms. Durden, and Ms. Earnest.  And what

13 Dr. Tosti said was that Ms. Durden and Ms. Francis had some

14 elements of what she called traction alopecia, but that they

15 also had permanent chemotherapy-induced alopecia, and she said

16 Ms. Earnest had that also.

17 So we have two plaintiffs with traction, but all

18 three have permanent chemotherapy-induced alopecia, which is

19 what she addressed in her report.  So that's the preface to

20 these questions, and here's what she had to say.

21 (WHEREUPON, a video clip was played.)

22 **MR. STRONGMAN:**  So that's what Dr. Tosti said, you

23 can never make these diagnoses for any type of drug-induced

24 hair loss.  You can never say what drug is causing the hair

25 loss.

OFFICIAL TRANSCRIPT

1        And when Dr. Tosti did her clinical assessment
2   of Ms. Earnest, she created what looks like a medical record.
3   And here's what she concluded at the end of her medical record,
4   the same thing, chemotherapy and not Taxotere.  Every once in a
5   while in a deposition, the truth gets loose, and you cannot put
6   it back in the bottle.  And the truth here is that plaintiffs'
7   experts cannot rule out the other chemotherapy drugs as a
8   potential cause for Ms. Earnest's hair loss; and if they cannot
9   do that, they cannot get over the hurdle to present this case
10  to a jury.
11       And Dr. Tosti wasn't the only one that said it.
12  Dr. Thompson did too.
13       (WHEREUPON, the video clip was played.)
14       **MR. STRONGMAN:**  So those are the words of the
15  plaintiffs' own expert, the only two we're here to talk about
16  today, and neither of them can rule out the other chemotherapy
17  drugs, which is a requirement to move forward.  So that is the
18  first hurdle.  They cannot cross it.
19       The second hurdle, which I mentioned briefly, is
20  that hair loss is a problem that affects a whole huge portion
21  of the population.  This is a quote from Dr. Claiborne, who is
22  one of the retained dermatologists that the plaintiffs used to
23  do biopsies.  And he was asked how prevalent hair loss is among
24  women, and he said 90-something percent in their lifetime.
25  There are scores of types of alopecia and causes for alopecia.

1    And the plaintiffs must do a rigorous analysis to rule out

2    those things too, and they haven't done it.

3            So let's talk a little bit about Dr. Thompson

4    and the process of how the case specific opinions got put

5    together in this case.

6            So Dr. Thompson is a pathologist, a

7    dermatopathologist.  And the plaintiffs decided to take

8    pathology from each of the plaintiffs, and they had

9    Dr. Claiborne do that here in town.

10           **THE COURT:**  Right.

11           **MR. STRONGMAN:**  Dr. Claiborne was given virtually no

12    information on the plaintiffs at all.  He was instructed to

13    take two biopsies one at a place that looked better, and one

14    that looked worse.  He took the biopsies with absolutely no

15    clinical information whatsoever.  And as Dr. Claiborne said:

16            "Is this is something you would ever do outside

17    of the litigation context?"

18            He said, "No."

19           **THE COURT:**  But has anybody -- I mean, I understand.

20    I've seen all of this, but I don't think even your experts had

21    a problem with the way that the pathology samples were taken,

22    unless I'm missing -- I thought -- I didn't see that.

23           **MR. STRONGMAN:**  I understand your point.

24           **THE COURT:**  I mean, I thought, you know, this is --

25           **MR. STRONGMAN:**  I understand, but it's all part of

1  the process.  Because you go to the next step.  So you have a

2  dermatologist and Dr. Claiborne that takes the biopsies in a

3  way that is abnormal in terms of the information that the

4  doctor has.  Okay.  Fine.  Set that aside.  He just took the

5  tissue; he sent it on.  Fair enough.

6          So we get to Dr. Thompson, who looks at it.

7  Dr. Thompson was given this information, their name, their age,

8  their gender, and that they were on chemotherapy.  That's it.

9  That's it.

10          Now, the plaintiffs may say, oh, you know,

11  that's not that unusual or whatnot.  It is.  It is.  There are

12  normally requisition forms.  There are normally clinical

13  information that's passed on so the pathologist has a context

14  for what he or she is looking at.

15          And Dr. Thompson here, there's a critical

16  example that kind of brings this to a head, and that's the fact

17  that Ms. Earnest is on, and has been on for a number of years,

18  aromatase inhibitors.  So Dr. Thompson was asked this question:

19          "What does the pathology look like for hair loss

20  caused by tamoxifen, or aromatase inhibitors?"

21          And he describes it.  And Mr. Sears, who you

22  met, said:

23          "So, basically, the features that you're

24  reporting on in these three plaintiffs?"

25          And he said:  "Oh, yes."

OFFICIAL TRANSCRIPT

1           So, obviously:

2           "Did you know that Ms. Earnest was on aromatase

3  inhibitors?"

4           And his answer:  "I didn't look at what they

5  took."

6           So why does that matter?  A, we have a process

7  that's set up for a particular result.  But the other is, what

8  happens is Dr. Thompson issues a report, and he issues a

9  conclusion of his pathology findings, and his conclusion is

10 persistent chemotherapy-induced alopecia.  What if that finding

11 said persistent chemotherapy-induced alopecia or aromatase

12 inhibitor-induced alopecia because the pathological findings

13 are similar?  I can't tell.

14          Well, that wasn't even on the table because

15 Dr. Thompson wasn't even told what the clinical features of

16 each of these patients were, what drugs they were on, what

17 other clinical issues that they had.  So Dr. Thompson was put

18 into a spot to generate a particular result, and that's what

19 happened.

20          And then what we know, and Dr. Thompson then did

21 the stem cell study, which we know if it turned out well, he

22 was going to include; if it didn't, he wasn't.  It didn't turn

23 out well; he didn't include it.

24          And what happens now when you read the

25 plaintiffs' brief about Dr. Thompson at this point, here's what

OFFICIAL TRANSCRIPT

1    they say:  "Dr. Thompson was not actually retained to opine on
2    whether Taxotere caused the plaintiff's alopecia, but rather to
3    help inform Dr. Tosti in that diagnostic process."  So we're
4    now to the point where Dr. Thompson is really not a case
5    specific causation expert anymore.  Instead, what they're
6    saying is, he simply generated some data that was sent to
7    Dr. Tosti to help her in her conclusions.
8              But what we know is that when you send a patient
9    to a dermatologist without information that takes a sample, it
10   then goes on to a pathologist that doesn't have information,
11   that comes up with a reading because all that doctor was told
12   was that the patient was on chemotherapy, you end up with a
13   pathology report that then Dr. Tosti relies on that has a
14   particular conclusion already baked in.  And so Dr. Tosti
15   essentially is at the end of the falling dominoes in this
16   process.
17             And I want to talk, and I'll try to be brief as
18   we go through this, but this is why Dr. Tosti's admission that
19   I played for you on video matters:  "I cannot say which drug is
20   causing the hair loss."  Of course.
21             And that is because when you look in the
22   literature, all the experts in this case will admit that there
23   are reports of persistent hair loss with the other chemotherapy
24   drugs, including Adriamycin and cyclophosphamide, that
25   Ms. Earnest took.  Every expert admits there are reports of

```
 1    persistent hair loss with Adriamycin and cyclophosphamide,
 2    which are the other chemotherapies Ms. Earnest took.
 3                    And there are reports even when patients are not
 4    on Taxotere or Taxol along with those, that's an undisputed
 5    fact.  So you're left with a situation, as the FDA has said, I
 6    quote you, "It's all confounded."  Right?  So how can I say
 7    when there are three agents, where there are reports, which one
 8    it is?
 9                    Well, Dr. Tosti --
10         THE COURT:  But don't we go back to -- well...
11         MR. STRONGMAN:  Go ahead, please.
12         THE COURT:  I think we're going back to where we are,
13    TAC versus FAC, and its probabilities in products liability
14    cases.  It's not absolute, 100 percent, this is it.  I don't
15    think -- there's no case that requires that.  But it's the
16    probability standard, more likely than not.  So she says -- she
17    has taken this drug, she's got this, I think -- I thought
18    Dr. Tosti, when she looked at it, considered whether or not it
19    was -- it was related to tamoxifen.  So she did some work
20    there.
21                    So I guess I'm -- I will be honest with you, I
22    am -- I'm less impressed with the complaints about the sample
23    being taken in New Orleans.
24         MR. STRONGMAN:  Understood.
25         THE COURT:  I think that's -- that's just --
```

OFFICIAL TRANSCRIPT

1          MR. STRONGMAN:  Enough.

2          THE COURT:  -- that's just, you know, a red herring

3  out there.  I mean, you sent -- anyway.  And then Dr. Thompson

4  gets these slides, he looks at them, and says, "It's consistent

5  with chemotherapy-induced alopecia."  But then he said that --

6  the way I view this, this is all about Tosti.  Now, these other

7  people provided information she needed as part of her analysis

8  of this, but this is all Tosti, in my view.

9          MR. STRONGMAN:  Understood.

10          THE COURT:  I read these reports, and I was like

11  she's the lady that put it together, she understands this.  She

12  looked at the various chemotherapy regimens that --

13  chemotherapy agents that this lady was administered and said,

14  you know, "Taxotere based upon other studies" --

15          MR. STRONGMAN:  I want to dig into that.

16          THE COURT:  -- "is" -- okay.  I'm listening.

17          MR. STRONGMAN:  I have no dispute with the fact that

18  this circles around Dr. Tosti.  I understand that.

19          THE COURT:  That's it.  So I think we can waste our

20  time talking about these other people, and I'm not interested.

21          MR. STRONGMAN:  And what we know is that Dr. Tosti

22  said, "I cannot exclude the other chemotherapies."  But she

23  does look at the others.

24          THE COURT:  But, again, we go back to probabilities,

25  and then we are -- we're at TAC, FAC, and we know Taxotere is

OFFICIAL TRANSCRIPT

1    the difference.

2              MR. STRONGMAN:  Let's talk about probabilities for a

3    second.  Do you think Dr. Tosti looked at the clinical studies

4    we've talking about, TAX316, GEICAM?  Do you think she -- she

5    did not.  So she's not relying on those probabilities.  So this

6    was a question asked.

7              THE COURT:  Is she looking at some of the other

8    literature?

9              MR. STRONGMAN:  She had case reports, and that's what

10   I'm going to explain to you.

11             THE COURT:  Okay.

12             MR. STRONGMAN:  So Dr. Tosti was asked the question

13   that I was just referencing.

14                  "So, Doctor, I know that you've offered your

15   report.  You know there are case reports of Adriamycin and

16   cyclophosphamide causing persistent chemotherapy-induced

17   alopecia; right?"

18                  Okay?

19                  "Case reports is different from evidence," is

20   her answer.

21                  Okay?

22             THE COURT:  Right.

23             MR. STRONGMAN:  So what do you think the plaintiffs

24   argue?  Dr. Tosti singles out Taxotere over the other two when

25   you look at their brief and you look at her report based on the

1  weight of the literature on Taxotere, which is case reports.
2  She can't have it both ways.  She can't say the A and the C
3  don't matter because they're case reports.  I'm looking at the
4  T which is case reports.
5          And what we know is that when you look at the --
6  when you look at all of the case law on causation when you're
7  talking about either exposure cases or product liability cases,
8  this whole conversation on case reports is in a fight about
9  general causation.  It is never in a fight about the specific
10  causation.  Case reports have no bearing on specific causation.
11  And as we've talked about, case reports simply raise questions;
12  they did not answer them.
13          And what Dr. Tosti did was when you look at her
14  report, at the end she essentially counts what she believes are
15  reports in the literature of case reports and says, "I count
16  more for Taxotere."  When she's challenged on what she looked
17  at, how she came up with it, she can't really answer that.
18          So what you know is she's shown a study that
19  says:
20          "This is a report of an A and a C patient that
21  has persistent hair loss.  You didn't count that."
22          Do you know what she says?
23          "Well, it's an abstract.  I don't count
24  abstracts."
25          "Oh, well, in your count, you have abstracts for

OFFICIAL TRANSCRIPT

1  Taxotere.  Did you know that?

2              "Oh, no, I didn't.  Those were the ones the

3  lawyers gave me.

4              "But you counted them for Taxotere.

5              "I guess I did."

6              So we have a situation here when you go back to

7  what the law requires, which is a methodology, Dr. Tosti didn't

8  employ any kind of methodology to rule out the A and the C.

9  She didn't.  She can't just randomly take things lawyers give

10  her and some other hand-picked case reports and say, "That, to

11  me, is enough."  That simply is what we've talked about before,

12  which is the weight of the literature, the weight of the

13  evidence.  And this was this MDL quote:

14              "When you use this kind of methodology, it is

15  virtually standardless and manipulatable," and that's the world

16  that we're in with Dr. Tosti.

17              Ms. Earnest had multiple chemotherapies.  She

18  lost all of her hair before she ever took Taxotere.  That's an

19  undisputed fact.  She was post-menopausal.  She is on aromatase

20  inhibitors known to cause hair loss.  There are other types of

21  alopecia that could be explained by her pathology.  There's

22  family history.  It is complicated.  There's no two ways about

23  it.  The legal issue may not be; the Ms. Earnest case is.

24              And when you cannot rule out the other causes,

25  when you can't rule out the other chemotherapies by anything

1    other than a case report count, you can't get over the hurdle

2    for specific causation.

3              And at the end of the day, this was a quote I

4    showed you before.  We all -- we all have sympathy for the fact

5    that there are individuals, cancer survivors here, Ms. Earnest

6    included, who believe they have a problem from Taxotere.  We're

7    all sympathetic to that.

8              And it's complicated, and it's hard to make a

9    decision to say, "You can't proceed in this case."  That's a

10   difficult decision.  But when it's unclear, when you can't rule

11   out the alternatives, the law requires the Court to exclude

12   that expert.  Because the law lags science, and we don't have

13   the science, generally or specifically.

14             And when you look at the law, what the law

15   requires, this is the law cited in our briefs, sanofi's briefs.

16   This is the law cited by the plaintiffs.  And it's the *Daubert*

17   case, a passing reference.  What the plaintiffs rely on is not

18   the law, it's not what the law requires.  What they rely on is

19   Dr. Tosti's *ipse dixit*, I say so and therefore it is, and

20   that's not enough to move forward.

21             Thank you, Your Honor.

22         **THE COURT:**  Thank you.

23             Mr. Schanker.

24         **MR. SCHANKER:**  Good afternoon, Your Honor.

25         **THE COURT:**  Good afternoon.

OFFICIAL TRANSCRIPT

1           **MR. SCHANKER:**  Let me get set up here.

2           **THE COURT:**  Take your time.

3           **MR. SCHANKER:**  May it please the Court, Your Honor,

4    Darin Schanker on behalf of my client, Barbara Earnest.

5                And as Mr. Strongman indicated, we only get to

6    specific causation after general causation, and what we have

7    were the company's own clinical trials proving general

8    causation.  In my experience, that's the best evidence that I

9    think you'll ever see, is the company's own clinical trials

10   demonstrating general causation.

11               Specifically with regard to specific causation,

12   sanofi, Your Honor, mischaracterizes what Dr. Tosti said.  And

13   we saw a quote, and I want to put it in the full context, as

14   in, what else did Dr. Tosti say.  And sanofi also

15   mischaracterizes what Dr. Tosti did, her methodology, and I

16   would like to take you through that methodology, with your

17   permission, here today, Your Honor.

18               And you hit the nail on the head that it is all

19   about probabilities with regard to Dr. Tosti, and that's --

20   those are the issues that I'd like to discuss with you here

21   today.

22               Sanofi's argument overlooks one very important

23   point, Your Honor, and that's:  What is the question in this

24   case?  The question is not what caused the plaintiff's hair to

25   fall out.  Rather, the question is:  What caused the

1  plaintiff's hair to never regrow?  And then Dr. Tosti goes
2  through her methodology to answer this question:  What caused
3  the plaintiff's hair to never regrow?
4             She performs a differential diagnosis.  She
5  examines the plaintiff's scalp under trichoscopy.  She rules
6  out alternative causes.  She reviews the biopsy results, as you
7  indicated, Your Honor.  She then relies on her clinical
8  experience and knowledge and reviews the weighted scientific
9  evidence.
10             Concerning specifically what Dr. Tosti said,
11  Your Honor, sanofi plays semantics, word games, and I'd like to
12  clarify that.  Sanofi would have you believe that Tosti can't
13  tell which chemotherapy drug causes the permanent hair loss,
14  and this is false.
15             Remember, this is not a case about what causes
16  the hair to fall out.  What's the case about?  Dr. Tosti
17  confirms that the real question that should be asked is what
18  caused the hair to not regrow.  If you listen carefully to the
19  question and answer, Mr. Sears, a colleague on the other side,
20  asked about hair loss.  What's one thing we know?  I'm sure,
21  Your Honor, before you got on this case, you knew, most all
22  chemotherapy drugs cause what?  You to have hair loss.  That's
23  not what this case is about.  It's about what causes the hair
24  to regrow.
25             And, specifically, in her deposition, as you

OFFICIAL TRANSCRIPT

1    have cited before you -- and let's remember this, Dr. Tosti's
2    first language is Italian.  She speaks multiple other
3    languages, including English.  It's her first language -- but
4    you can understand clearly in her response, her answer here,
5    she's asked about Mr. Sears about this.
6               Dr. Tosti responds:  "I said if you have a woman
7    who has chemotherapy and has hair loss" -- meaning with
8    chemotherapy -- "every person has hair loss."  There she's
9    talking about it.  So you have acute alopecia from
10   chemotherapy.  Your Honor, that's what we all understand
11   happens.
12              "I cannot tell you which drug it is because all
13   of them can be."  She's saying, "I know, all these drugs can
14   cause hair loss."  An important part of her quote, but then,
15   "If the hair do not regrow, which is different of having hair
16   loss, then it's a different situation.  And I believe that
17   permanent alopecia, which is hair not regrowing -- it's not
18   hair loss -- is caused by docetaxel."
19              Docetaxel, Your Honor understands, is Taxotere.
20   So right there, she clearly answers the question that it's her
21   opinion that it's Taxotere that presented the hair regrowth.
22              Next, Your Honor, the defendant mischaracterizes
23   what Dr. Tosti did in this case.  Defendant claims there's no
24   differential diagnosis in their papers.  Well, the fact is, as
25   you looked through the reports, you've indicated you looked

OFFICIAL TRANSCRIPT

1    through them carefully, 17 pages of Dr. Tosti's report were
2    spent on a differential diagnosis.  And I'll take you through
3    that as you like, Your Honor, the differential diagnosis, but I
4    think to fully understand what Dr. Tosti did, we need to know
5    who Dr. Tosti is.
6              Dr. Tosti is a scientist who has authored over
7    600 publications within her area of expertise.  Not only is she
8    a scientist, she's a clinician.  She practices.  She's treated
9    over 10,000 patients.  She's a professor of medicine in the
10   U.S. --
11             THE COURT:  I don't think anybody's arguing that
12   Dr. Tosti's not imminently qualified as a dermatologist with an
13   expertise in hair.
14             MR. SCHANKER:  And why that's important -- thank you,
15   Your Honor.  And why that is important -- and I will move
16   ahead -- is because her unique experience --
17             THE COURT:  Right.
18             MR. SCHANKER:  -- it's not just she's a general
19   dermatologist --
20             THE COURT:  Oh, I know that.
21             MR. SCHANKER:  -- or that she's a hair expert, or,
22   quite frankly, maybe the preeminent hair expert in the world,
23   but that she has unique experience with permanent
24   chemotherapy-induced alopecia, which, obviously, Your Honor
25   understands, is what this case is all about.

1          Well, what is Dr. Tosti's experience with PCIA,

2     or pecia (phonetic) or pica (phonetic).  And understand that

3     today, this is a globally recognized condition or disease.  Did

4     you know, Your Honor, this didn't exist 25 years ago.  And why

5     didn't it exist 25 years ago?  It's because it was about that

6     time that these more powerful chemotherapy drugs that are more

7     toxic started to be used in treatment.

8          Clinicians, just like Dr. Tosti, noticed

9     something popping up in their practice.  They noticed that

10    women, men, patients that were undergoing chemotherapy, and had

11    undergone it, that some occasions their hair --

12         **THE COURT:**  I think the question, Mr. Schanker, and

13    let's cut to the chase --

14         **MR. SCHANKER:**  Yes.

15         **THE COURT:**  -- is:  How does Dr. Tosti, how was she

16    able to identify Taxotere as the cause of plaintiff's

17    persistent alopecia, permanent alopecia, ongoing alopecia?

18         **MR. SCHANKER:**  Right.  Specifically, Your Honor, and

19    in her -- in her research with this where she was instrumental

20    in actually discovering the condition, permanent

21    chemotherapy-induced alopecia, she first published on it in

22    2005.  And then, importantly to answering your question, in

23    2011, she began writing about Taxotere-induced permanent

24    chemotherapy alopecia.

25         And so in her time as a clinician, she saw it;

OFFICIAL TRANSCRIPT

1   and then as a scientist, she investigated it, and then began to
2   understand it, and published on it.  And so Dr. Tosti has
3   specific experience in her background as a clinician and
4   scientist with specifically Taxotere-induced.
5                And, Your Honor, let's go right to your question
6   concerning -- so, as you know, you looked at her report, and
7   she went through the differential diagnosis painstakingly, and
8   she ruled out all the other alternate potential hair
9   afflictions, and then came to permanent chemotherapy-induced
10  alopecia.  And then the next step in her methodology, which is
11  what you asked about specifically.
12               **THE COURT:**  Right.
13               **MR. STRONGMAN:**  The defense mischaracterizes this,
14  and we just heard Mr. Strongman do this as case counts or that
15  all she did was look at case reports.  What she did, Your
16  Honor, is -- remember, she started publishing on this back in
17  2011 or wrote on this, and specifically what happened is she
18  began diagnosing it, and she developed this methodology.
19               And, remember, this is not a situation where she
20  was hired in this case and ran to the library and did a bunch
21  of research, and that that's where she came up -- the defense
22  claims there's like two or three studies that she relied on.
23  That's not what happened here.  She used her knowledge as a
24  scientist, really an innovator, in understanding this disease,
25  which is now globally recognized.  And those -- and in her

1    materials that are attached, she lists the references and
2    relied upon materials.  Exhibit E of her report, specifically,
3    Your Honor.
4                    And as you can see here, these are -- and I'll
5    just go through these and focus on a few of them to
6    specifically answer your question.  She relied upon and cited
7    16 different studies concerning PCIA, and more specifically
8    Taxotere-based regimens versus Adriamycin and Cytoxan.
9                    And I'd like to go through just a few of those,
10   zeroing in on the question that you asked.  Dr. Tosti draws on
11   her knowledge of the scientific literature to rule in Taxotere,
12   and you identified this correctly, Your Honor, as the most
13   probable cause.
14                   And let's look at some of these studies, the
15   studies that she looks at.  The first you see is the Kang
16   study.  And the Kang study, this is not just some random case
17   reports.  Specifically, Your Honor, the Kang study, which is a
18   relied upon material of Dr. Tosti, is a prospective cohort
19   study.  It was a clinical trial.  It was designed --
20   specifically designed to study if Adriamycin and Cytoxan with
21   Taxotere and without Taxotere resulted in permanent
22   chemotherapy-induced alopecia, the situation that we're talking
23   about right here.
24                   And what they did in this particular study, Your
25   Honor, is they followed these women at one month following

1    chemo, at three months, at six months, and then at three years,

2    three years being the time when certainly they would have

3    expected hair regrowth.

4                    What was the result of that study?  With the --

5    they specifically looked at AC, they looked at FAC, as you're

6    familiar with, Your Honor, and then they looked at AC followed

7    by Taxotere.  That is the exact regimen, with the exact same

8    dosage, by the way, that Barbara Earnest took in this case.

9    And what did clinical trial -- that prospective cohort study

10   reveal?  That with AC followed by Taxotere, the odds were eight

11   times higher of a patient getting permanent

12   chemotherapy-induced alopecia.

13                   She also looked at the Martin study.  And the

14   Martin study looked at Taxotere-based regimens, including the

15   TAC regimen, which Barbara Earnest took.  And it found that out

16   of the 358 cases, that ten percent of those suffered from

17   severe permanent chemotherapy-induced alopecia.

18                   Your Honor, I have a photo, if you'd like me to

19   show you, of Barbara Earnest.  And everyone agrees in this case

20   that she suffers from severe permanent chemotherapy-induced

21   alopecia.

22                   In the Martin study, those that took the AC

23   regimen without Taxotere, zero percent, none, reported severe

24   permanent chemotherapy-induced alopecia.

25                   We see the Bourgeois study, which has 104

OFFICIAL TRANSCRIPT

1   Taxotere regimen PCIA cases.  Look at the AC regimen in the
2   Bourgeois study.  There were only four.
3                   The Masidonski study, you had 11 cases of PCIA
4   with Taxotere.  AC, you only had two cases.
5                   And then Sedlacek, which we've heard about
6   before, and that abstract, that paper presentation by
7   Dr. Sedlacek.  Do you realize the AC regimen in his study, zero
8   of the 258 women had PCIA?  And the Taxotere regimen, we ended
9   up with 6.3 percent, and that was an ACT regimen, Taxotere
10  regimen, just like Barbara Earnest.
11                  And so it's based on her knowledge of the
12  literature in this area, which is the science.  And she, being
13  a scientist, quite frankly, and has contributed to this, and
14  done these studies, and is involved in this, and she lives and
15  breathes this.  This is not her going and checking out a few
16  case reports.  And based upon her study, her analysis, her
17  experience as a clinician, and as a scientist, she concluded
18  that Taxotere is the most probable cause of Ms. Earnest's
19  permanent lack of hair regrowth.
20                  I think it's important to know that no expert in
21  this case, the defense experts, do not claim that Barbara
22  Earnest's hair loss is caused by A or C.  So you don't hear the
23  defense dermatologist put this up.  Instead, we just hear this
24  from defense counsel, that, "Well, there's case reports."  But,
25  remember, and defense counsel indicated this, case reports do

1    not a causation finding make.

2              There is no scientific support for a conclusion

3    that Adriamycin, or Cytoxan, or that combination, is most

4    probable a cause of Barbara Earnest's permanent

5    chemotherapy-induced alopecia.

6              Instead, the defendant's experts, and we heard

7    about these other factors with regard to Barbara Earnest, they

8    don't -- the defense experts in this case don't try to claim

9    it's one of the other chemo drugs, but, "Oh, maybe it's because

10   she's obese.  Maybe it's because of Vitamin D deficiency, or

11   possibly her age, or her post-menopausal status."

12             We saw that 90 percent of women have some form

13   of alopecia.  As I hear this, I think that we're going to walk

14   out in the hall that 90 percent of women are going to be bald.

15   We know that common sense tells us otherwise.

16             Your Honor, Dr. Tosti ruled out all of the other

17   alternative causes that were suggested by the defense expert.

18   And, obviously, that's an area -- that's fodder for

19   cross-examination both ways, vigorous cross-examination, which

20   we certainly expect.

21             But the bottom line that Taxotere is the only

22   drug with a known causal association of permanent hair loss,

23   and that's what Dr. Tosti concluded in this case was the most

24   probable cause of Barbara Earnest's hair loss.

25             **THE COURT:**  Thank you.

OFFICIAL TRANSCRIPT

1              Mr. Strongman.

2          **MR. SCHANKER:**   Thank you, Your Honor.

3          **MR. STRONGMAN:**   Your Honor, my challenge to the

4    plaintiffs and to what you'll find in Dr. Tosti's report is to

5    say, we admit there are reports with the A and the C of

6    permanent alopecia after chemotherapy.  They admit that.  There

7    are.  Does it look different on -- on an examination of the

8    scalp?  Does it look different on pathology?  No, it doesn't.

9    So Mr. Schanker can talk about an eloquent articulation of the

10   literature, which Dr. Tosti didn't do in her report, by the

11   way.  She has a list of some stuff, but certainly didn't give

12   this analysis.

13              But the point being, there's nothing she did for

14   Ms. Earnest to rule that out other than when you look at the

15   conclusion of her report, she counts case reports.  That's it.

16   It's not tied to Ms. Earnest.  There's no pathology that

17   distinguishes Taxotere from the A or from the C.  There's no

18   examination that can.  And that's why she should not be allowed

19   to come in here and just offer an opinion because, as

20   Mr. Schanker would say, she's a great scientist.  That's not

21   enough.

22              Thank you.

23          **THE COURT:**   Thank you.

24              Okay.  I think the next one is preemption, but I

25   brought my stuff up here.  You're all just going to have to

1   take a break because I'm not going back there.  Just give me a
2   few minutes to get myself situated.  So feel free to move
3   around, do what you got to do.  Just give me a minute.
4                            * * * * *
5              (WHEREUPON, the Court took a recess.)
6                            * * * * *
7          **THE COURT:**  Are you ready, Ms. Byard?  Let's get
8   everybody situated.  Okay.
9          **MS. BYARD:**  Your Honor, Adrienne Byard for Defendant
10  sanofi.  Nice to see you again.
11              If you've read all the briefings surrounding
12  this issue, sort of swirling around this issue, there's been
13  some Supreme Court decisions that have come down, there's been
14  some cases construing the Supreme Court decision, and I'm sure
15  it all appears very, very complicated.  I promise you, it is a
16  straightforward legal issue that I can --
17         **THE COURT:**  Well, that's what the Supreme Court told
18  us, it's a legal issue to be made by the judge.
19         **MS. BYARD:**  They think it is.  They think it is.  And
20  what we do with that, I mean, we'll all see.  Judge Saylor is
21  getting the FDA's view in the *Zofran* MDL.  Other courts, you
22  hear talk of evidentiary rulings, *Markman* type rulings, because
23  we don't know what this job looks like, but I think that I can
24  make it simple for you today.
25              It'll be a little bit slow, but I think it's

OFFICIAL TRANSCRIPT

because of how the expert opinions in this case, just Barbara
Earnest's case, have been articulated.  I think it is a
straightforward issue for us today.

There are three things I would say that you need
to know.  Three things.  The first thing is that plaintiff,
Barbara Earnest, offers a single expert, one expert, who
identifies what sanofi's label should have said, upon which her
state law failure-to-warn claim is going to be premised.

And what he says is that in 2009, sanofi should
have included a capital "W" warning that Taxotere causes
permanent alopecia.  2009, we should have done this.  This
should be a capital "W" warning, and it should be that Taxotere
causes permanent alopecia.

But the reason I'm telling you it's easy, Judge,
is the second thing, the one of two of three things that you
need to know.  The second thing is that both before the 2015
labeling change, and after the 2015 labeling change, plaintiffs
and their counsel asked for a warning and a causation warning.

And the third thing you need to know is that
after two analyses spanning four years, FDA said, "Update two
sections of your label.  Update Section 6.2, post-marketing
experience, and update the patient information brochure."

And what the agency did was not a causation
warning, not a capital "W" warning.  It was on the 33rd page
into the label, "Cases of permanent alopecia have been

1  reported."

2          So what this means is that this is not a fact

3  pattern like so many before the Supreme Court where I have to

4  ask you to hypothesize or speculate with me about what the

5  agency would have done had I done something else.  We already

6  know, the history is already written, and not even David

7  Kessler -- Dr. David Kessler can rewrite it.

8          What's so clear and straightforward about this

9  case is that we know from the regulations, the Federal

10  Register, the CFR, and the FDA guidance, we know that that

11  capital "W" warning is reserved by the agency for things akin

12  to death and inpatient hospitalization.

13          Two, we know that the agency declined to adopt a

14  causation warning, and we're going to see this.  And we know

15  that that happened in 2015 based on the evidence that was

16  available in 2015, let alone the less significant body of data

17  that was available in 2009.

18          So here the labeling change that Dr. Kessler is

19  going to tell this jury I should be held liable for not having

20  adopted is one that the agency has said no to, unequivocally.

21  And Dr. Kessler and plaintiff cannot ask a civil jury to impose

22  liability on me when it's something that I would have to go

23  back to the agency, go back to FDA, and ask it to allow, ask it

24  to permit.

25          So I want to -- I just want to talk broadly for

1   15 seconds, which is that Taxotere is sold in a vial, taken out
2   by a syringe, diluted, put into an IV bag, it's administered
3   for an hour intravenously every three weeks.  And what this
4   means is that Taxotere's only lawfully sold on the prescription
5   of a doctor.  That's a good thing.  But what it also means,
6   because Taxotere is sold in interstate commerce, is that it is
7   subject to the enforcement authority of the federal Food and
8   Drug Administration.  That's a good thing.  The agency's job is
9   to ensure that beneficial medicines, safe medicines, are
10   available to improve people's lives.
11            But that FDA approval, Your Honor, comes with
12   approval of the precise language that has to be included in the
13   medicine's labeling.  The fact that I, as sanofi, the
14   manufacturer, can't unilaterally decide what goes in the label,
15   I agree, it's another good thing.  But what that means is that
16   the third branch of government, the court system, has a special
17   and unique, here, narrow place to fit into the picture.  Where
18   the third branch of government fits in is where it doesn't
19   impede the essential public health prerogative of the federal
20   agency.
21            If I had to go to the agency, Your Honor, and
22   say, "Would the agency allow me to make this change," that's
23   already putting the cart before the horse.  So I think that
24   there is an inclination to say, "Couldn't you have at least
25   proposed to the agency?  Couldn't you have pushed a little bit

OFFICIAL TRANSCRIPT

harder?"  And any time we ask that question, we're
automatically operating in a fact pattern where the state claim
is preempted, and here's why:

If the jury says that I have to put a capital
"W" warning on my label, Dr. Kessler testifies to that, he says
it has to be a capital "W" warning, it should have been in
2009, that's what the testimony, the claim that comes in,
that's the evidence that's before the jury, the jury comes back
with that verdict, I wouldn't be able to walk out of this door
and do that tomorrow.  I would have to go back to the agency to
make that change.  And so we don't have the cart before the
horse, the civil jury doing that --

THE COURT:  How does the changes being effected
factor in?

MS. BYARD:  Yes, absolutely.  I would love -- so I
don't think we even have to get to changes being effected.

THE COURT:  Well, I want to get that.

MS. BYARD:  That's fine.  We can.  Changes being
effected is the unilateral path where I can act independently,
and it's when data accumulates, and there's new evidence that I
don't relay to the agency.  So I will submit to you, and I can
show you a slide demonstrating this, all of the evidence that
Dr. Kessler relies upon was evidence that was before the agency
in 2015 when it decided what to do.

The 2011 clinical overview that we provided to

1    the agency in January of that year is 444 pages long.  We

2    provided another analysis in 2015 on this issue.  You know,

3    *Wyeth versus Levine* and *Albrecht* ask me to show you that the

4    agency was fully informed and had the record of the information

5    upon which the state tort law claim would be based.  I'm asked

6    to show you that.  And there's not anything that Dr. Kessler

7    points to as being justification for a capital "W" warning that

8    was not provided to the agency.

9                There's not this accumulation of data over time

10   that sanofi wasn't passing along.  We were working hand-in-hand

11   with FDA to do this analysis, and the agency said, "Update the

12   33rd page and put 'Cases of permanent alopecia have been

13   reported.'"  They didn't say capital "W" warning.

14            **THE COURT:**  I guess what -- preemption in this

15   context, it's an impossibility preemption --

16            **MS. BYARD:**  Correct.

17            **THE COURT:**  -- which means that -- and I think, as I

18   read it -- and maybe I need to back this train up, and who's

19   burden is it to show?  Because it seems to me that it's a

20   defense.  So it's your burden to carry.  And so because this

21   is -- burden to show that the FDA clearly would not have

22   approved this change --

23            **MS. BYARD:**  Yeah.

24            **THE COURT:**  -- and that you could not comply with

25   state tort law, and you could not comply with federal law at

OFFICIAL TRANSCRIPT

1    the same time.  And so that's why -- you know, with this

2    changes being effected, I don't know.  It seems like to me that

3    this is -- I think they've called it a demanding defense.

4            MS. BYARD:  I'll show you that I could not have

5    adopted a capital "W" warning that's permanent -- permanent

6    alopecia causation.  I can show you that.  I can demonstrate

7    that.

8            But if you look at it under the changes being

9    effected guidance too, I can show you that I could not have

10   made that change unilaterally.  Even though we updated the

11   label in 2015, we did it hand-in-hand with the agency, and

12   that's because at no point in time was there evidence

13   accumulating that we weren't analyzing with the agency, that we

14   weren't giving to the agency.

15           THE COURT:  So you're telling me that you could not

16   have adopted a changes being effected change in the label?

17           MS. BYARD:  No.  And FDA had us, when they said we

18   should update the label, they had us submit it for approval as

19   well.  So we used it -- we did it -- we called it a CBE

20   package, but the agency told us to submit it to them, and then

21   they formally approved it.  There's a formal approval package

22   I'd like to show you that is really great on the first point.

23   No, it couldn't be --

24           THE COURT:  So changes being effected is never

25   unilateral?

1          **MS. BYARD:**  Yes, changes being effected is.

2          **THE COURT:**  Once evidence is accumulated, changes

3    being effected is a unilateral thing that is available to drug

4    companies?

5          **MS. BYARD:**  Correct.  It's available to drug

6    companies if there's new evidence of a different or greater

7    risk not provided to the agency -- not previously provided to

8    the agency.

9               So there's three pieces of the CBE.  Newly

10   acquired, so things that they didn't look at before; not

11   previously provided, so they don't want to see -- they don't

12   want to see me coming in and saying, "Wait.  There are lawsuits

13   being filed now.  Remember the data I showed you in 2011?

14   Remember the TAX316 data that I gave in 2004?  Remember that?"

15   I've already given it to them.  That's not a CBE change because

16   I've already given them that data.  And it has to be of a

17   different severity or greater risk than what I provided for

18   them before.

19              So, again, that TAX316 data is a good example,

20   the risk data between the five-year data and the ten-year data.

21         **THE COURT:**  How do case reports factor into -- you

22   know, you do the study --

23         **MS. BYARD:**  Yes.

24         **THE COURT:**  -- and then you get these case reports

25   that people are reporting, you know, "I've got a problem with

OFFICIAL TRANSCRIPT

1    persistent alopecia.  I've got a problem with persistent

2    alopecia," and then -- is that something that you would bring

3    to the FDA to say --

4              **MS. BYARD:**  Yeah.  Absolutely.  Here, I'll show you

5    this, Your Honor.

6              **THE COURT:**  Yeah.  You know, some of this, I don't --

7              **MS. BYARD:**  You're going to have to be patient with

8    me because I'm going to have to find my way back, like Hansel

9    and Gretel.

10             **THE COURT:**  That's fine.  I just -- some of this, I

11   don't want to hear.

12             **MS. BYARD:**  So if you -- if you look at the case

13   reports which are cited, in Dr. Kessler's report, he comes for

14   Madigan.  Right?  And then there's the literature too.  I want

15   to show you both of those.

16             So the Sedlacek abstract that they make a lot of

17   noise about in 2006, here's the thing, every single year, I, as

18   a manufacturer, am completing what's called a periodic safety

19   update report.  And so all of the adverse event reports that

20   have come into the company during the reporting period that

21   year get bundled up, and they get sent.

22             So, as an example, this 2011 clinical overview,

23   so where when mined a thousand reports of alopecia and sat and

24   analyzed each one for whether that permanent alopecia was

25   really permanent, was it persistent, was it ladies who were

1   claiming that their hair still hadn't regrown 12 years -- 12
2   months after the fact, that goes in my periodic safety update
3   report to the agency in January of 2011, and I give it to them.
4   So they have all of those case reports within a year because
5   I'm reporting -- every year, I'm giving the agency all of the
6   data.
7                   And what's more --
8            THE COURT:   So how does that work?  Because I'm
9   just --
10           MS. BYARD:   Yeah, highly regulated.
11           THE COURT:   -- I'm very curious.  How does it work?
12  I mean, do you have to say, "Listen, FDA, we have an uptick in
13  these reports and these problems," or is it something that you
14  hand them this stack of information and say, "You might want to
15  go through this and see if there's something you want me to
16  do"?
17           MS. BYARD:   So what we did in January of 2011 is that
18  we flagged the issue of persistent permanent alopecia as a
19  current safety issue under review, and we explained to FDA that
20  the French authorities had asked us about it.  And then we went
21  through -- and the 2011 clinical overview -- I mean, I know
22  it's -- you've got a lot of reading on your hands, but --
23  but --
24           THE COURT:   That would be an understatement.
25           MS. BYARD:   Right.  So here's what we did, Your

OFFICIAL TRANSCRIPT

1   Honor, and this is what we gave the agency in 2011.  Let me
2   come back to it.
3                   So in 2011, we --
4                   Thank you.  Torrey is who should really be doing
5   this.
6                   This is our clinical overview.  And so after we
7   walked through all of the data, all of the reports, we tell the
8   agency that these reports of persistent alopecia, we didn't
9   think that there was any causal relationship to docetaxel
10  because of these factors.
11                  We said, "We looked at these reports, FDA,
12  French authorities, and there were ladies who had lost their
13  hair before they were ever on our medicine.  There were ladies
14  who had a lot of co-morbidities associated with the onset of
15  alopecia," not surprising, breast cancer, surgery,
16  hospitalization, co-morbidities, when they're describing that
17  they have alopecia.
18                  We told them that there was a time lag for some
19  of these women between when they're developing alopecia and
20  when they had already stopped chemo.  And that's not -- that's
21  something we see in the cases too.  It's not surprising to me.
22  We see women that start experiencing alopecia when their hair
23  regrew after chemo.  And that's what we told the agency in our
24  review.
25                  And then --

OFFICIAL TRANSCRIPT

```
 1              THE COURT:  Wait a minute.
 2              MS. BYARD:  Yes.
 3              THE COURT:  Maybe I need to understand this.
 4              MS. BYARD:  Yes.
 5              THE COURT:  So the hair started growing back after
 6    chemo?  They had --
 7              MS. BYARD:  And then they're saying --
 8              THE COURT:  -- a full head of hair, and then it all
 9    started falling out again, or it just didn't grow back?
10              MR. GIBBS:  When you look at the reports, there are
11    definitely instances like that, and I would say that's true in
12    the inventory, too.  We see cases where the hair grows back
13    after chemo and starts to fade again, I would say with other
14    factors, with age.  Yeah.  Yeah.
15              So the other thing that we pointed out to the
16    FDA is that we had cases where the characteristics of the
17    patient were the exact same, and some of them began regrowing
18    their hair again.  Even though it was 12 months later, they
19    just started regrowing their hair again.  And those patients
20    were in no way different than the women who -- whose hair
21    wouldn't start regrowing again.
22              So because of that, in our safety discussion and
23    conclusion that was provided to the agency in January of 2011,
24    we say that alopecia appears commonly, but persistent alopecia
25    cannot be predicted, and the available evidence doesn't show
```

1    that irreversible alopecia is being caused by docetaxel alone.

2    We say, "Here it is.  We looked at it.  It's an issue under

3    review.  It's in our periodic safety update report in January

4    of 2011.  It's No. 28."  And this is the information that was

5    provided.

6                So back to your question, Your Honor.  Is there

7    a gap in time?  The suggestion, if you look at *Wyeth*, if you

8    look at *Albrecht*, what's happening in those fact patterns, the

9    question isn't decided.  It gets, you know, pushed back in

10   *Albrecht* to the lower court again to do this issue of law,

11   which is hard, and doesn't feel like a lot of law.  But what

12   happens in those fact patterns is that these case reports start

13   coming in and accumulating, and at least on the record before

14   the Supreme Court, there's not it being submitted to the

15   agency.

16               And the reason why I say I don't even think you

17   need to get to the CBE is because we submitted it to the

18   agency, and the agency did something.  And what the agency did

19   was not a capital "W" warning.

20               If you'll bear with me on this.

21               So it's not surprising that it's not a capital

22   "W" warning because in 2011, the agency had put out guidance

23   for manufacturers about what constitutes a warning, and it's

24   death, it's life-threatening adverse events, it's inpatient

25   hospitalization, you see congenital anomaly or birth defect.

1  Alopecia is in the 2011 FDA guidance, and it's in there for
2  cancer drugs.
3            And if you look at the 2011 guidance, what it
4  tells you is that alopecia attendant to a life-saving drug for
5  cancer can be considered less clinically significant and not
6  appropriate for a capital "W" warning.  It's in the 2011 FDA
7  guidance.
8            So what happened, Your Honor -- and, again, what
9  I said the good news is, that you don't have to speculate, you
10  don't have to hypothesize, you don't have to guess about how
11  the FDA would have applied that regulation and that guidance to
12  our fact patterns because they did it.  They already did it.
13  The history is written.
14            After we submitted our four years, two analyses
15  of data to the agency, the agency said, "Amend the package
16  insert Section 6.2, and the patient information, if
17  appropriate."
18            I wanted to show you where on the label that it
19  appears just so you can see this is 33 pages in, and it's,
20  "Cases of permanent alopecia have been reported."
21            But there's a debate that starts developing
22  around the time of either our supplement or the plaintiffs' sur
23  reply about whether I, the manufacturer, have to -- have to
24  have been the one to propose a warning -- a capital "W" warning
25  for there to be preemptive effect.

OFFICIAL TRANSCRIPT

And it's clear throughout the line of cases that
we just have to say some indication, some affirmative
indication from the agency, in a formal action -- in a formal
action like the letter, like the approval letter, that the
agency makes an affirmative determination to preserve the
warning language as is.

And we have that here.  And the reason we have
it here -- so I told you the first thing that you were going to
know -- that you needed to know was Dr. David Kessler says
capital "W" warning.  The second thing is that plaintiffs and
their lawyers were heard by the agency.  They went to the FDA.
We found this out during the litigation.  That before FDA comes
to us and asks us for our analysis of permanent alopecia, the
plaintiffs, and at least one lawyer by phone, had met with the
agency in April of 2015.

And they had -- the plaintiffs had talking
points to have that conversation with the agency, and one of
them is when -- when is it enough for the agency to require the
manufacturer to revise their label?  That's what they're
planning to ask the agency.  So what happens after that is that
sanofi's asked to analyze the data; it does.  It provides it to
the agency.

The other benefit that we have in the lawsuits
now is that we have the internal communications to FDA.  And
I'm not suggesting that the e-mails have some sort of

1    preemptive effect; but what it shows you is that they
2    considered the capital "W" warning, and they considered the
3    causation warning, and that letter that we have ordering us to
4    update Section 6.2, and then later the approval package that we
5    have approving the label change they directed us to make, that
6    those are precisely the meaning that I am telling you they
7    have, which is that it was not a capital "W" warning.  The
8    agency decided to preserve the warning language that they had
9    suggested to us, which was Section 6.2.
10                  So what FDA is talking about here, Your Honor,
11   is that after they received our data, there were two breast
12   cancer teams at the agency who reviewed the data, and it was
13   determined that virtually all the described cases were
14   confounded by the use of other chemotherapy agents, other
15   cytotoxic agents, that were also known to cause alopecia.
16                  And so then what does the agency do?  The agency
17   concludes -- you've seen this before.  I think the sponsor
18   simple statement that "permanent cases of alopecia have been
19   reported" is all that can reliably say given the tremendous
20   limitations of the available data.
21                  So this is the agency.  They've ordered us to
22   update Section 6.2 in the patient information.  We say, "Here
23   it is."  And they say, "We think that's all that can reliably
24   say given the tremendous limitations of the data."  The capital
25   "W" warning Taxotere causes, 2009?  We know in 2015 it's just

OFFICIAL TRANSCRIPT

1    not the case.  I don't have to ask you to hypothesize or

2    speculate; the agency has told us.

3              So this is -- this is the other thing, again,

4    it's not the e-mails that have the preemptive effect, but I'll

5    tell you what does have the force of law that a civil jury

6    cannot second-guess is the approval.  In the supplemental

7    approval that comes to sanofi in December of 2015, when they're

8    deciding whether or not to accept the labeling change, and

9    they're setting out the agency's reasoning and rationale for

10   it.

11             THE COURT:  Do you know why they don't date anything?

12             MS. BYARD:  You have to go to the fax transmittal,

13   which is the last page of the document.  And every single time

14   you're thumbing through it -- this is on page 130.  I mean,

15   it's an official agency document.  It's an approval package.

16   This is the medical review, and it's on page 130, and you have

17   to go to page whatever to find out what date it was.

18             THE COURT:  Well, I never could find it.

19             MS. BYARD:  Well, I can tell you this one --

20             THE COURT:  And I was struggling.

21             MS. BYARD:  -- is December 7th.  December 7th,

22   because it's on the facsimile.  Torrey taught me all of this.

23   This is the only reason I know this.

24             So here's what the agency said.  This is its

25   formal medical review.  Okay?  It says, "Alopecia is a well

1    known complication of numerous cytotoxic agents, including the
2    taxanes such as docetaxel."  Here's where we know that the
3    agency considered and rejected the conclusion that the label
4    change should be anything different than what they ordered.
5    And they said, "Oncology patient advocates contacted the agency
6    to express concern that the current docetaxel label, which
7    describes alopecia as a common adverse reaction, did not
8    reflect that it could be permanent" -- "that alopecia could be
9    permanent."
10           So then it describes what I told you, the rest
11   of the story.  We submit the data.  Here's where they go with
12   it.  "Most of the reports do not provide an outcome for the
13   alopecia.  In 70 percent of the cases, patients had received
14   docetaxel as part of the chemotherapy regimen that included one
15   or more agents also known to cause alopecia, significantly
16   confounding the determination of causality."
17           And so then what did they decide to do in the
18   official approval package for the 2015 label change?  It says,
19   "FDA and the sponsor have agreed upon the following label
20   changes to be applied:  Addition of a statement that cases of
21   permanent alopecia have been reported."
22           So we know the evidence, newly acquired, old
23   evidence, what have you, doesn't matter, was submitted to the
24   agency.  The agency looked at it, considered it.  They heard
25   from the plaintiff, and one of their attorneys, in fact,

1    Bacchus and Schanker, Ms. Earnest's counsel, and they said,
2    "Here's what we're going to have the firm do.  Here's what
3    we're going to have the manufacturer do."
4              So plaintiff's request was a black box warning.
5    The other thing that's interesting is that FDA then loops back
6    to the plaintiffs and explains to them what they've asked
7    sanofi to do.  You have that in the supplement.
8              Here's the good thing, Your Honor, because I
9    think we see the plaintiffs talking to the agency, and we have
10   the -- maybe the inclination to say, "Well, if we were the
11   agency, what would we have done?  Would we have done something
12   different?  Would we have put it on page 33?"
13             But what I want to tell you and just pause for a
14   second to do is that the deference to the agency is a good
15   thing.  All right?  So sanofi not being able to make unilateral
16   label changes on its own, that's a good thing.  The civil jury
17   not being able to apply a state tort law to require me, sanofi,
18   to do something that the agency has told me no, that's a good
19   thing.
20             Because had FDA determined, the government
21   scientists at the agency determined, that this was a serious
22   adverse event that should be in the warnings, the regulations
23   that bind that branch of government invested with the public
24   health prerogative would have required them to make me change
25   it.  So the agency deference here is a good thing.

OFFICIAL TRANSCRIPT

1              This is the documentation that just shows the
2    plaintiff lawyers soliciting more lawsuits, and also talking
3    about their involvement in the conversation with the agency.
4    It's our supplement, Exhibit H.
5              What's interesting, though, Your Honor, is that
6    the story doesn't end here.  And, again, I'm not saying the
7    e-mails have a preemptive effect, but I'm --
8              **THE COURT:**  They don't.
9              **MS. BYARD:**  I know they don't.
10             **THE COURT:**  I want to -- I'm really not interested in
11   letters from counsel to the FDA.  I am more concerned about
12   impossibility preemption.  I told you CBA regulations, you
13   know, those --
14             **MS. BYARD:**  I'll end this -- I'll end this --
15             **THE COURT:**  -- those -- you know, so --
16             **MS. BYARD:**  Yes.  I'll end this here just because it
17   loops --
18             **THE COURT:**  You know what, I feel like this, I just
19   don't want to go there.  I think what's important, in my view,
20   is the interactions between sanofi and the FDA --
21             **MS. BYARD:**  Okay.
22             **THE COURT:**  -- and whether or not sanofi was
23   basically precluded from changing the warning.  Now, and this
24   is what I want to ask you.
25             **MS. BYARD:**  Yes.

OFFICIAL TRANSCRIPT

1          THE COURT:  I'm familiar with what a black box

2     warning is --

3          MS. BYARD:  Right.

4          THE COURT:  -- but are there other precautions and

5     warnings that are available that are outside of the black box?

6     Because I know black box means, "Listen, somebody may die if

7     you do this."  So I'm familiar with that.  So I think what I'm

8     hearing is it's either black box warning or --

9          MS. BYARD:  No, I'll show you.  So this is the first

10    page of our medicine's label.  The very first page has a

11    "warnings and precaution" section.  What it has in there, Your

12    Honor, are things like a secondary cancer.  Okay?

13               So, you have breast cancer, you do chemo -- I

14    don't know that we understand it, genetic mutation because of

15    chemo, who knows, you develop a --

16         THE COURT:  So this would be in an adverse reaction,

17    not in a warning; is that what you're telling me?

18         MS. BYARD:  No.  This is the warnings and precaution.

19    This is page No. 1.

20         THE COURT:  Right.  Right.

21         MS. BYARD:  So alopecia is in adverse reactions.

22         THE COURT:  Right.  Okay.

23         MS. BYARD:  Alopecia is in adverse reactions.  And

24    then the agency tells me to put in Section 6 also.  So this is,

25    you know, "Recent Major Changes" is the first heading.  "How

You Use the Medicine," is the second heading.  "How You Dose It
and Administer It," is the third heading.  You've got
"Contraindications," so who shouldn't take medicine.  Maybe
you're on medicine A and you can't take that if you're on
medicine B.

        **THE COURT:**  I got that.  I know what a
contraindication is.

        **MS. BYARD:**  Then you have your "Warnings and
Precaution" section.

        **THE COURT:**  Right.

        **MS. BYARD:**  What FDA tells us to do based on the same
data that Dr. Kessler is saying it should be a capital "W"
warning, they told us --

        **THE COURT:**  What it should have been -- and so Dr. --

        **MS. BYARD:**  -- they told us to change Section 6.2.
Warnings and precautions that Dr. David Kessler is telling us
to change, that he would ask a jury to hold me liable based on,
is on page 1, and it's this "Secondary Malignancy."  So I have
breast cancer, I take chemo, and then I get one of the soft
cancers, one of the blood or soft cancers.  It's things like,
"If you're pregnant and you're on chemo, the fetus may die."

        **THE COURT:**  Right.

        **MS. BYARD:**  Alopecia is not on this list.  And the
agency had the same information the civil jury will have, and
upon which David Kessler would say it should be a warnings and

1  precaution.

2           I'll close the loop, if you don't mind, because

3  I don't want you to be, you know, frustrated by the e-mail

4  traffic.  The reason it matters is that in 2018, the plaintiffs

5  go back to FDA again, and they say, "Shouldn't it be given more

6  prominence in the warning?  Shouldn't it be given more

7  prominence?"  They say that.  And what the agency directs the

8  plaintiffs to is the 2011 FDA guidance which has alopecia as

9  the hallmark example of something that is not a warnings and

10 precaution in the context of cancer and chemo.

11          Again, it gives us a more complete picture.  The

12 final agency determinations that are preemptive here are the

13 supplement request on the agency letterhead saying this is the

14 section you update, and the final approval package -- the final

15 approval package, which is, again, this formal document that

16 has the medical review in it and explains why they've made the

17 decision that they did.

18          Clearly, the agency in those contexts is acting

19 within its constitutionally delegated authority to weigh the

20 public health benefits and risks.

21          The agency has described this before, Your

22 Honor, in a little bit more detail.  And it's in the slide, so

23 I won't belabor it.  But there's a reason why they put what

24 they put in the warning, and it's so that other information

25 doesn't get diluted, and they don't put hypothetical risks in

1    the warning either.  You know, they put in secondary cancers,

2    they put in fetal death.  They don't put in hypothetical -- and

3    you see their analysis, their formal agency determinations,

4    that this is one where it's possible.

5                    Okay.  So the last thing I want to show you

6    because you're interested in the CBE piece of this, which I

7    don't think we even have to get to because I think we know that

8    the agency rejected a capital "W" warning, and that's the only

9    expert opinion that they have offered, is that I don't think

10   you have to concern the case with the changes being effected

11   because what happened here is that all along the agency was

12   getting the information that was accumulating about this issue.

13                   So in May 2010, the FDA does a class-wide label

14   change.  So all the taxane drugs, they change from "Hair

15   generally grows back," to, "Hair loss," period, and they just

16   list it.

17                   So in 2010 and 2011, when we conduct our

18   analysis -- our 444-page analysis, we give it to the agency.

19   That's PSUR 28.  We've given them by that point the TAX316

20   ten-year data too, which is the thing that plaintiffs are

21   hanging their hat on.  That goes to the agency.  It's provided.

22   And what sanofi gets back is a letter from the agency that

23   relieves us of our post-market study obligation.  "You're done.

24   We approved the drug in 2004 for adjuvant.  We approved it

25   before in 1996 for metastatic.  Your post-market study

1    obligations are done.  You can stop studying it now."

2              That's what happens after we give them the

3    ten-year data, after we give them the clinical overview.  They

4    relieve us of our post-market study obligations.

5              I showed you this.  I'm going to skip it.

6    Here's your question on CBE, I think.  Okay.  And that's the

7    agency interactions.  Is there anything that plaintiffs are

8    suggesting should be the basis for civil tort liability that we

9    didn't give to the agency?  And I'm showing you the Sedlacek

10   abstract.  Those patients were included on another one of our

11   periodic safety update reports.  Every year we're sending them

12   in.  That was No. 17.  The clinical overview is 28.  So there's

13   that many more in between.  But those patients are on No. 17

14   and 18.

15             The database that Madigan is mining is FDA's own

16   database.  That's not newly acquired evidence.  The PV

17   database, the pharmacovigilance database, that sanofi

18   maintains, that's the source of all the information that we

19   give them in 2011 and 2015.  FDA doesn't say capital "W"

20   warning.  And then there's the literature.

21             Do you have a question?

22             **THE COURT:**  I'm just thinking.

23             **MS. BYARD:**  There's a lot for a question of law, I

24   know.  I mean, there's a lot.

25             **THE COURT:**  I think I'm going to go back to a

1    question I asked you some time ago.

2              MS. BYARD:  Yeah.  That's fine.  Yeah.

3              THE COURT:  And, you know, there's a lot being said

4    and so I'm going to go back.

5              MS. BYARD:  Okay.

6              THE COURT:  And I want to go back this train up.  I

7    think most people believe that the FDA has some sort of super

8    lab somewhere where they test and they do all of this

9    themselves.  And then when you get into this, you realize it's

10   not the way it happens.  That they are necessarily relying on

11   information provided from the manufacturers, that their -- you

12   now, their reports, their findings.  And I'm just delving into

13   this --

14             MS. BYARD:  Yes.

15             THE COURT:  -- so I'm trying to get my brain around

16   how this operation works.

17                  But I believe I asked you early on, do you dump

18   this stack of documents to the FDA, "Look at what we have now

19   that's come and that we've developed," or do you say, "Mr. FDA,

20   with no dates on anything -- I say that -- I hate that's on the

21   record -- "we are seeing an uptick in this, and our analysis

22   shows this is problematic, and we believe perhaps it needs to

23   be addressed in some sort of way so that people that are being

24   administered this drug, whatever it be, should be aware of this

25   adverse event, these adverse events that we've seen, problem

OFFICIAL TRANSCRIPT

1  areas, and then, as a result, we think the warning -- or

2  parties should be notified that this is out there"?

3                And that's my -- because what I'm hearing is

4  they had all of these reports.  But are we relying on FDA to

5  delve through these reports and say, "Listen, I looked at

6  GEICAM and TAX316 and TAX310, and we're seeing that people --

7  we have reports of persisting alopecia," or is that something

8  that you're obligated to bring to the attention of FDA?  And

9  then if that is then your obligation, is that part of what we

10 call changes being effected where you have this unilateral

11 opportunity to at least put people on notice whether it's a

12 warning or an adverse event notification?

13               And it's hard for me to understand how the FDA

14 works.  That is not my world.

15          **MS. BYARD:**  Right.

16          **THE COURT:**  So that's my -- that's a long way of --

17          **MS. BYARD:**  So the number of regulations that apply

18 to sanofi that we have to comply with on a daily obligation

19 that are overseen and enforced by the agency is monumental.

20          **THE COURT:**  I bet it is.

21          **MS. BYARD:**  It is every second that we take a breath.

22 So, as an example, as sanofi's lawyer, if I'm at a cocktail

23 party and someone says, "I took Taxotere in 2010 and my hair

24 has never grown back," there is a reporting obligation mandated

25 by the agency that extends not only to the firm, the

1    manufacturer, but to its counsel, and that has to be reported.

2                     There's an adverse event, "Jane Doe has

3    introduced herself.  I know who the patient is.  She says she

4    took Taxotere.  She says, 'I have an outcome I didn't want,'

5    and she tells me when it happened."  That becomes a reportable

6    adverse event that I have to at least put -- some of those are

7    reported in 14 days.

8             **THE COURT:**  But that's not an answer to my question.

9             **MS. BYARD:**  So your --

10            **THE COURT:**  My question is:  Do you have an

11   obligation to analyze those adverse event reports and come to

12   the agency with a synopsis of your findings periodically and

13   when you see an uptick --

14            **MS. BYARD:**  Absolutely.

15            **THE COURT:**  -- do you have an obligation to say --

16            **MS. BYARD:**  Yes.

17            **THE COURT:**  -- "We're seeing this"?  And then so my

18   question is:  I know at some point there was a requirement in

19   Europe that something regarding alopecia be reported.

20            **MS. BYARD:**  Absolutely.  Any reports of alopecia that

21   the agency received at the very -- that the manufacturer

22   received at the very least went in a periodic safety update

23   report.  So in the year -- within the year, we provided that

24   report of that adverse event, that patient saying, "I have

25   alopecia" --

OFFICIAL TRANSCRIPT

1    **THE COURT:**  Not that patient --

2    **MS. BYARD:**  -- to the agency.

3    **THE COURT:**  -- the 50 patients --

4    **MS. BYARD:**  Yes.  Yes.

5    **THE COURT:**  -- that we see.  And there is a report

6    that's not a stack of paper, but some sort of synopsis or some

7    sort of findings that we're seeing?

8    **MS. BYARD:**  Yes.

9    **THE COURT:**  You see, I think we're talking about two

10   different things, and I want to make sure I'm understanding

11   what your obligation is vis-à-vis your reporting requirements

12   to FDA.  Is it enough to say, "I sent you the report.  Jane

13   Milazzo said she lost her hair.  I sent you that report"?  But

14   do you have to say, "We've gotten 50 reports from various women

15   that have taken Taxotere and all of them had node positive

16   whatever, and" --

17   **MS. BYARD:**  Yes.

18   **THE COURT:**  -- "they're all -- you know, 30 percent

19   are saying their hair's not growing back"?

20   **MS. BYARD:**  So one of the functions of the periodic

21   safety update report is to identify and analyze those safety

22   signals.

23   **THE COURT:**  Okay.

24   **MS. BYARD:**  So it's not just X number of reports.  If

25   it becomes a safety signal, there is an analysis, which is

1    why -- and another way that a safety signal --

2          **THE COURT:**  It's just not --

3          **MS. BYARD:**  No, absolutely.

4          **THE COURT:**  -- that easy for somebody that doesn't

5    live in this world to understand how this --

6          **MS. BYARD:**  Candidly, I don't think I give the

7    agency enough credit for what they do and the analysis that

8    happens at these companies.  I just don't.  I don't.  Because

9    Your Honor is asking, you know, "Did they really look at it?

10   Do they really" -- it almost sounds like we're talking in

11   general.  That happened here.  That happened here.  We don't

12   have to -- we don't have to worry about what the general

13   operation is because in 2011, sanofi said, "This is a safety

14   issue under review, persistent alopecia, here are the 444 pages

15   of analysis."

16              Then in 2015, the agency says, "Hey, we would

17   like another analysis.  We would like more information on this

18   issue."

19         **THE COURT:**  So from 2011, when you reported it, to

20   2015, nothing?

21         **MS. BYARD:**  No.  There was not an additional -- we

22   would submit the reports in the way that you described.  We

23   would just submit the reports because there wasn't another

24   safety signal that spun a more thorough analysis of the issue

25   during that time.

OFFICIAL TRANSCRIPT

1     **THE COURT:**  In 2011, did they say -- indicate to you

2   that you could not change the label?

3     **MS. BYARD:**  They did not.  They did not.

4     **THE COURT:**  They just -- it kind of went into a

5   "looking at it" category?

6     **MS. BYARD:**  There were label changes that had just

7   been made in May of 2010 where the agency had taken "the hair

8   generally grows back" language out.  So they had just done

9   that.  And there were intervening label changes with the

10  agency, but not to the alopecia language.

11    **THE COURT:**  Okay.

12    **MS. BYARD:**  So the question about burden, Your Honor,

13  the question about burden is that, yes, I have the obligation

14  to show you that I could not do what plaintiffs are asking the

15  civil jury to require me to do in order to avoid liability.

16  That's certainly my burden.  But I have to know what they're

17  telling the jury to impose liability on me for.

18    **THE COURT:**  Sure.

19    **MS. BYARD:**  And what I know in this case is that

20  they're telling me it should have been a capital "W" warning

21  that Taxotere causes permanent alopecia in 2009.  And that's

22  simple.  It's simple.  I know that the agency has said, "No.

23  Update Section 6.2, and update your patient information," in

24  2015 -- 2009.

25          The question is -- that I think you're asking

1   is, "Were we giving this information all along to the agency?
2   Was the agency involved?"  And, again, I can't tell you what --
3   what universe of things they might say wasn't passed along to
4   the agency.  They have to tell me what they think the basis for
5   me to act unilaterally is.
6              But I can tell you that of the things that
7   Dr. David Kessler has identified in his report, the analyses by
8   Dr. Madigan, the data, the Sedlacek abstract patients, I gave
9   all of that to the agency.  So that's not newly acquired
10  evidence not submitted to the agency.
11             And of the literature that's cited in Dr. David
12  Kessler's report are falls in that time frame -- so 2004 is
13  when we have the approval, and then to 2011 when Barbara
14  Earnest gets her medicine, you know, the question is:  Was
15  there any data that accumulated that was not provided to the
16  agency?
17             The studies that Dr. Kessler identifies during
18  that time frame either didn't discuss Taxotere, or were in my
19  periodic safety update report that I gave to the agency, or
20  that I gave them in 2011 when I did that, this is a safety
21  issue under review, this is something that we're looking at.
22  It was all in clinical overview that we gave them in 2011
23  before Barbara Earnest took this medicine.
24             So --
25             **THE COURT:**  Ms. Byard, we're going to have to...

OFFICIAL TRANSCRIPT

1          **MS. BYARD:**  Yeah.  Burden-wise -- burden-wise, I

2    can't -- I can't tell you what basis they're arguing, or what

3    content of what label they're saying the civil jury should

4    impose liability on me.  They've got to tell me that.  I can

5    tell you that everything that they've identified was turned

6    over, and that the only labeling change that they've

7    identified, a capital "W" warning that Taxotere causes

8    permanent hair loss, is one that the agency has rejected after

9    hearing from the plaintiffs and their counsel.

10          That's why I think this is a simple issue

11   because the history has already been written.  We don't have to

12   hypothesize or speculate.  We don't really even have to kind of

13   see when the data was accumulating because we already know that

14   the agency said no.

15          **THE COURT:**  Thank you.

16          **MS. BYARD:**  Thank you.

17          **THE COURT:**  Okay.  Mr. Mura.

18          **MS. BARRIOS:**  Your Honor, would you like a short

19   break at all?

20          **THE COURT:**  Two minutes.  Two minutes, and then we'll

21   come back.

22                    * * * * *

23          (WHEREUPON, the Court took a recess.)

24                    * * * * *

25          **THE COURT:**  When we finish up the argument -- I don't

OFFICIAL TRANSCRIPT

1    know how many of you are rushing out to get planes, probably
2    everybody's already missed it, but I would like to -- for five
3    minutes to just kind of give you an idea of how I see this
4    proceeding.
5                    Okay.  Ready to proceed.
6              MR. MURA:  Thank you, Your Honor.  Andre Mura for the
7    plaintiffs.
8                    I wanted to start with Plaintiff Earnest, but so
9    much of the argument that you heard today really doesn't relate
10   to the Earnest plaintiff; it relates to the 2015 label and
11   plaintiffs who were administered the drug post-2015.
12                   Sanofi's preemption motion is a document that
13   relates only to Plaintiff Earnest.  She was administered the
14   drug in 2011, and that label said nothing about permanent hair
15   loss.
16                   Now, to establish liability under state law,
17   Earnest has to show that the Taxotere label was inadequate.
18   She doesn't have to show what an adequate label would have
19   looked like.  She has to show -- identify the specific risks
20   that were not disclosed, and that's permanent hair loss.  It
21   wasn't disclosed anywhere on the label.
22                   Now, sanofi has said, "Well, what if Dr. Kessler
23   talks about warnings and precautions?"  We have told the Court
24   in our response to the notice of supplemental authority that
25   was essentially a brief, but we've told the Court in response

OFFICIAL TRANSCRIPT

1    to that that we are not going to go beyond the 2015 label in
2    the Earnest case.
3             So this entire discussion about the warnings and
4    precautions and whether the label could have included a warning
5    in that section versus the adverse reaction section, which we
6    know -- I mean, there isn't any dispute about the adverse
7    reaction section.  That dispute is academic.  It's not
8    presented in the Earnest case.
9             That's a legal controversy that's going to come
10   up later potentially in the litigation when you have a
11   plaintiff who was administered the drug with the 2015 label.
12   Because at that point, the label says -- has language in the
13   adverse reaction section, but not in the warnings and
14   precautions section, and therefore the argument there is
15   different -- the preemption argument is quite different.
16            So you don't have to address any of these
17   arguments in the Earnest case, especially now that we've told
18   the courts that we don't plan to go beyond the 2015 label.  So
19   all these arguments are -- there's no legal controversy about
20   the meaning of preemption in the Earnest case.
21            And you're essentially being asked to render an
22   advisory opinion about what the FDA might have done had sanofi
23   actually asked to change the label for the warnings and
24   precautions.  It never asked the FDA or -- and it never sought
25   unilaterally through the changes being effected process to

OFFICIAL TRANSCRIPT

1    change the label to warn in the warnings and precautions.  And
2    I'll talk a little bit more about that, but that's an issue
3    that's going to come up later.
4              I'm happy to answer any questions about that
5    specific point before turning --
6         THE COURT:  Well, I think what I heard from sanofi is
7    that your expert's going to say that belonged in the warnings.
8         MR. MURA:  And I just told you, we've represented no.
9    The experts --
10        THE COURT:  Do you have expert testimony that say
11   that this label needed to be changed and we --
12        MR. MURA:  Our expert testimony also concerns the
13   adverse reaction section.  And so that's at Kessler paragraphs
14   109, 126, 133 to 139, 149, I believe it's 154, 164 to 65.  This
15   is in our response to the notice of supplemental authority.
16   There's significant testimony from Dr. Kessler about the
17   adverse reaction section.  And there really isn't any debate.
18   If you read sanofi's motion on preemption, they say, "Our issue
19   is with any plaintiff who goes beyond the 2015 label."
20             They take no -- that's on page 2.  They take no
21   issue with a plaintiff who's arguing that the label was
22   inadequate because it didn't include language in the adverse
23   reaction section.  So there can be no preemption -- there's no
24   preemption argument before the Court with respect to that.
25             And Dr. Kessler can testify about the adverse

1   reaction section.  He discusses it in his report.  So I don't

2   think there's a legal controversy here that the Court needs to

3   address given the representation that we've made, and given the

4   nature of -- the limited nature of the preemption motion that

5   sanofi has filed.

6           **THE COURT:**  Okay.

7           **MR. MURA:**  But I would like to respond on the merits

8   to the arguments that the Court will see later with respect to

9   *Albrecht* and *Wyeth v. Levine*.  I do think that -- I feel like

10  I'm back in 2009 in the sense that so many of the arguments

11  that sanofi made today were the exact arguments that *Wyeth* made

12  before the U.S. Supreme Court.  They said, "Look, we're working

13  together with the FDA.  We present them all the information.

14  There's no information missing.  And the FDA didn't tell us to

15  make these changes to the label."

16          And what the Supreme Court said in *Wyeth against*

17  *Levine* is, "The manufacturer is primarily responsible at all

18  times for the content of the label."  So you asked the

19  question, "Don't you have to do an analysis?"  And the answer

20  to that is yes.  And you can just look at *Wyeth against Levine*.

21          So what the Court said there is, okay.  There

22  were about 20 incidents that presented the injury, and the

23  company was aware of this.  And so the question was, you know:

24  Was it enough that Wyeth had submitted all the information over

25  time to the FDA and had worked with the FDA to change the

1    drug's label over time?

2              And the court said, "Wyeth could have analyzed

3    the accumulating data and added a stronger warning."  It just

4    didn't.  And so it couldn't meet the first aspect of the *Levine*

5    and *Albrecht* tests.  It couldn't show clear evidence because it

6    couldn't prove that it had actually fully informed the FDA.

7              And one of the ways you inform the FDA is

8    through a label change, by either proposing a label change

9    through the prior approval supplement process, or unilaterally

10   changing the label, and then it's up to the FDA.  The FDA can

11   then reject that label.  Right?  And so if the FDA then rejects

12   that label through a considered and formal process --

13             **THE COURT:**  Mr. Mura, when do you think the label

14   should have been changed?

15             **MR. MURA:**  Well, Dr. Kessler's testified, and he gave

16   a -- I think it should have been changed as early as 2006.

17   There's evidence of that.  And there's a Sedlacek report.  I'm

18   happy to go through that.  It's in our statement of facts.  But

19   we only have to provide a case specific response based on the

20   date of administration.

21             **THE COURT:**  Right, which is for Ms. Earnest.

22             **MR. MURA:**  So for Ms. Earnest, certainly by 2011, and

23   that is the only opinion that Dr. Kessler needs to give with

24   respect to Ms. Earnest.

25             Sanofi has said that this is contrived because

1    he looked at 2009, and that's when Francis was administered the

2    drug.  But if you look at his reports, and this is paragraph

3    11, what Dr. Kessler says is, "Well, I was asked to provide a

4    case specific report as to when sanofi had a duty to warn with

5    respect to these individual plaintiffs."  And he says in other

6    cases he will update his report to provide an answer.  And

7    that's paragraph 11 of his report.

8                   He says, "And because of the date of the

9    Taxotere administration to the bellwether plaintiff cited

10   above.  So I'll provide an opinion as to sanofi's duty by as

11   early as 2009."  So that's why we have the 2009 date there.

12   And he looks at 2011 because he was asked to provide an opinion

13   about Earnest.

14                  But if I can go to -- you know, you can look at

15   *Wyeth against Levine* for the answer to your question.  But we

16   barely heard any discussion of *Albrecht*, and the facts of

17   *Albrecht* are directly on point here.  And I think it helps --

18   it'll help the Court understand precisely why sanofi won't be

19   able to establish preemption in post-2015 cases.

20                  So in *Albrecht*, the drug manufacturer, which was

21   Merck, sought to add language to the adverse reaction section

22   and the warnings and precaution section.  Here sanofi only

23   sought to add it to the adverse reaction section.  But there

24   the company tried to add it to the adverse reaction section and

25   the warnings and precaution section.  And the FDA sent a

1   complete response letter and they said, "Put it in the adverse
2   reaction section," but they said no to the warnings and
3   precaution section.

4           So then the company, it had done this through a
5   prior approval supplement, it pulled that, and it filed a CBE,
6   changes being effected, and it unilaterally changed the adverse
7   reaction section.  It didn't change the warnings and precaution
8   section because the company's position is we couldn't.  We were
9   told we couldn't.  Right?

10          And so the FDA -- and so the Supreme Court in
11  *Merck* says that, "To establish preemption, the company has to
12  show two things.  It has to show that it fully informed the
13  FDA, and it has to show that the FDA in turn told the company
14  that it couldn't provide the warning."  And so Justice Thomas,
15  he writes a concurrence where he says, "I'm going to apply that
16  rule, the majority's rule, to the facts of this case."  And he
17  says, "There's no preemption because although the FDA said, put
18  it in the adverse reaction section, they never told you that
19  you couldn't put it in the warnings and precaution section."

20          And he talks about there the complete response
21  letter was part of the dialogue that goes back between the FDA
22  and drug manufacturers.  There was no final agency process that
23  marked the consummation of the agency's decision making.

24          So here all that sanofi can say is it keeps
25  pointing to the letter where it says, "The FDA told us to put

OFFICIAL TRANSCRIPT

1   it in the adverse reaction section," and that's -- I think you
2   have that letter in your record.  And they put it on the
3   screen.  I'm happy to pass it up to you.
4           **THE COURT:**  Why don't you put it on the screen.  Let
5   me guess, it's not dated.
6           **MR. MURA:**  It's not dated.  But you were read No. 2,
7   "Amend the package inserts."
8           **THE COURT:**  Right.
9           **MR. MURA:**  So they were being told to amend the
10  package insert.  But No. 1 is, "Provide any additional
11  information regarding permanent or irreversible alopecia."  In
12  no way is this process the culmination -- the consummation of
13  the agency's decision making with respect to a warnings and
14  precautions because sanofi never unilaterally sought to change
15  the warnings and precautions.  And even in the prior approval
16  supplement, it just didn't make the case for changing it.
17          So you don't have an FDA conclusion with the
18  force and effect of law telling sanofi you cannot change this
19  letter.  They have no such document because it never happened.
20          Now, you had a lengthy discussion about CBE and
21  what newly acquired information means.  And again and again,
22  counsel said, "We gave everything to the FDA."  The definition
23  of "newly acquired information" in *Wyeth against Levine* makes
24  that clear, is that it includes a reanalysis of old data.
25          That's exactly why it doesn't matter if the

OFFICIAL TRANSCRIPT

1  company provides all the data to the FDA.  It has an
2  obligation.  It's primarily responsible for the labeling at all
3  times, and it has to analyze the data.  Surely, sanofi had a
4  significant cause to go back and propose a label change, and it
5  had the regulatory authority to do that.
6              And so for sanofi to keep saying, "None of this
7  is new," is really not sort of in line with what the regulation
8  actually says and the way it defines "newly acquired data" to
9  include old data and a reanalysis of that data.  And here
10 sanofi just never did that reanalysis.
11             So all you have here is sanofi's hypothesis that
12 the FDA would have rejected a proposed label change had it
13 asked.  That's all you have.  Sanofi is hypothesizing that the
14 FDA would have said no.  And it has e-mails, and it has
15 correspondence, and it's trying to make that case, but *Albrecht*
16 tells us that a hypothetical conflict is not enough for an
17 impossibility preemption.
18             Impossibility preemption is a demanding defense.
19 It requires an actual conflict.  And you do not have an actual
20 conflict until the FDA, through the force and effect of law,
21 tells the drug company, "No, you cannot change the label in
22 this way."
23             So for the post-2015 cases, that's going to be
24 the argument about whether they could have changed the label to
25 update it unilaterally to warn in the warnings and precaution

1    section.  Again, that's not an issue that's really before the

2    Court with Plaintiff Earnest.  But it's -- given *Albrecht* and

3    Justice Thomas' concurrence, you know, we just don't see how

4    sanofi can establish preemption under the *Albrecht* test.  And

5    sanofi has not addressed Justice Thomas' concurrence at all.

6              It has not even tried to explain why Justice

7    Thomas' fair application of the majority rule is wrong.  I

8    mean, there the company at least asked to change the warnings

9    and precautions section, and it got a complete response letter.

10   So the fight on remand is going to be whether that complete

11   response letter was the culmination of the agency's decision

12   making process.

13             Justice Thomas says no because he looks at the

14   regulation for complete response letter, and it says that it's

15   not the culmination.  But that's going to be the question on

16   remand.  Here it's much simpler because sanofi never

17   unilaterally sought to change the label to warn of permanent

18   hair loss in the warnings and precautions section.

19        **THE COURT:**  Tell me how the changes being effected,

20   how does that process work?

21        **MR. MURA:**  Yes.

22        **THE COURT:**  I know -- I talked to Ms. Byard about

23   that, but why don't you tell me.  Just tell me how that process

24   works.

25        **MR. MURA:**  Sure.  The company can change the label

OFFICIAL TRANSCRIPT

1   unilaterally.  It does not need permission of the agency if it

2   has reasonable evidence that the label needs to be updated.

3   And so that is based on newly acquired information, which as I

4   explained, is not just new data that hasn't been provided to

5   FDA.  It can be a reanalysis of old data.  Right?  Because data

6   over time accumulates and takes on new meaning.

7                   You may have one adverse event report, but once

8   you have 20, obviously it takes on new meaning.  And you can't

9   just say, "Well, we provided the other 19, so this 20th one is

10  not important."  So there is certainly the opportunity there.

11  And you just have to look at all the evidence -- and this is

12  documented in our statement of facts -- all the evidence that

13  we argue that sanofi could have updated the label at various

14  times, including as early as 2006.  It knew that there was a

15  problem as early as then.

16                  With the Sedlacek publication, it was a study

17  that found 6.3 percent of patients prescribed Taxotere had

18  persistent significant alopecia at a mean follow-up of 48

19  months.  I mean, the internal documents are not good for sanofi

20  here.  I mean, they show the company saying, "Oh, this is just

21  an excuse."  They have doctors contacting them saying, "What

22  about the Sedlacek report?"  They have doctors reaching out to

23  patients.  And the company's just not warning.  It's not

24  updating the labeling, though it could have.

25                  And so -- you know, and you look at the 77-month

1    follow-up, and the ten-year follow-up, which is all before

2    2011, I mean, sanofi is not taking that information and

3    updating the label.  And sanofi to this day has not gone to the

4    FDA and sought to unilaterally change the label.

5            The clear import of *Albrecht* is if a company

6    wants a preemption, go change the label and have the FDA say

7    no.  And if the FDA says no, then you have preemption.  But if

8    you don't ask and get the official no, then there is no

9    preemption.  Then there is no conflict.

10           And all the arguments about how there might be a

11   conflict, or we can look to these conference calls, or the FDA

12   sort of told us on the phone, or the FDA told women who were

13   writing in in an e-mail, none of that has force and effect of

14   law and preemptive effect, and for very good reason.

15           I think the court in *Merck* was confronted with

16   the question of, are we going to allow some FDA official who's

17   five levels down from the only presidentially appointed person,

18   the commissioner, to decide whether to preempt huge swaths of

19   law based on e-mails, based on informal correspondence, based

20   on informal consideration of what's going on, and the courts --

21       **THE COURT:**  So are you telling me the only way that

22   preemption applies in this case is if sanofi had used their

23   authority unilaterally to change the label and then were

24   instructed by the FDA to discontinue that label?

25       **MR. MURA:**  Yes, that's one way in which sanofi could

OFFICIAL TRANSCRIPT

1    show preemption.  I mean, obviously, there are other ways in
2    which the agency can come and tell a company, "You cannot
3    change the label."  There is none of that --
4              THE COURT:  But that's a formal -- that has to be a
5    formal request for a label change?
6              MR. MURA:  That is ordinarily how it happens.
7    There's a formal request for a label change.  Remember, the
8    prior approval supplement is a request.  It's asking for
9    permission.
10             THE COURT:  Right.
11             MR. MURA:  Changes being effected is not asking for
12   permission.  The FDA reviews the CBE submissions, but it's a
13   unilateral change.  The company can change the label
14   immediately.
15                  And so, yes, that's exactly what Justice Thomas
16   is saying.  Because you need the FDA to be fully informed, and
17   they're fully informed when they receive the CBE and the
18   reasons for the specific label change, and then the agency has
19   an opportunity to say no at that point.  And if the agency
20   says, "No, you cannot put this on the label," then there's
21   preemption.
22                  The agency could also have notice and comment
23   regulations.  That's one of the examples provided.  But as you
24   see from the examples, is that you have a considered agency
25   decision that's very well documented.  And you don't have that

1   here.  You're being shown e-mails.  You're being shown

2   correspondence.  You're not being shown that official FDA

3   decision, a rejection, because there was never a proposal with

4   respect to the warnings and precaution section.

5                   So they never got the answer no.  They still

6   haven't gone to the FDA.  They could go to the FDA tomorrow if

7   they were confident that the FDA would say no.  And if the FDA

8   said no at that point, there would be a preemption argument

9   that, you know -- you know, we would be here in a much

10  different posture.

11                  But *Albrecht* teaches that, you know, until --

12  it's a two-part test.  You have to fully inform the FDA of the

13  justifications for the state law change.  That's not just you

14  have to just send information.  You have to inform them of the

15  justifications for the reasons why state law's demanding a

16  change.  And the FDA has to inform the company that it can't

17  make that change for the label.  And that's the standard in

18  *Albrecht*.

19                  It wasn't met there even when the company,

20  Merck, asked to change the warnings and precautions and got a

21  no in a complete response letter.  It's certainly not met here

22  when sanofi has never asked and has never received a no.  So

23  that's quite the easy preemption argument to deal with in this

24  case, especially after *Albrecht*.

25                  So I'm happy to answer any other questions the

OFFICIAL TRANSCRIPT

1   Court has.

2           **THE COURT:**  I think I'm -- thank you.

3           **MR. MURA:**  Okay.  Thank you, Your Honor.

4           **THE COURT:**  Briefly, Ms. Byard.

5           **MS. BYARD:**  Yes, Your Honor.

6               I have three things I'd like to walk through

7   based on the argument from counsel.  The first point I would

8   like to make is that now, one month away from trial, I have now

9   heard on the record from my opponent that they are arguing that

10  sanofi should have included the 2015 label change earlier in

11  time.

12              And this is news to me because Dr. David Kessler

13  over the pages and pages and pages of his expert report has

14  taken the position that sanofi ought to have included a capital

15  "W" warning that Taxotere causes permanent alopecia.  That

16  matters.  Because what my opponent is now saying is that the

17  testimony that will be offered at trial will not be what was in

18  the expert report, will not be what the deposition was about,

19  and it will be something that I have not discovered.  The

20  reason that matters to me is that they are tacitly admitting

21  that the capital "W" warning opinion is one that is preempted.

22          **THE COURT:**  No, I don't think that's why -- that's

23  not what I heard.  I know that's what you heard.  What I heard

24  is this case is about Ms. Earnest, which who was administered

25  the drug in 2011, and it would be a different case if it were a

OFFICIAL TRANSCRIPT

1   post-2015 claim.

2          **MS. BYARD:**  So what they've said, I think, in the sur

3   reply they filed on Monday maybe, or the opposition --

4          **THE COURT:**  I don't know.  I'm lost.

5          **MS. BYARD:**  -- what they've said, Your Honor, and I

6   didn't believe that that's what they were saying until I heard

7   them stand up and say it just now is that they're arguing that

8   the information from 2015 ought to have been in the label,

9   which I understand to be that Dr. Kessler is not going to offer

10  a capital "W" warnings opinion at trial.  I would love to know

11  what the warnings opinion is on what allegation a

12  failure-to-warn claim is being based.

13          Because the one that's been worked up and

14  discovered is one that is preempted.  And I think that's why

15  we're now hearing that that's not what Dr. Kessler is going to

16  say.  I would love to know that.

17          **THE COURT:**  Okay.  I don't -- I didn't hear a

18  concession on the 2015 warning being preempted at all.  Because

19  what I heard is there's not been a final agency determination

20  that would result in a preemption finding by the Court.  That's

21  what I heard.

22          **MS. BYARD:**  Yeah.  No.  But so what I'm hearing is

23  something slightly different, that Dr. Kessler is not going to

24  offer a capital "W" warnings causation opinion.

25          **THE COURT:**  I think you heard that.  I think you

OFFICIAL TRANSCRIPT

1    heard that.  I think what you heard is Dr. Kessler, and I wrote

2    down the paragraphs, 109, 126 to 133.  But I don't have his

3    opinion in front of me.

4         **MS. BYARD:**  I don't have a report, Your Honor, that

5    has an adverse reaction opinion.  I have a capital "W" warnings

6    report.  So I have started on page 21, him starting to talk

7    about how there should be a warning.  And then I go -- he talks

8    about how there should be a warning for 86 -- 87 pages.  And

9    then I have him summarizing his conclusions, Your Honor, on

10   page 87.  He says, "Because the substantial number of factors

11   provided --

12        **THE COURT:**  Ms. Byard, could you get it -- I don't

13   know what you need to do, but I'm seeing only bits of it.

14   Thank you.

15        **MS. BYARD:**  "And because irreversible alopecia is a

16   serious or clinically significant adverse event, a warning

17   regarding irreversible alopecia was warranted by as early as

18   2009."

19             In his conclusion, after 86 pages of him telling

20   me it's a warning, me deposing him on it, my colleague deposing

21   him on it being a warning, us working up this case as a capital

22   "W" warnings case, I believe because there's an acknowledgment

23   that that opinion is preempted, the only labeling opinion I

24   have in this case, Barbara Earnest's case -- I don't care,

25   let's deal with the rest of the MDL later -- in Barbara

1   Earnest's case, I have a capital "W" warnings, irreversible

2   alopecia opinion.  That opinion is preempted because the agency

3   has declined to adopt it.

4                   Second point.  What my colleague is arguing to

5   you as the standard for the agency having declined to change

6   the warning having preserved the warning as is is from Justice

7   Thomas' concurrence.  There was a six-judge majority.

8   Dr. Thomas' concurrence is wonderful academia, but it is not an

9   articulation of the standard that applies for this Court.

10                  And we know this because other courts have been

11  looking at *Albrecht* with us since then.  This is why the

12  briefing has been swirling around because we got *Albrecht*, and

13  we got rulings.  So, as an example, we provide for you that in

14  the state of North Dakota, judges are looking at this with you.

15                  Here's why it matters, Your Honor, is that the

16  plaintiff in that case argued *Albrecht* the exact same way my

17  colleague is here.  Okay?  And, yet, the court does not read

18  *Merck* so narrowly.  The state's argument ignores *Merck's*

19  court's explicit warning that the question of the disapproval

20  method is not now before us.  The *Merck* -- and that's *Albrecht*.

21  They call it *Albrecht*.

22          **THE COURT:**  Yeah.

23          **MS. BYARD:**   -- noted only that the FDA's actions must

24  lie within the scope of the authority Congress has lawfully

25  delegated.

1              And it goes on to say:  "Other agency

2    actions" -- "The court did not decide whether other agency

3    actions, such as the denial of a citizen petition, would be

4    sufficient."

5              And it says:  "The court finds the state's

6    narrow interpretations of *Wyeth* and *Merck* to be nonsensical

7    where the FDA has already rejected a proposed label or a

8    warning change as it did in this case, there's no reason why

9    impossibility of a subsequent change would depend on whether

10   the earlier changes proposed by the manufacturer as opposed to

11   third party or the FDA itself.  Regardless of who submitted the

12   proposed warning or labeling change, the FDA has already

13   decided that the relevant evidence and the policies do not meet

14   the standards to justify a change."

15             And then it goes on talk about the types of

16   methods that could more broadly constitute affirmative agency

17   action.  Because what *Albrecht* talks about, Your Honor, is not

18   just a formal rejection.  It talks about absolutely a decision

19   where the agency orders sanofi in a supplemental request to

20   change the label.  It absolutely includes the 130 plus page

21   approval package where they outline why this is not a capital

22   "W" warning.

23             Okay.  The last thing that I want to talk about

24   is this CBE question.  Because if they get to -- if they get to

25   try a case on an opinion that I haven't heard until today,

1    which is that it's not a capital "W" warning, and that that's

2    not what Dr. Kessler is going to say, and even though

3    Dr. Kessler in his report says 2009 -- well, he's going to come

4    in and say 2011 now.  Great.  It's not going to be a capital

5    "W" warning; it's going to be adverse reactions.  Great.

6               We're going to talk about changes being

7    effected.  Okay?  This is Exhibit A, Your Honor.  This is my

8    third and final point.  Exhibit A to our original motion is

9    Janet Arrowsmith's report.  And here's why I commend this

10   exhibit to Your Honor, because Janet Arrowsmith, our regulatory

11   expert, has gone through the changes being effected much better

12   than I could do, as you saw.

13              And what she does is she describes the process

14   by which the manufacturer can unilaterally make a change.  And

15   it describes the circumstances, which are really quite narrow,

16   where there's a causal association to strengthen the

17   contraindication warning or precaution or adverse reaction.

18              But here's the thing that I think matters the

19   most for Your Honor's purposes, is that that type of unilateral

20   change is only appropriate for newly acquired information to

21   add or strengthen a contraindication warning or precaution only

22   if there's sufficient evidence of a causal association.  And

23   that FDA in response, it doesn't just do anything.  It's not as

24   if I change the label and then I go away.  It just means --

25              **THE COURT:**  No, I understand that.

OFFICIAL TRANSCRIPT

1    **MS. BYARD:**  It means that the FDA approves it on the
2  back end.
3           **THE COURT:**  Right.
4           **MS. BYARD:**  And so this idea --
5           **THE COURT:**  No, I don't think -- I never thought that
6  you would just send a new label and nobody -- I understood
7  that.
8           **MS. BYARD:**  But this idea is that it still remains
9  within the agency's charge to reject that.
10          **THE COURT:**  Sure.
11          **MS. BYARD:**  And here what we have is a record of the
12 agency and FDA working together on the change, and that large
13 approval package specifically dictating why the agency was
14 approving the change that it approved, which is not a causality
15 warning.  It's just "Cases of permanent alopecia have been
16 reported."
17              And I think that's what Your Honor was getting
18 at was both the process, which I think Arrowsmith's report will
19 help the Court with, but then also how we read *Albrecht*.  And
20 it's three standards.  It's three main thrusts, that the drug
21 manufacturer fully informs the FDA of the justifications for
22 the warning by submitting all of the material information to
23 the FDA.
24              That's why the 2011 clinical overview matters.
25 And that's why if you look at -- if you look to -- if you look

OFFICIAL TRANSCRIPT

1    to our charts -- which Torrey's going to grab me -- what
2    matters is that when my colleague stood up today, he says it's
3    2011 and Kessler's going to say 2011, and he's going to say
4    it's an adverse reaction, he didn't identify for you anything
5    that was newly acquired information that was not provided to
6    the FDA.
7                    We have gone through cycle after cycle after
8    cycle of briefing.  We have gone through changes in an expert
9    report that's over 86 pages --
10             THE COURT:  I got it.
11             MS. BYARD:  -- and I still don't know.
12             THE COURT:  I got it.
13             MS. BYARD:  I still don't know what I didn't give to
14   the agency, and upon which they would have a civil jury hold me
15   liable for.
16                    Thank you, Your Honor.
17             THE COURT:  Thank you.
18             MR. MURA:  Your Honor, could I just -- ten seconds?
19             THE COURT:  Ten seconds.
20             MR. MURA:  Thank you.
21             THE COURT:  I'll give you 20.
22             MR. MURA:  What Dr. Kessler was saying, if you meet
23   the warnings and the precautions standard, you necessarily meet
24   the adverse reaction standard.  They overlap in some respects.
25   One just has more factors.  It's the same causal association.

OFFICIAL TRANSCRIPT

1  So I don't think it's correct to read his opinions as only one.
2  It makes no sense as a logical matter or with respect to the
3  regulatory analysis that he did.
4              There are pages and pages of his report talking
5  about adverse reaction.  It's common for language to be in both
6  sections of the label.  He was opining on both sections of the
7  label.  In the representations I've made, I think I've made
8  clear there hasn't been a concession.
9          **THE COURT:**  Okay.  Thank you.
10         (WHEREUPON, the proceedings were concluded.)
11                       *****
12                   <u>**CERTIFICATE**</u>
13         I, Jodi Simcox, RMR, FCRR, Official Court Reporter
14  for the United States District Court, Eastern District of
15  Louisiana, do hereby certify that the foregoing is a true and
16  correct transcript, to the best of my ability and
17  understanding, from the record of the proceedings in the
18  above-entitled and numbered matter.
19
20
21              <u>*s/Jodi Simcox, RMR, FCRR*</u>
22              Jodi Simcox, RMR, FCRR
                Official Court Reporter
23
24
25

OFFICIAL TRANSCRIPT