UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)             MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

**THIS DOCUMENT RELATES TO:**

Elizabeth Kahn, Case No. 2:16-cv-17039.

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE EXPERT TESTIMONY OF DR. DAVID B. ROSS**

Because the PSC's Opposition fails to meaningfully address the arguments raised in Sanofi's Motion to Exclude Expert Testimony of Dr. David B. Ross, Sanofi's Motion should be granted.

**I.  DR. ROSS'S REGULATORY OPINIONS ARE INADMISSIBLE BECAUSE HE HAS NOT—OR CANNOT—ARTICULATE THE FACTS AND DATA THAT FORM THE BASIS OF HIS OPINIONS.**

As set out in Sanofi's opening brief, the problem with Dr. Ross's regulatory opinions is that he refuses to identify the methodology, facts, or data (beyond Dr. Madigan's signal-identification analysis) that support those opinions. Despite repeated inquiry at his deposition, Dr. Ross's most specific answer concerning the foundation for his regulatory opinion is that he reviewed "relevant" documents. Dr. Ross will not, however, explain *which* documents he actually deemed relevant for review or *how* he deemed them relevant.[1] Further, Dr. Ross admits that he

---

[1] Rec. Doc. 12576-3 (Ex. B), Mar. 4, 2021 Ross Dep. at 34:9−23 ("Q. What did you do to determine whether that specific document was relevant to be reviewed by you or not? A. So, I don't know what document – I mean honestly, that's not possible to answer. I mean let me just say this: You know, again, going back to the FDA – I described the methodology here. I have never seen an FDA reviewer say here's how many pages I reviewed, here's what percentage of pages I reviewed. They have access to all of it. But I have never seen that because that's not what's done. And again, I would refer you back to – I describe this in terms of methodology under

cannot testify under oath whether he actually read "Nabholtz, et al. (2001)"[2]—a central piece of evidence that he cites and purports to rely upon in the body of his report.[3]

In their opposition, the PSC fails to address this issue. Instead, the PSC argues that Dr. Ross's opinion is reliable because he "clearly set forth the relevant standard for an adverse reactions warning and the evidence [he] reviewed."[4] The relevant standard, however, is not in dispute. The problem is that neither Dr. Ross nor the PSC can identify the "evidence" that Dr. Ross purportedly "reviewed" with any specificity. The PSC's opposition refers only to this "evidence" in the most generic terms, stating that Dr. Ross based his opinions on "indisputable facts," "the available evidence," "all other bases referenced in Dr. Ross'[s] . . . report[]," "several bases," and "a non-exhaustive list of evidence."[5] Not once does the PSC identify a specific piece of evidence (other than Dr. Madigan's signal-identification analysis) as the foundation for Dr. Ross's opinions. Because the foundation for Dr. Ross's expert opinion has not (or cannot) be articulated, such opinion is inadmissible.

## II. DR. MADIGAN'S SIGNAL-IDENTIFICATION ANALYSIS CANNOT SUPPORT DR. ROSS'S REGULATORY OPINIONS.

The PSC next argues that Dr. Ross is not required to conduct an independent causation analysis, and that Dr. Ross should be permitted to "utilize and rely upon the statistical analysis by

---

"Good Review Practices." So again, it's the same. I mean I've identified methodology there.") (emphasis added); *id.* at 24:5−25:15.

[2] Nabholtz, J. M., et al. "Phase II study of docetaxel, doxorubicin, and cyclophosphamide as first-line chemotherapy for metastatic breast cancer." *Journal of Clinical Oncology* 19.2 (2001): 314-321.

[3] Rec. Doc. 12576-3 (Ex. B), Mar. 4, 2021 Ross Dep. at 242:12−17.

[4] Rec. Doc. 12739 at 6.

[5] Rec. Doc. 12739 at 6-8, 14.

Dr. Madigan in reaching his conclusions."[6] Sanofi, however, does not argue that Dr. Ross should have conducted a causation analysis, or that Dr. Ross should be precluded from relying on Dr. Madigan's statistical analysis. Rather, Sanofi argues that Dr. Ross's regulatory opinions are unreliable because they are predicated on a safety signal *evaluation* that has not been conducted by any of the PSC's experts in this litigation.

"Reasonable evidence" of a causal association requires more than just the identification of possible safety signals. Indeed, for the purposes of prescription drug labeling under 21 C.F.R. § 201.57(c), an "adverse reaction . . . does not include all adverse events observed during use of the drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." To determine whether "there is some basis to believe" that a causal relationship exists requires <u>both</u> safety <u>signal identification</u> and <u>signal evaluation</u>.[7]

As Plaintiff's regulatory expert offered to provide testimony that Sanofi had knowledge of some causal relationship between Taxotere and irreversible hair loss, Sanofi simply argues that Dr. Ross should both *identify* and *evaluate* the safety information available to Sanofi during the relevant time period before forming his opinion. This is consistent with FDA best practices, which provide that once individual case safety reports have been collected from a FAERS (or similar database) search, reviewers should "*evaluate ICSRs* for potential inclusion in a set of similar cases" by applying a predetermined case definition.[8]

---

[6] Rec. Doc. 12739 at 9.

[7] Rec. Doc. 12576-2 (Ex. A), Feb. 8, 2021 Ross Rpt. at 55, 65, 71.

[8] Rec. Doc. 12576-8 (Ex. C), *FDA Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff*, Nov. 6, 2019, at § 7.1.2 (emphasis added). The FDA defines "case definition" as "a set of uniformly applied criteria for determining whether a person should be identified as having a particular disease, injury, or other health condition . . . based on information from the medical literature and current expert clinical practice

This Court has already determined that Dr. Madigan's statistical analysis only identified safety signals that may have existed before the date of Ms. Kahn's treatment—he did not conduct a signal evaluation.[9]  Consistent with FDA best practices, Dr. Ross has acknowledged the importance of signal evaluation, but he admits that he has not reviewed Dr. Madigan's FAERS search to determine whether each report was properly classified as a case of permanent alopecia.[10] Indeed, the safety signals identified by Dr. Madigan have not been evaluated by any of the PSC's expert witnesses.[11]  Thus, although Dr. Ross *may* rely on Dr. Madigan's signal identification, he *may not* assume the results of a signal evaluation that was never conducted.

Because Dr. Ross failed to either confirm that a signal evaluation had been completed or conduct a signal evaluation himself, his assessment that Sanofi had "reasonable evidence" of a causal association is unreliable and should be excluded.[12]

## **CONCLUSION**

For the reasons stated above, and as stated in Sanofi's Motion to Exclude Expert Testimony of Dr. David B. Ross, this Court should exclude Dr. Ross's regulatory opinions.

---

    guidelines.  A case definition comprises a specific combination of signs, symptoms, and test results."  *Id.* at § 7.1.2.

[9]    Rec. Doc. 12098 at 13−14 (Order and Reasons re: Defs.' Mot. to Exclude Expert Testimony of Dr. David Madigan).

[10]    Rec. Doc. 12576-3 (Ex. B), Mar. 4, 2021 Ross Dep. 152:12–15, 156:10–18.

[11]    Because none of the PSC's experts conducted a safety signal evaluation, Sanofi identified the six individual FAERS reports upon which Dr. Madigan based his FAERS analysis.  Upon actual review of these FAERS reports, it became clear that these reports involved a host of other serious conditions with only passing reference to alopecia (and often only referencing alopecia occurring during chemotherapy treatment).  In essence, these six reports say nothing about a potential unexpected risk of permanent alopecia.  Rec. Doc. 12576-7 (Ex. F), Apr. 26, 2021 Chang Supp. Rpt.

[12]    Moreover, when asked to personally complete this analysis by *evaluating* the safety signals identified by Dr. Madigan, Dr. Ross conceded that none of the safety reports indicated an unexpected adverse reaction of permanent chemotherapy induced alopecia.  Rec. Doc. 12576-3 (Ex. B), Mar. 4, 2021 Ross Dep. 82:23−102:11, 197:21−202:2; Rec. Doc. 12576-8 (Ex. G), Mar. 4, 2021 Ross Dep. Exhibits 6−10, 21.

Respectfully submitted,

 /s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: 504-310-2100
dmoore@irwinllc.com

Harley V. Ratliff
Jon Strongman
Adrienne L. Byard
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
hratliff@shb.com
jstrongman@shb.com
abyard@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

5