# EXHIBIT A

Ellen T. Chang, Sc.D.

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3                          - - -
 4
 5   IN RE:   TAXOTERE (DOCETAXEL)
     PRODUCTS LIABILITY LITIGATION,
 6
 7                                          MDL No. 2740
                                            SECTION: "H"
 8   This Document Relates to:              Judge Milazzo
     ALL CASES,                             Mag. Judge North
 9   _____/
10                          - - -
11               Tuesday, May 4, 2021
12                          - - -
13         Remote Videotaped Stenographic Deposition
14   of ELLEN T. CHANG, Sc.D., Volume II, held with the
15   witness located in Menlo Park, California,
16   commencing at 10:04 a.m., before Gina V. Carbone, a
17   Registered Merit Reporter, California Certified
18   Realtime Reporter, California Certified Shorthand
19   Reporter State License No. 8249.
20                          - - -
21
22            GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 971.591.5672 fax
23                    deps@golkow.com
24
25
```

1   forward as a pharmacovigilance expert.

2       Q.  Right.

3           Every deposition you've given in this

4   litigation, you've had the opportunity to review it

5   and to make sure it accurately states what you want

6   it to state, correct?

7       A.  That's right.

8       Q.  Okay.

9       A.  I did notice, actually, when I was

10  reviewing -- I don't know if it matters -- there's

11  one part in, I think, the deposition where I failed

12  to make this correction before.  It should be

13  obvious.  I think Dr. -- I think Mr. Abramson asked

14  a question like, "Six is more than 30, correct?"  It

15  says in the transcript.  And I say, "Yes."

16          And he must have asked, "Six is more than

17  three."  But, anyway, so I didn't make that

18  correction.  Otherwise, yes, I have had a chance to

19  review and make corrections to my deposition

20  transcript.

21      Q.  I just wanted to confirm, you're not -- you

22  don't hold yourself out as an expert in

23  pharmacovigilance.  I think you confirmed that for

24  me.  You said there's some overlap, but you don't

25  hold yourself out as an expert, right?

```
 1        A.   Correct.
 2        Q.   You're not a regulatory expert, right?
 3        A.   I'm not a regulatory expert.  That's right.
 4   I have expertise in -- or I have familiarity with
 5   regulatory issues, but really not in this context.
 6   Not in the pharmaceutical context.
 7        Q.   You're not familiar with the regulatory
 8   requirements for label changes, right?
 9        A.   Correct.
10        Q.   Okay.  If I asked you to give me the Code
11   of Federal Regulations cites for what it takes that
12   sets out either the standard or the evidentiary
13   burden for making a label change, you wouldn't be --
14   you're not the expert to give me that, right?
15        A.   Correct.
16        Q.   Okay.  And have you talked to or read
17   Dr. Aerosmith's deposition to see if she either
18   agrees with us or agrees with plaintiffs' experts or
19   disagrees with them concerning what the evidentiary
20   burden is for a label change?
21        A.   I don't remember.  I've seen something from
22   Dr. Aerosmith.  I thought it was -- I think I've
23   only seen a report rather than deposition, but I
24   really -- listed in -- whatever I've seen from
25   Dr. Aerosmith is listed in my April 2020 report.
```

```
 1   Sanofi's Taxotere label, correct?
 2       A.   That's correct.
 3       Q.   And you don't attempt to directly address
 4   the regulatory opinions of Dr. Ross or Dr. Plunkett
 5   that were offered, correct?
 6       A.   That's correct, except as they rely on
 7   Dr. Madigan's analysis.
 8       Q.   Well, I understand that you -- that you
 9   offer some opinions about the reliance upon
10   Dr. Madigan's FAERS analysis, correct?
11       A.   That's right.
12       Q.   Have you been made aware of how the Court
13   has ruled on Sanofi's motion to exclude
14   Dr. Madigan's FAERS analysis?
15       A.   No, I haven't.
16            Your video is frozen.  I don't know if
17   that -- oh, it's okay now.
18       Q.   Okay.
19       A.   I'm not aware of any Court rulings on
20   Dr. Madigan's FAERS analysis.
21       Q.   So you're not familiar with or aware of any
22   ruling whatsoever about what the Court has said
23   concerning Sanofi's challenges to Dr. Madigan's
24   FAERS analysis, right?
25       A.   That's right.
```

 1       Q.   Would it be a fair statement to say that
 2   you are unfamiliar with regulatory requirements as
 3   they relate to labeling standards?
 4       A.   Yes.
 5       Q.   Okay.  And so to the extent that a
 6   regulatory expert who is qualified to offer
 7   regulatory opinions relies upon information from
 8   Dr. Madigan's report, you would not be able to say
 9   whether or not, from a regulatory standpoint, that
10   is appropriate?
11       A.   That's right.  From a regulatory
12   standpoint, I would not have an opinion.
13       Q.   Okay.  And you do not have -- and I may
14   have asked this a different way, but because I wrote
15   it, I'm going to ask it.
16            You do not address regulatory requirements
17   for labeling in your supplemental report?
18       A.   Correct.
19       Q.   And that includes what it takes to make a
20   label change -- excuse me.
21            And that includes the evidence -- the
22   evidence necessary to justify a label change to the
23   warnings and precautions and/or the adverse events
24   section of the label, correct?
25       A.   That's correct.

 1   method, but it just changes the search criteria
 2   slightly.
 3       Q.  Okay.  Well, let's see if we can't get just
 4   a clean question and a clean answer.
 5           You don't set out any methodology in your
 6   report for alternative exploratory investigations in
 7   the FAERS database, correct?
 8       A.  That's correct.  My opinion does not rely
 9   on any alternative analyses.
10       Q.  Okay.  So the answer to my question is
11   "correct"?
12       A.  Yes.  That's right.  And there's a reason
13   for it, because I don't rely on those analyses.
14       Q.  You don't rely on them, and you don't
15   document them, correct?
16       A.  That's correct.
17       Q.  All right.  So, but what we do know is that
18   you haven't done anything to challenge Dr. Hangai's
19   identification of 13 cases that Sanofi, through
20   Dr. Hangai, describes as permanent alopecia as of
21   the beginning of first quarter of 2008, correct?
22       A.  That's correct.  There are, I would say,
23   two major reasons why I have not attempted to do
24   that.
25           The first is because my role here, or part

1  of my role here, is to address Dr. Madigan's
2  opinions.  And Dr. Plunkett and Dr. Ross do not rely
3  on Dr. Hangai's analysis to the extent that they
4  rely on Dr. Madigan's.
5          The second reason is because, in the
6  clinical overview that Dr. Hangai wrote, she
7  provided comments that summarize the narrative of
8  each of the cases that she analyzed, whereas
9  Dr. Madigan did not provide comments from the
10 narratives of the cases that he analyzed.
11         And so Dr. Hangai provided some basis for
12 confirming that those were, in fact, cases of
13 permanent or irreversible alopecia, whereas
14 Dr. Madigan did not provide that confirmatory
15 information.
16     Q.  Hold on just one sec.
17         Now, one of the reasons you didn't do that
18 was that you were never provided with, by Sanofi's
19 counsel, the case report forms for the 13
20 individuals in the clinical overview that predate
21 2008, correct?
22     A.  I think -- I don't know if that's a reason
23 why I didn't -- I don't have those forms, but I
24 don't think that's a reason why I did not try to
25 confirm or refute Dr. Hangai's classification.

1  alopecia, correct?
2      A.  Yes.
3      Q.  Okay.  They both use the same words,
4  "irreversible alopecia," but they are using those
5  words in two different contexts; one, to determine
6  whether there is an outcome; and, two, in the other,
7  to determine whether there is a signal, correct?
8      A.  I think for your -- regarding your
9  question, the first one was not regarding an
10  outcome, it was regarding causality or regarding
11  whether there's causal effect.  And then the second
12  one was regarding whether there's a safety signal.
13      I agree that there are -- these are two
14  different contexts, looking --
15      Q.  Okay.
16      A.  -- for causation versus looking for a
17  safety signal.
18      Q.  Right.
19      A.  But I don't agree that the definition of
20  "permanent or irreversible alopecia," that that
21  health outcome necessarily differs between the two
22  contexts.
23      Q.  Well, you don't do signal detection
24  yourself, right?
25      A.  That's correct.  I don't do signal

 1   detection.  I do causation analysis.  I do look at

 2   outcome classification, in general, as an

 3   epidemiologist.

 4           I look at, when a case of cancer, for

 5   instance, is classified as a case, and then I look

 6   at the underlying data to see whether that case has

 7   been correctly classified or correctly identified.

 8           And so that is one commonality between

 9   causation analysis and signal analysis.  It's just

10   looking at the quality of the -- the underlying data

11   or looking at the correctness of that outcome

12   classification.

13      Q.   Well, let me ask a question and see if I

14   can get just a simple answer to my simple question.

15           You do not do signal detection analyses,

16   correct?

17      A.   Correct.

18      Q.   You don't regularly utilize the FAERS

19   database to do signal detection analyses, correct?

20      A.   That's correct.

21      Q.   Okay.  So to the extent that there is

22   similarity between two types of analyses, one that

23   you do and one that you do not do, you are not

24   qualified to -- would you agree with me that you are

25   not qualified to describe what is necessary for a

```
 1   signal detection analysis that you do not routinely
 2   perform?
 3        A.   I'd agree that I do not routinely
 4   perform -- or ever perform signal detection or
 5   signal detection analysis.
 6             I do not agree that I'm -- I am unqualified
 7   or that I have no basis to talk about the accuracy
 8   of the underlying data or the validity of the
 9   underlying data for any data analysis.
10             I think, as an epidemiologist, I am
11   qualified to talk about whether a patient who's
12   classified as having a certain outcome on the basis
13   of -- on the basis of certain data is or is not
14   correct.  I don't know if I -- I don't know if I
15   phrased that well.
16             What I mean is that I do routinely look at
17   case definitions or outcome classifications and
18   determine, as an epidemiologist, whether that is
19   correct.
20             And for signal detection, I have no opinion
21   on the method of signal detection or signal
22   analysis.  I'm not talking about the statistics;
23   here, I'm only talking about the underlying data.
24             And, I mean, just in general, as a data
25   scientist, this is an opinion that any person who
```

```
 1   works in data science or data analysis can have,
 2   that if you do any sort of data analysis on faulty
 3   data, then the results will be flawed.  The results
 4   will be equally faulty.
 5           So that's my opinion here.  I'm not talking
 6   about the statistical approach or the methods of
 7   signal analysis.
 8           I'm talking about the validity or the
 9   quality of the underlying data.
10           MR. MICELI:  Gina, can you tell me what my
11   last question was?
12           (Record read as follows: So to the extent
13            there is similarity between two types of
14            analyses, one that you do and one that you
15            do not do, you are not qualified -- would
16            you agree with me that you are not
17            qualified to describe what is necessary for
18            a signal detection analysis that you do not
19            routinely perform?)
20   BY MR. MICELI:
21       Q.  Okay.  Are you qualified to do a signal
22   detection analysis, Doctor?
23       A.  No.  I don't do signal analysis.  I don't
24   perform that --
25       Q.  Okay.  Okay.  Thank you.
```