# EXHIBIT A

# Reference Manual on Scientific Evidence

*Second Edition*

Federal Judicial Center 2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

An electronic version of the *Reference Manual* can be downloaded from the Federal Judicial Center's site on the World Wide Web. Go to

**http://air.fjc.gov/public/fjcweb.nsf/pages/16**

For the Center's overall homepage on the Web, go to

**http://www.fjc.gov**

*Reference Manual on Scientific Evidence*

# II. How Have the Data Been Collected?

An analysis is only as good as the data on which it rests.[16] To a large extent, the design of a study determines the quality of the data. Therefore, the proper interpretation of data and their implications begins with an understanding of study design, and different designs help answer different questions. In many cases, statistics are introduced to show causation. Would additional information in a securities prospectus disclosure have caused potential investors to behave in some other way? Does capital punishment deter crime? Do food additives cause cancer? The design of studies intended to prove causation is the first and perhaps the most important topic of this section.

Another issue is the use of sample data to characterize a population: the population is the whole class of units that are of interest; the sample is a set of units chosen for detailed study. Inferences from the part to the whole are justified only when the sample is representative, and that is the second topic of this section.

Finally, it is important to verify the accuracy of the data collection. Errors can arise in the process of making and recording measurements on individual units. This aspect of data quality is the third topic in this section.

## A. Is the Study Properly Designed to Investigate Causation?

### 1. Types of Studies

When causation is at issue, advocates have relied on three major types of information: anecdotal evidence, observational studies, and controlled experiments.[17] As we shall see, anecdotal reports can provide some information, but they are

---

16. For introductory treatments of data collection, see, e.g., David Freedman et al., Statistics (3d ed. 1998); Darrell Huff, How to Lie with Statistics (1954); David S. Moore, Statistics: Concepts and Controversies (3d ed. 1991); Hans Zeisel, Say It with Figures (6th ed. 1985); and Zeisel & Kaye, *supra* note 1.

17. When relevant studies exist before the commencement of the litigation, it becomes the task of the lawyer and appropriate experts to explain this research to the court. Examples of such "off-the-shelf" research are experiments pinpointing conditions under which eyewitnesses tend to err in identifying criminals and studies of how sex stereotyping affects perceptions of women in the workplace. *See, e.g.,* State v. Chapple, 660 P.2d 1208, 1223–24 (Ariz. 1983) (reversing a conviction for excluding expert testimony about scientific research on eyewitness accuracy); Price Waterhouse v. Hopkins, 490 U.S. 228, 235 (1989). Some psychologists have questioned the applicability of these experiments to litigation. *See, e.g.,* Gerald V. Barrett & Scott B. Morris, *The American Psychological Association's Amicus Curiae Brief in* Price Waterhouse v. Hopkins: *The Values of Science Versus the Values of the Law*, 17 Law & Hum. Behav. 201 (1993). For a rejoinder, see Susan T. Fiske et al., *What Constitutes a Scientific Review?: A Majority Retort to Barrett and Morris*, 17 Law & Hum. Behav. 217 (1993).

If no preexisting studies are available, a case-specific one may be devised. *E.g.*, United States v. Youritan Constr. Co., 370 F. Supp. 643, 647 (N.D. Cal. 1973) (investigating racial discrimination in the rental-housing market by using "testers"—who should differ only in their race—to rent a property),

more useful as a stimulus for further inquiry than as a basis for establishing association. Observational studies can establish that one factor is associated with another, but considerable analysis may be necessary to bridge the gap from association to causation.[18] Controlled experiments are ideal for ascertaining causation, but they can be difficult to undertake.

"Anecdotal evidence" means reports of one kind of event following another. Typically, the reports are obtained haphazardly or selectively, and the logic of "post hoc, ergo propter hoc" does not suffice to demonstrate that the first event causes the second. Consequently, while anecdotal evidence can be suggestive,[19] it can also be quite misleading.[20] For instance, some children who live near power lines develop leukemia; but does exposure to electrical and magnetic fields cause this disease? The anecdotal evidence is not compelling because leukemia also occurs among children who have minimal exposure to such fields.[21] It is necessary to compare disease rates among those who are exposed and those who are not. If exposure causes the disease, the rate should be higher among the exposed, lower among the unexposed. Of course, the two groups may differ in crucial ways other than the exposure. For example, children who live near power

---

*aff'd in part*, 509 F.2d 623 (9th Cir. 1975). For a critical review of studies using testers, see James J. Heckman & Peter Siegelman, *The Urban Institute Audit Studies: Their Methods and Findings*, *in* Clear and Convincing Evidence: Measurement of Discrimination in America 187 (Michael Fix & Raymond J. Struyk eds., 1993) (including commentary).

18. For example, smokers have higher rates of lung cancer than nonsmokers; thus smoking and lung cancer are associated.

19. In medicine, evidence from clinical practice is often the starting point for the demonstration of a causal effect. One famous example involves exposure of mothers to German measles during pregnancy, followed by blindness in their babies. N. McAlister Gregg, *Congenital Cataract Following German Measles in the Mother*, 3 Transactions Ophthalmological Soc'y Austl. 35 (1941), *reprinted in* The Challenge of Epidemiology 426 (Carol Buck et al. eds., 1988).

20. Indeed, some courts have suggested that attempts to infer causation from anecdotal reports are inadmissible as unsound methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See, e.g.*, Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1163–64 (S.D. Fla. 1996) (holding that reports to the Food and Drug Administration of "adverse medical events" involving the drug Halcion and "anecdotal case reports appearing in medical literature . . . can be used to generate hypotheses about causation, but not causation conclusions" because "scientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies"); Cartwright v. Home Depot U.S.A., Inc., 936 F. Supp. 900, 905 (M.D. Fla. 1996) (excluding an expert's opinion that latex paint caused plaintiff's asthma, in part because "case reports . . . are no substitute for a scientifically designed and conducted inquiry").

21. *See* Committee on the Possible Effects of Electromagnetic Fields on Biologic Sys., National Research Council, Possible Health Effects of Exposure to Residential Electric and Magnetic Fields (1997); Zeisel & Kaye, *supra* note 1, at 66–67. There are serious problems in measuring exposure to electromagnetic fields, and results are somewhat inconsistent from one study to another. For such reasons, the epidemiologic evidence for an effect on health is quite inconclusive. *Id.*; Martha S. Linet et al., *Residential Exposure to Magnetic Fields and Acute Lymphoblastic Leukemia in Children*, 337 New Eng. J. Med. 1 (1997); Edward W. Campion, *Power Lines, Cancer, and Fear*, 337 New Eng. J. Med. 44 (1997) (editorial); Gary Taubes, *Magnetic Field-Cancer Link: Will It Rest in Peace?*, 277 Science 29 (1997) (quoting various epidemiologists).

lines could come from poorer families and be exposed to other environmental hazards. These differences could create the appearance of a cause-and-effect relationship, or they can mask a real relationship. Cause-and-effect relationships often are quite subtle, and carefully designed studies are needed to draw valid conclusions.[22]

Typically, a well-designed study will compare outcomes for subjects who are exposed to some factor—the treatment group—and other subjects who are not so exposed—the control group. A distinction must then be made between controlled experiments and observational studies. In a controlled experiment, the investigators decide which subjects are exposed to the factor of interest and which subjects go into the control group. In most observational studies, the subjects themselves choose their exposures. Because of this self-selection, the treatment and control groups are likely to differ with respect to important factors other than the one of primary interest.[23] (These other factors are called confounding variables or lurking variables.[24]) With studies on the health effects of power lines, family background is a possible confounder; so is exposure to other hazards.[25]

---

22. Here is a classic example from epidemiology. At one time, it was thought that lung cancer was caused by fumes from tarring the roads, because many lung cancer patients lived near roads that had recently been paved. This is anecdotal evidence. But the logic is quite incomplete, because many people without lung cancer were exposed to asphalt fumes. A comparison of rates is needed. Careful study showed that lung cancer patients had similar rates of exposure to tar fumes as other people; the real difference was in exposure to cigarette smoke. Richard Doll & A. Bradford Hill, *A Study of the Aetiology of Carcinoma of the Lung*, 2 Brit. Med. J. 1271 (1952).

23. For present purposes, a variable is a numerical characteristic of units in a study. For instance, in a survey of people, the unit of analysis is the person, and variables might include income (in dollars per year) and educational level (years of schooling completed). In a study of school districts, the unit of analysis is the district, and variables might include average family income of residents and average test scores of students. When investigating a possible cause-and-effect relationship, the variable that characterizes the effect is called the dependent variable, since it may depend on the causes; dependent variables also are called response variables. In contrast, the variables that represent the causes are called independent variables; independent variables also are called factors or explanatory variables.

24. A confounding variable is correlated with the independent variables and with the dependent variable. If the units being studied differ on the independent variables, they are also likely to differ on the confounder. Therefore, the confounder—not the independent variables—could be responsible for differences seen on the dependent variable.

25. Confounding is a problem even in careful epidemiologic studies. For example, women with herpes are more likely to develop cervical cancer than women who have not been exposed to the virus. It was concluded that herpes caused cancer; in other words, the association was thought to be causal. Later research suggests that herpes is only a marker of sexual activity. Women who have had multiple sexual partners are more likely to be exposed not only to herpes but also to human papilloma virus. Certain strains of papilloma virus seem to cause cervical cancer, while herpes does not. Apparently, the association between herpes and cervical cancer is not causal but is due to the effect of other variables. *See* Viral Etiology of Cervical Cancer (Richard Peto & Harald zur Hausen eds., 1986); The Epidemiology of Cervical Cancer and Human Papillomavirus (N. Muñoz et al. eds. 1992). For additional examples and discussion, see Freedman et al., *supra* note 16, at 12–27, 150–52; David Freedman, *From Association to Causation: Some Remarks on the History of Statistics,* 14 Stat. Sci. 243 (1999).