# EXHIBIT 8

Emanuel Palatinsky, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF LOUISIANA

 3

 4

 5    ******************************

 6    IN RE:  TAXOTERE (DOCETAXEL)     MDL NO. 2740

 7    PRODUCTS LIABILITY LITIGATION     SECTION H

 8    THIS DOCUMENT RELATES TO:       JUDGE MILAZZO

 9    ALL CASES                       MAG. JUDGE NORTH

10    ******************************

11

12

13              VIDEOTAPED DEPOSITION OF:

14              EMANUEL PALATINSKY, M.D.

15                ROPES & GRAY LLP

16                Prudential Tower

17               800 Boylston Street

18              Boston, Massachusetts

19           August 10, 2018        8:38 a.m.

20

21

22

23              Darlene M. Coppola

24            Registered Merit Reporter

25            Certified Realtime Reporter
```

Emanuel Palatinsky, M.D.

```
 1          Q.   That was in 2011, correct?

 2          A.   I believe it was in 2011.

 3          Q.   At any time before you were

 4     transferred to another drug in 2013, while you

 5     were the global safety officer and while you

 6     were responsible for the safety profile of

 7     docetaxel, did you ever request that

 8     regulatory submit a proposal to the FDA to

 9     update the label to warn patients and doctors

10     that cases of persisting alopecia have been

11     reported?

12          A.   I do not recall making that proposal.

13

14

15          (Exhibit No. 23 marked for

16     identification.)

17

18     BY MR. BACHUS:

19          Q.   I've handed you what's been marked as

20     Exhibit No. 23.  For record purposes, this is

21     Sanofi 05059757 and 9758.

22          Have you seen this e-mail before?

23          A.   I do not recall having seen that.

24          Q.   Who is Noel Quinn?

25          A.   Noel Quinn is a pharmacovigilance
```

Emanuel Palatinsky, M.D.

1       scientist within Sanofi.

2           Q.   This is an e-mail from Noel Quinn to

3       multiple individuals identified on this

4       document.

5               Do you see that?

6           A.   Yes, I can see the distribution list.

7           Q.   It's dated Monday, December 20, 2010.

8               Do you see that?

9           A.   Yes, I see the date.

10          Q.   And the subject matter is, "Does

11      anyone have time to help with a large

12      cumulative review?"

13              Do you see that?

14          A.   That's the subject line.

15          Q.   And this is during the time frame when

16      you were preparing your clinical overview for

17      submission in response to the regulatory

18      request from the French regulatory agency?

19          A.   Yeah, it's around the same time.

20          Q.   And it says, "Hi, All.  I have an

21      Excel spreadsheet with 1,620 cases involving

22      alopecia and docetaxel."

23              Do you see that?

24          A.   Yeah, I can see that.

25          Q.   It says, "Alopecia is a listed event

Emanuel Palatinsky, M.D.

```
 1       for docetaxel."

 2               Do you see that?

 3       A.   Yes.

 4       Q.   And then it says, "However, the

 5   clinical overview" -- CO, is that clinical

 6   overview?

 7       A.   Clinical overview.

 8       Q.   "The CO or clinical overview should

 9   focus on" -- and then she writes in bold,

10   "persistent alopecia."

11               Do you see that?

12       A.   Yes.

13       Q.   And then in paren she says, "unlisted

14   event."

15               Do you see that?

16       A.   Yes.

17       Q.   So she says, "However, the clinical

18   overview should focus on persistent alopecia,

19   unlisted event defined by the company as,

20   'unresolved' after twelve months from the end

21   of chemotherapy.'"

22       A.   Yes.

23       Q.   Do you see that?

24       A.   (Witness nodding.)

25       Q.   So Noel Quinn in assisting in
```

Emanuel Palatinsky, M.D.

```
 1      preparing your clinical overview documents in

 2      this e-mail, that the term "Persistent

 3      alopecia" is an unlisted event.

 4              Do you see that?

 5      A.   I can see that.  And I can see that it

 6      doesn't document the listedness or

 7      unlistedness of alopecia.

 8      Q.   It only documents the listedness or

 9      unlistedness of the term "persistent

10      alopecia," correct?

11      A.   No.  It's not correct.

12              As I explained, it's only the personal

13      opinion that was written in an e-mail by Noel

14      Quinn --

15      Q.   Noel --

16      A.   -- and does not reflect the status of

17      persistent alopecia being considered listed or

18      unlisted.

19      Q.   Noel Quinn was an employee of

20      Sanofi?

21      A.   Yes.

22      Q.   And she was charged with assisting you

23      in preparing your clinical overview for

24      submission, correct?

25      A.   She certainly did.
```

Emanuel Palatinsky, M.D.

1      Q.   What was her title at the company?

2      A.   Pharmacovigilance scientist.

3      Q.   And so she's a scientist in the field

4      of pharmacovigilance, correct?

5      A.   Yes.

6      Q.   She was assigned to what job?

7      A.   She was assigned to a number of

8      projects.

9      Q.   Including docetaxel?

10     A.   Possibly.

11     Q.   Well, clearly, right?

12     A.   No.

13     Q.   You may have brought in other people

14     who had no familiarity with the drug to help

15     you prepare your clinical overview?

16     A.   Certainly might have been the case.

17     Q.   You don't know whether Noel Quinn had

18     prior experience with docetaxel?

19     A.   I assume that she did, but I'm not

20     sure.

21     Q.   And as of as a pharmacovigilance

22     scientist, she was supposed to understand the

23     difference between listed and unlisted,

24     correct?

25     A.   Not in the context of this e-mail.

Emanuel Palatinsky, M.D.

1          Q.   As an employee, as a pharmacovigilance

2     scientist for Sanofi in 2010, was it not the

3     expectation of the company that Noel

4     understood the difference between listed and

5     unlisted?

6          A.   Certainly Noel understood.

7               But this is different from stating

8     that persistent alopecia was an unlisted --

9          Q.   I didn't ask that.  I asked you

10    whether she was expected to understand the

11    difference between listed and unlisted.

12              She was, wasn't she?

13                   MR. RATLIFF:  Object to form.

14         A.   She was expected to know.  But this is

15    not what the e-mail says.

16              Unlisted adverse event -- it's not

17    intended here in the regulatory sense --

18    BY MR. BACHUS:

19         Q.   So Noel Quinn, who was a

20    pharmacovigilance scientist, who is supposed

21    to know the difference between listed and

22    unlisted, has placed in this e-mail the term

23    "persistent alopecia" and has identified it as

24    unlisted, correct?

25                   MR. RATLIFF:  Object to form.

Emanuel Palatinsky, M.D.

1         A.   She wrote that without the regulatory

2    implication of unlisted adverse event.

3    BY MR. BACHUS:

4         Q.   And she wrote that e-mail again in

5    December of 2010, correct?

6         A.   That e-mail is dated 2010.

7         Q.   She was working on a clinical overview

8    that was requested by a health authority,

9    correct?

10        A.   She was working on my clinical

11   overview, yes.

12        Q.   It was requested by the health

13   authority?

14        A.   But the answer is yes.

15             MR. RATLIFF:  Do you have an

16   additional copy of this one here?

17             MR. BACHUS:  I'm sorry?

18             MR. RATLIFF:  Do you have an

19   additional copy?

20             MR. BACHUS:  Yes.

21             MR. RATLIFF:  Thank you.

22

23             (Exhibit No. 24 marked for

24   identification.)

25

Emanuel Palatinsky, M.D.

```
 1      BY MR. BACHUS:

 2          Q.   I've handed you what's been marked as

 3      Exhibit No. 24.

 4               You recognize this document, don't

 5      you, Doctor?

 6          A.   No, I don't.

 7          Q.   This is a presentation for an SMC

 8      meeting on October 26, 2015.

 9               Do you see that?

10          A.   Yes.  That's the date of the

11      presentation.

12          Q.   And the topic as identified on page 1

13      by the way for Sanofi -- for record purposes,

14      this is Sanofi 01827600 through 614.

15               The topic listed on page 1 of Exhibit

16      24 is "Docetaxel permanent, irreversible

17      alopecia SMC meeting."

18               Correct?

19          A.   That's the title of the presentation.

20          Q.   If you turn to page 2.  The signal

21      nature for prompting this investigation says,

22      "Signal nature is permanent or irreversible

23      alopecia."

24               Do you see that?

25          A.   That's what the slide says.
```

Emanuel Palatinsky, M.D.

```
 1              Q.   And it says, The signal source is an

 2       FDA request.

 3                   Do you see that?

 4              A.   Yes, I can see that.

 5              Q.   Are you aware that an FDA request was

 6       made to update the label with additional

 7       information on permanent or irreversible

 8       alopecia in 2015?

 9              A.   I think I was made aware of that, yes.

10              Q.   You're not sure?

11              A.   I cannot recall the details.

12              Q.   And the scientific adjudication was to

13       "determine if there was a causal association

14       between docetaxel and permanent or

15       irreversible alopecia."

16                   Do you see that?

17              A.   That's the topic, yes.

18              Q.   You're familiar with this type of

19       presentation, are you not?

20              A.   Yes, I am.

21              Q.   Turn to page 3.  On page 3, the first

22       bullet point -- well, first of all, the topic

23       on page 3 is "Permanent, irreversible alopecia

24       in the labeling."

25                   Do you see that?
```

Emanuel Palatinsky, M.D.

1        A.   Yes, I can see that.

2        Q.   Is this a standard part of this

3   process?

4        A.   Yes.  Normally it's done.

5        Q.   To examine the labels to see what

6   currently exists --

7        A.   Yes.

8        Q.   -- at the time of the presentation?

9        A.   It's normally done.

10         The first bullet point says that "There

11   is no mention of permanent or irreversible

12   alopecia in the USPI."

13            Do you see that?

14       A.   Yes, I can see that bullet.

15       Q.   That's consistent with your last

16   recollection of the USPI at the time of your

17   departure?

18       A.   I cannot recall specifically; but,

19   yes, it makes sense.

20       Q.   However, it indicates that in the

21   European label at the same time that the

22   European label included post-marketing

23   experience information indicating that cases

24   of persisting alopecia had been reported,

25   correct?