# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 4   ELIZABETH KAHN,                      CASE NO.
            Plaintiff,                    2:16-cv-15397
 5   v.
     SANOFI S.A.,
 6   SANOFI-AVENTIS U.S.,
     L.L.C., SANOFI US
 7   SERVICE, INC.,
            Defendants.
 8
 9
10     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11
                        VIDEOTAPED
12                   EXPERT DEPOSITION
                          OF
13                   DAVID ROSS, M.D.
14            taken on Thursday, March 4, 2021
15              Commencing at 9:11 a.m.
16                        at
17                       Zoom
                  Baltimore, Maryland
18
19
20
21
22
23
24
25
```

1          (Witness peruses document.)

2     A.    Uhmm, give me a second here.  Yes.

3     Q.    And would you agree with me that signals

4  identification is a separate task from signal

5  evaluation?

6          MR. MICELI:  Object to the form.

7     A.    Well, obviously, there are -- they are

8  not the same process.  They are related in the sense

9  that they are both dealing with post-marketing

10 surveillance.  But they're distinct parts of that

11 process, I would agree with that.

12    Q.    And would you agree with me, if a signal

13 is identified, it's important to then evaluate that

14 signal, correct?

15    A.    Yeah.

16    Q.    Doctor, if you could turn to Page No. 27

17 of Exhibit No. 13, I would appreciate it.  And this

18 is where section No. 7 starts.

19    A.    Uh-huh.

20    Q.    Are you there?

21         (Witness peruses document.)

22    A.    I am.

23    Q.    And section No. 7 is entitled, "Signal

24 Evaluation and Documentation"; correct?

25    A.    Uhmm, yes.

Page 153

1          Q.    What it says is that:  "A

2     multidisciplinary team conducts an integrated top

3     management evaluation of the prioritized signal to

4     determine whether and what regulatory actions are

5     indicated."

6               Correct?

7          A.    Yes.

8          Q.    And it goes on to say that:  "The team

9     gathers information from available resources

10    including ICSR's submitted to FAERS."

11              Is that correct?

12              (Witness peruses document.)

13         A.    Yes.

14         Q.    What are ICSR's?

15         A.    I'm sorry, I didn't study this report.

16    I have to go back to the beginning and see if I can

17    get the abbreviations.  Like I said, I have not had

18    a chance to really review this.  If you want, I can

19    go back and see what it stands for.  SR is obviously

20    safety report.  So that's the best that I can do.  I

21    don't want to guess.  No.

22              Individual case safety reports.

23         Q.    Very good.

24              In this document it indicates once a

25    signal is identified, the ICSR's are retrieved and

1          Did I read that correctly?

2               MR. MICELI:   Objection to the form.

3          I'm not sure I'm following where you are.

4          You said last paragraph?

5     BY MR. STRONGMAN:

6          Q.    Did I read that correctly, doctor?

7          A.    So this is Paragraph 841?

8          Q.    Yes.

9               (Witness peruses document.)

10         A.    "Reviewers evaluate individual ICSR's

11    for potential inclusion in a set of similar cases by

12    using as a point of reference a case definition for

13    the event."

14         Q.    Did I read that correctly?

15         A.    I believe so.

16         Q.    Okay.

17              Do you know whether or not Dr. Madigan

18    evaluated individual ICSR's in evaluating the signal

19    that he identified in this case?

20         A.    So again, I'm going to provide the same

21    context that I did before.  Not -- not this

22    particular guidance was not something that would

23    have been available to Sanofi.  So it's not

24    something that I would consider here.  I mean...

25         Q.    Setting the document aside, doctor, do

1    you know whether or not Dr. Madigan evaluated the

2    individual ICSR's that were identified in the FAERS

3    database by his signal analysis?

4              MR. MICELI:  Object to the form.

5         A.    So again, I did not go into that level

6    of detail.  And it was not necessary for me to do

7    so.

8         Q.    You did not review the individual ICSR's

9    that Dr. Madigan identified in his FAERS signal

10   analysis, correct?

11             MR. MICELI:  Object to the form.

12        A.    So again, I'm sorry.  Just bear with me.

13   I'll be succinct.  In terms of making regulatory

14   decisions, and I'm not talking about -- I'm talking

15   about decisions, not signal identification and

16   analysis.  As you know, I explained and this was

17   true for all adverse event reports going through

18   them one by one, that is not something that is part

19   of the regulatory decision process.  It's not

20   necessary.  And as I pointed out, you know, it's

21   true for every single adverse event report that

22   you've shown.

23        Q.    Doctor, I think you're answering a

24   question as to why you didn't feel like you needed

25   to review certain things, but my question was not

Page 158

1    you know whether or not Dr. Madigan evaluated the

2    individual ICSR's that were identified in the FAERS

3    database by his signal analysis?

4                   MR. MICELI:  Object to the form.

5         A.    So again, I did not go into that level

6    of detail.  And it was not necessary for me to do

7    so.

8         Q.    You did not review the individual ICSR's

9    that Dr. Madigan identified in his FAERS signal

10   analysis, correct?

11                  MR. MICELI:  Object to the form.

12        A.    So again, I'm sorry.  Just bear with me.

13   I'll be succinct.  In terms of making regulatory

14   decisions, and I'm not talking about -- I'm talking

15   about decisions, not signal identification and

16   analysis.  As you know, I explained and this was

17   true for all adverse event reports going through

18   them one by one, that is not something that is part

19   of the regulatory decision process.  It's not

20   necessary.  And as I pointed out, you know, it's

21   true for every single adverse event report that

22   you've shown.

23        Q.    Doctor, I think you're answering a

24   question as to why you didn't feel like you needed

25   to review certain things, but my question was not

Page 159

1    why.

2              Okay?

3         A.    I understand.

4         Q.    My question was simply:  Did you review

5    the individual ICSR's that Dr. Madigan identified in

6    his signal analysis in the FAERS database, yes or

7    no?

8         A.    Oh.  And again, I think it's critical

9    not just to get a single word answer, but to say

10   that is not a relevant part of the methodology.

11   It's not what I do, so no.  There you go.

12        Q.    And do you know whether or not Dr.

13   Madigan reviewed individual ICSR's for the reports

14   that he identified in his signal analysis in the

15   FAERS database?

16              MR. MICELI:  Object to the form.

17        A.    Again, given the same context, it's not

18   necessary for me to know that.  It really isn't.

19        Q.    Okay.

20              And I know you think it's not necessary,

21   but you don't know one way or another whether he

22   did, correct?

23        A.    Again, it's not necessary for me to

24   know.  I don't know.  But it's not -- whether he did

25   or not would not make a difference in terms of my

1   It's like saying can I hear someone's sound on the

2   other side of the world with the stethoscope here?

3   It's a mis-sound.  It's not the right methodology.

4   That's all that I can say.

5       Q.   And doctor, I appreciate that you have

6   caveats.  Right?  You have caveats and concerns that

7   you expressed in your answer, correct?

8            MR. MICELI:  Objection to the form.

9       A.   Well, just it's a matter of not wanting

10   to get an answer that sounds like it applies to

11   every situation or all situations or is even

12   relevant here.  So I just want to be clear about

13   that.  You know, it's -- you know, this is just not

14   the appropriate methodology for reaching conclusions

15   about labeling.

16       Q.   And doctor, I appreciate that's your

17   opinion, but I just want you to answer my question.

18   And my question is based on the information provided

19   in Exhibit No. 21.  Alone.  With nothing else.

20   There's nothing here indicating that a patient

21   experienced an unexpected adverse event of alopecia

22   from taking Taxotere, correct?

23            MR. MICELI:  Object to the form.

24       A.   So I'm going to answer your question and

25   I'll be succinct.  It's like saying aside from that

1    Mrs. Lincoln, how did you enjoy the play?  The

2    answer is no, you can't conclude that.

3         Q.    And now if you look at what I've marked

4    Exhibit No. 22.

5                    (Whereupon Exhibit No. 22 was marked

6              for Identification.)

7                    (Witness peruses document.)

8         A.    I'm sorry, I can't -- so I've got

9    actually a sticker that says 21 and also 22.  So is

10   that a new exhibit?

11        Q.    Correct.  I've just marked Exhibit

12   No. 22.  If you can bring it up.

13                   (Witness peruses document.)

14        A.    I'm refreshing it and reloading the

15   browser.  Okay.

16        Q.    You have Exhibit No. 22 in front of you?

17        A.    I do.

18        Q.    And this also has an "I" in the column

19   for initial or follow-up.

20                   Do you see that?

21                   (Witness peruses document.)

22        A.    Yes.

23        Q.    And this is 2004, Quarter No. 4 in the

24   file name.

25                   Do you see that?

Page 223

1      that patient.

2              So, you know, it's -- it's something

3      again where I'm going to defer to Drs. Madigan and

4      Feigal.

5          Q.   If a patient passes away, can they be

6      followed up on?

7          A.   Can they be followed up?  Well,

8      typically in the event of interest, if you're

9      talking about a tied-to-event analysis, is

10     conventionally considered for obvious reasons to end

11     with death.  But again, that's an analysis that I'm

12     going to defer to Drs. Madigan and Feigal.

13         Q.   If a patient starts taking Taxol and

14     withdraws from the TAX316 study, is that a relevant

15     consideration?

16         A.   So I'd have to go back --

17              MR. MICELI:  Excuse me.  Object to the

18              form.

19              THE WITNESS:  Sorry, Mr. Miceli.

20              I would have to go back to the

21              protocol.  But generally patients are

22              followed regarding -- I mean they have a

23              right to withdraw at any time, but they

24              continue to be followed.  That's an

25              obligation of the sponsor.  Not just a

1              regulatory obligation, but an ethical

2              obligation under good clinical practices

3              and declaration of health psyches.

4    BY MR. STRONGMAN:

5         Q.    And do you know whether or not patients

6    who received other chemotherapy regimens outside of

7    TAX316 were followed for overall survival, but not

8    for specific adverse events?

9         A.    Again, I'm going to -- sorry, sorry.

10        Q.    You may answer.

11        A.    Okay.  Again, I'm going to defer to Drs.

12   Feigal and Madigan on that.

13        Q.    Okay.

14              Would you be interested in looking at a

15   case report form for one of these to see whether or

16   not they actually have documented permanent

17   alopecia?

18              MR. MICELI:  Object to the form.

19        A.    Well, I'm going to answer in two ways.

20   I always love -- love working with data.  Truly.

21   But I don't know what it's going to tell me.  I

22   mean, if I can use maybe not the best analogy here.

23   But you say you want to look at all these failed

24   expeditions of Everest.  That doesn't tell me about

25   the ones where it was another different event or