# EXHIBIT H

**Taxotere Rule 26 Report**

By: Linda D Bosserman, MD, FACP, FASCO
    Medical Oncologist and Breast Cancer Specialist
    City of Hope Medical Group
    4900 Rivergrade Road Suite 120, Office 1125
    Irwindale, CA 91706,

April 3, 2020

**Biography**

My name is Linda Bosserman, MD, FACP, FASCO, and I am an Assistant Clinical Professor, medical oncologist and value-based care leader at City of Hope. In addition to having served on the American Society of Clinical Oncology (ASCO) Board of Directors, the Pathways Task Force and the Guidelines Implementation Group, I currently serve on the Clinical Practice Committee, the Practice Guidelines Implementation Network and the Pathways Task Force. I have been an ASCO member since 1990 and have served on the Public Issues Committee, Quality Care Symposium and Oncology Practice Conference Planning Committees, and I served as the chair of the 2019 Oncology Practice Conference.

I have served as Chief Quality Officer and Chief Medical Officer for the Cancer Clinics of Excellence; Secretary and Board of Directors member of the Community Oncology Alliance; Chair of the Cancer Committee for the San Antonio Community Hospital; Director of the Psycho-Social Oncology, and Comprehensive Breast Programs; then as Associate and Medical Director of the Robert and Beverly Lewis Family Cancer Care Center in Pomona, California. I served on the Board of Directors for the California American Cancer Society and chaired their state-wide Breast Cancer Committee. I participated in the White House Physician Forum on Health Reform in 2009 and in many clinical research trials, primarily for breast cancer.

1

options and data on absolute benefits of any recommended systemic therapies are critical for clinicians to share with patients based on their tumor stage, tumor type and guidelines. Only after such informed decision-making discussions that then include individual patient's preferences and treatment options, can a final informed decision can be made.

### Systemic Therapy with Chemotherapy

The medical oncologist is the specialist who provides systemic (whole body) therapies including hormone therapy, chemotherapy, targeted and biologic therapies either before or after surgery. These therapies may be administered prior to surgery to shrink tumors and make surgery less radical (neo-adjuvant), or after surgery to reduce the risk of later recurrences. These same therapies can also be given as adjuvants, after surgery to reduce the risk of later recurrences of breast cancer in women with ESBC. The reason to give any type of systemic therapy after surgery for early breast cancer is to destroy any microscopic and currently undetectable cells that might have broken off the breast cancer and landed somewhere in the body such as the bones the liver or lungs. The goal of systemic therapy is to destroy any microscopic cells before they can get a foothold and later grow as cancer metastasis. The determination of a specific systemic therapy plan for an individual cancer patient, thus, is based on their original cancer information of tumor type, grade, stage and tumor features as well as their overall health and preferences that establishes an understanding of their individual risk of recurrence after local therapy alone. It is with the knowledge of her individual risk that the patient and her medical oncologist can evaluate the evidence of what benefits and risks each potential systemic therapy has been shown to do from clinical trials, including the risk of acute and chronic, reversible and irreversible side effects, as well as costs.

**Scalp Cooling**

Scalp cooling devices have been available and used in the US and in other countries for decades to reduce temporary alopecia. It a has always been legal to use caps in the US even before the 2015 and 2017 FDA clearances (approvals) for the DigniCap and Pacman devices. In 2005, Annals of Oncology published a review of 53 studies of scalp cooling done between 1973 and 2003; it demonstrated the average success rate (i.e., no wig needed) was 56 percent before 1995 and 73 percent thereafter. Subsequently, newer, smaller studies showed success rates of 80 and 90 percent with certain chemotherapy regimens.

In addition, research suggested that scalp metastasis were not more of a risk with cold caps than without. A review published in 2009 in the journal Breast Cancer Research and Treatment found that "the incidence of scalp metastasis was 1.1 percent (six cases out of 553 patients) among women who used scalp cooling and 1.2 percent . . . (one case out of 87 patients) among women who did not use scalp cooling." Those with stage 3 cancers were at higher risk.

Based on many clinical studies establishing efficacy and safety, in December of 2015 the FDA cleared the Dignitana's DigniCap® Scalp Cooling System for use in patients with breast cancer. This was followed by the agency's clearance of the Paxman® Scalp Cooling System in April of 2017 for use in patients with breast cancer. Subsequently the FDA expanded the devices' clearances to include solid tumors with the DigniCap in July 2017 and the Paxman in June of 2018. Their importance was well summarized by an experienced Memorial Sloan Kettering Cancer Center oncology nurse, Mikel Ross, who noted, "Scalp cooling is efficacious and has the potential to enhance quality of life and improve meaningful outcomes. It's not perfect but it's much better than doing nothing to help patients with this important quality-of-life issue, especially when we

4. Per the NCCN 2008 Breast Cancer Treatment Guidelines, Ms. Kahn had 5 third generation regimens options and 8 other NCCN category 1 treatment regimen options with similar impacts on reducing her risk of breast cancer recurrence and improving her survival. The 5 third generation and 8 other NCCN category 1 regimens have different toxicities, schedules and potential costs that are important to patients, including Ms. Kahn to consider before making a final treatment choice.

5. Hair loss, whether temporary and especially if permanent, is a highly important toxicity that women expect to be informed of and which can significantly impact their final treatment choices. Both Dr. Kardinal and Ms. Kahn, after reviewing the NSABP-40 informed consent form, still believed that any hair loss associated with Taxotere would be temporary in nature.[74] Had Sanofi included language in its labeling which stated Taxotere was associated with "permanent hair loss" in 2008, Dr. Kardinal expressly stated that such information should have been disclosed by Sanofi and would have been placed in the informed consent form by NSABP.[75] At the time Ms. Kahn entered the trial, Sanofi was in fact aware of the risk of PCIA yet did not warn physicians or patients. As a result, this information was not in the consent form.

6. Neither Dr. Kardinal, his oncology nurse, Shevonda Thomas, nor the writers of the national NSABP B-40 informed consent form, were informed about the risk of PCIA from Sanofi's adjuvant clinical trials, or otherwise, and thus the elevated risk of PCIA

---

[74] Deposition of Dr. Carl Karidnal at 87:2-88:17; 139:20-140:9; 141:22-143:1; see also Deposition of Elizabeth Kahn at 17:23-19:5, 192:6-193:21
[75] Id.

about the risks and benefits as they evaluate use of the Dignicap or other scalp cooling system for those who chose the TC regimen or other regimens with Taxotere.

**Summary Opinions**

Based on the material reviewed, my education, training and experience as a medical oncologist, breast cancer specialist, researcher/scientist, and in my various leadership roles in regional, national and international societies, I offer my opinions to a reasonable degree of medical certainty, that:

1) The accurate communication of information concerning the risk of PCIA with the use of Taxotere, from Sanofi to Dr. Kardinal, the treating physicians of Ms. Kahn, via the product label, marketing pieces, correspondence and through the sales representatives that visited the doctors' offices, would more likely than not, have been included in the discussion and process of informed consent in a real and substantial way for any standard or clinical trial docetaxel based regimen. It would have allowed for a more honest, accurate and complete informed consent process and discussions between the physician, the oncology nurse, the clinical trial investigators and Ms. Kahn, and would have allowed for a decision to be made on more truthful and accurate information.

2) Ms. Kahn had several NCCN category 1 options for neoadjuvant or adjuvant chemotherapy. Only 3 contained Taxotere. Her other options offered Ms. Kahn equally effective neoadjuvant chemotherapy without the risk of permanent chemotherapy induced alopecia (PCIA).

3) Had the risk of PCIA been communicated to medical oncologists they would have had the option in their professional judgement to offer the use of cold caps to patients who choose Taxotere regimens.