# EXHIBIT R

# SUPPLEMENTAL REPORT
## Dr. Laura M. Plunkett, Ph.D., DABT
### February 7, 2021

This supplemental report was prepared at the request of Plaintiff's counsel and provides additional opinions that I have formed based on my training and experience as well as my review of publicly available documents, documents produced during litigation by Sanofi Aventis (hereafter referred to as Sanofi) as part of a discovery process, deposition testimony and exhibits to depositions of company representatives and other experts in the litigation, the expert reports of Dr. Madigan, an expert for Plaintiff in the case. My opinions relate to the use of Taxotere in the adjuvant care of early-stage breast cancer.

The opinions I have formed relate to the pharmacology and toxicology of Taxotere and how, when viewed in the context of other evidence, the toxicity of Taxotere demonstrates "some basis to believe there is a causal relationship" between Taxotere and the occurrence of permanent-chemotherapy-induced alopecia, and the need to provide physicians and their patients with accurate adverse event information in the Taxotere label. These additional opinions were developed because the regulatory expert for Plaintiff, Dr. David Kessler, is currently unable to continue to serve as an expert in this case after taking a new position to head up the vaccine development and distribution efforts in the Biden-Harris administration. Dr. Kessler provided testimony about the addition of information related to toxic adverse effects of Taxotere, specifically adding the risk of persistent or irreversible alopecia associated with Taxotere use, to the adverse reactions section (Section 6) of Taxotere's prescription drug labeling. Although I had earlier testified that I was not providing regulatory opinions, Dr. Kessler's withdrawal from the case has changed the situation, and counsel asked that I review additional material and offer an opinion on whether the toxic effects of Taxotere demonstrate a basis to believe that a causal association exists between the drug and permanent chemotherapy-induced alopecia (PCIA). The following is a discussion of my additional opinions and the basis and support for those opinions. I incorporate by reference my initial report in this case dated March 13, 2020 (hereafter referred to as the "March Report"). All opinions expressed are based on my review of all materials referenced in my March Report (including the appendices to that report), my review of additional materials as listed in Appendix A to this report, my knowledge and experience as a pharmacologist and

1

Adverse Reactions section of a drug label as well as who to present the information. With respect to the process of choosing adverse events for inclusion in labeling, the guidance states:

> *"Decisions on whether there is some basis to believe there is a causal relationship are a matter of judgment and are based on factors such as: (1) the frequency of reporting, (2) whether the adverse event rate for the drug exceeds the placebo rate, (3) the extent of dose-response, (4) the extent to which the adverse event is consistent with the pharmacology of the drug, (5) the timing of the event relative to the time of drug exposure, (6) existence of challenge and dechallenge experience, and (7) whether the adverse event is known to be caused by related drugs."[FDA, 2006 at page 8]*

Then, with respect to information on adverse reactions that might be found in clinical trial data, the agency states:

> *"The presentation of adverse reactions identified from clinical trials is the major component of the ADVERSE REACTIONS section. The ADVERSE REACTIONS section must include a listing of all such reactions that occurred at or above a specified rate that is appropriate to the drug's safety database (see III.B.3), a separate listing of those adverse reactions that occurred below the specified rate, but for which there is some basis to believe there is a causal relationship between the drug and the event (see III.B.4), and, to the extent information is available and relevant, additional detail about the nature, frequency, severity, duration, dose-response, and demographic characteristics of those adverse reactions with significant clinical implications" (21 CFR § 201.57(c)(7)(ii)(A))."*

The FDA guidance provides important context for how the agency expects decisions to be made by a company.

92.     Before focusing on the need to add the CIPAL/ PCIA to the Taxotere labeling, I would like to provide a discussion of the new information that are part of the basis of my opinion. In addition to the evidence discussed in my March Report, I now have reviewed Dr. Madigan's report and his analyses of adverse event reporting data (both FDA data and Sanofi data) as well as a meta-analysis of Sanofi's clinical trial data.

93.     Dr. Madigan describes an analysis of the FDA's Adverse Event Reporting System database known as "FAERS" (see the report of Dr. David Madigan dated March 23, 2020) as well

15

as an analysis of Sanofi's own internal pharmacovigilance database, and a meta-analysis of the TAX 316 and TAX 301 clinical trials, combining the studies and examining the adverse event rate for irreversible alopecia. Dr. Madigan describes his analysis and mentions on page 20 that he confirmed the list of search terms used in his analysis of Sanofi's global pharmacovigilance database. Based on my training and experience in FDA postmarket surveillance regulations and FDA's approach to drug safety signal detection, Dr. Madigan's analysis is of the type that is performed by FDA themselves within their pharmacovigilance group (see FDA, 2012; https://www.fda.gov/files/drugs/published/Advances-in-FDA%27s-Safety-Program-for-Marketed-Drugs-%28PDF---188KB%29.pdf). As discussed by FDA in their 2012 Drug Safety report, the Division of Biometrics VII (DBVII), focuses on full-cycle drug safety evaluation using methods such as evaluation of randomized trials designed primarily to evaluate safety, design and analysis of observational studies (including propensity score and marginal structural models expertise), meta-analyses, signal detection, survey methodology, Bayesian methods in drug safety, data-mining techniques, time series analysis, graphical and computational methods for quantitative safety evaluation, and analyses of registry and health care databases (FDA, 2012). The methods used by Dr. Madigan fit within this overall approach to safety signal detection and drug safety evaluation that is used by FDA themselves.

94. Based on my review of Dr. Madigan's report, it is clear that the Taxotere FAERS adverse event reports provided a clear and constant safety signal for a relationship between Taxotere use and irreversible/ permanent alopecia (CIPAL/ PCIA) at least by 2000; the signal was consistently detectable from 2000 to 2017. Additionally, Sanofi's pharmacovigilance database contained adverse event reports as far back as 1999 that provide additional support for the safety signal identified by Dr. Madigan based on the FAERS database. Both of these analyses by Dr. Madigan provide a basis for my opinion regarding when Sanofi had some basis to suspect a causal association between Taxotere and CIPAL/ PCIA. The meta-analysis of Taxotere clinical trial data performed by Dr. Madigan provides additional support for opinions expressed in my March Report and also provide a basis for when information on the severity, duration and frequency of CIPAL/ PCIA should have been added to the Adverse Reactions section of the Taxotere label.

16

95. With the background regarding FDA regulations of human drug labeling and the clear and constant signal demonstrated in Dr. Madigan's FAERS disproportionality analysis, and other evidence, including the Sedlacek findings and Sanofi's internal pharmacovigilance database, I have formed opinions about the toxicities that should be included in the Taxotere labeling regarding CIPAL/ PCIA. It is my opinion to a reasonable degree of scientific certainty that there is some basis to believe that there is a causal relationship between Taxotere use and CIPAL/ PCIA in patients taking Taxotere as an adjuvant treatment for early-stage breast cancer, the standard for including safety information in the Adverse Reactions section of a human prescription drug label in the US (both pre-PLR and post-PLR). As discussed in my March Report, when the published literature relevant to the relationship between docetaxel exposure and CIPAL/ PCIA is considered as a whole, in conjunction with Taxotere clinical trial data, the weight-of-the-evidence indicates that it is biologically plausible that Taxotere/ docetaxel can cause CIPAL/ PCIA when the drug is used as an adjuvant to treat early stage breast cancer, that the risk of permanent, irreversible alopecia is not rare, that Taxotere/ docetaxel use carries an independent risk of CIPAL/ PCIA, and that Taxotere/ docetaxel use is associated with an increased risk of CIPAL/ PCIA as compared to other drugs used in breast cancer treatment. Thus, the evidence discussed in my March Report provides important support for my new opinion that there is a basis in the Taxotere database, importantly including clinical trial evidence, *"to believe there is a causal relationship between the drug and the occurrence of the adverse event"* (the adverse event standard cited above in paragraph 90; see the Final Rule dated January 24, 2006). Again, as discussed above, the standard I have applied for adding CIPAL/ PCIA to the Adverse Reactions section of the Taxotere labeling is the standard that FDA, Dr. Kessler and Dr. Arrowsmith recognize as being some basis to believe that Taxotere is associated with permanent/ irreversible alopecia (CIPAL/ PCIA).

96. With respect to the timing of addition of a statement in the Adverse Reactions section of the Taxotere labeling that Taxotere was associated with CIPAL/ PCIA in women undergoing treatment for early-stage breast cancer, the standard is some basis for a causal association. As mentioned above, Dr. Madigan's analysis of FAERS and Sanofi's pharmacovigilance databases indicate that a safety signal for CIPAL/ PCIA and Taxotere use appears at least by 2000. In my March Report (see paragraphs 34 and 35), I discussed two publicly available documents, one a paper from the peer-reviewed literature (Nabholtz *et al.* 2001. *J. Clin.*

17

*Oncol*. 19:314-321) and the other a presentation at the 2006 San Antonio Breast Cancer Symposium (Sedlacek, S.M. 2006). The 2001 report is important because Dr. Nabholtz was an investigator that was participating in a Taxotere clinical trial. Patients had been enrolled in a Phase II clinical study and the authors reported that the "most common treatment-related chronic non-hematologic toxicity was alopecia (87%) with long-lasting (longer than 2 years) partial alopecia in four patients" (see Nabholtz paper page 318; Sanofi_00217670). The percentage of patients at two years with irreversible alopecia was 4/54 or 7.4%. As I pointed out in my March Report, the fact that Dr. Nabholtz was an investigator for Sanofi (see page 331 of Gustavson deposition) made this paper of particular importance in terms of Defendant's knowledge over time. The second published dataset is from a presentation at a clinical meeting in 2006 where clinical experience in treating breast cancer is discussed based on a retrospective review of patient data in Dr. Sedlacek's clinical practice, data that was available to Sanofi prior to the clinical meeting in December 2006[8]. This report could be described as a "case series" and is one type of epidemiological investigation. As discussed in my March Report, alopecia associated with Taxotere therapy as an adjuvant to doxorubicin/cyclophosphamide chemotherapy was irreversible in some patients (he called the condition "persistent significant alopecia" and abbreviated it as "PSA"). PSA rates were investigated and reported for the three different treatment groups in Dr. Sedlacek's study; 6.3% in women administered doxorubicin plus Taxotere (AC/Tax; ATax; ACTax, AC/TaxXeloda; AC/TaxHerceptin; ATax/CAF; CAF/Tax), 0% in women administered doxorubicin plus Taxol (AC/T; AT/T; AC/T dose dense; ATC; AC/THerceptin), and 0% in women administered doxorubicin without a taxane (AC; FAC; A/CMF). The comparison of Taxotere experience with and without doxorubicin allowed for consideration of the contribution of each drug independently to the risk in the patients. Taxotere use was associated with an increased risk of permanent, irreversible alopecia, a risk that was not seen with use of doxorubicin alone or with doxorubicin combined with Taxol use. Therefore, Taxotere (docetaxel) carried an independent risk of CIPAL/ PCIA in this case series and was a substantial contributing factor to the condition in the women studied. Considering these two papers, in conjunction with Dr. Madigan's analyses of the FAERS database and Sanofi's pharmacovigilance database, Sanofi had some basis to believe a causal

---

[8] Oncology Field Coaching Report of Christine Muhlenhaupt by Perry Monaco, Aug. 15 &17, 2006 (Sanofi_04633925).

relationship between Taxotere use and CIPAL/ PCIA existed at least by 2006. As a result, it is my opinion to a reasonable degree of scientific certainty that the standard for adding a statement in the Adverse Reactions section of the Taxotere labeling about the relationship between Taxotere and CIPAL/ PCIA was met as early as 2006.

97. As discussed in my March Report, Sanofi has identified a causal association between docetaxel and irreversible alopecia (Sanofi_01101022; Sanofi_00829788; Sanofi_01827599; Sanofi_04876339; Sanofi_01268143[9]). The company stated based on their own review that: *"The cumulative weighted evidence **is sufficient to support a causal association** between Docetaxel and Permanent/Irreversible alopecia in patients who receive docetaxel."* [*emphasis* added] Notably, the information reviewed by Sanofi included their pharmacovigilance database (adverse events reported to the company), two literature articles (Kluger *et al.* 2012 and Miteva *et al.* 2011) and two Taxotere clinical studies (TAX316 and TAX301). Importantly, their identification of a causal association means that the level of evidence would meet the regulatory standard for adding information into the "Adverse Reactions" section of the label for a human prescription drug product[10].

98. Yet, it was not until December 2015 that Sanofi added permanent or irreversible alopecia to the Adverse Reactions section (Section 6) of its US label, even though evidence existed before 2006 that Sanofi should have known about based on the fact that their own pharmacovigilance database contained adverse event reports before 2006 (see report by Dr. Madigan), that one of their own investigators had published a paper on permanent alopecia in association with Taxotere use (Nabholtz *et al.* 2001), and that long-term interim data from TAX316, data that was available in 2004, contained evidence of Taxotere-induced alopecia that had not resolved at the five-year interim analysis time point (Interim TAX 316 Data, summarized by Dr. Madigan in Table 9 of his March 23, 2020 Report). It also is important to note that Sanofi themselves had recognized the existence of permanent or irreversible alopecia in documents that were submitted to the FDA starting in at least 2010 (Exhibit 16 to Dr. Palatinsky's deposition dated

---

[9] Exhibit 6 to the Hangai deposition of February 1, 2018 (page 192)

[10] See the guidance from FDA regarding data to support an Adverse Reactions statement (https://www.fda.gov/media/72139/download).

19

August 8-9, 2018; Exhibit 33 to Dr. Palatinsky's deposition dated August 8-9, 2018) and again in 2013 in their response to regulators in Europe where the European regulators were investigating a safety signal for permanent alopecia (Exhibit 37 to Dr. Mancini's deposition dated March 23, 2018). Thus, Sanofi should have been aware that there was some basis for a causal association between Taxotere use as an adjuvant treatment in patients with early-stage breast cancer at least by 2006 and before the 2015 label change was made by Sanofi to add permanent or irreversible alopecia to the Adverse Reactions section of Taxotere's label.

99. With respect to the issues of Taxotere's toxic effects on hair regrowth, permanent alopecia is hair loss that is characterized by a lack of regrowth (see paragraph 30 of my March Report), I noted in my review of Dr. Arrowsmith's deposition and her report that she has opined that the term "alopecia" in the Taxotere labeling is meant to subsume all forms of alopecia[11], both temporary drug-induced alopecia that is common to most chemotherapeutic drug products, including Taxotere, and the irreversible or permanent alopecia forms that physicians and scientists refer to as CIPAL/ PCIA. Yet, evidence in this case shows that at least by 2006, Sanofi recognized that Taxotere use was associated with permanent or irreversible alopecia and that it was a different adverse event than temporary or typical drug-induced alopecia (see Exhibits 22 through 25 of the of Isabelle Richard-Cassin's May 4, 2018 deposition, and pages 126-149 of the deposition). Yet, there is no evidence to suggest that Sanofi communicated their understanding to the FDA in 2006. This is important given that the FDA regulations require that physicians and their patients be provided with accurate and complete information about the risks and benefits of a drug. In my experience, regulators such as those at the FDA that were involved in the oversight and review of Taxotere's submissions can only make decisions and recommendations based on the information they have available for review, *i.e.,* based on what they know. Evidence in this case shows that my experience and understanding is consistent with what Sanofi's employees understood as well (see deposition testimony of Gerrit-Jan Nijveldt, global regulatory affairs, dated February 15, 2018 at pages 61-80). Additionally, I noted in my review of Dr. Arrowsmith's report and deposition that she appears to believe that since MedDRA did not include a listing for temporary alopecia or

---

[11] For example, pages 61 and 164 of Dr. Arrowsmith's deposition dated July 29, 2020 and paragraphs 67-68 of her December 9, 2019 report.

persistent alopecia, that labeling for Taxotere could not be changed to use the adjectives in conjunction with "alopecia" (see pages 61-70 of Dr. Arrowsmith's deposition dated July 29, 2020 and paragraph 68 of her December 9, 2019 report). This is not true based on a discussion of this issue in a recent paper (Wu *et al.* 2019 at page 135 of 149): *"Of note, MedDRA is used as the adverse event reporting terminology by many drug regulatory authorities and the pharmaceutical industry worldwide but is not required for FDA-approved drug labeling."* Additionally, evidence in this case related to the 2015 label changes by Sanofi shows that the term "permanent alopecia" was included in the Taxotere label (see 2015 Taxotere label at the website "drugs@FDA").

100.    Finally, in my March Report, I addressed the issue of other drugs used in chemotherapy regimens with Taxotere and the difference in the level of evidence that exists for a causal association between use of drugs other than Taxotere and CIPAL/ PCIA (see paragraphs 33 and 45-48). The opinion expressed in my March Report relates to the fact that Taxotere/ docetaxel use carries an independent risk of CIPAL/ PCIA. Moreover, as stated in paragraph 45 of my March Report, careful review of the literature shows that the level of evidence that exists to support a causal association between CIPAL/ PCIA and any particular chemotherapeutic drug used in early-stage breast cancer treatment other than Taxotere is not the same type of evidence that exists for Taxotere/ docetaxel. I pointed as well to the fact that the majority of the peer-reviewed, published medical/scientific literature that attempts to attribute a cause for CIPAL/ PCIA attribute the condition to docetaxel. With the review of Dr. Madigan's report, I would now point to his FAERS disproportionality analysis (discussed above) that demonstrates that Taxotere's signal for permanent or irreversible alopecia within FAERS was continual, *i.e.,* a permanent signal exists, while the signal for other drugs examined by Dr. Madigan did not exhibit a continual signal. This analysis provides additional evidence that Taxotere carries an independent risk of CIPAL/ PCIA, and that available scientific information, including FAERS data and Dr. Madigan's analysis, clearly show that other drugs used in treatment of early-stage breast cancer do not carry the level of risk of CIPAL/ PCIA that is posed by Taxotere.

**Appendix A**
**List of Additional Materials Reviewed and Cited in**
**Dr. Laura Plunkett's Supplemental Report**

In addition to the materials specifically referenced and/or discussed within my March 13, 2020 Report and accompanying appendices, and the references set forth in my Supplemental Report, the additional materials considered are as follows:

**Depositions & Deposition Exhibits:**

Dr. Sunil Gupta
Dr. Amy Freedman
Dr. Janet Arrowsmith

**Expert Reports:**

Dr. David Madigan, 10/20/2019, 03/23/2020
Dr. David Kessler's Original and Supplemental Report, and documents cited therein
Dr. Janet Arrowsmith, 12/09/2019

**Other Documents:**

USFDA regulations for drugs in 21 CFR parts 200 to 499 and parts 201.57, 314.70, and 314.80 in particular
FDA, 2006 Guidance on Adverse Reactions: Section of Labeling
FDA, 2012 Drug Safety Report
January 2006 PLR Final Rule
Taxotere's labels for 1999 through 2020 found at the FDA website known as "drugs@fda"