# EXHIBIT V

Page 1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                    CASE NO. 2:16-cv-17039

3

4    ELIZABETH KAHN,                    ) VIDEOCONFERENCE
                                          VIDEOTAPED
5                                       ) DEPOSITION OF:

                  Plaintiff,            )
6                                       )

       v.                               ) ELLEN G.
7                                       ) FEIGAL, M.D.
                                        )
8    SANOFI S.A., SANOFI-AVENTIS        )
     U.S. L.L.C., SANOFI US SERVICE,    )
9    INC., and AVENTIS-PHARMA S.A.,     )
                                        )
10                Defendants.           )
     _____   )
11

12

13               TRANSCRIPT of the stenographic notes of

14   the proceedings in the above-entitled matter, as

15   taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,

16   held via Zoom videoconference from multiple

17   locations, with the witness located at 11806 Barranca

18   Road, Santa Rosa Valley, California, on Friday,

19   April 10, 2020, commencing at 10:58 a.m.

20

21

22

23

24

25

1    Q.    I think you said that the last time you

2    consented a patient was in -- did you say 1990?

3    A.    It was the 1990s, but you asked

4    specifically about breast cancer.  And it was

5    probably in the 1990s, yeah.

6    Q.    And you said that you didn't know that

7    PCIA was a side effect.  So what regimen would you

8    have been considering in the 1990s that you thought

9    you would need to warn about PCIA?

10    MR. MICELI:  Object to the form.

11    A.    I didn't warn about permanent alopecia,

12    because I didn't know it was a potential.

13    Q.    Would you warn about PCIA now in a

14    non-Taxane regimen?

15    A.    I'm not currently seeing patients.  I'm

16    not in that position.  It probably depends on the

17    physician.  But there's no causative evidence that

18    these other agents cause permanent alopecia.  There's

19    just anecdotal cases.

20    Q.    So if you were treating a patient, and

21    let's say you gave them FAC, F-A-C, would you tell

22    them when you're consenting them that PCIA is a

23    potential risk?

24    A.    I can't really answer that question,

25    because I'm not currently seeing patients.  Perhaps

1    that's a question for Dr. Bosserman, who is currently

2    seeing breast cancer patients.

3         Q.    So because you're not currently seeing

4    patients, you're not in a position to offer an

5    opinion about what is or is not proper consent.  Is

6    that true?

7         A.    No.  You asked personally, in a specific

8    situation.  No, I very strongly feel that if

9    there's -- particularly if there's causal association

10   for a side effect that's permanently disfiguring,

11   yes, I think that should be communicated.

12        Q.    So again for FAC, if you were consenting

13   a patient, would you tell them that PCIA was a

14   potential risk?

15        A.    I would have to tell them what's in the

16   label; and if I have some other experience, you could

17   add that in your discussion with the patient, about

18   anecdotal cases having been seen in the publications.

19   If you happened to know that information.

20        Q.    And you know that there's reports of FAC

21   causing PCIA.  Right?

22             MR. MICELI:  Object to the form.

23        A.    Yeah, you're using the word "causes."

24   The word -- the correct word is "cases."  There's

25   been anecdotal cases that have been seen, but cases

1          A.     The discussion I would have, if I was

2     still seeing breast cancer patients, would be to talk

3     about what's known about PCIA in different regimens.

4     I would have an informed discussion and talk to them

5     about it.

6          Q.     If you were consenting a patient for a

7     Taxol-based regimen for adjuvant breast cancer --

8                 (Court reporter clarification.)

9          Q.     If you were consenting a patient for a

10     Taxol-based regimen for adjuvant breast cancer --

11          A.     Uh-huh.

12          Q.     -- would you tell them that there have

13     been case reports of PCIA?

14                 MR. MICELI:  Object to the form.

15          A.     So you're talking about me personally.

16     I'm not the one -- I'm a general causation expert.

17     I'm here to talk about whether or not Taxotere can

18     cause permanent chemotherapy-induced alopecia.  I'm

19     not here to speculate on imaginary patients that come

20     into an imaginary clinic for me.

21                 So you're sort of going beyond the scope

22     of what I'm here for.  I'm not here as a practicing

23     physician.  But I do -- (inaudible) --

24                 (Court reporter clarification.)

25                 (A discussion is held off the record.)

Page 140

1              A.      I'm here more for general information

2       about what took place between physicians and

3       patients, and the types of information a physician

4       would want to know.  So I'm not here to dictate what

5       they say to a patient; I'm just here to talk about,

6       information should be provided.  So if there's

7       information, whether it's me or somebody else, if

8       they have knowledge about things from their

9       experience, well, they can share that with the

10      patient.

11             Q.      Do you think your ability to provide

12      opinions about what proper consent is is limited,

13      because you are not a practicing medical oncologist?

14             A.      No.

15                     MR. MICELI:  Object to the form.

16             A.      I'm actively involved in clinical

17      studies, trials, informed consent.  So I feel

18      informed consent for a breast cancer patient; the

19      general principles apply to talking to any patient

20      about their condition and their options.  There's

21      nothing -- it's not unique to breast cancer to

22      provide informed consent in a discussion.

23             Q.      And as part of that informed consent

24      process, if a medical oncologist was consenting a

25      patient for a Taxol-based regimen for adjuvant breast

Page 141

1    cancer, should that physician tell the patient that

2    there have been case reports of PCIA with Taxol?

3                MR. MICELI:   Object to the form.

4         A.     Here's what I can say.   If there's

5    information, a body of evidence, that shows a drug

6    has an increased risk for permanent

7    chemotherapy-induced alopecia, yes, I think that

8    information should be shared with the physician, so

9    they can share it with the patient when they have a

10   discussion with that patient about their options.

11               I'm not here to talk about --   I'm not

12   here to talk about other chemotherapy agent a patient

13   receives.   I'm really focused on Taxotere, and the

14   types of information that would be relevant when

15   you're talking to a patient about permanent

16   chemotherapy-induced alopecia, where you have a body

17   of evidence.

18        Q.     So part of the reason why I'm asking you

19   these questions is because in your report, you're

20   offering opinions about what informed consent is.   Do

21   you agree with that?

22        A.     Could you point me, in the report, to

23   what conclusion you're talking about?   I've got the

24   report in front of me; just point me to the right

25   page.

1          Q.     Please look at 71 and 72, Paragraph 6

2     and 7.

3          A.     Yes.  And what's your question?

4          Q.     So you understand the reason I'm asking

5     you about consent, and what would be proper consent,

6     is because you are offering opinions about consent

7     and what a proper consent is.  Does that make sense?

8          A.     Yes, and I've been trying to be clear.

9     If you have a body of evidence, all pointing to a

10    drug causing permanent chemotherapy-induced alopecia,

11    that's the issue that should be communicated to

12    investigators who are taking care of those patients,

13    so they can have an informed discussion with their

14    patient.

15               I'm not commenting about anecdotes, or

16    any other type of side effect.  I'm just talking

17    about the information that's the subject of this

18    trial; and that's permanent chemotherapy-induced

19    alopecia, where there's a body of evidence.  That's

20    what I'm talking about in 6, and that's what I'm

21    talking about in 7; where you have a body of

22    evidence.

23               You've done your Bradford-Hill criteria.

24    You've shown strength of association, you've shown

25    temporality, you've shown biologic gradient, you've

Page 143

1   shown biologic plausibility, you've shown

2   temporality, specificity, coherence.  You've gone

3   through all those criteria, and you've got a body of

4   evidence.

5           And so I'm saying, yeah, you should

6   share that information with physicians so they can

7   have a discussion with their -- with their patient.

8   I'm not going beyond that, about everything else they

9   should talk to a patient about.

10          Q.    So you think that a potential side

11  effect needs to be proven to that level of evidence,

12  before a physician should tell a patient in the

13  informed consent process that that's a potential side

14  effect?

15          A.    No, you're misinterpreting my

16  conclusion.  My scope is to talk about Taxotere in

17  the -- and its causal relationship to permanent

18  chemotherapy-induced alopecia.  My conclusions are

19  related to the scope of what I was asked to talk

20  about.

21          You're asking me a different question:

22  If there is sufficient safety issues that have been

23  seen in clinical trials, and they raise the concern

24  about a signal, should that be communicated to

25  physicians, and thus to patients?  Yeah, the answer