# EXHIBIT Y

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   TAXOTERE (DOCETAXEL)
              PRODUCTS LIABILITY           Docket No.: 16-MD-2740
6             LITIGATION                   Section "H(5)"
                                           September 18, 2019
7                                          New Orleans, Louisiana

8    *Relates To*:  *Barbara Earnest,*
     *Case No.: 16-CV-17144*

9

10   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11
                         DAY 3, MORNING SESSION
12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
13                UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiffs:        Barrios, Kingsdorf & Casteix, LLP
                                BY:  DAWN BARRIOS, ESQ.
17                              701 Poydras Street
                                Suite 3650
18                              New Orleans, Louisiana 70139

19

20   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer, LLC
21                              BY:  PALMER LAMBERT, ESQ.
                                2800 Energy Centre
22                              1100 Poydras Street
                                New Orleans, Louisiana 70163
23

24

25

                         ***OFFICIAL TRANSCRIPT***

1    A.    We had a packet that we could give -- I gave it out a lot

2    to the nurses.  It was a CD-ROM and a USB port, and it housed

3    individual tear sheets on all of the side effects -- the common

4    side effects of the drug.

5          And so, it was nifty because the clinics could

6    customize it.  So they could put on the top of it

7    "Hematology/Oncology Specialist" and they could put their

8    number on it in case of an emergency or what have you.

9          Also, it did not take up a ton of space because it

10   was either a USB port or a CD-ROM, so they could put on it

11   their computer.  If they had somebody coming in and they were

12   having trouble with nail fungus and neutropenia, they could

13   just go on their desktop and click neutropenia, nail fungus,

14   and print out the associated sheet that is with that side

15   effect and hand it to the patient and say:  Here, take this

16   home.  This will help you.  They'd go over what's on the sheet

17   with the patient.

18         And so we used this a lot to help with side effect

19   management.

20   Q.    Let's just look at it briefly.  The first page we have

21   here, and then there's just a dark page, and then go to the

22   next page.  Can you tell us what this first page is here?

23   A.    This is the side effect sheet for hair loss, or *alopecia*

24   is the term for it.

25   Q.    Go one before that.  It's Bates ending 472, if you see

*OFFICIAL TRANSCRIPT*

1          MR. STRONGMAN:  Objection.

2          THE COURT:  Sustained.

3    EXAMINATION BY MS. MENZIES:

4    Q.   Did you ever have any conversations with Dr. Carinder or

5    Nurse Reso about Taxotere and the potential side effect of

6    permanent hair loss?

7    A.   I talked to Nurse Reso about loss.  I mean, it was a side

8    effect of the drug.  Its being permanent, no, and it being --

9    no.  No.  Because I didn't think it was permanent.  I wasn't

10   told it was permanent, so, I didn't say it was permanent or

11   have a conversation that it might be permanent.

12          We spoke to this.  We used things like

13   this (indicating).  And these -- to this day, understand this

14   as temporary, so I can't be conveying something that I didn't

15   think.

16          MS. MENZIES:  Thank you, Your Honor, no more questions

17   at this time.

18          THE COURT:  Thank you.

19             Mr. Strongman.

20          MR. STRONGMAN:  May I proceed, Your Honor?

21          THE COURT:  Yes, you may.

22                         CROSS-EXAMINATION

23   BY MR. STRONGMAN:

24   Q.   Good morning.  Now, Ms. Avila, you worked at Sanofi from

25   September 2004 until October 2009, correct?

                         *OFFICIAL TRANSCRIPT*

1    correct?

2    A.    Correct.

3    Q.    They don't just get information from you, correct?

4    A.    Correct.

5    Q.    With regard to -- let me just back up to this.  With

6    regard to this nurse pamphlet, when you were working with this

7    document, you would have certainly dropped off the entire

8    document to the office, correct?

9    A.    Yeah, we would dissect it.

10   Q.    You wouldn't just drop off one or two pages or five pages;

11   you would drop off the whole document, correct?

12   A.    Yeah, and it was not the only thing that we used as well.

13   Q.    Right.  You also know that this is dated in 2006, correct?

14   A.    Correct.

15   Q.    You certainly have no information about whether or not

16   Ms. Earnest ever saw one single page of this document, correct?

17   A.    I do not know what Ms. Earnest saw.

18   Q.    Do you know whether or not Nurse Reso even handed out any

19   information to patients that she received from Sanofi

20   salespeople; do you know one way or another?

21   A.    I know that they needed a lot.  They called me for them.

22   They ran out of them.  I handed them out like candy.

23   Q.    But you know you were never in any of those meetings with

24   Nurse Reso and any of her patients, correct?

25   A.    I was not in the meetings.

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    During all of those visits to the various oncology

3    practices, you would have conversations with those doctors

4    about Taxotere, correct?

5    A.    Correct.

6    Q.    In your experience, doctors would be open with you if they

7    were seeing something with Taxotere that they did not expect,

8    correct?

9    A.    Correct.

10   Q.    During all the time that you worked on Taxotere, from 2004

11   until 2009, you do not recall one single doctor relaying to you

12   any concern about a side effect of permanent hair loss,

13   correct?

14   A.    To me directly, no.

15   Q.    No doctor in 19 cities or two states over five years ever

16   said to you:  My patient's hair did not grow back.  Correct?

17         MS. MENZIES:  Objection, asked and answered.

18         THE COURT:  Sustained.

19   EXAMINATION BY MR. STRONGMAN:

20   Q.    Now, Ms. Avila, you were terminated for misconduct,

21   correct?

22   A.    I violated the policy of the lunch, correct.

23   Q.    Now, you testified that you sent a lunch to an office, but

24   that you didn't attend the meeting, correct?

25   A.    I forgot to cancel it.  We were traveling for a company

*OFFICIAL TRANSCRIPT*

1    meeting that day, so I wasn't in attendance at the lunch.

2    That's the company policy, and I was fired for that.

3    Q.    Now, Ms. Avila, the truth of the matter is you were fired

4    for more than just sending a pizza and not attending a lunch,

5    correct?

6    A.    No, it's not correct.  I was accused of a lot of other

7    things, but ultimately that is what I was fired for.

8    Q.    Now, Sanofi had a code of how you had to interact with

9    physicians, correct?

10   A.    Correct.

11   Q.    You knew that code, correct?

12   A.    Correct.

13   Q.    You had a dinner program in 2009 where you received a gift

14   card back from a restaurant instead of having the refund put on

15   the company credit card, correct?

16   A.    No.  That's not correct.  That's not how that happened.  I

17   was not fired for that.

18          I was not the only person present at that dinner

19   program.  Michael Gillespie was there, and he was senior to me.

20   He was party to everything that happened there, which is why I

21   was not fired for that, because he would have been fired as

22   well.

23          I was fired for the pizza.  Yes, that incident was

24   brought up in my HR conversation, as well as a lot of other

25   things that they were not able to prove.

**OFFICIAL TRANSCRIPT**

1          Our company was about to have company layoffs, and we

2     had three people that worked in my geography.  Somebody had to

3     go.

4          I worked for a manager who, the moment I got married

5     in 2009, was like:  Are you going to get pregnant?  I got fired

6     right after I got pregnant.

7          So, there is a lot more to that story.  I got fired

8     for the pizza, and I resent you bringing it up.

9     Q.   Ms. Avila, you sued Sanofi, correct?

10    A.   I entered a wage claim against Sanofi because I wanted to

11    get the money back that I earned in 2008, when I won regional

12    award of the year and completed all of that.  I was due that

13    money, to my understanding.

14         So I sought counsel for that.  He recommended -- very

15    vehemently, he recommended that I should get the money back,

16    because he felt like Louisiana statute said, if you earn it,

17    you should get it.  I had earned it in 2008.

18    Q.   My question was:  You filed a lawsuit against Sanofi,

19    correct?

20    A.   Yes.

21    Q.   The lawsuit wasn't successful, correct?

22    A.   No, it was not.

23    Q.   Now, you know --

24         MR. STRONGMAN:  May I approach the witness, Your Honor?

25         THE COURT:  Yes, you may.

*OFFICIAL TRANSCRIPT*

1    MS. MENZIES: Your Honor, objection. Objection on

2  relevance.

3  EXAMINATION BY MR. STRONGMAN:

4  Q.  Ms. Avila, as part of your lawsuit --

5    THE COURT: Wait.

6    MS. MENZIES: We have some objections to this.

7    MR. STRONGMAN: Do you want me to approach?

8    THE COURT: Yes.

9    (WHEREUPON, at this point in the proceedings, a

10  conference was held at the bench.)

11    MR. STRONGMAN: So Ms. Avila said it was the pizza. In

12  her lawsuit, it explains that the gift card was part of her

13  firing, and that she took doctors to dinner with the gift card.

14  She just denied that.

15    THE COURT: She took doctors to dinner with the gift

16  card?

17    MR. STRONGMAN: Correct.

18    THE COURT: So she didn't use it on herself?

19    MR. STRONGMAN: Correct. She then took doctors out to

20  dinner on it, which violated the code. That's documented in

21  her lawsuit.

22    THE COURT: What's the objection?

23    MS. MENZIES: The objection is relevance. He asked her

24  about the gift card. She admitted that she -- that that was an

25  issue. She talked about how other people were involved.

*OFFICIAL TRANSCRIPT*

1              So she's already answered this question.  She

2      didn't say --

3              MR. STRONGMAN:  This is a case, Judge.  This isn't some

4      kind of sworn testimony or something.

5              MR. COFFIN:  (Inaudible).

6              THE COURT REPORTER:  I really can't hear you.

7              THE COURT:  Well, that's because she's supposed to be

8      arguing.

9              You need to show me what word I'm looking for.

10             MR. STRONGMAN:  If you look here and here, it's these

11     two paragraphs.  She admitted to doing what she just denied

12     doing.  It's clear impeachment.  This is the reported decision

13     on her case.

14             THE COURT:  I'm going to let you ask the question, but

15     you understand on redirect, she's going to be able to say she

16     didn't use the gift card to buy anything except --

17             MR. STRONGMAN:  The problem was that she did use it for

18     doctors.  That was the problem.  Because that's not allowed.

19             MS. MENZIES:  She didn't -- but she didn't deny she

20     used it with doctors.  But she isn't recalling that.  That is

21     in the opinion.  And also, it's going to be -- the problem,

22     Judge, is the jurors, they're going to start trying the case

23     on --

24             THE COURT REPORTER:  I can't hear you.

25             THE COURT:  Y'all have got to start talking where I can

*OFFICIAL TRANSCRIPT*

1    hear you.

2          MS. MENZIES:  The problem is we're going to end up

3    retrying the case against Sanofi here on the stand, and it's

4    just simply not relevant.  She didn't deny that she was accused

5    of using this gift card incorrectly.  She explained the

6    circumstances of what happened to it.

7                He wants to point out that it was in judgment.

8    My concern is if we continue down this past path, we are going

9    to start retrying the case, and it has nothing to do with this

10   case here.

11         MR. STRONGMAN:  It all goes to her credibility.

12   They've brought her in here with an ax to grind, and it goes to

13   her credibility.

14         MS. MENZIES:  She testified she doesn't have an ax to

15   grind.

16         MR. STRONGMAN:  Of course she did.  I know.

17         THE COURT:  I'm going to allow you to ask her -- this

18   is, I have to tell you, difficult for someone that's not a

19   lawyer to follow.

20                I will allow you to ask her if her getting the

21   gift cards and subsequently using it for these purposes was a

22   violation of a policy, and was that part of the reason she was

23   fired.

24                Her testimony -- very frankly, it was a little

25   less, I think, clear for me what her testimony was about that

*OFFICIAL TRANSCRIPT*

1   because --

2         MR. STRONGMAN:  About the gift card, you mean?

3         THE COURT:  Yeah.  She said, yeah, that was part it,

4   but my boss was there, he did it too.  I was the one that got

5   blamed.  But I think you can -- where are we going with this?

6         MR. STRONGMAN:  It goes to her bias.

7         THE COURT:  I understand why you say she's got an ax to

8   grind.

9         MR. STRONGMAN:  I think it's a fair interpretation,

10  that's all.  That's a fair interpretation of the situation

11  we're in.  And her bias and credibility is relevant.

12        THE COURT:  Do you think this brings more than what

13  she's already admitted?

14        MR. STRONGMAN:  She denied --

15        THE COURT:  She didn't deny the gift card.

16        MR. STRONGMAN:  She denied she was fired for that.  And

17  it was clearly part of the reason she was fired.

18        MS. MENZIES:  She does deny that she understood that HR

19  told her that she was fired because --

20        THE COURT:  I think this is what I'm going to do.  I

21  think you need to ask the questions again, and if she ventures

22  far from it, I think you can direct her to it.  I think that's

23  fair.

24        THE COURT REPORTER:  The objection time goes to --

25        THE COURT:  The objection time goes to nobody.

*OFFICIAL TRANSCRIPT*

EXAMINATION BY MR. STRONGMAN:

Q.    Ms. Avila, you got a gift card after a dinner program,
correct?  In 2009, correct?

A.    Yes.

Q.    And you used that gift card, and you took a doctor and a
nurse out to dinner, correct?

A.    Correct.  Am I allowed to give context around these
questions?

        THE COURT:  Excuse me, ma'am.  What?

        THE WITNESS:  Am I allowed to give context around these
questions?

        THE COURT:  I think you just need to answer the
questions for now.

EXAMINATION BY MR. STRONGMAN:

Q.    And Sanofi believed that you doing that was a violation of
the company's prohibition of using funds for anything like
that, correct?

A.    They did.  And had I not sent the pizza, I would have been
disciplined with that, along with Michael Gillespie, who was my
superior, who was with me at the time that we received the gift
card, instead of wine or steak, which is what a lot of reps did
at the time, taking that home, because you invite ten people to
a dinner program and four show up, and you've guaranteed ten
people to the restaurant and there is all of this money left
over.  So what do you do with it?

**OFFICIAL TRANSCRIPT**

1        I didn't want to take steak or wine.  I conferred

2  with Michael.  We decided to do the gift card and use it for

3  the company.  That's not why I got fired.  I was fired for the

4  pizza.

5  Q.   Ms. Avila, is it fair to say you're upset with the

6  company?

7  A.   No.  I'm upset with you right now because this is uncalled

8  for.

9        MR. STRONGMAN:  I don't have any other questions.

10        THE COURT:  Okay.  Ladies and gentlemen of the Jury,

11  it's time for our morning break.  Court will be at recess until

12  10:30.  I remind you don't discuss the case amongst yourselves

13  or with anyone else.  Court will be in recess until 10:30.

14        (WHEREUPON, at 10:20 a.m. the jury panel leaves the

15  courtroom.)

16        THE COURT:  You cannot discuss your testimony with

17  anyone.

18        MS. SASTRE:  Your Honor, I do have something I'd like

19  to raise very quickly.  I think that people are expected to act

20  a certain way in a courtroom when the jury is present.  The

21  witness' statement was not a joke.  I noticed none of the

22  jurors laughed.  There wasn't any laughing on our side of the

23  room.

24        This was the about the third or fourth time that,

25  for some reason, the left side of the room erupts in laughter.

**OFFICIAL TRANSCRIPT**

**A.**   I had also, from time to time, a role in that, yes.

**Q.**   So why don't we look at that first label which was for metastatic breast cancer; correct?

**A.**   Yes.

**Q.**   Now, at the time that Sanofi -- or that Taxotere came on the market in the United States in 1996, no long-term studies had been done about the safety of Taxotere; is that correct?

**A.**   To my knowledge, yes.

**Q.**   And that's because one with metastatic breast cancers just generally don't live very long, unfortunately; is that correct?

**A.**   Yes.

**Q.**   So in 1996, then, it would be fair to say that Sanofi had no idea that Taxotere could cause permanent hair loss, could it?

**A.**   Based on the follow-up of the studies, I would agree, yes, that it's difficult to predict the full duration of alopecia, yes.

**Q.**   But Sanofi at that time would have no idea to know then that there was a permanent alopecia problem, would there?

**A.**   No, I don't think so.

**Q.**   You're generally familiar with drug labels; correct?

**A.**   No, I'm not.

**Q.**   And according to our labeling chronology, this is the first label for Taxotere; correct?

**A.**   Yes.  Correct.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:00PM | 1 | **Q.**   All right.   And if you see the top, it's a little hard to |
| 3:00PM | 2 | read because it's an old document.   It says "Patient |
| 3:00PM | 3 | Information Leaflet."   Do you see that? |
| 3:00PM | 4 | **A.**   Okay.   All right.   Yes, I can see that. |
| 3:00PM | 5 | **Q.**   Are you familiar that a patient leaflet information is? |
| 3:00PM | 6 | **A.**   I have a good idea what it could be, yes. |
| 3:00PM | 7 | **Q.**   Okay. |
| 3:00PM | 8 | **A.**   It's information to the patient in a lay language the |
| 3:00PM | 9 | patient can understand. |
| 3:00PM | 10 | **Q.**   Okay.   So this is written, just so I'm clear, in lay |
| 3:00PM | 11 | language that a patient can understand? |
| 3:00PM | 12 | **A.**   Yes. |
| 3:00PM | 13 | **Q.**   So let's turn to page 3 then.   Do you see at the top, |
| 3:00PM | 14 | there's a section that says "Hair Loss"? |
| 3:00PM | 15 | **A.**   Yes, I can see that. |
| 3:00PM | 16 | **Q.**   Okay.   And it says "Hair loss - Loss of hair occurs in |
| 3:00PM | 17 | most patients taking Taxotere, including the hair on your head, |
| 3:00PM | 18 | underarm hair, pubic hair, eyebrows and eyelashes."   Is that |
| 3:00PM | 19 | correct? |
| 3:00PM | 20 | **A.**   Yes.   Correct. |
| 3:00PM | 21 | **Q.**   It then says, "Hair loss will begin after the first few |
| 3:00PM | 22 | treatments and varies from patient to patient."   Correct? |
| 3:00PM | 23 | **A.**   Yes. |
| 3:00PM | 24 | **Q.**   And did then says, "Once you have completed all of your |
| 3:00PM | 25 | treatments, hair generally grows back."   Correct? |

OFFICIAL TRANSCRIPT

**A.**   Yes.

**Q.**   And then it says, "Your doctor or nurse can refer you to a store that carries wig, hair pieces and turbans for patients with cancer."  Correct?

**A.**   Yes.

**Q.**   So this language describing hair loss, this is language that Sanofi is using in 1996 when there have been no studies of long-term side effects represented to Taxotere; correct?

**A.**   Yes.  I see that.

**Q.**   And it would be -- it would be fair, then -- sorry, I stepped on your answer.

It would be fair to say, then, that Sanofi used this language when it had no idea that Taxotere could cause permanent hair loss; correct?

**A.**   Well, this language is the lay language translation for the data that were generated in the clinical trials.  And it was quite clear in the clinical trials conducted so far, in breast cancer, that there were hair loss in the studies.  And that after completion of the treatments, alopecia generally recovers.  That's what is the translation of the data that they are --

**Q.**   So Sanofi, then, had no way to know if the hair loss was permanent; correct?

**A.**   This is my understanding.

**Q.**   And not knowing if the hair loss was permanent, because

OFFICIAL TRANSCRIPT

1   there was no study of it, Sanofi chose to use the language
2   "hair generally grows back."  Is that correct?
3   A.   Yes.  I didn't know whether that was a question, yes.
4   Q.   Then when using the term hair "generally grows back," is
5   Sanofi warning about permanent hair loss in 1996?
6   A.   I don't think so, not with this language.  Although you
7   can understand that if it generally grows back, it means that,
8   in some cases, it does not, then -- that's all.
9   Q.   But there's no data to that effect in 1996?
10  A.   Again, there are some data showing that some patients
11  terminated the study or unfortunately died with their alopecia
12  still ongoing.  That's what the data shows.
13  Q.   Did the data show permanent hair loss?
14  A.   No, again, the data showed that, again, of the study the
15  patient still has hair loss.  Considering the duration of the
16  study, it's difficult to qualify that as permanent or
17  long-lasting.  I mean, it's the duration of the follow-up of
18  the study.  If it's two years, you can say after two years, X
19  many patients or potential patients had alopecia when they
20  died.
21  Q.   So let's do it this way.
22          So is it fair to say, then, that this statement is
23  saying hair generally grows back before you die and you may die
24  with alopecia?
25  A.   I'm not sure that that's the kind of language that can be

3:03PM   1   put in a document like this, but that's the data generated by
3:03PM   2   the studies.  Again, some patients don't die, they are
3:04PM   3   sometimes put in other treatments.  So, again, third-line,
3:04PM   4   fourth-line treatments for treatment of cancer, and they may
3:04PM   5   carry on alopecia, because chemotherapy drugs cause alopecia,
3:04PM   6   most of them.  So they continue to have alopecia -- alopecia
3:04PM   7   because of other chemotherapies.
3:04PM   8   Q.   Let's keep looking at this page 3.  Do you see that
3:04PM   9   there's a section called "Rash"?
3:04PM  10   A.   Okay.  Yes.
3:04PM  11   Q.   And then it says, "This side effect occurs commonly but is
3:04PM  12   severe in about 2 percent."  Is that right?
3:04PM  13   A.   Yes.
3:04PM  14   Q.   You may develop a rash that looks like a blotchy,
3:04PM  15   hive-like reaction."  Correct?
3:04PM  16   A.   Yes.
3:04PM  17   Q.   And then it says, "This usually occurs on the hands and
3:04PM  18   feet but may also appear on the arms, face and body."  Correct?
3:04PM  19   A.   Yes.
3:04PM  20   Q.   And then can you read with me what the next sentence is.
3:04PM  21   A.   "Generally, it will appear between treatments and will go
3:04PM  22   away before the next treatment.  Inform your doctor or nurse if
3:05PM  23   you experience a rash.  They can help you avoid discomfort."
3:05PM  24   Q.   Does that statement that begins with "generally," does
3:05PM  25   that tell people that they may permanently have a rash?

OFFICIAL TRANSCRIPT

**A.**   Here this sentence is all about the onset of the rash, saying that it will appear generally after a chemotherapy course and then disappear before you receive the next course. So it's all about the onset of the rash.  This is your understanding of the sentence.

**Q.**   And let's look at the next section called "Odd Sensations."  Do you see that?

**A.**   "Odd Sensations," yes.

**Q.**   And it says, "About half of patients getting Taxotere will feel numbness, tingling or burning sensations in their hands and feet."  Is that correct?

**A.**   Yes.

**Q.**   And it then says, "If you do experience this, tell your doctor or nurse."  Correct?

**A.**   Uh-huh, yes.

**Q.**   And then it says, "Generally, these go away within a few weeks or months after your treatments are completed."

Does that tell patients that they may permanently have odd sensations?

**A.**   No, it doesn't say so.  It says that "generally."  So I translate into most of the cases, these symptoms disappear after a few weeks or months after completion of treatments. That's what it says.

Again, I think it is substantiated by the data gathered in the clinical studies.  That's what I can say.

OFFICIAL TRANSCRIPT

**Q.**   And the next section says "Nail changes."

Do you see that?

**A.**   Yes.

**Q.**   And it says, "Color changes to your fingernails or toenails may occur while taking Taxotere."  Is that correct?

**A.**   Yes.

**Q.**   And then it says, "In extreme, but rare, cases nails may fall off."  Correct?

**A.**   Yes.

**Q.**   And it says, "After you have finished Taxotere treatments, your nails will generally grow back."

Did I read that right?

**A.**   Yes, you're correct.

**Q.**   When this says "your nails will generally grow back," does that tell patients that they may permanently lose their nails?

**A.**   I think it is a similar answer to all of these adverse events or side effects.  It says that the data generated in the clinical trials show that in many cases -- and here it is not specified how much or which is the percentage -- the side effect recover.

And this is what is said in the patient leaflet here. They aren't talking about permanent or anything.

**Q.**   Are they talking about permanent or not?

**A.**   They are not talking about permanent.

**Q.**   Okay.  So they're not talking about permanent nail

OFFICIAL TRANSCRIPT

1   changes, were they?

2   A.   No, they are not.  They just say that generally this

3   condition recovers.

4   Q.   They're not talking about permanent odd sensations, are

5   they?

6   A.   No, they are not.  As it's written here, they are not

7   talking about permanent.

8   Q.   They're not talking about permanent rash, are they?

9   A.   No, they are not.

10   Q.   And they're not talking about permanent hair loss, are

11   they?

12   A.   They're not either.

13   Q.   And if you look at the -- at page 10, there's an "Adverse

14   Reactions" section, if you see about halfway down on the left

15   side.  Do you see that?

16   A.   Okay.  Yes.  Before the table?

17   Q.   Yes, before the table.

18        And then the table represents, at the top, it says

19   "Summary of Adverse Events in Patients Receiving Taxotere at

20   100 milligrams."  Correct?

21   A.   Yes.  Correct.

22   Q.   And then it says "Alopecia."  Correct?  It's about

23   three-fourths of the way down.

24   A.   Yeah, I got it.  Alopecia.  Okay.

25   Q.   It just says the word "Alopecia."  Correct?

OFFICIAL TRANSCRIPT

**A.**   Yes.  Correct.

**Q.**   And at this time, as we discussed before, Sanofi is not referring to permanent hair loss here, because no long-term studies have been done to assess the safety of Taxotere; is that correct?

**A.**   This is correct.

**Q.**   Mr. Aussel, I'm going to hand you what I've marked as Exhibit 9.  If you look at this, this appears to be an informed consent; correct?

**A.**   Yes, this is correct.

**Q.**   For a study that appears to be 3501?

**A.**   Yes.  Correct.

**Q.**   And this is a study of the use of Taxotere for prostate cancer; correct?

**A.**   Correct.

**Q.**   All right.  And are you familiar with this study?

**A.**   Yes.  I know this study, yes.

**Q.**   All right.  And the date of issue at the bottom says May 24th, 2005; correct?

**A.**   Correct.

**Q.**   All right.  If you flip to the second page at the top, it says, "Document status:  Final."

        Do you see that?

**A.**   Second page.  Oh, "Status:  Final," yes.  Got it.

**Q.**   Where it says page 3 at the bottom, there's a section that

OFFICIAL TRANSCRIPT

says "What the Risks of the Study?"

     Do you see that?

**A.**  Yes, I see that.

**Q.**  All right.  And then if you flip to the next page -- let me take a step back.  This is a study that had -- it was a combination drug study; correct?

**A.**  Yes.  That is correct.  This is kind of a sophisticated design because there are several arms, what you call two-by-two design, meaning that the study wants to answer two questions in one clinical trial.

**Q.**  All right.  And so an informed consent like this, you would list the side effects of all the drugs that would be given possibly to the patient; correct?

**A.**  That is correct.

**Q.**  Okay.  And so in here, then, it's not surprising that there's a section that lists the side effects of Taxotere; is that correct?

**A.**  That's correct.

**Q.**  Okay.  And do you see that section on the top of page 4?

**A.**  Yes.

**Q.**  Where it says "With Taxotere"?

**A.**  Yes.

**Q.**  And then there's a second paragraph under that, that says, "The following events have also been reported."

     Do you see that?

| | | |
|---|---|---|
| 3:10PM | 1 | **A.**   Yes, I can see that there. |
| 3:10PM | 2 | **Q.**   And it starts off with "elevation of liver enzymes." |
| 3:10PM | 3 | Correct? |
| 3:10PM | 4 | **A.**   Yes. |
| 3:10PM | 5 | **Q.**   And then it has "fatigue."  Right? |
| 3:10PM | 6 | **A.**   Yes. |
| 3:11PM | 7 | **Q.**   And it lists "reversible pins and needles sensation in |
| 3:11PM | 8 | hands or feet."  Correct? |
| 3:11PM | 9 | **A.**   Yes. |
| 3:11PM | 10 | **Q.**   And then it says, "pain in the joints or the muscles." |
| 3:11PM | 11 | Correct? |
| 3:11PM | 12 | **A.**   Yes. |
| 3:11PM | 13 | **Q.**   And it says "reversible hair loss."  Correct? |
| 3:11PM | 14 | **A.**   Yes. |
| 3:11PM | 15 | **Q.**   So this informed consent is telling patients that |
| 3:11PM | 16 | reversible hair loss has been reported following use of |
| 3:11PM | 17 | Taxotere; correct? |
| 3:11PM | 18 | **A.**   Yes. |
| 3:11PM | 19 | **Q.**   And in document is dated May 24th, 2005; correct? |
| 3:11PM | 20 | **A.**   Yes. |
| 3:11PM | 21 | **Q.**   And you testified earlier that the informed consents, |
| 3:11PM | 22 | because they're signed by patients, are written in a language |
| 3:11PM | 23 | that patients can understand; correct? |
| 3:11PM | 24 | **A.**   This is correct, yes. |
| 3:11PM | 25 | **Q.**   And so there's not the use of the word "alopecia." |

OFFICIAL TRANSCRIPT

3:11PM 1   Instead, the informed consent used the nonmedical term

3:11PM 2   "reversible hair loss."  Correct?

3:11PM 3   A.   That's my understanding, yes.

3:11PM 4   Q.   I'm going to hand you what I'll mark as Exhibit No. 10.

3:11PM 5   And if we look at the bottom of this label, we see that it's

3:12PM 6   marked Sanofi_000213; correct?

3:12PM 7   A.   Yes.

3:12PM 8   Q.   And if we look over at Exhibit No. 7, which is the

3:12PM 9   labeling chronology.

3:12PM 10  A.   Yes.

3:12PM 11  Q.   If you look at where it as supplement No. 31.  Do you see

3:12PM 12  that?

3:12PM 13  A.   Yes.

3:12PM 14  Q.   And it has a label that's effective from January 6th,

3:12PM 15  2005, to August 10th of 2005; correct?

3:12PM 16  A.   Yes.

3:12PM 17  Q.   And that's a time period from this informed consent;

3:12PM 18  correct?

3:12PM 19  A.   Informed consent, May.  Yes.  Correct.

3:12PM 20  Q.   And that's the document we have in front of us.  So this

3:12PM 21  appears to be the label that was in effect in the United States

3:12PM 22  at the time that this informed consent was written; correct?

3:12PM 23  A.   Yes.

3:12PM 24  Q.   And if we turn to page 2, at the bottom, there's a "Hair

3:12PM 25  Loss" section.  Do you see that?

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:12PM | 1 | **A.**   I can see that, yes. |
| 3:13PM | 2 | **Q.**   And it says, "Loss of hair occurs in most patients taking |
| 3:13PM | 3 | Taxotere (including the hair on your head, underarm hair, pubic |
| 3:13PM | 4 | hair, eyebrows and eyelashes)."  Correct? |
| 3:13PM | 5 | **A.**   Yes. |
| 3:13PM | 6 | **Q.**   And it says, "Hair [sic] will begin after the first few |
| 3:13PM | 7 | treatments and varies from patient to patient."  Correct? |
| 3:13PM | 8 | **A.**   Yes. |
| 3:13PM | 9 | **Q.**   And then it says, "Once you have completed all of your |
| 3:13PM | 10 | treatments, hair generally grows back."  Correct? |
| 3:13PM | 11 | **A.**   Yes. |
| 3:13PM | 12 | **Q.**   That's the same language that we saw in the original 1996 |
| 3:13PM | 13 | label, isn't it? |
| 3:13PM | 14 | **A.**   Yes. |
| 3:13PM | 15 | **Q.**   And you had testified that this section is not talking |
| 3:13PM | 16 | about permanent hair loss; correct? |
| 3:13PM | 17 | **A.**   Yes.  I mean, I can hardly interpret what the people in |
| 3:13PM | 18 | charge of labeling meant here, but that's my interpretation. |
| 3:13PM | 19 | **Q.**   And then if we look at the informed consent, that confirms |
| 3:13PM | 20 | our understanding, because it warns of reversible hair loss as |
| 3:14PM | 21 | a reported side effect of Taxotere; correct? |
| 3:14PM | 22 | **A.**   Yes. |
| 3:14PM | 23 | **Q.**   And both this patient leaflet and the informed consent are |
| 3:14PM | 24 | written in language that -- for patients to understand; |
| 3:14PM | 25 | correct? |

OFFICIAL TRANSCRIPT

**A.**   I think so, yes.

**Q.**   Do you see anything inconsistent between the warning for reversible hair loss in the informed consent and the statement "hair generally grows back"?

**A.**   No, I don't see any inconsistency, but -- no inconsistency that I can appreciate.

**Q.**   So this "Hair Loss" section --

**A.**   In the --

**Q.**   -- in the patient leaflet --

**A.**   In the patient leaflet, yes.

**Q.**   -- is giving information on reversible hair loss like the informed consent says; correct?

**A.**   To my understanding, it gives information on hair loss. It doesn't mention specifically what -- it does mention some words about reversibility, even though the term "reversible" is not used in the label.

Again, I'm not a label specialist.  I don't know why it was used or not, but that's my interpretation.

**Q.**   The same terminology that would be used in a label; correct?

**A.**   Well, I -- I'm not sure it was the exact same terminology, because, again, I'm not a person specialized in labeling, and I have never been involved in labeling, but I assume my colleagues in charge of labeling takes the language of the study report and translate it into the labeling.

OFFICIAL TRANSCRIPT

**Q.** I guess my question is, but you can understand the medical terminology used in the label?

**A.** I can understand it, yes.

**Q.** And if you turn to the next page, page 22, at the top of the page, it says, "The safety profile is generally similar in patients receiving Taxotere for the treatment of breast cancer and in patients with other tumor types." Is that correct?

**A.** Yes. This is what's written, yes.

**Q.** What does that statement mean?

**A.** Difficult for me to interpret or to guess what is meant by the people in charge of labeling, by the regulatory. I mean, it's -- I can read that the safety profile generally is similar in patients receiving Taxotere for a year conditions.

**Q.** So let's at this first chart. It has a "Summary of Adverse Events in Patients Receiving Taxotere at 100 milligrams." Correct?

**A.** Correct.

**Q.** And then this you flip to the send -- the next page, there's a listing five up from the bottom that says "Alopecia." Correct?

**A.** Yes.

**Q.** And that's in a medical term; correct?

**A.** Correct.

**Q.** And we -- if we look back at the informed consent, it's written in language that patients can understand, Sanofi chose

OFFICIAL TRANSCRIPT

3:16PM  1   to use the term in patient language "reversible hair loss."
3:16PM  2   Correct?
3:16PM  3   **A.**   Hair loss.  Yes.  Correct.
3:16PM  4   **Q.**   Reversible hair loss; correct?
3:16PM  5   **A.**   Yes.
3:17PM  6   **Q.**   Okay.  So is it fair, then, to say that when we translate
3:17PM  7   from language that patients can understand, "reversible hair
3:17PM  8   loss" to "alopecia," what we're seeing here in this chart is
3:17PM  9   the percentage of people who had reversible hair loss?
3:17PM  10  **A.**   In the chart here?
3:17PM  11  **Q.**   Yes.
3:17PM  12  **A.**   No, that's what is not shown -- I mean, here in the chart.
3:17PM  13  In the table, the numbers are the percentage of patients who
3:17PM  14  experienced, once, alopecia during the course of the study.
3:17PM  15          It doesn't have any qualifier whether this
3:17PM  16  short-lasting or long-lasting, partial, total.
3:17PM  17  **Q.**   Okay.  But in the document that's given to patients --
3:17PM  18  **A.**   Yeah.
3:17PM  19  **Q.**   -- that patients read and sign before they participate in
3:17PM  20  Sanofi's experiment, which is what a clinical trial is, Sanofi
3:17PM  21  has translate the "alopecia" into "reversible hair loss."
3:17PM  22  Correct?
3:17PM  23  **A.**   That's what is written in the document, yes.
3:17PM  24  **Q.**   And if we go through the label, if you go to page 28,
3:18PM  25  there's another chart, and this is study TAX 316; correct?

OFFICIAL TRANSCRIPT

**A.**   Yes.

**Q.**   And here it lists alopecia about halfway down, just the term "alopecia."  Correct?

**A.**   Okay.  Got it.

**Q.**   And so for doctors, Sanofi is telling the doctors about alopecia, and they're telling the patients that alopecia is reversible hair loss; correct?

**A.**   Correct.

**Q.**   And this informed consent we've been looking at from this time period is an informed consent for a prostate cancer study; right?

**A.**   Yes.  Correct.  TAX 327 is a study in metastatic prostate cancer.  3501 is a study in earlier stages of prostate cancer, correct.

**Q.**   Is it your belief, Mr. Aussel, that when Sanofi tells doctors alopecia, that they are telling doctors about both permanent and reversible alopecia?

**A.**   I don't know.  I mean, the label says "alopecia."  I don't know what was agreed with the health authorities about the details to be provided regarding alopecia.  I don't know what was the -- what the specialists in labeling meant when listing this specific adverse event.

        As it is, I can't really comment.  But the form of alopecia, I mean the incidence of alopecia, there's no specific qualifier.

OFFICIAL TRANSCRIPT

**Q.   In anywhere in this Taxotere section, is Sanofi telling patients that permanent hair loss has been reported?**

**A.   This is a question?  Yes.  Correct.**

**Q.   So you're agreeing with me that there's no warning in this section of Sanofi telling patients that permanent hair loss has been reported following the use of Taxotere?**

**A.   I agree.**

**Q.   Do you believe that this informed consent from 2005 that is written in language for patients to understand is consistent with the label from 2005?**

**A.   I believe so, yes.**

**Q.   And I understand -- I asked you earlier, and you said you've never participated in any discussions with the health authority about a label; correct?**

**A.   Correct.  Difficult for me to interpret and to make the direct relationship between the detailed tables that we provide to the investigators, to the professional oncologists, and the lay language we use to inform the patients.  I can only say that, compared to the patient leaflet, there's no inconsistency with the informed consent.**

**Q.   Mr. Aussel, I'm going to hand you what I've marked as Exhibit 14.**

        And this appears to be a letter from Sanofi to the FDA dated June 12th, 2006; correct?

**A.   Yes.**

OFFICIAL TRANSCRIPT

770

3:20PM 1   **Q.**   I'm going to guess you haven't seen this letter before;

3:20PM 2   correct?

3:20PM 3   **A.**   No, I have not seen it before.

3:20PM 4   **Q.**   If you look at the last paragraph of that first page, it

3:20PM 5   says, "Enclosed please find a new protocol."  Correct?

3:21PM 6   **A.**   Yes.

3:21PM 7   **Q.**   Can you read the protocol title for me.

3:21PM 8   **A.**   "Phase IIb, randomized, multicenter, non-comparative pilot

3:21PM 9   study of the safety and efficacy of three docetaxel-based

3:21PM 10  chemotherapy regimens plus bevacizumab and trastuzumab for the

3:21PM 11  adjuvant treatment of patients with node-positive and high-risk

3:21PM 12  node-negative breast cancer."

3:21PM 13  **Q.**   Are you familiar with Study 714?

3:21PM 14  **A.**   Not at all.

3:21PM 15  **Q.**   But from reading the title, in your 20 years of

3:21PM 16  experience, you understand what the study is looking into?

3:21PM 17  **A.**   Yes.  Yes.

3:21PM 18  **Q.**   So this letter appears to be Sanofi transmitting a new

3:21PM 19  study protocol to the FDA; correct?

3:21PM 20  **A.**   Yes.  Yes.  Yes.  Could be a protocol amendment.  I don't

3:21PM 21  know what it means, the title here.  But it's a protocol

3:21PM 22  anyway, yes.

3:22PM 23  **Q.**   At the top of that page, it says "Amendment:  New

3:22PM 24  Protocol."  Correct?

3:22PM 25  **A.**   Okay.  New protocol, yes.

**Q.**   Let's turn to the page -- just to take a step back, you mentioned that you've worked a lot with protocols in executing clinical trials; correct?

**A.**   Yes.

**Q.**   So you have an understanding of how to read and understand clinical trial protocols from your years of experience?

**A.**   Oh, when reading, yeah.

**Q.**   You know a lot more about clinical trials than I do.  Let me just make sure I understand.

So if we look back -- and to be fair, actually, if we look back at a prior page, I didn't read the parentheticals where they have n=100 and n=150.

**A.**   I am not familiar at all with the general study, which is complex, I think, because there are many study drugs.  There is bevacizumab.  There is trastuzumab.  There is a plus/minus.  So I need to understand better, if needed, what are the actual treatment arms.

But this is basically -- and the -- Herceptin is a drug that can be used only in HER2-positive patients.  So that's why you also try to then pay attention to make sure that the HER2-negative patients don't receive Herceptin.

So it's a complex design that I will need a few minutes to understand.  But go ahead with your questions.

**Q.**   Let's turn to Appendix D.

**A.**   Yes.

772

**Q.**    And do you see that Appendix D contains the sample informed consent?

**A.**    Correct.

**Q.**    And this appears to have been submitted to the FDA as part of the protocol; correct?

**A.**    Correct.

**Q.**    All right.  If you turn to page 91, you'll see there's a section that begins with a question:  "What are the possible risks and inconveniences of being in the study?"  Correct?

**A.**    Correct.

**Q.**    And then if you turn to the next page, it begins with a section entitled "Non-cardiovascular Risks of Doxorubicin, Cyclophosphamide, Docetaxel, and/or Carboplatin."  Correct?

**A.**    Correct.

**Q.**    And the doxorubicin, cyclophosphamide, and docetaxel are commonly referred to as TAC; correct?

**A.**    Correct.

**Q.**    And, here, Sanofi is reporting the side effects that it knows about for the combination of drugs doxorubicin, cyclophosphamide, and docetaxel; correct?

**A.**    And carboplatin, yeah, correct.

**Q.**    And/or carboplatin.

        And then we see language like we've seen before.

        Do you see where it says, "The following events have also been reported"?

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:24PM | 1 | **A.**   Yes. |
| 3:24PM | 2 | **Q.**   Okay.  And then two lines under that, it lists reversible |
| 3:24PM | 3 | hair loss as a reported side effect; correct? |
| 3:24PM | 4 | **A.**   Correct. |
| 3:24PM | 5 | **Q.**   And do you see anything in that paragraph about |
| 3:24PM | 6 | long-standing hair loss? |
| 3:24PM | 7 | **A.**   No.  It's not written this way. |
| 3:24PM | 8 | **Q.**   Do you see anything in that paragraph about permanent hair |
| 3:25PM | 9 | loss being reported? |
| 3:25PM | 10 | **A.**   No. |
| 3:25PM | 11 | **Q.**   And then if you look down one paragraph, it says, "These |
| 3:25PM | 12 | side effects were reported from previous studies."  Correct? |
| 3:25PM | 13 | **A.**   Correct. |
| 3:25PM | 14 | **Q.**   And like the other informed consents we looked at, this |
| 3:25PM | 15 | informed consent is written in language that a non-doctor can |
| 3:25PM | 16 | understand; correct? |
| 3:25PM | 17 | **A.**   Yes.  This is the objective. |
| 3:25PM | 18 | **Q.**   So here in this informed consent, we have Sanofi telling |
| 3:25PM | 19 | patients that are participating in a clinical trial for Sanofi |
| 3:25PM | 20 | that a reported side effect of the TAC regimen is reversible |
| 3:25PM | 21 | hair loss; correct? |
| 3:25PM | 22 | **A.**   Yes. |
| 3:25PM | 23 | **Q.**   All right.  And if we look at the label that was in effect |
| 3:25PM | 24 | at this time, we have the hair loss section, which is the |
| 3:25PM | 25 | language we've seen before, "hair generally grows back." |

OFFICIAL TRANSCRIPT

1   Correct?

2   A.   Yes.

3   Q.   And you had testified that, you know, since the informed

4   consent and the patient leaflet -- or patient information

5   section are written in language that patients can understand,

6   "hair generally grows back," is a warning for reversible hair

7   loss; correct?

8   A.   Yes.

9   Q.   There's nothing in the label that says anything about

10   personal alopecia, is there?

11   A.   Correct.

12   Q.   Would you agree that, if Sanofi had knowledge that

13   Taxotere could be associated with long-standing or permanent

14   hair loss, it had an obligation to clearly warn parents

15   patients about that risk?

16   A.   I can hardly comment on this kind of consideration because

17   it was not my responsibilities at that time within Sanofi.

18          The people responsible for making such decisions were

19   people sitting in regulatory departments, labeling departments,

20   possibly pharmacovigilance departments.  They have regular

21   discussions with health authorities.  And in conjunction with

22   health authorities, they define what is in the label, what

23   should be brought to the patients in terms of information.

24          I can't really comment.

25   Q.   Have you ever worked in pharmacovigilance?

OFFICIAL TRANSCRIPT

**A.**   I'm sorry?

**Q.**   Have you ever worked in pharmacovigilance?

**A.**   Never.

**Q.**   Did you ever take part in any discussions, when you were working on clinical trials, about discussing or warning doctors about two different kinds of alopecia?

**A.**   No.  In my role -- again, we were conducting studies, making sure that we collect information about alopecia, that the studies are run in an appropriate way.  And we collect data.  And we contribute to feed the evidence that are then interpreted, discussed by the different labeling regulatory teams within Sanofi.

It was not specifically -- I didn't have the specific mission to inform the health authorities about the different types of alopecia.  I relied on what was in the informed consent based on, as we discussed before, based on what is in the patient leaflet.  And this is what is officially approved both by health authorities and Sanofi persons of labeling.

I mean, my responsibility was to -- to provide the data for each clinical trial so that those persons within Sanofi and these bodies, health authorities, can make an appropriate judgment on what is the safety profile of Taxotere.  And that's it.

**Q.**   Were you part of that regulatory team ever?

**A.**   Never.

OFFICIAL TRANSCRIPT

**Q.** All right.  So you didn't participate in any discussions with the FDA yourself, did you?

**A.** No, no, never.

**Q.** Do you recall any -- being told anything about the labeling discussions by the American team?

**A.** No, never.

**Q.** Were you ever on the safety management team for Taxotere?

**A.** No.  In my role at that time, I was not supposed to be part of this kind of team.

**Q.** At any point, have you been?

**A.** At any point, I did not -- never had any roles that justify my presence in such team.

**Q.** Good afternoon, Jean-Philippe.  How are you?

**A.** I'm fine.  Thank you.

**Q.** Have you ever worked in Sanofi's pharmacovigilance department?

**A.** Never.

**Q.** Have you ever been involved in making safety signal analyses?

**A.** No.

**Q.** Have you ever been involved in or engaged in any sort of determinations about the causal association or causal relationship between Taxotere and any particular side effect?

**A.** No.  It was up to the investigator to do it, not up to me.

**Q.** That would never -- making determinations as to a safety

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:29PM | 1 | analysis or a safety signal analysis or a causal relationship, |
| 3:29PM | 2 | has that ever, at any point in your time at Sanofi, been part |
| 3:30PM | 3 | of one of your roles or responsibilities? |
| 3:30PM | 4 | A.   No, never. |
| 3:30PM | 5 | Q.   And it would never be one of your roles or |
| 3:30PM | 6 | responsibilities to prepare leaflets or pamphlets that would go |
| 3:30PM | 7 | to oncologists or any type of medical professional? |
| 3:30PM | 8 | A.   No.  It was not my job. |
| 3:30PM | 9 | Q.   Okay.  And that's for your entire time at Taxotere; is |
| 3:30PM | 10 | that correct? |
| 3:30PM | 11 | A.   Yeah, correct. |
| 3:30PM | 12 | Q.   Jean-Philippe, you were asked if you remember, say, an |
| 3:30PM | 13 | hour and a half or several hours of questions about a variety |
| 3:30PM | 14 | of Taxotere labels. |
| 3:30PM | 15 |        Do you recall that?  It was kind of at the beginning |
| 3:30PM | 16 | of day. |
| 3:30PM | 17 | A.   Okay.  Yeah. |
| 3:30PM | 18 | Q.   Okay.  And all the questions that you had were related to |
| 3:30PM | 19 | what's known as the U.S. package insert or the Taxotere label |
| 3:30PM | 20 | that's used in the United States. |
| 3:30PM | 21 |        Does that sound about right? |
| 3:30PM | 22 | A.   Yes. |
| 3:30PM | 23 | Q.   At any time at Sanofi, have you been involved or part of |
| 3:30PM | 24 | any type of labeling group or labeling working committee or |
| 3:31PM | 25 | labeling review committee? |

OFFICIAL TRANSCRIPT

3:31PM 1  **A.**    No.  I've never been part of these kind of committees.

3:31PM 2  **Q.**    Have you ever drafted or provided input as to what should

3:31PM 3  go in a particular label?

3:31PM 4  **A.**    No, did not.

3:31PM 5  **Q.**    Have you ever been given a label to -- a proposed label to

3:31PM 6  review or provide comment on as it relates to Taxotere?

3:31PM 7  **A.**    No, I have not.

3:31PM 8  **Q.**    Okay.  Do you know who is responsible within Sanofi,

3:31PM 9  generally, for reviewing and preparing and updating drug

3:31PM 10 labels?

3:31PM 11 **A.**    Yes.  There is a labeling department whose responsibility

3:31PM 12 is to do this kind of activity.  I think they do it with the

3:31PM 13 support of regulatory affairs, medical doctors,

3:31PM 14 pharmacovigilance.

3:31PM 15 **Q.**    So, as we sit here today, would you have any information

3:31PM 16 about what safety information Sanofi proposed to regulatory

3:31PM 17 authorities related to Taxotere?

3:32PM 18 **A.**    I am not aware of such information.  I'm not part of the

3:32PM 19 people to be aware of these kind of discussions or information.

3:32PM 20 Today, I was shown some document about that.  So I could read

3:32PM 21 what was inside, but I wasn't part of the decisions.

3:32PM 22 **Q.**    And would you have any personal knowledge as to what was

3:32PM 23 meant or intended by particular language in a label, whether

3:32PM 24 that be the label in the U.S. or whether that be the label in

3:32PM 25 Europe?

3:32PM  1   **A.**   No.   I'm not knowledgeable about these technical labeling

3:32PM  2   details.   I don't know the meaning of the wording and what is

3:32PM  3   supporting the decisions.

3:32PM  4   **Q.**   Okay.   If you will grab Exhibit No. 8.

3:33PM  5           Exhibit No. 8 was the Taxotere label from, I believe,

3:33PM  6   1996 when the drug was first approved in the United States.

3:33PM  7           Does that sound about right?   Once you've had a

3:33PM  8   chance to look over that document.

3:33PM  9   **A.**   It doesn't seem there's any date here, but could be.

3:33PM  10  **Q.**   Okay.   I'll represent to you that this was during the

3:33PM  11  examination earlier today, the Taxotere label from 1996.

3:33PM  12          If you'll turn to Sanofi 000003 of this document.

3:33PM  13  **A.**   Okay.

3:33PM  14  **Q.**   I apologize, Jean-Philippe.   I believe this was the

3:33PM  15  relevant section.   It was both the label -- the FDA-approved

3:33PM  16  label as well as the FDA-approved patient leaflet, and the

3:34PM  17  discussion was about the patient leaflet.

3:34PM  18  **A.**   Okay.

3:34PM  19  **Q.**   Will you look at the section that's called "Hair Loss."

3:34PM  20          Do you see that section?

3:34PM  21  **A.**   I see, yes.

3:34PM  22  **Q.**   Okay.   And do you recall that you were asked a number of

3:34PM  23  questions about that particular section?

3:34PM  24  **A.**   Yes, I do.

3:34PM  25  **Q.**   So just to be clear for the record and for the ladies and

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

1  of patients.  Even though they're clinical studies, they're not

2  as large as the Phase III studies which are much more

3  controlled and much more robust in the way the data is

4  collected.  But those two were very informative to start out,

5  and they were early publications, some of the earliest

6  information in the scientific literature.

7  **Q.**  Did you determine whether or not permanent hair loss

8  associated with Taxotere is a common side effect?

9  **A.**  Yes, I did.

10  **Q.**  And what is your opinion in that regard?

11  **A.**  Based upon the information that's available in the medical

12  literature as well as in the clinical trial information that's

13  been collected, that permanent alopecia, irreversible alopecia,

14  permanent hair loss, whatever name you want to use, is not

15  rare; it's common.  That's because it's occurring in more than

16  1 percent of the people in many of the reports that are out

17  there.

18          So you rank things as being rare or common or

19  frequent in the medical literature based upon whether it's less

20  than 1 percent, more than 1 percent, more than 10 percent of

21  the people that are being studied at that time.  Rare is less

22  than 1 percent.

23  **Q.**  And, Doctor, let me stop you just for a second.

24          Is the ranking that you just provided WHO also?

25  **A.**  Yes.  That's another -- that's where you can find it.  The

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:27PM 1   World Health Organization also has published sort of this

4:27PM 2   standard for how you rank -- use names.  All the scientists in

4:27PM 3   the clinical literature, if they see the word "rare," they

4:27PM 4   should understand that that should be something that occurs

4:27PM 5   less than 1 percent of time.

4:27PM 6   Q.   All right.  Doctor, I'm going to put in front of the

4:27PM 7   jury -- publish to the jury something that's already been shown

4:27PM 8   as part of the opening about frequency of reactions.

4:27PM 9        Is this the WHO ranking scale?

4:27PM 10  A.   Yes, that's correct.

4:27PM 11  Q.   All right.  And so you were explaining a moment ago about

4:27PM 12  common.

4:27PM 13       Can you tell us, looking at this scale, what it is

4:27PM 14  you're talking about there?

4:27PM 15  A.   So the second bar at the top here, this here, so if it's

4:27PM 16  greater than 1 in 100, it's greater than 1 percent; less than

4:28PM 17  1 in 10, so it's between 1 and 10 percent of the people in the

4:28PM 18  study or the people in the population that you're talking

4:28PM 19  about.

4:28PM 20       So each -- each piece of literature I looked at, I

4:28PM 21  could look and see whether or not it was showing percentages

4:28PM 22  that would fit common or rare, for example.  If you look at

4:28PM 23  rare, it's going to be less than 1 percent.  Where it says less

4:28PM 24  than 1 in 100, that means less than 1 percent.

4:28PM 25  Q.   Okay.  So aside from Nabholz and Sedlacek, which I think

OFFICIAL TRANSCRIPT

4:28PM 1   you just told us about, did you review the 2009 study by

4:28PM 2   Prevazas?

4:28PM 3   A.   Yes, I did.

4:28PM 4   Q.   Did it inform your opinions in this case?

4:28PM 5   A.   Yes.

4:28PM 6   Q.   And how?

4:28PM 7   A.   So Prevazas is a case report.  So it fits back in one of

4:28PM 8   buckets of information that I was able to collect.  And the

4:28PM 9   Prevazas study reports on cases of permanent alopecia in

4:29PM 10  patients that -- in a patient that had been treated with

4:29PM 11  Taxotere.

4:29PM 12       So this is where the investigator felt it was

4:29PM 13  important to put it into the literature.  They wrote the case

4:29PM 14  report up and got it published.  So it fits in that case report

4:29PM 15  bucket.

4:29PM 16  Q.   All right.  And, Doctor, did you review the Bertrand study

4:29PM 17  from 2013?

4:29PM 18  A.   Yes, I did.

4:29PM 19  Q.   And did it inform your opinions in this case?

4:29PM 20  A.   It did.

4:29PM 21  Q.   And how so?

4:29PM 22  A.   So it fit into that middle bucket, observational

4:29PM 23  information, so observational studies.

4:29PM 24       It's something that is called a prospective study.

4:29PM 25  It's where the investigator decided to follow in his practice a

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:29PM  1   group of patients going forward over time, and they reported a

4:29PM  2   five-year follow-up for patients that were treated for breast

4:29PM  3   cancer with Taxotere.  And they found that there was -- that

4:29PM  4   persistent -- I think they called it persistent alopecia was

4:30PM  5   occurring that population they looked at about a third of the

4:30PM  6   time in five years.

4:30PM  7   Q.   And did you review the Kang 2018 study?

4:30PM  8   A.   Yes, I did.

4:30PM  9   Q.   And did it inform your opinions in this matter?

4:30PM  10  A.   It did.

4:30PM  11  Q.   And how so?

4:30PM  12  A.   So it's another one of those studies in the middle bucket

4:30PM  13  of observational.  It also is prospective, meaning someone is

4:30PM  14  following patients going forward in time, looking at the

4:30PM  15  experience of the patients.  And that investigator also finds

4:30PM  16  that persistent alopecia with Taxotere is a common event, so

4:30PM  17  more than 1 percent of the patients.

4:30PM  18  Q.   And the 2016 Namini study, did you review that?

4:30PM  19  A.   Yes.

4:30PM  20  Q.   And what type of study is that?

4:30PM  21  A.   So it's a review paper, but it cites to clinical data.

4:30PM  22  And when I say "clinical data," clinical trial data for

4:30PM  23  Taxotere.  And it actually reports on 316 data.

4:31PM  24  Q.   Okay.  316?

4:31PM  25  A.   Oh, it talks about the TAX 316 clinical trial for

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:31PM  1    Taxotere.

4:31PM  2    **Q.**   Okay.  And so we're going to get to the TAX 316.  I think

4:31PM  3    the jury's heard a lot about it already.

4:31PM  4           How did Namini inform your opinions in this matter?

4:31PM  5    **A.**   It was important because it was another piece of

4:31PM  6    information from the medical literature confirming the fact

4:31PM  7    that there was clinical trial information reporting that

4:31PM  8    Taxotere was being associated with an increased risk of

4:31PM  9    permanent alopecia in patients in the study and to a greater

4:31PM  10   rate than the comparator group.

4:31PM  11          And this is TAX 316.  So it's comparing the TAC and

4:31PM  12   the FAC groups, and it talks about the actual percentages.

4:31PM  13   And, again, the percentages reported would not fit with rare;

4:31PM  14   they would fit with common.

4:31PM  15   **Q.**   And, Doctor, you mentioned 316 just a minute ago in

4:32PM  16   connection with Namini.

4:32PM  17          Did you review Sanofi's TAX 316 study?

4:32PM  18   **A.**   I did.  I looked at the -- I didn't do what Dr. Madigan

4:32PM  19   did.  But I did look at the study report and the study results,

4:32PM  20   as reported to FDA.

4:32PM  21   **Q.**   And what, if anything, is important about TAX 316 to your

4:32PM  22   opinions in this case?

4:32PM  23   **A.**   It's the fact that, in a study where they had two -- it's

4:32PM  24   a well-controlled, well-designed, randomized study.  In order

4:32PM  25   to control all those things that make it reliable, they -- were

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:32PM  1   able to show, when they adjusted Taxotere in a population of

4:32PM  2   people as compared to 5-fluorouracil with the other regimens --

4:32PM  3   regimens being the same, that the Taxotere group, when you

4:32PM  4   added that drug into that group, that there was a difference in

4:32PM  5   the rate of permanent alopecia being reported.

4:33PM  6           So in other words, the pattern was more permanent

4:33PM  7   alopecia in the drug group that got the Taxotere as compared to

4:33PM  8   the drug group that didn't get it, even though both groups were

4:33PM  9   also getting other drugs.  And that's true, they were.  But the

4:33PM 10   variable that looked different was Taxotere or not.

4:33PM 11   Q.   Did you look at the Sanofi GEICAM study?

4:33PM 12   A.   Yes.

4:33PM 13   Q.   Did it inform your opinions in this case?

4:33PM 14   A.   Yes.  It's the same as the TAX 301 study, I believe, that

4:33PM 15   was talked about this morning.

4:33PM 16   Q.   All right.  And how did it inform your opinions?

4:33PM 17   A.   Because it was another clinical trial done by Sanofi on

4:33PM 18   Taxotere, also on a breast cancer population, that is, again,

4:33PM 19   seeing a difference in the rate that's being reported for

4:33PM 20   patients that were on Taxotere with the TAC versus patients on

4:33PM 21   the FAC.

4:33PM 22           And I think that was talked about a lot this morning.

4:33PM 23   But essentially the same pattern in those clinical trials is

4:34PM 24   seen for persistent alopecia.  And, again, the rate that's

4:34PM 25   reported was not rare, but it was common in those patients.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:34PM  1   Q.   Now, Doctor, did you review any of the other cancer agents
4:34PM  2   on the market to determine whether or not there was a permanent
4:34PM  3   toxic effect of hair loss?
4:34PM  4   A.   Yes.  I did a general survey, as part of my work, to look
4:34PM  5   first for literature on persistent alopecia and didn't limit it
4:34PM  6   just to one drug, looked across the literature to see what I
4:34PM  7   could find.
4:34PM  8   Q.   Did you find, through the literature that you did look at,
4:34PM  9   whether any other drug has, as a common toxic effect, permanent
4:34PM  10  hair loss?
4:34PM  11  A.   I did look for that, yes.
4:34PM  12  Q.   And what did you find?
4:34PM  13  A.   I found that the database of information that's available
4:34PM  14  for Taxotere looks very different than the kind of information
4:34PM  15  for any other drug that may have a report.
4:34PM  16          And the difference is, for Taxotere, you have all
4:34PM  17  three buckets of evidence we -- I showed on that.  You have
4:35PM  18  clinical trial data, you have observational data, and you have
4:35PM  19  case reports that are consistently showing that Taxotere has
4:35PM  20  been linked to or associated with permanent alopecia or
4:35PM  21  irreversible hair loss.
4:35PM  22          For some of the other drugs that are out there, I see
4:35PM  23  a few case reports for some of them, but I don't see all three
4:35PM  24  types of evidence that's available for me to look at publicly.
4:35PM  25  It just isn't there.

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - DIRECT

4:35PM 1          Even drugs -- and I focused, actually, on some of the

4:35PM 2     drugs that were being used in combination with Taxotere,

4:35PM 3     because I wanted to know about doxorubicin and I wanted to know

4:35PM 4     about cyclophosphamide and 5-fluorouracil.  So I really paid

4:35PM 5     attention to those.  And the database of information that's

4:35PM 6     available looks very different than it does for Taxotere.

4:35PM 7     Q.   And based -- did you utilize your weight-of-the-evidence

4:35PM 8     analysis to come to your conclusions regarding permanent hair

4:35PM 9     loss and Taxotere?

4:36PM 10    A.   Yes.

4:36PM 11    Q.   And so if you were looking at it and weighing the

4:36PM 12    evidence, how do you come down ultimately on that issue?

4:36PM 13    A.   I come down that there's a difference.  Taxotere looks

4:36PM 14    different.  My opinion is that Taxotere has a -- carries a

4:36PM 15    greater -- an increased risk of being associated with permanent

4:36PM 16    alopecia in patients as compared to the other drugs that I was

4:36PM 17    able to review and that I saw reviewed or discussed within the

4:36PM 18    scientific literature.  And that included Taxol as well.

4:36PM 19    Q.   Is it close?

4:36PM 20    A.   No, it wasn't close.  And that was, I think -- what was --

4:36PM 21    it jumps out when you look across the published literature.

4:36PM 22         MR. NOLEN:  Thank you.  I'll pass the witness.

4:36PM 23         MS. SASTRE:  Your Honor, may we approach?

4:36PM 24         (WHEREUPON, the following proceedings were held at

4:36PM 25    the bench.)

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:26PM   1   **A.**   I think the reports would fit either definition.

5:26PM   2   Sometimes it's called one and sometimes it's called the other.

5:26PM   3   **Q.**   Okay.  But let me just be clear.  When it came to Taxol

5:26PM   4   and the research and the work you did, you specifically

5:26PM   5   identified permanent hair loss as a hazard of Taxol; true?

5:26PM   6   **A.**   Within case reports, yes.  There were some case reports.

5:27PM   7   **Q.**   Let's talk about Adriamycin.  You identified permanent

5:27PM   8   hair loss as a hazard of Adriamycin; correct?

5:27PM   9   **A.**   Same answer.  There are some case reports for that as

5:27PM   10   well.  Not as many, but there are some.

5:27PM   11   **Q.**   But it's something you saw in the literature; correct?

5:27PM   12   **A.**   Yes, there are some case reports.

5:27PM   13   **Q.**   Okay.  And if we move to Cytoxan -- well, let me actually

5:27PM   14   stop for a moment.

5:27PM   15           Did you review the Adriamycin label?

5:27PM   16   **A.**   I believe that was on my reliance materials, yes.

5:27PM   17   **Q.**   Okay.

5:27PM   18   **A.**   I think I tell you that in my report, that I looked at the

5:27PM   19   labeling for the drugs that were used in combination with

5:27PM   20   Taxotere.

5:27PM   21   **Q.**   Okay.  And did you see that it says "reverse complete

5:27PM   22   alopecia occurs in most cases"?

5:27PM   23   **A.**   I don't recall the words.  I would have to pull it back

5:27PM   24   out.  But let me look at my report.  I might have it in here,

5:27PM   25   if you want me to -- I just don't recall the specific wording

OFFICIAL TRANSCRIPT

LAURA MASSEY PLUNKETT - CROSS

5:54PM  1   **A.**   I assume.  I said I assume she did based on the fact that
5:54PM  2   she was -- she was taking it for breast cancer -- well, I say
5:54PM  3   taking it, Taxotere, as an adjuvant treatment.  So I assume
5:54PM  4   that she was taking Adriamycin and cyclophosphamide, but I
5:54PM  5   don't know for sure.  I'm not a case-specific expert.
5:54PM  6   **Q.**   Okay.  Well, your assumptions were right.  So Cytoxan, you
5:54PM  7   just used the word "cyclophosphamide"?
5:54PM  8   **A.**   Yes.
5:54PM  9   **Q.**   And just to be clear, Cytoxan is cyclophosphamide;
5:54PM  10  correct?
5:54PM  11  **A.**   Yes.  And I'm using that word because that's what's in the
5:54PM  12  literature most of the time.
5:54PM  13  **Q.**   Okay.  Is it okay if we use the term "Cytoxan"?
5:54PM  14  **A.**   That's fine.
5:54PM  15  **Q.**   Okay.  Very good.
5:54PM  16          So you now know that Mrs. Earnest was also taking
5:54PM  17  Cytoxan; correct?
5:54PM  18  **A.**   If you're going to tell me that's true, I will believe
5:54PM  19  that's true.
5:54PM  20  **Q.**   Okay.  All right.  So with regard to, again, your work in
5:55PM  21  this case, your search, your review, your analysis of the
5:55PM  22  literature, you would agree with me that you identified
5:55PM  23  permanent hair loss as a hazard of Cytoxan; correct?
5:55PM  24  **A.**   In terms of case reports, yes, there are some case
5:55PM  25  reports.

OFFICIAL TRANSCRIPT