# EXHIBIT CC

```
 1                          UNITED STATES DISTRICT COURT
 2                          EASTERN DISTRICT OF LOUISIANA

 3      *******************************************************************

 4      IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
        PRODUCTS LIABILITY LITIGATION         Section H
 5                                            New Orleans, LA
        Relates to:  Barbara Earnest          Tuesday, September 24, 2019
 6                   16-CV-17144

 7      *******************************************************************

 8                        TRANSCRIPT OF TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 9                        UNITED STATES DISTRICT JUDGE
                             DAY 7, MORNING SESSION
10

11      APPEARANCES:

12      FOR THE PLAINTIFF:          BACHUS & SCHANKER, LLC
                                    BY:  DARIN L. SCHANKER, ESQ.
13                                       J. KYLE BACHUS, ESQ.
                                    1899 Wynkoop St., Suite 700
14                                  Denver, CO 80202

15                                  FLEMING NOLEN & JEZ
                                    BY:  RAND P. NOLEN, ESQ.
16                                  2800 Post Oak Blvd., Suite 4000
                                    Houston, TX 77056
17
                                    GIBBS LAW GROUP, LLP
18                                  BY:  KAREN B. MENZIES, ESQ.
                                    6701 Center Drive West, 14th Floor
19                                  Los Angeles, CA 90045

20                                  DAVID F. MICELI, LLC
                                    BY:  DAVID F. MICELI, ESQ.
21                                  P.O. Box 2519
                                    Carrollton, GA 30112-0046
22
                                    PENDLEY BAUDIN & COFFIN
23                                  BY:  CHRISTOPHER L. COFFIN, ESQ.
                                    2505 Energy Centre
24                                  1100 Poydras St.
                                    New Orleans, LA 70163
25
```

\\fs1\Sanofi\TAXOTERE_LITIGATION\WITNESS PREP.-working\NEW JERSEY\DEP PREP\2021.06.16 - Vasireddy (Valentine)

09:35:01  1   Q.  I am going to hand you what is being marked as Exhibit No. 11.

09:35:10  2   Now, this is a meeting invite and the meeting invite is on

09:35:22  3   4/25/2006, so we're about maybe a month after the Amy Freedman

09:35:34  4   e-mail that we just discussed, and the subject is going to be

09:35:38  5   proposed changes to section 4 of a product label.  Do you see that,

09:35:45  6   at the top, under "Subject"?

09:35:47  7   A.  Discussion of proposed changes to section 4PL, yes.

09:35:51  8   Q.  And then there's a list of required attendees for the meeting.

09:36:00  9   It looks like the first listed required attendee would be yourself.

09:36:05 10   Do you see that?

09:36:06 11   A.  I see myself on the list.

09:36:06 12   Q.  All right.

09:36:09 13   A.  But I do want to highlight that -- that required attendees is

09:36:15 14   an indication that this is something they would like you to be at,

09:36:20 15   but that doesn't necessarily that this is a meeting that was

09:36:23 16   attended.  In fact, there were times where I had two or even three

09:36:29 17   required meetings occurring at the same time.

09:36:35 18   Q.  You agree that this document, Exhibit 11, lists yourself as a

09:36:42 19   required attendee?

09:36:43 20   A.  I am -- I am listed.  I am just trying to clarify that doesn't

09:36:46 21   mean --

09:36:47 22   Q.  No, I appreciate it.

09:36:48 23   A.  -- that I would have attended it.

09:36:49 24   Q.  And the PL at the top, is that patient leaflet?

09:36:54 25   A.  I don't know.  I think that's a very good assumption.

09:36:58  1    Q.  Okay.  And what is a patient leaflet?

09:37:01  2    A.  A patient leaflet would be a part of the labelling that is

09:37:10  3    designed for the patient, with the patient's -- the patient reading

09:37:21  4    it as opposed to, let's say, the package insert, which is designed

09:37:28  5    more for physicians in terms of the language and the tone.

09:37:33  6    Q.  And so I think my question to you was simply whether you see

09:37:40  7    the attachment that says, "current patient leaflet," and if four

09:37:46  8    bullet points from the bottom you see the portion that says, "Very

09:37:49  9    common temporary loss of hair.  After your treatment, normal hair

09:37:54 10    growth should return."  Do you see that?

09:37:57 11    A.  I do.

09:37:57 12    Q.  Do you know who wrote that language?

09:38:02 13    A.  No, I do not.

09:38:04 14    Q.  And based upon the meeting invite, this is the current patient

09:38:10 15    leaflet at the time that they wanted to be updated, correct?

09:38:17 16    A.  Well, the top of the page says, "current PL."  That's the only

09:38:24 17    information I have here.

09:38:25 18    Q.  Well, you've been in this industry for decades.  You, I'm sure,

09:38:30 19    have dealt with these types of required meetings previously.

09:38:34 20    A.  True.  But you asked me if this is the current package leaflet.

09:38:39 21    I don't have an official patient leaflet corresponding to this date

09:38:47 22    to know whether this, indeed, is the current one.  So I -- I am

09:38:52 23    willing to proceed in the line of questioning as if it is and

09:38:56 24    assume that it is because it says, "current PL."  But I can't under

09:39:00 25    oath say that it is.

09:39:01  1   Q.  Sure.  The meeting was set to discuss updating the current PL,

09:39:04  2   correct?

09:39:05  3   A.  Apparently so, yes.

09:39:07  4   Q.  An attachment to the e-mail to the meeting contains this page,

09:39:10  5   which at the top identifies itself as "Current PL", correct?

09:39:15  6   A.  That's what it says, "Current PL."

09:39:18  7   Q.  If you turn past the current PL, you'll see a document that has

09:39:28  8   a title at the top that says, "Draft Proposal 1."

09:39:35  9   A.  Okay.

09:39:36 10   Q.  Do you see that?

09:39:36 11   A.  I do.

09:39:37 12   Q.  This was also attached to the e-mail.  And a draft proposal,

09:39:42 13   what does a proposal draft mean to you in pharmacovigilance?

09:39:53 14   A.  Well, I don't think there's any -- anything unique to

09:39:59 15   pharmacovigilance in the word draft proposal.  It is a draft

09:40:03 16   meaning it's not finalized.  It's a -- and proposal 1 would suggest

09:40:12 17   that this is a non-finalized, non -- probably non-reviewed proposal

09:40:17 18   that's being made.

09:40:18 19   Q.  Okay.  And if you --

09:40:20 20   A.  I would imagine it's being attached for discussion.

09:40:22 21   Q.  I'm sorry.  Were you able to finish?

09:40:25 22   A.  Yes.  Sorry.

09:40:25 23   Q.  All right.  If you go down to the proposal on page 1 of the

09:40:28 24   draft proposal No. 1, under "Very Common," do you see it says,

09:40:33 25   "Very Common" and then it says, "(experienced in more than 1 in 10

09:40:38  1   patients)."  Do you see that?

09:40:40  2   A.  All right.

09:40:45  3   Q.  And then -- one, two, three -- four bullet points down it says,

09:40:52  4   under "Very Common," "short-term hair loss, after normal -- after

09:40:57  5   treatment, normal hair growth should return."  Do you see that?

09:41:00  6   A.  I do see that.

09:41:01  7   Q.  And then if you turn the page to the second page of proposal

09:41:05  8   No. 1, at the bottom, under what's termed as "Rare," it says,

09:41:18  9   "Alopecia (hair loss) that did not reverse at the end of the

09:41:23 10   study."  Do you see that?

09:41:24 11   A.  I do.

09:41:24 12   Q.  Clearly, whoever -- well, first of all, do you know who drafted

09:41:28 13   proposal No. 1?

09:41:29 14   A.  Excuse me.  No.

09:41:31 15   Q.  Would you agree with me that clearly whoever it was that

09:41:34 16   drafted proposal No. 1 was able to identify and describe two

09:41:43 17   distinct types of hair loss related to the use of Taxotere; one

09:41:49 18   that was identified as occurring in -- as a very common side effect

09:41:56 19   in more than one in ten patients, as short-term hair loss; and the

09:42:01 20   second, that's rare alopecia that did not reverse at the end of the

09:42:04 21   study.  Do you see that?

09:42:06 22   A.  I do.  But I don't think I agree with the way that you posed

09:42:09 23   your question.  I don't think they're describing two distinct

09:42:11 24   types.  I think they're describing two different patterns of

09:42:17 25   recovery in terms of duration and frequency.

09:42:21  1    Q.  What were you going to do at the meeting if you didn't discuss

09:42:24  2    the proposals?

09:42:25  3    A.  No, I'm sure -- I'm sure at the meeting they were discussing

09:42:29  4    the proposal.  Whether people looked at it before the meeting or

09:42:33  5    looked at it during the meeting, I can't answer that.  I can't

09:42:36  6    answer it for myself because I don't have recollection of this, but

09:42:40  7    I can't certainly answer for other people also.

09:42:42  8    Q.  So when the people who bothered to attend this mandatory,

09:42:49  9    important meeting got as far as draft proposal No. 1 --

09:42:53  10   A.  Yes.

09:42:53  11   Q.  -- at that point in time in the year 2006, somebody in a

09:43:00  12   management position at Sanofi related -- with their work related to

09:43:07  13   Taxotere --

09:43:08  14   A.  Uh-huh.

09:43:09  15   Q.  -- would have had the opportunity to see, whether they wrote it

09:43:13  16   or not, which you can't testify about, that there -- that you can

09:43:18  17   characterize short-term hair loss as an outcome and you can

09:43:22  18   characterize alopecia that did not reverse at the end of the study

09:43:28  19   as an outcome, right?

09:43:30  20   A.  I would think that would be a reasonable assumption.

09:43:32  21   Q.  All right.  You see the draft proposal No. 2?

09:43:36  22   A.  Yes, I do.

09:43:37  23   Q.  If you will turn to page 2 of draft proposal 2 of the patient

09:43:44  24   leaflet.  Turn to page 2.

09:43:45  25   A.  Okay.

09:43:45 1    Q.  There is an area of proposal No. 2, it's about -- one, two,

09:43:50 2    three, four -- five paragraphs from the bottom and it starts with,

09:43:54 3    "Skin and subcutaneous tissue disorders."  Do you see that?

09:43:59 4    A.  Yes, I do.

09:44:00 5    Q.  And it lists hair loss (alopecia) -- do you see that?

09:44:04 6    A.  I do.

09:44:04 7    Q.  -- as very common, and then there's a semicolon.  Do you see

09:44:13 8    that?

09:44:13 9    A.  Yes.

09:44:13 10   Q.  And then listed as uncommon, alopecia (hair loss) that did

09:44:21 11   not -- it says did not reversible, but -- did not reversible at the

09:44:24 12   end of the study.  Do you see that?

09:44:26 13   A.  I do.

09:44:27 14   Q.  So here, again, in April of 2006 in Proposal 2 to a patient

09:44:36 15   leaflet, being discussed are two different outcomes of alopecia

09:44:43 16   described as such in this draft proposal, correct?

09:44:49 17   A.  Two different outcomes of resolution, yes, I think that's a

09:44:54 18   reasonable statement.

09:44:56 19   Q.  Have you found draft proposal No. 3?

09:44:58 20   A.  I have.

09:44:59 21   Q.  If you turn to page 2 of proposal No. 3, and, again, look under

09:45:07 22   "Skin and subcutaneous skin disorders."  It's the third set of

09:45:13 23   boxes down.

09:45:14 24   A.  Yes, I do see it.

09:45:15 25   Q.  That under "very common" it describes hair loss.  Do you see

09:45:19 1   that?  Alopecia, meaning, occurs in greater than ten percent.

09:45:23 2   Correct?

09:45:24 3   A.  Yes, I do see that.

09:45:25 4   Q.  And then do you see over in the uncommon it says, "Alopecia

09:45:31 5   non-reversible at the end of the study."  Do you see that?

09:45:35 6   A.  I do see that.

09:45:36 7   Q.  Do you agree with me that in April of 2006, in Taxotere patient

09:45:50 8   leaflet Proposals 1, 2, and 3, there are three different ways to

09:45:58 9   present two different outcomes for alopecia so that the patient can

09:46:06 10  understand the distinction?

09:46:13 11  A.  I agree -- I agree that in Leaflets 1, 2, and 3 there are --

09:46:23 12  there are the different presentations related to recovery.

09:46:30 13  Q.  Do you have any independent recollection as to your

09:46:35 14  participation in the meeting regarding updating the patient leaflet

09:46:41 15  for Taxotere?

09:46:42 16  A.  No, I'm afraid I don't recall that.

09:46:44 17  Q.  Looking at Exhibit No. 13, if you'll see at the top of Exhibit

09:46:50 18  No. 13, there is a date --

09:46:53 19  A.  Yes.

09:46:53 20  Q.  -- January of 2007?

09:46:55 21  A.  Yes.

09:46:56 22  Q.  And in this consent form, this is from a clinical trial in

09:47:06 23  Canada.  Do you see the Alberta Cancer Board?

09:47:10 24  A.  Okay.

09:47:10 25  Q.  Do you see that?

BARBARA EARNEST - CROSS

01:31 1    Q.   I'm going to put in there the word "permanent."  Okay?

01:31 2    A.   But it doesn't say permanent.

01:31 3    Q.   My question to you, Mrs. Earnest, is:  Even if the word

01:31 4    "permanent" had appeared before "hair loss" on this consent

01:31 5    form, you still would have signed it?

01:31 6    A.   No, I wouldn't have.  No.  I would have asked him about

01:31 7    explain that to me, more about that.  I know I would have.

01:31 8    Q.   So the only risk you were unwilling to accept was the risk

01:32 9    of permanent hair loss?

01:32 10   A.   Yes.

01:32 11   Q.   Even compared to brain damage?

01:32 12          MR. SCHANKER:  Objection.  Asked and answered.

01:32 13          THE COURT:  Sustained.

01:32 14   BY MS. SASTRE:

01:32 15   Q.   So you said if the word "permanent" had been there, you

01:32 16   would have asked Dr. Carinder about that?

01:32 17   A.   Yes, I would have.  I would have asked him if there would

01:32 18   be another drug.

01:32 19   Q.   Even though you didn't ask him questions about anything

01:32 20   else in the entire consent form?

01:32 21   A.   No, I didn't.  I think if he -- in my own opinion, I think

01:32 22   that if he had previously had anything happen like that, I

01:32 23   think he would have automatically told me, "Mrs. Earnest, I had

01:33 24   a patient that did this" or "Mrs. Earnest, I had a patient that

01:33 25   did that."  He didn't tell me that.