# EXHIBIT MM

**EXPERT REPORT OF JANET B. ARROWSMITH, M.D., F.A.C.P, F.A.C.E.**
**IN RE TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION**
**SUBMITTED DECEMBER 9, 2019**

## I.       BACKGROUND

1.       I earned my undergraduate degree in zoology from Duke University in 1972 and my medical degree in 1979 from Tulane University School of Medicine.

2.       I am board-certified in Internal Medicine and licensed to practice medicine in the State of New Mexico. I am an epidemiologist, trained through the Epidemic Intelligence Service (EIS) of the U.S. Centers for Disease Control and Prevention (CDC). I am an elected Fellow of the American College of Physicians and an elected Fellow of the American College of Epidemiology.

3.       As part of the CDC training, I was assigned to the postmarket safety surveillance division of the U.S. Food and Drug Administration's (FDA) Center for Drug Evaluation and Research (CDER).  As an EIS officer and later as an FDA medical epidemiologist and medical officer, I received training and experience in the application of the laws and regulations that govern the pre-market development, review, approval, labeling and postmarket safety review for pharmaceutical and other medical products intended for the U.S. market. I became very familiar with FDA's practices in the review, approval, and labeling of drugs intended for the U.S. market. My training and experience through the CDC program and at FDA provided me with the skills and knowledge necessary to practice pharmacoepidemiology, a subspecialty of the science of epidemiology having to do with assessing the safety of marketed pharmaceutical products.

4.       The CDC training program encompassed two years from July 1, 1984 through June 30, 1986, during which I received training in food, drug, biological product and medical

> *2011, both the 10-year TAX 316 data and the Sanofi clinical overview of persistent alopecia were submitted to FDA. FDA did not require a labeling change addressing persistent alopecia based on those data.*

> i. *Plaintiffs' experts' causation opinions are based on case reports and review of FAERS case report data, the weakest forms of scientific evidence. The currently available scientific evidence does not support an unequivocal causal role for Taxotere alone in persistent or permanent alopecia; in my opinion, the data are too confounded to make such an assertion with any scientific or medical certainty.*

## III.   STATEMENT OF OPINIONS

### FDA'S REGULATION OF PRESCRIPTION DRUGS

12.     FDA is the federal regulatory agency charged with protecting the public health by assuring that pharmaceutical products, medical devices including devices that use and emit radiation, biological products, veterinary products, tobacco and tobacco products, and foods and cosmetics are safe and that the therapeutic products are effective for their intended uses. To accomplish its public health mission, FDA employs over 10,000 people nationwide. Among FDA's employees are several thousand scientists and other professionals, as well as support staff.

13.     There are currently seven Centers within FDA, including the toxicology research center located in Arkansas. CDER, the pharmaceutical product regulatory center, is the largest drug regulatory body in the world. Based on the laws and regulations that FDA enforces and applies, virtually all aspects of the clinical research and development, manufacturing, evaluation, labeling, distribution, promotion, and postmarket safety surveillance of drugs in the United States fall under FDA's regulatory authority.

14.     Within CDER, there are several offices and multiple divisions and branches within those offices. There have been numerous reorganizations of CDER over time with changes in regulatory and scientific assignments and new organizational designations. The premarket review offices and divisions within CDER, which are generally organized by

6

108.     In 2004, FDA approved docetaxel as adjuvant therapy for operable, node-positive

breast cancer based on the findings from the TAX 316 study.  The TAX 316 study (also known

as EFC6041/BCIRG001), is "A multicenter phase III randomized trial comparing docetaxel in

combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in

combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment of operable

breast cancer patients with positive axillary lymph nodes."

109.     The primary objective of the TAX 316 study was to compare disease-free survival

(DFS) in operable breast cancer patients with positive axillary lymph nodes after treatment with

Taxotere (docetaxel) combined with doxorubicin and cyclophosphamide (TAC) versus disease

free survival following treatment with 5-fluorouracil in combination with doxorubicin and

cyclophosphamide (FAC). The secondary goals were to compare overall survival (OS), toxicity,

and quality of life between the two treatment arms and to evaluate pathologic and molecular

markers for predicting efficacy.

110.     Sanofi worked closely with FDA in designing and executing the TAX 316 study.

As FDA notes in its Medical Review of the TAX 316 second interim analysis, the protocol for

the study was submitted to FDA on August 13, 1997, in full compliance with the principles of

the Declaration of Helsinki.  (Sanofi_01254309).  The statistical analysis plan as well as

subsequent TAX 316 protocol amendments were submitted to, reviewed and approved by FDA

prior to implementation.  (Sanofi_01254309).  FDA was actively involved in all aspects of

protocol development and modification.

111.     I agree with FDA's assessment of the efficacy and safety profile demonstrated by

the TAX 316 study.  In reviewing the TAX 316 second interim analysis, FDA's Medical

Reviewers concluded that "the docetaxel (TAC) arm demonstrated statistically significant and

National survey of long-term recovery from chemotherapy-induced hair loss in patients with breast cancer." (2015): P5-15).

119.    I have reviewed the analysis of the TAX 316 final data performed by Dr. Michael Kopreski, an oncologist and former manager in Sanofi's pharmacovigilance department.  Dr. Kopreski concludes that of the 29 patients who received Taxotere and were identified as having "ongoing" alopecia, only six had any evidence of alopecia more than six months after chemotherapy.  For the remaining 23 patients, there was simply a report of alopecia into the follow-up period, reporting which may have occurred as soon as three months following chemotherapy treatment. It is important to note again that alopecia following cancer chemotherapy is not unexpected and certainly does not constitute, at 3 months post treatment, "permanent" or "irreversible" alopecia.  Similarly, of the 16 patients who received the FAC regimen, and were reported with "ongoing" alopecia, only three had evidence of alopecia more than six months after chemotherapy.

120.    It is therefore simply incorrect for Plaintiffs' experts to suggest that the results of the TAX 316 study demonstrate that approximately 4% of Taxotere patients experience "permanent" or "irreversible" alopecia.  In actuality, fewer than 1% of the Taxotere patients in the TAX 316 study had alopecia more than six months after chemotherapy.

121.    Dr. Kopreski explained that of the 744 patients who received Taxotere, 29 were identified as having evidence of "ongoing" alopecia at the end of the study.  However, "ongoing" does not mean the same as "persistent", as it has been defined by Plaintiffs' experts.  (Kopreski Dep. Tr. at 725:12–15.)  Instead, "ongoing" simply means that the last time the patient was assessed, the patient had some degree of hair loss, or alopecia.  *See* Kopreski Dep. Tr. at 725:16–19.

49

March 2012 requesting clarification of the term "ongoing" in describing adverse events in the TAX316 Clinical Study. (Sanofi_02368838).  Sanofi noted that adverse events in the TAX316 study "were to be followed until resolution or the initiation of further anti-cancer therapy" and then explained: "…'ongoing' does not necessarily mean that these AEs [adverse events] were ongoing for the entire 10-year follow-up period; rather it means that they were noted as ongoing at the last follow-up visit."

128.    I have also reviewed the follow-up durations for alopecia that are presented in the March 2012 chart.  From that review, it is clear that the vast majority of the 45 patients with ongoing alopecia in the TAX316 study had follow-up durations for their alopecia of less than 6 months.  It is therefore simply impossible to conclude that the TAX316 alopecia data demonstrate that Taxotere causes permanent or irreversible alopecia.[1]

GEICAM 9805

129.    The GEICAM 9805 study (also known as TAX.ESI.301) was "A multicenter Phase 3 randomized trial comparing docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus 5-fluorouracil in combination with doxorubicin and cyclophosphamide (FAC) as adjuvant treatment of high risk, operable breast cancer patients with negative axillary lymph nodes."

130.    The primary goal of the study was a comparison of disease-free survival after adjuvant treatment with either TAC or FAC among patients with high risk, operable breast cancer and negative axillary lymph nodes. The secondary goals were to compare overall survival, toxicity, and quality of life between the two groups, and to evaluate pathologic markers for predicting efficacy.

---

[1] I have also reviewed Dr. Wei's analysis of the TAX316 data presented in his Supplemental Expert Report.

131.    The first patient was enrolled in the study on June 21, 1999 and the final report cut-off date for patients followed for at least 5 years was March 4, 2009. The follow-up report cut-off date was April 22, 2013.

132.    The clinical study report, dated September 15, 2009, reported that TAC was associated with a statistically significantly 32% reduction in the rate of relapse as compared to FAC. There was also a non-significant improvement in overall survival with TAC compared to FAC. (Sanofi_00724383). The safety profile of TAC was consistent with the known toxicity of the individual drugs and the TAC combination and was consistent with the toxicity findings of the TAX 316 study. (Sanofi_00724385).

133.    The same report noted in the analysis of TEAEs persisting into the follow-up period that "alopecia remained ongoing in 3 of 49 (6.1%) of TAC patients compared with 1 of 35 (2.9%) FAC patients." (Sanofi_00724490).

134.    On November 30, 2009, Sanofi submitted the results of GEICAM 9805 as a supplemental NDA s-060 to FDA for the new indication of adjuvant chemotherapy among patients with high risk, operable breast cancer and negative axillary lymph nodes. As part of s-060, Sanofi also provided its proposed changes to the Taxotere label, reflecting the findings from GEICAM 9805. As it had done with the 2004 TAX 316 submission, Sanofi proposed adding to the Adverse Reactions section of the USPI the subsection "**Other persistent reactions**…The following events were observed to be ongoing in TAC-treated patients at the median follow-up time of 77 months; alopecia (n=3/49), amenorrhea (n=7/18), lymphoedema (4/5), peripheral sensory neuropathy (3/10)." (Sanofi_00384656).

135.    After a number of discussions with FDA, Sanofi withdrew the GEICAM 9805 efficacy supplement, citing changes in the standards of care for high-risk node-negative breast