# EXHIBIT GGG

```
 1                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
 2

                         -   -   -
 3

                                      :
 4   IN RE: TAXOTERE               :
     (DOCETAXEL) PRODUCTS          : MDL No. 2740
 5   LIABILITY LITIGATION          : Section H(5)
     _____   : JUDGE MILAZZO
 6                                 : MAG. JUDGE NORTH
     This Document Relates to: :
 7   All Cases                     :
 8

 9

10                       -   -   -
11                   January 17, 2019
12                       -   -   -
13                    LESLEY FIERRO
14                       -   -   -
15

16          Transcript of the videotaped
     deposition of LESLEY FIERRO, pursuant to
17   the Federal Rules of Civil Procedure, held
     at Nexsen Pruet, 400 Main Street, Suite 100A
18   Main Street Office Campus, Hilton Head Island,
     South Carolina, 29926, commencing 9:00 a.m. on
19   the above-referenced date, as taken by and
     before Karen Kidwell, RMR, CRR, CRC, and Notary
20   Public.
21                       -   -   -
22

23

24          GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377  |  fax 917.591.5672
25             deps@golkow.com
```

Lesley Fierro

```
 1   in 2010 -- once she received her treatment, I believe

 2   you testified that in your opinion, there was nothing

 3   in the U.S. package insert about permanent alopecia,

 4   correct?

 5              MR. DePAZ:  Objection to form.

 6              THE WITNESS:  As far as I recall, correct.

 7              MR. WOOL:  What number is that exhibit?

 8         It's on the front.  Is that 12?

 9              MR. DePAZ:  Is this mine or hers?

10         (Exhibit 13 was marked for identification.)

11   BY MR. WOOL:

12         Q.   All right, Ms. Fierro.  I'm going to hand

13   you what I've marked as Exhibit 13, which is an

14   e-mail that you did receive.

15         A.   Okay.

16         Q.   All right.  And I believe I asked you

17   earlier if you remembered there being an issue of

18   women posting on Sanofi's Facebook page about

19   permanent alopecia, and you said you remembered a

20   blog, correct?

21         A.   Mm-hmm.  Yes.

22         Q.   Does this refresh your recollection about

23   the Sanofi-Aventis Voices Facebook page?

24         A.   I don't specifically remember the

25   Sanofi-Aventis Voices Facebook page, but, you know, I
```

Lesley Fierro

1    recall that there were -- I mean, this did exist.

2         Q.   Okay.  So let's take a look at this

3    e-mail.  And it's from Kalpita Talauliker?

4         A.   Correct.

5         Q.   If I'm pronouncing that right.  And it's

6    from April 27th of 2010, correct?

7         A.   Correct.

8         Q.   And this is to medinfo@sanofi, right?

9         A.   This is to -- I mean, this came in from --

10   from U.S. Pharmacovigilance, and went to the database

11   at medical -- in medical information.

12        Q.   Let's start with the first e-mail, because

13   it appears there was an e-mail that was forwarded to

14   you that was then forwarded to pharmacovigilance, so

15   let's start with the original e-mail.

16             This Kalpita Talauliker appears to be

17   e-mailing medical information services, correct?

18        A.   She -- I'm assuming it's a she -- she is

19   e-mailing to the med info mailbox.

20        Q.   And is that the general mailbox of medical

21   information services?

22        A.   It's a -- a mailbox that was maintained

23   for inquiries that came in from different e-mail

24   sources.  I don't know if I'd call it the general --

25   I mean, it was there for specific e-mail sources that

Lesley Fierro

```
 1    came in.

 2         Q.   How about we'll just call it the med info

 3    e-mail --

 4         A.   Okay.

 5         Q.   -- when we're referencing that?

 6         A.   Okay.

 7         Q.   Is that fair?

 8         A.   Yeah.

 9         Q.   Okay.  So -- and she appears to work for a

10    company called InTouch Solutions?

11         A.   Correct.

12         Q.   Do you remember InTouch Solutions?

13         A.   Yes.

14         Q.   What -- what do you remember about InTouch

15    Solutions?

16         A.   They were a company that we contracted

17    with -- and when I say "we," it was between medical

18    information and pharmacovigilance -- contracted with

19    to review any Facebook inquiries that -- anything

20    that came in through Facebook.  So they looked at all

21    the Facebook postings to see if there were any

22    adverse events or medical information questions.

23         Q.   And as the company contracted by the two

24    departments, those two departments at Sanofi, how

25    would they have known what to do with the posts?  In
```

Lesley Fierro

```
 1   other words, did Sanofi provide them instructions on

 2   what they were being contracted to do?

 3        A.   Yes.

 4        Q.   Okay.  So Ms. Kalpita -- assuming it's a

 5   woman -- when she sent this e-mail, would have been

 6   following Sanofi's instructions on how to handle

 7   information on the Voices Facebook page, correct?

 8             MR. DePAZ:  Object to form.

 9             THE WITNESS:  Correct.

10   BY MR. WOOL:

11        Q.   And she writes, on April 7, 2010, to

12   medical information services, MIS:  "I am monitoring

13   the SA Voices Facebook page on behalf of

14   Sanofi-Aventis, and discovered the following

15   comments."  Right?

16        A.   Correct.

17        Q.   And then she appears to put what the

18   comment was?

19        A.   Correct.

20        Q.   "Your drug Taxotere has left me looking

21   like this permanently.  Have you heard of

22   nondisclosure?  Of course you have."

23             You see that?

24        A.   Yes.

25        Q.   And then she finishes -- she, Ms. Kalpita
```

Lesley Fierro

```
 1    -- "You are receiving this message in accordance with

 2    Sanofi-Aventis corporate guidelines."

 3         A.    Correct.

 4         Q.    Then she says -- and then she says "Thank

 5    you," and signs her name.

 6              And I guess those corporate guidelines are

 7    what I was referring to earlier, sort of the rules

 8    that InTouch Solutions would follow in doing the work

 9    that they were contracted to do with the corporate

10    guidelines given to them by pharmacovigilance and

11    medical information services, correct?

12              MR. DePAZ:   Objection to form.

13              THE WITNESS:   Correct.

14    BY MR. WOOL:

15         Q.    And so somebody on behalf of the med info

16    e-mail address forwards this e-mail, five minutes

17    later, to the U.S. Pharmacovigilance mailbox and to

18    you.

19         A.    Correct.   It was standard procedure, when

20    they came in from InTouch, they would forward them to

21    someone in the department whose responsibility it was

22    to then read them, if they belonged to -- if they had

23    an adverse event, send them to pharmacovigilance, and

24    to always copy me.

25         Q.    Okay.  And -- and then it appears that it
```

 1   BY MR. WOOL:

 2        Q.   Okay.  I'm going to hand you what I've

 3   marked as Exhibit 14.  And this appears to be another

 4   e-mail to the med info e-mail address from the same

 5   person.  Correct?

 6        A.   Correct.

 7        Q.   And this is the same day, April 7th, 2010?

 8        A.   Correct.

 9        Q.   And she reports to medical information

10   services, "I am monitoring the SA Voices Facebook

11   page on behalf of Sanofi-Aventis and discovered the

12   following comment."  Correct?

13        A.   Correct.

14        Q.   And then she reports -- and this next

15   portion is what she found on the Voices Facebook page

16   that someone had posted; is that right?

17        A.   Correct.

18        Q.   And that post that she found was, "You can

19   see with this photo how your breast cancer drug,

20   Taxotere, has left me disfigured.  You keep data for

21   this adverse side effect very quiet because you don't

22   want women choosing Taxol instead, which is not made

23   by you."  Correct?

24        A.   That's what it says, yes.

25        Q.   That's what the person, according to

Lesley Fierro

 1   InTouch Solutions, posted on the Sanofi's Facebook

 2   page, correct?

 3          MR. DePAZ:  Objection to form.

 4          THE WITNESS:  Right.

 5   BY MR. WOOL:

 6      Q.   And then she concludes the same way, "You

 7   are receiving this message in accordance with

 8   Sanofi-Aventis corporate guidelines."  Correct?

 9      A.   Correct.

10      Q.   Are you familiar with Taxol?

11      A.   It's a competitor to Taxotere.

12      Q.   Okay.  Then somebody from med info, Rubin

13   Bedell, forwarded this to pharmacovigilance and to

14   you that same day, correct?

15      A.   Correct.

16      Q.   Do you remember receiving any of these?

17      A.   No, not specifically.

18      (Exhibit 15 was marked for identification.)

19   BY MR. WOOL:

20      Q.   I'm going to hand you what I'll mark as

21   Exhibit 15.

22          Now, if we look down below, it appears

23   this e-mail was forwarded a couple of times.  It

24   appears the original e-mail is from Jim Dayton.  Do

25   you see that?

Lesley Fierro

```
 1          A.    The monitoring report?

 2          Q.    Yes.

 3          A.    Not that I recall.

 4          Q.    All right.  Let's look at the -- the first

 5   post.  And it appears that the post was put up on

 6   March 10th, 2010, correct?

 7          A.    Correct.

 8          Q.    And do you remember the date of that

 9   article that was in the Canadian Globe and Mail?

10   The -- the date of that article?

11          A.    March 5th.

12          Q.    So it was five days after that, correct?

13          A.    Mm-hmm.  Yes.

14          Q.    And I think earlier, when we were looking

15   at that original article that you were quoted in, we

16   talked a little bit about how news events can

17   sometimes -- about a drug or a product -- can

18   sometimes create an uptick in people interacting with

19   the company.  Do you remember that?

20          A.    Correct.

21          Q.    There was that list of three things on the

22   side, and it was the -- the second one.

23                So here we have, five days after that

24   article in the Globe and Mail, it appears we have a

25   comment from Melissa Ledlie.
```

Lesley Fierro

```
 1          A.    Mm-hmm.

 2          Q.    And it appears that she wrote, "When will

 3   you inform oncologists that there's a problem with

 4   your chemo drug, Taxotere?  Why don't you want women

 5   to know they could be left permanently disfigured?"

 6                Is that right?

 7                MR. DePAZ:  Object to form.

 8                THE WITNESS:  Yes, I see where you're

 9      reading.

10   BY MR. WOOL:

11          Q.    And that appears to be the comment that

12   was left on the Sanofi Facebook page, correct?

13                MR. DePAZ:  Object to form.

14                THE WITNESS:  Yes, presumably.

15   BY MR. WOOL:

16          Q.    Okay.  Logged per the guidelines given to

17   InTouch Solutions by Sanofi, right?

18                MR. DePAZ:  Object to form.

19                THE WITNESS:  This is the verbatim comment

20      that was on the page that they are reviewing.

21   BY MR. WOOL:

22          Q.    Okay.  That verbatim comment continues,

23   "Why you don't want women to know they could be left

24   permanently disfigured?"  Is that right?

25          A.    Correct.
```

Lesley Fierro

```
 1         Q.   And then she continues, "Because they will

 2    want to choose a different drug not made by you.  The

 3    net is closing in on you, Sanofi.  It's no longer

 4    your dirty little secret."

 5              Do you see that?

 6         A.   Yes.

 7         Q.   All right.  Then we'll read across.

 8    There's some columns in here, in this monitoring

 9    report, and the next one is "The Sentiment."  And

10    this reports that that's a negative sentiment,

11    correct?

12         A.   Yes.

13         Q.   And the next column is "Whether

14    inappropriate language was used," correct?

15         A.   Correct.

16         Q.   And it indicates that there was no

17    inappropriate language used, right?

18         A.   Correct.

19         Q.   And then it says, "Potential adverse

20    events," right?

21         A.   Yes.

22         Q.   And it indicates that this is not a

23    potential adverse event?

24         A.   Correct.

25         Q.   And then there's a question as to whether
```