# EXHIBIT HHH

Confidential - Under Protective Order

```
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF LOUISIANA
 3
      IN RE:  TAXOTERE (DOCETAXEL)    ) MDL No. 2740
 4    PRODUCTS LIABILITY LITIGATION,  ) SECTION:  "H"
                                      ) JUDGE MILAZZO
 5    This Document Relates to:       )
      ALL CASES                       )
 6    _____) MAG. JUDGE NORTH
                                      )
 7    ****************************************************
      ****************************************************
 8             CONFIDENTIAL UNDER PROTECTIVE ORDER
      ****************************************************
 9    ****************************************************
10         VIDEO DEPOSITION OF 30(b)(6) DEPOSITION OF
          INTOUCH SOLUTIONS, INC. BY AND THROUGH THEIR
11         DESIGNATED REPRESENTATIVE MATTHEW J. GOYER,
12
13    produced, sworn, and examined on Thursday,
      the 13th day of December, 2018, between the hours
14    of 8:00 o'clock in the forenoon and 6:00 o'clock in
      the afternoon of that day at the law offices of
15    Evans & Mullinix, P.A., 7225 Renner Road,
      Suite 200, in the City of Shawnee, County of
16    Johnson, State of Kansas, before:
17
         JANIECE Y. YOUNG, RPR, CSR-No. 1217, CCR-No. 798
18                Registered Professional Reporter
                    Certified Livenote Reporter
19
20
      a Certified Court Reporter within and for the State
21    of Missouri and a Certified Shorthand Reporter
      within and for the State of Kansas.
22
23
      Taken on behalf of Plaintiffs pursuant to
24    Amended Notice to Take Depositions.
25
```

Golkow Litigation Services                                Page 1

```
 1      Q.    Does Intouch assist Sanofi in being
 2   transparent about the Sanofi products?
 3            MS. BIERI:  I object to form.
 4      A.    I can't speak to Sanofi any more than any
 5   other client.  As I just mentioned, it's our job to
 6   promote all of our clients' brands in a manner that
 7   conforms with FDA regulations, which is to be
 8   transparent with the information that's provided.
 9            (Goyer Deposition Exhibit No. 4
10             was marked for identification.)
11      Q.    (By Mr. Centola)  And as part of the
12   production that was made, we were provided with a
13   spreadsheet of -- that was entitled "Sanofi-Aventis
14   Voices Facebook Page Comment Monitoring Report."
15   And I have provided you with a copy -- with a
16   printout of -- of that -- what looks to be an Excel
17   spreadsheet.  And we have identified that as
18   Exhibit 4 to this deposition.
19            In preparation for your -- the Intouch
20   deposition today, did you review this Voices
21   Facebook Page Comment Monitoring Report?
22      A.    No.
23      Q.    What is a Facebook Page Comment
24   Monitoring Report?
25      A.    It is my understanding that this is a
```

1  report that was maintained when providing social
2  media monitoring services in this case on behalf of
3  Sanofi.  This report would have been made available
4  to the Sanofi client that was responsible for this
5  project.
6      Q.   The Sanofi client that was responsible,
7  I'm confused on that.  The particular person at
8  Sanofi or?
9      A.   There -- there's --
10          MS. BIERI:  I object to form.
11     A.   Every client that we work with has a
12 person that's designated as being responsible for
13 the projects that we provide services to.  I don't
14 know for a fact who we provided this to at Sanofi.
15          Based on my experience working in this
16 industry this is a report that would have been
17 provided to the Sanofi representative that would
18 have been designated as responsible for Intouch
19 providing these services for this project.
20     Q.   (By Mr. Centola)  Are you familiar with
21 Jim Dayton?
22     A.   Yes.  Jim Dayton worked at Intouch -- at
23 the time, Intouch Solutions.
24     Q.   And is Mr. Dayton still employed at
25 Intouch?

```
 1        A.    No.
 2        Q.    Do you know Mr. Dayton -- where he works
 3   or lives?
 4        A.    No.
 5        Q.    You're not familiar with who those
 6   point people would be at -- at Sanofi that would
 7   have received this type of Facebook Page comment
 8   monitoring report?
 9        A.    No.
10              MS. BIERI:  I object to form.
11        A.    No.
12        Q.    (By Mr. Centola)  Are you familiar with
13   these types of Facebook page comment monitoring
14   report for other clients?
15        A.    What I am familiar with is that when our
16   company provides what we call social media
17   monitoring and moderation services, we develop a
18   plan with -- and partnership with our clients as to
19   what properties they wish to use in a social media
20   marketing campaign.
21              That plan is then submitted to each
22   clients' medical regulatory committee.  And the
23   medical regulatory committee for each client
24   provides guidelines as to how to respond to
25   unsolicited messages that come in against any
```

1    social media platform.

2        Q.   So it's the clients' medical and

3    regulatory affairs -- or medical and regulatory

4    department that assists in determining how to

5    respond to these comments?

6        A.   That's correct.

7        Q.   So on this document.  We have a post-date

8    in the left-hand column.  The second column has a

9    comment.  And the third column, it says sentiment.

10       A.   Uh-huh.

11       Q.   If we look on this first page, and these

12   are post in the March 2010 time frame, particularly

13   March 10, 2010.  And the sentiment is -- on all six

14   of these entries is negative.

15            Who determines whether -- or back up.

16            Sentiment, is -- is this a drop-down,

17   fill-in cell or is this able to receive typed text

18   in this cell?

19       A.   I would have to look at the electronic

20   version of this to determine that.

21       Q.   Who makes the determination as to -- to

22   categorize the sentiment?

23       A.   That, I don't know 100 percent.

24       Q.   Who makes the determination as to whether

25   or not there's a potential adverse event?

1    qualified as a corporate comment that needed to be

2    noted as a corporate comment in this report.

3        Q.   I have a lot of questions about this

4    report.  And I guess my question to you would be,

5    what would you need to do in order to prepare

6    yourself for testifying about this Sanofi Aventis

7    Voices Facebook Page Comment Monitoring Report?

8             MS. BIERI:  I object to the form.

9        A.   I'm not sure how to answer that question.

10   Being that I did not have direct context or working

11   relationship on this project as to when it took

12   place in the March 2010 time frame I don't know

13   that I would be the best to testify what was going

14   on because I wouldn't have the context to what

15   trainings were given, what guidance was given by

16   the medical regulatory committee, anything about

17   the comments coming in.

18             I'm going to have to assume these are on

19   a Facebook page because it says Facebook, but I

20   wouldn't be able to verifiably speak to that for a

21   fact.  I don't know what I'd have to do to prepare

22   for testimony because I just do not have context as

23   to what was done on this project.

24       Q.   (By Mr. Centola)  And you didn't -- or in

25   preparation for your deposition today you didn't

Confidential - Under Protective Order

 1    speak with any other Intouch employees, in
 2    particular, the Intouch employees that are -- we
 3    just went over that are listed in this document.
 4    You didn't discuss with any of them this Voices
 5    Facebook Page Comment Monitoring Report?
 6         A.    No.
 7         Q.    You didn't discuss with any Intouch
 8    employees any substance of documents in preparation
 9    for your testimony today?
10         A.    Could you clarify on substance?
11         Q.    Sure.  This document, this spreadsheet,
12    Sanofi-Aventis Voices Facebook Page Comment
13    Monitoring Report is important to us in this
14    litigation.
15         A.    Uh-huh.
16         Q.    And it was produced by Intouch in this
17    litigation.  We appreciate that.  And I'm here to
18    ask questions on this document.
19         A.    Uh-huh.
20         Q.    And my concern is, as I sit here today,
21    I'm not getting substantive answers from Intouch
22    regarding this particular document that was
23    produced.
24         A.    Uh-huh.
25         Q.    And so my question to you is, what would

1  you need to -- what did you do -- what did you do
2  to prepare yourself to give substantive responses?
3  And my understanding of your testimony is, not
4  much.  I don't want to put words in your mouth
5  but --
6           And so my question is then, what could
7  you do or who could you talk to, in order to
8  prepare to give substantive responses to questions
9  regarding this particular monitoring report.
10     A.    For this report I have not had
11  conversations with anybody.  This was a -- one of
12  thousands of files.  My role was to secure and
13  conform with the subpoena that we received.
14           I would have to talk to the individuals
15  listed within this report that still work at
16  Intouch to find out if they have any knowledge as
17  to what is in this report and what was done at that
18  time.
19     Q.    Going back, just in general questions --
20  I know substantive questions will be difficult to
21  answer, but let's look back at this Exhibit 4 --
22     A.    Uh-huh.
23     Q.    -- Facebook Page Comment Monitoring
24  Report in the right-hand column, "plan of action."
25     A.    Uh-huh.

                  Confidential - Under Protective Order

 1        Q.    "Post removed."  So what does that mean?
 2              MS. BIERI:  Foundation.
 3        A.    Being that this is a Facebook monitoring
 4    report, post removed would mean that the content
 5    under comment was removed.
 6        Q.    (By Mr. Centola)  So an Intouch employee
 7    would -- had access to the Sanofi-Aventis voices
 8    Facebook page and would remove that post?
 9        A.    That is my understanding.
10        Q.    Next words after "post removed" are "user
11    blocked."
12        A.    Uh-huh.
13        Q.    What was that user blocked from?
14        A.    Being that this is the Sanofi Voices
15    Facebook page, it is my assumption that the user
16    was blocked as a user to post to the Voices --
17    Sanofi-Aventis Voices Facebook page.
18        Q.    And the user blocked, was that a decision
19    made by Intouch using a guideline set forth by
20    Sanofi?
21        A.    It was my experience that the actions
22    taken for any social media monitoring process would
23    have been complied with based on the directions
24    that we had received, the guidance we would have
25    received from Sanofi.

Confidential - Under Protective Order

```
 1       Q.    So Intouch is blocking this user pursuant
 2    to the guidance received by Sanofi --
 3             MS. BIERI:  Objection to form --
 4       Q.    (By Mr. Centola) -- received from Sanofi?
 5             MS. BIERI:  Foundation and form.
 6       A.    Could you ask that again just to make
 7    sure I understand your question?
 8       Q.    (By Mr. Centola)  Sure.
 9             The user is being blocked by an Intouch
10    employee pursuant to the guidelines received by
11    Sanofi?
12             MS. BIERI:  Form and foundation.
13       A.    That would be my understanding.
14       Q.    (By Mr. Centola)  And the next clause is
15    "and reported."  Who is Intouch reporting to?
16       A.    It is my assumption that the "and
17    reported" means this document that we're referring
18    to here, and this document being provided to the
19    client.
20       Q.    If you'd go back to the Guidelines for
21    Comment Monitoring and Moderation of the SA Voices
22    Page, which is the 7th page in this document.
23       A.    Are we looking at the page that says
24    Step 1?
25       Q.    Yes, please.
```

 1                Look under No. 3, which says:  "Report
 2    the user using the 'report' link on the user's
 3    comment.  You will be asked to provide a reason for
 4    the report.  Please choose 'Attacking a group or
 5    individual' from the drop-down menu.  Reporting a
 6    user will remove all posts by this user.  So,
 7    remember to log the post before reporting the user
 8    and do not be alarmed if the post is no longer
 9    visible on the wall."
10        A.    Okay.
11        Q.    This Guidelines for Comment Monitoring
12    and Moderation of the SA Voices Page was approved
13    by Sanofi?
14              MS. BIERI:  Objection to form.
15        A.    That is my understanding.
16        Q.    (By Mr. Centola)  And this guideline asks
17    the Intouch employee to report the user for
18    attacking a group or individual; is that correct?
19              MS. BIERI:  I object to form and
20    foundation.
21        A.    The context of Step 3 under response plan
22    is that, yes.
23        Q.    (By Mr. Centola)  And look back at the
24    first page in this document, Exhibit 4.  Is it
25    Intouch's position that these comments are

```
 1    attacking a group or individual?
 2         A.    It is my position that the content we are
 3    looking at on page 1 would have fallen under the
 4    guidelines that we were provided as to what was
 5    considered to be potentially the attack of a group
 6    or individual and what should have been reported,
 7    per the guideline No. 3, Step 1, in the plan of
 8    action.
 9         Q.    So is it Intouch's position that the
10    posts on this first page were deemed by Sanofi
11    under the guidelines as attacking a group or
12    individual?
13               MS. BIERI:  Object to foundation and
14    form.
15         A.    It is my position that Intouch would have
16    operated under the guidelines that were provided to
17    us by Sanofi.
18         Q.    And under those guidelines, Intouch was
19    guided to choose "attacking a group or individual"
20    from the drop-down menu when reporting the comment.
21    These two --
22               MR. MULLINIX:  Objection as to
23    leading and suggestive.
24               MS. BIERI:  I object to form and
25    foundation.
```

Confidential - Under Protective Order

```
 1      Q.    (By Mr. Centola)  You can answer.
 2                  MR. MULLINIX:  You can answer.
 3                  THE WITNESS:  Okay.
 4      A.    I'm sorry.  I got distracted.  Could you
 5   ask your -- ask your question again?
 6                  MR. CENTOLA:  Could you repeat the
 7   question?
 8            (Whereupon, the requested portion of
 9             the record was read by the reporter.)
10      Q.    (By Mr. Centola)  -- when reporting the
11   comments contained on the first page of this
12   document.
13      A.    Uh-huh.  Per the guidelines --
14                  MS. BIERI:  I object to form and
15   foundation.
16      A.    -- per the guidelines presented to me
17   here, yes, we would have selected from a drop-down
18   menu and selected the option "attacking a group or
19   individual" from the drop-down menu.  And then it
20   appears that in doing so, per what it states here
21   in -- under item 3, "reporting a user will remove
22   all posts by this user."  So because these were the
23   guidelines provided, we would have conformed with
24   those guidelines.
25      Q.    Conform with the guidelines provided by
```

Confidential - Under Protective Order

```
 1     Sanofi?
 2         A.    Correct --
 3               MS. BIERI:  I object to form and
 4     foundation.
 5         A.    Correct.
 6         Q.    (By Mr. Centola)  Which the "removes all
 7     posts by this particular user," whomever is
 8     reported; correct?
 9         A.    Per what is demonstrated here in the
10     document, that would be my assumption, yes.
11         Q.    And so removing all posts by this user
12     would hide those posts from any other Facebook
13     user; correct?
14         A.    Within the Sanofi Voices Facebook page,
15     correct.
16         Q.    Essentially Intouch by reporting the user
17     as attacking a group or individual is removing the
18     posts by that user from public view?
19         A.    On that page, correct.
20         Q.    You're limiting it to "on that page."  Is
21     there another page that -- or is it particular that
22     when you remove the user, you're only removing the
23     user from that page?
24         A.    That is correct.
25         Q.    Okay.
```