```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ******************************************************************
     IN RE: TAXOTERE (DOCETAXEL)          MDL NO. 2740
 4   PRODUCTS LIABILITY LITIGATION        SECTION "H" (5)
                                          MAY 26, 2021
 5   This document relates to:
     16-17039 Elizabeth Kahn
 6   ******************************************************************

 7                  TRANSCRIPT OF MOTION PROCEEDINGS
             HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 8                    UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:
     FOR PLAINTIFFS:               Christopher L. Coffin, Esquire
11                                 Jessica Perez Reynolds, Esquire
                                   PENDLEY, BAUDIN & COFFIN
12                                 1515 Poydras Street, Suite 1400
                                   New Orleans, LA 70112
13

14   FOR DEFENDANTS:               Douglas Moore, Esquire
                                   IRWIN, FRITCHIE, URQUHART & MOORE
15                                 400 Poydras Street, Suite 2700
                                   New Orleans, LA  70130
16

17                                 Jon Strongman, Esquire
                                   SHOOK, HARDY & BACON
18                                 1155 F Street NW, Suite 200
                                   Washington DC 20004
19

20

21   Official Court Reporter:      Alexis A. Vice, RPR, CRR
                                   500 Poydras Street, HB-275
22                                 New Orleans, LA 70130
                                   (504) 589-7777
23                                 Alexis_Vice@laed.uscourts.gov

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.

                           OFFICIAL TRANSCRIPT
```

1         **P-R-O-C-E-E-D-I-N-G-S**

2              **MAY 26, 2021**

3            **(MOTION PROCEEDINGS)**

4

5              (The Court was called to order.)

6         **DEPUTY CLERK:** This is in the matter of Taxotere, MDL

7    NO. 2740.  Would Counsel arguing please make your appearances

8    for the record?

9         **MR. MOORE:** Good morning, Your Honor, Douglas Moore on

10   behalf of Sanofi.

11        **MR. COFFIN:** Good morning, Your Honor, Chris Coffin

12   with Pendley, Baudin & Coffin on behalf of Ms. Elizabeth Kahn.

13        **THE COURT:** Are we ready to proceed, Mr. Moore?

14        **MR. MOORE:** Yes, Your Honor.  And I know that there

15   are some other hearings this morning; so I'm going to do my

16   best to stick to the seven minutes.

17        I thought it made sense to start with answering the

18   question of why we filed this motion -- if I can get my screen

19   to advance -- we filed this motion for two reasons, Judge.

20   There were two developments that led us to bring this motion.

21   The first is we learned from Mr. Miceli that Dr. Kardinal will

22   not testify at trial, that his testimony is established.  His

23   deposition testimony will be the only testimony that the jury

24   could possibly hear in this case.

25        And when that happened, I went back to my colleagues,

OFFICIAL TRANSCRIPT

1   and we were discussing it.  My position was we needed to get

2   back in front of Your Honor on this issue.  Because when you

3   ruled on this motion the first time, you referred to

4   Dr. Kardinal's testimony as unclear testimony, but nonetheless,

5   sufficient to have him come in here and testify in front of a

6   jury.  That was the way I read it.

7           And now that we know his testimony is not changing,

8   this is his testimony, he's never actually asked, "Would you

9   change your prescribing decision?"  He never testifies that he

10  would change his prescribing decision.  So regardless of what

11  framework we're applying, the Court's framework always ended

12  with that question, whether there is testimony from the

13  prescribing doctor that they would change their prescribing

14  decision.

15          And based on this deposition, if that's all the jury

16  is going to hear in this case, we'd be asking the jury to

17  presume that he would be changing his prescribing decision

18  based on the testimony that was elicited by Mr. Miceli during

19  the deposition.  He's never really asked the question.  He

20  never really says it.

21          And we know from Your Honor's Motrin case that when

22  the question is not asked and the testimony is not given, the

23  defendant is entitled to judgment as a matter of law.  So when

24  his testimony became locked we were having that discussion

25  about figuring out a way, even procedurally, can we come back

OFFICIAL TRANSCRIPT

1  to you on this motion based on this change of circumstances.

2          While we're having that discussion, the Fifth

3  Circuit's decision came out in the *Kahn* case and established

4  analysis for learned intermediary for this litigation in

5  Louisiana.  We didn't appeal the *Kahn* case.  They appealed it,

6  but the analysis the Court undertook was, we thought,

7  materially different --

8          **THE COURT:** Is it the *Phillips* case?

9          **MR. MOORE:** The *Phillips* case.  Your Honor granted the

10  summary judgment, and the plaintiffs appealed it.  The Fifth

11  Circuit affirmed the ruling.

12          **THE COURT:** Yeah, that was my understanding, okay.

13          **MR. MOORE:** And so the way the Fifth Circuit got there

14  was, we think, meaningfully different than the way Your Honor

15  got there; even though the result was the same.

16          And so we thought that since Kardinal's testimony is

17  now locked, we know what it will be, if we analyze that

18  testimony under the analysis undertaken by the Fifth Circuit in

19  the *Phillips* case, then the result in the *Kahn* case should

20  really be the same as the *Phillips* case.

21          So what did the Fifth Circuit conclude?  The primary

22  difference, we think, between the analysis applied by the Fifth

23  Circuit and the approach that has been taken historically here

24  is where does the plaintiff's testimony fit.  And the way we

25  read the Fifth Circuit's decision is that it has to be the

OFFICIAL TRANSCRIPT

1  warning that changes the doctor's decision.  It can't be the
2  plaintiff that changes the doctor's decision.
3          And the plaintiff has to point to evidence about what
4  happened during the discussion and has to produce evidence
5  about what happened then to show that there's an issue of fact
6  that this discussion would have been steered in a different way
7  and that this doctor would have changed his prescribing
8  decision.  Because any plaintiff can come in now and say --
9          **THE COURT:** Oh, absolutely.
10          **MR. MOORE:** Right.
11          **THE COURT:** I understand that.
12          **MR. MOORE:** Okay, all right.
13          **THE COURT:** But I think what I have tried to convey,
14  apparently inartfully, all along was, you know, if there is no
15  warning given for this, you can't say, well, you know.  What
16  you have to understand is how that would have affected the
17  prescribing decision and what that conversation would have
18  looked like.
19          And I think that's consistent with Motrin.  If you'd
20  have seen this, would it have changed anything?  And I think
21  the Fifth Circuit talked about how it would have guided that
22  decision as well.
23          **MR. MOORE:** Right, and the Fifth Circuit's focus was
24  on --
25          **THE COURT:** Right, was the prescribing, yeah.

OFFICIAL TRANSCRIPT

1          **MR. MOORE:** -- what happened then.

2          **THE COURT:** Right, right.

3          **MR. MOORE:** Because Ms. Phillips said the same thing

4    that Ms. Kahn said, the same thing that Ms. Earnest said that,

5    "Well, had I known, had he told me of this, I would have asked

6    for something else.  I would have taken a different medicine."

7    That's exactly what Ms. Phillips said.

8          But what the Fifth Circuit analyzed was what did you

9    say then.  Did you tell the doctor then that your physical

10   appearance was so important to you that you wanted a

11   chemotherapy option that wouldn't change your physical

12   appearance, that you wanted to make sure you weren't going to

13   have any long-lasting side effects, "Don't affect my nails, my

14   gums," because all that stuff is in there too, other physical

15   issues, "or my hair."

16         And what the Fifth Circuit analyzed in *Kahn* -- or in

17   *Phillips* was that she didn't do any of those things, and her

18   testimony today about what she would have done doesn't create a

19   material factual dispute when she didn't do or say any of those

20   things then that would have steered that conversation.  And

21   that was the difference in the focus, I think -- I mean this is

22   the way the plaintiffs built this learned intermediary case

23   from before you ever made a ruling in *Earnest*.

24         If you look at all of the depositions, they built it

25   around the idea that if you said this and then she said that,

OFFICIAL TRANSCRIPT

1  even though it didn't change your risk benefit analysis of the

2  medicine, could the plaintiff have changed your mind.  That's,

3  I think, the key difference between the way this litigation was

4  built and how it can be applied under Louisiana law under the

5  *Phillips* case.

6          And so if we look at how the Fifth Circuit's analysis

7  would apply to Dr. Kardinal's testimony, his testimony, we

8  asked him does this change your decision to put her in this

9  clinical trial.  It was a Taxotere -- Taxotere was administered

10  in every arm of the clinical trial.  He didn't know which exact

11  medicine she would get.  Neither did she.

12          **THE COURT:** Does it matter?  Would it have changed her

13  recommendation -- his recommendation change the analysis from

14  decision?

15          **MR. MOORE:** Well, his -- well, every prescription is a

16  recommendation.  Every one is a recommendation.  And so the

17  question here is:  Would this warning have prompted him to say,

18  "I'm not going to put you in this clinical trial"?

19          **THE COURT:** Recommend this clinical trial.

20          **MR. MOORE:** Right, right.  And I think there's

21  certainly no testimony that his decision to have her go in the

22  clinical trial would have been different.  And so from that

23  perspective, to the extent that there's a distinction between

24  recommendation and decision, that question was never asked

25  either.

OFFICIAL TRANSCRIPT

1          The plaintiffs rely on testimony, this testimony to
2   suggest that it's unequivocal that Dr. Kardinal would have had
3   the provision of this information and would have made a
4   different decision.  But if you actually look at the full
5   answer we cited in our reply brief, he doesn't say that.  He
6   says, "I may still recommend the use of the medicine,"
7   referring to Taxotere.  And we asked him point blank -- wait,
8   I'll get to that later.

9          We asked him during his deposition, Kelly Bieri did,
10  "Are you saying you would have prescribed a different
11  medicine?"  Let me see if I can put that up.  Right, here it
12  is.  We asked him point blank, "Are you saying that you would
13  have prescribed a different medicine?"

14         He says, "No."  And so his answer continues in the
15  deposition to say that, "Well, I would have" -- "What is your
16  testimony?"

17         He said, "Well, it should have been in the consent
18  form."

19         If we look at Ms. Kahn's consent form, her consent
20  form indicated that basically she's participating in a
21  scientific experiment.  It's a clinical trial.  We don't know
22  all the side effects.  Some of the side effects may be serious.
23  They may be long-lasting.  They may be permanent.  So the
24  consent form and the consent discussion that happened then was
25  the focus of the *Phillips* court decision.

OFFICIAL TRANSCRIPT

1      When we look at how did those facts from the *Phillips*

2 case apply to Ms. Kahn, when we look at what was the discussion

3 around the consent form and the consent discussion at the time,

4 both of them, Ms. Kahn and Ms. Phillips say they would have

5 taken a different medicine "had I known about this, had someone

6 told me about this."  But at the time, they didn't make any

7 comments about their hair being important or their appearance

8 being important.  They didn't ask any questions about adverse

9 events.  They didn't ask any questions about oncologists.  They

10 both said they put their faith in their oncologists.  And

11 consequently, they haven't raised a material issue of fact as

12 to whether what happened then would have steered this decision

13 in a different direction.

14      At the end of the day, there is no testimony that the

15 jury will hear in this case from Dr. Kardinal saying he would

16 have prescribed a different medicine.  The testimony is just

17 not there.  And so we think that the question needed to be

18 asked and the testimony needed to be given in order for this

19 case to go to the jury.

20      For that reason, Your Honor, we ask that you

21 reconsider your ruling and dismiss the case.

22      **THE COURT:** Thank you.

23      Mr. Coffin, please proceed.

24      **MR. COFFIN:** Thank you, Your Honor.

25      The defendant's entire argument is really centrally

1  based on their belief that the *Phillips* opinion from the Fifth
2  Circuit changes the law and changes the standard that this
3  Court previously applied.
4           **THE COURT:** Well, I think I kind of -- I read footnote
5  4 too.
6           **MR. COFFIN:** Right, and I'm going to address footnote
7  4.
8           **THE COURT:** Well, you know, you can, but I have
9  reconciled it in my head because I really think -- I don't need
10 to do that because I don't think I ever said that after that.
11 It was always what steers the conversation.
12          **MR. COFFIN:** Right.  I think that's exactly right,
13 Your Honor.
14          **THE COURT:** So we don't need to talk about footnote 4.
15 I have lost enough sleep over that.
16          **MR. COFFIN:** Well, I think I will glance over footnote
17 4 just because I think I have a good interpretation of what the
18 Fifth Circuit was trying to do there.
19          **THE COURT:** Well, I think I do too, but okay.
20          **MR. COFFIN:** The reality is that the standard didn't
21 change.  The standard that you applied and the standard that
22 the Fifth Circuit applied was really the exact same standard,
23 and I'm going to show you that here.
24          What we know is that the Fifth Circuit's opinion in
25 *Phillips*, it really did not change the law.  I'm going to

OFFICIAL TRANSCRIPT

1  explain that.  And it didn't change the facts that the Court
2  originally applied.  So reconsideration, we believe, is
3  inappropriate.
4          I'm going to really focus on the law, but because
5  Mr. Moore talked about the facts of primarily Dr. Kardinal's
6  testimony --
7          **THE COURT:** I think the question I have is --
8          **MR. COFFIN:** Yes.
9          **THE COURT:** -- do you need to have testimony from the
10  treating physician that says, "Under these circumstances, my
11  decision would have changed, and I would have prescribed a
12  different drug.  And this is the drug I would have prescribed"?
13          **MR. COFFIN:** No.
14          **THE COURT:** And I think that's what Mr. Moore is
15  saying if we cut all of this out.  Because I have read the
16  *Phillips* decision, I did note that they spoke to -- I think
17  they followed the analysis that I applied in *Phillips* which was
18  these were her underlying conditions, this is what the doctor
19  said, there was nothing that could go beyond this.  And
20  regardless of what she said, under her circumstances, this is
21  what would have happened.
22          The Fifth Circuit talked about, you know, things that
23  she testified to.  So just so you know -- I think bottom line,
24  this is the question that Mr. Moore poses and that you need to
25  answer.

OFFICIAL TRANSCRIPT

```
 1            And we can go through the, you know.  I know
 2    everybody works really hard on these PowerPoints, but I think
 3    we can, often times, just get to, "This is the question."  And
 4    so you need to tell me:  Do you have to present testimony from
 5    the treating physician that says, "If this were the
 6    conversation I had with my plaintiff" -- because I don't think
 7    he can say, well, we didn't have that conversation.  You know,
 8    because we didn't have that conversation, you know, plaintiff
 9    loses because you can't have a conversation if you don't have
10    the information.
11            So I think what Mr. Moore poses is if the treating
12    physician had this information, if he had warned of this and
13    they had the conversation, would he have prescribed something
14    else.
15            MR. COFFIN:  Right.
16            THE COURT:  I think that's the question.  And do you
17    need testimony from the doctor saying, "Yes, I would have
18    prescribed something else"?
19            MR. COFFIN:  The answer is no, to get to the bottom
20    line.
21            THE COURT:  All right, now let's get to that argument.
22            MR. COFFIN:  Okay.  The reason that we don't need to
23    is it's a disputed issue of material fact.  That is exactly
24    what the jury is supposed to determine based on the testimony
25    that comes in.  Because it's not only Dr. Kardinal, it's what
```

1   the conversation looked like or would have looked like because
2   we don't know.  We have to consider what it may have looked
3   like, and that's for the jury to determine.

4          And that's the words that Your Honor used is how
5   would the conversation have been steered, what would have
6   steered the conversation.  In order to know what might have
7   steered the conversation, the jury has to be able to consider
8   what Ms. Kahn's considerations were about the risks and the
9   benefits, the facts that already exist in the record that
10  haven't changed where she testified that she would have chosen
11  something different if she had known about permanent hair loss.

12         And also, looking at things as Your Honor pointed out
13  that are important factually, what did Ms. Kahn do when she was
14  given multiple choices regarding a mastectomy?  That's
15  important information for the trier of fact to look at in
16  determining how the conversation would have been steered, and
17  ultimately, what would the doctor have done.  That's the
18  purview of the jury.  So I don't think it's as simple as would
19  Dr. Kardinal have said yes or no.

20         And the Fifth Circuit doesn't say that either.  The
21  Fifth Circuit actually adopts your language on two occasions
22  about how the conversation would have been steered, and in
23  order to determine that, for a fact finder to determine that,
24  there's a lot of facts that have to be analyzed.  So the answer
25  is no, but I don't think it's that simple to say --

OFFICIAL TRANSCRIPT

1          **THE COURT:** Does it matter that Dr. Kardinal is not
2    available to testify?  Is it Dr. Kardinal?
3          **MR. COFFIN:** Yes, correct.
4          **THE COURT:** Does it matter that his testimony is
5    locked in and we will never hear that, "Well, I would have used
6    this treatment"?
7          **MR. COFFIN:** It doesn't matter because the jury can
8    make a determination, like I'm saying, based on the facts that
9    come in, including, his testimony.  But Dr. Kardinal, if
10   Dr. Kardinal would have said, "I don't care what the risk was.
11   I was sticking with Taxotere, period," we'd be in a different
12   situation.  But that's not what happened.
13         Dr. Kardinal talks about the equivalency, the
14   efficacy equivalency between Taxol and Taxotere.  He says that
15   he would have considered what Ms. Kahn said.  We get back to
16   the issue of patient's input.  So a fact finder certainly can
17   take that information and make a determination based on the
18   testimony that exists.  I don't think we take that away from
19   the jury.
20         And so again, I think the simple answer is, well, no,
21   Dr. Kardinal's testimony, just because it's locked in, that
22   doesn't take the decision away.  But there's a lot more that
23   goes into that determination as to whether or not a jury would
24   find that Dr. Kardinal would have made a different decision.
25         But we have a lot of facts in this particular

                          OFFICIAL TRANSCRIPT

1   instance where Dr. Kardinal's testimony supports the idea that

2   he would have allowed or changed his decision based on what

3   Ms. Kahn said.  There's certainly enough to show that he would

4   have looked at how -- would have considered what Ms. Kahn would

5   have said in determining how the conversation would have

6   steered his prescribing decision.  And we don't take that away

7   from the jury just because his testimony is locked in.  So that

8   answers the factual question.

9           On the legal question, Judge, I could go through

10  this.  I don't need to.  You said you've looked at it

11  carefully.

12          **THE COURT:** I have, multiple times.

13          **MR. COFFIN:** But I do want to say, Your Honor, if I

14  could, and I won't even go to the slide, footnote 4 was really

15  the Fifth Circuit just saying, look, there is not a specific

16  standard in the law that says you have to ask these four

17  questions.  That's what it's saying.  They weren't saying

18  disregard, totally disregard the patient's input and choice.

19  They never said that at all.  In fact, they embraced that when

20  they embraced your language about how the conversation would be

21  steered.

22          The Fifth Circuit's point in footnote 4 was simply

23  this isn't the standard to ask these four questions.  That's

24  it.  It didn't change the standard that Your Honor applied.

25  You considered the input from the patient and so did the Fifth

1   Circuit, and that's the law.

2           So I hope that answers your questions, especially on

3   the factual side, but I strongly believe that you followed the

4   standard.  I think that's clear and that the facts are the

5   facts as they have been.  Just because Dr. Kardinal's testimony

6   is locked in, we do not take the decision away from the jury.

7   So reconsideration should be denied.

8           My colleague is reminding me that Judge Fallon has

9   applied the objective -- oh, reasonable doctor standard, yes,

10  in Xarelto.  But at any rate, I don't think -- I think that's

11  an alternative argument to say we could look at the reasonable

12  doctor standard since Dr. Kardinal is not available at trial.

13  I think that's an alternative argument that could be

14  successful.  But the reality is the jury could make that

15  decision on their own, Your Honor.  Thank you.

16          **THE COURT:**  Mr. Moore, briefly.

17          **MR. MOORE:**  Very briefly, Your Honor.  Two quick

18  points, it was said by Mr. Coffin that the Fifth Circuit

19  analyzed Ms. Phillips' input and analyzed her part of the

20  conversation.  All of the things that they rely upon from

21  Ms. Kahn's testimony, Ms. Phillips said those things too.  And

22  the Fifth Circuit did not focus on what she's saying now.

23  Because if you can come in now and say, "I would have done

24  something different," then there is no learned intermediary

25  doctrine.  That's the first point.


OFFICIAL TRANSCRIPT

1     The second point is that a jury, eight people sitting
2  in the box cannot write a prescription.
3     **THE COURT:** Let me ask this question, Mr. Moore.  Can
4  the jury consider objective evidence considering that the
5  people in the room, at least one of them, can't testify live?
6     **MR. MOORE:** I don't believe there would be any
7  precedent for that.  They had the opportunity to ask that
8  question, and Mr. Miceli, if you follow the deposition, goes
9  right up to that point, but he doesn't ask it.  I think the
10 reason he didn't ask it is because Dr. Kardinal had already
11 testified that this labeling change had not changed his risk
12 benefit assessment for this medicine.  And that's what they
13 need testimony on.
14     They never asked the question.  The testimony is not
15 there.  The jury will never hear it.  And we'd be asking the
16 jury to make a prescribing decision when it has to be
17 Dr. Kardinal's testimony.
18     **THE COURT:** Thank you.
19     Okay, we have a motion on reconsideration of statute
20 of limitations, but this one went over, and I have a sentencing
21 at 9:30.  So we've got one of two options.  We can move quickly
22 through reconsideration on statute of limitations, and I'm not
23 sure why that -- okay.  Because I don't mind having the
24 sentencing five minutes late, but I'm not going to let it be
25 this kind of late.  So I can hold you to five minutes on

OFFICIAL TRANSCRIPT

1    statute of limitations.

2            **MR. STRONGMAN:** It's up to the plaintiffs.  I can make

3    this argument in five minutes, Your Honor.

4            **THE COURT:** I think you can make it in five minutes.

5    We just don't need all of these PowerPoints.  I know you work

6    hard on them, but I've read everything.

7            **MR. STRONGMAN:** Good morning, Your Honor, Jon

8    Strongman on behalf of Sanofi.

9            Your Honor, in the *Thibodeaux* opinion, the Fifth

10   Circuit has set out a specific framework for analyzing

11   prescription and contra non valentem in this litigation, and

12   it's a framework that requires an objective analysis to be done

13   in addition to looking at what the plaintiff did and what the

14   plaintiff knew.  It looks at both the question of what they

15   knew and what they should have known.

16           **THE COURT:** Mr. Strongman, you have a woman that goes

17   to her doctor and says, "Why is my hair not -- why am I losing

18   hair?"

19           He says, "It's your age."  She doesn't like it, but

20   is that not a reasonable inquiry?  I mean does she have to look

21   up Taxotere at that point when a doctor says it's because

22   you're getting older?

23           **MR. STRONGMAN:** Well, Your Honor, as you understand

24   Ms. Kahn's testimony, one, she rejected Dr. Roberie's

25   conclusion that it was her age.  She dropped it.

OFFICIAL TRANSCRIPT

```
 1              But two, just because a question is asked of a doctor
 2     in 2009 does not mean that the plaintiff in perpetuity gets to
 3     sit without constructive notice coming her way.  So the
 4     question is what did she know.  That's the conversation she had
 5     with Dr. Roberie, what did she know, what did she ask, what was
 6     she told.
 7              The other piece is what should she have known.  And
 8     the Fifth Circuit has specifically concluded that, quote, "A
 9     reasonable inquiry would have uncovered at least some
10     information that linked Taxotere to persistent alopecia."  So
11     part of the problem that Ms. Kahn has is that when you look at
12     her inquiry, if it did not uncover information between Taxotere
13     and --
14              THE COURT:  All right, so is now the rule that if you
15     go to your doctor and you ask, "Why is my hair so thin," and
16     the doctor says, "Well, it's because you have -- it's your age.
17     This is age-induced alopecia.  That's your problem," that at
18     that point, you still have to go home and get on the Internet
19     and look up Taxotere?
20              MR. STRONGMAN:  I think the Fifth Circuit has
21     specifically said --
22              THE COURT:  I thought the Fifth Circuit was dealing
23     with -- because there was an argument that even had she, there
24     was no way she could find it.  They said, oh, no, no, no, it
25     was there if you looked.
```

OFFICIAL TRANSCRIPT

1          But if your doctor tells you that, are you still

2    charged with doing a separate investigation?

3          **MR. STRONGMAN:** I think the Fifth Circuit specifically

4    said still, we consider the standard of knew or should have

5    known to mean they needed to investigate Taxotere as a

6    potential cause.  And what the Fifth Circuit did is it then

7    went to the master complaint as Your Honor is familiar with.

8          **THE COURT:** Right, right.

9          **MR. STRONGMAN:** And it went through all of the

10    information that was there, and it concludes that appellants

11    are charged with whatever information that is, that is included

12    in the master complaint.  That's what the Fifth Circuit said.

13    And Ms. Kahn is no different than the three plaintiffs at issue

14    in that opinion.  She is charged --

15          **THE COURT:** Except that, except that her doctor told

16    her it was something else.  So she can't rely on that?

17          **MR. STRONGMAN:** I think that that is actually not what

18    the record says.  I think the record says that she asked her

19    doctor about thinning hair, and her doctor said that hair thins

20    with age.  And what Ms. Kahn said was, "I'm 50.  I don't think

21    that that's an accurate conclusion as to why I have thinning

22    hair.  So I dropped it."

23          So I think it's a little bit different than her going

24    in and saying, "Did Taxotere do this?"  And the doctor saying,

25    "No, it didn't."  That might be a different ball of wax, but

1   that's not what happened with Ms. Kahn.

2          And you can't just have a subjective question of what

3   she knew.  You have to couple it with what she should have

4   known.  And the Fifth Circuit has said what she should have

5   known, what was known well before, years before Ms. Kahn filed

6   suit is set out in the master complaint, and she is charged

7   with that information.  And as a result, you can't just sit on

8   your hands for years and years on the subjective.

9          **THE COURT:** Oh, I agree.

10          **MR. STRONGMAN:** And so just like the plaintiffs in the

11  *Thibodeaux* opinion, Ms. Kahn is charged with the information

12  that is set out in the master complaint which establishes years

13  before she filed her lawsuit that there was constructive

14  notice.  And as a result, we believe that based on that

15  addition of the objective analysis, Ms. Kahn's case cannot

16  survive.

17          **THE COURT:** Thank you, Mr. Strongman.  You have five

18  minutes.

19          **MS. PEREZ:** Yes, Your Honor.  Good morning, Your

20  Honor, Jessica Perez on behalf of Elizabeth Kahn.

21          Your Honor, you hit the question or the inquiry, the

22  nail on the head if you will.  The Fifth Circuit's decision in

23  *Thibodeaux* changes nothing about the analysis that this Court

24  utilized in rendering its opinion in the *Kahn* case in the first

25  instance.

OFFICIAL TRANSCRIPT

1        The Fifth Circuit's holding in *Thibodeaux* does not
2 require, as Sanofi has just suggested, that Ms. Kahn had to not
3 only inquire with a doctor, but that she also had to Google
4 Taxotere and causation.  Rather, the Fifth Circuit clearly
5 articulated in *Thibodeaux* that a reasonable inquiry into the
6 cause of one's persistent hair loss would include a
7 consultation with a doctor.
8        And the *Thibodeaux* decision is very distinct from the
9 facts here in *Kahn* because as Your Honor is well aware, each of
10 those three plaintiffs in that appeal did not make an inquiry
11 to a doctor.  Ms. Kahn did, and that inquiry was reasonable.
12 By going to the doctor and asking about her thinning hair loss,
13 Ms. Kahn, in making that complaint formally to a treating
14 physician, was inquiring as to the underlying cause and any
15 potential treatment.
16        The reason that we can be confident that that inquiry
17 was being made is because if you look at what Dr. Roberie told
18 Ms. Kahn, her inquiry was successful.  Dr. Roberie, based on
19 her complaint, said, "You have age-related hair loss."  Now
20 Ms. Kahn may have not liked receiving that information.  But
21 the suggestion that she dropped it and that that meant she
22 didn't believe it is not correct.  That language of "she
23 dropped it" was never explored in her deposition and can easily
24 mean that for Ms. Kahn "dropped it" means that she had received
25 her answer.

OFFICIAL TRANSCRIPT

1          Ms. Kahn has to be able to rely on the information

2    that she receives from her doctors, and nothing in the Fifth

3    Circuit's opinion says otherwise.  The Fifth Circuit, in fact,

4    recognizes under its adoption of the Louisiana Supreme Court

5    case of *Jordan* that when a plaintiff behaves in a reasonable

6    manner, you do not then impute constructive notice onto that

7    plaintiff of other items that may have existed.  You look at

8    the reasonableness of the plaintiff and her actions.

9          And as Your Honor noted originally, that question of

10   whether or not Ms. Kahn behaved reasonably and whether her

11   reliance on Dr. Roberie's opinion as to her hair loss is

12   reasonable is a question of fact for the jury to decide.  That

13   remains true today, Your Honor.  And Sanofi's motion for

14   reconsideration on this issue should likewise be denied.

15        **THE COURT:** Thank you.  One minute, Mr. Strongman.

16        **MR. STRONGMAN:** Less than one minute.  I want to point

17   out just one piece of the *Thibodeaux* opinion that deals a

18   little bit with this question of subjective.  Because if we

19   left this solely on the testimony of Ms. Kahn, it would result

20   in an unjust situation.  The Fifth Circuit said, "Any other

21   result would allow plaintiffs to say they became aware of the

22   information needed to file suit within the prescription period,

23   and no one could dispute their subjective state of awareness.

24   Such a result is untenable."

25        And that's what we have.  That's why you have to have

OFFICIAL TRANSCRIPT

```
 1  the objective overlay of what she should have known, and that's
 2  what the Fifth Circuit added with the master complaint
 3  analysis.  Thank you.
 4              THE COURT: Thank you.
 5                  (Whereupon this concludes the proceedings.)
 6
 7
 8
 9
10                          CERTIFICATE
11
12
13      I, Alexis A. Vice, RPR, CRR, Official Court Reporter for
14  the United States District Court, Eastern District of
15  Louisiana, do hereby certify that the foregoing is a true and
16  correct transcript, to the best of my ability and
17  understanding, from the record of the proceedings in the
18  above-entitled and numbered matter.
19
20                          /s/Alexis A. Vice, RPR, CRR
                            Alexis A. Vice, RPR, CRR
21                          Official Court Reporter
22
23
24
25


                      OFFICIAL TRANSCRIPT
```