```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************
     IN RE: TAXOTERE (DOCETAXEL)        MDL NO. 2740
 4   PRODUCTS LIABILITY LITIGATION      SECTION "H" (5)
                                        MAY 26, 2021
 5   This document relates to:
     16-17061 Clare Guilbault
 6   18-8086 Audrey Plaisance
     ****************************************************************
 7

 8        TRANSCRIPT OF MOTION PROCEEDINGS VIA VIDEO CONFERENCE
           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
 9                    UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:
     FOR PLAINTIFFS:               Josh Autry, Esquire
12                                 333 West Vine Street
                                   Suite 1200
13                                 Lexington, KY 40507

14

15                                 Darin L. Schanker, Esquire
                                   BACHUS SCHANKER
16                                 101 W Colfax Ave, Suite 650
                                   Denver, CO 80202
17

18
                                   Trevor B. Rockstad, Esquire
19                                 DAVIS & CRUMP
                                   2601 14th Street
20                                 Gulfport, MS 39501

21

22

23   FOR DEFENDANTS:               Heidi K. Hubbard, Esquire
                                   Richmond T. Moore, Esquire
24                                 WILLIAMS & CONNOLLY
                                   725 Twelfth Street, N.W.
25                                 Washington, D.C. 20005


                          OFFICIAL TRANSCRIPT
```

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR DEFENDANTS:                John F. Olinde, Esquire
                                    CHAFFE MCCALL
 4                                  1100 Poydras Street, Suite 2300
                                    New Orleans, LA  70163
 5

 6

 7

 8   Official Court Reporter:       Alexis A. Vice, RPR, CRR
                                    500 Poydras Street, HB-275
 9                                  New Orleans, LA 70130
                                    (504) 589-7777
10                                  Alexis_Vice@laed.uscourts.gov

11

12

13

14

15   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.
16

17

18

19

20

21

22

23

24

25

                           OFFICIAL TRANSCRIPT
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                        MAY 26, 2021
 3                    (MOTION PROCEEDINGS)
 4
 5              (The Court was called to order.)
 6         DEPUTY CLERK: 16-MD-2740, In Re: Taxotere Products
 7    Liability Litigation.
 8              Counsel who plan to argue today's matters, please
 9    make your appearances for the record.
10         MS. HUBBARD: Good afternoon, Heidi Hubbard from
11    Williams & Connolly.  I'm counsel for Hospira.
12              Should we all do appearances?
13         DEPUTY CLERK: All appearances.
14         MS. HUBBARD: So my colleague Rich Moore from
15    Williams~&~Connolly will also be arguing for Hospira on the
16    statute of limitations motion.
17              My co-counsel John Olinde will be arguing the
18    Plaisance choice-of-law motion, again, for Hospira.
19              So I'll be kicking things off on the learned
20    intermediary motion, and I will let plaintiff's counsel
21    introduce themselves.
22         MR. SCHANKER: Good afternoon, Your Honor, Darin
23    Schanker on behalf of Ms. Guilbault concerning the statute of
24    limitations matter.
25         MR. COFFIN: Your Honor, Josh Autry is via Zoom.  He
```

OFFICIAL TRANSCRIPT

1  will be arguing the learned intermediary.

2          **MR. AUTRY:** Good afternoon, Your Honor.

3          **MR. ROCKSTAD:** Good afternoon, Your Honor, Trevor

4  Rockstad.  I'll be arguing the *Plaisance* choice-of-law motion.

5          **THE COURT:** Thank you.  The first one I have is --

6          **MS. HUBBARD:** The first one is the learned

7  intermediary one.

8          **THE COURT:** Okay, I'm sorry.  You're just going to

9  have to bear with me because my list is off.  So I have to make

10 sure I have my right notes.

11         **MS. HUBBARD:** It's also, I know you have long lists.

12 Learned intermediary is first today.

13         **THE COURT:** Thank you.  Are you ready to proceed?

14         **MS. HUBBARD:** Yes, thank you, Your Honor.  I feel like

15 slides are ubiquitous.  After a year, I'm tired of them.  We do

16 have slides.  We will hand them out.  I can't promise I'm going

17 to stick to the slides because I would much rather talk with

18 Your Honor about this.

19         There's one single issue.  It's an interesting issue.

20 It is an issue that Your Honor has already addressed in the

21 *Stewart* case.  And on learned intermediary in the *Guilbault*

22 case, there is a single issue which is Hospira has moved for

23 summary judgment because a different Hospira label would not

24 have made a difference because the prescribing oncologist does

25 not recall ever reading the Hospira label.

OFFICIAL TRANSCRIPT

1          Your Honor has addressed learned intermediary or
2   warnings causation a number of times now in this litigation.
3   As Your Honor -- and there's good legal guidance from Your
4   Honor, from the Fifth Circuit, and from other decisions in this
5   district.  As Your Honor is well aware by this point, warnings
6   causation is an element of the plaintiff's case.

7          Plaintiffs must prove that a different warning would
8   have made a difference, and it has to be that a different
9   warning by Hospira would have made a difference.  And that is
10  the single issue here.  Because just like in the *Stewart* case,
11  the prescribing oncologist says he doesn't recall ever reading
12  the Hospira label, and so you cannot say a different Hospira
13  label would have made a difference.

14         As Your Honor is well aware, there are multiple
15  defendants in this litigation.  There is a brand, Sanofi out
16  front with the Taxotere label, and we have dramatic overlap
17  between the situation in the *Stewart* case where Your Honor
18  granted summary judgment for Sandoz and the situation in this
19  case.

20         Because in both of those cases, the prescribing
21  doctor may well have read the Sanofi Taxotere brand label.  The
22  doctor here said he thinks he probably, when he first started
23  practicing medicine and when he first started prescribing
24  docetaxel for chemotherapy, he probably read the Sanofi
25  Taxotere label.  But he doesn't ever recall reading the Hospira

1    label, and in fact, he says he didn't even know what
2    chemotherapy agent, which docetaxel was being used by the
3    pharmacy.  And to this day, just like in the *Stewart* case, he
4    has never looked at the updated Hospira label.

5         And so I think the overlap between this situation and
6    the *Stewart* case makes it a very specific issue for summary
7    judgment.  So let me just briefly walk through the key
8    testimony and the key legal framework from the *Stewart* case.
9    So as the Court is well aware, this is from both *Phillips* in
10   the Fifth Circuit and *Stewart* here, but for causation means
11   plaintiff has to carry that burden and has to carry it now that
12   a different Hospira warning would have made a difference.

13        And the challenge here is that if a physician does
14   not recall ever reading the label at issue, that isn't good
15   enough.  Like saying, "I don't recall," that doesn't get the
16   plaintiff home, doesn't get the plaintiff past summary
17   judgment.  Physician's lack of memory, as this Court said in
18   *Stewart*, of course, doesn't preclude the possibility that maybe
19   she read the materials, but it can't sustain the plaintiff's
20   burden.

21        So what was the testimony here?  I mean let's look
22   specifically at the prescribing doctor because it's an
23   interesting case in that the doctor says his practices are
24   different now.  We acknowledge that.  He has different
25   prescribing practices.  We acknowledge that.  He does.  He

OFFICIAL TRANSCRIPT

1   actually changed his prescribing practices because he had some

2   patients of his own that affected him.  Totally his choice.  He

3   has different practices.  But what is missing here is he never

4   changed his practices based on our later label because he never

5   looked at our updated label, and what matters here is he never

6   read our label.  He does not recall reading our label.  And if

7   you don't read, you can't heed.

8           His testimony is really the same as the oncologist in

9   *Stewart*.  He has no recollection of reading the Hospira label.

10  Let's look at what he said.  So this is a summary, and then

11  I'll show the specific testimony.  And of course, the key pages

12  of his testimony are pages 85 through 86, but these are the

13  most important things here.  So he does think way back when, he

14  looked at the Taxotere Sanofi label; so he does think he looked

15  at that label.  Of course, that's not the label that's being

16  accused of being inadequate here.  It has to be a different

17  Hospira label would have made a difference.

18          And if he never recalls reading the Hospira label,

19  how could a different Hospira label have made a difference.  So

20  he testified with respect to the Hospira label, he doesn't

21  recall reading it.  He got a little short in his testimony when

22  he got asked, you know, did you ever rely on the Hospira label.

23          And he said, "Basically, like I told you, I didn't

24  rely on anything from Hospira.  I don't remember reading that."

25  He didn't know.


                        OFFICIAL TRANSCRIPT

1          By the way, saying he doesn't remember reading it is
2    in no way a criticism of him.  He didn't even know what
3    manufacturer --
4          **THE COURT:** I read the testimony.
5          **MS. HUBBARD:** Yeah, okay, great.  All right, so, and
6    he still hasn't read the Hospira label, the new one.  That's on
7    page 125 of his deposition.
8          **THE COURT:** Right.
9          **MS. HUBBARD:** And so you've read the testimony.  I
10   don't need to go through these slides.  I'm skipping the
11   slides.  So I think the case law in a situation like this, not
12   only the *Stewart* case, but there are multiple other cases that
13   address this situation.  It's a specific situation.  It doesn't
14   come up all that often.
15         But it comes up here, and part of the reason it comes
16   up here is that he may well have read the Sanofi Taxotere
17   label.  But he was candid.  He just does not recall ever
18   reading our label.  And lack of recollection doesn't get
19   plaintiffs home.
20         So the other cases that I thought were particularly
21   on point and important on this issue is obviously the
22   *Pustejovsky* -- I'm never going to be able to say that, you know
23   what I mean.  I think the *Dykes* decision here in the Eastern
24   District of Louisiana cited on page 7 of our reply.  Again,
25   doctor never read the warning.  So you just don't get any

OFFICIAL TRANSCRIPT

1    further than that on warnings causation.

2            We have the *Hall* case out of the Fifth Circuit,

3    another good one, cited on page 6 of our brief where the doctor

4    never read the warning.  All of these are summary judgment

5    decisions where the district court was granting summary

6    judgment, the Fifth Circuit was affirming.

7            We have the *Moguel* case in the Eastern District of

8    Louisiana.  It was not a pharma case, but the users never read

9    the manual.  They never relied on the document that should have

10   been better.  And so it gets you -- and, of course, the *Stewart*

11   case which was really on all fours with our situation here.

12           So what you have is you have the prescribing doctor

13   here believing he read the Taxotere Sanofi label, not recalling

14   ever reading our label.  Still hasn't read our label, just like

15   in *Stewart,* and there's really only one conclusion from that

16   which is a different Hospira label would not have made a

17   difference because a doctor can't heed what he hasn't read or

18   what he doesn't read.  So that's sort of our straightforward,

19   simple argument.

20           Happy to answer any questions on it.  But it's right

21   on all fours with the existing case law in this court and in

22   the Fifth Circuit.

23           **THE COURT:** Thank you, Ms. Hubbard.

24           Mr. Autry.

25           **MR. AUTRY:** Good afternoon.  I believe I'm just going

OFFICIAL TRANSCRIPT

1  to start straight with the read and heed presumption because I
2  believe defense counsel assumes it's only a heeding presumption
3  and not a reading presumption.

4        Defense counsel comes up with the legal maxim that I
5  can't find in any Louisiana court case, state or federal, that
6  says you can't heed if you can't read.  I believe that was a
7  theme in defense counsel's argument.  Louisiana case law says
8  there's a presumption in an inadequate warning case that the
9  user will read and the user will heed.  It's a presumption both
10 of heeding and of reading.

11       So in this case, we start with a presumption that the
12 doctor would have read an adequate warning.  In this case, the
13 doctor clearly states that if he had read an adequate warning,
14 he would not have prescribed this medication.

15       **THE COURT:** What do I do, Mr. Autry, with a physician
16 that prescribes docetaxel and sends it to the pharmacy and
17 doesn't know which brand his patient is going to be prescribed?
18 Does that factor in at all?

19       **MR. AUTRY:** Your Honor, of course.

20       **THE COURT:** And I'm looking at the Fifth Circuit cases
21 that say it's not enough to say that he doesn't remember.

22       **MR. AUTRY:** Of course.  So I would start with, in
23 reverse order, the Fifth Circuit case that we're talking about
24 is one applying Texas law, and Texas does not have a read and
25 heed presumption like Louisiana does.  If we were in Texas,

OFFICIAL TRANSCRIPT

1   these plaintiffs might have a much tougher case because they
2   would have to create a presumption that the doctor read the
3   generic or read Hospira's label.

4        In this case, we don't need to come up with that
5   inference because we are starting on fantasy's 49-yard line.
6   It is their job to rebut the presumption with evidence, and
7   that is not enough to say, "We don't; so plaintiff loses."  In
8   the State of Louisiana, the plaintiff starts with no burden to
9   show that an adequate warning would have alerted the physician.
10  The plaintiff starts with the presumption that an adequate
11  warning would have alerted the physician.

12        Now secondarily, I would say in this case even if we
13  started on our own 49, we do have a reasonable inference that
14  the doctor would have read this warning and would have noticed.
15  We have a doctor here who has counseled thousands of cancer
16  patients, a doctor who has practiced -- 50 to 75 percent of his
17  patients were breast cancer patients.  This was his livelihood,
18  his practice.

19        His colleagues, that he worked closely with in his
20  practice, were breast cancer oncologists.  This was what they
21  focused on.  This was the research they stayed up-to-date on.
22  These were the conferences they went to.  This was not
23  something that went under his radar.  That was an issue that
24  was and is important to him.

25        Once he learned of the risk of permanent hair loss,

OFFICIAL TRANSCRIPT

1    he stopped prescribing it as a preoperative treatment,

2    Taxotere, to all women in Ms. Guilbault's situation.  That is,

3    I believe, huge, and it's a huge distinction between this case

4    and the *Stewart* case.

5            In the *Stewart* case, this Court first started in the

6    Section A of the analysis on the issue of is it enough when a

7    doctor doesn't know if he read the label, and then this Court

8    addressed the read and heed presumption.  In the read and heed

9    presumption section, Section B of this Court's analysis in

10   *Stewart*, the reason this Court said Stewart lost on that issue

11   was because Stewart's doctor said that Stewart -- the doctor

12   still would have prescribed docetaxel regardless.  That is the

13   exact opposite of what the doctor talks about in this case.

14           The doctor in this case switched to Taxol.  The

15   doctor in this case said that Taxol was equally effective

16   without carrying the negative side effects, and he no longer

17   saw any benefit or any reason to prescribe Taxotere or

18   docetaxel once he learned of this permanent risk.  And if

19   Hospira had alerted or had warned of this risk, I believe

20   there's a reasonable inference that a doctor who literally

21   lives with this issue, lives with this preoperative patient,

22   the lion's share of his practice, would have noticed a label

23   change.

24           The doctor said that he looked at the warnings from

25   the FDA in every single case when he talked to patients.  He

OFFICIAL TRANSCRIPT

1  would click the link, and he would go through those warnings

2  with his patients.  He talked about how important it was for

3  him to go to seminars, to talk to his colleagues about what was

4  going on and stay up-to-date in the medical literature.  This

5  is not a case of a doctor who's just -- maybe this is one of or

6  maybe it's 5 percent of their practice that they deal with

7  people taking this regimen.  This was what the doctor did, and

8  this is what the doctor focused on.

9          So I do believe there's a reasonable inference that

10  if Hospira had given adequate warning, the doctor would have

11  noticed.  But I would also add that unlike in the Texas case

12  law that defense counsel relies on, we don't need that.  It's

13  the opposite.  We start on their 49.  We start with a

14  presumption that they must rebut with evidence that the doctor

15  would have read an adequate warning because we're in the State

16  of Louisiana.  And that is a presumption not only that the

17  doctor would have heeded it, which we know from his testimony,

18  but that the doctor would have read it.  And the absence of

19  recollection --

20          **THE COURT:**  Okay, I'm going to go back to the question

21  I asked initially is:  What do I do in a circumstance where the

22  doctor doesn't know that "I am prescribing Hospira docetaxel

23  instead of, you know, Taxotere"?

24          Does that factor in at all that he doesn't know which

25  form of docetaxel his patient will be administered?

OFFICIAL TRANSCRIPT

1    **MR. AUTRY:** I would say first, that initial analysis
2  would only go to the first prescription filling.  He was not
3  asked if he would have learned for the multiple treatments that
4  Ms. Guilbault got during her treatment which prescriber or
5  which manufacturers' prescription she was taking.

6          And then secondarily, I would say the analysis for
7  the label takes place before then, right.  The question is
8  whether at some point he would have noticed a change in
9  Hospira's label before he made that prescription or gave that
10  prescription to Ms. Guilbault, and this is the doctor who
11  prescribed docetaxel on a regular basis to his patients across
12  the board.

13          So if there had been a change in labeling by Hospira
14  3 months, 6 months, 12 months, 24 months before that, I believe
15  there's a presumption that he would have discovered that label
16  change.  And not only would have stopped prescribing Hospira,
17  but would have stopped prescribing all docetaxel because
18  they're warning of a common risk and this is the common risk
19  that led to him changing his prescribing decisions, in cases
20  like Ms. Guilbault, I believe, he only now prescribes it in
21  post-operative scenarios.

22          **THE COURT:** Right, right, right.

23          **MR. AUTRY:** So you know, in this case, we don't know
24  if in this case if he read it at that exact moment.  I would
25  also say that when you look at the doctor's testimony and the

1   exact questions he was asked, I don't believe he was asked

2   these ever and never questions.  So I believe defense counsel

3   interprets the doctor's testimony as he never read Hospira's

4   label.

5        **THE COURT:** Well, I think he said he doesn't remember

6   reading it before he prescribed it to Ms. Guilbault.  That's my

7   recollection of the testimony.

8        **MR. AUTRY:** Correct.  And I believe there's two

9   reasonable interpretations of that question and answer.

10       **THE COURT:** Okay.

11       **MR. AUTRY:** I believe one reasonable interpretation of

12  that question and answer is whether he remembers that he read

13  it that day.  I believe another reasonable interpretation of

14  that answer in Hospira's favor would be potentially that he

15  doesn't remember if he read it before that day.

16       Hospira goes with the latter interpretation.  I don't

17  think it's clear from the question if he was being asked if he

18  had ever read it before that day in 2013.  And I believe it is

19  a reasonable interpretation, at least, for summary judgment

20  purposes, that the doctor was focused on, "Did I read it that

21  day?"  "No, I don't remember."

22       And he was asked a lot of questions about the

23  conversations he had with Ms. Guilbault that day, and he didn't

24  remember the specifics.  I mean when he talked about his advice

25  he gave her that day, he would talk about his habit and routine

OFFICIAL TRANSCRIPT

1   and how he would advise patients, but not specifically, "This

2   is what I talked to her about that day."

3          For temporary alopecia, you know, he talked about,

4   "Yes, I was advising women like Ms. Guilbault about temporary

5   alopecia, but I don't remember specifically what I told her

6   that day."

7          And so for the specifics of the conversation, we

8   would sort of go on Ms. Guilbault's testimony that she was only

9   advised of temporary and not permanent alopecia.

10         **THE COURT:** Thank you.

11         **MR. AUTRY:** Thank you, Your Honor.

12         **THE COURT:** Ms. Hubbard.

13         **MS. HUBBARD:** Thank you, Your Honor.

14         Briefly, first, the heeding presumption is a

15   rebuttable presumption that has been rebutted.  The law here in

16   Louisiana, it clearly states, including, *Stewart*, which was a

17   Louisiana case, that the presumption is rebutted when a doctor

18   or a user says they don't recall reading the label.  That was

19   *Stewart*.  The language in *Stewart* is when a physician does not

20   recall ever reading a label at issue, the learned intermediary

21   doctrine requires summary judgment for the manufacturer.

22         And recall that in *Stewart*, a lot of the same

23   arguments that plaintiff's counsel just made were made there

24   too, like, well, maybe the doctor would have learned from other

25   sources.  The doctor in Stewart belonged to some kind of

OFFICIAL TRANSCRIPT

1    subscription service, you know.  There are a lot of -- okay,
2    fine, there are a lot of ways we could guess, but guesses don't
3    fill in or satisfy the evidentiary burden that has shifted back
4    to the plaintiffs.

5            The doctor's testimony here that he didn't recall
6    reading the label rebuts any presumption.  If plaintiff's
7    counsel's views of the law were right, then there would never
8    be a summary judgment on this basis in Louisiana.  And yet case
9    after case, if a user or a doctor says, "I didn't read," or "I
10   didn't recall reading," that rebuts the presumption, and the
11   plaintiff has not then met their burden of proof.  You don't
12   get to meet your burden with an "I don't recall."

13           Now the doctor's testimony here, which Your Honor has
14   read, was not "I don't recall whether I read it that day."  He
15   says, "I don't recall that I ever read it."  And he got a
16   little short there at the end.  He's like, "I told you I didn't
17   rely on anything from Hospira.  I told you I haven't seen the
18   Hospira information."

19           He didn't say, "I read it at some point."
20   Plaintiff's counsel could have asked him.  He didn't say, "I
21   read it at some point," because he doesn't ever remember
22   reading it.  The bottom line is he just doesn't.  And as Your
23   Honor pointed out, you know, part of that may be that he didn't
24   even know that it was going to be the particular chemotherapy
25   medicine that was going to be used by the pharmacy.


                          OFFICIAL TRANSCRIPT

1          But it's a specific situation that really replicates
2   *Stewart*, a Louisiana case, which correctly applied the law in
3   Louisiana and elsewhere.  The doctor doesn't recall ever
4   reading it.  There's not warnings causation here.

5          **THE COURT:** Thank you.  Now we're going to argue
6   Hospira's motion for summary judgment on prescription,
7   Mr. Moore.

8          **MR. MOORE:** Your Honor, if I may approach, I'm just
9   going to hand up these slides.  I don't know if you'd like a
10  hardcopy version of them?

11         **THE COURT:** That's fine.  Just give me a minute.
12  Okay, I'm ready.

13         **MR. MOORE:** Thank you, Rich Moore from Williams &
14  Connolly on behalf of Hospira.

15         I was listening in to the arguments this morning, and
16  I just want to cut to the chase here.  I don't think there's
17  any dispute that her claim is prescribed on its face.

18         **THE COURT:** Right.

19         **MR. MOORE:** It's going to come down in the plaintiff's
20  argument that the conversations with the doctors tolled the
21  statute of limitations under contra non valentem.

22         **THE COURT:** All right, specifically, Dr. Terezakis.

23         **MR. MOORE:** Correct.  Dr. Terezakis diagnosed her with
24  androgenetic alopecia, female pattern hair loss.  Now she
25  doesn't remember that.  In her deposition, she said, "All I

OFFICIAL TRANSCRIPT

1  remember is she said it was not from chemotherapy."

2         So the reason that doesn't toll the statute of

3  limitations is threefold.  First, under the Fifth Circuit

4  opinion, as we talked about this morning, there's a separate

5  line of inquiry that the plaintiff needs to make for public

6  information apart from the inquiry with the doctor.  And that's

7  the allegations in the master complaint.  The Fifth Circuit

8  said you have a duty to investigate whether Taxotere was the

9  cause, No. 1.  If you do that reasonable investigation, that

10 includes looking at public literature, and No. 3, there was

11 sufficient information out there --

12         **THE COURT:**  Are you telling me that -- I'm going to

13 have to go back to where we were this morning.  Are you telling

14 me that a woman goes to a dermatologist and says, "I have lost

15 my hair.  I took chemotherapy, but look at what's happening to

16 my hair."

17         And the doctor says, "This is absolutely not related

18 to chemotherapy.  This is related to androgenetic alopecia, and

19 so I have this other treatment for you.  But it is not

20 chemotherapy," that she's then supposed to do independent

21 research to check out Taxotere?

22         **MR. MOORE:**  Yes, Your Honor, I believe, if you just

23 bear with me for a second, there's an exception.  The exception

24 we're talking about here about relying on the doctor.  It's not

25 what's in the Fifth Circuit's case.  It goes back to the

OFFICIAL TRANSCRIPT

1  *Hoerner* case.

2              **THE COURT:** Right.

3              **MR. MOORE:** The *Hoerner* case, if you'll recall, the

4  Court did not say you don't have to go look at public

5  literature.  That's not what the Court said.  The Court said

6  the public literature that existed was not relevant.  You

7  remember that case involved the contacts, and the Court said --

8  it didn't say when the defense made the argument you have to go

9  look at the public literature, the Court said, no, there's no

10 duty to look at public literature.  The Court said, no, there's

11 been public literature on the risk of infection generally with

12 contacts, but not with extended wear contacts, and therefore,

13 it's not relevant.

14             So it didn't say you don't have to look at the public

15 literature.  It said -- and I have the language here from the

16 opinion.  It uses a little bit of archaic language.  I had to

17 look it up frankly, Your Honor.  But it says, "We, therefore,

18 pretermit discussion of the evidence submitted regarding public

19 knowledge in 1987 of the causal relationship between contact

20 lenses and ulcerative keratitis."  So it's not saying you don't

21 have to do it.  It's just saying it's not relevant.  So that's

22 No. 1.

23             No. 2, it's different here because in that case, the

24 *Hoerner* case, the plaintiff believed her doctor.  So you had a

25 twofold issue in the *Hoerner* case.  There was no public

1  literature, and the doctor said in that case, "You have a bug,"
2  told the plaintiff, "You have a bug."  She believed him.
3  That's what the court says.

4       Here, we don't have that evidence.  We don't have the
5  evidence from Ms. Guilbault that would fit into this.  That's
6  not this case.  Ms. Guilbault didn't say, "You know what, I
7  believed I had female pattern hair loss."

8       She thought she had hair loss from chemotherapy, and
9  she was clear about that in her testimony.  She said when she
10 went in to see Dr. Hooper, she said, "I told her I had hair
11 loss from chemotherapy."  She went in to see -- "I told the
12 staff and Dr. Terezakis I had chemotherapy."

13      So what she's doing, the other thing is she's looking
14 for treatment for her hair.  She thinks that she has hair loss
15 from chemotherapy, and she wants to have it treated.  That came
16 up in the Fifth Circuit opinion.  One of the plaintiffs did the
17 same thing.  The Fifth Circuit said that's not the same thing.

18      **THE COURT:**  Okay, but this is my problem because I
19 think you're -- my recollection is she goes in and tells the
20 nurse -- all of us go to doctors -- "Why are you here?"  "I'm
21 here because I took chemotherapy.  Look at my hair."

22      **MR. MOORE:**  Okay.

23      **THE COURT:**  "Look at my hair."  And then the doctor
24 comes in and says, "It's not chemotherapy.  This is this, and
25 by the way, this is how you need to treat it."  And so she buys

1  this expensive treatment from Dr. Terezakis, multiple rounds of

2  that, and it doesn't work.  And she thought, well, maybe it

3  just wasn't going to get fixed.

4        **MR. MOORE:** Correct, Your Honor.  Two points on that.

5        **THE COURT:** All right.

6        **MR. MOORE:** One, what we don't have is evidence

7  anywhere that she said, "You know what, I thought I had that.

8  I did not think it was chemotherapy."  So there's not this case

9  where it suspended her investigation.

10       She could say that.  She's the plaintiff.  She can

11 say, "Look, I thought -- I believed her.  I thought I had

12 female pattern hair loss, and I just stopped all my

13 investigation."  That's what happened in the *Hoerner* case.  You

14 had these twin factors.

15       **THE COURT:** Right, right.

16       **MR. MOORE:** That's not this case.  So I think that's

17 the big difference here, Your Honor, is that there's no

18 evidence that she believed her hair loss was caused by anything

19 other than chemotherapy.  We're not saying she didn't do an

20 investigation, but she thought it was chemotherapy all along.

21       **THE COURT:** Do we have evidence that subsequent to her

22 visit with Dr. Terezakis, she went to anyone else and said, "Is

23 this chemotherapy, or is this androgenetic alopecia?"

24       **MR. MOORE:** After the visit with Dr. Terezakis?

25       **THE COURT:** Uh-huh.

OFFICIAL TRANSCRIPT

1        **MR. MOORE:** No, she didn't go back.  She stopped.  She

2   said it didn't work, and she never went back.  So she said the

3   treatment did not work.

4        **THE COURT:** The treatment didn't work.

5        **MR. MOORE:** Right.

6        **THE COURT:** So did she have a doctor subsequent to

7   that to say that it was not related to --

8        **MR. MOORE:** Androgenetic alopecia?

9        **THE COURT:** Yeah.

10       **MR. MOORE:** No.  But she did go back to

11  Dr. Theodossiou, her oncologist, in October.

12       **THE COURT:** And he said it was related to chemotherapy

13  and not androgenetic alopecia?

14       **MR. MOORE:** What he said was, and I'll show you the

15  testimony.

16       **THE COURT:** Let's look at that testimony.

17       **MR. MOORE:** He said at that point -- so in October,

18  this is still more than a year before she filed suit.

19       **THE COURT:** Right.

20       **MR. MOORE:** She said, "At that point, it was common

21  knowledge, permanent risk of alopecia, common knowledge.  I

22  suspect I had the discussion about the role of docetaxel."  Now

23  he doesn't say definitively.  Remember he says, "I suspect I

24  did."

25            The point there is either he did tell her as he

OFFICIAL TRANSCRIPT

1    suspects he did in which case she's plainly on notice.

2         **THE COURT:** Well, that's a different matter.

3         **MR. MOORE:** Right.  But even if he did not tell her,

4    at that point, she -- prescription starts because all she had

5    to do was ask her doctor.  It was right at her fingertips in

6    her own doctor's office.

7         **THE COURT:** So she couldn't rely on Dr. Terezakis at

8    that point?

9         **MR. MOORE:** No, it doesn't last forever.  As someone

10   said this morning, I believe, you don't get to just toll the

11   prescription period forever.  It only tolls for a reasonable

12   period of time.

13        At this point, she's using all these medications.

14   They're not working.  None of it's worked.  So at this point,

15   it's not reasonable for her to continue to be able to toll the

16   prescription period when her own doctor says, "I suspect I told

17   her, and I certainly would have told her."

18        **THE COURT:** When did it stop being reasonable?

19        **MR. MOORE:** Well, at this point, by no later than

20   November or October 22nd of 2015 when she visited

21   Dr. Terezakis.  At that point, her own doctor --

22        **THE COURT:** You mean doctor --

23        **MR. MOORE:** Theodossiou.  A lot of Greek names, I

24   believe, in this case for some reason.

25        And again, a couple of additional points.  First of

OFFICIAL TRANSCRIPT

1    all, again, going back to the *Hoerner* case which is the genesis
2    of all this, I think we all recognize --

3            **THE COURT:** Uh-huh.

4            **MR. MOORE:** -- it was different in that case.  The
5    doctor said something very different.  If she had questioned
6    him, he probably would not have addressed the issue.  That's
7    *Hoerner*.

8            Now here, we have a different situation.  The doctor
9    says, "I suspect I did, and certainly, I would have."  That can
10   be the only inference from that.  So I think that's another
11   reason.  So you have three reasons here why this is just not a
12   *Hoerner* case.

13           This is not a case where the doctor -- there's no
14   publicly available information.  The plaintiff actually relied,
15   and the doctor would not have told her, all of those confluence
16   of factors come together to create what happened in *Hoerner*,
17   and it's just not here in this case.

18           Finally, Your Honor, there's another point that I
19   skipped over which is that let's just give the plaintiff the
20   benefit of the doubt and say, "Dr. Terezakis, you know, I just
21   believed her, and I tolled it all the way out until I saw this
22   TV ad."  That's really the plaintiff's argument here.

23           It's not enough.  There's still too much time.  The
24   prescription period would suspend at Dr. Terezakis, and we even
25   gave the benefit and said Dr. Hooper.  Dr. Hooper only said try

OFFICIAL TRANSCRIPT

1   Rogaine.

2           **THE COURT:** Yeah, but that was not saying what I think

3   causes it.  That's different.

4           **MR. MOORE:** Okay, so then it's even more, even more

5   time would have passed.  So Dr. Terezakis, let's just say that

6   suspends it.  Well, it's not enough time because if you add the

7   time before that and the time she waited after the TV ad and

8   the time that she filed suit, it's more than one year.

9           So under Louisiana law, there are things that can

10  suspend the prescription period for a certain period of time.

11  If you have nine months before Dr. Terezakis and another

12  six months after the ad which everyone agrees, even she said

13  she was on notice at that point, you're at 15 months total.

14          **THE COURT:** 15 months, what?

15          **MR. MOORE:** So if prescription is running to the point

16  where it's suspended with Dr. Terezakis, that's nine months.

17  Then let's just give them the benefit of the doubt and say

18  there's this huge tolling period all the way from -- which I

19  don't believe is true.  I'm not accepting that, just arguendo.

20          You have this long tolling period all the way until

21  she sees the TV ad and then starts back up again.  Even then,

22  too much time has passed.  Prescription has only tolled for

23  that middle period, and you have a total of one year.

24          So, Your Honor, is that -- am I being clear about

25  what I'm saying?

OFFICIAL TRANSCRIPT

1            **THE COURT:** No, I see your argument.

2            **MR. MOORE:** In summary, Your Honor, it's really you

3   can come to this a number of different ways, really three

4   different ways.  I mean we don't think there's any tolling

5   based on this conversation with Dr. Terezakis.  That's one.

6            No. 2, if there was tolling, by the time you get to

7   October, it's over.  The tolling is over.  At that point, you

8   have a situation where her own doctor says he suspects he told

9   her about it and certainly would have told her about it.  So

10  any tolling ends by that point.

11           And then third, if you just back out this tolling

12  that the plaintiffs are arguing based on --

13           **THE COURT:** Could I ask a quick question?

14           **MR. MOORE:** Yes, Your Honor.

15           **THE COURT:** Since her treating -- and I'm not even

16  going to try to say his name.  I'll call him Dr. Theo.

17           **MR. MOORE:** Dr. Theodossiou, I think it is.

18           **THE COURT:** We're going to call him Dr. Theo.

19  Dr. Theo, she sees him in October, but there's nothing in his

20  notes that indicate that they talked about any of that.

21           Would that be a question of fact for the jury to

22  determine what occurred in October 2015 in that visit with him?

23           **MR. MOORE:** Whether she what?

24           **THE COURT:** Would that be a question of fact for the

25  jury to determine what happened in October 2015 when she saw

OFFICIAL TRANSCRIPT

1  her oncologist?

2          **MR. MOORE:** So we are not taking the position that

3  it's an undisputed fact that he said that at that visit.

4          **THE COURT:** Right, right, right, so that would be it.

5          **MR. MOORE:** Our argument doesn't ride on that.

6          **THE COURT:** I understand, I understand.

7          **MR. MOORE:** When he says, "I suspect," we're not

8  saying, you know, that's gospel.

9          **THE COURT:** That's dispositive, okay.

10         **MR. MOORE:** But I think, as I said, that's the real

11 argument.

12         **THE COURT:** Right, no, I get it.  I wanted to make

13 sure that you weren't saying this is dispositive on that issue.

14 Okay, good.

15         **MR. MOORE:** Thank you, Your Honor.

16         **THE COURT:** Mr. Schanker.

17         **MR. SCHANKER:** Yes, Your Honor, good afternoon.  So

18 first of all, it is our position that certainly that would be a

19 question of fact.  And just since you zeroed right in on that

20 important issue, the conversation with Dr. Theo in October of

21 2015 and the record we have of that and Counsel showed the

22 transcript, it didn't highlight the important response that was

23 in the papers.  The question in the deposition to Dr. Theo was,

24 "Would you have had a discussion with her, the plaintiff,

25 regarding the possible causes of that alopecia?"

OFFICIAL TRANSCRIPT

1        And Dr. Theodossiou answers, "I do not recall."  He

2   goes on then to speculate about that.

3        **THE COURT:** Let's talk about Dr. Terezakis because

4   that's what I think I'm interested in.  What happens when

5   Dr. Terezakis says, "This is what I think it is," and then

6   prescribes medication, and she just quits because it's not

7   working.  Is that -- is she at that point unreasonable?

8        **MR. SCHANKER:** Well, I think that in looking at the

9   whole record in context is important, and you are right that

10  Dr. Terezakis tells her she has androgenetic alopecia and tells

11  her it's not chemotherapy induced.  Now does the plaintiff

12  remember that years and years later, that exact conversation

13  and some highly technical scientific term of androgenetic

14  alopecia, no.

15       But what we do know is she followed the doctor's

16  advice.  It wasn't like she quit immediately using it.  She

17  followed through on the prescription, and unfortunately, for

18  her, she didn't see any immediate results from that.  Now

19  remember, what she was prescribed at that point in time takes

20  months and in some cases up to a year to be effective, the

21  treatment.  And so it's not unusual that -- and we know now why

22  she didn't see a result because she had PCIA not androgenetic

23  alopecia, but she didn't know that.

24       It is important, again, Dr. Terezakis certainly at

25  that point tolls the prescription period.

1    **THE COURT:** Was it unreasonable for her when she

2  followed up with her oncologist to not ask, "Wait a minute, you

3  know.  This really all started with chemotherapy"?

4    **MR. SCHANKER:** At that point in time, Your Honor,

5  which is late in 2015, the October 2015 visit you're referring

6  to with Dr. Theo, she's seen a specialist who she's been

7  referred to.  She understands that Dr. Theo is an oncologist.

8  She's seen a dermatologist who diagnosed her with a particular

9  condition.

10    And this was a woman who, how many -- as you saw, the

11  record was replete with her reasonable attempts to figure out

12  what was going on.  She made at least five inquiries to medical

13  providers from the time, from 2014 forward.  December of 2014,

14  she saw her prescribing doctor about the hair condition, and he

15  informed her that she needed to give hair time, take a

16  multivitamin.

17    She inquired again in April of 2015 at which time the

18  thought of referring her to a dermatologist came up.  She then

19  did go see a dermatologist in May of 2015 who told her that

20  Rogaine would work.  June of 2015 is when she sees

21  Dr. Terezakis who specifically diagnoses her with androgenetic

22  alopecia and prescribes Retin-A and minoxidil that takes months

23  up to a year to be effective.  She then follows up in October

24  of 2015 with Dr. Theodossiou, at what time he does not recall

25  the substance of the conversation.


OFFICIAL TRANSCRIPT

1          And so I think that that demonstrates a complete --
2    evidence of a complete reasonable inquiry.  I mean honestly,
3    what more could she have done?  She went to the doctors.  She
4    did what the doctors told her to do.  She trusted the doctors.
5    Doctors diagnosed her, misdiagnosed her through no fault of her
6    own with a different condition, and she followed that.
7          Your Honor, Counsel started by laying out what I
8    believe is inaccurate analysis from the Fifth Circuit
9    concerning what Ms. Guilbault's obligation is in this case.
10   With this reference, we heard it this morning, and you zeroed
11   in on it, and we heard it again this afternoon.  And this is
12   this idea that the Fifth Circuit is requiring of a plaintiff,
13   not only a reasonable inquiry of medical providers, but then
14   placing this obligation of constructive notice upon them.  And
15   that's simply not what the *Thibodeaux* case says.
16         The *Thibodeaux* case specifically says, "A reasonable
17   inquiry into the cause of one's persistent hair loss would
18   likely include consultation with doctors, but a plaintiff with
19   persistent hair loss might instead search for the cause
20   herself," indicating that a plaintiff could do either/or.
21         Well, in this case, we have an abundance of evidence
22   we've gone through of Ms. Guilbault inquiring.  And so box is
23   checked.  Statute is tolled.  End of story.
24         But in the papers, Your Honor, defense tries to say
25   that the inquiry that needs to be made is more specific than

OFFICIAL TRANSCRIPT

1  that that's been laid out by this Court and by the Fifth
2  Circuit.  Specifically, what the defense tries to do here, Your
3  Honor, is turn the inquiry into an obligation on the part of
4  Ms. Guilbault to specifically ask is it the docetaxel.  And
5  that isn't contained in the Fifth Circuit *Thibodeaux* opinion or
6  in any of the papers, any of the orders that you have issued
7  rulings in this case.
8          An analysis, asking a doctor, going in to see a
9  doctor about my hair condition, it's implicit wrapped up in
10  that is causation.  If you're going in to ask about the
11  condition of one's hair, "Why has it not come back," obviously,
12  for a doctor to answer that question requires a differential
13  diagnosis which implies causation.  That's what was done in
14  this case, and we know that she got a misdiagnosis.
15          One of the cases that we cite in our papers that is
16  important and I think is implicated is the *Sharkey* case, Your
17  Honor, and specifically, the *Sharkey* case says that the
18  defendant can't, in essence, have their cake and eat it too
19  which is exactly what they're trying to do in this case.
20  Defendant cannot put forth a causation defense and then at the
21  same time argue that a plaintiff is required to search and
22  required to demonstrate causation.  You can't put forth a
23  causation defense and then come forward and say that the
24  plaintiff has an obligation to know or reasonably investigate
25  or suspect that the defendant's conduct is what caused their

OFFICIAL TRANSCRIPT

1    harm.

2            **THE COURT:** What?

3            **MR. SCHANKER:** Let me read it to you right here.  It's

4    *Sharkey versus Sterling Drug*, and it's in the papers, Your

5    Honor.  "Sterling's contention that this action has prescribed

6    is greatly undermined by its own contention that the cause of

7    the condition in that case, the syndrome is unknown."  The

8    Court goes onto say, Your Honor, "If the cause is unknown for

9    purposes of the defendant's liability, then the defendant can

10   hardly argue that the cause was known to the plaintiffs more

11   than one year prior to the filing of this action."

12           In essence saying you can't argue causation and say

13   there is no causation in this case.  We know that that's what

14   has happened and is happening in this case with Hospira.

15           **THE COURT:** Well, then your cases would never

16   prescribe.

17           **MR. SCHANKER:** Pardon me?

18           **THE COURT:** Are you telling me the cases never

19   prescribe?  I guess -- okay, go ahead.

20           **MR. SCHANKER:** That's what's happening in this case.

21   I mean you don't have to argue causation.  But if you're going

22   to argue causation, then is that talking out of both sides of

23   your mouth.  Is it saying, "You know what, our drug doesn't

24   cause it.  But you had an obligation to research and try to

25   find out if our drug caused it"?  And that's what's happening

OFFICIAL TRANSCRIPT

1    in this case.

2           Your Honor, the last slide that we saw from defense

3    counsel, which I am not aware of any support under Louisiana

4    law for, which is that there's some sort of chunking and

5    tallying of time periods that to add up to a cumulative

6    one-year prescription.  And I don't see any support

7    specifically, but factually, that is not even what happens in

8    this case.

9           We don't ever have a period of time where the

10   plaintiff knows or has reason to believe that it's the

11   chemotherapy drug docetaxel that is causing her condition.

12   Instead she has questions.  She goes to see doctors, and she's

13   told over and over again that her hair loss is temporary, and

14   ultimately, that the cause of that hair loss is androgenetic

15   and not the docetaxel drug.

16          With regard to the plaintiff's obligation in this

17   case and constructive notice, Your Honor, as we discussed

18   earlier, it's not an X and Y requirement under the Fifth

19   Circuit, inquiry plus obligation of constructive notice.  But

20   even if we say that constructive notice is required and agree

21   with the law that constructive knowledge of items that the

22   plaintiff reasonably could have been expected to find, there's

23   been no showing in this case.  And we saw a slide with a

24   variety of items, and it's in the defendant's papers, that

25   there's some news report back in the mid-2000s, *The Globe and*

OFFICIAL TRANSCRIPT

1  *Mail.* You're familiar with *The Globe and Mail.*

2  There's been no demonstration, first of all, that

3  Ms. Guilbault even had a computer on which she could have

4  successfully searched and found that.  And any demonstration

5  that *The Globe and Mail* was online that she could have ever

6  even discovered, that she had a subscription to the Canadian

7  newspaper.  And so it's reasonable knowledge.

8  The Fifth Circuit, I'd respectfully say that the

9  language in which they talk about oncology articles and

10  publications, that that is simply dicta in this case.  Because

11  factually with regard to the Guilbault case, there's been no

12  connection made between information that may exist in the

13  public sphere and the ability of her to find it.

14  Because the reality is, Your Honor, those items that

15  were in the complaint, that constructive knowledge could

16  potentially be imputed for, to the plaintiff, many of those

17  items are items that were not readily available, were not

18  easily accessible, and as part of work product were only found

19  by plaintiff's counsel with hired experts who specialize in

20  that.  So realistically, those items were not available to a

21  plaintiff in this case.

22  And, Your Honor, for those reasons, we believe that

23  defendant's motion for summary judgment should be denied.

24  **THE COURT:** Thank you.  Mr. Moore.

25  **MR. MOORE:** Just a few quick points.

OFFICIAL TRANSCRIPT

1      **THE COURT:** Sure.

2      **MR. MOORE:** First of all, on the last point, you know,

3  I know Counsel feels differently, but the Fifth Circuit's ruled

4  on this issue about whether those sources in the master

5  complaint put a plaintiff on constructive notice.  That's been

6  decided.  It's not a matter of whether she actually found them

7  or whether she looked at them.

8      What the Fifth Circuit said is a reasonable

9  investigation would have uncovered these sources and that would

10 have put someone on, at least, a possibility that Taxotere was

11 the cause.  I think I misstated that slightly, but that's what

12 it said.

13     So that's No. 1, and that is the baseline.  That's

14 been established.  So there is constructive notice.  So we're

15 dealing with -- what they're arguing is some sort of exception

16 to that based on this doctor testimony.  And I didn't hear him

17 say that the plaintiff believed it was androgenetic alopecia.

18 I didn't hear him say that.  I certainly didn't hear him offer

19 any evidence of that because there is none.  It's just not in

20 the record.  And that's dispositive on that issue.

21     Nor did I hear him say that that's not a requirement

22 that you have to believe it.  I didn't hear him say that

23 either.  So that is another reason why this conversation

24 doesn't toll the prescription.

25     In any event, Your Honor, Counsel says, "I'm not

OFFICIAL TRANSCRIPT

1    aware of any law that provides for the starting and stopping of
2    the prescription period." We have cited in our reply under
3    Louisiana, the times -- this is a quote, "The time which
4    preceded the suspension is added to the time which follows it
5    to compose the necessary period. Only the period of the
6    suspension is deducted." That's what we're saying here. So if
7    there's been a suspension of the prescription period during the
8    time between Dr. Terezakis and the time that they say it starts
9    back up, you deduct that. That's what the case says. In our
10   reply, there is Louisiana law to support that.

11           So, Your Honor, we believe for those reasons, this is
12   not this perfect storm of factors where you have a *Hoerner*-type
13   situation, but really the Court says in that case there is no
14   way this plaintiff could have known that extended-wear contacts
15   caused her injury. It wasn't in the public literature. Doctor
16   told her it was something else. Her own doctor said he
17   wouldn't have told her about it.

18           I mean here, we have exactly the opposite. It is in
19   the public literature. The doctor told her something else.
20   She didn't believe it. Third, by October, doctor said, "I
21   would have told her." So it's not *Hoerner*, Your Honor, and the
22   case is prescribed. Thank you.

23           **THE COURT:** Thank you. Just a minute, Mr. Olinde. I
24   got to get the right binder.

25           **MR. OLINDE:** Your Honor, if I may approach, we have

OFFICIAL TRANSCRIPT

1    the PowerPoint slides in hardcopy for you.

2            **THE COURT:** Yes.  But I need my binder of cases.

3    Mr. Olinde.

4            **MR. OLINDE:** May it please the Court.

5            Your Honor, this is a motion which we have brought

6    for summary judgment based upon the claims which the plaintiff

7    has brought under Illinois law.  What this is, is a

8    choice-of-law issue.

9            **THE COURT:** Yes.

10           **MR. OLINDE:** And the question is:  Does Louisiana

11   choice-of-law apply, or does Illinois choice-of-law apply?  Now

12   before we get into that, we have a little bit of business which

13   is that the plaintiffs, for the first time in their opposition

14   brief, have conceded that the substantive claims are going to

15   be Louisiana Product Liability Law.  So the LPLA is going to

16   apply to those claims.

17           They have only asserted non-LPLA claims in their

18   short form complaint, but there does need to be a dismissal

19   with prejudice of those non-LPLA claims.

20           **THE COURT:** Right.

21           **MR. OLINDE:** Now with respect to the choice-of-law of

22   whether it's Louisiana or whether the choice-of-law of Illinois

23   applies, it doesn't make any difference.  We get to the same

24   result which is that in Louisiana, the substantive law is going

25   to apply whether you use Louisiana choice-of-law or whether you

                        OFFICIAL TRANSCRIPT

1   use Illinois choice-of-law.

2           Now we heard you this morning about the Yaz/Yasmin

3   rule which was in the pre-2006 motion, and you know, that was

4   one of our slides about this.

5           **THE COURT:** Yeah.

6           **MR. OLINDE:** But you know, Your Honor, this is the

7   majority rule in the MDL courts when you have direct filings.

8   In this particular instance -- and there's -- what you find in

9   this particular case, in our MDL here, is that this is actually

10  supported by the direct filing PTO.  If you look at the direct

11  filing PTO, you remember, the PTO is give and take.  It's

12  something which the parties craft.  There's nothing in the

13  federal rules which allow you to do direct filing.

14          It's really done by the parties.  And the parties,

15  when they do this, they say, "Okay, there's some things we're

16  going to do to make it more efficient.  But if we're going to

17  do this, you have to do that."

18          And if you read this, look at D, it says that after

19  the proceedings are completed, the cases will be transferred to

20  the district where the plaintiff allegedly was injured or the

21  plaintiff resided.  So in this particular case, Louisiana law,

22  it would be transferred to Louisiana.  And as the state which

23  would receive the case, Louisiana, that would be the case which

24  the substantive law would apply.  And the choice-of-law would

25  apply for Louisiana based upon this because it would then be

1   the transferee case.

2           Now the plaintiffs have said, well, yeah, there's
3   this other provision in there about how there's no impact on
4   the choice-of-law.  This is common in MDL's, this provision,
5   and so is the other one, but this is common.  The reason it's
6   common is because it goes back to this problem with direct
7   filing.  That theoretically, Your Honor would be the transferor
8   court in every case because you're transferring it back to a
9   particular state.  So under the Klaxon rule where you look at
10  the choice-of-law of the transferor court, the Louisiana law
11  would apply to every single case.

12          So what they do is they put this in here to say by
13  direct filing, we're not giving -- Louisiana is not going to be
14  the choice-of-law in every case.

15          **THE COURT:** Right.

16          **MR. OLINDE:** But that's what that's there for.  But
17  again, if you read the first part which says what's going to
18  happen, the transferor court is going to be Louisiana in this
19  instance and you're going to apply the choice-of-law because
20  it's where the plaintiff was injured or where the plaintiff
21  resided.

22          And we know from the facts, they're not in dispute.
23  This is a woman who is from Cut Off.  She resides, domiciled in
24  Louisiana.  She goes and has her treatment in Thibodaux, in
25  Louisiana.  She's administered the docetaxel in Louisiana, and

OFFICIAL TRANSCRIPT

1  she's injured in Louisiana.  So under this, Louisiana law, the

2  choice-of-law is going to apply because the case will go back

3  to Louisiana.

4         That is very similar, by the way, to what you have --

5  our first slide which talked about where the case originates.

6  That's where this kind of comes from is that it's the give and

7  take when you have a direct filing in the MDL.  So under

8  Louisiana law, choice-of-law, there is no doubt under the

9  choice-of-law Louisiana that there is not a punitive damage

10  claim.  In fact, if you look at Civil Code Article 3540 --

11         **THE COURT:**  I'm not worried about that.

12         **MR. OLINDE:**  -- it's conceded.  It's conceded.  The

13  plaintiff says, well, okay, I did put in my short form

14  complaint that if, indeed, and the language is district

15  division is proper where you might have otherwise filed, you

16  know, District Court Northern District of Illinois, but it does

17  say absent a direct filing order.  We have a direct filing

18  order.  The PTO 4 was confected and entered by the court in

19  December of 2016.  This was filed in August of 2018.  So we're

20  talking about 20 months later.

21         So what you would do or what any attorney would do

22  when they directly file a case, they're going to read the PTO

23  and say, okay, what am I going to do if I direct file this

24  case.  I know if I direct file the case that the choice-of-law

25  is going to be where the person is injured or where the person

OFFICIAL TRANSCRIPT

1   is domiciled.  So there is no surprise here.  Put down the

2   Northern District of Illinois, but it doesn't make any

3   difference because we're going to look at the PTO 4 which,

4   again, brings us back -- I know Your Honor talking about how

5   the Yaz/Yasmin rule does not apply.

6          **THE COURT:** I was saying that I did not mean it as a

7   judgment on choice-of-law.

8          **MR. OLINDE:** The Fifth Circuit has, as you've noticed

9   in your footnote, the Fifth Circuit has actually blessed --

10          **THE COURT:** Right.

11          **MR. OLINDE:** -- the Yaz/Yasmin rule.  So again,

12   Louisiana choice-of-law applies.  So that is why there is no

13   punitive damage claim in this case or can be asserted.

14          But let's assume just for the fact of assuming that

15   Illinois law choice-of-law would apply.  Well, under Erie, you

16   would have to look at the Supreme Court of Illinois.  And there

17   is a decision cited a lot, but it is a decision which is the

18   *Townsend* decision which both sides have briefed.  And it

19   involves a case where this almost exact same argument was made

20   by the plaintiff, and it was adopted by the appellate court.

21   But then, as you'll see, it was rejected by the Supreme Court

22   which is this.

23          This was the problem that was going on in Illinois at

24   the time.  The first restatement of torts had this idea that

25   it's going to lex loci, meaning, the place of the injury was

OFFICIAL TRANSCRIPT

1  going to control, control all cases.  It's a hard and fast
2  rule.  The second restatement came back a little bit more fuzzy
3  as to what exactly was going to happen.

4        And so Illinois' appellate courts, as talked about in
5  *Townsend*, were having all kinds of different decisions as to
6  what law would apply to a particular issue.  So the Supreme
7  Court said, look, our starting point is going to be -- is
8  actually going to be Section 146 which is going to be the
9  question of a strong presumption --

10        **THE COURT:** Right, let me ask you this Mr. Olinde.
11  You know, I read *Townsend* a few times, and then I read it again
12  very slowly with lots of notes in the margins.  And then I went
13  back and I read *Smith*, the *I-Flow* case.

14        And *I-Flow* makes this distinction because in *Townsend*
15  there was a question as to whether or not there was negligence
16  on the part of a third party, you know.  There may be fault
17  that went around, and one of those tortfeasors was a resident
18  of Illinois as opposed to just the Michigan tortfeasor.  And
19  somehow or another, in the *Smith* case, they say, well, we don't
20  have that here; so now we can divide the way we look at, you
21  know -- there's a term of art that I have to tell you.

22        **MR. OLINDE:** Probably the French *depecage*.

23        **THE COURT:** Yes, and I have it sounded out right up
24  here.  That you can then apply Michigan law for just this one
25  thing and Illinois law for the rest, and I have to tell you I

1   found it all curious.

2           I would just like to hear you on that very specific

3   issue because I wasn't quite sure I understood what *Smith* did

4   when I went through reading slowly what the *Townsend* court

5   said.  So I think -- I really want to just, let's just go right

6   to the heart of it and tell me why *Smith* is or is not allowed

7   under the *Townsend* framework.

8           **MR. OLINDE:** *Smith* is not allowed under the *Townsend*

9   framework.  The reason being, and you can see this in the

10  *Hammond* case that we cited.

11          **THE COURT:** Right, right.

12          **MR. OLINDE:** The *Hammond* case actually looks at the

13  *I-Flow* case and says this is the problem that *I-Flow* did which

14  is the same problem as I was getting to by the appellate courts

15  in Illinois.

16          **THE COURT:** Uh-huh.

17          **MR. OLINDE:** Which is they gave no value to the tort

18  scheme of a particular state which did not have punitive

19  damages.  And that's the problem is that this is what -- this

20  particular cite goes right to the heart of that which is the

21  appellate courts are saying, look, once you pay compensation,

22  then that state's interests ends, and that's what the appellate

23  courts were saying in Illinois.

24          And the Supreme Court said no, we are saying we

25  disagree, that the tort scheme of a particular state -- here in

OFFICIAL TRANSCRIPT

1   Louisiana -- it doesn't end when their compensation ends.  It's
2   part of the whole analysis dealing with -- they have an
3   interest in this whole idea of whether punitive damages do or
4   do not apply.  And that's what the *Townsend* case was saying and
5   that's what the *Hammond* case is saying which is the court is
6   not giving any value, the appellate court here, to the tort
7   scheme of the state which did not have punitive damages.  And
8   that doesn't overcome the strong presumption that the place of
9   injury is what controls as far as the substantive law is
10  concerned.

11         So, in fact, in *Hammond*, they even said, look, the
12  whole idea of the contributory negligence really had to do, if
13  you read the *Townsend* case and you took your notes, it doesn't
14  come up in the punitive damage aspect of it.  It comes on
15  whether their substantive law applies.  Here, we know Louisiana
16  substantive law is going to apply because they're looking at
17  the various factors.

18         The factors themselves, we can go through those.
19  There's four of them.  It's in Section 145.  The place where
20  the injury occurred.  Here, Louisiana.

21         The place the conduct causing injury occurred.  Here,
22  it would be, looking at punitive damages, Illinois.  So it's
23  one and one.

24         The place where the residence or place of business of
25  the party.  That's a wash because both of them.  You have one

OFFICIAL TRANSCRIPT

1   in Louisiana, one in Illinois.

2          And then the last one, the place where the party's

3   relationship is centered, and that is Louisiana.  That's what

4   the -- okay, so the context, if you look at it, Louisiana

5   actually has more factors under 145 than you would have in

6   Illinois.

7          But the whole idea of the *I-Flow* case was that, well,

8   we're just not going to think that a state such as Michigan,

9   which in that case did not have punitive damages, we don't

10  think they really have any interest anymore which, again, is

11  exactly the reason why *Townsend* rejected the argument.  That's

12  not what *Townsend* -- that's totally against what *Townsend* was

13  saying.

14         And if you look at the *Hammond* case which is in the

15  Central District, it actually takes on *I-Flow* and says, no, you

16  didn't read *Townsend* right.  A state has this, you know, they

17  have an interest.  So it says, you know, "Despite this explicit

18  caution, the appellate court cannot only undervalue the strong

19  presumption, but overemphasize this perception of interest and

20  have a different concept of torts.  We conclude 145 does not

21  override our strong presumption of the law of Michigan."

22         The plaintiffs, if you look at their opposition

23  brief, especially the last sentence, it basically says the same

24  thing the appellate courts were saying which is there's no

25  interest in Louisiana with respect to this idea of whether

OFFICIAL TRANSCRIPT

1    punitive damages apply.  There's no interest.  And that's not
2    what *Townsend* is saying.

3           This is the *Hammond* case and kind of puts it into
4    perspective, talking about the same thing, whether or not there
5    is going to be -- punitive damages are going to be allowed.
6    And it says here, "The plaintiff's domicile has an interest in
7    law to be applied in punitive damage claims even when the
8    defendant is a non-domiciliary, even in cases in which the
9    plaintiff's domicile does not provide for punitive damages."

10          So the *I-Flow* case, the *Townsend* was making it very
11   clear when it was -- if you read the case carefully that when
12   is it that the place of injury does not apply to all the
13   claims, when is it.  And what they say is it doesn't apply to
14   all the claims when there is a fortuitous injury.

15          **THE COURT:** Right.

16          **MR. OLINDE:** And it's a strong presumption, but a
17   fortuitist.  And so the question is what is a fortuitist
18   injury, and that's given actually in the restatement.  There's
19   some comments that talks about what that means is it's a rare
20   situation where you have, for example, a plane that's flying
21   over Illinois, has engine trouble, and for some reason because
22   of the trajectory or the speed, it just lands in some other
23   state.  The fact that it lands in that state is fortuitist.

24          But that's not what this case is about.  This is not
25   fortuitous injury.  The question here is that if you apply

OFFICIAL TRANSCRIPT

1   *Townsend* and the principles of *Townsend*, then you see where

2   there's no way that you could apply anything other than

3   Louisiana substantive law which would not allow punitive

4   damages.

5            There's also another case too which is cited here,

6   the *Holt versus Bayer* which says the same thing with respect to

7   why it is that you would apply the law of Louisiana, the

8   substantive law, and where you would not have punitive damages

9   because Louisiana does not allow punitive damages.

10           Does Your Honor have any further questions?

11           **THE COURT:** Thank you.

12           **MR. OLINDE:** Thank you.

13           **THE COURT:** I may have after listening to the

14   plaintiffs, but for right now, no.

15           Mr. Rockstad?

16           **MR. ROCKSTAD:** Trevor Rockstad for the plaintiff.  I'm

17   going to start with a response on *I-Flow*.

18           **THE COURT:** I think that's where we need to -- y'all

19   don't need to give me much background because I'm trying to

20   determine how *I-Flow* falls within the framework of *Townsend*

21   which is the pronouncement from the Illinois Supreme Court.

22           **MR. ROCKSTAD:** Sure.  So I'm glad to hear that you had

23   to read those cases multiple times to really get what was going

24   on because I did too.  And my colleagues here, we had a lot of

25   phone calls about them.  We read them, called each other,

OFFICIAL TRANSCRIPT

1  talked about it, trying to figure out exactly what was going on

2  with those cases.

3          I've also had the benefit of practicing in front of

4  Judge Kennelly who decided the *Smith* -- I call it the *I-Flow*

5  case just because it's easier for me to remember.  Judge

6  Kennelly is a sharp judge.  He's certainly not a judge who --

7  he's not a results-oriented judge.  He analyzes cases and makes

8  a careful determination based on the facts of the case that's

9  in front of him.

10          **THE COURT:** Oh, I'm sure he does.

11          **MR. ROCKSTAD:** The reason I bring that up, Your Honor,

12 is this choice-of-law analysis has to be specific to the facts

13 of each given case, and I think that really is what *Townsend* is

14 saying.  *Townsend* brings us to there's not a hard and fast

15 rule.  Lex loci is, I believe, the term.  It's not a hard and

16 fast rule that the place of injury, substantive law is going to

17 apply in all cases.  We have to do this restatement second

18 analysis under Section 145 and Section 6.

19          I heard discussion about the factors, the four

20 factors under restatement Section 145.  That's just part of the

21 analysis, though.  Then we have to look at those factors in

22 terms of and with the backdrop and in context of Section 6.

23          **THE COURT:** Right.

24          **MR. ROCKSTAD:** Section 6 is vitally important to the

25 issue of punitive damages and that is really where Judge

OFFICIAL TRANSCRIPT

1    Kennelly distinguishes *Townsend*.  So we look at the four

2    factors in *Townsend*, and you don't just count them.  You look

3    at what's important.

4              **THE COURT:** Right.

5              **MR. ROCKSTAD:** But then you look at them in terms of

6    what is the interest of the foreign state, what's the interest

7    of the state of injury, what's the interest of the state of

8    domicile of the defendant, and that's where he gets to the

9    imposition of punitive damages in the *Smith versus I-Flow* case.

10             You hit on the distinction he makes that there is

11   a -- when he is considering the Section 145 factors, he looks

12   at *Townsend* as a different factual scenario because there is a

13   factor that weighs more towards -- in *Townsend*, more towards

14   the other state, the state of injury.

15             **THE COURT:** Right.

16             **MR. ROCKSTAD:** In the present case --

17             **THE COURT:** I thought in the conduct, it was just that

18   you had -- it became a wash.

19             **MR. ROCKSTAD:** Right, it becomes a wash, and the

20   conduct is what's crucially important to the punitive damages

21   element, and that's where the Section 6 factors come in.

22             So in this case, we have an injury in Louisiana.  We

23   admit that.  And is this up on the screen?  And we have

24   wrongful conduct, all of which occurred in Illinois.

25             **THE COURT:** Right.

OFFICIAL TRANSCRIPT

1          **MR. ROCKSTAD:** We admit that or Hospira admits that.

2    The relationship, while it technically is in Louisiana, there's

3    case law, including, the Fluidmaster, Inc.,  water connector

4    components case.  It's MDL No. 2575.  That case talks about how

5    in a products liability case, that factor, that fourth factor

6    under restatement Section 145 is really, it's not relevant.

7    It's very insignificant when it comes to products liability.

8    Because in a products liability case, that's the most casual of

9    relationships.

10          And in this case, it's probably more casual because

11   it's Hospira who is selling their product through a distributor

12   that gets into the hospital.  It's not a situation where

13   Ms. Plaisance walked into a Hospira store and bought Hospira

14   docetaxel.  So that factor really isn't an issue here.  So we

15   have two -- the most compelling factors are the state of injury

16   and the state of residence -- or sorry, the state where the

17   wrongful conduct occurred.

18          If you follow the analysis in *I-Flow* under the

19   restatement Section 6 principles, that analysis leads to the

20   application of Illinois punitive damages law.  So I don't know

21   if I've helped that issue at all.  The factual scenarios in

22   *Hammond, I-Flow* or *Smith*, and *Townsend* are completely

23   different.  Each judge -- well, the circuit court and then each

24   district court judge conducted an analysis under the

25   restatement second conflict of laws and reached the conclusion

OFFICIAL TRANSCRIPT

1  they reached.  None of them are wrong.  The analysis was
2  specific to the facts in that case.
3          And I would urge Your Honor to look to *Smith* to guide
4  your analysis in the present case because it is -- it's the
5  same.  It's the same case.  The only difference which weighs
6  more in favor of applying Illinois punitive damages law, the
7  only difference is that here the forum is Illinois.
8  Ms. Plaisance filed her case in Illinois effectively.  I know
9  she filed it here, and that's an issue.
10          **THE COURT:** That's a different matter.
11          **MR. ROCKSTAD:** That's a separate issue.
12          **THE COURT:** But you have stipulated that Louisiana
13  substantive law, that is, the Louisiana Products Liability Act,
14  applies except as to the availability of punitive damages, so.
15          **MR. ROCKSTAD:** The analysis is different.  If you look
16  to the *Paulsen* case, it's very clear that because you don't
17  have the benefit -- I don't have the benefit of those Section 6
18  principles.  There's not the reason to apply the tort law from
19  a state in which the wrongful conduct occurred.  The key is
20  that the purpose of punitive damages is to punish wrongdoing of
21  a person or company and prevent future wrongdoing by way of
22  that punishment.  That really -- and this is what Judge
23  Kennelly says, "That puts it in the province of the state of
24  wrongdoing."  It's not that Louisiana has no interest in
25  whether punitive damages --

                      OFFICIAL TRANSCRIPT

1            **THE COURT:** I think that's where I'm curious is where

2     does Louisiana's interest in dealing with manufacturers that

3     send products, however, into our boundaries.

4            **MR. ROCKSTAD:** That's a good question.  As far as --

5            **THE COURT:** Are you telling me Louisiana doesn't have

6     an interest in how those --

7            **MR. ROCKSTAD:** I think there's an insignificant

8     interest in preventing the imposition of punitive damages on a

9     company that's not a Louisiana resident.

10           **THE COURT:** But that possibly impacts Louisiana

11    residents, wouldn't you think that would be a significant

12    interest to the forum state?  We have decided, we've adopted

13    this statutory scheme --

14           **MR. ROCKSTAD:** Right.

15           **THE COURT:** -- to protect our citizens.  I think

16    that's why --

17           **MR. ROCKSTAD:** Not imposing punitive damages does

18    nothing to benefit any Louisiana resident.  That's, you know, I

19    understand that tort law certainly is designed to protect and

20    benefit Louisiana residents, but the punitive damages, that's

21    not -- refusing to impose punitive damages will not benefit

22    Ms. Plaisance or any other Louisiana resident.  That is a --

23    now if the tables were turned and Hospira was a Louisiana

24    resident, certainly, there would be an interest there for

25    Louisiana.

OFFICIAL TRANSCRIPT

1          **THE COURT:** But aren't there other policy

2   considerations that fall into place when you're dealing with a

3   manufacturer that sends products into your state or your

4   jurisdiction?

5          **MR. ROCKSTAD:** Hospira might argue that they're not

6   going to sell their product in Louisiana if there's punitive

7   damages here.  I don't think that's -- that's not why that law

8   was passed.  That's not the reason behind that law.  That's not

9   the purpose of punitive damages law.  That's not why Louisiana

10  does not allow punitive damages is to encourage out-of-state

11  residents to come here and do business.  That's not the purpose

12  of that law.

13         **THE COURT:** What was Louisiana's purpose?

14         **MR. ROCKSTAD:** To protect its own companies, the

15  residents in its own state.

16         So one thing that -- can we move on from *Townsend,*

17  *I-Flow*, and *Hammond*?

18         **THE COURT:** Sure.

19         **MR. ROCKSTAD:** *Hammond*, I would just point out that's

20  also a very factually different case than what we have here and

21  that also was present in *Smith versus I-Flow*.  In *Hammond*,

22  there was an over-the-road trucker who was driving.  He started

23  in Missouri, drove through Missouri.  The accident occurred in

24  Illinois, 150 miles into Illinois.  I don't know the exact -- I

25  looked up the intersection because that's what's in the facts

OFFICIAL TRANSCRIPT

1  of the case.  I looked on a map.  It looks to be about 150

2  miles.

3             **THE COURT:** I'll give you 150.

4             **MR. ROCKSTAD:** So the *Hammond* court assumed, for

5  purposes of argument, that some of the wrongful conduct

6  occurred in Missouri because that's what the plaintiff was

7  arguing there, but obviously, some of the wrongful conduct also

8  occurred in Illinois.  So that factor was kind of a wash too,

9  and you don't have the same application of the Section 6

10 principles that you would in this case, and that were present

11 in *I-Flow*.

12            *I-Flow* was a product liability case where every

13 decision made regarding that product happened in the

14 defendant's home state.  That's what we have here.  The *I-Flow*

15 facts and the facts in this case are identical except that this

16 case was filed in Illinois which is the defendant's home state.

17 That was not the case in *I-Flow*.  They were a California

18 corporation.

19            **THE COURT:** Right, right.

20            **MR. ROCKSTAD:** One thing just on the initial issue

21 which gets us to that secondary issue, the PowerPoint on

22 page 4, Hospira's counsel pointed to, highlighted the language,

23 "where the plaintiff allegedly was injured or where plaintiff

24 resided at the time of his or her alleged injury," but they

25 didn't highlight the language right after that, "after giving

OFFICIAL TRANSCRIPT

1  the parties an opportunity to meet and confer and be heard on

2  this issue."

3         I don't think that the direct file order necessarily

4  is dispositive on the issue of can you select another venue.

5  The same with the Yasmin case and all the other cases, and I

6  understand Your Honor understands that issue.  I went and

7  looked at each one of those MDLs and looked at the pretrial

8  orders.  None of them had short form complaints that I could

9  find.  I was involved in some of them.  I don't recall there

10  being -- everybody filed their own complaint.  It wasn't the

11  same venue allegation there as there is here.  This is a very

12  specific issue.  Your Honor hasn't been presented with this

13  issue.  These other courts had not been presented with this

14  issue when they reached the rulings they did.

15         Ms. Plaisance made an informed decision to file her

16  case directly, but alleging in her short form claim that she

17  would have, absent direct filing order, filed in the Northern

18  District of Illinois.  If that's an irrelevant allegation, I'm

19  not sure why it's in the short form complaint.  It's got to

20  mean something.

21         And then one last comment on that, direct filing is

22  not just a benefit to the plaintiff.  Direct filing is

23  something that the judicial system, when it comes to MDLs,

24  wants to encourage.  And I understand Hospira's counsel said

25  it's by way of agreement between the parties, but there's a

OFFICIAL TRANSCRIPT

1  benefit there for everybody.  If you don't have -- and I know
2  Your Honor understands this.  If you don't have a direct file
3  order, there's a lot of administrative stuff that has to happen
4  across the country, and lots of lawyers have to do different
5  things, and different clerks have to do different things.
6  There's a lot of benefit.

7          Taking the right to choose your venue away, which you
8  would have otherwise, Ms. Plaisance had a right to choose her
9  venue.  Taking that away would discourage direct filing, and I
10  don't think that's something that any court should do.  So
11  unless Your Honor has any further questions, that's all I have.

12          **THE COURT:** Thank you.

13          **MR. ROCKSTAD:** Thank you, Your Honor.

14          **THE COURT:** Briefly, Mr. Olinde.

15          **MR. OLINDE:** Your Honor, just starting with PTO 4, it
16  hasn't discouraged any direct filing.  It's been in place for
17  now five years.  It specifically says where this case is going
18  to go back, what the transferor state.  It does say, "after
19  giving the parties an opportunity to meet, confer, and be
20  heard," but that's actually to determine, if you read it, it
21  really talks about whether or not the case is going to be ripe
22  to be sent back.  It says, "When it's completed, will transfer
23  each case," and then it says, "after giving this."  You're
24  going to transfer the case.

25          So Louisiana law choice-of-law would apply in a case

OFFICIAL TRANSCRIPT

1   like this involving Ms. Plaisance.  She knew that when she
2   filed the short form complaint.  If you look at the short form
3   complaint, they also ask what is your date of injury -- I mean
4   what is your place of injury, what is your residence.  The
5   place about where you could have otherwise filed, you could
6   have put down Eastern District.  It's really to inform the
7   court where it is that you think that this case is going to --
8   in Louisiana, where it is, what district you think that this
9   case is going to go to.  It's not a situation -- it would be a
10  violation of PTO 4 to put in there Northern District of
11  Illinois.
12          And then with respect to the *Hammond* case, the
13  *Hammond* case is there is no real distinction in the facts of
14  the *Hammond* case.  There was no contributory negligence which
15  is really what *I-Flow* went off on.  There was no contributory
16  negligence part of that in that particular case, and that's
17  what *Hammond* was saying.
18          The problem -- and we can go back to the slide.  But
19  the problem of having this which the *I-Flow* case did and which
20  the plaintiffs are doing here, it's really in the first part of
21  the *Townsend*.  If you read the first part of this quote that
22  comes from *Townsend*, you know, they're overemphasizing this
23  fact.  To some extent, every tort rule is designed to both
24  deter other wrongdoers and to compensate the injured person.
25  That's what the interest is.  And so the problem that the

OFFICIAL TRANSCRIPT

1   appellate courts are doing and in the sense *I-Flow* as *Hammond*
2   talks about, they don't give any value to the fact that
3   Louisiana has a tort rule that both deters the wrongdoers and
4   compensates the injured person.
5          So you have to give a strong presumption place of
6   injury, a strong presumption under *Townsend*.  And based upon
7   the facts of this case where the plaintiff is in Louisiana,
8   gets treated in Louisiana, it's not fortuitist.  That
9   particular situation, the strong presumption is not overcome.
10  Louisiana substantive law would apply, and there would not be
11  any punitive damages.  Thank you.
12          **THE COURT:** Thank you.  Court's adjourned.
13              (Whereupon this concludes the proceedings.)
14
15                      **<u>CERTIFICATE</u>**
16     I, Alexis A. Vice, RPR, CRR, Official Court Reporter for
17  the United States District Court, Eastern District of
18  Louisiana, do hereby certify that the foregoing is a true and
19  correct transcript, to the best of my ability and
20  understanding, from the record of the proceedings in the
21  above-entitled and numbered matter.
22
23                      */s/Alexis A. Vice, RPR, CRR*
                          Alexis A. Vice, RPR, CRR
24                        Official Court Reporter
25


                      OFFICIAL TRANSCRIPT