## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)                    MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                               SECTION "H" (5)

THIS DOCUMENT RELATES TO:

Elizabeth Kahn, Case No. 2:16-cv-17039.

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### OMNIBUS MOTIONS *IN LIMINE*

---

Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. ("Sanofi") submit the following Memorandum in Support of their Omnibus Motions *in Limine* under Case Management Order 14J:

**1.     MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE PURPORTED MORAL OR ETHICAL DUTIES OF PHARMACEUTICAL DRUG MANUFACTURERS.**

This Court previously ***granted*** Sanofi's Motion *in Limine*, in its entirety, in the *Earnest* case.[1]   For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

### ARGUMENT

Some of Ms. Kahn's experts have offered improper personal opinions about the moral and ethical duties governing how pharmaceutical drug companies should conduct themselves and whether Sanofi complied with those purported duties.[2]   Such evidence is inadmissible because

---

[1]   *See* Rec. Doc. 8206 at 2 (Order and Reasons on Mots. in Lim.) ("Granted. However, this ruling does not limit the testimony on the standard of care.").

[2]   *See, e.g.*, **Ex. A**, Mar. 4, 2021 Ross Dep. 223:13–224:3 (opining that a drug sponsor, like Sanofi, has "[n]ot just a regulatory obligation, but an ethical obligation under good clinical practices and declaration of health psyches" to follow patients who exercise their right to withdraw from a clinical trial).  Several of Ms. Kahn's experts opined on Sanofi's ethical and moral responsibilities before bellwether Plaintiff Barbara Earnest's trial.  **Ex. B**, Dec. 10,

(1) it is not relevant to any element of Ms. Kahn's claims, and (2) any probative value from these opinions is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  *See* Fed. R. Evid. 401–03; *see also* **Ex. D**, *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 14-2720, Order and Reasons, Doc. No. 6254, at 14 (E.D. La. Apr. 18, 2017) (excluding evidence and argument concerning the moral or ethical duties of pharmaceutical manufacturers).

## A. Opinions Regarding Moral or Ethical Duties Are Irrelevant.

The law—not subjective perspectives on morality or business ethics—governs this case. Evidence concerning the moral or ethical duties of drug manufacturers (separate and apart from their duties under the law) does not make any material fact in this case more or less probable.  So, this evidence is irrelevant and inadmissible.  *See* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14 (sustaining motion *in limine* to exclude evidence concerning the moral or ethical duties of pharmaceutical manufacturers); *see also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab. Litig.*, MDL No. 2100, 2011 WL 6740391, at *12 (S.D. Ill. Dec. 22, 2011) (precluding plaintiffs from asking defense witnesses whether they believed the defendant had acted "morally or with decency or in an ethical manner."); *Riley v. Ford Motor Co.*, No. 09-cv-148, 2011 WL 3273592, at *6 (S.D. Miss. July 29, 2011) (granting motion *in limine* excluding "evidence or argument concerning defendants' moral or ethical obligations."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543–45 (S.D.N.Y. 2004) (excluding expert

---

2018 Plunkett Dep. 311:21–313:2 (explaining that while she has not been asked to opine on Sanofi's conduct, she has an opinion "based on what [she] believe[s] the company should have been aware of."); **Ex. C**, Dec. 7, 2018 Feigal Dep. 102:4–16 ("I think there's an ethical responsibility"), 116:12–117:9 ("A company has their own ethical principles that don't necessarily -- there are legal requirements, but then there are ethics and principles that companies have about sharing information with physicians and with patients. . . . I will not opine on the specifics of inadequacy of a label, but I do have an opinion about whether or not communication of relevant information to physicians was done.").

testimony on ethics as an irrelevant and unreliable personal opinion); *In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1053–54 (D. Minn. 2007) (excluding an expert's personal views as to whether the defendant acted ethically, irresponsibly, or recklessly).[3]

### B.   The Unfair Prejudice Substantially Outweighs the Probative Value.

Evidence and argument about a manufacturer's moral or ethical duties is also inadmissible under Rule 403. *See, e.g.*, *In re Rezulin*, 309 F. Supp. 2d at 545 (excluding expert testimony about a manufacturer's moral or ethical duty because it would unfairly prejudice the defendant and confuse the trier of fact); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2001 WL 454586, at *9 (E.D. Pa. Feb. 1, 2001) (excluding medical ethics expert opinions as "marginally relevant" to defendant's conduct in manufacturing and marketing the drugs). Testimony from Ms. Kahn's experts on moral and ethical standards serves no purpose other than to paint Sanofi as a bad actor as judged by the subjective moral and ethical standards of Ms. Kahn's expert witnesses—not the legal standards governing Ms. Kahn's claims. Moreover, the presentation of such evidence would only waste valuable judicial time and resources.

---

[3]   *See also In re Welding Fume Prods. Liab. Litig.*, No. 03-cv-1700, 2010 WL 7699456, at *24–25 (N.D. Ohio June 4, 2010) (excluding expert testimony that defendants acted unethically because "the ethical standards [identified by the witness were] different from the legal standards" that applied in the case; "the critical question for [the] jury [was] whether the defendant corporations did what the law *required* them to do, not whether, from a societal perspective, they did what an 'ethical corporation' *should have done*."); *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 537 (5th Cir. 2013) ("[The Fifth Circuit has] long held that 'without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible.'"); *In re Prempro Prods. Liab. Litig.*, No. 03-cv-1507, 2010 WL 5576305, at *2 (E.D. Ark. June 29, 2010) (excluding expert's testimony that "could only be a subjective opinion on what [the expert] believe[s] Defendants **could have done** rather than what industry or governmental standards **require** them to do.").

2.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING PURPORTED LEGAL DUTIES AND CONCLUSIONS.**

This Court previously ***deferred*** ruling on Sanofi's Motion *in Limine* in the *Earnest* case due to vagueness.[4]  The Court should now grant Sanofi's Motion, or at the very least defer the issue again until trial, because Ms. Kahn's expert witnesses seek to offer improper testimony on Sanofi's purported legal duties.

**ARGUMENT**

The deposition testimony of Ms. Kahn's retained expert witnesses warrants granting Sanofi's motion outright or, at the very least deferring the issue again until trial, because Plaintiff will likely attempt to introduce evidence or testimony at trial as to Sanofi's *legal duty* to warn or *legal conclusions* regarding the same.[5]  But only the Court may instruct the jury on a party's legal duty.[6]  Neither Ms. Kahn's experts nor lay witnesses may offer opinions or conclusions as to Sanofi's legal duties in this case.  Such evidence and argument therefore should be excluded under Rules 704 and 403.

A.    **Lay and Expert Witnesses May Not Assert Legal Conclusions Under the Guise of Opinion Testimony.**

"[O]pinion testimony that states a legal standard or draws a legal conclusion by applying

---

4    *See* Rec. Doc. 8206 at 2 (Order and Reasons on Mots. in Lim.) ("Deferred due to vagueness.").

5    *See, e.g.*, **Ex. E**, Mar. 13, 2020 Plunkett Rpt. at 32 ¶ 63 ("when used in combination, Taxotere/docetaxel has been a substantial contributing factor to CIPAL/PCIA"); **Ex. F**, Nov. 19, 2019 Plunkett Dep. 105:1–4 (acknowledging that "substantial contributing factor" is a legal term of art); **Ex. G**, Feb. 8, 2021 Ross Supp. Rpt. at 12 ¶ 27 (Sanofi should have known by 2006 that a causal relationship exists between Taxotere or Taxotere-containing regimens and permanent chemotherapy induced alopecia); *id.* at 13 ¶ 29 ("Sanofi failed to comply with its obligations regarding post-marketing surveillance and pharmacovigilance with respect to Taxotere and the risk of PCIA."); *id.* at 37 ¶ 84 (opining that statements in Sanofi's label did not include information about duration or severity of alopecia until 2015); *id.* at 45 ¶ 90 (Sanofi's label failed to apprise physicians and patients about the risks of PCIA); **Ex. H**, Apr. 3, 2020 Bosserman Rpt. at 52 ¶ 5 ("At the time Ms. Kahn entered the [clinical] trial, Sanofi was in fact aware of the risk of PCIA yet did not warn physicians or patients."); *see also* **Ex. I**, Jan. 17, 2018 Kardinal Dep. 140:3–9 (Plaintiff's prescribing physician testified that Sanofi had a duty to include "permanent hair loss" in the NSABP B-40 clinical trial consent form).

6    *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 2014).

4

law to the facts is generally inadmissible." *Juawei Tech. Co. Ltd. v. T-Mobile US, Inc.*, No. 16-cv-00055, 2017 WL 4619791, at *4 (E.D. Tex. Oct. 16, 2017) (quoting *U.S. v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)). Consistent with this understanding of Rule 704, the Fifth Circuit has held that witnesses may not offer legal conclusions under the guise of opinion testimony. *See Askanase*, 130 F.3d at 673 ("However, it must be posited as an *a priori* assumption that there is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule for each dispute or issue, it requires only one spokes[person] of the law, who of course is the judge.") (internal quotations omitted); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("Moreover, allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").[7]

For example, Ms. Kahn's expert witness, Dr. Laura Plunkett, intends to testify that, "when used in combination, Taxotere has been a substantial contributing factor" to the occurrence of permanent alopecia.[8] Dr. Plunkett's choice of language is no coincidence. Dr. Plunkett acknowledged that the phrase "substantial contributing factor" is a legal term of art,[9] and the Court, in fact, used this legal term of art when it instructed the jury on the law in the *Earnest* trial.[10] Similarly, Ms. Kahn's regulatory expert, Dr. David B. Ross, intends to testify:

---

[7]   *See also Tajonera*, 2016 WL 9414347, at *12 ("*Askanase* is clear that an expert witness may not merely tell the jury what a defendant's duty was, how they breached it, and how the damages resulted from that breach."); *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (explaining that the role of the court is to distinguish opinion that embraces the ultimate issue of fact from opinion that states a legal conclusion, that is, specialized legal meaning); *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("A witness cannot be allowed to give an opinion on a question of law. . . . To allow anyone other than the judge to state the law would violate the basic concept. Reducing the proposition to a more practical level, it would be a waste of time if witnesses or counsel should duplicate the judge's statement of law, and it would intolerably confound the jury to have it stated differently.") (quoting William B. Stoebuck, *Opinions on Ultimate Facts: Status, Trends, and a Note of Caution*, 41 Den. L. Cent. J. 226, 237 (1964)).

[8]   Ex. E, Mar. 13, 2020 Plunkett Rpt. at 32 ¶ 63.

[9]   Ex. F, Nov. 19, 2019 Plunkett Dep. 105:1–4.

[10]  **Ex. J**, Sept. 26, 2019 Trial Tr. 2238:17–19 ("However, plaintiff must show that defendants' conduct was a substantial contributing factor in bringing about the result.").

- "[T]he inclusion of only alopecia without descriptive language of duration and severity as required by 21 USC [sic] §§ 201.57 and 314.80 is insufficient to apprise physicians and patients of the risk of PCIA known, or knowable, to Sanofi."[11]

- "Had Sanofi complied with is pharmacovigilance obligations . . . Sanofi should have deduced by 2006 that some basis to believe that a causal relationship exists between Taxotere or Taxotere-containing regimens and permanent chemotherapy induced alopecia."[12]

- Sanofi failed to comply with its obligations regarding post-marketing surveillance and pharmacovigilance with respect to Taxotere and the risk of PCIA.[13]

- Whether the applicable label sufficiently included the duration or severity of alopecia, which is an issue of factual dispute and legal application for the jury.[14]

Dr. Plunkett's and Dr. Ross's opinions are improper because they are disguised attempts to invade the province of the Court and direct the jury to draw the same legal conclusions reached by Drs. Plunkett and Ross.[15]  Accordingly, the Court should prevent Drs. Plunkett and Ross—as well as other fact and expert witnesses—from testifying as to legal duties and legal conclusions.

### B.      The Probative Value of Legal Conclusions by Plaintiff's Witnesses Does Not Outweigh the Testimony's Prejudicial Effect.

Any alleged duty that Sanofi may owe has a specialized legal meaning and, therefore, must be defined by the Court, not Ms. Kahn's witnesses.  Indeed, the Court must be the jury's sole source of law.  To permit any witness, such as Dr. Plunkett or Dr. Ross, to present such testimony

---

[11]   Ex. G, Feb. 8, 2021 Ross Rpt. at 45 ¶ 90.

[12]   *Id.* at 12 ¶ 27.

[13]   *Id.* at 13 ¶ 29.

[14]   *Id.* at 37 ¶ 84 ("[P]rior to May 29, 2008, the Taxotere label did not include listing for the unexpected adverse reaction of permanent, irreversible or persistent alopecia.  Sanofi's Taxotere label did not include any information about duration or severity of alopecia until 2015, when it included 'cases of permanent alopecia have been reported' with Taxotere use.").

[15]   Likewise, testimony from Ms. Kahn's prescribing physician about Sanofi's purported duty to include information in the clinical trial consent form should be excluded for the same reasons.

to the jury would mislead and confuse the jury—and risk that the jury may mistakenly and improperly rely on such testimony as the law governing the issues in the case. As such, the prejudicial effect of a witness opining about legal conclusions or a legal standards necessarily outweighs its probative value. *See* Fed. R. Evid. 403. The Court should therefore exclude testimony from any witness at trial that purports to state a legal duty or conclusion.

3.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING OTHER LAWSUITS, CLAIMS, OR INVESTIGATIONS AGAINST DEFENDANTS AND/OR OTHER SANOFI ENTITIES.**

The Court previously ***granted in part and denied in part*** Sanofi's Motion *in Limine* in the *Earnest* case.[16]  Specifically, the Court permitted only "testimony of other lawsuits, claims, or investigations to the extent they relate to alopecia pre-dating Ms. Earnest's treatment."[17]  At the very least, the same result is warranted here and should be applied to (1) the thousands of plaintiffs in this MDL proceeding and related state court actions and (2) the False Claims Act suit brought in the Eastern District of Pennsylvania entitled *United States ex rel. Gohil v. Sanofi-Aventis U.S. Inc.*, 96 F. Supp. 3d 504 (E.D. Pa. 2015).  The Court should also exclude reference to the pending Mississippi state attorney general action entitled *Fitch ex rel. Mississippi v. Sanofi S.A. f/k/a Sanofi Aventis S.A. et al.*, Case No. G2018-1453.

## ARGUMENT

Evidence or argument concerning litigation beyond the lawsuit at issue should be excluded because (1) it is not relevant to any element of Ms. Kahn's claims, (2) it constitutes inadmissible hearsay, and (3) any perceived probative value is substantially outweighed by the significant undue prejudice to Sanofi, confusion of the issues, and waste of judicial time and resources.  *See* Fed. R. Evid. 401–03, 802; *see also* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14–15 (sustaining motion *in limine* to exclude "evidence and argument concerning Defendants' other litigation.").  To the extent such evidence is even arguably probative, the Court should apply its holding from *Earnest* to Ms. Kahn's case and limit any evidence or argument about other lawsuits, claims, or investigations to only those (1) relating to alopecia and (2) pre-dating Ms.

---

[16]   *See* Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("The Court will allow testimony of other lawsuits, claims, or investigations to the extent they relate to alopecia pre-dating Earnest's treatment.").

[17]   *Id.*

Kahn's treatment, which began in May 2008.[18]  Sanofi also respectfully submits that lawsuits, claims, or investigations *post-dating* Ms. Kahn's treatment ought to be excluded as well for the same reasons.

### A.      Evidence of Other Lawsuits, Claims, or Investigations is Irrelevant.

Pleadings or allegations from other lawsuits, claims, or investigations do not establish or disprove any fact relevant to this matter but instead invite the jury to draw improper speculative inferences.  Here, Ms. Kahn's alleged injuries must be weighed and considered in the context of a multitude of individual factors, including prior medical histories, medical conditions, risk factors, and her prescribing physicians' treatment decisions, among others.

Evidence of other lawsuits, claims, or investigations consisting of allegations of unrelated events occurring under circumstances entirely different from those at issue in this case have no "tendency to make a fact more or less probable than it would be without the evidence" and should be excluded as irrelevant.  Fed. R. Evid. 401(a); *see, e.g.*, *Huss v. Gayden*, 571 F.3d 442, 458 (5th Cir. 2009) (holding that "anecdotes detailing individual patients' experiences when taking the drug . . . fall short of providing scientifically reliable evidence applicable to all other patients"); *Jorden v. Dolphin Towing, LLC*, No. 03-222, 2004 WL 602777, at *5 (E.D. La. Mar. 23, 2004) ("Evidence of other personal injury claims has no relevance to any issue in this lawsuit.").[19]  This is particularly true for products liability litigation.  *See Huss*, 571 F.3d at 458; *Rushing v. Wells Fargo Bank, N.A.*, No. 10-cv-1572, 2012 WL 3155790, at *1 (M.D. Fla. Aug. 3, 2012) ("[E]vidence of other

---

[18]   **Ex. K**, Pl.'s Third Am. Pl. Fact Sheet ("PFS") at 11 (stating she began chemotherapy in May 2008).

[19]   *See also Barnes v. Koppers, Inc.*, No. 03-cv-60, 2006 WL 940279, at *2–3 (S.D. Miss. Apr. 11, 2006) (concluding in a toxic tort case that "evidence of other lawsuits, claims, and injuries is irrelevant to this case and therefore inadmissible."); *In re Safety-Kleen Bondholders Litig.*, No. 00-1145-17, 2005 WL 6075368 (D.S.C. Feb. 4, 2005) (holding that the existence of "any other litigation against PwC," "widely-publicized accounting scandals," and "cease and desist orders of the S.E.C." were not relevant to the plaintiff's allegations that the defendants violated the Securities and Exchange Act).

lawsuits is not normally relevant and not permitted"); *Skibniewski v. Am. Home Prods. Corp.*, No. 99-cv-0842, 2004 WL 5628157, at \*4 (W.D. Mo. Apr. 1, 2004) ("Simply, evidence relating to different drugs, different injuries, different people and different conditions have no bearing on this case."). Such evidence is irrelevant and should be excluded.

**B.**     **Evidence of Other Lawsuits, Claims, and/or Investigations Constitutes Inadmissible Hearsay.**

Pleadings from other lawsuits and allegations related to other claims and investigations also are inadmissible to prove the truth of their content because they constitute inherently unreliable hearsay. *See* Fed. R. Evid. 801–02; *Johnson v. Ford Motor Co.*, 988 F.2d 573, 579 (5th Cir. 1993) (noting that an attempt to "introduce a brief summary of claims, lawsuits, and complaints . . . amounts to nothing more than a summary of allegations by others which constitute hearsay."); *Roberts v. Harnischfeger Corp.*, 901 F.2d 42, 45 (5th Cir. 1989) (excluding summaries of pending litigation as hearsay); *Smith v. E-backgroundchecks.com, Inc.*, No. 13-cv-02658, 2015 WL 11233453, at \*1 (N.D. Ga. June 4, 2015) ("Evidence of other lawsuits is generally considered to be inadmissible hearsay.") (collecting cases). Pleadings from other lawsuits may also contain hearsay-within-hearsay, thereby requiring Ms. Kahn to show that an exception applies to each level of hearsay in any given pleading—which she cannot do because pleadings from other lawsuits are inherently unreliable and consist of mere allegations of the parties. *See* Fed. R. Evid. 805.

**C.**     **Evidence of Other Lawsuits, Claims, or Investigations is Unduly Prejudicial.**

There is no probative value to any allegations set forth in other lawsuits, claims, or investigations, and any perceived probative value of such unsubstantiated allegations is substantially outweighed by (1) the danger of unfair prejudice to Sanofi, and (2) potential for jury confusion. *See, e.g.*, *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 408–09 (5th Cir.

2004) (finding no abuse its discretion where district court excluded evidence of prior lawsuits against defendant because any probative value "was outweighed by its prejudicial and inflammatory nature and by its tendency to confuse the jury with tangential litigation"); *Yellow Bayou Plantation, Inc. v. Shell Chem., Inc.*, 491 F.2d 1239, 1242–43 (5th Cir. 1974) (affirming exclusion of evidence of prior lawsuits against defendant because evidence was "of such faint probative value and high potential for unfair prejudice"); *Comardelle v. Sears, Roebuck & Co.*, No. 95-1371, 1996 WL 673971, *3 (E.D. La. Nov. 20, 1996) (excluding evidence where "the probative value of these other accidents is substantially outweighed by the danger of unfair prejudice to Defendants"); *Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.*, No. 05-cv-1887, 2009 WL 3754170, at *9 (D.N.J. Nov. 5, 2009) (excluding evidence of prior and/or collateral litigation because it would result in unfair prejudice, confusion and undue delay). Such evidence should therefore be excluded at trial on this basis.

Finally, allowing this evidence—whether pre- or post-Kahn's treatment—likely would lead to a series of "mini-trials," forcing Sanofi to distinguish other lawsuits and claims from those made here. *See Kelly v. Bowing Petroleum Servs., Inc.*, 61 F.3d 350, 357 (5th Cir. 1995) (affirming exclusion of evidence that would result in a "mini-trial" over each allegation); *Osler v. Codman Research Grp., Inc.*, 241 F.3d 91, 96 (1st Cir. 2001) (same); *Stubblefield v. Suzuki Motor Corp.*, No. 15-cv-18, 2018 WL 4762739, at *6 (S.D. Miss. Sept. 30, 2018) (same); *Smith*, 2015 WL 11233453, at *2 (same). As such, the Court should exclude all evidence of prior or existing litigation against Sanofi.

4.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING COMPLAINTS AND LAWSUITS AGAINST OTHER MANUFACTURERS OF DOCETAXEL.**

This Court previously ***granted in part and deferred in part*** Sanofi's Motion in *Limine* in the *Earnest* case.[20]  The Court deferred its ruling only "insofar as [the Motion] concern[ed] any complaints regarding alopecia that were made to the FDA."[21]  Here, however, the FDA could not have received complaints with respect to any other manufacturers of docetaxel prior to Ms. Kahn's treatment in 2008[22] because other manufacturers did not begin marketing docetaxel until at least March 8, 2011.[23]  The Court should, therefore, grant Sanofi's Motion in full.[24]

## ARGUMENT

The Court should preclude evidence and argument regarding complaints and lawsuits against other manufacturers of docetaxel to show that (1) the drug causes permanent or persistent alopecia, or (2) Sanofi knew or should have known that docetaxel may cause permanent or persistent alopecia.  Such evidence should be excluded as irrelevant, unfairly prejudicial, and because it will confuse and mislead the jury and waste time and resources.  *See Eghnayem v. Boston Sci. Corp.*, No. 13-cv-07965, 2014 WL 5465741, at *8 (S.D. W. Va. Oct. 28, 2014) (precluding evidence of lawsuits filed against other manufacturers of pelvic mesh products in

---

[20]   *See* Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("Deferred insofar as it concerns any complaints regarding alopecia that were made to the FDA.").

[21]   *Id.*

[22]   Ex. K, Pl.'s Third Am. PFS at 11 (stating she received chemotherapy from 5/29/2008 to 10/23/2008).

[23]   *See* Rec. Doc. 312 at 11–21 (alleging other docetaxel manufacturers did not receive FDA approval or begin marketing until—at the earliest—2011).

[24]   In *Earnest*, the plaintiff, in response to Sanofi's Motion, stated that she had "no intention to—and agree[d] not to—offer evidence or argument at trial concerning lawsuits, investigations, or formal complaints against other manufacturers of docetaxel."  Rec. Doc. 8023 at 9 (Pl.'s Opp. to Defs.' First Omnibus Mots. in Lim. (Nos.1–14)). Plaintiff instead directed her argument to evidence of Adverse Event Reports ("AERs").  *Id.*  Sanofi addresses AERs both here and *infra* in Motion in *Limine* No. 5.

pelvic mesh MDL proceedings) (citing *Lewis v. Ethicon, Inc.*, No. 2:12-cv-4301, 2014 WL 505234, at *6 (S.D. W. Va. Feb. 5, 2014)).

**A.     Lawsuits or Complaints, Including Adverse Event Reports, Related to Other Docetaxel Manufacturers are Irrelevant.**

Complaints or lawsuits against other docetaxel manufacturers are irrelevant and should be excluded.  Fed. R. Evid. 401.  Claims against other docetaxel manufacturers differ in numerous, meaningful ways (*e.g.*, date of use, dosage, and patient-specific factors such as age, medical history, and complications).  Accordingly, lawsuits and complaints against other docetaxel manufacturers do not make any fact of consequence in this case any more or less probable, and evidence of such should be excluded as irrelevant.

**B.     Lawsuits or Complaints, Including Adverse Event Reports, Against Other Docetaxel Manufacturers should be Excluded Because Any Probative Value is Outweighed by the Potential for Delay, Confusion, and Undue Prejudice.**

Even if lawsuits and complaints had some *de minimis* relevance, which they do not, this Court should still exclude such evidence because any relevance is substantially outweighed by the danger of unfair prejudice and the strong likelihood of confusing and misleading the jury and wasting time.  *See* Fed. R. Evid. 403; *Eghnayem*, 2014 WL 5465741, at *8.  In *Eghnayem*, the pelvic mesh MDL court held that:

> [e]vidence of lawsuits is generally considered inadmissible hearsay . . . Further, evidence of other lawsuits and the factual allegations therein is inadmissible under Rule 403.  Although other lawsuits may ultimately show that the [product] is defective, the jury must still find that the [product] caused [the plaintiff's] injuries.  Evidence of other lawsuits is likely to confuse and mislead the jury from that task, and it is highly prejudicial to [the defendant]. . . . Even assuming evidence about lawsuits brought against other manufacturers [had] some relevance to the present case, the relevance is dwarfed by the risk of unfair prejudice posed by requiring [defendants] to attest for lawsuits in which [they] were not involved.

2014 WL 5465741, at *8 (quoting, in part, *Lewis*, 2014 WL 505234, at *6).  The same reasoning applies here.

Moreover, the introduction of such evidence will lead to mini-trials on tangential issues and serves only to waste the court's time and cause undue delay.  *See Wilson v. Maricopa Cty.*, No. 04-cv-2873, 2007 WL 686726, at *13 (D. Ariz. Mar. 2, 2007) (precluding evidence of other lawsuits and granting defendants' motion *in limine* regarding same because "if evidence of these prior lawsuits was admitted, Defendants would be compelled to present rebuttal evidence concerning the nature and outcome of those lawsuits.  The case would devolve into a series of mini-trials concerning the relevancy and outcome of these other cases, resulting in an unnecessarily lengthy trial for the parties, the Court, and the jury."); *U.S. v. Insaulgarat,* 378 F.3d 456, 466 (5th Cir. 2004) (holding that the district court did not abuse its discretion by excluding evidence that was cumulative and would result in undue delay or waste of time).

For these reasons, Sanofi requests the Court prohibit Ms. Kahn from presenting evidence or argument concerning lawsuits and complaints against other docetaxel manufacturers.

5.   **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING ADVERSE EVENT REPORTS OR OTHER COMPLAINTS INVOLVING PATIENTS OTHER THAN PLAINTIFF.**

This Court previously ***deferred*** Sanofi's Motion *in Limine* on this identical issue in the *Earnest* case.   In doing so, the Court noted that:

> Individual adverse event reports are inadmissible.  However, if they are referenced in depositions, the jury may need context, in which case a conference with the Court should be held.[25]

At trial, the Court did not allow such reports to be published to the jury or admitted into evidence by plaintiff for purposes of demonstrating purported "notice" to Sanofi. The same result is warranted here.  Additionally, to provide context to the jury, it may be necessary for Sanofi to introduce evidence regarding individual adverse event reports or clinical trial reports to demonstrate that Ms. Kahn's experts counted reports as persistent or permanent alopecia that were not actually cases of persistent or permanent alopecia.

## ARGUMENT

Sanofi again anticipates that Ms. Kahn may offer evidence at trial of Adverse Event Reports ("AERs") or other complaints involving patients other than Ms. Kahn who reported experiencing hair loss after Taxotere (docetaxel) treatment to establish causation and/or notice.[26] The Court should issue an order, consistent with its ruling in *Earnest*, that such evidence is

---

[25]   Rec. Doc. 8216 at 1 (Order on Mots. in Lim.); **Ex. L**, Sept. 5, 2019 Oral Arg. Tr. at 73:24-84:24 (discussing the admissibility of AER testimony, with the Court ultimately concluding, "I am inclined to say I don't think it's coming in, but since it is in deposition and it may perhaps be contextual, I will defer to my review of the deposition.").

[26]   Ms. Kahn's deposition of Sanofi's Rule 30(b)(6) witness focused exclusively on these types of reports. *See, e.g.*, **Ex. M**, Pl.'s Second Notice of Videotaped Dep. of Sanofi U.S. Pursuant to Fed. R. Civ. P. 30(b)(6); **Ex. N**, Pl.'s Second Amended Notice of Dep. of Sanofi U.S. Pursuant to Fed. R. Civ. P. 30(b)(6) (noticing a 30(b)(6) deposition on "[r]eports of any kind. . .  regarding persisting alopecia being associated and/or related in any way with the use of Taxotere (alone or in combination) . . .).  Moreover, pervasive attorney advertising has likely artificially inflated AERs for Taxotere.  *See, e.g.*, **Ex. O**, Presentation of Data by Rustin Silverstein, Esq., *Data and Analysis of Television Advertisements Related to Taxotere Product Liability Claims, June 2016–May 2017* (June 2017).

inadmissible because it (1) constitutes inadmissible hearsay; (2) is irrelevant to causation and notice; and (3) serves only to promote confusion, delay, and unfair prejudice.  As in *Earnest*, however, appropriate fact and expert witnesses may offer testimony regarding their respective analyses of such data.  Sanofi would also plan to publish and offer individual adverse event reports for clinical trial and commercial patients only for the limited purpose of demonstrating that counted cases of purported persistent or permanent alopecia by Ms. Kahn's experts were not actually persisting or permanent.

## A.   FDA Adverse Event Reports Generally.

Federal regulations require pharmaceutical manufacturers to submit AERs—sometimes referred to as "case reports"—to the Food and Drug Administration ("FDA").[27]  As a regulatory matter, AERs are merely anecdotal reports of a temporal correlation or association between the use of a drug and some adverse event, "*whether or not considered drug related*"—*i.e.*, regardless of whether the drug caused the event.[28]

FDA regulations state that AERs do not demonstrate "that the drug caused or contributed to an adverse effect."[29]  To the contrary, the FDA acknowledges that the information in AERs "has not been scientifically or otherwise verified," and that "there is no certainty that the suspected drug caused the reaction," as the "event . . . may have occurred by chance at the same time the suspected drug was taken."[30]

## B.   AERs and Other Complaints Constitute Inadmissible Hearsay.

To the extent Ms. Kahn intends to use AERs or other complaints to prove the truth of the

---

[27]   *See* 21 C.F.R. § 314.80.

[28]   *Id.*

[29]   *Id.* § 314.80(l).

[30]   **Ex. P**, FDA, AER System, Office of Pharmacoepidemiology and Statistical Science, *Brief Description with Caveats of System*, at 4 (July 18, 2005).

matter asserted—that Taxotere caused the reported adverse event—such use constitutes classic, inadmissible hearsay.  *See* Fed. R. Evid. 801–02 (rendering hearsay evidence inadmissible); *see also Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2012 WL 38694, at *2 (E.D. Penn. Jan. 9, 2012) ("AERs are inadmissible hearsay when offered to prove the truth of the matter asserted."); *Goldstein v. Centocor*, *Inc.*, 310 F. App'x 331, 332 n.1 (11th Cir. 2009) (case reports submitted by doctors who observed possible reactions to a drug "are hearsay and do not fall within any of the exceptions to the hearsay rule.").[31]   Therefore, any AERs or other complaints offered for the truth of the matter asserted must be excluded under Rule 802.

### C.    AERs and Other Complaints Are Not Relevant To Causation.

Evidence of AERs should also be excluded as irrelevant to the issue of medical causation.[32] FDA regulations make clear that AERs are simply anecdotal reports of "[a]ny adverse event *associated* with the use of a drug,"—*i.e.*, whether or not the drug caused the adverse event.[33]  AERs and other complaints do not demonstrate "that the drug caused or contributed to an adverse

---

[31]   *See also Bartlett v. Mut. Pharm. Co., Inc.*, No. 08-cv-358, 2010 WL 3092649, at *1 (D.N.H. Aug. 2, 2010) ("[Adverse event] reports are indeed hearsay 'if offered to prove the truth of the matter[s] asserted' in them[.]" (internal quotation marks and citations omitted); *Appleby v. Glaxo Wellcome, Inc.*, No. 04-0062, 2005 WL 3440440, at *3 (D.N.J. Dec. 13, 2005) (explaining that AERs are hearsay and do not fall within the public-records exception in Fed. R. Evid. 803(8)); *Skibniewski*, 2004 WL 5628157, at *9 (granting a motion *in limine* to exclude AER evidence as hearsay); *Saari v. Merck & Co.*, 961 F. Supp. 387, 398 (N.D.N.Y. 1997) (explaining that an AER "was simply a report of what plaintiff told [the doctor] . . . and by making that report [the doctor] was neither confirming nor denying that there is any relationship between [the] symptoms and the vaccine."); *Cosgrove v. Merrell Dow Pharm., Inc.*, 788 P.2d 1293, 1298 (Idaho 1989) ("observations and information" in event reports "are clearly hearsay."); *Muilenberg v. Upjohn Co.*, 320 N.W.2d 358, 364–65 (Mich. Ct. App. 1982) (holding that event reports were hearsay and no exception applied).

[32]   *See* Rec. Doc. 11150 (Defs.' Opp. to Pl.'s Mot. for Partial Summ. J. on General Causation) (highlighting Dr. Madigan's testimony that AERs do not prove general causation and citing courts in this circuit recognizing the same); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (affirming conclusion that case reports do not establish causal relationship).

[33]   21 C.F.R. 314.80(a) (emphasis added); *see also In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 228 (S.D.N.Y. 2018) ("A case report is a report of an individual incident or episode, generally keyed to a specific user of a drug, that serves to bring attention to a *possible* problem or condition.") (internal citation omitted and emphasis added).

effect."[34]  Given these limitations, courts have recognized that AERs are "one of the least reliable sources to justify opinions about both general and individual causation."  *See Rhodes v. Bayer Healthcare Pharm., Inc.*, No. 10-1695, 2013 WL 1289050, at *5 (W.D. La. Mar. 26, 2013) (holding that trial court erred in admitting expert testimony based on AERs to establish general causation because "such anecdotal reports do not prove causation" (quoting *McClain v. Metabolife Int'l*, 401 F.3d 1233, 1250 (11th Cir. 2005))); *see also Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *8 (E.D. La. 2015) (explaining that reports "which anecdotally describe an occurrence . . . cannot establish general causation because they simply describe [] reported phenomena . . . do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation.") (internal quotation marks and citations omitted).[35]

There is a legion of cases rejecting the view that AER-based testimony can be used to demonstrate medical causation.  *See, e.g.*, *Burst*, 2015 WL 3755953, at *8 (excluding testimony from expert who relied in part on case reports to form his opinion); *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 41 (2d Cir. 2000) ("[T]he receipt of an adverse report does not in and of itself show a causal relationship between [the drug] and the illness mentioned in the report."); *Goldstein v. Centocor, Inc.*, 310 F. App'x 331, 332 (11th Cir. 2009) (affirming exclusion of expert general causation testimony based on "case reports submitted by doctors who observed possible

---

[34]  21 C.F.R. 314.80(l).

[35]  *Accord Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 537, 539 (W.D. Pa. 2003) ("[A]dverse event reporting system data are not a legitimate basis for causation opinions involving pharmaceutical products."); *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 53 (1st Cir. 2008) ("[T]he receipt of an adverse report does not in and of itself show a causal relationship between [a drug] and the illness mentioned in the report."); *In re Mirena IUD Prods. Liab. Litig.*, 202 F. Supp. 3d 304, 325 (S.D.N.Y. 2016) ("Case reports are not reliable evidence of causation . . . ."); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1298 (M.D. Fla. 2007) (case reports "are unreliable as proof [of] causation because, in general, the events were not observed in such a way as to rule out coincidence or other potential causes."); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1411 (D. Or. 1996) ("[C]ase reports and case studies are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls.").

reactions to [a prescription drug] but made without medical controls or scientific assessment.").[36]

### D.    AERs And Other Complaints Are Not Relevant To Notice.

AERs and other complaints are not relevant to show whether Sanofi knew of the alleged risk of permanent hair loss that Plaintiff contends is associated with Taxotere.  To be probative of notice, Ms. Kahn would be required to establish that the incidents reported in the AERs or other complaints (1) were reported before Ms. Kahn's first treatment on May 29, 2008[37] and (2) involved facts substantially similar to those at issue here.  *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2012 WL 413860, at *3 (E.D. La. Feb. 9, 2012) (excluding evidence of other incidents where the plaintiff failed to demonstrate any substantial similarity between the prior incidents and the incident at issue); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 964 (D. Minn. 2009) (expert's references to AERs for conditions other than that of the plaintiff were "irrelevant").  Ms. Kahn cannot make such a showing.

Indeed, Ms. Kahn's experts rely on reports that post-date Ms. Kahn's chemotherapy treatment.  Although Ms. Kahn received Taxotere in 2008, Dr. Madigan, for example, includes AERs through 2017 in his analysis.[38]  Dr. Plunkett and Dr. Ross, in turn, utilized Dr. Madigan's

---

[36] *See also Gibson v. Sanofi-Aventis U.S., LLC*, Civ. No. 07-cv-192, 2009 WL 3490454, at *7 (W.D. Ky. Oct. 27, 2009) (rejecting as inadmissible expert opinion based on review of case reports); *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 694 (N.D. Ga. 2006) (AERs "do not establish causation"); *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1133 (D. Ariz. 2001) (AERs "are merely compilations of occurrences, and have been rejected as reliable scientific evidence supporting an expert opinion"); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156 (D. Mont. 1999) (AERs lack "scientific analysis with the safeguards of a controlled experiment," and are merely "compilations of reported phenomena."); *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1164 (S.D. Fla. 1996), *aff'd*, 158 F.3d 588 (11th Cir. 1998) (AERs "contain raw information that has not been scientifically or otherwise verified as to cause and effect" and therefore cannot serve as a basis for expert testimony (citation omitted)); *Thomas v. Hoffman-La Roche, Inc.*, 731 F. Supp. 224, 227–28 (N.D. Miss. 1989) (rejecting expert testimony based in part on AERs), *aff'd*, 949 F.2d 806 (5th Cir. 1992); *Reynolds v. Warthan*, 896 S.W.2d 823, 828 (Tex. Ct. App. 1995) (rejecting AER evidence because it failed to "establish a causal link" between the drug and alleged injuries but instead "created a suspicion without any medical proof" and "any probative value attributable to the documents was outweighed by the danger of undue prejudice.").

[37] Ex. K, Pl.'s Third Am. PFS at 11 (stating Ms. Kahn received chemotherapy from 5/29/2008 to 10/23/2008).

[38] *See* **Ex. Q**, Mar. 23, 2020 Madigan Rpt. at 12–19 ¶¶ 39–48.

AER analysis through 2017 to reach their conclusions.[39]   Post-treatment AERs and other complaints are irrelevant to the issue of notice, thus any reliance on AERs or other complaints, should be cut off, at minimum, at the date of Ms. Kahn's treatment.

The Court, however, should also exclude AERs and complaints that pre-date Ms. Kahn's treatment to the extent the conditions described in other AERs and other complaints differ from Ms. Kahn's condition.  *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 2012 WL 413860, at *3.  These AERs may include potential contributing patient-specific factors that are difficult, if not impossible to control—*e.g.*, age, menopausal status, type of breast cancer diagnosis, stage of cancer at diagnosis, chemotherapy regimen, chemotherapy dosage, endocrine therapy, health history, health condition, family history, hair care practices, vitamin deficiencies, and degree, duration and locations of the hair loss, among other factors.  Absent some showing that the circumstances of a given unverified AER or other complaint are sufficiently similar to those present in this case, this Court should exclude such AERs and other complaints as irrelevant to the issue of notice—particularly when the evidence post-dates the date of Plaintiff's treatments.[40]  Indeed, the opposite purpose would be Sanofi's sole reason for introducing reports, namely, to demonstrate that cases counted as instances of persisting or permanent alopecia by Ms. Kahn's experts were not actually such.

### E.    The Risk of Unfair Prejudice Far Outweighs Any Probative Value.

Ms. Kahn presenting information on AERs or other complaints at trial serves no legitimate purpose and will only serve to confuse and prejudice the jury.  *See* Fed. R. Evid. 403; *see also*

---

[39]   **Ex**. **R**, Feb. 7, 2021 Plunkett Supp. Rpt. at 15–21 ¶¶ 92–100; Ex. G, Feb. 8, 2021 Ross. Supp. Rpt. at 25– 28 ¶¶ 57–60.

[40]   *See also* Motion in *Limine* No. 27 to Preclude Evidence and Argument Regarding Company Conduct That Post-Dates Plaintiff's Chemotherapy Treatment.

*Jones v. Ford Motor Co.*, 204 F. App'x 280, 285 (4th Cir. 2006) (excluding collection of 2,900 unsworn customer complaints of vehicle malfunctions received by defendant to establish causation and notice).   Admitting AERs or other complaints into evidence would create a "suspicion" of liability—simply because a patient using Taxotere reported an adverse reaction—"without any medical proof" that Taxotere actually caused the event in question.  *Reynolds*, 896 S.W.2d at 828 (affirming trial court's exclusion of incidence reports because their "marginal relevance was outweighed by the danger of confusing and misleading the jury.").   Sanofi would be unfairly prejudiced by the admission of statements made by other patients without the opportunity to examine them, especially where there is a high likelihood that the jury would be confused and misled by the reports.   As such, evidence of AERs or other complaints involving patients other than Ms. Kahn should be excluded pursuant to Rules 402 and 403.

6. **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE PRESENCE, ABSENCE, OR IDENTITY OF DEFENDANTS' CORPORATE REPRESENTATIVE AT TRIAL.**

This Court previously ***granted*** Sanofi's Motion *in Limine* on this identical issue in the *Earnest* case.[41] For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

## ARGUMENT

Any reference to the presence, absence, or identity of any corporate representative at trial would be inappropriate because (1) it is not relevant to any element of Ms. Kahn's claims, and (2) any probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time. *See* Fed. R. Evid. 401–03; *see also* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14 (sustaining motion *in limine* to exclude references to the presence, absence, or identity of a corporate representative at trial).

### A.   The Presence, Absence, or Identity of Sanofi's Corporate Representative at Trial is Irrelevant to Plaintiff's Claims.

There is "no requirement that a party or a corporate representative be present at trial." *Ray v. Ford Motor Co.*, No. 3:07-cv-175, 2011 WL 6183099, at *6 (M.D. Ala. Dec. 13, 2011). More importantly, "[t]he presence, absence, or identity of Defendants' corporate representatives is wholly irrelevant to Plaintiff's claims." *Riley v. Ford Motor Co.*, No. 2:09-cv-148, 2011 WL 3273592, at *3 (S.D. Miss. July 29, 2011) (granting a motion *in limine* to exclude any reference to the presence or absence of the defendant's corporate representative); *see also Ray*, 2011 WL 6183099, at *6 (same, explaining that this evidence would "not make the existence of any fact necessary to the Plaintiff's claims any more or less probable, and is therefore irrelevant," and that

---

[41]   *See* Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("Granted. Counsel is cautioned, however, not to 'vouch' improperly for Sanofi.").

any possible probative value would be "substantially outweighed by the danger of unfair prejudice and jury confusion . . . ."). Therefore, any references to the presence, absence, or identity of Sanofi's corporate representative at trial should be excluded.

**B.    Evidence Regarding the Presence, Absence, or Identity of Sanofi's Corporate Representative at Trial Offers No Probative Value.**

Any reference to the presence, absence, or identity of a corporate representative should also be excluded under Rule 403 because such references would encourage the jury to base its decision on an improper inference—*i.e.*, Sanofi does not take Ms. Kahn's claims sufficiently seriously. This is false and has nothing to do with Ms. Kahn's claims, Sanofi's conduct, or any other issue in the case. If Ms. Kahn's counsel mentions the presence, absence, or identity of the corporate representative during trial, a mini-trial would result. Sanofi would have to spend time explaining to the jury why a corporate representative is not present, why the representative who is present is an appropriate representative, or why the identity of the corporate representative does not support any adverse inference concerning any material fact. *See Ray*, 2011 WL 61830099, at *6 (explaining that any probative value from reference to the presence or absence of a corporate representative in the courtroom is outweighed by risk of unfair prejudice and jury confusion). The Court should therefore preclude any reference to the presence, absence, or identity of a corporate representative at trial. *See* Fed. R. Evid. 401–03; *see also* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14.

7.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' EXECUTIVE AND/OR EMPLOYEE COMPENSATION.**

This Court previously *deferred* Sanofi's Motion *in Limine* on this identical issue in the *Earnest* case until trial and, during trial, issued no further comments or rulings on the motion.[42] At the very least, the same result is warranted here.

## ARGUMENT

Ms. Kahn may attempt to introduce evidence concerning Sanofi's executive or employee compensation to curry favor with the jury or to portray Sanofi in a negative light. The Court should exclude such evidence because (1) it is not relevant to any element of Ms. Kahn's claims, and (2) the probative value of such evidence, if any, is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time. *See* Fed. R. Evid. 401–03.

A.    **Evidence of Executive and Employee Compensation is Irrelevant.**

Evidence about Sanofi's executive or employee compensation has no bearing on any material issues in this case. Indeed, this Court has excluded such evidence in both the *Vioxx* and *Xarelto* litigations. *See In re Vioxx Prods. Liab. Litig.*, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (granting motion to exclude evidence relating to the compensation and financial decisions of the defendant's employees, subject to the right of the Plaintiff to introduce such evidence to rebut good-motive testimony from the defendant); *see also* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14 (granting defendants' motion to exclude evidence and argument concerning executive compensation). The same ruling is warranted here.

B.    **Evidence of Executive and Employee Compensation Should Be Excluded Because the Risk of Undue Prejudice Outweighs Any Probative Value.**

---

[42]   Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("Deferred.").

Evidence or argument concerning executive and employee compensation also should be excluded under Rule 403 because is serves to inflame a juror's prejudices against Sanofi. Such use is improper, particularly where the effect is to divert the juror's attention towards collateral matters. *See, e.g.*, *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, No. 04-cv-10014, 2009 WL 3111766, at *6 (S.D.N.Y. Sept. 28, 2009) (even if evidence of executive compensation were relevant, "any limited probative value of this information is outweighed by its potential to bias the jury under Rule 403."). Indeed, such evidence serves no legitimate purpose in this case because punitive damages are unavailable under Louisiana law. *See Albert v. Farm Bureau Ins., Inc.*, 940 So.2d 620, 622 (La. 2006) (holding exemplary or punitive damages are not recoverable under Louisiana law unless expressly provided for by statute); La. Civ. Code Ann. Art. 3545 (punitive damages are not authorized in products liability cases where neither the product nor other products of the same type were "made available in [Louisiana] through ordinary commercial channels"). The only use of evidence of Sanofi's executive and employee compensation would be to induce the jury to render a verdict influenced by knowledge that Sanofi is a large pharmaceutical company with significant resources. For this additional reason, the Court should preclude evidence of employee compensation at trial.

8.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE COST OF TAXOTERE AND PRESCRIPTION DRUG PRICING GENERALLY.**

This Court previously ***granted*** in its entirety Sanofi's Motion *in Limine* in the *Earnest* case.[43]  For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

## ARGUMENT

The Court should exclude evidence or argument pertaining to (1) the cost of Taxotere and (2) prescription drug pricing generally—including phrases such as "big pharma," "drug costs are too high," "cost of medication crisis," or related language—because they are not relevant to the claims at issue and would cause unfair prejudice, risk confusing and misleading the jury, and waste the Court's time.[44]

A.     **Prescription Drug Pricing is Not Relevant to Any Matters at Issue.**

Evidence or argument on prescription drug pricing or the cost of Taxotere has no bearing on any element of Ms. Kahn's remaining failure-to-warn claim.  The price of Taxotere (or other medicine) is not relevant to whether the Taxotere warnings were adequate or whether it caused Plaintiff's alleged injuries.  *See* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14 (excluding evidence and argument concerning defendants' prescription drug pricing).

B.     **Evidence or Argument Related to Prescription Drug Pricing is Substantially More Prejudicial than Probative.**

Plaintiff may attempt to use inflammatory statements about prescription drug pricing, or the cost of Taxotere, to induce a favorable verdict based on widely publicized and hot-button topics

---

[43]   *See* Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("Granted.  If Plaintiff believes the 'door is opened' to this evidence, a conference with the Court should be held.").

[44]   To the extent Plaintiff attempts to introduce evidence or argument on Sanofi's prescription drug pricing to show profitability, the Court should exclude such evidence for the reasons set forth in Sanofi's Motion in *Limine* No. 9 to Preclude Evidence or Argument Concerning Sanofi's Finances or Employment Decisions.

about the pharmaceutical industry, rather than the merits of Ms. Kahn's claims.  Using evidence or argument intended to inflame the prejudices of the jury in this manner would be improper, particularly where doing so will direct the jury's attentions away from the facts of the case and toward unrelated, collateral matters.  *See* Fed. R. Evid. 403; *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1334–35 (9th Cir. 1985) (explaining that evidence is properly excluded where "it does nothing but generally show [a party] in a bad light.").  This jury will not be asked to determine whether prescription drug prices are too high, and Ms. Kahn should not be allowed to introduce such evidence or argument to the jury.  This evidence only serves to bias the jury and encourage a favorable verdict on an improper basis, especially where, as here, punitive damages are unavailable to Ms. Kahn under Louisiana law.  *Albert*, 940 So.2d at 622.

The introduction of such evidence at trial also would waste time and judicial resources. Sanofi would be forced to rebut such evidence, if permitted, by presenting evidence on the economic and market factors that impact prescription medication pricing generally, and the price of Taxotere specifically.  The resulting "mini-trials" would confuse the issues in this case and waste judicial resources.  Accordingly, such evidence should be excluded.  *See* Fed. R. Evid. 403; *Insaulgarat,* 378 F.3d at 466 (holding that the district court did not abuse its discretion by excluding evidence that was cumulative and would result in undue delay or waste time).

9.      **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' CORPORATE FINANCES OR EMPLOYMENT DECISIONS.**

This Court previously *deferred* Sanofi's Motion *in Limine* on this identical issue in the *Earnest* case until trial and, during trial, issued no further comments or rulings on the motion.[45] The Court should grant the Motion in Sanofi's favor or, at the very least, defer it once more.

## ARGUMENT

Sanofi anticipates that Ms. Kahn may offer evidence or argument relating to the company's finances (*e.g.*, company sales, pricing, profits, net worth) and employment decisions (*e.g.*, hiring, layoffs, termination, compensation).  For example, Ms. Kahn designated testimony from Jean-Philippe Aussel that Sanofi's ambition was to "[a]chieve WW sales of 2.5 billion Euros by 2008."[46] Ms. Kahn also designated testimony from Andris Ortmanis regarding Sanofi's desire for Taxotere to be the number one drug in the world, bonuses given based on Taxotere's sales, and Taxotere's market share.[47]  This evidence or argument should be excluded because it is irrelevant to the claims and defenses at issue.  Such evidence serves no legitimate purpose where punitive damages are unavailable in Louisiana for the *Kahn* trial, and allowing it would risk jury confusion and unfair prejudice to Sanofi.

### A.      Evidence of Sanofi's Finances and Employment Decisions are Irrelevant.

Evidence or argument relating to Sanofi's sales, profitability, market share, net worth, and actual or anticipated profits from Taxotere has no bearing on any element of a failure to warn

---

[45]    Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("Deferred.").

[46]    **Ex. S**, Oct. 11, 2018 Aussel Dep. 258:20–21.

[47]    **Ex. T**, Nov. 29, 2018 Ortmanis Dep. 66:9–21 ("Q. How much were your bonuses? A. Well, if I made full bonus, it could have been about 25 percent, I believe, 25 percent of my base pay. Q. And what was your base pay? A. My goodness. What was it? It would have been somewhere around 210 or something like that. I don't know. Something like that. Q. $200,000? A. Yes. . . ."), 78:13–21 (Q. Do you remember that the market share was decreasing for Taxotere in 2006?  A. Well, what I read here was that in 2006 the metastatic share was pulling back a little bit. Q. Do you recall that occurring? A. Actually, yes, I do."), 317:21–23 ("Q. Were your bonuses based, in part, on the sales of Taxotere? A. Yes.").

claim.  *See* Ex. D, *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14 (granting

defendants' motions to exclude evidence and argument concerning: (1) defendants' actual or

anticipated profits from the sale of Xarelto; (2) defendants' overall sales, profitability, and market

share; and (3) defendants' prescription drug pricing); *see also In re Vioxx Prods. Liab. Litig.*, MDL

No. 1657, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (granting defendants' motion to

exclude evidence about the assets and profitability of the defendant, subject to the right of the

plaintiffs to introduce such evidence to rebut good-motive testimony from the defendant).[48]  This

is particularly true where, as here, Plaintiff may not recover punitive damages.  *See Bladen v. C.B.*

*Fleet Holding Co.*, 487 F. Supp. 2d 759, 770 (W.D. La. 2007) (noting that the Louisiana Product

Liability Act does not permit punitive damages (citing, *inter alia*, *Cantu v. C.B. Fleet Holding Co.*,

No. 06-cv-2168, 2007 WL 689566, at *2 (W.D. La. Mar. 1, 2007) ("Punitive damages are not

recoverable under the LPLA."))).

Numerous courts have reached this same conclusion in failure-to-warn cases.  *See, e.g.*,

*Bunch v. Pac. Cycle, Inc.*, No. 13-cv-0036, 2015 WL 11622952, at *10 (N.D. Ga. Apr. 27, 2015)

(granting a motion *in limine* and precluding the plaintiffs from introducing "evidence or argument

concerning the profit margin of the [product] at trial."); *Cross v. Wyeth Pharm Inc.*, No. 06-cv-

429, 2011 WL 2517211, at *6 (M.D. Fla. June 23, 2011) (granting motions *in limine* to preclude

the plaintiffs from presenting evidence of the defendants' profit margins and wealth); *In re*

*Norplant Contraceptive Prods. Liab. Litig.*, MDL No. 1038, 1997 WL 80526, at *1 (E.D. Tex.

---

[48]   *Accord Gray v. Energy XXI GOM LLC*, No. 12-cv-165, 2013 WL 4011990, at *6 (M.D. La. Aug. 5, 2013) ("No
reference may be made to any party's financial status, including the wealth or poverty of a party, or the ability to
pay a verdict.  The financial statuses and abilities of the parties are irrelevant under Federal Rule of Evidence
401."); *Fabre v. Royal Freight, LP*, No. 11-cv-800, 2013 WL 3821478, at *4 (M.D. La. July 23, 2013) (excluding
evidence regarding financial condition as irrelevant); *Okuda v. Wyeth Pharm., Inc.*, Civ. No. 04-cv-80, 2012 WL
12337860, at *3 (D. Utah July 24, 2012) (granting motion *in limine* "to exclude reference to and evidence of
Defendants' wealth, profit margins for hormone therapy and/or alleged 'profit motive,'" because "Defendants'
wealth has no relevance to this case, except to the extent Defendants might argue that they were financially unable
to complete any necessary testing.").

Feb. 19, 1997) (granting the defendant's motion *in limine* because "evidence of profit margin . . . is not relevant to any failure to warn issue.").

Ms. Kahn also may argue that Sanofi's net worth or profits are relevant to demonstrate improper "motive" in Sanofi's development, labeling, and marketing of Taxotere.  But such a contention is meritless and irrelevant to any element of a failure-to-warn claim.  *See Gray v. Hoffman-LaRoche, Inc.*, 82 F. App'x 639, 651 (10th Cir. 2003) (defendant's "alleged motive for failing to issue a stronger warning is immaterial to any element of [the plaintiff's] . . . causes of action, and is therefore inconsequential to the determination of the case.").

**B.**     **The Prejudicial Effect of Introducing Evidence of Sanofi's Finances and Employment Decisions Substantially Outweighs the Probative Value.**

Ms. Kahn also may use evidence of corporate finances and employment decisions to induce the jury to render a verdict influenced by knowledge that Sanofi is a large pharmaceutical company with significant resources.  Consistent with the jurisprudence of this Court and others, evidence and argument related to Sanofi's finances and employment decisions should be excluded under Rule 403 because "its probative value is substantially outweighed by . . . unfair prejudice."  Moreover, excluding this evidence will help ensure that Sanofi's right to trial by a fair and impartial jury is not impaired.  *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 416 (1994) ("[E]vidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses.").

The admission of evidence related to corporate finances and employment decisions is outweighed by its inevitable tendency to inflame or prejudice the jury against Sanofi—*i.e.*, painting Sanofi as a bad corporate actor improperly motivated by profit.  Indeed, such evidence has a high probability of misleading the jury into believing Sanofi somehow profited from Ms. Kahn's conditions or the conditions of others and that Sanofi's net worth or profits justify

compensating Ms. Kahn regardless of the merits of her claim.  Fed. R. Evid. 403; *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) ("[T]he presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses[.]").[49]  This Court has precluded plaintiffs from making these arguments under similar circumstances:

> Defendant moves to exclude any reference at trial to its "size, wealth, revenue, profits, or any other financial information" because it is irrelevant and prejudicial.  This Court agrees and finds that the prejudice that would result from the admission of evidence relating to Defendant's wealth or resources outweighs its probative value. Plaintiff cites this Court to cases in which the wealth of the party was relevant in assessing punitive damages.  In this matter, however, Louisiana Revised Statutes §§ 22:1973 and 18:1892 provide for specific damage calculations after a finding of liability.  The jury would not, therefore, be called upon to calculate damages based upon the resources of the Defendant.  Accordingly, this request is GRANTED, and Plaintiff is barred from referring to Defendant's financial position at trial.

*F.H. Paschen, S.N. Nielsen & Assocs. LLC v. Hiscox, Inc.*, No. 13-cv-5843, 2015 WL 13532830, at *2 (E.D. La. Nov. 25, 2015) (citations omitted).[50]

Furthermore, if Ms. Kahn presented evidence of Sanofi's finances or employment decisions at trial, Sanofi would be forced to present rebuttal evidence, placing its profitability and

---

[49]   *See also Blankenship v. Rowntree*, 219 F.2d 597, 598 (10th Cir. 1955) ("It is the general rule that . . . the admission of evidence concerning the wealth of a party litigant constitutes error . . . .  [S]uch evidence tends to inject . . . a foreign, diverting, and distracting issue which may effectuate prejudicial results.") (citations omitted); *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (same); *Fabre*, 2013 WL 3821478.

[50]   *See also In re Norplant*, 1997 WL 80526, at *1 (excluding profit evidence under Rule 403); *La Plante v. Am. Honda Motor Co.*, 27 F.3d 731, 740 (1st Cir. 1994) (holding that evidence of manufacturer's profits was inadmissible at retrial because likely prejudice outweighed any probative value); *Gray*, 82 F. App'x at 651 (affirming the trial court's exclusion of profit evidence as "more prejudicial than probative."); *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (ordering a new trial after, among other improprieties, "[c]ounsel repeatedly made reference to the wealth of the defendants in contrast to the relative poverty of the plaintiff."); *Foster v. Crawford Shipping Co.*, 496 F.2d 788, 792 (3d Cir. 1974) (noting that court does not sanction "appeals to juror prejudice by virtue of disparity of financial resources"); *St. Cyr v. Flying J Inc.*, No. 3:06-cv-13, 2007 WL 2696791, at *2 (M.D. Fla. Sept. 12, 2007) ("As punitive damages are not an issue in this case, this Court finds that it would be inappropriate, and unfairly prejudicial to Defendant, to allow the Plaintiff to refer to Defendant's net worth, revenues, profits, and financial condition.").

employment decisions in context, thus wasting time on collateral issues.  For these reasons, the

Court should exclude all argument and evidence of Sanofi's finances or employment decisions.

10. **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING EXPERT OPINIONS THAT HAVE BEEN DISCLAIMED AND/OR THAT EXCEED THE SCOPE OF PLAINTIFF'S EXPERTS' RULE 26 DISCLOSURES AND DEPOSITION TESTIMONY.**

This Court previously *deferred* Sanofi's Motion *in Limine* on the issue of opinions that exceed Plaintiff's Experts' Rule 26 disclosures in *Earnest*, "except to the extent this has already been addressed in the Court's rulings on the parties' *Daubert* Motions."[51]  At a minimum, the same ruling the Court issued in *Earnest* is warranted here.  In addition, here, Ms. Kahn's experts have offered a variety of conflicting and inconsistent testimony on issues for which they have otherwise disclaimed opinions.  Accordingly, the Court should also preclude Ms. Kahn's experts from offering testimony on issues they have disclaimed, as set forth below.

## ARGUMENT

Rule 26(a)(2)(B)(i) requires a retained expert to provide a written report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them." This rule makes good sense.  "The purpose of requiring disclosure of expert reports is to notify opposing parties of the scope and content of the expert's proposed testimony."  *Williams v. Am. Strategic Ins. Corp.*, No. 13-5411, 2014 WL 1246846, at *3 (E.D. La. Mar. 25, 2014) (citation omitted).  If a party fails to provide information required in a Rule 26 expert report, "the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Ms. Kahn's experts' deposition testimony includes opinions outside the scope of their Rule 26 reports, and Sanofi reasonably anticipates that such experts' trial testimony may also go beyond

---

[51]  *See* Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.).

their reports.[52]  Ms. Kahn has offered no justification for her experts' supplemental testimony, and there is no justification for admitting such testimony at trial.  Sanofi—with no opportunity to test these opinions or discover their purported bases—would be prejudiced by these new opinions during trial.  Therefore, the Court should exclude any opinion not described in the experts' Rule 26 reports.  *See Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 432–33 (5th Cir. 2012) (per curiam) (district court did not abuse its discretion in excluding an expert affidavit that presented new, previously undisclosed opinions); *Williams*, 2014 WL 1246846, at *2 (striking an expert's supplemental report and any evidence obtained pursuant to testing after the original report was disclosed); *Peña v. Hawes*, No. 12-cv-0622, 2014 WL 11512593, at *2 (D.N.M. Apr. 30, 2014) (granting motion to strike expert opinion testimony beyond the opinions disclosed in the expert report).

Similarly, the Court should also exclude any opinion on a subject which an expert has expressly disclaimed, even if other testimony or statements made by the expert implicate that subject or evince such an opinion.  For example, Dr. Feigal disclaims any opinions on the adequacy of the Taxotere labeling, but then purports to offer opinions on "information" that should have

---

[52]  For example, in her deposition, Ms. Kahn's specific causation expert, Dr. Antonella Tosti, for the first time suggested a potential causal link between the skin disorder actinic keratosis (with which Ms. Kahn was diagnosed in 2012) and PCIA.  *See* **Ex. U**, Sept. 29, 2020 Tosti Dep. 64:2-6, 67:19-23. But Dr. Tosti does not offer this opinion in her expert report, nor does she support it with appropriate facts, methods, or application as required by FRE 702.  The Court should exclude all such attempted end-runs around the requirements of the Federal Rules. See FRE 702; *see also* Fed. R. Civ. P. 37(c)(1); *Williams*, 2014 WL 1246846, at *3 (E.D. La. Mar. 25, 2014) ("The purpose of requiring disclosure of expert reports is to notify opposing parties of the scope and content of the expert's proposed testimony.").  For further discussion, *see infra* Sanofi's Motion No. 29 to Preclude Evidence or Argument Concerning the Cause or Claimed Damages for Plaintiff's Actinic Keratosis.

been shared with physicians, which the Court properly excluded.[53]  Likewise, Dr. Plunkett has repeatedly disavowed any general causation analysis or opinion,[54] only to repeatedly offer opinions that go directly to general causation.[55]  And Dr. Ross disclaims opinions based on information post-dating Ms. Kahn's treatment,[56] but then repeatedly cites information post-dating 2008, along with other experts' analysis of that information in support of his opinions in *Kahn*.[57]

In such instances, Sanofi is entitled to rely on experts' express disavowal of any opinions or testimony on a given subject in conducting discovery and preparing for trial.  By the same token, a witness should not be allowed to avoid scrutiny or questioning on a given subject by disclaiming any opinion when directly asked, but then offer such opinions at a different time, in a different context, or in an oblique or roundabout way.  Dr. Feigal again offers instructive examples.  In her report, Dr. Feigal purports to opine extensively on both the informed consent process and non-

---

[53]  In *Kahn*, as in *Earnest*, Dr. Feigal's report did not disclose any opinion on the adequacy of Taxotere labeling, and she has repeatedly disclaimed any such opinion.  *See, e.g.*, Ex. C, Dec. 7, 2018 Feigal Dep. 116:10-11 ("I will not opine on adequacy of the Taxotere label.").  Nevertheless, Dr. Feigal has also repeatedly testified that Sanofi should have informed physicians of a risk of permanent alopecia with Taxotere.  *See, e.g.*, **Ex. V**, Apr. 10, 2020 Feigal Dep. 142:8-14 (information about permanent alopecia with Taxotere "should be communicated to investigators who are taking care of [] patients, so they can have an informed discussion with their patient"); 143:57 ("you should share that information with physicians so they can have a discussion with their – with their patient.").  In its Order on Sanofi's Motion to Exclude Dr. Feigal's testimony under *Daubert*, the Court correctly found that Dr. Feigal's statements regarding what should have been shared with physicians are opinions on the adequacy of the Taxotere label, and excluded them.  *See* Rec. Doc. 11810 (Order and Reasons granting in part and denying in part Defs' Mot. to Exclude Expert Testimony of Dr. Ellen Feigal) at 5-6.

[54]  *See, e.g.*, **Ex. W**, Apr. 27, 2020 Plunkett Dep. 138:6–7 ("I'm not doing a causation analysis here.").

[55]  *See, e.g.*, Ex. R, Feb. 7, 2021 Plunkett Supp. Rpt. at ¶ 100 ("Taxotere/ docetaxel use carries an independent risk of CIPAL/ PCIA"); ¶ 196 ("Taxotere (docetaxel) carried an independent risk of CIPAL/ PCIA in this case series and was a substantial contributing factor to the condition in the women studied").  The Court has previously made clear that Dr. Plunkett cannot such implied causation opinions, and should do likewise here.  *Cf.* Rec. Doc. 11823 (Order and Reasons granting in part and denying in part Defs' Mot. to Exclude Expert Testimony of Dr. Laura Plunkett) at 5-6 ("Dr. Plunkett did not conduct an analysis to assess general causation, so she may not suggest to the jury that Taxotere can cause permanent alopecia.").

[56]  *See, e.g.*, Ex. G, Feb. 8, 2021 Ross Rpt. at 22 ¶ 51 ("Any reliance upon [other Plaintiff's] expert reports is limited to the information set out that pre-dates May 29, 2008").

[57]  *See, e.g.*, *Id.* at ¶ 57 ("Dr. Madigan's disproportionality analysis demonstrates that a consistent safety signal for PCIA is present from 2000 through 2017"); ¶ 59 (citing case reports from 2009 and 2010 in support of his opinion in *Kahn*).

Taxotere chemotherapy agents a patient might receive.[58]  Yet when asked whether she would warn a patient receiving Taxol of a risk of PCIA, Dr. Feigal disclaimed opinions on anything other than general causation, such as the informed consent process or hair loss with other chemotherapy agents:

> "I'm a general causation expert.  I'm here to talk about whether or not Taxotere can cause permanent chemotherapy-induced alopecia.  I'm not here to speculate on imaginary patients that come into an imaginary clinic for me. So you're sort of going beyond the scope of what I'm here for. I'm not here as a practicing physician."[59]

By disclaiming opinions when convenient or preferable, Ms. Kahn and her experts effectively deny Sanofi the opportunity to discover and challenge the bases, extent, and validity of those opinions.  The witnesses should be held to these disavowals and their testimony limited accordingly.

That the experts may have expressed such opinions in their reports does not warrant admission.  By disclaiming such opinions and narrowly limiting their professed scopes at deposition, such experts have effectively denied Sanofi the opportunity to question them on the disclaimed opinions.[60]  By disclaiming such opinions, the experts have disavowed conflicting

---

[58]  *See, e.g.*, **Ex. X**, Mar. 23, 2020 Feigal Rpt. at 32-33 (discussing role of informed consent in prescription process); 25-32 (discussing chemotherapy treatment options for breast cancer, including Taxol and FAC); 40-67 (purporting to address data on PCIA with a variety of chemotherapy agents, including Taxol and FAC).

[59]  Ex. V, Apr. 10, 2020 Feigal Dep. 139:15-23.  *See also id.* at 136:20-137:2 (Q. So if you were treating a patient, and let's say you gave them FAC, F-A-C, would you tell them when you're consenting them that PCIA is a potential risk?  A. I can't really answer that question, because I'm not currently seeing patients. Perhaps that's a question for Dr. Bosserman, who is currently seeing breast cancer patients."); 140:24-141:17 (Q. ... if a medical oncologist was consenting a patient for a Taxol-based regimen for adjuvant breast cancer, should that physician tell the patient that there have been case reports of PCIA with Taxol?  A. . . . . I'm not here to talk about other chemotherapy agent a patient receives. I'm really focused on Taxotere, and the types of information that would be relevant when you're talking to a patient about permanent chemotherapy-induced alopecia, where you have a body of evidence."); 143:16-20 ("My scope is to talk about Taxotere in the -- and its causal relationship to permanent chemotherapy-induced alopecia.  My conclusions are related to the scope of what I was asked to talk about.").

[60]  Indeed, in the Feigal examples cited above, statements in Ms. Kahn's experts' reports were the express basis for Sanofi's questions.  *See, e.g.*, Ex. V, Apr. 10, 2020 Feigal Dep. 142: 4-7 ("Q. So you understand the reason I'm asking you about consent, and what would be proper consent, is because you are offering opinions about consent and what a proper consent is.  Does that make sense?  A. I'm not commenting about anecdotes, or any other type

statements in their reports.  This conduct is tantamount to Ms. Kahn refusing to produce the expert for deposition on certain subjects, and warrants the same relief: exclusion of the disclaimed opinions.

---

of side effect. I'm just talking about the information that's the subject of this trial; and that's permanent chemotherapy-induced alopecia [with Taxotere] . . . I'm not going beyond that, about everything else they should talk to a patient about.").

11.   **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' CORPORATE INTENT, MOTIVES, OR STATE OF MIND.**

The Court previously ***granted in part and denied in part*** Sanofi's Motion in the *Earnest* case.[61]   While the Court permitted Ms. Kahn to present "*factual evidence* that may go to show intent, motive, or state of mind," the Court did not permit Ms. Kahn's witnesses to speculate on these issues.[62]   At the very least, the same result is warranted here.

### ARGUMENT

The Court should exclude all evidence and argument regarding Sanofi's corporate intent, motives, and/or state of mind, including evidence and argument suggesting that it had a financial motive to downplay potential risks associated with Taxotere.[63]   Such evidence is (1) irrelevant to Ms. Kahn's claims; (2) speculative and beyond the scope of Ms. Kahn's experts' knowledge and expertise; and (3) unduly prejudicial, serving only to confuse the jury and waste judicial time and resources.   *See* Fed. R. Evid. 401–03.

### A.   Motive, Intent, and State of Mind Evidence is Irrelevant.

Evidence of a party's intent, motives, or state of mind is irrelevant to a determination of liability in a product liability action.   *See, e.g.*, *La Plante v. Am. Honda Motor Co., Inc.*, 27 F.3d 731, 739 (1st Cir. 1994) ("A defendant's motive for its action or inaction is, generally speaking,

---

[61]   *See* Rec. Doc. 8206 at 3 (Order and Reasons on Mots. in Lim.) ("The Court will allow factual evidence that may go to show intent, motive, or state of mind.").

[62]   *Id.*  (emphasis added).

[63]   A review of Ms. Kahn's expert reports and deposition testimony indicates that Ms. Kahn may seek to offer testimony on Sanofi's corporate intent, motive, or ethics.  Ms. Kahn's expert witnesses, Laura Plunkett and Ellen Feigal, attempted to offer testimony on Sanofi's ethical and moral responsibilities before bellwether Plaintiff Barbara Earnest's trial.  Ex. B, Dec. 10, 2018 Plunkett Dep. 311:21–313:2 (explaining that while she has not been asked to opine on Sanofi's conduct, she has an opinion "based on what [she] believe[s] the company should have been aware of."); Ex. C, Dec. 7, 2018 Feigal Dep. 102:4–16 ("I think there's an ethical responsibility."), 116:12–117:9 ("A company has their own ethical principles that don't necessarily -- there are legal requirements, but then there are ethics and principles that companies have about sharing information with physicians and with patients. . . . I will not opine on the specifics of inadequacy of a label, but I do have an opinion about whether or not communication of relevant information to physicians was done.").

immaterial to the question of whether the defendant acted negligently."); *Gray v. Hoffman-La Roche*, 82 F. App'x 639, 651 (10th Cir. 2003) (defendant's "alleged motive for failing to issue a stronger warning is immaterial to any element of [plaintiff's] . . . causes of action, and is therefore inconsequential to the determination of the case."). Indeed, any evidence or argument relating to Sanofi's sales, profitability, market share, net worth, and actual or anticipated profits from Taxotere offered in an attempt to demonstrate improper motive is impermissibly speculative and irrelevant to any element of a failure-to-warn claim.[64]

Nothing about *why* Sanofi acted (or not) has any bearing on whether Taxotere caused the alleged injuries in this case; nor do Sanofi's motives, intent, or state of mind have any bearing on the prescribing physician's decision to use a Taxotere-containing regimen to treat Ms. Kahn. Thus, any proffer of evidence or argument on Sanofi's corporate intent, motives, or state of mind is irrelevant. *See* Fed. R. Evid. 401.

**B.     Motive and Intent Evidence is Inherently Speculative, Unreliable, and Falls Within the Province of the Jury.**

No witness, including Ms. Kahn's expert, is qualified to opine on Sanofi's alleged corporate intent, motives, or state of mind. *See First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996) (stating that "expert testimony . . . [offering] opinion of dishonesty goes beyond the scope of expertise."); *United States v. Cytogel Pharma, LLC*, No. 16-cv-13987, 2018 WL 5777510, at *3 (E.D. La. Nov. 2, 2018) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.") (internal citation omitted); *Drake v. Allergan, Inc.*, No. 13-cv-234, 2014 WL 5392995, at *6 (D. Vt. Oct. 23, 2014) (prohibiting expert

---

[64]   Argument pertaining to Sanofi's profitability, market share, net worth, and actual or anticipated profits from the sale of Taxotere is incorporated by reference and more fully set forth in Sanofi's Motion in *Limine* No. 9 to Preclude Evidence or Argument Concerning Sanofi's Finances or Employment Decisions.

witnesses from speculating about individual or entity motives, knowledge, or intent); *Retractable Techs. Inc. v. Abbott Labs., Inc.*, No. 05-cv-157, 2010 WL 11531436, at *5–6 (E.D. Tex. June 18, 2010) (collecting cases); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("Dr. Parisian conceded at the hearing that her regulatory expertise does not give her the ability to read minds.  Nevertheless, her report is replete with such conjecture.  This is not a proper subject for expert or even lay testimony.").  Accordingly, the Court should exclude any testimony on a party's intent, motives, and/or state of mind because it is inherently speculative and unreliable.

To that end, expert testimony on these topics is speculative—and ultimately unhelpful— because intent, motive, and state of mind issues present classic jury questions.  *In re Rezulin*, 309 F. Supp. 2d 531, 545–47 (S.D.N.Y. 2004) (precluding expert testimony on the motive, intent, and state of mind of the defendants and others because it describes "lay matters which a jury is capable of understanding and deciding without the expert's help."); *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts[.]").  The same result is warranted here.  All testimony offered by Ms. Kahn's witnesses on Sanofi's corporate intent, motives, or state of mind should be precluded.

### C.     Motive and Intent Evidence is Prejudicial, Unhelpful to the Jury, and Will Waste Judicial Time and Resources.

If permitted, state of mind evidence would prejudice Sanofi, create confusion, mislead the jury, and lengthen the trial.  Fed. R. Evid. 403.  Sanofi would then be forced to spend time rebutting and contextualizing evidence on issues that have no bearing on the claims in this case.  *See In re C.R. Bard Pelvic Repair Sys. Prods. Liab. Litig.*, 948 F. Supp. 2d 589, 611 (S.D.W. Va. June 4, 2013), *on reconsideration in part* (June 14, 2013) ("[K]nowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects

40

of expert testimony because opinions on these matters will not assist the jury.").  For these reasons,

evidence of Sanofi's motives, intent, and state of mind should be excluded from trial.

12. **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' CORPORATE INTEGRITY AGREEMENTS, GOVERNMENT INVESTIGATIONS OR SETTLEMENTS, OR ANY OTHER ALLEGED "BAD ACTS" UNRELATED TO TAXOTERE.**

This Court previously **granted** Sanofi's Motion *in Limine* in the *Earnest* case.[65]  For the same reasons—provided below—the Court should grant Sanofi's Motion in Ms. Kahn's case.

## ARGUMENT

Ms. Kahn may attempt to portray Sanofi as a bad actor and make this trial a referendum on its corporate conduct by introducing, among other things, evidence of Corporate Integrity Agreements ("CIAs"), government investigations, settlements, or other purported "bad acts" that are unrelated to Taxotere.  The Court should exclude such evidence because it (1) is irrelevant to Ms. Kahn's claims; (2) is substantially more prejudicial than probative; and (3) constitutes improper propensity evidence.  Evidence of settlement also violates Rule 408 (compromise offers and negotiations).

### A.    Evidence of "Bad Acts" Unrelated to Taxotere is Not Relevant.

Sanofi's corporate conduct for other products is not relevant to any material issue in this case, and courts across the country routinely exclude such "other product" evidence.  *See, e.g.*, *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769, 2009 WL 223140, at *7 (M.D. Fla. Jan. 30, 2009) ("[A] party's agreement as to a particular standard of care for a completely different medication, used to treat a completely different condition [] is irrelevant to Plaintiff's claims in this case."); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5258858, at *4 (S.D. Ohio Sept. 10, 2015) (excluding settlement and CIA evidence from a different case because such evidence "ha[d] no relevance in this case."); *In re Depakote*, No. 14-cv-847, 2015 WL 4775937,

---

[65]    *See* Rec. Doc. 8206 at 4 (Order and Reasons on Mots. in Lim.) ("Granted, unless the door is opened.").

at *2 (S.D. Ill. Feb. 20, 2015) (excluding evidence of a prescription drug manufacturer's civil settlement and CIA because the evidence had "no relevance in this case.").

**B.      Evidence of "Bad Acts" Unrelated to Taxotere is Substantially More Prejudicial than Probative.**

The Court should exclude evidence or argument concerning "bad acts" unrelated to Taxotere because such evidence would unfairly prejudice Sanofi under Rule 403. *See Rheinfrank*, 2015 WL 5258858, at *4 (concluding that the probative value of a settlement and CIA was "outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time."). As this Court has recognized, this evidence would require mini-trials to provide the appropriate context for the jury. *See Landrieu Constr., Inc. v. DRC Emergency Servs., LLC*, Civ. No. 09-3418, 2010 WL 1817768, at *5 (E.D. La. Apr. 30, 2010) (Fallon, J.) ("[I]ntroduction of this evidence is likely to unfairly prejudice the jury by leading them to draw conclusions about the Defendants' actions in this case based on their past conduct. This danger substantially outweighs the probative value of the challenged evidence.").

Whatever negligible value other alleged "bad acts" might possess, it does not outweigh the danger of prejudicing Sanofi, confusing the issues, misleading the jury, and wasting time, all which would result from conducting mini trials on these alleged "bad acts." *See Kelly*, 61 F.3d at 356 (upholding exclusion of evidence that would require "mini-trials" of "other acts" because it "would amount to needless waste of judicial resources"); *Coursen*, 764 F.2d at 1334–35 (affirming exclusion of "innuendos of collateral misconduct" by a medical device manufacturer as unduly prejudicial and confusing under Rule 403); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 223140, at *7 (evidence of a party's agreement as to a particular standard of care for a completely different medication, used to treat a completely different condition wastes time, will confuse the jury, and is more prejudicial than probative); *In re Depakote*, 2015 WL 4775937, at *2 (noting that even if

43

evidence of a CIA "had minimal probative value, any probative value is outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and/or wasting time.").

#### C.      This Evidence is Inadmissible Character or Propensity Evidence.

Evidence of CIAs, investigations, settlements, or other "bad acts" unrelated to Taxotere is not admissible to prove Sanofi's character or propensity to engage in purported misconduct.  *See* Fed. R. Evid. 404(b)(1); *see also In re Vioxx Prods. Liab. Litig.*, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (Fallon, J.) (excluding evidence of alleged misconduct unrelated to Vioxx under Rule 404(b)).  Ms. Kahn may not present evidence of unrelated "bad acts" to paint Sanofi as a bad corporate citizen or to argue that Sanofi was more likely to engage in misconduct with Taxotere because it purportedly was involved in other, prior alleged misconduct involving different products.  *See Landrieu*, 2010 WL 1817768, at *5 (excluding "evidence of other crimes, wrongs, or acts" under Rule 404(b)).

13.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING SPECIFIC LITIGATION CONDUCT.**

This Court previously ***granted*** Sanofi's Motion *in Limine* in its entirety in the *Earnest* case.[66]   For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

## ARGUMENT

The Court should preclude Ms. Kahn from proffering evidence or argument about specific litigation conduct in this MDL (or related proceedings), specifically: (1) Sanofi's designation of documents or testimony as confidential and/or any suggestion that such designations were improper or made in an attempt to keep certain information secret; (2) Sanofi's document production generally; (3) the parties' motions and Court rulings on issues in this litigation; and (4) all references to settlement negotiations.   Such evidence and argument should be excluded as irrelevant to the claims at issue and because its probative value, if any, is substantially outweighed by the risk of unfair prejudice.  *See* Fed. R. Evid. 401–03.

### A.    The Legitimate Litigation Act of Designating Documents and Testimony as "Confidential" is Irrelevant.

Ms. Kahn should not be permitted to present evidence or argument about Sanofi's litigation-based designation of documents and testimony as "confidential" to suggest that Sanofi concealed information, acted improperly, or is otherwise blameworthy in some way.  *See* Fed. R. Evid. 401–03.   Sanofi's designation of documents or testimony as "confidential" under the Protective Order entered in this MDL has no bearing on the issues in this case.  *See In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, No. 12-cv-4301, 2014 WL 505234, at *7 (S.D.W. Va. Feb. 5, 2014) ("Whether a party designates a document as confidential during the litigation process

---

[66]   *See* Rec. Doc. 8206 at 4 (Order and Reasons on Mots. in Lim.) ("Granted.").

is *absolutely irrelevant*.") (emphasis added).  Because designating documents and testimony in litigation is neither improper nor relevant, the Court should preclude Ms. Kahn from introducing evidence or argument on this topic at trial.  *See* Fed. R. Evid. 401–03.

### B.   Evidence or Argument About Sanofi's Document Production in Litigation is Irrelevant.

The Court should prohibit Ms. Kahn from presenting evidence or argument suggesting that Sanofi or its counsel refused or failed to produce any document, report, statement, material, or other information that is privileged or the production of which was not required by the Court.  *See* Fed. R. Evid. 401–03.  The Court should also preclude Ms. Kahn from submitting evidence or argument about any request for production that the Court overruled and denied, or to which Sanofi objected.  *See* Fed. R. Evid. 401–03.

### C.   Evidence or Argument Regarding the Parties' Motions, Sanofi's Objections, or Court Rulings is Irrelevant.

The Court also should exclude evidence and argument on the parties' litigation conduct in the form of motions filed, objections asserted, and rulings issued because such conduct is not relevant to the claims at issue.  *See* Fed. R. Evid. 401–03.  Specifically, evidence or argument concerning Sanofi's objections—including those made in pleadings, discovery responses, depositions, and hearings, as well as Sanofi's refusal to answer questions to which objections were made—should be precluded as irrelevant and unfairly prejudicial.  *See* Fed. R. Evid. 401–03.  Such evidence is meaningless, irrelevant, and immaterial to any issue in this case and would serve only to prejudice the jury against Sanofi.  *See* Fed. R. Evid. 401–03; *Sw. La. Convention & Visitors Bureau v. Emp'rs Mut. Cas. Co.*, No. 06-2006, 2009 WL 1787680, at *2 (W.D. La. June 22, 2009)

("The Court has reviewed the law and the evidence and rules that any correspondence of counsel related to discovery disputes, motions to compel and/or other discovery issues will be excluded.").

Likewise, references to this Court's rulings should also be precluded as irrelevant because they do not tend to make the existence of any fact of consequence more or less probable. *See* Fed. R. Evid. 401. And such references could mislead and prejudice the jury, and confuse the issues. *See* Fed. R. Evid. 403; *Harris v. Q&A Assocs., Inc.*, No. 16-cv-46, 2018 WL 3084709, at *8 (N.D.W. Va. June 22, 2018) (precluding any mention of the court's pre-trial rulings and any other rulings made outside the presence of the jury).

**D.     Evidence or Argument Relating to Settlement Negotiations is Irrelevant.**

Any question, statement, or reference to settlement discussions, including failure to settle, or any reference to mediation, negotiation, or compromise should be precluded because it is not relevant. Fed. R. Evid. 401. Moreover, such evidence is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408; *see also King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 720 (5th Cir. 2011) ("Dr. King's reliance on settlement negotiations to prove liability would be a paradigmatic Rule 408(a) violation."); *Mailly v. Park Place Entm't Corp.*, 114 F. App'x 602, 603 (5th Cir. 2004) ("The evidence in question comes exclusively from a settlement conference and thus falls squarely within the protection granted by Rule 408 of the Federal Rules of Evidence. . . . Therefore, the district court did not abuse its discretion by excluding the evidence."); *Marine Power Holding, L.L.C. v. Malibu Boats, LLC*, No. 14-912, 2016 WL 4218217, at *3–4 (E.D. La. Aug. 8, 2016) (excluding evidence under Rule 408).

14.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING ALLEGED FRAUD ON THE FDA.**

This Court previously *deferred* Sanofi's Motion *in Limine* on this identical issue in the *Earnest* case due to "vagueness" noting "that there [were] no allegations of fraud."[67]  At the very least, the same result is warranted here.

As in *Earnest*, Sanofi anticipates Ms. Kahn may argue that Sanofi withheld information from, misled, and/or committed fraud on the FDA through statements and opinions offered by her experts in this case.[68]  Such arguments are improper and run contrary to the Supreme Court's decision in *Buckman Co. v. Pl's Legal Comm.*, 531 U.S. 341, 343 (2001), which precludes the admission of evidence, testimony, or argument concerning any alleged fraud on the FDA.  Further, the probative value of such evidence, if any, is substantially outweighed by the unfair prejudice Sanofi would suffer and the extreme likelihood that the evidence would mislead and confuse the jury.

## ARGUMENT

FDA is charged with investigating potential violations of the Federal Food, Drug and Cosmetic Act ("FDCA").[69]  In *Buckman*, the Supreme Court held that the FDCA preempted state law causes of action that sought to supplant the FDA's role in policing fraud on the agency, which was a power Congress exclusively granted to it in the FDCA.  531 U.S. at 350.[70]  The Court also

---

[67]    *See* Rec. Doc. 8206 at 4 (Order and Reasons on Mots. in Lim.) ("Deferred due to vagueness.  The Court notes that there are no allegations of fraud.").

[68]    *See*, *e.g.*, Ex. G, Feb. 8, 2021 Ross Rpt. at ¶¶ 23-29; *id.* at Ex. C (Reliance List); Ex. R, Feb. 7, 2021 Plunkett Supp. Rpt. at Appendix A (List of Additional Materials Reviewed and Cited in Dr. Laura Plunkett's Supplemental Report).

[69]    21 U.S.C. § 372.

[70]    Courts applying *Buckman*, which involved a manufacturer of a federally regulated medical device, have uniformly applied *Buckman*'s reasoning to manufacturers of regulated pharmaceuticals.  *See Dawson ex rel. Thompson v. Ciba-Geigy Corp.*, 145 F. Supp. 2d 565 (D.N.J. 2001); *Globetti v. Sandoz Pharm. Corp.*, No. 98-cv-2649, 2001 WL 419160 (N.D. Ala. Mar. 5, 2001).

noted that the "FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" of its provisions.  *Id.* at 349 n.4; *see also* 21 U.S.C. § 337(a) (barring all private enforcement of the FDCA).

The Fifth Circuit has held that claims alleging a manufacturer committed fraud on the FDA are preempted.  *See, e.g.*, *Morris v. PLIVA, Inc.*, 713 F.3d 774, 777 (5th Cir. 2013) ("[A] claim that [defendant] breached a federal labeling obligation sounds exclusively in federal (not state) law, and is preempted."); *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 380 (5th Cir. 2012) ("In cases like this, where the FDA has not found fraud, the threat of imposing state liability on a drug manufacturer for defrauding the FDA intrudes on the competency of the FDA and its relationship with regulated entities.  Under such circumstances *Buckman* found a violation of the Supremacy Clause.").

Courts interpreting *Buckman* specifically have rejected efforts to turn prescription drug cases into sideshows about regulatory compliance.  In *Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 813 (N.D. Ohio 2002), the federal court precluded the plaintiff from introducing the very type of evidence that Ms. Kahn may introduce here.  In *Bouchard*, the court held:

> Evidence will be excluded outright when it is offered only to show that the FDA was misled, or that information was *intentionally concealed from the FDA*.  Exclusion of further evidence may be necessary to prevent confusion of the jury as to the nature of Bouchard's claims; to the extent that is the case, further objections may be made at trial.

*Id*. at 812 (emphasis added).

Similarly, in *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 346–49 (Minn. Ct. App. 2001), the Minnesota Court of Appeals stated that, "[a]s in *Buckman*, the existence of state-law claims against applicants for, and recipients of, FDA drug approval for alleged violation of FDA regulations conflicts with the FDA's authority to consistently police fraud within the agency's

49

powers." *Id.* at 349.  Other courts likewise have excluded evidence of alleged fraud on the FDA.

*See Dawson*, 145 F. Supp. 2d at 572 (recognizing that fraud-on-the-FDA claims are preempted);

*Globetti v. Sandoz Pharms. Corp.*, 2001 WL 419160, at *1–3 (N.D. Ala. Mar. 5, 2001) (plaintiff's

claims for fraud-on-the-FDA were dismissed).  The same reasoning applies here.

Evidence is relevant if it "has any tendency to make a fact more or less probable than it

would be without the evidence . . . and the fact is of consequence in determining the action."  Fed.

R. Evid. 401.  Here, any evidence, testimony, or argument regarding alleged inadequacies or

deficiencies in Sanofi's correspondence or disclosures to FDA would only be relevant to show

fraud-on-the-FDA, which is preempted under *Buckman*.[71]

Moreover, evidence and argument that Sanofi withheld information from the FDA would

mislead and confuse the jury on collateral issues, while unfairly prejudicing Sanofi.  *See* Fed. R.

Evid. 403.  For this additional reason, such evidence should be excluded.

---

[71]   *See, e.g.*, Ex. G, Feb. 8, 2021 Ross Rpt. at ¶¶ 23-29.

15.     **MOTION TO PRECLUDE REFERENCE TO PCIA AS "COMMON".**

This Court should exclude any reference to permanent chemotherapy-induced alopecia as a "common" side effect of Taxotere or any other chemotherapy.  During the *Earnest* trial, however, Ms. Earnest's expert witnesses asserted that permanent hair loss is a "common" side effect of Taxotere.[72]  This, however, is inconsistent with FDA's approval of the language "[c]ases of permanent alopecia have been reported" in Taxotere's 2015 and subsequent labels with the caveat that "[b]ecause they are reported from a population of unknown size, precise estimates of frequency cannot be made."[73]  FDA approved substantially similar language in each of Taxotere's subsequent labels.[74]  This also is inconsistent with the Court's prior ruling that the FDA was "fully informed" and "worked closely with Sanofi to assess the risk of permanent alopecia" in connection with Sanofi's 2015 label change adding this language.[75]

Accordingly, any reference to PCIA as a "common" side effect of Taxotere not only is incorrect and therefore irrelevant under FDA's approved language for Taxotere's label.[76]  *See* Fed. R. Evid. 401–402.  It also is irrelevant because FDA further cautions against use of nonspecific terms, such as "common," to describe adverse events.[77]  Further, any reference to PCIA as a

---

[72]   *See, e.g.*, **Ex. Y**, Sept. 18, 2019 Trial Tr. at 817:7–9 ("Q.  Did you determine whether or not permanent hair loss associated with Taxotere is a common side effect?  A.  Yes, I did."); *see also id.* at 817:10–824:22 ("Q. . . . Is the ranking that you just provided WHO also?  A.  Yes.  That's another – that's where you can find it.  The World Health Organization also has published sort of this standard for how you rank – use names.").

[73]   *See* **Ex. Z**, 2015 Label.

[74]   *See also* Oct. 5, 2018 Label; June 6, 2019 Label; Dec. 17, 2019 Label; and May 15, 2020 Label.

[75]   Rec. Doc. 11682 at 20 (Order and Reasons Granting in Part and Denying in Part Defs.' Mot. for Summ. J. Based on Preemption).

[76]   Ex. W, Apr. 27, 2020 Plunkett Dep. 64:10–14 ("Q.  Now, the World Health Organization, they do not regulate prescription pharmaceutical products in the United States.  Is that correct?  A.  Not in the way that I would describe regulatory oversight, no.  That is true.").

[77]   *See, e.g.*, **Ex. AA**, FDA, Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format at 9 (2006) (providing guidance on how to classify and categorizes adverse reactions) [hereinafter "Guidance for Industry"].

"common" side effect of Taxotere poses a high risk of unfair prejudice, confusing the issues, and misleading the jury.  Fed. R. Evid. 403.

        **A.**      **FDA Guidance, Both Specific to the Taxotere Label and General to Describing Adverse Events, Confirms Use of Non-Specific Terms Like "Common" Is Improper.**

FDA is the relevant governing regulatory body in the United States and in this case with respect to pharmaceutical chemotherapy drugs like Taxotere.  Under the U.S. Food, Drug, and Cosmetic Act and corresponding federal regulations, FDA directs drug manufacturers to monitor, report, and classify risks associated with a drug.[78]  As the Court recognized, FDA "worked closely with Sanofi to assess the risk of permanent alopecia" in 2015 and approved determined that "[Sanofi's] simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."[79]  Importantly, FDA recognized that the available data did not support any statement concerning the estimated frequency of permanent alopecia could not be made.  In fact, under section 6.2 (Postmarketing Experience), FDA approved the following:

> The following adverse reactions have been identified from clinical trials and/or postmarketing surveillance.  Because they are reported from a population of unknown size, precise estimates of frequency cannot be made.
>
> . . .
>
> Cases of permanent alopecia have been reported.

FDA also approved the following in the Patient Information section:

---

[78]   *Id*. at 10 (providing guidance on how to classify and categorizes adverse reactions).

[79]   Rec. Doc. 11682 at 9, 20.

> hair loss: in most cases normal hair growth should return.  In some cases (frequency not known) permanent hair loss has been observed.[80]

Since 2015, the same or substantially similar language has remained in Taxotere's label.[81]  Any reference to PCIA as a "common" side effect of Taxotere therefore is inconsistent with the FDA's determination that the frequency of permanent hair loss in patients receiving Taxotere is unknown.

Additionally, FDA counsels against the use of nonspecific terms, such as "rare" or "common," because these terms "do not provide meaningful information about the frequency of occurrence of adverse reactions."[82]  The Court should therefore preclude any reference to PCIA as a "common" side effect of Taxotere (or any other chemotherapy) because it also is inconsistent with FDA's guidance against using nonspecific terms to describe the frequency of adverse events and therefore not relevant to the FDA's approval or postmarket monitoring of Taxotere (including its FDA-approved warnings), or the claims at issue in this case.

**B.    Referring to PCIA as a "Common" Side Effect of Taxotere Risks Unfair Prejudice, Confusing the Issues, and Misleading the Jury.**

The risk of confusing the issues and misleading the jury far outweigh the limited probative value, if any, of Plaintiff's reference to PCIA as a "common" side effect of Taxotere for several reasons.  Fed. R. Evid. 403.

First, the use of a term that is inconsistent with the FDA's determination regarding the frequency of the adverse event at issue will serve little purpose other than to confuse and mislead the jury.  *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 4168410, at *3 (expressing concern that the jury "must decide the case based on [existing] standards" rather than references

---

[80]  Ex. Z, 2015 Label.

[81]  *See supra* nn.73-74.

[82]  Ex. AA, Guidance for Industry at 9 ("Avoiding Nonspecific Terms").

to inapplicable standards or regulations).  The risk of confusion is especially high because terms such as "common" and "rare" are lay terms to which jurors could easily attribute improper, and inaccurate meanings that do not correspond to the more specific FDA guidelines for providing information regarding adverse events.  For this reason, FDA counsels against manufacturers using these terms:

> **In characterizing overall adverse reaction experience, nonspecific terms that lack a commonly understood or precise meaning are discouraged, as use of such terms can be misleading.**  For example, the phrase *well-tolerated* is a vague and subjective judgment about a drug's adverse reaction profile for which there are no commonly understood parameters.  In addition, **the terms *rare*, *infrequent*, and *frequent* do not provide meaningful information about the frequency of occurrence of adverse reactions.**  Specific frequency ranges (e.g., adverse reactions occurring in < 1/500) provide more precise information about incidence.[83]

While Sanofi does not object to the use of incidence rates expressed as either a percentage (*e.g.*, 10%) or a numerator over a denominator (*e.g.*, 1/10), it does take issue with Plaintiff using terms—such as "common" or "rare"—to ascribe particular meaning to incidence rates that are not recognized by FDA, as such terms will only confuse or mislead the jury.  Accordingly, the Court should exclude any reference to PCIA as a "common" side effect of Taxotere or any other chemotherapy, either in argument or evidence.

---

[83] *Id.* at 9 ("Avoiding Nonspecific Terms").

16. **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING WHAT MS. KAHN WOULD HAVE DONE DIFFERENTLY IF SHE HAD BEEN GIVEN DIFFERENT RISK INFORMATION BY HER PRESCRIBING ONCOLOGIST.**

The Court previously ***denied*** Sanofi's Motion in *Limine* on this issue in the *Barbara Earnest* case.[84]   A different outcome is warranted in *Kahn*, however, because Ms. Kahn cannot present any non-speculative evidence on what she would have done had she been presented with different information about the risk of permanent hair loss by her prescribing oncologist, Dr. Carl Kardinal.   In addition, a different outcome is warranted because Dr. Kardinal's testimony in the *Kahn* trial will be offered via video deposition, and Dr. Kardinal's deposition testimony lacks evidence that he would have prescribed her a non-Taxotere chemotherapy regimen under any circumstances.   The Fifth Circuit has also provided more guidance on the ambit of relevant (and irrelevant) evidence under application of Louisiana's learned intermediary doctrine.   For these reasons, the Court should grant Sanofi's Motion.

## ARGUMENT

Ms. Kahn testified at her deposition that the only way she could provide a definitive answer regarding what she would have done if Dr. Kardinal warned her of the risk of permanent hair loss would be based solely on hindsight.[85]   But Louisiana law disregards such testimony precisely "[b]ecause of the likelihood of a patient's bias in testifying in hindsight" on the issue of warnings causation.   *Hondroulis v. Schuhmacher*, 553 So. 2d 398, 412 (La. 1998) ("Because of the likelihood of a patient's bias in testifying in hindsight on [the causal relationship between an alleged failure to warn and injury], this court and others have adopted an objective standard of

---

[84]   *See* Rec. Doc. 8206 at 4 (Order and Reasons on Mots. in Lim.) ("Denied.   As previously ruled, the jury must decide whether the prescribing decision would have changed; this depends on the oncologist's conversations with Plaintiff and what risks Plaintiff was willing to accept.").

[85]   **Ex. BB**, Dec. 7, 2017 Kahn Dep. 303:4–5 ("*In hindsight*, I would say I would definitely ask for other options.") (emphasis added).

causation: whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed.").

Unlike Plaintiff Earnest,[86] Ms. Kahn's testimony is expressly based on hindsight—the knowledge not only of a *risk* of permanent hair loss, but that the risk was *realized* and is her alleged injury. Ms. Kahn's testimony that she may not have taken Taxotere *if she knew she would be injured*—not that a risk of persisting hair loss would have caused her to refuse treatment—does not pass muster under Louisiana law, this Court's *Earnest* framework,[87] or the Fifth Circuit's recent affirmation of summary judgment on Warnings Causation in *Phillips*.[88]

In affirming summary judgment in *Phillips*, the Fifth Circuit noted that "to the extent that patient choice is relevant, that relevance is cabined to helping [the Court] decide whether . . . [the doctor's] prescribing decision would have been different had *he* known that Taxotere's associated risk of alopecia was potentially permanent rather than temporary."[89] Where, as here, the prescribing physician has testified that an adequate label would not have changed his prescribing

---

[86] Ms. Earnest testified unequivocally that the mere risk of permanent hair loss would have caused her to refuse treatment with Taxotere. *See* **Ex. CC**, Sept. 24, 2019 Trial Tr. 1798:3–10 ("Q My question to you, Mrs. Earnest, is: Even if the word 'permanent' had appeared before 'hair loss' on this consent form, you still would have signed it? A. No, I wouldn't have. No. I would have asked him about explain that to me, more about that. I know I would have. Q. So the only risk you were unwilling to accept was the risk of permanent hair loss? A. Yes.").

[87] Ms. Kahn additionally testified that by signing the clinical trial informed consent form before receiving Taxotere, she had "signed off on" risks of undisclosed injuries up to 3 percent, so "when it gets down to percentages, I don't know." Ex. BB, Dec. 7, 2017 Kahn Dep. 302:12-20. She went on to state that "at 10 percent, I certainly would [have asked for other options]" but "[w]hen you start going down in smaller numbers, I can't give you a definitive answer what I would have said at the time. *In hindsight*, I would say I would definitely ask for other options." *Id.* at 302:12-303:5 (emphasis added). But Plaintiffs' experts have steadfastly refused to quantify any percentage risk or rate of persisting hair loss with Taxotere, much less a risk of 10 percent or more. *See, e.g.*, Ex. Y, Sept. 18, 2019 Trial Tr. 883:14-885:12 (Dr. Plunkett cannot quantify incidence rate of persistent alopecia with Taxol, Adriamycin, Cytoxan, 5-flurouracil, or Taxotere); Ex. U, Sept. 29, 2020 Tosti Dep. 143:1-23 (Dr. Tosti cannot quantify risk of permanent alopecia by counting cases in published literature). In this context, any testimony from Ms. Kahn regarding what she would have done if warned of a persisting alopecia risk is not only hypothetical, but counterfactual—based on a premise squarely rejected by Plaintiff's own experts. Such testimony is irrelevant and inadequate, threatens to mislead and confuse the jury, and should be excluded.

[88] *June Phillips v. Sanofi US Services, Inc. In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No. 20-30405, 2021 WL 1526429 (5th Cir. Apr. 19, 2021).

[89] *Id.* at 7.

56

decision,[90] a plaintiff's testimony regarding how she would have responded if differently warned of a risk is irrelevant.[91]

As such, evidence of what Ms. Kahn allegedly would have done differently had she received different risk information from her prescribing oncologist should be excluded because: (1) it constitutes irrelevant hindsight conjecture and improper lay witness testimony, and (2) its limited probative value, if any, will serve only to confuse the issues and mislead the jury.[92]  *See* Fed. R. Evid. 701; *see also Howard v. Offshore Liftboats, LLC*, No. 13-4811, 2016 WL 316716, at *4 (E.D. La. Jan. 26, 2016) (precluding lay witness from testifying on "various speculative, hypothetical questions" about "how the incident could have been prevented"); Fed. R. Evid. 401–03.

### A.    Evidence Regarding What Ms. Kahn Would Have Done Differently Should Be Excluded as Speculative, Hindsight Conjecture and Improper Lay Witness Opinion Testimony.

Evidence or argument about what Ms. Kahn "would have done differently" should be excluded because it constitutes speculative, self-serving conjecture based solely upon the benefit of hindsight.  Louisiana courts have recognized the "likelihood of a patient's bias in testifying in hindsight on this hypothetical matter," and thus "have adopted an objective standard of causation:

---

[90]   *See* Ex. I, Jan. 17, 2018 Kardinal Dep. 105:18–106:1 ("Q. . . . If the Taxotere label . . . had said, "In most cases, normal hair growth should return. In some cases, frequency not known, permanent hair loss has been observed," would that change your recommendation that Miss Kahn participate in NSABP B-40?  A. No.").

[91]   *See Phillips*, 2021 WL 1526429 at 7; *see also id.* at n.4.

[92]   In addition, Ms. Kahn also should be precluded from presenting evidence regarding what she would have done with different risk information because, under Louisiana law, the only legally relevant inquiry is whether the alleged risk would have changed the prescribing physician's decision to prescribe Taxotere in this case.  *Ferguson v. Proctor & Gamble Pharm., Inc.*, 353 F. Supp. 2d 674, 678–79 (E.D. La. 2004) ("In failure-to-warn cases involving prescription drugs, Louisiana courts apply the learned intermediary doctrine," which requires the plaintiff to "show that the defendant failed to warn (or inadequately warned) *the physician* of a risk associated with the product that was not otherwise known to the physician" and "that this failure to warn *the physician* was both a cause in fact and the proximate cause of the plaintiff's injury.") (emphasis added); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 268 (5th Cir. 2002) ("The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the *treating physician*.  The treating physician's knowledge is thus the focus of the inquiry.").

whether a reasonable patient in the plaintiff's position would have consented to the treatment . . . had the material information and risks been disclosed." *See Hondroulis*, 553 So. 2d at 412.

Ms. Kahn now is cancer-free and no longer faces the uncertainty associated with her breast cancer diagnosis.[93]  When asked what she would have done at the time of treatment, Ms. Kahn could not give a definitive answer and instead resorted to impermissible hindsight.[94]  This type of after-the-fact evidence—offered in the context of having defeated cancer following treatment with a Taxotere-containing regimen—is detached from the reality in which her original treatment decision was made and the degree of risk she was willing to accept in that critical moment.  This reality is underscored by Ms. Kahn's testimony that her cancer diagnosis was "devastating news," and that "the stance [she] took after getting diagnosed" was to ask "how are we going to fight this," and resolve to beat cancer and survive.[95]

**B.     Dr. Kardinal's Deposition Testimony Fails To Establish What Different Hair Loss Warning He Might Have Provided, and Whether He Would Have Prescribed Ms. Kahn a Non-Taxotere Regimen In Any Event.**

The speculative nature of Ms. Kahn's testimony is exacerbated by the inadequate testimony Ms. Kahn elicited from Dr. Kardinal on the issue of his Taxotere warnings and prescription.  Ms. Kahn's admission that she couldn't "give a definitive answer" about changed behavior with a permanent hair loss risk of less than 10% meant that she needed to elicit testimony from Dr. Kardinal that, on the basis of the new label, he would have warned her of a 10% or higher risk of permanent hair loss.  But Ms. Kahn neither sought nor obtained such testimony.  On the contrary, Dr. Kardinal unequivocally testified that a legally adequate warning would not have changed his

---

93     Ex. BB, Dec. 7, 2017 Kahn Dep. 16:19–23.

94     *Id.*

95     *Id.* at 156:12-20.

decision to prescribe Ms. Kahn Taxotere as part of the clinical trial NSABP B-40.[96]  Furthermore,

Dr. Kardinal testified that he had not reviewed the Taxotere label in years,[97] was unaware of

whether it (or any drug label) warned of permanent hair loss,[98] and that in his experience hair loss

was "rarely" permanent.[99]

Moreover, Ms. Kahn failed to elicit any testimony from Dr. Kardinal regarding what

different hair loss warning he might have provided, or what purported alternative treatment option

he would have prescribed had Ms. Kahn refused a Taxotere regimen.  Instead, Dr. Kardinal

testified that a certain Taxol regimen was "similar" and "fairly equivalent" in terms of efficacy.[100]

But Ms. Kahn's counsel failed to elicit any testimony from Dr. Kardinal that he would have

prescribed such a regimen for Ms. Kahn.[101]  In fact, Dr. Kardinal expressly denied testifying as

such: when asked whether his testimony was that "if [he] knew that Taxotere had a risk of

persistent hair loss and a patient expressed a concern about persistent hair loss, [he] would

potentially prescribe Taxol to that patient," he plainly answered "no." [102]  Rather, Dr. Kardinal

---

[96]  *See supra* n. 90; Ex. I, Jan. 17, 2018 Kardinal Dep. 105:18-106:1.  This Court has already ruled that the language provided in FDA-approved 2015 Taxotere label, which includes no percentage risk of permanent hair loss, is adequate as a matter of law to inform patients of the injury Ms. Kahn claims.  *See* Rec. Doc. 10464 (Order and Reasons granting Defs' Mot. for Summ. J. on the Claims of Plaintiffs Whose Taxotere Treatment Started After December 11, 2015) at 4-5.

[97]  Ex. I, Jan. 17, 2018 Kardinal Dep. 29:25-30:6 ("Q. Do you have any recollection of reviewing the Taxotere label after the mid 2000s? A. Of course not.  Q. Do you have any recollection of reviewing the Taxotere label at all? A. Yes. I reviewed it at the time that we started using Taxotere."); 28:2-16 (Dr. Kardinal started prescribing Taxotere in the 1990s).

[98]  *Id.* at 87:10-13 ("Q. Tell me a drug for which the package insert says that there's a risk of permanent or persistent hair loss. A. Can't do that. Don't know.").  Dr. Kardinal's failure to review the Taxotere label for years before treating Ms. Kahn, and his lack of awareness of later-added references to permanent hair loss, further render Ms. Kahn's testimony irrelevant to the issue of warnings causation.  *See* Rec. Doc. 12494 (Order and Reasons granting Mot. for Summ. J. on the claims of Wanda Stewart) at 6 (finding prescribing doctor's testimony that he was "sure [he had] looked at [the relevant manufacture's label] at one point," but had not "recently reviewed it" and had not seen a subsequent warning regarding permanent hair loss dispositive on the issue of warnings causation).

[99]  Ex. I, Jan. 17, 2018 Kardinal Dep. 23:10-11 ("Over the years, hair loss was rarely permanent.").

[100]  *Id.* at 143:2–146:12.

[101]  *See id.*; *see also id.* 219:10–19.

[102]  *Id.* at 219:13-17.

testified that the Taxotere regimen Ms. Kahn received was "the standard treatment," and expressly rejected alternatives including 5-flurouracil or AC alone for Ms. Kahn.[103]  Moreover, Dr. Kardinal testified that he preferred Taxotere over Taxol because of Taxotere's superior side effect profile.[104] Taxol carried a significantly higher risk of severe neuropathy and infusion-site reactions.[105]  There is no evidence that Dr. Kardinal would have prescribed a non-Taxotere containing alternate regimen for Ms. Kahn.  To find otherwise based on this record would be entirely speculative and contrary to his testimony.

In addition, Ms. Kahn offered no testimony that she would have accepted such risks after having been advised of them at the time of treatment.  *See Hunt v. McNeil Consumer Healthcare*, 2014 WL 1779471, at *3 (E.D. La. May 5, 2014) (holding that no reasonable jury could find Plaintiff had "establish[ed] causation [in part because] Plaintiff did not testify that a different warning label would have changed her decision to administer Children's Motrin to M.H., nor was she ever asked questions to this effect by counsel.").  Any evidence or argument that Ms. Kahn would have chosen a different treatment regimen in this context lacks reliability and amounts to nothing more than self-serving conjecture and speculation.  As such, it should be excluded at trial under Rule 701.  *See Howard*, 2016 WL 316716, at *4 ("[The witness] may not speculate or give his opinion with respect to how his actions, or the actions of other individuals involved in the incident, would have been different under different factual scenarios.").

## C.    The Admission of Such Irrelevant and Speculative Evidence Risks Confusing and Misleading the Jury.

Not only does Ms. Kahn's hindsight testimony lack any probative value, it also carries a

---

[103]    *See id.* at 144:18–145:16.

[104]    *Id.* 71:25–73:23.

[105]    *Id.*

real danger of confusing the issues and misleading the jury.  Fed. R. Evid. 403.  As noted above, the only legally relevant inquiry here is whether knowledge of the alleged risk would have changed the prescribing physician's decision to prescribe Taxotere in this case.  *See Ferguson*, 353 F. Supp. 2d at 678–79; *Stahl*, 283 F.3d at 268.  The admission of evidence subject to this Motion risks confusing the jury on issues that are legally irrelevant and speculative, and prejudicing the jury against Sanofi.  Indeed, Plaintiff should not be permitted to speculate about what she would have done if she had been given a purportedly adequate (yet, unspecified) warning—especially when the record lacks evidence that Dr. Kardinal would have prescribed her a non-Taxotere containing regimen.  For these reasons, any evidence or testimony regarding what Ms. Kahn "would have done differently" if she had been provided different risk information should be excluded.

17.   **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING SANOFI PROMOTIONAL AND/OR MARKETING MATERIALS NOT POSSESSED OR RELIED ON BY MS. KAHN OR HER PRESCRIBING PHYSICIAN.**

The Court previously ***denied*** Sanofi's Motion in *Limine* on this issue after Ms. Kahn argued that such materials were "relevant to impeach" Sanofi and that "Plaintiff should be permitted to introduce company-written materials that show that Sanofi knew 'alopecia' warned only of temporary hair loss if Sanofi contends that 'alopecia' means both temporary and permanent alopecia."[106] Ms. Kahn's use of such materials in *Earnest*, coupled with the unequivocal testimony that such materials had no role in Ms. Kahn's treatment, warrant a different result in this case. At the very least, the Court should *defer* its ruling on this Motion until trial when the relevance, probative value, and prejudice can be determined in the context of the specific promotional and/or marketing material sought to be introduced by Ms. Kahn.

## ARGUMENT

Before the *Earnest* trial, Plaintiffs insisted that Sanofi marketing materials were relevant for impeachment on the issue of Sanofi's knowledge regarding the meaning of alopecia.[107] But at the trial, Plaintiffs strongly implied that such materials had in fact been seen and relied on by Ms. Earnest or her healthcare providers, which is untrue. Witness Ruth Avila testified that she "used things like" a 2006 nurse brochure to discuss hair loss with Ms. Earnest's treaters,[108] and that

---

[106]   *See* Rec. Doc. 7855 (Pl.'s Opp. to Defs.' Second Omnibus Motion *In Limine* (Nos. 15-20) at 8 ("Plaintiff does not intend trial to introduce Sanofi's promotional materials as evidence of Sanofi's marketing efforts . . . . [but] Plaintiff should be permitted to introduce company-written materials that show that Sanofi knew "alopecia" warned only of temporary hair loss if Sanofi contends that 'alopecia' means both temporary and permanent alopecia"); *see also* Rec. Doc. 8201 at 5 (Order and Reasons on Mots. in Lim.) ("Evidence showing how Sanofi communicated with doctors or patients about hair loss is relevant to Sanofi's state of mind and what knowledge Sanofi had of Taxotere's risk of hair loss.").

[107]   *See supra* n.106.

[108]   *See* Ex. Y, Sept 18, 2019 Trial Tr. 585:4-15.

62

nurses to whom she gave the materials would "go over what's on the sheet with the patient."[109] When asked directly whether she knew if Ms. Earnest had ever seen the brochure, the following exchange took place:

> Q. You certainly have no information about whether or not Ms. Earnest ever saw one single page of this document, correct?
>
> A. I do not know what Ms. Earnest saw.
>
> Q. Do you know whether or not Nurse Reso even handed out any information to patients that she received from Sanofi salespeople; do you know one way or another?
>
> A. I know that they needed a lot. They called me for them. They ran out of them. **I handed them out like candy.**[110]

Contrary to Ms. Earnest's representations about the limited purpose of offering such evidence, in practice, such testimony was offered not to impeach Sanofi or to demonstrate its knowledge or understanding of alopecia, but to suggest that specific marketing materials may have influenced Ms. Kahn or her treaters. But Ms. Earnest lacked any evidence that she or her specific treaters ever saw such materials.[111] Used in this way, this evidence is highly prejudicial and tends to confuse and mislead jurors, inviting them to speculate about the potential role of such materials in a plaintiff's treatment and counseling in the absence of evidence.

Moreover, in *Kahn* there is not only an absence of evidence, but affirmative testimony disproving any reliance by Ms. Kahn and Dr. Kardinal on Sanofi promotional or marketing

---

[109] *See id.* at 574:16-17.

[110] *Id.* at 604:15-23 (emphasis added).

[111] In fact, on the issue of whether the brochure had ever been distributed to healthcare providers at all, Ms. Avila's testimony stands alone.  As such, Ms. Avila's testimony stood in contrast to Plaintiffs' representations and arguments prior to the *Earnest* trial that "[i]t is unclear if Sanofi utilized this brochure as a marketing tool—regardless, this evidence is relevant to impeach Sanofi's claims that it warned of permanent hair loss prior to 2015 with the world 'alopecia.'"  Rec. Doc. 7855 (Pl.'s Opp. to Defs' Second Omnibus Motion *In Limine* (Nos. 15-20)) at 8.

materials.[112]   The testimony indicates that Dr. Kardinal's decision to recommend Ms. Kahn participate in a clinical trial involving Taxotere—and Ms. Kahn's decision to participate in the clinical trial—was not based on any review of such materials.[113]   Dr. Kardinal unequivocally testified that he relies upon his own judgment, not Sanofi, in forming treatment decisions for his patients.[114]   He stated point-blank that he had never seen the nurse brochure presented by Ms. Kahn prior to his deposition,[115] and when asked whether he knew to whom it was distributed, he answered, "not to me."[116]   Such material then is irrelevant and will mislead the jury, confuse the issues, and prejudice Sanofi.   *See* Fed. R. Evid. 401–03; *see also* Ex. D, *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, No. 14-2720, Order and Reasons, Doc. No. 6254 at 3 (E.D. La. Apr. 18, 2017) (excluding evidence and argument concerning marketing, advertising, or promotional materials not relied upon by plaintiff's prescribing physician).

Here, deposition testimony establishes that neither Ms. Kahn nor her prescribing physician possessed or reviewed (much less relied upon) any Sanofi materials that promoted, advertised, or marketed Taxotere.

Courts across the country routinely reject the argument that marketing evidence is relevant absent proof of reliance.   *In re Norplant Contraceptive Prods. Litig.*, 165 F.3d 374, 379 (5th Cir. 1999) (declining to find that marketing materials could create a genuine issue of material fact for

---

[112]   *See* Ex. BB, Dec. 7, 2017 Kahn Dep. 65:9–14, 83:22–84:3 (testifying that she never saw "written or visual" advertisements or promotional materials related to docetaxel or Taxotere); *see also* Ex. I, Jan. 17, 2018 Kardinal Dep. 118:3–8 (testifying that he "didn't rely on any representation from a Sanofi sales representative in [his] decision to prescribe Taxotere to Elizabeth Kahn[.]"), 214:8–215:1 (testifying that he did not provide patients with information "from drug companies[.]").

[113]   *See id.*

[114]   *See* Ex. I, Jan. 17, 2018 Kardinal Dep. 118:15–21 (testifying that he relied on his "own clinical experience" and "medical training").

[115]   *Id.* at 204:11–13 ("Q. Prior to today, have you ever seen what was marked as Plaintiff's Exhibit 14? A. No.").

[116]   *Id.* at 214:25–215:1 ("Q. …Do you know who this document was distributed to? A. Not to me.").

summary judgment in the "absence of any evidence on the record that [Plaintiff] actually saw, let alone relied, on any marketing materials issued[.]"); *accord In re Norplant Contraceptive Prods. Liab. Litig.*, No. MDL 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997) ("Absent evidence that the physicians were exposed to the above listed materials, the court finds that the promotional and advertising materials are not relevant evidence."); *see also In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 966–67 (D. Minn. 2009) (excluding marketing material evidence in the absence of any evidence that the plaintiffs or their prescribing physicians relied on the materials). The same result is warranted here.

Moreover, the admission of such evidence would only mislead the jury, confuse the issues, waste time, and prejudice Sanofi.  *See* Fed. R. Evid. 403.  Marketing, advertising, and promotional materials bear no connection to Ms. Kahn's case, especially because Dr. Kardinal recommended (and Ms. Kahn chose to participate in) an experimental clinical trial involving investigational combinations of chemotherapy drugs.[117]  Dr. Kardinal specifically recommended that Ms. Kahn participate in the clinical trial because it offered state-of-the-art treatment in addition to the standard of care regimen for Ms. Kahn's breast cancer.[118]  What Dr. Kardinal did not say, however, is that any marketing, advertising, or promotional materials factored into his decisional calculus in any way.   To the contrary: he based his decision on his "clinical experience" and "medical training."[119]  Because these materials have no connection to the facts of the case, their use would be limited to portraying Sanofi as a "bad actor" and advancing a slanted narrative that Sanofi over-promoted the benefits of Taxotere and/or minimized its risks.  As such, the probative value of these materials, if any, is substantially outweighed by the risk of unfairly prejudicing Sanofi, confusing

---

[117] *See* Ex. BB, Dec. 7, 2017 Kahn Dep. 174:22–176:23; Ex. I, Jan. 17, 2018 Kardinal Dep. 58:20–61:12.

[118] Ex. I, Jan. 17, 2018 Kardinal Dep. 88:25–89:12, 93:15–25.

[119] *See id.* 118:3–21.

the issues, and wasting time. *See* Fed. R. Evid. 403. Such evidence should be excluded under Rule 403.

18.   **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING NON-EXPERT CAUSATION TESTIMONY.**

This Court previously **deferred** Sanofi's Motion *in Limine* in the *Earnest* case due to vagueness.[120]   A different result is warranted in the *Kahn* case because both parties and the Court now have a clearer picture about specific non-expert causation testimony Ms. Kahn will offer from certain fact witnesses, including former Sanofi witnesses, in violation of Federal Rules of Evidence 701 and 702.   For these reasons, the Court should grant Sanofi's Motion on this issue, or alternatively, at the very least, defer its ruling again until trial.

## ARGUMENT

Causation testimony from non-expert witnesses must be excluded because it exceeds the scope of Rule 701 and does not meet the requirements of Rule 702.   *See Rodgers v. Hopkins Enters. of Ms., LLC*, No. 17-cv-6305, 2018 WL 3104288, at *5 (E.D. La. June 21, 2018) (excluding lay testimony as to the diagnosis or causation of plaintiff's injuries); *see also Kie v. Williams*, No. 15-cv-02304, 2016 WL 6208692, at *1 (W.D. La. Oct. 23, 2016) (permitting lay witness opinion based on personal observations of the plaintiff but not on the cause or extent of plaintiff's medical condition, ". . . which require[s] specialized medical knowledge within the scope of Rule 702."); *Spencer-Martin v. Exxon Mobil Corp.*, No. 16-cv-789, 2018 WL 3015759, at *5 (M.D. La. June 15, 2018) (same).

### A.   Lay Witness Testimony Regarding the Medical or Legal Cause of Ms. Kahn's Alleged Hair Loss Falls Outside the Scope of Rule 701.

Federal Rule of Evidence 701 bars fact witnesses from offering testimony unless it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other

---

[120]   *See* Rec. Doc. 8206 at 4 (Order and Reasons on Mots. in Lim.) ("Deferred due to vagueness.").

specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701; *see U.S. v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) ("[*A*]*ny* part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701.") (emphasis added).  Here, lay witness testimony on the issue of causation—including whether Taxotere can cause permanent hair loss as well as the relationship between Taxotere and Ms. Kahn's alleged injury—is precisely the type of "scientific" or "other specialized knowledge" that falls outside the scope of permissible opinion testimony from any lay witness.  As such, Ms. Kahn should be precluded from offering such evidence at trial.

### a.  Non-Expert Sanofi Witnesses.

Although courts "have permitted witnesses to give lay opinion testimony about a business's policies, practices, or procedures, based on an after-the-fact review or analysis of documents or facts," the seminal requirement for such testimony is that the witness's testimony is "derived from duties he [or she] held" at the company.[121]  But at the *Earnest* trial, Ms. Earnest presented video deposition testimony from three Sanofi witnesses—Lesley Fierro, Jean Aussel and Frances Polizzano—to purportedly establish that Taxotere causes permanent hair loss, even though none of those witnesses served as corporate representatives for Sanofi or testified based on information arising out of their roles or duties at Sanofi.

For instance, in the *Earnest* trial, Ms. Earnest's counsel introduced the following testimony from Lesley Fierro:

> Q.  . . . As a pharmacist, do you understand today that Taxotere can cause permanent hair loss?

---

[121]  *See* Rec. Doc. 11332 at 7 (Order and Reasons denying Pl.'s Mot. to Exclude Testimony of Michael Kopreski (citing *United States v. Kerley*, 784 F.3d 327, 337 (6th Cir. 2015) and *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2015)).

A. Correct, yes.[122]

Ms. Fierro, however, testified that she did not know whether Taxotere alone could cause permanent alopecia, that it was not part of her job to make that determination, and that she never assessed the medical literature to determine whether a causal association existed between Taxotere permanent alopecia.[123] Put simply, Plaintiffs' counsel did not and cannot designate testimony from Ms. Fierro that lays the requisite foundation to permit lay witness causation testimony pursuant to Fed. R. Evid. 701.

Similarly, Ms. Earnest played video deposition testimony from Sanofi witnesses Jean Aussel and Frances Polizzano about the meaning of Taxotere's label and the alleged causal association or causal relationship between Taxotere and permanent hair loss.[124] For instance, Mr. Aussel testified:

> Q. You're generally familiar with drug labels; correct?
>
> A. No, I'm not.[125]

Despite Mr. Aussel's testimony, Ms. Earnest continued to play testimony from Mr. Aussel in which her counsel nevertheless asked Mr. Aussel to interpret the language of the Taxotere label:

> Q. And if we turn to page 2, at the bottom, there's a "hair Loss" section.  Do you see that?
>
> A. I can see that, yes.
>
> Q. And it says, "Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows and eyelashes)."  Correct?

---

[122]   *See* **Ex. DD**, Sept. 23, 2019, Trial Tr. 1639:6–8.

[123]   *Id.* at 1659:5–18.

[124]   *See* Ex. Y, Sept. 18, 2019, Trial Tr. 752:5–779:3 (Plaintiff's counsel repeatedly questioned Mr. Aussel about Taxotere's label, despite Mr. Aussel's testimony that he was not familiar with Taxotere's label); **Ex. EE**, Sept. 16, 2019, Trial Tr. 241:15–242:15 (questioning Ms. Polizzano regarding safety signal detection, *i.e.*, causal association).

[125]   Ex. Y, Sept. 18, 2019, Trial Tr. 752:21–22.

A. Yes.

. . .

Q. And then it says, "Once you have completed all of your treatments, hair generally grows back."  Correct?

A. Yes.

Q. That's the same language we saw in the original 1996 label, isn't it?

A. Yes.  *I mean, I can hardly interpret what the people in charge of labeling meant here*, but that's my interpretation.[126]

Notwithstanding Mr. Aussel's continued representations that he was unable to interpret Taxotere's label or the labeling decisions made by members of Sanofi's labeling department, and whose pronunciation as a non-native English speaker was so difficult that Ms. Earnest argued it required closed captioning to his testimony, Ms. Earnest continued to play video testimony in which her counsel questioned Mr. Aussel about the Taxotere label.[127]  Mr. Aussel repeatedly disclaimed any role in Sanofi's labeling, testifying: "[a]gain, I'm not a label specialist,"[128] "I'm not a person specialized in labeling,"[129] "I have never been involved in labeling," "[d]ifficult for me to interpret or to guess what is meant by the people in charge of labeling,"[130] "I don't know what the -- what the specialists in labeling meant when listing this specific adverse event."[131]  Mr. Aussel therefore lacks the requisite foundation to testify regarding Taxotere's label pursuant to Rules 402, 403, and 701.[132]

---

[126] *Id.* at 763:24–764:18 (emphasis added).

[127] *Id.* at 764:19–769:20.

[128] *Id.* at 764:19–765:18.

[129] *Id.* at 765:22.

[130] *Id.* at 766:10–11.

[131] *Id.* at 768:20–22.

[132] *See id.* at 778:2–779:3.

Similarly, both Mr. Aussel and Ms. Polizzano lack the requisite foundation to testify regarding causation.[133]  Ms. Earnest played video-deposition testimony from Sanofi's witnesses intended to suggest that they were knowledgeable on the subjection and offering opinions based on their duties at Sanofi.[134]  Both Mr. Aussel and Ms. Polizzano testified in *Earnest* that, in their roles at the company, they were never engaged in any determinations about the causal association or causal relationship between Taxotere and any particular side effect, including permanent alopecia.[135]  Specifically, Mr. Aussel testified that he was never a member of the safety or pharmacovigilance departments, and he never had any responsibility for making causal determinations or safety signal analyses.[136]  Ms. Polizzano similarly testified that her duties never included making causal determinations or determination of "safety analysis, safety signal detection, [or] what information should or should not go in a particular product label."[137]

Put simply, none of these witnesses held positions at Sanofi where they reliably or logically derived, from their duties at the company, the causation conclusions they were being asked to make.  Alternately, Sanofi might play for the juries the dozens of witnesses who denied or disclaimed sufficient information to make any conclusions about causation.  Tellingly, Ms. Earnest

---

[133]  In contrast, in the *Earnest* trial, the Court declined to permit Sanofi's designation of causation-related testimony from its oncologist and pharmacovigilance head, Dr. Michael Kopreski, on Plaintiff's objections that it constituted improper expert opinion testimony.  Ms. Kahn should not be allowed to have it both ways: requiring proper foundation for areas of inquiry with witnesses who they would avoid and arguing that foundation is unnecessary for areas of inquiry with witnesses whose lay and speculative testimony they would like the jury to hear.

[134]  *See, e.g.*, *id.* at 769:1–7 ("Q. In anywhere in this Taxotere section, is Sanofi telling patients that permanent hair loss has been reported?  A. That is a question?  Yes. Correct.  Q. So you're agreeing with me that there's no warning in this section of Sanofi telling patients that permanent hair loss has been reported following the use of Taxotere.  A. I agree.").

[135]  *See* Ex. Y, Sept. 18, 2019, Trial Tr. 776:1–777:4; *see* Ex. EE, Sept. 16, 2019, Trial Tr. 241:15–242:15.

[136]  Ex. Y, Sept. 18, 2019, Trial Tr. 776:1–777:4.

[137]  Ex. EE, Sept. 16, 2019, Trial Tr. 241:15–242:15.

did not present testimony from Sanofi witnesses who were in positions to address such issues—presumably because such testimony did not align with Ms. Earnest's case themes.

Regardless, Ms. Kahn should not be permitted to present this type of cherry-picked, unreliable testimony to the jury simply because they like the soundbite. Rather such testimony should be excluded because it lacks the requisite foundation pursuant to Rules 402, 403, and 701.

### b. Ms. Kahn's Family and Friends.

Sanofi also anticipates that Ms. Kahn will seek to introduce improper causation testimony through Ms. Kahn's family members and friends, but again, such testimony falls outside the scope of Rule 701. For instance:

- Ms. Kahn's sister, Felicia Kahn, testified at deposition that her "understanding is that [her] sister . . . was given a drug that apparently made her hair not come back" and that "it's called Taxotere."[138]

- Ms. Kahn's friend, Leslie McDermott testified that she "know[s] that Taxotere . . . has been implicated in permanent hair loss, and that it was not reported in the beginning at least when they used it that it could be permanent or that at least it was not reported to the patients."[139]

- Ms. Kahn's husband, Steven Seebol, testified that "there was a known problem with the drug that it caused in a certain percentage of women hair loss, permanent hair loss."[140]

These examples represent the type of unreliable lay witness opinion testimony that Rule 701 is intended to preclude. For these reasons, lay witness opinion testimony related to causation should be excluded. *See* Fed. R. Evid. 701.

---

[138] **Ex. FF**, Mar. 7, 2020 Felicia Kahn Dep. 9:16–10:4; *see also id.* 13:4–8, 86:1–88:10 (testifying that, it's her opinion "there's no reason" for Plaintiff's alleged hair loss "other than this drug").

[139] **Ex. GG,** Mar. 9, 2020 Leslie McDermott Dep. 55:24–56:4.

[140] **Ex. HH,** Mar. 10, 2020 Steven Seebol Dep. 61:18–25.

**B.  Lay Witness Testimony Regarding the Cause of Ms. Kahn's Alleged Hair Loss Does Not Satisfy the Requirements of Rule 702.**

The same lay witness opinion testimony also should be excluded under Rule 702 because neither the Sanofi witnesses nor Ms. Kahn's friends or family (1) are qualified to offer causation opinions, or (2) have formed such opinions based on sufficient data or facts, or pursuant to a reliable methodology.  *See* Fed. R. Evid. 702.

In the Fifth Circuit, expert testimony is required to prove causation when the nexus between the injury and alleged cause is not obvious to the lay juror.  *See Gowdy v. Marine Spill Response Corp.*, 925 F.3d 200, 205–06 (5th Cir. 2019); *see also Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 524 (E.D. La. 2002) ("[W]hen the conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required to prove causation.").  Rule 702 requires that testifying experts are qualified by "knowledge, skill, experience, training or education." *Williams v. Manitowoc Cranes, LLC*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting Fed. R. Evid. 702).  Here, the nexus between Ms. Kahn's alleged injury and the purported cause is not within the common knowledge of any lay juror.  Expert testimony on the issue is therefore required, and Ms. Kahn should be precluded from offering such evidence through lay witnesses at trial who are not qualified to offer such opinions and who have not conduced the necessary causation analyses to reliably support such opinions.

Ms. Kahn's counsel has contended throughout this litigation that a witness cannot testify on *causation* without first satisfying the strict requirements under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).[141]  Indeed, Ms. Kahn's counsel has asked this Court to preclude nearly every Sanofi expert from testifying about causation because those experts

---

[141]  *See, e.g.*, *generally* Rec. Doc. 10924-1 (Mem. in Supp. of Pl.'s Mot. to Exclude Testimony of John Glaspy, M.D.).

allegedly did not set forth methodologies for their supposed causation opinions, such as Bradford Hill analyses or the like.[142]   Unlike Sanofi's experts, who are not required to "prove general causation before testifying about possible alternative causes of a plaintiff's injury,"[143] Ms. Kahn's attempt to backdoor unreliable causation testimony through lay witnesses should not be permitted, since Ms. Kahn offers these lay witnesses *affirmatively* in support of her obligation to prove general and specific causation.   Yet none of them is qualified to do so and none has performed the analysis required under Rule 702.   For these reasons, the Court should grant Sanofi's motion and preclude this type of unreliable, non-expert causation testimony.

---

[142]   *See, e.g.*, *id.* at 10–20.

[143]   *See, e.g.*, Rec. Doc. 11780 (Order and Reasons Denying Pl.'s Mot. to Exclude Test. of John Glaspy, M.D.).

19.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING PLAINTIFF'S MOTIVE AND/OR MENTAL STATE.**

The Court previously ***granted in part and deferred in part*** Sanofi's Motion in the *Earnest* case.[144]  The Court noted that it would "allow testimony from others as to their observations of Plaintiff from which the factfinder may infer motive or state of mind."[145]  Clarifying its Motion, Sanofi requests that this Court exclude any lay or expert testimony on Ms. Kahn's motive or state of mind not rationally based on the perceptions of the witness.  Fed. R. Evid. 602, 701.  The issue here is that multiple fact witnesses testified—without really knowing—about whether Ms. Kahn was worried about her losing her hair or how she feels about her hair now.  As such, the Court should grant Sanofi's Motion, or at the very least, maintain its ruling from *Earnest*.

## ARGUMENT

"[S]peculative opinion testimony by lay witnesses—*i.e.*, testimony not based upon the witness's perception—is generally considered inadmissible."  *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993); *see also Howard v. Offshore Liftboats, LLC*, 2016 WL 316716, at *4 (E.D. La. Jan. 26, 2016) ("a lay opinion witness may not testify based on speculation") (quotation omitted); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 878 F. Supp. 884, 887 (E.D. La. 1995) ("Certainly, this Court will not permit a lay witness to speculate or give an opinion unless it is based on his or her own perception and helpful to the factfinding process.").  As such, the Court should exclude testimony that contravenes Rules 602 and 701 of the Federal Rules of Evidence.

---

[144]   *See* Rec. Doc. 8206 at 4 (Order and Reasons on Mots. in Lim.) ("Granted in part and deferred in part due to vagueness.  The Court will allow testimony from others as to their observations of Plaintiff from which the factfinder may infer motive or state of mind.").

[145]   *Id.*

For example, the Court should not permit Ms. Kahn's husband to testify that Ms. Kahn was worried about losing her hair during chemotherapy because it is not based on his perception:

> Q Was she worried about losing her hair?
>
> A I think she was concerned about it.
>
> Q Did she talk to you about being worried about it?
>
> A Possibly.
>
> Q What makes you think she was concerned?
>
> A She probably said -- said something to me about it. Specifically, I do not remember.[146]

By Ms. Kahn's husband's own admission, he does not remember having a conversation with his wife about her state of mind regarding hair regrowth.

The record is filled with other speculative opinion testimony from lay witnesses on Ms. Kahn's motive and mental state, including:

- Ms. Kahn's husband's testimony that he would "probably" say that Ms. Kahn's hair loss has impacted her emotionally but that he cannot say how often his wife talks to him about her hair loss except that it is "some."[147]

- Ms. Kahn's husband's testimony that he cannot answer whether his wife was frustrated with her level of hair regrowth in 2009 and 2010, but "in [his] opinion, probably" and she "probably" complained about her hair since then.[148]

- Ms. Kahn's husband's testimony that he is not "aware" of any instance where someone has said something to his wife about her hair that hurt her feelings, and that he has not "deliberately" said anything that might hurt her feelings but might "possibly" have said something that hurt her feelings.[149]

---

[146] Ex. HH, Mar. 10, 2020 Steven Seebol Dep. 143:11–18.

[147] *Id*. at 184:23–185:20.

[148] *Id*. at 186:11–23.

[149] *Id*. at 187:1–9.

- ▪ Ms. Kahn's sister's testimony that she has "not really" discussed Ms. Kahn's hair loss with Ms. Kahn but that her sister's hair loss is "like a scar that is visible" and "may hinder [her] self-esteem and self-confidence."[150]

- ▪ Ms. Kahn's sister's testimony that she and Ms. Kahn do not discuss "how [they] feel about [their] physical appearance."[151]

- ▪ Ms. Kahn's father's testimony that he and his daughter do not really discuss how she feels about her loss, but that he believes Ms. Kahn "braves [her hair loss] out" but that her hair loss is a "closed subject" between them.[152]

Testimony that lacks the requisite perception or foundation should be excluded.

---

[150] Ex. FF, Mar. 7, 2020 Felicia Kahn Dep. 125:16–126:7.

[151] *Id*. at 128:20–129:2.

[152] **Ex. II**, Mar. 12, 2020 Charles Kahn Jr. Dep. 51:13–18, 62:1–21.

20.   **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING SANOFI SALES REPRESENTATIVES, AND TO EXCLUDE SALES REPRESENTATIVE WITNESS TESTIMONY.**

The Court previously ***denied*** Sanofi's Motion on this issue in the *Earnest* case.[153] A different result is warranted here, however, because unlike in the *Earnest* case, Ms. Kahn participated in a clinical trial and her prescribing physician, Dr. Carl Kardinal, testified that (1) he never met with sales representatives regarding clinical trials and (2) he does not remember Sanofi sales representatives at all.  For these reasons, the Court should grant Sanofi's Motion.

**ARGUMENT**

Evidence and argument about Sanofi's sales representatives should be excluded because (A) it is not relevant to Ms. Kahn's claims, and (B) because the probative value, if any, is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury and wasting time.  *See* Fed. R. Evid. 401–03.  For these same reasons, Plaintiff should be precluded from calling Sanofi's sales representatives at trial to testify.

A.   **Evidence Regarding Sanofi Sales Representatives and Their Testimony Is Irrelevant Because Dr. Kardinal Did Not Rely on Sales Representatives In Exercising His Medical Judgment In This Case.**

Ms. Kahn listed two former Sanofi sales representatives on her witness list: Ruth Avila and Katherine Melancon (Theunissen).  Ms. Avila has never identified Dr. Kardinal as a physician with whom she had worked or was familiar, and her two deposition transcripts contain no reference to him whatsoever.[154]  Ms. Melancon's deposition transcript contains only four passing references to Dr. Kardinal as a former Ochsner physician who treated breast cancer and whom she remembered calling on.[155]

---

[153]   *See* Rec. Doc. 8201 at 5 (Order and Reasons on Mots. in Lim.).

[154]   *See* May 1, 2018 Avila Dep. Vol I; June 27, 2018, Avila Dep. Vol. II.

[155]   *See* **Ex**. **JJ**, Jan. 19, 2018 Melancon Dep. 211:13-22, 213:6-11, 216:3-6.

Ms. Kahn's prescribing physician, Dr. Kardinal, unequivocally testified that he never talked to sales representatives regarding clinical trials and he does not remember having contact with Sanofi sales representatives about Taxotere at all.[156]  As such, evidence regarding Sanofi's sales representatives does not make any material fact in *Kahn* more or less probable, nor does such representatives' testimony.  Such evidence and testimony are therefore irrelevant.  *See* Fed. R. Evid. 401.

**B.      The Probative Value of Such Evidence, if Any, Is Substantially Outweighed by Danger of Confusing the Issues and Wasting Time.**

Evidence regarding Sanofi sales representatives and their testimony also should be precluded because it likely will confuse and mislead the jury.  Dr. Kardinal does not remember ever having contact with a Sanofi sales representative, so any Sanofi sales representative's action (or inaction) had no bearing on Dr. Kardinal's decision to recommend Ms. Kahn's participation in the clinical trial.[157]  The admission of evidence from or about Sanofi sales representatives, therefore, will only mislead and confuse the jury about the central issues to be decided.  *See* Fed. R. Evid. 403.

Further, if Ms. Kahn is allowed to introduce sales representative evidence, a mini-trial will result—Sanofi will be forced to spend time explaining why the actions of its sales representatives were appropriate or not relevant to the case, wasting valuable judicial time and resources.  This

---

[156]  Ex. I, Jan. 17, 2018 Kardinal Dep. 115:21–118:21 ("I never talked to a pharmaceutical representative with reference to a clinical trial …. I did speak to sales representatives, but I didn't really place much weight in what they said …. I don't remember any representative from Sanofi specifically.").  This stands in stark contrast to *Earnest* prescriber Dr. James Carinder, who specifically recalled representative Ruth Avila as "the Taxotere person" and noted that he had "known her for years," that she had worked for several pharmaceutical companies in that time, that she was an oncology-certified nurse practitioner, that she was "more knowledgeable than a lot of pharma reps because of her background" and "keeps herself informed," and that her boss at Sanofi was Michael Gillespie of Jackson, Mississippi.  *See* **Ex. KK**, Jan. 11, 2018 Carinder Dep. 170:4-174:4.

[157]  Ex. I, Jan. 17, 2018 Kardinal Dep. 116:15-21; 117:24-118: 8 ("Q. Was there any representative from Sanofi that you relied upon in deciding to prescribe Tax -- A. I don't remember any representative from Sanofi specifically. Q. So is it fair to say that you didn't rely on any representation from a Sanofi sales representative in your decision to prescribe Taxotere to Elizabeth Kahn? A. Right.").

danger was fully realized in the *Earnest* trial, where substantial time and resources were spent on the testimony of Ruth Avila, despite the fact that she was fired from Sanofi some two years prior to Ms. Kahn's breast cancer treatment.  This included frequent objections and complaints of "re-trying" Ms. Avila's unsuccessful lawsuit against Sanofi stemming from her termination.[158]  Here, where Dr. Kardinal has unequivocally testified that he did not remember any Sanofi sales representatives and did not discuss clinical trials with representatives in any event, excluding such distracting and irrelevant testimony is all the more warranted.

The probative value of such evidence, if any, is substantially outweighed by the risk of unfairly prejudicing Sanofi, confusing the issues, and wasting time.  The Court should exclude such evidence under Rule 403.  *See Cross v. Wyeth Pharms. Inc.*, No. 06-cv-429, 2011 WL 2517211, at *5 (M.D. Fla. June 23, 2011) (excluding notes from sales representatives who did not call prescriber as irrelevant and prejudicial); *see also Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095, 1122 n.92 (D. Kan. 2002) (explaining that the Court previously had excluded marketing materials not relied on by the prescribing physician "because they were irrelevant and unfairly prejudicial."), *aff'd*, 356 F.3d 1326 (10th Cir. 2004); *Newman v. McNeil Consumer Healthcare*, No. 10-cv-1541, 2013 WL 4460011, at *18 (N.D. Ill. Mar. 29, 2013) (excluding marketing and promotional materials because the evidence had "such limited probative value.").

---

[158]   *See* Ex. Y, Sept. 18, 2019 Trial Tr. 608:20-616:9.

21.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING CORRESPONDENCE BETWEEN DDMAC AND SANOFI.**

This Court previously **granted** Sanofi's Motion *in Limine*, in its entirety, in the *Earnest* case.[159]  For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

## ARGUMENT

Sanofi anticipates that Ms. Kahn may seek to admit evidence of communications between it and DDMAC—the division of FDA charged with monitoring prescription drug manufacturer compliance with marketing, advertising, and communication standards—related to the promotion of Taxotere for the treatment of cancers that are not at issue in this litigation.  Specifically, Ms. Kahn may seek to introduce "untitled letters" and/or "warning letters" Sanofi received from DDMAC about its promotion of Taxotere for treating (1) locally advanced or metastatic non-small cell *lung cancer* and (2) locally advanced or *metastatic* breast cancer—conditions that Ms. Kahn did not experience.  Indeed, none of the promotional claims in these letters address the treatment of early stage breast cancer[160] or the alleged risk of permanent or persistent alopecia.  Therefore, such evidence should be precluded as irrelevant, unfairly prejudicial, and improper character evidence.[161]

---

[159]    *See* Rec. Doc. 8201 at 5 (Order and Reasons on Mots. in Lim.) ("This Motion is Granted.  The letters at issue related to the use of Taxotere for lung cancer and metastatic breast cancer, neither of which Plaintiff had.").

[160]    The majority of DDMAC correspondence regarding Taxotere took place before FDA approved Taxotere for the adjuvant treatment of patients with early stage breast cancer.

[161]    Such correspondence also should be excluded as improper hearsay evidence.  *See* Fed. R. Evid. 801(c), 802; *see also* U.S. Food and Drug Administration, Warning Letters and Notice of Violation Letters to Pharmaceutical Companies, https://www.fda.gov/drugs/warning-letters-and-notice-violation-letters-pharmaceutical-companies/warning-letters-2019 ("Matters described in FDA warning letters may have been subject to subsequent interaction between FDA and the recipient of the letter that may have changed the regulatory status of the issues discussed in the letter.") (last visited Mar. 26, 2020).  As such, DDMAC communications are not "factual findings from a legally authorized investigation" and are inadmissible under Fed. R. Evid. 803(8).

### A.    DDMAC Evidence Should be Excluded as Irrelevant.

DDMAC evidence is irrelevant to Ms. Kahn's claims and defenses for three reasons.  *See* Fed. R. Evid. 401.  First, as this Court has recognized, this evidence concerns the promotion of Taxotere for the treatment of lung cancer and metastatic breast cancer—diseases Ms. Kahn did not experience.  Indeed, none of the DDMAC letters involves promotional claims about Taxotere for the treatment of early stage breast cancer.

Second, neither Ms. Kahn nor her prescribing physician testified that they: (1) reviewed any of the promotional claims raised in the DDMAC letters or (2) relied on such claims in connection with selecting a Taxotere-containing regimen to treat Ms. Kahn's early stage breast cancer in a clinical trial.  *See, e.g.*, *Dobbs v. Wyeth Pharm.*, 848 F. Supp. 2d 1335, 1340 (W.D. Okla. 2012) (granting summary judgment where there was no evidence of reliance on a false representation in making the decision to prescribe the drug at issue); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 223140, at *5 (M.D. Fla. Jan. 30, 2009), *aff'd,* 601 F. Supp. 2d 1313 (M.D. Fla. 2009) (excluding DDMAC evidence where "Plaintiffs have not shown that their prescribing physicians were exposed to the promotional materials.").  This is not surprising given that most of the Taxotere-related DDMAC evidence involves promotional claims made between 1996 and 2005—years before Ms. Kahn's oncologist initially prescribed her a Taxotere-containing regimen to treat a different type of cancer.

Third, none of the Taxotere-related DDMAC promotional claims involve permanent or persistent alopecia—the alleged injury in this case.  So even if there were evidence of reliance on promotional claims that were the subject of DDMAC letters (which there is not), such reliance still bears no relevant relationship to the injuries allegedly incurred by Ms. Kahn.  For these reasons, Ms. Kahn should be precluded from presenting evidence of DDMAC correspondence.

**B.      DDMAC Evidence Should be Excluded as Unduly Prejudicial.**

In addition, the probative value of DDMAC evidence, if any, is substantially outweighed by its prejudicial effect.  *See* Fed. R. Evid. 403.  The only purpose of such evidence at trial would be to improperly paint Sanofi as a "bad actor" and bias the jury.  *See In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1347 n.31 (S.D. Fla. 2010) (excluding expert testimony summarizing a DDMAC letter and commenting on DDMAC's "considerations and concerns" because it would not assist the trier of fact).

**C.      DDMAC Evidence Should be Excluded Under Federal Rule of Evidence 404.**

If Ms. Kahn seeks to introduce DDMAC evidence to suggest that Sanofi has a propensity for providing misleading information in the promotion of its products, the Court should exclude such evidence as inadmissible character evidence.  *See* Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."), (b)(1) ("Evidence of a [] wrong . . . is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *see also In re DePuy Orthapaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 888 F.3d 753, 784–86 (5th Cir. 2018) (overturning plaintiff's verdict because impermissible character evidence under Rule 404(b) was admitted against defendant company); *Emerald City Mgmt., LLC v. Kahn*, No. 14-cv-00358, 2016 WL 3770960, at *3 (E.D. Tex. Jan. 14, 2016) (excluding evidence that company paid Google to run improper advertisements as inadmissible character evidence); *Sec. Nat'l Bank of Sioux City v. Abbott Labs.*, No. 11-4017, 2013 WL 12140998, at *13 (N.D. Iowa Aug. 13, 2013) (excluding evidence of pharmaceutical company's investigation, plea agreement, and civil settlement under Rule 404(b)).

Accordingly, the Court should exclude all evidence or argument concerning any communication between DDMAC and Sanofi.

22.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REFERRING TO SANOFI AS A "FRENCH" OR "FOREIGN" COMPANY.**

The Court previously ***granted in part and denied in part*** Sanofi's Motion in *Limine* in the *Earnest* case.[162]  The Court limited this type of evidence or testimony establishing that Sanofi is a French corporation.[163]  The Court, however, cautioned that it would reject "any improper inference or characterization relating to this fact."[164]  At the very least, the same ruling is warranted here.

**ARGUMENT**

Sanofi again requests the Court preclude evidence or argument referring to the two named defendants in this trial—sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.—as "French" or "foreign" companies.  Sanofi's global headquarters are in France, but the two named defendants in the *Kahn* case are legally incorporated in the United States.  Such references, then, are irrelevant and intended solely to prejudice the jury against Sanofi.  *See* Fed. R. Evid. 401–03.

A.    **Evidence that the Named U.S. Sanofi Defendants are "French" or "Foreign" Companies is Irrelevant.**

The named defendants—sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.—are both incorporated in and legally reside in the United States.  The fact that they have counterpart entities in France is irrelevant to Ms. Kahn's claims.  *See* Fed. R. Evid. 401.  As there is no relevant factual reason to refer to the named defendants as a "French" or "foreign" pharmaceutical drug manufacturer (both are American entities), the Court should exclude such evidence or argument at trial.  *See, e.g.*, *Steffy v. Home Depot, Inc.*, 2009 WL 4279878, at *2 (M.D. Pa. June 15, 2009) (noting the court is "not persuaded by the Plaintiff's arguments that the [product's foreign] origin

---

[162]   *See* Rec. Doc. 8206 at 5 (Order and Reasons on Mots. in Lim.) ("Granted in part and denied in part.  The Court will allow testimony establishing that Sanofi is a French corporation.  The Court will not allow any improper inference or characterization relating to this fact.").

[163]   *Id.*

[164]   *Id.*

is relevant to any issue remaining in this case."); *Saad v. Shimano Am. Corp.*, 2000 WL 1036253, at *25 (N.D. Ill. July 24, 2000) ("[T]he Court cannot see any possible relevance or materiality in the fact that defendant, while a California corporation, is a subsidiary of a Japanese corporation.").

## B. References to a Sanofi's Foreign Entities Are Unfairly Prejudicial.

The Court also should preclude Ms. Kahn from referring to Sanofi's foreign entities as "French" or "foreign" companies as a means to prejudice the jury against Sanofi. *See* Fed. R. Evid. 403. Courts across the country prohibit such evidence and argument at trial. The Fifth Circuit, for example, has recognized that "[s]uch appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders." *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238–39 (5th Cir. 1985) (an "us-against-them plea can have no appeal other than to prejudice by pitting 'the community' against a nonresident corporation."); *see also United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1046 (7th Cir. 2013) ("[A] jury cannot consider a defendant's race, ethnicity, or national origin in reaching a verdict."); *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1009 (9th Cir. 2001) (new trial required because a party's "status as a Korean business was exploited" and "begged the jury to draw an inference adverse . . . based entirely on its ethnic identity or national origin."); *Boyle v. Mannesmann Demag Corp.*, 991 F.2d 794 (6th Cir. 1993) ("repeated references to a party's citizenship or nationality can be unduly prejudicial to that party."); *Gearhart v. Uniden Corp. of Am.*, 781 F.2d 147, 153 (8th Cir. 1986) ("[P]laintiff's references in closing argument to defendant's foreign parent corporations were improper. . . . [S]uch repeated references to Far Eastern parent corporations and 'foreign goods' or 'foreign products,' could prejudicially appeal to xenophobia and the current United States-Japanese trade imbalance. Such remarks should not be permitted on retrial."); *Foster v. Crawford Shipping Co.*, 496 F.2d 788, 792 (3d Cir. 1974) (closing argument emphasizing

defendant's "foreign ownership" justified conclusion "that the refusal of the district court to grant a new trial was inconsistent with substantial justice.").[165]   Accordingly, any evidence or argument referring to Sanofi as a "French" or "foreign" company—or any improper or negative inference regarding the same—should be excluded.

---

[165]   *See also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prods. Liab. Litig.*, No. 09-cv-10012-DRH, 2011 WL 6740391, at *3 (S.D. Ill. Dec. 22, 2011) ("[P]laintiff is also precluded from referencing Bayer's headquarters in Germany as a means of trying to persuade the jury that the location of Bayer's headquarters is a reason to find against Bayer. . . .  [T]he Court will not allow the plaintiff to emphasize it in such a way that it is clear that the plaintiff is playing to a pro-American sentiment and an anti-foreign mentality."); *Whirlpool Corp. v. TST Water, LLC*, No. 2:15-CV-1528, 2017 WL 2931403, at *1 (E.D. Tex. Mar. 3, 2017) ("There will be no disparaging or denigrating of witnesses by nationality or of any individual by nationality. There will be no direct or indirect, overt or non-overt attempt to show that something is superior or inferior based on its place of origin."); *Nair v. Columbus State Cmty. Coll.*, No. 2:02-CV-595, 2008 WL 3822341, at *6 (S.D. Ohio Aug. 12, 2008) ("Any argument to the jury or evidence based on xenophobic or nationalistic fears of individuals of different national origin would, of course, be unduly prejudicial and excludable."); *Dyson Tech. Ltd. v. Maytag Corp.*, No. 05-CV-434, 2007 WL 6599027, at *2 (D. Del. May 25, 2007) (a party's "foreigner status" "has only marginal probative value, which is substantially outweighed by the prejudice"); *Sanford v. Ektelon/Prince Sports Grp., Inc.*, No. 97-cv-368, 1999 WL 33544436, at *3 (D. Neb. Nov. 5, 1999) ("[R]eferences to foreign affiliation in this case would be prejudicial to the defendants and such references are not relevant to the issues in this case."); *LeBlanc v. Am. Honda Motor Co.*, 688 A.2d 556, 561 (N.H. 1997) ("[R]emarks, calculated as they were to encourage the jury to make a decision based on bias rather than reason and the presented evidence, were so prejudicial as to require a new trial.") (citation and internal quotation marks omitted); *Donelly Corp. v. Gentex Corp.*, 918 F. Supp. 1126, 1136 (W.D. Mich. 1996) ("[N]ationalistic rhetoric . . . [was] calculated to play on the jury's passions and prejudices and should be excluded at trial[.]").

23.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING FAERS SIGNAL EVALUATION.**

The Court should exclude any evidence or argument regarding the FDA Adverse Event Report ("FAERs") database because no expert has evaluated the reports in the database that comprise Dr. Madigan's signal. Any discussion of the FAERs database is accordingly irrelevant, and any minimally probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time. *See* Fed. R. Evid. 401–03.

### A. FAERs Signal Identification, Without Evaluation, is Irrelevant.

In his Report, Dr. Madigan purports to use the FAERs database "to conduct an analysis of a specific issue, namely docetaxel and irreversible alopecia."[166] Specifically, Dr. Madigan "was asked to investigate whether a safety signal existed for docetaxel and irreversible alopecia and, if so, to calculate the timing of any safety signal in FAERs for docetaxel and irreversible alopecia."[167] According to Dr. Madigan, his analysis of FAERs identified "emergence of a safety signal at various times dating back to as early as 2000."[168] Dr. Madigan, however, never evaluated the signal he identified.[169] Indeed, this Court recognized that "Dr. Madigan, being a statistician, focused on signal identification," not signal evaluation.[170] Dr. Ross likewise testified that signal identification and signal evaluation are "distinct parts" of the post-marketing surveillance

---

[166]  Ex. Q, Mar. 23, 2020 Madigan Rpt. at 6.

[167]  Ex. Q, Mar. 23, 2020 Madigan Rpt. at 2.

[168]  Ex. Q, Mar. 23, 2020 Madigan Rpt. at 19.

[169]  **Ex. LL**, Nov. 14, 2019 Madigan Dep. 135:9–12 (Madigan did not change his underlying methodology for his FAERs analysis from the first trial); 137:16–138:6 (Madigan identified six case reports in the FAERs database relevant to his signal identification, but he did not review any of them).

[170]  Rec. Doc. 12098 (Order and Reasons Granting in Part Sanofi's Mot. to Exclude Dr. David Madigan) at 14.

process.[171]   A signal identification without signal evaluation, however, is meaningless.[172]   Yet neither Dr. Ross nor Dr. Madigan evaluated the FAERs signal Dr. Madigan purported to identify.[173]   Dr. Madigan's "signal identification" is accordingly irrelevant.   *See Kelly v. Bowing Petroleum Servs., Inc.*, 61 F.3d 350, 357–58 (5th Cir. 1995) (affirming trial court's decision to exclude testimony that was only tenuously related to the topic at issue).

### B.  The Unfair Prejudice Substantially Outweighs The Probative Value.

Evidence and argument about the FAERs database is also inadmissible because the minimal probative value, if any, is substantially outweighed by the risk of unfair prejudice to Sanofi.  *See* Fed. R. Evid. 403.  Evidence or argument about the FAERs database will risk confusing and misleading the jury into believing that the FAERs database contained information linking docetaxel and permanent or irreversible alopecia dating back almost 20 years when no expert has actually evaluated the signal to see if this is true.  Indeed, when Dr. Ross was asked to evaluate the six case reports underlying Dr. Madigan's signal at deposition, he conceded that nothing in the reports indicated that the patient at issue was experiencing an unexpected adverse event of alopecia from taking Taxotere.[174]

Evidence or argument about the FAERs database will also waste time and judicial resources on collateral issues.  If argument or evidence is permitted, Sanofi will be forced to spend time conducting a "signal evaluation" during trial to demonstrate that the FAERs reports are

---

[171]   Ex. A, Mar. 4, 2021 Ross Dep. 152:7–11.

[172]   *Id*. at 152:12–15 ("Q. And would you agree with me, if a signal is identified, it's important to then evaluate that signal, correct? A. Yeah.").

[173]   *See id*. at 157:25–158:22 (explaining that "signal identification" analysis is "not something that is part of the regulatory decision process"); 159:4–18 (same). November 14, 2019 Madigan Dep. 135:9–12 (Madigan did not change his underlying methodology for his FAERs analysis from the first trial); 137:16–138:6 (Madigan identified six case reports in the FAERs database relevant to his signal identification, but he did not review any of them).

[174]   *Id*. at 201:16–202:2.

meaningless.  The resulting "mini-trial" will serve only to confuse the issues and waste judicial resources.  Accordingly, such evidence should be excluded.  *See* Fed. R. Evid. 403; *See Kelly*, *Inc.*, 61 F.3d at 357–58 (affirming exclusion of evidence that would result in a "mini-trial" over each allegation); *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 454 (3d Cir. 1997) (court does not need to hold "time-consuming mini-trials on [ ] minimally relevant issues"); *Osler v. Codman Research Grp.*, *Inc.*, 241 F.3d 91, 96 (1st Cir. 2001) (same); *Stubblefield v. Suzuki Motor Corp.*, No. 15-cv-18, 2018 WL 4762739, at *6 (S.D. Miss. Sept. 30, 2018) (same).

24. **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING FOREIGN LABELING AND REGULATORY ACTIONS.**

The Court previously ***granted in part and denied in part*** Sanofi's Motion in the *Earnest* case.[175]  The Court's ruling permitted Ms. Earnest to elicit evidence about what Sanofi said about hair loss to foreign regulators but precluded evidence regarding what foreign regulatory bodies required of Sanofi.[176]  Once again, Sanofi anticipates Ms. Kahn will seek to introduce evidence of (1) foreign regulatory actions related to Taxotere, specifically actions by the European Medicines Agency, Health Canada, and the French Agency for the Safety of Health Products, and (2) the Taxotere labeling adopted by these and/or other foreign agencies to support her failure to warn claims.[177]  Because the date of Ms. Kahn's treatment is much earlier than Ms. Earnest's, all evidence of this nature should be excluded in the *Kahn* trial.  At the very least, the same ruling from *Earnest* is warranted here.

### ARGUMENT

Evidence of foreign labeling and regulatory actions related to Taxotere should be excluded because it is irrelevant to the claims at issue in the case, will lead to mini-trials on collateral issues, will serve to mislead and confuse the jury, and will unfairly prejudice Sanofi.  *See* Fed. R. Evid. 401–03; *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 WL 2780760, at *6 (E.D. La. May 26, 2017) (excluding evidence of foreign product labels and foreign regulations under Rules 401 and 403).

---

[175]  *See* Rec. Doc. 8201 at 5 (Order and Reasons on Mots. in Lim.) ("This Motion is granted in part and denied in part.  Plaintiff may elicit evidence showing what Sanofi said about hair loss to foreign regulatory bodies.  The Court will not allow evidence, however, regarding what any foreign regulatory bodies required of Sanofi.").

[176]  *Id.*

[177]  For example, Ms. Kahn identified numerous documents on her exhibit list concerning foreign labeling and foreign regulatory actions.  *See also* Sanofi's forthcoming objections to Ms. Kahn's deposition designations.

### A.      Foreign Labeling and Foreign Regulatory Actions Are Not Relevant.

Taxotere is approved to treat certain cancers in more than 100 countries worldwide.  In the United States, the Food and Drug Administration ("FDA") regulates the sale, marketing, and labeling of pharmaceutical products like Taxotere.[178]   Other countries, including France and Canada, utilize their own regulatory authorities to apply their own "controlling standards of behavior" to determine whether medications should be made available for use, and if so, whether certain risk information should be communicated to physicians.[179]   *See Doe v. Hyland Therapeutics*, 807 F. Supp. 1117, 1129 (S.D.N.Y. 1992).   As the district court in *Hyland Therapeutics* noted, each jurisdiction's "controlling standards of behavior"

> . . . reflect the unique balance struck between the benefit each market derives from the product's use and the risks associated with that use; between the community's particular need for the product and its desire to protect its citizens from what it deems unreasonable risk. . . . [E]ach community faces distinct demands, and has unique concerns that make it peculiarly suited to make this judgment.

*Id.*  As a result, the actions taken by foreign regulatory authorities with respect to a particular drug—its intended uses, its approved dosages, the risk information communicated in its approved product labeling, etc.—will differ across jurisdictions.[180]

---

[178]  **Ex. MM**, Dec. 9, 2019 Arrowsmith Rpt. at 6 ¶ 12.  Dr. Arrowsmith adopted her previous report from December 9, 2019.  **Ex. NN**, May 22, 2020 Defs.' Discl. of Witnesses at 2.

[179]  Health Canada regulates pharmaceutical products in Canada and the European Medicines Agency ("EMA") in conjunction with each member states' national regulatory authorities regulate pharmaceutical products for the European Union.

[180]  *See also In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2009 WL 1636244, at *9 (E.D. La. Feb. 10, 2009) (Fallon, J.) (dismissing claims of foreign product-liability plaintiffs on forum non conveniens grounds because "trying the plaintiffs' claims in the United States would risk disrupting the judgments of foreign regulatory bodies by imposing an American jury's view of the appropriate standards of safety and labeling on companies marketing and selling drugs in the plaintiffs' respective home forums."); *Harrison v. Wyeth Labs.*, 510 F. Supp. 1, 4–5 (E.D. Pa. 1980) (dismissing claims of foreign product-liability plaintiffs on forum non conveniens grounds because "[e]ach country has its own legitimate concerns and its own unique needs which must be factored into its process of weighing the drug's merits, and which will tip the balance for it one way or the other."), *aff'd*, 676 F.2d 685 (3d Cir. 1982).

For this reason, federal district courts in the United States—including the Eastern District of Louisiana—exclude evidence and argument regarding foreign product labels and foreign regulatory actions. *See, e.g.*, *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 2780760, at *6 ("What is not admissible, however, is what the Defendants did or what they put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies.  This information is irrelevant."); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 965 (D. Minn. 2009) ("The Court finds that any discussion of foreign regulatory actions is irrelevant to the current litigation and should therefore be excluded."); *In re Seroquel Prods. Liab. Litig.*, No. 06-md-1769, 2009 WL 223140, at *6 (M.D. Fla. Jan. 30, 2009) ("The foreign Seroquel labels and the foreign regulatory actions have no relevance to [p]laintiffs' main case."), *aff'd*, 601 F. Supp. 2d 1313 (M.D. Fla. 2010).  The same result is warranted here.  Evidence of foreign Taxotere labeling and regulatory actions have no bearing on any claim at issue in Ms. Kahn's case.  Indeed, the relevant regulatory inquiry in this case should be limited to FDA's oversight of Taxotere in the United States.

This Court's ruling should include evidence of internal meetings regarding what foreign regulatory agencies required of Sanofi.[181]  For example, Ms. Kahn's expert, Dr. David Ross, plans to offer opinions related to an April 2006 meeting discussing changes to Taxotere's *European* label requested by the EMEA.[182]  In his report, Dr. Ross cites the deposition testimony and exhibits used in the deposition of Isabelle Richard-Cassin, the former Regulatory Affairs Manager for Europe, who was working on the requested update to Taxotere label from EMEA and attended the April

---

[181]   *See* Rec. Doc. 8201 at 5 (Order and Reasons on Mots. in Lim.).

[182]   Ex. G, Feb. 8, 2021 Ross Supp. Rpt. at 26, ¶ 57 ("And, finally, in April 2006, Sanofi recognized the distinction between temporary alopecia and alopecia that does not resolve, as evidenced by drafts of labeling in the EU . . . .").

2006 meeting.[183]  One exhibit Dr. Ross cites includes the April 2006 meeting invitation, which provides that the alleged basis for the meeting was "to discuss the *requested* changes from the EMEA for patient leaflet (section 4.0) for Taxotere. . . .  *We have been requested* to reword this section giving more detailed information."[184]  Dr. Ross also cites other exhibits including a number of draft European-label proposals, which—as the name suggests—were not official proposals communicated to EMEA.[185]  Dr. Ross's testimony and any corresponding documents fall within the scope of this Court's previous order because they address the EMEA's requested changes and do not address any statement Sanofi made to EMEA.  *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 2780760, at *6 ("What is not admissible, however, is what the Defendants did . . . in order to comply with foreign regulatory bodies or agencies.").

The Court should therefore preclude Ms. Kahn from introducing evidence or argument of any foreign Taxotere label or foreign regulatory actions involving Taxotere.  *See* Fed. R. Evid. 401–02.

### B.    The Probative Value of Such Evidence, If Any, Is Substantially Outweighed by the Risk of Unfair Prejudice, Jury Confusion, and Wasted Judicial Time.

Even putting aside the relevance issue, evidence concerning foreign regulatory actions and labeling should be excluded under Rule 403.  Such evidence unfairly prejudices defendants, confuses juries, and wastes time on collateral issues, resulting in unnecessary mini-trials on foreign regulatory laws, regulations, and standards.  *See* Fed. R. Evid 403; *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 WL 4168410, at *3 ("The Court was concerned that the jury would be

---

[183]  *Id.* at 26, ¶ 57 n.19.

[184]  *Id.* (citing **Ex. OO**, May 4, 2018 Richard-Cassin Dep. 117:24–118:8; **Ex. PP**, Ex. 22 of May 4, 2018 Richard-Cassin Dep. (Sanofi_05364125 and Sanofi_05364126)).

[185]  *Id.* (citing **Ex. QQ**, Ex. 23 of May 4, 2018 Richard-Cassin Dep. (Sanofi_05364129); **Ex. RR**, Ex. 24 of May 4, 2018 Richard-Cassin Dep. (Sanofi_05364128); **Ex**. **SS**, Ex. 25 of May 4, 2018 Richard-Cassin Dep. (Sanofi_05364127)).

confused by references to foreign regulations and standards because the jury must decide the case based on standards in the United States.  The Court has consistently excluded evidence related to foreign regulations under Rule 403."); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 488 (S.D.N.Y. 2016) ("Because this litigation is based on U.S. law, and because evidence regarding the FDA will be admitted, the actions taken by foreign regulatory agencies are not particularly probative and likely will be confusing."); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 223140, at *6 ("[W]hatever minimal relevance the foreign regulatory actions might have is clearly overwhelmed by the likelihood of jury confusion."), *aff'd*, 601 F. Supp. 2d 1313 (M.D. Fla. 2010) ("Accepting for argument's sake that such evidence [concerning foreign regulatory actions] is relevant regarding notice and scienter, the fact remains that its probative value is greatly overmatched by the jury confusion, waste of time, and unfair prejudice that would result if the Court were to allow Plaintiffs to introduce this evidence during their main case."); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d at 965–66 ("[T]o the extent that foreign regulatory information is relevant, 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"); *In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007) ("[A]llowing the admission of evidence of foreign regulatory actions, in a case that is governed by domestic law, would likely cause jury confusion.").

To the extent regulatory topics are at issue in this case, the parties may educate the jury on FDA's rules, regulations, and standards—not those of other countries.  Accordingly, the Court should preclude Ms. Kahn from introducing evidence or argument at trial of any foreign Taxotere labeling or foreign regulatory actions involving Taxotere.  *See* Fed. R. Evid. 403.

25. **MOTION TO PRECLUDE EVIDENCE AND ARGUMENT THAT "ONGOING ALOPECIA" DATA OBSERVED IN THE TAX316 AND GEICAM 9805 CLINICAL TRIALS REPRESENTS EVIDENCE OF "PERSISTENT," "PERMANENT," OR "IRREVERSIBLE" ALOPECIA.**

This Court previously ***denied*** Sanofi's Motion in *Limine* in the *Earnest* case.[186]  Sanofi, again, respectfully moves to preclude such evidence because it is inaccurate and misleading. Specifically, the "ongoing alopecia" data collected from the TAX 316 and GEICAM 9805 clinical trials merely identifies alopecia that existed at a given moment in time (the patient's last follow-up visit)—not alopecia medically-determined to be "permanent" or alopecia that continues to "persist" even today.  Following trial, however, Sanofi now hopes it is evident that there is no reasonable basis for Ms. Kahn or her experts to testify or offer evidence to the contrary.  For these reasons, the Court should grant Sanofi's Motion.

## ARGUMENT

Sanofi anticipates that Ms. Kahn will again seek to introduce evidence and argument at trial that "ongoing alopecia" data collected during the TAX316 and GEICAM 9805 clinical trials represents data on the rate of "persistent," "permanent," or "irreversible" alopecia associated with Taxotere.[187]  Evidence and argument conflating these terms and data should be excluded because (1) they misrepresent and mischaracterize the data that was actually collected during those studies; and (2) their admission at trial would serve only to mislead and confuse the jury, waste time, and unfairly prejudice Sanofi.  *See* Fed. R. Evid. 403.

### A.     Background on the TAX316 and GEICAM 9805 Clinical Studies.

TAX316 was a multicenter Phase III randomized clinical trial comparing two different

---

[186]   Rec. Doc. 8207 at 1 (Order).

[187]   *See, e.g.*, Ex**.** G, Feb. 8, 2021 Ross Supp. Rpt. at ¶¶ 57, 88(d), 89(d); **Ex. TT**, Oct. 21, 2019 Kessler Suppl. Rpt. at ¶¶ 13, 14; Ex. X, Mar. 23, 2020 Feigal Rpt. at 36–37, 40–41 & nn.80.  Sanofi notes that Dr. Feigal's March 23, 2020 report contains two footnotes numbered "80."  This citation refers to both notes.

chemotherapy regimens in the adjuvant treatment of node positive breast cancer: (1) Taxotere in combination with doxorubicin and cyclophosphamide ("TAC"), against (2) a combination of 5-fluorouracil, doxorubicin, and cyclophosphamide ("FAC").[188]   Similarly, GEICAM 9805 was a multicenter Phase III randomized clinical trial comparing TAC versus FAC as adjuvant treatment of high risk, operable breast cancer patients with negative axillary lymph nodes.[189]   The primary objective of the studies was a comparison of disease-free survival after adjuvant treatment with either TAC or FAC among patients with high risk, operable breast cancer and negative axillary lymph nodes.[190]   The secondary objectives were to compare overall survival, toxicity, and quality of life between the two groups, and to evaluate pathologic markers for predicting efficacy.[191]

As part of these studies, investigators recorded the occurrence of adverse events observed during the administration of chemotherapy and at subsequent follow up visits, including alopecia.[192]   Both studies were designed to follow participants for up to 10 years after chemotherapy treatment, although some patients prematurely withdrew or discontinued follow up for various reasons.[193]   In TAX316, investigators studied the occurrence of 69 different types of adverse events.[194]   With respect to alopecia, the final clinical study report showed that 29 patients in the TAC group (and 16 patients in the FAC group) had "ongoing alopecia" at the time of their last follow up visit.[195]   In GEICAM 9805, investigators studied the occurrence of 40 different types

---

[188]  **Ex. MM**, Dec. 9, 2019 Arrowsmith Rpt. ¶ 108.

[189]  *Id.* at ¶ 129.

[190]  *Id*. at ¶ 109, 52 ¶ 130.

[191]  *Id.*

[192]  *See, e.g.*, **Ex. UU**, Dec. 13, 2018 Kopreski Dep. 552:22–556:12.

[193]  *See*, *e.g.*, **Ex. VV**, Exhibit 13 to Dec. 13, 2018 Kopreski Dep.

[194]  **Ex. WW**, Sanofi_00724262, at Sanofi_00724298–99.

[195]  Ex. MM, Dec. 9, 2019 Arrowsmith Rpt. ¶ 119.

of adverse events.[196]  With respect to alopecia, the final clinical study report showed three TAC

patients (and one FAC patient) had "alopecia that remained ongoing" at the time of their last follow

up visit.[197]  It is this "ongoing alopecia" data from both studies that is the subject of this Motion *in

Limine*.

B.    **Misrepresentations About The Meaning of "Ongoing Alopecia" Data From These Clinical Trials Will Mislead the Jury, Confuse the Issues, and Unfairly Prejudice Sanofi.**

At trial, Ms. Kahn will seek to use the terms "persistent," "irreversible," "permanent" and

"ongoing" interchangeably with respect to the occurrence of alopecia in patients that received a

Taxotere-containing regimen in these clinical studies[198]—but these terms are not synonymous.  At

a basic level "irreversible" or "permanent" means that an individual's hair will *never* regrow.[199]

"Persistent alopecia" generally describes hair loss for some duration of time following

chemotherapy (e.g., 3 days, 30 days, 3 months, 6 months, etc.) and carries with it the potential for

hair regrowth to occur.[200]

In the context of the TAX316 and GEICAM 9805 clinical trials, "ongoing alopecia" refers

to patients that had alopecia at the time of their last follow-up visit, whenever that visit may have

been.  The studies considered patients to have ongoing adverse events either (1) at the completion

of the study, or (2) when the patient left the study early for any reason (e.g., a patient died, a patient

---

[196]  **Ex. XX**, Sanofi_00724381, at Sanofi 00724490.  Collectively, a vast number of potential adverse events were reported and monitored in both studies, including alopecia, resulting in over 10,000 pages of patient records logged.

[197]  **Ex. MM**, Dec. 9, 2019 Arrowsmith Rpt. ¶ 133.

[198]  *See, e.g.*, **Ex. YY**, Nov. 6, 2018 Kessler Rpt. ¶ 123 (incorrectly stating that TAX 316 and GEICAM 9805 "identified reports of irreversible alopecia following Taxotere treatment.").

[199]  *See, e.g.*, **Ex. ZZ**, Dec. 20, 2018 Kessler Dep. 142:22–25 ("if it regrows . . . it's, obviously, not irreversible.").

[200]  For purposes of 30(b)(6) depositions in this litigation, Magistrate Judge North defined "persistent alopecia" as alopecia remaining six months after chemotherapy ended and without resolution.  Rec. Doc. 3473 (Order).  This definition is also consistent with the injury alleged in Plaintiff's operative Complaint.  Rec. Doc. 4407 at ¶ 181 (Pls.' Second Am. Master. Long Form Compl.).

removed informed consent, a patient left the study protocol, a patient had recurrence of cancer requiring new or additional treatment, etc.).[201]   "Ongoing alopecia" as used in these studies therefore includes patients who were lost from participation in the trial—some even before 6 months of time had lapsed from the last date of treatment—and who were never re-evaluated to determine whether their alopecia resolved.   Indeed, Plaintiffs acknowledged this fact when successfully requesting to depose Sanofi representatives over reports of alopecia less than six months after treatment.[202]

Importantly, "ongoing alopecia" data from these studies does not imply that the alopecia was unanticipated or that it continued (or was expected to continue) for any duration of time. Rather, it is merely a recording of a condition existing at a particular moment in time.[203]   Indeed, of the 69 types of adverse events reported and monitored in the TAX316 clinical trial, the majority had at least some patients with adverse events recorded as "ongoing" under the same standard as patients who were recorded as having "ongoing" alopecia.[204]   Similarly, many types of adverse

---

[201] *See* Ex. UU, Dec. 13, 2018 Kopreski Dep. 560:10–21; *see also* **Ex. AAA**, Mar. 23, 2018 Mancini Dep. 161:3–22; **Ex. BBB**, Apr. 10, 2018 Gupta Dep. 175:25–178:14.

[202] *See* **Ex. CCC**, July 18, 2018 Hr'g Tr. 11:22–12:1 (Mr. Bachus: "for instance, somebody makes a report four months after. They say their hair has not grown back. If there is no follow-up report, did that get better in the next two months or is that something that went on for three, five, or seven years?"); 13:15–16 (arguing against conflating "persistent alopecia" as defined by the Court for 30(b)(6) purposes and described in Plaintiffs' Master Complaint with other instances of alopecia, citing the example of a potential plaintiff "who has filed a case who had alopecia that persisted for six months and [then] got better"); 14:18–15:6 (parties and Court discussing distinction between "permanent" and "persistent" alopecia in context of 30(b)(6) depositions).

[203] Terms like "permanent" or "persistent" were never used in the TAX316 or GEICAM9805 clinical trial data. Rather, these terms are simply litigation-driven characterizations that serve only to perpetuate a false narrative about the information available to Sanofi.

[204] *See* Ex. WW, Sanofi_00724262, at Sanofi_00724298–99 (for example, at the 10-year follow up, 10 patients had on going nausea, 4 had ongoing nail disorders, 2 had ongoing headaches).

events reported and monitored in GEICAM 9805 also were recorded as "ongoing."[205]   There has been no suggestion that any of these adverse events are "permanent."

Moreover, there is no evidence any of the "ongoing alopecia" patients from these studies were ever formally diagnosed with "permanent" or "irreversible" alopecia, or whether they even have alopecia today.  Citing "ongoing alopecia" data as evidence of "permanent" or "irreversible" alopecia is thus akin to suggesting that a high school classmate who was last seen ten years ago at graduation with acne currently constitutes a case of "permanent acne."

Ms. Kahn should be precluded from using or characterizing the "ongoing alopecia" data from these studies as evidence of "persistent," "irreversible," or "permanent" alopecia because such representations are misleading, will confuse the jury, and will unfairly prejudice Sanofi.  *See* Fed. R. Evid. 403.  The "ongoing alopecia" data does not reflect patients with diagnoses of irreversible alopecia caused by chemotherapy, nor does it even identify patients who experienced alopecia for an extended period.  Instead, the data simply reflects alopecia during a snapshot in time (the last follow-up visit), which in some cases occurred very early in the follow-up period (*i.e.*, less than six months after the completion of chemotherapy).[206]  The mischaracterization of this data will only mislead and confuse the jury about what can reasonably be concluded from the data, thereby prejudicing Sanofi.  *See* Fed. R. Evid. 403.  Ms. Kahn should therefore be precluded from introducing evidence or argument that "ongoing alopecia" data in the TAX316 and GEICAM 9805 studies represents evidence of "persistent," "permanent," or "irreversible" alopecia.

---

[205]   *See* Ex. XX, Sanofi_00724381, at Sanofi 00724490 (for example, 2 patients had ongoing pain).

[206]   *See* Ex**.** UU, Dec. 13, 2018 Kopreski Dep. 560:1–21 (discussing documentation of ongoing adverse events in the TAX316 clinical trial).  For example, Patient 15002—one of the 29 patients recorded as showing ongoing alopecia in TAX316—withdrew from the TAX 316 clinical trial because she experienced a gastrointestinal adverse event. *Id.* at 576:7–578:21; *see also* **Ex. DDD**, Exhibit 27 to Dec. 13, 2018 Kopreski Dep.  She only attended one follow-up visit less than three months after her first administration of Taxotere.  Ex**.** UU, Dec. 13, 2018 Kopreski Dep. 576:7–578:21.  Because she had alopecia at that time and because there were no subsequent follow-up visits, the study recorded her alopecia as ongoing.  *Id.*

26. **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING SHIRLEY LEDLIE, ANY "TAXOTEARS" OR OTHER THIRD PARTY ADVOCACY OR COMMUNICATIONS GROUP OR GROUP MEMBERS, FACEBOOK VOICES PAGE, AND INTOUCH SOLUTIONS.**

This Court previously ***granted*** Sanofi's Motion *in Limine* on this identical issue, in its entirety, in the *Earnest* case.[207]  For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

## ARGUMENT

The Court should exclude all evidence and argument concerning Shirley Ledlie (a foreign breast cancer patient), any "Taxotears" or other third party advocacy or communications group or group members,[208] the Facebook VOICES page, and InTouch Solutions ("InTouch") because (1) Plaintiffs have conceded this evidence is irrelevant, (2) admission of this evidence would mislead the jury, waste time, and unfairly prejudice Sanofi, and (3) it constitutes classic hearsay.  *See* Fed. R. Evid. 401–03, 802.

> A. **Evidence Involving Shirley Ledlie, any "Taxotears" or Other Third Party Group or Its Members, Facebook VOICES Page, and InTouch Is Irrelevant to Ms. Kahn's Claims.**

It is undisputed that evidence and argument related to Shirley Ledlie or any "Taxotears" or other advocacy group or its members is irrelevant to Ms. Kahn's claims.  *See* Fed. R. Evid. 401.

---

[207]  *See* Rec. Doc. 8201 at 6 (Order and Reasons on Mots. in Lim.) ("This Motion is granted.  However, if Plaintiff believes that Defendants have elicited testimony that 'opened the door' on this subject, Plaintiff should request a conference with the Court to decide if the probative value of testimony relating to 'Taxotears' or similar groups outweighs its prejudicial effect.").

[208]  Shirley Ledlie is a resident of France who has alleged that she experienced permanent hair loss following chemotherapy treatment with a Taxotere-containing regimen in France.  Proceedings in France led to the dismissal her claim for indemnification from a French administrative agency.  Sanofi was not a litigant.  Ms. Ledlie helped form several advocacy and communications groups about hair loss and Taxotere, including a "Taxotears" Google group, a "Taxotears" Facebook group, and an online blog titled "A Head of Our Time."  There is no evidence that Ms. Kahn has ever communicated with any member of any such group.

The Plaintiffs' Steering Committee ("PSC") has repeatedly taken this same position in prior submissions to this Court:

- "Ms. Ledlie can add no information that is relevant to any Trial Plaintiff."[209]

- " . . . Sanofi has failed to articulate how the documents and testimony sought from Ms. Ledlie would be relevant to the claims and defenses of the named Trial Plaintiffs. None of the Trial Plaintiffs have had any contact with Ms. Ledlie and none are or were members of the Taxotears Google Group."[210]

- "There is far more important work to be done for these trials than to 'get in the weeds' on such a wild goose chase abroad about what a woman living in France may have said or done."[211]

- "[T]he failure of Sanofi to specifically or clearly tie any relevance of whatever Ms. Ledlie did or said to . . . Ms. Earnest . . . should be fatal to its Motion [for discovery]."[212]

- "Ms. Ledlie's personal opinions about Sanofi are entirely irrelevant to . . . Ms. Earnest's . . . trial[]."[213]

- "[T]he trial Plaintiffs will remove Ms. Ledlie as a 'may call' witness. Thus Ms. Ledlie is neither a Plaintiff nor a witness for the Plaintiffs."[214]

- "Ledlie's testimony simply lacks relevance to the merits of the claims of thousands of women who have sued Sanofi for their injuries."[215]

---

[209] **Ex. EEE**, Oct. 11, 2018 PSC Letter Brief.

[210] Rec. Doc. 4598 at 1–2 (Pls.' Opp. to Mot. for Issuance of Letters of Req. for International Judicial Assistance from France to Obtain Evid. from Shirley Ledlie).

[211] *Id.* at 3.

[212] *Id.*

[213] *Id.* at 4.

[214] *Id.* at 1.

[215] **Ex. FFF**, May 29, 2019 PSC Letter Brief.

Moreover, Magistrate Judge North issued similar rulings on past discovery motions regarding Ms. Ledlie.[216]  With respect to the admissibility of such evidence at trial in Ms. Kahn's case, Sanofi agrees.

Like in *Earnest*, the record in Ms. Kahn's case is clear that she has never been a member of any "Taxotears" or other advocacy group, nor is there any evidence that she ever communicated with or was aware of the group or its members.[217]  There is also no evidence that Ms. Kahn had any involvement with the Facebook VOICES page.

Further, and unlike in *Earnest*, any communications between Ms. Ledlie and Sanofi's Facebook Voices page happened <u>after</u> Ms. Kahn was treated with Taxotere.[218]  Indeed, Ms. Ledlie's posts on Sanofi's Facebook VOICES page, Sanofi's response, and InTouch Group's monitoring of the VOICES page all took place in 2010—two years after Ms. Kahn was treated with Taxotere.

Accordingly, the Court should exclude all evidence and argument related to Shirley Ledlie and any "Taxotears" or other third party advocacy or communications groups or group members, Sanofi's Facebook VOICES page, and InTouch under Rule 401.  Such evidence would include Ms. Kahn's designation of any testimony of the 30(b)(6) witness for InTouch Solutions.

---

[216]  *See* Rec. Doc. 7276 (Minute Entry) ("Under the circumstances and in light of its arguments that any discovery concerning Ms. Ledlie is improper, the PSC's request for additional documents concerning this foreign non-party's claim in another country . . . is denied as falling outside the scope of discovery."); May 30, 2019 Hr'g Tr., ("Ultimately, I don't think any of the information that's been requested, and I'll borrow again from the PSC's own arguments, can be described as having a direct and precise link with the trial plaintiffs' trials").

[217]  *See, e.g.*, Ex**.** K, Pl.'s Third. Am. PFS § II.20 ("Are you now or have you ever been a member of an alopecia support group?  No."); Ex. BB, Dec. 7, 2017 Kahn Dep. 103:19–22 ("Q. Have you ever commented on a blog or a message board related to cancer, cancer treatment, or chemotherapy?  A. I don't think I ever did.").

[218]  **Ex. GGG**, Jan. 17, 2019 Fierro Dep. 136:12-140:3; 142:2-143:11; 161:4-163:6.  **Ex. HHH**, Dec. 13, 2018 Goyer Dep. 43:9-46:20; 58:3-66:15.  **Ex. III**, Oct. 10, 2018 Malia Dep. 294:1-297:8; 326:16-327:19.

**B.**   **The Probative Value of This Evidence, If Any, Is Substantially Outweighed By The Undue Prejudice To Sanofi and Potential To Waste Time.**

Even if such third party evidence were relevant, which it is not, it should still be excluded because its probative value is substantially outweighed by the risk of unfair prejudice to Sanofi. *See* Fed. R. Evid. 403.  For example, Ms. Kahn may introduce this type of evidence or argument to argue that Sanofi "silenced Ms. Ledlie's voice" by having InTouch monitor and remove her posts from the VOICES Facebook page.  But, again, these events occurred <u>after</u> Ms. Kahn was treated with Taxotere and, therefore, would serve only to bias the jury against Sanofi and encourage a favorable verdict on an improper basis.

The introduction of such evidence at trial would also waste time and judicial resources on collateral issues.  If permitted, Sanofi would be forced to rebut such evidence with evidence to explain Sanofi's conduct and put it in the proper context.  The resulting "mini-trial" will confuse the issues and waste judicial resources.  Accordingly, such evidence should be excluded.  *See* Fed. R. Evid. 403.

**C.**   **This Third Party Evidence Constitutes Classic Hearsay.**

This third party evidence also should be excluded as improper hearsay.  *See* Fed. R. Evid. 802; *Miles v. Raycom Media, Inc.*, No. 09-cv-713, 2010 WL 4791764, at *3 n.1 (S.D. Miss. Nov. 18, 2010) ("Because the facebook page and the comment to the article constitute unsworn statements made by third parties that are offered to prove the truth of the matter asserted, they constitute inadmissible hearsay that cannot be relied on by the Court."); *see also Greco v. Velvet Cactus, LLC*, No. 13-cv-3514, 2014 WL 2943598, at *6 (E.D. La. June 27, 2014) (holding that a Facebook message constitutes inadmissible hearsay and cannot be introduced for the truth of the matter asserted).  The Court should therefore exclude such evidence and argument on this additional ground.

27.   **MOTION TO PRECLUDE EVIDENCE AND ARGUMENT REGARDING COMPANY CONDUCT THAT POST-DATES PLAINTIFF'S CHEMOTHERAPY TREATMENT.**

This Court previously **granted** Sanofi's Motion *in Limine* in its entirety in the *Earnest* case.[219]   For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

## ARGUMENT

Ms. Kahn received a Taxotere-containing chemotherapy regimen from May 29, 2008 to July 31, 2008.  Sanofi anticipates that Ms. Kahn will seek to offer evidence of Sanofi's conduct that post-dates such treatment, including but not limited to changes to the Taxotere label and warnings, correspondence with FDA regarding such labeling changes, pharmacovigilance monitoring of adverse events, and company analyses of clinical and adverse event data, among other topics.  Sanofi moves to preclude Ms. Kahn from offering such evidence or argument for three reasons: (1) as this Court already acknowledged, "evidence of labeling changes occurring after Ms. Kahn's treatment constitute subsequent remedial measures as contemplated by Federal Rule of Evidence 407";[220] (2) all post-treatment evidence is irrelevant to the issue of notice and Ms. Kahn's failure-to-warn claim; and (3) this post-treatment evidence will only confuse the jury, unfairly prejudice Sanofi, and waste time.  *See* Fed. R. Evid. 401, 403, 407.

### A.   **Post-Treatment Label Changes Constitute Inadmissible Subsequent Remedial Measures Under Rule 407**.

Allowing Ms. Kahn to present evidence of changes to the Taxotere label that post-date her chemotherapy treatment would contravene Rule 407:

---

[219]   *See* Rec. Doc. 8201 at 6 (Order and Reasons on Mots. in Lim.) ("This Motion is granted.  Any evidence of labeling changes occurring after Plaintiff's treatment constitute subsequent remedial measures as contemplated by Federal Rule of Evidence 407.").

[220]   *Id.*

> When measures are taken that would have made an earlier injury or
> harm less likely to occur, evidence of the subsequent measures is
> not admissible to prove: negligence; culpable conduct; a defect in a
> product or its design; or a need for a warning or instruction.

Fed. R. Evid. 407.  The "primary justification" for the rule is "the 'social policy of encouraging

people to take, or at least not discouraging them from taking, steps in furtherance of added safety.'"

*Kirkland v. Marriot Int'l, Inc.*, 416 F. Supp. 2d 480, 489 (E.D. La. 2006) (quoting Fed. R. Evid.

407, Advisory Committee's Note).  For this reason, federal courts across the country routinely

exclude evidence of post-treatment/exposure label changes.  *See, e.g.*, *Stahl v. Novartis Pharm.*

*Corp.*, 283 F.3d 254, 271 n.10 (5th Cir. 2002) (noting that product warning labels modified after

the alleged injury are inadmissible under Rule 407 as subsequent remedial measures); *Guilbeau v.*

*W.W. Henry Co.,* 85 F.3d 1149, 1171 (5th Cir. 1996) (affirming the trial court's exclusion of label

change evidence that post-dated plaintiff's exposure as a subsequent remedial measure); *Werner*

*v. Upjohn Co., Inc.,* 628 F.2d 848, 859 (4th Cir. 1980) (affirming the exclusion of label change

evidence under Rule 407); *DeLuryea v. Winthrop Labs.,* 697 F.2d 222, 229 (8th Cir. 1983) (Rule

407 requires exclusion of evidence of subsequent remedial changes in defendant's warning

literature).  The same result is warranted here.

Sanofi anticipates that Ms. Kahn will offer evidence of changes to the Taxotere labeling

that took place after her chemotherapy treatment in 2008—specifically label changes in 2015 and

2018 adding (1) language that "cases of permanent alopecia have been reported," and (2) the

"ongoing alopecia" data from the TAX316 study.[221]  The only possible use for such evidence is to

show that Sanofi should have changed the label earlier (before Plaintiff's treatment in 2008).  Rule

---

[221]  *See, e.g.*, Ex. G, Feb. 8, 2021 Ross. Supp. Rpt. at 47 ¶ 92 (discussing the 2015 and 2018 label changes).

407 forbids this use.  Accordingly, the Court should preclude evidence of label changes that post-date Ms. Kahn's 2008 chemotherapy treatment.

### B. Company Conduct Evidence That Post-Dates Plaintiff's 2008 Treatment Is Irrelevant to Notice and the Claims at Issue.

All company conduct evidence that post-dates Ms. Kahn's 2008 chemotherapy treatment is irrelevant.  Fed. R. Evid. 401.  The only relevant company conduct evidence concerns what Sanofi knew about Taxotere's risks *at the time of Plaintiff's treatment*.[222]  Indeed, Sanofi's knowledge and actions after Ms. Kahn's treatment have no bearing on what was known or knowable at the time of treatment.

Moreover, the use of such post-treatment evidence to show that the company was a "bad actor" or acted with malicious intent also is irrelevant because punitive damages are not available to Ms. Kahn.  *See Bladen v. C.B. Fleet Holding Co.*, 487 F. Supp. 2d 759, 770 (W.D. La. 2007) (noting that the Louisiana Product Liability Act does not permit punitive damages) (citing, *inter alia*, *Cantu v. C.B. Fleet Holding Co.*, No. 06-cv-2168, 2007 WL 689566, at *2 (W.D. La. Mar. 1, 2007) ("Punitive damages are not recoverable under the LPLA.").  Accordingly, Ms. Kahn should be precluded from offering company conduct evidence post-dating her 2008 treatment because it of no consequence to the merits of her claim.

### C. The Probative Value of Post-Treatment Evidence, If Any, Is Substantially Outweighed by the Risk of Confusing the Issues, Misleading the Jury, and Unfairly Prejudicing Sanofi.

The Court also should exclude evidence of company conduct after Ms. Kahn's treatment because any probative value that Ms. Kahn may attach to this evidence is substantially outweighed

---

[222]  *See* La. Rev. Stat. § 9:2800.57 ("A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.").

by its potential for undue prejudice, confusion of the issues, misleading the jury, and undue delay. *See* Fed. R. Evid. 403; *Grenada Steel Indus., Inc. v. Ala. Oxygen Co.*, 695 F.2d 883, 889 (5th Cir. 1983) (affirming the exclusion of evidence of subsequent remedial measures because the evidence "lacked sufficient probative value and injected the dangers of confusion and misleading the jury."); *see also Thibodeaux v. Wellmate*, No. 12-cv-1375, 2016 WL 2983952, at *3 (E.D. La. May 23, 2016) (finding evidence of "warnings and procedures" implemented after the time of the incident was "not relevant," that such evidence "risk[ed] confusing the jury," and that "its limited probative value [was] substantially outweighed by dangers of prejudice, confusing the issues, and misleading or confusing the jury.").   Indeed, such evidence threatens to confuse and mislead the jury by diverting its attention from whether the warning was adequate at the time of Ms. Kahn's chemotherapy treatment.  *See Grenada Steel Indus., Inc.*, 695 F.2d at 889; *see also Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 763 n.4 (5th Cir. 1989) (explaining that even if Rule 407 did not apply, the evidence "would still have been properly excluded under Rule 403.").  The admission of such evidence also would result in wasted trial time and undue delay on collateral issues that have no bearing on Ms. Kahn's claim.  For these reasons, the Court should preclude Ms. Kahn from offering evidence related to post-treatment company conduct at trial.  *See* Fed. R. Evid. 403.

28.    **MOTION TO PRECLUDE EVIDENCE AND ARGUMENT CONCERNING FDA'S JANUARY 2011 WARNING LETTER AND CORRESPONDING 483 INSPECTION.**

This Court previously *granted* Sanofi's Motion *in Limine* in its entirety in the *Earnest* case.[223]  For the same reasons—provided below—the Court should once again grant Sanofi's Motion.

### ARGUMENT

To the extent Ms. Kahn seeks to offer evidence of a January 2011 FDA Warning Letter issued to Sanofi about its pharmacovigilance processes,[224] such evidence should be excluded because (1) it is not relevant to any element of Ms. Kahn's claim, and (2) any probative value from these opinions is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  *See* Fed. R. Evid. 401–03.

A.    **Background.**

In April 2010, as part of a routine inspection of Sanofi's pharmacovigilance department, FDA identified specific deficiencies concerning Sanofi's pharmacovigilance processes and procedures.  FDA's correspondence was not specific to Taxotere or the risk of permanent alopecia. The Warning Letter was sent to improve Sanofi's pharmacovigilance practices for *all* drugs, and it never discussed Taxotere and permanent alopecia.[225]

---

[223]  *See* Rec. Doc. 8216 at 1 (Order on Mots. in Lim.) ("[T]he Motion in Limine to Preclude Evidence or Argument Concerning FDA's January 2011 Warning Letter and Corresponding 483 Inspection (Doc. 7673) is **GRANTED**. However, if the door is opened, a conference with the Court should be held").

[224]  For example, Ms. Kahn lists as exhibits the 2011 FDA Warning Letter and various correspondence with FDA regarding the same.  *See* **Ex. JJJ**. Pl.'s Tr. Ex. List at Ex. 321 ("FDA Warning Letter 2011"), Ex. 326 ("Letter to FDA Re: Warning Letter dated January 28, 2011"), Ex. 363 ("Letter to FDA re Warning Letter Response dated February 23, 2011 Quality Enhancement Plan Update"), Ex. 420 ("Internal Memo re: 1/28/11 Warning Letter from FDA").

[225]  *See id*. at Ex. 321 ("FDA Warning Letter 2011").

**B.**   **The FDA's January 2011 Warning Letter and Corresponding 483 Letter Are Not Relevant to Plaintiff's Claims and Their Use at Trial Would Serve Only to Mislead the Jury, Confuse the Issues, and Unfairly Prejudice Sanofi.**

Alleged "bad acts" do not make any fact of consequence more or less likely and thus are irrelevant.  *See* Fed. R. Evid. 401.  All evidence about FDA's January 2011 Warning Letter, corresponding 483 inspection, and related documents and testimony have no bearing on the claims at issue in this case.  *See id.*; *Allen v. Hylands Inc.*, No. 12-cv-1150, 2015 WL 12720304, at *11 (C.D. Cal. Aug. 20, 2015), *aff'd*, No. 17-56184, 2019 WL 2142843 (9th Cir. May 15, 2019) (granting motion *in limine* to exclude FDA inspections and Warning Letters as irrelevant because they were not related to the claims in the case).

Such evidence is not specific to Taxotere, the risk of alopecia, or the adequacy of Taxotere's warnings.[226]  Instead, such evidence serves only to improperly paint Sanofi as a "bad actor" and bias the jury against the company, resulting in unfair prejudice to Sanofi.  *See* Fed. R. Evid. 403; *Pom Wonderful LLC v. Tropicana Prods., Inc.*, No. 09-cv-00566, 2010 WL 11519185, at *4 (C.D. Cal. Nov. 1, 2010) ("FDA allegations have minimal relevance" and "are likely to cause Pom unfair prejudice.").  This type of improper character evidence is also inadmissible under Fed. R. Evid. 404.  And, if such evidence were permitted at trial, a mini-trial would result as Sanofi would be forced to spend time rebutting and contextualizing Plaintiff's claims.  *Moon v. Advanced Med. Optics, Inc.*, No. 08-cv-0021, 2010 WL 11509119, at *6 (N.D. Ga. Dec. 29, 2010) (excluding "evidence and argument concerning the FDA warning letters issued[.] . . .  The Court's concern with those letters is that Defendant will make the letters into a mini-trial of a minor side issue. The

---

[226] *Id.* at Ex. 321 ("FDA Warning Letter 2011"), Ex. 326 ("Letter to FDA Re: Warning Letter dated January 28, 2011"), Ex. 363 ("Letter to FDA re Warning Letter Response dated February 23, 2011 Quality Enhancement Plan Update"), Ex. 420 ("Internal Memo re: 1/28/11 Warning Letter from FDA").

letters have only limited relevance, even for impeachment purposes."). For these reasons, the Court should exclude all evidence related to FDA January 2011 Warning Letter.

29.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT THAT PLAINTIFF'S ACTINIC KERATOSIS WAS CAUSED BY TAXOTERE OR PCIA, OR CLAIMING DAMAGES THEREFOR.**

Ms. Kahn was diagnosed with actinic keratosis—*i.e.*, rough or scaly skin lesions caused by decades of exposure to ultraviolet rays—on her scalp in 2012. After examining Ms. Kahn, Sanofi's expert dermatologist, Dr. Mamina Turegano, stated in her report and testimony that Ms. Kahn's actinic keratosis points to years-long hair thinning pre-dating her chemotherapy treatment.[227] This opinion has been fully disclosed and vetted, and would be subject to cross examination if offered at trial. By contrast, Ms. Kahn's expert, Dr. Antonella Tosti, has obliquely implied that Plaintiff's actinic keratosis may have been caused by Taxotere or her alleged PCIA, and Plaintiff has intimated that this condition amplifies her damages related to PCIA and Taxotere. But Ms. Kahn as adduced neither fact nor expert evidence demonstrating that this condition has anything to do with Taxotere or Ms. Kahn's alleged PCIA. By contrast, there is reliable evidence that this condition results from long-term sun exposure, and could not have resulted from Ms. Kahn's chemotherapy treatment beginning in 2008. Accordingly, this Court should preclude any evidence or argument that Ms. Kahn developed actinic keratosis because of Taxotere or her alleged PCIA and/or that this condition forms any part of her alleged injuries in this case as irrelevant under Rule 402 and inadmissible under Rule 702.

## ARGUMENT

### A.    No Evidence Suggests Ms. Kahn's Alleged PCIA Caused Her Actinic Keratosis.

Actinic keratosis is a skin condition associated with decades of unprotected sun exposure. Sanofi does not dispute that Ms. Kahn has experienced actinic keratosis since at least 2012. Ms.

---

[227]  *See* **Ex. KKK**, Oct. 9, 2020 Turegano Rpt. at 21-22; *see also, e.g.*, **Ex. LLL**, Oct. 23, 2020 Turegano Dep. 130:16-131:13.

Kahn's diagnosis with actinic keratosis on her scalp, only a few years after her cancer treatment, provides compelling evidence that her hair had begun thinning long before she received chemotherapy.[228]

But actinic keratosis is not one of Ms. Kahn's properly pled or substantiated injuries in this case.[229]  Like any claimed medical injury, actinic keratosis is a specific diagnosable condition on which Ms. Kahn bears the burden of proving both general and specific causation.  *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007)).  Ms. Kahn has adduced no evidence to meet this burden here, so should not be allowed to argue or imply that Taxotere or PCIA caused Ms. Kahn's actinic keratosis, or claim damages for that injury.  Nevertheless, Ms. Kahn has sought to elicit oblique fact testimony suggesting that Ms. Kahn's actinic keratosis lesions have been caused by increased sun exposure due to her alleged PCIA—and in turn, by Taxotere.  For example, Ms. Kahn's husband alluded to Ms. Kahn's actinic keratosis lesions when he testified that Ms. Kahn always wore a hat in the sun "[b]ecause she's already had precancerous things removed.  She's advised by her dermatologist to always wear a hat."[230]  Similarly, during Ms. Kahn's friend (and fellow librarian) JoAnn Moinet, testifed:

> Q. How often would you say you observe her wearing a hat out when you see her?

---

[228]  Ms. Kahn's treating dermatologist, Dr. Jessica Coller Ochsner, testified that actinic keratosis typically takes 20 or more years of unprotected sun exposure to develop, and that the sun damage leading to Ms. Kahn's actinic keratosis "had to have been older."  Feb. 27, 2020 Coller Oschner Dep. 74:19-76:25.  *See also* **Ex. MMM**, Oct. 9, 2020 Shapiro Rpt. at ¶ 45 ("…actinic keratosis is a skin condition often caused by sun exposure over many years—typically a decade or more. Knowing that a patient has been diagnosed with actinic keratosis on an area of skin normally covered by hair would suggest that alopecia in that area had likely progressed for over a decade predating the diagnosis.").

[229]  *See* Ex. K, Pl.'s Third Am. Pl. Fact Sheet at § VI.5, 18.

[230]  Ex. HH, Mar. 10, 2020 Seebol Dep. 185:21-186:5.

A. Any time I see her outside she has on a hat, I mean not at night, but during the day.

Q. Has she ever talked to you about that or –

A. Have we ever talked about it? I'm not really sure. We ever talked about it. But I do remember a conversation about -- we go to the same dermatologist, and about some issues with the top of her head because of her thinning hair and that wearing a hat was of most importance.

Q. When you were discussing those issues that1 she was having do you recall what they were?

A. I don't. I don't remember if it's like -- I don't know. I know there are levels of issues, sun damage issues, so I don't.

Q. Do you know if the issues she was experiencing when she was telling you about her interactions with the dermatologist and wearing a hat were related to concerns about the sun?

A. Oh, definitely. Definitely.

Q. Did she express what those concerns were regarding the sun?

A. Well, just that with no protection, with no hair protection, you know, that's -- it's just, you know, like any other exposed area.[231]

Insofar as it purports to relate Ms. Kahn's actinic keratosis with Taxotere or any hair loss associated with chemotherapy, such testimony is hearsay and also constitutes unqualified expert testimony. *See* FRE 801; 702.

Ms. Kahn also sought testimony to insinuate actinic keratosis caused by Taxotere or PCIA from Ms. Kahn's treating dermatologist, Dr. Jessica Coller Ochsner:

Q. Does hair on the scalp provide any type of protective function –

A. Absolutely.

Q. -- for us against the sun?

---

[231]  **Ex**. **NNN**, Mar. 6, 2020 Moinet Dep. 145:13-146:14.

A. Absolutely.

Q. Is it common that in persons who have thin hair or where their scalp can be visualized through their hair, that they may experience skin lesions on a scalp more regularly than someone with a full head of hair?

A. Correct.[232]

But Ms. Kahn has not adduced evidence showing—or even an expert opinion affirmatively stating—that her actinic keratosis could have been caused by any alleged PCIA. Ms. Kahn's specific causation expert, Dr. Antonella Tosti, alluded to a potential link in her deposition testimony, stating that Ms. Kahn's "dermatologist doesn't write on the records about the alopecia, but she saw the dermatologist for actinic keratosis of the scalp, which are, by definition, something that happens when the skin is exposed to the sun," and that "I'm saying that if she had actinic keratosis in the scalp, she should have alopecia, because that's never been described with a full head of hair. So it's no way she had alopecia."[233]  Dr. Tosti nowhere states (much less demonstrates, with *Daubert*-satisfying methodology) that Taxotere or PCIA can cause or contribute to actinic keratosis, much less that it caused or contributed to Ms. Kahn's actinic keratosis.[234]  Likewise, Dr. Tosti does not offer this opinion in her expert report.[235] The Court should exclude all evidence or argument that Taxotere or PCIA caused Ms. Kahn's actinic keratosis for this reason alone.  Fed. R. Civ. P. 37(c)(1); *see also Williams*, 2014 WL 1246846, at *3 (E.D. La. Mar. 25, 2014) ("The purpose of requiring disclosure of expert reports is to notify opposing parties of the scope and content of the expert's proposed testimony.").

---

[232] **Ex**. **OOO**, Feb. 27, 2020 Ochsner Dep. 71:3-14.

[233] Ex. U, Sept. 29, 2020 Tosti Dep. 64:2-6; 67:19-23.  *See also generally id.* 63:21–67:23.

[234] *See id.*

[235] *See generally* **Ex**. **PPP**, Sept. 15, 2020 Tosti Rpt.

The Court should also exclude any evidence or argument that Taxotere or PCIA caused Ms. Kahn's actinic keratosis because it would not be based on sufficient facts or data, reliable principles and methods, or reliable application of such principles and methods to the case facts as required by Rule 702.  There is no scientific evidence that hair loss—including chemotherapy-related hair loss—can lead to actinic keratosis in a few months, as Dr Tosti anecdotally reported.[236]  It is Ms. Kahn's burden to "show both general causation and specific causation."  *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007)).  Save for Dr. Tosti's passing speculation, Ms. Kahn has adduced no affirmative evidence (A) to show that Taxotere or PCIA cause actinic keratosis generally or (B) to show that Taxotere or PCIA caused Ms. Kahn's actinic keratosis specifically.  Neither Dr. Tosti nor any of Ms. Kahn's other experts have considered other causes of actinic keratosis or diagnosed Ms. Kahn with actinic keratosis because of PCIA.  Accordingly, this Court should exclude any evidence or argument that Taxotere or PCIA caused Ms. Kahn's actinic keratosis.

**B.     The Court Should Preclude Any Argument That Actinic Keratosis Is Part of Ms. Kahn's Claimed Damages.**

The Court should preclude any claim or reference to actinic keratosis as part of Ms. Kahn's claimed damages.  Instead, Ms. Kahn has asserted that her injury is hair loss and hair thinning and

---

[236]  Ex. U, Sept. 29, 2020 Tosti Dep. 65:2–11 (denying that it takes "a course of years" for actinic keratosis to develop, and reporting "I've seen patients developing in months.").  This contradicts, without support, the testimony of Dr. Coller Oschner, who actually treated Ms. Kahn's actinic keratosis.  *See supra* n. 228.  Moreover, even if actinic keratosis could develop as quickly as Dr. Tosti suggests, this would not establish that Plaintiff's actinic keratosis resulted from PCIA.  Plaintiff was diagnosed with actinic keratosis in 2012.  If actinic keratosis can develop with a few months after hair loss, Plaintiff could have developed actinic keratosis from the temporary, total hair loss she admittedly expected and consented to as part of her chemotherapy treatment.  Put another way, even if actinic keratosis only developed after and because of Plaintiff's chemotherapy, Plaintiff cannot establish whether her actinic keratosis was the result of "temporary" or "permanent" hair loss.

that she has suffered mental and emotional damages.[237]   Ms. Kahn has not claimed any actinic keratosis-related damages in her Plaintiff Fact Sheet or her responses to written discovery, so the Court should exclude any argument or evidence about actinic keratosis with respect to damages.

---

[237]   Ex. K, Pl.'s Third Am. PFS at § VI.5, 18; *see also* Rec. Doc. 325 at 4 ¶ 8 (Am. Pretrial Order No. 22) ("Plaintiffs' responses to the PFS shall be treated as answers to interrogatories under Fed. R. Civ. P. 33[.]").

30.   **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE USE OF COLD CAPS.**

The Court should exclude any evidence or argument about the use of cold caps as irrelevant because (1) cold caps were not FDA approved at the time Ms. Kahn underwent breast cancer treatment with a Taxotere-containing regimen and would not have been used in a clinical trial, and (2) even if cold caps were approved and available to Ms. Kahn, there is no evidence that her prescribing oncologist, Dr. Kardinal, would have utilized the device as part of Ms. Kahn's treatment.[238]   Additionally, because cold caps were neither available at the time of Ms. Kahn's treatment nor considered by her oncologist, evidence or argument about these devices will create confusion and mislead the jury.  For these reasons, the Court should exclude all references to cold caps at trial.  *See* Fed. R. Evid. 401-03.

A.   **Evidence or Argument Concerning Colds Caps Is Not Relevant to Plaintiff's Case**

Information relating to cold caps is irrelevant to this matter because it does not make any fact of consequence more or less likely.  *See* Fed. R. Evid. 401.  Indeed, FDA did not approve cold caps until after Ms. Kahn underwent chemotherapy treatment.[239]   Despite the time gap between Ms. Kahn's treatment and FDA's approval of the first scalp cooling device, Ms. Kahn's expert oncologist, Dr. Linda Bosserman, may offer testimony that "[i]t has always been legal to use caps

---

[238]   Plaintiff's expert oncologist, Dr. Linda Bosserman will likely offer testimony that "[h]ad the risk of PCIA been communicated to medical oncologists they would have had the option in their professional judgment to offer the use of cold caps to patients who chose Taxotere regimens." Ex. H, Apr. 3, 2020 Bosserman Rpt. at 55.

[239]   *See* **Ex.** QQQ, Apr. 29, 2020 Glaspy Rpt. at 28 ("Cooling caps were not approved by the FDA at the time Ms. Kahn underwent chemotherapy."); Ex. H, Apr. 3, 2020 Bosserman Rpt. at 46 ("[I]n December of 2015 the FDA cleared the Dignitana's DigniCap® Scalp Cooling System for use in patients with breast cancer.  This was followed by the agency's clearance of the Paxman® Scalp Cooling System in April of 2017 for use in patients with breast cancer.").

in the US," even before FDA approval.[240]   Dr. Bosserman's comments, however, fail to acknowledge that Ms. Kahn received treatment through a clinical trial.   As such, non-FDA approved devices such as cold caps would not have been available due to concerns about affecting the clinical trial controls or the risk of scalp metastasis.

Moreover, permitting such testimony or evidence about cold caps assumes that Ms. Kahn's prescriber, Dr. Kardinal, would have advised Ms. Kahn about these devices if Sanofi had provided an allegedly adequate warning.   No testimony supports this assumption.   Dr. Kardinal never testified that he recommended or would have recommended the use of cold caps to Ms. Kahn in 2008, regardless of the risk information contained in the Taxotere label.   Accordingly, evidence and testimony about cold caps is not relevant in Ms. Kahn's case because no evidence suggests that cold caps were ever considered in Ms. Kahn's course of treatment with Dr. Kardinal.

### B.   Evidence or Argument Concerning Cold Caps Would Serve Only To Confuse and Mislead the Jury.

The Court should also exclude evidence and argument regarding cold caps because it would create confusion and mislead the jury.   Fed. R. Evid. 403.   The narrow question at issue in Ms. Kahn's case is whether she can prove by a preponderance of the evidence that Sanofi failed to warn about the alleged risk of permanent hair loss before she received Taxotere in 2008.   If permitted to introduce evidence about cold caps, Ms. Kahn will force Sanofi to spend time

---

[240]   Ex. H, Apr. 3, 2020 Bosserman Rpt. at 46.   Sanofi acknowledges that this Court permitted Dr. Bosserman to offer general testimony on cooling caps in *Earnest* and respectfully requests that the Court reconsider the issue.   Rec. Doc. 7807 at 6–7 (Order Granting Part Mot. to Exclude Expert Test. of Dr. Bosserman).   Notably, Ms. Earnest was treated in 2011, whereas Ms. Kahn was treated three years earlier in 2008 when cooling caps were even more remote in terms of mainstream use and availability.   Indeed, until 2009, the medical community was concerned about the risk of scalp metastasis from cooling caps, making it even more unlikely that Dr. Kardinal would have recommended or prescribed a cooling cap in Ms. Kahn's case.   *See* Ex. H, Apr. 3, 2020 Bosserman Rpt. at 46 (discussing a review published in 2009, one year after Ms. Kahn's treatment, concluding that there were not more incidences of scalp metastasis in patients who used scalp cooling than those who did not).   And, unlike Ms. Earnest, Ms. Kahn received treatment through a clinical trial, where the risk of affecting the controls would have precluded use from a non-FDA approved medical device such as a cooling cap.

rebutting and/or putting into context evidence that has no bearing on this case.  Indeed, litigating treatments that were nonexistent in 2008 that Ms. Kahn's prescribing physician did not discuss with Ms. Kahn would serve only to waste time, confuse the issues, and mislead the jury.  The Court should, therefore, preclude any reference to cold caps at trial.

31.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE CANADIAN INFORMED CONSENT.**

As was done in the *Earnest* trial, Sanofi anticipates that Ms. Kahn may seek to admit evidence or argument about the "Canadian Informed Consent," a document drafted by a Canadian cancer treatment facility for use in a clinical trial unrelated to Ms. Kahn's case.  This document and any related testimony or argument should be precluded because (1) it is not relevant to any element of Ms. Kahn's claims, and (2) any potentially probative value from this evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  *See* Fed. R. Evid. 401–03; *see also Kelly v. Bowing Petroleum Servs.*, *Inc.*, 61 F.3d 350, 357–58 (5th Cir. 1995); *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 454 (3d Cir. 1997).

A.     **The Canadian Informed Consent is Irrelevant.**

The Canadian Informed Consent is irrelevant to Ms. Kahn's claims for two reasons.  First, it is not relevant to proving what Sanofi' "knew" or "should have known" because Sanofi's relationship to the document is tangential at best:

- The Canadian Informed Consent was drafted by a third party cancer treatment facility;[241]

- Dr. Emanuel Palatinsky, the only Sanofi officer who reviewed the Canadian Informed Consent, merely proposed deleting "hair loss" to avoid redundancy since the document already identified "permanent hair loss" as a risk; and[242]

- The corresponding study was permanently suspended before any patients enrolled.[243]

---

[241]   Rec. Doc. 10704 at 6 (Order and Reasons Denying Pls.' Mot. for Partial Summ. J. on Affirm. Defenses Under La. Rev. State. § 9:2800.59).

[242]   Pl.'s Tr. Ex. 200 (Email from Emanuel Palatinsky to Penny Kegg).

[243]   **Ex. RRR**, Clinical Study Report at 3.

Accordingly, no one ever used the Canadian Informed Consent to enroll patients in the study—including Ms. Kahn and her prescribing oncologist Dr. Kardinal.

Second, the Canadian Informed Consent is not relevant to Taxotere's propensity to cause permanent hair loss. The Canadian Informed Consent was prepared for a study focused on the effects from adding bevacizumab to established chemotherapy regimens:

> The purpose of this Phase II study is to evaluate the safety, with respect to the heart, of adding treatment with a drug called bevacizumab to two established chemotherapy regimens whose cardiac (heart) safety profile has already been described . . . Both anticancer regimens will include one or more established chemotherapy drugs: docetaxel, doxorubicin, and cyclophosphamide (TAC), or docetaxel and carboplatin combined with a biologic drug, trastuzumab (TCH).[244]

As this Court already recognized, "it was not focused on Taxotere."[245] The effects of each drug in the regimen were not isolated, and Ms. Kahn's experts have admitted that there are reports of permanent alopecia associated with other drugs in the study.[246] For these reasons, Ms. Kahn should be precluded from presenting evidence or argument relating to the Canadian Informed Consent.

## B. The Unfair Prejudice Substantially Outweighs The Probative Value.

Evidence and argument about the Canadian Informed Consent is also inadmissible because the minimal probative value, if any, is substantially outweighed by the risk of unfair prejudice to Sanofi. *See* Fed. R. Evid. 403. Evidence or argument about the document will risk confusing and misleading the jury into believing that the Canadian Informed Consent was a Sanofi document drafted for use in a Sanofi study (it was not), or that it was utilized, or should have been utilized,

---

[244]   Rec. Doc. 10704 at 6 (Order and Reasons Denying Pls.' Mot. for Partial Summ. J. on Affirm. Defenses Under La. Rev. State. § 9:2800.59).

[245]   Rec. Doc. 10704 at 6 (Order and Reasons Denying Pls.' Mot. for Partial Summ. J. on Affirm. Defenses Under La. Rev. State. § 9:2800.59).

[246]   **Ex. SSS**, Sept. 17, 2019 Trial Tr. at 478:10-20; Ex. Y, Sept. 18, 2019 Trial Tr. at 861:7−10, 873:20−25; Ex. **TTT**, Sept. 19, 2019 at 1030:6−14, 1031:11−16, 1057:17−24; **Ex. UUU**, Sept. 20, 2019 Trial Tr. at 1219:4−24.

by Dr. Kardinal as part of Ms. Kahn's cancer treatment.  It will also waste time and judicial resources on collateral issues.  If argument is permitted, Sanofi will be forced to spend time rebutting the argument and providing the jury with the necessary context noted above.  The resulting "mini-trial" will serve only to confuse the issues and waste judicial resources. Accordingly, such evidence should be excluded.  *See* Fed. R. Evid. 403; *See Kelly*, *Inc.*, 61 F.3d at 357–58 (affirming exclusion of evidence that would result in a "mini-trial" over each allegation); *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 454 (3d Cir. 1997) (court does not need to hold "time-consuming mini-trials on [ ] minimally relevant issues"); *Osler v. Codman Research Grp.*, *Inc.*, 241 F.3d 91, 96 (1st Cir. 2001) (same); *Stubblefield v. Suzuki Motor Corp.*, No. 15-cv-18, 2018 WL 4762739, at *6 (S.D. Miss. Sept. 30, 2018) (same).

32.     **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DR. KESSLER OR HIS ROLE IN THE U.S. GOVERNMENT'S COVID-19 RESPONSE TEAM.**

Sanofi anticipates that Ms. Kahn may seek to introduce evidence or argument regarding Dr. Kessler, who is no longer available as Ms. Kahn's witness because of his involvement in President Biden's Covid-19 Response Team.  The Court should exclude any reference to Dr. Kessler because (1) he is no longer serving as a witness, and accordingly is not relevant to Ms. Kahn's case; and (2) reference to Dr. Kessler would be substantially more prejudicial than probative.  Fed. R. Evid. 401–403.

A.      **Evidence or Argument about Plaintiff's Former Expert is Not Relevant.**

The Court should exclude evidence or argument concerning Dr. Kessler or his involvement in the Covid-19 Response Team because it is not relevant to any issue in this case.  Whatever knowledge and skill Dr. Kessler brought to Ms. Kahn's case previously, or that he may gain as part of the President's Response Team, it has no bearing on the claims or defenses in this case—particularly since Dr. Kessler is no longer involved in the litigation.[247]  As such, the Court should preclude all references to Dr. Kessler and his involvement in the Covid-19 Response Team.  Fed. R. Evid. 401-02.

B.      **The Probative Value of Such Evidence, If Any, is Substantially Outweighed by Its Prejudicial Effect.**

The Court should also exclude evidence or argument concerning Dr. Kessler or his role on the Covid-19 Response Team because it lacks any probative value and would unfairly prejudice Sanofi.  Fed. R. Evid. 403.  Indeed, such evidence or argument would serve only to improperly bolster Dr. Kessler's and Ms. Kahn's credibility with the jury.  Moreover, Dr. Kessler will no

---

[247]   Rec. Doc. 12173 (Order Denying as Moot Defs.' Mot. to Exclude Dr. Kessler).

longer be called as a witness in this case, and he and his work in this litigation will not be subject to cross-examination.  The Court should preclude such evidence and argument for this additional reason.  Fed. R. Evid. 403.

33.     **MOTION TO PRECLUDE DUPLICATIVE EXPERT TESTIMONY.**

This Court should preclude the duplicative testimony of Ms. Kahn's experts. This Court precluded duplicative expert testimony in its *Daubert* rulings before trial.[248] In limiting Sanofi's expert, Dr. Gerald Miletello, this Court identified areas where Dr. Milletello's testimony overlapped with Dr. John Glaspy's testimony, such as alternative explanations for Ms. Kahn's hair loss, and precluded Dr. Miletello "from offering any opinions that are duplicative of Dr. Glaspy's opinions."[249]

The Court should also apply this ruling to Ms. Kahn's experts, such as the opinions of Dr. Feigal and Dr. Bosserman, and Dr. Ross and Dr. Plunkett. *Matthews v. Remington Arms Co.*, 2009 WL 1220541, at *2 (W.D. La. May 4, 2009) (granting motion *in limine* in part because the "testimony by both experts on the [same] issue would be needlessly cumulative"); Fed. R. Evid. 403. This Court has already precluded Dr. Bosserman from offering case-specific opinions, but Ms. Kahn has asserted that Dr. Bosserman will offer general opinions on informed consent.[250] This testimony, however, is duplicative of Dr. Feigal, who also offers general opinions on informed consent:

| Dr. Feigal | Dr. Bosserman |
|---|---|
| Physicians and patients need to be well-informed on the risks and benefits of the chemotherapy options, particularly those that can lead to permanent and disfiguring side effects, including permanent chemotherapy- | Only after such informed decision-making discussions that then include individual patient's preferences and treatment options, can a final informed decision can be made.[253] |

---

[248]  Rec. Doc. 11804 at 4–5 (Order and Reasons Granting in Part and Denying in Part Pl.'s Mot. to Exclude Expert Test. of Dr. Gerald Miletello).

[249]  *Id.*

[250]  Rec. Doc. 12109 at 4 (Order and Reasons Granting in Part and Denying in Part Defs.' Mot. to Exclude Expert Test. of Linda Bosserman, M.D.) ("Plaintiff claims that [Dr. Bosserman] will offer only general opinions on informed consent and alternative treatments to Taxotere.").

[253]  Ex**.** H, Apr. 3, 2020 Bosserman Rpt. at 11.

| | |
|---|---|
| induced alopecia, so that an informed treatment decision can be made.[251]<br><br>Had physicians been informed of the risk of permanent chemotherapy-induced alopecia, reasonable physicians would and could have included a discussion of the risk of PCIA in their benefit-risk interaction with patients about treatment options for their early stage breast cancer, to allow for more informed decisions.[252] | The risk of a permanent disfiguring condition would have changed the weighing of risks and benefits for patients, the informed consent process with their medical oncologist, and allowed the women to choose or consider choosing different chemotherapy regimens or even to avoid chemotherapy altogether.[254] |

Likewise, Dr. Plunkett now opines in her supplemental report that her "independent risk" and "substantial contributing factor" opinions—both previously excluded—"provide important support for [her] new opinion" that Sanofi should have updated the Adverse Reaction Section of its label before Ms. Kahn was treated.[255]  Her opinion is duplicative of Dr. Ross's, who also opines that Sanofi should have updated its label "to inform physicians and patients about the adverse reaction of PCIA" before Ms. Kahn's treatment with Taxotere.[256]

| Dr. Plunkett | Dr. Ross |
|---|---|
| With respect to the timing of addition of a statement in the Adverse Reactions section of the Taxotere labeling that Taxotere was associated with CIPAL/ PCIA in women undergoing treatment for early-stage breast cancer, the standard is some basis for a causal association.<br>[. . .]<br>Considering these two papers, in conjunction with Dr. Madigan's analyses of the FAERS database and Sanofi's pharmacovigilance database, Sanofi had some basis to believe a causal relationship between Taxotere use and | Had Sanofi complied with its pharmacovigilance obligations, including appropriate surveillance and analysis of the available data (including but not limited to FAERS signal data, its own internal data, worldwide medical literature, clinical trial data, and other data available to the company), Sanofi should have deduced by 2006 that some basis to believe that a causal relationship exists between Taxotere or Taxotere-containing regimens and permanent chemotherapy induced alopecia (PCIA). |

---

[251] Ex. X, Mar. 23, 2020 Feigal Rpt. at 71.

[252] *Id.*

[254] *Id.*

[255] *Id.* at ¶ 95.

[256] *Id.* at ¶ 27–28.

| | |
|---|---|
| CIPAL/ PCIA existed at least by 2006. As a result, it is my opinion to a reasonable degree of scientific certainty that the standard for adding a statement in the Adverse Reactions section of the Taxotere labeling about the relationship between Taxotere and CIPAL/ PCIA was met as early as 2006.[257] | Had Sanofi complied with these obligations and discovered the basis for suspecting the potential causal relationship, it could have met its regulatory obligations by updating the Taxotere label to inform physicians and patients about the adverse reaction of PCIA no later than April 2006.[258] |

Significant overlap exists between Dr. Bosserman and Dr. Feigal's informed consent opinions, Dr. Ross and Dr. Plunkett's labeling opinions, and this Court should apply its previous ruling regarding Dr. Miletello to Ms. Kahn's experts as well.[259]

---

[257] Ex. R, Feb. 7, 2021 Plunkett Supp. Rpt. at ¶ 96.

[258] Ex. G, Feb. 8, 2021 Ross Supp. Rpt. at ¶¶ 27−28.

[259] Significant overlap also exists, for example, between the opinions of Drs. Plunkett and Ross. Plaintiff has represented to the Court that only one will testify at trial. **Ex. VVV**, Feb. 15, 2021 Ltr. from PSC to Judge Milazzo at 1 ("We have limited this submission to address the implementation of a fair and equitable plan to allow Ms. Kahn to replace Dr. Kessler with two experts, only one of whom will testify regarding labeling/regulatory opinions at trial.").

34.     **MOTION TO PRECLUDE PUNITIVE DAMAGES EVIDENCE.**

Sanofi anticipates that Ms. Kahn may seek to admit "punitive damages" evidence—or evidence related to punishing Sanofi rather than compensating Ms. Kahn.  Specifically, Sanofi anticipates from Ms. Kahn's affirmative deposition designations that Ms. Kahn will attempt to introduce evidence or argument about Sanofi's efforts and profits from marketing Taxotere with the goal of coloring Sanofi as a "bad company" that put profit over patients.  This type of evidence, however, is not relevant to proving Ms. Kahn's compensable damages, the only damages available in this case.  This type of "punitive damages" evidence is inadmissible because (1) punitive damages evidence is not relevant to Ms. Kahn's case, and (2) any probative value from this evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  *See* Fed. R. Evid. 401–03.

C.     **Louisiana Does Not Award Punitive Damages.**

Louisiana permits punitive damages only when expressly authorized by statute, and they are not authorized in Ms. Kahn's case pursuant to the Louisiana Products Liability Act ("LPLA"). *See* La. Civ. Code Ann. Art. 3545 (punitive damages are not authorized in products liability cases where neither the product nor other products of the same type were "made available in [Louisiana] through ordinary commercial channels").[260] Although punitive damages are unavailable in this case, Ms. Kahn designates deposition testimony that can only be relevant for punitive goals—*i.e.*, painting Sanofi as improperly motivated by profit—and not for compensating Ms. Kahn for her injuries.  *See Warren v. Shelter Mut. Ins. Co.*, 2016-1647 (La. 10/18/17), 233 So. 3d 568, 598–99

---

[260]   *See also* La. Civ. Code Ann. Art. 2315.3, 2315.4, 2315.7 (authorizing punitive damages in cases involving child pornography, driving while intoxicated, and child molestation); La. Civ. Code Ann. Art. 3546 (authorizing punitive damages only if *two of three* criteria are met:  (1) punitive damages are authorized by the state where the injury-causing conduct occurred, and/or (2) punitive damages are authorized by the state where the injury occurred, (3) and/or where the defendant is domiciled)).

(considering whether evidence established that defendant was "profit-driven" as a factor in evaluating the support for a punitive damages award under maritime law); *see also* Okla. Stat. tit. 23 § 9.1 (considering the "profitability of the misconduct" in determining award for punitive damages); Note (b) to La. Civ. Code Ann. Art. 3546 ("[P]unitive damages are for the most part designed to 'punish' the individual tortfeasor, to deter him and other potential tortfeasors in the future.").   For example, Ms. Kahn affirmatively designates testimony from the following witnesses:

- Jean-Philippe Aussel Dep. at 249:1−7, 266:24−267:4 (designating testimony that breast cancer was a "key priority for Taxotere" because of sales potential, and that there are "a lot of competitors" to Taxotere).

- Amy Freedman Dep. at 172:22−173:6 (designating testimony that "Taxol was a big competitor in the breast cancer treatment market with Taxotere.")

- Matthew Goyer Dep. at 36:9−15 (designating testimony about the amount of money Sanofi spent retaining a marketing agency).

- Andris Ortmanis Dep. at 30:2−15 (designating testimony estimating how much money Sanofi made on Taxotere, including that Taxotere was a "blockbuster drug."); 43:7−20 (designating testimony that "the company wanted to establish Taxotere as the number one chemotherapy drug in the word.")

Evidence about Sanofi's goals for marketing Sanofi, and any profits derived therefrom, is not relevant to Ms. Kahn's compensable damages.  *See* Note (b) to La. Civ. Code Ann. Art. 3546 (Punitive damages are not designed to compensate the plaintiff, who "has been compensated for [her] loss through ordinary damages."); *see also* La. Civ. Code Ann. art. 2315 (damages under the LPLA are for "repair[ing] the person" and "may include loss of consortium, service, and society"). Because this type of "punitive damages" evidence is not relevant to any element of Ms. Kahn's claim, it should be excluded.

### D.     The Unfair Prejudice Substantially Outweighs The Probative Value.

Evidence and argument about Sanofi's marketing goals and profits from Taxotere is also inadmissible under Rule 403 because its probative value is substantially outweighed by the risk of unfair prejudice to Sanofi.  *See* Fed. R. Evid. 403.  Specifically, evidence about Sanofi's profits or profitability may prejudice the jury against Sanofi as a "big business," risking that the verdict might be based on bias and not on merit.  *See Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 416 (1994) ("[E]vidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses."); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) ("[T]he presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses[.]").[261]

It would also waste time and judicial resources on collateral issues.  If permitted, Sanofi would be forced to rebut such evidence to put the offending testimony in context.  The resulting "mini-trial" will confuse the issues and waste judicial resources.  Accordingly, such evidence should be excluded.  *See* Fed. R. Evid. 403; *United States v. Insaulgarat,* 378 F.3d 456, 466 (5th Cir. 2004) (holding that the district court did not abuse its discretion by excluding evidence that was cumulative and would result in undue delay or waste time).

---

[261] *See also Blankenship v. Rowntree*, 219 F.2d 597, 598 (10th Cir. 1955) ("It is the general rule that . . . the admission of evidence concerning the wealth of a party litigant constitutes error . . . .  [S]uch evidence tends to inject . . . a foreign, diverting, and distracting issue which may effectuate prejudicial results.") (citations omitted); *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (same); *Fabre*, 2013 WL 3821478.

35.    **MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING DEAR HEALTH CARE PROVIDER LETTERS.**

Sanofi anticipates that Ms. Kahn may seek to introduce evidence or argument that Sanofi should have sent a Dear Health Care Provider Letter ("DHCP Letter") to physicians regarding PCIA. Specifically, Sanofi anticipates from Ms. Kahn's affirmative deposition designations that Ms. Kahn will attempt to introduce evidence or argument that Sanofi should have sent a DHCP Letter about reports of permanent hair loss, and that if Sanofi had, Dr. Kardinal might have changed his prescribing decision for Ms. Kahn's treatment.[262]  The Court should exclude any reference to such evidence because (1) it is not relevant to Ms. Kahn's claim, and (2) any reference to a DHCP Letter would be substantially more prejudicial than probative, would create confusion, and would mislead the jury.  Fed. R. Evid. 401–403.

C.    **Evidence or Argument About DHCP Letters is Not Relevant.**

The Court should exclude evidence or argument concerning DHCP Letters because it is not relevant to Ms. Kahn's failure-to-warn claim.  Fed. R. Evid. 401.  First, failure-to-warn claims like Ms. Kahn's focus on the adequacy of the label, and do not encompass other avenues by which a physician might hypothetically learn of a potential risk.[263]

Second, DHCP Letters are regulated by the FDA.  Pharmaceutical manufacturers do not unilaterally decide when to send a DHCP Letter or even what kind of DHCP Letter to send.[264]

---

[262] Plaintiff's Designation of Kardinal Dep. at 129:25−130:20, 141:19−142:12 (designating testimony about what Dr. Kardinal hypothetically would have done if he had received a DHCP Letter from Sanofi regarding permanent hair loss).

[263] *See* Rec. Doc. 12494 (Order and reasons granting summary judgment on the claims of Wanda Stewart) at 6 ("When a physician does not recall ever reading the label at issue, the learned intermediary doctrine requires summary judgment for the manufacturer") (citing *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010)); *see also Pustejovsky*, 623 F.3d at 277 (rejecting plaintiffs' "speculat[ion] about other ways an adequate warning might have reached [the prescriber] and altered her decision," where doctor did not remember reading drug label).

[264] **Ex. WWW**, Guidance for Industry and FDA Staff, Dear Health Care Provider Letters: Improving Communication of Important Safety Information at 2−3.

FDA instead "encourages manufacturers to consult with the appropriate [FDA] revision division" to develop DHCP Letters "to ensure that the letter clearly and accurately reflects both the manufacturer's and FDA's understanding of the issue and the action required.[265]  Ms. Kahn, however, has adduced no evidence that FDA would have encouraged, or approved, a DHCP Letter regarding permanent hair loss and Taxotere.  Indeed, FDA Guidance on DHCP Letters provides these types of letters are "used to notify health care providers about important new or updated information about a drug," usually relating to "an important safety concern that could affect the decision to use a drug or require some change in behavior by health care providers, patients or caregivers to reduce the potential for harm from a drug."[266]  FDA goes on to give examples of the types of situations in which a DHCP is appropriate, including:

- Previously unknown serious or life-threatening adverse reactions;

- Clinically important new information about a known adverse reaction;

- Identification of a subpopulation at greater risk; or

- A drug interaction or medication that may result in a serious or life-threatening adverse reaction. [267]

After years of back and forth on the issue, FDA ultimately instructed Sanofi to place information about permanent hair loss in the Adverse Reactions section of the Taxotere labeling in 2015, and not in the Warnings and Precautions section, indicating that FDA did not consider permanent hair loss a serious or life-threatening adverse reaction in the context of cancer chemotherapy.[268]

---

[265] *Id.*

[266] *Id.* at 3.

[267] *Id.* at 4.

[268] Ex. MM, Dec. 9, 2019 Arrowsmith Rpt. at 165−67.

Finally, this Court ruled that the 2015 label change, which did not include a DHCP Letter, was adequate as a matter of law.[269]  Accordingly, any argument that the warnings should have entailed more should be excluded under this Court's prior rulings.[270]  For these reasons, any evidence or argument about DHCP Letters is irrelevant to the failure-to-warn issues in Ms. Kahn's case.

###   D.     The Probative Value of Such Evidence, if any, is Substantially Outweighed by its Prejudicial Effect.

The Court should also exclude evidence or argument concerning DHCP Letters because it lacks any probative value, would create confusion, mislead the jury, and unfairly prejudice Sanofi. Fed. R. Evid. 403.  If Ms. Kahn is permitted to introduce evidence about DHCP Letters, Sanofi will be forced to spend time explaining the FDA Guidelines on DHCP Letters and why a DHCP Letter would have been inappropriate for the label change at issue.  Litigating whether Sanofi should have sent a DCHP Letter would serve only to waste time, confuse the issues, and mislead the jury, because the applicable label change ("cases of permanent hair loss have been reported") would not have (and, in 2015, did not) include a DHCP Letter.[271]  The Court should preclude such evidence and argument for this additional reason.  Fed. R. Evid. 403.

---

[269]  Rec. Doc. 9268 at 4−5.

[270]  Rec. Doc. 9268 at 4−5 (Order and Reasons on Claims of Pls.' after 2015); Rec. Doc. 11020 at 20−21 (Order and Reasons on Preemption) (Finding "clear evidence" that "the FDA would not have approved of placing a warning in the more serious 'Warnings and Precautions' section of the label" and to the extent Ms. Kahn alleges that Sanofi should have done so before she was treated, her claim is preempted.").  Any argument that Sanofi should have included a DHCP as an additional means of communicating the 2015 label update should also be excluded under these rulings, as FDA and Sanofi were working together, and FDA did not ask Sanofi to prepare a DHCP letter based on the mutual understanding of the issue.  *See* Ex. VVV, Guidance for Industry and FDA Staff, Dear Health Care Provider Letters: Improving Communication of Important Safety Information at 2−3.

[271]  Evidence or argument relating to DHCP letters will also require Sanofi to explain that FDA did not ask for a DHCP Letter in 2015, necessarily implicating evidence that post-dates Ms. Kahn's treatment.

## CONCLUSION

For the foregoing reasons, Sanofi requests the Court grant its Omnibus Motions *in Limine* in their entirety.


Respectfully submitted,

 /s/ *Douglas J. Moore*

Douglas J. Moore (Bar No. 27706)           Harley V. Ratliff
**IRWIN FRITCHIE  URQUHART & MOORE LLC**    Jon Strongman
400 Poydras Street, Suite 2700              Adrienne L. Byard
New Orleans, LA  70130                      **SHOOK, HARDY & BACON L.L.P.**
Telephone: 504-310-2100                     2555 Grand Boulevard
Facsimile:  504-310-2120                    Kansas City, Missouri 64108
dmoore@irwinllc.com                         Telephone: 816-474-6550
                                            Facsimile:  816-421-5547
                                            hratliff@shb.com
                                            jstrongman@shb.com
                                            abyard@shb.com

                                            *Counsel for sanofi-aventis U.S. LLC and*
                                            *Sanofi U.S. Services Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Douglas J. Moore*