# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3    * * * * * * * * * * * * * * * * * * * * *
 4   ELIZABETH KAHN,                    CASE NO.
          Plaintiff,                    2:16-cv-15397
 5   v.
     SANOFI S.A.,
 6   SANOFI-AVENTIS U.S.,
     L.L.C., SANOFI US
 7   SERVICE, INC.,
          Defendants.
 8
 9
10    * * * * * * * * * * * * * * * * * * * * *
11
                          VIDEOTAPED
12                   EXPERT DEPOSITION
                            OF
13                   DAVID ROSS, M.D.
14         taken on Thursday, March 4, 2021
15            Commencing at 9:11 a.m.
16                         at
17                        Zoom
                   Baltimore, Maryland
18
19
20
21
22
23
24
25
```

Page 152

1         (Witness peruses document.)
2    A.   Uhmm, give me a second here.  Yes.
3    Q.   And would you agree with me that signals
4    identification is a separate task from signal
5    evaluation?
6         MR. MICELI:  Object to the form.
7    A.   Well, obviously, there are -- they are
8    not the same process.  They are related in the sense
9    that they are both dealing with post-marketing
10   surveillance.  But they're distinct parts of that
11   process, I would agree with that.
12   Q.   And would you agree with me, if a signal
13   is identified, it's important to then evaluate that
14   signal, correct?
15   A.   Yeah.
16   Q.   Doctor, if you could turn to Page No. 27
17   of Exhibit No. 13, I would appreciate it.  And this
18   is where section No. 7 starts.
19   A.   Uh-huh.
20   Q.   Are you there?
21        (Witness peruses document.)
22   A.   I am.
23   Q.   And section No. 7 is entitled, "Signal
24   Evaluation and Documentation"; correct?
25   A.   Uhmm, yes.

Page 153

1   Q.   What it says is that:  "A
2   multidisciplinary team conducts an integrated top
3   management evaluation of the prioritized signal to
4   determine whether and what regulatory actions are
5   indicated."
6        Correct?
7   A.   Yes.
8   Q.   And it goes on to say that:  "The team
9   gathers information from available resources
10  including ICSR's submitted to FAERS."
11       Is that correct?
12            (Witness peruses document.)
13  A.   Yes.
14  Q.   What are ICSR's?
15  A.   I'm sorry, I didn't study this report.
16  I have to go back to the beginning and see if I can
17  get the abbreviations.  Like I said, I have not had
18  a chance to really review this.  If you want, I can
19  go back and see what it stands for.  SR is obviously
20  safety report.  So that's the best that I can do.  I
21  don't want to guess.  No.
22       Individual case safety reports.
23  Q.   Very good.
24       In this document it indicates once a
25  signal is identified, the ICSR's are retrieved and

1        Did I read that correctly?
2              MR. MICELI:  Objection to the form.
3        I'm not sure I'm following where you are.
4        You said last paragraph?
5   BY MR. STRONGMAN:
6        Q.   Did I read that correctly, doctor?
7        A.   So this is Paragraph 841?
8        Q.   Yes.
9              (Witness peruses document.)
10       A.   "Reviewers evaluate individual ICSR's
11  for potential inclusion in a set of similar cases by
12  using as a point of reference a case definition for
13  the event."
14       Q.   Did I read that correctly?
15       A.   I believe so.
16       Q.   Okay.
17            Do you know whether or not Dr. Madigan
18  evaluated individual ICSR's in evaluating the signal
19  that he identified in this case?
20       A.   So again, I'm going to provide the same
21  context that I did before.  Not -- not this
22  particular guidance was not something that would
23  have been available to Sanofi.  So it's not
24  something that I would consider here.  I mean...
25       Q.   Setting the document aside, doctor, do

Page 158

```
 1   you know whether or not Dr. Madigan evaluated the
 2   individual ICSR's that were identified in the FAERS
 3   database by his signal analysis?
 4              MR. MICELI:  Object to the form.
 5        A.    So again, I did not go into that level
 6   of detail.  And it was not necessary for me to do
 7   so.
 8        Q.    You did not review the individual ICSR's
 9   that Dr. Madigan identified in his FAERS signal
10   analysis, correct?
11              MR. MICELI:  Object to the form.
12        A.    So again, I'm sorry.  Just bear with me.
13   I'll be succinct.  In terms of making regulatory
14   decisions, and I'm not talking about -- I'm talking
15   about decisions, not signal identification and
16   analysis.  As you know, I explained and this was
17   true for all adverse event reports going through
18   them one by one, that is not something that is part
19   of the regulatory decision process.  It's not
20   necessary.  And as I pointed out, you know, it's
21   true for every single adverse event report that
22   you've shown.
23        Q.    Doctor, I think you're answering a
24   question as to why you didn't feel like you needed
25   to review certain things, but my question was not
```

Page 158

1   you know whether or not Dr. Madigan evaluated the
2   individual ICSR's that were identified in the FAERS
3   database by his signal analysis?
4               MR. MICELI:  Object to the form.
5       A.   So again, I did not go into that level
6   of detail.  And it was not necessary for me to do
7   so.
8       Q.   You did not review the individual ICSR's
9   that Dr. Madigan identified in his FAERS signal
10  analysis, correct?
11              MR. MICELI:  Object to the form.
12      A.   So again, I'm sorry.  Just bear with me.
13  I'll be succinct.  In terms of making regulatory
14  decisions, and I'm not talking about -- I'm talking
15  about decisions, not signal identification and
16  analysis.  As you know, I explained and this was
17  true for all adverse event reports going through
18  them one by one, that is not something that is part
19  of the regulatory decision process.  It's not
20  necessary.  And as I pointed out, you know, it's
21  true for every single adverse event report that
22  you've shown.
23      Q.   Doctor, I think you're answering a
24  question as to why you didn't feel like you needed
25  to review certain things, but my question was not

1   why.
2           Okay?
3       A.   I understand.
4       Q.   My question was simply:  Did you review
5   the individual ICSR's that Dr. Madigan identified in
6   his signal analysis in the FAERS database, yes or
7   no?
8       A.   Oh.  And again, I think it's critical
9   not just to get a single word answer, but to say
10  that is not a relevant part of the methodology.
11  It's not what I do, so no.  There you go.
12      Q.   And do you know whether or not Dr.
13  Madigan reviewed individual ICSR's for the reports
14  that he identified in his signal analysis in the
15  FAERS database?
16              MR. MICELI:  Object to the form.
17      A.   Again, given the same context, it's not
18  necessary for me to know that.  It really isn't.
19      Q.   Okay.
20           And I know you think it's not necessary,
21  but you don't know one way or another whether he
22  did, correct?
23      A.   Again, it's not necessary for me to
24  know.  I don't know.  But it's not -- whether he did
25  or not would not make a difference in terms of my

1   It's like saying can I hear someone's sound on the
2   other side of the world with the stethoscope here?
3   It's a mis-sound.  It's not the right methodology.
4   That's all that I can say.
5        Q.   And doctor, I appreciate that you have
6   caveats.  Right?  You have caveats and concerns that
7   you expressed in your answer, correct?
8             MR. MICELI:  Objection to the form.
9        A.   Well, just it's a matter of not wanting
10  to get an answer that sounds like it applies to
11  every situation or all situations or is even
12  relevant here.  So I just want to be clear about
13  that.  You know, it's -- you know, this is just not
14  the appropriate methodology for reaching conclusions
15  about labeling.
16       Q.   And doctor, I appreciate that's your
17  opinion, but I just want you to answer my question.
18  And my question is based on the information provided
19  in Exhibit No. 21.  Alone.  With nothing else.
20  There's nothing here indicating that a patient
21  experienced an unexpected adverse event of alopecia
22  from taking Taxotere, correct?
23            MR. MICELI:  Object to the form.
24       A.   So I'm going to answer your question and
25  I'll be succinct.  It's like saying aside from that

Page 202

```
 1    Mrs. Lincoln, how did you enjoy the play?  The
 2    answer is no, you can't conclude that.
 3         Q.   And now if you look at what I've marked
 4    Exhibit No. 22.
 5              (Whereupon Exhibit No. 22 was marked
 6         for Identification.)
 7              (Witness peruses document.)
 8         A.   I'm sorry, I can't -- so I've got
 9    actually a sticker that says 21 and also 22.  So is
10    that a new exhibit?
11         Q.   Correct.  I've just marked Exhibit
12    No. 22.  If you can bring it up.
13              (Witness peruses document.)
14         A.   I'm refreshing it and reloading the
15    browser.  Okay.
16         Q.   You have Exhibit No. 22 in front of you?
17         A.   I do.
18         Q.   And this also has an "I" in the column
19    for initial or follow-up.
20              Do you see that?
21              (Witness peruses document.)
22         A.   Yes.
23         Q.   And this is 2004, Quarter No. 4 in the
24    file name.
25              Do you see that?
```

1  that patient.
2          So, you know, it's -- it's something
3  again where I'm going to defer to Drs. Madigan and
4  Feigal.
5       Q.   If a patient passes away, can they be
6  followed up on?
7       A.   Can they be followed up?  Well,
8  typically in the event of interest, if you're
9  talking about a tied-to-event analysis, is
10 conventionally considered for obvious reasons to end
11 with death.  But again, that's an analysis that I'm
12 going to defer to Drs. Madigan and Feigal.
13      Q.   If a patient starts taking Taxol and
14 withdraws from the TAX316 study, is that a relevant
15 consideration?
16      A.   So I'd have to go back --
17           MR. MICELI:  Excuse me.  Object to the
18           form.
19           THE WITNESS:  Sorry, Mr. Miceli.
20           I would have to go back to the
21           protocol.  But generally patients are
22           followed regarding -- I mean they have a
23           right to withdraw at any time, but they
24           continue to be followed.  That's an
25           obligation of the sponsor.  Not just a

Page 224

1      regulatory obligation, but an ethical
2      obligation under good clinical practices
3      and declaration of health psyches.
4  BY MR. STRONGMAN:
5      Q.   And do you know whether or not patients
6  who received other chemotherapy regimens outside of
7  TAX316 were followed for overall survival, but not
8  for specific adverse events?
9      A.   Again, I'm going to -- sorry, sorry.
10     Q.   You may answer.
11     A.   Okay.  Again, I'm going to defer to Drs.
12 Feigal and Madigan on that.
13     Q.   Okay.
14          Would you be interested in looking at a
15 case report form for one of these to see whether or
16 not they actually have documented permanent
17 alopecia?
18          MR. MICELI:  Object to the form.
19     A.   Well, I'm going to answer in two ways.
20 I always love -- love working with data.  Truly.
21 But I don't know what it's going to tell me.  I
22 mean, if I can use maybe not the best analogy here.
23 But you say you want to look at all these failed
24 expeditions of Everest.  That doesn't tell me about
25 the ones where it was another different event or