# EXHIBIT I

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    ELIZABETH KAHN,

5    Plaintiff,

6     vs.                        Case No. 2:16-cv-17039

7    SANOFI S.A., SANOFI-AVENTIS U.S.

     L.L.C., SANOFI US SERVICE, INC., and

8    AVENTIS-PHARMA S.A.,

9    Defendants.

10

                 * * * * * * * * * *

11

12   CYNTHIA THIBODEAUX,

13   Plaintiff,

14    vs.                        Case No. 2:16-cv-15859

15   SANOFI S.A., SANOFI-AVENTIS U.S.

     L.L.C., SANOFI US SERVICE, INC., and

16   AVENTIS-PHARMA S.A.

17   Defendants.

18

19            Videotape Deposition of CARL KARDINAL, M.D.,

20   taken on behalf of the defendants, at the residence of

21   Carl Kardinal, M.D., 6008 Dornagh Court, in the city

22   of Columbia, State of Missouri, on the 17th day of

23   January 2018, before Heather L. Shallow, Certified

24   Court Reporter, Registered Professional Reporter,

25   Registered Merit Reporter.        Job No. NJ2783240

Page 23

1    spent looking at Exhibit 1 during your meeting with

2    Plaintiffs' counsel?

3          A.   How long I spent looking at Exhibit 1?

4          Q.   Yeah, during your meeting with Plaintiffs'

5    counsel.

6          A.   Oh, 10 minutes maybe.

7          Q.   Do you remember anything you said to

8    Plaintiffs' counsel during your meeting with them?

9          A.   That hair loss was common, you know, with

10   multiple chemotherapy drugs.  Over the years, hair

11   loss was rarely permanent.  It came back and they

12   often came back a little different than it was

13   originally:  Sometimes more wavy, sometimes more full.

14   But other than that, nothing specific.

15         Q.   So you said over the years, hair loss was

16   rarely permanent.  Have you seen cases of permanent

17   hair loss after the use of a chemotherapy drug or

18   chemotherapy regimen?

19         A.   I don't know that I've permanent -- that

20   I've definitely seen that.  I've had some patients

21   that have -- particularly with Adriamycin who have had

22   some thinning that has never -- I guess you could say

23   it was permanent, but it was not that they were bald

24   and just had some thinning.

25         Q.   It wasn't complete, no-hair baldness?

1          A.   Of course.

2          Q.   Do you have any memory of reviewing

3     Exhibit 1, the Taxotere label, at any time after you

4     start -- first started prescribing it until the time

5     you met with Plaintiffs' counsel?

6          A.   I can remember reviewing, you know, the

7     label at the time I was prescribing the drug years

8     ago, but in terms of remembering specifics, I cannot.

9          Q.   When, to your recollection, did Taxotere

10    come onto the market?

11         A.   Certainly in the 1980s, 1990s we were using

12    Taxol and Taxotere in clinical trials when we were

13    doing a lot of clinical trials, but I don't think it

14    became commercially available until 1990 or so.

15         Q.   Maybe the late 1990s?

16         A.   Yeah.

17         Q.   So would you have been looking -- I'm just

18    trying to understand your common practice of looking

19    at chemotherapy drug labels.  Was it your practice to

20    refer back to them -- let's say -- strike all that.

21              Say you had been prescribing a chemotherapy

22    drug for five years.

23         A.   Yeah.

24         Q.   Was it your practice to look at the

25    chemotherapy drug label after you'd been prescribing

1   it for some period of years?

2          I -- Dr. Kardinal, I'm trying to get a sense

3   of if it was common for you just to review labels in

4   the early days of prescribing a drug or if you would

5   have reviewed the Taxotere label at some point later.

6          MR. MICELI:  Let me just object to the -- to

7   the form because it's compound.  And Kelly, I don't

8   mean to interrupt, but you asked a question, then

9   before he answered, you adjusted your question.  I

10  don't know if you want to just start all over again so

11  it's clear for the record.  Or you can -- I'll just

12  sit back and be quiet.

13         MS. BIERI:  I will ask a different question.

14         MR. MICELI:  Okay.  Again, I don't want to

15  interrupt.  I just wanted to -- it's a strange

16  objection but I want to make sure we were clear.

17  Thank you.

18         Q.  (By Ms. Bieri)  Dr. Kardinal --

19         A.  You're going to ask another question?

20         Q.  Let me try a different question.  How often

21  did you reread labels after you first started

22  prescribing a drug?

23         A.  If something unexpected happened, I would

24  refer back to it.

25         Q.  Do you have any recollection of reviewing

1    the Taxotere label after the mid 2000s?

2         A.  Of course not.

3         Q.  Do you have any recollection of reviewing

4    the Taxotere label at all?

5         A.  Yes.  I reviewed it at the time that we

6    started using Taxotere.

7         Q.  And no -- and did you -- do you have any

8    memory of reviewing it after the time when you started

9    prescribing and using Taxotere?

10        A.  Not specifically.

11        Q.  Beyond Exhibit 1, this label --

12        A.  This?

13        Q.  Beyond this document, did Plaintiffs'

14   counsel show you any other documents?

15        A.  I don't recall.

16        Q.  Do you recall if you discussed any other

17   documents with Plaintiffs' counsel?

18        A.  That's very vague.

19        Q.  Well, I asked you if you recall if they

20   showed you any other documents.  I'm asking --

21        A.  And my answer at that time was?

22        Q.  That you didn't recall.

23        A.  Okay.

24        Q.  Now I'm asking you if you remember

25   discussing any other documents that may not have

Page 58

```
 1   at Ochsner, but I did not do that primarily.
 2        Q.   What would you say you did primarily?
 3        A.   I was the -- in terms of clinical trials, I
 4   was the principal investigator at Ochsner for clinical
 5   trials in the NSABP which is this here what stands for
 6   the National Surgical Adjuvant Breast Project.  Was
 7   also the principal investigator for clinical trials
 8   for the North Central Cancer Treatment Group which was
 9   home based at Mayo.  And I saw patients also who were
10   not on clinical trials.
11        Q.   So would you be considered the principal
12   investigator for any trial that doctors at -- strike
13   that.
14             Would you be considered the principal
15   investigator for any oncology clinical trial through
16   the NSABP or the NCC --
17        A.   TG.
18        Q.   -- TG?
19        A.   Yes.
20        Q.   Okay.  This is going to be a broad question.
21   Generally speaking, can you explain what a clinical
22   trial is?
23        A.   Clinical trial is where we're investigating
24   -- well, there are, several times, a Phase III trial
25   which I participated in primarily.  It's a randomized
```

1    trial which is comparing a standard treatment to a new

2    treatment that we have reason to think should be

3    better.  And -- go ahead.

4         Q.  I didn't -- I don't want to cut you off.

5         A.  Well, I mean, the patients are assigned to

6    that type of clinical trial on a random basis.

7         Q.  Was NSABP B-40 a Phase III clinical trial?

8         A.  As I recall, yes.  It actually started out

9    off with B-01.

10        Q.  Do you believe that clinical trial work is

11   important?

12        A.  It's critical to finding out what's better.

13   Not all of them are successful which is, you know, I

14   mean, not every one of them proves that the treatment

15   arm is -- is better.  Very few of them show that the

16   treatment arm is worse, fortunately.

17        Q.  Worse how so?  What do you mean?

18        A.  That the disease-free interval, meaning the

19   time for -- that the treatment -- breast --

20   disease-free interval was short.

21        Q.  Are you aware of if there have been any --

22   if anyone has drawn conclusions about NSABP B-40 in

23   any peer-reviewed literature?

24        A.  Just a minute.

25             THE VIDEOGRAPHER:  Can we -- Veritext

Page 60

```
 1   requires I change media at 90 minutes.  I'm five
 2   minutes away from that.
 3           MS. BIERI:  You know what?  Would you-all be
 4   amenable to taking a break now?
 5           MR. MICELI:  Yeah.
 6           MS. BIERI:  The court -- not the court
 7   reporter.  The videographer has requested to change
 8   tapes.
 9           MS. PEREZ REYNOLDS:  Sure.
10           MS. BIERI:  We can go off.  Thank you.
11           MR. MICELI:  We'll just table the question.
12   He can answer it and come back.  Yeah.
13           THE VIDEOGRAPHER:  Okay.  The time is
14   9:59 a.m.  We are off the record.  This completes
15   Media 1.
16           (A brief recess was had.)
17           THE VIDEOGRAPHER:  Okay.  We are back on the
18   record.  This is the beginning of Media 2, and the
19   time is 10:21 a.m.
20           MS. BIERI:  Madame court reporter, would you
21   be willing to read back the last question that was
22   asked?
23   (The requested material read back by the reporter.)
24       Q.  (By Ms. Bieri)  Did you understand that
25   question, Doctor?
```

1    A.   I understand the question, yes.  I suspect

2  the answer is -- is "yes" because they review these

3  clinical trials and then they publish their clinical

4  trials.  I don't happen to know specifics --

5    Q.   You don't know what --

6    A.   -- what the publication is.

7    Q.   You don't know what the conclusions

8  regarding NSABP B-40 are; correct?

9    A.   Let me see.  "Neoadjuvant trial of palpable

10  operable breast cancer, effective pathologic complete

11  response in capecitabine, gemcitabine, docetaxel."

12  No, I don't know the results of the trial.

13    Q.   Okay.  While we were -- excuse me.  While we

14  were on the break I was handed some documents.

15    A.   Yes.

16    Q.   And an envelope.  And Dr. Kardinal, what was

17  in the envelope?

18    A.   It was just a notice of the deposition.

19    Q.   Okay.  So you did get the notice of

20  deposition?

21    A.   Yeah.  Right.

22    Q.   I was also handed what I'm going to mark as

23  Exhibit 8 -- would you like me to take that out of

24  your way, Doctor?

25    A.   Yeah.

1      A.   What did I say?

2      Q.   Your name is listed as the first author.

3      A.   All right.  What did I say?

4      Q.   Well, it talks about the development of

5  taxanes and indicating that paclitaxel, the prototype

6  taxane, came from the bark of the Pacific yew tree --

7      A.   Right.

8      Q.   -- and had supply concerns.  Do you recall

9  what you were referring to in that publication about

10  the supply concerns related to paclitaxel?

11      A.   Not -- no.

12      Q.   Okay.  In terms of -- you said they have

13  different toxicities.

14      A.   Yes.

15      Q.   Can you tell me, in 2008, for example, would

16  you -- would you say that paclitaxel was associated

17  with cardiotoxicity more so than docetaxel?

18           MR. MICELI:  Object to the form.

19      A.   Neither of the drugs were terribly

20  cardiotoxic.  I mean certainly not like Adriamycin.

21      Q.   (By Ms. Bieri)  Any thoughts on the use of

22  paclitaxel with Adriamycin?

23      A.   I have no specific recollection, you know,

24  memory of that.

25      Q.   Would you agree that neuromuscular toxicity

Page 72

1   was considerably less common with docetaxel than with

2   paclitaxel?

3           MR. MICELI:  Object to the form of the

4   question.

5           A.  Well, I'll agree to that, yeah.

6           Q.  (By Ms. Bieri)  Can you --

7           A.  Neurotoxicity with paclitaxel was a big

8   concern.

9           Q.  And tell me a little bit more about the

10  neurotoxicity that was associated with paclitaxel.

11  What would that look like for a patient?  Or what

12  could that look like for a patient?

13          A.  Well, there was sensory neuropathy which,

14  you know, that people would have abnormal sensation in

15  their hands and feet.  May be severe enough to

16  interfere with their gait.  The -- there appeared to

17  be less neurotoxicity with docetaxel than there was

18  with paclitaxel which was one of the reasons I tended

19  to use docetaxel in preference to paclitaxel.

20          Q.  Did -- were you aware of any cases of

21  permanent neuropathy with paclitaxel?

22          A.  At the time, no.

23          Q.  Ever?

24          A.  See, I can't say ever.  You know, I retired

25  way before "ever" happened.

Page 73

1      Q.  Well, you can tell me if you're aware of any

2   cases of permanent neuropathy with paclitaxel.

3      A.  Permanent is defined as when I stopped

4   practicing.

5      Q.  For you.  Okay.

6      A.  You know.  I mean, I can't say permanent is

7   permanent.

8      Q.  Okay.

9      A.  You know.  There were patients that retained

10  the neuropathy at the time I retired.  So that --

11     Q.  Are you familiar with cases of long lasting

12  neuropathy --

13     A.  Yes.

14     Q.  -- with paclitaxel?

15     A.  With paclitaxel, yes.  Perhaps less so with

16  docetaxel.

17     Q.  Would you dispute that in the chapter of The

18  Chemotherapy Source Book you wrote, "Neuromuscular

19  toxicity is considerably less common with docetaxel"?

20     A.  If I said it then, I believe it now.

21     Q.  Were there concerns with infusion reactions

22  related to paclitaxel?

23     A.  Yes.

24     Q.  Can you tell me a little bit about those?

25     A.  I can't tell you too much because we didn't

1        A.   It was not common.

2        Q.   Do you remember telling me that you warned

3   of common side effects?

4        A.   Yeah.

5        Q.   Okay.  So would you have warned of the risk

6   of persistent hair loss?

7        A.   Not unless it was in the package insert.  If

8   it was in the package insert, I would have warned

9   about it.

10       Q.   Tell me a drug for which the package insert

11  says that there's a risk of permanent or persistent

12  hair loss.

13       A.   Can't do that.  Don't know.

14       Q.   For what drugs did you warn of a risk of

15  permanent or persistent hair loss?

16       A.   I did not warn about permanent or persistent

17  hair loss because, in my experience, hair came back.

18       Q.   So for no chemotherapy drug at any time did

19  you ever warn about the risk of permanent or

20  persistent hair loss?

21            MR. MICELI:  Object to the form.

22       A.   No.

23       Q.   (By Ms. Bieri)  No, you did not?

24       A.   Correct.

25       Q.   And that was based on your experience that

1  you did not see that?

2        A.  Correct.

3            MR. MICELI:  Object to the form.  Pardon me.

4        Q.  (By Ms. Bieri)  Have you ever seen any

5  literature at all regarding any chemotherapy drug

6  regarding reporting cases of permanent or persistent

7  hair loss?

8            MR. MICELI:  Object to the form.

9        A.  Not during the time I was practicing.

10       Q.  (By Ms. Bieri)  Have you seen something

11 since then?

12       A.  No.  I haven't kept up.

13       Q.  Sure.  Understood.  I just wanted to make

14 sure I understood your testimony.

15       A.  I was pretty up to date at the time I

16 retired, but since that time, I've not been keeping

17 up.

18       Q.  Let me turn and ask you a little bit about

19 NSABP-40.  And to the extent it helps you, in the pile

20 you have, there are some documents related to that.

21       A.  Okay.

22       Q.  To the extent you want to look at those

23 while we're talking.

24       A.  All right.

25       Q.  Do you know when you first assisted a

1  patient who was enrolled in NSABP-40?

2       A.  Do I know when I first --

3       Q.  (Nods head.)

4       A.  -- enrolled a patient in that?  Probably

5  would have been sometime in 2007 or '8.  I thought

6  very strongly that if a clinical trial was available

7  for a given patient that we should try to enroll the

8  case because -- for two reasons:  One, they were

9  always state-of-the-art treatment, and secondly, we

10  would be able to answer a question, with regard to the

11  treatment of breast cancer, whether one treatment was

12  preferable to another.

13       Q.  How did you learn about clinical trials such

14  as NSABP-40 such --

15       A.  I was a member of NSABB.

16       Q.  And so who at Ochsner decided if doctors at

17  Ochsner participated in certain clinical trials?  So a

18  clinical --

19       A.  Was it me?

20       Q.  Was it you?  I don't know.  Was it?

21       A.  I was the principal investigator for Ochsner

22  for NSABP.  So I guess the answer to that is "yeah."

23       Q.  Okay.  So in NSAB --

24       A.  I made these trials available.  We discussed

25  them.  If they -- another physician had a suitable

Page 93

1   patients about clinical trials, would you review the

2   risks listed for each of the drugs as identified in

3   the informed consent?

4        A.  I tried to.  Yeah.

5        Q.  Would you -- I'm so sorry.

6        A.  Yes.  I tried to be as comprehensive as

7   possible.  That doesn't mean I succeeded every single

8   time because patients often didn't quite understand

9   but didn't let you know they -- embarrassed to let you

10  know that they didn't quite understand.

11       Q.  But just because a patient didn't understand

12  doesn't mean you didn't say it; correct?

13       A.  Correct.

14            MR. MICELI:  Object to the form.

15       Q.  (By Ms. Bieri)  Okay.  You said you felt

16  strongly that patients should be in clinical trials if

17  available.

18       A.  Correct.

19       Q.  Do you mean that you would recommend a trial

20  for a patient even if you might otherwise prescribe a

21  slightly different regimen?

22       A.  The answer to that is I wouldn't prescribe a

23  slightly different regimen.  If I didn't think that

24  the clinical trial was equal to or whatever the

25  standard therapy was, I wouldn't recommend the trial.

1    Q.  Because the incidence of significant hair

2  thinning that you saw in patients with Adriamycin, it

3  was rare, you didn't specifically warn them of the

4  risk of persistent significant hair thinning; correct?

5    A.  Correct.

6    Q.  If -- if Miss Kahn had said to you, "I don't

7  know if I want to be an NSABP B-40," what, if

8  anything, would you offer her as an alternative?

9    A.  I would have treated her very -- very

10  similarly.

11    Q.  And what does that mean?

12    A.  Meaning I would have used Adriamycin and

13  cyclophosphamide followed by a taxane.

14    Q.  And if Miss Thibodeaux had said --

15    A.  Same.

16    Q.  And I forgive -- forgive me for doing this

17  but I have to do the full question for the record.  If

18  Miss Thibodeaux had said, "Is there another option

19  other than being in a clinical trial?" what would you

20  have recommended to her?

21    A.  I would have recommended treating her with

22  Adriamycin and Cytoxan followed by a taxane.

23    Q.  Followed by Taxotere?

24    MR. MICELI:  Object to the form.

25    A.  Taxane.  Either.  Usually Taxotere is what I

Page 105

1    would use.

2           Q.   You typically used Taxotere?

3           A.   I used Taxotere because of the -- has lesser

4    neurological toxicity than Taxol.

5           Q.   So then would you have recommended Taxotere

6    over Taxol?

7                MR. MICELI:   Object to the form.

8           A.   Yes.

9           Q.   (By Ms. Bieri)  Do you agree that saying

10   hair generally grows back is not the same as saying

11   hair always grows back?

12          A.   They're not exactly the same.  To say it

13   generally grows back, that doesn't necessarily mean

14   always.

15          Q.   Did you recommend to Miss Kahn NSABP --

16   strike that.

17          A.   B-40.

18          Q.   Strike that.  If the Taxotere label, which I

19   understand you can't remember when you last looked at

20   other than from Plaintiffs' counsel about a month

21   ago -- if the Taxotere label had said, "In most cases,

22   normal hair growth should return.  In some cases,

23   frequency not known, permanent hair loss has been

24   observed," would that change your recommendation that

25   Miss Kahn participate in NSABP B-40?

1     A.  No.

2     Q.  If -- I'm going to ask you the question same

3 about Miss Thibodeaux, for the record.  If the

4 Taxotere label had said, "In most cases, normal hair

5 growth should return.  In some cases, frequency not

6 known, permanent hair loss has been observed," would

7 that change your recommendation that Miss Thibodeaux

8 participate in NSABP B-40?

9     A.  No.

10    Q.  Can you say, to a reasonable degree of

11 medical certainty, that Miss Kahn would survive --

12 would have survived if she didn't participate in NSABP

13 B-40?

14        MR. MICELI:  Object to the form.

15    A.  Well, she would have been treated

16 essentially the same.

17    Q.  (By Ms. Bieri)  I'm not talking about

18 comparisons right now.  We know Miss Kahn was treated

19 with NSABP B-40; right?

20    A.  Mm-hmm.

21    Q.  And we know that she has survived; correct?

22 Can you --

23    A.  Wouldn't be talking here if she hadn't

24 survived.

25    Q.  Can you say that you know, to a reasonable

1  cases, side effects may be very serious, long lasting,

2  or may never go away.  There's also a risk of death."

3  And is that consistent with what you would tell your

4  patients who participated in NSABP B-40?

5         A.  Yeah.

6         Q.  I'm sorry?

7         A.  Yes.

8         Q.  Okay.  Let me ask you, have you ever acted

9  as a consultant for a pharmaceutical company?

10         A.  No.

11         Q.  No?

12         A.  (Shakes head.)

13             MR. MICELI:  She's having to go get

14  something for me.

15         Q.  (By Ms. Bieri)  Have you ever served on an

16  advisory board for a pharmaceutical company?

17         A.  (Shakes head.)  No.

18         Q.  Have you ever been a speaker on behalf of a

19  pharmaceutical company?

20         A.  No.

21         Q.  To your recollection, did Ochsner allow

22  pharmaceutical sales representatives to come to the

23  oncology clinic?

24         A.  Yes, they do.

25         Q.  Are you aware of Ochsner's policy concerning

1    sales representative contacts for doctors involved

2    with clinical trials?

3                MR. MICELI:  Object to the form.

4         A.  I never talked to a pharmaceutical

5    representative with reference to a clinical trial.

6         Q.  (By Ms. Bieri)  Did you speak to -- over the

7    course of your career, your fortyish-year career, did

8    you ever speak with pharmaceutical sales

9    representatives?

10        A.  Of course.  I mean, my God.  No.  I lived in

11   a closet.

12        Q.  For just one company or more than one

13   company?

14        A.  More than one.

15        Q.  With regard to Taxotere, do you recall

16   having any contacts with Sanofi sales representatives?

17        A.  Not specifically.

18        Q.  So you can't say one way or the other -- can

19   you say one way or the other whether you had any

20   contacts with a Sanofi sales representative?

21        A.  I have no -- no specific recollection.

22        Q.  So could you identify by name any sales

23   representative for Sanofi that you spoke to?

24        A.  (Shakes head.)

25        Q.  No specific recollection of what, if

Page 117

1    anything, if any contact even happened, was discussed?

2         A.   Right.

3         Q.   Do you have any criticism of any sale --

4    sales representative for Sanofi?

5         A.   No.

6         Q.   To your recollection, Sanofi sales

7    representatives acted professionally, in your

8    experience?

9              MR. MICELI:   Object to the form.

10        A.   I have no negative reactions on that.  As a

11   rule, I -- I did speak to sales representatives, but I

12   didn't really place much weight in what they said.

13        Q.   (By Ms. Bieri)  So did you understand that

14   -- you were the doctor; right?

15        A.   Damn right.

16        Q.   And what did you understand -- did you

17   understand sales representatives were there --

18        A.   They --

19        Q.   -- to promote the product?

20        A.   Exactly.

21        Q.   And did you understand that they weren't

22   medically trained like you?

23        A.   Correct.

24        Q.   Was there any representative from Sanofi

25   that you relied upon in deciding to prescribe Tax --

1      A.   I don't remember any representative from

2  Sanofi specifically.

3      Q.   So is it fair to say that you didn't rely on

4  any representation from a Sanofi sales representative

5  in your decision to prescribe Taxotere to Elizabeth

6  Kahn?

7           MR. MICELI:   Object to the form.

8      A.   Right.

9      Q.   (By Ms. Bieri)  Did you rely on the

10  representation of any Sanofi sales representative in

11  your decision to prescribe Taxotere to Cynthia

12  Thibodeaux?

13      A.   No.

14           MR. MICELI:   Same objection.

15      Q.   (By Ms. Bieri)  You relied on your own -- is

16  it fair to say you relied on your own clinical

17  experience?

18           MR. MICELI:   Object to the form.

19      A.   (Nods head.)

20      Q.   (By Ms. Bieri)  And medical training?

21      A.   Right.

22      Q.   Doctor, I think that I am done with my

23  questions.

24      A.   All right.

25      Q.   Mr. Miceli will also likely have questions

1          A.   No.

2          Q.   Okay.  What you will want to do -- I think

3     I'm done with that for right now.

4          A.   Okay.

5          Q.   But I'm going to -- if you want to just keep

6     it sort of like this because I know we're going to

7     come back to that one.

8          A.   Okay.

9          Q.   I want to ask you just generally speaking --

10    we're going to get into this a little bit deeper in a

11    moment, but I believe you talked to Sanofi's counsel

12    earlier today about when you would review the product

13    insert.  Do you recall that?

14         A.   Yes.

15         Q.   And I think you said that you would recall

16    it when it was first on the market?

17         A.   Right.

18              MS. BIERI:  Object to the form.

19         Q.   (By Mr. Miceli)  And then when there were

20    new occurrences to you, you would go to the --

21              MS. BIERI:  Object to the form.

22         Q.   (By Mr. Miceli)  Do you recall making that

23    comment?

24         A.   Yes.

25         Q.   Okay.  Now, have you, over the course of

1   your career, received letters from pharmaceutical

2   companies alerting you to label changes?

3        A.   Yes.

4        Q.   And have you received letters from time to

5   time from pharmaceutical companies alerting you to new

6   indications for usage of their chemotherapy products?

7        A.   Yes.

8        Q.   Okay.  And when you receive that new

9   information about indications for usage, do they send

10  you a new label as well?

11            MS. BIERI:  Object to the form.

12       A.   I don't recall.

13       Q.   (By Mr. Miceli)  When they send you letters

14  directing you to new indications of usage for their

15  products, do you read about -- do you read the letter

16  to learn about the new indications for the use of

17  their products?

18            MS. BIERI:  Object to the form.

19       A.   Yes, but we're usually way ahead of them,

20  you know, because we've done the clinical trials.

21       Q.   (By Mr. Miceli)  Understood.  You were

22  sometimes before even the tip of the spear because --

23       A.   Right.

24       Q.   -- you do clinical trials?

25       A.   Right.

1           MS. BIERI:  Object to the form.

2       A.  That -- that's correct.

3       Q.  (By Mr. Miceli)  Okay.  And to flip that

4   around, if the words "permanent hair loss" were

5   associated with the use of Taxotere, would you discuss

6   that with your patient?

7           MS. BIERI:  Object to the form.

8       A.  Yes, and it should be included in the

9   consent form.

10      Q.  (By Mr. Miceli)  Thank you.  Now, you

11  retired in 2012; correct?

12      A.  (Nods head.)

13      Q.  That's "yes" for her?

14      A.  Yes.

15      Q.  Sorry.  I know it's getting late in the day,

16  Doctor.

17      A.  Yes.

18      Q.  Have you -- aside from the meeting that you

19  and I -- or we had with you back in December here --

20      A.  Yes.

21      Q.  -- have you looked over any other product

22  inserts of chemotherapy agents since retiring?

23      A.  No.

24      Q.  Okay.  So for the last five years you

25  haven't reviewed any product inserts?

Page 141

```
 1        A.   Correct.
 2        Q.   And again, I keep -- because I'm going
 3   through my notes of what you talked about with
 4   Ms. Bieri, I want to make sure that I have this
 5   correct.  Did you say earlier that you were not aware
 6   of any chemotherapy label that lists permanent
 7   alopecia or permanent hair loss as an adverse event?
 8        A.   Permanent hair loss?
 9        Q.   Correct.
10        A.   You know, the answer is I -- I don't recall
11   reviewing one that ever listed permanent hair loss.
12        Q.   Okay.
13        A.   They may possibly have been there, but...
14        Q.   Okay.  But you're not -- as we sit here
15   today, you don't recall one?
16        A.   I don't recall --
17        Q.   Okay.
18        A.   -- a specific one that says permanent.
19        Q.   And you practiced medicine for 40 some-odd
20   years?
21        A.   Yes.
22        Q.   So based on the fact that, as we sit here,
23   you can't recall the product insert, product label
24   that listed permanent hair loss as a potential side
25   effect, would it be a fair statement to say that if
```

1    you received a letter from a pharmaceutical company

2    updating you on their label, that they were changing

3    it to include permanent hair loss as a adverse event

4    associated with the use of their drug, would that be

5    news to you?

6           MS. BIERI:  Object to the form.

7       A.   Yeah.

8       Q.   (By Ms. Bieri)  And would that change what

9    you discuss with your patient concerning that drug?

10          MS. BIERI:  Object to the form.

11      A.   It would be something that would have to be

12   included in the discussion.

13      Q.   (By Mr. Miceli)  Okay.

14      A.   I may -- may perhaps still recommend the use

15   of the drug.

16      Q.   But it's something you would discuss with

17   your patient?

18      A.   Yes.

19      Q.   And if, after discussing it with your

20   patient, your patient told you, because of that, they

21   did not wish to take that drug --

22      A.   Correct.

23      Q.   -- and asked you for other options, would

24   you discuss other options with them?

25          MS. BIERI:  Object to the form.

1      A.   Correct.

2      Q.   (By Mr. Miceli)  Okay.  And is paclitaxel an

3  adequate alternative to docetaxel?

4           MS. BIERI:  Object to the form.

5      A.   In terms of its efficacy?

6      Q.   (By Mr. Miceli)  Yes.

7      A.   They're very similar.

8      Q.   Okay.  And are there other adjuvant

9  therapies that do not include taxanes that are also

10  within the standard of care for use in patients?

11           MS. BIERI:  Object to the form.

12      A.   Yes.

13      Q.   (By Mr. Miceli)  Okay.

14           MR. MICELI:  Where's your phone?  I need to

15  see that.

16           MS. PEREZ REYNOLDS:  Give me a second.

17           MR. MICELI:  Okay.  All right.  I'll let you

18  find that.

19      Q.   (By Mr. Miceli)  Now, in Exhibit 6 to your

20  deposition -- I believe that was one of the informed

21  consents.  I'm going to do my best to locate it for

22  us, Doctor.  On page 2 there was some discussion -- I

23  think it's in this first paragraph -- I apologize for

24  pointing there -- about what standard care was.  Do

25  you remember that?

Page 144

1          A.   Well, the talk in this that AC, which was
2     Adriamycin and Cytoxan, is a standard treatment for
3     breast cancer.
4          Q.   With docetaxel; correct?
5          A.   With docetaxel?
6          Q.   If you look at that, three chemo -- "Three
7     of the chemotherapy drugs used in this study are
8     docetaxel followed the combination of doxorubicin and
9     cyclophosphamide --
10         A.   Okay.
11         Q.   -- AC, a standard treatment for breast
12    cancer."  Do you see that?
13         A.   Yeah.  It is the standard treatment.
14         Q.   Okay.  And is the -- is the docetaxel plus
15    doxorubicin plus cyclophosphamide sometimes referred
16    to as TAC?
17         A.   Yeah.
18         Q.   Okay.  Now, are you familiar with the
19    treatment option FAC?
20         A.   Right.
21         Q.   And that's --
22         A.   5FU.
23         Q.   5FU, doxorubicin, and cyclophosphamide?
24         A.   Right.
25         Q.   And is that -- is that a standard of care --

1   or is that a -- is that a treatment option within the

2   applicable standard of care --

3           MS. BIERI:  Object to the form.

4       Q.   -- for adjuvant therapy?

5           MR. MICELI:  Go ahead.  I'm sorry.

6           MS. BIERI:  Object to the form.

7       A.   That was an old treatment and it probably

8   doesn't have the potency or efficacy of TAC.

9       Q.   (By Mr. Miceli)  Okay.

10      A.   It would not be something I would choose.

11      Q.   How about AC only without docetaxel?  Is

12  that within the standard of care?

13          MS. BIERI:  Object to the form.

14      A.   I think in selected cases of multi node

15  positive breast cancer, AC by itself is -- is not

16  adequate.

17      Q.   (By Mr. Miceli)  Okay.  How about

18  doxorubicin, paclitaxel and cyclophosphamide?  Is that

19  an adequate standard of care treatment option?

20          MS. BIERI:  Object to the form.

21      A.   Paclitaxel, I would think that would be an

22  adequate -- fairly equivalent treatment.

23      Q.   (By Mr. Miceli)  So if your patient came to

24  you and said because of -- and assume -- this would

25  assume that you were warned about the hair loss in the

Page 146

1   label -- so -- strike that question.

2          Assuming that you had been warned about the

3   use -- or the permanent alopecia being associated with

4   the use of docetaxel, Taxotere, and your client -- and

5   you advised your client of that association -- or your

6   patient of that association, and she informed you she

7   did not wish to use that product, would the

8   combination of paclitaxel, cyclophosphamide, and

9   doxorubicin be an adequate treatment option for that

10  person?

11         MS. BIERI:  Object to the form.

12     A.  Well, it should be fairly equivalent.

13     Q.  (By Mr. Miceli)  Okay.  And with neoadjuvant

14  treatment for --

15     A.  Yes.

16     Q.  -- for Ms. Thibodeaux, that ultimately --

17  her treatment ultimately included a surgery to remove

18  her --

19     A.  Tumor.

20     Q.  -- her tumor; correct?

21     A.  Yes.

22     Q.  And do you recall that -- that the removal

23  of the tumor included good, clean margins of the

24  tumor?

25         MS. BIERI:  Object to the form.

1      A.  Of what?  Because nobody can remember.

2      Q.  Prior to today, have you ever seen what was

3  marked as Plaintiff's Exhibit 11?

4      A.  No.

5      Q.  Prior to today, have you ever seen what was

6  marked as Plaintiff's Exhibit 12?

7      A.  No.

8      Q.  Prior to today, have you ever seen what is

9  marked as Plaintiff's Exhibit 13?

10      A.  No.

11      Q.  Prior to today, have you ever seen what was

12  marked as Plaintiff's Exhibit 14?

13      A.  No.

14      Q.  Prior to today, have you ever seen what was

15  marked as Plaintiff's Exhibit 15?

16      A.  No.

17      Q.  Prior to today, have you ever seen what was

18  marked as Plaintiff's Exhibit 16?

19      A.  No.

20      Q.  Okay.  We talked -- you talked both with me

21  and with Mr. Miceli about authoritative journals and

22  you listed some journals that you said you considered

23  authoritative.  Do you remember that?

24      A.  Yes.

25          MR. MICELI:  Just object to the form.

Page 214

1   feel it's an idiotic question?

2        A.   Yes.

3        Q.   Understood.  So you don't just rely on drug

4   companies to tell you about side effects; correct?

5        A.   I thought I made that point earlier.

6        Q.   You do not; correct?

7        A.   No.  Certainly not.

8        Q.   Would you have provided -- I want to make

9   sure I didn't misunderstand testimony.  Did you tell

10  Mr. Miceli that you provided patients with information

11  that you received from drug companies?

12       A.   I provided patients with information that --

13  not directly from drug companies, but we belonged to

14  the Mayo Clinic study group that went to the meetings

15  at Mayo twice a year.  Went to ask how -- materials

16  that we learned in scientific sessions we would

17  provide to patients.

18       Q.   Understood.  Not necessarily -- not --

19  strike that.

20            Not materials directly from the

21  manufacturer; correct?

22       A.   Not at all.

23       Q.   Okay.  Regarding Exhibit 14, you've told me

24  you had never seen that before today.  Do you know who

25  this document was distributed to?

1      A.   Not to me.

2      Q.   Can you say with certainty that it was

3 distributed to anybody at Ochsner?

4      A.   I -- no, I can't say with certainty it was

5 given to anybody at Ochsner.  It probably perhaps was.

6      Q.   But you don't know that; correct?

7      A.   No, I do not know that.

8      Q.   Now, will you -- would you agree that

9 Exhibit 14 -- and I'll direct you to the third page

10 that's Bates labeled 472.

11      A.   Okay.

12      Q.   Would you agree that this document isn't

13 limited to talking about Taxotere?

14      A.   It is not --

15      MR. MICELI:  Object to the form.

16      A.   That this form is limited to talking about

17 Taxotere?

18      Q.   (By Ms. Bieri)  Is not limited to just

19 talking about the chemotherapy drug Taxotere.

20      MR. MICELI:  Object to the form.

21      A.   Well, this applies to part of Taxotere but

22 this appears to be specifically discussing Taxotere or

23 at least mentioning Taxotere.

24      Q.   (By Ms. Bieri)  The word Taxotere is used in

25 Exhibit 14?  Is that what you're saying?

1    when they were speaking.  Have you ever seen an

2    agreement between Sanofi and any doctor regarding

3    consulting?

4         A.  No.

5         Q.  Do you know what Sanofi requires regarding

6    disclosures of that relationship?

7         A.  No.  Nor have I been involved or seen or

8    witnessed or -- nor have I been a consultant for

9    Sanofi.

10        Q.  And Doctor, I think I just have about --

11   just a few more questions.  If I'm remembering

12   correctly, Mr. Miceli phrased a question that if you

13   knew -- something to the effect of if you knew that

14   Taxotere had a risk of persistent hair loss and a

15   patient expressed a concern about persistent hair

16   loss, you would potentially prescribe Taxol to that

17   patient.  Was that your testimony?

18             MR. MICELI:  Object to the form.

19        A.  No.

20        Q.  (By Ms. Bieri)  Sorry.  Tell me your

21   testimony.

22        A.  If Sanofi said that Taxotere may cause

23   permanent hair loss, then that should, at a minimum,

24   be included in the consent form for the use of that

25   drug.  And if they stated that the incidence of