# EXHIBIT CC

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

*****************************************************************

IN RE:  TAXOTERE (DOCETAXEL)          Docket No. 16-MD-2740
PRODUCTS LIABILITY LITIGATION         Section H
                                      New Orleans, LA
Relates to:  Barbara Earnest          Tuesday, September 24, 2019
             16-CV-17144

*****************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                    UNITED STATES DISTRICT JUDGE
                       DAY 7, MORNING SESSION


APPEARANCES:

FOR THE PLAINTIFF:           BACHUS & SCHANKER, LLC
                             BY:  DARIN L. SCHANKER, ESQ.
                                  J. KYLE BACHUS, ESQ.
                             1899 Wynkoop St., Suite 700
                             Denver, CO 80202

                             FLEMING NOLEN & JEZ
                             BY:  RAND P. NOLEN, ESQ.
                             2800 Post Oak Blvd., Suite 4000
                             Houston, TX 77056

                             GIBBS LAW GROUP, LLP
                             BY:  KAREN B. MENZIES, ESQ.
                             6701 Center Drive West, 14th Floor
                             Los Angeles, CA 90045

                             DAVID F. MICELI, LLC
                             BY:  DAVID F. MICELI, ESQ.
                             P.O. Box 2519
                             Carrollton, GA 30112-0046

                             PENDLEY BAUDIN & COFFIN
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             2505 Energy Centre
                             1100 Poydras St.
                             New Orleans, LA 70163
```

\\fs1\Sanofi\TAXOTERE_LITIGATION\WITNESS PREP - working\NEW JERSEY\DEP PREP\2021.06.16 - Vasireddy (Valentine)

| | | |
|---|---|---|
| 09:35:01 | 1 | Q.  I am going to hand you what is being marked as Exhibit No. 11. |
| 09:35:10 | 2 | Now, this is a meeting invite and the meeting invite is on |
| 09:35:22 | 3 | 4/25/2006, so we're about maybe a month after the Amy Freedman |
| 09:35:34 | 4 | e-mail that we just discussed, and the subject is going to be |
| 09:35:38 | 5 | proposed changes to section 4 of a product label.  Do you see that, |
| 09:35:45 | 6 | at the top, under "Subject"? |
| 09:35:47 | 7 | A.  Discussion of proposed changes to section 4PL, yes. |
| 09:35:51 | 8 | Q.  And then there's a list of required attendees for the meeting. |
| 09:36:00 | 9 | It looks like the first listed required attendee would be yourself. |
| 09:36:05 | 10 | Do you see that? |
| 09:36:06 | 11 | A.  I see myself on the list. |
| 09:36:06 | 12 | Q.  All right. |
| 09:36:09 | 13 | A.  But I do want to highlight that -- that required attendees is |
| 09:36:15 | 14 | an indication that this is something they would like you to be at, |
| 09:36:20 | 15 | but that doesn't necessarily that this is a meeting that was |
| 09:36:23 | 16 | attended.  In fact, there were times where I had two or even three |
| 09:36:29 | 17 | required meetings occurring at the same time. |
| 09:36:35 | 18 | Q.  You agree that this document, Exhibit 11, lists yourself as a |
| 09:36:42 | 19 | required attendee? |
| 09:36:43 | 20 | A.  I am -- I am listed.  I am just trying to clarify that doesn't |
| 09:36:46 | 21 | mean -- |
| 09:36:47 | 22 | Q.  No, I appreciate it. |
| 09:36:48 | 23 | A.  -- that I would have attended it. |
| 09:36:49 | 24 | Q.  And the PL at the top, is that patient leaflet? |
| 09:36:54 | 25 | A.  I don't know.  I think that's a very good assumption. |

| | | |
|---|---|---|
| 09:36:58 | 1 | Q. Okay. And what is a patient leaflet? |
| 09:37:01 | 2 | A. A patient leaflet would be a part of the labelling that is |
| 09:37:10 | 3 | designed for the patient, with the patient's -- the patient reading |
| 09:37:21 | 4 | it as opposed to, let's say, the package insert, which is designed |
| 09:37:28 | 5 | more for physicians in terms of the language and the tone. |
| 09:37:33 | 6 | Q. And so I think my question to you was simply whether you see |
| 09:37:40 | 7 | the attachment that says, "current patient leaflet," and if four |
| 09:37:46 | 8 | bullet points from the bottom you see the portion that says, "Very |
| 09:37:49 | 9 | common temporary loss of hair. After your treatment, normal hair |
| 09:37:54 | 10 | growth should return." Do you see that? |
| 09:37:57 | 11 | A. I do. |
| 09:37:57 | 12 | Q. Do you know who wrote that language? |
| 09:38:02 | 13 | A. No, I do not. |
| 09:38:04 | 14 | Q. And based upon the meeting invite, this is the current patient |
| 09:38:10 | 15 | leaflet at the time that they wanted to be updated, correct? |
| 09:38:17 | 16 | A. Well, the top of the page says, "current PL." That's the only |
| 09:38:24 | 17 | information I have here. |
| 09:38:25 | 18 | Q. Well, you've been in this industry for decades. You, I'm sure, |
| 09:38:30 | 19 | have dealt with these types of required meetings previously. |
| 09:38:34 | 20 | A. True. But you asked me if this is the current package leaflet. |
| 09:38:39 | 21 | I don't have an official patient leaflet corresponding to this date |
| 09:38:47 | 22 | to know whether this, indeed, is the current one. So I -- I am |
| 09:38:52 | 23 | willing to proceed in the line of questioning as if it is and |
| 09:38:56 | 24 | assume that it is because it says, "current PL." But I can't under |
| 09:39:00 | 25 | oath say that it is. |

| | | |
|---|---|---|
| 09:39:01 | 1 | Q. Sure. The meeting was set to discuss updating the current PL, |
| 09:39:04 | 2 | correct? |
| 09:39:05 | 3 | A. Apparently so, yes. |
| 09:39:07 | 4 | Q. An attachment to the e-mail to the meeting contains this page, |
| 09:39:10 | 5 | which at the top identifies itself as "Current PL", correct? |
| 09:39:15 | 6 | A. That's what it says, "Current PL." |
| 09:39:18 | 7 | Q. If you turn past the current PL, you'll see a document that has |
| 09:39:28 | 8 | a title at the top that says, "Draft Proposal 1." |
| 09:39:35 | 9 | A. Okay. |
| 09:39:36 | 10 | Q. Do you see that? |
| 09:39:36 | 11 | A. I do. |
| 09:39:37 | 12 | Q. This was also attached to the e-mail. And a draft proposal, |
| 09:39:42 | 13 | what does a proposal draft mean to you in pharmacovigilance? |
| 09:39:53 | 14 | A. Well, I don't think there's any -- anything unique to |
| 09:39:59 | 15 | pharmacovigilance in the word draft proposal. It is a draft |
| 09:40:03 | 16 | meaning it's not finalized. It's a -- and proposal 1 would suggest |
| 09:40:12 | 17 | that this is a non-finalized, non -- probably non-reviewed proposal |
| 09:40:17 | 18 | that's being made. |
| 09:40:18 | 19 | Q. Okay. And if you -- |
| 09:40:20 | 20 | A. I would imagine it's being attached for discussion. |
| 09:40:22 | 21 | Q. I'm sorry. Were you able to finish? |
| 09:40:25 | 22 | A. Yes. Sorry. |
| 09:40:25 | 23 | Q. All right. If you go down to the proposal on page 1 of the |
| 09:40:28 | 24 | draft proposal No. 1, under "Very Common," do you see it says, |
| 09:40:33 | 25 | "Very Common" and then it says, "(experienced in more than 1 in 10 |

```
09:40:38   1   patients)."  Do you see that?
09:40:40   2   A.  All right.
09:40:45   3   Q.  And then -- one, two, three -- four bullet points down it says,
09:40:52   4   under "Very Common," "short-term hair loss, after normal -- after
09:40:57   5   treatment, normal hair growth should return."  Do you see that?
09:41:00   6   A.  I do see that.
09:41:01   7   Q.  And then if you turn the page to the second page of proposal
09:41:05   8   No. 1, at the bottom, under what's termed as "Rare," it says,
09:41:18   9   "Alopecia (hair loss) that did not reverse at the end of the
09:41:23  10   study."  Do you see that?
09:41:24  11   A.  I do.
09:41:24  12   Q.  Clearly, whoever -- well, first of all, do you know who drafted
09:41:28  13   proposal No. 1?
09:41:29  14   A.  Excuse me.  No.
09:41:31  15   Q.  Would you agree with me that clearly whoever it was that
09:41:34  16   drafted proposal No. 1 was able to identify and describe two
09:41:43  17   distinct types of hair loss related to the use of Taxotere; one
09:41:49  18   that was identified as occurring in -- as a very common side effect
09:41:56  19   in more than one in ten patients, as short-term hair loss; and the
09:42:01  20   second, that's rare alopecia that did not reverse at the end of the
09:42:04  21   study.  Do you see that?
09:42:06  22   A.  I do.  But I don't think I agree with the way that you posed
09:42:09  23   your question.  I don't think they're describing two distinct
09:42:11  24   types.  I think they're describing two different patterns of
09:42:17  25   recovery in terms of duration and frequency.
```

```
09:42:21  1   Q.  What were you going to do at the meeting if you didn't discuss
09:42:24  2   the proposals?
09:42:25  3   A.  No, I'm sure -- I'm sure at the meeting they were discussing
09:42:29  4   the proposal.  Whether people looked at it before the meeting or
09:42:33  5   looked at it during the meeting, I can't answer that.  I can't
09:42:36  6   answer it for myself because I don't have recollection of this, but
09:42:40  7   I can't certainly answer for other people also.
09:42:42  8   Q.  So when the people who bothered to attend this mandatory,
09:42:49  9   important meeting got as far as draft proposal No. 1 --
09:42:53 10   A.  Yes.
09:42:53 11   Q.  -- at that point in time in the year 2006, somebody in a
09:43:00 12   management position at Sanofi related -- with their work related to
09:43:07 13   Taxotere --
09:43:08 14   A.  Uh-huh.
09:43:09 15   Q.  -- would have had the opportunity to see, whether they wrote it
09:43:13 16   or not, which you can't testify about, that there -- that you can
09:43:18 17   characterize short-term hair loss as an outcome and you can
09:43:22 18   characterize alopecia that did not reverse at the end of the study
09:43:28 19   as an outcome, right?
09:43:30 20   A.  I would think that would be a reasonable assumption.
09:43:32 21   Q.  All right.  You see the draft proposal No. 2?
09:43:36 22   A.  Yes, I do.
09:43:37 23   Q.  If you will turn to page 2 of draft proposal 2 of the patient
09:43:44 24   leaflet.  Turn to page 2.
09:43:45 25   A.  Okay.
```

```
09:43:45   1   Q.  There is an area of proposal No. 2, it's about -- one, two,
09:43:50   2   three, four -- five paragraphs from the bottom and it starts with,
09:43:54   3   "Skin and subcutaneous tissue disorders."  Do you see that?
09:43:59   4   A.  Yes, I do.
09:44:00   5   Q.  And it lists hair loss (alopecia) -- do you see that?
09:44:04   6   A.  I do.
09:44:04   7   Q.  -- as very common, and then there's a semicolon.  Do you see
09:44:13   8   that?
09:44:13   9   A.  Yes.
09:44:13  10   Q.  And then listed as uncommon, alopecia (hair loss) that did
09:44:21  11   not -- it says did not reversible, but -- did not reversible at the
09:44:24  12   end of the study.  Do you see that?
09:44:26  13   A.  I do.
09:44:27  14   Q.  So here, again, in April of 2006 in Proposal 2 to a patient
09:44:36  15   leaflet, being discussed are two different outcomes of alopecia
09:44:43  16   described as such in this draft proposal, correct?
09:44:49  17   A.  Two different outcomes of resolution, yes, I think that's a
09:44:54  18   reasonable statement.
09:44:56  19   Q.  Have you found draft proposal No. 3?
09:44:58  20   A.  I have.
09:44:59  21   Q.  If you turn to page 2 of proposal No. 3, and, again, look under
09:45:07  22   "Skin and subcutaneous skin disorders."  It's the third set of
09:45:13  23   boxes down.
09:45:14  24   A.  Yes, I do see it.
09:45:15  25   Q.  That under "very common" it describes hair loss.  Do you see
```

| | | |
|---|---|---|
| 09:45:19 | 1 | that? Alopecia, meaning, occurs in greater than ten percent. |
| 09:45:23 | 2 | Correct? |
| 09:45:24 | 3 | A. Yes, I do see that. |
| 09:45:25 | 4 | Q. And then do you see over in the uncommon it says, "Alopecia |
| 09:45:31 | 5 | non-reversible at the end of the study." Do you see that? |
| 09:45:35 | 6 | A. I do see that. |
| 09:45:36 | 7 | Q. Do you agree with me that in April of 2006, in Taxotere patient |
| 09:45:50 | 8 | leaflet Proposals 1, 2, and 3, there are three different ways to |
| 09:45:58 | 9 | present two different outcomes for alopecia so that the patient can |
| 09:46:06 | 10 | understand the distinction? |
| 09:46:13 | 11 | A. I agree -- I agree that in Leaflets 1, 2, and 3 there are -- |
| 09:46:23 | 12 | there are the different presentations related to recovery. |
| 09:46:30 | 13 | Q. Do you have any independent recollection as to your |
| 09:46:35 | 14 | participation in the meeting regarding updating the patient leaflet |
| 09:46:41 | 15 | for Taxotere? |
| 09:46:42 | 16 | A. No, I'm afraid I don't recall that. |
| 09:46:44 | 17 | Q. Looking at Exhibit No. 13, if you'll see at the top of Exhibit |
| 09:46:50 | 18 | No. 13, there is a date -- |
| 09:46:53 | 19 | A. Yes. |
| 09:46:53 | 20 | Q. -- January of 2007? |
| 09:46:55 | 21 | A. Yes. |
| 09:46:56 | 22 | Q. And in this consent form, this is from a clinical trial in |
| 09:47:06 | 23 | Canada. Do you see the Alberta Cancer Board? |
| 09:47:10 | 24 | A. Okay. |
| 09:47:10 | 25 | Q. Do you see that? |

BARBARA EARNEST - CROSS

01:31 1  Q. I'm going to put in there the word "permanent." Okay?
01:31 2  A. But it doesn't say permanent.
01:31 3  Q. My question to you, Mrs. Earnest, is: Even if the word
01:31 4  "permanent" had appeared before "hair loss" on this consent
01:31 5  form, you still would have signed it?
01:31 6  A. No, I wouldn't have. No. I would have asked him about
01:31 7  explain that to me, more about that. I know I would have.
01:31 8  Q. So the only risk you were unwilling to accept was the risk
01:32 9  of permanent hair loss?
01:32 10 A. Yes.
01:32 11 Q. Even compared to brain damage?
01:32 12         MR. SCHANKER: Objection. Asked and answered.
01:32 13         THE COURT: Sustained.
01:32 14 BY MS. SASTRE:
01:32 15 Q. So you said if the word "permanent" had been there, you
01:32 16 would have asked Dr. Carinder about that?
01:32 17 A. Yes, I would have. I would have asked him if there would
01:32 18 be another drug.
01:32 19 Q. Even though you didn't ask him questions about anything
01:32 20 else in the entire consent form?
01:32 21 A. No, I didn't. I think if he -- in my own opinion, I think
01:32 22 that if he had previously had anything happen like that, I
01:32 23 think he would have automatically told me, "Mrs. Earnest, I had
01:33 24 a patient that did this" or "Mrs. Earnest, I had a patient that
01:33 25 did that." He didn't tell me that.