# EXHIBIT CCC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
IN RE:  TAXOTERE (DOCETAXEL)      *      16-MD-2740
PRODUCTS LIABILITY LITIGATION     *
                                  *      Section H
                                  *
Relates to:                       *      July 18, 2018
                                  *
Gahan v. Sanofi, et al.           *      11:30 a.m.
16-CV-15283                       *
                                  *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING BEFORE
THE HONORABLE JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

Appearances:

| | |
|---|---|
| For Kelly Gahan: | Bachus & Schanker, LLC<br>BY: DARIN L. SCHANKER, ESQ.<br>1899 Wynkoop Street, Suite 700<br>Denver, Colorado 80202 |
| For the Sanofi<br>Defendants: | Shook Hardy & Bacon, LLP<br>BY: HARLEY V. RATLIFF, ESQ.<br>2555 Grand Boulevard<br>Kansas City, Missouri 64108 |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR<br>500 Poydras Street, Room B-275<br>New Orleans, Louisiana 70130<br>(504) 589-7778 |

Proceedings recorded by mechanical stenography using computer-aided transcription software.

1  plaintiffs' counsel and review all of those complaints?
2            MR. RATLIFF:  Well, there's two parts to that.  Yes,
3  we have had multiple meet-and-confers, but we sent them a
4  letter on maybe May 22.  That letter, Your Honor, was
5  essentially verbatim of what our motion was going to be.  We
6  said, "Here are the various types of relief that we are going
7  to be seeking," so not just a dismissal, but the kind of
8  laundry list of other potential lesser sanctions:  Can we have
9  access to her computer?  Can we get another deposition?  Will
10 you agree to pay for costs?
11           The only thing I got back from the other side
12 was "We are not going to respond to your accusations of
13 malfeasance."  That's it.  "We have your requests, Sanofi.  We
14 have your demands, Sanofi."
15           "Here's what we want," and the only response I
16 got back from plaintiffs' counsel is "I'm not going to respond
17 to your actions of malfeasance."  At that point, Your Honor,
18 I'm not sure what a meet-and-confer is going to do.
19           I think the other part, Your Honor, is --
20           THE COURT:  I understand, as I appreciate it, the
21 letter contained a list of demands, but I'm curious if there
22 was ever a conversation where you indicated, "I need to see
23 these photographs"?
24           MR. RATLIFF:  Absolutely.
25           THE COURT:  "The two-week photographs from

1  Dr. Weinstein, I need those produced within the next two
2  weeks," has that conversation taken place?
3             MR. RATLIFF:  Absolutely, absolutely.
4             THE COURT:  And they have refused to turn those
5  photographs over?
6             MR. RATLIFF:  Correct and still have not done so
7  today, and we have asked for additional deposition time.  They
8  have refused that.  We would like some of our costs spent on
9  having to go back and forth with Dr. Weinstein to serve
10 subpoenas, to follow up with him, to pay for our vendor to
11 follow up with him because he said, "I don't have records.  I
12 don't have records because Dr. Gahan told me to tell them I
13 don't have records."
14            So I think the other part, Your Honor, about a
15 meet-and-confer is I'm not entirely sure how to meet and confer
16 to say, "Well, tell your client to stop committing discovery
17 fraud, to stop concealing evidence, to stop signing authorized
18 or verified fact sheets that she knows are incorrect, to stop
19 telling your client to tell other treaters to lie to Sanofi."
20 I'm not sure what type of meet-and-confer that is.
21            THE COURT:  Well, I was thinking in terms of
22 photographs, information from Dr. Weinstein, and that sort of
23 thing.
24            MR. RATLIFF:  Your Honor, I think that's
25 information -- I guess what's frustrating to us, Your Honor, is

1  that's information that we were entitled to without a
2  meet-and-confer.  That was information that we were entitled to
3  through the fact sheet process.  That is information we were
4  entitled to through PTO 71A.
5                So I think what we are asking for is not just
6  simply the production of photographs and other documents that
7  we should have been given long ago subject to multiple orders,
8  certainly should have been given to us once it was disclosed at
9  her deposition, but I'm looking for something that sanctions
10 the activity of Dr. Gahan and her willingness to do it
11 repeatedly and her willingness to do it intentionally and her
12 willingness to do it unapologetically.
13           THE COURT:  Thank you.
14            Mr. Schanker.
15           MR. SCHANKER:  Still good morning, Your Honor.
16           THE COURT:  Good morning.
17           MR. SCHANKER:  It's an honor to appear before you
18 here today to discuss a case that I've dedicated a significant
19 part of my life to over the last three years.  As has been made
20 clear in these motions, Dr. Gahan was the first plaintiff in
21 this case.  I think you understand that.  Quite frankly,
22 without Dr. Gahan, I think most here would agree that this case
23 wouldn't even exist.  Because of that, 9,000 women have the
24 opportunity for redress.
25                What I have to say -- I've never really been in

Page 14

1  this situation before, with the false allegations just
2  constructed out of whole cloth, and I'm disgusted by it.
3           THE COURT: Okay. We are going to bring down the
4  vitriol.
5           MR. SCHANKER: Yes, I will. Yes.
6           THE COURT: I read the texts to Dr. Weinstein -- and
7  it's troubling -- that Dr. Gahan forwarded to him basically
8  saying, "I think you can tell them we are just colleagues and
9  I'm not your patient," and the subpoena is coming.
10          MR. SCHANKER: May I address that?
11          THE COURT: Well, I think you need to. Those things
12 are troubling.
13          MR. SCHANKER: Specifically, I will talk about the
14 Dr. Weinstein relationship. So understanding the context of
15 how Dr. Gahan came into contact with Dr. Weinstein, she had
16 lost her hair --
17          THE COURT: Right.
18          MR. SCHANKER: -- and she was devastated. She
19 reached out to Dr. Weinstein not for treatment. As you see
20 from the response, she reached out to Dr. Weinstein to see if
21 she could organize a clinical trial.
22          THE COURT: Right.
23          MR. SCHANKER: Not for treatment at all. As a matter
24 of fact, a clinical trial through the FDA.
25               That was the communication for several months.

1  Then Dr. Weinstein reaches back to her after this had gone on
2  and says, "You know, I have, obviously, this product.  Are you
3  interested in using it?"
4              So, first of all, kind of this idea of a
5  doctor-patient relationship existing and then getting on to the
6  facts that you referenced is it's Dr. Gahan's professional
7  opinion and personal opinion there was no doctor-patient
8  relationship.  Specifically, Dr. Weinstein doesn't even
9  practice.  He is not a medical practitioner.  He is a
10 biopharmaceutical engineer.
11             He didn't ever examine or meet Dr. Gahan
12 specifically.  There was no testing.  He gave her no prognosis,
13 no diagnosis.  He didn't get paid by her.  She never
14 compensated him.  He had no medical records.  All there were
15 were the email communications that, by the way, were not
16 hidden.  They were provided in the ESI discovery.
17             There's nothing else that exists.  There's no
18 medical records in the classic context, no evaluation, no SOAP
19 notes, nothing like that, literally the email correspondence
20 that you saw back and forth.
21             Another clarification, nobody reached out to
22 warn our office or Dr. Gahan that a medical records request was
23 going to be coming.  So what happens is Dr. Weinstein gets this
24 request and says, "I don't know what to do with it.  I don't
25 have any medical records."  He reaches out to Dr. Gahan.