# EXHIBIT GGG

Lesley Fierro

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
 2
                             -  -  -
 3
                                     :
 4    IN RE: TAXOTERE              :
      (DOCETAXEL) PRODUCTS         : MDL No. 2740
 5    LIABILITY LITIGATION         : Section H(5)
      _____      : JUDGE MILAZZO
 6                                 : MAG. JUDGE NORTH
      This Document Relates to: :
 7    All Cases                    :
 8
 9
10                           -  -  -
11                     January 17, 2019
12                           -  -  -
13                      LESLEY FIERRO
14                           -  -  -
15
16           Transcript of the videotaped
      deposition of LESLEY FIERRO, pursuant to
17    the Federal Rules of Civil Procedure, held
      at Nexsen Pruet, 400 Main Street, Suite 100A
18    Main Street Office Campus, Hilton Head Island,
      South Carolina, 29926, commencing 9:00 a.m. on
19    the above-referenced date, as taken by and
      before Karen Kidwell, RMR, CRR, CRC, and Notary
20    Public.
21                           -  -  -
22
23
24            GOLKOW TECHNOLOGIES, INC.
          ph 877.370.3377  |  fax 917.591.5672
25               deps@golkow.com
```

1   in 2010 -- once she received her treatment, I believe

2   you testified that in your opinion, there was nothing

3   in the U.S. package insert about permanent alopecia,

4   correct?

5              MR. DePAZ:  Objection to form.

6              THE WITNESS:  As far as I recall, correct.

7              MR. WOOL:  What number is that exhibit?

8         It's on the front.  Is that 12?

9              MR. DePAZ:  Is this mine or hers?

10         (Exhibit 13 was marked for identification.)

11  BY MR. WOOL:

12       Q.   All right, Ms. Fierro.  I'm going to hand

13  you what I've marked as Exhibit 13, which is an

14  e-mail that you did receive.

15       A.   Okay.

16       Q.   All right.  And I believe I asked you

17  earlier if you remembered there being an issue of

18  women posting on Sanofi's Facebook page about

19  permanent alopecia, and you said you remembered a

20  blog, correct?

21       A.   Mm-hmm.  Yes.

22       Q.   Does this refresh your recollection about

23  the Sanofi-Aventis Voices Facebook page?

24       A.   I don't specifically remember the

25  Sanofi-Aventis Voices Facebook page, but, you know, I

```
 1   recall that there were -- I mean, this did exist.
 2       Q.   Okay.  So let's take a look at this
 3   e-mail.  And it's from Kalpita Talauliker?
 4       A.   Correct.
 5       Q.   If I'm pronouncing that right.  And it's
 6   from April 27th of 2010, correct?
 7       A.   Correct.
 8       Q.   And this is to medinfo@sanofi, right?
 9       A.   This is to -- I mean, this came in from --
10   from U.S. Pharmacovigilance, and went to the database
11   at medical -- in medical information.
12       Q.   Let's start with the first e-mail, because
13   it appears there was an e-mail that was forwarded to
14   you that was then forwarded to pharmacovigilance, so
15   let's start with the original e-mail.
16            This Kalpita Talauliker appears to be
17   e-mailing medical information services, correct?
18       A.   She -- I'm assuming it's a she -- she is
19   e-mailing to the med info mailbox.
20       Q.   And is that the general mailbox of medical
21   information services?
22       A.   It's a -- a mailbox that was maintained
23   for inquiries that came in from different e-mail
24   sources.  I don't know if I'd call it the general --
25   I mean, it was there for specific e-mail sources that
```

```
 1    came in.
 2         Q.   How about we'll just call it the med info
 3    e-mail --
 4         A.   Okay.
 5         Q.   -- when we're referencing that?
 6         A.   Okay.
 7         Q.   Is that fair?
 8         A.   Yeah.
 9         Q.   Okay.  So -- and she appears to work for a
10    company called InTouch Solutions?
11         A.   Correct.
12         Q.   Do you remember InTouch Solutions?
13         A.   Yes.
14         Q.   What -- what do you remember about InTouch
15    Solutions?
16         A.   They were a company that we contracted
17    with -- and when I say "we," it was between medical
18    information and pharmacovigilance -- contracted with
19    to review any Facebook inquiries that -- anything
20    that came in through Facebook.  So they looked at all
21    the Facebook postings to see if there were any
22    adverse events or medical information questions.
23         Q.   And as the company contracted by the two
24    departments, those two departments at Sanofi, how
25    would they have known what to do with the posts?  In
```

1  other words, did Sanofi provide them instructions on
2  what they were being contracted to do?
3      A.  Yes.
4      Q.  Okay.  So Ms. Kalpita -- assuming it's a
5  woman -- when she sent this e-mail, would have been
6  following Sanofi's instructions on how to handle
7  information on the Voices Facebook page, correct?
8          MR. DePAZ:  Object to form.
9          THE WITNESS:  Correct.
10 BY MR. WOOL:
11     Q.  And she writes, on April 7, 2010, to
12 medical information services, MIS:  "I am monitoring
13 the SA Voices Facebook page on behalf of
14 Sanofi-Aventis, and discovered the following
15 comments."  Right?
16     A.  Correct.
17     Q.  And then she appears to put what the
18 comment was?
19     A.  Correct.
20     Q.  "Your drug Taxotere has left me looking
21 like this permanently.  Have you heard of
22 nondisclosure?  Of course you have."
23         You see that?
24     A.  Yes.
25     Q.  And then she finishes -- she, Ms. Kalpita

1    -- "You are receiving this message in accordance with
2    Sanofi-Aventis corporate guidelines."
3         A.   Correct.
4         Q.   Then she says -- and then she says "Thank
5    you," and signs her name.
6              And I guess those corporate guidelines are
7    what I was referring to earlier, sort of the rules
8    that InTouch Solutions would follow in doing the work
9    that they were contracted to do with the corporate
10   guidelines given to them by pharmacovigilance and
11   medical information services, correct?
12             MR. DePAZ:  Objection to form.
13             THE WITNESS:  Correct.
14   BY MR. WOOL:
15        Q.   And so somebody on behalf of the med info
16   e-mail address forwards this e-mail, five minutes
17   later, to the U.S. Pharmacovigilance mailbox and to
18   you.
19        A.   Correct.  It was standard procedure, when
20   they came in from InTouch, they would forward them to
21   someone in the department whose responsibility it was
22   to then read them, if they belonged to -- if they had
23   an adverse event, send them to pharmacovigilance, and
24   to always copy me.
25        Q.   Okay.  And -- and then it appears that it

```
 1   BY MR. WOOL:
 2        Q.   Okay.  I'm going to hand you what I've
 3   marked as Exhibit 14.  And this appears to be another
 4   e-mail to the med info e-mail address from the same
 5   person.  Correct?
 6        A.   Correct.
 7        Q.   And this is the same day, April 7th, 2010?
 8        A.   Correct.
 9        Q.   And she reports to medical information
10   services, "I am monitoring the SA Voices Facebook
11   page on behalf of Sanofi-Aventis and discovered the
12   following comment."  Correct?
13        A.   Correct.
14        Q.   And then she reports -- and this next
15   portion is what she found on the Voices Facebook page
16   that someone had posted; is that right?
17        A.   Correct.
18        Q.   And that post that she found was, "You can
19   see with this photo how your breast cancer drug,
20   Taxotere, has left me disfigured.  You keep data for
21   this adverse side effect very quiet because you don't
22   want women choosing Taxol instead, which is not made
23   by you."  Correct?
24        A.   That's what it says, yes.
25        Q.   That's what the person, according to
```

1  InTouch Solutions, posted on the Sanofi's Facebook
2  page, correct?
3            MR. DePAZ:  Objection to form.
4            THE WITNESS:  Right.
5  BY MR. WOOL:
6      Q.   And then she concludes the same way, "You
7  are receiving this message in accordance with
8  Sanofi-Aventis corporate guidelines."  Correct?
9      A.   Correct.
10     Q.   Are you familiar with Taxol?
11     A.   It's a competitor to Taxotere.
12     Q.   Okay.  Then somebody from med info, Rubin
13 Bedell, forwarded this to pharmacovigilance and to
14 you that same day, correct?
15     A.   Correct.
16     Q.   Do you remember receiving any of these?
17     A.   No, not specifically.
18          (Exhibit 15 was marked for identification.)
19 BY MR. WOOL:
20     Q.   I'm going to hand you what I'll mark as
21 Exhibit 15.
22          Now, if we look down below, it appears
23 this e-mail was forwarded a couple of times.  It
24 appears the original e-mail is from Jim Dayton.  Do
25 you see that?

1          A.    The monitoring report?

2          Q.    Yes.

3          A.    Not that I recall.

4          Q.    All right.  Let's look at the -- the first
5    post.  And it appears that the post was put up on
6    March 10th, 2010, correct?

7          A.    Correct.

8          Q.    And do you remember the date of that
9    article that was in the Canadian Globe and Mail?
10   The -- the date of that article?

11         A.    March 5th.

12         Q.    So it was five days after that, correct?

13         A.    Mm-hmm.  Yes.

14         Q.    And I think earlier, when we were looking
15   at that original article that you were quoted in, we
16   talked a little bit about how news events can
17   sometimes -- about a drug or a product -- can
18   sometimes create an uptick in people interacting with
19   the company.  Do you remember that?

20         A.    Correct.

21         Q.    There was that list of three things on the
22   side, and it was the -- the second one.

23               So here we have, five days after that
24   article in the Globe and Mail, it appears we have a
25   comment from Melissa Ledlie.

Lesley Fierro

 1        A.    Mm-hmm.

 2        Q.    And it appears that she wrote, "When will

 3   you inform oncologists that there's a problem with

 4   your chemo drug, Taxotere?  Why don't you want women

 5   to know they could be left permanently disfigured?"

 6              Is that right?

 7              MR. DePAZ:  Object to form.

 8              THE WITNESS:  Yes, I see where you're

 9         reading.

10   BY MR. WOOL:

11        Q.    And that appears to be the comment that

12   was left on the Sanofi Facebook page, correct?

13              MR. DePAZ:  Object to form.

14              THE WITNESS:  Yes, presumably.

15   BY MR. WOOL:

16        Q.    Okay.  Logged per the guidelines given to

17   InTouch Solutions by Sanofi, right?

18              MR. DePAZ:  Object to form.

19              THE WITNESS:  This is the verbatim comment

20       that was on the page that they are reviewing.

21   BY MR. WOOL:

22        Q.    Okay.  That verbatim comment continues,

23   "Why you don't want women to know they could be left

24   permanently disfigured?"  Is that right?

25        A.    Correct.

Lesley Fierro

1      Q.   And then she continues, "Because they will
2  want to choose a different drug not made by you.  The
3  net is closing in on you, Sanofi.  It's no longer
4  your dirty little secret."
5           Do you see that?
6      A.   Yes.
7      Q.   All right.  Then we'll read across.
8  There's some columns in here, in this monitoring
9  report, and the next one is "The Sentiment."  And
10 this reports that that's a negative sentiment,
11 correct?
12     A.   Yes.
13     Q.   And the next column is "Whether
14 inappropriate language was used," correct?
15     A.   Correct.
16     Q.   And it indicates that there was no
17 inappropriate language used, right?
18     A.   Correct.
19     Q.   And then it says, "Potential adverse
20 events," right?
21     A.   Yes.
22     Q.   And it indicates that this is not a
23 potential adverse event?
24     A.   Correct.
25     Q.   And then there's a question as to whether