# EXHIBIT KKK

# Mamina Turegano, M.D. Expert Report
# October 9, 2020

## Generic Opinions

### Introduction/Education/Practice/Qualifications

I am a triple board-certified dermatologist, internist, and dermatopathologist. I attended undergraduate at Centenary College where I studied neuroscience and piano performance. I graduated summa cum laude.

After graduating from Centenary College, I attended Louisiana State University School of Medicine in New Orleans and received my medical degree. After graduation, I completed a five-year double residency program in internal medicine and dermatology at Georgetown University Hospital and MedStar Washington Hospital Center in Washington, D.C. I was chief resident.

I then worked in private practice dermatology in the metro D.C. area. Then, I moved to Los Angeles and completed a fellowship in dermatopathology at UCLA.

After completing my fellowship, I returned to New Orleans where I am now in private practice at Sanova Dermatology. I am licensed to practice medicine in Louisiana. My practice consists both of general dermatology and dermatopathology. As part of my practice, I diagnose and treat alopecia.

I am also a volunteer instructor at Tulane University in the department of dermatology.

I have published articles in the Journal of the American Academy of Dermatology, Pediatric Dermatology, Journal of the American Medical Association—Dermatology, and Journal of Cutaneous Pathology.

In addition, I have received multiple awards for my presentations at international dermatopathology meetings, and I have received the American Society of Dermatopathology Mentorship Award.

My professional affiliations include: Vice Chair of the South Regional Group Committee of the Women's Dermatologic Society, American Academy of Dermatology, American Society of Dermatopathology, Society for Dermatology Hospitalists, Institute for Functional Medicine, and Academy of Integrative Health & Medicine.

My curriculum vitae is attached as Exhibit A. It contains a list of my publications from the previous 10 years.

I am compensated at the rate of $1,100 per hour for my work on this lawsuit. I previously have not testified as an expert at trial or deposition.




**Dr. Ochsner/Actinic Keratosis**

Ms. Kahn started seeing Dr. Ochsner, a dermatologist, in 2012. [8/14/12 Metairie Road Dermatology.] For Ms. Kahn's first visit, her chief complaint was a mole check. Dr. Ochsner testified that because there was no discussion of hair loss in the record, "it must have not been a recent issue, or at least she never brought it up to me." [Jessica Coller Ochsner Dep. 31:3-10.] If Ms. Kahn raised alopecia as a concern, Dr. Ochsner would have noted it in her record. [Jessica Coller Ochsner 31:11-23.] Dr. Ochsner documents concerns like alopecia in her medical records. [Jessica Coller Ochsner 17:22-18:2.]

Over the course of many years, Ms. Kahn saw Dr. Ochsner seven times. [Jessica Coller Ochsner Dep. 54:13-55:3.] According to Dr. Ochsner's records, Ms. Kahn never raised alopecia as a concern. Instead, during those visits, Ms. Kahn's main concern was actinic keratosis. And Dr. Ochsner removed numerous actinic keratosis lesions from Ms. Kahn's scalp with liquid nitrogen. [Jessica Coller Ochsner Dep. 34:16-35:3.] Treating actinic keratosis can cause alopecia. [Jessica Coller Ochsner Dep. 35:4-18.]

Actinic Keratosis is caused by sun damage. As Dr. Ochsner noted in her deposition, hair provides a protective function from the sun for the scalp, which helps prevent lesions. [Jessica Coller Ochsner Dep. 71:3-7.]

Actinic keratosis lesions take many years of sun damage to develop. In general, over a decade of sun damage must accrue for an individual to be at risk for actinic keratosis lesions.

Consequently, for individuals like Ms. Kahn who develop many actinic keratosis lesions on their scalp, it is a strong indication that the individual has a long history of alopecia. [Jessica Coller Ochsner Dep. 73:8-21.] And Dr. Ochsner believes that Ms. Kahn's

21

actinic keratosis lesions are due to old sun damage. [Jessica Coller Ochsner Dep. 74:14-76:25.]

I agree with Dr. Ochsner. Ms. Kahn likely had well over a decade of alopecia and sun damage before she developed the actinic keratosis lesions that she had removed in 2012. In other words, based on the timing of Ms. Kahn's actinic keratosis lesions, Ms. Kahn likely had a history of alopecia dating back to the early 2000s. That is consistent with a diagnosis of progressive androgenetic alopecia.

## Ms. Kahn Has Not Treated Her Alopecia

If Ms. Kahn tried to treat her alopecia, she could have significant hair regrowth. It is not possible to conclude that Ms. Kahn's hair loss is permanent or irreversible because she has not tried treatment.

## Ms. Kahn's Pathology

Ms. Kahn underwent a scalp biopsy. I have reviewed Dr. Tosti's photographs showing the location of Ms. Kahn's biopsies, as well as Dr. Thompson's photographs of Ms. Kahn's pathology.

Biopsies should be taken from a location with an active alopecia process to ensure that there is sufficient pathological information to review in assessing the specific alopecia process. Biopsies taken from locations where the alopecia process is end stage or has run its course will provide less information, potentially misleading information, and at times will not provide enough information to accurately assess the type of alopecia. Additionally, when assessing androgenetic alopecia, having a "control" biopsy taken from a non-androgen dependent area of the scalp can provide useful information.

Despite taking two biopsies, Dr. Tosti did not take a "control" biopsy. Because of this, it is impossible to pathologically determine Ms. Kahn's baseline hair count.

Further, I disagree with the location where Dr. Tosti decided to take biopsy B. As noted by Dr. Thompson in his label for photographs of the pathology for biopsy B, biopsy B was taken from an area with "end state alopecia with few follicles." The biopsy should have been taken from a location with an active disease process, and a biopsy should have been taken from a non-androgen-dependent area of the scalp.

Additionally, Dr. Tosti's photograph of biopsy B's location shows that it was taken from an area essentially devoid of hair when other nearby areas, such as four millimeters to the left had significantly more hair: