# EXHIBIT B

Page 1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2
3
    CINDY L. SMITH                        PLAINTIFF
4
    VS.                    CASE NO. 2:18-cv-07702
5
    SANOFI US SERVICES,                   DEFENDANT
6   INC. F/K/A
    SANOFI-AVENTIS U.S.,
7   INC., SANOFI-AVENTIS
    U.S. LLC, ET AL.
8
9
    **************************************************
10   VIDEO DEPOSITION OF ELIZABETH HERRINGTON, M.D.
    **************************************************
11
     Taken at the instance of the Defendants via Zoom,
12                on October 14, 2020
         beginning at approximately 1:00 p.m.
13
14
15
                 (APPEARANCES NOTED HEREIN)
16
17
18
19
20
21
22              * * * * * * * *
23                Reported by:
                Julie Brown, CCR 1587
24
25

Page 2

```
 1   APPEARANCES OF COUNSEL:
 2
             For the Plaintiff:
 3
 4               THOMAS A. STRINGER
                 Lowe Law Group
 5               6028 S. Ridgeline Drive
                 Suite 200
 6               Ogden, Utah  84405
                 (801) 917-8500
 7               aaron@lowlawgroup.com
 8
             For the Defendant:
 9
10               LORI R. SCHULTZ
                 TORREY PETERSON
11               Shook Hardy & Bacon L.L.P.
                 2555 Grand Blvd.
12               Kansas City, Missouri  64108
                 (816) 559-2039
13               lschultz@shb.com
14
             For the Witness:
15
16               WHITMAN B. JOHNSON III
                 Currie Johnson Griffin Gaines &
17               Myers, P.A.
                 PO Box 750
18               Jackson, Mississippi  39205-0750
                 601-969-1010
19               Wjohnson@curriejohnson.com
20
     VIDEOGRAPHER:  Evan Tsilimidos
21
22
23
24
25
```

Page 3

I N D E X                      Page

1

2

3    Appearances                                    2

4    Certificate of Court Reporter              111

5    Certificate of Deponent                    112

6

7

8              E X A M I N A T I O N          Page

9    Examination By Mr. Stringer                    5

10   Examination By Ms. Schultz                    56

11

12                   E X H I B I T               Page

13   Exhibit 1        Notice of deposition              10

14   Exhibit 2        CV of Dr. Elizabeth Herrington    10

15   Exhibit 3        Drug information sheet            34

16   Exhibit 4        Dose Recordings                   37

17   Exhibit 5        NCCN Guidelines                   41

18   Exhibit 6        Chemotherapy PowerPoint           48

19   Exhibit 7        Photographs                       62

20   Exhibit 8        American Cancer Society Breast Cancer   65

21                    Dictionary

22   Exhibit 9        National Cancer Institute booklet   71

23   Exhibit 12       Medical records                   88

24

25

Page 4

1           THE VIDEOGRAPHER:  Good afternoon,

2    everybody we are going on the record at

3    approximately 1:02 p.m. on Wednesday October 14,

4    2020.  This begins Media Unit Number 1 of the

5    video-recorded deposition of Elizabeth Herrington,

6    DO, in the matter of Cindy Smith versus Sanofi US

7    Service Inc. et al.  This deposition is being held

8    remotely.  My name is Evan Tsilimidos from Veritext

9    Legal Solutions.  I am the videographer our court

10   reporter today is Julie Brown from Veritext Legal

11   Solutions.

12           Will counsel and all parties presented

13   state your appearances and affiliations for the

14   record.

15           MR. STRINGER:  Aaron Stringer with Lowe

16   Law Group for the plaintiff, Cindy Smith.

17           MS. SCHULTZ:  Lori Schultz and Torrey

18   Peterson for the defendant, Sanofi.

19           MR. JOHNSON:  This is Whit Johnson.  I'm

20   here with Dr. Herrington.

21           THE VIDEOGRAPHER:  Will the court

22   reporter please swear in the witness.

23             Elizabeth Herrington, DO,

24   having been first duly sworn, was examined and

25   testified as follows:

Page 15

1    the efficacy of chemotherapy drugs and the treatment

2    of cancer?

3         A.    No.

4         Q.    Have you ever attended any lectures on

5    the use of taxanes such as Taxol or Taxotere in the

6    treatment of breast cancer?

7         A.    Can you repeat that question?

8         Q.    Sure.  Have you ever attended any

9    lectures on the use of taxanes such as Taxol or

10   Taxotere in the treatment of breast cancer?

11        A.    No, not one drug.

12        Q.    What about taxanes in general for the

13   treatment of breast cancer?

14        A.    No, not specifically, strictly talking

15   about that class of drugs.

16        Q.    Okay.

17        A.    Usually with lectures, they are more --

18   it's a little bit more generalized.

19        Q.    Was it possible that taxanes were

20   discussed during a lecture about treatment in

21   general for breast cancer?

22        A.    Oh, of course, yes.

23        Q.    Have you ever published in any scientific

24   research paper regarding breast cancer?

25        A.    No.

Page 16

1        Q.     Have you ever published any articles

2    elsewhere regarding breast cancer?

3        A.     No.

4        Q.     What medical journals do you subscribe

5    to?

6        A.     Oncology Lancet and Journal of America --

7    it's the medical association, like a journal.

8        Q.     Do you subscribe to the New England

9    Journal of Medicine?

10       A.     Yes.  I get several journals so sometimes

11   it's hard to keep up with each one but...

12       Q.     Right.  And I just have a couple of noted

13   here for I'll ask about.  Do you subscribe to the

14   British Medical Journal?

15       A.     No.

16       Q.     Okay.  Any others that you can think of

17   that you haven't already mentioned?

18       A.     Not that I can think of.

19       Q.     Have you ever testified as an expert?

20       A.     No.

21       Q.     Have you ever served as a consultant or

22   key opinions leader for a pharmaceutical company?

23       A.     No.

24       Q.     Do you have any training in the

25   development of a treatment regimen for breast

1    cancer?

2           MS. SCHULTZ:  Object to the form.

3           THE WITNESS:  Can you ask that again?

4    BY MR. STRINGER:

5       Q.    Sure.  Do you have any training

6    specifically in the development of chemotherapy

7    regimens?

8       A.    Like a development of a new drug?

9       Q.    Drug or cocktail, just some kind of

10   regimen for the treatment of breast cancer.

11          MS. SCHULTZ:  Object to the form.

12          THE WITNESS:  I'm sorry.  Can you repeat

13   that question?

14   BY MR. STRINGER:

15      Q.    Sure.  Yeah.  Do you have any training in

16   the developments of a chemotherapy regimen for

17   treatment of breast cancer?

18          MR. JOHNSON:  I think what he's asking

19   is, if I can help her because I think what he's

20   asking is, is part of your practice, separate and

21   apart from trying to figure out what's best for an

22   individual patient, do you try to work up regimens

23   that apply to groups?  Is that a fair summary of

24   what you're trying to ask?

25          MR. STRINGER:  I think so.  Not

1          And you can see it in the middle column

2     there, the third one down, it says "hair loss";

3     correct?

4          A.    Yes.

5          Q.    And did I read that paragraph above

6     correctly?

7          A.    Yes.

8          Q.    Okay.  Anything in that paragraph, as far

9     as -- anything in that paragraph that you disagree

10    with?

11         A.    I mean, a lot of those, like example for

12    the hair loss, of course it's going to be more than

13    a few hours.

14         Q.    Would you agree that part of what it

15    says, what I read, it says "They are almost always

16    reversible and will go away after treatment is

17    complete," would that apply to most of those side

18    effects that are listed?

19         A.    Generally, yes.

20         Q.    Okay.  So would you say that, generally,

21    hair loss, as one of those symptoms that's listed,

22    is almost always reversible and will go away after

23    treatment is complete?

24         A.    Well, it depends.  We are now telling

25    patients that there's a possibility of permanent

1    hair loss.

2         Q.    Why are you telling them that now?

3         A.    Just basically to prepare them so that

4    they will know what to expect.

5         Q.    Okay.  Do you recall when you started

6    telling your patients that it might be permanent?

7         A.    I can't remember exactly but I think it

8    may have been a year or two ago.

9         Q.    Do you recall what brought about that

10   change?

11             MS. SCHULTZ:  Object to the form.

12             THE WITNESS:  I basically just remember

13   seeing the commercial on TV.

14   BY MR. STRINGER:

15        Q.    Okay.  Are you referring to the lawsuit

16   commercials?

17        A.    Yes.

18        Q.    Okay.

19             MR. STRINGER:  So I'm going to now

20   introduce what I believe is Exhibit 4.

21             (Exhibit 4 marked for identification.)

22             MR. JOHNSON:  I'm just going to move this

23   and get that up for you.

24             THE WITNESS:  Okay.  Thank you.

25   BY MR. STRINGER:

Page 38

1      Q.    Can you see that, this exhibit, at the

2  top, it says "Dose Recordings"?

3      A.    Yes.

4            MR. JOHNSON:  Just so you know, every

5  time you put something up, if we've got it, I'm

6  giving her the hard copy to look at too.

7            THE WITNESS:  I appreciate that.  Thank

8  you.

9  BY MR. STRINGER:

10     Q.    Do you recognize this document?

11     A.    Yes.

12     Q.    And I can represent to you this is --

13  well, I won't represent it.  The name there, can you

14  see where it says "Name:  Cindy Smith"?

15     A.    Yes.

16     Q.    "Smith, Cindy."  And "Birth Date:

17  January 10, 1960"?

18     A.    Yes.

19     Q.    I'm going to backtrack a little bit.  I

20  should have done this at the start.

21         Do you understand that Cindy Smith is part

22  of a lawsuit involving the manufacturer of Taxotere?

23  Do you understand that?

24     A.    Yes.

25     Q.    And do you have any independent

Page 48

1          (Exhibit 6 marked for identification.)

2               MR. STRINGER:  So this will be, I

3     believe, Exhibit 6.  So this, I will represent to

4     you, was provided by Ms. Smith.

5     BY MR. STRINGER:

6          Q.    Do you recognize what it is?

7          A.    I do not.  I presume that this was a

8     handout maybe given in chemo class.

9          Q.    Okay.  Do you ever participate in the

10    chemo class?

11         A.    No.

12         Q.    Okay.  Who runs the chemo class?

13         A.    I think that's the chemotherapy nurses.

14         Q.    So have you seen this before, then?

15         A.    I have not seen this before.

16         Q.    Okay.

17         A.    Or if I have, I don't remember seeing it.

18         Q.    Sure.  Do you know who would have

19    compiled this, it appears to be a PowerPoint of some

20    kind?

21         A.    I would think one of the chemotherapy

22    nurses.

23         Q.    And do you know where they would obtain

24    information to put together a document like this?

25               MS. SCHULTZ:  Object to the form.

```
 1              THE WITNESS:  I do not.
 2    BY MR. STRINGER:
 3         Q.    I'm just going to scroll down.  So
 4    there's several slides, I guess you would call them,
 5    regarding side effects.  So I'm going down to what's
 6    marked page 8 of the exhibit.  Do you see the bottom
 7    slide here where it's titled "Hair Loss"?
 8         A.    Yes.
 9         Q.    So the top bullet point says "Damage to
10    hair follicles by chemo."  Did I read that
11    correctly?
12         A.    I see that.
13         Q.    Okay.  And the sub-bullet point
14    underneath that statement says "Hair will regrow
15    after chemo is completed."  Did I read that
16    correctly?
17         A.    Yes.
18         Q.    Okay.  So is it your testimony that you
19    don't know where they would have -- you don't know
20    where whoever compiled this document would have
21    obtained information?
22         A.    I don't.  I can't speak for them.
23         Q.    Okay.  Do you agree with that statement
24    where it says "Hair will regrow after chemo is
25    completed"?
```

1      A.    Most of the time, it does.  However, we

2  now know that there is the possibly side effect of

3  permanent hair loss.

4      Q.    How much time do you typically devote to

5  discussing temporary hair loss with your patients

6  prior to chemotherapy?

7      A.    I will discuss it as a possible side

8  effect.  But I'm more worried, again, about their

9  life than a cosmetic outcome.  So I tend to focus

10  our discussion on their tumor biology, either stage,

11  and what we prioritize as, you know, the more

12  important side effects.

13      Q.    Okay.  Based on your experience, are

14  patients concerned about hair loss associated with

15  chemotherapy?

16      A.    No, it seems like pretty much all of them

17  know that chemotherapy causes hair loss.

18      Q.    Okay.  So, generally, would you say,

19  then, that temporary alopecia, temporary hair loss

20  is an expected and anticipated side effect of

21  chemotherapy?

22      A.    Yes.

23      Q.    Would you say that permanent alopecia is

24  an expected and anticipated side effect of

25  chemotherapy?

Page 51

1      A.     No, it's not something we usually expect.

2      Q.     How often do you encourage your patients

3  to be an active participant in deciding what

4  regimen, what chemotherapy they will receive?

5      A.     You know, if they have that option,

6  that's wonderful, but with all due respect, it is

7  not like a McDonald's menu where you can just go and

8  pick and choose which ones you want.

9          A lot of times, the regimens, there's, you

10  know, data to support that, and especially in any

11  given clinical situation, with that patient, if

12  there's one that we highly recommend that we feel

13  like that is the best regimen for them, we tell them

14  that.

15          But, of course, you know, if we do feel

16  like that, "Hey, these are two regimens that are

17  available.  Here's the side effects of this.  Here's

18  the side effects."  You know, if there's that

19  option, that's great.  But a lot of times, as a

20  physician, that's what we are trained to do is

21  choose the best for them.

22              MR. JOHNSON:  Hang on just a minute.  I'm

23  sorry.  This conference room is right next to our

24  reception area.

25              MR. STRINGER:  No problem.  I think we

Page 53

1      Q.    Okay.  And what was your --

2      A.    And I don't have that happen frequently.

3      Q.    I'm sorry.  I started talking over you.

4      A.    That's okay.  We don't -- I personally

5  don't have that to happen often because patients

6  want to live most of the time, you know.

7      Q.    Okay.  What do you -- either if you can

8  think of a specific example of that, can you recall

9  what you did in that situation?

10     A.    Well, in those situations, I think it's

11 very important to counsel them and just really spend

12 time with them, make sure that they are

13 understanding what kind of cancer they have, the

14 consequences of their choices and to answer any

15 questions they may have or also just try to

16 understand what their reasoning is behind that.

17     Q.    Okay.

18     A.    And then if they still don't want it,

19 then, you know, we're not going to force somebody,

20 you know, it's their decision.  But as long as they

21 have all of the information to make that decision.

22     Q.    Okay.  And at the time and looking at

23 Ms. Smith situation and when she was treated, at

24 that time, when you prescribed Taxotere to her, did

25 you assume that in doing so that you had been

Page 54

1  provided with true and accurate information

2  regarding side effects of Taxotere?

3      A.   Yes.

4      Q.   And at the time that you prescribed

5  Taxotere to Ms. Smith, you were not aware of the

6  potential risk of permanent hair loss; correct?

7      A.   That's correct.

8      Q.   Had you been made aware of that risk of

9  permanent alopecia at the time of her treatment,

10  would this information have factored into your

11  decisionmaking process?

12          MS. SCHULTZ:  Object to the form.

13          THE WITNESS:  No.

14  BY MR. STRINGER:

15      Q.   Would you have warned the patient that

16  Taxotere was associated with permanent hair loss?

17      A.   Yes.

18      Q.   So after presenting your patient with

19  accurate information about the risks associated with

20  Taxotere, would you honor a patient's decision to

21  not use it if they had concerns about the risk of

22  permanent alopecia?

23          MS. SCHULTZ:  Object to the form.

24          THE WITNESS:  Yes.  I mean, that's part

25  of informed consent.  I'm not going to force someone

Page 55

1  to take a drug.  It may be that that patient, you

2  know, needed to see another doctor if there's a

3  trust issue regarding that.

4  BY MR. STRINGER:

5       Q.    Okay.  And would you agree that the

6  decision on the ultimate use of a chemotherapy drug

7  or regimen is a decision for the patient to make?

8       A.    Yes.  In terms of if they want the

9  treatment or not, is that the question?

10      Q.    Yes.

11      A.    Okay.  Yes.

12      Q.    So assuming they are fully informed of

13  the potential for permanent hair loss.

14      A.    Right.

15      Q.    Okay.

16            MR. STRINGER:  I actually think that I am

17  at a point where I am done for now.  So I don't know

18  if we want to take a short break and come back in

19  and turn it over to you.

20            MS. SCHULTZ:  Yeah, let's do that.  Why

21  don't we take about ten minutes and I'll get my

22  exhibits and things pulled together.  All right?

23            MR. STRINGER:  Okay.  So back just a

24  little bit after 1:30 maybe?

25            THE VIDEOGRAPHER:  The time is 2:22.  We

Page 72

1    could have been, you are saying, something that a

2    chemotherapy nurse might have given to her?

3           A.    Right.

4           Q.    Do you yourself ever provide written

5    information to your patients about chemotherapy?

6           A.    Yes, I do.  Because, you know, especially

7    at that first visit, patients are overwhelmed for

8    the most part and they are not comprehending a lot

9    or will be able to remember a lot of it.  So I try

10   to give them something and go over that with them as

11   well.  And usually now what we use is, what I'll go

12   to is like the document that was exhibited earlier,

13   and then there's also a website, chemocare.com.

14          Q.    So at the time that you were meeting with

15   Ms. Smith, did you -- if you were going to provide

16   information about a drug, did you get that

17   information from chemocare.com?

18          A.    Yes.

19          Q.    And so if you had provided information to

20   Ms. Smith about the drugs that she would be taking,

21   that information would have come from chemocare.com?

22          A.    Basically -- chemocare.com but also in

23   practice with my experience with the drug.

24          Q.    My question was confusing.

25          A.    That's okay.

Page 73

1      Q.    In terms of written information that you

2  provide, if you're providing it about a specific

3  drug, that's information that you get from

4  chemocare.com; correct?

5      A.    Right.  I just find that it's easier, a

6  lot of times, for them to understand, you know.

7      Q.    I understand.  And then so if a patient

8  can then take written information home with them,

9  that gives them some time after the appointment to

10  read through it and learn about chemotherapy?

11      A.    Correct, exactly.

12      Q.    And their drugs?

13      A.    Right.

14      Q.    And so this National Cancer Institute

15  booklet that was given to Ms. Smith, I'm going to

16  ask you some questions about that.

17      A.    Sure.

18      Q.    Let's turn to page 28 of the booklet,

19  which is Bates-stamped PPR189, and this section is

20  entitled "Hair Loss."  Do you see that it says "What

21  it is and why it occurs"?

22      A.    Yes.

23      Q.    If you look with me at that second

24  paragraph.

25      A.    Okay.

Page 74

1        Q.    "Some types of chemotherapy damage the

2   cells that cause hair growth.  Hair loss often

3   starts two to three weeks after chemotherapy begins.

4   The scalp may hurt at first.  Then you may lose your

5   hair, either a little at a time or in clumps.  It

6   talks about one week for all of your hair to fall

7   out."

8            Do you agree with that statement?

9        A.    Yes, generally.

10        Q.    Okay.  Then the next line says "Almost

11   always, your hair will grow back two to three months

12   after chemotherapy is over."

13            Do you agree with that statement?

14        A.    Yes, generally, for the most part.

15        Q.    So almost always, but not always, your

16   hair is going to grow book after chemotherapy is

17   over; correct?

18        A.    Correct.

19        Q.    And that was information provided to

20   Ms. Smith in this booklet; agree?

21        A.    I don't have the information on that.

22   I'll have to take your word.

23        Q.    Do you know if -- and this language in

24   here that says "Almost always, your hair will grow

25   back."  Do you see that phrase?

Page 75

1          A.     Yes.

2          Q.     That's very similar to the language that

3     you use in your current drug information materials

4     for Taxotere; correct?

5          A.     Yes.

6          Q.     And the current materials that you

7     provide to patients about Taxotere includes hair

8     loss as a side effect; correct?

9          A.     That's correct.

10         Q.     And then it says that "The side effects

11    are almost always reversible and will go away after

12    treatment is complete"; correct?

13         A.     Correct.

14         Q.     So, then, in terms of this --

15              MS. SCHULTZ:   What exhibit was this?   The

16    Jackson oncology.   Number 3?   All right.

17

18    BY MS. SCHULTZ:

19         Q.     You know what.   Let's just pull up

20    Number 3 again.   I don't want you to have to answer

21    questions without this in front of you.   This was

22    previously marked as Deposition Exhibit 3.   And is

23    it correct that this is the current written

24    information you give to your patients about

25    docetaxel or Taxotere?

Page 111

1          CERTIFICATE OF COURT REPORTER
2              I, Julie Brown, Court Reporter and Notary
3     Public, in and for the State of Mississippi, do
4     hereby certify that the above and foregoing 110
5     pages contain a full, true and correct transcript of
6     the proceedings had in the aforenamed case at the
7     time and place indicated, which proceedings were
8     recorded by me to the best of my skill and ability.
9              I also certify that I placed the witness
10    under oath to tell the truth and that all answers
11    were given under that oath.
12             I certify that the witness has chosen her
13    right to the reading and signing of the deposition.
14             I certify that I have no interest, monetary
15    or otherwise, in the outcome of this case.
16             Witness my signature and seal this day,
17    October 28, 2020.
18
19
20
21
                        JULIE BROWN, CCR, RPR #8606
22
23    My Commission Expires:
      April 6, 2024
24
25

Page 112

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3    CINDY L. SMITH                        PLAINTIFF

4    VS.                    CASE NO. 2:18-cv-07702

5    SANOFI US SERVICES,                   DEFENDANT

     INC. F/K/A

6    SANOFI-AVENTIS U.S.,

     INC., SANOFI-AVENTIS

7    U.S. LLC, ET AL.

                    Certificate of Deponent

8

9         I, Elizabeth Herrington, M.D., do hereby

10   certify that the foregoing testimony is true and

11   accurate to the best of my knowledge and belief, as

12   originally transcribed, or with the changes as noted

13   on the attached Correction Sheet.

14

15                          _____

16                          Elizabeth Herrington, M.D.

17

18        Subscribed and sworn to before me, this

     the ____ day of _____, 2020.

19

20                          _____

                            Notary Public

21   My Commission Expires:

22   _____

23

24

25

Page 113

1                            ERRATA SHEET

2      PAGE            LINE            CORRECTIONS (IF ANY)

3      _____           _____           _____

4      _____           _____           _____

5      _____           _____           _____

6      _____           _____           _____

7      _____           _____           _____

8      _____           _____           _____

9      _____           _____           _____

10     _____           _____           _____

11     _____           _____           _____

12     _____           _____           _____

13     _____           _____           _____

14     _____           _____           _____

15     _____           _____           _____

16     _____           _____           _____

17     _____           _____           _____

18     _____           _____           _____

19     _____           _____           _____

20     _____           _____           _____

21     _____           _____           _____

22     _____           _____           _____

23     _____           _____           _____

24     SIGNATURE:_____DATE:_____

25                    Elizabeth Herrington, M.D.

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.