# EXHIBIT C

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2

3

4   CINDY L. SMITH                        PLAINTIFF

5   VS.                   CASE NO. 2:18-cv-07702

6   SANOFI US SERVICES,                   DEFENDANT
    INC. F/K/A
7   SANOFI-AVENTIS U.S.,
    INC., SANOFI-AVENTIS
8   U.S. LLC, ET AL.

9

10

11

    ****************************************************
12        ZOOM DEPOSITION OF CALVIN ENNIS, M.D.
    ****************************************************
13

     Taken at the instance of the Defendant virtually
14               on November 17, 2020
         beginning at approximately 3:00 p.m.
15

16

17

                 (APPEARANCES NOTED HEREIN)
18

19

20

21

                     * * * * * * * *
22

23                     Reported by:
             Julie Brown, RPR, CCR 1587
24

25

Page 2

1

APPEARANCES OF COUNSEL:

2

3          For the Plaintiff:
4                THOMAS A. STRINGER
                 Lowe Loaw Group
5                6028 S. Ridgeline Drive
                 Suite 200
6                Ogden, Utah  84405
                 (801) 917-8500
7                aaron@lowlawgroup.com
8
           For the Defendant:
9
10               TORREY PETERSON
                 LORI R. SCHULTZ
11               Shook Hardy & Bacon L.L.P.
                 2555 Grand Blvd.
12               Kansas City, Missouri  64108
                 (816) 559-0317
13               tpeterson@shb.com
14
15    ALSO PRESENT:  Jason Hopkins, videographer
16
17
18
19
20
21
22
23
24
25

Page 3

I N D E X                    Page

1

2

3    Appearances                                    2

4    Stipulation                                    6

5    Certificate of Court Reporter                 72

6

7

8                E X A M I N A T I O N        Page

9    Examination By Ms. Peterson                    7

```
                                                        Page 4
 1                     E X H I B I T S                   Page

 2   Exhibit 1      Photograph                            11

 3   Exhibit 2      Deposition notice                     15

 4   Exhibit 3      Curriculum vitae                      17

 5   Exhibit 4      Initial assessment patient history    31

 6   Exhibit 5      Medical records, May 2016             37

 7   Exhibit 6      Medical records, September 2016       38

 8   Exhibit 7      Medical records, December 5, 2016     39

 9   Exhibit 8      Medical records, September 28, 2016   47

10   Exhibit 10     Medical records, July 5, 2018         49

11   Exhibit 11     Medical records, June 18, 2018        51

12   Exhibit 12     Mississippi Prescription Monitoring   55

13                  Programming record

14   Exhibit 13     Burnham McKinney Pharmacy record      56

15   Exhibit 14     Medical records, July 19, 2019        59

16   Exhibit 15     Medical records, August 16, 2019      65

17   Exhibit 18     ICD code                              43

18

19

20   **REPORTER NOTE**

21   No Exhibit No. 9, 16 or 17 marked in this

22   deposition.

23

24

25
```

Page 5

1

2                    S T I P U L A T I O N

3

4              It is hereby stipulated and agreed by

5       and between the parties hereto, through their

6       respective attorneys of record, and in accordance

7       with the Supreme Court of Mississippi's Emergency

8       Administrative Order 6, that this deposition may be

9       taken at the time and place, with the use of

10      audio-visual communications, by JULIE BROWN, Court

11      Reporter and Notary Public, pursuant to the Rules;

12                    That the formality of READING AND

13      SIGNING is specifically WAIVED;

14                    That all objections, except as to the

15      form of the questions and the responsiveness of the

16      answers, are reserved until such time as the

17      deposition, or any part thereof, may be used or

18      sought to be used in evidence.

19                          - - -

20

21

22

23

24

25

1    Julie can take down everything.  Okay?

2         A.    Okay.  Thank you.

3         Q.    And if you need a break at any time, just

4    let me know.

5              So what type of physician are you?

6         A.    Family practice.

7         Q.    And how long have you been practicing?

8         A.    54 years.

9         Q.    And what is the name of your practice?

10        A.    Escatawpa.  E-S-C-A-T-A-W-P-A.

11             THE VIDEOGRAPHER:  Torrey, we may want to

12   go to phone audio.  Let's try the phone since we

13   have help there.  So the time is 3:31 p.m.  We are

14   off the record.

15                  (Off the record.)

16             THE VIDEOGRAPHER:  We are back on the

17   record.  The time is 3:38 p.m.

18   BY MS. PETERESON:

19        Q.    Okay.  Doctor, you were just telling me

20   that your practice is called Escatawpa.  Did I

21   pronounce that right?

22        A.    That's good.  That's a great start.  You

23   now can be a Choctaw.

24        Q.    Okay.  Do you own that practice?

25        A.    Not anymore.  I sold my practice to the

1   hospital five years ago, but I own the physical

2   structure and the contents.

3        Q.    Okay.  How long have you been working at

4   Escatawpa Family Clinic?

5        A.    Four years.

6        Q.    And how many office locations are there?

7        A.    One.

8        Q.    Do you understand that you're here today

9   to testify about your care and treatment of

10  Ms. Cindy Smith?

11       A.    Yes, I am.

12       Q.    Is Ms. Smith your patient?

13       A.    Yes, she is.

14       Q.    How long has she been your practice?

15       A.    Well, her first visit was August 2016.

16       Q.    Did you treat Ms. Smith in 1995 or have

17  any recollection of treating her back then?

18       A.    No, I did not.  I may have, but that note

19  would be gone by now.

20       Q.    When is the last time you saw her?

21       A.    I saw her on November -- I saw her -- I

22  did a telephone consultation on November the 13.

23       Q.    2020?

24       A.    2020.  No, that was a face-to-face on

25  November 13, 2020.

1      Q.    Okay.  So she came into your office then?

2      A.    Yes, she did.

3      Q.    Do you have an independent recollection

4  of Ms. Smith?

5      A.    Independent?

6      Q.    Do you know what she looks like, off the

7  top of your head?

8      A.    Yes, I do.

9      Q.    And you've been treating her for about

10  every month for the past four years; is that right?

11      A.    Not every month.  Every month for about

12  the past three years probably.  I'll have to see how

13  far this -- computer goes back 24 months.  So every

14  month for 24 months.

15      Q.    I'm going to share -- go ahead.

16      A.    I'm sorry.  And intermittently before

17  that.

18      Q.    I'm going to share my screen and show you

19  what's been marked as Exhibit 1.

20      (Exhibit 1 marked for identification.)

21      Q.    And this is a photo I have of Ms. Smith,

22  and it's from April of 2018.  Is this photo

23  consistent with your recollection of what Ms. Smith

24  looks like or who Ms. Smith is?

25      A.    Yeah, I recognize her.

Page 12

1      Q.    Are you aware that she filed a lawsuit
2   against my client, Sanofi?
3      A.    I am now, yes.  I know that.
4      Q.    How did you find --
5      A.    When you asked for a deposition.
6      Q.    Did you ever discuss this lawsuit with
7   Ms. Smith?
8      A.    Yes, I did.
9      Q.    When did you discuss it with her?
10      A.    In the last visit.  I asked her why she
11   was suing you.
12      Q.    What did she tell you?
13      A.    Because she lost her hair because of the
14   chemotherapy.
15      Q.    Did she tell you anything else about her
16   allegations in this case?
17      A.    No, not as I recall.
18      Q.    Did she tell you what type of hair loss
19   she is claiming?
20      A.    She claims she lost her scalp hair and
21   her eyebrow hair.
22      Q.    And when did she lose it?
23      A.    I don't know exactly when but sometime
24   after chemotherapy.
25      Q.    And did she tell you that she's still

1      Q.    And how -- approximately, in 54 years,

2   how many patients have you treated with hair loss?

3      A.    Hundreds.

4      Q.    What percentage is female?

5      A.    Probably 60 percent, I would say,

6   60 percent.

7      Q.    Okay.  And what are the typical ages that

8   you would --

9      A.    I lost you again.  I've got to put in my

10  password again.  Just hold on.  This system knocks

11  me out after a few minutes.  Why, I don't know.  I'm

12  trying to get -- okay.  Where's the okay on here?  I

13  put the password in so...  There we are.

14         Okay.  Say that again, please.

15     Q.    What is the typical age range of the

16  patient population you've treated for hair loss?

17     A.    Oh, probably over 40.  40 to 60 maybe.

18     Q.    Okay.  And what types of medical

19  conditions do these patients have?

20     A.    Most of them have a condition called

21  alopecia areata, which is autoimmune loss of hair.

22  We're talking about the women; right?  Number two is

23  hair loss from chemotherapy.  Pretty common.

24     Q.    When you say that hair loss from

25  chemotherapy, what to kind of hair loss do you mean?

1      A.      Scalp hair loss usually.

2      Q.      And is that temporary hair loss?

3      A.      Usually, yeah, usually.

4      Q.      Have you ever seen anything aside from

5   temporary hair loss following chemotherapy?

6      A.      I don't think so.  Almost all recover.

7   Whether they recover a full head of hair, I don't

8   know.  But all I know, they recover some hair.

9      Q.      Okay.  And then the first one you said

10  was alopecia areata that is caused by autoimmune

11  diseases.  What are some of the autoimmune diseases

12  that have caused that?

13     A.      Well, it's its own autoimmune disease.

14     Q.      Okay.

15     A.      It's its own autoimmune disease.

16     Q.      Okay.  And how do you go about diagnosing

17  a patient is alopecia?

18     A.      Loss of hair.  "My hair is falling out,

19  Doctor.  My hair is falling out."

20     Q.      Would you say that most of the times you

21  treat patient for hair loss, it's patient reported?

22     A.      Yes.

23     Q.      Do you do scalp exams?

24     A.      Yes.

25     Q.      Do you use any type of instrument, like a

1     trichoscopy?

2          A.    What's it called?

3          Q.    Tri -- I think I'm pronouncing right but

4     I might be --

5          A.    I never heard it of it.  That's a new one

6     on me.

7          Q.    How about this:  When you look at a

8     patient's scalp, how do you exam it to determine if

9     there's hair loss?

10         A.    I'll use this instrument, it's called

11    fingers.

12         Q.    Okay.  And you talked about two main

13    categories, the alopecia areata and chemotherapy.

14    What percentage, would you say, of your patients

15    that have hair loss are experiencing it from

16    alopecia areata?

17         A.    I'd say most because that's more common

18    than breast cancer and chemotherapy.

19         Q.    And for chemotherapy, would you say it's

20    less than 15 percent?

21         A.    Yeah.  Probably.  That's a good number.

22         Q.    Okay.  Any other medical conditions that

23    can cause hair loss?

24         A.    Oh, yeah.  Lots of other ones.

25         Q.    What ones can you share with me?

Page 27

1        A.     Hypothyroidism.

2        Q.     Okay.

3        A.     Underfunctioning of your thyroid gland is

4   probably number three.

5        Q.     What about anxiety and depression and

6   stress?

7        A.     Yeah, that can do some too.

8        Q.     Menopause?

9        A.     No, I haven't noticed that much.

10       Q.     Okay.  What about just age of a patient?

11       A.     Age can do it, yeah.

12       Q.     Hereditary conditions?

13       A.     I don't know if hair loss is hereditary.

14  I don't think that anybody knows that.  I'd have to

15  google it.  I don't know.

16       Q.     Have you ever heard of androgenetic

17  alopecia?

18       A.     Yes.

19       Q.     And is that something you've seen in your

20  patients?

21       A.     Yes, I've seen that too.

22       Q.     And how would you describe androgenetic

23  alopecia?

24       A.     In females?

25       Q.     Yes.

1      A.     I know it causes kind of a Christmas tree

2    appearance like that, whereas men, we lose hair up

3    here, like Aaron has, up here on the top itself.

4    But women have a Christmas tree appearance, like

5    limbs off a Christmas tree.

6      Q.     Okay.  Can medications cause hair loss?

7      A.     Yeah, sometimes, sure.  What ones, I

8    don't know.  If you look, almost every drug has a

9    complication of hair loss, that I know of, in the

10   insert.

11     Q.     Do you know why that is?

12     A.     Why that is?  Because if more than one

13   percent of people using the drug have hair loss,

14   it's got to be reported by you companies in the

15   insert; right?  Something like that.

16     Q.     Okay.  Okay.  So I guess if a patient

17   walks in and says, "Dr. Ennis, I have hair loss,"

18   can you walk me through what would you do with that

19   patient?

20     A.     Well, I would ask them if they had

21   chemotherapy, and I'd examine them and try to

22   determine what kind of hair loss.  Do some lab work.

23   Make sure they are not hypothyroid or any other

24   metabolic abnormality and then go from there.

25     Q.     Okay.  What kind of lab work would you

Page 29

1   do?

2        A.    Check thyroid, complete metabolic

3   profile, CBC, ask them what drugs they have been

4   taking, if they've been pulling their hair or not.

5   A lot of women use excess tracks on their hair and

6   such.  Especially African-American women like to use

7   a lot of beads and pulls and whatever other

8   contraptions, and that places stress on the hair

9   follicle, and that causes hair loss so...

10        Q.    And if a patient has hypothyroidism, what

11   would you do?

12        A.    Try to find out why.  Makes sure it's

13   what is called primary and the thyroid gland itself

14   is secondary from another cause, which is more lab

15   work and sometimes imaging of the thyroid.

16        Q.    Okay.  If a woman has hypothyroidism and

17   is complaining of hair loss, is there anything you

18   can do about her hair loss?

19        A.    Well, she probably needs thyroid

20   replacement therapy, and very often her hair will

21   come back.

22        Q.    Do you ever refer patient to

23   dermatologists if they are complaining of hair loss?

24        A.    Sometimes.

25        Q.    Is that at the patient's request or just

Page 30

1    your professional decision-making?

2         A.    I think both.  Both.

3         Q.    And what medications do you prescribe for

4    a woman who has complained of hair loss?

5         A.    Usually I put them on spironolactone.

6    The trade name is Aldactone, A-L-D-A-C-T-O-N-E.

7    Generic name is spironolactone,

8    S-P-I-R-O-N-O-L-A-C-T-O-N-E.

9         Q.    And how does spironolactone treat hair

10   loss?

11        A.    It has an antiandrogenic effect.

12        Q.    And what is that?

13        A.    It reduces testosterone levels.  High

14   testosterone, both in males and females, often

15   causes the atrophy of hair follicles.

16        Q.    Okay.  Now, you'd agree with me that

17   you're not an expert in dermatology; right?

18        A.    No, I'm not an expert in dermatology.  I

19   guess I'm not an expert in dermatology.

20        Q.    Me neither.  And you wouldn't say you're

21   an expert hair loss; right?

22        A.    No, I'm not an expert in hair loss.

23        Q.    Okay.  So let's go ahead and turn to your

24   treatment of Ms. Smith.  And I'm going to go ahead

25   and -- here we go.  Look at Exhibit 4, and I'll

1      Q.    Okay.  So without going through every

2   single record, I'll represent to you that Ms. Smith

3   also visited you in June of 2016, July of 2016,

4   August of 2016, and there were no complaints of

5   alopecia or hair loss at those visits.  Do you have

6   any reason to disagree with that, that we would need

7   to walk through those individual records?

8      A.    Well, I'm looking at it now, and I see

9   no -- no recording of alopecia.

10           MS. PETERESON:  Then let's move on to

11   Exhibit 6.

12       (Exhibit 6 marked for identification.)

13   BY MS. PETERESON:

14      Q.    Okay.  And this is from September of

15   2016, and it has your name here.

16           Do you see that?

17      A.    Yes, I do.

18      Q.    Okay.  And I want to go down.  And on

19   page 10, Bates stamp 000077, under history of

20   present illness, Number 1, it says "Left breast

21   cancer.  She had surgery done in 2014.  She sees

22   Dr. Gatewood for management to make sure she does

23   not have any glands on her collar bones and under

24   her arms.  Patient states her chemotherapy radiation

25   caused arthritis."

Page 39

1           Do you see that?

2     A.    Yes, I do.

3     Q.    Did I read that correctly?

4     A.    Yes.

5     Q.    So at this visit, Ms. Smith was

6  complaining about a side effect that she was still

7  experiencing from her chemotherapy; is that right?

8     A.    Yes.

9     Q.    And this was in September of 2016, so

10  this was over two years after her chemotherapy;

11  correct?

12     A.    Yes, it is.

13     Q.    And I'm happy to scroll again.  At this

14  visit, Ms. Smith did not complain of her hair loss

15  related to chemotherapy or even generally; correct?

16     A.    That is correct.

17           MS. PETERESON:  Let's go to Exhibit 7.

18      (Exhibit 7 marked for identification.)

19  BY MS. PETERESON:

20     Q.    Exhibit 7 is another medical record from

21  your office, and it shows your name here, and this

22  is from December 5, 2016.

23           Do you see that?

24     A.    I do see it.

25     Q.    I'm going to scroll down here.  Under the

Page 40

```
 1  office and clinic notes, it says "Ursula Knight."
 2  Who is Ursula Knight?
 3       A.    Ursula Knight is a nurse practitioner.
 4       Q.    Do you work with her?
 5       A.    She was here for a couple of years and
 6  apparently she saw Ms. Smith on that visit.
 7       Q.    Okay.  Does Ms. Knight still work at the
 8  clinic?
 9       A.    No, she does not.
10       Q.    Okay.  What were your impressions of
11  Ms. Knight?
12       A.    She was well-educated and an excellent
13  nurse practitioner.
14       Q.    Do you know where she works now?
15       A.    She works in another clinic about ten
16  miles from here.
17       Q.    Do you know the name of it?
18       A.    No, I don't know the official name.
19       Q.    Do you know the unofficial -- what was
20  that?
21       A.    It's in Pascagoula, Mississippi.
22       Q.    Okay.
23       A.    Do you want me to spell a Pascagoula for
24  you?
25       Q.    So did you also see Ms. Smith on this
```

1   visit or would that have just been Ms. Knight?

2        A.    No, she would have seen her alone.

3        Q.    So under chief complaint here, it says

4   "Prescription refill, anxiety referral to derm."

5             Do you see that?

6        A.    I do.

7        Q.    Okay.  And then under history of present

8   illness, Number 3, it says "Alopecia.  Patient's

9   hair has thinned since it has grown back from

10  chemotherapy.  Patient would like a referral to

11  dermatology to see if there's something that can

12  help with her hair growth."

13            Did I read that correctly?

14       A.    Yes, you did.

15       Q.    Does this -- knowing that it was actually

16  Ms. Knight who filled out this medical record, but

17  based on your practices at Escatawpa Family

18  Practice, is it your impression that it was

19  Ms. Smith who was telling Ms. Knight that she had

20  hair loss?

21       A.    Well, I can't tell for sure.  It doesn't

22  say that.

23       Q.    Okay.

24       A.    I don't know.

25       Q.    If it says "Patient will like a referral

Page 42

```
 1   to dermatology," what does that mean to you?
 2        A.    That a patient asked for a referral.
 3        Q.    Do patients need referrals for insurance
 4   coverage?
 5        A.    Sometimes, but not -- do you mean can
 6   they self refer?  Most of them can, they don't need
 7   a referral.
 8        Q.    What would a patient coming to see you
 9   asking -- or to your clinic asking for a referral to
10   dermatology, what would be the purpose of that,
11   then?
12        A.    To help -- in this case?
13        Q.    Yeah.
14        A.    Or in any case?  In general, it would be
15   for a skin problem, which includes hair.
16        Q.    Okay.  And then let's go under the
17   physical exam.  And under the physical exam section,
18   Ms. Knight did not note hair loss or alopecia under
19   it; correct?
20        A.    That is correct.
21        Q.    If you were going to report hair loss
22   under the physical exam section, where would it
23   appear?
24        A.    It would appear under skin, third from
25   the bottom.
```

```
 1          Do you see that?

 2      A.    I see it.

 3      Q.    And that's the same thing as

 4  spironolactone; correct?

 5      A.    Yes, it is.

 6      Q.    And you already shared with us earlier

 7  that spironolactone can be used to treat hair loss;

 8  correct?

 9      A.    Yes.  It is used for that.

10      Q.    And it's used to treat androgenetic hair

11  loss or androgenetic alopecia?

12      A.    Yes, it is.

13      Q.    Okay.  Do you also use it to treat

14  alopecia areata?

15      A.    Yes, sure.

16      Q.    Did you do a biopsy of Ms. Smiths's

17  scalp?

18      A.    No, I did not.

19      Q.    Did you do an evaluation of her full

20  scalp?

21      A.    I can't recall.  That's two years ago.  I

22  can't recall.

23      Q.    Do you know where she had alopecia at?

24      A.    No, I can't recall.  Two years ago.

25  Two-and-a-half years ago almost.
```

1      Q.    Based on this medical record, did you

2   diagnose Ms. Smith with permanent

3   chemotherapy-induced alopecia caused by Taxotere?

4      A.    No, I did not.

5      Q.    Have you ever diagnosed Ms. Smith with

6   permanent chemotherapy-induced alopecia caused by

7   Taxotere?

8      A.    No, I have not.

9      Q.    Are you familiar with the drug Taxotere?

10     A.    I know the name, but that's about it.

11     Q.    Do you know what type of drug Taxotere

12   is?

13     A.    It's used for chemotherapy in certain

14   types of breast cancer.

15     Q.    Now, this appointment in July of 2019 is

16   about three years after Ms. Knight referred

17   Ms. Smith to a dermatologist.  Do you recall any

18   time in those three years, in the 36 appointments

19   that Ms. Smith came to your office, that she raised

20   a complaint about her hair?

21     A.    No, I do not recall that.

22     Q.    I want to jump back to Exhibit 1.  This

23   is the picture of Ms. Smith, and this is from April

24   of 2018.  And I'll represent to you that this is the

25   closest in time -- you know, basically the closest

1    in time photo I have of Ms. Smith from this

2    July 2019 appointment.  I don't have a photo of her

3    from 2019.

4         A.    Okay.

5         Q.    Is this photograph of her and her hair

6    consistent with what your memory is when discussing

7    alopecia with her in July of 2019?

8              MR. STRINGER:  Object to the form.

9              THE WITNESS:  I can't remember.

10   BY MS. PETERESON:

11        Q.    Do you remember if Ms. Smith showed any

12   additional hair loss from the picture in Exhibit 1?

13        A.    Any additional hair loss.

14        Q.    Or just did you -- do you know any -- do

15   you remember any hair loss specific from that

16   appointment that wouldn't be represented in this

17   photograph?

18        A.    I can't recall.  I don't know.

19        Q.    And I think you said that you saw

20   Ms. Smith just about a week ago; correct?

21        A.    Three or four days ago.

22        Q.    Was Ms. Smith's hair, at that appointment

23   three or four days ago, consistent with how it looks

24   in this photograph?

25        A.    No.  No, it is not.

Page 72

1            CERTIFICATE OF COURT REPORTER

2                I, Julie Brown, Court Reporter and Notary

3       Public, in and for the State of Mississippi, do

4       hereby certify that the above and foregoing 71

5       pages, including this page, contain a true and

6       accurate transcription of the testimony of Calvin

7       Ennis, M.D., in the aforenamed case at the time and

8       place indicated, which proceedings were recorded by

9       me to the best of my skill and ability.

10               I also certify that I placed the witness

11      under oath to tell the truth and that all answers

12      were given under that oath.

13               I certify that the witness has chosen to

14      waive his right to the reading and signing of the

15      deposition.

16               I certify that I have no interest, monetary

17      or otherwise, in the outcome of this case.

18               Witness my signature and seal this day,

19      December 3, 2020.

20

21

22                      _Julie Brown_

23                      JULIE BROWN, CCR, RPR #8606

24

25      My Commission Expires: April 6, 2024

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.