# EXHIBIT E

**EXPERT REPORT**

**DAVID A. KESSLER, M.D.**

## TABLE OF CONTENTS

I.      QUALIFICATIONS ................................................................................................ 1

II.     SCOPE OF EXPERT OPINIONS ........................................................................ 3

III.    DEVELOPMENT OF TAXANES AND REGULATORY OVERVIEW OF
        TAXOTERE ........................................................................................................... 3

IV.     THE ROLE OF THE DRUG MANUFACTURER AND THE FDA................................. 9

        A.     The Purveyor Of A Drug Has Primary Responsibility For A Drug's Safety ........ 9
        B.     A Drug Manufacturer's Responsibility To Investigate And Disclose Risks
               After A Drug Is On The Market ........................................................................... 15

V.      KEY DEFINITIONS ............................................................................................. 20

VI.     IRREVERSIBLE ALOPECIA MEETS FDA CRITERIA OF "SERIOUS" AND/OR
        "CLINICALY SIGNIFICANT" ............................................................................... 21

VII.    METHODOLOGY FOR ASSESSING WHETHER THERE IS REASONABLE
        EVIDENCE OF A CAUSAL ASSOCIATION BETWEEN TAXOTERE AND
        IRREVERSIBLE ALOPECIA ................................................................................. 31

VIII.   APPLICATION OF FACTORS FROM FDA LABELING GUIDANCE TO THE
        DATA REGARDING TAXOTERE AND IRREVERSIBLE ALOPECIA .................... 39

        A.     First Factor: The Frequency of Reporting ........................................................... 39
        B.     Second Factor: Whether the Adverse Event Rate in the Drug Treatment Group
               Exceeds the Rate in the Placebo and Active Control Group in Controlled
               Trials ..................................................................................................................... 44
        C.     Third Factor: Whether There Is Evidence of a Dose-Response Relationship ...... 47
        D.     Fourth Factor: The Extent to Which the Adverse Event Is Consistent with the
               Pharmacology of the Drug ................................................................................... 48
        E.     Fifth Factor: The Temporal Association Between Drug Administration and the
               Event ..................................................................................................................... 50
        F.     Sixth Factor: Existence of Dechallenge and Rechallenge Experience ................ 51
        G.     Seventh Factor: Whether the Adverse Event Is Known to Be Caused by
               Related Drugs........................................................................................................ 52
        H.     Conclusions Regarding the Seven Factors............................................................ 54

IX.     SANOFI'S LABELING FAILED TO ADEQUATELY DISCLOSE THE RISK OF
        IRREVERSIBLE ALOPECIA WITH TAXOTERE ...................................................... 54

X.      SANOFI'S MARKETING AND PROMOTIONAL EFFORTS TO
        DIFFERENTIATE TAXOTERE VERSUS TAXOL/PACLITAXEL MISLED
        PHYSICIANS AND DOCTORS AND PUT PATIENTS AT AN INCREASED RISK
        OF HARM ............................................................................................................. 63

XI.     CONCLUSIONS.................................................................................................... 87

ii

# APPENDICES

Appendix A    Curriculum Vitae

Appendix B    Prior Testimony

Appendix C    Materials Considered

# SCHEDULES[1]

Schedule 1    Prior and Current FDA Regulations Regarding Manufacturers' Duties and Responsibilities

Schedule 2    MDL Bellwether Cases

Schedule 3    Taxotere Indications

Schedule 4    Alternative Therapies for the Types of Cancer for Which Taxotere is Indicated

Schedule 5    Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report

Schedule 6    Sanofi Employees and Personnel Cited or Referenced in Report

Schedule 7    Relevant Language and Revisions Made to Taxotere Labeling Related to Irreversible Alopecia

Schedule 8    Communications between Sanofi and the FDA Regarding Proposed Language for the 2004 Label Change

Schedule 9    Published Medical Literature Used, Referenced, or Cited in Abbott's Marketing and Promotion of Taxotere

---

[1] All schedules were prepared by legal staff at my request and subject to my review.

I.    **QUALIFICATIONS**

1.      My name is David A. Kessler, M.D. I received my M.D. degree from Harvard Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.

2.      I did my pediatrics training at Johns Hopkins Hospital.

3.      I was appointed in 1990 by President George H. W. Bush as Commissioner of the United States Food and Drug Administration ("FDA") and was confirmed by the United States Senate.  I also served in that position under President William Jefferson Clinton until February 1997.

4.      I have taught food and drug law at Columbia University Law School, and I have testified many times before the United States Congress on food, drug, and consumer protection issues under federal and state law.  Over the last thirty years, I have published numerous articles in legal, medical, and scientific journals on the federal regulation of food, drugs, and medical devices. I have had special training in pharmacoepidemiology at Johns Hopkins Hospital. My resume, including a list of my published books and articles, is included in Appendix A.  A list of cases in which I have appeared as a witness in the last five years, and documentation of my expert witness fee, is attached as Appendix B.

5.      As Commissioner, I had ultimate responsibility for implementing and enforcing the United States Food, Drug, and Cosmetic Act.  I was responsible for overseeing five Centers within the FDA.  They included, among others, the Center for Drug Evaluation and Research, the Center for Devices and Radiological Health and the Center for Biologics Evaluation and Research.  In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as possible.  During my tenure as Commissioner, the FDA announced a number of new programs including: the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for

drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MEDWatch program for reporting adverse events and product problems involving both drugs and devices. I created an Office of Criminal Investigation within the Agency to investigate suspected criminal violations of the Food, Drug, and Cosmetic Act, FDA regulations, and other related laws. I worked closely with and was ultimately responsible for the FDA's Division of Drug Marketing, Advertising and Communications. I have published articles on drug promotion and marketing practices.[2]

6.      I am a senior advisor to TPG Capital, a leading global private equity firm, which owns pharmaceutical and biomedical companies. I previously served on the board of Aptalis Pharma and Tokai Pharmaceuticals, and I currently serve on the board of the medical device and biologics company Immucor, Inc. In these advisory and fiduciary capacities, I have advised companies on the standards and duties of care within the pharmaceutical and medical device industry. I also previously chaired the compliance committees of both Aptalis, and I currently chair the quality committee of Immucor, which involves ensuring compliance with FDA laws and requirements.

7.      The documents provided to me by counsel, or that I accessed independently from various sources, including but not limited to the FDA's website, are listed in Appendix C to this report. Based on my review of those documents and my training and experience, I have a number of opinions that are detailed below.

---

[2] These include: "The federal regulation of prescription drug advertising and promotion." (*JAMA*. 1990 Nov 14;264(18):2409-15); "Drug promotion and scientific exchange. The role of the clinical investigator." (*N Engl J Med*. 1991 Jul 18;325(3):201-3); "Communicating with patients about their medications." (*N Engl J Med*. 1991 Dec 5;325(23):1650-2); "Therapeutic-class wars--drug promotion in a competitive marketplace." (*N Engl J Med*. 1994 Nov 17;331(20):1350-3); and "Direct-to-consumer advertising: is it too late to manage the risks?" (*Ann Fam Med*. 2007 Jan-Feb;5(1):4-5).

II.   **SCOPE OF EXPERT OPINIONS**

8.      It is my understanding that the cases in this litigation include but are not limited to the following claims as they relate to docetaxel/Taxotere (hereinafter referred to as "Taxotere"): failure to warn and misrepresentation claims based on strict products liability and negligence theories, fraudulent misrepresentation, fraudulent concealment, and fraud and deceit.

9.      In this report, I use the term "Sanofi" to refer to Sanofi US Services Inc. f/k/a Sanofi Aventis U.S. Inc. Sanofi-Aventis U.S. LLC, and their affiliates, subsidiaries, successors, and assigns.

10.     My understanding is that the bellwether plaintiffs at this time include, but are not limited to: 1) Antoinette Durden v. Sanofi S.A., et al., Case No. 2:16-cv-166335; 2) Tanya Francis v. Sanofi S.A., et al., Case No. 2:16-cv-17410; and 3) Barbara Earnest v. Sanofi S.A., et al., Case No. 2:16-cv-17144.[3]

11.     I have been asked to address Sanofi's duty to warn physicians and patients about the risks of irreversible[4] hair loss associated with Taxotere from the years 1990 to 2015 and, because of the date of Taxotere administration to the bellwether plaintiffs cited above, to specifically provide opinions about Sanofi's duty by as early as 2009.[5]

III.   **DEVELOPMENT OF TAXANES AND REGULATORY OVERVIEW OF TAXOTERE**

12.     Taxanes are a class of drugs that includes Taxotere.

---

[3] *See* Schedule 2, MDL Bellwether Cases.

[4] I use the term "irreversible" in this Report to distinguish between the temporary and non-temporary nature of this injury.  For purposes of this Report, however, "irreversible" also includes other non-temporary descriptions, including but not limited to: chronic, permanent, long-term, ongoing, persistent, and persisting.  The definition of "irreversible" hair loss is more fully discussed below in Section V of this Report.

[5] I reserve the right to study the issues at both earlier and later dates.  I also reserve the right to supplement this report should additional documents or information be produced.

13.     In 1962, the U.S. Department of Agriculture, under contract to the National Cancer Institute ("NCI") collected bark from the Pacific yew tree, *Taxus brevifolia*, as part of their natural products screening program.[6] Under this program, the NCI looked to find natural products that might cure cancer.[7]

14.     By 1966, researchers discovered that extracts from the bark of the Pacific yew tree had cytotoxic activity against cultures of carcinoma cells.[8] The active component was isolated and called paclitaxel.[9] Due to the scarcity of the compound—a half a gram of taxol required twelve kilograms of dried bark and a Pacific yew tree yielded approximately two kilograms—researchers looked to synthesize the compound.[10]

15.     In 1984, NCI began phase I clinical trials of paclitaxel extracted from bark of the Pacific yew tree.[11] Following initial encouraging results, NCI convened workshops in 1990 and 1992 to discuss the importance of the paclitaxel and strategize solutions to the drug's supply problem.

16.     In addition, to address the supply issue, NCI sought collaboration with private industry, and in 1991, NCI signed a Cooperative Research and Development Agreement with Bristol-Myers Squibb ("BMS").[12] BMS received the marketing rights for paclitaxel and access to

---

[6] Donehower R. (1996). The Clinical Development of Paclitaxel: A Successful Collaboration of Academia, Industry, and the National Cancer Institute. The Oncologist 1:240.

[7] (Sanofi_02489593 at 3); Donehower R. (1996). The Clinical Development of Paclitaxel: A Successful Collaboration of Academia, Industry, and the National Cancer Institute. The Oncologist 1:240.

[8] Donehower R. (1996). The Clinical Development of Paclitaxel: A Successful Collaboration of Academia, Industry, and the National Cancer Institute. The Oncologist 1:240.

[9] (Sanofi_02489593 at 3).

[10] *Discovery of Camptothecin and Taxol,* National Historic Chemical Landmark – American Chemical Society. April 23, 2003.

[11] Donehower R. (1996). The Clinical Development of Paclitaxel: A Successful Collaboration of Academia, Industry, and the National Cancer Institute. The Oncologist 1:240.

[12] Stephenson F. (2002). Tale of Taxol, http://www.whale.to/cancer/taxol5.html.

the data from ongoing and completed clinical trials.[13] They also assumed responsibility for supplying paclitaxel for clinical trials as well as rapid development of a new drug application.[14] In 1992, under my direction as Commissioner,[15] the FDA approved Taxol for the treatment "of patients with metastatic carcinoma of the ovary after failure of first-line or subsequent chemotherapy."[16]

17.     Following the publication of paclitaxel's mechanism of action during initial drug development,[17] researchers at Le Centre National de la Recherche Scientifique (CRNS) analysed specimens from a different yew tree, *Taxus baccata*, known as the common yew tree.[18] In the needles of the common yew, the researchers discovered docetaxel, a compound having cytotoxic activity similar to taxol.[19]  In 1981, the researchers began working to synthesize this compound under a collaboration agreement with Rhône-Poulenc Rorer S.A., the predecessor company to Sanofi.[20]

18.     In 1986, chemists at Rhône-Poulenc patented docetaxel,[21] and the results of early in vivo studies showed that 56 976 R.P. had greater antitumor than paclitaxel.[22]

19.     Sanofi began Taxotere phase I clinical trials in 1990.[23] The first results, published

---

[13] *Id.*

[14] *Id.*

[15] *See* https://www.washingtonpost.com/archive/politics/1992/12/30/fda-approves-taxol-to-treat-cancer/efc4e378-b90d-4de0-baa8-e1d4678ac6e0/?utm_term=.6bb2491ffa25.

[16] FDA Approval Letter to Bristol-Myers Squibb Co.

[17] Horowitz S. (1979).  Promotion of Microtubule Assembly In Vitro by Taxol. Nature 277:665.

[18] Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 174 (2017).

[19] *Id.*

[20] (Sanofi_02489593 at 4); Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 177 (2017).

[21] (Sanofi_02489593 at 5); Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 206 (2017).

[22] Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 203 (2017).

[23] (Sanofi_02489593 at 8); Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 216 (2017).

the next year, indicated clinical activity against breast and ovarian cancers.[24] The promising phase I results prompted Sanofi to start phase II clinical trials in May 1992.[25]

20.     On July 27, 1994, Sanofi applied for FDA approval for Taxotere under NDA 20449 based on the results of the phase I and II clinical trials for the following indications: (1) "metastatic breast cancer patients in whom previous chemotherapy failed" and (2) "locally advanced or metastatic non-small cell lung cancer patients after failure of platinum based chemotherapy."[26] In December 1994, the FDA's Oncologic Drugs Advisory Committee unanimously decided to withhold approval of the drug, requesting more data on toxicity and additional phase III trials.[27]

21.     Taxotere was first approved by the European Union on April 12, 1995 for the treatment of locally advanced or metastatic breast cancer.[28]

22.     On October 17, 1995 the FDA's Oncologic Drugs Advisory Committee ("ODAC") voted 6 to 1 in favour of approving Taxotere for the treatment of metastatic breast cancer patients who were anthracycline-resistant.[29]

23.     On May 14, 1996, while I was Commissioner, the FDA approved Taxotere for the treatment of patients with locally advanced or metastatic breast cancer after failure of prior chemotherapy.[30]

24.     On December 23, 1999, the FDA approved Taxotere for treatment of patients with

---

[24] Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 217 (2017).

[25] (Sanofi_02489593 at 9); Muriel Le Roux and Francoise Gueritte, *Navelbine and Taxotere*, 217 (2017).

[26] (Sanofi_02489593 at 22).

[27] (Sanofi_02489593 at 23); *FDA Withholds Approval for Taxotere*, 6 ANNALS OF ONCOLOGY  200 (1995).

[28] (Sanofi_02489593 at 27).

[29] (Sanofi_02489593 at 28).

[30] (Sanofi_02489593 at 29).  As a condition of approval, Sanofi made a post-marketing commitment to complete four controlled clinical trials and submitting completed findings of these studies for FDA review.  FDA Approval Letter to Rhone-Poulenc Rorer dated May 14, 1996.

locally advanced or metastatic non-small cell lung cancer after failure of prior platinum-based chemotherapy.[31]

25.     On November 27, 2002, the FDA approved Taxotere for use in combination with cisplatin for the treatment of patients with unresectable, locally advanced or metastatic non-small cell lung cancer who have not previously received chemotherapy for this condition.[32]

26.     On May 19, 2004, the FDA approved Taxotere for use in combination with prednisone as a treatment for patients with androgen independent (hormone refractory) metastatic prostate cancer.[33]

27.     On August 18, 2004, the FDA approved Taxotere in combination with doxorubicin and cyclophosphamide for the adjuvant treatment of patients with operable node-positive breast cancer.[34]

28.     On March 22, 2006, the FDA approved Taxotere in combination with cisplatin and fluorouracil for the treatment of patients with advanced gastric adenocarcinoma, including adenocarcinoma of the gastroesophageal junction, who have not received prior chemotherapy for advanced disease.[35]

29.     On October 17, 2006, the FDA approved Taxotere in combination with cisplatin and fluorouracil for the induction treatment of patients with inoperable locally advanced

---

[31] (Sanofi_02489593 at 35).

[32] (Sanofi_02489593 at 87); FDA Approval Letter to Aventis Pharmaceuticals, dated November 27, 2002.

[33] (Sanofi_02489593 at 47).

[34] (Sanofi_02489593 at 57).  As explained above, Sanofi submitted interim clinical trial data to support approval of this indication.  As a condition to approval, Sanofi made a post-marketing study commitment to provide a complete report of this data.  *See* FDA Approval Letter to Aventis Pharmaceuticals, August 18, 2004 ("To submit a complete report of the updated TAX316 data to verify the efficacy based on 700 events of DFS and safety of Taxotere in the adjuvant treatment of women with operable node- positive breast cancer and to submit the final analysis of overall survival (expected to occur in the year 2010).").

[35] (Sanofi_02489593 at 69). FDA Approval Letter to Sanofi-Aventis U.S., Inc., dated March 22, 2006.

squamous cell carcinoma of the head and neck (SCCHN)."[36] On September 28, 2007, the FDA approved the use of Taxotere in combination with cisplatin and fluorouracil for the induction treatment of patients with locally advanced squamous cell carcinoma of the head and neck (SCCHN).[37]

30.    On May 13, 2010, the FDA approved a change in the label to add language related to pediatric safety and efficacy.[38]

31.    After responding to a March 2015 FDA request for "a summary of cases of permanent partial or total alopecia associated with docetaxel use,"[39] Sanofi submitted a CBE sNDA on November 24, 2015 concerning "permanent or irreversible alopecia."[40]  In November-December 2015, FDA and Sanofi agreed to add the statement "Cases of permanent alopecia have been reported,"[41] which Sanofi implemented "In accordance with 21 CFR 314.70(c) [Changes Being Effected]."[42]  On December 11, 2015, the FDA approved the CBE sNDA.[43]

32.    Sanofi submitted a sNDA on April 11, 2018 under section 505(b) of the FDCA concerning the risk of adverse events during the TAX 316 clinical trial study and adverse events

---

[36] (Sanofi_02489593 at 87); FDA Approval Letter to Sanofi-Aventis U.S., Inc., dated October 17, 2006.

[37] (Sanofi_02489593 at 87); FDA Approval Letter to Sanofi-Aventis U.S., Inc., dated September 28, 2007.

[38] (Sanofi_02489593 at 83).  Prior to this time, in 2009, Sanofi submitted a sNDA to FDA seeking approval for a node-negative adjuvant breast cancer indication.  However, after receiving "clear FDA feedback from FDA on the risk of filing this application," Sanofi withdrew its application.  E-mail from Linda Gustavson dated July 15, 2009 (Sanofi_01031668) ("This decision is based on the short duration of patent remaining, the risk of filing, the limited market interest in the U.S. and the desire to maintain credibility with FDA based on our successful approvals of Taxotere over the years."); *see also* FDA Responses to Sponsor's Questions (Sanofi_01246597) ("We are concerned about the small improvement in DFS in the face of the increased risk of toxicity in the TAC regimen.  It is not clear that the benefit risk ratio is favorable.").

[39] Email from Frank Cross, Jr. to Frances Polizzano, Mar. 23, 2015 (Sanofi_04878450).

[40] FDA Approval Letter to Sanofi-Aventis U.S. LLC dated December 11, 2015.

[41] FDA PAS for alopecia, Review completed Dec. 4, 2015 for NDA #020449.

[42] Letter from Frances Polizzano to FDA's Geoffrey Kim, Nov. 24, 2015 (Hangai Ex. 18; (Sanofi_03333249).

[43] *Id.*

that persisted following completion of the study, including but not limited to alopecia.[44]   On

October 5, 2018, the FDA approved the sNDA.[45]

IV.      **THE ROLE OF THE DRUG MANUFACTURER AND THE FDA**

       A.      **The Purveyor Of A Drug Has Primary Responsibility For A Drug's Safety**

    33.     It is the purveyor of a drug that is responsible for the safety of its product.

    34.     A drug company has a responsibility, independent of what the FDA directs it to

do, to alert physicians and patients to risks that were unknown to or poorly understood by the

FDA, but were known to the company.[46]   This duty predates by decades the advent of federal

regulation of drugs.  *See, e.g.*, *Thomas v. Winchester*, 6 N.Y. 397 (1852).

    35.      FDA regulation of a drug cannot anticipate and protect against all safety risks to

individual consumers.  Even the most thorough regulation of a product may fail to identify

potential problems presented by the product.

    36.     As I have written and testified about before the United States Congress, the Food,

Drug, and Cosmetic Act grants the FDA substantial authority over the approval, labeling, and

promotion of pharmaceutical products.  But, in my opinion, nothing in the Food, Drug, and

Cosmetic Act, or in the FDA's implementing regulations, relieves a manufacturer of its duty to

act according to the company's knowledge about a product and its potential risks.

    37.     It was my opinion while Commissioner of the FDA, and remains to this day, that

the two systems of state consumer protection (including potential product liability) and federal

food and drug regulation should and do operate in a complementary but independent manner.

---

[44] FDA Approval Letter to Sanofi-Aventis U.S. LLC dated October 5, 2018, at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/020449Orig1s079ltr.pdf.

[45] *Id.  See also* Schedule 3, Taxotere Indications; Schedule 4, Alternative Therapies for the Types of Cancer for
Which Taxotere is Indicated.

[46] *See* Schedule 1, Prior and Current FDA Regulations Regarding Manufacturers' Duties and Responsibilities.

38.     As the Supreme Court has recently ruled, generally, state law imposes responsibilities on pharmaceutical companies to create products that are "reasonably safe," a duty that can be satisfied by the "presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses."[47]

39.     The Institute of Medicine and Government Accountability Office has noted that the FDA's ability to oversee drug safety has been constrained, especially during the post-approval portions of a drug's life.  Specifically, the Institute of Medicine, in its report titled, "The Future of Drug Safety: Promoting and Protecting the Health of the Public," stated: "the drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER [Center for Drug Evaluation and Research] that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement."  The report further stated: "the committee found that the FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."[48]

40.     In its report titled "Drug Safety: Improvement Needed in FDA's Postmarket Decision-Making and Oversight Process," the General Accounting Office stated:

> Two organizationally distinct FDA offices, the Office of New Drugs (OND) and the Office of Drug Safety (ODS), are involved in postmarket drug safety

---

[47] *Mut. Pharm. Co. Inc. v. Bartlett*, 133 S.Ct. 2466, 2480 (2013) (internal citations omitted); *see also Hill v. Searle Labs*, 884 F.2d 1064, 1068 (8th Cir. 1989) ("FDA regulations are generally minimal standards of conduct . . . ."); *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 746 (11th Cir. 1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes."); *Feldman v. Lederle Lab.*, 125 N.J. 117, 121 (N.J. 1991); *Vautour v. Body Masters Sports Indus.*, 147 N.H. 150, 153-54 (2001).

[48] Institute of Medicine, "The Future of Drug Safety: Promoting and Protecting the Health of the Public," 2007, p.4; http://www.nap.edu/openbook.php?record_id=11750&page=4.

activities. OND, which holds responsibility for approving drugs, is involved in safety activities throughout the life cycle of a drug, and it has the decision-making responsibility to take regulatory actions concerning the postmarket safety of drugs. OND works closely with ODS to help it make postmarket decisions. ODS, with a primary focus on postmarket safety, serves primarily as a consultant to OND and does not have independent decision-making responsibility. ODS has been reorganized several times over the years. There has been high turnover of ODS directors in the past 10 years, with eight different directors of the office and its predecessors. In the four drug case studies GAO examined, GAO observed that the postmarket safety decision-making process was complex and iterative . . . FDA lacks clear and effective processes for making decisions about, and providing management oversight of, postmarket safety issues. The process has been limited by a lack of clarity about how decisions are made and about organizational roles, insufficient oversight by management, and data constraints. GAO observed that there is a lack of criteria for determining what safety actions to take and when to take them. Certain parts of ODS's role in the process are unclear, including ODS's participation in FDA's scientific advisory committee meetings organized by OND. Insufficient communication between ODS and OND has been an ongoing concern and has hindered the decision-making process. ODS does not track information about ongoing postmarket safety issues, including the recommendations that ODS staff make for safety actions. FDA faces data constraints in making postmarket safety decisions. There are weaknesses in the different types of data available to FDA, and FDA lacks authority to require certain studies and has resource limitations for obtaining data.[49]

41.     Risks that are rare, appear as common illnesses, have long latency periods, result from drug interactions, or have adverse impacts on subpopulations may go undetected in clinical testing.  However, if a drug company has reason to know that the risks of a drug may result in adverse events, it has a responsibility to investigate them and to inform physicians and health care providers.

42.     Generally, the FDA does not test the safety or effectiveness of drugs nor conduct clinical trials.  That is the responsibility of the manufacturer.  The FDA can approve a company's drug application or take steps to withdraw a drug that is on the market.  In certain instances,

---

[49] Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process, GAO-06-402, March 31, 2006, Introduction page, http://www.gao.gov/new.items/d06402.pdf.

individuals at the FDA have undertaken research analyses on specific questions.[50]  Such research

analyses do not take the place, nor relieve the manufacturer, of its responsibility to assure the

safety and effectiveness of its drug.  Prior to 2007, once a drug was on the market, the FDA had

limited authority to require a company to conduct clinical trials or to change the drug's label.  In

these instances, the FDA was left to "negotiate" with the drug company.[51]

      43.     As Dr. Sandra L. Kweder, Deputy Director of the Office of New Drugs for the

FDA, testified on March 1, 2005, before the U.S. Congress Committee on Health, Education,

Labor, and Pensions:

    "Q.    On the clinical trial, the FDA cannot order a company to do a clinical trial, is that
correct?"

    A.    That is correct."[52]

      44.     Once a drug is approved, the FDA's regulations make clear that a drug company

has a duty to warn and modify labeling without delay when hazards emerge with one of its

drugs.[53]  The regulations specifically authorize a drug company to make labeling changes, and

---

[50] *See, e.g.*, Rosa F. (1991).  Spina Bifida in Infants of Women Treated with Carbamazepine During Pregnancy. New England J. Med. 324 (Vol. 10): 674-77.

[51] The FDCA was amended in 2007.  "For the first time, it granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval."  *Wyeth v. Levine*, 555 U.S. 555, 567 (2009).  "The FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times." *Id.* at 578-579.  Also, authority was granted allowing the FDA to require further studies and clinical trials. As summarized by the FDA: "Section 505(o)(3) of the Act authorizes FDA to require postmarketing studies or clinical trials at the time of approval or after approval if FDA becomes aware of new safety information . . . .  In some cases, FDA may be concerned about a risk and believe that it is serious, but may not know enough about the risk to determine how to address the risk in labeling and what information would be appropriate to include. In such a case, FDA can require a postmarketing study or clinical trial to obtain more information." USDHHS, FDA, *Guidance for Industry: Postmarketing Studies and Clinical Trials – Implementation of Section 505(o)(3) of the Federal Food, Drug, and Cosmetic Act*, at 3-4 (April 2011). The 2007 amendment complements, but does not replace, the manufacturer's primary duty to provide adequate warnings of safety hazards associated with its products.

[52] Hearing, March 1, 2005, FDA's Drug Approval Process: Up to the Challenge?, S.Hrg. 109-67, at 24.

[53] 21 CFR 201.57(e) (1999).

take other steps to inform physicians and patients of emerging risks, without advanced approval from the FDA.[54]  Such responsibility is intended to complement, not undercut, the FDA's job of protecting consumers from dangerous drugs.

45.     The FDA has stated that nothing in FDA's regulations prohibit a manufacturer from warning doctors and patients whenever possible.  As the FDA stated in 1979: "The Commissioner also advises that these labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered.  The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations."[55]

46.     Manufacturers have superior resources that are or should be committed to overseeing the safety of the drugs they market.  As a result, manufacturers invariably get safety information before the FDA does and have access to information that is not available to the FDA.  Company scientists and physicians also develop impressions and understanding of a drug's potential safety profile that may be more informed than the FDA's.

47.     Thus, what a drug company knows about a drug and what the FDA knows may be different.

48.     The duties of a pharmaceutical company are based not only on FDA laws and regulations, but also on the risks presented by a drug about which the company knew, should have known, or should have investigated.

---

[54] For a discussion of the procedure for making changes to a black box, *see* Section IV(E) in this report below.

[55] 44 F.R. 37434 at 37447 (June 26, 1979).

49.     In my opinion, Sanofi's responsibility for the safety of its product and the adequacy of its warnings exists regardless of what the FDA did or did not do.

50.     As Commissioner of the FDA from 1990 through 1997, I can attest that the responsibility of drug sponsors has been in force for decades.

51.     In my opinion, in light of the FDA's limited resources and scope, the purveyor of a drug, not the FDA, has primary responsibility for the safety of its product.

52.     The manufacturer has the responsibility to ensure the safety of its drug both prior to marketing and after the drug has been approved and is on the market.

53.     The manufacturer has the responsibility to understand a drug's safety risks both pre- and post-marketing.

54.     In essence, the manufacturer must constantly study and convey the risks associated with the drug throughout a drug's life history.

55.     The manufacturer must update the drug's label with new safety information throughout a drug's life history.

56.     To ensure the safety of its drug, a manufacturer must analyze a drug's safety profile throughout a drug's life history.

57.     As the FDA has stated: "Once a product is marketed, there is generally a large increase in the number of patients exposed, including those with co-morbid conditions and those being treated with concomitant medical products. Therefore, postmarketing safety data collection and risk assessment based on observational data are critical for evaluating and characterizing a product's risk profile and for making informed decisions on risk minimization."[56]

---

[56] FDA, Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (March 2005), *available at* http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM126834.pdf.

14

**B.      A Drug Manufacturer's Responsibility To Investigate And Disclose Risks After A Drug Is On The Market**

58.      The drug manufacturers' responsibility to assure the safety of their drugs throughout the life of the drug is to assure the safety and efficacy of a drug prior to approval and also after the drug is on the market.

59.      Under United States food and drug laws, a drug may not be introduced into interstate commerce unless its sponsor has shown that the drug is safe and effective for the intended conditions of use.[57]

60.      The law requires that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness.[58]

61.      The FDA approves a drug if there are "adequate and well-controlled" clinical trials that demonstrate a drug's safety and effectiveness for its intended conditions of use.[59]

62.      The "intended conditions" for use of a drug are listed in the drug's labeling which is reviewed and approved by the FDA.[60]

63.      Indications for use that are not listed in a drug's labeling have not been approved by the FDA.[61]

---

[57] 21 U.S.C. § 355.

[58] 21 U.S.C. § 355(d)(7).

[59] 21 U.S.C. § 355(d)(7).

[60] 21 U.S.C. §§ 355(d)(1) and (2).

[61] "The labeling is derived from the data submitted with the new drug application.  It presents a full disclosure summarization of drug use information, which the supplier of the drug is required to develop from accumulated clinical experience and systemic drug trials of preclinical investigations and adequate, well-controlled clinical investigations that demonstrate the drug's safety and the effectiveness it purports or is represented to possess." (37 Fed. Reg. 16,503 (1972)).

64.     The following standards are based on my experience as FDA Commissioner from 1990 to 1997, having written about and taught food and drug law, dealt with FDA statutes and regulations and acted as chair of compliance committees of FDA-regulated companies.

65.     In 1979, FDA, as part of a final rule titled "Labeling and Prescription Drug Advertising: Content and Format for Labeling for Human Prescription Drugs[62]" issued 21 CFR §§ 201.57 (e) and (g) which stated, respectively:[63]

> "(e) Warnings: Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them and steps that should be taken if they occur. The labeling shall be revised to include a warning <u>as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved</u>."[64]
>
> "(g) Adverse Reactions: An adverse reaction is an undesirable effect reasonably associated with the use of the drug that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence."[65]

66.     In 2006, FDA adopted final rules for 21 CFR §§ 201.57 (c)(6) and (7) which stated:

> "(c)(6) 5 Warnings and precautions. (i) General. This section must describe clinically significant adverse reactions….the labeling must be revised to include a warning about a clinically significant hazard <u>as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established</u>…." "(c)(7) 6 Adverse reactions. This section must describe the overall adverse reaction profile of the drug based on the entire safety database. For purposes of prescription drug labeling, an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence. This definition does not include all adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."[66]

---

[62] 44 Fed. Reg. 37434 (June 26, 1979).

[63] 44 Fed. Reg. 37434 (June 26, 1979) at 37465.

[64] 21 CFR § 201.57(e) (emphasis added).

[65] 21 CFR § 201.57(g) (emphasis added).

[66] 71 Fed. Reg. 3922-3997 (January 24, 2006) at 3990.

16

67.     Also under 21 C.F.R. § 201.57(c)(6), the Warnings and Precautions section of prescription drug labels must "describe <u>clinically significant</u> adverse reactions (including any that are potentially fatal, are <u>serious</u> even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacological class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification)."[67]

68.     A manufacturer "must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling of the drug."[68]

69.     The U.S. Supreme Court has reaffirmed this responsibility: "It has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.  It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.  See, *e.g.,* 21 CFR § 201.56 (requiring manufacturer to provide labeling that contains a "summary of essential scientific information needed for the safe and effective use of the drug," and "be informative and accurate and neither promotional in tone nor false or misleading in any particular"); 21 CFR § 201.80(e) (requiring a manufacturer to revise its label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug"); § 314.80(b) (placing responsibility for post-marketing surveillance on the manufacturer); 73 Fed.Reg. 49605 ('Manufacturers continue to have a responsibility under Federal law ... to maintain their labeling and update the labeling with new safety information')."  *Wyeth v. Levine*, 555 U.S. 555 (2009).

---

[67] 21 C.F.R. § 201.57(c)(6) (emphasis added).

[68] *Wyeth v. Levine*, 555 US 555 (2009) at 608, citing 21 U.S.C. § 355(k).

70.     As I have written in an article co-authored with David Vladek: "In fact, drug manufacturers have significant authority — and indeed a responsibility — to modify labeling when hazards emerge and may do so without securing the FDA's prior approval."[69]

71.     In many instances, safety issues arise after a drug is on the market.  It is the responsibility of the manufacturer to identify, analyze, assess, evaluate, and inform physicians and patients about such safety risks.[70]

72.     Sanofi recognizes this responsibility.  It's vice-president and head of global regulatory affairs for North America testified:

> Q.     Okay.  Do you agree that a drug manufacturer has an ongoing obligation to make sure that its labeling accurately reflects the company's current knowledge concerning the common risks posed by its drug?
>
> A.     Yes, I do.[71]

73.     Sanofi's global safety officer for Taxotere from May 2006 to December 2013 stated:

> A.     . . .  If I know that a certain risk, it's inherent to my drug, I have the obligation to state how it can be minimized, how patients can take my drug and either not having that risk or having it at tolerable levels.[72]

74.     Sanofi's Senior Manager for labeling for oncology products in the U.S. regulatory affairs department from June 2013 to October 2016 testified:

> Q.     Do you agree that a drug manufacturer must provide informative and accurate information in its label to effectively communicate with doctors?

---

[69] Kessler D., Vladeck D. (2008). A Critical Examination of the FDA's Efforts to Preempt Failure-to-Warn Claims, 96 Geo. L.J. 461

[70] See id.

[71] Deposition of Sunil Gupta, M.D., FRCPC, dated April 10, 2018, at 26:7-12.  See also Schedule 6, Sanofi Employees and Personnel Cited or Referenced in Report.

[72] Deposition of Emanuel Palatinsky, M.D., dated August 9, 2018, at 65:19-23.

A.  Yes, and they do that by constant monitoring of the product.  You know, the label is a living document that is constantly changing over its life -- lifecycle.[73]

75.     The Food, Drug, and Cosmetic Act requires drug manufacturers to provide adequate warnings about a drug.  21 U.S.C. 352 states: "A drug or device shall be deemed to be misbranded—(a) False or Misleading Label: If its labeling is <u>false or misleading in any particular</u>….(f) Directions for use and warnings on label: Unless its labeling bears (1) adequate directions for use; and (2) such <u>adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health</u>, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users…(j) Health-endangering when used as prescribed: If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." (Emphasis added).

76.     The supplemental applications to market a new drug submitted by Sanofi to the FDA[74] include a certification signed by a Sanofi-responsible official stating: "I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. . . .  I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following: . . . 6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80 and 600.81."[75]

77.     FDA regulations also require that new information be reported in periodic and annual reports.  21 CFR 314.81(b)(2)(i) states: "Summary: A brief summary of significant new

---

[73] Deposition of Frances Polizzano, PharmD, dated February 28, 2018, at 28:6-17 (objection omitted).

[74] As discussed above in Section III of this Report, Sanofi submitted supplemental NDAs for new indications for Taxotere at various times.

[75] Application to Market a New Drug, Biologic, or an Antibiotic Drug for Human Use (21 CFR 314 & 601).

information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of the actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study."[76]

78.     If a drug manufacturer states on the label that a drug has risks that are similar to other drugs in its class, but in fact there are scientific data that indicate that the drug has increased risk compared to other drugs in the class, that label would be false or misleading under the Food, Drug, and Cosmetic Act.

## V.     KEY DEFINITIONS

79.     The National Cancer Institute at the National Institutes of Health defines alopecia as "[t]he lack of hair from areas of the body where hair is usually found. Alopecia can be a side effect of some cancer treatments."[77]

80.     According to a Sanofi leaflet distributed to healthcare providers, alopecia "is another word for hair loss or thinning of the hair. It is a common, yet temporary, side effect of some cancer medicines. Alopecia can occur anywhere on the body and may happen after a few treatments."[78]

81.     With respect to irreversible alopecia, the medical literature has generally defined this condition as the "complete loss of growth or partial regrowth at least 6 months after chemotherapy."[79]

---

[76] *Id.*

[77] National Cancer Institute Diction of Cancer Terms, *available at* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/alopecia (last visited Sep. 21, 2016).

[78] (Sanofi_01038470 at 5).

[79] *See, e.g.,* Kim G, Kim S, Park H. et al. (2017). Chemotherapy-induced irreversible alopecia in early breast cancer patients. Breast Cancer Res Treat 163:527-533; Namini S. (2016). Systematic Review of the Risk of Permanent Alopecia with Docetaxel Treatment for Breast Cancer. J Clin Case Rep 6(8); Haider M, Hamadah I, Almutawa A.

82.    Over the last decade, Sanofi has defined irreversible alopecia multiple ways.

83.    In an email dated March 16, 2010 regarding the social media communication plan for Taxotere, Sanofi's Global Safety Officer, Dr. Emanuel Palatinksy, wrote it was reasonable to consider alopecia permanent if the alopecia lasted for more than four years following treatment with Taxotere.[80]

84.    In Sanofi's Periodic Safety Update Report ("PSUR") dated January 18, 2011, Sanofi attached Appendix 13 titled "Clinical Overview Docetaxel – Persistent Alopecia," which defined "persistent alopecia" as "alopecia nor[sic] recovered after 12 months from the end of a chemotherapy regimen than included docetaxel."[81]

85.    Sanofi subsequently changed its definition, stating that irreversible alopecia is "alopecia lasting more than 2 years"[82] in response to a March 23, 2015 request by FDA for a summary of irreversible alopecia cases associated with Taxotere use.[83]

## VI.    IRREVERSIBLE ALOPECIA MEETS FDA CRITERIA OF "SERIOUS" AND/OR "CLINICALY SIGNIFICANT"

86.    As noted above, under FDA regulations, the Warnings and Precautions section of drug labels must include serious and/or clinically significant adverse events"[84]

---

(2013). Radiation- and Chemotherapy-Induced Permanent Alopecia: Case Series. J Cutaneous Med & Surgery 17(1):55-61; Kluger N, Jacot W, Frouin E. et al. (2012). Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/ epirubicin/ cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Annals of Oncology 23(11):2879-2884; Tallon B. Blanchard E. Goldberg L. (2010). Permanent chemotherapy-induced alopecia: Case report and review of the literature. J Am Acad Dermatol 63:333-6; *see also* Sanofi_01021777 at 1.

[80] (Sanofi_05252079 at 2); *see also* Emanuel Palatinksy, M.D. Dep. 443:15-445:09.

[81] (Sanofi_00197757 at 8); (Sanofi_01397018 at 2); (Sanofi_05059757 at 1); Emanuel Palatinksy, M.D. Dep. 291:16-294:09.

[82] (Sanofi_04878450 at 4; *see also* (Sanofi_01021777 at 1); (Sanofi_00800098 at 3); (Sanofi_02664951); (Sanofi_01268180 at 35).

[83] (Sanofi_04878450 at 7); (Sanofi_01268180 at 8).

[84] 21 C.F.R. § 201.57(c)(6).

87.     FDA's 2011 Guidance on Warnings in labeling directs "The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are *serious* or are *otherwise clinically significant* because they have implications for prescribing decisions or for patient management."[85]

88.     According to 21 C.F.R. § 314.80, a serious adverse drug experience includes the following outcomes: "death; a life-threatening adverse event; inpatient hospitalization or prolongation of existing hospitalization; a persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions; or a congenital anomaly or birth defect."[86]

89.     FDA's Guidance also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."[87]

90.     In determining if an adverse reaction is otherwise clinically significant, the drug's indication (i.e. the relative seriousness of the disease or condition treated)[88] and the incidence of an adverse reaction should be considered.[89]

---

[85] FDA Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products (2011), at 3, available at https://www.fda.gov/downloads/drugs/guidances/ucm075096.pdf.

[86] *Id.* at 3; *see also* 21 C.F.R. § 314.80.

[87] FDA 2011 Guidance for Industry, at 4.

[88] FDA's Guidance states:

> The relative seriousness of the disease or condition treated should be considered.  For example, non-serious adverse reactions (e.g., nausea, pruritis, alopecia) caused by drugs intended to treat minor, self-limiting conditions (e.g., allergic rhinitis, cosmetic conditions, transient insomnia) may be considered clinically significant.  However, those same adverse reactions caused by drugs intended to treat serious or life-threatening conditions (e.g., cancer) may be considered much less clinically significant and not appropriate for inclusion in this section.

91.     With respect to incidence, the FDA's Guidance provides, "A high absolute risk or rate of occurrence of an adverse reaction can be a factor in deciding whether to include the reaction in this section."[90]

92.     FDA instructs that the following adverse reactions could be considered otherwise clinically significant:

> (1) an adverse reaction that may lead to a potentially serious outcome unless the dosage or regimen is adjusted, the drug is discontinued, or another drug is administered to prevent the serious outcome; (2) an adverse reaction that could be prevented or managed with appropriate patient selection, monitoring, or avoidance of concomitant therapy, and prevention or management of the adverse reaction is needed to avoid a potentially serious outcome; (3) an adverse reaction that can significantly affect patient compliance, particularly when noncompliance has potentially serious consequences.[91]

93.     The medical literature discussing alopecia and irreversible alopecia (including not just scalp hair, but also loss of eyebrows, eyelashes, and hair in other body regions) describes the distressing nature of this injury and its profound impact on mental health, physical, psychosocial and psychological distress, quality of life, patient compliance, and patient willingness to undergo chemotherapy or instead choose a different therapy or treatment.[92]

---

*Id.* at 4. FDA's Guidance does not discuss how the adverse reaction of irreversible alopecia may be considered. FDA's Guidance does not provide that consideration of indication limits an analysis of other factors and examples provided in its Guidance, including but not limited to, incidence and affect on potential compliance.

[89] *Id.*

[90] *Id.* at 4.

[91] *Id.*

[92] Kang D. (2018). Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A 3-Year Prospective Cohort Study. The Oncologist 23:1-7 ("Similar to the results of previous studies, patients with PCIA [permanent chemotherapy-induced alopecia] had much worse body image than patients without PCIA. In previous studies, patients with worse body image were more likely to have depression, lower social and role functioning, problems with sexuality, and poorer quality of life."); Davis D.S. (2017). Review of quality of life studies in women with alopecia. International Journal of Women's Dermatology 4:18-22 ("Alopecia has been shown in multiple studies to have a psychosocial impact in both men and women; however, the impact may be more severe and devastating in women. The psychological burden of hair loss in women is significant and should not be overlooked. Both scarring and nonscarring forms of alopecia have been shown to have a negative impact on QoL."); Kim G. (2017). Chemotherapy-induced irreversible alopecia in early breast cancer patients. Breast Cancer Res Treat

published online at doi:10:10007/s10549 017 4204 x) ("Chemotherapy-induced alopecia (CIA) is very common and causes a severe stress to these potentially curable female patients. It does affect not only sociological function of the patients but also tribute a physical and psychological distress to these women leading to low self-esteem and low quality of life."); Smith K. (2017). Madarosis: a qualitative study to assess perceptions and experience of Australian patients with early breast cancer treated with taxane-based chemotherapy. Support Care Center DOI 10.1007/s00520-017-3852-z ("Our data suggests that chemotherapy-induced madarosis may result in a range of psychological issues of importance. It also indicates physical side effects of dry eye and irritation can occur. . . . Many women struggled with the perceived change of appearance associated with madarosis. The women in this study felt that their physical attractiveness was lessened by the presence of madarosis and experienced distress. There was a clear message that the loss of eyelashes and eyebrows resulted in personal identification with the sick or cancer role."); Rice B. (2017). Registry study to assess hair loss prevention with the Penguin Cold Cap in breast cancer patients receiving chemotherapy. Breast Cancer Res Treat DOI 10.1007/s10549-017-4506-z ("CIA has been shown to affect female breast cancer patients who report loss of self-confidence and increased concern over being publicly identified as a cancer patient. Complete alopecia is a reminder to the patient and others of her disease, and patients have reported negative effects on self-image, quality of life, and normal social and professional functioning."); Rencz F. (2016). Alopecia areata and health-related quality of life: a systematic review and meta-analysis. Br J Dermatol 175(3):561-571 ("Patients with AA [alopecia areata] experience significant impairment in HRQOL [health-related quality of life], especially in the area of mental health."); Rossi A. (2016). Chemotherapy-induced alopecia management: Clinical experience and practical advice. J Cosmet Dermatol 2017:1-5 ("Chemotherapy-induced alopecia (CIA) is probably one of the most shocking aspects for oncological patients and underestimated by physicians. It negatively influences body image, sexuality, and self-esteem, so that up to 8% of patients decide to refuse chemotherapy if there is the risk of hair loss."); Shilpashree P. (2016). Impact of female pattern hair loss on the quality of life of patients. Journal of Pakistan Association of Dermatologists. 26(4):347-352 ("Hair loss in women is associated with significant psychological morbidity. Societal norms dictate that hair is an essential part of a woman's sexuality and gender identity, and any hair loss generates feelings of low self-esteem and anxiety from a perception of diminished attractiveness. Women are more likely than men to have a lowered quality of life and to restrict social contacts as a result of hair loss."); Sibaud V. (2016). Dermatological adverse events with taxane chemotherapy. Eur J. Dermatol (26(5): 427-443) ("It is imperative that patients are forewarned of the potential for CIPAL [Chemotherapy-induced persistent alopecia] with taxanes, for ethical and medico-legal reasons. This is particularly true in the adjuvant treatment setting, especially in the female breast cancer population, where the overall prognosis is generally good and patients are younger."); Trusson D. (2016). The Role of Hair Loss in Cancer Identity. Cancer Nursing Vol. 39, No. 4 ("[H]air loss as a result of chemotherapy treatment for breast cancer can have profound implications for women's mental health and social interactions."); Lewis-Smith H. (2015). Physical and psychological scars: The impact of breast cancer on women's body image. Journal of Aesthetic Nursing 4(2):80-83 ("Hair holds meaningful value across many cultures, reflecting beauty, gender, age, and religious affiliations, whilst being associated with personal growth and life (Batchelor, 2001; Freedman, 1994). Hair loss is also a traumatic experience and can impose detrimental and long-lasting impacts on body image, sexuality and self-concept (Batchelor, 2001; Münstedt et al., 1997). In fact, women with breast cancer often consider scalp hair loss as the most distressing appearance-altering side effect of chemotherapy treatment, followed by the loss of eyebrows and loss of eyelashes (Nozawa et al., 2013). One study found that body satisfaction which dropped during treatment, failed to improve to pre-treatment levels when the hair started to grow back (Münstedt et al., 1997). The loss of hair is often experienced more negatively than the loss of a breast, with hair considered integral in the sense of identity and its loss representing a visible reminder of the cancer, leaving the person to feel like a "cancer patient" (Browall et al., 2006; Freedman, 1994)."); Pavey R. (2015). Dermatological adverse reactions to cancer chemotherapy. Indian J Dermatol Venereol Leprol 2015;81:434 ("Hair loss has been rated as one of the most distressing side effects of chemotherapy, along with vomiting and nausea. There have been reports of refusal of chemotherapy, especially among women, because of the risk of hair loss."); Choi E. (2014). Impact of chemotherapy-induced alopecia distress on body image, psychosocial well-being, and depression in breast cancer patients. Psycho-Oncology 23(1103-1110) ("Among side effects, alopecia is considered one of the most traumatizing and distressing experiences for women with breast cancer. Often, losing hair has been described as a harder experience than losing breasts, and some patients refuse chemotherapy because of the expected hair loss."); Thorp N. (2014). Abstract P5-17-04: Long term hair loss in patients with early breast cancer receiving docetaxel chemotherapy. Presented at the Annual San Antonio Breast Cancer Symposium, December 9-13, 2014 ("Long term hair loss had a significant impact on quality of survival. This is an important quality of life issue for patients which

24

merits prospective study to confirm incidence, to identify effective preventive and management strategies. This risk should be discussed routinely (as part of the process of informed consent) with all patients embarking on docetaxel as a component of management of EBC [early breast cancer].)"; Van den Hurk C.J.G. (2014). Measurement of chemotherapy-induced alopecia—time to change. Support Care Center DOI 10.1007/s00520-015-2647-3 ("For breast cancer patients, the impact of CIA is much higher than expected by MDs and nurses."); Villasante A. (2014). Chemotherapy-Induced Alopecia. J Clin Investigat Dermatol 2014;2(2):8 ("Alopecia makes patients aware of their own vulnerability and serves as a constant reminder of illness and mortality. About half with CIA [chemotherapy-induced alopecia] believe that their cancer diagnosis is obvious to everyone around them despite camouflage with wig use. Patients mention not only the loss of scalp hair, but also the loss of eyebrows and eyelashes, as particularly conspicuous. . . . In a pretreatment survey of female breast cancer patients, 8.3% felt so distressed by the likelihood of CIA that they would consider declining chemotherapy. In a 1997 study, 46.6% of patients cited CIA as the single most traumatic side effect of cancer therapy."); Bertrand M. (2013). Abstract P3-09-15: Permanent chemotherapy induced alopecia in early breast cancer patients after (neo)adjuvant chemotherapy: Long term follow up. Thirty-Sixth Annual CTRC-AACR San Antonio Breast Cancer Symposium, Dec. 10-14, 2013 ("The presence of impaired quality of life was significantly higher in the group alopecia than in the control group (p=0.00006)."); Can G. (2013). A comparison of men and women's experiences of chemotherapy-induced alopecia. European Journal of Oncology Nursing 15:255-260 ("The visual nature of alopecia can affect the body image, quality of life, social interaction and sexuality of the patient (Randall and Ream, 2005). It may seriously affect body image, which in turn has an impact on self-esteem and self-confidence. Consequently, it may cause emotional suffering, may lead to personal, social and work-related problems, and may have a negative effect on quality of life (Auvien et al., 2010; Cartwright et al., 2008; Christodoulou et al., 2002; Hunt and McHale, 2005; Hurk et al., 2010)."); Cho J. (2013). Development and validation of Chemotherapy-induced Alopecia Distress Scale (CADS) for breast cancer patients. Annals of Oncology 00:1-6 ("Overall, research suggests that chemotherapy-induced alopecia (CIA) significantly impacts QOL and psychosocial adjustment among breast cancer patients."); Jayde V. (2013). The experience of chemotherapy-induced alopecia for Australian women with ovarian cancer. European Journal of Cancer Care 22:503-512 ("Chemotherapy-induced alopecia is frequently described as one of the most distressing aspects of treatment for cancer (Freedman 1994; Munstedt *et al*. 1997; Carelle *et al*. 2002; Rosman 2004; Hansen 2007; Lemieux *et al*. 2008; Power & Condon 2008; Trueb 2009; Borsellino & Young 2011; Chon *et al*. 2012). Alopecia has been linked to changes in self-concept and body image (Munstedt *et al*. 1997; Williams *et al*. 1999; Hesketh *et al*. 2004). 'Throughout history, hair has been symbolic of the social, cultural, and political climate' (Munstedt *et al*. 1997, p. 140). In western society, glossy healthy looking hair on women is viewed as being desirable and symbolizing femininity. Women typically 'do' their hair each morning, as part of preparation of their external self for the day ahead (Cash 2001)."); Chon S. (2012). Chemotherapy-induced alopecia. J Am. Acad Dermatol 2012:67:e37-47 ("Across the literature, hair loss consistently ranks among the most troublesome and traumatic aspects of chemotherapy. . . Some women have found hair loss to be more difficult to cope with than the loss of a breast. Others have considered refusing treatment because of anticipated alopecia. These strong reactions may reflect the importance of hair in self-identity."); Kim I. (2012). Perception, Attitudes, Preparedness and Experience of Chemotherapy-Induced Alopecia among Breast Cancer Patients: a Qualitative Study. Asian Pacific J Cancer Prev 13:1384-1388 ("Alopecia is one of the most painful side effects of chemotherapy, and it often ranks among the first three most important side effects for breast cancer patients (Sitzia and Huggins, 1998; Duric et al., 2005; Lemieux et al., 2008). Chemotherapy-induced alopecia has a strong negative impact self-image (Baxley et al., 1984; Hunt and McHale, 2005), shame feeling (Auvinen et al., 2010), and perception of aging and body image (Baxley et al., 1984; Fobair et al., 2006), resulting in reduced quality of life in breast cancer patients (Rosman, 2004; Cartwright et al., 2009 ). . . . If baldness represented being sick, new hair after alopecia represented hope and renewed life. Many participants said that they felt that hardship was over when they saw newly growing hair and that that looking at new hairs made them feel alive and happy. All participants said that they recognized again the importance of their lives. . . . We found that breast cancer patients experienced a variety of psychosocial problems related to alopecia, and the resulting distress interfered with social activities and interactions, including their willingness to continue working or returning to work. In addition, the range of physical problems due to alopecia reported in our study was broader than the problems reported in the literature and were not limited to the head or scalp but also to the nose, eyes, and other body hair."); Kluger N. (2012). Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Annals of Oncology 23:2879-2884; Koszalinski R. (2012). Embodying Identity in Chemotherapy-Induced Alopecia. Perspectives in Psychiatric Care 48:116-121; Zannini L. (2012). My wig has

25

been my journey's companion': perceived effects of an aesthetic care programme for Italian women suffering from chemotherapy-induced alopecia.  European Journal of Cancer Care DOI: 10.1111/j.1365-2354.2012.01337.x ("A recent study reported that 47% of female patients consider hair loss to be the most traumatic aspect of chemotherapy (Trüeb 2010). Chemotherapy-induced alopecia can cause the development of a negative body image, lowered self-esteem, and a reduced sense of well-being (Hesketh *et al*. 2004). Hair is indeed a symbol of life and identity, and in many cultures, it is perceived as an element characteristic of a woman's femininity (Freedman 1994; McGarvey *et al*. 2001). Hair loss can be associated with the condition of sickness, and alopecia is considered to be a constant reminder of the presence of cancer (Williams *et al*. 1999; Batchelor 2001). Furthermore, as noted by Freedman (1994), 'for many, across cultures and religious groups, the meaning of the shaved head, can be symbolic of the state of disgrace, which becomes a stigmata of sin or wrongdoing' (Freedman 1994, p. 337)."); Bernard M. (2011). Perception of alopecia by patients requiring chemotherapy for non-small-cell lung cancer: A willingness to pay study.  Lung Cancer 72:114-118 ("Hair loss is reported to be one of the most traumatic effects of chemotherapy, affecting both body image and self-perception. Alopecia has been cited as the most feared side effect by up to 58% of women preparing for chemotherapy, and some patients may avoid treatment for this reason.  Women with cancer who experience alopecia report lower self-esteem, poorer body image, and lower quality of life."); Breed R. (2011). Presentation, Impact and Prevention of  Chemotherapy-induced Hair Loss.  Expert Rev Dermatol 6(1):109-125 ("For some patients, CIA is a reason to refuse chemotherapy, and as much as 8% of patients may choose chemotherapy regimens with possibly less favorable tumor outcomes as long as these regimens do not cause severe hair loss."); Miteva M. (2011).  Permanent Alopecia After Systemic Chemotherapy: A Clinicopathological Study of 10 Cases.  Am J Dermatopathol 33:345-350 ("The psychological impact of chemotherapy-induced alopecia (CIA) is of prime concern among patients receiving chemotherapy, particularly women.  One survey demonstrated that 47% of female cancer patients consider CIA the most traumatic aspect of chemotherapy, and 8% would even decline chemotherapy because of this fear of hair loss."); Roe H. (2011).  Chemotherapy-induced alopecia: advice and support for hair loss.  British Journal of Nursing Vol. 20, No. 10 ("Many women have reported that their hair loss was the most traumatic psychological side effect they faced while receiving chemotherapy (McGarvey et al, 2001), the third worse overall side effect they experienced after nausea and vomiting (Munstedt et al, 1997), and the one that added to the distress of their original diagnosis (McGarvey et al, 2001)."); Yeager C. (2011).  Treatment of chemotherapy-induced alopecia.  Dermatologic Therapy Vol. 24:432-442 ("Although not life threatening, hair loss continues to be one of the most distressing and troublesome side effects of chemotherapy for patients. In his study of women undergoing treatment for primary breast cancer, Freedman found that some women refused chemotherapy because of the risk of developing hair loss. Likewise, Tierney and colleagues found that 8% of the women in their study considered refusing chemotherapy because of the risk of chemotherapy-induced alopecia."); Corina J. (2010).  Impact of alopecia and scalp cooling on the well-being of breast cancer patients.  Psycho-Oncology 19:701-709 ("Alopecia may seriously affect one's body image, which in turn has an impact on self-esteem and self-confidence. Consequently, it may cause emotional suffering, may lead to personal, social and work related problems and may have a negative effect on quality of life."); Masidonski P. (2009).  Permanent Alopecia in Women Being Treated for Breast Cancer.  Clinical Journey of Oncology Nursing Vol. 13, No. 1 ("Alopecia is a devastating diagnosis for women and men, regardless of the cause. Hair can reveal aspects of self, health, ethnicity, and socioeconomic status. Self-esteem and confidence are negatively affected in patients who experience hair loss."); Prevezas C. (2009).  Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer.  British Journal of Dermatology; 160:881-898 ("Explaining and preventing such complications is very important as the possibility of developing irreversible alopecia plays a major role in a patient's decision regarding the proposed chemotherapy regimen."); Trueb R. (2009).  Chemotherapy-Induced Alopecia.  Semin Cutan Med Surg 28:11-14 ("Few dermatologic conditions carry as much anxiety and emotional distress as hair loss resulting from chemotherapy-induced alopecia (CIA). CIA is considered one of the most traumatic factors in cancer patient care and occurs with an estimated incidence of 65%. Hair loss negatively affects a patient's perception of appearance, body image, sexuality, and self-esteem. Moreover, patients feel deprived of their privacy because the hair loss is readily interpreted by the lay public as associated with having cancer.  Women are particularly affected. A survey demonstrates that 47% of female cancer patients consider CIA the most traumatic aspect of chemotherapy, and 8% would even decline chemotherapy because of this fear of hair loss."); Power S. (2008). Chemotherapy-induced alopecia: a phenomenological study.  Cancer Nursing Practice, Vol. 7, No. 7 ("Alopecia is one of the most distressing and visually noticeable effects of cancer treatment. For some patients, the fear of treatment-induced alopecia is so significant that some women may refuse potentially curative chemotherapy."); Lemieux J. (2008).  Chemotherapy-induced alopecia and effects on quality of life among women with breast cancer: a literature review.

26

Psycho-Oncology 17:317-328 ("[C]hemotherapy-induced hair loss is considered to be the most important side effects of chemotherapy, frequently ranking among the first three for breast cancer patients and can lead to refusal of chemotherapy. Secondly, it is described by breast cancer women as causing distress and as being traumatizing."); Harcourt D. (2008).  Women's Experiences of an Altered Appearance during Chemotherapy: An Indication of Cancer Status. J Health Psychol 13:597 ("Previous research into the psychological impact of chemotherapy has reported patients ranking hair loss as the second most severe side-effect of treatment (Carelle et al., 2002). Our findings support those of Rosman (2004) in demonstrating that it is the outward changes that publicly identified participants as having cancer and as a consequence, presented them with an additional array of potential stressors. In essence their appearance acts as a visible indicator of their disease status to both themselves and others, including those who may have previously been unaware of it. Hair loss is seen as a confirmation of identity as a cancer patient (Rosman, 2004)."); Firth H. (2007).  Anticipating an altered appearance: Women undergoing chemotherapy treatment for breast cancer.  European Journal of Oncology Nursing 11, 385-391 ("Alopecia or hair loss is often rated as one of the most common, feared, and traumatic aspects of chemotherapy and may even be considered emblematic of the treatment and of cancer itself."); Hansen H. (2007).  Hair Loss Induced by Chemotherapy: An Anthropological Study of Women, Cancer and Rehabilitation.  Anthropology & Medicines Vol. 14, No. 1:15-26; Wang J. (2006).  Protection against chemotherapy-induced alopecia.  Pharmaceutical Research, Vol. 23, No. 11 ("Alopecia negatively affects a patient's perception of physical appearance, body image, sexuality and self-esteem, and deprives patients of the privacy of having cancer. Chemotherapy-induced alopecia (CIA) is considered one of the most negative factors in cancer patient care. The National Coalition for Cancer Survivorship cites CIA as one of the most emotionally upsetting aspects of coping with cancer. Female patients are particularly affected; a survey shows that 47% patients consider CIA the most traumatic side effect of chemotherapy, and 8% would reject chemotherapy due to fear of CIA.  Alopecia also results in reduced social interactions in school-age children and teenagers.  The negative psychological impact of CIA may have additional undesirable biological consequences, as depression lowers immune function and is associated with cancer progression."); Sedlacek SW, Persistent Significant Alopecia (PSA) form Adjuvant Docetaxel after Doxorubicin/Cyclophosphamide (AC) Chemotherapy in Women With Breast Cancer.  Presented at the Annual San Antonio Breast Cancer Symposium, December 14-17, 2006 ("Such an emotionally devastating long term toxicity from this combination must be taken into account when deciding on adjuvant chemotherapy programs in women who will likely be cured of their breast cancer."); Hunt N. (2005). The psychological impact of alopecia.  British Med. J. 331:951-3 ("Such evidence as exists supports the view that the experience of alopecia is psychologically damaging, causes intense emotional suffering, and leads to personal, social, and work related problems. There is an important link between hair and identity, especially for women. About 40% of women with alopecia have had marital problems as a consequence, and about 63% claim to have had career related problems. The extent of alopecia is one of the predictors of psychological distress. People with severe hair loss are more likely to experience psychological distress."); Luoma M.  (2004). The meaning of quality of life in patients being treated for advanced breast cancer: a qualitative study.  Psycho-Oncology 13:729-739 ("Changes in appearance occurred more often in the docetaxel group, with altered body image including instances of alopecia and oedema.  Patients reported alopecia as a distressing side effect. Changes in appearance often led to limitations in social functioning, influencing the patients' willingness to go outdoors, visit other people and continue employment. Many patients felt that they did not want to go outdoors, because strangers would become aware of their illness by noticing them wearing a wig"); Hesketh P. (2004).  Chemotherapy-induced alopecia: psychosocial impact and therapeutic approaches.  Support Care Center 12:543-49 ("The impact of hair loss can be enormous. For some women, hair loss can have more of an impact than a mastectomy. Others are so distressed at facing the prospects of losing their hair that they may choose less effective therapies or opt for no treatment at all. CIA can cause anxiety, depression, negative body image, lowered self-esteem, and a reduced sense of well-being."); Batchelor D.  (2001). Hair and cancer chemotherapy: consequences of nursing care – a literature study.  European Journal of Cancer Care 10:147-163 ("When patients experience hair loss, they experience many thoughts and feelings such as anger, sadness, embarrassment and fear of rejection (Chernecky 1983)."); McGarvey E. (2001). Psychological Sequelae and Alopecia Among Women with Cancer.  Cancer Practice Nov./Dec. 2001, Vol. 9, No. 6 ("Alopecia is a prime concern of women with cancer, so much so that it may influence their choice of or agreement to consent to potentially lifesaving treatments."); Williamson D. (2001).  The effect of hair loss on quality of life. J Eur Acad Dermatol Venereol 2001 Mar., 15(2):137-9 ("This study specifically identifies the feelings of loss of self-confidence, low self-esteem and heightened self-consciousness in people affected by hair loss."); Munstedt K. (1997).  Changes in self-concept and body image during alopecia induced cancer chemotherapy.  Support Care Cancer 5:139-143 ("Especially in women, hair is a part of the identity and sense of self.  Loss of hair due to cancer

94.     Sanofi recognizes the serious and significant nature of irreversible alopecia and its potential impact on patient compliance and patient willingness to undergo a particular chemotherapy or instead choose a different therapy or treatment.

94.1. Sanofi's global safety officer for Taxotere from May 2006 to December 2013 stated:

a.      What I was telling you is that the impact of losing part of the hair permanently, a slight hair loss, could be much more severe or felt more severely from a patient than losing the entire amount of hair only for a partial -- for a part of a time. That's what I was saying.[93]

94.2. Sanofi's vice-president and head of global regulatory affairs for North America testified:

Q.      Do you agree that permanent alopecia or irreversible alopecia can cause serious psychological consequences in the women who are affected by it?

A.      Yes.  That, I think, would be disturbing for women, yes.

. . .

Q.      When you were preparing and working on the label for Taxotere, did you ever consider the serious psychological effects of permanent alopecia on women?

A.      Yes, I think I mentioned even in an earlier testimony that we don't take these things lightly.  Psychological effects are important, aesthetic aspects are important, so we do not take this lightly.[94]

---

chemotherapy has been proven to alter patients' body image and self-concept, resulting in altered social behavior and a higher degree of depression and anxiety."); Tierney A. (1992).  Knowledge, Expectations and Experiences of Patients receiving Chemotherapy for Breast Cancer.  Scand J. Caring Sci, Vol. 6, No. 2 ("Of the side-effects mentioned, each patient was asked which she anticipated would be, for her, the most difficult to cope with. Hair loss was most frequently cited, this being expected.  as the most difficult side-effect by 35 patients (58.3%) in the sample. A small number of patients (*n* = 5, 8.3%) admitted to having been so distressed by the prospect of hair loss as to consider refusing the treatment."); Coates A. (1983).  On the Receiving End—Patient Perception of the Side-effects of Cancer Chemotherapy.  Eur J Cancer Clin Oncol., Vol. 19, No. 2:203-208.  *See also* Schedule 5, Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report.

[93] Deposition of Emanuel Palatinsky, M.D., dated August 9, 2018, at 180:19-25.

[94] Deposition of Sunil Gupta, M.D., FRCPC, dated April 10, 2018, at 103:10-16, 104:7-16 (objections omitted).

94.3. In 2007, Sanofi internally circulated a "Taxotere Lung Cancer Transmission" summarizing a 2005 article from Dubey titled "Patient Preferences in Choosing Chemotherapy Regimens for Advanced Non-Small Cell Lung Cancer" published in The Journal of Supportive Oncology.[95]  The internal transmission included a bolded footer stating "**For Background Information Only.  Do Not Duplicate, Distribute, or Use in Promotion**."[96] Under "Key Findings," Sanofi wrote: "In this study, 90% of women were concerned about alopecia; 11% would consider refusing treatment that may result in hair loss; This is similar to results of breast cancer questionnaires."[97]

94.4. In July 2009, Sanofi sponsored a clinical trial with a stated primary objective/endpoint described as "Rate of complete chemotherapy induced alopecia (WHO grade III or IV, physician grading)."[98]  The publication co-authored by Sanofi after completion of its study stated:

> Chemotherapy-induced alopecia is very distressing for a patient and may have an impact on treatment decisions.  On docetaxel-based therapy, alopecia occurs in a substantial proportion of patients.
>
> . . .
>
> For many patients, alopecia is emotionally extremely distressing, causing traumalike fears and anxieties, depression, reduced self-esteem, and reduced willingness to undergo cancer therapy.[99]

---

[95] (Sanofi_01039954) (summarizing Dubey S. (2005).  Patient Preferences in Choosing Chemotherapy Regimens for Advanced Non-Small Cell Lung Cancer.  The Journal of Supportive Oncology 3(2):149-154.

[96] *Id.*

[97] *Id.*

[98] *See* Sanofi-sponsored clinical trial at https://clinicaltrials.gov/ct2/show/NCT01008774.  Secondary objectives included: (1) compliance to scalp cooling procedure; (2) received number of cycles of chemotherapy in each subgroup; (3) patient perception of scalp cooling procedure; and (4) side effects of scalp cooling systems.

[99] Betticher D. (2013). Efficacy and tolerability of two scalp cooling systems for the prevention of alopecia associated with docetaxel treatment. Support Care Cancer (2013) 21:2565-2573.  *See also* excerpts from Sanofi Periodic Safety Reports labeling irreversible alopecia as a "serious" condition (*e.g.*, Sanofi_00181652, Sanofi_00181660, Sanofi_00181671, Sanofi_00182055).

95.     Regulatory authorities have concluded and corresponded with Sanofi regarding the serious and significant nature of irreversible alopecia.

95.1. On June 29, 2011, the European Medicines Agency (EMA) advised Sanofi that "Given the serious psychological consequences of this adverse effect in, often young, patients treated mainly in the adjuvant scheme, Health care professionals and patients should be informed of the possible irreversibility of alopecia."[100]

95.2. In correspondence dated March 2011, the French Agency for the Safety of Health Products (AFSSAPS) provided Sanofi with the same conclusion as EMA.[101]

95.3. In a report dated March 2018 from FDA and Center for Drug Evaluation and Research (CDER) as part of FDA's Patient-Focused Drug Development Initiative, FDA and CDER stated, "The perspectives shared by participants, both adult and pediatrics, at this meeting provided a vivid examination of the challenges and burdens facing patients with alopecia. These discussions clearly conveyed that alopecia areata can have a debilitating emotional and psychological impact on patients which goes beyond the loss of hair."[102]

96.     I also reviewed data from the medical literature[103] and Sanofi's clinical trials regarding the incidence rate or rate of occurrence for irreversible alopecia associated with Taxotere.

96.1. The medical literature provides an incidence rate or rate of occurrence ranging from 6.3% - 10.06% (or higher).[104]

---

[100] (Sanofi_04864365).

[101] (Sanofi_02540992).

[102] FDA and CDER, Voice of the Patient: Alopecia Areata, March 2018.

[103] A more detailed review of the medical literature regarding irreversible alopecia is set forth below and in Schedule 5, Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report.

96.2. The 2004 interim data and 2009 final data from two of Sanofi's clinical trials (TAX 316 and TAX 301/GEICAM 9805) provide an incidence rate or rate of occurrence ranging from 3.2% to 9.2%.[105]  Sanofi referenced these incidence rates or rates of occurrence in internal presentations and email correspondence, in responses to correspondence and requests for information from foreign regulatory authorities, and in certain Summaries of Product Characteristics provided in Europe.[106]

97.    In my opinion, irreversible alopecia meets the criteria for seriousness or otherwise clinically significant.

## VII.    METHODOLOGY FOR ASSESSING WHETHER THERE IS REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION BETWEEN TAXOTERE AND IRREVERSIBLE ALOPECIA

---

[104] *See* Martin M. (2018). Persistent Major Alopecia Following Adjuvant Docetaxel for Breast Cancer: Incidence, Characteristics, and Prevention with Scalp Cooling.  Breast Cancer Research and Treatment 171:627-634; Thorp N. (2014).  Abstract P5-17-04: Long term hair loss in patients with early breast cancer receiving docetaxel chemotherapy.  Presented at the Annual San Antonio Breast Cancer Symposium, December 9-13, 2014 ("The retrospective questionnaire study confirms that long term significant scalp alopecia (here lasting for up to 3.5 years following completion of chemotherapy) may affect 10-15% of patients following docetaxel for EBC [early breast cancer] (taking into consideration of a potential bias for no hair loss in the non-responders).  This rate is higher than previous estimates.  Long term hair loss to other parts of the body was also widely reported."); Bourgeois H. (2014). ERALOP study: Hair regrowth after adjuvant FEC-docetaxel chemotherapy for early breast cancer in the real life. Journal of Clinical Oncology Vol. 32, No.15_suppl:e12014 (reporting global persisting alopecia incidence of 33.4% at time of inquiry with median follow up period of 3.7 years); Sedlacek SW, Persistent Significant Alopecia (PSA) form Adjuvant Docetaxel after Doxorubicin/Cyclophosphamide (AC) Chemotherapy in Women With Breast Cancer.  Presented at the Annual San Antonio Breast Cancer Symposium, December 14-17, 2006.

[105] *See* TAX 316 Interim Clinical Study Report, Jan. 21, 2004 (Sanofi_02640580); TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 316 Clinical Study Report, Sept. 9, 2010 (Sanofi_02645200); TAX 301/GEICAM 9805 Clinical Study Report, Nov. 9, 2009 (Sanofi_00799597); *see also* Docetaxel Labeling Queries from PMDA (Inquiry 160415-001), May 24, 2016 (Sanofi_01331114).

[106] *See* DOCETAXEL-Permanent/Irreversible Alopecia Presentation at meeting dated October 26, 2015, presented by Nanae Hangai and Shang Jen (Sanofi_01827600); e-mail from Emanuel Palatinsky to Ana-Carolina Giuseppi dated March 16, 2010 (Sanofi_05252079); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); *see generally* Summary of Product Characteristics ("*Skin and subcutaneous tissue disorders*: In study TAX 316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 of 744 TAC patients and 645 of 736 FAC patients. At the end of the follow-up period (actual median follow-up time of 96 months), alopecia was observed to be ongoing in 29 TAC patients (3.9%) and 16 FAC patients (2.2%).  In GEICAM 9805 study, alopecia persisted into the follow-up period (median follow-up time of 10 years and 5 months) and was observed to be ongoing in 49 patients (9.2 %) in TAC arm and 35 patients (6.7 %) in FAC arm. Alopecia related to study drug started or worsened during the follow-up period in 42 patients (7.9 %) in TAC arm and 30 patients (5.8 %) in FAC arm.").

31

98.     In my report, I have analyzed the available data in a manner consistent with the FDA's "Guidance for Industry on Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products —Content and Format" from 2011, which provides guidance to drug manufacturers on "how to decide which adverse reactions or other potential safety hazards are significant enough to warrant inclusion in the WARNINGS AND PRECAUTIONS section."[107]

99.     The Guidance notes, in keeping with the FDA regulations set forth above, that "[t]he WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or are otherwise clinically significant because they have implications for prescribing decisions or for patient management. To include an adverse event in the section, there should be reasonable evidence of a causal association between the drug and the adverse event, but a causal relationship need not have been definitively established."[108]

100.    The FDA Guidance provides the following factors to be considered in assessing whether there is reasonable evidence of a causal association:

1.      The frequency of reporting;

2.      Whether the adverse event rate in the drug treatment group exceeds the rate in the placebo and active control group in controlled trials;

3.      Evidence of a dose-response relationship;

4.      The extent to which the adverse event is consistent with the pharmacology of the drug;

---

[107] FDA 2011 Guidance for Industry.

[108] *Id.* at 3.  *See also* European Medicines Agency GVP Module IX: Signal Management, SME Workshop "Focus on Pharmacovigilance," April 19, 2012 ("Signal validation: A signal becomes validated, if the verificatory process of all relevant documentation is suggestive of a new causal association, or a new aspect of a known association, and therefore justifies further assessment.").

5.      The temporal association between drug administration and the event;

6.      Existence of dechallenge and rechallenge experience; and

7.      Whether the adverse event is known to be caused by related drugs.[109]

101.    The use of the seven factors above in regulatory science and pharmacovigilance dates back to well before 2011.  FDA as well as Sanofi employed many of these factors in earlier years to assess the causal association between an adverse event and a drug.

101.1. In 2006, the FDA's Guidance for Industry on "Adverse Reactions Section for Labeling for Human Prescription Drug and Biological Products" stated that adverse events should be listed in the adverse reactions section of a drug label where there is "some basis to believe there is a causal relationship between occurrence of an adverse event and the use of a drug," citing to C.F.R. § 201.57(c)(7).[110]  FDA noted that "decisions on whether there is some basis to believe there is a causal relationship are a matter of judgment and are based on such factors as" the following, which are the same as those in the 2011 Labeling Guidance:

> (1) the frequency of reporting, (2) whether the adverse event rate for the drug exceeds the placebo rate, (3) the extent of dose response, (4) the extent to which the adverse event is consistent with the pharmacology of the drug, (5) the timing of the event relative to the time of drug exposure, (6) existence of challenge and dechallenge experience, and (7) whether the adverse event is known to be caused by related drugs."[111]

101.2. FDA's 2005 FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment provided the following factors "that may suggest a causal relationship between the use of a product and the adverse event:"

---

[109] FDA 2011 Guidance for Industry.

[110] FDA Guidance for Industry: Adverse Reactions Section for Labeling for Human Prescription Drug and Biological Products – Content and Format p. 8 (Jan. 2006).

[111] *Id.*

(1) occurrence of the adverse event in the expect time (e.g., type 1 allergic reactions occurring within days of therapy, cancers developing after years of therapy); (2) absence of symptoms related to the event prior to exposure; (3) evidence of positive dechallenge or positive rechallenge; (4) consistency of the event with the established pharmacological/toxicological effects of the product . . .; (5) consistency of the event with the known effects of other products in the class; (6) existence of other supporting evidence from preclinical studies, clinical trials, and/or pharmacoepidemiologic studies; and (7) absence of alternative explanations for the event (e.g., no concomitant medications that could contribute to the event; no co- or pre-morbid medical conditions).[112]

101.3. FDA's 2005 Reviewer Guidance on "Conducting a Clinical Safety review of a New Product Application and Preparing a Report on the Review" contained a section on "Causality Determination," which stated:

In assessing the critical question of whether an adverse event is caused by a drug, whether the drug is capable of causing that adverse event in the population is usually of greater interest than whether the drug caused the event in each patient who reported the event, but the approach to causality is distinctly different for relatively common events and relatively rare, serious events.[113]

101.4. In its 2005 Reviewer Guidance, FDA directed reviewers to consider the following: (1) Was the patient in fact exposed to drug and did the adverse event occur after drug exposure?; (2) Did the patient have a clinical experience that meets the criteria for the adverse event of interest; (3) Is there a reasonably compelling alternative explanation for the event?; (4) The observed rate of occurrence of the event in the database compared to an estimated background rate; (5) Is the adverse event of a type commonly associated with drug exposure?; (6) Whether the drug is a member of a class of drugs known to be causally associated with the

---

[112] FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment p. 6-7 (Mar. 2005) (guidance for identifying and describing safety signals and, specifically, assessing case reports).

[113] FDA Reviewer Guidance: Conducting a Clinical Safety review of a New Product Application and Preparing a Report on the Review p. 50-51 (Feb. 2005).

event of interest; (7) Presence of other adverse events in the database that may be associated with the event of interest; and (8) Positive re-challenge with the drug.[114]

       101.5. In 2000, the FDA Draft Guidance for Industry on the "Content and Format of the Adverse Events Section of Labeling for Human Prescription Drugs and Biologics" directed reviewers and sponsors to consider the following factors in selecting events for inclusion in the adverse reactions section: "frequency of reporting, whether the adverse reaction rate for drug exceeds the placebo rate, extent of dose-response, extent to which the adverse reaction is consistent with the pharmacology of the drug, timing of the reaction relative to time of drug exposure, and whether the adverse reaction is known to be caused by related drugs."[115]

       101.6. As early as 1992, FDA defined "causality assessment" in its "Guideline for Postmarketing Reporting of Adverse Event Experiences" as the "[d]etermination of whether there is a reasonable possibility that the product is etiologically related to the adverse experience. Causality assessment includes, for example, assessment of temporal relationships, dechallenge/rechallenge information, association with (or lack of association with) underlying disease, presence (or absence) of a more likely cause, plausibility, etc."[116]   These same factors were restated in the definition of "causality assessment" in FDA's 2001 Draft Guidance for Industry for the Postmarketing Safety Reporting for Human Drug & Biological Products Including vaccines.[117]

---

[114] *See id.* at 50-51.

[115] FDA Draft Guidance for Industry: Content and Format of the Adverse Reactions Section of Labeling for Human Prescription Drugs and Biologics (2000), available at https://www.fda.gov/OHRMS/DOCKETS/98fr/001306gl.pdf.

[116] FDA Guidance for Industry: Postmarketing Safety Reporting for Human Drug & Biological Products Including Vaccines p. 18 (1992) (directing adverse events to be reported if there a "reasonable possibility" that the event is causally related to the drug exposure).

[117] FDA Draft Guidance for Industry for the Postmarketing Safety Reporting for Human Drug & Biological Products Including Vaccines p. 35 (Mar. 2001).

102.    Similarly, Sanofi's Pharmacovigilance Department and Standard Operating Procedures acknowledged the use of many of these factors to internally analyze a reasonable causal relationship and otherwise identify safety signals.

102.1. Sanofi's March 13, 2013 presentation on Safety Signal Detection Management in GPE provided that "Signal Evaluation" should include assessment of "Qualitative assessment: case analysis, de-challenge/re-challenge, medical plausibility; Quantitative assessment: epidemiology, claims data, registry" and further discusses case review, data mining, clinical trial review and literature surveillance as part of Sanofi's "Signal Detection Process."[118]

102.2. An April 2016 Sanofi presentation titled "Product Safety topics" discusses "signal source and context of evaluation" and its impact on "relevant current labeling" and "scientific adjudication required," and noting Sanofi's policy to analyze biologic plausibility, case reports, clinical trial data, and medical literature, amongst other items, in evaluating the existence of a reasonable causal association."[119]

103.    The epidemiological literature has utilized many of these factors in assessing the relationship between a drug and an adverse event for decades also. In his seminal 1965 article "The Environment and Disease: Association or Causation?" Sir Austin Bradford Hill laid out nine "aspects of [an] association" to consider in determining whether the association is causal,

---

[118] Safety Signal Detection Management in GPE, Emanuel Palatinsky, March 13, 2013 (Sanofi_1363709).

[119] Sanofi April 2016 Presentation "Product-Safety topic" (Sanofi_01329596); *see also* Sanofi Standard Operating Procedure Supporting GPE Signal Detection for Registered Products in US Pharmacovigilance, Aug. 4, 2015 (Sanofi_PJ_00017228); Sanofi Standard Operating Procedure for Collecting, Processing and Regulatory Reporting of Solicited Adverse Events, Jan. 16, 2011 (Sanofi_PJ_0016214); Sanofi Standard Operating Procedure for Safety Signal and Risk Management, Nov. 2, 2014 (Sanofi_05061309); Sanofi Standard Operating Procedure for Safety Signal and Risk Management, Aug. 30, 2015 (Sanofi_05061269); Safety Economic Part II, Emanuel Palatinsky, Nov. 2, 2011 (Sanofi_03073713); Appendix 8: Methods of Signal Detection and Screened Sources (Sanofi_01076720).

now often referred to in pharmacoepidemiology as the Bradford Hill factors or criteria.[120]  The

Bradford Hill criteria include: consistency (reproducibility), temporality (whether condition

followed exposure); biological gradient (dose response relationship); plausibility (whether the

association is biologically plausible); experiment (whether the condition improves upon removal

of the hypothesized causative agent); and analogy.[121]

104.    As with any set of factors, FDA's set of seven factors has certain limitations. FDA

does not explicitly define all the terms it uses in the factors, but there is a generally-accepted

basis for the terminology in regulatory science and pharmacovigilance, and I draw upon my

expertise in same in understanding and applying the factors.

105.    In addition, there are certain factors that may be useful under certain

circumstances but not others.  For example, if there is no available dechallenge/rechallenge

information or data, then it is not possible to use this factor.  In addition, the factors do not

include other kinds of epidemiological studies beyond controlled trials, in part because such

studies are often not available.

106.    I analyzed the available data in this case in light of each of these seven factors

with these limitations in mind.

107.    In my opinion, there is recognition on the part of FDA and the scientific and

epidemiological community that not all of these factors must be present in order for there to be

---

[120] Hill, Austin Bradford (1965). "The Environment and Disease: Association or Causation?" Proceedings of the
Royal Society of Medicine. 58(5): 295-300. PMC 1898525.

[121] The complete list of the nine Hill factors is as follows: (1) strength of the association; (2) consistency (whether
the association has been repeatedly observed "by different persons, in different places, circumstances and times");
(3) specificity (whether there are alternative causes of a condition); (4) temporality (whether the condition followed
the exposure to the agent); (5) biological gradient (whether a dose-response relationship exists); (6) plausibility
(whether the association is biologically plausible); (7) coherence (whether the association "seriously conflict[s] with
the generally known facts of the natural history and biology of the disease"); (8) experiment (whether the condition
improves upon removal of the hypothesized causative agent); and (9) analogy. *See id.*

reasonable evidence of a causal association such that a Warning is warranted.  In fact, FDA's language in the Guidance says that "some factors to consider . . . ."[122]

108.    Moreover, as the Guidance notes,[123] the FDA Warning Standard states that "a causal relationship need not have been definitively established."[124]  The question to be addressed is thus whether a substantial majority of the factors that can be assessed demonstrate reasonable evidence of a causal association.

109.    In a review and analysis performed by Sanofi in 2015 (hereinafter referred to as "Sanofi's 2015 Causation Analysis"), Sanofi concluded in its internal and regulatory communications that "Based on review of the Sanofi global pharmacovigilance database, worldwide scientific literature, clinical studies, and biological plausibility, the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."[125]  I agree with Sanofi's conclusion that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia.  As discussed below, based on many of the same factors analyzed by Sanofi,[126] I conclude that such evidence existed by as early as 2009.

---

[122] FDA Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products (2011) at 3, available at https://www.fda.gov/downloads/drugs/guidances/ucm075096.pdf.

[123] *Id.*

[124] 71 Fed. Reg. 3922-3997 (January 24, 2006) at 3990.

[125] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599); *see also* Email from Nanae Hangai to Yoshiko Shimazaki and Vanina Groult, Feb. 16, 2016 (Sanofi_02664951) ("The bottom line is: **cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel**.") (emphasis in original).

[126] Although Sanofi was communicating its conclusion regarding a causal association between Taxotere and irreversible alopecia in 2015 (as set forth in the documents cited in the above footnote), the data and information both relied upon by Sanofi to reach this conclusion and otherwise available to Sanofi dates back far earlier, as

## VIII.    APPLICATION OF FACTORS FROM FDA LABELING GUIDANCE TO THE DATA REGARDING TAXOTERE AND IRREVERSIBLE ALOPECIA

### A.    First Factor: The Frequency of Reporting

110.    For the frequency of reporting factor, I reviewed when safety signals emerged in FDA's Adverse Event Reporting System (FAERS) for Taxotere and adverse events associated with irreversible alopecia.

111.    The emergence of a safety signal for a particular drug and event does not in itself establish that the association is causal, but generates a hypothesis that warrants additional investigation. As FDA has stated, "Signals generally indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event. After a signal is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other action should be taken."[127]

112.    FAERS data has recognized limitations that arise from its nature as a voluntary reporting system, including underreporting and stimulated reporting, and event reports with incomplete information.[128]    Nonetheless, it has played an important role in regulatory review of drug safety issues, and in decisions regarding labeling changes.[129]

---

discussed more fully in my analysis below.  *See also* Email from Emanuel Palatinsky to Nanae Hangai, Jan. 22, 2014 (Sanofi_01718843) ("It is up to the GSO to determine with certainty the ADRs that have an important impact on public health, as you have correctly identified from the regulatory guideline.  Especially in relation to well characterized safety signals (*e.g.*, persistent alopecia . . . .").

[127] FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment p. 4, 9 (Mar. 2005).

[128] *Id.* at 9.

[129] See, e.g., Lester, J., Neyarapally, G. A., Lipowski, E., Graham, C. F., Hall, M., & Dal Pan, G. (2013). Evaluation of FDA safety-related drug label changes in 2010. Pharmacoepidemiology and Drug Safety, 22(3), 302-305. Moore, T. J., Singh, S., & Furberg, C. D. (2012). The FDA and new safety warnings. Archives of Internal Medicine, 172(1), 78-80.

113.     While I am a Professor of Biostatistics, as has been my practice both as FDA Commissioner and in my academic appointments, and as is standard for regulatory experts, I utilize the work of biostatisticians where appropriate.

114.     I requested that biostatistician David Madigan, Ph.D., Professor of Statistics at Columbia University, calculate when a safety signal emerged in FAERS for endpoints related to irreversible alopecia.  Dr. Madigan searched MedWatch Reports from 2000 through 2017 with Higher Level Term ("HLT") alopecia and tagged with an outcome of "Disability or Permanent Damage."[130]  The search terms are listed in Dr. Madigan's liability report.[131]

115.     Dr. Madigan calculated when a safety signal emerged for these endpoints using certain recognized signaling statistics including the Proportional Reporting Ratio ("PRR"), Empirical Bayes Geometric Mean ("EBGM"), and EB05.[132]  I use the results of those calculations as stated in his expert report of November 2, 2018.

116.     The PRR is a widely-recognized measure in signal detection for drug-associated adverse events, including by FDA,[133] and Sanofi's pharmacovigilance department cited use of this measure as part of safety signal detection management.[134]

117.     As set forth in the Evans article cited by FDA, a PRR signal exists where the PRR is $\geq$ 2, there are at least 3 cases, and chi-squared is $\geq$4.[135]

---

[130] Madigan Report of November 2, 2018 at 11-16 ("Madigan Report").

[131] Id.

[132] Dr. Madigan also performed a lasso logistic regression analysis to assess the impact of the innocent bystander effect.  Id. at 15-16.

[133] Evans SJ, Waller PC, Davis S. (2001). Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports. Pharmacoepidemiol Drug Saf, 10(6), 483-486; Finney DJ (1974). Systemic signaling of adverse reactions to drugs.  Methods Inf Med. 13(1):1-10; Hesha J. Data Mining at FDA ("The Proportional Reporting Ratio (PRR) is the foundational concept for many disproportionality methods."); Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, March 2005.

[134] Safety Signal Detection Management in GPE, Emanuel Palatinsky, March 13, 2013 (Sanofi_1363709).

118.     Dr. Madigan's calculations of this signal detection measure for the drug-adverse event pair of Taxotere and HLT alopecia with "Disability or Permanent Damage" yielded a signal date beginning in the First Quarter of 2000, and continuing without interruption through the end of his analysis in the Fourth Quarter of 2017.[136]

119.     I also reviewed and analyzed reports disclosed to Sanofi in Sanofi's internal global pharmacovigilance database, data from Sanofi's own clinical trial studies, reports in the medical literature, and inquiries and correspondence about this injury from patients, physicians, and foreign regulatory authorities.

120.     At my request, Dr. Madigan performed a review of Sanofi's internal global pharmacovigilance database.  Dr. Madigan identified 291 cases of irreversible alopecia in Sanofi's internal global pharmacovigilance database from 1999 through 2015.[137]

121.     In Sanofi's 2015 Causation Analysis, Sanofi performed a review of its internal global pharmacovigilance database.  Sanofi identified 117 cases reporting irreversible alopecia based on its methodology,[138] which was limited to "a verbatim event that included either 'permanent' or 'irreversible', or alopecia that lasted more than 2 years with an outcome of not recovered/recovering/unknown."[139]  This represented 5.3% of the 2,172 cases reporting a HLT

---

[135] Evans SJ, Waller PC, Davis S. (2001). Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports. Pharmacoepidemiol Drug Saf, 10(6), 483-486; *see* Hesha J. Data Mining at FDA ("The Proportional Reporting Ratio (PRR) is the foundational concept for many disproportionality methods."); Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, March 2005.

[136] Madigan Report at 11-16.  Dr. Madigan also found a signal date using EBGM in 2008, using EB05 in 2012, and using lasso logistic regression analysis in 2010.  *Id.*

[137] Madigan Report at 16-18.  When narrowed to exclude any cases labeled as "recovered" in the database, Dr. Madigan identified 263 cases of irreversible alopecia.  *Id.*

[138] As noted by Sanofi, "there are obvious finding that the docetaxel has been involving in these case; some cases only reported docetaxel as suspect drugs.  And combinations are mostly AC/EC, but random."  Email from Nanae Hangai, Jan. 22, 2016 (Sanofi_02664951).

[139] *See* Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788).

"Alopecia."[140]  Sanofi's definition of irreversible alopecia does not conform to the definition of

irreversible alopecia generally set forth in the medical literature,[141] and Sanofi recognized

internally that if the two-year time period was reduced, there would be "more cases."[142]

      122.    Sanofi's 2015 Causation Analysis cited to the reports it identified in its internal

global pharmacovigilance database to support its conclusion that "the cumulative weighted

evidence is sufficient to support a causal association between docetaxel and

permanent/irreversible alopecia in the patients who received docetaxel."[143]

      123.    Sanofi's internal clinical trial studies identified reports of irreversible alopecia

following Taxotere treatment.  The 2004 interim data and 2009 final data from two of Sanofi's

clinical trials (TAX 316 and TAX 301/GEICAM 9805) identified an incidence rate or rate of

occurrence ranging from 3.2% - 9.2%.[144]  Sanofi's 2015 Causation Analysis cited to these

---

[140] *Id.*

[141] *See* Section V. of this Report (citing to medical literature defining condition as "complete loss of growth or partial regrowth at least 6 months after chemotherapy.").  Sanofi previously performed a review of its global pharmacovigilance database in 2011.  *See* Sanofi, 2.5 Clinical Overview Docetaxel - Persistent Alopecia, January 18, 2011 (Sanofi_04353204).  In its 2011 review, Sanofi identified 1,620 cases with HLT "Alopecia" but defined the injury to be "not recovered ≥ 12 months following the last dose of chemotherapy."  *Id.*  Although the time period in its 2011 analysis was ≥ 12 months rather than 24 months, this definition also fails to conform to the definition of irreversible alopecia generally set forth in the medical literature as described in Section V. of this Report.  This definition resulted in 142 identified cases (8.8%) of those reporting HLT "Alopecia." *Id.*

[142] Email from Nanae Hangai to Yoshiko Shimazaki and Vanina Groult, Feb. 16, 2016 (Sanofi_02664951) ("Therefore, I selected the cases: 1. If the verbatim contains 'permanent' or 'irreversible' and 2. The verbatim does not contains 'permanent' or 'irreversible' but lasted more than 2 years (**since if set less, we know we have more cases.**") (emphasis added).

[143] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).   Although Sanofi identified more reports in 2011 (142) than it did using the longer 24-month timeframe in 2015 (117), Sanofi concluded in its 2011 review that these reports "revealed no evidence of a causal relationship with docetaxel . . . ." Sanofi, 2.5 Clinical Overview Docetaxel - Persistent Alopecia, January 18, 2011 (Sanofi_04353204).

[144] *See* TAX 316 Interim Clinical Study Report, Jan. 21, 2004 (Sanofi_02640580); TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 316 Clinical Study Report, Sept. 9, 2010 (Sanofi_02645200); TAX 301/GEICAM 9805 Clinical Study Report, Nov. 9, 2009 (Sanofi_00799597); *see also* Docetaxel Labeling Queries from PMDA (Inquiry 160415-001), May 24, 2016 (Sanofi_01331114).

clinical trial studies and the reports of irreversible alopecia reported to support its conclusion that "the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."[145]

124.    The publically available medical literature disclosed reports of irreversible alopecia associated with Taxotere.[146] Sanofi's 2015 Causation Analysis[147] cited to certain of this

_____

[145] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).

[146] *See, e.g.*, Kang D. (2018).  Permanent Chemotherapy-Induced Alopecia in Patients with Breast Cancer: A 3-Year Prospective Cohort Study.  The Oncologist 23:1-7 (describing women being administered docetaxel as part of a taxane-based regimen versus other regimens and finding that "[p]atients with taxane-based treatment had about eight times higher odds of PCIA [permanent chemotherapy-induced alopecia] 3 years after completion of chemotherapy (8.01; 95% CI, 1.20-53.26] adjusting for age, hair density, and thickness at diagnosis."); Martin M. (2018). Persistent Major Alopecia Following Adjuvant Docetaxel for Breast Cancer: Incidence, Characteristics, and Prevention with Scalp Cooling.  Breast Cancer Research and Treatment 171:627-634; Crown J. (2017).  Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer. J Clin Oncol, available at http://ascopubs.org/doi/abs/10.1200/JCO.2017.35.15_suppl.e21576; Fonia A. (2017).  Permanent alopecia in patients with breast cancer after taxane chemotherapy and adjuvant hormonal therapy: Clinicopathologic findings in a cohort of 10 patients.  J Am Acad Dermatol, available at http://dx.doi.org/10.1016/j.jaad.2016.12.027; Namini S. (2016).  Systematic Review of the Risk of Permanent Alopecia with Docetaxel Treatment for Breast Cancer.  J Clin Case Rep 6:851; Sibaud V. (2016). Dermatological adverse events with taxane chemotherapy.  Eur J. Dermatol (26(5): 427-443); Bourgeois H. (2014).  ERALOP study: Hair regrowth after adjuvant FEC-docetaxel chemotherapy for early breast cancer in the real life.  Journal of Clinical Oncology Vol. 32, No.15_suppl:e12014; Thorp N.  (2014). Abstract P5-17-04: Long term hair loss in patients with early breast cancer receiving docetaxel chemotherapy.  Presented at the Annual San Antonio Breast Cancer Symposium, December 9-13, 2014; Tosti A. (2013).  Docetaxel and permanent alopecia.  J Am Acad Dermatol, available at http://dx.doi.org/10.1016/j.jaad.2010.06.064; Kluger N. (2012).  Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Ann Oncol 23(11):2879-84; Miteva M. (2011).  A Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases. Am J Dermatopathol 33(4):345-50; Palamaras I. (2011).  Permanent chemotherapy-induced alopecia: A review.  J Am Acad Dermatol 64(3):604-606; Tallon B. (2010). Permanent chemotherapy-induced alopecia: case report and review of the literature. J Am Acad Dermatol 63(2):333-336; Burgeois H. (2009).  Long term persistent alopecia and suboptimal hair regrowth after adjuvant chemotherapy for breast cancer: Alert for an emerging side effect: ALOPERS Observatory, Cancer Research 69(24 Suppl): Abstract nr 3174; Prevezas C. (2009). Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer. Br J Dermatol 160(4):883-885; Sedlacek SW, Persistent Significant Alopecia (PSA) form Adjuvant Docetaxel after Doxorubicin/Cyclophosphamide (AC) Chemotherapy in Women With Breast Cancer. Presented at the Annual San Antonio Breast Cancer Symposium, December 14-17, 2006; Park J. (2005). Five cases of permanent alopecia following chemotherapy.  Korean J Dermatol 43:1365-70; *see also* SABCS Interview Series, May 14, 2010, available at https://www.onclive.com/publications/obtn/2010/march2010/sabcs_interview_series ("How many patients out of the 82 reports you looked at suffered permanent hair loss? One hundred percent, and now [there] are 100 women! Dramatic!").  *See also* Schedule 5, Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report; *see also* Email from Madeline Malia to Mark Gaydos, March 16, 2010 (Sanofi_05446831, Gaydos Ex. 26) (internally forwarding abstract of Burgeois H. (2009).  Long term persistent alopecia and suboptimal hair regrowth after adjuvant chemotherapy for breast cancer:

medical literature in supporting its conclusion that "the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."[148]

125.    Sanofi also received inquiries and correspondence regarding reports of irreversible alopecia from patients, physicians, internal Sanofi departments, and foreign regulatory authorities.[149]

126.    In my opinion, the frequency of reporting from the sources discussed above beginning as early as 2009 reveals safety signals that were evident and warranted further investigation, including consideration of the other factors set forth in this Report.

**B.     Second Factor: Whether the Adverse Event Rate in the Drug Treatment Group Exceeds the Rate in the Placebo and Active Control Group in Controlled Trials**

---

Alert for an emerging side effect: ALOPERS Observatory, Cancer Research 69(24 Suppl): Abstract nr 3174 to Vice President of general medicine US advertising and promotion in North American global regulatory affairs Mark Gaydos); Emails between Gina Vestea and Mark Gaydos, August 21, 2012 (Sanofi_04691718, Gaydos Ex. 28) (internally forwarding Kluger (2012) and Miteva (2011) abstracts).

[147] Sanofi's 2011 review cited to other medical literature.  *See* Sanofi, 2.5 Clinical Overview Docetaxel - Persistent Alopecia, January 18, 2011 (Sanofi_04353204) (citing Prevezas C. (2009). Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer.  Br J Dermatol 160(4):883-885; Tallon B. (2010). Permanent chemotherapy-induced alopecia: case report and review of the literature.  J Am Acad Dermatol 63(2):333-336; Roche H. (2006).  Sequential adjuvant epirubicin-based and docetaxel chemotherapy for node-positive breast cancer patients: the FNCLCC PACS 01 Trial.  J Clin Oncol 24(36):56664-5671).

[148] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788) (citing Kluger N. (2012).  Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients.  Ann Oncol 23(11):2879-84; Miteva M. (2011).  A Permanent alopecia after systemic chemotherapy: a clinicopathological study of 10 cases.  Am J Dermatopathol 33(4):345-50); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).

[149] *See, e.g.*, Gaydos Exhibit 23 (Sanofi_05446835); Vestea Exhibit 8 (Sanofi_04731188); Email from Lynette Melman, Dec. 4, 2012 (Sanofi_01363974); Gaydos Exhibit 24 (Sanofi_05075741); AFSSAPS letter, July 9, 2010 (Sanofi_03643994); Emails from Heidi Filternborg, Mar. 3-8, 2006 (Sanofi_01035453; Sanofi_01035459); Response to EMA Agency Request, Sept. 22, 2011 (Sanofi_01112867).

127.    For this factor I considered if and when there was evidence that the adverse event rate for irreversible alopecia in Taxotere subjects exceeded the rate in comparator groups in controlled trials.

128.    In 1999, Sanofi commenced two clinical trial studies (TAX 316 and TAX 301/GEICAM 9805), both of which sought to compare patients receiving docetaxel in combination with doxorubicin and cyclophosphamide (TAC) versus those receiving 5-fluorouacil in combination with doxorubicin and cyclophosphamide (FAC).[150]  Sanofi prepared interim clinical study reports for both trials in 2004, and final clinical study reports for both trials in 2009.[151]  The interim and final clinical study reports for both clinical trials provided data and information regarding irreversible alopecia in patients in the TAC and FAC arms.[152]

129.    At my request, Dr. Madigan performed a statistical analysis comparing the adverse event rate for irreversible alopecia in the TAC versus FAC arms from the TAX 316 and TAX 301/GEICAM 9805 clinical trials.[153]  Dr. Madigan's analysis demonstrates a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus the FAC arm at nearly all time periods in both the TAX 316 TAX 301/GEICAM 9805 clinical trials.[154]  I

---

[150] TAX 316 Interim Clinical Study Report, Jan. 21, 2004 (Sanofi_02640580); TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 316 Clinical Study Report, Sept. 9, 2010 (Sanofi_02645200); TAX 301/GEICAM 9805 Clinical Study Report, Nov. 9, 2009 (Sanofi_00799597).

[151] *Id.*

[152] *Id.*

[153] Madigan Report at 18-20.

[154] The risk ratio of irreversible alopecia for patients in the TAC arm versus the FAC at the 2009 final time period for the TAX 316 clinical trial is 1.80, 95% confidence interval (0.98, 3.28).  *Id.*  Nevertheless, based on my review and Dr. Madigan's report, the incidence rate for irreversible alopecia in both GEICAM 9805/TAX 301 and TAX 316 may be under reported.  *See id.*

The number of subjects followed into the follow-up period for GEICAM 9805/TAX 301 was only 49/532 (9.2%).  *See* TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 301/GEICAM 9805 Clinical Study Report, Nov. 9, 2009 (Sanofi_00799597).  As Sanofi acknowledges, the final clinical trial report for GEICAM 9805/TAX 301 states "during 5 year follow-up, the CSR [clinical trial report] notes 'Most TEAEs were followed into the follow-up period at the discretion of the Investigator.'  This implies that the most of cases of alopecia were not followed during the follow up period in the GEICAM study."  Nanae Hangai, Docetaxel

have seen no evidence that Sanofi conducted any statistical analysis comparing the risk of irreversible alopecia in the TAC versus FAC arms of either the TAX 316 or TAX 301/GEICAM 9805 clinical trials at any other time.[155]

130.   At my request, Dr. Madigan also conducted a pooled analysis of the adverse event rates for irreversible alopecia from the TAX 316 and TAX 301/GEICAM 9805 clinical trials.[156] I have seen no evidence that Sanofi conducted such a pooled analysis at any time.

131.   Dr. Madigan's random effects meta-analysis demonstrates that, when the data from the TAX 316 and TAX 301/GEICAM 9805 clinical trials is pooled, there is a statistically significant increased risk of irreversible alopecia for patients in the TAC arm versus the FAC arm (a rate ratio of 1.85 with a corresponding 95% confidence interval (1.04, 3.31) and a p-value of 0.04).[157]

132.   Sanofi's 2015 Causation Analysis cited to these clinical trial studies and the adverse event rates of irreversible alopecia reported to support its conclusion that "the

---

Labeling Queries from PMDA [Japan's Pharmaceutical and Medical Devices Agency], May 24, 2016 (Sanofi_01331114).

For TAX 316, Sanofi acknowledges that its follow-up reporting and collection strategy did not include capturing adverse event start and stop dates to fully understand the duration of adverse events like irreversible alopecia *See, e.g.*, Email from Jean-Philippe Aussel to Catherine Crane and Michael Kopreski, May 21, 2012 (Sanofi_02932469) ("I confirm also that the CRF AE modules did not capture AE start and stop dates . . . . Note for very large adjuvant trials conducted on product with a well known safety profile (here Taxotere) and in which AE durations are not analyzed, the collection of AE start and stop dates would have yielded only extra validation, queries etc for no added value in terms of safety results.  FYI-similar AE collection strategy (without dates) was applied for the TAX-316/BCIRG-001 early breast cancer pivotal registration study without any consequences on the positive outcomes of the FDA/EMA approvals.").

[155] *See also* Deposition of Barry Childs, M.D., October 26, 2018 at 113:23-114:9 ("Q. Do you know whether Sanofi ever engaged in any clinical trials to determine whether or not Taxotere can cause permanent hair loss in some people who are administered the drug?  A. I'm not aware that Sanofi did that, and I certainly was not part of anything that they did with respect to that.") (objection omitted).

[156] Madigan Report at 18-20.

[157] *Id.*

46

cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."[158]

133.    In my opinion, there was evidence that the adverse event rate for irreversible alopecia in Taxotere subjects exceeded the rate in comparator groups in controlled in as early as 2009.

### C.    Third Factor: Whether There Is Evidence of a Dose-Response Relationship

134.    For this factor I considered whether there is evidence of a dose-response relationship between Taxotere and adverse events of irreversible alopecia.

135.    In a 2018 study by Martin titled "Persistent Major Alopecia Following Adjuvant Docetaxel for Breast Cancer: Incidence, Characteristics, and Prevention with Scalp Cooling," the authors evaluated, among other things, the prevalence of irreversible alopecia following adjuvant docetaxel for breast cancer, patients receiving Taxotere regimens at a cumulative dose equal to or greater than 400 mmg/m$^2$ had a significantly higher incidence of irreversible alopecia.[159]

136.    In addition, in the 2018 Martin study, complete irreversible alopecia was seen in patients receiving docetaxel regimens with a cumulative dose of equal to or greater than 400

---

[158] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).

[159] As compared to other chemotherapy regimens, including lower dose regimens of docetaxel, the prevalence of irreversible alopecia increased 33-52% in patients treated with docetaxel regimens having a cumulative dose equal to or exceeding 400mmg/m$^2$. *See* Martin M. (2018). Persistent Major Alopecia Following Adjuvant Docetaxel for Breast Cancer: Incidence, Characteristics, and Prevention with Scalp Cooling.  Breast Cancer Research and Treatment 171:627-634.

mmg/m$^2$ (36/358, 10.06%, 95% CI 7.36-13.61) .[160]   In the 59 patients receiving docetaxel

regimens less than 400 mmg/m$^2$, no instances of complete irreversible alopecia were reported.[161]

137.    Other studies I reviewed reached similar conclusions.

137.1. For example, in a 2017 abstract authored by Crown titled "Incidence of

permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer,"

he concluded that "For patients receiving D [Docetaxel] non A [Anthracyclines], the risk is dose-

dependent."[162]

137.2. In a 2014 presentation by Bourgeois at the San Antonio Breast Cancer

Symposium titled "ERALOP: Post-adjuvant FEC-docetaxel chemotherapy for early breast

cancer: hair regrowth in the real life," he found that "Docetaxel dose reduction: dose reduction

(acute toxicity) is correlated with a PSA [Persisting Significant Alopecia] decrease (reversible

alopecia) OR =.43 [0.30-0.89]."[163]

138.    I found no evidence of a study concluding that a dose-response relationship failed

to exist.[164]

139.    In my opinion, based on the above, there was reproducible evidence of a dose

response relationship between Taxotere and irreversible alopecia beginning as early as 2009.

D.    **Fourth Factor: The Extent to Which the Adverse Event Is Consistent with the Pharmacology of the Drug**

---

[160] *Id.*  In addition, the incidence of complete irreversible alopecia was similar in patients with (22/221, 9.96%) and without hormonal therapy (14/137, 10.2%).

[161] *Id.*

[162] Crown J. (2017).  Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer. J Clin Oncol, available at http://ascopubs.org/doi/abs/10.1200/JCO.2017.35.15_suppl.e21576

[163] Bourgeois H. (2014).  ERALOP: Post-adjuvant FEC-docetaxel chemotherapy for early breast cancer: hair regrowth in the real life.  San Antonio Breast Cancer Symposium, Dec. 9-13, 2014 (P5-21-05)).

[164]

140.    For this factor, I reviewed, based on my own experience and knowledge, the medical literature, and Sanofi's internal documents, whether and when there was evidence that irreversible alopecia is consistent with the pharmacology of Taxotere.  In other words, at what point in time, if any, was there evidence of a plausible biological mechanism by which Taxotere can cause irreversible alopecia

141.    A *plausible* biological mechanism differs from a *known* biological mechanism.[165] Biological plausibility is satisfied if the relationship is consistent with the current body of knowledge regarding the etiology and mechanism of disease.[166]

142.    Anagen effluvium, which is the pathologic loss of hair during the anagen (first) phase of the hair's growth cycle, is a common adverse event of cytotoxic drugs, including agents like Taxotere.

143.    As explained in Sanofi's 2015 Causation Analysis, "[c]ytotoxic chemotherapy agents target rapidly dividing cells and as a result the highly proliferative hair matrix cells are an unintended target."[167]

144.    As a result, anagen phase hairs are rapidly lost because of massive apoptosis of hair matrix cells of hair bulbs.[168]

145.    It is not well understood how this type of chemotherapy-induced alopecia becomes irreversible but a number of hypotheses have been put forth by Sanofi and in the medical literature.

---

[165] Weed D. (1998). Biologic Plausibility in Causal Inference: Current Method and Practice. Am J Epidemiol 147:415-25.

[166] Fedak K. (2015). Applying the Bradford Hill criteria in the 21st century: how data integration has changed causal inference in molecular epidemiology. Emerg Themes Epidemiol 12:14.

[167] Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788).

[168] *See* Bodó E. (2007). Dissecting the Impact of Chemotherapy on the Human Hair Follicle. Am J Pathology 171:1153-68.

146.    In its 2015 Causation Analysis, Sanofi included a section specific to "Biologic Plausibility," which identified the following hypotheses: "toxic damage to stem cells/hair matrix cells of the hair bulb or disturbance of the signaling pathway to the secondary hair germ."[169]

147.    The medical literature likewise supports these hypotheses.[170]

148.    Sanofi's 2015 Causation Analysis cited to its review of biologic plausibility in reaching its conclusion that "the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."[171]

149.    In my opinion, there was evidence of a plausible biological mechanism by which Taxotere can cause irreversible alopecia in as early as 2009.

**E.     Fifth Factor: The Temporal Association Between Drug Administration and the Event**

150.    For this factor, I looked for adverse event reports received by Sanofi of irreversible alopecia showing that the adverse event occurred after the patient was exposed to Taxotere.

151.    It is almost always the case that adverse event reports involve an adverse event that occurs after the patient is exposed to the suspect drug.  While in some cases a report may

---

[169] Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788)

[170] *See, e.g.,* Fonia A. (2017).  Permanent alopecia in patients with breast cancer after taxane chemotherapy and adjuvant hormonal therapy: Clinicopathologic findings in a cohort of 10 patients. J Am Acad Dermatol, available at http://dx.doi.org/10.1016/j.jaad.2016.12.027; Miteva M. (2011).  Permanent Alopecia After Systemic Chemotherapy: A Clinicopathological Study of 10 Cases.  Am J Dermatopathol 33:345-350; Paus R. (2013). Pathobiology of chemotherapy-induced hair loss. Lancet Oncol 14: e50–59; Prevezas C. (2009).  Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer.  British Journal of Dermatology; 160:881-898.

[171] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).

involve a worsening of a pre-existing condition or the reappearance of an event that also occurred earlier in the person's medical history, this would still satisfy the temporality criterion.

152.    As indicated in the discussions of the frequency or reporting and controlled trials above, Sanofi received numerous adverse event reports of irreversible alopecia involving Taxotere.  For example, as discussed above, Dr. Madigan identified 291 cases of irreversible alopecia in Sanofi's internal global pharmacovigilance database from 1999 through 2015.[172] These events occurred after the person was exposed to Taxotere.

153.    Sanofi's 2015 Causation Analysis cited to its global pharmacovigilance database with reports of irreversible alopecia after Taxotere treatment to support its conclusion that "the cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent/irreversible alopecia in the patients who received docetaxel."[173]

154.    In my opinion, these numbers establish this temporal association factor by as early as 2009.

**F.    Sixth Factor: Existence of Dechallenge and Rechallenge Experience**

155.    "Dechallenge" refers to the dose reduction or discontinuation of a drug from a patient's treatment.  A positive dechallenge denotes the disappearance or reduction in severity of the adverse event.  "Rechallenge" refers to the reintroduction or increase in dose of a drug suspected of having caused an adverse experience following a positive dechallenge.  A positive rechallenge is reoccurrence of the adverse event upon reintroduction or increase in dose of the drug.

---

[172] Madigan Report at 16-18.

[173] European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).

156.    Based on my review of the data available for Taxotere, there is insufficient information regarding dechallenge and rechallenge experiences to render an opinion regarding the existence of this factor.

**G.    Seventh Factor: Whether the Adverse Event Is Known to Be Caused by Related Drugs**

157.    For this factor, I analyzed whether irreversible alopecia is known to be caused by related drugs.  In particular, at my request, Dr. Madigan analyzed if and when safety signals emerged in FAERS for adverse events associated with irreversible alopecia and the following other related drugs: paclitaxel, fluorouracil, cyclophosphamide, doxorubicin, and cisplatin.[174]

158.    Dr. Madigan searched MedWatch Reports from 2000 through 2017 with Higher Level Term ("HLT") alopecia and tagged with an outcome of "Disability or Permanent Damage" and analyzed whether a PRR signal existed (where the PRR is $\geq 2$, there are at least 3 cases, and chi-squared is $\geq 4$).[175]

159.    Dr. Madigan's calculations of this signal detection measure yielded a signal date:

- For paclitaxel: beginning in Second Quarter of 2001through the First Quarter of 2004, then from the First Quarter of 2005 through the Third Quarter of 2006, then from the Fourth Quarter of 2008 through the Second Quarter of 2009, and then at no time thereafter.

- For fluorouracil: no signal

- For cyclophosphamide: no signal

- For doxorubicin: no signal

---

[174] Madigan Report at 11-16.  These are other cancer medications used in adjuvant care for early stage breast cancer that have or could be competitors for Taxotere.  *Id.*

[175] *Id.*; Evans SJ, Waller PC, Davis S. (2001). Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports. Pharmacoepidemiol Drug Saf, 10(6), 483-486; *see* Hesha J. Data Mining at FDA ("The Proportional Reporting Ratio (PRR) is the foundational concept for many disproportionality methods."); Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, March 2005.

- For cisplatin: no signal[176]

160.    Paclitaxel is the only comparator drug that yielded a PRR signal at any time, but the signal was early, smaller, and dissipates over time.[177] Taxotere is the only drug that yielded a PRR signal for irreversible alopecia that emerged continuously during the entire 2000 through 2017 time period Dr. Madigan analyzed, Taxotere was also the only drug to ever exhibit a safety signal using EBGM, EB05, and/or lasso logistic regression analysis at any time, and Taxotere was shown to have more cumulative reports of irreversible alopecia than all of the other comparator drugs combined.[178]

161.    I also reviewed publically available medical literature, Sanofi's clinical trial data, and documents produced by Sanofi in this litigation to determine whether irreversible alopecia is known to be caused by these other related drugs.[179]   Based on my review, while many of these drugs are associated with alopecia, reports regarding irreversible alopecia are more prevalent with Taxotere than these other drugs.[180]

162.    I have seen no evidence that Sanofi ever communicated internally or externally that irreversible alopecia was known to be caused by any drug other than Taxotere.[181]

---

[176] Madigan Report at 11-16   Dr. Madigan also analyzed whether a signal existed for any comparator drug using EBGM, EB05 and lasso logistic regression analysis.  *Id.*  There was no safety signal for any comparator drug using any of these other safety signals at any time.  *Id.*

[177] *Id.*

[178] *Id.*

[179] *See, e.g.*, TAX 316 Interim Clinical Study Report, Jan. 21, 2004 (Sanofi_02640580); TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 316 Clinical Study Report, Sept. 9, 2010 (Sanofi_02645200); TAX 301/GEICAM 9805 Clinical Study Report, Nov. 9, 2009 (Sanofi_00799597); *see* Schedule 5, Studies Regarding the Risk of Irreversible Alopecia Associated with Taxotere and Details of Other Studies Cited or Referenced in This Report.

[180] *Id.*

[181] *See* European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599); *see also* E-mails between Sanofi's Michael Kopreski and Nanae Hangai, October 22, 2015

163.     Based on my discussion of the factors above, my opinion is that there is insufficient evidence to conclude that other related drugs are also known to cause irreversible alopecia.

### H.     Conclusions Regarding the Seven Factors

164.     In my opinion, a substantial number of the seven factors provided by the FDA to consider in assessing whether there is reasonable evidence of a causal association were satisfied to establish reasonable evidence of a causal association between Taxotere and irreversible alopecia by as early as 2009.[182]

165.     In my opinion, because a substantial number of the factors provided by the FDA to consider in assessing whether there is reasonable evidence of a causal association were satisfied as to Taxotere and irreversible alopecia by as early as 2009, and because irreversible alopecia is a serious and/or clinically significant adverse event, a Warning regarding irreversible alopecia was warranted by as early as 2009.

## IX.     SANOFI'S LABELING FAILED TO ADEQUATELY DISCLOSE THE RISK OF IRREVERSIBLE ALOPECIA WITH TAXOTERE

166.     As acknowledged by Sanofi, prior to December 2015, Sanofi's Taxotere labeling included a reference to the adverse event of alopecia, but Sanofi never disclosed the risk of irreversible alopecia in its label or in communications with patients, physicians, or United States

---

(Sanofi_04876339) ("Nanae, I am okay with slides with following comments: The conclusion should be one sentence that ends with '…in patients who receive docetaxel in combination with other agents.' However, you report one case with single agent. The question then is whether we should say just 'in patients who receive docetaxel.' . . . The cases only reported docetaxel as suspect drugs are unsolicited cases; yes, only docetaxel was entered and no information in the narrative either. We will amend the conclusion as: Conclusion Proposal **The cumulative weighted evidence is sufficient to support a causal association between Docetaxel and Permanent/Irreversible alopecia in patients who receive docetaxel.**") (emphasis in original).

[182] As noted above, because of the date of Taxotere administration to the bellwether plaintiffs cited above, I was asked to address these issues by as early as 2009. I reserve the right to study the issues at both earlier and later dates.

regulatory authorities[183] and internally determined that "alopecia . . . should be 'not important risk'" in certain regulatory documents."[184]

167.    On March 17, 2004, Sanofi submitted to FDA sNDA (S-029) in support of the following indication: use of Taxotere in combination with doxorubicin and cyclophosphamide for the adjuvant treatment of patients with operable node-positive breast cancer.[185]  To support of this indication, Sanofi submitted interim analysis of 55 month follow-up data from the TAX 316 clinical trial.[186]

---

[183] *See, e.g.*, Emails between Rebecca Falcone and Gina Vestea, Aug. 20, 2012 (Sanofi_04691790) ("Do you happen to know if the HCP [health care provider] letter provides any incidence of permanent alopecia? . . .  No, nothing regarding permanent alopecia.  Just PI incidence."); Email from Lynette Melman, Dec. 4, 2012 (Sanofi_01363974) ("The question is now being asked by the patient how the information regarding longstanding alopecia is communicated to doctors as it is not included in the local labeling."); Email from Shang Jen to Nanae Hangai, Oct. 6, 2015 (Sanofi_05059732) ("My interpretation of the FDA's request is that they would like more information in the PI regarding the details of permanent or irreversible alopecia because as of now, a vague alopecia is in the labeling with no further information."); Email from Frances Polizzano, Oct. 6, 2015 (Sanofi_04876332) ("It should be noted that alopecia is listed as an adverse event in Section 6 Adverse Reaction (under Subsection 6.1 Clinical Trial Experience) of the Taxotere USPI and in Section 11 Adverse Reactions (under Subsection 11.1 Clinical Studies) of the Docetaxel CCDS.  **However, permanent or irreversible alopecia is not listed in the Taxotere USPI nor the Docetaxel CCDS.**") ("Since permanent or irreversible alopecia is outside the scope of the current Docetaxel CCDS . . .") (emphasis added); Draft of 2.5 Clinical Overview: Docetaxel and Permanent Alopecia, Nanae Hangai, Oct. 29, 2015 (Sanofi_01327311) ("None of the above labeling documents contain information on permanent or irreversible alopecia."); Sanofi Presentation on Docetaxel-Permanent/Irreversible Alopecia, Nanae Hangai and Shang Jen, Oct. 26, 2015, at p. 3 (Sanofi_01827600) ("No mention of 'permanent or irreversible' alopecia in USPI.").

[184] *See, e.g.*, Email from Dominique Destree to Nanae Hangai, Jan. 21, 2014 (Sanofi_01086042); ("I cannot agree that alopecia or other risks listed are considered as important risk."); Emails between Nanae Hangai and Emanuel Palatinsky, Jan. 22, 2014 (Sanofi_01718843) ("I still think alopecia is important risk for this product, she [Dominique Destree], she does not at all."); Email from Nanae Hangai, Jan. 23, 2014 ("She [Dominique Destree] commented that alopecia . . . should be 'not important risk.'"); Safety Economics Part II, Emanuel Palatinsky, Nov. 2, 2011 (Sanofi_03073713) ("AEs are likely to be prevented if HCPs recognized that they could cause them" . . . "IN THEORY, ALL AEs ARE PREVENTABLE" . . . slide depicting cartoon "The good news is that we managed to save your life!  The bad news is that you are going to spend it paying for the good news!"); Partnering with Your Patients Along Their Journey, Oct. 2006 (Polizzano Ex. 23; Sanofi_01038470) ("Alopecia (a-lo-PEE-shee-ah) is another word for hair loss or thinning of the hair.  It is a common, yet temporary, side effect of some cancer medicines."); Oncology Field Coaching Report of Christine Muhlenhaupt by Perry Monaco, Aug. 15 &17, 2006 (Sanofi_04633925) ("With Dr. Sedlacek, he is bending, but not breaking . . . .  The excuse of permanent alopecia is a concern of his, but should not stop him from giving TAC an opportunity."); *see also* Schedule 7, Relevant Language and Revisions Made to Taxotere Labeling Related to Irreversible Alopecia.

[185] (Sanofi_04154773 at 1); (Sanofi_03928809 at 1).

[186] (Sanofi_04154773 at 1; Sanofi_03928809 at 1).

168.    It appears that Sanofi submitted a proposed label as part of this sNDA.[187] This annotated label includes changes to the following sections of the report: Clinical Studies, Precautions, Indications and Usage, Precautions, Adverse Reactions, and Dosage and Administration.[188]

169.    The changes proposed by Sanofi to the Adverse Reactions section related to the TAX 316 clinical trial and included a chart of adverse events experienced by subjects during study treatment; paragraphs providing additional detail about certain categories of adverse events; and paragraphs describing certain adverse reactions that existed at the median follow-up time of 55 months.[189] With respect to the latter category, one such paragraph added by Sanofi included the following language:

**<u>Other persistent reactions</u>**

<u>The following events were observed to be ongoing in TAC-treated patients at the medium follow-up time of 55 months: alopecia (22/687), amenorrhea (133/233), neurosensory (9/73) and peripheral edema (18/112). These events were also observed in the FAC arm during the follow-up period: alopecia (9/642), amenorrhea (101/186), neurosensory(2I15) and peripheral edema (3/19).</u>[190]

170.    On June 23, 2004, Dr. Michael Rozycki, Sanofi's Director of Oncology Regulatory Affairs and Global Regulatory Liaison for Taxotere, emailed Commander Ann Staten, FDA's Taxotere Project Manager, attaching a word document of the proposed Taxotere label for sNDA S-029.[191] In his email, Dr. Rozycki notes the attached label contains endnotes to what are presumably references to the sNDA and uses track changes to identify proposed edits to

---

[187] (Sanofi_01296736, Sanofi_01296737).

[188] (Sanofi_01296737 at 18-24, 30, 35-36, 41-44, 52, 54).

[189] (Sanofi_01296737 at 41-44).

[190] (Sanofi_01296737 at 44).

[191] (Sanofi_00355202 at 1).

the label.[192] These proposed changes included the above quoted "Other persistent reactions" paragraph in the Adverse Events section.[193]

171.    On August 4, 2004, FDA updated Sanofi on the labeling for sNDA S-029, requesting a word version of the proposed labeling without endnotes and noting that "FDA had difficulty in using the track-changes utility with this file."[194]

172.    Dr. Rozycki submitted the proposed label without endnotes to FDA on August 5, 2004.[195] This draft label included the "Other persistent reactions" paragraph in the Adverse Events section.[196]

173.    On August 9, 2004, Commander Staten at FDA contacted with Daniel Bollag, Sanofi's Regulatory Liaison, summarizing the labeling changes requested by FDA:

> Cmdr. Staten remarked that the FDA's labeling text would contain "some major revisions" in the adjuvant breast efficacy section. In addition, changes would be requested in the AE tables. She clarified further that the FDA would request that Aventis list AEs in descending order of frequency. Also, there were concerns about the way that AEs related to fluid retention were presented, which was different from the AE tables in the label for other Taxotere indications.[197]

174.    According to the Regulatory Contact Report for this communication with FDA, Commander Staten did not discuss any changes planned by FDA to the "Other persistent reactions" paragraph in the Adverse Reactions section.[198]

---

[192] (Sanofi_00355202 at 2-42).

[193] (Sanofi_00355202 at 30).

[194] (Sanofi_00559223).

[195] (Sanofi_00559182 at 1).

[196] (Sanofi_00559182 at 30).

[197] (Sanofi_00553474 at 2).

[198] (Sanofi_00553474 at 2).

175.    On August 11, 2004, FDA submitted its proposed changes to the Taxotere label to Sanofi and attached a document containing "statements [that] reflect the reasoning for FDA's changes to the TAXOTERE label."[199]

176.    This draft label used track changes; however, because the label was produced in black and white text and not in color, the timing and authorship of the changes is not clear.

177.    The draft label includes modification to the Adverse Reactions section, including deletion of all references to the median follow-up time of 55 months, including omission of the "Other persistent reactions" paragraph.[200]

178.    On August 13, 2004, Dr. Bollag responded to FDA's suggested edits to the Taxotere label with proposed modifications by Sanofi.[201] Sanofi did not add or otherwise comment on the "Other persistent reactions" paragraph or the data related to irreversible alopecia in TAX 316.[202]

179.    Sanofi submitted its final labeling package to FDA on August 18, 2004, which included the following postmarking commitment: "[S]ubmit a complete report of the updated TAX 316 data to verify the … safety of Taxotere in the adjuvant treatment of women with operable node-positive breast cancer and to submit the final analysis of overall survival (expected to occur in 2010)."[203]

180.    This same day, FDA approved sNDA 0-29 for use as "recommended in the agreed-upon labeling text."[204]

---

[199] (Sanofi_00548479 at 1; 46-48).

[200] (Sanofi_00548479 at 34).

[201] (Sanofi_00548432 at 1).

[202] (Sanofi_00548432 at 36).

[203] (Sanofi_0054613 at 8); *see also* (Sanofi_00354859).

[204] (Sanofi_00574334 at 1).

181.     On August 24, 2004, Sanofi submitted its final label to the FDA.[205] The label did not include the "Other persistent reactions" paragraph nor any reference to data related to irreversible alopecia in TAX 316.[206]

182.     With respect to alopecia, the approved Taxotere label included the following statement:

> Loss of hair occurs in patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows, and eyelashes). Hair loss will begin after the first few treatments and varies from patient to patient. Once you have completed all your treatments, hair generally grows back. Your doctor or nurse can refer you to a store that carries wigs, hairpieces, and turbans for patients with cancer."[207]

183.     The label had no language on persistent alopecia.[208]

184.     On July 9, 2010, AFSSAPS sent Sanofi a letter requesting "a review of all of the cases of persistent alopecia."[209]  AFSSAPS made this request after analyzing cases recorded in the National Pharmacovigilance database, published cases, and reported cases from a study presented at the 2009 SABCS conference in San Antonio, all of which found cases of irreversible alopecia significantly more prevalent in patients administered Taxotere.[210]

185.     In response, Sanofi performed a review of its global pharmacovigilance database, and identified 1,620 cases with HLT "Alopecia."[211] After defining the injury of irreversible

---

[205] (Sanofi_04817016).

[206] (Sanofi_04817016 at 30-31).

[207] (Sanofi_04817016 at 6).  *See also* Schedule 8, Communications between Sanofi and the FDA Regarding Proposed Language for the 2004 Label Change.

[208] (Sanofi_04817016 at 5-42).

[209] AFSSAPS letter, July 9, 2010 (Sanofi_03643994).

[210] *Id.* ("docetaxel is a common feature of the great majority of the cases involving chemotherapy" . . . "of the cases collected 95% of the patients have been treated with Taxotere").  Additionally, beginning in the mid-1990s and continuing through 2018, Sanofi received adverse event reports specifically relating to irreversible alopecia.  *See* Depositions of Michael S. Kopreski, M.D., dated September 6, 2018 and October 11, 2018.

[211] Sanofi, 2.5 Clinical Overview Docetaxel - Persistent Alopecia, January 18, 2011 (Sanofi_04353204).

alopecia to be "not recovered ≥ 12 months following the last dose of chemotherapy,"[212] Sanofi

identified 142 cases (or 8.8% of those reporting HLT "Alopecia.").[213]   Nevertheless, Sanofi

concluded to AFSSAPS that "This cumulative review of 142 reports of persistent alopecia

revealed no evidence of a causal relationship with docetaxel . . . ."[214]

186.    On January 28, 2011, Sanofi submitted similar information to EMA regarding its

next Periodic Safety Update Report (PSUR) for Taxotere.[215]

187.    After reviewing Sanofi's submissions, these European regulatory authorities both

concluded that "Given the serious psychological consequences of this adverse effect in, often

young, patients treated mainly in the adjuvant scheme, Health care professionals and patients

should be informed of the possible irreversibility of alopecia."[216]

188.    The European regulatory authorities then required Sanofi to update its PSUR and

EU SmPC [Summary of Product Characteristics] to "provide comparative safety results of long

term follow up [from TAX 316 and GEICAM 9805/TAX 301] . . . and address th[is] risk more

clearly."[217]

189.    In 2013, EMA subsequently required Sanofi to update its EU SmPC to add a

specific reference to "persisting" alopecia.[218]

---

[212] As discussed above in Section VIII(A) of this Report, although the time period in Sanofi's 2011 analysis was ≥ 12 months rather than 24 months used by Sanofi in 2015, this definition fails to conform to the definition of irreversible alopecia generally set forth in the medical literature as described in Section V. of this Report.

[213] Sanofi, 2.5 Clinical Overview Docetaxel - Persistent Alopecia, January 18, 2011 (Sanofi_04353204).

[214] *Id.*

[215] (Sanofi_04864365).

[216] *Id.*; (Sanofi_02540992).

[217] (Sanofi_04864365); (Sanofi_02540992).

[218] *See* Email between Sanofi and EMA, Dec. 13, 2013 (Sanofi_01026734); Sanofi Response to Agency Request, Nov. 26, 2012 (Sanofi_00811958).

190.    As acknowledged by Sanofi, Sanofi failed to provide FDA with any of the data or information from its 2010-11 global pharmacovigilance database review that it provided to the European regulatory authorities, failed to provide FDA with the 2010-13 submissions or correspondence it made to these European regulatory authorities with analysis of Sanofi's internal review and, ultimately, failed to update its United States Taxotere labeling to address the risk of irreversible alopecia "more clearly" to ensure that "Health care professionals and patients [were] informed of the possible irreversibility of alopecia."[219]

191.    Instead, Sanofi's Taxotere labeling continued to advise patients and physicians that alopecia after completion of Taxotere was common, but "hair generally grows back."[220]

192.    In March 2015, FDA requested "a summary of cases of permanent partial or total alopecia associated with docetaxel use."[221]

193.    In response, Sanofi performed an updated review of its global pharmacovigilance database, identifying 2,118 cases with HLT "Alopecia," and "89 cases [of the 2,118] reported verbatim including word of 'permanent' or 'irreversible', or alopecia lasted more than 2 years with outcome of not recovered/Recovering/UNK."[222] Sanofi concluded to FDA that "It was

---

[219] *See* Email from Emanuel Palatinsky, Oct. 4, 2011 (Palatinsky Ex. 21, Sanofi_04977753) (regarding need to add final TAX 316 data to United States Taxotere labeling); Email from Theresa Stathatos to Gerrit-Jan Nijveldt, Mar. 10, 2015 (Nijveldt Ex. 28, Sanofi_02983317) ("During this latest US affiliate audit I went through the Taxotere PI and found some of the findings not corrected so am not sure if they were never corrected or if they could not be."); Email from Frances Polizzano to Gina Vestea, Nov. 9, 2015 (Sanofi_05207927) ("Well this is going to be fun submitting > 4 year old labeling changes to the FDA now.").

[220] *See* Schedule 7, Relevant Language and Revisions Made to Taxotere Labeling Related to Irreversible Alopecia; *see also* Taxotere and Persistent Alopecia, Planning for possible questions about persistent alopecia, Taxotere and Social Media Strategy, Standby Statements and Questions & Answers, Mar. 23, 2010 (Sanofi_04691789); Sanofi Consumer Information Document on Taxotere, July 2012 (Sanofi_04691845) ("Once you stop Taxotere treatment, hair generally grows back.").

[221] Email from Frank Cross, Jr. to Frances Polizzano, Mar. 23, 2015 (Sanofi_04878450).

[222] Sanofi Response to Agency Request, Apr. 8, 2015 (Sanofi_01259408).  Sanofi used the same "2 year" timeframe as that used in Sanofi's 2015 Causation Analysis.   European Medicines Agency, CHMP Type II Variation Assessment Report, May 12, 2016; Sanofi LRC Topic: Docetaxel CCDS v 30, Permanent/irreversible alopecia, Vanina Groult, Global Regulatory Affairs Labeling (GRAL), Nov. 16, 2015 (Sanofi_01101022); Sanofi, 2.5 Clinical

concluded that alopecia occurs very commonly.  Permanent alopecia is mostly reported in the female patients with breast cancer.  The available evidence does not show that permanent alopecia is caused by docetaxel alone."[223]

194.    In November-December 2015, FDA and Sanofi agreed to add the statement "Cases of permanent alopecia have been reported,"[224] which Sanofi implemented "In accordance with 21 CFR 314.70(c) [Changes Being Effected]."[225]

195.    In October 2018, FDA approved Sanofi's April 2018 sNDA to include certain information concerning the risk of adverse events during the TAX 316 clinical trial study and adverse events that persisted following completion of that study, including but not limited to alopecia.[226]

196.    In my opinion, by as early as 2009, Sanofi knew or should have known that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia.

197.    In my opinion, by as early as 2009, Sanofi knew or should have known that patients taking Taxotere were at an increased risk of irreversible alopecia compared to alternative therapies.

---

Overview: Docetaxel and Permanent Alopecia, November 11, 2015 (Sanofi_00829788); Sanofi Safety Management Committee Meeting Minutes, Oct. 26, 2015 (Sanofi_01827599).

Based on my review, neither the 12-month timeframe used by Sanofi in 2010-11 nor the 2-year timeframe used by Sanofi in 2015 conform to the definition of irreversible alopecia generally set forth in the medical literature as described in Section V. of this Report.  As discussed above, Sanofi recognized internally that if the two-year time period was reduced, there would be more cases.  Email from Nanae Hangai to Yoshiko Shimazaki and Vanina Groult, Feb. 16, 2016 (Sanofi_02664951) ("Therefore, I selected the cases: 1. If the verbatim contains 'permanent' or 'irreversible' and 2. The verbatim does not contains 'permanent' or 'irreversible' but lasted more than 2 years (**since if set less, we know we have more cases**.") (emphasis added).

[223] Sanofi Response to Agency Request, Apr. 8, 2015 (Sanofi_01259408).

[224] FDA PAS for alopecia, Review completed Dec. 4, 2015 for NDA #020449.

[225] Letter from Frances Polizzano to FDA's Geoffrey Kim, Nov. 24, 2015 (Hangai Ex. 18; Sanofi_03333249).

[226] FDA Approval Letter to Sanofi-Aventis U.S. LLC dated October 5, 2018, at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/020449Orig1s079ltr.pdf.

198.    In my opinion, by as early as 2009, it was not impossible for Sanofi to include language about irreversible alopecia in its Taxotere label.

199.    Based on all scientific evidence, in my opinion, by as early as 2009, Sanofi should have clearly and prominently warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label.

200.    In my opinion, by as early as 2009 and continuing through at least 2015, Sanofi's Taxotere labeling failed to adequately warn that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia.

201.    In my opinion, Sanofi's statement in its label that "hair generally grows back" was misleading when there was reasonable evidence of a causal association between Taxotere and irreversible alopecia available to Sanofi.

202.    In my opinion, Sanofi's statement in its label that "hair generally grows back" was misleading when Sanofi knew or should have known that patients taking Taxotere were at an increased risk of irreversible alopecia compared to alternative therapies.

## X.    SANOFI'S MARKETING AND PROMOTIONAL EFFORTS TO DIFFERENTIATE TAXOTERE VERSUS TAXOL/PACLITAXEL MISLED PHYSICIANS AND DOCTORS AND PUT PATIENTS AT AN INCREASED RISK OF HARM

203.    Based on my review, beginning in at least 2000 and continuing thereafter, Sanofi's marketing and promotional strategy for Taxotere was to build Taxotere into "'The First' Billon Dollar Taxane Franchise in the US" by aggressively positioning Taxotere as the foundation and cornerstone of therapy for multiple types of cancer, including breast cancer.

203.1. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi identified its "Brand Objective" for Taxotere as: "Current Brand Position:

Sanofi: The foundation of every regimen associated with optimal survival and quality of life for a wide range of cancers."[227]

203.2. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi represented that its Strategic Intent was: "We believe that by aggressively marketing Taxotere's superior clinical profile, results of phase II and III clinical trials, and by producing data in combination with novel therapeutic agents, we will position <u>Taxotere as the cornerstone of therapy</u> for breast, lung, prostate/bladder, SCCHN, and gastric cancer, and we will generate yearly sales of over $500M by 2004."[228]

203.3. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi stated that it's "Strategic Plan: Taxotere Breast Cancer Positioning" was "Taxotere is the cornerstone therapy in the treatment of breast cancer . . . ."[229]

203.4. In its 2001-2005 marketing plan detailing Sanofi's Objectives for Taxotere, Sanofi stated that it wanted to "Position Taxotere as the cornerstone of therapy for breast, lung, prostate, ovarian, head/neck and gastric cancers," and "Build Aventis taxane sales to $1 billion by 2010."[230]

203.5. In its 2002-2011 marketing plan for Taxotere titled "Building 'The First' Billion Dollar Taxane Franchise in the US," Sanofi presented its plans to "Exceed $1 Billion annually in 2004 and beyond."[231]

203.6. In its 2002-2011 marketing plan for Taxotere titled "Building 'The First' Billion Dollar Taxane Franchise in the US," Sanofi stated: "Taxotere – Momentum Objectives . .

---

[227] Global Marketing Strategy for Taxotere, 2000 (Sanofi_00749905).

[228] Sanofi Taxotere 2000-2004 Strategic Plan (Sanofi_00739377) (emphasis in original).

[229] *Id.*

[230] Sanofi Plan 2001-2005: Taxotere-Objectives (Sanofi_00749772).

[231] Sanofi Plan 2002-2011: Taxotere (Sanofi_00749997).

. Position Taxotere as the cornerstone of therapy for breast, lung, prostate, ovarian, head/neck and gastric cancers . . . . Expand use of taxanes in key markets."[232]

      203.7. Sanofi's January 19, 2005 "Strategic Product Summary" for Taxotere stated "The Ambition: Become the most successful cytotoxic ever . . . Establish Taxotere as the **cornerstone treatment** . . . Achieve WW [world-wide] sales of **2.5 billion euros** by 2008.[233]

      203.8. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi identified its "US Brand Strategy & Key Challenge" to "Reaffirm Taxotere's critical role as the chemotherapy platform of choice in both early stage and metastatic breast cancer."[234]

      203.9. In Sanofi's reminders to the Taxotere Marketing team following its 2009 National Sales Team Meeting, Sanofi noted that its "Key Strategy for MBC [metastatic breast cancer]" was "Defend and extend Taxotere as the choice of chemotherapy."[235]

      204.    Sanofi recognized that Taxol/paclitaxel—another drug in the taxane class brought to market prior to Taxotere—was Taxotere's primary competitor, and that Taxol/paclitaxel would become generic in 2001.  Sanofi's marketing and promotional strategy focused on becoming the leader of the taxane market—given the presumed decreased economic incentive for the manufacturers of Taxol and generic paclitaxel, and differentiating Taxotere from Taxol/paclitaxel to increase market share and justify Taxotere's presumed higher price after Taxol/paclitaxel became generic.

---

[232] *Id.*

[233] Sanofi Strategic Product Summary for Taxotere, January 19, 2005 (Sanofi_01500984) (emphasis in original).

[234] Taxotere Breast Cancer IMAP Review, IMPACT 2008 (Sanofi_04818699).

[235] (Sanofi_00791306).

204.1. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi stated: "Current Brand Position: The second of two, essentially similar, drugs that comprise one of the most powerful classes of chemotherapy agents."[236]

204.2. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi stated: "Executive Summary" for the "Breast Cancer Neoadjuvant and Adjuvant" Indication: "We are currently at a significant disadvantage in our market position in the neoadjuvant/adjuvant setting, due to the 1999 launch of BMS [Bristol Myers Squibb]'s Taxol in this very important indication.  Although the early launch of Taxol was a setback, their indication does set the stage for the use of Taxanes in the treatment of early stage breast cancer." Position Taxotere as the cornerstone of therapy for 1st line MBC [metastatic breast cancer]."[237]

204.3. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi stated: "Evolution of Market Pricing: Price will continue to rise in U.S. until generic Taxol entry, after which stabilization will occur."[238]

204.4. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi stated: "Evolution of Reimbursement Levels: Reimbursement levels in US will continue to be challenged by insurers.  Generic paclitaxel will further erode class reimbursement levels."[239]

204.5. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi stated for both the "Breast Cancer Neoadjuvant and Adjuvant" Indication and "Breast Cancer First-Line Metastatic" Indication: "Pricing & Reimbursement Strategy: U.S.:

---

[236] Global Marketing Strategy for Taxotere, 2000 (Sanofi_00749905).

[237] *Id.*

[238] *Id.*

[239] *Id.*

Continue to annually raise prices 3-5%, drop or cease upon entry of generic paclitaxel, ROW [Rest of World]: Use economic studies to support price, use new indications to drive reimbursement.  Pricing strategy is to keep US$9.8/mg.  Support positioning as superior drug to Taxol by always pricing above Taxol price.  EU: continue to differentiate Taxol to support pricing."[240]

       204.6. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi identified the following "Marketing Issues: External . . . Incomplete differentiation vs. paclitaxel (generic); Toxicity perceptions remain; Loyalty to paclitaxel; . . . Efficacy gains with added toxicity unacceptable"[241]

       204.7. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi included amongst its "Marketing Issues: Internal . . . Preparation for generic paclitaxel."[242]

       204.8. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi presented a slide titled "How Robust Are Projections That Taxotere Sales Will Hold Up Well," which stated: "Perceived differences between Taxol and Taxotere are small; The reasons underlying use are not always clear; Lack of clear clinical advantage may raise doubt over Taxotere's continued use ("Taxotere use will fall if its reimbursement position places it at a disadvantage to the generic); Conclusion: HMO's and Medicare's reimbursement of Taxotere will be critical."[243]

---

[240] *Id.*

[241] Sanofi Taxotere 2000-2004 Strategic Plan (Sanofi_00739377) .

[242] *Id.*

[243] *Id.*

204.9. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi presented a slide titled "Financial Disincentives To Use Taxotere Could Well Impact On Physician Behavior."[244]

204.10. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi presented a slide titled: "Strategic Plan: The goal in 2000 must be to continue to differentiate . . . With . . . oncologists; managed care; Medicare . . . Continue to generate data supporting Taxotere's superiority."[245]

204.11. In its 2001-2005 marketing plan detailing Sanofi's Objectives for Taxotere, Sanofi states: "Taxotere – Key Assumptions . . . Availability of paclitaxel generics provides opportunity for Taxotere."[246]

204.12. In its 2001-2005 marketing plan detailing Sanofi's Objectives for Taxotere and its 2002-2011 marketing plan for Taxotere titled "Building 'The First' Billion Dollar Taxane Franchise in the US," Sanofi listed as a "Taxotere: Decelerator . . . Generic paclitaxel gains formulary and/or reimbursement advantage versus Taxotere . . . Key Issues: Differentiation of the taxanes; Clinical superiority established; Investment level commensurate with leadership objective."[247]

204.13. In its 2002-2011 marketing plan for Taxotere titled "Building 'The First' Billion Dollar Taxane Franchise in the US," Sanofi stated: "Plan 2002 – 2011: Taxotere Business Plan – Opening Message: . . . We are in the 'right market' with the 'right product' ant the 'right

---

[244] *Id.*

[245] Sanofi Taxotere 2000-2004 Strategic Plan (Sanofi_00739377).

[246] Sanofi Plan 2001-2005: Taxotere-Objectives (Sanofi_00749772).

[247] *Id.*; Sanofi Plan 2002-2011: Taxotere (Sanofi_00749997).

time' . . . Generic paclitaxel = OPPORTUNITY . . .  Aventis Oncology must 'lead' while 'leadership' is up for grabs."[248]

204.14. In its 2002-2011 marketing plan for Taxotere titled "Building 'The First' Billion Dollar Taxane Franchise in the US," Sanofi stated: "Taxotere – Key Assumptions . . . Availability of multiple paclitaxel generics launched by Q3 '01, significantly eroding economic outlook for the multi-source drug; Taxanes continue to be standard of care for breast, lung and ovarian cancers; Aventis dominates share of voice in taxane market."[249]

204.15. In its January 21, 2004 "Oncology MAX Team Meeting," Sanofi presented a slide titled "Expanding Taxotere Market Leadership Strategic Objectives and Key Initiatives," which included under "Market Share Gain: . . . Differentiate vs. Taxol."[250]

204.16. Sanofi's January 19, 2005 "Strategic Product Summary" for Taxotere stated "Competitive Situation: Invest to win in a challenging market . . . Paclitaxel continues to present serious market challenges (weekly / dose-dense Paclitaxel continues to grow in the US where the reimbursement system is unfavorable to Taxotere while paclitaxel generics are entering in the EU market."[251]

204.17. Sanofi's January 19, 2005 "Strategic Product Summary" for Taxotere stated "Global Strategy: Expanding Taxotere market leadership . . . Market share gain (in the approved indications) / market expansion strategy . . . Leveraging the unique profile and

---

[248] Sanofi Plan 2002-2011: Taxotere (Sanofi_00749997).

[249] *Id.*

[250] Sanofi Oncology MAX Team Meeting, January 21, 2004 (Sanofi_00743074).

[251] Sanofi Strategic Product Summary for Taxotere, January 19, 2005 (Sanofi_01500984).

unsurpassed clinical evidence to better differentiate versus Taxol and gain market share in MBC

[metastatic breast cancer] and NSCLC [non-small cell lung cancer]."[252]

204.18. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core

Team, Sanofi's slide titled "Taxotere Breast Cancer SWOT Analysis" included under

"Weaknesses . . . Perceived lack of efficacy differentiation among taxanes . . .

Cost/reimbursement limitations (high cost, 3 weekly regimen, and more outlay from the

patient)."[253]

204.19. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core

Team, Sanofi's slide titled "Taxotere Breast Cancer SWOT Analysis" included under "Threats . .

. "Weekly paclitaxel (reimbursement, efficacy)."[254]

204.20. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core

Team, Sanofi stated under "Key Market Dynamics": "Although established as important

components of both early stage and metastatic breast cancer therapy, multiple taxanes are

available to physicians.  Paclitaxel usage remains substantial based on historical precedent.

Usage of FDA-approved TAC regimen in ESBC limited by perception of toxicity."[255]

204.21. In Sanofi's reminders to the Taxotere Marketing team following its 2009

National Sales Team Meeting, Sanofi stated: "Key Strategy MBC [metastatic breast cancer] –

Defend and extend Taxotere as the choice of chemotherapy, Differentiate Taxotere as the 'choice

of chemotherapy' backbone."[256]

---

[252] *Id.*

[253] Taxotere Breast Cancer IMAP Review, IMPACT 2008 (Sanofi_04818699).

[254] *Id.*

[255] *Id.*

[256] (Sanofi_00791306).

204.22. Sanofi's 2009-2013 Strategic Brand Plan for Taxotere stated: "Taxotere was the second 'taxane' to market after Taxol (paclitaxel).  Paclitaxel is now a generic product, but its legacy remains as the 'backbone' treatment of many cooperative group (which tends to influence usage in the community), and a market leader in some tumor types (NSCLC [non-small cell lung cancer], MBC [metastatic breast cancer]).  The generic product has advantages in acquisition costs to the practice and lower co-pay requirements for patients.  . . .  Paclitaxel is Taxotere's biggest competition in ESBC [early stage breast cancer], MBC, and NSCLC."[257]

204.23. Sanofi's 2009-2013 Strategic Brand Plan for Taxotere stated: "Qualitative Opportunities: . . . Adjuvant Breast Cancer including HER2+ node + and high risk node – (per Herceptin PI) and HER2-, Increase market penetration: Differentiate Taxotere vs paclitaxel and anthracyclines."[258]

204.24. Sanofi's 2009-2013 Strategic Brand Plan for Taxotere stated: "Core competitor in ESBC [early stage breast cancer] HER 2 negative Node + disease is Paclitaxel."[259]

204.25. In a 2011 article published in Cancer Treatment Reviews, Arroyo noted the "current price differential between [docetaxel and paclitaxel] (20-fold higher for docetaxel)."[260]

204.26. Sanofi's Associate Director of Clinical Affairs, Dr. Barry Childs, testified as follows:

> "Q.    And by that you mean that pharmaceutical companies market and
> promote drugs like Taxotere when the patent exists, but when the

---

[257] Sanofi's 2009-2013 Strategic Brand Plan for Taxotere, May 30, 2008 (Sanofi_04451595).

[258] *Id.*

[259] *Id.*

[260] Arroyo P (2011). Controversies in the management of adjuvant breast cancer with taxanes: Review of the current literature.  Cancer Treatment Reviews 37:105-110.  *See also* Schedule 9, Published Medical Literature Used, Referenced, or Cited in Abbott's Marketing and Promotion of Taxotere.

> patent expires in your experience they stop marketing the drug like they did when it was on patent?

A.   I would say for the most part what you said is true.  But I think it's – it's purely, you know, a revenue generating thing.  That they will not be able to obtain any revenue related to the branded drug once the patent has expired. And because of that, you know, they cannot afford the bottom line as much anymore of doing work-related to it."[261]

205.   Sanofi's marketing and promotional strategy therefore focused, in part, on increasing Taxotere sales and market share by differentiating Taxotere as more efficacious, more tolerable, and just as safe or even safer than Taxol/paclitaxel.

205.1. In its 2000 Global Marketing Strategy Document regarding Taxotere's branding, Sanofi identified the "Role of the Brand" as "Taxotere delivers maximum activity and combinability with minimum negative impact on patients' daily lives."[262]  To differentiate Taxotere from paclitaxel (Taxol), Sanofi stated that "The Compelling Truth" is "Taxotere— alone and in combination—has not only repeatedly made a difference where paclitaxel has not, it is also more tolerable and easier to use than the 'older' taxane," and "Taxotere has a better safety profile than paclitaxel—an important consideration when combining agents."[263]

205.2. In Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi stated that it's "Strategic Plan: Taxotere Breast Cancer Positioning" was "Taxotere is the cornerstone therapy in the treatment of breast cancer, with significantly

---

[261] Deposition of Barry Childs, M.D., dated October 26, 2018, at 53:19-54:14 (objections omitted); *see also id.* at 356:8-20 ("Q. And was, to your knowledge, Bristol-Myers Squibb promoting the results of the CALGB study for paclitaxel?  A. No.  Q.  No?  A. By this time [2008] Bristol was not at all interested in whatever paclitaxel was doing.  I'm sure it was a generic drug by then.  Q. It had gone off patent by then?  A. Yes.").

[262] *Id.*

[263] Global Marketing Strategy for Taxotere, 2000 (Sanofi_00749905).

superior response and survival rates as a single agent or in combination, and with a favorable safety profile."[264]

205.3. Sanofi's "2001 Tactical Plan" for Taxotere stated under "Key Brand Objectives": "Continue to differentiate Taxotere from paclitaxel on the basis of efficacy, tolerability, and convenience."[265]

205.4. In its 2001-2005 marketing plan detailing Sanofi's Objectives for Taxotere, Sanofi noted: "Taxotere – Main Findings of Market Research/Advisory Boards/Focus Groups Conducted . . . Encourage continued promotion of the 'difference' and Phase III trials."[266]

205.5. In its 2001-2005 marketing plan detailing Sanofi's Objectives for Taxotere, Sanofi stated: "Taxotere – Core Product Strategy & Positioning . . . Positioning – Taxotere, the most active taxane, is the cornerstone of treatment in solid tumors with unmatched efficacy and tolerability, both alone and in combination with other agents, in both advanced and early stage disease."[267]

205.6. In its 2001-2005 marketing plan detailing Sanofi's Objectives for Taxotere and its 2002-2011 marketing plan for Taxotere titled "Building 'The First' Billion Dollar Taxane Franchise in the US," Sanofi listed as a "Taxotere: Accelerator . . . . TAX 311 [a study comparing docetaxel and paclitaxel both administered every three weeks] demonstrates superiority."[268]

205.7. In its January 21, 2004 "Oncology MAX Team Meeting," Sanofi listed: "2003 Objectives . . . Breast cancer: Generate awareness & get buy-in of the adjuvant data while

---

[264] Sanofi Taxotere 2000-2004 Strategic Plan (Sanofi_00739377) .

[265] Sanofi 2001 Tactical Plan for Taxotere (Sanofi_00772869).

[266] Sanofi Plan 2001-2005: Taxotere-Objectives (Sanofi_00749772).

[267] *Id.*

[268] *Id.*; Sanofi Plan 2002-2011: Taxotere (Sanofi_00749997).

consolidating leadership position in the metastatic setting with patient MS above taxol / file adjuvant dossier by Q4-03," and then "Performance . . . Awareness and leadership position – achieved."[269]

205.8. In its January 21, 2004 "Oncology MAX Team Meeting," Sanofi presented a slide titled "Expanding Taxotere Market Leadership Strategic Objectives and Key Initiatives," which included under "Market Share Gain: . . . . Leverage the unique pharmacologic profile & unsurpassed clinical evidence – Differentiate vs. Taxol."[270]

205.9. Sanofi's January 19, 2005 "Strategic Product Summary" for Taxotere stated under "Recommendations to Affiliates" for "Breast" to "Leverage key monotherapy (TAX 311 [a study comparing docetaxel and paclitaxel both administered every three weeks] . . . data to secure Taxotere position as market leader in the MBC [metastatic breast cancer]."[271]

205.10. In its presentation titled "One Voice: Questions anticipated following release of FY 2005 earnings / Feb 24th information meeting," Sanofi commented on the "competitive environment and impact on Taxotere" by noting: "Generic paclitaxel (in most countries except Japan) continues to challenge the performance of Taxotere, particularly in the U.S.  The head-to-head TAX 311 Taxotere vs. paclitaxel study in metastatic breast cancer, which resulted in an overall survival benefit in favor of Taxotere, remains key in demonstrating that Taxotere is clinically different from paclitaxel."[272]

205.11. Sanofi's presentation titled "Taxotere 2005: Unleash the Power," listed under "2005-2009 Strategic Imperatives to Unleash the Power of Taxotere": "Definitively

---

[269] Sanofi Oncology MAX Team Meeting, January 21, 2004 (Sanofi_00743074).

[270] *Id.*

[271] Sanofi Strategic Product Summary for Taxotere, January 19, 2005 (Sanofi_01500984).

[272] One Voice: Questions anticipated following release of FY 2005 earnings / Feb 24th information meeting (Sanofi_02012589).

Differentiate Taxotere In current indications . . . Bring our data to life to cement evidence of efficacy & tolerability of Taxotere . . . Increase MS in MBC [metastatic breast cancer]based on [TAX] 311 findings."[273]

205.12. Sanofi's presentation titled "Taxotere 2005: Unleash the Power" included a slide titled "Market Opportunity: Position TAXOTERE as a superior choice in ESBC [early stage breast cancer" that listed under "Strategies": "Leverage Taxotere MBC [metastatic breast cancer] survival story as a proof of concept for the use of Taxotere in ESBC."[274]

205.13. Sanofi's presentation titled "Taxotere 2005: Unleash the Power" included a slide titled "Market Opportunity: Position TAXOTERE as a superior choice in ESBC [early stage breast cancer" that listed under "Action Steps / Key Tactics": "Develop a comprehensive breast cancer historical visual aid highlighting the high efficacy of Taxotere in both MBC [metastatic breast cancer] and ESBC [early stage breast cancer] patients.  (Ravdin – Valero – Tax 303 – Tax 304 – Tax 313 – Tax 311 – Tax 316)."[275]

205.14. Sanofi's presentation titled "Taxotere 2005: Unleash the Power" included a slide titled "Market Opportunity: Maximize Taxotere leadership position in MBC [metastatic breast cancer]" that listed under "Action Steps / Key Tactics": "Use 311 reprint carrier to transition ESBC [early stage breast cancer] / MBC call and answer both q3w and qwkly paclitaxel threat."[276]

205.15. Sanofi's presentation titled "Taxotere 2005: Unleash the Power" included a slide titled "Post ESBC [early stage breast cancer] launch integrated sales call: NO TRADE-

---

[273] Taxotere 2005: Unleash the Power (Sanofi_04666990).

[274] *Id.*

[275] *Id.*

[276] *Id.*

OFFS MBC [metastatic breast cancer] & ESBC" that stated under "Objective": "Provide combined sales materials" and "NO TRADE-OFFS means a full BREAST CANCER sales call."[277]

205.16. Sanofi's March 31, 2005 "Tactical Plan: Breast Team" stated under "Market Opportunity: Position TAXOTERE after launch as the preferred choice in ES [early stage]" with "Strategies" that included "Leverage Taxotere's MBC [metastatic breast cancer] survival story to drive it's adoption in adjuvant setting."[278]

205.17. Sanofi's March 31, 2005 "Tactical Plan: Breast Team" stated in a slide titled "Alignment of Medical Drivers with Strategies is Critical" that "Marketing Strategies" included "ESBC [early stage breast cancer]: Leverage MBC [metastatic breast cancer] Story" and "MBC: Leverage [TAX] 311" and then as "Medical Drivers" for both of these "Marketing Strategies" listed "Generate and communicate key clinical data in all stages of breast cancer."[279]

205.18. Sanofi's March 31, 2005 "Tactical Plan: Breast Team" stated in a slide titled "Alignment of Medical Drivers with Strategies is Critical" that "Marketing Strategies" included "ESBC [early stage breast cancer]: Address Toxicity" and then as a corresponding "Medical Driver" provided "Differentiate toxicity and QOL [quality of life] profiles of Taxanes in breast cancer."[280]

205.19. In Sanofi's "Smart Group Minutes" from February 28, 2006 regarding Taxotere's "Core Mission," Sanofi stated under "Define Message: Position statement brainstorm

---

[277] *Id.*

[278] Sanofi's Breast Cancer Strategic Review, March 31, 2005 (Sanofi_05665331).

[279] *Id.*

[280] *Id.*

. . . Predictable, management safety profile . . . You know Taxotere is effective.  We know Taxotere also has toxicities but we are going to help you manage them."[281]

205.20. In Sanofi's Oncology Field Coaching Report of Christine Muhlenhaupt, a sales representative calling on Dr. Sedlacek, the author of a 2006 study finding that 6.3% of patients experienced irreversible alopecia with Taxotere,[282] Sanofi District Manager Perry Monaco stated: "With Dr. Sedlacek, he is bending, but not breaking.  He informed you that he is no longer using dose dense for [his] er+ patients, but is now using traditional AC followed by Taxol.  There is no reason why this should have been his regimen of choice.  The excuse of permanent alopecia is a concern of his, but should not stop him from giving TAC an opportunity. . . .  Don't let him off the hook!!!!!!"[283]

205.21. In Sanofi's 2007 Taxotere Tactics: Recommendations for Breast Indications presentation, Sanofi stated under "Strategic Imperatives" for "ESBC [early stage breast cancer]": Position as 'kinder'—no chronic toxicities."[284]

205.22. In Sanofi's 2007 Taxotere Tactics: Recommendations for Breast Indications presentation, Sanofi presented a slide titled "Establish Manageability of Taxotere," which included the "Look Good/Feel Better Program" that would "Provide Kits, that could be handed out at national events.  Kits could include: Nail Kits, Scarves, Blankets, Pink Diaries, Makeup specifically created for patients undergoing chemotherapy."[285]

---

[281] Smart Group Minutes, Feb. 28, 2006 (Sanofi_04508007).

[282] *See* Sedlacek SW, Persistent Significant Alopecia (PSA) form Adjuvant Docetaxel after Doxorubicin/Cyclophosphamide (AC) Chemotherapy in Women With Breast Cancer. Presented at the Annual San Antonio Breast Cancer Symposium, December 14-17, 2006.

[283] Oncology Field Coaching Report of Christine Muhlenhaupt by Perry Monaco, Aug. 15 &17, 2006 (Sanofi_04633925).

[284] Life Brands: 2007 Taxotere Tactics, Recommendations for Breast Indications (Sanofi_04490670).

[285] *Id.*

205.23. In Sanofi's 2007 Taxotere Tactics: Recommendations for Breast Indications presentation, Sanofi presented a slide titled "Establish Manageability of Taxotere," which included a section on "Nurse Counseling Resource" that would "Elevate role of Oncology nurses when educating patients on disease state and adverse event management."[286]  Regarding the adverse effect of alopecia, Sanofi was informing nurses (and patients) that alopecia is a "common, yet temporary, side effect of some cancer medications," and "hair should grow back once you stop treatment."[287]

205.24. In its 2008 Breast Cancer Brand Plan, Sanofi states under a slide titled "MBC [metastatic breast cancer] Core Strategic Imperatives/Operational Initiatives/Resources": "Differentiation vs paclitaxel, multiple Taxane formulations and other competitors" and included as "Key Messages": "Proven survival vs paclitaxel (Jones) [the 2005 Jones article noted below regarding Sanofi's TAX 311 study]".[288]

205.25. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi stated: "US Brand Vision . . . To the oncologist treating breast cancer in the adjuvant setting, Taxotere (TAC) provides significantly longer DFS [disease free survival and longer OS [overall survival].  Risk of recurrence reduced regardless of prognostic factors, with a well established safety profile."[289]

---

[286] *Id.*

[287] Partnering with Your Patients Along Their Journey, Oct. 2006 (Polizzano Ex. 23; Sanofi_01038470) ("Alopecia (a-lo-PEE-shee-ah) is another word for hair loss or thinning of the hair.  It is a common, yet temporary, side effect of some cancer medicines."); Talking About Taxotere, Answers to Important Questions About Your Treatment, for patients (Sanofi_00741049) ("Hair Loss . . . **However, your hair should grow back once you stop treatment**.") (emphasis in original); *see also* Sanofi's Oct. 16, 2006 Taxotere Patient Information Leaflet (Nijveldt Ex. 32) (Under "What are the possible side effects of Taxotere," included "Hair Loss . . . Once you have completed all your treatments, hair generally grows back.").

[288] Sanofi 2008 Breast Cancer Brand Plan (Sanofi_04460197).

[289] Taxotere Breast Cancer IMAP Review, IMPACT 2008 (Sanofi_04818699).

205.26. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi stated: "Taxotere Breast Cancer Product Profile . . . Superior median overall survival to paclitaxel (TAX 311) . . . Superior RR [response rate] in the ITT population and superior TPP [time to progression] in both evaluable and ITT [intent to treat] population."[290]

205.27. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi's slide titled "Taxotere in Breast Cancer: Medical Rationale" included "Superior efficacy when compared to Q3 Week Paclitaxel in MBC [metastatic breast cancer] and Adjuvant BC [breast cancer]."[291]

205.28. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi's stated: "Medical Value & Stakeholder Barriers for Physicians . . . Address/Counter weekly Paclitaxel & Abraxane challenges . . .  Inability to embrace safety/efficacy data differentiating Taxotere, Abraxane and Paclitaxel . . . [and then TAX] 311 data in MBC [metastatic breast cancer] establishes efficacy versus Paclitaxel."[292]

205.29. In Sanofi's reminders to the Taxotere Marketing team following its 2009 National Sales Team Meeting, Sanofi stated: "Key Reminders from the Breast Workshops: . . . MBC [metastatic breast cancer]: . . . Jones et al [regarding Sanofi's TAX 311 study] Reprint Carrier."[293]

205.30. Sanofi's 2009-2013 Strategic Brand Plan for Taxotere stated under "Growth Drivers" for "Metastatic Breast Cancer": . . . Leverage the Taxotere efficacy versus

---

[290] *Id.*

[291] *Id.*

[292] *Id.*

[293] (Sanofi_00791306).

paclitaxel (head-to-head TAX311 study to differentiate Taxotere from paclitaxel / nab-paclitaxel in metastatic breast cancer)."[294]

205.31. In its Taxotere Branding Tool Kit, Version 1.0, Sanofi states: "Key Brand Messages – Breast cancer (early-stage) – Positioning – Taxotere in combination with an anthracycline-based regimen is a *new standard of care* for node-positive, early-stage breast cancer (ESBC) patients because it provides significant 5-year disease free and overall survival advantages and has a generally predictable and manageable safety profile."[295]

205.32. In its Taxotere Branding Tool Kit, Version 1.0, In its Taxotere Branding Tool Kit, Version 1.0, Sanofi states: "Key Brand Messages – Overall core messages: The first Taxotere-based adjuvant regimen to demonstrate significant advantage in disease-free survival and overall survival in women with early-stage, node-positive breast cancer . . . ; Generally predictable and manageable safety profile; Most convenient taxane available."[296]

205.33. In its Taxotere Branding Tool Kit, Version 1.0, Sanofi's "Key Promotional Messages" for its TAX 316 clinical trial included "Adding Taxotere to anthracycline regimens for early breast cancer improves survival with manageable toxicity, and no impact on quality of life."[297]  The "Safety" from the TAX 316 clinical trial provided in its Branding Tool Kit includes data regarding neutropenia and infections, but does not include any data, information or references to the TAX 316 irreversible alopecia data.[298]

---

[294] Sanofi's 2009-2013 Strategic Brand Plan for Taxotere, May 30, 2008 (Sanofi_04451595).

[295] (Sanofi_04534603).

[296] *Id.*

[297] *Id.*

[298] *Id.*; *see* TAX 316 Interim Clinical Study Report, Jan. 21, 2004 (Sanofi_02640580); TAX 301/GEICAM 9805 Interim Clinical Study Report, Jan. 30, 2004 (Sanofi_00799397); TAX 316 Clinical Study Report, Sept. 9, 2010 (Sanofi_02645200).

205.34. In its Taxotere Branding Tool Kit, Version 1.0, Sanofi provides the following regarding its TAX 311 study: "Overall: Taxotere offers a proven survival advantage over paclitaxel in metastatic breast cancer in the first and only direct clinical comparison of taxanes . . . Efficacy: Superior overall survival with Taxotere vs. paclitaxel (intent-to-treat); . . . Significantly longer time to disease progression with Taxotere vs paclitaxel; . . . Higher overall response with Taxotere vs. paclitaxel . . . Safety: . . . Safety profile of Taxotere in this patient population is well characterized."[299]

206.     However, during this timeframe, and as cited by regulatory authorities, Sanofi knew or should have known that it lacked any evidence to support its marketing and promotional strategy seeking to differentiate Taxotere versus Taxol/paclitaxel—including its reliance on the TAX 311 study, that its claims regarding Taxotere's superiority and efficacy compared with Taxol/paclitaxel were "unsubstantiated" and "misleading," and that Sanofi's internal documents acknowledged and published medical literature found that there was little differentiation between these taxanes and even evidence that Taxol/paclitaxel was just as or even more efficacious than Taxotere, more tolerable than Taxotere, and less toxic than Taxotere.

206.1. As noted above, in Sanofi's Taxotere 2000-2004 Strategic Plan titled "The Cornerstone of Cancer Therapy," Sanofi presented a slide titled "How Robust Are Projections That Taxotere Sales Will Hold Up Well," which stated: "Perceived differences between Taxol and Taxotere are small; The reasons underlying use are not always clear; Lack of clear clinical advantage may raise doubt over Taxotere's continued use . . . ."[300]

206.2. Sanofi's January 19, 2005 "Strategic Product Summary" for Taxotere provided a SWOT analysis that among Taxotere's "Weaknesses" listed "Incomplete

---

[299] (Sanofi_04534603).

[300] Sanofi Taxotere 2000-2004 Strategic Plan (Sanofi_00739377) .

differentiation vs. Taxol" and among its "Threats" listed "Emergence of widely available generic Taxol/paclitaxel across major markets," "Taxane reimbursement policies favoring (generic) paclitaxel where strong differentiation has not been achieved," and "Weekly / dose dense paclitaxel regimens intensify its usage among prescribers."[301]

206.3. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi stated: "Key SWOT Elements: Weaknesses – Perceived lack of efficacy differentiation among taxanes; Toxicity (perception, neutropenia, neuropathy, asthenia, alopecia, hyperlacrimation, fluid retention, nail toxicities]."[302]

206.4. In Sanofi's 2008 Presentation from the Taxotere Breast Cancer Core Team, Sanofi stated: "Taxotere Breast Cancer: Executive Summary – Key Medical Challenges: Superiority of Taxotere to Paclitaxel in ESBC [early stage breast cancer] and MBC [metastatic breast cancer] confirmed only vis-avis Q3w schedule of paclitaxel . . . Lack of head-to-head data with weekly paclitaxel and Abraxene."[303]

206.5. Sanofi's 2009-2013 Strategic Brand Plan for Taxotere stated under the section titled "ESBC [early stage breast cancer] Her2 negative, Node + and Node negative disease: (Adjuvant Breast Cancer)": "Most recent publication of E1199 cooperative group clinical trial indicated that weekly AC/paclitaxel was superior to Q3w, AC/Taxotere compared favorably on DFS [disease free survival] and specifically in ER/PR positive disease."[304]

---

[301] Sanofi Strategic Product Summary for Taxotere, January 19, 2005 (Sanofi_01500984).

[302] Taxotere Breast Cancer IMAP Review, IMPACT 2008 (Sanofi_04818699).

[303] Taxotere Breast Cancer IMAP Review, IMPACT 2008 (Sanofi_04818699).

[304] Sanofi's 2009-2013 Strategic Brand Plan for Taxotere, May 30, 2008 (Sanofi_04451595).

206.6. Sanofi's 2009-2013 Strategic Brand Plan for Taxotere stated "There is not a great deal of perceived difference between paclitaxel and Taxotere with 'less neuropathy' and 'survival benefit' being possible points of differentiation."[305]

206.7. On April 16, 2009, DDMAC[306] sent Sanofi a letter relating to a reprint carrier that included a reprint from the Journal of Clinical Oncology describing Sanofi's clinical trial TAX 311.[307]  Sanofi's TAX 311 trial studied the efficacy benefits of Taxotere versus paclitaxel (Taxol).[308]  DDMAC concluded that Sanofi's promotional material was misbranded in violation of the FDCA in that it was false and misleading because it presented "unsubstantiated superiority claims and overstates the efficacy of Taxotere."[309]  Specifically, DDMAC found that the claims of Taxotere's significantly higher response rates, significantly longer duration of response, significantly longer median overall survival, significantly longer median time to progression compared to Taxol "misleadingly suggest that Taxotere is superior to paclitaxel in

---

[305] *Id.*

[306] Separately, DDMAC cited Sanofi on two other occasions for distributing marketing and promotional materials in violation of the FDCA.  *See* Letter from DDMAC's Joseph Grillo to Sanofi's Kerry Rothschild, Dec. 18, 2002 (Gaydos Ex. 5) ("These promotional pieces are false or misleading because they omit material facts with regard to the indication for Taxotere, make misleading efficacy claims, and omit safety information."); Letter from DDMAC's Thomas Abrams to Sanofi's Gerald Belle, Nov. 12, 2003 (Sanofi_008539) ("These DTC [direct-to-consumer] ads misleadingly overstate the survival benefits of Taxotere and imply that survival depends on treatment with Taxotere, while also minimizing the serious and potentially life-threatening risks associated with the drug by omitting some risk information and presenting other risk information in an inconspicuous manner.").

[307] Letter from DDMAC's to Sanofi's MaryRose Salvacion, Apr. 16, 2009 (Sanofi_01302842).

[308] *Id.*; Jones SE. (2005). Randomized phase III study of docetaxel compared with paclitaxel in metastatic breast cancer.  J Clin Oncol 23(24):5542-51.  The Authors' Disclosures of Potential Conflicts of Interest indicates that of the article's 15 authors, 12 were consultants for, held stock in, receiving Honoria from, or received other compensation from Aventis, Sanofi, or Sanofi Aventis.  *Id.*  Sanofi funded the authors of additional studies aimed at highlighting the benefits of docetaxel compared to competitor drugs.  *See also, e.g.*, Bernard L.M. (2011).  A Canadian economic analysis of U.S. Oncology Adjuvant Trial 9735.  Curr Oncol 18(2):67-75 (concluding that "[c]ost effectiveness, combined with efficacy and an acceptable safety profile, support the adoption of TC [docetaxel and cyclophosphamide] as an alternative to AC [doxorubicin and cyclophosphamide] in Canadian clinical practice for the adjuvant treatment of operable early breast cancer" in an article written by Cornerstone Research Group Inc., an organization "contracted by Sanofi-Aventis Canada to develop the health economic model and to conduct the economic evaluation.  Sanofi-Aventis was solely responsible for the funding of the all components of the study" and further noting that certain authors were consultants and have received Honoria and unrestricted funding from Sanofi).

[309] Letter from DDMAC's to Sanofi's MaryRose Salvacion, Apr. 16, 2009 (Sanofi_01302842).

the treatment of patients with locally advanced or metastatic breast cancer after failure of prior

chemotherapy, and overstate the efficacy of Taxotere.  FDA is unaware of substantial evidence

to support these claims."[310]

206.8. Sanofi's Associate Director of Clinical Affairs, Dr. Barry Childs, testified

as follows:

> "Q.     When you were at Sanofi, you did understand that the company
>         wanted to use the TAX311 data to promote the efficacy of
>         Taxotere over Taxol, right?
>
> A.      At some point in my tenure there, yes.
>
> . . .
>
> Q.      And the reason they wanted to promote the drug, is so their
>         physicians would use the drug, right?
>
> A.      Yes, I think that's a fair conclusion, yeah.
>
> . . .
>
> Q.      While you were at Sanofi, did you see any studies that indicated to
>         you that Taxotere was more efficacious than Taxol in treating
>         breast cancer?
>
> A.      Clinical studies?
>
> Q.      Yes, sir.
>
> A.      No.
>
> Q.      Since you've left Sanofi [in 2012], have you seen any studies that
>         indicate to you that Taxotere is superior to Taxol with regard to
>         efficacy?

---

[310] *Id.*  The reprint was authored by, among others, Sanofi employees and consultants.  Despite FDA's concerns regarding the misleading nature of the reprint, the article was neither withdrawn nor amended and, to date, has been cited in many other publications as authoritative.  *See, e.g.*, Berlfiglio M. (2012).  Meta-analysis of phase III trials of docetaxel alone or in combination with chemotherapy in metastatic breast cancer.  Journal of Cancer Research and Clinical Oncology 138(2): 221-229; *see also* Deposition of Dr. Barry Childs, October 26, 2018 at 81:23- 82:8 ("Q. Was it the situation with the TAX311 reprint that despite the review committees lack of unanimous agreement, that high level executives override that and decided that the print should be used?  A. Such an appeal process was in place and I believe that was what was done here.") (objection omitted).

A.      No."[311]

206.9. In a 2008 article published in the New England Journal of Medicine comparing "the efficacy of two different taxanes, docetaxel and paclitaxel, given either weekly or every 3 weeks, in the adjuvant treatment of breast cancer," Sparano et al. concluded that "[W]eekly paclitaxel after standard adjuvant chemotherapy with doxorubicin and cyclophosphamide improves disease-free and overall survival in women with breast cancer."[312]

206.10. In a 2010 article published in Cancer Treatment Reviews, Arroyo et al. noted that "Against the backdrop of a major increase in the use of docetaxel rather than paclitaxel in our setting over the past few years, implying a major increase in costs, we examined whether this higher use of docetaxel is supported by the available evidence" and found, based on a review of "sixteen randomized clinical trials, three meta-analyses, one systematic review, and five clinical practice guidelines" that "In this wide study, we found no evidence that regimens containing docetaxel yield greater benefits than those including paclitaxel.  From an effectiveness standpoint, the change from paclitaxel to docetaxel is not justified."[313]  Arroyo further wrote: "NCCN [National Comprehensive Cancer Network], CCO [Cancer Care Ontario], and ESMO [European Society for Medical Oncology] guidelines do not prioritize one taxane over another."[314]

---

[311] Deposition of Barry Childs, M.D., dated October 26, 2018, at 176:5-180:19 (objections omitted).

[312] Sparano J. (2008).  Weekly Paclitaxel in the Adjuvant Treatment of Breast Cancer. New England Journal of Medicine 358:16.  Sparano also found "no significant differences in survival between the groups treated with paclitaxel and those treated docetaxel or between the groups treated weekly and those treated every 3 weeks." *Id.*

[313] Arroyo P. (2010).  Controversies in the management of adjuvant breast cancer with taxanes: Review of the current literature.  Cancer Treatment Reviews 37:105-110.

[314] *Id.* (But noting that NICE [National Institute for Health and Clinical Experience] guidelines do not include paclitaxel among its recommendations because of a lack of a systematic review).

206.11. In a 2013 article published in Current Medical Research and Opinion, Qi et al. sought to perform a "meta-analysis of randomized controlled trials to compare the safety and efficacy of [docetaxel and paclitaxel] in MBC [metastatic breast cancer]."[315]  The authors reviewed seven eligible trials involving 1,694 patients with MBC, and concluded that "The present systematic review and meta-analysis demonstrates that both taxane-based regimens have comparable efficacy for patients with MBC [metastatic breast cancer], and the paclitaxel-based regimen is associated with less toxicity and better tolerability, especially in older patients and when used in weekly regimens."[316]

206.12. In a 2015 article published in Cancer Treatment Reviews, Carbognin et al. reviewed data from 15 trials (3,601 patients) to address questions regarding the "difference in terms of activity and tolerability" between paclitaxel and docetaxel.[317]  The authors found that "Although the activity of neoadjuvant paclitaxel and docetaxel HER2-positive breast cancer is considered similar, the slight advantage in pCR [pathological complete response], the significantly lower neutropenia and FN [febrile neutropenia], do favor paclitaxel (in the weekly fashion) over docetaxel, despite the slightly worst neurotoxicity."[318]

206.13. In a 2015 abstract published in the Chinese Journal of Oncology, Wei et al. sought to "analyze the efficacy and safety of paclitaxel liposomal and docetaxel for

---

[315] Qi W (2013).  Paclitaxel-based versus docetaxel based regimens in metastatic breast cancer: a systematic review and meta-analysis of randomized controlled trials.  Current Medical Research & Opinion 29 (Vol. 2): 117-125.

[316] Id. (But noting that a "sub-group analysis based on previous treatment for MBC" . . . "found that a paclitaxel-based regimen significantly improved OS [median overall survival] compared with a docetaxel-based regimen as first-line treatment for MBC.").

[317] Carbognin L. (2015).  Balancing activity and tolerability of neoadjuvant paclitaxel- and docetaxel-based chemotherapy for HER2-postiive early stage breast cancer: Sensitivity analysis of randomized trials.  Cancer Treatment Reviews 41:262-270.

[318] Id.

86

neoadjuvant chemotherapy of breast cancer."[319]  The authors concluded that "Compared with docetaxel, paclitaxel liposome has the same anti-tumor efficacy, but causes fewer and milder adverse reactions with a higher safety in the neoadjuvant chemotherapy for breast cancer."[320]

207.    In my opinion, Sanofi's marketing and promotional efforts to differentiate Taxotere versus Taxol/paclitaxel using "unsubstantiated" and "misleading" claims about Taxotere's efficacy, safety, and tolerability and Taxotere's superiority versus Taxol/paclitaxel misled physicians and doctors and put patients at an increased risk of harm.

## XI.   CONCLUSIONS

208.   **In Summary, in my opinion and for the reasons set forth in this Report**:[321]

208.1. Irreversible alopecia meets the criteria for a serious and/or clinically significant adverse event because of the distressing nature of this injury and its profound impact on mental health, physical, psychosocial and psychological distress, quality of life, patient compliance, and patient willingness to undergo chemotherapy or instead choose a different therapy or treatment, and the absolute risk or rate of occurrence of this adverse reaction.

208.2. A substantial number of the factors provided by the FDA to consider in assessing whether there is reasonable evidence of a causal association were satisfied to establish reasonable evidence of a causal association between Taxotere and irreversible alopecia by as early as 2009.

208.3. Because a substantial number of the factors provided by the FDA to consider in assessing whether there is reasonable evidence of a causal association were satisfied as to Taxotere and irreversible alopecia by as early as 2009, and because irreversible alopecia is

---

[319] Wei S. (2015).  Efficacy and safety analysis of paclitaxel liposomal and docetaxel for the neoadjuvant chemotherapy of breast cancer.  Chin J Oncol 37(5):379-382.

[320] *Id.*

[321] This section is not meant as an all-inclusive list of my opinions.  For all opinions, please see the Report.

a serious and/or clinically significant adverse event, a Warning regarding irreversible alopecia was warranted by as early as 2009.

208.4. By as early as 2009, Sanofi knew or should have known that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia.

208.5. By as early as 2009, Sanofi knew or should have known that patients taking Taxotere were at an increased risk of irreversible alopecia compared to alternative therapies.

208.6. By as early as 2009, it was not impossible for Sanofi to include language about irreversible alopecia in its Taxotere label.

208.7. Based on all scientific evidence, by as early as 2009, Sanofi should have clearly and prominently warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label.

208.8. By as early as 2009 and continuing through at least 2015, Sanofi's Taxotere labeling failed to adequately warn that there was reasonable evidence of a causal association between Taxotere and irreversible alopecia.

208.9. Sanofi's statement in its label that "hair generally grows back" was misleading when there was reasonable evidence of a causal association between Taxotere and irreversible alopecia available to Sanofi.

208.10. Sanofi's statement in its label that "hair generally grows back" was misleading when Sanofi knew or should have known that patients taking Taxotere were at an increased risk of irreversible alopecia compared to alternative therapies.

208.11. Sanofi's marketing and promotional efforts to differentiate Taxotere versus Taxol/paclitaxel using "unsubstantiated" and "misleading" claims about Taxotere's

efficacy, safety, and tolerability and Taxotere's superiority versus Taxol/paclitaxel misled

physicians and doctors and put patients at an increased risk of harm

_____
David A. Kessler, M.D.

    11    /  6   /2018
            Date