**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                             **SECTION "H" (5)**

THIS DOCUMENT RELATES TO
*Kahn v. Sanofi-Aventis US, LLC*, No. 16-17039

<u>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' *THIRD* RENEWED**</u>
<u>**MOTION FOR RECONSIDERATION BASED ON PRESCRIPTION**</u>

## I.  <u>INTRODUCTION</u>

This Court has held—three times (twice denying reconsideration)—that there is a genuine dispute of material fact as to whether *contra non valentem* tolled the prescription period until Ms. Kahn filed suit. And yet, for the *third* time, Sanofi asks this Court to reconsider that decision. (Rec. 9885).

There is no reason to do so. The Fifth Circuit's affirmance in *Durden* changes nothing. The Court of Appeals did not announce new law—its decision is unpublished and per curiam because it merely applied the prior panel ruling in the *Thibodeaux* appeal. This Court has already rejected Sanofi's arguments that the *Thibodeaux* appeal changed the law in a way that affects Kahn.

> "Here, however, Plaintiff Kahn did investigate her injury—she consulted with a doctor and was told her age was causing her hair loss. This Court, then, need not speculate and will not automatically charge Kahn with knowledge of the information available on the internet, as the Fifth Circuit did for the *Thibodeaux* Plaintiffs. A jury will need to consider whether Plaintiff Kahn's investigation was reasonable or whether Kahn, despite what Dr. Roberie told her, should have conducted her own research at some point before 2016. A jury will need to assess whether Plaintiff, as part of reasonable diligence, should have found the information available online and brought it to her doctors. For these reasons, the Court declines to reverse its original Order."

1

Rec. Doc. 12805. Given that *Durden* merely applied *Thibodeaux,* and this Court has already held

that *Thibodeaux* does not require this Court to reverse its earlier ruling, there is zero reason to find

that *Durden* requires reversal, either.

That leaves Sanofi to argue that the facts of *Durden* are the same as or similar to *Kahn*. But

this Court has already rejected that very argument:

> Plaintiff Elizabeth Kahn testified that she spoke to her gynecologist
> who told her that "as you age, your hair gets thinner," giving Kahn
> a reason to believe something other than her chemotherapy
> treatment was causing her poor hair regrowth. Unlike these
> plaintiffs, Plaintiff Durden presents no evidence showing that any of
> her doctors told her, after her treatment, that regrowth can take time
> or that something else was causing her injury.

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 4228375, at *3 (footnotes omitted).

There is nothing new here. Reconsideration should be denied.

## II.   STATEMENT OF FACTS

In 2008, Plaintiff Elizabeth Kahn was diagnosed with breast cancer and agreed to

participate in a clinical study.[1] Ms. Kahn's treatment involved Taxotere, Adriamycin, and

Cyclophosphamide—all toxic chemotherapy agents known at the time to cause temporary hair

loss.[2] Ms. Kahn's oncologist, Dr. Kardinal, and her nurse told her that she would have temporary

hair loss.[3] Dr. Kardinal did not know that Taxotere could cause permanent hair loss.[4]   The consent

---

[1] *See* Rec. Doc. 9295-1, Defendants' Statement of Undisputed Material Facts (Sanofi's Facts), at ¶ 2-3; *see also* Rec. Doc. 9418-1, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Kahn's Facts), at ¶2-3.

[2] *See* Rec. Doc. 9418-2, *sealed* Ex. A, at NSABP 000027. In addition to Exhibits A-V that were attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment based on Statute of Limitations (Rec. Doc. 9418), plaintiff also references Exhibits W-GG that were attached to Plaintiff's Brief Opposing Defendants' Second Motion to Reconsider this Court's Order Denying Summary Judgment based on Prescription (Rec. Doc. 12583).

[3] *See* Rec. Doc. 9418-17, Ex. P, Dep. of E. Kahn, 12/07/17, at pp. 254:20-255:4, and 205:21-206:19; *see also* Rec. Doc. 9418-23, Ex. V, Dep. of S. Thomas, 01/10/18, at pp. 68:09-14, 69:09-13, and 178:20-179:17.

[4] *See* Rec. Doc. 9418-22, *sealed* Ex. U, Dep. of C. Kardinal, M.D., 01/17/18, at pp. 175:9-17, 87:2-22.

form also did not warn Taxotere could cause permanent hair loss, and the chemotherapy education materials explained that hair loss from chemotherapy would be temporary.[5]

Ms. Kahn began toxic chemotherapy in May 2008, and the hair on her head, eyebrows, and eyelashes fell out in June 2008.[6] After Ms. Kahn completed toxic chemotherapy in October 2008, Ms. Kahn underwent breast surgery to remove her tumor followed by post-surgery treatment that involved a drug called Avastin (bevacizumab).[7] Hair loss is not associated with the use of Avastin, which is not toxic chemotherapy.[8]

During her post-surgery treatment, Ms. Kahn's hair grew back thinner on her head, but her eyebrows never grew back.[9] Although Ms. Kahn acknowledged that Taxotere initially caused her hair to fall out, she did not know whether any of the other toxic chemotherapy drugs had prevented or contributed to her hair from growing back to its full thickness:

> Q. Do you think that the changes to your hair since 2008, are due solely to Taxotere?
>
> A. I can't say that because I lost my hair and I had several cocktails of chemotherapy drugs. So my initial loss of hair was Taxotere, because that was one of the first drugs I took. And then, in the second phase, I took different drugs. My hair didn't grow back. So I don't know what -- you know, it was a cocktail of drugs.
>
> Q. So your hair loss might be contributed to by some of the other chemotherapy drugs that you took? …
>
> A. Well, several of the drugs that I took say it had temporary hair loss as a side effect.[10]

---

[5] *See* Rec. Doc. 9418-2; *see also* Rec. Doc. 12583-6, Ex. BB, Plaintiff's Chemotherapy Education Materials.
[6] *See* Rec. Doc. 9295-1, Sanofi's Facts, at ¶7-9; *see also* Rec. Doc. 9418-1, Kahn's Facts, at ¶7-9.
[7] *See* Rec. Doc. 9295-3, Sanofi's Ex. A, at pp. 10-11; *see also* Rec. Doc. 9418-2 at NSABP 000027.
[8] *See* Rec. Doc. 9418-2 at NSABP 000022, 000036-000038; *see also* Rec. Doc. 9418-3, *sealed* Ex. B and Rec Doc. 9418-4, *sealed* Ex. C, Avastin prescribing information; *see also* Rec. Doc. 9418-17 at pp. 177:17-178:3, 229:11-230:15.
[9] *See* Rec. Doc. 9295-1, Sanofi's Facts, at ¶ 22-24; *see also* Rec. Doc. 9418-1, Kahn's Facts, at ¶22-24.
[10] *See* Rec. Doc. 9418-17 at p. 259:1-23.

3

In April 2009, Ms. Kahn asked her gynecologist, Dr. Margaret Roberie, why her hair had not fully grown back to its full thickness after completing chemotherapy, and Dr. Roberie, despite being aware that Ms. Kahn had taken chemotherapy, told Ms. Kahn that her hair might be thinning due to her age.[11] Sometime in 2009 or 2010, Ms. Kahn asked her treating oncologist, Dr. Zoe Larned who was well aware of Ms. Kahn's use of Taxotere, when her hair would return to its original thickness, but Dr. Larned could not provide her with a specific timeframe.[12] In fact, only as a result of this litigation has Dr. Larned started warning about the potential risk of permanent hair loss with Taxotere.[13] In addition, a dermatologist advised Ms. Kahn in July of 2009 to try taking Biotin to encourage faster regrowth.[14]

From April of 2009, six months after Ms. Kahn completed cytotoxic chemotherapy in October of 2008, through April of 2010, Sanofi actively removed and concealed public postings on its Facebook page regarding permanent hair loss, blocked any users who attempted to post about permanent hair loss, and reported such users to Facebook requesting that they be banned.[15] Additionally, information published in medical journals was not accessible to members of the public such as Ms. Kahn without subscription to such services and no showing has been made as to when any other forms of information became published online.

Despite Ms. Kahn's inquiries following her chemotherapy treatments, her doctors never confirmed that she had a permanent condition from her use of Taxotere.[16] Given that she had been

---

[11] *See* Rec. Doc. 9418-17 at pp. 257:9-258:5; *see also* Rec. Doc. 9418-18, *sealed* Ex. Q, Dep. of M. Roberie, M.D., 02/21/20, at p. 139:3-13.

[12] *See* Rec. Doc. 9418-17 at pp. 255:8-258:5 and 229:11 – 230:15.

[13] *See* Rec. Doc. 9418-20, Ex. S, Dep. of Z. Larned, M.D., 02/21/18, at pp. 109:12- 110:05.

[14] *See* Rec. Doc. 9418-19, Ex. R, Dep. of E. Kahn, Vol. II, 01/31/18, at pp. 44:9-45:21.

[15] *See* Ex. HH, Sanofi_05932261-2267, at p. 4; *see also* Ex. II, 30(b)(6) Dep. of InTouch Solutions, Inc. by and through their designated representative, M. Goyer, 12/13/18, at pp. 61:6-62:13; *see also* Ex. JJ, Dep. of L. Fierro, 01/17/19, at pp. 143:22-147-22.

[16] *See* Rec. Doc. 9418-17 at p. 318:4-15.

informed that her hair loss was due to her age, Ms. Kahn did not attribute the lack of regrowth to Taxotere until 2016.[17] In December 2016, Ms. Kahn filed suit.[18]

## III.   ARGUMENT

### A. Because this Court has already distinguished Ms. Kahn's case from those it dismissed, the Fifth Circuit's affirmances provide no basis whatsoever to revisit or reverse its decision in Ms. Kahn's case.

This Court granted Sanofi's summary judgment motions as to Ms. Francis, Ms. Johnson, Ms. Thibodeaux and Ms. Durden. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2019 WL 2995897 (E.D. La. July 9, 2019), reconsideration denied, 2020 WL 375597 (Jan. 23, 2020); *In re Taxotere (Docetaxel) Prod. Liab. Litig.,* 2020 WL 8257755 (E.D. La. Jan. 23, 2020); *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-16635, 2020 WL 4228375 (E.D. La. July 23, 2020), *aff'd,* No. 20-30495, 2021 WL 2373490 (5th Cir. June 9, 2021). The Court found that these four Plaintiffs were unreasonable as a matter of law because they "did nothing to investigate" their permanent hair loss. 2019 WL 2995897, at *3 (Johnson has presented no evidence demonstrating that she investigated her injury. …Johnson had a duty to investigate and failed to do so…"); *id*. at *4 ("…Francis made no effort to investigate her injury or to identify which drug and which manufacturer was responsible for her injury. …Francis had a duty to investigate and failed to do so…"); 2020 WL 8257755, at *3 ("Thibodeaux … did nothing to investigate… [S]he did not act to discover the cause of the problem. She never inquired with her doctors…"); 2020 WL 4228375, at *2 ("Instead, the evidence establishes that [Durden] suspected something was wrong and yet failed to investigate its cause) *Id.* at *3 ("Critically, however, [Durden] points to no evidence showing that she asked her doctors about the cause of her hair loss… Unlike these plaintiffs,

---

[17] *Id*. at pp. 259:1-260:14.
[18] *See* Rec. Doc. 9295-1, Sanofi's Facts, at ¶ 28; *see also* Rec. Doc. 9418-1, Kahn's Facts, at ¶ 28.

Plaintiff Durden presents no evidence showing that any of her doctors told her, after her treatment, that regrowth can take time or that something else was causing her injury…. Unlike the plaintiff in *Hoerner*, Durden presents no evidence to show that she reasonably relied on information she discovered from an investigation").

On appeal, the Fifth Circuit agreed with this Court holding that Ms. Francis, Ms. Johnson, and Ms. Thibodeaux acted unreasonably because they did nothing to investigate their permanent hair loss. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, -- F.3d --, 2021 WL 1560724 at *6 (5th Cir. Apr. 21, 2021) ("*Thibodeaux*"). The Fifth Circuit reiterated: "Appellants made no inquiry, and they are charged with knowledge of all that a reasonable inquiry would have revealed." *Id*. at *7.

Likewise, in the recent unpublished *Durden* decision, the Fifth Circuit stated, "Like the plaintiffs in *Thibodeaux*, Durden never 'explored' Taxotere 'as a possible explanation' for her persistent hair loss." *In re Taxotere (Docetaxel) Prod. Liab. Litig.,* No. 20-30495, 2021 WL 2373490, at *6 (5th Cir. June 9, 2021).

These factual circumstances are easily distinguishable from Ms. Kahn's case. Indeed, this Court has ***already*** distinguished these fact patterns:

> This differs from the evidence that was before the Court regarding Plaintiff Barbara Earnest. Plaintiff Earnest testified that when she grew concerned about her hair loss, she asked her oncologist about it, and he told her that "it's going to come back. It just takes time." Similarly, Plaintiff Elizabeth Kahn testified that she spoke to her gynecologist who told her that "as you age, your hair gets thinner," giving Kahn a reason to believe something other than her chemotherapy treatment was causing her poor hair regrowth. Unlike these plaintiffs, Plaintiff Durden presents no evidence showing that any of her doctors told her, after her treatment, that regrowth can take time or that something else was causing her injury. Indeed, to the contrary, Dr. Jancich told Durden that her hair was "likely not going to come back."

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 4228375, at *3 (footnotes omitted).

What's more, the Court has already denied reconsideration—twice. Most recently, it concluded:

> "Here, however, Plaintiff Kahn did investigate her injury—she consulted with a doctor and was told her age was causing her hair loss. This Court, then, need not speculate and will not automatically charge Kahn with knowledge of the information available on the internet, as the Fifth Circuit did for the *Thibodeaux* Plaintiffs. A jury will need to consider whether Plaintiff Kahn's investigation was reasonable or whether Kahn, despite what Dr. Roberie told her, should have conducted her own research at some point before 2016. A jury will need to assess whether Plaintiff, as part of reasonable diligence, should have found the information available online and brought it to her doctors. For these reasons, the Court declines to reverse its original Order."[19]

For these reasons, the Court should deny reconsideration of its order finding that Ms. Kahn is not like these other women but did enough to raise a jury question on the reasonableness of her efforts.

### B. Sanofi's remaining arguments provide no basis to revisit or reverse this Court's order in Ms. Kahn's case.

Sanofi strives mightily to get this Court to consider new issues that are entirely beside the point and too late. If anything, if this Court entertains Sanofi's new issues, then it must also consider Ms. Kahn's strong arguments that Sanofi should carry the burden of proof even if her claim is facially prescribed, and that he claims could never be prescribe because of Sanofi's fraudulent concealment.

Start with Sanofi's new arguments. Sanofi appears to argue—as a separate basis for reconsideration—that Ms. Kahn is charged with all information even if she acted reasonably.[20] However, the *Durden* Court did not hold that a *reasonable* plaintiff is charged with constructive notice. The *Durden* Court only imputed constructive knowledge to those Plaintiffs because it

---

[19] *See* Rec. Doc. 12805.
[20] *See* Rec. Doc. 12916-1, Mem. in Support of Defendants' Renewed Mot. for Reconsideration, at p. 2.

found—like this Court—that they acted unreasonably by doing *nothing* to investigate their permanent hair loss.

Like this Court, the Fifth Circuit held that the focus is on a plaintiff's reasonableness: "This requirement of notice was 'refined to focus on the reasonableness of [the plaintiff's] action or inaction.'" 2021 WL 1560724 at *4 (quoting *Jordan v. Emp. Transfer*, 509 So. 2d 420, 423 (La. 1987)). The Fifth Circuit held that a plaintiff's reasonableness—or lack thereof—determines whether the plaintiff is charged with constructive-notice:

> "[M]ere apprehension that something may be wrong is insufficient ... unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem *may* have been caused by" tort.

*Id.* at *5 (quoting *Oil Ins. v. Dow Chem.*, 977 So. 2d 18, 22 (La. App. 1st Cir. 2007) (quoting *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002) (emphasis by *Oil Ins.* Court)). As a result, courts cannot impute knowledge to plaintiffs who are *reasonably* unaware of their injury or its cause.

Under *Jordan*, the Fifth Circuit has repeatedly rejected a standard that would impose constructive notice on *reasonable* plaintiffs: "This rule would seemingly start prescription as soon as a potential plaintiff suspected something was wrong. But that is not the law." *Chevron v. Aker Mar.*, 604 F.3d 888, 894 (5th Cir. 2010). Rather, "[w]hen a plaintiff acts reasonably to discover the cause of a problem, 'the prescriptive period [does] not begin to run until [he has] a reasonable basis to pursue a claim against a specific defendant.'" *Id.* (quoting *Jordan*, 509 So.2d at 424 ). *See also Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission*, 290 F.3d 303, 320, 322-23, n. 60, & n. 71 (5th Cir. 2002) (reversing because District Court applied wrong standard); *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 761 (5th Cir. 1992); *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1139-40 (5th Cir. 1987) (reversing for District Court to apply "*Jordan*'s new standard"). Likewise,

the Court in *Sharkey v. Sterling Drug,* 600 So.2d 701 (La. App. 1 Cir. 1992), held that the plaintiff reasonably ignored articles for years that she had cut out of newspapers. *Id.* at 714-15.

As in these cases, and under the Fifth Circuit's holding in *Durden,* this Court correctly did not impute knowledge to Ms. Kahn because *she acted reasonably.*

### C. This Court correctly held that there is a material dispute of fact as to the discovery rule.

#### 1. Ms. Kahn asked three doctors about the fact that her hair did not return to its full thickness.

This Court previously denied Sanofi's summary judgment motion on prescription on three separate occasions, and held that a jury should determine whether Ms. Kahn acted reasonably. *See In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 1815854 (E.D. La. Apr. 7, 2020).[21] As this Court explained, after chemotherapy, Ms. Kahn asked *three* doctors about her hair loss:

> She finished with this chemotherapy regimen in October 2008. She testified that in April 2009, she made her first inquiry with a doctor, her gynecologist, about her persisting hair loss. She further testified that sometime in 2009 or 2010, she asked her oncologist when her hair would fully regrow, and in July 2009, she spoke to her dermatologist about her hair.

*Id.* at *1.

As this Court noted, in April of 2009, Ms. Kahn initially asked her gynecologist, Dr. Roberie, why her hair had not fully re-grown, and Dr. Roberie opined that it might be age-related.[22] Based upon this conversation, this Court held that a jury could find that Ms. Kahn acted reasonably:

> Plaintiff Kahn may have had reason to believe that something other than Defendants' conduct caused her injury. Dr. Roberie, for example, told Kahn that her hair loss may be due to her age. Kahn testified as follows:

---

[21] *See* Rec. Docs. 9885, 10399, and 12805.
[22] *See* Rec. Doc. 9418-17 at pp. 257:9-258:5.

Q: Have you ever asked any health care provider why they thought your hair is thinner than it was before chemotherapy?

A: I talked once to my gynecologist, and her comments were back -- her comment to me was, Well, as you age, your hair gets thinner.

Q: And which gynecologist was this?

A: Dr. Roberie.

Q: So have you considered whether the current condition of your hair is affected by the aging process?

A: I was 50 at the time, and most 50-year-old's hair do not thin. You know, 80, maybe, but not 50. So when she told me that, I was a little taken aback, but -- so I dropped it.

Based on the evidence, the Court finds that there is an issue of fact on whether *contra non valentem* applies to toll prescription for Plaintiff. A jury will have to consider whether Plaintiff was reasonable in relying on such statements from her doctors and whether Plaintiff was reasonable in failing to attribute her injury to Taxotere until she learned of the attorney advertisement years after she sustained her injury.

*Id.* at *3 (citing Doc. 9418-17 (Kahn's Ex. P) (pp. 257–58 of deposition)). *See also* 2020 WL 2473772 at *2 ("[T]he evidence shows that Kahn had conversations with her doctors about her injury. Kahn investigated her injury to some extent.").

In addition, Ms. Kahn asked her treating oncologist, Dr. Larned, in 2009 or 2010 when her hair would fully grow back, but Dr. Larned could not provide her with a specific timeframe.[23] She also asked her dermatologist in July of 2009 about her hair thinness, and her dermatologist recommended Biotin to encourage faster regrowth.[24] After three doctors could not diagnose her condition, Ms. Kahn reasonably did not know that she had permanent hair loss.[25]

---

[23] *Id.* at pp. 255:8-258:5 and pp. 229:11 – 230:15.
[24] *See* Rec. Doc. 9418-19 at pp. 44:9-45:21.
[25] *See* Rec. Doc. 9418-17 at pp. 255:2-257:9.

No good cause exists for this Court to reverse course as the facts have not changed.  Rather, this Court should deny Sanofi's motion for a fourth time.

> **2.**    **Because Ms. Kahn reasonably inquired with three different doctors, a jury could determine that she reasonably did not make further inquiries.**

Sanofi argues that no juror could find Ms. Kahn reasonable because she did not further ask the doctors whether Taxotere caused the permanent condition that she reasonably did not know she had. Because Ms. Kahn's doctors either misdiagnosed her condition, as age related hair loss, or refrained from diagnosing her condition, she reasonably did not ask them for the root cause of the misdiagnosed or undiagnosed condition that she—and her three doctors—did not understand.

Ms. Kahn's actions do not resemble the no-inquiry facts in *Durden*. This case is more like *Hoerner, Cole*, and *Ducre*. In *Hoerner v. Wesley–Jensen*, 684 So.2d 508 (La. App. 4th Cir. 1996), the plaintiff developed a severe eye infection as a result of an extended-wear contact lens. More than two years after developing the eye infection, the plaintiff reviewed a magazine article regarding the connection between the use of extended-wear lenses and the significantly increased risk of eye infections. The defendants argued that the causal relationship between contact lenses and ulcerative keratitis was widely evident prior to the plaintiff's eye infection, and that common knowledge should have been construed as constructive knowledge on the part of the plaintiff. The Court rejected those arguments, holding that "the knowledge that contact lens use in general could cause infection is not sufficient to put [the plaintiff] on notice that her infection and ensuing injury resulted from wearing the extended-wear contact lenses." *Id*.

The Louisiana Supreme Court's decision in *Cole v. Celotex*, 620 So.2d 1154 (La. 1993) (unanimous) is also informative. In *Cole*, the Court held that prescription did not begin when the plaintiff was diagnosed with pneumonia in 1955, placed on asbestos monitoring in 1979, advised

in 1983 "that the plaque on his lungs… could be due to several causes besides asbestosis," or told in 1984 that he "had evidence of asbestos-related lung disease." *Id.* at 1157. The Court held that prescription began instead when the plaintiff was diagnosed with asbestosis in 1985, and thus the trial court committed "manifest error" by ruling otherwise. *Id*.

Similarly, in *Ducre*, the Fifth Circuit rejected an argument that prescription began when Bartholomew learned of "sand in his lungs" and "evidence of silicosis" in 1981 because the diagnosis was not definitive, Bartholomew did not connect their injury to the use of a sand-blaster, and Bartholomew did not understand what silicosis is. 963 F.2d at 760-61. The Fifth Circuit held that the jury should decide whether Bartholomew reasonably waited *nine years* to file suit until 1990. *Id*. at 758, 761-62.

As in these cases, Ms. Kahn reasonably did not know—based upon inquiries with *three* doctors—that her hair would *never* return to its original thickness; neither did her physicians. Viewing the evidence in the light most favorable to Ms. Kahn, a jury could find that she was reasonable.

### 3.    Further inquiry from Ms. Kahn's doctors would have been futile.

Viewing the evidence in the light most favorable to Ms. Kahn, even with further inquiries, her doctors would not have told her that her hair would never return to its original thickness or that Taxotere caused her condition. Initially, none of her doctors said either of these things when Ms. Kahn asked about her condition. One doctor misdiagnosed her condition as age-related; two other doctors made no diagnosis. In fact, many doctors and dermatologist are unaware of the existence of permanent chemotherapy induced alopecia (PCIA) and misdiagnose PCIA as age related, androgenetic, hair loss because PCIA involves androgen dependent areas of the scalp.[26]  No doctor

---

[26] *See* Rec. Doc. 12583-7, Ex. CC, Dep. of A. Tosti, M.D., 12/05/18, at pp. 306:5-307:5.

ever suggested there was any permanent condition caused by her use of Taxotere and/or chemotherapy.[27] In fact, even Ms. Kahn's oncologists did not know Taxotere could cause permanent hair loss.[28]

Moreover, even if Ms. Kahn had independently researched medical literature—at Sanofi's proposed sixth-month deadline on April 23, 2009—to decipher the difference between "temporary," "permanent," and "persistent" hair loss, she would not have discovered the answer as there was no clear definition to find.[29] Furthermore, Ms. Kahn may have been unable to successfully search the medical literature as she did not have access to such medical journals and no evidence has been presented as to the date such information became or ever did become publicly available on the internet without access to paywalls or subscription services.[30] Indeed, Sanofi's expert epidemiologist, Dr. Ellen Chang, agrees that there is no single definition despite Sanofi's insistence (in the courtroom) otherwise:

> I consider terms such as "irreversible alopecia," "permanent alopecia," "nonreversible alopecia," "persistent alopecia," and "persisting alopecia" to refer to the same concept, that is, hair loss that continues over an extended duration of time, without subsequent resolution. There is no universal or authoritative clinical definition of this condition, and various scientists and clinicians may define it differently, for example, based on the duration of persistence or the degree of hair regrowth.[31]

---

[27] *See* Rec. Doc. 9418-17 at p. 318:4-15.
[28] *See* Rec. Doc. 9418-22 at pp. 175:9-17 and 87:2-22; *see also* Rec. Doc. 9418-20 at pp. 109:12- 110:05.
[29] *See* Rec. Doc. 12583-1, Ex. W, Report of E. Feigal, M.D., 10/21/19, at pp. 41-66 (summarizing published articles on irreversible alopecia including endpoints).
[30]   *Scientific Research Shouldn't Sit behind a Paywall*, Scientific American (June 20, 2019) (https://blogs.scientificamerican.com/observations/scientific-research-shouldnt-sit-behind-a-paywall/) ("Most of the scientific research conducted in the U.S. and abroad is supported by federal government funds — that is to say, by taxpayer dollars. Yet much of the information that results from such funding is not publicly available outside of research institutions that can afford expensive scientific journal subscriptions.")
[31] *See* Rec. Doc. 9418-21, sealed Ex. T, Report of E. Chang, Sc.D., 12/09/19, at p. 4.

### 4.    Sanofi's causation defense shows Ms. Kahn's reasonableness.

Sanofi continues to argue that Taxotere did not cause permanent hair loss. For example, in

the *Durden* appeal, Sanofi recently wrote in no uncertain terms:

> Sanofi disputes plaintiffs' claims that Taxotere causes permanent
> hair loss, in particular because cancer treatment involves numerous
> medicines with which cases of permanent hair loss have also been
> reported. In fact, the parties tried the first bellwether case in
> September 2019, which resulted in a defense verdict on medical
> causation.[32]

Notably, in *Sharkey*, the Court found that such a causation defense supports the discovery

rule and the reasonableness of a plaintiff:

> …Sterling's contention that this action has prescribed is greatly
> undermined by its own contention that the cause of Reye's
> Syndrome is unknown. If the cause is unknown for purposes of
> Sterling's liability, then Sterling can hardly argue that the cause was
> known to the Sharkeys more than one year prior to their filing this
> action.

600 So.2d  at 714. As in *Sharkey*, Sanofi's own causation defense (that it *does not* cause permanent

hair loss) negates its simultaneous and contradictory claim that every reasonable person knew at

least six months after their chemotherapy treatment that Taxotere *does* cause permanent hair loss.

At a minimum, Sanofi's causation defense creates a factual dispute as to what a reasonable person

would have known.  Sanofi cannot be permitted to embrace permanent hair loss six months after

use of Taxotere as causation for purposes of statute of limitations but then deny Taxotere can even

cause permanent hair loss for the purpose of liability.

---

[32] *See* Ex. KK, Appellee's' Response Brief, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 20-30495, at p. 1, fn. 1
(5th Cir. Feb. 8, 2021).

**5.      Ms. Kahn reasonably did not know whether other chemotherapy drugs prevented her hair from coming back.**

Viewing the facts in the light most favorable to Ms. Kahn, she was reasonably unaware that Taxotere—as opposed to other toxic chemotherapy medications—prevented her hair from growing back. See *supra* at XX. Just as the Court previously decided, a juror could easily conclude that Ms. Kahn reasonably did not know which toxic chemotherapy drug prevented her hair form growing back to its original thickness.  This approach is reasonable, especially in light of Sanofi's own defense that it difficult if not impossible to assess whether Taxotere causes permanent alopecia considering it is given as a part of combination chemotherapy treatment.

Given the reasonable difficulty in determining which medication prevented her hair from returning, this case is like *Jordan*, *Knaps*, *Aker Maritime, and Sharkey*. The *Jordan* Court held that prescription did not begin to run until the Jordans' den flooded a second time, ruling out alternative causes. 509 So.2d at 421-24. The Louisiana Second Circuit charged the Jordans with constructive notice from the date of the first flood because "[t]he Jordans did not contact anyone to determine the cause of the flooding." *Jordan v. Emp. Transfer*, 499 So.2d 454, 456 (La. App. 2d Cir. 1986). The Louisiana Supreme Court rejected this standard and held that "prescription did not begin to run until they had a reasonable basis to pursue a claim against a specific defendant." *Jordan*, 509 So.2d at 424.

The Fifth Circuit first followed *Jordan* in *Knaps*. In that case, Knaps had an adverse reaction to the defendant's soap in 1982, but no doctor diagnosed soap as the cause until 1986. 828 F.2d at 1139. Like the panel's reasoning in this case, the district court found that prescription began to run in 1982 because Knaps believed that the soap caused his injury. *Knaps v. B & B Chem.*, 1987 WL 14350, at *2 (E.D. La. July 16, 1987). Accordingly, the district court held that Knaps was "on notice that he needed to inquire further…" *Id*. The Fifth Circuit reversed because the

district court applied a standard that *Jordan* had rejected and noted that the District Court's result would have been correct before *Jordan* changed the standard:

> Were this the standard we would have no problem with the district court's ruling. The immediacy of Knaps' reaction to the soap and Knaps' own efforts to inquire about causation indicate that Knaps' attention was excited.

*Knaps*, 828 F.2d at 1139. *See also Aker Maritime*, 604 F.3d at 894 (prescription did not begin after manufacturer's first bolt broke in 2001 or after more bolts broke in July 2002 because the plaintiff could also suspect improper use as a cause).

As in these cases, Ms. Kahn reasonably did not know that Taxotere prevented her hair from returning to its original thickness. She took multiple other chemotherapy drugs known to cause temporary hair loss, all of which Defendants now assert are alternative causes, and none of her doctors could diagnose her condition—much less identify the culprit. Furthermore, following the end of her chemotherapy treatments, Ms. Kahn also took hormone therapy for approximately nine years.  Sanofi's own experts assert that Ms. Kahn's use of hormone therapies is one of the causes of her hair loss in addition to the age-related, androgenetic, hair loss, such as that diagnosed by Dr. Roberie.[33]  Viewing the facts in the light most favorable to her, a jury could find that she reasonably did not know her injury or its cause.

**D.  There is a material dispute of fact as to fraudulent concealment.**

Viewing the facts in the light most favorable to Ms. Kahn, Sanofi intentionally misrepresented the risk in the label and their actions prevented Ms. Kahn and her doctors from learning either that her hair would not return or that Taxotere caused her permanent condition.  The doctrine of *contra non valentem* provides an exception to Louisiana's one-year liberative prescription also in cases "where the defendant has done some act effectually to prevent the

---

[33] *See* Rec. Doc. 12583-8, Ex. DD, Report of J. Shapiro, M.D., 10/09/20, at pp. 45, 49; *see also* Rec. Doc. 12583-9, Ex. EE, Report of M. Turegano, M.D., 10/09/20, at pp. 24-25.

plaintiff from availing himself of his cause of action." *Morgan v. Entergy New Orleans*, 234 So. 3d 113, 116 (La. App. 4th Cir. 2017). Sanofi fraudulently concealed the risk of permanent hair loss because it had knowledge of the actual potential harm (permanent hair loss) and nonetheless made a material misstatement of the risk (warning only of temporary hair loss in its labeling).

There is substantial evidence that Sanofi knew of the causal relationship between Taxotere and permanent hair loss for more than a decade before electing to update the Taxotere label in December 2015.[34] For example, in the pivotal clinical trial (referred to as "TAX 316") used by Sanofi to support approval of Taxotere for the treatment of adjuvant breast cancer (early stage), subjects taking Taxotere reported an increased incidence of permanent hair loss compared to subjects who received treatment without Taxotere.[35] In 2005, a different Sanofi clinical trial (referred to as "GEICAM 9805" or "TAX 301") confirmed that subjects receiving Taxotere had a higher incidence of permanent hair loss than those who received treatment without Taxotere.[36] All of this information was confidential to Sanofi and was therefore not publicly available to consumers such as Ms. Kahn.

Sanofi also received adverse event reports from clinicians whose patients reported permanent hair loss with Taxotere.[37] Defendants' Global Safety Officer for Taxotere, Dr. Amy Freedman, acknowledged that irreversible hair loss had been documented in Sanofi's clinical trials for Taxotere as early as 2006,[38] but advised the recipients "NOT" to do a literature search on the topic because the medical literature might contain additional reports of irreversible alopecia

---

[34] *See* Rec. Doc. 12583-2 at pp. 39-63 (summarizing evidence available to Sanofi regarding Taxotere's risk of permanent hair loss); *see also* Rec. Doc. 12583-3, Ex. Y, Supp. Report of D. Kessler, M.D., 10/21/19, at p. 1 ("Sanofi should have warned patients and physicians about the risk of irreversible alopecia with Taxotere in its label by as early as 2006, and certainly by 2008."); *Id.* at pp. 20-21 (summarizing testimony by Sanofi employees regarding knowledge of causal relationship between Taxotere and permanent hair loss).

[35] *See* Rec. Doc. 12583-2 at pp. 31, 42, and 45-47.

[36] *Id.*

[37] *Id.* at p. 44; *see also* Rec. Doc. 12583-3 at p. 1; *see also* Rec. Doc. 9418-6, *sealed* Ex. E, Sanofi_01035459-5460.

[38] *See* Rec. Doc. 12583-3 at p. 21; *see also* Rec. Doc. 9418-6, Sanofi_01035459.

associated with Taxotere.[39] Furthermore, Dr. Amy Freedman admitted that Sanofi knew in 2006 that Taxotere caused permanent hair loss.[40]

In 2007, Sanofi approved a warning of "permanent" hair loss in a Canadian consent form.[41] In fact, the Canadian consent form was reviewed by Sanofi's Regional Site Manager for *US* Medical Affairs, Penny Kegg, who forwarded the forms in January 2007 to Dr. Emanuel Palantisky for review.[42] Dr. Palantinsky responded that the separate "hair loss" warning was repetitive given the warning for "permanent hair loss."[43] Despite discussing how to warn patients of permanent hair loss, no such warning was ever incorporated in the label in 2008 or into Ms. Kahn's consent form.

In 2010, Sanofi completed its analysis of the ten-year follow-up results for TAX 316, the clinical trial used to support the adjuvant breast cancer indication.[44] This analysis found that 4.2% of TAX 316 patients reported persisting hair loss at the end of the ten-year follow-up.[45] This represented an increase in the incidence of persistent alopecia from approximately 3% to 4.2%. Sanofi had previously decided in 2009 to submit to the FDA only the Final Clinical Study Report for TAX 316, which is over a thousand pages long, without submitting a labeling change.[46] Further, by 2010, Sanofi had received reports from hundreds of women describing the failure of their hair to regrow following treatment with Taxotere.[47] These reports remained confidential and were not available to Ms. Kahn or her treaters.

---

[39] *See* Rec. Doc. 9418-6, Sanofi_01035459.
[40] *See* LL, Dep. of A. Freedman, 10/26/18, at pp. 195:20-24 – 196:1-2.
[41] *See* Rec. Doc. 9418-5, *sealed* Ex. D, Docetaxel-L-00713 Consent Form.
[42] *Id*.
[43] *Id*.
[44] *See* Rec. Doc. 9418-8, *sealed* Ex. G, Sanofi_02645200 – 02645278.
[45] *Id*. at p. 37, Sanofi_02645236.
[46] *See* Rec. Doc. 9418-9, *sealed* Ex. H, Sanofi_03336652.
[47] *See* Rec. Doc. 12583-2 at pp. 59-60; *see also* Rec. Doc. 9418-7, *sealed* Ex. F, Sanofi_00792534.

As usage of Taxotere increased, published reports of permanent[48] hair loss associated with Taxotere began to appear in the medical literature.[49] For instance, a study published in 2001 that evaluated Taxotere in the treatment of metastatic breast cancer noted four patients who experienced partial alopecia lasting "longer than 2 years."[50] However, the publication never stated that the hair loss was permanent and/or caused by Taxotere. As reports grew in the published scientific literature of permanent hair loss associated with Taxotere, Sanofi took affirmative steps to eliminate reports from a much more accessible platform: social media. In 2010, Sanofi began to actively remove negative public posts made on its Facebook page by women, including women who were members of the Taxotears group, who took Taxotere and suffered permanent hair loss.[51] Even if Ms. Kahn would have conducted a search for Taxotere and permanent hair loss, a juror could find—taking all inferences in Ms. Kahn's favor—that she would not have found any pertinent information *because* Sanofi actively removed such information from its public platforms.

That same year, French authorities requested that Sanofi analyze cases of permanent hair loss reported with Taxotere.[52] The resulting report issued by Sanofi and submitted in January 2011 concluded there was insufficient evidence to determine whether Taxotere caused permanent alopecia.[53] These European authorities rejected Sanofi's conclusion, finding that patients and healthcare providers needed to be provided information about the risk of permanent alopecia

---

[48] "Permanent" hair loss is also referred to as "persisting," or "irreversible" hair loss in the medical literature, *see, e.g.,* Second Amended Master Long Form Complaint and Demand for Jury Trial, 2:16-md-02740-JTM-MBN, Doc. 4407 ¶¶ at ¶¶ 149-162, and for purposes of this brief, a reference to "permanent" hair loss encompasses these other terms.

[49] *See* Rec. Doc. 12583-1 at pp. 41-66 (summarizing articles on irreversible alopecia).

[50] *See* Rec. Doc. 12583-4, Ex. Z, Report of L. Plunkett, Ph.D., DABT, 10/21/19, at p. 15; s*ee also* Rec. Doc. 12583-5 at p. 2, Sanofi_05252079; *see also* Rec. Doc. 12583-2 at p. 21.

[51] *See, e.g.,* Rec. Doc. 12583-5 at p. 5, Sanofi_05252082; Rec. Doc. 12583-10, Ex. FF, marked as Ex. 4 to the 30(b)(6) Dep. of InTouch Solutions, Inc., Sanofi-Aventis VOICES Facebook Comment Monitoring Report, at pp. 1 and 4; Rec. Doc. 12583-11, Ex. GG, marked as Ex. 5 to the 30(b)(6) Dep. of InTouch Solutions, Inc., excerpt from InTouch Powerpoint; and Ex. II at pp. 61:6-62:1;  Ex. JJ at pp. 143:22-147-22, and 170:20-171:16.

[52] *See* Rec. Doc. 12583-2 at pp. 59—60; *see also* Rec. Doc. 9418-13, Ex. L, Sanofi_04864365; *see also* Rec. Doc. 9418-14, Ex. M, Sanofi_01112867 at p. 7.

[53] *See* Rec. Doc. 9418-10, Ex. I, at p. 7-8 (Sanofi_04353204, Sanofi_04353247); *see also* Rec. Doc. 12583-2 at p. 60.

"given the serious psychological consequences of this adverse effect."[54] The European Medicines Agency adopted this same conclusion in June 2011, informing Sanofi that the label for Taxotere needed to be updated to inform patients of the risk of permanent alopecia.[55] However, Sanofi did not update the United States label with this information at that time.[56] Even if Ms. Kahn or her treaters would have searched the U.S. label in 2011 they would have been unable to locate any information pertaining to permanent hair loss or the results of TAX 316.

Meanwhile, in April 2011, Sanofi's Compliance Department issued an internal audit of drug labeling for various drug products, including Taxotere, to evaluate the accuracy and completeness of the safety data presented in the drug labeling.[57] For Taxotere, the audit revealed that the labeling failed to include the incidence rate of persistent alopecia from TAX 316. Sanofi did not add this information to the United States label for Taxotere until 2018.[58]

In an internal audit conducted on March 5, 2015, Sanofi again confirmed that the U.S. label lacked required safety information, including information on permanent alopecia.[59] Shortly thereafter, the FDA requested information from Sanofi on reports of Taxotere associated with permanent hair loss.[60] Sanofi subsequently acknowledged a causal relationship between Taxotere and permanent alopecia and that they had failed to update the United States label for Taxotere with information about this risk, stating "[t]his is going to be fun submitting >4 year old labeling changes to the FDA now."[61] This admission is in direct contradiction with Sanofi's defense in this case that Taxotere does not cause permanent hair loss. However, this confidential admission was

---

[54] *See* Rec. Doc. 12583-2 at pp. 59-60; *see also* Rec. Doc. 9418-11, Ex. J, Sanofi_02540992 at p. 4.
[55] *See* Rec. Doc. 12583-2 at pp. 59-60.
[56] *Id*. at p. 61.
[57] *See* Rec. Doc. 9418-12, *sealed* Ex. K, Sanofi_02983328.
[58] *Id*. at p. 7, Sanofi_02983328.
[59] *See* Rec. Doc. 12583-2 at p. 61, fn. 219 (describing 2015 US affiliate audit that identified information missing from Taxotere's product insert); *see also* Rec. Doc. 9418-15, *sealed* Ex. N, Sanofi_00837648.
[60] *See* Rec. Doc. 12583-2 at p. 61; *see also* Rec. Doc. 9418-15, Sanofi_00837648.
[61] *See* Rec. Doc. 9418-16, Ex. O, at p. 11, Sanofi_05207927.

not accessible to Plaintiff until she filed the instant lawsuit. On November 24, 2015, Sanofi submitted a revised label to the FDA adding language about permanent hair loss in the adverse events section,[62] which was finalized by the FDA on December 11, 2015.[63]

Viewing this evidence in the light most favorable to Ms. Kahn, Sanofi knew of the risk of permanent hair loss and yet withheld that information during the same period of time in which Sanofi claims Ms. Kahn and her doctors should have realized that Taxotere caused permanent hair loss. This Court has found that such concealment was sufficient to allow a fraud claim for Plaintiff Jacqueline Mills to proceed under Georgia law, because Sanofi failed to include any reference to permanent hair loss in its label until 2015:

> Defendants made express statements to Dr. Shah through Taxotere's label. In their Motion, Defendants admit that while the Taxotere label has since its inception warned of hair loss, it did not warn of permanent hair loss until December of 2015. Further, Dr. Shah's testimony provides evidence tending to show that she did rely on Defendants' representation. In reliance on the Taxotere/docetaxel label, she did not warn her patient, Ms. Mills, of permanent hair loss. Accordingly, Plaintiffs have created an issue of fact on their fraud-based claims.

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2019 WL 2995897, at *8 (E.D. La. July 9, 2019) (footnote omitted). Here too, the portion of the Louisiana Supreme Court's test for application of *contra non valentem* based on the same conduct by Sanofi strongly weighs in favor of finding Ms. Kahn's claims are timely. These disputed material facts regarding concealment preclude a finding that this case is prescribed as a matter of law.

---

[62] *See* Rec. Doc. 12583-2 at p. 62. Sanofi used the Changes Being Effected regulation that permits manufacturers to change labels without prior FDA approval. 21 C.F.R. 314.70(c).
[63] *Id.*

**E.   Lastly, if the Court revisits its rulings on the merits, the burden should remain on Sanofi even if the claims are prescribed.**

"The court shall grant summary judgment if *the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a) (emphasis added); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Consequently, the burden remains with Sanofi to demonstrate there is no genuine issue of material fact.  *See Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992) ("[T]he defendant's burden was to demonstrate the absence of a genuine issue of material fact.").

The burden here should remain with Sanofi even if the Court finds that the claims are facially prescribed. Although the Fifth Circuit did not consider this issue in either *Thibodeaux*, 2021 WL 1560724, at *2, or the *Durden* appeal, *see In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 20-30495, 2021 WL 2373490, at *3 (5th Cir. June 9, 2021), Plaintiff Kahn here avers Sanofi should carry the burden of proof. That position is fully supported by longstanding Fifth Circuit caselaw concerning the federal summary judgment standard in diversity cases such as this and the constitutional right to trial by jury.

FRCP 56(a) squarely places the summary judgment burden on the movant, and Louisiana law does not override the federal summary judgment standard. The Fifth Circuit has long held in diversity cases that "[t]he [summary judgment] standard to be applied is, of course, a federal one." *Nunez v. Superior Oil*, 572 F.2d 1119, 1123 n.5 (5th Cir. 1978) (citing *Hanna v. Plumer*, 380 U.S. 460 (1965)). The *Nunez* Court held that federal law, not Louisiana law, governed the summary judgment standard in diversity cases. *Id*. *See also Ducre*, 963 F.2d at 760 ("[T]he defendant's burden was to demonstrate the absence of a genuine issue of material fact.").[64]

---

[64] *See also Lloyd v. Lawrence*, 472 F.2d 313, 316 (5th Cir. 1973) ("Defendant's claims under Texas summary judgment practice are likewise ineffectual as the sufficiency of a complaint or the adequacy of proof for summary judgment under Rules 8 and 56, F.R.C. P., respectively, are determined by recourse to federal law."); *Reid v. Sears, Roebuck &*

In federal court, a non-movant with the burden at trial need only demonstrate a material dispute of fact. For example, a plaintiff opposing summary judgment on liability does not need to "establish" liability to get to trial. Indeed, "[e]ven thin contrary evidence" can suffice. *Crochet v. Bristol-Myers Squibb Co.*, 804 F.App'x 249, 254-55 (5th Cir. 2020) (unpublished).

The Fifth Circuit has long held that a jury should determine a party's reasonableness, *Nunez*, 572 F.2d at 1127, and specifically held that prescription "must be left to the jury." *Ducre*, 963 F.2d at 762. Because Ms. Kahn has a federal right to a jury trial, this Court should not assume—like the *Durden* Court—that she must "establish" her reasonableness *before trial*.

### 1. Movants have the summary judgment burden in Louisiana courts.

Even if this case were in state court, the movant would bear the summary judgment burden:

> This traditional allocation of the burden of proof is altered somewhat when prescription is raised through a motion for summary judgment rather than through the peremptory exception. In such a case, the movant is required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which the plaintiffs acquired actual or constructive knowledge of the damage sufficient to commence the running of prescription.

*Hogg v. Chevron*, 45 So.3d 991, 998 (La. 2010) (internal citations omitted). *See Labbe Serv. Garage v. LBM Distributors,* 650 So.2d 824, 829 (La. App. 3 Cir. 1995).

Louisiana does, however, use a burden-shifting framework for another procedural device under state law called "exceptions." [65] There is no federal equivalent to an exception. Unlike summary judgment, Louisiana courts hold evidentiary hearings on exceptions to make fact and

---

*Co.*, 790 F.2d 453, 459 (6th Cir. 1986) ("Summary judgment is a procedural device for deciding a case without the necessity of a full-blown trial. When there is a motion for summary judgment in a diversity case, the provisions of Rule 56 control its determination.")
[65] La. Code Civ. Proc. Ann. art. 891, 927(A)(1).

credibility findings,[66] which "may not be reversed absent manifest error or unless clearly wrong." *Guitreau v. Kucharchuk*, 763 So.2d 575, 580–81 (La. 2000).

Also unlike summary judgment, exceptions test pleadings. The defendant has the burden at the hearing if the plaintiff pled the discovery rule. *See Bailey v. Khoury*, 891 So.2d 1268, 1275 (La. 2005); *Campo*, 828 So.2d at 509. In addition, the defendant has the burden "unless the face of her petition reveals that she had knowledge of the damage and its cause at a time beyond the prescription period." *Sadler v. Midboe*, 723 So.2d 1076, 1082 (La. App. 1st Cir. 1998). Unlike summary judgment, a plaintiff can amend their pleading to prevent burden-shifting before the hearing, or even amend after a hearing to avoid prescription.[67]

Because summary judgment prevents both trial and amendment, Louisiana courts—like federal courts—place the summary judgment burden on the movant. In addition, as the pleadings do not disprove the discovery rule, Sanofi would have the burden even at an exception hearing.

### 2.    The movant has the burden as to the discovery rule and fraudulent concealment.

The Fifth Circuit assumed without deciding that Louisiana courts place the summary judgment burden on the movant in discovery rule and fraudulent concealment cases. As explained above, this inquiry is irrelevant because federal law dictates the summary judgment burden in diversity cases.

In any event, the movant retains the summary judgment burden in discovery rule cases:

> [T]he general premise of BP's motion for summary judgment was that… the burden of proof shifted to Plaintiffs to prove that prescription was suspended by the application of *contra non valentum*. That premise is fundamentally flawed. Because BP chose to file a motion for summary judgment based on prescription rather

---

[66] La. Code Civ. Proc. Ann. art. 929, 931; *Marin v. Exxon Mobil*, 48 So.3d 234, 261 (La. 2010).
[67] La. Code Civ. Proc. Ann. art. 934.

> than an exception of prescription, no such shifting of the burden of
> proof to the non-movant occurred.

*Trahan*, 209 So.3d at 172.

The Fifth Circuit has previously reached the same conclusion:

> When a plaintiff alleges the affirmative defense of *contra non
> valentem*, the defendant must show "that the plaintiff had actual or
> constructive notice of the tortious act, the resulting injury, and the
> causal connection between the two…"

*Carter v. Matrixx Initiatives,* 391 F.App'x 343, 345 (5th Cir. 2010) (unpublished) (citing *Sharkey
v. Sterling Drug,* 600 So.2d 701 (La. App. 1st Cir. 1992)).

## IV.   CONCLUSION

The Court should deny reconsideration. *Durden* merely applied *Thibodeaux*, and this Court has already held that *Thibodeaux* does not require this Court to reverse its earlier ruling. There is no reason, then, to find that *Durden* requires reversal, either. Also, this Court has already considered and rejected Sanofi's argument that Durden is factually like Kahn (it is not). With nothing new to see here, Sanofi should not have asked for reconsideration a third time.

Alternatively, if the Court reconsiders the merits, it should reach the same conclusion as before, or reach the same conclusion on alternate grounds, such as based on fraudulent concealment. All the while, it should require that Sanofi carry the burden as the movant.

Dated: July 7, 2021                     Respectfully submitted,

*/s/ Christopher L. Coffin*              */s/ Karen B. Menzies*
Christopher L. Coffin (#27902)          Karen Barth Menzies (CA Bar #180234)
PENDLEY, BAUDIN & COFFIN, L.L.P.        GIBBS LAW GROUP LLP
1100 Poydras Street, Suite 2225         6701 Center Drive West, Suite 1400
New Orleans, Louisiana 70163            Los Angeles, California 90045
Phone: (504) 355-0086                   Telephone: 510-350-9700
Fax: (504) 355-0089                     Facsimile: 510-350-9701
ccoffin@pbclawfirm.com                  kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*           *Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045 Phone:
510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com

Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000
hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ M. Palmer Lambert*
M. PALMER LAMBERT
