# EXHIBIT A

Page 1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

             CASE No.  2:16-cv-17039
3

     ELIZABETH KAHN,
4                 Plaintiffs,

5    v.

6    SANOFI-AVENTIS U.S. L.L.C. and
     SANOFI US SERVICE, INC.
7

8                 Defendant
9    _____/

10                           Remote Proceedings
                             September 29, 2020
11                           10:03 a.m. - 4:39 p.m.

12

13         VIDEO DEPOSITION OF ANTONELLA TOSTI, M.D.
14                  (Via Teleconference)
15      Taken before SUZANNE VITALE, R.P.R., F.P.R.
16   and Notary Public for the State of Florida at Large,
17   pursuant to Notice of Taking Deposition filed in the
18   above cause.
19
20
21
22
23
24
25

1              MR. LAMBERT:  Object to form.
2              THE WITNESS:  No.
3     BY MR. STRONGMAN:
4         Q.   Dr. Tosti, you've also had the opportunity
5     to see and evaluate Ms. Kahn; is that correct?
6         A.   Yes, it is.
7         Q.   You are an expert in this case that's been
8     hired by the plaintiffs, correct?
9         A.   Yes.
10             MR. LAMBERT:  Object to form.
11             THE WITNESS:  Yes.
12    BY MR. STRONGMAN:
13        Q.   And do you believe that, even though
14    you've been hired by the plaintiff, it's your
15    obligation to be fair and impartial in this case?
16        A.   Yes.
17        Q.   Do you believe it's your duty, as an
18    expert, to consider all the relevant information
19    about this case?
20             MR. LAMBERT:  Object to form.
21             THE WITNESS:  Yes.
22    BY MR. STRONGMAN:
23        Q.   That would include information that might
24    help Ms. Kahn's case and information that might not
25    help Ms. Kahn's case, correct?

```
 1        A.   I believe that.
 2        Q.   When was the visit that you had with
 3   Ms. Kahn?  Was it September 4, 2020?
 4        A.   Yes.
 5        Q.   Where was the visit?
 6        A.   University of Miami Hospital.
 7        Q.   Was it in your normal office?
 8        A.   Yes, in my normal office.
 9        Q.   Were there any kind of restrictions, in
10   light of the pandemic, of patients coming into your
11   office?
12             MR. LAMBERT:  Object to form.
13             THE WITNESS:  Yes, there are restrictions.
14        Patients should come alone.  They cannot come
15        with anybody.  And they have to wear a mask.
16        We measure the temperature.
17   BY MR. STRONGMAN:
18        Q.   Did you tell the university that you were
19   seeing somebody in your offices during the pandemic
20   for purposes of a lawsuit?
21        A.   Yes, because the university has a contract
22   with the plaintiff for that.
23        Q.   And describe that to me.
24        A.   Since I work for the university, I don't
25   see patients outside the university because it would
```

Page 41

1       her and her husband to Miami?
2            A.   I think one of the lawyers, but I don't
3       know who.
4            Q.   While -- strike that.
5                 Did you have any conversations with
6       Ms. Kahn's lawyers while she was in Miami on
7       September 3rd, 4th, 5th, whatever dates she was
8       there?
9                 MR. LAMBERT:  Hold on one second.  Hold
10           on, Dr. Tosti.
11                Object to form.  Any conversations that
12           you had with us, the contents of those, I'm
13           going to object and instruct you not to answer,
14           but you can respond to Mr. Strongman as far as
15           whether or not you had conversations, of
16           course.
17                THE WITNESS:  I didn't understand the
18           question.  If I had the conversation with the
19           lawyers?
20      BY MR. STRONGMAN:
21           Q.   And so let me just start over and
22      hopefully we'll make it a little more clear, okay?
23                You believe that a lawyer accompanied
24      Ms. Kahn and her husband to Miami, correct?
25           A.   Yes.

Page 43

1    quarantine ended?
2        A.   Yes, my first clinic -- I included her in
3    my first clinic.
4        Q.   So Ms. Kahn was included in the first set
5    of patients that you were able to see after your
6    quarantine coming back from Italy, correct?
7             MR. LAMBERT:  Object to form.
8             THE WITNESS:  Yes.
9    BY MR. STRONGMAN:
10       Q.   Just to be clear, Ms. Kahn is not your
11   patient, though, correct?
12            MR. LAMBERT:  Object to the form.
13            THE WITNESS:  No, it's not my patient.
14   BY MR. STRONGMAN:
15       Q.   Obviously, Ms. Kahn had to travel from New
16   Orleans to Miami during a pandemic to see you,
17   correct?
18       A.   Yes, she did.
19       Q.   Did Ms. Kahn express any reservation to
20   you about having to travel to Miami during the
21   pandemic from New Orleans?
22       A.   No, she did not.  But, for instance, in
23   June, because she was scheduled in June and we
24   discussed, and I recommend her not to come.
25       Q.   Was telemedicine an option for your visit

Page 45

1    Q.   Do you believe that there's only one
2    doctor in all of New Orleans that could have
3    performed an evaluation of Ms. Kahn?
4         MR. LAMBERT:  Object to form.
5         THE WITNESS:  I think there's only one
6    hair expert in New Orleans, which is her.
7    There are not so many hair experts in many
8    place, so ...
9    BY MR. STRONGMAN:
10   Q.   How do you define hair expert?
11   A.   I define hair expert as somebody who goes
12   to hair meeting, published in the hair literature,
13   is an expert.
14   Q.   Did you ever suggest that Ms. Kahn be
15   evaluated by Dr. Rogers?
16        MR. LAMBERT:  Object to form.
17        THE WITNESS:  No, I did not, but nobody
18   asked me an alternative in New Orleans.
19   BY MR. STRONGMAN:
20   Q.   With regard to the examination that you
21   performed, did Ms. Kahn pay for it?
22        MR. LAMBERT:  Object to form.
23   BY MR. STRONGMAN:
24   Q.   Was that a no?
25   A.   No, she didn't pay.

Page 46

1  Q.  Who paid for it?
2  A.  The plaintiff.
3  Q.  The lawyers?
4  A.  Yes.
5  Q.  How much was the expense for your office
6  visit with Ms. Kahn?
7  A.  I think it was $500 for the biopsy and
8  1,000 for the visit.
9  Q.  And how did you determine those dollar
10  amounts?
11  A.  There is a contract between the University
12  of Miami and the law firm.
13  Q.  Is the contract between the law firm and
14  the University of Miami separate from your
15  engagement with the plaintiff's lawyers?
16  A.  Yes, because that --
17      MR. LAMBERT:  Object to form.
18      THE WITNESS:  -- that contract is just for
19  medical -- medical stuff, so visit and
20  biopsies.
21  BY MR. STRONGMAN:
22  Q.  Is there anything else in that contract
23  other than rates for visits and biopsies?
24  A.  Not that I know.
25  Q.  Were you involved in forming that

1    Q.   Anywhere in your progress note, do you
2 state that Ms. Kahn was referred to you by a lawyer?
3    A.   No, I don't think so.
4    Q.   Anywhere in your office note, do you
5 indicate that Ms. Kahn was seeing you as part of a
6 lawsuit?
7    A.   No.
8    Q.   Now, if you could, just walk through the
9 process with me from the time Ms. Kahn gets to your
10 office until she leaves.
11         Can you just walk through with me what you
12 do and what the sequence of events is?
13    A.   She comes to my office and my medical
14 assistant puts her in the room and gets all the
15 information it needs to set up the computer.  And
16 that part, I don't know exactly what they do.
17         Then I came in and I ask her history.  So
18 I spoke with her probably for 20 minutes to get the
19 history and to write the history down.
20         Then I perform the visit, so I look at
21 her.  I do the tool test.  I look at her armpits, at
22 the pubic hair.  So I look at the limbs.
23         And then I did the dermoscopy, the
24 pictures, the dermoscopy.  Then I maybe ask a few
25 other questions that came in my mind after that.

Page 62

1       Then I took the biopsy.  My resident put
2  the sutures.  Then we talk a little bit more about
3  her possibility, and then that's it.
4       Q.  Right at the end there, you say you talk a
5  little bit more about -- did you say the
6  possibilities?
7       A.  Yes.  I discuss a little bit with her
8  possible treatment options.
9       Q.  What do you recall discussing with
10  Ms. Kahn regarding the possible treatment options?
11      A.  I told her that maybe minoxidil can
12  provide mild improvement, not something big, but
13  mild improvement.  And that was what I discussed
14  with her.
15      Q.  Did you discuss anything else other than
16  minoxidil --
17      A.  No.
18      Q.  -- in terms of treatment?
19      A.  No.
20      Q.  Did you provide Ms. Kahn with a
21  prescription for minoxidil?
22      A.  No, but minoxidil is over the counter.  It
23  doesn't require a prescription.
24      Q.  Did Ms. Kahn indicate whether or not she
25  was going to try minoxidil for her hair?