UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)            MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

                                                                                                 SECTION "H" (5)

THIS DOCUMENT RELATES TO:

*Elizabeth Kahn*, Case No. 2:16-cv-17039.

### SANOFI'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 5 TO PRECLUDE TESTIMONY AND EVIDENE REGARDING "STEM CELL" STAINING

In *Earnest*, the Court permitted Sanofi to introduce evidence about cytokeratin 15 and Ki-67 stem cell staining for diagnosing PCIA because the evidence "would be helpful to the jury and [would] allow Defendants the opportunity to refute Plaintiff's theory of causation."[1] The Court prohibited Sanofi from referring to the stem cell staining performed on Ms. Earnest as a "failed study," but otherwise ruled that Sanofi could discuss it.[2]

Evidence regarding cytokeratin 15 and Ki-67 stem cell staining, including the lack of staining on Plaintiff's tissue in this case, is equally relevant here for at least two reasons. First, it is relevant to show *lack* of evidence supporting the only theorized mechanism of action for PCIA—that Taxotere purportedly causes PCIA by damaging stem cells in the hair follicle. Second, stem cell staining is relevant to impeach the credibility of Plaintiff's specific causation experts for not having conducted cytokeratin 15 and Ki-67 stem cell staining when they were able to do so. For these reasons, cytokeratin 15 and Ki-67 stem cell staining is relevant to refuting Plaintiff's causation evidence, and the Court should deny Plaintiff's Motion.

---

[1] Rec. Doc. 8133 at 7 (Order and Reasons on Pl.'s Mot. to Exclude Dr. Shapiro and Dr. Smart's Stem Cell Opinions).

[2] Rec. Doc. 8206 at 5 (Order and Reasons on Motions in Limine).

1

A.   **The Lack of Stem Cell Testing in Plaintiff's Case is Relevant to Refuting Specific Causation.**

Plaintiff argues that that testimony and evidence about cytokeratin 15 or Ki-67 staining for diagnosing PCIA should be excluded because it is unreliable and irrelevant.[3] The Court already ruled on the reliability of cytokeratin 15 and Ki-67 stem cell staining in *Earnest*.[4] As to relevance, Plaintiff argues that cytokeratin 15 and Ki-67 staining is not specifically relevant to this case because no expert used these stains to test Plaintiff's tissue for stem cells. The lack of testing on Plaintiff's tissue, however, is equally relevant.

Plaintiff's sole mechanism of action theory for PCIA is that chemotherapy damages stem cells in the hair follicle. For example, Dr. Plunkett opines in her report that the "mechanism of action" of Taxotere likely operates to "inhibit[] mitotic activity in cells which are rapidly dividing (*i.e.*, cancer cells, blood stem cells, cells in the hair follicles)."[5] Dr. Feigal likewise opines in her report that "PCIA is thought to be likely a result of the hair follicle being permanently damaged, and the hair density is markedly reduced. . . . It has been hypothesized that this may be due to irreversible damage of the stem cells/hair matrix cells of the hair bulb, or disturbance of the signaling pathways to the secondary hair germ."[6]

Dr. Thompson, Plaintiff's dermatopathologist, also theorizes that testing stem cells is relevant to diagnosing PCIA. Dr. Thompson testified during his deposition that "the stem cells

---

[3]   Rec. Doc. 12889-1 at 1–2 (Pl.'s Mot. to Exclude Test. And Evid. On Stem Cell Staining).

[4]   Rec. Doc. 8133 at 5–6 (Order and Reasons on Pl.'s Mot. to Exclude Dr. Shapiro and Dr. Smart's Stem Cell Opinions) (rejecting Plaintiff's argument that the cytokeratin 15 and Ki-67 staining is inherently unreliable because Plaintiff's experts have testified that PCIA's mechanism of action is likely related to patient stem cells, and Plaintiff's own experts chose the cytokeratin 15 and Ki-67 staining to test the theory). Indeed, it was Plaintiff's dermatopathology expert Dr. Thompson who selected the specific Ki-67 and Cytokeratin 15 stains used on other biopsies. **Ex. A**, Apr. 3, 2019 Thompson Dep. 401:12–13, 434:5–8. Dr. Thompson also specifically testified that he chose Cytokeratin 15 because "it works" and it is "all we have" to assess stem cell damage in the hair follicle. *Id*. at 434:5–8, 452:6–9.

[5]   **Ex. B**, Mar. 13, 2020 Plunkett Rpt. ¶ 50.

[6]   **Ex. C**, Mar. 23, 2020 Feigal Rpt. at 36.

are damaged, not functioning, then it may, nothing may . . . turn that [hair loss] around."[7] This is consistent with a paper Dr. Thompson wrote, where he hypothesized that the "theoretical mechanism of action for why a chemotherapy drug would result in ongoing hair loss after the completion of chemotherapy is that there would be some toxicity of the drug that would harm the follicular stem cell."[8] Indeed, during a bench conference at the *Earnest* trial, Plaintiff's attorney represented that Dr. Thompson "wanted hundreds of women to do a scientific study" using cytokeratin 15 and Ki-67 to test stem cells.[9]

Despite damage to stem cells being Plaintiff's sole theory for how Taxotere causes PCIA, no expert has tested Plaintiff's tissue to see if the stem cells have been damaged. Plaintiff accordingly lacks any evidence connecting her tissue to the theorized mechanism of action of the injury she alleges, and the lack of testing in Plaintiff's case is relevant to refuting Plaintiff's specific causation evidence.

### B. The Lack of Stem Cell Testing in Plaintiff's Case is Relevant to Impeaching Plaintiff's Specific Causation Experts.

Stem cell staining evidence is also relevant to challenge the credibility of Plaintiff's experts. *See Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993) ("Where . . . the district court has not excluded expert evidence as inadmissible, it ordinarily is the province of the jury to gauge the expert witnesses credibility and the reliability of his data."); *U.S. v. Harper*,

---

[7] **Ex D**, Sept. 23, 2020 Thompson Dep. at 140:2−5.

[8] Ex. A, Apr. 3, 2019 Thompson Dep. 402: 5–12, 404:2–10 ("Q. You speculated that the theoretical mechanism of action for why a chemotherapy drug might result in ongoing hair loss is that it would kill the stem cell in the bulge region, right?  A. In permanent hair loss, not -- yes, that the cells die.").

[9] **Ex. E**, Trial Tr. 1094:11−1095:11 (During a bench conference explaining the PSC's objection to an email where Dr. Tosti arranged with the PSC to have the plaintiff's scalp biopsies tested for stem cells, Mr. Schanker, said: "The problem is that the entire purpose of [this email], which I would need to elicit, is that the reason, and what she would explain is that Curtis Thompson was interested in this because he wanted hundreds of women to do a scientific study."  The Court ruled that it was an "appropriate line of inquiry" for Sanofi to ask Dr. Tosti whether she lined up the stem cell testing in the case. *Id*. at 1095:12−17.

450 F.2d 1032, 1037 (5th Cir. 1971) ("[I]t is the jury's function to assess the credibility of the expert witnesses and the weight to be given to their testimony."). Both Dr. Tosti and Dr. Thompson have tested suspected PCIA patients with cytokeratin 15 and Ki-67 in the past, but past results have not supported their theory.[10] Their decision to decline the same testing on Plaintiff's tissue samples calls into question their credibility and the reliability of their methodology.[11] Plaintiff's experts' hypotheses about the relationship between stem cells and PCIA—and their desire to possibly conduct widespread testing on the issue in the future[12]—makes the *lack* of stem cell staining in Plaintiff's case relevant. Simply put, this is testing that could have been done to support Plaintiff's diagnosis, but was purposefully not conducted in this case.

## CONCLUSION

For these reasons, testimony, argument, and evidence relating to cytokeratin 15 and Ki-67 stem cell staining is both relevant and admissible, and the Court should deny Plaintiff's motion.

---

[10] Ex. A, Apr. 3, 2019 Thompson Dep. 492:4−494:14 (testifying he previously conducted cytokeratin 15 staining on three patients, but the results were positive, meaning that stem cells were present and proliferating, so he did not purse further testing).

> Q. So the Cytokeratin 15 tested positive in Ms. Earnest, Ms. Durden, and Ms. Francis' tissue?
>
> A. In these structures, yeah. We use --
>
> Q. You wrote because it tested positive you did not pursue this further, right?
>
> A. Yes.
>
> Q. If it tested negative, would've you pursued it further?
>
> A. Yes.

Dr. Thompson also testified that if the stains had been negative, he would have conducted eventual research to confirm his hypothesis for why chemotherapy may cause ongoing alopecia, and eventually would have used the test as a diagnostic tool.

[11] **Ex. F**, Sept. 29, 2020 Tosti Dep. 100:2−7 ("Q. Did you ask Dr. Thompson to do any kind of stem cell testing? A. No, I did not. Q. Do you know whether or not any stem cell testing was done on Ms. Kahn's pathology? A. No. I don't know, but I don't think so."); Ex. D, Sept. 23, 2020 Thompson Dep. 110:17−24 ("Q. [F]air to say that you did not do any cytokeratin 15 and Ki-67 staining for Ms. Kahn? A. No, I did not.").

[12] Ex. E, Trial Tr. 1094:11−1095:11.

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
Jon Strongman
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
jstrongman@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*