# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | * | MDL DOCKET NO. 1657 |
| THIS DOCUMENT RELATES TO CASE NO. 05-4046: | * | NEW ORLEANS, LOUISIANA |
| EVELYN IRVIN PLUNKETT, ET AL | * | FEBRUARY 15, 2006 |
| VERSUS | * | 8:30 A.M. |
| MERCK & CO., INC. | * | |

VOLUME VIII - DAILY COPY
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

BEASLEY ALLEN CROW METHVIN
PORTIS & MILES
BY: ANDY D. BIRCHFELD, JR., ESQ.
LEIGH O'DELL, ESQ.
234 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103

FOR THE PLAINTIFF:

LEVIN, PAPANTONIO, THOMAS,
MITCHELL, ECHSNER & PROCTOR
BY: TROY RAFFERTY, ESQ.
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FLORIDA 32502

Draft Copy

Page 2050

Q AND WHAT STUDY IS IT THAT MERCK DECIDED TO DO INSTEAD OF DR TOPOL'S IDEA?
A THAT WOULD HAVE BEEN PROTOCOL 203, WHICH WAS GOING TO BE A PRESPECIFIED POOLED ANALYSIS OF DATA FROM THREE LARGE CANCER-PREVENTION STUDIES WHERE VIOXX WAS BEING TESTED COMPARED WITH PLACEBO
Q AND WAS ONE OF THOSE CANCER-PREVENTION STUDIES KNOWN AS APPROVE?
A YES, THAT IS CORRECT
Q AND WHAT WAS THE CANCER TREATMENT UNDER CONSIDERATION THERE?
A IT WAS VIOXX 25 MILLIGRAMS
Q COMPARED TO PLACEBO?
A THAT'S CORRECT
Q DID THERE COME A TIME IN SEPTEMBER 2004 WHEN MERCK LEARNED OF CERTAIN CARDIOVASCULAR RESULTS FROM THE APPROVE STUDY?
A YES, THAT IS CORRECT
Q WAS THAT IN SEPTEMBER 2004?
A SEPTEMBER OF 2004
Q I'LL PUT UP THAT HERE AND THE JURY IS SEEING THE PUBLICATION OF THE APPROVE STUDY, EXHIBIT 686, AND THIS IS A PUBLICATION THAT WAS DONE AFTER SEPTEMBER 2004; IS THAT CORRECT?
A YES, THIS PUBLICATION WAS AFTER WE GOT THE PRELIMINARY DATA

Page 2051

Q AND YOU RECOGNIZE THIS GRAPHIC DEPICTION OF THE CARDIOVASCULAR RESULTS IN THE APPROVAL TRIAL?
A YES, I DO
Q PRIOR TO SEPTEMBER 2004, HAD MERCK EVER HAD ANY PLACEBO-CONTROLLED DATA WHICH SHOWED A STATISTICALLY SIGNIFICANT INCREASED RISK FOR VIOXX FOR CARDIOVASCULAR EVENTS?
A NO, WE DID NOT I THINK WE SPOKE ABOUT THE ALZHEIMER'S DATA, WHICH ACTUALLY THE RATE OF EVENTS WAS SIMILAR ON VIOXX AND PLACEBO
Q WHAT DID MERCK DO IN RESPONSE TO THE -- WHEN IT RECEIVED NOTICE OF THIS APPROVE DATA SHOWING SEPARATION OF THE CURVES AFTER 18 MONTHS?
A WE MET WITH A GROUP OF OUTSIDE CONSULTANTS AND WE SHOWED THEM THE DATA, ASKED THEIR -- ASKED THEM THEIR OPINION ON WHAT WE SHOULD DO
Q BY THE WAY, WHAT WAS THE -- DID VIOXX PROVE EFFECTIVE IN ITS CANCER-PREVENTION ENDPOINT IN THE APPROVE TRIAL?
A YES, IT DID WE DID NOT HAVE THAT DATA -- AT LEAST, MY RECOLLECTION IS THAT WE DID NOT HAVE THAT DATA AT THAT POINT IN TIME, HOWEVER
Q NOW, YOU SAID THAT YOU DISCUSSED THE CARDIOVASCULAR DATA WITH OUTSIDE EXPERTS AFTER SEPTEMBER 24, 2004; IS THAT CORRECT?
A THAT'S CORRECT
Q WHAT WERE THE OUTSIDE EXPERTS ADVISING MERCK WITH REGARD TO WHAT MERCK SHOULD DO IN RESPONSE TO THE APPROVE DATA?

Page 2052

A THE MAJORITY OF THEM THOUGHT THAT WE SHOULD LEAVE VIOXX ON THE MARKET BUT THAT WE SHOULD CHANGE THE LABEL AND PUT THE APPROVE DATA IN THE LABEL ALONG WITH THE WARNING THEY FELT THAT MANY PATIENTS GOT PAIN RELIEF FROM VIOXX, MANY OF WHOM DID NOT GET PAIN RELIEF FROM OTHER MEDICATIONS, AND THEY FELT IT WAS AN IMPORTANT ALTERNATIVE FOR PATIENTS BUT THAT PATIENTS SHOULD KNOW WHAT THE BENEFITS AND THE RISKS WERE
Q AND WHAT DID MERCK DO INSTEAD?
A WE DECIDED TO TAKE THE CONSERVATIVE APPROACH AND WE TOOK -- WE VOLUNTARILY TOOK VIOXX OFF THE MARKET
Q DO YOU RECALL THAT THAT DECISION TO VOLUNTARILY WITHDRAW THE DRUG TOOK PLACE A WEEK LATER, SEPTEMBER 2004?
A THAT'S CORRECT
Q DOCTOR, DID YOU ATTEND ANOTHER ADVISORY COMMITTEE MEETING OF THE FDA IN FEBRUARY OF 2005?
A YES, I DID
Q AND WHAT WAS YOUR ROLE AT THAT MEETING?
A I WAS NOT ONE OF THE PRIMARY SPEAKERS AT THIS MEETING, BUT I WAS THERE TO LISTEN AND TO HELP ANSWER QUESTIONS
Q AND DID YOU EVER REVIEW THE MEMORANDUM OF THE FDA THAT CAME OUT AFTER THAT ADVISORY COMMITTEE?
A YES, I HAVE REVIEWED THAT
Q AND DO YOU RECALL WHAT IT WAS THAT THE FDA CONCLUDED WITH REGARD TO SHORT-TERM RISKS OF VIOXX?
A WELL, BASED ON -- AFTER THE VIOXX RESULTS FOR APPROVE CAME

Page 2053

OUT, THERE WERE ACTUALLY -- THERE WERE ACTUALLY STUDIES WITH OTHER COX-2 INHIBITORS THAT SHOWED SIMILAR CARDIOVASCULAR RESULTS COMPARED WITH PLACEBO
AND THE FDA CONCLUDED THAT YOU COULDN'T DIFFERENTIATE THE CARDIOVASCULAR SAFETY OF VIOXX FROM THE OTHER COX-2 INHIBITORS OR FROM TRADITIONAL NSAIDS EXCEPT POTENTIALLY NAPROXEN, WHICH THEY SAID APPEARED TO HAVE A LOWER RATE OF CARDIOVASCULAR EVENTS IN SOME OF THE STUDIES
MR ISMAIL: YOUR HONOR, MAY MR BIRCHFIELD AND I APPROACH?
THE COURT: SURE
MR Ismail: YOUR HONOR, I HAD ASKED MR BIRCHFIELD IF HE HAD AN OBJECTION IF WE ASK ABOUT PERSONAL USE, AND GIVEN WHAT WE DISCUSSED IN CHAMBERS, I JUST ASKED ANDY IF HE HAD A PROBLEM WITH THAT
MR BIRCHFIELD: AND I JUST WANTED TO PUT MY OBJECTION ON THE RECORD UNDER 403
THE COURT: THE WAY I SEE IT IS THAT SHE HAS NOW BEEN ATTACKED RATHER FORCEFULLY, OR WILL BE ATTACKED RATHER FORCEFULLY, AND THIS GOES TO CREDIBILITY, SO I'LL OVERRULE THE OBJECTION
BY MR ISMAIL:
Q DOCTOR, JUST A COUPLE MORE QUESTIONS DOCTOR, DID YOU EVER TAKE VIOXX YOURSELF?
A YES, I DID

Draft Copy

Page 2054

Q FOR WHAT CONDITION? I THINK WE ALL CAN GUESS AT THIS POINT
A YES, CHRONIC LOW-BACK PAIN
Q WHEN DID YOU FIRST BEGIN TO TAKE VIOXX TO THE BEST OF YOUR RECOLLECTION?
A TO THE BEST OF MY RECOLLECTION, IT WAS SOMETIME IN THE SUMMER OF 2001
Q AFTER THE VIGOR TRIAL?
A THAT IS CORRECT
Q AND WHAT DOSE OF THE DRUG DID YOU TAKE?
A I USUALLY TOOK 25 MILLIGRAMS OCCASIONALLY, I WOULD TAKE 50 MILLIGRAMS AS WELL FOR SHORT PERIODS OF TIME
Q AND HOW FREQUENTLY DID YOU TAKE THE MEDICINE?
A IT -- SOMETIMES IT WAS INTERMITTENT THERE WERE PERIODS OF TIMES, HOWEVER, THAT I WAS TAKING IT EVERY DAY FOR SEVERAL MONTHS
Q AND, DOCTOR, DURING THE TIME THAT YOU WERE TAKING VIOXX PERSONALLY, DID YOU EVER BELIEVE THAT VIOXX INCREASED RISKS OF CARDIOVASCULAR EVENTS?
A NO, I DID NOT

MR ISMAIL: YOUR HONOR, I MOVE THE ADMISSION OF THE APPROVAL LETTERS WITH RESPECT TO THE THREE SUBSEQUENT APPROVALS IN APRIL '02 AND THE TWO APPROVALS IN '04 AND I'LL PROVIDE THEM

THE DEPUTY: WHAT NUMBER?

Page 2055

MR ISMAIL: I HAD THEM HERE A MINUTE AGO IF ANDY DOESN'T OBJECT, I'LL GO AHEAD AND PUT THEM ON THE RECORD TOMORROW MORNING, IF THAT'S ALL RIGHT

MR BIRCHFIELD: THAT'S FINE

MR ISMAIL: JUST GIVE ME ONE SECOND, YOUR HONOR, TO CHECK MY NOTES THANK YOU, DOCTOR, I HAVE NOTHING FURTHER

THE COURT: WE'LL STOP HERE, MEMBERS OF THE JURY, AND WE'LL RESUME AT 8:30 TOMORROW WITH CROSS-EXAMINATION OF DR REICIN TOMORROW, MEMBERS OF THE JURY, THE ATTORNEYS ARE GOING TO DO THEIR VERY BEST TO FINISH THE EVIDENCE, SO WE'LL TRY TO GET ALL OF THE EVIDENCE IN BY TOMORROW WE MAY HAVE TO GO A LITTLE LATE AGAIN, SO PLEASE BRING YOUR KEYS WITH YOU TO YOUR CARS COURT WILL STAND IN RECESS UNTIL 8:30, AND I'LL SEE COUNSEL ABOUT 8:15

THE MARSHAL: ALL RISE

(WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING )

* * *

Draft Copy

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS LIABILITY LITIGATION * MDL DOCKET NO. 1657

THIS DOCUMENT RELATES TO CASE NO. 05-4046: * HOUSTON, TEXAS

EVELYN IRVIN PLUNKETT, ET AL * DECEMBER 5, 2005

VERSUS * 8:30 A.M.

MERCK & CO., INC.

* * * * * * * * * * * * * * * * *

VOLUME VI
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: BEASLEY ALLEN CROW METHVIN PORTIS & MILES
BY: JERE LOCKE BEASLEY, ESQ.
ANDY D. BIRCHFELD, JR., ESQ.
LEIGH O'DELL, ESQ.
J. PAUL SIZEMORE, ESQ.
FRANK WOODSON, ESQ.
234 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103

FOR THE PLAINTIFF: ROBINSON, CALCAGNIE & ROBINSON
BY: MARK P. ROBINSON, JR., ESQ.
620 NEWPORT CENTER DRIVE
NEWPORT BEACH, CALIFORNIA 92660

Draft Copy

Q RIGHT WE'RE LOOKING HERE AT AN OCTOBER 20, 1998, E-MAIL FROM YOU FORWARDING AN ANALYST REPORT, CORRECT?
A YES, I THINK SO
Q THE ANALYST REPORT IS DATED THE SAME DAY, OCTOBER 20, RIGHT?
A YES, IT IS
Q SO IT IS, IN FACT, ACCURATE TO STATE THAT IN 1998 MERCK HAD DECLINING SALES IN SEVERAL OF ITS KEY FRANCHISES, CORRECT?
A I'VE ANSWERED YOUR QUESTION
Q I WOULD LIKE YOU TO ANSWER THAT QUESTION, PLEASE
A SOME OF ITS FRANCHISES HAD DECLINING SALES
Q THEY WERE KEY FRANCHISES?
A SOME OF THEM WERE KEY
Q OKAY YOU ALSO HAD SEVERAL DRUGS GOING OFF PATENT IN THE NEAR FUTURE, RIGHT?
A CORRECT
Q YOU THOUGHT IT WAS IMPORTANT TO TELL YOUR EMPLOYEES THAT MERCK'S BASE BUSINESS WAS ERODING?
A YES
Q YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT MERCK HAD SEVERAL PRODUCTS GOING OFF PATENT?
A THEY KNEW THAT THIS WAS TO REEMPHASIZE THAT
Q YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT SEVERAL OF THE RECENTLY LAUNCHED PRODUCTS HAD NOT BEEN AS SUCCESSFUL AS ANTICIPATED?



A I WANTED TO PROVIDE THEM THE INFORMATION IN THIS DOCUMENT, YES, THAT'S CORRECT
Q YOU THOUGHT IT WAS IMPORTANT TO TELL THEM THAT SEVERAL OF THE RECENTLY LAUNCHED PRODUCTS WEREN'T AS SUCCESSFUL AS YOU ANTICIPATED THEY'D BE, RIGHT?
A THAT'S WHAT'S IN HERE, AND I WANTED TO PROVIDE THEM THAT INFORMATION
Q AT THIS POINT IN TIME IN OCTOBER OF 1998, WHERE WAS VIOXX IN THE DEVELOPMENT PROCESS?
A I DON'T RECALL I'M SORRY
Q HAD THE NDA BE FILED YET?

THE COURT: WE HAVE TO STOP, PLEASE WE HAVE TO TAKE A 10-MINUTE BREAK THE COURT WILL STAND IN RECESS FOR 10 MINUTES

THE MARSHAL: ALL RISE

(WHEREUPON, THE COURT TOOK A BRIEF RECESS, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HELD AT THE BENCH )

MR BECK: YOUR HONOR, I HAD RAISED, BECAUSE WE'RE IN THE MIDDLE OF DR SCOLNICK'S VIDEOTAPED DEPOSITION, THERE IS A CLIP LATER ON THAT WE WOULD WANT TO PLAY THAT HE TALKS ABOUT HOW HE USES VIOXX THERE WAS IN LIMINE RULING ON THIS THAT WE'RE NOT ALLOWED TO DO THAT WITHOUT APPROACHING THE COURT, AND I ASKED, AS I DID LAST WEEK, THAT WE BE ALLOWED TO PRESENT EVIDENCE THAT OUR WITNESSES USED VIOXX

THE PLAINTIFFS, HAVING SECURED THE IN LIMINE



RULING THEN INTRODUCED EVIDENCE FROM MR AYCOCK THAT HE USED VIOXX, AND THEY INTRODUCED EVIDENCE THAT IT DIDN'T WORK THEN THEY HAD THEIR -- THE DAUGHTER ALLESHA, COME ON AND THEY ELICITED TESTIMONY FROM HER ON THE STAND THAT SHE USED VIOXX AND THAT IT DIDN'T WORK

THEN OVER THE WEEKEND WHEN WE HEARD FROM DR TOPOL, THERE WAS EVIDENCE -- SOME WAS DESIGNATED BY US, SOME BY THEM -- THAT HE USED VIOXX, BUT THEN THEY DESIGNATED EVIDENCE ABOUT HOW, YEAH, BUT HE HAD DETERMINED THAT HE WAS AT LOW RISK FOR HEART ATTACK AND SO IT WAS OKAY FOR HIM TO USE VIOXX

SO WE'VE GOT A WHOLE BUNCH OF EVIDENCE FROM THE PLAINTIFF'S WITNESSES ON THEIR USE OF VIOXX, WHETHER IT WORKED OR NOT, AND WHETHER THEY WERE CONCERNED ABOUT HEART ATTACK RISKS WHEN THEY USED IT WE'RE ENTITLED TO PUT IN EVIDENCE FROM OUR WITNESSES ON THE SAME ISSUE

I THINK IT'S MORE RELEVANT FROM OUR WITNESSES BECAUSE DR SCOLNICK, FOR EXAMPLE, IS BEING CHARGED WITH -- WITH BASICALLY SELLING VIOXX WHILE HE KNEW THAT IT CAUSED HEART ATTACKS EVEN WITH INTERMITTENT USE AND THE FACT THAT HE USED VIOXX AT THE TIME IS -- IS RELEVANT TO REFUTE THAT, THOSE ALLEGATIONS ABOUT HIS STATE OF MIND, SO WE WOULD ASK THAT YOU LIFT THAT RULING AND ALLOW US TO INTRODUCE THE EVIDENCE

MR BIRCHFIELD: YOUR HONOR, FIRST OF ALL, WHETHER VIOXX IS EFFECTIVE IN TREATING PAIN IS NOT AT ISSUE IN THIS



CASE I MEAN, WE'LL STIPULATE THAT IT'S EFFECTIVE; IT'S EFFECTIVE IN TREATING PAIN THE FACT THAT DR TOPAL, IN FACT, HE SAID, I TOOK IT, BUT I HAD A FULL HEART CHECKUP I HAD A STRESS CHEST AND I TOOK IT INTERMITTENTLY THAT IS TESTIMONY THAT MERCK INTRODUCED, NOT US

THERE IS A BIG DISTINCTION BETWEEN, YOU KNOW, WHEN MERCK IS OFFERING IT FOR, AND THEY ARE OFFERING IT TO SHOW THAT THERE WAS -- THERE WAS A LACK OF KNOWLEDGE THAT'S NOT -- THAT DIDN'T HAVE ANYTHING TO DO WITH THE TESTIMONY THAT HAS BEEN ELICITED, YOU KNOW, SO FAR

A KEY DISTINCTION IS THAT WE TO NOT HAVE, YOU KNOW, THE MEDICAL RECORDS OF THE MERCK EMPLOYEES IN ORDER TO CROSS-EXAMINE HIM IF THEY HAD A FULL HEART, YOU KNOW, HEART CHECKUP AND KNEW THAT THEY WERE CLEAN AND THEY TOOK IT INTERMITTENTLY, THAT'S A COMPLETELY DIFFERENT STORY BUT WE DON'T HAVE, WE DON'T HAVE ANY OF THAT INFORMATION TO -- TO CROSS-EXAMINE THEM ON WE HAVEN'T GOTTEN INTO ANY AREAS THAT WE OPENED THE DOOR FOR

MR BECK: YOUR HONOR, JUST TO REPLY BRIEFLY THE REASON THAT THEY ELICITED FROM THEIR WITNESSES THAT VIOXX DIDN'T WORK IS BECAUSE THERE IS A QUESTION OF COST/BENEFIT ANALYSIS HERE, AND SO THEY ARE THE ONES WHO CALL A WITNESS TO THE STAND, ALLESHA, AND SAY THAT VIOXX DOES NOT WORK

MOREOVER, YOUR HONOR, WHAT MR BEASLEY DID, WHICH THEY PLAYED, THEY DESIGNATED WITH DR SCHIRMER, IS TO

Draft Copy

Page 1185

SAY, DO YOU KNOW THAT MERCK IS NOW SAYING THAT VIOXX ISN'T ANY BETTER THAN ALEVE OR ADVIL? IF YOU HAD KNOWN THAT VIOXX WAS SAYING OR MERCK WAS SAYING THAT VIOXX WASN'T ANY BETTER THAN ALEVE OR ADVIL, SO THEY PUT THE ISSUE WHETHER VIOXX IS A GOOD PAIN RELIEVER IN, AND IT'S IRRELEVANT TO THE COST/BENEFIT ANALYSIS

THE COURT: I UNDERSTAND THE ISSUE AT FIRST WHEN I SAW THIS SITUATION, I FELT THAT IT WAS ADMISSIBLE FROM THE STANDPOINT OF CROSS-EXAMINATION IF SOMEONE SAYS THAT VIOXX IS A TERRIBLE DRUG AND A DANGEROUS DRUG, THEN I THOUGHT IT WAS APPROPRIATE TO INTRODUCE EVIDENCE TO THE FACT THAT THAT INDIVIDUAL TOOK THE DRUG IT GOES TO CREDIBILITY AND CAN BE INTRODUCED IN THAT REGARD

BUT THE DEFENSE IS CORRECT IN THE SENSE THAT SOME TESTIMONY OF PEOPLE WHO DON'T LIKE VIOXX HAVE ALSO INDICATED THAT THEY TOOK IT, BUT THEY DIDN'T EXPLAIN THE WAY THEIR REASON FOR TAKING IT AND THAT ASPECT OF IT INTRODUCES A QUESTION THAT BEARS, TO SOME EXTENT, ON PLAINTIFF'S CLAIM OF WARRANTY WHETHER OR NOT THE DEFENDANT WARRANTED THE DRUG FOR ITS INTENDED PURPOSE OR WHETHER THE DRUG WAS APPROPRIATE FOR ITS INTENDED PURPOSE, WHICH THEY NOW HAVE AN OPPORTUNITY TO REBUT

I'M GOING TO ALLOW SCOLNICK TO TESTIFY AS TO WHETHER OR NOT HE TOOK THE DRUG, BUT I'M NOT GOING TO MAKE A BLANKET RULING AT THIS TIME AND I DON'T THINK THAT IT'S

Page 1186

APPROPRIATE TO GO INTO SPECIFICS OF TAKING THE DRUG I THINK IT'S -- HE TOOK IT BECAUSE IT WAS HELPFUL HE TOOK IT BECAUSE HE FELT IT WAS SAFE I CAN SEE THAT BUT THE PLAINTIFFS HAVE A POINT THAT WE DON'T KNOW AT THIS POINT THE BACKGROUND OR THE MEDICAL BACKGROUND OF THOSE INDIVIDUALS AND I DON'T WANT TO TRY ANOTHER CASE OTHER THAN THIS PARTICULAR CASE

SO I'LL GRANT THE DEFENDANT'S MOTION, AT LEAST WITH REGARD TO SCOLNICK, AND I'LL HAVE TO TAKE A LOOK AT IT OTHERWISE

MR BIRCHFIELD: YOUR HONOR, WILL YOU ORDER THE PRODUCTION OF HIS MEDICAL RECORDS TO US?

THE COURT: NO, I'M NOT GOING TO DO THAT I'LL DENY THAT

MR BECK: THANK YOU

THE COURT: THANK YOU VERY MUCH

(WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT )

THE MARSHAL: ALL RISE

THE COURT: BE SEATED, PLEASE LET'S CONTINUE, COUNSEL

(WHEREUPON, THE VIDEOTAPED DEPOSITION OF DR EDWARD SCOLNICK CONTINUED AS FOLLOWS:)

A I THINK SO, BUT I DON'T RECALL, I'M SORRY IT'S BEEN A LONG TIME

Q WELL, YOU HAD A BUNCH OF REGULATORY PEOPLE COPIED ON THIS

Page 1187

PARTICULAR E-MAIL, RIGHT?

A YES, I DID

Q THEY ARE THE PEOPLE WHO DEAL WITH THE FDA?

A YES

Q THEY ARE THE PEOPLE WHO WOULD LIAISE OR COMMUNICATE WITH THE FDA CONCERNING AN NDA?

A YES

Q THEY'RE THE PEOPLE WHO WOULD MAKE SURE THAT AN NDA MOVES THROUGH THE REGULATORY PROCESS SMOOTHLY?

A THAT IS PART OF THEIR RESPONSIBILITY

Q THEY ARE THE PEOPLE WHO YOU WOULD HOPE WOULD BE ABLE TO FACILITATE THE SPEEDY APPROVAL OF YOUR DRUG, CORRECT?

A THAT IS PART OF THEIR RESPONSIBILITY, PART OF THEIR JOBS, YES

Q AND THAT'S PART OF WHY YOU PROVIDED THIS E-MAIL TO THEM, RIGHT?

A YES

Q YOU WANTED THEM TO KNOW HOW IMPORTANT IT WAS THAT THIS DRUG PROCEED QUICKLY THROUGH THE REGULATORY APPROVAL PROCESS, RIGHT?

A YES

Q IT WAS ESSENTIAL TO THE FINANCIAL SUCCESS OF YOUR FIRM?

A YES IT WAS ESSENTIAL TO WORK IT WAS IMPORTANT TO MERCK, YES

Q AND IN FACT, IT WAS NOT ONLY ESSENTIAL, BUT VIOXX'S

Page 1188

SUCCESS WAS NECESSARY TO PRESERVE MERCK AND MERCK RESEARCH LABS PERIOD, CORRECT?

A THAT IS WHAT I SAID IN MY E-MAIL

Q MERCK GOT VIOXX APPROVED?

A YES, IT DID

Q THESE FOLKS ON THIS E-MAIL WERE INVOLVED IN THE APPROVAL OF VIOXX?

A YES

Q SO THESE SCIENTISTS WERE INVOLVED IN THE DEVELOPMENT PROCESS FOR VIOXX?

A YES

Q HAD ACCESS TO THE GOOD THINGS ABOUT VIOXX THAT CAME OUT OF THAT DEVELOPMENT PROCESS?

A THEY HAD ACCESS TO ALL OF THE DATA THAT CAME OUT OF THE VIOXX DEVELOPMENT PROCESS

Q THE GOOD AND THE BAD?

A YES

Q AND THEY KNEW, THOUGH, THAT NOT WITHSTANDING THAT BAD INFORMATION, NOTHING COULD STAND IN THE WAY OF THIS DRUG OR MERCK OR MERCK RESEARCH LABS WOULD NOT FLOURISH AS IT HAD TRADITIONALLY FLOURISHED, TRUE?

A THEY WOULD NOT HAVE AGREED WITH THAT STATEMENT THEY KNEW, BASED ON THE BASIC VALUES OF THE LABORATORY, IF THERE WAS SOMETHING BAD ABOUT THE DRUG, THAT THEIR RESPONSIBILITY WAS TO MAKE THAT INFORMATION AVAILABLE TO THE AGENCY, TO ANYONE ELSE,

Draft Copy