UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: TAXOTERE (DOCETAXEL)               MDL NO. 2740
PRODUCTS LIABILITY LITIGATION

SECTION "H" (5)

**THIS DOCUMENT RELATES TO:**

*Elizabeth Kahn*, Case No. 2:16-cv-17039.

### SANOFI'S OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 11 TO PRECLUDE CLAIMS OF ALTERNATIVE CAUSATION

The PSC has already litigated and lost this issue. The Court has made clear on more than one occasion that: (1) Plaintiff bears the burden to prove causation, which, under Louisiana law, requires Plaintiff prove "with reasonable certainty that all other alternatives are impossible," (2) the law does not require that Sanofi prove general causation before offering evidence about alternative causes of Plaintiff's injury, and (3) Sanofi can challenge Plaintiff's causation evidence with alternate cause evidence as long as there is a "good faith" basis for doing so. Nothing in Plaintiff's *limine* motion changes the Court's analysis, and the Court should deny Plaintiff's motion for the same reasons the Court has already articulated.

**A.**    **The Court Has Already Decided that Sanofi's Alternative Causation Evidence is Reliable and Admissible.**

Plaintiff's argument that Sanofi should not be allowed to introduce evidence or argument inferring alternative causation is squarely rejected under this Court's prior orders. In Plaintiff's motion, the PSC again argues that "Sanofi should be precluded from the introduction of alternative causation evidence" because Sanofi's experts did not undertake a general causation analysis to determine whether other chemotherapy medicines, medical conditions, or endocrine therapies

(such as Tamoxifen) can cause permanent hair loss.[1]  According to Plaintiff, Sanofi's experts' failure to undertake a general causation analysis renders their alternate cause opinions unreliable and inadmissible.

The Court fully considered and denied this issue first in *Earnest* when the PSC filed a motion *in limine* asking the Court to "preclude testimony and evidence regarding other chemotherapy medications or medical conditions that purportedly cause permanent hair loss."[2]  In *Earnest*, the PSC asserted that because Sanofi's experts had not offered "evidence to a reasonable degree of medical certainty that any of these other treatments or conditions caused or contributed to [the plaintiff's] permanent hair loss," the Court should "preclude [Defendants] and all witnesses from introducing any evidence, testimony, or argument relating to other medications or medical conditions purportedly causing permanent hair loss."[3]  The Court denied the motion, and at oral argument, the Court was clear:

> ***Plaintiff has the burden of proof.***  You have the burden of proof on causation and the defendants have to challenge that.  Now, I think [defendants] have to have a good faith basis for the challenge[,] . . . but I think *[defendants are] going to have to be able to question your experts about other chemotherapy drugs that were prescribed to [Plaintiff] and whether or not those caused permanent alopecia* and I'm not going to preclude them from -- from challenging your causation experts.[4]

The Court fully considered and denied this issue again in this case when the PSC filed a

---

[1]  Rec. Doc. 12909-1 at 2−3 (Pl.'s Mot. to Exclude Alt. Cause Evid.).

[2]  *See* Rec. Doc. 7651 (Pl.'s Mot. to Preclude Test. and Evid. Re Other Chemotherapy Medications or Medical Conditions that Purportedly May Cause Permanent Hair Loss); Rec. Doc. 8198 (Order Denying Pl.'s Mot. in Part).

[3]  Rec. Doc. 7651-1 at 1.

[4]  **Ex. A**, Sept. 5, 2019 Hr'g Tr. at 35:2–14 (emphases added).

Motion for Partial Summary Judgment on Affirmative Defenses Concerning Alternative Causes.[5] Recognizing that Plaintiff's summary judgment argument was based on the "erroneous premise that alternative causation is an affirmative defense," the Court denied Plaintiff's motion, explaining:

> Plaintiff Kahn bears the burden of proving that Taxotere caused her injury. The fact that Sanofi mischaracterized certain defenses ***does not shift the burden to Sanofi to prove that a cause other than Taxotere caused Kahn's hair loss.*** Accordingly, as in the first bellwether trial, Sanofi will be permitted to challenge Plaintiff's causation experts with reliable evidence.[6]

The Court also considered this issue in six separate *Daubert* motions where Plaintiff argued that Sanofi's experts "opine[d] on other causes of persistent hair loss without using a reliable methodology to assess causation for these other possible causes."[7] The Court denied Plaintiff all six times.[8] In its Order denying Plaintiff's motion on Dr. Turegano, the Court specifically stated:

> Plaintiff Kahn has not pointed to any law providing that a defendant must prove general causation before testifying about possible alternative causes of a plaintiff's injury, and this Court has found no such law. Dr. Turegano, therefore, need not conduct a general causation analysis—pointing to evidence of a statistically significant association and assessing the Bradford Hill factors—before offering an opinion on the specific cause of Plaintiff Kahn's hair loss.[9]

Plaintiff has not since identified any authority that changes the Court's analysis. Indeed,

---

[5] Rec. Doc. 11684 (Order and Reasons Denying Pl.'s Mot. for Summ. J. on Affirmative Defenses Concerning Alt. Causes).

[6] *Id.* at 4.

[7] *See, e.g.*, Rec. Doc. 11780 (Order and Reasons Denying Pl.'s Mot. to Exclude Dr. Glaspy).

[8] *Id.* at 7−8 (Order and Reasons on Glaspy); Rec. Doc. 11804 at 3 (Order and Reasons on Milettello); Rec. Doc. 12404 at 7 (Order and Reasons on Freites-Martinez); Rec. Doc. 12160 at 4−5 (Order and Reasons on Turegano); Rec. Doc. 12402 at 3−4 (Order and Reasons on Shapiro) (declining to address Plaintiff's argument on Dr. Shapiro's alternative causation opinions because the Court already "made clear than Sanofi, unlike Plaintiff, is not required to prove general causation"); Rec. Doc. 12108 at 5−6 (Order and Reasons on Chang).

[9] Rec. Doc. 12160 at 4−5 (Order and Reasons on Turegano).

in her motion *in limine*, Plaintiff relies on *Hall v. Freese*[10] and *Berguido v. E. Air Lines*,[11] two cases where the court ruled that the defense made improper alternative causation arguments. Importantly, however, there was no evidence to support defendants' arguments in either *Hall* or *Berguido*. *See Hall*, 735 F.2d at 961 (finding error where the defense impliedly and expressly suggested that the plaintiff's psychosis was caused by the plaintiff's drug use, without presenting any evidence to support the suggestion that plaintiff used drugs or that plaintiff's condition was caused by drugs); *see also Berguido*, 35 F.R.D. at 210 (finding error where the defense argued inferences about possible causes of the accident, including possible mechanical failure, where there were no reported malfunctions and all tested parts were found to be in good working order).

By contrast, there is ample evidence in this case about possible alternative causes of Ms. Kahn's hair loss. It is undisputed that Ms. Kahn received five chemotherapy medications—Adriamycin (doxorubicin), Avastin (bevacizumab), cyclophosphamide, Taxotere, and Xeloda (capecitabine).[12] Ms. Kahn also received Tamoxifen for approximately nine years after completing chemotherapy.[13] As this Court has recognized, "Plaintiffs' own experts have acknowledged that [Adriamycin and cyclophosphamide] are associated with permanent hair loss."[14] Likewise, Plaintiff's experts have acknowledged that there have been reports of permanent

---

[10]   735 F.2d 956 (5th Cir. 1984).

[11]   35 F.R.D. 200 (E.D. Pa. 1964).

[12]   Rec. Doc. 10928-1 at 1–2 (Pl.'s Mem. of Law in Supp. of Mot. on Affirm. Defenses Concerning Alt. Causes).

[13]   *Id.*

[14]   Rec. Doc. 10704 (Order and Reasons on Pl.'s Mot. for Partial Summ. J. on Aff. Defenses Under La. Rev. Stat. § 9:2800.59) at 7; *see also, e.g.*, **Ex. B**, Trial Tr. at 1057:17–24 (Dr. Tosti testified during the Earnest trial that "what I really think is that those drugs are, you know, sometimes occasionally causing the problem. I never said they never cause. It's just a question of, likely, frequency."); **Ex. C**, Trial Tr. 861:7–9, 873:19–21 (Dr. Plunkett testifying during the *Earnest* trial that she identified permanent hair loss as a hazard associated with Adriamycin and cyclophosphamide); **Ex. D**, Trial Tr. 1219:4–9 (Dr. Feigal testifying during the *Earnest* trial that there have been cases of permanent hair loss reported for both cyclophosphamide and Adriamycin); 1235:22–1236:22 (testifying that of the 16 patients in the TAX 316 FAC arm who allegedly experienced permanent alopecia, either the A or C or both could have caused the patient's permanent alopecia).

hair loss following endocrine therapy use—like Tamoxifen.[15] Existing medical literature on PCIA confirms that other chemotherapies and Tamoxifen have been associated with permanent hair loss.[16] Accordingly, neither *Hall* nor *Berguido* supports Plaintiff's argument, and the Court should again deny Plaintiff's motion.

---

[15] *See, e.g.*, Ex. B, Trial Tr. 1066:12–19 (Tosti co-authored a paper that reported 25% of patients receiving post-chemotherapy endocrine therapy experienced endocrine-induced alopecia); **Ex. E**, Nov. 21, 2019 Feigal Dep. 242:13−16 (Q. There's also a risk of persisting alopecia associated with endocrine therapy, yes? A Right; but the topic is persisting chemotherapy induced alopecia, not alopecia with endocrine therapy).

[16] Wim PM Breed et al., *Presentation, impact and prevention of chemotherapy-induced hair loss: scalp cooling potentials and limitations*, EXPERT REV. DERMATOL. 6(1), 109, 110 (2011) ("Permanent baldness has been reported with high-dose busulfan, cyclophosphamide, thiotepa, melphalan, etoposide, carboplatin, DT and paclitaxel"); **Ex. F**, J. Crown, et al., *Incidence of Permanent Alopecia Following Adjuvant Chemotherapy in Women w/ Early Stage Breast Cancer*, J. CLIN. ONCOL. (2017) (reporting grade 2 alopecia in 8% of patients who received Adriamcyin *without* Taxotere and in 13% of patients who received Adriamycin plus Taxol); **Ex. G**, ME de Jonge et al., *Relationship between irreversible alopecia and exposure to cyclophosphamide, thiotepa and carboplatin (CTC) in high-dose chemotherapy*, BONE MARROW TRANSPL. (2002) 30, 593, 593 ("In our hospital, we have observed incomplete scalp hair regrowth and permanent hair loss in some patients undergoing high-dose chemotherapy with cyclophosphamide, carboplatin and thiotepa (CTC) with peripheral blood progenitor cell transplantation."); **Ex. H**, Azael Freites-Martinez, MD et al., *Assessment of Quality of Life and Treatment Outcomes of Patients With Persistent Postchemotherapy Alopecia*, 155(6) JAMA DERMATOL. 724, 725–26 (2019) (eight-year, cohort study co-authored by Dr. Tosti in which more patients who were diagnosed with PCIA received Taxol than Taxotere); **Ex. I**, Azael Freites-Martinez, MD et al., *Hair disorders in cancer survivors*, J. AM. ACAD. DERMATOL. 2019; 80:1199–1213, 1200 (PCIA "has been mostly reported in breast cancer survivors treated with taxane-based chemotherapy (paclitaxel and docetaxel) and cyclophosphamide-based chemotherapy"); **Ex. J**, B. Guillot et al., *Mucocutaneous side effects of antineoplastic chemotherapy*, EXPERT OPIN. DRUG SAF. (2004) 3(6):579–587, 580 ("permanent alopecia has been described after treatment with cyclophosphamide"); **Ex. K**, Gun Min Kim et al., *Chemotherapy-induced irreversible alopecia in early breast cancer patients*, BREAST CANCER RES. TREAT. (2017) 163:527–533 (AC, AC followed by taxane, fluorouracil/epirubicin/cyclophosphamide (FEC), and docetaxel); **Ex. L**, N. Kluger et al., *Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients*, ANNALS OF ONCOL. 23:2879–2884, 2879 (2012) ("More recently, cases of permanent alopecia after chemotherapy protocols applied for breast cancers have been described, including taxanes alone, docetaxel or paclitaxel, or a regimen of docetaxel, carboplatin and trastuzumab" and reporting a case series of 20 women who developed permanent alopecia after sequential FEC and docetaxel regimen); **Ex. M**, Pat Masidonski & Suzanne M. Mahon, *Permanent alopecia in women being treated for breast cancer*, CLIN. J. OF ONCOL. NURSING 13.1 (2009): 13 (reporting that two of the study's 13 reported cases of PCIA occurred in patients treated with the AC regimen, but not Taxotere); **Ex. N**, Ioulios Palamaras et al., *Permanent chemotherapy-induced alopecia: A review*, J. AM. ACAD. DERMATOL. 2011; 64(3):604–606 ("Ninety case reports of CIPAL were identified in the literature. These were associated with Bu and/or cyclophosphamide (Cy)econditioning regimens used for bone marrow transplantation (BMT), taxanes (docetaxel, paclitaxel), tamoxifen for breast cancer, and alfa-2a interferon (a-2a IFN) for essential thrombocythemia"); **Ex. O**, Vishal Saggar et al., *Alopecia with endocrine therapies in patients with cancer*, THE ONCOLOGIST 18.10 (2013): 1126–34 (a 2013 meta-analysis of studies assessing hair regrowth in patients treated with hormonal therapies following chemotherapy for breast cancer and finding that 9.3% of patients who took Tamoxifen reported alopecia and 6.4% reported grade 2 alopecia); **Ex. P**, Ben Tallon et al., *Permanent chemotherapy-induced alopecia: Case report and review of the literature*, J. AM. ACAD. DERMATOL. 2010; 63:333–36, 334 ("Permanent CIA has been described following the use of busulphan, cyclophosphamide, thiotepa, melphalan, etoposide, carboplatin, docetaxel, and paclitaxel. Its reported incidence varies widely,

### B. The Court's Prior Rulings Are Consistent with the Jury Charges on Causation.

Plaintiff also argues that Sanofi should be "precluded from eliciting" testimony that it is "impossible to determine" which chemotherapy medicine caused Plaintiff's permanent hair loss because it will "mischaracterize the applicable burden in this case."[17] Plaintiff specifically argues that she need not prove with "fair amount of certainty" that "other drugs and/or conditions" did not cause her injury because no other drugs or conditions have been shown to be "causally active." Plaintiff's argument is not supported by the law or by the Court's jury charges in *Earnest*.

The law on medical causation in Louisiana is clear: a plaintiff may prove the cause of her injury through circumstantial evidence, but she "must exclude every other reasonable hypothesis with a fair amount of certainty." *Rando v. Anco Insulations, Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1089 (Plaintiff without direct evidence of causation must eliminate other causes.).[18] Contrary to Plaintiff's argument, "reasonable" hypotheses are not only those that have been shown to be causally active by one of defendant's experts, but also those supported by at least some evidence and that are not "remote, conjectural, [or] speculative." *Weber v. Fidelity & Cas. Ins. Co. of NY*, 250 So. 2d 754, 757–58 (La. 1971) (disregarding other "intimations of fault" where there was no evidence to support them).[19]

---

ranging from 0.9% to 43%. Busulphan is the most commonly implicated agent."); **Ex. Q**, Xinyi Yang & Keng-Ee Thai, *Treatment of permanent chemotherapy-induced alopecia with low dose oral minoxidil*, AUSTRAL. J. OF DERMATOL. 2016 57, e130-e132, e130 ("PCIA is commonly associated with busulfan-containing regimens and bone marrow transplant for haematologic malignancies. It has also been reported following the use of cyclophosphamide, melphalan, thiotepa, carboplatin, docetaxel, paclitaxel, tamoxifen and alfa-2a interferon.").

[17] Rec. Doc. 12909-1 at 5−6.

[18] *See also Llewellyn v. Lookout Saddle Co.*, 315 So. 2d 69, 71 (La. App. 2d Cir. 1975) (same); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 n.5 (5th Cir. 2002) ("[T]he plaintiff may prove causation by establishing '*with reasonable certainty* that all other alternatives are impossible.'") (citing *Joseph v. Bohn Ford, Inc.*, 483 So. 2d 934, 940 (La. 1986) and *Todd v. State*, 96-3090 (La. 9/9/97), 699 So. 2d 35, 43).

[19] *See also Houston-New Orleans, Inc. v. Page Eng'r Co.*, 353 F. Supp. 890, 896 (E.D. La. 1972) ("[o]ther possible causes of an accident which are 'remote, conjectural and speculative . . . as a possible cause in fact' may be disregarded.") (citing *Metrailer v. F&G Merc., Inc.*, 230 So. 2d 395, 400 (La. App. 1 Cir. 1969)); *Wheat v. Pfizer*,

6

The Court instructions in *Earnest* were consistent with the law:

> Where two or more possible causes for an injury are identified, plaintiff must establish with reasonable probability that [plaintiff's] injury resulted from a cause for which defendants would be liable.[20]

Plaintiff has again failed to identify any support for her argument that Sanofi should be precluded from introducing alternative cause evidence, or evidence that it is impossible to determine what is causing Plaintiff's hair loss. It is worth noting that Plaintiff's own experts have admitted there is no way to determine what chemotherapy medicine is causing PCIA in any single individual.[21] Evidence that it is "impossible to determine" what is causing Plaintiff's hair loss is consistent with burden of proof in the case, which requires Plaintiff rule out other reasonable hypotheses of her hair loss. If Plaintiff cannot prove with "reasonable probability" that it is more likely that Taxotere, as opposed to another medicine or medical condition, caused her injury, then she is not entitled to a verdict in her favor. *See Rando*, 16 So. 3d at 1089.

## CONCLUSION

For these reasons, testimony, argument and evidence relating to other medications and conditions as potential alternative causes are both relevant and admissible, and the Court should deny Plaintiff's Motion.

---

31 F.3d 340, 342–43 (5th Cir. 1994) (affirming summary judgment for defendant where plaintiff, alleging a particular drug caused her hepatitis, failed to rule out other possible causes including contact with a family member who had hepatitis and another drug also associated with hepatitis that plaintiff took).

[20] **Ex. R**, Trial Tr. 2238:23−2239:1.

[21] **Ex. S**, Dec. 12, 2019 Tosti Dep. 64:5–9 (agreeing that "there's no test that can be used to determine which chemotherapy drug caused PCIA in any specific patient"); **Ex. T**, Nov. 21, 2019 Thompson Dep. 201:24–202:7 (Dr. Curtis Thompson, the PSC's expert pathologist, testified that a person would need a "time machine to go in the future when we have more experience with some of these drugs" in order to make a claim or distinction about whether "a specific chemotherapy drug caused ongoing alopecia in any specific individual.").

7

Respectfully submitted,

/s/ *Douglas J. Moore*
Douglas J. Moore (Bar No. 27706)
**IRWIN FRITCHIE URQUHART & MOORE LLC**
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: 504-310-2100
Facsimile: 504-310-2120
dmoore@irwinllc.com

Harley V. Ratliff
Adrienne L. Byard
Jon Strongman
**SHOOK, HARDY& BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
hratliff@shb.com
abyard@shb.com
jstrongman@shb.com

*Counsel for sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Douglas J. Moore*

8