# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA



IN RE:  TAXOTERE (DOCETAXEL)     *     16-MD-2740
PRODUCTS LIABILITY LITIGATION    *
                                 *
                                 *     Section H
Relates to:  Barbara Earnest     *
             16-CV-17144         *
                                 *     September 25, 2019
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


                   DAY 8 - AFTERNOON SESSION
                TRANSCRIPT OF JURY TRIAL BEFORE
                 THE HONORABLE JANE T. MILAZZO
                 UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:          Barrios Kingsdorf & Casteix, LLP
                             BY:  DAWN M. BARRIOS, ESQ.
                             701 Poydras Street, Suite 3650
                             New Orleans, Louisiana 70139


For the Plaintiffs:          Gainsburgh Benjamin David Meunier
                                & Warshauer, LLC
                             BY:  M. PALMER LAMBERT, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Pendley Baudin & Coffin, LLP
                             BY:  CHRISTOPHER L. COFFIN, ESQ.
                             1100 Poydras Street, Suite 2505
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gibbs Law Group, LLP
                             BY:  KAREN BARTH MENZIES, ESQ.
                             6701 Center Drive West, Suite 1400
                             Los Angeles, California 90045
```

Page 2022

1  BY MR. STRONGMAN:
2  Q. Doctor, what I have handed you is --
3      MR. STRONGMAN: Actually, for the Court's record,
4  this will get -- I could go ahead and admit it because I have
5  entered the document with the same number before.
6      What I have handed the Doctor is Defense 401.4,
7  I believe, which is the 2004 package insert for Taxotere. I
8  believe this was already admitted under D-317 as well.
9      THE COURT: Okay.
10 BY MR. STRONGMAN:
11 Q. Doctor, when you look at the 2004 package insert -- I want
12 to point your attention to the second page. Do you see that
13 this is information on hair loss? Do you see that down there?
14 You can also look at your screen.
15 A. Yes, I do. I see it.
16 Q. What we know and what the jury has heard is that the
17 Taxotere labeling has said: "Once you have completed all of
18 your treatments, hair generally grows back." Do you see that?
19 A. Yes.
20 Q. Doctor, as an oncologist with decades of experience, what
21 does that language mean to you?
22 A. To me it means that -- hair usually grows back would be a
23 synonym.
24 Q. Doctor, does it mean that hair always grows back?
25 A. It does not.

Page 2023

1  Q. Based on your knowledge of the Taxotere labeling, is
2  alopecia also always listed as a potential side effect?
3  A. Yes.
4  Q. Doctor, as an oncologist who has these conversations who
5  knows the contents of drug labeling, what does "alopecia" mean
6  to you?
7  A. To me it means hair loss, and I think it means that to
8  everybody.
9      But to me it would -- what it calls to mind is that
10 initial loss of pretty much all the hair on the head following
11 some of these chemotherapy drugs.
12 Q. Doctor, does alopecia include both the possibility that
13 your hair may return and the possibility that it may not?
14     MR. MICELI: Object. Leading.
15     THE COURT: Rephrase your question.
16 BY MR. STRONGMAN:
17 Q. Doctor, does "alopecia" by definition include any kind of
18 temporal aspect?
19     MR. MICELI: Still leading, Your Honor.
20     THE COURT: I'm going to let him answer the question.
21     THE WITNESS: So if the medicine that's causing it is
22 being stopped, generally the hair starts to regrow; but I have
23 already testified that in my experience, it's not infrequent
24 that women are not happy with what grows back. And that is
25 often because of thinness, and that could be something that I

Page 2024

1  can't see. Doesn't matter if she is unhappy. It can be
2  something that looks really severe. It can be anywhere along
3  that spectrum.
4  BY MR. STRONGMAN:
5  Q. Doctor, in your practice is the language "hair generally
6  grows back" consistent with what you see in your patient
7  population?
8  A. Yes.
9  Q. Doctor, in your opinion, was the label that we have looked
10 at here for Taxotere -- does that label adequately warn of the
11 risk of alopecia, including the possibility of hair not
12 returning following treatment?
13     MR. MICELI: Object. Leading again.
14     THE COURT: I'm going to allow him to answer the
15 question.
16     MR. MICELI: Excuse me, Your Honor. May we approach?
17     THE COURT: Yes.
18     (The following proceedings were held at the bench.)
19     MR. MICELI: Your Honor, this was the labeling issue
20 I talked about before. If he is going to talk about what a
21 normal doctor, normal oncologist wants to look at, and now he
22 wants to talk about what a label should include, I think that's
23 a little different.
24     THE COURT: I think his report says that as he read
25 the label, that's what it meant to him as an oncologist. The

Page 2025

1  question I'm seeing here is: Does that label adequately warn
2  of the risk of alopecia?
3      So are you saying that that requires some sort
4  of --
5      MR. MICELI: Well, for him -- if it warns him, that's
6  fine. But he can't speak for -- he said he doesn't do
7  regulatory. What is an adequate warning --
8      MR. STRONGMAN: I can say, "I'm not asking you for an
9  FDA opinion." I'm going to ask his opinion as a clinical
10 oncologist.
11     THE COURT: "Your opinion in the treatment of
12 cancer."
13     MR. STRONGMAN: Yeah.
14     THE COURT: Okay. Thank you.
15     (End of bench conference.)
16     THE COURT: Rephrase your question, please.
17 BY MR. STRONGMAN:
18 Q. And I'm talking about in your role as a clinical
19 oncologist, okay? Are you following?
20 A. I'm following.
21 Q. And in that role as an oncologist treating patients, does
22 the Taxotere label that we are looking at here from 2004 with
23 the language that hair generally grows back, does that label
24 adequately warn of the risk of alopecia, including the
25 possibility that hair may not return?

Page 2026

1  A. As an oncologist, that informs me of that, yes.
2  Q. I want to back up and talk a little bit more about
3  clinical trials for a second, Doctor.
4      I think you've talked a little bit about how clinical
5  trials get started because they are looking for new therapies.
6  Can you talk a little bit more about how a clinical trial is
7  actually run in terms of patient follow-up and in terms of the
8  way that safety and efficacy is monitored in a clinical trial.
9  A. To make this efficient, can we focus on Phase III trials?
10 Q. Sure.
11 A. Okay.
12 Q. Go ahead.
13 A. Then we don't have to go through all the other . . .
14     So when you do a Phase III trial, patients will be
15 randomly assigned to get the old standard and the new
16 treatment. And in chemotherapy trials, they will be treated
17 for a period of time, say 18 weeks, and then they will be
18 followed for a period of time.
19     The patients, when they sign into the trial, are
20 given a subject's bill of rights. And that subject's bill of
21 rights informs them that they can withdraw their consent any
22 time they want, for the reasons of their own, with no argument.
23 So the patients have the control over their follow-up,
24 especially once they are done with treatment and they are just
25 being followed.

Page 2027

1      They will generally be followed for two things: One
2  is efficacy, meaning did the treatment work; in this case, in
3  early breast cancer, are they having a relapse? And so they
4  will be scanned periodically. Once they are done with the
5  chemo, they will be brought in to be scanned to see if there is
6  a relapse so that people can see if there's a difference
7  between the two groups in how long it takes the cancer to come
8  back.
9      They will also be followed to see if they are alive.
10 Now, that is recorded -- every time the doctor sees the
11 patient, they fill out what's called a case report form that is
12 aimed at efficacy. So it asks you about has the patient
13 relapsed, is there evidence of relapse, etc., and is the
14 patient alive.
15     Then there's a second thing that's checked, and
16 that's safety. And those are a second case report form that
17 you fill out, and the side effects of interest, whatever they
18 are, are recorded there.
19     Sometimes patients go through the chemotherapy part
20 of this, say, and then they decide that they don't want to keep
21 coming in every month and they don't want to do the scans or
22 they don't want to have the blood tests, and they withdraw
23 their consent. They call up and say, I'm not going to stay on
24 the study, so I'm not going to come in for these visits.
25     If that happens, sometimes they will say, It's okay

Page 2028

1  if you call me to make sure I'm alive, but I'm just not coming
2  in. So on those patients, we would call them when their visit
3  was due and at least get that information, the survival
4  information; but we wouldn't have scan follow-up and we
5  wouldn't have safety follow-up. We would have some follow-up,
6  but not all of it.
7      When you do clinical trials, you anticipate that this
8  is going to happen. It's called the dropout rate, and you
9  build this into your clinical trials so that you are treating
10 more patients than you're actually going to need in order to
11 find out your real endpoint survival, because you are
12 anticipating that there are going to be dropouts.
13     Another thing that can happen is that --
14     MR. MICELI: Your Honor, I believe this is just a
15 narrative. There's been no breaking question.
16     MR. STRONGMAN: I think he is just explaining how
17 patients are followed up in Phase III clinical trials. And
18 I'll ask some questions.
19     THE COURT: I think we are starting to get to a
20 narrative, so --
21     BY MR. STRONGMAN:
22 Q. And so, Doctor, one of the questions that I want to follow
23 up on, one of the points I want to follow up on, is I think you
24 indicated that there can be an occasion when a patient in a
25 clinical trial is followed for an adverse event for a certain

Page 2029

1  period of time.
2      Is that correct?
3  A. Yes.
4  Q. And then, let's just say hypothetically, that patient has
5  a recurrence and goes onto different medication, and so they
6  drop out of the study as it relates to the adverse event
7  follow-up.
8      Is that an example of what you are talking about?
9      MR. MICELI: Your Honor, that's a leading narrative.
10     THE COURT: I think you need to rephrase your
11 question.
12     BY MR. STRONGMAN:
13 Q. Can you give the jury an example of how someone could be
14 followed up for a certain period of time for an adverse event,
15 but followed up for a longer period of time for overall
16 survival?
17 A. I have given one example, which is the patient just drops
18 out.
19     Another example in the -- in, say, the TAC/FAC trial,
20 another example would be that the patient's cancer came back
21 and they started another chemotherapy drug. And at that point,
22 you're not going to be collecting safety data on the previous
23 chemotherapy drug used, so you stop collecting safety data.
24 Q. So, Doctor, you certainly are familiar with -- have
25 established you're familiar with TAX 316, correct?