# EXHIBIT C

In re: Taxotere (Docetaxel) Products Liability Litigation
MDL No. 2740
Report of David Ross, M.D., Ph.D., M.B.I.

## I. INTRODUCTION

### A. Consultation questions

1. I have been retained by the Plaintiffs' Steering Committee to serve as an expert witness in In Re: TAXOTERE (DOCETAXEL), MDL 2740 litigation, in the US District Court for the Eastern District of Louisiana.[1] I was previously identified as an expert witness in this Multi-District Litigation to offer opinions in cases pending against certain defendants with products approved through the 505(b)(2) regulatory pathway. Following Dr. David Kessler's appointment by President Biden to head up the administration's vaccine initiative, I was asked to review additional materials and offer opinions in this matter as to Sanofi, the 505(b)(1) New Drug Application (NDA) holder for Taxotere®/docetaxel (Taxotere). Specifically, I have been asked to provide opinions regarding the regulatory obligations of drug manufacturers for products approved under Section 505(b) of the Food, Drug, and Cosmetic Act

---

[1] I understand that my testimony will be offered in the case of Elizabeth Kahn, however I am offering regulatory opinions and have not reviewed Ms. Kahn's medical records, or any case-specific depositions. I am aware that Ms. Kahn's first use of Sanofi's Taxotere product took place on May 29, 2008. I do not intend to offer any case-specific opinions in this matter. I reserve the right to supplement this report should additional documents or information be made available.

**CONFIDENTIAL**

1

pharmacovigilance methods to detect signals indicating potential associations between exposure to Taxotere and unexpected adverse events, i.e., AEs not included in the Taxotere label. Unexpected AEs include "events that may be symptomatically and pathophysiologically related to an event listed in the labeling, but differ from the event because of greater severity or specificity." 21 CFR 314.80(a).

26. Sanofi's obligations included submitting a Changes Being Effected (CBE) or a Prior Approval Supplement (PAS) labeling supplement to update the Taxotere label when its pharmacovigilance obligations reveal an unexpected adverse event (AE) meeting the criteria for being listed as an Adverse Reaction in the Taxotere label. 21 CFR 201.57(c)(7).

27. Had Sanofi complied with its pharmacovigilance obligations, including appropriate surveillance and analysis of the available data (including but not limited to FAERS signal data, its own internal data, worldwide medical literature, clinical trial data, and other data available to the company), Sanofi should have deduced by 2006 that some basis to believe that a causal relationship exists between Taxotere or Taxotere-containing regimens and permanent chemotherapy induced alopecia (PCIA).

28. Had Sanofi complied with these obligations and discovered the basis for suspecting the potential causal relationship, it could have met its regulatory

**CONFIDENTIAL**

when there is reason to suspect that the drug may have caused the event. Typical reasons to suspect causality for an event include (1) timing of onset or termination with respect to drug use, (2) plausibility in light of the drug's known pharmacology, (3) occurrence at a frequency above that expected in the treated population, and (4) occurrence of an event typical of drug-induced adverse reactions (e.g., liver necrosis, agranulocytosis, Stevens-Johnson syndrome). For serious events that are typical of drug-induced adverse reactions, the occurrence of even a single event could be a basis for inclusion in the list."[14]

57. For purposes of assessing whether there was "some basis to believe a causal association exists between Taxotere and PCIA, Dr. Madigan's disproportionality analysis demonstrates that a consistent safety signal for PCIA is present from 2000 through 2017, while no other chemotherapy drug analyzed demonstrated a consistent and ongoing signal. In addition to Dr. Madigan's PRR/FAERS analysis, there were at least 32 adverse events received by Sanofi's pharmacovigilance department prior to 2008.[15] In August 2006 Sanofi became aware of the study performed by Dr. Sedlacek, and his

---

[14] Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products - Content and Format (January 2006), available at https:// www.fda.gov/ media/72139/download.

[15] Sanofi_02994797.

**CONFIDENTIAL**

25

finding that Taxotere containing regimens alone demonstrated an increased incidence of PCIA.[16] This study demonstrated a statistically significant risk of PCIA in with Taxotere-containing regimens versus non-Taxotere containing regimens.[17] Sanofi's own interim data from its randomized study, TAX316, demonstrated a statistically significant increase in the incidence of PCIA in the TAC group compared to the FAC group in the study.[18] And, finally, in April 2006, Sanofi recognized the distinction between temporary alopecia and alopecia that does not resolve, as evidenced by drafts of labeling in the EU discussed among Sanofi employees in the United States and France.[19]

58. The causal relationship between Taxotere and PCIA has been further elucidated in several studies published after 2008 that provide evidence of a causal relationship between Taxotere and docetaxel-containing regimens and PCIA; these studies are set out more fully in the report of Dr. Ellen Feigal. This evidence confirms that the basis for the belief that a causal relationship

---

[16] Sanofi_04633925.

[17] Madigan Report, June 7, 2020, pp. 221-24, Table 8.

[18] *See* Interim (55-month follow-up) Clinical Study Report, TAX316, January 21, 2004, demonstrating 4.2% (31/744) of patients in the TAC arm and 2.2% (16/736) in the FAC arm (rr: 1.92); *See also,* Madigan report, table 8, calculating statistical significance at dates prior to 2008.

[19] *See* I. Richard-Cassin, dep. May 4, 2018, pp. 115 -147; exhibits 22-25. Also see G. Nijveldt dep., Feb. 15, 2018, pp. 80:15 – 89:22; exhibit 7, GSOP, Implementation Process for Corp orate Labeling, explaining Sanofi's policy is to harmonizing labels worldwide.

**CONFIDENTIAL**

26

adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."

87. And 21 USC § 314.80(a) sets out the definition of an "Unexpected adverse drug experience," as follows:

   a. "Any adverse drug experience that is not listed in the current labeling for the drug product. This includes events that may be symptomatically and pathophysiologically related to an event listed in the labeling, but differ from the event because of greater severity or specificity." *Id.*

88. The evidence available to Sanofi prior to May 29, 2008, that would inform and support a § 6 (Adverse Reactions) label change, included at least the following:

   a. The consistent and growing safety signal for Taxotere and PCIA as demonstrated in Dr. Madigan's increased PRR for Taxotere and PCIA from 2000 – 2008 (and in fact through 2017, the last year for which Dr. Madigan provides his FAERS analysis), and the lack of any consistent increased PRR for any of the other drugs analyzed (Adriamycin, Cyclophosphamide, 5-FU, Paclitaxel, Xeloda and Avastin). *See* Dr. Madigan's expert report for Kahn.

**CONFIDENTIAL**

    b. Nabholtz, et al.,(2001) documenting cases of PCIA in a Sanofi-sponsored study.

    c. Sanofi's internal pharmacovigilance database. The two Clinical Overviews conducted in 2011 and 2015 reflect that Sanofi received numerous reports of permanent/irreversible alopecia that predate, 2008, and should be considered in assessing a label change prior to this date. Interestingly, although recognizing the presence of over 140 AEs for permanent/irreversible alopecia by 2011, rather than inspiring further investigation – including a FAERs analysis for signal detection, among other potential actions – Sanofi's employee Emanuel Palatinsky simply explained the events away stating "available evidence does not show that irreversible alopecia is caused by docetaxel alone." E. Palatinsky deposition, Ex. 16, p. 44.

    d. Sanofi's TAX316 55-month interim analysis comparing a TAC (Taxotere, Adriamycin and Cyclophosphamide) regimen with a FAC (5-FU, Adriamycin and Cyclophosphamide) regimen, demonstrating a statistically significant increased incidence of PCIA.[32] When requested by the European Medical Agency (the European equivalent of the FDA)

---

[32] *See* Madigan Report, Table 8, p. 24 and Sanofi_05097326.

**CONFIDENTIAL**

40

to provide information and rates of permanent alopecia, Sanofi provided its data from TAX316 and GEICAM 9801, and thus the data from those studies should be looked to at the 55-month period for instruction on regulatory questions.

e. Dr. Madigan's analysis of Safety Update Reports compiled by Sanofi as part of its ongoing regulatory obligations in Europe; Dr. Madigan documents the number of reported cases of irreversible alopecia from TAX 316 that Sanofi reported to EMA from 2004 – 2009.[33]

f. Sedlacek (2006) was an retrospective study performed on clinical experience between January 1994 and December 2004 and demonstrated PCIA only in the treatment group treated with Taxotere-containing regimens, and not in groups receiving regimens that included paclitaxel or no taxane at all. As discussed below, there is evidence that demonstrates Sanofi had knowledge of Dr. Sedlacek's study findings before he presented them at the San Antonio Breast Cancer Symposium in December 2006.

---

[33] Madigan Report June 7, 2020, at 23-26; Sanofi_01294774 (2005 Safety Update Report); Sanofi_05956179 (2006 Safety Update Report).; Sanofi_04014414 (2007 Safety Update Report); Sanofi_03929385 (2008 Safety Update Report).' Sanofi_03935020 (2009 Safety Update Report); Sanofi_01294924 (2006 Rapporteur Assessment Report).

**CONFIDENTIAL**