**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: TAXOTERE (DOCETAXEL)                          **MDL NO. 2740**
PRODUCTS LIABILITY LITIGATION

                                                     **SECTION "H" (5)**

**THIS DOCUMENT RELATES TO**
**Elizabeth Kahn, Case No. 2:16-cv-17039**

---

**PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE***

---

Plaintiff respectfully submits this response in opposition to Sanofi's Omnibus Motions *in Limine.*

1. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE PURPORTED MORAL OR ETHICAL DUTIES OF PHARMACEUTICAL DRUG MANUFACTURERS**

Sanofi requests that this Court exclude testimony by Plaintiff's experts regarding duties imposed not by law, but by "subjective perspectives on morality or business ethics," which Sanofi characterizes as impermissible judgments by Plaintiff's experts regarding "moral or ethical duties."  First and foremost, the testimony cited by Sanofi does not contain opinions regarding moral and ethical duties, and Plaintiff's experts do not intend to testify about Sanofi's ethical or moral duties.  Instead, they will offer their professional opinions about typical customs and practices within the pharmaceutical industry, which they are aptly qualified to provide.  This is by no means a subjective inquiry, but rather an informed observation about what should be considered the applicable industry standards in this case, and Plaintiff's experts should not be prevented from offering opinions in this regard.

1

A.     ARGUMENT

Plaintiff's experts do not intend to offer opinions about Sanofi's "moral and ethical"

duties to consumers.   Rather, Plaintiff's experts will opine as to industry standards applicable

to thepharmaceutical industry, including the basis for those industry standards.  Sanofi's vague

motion fails to identify how this type of testimony could be construed as "moral and ethical" or

otherwiseobjectionable, particularly given that qualified experts are routinely permitted to

opine as to applicable industry standards.[1]

It is clear that the opinions of Plaintiff's experts speak to Sanofi's duty to create a safe

product and their breach of that duty, as well as Sanofi's failure to create an adequate warning

label for Taxotere, *none of which* constitute improper personal opinions regarding the moral

and/orethical duties of a pharmaceutical drug company, like Sanofi.  By means of example,

Laura Plunkett's opinions are wholly appropriate, as they are objective assessments of

Sanofi's behavior in light of the industry standards.  Likewise, Dr. David Ross, a former FDA

reviewer, with years in the industry, has all of the experience to offer an objective take on a

company's actions based on industry standards over time.  Lastly, Dr. Feigal is certainly

qualified to testify as to industry standards and expectations in the clinical trial process and in

the communication of safety risks to doctors and patients.  This testimony proffered by

Plaintiff's experts is critical because it establishes that Sanofi did not act in accordance with

applicable industry safety practices to create a product that was reasonably safe in its labeling.

---

[1] *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.,* No. MDL 2592,2017 WL 1352860, at *2-3 (E.D. La. Apr. 13, 2017); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings,* No. 14 C 1748, 2017 WL 1836443,at *15 (N.D. Ill. May 8, 2017); *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2:12-CV-07263, 2016 WL 4039329, at *5 (E.D. Pa. July 28, 2016); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 120973, at *11-12 (W.D. La. Jan. 10, 2014).

In addition, Sanofi argues that Rule 403 counsels against admission of evidence concerningprevailing industry standards.  Such evidence, however, is highly probative, and the suggestion thatpharmaceutical companies should not be accountable for standard industry practices is nothing short of remarkable.  This evidence is by no means unfairly prejudicial. Plaintiff's experts are presenting informed opinions, and the presentation of such expert testimony will not confuse the issues or mislead the jury.  In fact, this testimony does not contain any concepts that Sanofi does not already plan to counter with their own evidence. This expert testimony will clarify Plaintiff's arguments and assist the jury in understanding the case.  The fact that it may take time to cover these issues does not mean that the time will be wasted, because this evidence is relevant to and highly probative of Plaintiff's claims.

**B.      CONCLUSION**

For these reasons, Sanofi's motion should be denied.  Plaintiff's experts will offer their professional opinions about standards in the pharmaceutical industry as they pertain to this case, which by no means constitutes a subjective inquiry, but rather an informed observation about what should be considered the applicable standards.  Therefore, Plaintiff's experts should not be prevented from offering opinions in this regard.

## 2. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING PURPORTED LEGAL DUTIES AND CONCLUSIONS

Sanofi's motion fails on the merits by masquerading under the guise of yet another improper *Daubert* motion. As Plaintiff explained in her Oppositionto Sanofi's Omnibus Motion to Preclude Improper Expert Testimony, qualified experts are allowedto offer testimony on FDA regulations, as well as the relevant duty of care under state law. Sanofi should not be allowed to conflate the issues by painting a picture with the Court that allowing such testimony, *albeit the fact that it does not constitute improper legal conclusions*, will somehow usurp the Court's role in explaining the law to the jury.

### A. ARGUMENT

Sanofi should not be allowed a second bite at the apple by filing yet another improper *Daubert* motion along these same lines. As enumerated by Plaintiff in her Opposition toSanofi's Motion to Preclude Improper Expert Testimony (Rec. Doc. 7464), which is incorporated herein as if restated in full, Sanofi confuses the issue by conflating two schemes at play in these cases: (1) the federal regulatory framework governing manufacture, marketing, and sale of prescription drugs in this country; and (2) the state tort law governing the cases, which the jury will be instructed on before deciding whether Sanofi failed to adequately warn prescribing physicians. Contrary to Sanofi's arguments, courts allow a qualified expert to offer testimony on FDA regulations, including whether a party complied with such regulations, as well as the relevantduty of care under state law. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 467 (S.D.N.Y. 2016) ("expert testimony regarding Bayer's compliance with FDA regulations thereforewill not usurp the Court's role in explaining the law to the jury but will assist the jury in determining whether Bayer acted as a reasonably prudent pharmaceutical manufacturer") (internalquotations omitted) (*citing Wells*,

2013 WL 7208221, at *1); *In re Yasmin & YAZ (Drospirenone)Mktg., Sales Practices & Prod. Liab. Litig.*, 09-md-02100, 2011 WL 6302287, at *25 (S.D. Ill. Dec. 16, 2011); *In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 191 (S.D.N.Y. July 27, 2009)); *see also In re Bard IVC Filters*, 2017 WL 6523833, at *8 (expert permitted to offer opinions concerning the FDA regulatory process and drug-maker's compliance).

It is clear that none of the opinions of Plaintiff's experts constitute improper legal conclusions. For example, Dr. Feigal is certainly qualified to testify as to industry standards and expectations regarding the communication of safety risks to doctors and patients, and she made clear that she intends to offer no opinions as to whether Sanofi did or did not meet FDA requirements regarding adequacy of the label. [2] Additionally, Dr. Ross, who worked for the FDA reviewing adverse events from 1996-2006, is without a doubt qualified to testify as to what a company should know and their obligations following notice and compliance with state laws as this is directly what area he worked in with the FDA for a decade. Lastly, Dr. Plunkett is beyond qualified as she is a pharmacologist, toxicologist, and patent agent that specializes in regulation of products by the United States Food and Drug Administration and has been in the industry for over 30 years. Her experience and knowledge is extensive as to industry standards and expectations across the board.[3]

In addition, Sanofi argues that Rule 403 counsels against admission of evidence concerningany legal duty Sanofi allegedly owed to prescribing oncologists. Such evidence, however, is highlyprobative, and the suggestion that pharmaceutical companies should not be accountable for complying with FDA regulations and adhering to standard industry practices is nothing short of remarkable. This evidence is by no means unfairly prejudicial. Plaintiff's

---

[2]Plf. Opp.Mot. Exclude Improper Expert Testimony, Rec. Doc. 7464 at pg. 13-14.
[3]Plf. Supplemental Report, Rec. Doc. 12739-1 at pg. 2-3.

experts are presenting informed opinions, the presentation of which will not confuse the issues or mislead the jury.  In fact, this testimony does not contain any concepts that Sanofi does not already plan to counter withits own evidence. Such expert testimony will clarify Plaintiff's arguments and assist the jury in understanding the case, and the fact that it may take time to cover these issues does not mean thattime will be wasted, because this evidence is relevant to and probative of Plaintiff's claims.

### B.    <u>CONCLUSION</u>

For these reasons, Sanofi's motion should at a minimum be deferred, which was the ruling in the Earnest case regarding this Motion *in Limine*, but even further should be denied.[4] Not only is it vague, but it is without merit.  Clearly, Plaintiff's experts offer no opinions constituting improper legal conclusions. Rather, they intend to offer testimony on FDA regulations, including whether Sanofi complied with such regulations, as well as the relevant duty of care under state law, all of which are within the appropriate confines of expert testimony.

---

[4] *See* Rec. Doc. 8206.

3. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING OTHER LAWSUITS, CLAIMS, OR INVESTIGATIONS AGAINST DEFENDANTS AND/OR OTHER SANOFI ENTITIES**

Defendant seeks to exclude any evidence of other lawsuits, claims or investigations, without limitation. Apart from the False Claims Act suit in the Eastern District of Pennsylvania and the "thousands of plaintiffs in this MDL and related state court actions," Defendant does not identify which specific evidence of which specific lawsuits, claims or investigations it seeks to exclude. Plaintiff opposes such a blanket exclusion. As a general rule, evidence of other claims and investigations is admissible to show that a defendant had notice of a hazard associated with a product.[5] The fact that others had brought claims alleging that Taxotere resulted in permanent hair loss, and/or that Defendant knew or could have known of other investigations into permanent hair loss associated with Taxotere, is highly probative of whether Defendant was on notice of the potential for permanent hair loss.[6] It should be noted that, when offered for purposes of notice, hearsay is not an issue, as the evidence of other claims is not being offered for the truth of the matter asserted, but rather to demonstrate what the Defendant had been told about its product.[7]

In the Earnest trial, this Court denied in part a substantially identical motion in *limine*. Consistent with Plaintiffs' argument here, this Court held that evidence of other lawsuits would be admissible insofar as they relate to alopecia and pre-date the trial Plaintiffs' treatment. The Court should so rule here. Additionally, Plaintiff asks that this Court be mindful of the possibility that Defendant could "open the door" to claims that post-date Kahn's treatment by

---

[5] *Noah v. General Motors Corp.*, 882 So.2d 235, 237 (5th Cir. 2004).
[6] *See also*, discussion of Adverse Event Reports, *infra*.
[7] *See Sears, Roebuck & Co. v. Kunze*, 996 S.W.2d 416, 427 (Tex. App. 1999).

falsely suggesting that her claim is unique or that there have been no other claims of alopecia associated with use of Taxotere.

4. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING COMPLAINTS AND LAWSUITS AGAINST OTHER MANUFACTURERS OF DOCETAXEL**

Plaintiff has no intention to—and agrees not to—offer evidence or argument at trial concerning lawsuits, investigations, or formal complaints against other manufacturers of docetaxel.   However, Plaintiff is concerned that such an *in limine* ruling, as written, may be overlybroad, and could be construed to exclude highly pertinent evidence regarding adverse event reporting (AERs).   AERs or other documentation of AEs that may relate to docetaxel, the bioequivalent of Taxotere, cannot and need not be segregated and excluded from the evidence considered by Plaintiff's experts on the issues of causation and notice.

First, as AERs relate purely to notice, they are relevant insofar as generic docetaxel provided essentially the same safety signal to Sanofi as its own brand-name product.   This would include all reports of generic-related AEs that may happen to appear in the FDA's FAERs databaseor Sanofi's internal databases.

Second, case studies and AERs involving generic docetaxel are unquestionably probative evidence on the issue of causation.   To the extent Plaintiff's general causation experts have reliedon reports from the medical literature that happen to involve generic docetaxel, Sanofi may easilyand effectively cross-examine the experts on those cases to the extent they are actually and appreciably distinguishable.

Barring *any* evidence of lawsuits, investigations, or formal complaints against other manufacturers of docetaxel, as proposed by Sanofi, could be construed to preclude admission of this highly probative evidence.   Sanofi's overbroad motion on this topic makes offers no countervailing reason why this type of evidence would be irrelevant or prejudicial and accordinglyshould be denied.

5. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING ADVERSE EVENT REPORTS OR OTHER COMPLAINTS INVOLVING PATIENTS OTHER THAN PLAINTIFF**

Plaintiff does not intend to introduce individual adverse event reports (AERs)as evidence of causation, or otherwise for the truth of their contents—for instance, if a report claims that Taxotere caused that individual's permanent or irreversible alopecia.  However, consistent with this Court's prior ruling on this issue "there are at least two ways the AERs may be introduced in this case: 1) through Plaintiff's experts and 2) not for their truth." *Drake v. Allergan, Inc.,* No. 2:13-CV-234, 2014 WL 12717875, at *2 (D.Vt. Oct. 23, 2014).  To the extent Plaintiff's experts and Defense experts have relied in part on the body of collective adverse event reporting in reaching their opinions on causation or safety signaling, such reliance is completely permissible—indeed common—and not subject to a separate attack on grounds of hearsay or relevance under FRE 802 and 401, respectively.

Further, individual AERs are widely accepted as admissible evidence on the issue of a drug maker's notice of a safety issue so far as they predate Ms. Kahn's injury, a limitation to which Plaintiff will adhere at trial.  This very standard use of AERs has routinely survived Rule 403 challenges, as federal courts have found this type of evidence so highly probative on the issue of notice as to outweigh the potential for confusion or waste. For these reasons, Sanofi's motion to exclude AERs should be denied.

At this time, the Court should reserve ruling on the AERs until the use at the time of trial as:

1.) AERs are admissible to establish notice. *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, No. 1:17-CV-00944, 2021 WL

2407566, at *2 (D. Md. June 11, 2021) *citing Berman v. Stryker Corp.,* No. 11 C 1309, 2013 WL 5348324, at *4 (N.D. Ill. Sept. 24, 2013).

2.) AERs may provide support for an expert's causation opinion.  *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, No. 1:17-CV-00944, 2021 WL 2407566, at *2 (D. Md. June 11, 2021) *citing In re Tylenol (Acetaminophen) Mktg., Sales Practices and Prods. Liab. Litig.,* 181 F. Supp. 3d 278, 286–87 (E.D. Pa. 2016).

**A. ARGUMENT**

*1.      Experts Are Permitted to Rest Their Opinions on Otherwise Inadmissible Facts or Data.*

Sanofi is taking yet another swing at excluding expert testimony that it does not want the jury to hear: that the collective weight of the AERs corroborates the strong evidence for causation found in the clinical studies and medical literature. FRE 802 provides no basis for such exclusion. Rule 703 provides that experts may rely on otherwise inadmissible facts or data so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed.R.Evid. 703; *see Newman ex rel. Newman v. McNeil Consumer Healthcare*, No. 10 C 1541, 2013 WL 4460011, at *15 (N.D.Ill. Mar. 29, 2013) ("[E]xpert opinions that rely on AERs are admissible under Rule 703"); Drake, 2014 WL 12717875, at *2. "Standing alone," these AERs "might not be permissible as evidence to make the causal link between the plaintiffs' injuries" and a pharmaceutical product. *In re Levaquin Prod. Liab. Litig.,* No. 08-1943 JRT, 2010 WL 4676973, at *4 (D. Minn. Nov. 9, 2010). "However, they are commonly used by experts in the field to determine causation in correlation with other evidence." Id. (citing *In re Viagra Prod. Liab. Litig.*, 658 F.Supp.2d 950, 961–62 (D.Minn.2009)); Drake, 2014 WL 12717875, at *1 ("It may be inappropriate in some instances

for a court to admit AERs as the sole evidence of causation.  However, AERs may be relevant

corroborative evidence, particularly when there is other evidence of causation such as a peer-

reviewed epidemiological study connecting the drug at issue and the plaintiff's alleged injury as

is the case here.") (*citing In re Fosamax Products Liability Litig*., 645 F. Supp. 2d 164, 184

(S.D.N.Y. 2009)); *Brown v. Johnson & Johnson,* No. CV 12-4929, 2015 WL 12834346, at *2

(E.D. Pa. Aug. 28, 2015) (AERs "are contributory evidence of causation that forms the basis of

an expert opinion."); *Wolfe v. McNeil-PPC, Inc*., No. CIV.A. 07-348, 2012 WL 38694, at *3

(E.D. Pa. Jan. 9, 2012) ("The Court reiterates its conclusion that, because plaintiff's experts did

not solely rely on case reports in forming their opinions on causation but used them to

supplement their extensive review of other evidence, such testimony is admissible.") (citation

and quotations omitted).

Further, even if these AERs would be otherwise admissible, their existence may be

disclosed to the jury at trial because "their probative value in helping the jury evaluate the

opinion substantially outweighs their prejudicial effect." Fed.R.Evid. 703.  This is on account of

"the accepted theory that a vast number of reports contribute to the plausibility of causation."

*Drake*, 2014 WL 12717875, at *2 (citing *Deutsch v. Novartis Pharm. Corp*., 768 F. Supp. 2d

420, 451 (E.D.N.Y. 2011) ("Dr. Marx does not cite un-reviewed AE reports for their truth, but

rather for the accepted theory that a vast number of reports contributes to the plausibility of

causation.")).  Accordingly, the Court should reject Sanofi's objections to experts' use of AERs

as but one factor supporting their opinions on general causation.

### 2.     *AERs Are Relevant and Admissible Non-Hearsay on the Issue of Notice*

Sanofi does not seem to contest that AERs generally constitute admissible non-hearsay

on the issue of a drug maker's notice of a safety issue. Indeed, this use of AERs is well-

recognized in the case law. *See In re Levaquin Prod. Liab. Litig*., No. 08-1943 JRT, 2010 WL

4676973, at *4 (D. Minn. Nov. 9, 2010); *accord. Brown v. Johnson & Johnson*, No. CV 12-4929, 2015 WL 12834346, at *2 (E.D. Pa. Aug. 28, 2015); *Drake v. Allergan, Inc*., No. 2:13-CV-234, 2014 WL 12717875, at *3 (D. Vt. Oct. 23, 2014); *In re Depakote*, No. 14-CV-847-NJR-SCW, 2015 WL 4775937, at *3 (S.D. Ill. Feb. 20, 2015). Sanofi's objection rather is that the AERs that might be proffered by Plaintiff are either too dissimilar to be relevant or post-date her chemotherapy.  However, Sanofi has not singled out any AERs as violative of Rule 401. Rather, Sanofi attempts to distract the Court with a veritable buffet of possible, non-Taxotere causes for those reported AEs (See Defs' Br. 20, Rec. Doc. 12911-3).  This strategy should be rejected not only (1) because it fails to identify any specific AERs or dissimilarities; but also (2) because it fully misses the point of notice evidence—what actually caused the reported AE in a Taxotere user is less important than the fact that the AE was reported at all. Absent concrete objections from Sanofi, the Court should reject this argument and deny its motion.

Finally, notice evidence in the form of AERs pose little risk for confusion, waste, or prejudice under FRE 403. "The risk of prejudice is low and the cure for any unwarranted potential suspicion of causation they might create is cross-examination and competing testimony rather than exclusion." *Drake,* 2014 WL 12717875, at *3 (rejecting arguments that the AERS "could improperly create suspicion of causation without any medical proof").  Further, the "objections required to address AERs" that Sanofi may "contend[] are insufficiently similar will not unduly lengthen the trial." Id. Defendants' Rule 403 arguments are without merit.

### B. CONCLUSION

For these reasons, Sanofi's motion should be denied. Plaintiff's expert has properly relied

on adverse event reporting in reaching their opinions on causation or safety signaling and individual AERs are widely accepted as admissible evidence on the issue of a drug maker's notice of a safety issue as long as they predate her injury.

6.  **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE PRESENCE, ABSENCE, OR IDENTITY OF DEFENDANTS' CORPORATE REPRESENTATIVE AT TRIAL**

As in *Earnest* , Plaintiffs do not object to this Motion *in Limine*, and only request that this Court admonish Defendant that defense counsel may not engage in any "vouching" for Sanofi by creating any false impression that defense counsel are part of Sanofi.  Plaintiff is concerned that, if Plaintiff is precluded from identifying the Sanofi corporate representative, defense counsel may attempt to substitute themselves for Sanofi's corporate representative by referring to Sanofi as "we" or "us."  Plaintiffs' concerns are far from speculative.  Indeed, in the *Earnest* trial this Court granted an identical motion *in limine* with an admonition to defense counsel not to engage in any such "vouching."  However, and despite this ruling, defense counsel repeatedly engaged in "vouching",

> "September 26, 2019: 2195 4-7 "What else did you learn during trial? We told you this, ladies and gentlemen, on the very first day we met. In our opening statement we said to you…"

> "And we brought you that evidence from the first day of trial and every day afterwards…"

> "Eight years later, today, she is alive and cancer free thanks in part to Taxotere. And maybe Mr. Schanker wants to trivialize that or minimize it. I don't think you should. I don't think Mrs. Earnest does. It means something. She received a benefit like no other. It's the gift of life. It's time with her husband. They have a happy marriage. You heard that. She had two grandbabies born since she was diagnosed, and you know she loves them. We don't question that."

> "Ladies and gentlemen, we very, very much appreciate the time that you've devoted to us, to this trial, and your good attention that you have paid throughout."[8]

Again, we ask that the Court give the same admonition in this trial.

---

[8] Ex. 1, September 26, 2019 *Earnest* Trial Tr. at 2195:4-7, 2196:11-12, 2217:17-24 and 2218:25 - 2219:2. *See also* Plaintiff's MIL No. 3, Rec.Doc. 12896.

7. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' EXECUTIVE AND/OR EMPLOYEE COMPENSATION**

With this motion, Sanofi seeks to preclude all evidence and argument concerning its executive and/or employee compensation from trial. This request, as it was previously, remains premature. It is Plaintiff's position that, if Defendants are permitted to introduce evidence that their employees or employees' relatives use Taxotere in an effort to bolster their credibility in defending the product, then Plaintiff should be allowed to explore all other reasons why the witness would be defending the product, including financial incentives enjoyed through that product promotion. Sanofi cannot use its business practices as both a sword and a shield, so if such evidence is offered at trial, it would certainly open the door to Plaintiff's use of contrary evidence to demonstrate proof of bias in rebuttal.

## A. ARGUMENT

Defendant has failed to establish how the evidence of executive compensation is immaterial, irrelevant, or prejudicial pursuant to Fed. R. Evid. 403. This same issue was previously raised and deferred by this Court via order dated September 10, 2019, because it was premature prior to trial then—as it is premature prior to trial now.[9]

Sanofi offers no new justification or change in law or circumstance which would entitle them to the relief they seek. Sanofi's previously relied on *In re Vioxx Prods. Liab. Litig.* 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) and *In re: Xarelto*, MDL No. 2592, No. 14-2720, Doc. No. 6254, at 14, and those precedents were not previously sufficient to sway this Court. The Court should not be influenced by them any differently now.

---

[9] Rec. Doc. 8206.

Executive compensation (if the need to offer it actually arises during trial) would be relevant because it is tied directly to a witnesses' potential bias.  As the United States Supreme Court has stated, "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *U.S. v. Abel*, 469 U.S. 45, 52 (1984).  "The partiality of a witness is subject to exploration at trial, and is always relevant to discrediting the witness and affecting the weight of his testimony."[10]  Indeed, it is well-established that bias is one of the principal subjects for cross-examination.[11]

In fact, the Fifth Circuit has long-recognized that the employment of a witness by a party is relevant to the possible bias or interest of the witness. *See, e.g., Central Truck Lines, Inc*., v. Lott, 249 F.2d 722, 724 (5th Cir. 1957) ("The interest of a witness in the result of the suit may always be considered in passing on his credibility; and [t]he fact that a witness is an employee of one of the parties is a proper matter to be considered by the jury in passing upon his credibility."); *Arnall Mills v. Smallwood*, 68 F.2d 57, 59 (5th Cir. 1933) ("Employment or other relationship of a witness may be considered on the point of his credibility in weighing his against opposing evidence."). This would undoubtedly include evidence of the employee's compensation, because it is the fact of compensation that creates the bias or interest, and the amount of compensation that, in turn, impacts the degree of bias or interest.

---

[10] *Davis v. Alaska*, 415 U.S. 308, 316 (1974).
[11] *See, e.g., Stevens v. Bordenkircher*, 746 F.2d 342, 346 (6th Cir. 1984) ("[C]ross-examination concerning the partiality of a witness is always relevant."); *U.S. v. Frankenthal*, 582 F.2d 1102, 1106 (7th Cir. 1978) ("Because of the importance of evidence of bias or interest, inquiry into the area is never collateral."); *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994) ("The motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination.").

It is beyond dispute that Sanofi's employees have profited, some extensively, from Sanofi's sales of Taxotere, and certain employees may have compensation packages that include performance-based incentives implicitly designed to encourage prioritization of sales.  As such, evidence of employee compensation is relevant and admissible to evaluate the veracity of the employee's testimony in order to explore potential bias and issues affecting credibility.  For these reasons, courts in other pharmaceutical cases have ruled that the admission of such evidence regarding employees' compensation is proper for this purpose.  For example, in the Vioxx MDL, the ruling was reserved because the court noted that it may be relevant to explain the defendant's actions or inactions, or to show motive.[12]  Likewise, in the Tylenol MDL, the court deemed compensation evidence admissible for both former and current employees because compensation can create bias or a conflict of interest.[13]

Sanofi argues that the probative value of this evidence is substantially outweighed by the risk of prejudice.  But Sanofi's argument entirely ignores the probative value of this evidence as described above. Evidence of an employee-witness's compensation is clearly relevant to showing bias, interest, or motive – and courts across the country agree.

---

[12] See *In re: Vioxx Prods. Liab. Litig.* (Barnett), MDL No. 1657, Order, at 9 ¶ 1 (E.D. La. June 28, 2006).

[13] See *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 294 (E.D. Pa. 2016); Additionally, the Fourth Circuit recently addressed whether executive compensation was properly introduced at trial in the case *McKiver v. Murphy-Brown, LLC* (*In Re NC Swine Farm Nuisance Litig.*), 980 F.3d 937 (4th Cir. 2020)(holding that company financial evidence, including executive compension, for the defendant and their parent companies were properly introduced at trial with regard to liability for purposes of establishing the feasibility of mitigation measures.) *Id.* at 972.  The Court further held that with respect to punitive damages, only the parent company financials should have been excluded at trial. *Id.* at 977.

**B**. **CONCLUSION**

For these reasons, it would be premature at this stage for the court to preclude all evidence and argument concerning Sanofi's executives and employees' compensation.  While Plaintiff does not necessarily disagree that in certain circumstances such evidence should not be presented at trial, if Sanofi is permitted to introduce evidence of its support for the product – for example, by means of touting personal use of Taxotere – then Plaintiff should certainly be permitted to offer evidence of the employees' compensation in rebuttal, as such information is clearly relevant to the employee-witnesses' credibility and bias.

8.  **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE COST OF TAXOTERE AND PRESCRIPTION DRUG PRICING GENERALLY**

In principle, Plaintiff does not oppose exclusion of evidence or argument regarding the "high cost of prescriptions" in general or Taxotere in particular.  However, Plaintiff is concerned that such an *in limine* ruling, as written, may be overly broad, and could be construed to exclude highly pertinent testimony regarding the Defendant's motivations and state of mind in making key decisions regarding the labeling of Taxotere.  Excluding *any* reference to the price of Taxotere could inadvertently result in the exclusion of relevant evidence regarding Sanofi's motives with respect to labeling of Taxotere.  An important consideration for the jury will be whether Sanofi's fear of competition with cheaper docetaxel influenced decisions with respect to providing adequate warnings regarding the risk of permanent hair loss.  Barring *any* evidence of Taxotere's price, as proposed by Defendant, prior to trial could be construed to preclude admission of this highly probative evidence.

In *Earnest*, this Court granted in part and denied in part a motion *in limine* to allow "factual evidence that may go to show intent, motive or state of mind."  Because the Court recognized the possibility that Defendant may "open the door" to such evidence, the Court instructed Plaintiffs to request a conference in the event that they believe that Defendant has "opened the door."[14]

Plaintiff requests that the Court issue a similar instruction in this trial should Sanofi open the door to the cost of Taxotere.

---

[14] Rec. Doc 8206 at pg. 3 (Order and Reasons).

9. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' CORPORATE FINANCES OR EMPLOYMENT DECISIONS**

Sanofi makes the same blanket attempt to exclude evidence or argument related to its corporate finances and employment decisions as it did in the *Earnest* case.  The motion is overbroad and should be denied or deferred as this Court ruled previously.[15]  Sanofi's status as a large, multinational pharmaceutical corporation with significant industry expertise and assets - financial, human, and physical - is relevant because the evidence demonstrates its ability to improve the Taxotere label and provide accurate and up-to-date information about Taxotere to the FDA, the medical community, and the public as well as Plaintiff and her treating physicians. The balancing test mandated by Federal Rule of Evidence 403 weighs in favor of the admission of evidence related to the resources available to Sanofi.  The probative value is considerable because the evidence demonstrates that Sanofi had the wherewithal to create a safer product, the power to act as necessary to do so, and to provide a better warning of PCIA.  The assets available to Sanofi and how it chooses to utilize those assets is pertinent to the core issue of reasonableness of its actions or failure to act.[16]  The prejudicial effect is minimal considering that much of the information regarding Sanofi is publicly available and jurors are already aware that big companies often have extensive assets at their disposal and are in business to make a profit.

---

[15] Rec. Doc. 8206.
[16] *See CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assoc.*, 411 B.R. 591, 604-605 (N.D. Ill. 2009) (testimony of size, wealth, revenues, profits, and resources of the defendants may be admitted to show reasonableness, but not to suggest "deep pockets."); *see also* **Error! Main Document Only.***Kammerer v. Wyeth*, 8:04CV196, 2012 WL 13033732, at *3 (D. Neb. Jan. 31, 2012) (evidence of profit margins is germane to questions of reasonableness and failure to warn even without a claim for punitive damages).

Moreover, to the extent that Sanofi makes motive or resources an issue, then its finances and employment decisions would be proper material to rebut assertions of good motive and inability to act due to lack of means.[17]

The bias or credibility of a witness is always relevant and employee compensation is an appropriate area for exploration at trial to demonstrate a witness' partiality or conflict of interest.[18]  However, if evidence or argument of Sanofi's employment decisions is excluded, then Sanofi should be precluded from introducing evidence of a similar nature.  In particular, Sanofi should not be allowed to introduce evidence or argument related to the termination of Sanofi sales representative, Ruth Avila, R.N., and her lawsuit against the company.  For the foregoing reasons, Plaintiff requests Sanofi's nonspecific and overreaching motion with respect to evidence or argument related to its corporate finances and employment decisions be denied or deferred.

---

[17] *See In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2005 WL 3164254, at *1 (E.D. La. Nov. 21, 2005) (finances and employment decisions are relevant for impeachment purposes during cross-examination when evidence of good motive is presented); *see **Error! Main Document Only.**Okuda v. Wyeth*, No. 1:04-cv-90 DN, 2012 WL 12337860, at *3 (D. Utah July 24, 2012) (if the defendants argue financial inability to act, then evidence of wealth would be pertinent).***Error! Main Document Only.***

[18] *See In re Tylenol (Acetaminophen) Marketing, Sales Practices and Prod. Liab. Litig.*, 181 F.Supp.3d 278, 294 (E.D. Pa. 2016) (compensation of current and former employees of defendants was admissible to show bias); *see also Kammerer*, 2012 WL 13033732, at *3 (employee compensation including compensation of employee experts is relevant to the bias and credibility of a witness).

**10. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING EXPERT OPINIONS THAT HAVE BEEN DISCLAIMED AND/OR THAT EXCEED THE SCOPE OF PLAINTIFF'S EXPERTS' RULE 26 DISCLOSURES AND DEPOSITION TESTIMONY**

Sanofi moves pursuant to Rule 37(c)(1) to exclude experts' opinions at trial that were "disclaimed" or "exceed the scope" of Plaintiff's Rule 26 disclosures.[19] This motion seeks only general relief by putting forth cherry-picked and out-of-context statements made during Defendants' examination of Plaintiff's experts. Notwithstanding that Plaintiff's experts have not offered nor will offer undisclosed opinions, Plaintiff respectfully submits that, as in *Earnest*, the Court should deny or defer ruling on Defendants' premature, vague, speculative, and *Daubert*-redundant request. Moreover, the parties do not need a motion *in limine* instructing them to follow the Court's previous Orders and the Federal Rules of Civil Procedure.

**A. ARGUMENT**

Under Rule 37(c)(1), "opinions not properly disclosed [ . . .] may be excluded 'unless the failure was substantially justified or is harmless.'"[20] In evaluating whether a new opinion is harmless, the Court must consider: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose.'"[21] Where a movant fails to identify, as Sanofi does here, which opinion evidence the non-movant has failed to disclose and now offers in support of her claims, the movant's argument fails and its motion must be denied.[22]

---

[19] Rec. Doc. 12911-3 at pg. 33-37.
[20] *Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 432–33 (5th Cir. 2012).
[21] *Bailey v. Shell W. E & P, Inc.,* 609 F.3d 710, 729 (5th Cir.2010).
[22] *Id.*

Defendants misstate testimony from Dr. Tosti and then claim it was undisclosed.  During

her September 29, 2020, deposition, Dr. Tosti testified:

> …actinic ketosis[23] of the scalp, which are, by definition, something
> that happens when the skin is exposed to the sun
>
>    * * *
>
> I'm saying that if she had actinic keratasis in the scalp, she should
> have alopecia, because that's never been described with a full head of
> hair.  So it's no way she had alopecia.[24]

Dr. Tosti has over 30 years of education, experience, and training as a dermatologist and

as a specialist in diagnosing hair and scalp disorders.[25]  Dr. Tosti should be allowed to testify

about a condition that she observed in her clinical examination of Ms. Kahn. Further, Dr. Tosti

reviewed all of Plaintiff's medical records, which includes records from Dr. Ochsner's

dermatological treatment of Plaintiff's actinic ketosis.[26]  Most importantly, Dr. Tosti never

makes a "causal link" specifically between actinic ketosis and PCIA, as Defendants suggest. She

makes a statement, supported by Defendants' expert, Dr. Turegano,[27] that the scalp's exposure to

the sun causes actinic keratosis. Defendants assert Dr. Tosti's opinion was not supported with

"appropriate facts, methods, or application" despite their own expert's testimony regarding

similar causal conclusions based on her "education throughout residency and my clinical

practice."[28]  Thus, Dr. Tosti's opinion - that sun exposure causes actinic ketosis - passes muster

under Fed. R. Evid. 702 if Dr. Turegano's opinion does.

---

[23] Defined as a rough, scaly patch on the skin caused by sun exposure.  *See* https://www.mayoclinic.org/diseases-conditions/actinic-keratosis/symptoms-causes/syc-20354969
[24] *See* Ex. 2, Sept. 29, 2020, Deposition Transcript of Antonella Tosti, M.D. ("Tosti Dep.") at 64:2-6, 67:19-23.
[25] See Ex. 3, Antonella Tosti, M.D. Report, 10/21/2019, at pg. 1.
[26] Ex. 2, Tosti Dep. at 7:14-20
[27] Q: "The thinner your hair is on the top of your calp probably the quicker you can get actinic keratosis; is that fair?" A: "That's fair to say. I see—patients who have less hair on the top of the scalp, I see more actinic keratoses there." Ex. 4, Oct. 23, 2020, Deposition Transcript of Mamina Turegano ("Turegano Dep.") at 132:18-23
[28] *Id.* at 132:12-17.

Defendants had the opportunity to depose Dr. Tosti on this topic *before* Dr. Turegano's report was disclosed and *before* Dr. Turegano's deposition, negating any prejudice. Defendants had the opportunity to challenge this opinion - which appears to be commonly accepted in the dermatologic field - both in Dr. Turegano's report, Dr. Turegano's deposition, and with their Daubert motions and <u>chose not to</u>. Defendants must not be rewarded for failing to meet their deadline to challenge expert opinions. If Dr. Turegano will be allowed to suggest to the jury that Ms. Kahn's actinic keratosis is evidence that she had existing hair loss prior to use of Taxotere, Dr. Tosti should be allowed to rebut that opinion based on her significantly greater experience in addressing hair loss disorders over her career.

Besides their untimely and unwarranted *Daubert* challenge to Dr. Tosti's opinion regarding actinic keratosis, Defendants devote the remainder of their Motion to opinions they mislabel as "disclaimed." Though citing no authority or definition for what a "disclaimed" opinion is or citing support for whether or when it should be excluded, Defendants repeatedly take a few cherry-picked and out-of-context lines of testimony from Drs. Feigal, Plunkett, Ross, and Madigan, and compare other statements in reports or depositions from the same witness. Additionally, general causation experts are entitled to rely on evidence that post-dates use; thus, Defendants cannot claim that general causation experts should be precluded from considering post-use data as they suggest.[29] Contrary to Defendants' Motion, these witnesses never disclaim or disavow *any* opinions, contrary to what Defendants claim.

To the extent the Court has limited a specific expert's testimony under Fed. R. Evid. 702, Plaintiff will not seek to introduce such testimony; however, to the extent that some of these witnesses' testimony - evidence that has already been deemed allowable by this Court - is

---

[29] Rec. Doc. 8094 at pg. 5; Rec. Doc. 12098 at pg. 5 discussing the Bradford Hill criteria.

somehow contradictory to the soundbites now cited by Defendants, such contradictions are nothing more than fodder for cross examination.[30]

Again, Plaintiff will adhere to the Court's rulings on Fed. R. Evid. 702 motions;[31] however, Defendants articulate neither exactly how they wish to further restrict each expert's testimony nor a compelling/particularized reason for the Court to revisit its previous *Daubert* Orders.  Defendants likewise provide no reasoning why some challenges were not raised at the appropriate time.  Based on the above, Defendants' Motion should be denied, or a deferred, as in *Earnest*.

---

[30] *See* Defendants' examples at Rec. Doc. 12911-3 n. 56, 57, 58, 59, 60; *See also Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.,* 753 F. App'x 191, 196 (5th Cir. 2018) (ruling that the district court abused its discretion in excluding expert testimony when some data points were inconsistent with the expert's opinion because the basis of the opinion was fodder for cross-examination).
[31] *See* Rec. Doc. 12911-3 n. 53, 54, 55.

**11. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' CORPORATE INTENT, MOTIVES, OR STATE OF MIND**

Sanofi's request herein is made in various forms throughout this omnibus motion *in limine*.  Sanofi is attempting to recast the evidence that it intentionally concealed the risk of permanent hair loss to be more competitive in the market as improper motive evidence, overreaching speculation by experts, and/or inadmissible punitive damages evidence.  However, as set forth herein, as well as in Plaintiff's opposition to motions to exclude improper expert testimony and punitive damages evidence, Sanofi's request should be denied.  Specifically, the Court should deny this Motion as 1) evidence of motive and intent was allowed in the *Earnest* trial; 2) the effort to exclude all evidence and argument regarding Sanofi's intent, motives, and/or state of mind masquerades under the guise of yet another improper *Daubert* motion; and 3) motive is probative of Plaintiff's *contra non valentem* defense to liberative prescription.  As Plaintiff explained in her Opposition to Sanofi's Omnibus Motion to Preclude Improper Expert Testimony, experts cannot *speculate*; however, experts *can* offer testimony as to a party's knowledge, potential motivations, or state of mind *so long as it is supported factually in the record*.  Thus, contrary to Sanofi's blanket assertions, Plaintiff's experts' testimony is within the confines of appropriate expert testimony, and their opinions should not be excluded as such.

**A. ARGUMENT**

First, Your Honor should deny Sanofi's motion as in *Earnest* the Court ruled it would allow factual evidence that shows intent, motive, or state of mind.[32]  Much of the evidence

---

[32] Rec. Doc. 8206.

Sanofi seeks to exclude in its motion, such as being "profit-driven" or taking steps to eradicate any mention of PCIA to doctors and patients, is admissible as it establishes motive.

Second, Sanofi should not be allowed a second bite at the apple by filing under the guise of yet another improper *Daubert* motion along these lines.  As enumerated by Plaintiff in her Opposition to Sanofi's Omnibus Motion to Preclude Improper Expert Testimony,[33] which is incorporated herein as if restated in full, and contrary to Sanofi's suggestion, the Federal Rules of Evidence *do not* categorically preclude such testimony.  Plaintiff's experts are free to testify regarding a party's knowledge, potential motivations, or state of mind so long as it is demonstrated in the record.

Contrary to Sanofi's assertion, Plaintiff's experts *are* able to testify regarding the business goals of Sanofi with respect to Taxotere – because such testimony in no way speculates definitively as to the party's motive. Indeed, in the widely-cited appellate opinion in *DePaepe v. General Motors Corp.*, the court ruled that while plaintiff's expert could not give opinion testimony that General Motors ("GM") had a particular motive when it designed a vehicle part, "[h]e could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason)." 141 F.3d 715, 720 (7th Cir. 1998); *accord Neuharth v. NACCO Materials Handling Grp., Inc.*, No. CIV. 01-4034, 2002 WL 34700601, at *5 (D.S.D. Dec. 17, 2002) (expert may testify as to financial motivations but may not speculate as to motive). *DePaepe* makes clear that the expert can go as far as the evidence takes him or her.

---

[33] *See* Plaintiff's Memorandum in Opposition to Sanofi's Omnibus Motion to Preclude Improper Expert Testimony, Rec. Doc. 7476.

Likewise, it is acceptable for Plaintiff's experts to describe economic conditions in Sanofi's industry and explain market factors impacting its choices because such testimony "seeks to articulate why there existed economically rational, independent business reasons" for decisions made, which is easily distinguishable from characterizing defendant's mental state, attitude, or corporate intent. *In re: Processed Egg Prod. Antitrust Litig.*, No. 08-md-2002, 2016 WL 4385843, at *3 (E.D. Pa. Aug. 15, 2016); *see also Retractable Techs. Inc. v. Abbott Labs., Inc.*, 05-CV-157, 2010 WL 11531436, at *5 (E.D. Tex. June 18, 2010) (allowing testimony on the sources of pressure on working capital, the effect of marketing decisions on sales, and other financial concerns, finding them to be "issues of sufficient complexity to warrant expert testimony") (*citing Bauman v. Centex Corp.*, 611 F.2d 1115, 1120–21 (5th Cir. 1980)).

Plaintiff's expert opinions on the interplay between Sanofi's marketing of Taxotere, the drug life cycle, and regulatory and labeling requirements do not speculate about the company's intent, but instead fairly describe and contextualize its strategy, as demonstrated in the factual record. In Sanofi's Taxotere 2000-2004 Strategic Plan, Sanofi defined its Strategic Intent: "We believe that by aggressively marketing Taxotere's superior clinical profile, results of phase II and III clinical trials, and by producing data in combination with novel therapeutic agents, we will position <u>Taxotere as the cornerstone therapy</u> for breast, lung, prostate/bladder, SCCHN, and gastric cancer, and we will generate yearly sales of over $500M by 2004."[34]  In its 2001-2005 marketing plan detailing its Objectives for Taxotere, Sanofi stated one of its primary goals was to "Build [Taxotere] sales to $1 billion by 2010."[35]

---

[34] Ex. 5, Sanofi Taxotere 2000-2004 Strategic Plan, Sanofi_00739377 (emphasis in original).
[35] Ex. 6, Sanofi Plan 2001-2005: Taxotere-Objectives, Sanofi_00749772.

In her expert report, Dr. Feigal describes each step of the "Drug Development Life-Cycle" and details the requirements of manufacturers, including with respect to marketed products and postmarketing safety surveillance. [36]  Dr. Feigal explains, "An important purpose of spontaneous reporting systems is to detect a previously unknown potential association between an adverse effect and a drug. If a potential association is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other action should be taken."[37]  Likewise, in her expert report, Dr. Plunkett explains that it is important to provide an overview of applicable FDA regulations in the context of Taxotere marketing and labeling in order to explain the "regulatory aspects of communicating demonstrated toxicities to physicians and patients, concerning CIPAL/PCIA associated with Taxotere use … ."[38]  Dr. Plunkett cites regulatory guidance, scientific literature, and clinical trial data to conclude: "Sanofi should have been aware that there was some basis for a causal association between Taxotere use as an adjuvant treatment in patients with early-stage breast cancer at least by 2006 and before the 2015 label change was made by Sanofi to add permanent or irreversible alopecia to the Adverse Reactions section of Taxotere's label."[39]

As Plaintiff has made clear, Drs. Feigal and Plunkett will not testify regarding the case law on failure to warn at trial.  However, Drs. Feigal and Plunkett are certainly qualified to testify as to industry standards and expectations regarding the communication of safety risks to doctors and patients—all of which is relevant under Louisiana's learned intermediary doctrine.

---

[36] Ex. 7, Feigal Expert Report, 03/23/2020, at pg. 13-17.
[37] *Id.* at 17.
[38] Ex. 8, Plunkett Supplemental Expert Report, 02/07/2021 at ¶71.
[39] *Id.* at ¶ 98.

Sanofi's experts have testified about the importance of a risk-benefit profile of various drugs, including Taxotere, and questioned Dr. Kardinal about his risk-benefit analysis prior to treating a patient. None of Sanofi's experts were provided with the above-referenced documents that set out the company's motive in Taxotere generating $500,000,000 by 2004, or in creating the first $1,000,000,000 taxane in Taxotere. Such lofty financial goals create the incentive to skew the risk-benefit profile in favor of Taxotere being as safe as, or safer than, other chemotherapy options by understating the risk of PCIA.

Finally, Sanofi argues that Rule 403 counsels against admission of such evidence. Not only is such evidence highly probative, but it is by no means unfairly prejudicial and will not confuse the jury or waste time. Rather, this expert testimony will clarify Plaintiff's arguments and prove helpful to the jury's understanding of the case. The fact that it may take time to cover these issues does not mean that the time will be wasted because this evidence is relevant to and probative of Plaintiff's claims.

Third, as more fully set forth in Plaintiff's response to No. 34 and incorporated herein by reference, Sanofi's marketing efforts in promoting Taxotere, including its employment of In Touch Solutions, is directly tied to Sanofi's efforts and motive to hide the risk of PCIA. Plaintiff offers that this evidence is relevant to a *contra non valentem* defense to liberative prescription because it shows the great extent to which Sanofi went to promote Taxotere but, yet, conceal its risks. *See, e.g., In re Med. Rev. Panel of Gerard Lindquist*, 18-444 (La. App. 5 Cir. 5/23/19), 274 So. 3d 750, 759, *writ denied*, 2019-01034 (La. 10/1/19), 280 So. 3d 165 (evaluating "defendant's conduct to determine whether it rose to a level of concealment, misrepresentation, fraud or ill practices" for purposes of *contra non valentem*); *see also Carter v. Haygood*, 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1269.

**B. CONCLUSION**

For these reasons, Sanofi's motion should be denied. Contrary to Sanofi's suggestion, the Federal Rules of Evidence *do not* categorically preclude such testimony.  Instead, Plaintiff's experts are free to testify regarding a party's knowledge, potential motivations, or state of mind so long as it is demonstrated in the record, and Plaintiff's experts should not be prevented from offering opinions in this regard at trial. As with the *Earnest* trial, the Court should allow Ms. Kahn to present "factual evidence that may go to show [Sanofi's] intent, motive, or state of mind."[40]

---

[40] *See* Rec. Doc. 8206 at pg. 3 (Order and Reasons on Mots. *in Lim.*).

12. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DEFENDANTS' CORPORATE INTEGRITY AGREEMENTS, GOVERNMENT INVESTIGATIONS OR SETTLEMENTS, OR ANY OTHER ALLEGED "BAD ACTS" UNRELATED TO TAXOTERE**

This Court previously granted Sanofi's Motion *in Limine* in the *Earnest* case, although the Court's ruling was qualified that the Motion was granted, "***unless the door is opened***."[41]  For the same reasons – provided below – the Court should deny the wholesale exclusion of all evidence and argument concerning Sanofi's corporate integrity agreements, government investigations or settlements, and any other alleged "bad acts" unrelated to Taxotere.  While Plaintiff does not necessarily disagree that in certain circumstances such evidence should not be presented at trial, it would be premature to preclude the evidence now without the benefit of context at trial.  For example, if Sanofi is permitted to introduce evidence of its "good" character (i.e., charitable contributions, reputation, good acts such as claiming that it is "saving lives" by virtue of its products), then Plaintiff should be permitted to offer evidence of Defendant's "bad" character in rebuttal.

A.     **ARGUMENT**

As Plaintiff explained in their Motion *in Limine* No. 1 to Exclude Evidence Regarding Sanofi's Corporate Character and Good Acts,[42] Sanofi cannot use its business practices as both a sword and shield.  If evidence of its "good" character is offered at trial, it would certainly open the door to Plaintiff's use of contrary evidence to show the jury the "bad acts."  Simply put, the jury must be shown the other side of the coin.

---

[41] *See* Rec. Doc. 8206 at pg. 4 (Order and Reasons on Mots. *In Lim*) ("Granted, unless the door is opened.") emphasis added.
[42] *See* Plaintiff's Motion *in Limine* No. 1 to Exclude Evidence Regarding Sanofi's Corporate Character and Good Acts, ECF. No. 12892.

Nothing about this evidence would be unfairly prejudicial to preclude its presentation under Rule 403. Sanofi claims otherwise; however, such an argument completely ignores the fact that the evidence would be presented *only if* Sanofi touts its "good acts" to the jury. If Sanofi opens the door to such evidence, any prejudice caused by the presentation of contrary evidence in rebuttal would by no means be unfair.

In addition, Sanofi claims that the evidence should be precluded under Rule 404, which prohibits the presentation of evidence of a crime, wrong, or other act to prove a person's character in order to show the person acted in accordance with that character on the questioned occasion. Sanofi cites to *Vioxx* in support of its position that such evidence should be excluded under Rule 404; however, such reliance is misplaced. In *Vioxx*, the court did not preclude the evidence on that ground. Rather, that ground was merely suggested by Defendants, along with irrelevance and prejudice, as a potential basis for precluding the evidence.[43] Additionally, the court in *Vioxx* noted that the evidence could be presented if "it becomes an issue of cross-examination," which is consistent with Plaintiff's potential use of this evidence at trial.[44]

## B.   CONCLUSION

For these reasons, it would be premature at this stage for the court to preclude all evidence and argument concerning Sanofi's corporate integrity agreements, government investigations or settlements, and any other alleged "bad acts" unrelated to Taxotere. If Sanofi is permitted to introduce evidence of its "good acts" as described above, then Plaintiff should certainly be permitted to offer evidence of Defendant's "bad acts" in rebuttal to show the jury the other side of the coin.

---

[43] *See In re Vioxx Prods. Liab. Litig.*, 2005 WL 3164254, at *1 ¶16. (E.D. La. Nov. 21, 2005).
[44] *Id.*

13. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING SPECIFIC LITIGATION CONDUCT**

Sanofi seeks to preclude evidence or argument concerning specific litigation conduct on an array of different topics, spanning from the voluntary designation of their own internal documents as "confidential" to settlement negotiations between the parties.  While Plaintiff finds no issue with Sanofi's request pertaining to settlement negotiations (as such is aligned with a similar motion *in limine* filed by Plaintiff), the other requested remedies leave room for the jury to infer that Plaintiff always had access to Defendants' internal documents and asks the Court to apply unequal evidentiary standards to Plaintiff.

A. **ARGUMENT**

1. *Designation of Documents and Testimony as "Confidential"*

The jury will need to consider whether Plaintiff was reasonable in failing to attribute her injury to Taxotere until she learned of this litigation and will also need to decide whether Defendants' warnings were sufficient.[45]  If the jurors are unaware that Defendants' "confidential" materials were not publicly available, they could infer that Plaintiff and her physicians had access to or possessed information linking Taxotere to her injury well before her lawsuit and potentially prior to her treatment.  In order to avoid the inference that Defendants' disclosures were readily available, the documents must either be displayed as "confidential," or the Court should give a curative instruction informing the jury that Plaintiff and her physicians did not have access to the documents.

2. *Evidence or Argument about Sanofi's Document Production & Parties' Motions, Sanofi's Objections, or Court Rulings*

---

[45] Rec. Doc. 9885.

Sanofi's motion is vague and non-specific and asks the Court to apply an uneven evidentiary standard to the parties. Defendants purposefully left out any examples of the evidence they anticipate Plaintiff will introduce should this motion not be granted in order to use it as a shield when convenient and as a sword when favorable. For example, Defendants wish the Court to exclude all evidence of Sanofi's failings to participate in discovery, but will inevitably attack the credibility of Plaintiff's experts for not publishing on Permanent Chemotherapy Induced Alopecia, ("PCIA"), caused by Taxotere, even though the protective order prevents these same experts from publishing information they learned during this litigation.[46]

Notwithstanding the vagueness of Sanofi's motion, Plaintiff agrees that in certain circumstances some such evidence should not be presented at trial; however, Plaintiff disagrees with Sanofi's request to the extent that it usurps the Court's express power to *sua sponte* address previously filed motions and rulings with the jury. *See Shea v. Bonutti Research, Inc*., 2013 U.S. Dist. LEXIS 76102 (S.D. Ohio May 30, 2013). The court in *Shea* stated that it would not "hamstring itself" with such a ruling *in limine*. *Id*. at *6. Likewise, this Court should not hamstring itself by limiting what could be relevant, probative, and instructive evidence with pre-trial motions and rulings. While a ruling on this motion would be premature and speculative, should the Court exclude this type of evidence, it must apply in equal force to prevent evidence related to what Plaintiff or her experts "refused or failed to produce" based on previous orders.

## B. CONCLUSION

For these reasons, it would be improper for the Court to preclude all evidence and argument regarding the voluntary designation by Sanofi of its own documents as "confidential,"

---

[46] Rec. Doc. 612-1.

that is unless the Court gives a curative instruction to the jury. Further, it would be premature at this stage for the Court to preclude all evidence and argument concerning Sanofi's document production and the parties' motions, objections, or court rulings, so as not to hamstring itself with such a ruling *in limine*.  Should the Court consider entry of such an order necessary, it must preclude Defendants from introducing evidence of the same.  Finally, Plaintiffs do not oppose Defendants' request to exclude evidence of settlement negotiations.

14. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING ALLEGED FRAUD ON THE FDA**

The Court should defer its ruling on this issue, just as it did in *Earnest*. Sanofi's motion is again vague and fails to identify any specific examples of the type of evidence Plaintiff may allegedly argue regarding Sanofi withholding information from, misleading, and/or committing fraud on the FDA, making it extremely difficult, if not impossible, for Plaintiff to meaningfully respond. Notwithstanding this, Sanofi's motion is without merit by misapplying a preemption standard to evidentiary issues and by failing to recognize that certain matters that may be considered fraudulent in nature are clearly relevant to and highly probative of Plaintiff's failure-to-warn claims.

A.    **ARGUMENT**

Sanofi's motion fails to identify specific examples of the type of "fraud on the FDA" evidence that Sanofi seeks to exclude, making it exceptionally difficult to respond absent "guessing" at the type of evidence Sanofi may find questionable. Moreover, Sanofi's claim that evidence regarding Sanofi's regulatory compliance would result in a preemption sideshow misses the point. Plaintiff is not pursuing a fraud-on-the-FDA claim and therefore does not implicate the Supreme Court's decision in *Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 343 (2001). As the Actos court explained in addressing an almost identical argument raised by Takeda:

> Again, this Court notes, one must not lose sight of the actual clams made by Plaintiffs that will be pursued at trial. Plaintiffs will not be litigating a "fraud-on-the-FDA claim" as Defendants' argument implies. Thus, Buckman does not, by its own terms, apply to this case and Defendants' reliance upon it is misplaced. Moreover, additionally, even the Buckman Court acknowledged there are certain types of state law claims based upon violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") that are not preempted, and distinguished the surviving

claims by noting that pre-empted claims were based entirely on alleged violations of FDCA disclosure requirements; that is not the factual scenario at play in the instant case. In light of this distinction, Buckman does not govern, and, therefore, does not preclude any and all evidence of FDCA reporting violations, but in Buckman pre-empted claims based solely on those alleged violations. … Again, whether such evidence in the manner presented might or might not be otherwise admissible is not the inquiry now before the Court and is better reserved until trial, however, the evidence is relevant to the issues inherent within the "failure to adequately warn" claim made by Plaintiffs and not precluded by law as Defendants argue. Thus, Defendants' reliance on Buckman, is, in and of itself, misguided as to the actual legal question before the Court.

*In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 120973, at *5 (W.D. La. Jan. 10, 2014) (original emphasis); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig.,* No. 14 C 1748, 2017 WL 1836443, at *7–8 (N.D. Ill. May 8, 2017) ("*Buckman* does not mean plaintiffs cannot bring state law claims based on conduct that violates the FDCA."); *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.,* No. 2436, 2016 WL 4039286, at *11 (E.D. Pa. July 28, 2016) ("*Buckman* preempts 'fraud on the FDA' claims, not evidence.").

Per rulings of the Fifth Circuit, a plaintiff can introduce evidence of violations of FDA regulations in support of her claim for a breach of the underlying state court duty.[47] "Buckman does not preempt claims of a violation of an independent state-law duty, nor does it prevent plaintiffs from supporting such claims with evidence 'that [a defendant manufacturer] violated the FDA's ... regulations [for medical devices].'" *Celino v. Biotronik, Inc*., No. CV 20-2298, 2021 WL 1699847, at *6 (E.D. La. Apr. 29, 2021) citing *Hughes v. Bos. Sci. Corp.*, 631 F.3d 762, 775 (5th Cir. 2011). Sanofi's argument fails to recognize that certain matters that may be considered fraudulent in nature are entirely proper to present at trial. For example, it would be ill-conceived to blankly assert that AEs not shared with the FDA should be excluded on that

---

[47] *Hughes v. Bos. Sci. Corp.*, 631 F.3d 762, 775 (5th Cir. 2011)

basis alone, especially when there are other reasons for presenting such evidence, most importantly being the notice on the part of the manufacturer—which is clearly relevant to Plaintiff's failure-to-warn claims.[48] Indeed, the requirements for a manufacturer, like Sanofi, to report AEs is an integral part of the FDA's ability to monitor the safety of pharmaceutical drugs. The FDA relies heavily upon post-marketing reports, such as AEs, to track safety issues and require label changes.

Similarly, pharmaceutical companies, like Sanofi, utilize AEs to provide "pharmacovigilance" signals of potential and actual reactions to marketed drugs, which could prompt further studies, testing, changes to warnings, and/or the ultimate withdrawal of the product from the market. Not only would Sanofi's reporting of AEs, or lack thereof, to the FDA be relevant, but it is entirely proper to use AEs to show that Sanofi had notice of adverse events of the type suffered by Plaintiff – and, in fact, courts across the country in pharmaceutical cases agree.[49]

In addition, Sanofi argues that Rule 403 counsels against admission of any evidence or argument that Sanofi withheld information from the FDA on the basis that it would "mislead and confuse the jury on collateral issues, while unfairly prejudicing Sanofi."  Such evidence, however, is highly probative, and the suggestion that pharmaceutical companies should not be accountable for complying with FDA regulations by properly reporting AEs is nothing short of

---

[48] This type of evidence is also addressed in Sanofi's Motion *in Limine* No. 5 to Exclude Evidence Concerning Adverse Events Not Involving Plaintiff (Rec. Doc. 7655-3 at 13); in Sanofi's Motion *in Limine* No. 26 to Exclude Evidence Related to Third-Party Advocacy Groups (Rec. Doc. 7670) and in Sanofi's Motion *in Limine* No. 28 to Exclude Evidence or Argument Related to 2011 FDA Warning Letter and Related Communications (Rec. Doc. 7673). Plaintiff's opposition to these MILs, when reviewed together, demonstrate the relevancy of AEs in general as opposed to reviewing them piecemeal (or independently) as Sanofi has done.

[49] *See, e.g.*, *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.,* 956 F. Supp. 2d 809, 815 (N.D. Ohio 2013), *aff'd sub nom. Decker v. GE Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014); *In re Heparin Prods. Liab. Litig.,* 803 F. Supp. 2d 712, 726-27, 730, 745, 754 (N.D. Ohio 2011); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.,* 817 F. Supp. 2d 535, 549 n.79 (E.D. Pa. 2011).

remarkable. This evidence is by no means unfairly prejudicial, nor is it misleading or confusing. By not disclosing facts to the contrary, the jury is left with the impression that the manufacturer complied with FDA regulations and properly reported all AEs.  This would certainly be misleading and confusing.  The jury must be told the truth, especially when such evidence points to notice and is relevant to and probative of Plaintiff's failure-to-warn claims.  The fact that it may take time to cover these issues does not mean that such evidence will be misleading or confusing, and it should not be excluded as such.

**B.     CONCLUSION**

For these reasons, Sanofi's motion should be denied. Not only is it vague, but it is without merit.  It would be premature at this point to blanketly preclude evidence falling under Sanofi's definition of "withholding information from the FDA," especially without the benefit of context at trial.

## 15. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE REFERENCE TO PCIA AS "COMMON"

Sanofi's sole argument in support of its motion seeking to preclude any reference to PCIA as a common side effect of Taxotere is that it is "inconsistent" with the language now appearing in the Taxotere label approved by the FDA. Common is a recognized medical classification that Sanofi endorses in several internal company documents and the current Taxotere label indicates persistent alopecia is a common side effect. Notably, Sanofi does not cite a single case where a court has done what it is requesting here. Sanofi's motion fails to establish that referring to PCIA as common would be irrelevant[50] and/or unduly prejudicial. For the following reasons, Sanofi's motion must be denied.

The frequency of adverse drug reactions is classified into five categories by the CIOMS based on percentage rates: very common being 10% or higher, common being between 1 and 10%, uncommon being between .01 and 1%, rare being between .01 and .1%, and very rare being less than .01%.[51] These categories are commonly used in the medical community when determining the frequency of adverse drug reactions. Indeed, these same categories are recognized and utilized by Sanofi in its Summary of Product Characteristics[52] and Company Core Data Sheet (CCDS) for Docetaxel.[53] While Sanofi may wish to acknowledge the categories in some scenarios, while ignoring them in others, it cannot have it both ways.

According to Sanofi's own data, TAX316, 3.9% of patients experienced PCIA with Taxotere. Further, in the Nabholtz, et al. publication, 7.4% of patients experienced alopecia that

---

[50] There is nothing in the Taxotere label (prior and current versions) indicating persistent alopecia is uncommon or that the FDA has rejected the notion that persistent alopecia is common.
[51] World Health Organization, Frequency of Adverse Drug Reactions CIOMS. https://www.who.int/medicines/areas/quality_safety/safety_efficacy/trainingcourses/definitions.pdf, at Slide 10 (last accessed July 2, 2021).
[52] Ex. 9, Sanofi_05320184, at pg. 10.
[53] Ex. 10, Sanofi_00805192, at pg. 16, Section 11.

lasted greater than two years.[54]  Thus, it is entirely accurate to say that PCIA is a common side effect of Taxotere pursuant to the CIOMS categories.  Sanofi is free at trial to explain the background of its studies, cross-examine Plaintiff's expert(s) regarding the classification, and/or produce its own expert to opine why the categorization is wrong, but precluding reference to PCIA as common according to categories recognized by Sanofi is unfounded.  The adverse drug reactions categories are absolutely relevant, and the categories are endorsed within Sanofi's own documents.

In claiming that the jury will be confused or misled, Sanofi is underestimating the ability of the jury.  The testimony Sanofi is trying to preclude here is certainly not the type of evidence that is "dragged in by the heels for the sake of its prejudicial effect."[55]  Indeed, the jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony *in light of the bases and sources for the expert's opinion*.[56]  Thus, the jury can weigh the expert's opinion that PCIA with Taxotere is common pursuant to the CIOMS frequency of adverse drug reactions categories.  Sanofi seems to have forgotten that it will have the opportunity to cross-examine Plaintiff's experts at trial and will surely parade its own witnesses to explain the alleged rarity of PCIA with Taxotere.  The adversary system provides Sanofi adequate opportunity to refute this testimony, and thus exclusion due to the danger of misleading the jury is inappropriate.

For the foregoing reasons, Sanofi's motion should be denied.

---

[54] Ex. 11, Nabholtz, et al., Phase II Study of Docetaxel, Doxorubicin, and Cyclophosphamide as First-Line Chemotherapy for Metastatic Breast Cancer, J.Clin. Onc., Vol 19, No 2, 2001: pp. 314-321.

[55] *Stephens v. Florida Marine Transporters, Inc.*, 12-1873, 2013 WL 5236624, at *4 (E.D. La. Sept. 16, 2013) (quoting *Baker v. Canadian Nat'l/Illinois Cent. R.R.*, 536F.3d 357, 369 (5th Cir. 2008)).

[56] *Gaddy v. Taylor Seidenbach, Inc.*, 446 F.Supp.3d 140, 158 (E.D. La. 2020) (emphasis added).

16. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING WHAT MS. KAHN WOULD HAVE DONE DIFFERENTLY IF SHE HAD BEEN GIVEN DIFFERENT RISK INFORMATION BY HER PRESCRIBING ONCOLOGIST**

Plaintiff respectfully submits this response in opposition to Sanofi's Motion *in Limine* No. 16 to preclude evidence or argument concerning what Ms. Kahn would have done differently if she had been given different risk information by her prescribing oncologist.

A.     **ARGUMENT**

1.     *Plaintiff's testimony regarding whether she would have agreed to take Taxotere if Sanofi had provided an adequate warning is relevant to the causation analysis.*

Sanofi seems to abandon its argument from its comparable motion *in limine* in *Earnest* that evidence regarding what Plaintiff would have done differently had an adequate warning been provided is legally irrelevant.  Instead, Defendants argue that a different outcome is warranted here as a result of Ms. Kahn's and her prescribing physician's testimony surrounding the prescribing decision and whether/how an adequate warning would have changed that decision.  But Sanofi is only attempting to relitigate fact issues regarding how the conversation between Ms. Kahn and her prescribing physician would have gone had they known of Taxotere's risk of permanent hair loss through a motion *in limine* despite this Court's ruling on Sanofi's motion for summary judgment on warnings causation.[57]  Sanofi's slanted reading of the record does not warrant the exclusion of evidence concerning what Ms. Kahn would have done if her prescribing physician, Dr. Kardinal, had informed her that Taxotere causes permanent hair loss.

As this Court has recognized in multiple rulings, the prescription decision is a two-sided process that involves a doctor sharing risk/benefit information and a patient deciding whether to

---

[57] Rec. Doc. 9888.

agree or disagree with accepting the risks of the proposed treatment.  Accordingly, it would be nonsensical for the jury not to hear this important testimony of Ms. Kahn regarding how she would have reacted to a different risk/benefit profile, had she been provided with a different warning regarding permanent hair loss with use of Taxotere.

Dr. Kardinal testified that Sanofi never warned him of the risk of permanent hair loss, and if they had, he would have counseled Ms. Kahn on that risk and would have respected her decision to go with a different treatment regimen.[58]  Dr. Kardinal further testified that Taxotere and Taxol are equivalent in efficacy, and he considered treatment with Taxol, Adriamycin, and Cyclophosphamide to be an adequate alternative if a patient did not wish to undergo treatment with Taxotere due to the risk of permanent hair loss.[59]  In light of Dr. Kardinal's testimony, evidence of Ms. Kahn's ultimate decision to take Taxotere is relevant and admissible for the purposes of causation.  Like in *Earnest*, "the jury must decide whether the prescribing decision would have changed; this depends on the oncologist's conversations with Plaintiff and what risks Plaintiff was willing to accept."[60]

### 2. *The learned intermediary doctrine necessarily involves "speculative" testimony where no warning information was conveyed by the drug manufacturer.*

Sanofi seeks to exclude hypothetical testimony that is routinely admitted under the learned intermediary doctrine. Sanofi contends that evidence of what Ms. Kahn would have done differently had she been warned that Taxotere causes permanent hair loss is speculative, bias, and based on hindsight.[61]  Ms. Kahn testified as follow: "If my doctor had told me that one of the

---

[58] Ex. 12, Jan. 17, 2018, Deposition Transcript of Dr. Kardinal ("Kardinal Dep.") at 87:2-88:17, 139:20-140:9, 141:2-145:22, 175:9-17.
[59] *Id.* at 145:11-146:12.
[60] Rec. Doc. 8206 at pg. 4.
[61] *See* Defs. Br. at 57-58.

side effects of Taxotere was permanent hair loss, I would have asked him, what are my other options. Just like when I was told about the surgery, about a mastectomy, I wanted to know what my other options were."[62] While Ms. Kahn's primary goal was to survive breast cancer, she wanted to be as whole as possible after the conclusion of her cancer treatment "so that [she] wouldn't be reminded every day, that [she] had cancer."[63]

After considering the evidence described above for summary judgment purposes, this Court determined that "[t]here are fact issues for the jury to decide regarding how the conversation between Plaintiff and her doctor would have gone if they had known of Taxotere's risk."[64] Moreover, the Fifth Circuit in *Phillips*, just like this Court, recognized that a patient's input might "steer[] the conversation in a such a way that [the prescribing physician] would have changed his prescribing decision had he known that the risk of alopecia associated with Taxotere was potentially permanent rather than temporary."[65]

As such, evidence concerning what Ms. Kahn would have done if Dr. Kardinal had informed her that Taxotere causes permanent hair loss should not be replaced with objective evidence nor precluded from the trial of this matter. The jury should be allowed to evaluate the credibility of Ms. Kahn's testimony, and Sanofi's concerns about the hindsight nature of the testimony will appropriately be considered in light of their vigorous cross examination of such testimony.

---

[62] Ex.13, Dec. 7, 2017, Deposition Transcript of Elizabeth Kahn ("Kahn Dep.") at 301:16-21.
[63] *Id.* at 156:9-157:5.
[64] Rec. Doc. 9888 at pg. 5.
[65] *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, No. 20-30205, 2021 WL 1526420, at *4.

**3.** ***Neither Fed. R. Evid. 701 nor Fed. R. Evid. 403 warrant the preclusion of evidence concerning what Ms. Kahn would have done differently if she had been given different risk information by her prescribing oncologist.***

Fed. R. Evid. 701 provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Ms. Kahn repeatedly testified that if she had known Taxotere could cause permanent baldness, she would have asked about alternative treatment options that could cure her cancer that did not cause permanent baldness.[66]  Ms. Kahn's testimony is based on her firsthand knowledge and helpful to determining a fact in issue – that the failure to warn was both the cause in fact and proximate cause of her injury.

Also, evidence of what Ms. Kahn would have done differently had she been informed of the risk of permanent hair loss is not based on scientific, technical or other specialized knowledge.  In fact, Ms. Kahn's testimony confirms that she would have relied on her oncologist for scientific information on alternative treatments.  Finally, the probative value of the evidence at issue outweighs any potential danger of unfair prejudice or jury confusion under Fed. R. Evid. 403.

**B.    CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion *in Limine* No. 16.

_____

[66] Ex. 13, Kahn Dep. at 301:16-305:13, 338:8-20.

**17. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING SANOFI PROMOTIONAL AND/OR MARKETING MATERIALS NOT POSSESSED OR RELIED ON BY MS. KAHN OR HER PRESCRIBING PHYSICIAN**

This Court denied Sanofi's comparable motion *in limine* in the *Earnest* matter stating: "Evidence showing how Sanofi communicated with doctors or patients about hair loss is relevant to Sanofi's state of mind and what knowledge Sanofi had of Taxotere's risk of hair loss."[67]  For the same reasons, this Court should deny Sanofi's motion here.  Moreover, Plaintiff's use of Sanofi's marketing and promotional materials in the *Earnest* trial does not warrant a different result.

Plaintiff does not intend to introduce Sanofi's promotional materials as evidence of Sanofi's marketing efforts.  However, Plaintiff anticipates that Sanofi will continue to argue that the Taxotere label warned doctors of permanent hair loss with the single word "alopecia" prior to 2015.  To counter this argument, Plaintiff intends to utilize an informational brochure created by Sanofi in 2006 that identifies alopecia has a "common, **yet temporary**, side effect."[68]  It is unclear if Sanofi utilized this brochure as a marketing tool—regardless, this evidence is relevant to impeach Sanofi's claims that it warned of permanent hair loss prior to 2015 with the word "alopecia."  Accordingly, Plaintiff should be permitted to introduce company-written materials showing that Sanofi knew "alopecia" warned only of temporary hair loss when Sanofi contends that "alopecia" means both temporary and permanent alopecia.

In addition, Plaintiff disagrees with Sanofi's interpretation that Ms. Earnest improperly suggested that Sanofi's brochure may have influenced her or her prescribing physician in the

---

[67] Rec. Doc. 8201 at pg. 5.
[68] *See* Ex. 14, Sanofi_01038470 at 5 (emphasis added).

*Earnest* trial.[69]  In fact, testimony from Sanofi's sales representative, Ruth Avila, highlighted by Sanofi from the *Earnest* trial, reveals that Ms. Avila testified that she did not know whether Ms. Earnest saw certain marketing materials.[70]  Certainly, Sanofi could pose the same question in the *Kahn* matter to both Ms. Avila and Ms. Kahn with regard to the brochure to cure any potential jury confusion that Sanofi fears.

Sanofi's marketing and promotional materials depict what Sanofi knew and chose to share with the medical community about Taxotere.  Such evidence directly bears on whether Sanofi provided adequate warnings about Taxotere regardless of whether Sanofi's marketing efforts reached Ms. Kahn or her prescribing physician.  Indeed, courts, including this Court in the *Earnest* trial, have declined to exclude marketing evidence, regardless of whether the plaintiff or the prescribing physician relied on marketing evidence, when such evidence is probative of the drug manufacturer's knowledge.[71]

---

[69] Plaintiff's Opposition to Sanofi's Motion *in Limine* No. 20 also addresses the relevancy of Sanofi's sales representative's testimony and related marketing and promotional materials.

[70] *See* Sanofi's brief at 62-63.

[71] *See Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 853-55 (M.D. Tenn. 2010) (Denying motion *in limine* to exclude marketing or advertising materials because marketing efforts encouraging off-label use were relevant to the plaintiff's negligence claim that the defendants knowingly failed to perform adequate pharmacovigilance on whether the drug was safe for off-label use); *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 181 F. Supp. 3d 278, 308-312 (E.D. Pa. 2016) (Denying motion *in limine* to exclude marketing and promotional materials because evidence concerning marketing and advertising decisions may be relevant to show the defendants' state of mind and whether the risk was known and obvious to consumers); *In re Depakote*, 87 F. Supp. 3d 916 (S.D. Ill. 2015) (Denying motion *in limine* to exclude reference to promotional activities, promotional materials, and sales and marketing practices because "[e]ven without testimony that these materials affected the decisions of [the plaintiff's] physicians […], this evidence is relevant on the issue of what [the defendant] knew and when it knew about the scope of [the drug's] birth defect risks and its proper use…"); *In re Testosterone Replacement Prods. Liab. Litig. Coordinated Pretrial Proc.*, 2018 WL 305503, at *8 (N.D. Ill. Jan. 6, 2018) ("Marketing and promotional materials that were not viewed or relied upon by a plaintiff or his prescribing physician may still be relevant and admissible on the question of the motive and intent underlying a manufacturer's promotional activities."); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, 2017 WL 5029601, at *2 (N.D. Ill. Nov. 3, 2017) ("[E]ven if a manufacturer's marketing material played no direct role in causing a plaintiff to take a TRT drug, the material may still be relevant 'on the question of [the manufacturer's] knowledge that it s marketing was misleading or its intent to create an off-label market.'").

52

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

Motion *in Limine* No. 17.

## 18. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING NON-EXPERT CAUSATION TESTIMONY

Plaintiff does not intend to illicit "causation" testimony from the lay witnesses identified in Sanofi's Motion—namely, Felicia Kahn, Leslie McDermott, and Steven Seebol.  To the extent that Sanofi seeks to exclude such testimony from any other witness not identified in Sanofi's motion, Plaintiff opposes the requested relief as overbroad.  Indeed, it is virtually impossible to respond without further information as to the witnesses Sanofi claims are unqualified to offer testimony.

To the extent that Sanofi seeks to exclude general causation testimony from non-expert witnesses, which would include Sanofi witnesses, Plaintiff again opposes as overbroad and unsubstantiated.  Multiple Sanofi witnesses have testified that Taxotere causes permanent hair loss, including but not limited to:

- Lesley Fierro, Pharm.D., Sanofi Head of Medical Information Services – ("Q. … As a pharmacist, do you understand today that Taxotere can cause permanent hair loss? A.  Correct, yes.")[72]

- Nanae Hangai, M.D., Sanofi Global Safety Officer – ("Q. And you believe that Taxotere is causally associated with permanent hair loss, correct? A. Docetaxel/Taxotere may cause permanent hair loss, but it's case-by-case.")[73]

- Amy Freedman, M.D., Sanofi Global Safety Officer – ("Q. … [B]ased upon your knowledge at Sanofi in 2006, Sanofi knew that Taxotere could cause irreversible alopecia in 2006, correct? A. Yes.")[74]

Excluding such testimony of company witnesses with personal knowledge of the topic discussed as part of their responsibilities at Sanofi would not only be improper but also contradict this Court's *Daubert* ruling regarding Dr. Kopreski.

---

[72] Ex. 15, Jan. 17, 2019, Deposition Transcript of Lesley Fierro at 89:22-90:01
[73] Ex. 16, Feb. 1, 2018, Deposition Transcript of Nanae Hangai at 17:22-18:02
[74] Ex. 17, Oct. 26, 2018 Deposition Transcript of Amy Freedman ("Freedman Dep.") at 195:20-196:02

In addition, Sanofi seeks to exclude testimony from three Sanofi witnesses—Lesley

Fierro, Jean Aussel and Frances Polizzano; however, this testimony is permissible because it is

"derived from duties [they] held"[75] at Sanofi and provides relevant and probative information

regarding (1) the relationship between Sanofi's regulatory, safety, pharmacovigilance, labeling,

and clinical departments, (2) Sanofi's knowledge at the time of these statements, and (3)

intersection of this information with Sanofi's compliance with legal duties.

For example, Plaintiff presented the jury with deposition testimony in the *Earnest* trial of

Lesley Fierro, Pharm.D., Sanofi's Head of Medical Information Services, who "was responsible

to build and maintain a system within medical information for handling inquiries, as well as

putting together the documents that were necessary to answer the questions" that came in from

physicians and patients regarding, among other things, Taxotere and permanent alopecia.[76]  This

testimony is relevant to explain Sanofi's procedures for responding to questions regarding

Taxotere and side effects.  In addition, Jean Aussel, PhD, who was involved in both TAX316 and

GEICAM 9805, testified regarding the interplay between his role as Medical Director, reporting

to regulatory authorities, and empowering oncologists to fulfil "their job and their duty to assess

what is meaningful as a side effect, to inform the patients, to discuss individually with the

patients."[77]  Dr. Aussel's testimony contextualized the interplay between clinical trials, clinical

protocols, clinical study reports, and labelling of drugs.[78]  Finally, Frances Polizzano, PharmD.,

testified regarding the necessity for drug manufacturers to "continue to monitor for their

products" and provide accurate and complete information in their labeling to effectively

---

[75] *See United States v. Kerley*, 784 F.3d 327, 337 (6th Cir. 2015) and *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2015)*; see also* Rec. Doc. 11332 (Order and Reasons of October 21, 2020).

[76] *See* Ex. 18, Sept. 23, 2019, Trial Tr. at 1638:02-1639:05.
[77] *See* Ex. 19, Sept. 18, 2019, Trial Tr.at 739:8-22.
[78] *See Id.* at 744-748.

communicate with physicians.[79]  Dr. Polizzano testified that she led the group at Sanofi that was responsible for signal detection.[80]

This and other similar testimony from Sanofi witnesses is relevant to Plaintiff's case, and excluding *any* evidence that could be couched as non-expert causation testimony, as proposed by Sanofi, would likely preclude admission of this highly probative evidence.  Sanofi's overbroad motion on this topic offers no countervailing reason why this type of evidence would be irrelevant or prejudicial, and accordingly the motion should be denied.

---

[79] *See* Ex. 20, Sept. 16, 2019, Trial Tr. at 239-241.
[80] *See Id.* at 241.

### 19. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING PLAINTIFF'S MOTIVE AND/OR MENTAL STATE

The testimony of persons familiar with Plaintiff, including her husband, father, and sister, that is based on their personal knowledge and opinions derived from their perception is relevant, probative, and admissible.  A witness may testify as to matters within his or her personal knowledge.[81]  Opinion testimony of a lay witness is also permissible to the extent "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[82]

Based on the deposition testimony highlighted by Sanofi, Sanofi appears to confuse the requirement that the opinion of a lay witness be rationally based on the witness's perception with a requirement that the witnesses in this case have had a conversation or discussion about motive or state of mind with Plaintiff in order for their testimony to be admissible.  An opinion rationally based on the witness's perception means only that it must be one which a normal person would form based upon firsthand knowledge or observation.[83]  Courts permit witness testimony "as to their firsthand observations of the mental anguish or emotional distress suffered by parties…."[84]  Similarly, a person acquainted with the behavior and disposition of another person would be

---

[81] Fed. R. Evid. 602.
[82] Fed. R. Evid. 701.
[83] *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, *263-264 (5th Cir. 1980).
[84] *Eubanks v. St. Tammany Parish Hosp., Serv. Dist. No. 1*, No. Civ.A. 03-2878, 2004 WL 1403403, at *2 (E.D. La. June 22, 2004); *See also Frazier v. Ind. Dept. of Labor*, IP 01-198-C-T/K, 2003 WL 21254567, at *2 (S.D. Ind. Mar. 24, 2003) ("Plaintiff's lay witnesses may testify about their firsthand observations of his emotional distress and mental anguish and any physical manifestations attributed to such distress and anguish."); *Watson v. Allen Cty. Sheriff's Officers*, No. 1:12-CV-55, 2013 WL 4540597, at *4-5 (N.D. Ind. Aug. 27, 2013) (Lay witness testimony related to knowledge and understanding of physical and mental health of the plaintiff before and after incident is admissible.); *Maremont v. Susan Fredman Design Group, Ltd.*, No. 10 C 7811, 2014 WL 812401, at *7 (N.D. Ill. Mar. 3, 2014) (The testimony of the plaintiff, her husband, and her father regarding "observations of her mental health before and after the incident in question constitute proper lay opinion testimony.")

competent to testify regarding that person's general demeanor and any changes in demeanor such as unhappiness, anguish, distress, and unrest.[85]

In both *Washington v. Department of Transp.* and *Howard v. Offshore Liftboats, LLC*, cited by Sanofi, the issue was speculative testimony about what a lay witness would have done if the factual circumstances had been different.  *Washington v. Department of Transp.*, 8 F.3d 296, 299-300 (5th Cir. 1993) (evidence of what witness would have done had he seen the allegedly inconspicuous warning label on a vacuum was properly excluded at trial); *Howard v. Offshore Liftboats, LLC*, Civil Action No. 13-4811 c/w 13-6407 & 14-1188, 2016 WL 316716, at *4-5 (E.D. La. Jan. 26, 2016) (witness would not be allowed to speculate or opine at trial in response to hypothetical questions about what he or others could have done differently under different scenarios ).  The witnesses here are not going to be asked to speculate about what Plaintiff would have done or answer hypothetical questions about Plaintiff.  The close family member witnesses identified by Sanofi have direct and intimate knowledge of the mental and physical condition of Plaintiff gleaned through observations over time and opinions formed based on personal knowledge.

Plaintiff is seeking damages for mental anguish; severe and debilitating emotional distress; mental pain, suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.  Testimony about the mental and emotional suffering endured by Plaintiff as well as her diminished quality and enjoyment of life is an important component of proof as to damages.  In

---

[85] *See Cole v. U.S.*, 327 F.2d 360, 361 (9th Cir. 1964) ("As to opinion, a witness need not be an expert in order to draw a conclusion that a person is distraught who has suddenly grown pale and is shaking."); *Ishee v. Fed. Nat. Mortg. Ass'n*, 2014 WL 6686705, at *1-2 (S.D. Miss. Nov. 26, 2014) (The daughter of the plaintiff who witnessed events as well as the plaintiff's mental and emotional state could testify about personal knowledge and opinion, "One does not need a medical degree to observe another person and discern whether they are upset."); *Lillie v. ManTech Int'l. Corp.*, Case No. 2:17-cv-02538-CAS-SSx, 2018 WL 6323076, at *5-6 (C.D. Ca. Dec. 3, 2018) ("Plaintiff's wife may similarly testify regarding her perceptions of plaintiff's emotional state."); *See also Burke v. City of Santa Monica*, Case No. CV 09-02259 MMM (PLAx), 2011 WL 13213593, at *19-21 (S.D. Ca. Jan. 10, 2011).

the *Earnest* case, this Court allowed the testimony of other witnesses related to their observations of Plaintiff from which motive or state of mind may be inferred by the factfinder.  Sanofi's motion to exclude evidence or argument concerning Plaintiff's motive or mental state should be denied or, at least, deferred so that the Court can assess the testimony in the context in which it is presented at trial.

**20. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING SANOFI SALES REPRESENTATIVES, AND TO EXCLUDE SALES REPRESENTATIVE WITNESS TESTIMONY**

### A. Evidence Pertaining to Sanofi's Sales Representatives is Relevant and Admissible.

With this motion, Sanofi seeks to exclude evidence of permanent hair loss from not only the drug labeling and package inserts, but from the marketers tasked with selling the drug to medical professionals. But the relevance of this sales representative evidence is self-evident. Sanofi's request to exclude this same testimony was denied in the *Earnest* trial, and the Court should rule identically here.

Though this motion is presented as a request to bar all sales representative testimony, what Sanofi truly wants is for this Court to exclude the very critical testimony of Ms. Ruth Avila, a former oncology nurse and Taxotere Sales representative. This is because Ms. Avila clearly testified that Sanofi expressly ordered its sales representatives to *not* discuss the possibility of permanent hair loss relating to the use of Taxotere, even though Sanofi was aware of the risk of such injury and aware that a warning of permanent hair loss was not in its label.

Specifically, Ms. Avila testified in the *Earnest* trial that she was expressly told that she was prohibited from relaying a risk of permanent hair loss associated with Taxotere to prescribers.[86] (*See* Testimony of Ruth Avila. She testified the promotional materials indicated hair would eventually "grow back."[87] The fact that hair loss may be permanent was not part of the instructions Ms. Avila received from Sanofi Corporate about the Taxotere product.)[88]

---

[86]Ex. 21, Sept. 18, 2018, Avila Trial Tr. at 546:23-547:5.
[87]*Id.* at 577:5-7.
[88]*Id.* at 601:16-18.

There are many ways that safety information, once added to the product label, can be broadcast to product prescribers.  One of those avenues is through company sales representatives.  Sanofi also understands that one of the best ways to prevent safety information from being broadcast to prescribers is to keep the safety information out of the product label.  Here the Sanofi sales representative is expected to testify about the fact that sales representatives are prohibited from talking with prescribers about side-effects or safety issues that are not described in the product label.  The sales representatives can also confirm that if Sanofi had included information about PCIA in the product label that the sales representatives would have been permitted to disclose and discuss this important side effect with the prescribers but that because Sanofi kept this important information out of the Taxotere product label, the sales representatives were unable to talk to prescribers, including Ms. Kahn's prescriber about Taxotere use being associated with PCIA.  Further the sales representatives can confirm that if the PCIA side-effect had been included in the Taxotere label that the sales representatives would have alerted prescribers about this potential patient outcome.  By purposely keeping information about PCIA out of the product label, Sanofi silenced the sales representative "megaphone" and prevented prescribers from learning about PCIA from its sales force.

Ms. Avila's testimony also shows that Sanofi actively suppressed information about permanent hair loss resulting from Taxotere use.  She testified that while working as a Sanofi representative, the only information concerning permanent hair loss and Taxotere came from an independent abstract presented at the 2006 San Antonio Breast Conference, which profiled seven patients that suffered permanent hair loss after taking Taxotere.[89]  It was only then that Ms. Avila learned the company was aware of the issue. *Id.*  However, despite Sanofi's awareness, Ms. Avila

---

[89]*Id*. at 583:3-15; 584:1.

testified that she was not permitted to discuss the abstract with prescribers, as it was considered "off label."[90]

### B.  Whether Dr. Kardinal can recall meeting Ms. Avila does not affect the admissibility of Ms. Avila's testimony.

Defendant focuses much of its argument on the statements by plaintiff's prescriber, Dr. Carl Kardinal, which indicated he could not recall meeting Ms. Avila or any Sanofi sales representative, and thus could not definitively say whether his prescription choices were influenced by Sanofi's marketing.

However, whether the prescribing physician relied on marketing materials or a meeting with a sales representative is not a condition precedent for admissibility of this sales representative evidence.  Indeed, other federal courts have recently rejected efforts to bar such evidence in similar circumstances.  For example, the Southern District of Ohio rejected the same argument Sanofi advances here.  *See Rheinfrank, et al. v. Abbott Laboratories, Inc., et al.,* 2015 U.S. Dist. LEXIS 120581, at *16-17 (S.D. Ohio Sept. 10, 2015) (Admitting sales representative testimony even where the Physician did not rely on corporate sales materials or sales representative conversations.)[91]

Further, even if Dr. Kardinal did have a meeting with Ms. Avila (or any Sanofi sales representative), Ms. Avila's testimony will show that the risk of permanent hair loss was not

---

[90] *Id.* at 583:21-23.

[91] Other courts presiding over cases involving Depakote similarly held and admitted information about sales representatives and sales activities. See e.g. Order, *Z.H., et al., v. Abbott Laboratories, Inc.*, No. 14-cv-176, 2017 U.S. Dist. LEXIS 3437, at *6 (N.D. Ohio Jan. 10, 2017) ("The Court agrees that Abbott's pre-1996 Depakote promotional, marketing and sales activities and materials are relevant to what Abbott knew, when Abbott knew it, what was communicated to the medical community and how Abbott's labeling decisions were impacted."); see also *E.R.G., et al., v. Abbott Labs., Inc.* (In re Depakote), No. 15-cv-702-NJR-SCW, 2017 U.S. Dist. LEXIS 74475, *19 (S.D. Ill. May 16, 2017).

something she was allowed to discuss.   In fact, she was expressly ordered not to do so.  If Sanofi instructed her not to discuss it with oncologist, why is Dr. Kardinal's not recalling a conversation with a sales representative relevant?

Finally, contrary to Sanofi's assertion, the introduction of Ms. Avila's testimony would not require a minitrial and would not otherwise confuse the jury.  Ms. Avila's testimony is critical to what Sanofi knew about permanent hair loss, when it knew it, and most importantly demonstrates Sanofi's suppression of the risk.  The jury is perfectly capable of weighing this kind of evidence and must be given the opportunity to consider what information Sanofi was providing to prescribing physicians or not providing to prescribing physicians in resolving whether the company's actions prevented Ms. Kahn from knowing the risk of permanent hair loss or provided adequate warnings about Taxotere.

### C.  The Evidence Would Not Be Unfairly Prejudicial, Confusing Or A Waste Of Time.

Exclusion of evidence for unfair prejudice under Rule 403 of the Federal Rules of Evidence is an extraordinary remedy that should be used sparingly. See *Westcott v. Crinklaw*, 68 F.3d 1073, 1077–78 (8th Cir. 1995). Further, excluding this kind of evidence pretrial is typically considered premature.  *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d at 859 (3d Cir. 1989) ( "[A] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence.")  However, this Court is aware of the relevance of this evidence as it presided over the Earnest trial and has already determined Ms. Avila's testimony is relevant.

Sanofi argues that the aforementioned sales and marketing information, if found relevant, should not be admitted on the grounds that it would result in unfair prejudice and jury confusion. However, this evidence is clearly relevant as the Court previously found, and simply because Sanofi considers it adverse to their litigation position does not render this evidence *unduly* prejudicial.   As the Fifth Circuit has long cautioned, Fed. R. Evid. 403 is designed to exclude evidence that is *unfairly* prejudicial only.  *See Ballou v. Henri Studios, Inc*., 656 F.2d 1147, 1155 (5th Cir. 1981)("unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'")  The probative value of this information greatly outweighs any unspecified danger of unfair prejudice, confusion or waste of time.  Sanofi has not met its burden here.  This motion must be denied.

## CONCLUSION

Wherefore, it is respectfully submitted that defendant Sanofi's motion be denied in its entirety, along with such other and further relief as this Court deem proper and just.

21. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING CORRESPONDENCE BETWEEN DDMAC AND SANOFI**

Sanofi seeks to prohibit the introduction of any evidence at trial of correspondence between DDMAC and Sanofi, arguing the correspondence is irrelevant, prejudicial or constitutes inadmissible character evidence.  The Court granted a similar motion in the *Earnest* matter finding that the "letters at issue relate to the use of Taxotere for lung cancer and metastatic breast cancer, neither of which Plaintiff [Earnest] had."  However, the Court should revisit its prior ruling as this correspondence is admissible to refute Sanofi's defense that Taxotere is superior to alternative available chemotherapy treatments, or at the very least, is admissible for impeachment purposes.

Sanofi's argument that the letter is irrelevant because it relates to its promotion of Taxotere for lung cancer and metastatic breast cancer is a distinction without a difference.  According to Sanofi's expert, Dr. John Glaspy, the development of a chemotherapy drug always starts with confirming its effectiveness and favorable toxicity profile in the metastatic setting, and only once that is established do you move on to the adjuvant setting.[92]  In other words, the materials and data relied on in deciding to test the adjuvant setting have a direct relationship to testing done in the metastatic setting.  Thus, the letter at issue illustrates Sanofi's consistent efforts to market its product as the best available in the marketplace, despite the absence of scientific support.  In fact, the letter directly addresses Sanofi's failure to provide the necessary evidence to make a superiority claim.  To the extent Sanofi argues that Plaintiff Kahn might not be alive today had she been given Taxol or that she is only alive today because she received

---

[92] Ex. 22, Jan. 9, 2020, Deposition Transcript of Dr. John Glaspy at 45:6-46:6.

Taxotere, Plaintiff must be able to introduce the DDMAC letter to oppose any superiority arguments.

Further, Plaintiff is not seeking to introduce the letter to prove its substance, rather to refute Sanofi's primary defense that Taxotere is more effective than Taxol and that only Taxotere is a life-saving drug.[93]  Indeed, Dr. Glapsy confirms that Taxol is a life-saving drug, and that he will not claim that Taxotere is any more effective than Taxol.[94]  Sanofi's misrepresentations about Taxotere's superiority over Taxol, and DDMAC's outlining Sanofi's failures to justify its promotion, are directly relevant to its efforts to convince the jury that Taxotere is the "best choice" for Ms. Kahn.  If Sanofi will attempt to make this argument, as it did in *Earnest*, Plaintiff must be allowed to fully cross examine witnesses with the DDMAC letter.

 Similarly, Sanofi's argument that the DDMAC letter does not relate to promotional claims involving alopecia is also of no consequence.  It is Sanofi, not Plaintiff Kahn, who will be arguing the superiority and life-saving attributes of Taxotere, neither of which arguments relate, in any respect, to Taxotere's PCIA propensities.  Thus, if the DDMAC letter is inadmissible because it does not relate to alopecia, Sanofi's defenses should likewise be inadmissible.

Contrary to Sanofi's suggestion, and as stated above, Plaintiff intends to use the letter to counter defenses raised by Sanofi, not to malign Sanofi.  But if Sanofi attempts to argue that Taxotere is superior to Taxol, Plaintiff must be allowed to fully cross examine witnesses – including with the DDMAC letter.  As the evidence is relevant and Plaintiff is not simply attempting to paint Sanofi as a "bad actor," any danger of unfair prejudice does not outweigh the

---

[93] Sanofi also argues the DDMAC letter should be excluded as improper hearsay evidence under Fed. R. Evid. 801(c) and 802.  DDMAC correspondence has routinely been admitted into evidence under the public records exception to the hearsay rule.  Fed. R. Evid. 803(8); *See e.g., Novartis Pharmaceuticals Corp. v. Teva Pharmaceuticals USA, Inc.*, 2009 WL 3754170, at *10 (D. N. J. Nov. 5, 2009) (holding that DDMAC records are public records under Rule 803(8) and "will not be excluded as inadmissible hearsay.")

[94] Ex. 23, May 13, 2020, Deposition Transcript of Dr. John Glaspy at 89:2-4, 17-21; 129:19-130:19; 153:6-8.

evidence's probative value.[95]  Balancing the probative value of the DDMAC letter against the possibility of any prejudice to Sanofi, the probative value is not "substantially outweighed" by any potential prejudice as its use could only follow Sanofi's repeated attempt to misstate Taxotere's superiority.

Finally, Sanofi attempts to exclude the DDMAC evidence arguing that it constitutes inadmissible character evidence under Fed. R. Evid. 404. Sanofi cites *In re Dupuy Orthopedics, Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F. 3d 753 (5th Cir. 2018), *Emerald City Mgmt., LLC v. Kahn*, 2016 WL 3770960 (E.D. Tex. Jan. 14, 2016), and *Sec. Nat'l Bank of Sioux City, IA v. Abbott Labs.*, 2013 WL 12140998 (N.D. Iowa Aug. 13, 2013) for support, which are all inapposite as they involve irrelevant evidence of **<u>criminal or quasi-criminal</u>** acts **<u>entirely unrelated</u>** to the litigation which the parties had attempted to introduce for the sole purpose of prejudicing the jury.  Here, the DDMAC evidence is relevant, non-criminal, directly related to the litigation (and Sanofi's argument), and is not being introduced for prejudicial purposes.  The evidence here is admissible character evidence intended to show Sanofi's propensity to provide misleading information in the promotion of its products, in the face of DDMAC and Sanofi's own expert stating otherwise.  Utilizing the balancing test of Rule 403 to evaluate the admissibility of evidence under Rule 404, the DDMAC evidence is admissible.

Accordingly, the DDMAC evidence is admissible to refute Sanofi's defense that Taxotere is superior to alternative available chemotherapy treatments, or at the very least, is admissible for impeachment purposes.  Sanofi's motion should be denied.

---

[95] *See Sprint/United Management Co. v. Mendelsohn*, 128 S. Ct. 1140,1147 (2008).

## 22. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REFERRING TO SANOFI AS A "FRENCH" OR "FOREIGN" COMPANY

In the *Earnest* case, this Court considered nearly identical arguments to those Defendants have put forth in the instant motion.  Defendants have not added any new case law or argument.[96]  After fully briefing this issue, the Court allowed testimony establishing that Sanofi is a French corporation and only excluded improper inferences or characterizations relating to this fact.[97]  Moreover, the central issue in Defendants' Motion was already addressed by the parties in a stipulation entered back on November 3, 2017; thus, this Motion is unnecessary and there is no reason to depart from the Court's previous order.[98]

## I.      ARGUMENT

Sanofi's Motion to exclude evidence or argument regarding its French entities should be denied for multiple reasons. First, evidence concerning the French entities is admissible by agreement of the parties. On November 3, 2017, the parties entered the Stipulation of Terms Related to Defendants, Sanofi and Aventis Pharma S.A. ("Stipulation").[99]  The Stipulation provides that, "Defendants shall not object to the admissibility of any evidence or argument at trial on the basis of the dismissal of the French Defendants or on the basis that documents came from foreign sources."[100]  Defendants have additionally agreed not to move to exclude "references to the French Defendants' or their predecessor entities' participation and role in the

---

[96] *Compare* Rec. Doc. 7662-1 to Rec. Doc. 7842.
[97] Rec. Doc. 8206 at pg. 5.
[98] Rec. Doc. 1072.
[99] *Id.*
[100] *Id.* at Section 6.

development, submission for approval, and commercialization of Taxotere, during preliminary

proceedings and trial."[101]

Second, even if this stipulation did not exist, the fact that Sanofi S.A. and Aventis

Pharma S.A. are foreign entities located in France should not be hidden from the jury because the

information is necessary to put some evidence into context.  The information is no different from

the identification of Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. as Delaware

corporations with principal places of business in New Jersey or Ms. Kahn as a resident of

Louisiana.  There is simply no prejudice associated with the general fact that a company is

located outside of the United States.

Third, it is highly probative and hardly prejudicial to address activities

surrounding Taxotere that occurred in France.  Several of the witnesses who will testify are or

were from France and/or are or were employed by the French entities.   In fact, prohibiting

Plaintiff from referencing the French entities would prevent Plaintiff from asking such basic

questions like where the witness is employed.

Fourth, references to Defendants as a "French" or "foreign" in the manner allowed by

the Court in *Earnest* did not lead to any prejudice against Defendants, the verdict favored

Defendants.  Having already tried one bellwether case, Defendants have not provided any

evidence that Plaintiff will improperly characterize or make improper inferences related to the

nationality of Defendants' parent companies.

Finally, Defendants misconstrue many of the cases they cite.  The distinguishable posture

of the cases cited by Defendants in their Motion were discussed in *Earnest*.  (Rec. Doc. 7842);

*see also Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1006 (9th Cir.); *United States*

---

[101] *Id.* at Section 8.

*v. Ramirez-Fuentes*, 703 F.3d 1038, 1046 (7th Cir. 2013); *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985); *Boyle v. Mannesmann Demag Corp.*, 991 F.2d 794 (6th Cir. 1993); *Gearhart v. Uniden Corp. of Am.*, 781 F.2d 147, 153 (8th Cir. 1986); *Foster v. Crawford Shipping Co.*, 496 F.2d 788, 792 (3d Cir. 1974); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.,* 2011 WL 6740391, at *2-3 (S.D. Ill. Dec. 22, 2011); *Whirlpool Corp. v. TST Water, LLC* 2017 WL 2931403, at *1 (E.D. Tex. Mar. 3, 2017).

Interestingly, the cherry-picked quotes chosen by Defendants leave out the same courts' acknowledgment that the location of a company's headquarters is natural in the course of discussing the case; that "the factual reality of a place of manufacture, location of a facility, place of employment, and other kinds of factual matters that relate to location are permitted"; and that "not all references to a defendant's race, ethnicity, nationality, and cultural traits or behavior are objectionable."[102]

## II.   CONCLUSION

The Court should reiterate its' ruling in *Earnest* and permit evidence or argument referring to Sanofi as a "French" or "foreign" company, except to the extent of improper inferences or characterizations relating to this fact.

---

[102] *Yasmin* at *2-3; *Whirlpool* at *1; *Jinro* at 1006.

**23. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING FAERS SIGNAL EVALUATION**

In *Kahn*, this Court found that "Dr. Madigan was not required to conduct a signal evaluation for his opinion to be reliable and that Dr. Madigan's methodology is sufficiently reliable"[103]  These rulings followed the Court's ruling in *Earnest* finding that "Dr. Madigan's methodology passes muster."[104]  Despite the previous orders from this Court specifically allowing Dr. Madigan's testimony, and noting that his methodology is acceptable, Sanofi again attempts to preclude Dr. Madigan from giving his opinions, or allowing others to rely upon them.

Contrary to Sanofi's motion, Your Honor determined Dr. Madigan's opinions to be reliable.  "Dr. Madigan, being a statistician, focused on signal identification, which would be governed by Section 6 of the FDA document, which is titled 'Safety Signal Identification.'  Despite Sanofi's contentions, the Court finds that Dr. Madigan was not required to conduct a signal evaluation for his opinion to be reliable."[105]  Dr. Madigan's Signal Identification is relevant, probative, and will not waste time on collateral issues.

*A.   FAERs signal identification is relevant.*

"Sanofi confuses signal identification with signal evaluation."[106]  Plaintiff's regulatory experts opine that Sanofi failed to provide an adequate adverse reactions warning in its Taxotere label concerning the use of Taxotere in the adjuvant setting and permanent hair loss.  Both regulatory experts reviewed and rely, in part, on Dr. Madigan's FAERS analysis.[107]  Their reliance, in part, on the FAERS analysis is entirely appropriate, and Sanofi can address any of its concerns on cross examination with the witnesses.

---

[103] Rec. Doc. 12098 at pg. 14.
[104] Rec. Doc. 8094 at pg. 9.
[105] Rec. Doc. 12098 at pg. 13-14.
[106] *Id.* at pg. 13.
[107] Ex. 24, Ross Report, 2/8/2021, ¶¶ 50-54; Ex. 8, Plunkett Supplemental Report, 2/7/2021, ¶¶ 95 - 98.

One of Plaintiff's regulatory experts, Dr. David Ross, recognized Dr. Madigan's FAERs signal identification analysis as an appropriate methodology.[108]  Dr. Ross treated Dr. Madigan's signal identification analysis exactly as he would have treated the work of other subject matter experts while at FDA.[109]

*The references to the FAERs database will not result in a "mini-trial" on minimally relevant issues.*

Dr. Madigan's FAERs signal detection provides some support for Plaintiff's regulatory experts' conclusions that Sanofi's label failed to provide an adequate adverse reactions warning, and the experts' reliance on Dr. Madigan's FAERS signal detection is entirely appropriate. Sanofi's failure to provide an adequate warning is one of the central issues in this case.  Thus, Dr. Madigan's FAERs signal detection is highly relevant.

This Court already fashioned a remedy for Sanofi's objections to Dr. Madigan's FAERs signal detection analysis: "[O]n cross-examination, Sanofi may emphasize for the jury that Dr. Madigan's work has limitations."[110]  Since this Court's January 29, 2021 ruling on the reliability and admissibility of Dr. Madigan's testimony, Sanofi has not provided any evidence or argument that justifies a different result.. Sanofi's  Motion *in Limine* is an impermissible collateral attack on this Court's January 29, 2021 ruling permitting Dr. Madigan's testimony, as well as the same ruling in *Earnest*.[111]

---

[108] Ex. 25, March 4, 2021, Deposition Transcript of David Ross at 31:4 – 33:15; see also, *Id.*.
[109] *Id.*; *See also,* Ex. 24, Ross Report, 2/8/2021, ¶¶ 7 and 30.
[110] Rec. Doc. 12098 at pg. 14.
[111] A "collateral attack" is "[a]n attack on a judgment in a proceeding other than a direct appeal." *Wall v. Kholi*, 562 U.S. 545, 552, 131 S. Ct. 1278, 1284, 179 L. Ed. 2d 252 (2011) citing to Black's Law Dictionary 298 (9th ed.2009)

This motion *in limine* should be denied.  This Court already ruled on the admissibility of Dr. Madigan's FAERs analysis and this analysis is highly relevant to one of the main issues in the case – Sanofi's failure to adequately warn.

24. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING FOREIGN LABELING AND REGULATORY ACTIONS**

## I.      INTRODUCTION

Plaintiff has no intention of invoking foreign labeling requirements or agency actions to establish a standard for Sanofi's behavior in the United States.  However, it is wholly appropriate for Plaintiff to introduce evidence and argument regarding when Sanofi received questions about permanent and persistent hair loss from foreign regulatory bodies and when Sanofi finally warned doctors and patients in the United States of permanent and persistent hair loss.  To the extent evidence involving foreign agencies may be presented at trial, Plaintiff would do so to establish Sanofi's notice and/or knowledge of safety concerns arising in the context of communications with those agencies.  Use of this type of evidence to speak to notice and knowledge has broad support in the case law, with MDL courts in pharmaceutical failure-to-warn cases ruling that it is not only relevant, but also far more probative than prejudicial.

This information is further relevant to the reasonableness of Ms. Kahn's actions and alleged inactions under the *contra non valentem* analysis as it relates to Sanofi's statute of limitations defense, as Sanofi's knowledge and conduct post-dating Ms. Kahn's treatment – while falling in the window of time that Sanofi alleges Plaintiff should have inquired about permanent hair loss – is equally as relevant to this case for reasons stated in more detail below. Accordingly, the Court should deny Sanofi's motion and permit the use of this evidence at trial.

## II.     ARGUMENT

At trial, Plaintiff may use Sanofi's interactions with foreign regulatory authorities as evidence of safety signals for Taxotere and permanent or irreversible alopecia, consistent with

Sanofi's internal pharmacovigilance standards.[112]  Such use at trial would be limited to the issue

of Sanofi's notice and/or knowledge of this safety issue, a use expressly sanctioned by the

majority of MDL courts considering the issue, as opposed to foreign regulatory actions or

labeling used to establish labeling standards of care under state law.

The authorities on which Sanofi's broad argument relies upon in fact support this use of

foreign regulatory evidence that speaks to knowledge or notice.  For instance, in *In re Xarelto*,

plaintiffs argued "that evidence of foreign labeling goes to Defendants' knowledge and state of

mind," and defendants agreed that such use was permissible.[113]  The court ruled "that anything

the Defendants have said to anyone, even foreign regulatory bodies, should be admissible."[114]  In

the *Mirena IUD* litigation, the MDL court likewise permitted the jury to hear evidence of such

interactions and communications for this purpose.[115]

This view enjoys broad support in the case law. Hearing Rule 401, 402 and 403

challenges to evidence related to labeling or regulatory actions outside the United States, the

MDL court in *In re Tylenol* agreed that foreign labels "are evidence of the defendants'

knowledge of potential risks related to their products."[116]  Recognizing that "the admission of

foreign labels may require context of a foreign country's regulatory system in order to present

them accurately," the court believed it was "possible for the plaintiff to offer evidence that

---

[112] *See*, *e.g.* Ex. 17, Freedman Dep. at 32:15-34:02.
[113] *In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, MDL No. 2592, 2017 WL 2780760, at *6 (E.D. La. May 26, 2017).
[114] *Id*.
[115] *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 487-88 (S.D.N.Y. 2016) ("To the extent Bayer's interactions with [German regulators] case light on what Bayer knew and when it knew it, direct evidence of those interactions may be introduced to the extent relevant […]").
[116] *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, 181 F. Supp. 3d 278, 306-307 (E.D.Pa. 2016).

foreign regulatory agencies raised concerns about acetaminophen dosing years before the decedent's death, to show notice and/or knowledge."[117]

In addition to the issue of notice and company knowledge, this type of evidence is relevant to Sanofi's statute of limitations defense. In its memorandum in support of this motion *in limine*, Sanofi seems to place a "cut-off" for the date of when *any* evidence related to Sanofi's conduct would be admissible, and they use the cut-off of when Ms. Kahn's treatment occurred.[118]  However, the analysis of Sanofi's overseas actions and its internal communications regarding such does not stop at when Ms. Kahn's treatment concluded. Sanofi has raised prescription as an affirmative defense.  Ms. Kahn's prescriptive period is suspended, though, if *contra non valentem* applies.  Under Louisiana law, a fact finder must consider four scenarios when determining whether *contra non valentem* tolls the running of the prescriptive period.[119] The third scenario, dealing with Defendants' actions to conceal information relevant to the

---

[117] *Id.* at 307. *See also Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 809, 826 (S.D. W.Va. 2018) ("The foreign labels and Data Sheet demonstrate Defendant's knowledge and beliefs regarding the bleed risks of Pradaxa. […] The Court finds that this evidence is relevant, establishing what [defendant] knew and believed regarding the bleed risks with certain patients on Pradaxa."); *McWilliams v. Novartis AG*, No. 2:17-CV-14302, 2018 WL 3369655, at *6 n. 2 (S.D. Fla. July 9, 2018), *on reconsideration in part*, No. 2:17-CV-14302, 2018 WL 3637083 (S.D. Fla. July 31, 2018) ("Because the company transcends international boundaries, the labeling in other countries could bear on what information the company's executives were privy to and when they recognized the alleged connection between [the drug] and [the injury]. The Court will permit this evidence, as it may bear on [defendant's] knowledge and the notice it had of [the drug]'s side effects.") (citations and quotations omitted).
[118] *See* Defendants' Memorandum in Support, Pg. 91 ("Because the date of Ms. Kahn's treatment is much earlier than Ms. Earnest's, all evidence of this nature should be excluded in the Kahn trial.")
[119] "The doctrine operates to suspend prescription when the plaintiff is prevented from acting under one of four scenarios: (1) where there was some legal cause which prevented the courts or their officers from acting or taking cognizance of the plaintiff's action; (2) where there was some condition or matter coupled with the contract or connected with the proceedings which prevented the plaintiff from availing himself of his cause of action; (3) where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant."*Morgan v. Entergy New Orleans, Inc.*, 2016-1250 (La. App. 4 Cir. 12/6/17), 234 So. 3d 113, 116, *writ denied*, 2017-2172 (La. 2/23/18), 237 So. 3d 520.

inquiry, is crucial here, because Sanofi did just that – actively and fraudulently concealed what it knew about Taxotere causing permanent hair loss.[120]

As this Court noted in its April 7, 2020 Order denying Sanofi's motion for summary judgment based on the statute of limitations, "Defendants posit… that the one-year prescription period began to run in January 2010… Defendants also argue that contra non valentem does not apply because Plaintiff failed to investigate her claim."[121]  In its Order, the Court ruled: "Based on the evidence, however, the Court finds that there is an issue of fact on whether Plaintiff acted reasonably to discover the cause of her hair loss… Because the *Hoerner* plaintiff conducted an investigation and reasonably relied on what she learned in her investigation, prescription was tolled."[122]  Thus, the prescriptive period for her cause of action – unless it is tolled – started to run in January 2010 and would have ended in January 2011.

Plaintiff had numerous conversations with her oncologist and dermatologists regarding her hair loss occurred from 2009 to 2011, during the same time period that Sanofi was actively removing information regarding permanent hair loss from its online pages as a result of the backlash from a foreign newspaper article regarding permanent hair loss associated with Taxotere, as stated in more detail in Plaintiff's Memorandum in Support of Motion *in Limine* to Include Evidence and Argument Regarding Online Advocacy (MIL No. 17) (Rec. Doc. 12907-1).  The doctrine of *contra non valentem* provides an exception to Louisiana's one-year liberative prescription also in cases "where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action."[123]  Thus, should Sanofi make the

---

[120] As the Court probably remembers, Amy Freedman – Sanofi's Global Safety Officer in charge of Taxotere – admitted in her deposition that Sanofi knew in 2006, years before Mrs. Kahn took Taxotere, that Taxotere caused permanent hair loss.
[121] Rec. Doc. 9885 at pg. 3.
[122] *Id*. at pg. 6-7.
[123] *Morgan v. Entergy New Orleans*, 234 So. 3d 113, 116 (La. App. 4th Cir. 2017).

argument to the jury that Plaintiff Kahn's claims are prescribed, Plaintiff is entitled to present this evidence that post-dated her treatment to the jury regarding Sanofi's actions in preventing Plaintiff from availing herself of her cause of action.

Court have also regularly found that the probative value of this type of evidence outweighs Rule 403 concerns voiced by defendants seeking its exclusion.  The court in *In re Tylenol* found that concerns of prejudice or confusion were unfounded because a "jury instruction can be given to ensure that jurors understand the limited nature of this evidence."[124] This is especially so where "plaintiffs are not presenting *final* regulatory action to which a jury might defer out of confusion" but rather "presenting only preliminary actions in Europe, in conjunction with defendants' responses," just as Plaintiff does in the instant case.[125]

This evidence is additionally relevant and probative in the present action where Sanofi seeks to draw a meaningful distinction between the meaning of the words "ongoing," "persistent," and "permanent."[126]  However, Sanofi represented to a foreign regulator, the European Medical Agency, in January 2013 that the 29 patients identified in TAX-316 as "ongoing" at the end of follow-up were suffering from "persisting alopecia" at the end of follow-up – thereby conflating its own argument that these are distinct terms with each having an individualized meaning.[127]

---

[124] 181 F. Supp. 3d at 307. *See also Knight*, 323 F. Supp. 3d at 826-27 (rejecting arguments of confusion, unfair prejudice, and misleading the jury and doubting the likelihood that "mini trials" on foreign regulatory decisions would result). The "full body of knowledge including the foreign regulatory process that came to bear on the drugs at issue" is admissible in determining "whether all the information which should have been utilized […] was so utilized." *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig.*, No. 3:09-CV-10012-DRH, 2011 WL 6740391, at *2 (S.D. Ill. Dec. 22, 2011) (holding that because the jury can be instructed that foreign regulatory actions are not binding on the FDA, any concerns of prejudice do not outweigh the "clearly probative" value of evidence the drugmaker's knowledge gained in interacting with those regulators); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748. 2017 WL 2313201, at *3 (N.D. Ill. May 29, 2017) (finding probative value of foreign regulatory evidence "outweighs potential to be misleading or to unfairly prejudice" where "the evidence does not require extensive understanding of [foreign] regulatory procedure").
[125] *In re Levaquin Prod. Liab. Litig.*, No. 08-1943 JRT, 2010 WL 4676973, at *5 (D. Minn. Nov. 9, 2010).
[126] *See* Defs. Mot. *in Limine* No. 25, Rec. Doc. 12911-3 at 96.
[127] *See* Ex. 26, Sanofi_01282459.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion *in Limine* No. 24, and deny it *with prejudice* as to evidence relevant to Sanofi's knowledge or notice of the safety issue of permanent alopecia and further relevant to the *contra non valentem* analysis.

**25. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE AND ARGUMENT THAT "ONGOING ALOPECIA" DATA OBSERVED IN THE TAX316 AND GEICAM 9805 CLINICAL TRIALS REPRESENTS EVIDENCE OF "PERSISTENT," "PERMANENT," OR "IRREVERSIBLE" ALOPECIA**

Sanofi's Motion *in Limine* No. 25 doubles down on the same arguments made in its other pre-trial memoranda to seek no less than the wholesale exclusion at trial of Taxotere's clinical trial data as evidence of causation and notice. Its argument is largely semantic, proceeding on the flimsy premise that because the TAX316 and GEICAM 9805/TAX301 data only captured the presence of alopecia that was ongoing "at a particular moment in time," we can never be sure that it was truly *permanent*. Sanofi attempts to prove that "ongoing" is not "permanent" to the Court by pointing to *one instance* from the *32 cases* of "ongoing alopecia" recorded in the combined data that it claims did not reach six months' follow-up because of discontinuation of the drug. Sanofi also incorrectly suggests—without support—that each patient in its study must have been *formally diagnosed* with permanent alopecia in order for the data to have relevance to this case.

To the contrary, evidence of "ongoing alopecia" from Taxotere's clinical trials—the best of its kind on the issue of causation, and important on the issue of notice—should not be excluded under FRE 403 because it is highly probative to the injuries at issue in this case. It is indisputable that Sanofi has put this data to use internally for years in the exact same way Plaintiff seeks to proffer it at trial—as evidence of patients' inability to regrow hair after chemotherapy. Further, Sanofi has aggressively used this very data as a sword in this litigation, arguing that its submission to the FDA in 2004 preempts *all claims* in this MDL. As Sanofi's Motion once again offers little more than quibbling over diction, it has failed to show why under

80

FRE 403 this highly probative evidence should be excluded at trial and accordingly should be denied as it was in the *Earnest* case.[128]

## C. ARGUMENT

The significance and admissibility of Taxotere's clinical trials, TAX316 and GEICAM 9805/TAX301, have been exhaustively briefed by the parties through numerous *Daubert*-related filings.  Sanofi nonetheless raises them here, arguing again that words matter more than substance, that "ongoing" is not "permanent," and that its clinical trial results cannot speak to the injury at issue in this MDL.  To the contrary, the terms "ongoing," "persistent," "irreversible," and "permanent" have all been used by Sanofi to describe the condition observed in Taxotere's clinical trials until drawing distinctions became advantageous in this litigation.  The use of its clinical trial data in this way is hardly a "misrepresentation" as Sanofi now claims but in fact was the company's practice for over a decade.

For instance, in March 2006, Sanofi's Amy Freedman, a Global Safety officer working on Taxotere, stated, "I know there were some irreversible cases of alopecia as documented in clinical trials" in response to an inquiry from a Danish doctor—who had a patient with alopecia since 2004—about the reversibility of hair loss following use of the Taxotere.[129]  Years later, in 2010, a regular flurry of inquiries about persistent alopecia prompted Sanofi to create an internal document to respond to them. Global Safety Officer Emmanuel Palatinsky was asked about the incidence rate of permanent hair loss.  He responded:

> The current docetaxel CCDS [company core data sheet] version 23 presents **persistent alopecia** at 55 months in 22/687 (3%) from one study (TAX316), and 3/49 (6%) at 77 months in a different study (GEICAM9805).  Even if we make the **reasonable assumption** that **persistent alopecia** after more than 4 years is

---

[128] Rec. Doc. 8207 at pg. 1 (Order).
[129] Ex. 27, Sanofi_01035459.

consistent with **"permanent" alopecia**, I cannot estimate the general incidence rate of **permanent alopecia** when docetaxel is administered in combination with other chemotherapy agents on the basis of only two studies (both using the adjuvant TAC regimen in breast cancer).

Given these limitations, I cannot say more than "***persistent alopecia** was reported in 3 to 6% of patients in two studies where adjuvant docetaxel was administered in combination with doxorubicin, and cyclophosphamide for breast cancer.*"[130]

Then, in 2012, Sanofi's head of pharmacovigilance in South Africa emailed global pharmacovigilance to ask whether the company was investigating "permanent/longstanding/irreversible" alopecia following an inquiry on the topic.[131]  Dr. Palatinsky eventually responded by citing the TAX316 and GEICAM percentages of persisting alopecia (4.2 and 6.1%, respectively).  The South African officer responded by saying that she could not find anything about persisting alopecia in the CCDS,[132] at which point Dr. Palantinsky sent her excerpted pages from the CCDS in which he drew an arrow to the TAX316 and GEICAM data.[133] Importantly, this information was located in the CCDS under the heading "other persisting reactions."[134]

Further, calling the TAX316 data evidence of persistent, irreversible, or permanent alopecia is hardly a "misrepresentation" (as Sanofi claims) unless the company itself is guilty of making misrepresentations in its submissions to regulatory authorities.  For instance, Sanofi pointed to the TAX316 and GEICAM data to show "persistent alopecia" in 29 of its Taxotere-arm patients in its 2013 responses to the European Medicines Authority's request for such

---

[130] Ex. 28, Sanofi_05252078. Bolded emphasis added; italics in original.
[131] Ex. 29, Sanofi_04942169.
[132] *Id.*
[133] Ex. 30, Sanofi_04942173.
[134] *Id.*

data.[135]  Sanofi likewise submitted the TAX316 clinical trial safety data to the FDA in 2004 and 2010, as part of its periodic safety updates, and in support of its preemption motion represented that the data showed "persistent" alopecia, and in this litigation – although never seeking a label supplement to warn of permanent alopecia - used that fact as the basis for its argument that Plaintiffs' claims for failure to warn of permanent alopecia are preempted.  For these reasons, use of the TAX316 and GEICAM 9805 data as reflecting "persistent," "irreversible," or "permanent" alopecia would not mislead the jury, but instead would allow the jury to reach the same conclusions Sanofi reached internally and presented to regulatory authorities, including its label supplementation in 2018, with the participation of its present litigation counsel.[136]

Sanofi's position in this motion contradicts the company's position in its pharmacovigilance and regulatory dealings in the years before this litigation, and during the pendency of this MDL, and should be rejected.  Further, this evidence directly refutes Sanofi's litigation-driven reanalysis accomplished by Dr. Michael Kopreski and counsel, and its professed reason for such a reanalysis. The evidence Sanofi seeks to exclude impeaches its stated reason for enlisting Dr. Kopreski.  Thus, the evidence is relevant, probative, and necessary to cross examine Sanofi's witnesses, including Dr. Kopreski, if he is allowed to testify concerning the reanalysis.

## D.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion *in Limine* No. 25.

---

[135] Ex. 26, Sanofi_01282459 at 4; *see* Ex. 31, Sanofi_04938219 at 3. In discussions that followed, the EMA considered these results to show "irreversible alopecia," "[a]s the median follow up was 96 months in TAX 316 and 77 months in the GEICAM study."  (Ex. 32, Sanofi_01363130 at 1-2.)
[136] Ex. 33, Sanofi 05173852, updating Company Core Data Sheet (CCDSv26) to include data from TAX316 and GEICAM9805, LRC meeting attended by Harley Ratliff.

**26. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING SHIRLEY LEDLIE, ANY "TAXOTEARS" OR OTHER THIRD PARTY ADVOCACY OR COMMUNICATIONS GROUP OR GROUP MEMBERS, FACEBOOK VOICES PAGE, AND INTOUCH SOLUTIONS**

Sanofi seeks to exclude evidence or argument concerning advocacy and communications groups and group members generally, and also evidence or argument concerning advocacy group "Taxotears" and one of its founding members, Shirley Ledlie.  This Court granted Sanofi's same motion in the *Earnest* matter while preserving Ms. Earnest's ability to request a conference with the Court if she believed that Sanofi opened the door on the subject.  Rec. Doc. 8201 at 6. However, in light of the Fifth Circuit's holding that evidence concerning advocacy and communications groups is relevant to the *contra non valentem* doctrine in *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F. 3d 384 (5th Cir. April 21, 2021), Sanofi's motion should be denied.

**I.    ARGUMENT**

**A.    Breast Cancer Patients' Campaign to Bring Awareness to Taxotere and Permanent Hair Loss and Sanofi's Reaction are Relevant to Plaintiff's Claims and Sanofi's Defenses Under Fed. R. Evid. 401.**

Although Ms. Kahn does not appear to have been a member of an advocacy group such as "Taxotears," evidence and argument concerning advocacy and communications groups and group members, however, are relevant to this case.  In addition to the arguments made in *Earnest* that evidence and argument concerning advocacy and communications groups are relevant to Sanofi's notice of complaints that Taxotere causes permanent hair loss and Sanofi's failure to warn about it[137], Ms. Kahn asserts such evidence is relevant, and central, to issues of fact to be determined by the jury in this matter according to the *contra non valentem* doctrine.

---

[137] Sanofi was aware of various advocacy groups claiming that Taxotere causes permanent hair loss at least by April 2009.  *See, e.g.,* Ex. 34, Sanofi_005446835 at 4.

Sanofi not only ignored patients' safety concerns but went so far as to conceal/cover-up these reports through an active campaign to silence those making them.  For example, Sanofi hired communications experts to manage negative comments about Sanofi's products, including claims that Taxotere causes permanent hair loss.[138]  These efforts by Sanofi took place at a critical moment for Ms. Kahn as they occurred within the one year time period this Court and the Fifth Circuit have charged a plaintiff with a duty to investigate.[139]

Moreover, consider the following evidence: Sanofi maintained an American Facebook page, entitled "Voices," for the purported purpose of "mak[ing] Voices heard throughout the community on issues of importance to patients…"[140]  Following a March 5, 2010 Canadian newspaper article on Sanofi hiding Taxotere's risk of permanent hair loss, women began posting on the Voices page about that very topic. In response to the article and the posts, Sanofi's communications department formed a Rapid Response Team.[141]  Part of the Rapid Response Team's responsibility included monitoring the Voices page on Facebook twenty-four hours a day to remove any posts about Taxotere and permanent hair loss.[142]  Sanofi shortly thereafter hired an outside company, InTouch Solutions, to conduct this around-the-clock monitoring of its Facebook page.  At Sanofi's direction, InTouch logged and removed posts about permanent hair loss, blocked the user posting about it, and reported the user to Facebook to have her banned from the platform.[143]

---

[138] *See* Ex. 35, Oct. 10, 2018. Deposition transcript of  Malia at 360:21-362:4; *see also,* Ex. 15, Fierro Dep.  at 144:7-146:0.
[139] Ms. Kahn finished her cytotoxic chemotherapy in October of 2008.  As this Court and the Fifth Circuit have articulated, based upon the short form complaint, Ms. Kahn sustained her injury at least six months later in April of 2009.  Therefore, Ms. Kahn's one-year prescriptive period began to run from April of 2009 to April of 2010. Therefore, Sanofi's actions during this time period are highly relevant to the *contra non valentem* inquiry.
[140] Ex. 15, Fierro Dep. at 179:10-181:16.
[141] Ex. 35, Malia Dep. 298:6-302:7.
[142] Ex. 36, Sanofi_05932261, at 4.
[143] Ex. 37, InTouch Solutions, Inc. 30(b)(6) Dep. 61:6-62:13, Dec. 13, 2018; Ex. 15, Fierro Dep. at 143:22-147-22.

One user posted the following: "When will you inform oncologists that there is a problem with your chemo drug, Taxotere?  Why don't you want women to know they could be left permanently disfigured?  Because they will choose a different drug not made by you.  The net is closing in on you, Sanofi."[144]  At Sanofi's direction, InTouch Solutions removed the post within an hour, blocked the user from posting on the page, and reported the user to Facebook.[145]

Another user posted, "My medical team have spoken to you, and therefore I have been informed that YOUR DRUG Taxotere has done this to me.  Why do you ignore me and REFUSE to contact me?  Why don't you explain to me why your drug Taxotere has permanently disfigured me and hundreds of others?"[146]  InTouch Solutions removed the post within an hour and reported the user to Facebook.  But the user was undeterred, posting that same post 28 more times after it was removed.  And 28 more times, InTouch Solution – at Sanofi's direction – scrubbed the post from Facebook.[147]  And the woman was permanently banned from the page.[148]

Another user posted "I did say I wouldn't stop until there was global publicity.  You can't shut up women that you disfigure."  Sanofi did silence up; it had InTouch Solutions scrub her post from Facebook in less than an hour.[149]

After successfully scrubbing mention of permanent hair loss from Sanofi's Voices Facebook page, InTouch Solutions created a presentation to market its services to other drug companies, and it used the "crisis management" services it provided to Sanofi as a case study of what it could accomplish for its clients.[150]  Such actions by Sanofi to conceal the link between Taxotere and permanent hair loss "prevent the plaintiff from availing himself of his cause of

---

[144] Ex. 38, sanofi-aventis VOICES Facebook Comment Monitoring Rep., at 1.)
[145] *Id.*
[146] *Id.* at 4.
[147] *Id.*
[148] *Id.*
[149] Ex. 15, Fierro Dep. at 170:20-171:16.
[150] Ex. 39, Excerpt from InTouch PowerPoint.

action" and serve as a basis for tolling Louisiana's one-year liberative prescription period under the doctrine of *contra non valentem* .

    In its Order and Reasons denying Sanofi's motion for summary judgment based on statute of limitations, this Court stated: "there is an issue of fact on whether Plaintiff acted reasonably to discover the cause of her hair loss"; "there is an issue of fact on whether contra non valentem applies to toll prescription for Plaintiff"; and "[a] jury will have to consider whether Plaintiff was reasonable in relying on such statements from her doctors and whether Plaintiff was reasonable in failing to attribute her injury to Taxotere until she learned of the attorney advertisement years after she sustained her injury." Rec. Doc. 9885 at 6-8. This Court further denied Sanofi's motion for reconsideration in which Sanofi argued that this Court erred in finding an issue of fact on *contra non valentem*. Rec. Doc. 12805. In doing so, this Court specifically stated:

> A jury will need to consider whether Plaintiff Kahn's investigation was reasonable or whether Kahn, despite what Dr. Roberie told her, should have conducted her own research at some point before 2016. **A jury will need to assess whether Plaintiff, as part of reasonable diligence, should have found the information available online and brought it to her doctors.**

*Id.* at 7 (emphasis added) (citing *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F. 3d 384, 393 (5th Cir. 2021)).

    When the Fifth Circuit speculated what an investigation would have uncovered for Appellants Johnson, Francis, and Thibodeaux, it noted the "Taxotears" group's presence online and the Canadian newspaper article published online may be taken into consideration. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F. 3d at 393. Considering Sanofi relies on the presence of advocacy groups like Taxotears as a method of attributing notice to plaintiffs in this litigation, Plaintiff should be permitted to educate the jury on how Sanofi actively sought to

conceal the activities of such groups and group members.  Although this Court "will not automatically charge Kahn with knowledge of the information on the internet" because Ms. Kahn investigated her injury through inquiries to her treating physicians, the factfinder will still consider whether Ms. Kahn should have discovered the information online and brought it to her physicians.  Rec. Doc. 12805 at 7.  Therefore, Ms. Kahn must be permitted to submit evidence to the factfinder that Sanofi's concealment of adverse events reported to it through advocacy groups and group members prevented Ms. Kahn and her prescribing physician from discovering the risk of permanent hair loss associated with Taxotere.  In other words, Ms. Kahn must be permitted to submit evidence on why an investigation would have been futile because of Sanofi's concealment of the association between Taxotere and permanent baldness.

### B.   Fed. R. Evid. 403 Does Not Warrant the Exclusion of Evidence or Argument Regarding Advocacy and Communications Groups or Group Members.

Sanofi attempts to exclude evidence and argument that would portray it in a negative light, arguing that such evidence is "prejudicial." For example, Sanofi argues that "Ms. Kahn may introduce this type of evidence or argument to argue that Sanofi 'silenced Ms. Ledlie's voice' by removing her posts from a purportedly Sanofi-affiliated Facebook page."  Defs. Br. at 104.  This argument misunderstands evidentiary rules: "'Unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial, or it isn't material.  The prejudice must be 'unfair.'"  *Dollar v. Long Mfg*. 561 F. 2d 613, 618 (5th Cir. 1977).  There is nothing unduly unfair about the admission of such truthful evidence regarding Sanofi's conduct in the face of complaints that it failed to warn about a known side effect.  In any event, the probative value of evidence regarding Sanofi's reaction to conceal patient activism on permanent hair loss as described above outweighs any potential danger of unfair prejudice or jury confusion under Fed. R. Evid. 403.  Accordingly, Plaintiff

should be permitted to confront Sanofi with evidence of its own actions in response to breast cancer patient activism.

C.    **Statements by Advocacy Groups and Group Members are Admissible for Non-Hearsay Purposes.**

Sanofi's request for the broad exclusion of third-party evidence as hearsay is improper. Plaintiff does not seek to admit statements of advocacy and communications groups or group members "to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801, i.e. that Taxotere causes permanent hair loss or that the Taxotere drug label was inadequate. Rather, this evidence may be offered to show Sanofi's notice that patients treated with Taxotere experienced permanent hair loss, and that Sanofi sought to suppress such information rather than abide by its responsibilities to investigate and ultimately to warn.

Insofar as Sanofi's motion *in limine* seeks to exclude testimony from Sanofi company witnesses, testimony of Sanofi company witnesses is not hearsay. *See* Fed. R. Evid. 801. Any further hearsay objections may be raised at trial as the evidence is presented.

II.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion *in Limine* No. 26.

27. **PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE AND ARGUMENT REGARDING COMPANY CONDUCT THAT POST-DATES PLAINTIFF'S CHEMOTHERAPY TREATMENT**

Defendants allege that changes to the Taxotere label post-dating Plaintiff's chemotherapy treatment in 2008 should be excluded as testimony concerning subsequent remedial measures. Rather, Sanofi's conduct post Plaintiff's chemotherapy treatment confirms that Sanofi could and should have modified the Taxotere label prior to Plaintiff's chemotherapy – this is not a subsequent remedial measure, and the evidence's probative value as to general causation, impeachment and feasibility far outweighs any possible prejudice to Sanofi. Moreover, Defendants allege that any company conduct evidence that post-dates Ms. Kahn's 2008 treatment should be excluded as irrelevant to notice and the claims at issue. However, Sanofi ignores this evidence's obviously probative value to answering important questions at issue in this case: First, whether Sanofi's labeling prior to 2015 contained any information regarding permanent chemotherapy induced alopecia (PCIA)[151]. Since Sanofi's counsel will likely seek to revive its improper and unsupported representation to the jury that Taxotere labeling included a warning for permanent alopecia, Ms. Kahn should be able to use the sworn testimony of leaders in Sanofi's own regulatory and safety department who testified that the Sanofi U.S. Taxotere label contained NO information regarding permanent hair loss until the 2015 label change was implemented. These important admissions clearly contradict the position Sanofi takes, through its' trial lawyers, now claiming that the Taxotere US label has *always* warned of permanent hair loss. That is not what Sanofi's own safety and regulatory executives say and the jury should have the opportunity to hear it. In addition to

---

[151] Ms. Kahn anticipates that, as in the *Earnest* trial, Defendants may improperly attempt to convince the jury that a warning for PCIA has always existed in the Taxotere labeling, despite multiple Sanofi employees testifying under oath to the contrary – that no information or language regarding PCIA existed in the Sanofi labeling until the label change in 2015. *See* Plaintiff's Motion *in Limine* No. 16 to Preclude Unsupported Statements from Counsel in Opening and Closing Statements, ECF. No. 12903-1 at 3-5.

the oral testimony, when Sanofi's Labeling Work Group met in 2015, the committees PowerPoint presentation slides confirm that the Sanofi US Taxotere label did *not* include any information about permanent hair loss as late as 2015.  This document contradicts the claim by Sanofi, through its' trial lawyers that the US Taxotere Label *always* included information about permanent hair loss. This evidence from Sanofi itself is both important and relevant and should not be excluded from jury consideration.

Second, the evidence is relevant and probative to prescription and the *contra non valentem* inquiry as to Ms. Kahn.  Since evidence regarding whether Ms. Kahn acted reasonably and within the appropriate time frame for filing her lawsuit will be admissible per this Court's ruling,[152] and in turn, Sanofi's conduct during the same time frame should be brought into question.

While this Court previously granted Sanofi's Motion *in Limine* in the *Earnest* case,[153] the analysis into these evidentiary issues is not analogous to the *Earnest* case, given Sanofi's presentation of a prescription defense and Ms. Kahn's *contra non valentem* defense.  For the reasons provided below, Sanofi's motion should be denied.

## C.   ARGUMENT

### I.   References Made to Post-Treatment Subsequent Remedial Measures Are Admissible to Prove Impeachment, Feasibility and General Causation.

Although Rule 407 prohibits the use of evidence of a subsequent remedial measure as proof of a party's negligence, the rule provides that evidence of such remedial measures may be admissible for certain purposes.  *See* Fed. R. Evid. 407; *Kirkland v. Marriott Int'l, Inc.*, 416 F.

---

[152] *See* Rec. Doc. 12805 at 7 (Order and Reasons on Mot. for Reconsideration on Statute of Limitations).  ("A jury will need to consider whether Plaintiff Kahn's investigation was reasonable or whether Kahn, despite what Dr. Roberie told her, should have conducted her own research at some point before 2016.  **A jury will need to assess whether Plaintiff, as part of reasonable diligence, should have found the information available online and brought it to her doctors.**") emphasis added.

[153] *See* Rec. Doc. 8201 at 6 (Order and Reasons on Mots. in Lim.)

Supp. 2d 480 (E.D. La. 2006) (holding that evidence of subsequent remedial measures was admissible for impeachment purposes); *Scurlock Marine v. W.W. Patterson, Co.*, 1997 U.S. Dist. LEXIS 14044 *4-5 (E.D. La. 1997) (allowing evidence under Rule 407 as proof of feasibility); *see also Polythane Systems, Inc. v. Marina Ventures Int'l, Ltd.*, 993 F. 2d 1201 (5th Cir. 1993).

Defendant's Motion to exclude all evidence of labeling changes and company conduct post-dating Plaintiff's chemotherapy treatments is unfounded. Despite Defendants' claims that changes to the Taxotere label were subsequent remedial measures, a characterization Plaintiff disputes, Plaintiff seeks to introduce such evidence under two of the exceptions permitted by Rule 407 – for impeachment and feasibility purposes. *See* Fed. R. Evid. 407.[154] Indeed, admission of subsequent remedial measures for impeachment is permissible by Rule 407, and when at issue, for feasibility as well. Defendants cite to *Thibodeaux v. Wellmate*, No. 12-cv-1375, 2016 WL 2983952 (E.D. La. May 23, 2016), and *Mills v. Beech Aircraft Corp.*, 886 F.2d 758 (5th Cir. 1989) as support for their argument.[155] However, these cases are distinguishable as feasibility was not at issue in either *Thibodeaux* or *Mills*, as noted by the court in both decisions, as it is in the present case of Ms. Kahn.[156] If Sanofi in fact had the means to change the label before or at the time of Ms. Kahn's treatment, then evidence of Sanofi's post-treatment labeling is not a subsequent remedial measure. At trial, Defendants will attempt to refute Plaintiff's claims that the company misrepresented its Taxotere safety profile and minimized significant risks associated with the drug. Yet evidence suggests that Defendants did not follow proper reporting procedures for their post-marketing studies.

---

[154] ". . . evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction. But the court may admit this evidence for another purpose, such as **impeachment** or –if disputed – proving ownership, control, or the ***feasibility*** of precautionary measures." Fed. R. Evid. 407 *emphasis added*.

[155] *See* Def. Mot. at 108.

[156] "Further, feasibility is not at issue in this case." *Thibodeaux*, 2016 WL 2983952, at *3, *Mills*, 886 F.2d 758, 764.

On March 5, 2015, Defendants conducted an audit of their U.S. product labels.[157]  This audit found three labels, including the U.S label for Taxotere, were not in compliance with core safety information. *See id.* Defendants' investigation to determine why "these core safety information statements" had not been added to the Taxotere label revealed that information regarding persistent alopecia should have been added to the label in 2011 pursuant to a prior audit, and that Defendants had internally failed to sufficiently respond.[158]  In March 2015, the FDA requested "a summary of cases of permanent partial or total alopecia associated with docetaxel use."[159]  In response, Defendants performed an updated review of their global pharmacovigilance database, identifying 2,118 cases with HLT "Alopecia," and "89 cases [of the 2,118] reported verbatim including word of 'permanent' or 'irreversible', or alopecia lasted more than two years with outcome of not recovered/Recovering/UNK."[160]  In response to Defendants' information regarding permanent alopecia—information that was known to the company prior to the 2011 audit—the FDA issued a letter requesting that the company update its label accordingly.[161]

Based on this evidence, Dr. David Ross, a former medical officer for the FDA, concluded that "sufficient evidence existed to support some basis to believe a causal association existed between Taxotere and PCIA, at least as early as the April 25, 2006 telephone conference/meeting documented in Richard-Cassin exhibits 22, 24 and 25"[162] and that as the manufacturer of Taxotere, "Sanofi had an ongoing obligation to update its label to include accurate information, including the adverse reaction of PCIA." *Id.*  Sanofi's investigation in 2015 and the subsequent actions taken

---

[157] *See* Ex. 40, Sanofi_01383493-01383494.
[158] *See* Ex. 41, Sanofi_02983325.
[159] *See* Ex. 42, Sanofi_04878450.
[160] *See* Ex. 43, Sanofi_01259408.
[161] Ex. 44_, *See* Sanofi_00837650.
[162] Ex.24, Ross Expert Report at 45 (internal citations omitted).

to comply with its labeling obligations demonstrate Sanofi's failures after Ms. Kahn's treatment in 2008.

Moreover, labeling changes post-2008 are relevant and admissible as to general causation. The inquiry into whether Taxotere causes PCIA allows Plaintiff to confront defendant's experts with the content of the 2015, 2018 and 2019 Taxotere labeling.  While the 2015 labeling update added the language that "cases of permanent alopecia have been reported,"[163] the 2018[164] and 2019[165] labeling update included data linking Taxotere to an increased risk of permanent alopecia, and not the reanalysis conducted by Dr. Kopreski for the purposes of litigation.  In her general causation inquiry, Plaintiff is entitled to question defense experts on cross-examination, given that Sanofi disputes that Taxotere even causes permanent hair loss, as to  whether or not the cases of permanent alopecia that have been reported, and whether the data contained in its subsequent labeling demonstrates causation between use of Taxotere and PCIA.  The post-treatment labeling evidence is admissible as statements against interest, since defense experts and Sanofi's company witness testified under oath that Taxotere does not cause PCIA, yet Sanofi included such information in its subsequent labeling in 2015, 2018 and 2019.[166]

Accordingly, evidence post-dating Plaintiff's treatment directly contradicts Defendants' claims that such evidence is irrelevant to the issue of notice and failure to warn. Since it was feasible for Defendants to add a warning concerning the risk of permanent alopecia to their label prior to Plaintiff's chemotherapy treatment, evidence of labeling changes post-2008 are inherently

---

[163] Ex. 45, 2015 Taxotere Label
[164] Ex. 46, 2018 Taxotere Label.
[165] Ex. 47 2019 Taxotere Label
[166] See Plaintiff's Motion in Limine No. 16 to Preclude Unsupported Statements from Counsel in Opening and Closing Statements, ECF. No. 12903-1 at 3-5. See also Kopreski Daubert ruling (Rec. Doc. 11332).

admissible.  Equally important is this evidence's relevance to the general causation inquiry and the probative value of this evidence far outweighs any prejudice to Sanofi.

## II.  Evidence Of Defendants' Conduct Post-dating Plaintiff's Treatment Is Relevant To The Issues Of This Litigation.

A movant *in limine* has the burden of establishing that the evidence sought to be excluded on relevancy grounds is not relevant to *any* issue in the case.[167]  Relevant evidence is broadly defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[168]  Contrary to Defendants' argument, the company's post-2011 conduct is highly relevant to the issues in this litigation.

Specific evidence, including statements from Defendants' own employees, exposes the fact that data on permanent alopecia was available as early as 2006.[169]  However, as indicated, the data was omitted from required submissions to the FDA.  Changes to the label that could have been made before or in 2008, at the time Plaintiff was receiving chemotherapy treatments, were not made until nearly seven years later.  Accordingly, post-2008 evidence, such as internal emails or general statements made concerning the company's knowledge of the adverse event are directly relevant to proving that Defendants knew or should have known that patients taking Taxotere were at an increased risk of irreversible alopecia during the relevant time period.

Sanofi has repeatedly argued to this Court that Ms. Kahn's claims are prescribed and has made statute of limitations a primary defense in this case.  As this Court has made clear, a

---

[167] *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 599 (E.D. La. 1993).
[168] FED. R. EVID. 401; *see also State v. McGinnis*, 2005 WL 2464632 *12 (La. App. 5 Cir. 2005) (quoting LSA-C.E. art. 401).
[169] "…[B]ased upon your knowledge at Sanofi in 2006, Sanofi knew that Taxotere could cause irreversible alopecia in 2006, correct?  A. Yes." *See* Ex. 17, Freedman Dep. at 195:20-196:2.

Plaintiff's injury is deemed to be discernable, based upon the Master Complaint, six months following Plaintiff's last chemotherapy treatment.[170]  Ms. Kahn finished cytotoxic chemotherapy in October of 2008.  By this Court's analysis her injury became discernable by at least April of 2009 and her one year period, in which an investigation must have been conducted, ran from April 2009 to April 2010.  As a result, the acts and omissions of Sanofi during this time period, even though they postdate Ms. Kahn's usage, are relevant as to *contra non valentem* and are therefore admissible just as Ms. Kahn's conduct during this time period is both relevant and admissible. Plaintiff refers the Court to her argument which is further explained in Plaintiff's Opposition to Defendant's Motion *in Limine* No. 26: Motion to Preclude Evidence or Argument Regarding Shirley Ledlie, Any "Taxotears" or Other Third Party Advocacy or Communications Group or Group Members, Facebook Voices Page, and Intouch Solutions.[171]

## III.   The Probative Value Of Defendants' Conduct Post-dating Plaintiff's Treatment Clearly Outweighs Any Risk Of Unfair Prejudice, Confusion Of The Issues, Or Misleading Of The Jury.

To exclude relevant evidence under Rule 403, its probative value must be *substantially* outweighed by one of the enumerated risks, i.e., unfair prejudice, confusion of the issues, misleading the jury, or undue delay. Fed. R. Evid. 403; *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir. 1983) (affirming denial of Rule 403 challenge; "[S]ince the rule requires that the probative value of the challenged evidence be substantially outweighed by the danger of prejudice, the rule favors admissibility of relevant evidence . . . a slight danger that the admission of such evidence will cause unfair prejudice is to be ignored"). As the Fifth Circuit has made clear,

---

[170] *See* Rec. Doc. 12805 at 7 (Order and Reasons on Mot. for Reconsideration on Statute of Limitations).
[171] *See* Rec. Doc. 7836.

"[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403."[172]

Defendants argue against the admission of evidence concerning the company's conduct post-2008 as "unfair." However, Defendants primary defenses in Ms. Kahn's case revolve around prescription and a purported lack of proof as to general causation. Given that the reasonableness of Ms. Kahn's inquiry includes the efforts she undertook from April of 2009 to April of 2010, Sanofi's conduct within this time period is likewise relevant as to *contra non valentum* in order for the jury to determine whether or not Sanofi undertook acts to conceal information from members of the public, such as Ms. Kahn. Sanofi cannot raise a defense centered upon conduct which postdates Ms. Kahn's usage and escape from its own conduct during that relevant time period.

Sanofi's defense that Ms. Kahn's case is prescribed is greatly undermined by its own contention that it is impossible to know if Taxotere causes permanent hair loss because Taxotere is used in combination with other chemotherapy drugs with which cases of permanent hair loss have been reported.[173] Given that Sanofi purports that Taxotere does not cause permanent hair loss, Sanofi's statements to the contrary, even though they postdate Ms. Kahn's usage in 2008, remain relevant as Sanofi has made a purported lack of proof of general causation a focal point of its defense. The probative value of Sanofi's statements which acknowledge causation and/or causal association between Taxotere and permanent alopecia outweigh any danger of unfair prejudice, confusing of issues, misleading the jury, or undue delay.

---

[172] *United States v. Pace*, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (further cautioning that exclusion of evidence under Rule 403 "should occur only sparingly"); *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977); *see also Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008).

[173] *Durden* Appellees Br. p. 1 n.1.

Additionally, for purposes of general causation, post-treatment labeling changes are highly relevant.  Such evidence is not unfairly prejudicial and would not mislead or confuse the jury. Importantly, no new clinical trial data was generated or served as a basis Sanofi's actions in 2015 or 2018 concerning Taxotere's label.  Rather, these facts clearly demonstrate that, at the time of Plaintiff's treatment, it was feasible for Defendants to change the label to adequately address the risk of permanent alopecia as future label changes were made based upon information available to Sanofi at the time of Ms. Kahn's treatment in 2008 (and earlier) and/or within the one year period of investigation from April 2009 to April 2010.  Accordingly, evidence of Defendants' post-2008 conduct is highly probative and thus admissible.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny in its entirety Defendant's Motion *in Limine* No. 27.

**28. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE AND ARGUMENT CONCERNING FDA'S JANUARY 2011 WARNING LETTER AND CORRESPONDING 483 INSPECTION**

This Court previously granted Sanofi's Motion *in Limine* in the *Earnest* case, although the Court's ruling was qualified: "Granted. ***However, if the door is opened, a conference with the Court should be held***."[174]  Ms. Kahn's case and Sanofi's defenses, including Sanofi's contention that Ms. Kahn's case is prescribed, requires looking at the evidence that Sanofi seeks to exclude through a different lens.

Defendants' attempt to exclude the 2011 FDA Warning Letter[175] and corresponding inspection by FDA is yet another attempt by Sanofi to exclude evidence that it does not like. Following a month-long FDA inspection that focused specifically on Defendants' compliance with Post-marketing Adverse Drug Experience ("PADE") reporting requirements, FDA issued a Warning Letter in 2011 that documented serious non-compliances, including that Defendants failed to submit "serious and unexpected adverse drug experience (ADE) reports" within the required timeframe and failed to "include all post-marketing studies in the Annual Report" to the agency.[176]  FDA's inspection and the corresponding 2011 Warning Letter are relevant as they directly implicate the reliability of Sanofi's overall process for adverse event reporting and are not limited to the drugs identified in the report, and occurred prior to Plaintiff being treated with Taxotere. Furthermore, in Motions in *Limine* Nos. 5, 14, 26, presently before the Court, Sanofi attempts to discredit the value and reliability of adverse event reports—but FDA's 2011 Warning Letter counters this argument, demonstrating that FDA takes seriously adverse event reporting and the function it serves in providing notice to drug companies about harmful side-effects.

---

[174] *See* Rec. Doc. 8216 (Order and Reasons on Mots. *In Lim.*) emphasis added.
[175] *See* Ex. 48, January 28, 2011 Warning Letter from Amador-Toro to Irace.
[176] *See* Def. Mot. Ex. A., Rec. Doc. 7673-2.

Moreover, this evidence counters claims made by Sanofi's own experts that Sanofi complied with pharmacovigilance processes and that the risk of permanent alopecia is unsupported by adverse event reports.  As such, Sanofi's Motion should be denied.

**ARGUMENT**

I.     **The January 28, 2011 FDA Warning Letter Is Relevant In Addressing Defendants' Failure To Comply With Post-marketing Adverse Drug Reporting Requirements.**

A movant *in limine* has the burden of establishing that the evidence sought to be excluded on relevancy grounds is not relevant to *any* issue in the case.[177]  Relevant evidence is broadly defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401; *see also State v. McGinnis*, 2005 WL 2464632 *12 (La. App. 5 Cir. 2005) (quoting LSA-C.E. art. 401). Contrary to Defendants' argument, the January 28, 2011 FDA Warning Letter is highly relevant to the issues in this present litigation. The content of the very document Sanofi is attempting to exclude relates directly to the issue of whether the company failed to warn Plaintiff of the risks associated with the use of Taxotere—particularly, the risk of developing permanent alopecia.  It also goes directly to Ms. Kahn's defense to prescription *–contra non valentem* – that Sanofi's fraudulent concealment of the risk of permanent alopecia associated with Taxotere resulted in Ms. Kahn's inability to understand the cause of her permanent hair loss injury and accordingly resulted in her delayed discovery of her cause of action.

---

[177] *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 599 (E.D. La. 1993).

At trial, Defendants may attempt to refute Plaintiff's claims that the company misrepresented its Taxotere safety profile and minimized significant risks associated with the drug. To support this argument, Defendants have continuously relied on the underlying data from their TAX 316 study. Yet evidence suggests that Defendants did not follow proper reporting procedures for their post-marketing studies. As reported in the FDA's Warning Letter, Defendants failed to comply with mandated regulations. Not only did the company fail to submit timely reports for serious and unexpected adverse events, but it failed to include all post-marketing studies in their Annual Report to the FDA. As a result of Defendants' improper conduct, significant trial data from post-marketing studies went unreported.

Defendants argue that the FDA Warning Letter should be excluded because it cannot be read to concern Taxotere or permanent alopecia. That is not accurate. The FDA explicitly states in its letter that it is not identifying all issues and violations. (*See* Def. Mot. Ex. A, Rec. Doc. 7673-2 ("The issues and violations cited in this letter are not intended to be an all-inclusive statement of violations that exist at your facility. It is your responsibility to ensure compliance with all requirements of federal law and FDA regulations.")) Separate and apart from the letter, Defendants have admitted that follow-up data from their TAX 316 study—which would have included the rate of persisting alopecia—was never submitted to the FDA in 2011.[178] As such, the FDA Warning Letter demonstrates Defendants' pattern and practice of non-compliance with regulations concerning the disclosure of risk information. *See Spinden v. Johnson & Johnson*, 177 N.J. Super 605, 609 (App. Div.), *cert. denied*, 87 N.J. 376 (1981); *In re Able Labs Secs. Litig.*, 2008 WL1967509, at *15 n.20 (D.N.J. Mar. 24, 2008) ("[The] specific violations noted in

---

[178] *See* Ex. 49, Sanofi_00837661 at 1-2.

th[e] [FDA's] letter are serious and . . . symptomatic of serious underlying problems."); *see also* *Figueroa v. Boston Scientific Corp.*, 2003 WL21488012 (S.D.N.Y. June 27, 2003).

Underscoring the relevance of this Warning Letter, Defendant's regulatory expert, Janet Arrowsmith, M.D. has opined that Sanofi acted appropriately in managing, gathering and communicating important safety information about Taxotere. Critically, however, Dr. Arrowsmith was not provided with a copy of the 2011 Warning Letter *before* forming this opinion.[179]  Despite FDA's statements to Sanofi in the 2011 Warning Letter that the agency identified significant deficiencies in the department's processes and procedures, including that Sanofi failed to submit "serious and unexpected adverse drug experience (ADE) reports" within the required timeframe and failed to "include all post marketing studies in the Annual Report," Dr. Arrowsmith concludes that:

> "Sanofi and FDA have appropriately evaluated the safety and effectiveness data for Taxotere throughout product development, during the approval process, and through careful postmarket safety surveillance. The labeling has been updated repeatedly and as needed to reflect new safety and effectiveness data. Sanofi's postmarket studies and safety surveillance of Taxotere is consistent with the good pharmacovigilance and pharmacoepidemiologic assessments and practices recommended by the FDA. . . Sanofi repeatedly and appropriately shared the information it had on alopecia with the FDA" relevant to Taxotere.

(Ex. 50, Expert Report of Janet Arrowsmith, M.D., F.A.C.P., F.A.C.E., 12/09/2019, at p. 57, ¶143.)

Sanofi's decision not to share the 2011 FDA Warning Letter with its expert is clearly appropriate for cross examination.

---

[179] *See* Ex. 51, Materials Reviewed by Janet Arrowsmith, M.D.

Further still, Sanofi's experts never address serious follow-up issues that were identified in the TAX316 study. Specifically, it was not until attempting to gather "missing 10-yr FUP (follow-up) information" in 2010 that Sanofi's Clinical Trial Manager for TAX316, Kim Bassi, learned that one study investigator had lost privileges at his study center in 2000 due to ethics reasons.[180] This ten-year gap in follow-up communication with its investigator is relevant for cross examination of Sanofi experts who may offer testimony that Sanofi acted appropriately in managing, gathering and communicating important safety information about Taxotere. Sanofi's difficulty in keeping up with its study centers, and in failing to timely obtain TAX316 data, if at all, from study centers seems to have been a challenge throughout the study.[181] In light of Sanofi's experts' testimony, this evidence is directly relevant to the 2011 Warning Letter that addresses such systematic failures. At the very least this evidence is ripe for use while cross examining Sanofi's experts.

Based on the foregoing, the January 28, 2011 FDA Warning Letter *is* relevant to Plaintiff's claims and Sanofi's defenses. Further, the agency's letter is admissible for cross-examination of Sanofi's regulatory expert witnesses, and as impeachment evidence to rebut Defendants' claims that the risk of permanent alopecia was unsupported by the underlying data of their post-marketing studies.

## II.  Admission of the January 28, 2011 FDA Warning Letter Is Not Unduly Prejudicial Against Defendants.

---

[180][180] Ex. 52, Sanofi_03930089, See Ex. 53, 8/10/201, Deposition Transcript of Bassi at 400:12-405:10.
[181] Ex. 54, Sanofi_04168367 ("Perhaps the sites are just complaining, but from the feedback I received several study centers have refused to answer anything further." and "What the sites are upset about is that for so long there was no activity with this study then all of a sudden everything is needed yesterday."); Ex. 55, Sanofi_03935910, "The database Lock of 29 Jan 09 has been postponed until Mid Feb due to missing data for 62 patients."

Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403; *see* Advisory Committee's Notes on Fed. Rule Evid. 403 ("'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"); *Old Chief v. United States*, 519 U.S. 172, 180 (1997). As the Fifth Circuit has made clear, "[r]elevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Pace*, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (further cautioning that exclusion of evidence under Rule 403 "should occur only sparingly"); *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977); *see also Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008).

Defendants have identified no credible arguments regarding unfair prejudice with respect to the January 28, 2011 FDA Warning Letter. As the letter plainly demonstrates, Defendants were in violation of several post-marketing requirements. Such violations indicate significant structural and organizational problems which broadly implicate the quality and reliability of Defendants' pharmacovigilance practices for each of their marketed drugs—including Taxotere®. Thus, given the extremely high probative value of the evidence, there is no risk of unfair prejudice with the admission of the FDA Warning Letter.

### III. Conclusion

Sanofi Defendants failed to demonstrate that the January 28, 2011 FDA Warning Letter is inadmissible for any purpose. Therefore, Plaintiff respectfully requests that the Court deny in its entirety Defendant's Motion *in Limine* No. 28.

**29. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT THAT PLAINTIFF'S ACTINIC KERATOSIS WAS CAUSED BY TAXOTERE OR PCIA, OR CLAIMING DAMAGES THEREFOR**

Sanofi seeks to exclude evidence or argument that Ms. Kahn's actinic keratosis was caused by Taxotere or PCIA, or claiming damages therefor. But the conditions are indisputably linked.[182] Sanofi admits that Ms. Kahn has experienced actinic keratosis since at least 2012.[183] Sanofi's expert also admits that acinic keratosis lesions form as a result of sun exposure to an unprotected scalp.[184] Plaintiff's expert, Dr. Tosti, has opined that a diagnosis of actinic keratosis is always coupled with alopecia: "…you cannot have those lesions if the head is covered."[185]

But Sanofi disagrees on the duration of sun exposure necessary for the condition to present. Sanofi intends to argue that Ms. Kahn's actinic keratosis diagnosis reveals that she suffered from hair thinning long before her chemotherapy treatment because actinic keratosis develops as a result of long-term sun exposure.[186] Ms. Kahn's expert dermatopathologist, Dr. Antonella Tosti, disagrees. When asked how quickly actinic keratosis can develop, Dr. Tosti responded: "…Depends on skin type and depends on, you know, the UV index. New Orleans is definitely faster than in New York….I've seen patients developing in months."[187]

Therefore, Sanofi hopes to argue through its expert dermatologist, Dr. Mamina Turegano, that Ms. Kahn had alopecia prior to her chemotherapy treatment because actinic keratosis is caused by long-term sun exposure to an unprotected scalp, while, at the same time, attempting to exclude Ms. Kahn's expert from discussing the same concept – that actinic keratosis is related to

---

[182] *See also* Plaintiff's Opposition to MIL No. 10, insofar as Dr. Tosti is testifying regarding a condition that she observed in her clinical examination of Ms. Kahn's scalp, after reviewing her history and medical records that document her actinic keratosis.
[183] *See* Sanofi's Brief at 112.
[184] Ex. 56, Expert Report of Dr. Mamina Turegano, 10/9/2020 at 21-22.
[185] Ex. 2, Tosti Dep. at 69:5-12.
[186] *See* Sanofi's Brief at 113.
[187] Ex. 2, Tosti Dep. at 65:2-11.

sun exposure to an unprotected scalp – to explain that Ms. Kahn's actinic keratosis is amplified by her baldness due to Taxotere.  Sanofi's argument that actinic keratosis results from more long-term sun exposure is proper for cross examination.  Further, if Dr. Tosti is precluded from providing her opinions on the relationship between Ms. Kahn's PCIA and actinic keratosis and the length of time in which actinic keratosis can present, Dr. Turegano should likewise be precluded from discussing the cause of actinic keratosis under the same reasoning.  Dr. Turegano did not provide any scientific evidence to support her position that the condition only results from long term exposure.  In fact, Dr. Turegano stated her opinion was based solely on her education and experience rather than medical literature or scientific authority.[188]

Finally, Sanofi is clearly aware that Ms. Kahn's baldness due to Taxotere amplifies her actinic keratosis and risk of cancerous lesions.  Indeed, that claimed injury has been fully vetted through the testimony of Ms. Kahn's family, friends, and treaters as highlighted in Sanofi in its motion.[189]  For the foregoing reasons, Plaintiff respectfully requests that the Court deny Sanofi's Motion *in Limine* No. 29. Alternatively, any limitation should, in fairness, be applied evenly to Plaintiff's and Defendants' experts.

---

[188] Ex. 4, Turegano Dep. at 130:16-132:23.
[189] *See* Sanofi's Brief at 114-115.

## 30. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE USE OF COLD CAPS

Sanofi moves to exclude all evidence and argument regarding the use of cold caps. However, this evidence and argument is highly relevant, probative, and important for the education of the jury and is therefore admissible.

### E. ARGUMENT

Contrary to Sanofi's assertions, cold caps *were* being utilized at the time Ms. Kahn underwent chemotherapy, and there *is* sufficient evidence that her prescribing physician, Carl Kardinal, MD, would have utilized cold caps in ameliorating the risk of permanent alopecia had he known of the risk at the time of Ms. Kahn's treatment.

The Gayle and Tom Benson Cancer Center at the Ochsner Clinic Foundation, the facility where Ms. Kahn received her cancer treatment, is currently one of hundreds of oncology centers across the United States that makes the DigniCap cooling machine available for cold cap users.[190] Other facilities have freezers and/or the Paxman scalp cooling machine.[191] In addition, for patients who do not have access to a facility with machines in place, the dry ice method allows cold caps to be used at any location.[192]

Cold caps were used in oncology facilities across the country long before the DigniCap and Paxman devices were approved by the FDA in 2015 and 2017. In fact, defense expert oncologist John Glaspy, MD testified that his center at UCLA began utilizing cold caps to prevent chemotherapy-induced alopecia "[a]s soon as the modern ones became available."[193] Scalp cooling has been used since the 1970s to prevent temporary chemotherapy-induced

---

[190] http://www.rapunzelproject.org/ColdCaps/Locations.aspx
[191] *Id.*
[192] *Id.*
[193] Ex. 57, 01/18/2019, Deposition Transcript of John A. Glaspy, MD at 86:20-24.

alopecia, and by 2005, it had become recognized as "an increasingly effective method to prevent chemotherapy-induced hair loss."[194]

In her expert report, clinical oncologist Linda Bosserman, MD explains how the accuracy and completeness of discussions between prescribing oncologists and their patients regarding cold caps necessarily depends on a manufacturer's communication of known risks regarding permanent alopecia:

> If oncologists had been informed of the risk of permanent alopecia with Taxotere regimens, it would have permitted them to advise patients about the risk and the option of scalp cooling to prevent or decrease the risks of both temporary and permanent alopecia. The risk of a permanent disfiguring condition would have changed the weighing of risks and benefits for patients [and] the informed consent process with their medical oncologist . . . A study published in 2018 examined the effectiveness of cold caps in preventing PCIA from Taxotere/docetaxel regimens. After a median follow-up of 8 years, one of 120 patients presented with grade 1 alopecia, and no cases of grade 2 permanent alopecia were seen.[195]

Dr. Kardinal testified that he would have warned Ms. Kahn of the risk of permanent alopecia from Taxotere regimens if he had known at the time of her treatment: "If Sanofi said that Taxotere may cause permanent hair loss, then that should, at a minimum, be included in the consent form for the use of that drug. And if they stated that the incident of permanent hair loss were X percent or whatever, those things should be made known to the patient."[196] Sufficient knowledge would have empowered Dr. Kardinal to fully discuss the risks and benefits of different treatment options with Ms. Kahn. If Ms. Kahn had been informed of the risk of permanent alopecia from Taxotere regimens, she could have meaningfully considered the option

---

[194] *See* Ex. 58 - Linda Bosserman, MD Expert Report, Oct. 21, 2019 at 39, *quoting* E.G. Grevelman & W.P.M. Breed, *Prevention of Chemotherapy-Induced Hair Loss by Scalp Cooling*, 16 ANNALS OF ONCOLOGY 352, 357 (2005).
[195] *Id.* at 41-42, *citing* Miguel Martín et al., *Persistent Major Alopecia Following Adjuvant Docetaxel for Breast Cancer: Incidence, Characteristics, and Prevention with Scalp Cooling*, BREAST CANCER RES. & TREAT. (2018).
[196] *See* Ex. 12, Kardinal Dep. at 219:22-220:2.

of utilizing a cold cap and reasonably could have opted out of the clinical trial if she decided not to use a Taxotere regimen and/or to use a cold cap.

At trial, Defendants are likely to present evidence that minoxidil is a medication which Ms. Kahn could have or should have used to potentially treat her permanent alopecia and/or mitigate her damages.[197]   However, Defendants should not be permitted to put on evidence of potential ("mild improvement" at best)[198] treatments for permanent chemotherapy induced alopecia while excluding evidence of measures which could have been taken to prevent grade two permanent chemotherapy induced alopecia *altogether*, such as cold caps.  Rather, evidence of cold caps and their ability to prevent grade two permanent chemotherapy induced alopecia from Taxotere is relevant for the jury to consider in determining whether or not Sanofi provided an adequate warning.  Under the Louisiana Products Liability Act an "adequate warning" is one which "would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made."  La.R.S. 9:2800.53(9).  Therefore, Ms. Kahn should be permitted to present evidence of methods by which the she could have avoided damage, mainly the use of cold caps to prevent grade two permanent chemotherapy induced alopecia from Taxotere, had she been properly warned of the risk of permanent chemotherapy induced alopecia from Taxotere.

---

[197] In her expert report, defense expert Dr. Turegano states: "The medical literature indicates that pCIA can respond to treatment, such as minoxidil. So if a person has not tried to treat their alopecia, it is impossible to conclude that the alopecia is permanent or that it would not respond to treatment." Ex. 56, Mamina Turegano, MD, Expert Report, Oct. 9, 2020, at pg.13. *See also* Ex. 2, Tosti, Dep. at 62-63 (defendants questioning Dr. Tosti regarding minoxidil as a possible treatment option for Ms. Kahn).

[198] Dr. Tosti testified that for cases of PCIA, minoxidil can "maybe" provide "mild improvement." *Id.* at 62.

**F.  CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

Motion *in Limine* No. 30.

**31. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING THE CANADIAN INFORMED CONSENT**

Sanofi seeks to bar the introduction of an informed consent form from a Canadian study involving Taxotere on the basis that it is irrelevant and unduly prejudicial. Curiously, Sanofi's motion ignores the fact that the Court permitted this evidence in the *Earnest* trial and instead cherry-picks soundbites from the Court's ruling on Plaintiff's partial summary judgment motion to support its instant motion. Putting aside the burdens of proof being completely different for the two motions, Sanofi has failed to advance any plausible argument why the Court should change its ruling. Accordingly, Sanofi's motion should be denied.

In 2007, Emanual Palatinsky, Sanofi's Global Safety Officer, the person chiefly responsible for the safety of Taxotere at Sanofi, was tasked with reviewing the content in the "TAXOTERE" section of the informed consent form for Sanofi. The draft informed consent form sent to Sanofi for review identified **both** "hair loss" and "permanent hair loss" as side effects known by Sanofi to be associated with the use of Taxotere. In his review, Palatinsky deleted the term "hair loss" and specifically kept in the reported and known side-effect "permanent hair loss" while stating "permanent h[air] l[oss] is sufficient once."[199] Later when asked about his decision to maintain the notice of "permanent hair loss" in the consent form, Palatinsky testified that including "permanent hair loss" as a known outcome of Taxotere represented the most accurate information about what Sanofi actually **knew** at the time.[200] The relevancy of the timing of this important "smoking gun" admission should not be lost on the Court. Palatinsky makes this important admission about Sanofi's knowledge regarding "permanent hair loss" in the year 2007—more than sixteen months **before** Ms. Kahn was

---

[199] Rec. Doc. 9230-09 at pg. 2, 12.
[200] Ex. 59, Aug. 9, 2018, Deposition Transcript of Emanuel Palatinsky, at 349:11-350:11.

prescribed Taxotere with **no** warning from Sanofi about "permanent hair loss" as a potential outcome with the use of Taxotere!  So, what we have in this informed consent form is Sanofi's Global Safety Officer over Taxotere admitting in writing that in 2007, the use of Taxotere was known **by Sanofi** to be associated with an outcome of permanent hair loss.  And in his role as Global Safety Officer over Taxotere, Palatinsky believed that an accurate statement of Taxotere side effects known to Sanofi in 2007 included "permanent hair loss."  Contrary to Sanofi's argument that its relationship to the document is "tangential at best" and thus irrelevant, this evidence is relevant, indeed crucial, to Plaintiff's claim to prove Sanofi's knowledge.

Sanofi further contends the informed consent is irrelevant because the purpose of the underlying study was to evaluate another drug being added to various chemotherapy regimens. While Plaintiff has no intention of invoking any testimony regarding the purpose or anything substantively related to the underlying study, Sanofi's argument is belied by the fact that Ms. Kahn was administered Taxotere through a clinical study that was intended to study the addition of another chemotherapy drug, not to evaluate Taxotere.  The Canadian informed consent form is even more relevant here, as Ms. Kahn did not get the benefit of an informed consent form with Palatinsky's edit regarding the risk of permanent hair loss.  Notwithstanding the parallels between the Canadian clinical trial and Ms. Kahn's clinical trial, use of this type of evidence to speak to Sanofi's knowledge has broad support in the caselaw finding that it is not only relevant, but also far more probative than prejudicial.[201]  Further, to the extent there is confusion, a "jury

---

[201] *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liab. Litig.*, 499 F.Supp.3d 505, 522 (S.D. Ohio 2020) (when evidence is put forward to demonstrate mere notice, the concern for a mini-trial disappears); *In re Xarelto (Rivaroxaban) Products Liab. Litig.*, 2017 WL 2780760, at *7 (E.D. La. May 26, 2017) (finding "anything the Defendants have said to anyone, even foreign regulatory bodies, should be admissible."); *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Products Liab. Litig.*, 181 F.Supp.3d 278, 307 (E.D. Pa. 2016) (foreign label admissible to show defendant's knowledge of potential risks associated with its product); *see also Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F.Supp.3d 809, 827 (S.D.W. Va. 2018); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab.*, 2011 WL 6740391, at *2 (S.D. Ill. Dec. 22, 2011); *In re Levaquin Products*

instruction can be given to ensure that jurors understand the limited nature of this evidence."[202]

Given the probative value of the evidence, there is no risk of unfair prejudice with the admission.

Accordingly, Sanofi's motion should be denied.

---

*Liab. Litig.*, 2010 WL 4676973, at *4-5 (D. Minn. Nov. 9, 2010); *In re Viagra Prod. Liab. Litig.*, 658 F.Supp.2d 950, 961-2 (D. Minn. 2009).
[202] *In re Tylenol*, 181 F. Supp. 3d at 307.

**32. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING DR. KESSLER OR HIS ROLE IN THE U.S. GOVERNMENT'S COVID-19 RESPONSE TEAM**

Plaintiff does not intend to introduce evidence or testimony about Dr. Kessler's involvement in the Biden administration's COVID-19 task force.  However, Plaintiff anticipates that Sanofi will argue to the jury that opinions by Plaintiff's experts, Drs. Plunkett and Ross, are in some way less reliable because Drs. Plunkett and Ross were designated later in time or spent less time preparing their analysis in Ms. Kahn's case after Dr. Kessler's departure.  More specifically, Plaintiff is concerned that Sanofi may imply through cross examination of Drs. Plunkett and/or Ross that Plaintiff's experts became involved in Ms. Kahn's case late, did not spend a significant amount of time in forming their opinions, and/or simply adopted an absent expert's opinions.  To counter these types of arguments, Plaintiff's experts should be allowed to explain to the jury why there was considerable work done in advance of their reports by the former FDA commissioner Dr. Kessler who had to vacate his role in the litigation and is no longer a witness in her case.  Accordingly, Plaintiff should be permitted to introduce testimony on Dr. Kessler's departure from the litigation due to his role on the COVID-19 task force if Sanofi opens the door by arguing that Plaintiff's experts' later designation affects their opinions.

### 33. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE DUPLICATIVE EXPERT TESTIMONY

Sanofi seeks to limit the testimony of either Dr. Bosserman or Dr. Feigal as their testimony is duplicative, and either Dr. Ross and Dr. Plunkett for the same reason. Ms. Kahn has represented to the Court that she will not advance duplicate testimony, and will not do so at trial. Specifically, Sanofi argues that Dr. Bosserman's opinions should be limited because they are duplicative of Dr. Feigal's opinions related to informed consent, and Dr. Plunkett's should be also limited as her testimony overlaps with Dr. Ross's regulatory opinions.  The Court should deny this motion 1) because Dr. Feigal's opinions are complementary, not duplicative, to Dr. Bosserman's; and 2) because there are pending *Daubert* motions involving Dr. Plunkett and Dr. Ross.

Recently the Court held that Dr. Miletello's testimony regarding alternative causes of Plaintiff's hair loss overlapped with that of Dr. John Glaspy, and limited his testimony.[203]

Plaintiffs do not intend to offer cumulative and unnecessary testimony and have indicated as much to the Court.  Although they are both clinical oncologists, Dr. Feigal will be offered as an expert on general causation and clinical trials, and Dr. Bosserman as an expert in predictive modeling and general clinical oncology.  Their respective testimony will not overlap in any way but, rather, covers different topics entirely. Their opinions are complementary and not duplicative.[204]

---

[203] *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-17039, 2021 WL 111778, at *1 (E.D. La. Jan. 12, 2021); *see also* Fed. R. Evid. 403 (providing "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence); *but see In re Katrina Canal Breaches Consol. Litig.,* No. 10-866, 2012 WL 3815672, at *1 (E.D. La. Sept. 4, 2012) (deferring ruling on motion to exclude duplicative testimony to determine whether it would be repetitive rather than complementary).
[204] *See Lightfoot v. Hartford Fire Ins. Co.*, No. CV 07-4833, 2011 WL 13208896, at *4 (E.D. La. Jan. 31, 2011) (citing *Banks v. United States*, 93 Fed. Cl. 41, 51 (Fed. Cl. 2010) (declining to exclude one of the defendant's three

With respect to the opinions of Dr. Plunkett and Dr. Ross, it is premature at this time to exclude either doctor  as there are pending *Daubert* motions regarding both experts. Ms. Kahn cannot commit to which expert will be called to testify on regulatory obligations and labeling issues, but acknowledge that calling both would be unnecessarily cumulative on the topic.

And finally, Plaintiff's counsel fully understands Your Honor's position on cumulative testimony, and suggests that the prohibition against cumulative testimony also be imposed on cross examination.

---

experts on shoreline composition from testifying on the grounds of cumulativeness given that each proffered expert offered a different perspective that potentially could assist the court))

## 34. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE PUNITIVE DAMAGES EVIDENCE

Plaintiff opposes this overly broad request to exclude punitive damage evidence.  Sanofi gives only 4 examples of what it considers to be "punitive damage evidence", each of which it mischaracterizes as such. Sanofi also seeks to exclude other evidence which is not particularized under the umbrella of it being "punitive damage evidence".  This motion should be denied as (1) the Court in *Earnest* previously allowed evidence of intent, motive or state of mind, evidence which Sanofi labels "punitive damage" evidence (2) it seeks to exclude so-called "punitive damages" evidence that is relevant to other central issues in the case; (3) it may be appropriate to present to the jury should Sanofi open the door to such evidence in its efforts to bias the jury at trial with favorable "character evidence;" and (4) it is overly broad and ambiguous ,  Defendant Sanofi seeks to exclude evidence it characterizes as serving only punitive goals, which, in this case, admittedly, would be inadmissible as punitive damages are not allowed under Louisiana law in this products liability action.  Further, Sanofi interprets its 4 examples as suggesting that the quoted testimony from deposition designations could only be offered by Ms. Kahn to show Sanofi is a "bad company," "profit-driven" or, otherwise, "a big business" and, therefore, should be excluded by the Court as unfairly prejudicial.  Each of Sanofi's arguments lack merit.

First, Your Honor should deny Sanofi's motion as in *Earnest* the Court ruled it would allow factual evidence that shows intent, motive, or state of mind.[205] Much of the evidence Sanofi seeks to exclude in its motion, such as being "profit-driven" or taking steps to eradicate any mention of PCIA to doctors and patients, is admissible as it establishes motive.

---

[205] Rec. Doc. 8206.

Second, Sanofi's request should be denied as evidence it classifies as punitive damage related to Sanofi's marketing goals and profits is probative of Ms. Kahn's *contra non valentem* argument and that any unfair prejudice that would result by introduction of evidence related to Sanofi's aggressive marketing and sales efforts is outweighed by its probative value.[206] Specifically, there is ample evidence of Sanofi's efforts to conceal from the general public and physicians that Taxotere could cause permanent hair loss.  Evidence of the amount of resources Sanofi dedicated to marketing Taxotere, and the profits derived therefrom, puts into context Sanofi's efforts to suppress the permanency of hair loss which prevents plaintiffs from learning that Taxotere causes PCIA.  It is a red flag of motive evidence. Sanofi's failures to publicize the drug's risk of use is probative of whether Sanofi engaged in intentional concealment, fraud, or other ill practices which prevented Ms. Kahn from locating information on Facebook.

Third, notwithstanding its relevance to Ms. Kahn's *contra non valentem* arguments, Sanofi points to designated testimony from Jean-Philippe Aussel, Amy Freedman, Matthew Goyer, and Andris Ortmanis. These witnesses testified to Sanofi's goals and success in its promotion and sale of Taxotere in the breast cancer drug market.  For example, Dr. Aussel, the clinical trials manager for Sanofi, testified that he understood the Taxotere warning label's reference to alopecia was not intended to indicate permanent hair loss.[207]  Dr. Aussel's reference to Sanofi's marketing and sales efforts arose in the context of Sanofi's efforts to expand use of Taxotere for metastatic or middle/late-stage breast cancer to early-stage breast cancer.[208]  In this context, Dr. Aussel acknowledged that there was an effort by Sanofi to do so because of the sales

---

[206] Fed. R. Evid. 401-403; *see, e.g., In re Med. Rev. Panel of Gerard Lindquist*, 18-444 (La. App. 5 Cir. 5/23/19), 274 So. 3d 750, 759, *writ denied,* 2019-01034 (La. 10/1/19), 280 So. 3d 165 (evaluating "defendant's conduct to determine whether it rose to a level of concealment, misrepresentation, fraud or ill practices" for purposes of *contra non valentem*); *see also Carter v. Haygood,* 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1269.

[207] Ex. 60, Oct. 11, 2018, Deposition Transcript of Jean-Philippe Aussel at 65:5-8, 74:23-75:3.

[208] *Id.* at 260:7 – 261:14.

potential in such a market expansion.[209]  Taking this evidence out of context, Sanofi suggests

that Dr. Aussel's testimony could only be relevant to a punitive damages claim.  However, when

presented in the proper context it shows Sanofi's motives in minimizing any adverse publicity it

would receive if Taxotere was publicly known to cause permanent hair loss, which is relevant, as

presented above, because Sanofi has raised liberative prescription as a defense to Ms. Kahn's

claims.

Similarly, Freedman's testimony regarding Taxol as a market competitor to Taxotere is

relevant to Plaintiff's position that there were alternatives to Taxotere available in the

marketplace which did not cause permanent hair loss and that Sanofi engaged in efforts to

conceal this distinction.  The statement referenced by Sanofi does not explicitly relate to punitive

damages but, to the extent that it implies that Taxol and Taxotere had major market share in the

breast cancer drug arena should be of no moment, as its relevance goes to show that there were

equally effective, less risky drugs available in the market and that Sanofi went to great lengths to

conceal permanent hair loss as a side effect of Taxotere.

Finally, the testimony of Matthew Goyer and Andris Ortmanis who testified as to

Sanofi's marketing efforts in promoting Taxotere including its employment of In Touch

Solutions is directly tied to Sanofi's efforts and motive to hide the risk of PCIA.[210]  Plaintiff

offers that this evidence as relevant to a *contra non valentem* defense to liberative prescription

because it shows the great extent to which Sanofi went to promote Taxotere but, yet, conceal its

risks.

---

[209] *Id* at 249:1-7.
[210] Ex. 37, Dec.13, 2018, Deposition Transcript of Michael Goyer at 17:16-22, 77:18-78:18; *See also*  Ex. 61, Nov. 30, 2018, Deposition Transcript of Andris Ortmanis at 331:16-333:10.

Third, Ms. Kahn should be permitted to introduce this evidence to rebut attempts by Sanofi to paint itself as a benevolent or charitable pharmaceutical company.  Should Sanofi offer evidence of its motives in developing, marketing, and selling Taxotere in any fashion, it would open the door to allow Ms. Kahn the right to show its profit-driven practices aimed at gaining a larger market share in the breast cancer drug arena.

Fourth, the motion should be denied because it is vague and ambiguous.  Any defendant can interpret a myriad of evidence as punitive damage evidence; but to make that determination the Court must hear the proposed testimony, allow plaintiff's counsel to refute the classification and demonstrate it is relevant and material.  As such, this motion is premature.

For the numerous reasons set forth above, Sanofi's motion should be denied.

### 35. PLAINTIFF'S OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING DEAR HEALTH CARE PROVIDER LETTERS

In all failure to warn cases, it is relevant whether the drug company communicated information about a drug's risk to the prescribing physician. That's the central issue. Drug companies communicate with doctors in myriad ways—label changes, emails, so-called Dear Doctor letters (or DCHP letters), or publications. In fact, Sanofi regularly communicates with doctors in these ways, and it does so regularly without the FDA's prior permission, because there is no legal impediment to its providing the medical community with information about a drug's risks.

Sanofi nevertheless seeks to exclude one such means of communication from the Kahn trial—Dear Health Care Provider Letters. That request makes little sense. Dr. Kardinal was asked at his deposition whether he had ever received letters from Sanofi, or whether he would have changed his prescribing decisions if Sanofi had communicated the risks associated with Taxotere. He testified he never received such a letter but would have changed his prescribing habits had Sanofi given him more information. The Court allowed the same testimony in *Earnest*[211] and we are aware of no failure-to-warn case (and Sanofi cites none) in which counsel was prohibited from even asking a prescribing physician if the defendant drug company had in fact communicated a risk in some fashion such as through a letter.

Sanofi's motion is not only extreme, it also badly misstates the law. Federal law does not prohibit a drug company from speaking with doctors about their products. The opposite is true: drug companies are primarily responsible for pharmacovigilance and must update doctors with information. In fact, the record is replete with instances where Sanofi communicated risks to doctors—including through Dear Doctor letters—indeed, including about permanent hair loss.

---

[211] Ex. 62, September 23, 2019 *Earnest* Trial Tr. at pg. 1416.

Although Sanofi brings up this Court's post-2015 ruling on warnings and precautions, this dispute has nothing to do with that. The portion of Dr. Kardinal's deposition testimony where he discusses letters and communications only discusses whether he would have altered his prescribing decision for Ms. Kahn in 2008 had Sanofi communicated to him the risks it knew then about Taxotere. That testimony is highly relevant and does not implicate in anyway this Court's post-2015 ruling.

For these reasons, Sanofi's request to exclude such testimony should be denied.

## A. ARGUMENT

Sanofi incorrectly asserts that DHCP Letters are not relevant to failure to warn claims like Ms. Kahn's. Defendant inappropriately uses this Court's Order from the *Stewart* case to try to make it fit the facts of this case:  Sanofi misleadingly cites this Court's Order and case law for the proposition that information about other ways an adequate warning could have reached a prescribing physician are irrelevant where a doctor "does not recall ever reading the label at issue."[212] That is not this case. Dr. Kardinal, Ms. Kahn's prescribing physician, testified that he read the Taxotere label "at the time [he] started using Taxotere."[213] Further, Dr. Kardinal testified that "[i]f something unexpected happened," it was his custom and practice to "refer back" to chemotherapy labels."[214]

In addition to having read the Taxotere label in advance of Ms. Kahn's treatment, Dr. Kardinal testified that he would have counselled Ms. Kahn about the risk of permanent alopecia and would have discussed other treatment options with her if he had received a DHCP Letter

---

[212] *See* Rec. Doc. 12494 (Order and reasons granting summary judgment on the claims of Wanda Stewart) at 6 ("When a physician does not recall ever reading the label at issue, the learned intermediary doctrine requires summary judgment for the manufacturer") (*citing Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010)).
[213] Ex. 12, 01/17/2018 Deposition Transcript of Carl Kardinal, MD at 30:3-6.
[214] *Id.* at 29:20-24.

from Sanofi regarding that risk.[215] In fact, Dr. Kardinal testified that if he had received such a letter, the risk of permanent alopecia "would be something that would *have* to be included in the discussion."[216]

What's more, Linda Bosserman, MD explains in her expert report how Sanofi kept her and other oncologists in the dark about a risk universally considered important to patients:

> The Taxotere labeling and other materials circulated and communicated to oncologists, mentioned the adverse event of alopecia; which I understood to refer to the well-known adverse effect of temporary alopecia. The Taxotere label did not mention cases of permanent alopecia until 2015, but even then, the label did not include a warning for PCIA. I did not receive a dear doctor letter notifying me of the adverse event of PCIA.[217]

Contrary to Sanofi's assertions, Sanofi *can* send a DHCP Letter on its own – they do not need the FDA to tell them to do it. Neither the FDCA nor FDA's regulations prohibit a brand-name drug manufacturer from unilaterally sending a DHCP letter. And a DHCP letter is an appropriate way to inform medical professionals about new information. Indeed, Sanofi sent letters in as early as 2008 regarding permanent hair loss in response to inquiries from consumers and healthcare providers.[218] But it never sent the letters to all doctors, just select doctors. Another example is a DHCP Letter that Sanofi sent out on a safety issue (explaining that a 21-gauge needle should be used in withdrawing Taxotere from its vial because of an increase in the potential for stopper coring when large gauge needles are used) that was not covered in the Taxotere label[219] – illustrating that manufacturers can send update doctors using these forms of communication.

---

[215] *Id.* at 130:13-20, 141:22-143:12.
[216] *Id.* at 142:11-12 (emphasis added).
[217] Ex. 63, Linda Bosserman, MD, Expert Report, April 3, 2020, at 53.
[218] Ex. 64, Sanofi_05061406; Ex. 65, Sanofi_05969205; Ex. 66, Sanofi_05969194, Ex. 67, Sanofi_05969189; Ex. 68, Sanofi_05969209; Ex. 69, Sanofi_05969184.
[219] Ex. 70, Sanofi_04797747.

Sanofi misleadingly characterizes the FDA's guidance regarding DHCP letters: the FDA's "Nonbinding Recommendations" are significantly more expansive and less rigid than Sanofi contends.[220] While the FDA encourages manufacturers to consult with the Agency regarding DHCP letters, such consultation is not required.[221] Sanofi contends that Ms. Khan has provided no evidence that the FDA would have encouraged or approved a DHCP Letter regarding permanent alopecia and Taxotere. This argument is misplaced: it is *Sanofi* that has provided no evidence that it even *attempted* to consult the FDA about a DHCP Letter regarding permanent alopecia and Taxotere. The FDA explains that "there are occasions when it is important to communicate [new or updated] information promptly to health care providers involved in prescribing or dispensing a drug or in caring for patients who receive a drug."[222] Sanofi was not prohibited by regulatory law to warning about the risk of permanent alopecia and, as just mentioned, has previously done so when questioned by a consumer or healthcare provider about permanent hair loss among users of Taxotere. Just as Sanofi was not prevented from sending the letters discussed above.  Sanofi was not prevented from sending a DHCP Letter to Ms. Kahn's treating physician.  Thus, the question of whether the warning was important to communicate is a material issue at trial.  The availability of a prompt and practical method to warn of an important side effect is relevant evidence.

Lastly, the testimony Sanofi seeks to exclude about DCHP letters has nothing to do with this Court's ruling about post-2015 cases.  Dr. Kardinal's deposition testimony about letters and communications only discusses whether he would have altered his prescribing decision for Ms.

---

[220] Ex. 71, FDA, Guidance for Industry and FDA Staff, Dear Health Care Provider Letters: Improving Communication of Important Safety Information at 1 ("FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.")
[221] *Id.* at 2-3.
[222] *Id.* at 2.

Kahn in 2008 had Sanofi communicated to him the risks it knew then about Taxotere. That testimony is highly relevant and does not implicate in anyway this Court's post-2015 ruling.

**B.  CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion *in Limine* No. 35.

Dated: July 8, 2021

Respectfully submitted,

*/s/ Christopher L. Coffin*
Christopher L. Coffin (#27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Karen B. Menzies*
Karen Barth Menzies (CA Bar #180234)
GIBBS LAW GROUP LLP
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Telephone: 510-350-9700
Facsimile: 510-350-9701
kbm@classlawgroup.com

*Plaintiffs' Co-Lead Counsel*

*/s/M. Palmer Lambert*
M. Palmer Lambert (#33228)
GAINSBURGH BENJAMIN DAVID
MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: 504-522-2304
Fax: 504-528-9973
plambert@gainsben.com

*Plaintiffs' Co-Liaison Counsel*

*/s/Dawn M. Barrios*
Dawn M. Barrios (#2821)
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: 504-524-3300
Fax: 504-524-3313
barrios@bkc-law.com

*Plaintiffs' Co-Liaison Counsel*

## PLAINTIFFS' STEERING COMMITTEE

Anne Andrews
Andrews Thornton Higgins Razmara, LLP
2 Corporate Park, Suite 110
Irvine, CA 92606
Phone: (800) 664-1734
aa@andrewsthornton.com

Abby E. McClellan
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100
Fax: (816) 714-7101
mcclellan@stuevesiegel.com

J. Kyle Bachus
Bachus & Schanker, LLC
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
kyle.bachus@coloradolaw.net

Karen Barth Menzies
Gibbs Law Group LLP
6701 Center Drive West, Suite 1400
Los Angeles, CA 90045
Phone: 510-350-9700
Fax: 510-350-9701
kbm@classlawgroup.com

Lawrence J. Centola, III
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
Phone: (504) 581-9065
Fax: (504) 581-7635
lcentola@mbfirm.com

Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1100 Poydras Street, Suite 2225
New Orleans, Louisiana 70163
Phone: (504) 355-0086
Fax: (504) 355-0089
ccoffin@pbclawfirm.com
Alexander G. Dwyer
Kirkendall Dwyer LLP
440 Louisiana, Suite 1901
Houston, TX 77002
Phone: (713) 522-3529
Fax: (713) 495-2331
adwyer@kirkendalldwyer.com

John Gomez
The Gomez Law Firm, PLLC
655 West Broadway, Suite 1700
San Diego, CA 92101
Phone: (619) 237.3490
Fax: 619.237.3496.
john@thegomezfirm.com

Emily C. Jeffcott
Morgan & Morgan
700 S. Palafox Street, Suite 95
Pensacola, FL 32505
Phone: (850) 316-9074
Fax: (850) 316-9079
ejeffcott@forthepeople.com

Andrew Lemmon
Lemmon Law Firm, LLC
P.O. Box 904 15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789

David F. Miceli
David F. Miceli, LLC
P.O. Box 2519
Carrollton, GA 30112
Phone: (404) 915-8886
dmiceli@miceli-law.com

Andre M. Mura
Gibbs Law Group LLP
505 14th Street Suite 1110
Oakland, CA 94612
Phone: (510) 350-9717
Fax: (510) 350-9701
amm@classlawgroup.com
Rand P. Nolen
Fleming, Nolen & Jez, L.L.P.
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: (713) 621-7944
Fax: (713) 621-9638
rand_nolen@fleming-law.com

Jessica Perez Reynolds
Pendley, Baudin & Coffin
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Phone: (225) 687-6396
Fax: (225) 687-6398
jperez@pbclawfirm.com

Darin L. Schanker
Bachus Schanker
101 W Colfax Ave, Suite 650
Denver, CO 80202
Phone: (303) 222-2222
Fax: (303) 893-9900
dls@coloradolaw.net

Hunter J. Shkolnik
Napoli Shkolnik PLLC
360 Lexington Avenue, 11th Floor
New York, NY 10017
Phone: (212) 397-1000

Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Daniel P. Markoff
Atkins & Markoff Law Firm
9211 Lake Hefner Parkway, Suite 104
Oklahoma City, OK 73120
Phone: (405) 607-8757
Fax: (405) 607-8749
dmarkoff@amalaw.com

hunter@napolilaw.com

Zachary Wool
Barrios Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
zwool@bkc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2021, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of

record who are CM/ECF participants.

/s/ M. Palmer Lambert
M. PALMER LAMBERT