# EXHIBIT 12

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   ELIZABETH KAHN,
 5   Plaintiff,
 6    vs.                          Case No. 2:16-cv-17039
 7   SANOFI S.A., SANOFI-AVENTIS U.S.
     L.L.C., SANOFI US SERVICE, INC., and
 8   AVENTIS-PHARMA S.A.,
 9   Defendants.
10
                    * * * * * * * * * *
11
12   CYNTHIA THIBODEAUX,
13   Plaintiff,
14    vs.                          Case No. 2:16-cv-15859
15   SANOFI S.A., SANOFI-AVENTIS U.S.
     L.L.C., SANOFI US SERVICE, INC., and
16   AVENTIS-PHARMA S.A.
17   Defendants.
18
19          Videotape Deposition of CARL KARDINAL, M.D.,
20   taken on behalf of the defendants, at the residence of
21   Carl Kardinal, M.D., 6008 Dornagh Court, in the city
22   of Columbia, State of Missouri, on the 17th day of
23   January 2018, before Heather L. Shallow, Certified
24   Court Reporter, Registered Professional Reporter,
25   Registered Merit Reporter.         Job No. NJ2783240
```

```
 1   it for some period of years?
 2           I -- Dr. Kardinal, I'm trying to get a sense
 3   of if it was common for you just to review labels in
 4   the early days of prescribing a drug or if you would
 5   have reviewed the Taxotere label at some point later.
 6           MR. MICELI:  Let me just object to the -- to
 7   the form because it's compound.  And Kelly, I don't
 8   mean to interrupt, but you asked a question, then
 9   before he answered, you adjusted your question.  I
10   don't know if you want to just start all over again so
11   it's clear for the record.  Or you can -- I'll just
12   sit back and be quiet.
13           MS. BIERI:  I will ask a different question.
14           MR. MICELI:  Okay.  Again, I don't want to
15   interrupt.  I just wanted to -- it's a strange
16   objection but I want to make sure we were clear.
17   Thank you.
18        Q.  (By Ms. Bieri)  Dr. Kardinal --
19        A.  You're going to ask another question?
20        Q.  Let me try a different question.  How often
21   did you reread labels after you first started
22   prescribing a drug?
23        A.  If something unexpected happened, I would
24   refer back to it.
25        Q.  Do you have any recollection of reviewing
```

Page 30

1  the Taxotere label after the mid 2000s?
2      A.  Of course not.
3      Q.  Do you have any recollection of reviewing
4  the Taxotere label at all?
5      A.  Yes.  I reviewed it at the time that we
6  started using Taxotere.
7      Q.  And no -- and did you -- do you have any
8  memory of reviewing it after the time when you started
9  prescribing and using Taxotere?
10     A.  Not specifically.
11     Q.  Beyond Exhibit 1, this label --
12     A.  This?
13     Q.  Beyond this document, did Plaintiffs'
14 counsel show you any other documents?
15     A.  I don't recall.
16     Q.  Do you recall if you discussed any other
17 documents with Plaintiffs' counsel?
18     A.  That's very vague.
19     Q.  Well, I asked you if you recall if they
20 showed you any other documents.  I'm asking --
21     A.  And my answer at that time was?
22     Q.  That you didn't recall.
23     A.  Okay.
24     Q.  Now I'm asking you if you remember
25 discussing any other documents that may not have

Page 87

1        A.   It was not common.
2        Q.   Do you remember telling me that you warned
3   of common side effects?
4        A.   Yeah.
5        Q.   Okay.  So would you have warned of the risk
6   of persistent hair loss?
7        A.   Not unless it was in the package insert.  If
8   it was in the package insert, I would have warned
9   about it.
10       Q.   Tell me a drug for which the package insert
11  says that there's a risk of permanent or persistent
12  hair loss.
13       A.   Can't do that.  Don't know.
14       Q.   For what drugs did you warn of a risk of
15  permanent or persistent hair loss?
16       A.   I did not warn about permanent or persistent
17  hair loss because, in my experience, hair came back.
18       Q.   So for no chemotherapy drug at any time did
19  you ever warn about the risk of permanent or
20  persistent hair loss?
21            MR. MICELI:  Object to the form.
22       A.   No.
23       Q.   (By Ms. Bieri)  No, you did not?
24       A.   Correct.
25       Q.   And that was based on your experience that

1    you did not see that?
2         A.   Correct.
3              MR. MICELI:  Object to the form.  Pardon me.
4         Q.   (By Ms. Bieri)  Have you ever seen any
5    literature at all regarding any chemotherapy drug
6    regarding reporting cases of permanent or persistent
7    hair loss?
8              MR. MICELI:  Object to the form.
9         A.   Not during the time I was practicing.
10        Q.   (By Ms. Bieri)  Have you seen something
11   since then?
12        A.   No.  I haven't kept up.
13        Q.   Sure.  Understood.  I just wanted to make
14   sure I understood your testimony.
15        A.   I was pretty up to date at the time I
16   retired, but since that time, I've not been keeping
17   up.
18        Q.   Let me turn and ask you a little bit about
19   NSABP-40.  And to the extent it helps you, in the pile
20   you have, there are some documents related to that.
21        A.   Okay.
22        Q.   To the extent you want to look at those
23   while we're talking.
24        A.   All right.
25        Q.   Do you know when you first assisted a

```
 1        Q.   Okay.  You don't have any reason to know
 2   what "superiority" means from an FDA regulatory
 3   standpoint?  To the extent it has a particular meaning
 4   in that context.
 5        A.   I guess not.
 6        Q.   Okay.  When you were talking about -- with
 7   Ms. Bieri about Arimidex and thinning hair -- do you
 8   remember that series of questions?
 9        A.   Yes.
10        Q.   Okay.  When -- when Arimidex is removed from
11   the patient using it, does -- does the hair generally
12   grow back?
13             MS. BIERI:  Object to the form.
14        A.   Well, Arimidex is not associated with much
15   hair loss --
16        Q.   (By Mr. Miceli)  Fair.
17        A.   -- to start with, so -- I don't know that
18   I've had a patient with Arimidex who had significant
19   hair loss.
20        Q.   And I want to make sure I understood you
21   correctly earlier when you were discussing with
22   Ms. Bieri what you would warn about with a patient.
23   I've written down here that you would not warn of
24   permanent hair loss unless it were in the label.  Did
25   I get that correct?
```

1            MS. BIERI:  Object to the form.
2        A.   That -- that's correct.
3        Q.   (By Mr. Miceli)  Okay.  And to flip that
4   around, if the words "permanent hair loss" were
5   associated with the use of Taxotere, would you discuss
6   that with your patient?
7            MS. BIERI:  Object to the form.
8        A.   Yes, and it should be included in the
9   consent form.
10       Q.   (By Mr. Miceli)  Thank you.  Now, you
11  retired in 2012; correct?
12       A.   (Nods head.)
13       Q.   That's "yes" for her?
14       A.   Yes.
15       Q.   Sorry.  I know it's getting late in the day,
16  Doctor.
17       A.   Yes.
18       Q.   Have you -- aside from the meeting that you
19  and I -- or we had with you back in December here --
20       A.   Yes.
21       Q.   -- have you looked over any other product
22  inserts of chemotherapy agents since retiring?
23       A.   No.
24       Q.   Okay.  So for the last five years you
25  haven't reviewed any product inserts?

1    A.    Correct.
2    Q.    And again, I keep -- because I'm going
3  through my notes of what you talked about with
4  Ms. Bieri, I want to make sure that I have this
5  correct.  Did you say earlier that you were not aware
6  of any chemotherapy label that lists permanent
7  alopecia or permanent hair loss as an adverse event?
8    A.    Permanent hair loss?
9    Q.    Correct.
10   A.    You know, the answer is I -- I don't recall
11 reviewing one that ever listed permanent hair loss.
12   Q.    Okay.
13   A.    They may possibly have been there, but...
14   Q.    Okay.  But you're not -- as we sit here
15 today, you don't recall one?
16   A.    I don't recall --
17   Q.    Okay.
18   A.    -- a specific one that says permanent.
19   Q.    And you practiced medicine for 40 some-odd
20 years?
21   A.    Yes.
22   Q.    So based on the fact that, as we sit here,
23 you can't recall the product insert, product label
24 that listed permanent hair loss as a potential side
25 effect, would it be a fair statement to say that if

Page 142

1  you received a letter from a pharmaceutical company
2  updating you on their label, that they were changing
3  it to include permanent hair loss as a adverse event
4  associated with the use of their drug, would that be
5  news to you?
6          MS. BIERI:  Object to the form.
7      A.  Yeah.
8      Q.  (By Ms. Bieri)  And would that change what
9  you discuss with your patient concerning that drug?
10         MS. BIERI:  Object to the form.
11     A.  It would be something that would have to be
12  included in the discussion.
13     Q.  (By Mr. Miceli)  Okay.
14     A.  I may -- may perhaps still recommend the use
15  of the drug.
16     Q.  But it's something you would discuss with
17  your patient?
18     A.  Yes.
19     Q.  And if, after discussing it with your
20  patient, your patient told you, because of that, they
21  did not wish to take that drug --
22     A.  Correct.
23     Q.  -- and asked you for other options, would
24  you discuss other options with them?
25         MS. BIERI:  Object to the form.

Page 143

1       A.   Correct.
2       Q.   (By Mr. Miceli)  Okay.  And is paclitaxel an
3   adequate alternative to docetaxel?
4            MS. BIERI:  Object to the form.
5       A.   In terms of its efficacy?
6       Q.   (By Mr. Miceli)  Yes.
7       A.   They're very similar.
8       Q.   Okay.  And are there other adjuvant
9   therapies that do not include taxanes that are also
10  within the standard of care for use in patients?
11           MS. BIERI:  Object to the form.
12      A.   Yes.
13      Q.   (By Mr. Miceli)  Okay.
14           MR. MICELI:  Where's your phone?  I need to
15  see that.
16           MS. PEREZ REYNOLDS:  Give me a second.
17           MR. MICELI:  Okay.  All right.  I'll let you
18  find that.
19      Q.   (By Mr. Miceli)  Now, in Exhibit 6 to your
20  deposition -- I believe that was one of the informed
21  consents.  I'm going to do my best to locate it for
22  us, Doctor.  On page 2 there was some discussion -- I
23  think it's in this first paragraph -- I apologize for
24  pointing there -- about what standard care was.  Do
25  you remember that?

Page 144

1     A.   Well, the talk in this that AC, which was
2  Adriamycin and Cytoxan, is a standard treatment for
3  breast cancer.
4     Q.   With docetaxel; correct?
5     A.   With docetaxel?
6     Q.   If you look at that, three chemo -- "Three
7  of the chemotherapy drugs used in this study are
8  docetaxel followed the combination of doxorubicin and
9  cyclophosphamide --
10    A.   Okay.
11    Q.   -- AC, a standard treatment for breast
12 cancer."  Do you see that?
13    A.   Yeah.  It is the standard treatment.
14    Q.   Okay.  And is the -- is the docetaxel plus
15 doxorubicin plus cyclophosphamide sometimes referred
16 to as TAC?
17    A.   Yeah.
18    Q.   Okay.  Now, are you familiar with the
19 treatment option FAC?
20    A.   Right.
21    Q.   And that's --
22    A.   5FU.
23    Q.   5FU, doxorubicin, and cyclophosphamide?
24    A.   Right.
25    Q.   And is that -- is that a standard of care --

Page 145

1  or is that a -- is that a treatment option within the
2  applicable standard of care --
3           MS. BIERI:  Object to the form.
4      Q.   -- for adjuvant therapy?
5           MR. MICELI:  Go ahead.  I'm sorry.
6           MS. BIERI:  Object to the form.
7      A.   That was an old treatment and it probably
8  doesn't have the potency or efficacy of TAC.
9      Q.   (By Mr. Miceli)  Okay.
10     A.   It would not be something I would choose.
11     Q.   How about AC only without docetaxel?  Is
12 that within the standard of care?
13          MS. BIERI:  Object to the form.
14     A.   I think in selected cases of multi node
15 positive breast cancer, AC by itself is -- is not
16 adequate.
17     Q.   (By Mr. Miceli)  Okay.  How about
18 doxorubicin, paclitaxel and cyclophosphamide?  Is that
19 an adequate standard of care treatment option?
20          MS. BIERI:  Object to the form.
21     A.   Paclitaxel, I would think that would be an
22 adequate -- fairly equivalent treatment.
23     Q.   (By Mr. Miceli)  So if your patient came to
24 you and said because of -- and assume -- this would
25 assume that you were warned about the hair loss in the

```
 1   label -- so -- strike that question.
 2            Assuming that you had been warned about the
 3   use -- or the permanent alopecia being associated with
 4   the use of docetaxel, Taxotere, and your client -- and
 5   you advised your client of that association -- or your
 6   patient of that association, and she informed you she
 7   did not wish to use that product, would the
 8   combination of paclitaxel, cyclophosphamide, and
 9   doxorubicin be an adequate treatment option for that
10   person?
11            MS. BIERI:  Object to the form.
12       A.   Well, it should be fairly equivalent.
13       Q.   (By Mr. Miceli)  Okay.  And with neoadjuvant
14   treatment for --
15       A.   Yes.
16       Q.   -- for Ms. Thibodeaux, that ultimately --
17   her treatment ultimately included a surgery to remove
18   her --
19       A.   Tumor.
20       Q.   -- her tumor; correct?
21       A.   Yes.
22       Q.   And do you recall that -- that the removal
23   of the tumor included good, clean margins of the
24   tumor?
25            MS. BIERI:  Object to the form.
```

Page 175

1      MS. BIERI: Object to the form.
2      A. Yeah. Any patient on potent chemotherapy is
3  feeling kind of crummy.
4      Q. (By Mr. Miceli) And is -- is Sanofi's
5  statement in this document that "The fatigue will go
6  away gradually after treatment is completed"
7  consistent with how you advised your patients?
8      A. Yes.
9      Q. Okay. And similarly, we talked about -- I
10 should have asked you this before when we were talking
11 about alopecia, but explaining that alopecia is a
12 common, yet temporary, side effect of some cancer
13 medications, is that consistent with how you advised
14 your patients about hair loss related to Taxotere?
15     MS. BIERI: Object to the form. Misstates
16 testimony.
17     A. Yes.
18     Q. (By Mr. Miceli) Okay. And then if you flip
19 to the page that ends in 488.
20     A. Okay.
21     Q. Okay. And this is the page that's titled
22 "Neuropathy and Myalgia."
23     A. Correct.
24     Q. And that is in parentheses underneath "Nerve
25 and Muscle Side Effects"; correct?

```
                                                 Page 219
 1   when they were speaking.  Have you ever seen an
 2   agreement between Sanofi and any doctor regarding
 3   consulting?
 4        A.   No.
 5        Q.   Do you know what Sanofi requires regarding
 6   disclosures of that relationship?
 7        A.   No.  Nor have I been involved or seen or
 8   witnessed or -- nor have I been a consultant for
 9   Sanofi.
10        Q.   And Doctor, I think I just have about --
11   just a few more questions.  If I'm remembering
12   correctly, Mr. Miceli phrased a question that if you
13   knew -- something to the effect of if you knew that
14   Taxotere had a risk of persistent hair loss and a
15   patient expressed a concern about persistent hair
16   loss, you would potentially prescribe Taxol to that
17   patient.  Was that your testimony?
18             MR. MICELI:  Object to the form.
19        A.   No.
20        Q.   (By Ms. Bieri)  Sorry.  Tell me your
21   testimony.
22        A.   If Sanofi said that Taxotere may cause
23   permanent hair loss, then that should, at a minimum,
24   be included in the consent form for the use of that
25   drug.  And if they stated that the incidence of
```

Page 220

1  permanent hair loss were X percent or whatever, those
2  things should be made known to the patient.
3       Q.  Let me ask you this:  Would it be misleading
4  to you, Doctor, if Sanofi told you that there was a
5  risk associated with a drug even though there was no
6  substantial evidence?
7       A.  What?
8           MR. MICELI:  Hold on.  Object to the form of
9  the question.
10      A.  I mean, that's not even a question.
11      Q.  (By Ms. Bieri)  It is.  Do you remember
12 Mr. Miceli talking to you about --
13      A.  Try again.
14      Q.  Do you remember Mr. Miceli talking to you
15 about the term "substantial evidence"?
16      A.  That's --
17      Q.  I'm trying to reorient you because I think
18 you thought my question was out of left field.
19      A.  Well, if I remember -- you're not coming
20 across right now at all.
21      Q.  I apologize.  Thank you for telling me.  Let
22 me try again.
23      A.  Yes.
24      Q.  If a drug manufacturer didn't have
25 substantial evidence to support something, would it