# EXHIBIT 24

In re: Taxotere (Docetaxel) Products Liability Litigation
MDL No. 2740
Report of David Ross, M.D., Ph.D., M.B.I.

## I. INTRODUCTION

### A. Consultation questions

1. I have been retained by the Plaintiffs' Steering Committee to serve as an expert witness in In Re: TAXOTERE (DOCETAXEL), MDL 2740 litigation, in the US District Court for the Eastern District of Louisiana.[1] I was previously identified as an expert witness in this Multi-District Litigation to offer opinions in cases pending against certain defendants with products approved through the 505(b)(2) regulatory pathway. Following Dr. David Kessler's appointment by President Biden to head up the administration's vaccine initiative, I was asked to review additional materials and offer opinions in this matter as to Sanofi, the 505(b)(1) New Drug Application (NDA) holder for Taxotere®/docetaxel (Taxotere). Specifically, I have been asked to provide opinions regarding the regulatory obligations of drug manufacturers for products approved under Section 505(b) of the Food, Drug, and Cosmetic Act

---

[1] I understand that my testimony will be offered in the case of Elizabeth Kahn, however I am offering regulatory opinions and have not reviewed Ms. Kahn's medical records, or any case-specific depositions. I am aware that Ms. Kahn's first use of Sanofi's Taxotere product took place on May 29, 2008. I do not intend to offer any case-specific opinions in this matter. I reserve the right to supplement this report should additional documents or information be made available.

**CONFIDENTIAL**

1

Effected (CBE) sNDAs, which most often concerned changes implemented by the holder of an NDA to safety-related information in the approved label prior to formal FDA review.

6. My responsibilities included regulation of approved, marketed drug products, a major component of my responsibilities included reviewing post-marketing surveillance of adverse events. These responsibilities included review of reports required of NDA holders, such as annual NDA reports, periodic safety update reports, initial and follow-up reports of serious and unexpected adverse events, and clinical study reports. They also included analysis of data in FDA's Adverse Event Reporting System (FAERS), which I performed on my own as well as in collaboration with pharmacoepidemiologists and other scientists in CDER.

7. As Medical Team Leader and Senior Medical Reviewer in DAIDP, Deputy Director of ODE VI, and Associate Director for Regulatory Science in OODP, my responsibilities broadened to include secondary, and in some instances tertiary, reviews of findings, conclusions, and recommendations from primary reviewers regarding NDAs, Biologics Licensing Applications (BLAs), and supplements to such applications. I was also responsible for synthesizing findings from the primary multi-disciplinary review team into an integrated written summary of the basis for the regulatory action taken. Both as a primary

medical reviewer and a more senior review official, I was responsible for understanding and incorporating non-clinical review findings and recommendations into my reviews, including reviews in the disciplines of chemistry, manufacturing, and controls; microbiology; toxicology; clinical pharmacology; and statistics, after receiving input from subject matter experts.

8. My regulatory experience and expertise are based on my FDA training and extensive experience in applying regulatory concepts to a broad range of drug regulatory situations, and contributions to regulatory science. As a primary medical reviewer, I received extensive didactic training covering the spectrum of products regulated by FDA, as well as mentorship by more experienced primary and senior reviewers. My practical training involved detailed discussions with senior FDA officials during reviews of specific products to ensure that I was applying regulatory principles correctly, as well as consultation with reviewers in other disciplines. Such discussions frequently involved FDA staff with experience specific to a particular regulatory issue. My written reviews were considered by a supervisory reviewer, with unresolved differences in opinion regarding regulatory and scientific issues generally addressed through a written secondary regulatory review. This

obligations by updating the Taxotere label to inform physicians and patients about the adverse reaction of PCIA no later than April 2006.

29. However, Sanofi failed to comply with its obligations regarding post-marketing surveillance and pharmacovigilance with respect to Taxotere and the risk of PCIA. It did not update the Taxotere label with regard to permanent alopecia until 2015, and then only after breast cancer advocates contacted the FDA asking it to investigate this side-effect of Taxotere.[4]

## II. METHODS

30. In analyzing FDA regulatory issues to offer opinions in this matter, I take the same approach that I employed as an FDA reviewer charged with making recommendations regarding a regulatory decision in my review of NDAs and sNDAs. This approach is based on documented best practices within CDER, which are formally referred to as Good Review Practices (GRPs). GRPs, which were introduced during my tenure at the FDA, are published as sections of CDER's Manual of Policy and Procedures (MAPP), and are publicly available.[5] As explained in MAPP 6025.1, *Good Review Practices,* GRPs

---

[4] Taxotere-FOIA-005251, p. 77.

[5] "CDER Manual of Policies & Procedures (MAPP)," *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research/cder-manual-policies-procedures-mapp.

**CONFIDENTIAL**

13

"improve efficiency, clarity, and transparency of the review process and review management."[6]

31. Unless otherwise indicated, the terms "regulation" and "regulatory" refer to the FDA, as opposed to another Executive Branch agency. The terms "drug" and "new drug" are used as defined in the Food, Drug, and Cosmetic Act (FDCA) at 21 USC 321(g) and 21 USC 321(p); they do not necessarily refer to a particular product that is the subject of an NDA or BLA.

32. Regulatory analyses in this report generally rely on FDA Guidance, the default regulatory and technical standards used by FDA reviewers.[7,8] Draft and Final Guidance published in the *Federal Register* under FDA's Good Guidance Practices regulation[9] reflect the FDA's current thinking at a given point in time on a particular regulatory or technical issue. Guidance publications represent a safe harbor for FDCA compliance, and manufacturers who choose an approach different from that described in a relevant Guidance must still comply with the FDCA and justify its position.[10] Guidance

---

[6] CDER MAPP 6025.1: *Good Review Practices* (February 2017), *available at* https://www.fda.gov/media/72747/download.

[7] 21 CFR 10.115(d)(3).

[8] 21 CFR 10.115(b)(1).

[9] 21 CFR 10.115.

[10] 21 CFR 10.115(d)(2).

**CONFIDENTIAL**

14

    d. Meta-analyses of observational studies

    e. Published case reports

    f. Published case series

    g. Published pharmacoepidemiology studies

    h. Follow-up data from clinical trials

    i. Spontaneous adverse event reports

    j. Signal detection and analyses

### 4. Assessing whether there is "some basis to believe there is a causal relationship between" Taxotere and PCIA

50. To understand the scientific evidence available to Sanofi, I reviewed the various data sources that were available to the company as the NDA holder before and after the approval of Taxotere:

    a. The publicly available worldwide medical literature;

    b. Dr. Madigan's disproportionality analysis (PRR) reporting based upon data from the FDA's Adverse Event Reporting Database ("FAERS") (focusing on years 2000 – 2008, quarter 1);

    c. Information from Sanofi's worldwide pharmacovigilance database concerning reported cases of permanent/irreversible alopecia;

    d. Clinical trial data from TAX 316 55-month, and the analysis performed by Dr. Madigan to determine statistical significance;

    e. Sanofi's Taxotere (docetaxel) labeling;

    f. Internal Sanofi documents;

    g. Deposition testimony of Sanofi employees, with exhibits.

    h. Other sources of data and information as set out in this report.

51. For purposes of this case, my understanding and opinions are supported by the analyses and opinions of Plaintiffs' expert witnesses Dr. Ellen Feigal, Dr. David Madigan, and Dr. Laura Plunkett. I have reviewed their expert reports, and I accept and consider their assessments valid. Any reliance upon these expert reports is limited to the information set out that pre-dates May 29, 2008.

52. From 1979 to 2006, the regulatory standards for including adverse events in a drug label required that an AE be "an undesirable effect, reasonably associated with the use of the drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." (2005 CFR, 21 CFR 201.57(g)).

53. In January 2006, FDA published a major revision of the requirements for the format and content of drug labeling, frequently referred to as the *Physician Labeling Rule* (PLR). 71 FR 3921-3997 (2006).

**CONFIDENTIAL**

23

54. The PLR significantly tightened the standard for inclusion of AEs in drug labels by the following qualification:

> "This definition does not include all adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." 71 FR 3921 3990.

55. The required content of the ADVERSE REACTIONS section of the label, provides that this section "must describe the overall adverse reaction profile of the drug based on the entire safety database." And it limits the content to "only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." 21 CFR 201.57(c)(7) 21 CFR 201.57(c)(7)(ii)(A) further describes that:

> "[f]or adverse reactions with significant clinical implications, the listings must be supplemented with additional detail about the nature, frequency, and severity of the adverse reaction and the relationship of the adverse reaction to drug dose and demographic characteristics, if data are available and important."

56. FDA's Guidance for Industry on the ADVERSE REACTIONS section explains that "Serious, low-frequency adverse events generally will be listed

CONFIDENTIAL

90. Applying the evidence described in this report, and the documents and depositions reviewed and considered, against the standard set out in 21 CFR §§ 201.57 and 314.80, as described in this report, it is my opinion to a reasonable degree of regulatory and scientific certainty that sufficient evidence existed to support some basis to believe a causal association existed between Taxotere and PCIA, at least as early as the April 25, 2006 telephone conference/meeting documented in Richard-Cassin exhibits 22, 24 and 25.[38] This was followed closely by Sanofi's awareness of Dr. Sedlacek's study findings, and then by his presentation and publication of his findings at the San Antonio Breast Cancer Symposium in December 2006. As the manufacturer and marketer of Taxotere, Sanofi had an ongoing obligation to update its label to include accurate information, including the adverse reaction of PCIA. Further, while I recognize that the word "alopecia" appears in § 6 (Adverse Reactions) of the Taxotere label in effect in May 2008, the inclusion of only alopecia without descriptive language of duration and severity as required by 21 USC §§ 201.57 and 314.80 is insufficient to apprise physicians and patients of the risk of PCIA known, or knowable, to Sanofi.

---

[38] Based on the Court's direction I am not offering an opinion a date earlier than 2006, but offer my opinion based on my review of the available evidence, and within the constraints that time allowed.

**CONFIDENTIAL**

I state all of the opinions expressed in this report to a reasonable degree of regulatory and scientific certainty.

February 8, 2021

_____

**David B. Ross, M.D., Ph.D., M.B.I.**

**CONFIDENTIAL**

49