# EXHIBIT 21

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


IN RE:   TAXOTERE (DOCETAXEL)
         PRODUCTS LIABILITY            Docket No.: 16-MD-2740
         LITIGATION                    Section "H(5)"
                                       September 18, 2019
                                       New Orleans, Louisiana

Relates To:  Barbara Earnest,
Case No.: 16-CV-17144


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


                    DAY 3, MORNING SESSION
              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:       Barrios, Kingsdorf & Casteix, LLP
                          BY:  DAWN BARRIOS, ESQ.
                          701 Poydras Street
                          Suite 3650
                          New Orleans, Louisiana 70139


For the Plaintiffs:       Gainsburgh, Benjamin, David,
                             Meunier & Warshauer, LLC
                          BY:  PALMER LAMBERT, ESQ.
                          2800 Energy Centre
                          1100 Poydras Street
                          New Orleans, Louisiana 70163
```

*OFFICIAL TRANSCRIPT*

1   indication was adjuvant and metastatic breast.
2           And I was to do that through educating, not only the
3   physicians, but the staff that work with them in the clinic.  I
4   was to use my company resources wisely and appropriately.  And
5   I was to use my skills of building and strengthening and
6   maintaining relationships in the clinic to help maximize those
7   sales.
8   Q.   And what were your roles, duties and responsibilities with
9   regard to Sanofi and Taxotere?
10  A.   Well, I guess -- didn't I just say what the job was?
11  Q.   That's fine.  So that job that you described, that was
12  part of your role with Sanofi and particularly --
13  A.   Yes.  I mean, there is a lot of different ways that you do
14  the job.  I'm not sure if that's what you're asking me right
15  now.  That was my job, to sell the drug in my approved
16  indications.
17  Q.   Okay.  Was there an educational aspect to your role?
18  A.   Yeah.  Absolutely.  That's what I said, you know, you have
19  to educate the physicians on the product in order to sell it.
20  And also how do they manage the side effects of the drugs.  My
21  job was to educate them on all of that within the profile of
22  the product and the indications.
23  Q.   At any time before you left Sanofi, did Sanofi ever tell
24  you that Taxotere could cause permanent hair loss?
25  A.   They did not tell me.  I heard it at a meeting we had for

```
 1   the very first time. And then it was addressed at the meeting,
 2   and it was an off-label thing, so we were not allowed to talk
 3   about it, and then I never heard about it again until my
 4   deposition. Well, no, then I heard about it again years later.
 5   It was like a year after I left there --
 6           MR. STRONGMAN:  Your Honor, objection.
 7           THE COURT:  Sustained.  Rephrase your question.
 8   EXAMINATION BY MS. MENZIES:
 9   Q.   Let me ask it this way.  What was your understanding,
10   while you worked for Sanofi between 2004 and 2009 about
11   Taxotere and the side effect of hair loss?
12   A.   That it was a temporary side effect and that the women's
13   hair would return once they finished their chemotherapy
14   treatment.
15   Q.   Did you receive a subpoena to come and testify for us
16   today?
17   A.   Yes.  I did not volunteer for this.  I'm nervous as heck,
18   if you can't tell.  I work for pharma and I'm a single mom.
19   This is a very precarious position I don't like being in.
20           THE COURT:  Ms. Avila, you can pour a glass of water.
21           THE WITNESS:  Thank you.
22   EXAMINATION BY MS. MENZIES:
23   Q.   We'll take our time through this and we'll kind of get
24   into a roll.  We understand why you're nervous.  All of us are,
25   in some ways.
```

OFFICIAL TRANSCRIPT

Case 2:16-md-02740-JTM-MBN   Document 13055-21   Filed 07/13/21   Page 5 of 8

577

1  Q.   Is this part of the brochure telling you when --
2       MR. STRONGMAN:  Objection.  Leading.
3  EXAMINATION BY MS. MENZIES:
4  Q.   What is this part of the brochure telling you?
5  A.   It's telling me that the patient's hair is going to grow
6  back when their treatment is over, and it might grow back
7  different.
8  Q.   Is that because it varies between patients?
9       MR. STRONGMAN:  Same objection.
10      THE COURT:  Overruled.
11      THE WITNESS:  It does vary between patients.  I've seen
12 it myself.  And it does.  Sometimes it grows back curly,
13 sometimes it grows back straight.  A different color.
14 EXAMINATION BY MS. MENZIES:
15 Q.   And then it says:  "When my hair grows back."
16      What is the purpose of that explanation?
17 A.   This is telling -- this whole entire sheet is telling the
18 patient how to manage hair loss.  Hair loss is -- was -- it is
19 a devastating side effect to these patients.  It's one of the
20 number one things that they talk about.  And this sheet is to
21 help them cope with that side effect and how difficult it is.
22      So it's reassuring them that you can deal with it,
23 it's going to grow back.  It might grow back a little
24 different, but it's going to grow back.  And if you wash your
25 hair, you can maybe help it.  Maybe you shave it.  This is what

1  A.  Yes.
2  Q.  And what is your recollection of that?
3  A.  We were at a national meeting.  It was the one right after
4  this abstract came out, so it was our beginning-of-the-year
5  plan of action or whatever, meeting.  And they have sometimes
6  forums where people can get up and ask marketing and all the
7  leaders questions.
8       And a girl got up in the audience and asked directly
9  about the abstract that was presented at San Antonio breast
10 conference.  And that was the first I had heard of it.
11      And she was given direction that the company knew,
12 they were investigating it.  Until they, you know, looked at it
13 all, that, you know, we were to proceed as usual with our
14 on-label discussions and, you know, like everything was going
15 to be okay.
16      And when you are in this position --
17      THE COURT:  Okay.  I think that's the answer to the
18 question.
19      MS. MENZIES:  Thank you, Your Honor.
20 EXAMINATION BY MS. MENZIES:
21 Q.  Were you ever permitted to talk to doctors or nurses about
22 that abstract?
23 A.  No.
24 Q.  Do you recall the name of the abstract?
25 A.  Seledak, S-E-L-E-D-A-K [verbatim].  I can't pronounce his

Case 2:16-md-02740-JTM-MBN   Document 13055-21   Filed 07/13/21   Page 7 of 8

584

1  name. And it was seven patients that had permanent hair loss.
2  Q. Okay. Let's talk a little bit more about the risk of
3  permanent hair loss. You were not -- were you allowed to talk
4  about permanent hair loss or risks related to Taxotere with
5  doctors at all?
6         MR. STRONGMAN: Objection. Leading again.
7         THE COURT: Just rephrase your question.
8  EXAMINATION BY MS. MENZIES:
9  Q. Okay. Are you able to talk to doctors and nurses about
10 the side effects on the Taxotere label?
11 A. If it's within the label, I'm allowed to speak to what's
12 in the label.
13 Q. And did the label include permanent hair loss?
14 A. It -- to my understanding, it did not include permanent
15 hair loss.
16 Q. So you couldn't talk to doctors and nurses about that?
17        MR. STRONGMAN: Same objection.
18 EXAMINATION BY MS. MENZIES:
19 Q. And were you able to talk to doctors and nurses about
20 permanent hair loss?
21 A. We were not able to talk to doctors and nurses about
22 anything that was not in the label, and I was not understanding
23 or told that my label meant that there was permanent hair loss.
24 Q. If Sanofi had put the risk of permanent hair loss in the
25 label, could you have talked to doctors and nurses about that?

1   Q.   If you look at this label, I want to show you -- we've
2   seen this before, but you understand that in the label -- this
3   is in Defendant's Exhibit Number 5 -- that it states
4   specifically that once you've completed all your treatments,
5   hair generally grows back, correct?
6   A.   Correct.
7   Q.   If hair generally grows back is what is in the label, that
8   would have been your message to doctors, correct?
9   A.   Yeah, we thought it grew back. I mean, yeah.
10  Q.   Because if hair generally grows back is what is in the
11  label, that is what you are bound to in terms of your
12  conversation with a doctor, correct?
13  A.   Correct. And also to my tools.
14  Q.   If I took out the Webster's dictionary and looked up
15  *generally*, it's not going to say always, correct?
16  A.   It's not going to say always. But, generally -- and
17  this -- we were not instructed that it did not grow back.
18  Like, we -- this, to me, meant it grew back.
19  Q.   Ms. Avila, you had to stick to the label, fair enough,
20  right?
21  A.   Correct.
22  Q.   You were asked some questions about something that you may
23  or may not have heard about Dr. Sedlacek. Do you remember
24  that?
25  A.   Yes.