# EXHIBIT 35

```
 1       IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF LOUISIANA
 3                      - - -
 4
         IN RE:  TAXOTERE       :   MDL NO. 2740
 5       (DOCETAXEL) PRODUCTS   :   SECTION: "N"
         LIABILITY LITIGATION   :   (5)
 6                              :   JUDGE
         THIS DOCUMENT RELATES  :   ENGELHARDT
 7       TO:                    :   MAG. JUDGE
                                :   NORTH
 8       ALL CASES              :
 9
                            - - -
10
                      October 10, 2018
11
                            - - -
12
13            Videotaped deposition of
      MADELINE MALIA, taken pursuant to notice,
14    was held at the law offices of Shook
      Hardy & Bacon, 2001 Market Street,
15    Philadelphia, Pennsylvania beginning at
      9:11 a.m., on the above date, before
16    Michelle L. Gray, a Registered
      Professional Reporter, Certified
17    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
18
19                      - - -
20
             GOLKOW LITIGATION SERVICES
21        877.370.3377 ph| 917.591.5672
                deps@golkow.com
22
23
24
```

Madeline Malia

1          Form.
2               THE WITNESS:  This is a
3          document that they -- that they've
4          shared with me.
5   BY MS. MENZIES:
6          Q.   Okay.  All right.  And so
7   it's -- this first e-mail is from you to
8   a number of individuals dated March 8th.
9   And this was -- it looks like it was sent
10  at 9:51 p.m. and it's -- the subject is
11  "Taxotere again.  Taxotere alopecia
12  communication plan response and next
13  steps."
14               Do you see where I'm at?
15         A.   I do.
16         Q.   And you write here in this
17  e-mail, "Dear colleagues, as we map out
18  our strategy based on our information
19  gathering, I'm recommending that we
20  identify a smaller group (Taxotere rapid
21  response team), that will communicate on
22  this matter to determine next steps
23  moving forward."
24               Do you recall why you wanted

1   to put together a smaller rap- -- and why
2   you called it a rapid response team?
3           A.   Yeah, I think I mentioned
4   earlier, just -- so in this situation,
5   social media, again, was really new.  And
6   so there wasn't a sort of approved
7   process for how you quickly respond to
8   things.  I mean, sometimes responses can
9   take a surprisingly long time.
10              So the point here was to be
11  able to put together a team of people who
12  were sort of, you know, empowered and
13  responsible for responding quickly to
14  social -- any discussion that was
15  specifically happening on social media or
16  media inquiries that were coming through.
17          Q.   Okay.  And then you kind of
18  describe here an immediate team, a review
19  team, and then informed.
20              Can you just generally
21  explain what the differences are amongst
22  those?
23          A.   Right.  So the immediate
24  team, myself is included here, is

1  communications, digital and social media.
2  So that team would presumably be
3  responsible for sort of project
4  management, if you will.
5           The review team here,
6  there's, as I mentioned before legal,
7  medical, and regulatory which is very
8  standard.
9           And then informed, you know,
10 just making sure that folks within the
11 company who might see online discussion
12 know that, you know, know that this is
13 happening.
14      Q.   Okay.  And then in the --
15 then you -- below that you have,
16 "Situation analysis."  As a
17 communications person, what does
18 situation analysis refer to?
19      A.   Like background, just sort
20 of capturing, you know, what's happening
21 from whatever, you know, purview you're
22 looking at this.  So in this case it
23 looks like it's outlining the -- the
24 discussion starting with the Globe and

Madeline Malia

1  Mail.
2      Q.   In other words, what is the
3  situation we're dealing with?
4      A.   Yeah, background, so that
5  when, you know, you're starting to engage
6  people, they know what it is that you're
7  referring to.
8      Q.   Sure.  What this project,
9  what this situation, what you're working
10 on?
11     A.   Right.
12     Q.   Okay.  And then you talk
13 about the Globe and Mail article.  And
14 you mention Dr. Jacobs who was the doctor
15 from Sanofi cited in the Globe and Mail
16 article, right?
17     A.   I'm sorry.  Let me just
18 catch up with you.
19     Q.   That's fine.
20     A.   Yes.  Dr. Jacobs, okay.
21     Q.   And you give them a status
22 of additional mainstream story -- oh, I'm
23 sorry.
24          "The Globe and Mail story

1   has not generated any additional
2   mainstream stories, but it was picked up
3   by" -- and then you mentioned a few, Rita
4   Rubin of USA Today, and some digital/
5   PharmaMarketing Consultants, those blogs
6   from PharmaMarketing and John Mack and
7   World of DTC.
8           A.    Right.
9           Q.    Okay.
10          A.    That's where I was
11  mentioning earlier, like why they were
12  interested was because of the fact that
13  it was, you know, something that was
14  happening and taking place on social
15  media.
16          Q.    And then -- then you said,
17  "The Globe article also spurred blog
18  discussions on BNET," which we just
19  looked at?
20          A.    Mm-hmm.
21          Q.    And you also mentioned
22  Pharmalot which we saw in an earlier
23  document, right?
24          A.    Yes.

Madeline Malia

1      A.   Yes.
2      Q.   Looks to be an accurate copy
3  of a communication plan that you were
4  involved with working on in March 2010
5  time frame?
6      A.   Yeah, I don't -- I don't
7  remember this document specifically, but
8  it seems that's the reason that is that
9  would have been something that would have
10 been -- that I would have been involved
11 in developing, sure.
12     Q.   Sure.  This kind of follows
13 the same format.  It looks like a
14 document that you have -- you have seen
15 during the time of your employment at
16 Sanofi?
17     A.   Yes.
18     Q.   Okay.  Thank you.  And that
19 was Exhibit 17.  I misspoke.
20     A.   Okay.
21     Q.   Let's look at, C, on Exhibit
22 17, the later revised communication plan.
23 This section it says "Facebook Voices."
24 And there's a site there.

1      And then it says, "Process:
2  Facebook will be monitored on an hourly
3  basis within the first 30 minutes of each
4  hour throughout a 24-hour time frame.
5  This monitoring will be in place for at
6  least 48 hours or until another plan is
7  in place over the next few days.  This
8  will be done by all internal employees
9  (all which were trained during the social
10 media pilots).  Continuing plan is to use
11 InTouch Solutions who were trained during
12 the initial social media pilots with
13 Sanofi-Aventis.
14      "Joan is working to secure
15 scope of work for InTouch to start.
16 Working with InTouch to confirm if
17 comments postings can be disabled during
18 nonbusiness hours and on the weekends on
19 Facebook fan pages.
20      "If this is possible this
21 will be the plan implemented with
22 InTouch.
23      And then it has a bullet
24 point that says, "Responsible.  The table

Madeline Malia

1  below lists the schedule for 24-hour
2  monitoring."
3           Did I read that correctly?
4      A.   You did.
5      Q.   And then we see in this
6  document, it starts March 15th, 16th,
7  17th.  It has, starting at 12:00 a.m. to
8  7:00 a.m., we've got Ivan and global
9  team.
10          Do you see that there?
11     A.   Yes.
12     Q.   And does the Ivan and global
13 team, does that indicate that it's people
14 involved in Paris are helping to monitor
15 this at this point, or do you know either
16 way?
17     A.   I would -- I would assume.
18 But I don't know what that was referring
19 to.
20     Q.   And Ivan is Ivan Nelson,
21 correct?
22     A.   I think he's the only Ivan
23 that I worked with.  I don't know though.
24     Q.   And he's in France, right?