# EXHIBIT A

Michael S. Kopreski, M.D.

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

- - -

| | | |
|---|---|---|
| IN RE:  TAXOTERE | : | MDL No. 2740 |
| (DOCETAXEL) PRODUCTS | : | |
| LIABILITY LITIGATION | : | SECTION: "H" |
| | : | |
| | : | JUDGE MILAZZO |
| This Document Relates | : | |
| To:  ALL CASES | : | MAG. JUDGE |
| | : | NORTH |

- - -

April 3, 2019

- - -

Videotape realtime deposition of MICHAEL S. KOPRESKI, M.D., taken pursuant to notice, was held at the law offices of McElroy, Deutsche, Mulvaney & Carpenter, LLP, 1300 Mt. Kemble Avenue, Morristown, New Jersey, beginning at 9:10 a.m., on the above date, before Kimberly A. Cahill, a Federally Approved Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

Michael S. Kopreski, M.D.

Page 26

1  little confusing, you can have a product
2  that is marketed and yet is still in
3  development.
4          So, for example, when --
5  when Taxotere was first approved in the
6  United States, it was approved for the --
7  for the lung cancer and breast cancer
8  indications; but later on in its
9  development, it obtained approval for
10 other indications, such as prostate
11 cancer and head and neck cancer.
12         At the time -- there was a
13 time when the prostate cancer indication
14 was not yet marketed.  It was under
15 development, even though the breast
16 cancer and the lung cancer were marketed.
17         So you can -- so you can
18 have a product, and Taxotere's a good
19 example, where it has both development
20 activities going on and marketed
21 activities going on at the same time.
22     Q.  In 2005, Taxotere was a
23 marketed product for breast cancer.
24 Would you agree?

Page 27

1     A.  Yes.
2     Q.  From 2005 until your
3  retirement, as it related to Taxotere as
4  a marketed product for breast cancer, did
5  the global safety officers report to you
6  in pharmacovigilance?
7     A.  Not always as -- to my
8  recollection.  To my recollection, around
9  the 2005 period, or maybe shortly after
10 that, there was a separation of units
11 between the marketed product unit and the
12 development product unit.
13         And my recollection is that
14 there was a time -- and, you know, going
15 back 2005, you know, I could be a little
16 off on my recollection as to was it
17 before I became head or after, but my
18 recollection is, there was a time where
19 the marketed -- the global safety officer
20 responsible for marketed products had a
21 different line of reporting from the
22 development products.
23         That -- later on, those --
24 those two divisions were joined into a

Page 28

1  single division and both marketed
2  activities and -- and development
3  activities all reported to me.
4     Q.  For what period of time are
5  you certain that -- for Taxotere related
6  to the marketed product sale of Taxotere
7  and its use for breast cancer, for what
8  period of time did the global safety
9  officers in pharmacovigilance all report
10 to you?
11    A.  I'm sorry.  I can't recall
12 the specific time when that occurred.
13    Q.  What's your best -- what's
14 your best estimate?
15    A.  I really could be
16 substantially off.  I -- I don't recall.
17    Q.  Nonetheless, you were the
18 head of safety surveillance and risk
19 management in the global
20 pharmacovigilance and epidemiology at
21 Sanofi over Taxotere from 2005 to 2017?
22    A.  I'm sorry.  Could you repeat
23 that?
24    Q.  Sure.

Page 29

1     A.  I was the head of?
2     Q.  You were the head of safety
3  surveillance and risk management in the
4  global pharmacovigilance and epidemiology
5  department at Sanofi over Taxotere from
6  2005 to 2017.
7     A.  I was -- I was -- I was --
8  you know, if you look at my C.V., which
9  is up there -- and maybe this will direct
10 you -- maybe this will help on the issue
11 that I can't recall, maybe, but I'm not
12 positive, but you'll see that the title
13 in 2005 to 2010 says global studies
14 pharmacovigilance unit, and I was -- I
15 was the head of the oncology division of
16 what we call the CSPU.
17         There was -- the marketing
18 counterpart to the best of my
19 recollection was called the MPPU, so it's
20 the marketed product pharmacovigilance
21 unit.  So you have that split.
22         Now, on my C.V., I'm saying
23 2005 to 2010 and -- and that might be an
24 indication of when that split occurs,

8 (Pages 26 to 29)

Michael S. Kopreski, M.D.

Page 30

1  because you can see in 2010 to 2011, that
2  there's a different title, but there's
3  also a different unit. Those two units
4  are now combined into the oncology
5  division medical safety evaluation group.
6       So I was the head of the
7  respective oncology units that --
8  outlined here showing for the development
9  from 2005 through 2017, although the
10 names differ.
11      But in terms of the marketed
12 side, I was not responsible for the
13 oncology marketed side to the best of my
14 recollection until the CSPU and the MPPU
15 combined into the MSC, which you see up
16 in the medical safety evaluation group.
17      I'm sorry if that's a little
18 confusing.
19      Q.   That's fine.
20      A.   I'm trying --
21      Q.   I'm trying to -- what I --
22      A.   I'm trying to, you know,
23 tell you what's going on.
24      Q.   I had understood from your

Page 31

1  previous testimony that although the job
2  title changed between 2005 and 2017, that
3  essentially your job duties were the
4  same. That's what I thought you said.
5       A.   Well, yes -- what I -- what
6  I meant by that, not that the job duties
7  were identical, you know. The -- the
8  drugs changed. The personnel changed and
9  the scope of the drugs that we were
10 responsible for changed over that period
11 of time.
12      But the type -- the type of
13 activity that I would have in terms of
14 leading the group was similar. That's
15 what I -- that's what I had meant, but --
16      Q.   The description at the last
17 time that you worked for Sanofi was that
18 the head -- the oncology area -- and,
19 again, carrying over second page of
20 Exhibit 2 -- safety surveillance and risk
21 management, global pharmacovigilance and
22 epidemiology; correct?
23      A.   Yes.
24      Q.   And that meant that Dr.

Page 32

1  Palatinsky reported to you; correct?
2       A.   Correct.
3       Q.   And that meant that Dr.
4  Hangai reported to you.
5       A.   Correct.
6       Q.   All right.
7       A.   Yeah, just -- just, Mr.
8  Bachus, so we don't get entirely
9  confused, if you look at my C.V., you'll
10 see the change in the names between the
11 different units over the different times.
12 And the last one you see is -- is the
13 SSRM, but the predecessor unit to that
14 was the MSC and the predecessor unit to
15 that was the two divisions that I
16 mentioned to you on the marketed side,
17 the MPPU, and on the development side,
18 the CSPU.
19      Q.   Just so that my record is
20 clear, Dr. Palatinsky reported to you.
21      A.   Yes, I hired Dr. Palatinsky.
22      Q.   And Dr. Hangai reported to
23 you.
24      A.   That's correct.

Page 33

1       Q.   You were their boss.
2       A.   That's correct.
3       Q.   Okay.
4       A.   While they were GSOs.
5       Q.   Yes, while they were global
6  safety officers --
7       A.   While they were --
8       Q.   -- over Taxotere.
9       A.   Correct.
10      Q.   I think we're --
11      A.   That's --
12      Q.   -- speaking over one
13 another. Let me repeat again for a clear
14 record.
15      During the period of time
16 that Dr. Palatinsky and Dr. Hangai were
17 global safety officers over Taxotere in
18 pharmacovigilance, you were their boss.
19      A.   That is correct.
20      Q.   All right.
21      I have some -- some
22 housekeeping items I want to go over.
23 Then we're going to go through some
24 documents. Okay?

Michael S. Kopreski, M.D.

Page 166

1 referring to as to whether this Nabholtz
2 document would be the kind of document
3 that you would keep.
4          I don't know whether you
5 keep it in a file or whether you scanned
6 it in back in the day or what, but it's
7 the kind of information that you want to
8 have.
9      A.  Yeah, maybe I wasn't clear
10 in my response, because of -- the
11 information in the Nabholtz is clearly in
12 the Sanofi clinical trial database and in
13 -- in -- the SAEs are in the
14 pharmacovigilance database.
15          Now, what I may not have
16 been clear about is the study itself.  I
17 don't know what the process would have
18 been at that time regarding a Sanofi
19 publication and how that would have been
20 dealt with.
21      Q.  You weren't there when it
22 was published in 2001.
23      A.  I wasn't there in 2001,
24 that's correct.

Page 167

1      Q.  You would expect, though,
2 that your predecessor or somebody in
3 pharmacovigilance responsible for the
4 safety of Taxotere would in some way
5 catalog this type of information
6 published in what is a well-known
7 publication; correct?
8          MR. KEENAN:  Object to the
9      form.
10          THE WITNESS:  Yeah, I don't
11      think I should speculate on
12      something when I wasn't there and
13      processes are continually
14      changing, so you would have to
15      refer back to the processes of
16      that time.
17          MR. BACHUS:  Okay.
18          THE WITNESS:  And I don't
19      have knowledge of that.
20              - - -
21          (Deposition Exhibit No.
22      Kopreski-7, 2/28/02 Statistical
23      Analysis Plan, RP56976V - 316, "A
24      Multicenter Phase III Randomized

Page 168

1      Trial Comparing Docetaxel in
2      Combination with Doxorubicin and
3      Cyclophosphamide (TAC) Versus
4      5-Fluororacil in Combination with
5      Doxorubicin and Cyclophosphamide
6      (FAC) as Adjuvant Treatment of
7      Operable Breast Cancer Patients
8      with Positive Axillary Lymph
9      Nodes," Sanofi_01234391 through
10      Sanofi_01234437, was marked for
11      identification.)
12              - - -
13 BY MR. BACHUS:
14      Q.  I'm going to hand you what's
15 been marked as Exhibit 7.  Do you have
16 Exhibit 7 in front of you, Doctor?
17      A.  I do, thank you.
18      Q.  Okay.  So we talked about
19 the adverse event reports in 1999.  We
20 talked about the Journal of Clinical
21 Oncology publication in 2001, and this
22 document is a statistical analysis plan.
23 And if you look towards the bottom of the
24 document, there's a date on the document

Page 169

1 and that date is --
2      A.  28th of February --
3      Q.  -- February 28, 2002.  Do
4 you see that?
5      A.  Yes, I do.
6      Q.  And if you go to the top,
7 this is a statistical analysis plan
8 regarding a clinical trial at Sanofi that
9 is labeled as TAX316.
10          Do you agree with me?
11      A.  Yes.
12      Q.  And, again, we see, though,
13 the word "docetaxel" and in the jury's
14 mind, we can substitute Taxotere when we
15 see "docetaxel"; correct?
16      A.  In this -- in this case, you
17 can make that substitution because this
18 is a Sanofi trial, but you cannot
19 routinely make that substitution because
20 there are generic non-Sanofi docetaxels
21 that patients have received.
22      Q.  After 2011; correct?
23      A.  I don't know the exact time
24 --

43 (Pages 166 to 169)

### Page 170

1  Q. All right.
2  A. -- that Taxotere went
3  generic. But this is, as you say, a
4  trial of Taxotere in combination with
5  docetaxel and cyclophosphamide or the
6  T-AC regimen, as we've extensively
7  discussed in the past.
8  Q. For purposes of a case where
9  the use of docetaxel occurred in 2009, we
10 can look at this docetaxel on the first
11 page of Exhibit 7 and we can just think
12 about that as that is Taxotere; correct?
13 A. A case prior to 2009?
14 Q. In 2009.
15 A. A case in 2009.
16 Q. Yeah.
17 A. Again, I don't know when
18 non-Sanofi Taxoteres were being used and
19 not necessarily when they came on the
20 market, but when were they -- when were
21 they being used.
22     But if it's a Sanofi trial,
23 you can make the assumption that it's
24 Taxotere.

### Page 171

1  Q. And this is a Sanofi trial.
2  A. This is a Sanofi trial.
3  Q. And as a Sanofi trial, when
4  we see the word "docetaxel," we can
5  presume that's Taxotere.
6  A. You can treat them the same.
7  Q. All right. And if you look
8  down at the name of the study chair, the
9  study chair is listed as Dr. Nabholtz.
10 Do you see that?
11 A. Yes.
12 Q. And if you would -- and
13 again it's February the 2nd -- February
14 28th, 2002; correct?
15 A. 28th of February, 2002.
16 Q. All right. If you would
17 turn to page 30 of 47 -- the numbers are
18 in the top right-hand corner of Exhibit
19 7. The document I think is double -- I
20 don't know if your document is
21 double-sided. Mine is. But if you turn
22 the page -- you'll see numbering at the
23 top -- you can look -- I'll show you on
24 the -- if you look on the screen, you'll

### Page 172

1  see where the numbering system is.
2  A. I'm sorry that I got
3  distracted. I was just confused as to
4  whether this is the same Nabholtz as the
5  previous Dr. Nabholtz and not -- because
6  the case is previously from Canada and
7  this Dr. Nabholtz is in California.
8     But there was no question
9  there. I apologize for my distraction.
10 Q. Okay. And the Dr. Nabholtz
11 listed on the statistical analysis plan
12 is Jean-Marc Nabholtz, M.D. Do you see
13 that?
14 A. Yes, I do.
15 Q. Okay.
16 A. I'm sorry. You want me to
17 turn to what page now?
18 Q. Turn to page 30 of 47 and
19 look for a section titled "11.7
20 Reversibility."
21 A. Yes.
22 Q. And we discussed earlier
23 what reversibility is; correct?
24 A. We did -- well, we discussed

### Page 173

1  the way that I view reversibility.
2  Q. And you agree with me that
3  as part of the TAX316 statistical
4  analysis plan, as promulgated by the
5  study chair Dr. Nabholtz, that if you
6  look at page 30 of 47, it says that the
7  reversibility of the following adverse
8  events will be analyzed.
9     Do you see that?
10 A. I do.
11 Q. And what's the first adverse
12 event that's listed as one that is going
13 to be analyzed for reversibility?
14 A. Alopecia.
15 Q. Okay. So at least as of
16 2002, would you agree with me that the --
17 that Sanofi was going to look at the
18 reversibility of alopecia as part of its
19 TAX316 clinical trial?
20 A. Well, certainly on this
21 date, on this particular document -- I
22 don't know, you know, if this is the
23 final document or not, but on this
24 document, it includes that statement.

Michael S. Kopreski, M.D.

Page 194

1    Q.   Do you see that?
2    A.   Yes.
3    Q.   And table 1 says: Table 1
4  is an update of table 51 from the TAX316
5  CSR.  Do you see that?
6    A.   I do.
7    Q.   And so as you were saying a
8  moment ago, before, we were looking in
9  2004.  This is updated information in
10 2006; correct?
11   A.   Well --
12   Q.   Let me help you.  I think
13 there's a --
14   A.   I don't -- that's not really
15 --
16   Q.   Go -- if you go to page 10
17 really quickly.  We'll come back to the
18 table --
19   A.   Okay.
20   Q.   -- but I think this will
21 help.  If you go to page 10 --
22   A.   Yes.
23   Q.   -- you'll see at the bottom
24 it says:  The additional information in

Page 195

1  the follow-up period represents 22
2  additional months of safety data for the
3  pivotal TAX316, with now a median
4  follow-up of more than six years.
5        Do you see that?  And,
6  again, I've got it up on the --
7    A.   Okay.
8    Q.   -- on the screen --
9    A.   Yes.
10   Q.   -- as well.  So this
11 represents 22 additional months of data
12 and is -- now the median follow-up is
13 more than six years.
14   A.   If I can just have a second.
15       MR. BACHUS:  Sure.
16       (Pause.)
17 BY MR. BACHUS:
18   Q.   Do you agree with me on
19 that?
20   A.   I'm -- I'm just trying to
21 get context of this.
22       (Pause.)
23       THE WITNESS:  You wouldn't
24   happen to have the request that

Page 196

1  generated this report, would you?
2        MR. BACHUS:  I don't have
3  that in front of me right now.
4        THE WITNESS:  Because I seem
5  to remember --
6        MR. BACHUS:  The table
7  itself is also helpful because
8  there's a date with a cut-off date
9  of March -- this information, a
10 cut-off date of March 2005 in the
11 table -- or 2006, actually, I
12 think, 2006.  It's hard to read
13 it.
14       THE WITNESS:  Could I
15 briefly look at the previous
16 exhibit of the study report?
17       MR. BACHUS:  Sure.  You want
18 to look at exhibit number --
19       MR. KEENAN:  Is it 7?
20       MR. BACHUS:  7?
21       MR. KEENAN:  No, 8.
22       MR. BACHUS:  Or 8.  It's 8.
23       THE WITNESS:  Thank you.
24       (Pause.)

Page 197

1        THE WITNESS:  Okay.  Thank
2  you.  Let me have this just for a
3  second nearby.
4        MR. BACHUS:  Are you ready
5  to continue?
6        THE WITNESS:  Yes.  Yes.
7  BY MR. BACHUS:
8    Q.   All right.  Again, just to
9  reframe where we are, if you look at page
10 7 of Exhibit 9, where table 1 is -- and,
11 again, I put this up on the screen --
12 table 1 is an update of table 51 from the
13 TAX316 CSR.
14       Do you see that language?
15   A.   I do see that.
16   Q.   Okay.
17       And there's a cut-off date
18 here that looks like it's March of 2005
19 for information.  It's hard to read.
20 I've tried to blow it up --
21   A.   Yeah.
22   Q.   -- on the screen here.  It's
23 not a great copy, but that would make
24 some sense since the publication date is

Page 198

1  January of 2006 for this document.
2      A.   I -- it's probably
3  reasonable to be 2005.  It is difficult
4  to read.
5      Q.   And, again, the update, now
6  with 22 additional months of data, shows,
7  again, if we look at -- here's the
8  Taxotere arm and follow-up and it says up
9  here, treatment-emergent adverse events
10 persisting into the follow-up, correct,
11 regardless of relationship?
12     A.   Yes.
13     Q.   And then in the follow-up,
14 it has ongoing or resolved and then has
15 21, which I think is down 1 individual --
16     A.   Yes.
17     Q.   -- at the 77-month
18 follow-up.  Alopecia was reported to be
19 ongoing in the follow-up in the TAC arm
20 at now 77 months; correct?
21     A.   Alopecia was reported to be
22 ongoing for 21 patients in the follow-up,
23 meaning, for the benefit of the jury,
24 again, I -- that ongoing refers to

Page 199

1  whether or not there was documented
2  resolution.  But the follow-up period of
3  -- you said 77 months -- does not
4  necessarily indicate that all patients
5  went for 77 months.
6      Q.   What the company -- you
7  would agree with me that what the company
8  was reporting in table 1 on Exhibit 9 to
9  a regulatory authority was that at 77
10 months -- that the updated information
11 was that at 77 months, alopecia was
12 ongoing for 21 of the patients; correct?
13 That's what's reported.
14     A.   That's what's reported and
15 the regulatory authority would understand
16 what ongoing means, which means that the
17 -- it is up to the point that the patient
18 was -- was being followed.  As the last
19 time that alopecia was recorded, it was
20 still ongoing.
21     Q.   Okay.
22     A.   But it does not mean that
23 each patient went for 77 months.  If you
24 have a patient that died two weeks into

Page 200

1  the follow-up who had alopecia, that
2  alopecia would be ongoing.
3      Q.   You --
4      A.   If the -- I'm sorry.  Go
5  ahead.
6      Q.   You would agree with me that
7  this table doesn't make a representation
8  that any patient died two weeks after
9  getting alopecia; correct?
10     A.   The regulatory authority has
11 the -- the documentation of -- of all the
12 statistical -- or I'm sorry -- all of the
13 safety information that was built into
14 this representation and they would
15 understand, also, what the 77-month
16 period would be.  They would have how
17 long patients were -- were being -- being
18 treated.
19          So I don't know whether or
20 not somebody died two weeks or not, but
21 that information would be available to
22 the regulatory authority, as would the
23 information be -- and I think it said --
24 I read someplace in here that -- if you

Page 201

1  look on that paragraph you were pointing
2  out, a little below, it says, for those
3  events, the follow-up was interrupted if
4  the subject was to receive additional
5  nonprotocol chemotherapy.
6          So a lot of -- a lot of the
7  patients, whether they had a relapse or
8  an occurrence, would go off study and
9  receive another therapy.  And they're
10 also being included in the 77-month
11 cut-off, but -- but they're not -- but
12 the follow-up period is stopping
13 beforehand, as -- as it says here.
14          So --
15     Q.   The purpose of -- the
16 purpose here is to make sure that when
17 we're communicating with regulatory
18 agencies, that we're clear, unequivocal,
19 so that everybody's on the same page;
20 correct?
21     A.   So the regulatory agencies
22 are very familiar with pharmacovigilance
23 in clinical study protocol language, so
24 we are on the same page; and not only

Michael S. Kopreski, M.D.

Page 202

1  that, but they have the data.
2      Q.  Okay.
3      A.  So, you know, I've -- as you
4  know, in my review during the 30(b)(6), I
5  found many patients had resolution of
6  their alopecia or did not document them
7  going on beyond six months that were
8  still considered ongoing.  And the
9  question is, how can that be?
10         Well, that's because you
11  might have been seen for alopecia, or
12  let's say, three months after treatment,
13  it's ongoing, and be followed up just for
14  efficacy, for example, at the 77-month
15  point, with no further recording of the
16  status of your -- of your alopecia.
17         So I think when you talk
18  about ongoing in these numbers, you have
19  to be very careful and I -- you know, I
20  am quite sure that the regulatory
21  agencies who's familiar with the
22  definitions of ongoing and -- and the
23  follow-up period and the protocol and
24  have all the data know exactly what's

Page 203

1  being discussed.
2         MR. BACHUS:  Okay.  I move
3     to strike as absolutely
4     nonresponsive to the previous
5     question.
6  BY MR. BACHUS:
7      Q.  This communication is to
8  European regulatory agency, but it's the
9  exact same TAX316 study; correct?
10     A.  That's correct.  This is a
11  communication to the European regulatory
12  authorities who have the -- the study
13  data.
14     Q.  It's the same TAX316 is my
15  point.  Is that true?  It's the same --
16  there's not a -- I just don't want the
17  jury to be confused.
18         There's not a TAX316 study
19  that occurred for the European regulatory
20  agency submission and a different TAX316
21  for the United States.  It's the same
22  TAX316; isn't that true?
23     A.  There was one study.  In
24  terms of -- in terms of this follow-up

Page 204

1  period, if you're talking about this
2  document, I'm not sure -- I mean, when
3  you say the same, you're referring to the
4  study itself.
5      Q.  I am.
6      A.  Okay.  There's only to my
7  knowledge one TAX316 study that was
8  submitted both to the United States and
9  -- and to Europe.
10        MR. KEENAN:  Are we near a
11    stopping point?
12        MR. BACHUS:  Yes.
13        MR. KEENAN:  Okay.  Go on.
14    Go on.  That's fine.
15 BY MR. BACHUS:
16     Q.  Now we're in 2006 with
17 Exhibit 9, and in 2006, the
18 representation made in table 1 is that
19 there remain more than 3 percent of
20 patients in the TAC arm who were reported
21 as having ongoing alopecia in table 1;
22 correct?
23        It's right on the screen.
24     A.  I wouldn't say that the

Page 205

1  representation is that there remains more
2  than 3 percent.  The representation is,
3  of the patients that have the analysis in
4  2006, regardless of when they may have
5  gone off study, that 21 of those
6  patients, which I -- 21 of those patients
7  had -- had not -- or were technically
8  still ongoing because they didn't show a
9  resolution or because they were lost to
10 follow-up or because they went on to
11 another study or another -- another
12 treatment.
13        So I somewhat disagree with
14 the way that you phrased the question.
15        MR. BACHUS:  Okay.  Thank
16    you.  We'll take a break.
17        MR. KEENAN:  Okay.  Very
18    good.
19        THE VIDEO TECHNICIAN:
20 Remove your microphones.  The time
21 is 1:14 p.m.  We're off the
22 record.
23        (A luncheon recess was taken
24 from 1:14 p.m. to 2:09 p.m.)

Michael S. Kopreski, M.D.

Page 214

1  Q. And then Amy, who at this
2  time, according to your testimony, would
3  have been the global safety officer
4  responsible for Taxotere in March of 2006
5  -- is that right?
6  A. Well --
7  Q. -- along with Emanuel
8  Palatinsky?
9  A. Well, again, just to be
10 clear on my testimony, I'm unsure of the
11 dates, but that's my supposition that I'm
12 sort of putting together; and as I
13 recall, Amy was the global safety officer
14 for Taxotere on the MPPU side and Emanuel
15 was the global safety officer for
16 Taxotere on the CSPU side.
17 Q. And you've said that several
18 times. I'm just trying to short-circuit
19 this and understand that Amy Freedman,
20 who writes this e-mail on March the 5th,
21 2006 at 2:17 p.m. and sends that back to
22 Steven Neibart, to Dr. Palatinsky, and
23 cc's you, she would have been a global
24 safety officer over Taxotere on this

Page 215

1  date; correct?
2  A. That's my recollection.
3  Q. Okay. And what she writes
4  is: I know there were some irreversible
5  cases of alopecia -- do you see that?
6  A. Uh-hum.
7  Q. -- as documented in clinical
8  trials. And then she goes on to say:
9  I'm sorry that I do not have more to
10 offer.
11     Do you see that?
12 A. Yes.
13 Q. And then she says: This is
14 the kind of thing that a noncompany
15 physician would review in their practice
16 and possibly report in the literature.
17     Do you see that?
18 A. Okay.
19 Q. And then she says: However,
20 I am not, in all caps, advising a
21 literature search for this topic,
22 exclamation point.
23     Do you see that?
24 A. I do.

Page 216

1  Q. Were you involved in any way
2  in the decision made by Amy Freedman as
3  documented in this e-mail to not conduct
4  a literature search on this topic of
5  irreversible alopecia?
6  A. Not -- not that I recall,
7  but I -- I'm being cc'd and I don't
8  particularly recall this entire case, but
9  I --
10 Q. Do you have any recollection
11 as you sit here today as to why Ms.
12 Freedman was writing that she is not, in
13 all caps, advising a literature search
14 for this topic in response to this Danish
15 doctor's inquiry?
16 A. No. I think you'd have to
17 direct that to Dr. Freedman.
18     MR. BACHUS: Okay. Again,
19 that was March of 2006.
20     - - -
21     (Deposition Exhibit No.
22 Kopreski-11, Communication
23 Regarding a 4/25/06 Meeting, with
24 the Subject Being "Discussion of

Page 217

1  Proposed Changes to Section 4.0PL"
2  from Diamond to Kopreski, et al,
3  with Attachments, Beginning with
4  Sanofi_05364125, was marked for
5  identification.)
6     - - -
7  BY MR. BACHUS:
8  Q. I'm going to hand you what
9  is being marked as Exhibit No. 11.
10 They're a group of documents and I want
11 to describe for you what this group of
12 documents represents.
13     The first is an e-mail and
14 behind the e-mail are the attachments
15 that were attached to the e-mail. Okay?
16 A. So these are the attachments
17 here (Indicating).
18 Q. Right. So the first part of
19 it is an e-mail and then you'll see where
20 it indicates with -- behind the e-mail
21 that files are produced natively and
22 there are multiple additional documents
23 that are attached behind it that we'll go
24 over that were attached to the e-mail.

55 (Pages 214 to 217)

Michael S. Kopreski, M.D.

Page 226

1    If you turn past the current
2 PL, you'll see a document that has a
3 title at the top that says "Draft
4 Proposal 1."
5    A.   Okay.
6    Q.   Do you see that?
7    A.   I do.
8    Q.   This was also attached to
9 the e-mail and a draft proposal, what --
10 what does a proposal draft mean to you in
11 pharmacovigilance?
12    A.   Well, I don't think there's
13 any -- anything unique to
14 pharmacovigilance in the word draft
15 proposal.  It is a draft meaning it's not
16 finalized.  It's -- it's a -- and
17 proposal 1 would suggest that this is a
18 nonfinalized, non -- probably nonreviewed
19 proposal that's being made.
20    Q.   Okay.  And if you --
21    A.   I would imagine it's being
22 attached for discussion.
23    Q.   I'm sorry.  Were you able to
24 finish?

Page 227

1    A.   Yes.  Sorry.
2    Q.   All right.  If you go down
3 to the proposal on page 1 of draft
4 proposal number 1, under "Very Common,"
5 do you see, it says very common and then
6 it says, "(experienced in more than 1 in
7 10 patients)."  Do you see that?
8         You can look on the
9 screen --
10    A.   Okay.
11    Q.   -- you may orient yourself
12 to that document.
13    A.   Yes, I do see that.
14    Q.   All right.
15         And then -- one, two,
16 three -- four bullet points down, it
17 says, under "Very Common":  Short-term
18 hair loss, after normal -- after
19 treatment, normal hair growth should
20 return.
21         Do you see that?
22    A.   I do see that.
23    Q.   And then if you turn the
24 page to the second page of proposal

Page 228

1 number 1, at the bottom, under what's
2 termed as "Rare," it says:  Alopecia
3 (hair loss) that did not reverse at the
4 end of the study.
5         Do you see that?
6    A.   I do.
7    Q.   Clearly, whoever -- well,
8 first of all, do you know who drafted
9 proposal number 1?
10    A.   Excuse me.  No.
11    Q.   Would you agree with me that
12 clearly whoever it was that drafted
13 proposal number 1 was able to identify
14 and describe two distinct types of hair
15 loss related to the use of Taxotere, one
16 that was identified as occurring in -- as
17 a very common side effect, in more than 1
18 in 10 patients, as short-term hair loss
19 and the second at rare, alopecia that did
20 not reverse at the end of the study.
21         Do you see that?
22    A.   I do, but I don't think I
23 agree with the way that you posed your
24 question.  I don't think they're

Page 229

1 describing two distinct types.  I think
2 they're describing two different patterns
3 of recovery in terms of duration and
4 frequency --
5    Q.   One of them that recovers
6 and one of them that does not reverse at
7 the end of the study; correct?
8    A.   Yes.
9    Q.   So clearly by the time that
10 draft proposal 1 was created by Sanofi,
11 the company knew how to describe those
12 two different outcomes of alopecia;
13 correct?
14    A.   Well, again, I'm not going
15 to presume who created the document since
16 I don't know who created the document;
17 and, you know, the document basically,
18 you know, in my view, states what I
19 previously testified.
20         MR. BACHUS:  I'm going to
21    move to strike.  I don't think you
22    answered my question.
23         The question, you should be
24    able to see on the realtime

Michael S. Kopreski, M.D.

Page 302

1    A.   I didn't direct Dr.
2    Palatinsky to call anybody.
3    Q.   All right.
4         In the conclusion, do you
5    agree that this group of doctors
6    concluded in part by stating:  It's an
7    important side effect and must be
8    considered by oncologists as optimal
9    information to give to curable patients?
10        Do you see that on the
11   conclusion, the second sentence?
12   A.   Yes, I do see that.
13   Q.   And above that, just above
14   that, in the paragraph above, it says:
15   Some oncologists quickly decided to
16   change their standard regimen from FAC a
17   hundred, docetaxel a hundred to EC 100
18   followed by weekly paclitaxel.
19        Do you see that?
20   A.   Yes, and it continues to
21   say:  Forthcoming data on persistent
22   alopecia will be presented.
23   Q.   At this symposium.  Right?
24   A.   Correct.

Page 303

1    Q.   That you didn't attend;
2    correct?
3    A.   I testified already that I
4    did not attend this.
5    Q.   Well, we were talking about
6    a different --
7    A.   I'm sorry.  No, I did not --
8    I think I testified I have not attended
9    any San Antonio Breast Cancer Symposiums
10   in my career.
11            - - -
12        (Deposition Exhibit No.
13   Kopreski-16, 9/9/10 Clinical Study
14   Report on "A Multicenter phase III
15   randomized trial comparing
16   docetaxel in combination with
17   doxorubicin and cyclophosphamide
18   (TAC) versus 5-flurorouracil in
19   combination with doxorubicin and
20   cyclophosphamide (FAC) as adjuvant
21   treatment of operable breast
22   cancer patients with positive
23   axillary lymph nodes, 10-year
24   follow-up," Sanofi_02645200

Page 304

1    through Sanofi_02645278, was
2    marked for identification.)
3            - - -
4    BY MR. BACHUS:
5    Q.   I'm going to hand you what's
6    been marked as Exhibit 16 to the
7    deposition and then a copy to your
8    counsel.
9         You now have what's been
10   handed to you as Exhibit 16?
11   A.   Yes, thank you.
12   Q.   This is the clinical study
13   report for the ten-year follow-up on the
14   TAX316 clinical trial; is that right?
15   A.   Yes, correct.
16   Q.   And that's -- again, that's
17   different than the TAX301 clinical trial
18   that we discussed a few minutes ago;
19   correct?
20   A.   Yes, this is --
21   Q.   Those are not the same.
22   A.   This trial is for
23   node-positive -- node-positive patients
24   and the GEICAM study is for node-negative

Page 305

1    patients --
2    Q.   And the report --
3    A.   -- although the regimens,
4    T-AC versus F-AC, are the same as I
5    recall.
6    Q.   The report date for this was
7    September the 9th, 2010.  Do you see that
8    on the first page?
9    A.   I do -- I do see the report
10   date for this ten-year follow-up.  Of
11   course, the initial report was submitted
12   back in 2004, I believe.
13   Q.   So this is new information
14   with a first patient that participated in
15   1997 and now we have the completion date.
16   The last patient follow-up date was
17   January 25th, 2010.
18        Do you see that?
19   A.   Yes, I do.
20   Q.   And previously, we looked at
21   four and a half years of data, but now
22   we're looking at ten years of data;
23   correct?
24   A.   Correct.

Michael S. Kopreski, M.D.

Page 306

1    Q.   If you'd please turn to page
2  37 of the document, but it's table 7?
3    A.   (Witness complies.)
4       Okay.
5    Q.   Now, do you agree with me
6  that table 7 is the end of study
7  follow-up information regarding patients
8  with treatment-emergent adverse events
9  that arose during the treatment period
10 and persisted into the follow-up period?
11   A.   That's -- that's correct.
12   Q.   Okay.
13      And the Taxotere arm of this
14 study describes adverse events that
15 persisted into the follow-up period and
16 either resolved or were documented as
17 ongoing, would you agree with that?
18   A.   Correct.
19   Q.   And the first adverse event
20 or side effect listed is alopecia in the
21 table on the far left side, which I've
22 highlighted.  Do you agree with me?
23   A.   Yes.
24   Q.   And under the column titled

Page 307

1  "Ongoing," do you agree with me that the
2  final number reported in table 7 for
3  alopecia ongoing is 4.2 percent?
4    A.   Well, the 4.2 percent,
5  again, refers -- and I refer you to the
6  subgroup A -- percentages calculated over
7  the number of patients for each event
8  during the follow-up period.
9       So it's -- in other words, I
10 think the 29 patients is being divided --
11   Q.   By 687.
12   A.   By 687, not by the 744, the
13 number of patients who received Taxotere.
14   Q.   Of those patients that were
15 in the clinical trial that were followed
16 up after the end of treatment for
17 persisting alopecia, as reported, 4.2
18 percent are reported as ongoing in table
19 7; correct?
20   A.   Correct, 4.2 percent,
21 regardless of the duration that the
22 follow-up could be performed, were
23 reported as ongoing as the last follow-up
24 for alopecia.

Page 308

1       MR. BACHUS:  All right.
2         - - -
3       (Deposition Exhibit No.
4  Kopreski-17, Redacted 3/5/10
5  Article in The Globe and Mail
6  "'It's devastating...no going back
7  to normal'; Women angered they
8  weren't warned about permanent
9  hair loss, but maker of cancer
10 drug says risk is low,"
11 Sanofi_05920825 and
12 Sanofi_05920826, was marked for
13 identification.)
14        - - -
15 BY MR. BACHUS:
16   Q.   I'm going to hand you what's
17 been marked as Exhibit 17.  Doctor,
18 you've been handed Exhibit 17.  If you'll
19 turn to the very last page -- there's
20 only three pages -- the last page of
21 Exhibit 17, you'll see that this document
22 was produced by your lawyer -- by the
23 lawyers for Sanofi -- as having this
24 document coming out of your custodian

Page 309

1  file.
2    A.   Okay.
3    Q.   All right?
4       And the date, if you'll look
5  at the date of this document that it was
6  created in your computer system in your
7  custodial file, is March of 2010.  All
8  right?
9    A.   Yes.
10   Q.   So you can agree with me, I
11 believe, that the head safety officer
12 over Taxotere had knowledge of this Globe
13 and Mail article regarding permanent hair
14 loss and Taxotere back in 2010; correct?
15   A.   Yes, I -- I do believe I was
16 aware of this.
17   Q.   And this is an article
18 published by a Canadian newspaper; is
19 that your understanding?
20   A.   I do not recall --
21   Q.   Have you ever heard of a
22 publication called The Globe and Mail?
23   A.   Only with reference to this
24 document.

78 (Pages 306 to 309)