# EXHIBIT H

Page 1

```
       UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF LOUISIANA
                  - - -

                              :
IN RE: TAXOTERE               :
(DOCETAXEL) PRODUCTS          : MDL No. 2740
LIABILITY LITIGATION          : Section H(5)
_____:
                              :
This Document Relates to:     :
All Cases                     :


                  - - -
            December 12, 2018
                  - - -


       MICHAEL S. KOPRESKI, M.D.

              (VOLUME I)

                  - - -
```

Transcript of the videotaped deposition of Sanofi U.S. Services, Inc., pursuant to Fed. R. Civ. P. 30(b)(6) held at McElroy Deutsch Mulvaney & Carpenter, LLP, 1300 Mt. Kemble Avenue, Morristown, New Jersey, commencing 9:22 a.m. on the above-referenced date, as taken by and before Constance E. Perks, CRR, CRC, RSA, a Federally-Approved Certified Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377  |  fax 917.591.5672
deps@golkow.com

Michael S. Kopreski, M.D.

Page 18

```
 1     back.                              09:35:41
 2             THE WITNESS:  Very back.  I 09:35:41
 3     see a date of December 4th, 2018,  09:35:44
 4     certified, certified December 4th, 09:35:49
 5     2018.                              09:35:53
 6  BY MR. BACHUS:                        09:35:54
 7     Q.   Okay.  Thank you.             09:35:54
 8             If you, on Exhibit 1, if you 09:36:03
 9     look at the bottom of page 9 just after 09:36:06
10     the end of Table 2, and there's a number 09:36:09
11     2, do you see that?                09:36:13
12     A.   Yes, I do.                    09:36:14
13     Q.   And if you'll turn to page    09:36:15
14     10 and you look at the subsections of 09:36:23
15     this exhibit, subsection 2, and then it's 09:36:29
16     i, j, and if you turn to i, j, k, l, m, 09:36:32
17     n, o, do you see those?            09:36:38
18     A.   Yes, I do.                    09:36:40
19     Q.   Part of the areas of inquiry  09:36:43
20     that are designated are topics regarding 09:36:47
21     how Sanofi characterizes and categorizes 09:36:57
22     and records adverse event reports.  Do 09:37:02
23     you see that, under section i?     09:37:03
24     A.   Yes.                          09:37:06
25     Q.   And the databases in which    09:37:06
```

Page 19

```
 1     reports are recorded, do you see that 09:37:08
 2     under j?                           09:37:11
 3     A.   Yes.                          09:37:12
 4     Q.   And how reports are handled   09:37:12
 5     in the regular course and scope of 09:37:19
 6     Sanofi's business under section m, do you 09:37:21
 7     see that?                          09:37:24
 8     A.   Yes, I do.                    09:37:24
 9     Q.   All right.  And section o,    09:37:25
10     "Whether the report alone or in    09:37:30
11     combination with other reports might 09:37:33
12     constitute a safety signal and why," do 09:37:36
13     you see that as an area of inquiry? 09:37:38
14     A.   Yes, I do.                    09:37:40
15     Q.   All right.  What I want to    09:37:41
16     do is I want to start, and I think you 09:37:45
17     can see -- do you have a computer screen 09:37:57
18     in front of you here that allows you to 09:38:00
19     see what I'm putting on this ELMO device 09:38:02
20     over here?                         09:38:05
21             MR. KEENAN:  Can you see   09:38:10
22     this?                              09:38:11
23  BY MR. BACHUS:                        09:38:11
24     Q.   Can you see that?             09:38:11
25     A.   Yes.                          09:38:13
```

Page 20

```
 1     Q.   What I want to do is kind of  09:38:13
 2     provide the -- the jury with a road map 09:38:18
 3     of what we're going to be covering in the 09:38:24
 4     -- during the course of your deposition. 09:38:27
 5     A.   Okay.                         09:38:28
 6     Q.   And, you know, the first      09:38:29
 7     thing here, I have a copy of this road 09:38:33
 8     map that I've put up on this ELMO, and 09:38:37
 9     what I want to go over with you is 09:38:40
10     briefly discuss safety signals and how 09:38:46
11     you determine if something is a safety 09:38:50
12     signal, and why, and we'll then apply 09:38:52
13     that to the adverse event reports. 09:38:56
14             And so kind of the first -- 09:38:58
15     the first stop on this roadway is going 09:39:00
16     to be to discuss safety signals, and then 09:39:04
17     we'll from there to the see -- to discuss 09:39:11
18     what Sanofi has learned through the 09:39:11
19     adverse event reports that were submitted 09:39:13
20     during this time frame from January of 09:39:15
21     2005 to 2011.                      09:39:18
22             And then we'll, after we go 09:39:19
23     over some of the case reports, we'll 09:39:22
24     discuss your -- the company's      09:39:24
25     understanding of what are reasonable and 09:39:28
```

Page 21

```
 1     responsible company behaviors with 09:39:32
 2     respect to actions taken associated with 09:39:37
 3     the receipt of reports.            09:39:40
 4             And then we'll cover what  09:39:42
 5     Sanofi knew and learned from the reports, 09:39:44
 6     and -- and how it conducted itself after 09:39:49
 7     it learned that -- you know, from the 09:39:53
 8     reports, under the last exit here, where 09:39:55
 9     it says Sanofi's behavior.  Okay?  09:39:58
10             So that's kind of the course 09:40:00
11     of what we're going do cover with you. 09:40:02
12     All right?                         09:40:04
13     A.   Okay.                         09:40:04
14     Q.   Do you agree with me that     09:40:05
15     when we talk about the detection of 09:40:16
16     safety signals that not all side effects 09:40:22
17     or adverse events are known to the 09:40:26
18     company at the time that a drug is first 09:40:29
19     licensed to be sold?               09:40:32
20     A.   That's correct.               09:40:34
21     Q.   And some side effects are     09:40:35
22     detected only after a drug is on the 09:40:39
23     market.                            09:40:42
24             MR. KEENAN:  Move it this  09:40:42
25     way.                               09:40:42
```

Michael S. Kopreski, M.D.

Page 158

1   It just shifts.  13:47:27
2   BY MR. BACHUS:  13:47:29
3   Q.  Have you located this --  13:47:29
4   A.  Yes.  13:47:29
5   Q.  -- adverse event report?  13:47:33
6   A.  Yes, Mr. Bachus.  Go ahead.  13:47:33
7   Q.  This appears to be a report  13:47:34
8   received as part of an observational  13:47:36
9   study, observational project.  Do you  13:47:39
10  agree with that?  13:47:43
11  A.  Yes.  13:47:44
12  Q.  And what was this  13:47:44
13  observational project, if you know?  13:47:46
14  A.  It says it's a Project XRP  13:47:49
15  6976D/5002.  13:48:00
16  Q.  And this is a report of a  13:48:09
17  woman who had Taxotere treatment in  13:48:18
18  December of 2005.  Do you agree with  13:48:23
19  that?  13:48:25
20  A.  Yes, I do.  13:48:26
21  Q.  And the outcome was that she  13:48:28
22  was suffering from alopecia, and they  13:48:36
23  have Grade 4 alopecia here.  Do you see  13:48:39
24  that?  During -- "the patient suffered  13:48:42
25  from alopecia Grade 4."  13:48:48

Page 159

1   A.  Yes.  13:48:53
2   Q.  The investigator assumed a  13:48:53
3   causal relationship with docetaxel.  Do  13:49:01
4   you see that?  13:49:07
5   A.  That's what it says, yes.  13:49:08
6   Q.  And there's a follow-up in  13:49:09
7   October, October 25th, 2007, with the  13:49:12
8   outcome considered to be ongoing.  Do you  13:49:13
9   see that?  13:49:16
10  A.  Well, once again, like the  13:49:17
11  other clinical trial case, this is a  13:49:22
12  clinical trial case, so it says it's a  13:49:25
13  date of reconciliation on the 25th of  13:49:27
14  October 2007, reveals that it's -- that  13:49:30
15  it's ongoing.  But, in effect, there's no  13:49:34
16  documentation that there's more than six  13:49:38
17  months of alopecia in this case.  13:49:44
18  Q.  When -- this is similar to  13:49:47
19  your testimony about the Japanese  13:49:48
20  clinical trial?  13:49:50
21  A.  It's a clinical trial case.  13:49:51
22  Q.  Okay.  When the term  13:49:52
23  "ongoing" is used from clinical trial  13:49:55
24  data, is it your testimony that no one  13:49:59
25  should understand that to mean that the  13:50:05

Page 160

1   reported adverse event is permanent or  13:50:08
2   irreversible or persistent?  13:50:14
3   A.  No.  I'm very -- my  13:50:17
4   testimony is that the term in clinical  13:50:20
5   trial data for outcome data, when it says  13:50:23
6   "ongoing," it means that the adverse  13:50:26
7   event that pertains to that outcome was  13:50:29
8   present at the time that the patient was  13:50:32
9   -- was -- was seen, at the time of -- of  13:50:37
10  the last -- last -- well, to be simple,  13:50:42
11  the last recording.  And, I mean, it --  13:50:47
12  it actually -- outgoing is a term that --  13:50:51
13  that would be recorded for the outcome,  13:50:55
14  potentially recorded for the outcome, at  13:50:59
15  each visit that that adverse event is --  13:51:02
16  is being assessed.  13:51:04
17  Q.  What I'm understanding from  13:51:06
18  you, though, is that when looking at  13:51:07
19  adverse event reporting or tabulation,  13:51:11
20  that if it comes from a clinical trial  13:51:14
21  and it uses the word "ongoing," that no  13:51:17
22  one should understand that to mean  13:51:21
23  permanent, persistent, or irreversible?  13:51:23
24  A.  No, that's incorrect.  13:51:28
25  Q.  Okay.  So --  13:51:28

Page 161

1   A.  That's incorrect.  What --  13:51:30
2   Q.  So -- so, let me -- let me  13:51:31
3   ask a different question.  13:51:32
4   A.  Well, let me -- could I  13:51:33
5   finish my answer?  13:51:34
6   Q.  Sure.  13:51:35
7   A.  Okay.  What outgoing --  13:51:36
8   Q.  Ongoing.  13:51:40
9   A.  What -- what ongoing refers  13:51:41
10  to is the status of the event at a  13:51:42
11  specific date.  Now, in terms of  13:51:46
12  persistent or permanent, for the purpose  13:51:48
13  of this deposition, or -- you don't --  13:51:51
14  you don't utilize the criteria that, if  13:51:57
15  the alopecia persists more than six  13:51:59
16  months after chemotherapy without  13:52:03
17  resolution, that it would be -- fall  13:52:05
18  underneath the persistent or permanent  13:52:10
19  criteria.  13:52:13
20      If you have a clinical trial  13:52:14
21  where the ongoing criteria is documented  13:52:16
22  to be more than the six months beyond the  13:52:22
23  clinical trial, and you don't have  13:52:25
24  resolution, by the definition that we're  13:52:27
25  using, you could apply the term  13:52:31

Page 162

1  persistent. But if you have clinical         13:52:34
2  trial data where the ongoing is less than    13:52:39
3  six months, it doesn't qualify for the       13:52:41
4  definition of -- of persistent.              13:52:45
5       Now, if the date of the                 13:52:47
6  ongoing is not specified, then you -- you    13:52:50
7  can't address that question.                 13:52:54
8       Q.  So, first of all, I have no         13:52:56
9  idea what you're talking about when you      13:52:58
10 reference a definition to be used for        13:53:00
11 purposes of this deposition. There is no     13:53:02
12 such thing. There -- there just simply       13:53:05
13 isn't.                                       13:53:10
14      There -- just to be crystal             13:53:11
15 clear on the record with you, and I think    13:53:12
16 I've tried to do this previously, there      13:53:14
17 was an agreement reached about what          13:53:19
18 Sanofi would look for in their documents     13:53:20
19 to make sure that my table was complete      13:53:22
20 for purposes of the deposition. That's       13:53:24
21 it. Okay. So I have no idea, when you        13:53:27
22 say a definition of six months, I have no    13:53:29
23 idea what you're talking about.              13:53:32
24      A.  Okay. So --                         13:53:34
25      Q.  Okay? So -- so let me just          13:53:35

Page 163

1  back up and rephrase my question --          13:53:36
2       A.  Okay.                               13:53:36
3       Q.  -- to make sure that we're          13:53:38
4  on -- we're on the same page. Okay?          13:53:40
5       Here, in this adverse event             13:53:42
6  report, the data reconciliation revealed     13:53:50
7  that as of October 2007, the adverse         13:53:53
8  event of alopecia was ongoing. That is a     13:53:58
9  date that's more than two years after the    13:54:01
10 last Taxotere treatment, right?              13:54:04
11      Yet, you say that because it            13:54:09
12 was from a clinical trial and because it     13:54:12
13 uses the word "ongoing," that you cannot     13:54:15
14 derive from that that the condition is       13:54:19
15 persistent, irreversible, or permanent.      13:54:23
16 That's your testimony, right?                13:54:27
17      A.  For -- for this case, my            13:54:28
18 testimony is that the reconciliation date    13:54:31
19 of 25th of October '07 does not mean that    13:54:36
20 that was the date that the patient was       13:54:40
21 last seen with alo -- alopecia.              13:54:43
22      Q.  So from a --                        13:54:48
23      A.  In the absence of another           13:54:49
24 date -- which I see that the patient was     13:54:52
25 treated on the 1st of December 2005. I       13:54:53

Page 164

1  don't see another date. In the absence       13:55:00
2  of another date, one cannot determine the    13:55:02
3  duration of alopecia.                        13:55:08
4       Q.  So --                               13:55:08
5       A.  So if a patient received            13:55:09
6  treatment, as an example, in March of        13:55:11
7  2006, and then died in April of 2006, a      13:55:12
8  month after receiving treatment --           13:55:18
9       Q.  Yes.                                13:55:20
10      A.  -- and had alopecia at the          13:55:20
11 time of his death, that event would be       13:55:23
12 ongoing. The reconciliation could occur      13:55:28
13 in 2008. At that reconciliation date,        13:55:30
14 the outcome for that alopecia for the        13:55:37
15 patient that died a month after              13:55:40
16 chemotherapy would be ongoing.               13:55:42
17      Q.  So the data, alone, from a          13:55:43
18 clinical trial, the data alone of an         13:55:45
19 ongoing adverse event is simply              13:55:47
20 incomplete, unless you --                    13:55:49
21      A.  No.                                 13:55:52
22      Q.  -- unless you look -- well,         13:55:53
23 in -- in this particular instance, you       13:55:55
24 have the adverse event listed as ongoing     13:55:57
25 two years after last docetaxel, but          13:56:01

Page 165

1  you're saying because you don't have the     13:56:05
2  intervening data to examine, you can't       13:56:07
3  tell whether it means that it's truly        13:56:10
4  persistent, irreversible. That's what        13:56:15
5  you're saying, right?                        13:56:19
6       A.  No. First off, your -- your         13:56:20
7  -- your statement is, I believe, is          13:56:23
8  incorrect. When you said that you have       13:56:23
9  documentation of ongoing on -- when you      13:56:25
10 say that it's ongoing on 25th of October     13:56:27
11 of 2007, I'm saying that is when the         13:56:31
12 reconciliation -- no, let me --              13:56:34
13      Q.  I understand that.                  13:56:34
14      A.  Let me say --                       13:56:35
15      Q.  You said that three times.          13:56:35
16      A.  Let me say what the                 13:56:37
17 reconciliation is. You have a --             13:56:39
18      Q.  I understand what it is.            13:56:40
19      A.  -- final visit --                   13:56:40
20      Q.  I didn't ask what it was. I         13:56:41
21 -- I want to just answer -- answer my        13:56:43
22 questions.                                   13:56:44
23      A.  I wanted to make sure the           13:56:44
24 jury was aware of --                         13:56:46
25      Q.  Okay.                               13:56:46

Page 218

1  with docetaxel whose hair didn't regrow    15:04:32
2  after treatment, that in response to the    15:04:36
3  data request, that your company provided    15:04:38
4  the Sedlacek abstract as the data?    15:04:41
5      A.  The request is, "Is there    15:04:51
6  any data on this?"  The company provided    15:04:55
7  the package insert and the Sedlacek    15:04:57
8  abstract.  I don't -- I don't -- I don't    15:05:04
9  see anything else that was provided.    15:05:14
10     Q.  We know from this entry that    15:05:16
11 the company was in possession of the data    15:05:22
12 from Sedlacek regarding irreversible and    15:05:29
13 permanent hair loss and docetaxel,    15:05:34
14 correct?    15:05:37
15     MR. KEENAN:  Object to the    15:05:41
16     form.    15:05:42
17     THE WITNESS:  Yes, the    15:05:42
18     company was aware of that data and    15:05:43
19     -- that's correct.    15:05:46
20 BY MR. BACHUS:    15:05:47
21     Q.  And it appears from this    15:05:47
22 entry that the company felt that the data    15:05:53
23 from Sedlacek was reliable enough to    15:05:54
24 provide a copy of the Sedlacek abstract    15:05:58
25 and data to a doctor specifically making    15:06:02

Page 219

1  inquiry from the company on July 30th,    15:06:07
2  2007, about data possessed by the company    15:06:09
3  regarding hair not growing back after    15:06:15
4  docetaxel, correct?    15:06:19
5      MR. KEENAN:  Object to form.    15:06:20
6      THE WITNESS:  I do not    15:06:21
7      believe the company providing the    15:06:24
8      abstract of Sedlacek makes any --    15:06:27
9      should be interpreted as the    15:06:31
10     company making any representation    15:06:32
11     as to the reliability of -- of the    15:06:34
12     abstract.    15:06:35
13 BY MR. BACHUS:    15:06:39
14     Q.  Why didn't the company    15:06:39
15 provide the Nabholz study?    15:06:41
16     A.  I -- I cannot answer that    15:06:45
17 question.    15:06:46
18     Q.  Why didn't the company    15:06:46
19 provide the data it held regarding TAX    15:06:48
20 316 77-month follow-up data?    15:06:54
21     A.  You mean the 55-month?    15:06:57
22     Q.  77-month.    15:07:00
23     A.  Well, I believe the analysis    15:07:02
24 that was done was the 55-month at this --    15:07:05
25 at this time.  But --    15:07:17

Page 220

1      Q.  Why didn't they provide that    15:07:17
2  data?    15:07:21
3      A.  But -- but -- but I can -- I    15:07:21
4  cannot answer the basis of the searchs    15:07:22
5  that the company provided and decisions    15:07:24
6  as to what to provide and not to provide    15:07:27
7  through this communication.    15:07:30
8      Q.  Why didn't the company    15:07:31
9  indicate to Dr. Carroll: "Actually,    15:07:33
10 Dr. Carroll, we've been getting reports    15:07:35
11 just like your report for each and every    15:07:38
12 month or so for years.  We would invite    15:07:43
13 you to participate and help us figure out    15:07:46
14 what's going on with our product and    15:07:49
15 permanent hair loss."  Why didn't that    15:07:51
16 happen?    15:07:54
17     MR. KEENAN:  Object to form.    15:07:55
18     THE WITNESS:  Well, first    15:07:56
19     off, the company did an analysis    15:07:57
20     of -- of persistent alopecia    15:07:59
21     within the context of the TAX 316.    15:08:01
22     And, as you mentioned, there was    15:08:10
23     data from TAX 316 on -- on    15:08:12
24     patients who had ongoing hair loss    15:08:17
25     into the follow-up period.    15:08:19

Page 221

1      But in terms of why that was    15:08:23
2      not provided, or -- or if it was    15:08:24
3      provided, because I can't -- you    15:08:31
4      know, it says -- it says Taxotere    15:08:33
5      PI.  I don't absolutely know that    15:08:35
6      this was -- you know, what P --    15:08:39
7      what -- what PI or -- was    15:08:42
8      provided, but -- but as to --    15:08:44
9  BY MR. BACHUS:    15:08:46
10     Q.  Just on that point, it says:    15:08:47
11 "Enclosed for your professional review is    15:08:48
12 the result of the search and the Taxotere    15:08:51
13 package insert so that you can view the    15:08:55
14 full prescribing information."    15:08:59
15     Doesn't that tell us that's    15:09:01
16 what the PI was?    15:09:04
17     A.  Well, the PI would be the    15:09:05
18 package insert.    15:09:07
19     Q.  It looks like they gave the    15:09:10
20 package insert and the Sedlacek article.    15:09:12
21     A.  Yes.  Yes.  What I'm saying    15:09:16
22 was this -- the US package insert and the    15:09:17
23 Sedlacek, and was there anything else    15:09:23
24 provided, I -- in terms of your question    15:09:23
25 of, you know, why wasn't other documents    15:09:25