1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3       ****************************************************************

4       IN RE:   TAXOTERE (DOCETAXEL)
5       PRODUCTS LIABILITY LITIGATION

6                                    CIVIL ACTION NO. 16-MD-2740 "H"
                                     NEW ORLEANS, LOUISIANA
7                                    THURSDAY, AUGUST 26, 2021, 9:30 A.M.

8       THIS CASE RELATES TO
        ELIZABETH KAHN,
9       CASE NO. 16-CV-17039

10      ****************************************************************

11               TRANSCRIPT OF MOTION HEARING PROCEEDINGS
                     VIA ZOOM VIDEO TELECONFERENCE
12           HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                     UNITED STATES DISTRICT JUDGE

13

14
        APPEARANCES:
15

16      FOR THE PLAINTIFFS:         GAINSBURGH BENJAMIN DAVID
                                    MEUNIER & WARSHAUER
17                                  BY:  M. PALMER LAMBERT, ESQ.
                                    1100 POYDRAS STREET, SUITE 2800
18                                  NEW ORLEANS, LOUISIANA 70163

19

20                                  PENDLEY BAUDIN & COFFIN
                                    BY:  CHRISTOPHER L. COFFIN, ESQ.
21                                  1515 POYDRAS STREET, SUITE 1400
                                    NEW ORLEANS, LOUISIANA 70112

22

23                                  PENDLEY, BAUDIN & COFFIN
24                                  BY:  JESSICA P. REYNOLDS, ESQ.
                                    24110 EDEN STREET
25                                  PLAQUEMINE, LOUISIANA 70765

                          *OFFICIAL  TRANSCRIPT*

09:20:55 (line 7)
09:21:11 (line 12)

```
 1   APPEARANCES CONTINUED:

 2

 3                            SIMMONS HANLY CONROY
                             BY:  DAVID F. MICELI, ESQ.
 4                            ONE COURT STREET
                             ALTON, ILLINOIS 62002
 5

 6
                             BACHUS & SCHANKER
 7                            BY:  J. KYLE BACHUS, ESQ.
                             1899 WYNKOOP STREET
 8                            SUITE 700
                             DENVER, COLORADO 80202
 9

10
                             BACHUS SCHANKER
11                            BY:  DARIN L. SCHANKER, ESQ.
                             101 W COLFAX AVE, SUITE 650
12                            DENVER, COLORADO 80202

13

14                            GIBBS LAW GROUP
                             BY:  ANDRE M. MURA, ESQ.
15                            505 14TH STREET SUITE 1110
                             OAKLAND, CALIFORNIA 94612
16

17
     FOR SANOFI-AVENTIS U.S.,
18   LLC AND SANOFI US
     SERVICES, INC.:          IRWIN FRITCHIE URQUHART & MOORE
19                            BY:  DOUGLAS J. MOORE, ESQ.
                             400 POYDRAS STREET, SUITE 2700
20                            NEW ORLEANS, LOUISIANA 70130

21

22                            SHOOK, HARDY & BACON
                             BY:  HARLEY V. RATLIFF, ESQ.
23                                 JON A. STRONGMAN, ESQ.
                                   MATT DEPAZ, ESQ.
24                            2555 GRAND BOULEVARD
                             KANSAS CITY, MISSOURI 64108
25
```

***OFFICIAL TRANSCRIPT***

1   APPEARANCES CONTINUED:

2

3                                    SHOOK HARDY & BACON
                                     BY:  HILDY M. SASTRE, ESQ.
4                                    201 BISCAYNE BOULEVARD
                                     SUITE 3200
5                                    MIAMI, FLORIDA 33131

6

7   ALSO PRESENT:            JORDAN BAEHR, ESQ.

8

9   OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                     CERTIFIED REALTIME REPORTER
10                                   REGISTERED MERIT REPORTER
                                     500 POYDRAS STREET, ROOM B-275
11                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7779
12                                   Cathy_Pepper@laed.uscourts.gov

13

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
14  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL  TRANSCRIPT*

1                                    **I N D E X**

2

3    <u>ITEMS</u>                                                    <u>PAGE</u>

4

5    MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING

6    ADVERSE EVENT REPORTS OR OTHER COMPLAINTS INVOLVING

7    PATIENTS OTHER THAN PLAINTIFF........................  10

8    MR. STRONGMAN.......................................  10

9    MR. BACHUS..........................................  11

10   MR. STRONGMAN.......................................  14

11   MOTION IN *LIMINE* IS TO PRECLUDE EVIDENCE OR

12   ARGUMENTS CONCERNING SANOFI'S PROMOTIONAL OR

13   MARKETING MATERIALS NOT POSSESSED OR RELIED ON BY

14   MS. KAHN OR HER PRESCRIBING PHYSICIAN...............  15

15   MR. MOORE...........................................  15

16   MR. COFFIN..........................................  17

17   MR. MOORE...........................................  20

18   PRECLUDE EVIDENCE OR ARGUMENT CONCERNING NONEXPERT

19   CAUSATION TESTIMONY.................................  22

20   MR. LAMBERT.........................................  26

21   MS. SASTRE..........................................  28

22   MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING

23   SANOFI SALES AND TO EXCLUDE SALES REPRESENTATIVE

24   TESTIMONY...........................................  30

25   MR. BACHUS..........................................  32

*OFFICIAL TRANSCRIPT*

1   MR. DEPAZ...........................................  34

2   MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING

3   FDA EVENT REPORTS SIGNAL EVALUATION.................  34

4   MR. STRONGMAN.......................................  34

5   MR. MICELI..........................................  35

6   MR. STRONGMAN.......................................  37

7   MOTION TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING

8   FOREIGN LABELING AND REGULATORY REACTIONS...........  38

9   MR. RATLIFF.........................................  38

10  MR. MICELI..........................................  40

11  MR. RATLIFF.........................................  45

12  MOTION TO PRECLUDE EVIDENCE REGARDING SHIRLEY LEDLIE

13  AND TAXOTEARS OR A THIRD-PARTY ADVOCACY GROUP.......  46

14  MS. SASTRE..........................................  46

15  MS. REYNOLDS........................................  51

16  CONDUCT TO PRECLUDE EVIDENCE AND ARGUMENT REGARDING

17  COMPANY CONDUCT THAT POST-DATES PLAINTIFF'S

18  CHEMOTHERAPY THERAPY................................  56

19  MR. STRONGMAN.......................................  56

20  MR. BACHUS..........................................  57

21  MR. STRONGMAN.......................................  59

22  MOTION TO PRECLUDE EVIDENCE OR ARGUMENT THAT

23  PLAINTIFF'S ACTINIC KERATOSIS WAS CAUSED BY TAXOTERE

24  OR PCIA, OR CLAIMING DAMAGES THEREFOR...............  61

25  MR. BAEHR...........................................  61

*OFFICIAL TRANSCRIPT*

1    MR. LAMBERT......................................... 62

2    MR. BAEHR........................................... 64

3    MR. LAMBERT......................................... 66

4    MR. BAEHR........................................... 68

5    MR. LAMBERT......................................... 68

6    PRECLUDE EVIDENCE OR ARGUMENTS CONCERNING CANADIAN

7    INFORMED CONSENT.................................... 68

8    MR. STRONGMAN....................................... 69

9    MR. BACHUS.......................................... 70

10   MR. STRONGMAN....................................... 71

11   MOTION TO PRECLUDE PUNITIVE DAMAGES EVIDENCE........ 72

12   MR. RATLIFF......................................... 72

13   MR. SCHANKER........................................ 73

14   MR. RATLIFF......................................... 75

15   MR. SCHANKER........................................ 77

16   DEAR HEALTHCARE PROVIDER LETTERS.................... 79

17   MS. SASTRE.......................................... 79

18   MR. MURA............................................ 81

19   MS. SASTRE.......................................... 84

20   MOTION TO BAR PREJUDICIAL LITIGATION CONDUCT........ 85

21   MR. SCHANKER........................................ 86

22   MR. MOORE........................................... 86

23   EXCLUDE TESTIMONY OR ARGUMENT THAT TAXOTERE HAS BEEN

24   PROVEN SUPERIOR TO TAXOL -- OR ANY OTHER DRUG OTHER

25   THAN 5-FU -- OR THAT TAXOTERE GAVE PLAINTIFF THE .... 87

*OFFICIAL TRANSCRIPT*

1  "BEST CHANCE" OF SURVIVING CANCER, OR THAT TAXOTERE

2  GAVE HER THE "BEST CHANCE" FOR PREVENTING HER CANCER

3  FROM RETURNING......................................

4  MR. MICELI........................................  88

5  MR. STRONGMAN.....................................  91

6  MOTION TO EXCLUDE EVIDENCE OF UNRELATED MEDICAL

7  CONDITIONS, UNRELATED FAMILIAL MEDICAL HISTORY, AND

8  UNRELATED MEDICAL USAGE...........................  93

9  MR. RATLIFF.......................................  94

10  MR. SCHANKER.....................................  96

11  MR. RATLIFF......................................  99

12  PROHIBIT THE USE OF UNRELIABLE EVIDENCE TO SUPPORT

13  CLAIMS OF ALTERNATIVE CAUSATION AND/OR QUESTIONING

14  WHICH MISCONSTRUES THE APPLICABLE BURDEN.......... 100

15  MR. SCHANKER..................................... 100

16  MR. MOORE....................................... 101

17  MOTION TO EXCLUDE IMPROPER ARGUMENTS OR SUGGESTIONS

18  REGARDING FDA APPROVAL........................... 102

19  MR. MURA........................................ 102

20  MR. RATLIFF..................................... 103

21  MR. MURA........................................ 107

22  MOTION TO EXCLUDE LOW QUALITY PHOTOGRAPHS........ 107

23  MS. REYNOLDS.................................... 107

24  MS. REYNOLDS.................................... 109

25  NEXT MOTION WAS 17.............................. 109

*OFFICIAL TRANSCRIPT*

1   MS. SASTRE......................................... 110

2   MOTION TO PRECLUDE ANY COMMENT OR ARGUMENT

3   CONCERNING THE COMPARATIVE FAULT OF HER TREATING

4   PHYSICIANS AND MISUSE OF TAXOTERE.................... 110

5   MR. COFFIN......................................... 110

6   MR. MOORE.......................................... 113

7   MR. COFFIN......................................... 114

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

1            **P-R-O-C-E-E-D-I-N-G-S**

2            M O R N I N G   S E S S I O N

09:20:55  3            THURSDAY, AUGUST 26, 2021

09:21:11  4            (VIA ZOOM VIDEO TELECONFERENCE)

09:21:11  5

09:21:11  6

09:30:24  7            THE COURT:  Good morning, Jon.  Good morning, Palmer.

8            MR. PALMER:  Good morning.

9            THE COURT:  Good morning, Darrin.  Good morning, Chris.

10            MR. COFFIN:  Good morning.

11            THE COURT:  Good morning, Jessica.  Good morning,

12    Harley.

09:30:35 13            All right.  Before we even get started, my life

09:30:42 14    is much better because now I have my new MDL law clerk that's

09:30:46 15    with me, and I thought I would give you an opportunity to see

09:30:50 16    Brittany.  Her name is Brittany Flanders.  She started a couple

09:30:55 17    of weeks ago.  Actually, she was supposed to start the day

09:30:56 18    before the trial, so I told her when we were planning this,

09:31:00 19    "Good luck.  Come into the fire."  As it turned out, getting

09:31:06 20    off put off, I think, has been helpful.

09:31:08 21            I'm going to let Brittany just say good morning

09:31:12 22    so you know her when you see her.

09:31:14 23            THE LAW CLERK:  Hi, everyone.  Good morning.

09:31:17 24            THE COURT:  All right.  With that, Erin, are we ready

09:31:20 25    to proceed?

                        ***OFFICIAL  TRANSCRIPT***

09:31:21  1          THE DEPUTY CLERK:  Yes, ma'am.  Good morning.  This is

09:31:24  2   Taxotere, MDL 2740.

09:31:24  3          THE COURT:  Erin?

09:31:32  4          THE DEPUTY CLERK:  Can you all hear me?

09:31:34  5          THE COURT:  I can't hear you.  Now I can.

09:31:36  6          THE DEPUTY CLERK:  Can you all hear me?  Okay.

09:31:42  7          THE COURT:  I can.

09:31:44  8          THE DEPUTY CLERK:  Okay.  Counsel, I'm just going to

09:31:45  9   ask that you all just state your name just right before the

09:31:48 10   motion you intend to argue rather than having everybody

09:31:53 11   introduce themselves now.

09:31:57 12          THE COURT:  All right.  The first argument is Sanofi's

09:32:01 13   Motion in *Limine* number 5, Motion to Preclude Evidence or

09:32:04 14   Argument Concerning Adverse Event Reports or Other Complaints

09:32:12 15   Involving Patients Other Than Plaintiff.

09:32:13 16          Mr. Strongman.

09:32:13 17          MR. STRONGMAN:  That is me.  Good morning, Your Honor.

09:32:16 18   Jon Strongman on behalf of Sanofi.

09:32:18 19          Your Honor, with regard to our Motion in *Limine*

09:32:21 20   number 5, what we've requested is simply that the Court

09:32:25 21   approach the issue of adverse events in a similar fashion as

09:32:30 22   they did in the *Earnest* trial, which was the individual adverse

09:32:35 23   events themselves were not admissible.

09:32:36 24          We certainly understand that there are moments in

09:32:38 25   times when the individual facts of an adverse event may be

**OFFICIAL TRANSCRIPT**

09:32:42  1   needed for context to cross-examine a witness, to challenge a

09:32:46  2   methodology, and we certainly understand that, but simply move

09:32:51  3   to exclude these individual adverse events on their

09:32:57  4   admissibility themselves is similar to what happened in

09:33:03  5   *Earnest*.

09:33:03  6            Thank you.

09:33:07  7        THE COURT:  Mr. Bachus.

09:33:07  8        MR. BACHUS:  Good morning, Your Honor.  Kyle Bachus on

09:33:09  9   behalf of plaintiffs.

09:33:11 10            A couple of things.  First, it's our position, we

09:33:13 11   believe the loss of (audio distortion) that AERs are admissible

09:33:18 12   to establish a notice.  They constitute nonhearsay on the issue

09:33:23 13   of drugmakers on notice for safety issues.  I believe that's

09:33:27 14   well recognized in the law.

09:33:30 15            They are also admissible in some instances when

09:33:34 16   they contain statements that are attributed to the defendants

09:33:37 17   or its employees or agents and could be admissible as a party

09:33:42 18   admission contained within a business record under 801(d),

09:33:47 19   803(6), 803(8).

09:33:49 20            There is a case on point with respect to AERs and

09:33:51 21   statements made by manufacturers in those --

09:33:54 22        THE COURT:  How is this different, Mr. Bachus, on what

09:33:57 23   we did in the *Earnest* trial because I indicated that every, I

09:34:04 24   think, every expert said, listen, this is where we find notice,

09:34:08 25   but we didn't go through the individual ever to get reports and

*OFFICIAL TRANSCRIPT*

09:34:13 1  say this is Ms. Milazzo from down the bayou reported this on

09:34:19 2  this day.  It was more that we had this collection of adverse

09:34:23 3  events reports.  What's different?

09:34:24 4      MR. BACHUS:  Well, so, I think that, first of all, I

09:34:26 5  agree with you that most of the time it's talked about in the

09:34:30 6  aggregate.  I can give you a specific example that maybe there

09:34:33 7  is not an objection to.  I'm unclear on it, frankly.

09:34:37 8          For instance, there is Dr. Naples, who is a

09:34:39 9  clinical trials chair.  In 2000, he submitted AERs to the

09:34:44 10 safety department at Sanofi acting as an agent on their behalf,

09:34:49 11 and there is some testimony in one of the depositions which

09:34:53 12 just briefly goes through what was reported, his determination

09:34:56 13 that this was a serious side effect, and so, it's very limited.

09:35:03 14         There is not -- what we're talking about is very

09:35:06 15 limited, but that's a good example of there is a conversation

09:35:08 16 about individual -- three or four individual reports in 2000

09:35:12 17 that Naples made to the company that's in the deposition

09:35:12 18 testimony.

09:35:17 19         We believe that that is appropriate because it

09:35:19 20 shows that the company received notice, and the people being

09:35:22 21 asked about it are actually safety officers at the company, and

09:35:27 22 being asked in the deposition, can you confirm that the company

09:35:29 23 did, in fact, receive this notice from Dr. Naples about PCIA in

09:35:35 24 2000 being experienced in clinical trials --

09:35:38 25         THE COURT:  I don't think that would affect the motion

*OFFICIAL TRANSCRIPT*

09:35:39  1    before me.  What I did last time was defer it until we had an

09:35:43  2    opportunity to see, but it's quite a different thing.  What I

09:35:48  3    didn't allow was the individual reports to come in.

09:35:48  4         MR. BACHUS:  Right.

09:35:52  5         THE COURT:  They spoke about them in the aggregate,

09:35:53  6    they spoke about them in terms of -- with this getting a signal

09:35:57  7    at this point because we have enough of these that concerned

09:36:00  8    us, but we didn't go individually and introduce those private

09:36:04  9    medical records into the record.

09:36:06 10         MR. BACHUS:  Yes, ma'am.  Yes, ma'am.  I believe this

09:36:08 11    Naples testimony that I'm referring to was permitted in the

09:36:13 12    *Earnest* case.  So, I just want to point out an example.  If

09:36:16 13    their motion is about individuals, there are a few individual

09:36:19 14    reports that are discussed in deposition testimony, as I just

09:36:21 15    described.

09:36:22 16         If I could, I would like to address one other

09:36:24 17    issue that's raised in their motion that seems to be a motion

09:36:27 18    asking for the Court to permit them to use the AERs in the

09:36:33 19    compression reanalysis.  I just want to put on the record what

09:36:36 20    I think is an important matter for the Court's consideration

09:36:39 21    very briefly.

09:36:40 22         And that is, what they are attempting to do is

09:36:42 23    use, in the compression reanalysis, is use, admittedly,

09:36:46 24    incomplete AER data to refute their own locked clinical trial

09:36:52 25    results in TAC316.  They are putting that through, not an

**OFFICIAL TRANSCRIPT**

09:36:56 1    expert testimony, but through lay witness opinion testimony

09:36:59 2    where Dr. Kopreski looked at partial AER data, characterized it

09:37:05 3    as *reliable data,* and then it's actually offered to prove the

09:37:09 4    truth of the matter asserted in that data to support

09:37:11 5    Dr. Kopreski's reanalysis.

09:37:13 6              We believe that if the Court looked at that

09:37:16 7    closely, whether you reserve ruling on it or not, if you look

09:37:19 8    at that closely, we believe that's an impermissible use of AERs

09:37:23 9    under the case law as cited by the defense in their own motion.

09:37:28 10          THE COURT:  Mr. Strongman.

09:37:29 11          MR. STRONGMAN:  I think we have been down the

09:37:31 12   Dr. Kopreski road many a time, and as this court has already

09:37:35 13   held, there are certainly circumstances when, whether it be

09:37:41 14   with Dr. Kopreski or whether it be with Dr. Madigan or Dr. Ross

09:37:45 15   or even Dr. Plunkett, where, if they offer an opinion that says

09:37:54 16   there is a signal or that there is a result from a

09:37:58 17   clinical trial based on these reports, you have to be able to

09:38:02 18   cross-examine them on what is actually in a few of those

09:38:05 19   reports to show that what they are saying is inaccurate.  So,

09:38:10 20   that's the context that, I think, is important at times with

09:38:14 21   the adverse event reports.

09:38:16 22             So, those don't have to actually be introduced

09:38:18 23   into evidence either, so it's a matter that the testimony on

09:38:22 24   what the substance is versus actually introducing the

09:38:26 25   individual reports into evidence, and we believe that this was

*OFFICIAL TRANSCRIPT*

09:38:29 1    all addressed and dealt with appropriately in the *Earnest*

09:38:33 2    trial.

09:38:34 3         THE COURT:  Okay.  I'm going to defer ruling on that.

09:38:36 4    You're going to get a copy of my ruling, but I'm going to allow

09:38:39 5    the experts to refer to adverse event reports, as I did in the

09:38:43 6    *Earnest* trial, but basic signalling that predates Ms. Kahn's

09:38:48 7    treatment, such as individual adverse event reports, are not

09:38:51 8    admissible to prove causation; however, adverse event reports

09:38:55 9    as a whole can be a factor considered on the issue of causation

09:38:59 10   as corroborative evidence only.

09:39:02 11        All right.  The second Motion in *Limine* is To

09:39:06 12   Preclude Evidence or Arguments Concerning Sanofi's Promotional

09:39:11 13   or Marketing Materials Not Possessed or Relied on by Ms. Kahn

09:39:15 14   or Her Prescribing Physician.  Mr. Coffin and Mr. Moore.

09:39:23 15        MR. MOORE:  Good morning, Judge.

09:39:23 16        From your question to Mr. Bachus, I gather that

09:39:30 17   you would appreciate it if we could probably focus on what's

09:39:32 18   different this time from the motions that were ruled on before,

09:39:36 19   so I will try to do that as it relates to this particular

09:39:40 20   motion.

09:39:42 21        We think that the way that this evidence was used

09:39:46 22   and displayed in the *Earnest* trial, together with testimony

09:39:49 23   from Dr. Kardinal, as it relates to his lack of reliance or

09:39:56 24   review of marketing material for making his decision once a

09:40:03 25   different ruling in this circumstance, specifically

**OFFICIAL TRANSCRIPT**

09:40:04 1  Dr. Kardinal testified that he had not seen the particular

09:40:07 2  marketing piece that's Exhibit 14 to the plaintiff's

09:40:10 3  opposition, he did not rely upon it, he doesn't provide it to

09:40:14 4  his patients, and our concern was the way it was presented in

09:40:20 5  the *Earnest* trial proves -- we don't think she even testified

09:40:24 6  in this case, that's a separate motion, whether this thing was

09:40:28 7  out there -- given out there routinely, and this was the

09:40:32 8  information that was given to the doctors.

09:40:34 9         In the particular piece -- if I can share my

09:40:37 10 screen quickly -- this is the exhibit that I'm displaying on

09:40:43 11 the screen.  It's a nurse tear sheet and it talks of the

09:40:48 12 section that they rely upon is where it says, "Alopecia being a

09:40:51 13 common, yet temporary side effect of some cancer medicine."

09:40:56 14 It's not referring to Taxotere.  The citations are not to the

09:40:59 15 Taxotere label.  It's to the national -- I think it's to the

09:41:02 16 American Cancer Society.

09:41:04 17        It does say on the other side, "Will my hair grow

09:41:08 18 back?"  It says that it will usually grow back, which we think

09:41:13 19 is consistent with what our label did say at the time about

09:41:16 20 hair generally growing back, but our concern is that this

09:41:18 21 becomes something that the jury is assessing the sufficiency of

09:41:22 22 our warnings clause, and the warning says what it says.

09:41:27 23        Dr. Kardinal said he looked at it when he started

09:41:30 24 prescribing the medicine.

09:41:31 25        THE COURT:  I got it.

                         ***OFFICIAL TRANSCRIPT***

09:41:34   1          MR. MOORE:  Thank you, Judge.

09:41:36   2          THE COURT:  Mr. Coffin.

09:41:36   3          MR. COFFIN:  Good morning, Your Honor.

09:41:39   4              The outcome that Your Honor reached in the

09:41:42   5   *Earnest* case on the same MIL, same issue here, and that is, the

09:41:46   6   focus is on Sanofi's state of mind and knowledge.  What Sanofi

09:41:50   7   wants you to focus on is whether or not Dr. Kardinal actually

09:41:53   8   read this document or not, which is not the issue that we

09:41:57   9   should be focusing on, as the courts that have supported your

09:42:01  10   opinion say.  We cited those in footnote 17, but I would like

09:42:04  11   to run through three different examples that actually support

09:42:07  12   what Your Honor found in the *Earnest* case.

09:42:11  13              First of all, Sanofi has consistently argued

09:42:14  14   throughout this litigation and in the Kahn case that the term

09:42:18  15   *alopecia* in the label means both temporary and permanent.

09:42:18  16          THE COURT:  Right.  Right.

09:42:23  17          MR. COFFIN:  The plaintiffs, we need to be able to

09:42:24  18   bring forth evidence like the nurse tear sheet that showed

09:42:29  19   that, in fact, they were representing to their sales reps --

09:42:33  20          THE COURT:  How is this beyond impeachment?

09:42:37  21          MR. COFFIN:  Correct.  I'm sorry.

09:42:38  22          THE COURT:  The question is:  How would you need this

09:42:40  23   beyond a situation where Sanofi opens the door for impeachment?

09:42:45  24          MR. COFFIN:  I can go to that to the second point,

09:42:48  25   which is, it's not in our briefing, so I think it's very

*OFFICIAL TRANSCRIPT*

09:42:52  1   important, and that is, the issue of statute of limitations.

09:42:56  2   As you're well aware, statute of limitations is brought up over

09:42:59  3   and over, and under the concept of contra non valentem, the

09:43:04  4   jury is going to have to consider the defendant's conduct.

09:43:06  5          The defendant's conduct is important, so what do

09:43:08  6   we know about the defendant's conduct?  We know that

09:43:12  7   Amy Freedman, the global safety officer, is going to testify

09:43:15  8   that in 2006, in 2006, Sanofi knew that Taxotere can cause

09:43:23  9   permanent hair loss.  We also know that this nurse tear sheet

09:43:27 10   was being used over and over to educate their sales reps in

09:43:34 11   2006 and 2007, and it says that it's a common, yet temporary

09:43:41 12   side effect, okay?

09:43:42 13          THE COURT:  But aren't we going back to you using

09:43:44 14   these -- I think we're back in that circular argument that we

09:43:49 15   identified early on with regard to statute of limitations, that

09:43:54 16   you're using it kind of as a substantive argument, if they

09:43:54 17   didn't warn properly when she began treatment.

09:44:10 18          Let me see if get my brain around it because I

09:44:12 19   didn't think this was a statute of limitations at all.  I don't

09:44:15 20   see it but the time -- (speaking simultaneously).  What you're

09:44:17 21   saying at the time that she began treatment she was

09:44:20 22   inadequately warned.

09:44:23 23          MR. COFFIN:  Correct.  They say -- right.

09:44:26 24          THE COURT:  If she was warned, there would be no case.

09:44:29 25   If she was inadequately warned, that's the gravamen of this

*OFFICIAL TRANSCRIPT*

09:44:33  1   complaint, that there was no warning.  So, if I take your

09:44:38  2   argument to its logical conclusion, it means that the statute

09:44:41  3   of limitations never runs on an inadequate warning.

09:44:47  4       MR. COFFIN:  Oh, it does.  It does run (speaking

09:44:49  5   simultaneously) -- but that doesn't matter, Your Honor, under

09:44:55  6   this analysis.  If we just look under contra non valentem, the

09:45:00  7   point here is is this document relevant?  Is it relevant?  And

09:45:02  8   I'm giving you another example as to why it's relevant.

09:45:05  9        It's relevant because Sanofi is going to argue

09:45:07 10   that the statute has run, and we need to be able to say, well,

09:45:12 11   wait, wait, let's look at the defendant's behavior.  Were they

09:45:14 12   concealing?  Were they concealing this fact?  Were they

09:45:19 13   concealing this fact that the hair loss can be permanent?

09:45:22 14        The answer is yes, they were, and how do we show

09:45:25 15   that to the jury?  We show it because Amy Freedman said they

09:45:30 16   knew about it; yet, in the nurse tear sheet, they say that it's

09:45:35 17   only temporary.

09:45:35 18       THE COURT:  Well, that's your inadequate warning.

09:45:37 19        Okay.  Go to your third one because that one you

09:45:40 20   didn't sell me on.

09:45:40 21       MR. COFFIN:  The third one is not in our briefings as

09:45:43 22   well, Your Honor, but in this particular case, in Ms. Kahn's

09:45:46 23   case, Dr. Kardinal was called on, was called on by Ruth Avila,

09:45:52 24   and we already know that Ruth Avila's testimony is that she

09:45:56 25   passed these out like candy.

***OFFICIAL TRANSCRIPT***

09:45:57 1          Whether she actually handed a nurse tear sheet to

09:46:01 2     Dr. Kardinal or his nurses, that's not what makes this

09:46:05 3     relevant.  What makes it relevant is she educated -- she's the

09:46:09 4     one who is giving the education about the drugs from the

09:46:13 5     company and then passing that on.

09:46:16 6          So, even if you don't follow your previous

09:46:18 7     ruling, even if you, for some reason, think that this nurse

09:46:21 8     tear sheet doesn't go to state of mind or doesn't go to their

09:46:24 9     knowledge, as you did in *Earnest*, it's certainly relevant here

09:46:27 10    because we know that this -- this sales rep called on

09:46:32 11    Dr. Kardinal in 2006 and in 2007 prior to the prescription that

09:46:39 12    was given for Ms. Kahn.  So, those are the reasons why you

09:46:42 13    should deny this motion.

09:46:46 14         Thank you.

09:46:46 15         THE COURT:  Thank you.

09:46:49 16         MR. MOORE:  Thirty seconds, just briefly.  I'm sorry.

09:46:52 17         The statute of limitations issue, I think we're

09:46:55 18    going to hear about that in many motions today, and just

09:46:58 19    quickly, the defendant's conduct is not the issue of fact that

09:47:04 20    Your Honor deemed existed for the Kahn case, and the fraudulent

09:47:09 21    concealment argument has been adjudicated by Your Honor and by

09:47:14 22    the Fifth Circuit.

09:47:16 23         So, to the extent that they think this would be

09:47:18 24    relevant to some sort of concealment, that issue, we think, is

09:47:22 25    not the issue that Your Honor indicated would be the question

*OFFICIAL TRANSCRIPT*

09:47:26  1    of fact for the jury on the issue of statute of limitations,

09:47:30  2    and I think we're going to hear that many times today looking

09:47:33  3    at some of these documents.

09:47:37  4         THE COURT:  You're going to hear me say this several

09:47:43  5    times today, so perhaps I should define what *conditionally*

09:47:48  6    *granted* means.  It means that on the face of it as the evidence

09:47:54  7    was brought in case in chief, I'm going to conditionally grant

09:47:57  8    it but I am going to allow.  That means that I would allow it

09:48:01  9    for impeachment purposes or if somebody opens the door.

09:48:05 10         What I am concerned about with this is Sanofi

09:48:10 11    taking the position that, listen, this is what was put in

09:48:12 12    our -- we never meant temporary alopecia.  We never meant that

09:48:17 13    in the warnings or the adverse events warned of.  If that's the

09:48:22 14    position, then I think it comes in because this is a Sanofi

09:48:25 15    product.

09:48:25 16         I know you're saying we didn't prepare it, we

09:48:28 17    just put our label on it and gave it out.  Then it's yours.  If

09:48:33 18    you defined it in there as *temporary alopecia*, I think it goes

09:48:37 19    directly as to what you intended in your warning label, in your

09:48:41 20    actual label.  So, for those purposes, I would allow it.

09:48:46 21         So, conditionally grant it.  When you hear me say

09:48:48 22    this over and over and over again is I grant it as it is, but

09:48:53 23    that could change because if you open the door, then it comes

09:48:58 24    in, and it can be used sometimes for impeachment purposes,

09:49:04 25    okay?

*OFFICIAL TRANSCRIPT*

09:49:04  1          Let's go to Preclude Evidence or Argument

09:49:08  2     Concerning Nonexpert Causation Testimony, and this is

09:49:14  3     Mr. Lambert and Ms. Sastre.

09:49:14  4               Mr. Lambert.

09:49:14  5          MS. SASTRE:  Your Honor, the defendants --

09:49:20  6          THE COURT:  Oh, I'm sorry, Ms. Sastre.

09:49:24  7          MS. SASTRE:  That's okay.  Good morning, Your Honor.

09:49:24  8     It's nice to see you again.

09:49:26  9          So, Your Honor, this was a motion which was filed

09:49:29 10     in *Earnest*, but the Court decided to defer ruling, and you

09:49:34 11     deferred it based upon what you described as *vagueness,*

09:49:37 12     Your Honor.  So, I want to make clear at the onset, we now, as

09:49:41 13     a result of having gone through the *Earnest* trial together, we

09:49:43 14     have a clear picture of what, in fact, plaintiffs intend to

09:49:47 15     offer from a Sanofi employee and, also, now fact witnesses, and

09:49:52 16     so that's why we're re-raising the issue with the Court.

09:49:54 17          So, as Your Honor is aware, there is a

09:49:59 18     foundational requirement which must be laid for any witness to

09:50:02 19     offer a scientific opinion or a medical opinion.  This is made

09:50:06 20     clear under Rule 701, and it states specifically, Your Honor,

09:50:09 21     that a fact witness cannot offer scientific opinion or opinions

09:50:13 22     based upon specialized knowledge that falls within the scope of

09:50:17 23     Rule 702.

09:50:18 24          Now, I'll start with a place where I think, and

09:50:24 25     we'll see when we hear from Mr. Lambert if I'm right, I believe

09:50:26  1     we have some agreement on the first issue, Your Honor, and that
09:50:28  2     relates specifically to lay witnesses or fact witnesses that
09:50:32  3     I'll put in the category of sort of like *family and friends*,
09:50:35  4     all right, as to be contrasted or distinct from *Sanofi*
09:50:40  5     *employees*.
09:50:40  6              So, it's clear, Your Honor, that that sort of
09:50:44  7     testimony regarding medical causation or general causation,
09:50:49  8     what Taxotere can do must also be excluded because these are
09:50:53  9     witnesses that are simply not qualified to offer such opinions,
09:50:58 10     and I'll give you very briefly just an example to give
09:51:02 11     Your Honor some flavor for it.
09:51:03 12              So, Ms. Kahn's sister, she testified that she
09:51:08 13     understands her sister, the plaintiff, was given a drug, and
09:51:12 14     that apparently made her hair not come back.  Ms. Kahn's
09:51:17 15     friend, Leslie McDermott, she testified in her deposition --
09:51:19 16          THE COURT:  Ms. Sastre, I don't think we need to go
09:51:22 17     through all that.
09:51:22 18          MS. SASTRE:  Okay.
09:51:23 19          THE COURT:  I think family and friends can say she lost
09:51:25 20     her hair and she was very sad.  This is my personal observation
09:51:30 21     of what her hair looked like before and after and that's it.  I
09:51:35 22     don't expect us to hear Ms. Kahn's neighbor say, I think
09:51:40 23     Taxotere did that.  If they did, I would not allow.
09:51:49 24              Mr. Lambert.
09:51:49 25          MS. SASTRE:  Okay.  Very good.  So, that was the

*OFFICIAL TRANSCRIPT*

09:51:51 1    testimony I was citing, Your Honor, so thank you for that.

09:51:53 2              So, here is the second category, Your Honor.

09:51:54 3    This relates to Sanofi employees.  The analysis is a little bit

09:51:57 4    different, but I think the result is the same, Judge.  That's

09:52:00 5    because, when it comes to a witness like this, an employee, if

09:52:04 6    you will, the law says that to the extent a causation opinion

09:52:06 7    is allowed, it must, and this is the key part, must be derived

09:52:11 8    from duties that they held at the company.

09:52:14 9              Here, we know from the testimony that plaintiffs

09:52:18 10   claim in *Earnest* that the witnesses that they sought this

09:52:22 11   testimony from, the very opposite is true.  I'll briefly tell

09:52:27 12   who they are and what their testimony was.

09:52:28 13             One is a lady named Lesley Fierro, and plaintiffs

09:52:33 14   played testimony that she talked about Taxotere and whether it

09:52:37 15   can cause permanent hair loss.  What she said, Your Honor,

09:52:41 16   though, was that it was not part of her job to make that

09:52:45 17   determination.  She clearly testified repeatedly that she never

09:52:48 18   assessed whether a causal association existed between Taxotere

09:52:52 19   and permanent alopecia, and as a result, there is nothing in

09:52:55 20   her testimony that lays the requisite foundation.

09:52:58 21             Now, oddly, plaintiff's counsel seems to argue

09:53:02 22   that this sort of testimony is admissible because it is

09:53:05 23   relevant.  That simply is not the issue, and I think, with all

09:53:08 24   due respect, that it misses the point.

09:53:10 25             They also played transcripts or clips, if you

*OFFICIAL TRANSCRIPT*

09:53:15 1   will, Your Honor, from another Sanofi employee named

09:53:18 2   Gene Aussell, and Gene Aussell was asked to, again, interpret

09:53:22 3   the label with regard to the hair loss warning.  He repeatedly

09:53:27 4   testified about ten times, without exaggerating, that he could

09:53:30 5   not speak to the decisions made by Sanofi labeling.  He said he

09:53:33 6   had no involvement with it, wasn't a specialist, had never been

09:53:37 7   involved with labeling, and had never been responsible for

09:53:39 8   making a causal determination; so, again, no foundation laid to

09:53:43 9   him that those opinions were derived from his job duties.

09:53:48 10          Finally, Your Honor, also a last witness,

09:53:51 11  Frances Polizzano.  This list is not meant to be extensive,

09:53:55 12  Judge, but it is what we saw in *Earnest*.  Counsel played clips

09:53:59 13  of similar causation testimony.

09:54:01 14          Ms. Polizzano testified repeatedly that she was

09:54:04 15  never engaged in making causal determinations or assessing side

09:54:10 16  effects.  So, simply put, Judge, a foundation has not been laid

09:54:12 17  here, candidly, based upon the testimony provided.  It could

09:54:12 18  not be.

09:54:15 19          My last point, Your Honor, is that this really is

09:54:18 20  a goose/gander thing because, to contrast -- in contrast to the

09:54:21 21  arguments that counsel is making here, we, Your Honor, Sanofi

09:54:26 22  was not allowed to present causation relation -- excuse me,

09:54:29 23  testimony from Dr. Kopreski.  Counsel objected and they said it

09:54:36 24  constituted improper expert opinion testimony.  As Your Honor

09:54:39 25  is familiar, he's an oncologist, and he certainly is someone

09:54:43   1    that would possess the requisite specialization training,

09:54:46   2    knowledge to offer those opinions; so, it's very unclear how it

09:54:51   3    possibly could be allowed under these circumstances when

09:54:54   4    employees have said, That was never something that I did, and

09:54:57   5    counsel cannot have it both ways.

09:54:59   6                Thank you, Your Honor.

09:55:01   7            THE COURT:  Thank you.

09:55:02   8                Mr. Lambert.

09:55:02   9            MR. LAMBERT:  Good morning, Judge.  There is a little

09:55:07  10    bit of a thunderstorm here, so I'm sorry for the background

09:55:11  11    noise.

09:55:11  12                Your Honor, I'm going to start with the Sanofi

09:55:14  13    witnesses first.  First of all, these witnesses give the state

09:55:21  14    of their knowledge, Sanofi's knowledge, within their particular

09:55:27  15    department or area.  The information tends to show what level

09:55:30  16    of internal sharing of information is going on about Taxotere's

09:55:37  17    propensity to cause permanent hair loss, and each of them is

09:55:42  18    asked to answer questions knowing their respective capacities

09:55:46  19    at Sanofi.

09:55:48  20                Sanofi counter designates much testimony that

09:55:55  21    they want to have the jury hear about what their

09:55:59  22    responsibilities were and whatnot, but with regard to

09:56:04  23    Ms. Fierro, she is a pharmacist, vice-president of medical

09:56:09  24    information services, responsible for handling communications

09:56:14  25    with healthcare providers and with consumers.  Mr. Aussell

*OFFICIAL TRANSCRIPT*

09:56:19  1    oversees clinical trials.  He oversaw the five clinical trials

09:56:23  2    that form the basis for the drug's approval and for the

09:56:28  3    labeling of the drug.  And Polizzano is a high-level

09:56:36  4    pharmacist, associate director of labeling, labeling manager

09:56:41  5    and, prior to that, was a senior manager of oncology products

09:56:48  6    in U. S. regulatory affairs.

09:56:49  7         Your Honor, it's interesting that Sanofi takes

09:56:52  8    this position that these folks can't testify about their

09:56:55  9    understanding of the label and what Taxotere internally is

09:57:03  10   associated with in terms of risk when these are very relevant

09:57:09  11   and related to their responsibilities at Sanofi.

09:57:12  12        The Kopreski situation is really hypocritical

09:57:20  13   because Dr. Kopreski didn't do the things that he is being

09:57:27  14   allowed to testify as a lay witness expert about while he was

09:57:31  15   there at Sanofi.  For that reason -- and for those reasons, the

09:57:37  16   statements against Sanofi's interests are relevant.  They

09:57:41  17   should be allowed, as they were before, and at the very least,

09:57:46  18   Your Honor should deny ruling on this or defer it until

09:57:50  19   Your Honor has a chance to look through the designations that

09:57:53  20   have been submitted and hear from the parties at the

09:57:56  21   September 30th designations conference.

09:57:59  22        Regarding the lay witnesses, you know, clearly

09:58:02  23   these family members of Ms. Kahn are not experts.  They are

09:58:09  24   testifying as to what their understanding was based on their

09:58:12  25   personal observations.  I think in some instances, they are

*OFFICIAL TRANSCRIPT*

09:58:18 1   appropriate, and perhaps it's for statute of limitation reasons

09:58:24 2   because, you know, limited prescription goes to the

09:58:28 3   reasonableness of a plaintiff's action or inactions, and when

09:58:33 4   these folks become aware of some relationship or cause between

09:58:40 5   Taxotere and permanent hair loss suffered by Ms. Kahn is

09:58:43 6   relevant to the defense that, apparently, is going to be

09:58:49 7   affirmatively brought at trial that Ms. Kahn was too late, and

09:58:52 8   she should have figured this out earlier.  So, for those

09:58:55 9   reasons we believe this motion should be denied.

09:59:04 10          MS. SASTRE:  Your Honor, I want to be cognizant of the

09:59:07 11   timeline and, you know, the Court's instructions today on three

09:59:10 12   minutes.  I know everyone has gone over, so if you want to give

09:59:14 13   me 30 seconds, I'll take it.  I won't cry so....

09:59:18 14          THE COURT:  I'll give you 20.

09:59:20 15          MS. SASTRE:  Okay.  I read a transcript the other day

09:59:23 16   where you said I asked for 10 and you gave me 11; so,

09:59:27 17   anyway....

09:59:27 18            Well, Your Honor, you know, we heard a little bit

09:59:29 19   of the same thing that I forecasted you are hearing about

09:59:34 20   relevancy.  That is simply not the issue here.

09:59:36 21          THE COURT:  But, Ms. Sastre, I understand you're

09:59:38 22   saying, wait a minute, everyone should have done an analysis to

09:59:42 23   testify as to causation, but if it's Sanofi employees, it's in

09:59:51 24   their scope of knowledge of what the company knew and it is a

09:59:57 25   statement of against interest, I'm going to allow it.

*OFFICIAL TRANSCRIPT*

10:00:00  1          Now, if you brought in the janitor and say, "Read
10:00:06  2   this label and tell me what you think," then that, of course,
10:00:09  3   is well outside of his area of knowledge, so you have to defer
10:00:17  4   and look to make sure that the information that's being
10:00:19  5   provided is, indeed, within their scope of knowledge whether or
10:00:22  6   not they, indeed, did the analysis themselves.  If they were
10:00:28  7   privy to communications that brought that and it's within their
10:00:32  8   scope of knowledge, how is that not a statement against
10:00:36  9   interest when they are currently employed by Sanofi?
10:00:38 10          MS. SASTRE:  Well, those are fair questions,
10:00:41 11   Your Honor, but that's not how the testimony came in, and, you
10:00:45 12   know, counsel, you know, Mr. Lambert just basically said it's
10:00:48 13   relevant to their responsibilities, but they testified to the
10:00:51 14   exact opposite, and I really --
10:00:55 15          THE COURT:  Okay.  I get the argument.  I'm going to
10:00:58 16   defer on these.
10:00:59 17          Now, as to her family members, that's going to be
10:01:03 18   very careful, Mr. Lambert, because you know the rules of
10:01:13 19   hearsay, and I expect everybody to follow the Rules of
10:01:18 20   Evidence.  That's going to be a new rule.  We're going to
10:01:21 21   follow the Rules of Evidence.
10:01:22 22          Now, what they can say is their personal
10:01:26 23   observations.  If it is a statement, a consistent statement in
10:01:32 24   response to what's the actual language, a showing of untruthful
10:01:40 25   testimony -- it's much more articulately laid out in the Rules

*OFFICIAL TRANSCRIPT*

10:01:46  1    of Evidence -- then that can come in, of recent fabrication, if

10:01:54  2    that's what we hear, but we're going to have to be very, very

10:02:00  3    careful as to how we proceed with family members and what their

10:02:05  4    state of knowledge is, but they can certainly speak to their

10:02:09  5    personal observations.

10:02:13  6              If Ms. Kahn says something and then the

10:02:17  7    defendants basically allege that's recent fabrication, then

10:02:25  8    they can speak to what they heard at the time, that's a

10:02:28  9    different matter, but, you see, this is all going to have to be

10:02:32 10    deferred and approached carefully.  It's not going to be the

10:02:36 11    Wild Wild West.  Is that a ruling?  Deferred.

10:02:43 12              MR. LAMBERT:  Thank you, Your Honor.

10:02:43 13              THE COURT:  Thank you.

10:02:43 14              Motion to Preclude Evidence or Argument Regarding

10:02:48 15    Sanofi Sales and to Exclude Sales Representative Testimony.  We

10:02:52 16    have Mr. DePaz and Mr. Baehr.

10:03:05 17              MR. DEPAZ:  Good morning, Your Honor.

10:03:05 18              THE COURT:  Good morning.

10:03:08 19              MR. DEPAZ:  Just to clarify, it says Jordan Baehr at

10:03:08 20    the bottom but I am Matt DePaz.  We ran into some Zoom issues

10:03:08 21    this morning.

10:03:08 22              Your Honor, in *Earnest*, Your Honor ruled that

10:03:11 23    Dr. Carinder's relationship with Sanofi's sales representatives

10:03:14 24    is relevant.  In underscoring that decision, there was evidence

10:03:17 25    that Ruth Avila and Dr. Carinder had a close relationship and

*OFFICIAL TRANSCRIPT*

10:03:23 1    that Dr. Carinder relied on representations from Sanofi sales

10:03:29 2    representatives, and it would impact his counseling

10:03:34 3    conversations and prescribing decisions.  Here that evidence

10:03:38 4    does not exist.

10:03:40 5            Dr. Kardinal testified that he never saw sales

10:03:44 6    representatives with respect to clinical trials, he testified

10:03:46 7    he did not recall any Sanofi sales representatives, and they

10:03:49 8    did not rely on any Sanofi sales representatives in his

10:03:52 9    treatment of Ms. Kahn.

10:03:54 10           I think importantly here, Your Honor, in

10:03:56 11   plaintiff's opposition, they don't even argue that Ruth Avila's

10:04:01 12   relationship with Dr. Kardinal was relevant.  Instead, they

10:04:05 13   argue that testimony from Ruth Avila in the *Earnest* case

10:04:11 14   regarding a December 10th study is relevant as it demonstrates

10:04:17 15   that Sanofi silenced its sales representatives' voices when it

10:04:21 16   came to the issue of permanent alopecia.

10:04:25 17           Your Honor, that is a misrepresentation, it's

10:04:27 18   misleading, unduly prejudicial, and a waste of time if admitted

10:04:31 19   because what Ms. Avila testified to in *Earnest* was that it was

10:04:36 20   not within her scope of responsibility as a

10:04:40 21   sales representative to pass medical literature on to

10:04:44 22   prescribing physicians.

10:04:46 23           Instead, she clarified it at 615 through 23 of

10:04:52 24   Day 3 of the *Earnest* trial that that was something that the

10:04:54 25   medical science liaisons would do and were permitted to do.

**_OFFICIAL  TRANSCRIPT_**

10:04:59  1    So, by taking her testimony out of context and acting as if and

10:05:06  2    arguing as if Sanofi silenced her voice, when it was never her

10:05:11  3    role to begin with, this evidence is only going to serve --

10:05:15  4         THE COURT:  Does it show any evidence of what Sanofi

10:05:17  5    knew and learned?

10:05:24  6         MR. DEPAZ:  Your Honor, I don't think it does because

10:05:24  7    Ms. Avila, during the *Earnest* trial, couldn't testify about the

10:05:26  8    Sedlacek abstracts.  She didn't show what the dosing was, and,

10:05:29  9    Your Honor, that's 602, 17 through 20.  All she remembered was

10:05:35 10    someone asking questions about it at a conference.

10:05:38 11         Your Honor, there is going to be other experts

10:05:41 12    that come in on the plaintiff's side.  They are going to talk

10:05:44 13    about Sedlacek, and they are going to talk about the facts of

10:05:46 14    Sedlacek.  It's not a disputed issue as to whether or not

10:05:49 15    Sanofi knew about the case reports.  So, for those reasons,

10:05:53 16    Your Honor, we ask that you grant it.

10:05:56 17         THE COURT:  Okay.  Mr. Bachus.

10:06:03 18         MR. BACHUS:  Good morning, Your Honor.  Some very

10:06:06 19    important information to be considered here.  Can you hear me

10:06:09 20    okay?

10:06:10 21         THE COURT:  Yes.

10:06:11 22         MR. BACHUS:  Okay.  First and foremost, the record,

10:06:16 23    sworn discovery responses from Sanofi confirm with one-hundred

10:06:21 24    percent certainty that Ms. Avila saw and called on

10:06:28 25    Dr. Kardinal, and let me tell you the dates, three of the dates

*OFFICIAL TRANSCRIPT*

10:06:31 1   that are important that are documented in this one response;

10:06:35 2   and, frankly, in their motion, they should have told you about

10:06:37 3   this:

10:06:38 4           September 11, 2006, she called on Dr. Kardinal

10:06:42 5   and specifically discussed Taxotere adjuvant breast cancer --

10:06:49 6   for breast cancer.  January 4, 2007, she called on him.

10:06:54 7   January 25, 2007, she called on him.  Now, the Sedlacek kind of

10:07:02 8   alerting of PCIA occurred in December 2006; so, she was calling

10:07:05 9   on him both before and after the Sedlacek symposium.

10:07:12 10          What is important -- let me also just say this:

10:07:15 11  As for Dr. Kardinal's current memory of these multiple meetings

10:07:22 12  at the time of his deposition, I would like to just remind the

10:07:25 13  Court of the --

10:07:25 14          THE COURT:  I remember.

10:07:26 15          MR. BACHUS:  So, Ms. Avila's testimony about those

10:07:31 16  conversations becomes more, not less important under the

10:07:35 17  circumstances.

10:07:35 18          Ms. Avila is very important because she testified

10:07:40 19  that prescribers can receive warnings from Sanofi about side

10:07:45 20  effects from sources outside of the product label, and one of

10:07:48 21  those sources is the sales representative, and she testified

10:07:52 22  going to what Sanofi knew and when it knew it.

10:07:55 23          She testified Sanofi never informed her that

10:07:59 24  Taxotere can cause PCIA, and as a result, she never informed

10:08:03 25  prescribers about it.  She testified that sales representatives

*OFFICIAL TRANSCRIPT*

10:08:06 1   were prohibited from talking about side effects outside of the

10:08:10 2   label, and I think you'll remember that.  She testified about

10:08:12 3   that, which is very interesting here because --

10:08:16 4           THE COURT:  Okay.  I get it.  I get it.  We really have

10:08:20 5   three minutes.

10:08:20 6               Mr. DePaz, anything briefly?  You have 22

10:08:24 7   seconds.

10:08:24 8           MR. DEPAZ:  Your Honor, I would just say that the focus

10:08:27 9   here is on the prescribing decision and what influenced the

10:08:31 10  prescribing physician, and Dr. Kardinal was unequivocal that he

10:08:35 11  did not take into account any representations made by sales

10:08:40 12  representatives.

10:08:43 13          THE COURT:  Okay.  Thank you.  I'm going to look more

10:08:46 14  at this and I'll get back to you.  Thank you.

10:08:50 15              Motion in *Limine* number 23, Motion to Preclude

10:08:53 16  Evidence or Argument Regarding FDA Event Reports Signal

10:08:57 17  Evaluation.  This is Mr. Strongman and Mr. Miceli.

10:09:03 18              Mr. Strongman.

10:09:04 19          MR. STRONGMAN:  Yes.  Thank you.  I will be brief.  I

10:09:08 20  have argued this in one context with you already regarding

10:09:12 21  Dr. Ross.

10:09:14 22          THE COURT:  Isn't this another bite at the Daubert?

10:09:17 23          MR. STRONGMAN:  Well, I think the distinction that

10:09:20 24  needs to be made here, I can foresee a situation where one

10:09:23 25  witness testified about a signal identification and another

**OFFICIAL TRANSCRIPT**

10:09:26  1   witness testified about a signal evaluation.  So, by letting

10:09:31  2   Dr. Ross come in and talk about an identification, I still

10:09:36  3   think it's important for the reliability and for the relevance

10:09:41  4   and the evidence to have somebody -- some witness come in and

10:09:44  5   talk about the signal evaluation.

10:09:47  6        So, in this particular instance, we have

10:09:50  7   Dr. Madigan, Dr. Plunkett, Dr. Ross, all of which talk about

10:09:55  8   signal identification.  Not one talks about evaluation.  In

10:09:59  9   fact, I think they would all three admit none of them

10:10:03 10   individually did any signal evaluation.

10:10:06 11        So, our position is simply that when you present

10:10:10 12   an identified signal without evaluating it, it renders it both

10:10:15 13   unduly prejudicial but irrelevant to the issue of notice.  So,

10:10:20 14   that is our argument.  They need to have some witness to do it,

10:10:23 15   and they don't have any witness that does.

10:10:25 16        Thank you.

10:10:26 17        THE COURT:  Thank you.

10:10:26 18        Mr. Miceli.

10:10:30 19        I can't hear you.  I can't hear you.  I can't

10:10:39 20   hear you at all.  Isn't that something?  Call us.

10:11:11 21        MR. LAMBERT:  Try *6 and unmute your phone.

10:11:11 22        MR. MICELI:  How about now?

10:11:14 23        THE COURT:  Thank you, Mr. Palmer.

10:11:15 24        MR. MICELI:  Thank you very much.

10:11:16 25        Okay.  Your Honor, thank you.  It's a pleasure to

*OFFICIAL TRANSCRIPT*

be here again.

I think you hit the nail right on the head at the start.  This is just another bite at the apple, and by my count, it's, like, the fifth bite at the apple.

You have already determined that Dr. Madigan is not required to conduct a signal evaluation.  There is an evaluation of not just a signal but general causation, and that comes through other witnesses like Dr. Feigal.

But what's important about the FAERs analysis is that you've looked at this as a 702 motion in *Earnest* and as an MIL in *Earnest* and repeated, I think, a repeated MIL in *Earnest* and then again as a 702 in Kahn and here we are again.  You determine that his methodology is sufficiently reliable and the methodology passes muster.

Your last decision was seven months ago, and there is nothing that's happened in the interim in the last seven months that should change that.  You've addressed it.  The proper way to address limitations of a FAERs analysis is through a proper cross-examination.  That's what was done.

The best indicator of what we are going to do is what we have done, and if you look at the *Earnest* trial, we did not do what Mr. Strongman is concerned about.  But to the extent that he was concerned about signal evaluation, the evaluation or, excuse me, the FAERs analysis goes to signal detection, and Your Honor has already noted that.

*OFFICIAL TRANSCRIPT*

10:12:45  1          It is not about causation assessment.  Causation

10:12:49  2     assessment is done through other experts, and so, there is

10:12:53  3     nothing different here.  There is nothing new to see, but to

10:12:56  4     the extent you look at signal evaluation, even the document

10:13:00  5     that the defendants rely upon, the signal evaluation and

10:13:05  6     documentation notes that it includes information outside of the

10:13:10  7     FAERs database.  It includes medical literature.  It includes

10:13:14  8     product utilization data from the company, pharmacovigilance

10:13:19  9     information from the company that's not found inside FAERs, and

10:13:23 10     an epidemiological assessment, again, not capable within FAERS.

10:13:29 11          All of those things are done in this case through

10:13:31 12     other experts, just like Mr. Strongman wants.  They are going

10:13:35 13     to have the opportunity to cross Dr. Madigan, Dr. Feigal, and

10:13:39 14     every other witness we call.

10:13:41 15          Thank you, Your Honor.

10:13:42 16          THE COURT:  Okay.

10:13:45 17          MR. STRONGMAN:  The only thing I would say, Your Honor,

10:13:47 18     is that I think there is a distinction to be made between an

10:13:52 19     individual witness' testimony being appropriate like you found

10:13:56 20     for Dr. Madigan and even for Dr. Ross.  The fact that with

10:14:00 21     regard to the FAERS detection, we have an indication where each

10:14:03 22     of the experts is essentially pointing a finger at another,

10:14:07 23     saying, oh, that's not my job; it's another experts' job, and

10:14:11 24     they are all pointing fingers at other experts who don't

10:14:14 25     actually look at and evaluate the signal.  So, that's the

*OFFICIAL TRANSCRIPT*

10:14:17   1   distinction between an individual ruling like you've made on

10:14:20   2   Madigan and what we're asking here.

10:14:21   3              Thank you.

10:14:22   4        THE COURT:  I'm going to deny the motion.  I really do

10:14:26   5   think, as I've said earlier, I think it's appropriate for

10:14:32   6   Dr. Madigan to perform signal identification.  I have no doubt

10:14:36   7   that he will be crossed aggressively about that, about his

10:14:42   8   signal evaluation, but my *Daubert* ruling stands.  Thank you.

10:14:48   9              Motion to Preclude Evidence or Argument

10:14:51  10   Concerning Foreign Labeling and Regulatory Reactions.  This is

10:14:56  11   Mr. Miceli and Mr. Ratliff.

10:15:00  12        MR. RATLIFF:  Good morning, Your Honor.

10:15:01  13              This is defendant's motion to exclude foreign

10:15:04  14   labeling.  It was something that was raised in the *Earnest*

10:15:08  15   trial.

10:15:08  16        THE COURT:  How is this different from what I did in

10:15:10  17   the *Earnest* trial?

10:15:11  18        MR. RATLIFF:  Well, Your Honor, I have no expectation

10:15:13  19   that I'm going to change your mind.

10:15:15  20        THE COURT:  Good.

10:15:16  21        MR. RATLIFF:  But I do think there are a couple of

10:15:17  22   points that I do want to raise here, which is, one, you allowed

10:15:21  23   plaintiffs to submit evidence of what Sanofi submitted about

10:15:24  24   hair loss to foreign regulatory bodies that deny the ability

10:15:28  25   for them to say what regulatory bodies requested of Sanofi.  In

**OFFICIAL TRANSCRIPT**

10:15:32 1    oral argument, we said that went to a notice issue, and that's

10:15:36 2    the same issue plaintiffs say in their opposition it goes to

10:15:38 3    now.

10:15:38 4          I think the one issue that is of concern for us,

10:15:41 5    and I think it's telegraphed in plaintiff's motion, is the

10:15:45 6    treatment dates for Ms. Kahn is considerably earlier than what

10:15:48 7    it was for Ms. Earnest.  Ms. Earnest was 2011; Ms. Kahn is

10:15:52 8    2008.

10:15:52 9          So, what that does, Your Honor, as it relates to

10:15:55 10   notice, it limits considerably what information was submitted

10:15:58 11   to foreign regulatory bodies before Ms. Kahn's treatment in

10:16:02 12   2008.  I think it really goes to a submission about a change to

10:16:06 13   the European patient input, which is something I'm sure you've

10:16:12 14   seen in other arguments in other briefing.

10:16:21 15         Our concern is that plaintiffs are going to try

10:16:22 16   to extend what evidence they try to get in as it relates to

10:16:24 17   interactions with foreign regulatory bodies that go well beyond

10:16:27 18   2008.

10:16:27 19         Their argument, Your Honor, as you've seen in the

10:16:30 20   motion and what we see in a number of their motions, is it

10:16:33 21   somehow goes to the contra non valentem issue.  Your Honor,

10:16:39 22   simply invoking the words *contra non valentem* doesn't make

10:16:39 23   inadmissible evidence all of a sudden admissible.  We've heard

10:16:42 24   it from Mr. Lambert, we've heard it from Mr. Kaufman, and we're

10:16:44 25   going to hear it from Mr. Miceli and others.

10:16:45  1          So, in terms of what Sanofi did or did not say to

10:16:48  2     a foreign regulatory body in 2013, 2014, 2015, certainly that

10:16:55  3     doesn't go to notice, but it has no bearing on the statute of

10:16:58  4     limitations defense of contra non valentem.

10:17:03  5          As I understand it, I think Mr. Moore articulated

10:17:06  6     this, the fact issue of the question is what inquiry did

10:17:08  7     Ms. Kahn make, and we really focused on that doctor visit with

10:17:12  8     her gynecologist and her question about hair pins.  So, what

10:17:16  9     happened with what Sanofi submitted in 2013 regarding hair loss

10:17:21 10     in May would have no bearing on that.

10:17:23 11          The issue that they raised, Your Honor, was the

10:17:25 12     fraudulent concealment issue.  That issue has been adjudicated

10:17:29 13     by Your Honor, and it has certainly been adjudicated by the

10:17:30 14     Fifth Circuit, who said this is not applicable in these cases

10:17:33 15     because the Fifth Circuit has already determined that there was

10:17:36 16     ample public information that a witness or a plaintiff could

10:17:38 17     have found had they conducted a reasonable inquiry.

10:17:40 18          So, Your Honor, we just want to make sure that

10:17:42 19     your ruling is preserved as it relates to your previous ruling

10:17:45 20     and the cut off of this date of treatment for Ms. Kahn.

10:17:49 21          Thank you.

10:17:49 22          THE COURT:  Mr. Miceli.

10:17:57 23          MR. MICELI:  Okay.  Thank you.  Can you hear me now?

10:17:57 24          THE COURT:  I can hear you now.

10:17:57 25          MR. MICELI:  Okay.  Thank you.

*OFFICIAL TRANSCRIPT*

10:18:00  1          I think there is one point we need to make early
10:18:02  2     on in this argument and that is, when you look at the title of
10:18:08  3     Sanofi's motion, it seeks to preclude evidence about regulatory
10:18:12  4     actions, the action -- the official actions of a foreign
10:18:16  5     regulatory body.  What Mr. Ratliff morphed that into was
10:18:24  6     requests made by regulatory bodies.
10:18:25  7          If you look if all of the cases they cite,
10:18:27  8     indeed, all of the cases we cite, they discussed formal
10:18:31  9     regulatory action by the agencies.  Let's just keep that in
10:18:36 10     mind.  Your Honor has said -- has said in *Earnest* that
10:18:39 11     plaintiff may elicit evidence showing what Sanofi said about
10:18:43 12     hair loss to foreign regulatory bodies.  It was not limited in
10:18:46 13     time because it goes to issues of general knowledge of what
10:18:50 14     their -- what their drug causes.
10:18:53 15          THE COURT:  What they discovered after Ms. Kahn's
10:18:56 16     treatment, I mean, does it matter?
10:19:05 17          MR. MICELI:  It does matter because it's two issues.
10:19:07 18     As you know from *Burst v. Shell Oil,* we have to prove general
10:19:08 19     causation and specific, and then we have to address how they
10:19:11 20     warned about it.  In addressing general causation, the
10:19:14 21     defendant is saying our drug doesn't cause it; oh, but if it
10:19:17 22     does cause it, we warn about it already.
10:19:20 23          Well, we have them saying and making statements
10:19:23 24     against interests, the 801 information that Mr. Bachus
10:19:29 25     mentioned earlier, that it does cause, the reasonable evidence

*OFFICIAL TRANSCRIPT*

10:19:31  1   to establish a causal association between Taxotere either alone

10:19:35  2   or in a regimen, is causally associated with or is associated

10:19:41  3   with permanent chemotherapy induce hair loss.  The conflating

10:19:46  4   of the term *foreign labeling* or *foreign regulatory actions* with

10:19:51  5   *internal discussions*, what internal discussions were or did the

10:19:57  6   employees of Sanofi have?

10:19:59  7         Now, what they are trying to do goes far beyond

10:20:03  8   the Court's ruling in *Earnest*, and it goes far beyond what

10:20:07  9   Judge Fallon did in the *Xarelto* MDL, and we cite that in our

10:20:14 10   papers where he says we can put on evidence of anything that

10:20:17 11   the defendant said about anybody about the issue -- the facts

10:20:20 12   at tissue, and that is permanent chemotherapy induced

10:20:24 13   hair loss.

10:20:25 14         Sanofi wants to keep us from bringing certain

10:20:28 15   evidence up because they were caught red-handed.  We found in

10:20:32 16   2006 where they were discussing internally how to separate

10:20:35 17   temporary hair loss from permanent hair loss or hair loss that

10:20:39 18   doesn't reverse.  That is confirmed, as you heard

10:20:44 19   Amy Freedman's testimony, that by 2006, they knew Taxotere

10:20:48 20   could cause it.

10:20:50 21         Dr. Palatinsky's testimony --

10:20:55 22      THE COURT:  How is what you're asking me to do

10:20:58 23   different than what I did in *Earnest*, which is whatever he said

10:21:03 24   to those people is admissible?

10:21:08 25      MR. MICELI:  I agree with you but what I heard

***OFFICIAL TRANSCRIPT***

10:21:12 1   Mr. Ratliff say is he wants to dial that back and reign us in

10:21:16 2   from what you ordered in *Earnest*, if what you ordered in

10:21:19 3   *Earnest* was appropriate, but we have statements both before

10:21:22 4   Ms. Kahn's treatment and after Ms. Kahn's treatment that --

10:21:24 5        THE COURT:  The statements after Ms. Kahn's treatment,

10:21:27 6   and I just want to make sure that I understand this, you offer

10:21:31 7   solely for the proposition of causation, not failure to warn,

10:21:36 8   but because there are lots of things that come into your burden

10:21:42 9   of proof, one is you have to show that it actually causes it,

10:21:47 10  biologically causes it, and that they knew sometime prior to

10:21:51 11  her treatment that they knew that prior to her treatment and

10:21:56 12  they failed to warn about it.

10:21:57 13       MR. MICELI:  Yes and no.  Let me just point out

10:22:03 14  (speaking simultaneously)  --

10:22:03 15       THE COURT:  Briefly.  Why would we allow statements

10:22:07 16  post treatment?

10:22:08 17       MR. MICELI:  Because it establishes the general

10:22:10 18  causation.  Remember, general causation is not limited in time,

10:22:14 19  but --

10:22:15 20       THE COURT:  I got that.

10:22:16 21       MR. MICELI:  But the part I want to say I agreed in

10:22:19 22  part and disagreed in part with the second statement you made

10:22:22 23  was because in this particular case we're limited to what we

10:22:26 24  can establish per the label, and that is, we don't have to show

10:22:31 25  causation for the warning.  What we have to show is there is

**OFFICIAL TRANSCRIPT**

10:22:34   1    some basis to believe there is a causal relationship; so, it's

10:22:38   2    a little lower standard.

10:22:41   3              But the fact that they are admitting, at several

10:22:45   4    points in time, making statements against interests from which

10:22:48   5    an admission can be inferred at several points before and

10:22:51   6    after, it's important to have all of that information before

10:22:53   7    the jury and particularly where we have to establish, you know,

10:22:57   8    knowledge and their clear knowledge, though.

10:22:57   9              MR. RATLIFF:  Your Honor --

10:23:06  10              MR. MICELI:  Just one last thing, if you don't mind,

10:23:08  11    Mr. Ratliff.

10:23:09  12              Sanofi's internal communications that demonstrate

10:23:11  13    their notice and knowledge, this is just the bottom line, their

10:23:15  14    internal communications --

10:23:15  15              THE COURT:  Wait.  Let me ask a question.  How do I

10:23:18  16    allow statements made by Sanofi post 2008 into evidence without

10:23:29  17    it being so unduly prejudicial?

10:23:33  18              MR. MICELI:  Well, simply, Your Honor, the same way

10:23:35  19    when our general causation and their general causation experts

10:23:40  20    are evaluating whether or not a product -- Taxotere can cause

10:23:45  21    permanent chemotherapy induced alopecia.  We rely on -- we rely

10:23:49  22    on scientific evidence -- the treatment.  There is --

10:23:54  23              THE COURT:  I understand.

10:23:56  24              MR. MICELI:  There is no difference between us using a

10:23:59  25    2013 admission to the EMA, the statement that we used in the

**OFFICIAL TRANSCRIPT**

10:24:03  1   *Earnest* trial and Sanofi trying to use Dr. Freites-Martinez's

10:24:08  2   involvement in the study -- the quality-of-life study that was

10:24:15  3   published in December of 2019.

10:24:17  4           The difference is one is a publication and one is

10:24:19  5   an admission, but both of our experts are using information for

10:24:24  6   general causation purposes that postdate the treatment of the

10:24:27  7   plaintiff.  We're on equal footing there, Your Honor.

10:24:31  8           THE COURT:  Okay.  Mr. Ratliff.

10:24:35  9           MR. RATLIFF:  Yeah, Your Honor, we would just urge you

10:24:37 10   to keep your original ruling as it was, which was based on

10:24:41 11   notice, if you look at the oral argument, and is the argument

10:24:45 12   that Mr. Miceli and the plaintiff's side uses here and in their

10:24:51 13   actual pleadings is that these things go to notice because they

10:24:55 14   are before treatment, and the only argument they raise about

10:24:59 15   anything related to post treatment relates to

10:25:00 16   contra non valentem; so, Your Honor, we ask that you keep the

10:25:02 17   same ruling --

10:25:02 18           THE COURT:  That's not what I heard.

10:25:03 19           MR. RATLIFF:  Well, that's not what I heard from

10:25:07 20   Mr. Miceli --

10:25:07 21           THE COURT:  It was an admission that goes to causation,

10:25:14 22   general causation.

10:25:15 23           MR. RATLIFF:  Your Honor --

10:25:17 24           THE COURT:  I have to look at the statements again.  I

10:25:20 25   was considering this motion in a different way.  Go ahead.

**OFFICIAL TRANSCRIPT**

10:25:24 1      MR. RATLIFF:  So, Your Honor, one, this is the first

10:25:27 2  I've ever heard from Mr. Miceli that this is their argument but

10:25:30 3  apparently it is now.  I would say that I don't think any of

10:25:32 4  this can change, and if you look at what their experts rely on

10:25:36 5  in terms of the causation analysis and you look at what

10:25:39 6  Dr. Madigan did, that relates to his FAERS analysis and his

10:25:42 7  signal detection analysis.  It has nothing to do with what

10:25:46 8  Sanofi did submit to EMA post Kahn's treatment, which goes to

10:25:51 9  the failure to warn component here, Your Honor.

10:25:52 10     THE COURT:  Okay.  Thank you.  I've got to look at it

10:25:56 11 because I did not consider it under a general causation

10:25:59 12 analysis whatsoever, but I will look at it again, so I'm going

10:26:06 13 to move that to my need to consider list.

10:26:09 14         Motion to Preclude Evidence Regarding

10:26:15 15 Shirley Ledlie and Taxotears or a Third-Party Advocacy Group.

10:26:21 16 That's Ms. Reynolds and Ms. Sastre.

10:26:23 17     MS. SASTRE:  Yes, Your Honor.  Thank you.

10:26:28 18         So, Your Honor, this motion, which is defendant's

10:26:31 19 Motion in *Limine* number 26 is related to plaintiff's Motion in

10:26:36 20 *Limine* to allow, basically, the same evidence, and that's

10:26:41 21 plaintiff's motion number 17.  My suggestion is the only way to

10:26:45 22 handle those is to do it together, and they do raise some

10:26:50 23 different arguments in 17; in particular, what they raise is

10:26:53 24 the exception to prescription or contra non valentem, as you've

10:26:53 25 heard about.

*OFFICIAL TRANSCRIPT*

10:26:57  1                    So, with the Court's permission, I would like to

10:27:02  2       address that -- this entire topic in those motions at the same

10:27:05  3       time, Your Honor.

10:27:05  4                    THE COURT:  Okay.

10:27:05  5                    MS. SASTRE:  Okay.  Very good, Your Honor, as you

10:27:08  6       stated, this is a motion to exclude what is called the *Voices*

10:27:13  7       *page on Facebook, Taxotears*, and other online advocacy groups,

10:27:22  8       statements and posts made by a French woman named

10:27:22  9       *Shirley Ledlie*, who was, you know, somewhat active online or

10:27:25 10       any other group members.

10:27:27 11                    Let me start, importantly, with where Your Honor

10:27:30 12       left off on this issue, because I do want to say this:  The

10:27:34 13       statute of limitations defense was alive and well in the

10:27:38 14       *Earnest* case; so, as a matter of fact, there isn't anything

10:27:42 15       that's changed about the situation.

10:27:44 16                    We're just hearing now, and I don't want to be

10:27:46 17       flip, but sort of what Mr. Ratliff said, a lot of what you're

10:27:51 18       going to hear today is all of a sudden that everything gets

10:27:53 19       dropped into this bucket of it's okay because it's

10:27:57 20       contra non valentem.  This isn't.  That is not a response to

10:28:01 21       this and in no way makes this admissible.

10:28:04 22                    I'll explain why in detail, but I importantly do

10:28:07 23       want to start with where you left off on this, Your Honor.

10:28:08 24       This is what you stated in *Earnest*.  This is your extensive

10:28:11 25       argument on this.  You said, quote, I think if we found out

                                  ***OFFICIAL TRANSCRIPT***

10:28:14  1   that Sanofi was not accepting adverse reports, that would be

10:28:19  2   one thing, but what you had was angry women posting on social

10:28:22  3   media.  What I heard is that Sanofi told them to make the

10:28:26  4   complaints in the proper way, and we are not going to assess it

10:28:30  5   on Facebook.

10:28:31  6          You also stated, Judge -- I'm reading from the

10:28:34  7   transcript -- you said, "I don't think it's improper for Sanofi

10:28:38  8   to take it off its Facebook page," and you said, "The fact that

10:28:41  9   they took down a really ugly post I don't think tells you

10:28:46 10   anything other than they wanted a clean Facebook page, and they

10:28:49 11   were going to take whatever complaints that she had,"

10:28:52 12   indicating, obviously, in your mind, Your Honor, under 403,

10:28:55 13   this simply has no value.  You concluded by stating, "This is

10:28:59 14   very, very," you used that word twice, "prejudicial, clearly

10:29:05 15   403 categorically excluded.

10:29:07 16          Now, as I stated, Judge, nothing has changed with

10:29:09 17   regard to the facts.  Nothing has changed with regard to the

10:29:12 18   law except that I would submit is that any relationship between

10:29:16 19   all of this and Ms. Kahn is even ten times more attenuated than

10:29:21 20   it was in Ms. Earnest's case, and I'll explain that in a

10:29:24 21   moment, Judge.

10:29:25 22          Now, let me start with the backdrop, which is the

10:29:29 23   PSC has repeatedly taken the position in this litigation that

10:29:34 24   these admissions and these statements are as they applied to

10:29:37 25   the trial plaintiff as a whole.  They have stated, and we cited

*OFFICIAL TRANSCRIPT*

10:29:40  1  this in our briefing, Your Honor, that this has zero value,

10:29:47  2  there is zero evidence that -- excuse me.  These statements

10:29:51  3  made by them -- I'm sorry, Your Honor.

10:29:55  4          It's undisputed that the evidence is relevant --

10:30:01  5  is irrelevant, excuse me, and the PSC has made that admission

10:30:06  6  repeatedly to Your Honor, and they stated that with regard to

10:30:08  7  the trial plaintiff as a whole, and it is even more true when

10:30:12  8  it comes to Ms. Kahn.

10:30:13  9          The reason is is that Ms. Kahn never had anything

10:30:16 10  to do with these online groups.  She never visited the

10:30:21 11  Facebook Voices page, but most importantly, Your Honor, I want

10:30:24 12  to put this in context, her treatment was four days' worth of

10:30:29 13  Taxotere in 2008.  It was not until eight years later, as you

10:30:33 14  know, in 2016, that she said, well, I heard about a lawyer

10:30:39 15  advertisement, and then I went online and start looking around

10:30:43 16  with regard to Taxotere.

10:30:44 17          So, as a matter of fact and law, as we know from

10:30:48 18  Your Honor's ruling and the Fifth Circuit framework, look, the

10:30:53 19  statute of limitations has run.

10:30:55 20      THE COURT:  That statute of limitations, I may have not

10:31:01 21  made myself clear, the issue is whether or not Ms. Kahn's

10:31:06 22  actions are reasonable.  What I said, ad nauseam, if you will,

10:31:13 23  was that her gynecologist told her it was related to age.

10:31:21 24  Whether or not it was reasonable for her to stop her evaluation

10:31:29 25  or investigation or her asking other doctors hoping for a

*OFFICIAL TRANSCRIPT*

10:31:36  1    better answer, but what she said is he told her you're old and

10:31:41  2    she dropped it, and I don't know what that means.

10:31:46  3           I know sometimes it's not what you want to hear,

10:31:50  4    and so you just stop.  You think it doesn't make sense to me,

10:31:57  5    but you know your doctor said it or I don't believe him but I'm

10:32:01  6    not going to do anything about it.  That's for the jury to

10:32:04  7    determine whether her actions are reasonable.  That's

10:32:07  8    contra non valentem.  I'm not sure.  I don't know how else to

10:32:12  9    say it.

10:32:12  10       MS. SASTRE:  Well, I don't disagree with anything you

10:32:18  11   just said, Judge.

10:32:18  12       THE COURT:  Those of us that went to Louisiana law,

10:32:21  13   it's whether or not you're reasonable, and those are fact

10:32:25  14   issues for a jury to determine.  They may say that wasn't

10:32:31  15   reasonable one bit.

10:32:35  16          So, let me hear from you, Ms. Reynolds, because I

10:32:39  17   don't want to talk about contra non valentem.

10:32:40  18       MS. SASTRE:  Well, Your Honor -- I'm sorry, Judge, but

10:32:42  19   I do need to make my argument on that point.  Just very

10:32:46  20   briefly, if I may, if I have a minute or two.

10:32:50  21       THE COURT:  No, I've read your argument.

10:32:50  22       MS. SASTRE:  Okay.

10:32:54  23       THE COURT:  Ms. Sastre, I tell you what, if

10:32:56  24   Ms. Reynolds says something that changes my mind, I'll let you

10:33:00  25   respond to it.

                        *OFFICIAL TRANSCRIPT*

10:33:01  1          MS. SASTRE:  You've got a deal.  I'll be quiet.  Thank

10:33:05  2   you.

10:33:05  3          MS. REYNOLDS:  Yes, Your Honor.  There is information

10:33:09  4   which is new that has changed since the *Earnest* trial, and that

10:33:12  5   is the ruling out of the Fifth Circuit analyzing this issue.

10:33:16  6              During the course of the trial in the *Earnest*

10:33:18  7   matter, Your Honor, there were not any questions that I recall

10:33:21  8   directed to Ms. Earnest related to her investigation of a

10:33:27  9   Golanel (spelled phonetically) article, Taxotears or any online

10:33:31 10   advocacy group.  That argument was first made in those appeals

10:33:35 11   in which Sanofi took the position that it constituted notice to

10:33:38 12   the plaintiff.

10:33:40 13          THE COURT:  Isn't that all in the master complaint,

10:33:42 14   what was available?

10:33:46 15          MS. REYNOLDS:  Your Honor, there are allegations about

10:33:48 16   information that came out online that are in the master

10:33:51 17   complaint.  The information about Sanofi's action in trying to

10:33:55 18   conceal that information are not contained in the master

10:33:58 19   complaint, Your Honor, because plaintiffs were not aware of

10:34:01 20   that information at the time of filing.

10:34:04 21              I think what's important here is Your Honor said

10:34:06 22   in one of your orders on Sanofi's motion for reconsideration to

10:34:11 23   dismiss Ms. Kahn's claim on statute of limitations, "Not only

10:34:15 24   does the jury have to assess the reasonableness of Ms. Kahn

10:34:21 25   relying on Dr. Roberie's statement, but," you stated, "a jury

*OFFICIAL TRANSCRIPT*

10:34:23  1    will need to assess whether the plaintiff, as part of

10:34:27  2    reasonable diligence, would have found the information

10:34:28  3    available online and brought it to her doctors."

10:34:32  4         Your Honor, plaintiffs fully believe that Sanofi

10:34:35  5    intends to question Ms. Kahn about whether she reviewed,

10:34:39  6    investigated, or searched for this material.  What Sanofi is

10:34:42  7    really asking this court to do is grant it a one-sided

10:34:47  8    presentation of the evidence in this case where the plaintiff

10:34:50  9    can be questioned about whether it was reasonable for her to

10:34:55 10    discover or not discover this information but no evidence,

10:34:58 11    according to Sanofi, should be put on to the jury about

10:35:02 12    Sanofi's conduct.

10:35:03 13         All the plaintiffs are asking for here,

10:35:05 14    Your Honor, really, is a very technical Louisiana rule of due

10:35:10 15    standard, and it's also incorporated into contra non valentem.

10:35:17 16         THE COURT:  Is there any information that Taxotere went

10:35:41 17    to the Internet somehow or another and removed articles, the

10:35:48 18    Sedlacek, if that's reported, any of the Navajo, if those

10:35:49 19    things were reported, and when I do research, these articles

10:35:55 20    will come up?  Are you telling me that Sanofi went in and

10:35:58 21    somehow or another scrubbed all of that from the Internet, or

10:36:02 22    is it just they removed these really acerbic posts from their

10:36:16 23    Facebook page?

10:36:17 24         Are you telling me that's what would have put her

10:36:20 25    on notice that a group of really angry women were posting

*OFFICIAL TRANSCRIPT*

10:36:24 1 things to the Sanofi Facebook page, that they have no other

10:36:28 2 place?  Was there no blog out there?

10:36:30 3        I guess that this is my problem:  What I'm

10:36:33 4 hearing from you is, listen, the only place this woman could

10:36:40 5 have found this information was from these other posts made to

10:36:46 6 Sanofi's Facebook page.

10:36:49 7     MS. REYNOLDS:  No, Your Honor.  That is not our

10:36:51 8 position that it would have been the only place but it is a

10:36:54 9 place, and it is a part of the market of information within the

10:36:57 10 public forum.  If you just Google, as you know, often Facebook

10:37:02 11 will pop up.

10:37:03 12        So, what's important here, and I want to address

10:37:05 13 your concerns primarily which you raised the last time in

10:37:08 14 *Earnest* about these ugly posts, I think it's very important to

10:37:12 15 put this into context.  When the Golanel article came out and

10:37:18 16 the Taxotears were being more present online, Sanofi grew

10:37:23 17 concerned about this.  They grew concerned about how it would

10:37:26 18 impact them; so, it was actually Sanofi itself, between this

10:37:29 19 call center and pharmacovigilance department, they got together

10:37:33 20 and came up with this plan to hire Intouch Solutions to act as

10:37:37 21 an agent on behalf of Sanofi and to patrol their Facebook page.

10:37:42 22 The moment that anyone posted anything related to permanent

10:37:46 23 hair loss, it was immediately removed from the marketplace of

10:37:52 24 information.

10:37:53 25     THE COURT:  Their personal Facebook page?

*OFFICIAL TRANSCRIPT*

10:37:57  1          MS. REYNOLDS:  That was open to the public and was a

10:37:59  2   tool that Sanofi used to provide notice and information to

10:38:03  3   consumers such as Ms. Kahn.  It is a way in which they could

10:38:06  4   directly communicate to consumers and that consumers could

10:38:11  5   communicate to them.

10:38:12  6          In terms of the type of posts that were being

10:38:14  7   posted, Your Honor, there was nothing bolder or profane being

10:38:20  8   posted.  One example of something that was posted said the

10:38:25  9   following:  "When you inform oncologists," this is a patient,

10:38:29 10   "that there is a problem with your chemotherapy drug Taxotere,

10:38:32 11   why do you not want women to know that they could be left

10:38:36 12   permanently disfigured?  It is because they would choose a

10:38:42 13   different drug not made by you?  Then that is closing on you,

10:38:42 14   Sanofi."

10:38:46 15          That post was immediately taken down by

10:38:50 16   Intouch Solutions and that user was blocked from posting; so,

10:38:53 17   Sanofi was actively preventing consumers and patients such as

10:38:57 18   Ms. Kahn from trying to inform other consumers or even report

10:39:01 19   directly to Sanofi on a public page where other people could

10:39:04 20   see it about the issues that they were seeing.

10:39:07 21          It is because of those actions, Your Honor, that

10:39:09 22   the information is relevant.  If Ms. Kahn would have saw that

10:39:14 23   post on Facebook, then she could have went to her doctor with

10:39:18 24   that, or even if she would have seen one of these other

10:39:22 25   articles that Sanofi said plaintiff should have been on notice

10:39:26  1   of, if she would have saw *Globe and Mail,* then she would have

10:39:30  2   decided, I wonder if Sanofi has anything out there on any

10:39:33  3   Sanofi-sponsored page, on anything Sanofi actually put its

10:39:38  4   brand on, and she would have gone to Sanofi's page, that page

10:39:40  5   is completely scrubbed of all of that information; and if

10:39:46  6   Sanofi's actions, contra non valentem, the third prong, does

10:39:50  7   ask you to take into consideration what the defendant did, it's

10:39:54  8   not solely a test of just the plaintiff's reasonableness, you

10:39:57  9   have to look not only at whether the plaintiff was reasonable

10:40:00 10   but also at the defendant's conduct in trying to conceal

10:40:04 11   relevant information from the plaintiff.

10:40:05 12        That's all that the plaintiffs are asking for

10:40:08 13   here in this case, Your Honor, is that if Sanofi is allowed to

10:40:08 14   question --

10:40:13 15        THE COURT:  I think the contra non valentem, there are

10:40:19 16   four areas, and I think what I found was that she didn't

10:40:24 17   discover it and whether or not her actions were reasonable in

10:40:29 18   not examining beyond.  I don't think there was ever an issue of

10:40:35 19   active concealment.  I have to tell you, I think keeping

10:40:40 20   Facebook clean is not a way that one actively conceals it.

10:40:46 21   That would have required removing articles from other people.

10:40:50 22        Listen, I'm going to grant this motion; however,

10:40:55 23   if somehow this door is opened, you can request a conference

10:41:00 24   with the Court and I will consider it, but I still think its

10:41:05 25   prejudiced outweighs any probative value.  I've told you that

*OFFICIAL TRANSCRIPT*

10:41:09  1   before repeatedly:  You can't just peek through the door; if

10:41:14  2   you open it at all, it's open.

10:41:17  3          All right.  Conduct to Preclude Evidence and

10:41:19  4   Argument Regarding Company Conduct That Post-Dates Plaintiff's

10:41:22  5   Chemotherapy Therapy.  That is Mr. Bachus and Mr. Strongman.

10:41:28  6          Mr. Strongman.

10:41:28  7   MR. STRONGMAN:  Thank you, Your Honor.

10:41:30  8          What we are seeking in this motion is the same

10:41:33  9   ruling that the Court entered in *Earnest*.  In that case, our

10:41:40  10  parallel, identical motion was granted, and the Court found

10:41:43  11  that any evidence of label changes occurring after plaintiff's

10:41:47  12  treatment constituted subsequent remedial measures as

10:41:52  13  contemplated by 407.

10:41:54  14         There are no circumstances which are different in

10:41:58  15  Ms. Kahn's case that would make the evidentiary decisions any

10:42:03  16  different.  We believe that the subsequent remedial measure

10:42:07  17  ruling applies.  In addition, such evidence would also be,

10:42:12  18  obviously, prejudicial, 403 excluded.

10:42:16  19         The plaintiffs in their brief tried to raise a

10:42:21  20  couple of points that I'll touch on very briefly that I think

10:42:24  21  we've already dealt with both in *Earnest* and at times earlier

10:42:30  22  today.  The first is contra non valentem.  I won't discuss

10:42:33  23  that.  We just went over that.

10:42:35  24         The second is feasibility, which the plaintiffs

10:42:37  25  argue is an exception to 407; however, with the Court's

**OFFICIAL TRANSCRIPT**

10:42:41  1   preemption ruling, I don't think feasibility is even on the

10:42:44  2   table at this point; so, that exception doesn't apply.

10:42:48  3           Then the last point that the plaintiffs make in

10:42:52  4   their briefing revolves around what, I guess, they would call

10:42:56  5   *impeachment*.  The point that simply arguing the plain language

10:43:03  6   is a label in 2008 somehow opens the door for impeachment on

10:43:08  7   label changes at a later date.  All of these arguments were

10:43:13  8   addressed, raised, and considered in *Earnest* when the Court

10:43:17  9   entered its ruling, and we believe the same ruling is

10:43:20  10  appropriate here.

10:43:20  11          Thank you.

10:43:24  12          THE COURT:  Mr. Bachus.

10:43:26  13          MR. BACHUS:  Thank you, Your Honor.

10:43:26  14          I think part of the problem might be the title

10:43:30  15  and the scope of the motion versus what Mr. Strongman has just

10:43:35  16  described.  The motion asked the Court to preclude company

10:43:40  17  conduct after Ms. Kahn's treatment dates, and part of that

10:43:44  18  might be a label change, but that's not all of the conduct; so,

10:43:46  19  I just would like a moment to clarify.

10:43:50  20          Number one, there are -- we did not -- we're not

10:43:55  21  intending to introduce the actual change to label; however,

10:44:02  22  there is two pieces of information that aren't there:  One goes

10:44:05  23  to what Mr. Miceli was talking with you about earlier, general

10:44:07  24  causation.

10:44:08  25          In this case, Sanofi denied that Taxotere can

*OFFICIAL TRANSCRIPT*

cause PCIA.  We have documents in this case where the company
internally determined and admitted post Ms. Kahn's treatment
date that Taxotere alone and in combination can cause PCIA in
some patients, and there is testimony from individuals within
the company on this issue of general causation; so, if that's
considered to be conduct, having a meeting and making that
determination after Ms. Kahn took the drug regarding general
causation as conduct, we believe that that is not subject to
this motion -- to a granting of the motion, and Mr. Strongman
didn't seem to raise that issue as talking about the label.

Now, with respect to the label itself, there is
also a narrow area of post treatment conduct that needs to be
considered that we believe is relevant, and that is, in this
lawsuit, Sanofi claims it has always warned of PCIA in its
label, but we have documents that postdate Ms. Kahn's treatment
date where Sanofi's own internal labeling and safety group
evaluates the label and reach the conclusion specifically that
PCIA was not warned about in the Taxotere label, and so, this
evidence directly contradicts Sanofi's claim that they have
always warned about PCIA, and so, it's a statement against
Sanofi's interests.

So, if you look at the narrow scope of the relief
that Mr. Strongman just asked you, which is we don't want them
to introduce evidence of the change of the label, we're okay
with that, but we are not okay with having it used later and

*OFFICIAL TRANSCRIPT*

10:46:00  1    say she granted a motion about posttrial conduct because we

10:46:05  2    believe that general causation is not -- is not contained by

10:46:10  3    the date of treatment, and we believe that post treatment

10:46:14  4    conduct where they are evaluating the labels and reach a

10:46:18  5    conclusion that this does not contain a warning against PCIA

10:46:23  6    and, therefore, this may have been the promulgation that led to

10:46:28  7    a change in the label, you see, Your Honor, it was part of a

10:46:31  8    process, right, but they are looking at it.  Is it there yet?

10:46:33  9    You know, and they reach a conclusion.  It is outside the scope

10:46:35 10    of what's currently in the label and we'll stop there.  We

10:46:38 11    don't have to talk about the change in the label, and that's a

10:46:42 12    very important admission on the part of the company,

10:46:44 13    Your Honor.

10:46:44 14         THE COURT:  Thank you.

10:46:45 15             Mr. Strongman, briefly.

10:46:45 16         MR. STRONGMAN:  With regard to general causation,

10:46:49 17    Your Honor, I think that these issues should be dealt with on

10:46:52 18    an individualized basis.  The Court is certainly capable of

10:46:57 19    looking at any particular piece of evidence and making a

10:47:01 20    decision on whether it had is a bearing on general causation.

10:47:03 21             I think that most of the documents that

10:47:06 22    Mr. Bachus is inferring have a bearing here were dealt with in

10:47:13 23    the *Earnest* case, such as the clinical overviews and things

10:47:18 24    like that, that go to labeling decisions.

10:47:18 25             So, our opinion would just be these can be dealt

**OFFICIAL TRANSCRIPT**

10:47:22  1   with on an individualized basis as the Court sees them as it

10:47:25  2   relates to general causation.

10:47:26  3           With regard to the second point, again, the fact

10:47:31  4   that Sanofi's label in 2008 said that once treatment is

10:47:37  5   completed, hair generally grows back, we certainly should be

10:47:41  6   able to articulate the plain meaning of those words without it

10:47:46  7   opening some door to what Mr. Bachus would call some sort of

10:47:50  8   *admission*.  We think that the evidence is unduly prejudicial

10:47:54  9   and subsequent remedial measures as we have articulated.

10:47:59 10       THE COURT:  Okay.  All right.  The label change in 2015

10:48:01 11   is not admissible.  I do think that's a subsequent remedial

10:48:06 12   measure.

10:48:06 13           I don't know what if there were admissions at

10:48:09 14   some point that said this is not that label.  I would think

10:48:14 15   that that could potentially be evidence.  I don't know.  I

10:48:20 16   don't have the specimen in front of me, so I will tell you I

10:48:24 17   will grant it in terms of that it's the label change in 2015.

10:48:29 18   What it reads now and what it read then, that's inadmissible.

10:48:35 19   I do think that's a subsequent to remedial measure.

10:48:38 20           I do not know if there were statements subsequent

10:48:45 21   to the 2008 label that was there during Ms. Kahn's treatment

10:48:50 22   where Sanofi admitted that this does not warn, and that could

10:48:57 23   potentially be admissible.  I would need to see the statements,

10:49:00 24   so I'll defer as to those two issues.

10:49:04 25           Now, I realize that I was supposed to take a

*OFFICIAL TRANSCRIPT*

10:49:06 1  break before this motion.  Brittany sent me a notice from

10:49:13 2  Mr. Lambert, so Court will be at recess for ten minutes.

10:49:18 3       (WHEREUPON, at 10:49 a.m., the Court took a recess.)

10:57:26 4       THE COURT:  Mr. Lambert and Mr. Baehr, are we ready to

10:57:32 5  proceed?  Motion to Preclude Evidence or Argument That

10:57:35 6  Plaintiff's Actinic Keratosis Was Caused By Taxotere or PCIA,

10:57:37 7  or Claiming Damages Therefor.  Is there really much

10:57:45 8  disagreement?

10:57:45 9       Mr. Baehr.

10:57:45 10      MR. BAEHR:  Certainly, Your Honor.  Good morning.

10:57:51 11  Jordan Baehr on behalf of Sanofi.

10:57:53 12      I believe that there is some disagreement here.

10:57:55 13  I'll try to highlight that for you.  This is a new motion that

10:57:59 14  was not presented in *Earnest*, and it presents a question of

10:58:02 15  whether plaintiffs --

10:58:03 16      THE COURT:  Right.  Right.

10:58:03 17      MR. BAEHR:  -- whether plaintiffs should be permitted

10:58:06 18  to present --

10:58:07 19      THE COURT:  No, I got it.

10:58:08 20      MR. BAEHR:  Okay.  Well, let me clarify a few things

10:58:12 21  that Sanofi isn't disputing and isn't seeking to exclude.

10:58:17 22  Just --

10:58:17 23      THE COURT:  Well, good.  Just go to what you're seeking

10:58:21 24  to exclude.  I don't mean to be hard you on, Mr. Baehr.  Nobody

10:58:25 25  has stayed within three minutes, and we'll be here until

*OFFICIAL TRANSCRIPT*

10:58:26  1   tomorrow.

10:58:26  2       MR. BAEHR:  Certainly.  Okay.  What we're seeking to

10:58:28  3   exclude is any testimony or evidence or arguments that Taxotere

10:58:31  4   or PCIA caused -- can cause actinic keratosis, a medical

10:58:37  5   condition, so that would be a sort of general causation type

10:58:40  6   testimony, any testimony or argument that Taxotere or PCIA

10:58:45  7   specifically caused Ms. Kahn's actinic keratosis, and then,

10:58:51  8   relatedly, any evidence that Taxotere or PCIA can cause actinic

10:58:54  9   keratosis within a certain time frame or a certain number of

10:58:57 10   months.

10:58:57 11       The reason for excluding these opinions is the

10:59:01 12   same for all three, which is that they were unpled.  They were

10:59:05 13   not pled by plaintiff.

10:59:06 14       THE COURT:  Does anybody say that it did cause it?

10:59:09 15       MR. BAEHR:  Not in their discovery, Your Honor, but in

10:59:13 16   the briefing on this motion and also on defendant's motion

10:59:16 17   number 10, it's pretty plain that plaintiff does intend to

10:59:22 18   present these types of opinions at trial.

10:59:24 19       THE COURT:  Okay.  Mr. Lambert.  Are you going to say

10:59:30 20   that Taxotere caused this actinic keratosis?  The fact that she

10:59:36 21   has it, I think that's a fact.

10:59:42 22       MR. LAMBERT:  Yes, it is a fact.  Both of the

10:59:47 23   dermatologist experts that will testify at trial, at least I

10:59:48 24   presume will testify, examined Ms. Kahn.  They found that she

10:59:51 25   has it.  We're not suggesting that Taxotere generally or

*OFFICIAL TRANSCRIPT*

11:00:00 1   specifically causes actinic keratosis.  That's not one of the

11:00:01 2   claims here.

11:00:06 3         THE COURT:  How do you explain (audio disruption) --

11:00:07 4         MR. LAMBERT:  Yes.  Let me try to explain.  Those

11:00:10 5   experts agree that thinning on the top of the scalp can relate

11:00:18 6   in skin damage from sun exposure, okay, and that is basically

11:00:22 7   what she has.  She has precancerous lesions because of sun

11:00:25 8   exposure, and the technical term for that is *actinic keratosis*.

11:00:33 9         It's goose/gander here, Judge.  They can't have

11:00:35 10  it both ways.  They can't have their expert come in without any

11:00:40 11  scientific articles whatsoever and say because she has actinic

11:00:44 12  keratosis, she had preexisting thinning of the hair.

11:00:48 13        Dr. Tosti said that the timing of this is

11:00:51 14  relevant.  Dr. Tosti's deposition was on September 29th of

11:00:56 15  2020.  Turegano's report was on September 9th of 2020.  Sanofi

11:01:03 16  was able to explore what -- Dr. Tosti's opinions about actinic

11:01:09 17  keratosis and how long --

11:01:09 18        THE COURT:  Is Dr. Tosti saying that her PCIA caused

11:01:13 19  this?

11:01:14 20        MR. LAMBERT:  Well, what I think she is saying is that

11:01:18 21  the permanent thinning on the top of Ms. Kahn's head occurred

11:01:28 22  as a result of Taxotere and that that thinning makes her more

11:01:35 23  prone to sun damage to the top of her scalp and that it's

11:01:41 24  happened the reverse way that Dr. Turegano says, that that skin

11:01:49 25  thinning happened first, that we're in a southern environment

11:01:51  1    here in New Orleans, where there's a high heat index.

11:01:54  2         THE COURT:  All right.  Let me ask this question,

11:01:56  3    Mr. Lambert, if I could just kind of cut to the chase:  Is

11:01:59  4    Dr. Tosti saying her actinic keratosis was caused by PCIA?

11:02:05  5         MR. LAMBERT:  No.  I think what she's saying is that

11:02:08  6    the thinning on top of her scalp contributed to her risk of

11:02:15  7    skin damage and sun exposure and that that's sort of a common

11:02:20  8    knowledge understanding of what the function of hair is.

11:02:25  9         THE COURT:  No. I get that.  My husband is thin, very

11:02:33 10    thin.  He has to wear a hat all the time.  I get that.  But my

11:02:39 11    question is:  Did she have actinic keratosis prior to taking

11:02:48 12    Taxotere?

11:02:49 13         MR. LAMBERT:  I think, Your Honor, that is an excellent

11:02:51 14    question, and that's one question that either both experts

11:02:55 15    should be able to opine about or neither should be able to

11:02:59 16    opine about because Sanofi can't come in and say actinic

11:03:04 17    keratosis, that's the reason why she had preexisting hair loss,

11:03:07 18    and that's why you should find that Taxotere didn't cause any

11:03:10 19    damage and Tosti not be able to talk about it at all.  That

11:03:15 20    would not be fair and be unduly prejudicial.

11:03:23 21         THE COURT:  Mr. Baehr.

11:03:23 22         MR. BAEHR:  So, a couple of clarifications that I just

11:03:27 23    think are inaccurate from what Mr. Lambert said, respectfully.

11:03:29 24    He said -- You know, he kind of tried to lay out a timeline and

11:03:31 25    say that Sanofi had an opportunity to explore these opinions

*OFFICIAL TRANSCRIPT*

with Dr. Tosti, etcetera.  That's not true.

The words *actinic keratosis* do not an appear in Dr. Tosti's examination record of the plaintiff.  They do not appear anywhere in her report in this case for the plaintiff. She was questioned on it because it is a basis of Sanofi's expert opinion which was fully disclosed in her report and thoroughly explored on cross-examination at her deposition, but other than that, she has not presented any opinion whatsoever on actinic keratosis.

So, the goose/gander invocation here is a bit of a red herring.  The rule, What's good for the goose and gander, is that the parties should disclose their opinions in their reports and in pleadings, etcetera, and explore them in discovery and then be entitled to rely on those at trial.

Frankly, how he's characterized the connection between permanent hair thinning and sun-exposure hair loss, those are Mr. Lambert's words.  Even Dr. Tosti hasn't testified to that to date, so she absolutely should not be allowed to get up on the stand and say these things for the first time in front of a jury.

On the contrary, everything that Dr. Turegano could or plans to say is fully disclosed in her report.  It's explicitly set forth, and the plaintiffs asked numerous questions about it during her deposition and had the opportunity to explore that.

*OFFICIAL TRANSCRIPT*

11:04:55  1          So, the rule that should apply to both parties in

11:04:58  2   this case that is good for the goose and gander is just that we

11:05:01  3   get to rely on the evidence that's been produced in discovery

11:05:04  4   and the claims and arguments that have been made.

11:05:09  5          If you don't have any other questions....

11:05:13  6          THE COURT:  I will say that I don't have Dr. Tosti's

11:05:18  7   report in front of me, but the parties are bound by their

11:05:27  8   Rule 26 report and the discovery is closed.  If this is not

11:05:34  9   something that was ever raised, then it's not going to be

11:05:39 10   admissible at trial.

11:05:42 11          Mr. Lambert, was there anywhere that Dr. Tosti

11:05:44 12   mentioned this?

11:05:46 13          MR. LAMBERT:  I thought that she had mentioned thinning

11:05:50 14   on the scalp predisposing her to skin cancer.  I don't know if

11:05:55 15   that's in her report or not.  I trust what Mr. Baehr says but

11:06:01 16   she was asked about it in the deposition.  It was explored

11:06:06 17   there by Sanofi.

11:06:08 18          The point on timing is important because it was

11:06:12 19   explored in her deposition, and then two weeks later in

11:06:15 20   Dr. Turegano's expert report, Dr. Turegano does put a section

11:06:20 21   in her report on that.  Technically, we could have asked for a

11:06:23 22   rebuttal report on that issue, but we didn't because it was

11:06:28 23   addressed in the deposition.  Certainly, it's within the

11:06:31 24   purview of the jury.

11:06:32 25          THE COURT:  Wait, did Dr. Turegano see Ms. Kahn?

**OFFICIAL TRANSCRIPT**

11:06:39  1          MR. LAMBERT:  Dr. Turegano saw Ms. Kahn.  Yes, she had

11:06:39  2      a Rule 35 medical exam.

11:06:47  3          THE COURT:  Okay.  She diagnosed -- I'm going to call

11:06:48  4      it AK -- she diagnosed AK, and are you telling me Dr. Tosti did

11:06:56  5      not diagnose AK?

11:07:00  6          MR. LAMBERT:  Well, Your Honor, it had already been

11:07:02  7      diagnosed in 2012 by her prior dermatologist, and that's in

11:07:10  8      Dr. Tosti's reliance materials as far as prior dermatology

11:07:17  9      records.  So, Dr. Tosti is aware of that, and it's disclosed in

11:07:18 10      reliance materials, and she's asked about it in her deposition.

11:07:21 11          So, I just -- I'm really at a loss as to why

11:07:26 12      Dr. Turegano could talk about it and Dr. Tosti can't.  They

11:07:30 13      both talk about it in the context of their experience,

11:07:33 14      training, and education.  Dr. Turegano doesn't cite to any

11:07:38 15      scientific article in their support for the premise that it's

11:07:43 16      evidence that her hair loss preexisted.

11:07:48 17          Both can talk about how it's related to

11:07:53 18      predisposition to skin cancer when there is hair thinning on

11:07:59 19      somebody's scalp, and Dr. Turegano can say that it's a

11:08:04 20      long-term thing, and Dr. Tosti, as she said in her deposition,

11:08:07 21      that it can happen very quickly, in a matter of months,

11:08:10 22      depending on UV light exposure and thinness of the hair.

11:08:18 23          MR. BAEHR:  Your Honor --

11:08:18 24          THE COURT:  My first inclination would be, Plaintiffs,

11:08:23 25      take your victim as you find them.  Defendant, this is a

**OFFICIAL TRANSCRIPT**

11:08:26 1    potential other cause.  I really probably need to look at

11:08:30 2    Dr. Tosti's deposition.  I do have problems with things, you

11:08:33 3    know, it's in your rules -- report.

11:08:37 4           If you can direct me to the specific pages of

11:08:40 5    Dr. Tosti's deposition and whether or not that you should have

11:08:44 6    asked for a rebuttal report on just that specific issue.  Maybe

11:08:49 7    I just need to see the scope of the examination at that time.

11:08:52 8           Mr. Baehr, let me hear from you.  I know you had

11:08:54 9    something else to say.

11:08:55 10        MR. BAEHR:  I was just going to reiterate and ask you

11:08:59 11   to look at the reports and see and prove up that the words

11:09:03 12   *actinic keratosis* and the concept are not discussed at all in

11:09:06 13   Dr. Tosti's report.  They are discussed at length in

11:09:09 14   Dr. Turegano's report, and we think that should be the guiding

11:09:13 15   principle for what the scope of the testimony is.

11:09:14 16        Thank you.

11:09:15 17        THE COURT:  Okay.  Thank you.  I'm going to defer until

11:09:16 18   I get --

11:09:16 19        MR. LAMBERT:  Your Honor, the -- I'm sorry to step on

11:09:20 20   you.  Document number 13036-3 is the part of the transcript

11:09:31 21   that we attached involving Dr. Tosti's testimony, and we can

11:09:35 22   provide Your Honor with a copy of her report and reliance list.

11:09:39 23        THE COURT:  No.  I'll be honest with you, when we go

11:09:43 24   through this many motions -- Okay.  Thank you.

11:09:46 25        All right.  The next one is Preclude Evidence or

*OFFICIAL TRANSCRIPT*

11:09:50  1    Arguments Concerning Canadian Informed Consent, and that is

11:09:59  2    Mr. Bachus and Mr. Strongman.

11:10:00  3            MR. STRONGMAN:  Your Honor, with respect to the

11:10:03  4    Canadian informed consent, this was a document that the Court

11:10:07  5    has looked at and considered in other contexts as well as

11:10:10  6    including summary judgment motion on, I believe, plaintiff's

11:10:16  7    motion for summary judgment on affirmative defenses.

11:10:18  8            The Court pointed out several of the problems

11:10:20  9    with this document, namely, that it was not drafted by Sanofi,

11:10:24 10    it was never actually used, and that the clinical trial at

11:10:27 11    issue wasn't focused on Taxotere.

11:10:30 12            Looking at the briefing in the matter, I think

11:10:33 13    the plaintiffs called it the *smoking gun document* and intend,

11:10:39 14    clearly, to center a lot of their case around it.  We believe

11:10:42 15    that it's unduly prejudicial and irrelevant for the reasons

11:10:46 16    that I just mentioned.

11:10:49 17            Specifically, as it relates to the *Earnest* case,

11:10:53 18    I think this was discussed in a deposition that was played in

11:10:59 19    the *Earnest* case; however, I don't believe that portion of that

11:11:03 20    testimony has been designated in this case.

11:11:06 21            In addition to that, we have a situation where

11:11:09 22    Ms. Kahn was in a clinical trial; Ms. *Earnest* was not.  So, the

11:11:15 23    confusion and the prejudice with regard to this Canadian

11:11:19 24    consent is elevated in this case.  So, for those reasons we

11:11:23 25    believe that this specific document, the Canadian informed

*OFFICIAL TRANSCRIPT*

1    consent that was never used or drafted by Sanofi, should be

2    excluded.

3            THE COURT:  Mr. Bachus.

4            MR. BACHUS:  Thank you, Your Honor.

5                    First, I think it's important to point out that

6    the Court did consider this issue in the *Earnest* trial, and the

7    Court permitted the evidence in question.  To Mr. Strongman's

8    point, the deposition testimony that was played in *Earnest* has,

9    in fact, been designated again in this case with respect to

10   that same document.

11                   I do think it's important for the Court just to

12   understand what this is, and this is in 2007, Dr. Palatinsky

13   was the global safety officer at Sanofi responsible for the

14   safety profile in Taxotere.  In 2007, he is asked to weigh in

15   as the global safety officer.

16           THE COURT:  No, I get it.  I get it.

17           MR. BACHUS:  But he has to weigh in on what's the most

18   accurate information known to Sanofi at the time about the side

19   effects of hair loss, and he puts in writing the words

20   *permanent hair loss* as the most accurate known outcome in 2007.

21                   We believe this is a very important admission

22   against the interests by the global safety officer that

23   occurred 16 months before Ms. Kahn was prescribed Taxotere.

24           THE COURT:  I got it.  I got it.  I got it.

25           MR. BACHUS:  Okay.  Thank you.

**OFFICIAL TRANSCRIPT**

11:12:47  1          THE COURT:  Mr. Strongman.

11:12:56  2              Mr. Strongman, I will tell you that I don't think

11:13:00  3     the whole label, whatever plan went in to preparing it, but I

11:13:04  4     think Taxotere's input into the language of that label is

11:13:07  5     relevant.  Now, what other people said, that's a different

11:13:14  6     matter and I know they didn't use it, they didn't have the

11:13:17  7     trial, other persons were part of the preparation, but the

11:13:22  8     reality from my perspective is whatever -- with Taxotere's

11:13:28  9     input, I think, goes to their knowledge.

11:13:31 10          MR. STRONGMAN:  Yeah, I think one specific

11:13:33 11     clarification is worth making as well from what Mr. Bachus has

11:13:37 12     said, it's my understanding that what was taken -- the

11:13:41 13     suggestion made by Dr. Palatinsky is not so much put in writing

11:13:46 14     permanent hair loss, it's that hair loss is in there in

11:13:48 15     multiple ways, so he suggested that it was duplicative in

11:13:53 16     certain ways.  That was the specific issue, I believe, and so,

11:13:57 17     it's a little bit different than, I think --

11:14:00 18          THE COURT:  I remember.

11:14:00 19          MR. STRONGMAN:  But --

11:14:02 20          THE COURT:  I remember.

11:14:02 21          MR. STRONGMAN:  But it's not relevant and sort of far

11:14:07 22     afield of really what happened specific to Ms. Kahn and her

11:14:12 23     consent form, so those are the reasons that we are

11:14:15 24     articulating.

11:14:15 25          THE COURT:  This matter (audio disruption) -- this

*OFFICIAL TRANSCRIPT*

11:14:19  1    ruling has denied the testimony is limited; however, the facts

11:14:22  2    have input in the Canadian informed consent and only Taxotere's

11:14:26  3    input.

11:14:27  4            Okay.  Motion To Preclude Punitive Damages

11:14:32  5    Evidence, and this is Mr. Ratliff and Mr. Schanker.

11:14:35  6            I have to tell you, I was very confused.  I don't

11:14:40  7    understand, Mr. Schanker, what your objection is.

11:14:40  8            Go ahead, Mr. Ratliff, but make it quick.  I

11:14:43  9    mean, I read it basically.

11:14:43 10        MR. RATLIFF:  Yeah, Your Honor, so this was a motion we

11:14:53 11    originally filed the Defendant's Motion in *Limine* number 9

11:14:56 12    related to corporate finances, revenue, profits, market share

11:14:59 13    in the *Earnest* trial.  It was deferred and became of no moment

11:15:03 14    because that type of evidence was never attempted to be entered

11:15:06 15    into evidence at the *Earnest* trial.

11:15:09 16            I think while we and be mindful what's pending in

11:15:10 17    this case but the reason we raised this one is because of what

11:15:12 18    we saw was, I think, a clear shift in strategy, which is to

11:15:16 19    designate a lot of testimony from Sanofi witnesses that is,

11:15:20 20    frankly, just abstract testimony about the revenue that

11:15:24 21    Taxotere generated, what were revenue goals of Taxotere, that

11:15:29 22    stuff is plainly irrelevant and inadmissible under 401, it's

11:15:34 23    prejudicial under 403, it doesn't go to failure to warn, it

11:15:38 24    doesn't go to causation, it certainly doesn't go to contra non

11:15:41 25    valentem, Your Honor.

**OFFICIAL TRANSCRIPT**

11:15:42  1          The only thing that that type of testimony is

11:15:44  2     used for would be in a situation of punitive damages situation,

11:15:47  3     which is not the case here, and really, it's an opportunity for

11:15:51  4     plaintiffs to --

11:15:52  5          THE COURT:  Let me hear from Mr. Schanker.  I know your

11:15:52  6     argument.

11:15:56  7               Mr. Schanker.

11:15:56  8          MR. SCHANKER:  Thank you, Your Honor.

11:15:57  9          The evidence does not only go to punitive

11:16:01 10     damages, not at all.  That's the key to this.  Certainly, we

11:16:04 11     agree that we can't --

11:16:05 12          THE COURT:  What does it go to?

11:16:09 13          MR. SCHANKER:  It goes to motive, Your Honor.

11:16:12 14     Specifically, you will properly -- I'll explain to you why --

11:16:14 15     you will properly, in *Earnest*, that motive evidence is

11:16:18 16     admissible, and this fit clearly within motive evidence.

11:16:22 17          Motive evidence goes to goals, intent, plan, the

11:16:26 18     motive.  The case law said -- supports that, and it says that

11:16:32 19     the question of intent is a classic jury question.  The

11:16:36 20     question of intent is a classic jury question -- *Tyree v.*

11:16:42 21     *Boston Scientific*, 214 WL 5486694, as well as *In re Rezulin*,

11:16:52 22     2004 309 F.Supp 531.

11:16:57 23          This fits in the mode of evidence, Your Honor.

11:17:00 24     To understand the concept of this, one of the quotes that they

11:17:03 25     cite is the goal for Taxotere, and the goal was to be the

*OFFICIAL TRANSCRIPT*

11:17:06  1    number one chemotherapy drug in the world, right?  That was a

11:17:12  2    quote from George Manis, and George Manis was the marketing

11:17:18  3    director.

11:17:18  4              We understand that early-stage breast cancer is

11:17:22  5    the cornerstone of the Taxotere treatment, so they have this

11:17:25  6    goal.  Their number one competitor was, right, it was Taxol,

11:17:30  7    and Aussell and Freedman go to support them that that was the

11:17:35  8    number one competitor.

11:17:37  9              Remember, Your Honor, you heard in the first

11:17:39 10    trial that Taxotere and Taxol are, more or less, equally

11:17:42 11    effective and that doctors prescribed based upon side effects.

11:17:47 12    Well, what would happen if the information of PCIA got out into

11:17:54 13    the marketplace?  Reasonably, it would impact the use of the

11:17:57 14    drug.

11:17:59 15              It's clear and it's simple because doctors

11:18:03 16    prescribe based upon side effects.  That fits within, clearly,

11:18:06 17    Sanofi's motive in this case in not allowing the information of

11:18:11 18    PCIA to get out there and not changing their label and not

11:18:15 19    activating the megaphone so that doctors would have known --

11:18:19 20              THE COURT:  Wait.  I'm so confused.  I thought this was

11:18:22 21    a motion to preclude punitive damage evidence.

11:18:28 22              MR. SCHANKER:  That's the title of the motion,

11:18:32 23    Your Honor, but if you (speaking simultaneously) --

11:18:34 24              THE COURT:  -- not relevant and any probative value of

11:18:39 25    this evidence was substantially outweighed, so you're not going

*OFFICIAL TRANSCRIPT*

11:18:42  1  to attempt to offer any evidence regarding profits, the

11:18:47  2  financial size of Sanofi.  Okay.  So, what you intend to offer

11:18:54  3  is they had incentive not to warn.

11:18:58  4      MR. SCHANKER:  Right on, Your Honor.  Right within your

11:19:03  5  ruling within the *Earnest* case on motions.

11:19:09  6      THE COURT:  Now, Mr. Ratliff, how is it relevant that

11:19:10  7  you had an incentive not to warn about something that you knew?

11:19:15  8      MR. RATLIFF:  So, Your Honor, I think you will see when

11:19:17  9  you start looking at the designations, all you have heard is

11:19:17 10  attorney arguments.  What you do not have is anything linking

11:19:21 11  us to any sort of motive or incentive between what the revenue

11:19:25 12  was of Taxotere in the United States and what the revenue goals

11:19:30 13  of Taxotere was in Europe with anything related to permanent

11:19:35 14  chemotherapy induced alopecia.  There will be no evidence, even

11:19:39 15  speculative evidence that somebody said --

11:19:39 16      THE COURT:  Let me see if I can make myself clear.  I

11:19:50 17  think I'm not going to have evidence regarding whatever your

11:19:56 18  goals and that sort of thing.  I think that's punitive damage

11:20:00 19  evidence.  However, I would allow evidence regarding incentive

11:20:09 20  not to report the side effects.  Now, that's a pretty nuanced

11:20:16 21  response, but it's a little bit I have to see the question

11:20:19 22  before I think you cross the line.

11:20:23 23      I think because there are concerns that this is a

11:20:26 24  side effect that will cause doctors not to prescribe it so

11:20:36 25  maybe we just keep this under our hat, that's a different

**OFFICIAL TRANSCRIPT**

11:20:40  1    matter, but this broad, and I think for people -- Mr. Schanker,

11:20:50  2    I will tell you, I would be the most shocked person in the

11:20:54  3    world if the people at Sanofi didn't say it was our intent to

11:20:59  4    corner this market.

11:21:01  5            I think every pharmaceutical company that

11:21:01  6    manufactures a drug that they believe to be a good drug has the

11:21:05  7    intent to be the primary distributor of a medication to treat a

11:21:15  8    certain illness.  I think that's relevant.  But if we determine

11:21:28  9    that this is some sort of intent of to not report a side

11:21:28 10    effect, that's a different matter.

11:21:35 11            MR. SCHANKER:  Your Honor, may I address this?

11:21:35 12            THE COURT:  Wait.  Mr. Ratliff is talking.

11:21:39 13            MR. RATLIFF:  Yeah, let me just address that very

11:21:39 14    briefly.  One, there will not be any evidence like that that we

11:21:44 15    have got some sort of financial incentive with not disclosing

11:21:45 16    PCIA.  I'm certain of that.

11:21:47 17            Our concern is questioning like this.  This is

11:21:49 18    from George Manis' testimony that we cited:

11:21:50 19            QUESTION:  "Do you know how much money Sanofi

11:21:52 20    made from the sale of Taxotere?"

11:21:53 21            This is the answer:

11:21:55 22            ANSWER:  "In terms of revenue, it was a

11:21:57 23    blockbuster drug.  Its revenue exceeds one billion in the

11:22:01 24    United States."

11:22:01 25            That's it.  What we don't want to have happen,

*OFFICIAL TRANSCRIPT*

11:22:04  1    Your Honor, is Mr. Schanker in his opening saying this is a

11:22:07  2    billion-dollar drug, this is a blockbuster drug, and then

11:22:09  3    trying to draw an inappropriate reference -- inference that

11:22:13  4    somehow the blockbuster drug, the, quote, blockbuster drug or

11:22:17  5    billion-dollar drug has any relationship to what was or was not

11:22:21  6    done with permanent hair loss in the Taxotere label.  If they

11:22:26  7    have evidence of that, we're happy to see it -- and that's our

11:22:30  8    real concern, Your Honor.

11:22:30  9         THE COURT:  Got it.

11:22:33  10         Mr. Schanker.

11:22:34  11    MR. SCHANKER:  Your Honor, if I may.  We hear you loud

11:22:37  12    and clear.  We're not going to introduce -- we're not trying to

11:22:38  13    introduce evidence about what the profits were.  We understand

11:22:40  14    what you're saying concerning about that.

11:22:42  15         That's a much different question from the goals

11:22:44  16    of the company.  Because the testimony that's been offered,

11:22:49  17    Dr. Kardinal, the prescribing doctor, said that if he knew

11:22:51  18    about this, he would have gone with Taxol.  He would have

11:22:55  19    advised the patient.  This is one example of where a patient

11:22:58  20    would have gone to Taxol.

11:22:59  21         The goals of the company were to become a

11:23:02  22    billion-dollar taxane, to become a blockbuster taxane, not what

11:23:07  23    their profits were.  That was the goal they set out to achieve,

11:23:11  24    to become the number one taxane, the number one chemotherapy

11:23:15  25    drug in the world, and there is evidence that showed that they

*OFFICIAL TRANSCRIPT*

11:23:20  1   understood that if doctors knew about this, that they wouldn't

11:23:24  2   use their drug.  That goes -- that fits right into the --

11:23:27  3        THE COURT:  Well, if you have evidence that they said

11:23:30  4   we know that doctors know about this, they won't use my drug --

11:23:36  5        MR. SCHANKER:  We have evidence from a doctor in this

11:23:37  6   case that said just that.

11:23:39  7        THE COURT:  Well, you can say that doctor said that

11:23:41  8   but, I think that's prejudicial to say that Sanofi knew and

11:23:46  9   they intentionally didn't warn about it because they thought it

11:23:53 10   would affect their profits.  That's a different matter.

11:23:56 11            I think you're going from one step way to the

11:23:59 12   finish line without running the race.  I think that's really

11:24:07 13   prejudicial without your ability to connect the dots.

11:24:10 14        MR. SCHANKER:  Your Honor, as you know well, expert

11:24:15 15   testimony is not allowed in this.  We can't have an expert come

11:24:18 16   in and say it's my expert opinion that the company did this and

11:24:22 17   that this was their motive.  Instead --

11:24:25 18        THE COURT:  No, you have to have fact testimony.

11:24:26 19        MR. SCHANKER:  Right.  Right.  The facts.

11:24:28 20        THE COURT:  And somebody has to say it.  I have to see

11:24:42 21   it.  Punitive damages are not allowed in Louisiana.

11:24:42 22        MR. SCHANKER:  Right.

11:24:45 23        THE COURT:  If there is evidence that there was an

11:24:50 24   incentive not to report this, then I'll have to see that

11:24:55 25   evidence, because I think then that's relevant.

*OFFICIAL TRANSCRIPT*

11:24:55  1        MR. SCHANKER:  Yes, Your Honor.

11:24:59  2        THE COURT:  And it's admissible.

11:24:59  3        MR. SCHANKER:  Mr. Ratliff recommended that this issue

11:25:04  4   really will be teed up for you well when you go through the

11:25:07  5   depositions, so thank you for listening to us.  (Audio

11:25:10  6   disruption) when you go through those documents, you'll see

11:25:12  7   that.

11:25:12  8        THE COURT:  I know a lot of this I'm deferring.  You

11:25:14  9   just want to be able to articulate the objection prior to me

11:25:18 10   seeing the testimony.  Thank you.

11:25:20 11        MR. SCHANKER:  Thank you.

11:25:21 12        THE COURT:  All right.  Number 35, Ms. Sastre and

11:25:25 13   Mr. Mura, Dear Healthcare Provider Letters.

11:25:27 14        MS. SASTRE:  Yes, Your Honor.  Hildy Sastre.  I just

11:25:34 15   realized I'm supposed to be announcing who I was every time I

11:25:35 16   spoke.  I haven't done that yet.  So, I'll try and be brief.

11:25:38 17        Your Honor, we are the last defense motion, so

11:25:40 18   there is some good news there.  This was a motion that it was

11:25:44 19   not filed in the *Earnest* case, and so, it is something that is

11:25:49 20   different here.  You're hearing it for the first time.

11:25:51 21        It's to exclude evidence or argument as to what

11:25:55 22   Sanofi should have done with regard to sending out what's

11:25:58 23   called, essentially, a *Dear Health letter,* and specifically,

11:26:01 24   that one should have been sent to the prescriber, in this case,

11:26:04 25   Dr. Kardinal, regarding permanent hair loss.

***OFFICIAL TRANSCRIPT***

11:26:06  1            So, the first argument, Your Honor, is that this

11:26:09  2    argument -- and, really, there is no evidence of it.  It's just

11:26:13  3    sort of like, as Mr. Ratliff just said, it's really kind of

11:26:18  4    attorney talk.  It's an argument that it should happen.  It's

11:26:21  5    simply not relevant to plaintiff's claim.

11:26:22  6            So, as Your Honor is aware, the focus of the

11:26:26  7    failure to warn claim, the thrust of it comes down to what was

11:26:31  8    in the label.  We all, I'm sure, can agree today that even if a

11:26:35  9    *Dear Doctor* letter had gone out, we would still be sitting here

11:26:39  10   in this MDL with the failure to warn claim, and so, that is

11:26:42  11   what this really comes down to, Your Honor.

11:26:46  12           The idea, there is sort of like this theory,

11:26:49  13   this, like, worst kind of speculation, Judge, that, one, that

11:26:54  14   this should have been done, which, by the way, just to pause

11:26:56  15   there for a moment, that statement, in and of itself, is going

11:27:02  16   to lead to, truly, sort of a mini trial on all things related

11:27:06  17   to FDA guidance and regulation under what circumstances these

11:27:12  18   letters can be sent out and whether they require FDA approval

11:27:14  19   and on and on and on.

11:27:17  20           But the idea in theory is that it should have

11:27:20  21   been done, that if it had been done, that FDA would have said

11:27:22  22   okay, and that if Dr. Kardinal had gotten something like this,

11:27:27  23   then he would have looked at it and he would have paid

11:27:30  24   attention and something different would have happened here, but

11:27:32  25   none of that makes a difference because we still come back to

**OFFICIAL TRANSCRIPT**

11:27:36 1   the question, Judge -- and, again, it's pure speculation upon

11:27:41 2   speculation -- which is, is the information in the label

11:27:45 3   accurate?

11:27:45 4          So, the second argument, Your Honor, and is,

11:27:50 5   perhaps, most important is that these letters, as a matter of

11:27:53 6   fact, are regulated by FDA, and FDA clearly states that such

11:27:57 7   letters, particularly when you're talking about a change in

11:28:01 8   something like a warning -- this isn't like, hey, you know, for

11:28:05 9   example, there is a letter that went out on --

11:28:06 10          THE COURT:  What does the FDA say about these letters?

11:28:06 11          Ms. Sastre, y'all have gone 10 minutes but (audio

11:28:09 12   disruption) --

11:28:13 13          MS. SASTRE:  Okay.  So, the FDA says, Your Honor, that

11:28:19 14   such letters can be used to notify healthcare providers of

11:28:22 15   important new or updated information, and here is the important

11:28:25 16   part, when leading to important safety concerns, and the

11:28:29 17   examples given are serious, life-threatening reactions.  But

11:28:33 18   here, as we know, Judge, when the label is updated in 2015, FDA

11:28:38 19   instructed Sanofi --

11:28:39 20          THE COURT:  Okay.  I got it.

11:28:41 21          Mr. Mura.

11:28:44 22          MR. MURA:  Good morning, Your Honor.  Ms. Sastre was

11:28:47 23   right that this wasn't raised in *Earnest*, and it hasn't been

11:28:51 24   raised in any other case.  Ms. Sastre hasn't cited a single

11:28:55 25   court that has excluded or prevented plaintiffs in a failure to

**OFFICIAL TRANSCRIPT**

11:28:58  1  warn case from even mentioning whether the company had informed

11:29:02  2  doctors in some way, including for these letters, which are

11:29:05  3  routinely sent.

11:29:06  4          We cited two samples of where Sanofi itself sent

11:29:11  5  *Dear Doctor* letters in 2008 related to permanent hair loss and

11:29:16  6  also related to the use of a particular needle and how it

11:29:21  7  should be used.  It's not limited to serious warnings and

11:29:27  8  precautions.  The company does and can use this sort of

11:29:30  9  communication tool to inform doctors about risks and

11:29:34 10  information as it learns them.

11:29:37 11          The simple question in *Earnest*, which was asked

11:29:40 12  of treating physician there, was did Sanofi ever send you a

11:29:44 13  letter or communication or a *Dear Doctor* letter letting you

11:29:47 14  know about these risks or letting you know what the company

11:29:49 15  knew?  And the answer there was no.  Dr. Kardinal was asked

11:29:52 16  about the same thing in his deposition.  He said no.  That, of

11:29:56 17  course, is relevant.  It's relevant to Sanofi's knowledge.

11:30:02 18          THE COURT:  They're just listed as serious,

11:30:04 19  life-threatening conditions -- reactions.

11:30:06 20          MR. MURA:  No, I don't believe it's limited to those

11:30:10 21  with serious, life-threatening reactions.  It can be a

11:30:14 22  communication tool to inform doctors of risks or safety

11:30:19 23  information that the company is aware of.

11:30:22 24          So, we gave two examples.  One was as early as

11:30:26 25  2008, Sanofi was sending letters regarding permanent hair loss

*OFFICIAL TRANSCRIPT*

11:30:30  1    in response to inquiries from consumers and healthcare

11:30:33  2    providers.  That's footnote 218 of our brief.  That's an

11:30:37  3    example.  So, Sanofi can't be right about the FDA guidance and

11:30:45  4    how limited it is.  It's not so limited.

11:30:47  5          We cited another example in which Sanofi sent out

11:30:51  6    on a safety issue explaining you need to use a particular

11:30:53  7    needle when withdrawing Taxotere from its vial.  That's not

11:30:57  8    related to any sort of serious adverse event.  That's just

11:31:01  9    medical information that a manufacturer can update doctors for.

11:31:05 10    So, this is just --

11:31:07 11          THE COURT:  Is this just a form of promulgation of new

11:31:10 12    information?

11:31:11 13          MR. MURA:  Correct, Your Honor.  The testimony that

11:31:13 14    we're talking about for Dr. Kardinal is about a sentence or two

11:31:17 15    long where David Miceli just asked Dr. Kardinal, "Did they send

11:31:23 16    you a letter?  Did you get anything called a *Dear Doctor*

11:31:26 17    letter?  Did you remember any communication?"

11:31:27 18          He says, "No, I don't remember any

11:31:30 19    communication."

11:31:30 20          Then he's asked, "Would you have changed your

11:31:32 21    prescribing habits had Sanofi given you more information?"

11:31:36 22          He says, "Yes."

11:31:37 23          That's -- of course, that's relevant.  That's the

11:31:39 24    central issue in a failure to warn case; so, we're talking

11:31:43 25    about three sentences of videotape information.  There is no

*OFFICIAL TRANSCRIPT*

11:31:46  1   reason to exclude it.

11:31:47  2                Thank you.

11:31:48  3        THE COURT:  Thank you.

11:31:51  4        MS. SASTRE:  Your Honor, briefly.  So, I think, just

11:31:53  5   from the back and forth that you're hearing, there is a very

11:31:58  6   significant and fundamental disagreement with regard to FDA

11:32:02  7   guidance and where they are on this issue, and that is

11:32:04  8   something that is going to have to be addressed because, again,

11:32:07  9   the examples are previously unknown, serious, or

11:32:11  10  life-threatening adverse reactions.

11:32:14  11               Again, we know here, Judge, when this information

11:32:18  12  was added to the label, the FDA did not consider it serious or

11:32:23  13  life-threatening, and we know that because they placed this

11:32:24  14  information not on the warning section but in the adverse

11:32:29  15  reactions section.

11:32:31  16       THE COURT:  Were you talking about Dr. Kardinal's

11:32:36  17  testimony?

11:32:36  18       MS. SASTRE:  I'm sorry.  I didn't hear your question.

11:32:34  19       THE COURT:  Were you talking about Dr. Kardinal's

11:32:36  20  testimony?

11:32:37  21       MS. SASTRE:  I believe that's right, Your Honor.

11:32:39  22               I guess, simply, the last thing I said, the last

11:32:42  23  sentence is that, at the end of the day, again, even if

11:32:45  24  Dr. Kardinal had received this letter, even if it had been

11:32:47  25  allowed, you know, we were in a multi (indiscernible)

*OFFICIAL TRANSCRIPT*

11:32:50 1    conversation with FDA as to what was going to happen with

11:32:53 2    regard to this warning in the label.  Even if that had

11:32:56 3    happened, they would still be in here saying that the warning

11:33:00 4    label is inaccurate.

11:33:03 5           It is simply not probative of any issue, and it's

11:33:05 6    basically taking a shot saying the company didn't do something

11:33:09 7    that they were supposed to do, but there is no evidence to

11:33:12 8    suggest that that should have been done.

11:33:13 9           Again, that's just sort of like this argument

11:33:16 10   based upon inference upon inference that it would have been

11:33:19 11   allowed, and we will have to spend time on that now.

11:33:21 12        THE COURT:  Okay.  Thank you.  I'll have to --

11:33:21 13        MS. SASTRE:  (Speaking simultaneously) Thank you,

11:33:21 14   Your Honor.

11:33:21 15        THE COURT:  -- that.  Thank you.

11:33:23 16           Motion to Bar Prejudicial Litigation Conduct.

11:33:29 17        MS. SASTRE:  I'm sorry, Judge, what was your ruling on

11:33:31 18   the last one?

11:33:31 19        THE COURT:  I'm going to look at Dr. Kardinal's study.

11:33:31 20        MS. SASTRE:  You're going to look.

11:33:35 21        THE COURT:  Motion to Bar Prejudicial Litigation

11:33:38 22   Conduct.  I'm going to be honest with you, do you know what I

11:33:40 23   wrote in my notes?  *Ridiculous*, but you can make your

11:33:44 24   arguments, Mr. Schanker.  This is plaintiff's Motion in *Limine*.

11:33:49 25   I will tell you, anybody can try a fake Cajun accent, and you

**OFFICIAL TRANSCRIPT**

11:33:56  1   can talk about Alabama football all you want with the jury.

11:33:59  2        MR. SCHANKER:  Your Honor, you know what I wrote in my

11:34:04  3   notes when I saw my name on this one?  *Ridiculous*.  Why is it

11:34:07  4   even on the list?  You can look at the simple issue that was in

11:34:11  5   the papers, and quite frankly, I didn't see the defendants

11:34:13  6   violate this.  They shouldn't be referring to *us* and *we*.

11:34:17  7        By the way, Your Honor, just to be clear, I

11:34:19  8   appreciated Mr. Moore's comment about the *foot of the Causeway*

11:34:23  9   *and getting everybody there*.

11:34:24 10        Thank you.

11:34:27 11        THE COURT:  Mr. Moore, do you want to talk about

11:34:28 12   Alabama football to the jury?

11:34:32 13        MR. MOORE:  I think the motion is -- I had a lot of

11:34:35 14   things to say about it because I thought it was directed to me

11:34:38 15   and my behavior in front of the jury, but I think that

11:34:43 16   Your Honor has -- I have full faith in Your Honor's ability to

11:34:50 17   reign someone in if they do something inappropriate in front of

11:34:53 18   the jury.

11:34:53 19        THE COURT:  Okay.  We don't need three minutes on this

11:34:56 20   one.  We certainly don't need three minutes.

11:34:58 21        When I read it, I will be honest with you, my

11:35:01 22   note, because my law clerk then took all of my notes which were

11:35:06 23   in the margin, was *ridiculous*.  It's ridiculous.  I didn't see

11:35:10 24   anything that occurred in that first trial that in any way I

11:35:18 25   thought prejudicial.

**OFFICIAL TRANSCRIPT**

11:35:18  1          I did think, if you want to prejudice the jury,

11:35:21  2   try to fake a Cajun accent.  Then you're going to really

11:35:24  3   prejudice a jury.  Talking about Alabama football, that was the

11:35:27  4   other reference, but I saw nothing where anybody attempted in

11:35:33  5   any way to be anything but very prejudicial during a trial of

11:35:37  6   this matter, and I thought Mr. Moore's comment, I have to tell

11:35:40  7   you, when I read it, I thought, I don't even remember that.

11:35:43  8   I'm sure it was at the end of a day when everybody was tired,

11:35:47  9   and I thought -- and then I have to tell you, I was a bit

11:35:51 10   surprised that anybody wanted this at oral argument.

11:35:54 11          So, what I will say is this:  I'm going to defer

11:35:57 12   all of this nonsense to trial, and if somebody starts behaving

11:36:04 13   in a way that's problematic, I will probably call a recess and

11:36:07 14   call you to the bench and tell you to stop acting

11:36:16 15   unprofessional, but I don't need a Motion in *Limine* for this.

11:36:18 16   So, I don't know whose idea it was.  That's (audio distortion).

11:36:23 17   Just don't do that again.

11:36:23 18          MR. MOORE:  Thank you, Judge.

11:36:29 19          THE COURT:  Thank you.

11:36:29 20          Let's to go the next motion.  So, Mr. Moore, I

11:36:31 21   hope you had more to argue about, and that you're not just

11:36:34 22   stuck hanging around for this one.  This is Exclude Testimony

11:36:37 23   or Argument That Taxotere Has Been Proven Superior to Taxol --

11:36:41 24   or Any Other Drug Other Than 5-FU -- Or That Taxotere Gave

11:36:48 25   Plaintiff the "Best Chance" of Surviving Cancer, or That

*OFFICIAL TRANSCRIPT*

Taxotere Gave Her the "Best Chance" for Preventing Her Cancer from Returning.

I have read this.  I'm not sure I understand that there is much disagreement, and I will tell you what my thoughts on this entire thing:  I don't think there is any evidence that says that Taxotere has been proven superior to Taxol in terms of efficacy.

What I have read is that they have different side effects, and the different side effects causes a cost-to-benefit analysis that every doctor goes through when determining what's the best course of action for the plaintiff, given the patient and in conversations with the plaintiff -- the patient.  I'm sorry.

So, I think anything here has to be deferred.  I don't think that anybody is going to say Taxotere gave her her best chance over Taxol.  The question is whether or not there was a side effect that they were primarily concerned with.

So, with that, Mr. Strongman.  You can make your argument.  You don't need to repeat what I've already said.

MR. MICELI:  I think that's mine.  Can you hear me, Your Honor?

THE COURT:  Okay.  Mr. Miceli.

MR. MICELI:  This is David Miceli.  Yes, Your Honor. With what you have said, I would point out that you're prefacing for this motion -- before we start, that's an Auburn

*OFFICIAL TRANSCRIPT*

11:38:40  1   helmet back there, Your Honor.  I will not talk about Alabama

11:38:46  2   football.

11:38:46  3        THE COURT:  I wouldn't talk about Auburn or Alabama

11:38:52  4   here in Louisiana, or Miami, for that matter.

11:38:53  5        MR. MICELI:  The enemy of my enemy is my friend.

11:38:53  6        THE COURT:  Feel free to do that.

11:38:56  7        MR. MICELI:  What you brought up at the beginning in

11:38:59  8   prefacing this argument was really the difference between

11:39:01  9   talking about the efficacy of Taxotere and talking about a

11:39:05 10   risk/benefit based upon the side effects.

11:39:07 11        Without going through too much of this or

11:39:09 12   repeating it, it's important to point out that no expert for

11:39:14 13   Sanofi, when addressing simply efficacy, says that Taxotere is

11:39:22 14   better than Taxol or that Taxotere is more effective than

11:39:31 15   Taxol.  We recognize that.  Dr.  Glaspy says it eight times in

11:39:32 16   his deposition.

11:39:32 17        Most importantly, there are only two studies that

11:39:34 18   have ever compared the two, and that is the SOPRANO study,

11:39:36 19   which, again, like Dr. Glaspy says demonstrates equal efficacy,

11:39:41 20   and he repeats that over and over.

11:39:43 21        THE COURT:  Based on what I've said, Mr. Miceli, what

11:39:46 22   changes?

11:39:47 23        MR. MICELI:  What changes is there is no basis.  As

11:39:51 24   Your Honor knows, the test is when someone is making an

11:39:54 25   argument before the jury or cross-examining an expert, evidence

*OFFICIAL TRANSCRIPT*

11:39:58 1    has to have some basis in fact.

11:40:01 2            What Ms. Sastre said in her closing argument at

11:40:07 3    page 2218, lines 1 through 5, of the *Earnest* trial, she said,

11:40:12 4    "The evidence has proven that a Taxotere regimen gave her the

11:40:18 5    best chance to survive and the best chance for her cancer not

11:40:22 6    to come back."

11:40:23 7            That is exactly what she just said I don't

11:40:26 8    believe anybody is saying; yet, Ms. Sastre said that, and that

11:40:28 9    is a scientific statement of (speaking simultaneously) --

11:40:31 10           THE COURT:  If I -- if I -- let me -- let me -- if I

11:40:33 11   issue this order, do you have a problem with it, what I said?

11:40:40 12           MR. MICELI:  Issue an order granting my motion, or our

11:40:42 13   motion, I would not have any problem, Your Honor.

11:40:44 14           THE COURT:  I just said that the Court notes that

11:40:46 15   evidence -- that side effects, the efficacy is the same.  The

11:40:54 16   side effects is what's considered when making a determination

11:41:00 17   of the appropriate course of action for the patient.

11:41:02 18           MR. MICELI:  I think that's one of the things.  I think

11:41:05 19   that the individual doctor has to say what he does, but what's

11:41:08 20   important, well, I didn't get to the second head-to-head study.

11:41:12 21   The second head-to-head study between Taxotere and Taxol --

11:41:17 22           THE COURT:  Nobody says Taxotere is better than Taxol

11:41:21 23   in terms of efficacy.

11:41:23 24           Mr. Strongman, do you have anybody that's going

11:41:25 25   to say that?

*OFFICIAL TRANSCRIPT*

11:41:25  1        MR. STRONGMAN:  No.

11:41:26  2        THE COURT:  Now, Mr. Miceli, now what's your problem?

11:41:28  3        MR. MICELI:  It's not a problem, Your Honor.  It's just

11:41:31  4   that the only study -- the only other study is this Taxotere

11:41:36  5   revenue study that demonstrated more neurotoxicity with

11:41:40  6   Taxotere, not Taxol.

11:41:42  7             Now, what Dr. Glaspy said is everybody knows that

11:41:48  8   Taxol has more neurotoxicity, and everybody knows that is not a

11:41:52  9   basis, and so, there is no basis in fact to make that statement

11:41:57 10   that Taxotere is superior even based on cost, not talking

11:42:03 11   cost/benefit, but a risk/benefit analysis simply because one

11:42:07 12   expert says, yes, everybody knows it.  That's not a

11:42:09 13   methodology.

11:42:11 14             It's cited in our briefing, but *U.S. v Morris*, an

11:42:14 15   attorney can't just inject argument of extrinsic facts that

11:42:18 16   have no basis in fact, and that's our problem, Your Honor.

11:42:22 17   They can't do it through Dr. Kardinal because he says the same

11:42:26 18   thing that Dr. Glaspy does, that they are equally effective,

11:42:30 19   and he doesn't talk generally about risks.  He even said that

11:42:33 20   he can only testify in a permissive core of issue pertaining to

11:42:38 21   his treatment alone.

11:42:39 22             That's all, Your Honor.  Thank you.

11:42:40 23        THE COURT:  Thank you.

11:42:40 24             Mr. Strongman.

11:42:42 25        MR. STRONGMAN:  The only thing I would add, I agree

*OFFICIAL TRANSCRIPT*

11:42:45 1    with you, Your Honor, that we are not going to bring in an

11:42:47 2    expert or any witnesses that says Taxotere is more effective.

11:42:50 3    We certainly do believe, however, that the risk/benefit

11:42:54 4    analysis that you articulated at the beginning of this is

11:42:58 5    absolutely irrelevant, and that includes the side-effect

11:43:00 6    profile.  Dr. Glaspy talks about that.  Dr. Kardinal talks

11:43:03 7    about that.

11:43:04 8           There certainly is evidence about neurotoxicity.

11:43:06 9    There is testimony about that directly from Dr. Kardinal, so we

11:43:11 10   do believe it is appropriate to argue, you know, to argue and

11:43:14 11   put on evidence about what the best options were for her.

11:43:18 12   That's different than saying Taxotere is higher in efficacy.

11:43:22 13   We won't do that, so I think we --

11:43:24 14        THE COURT:  Okay.  Then I'm not going to allow argument

11:43:26 15   that Taxotere was the only drug that could save her life

11:43:30 16   because Taxol could.  When you look at side effects, that's a

11:43:33 17   different matter.  Background of people is a different matter.

11:43:37 18           All right.  So, I'm going to grant it to the

11:43:40 19   extent that I will not allow testimony, because there is none,

11:43:44 20   that says that Taxotere has greater efficacy than Taxol.

11:43:49 21           Now, what doctors look at in an individual

11:43:54 22   patient for background and side-effect protocols are a

11:43:57 23   different matter, and that is absolutely relevant in this case.

11:43:59 24        MR. STRONGMAN:  Thank you, Your Honor.

11:44:03 25        MR. MICELI:  That's fine.  Thank you.

                          *OFFICIAL TRANSCRIPT*

THE COURT:  Motion to Exclude Evidence of Unrelated Medical Conditions, Unrelated Familial Medical History, and Unrelated Medical Usage.  This is Mr. Schanker and Mr. Ratliff.

MR. SCHANKER:  Thank you, Your Honor.  May I?

THE COURT:  Yeah.  I'm trying to hurry you up.

MR. SCHANKER:  Yes, I'll do my best to speed along.

Your Honor, we appreciate that you're not going to allow unreliable, the way you've said it, you're not going to allow unreliable scientific evidence in this case, but it's our belief, based on all the questioning that's been done in the depositions and all the discovery, that, in fact, defendant's strategy in this case is try to inject unreliable evidence.  I have a laundry list of it.  I guess, practically, the issue is how are we going to deal with that?  How are we going to keep that unreliable evidence out following that line that you've drawn?

To give you some examples, Your Honor, we have metabolic syndrome, which we don't have a diagnosis of metabolic syndrome in this case.  We have regulated vitamin D deficiency.  There is no reliable evidence that regulated vitamin D deficiency leads to permanent hair loss.  The distinction, as you're well aware, is between hair loss and permanent hair loss.  This case is not about hair loss; it's about permanent hair loss.

Other deficiencies, autoimmune conditions,

*OFFICIAL TRANSCRIPT*

seborrheic dermatitis.  No evidence of reliable evidence that it causes permanent (verbatim).  Lisinopril.  Fluconazole. Drugs that she's on.  Fluconazole is an antifungal medication that the defense is trying to inject.  These are all testosterone gels.  The chemotherapy drugs for which there is no reliable evidence that they cause PCIA.  Avastin.  Solodyn. There is zero evidence that any of those cause PCIA.

The concern is that if the defense strategy, Your Honor, is to throw all of this stuff against the wall, see what sticks, if anything does, if anything doesn't, but more so to confuse the jury and, obviously, more gatekeeper function. It feels like this is the time to be vetting at the gate.

Your Honor, if you remember Dr. Fonseca -- this goes back a couple of years.  The name may be familiar. Dr. Fonseca was an endocrinologist that the defense endorsed, and you indicated that you were going to exclude him on *Daubert* in his entirety in a conference in chambers, and defense then promptly withdrew him.  Fonseca -- this is all that Fonseca was going to testify about all this stuff and it wasn't reliable testimony.  He was going to talk about obesity.  He was going to talk about --

THE COURT:  Okay.  Let me hear from Mr. Ratliff.

MR. RATLIFF:  Thank you.

Thank you, Your Honor.

I think Mr. Schanker is correct that when he

*OFFICIAL TRANSCRIPT*

11:46:55  1    talks about this being a gatekeeping function, none of these

11:46:57  2    issues relate to *Daubert*.  All of our dermatologists passes

11:47:01  3    through the *Daubert* hurdle, and if you look at the issues that

11:47:03  4    they raise, what they call *unreliable conditions*, if you look

11:47:05  5    at each one of our experts' reports, whether it's Turegano,

11:47:08  6    Shapiro or Freites-Martinez, they talk about each one of these

11:47:12  7    conditions as being something that contributes to hair loss,

11:47:15  8    contributes to permanent hair loss, and is part of the

11:47:17  9    underlying basis of their diagnosis that she had androgenetic

11:47:23  10   alopecia, and that is how they reach that conclusion.

11:47:25  11          I think there is a disconnect.  Our experts don't

11:47:26  12   say that she had permanent chemotherapy induced alopecia, but

11:47:31  13   what they do do is they walk through, and I'm looking at

11:47:34  14   Turegano's report for vehicle number 12.  They raise the issue

11:47:37  15   of menopause.  She talks about the causes and risk factors of

11:47:39  16   alopecia, page 12 of her report.  She talks about that

11:47:42  17   menopause is a contributing and causative factor of

11:47:48  18   androgenetic alopecia.

11:47:50  19          Then she looked at page 16 of her report, and she

11:47:52  20   talks about -- she says, "In my opinion, my expert opinion,

11:47:54  21   Ms. Kahn has androgenetic alopecia.  Let me walk through the

11:47:58  22   rationale and the basis of which I reached that opinion," and

11:48:01  23   she lines up the conditions that cause hair loss, cause

11:48:08  24   persistent hair loss, and she winds up which of those

11:48:10  25   conditions has Ms. Kahn been diagnosed with, which of those

*OFFICIAL TRANSCRIPT*

11:48:14 1    medications has she been taking long term, and they all come

11:48:18 2    from her medical record, they all come from medical records

11:48:19 3    describing what medications she's taking, and they come from

11:48:24 4    Dr. Turegano's in-person examination of this plaintiff.

11:48:29 5            So, really, what Mr. Schanker is trying to do is

11:48:32 6    instead of raising this as *Daubert*, they thought these were

11:48:35 7    unreliable causes, is to now challenge the expert opinions and

11:48:39 8    conclusions of Turegano, Shapiro, Freites-Martinez and then

11:48:43 9    take out the legs of all the bases that are all of the factors

11:48:46 10   that went into their ultimate conclusion that she had

11:48:49 11   androgenetic alopecia and not chemotherapy induced alopecia,

11:48:49 12   Your Honor.

11:48:54 13           If you look at those reports, I know you have

11:48:56 14   them from the *Daubert* briefing, you will see every single one

11:48:59 15   of those conditions that they say is unreliable listed and

11:49:03 16   described and detailed and lined up with medical records as the

11:49:06 17   basis and support for their diagnosis of androgenetic alopecia

11:49:12 18   or potentially some form of adrenochrome therapy alopecia.

11:49:12 19           MR. SCHANKER:  May I respond, Your Honor?

11:49:12 20           THE COURT:  Wait.

11:49:22 21           MR. RATLIFF:  I think none of these are unreliable.

11:49:23 22   They are all reliable from experts who are --

11:49:24 23           THE COURT:  I got it.  Mr. Schanker.

11:49:28 24           MR. SCHANKER:  I'm glad Mr. Ratliff said that.  The key

11:49:31 25   thing he said there was dermatologists, not oncologists.

*OFFICIAL TRANSCRIPT*

11:49:36 1    Your Honor, do you remember who they called last time as their

11:49:39 2    omnibus expert?  An oncologist to testify about hair loss.  An

11:49:39 3    oncologist.

11:49:46 4              This ties into the next motion.  An oncologist,

11:49:50 5    Dr. Glaspy, to talk about permanent hair loss, and the

11:49:55 6    dermatologist to come in to talk about this reliable evidence,

11:49:58 7    but certainly not an, oncologist, and that is exactly what

11:50:03 8    Dr. Glaspy did last time.

11:50:04 9         THE COURT:  But Dr. Glaspy didn't cover that in his

11:50:07 10   report.

11:50:10 11        MR. SCHANKER:  Sorry, Your Honor.  Go ahead.

11:50:11 12        THE COURT:  Go ahead.  You're going to have to help me.

11:50:13 13        MR. SCHANKER:  Dr. Glaspy did talk about other causes,

11:50:16 14   but she could not rule out a permanent hair loss.  What we are

11:50:22 15   faced with here then -- and with all due respect, the devils

11:50:27 16   will be in the detail, but specifically concerning the litany

11:50:30 17   of alternate causes, we are not conceding that every single one

11:50:35 18   of them was covered properly in the expert report of the

11:50:37 19   dermatologists, but, again, that is in the details for the 2618

11:50:41 20   disclosure, etcetera.

11:50:42 21             But what's important for us here on this motion

11:50:44 22   is, and it really overlaps to some extent with the next, is

11:50:49 23   that Dr. Glaspy, an oncologist, or Dr. Miletello, who is not a

11:50:54 24   hair loss expert, they don't know anything about the causes of

11:50:57 25   hair loss.  They've never done a differential diagnosis, so to

*OFFICIAL TRANSCRIPT*

11:51:01  1    allow them to be omnibus experts, in essence, to come in and

11:51:05  2    offer what is unreliable testimony concerning permanent hair

11:51:08  3    loss and what is -- what is and what isn't when there is no

11:51:12  4    reliable testimony.  Dr. Glaspy shouldn't be allowed to comment

11:51:16  5    on any of those issues that we just talked about and whether or

11:51:20  6    not they are a cause of permanent hair loss.  That would have

11:51:21  7    to come through the mouth of a dermatologist.

11:51:24  8                The question is when we get to these areas that

11:51:27  9    are unreliable, as I said, previously --

11:51:31 10          THE COURT:  I get.  I get it.

11:51:36 11          MR. SCHANKER:  If I may, Your Honor, just one more

11:51:38 12    point.  This very well --

11:51:40 13          THE COURT:  Are you telling me that you're concerned

11:51:42 14    that defendants are going to introduce the evidence from a

11:51:47 15    dermatologist through a witness who is not qualified to render

11:51:51 16    those opinions?

11:51:52 17          MR. SCHANKER:  Beyond that, Your Honor.  Mentioning

11:51:54 18    these things in opening statements that all of these things are

11:51:57 19    a cause when the fact is that some of them are not and that

11:52:00 20    there is no expert that is going to come in and offer

11:52:04 21    substantiating reliable evidence that it is is improper.  You

11:52:10 22    would agree with that.

11:52:11 23                If, for example, the dermatologist doesn't offer

11:52:15 24    that seborrheic dermatitis is one of the -- in the differential

11:52:21 25    diagnosis and a condition that the plaintiff was suffering

                        *OFFICIAL TRANSCRIPT*

set

11:52:23  1   from, then that has no business being in this case.

11:52:29  2       MR. RATLIFF:  Your Honor, these are a lot of the --

11:52:31  3   Mr. Schanker --

11:52:31  4       THE COURT:  Okay.  All right.  I'm not going to allow

11:52:36  5   the defendant's experts to offer speculative testimony about

11:52:40  6   medical conditions for which the plaintiff has no diagnosis.

11:52:44  7   Similarly, they cannot offer testimony regarding medication

11:52:47  8   that the plaintiff does not use.

11:52:48  9       If defendants have a proper foundation for

11:52:51 10   testimony of medical conditions for which plaintiff has a

11:52:55 11   diagnosis or medications that plaintiff uses, defendants may

11:53:00 12   introduce limited testimony of this nature if it is relevant to

11:53:03 13   determining the cause of plaintiffs.

11:53:07 14       I am going to allow limited testimony of

11:53:11 15   plaintiff's family history of cancer because I think it's

11:53:13 16   relevant to her mind-set in deciding her treatment.  In

11:53:17 17   deciding her treatment, I think it matters that a mother, a

11:53:22 18   sister had breast cancer and what her history is.  I don't know

11:53:25 19   if that helps.

11:53:26 20       So, I guess I'm going to have to defer it to

11:53:30 21   trial because I'm just not sure exactly, but if they have an

11:53:35 22   expert that says this lady had this condition and this causes

11:53:39 23   alopecia --

11:53:42 24       MR. SCHANKER:  Your Honor, if I may, concerning the

11:53:44 25   family history of cancer, just to understand where you're

*OFFICIAL TRANSCRIPT*

11:53:47  1    drawing that line, and you referenced mother, sister, brother.

11:53:54  2    I understand that.  I would assume some other kind of cancer

11:54:01  3    that her dad suffered from unrelated to breast cancer, that

11:54:03  4    that is not appropriate --

11:54:04  5         THE COURT:  No.  I really think experience with cancer

11:54:15  6    means something.  Experience with a specific kind of cancer

11:54:19  7    means something else.  I don't want to get into the entire

11:54:22  8    family history issue, but it is relevant if a mother, aunt, or

11:54:25  9    sister because that goes into your entire mind-set.

11:54:29  10        MR. SCHANKER:  Thank you.

11:54:30  11        MR. RATLIFF:  Thank you, Your Honor.

11:54:33  12        THE COURT:  Okay.  The next one, Prohibit the Use of

11:54:36  13   Unreliable Evidence to Support Claims of Alternative Causation

11:54:41  14   and/or Questioning Which Misconstrues the Applicable Burden,

11:54:46  15   and this is Mr. Schanker and Mr. Moore.

11:54:54  16        MR. SCHANKER:  Yes, Your Honor.  If I could take the

11:54:58  17   last part of that first.  We addressed the first part already,

11:55:02  18   but if I could take the last part of that, and, really, that

11:55:03  19   refers to what is the burden implication.  This is just simply

11:55:07  20   just a cause versus the cause, as Your Honor is well aware, a

11:55:12  21   substantial factor.  We don't have to demonstrate it's the sole

11:55:15  22   cause, and we just want to make sure in this case, the

11:55:20  23   defendant shouldn't be able to elicit testimony that it's

11:55:22  24   impossible to determine the sole cause because that's not the

11:55:24  25   law in this case, and simply that's what we're asking for in

*OFFICIAL TRANSCRIPT*

11:55:27 1    this case, that we just carefully, because it can be very

11:55:30 2    confusing for the jury, obviously a cause versus the cause.  We

11:55:35 3    understand that Louisiana law falls in the former camp, and so

11:55:40 4    with regard to that, that's what we're interested in.

11:55:43 5          Then on the first part on the title of the

11:55:46 6    motion, we're referring, again, to Dr. Glaspy, the oncologist,

11:55:49 7    coming in and offering what is unreliable testimony concerning

11:55:53 8    PCIA, permanent hair loss.  The only -- he said he did the

11:55:57 9    eyeball test.  That's the testing that he did, and in, you

11:56:01 10   know, my experience, that doesn't have scientific validity.

11:56:06 11   It's not reliable.  He uses classic, post-hoc, ergo, hoc

11:56:12 12   analysis that somebody's hair fall out -- fell out; therefore,

11:56:15 13   it was caused by this.

11:56:17 14         Dr. Glaspy is certainly an expert in cancer.

11:56:19 15   He's not an expert in permanent hair loss.  He shouldn't be

11:56:22 16   permitted to be talking about causes of permanent hair loss.

11:56:25 17   Simple enough.

11:56:26 18         THE COURT:  Mr. Moore.

11:56:28 19         MR. MOORE:  Yes, Your Honor.  I'll address the two

11:56:30 20   points very briefly.  I don't think the Motion in *Limine* is the

11:56:34 21   right place to argue about what the jury charges will be.  I

11:56:40 22   think that we'll have a charge conference, and the Court will

11:56:43 23   make out the jury charges, and everybody will have their

11:56:46 24   opportunity to say what the expression of the burden of proof

11:56:50 25   should be.

**OFFICIAL TRANSCRIPT**

11:56:51  1              As it relates to the evidence, we think

11:56:54  2    Your Honor has ruled on this several times.  As it relates to

11:56:58  3    Dr. Glaspy specifically, a *Daubert* motion was presented.  You

11:57:04  4    ruled on that *Daubert* motion.  We had challenges to what he

11:57:09  5    could say about the other medicines that the plaintiff took and

11:57:12  6    the reports and the literature that associate those medicines

11:57:15  7    with PCIA as well as other chemotherapy agents.  We think that

11:57:21  8    the Court should -- we see no reason for the Court to change

11:57:23  9    its approach on any of this to this motion.

11:57:26 10         THE COURT:  I'm going to deny the motion.  I think it's

11:57:29 11    a little bit of another bite at the *Daubert* apple, but, again,

11:57:33 12    as I said last time, it's barred and you're going to be limited

11:57:40 13    to what's in the *Daubert* motion.

11:57:43 14              Okay.  Mr. Mura and Mr. Ratliff, Motion to

11:57:48 15    Exclude Improper Arguments or Suggestions Regarding FDA

11:57:51 16    Approval.

11:57:55 17         MR. MURA:  Thank you, Your Honor.

11:57:55 18              This motion just asks the Court to enter the same

11:57:58 19    order that it entered in *Earnest*.  It had two prongs to it.

11:58:01 20    First, the Court said it would not allow defendants to argue or

11:58:06 21    suggest that Sanofi was precluded from changing the label; and,

11:58:10 22    second, the Court said it will not allow the defendants to

11:58:14 23    argue or suggest that Sanofi provided the FDA with all

11:58:19 24    pertinent information; and, yet, the FDA did not take action.

11:58:20 25    Citing why it's an establish case law, the Court explained that

***OFFICIAL TRANSCRIPT***

11:58:24 1   this would improperly suggest to the jury that the FDA shared

11:58:28 2   responsibility for Sanofi's label, which is not correct.

11:58:31 3            So, we simply ask for the same ruling which

11:58:35 4   mostly applies, and Sanofi's response is, well, every time

11:58:38 5   someone, for example, brings up Navajos, we want to tell the

11:58:44 6   jury that the FDA has Navajos, and that's directly contrary to

11:58:47 7   the ruling that the Court entered because that would mislead,

11:58:48 8   as the Court explains, the jury into believing that the FDA,

11:58:53 9   not Sanofi, bears primary responsibility, and just because they

11:58:55 10  had an article, just because they had pertinent information

11:58:59 11  and, yet, did not take action, that it's the FDA's fault and

11:59:03 12  that Sanofi is off the hook.  That would directly contravene --

11:59:05 13  the examples that they gave all directly contravene this

11:59:08 14  court's ruling in *Earnest*.  We merely ask that the Court enter

11:59:12 15  the same order, and I'm happy to answer any questions.

11:59:16 16           THE COURT:  Mr. Ratliff.

11:59:16 17           MR. RATLIFF:  Yeah, Your Honor, we have no indication

11:59:20 18  of -- suggesting that Sanofi could not have changed the label

11:59:23 19  or that it was FDA's responsibility.  You made that very clear

11:59:26 20  in your ruling and at trial.

11:59:28 21           I think the one issue that we to have here,

11:59:29 22  Your Honor, is certainly Ms. Kahn was able to take this product

11:59:33 23  or prescribed this production because FDA did approve it.  It

11:59:37 24  wasn't something that was sold off the shelf, and we have two

11:59:39 25  experts from them, Dr. Plunkett on the one hand and Dr. Ross on

*OFFICIAL TRANSCRIPT*

11:59:41  1    the other, because they look at the TAC316 55-month interim

11:59:47  2    data, and based on that data, Sanofi should have updated

11:59:50  3    Section 6.2 to the label.

11:59:52  4            I think from that testimony it comes in

11:59:54  5    Your Honor.  We should at least be able to say, actually, here

11:59:58  6    is what we did submit on that exact same data in the exact same

12:00:04  7    section and it didn't go in.

12:00:06  8            Now, I think the curative factor is Dr. Plunkett

12:00:09  9    or Dr. Ross, can say, yes, they did that, but that's not

12:00:13 10    enough.  That's not enough.  They should have done more, and

12:00:16 11    here is the reasons they should have done more.  I think that

12:00:19 12    solves the solution; but, otherwise, we're going to be left in

12:00:22 13    a situation, Your Honor, where Dr. Ross or Dr. Plunkett is

12:00:24 14    going to talk ad nauseam about TAC316, about it being

12:00:29 15    statistically significant, as it being the basis for a label

12:00:32 16    change that they say did not happen.

12:00:35 17            They are going to call it a *Sanofi study,* and the

12:00:38 18    impression or the inference that's going to be left with the

12:00:41 19    jury is that this is a study that Sanofi had that it did not

12:00:44 20    disclose, that it did nothing with, when, really, the safety

12:00:47 21    and efficacy that goes to that study were the backbone of the

12:00:52 22    approval of adjuvant chemotherapy, which is what Ms. Kahn got,

12:00:54 23    and that Sanofi attempted or they at least proposed on multiple

12:00:58 24    occasions to submit the safety results on TAC316 55-month

12:01:04 25    interim data, some of which FDA accepted, some of which FDA

*OFFICIAL TRANSCRIPT*

12:01:08 1   requested to be deleted, and I think that type of information,

12:01:13 2   Dr. Ross and Dr. Plunkett are going to rely on it, and they are

12:01:17 3   going to say that was the basis for a label change.  We should

12:01:19 4   at least be able to present the facts of what Sanofi did do,

12:01:22 5   and I think that can be done without any implication or without

12:01:26 6   any inference that we could not have done more or that it was

12:01:30 7   FDA's fault.

12:01:30 8         I guess --

12:01:37 9         MR. MURA:  Your Honor --

12:01:37 10        THE COURT:  Are you trying to say those adverse events

12:01:45 11   that you wanted to report were just from the study that FDA

12:01:51 12   says we're not putting in these adverse event reports, these

12:01:57 13   findings?

12:01:59 14        MR. RATLIFF:  The data from --

12:02:01 15        THE COURT:  The data.  But it wasn't that you proposed

12:02:04 16   at that time to change the adverse events in the actual label?

12:02:12 17        MR. RATLIFF:  Yes, it was, Your Honor.  That's exactly

12:02:14 18   what it was.  It was a proposal --

12:02:17 19        THE COURT:  You made a proposal for a label change for

12:02:20 20   Sanofi.

12:02:21 21        MR. RATLIFF:  In 2004 and it's documented, Your Honor,

12:02:23 22   in your preemption ruling denying in part and granting in part

12:02:29 23   the preemption ruling that in 2004 Sanofi proposed to the FDA

12:02:34 24   to include the TAC316 data on alopecia, which Dr. Ross and

12:02:36 25   which Dr. Plunkett rely on for which they say it's

*OFFICIAL TRANSCRIPT*

12:02:39 1   statistically significant, and it's the basis why they think

12:02:41 2   the label change should have been made.

12:02:45 3          You acknowledge in your ruling, Your Honor, the

12:02:45 4   FDA deleted it.  You acknowledge that there was no reason given

12:02:48 5   for FDA's deletion; and, therefore, you were not going to

12:02:51 6   speculate more as to the reason why that was done.  Those are

12:02:55 7   all findings of fact in your own opinion, Your Honor.

12:02:58 8          We think that type of information should come in,

12:03:01 9   and we think it can be done in a careful and appropriate manner

12:03:05 10  that does not violate your otherwise preemption ruling.  Like I

12:03:12 11  said, Dr. Plunkett or Dr. Ross certainly can say we should have

12:03:15 12  done more.

12:03:16 13         I think the last two points I would like to make

12:03:19 14  on this, Your Honor, is, you know, on the one hand Dr. Ross, in

12:03:21 15  his deposition testimony, said Sanofi never proposed anything

12:03:25 16  based on that data to the FDA.  That's factually incorrect.

12:03:29 17  Dr. Ross also in his report said Sanofi submitted the TAC316

12:03:34 18  data to EMA but is silent on whether Sanofi submitted it to

12:03:40 19  FDA.

12:03:40 20         So, the world we're going to be living in is

12:03:42 21  completely counterfactual where plaintiffs are requesting that

12:03:45 22  submission to EMA on TAX316 are appropriate but submissions on

12:03:49 23  TAC316 and proposed label changes to FDA are not appropriate.

12:03:54 24  So, we think that type of information should be able to come

12:03:58 25  in, Your Honor.

                          *OFFICIAL TRANSCRIPT*

12:03:59  1        THE COURT:  Mr. Mura.

12:04:00  2        MR. MURA:  Your Honor rejected Sanofi's argument that

12:04:04  3   in 2004 there was clear evidence that Sanofi tried to warn of

12:04:10  4   permanent hair loss, and now Sanofi is just trying to say,

12:04:12  5   well, let us take a shot at the jury, let us argue these facts

12:04:15  6   to the jury and maybe the jury will believe us that in 2004 we

12:04:19  7   tried to warn about permanent hair loss and the FDA wouldn't

12:04:21  8   let us.

12:04:22  9        That's the exact argument that this court found

12:04:25  10  no clear evidence of, the Court did not allow in the *Earnest*

12:04:28  11  trial.  Every single time Mr. Ratliff starts to argue this

12:04:32  12  point, the Court did not allow it to come into evidence because

12:04:35  13  it directly violates this court's preemption order.  It

12:04:37  14  violates (audio distortion) -- preemption is not an issue for

12:04:40  15  the jury.  None of this evidence shows that Sanofi ever warned

12:04:44  16  about permanent hair loss, especially in 2004.

12:04:47  17        So, the Court should just enter the same order

12:04:50  18  and pursue the same evidence.  Sanofi will have a full

12:04:54  19  opportunity to make a defense.  What it cannot do is suggest

12:04:58  20  that it tried to make the changes but the FDA wouldn't let it.

12:05:01  21        Thank you.

12:05:02  22        THE COURT:  Okay.  I'm going to rule on that one.

12:05:07  23        The next motion is Motion to Exclude Low Quality

12:05:11  24  Photographs.  I don't have the photographs.

12:05:15  25        MS. REYNOLDS:  Yes, Your Honor.  May I address the MIL?

**OFFICIAL TRANSCRIPT**

12:05:19  1    Is that okay?

12:05:19  2              THE COURT:  Yes.

12:05:20  3              MS. REYNOLDS:  All plaintiffs are seeking to do here,

12:05:23  4    as Your Honor already stated, is to follow the rules of

12:05:26  5    evidence.  Here we're specifically talking about the best

12:05:30  6    evidence rules, and the reason that we're raising this in the

12:05:32  7    MIL stage is that we have a real concern is it could happen at

12:05:36  8    trial.  If it's okay with Your Honor --

12:05:37  9              THE COURT:  But I don't see the photographs.  I don't

12:05:40 10    have the photographs.  How can I rule on them?

12:05:42 11              MS. REYNOLDS:  I'm about to share my screen, if that's

12:05:46 12    okay with you, and I will show you a direct example of the one

12:05:49 13    picture that we're concerned about; is that okay?

12:05:51 14              THE COURT:  Yes.

12:05:51 15              MS. REYNOLDS:  Okay.  Your Honor, I can send the

12:06:11 16    photograph to you later.  I'm having a technical difficulty.

12:06:14 17    It's not working.  Here, Your Honor.  I apologize.  Just one

12:06:17 18    second.  My computer does not seem to want to cooperate with my

12:06:25 19    request.  I can send the photographs to you later.

12:06:43 20              THE COURT:  Can't we handle that at the pretrial

12:06:46 21    conference?  Yes.  Low quality photographs probably shouldn't

12:06:52 22    be admissible but --

12:06:55 23              MS. REYNOLDS:  Absolutely, Your Honor.  I agree.

12:06:57 24    Another completely acceptable route would be that if there are

12:07:00 25    any objections to photographs by either party, that we could

                          *OFFICIAL TRANSCRIPT*

1   address that in a pretrial conference.

2          THE COURT:  Let's do it that way.

3          MS. REYNOLDS:  Yes, ma'am.

4          Your Honor, as to the next motion that was 17, I

5   believe Ms. Sastre, that's the one she told you about when we

6   did the argument for D-26, I do not wish to re-argue anything

7   about that motion.  I just wanted to, for some context for

8   Your Honor, you had noted with Mr. Schanker earlier that you

9   understand a lot of these MILs really are going more to being

10  informative prior to your review of deposition designations.

11         The only thing I wish to point out as it relates

12  to D-26 and, really, P-17 here is that when Your Honor is

13  reviewing the Fierro designations, you're going to see on pages

14  180 to 181 of this transcript --

15         THE COURT:  What deposition?  I'm sorry.

16         MS. REYNOLDS:  The deponent's name is Leslie Fierro.

17         THE COURT:  Oh, okay.

18         MS. REYNOLDS:  Yes, Your Honor.

19         She's asked a direct question about what the

20  Sanofi *Facebook Voices* page, as it was called, what the purpose

21  of it was, and you'll see that she responds there, Your Honor,

22  that the purpose was to provide information on issues of

23  importance to patients.

24         So, I do think that that's important just for you

25  to take into consideration because it's not a socialization

**OFFICIAL TRANSCRIPT**

12:08:29  1    page on Facebook but, rather, a page that's been set up to

12:08:34  2    provide information to consumers on important issues to

12:08:37  3    patients.

12:08:37  4              That's all that I have to add there, Your Honor.

12:08:40  5    Thank you so much.

12:08:41  6              THE COURT:  Ms. Sastre, I think (audio distortion) dead

12:08:41  7    horse.

12:08:43  8              MS. SASTRE:  I didn't hear you, Your Honor.

12:08:46  9              THE COURT:  I think we've done enough beating of this

12:08:48 10    dead horse regarding the Facebook page.

12:08:54 11              MS. SASTRE:  I agree with you.

12:08:55 12              THE COURT:  Good.  Let's go to the next one.  12905 but

12:09:06 13    it's number 18 that I have here, Motion to Preclude Any Comment

12:09:09 14    or Argument Concerning the Comparative Fault of Her Treating

12:09:12 15    Physicians and Misuse of Taxotere.

12:09:14 16              Mr. Coffin.

12:09:19 17              MR. COFFIN:  Yes, Your Honor.  Chris Coffin on behalf

12:09:22 18    of Ms. Kahn.

12:09:23 19              This motion seeks to preclude Sanofi from

12:09:28 20    inferring that Ms. Kahn's doctors did something wrong when they

12:09:32 21    prescribed Taxotere but specifically inferring that an

12:09:38 22    off-label prescription for a prescription outside of the NCCN

12:09:41 23    guidelines is somehow a breach of the standard of care.

12:09:45 24              I'm going to get to what's different in just a

12:09:49 25    second, but just to be clear, Sanofi's own experts testify and

*OFFICIAL TRANSCRIPT*

12:09:55 1    state that a prescription that is off label is not a breach of

12:10:00 2    standard of care, that Dr. Kardinal was within the standard of

12:10:04 3    care when he prescribed through a clinical trial the Taxotere

12:10:07 4    to Ms. Kahn.

12:10:09 5              They also, the experts for Sanofi, also

12:10:14 6    specifically state that a prescription is outside of the NCCN

12:10:18 7    guidelines is not a breach of the standard of care, and so

12:10:23 8    Sanofi, in their response for a motion specifically say, look,

12:10:27 9    we're not disputing that because they can't because of what

12:10:31 10   their experts say, but they still try to show that it's

12:10:34 11   relevant somehow to tell this jury that Dr. Kardinal prescribed

12:10:41 12   off label and outside of the NCCN guidelines.

12:10:44 13             The problem there it's clearly prejudicial

12:10:46 14   because we have this empty chair of Dr. Kardinal, who is not

12:10:50 15   there for them to point the finger at, and this is exactly what

12:10:54 16   you said before your concern was, when you moved on this motion

12:10:58 17   in *Earnest*, you said, look, I don't want this to go down this

12:11:01 18   rabbit hole of chasing after did these doctors do something

12:11:07 19   wrong and was their doing something wrong the whole reason

12:11:12 20   we're here in this courtroom?  That's exactly what happened in

12:11:15 21   *Earnest*.

12:11:17 22             I would like to just give you a couple examples

12:11:18 23   of how that came about in the *Earnest* trial.  This is not in

12:11:21 24   our briefing, by the way, Judge, but I would encourage you to

12:11:24 25   look back at the trial transcript is page 1598 through 1603,

*OFFICIAL TRANSCRIPT*

12:11:30  1    and this is the cross-examination of Dr. Carinder in *Earnest*.

12:11:37  2                The questions come from Ms. Sastre, and she says,

12:11:40  3    "Now, the doseage that you gave, Adriamycin at 60 milligrams,

12:11:46  4    right?

12:11:46  5                He says, "Yes."

12:11:48  6                "QUESTION:  "And Cytoxan at 600?

12:11:50  7                "ANSWER:  Yes.

12:11:51  8                "QUESTION:  Which, you would agree with me, it's

12:11:54  9    different than the Taxotere label; is that fair?"

12:11:57 10                He says, "Yes.  That is different."

12:11:59 11                And she said --

12:12:01 12        THE COURT:  I don't need the testimony.

12:12:01 13        MR. COFFIN:  Right.

12:12:05 14                When she gets to the point about the Taxotere,

12:12:07 15    she says, "And then when you got to the Taxotere, instead of

12:12:10 16    giving it an hour later according to label, you gave it on a

12:12:15 17    different schedule," essentially, is what she --

12:12:16 18        THE COURT:  Right.

12:12:16 19        MR. COFFIN:  That happened over and over multiple

12:12:20 20    times, planting a seed with the jury -- look at what

12:12:23 21    Dr. Carinder did, it was outside of the label, he did something

12:12:26 22    wrong, and, ladies and gentlemen, that's why we're here today.

12:12:29 23    The same thing happened with the NCCN guidelines, and perhaps

12:12:32 24    you remember this --

12:12:33 25        THE COURT:  I do.  I do.  Actually, I do, so I don't

*OFFICIAL TRANSCRIPT*

<div style="font-family: monospace;">

12:12:35 1   think we need to read it.  I do.  I do.  I remember that.

12:12:40 2       MR. COFFIN:  The point is it is really prejudicial to

12:12:43 3   the plaintiffs when you've got the defendant coming in and

12:12:47 4   inferring that an off-label prescription or an outside of the

12:12:51 5   NCCN prescription somehow caused the reason we're all here

12:12:57 6   today.

12:12:57 7       There is no other relevant reason to bring out

12:13:00 8   this testimony other than to try to show that the doctors did

12:13:06 9   something wrong, and that's what caused Ms. Kahn's permanent

12:13:09 10  hair loss; so, that is why we brought this.

12:13:13 11      THE COURT:  Mr. Moore.

12:13:15 12      MR. MOORE:  Yes, Judge.  We think that the ruling you

12:13:17 13  made last time should apply here as well.  We are not going to

12:13:21 14  ask for a place on the verdict form for Dr. Kardinal.  We are

12:13:27 15  not going to offer a standard of care of evidence.  We think

12:13:31 16  that the facts of what happened, the fact that she was in a

12:13:35 17  clinical trial, the fact that he didn't re-review the label

12:13:39 18  after the first time that he looked at it, the fact that the

12:13:42 19  prescription was outside the NCCN guidelines and off label are

12:13:46 20  relevant facts in the case.  We're not arguing that he violated

12:13:51 21  the standard of care.

12:13:52 22      But we think it is relevant to the question of

12:13:55 23  whether or not a different label would have made a difference

12:13:58 24  to this man.  Was it something that they have to prove?  So, if

12:14:02 25  he's not reading the label, he's not following the label, a
</div>

**OFFICIAL TRANSCRIPT**

12:14:06  1    jury could conclude that a different label wouldn't make a

12:14:09  2    difference to him.  So, that's why we think it's independently

12:14:11  3    relevant on an issue that will be on the jury verdict form even

12:14:15  4    beyond the fact of what happened to this particular plaintiff.

12:14:18  5    So, we're not going to argue that he breached the standard of

12:14:22  6    care.  We're not going to put it on a verdict form.  We're just

12:14:29  7    going to introduce the relevant facts to the jury.

12:14:29  8            MR. COFFIN:  Your Honor, may I briefly respond?

12:14:29  9            THE COURT:  Briefly.

12:14:32 10            MR. COFFIN:  I didn't hear Mr. Moore address

12:14:34 11    specifically whether or not they are going to elicit testimony

12:14:37 12    about off-label prescribing and whether or not they are going

12:14:40 13    to elicit testimony about prescribing outside the NCCN

12:14:43 14    guidelines.  The reasoning (speaking simultaneously) --

12:14:44 15            THE COURT:  Oh, that's --

12:14:47 16            MR. COFFIN:  He said it has nothing to do with (audio

12:14:48 17    distortion) -- he said that, but he didn't say it in the

12:14:50 18    context of what is relevant to -- he said it in what's relevant

12:14:55 19    to the labeling issue.

12:14:57 20            I don't understand the argument, Judge.  I don't

12:14:59 21    understand how asking a doctor did you prescribe off label or

12:15:04 22    outside the guidelines can be relevant to anything else other

12:15:08 23    than you didn't do what you're supposed to do.  What else are

12:15:10 24    they trying to show the jury?

12:15:12 25            I hear none of that and I see none of that in

                              *OFFICIAL TRANSCRIPT*

12:15:15 1   their papers.  I don't know what else they can be doing other

12:15:18 2   than saying, Doctor, you did it wrong.  You didn't follow the

12:15:22 3   guidelines, and that's not what this case is about, and that's

12:15:24 4   the rabbit hole that we're going to go down if you allow this

12:15:27 5   again.

12:15:27 6           That's all I have, Your Honor.

12:15:29 7       THE COURT:  Thank you.

12:15:31 8           All right.  Brittany and I have been working on

12:15:36 9   all of these motions in *limine*, and today is Wednesday, we're

12:15:42 10  going to have my rulings, I would think, by Monday.  Court is

12:15:49 11  adjourned.

12           (WHEREUPON, at 12:15 p.m., the proceedings were

13  concluded.)

14                              *   *   *

15

16                      REPORTER'S CERTIFICATE

17

18       I, Cathy Pepper, Certified Realtime Reporter, Registered
    Merit Reporter, Certified Court Reporter in and for the State
19  of Louisiana, Official Court Reporter for the United States
    District Court, Eastern District of Louisiana, do hereby
20  certify that the foregoing is a true and correct transcript to
    the best of my ability and understanding from the record of the
21  proceedings in the above-entitled and numbered matter.

22                      *s/Cathy Pepper*
                        _____
                        Cathy Pepper, CRR, RMR, CCR
23                      Certified Realtime Reporter
                        Registered Merit Reporter
24                      Official Court Reporter
                        United States District Court
25                      Cathy_Pepper@laed.uscourts.gov

                    **OFFICIAL  TRANSCRIPT**