```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

****************************************************************
IN RE:  TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

                         Civil Action No. 16-MD-2740
                         Section "H"(5)
                         New Orleans, Louisiana
                         October 12, 2021

THIS DOCUMENT RELATES TO ALL CASES
****************************************************************

       TRANSCRIPT OF DEPOSITION DESIGNATION CONFERENCE
       HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFFS:

```
                    DAWN BARRIOS
                    BARRIOS KINGSDORF & CASTEIX
                    701 POYDRAS STREET
                    SUITE 3650
                    NEW ORLEANS, LA 70139

                    MATTHEW PALMER LAMBERT
                    GAINSBURGH BENJAMIN DAVID MEUNIER
                    & WARSHAUER
                    1100 POYDRAS STREET
                    SUITE 2800
                    NEW ORLEANS, LA 70163

                    KYLE BACHUS
                    BACHUS & SCHANKER
                    1899 WYNKOOP STREET
                    SUITE 700
                    DENVER, CO 80202

                    DAVID F. MICELI
                    SIMMONS HANLY CONROY
                    ONE COURT STREET
                    ALTON, IL 62002
```

*APPEARANCES CONTINUED*

*FOR SANOFI S.A.:*

    *HARLEY V. RATLIFF*
    *ADRIENNE BYARD*
    SHOOK HARDY & BACON
    2555 GRAND BOULEVARD
    KANSAS CITY, MS 64108

    *HILDY SASTRE*
    CITIGROUP CENTER
    201 S. BISCAYNE BLVD
    SUITE 3200
    MIAMI, FL 33131

    *DOUGLAS MOORE*
    IRWIN FRITCHIE URQUHART & MOORE
    400 POYDRAS STREET
    SUITE 2700
    NEW ORLEANS, LA 70130

    *JON STRONGMAN*
    SHOOK, HARDY & BACON
    1155 F STREET NW, SUITE 200
    WASHINGTON, DC  20004

Official Court Reporter:  Nichelle N. Drake, RPR, CRR
          500 Poydras Street, B-275
          New Orleans, Louisiana 70130
          (504) 589-7775

  Proceedings recorded by mechanical stenography,
transcript produced via computer.

**1**                    <u>P R O C E E D I N G S</u>

09:04:08AM   **2**                    (Call to order of the court.)

09:04:08AM   **3**          THE COURT:  We're here today on argument regarding

09:04:20AM   **4**    deposition designations and I'm not sure who should --

09:04:27AM   **5**          MR. BACHUS:  I'm happy to start, Your Honor.

09:04:30AM   **6**          Mr. MOORE:  Your Honor, just for a point of clarity,

09:04:33AM   **7**    I think on what Mr. -- is it okay if I pull the mask -- is it

09:04:37AM   **8**    better for me if I pull the mask down?

09:04:37AM   **9**          THE COURT:  Yes, because I can't --

09:04:39AM   **10**         MR. MOORE:  Douglas Moore on behalf of Sanofi.  Sort

09:04:42AM   **11**   of I think building on what Mr. Bachus had said a moment ago

09:04:44AM   **12**   that there are these larger topics and we're looking at the

09:04:49AM   **13**   agenda and thought perhaps -- I mean, I assume those are the

09:04:55AM   **14**   three topics, the large buckets?

09:04:57AM   **15**         MR. BACHUS:  I'm happy to go whenever you're done.

09:05:00AM   **16**         MR. MOORE:  Okay.  So the first one would be post-use

09:05:04AM   **17**   company conduct that contradicts the defendant's designations

09:05:08AM   **18**   and arguments and maybe we can get some clarity from Mr.

09:05:12AM   **19**   Bachus on specifically what those arguments are that he

09:05:15AM   **20**   wants to -- or he thinks these designations are implicating.

09:05:19AM   **21**         MR. BACHUS:  Good morning, Your Honor.

09:05:20AM   **22**         THE COURT:  Good morning.

09:05:21AM   **23**         MR. BACHUS:  Kyle Bachus on behalf of the plaintiffs.

09:05:26AM   **24**   Really at Doug's request we had moved up on the agenda the

09:05:31AM   **25**   Kopreski deposition topics to No. 3.  Did you get a copy of

09:05:37AM  1    the agenda that was sent --

09:05:39AM  2            THE COURT:  I do.  I have it.  Yes.

09:05:43AM  3            MR. BACHUS:  So I'm happy to start with what we have

09:05:46AM  4    as Agenda Item No. 3.

09:05:48AM  5            THE COURT:  Let's start.

09:05:49AM  6            MR. BACHUS:  And that has to do with a subpoena that

09:05:53AM  7    was issued to Dr. Kopreski and the relationship between that

09:05:56AM  8    subpoena and the deposition designations regarding Kopreski

09:06:00AM  9    and just to set the table appropriately for the Court, as the

09:06:03AM  10   court is aware, Kopreski was an employee.  We took an

09:06:06AM  11   individual deposition of Kopreski.  Outside of that

09:06:09AM  12   individual deposition, he was also designated as a 30(b)(6).

09:06:09AM  13           THE COURT:  30(b)(6), yes.

09:06:13AM  14           MR. BACHUS:  As part of his work as a 30(b)(6)

09:06:15AM  15   witness, after he left, not in way related to his job duties,

09:06:20AM  16   he conducted this, what we now refer to as the Kopreski

09:06:23AM  17   re-analysis that has been the subject of some much fodder in

09:06:28AM  18   this case.  And as the Court knows in pretrial motions, we

09:06:33AM  19   raised concerns about the fact that this came up in the

09:06:36AM  20   context of a 30(b)(6) really outside the scope of what the

09:06:40AM  21   designation was about and they put on the record this direct

09:06:43AM  22   and we did not have a real opportunity for a robust

09:06:47AM  23   cross-examination.  And so we complained about that to the

09:06:52AM  24   Court and the Court recognized that and said if that

09:06:54AM  25   re-analysis was going to be brought before the Court again at

```
09:06:58AM   1   trial that we were going to have an opportunity for robust
09:07:02AM   2   cross-examination.
09:07:02AM   3          As a result of that, we filed a motion with the Court
09:07:06AM   4   asking for Sanofi to be compelled to bring Dr. Kopreski along
09:07:09AM   5   with them if he was going to present this reanalysis and the
09:07:12AM   6   Court I think found that technically as he qualified as an
09:07:15AM   7   unavailable witness, you weren't going to compel the defense
09:07:19AM   8   to go down that road.  As a result of that, you did find in
09:07:23AM   9   that -- in that order that his presence was appropriate under
09:07:31AM  10   Rule 43 and 45, but you just weren't going to compel the
09:07:35AM  11   defense to make that happen because he technically picked the
09:07:40AM  12   label of unavailability and opened up their ability to use
09:07:42AM  13   the deposition.
09:07:42AM  14          Based upon all of that, we have issued a trial
09:07:45AM  15   subpoena for Kopreski that has been served upon him to appear
09:07:51AM  16   at a local facility to be broadcast into trial for purposes
09:07:56AM  17   of his cross-examination regarding that Kopreski analysis.
09:08:01AM  18   Okay.  So that is all -- that all has occurred.  We have also
09:08:08AM  19   -- and this is where I think it doubles back to the
09:08:11AM  20   deposition issue.
09:08:11AM  21          In his individual capacity, we have designated, the
09:08:16AM  22   plaintiffs have designated -- I'm looking for the time.  We
09:08:20AM  23   have designated 35 minutes of testimony of Kopreski in his
09:08:26AM  24   individual capacity to be played in our case-in-chief.  And
09:08:35AM  25   so I would say to the Court that in response to our
```

09:08:39AM 1   35 minutes of designation the defense designated 2-plus hours

09:08:46AM 2   of Kopreski's individual deposition that we think is

09:08:46AM 3   inappropriate to play in our case-in-chief.  And I will make

09:08:50AM 4   representations to the Court that there is not -- nothing in

09:08:52AM 5   the 35 minutes that the plaintiffs designated that address

09:08:56AM 6   the re-analysis at all.  That is not something that we, as

09:09:00AM 7   you know, Your Honor, we don't believe it's appropriate to

09:09:04AM 8   begin with and so we certainly aren't going to be designating

09:09:09AM 9   testimony in our case-in-chief related to this re-analysis.

09:09:13AM 10          So our request in terms of this whole big picture is

09:09:18AM 11  that because he is in a unique position as a witness that we

09:09:23AM 12  be permitted to play the 35 minutes of his individual

09:09:27AM 13  testimony.  And then that has nothing to do with the Kopreski

09:09:33AM 14  re-analysis.  It has stuff -- it has to do with stuff that he

09:09:37AM 15  did while he was working for the company, not after he

09:09:39AM 16  stopped working for the company, and then we play that.  And

09:09:42AM 17  if there's some portion not two hours and five minutes, but

09:09:46AM 18  some portion of that deposition that is appropriate to be

09:09:50AM 19  played truly for completeness, that Sanofi gets the

09:09:54AM 20  opportunity to do that.  And then in their case-in-chief, if

09:09:56AM 21  they elect either to call him live because he's now been

09:09:59AM 22  subpoenaed live or they elect to proceed with their

09:10:03AM 23  designations for their case-in-chief that involved the

09:10:06AM 24  Kopreski re-analysis that we then get the opportunity to --

09:10:09AM 25  subject to that subpoena to cross-examine him robustly as the

09:10:15AM  **1**   Court has found to be appropriate live and in their

09:10:18AM  **2**   case-in-chief.  And I think those logistics that I laid out

09:10:22AM  **3**   for you cause strife and concern to the defense.

09:10:22AM  **4**          THE COURT:  Thank you.

09:10:28AM  **5**          MR. BACHUS:  Shall I take a seat for a few moments?

09:10:31AM  **6**          THE COURT:  Please.

09:10:44AM  **7**          MR. RATLIFF:  Good morning, Your Honor.  Harley

09:10:46AM  **8**   Ratliff on behalf of Sanofi.  I think there's a few things

09:10:49AM  **9**   that need to be cleared up here which is the issue of

09:10:51AM  **10**  Kopreski coming live and whether this Court can subpoena him

09:10:52AM  **11**  or subpoena can be issued is something that we obviously

09:10:53AM  **12**  discussed for months and months and months.  You then told

09:10:56AM  **13**  the plaintiffs to file a motion, ask for your requested

09:11:00AM  **14**  relief.  They said we want Sanofi to subpoena him in --

09:11:03AM  **15**         THE COURT:  I remember all of that.

09:11:06AM  **16**         MR. RATLIFF:  Denied.  What Mr. Bachus has left out

09:11:08AM  **17**  of his argument is the subpoena that was sent to Mike

09:11:13AM  **18**  Kopreski last week is a subpoena to compel him to come for

09:11:18AM  **19**  cross-examination in the defendant's case.  There is no

09:11:22AM  **20**  authority, Your Honor, that allows them to issue a trial

09:11:25AM  **21**  subpoena to appear for cross-examination in our case.  That's

09:11:30AM  **22**  the subpoena, set it for November 15th, which would be the

09:11:33AM  **23**  first day under the schedule that the defendants would take

09:11:37AM  **24**  hold of the case to present their case-in-chief.

09:11:38AM  **25**         THE COURT:  Well, let me ask you this, Mr. Ratliff.

| | | |
|---|---|---|
| 09:11:40AM | 1 | Can they call him in rebuttal? |
| 09:11:44AM | 2 | MR. RATLIFF:  Can they call him in rebuttal? |
| 09:11:46AM | 3 | THE COURT:  Uh-huh. |
| 09:11:47AM | 4 | MR. RATLIFF:  Well, Your Honor, I don't think that's |
| 09:11:49AM | 5 | a subpoena that's been issued and I think that's something |
| 09:11:52AM | 6 | that would have to be briefed because here's the other part |
| 09:11:53AM | 7 | Your Honor and this is something you recognized in your order |
| 09:11:53AM | 8 | -- |
| 09:11:53AM | 9 | THE COURT:  I know. |
| 09:11:55AM | 10 | MR. RATLIFF:  -- which is you talked about the scope |
| 09:11:56AM | 11 | of Rule 43 and Rule 45.  We disagree with you, but you |
| 09:12:00AM | 12 | pointed to other courts.  What you did note though is they |
| 09:12:03AM | 13 | would still have to show good cause and compelling |
| 09:12:06AM | 14 | circumstances.  That's not something that was addressed in |
| 09:12:08AM | 15 | your order, Your Honor, and if you look at Rule 43 and the |
| 09:12:12AM | 16 | advisory notes, they make it very clear in the advisory notes |
| 09:12:15AM | 17 | that when the reason for bringing this person is something |
| 09:12:19AM | 18 | you knew well beforehand, the ability to establish compelling |
| 09:12:23AM | 19 | circumstances, that burden is extremely high.  They've known |
| 09:12:28AM | 20 | Dr. Kopreski would be unavailable not years, certainly many, |
| 09:12:32AM | 21 | many months.  This is not a situation where Mike Kopreski has |
| 09:12:37AM | 22 | an illness or was in a car accident and could come otherwise. |
| 09:12:41AM | 23 | He is an unavailable witness which Your Honor has found him |
| 09:12:44AM | 24 | to be unavailable under Rule 32.  And so that issue, it's not |
| 09:12:47AM | 25 | as simple as Mr. Bachus makes it seem which is they would |

09:12:51AM 1   still have to establish those grounds.  And this is a

09:12:54AM 2   subpoena that was served on Mike Kopreski in New Jersey.  So

09:12:57AM 3   there's that issue as well, Your Honor.  And so I don't think

09:13:01AM 4   this is something that can simply be ruled on here at this

09:13:04AM 5   moment other than the subpoena they've issued for bringing

09:13:09AM 6   Mike Kopreski in our case is plainly inappropriate and it's

09:13:14AM 7   something that is not supported by the weight of authority

09:13:16AM 8   which is something Your Honor touched on in the order denying

09:13:21AM 9   their motion to compel.

09:13:22AM 10        And nothing, Your Honor, has changed about

09:13:24AM 11  Dr. Kopreski's circumstances.  He remains unavailable.  He's

09:13:27AM 12  not within our control.  He is a former employee of Sanofi.

09:13:31AM 13        And I will say as it relates to the designations I'm

09:13:35AM 14  not here to go line by line.  They've designated 35 minutes.

09:13:38AM 15  What they want to do is, they want to play their key part of

09:13:42AM 16  Mike Kopreski in their case.  They do not want us to play

09:13:46AM 17  Mike Kopreski in our case.  And if we do play that video,

09:13:50AM 18  they still want to cross-examine him in person or by live

09:13:54AM 19  video transmission.  Your Honor, that's having your cake and

09:13:56AM 20  eating it too.  And so I think nothing has been established

09:13:59AM 21  that makes this subpoena valid other than it had just been

09:14:02AM 22  served in New Jersey on Dr. Kopreski.

09:14:14AM 23        THE COURT:  Thank you.

09:14:14AM 24        MR. BACHUS:  Just very briefly on the issue of the

09:14:18AM 25  circumstances in support of satisfying the burden for an

09:14:25AM   1   appropriate deposition under Rule 43 and Rule 45, in your

09:14:31AM   2   order, we would cite the Court to Document 11332, which is

09:14:39AM   3   your order of October the 21st, 2020, where in conclusion you

09:14:47AM   4   state, quote, "Plaintiff must be able to conduct a robust

09:14:50AM   5   cross-examine of him in a way that is conducive for the jury.

09:14:54AM   6   Accordingly, the Court will address options with counsel

09:14:57AM   7   prior to trial."

09:14:58AM   8        We believe that we have established the necessity of

09:15:02AM   9   a robust cross-examination and we believe that the Court has

09:15:08AM   10  permitted us to proceed as we have pursuant to Rule 43 and

09:15:16AM   11  Rule 45.  And the date of the subpoena is a courtesy to Dr.

09:15:20AM   12  Kopreski because we could've subpoenaed him for the first day

09:15:22AM   13  of trial and had him wait throughout it, but we tried to look

09:15:26AM   14  at when he was most -- when the analysis that we want to

09:15:29AM   15  examine him about is most likely to occur.  And it's not

09:15:34AM   16  going to happen in our case-in-chief and so that was the

09:15:39AM   17  reason for the date of the subpoena, Your Honor.  I don't

09:15:42AM   18  know whether you want me to move on to --

09:15:43AM   19        THE COURT:  I think we need to move on.  I'll be

09:15:46AM   20  perfectly honest with you.  Until I saw this agenda, I did

09:15:49AM   21  not know that a subpoena had been served on Dr. Kopreski.

09:15:52AM   22  And so I think we need to move on and I need to think about

09:16:00AM   23  it maybe.  Okay.  Let's move onto the next.

09:16:05AM   24        MR. BACHUS:  Okay, Your Honor.  The next deposition

09:16:08AM   25  is the Aussel deposition that we wanted to discuss and Doug

09:16:17AM  1    is correct that there are -- I think there's a couple of

09:16:20AM  2    categories of information that -- that it's important for us

09:16:25AM  3    to discuss with Your Honor this morning and one of those is

09:16:29AM  4    what is characterized as post-treatment conduct on behalf of

09:16:35AM  5    Sanofi.  And this post-treatment conduct comes to light first

09:16:42AM  6    in the Aussel deposition in terms of this list and the Court

09:16:50AM  7    in its order regarding defendant's MIL 27 requires that

09:16:58AM  8    before any post-treatment conduct is played to the jury that

09:17:03AM  9    that be cleared through you.  And so since we're talking

09:17:06AM  10   about trial designations here, it seems like this is the

09:17:09AM  11   appropriate time to clear that through you.

09:17:11AM  12       And so if you -- and I'm just going to for the record

09:17:15AM  13   cite some page numbers, not that we have to go there right

09:17:18AM  14   now, but just so that you have it in the record.  On page 17,

09:17:22AM  15   line 17 through page 18 line 17 in the Aussel deposition,

09:17:26AM  16   there's discussions regarding the safety management committee

09:17:31AM  17   in 2015.  This is a time period that postdates.  You may be

09:17:37AM  18   familiar if you've started to look at some of these, Your

09:17:43AM  19   Honor, but that -- and this is one of a couple of different

09:17:44AM  20   depositions where this document raises its head.  This is a

09:17:47AM  21   safety management committee internally at Sanofi that is

09:17:52AM  22   looking at the issue of general causation internally.  And

09:18:00AM  23   they do a causation adjudication and determine that it is

09:18:08AM  24   Sanofi's company position that Taxotere can cause PCIA.  This

09:18:16AM  25   directly rebuts -- and general causation, of course, is not

09:18:20AM 1    time bound.  It either does or it doesn't cause PCIA and this

09:18:25AM 2    directly rebuts Sanofi and its lawyers' position in this case

09:18:29AM 3    that Taxotere does not cause PCIA.  So when we have the

09:18:32AM 4    educated doctor-filled safety management committee of the

09:18:39AM 5    defendant itself opining in writing that their drug causes

09:18:43AM 6    PCIA that seems to be post-trial -- post-treatment conduct

09:18:47AM 7    that would be appropriate to rebut their contention that it

09:18:50AM 8    does not.  That's their own company's determination.

09:18:55AM 9        And so we point that out, not that Your Honor has to

09:19:00AM 10   rule on any of this today, but you're looking at the

09:19:02AM 11   depositions actively and so I want to bring these issues in

09:19:05AM 12   front of you.

09:19:09AM 13       The other important point in Aussel is defendant's

09:19:16AM 14   MIL No. 11 addresses -- well, sought to exclude evidence of a

09:19:23AM 15   motive, intent, or state of mind and the Court ruled that

09:19:27AM 16   under some circumstances that evidence would be appropriate,

09:19:30AM 17   it can't be speculative, it must be factual.  And there are

09:19:37AM 18   -- there's a section of this deposition, Your Honor, it's

09:19:41AM 19   really found in pages 246 through 274 and there are multiple

09:19:50AM 20   examples of factual information regarding the motive, intent

09:19:55AM 21   and state of mind of Sanofi.  And during our conferral, the

09:20:00AM 22   defense had indicated that they believe that this swap of

09:20:04AM 23   testimony should be excluded under MIL Ruling No. 11.

09:20:08AM 24       And just briefly for the record, on page 250 and

09:20:13AM 25   page 251, there's testimony about that breast cancer is an

09:20:17AM  1    important category for sales.  On page 257 beginning on line

09:20:21AM  2    1, there is a document discussed.  This is really important.

09:20:26AM  3    It's a Strategic Product Summary for Taxotere in 2005.  This

09:20:31AM  4    predates, of course, Ms. Kahn's treatment and this is a

09:20:35AM  5    document, this is factual, it is not speculation.  And in the

09:20:39AM  6    context of this Strategic Product Summary for Taxotere,

09:20:44AM  7    Sanofi puts down in writing that it is their intent for this

09:20:48AM  8    drug to become, quote, "the most successful cytotoxic ever."

09:20:57AM  9         THE COURT:  Mr. Bachus, my recollection from

09:20:59AM  10   Dr. Aussel's deposition -- and I'm going to ask you to

09:21:01AM  11   correct me if I'm wrong because I don't have it in front of

09:21:04AM  12   me, but I read it -- is that he was unfamiliar with those

09:21:07AM  13   documents dealing with marketing and strategic planning for

09:21:12AM  14   the future.  So I have difficulty putting in front of

09:21:18AM  15   somebody else things that deal with strategic marketing and

09:21:22AM  16   what that means.

09:21:26AM  17        MR. BACHUS:  I'm happy to address that.

09:21:26AM  18        THE COURT:  Am I missing --

09:21:28AM  19        MR. BACHUS:  -- I think the connection to Aussel with

09:21:31AM  20   this particular document, this document that appears on --

09:21:35AM  21   first on page 246 -- I'm sorry, on 257, line 1 -- is he is

09:21:42AM  22   cc'd and acknowledges that as part of his job he receives --

09:21:47AM  23   here he is --

09:21:47AM  24        THE COURT:  Right.

09:21:48AM  25        MR. BACHUS:  -- he's working on the clinical trial

09:21:51AM   1   side of it --

09:21:51AM   2        THE COURT:  Right.

09:21:51AM   3        MR. BACHUS:  -- but he is cc'd and involved in this

09:21:54AM   4   dissemination of information.  It was in his file.  He's --

09:21:57AM   5        THE COURT:  Right.  Right.

09:21:58AM   6        MR. BACHUS:  -- he's looked at it.

09:21:58AM   7        THE COURT:  And that's what I remember, but I may be

09:22:03AM   8   wrong.  My recollection now is that he said I don't know

09:22:07AM   9   anything about this.  I may have received it.  I see I'm

09:22:10AM   10  cc'd, but I cannot speak to any of this.  And it was just --

09:22:15AM   11  it was just like we're going to now read it in the record and

09:22:20AM   12  that's what it says, but I can't -- I can't discuss it.

09:22:23AM   13       MR. BACHUS:  Yes, Your Honor, I believe he said that

09:22:25AM   14  annually, when this annual --

09:22:25AM   15       THE COURT:  Right.

09:22:27AM   16       MR. BACHUS:  -- strategic plan would come out, he

09:22:29AM   17  would receive copies of the strategic plan.  We can only

09:22:33AM   18  presume --

09:22:33AM   19       THE COURT:  But --

09:22:34AM   20       MR. BACHUS:  We can only presume that the reason that

09:22:36AM   21  he's getting a copy is that they want everybody thinking

09:22:40AM   22  about this in the same light.

09:22:42AM   23       THE COURT:  Sure.  And I guess my question then

09:22:45AM   24  becomes how is that --  I mean, what is that relevant to?  I

09:22:50AM   25  would imagine any manufacturer wants their product to be

09:22:53AM 1    disseminated to the public.

09:22:56AM 2         MR. BACHUS:  Well, I think that just for purposes of

09:22:58AM 3    the record there's a couple of other excerpts that I think

09:23:01AM 4    will give you the fuller picture.  I started down that road

09:23:01AM 5    and yes -- so it says here we wanted to become the most

09:23:08AM 6    successful, on page 259, line 19, achieve 2.5 billion in

09:23:10AM 7    sales by 2008.  On page 260, our marketing expansion

09:23:15AM 8    strategy, selling patient benefit rather than data.  At 261

09:23:20AM 9    market, share gains focus on early stage breast cancer, it's

09:23:24AM 10   the largest growth potential for the company.  If you take

09:23:28AM 11   all of -- we believe if you take all of this information

09:23:30AM 12   together it paints a picture of why this company may have

09:23:34AM 13   been motivated once it learned that its drug caused PCIA in

09:23:38AM 14   2006 and we have two pieces of critical evidence, one,

09:23:43AM 15   Freedman, the global safety officer, acknowledging by 2006

09:23:48AM 16   the company knew it caused PCIA and then we have Dr.

09:23:54AM 17   Palatinsky in writing in an e-mail in January of 2007 also

09:23:56AM 18   saying, yeah, we ought to be referring to this as permanent

09:24:00AM 19   hair loss.  And then we have a meeting where they discuss

09:24:03AM 20   here's three different ways we can tell the public about this

09:24:06AM 21   differential in outcome and nothing ever materializes.  So

09:24:10AM 22   we're asking why, why is that happening?  Well, it may just

09:24:13AM 23   be that because their ambition was by 2008 to achieve

09:24:18AM 24   2.5 billion dollars in sales and their ambition was to be the

09:24:21AM 25   -- that breast cancer is the most important category of sales

09:24:24AM   1    and we need to market this to ESBC, the women who are going

09:24:28AM   2    to recover.

09:24:28AM   3           THE COURT:  Are you alleging that they -- that

09:24:29AM   4    because of that marketing plan that they strategically chose

09:24:34AM   5    not to warn people of this side effect?

09:24:37AM   6           MR. BACHUS:  Yes, Your Honor.  That's what we're

09:24:38AM   7    saying.  We believe the jury can reach that conclusion based

09:24:42AM   8    upon the totality of the evidence.  They had an ambitious

09:24:47AM   9    goal.  This is what they wanted to do and this is how they

09:24:49AM   10   wanted to accomplish it.  They then learned that a side

09:24:51AM   11   effect that's important to a class of women, the ESBC, early

09:24:56AM   12   stage breast cancer, ESBC patients are the ones who are going

09:24:58AM   13   to -- who have the greatest likelihood of a full recovery.

09:25:03AM   14   They're the ones who are going to be most impacted.  They

09:25:03AM   15   know that the drug is equally efficacious to Taxol.  So side

09:25:10AM   16   effects matter.  Right.  It's the differentiating side

09:25:12AM   17   effects that lead to the decision to write the script for

09:25:17AM   18   their drug and so we believe in the totality that the jury

09:25:19AM   19   can look at this and say, yeah, you know what, yeah, I know

09:25:22AM   20   why they didn't tell women, because they had this ambitious

09:25:26AM   21   goal with respect to how they were going to do this, they

09:25:29AM   22   learned this information, they discussed it internally and

09:25:31AM   23   they sank it because they decided that it was going to impact

09:25:35AM   24   their sales goals for 2008.  So we think it's a critical

09:25:38AM   25   piece of evidence and we think the timing of it is important.

09:25:40AM 1   It's in writing.  It's not speculative.  It's what they said.

09:25:44AM 2         We asked somebody about it who received a copy of it

09:25:46AM 3   and, you know, he can say under oath and they can judge his

09:25:49AM 4   credibility about whether that impacted his job, but he was

09:25:51AM 5   on the cc list for a reason.  He's overseeing the clinical

09:25:55AM 6   trials.

09:25:56AM 7         One of the things says our market strategy is sell

09:25:59AM 8   patient benefit rather than Taxotere data and who's

09:26:02AM 9   collecting the data?  Mr. Aussel is collecting the data,

09:26:05AM 10  right?  So if you're trying to say globally what were they

09:26:09AM 11  doing and why were they doing it and whose right or whose

09:26:13AM 12  wrong about what's there, we think this is an important piece

09:26:16AM 13  of information and we think it's not in any way speculative.

09:26:19AM 14  It's their own document titled Strategic Product Summary for

09:26:24AM 15  Taxotere Ambitions 2005.

09:26:26AM 16        THE COURT:  Thank you.

09:26:27AM 17        MR. BACHUS:  Thank you.

09:26:29AM 18        MR. RATLIFF:  Your Honor, may I address something?

09:26:32AM 19  Ms. Byard is going to address the substance of this, but you

09:26:32AM 20  know we have argument and -- yeah, we --

09:26:32AM 21        THE COURT REPORTER:  Can you speak up for me?  I

09:26:36AM 22  can't hear you.

09:26:42AM 23        THE COURT:  I heard you.

09:26:42AM 24        MR. RATLIFF:  Yeah.  This seems to be unbridled

09:26:45AM 25  argument on things that we have already argued in a motion in

09:26:50AM  1    limine and so this is what we're going to have, which is we

09:26:52AM  2    had no preview of what was going to --

09:26:55AM  3         THE COURT:  Fine.  We'll set five-minute time limits

09:26:57AM  4    because I have had a brief through the motions in limine.  I

09:27:01AM  5    read the depositions, so...

09:27:04AM  6         MS. BYARD:  Yes, and that was going to be my very

09:27:07AM  7    first point, Your Honor.  We argued a motion in limine on

09:27:11AM  8    this subject.  It was Motion in Limine 34, defense motion in

09:27:12AM  9    limine.  We talked about Aussel's testimony, Dr. Ortmanis'

09:27:17AM  10   testimony at length.  I believe the question that the Court

09:27:20AM  11   posed to Darin Schanker when he argued the motion was aren't

09:27:23AM  12   you making a large leap, you're taking -- you're missing

09:27:27AM  13   several steps.  Do you have a document that ties a Sanofi

09:27:32AM  14   decision to suppress safety information to the desire to

09:27:34AM  15   profit off this drug?  And he was unable to answer that

09:27:38AM  16   question to the Court's satisfaction.  The Court subsequently

09:27:39AM  17   granted our motion and has said evidence about profit or the

09:27:43AM  18   cost of Taxotere or the money made off of it, punitive

09:27:47AM  19   damages evidence, that's excluded in Louisiana.  So that's

09:27:51AM  20   the first point I would make.

09:27:52AM  21        The second point that I would make on the marketing

09:27:55AM  22   related documents, Exhibits 28, 26, and 29, the Aussel

09:28:00AM  23   depositions that Your Honor's recollection of the testimony

09:28:03AM  24   is exactly right.  Mr. Aussel said, "I cannot comment on

09:28:08AM  25   that.  I mean, this is typically a medical marketing

09:28:11AM  1    statement.  I don't know on what it is based.  I've not

09:28:12AM  2    worked on this principle.  Again, my job was to conduct

09:28:14AM  3    clinical trials and get the data from the clinical trials.  I

09:28:18AM  4    have nothing to do with this kind of ambition or I'm not able

09:28:21AM  5    to measure the success."  So he completely disavowed any

09:28:25AM  6    understanding of the document.  He's one of 250 recipients on

09:28:29AM  7    it.  He doesn't have any foundation for that use of the

09:28:31AM  8    document.  Just like when that -- those documents are used

09:28:33AM  9    with Mr. Ortmanis, with Mr. Aussel as well, the Court has

09:28:39AM  10   excluded that testimony under Defense MIL 34.

09:28:44AM  11         The second bucket that I would address from

09:28:49AM  12   Mr. Bachus' argument is this -- are these exhibits related to

09:28:55AM  13   the 2015 labeling change and similarly what I've heard today

09:29:00AM  14   is a re-argument of motions in limine because when Your Honor

09:29:05AM  15   has been confronted with the evidence surrounding the 2015

09:29:08AM  16   labeling change, both in the *Earnest* motion in limines and

09:29:12AM  17   the *Earnest* deposition designations and now in the *Kahn*

09:29:15AM  18   motions in limine, Your Honor has excluded that category of

09:29:18AM  19   evidence as evidence of a subsequent remedial measure.  A

09:29:21AM  20   subsequent remedial measure isn't just the labeling change.

09:29:25AM  21   It's the internal dialog and discussion regarding that

09:29:28AM  22   labeling change that's protected in order to serve the public

09:29:30AM  23   policy of encouraging manufacturers to take positive changes

09:29:34AM  24   with respect to their labeling.

09:29:35AM  25         But there's four other arguments here, Your Honor.

09:29:37AM   1   The first is that when --

09:29:39AM   2           THE COURT:  Let me ask this --

             3           MS. BYARD:  Yes.

             4           MR. BACHUS:  -- because this is a little nuanced --

             5           MS. BYARD:  Yes.

             6           THE COURT:  -- and I agree.

             7           MS. BYARD:  Yes.

09:29:43AM   8           THE COURT:  The label change clearly was a subsequent

09:29:46AM   9   remedial measure --

09:29:46AM  10           MS. BYARD:  Yes.

09:29:48AM  11           THE COURT:  -- and even the internal dialogue --

09:29:48AM  12           MS. BYARD:  Yes.

09:29:51AM  13           THE COURT:  -- was getting to that point.  But with

09:29:53AM  14   the defendants clearly taking the position that it does not

09:30:00AM  15   cause permanent alopecia and then there are documents because

09:30:08AM  16   that is, that is -- that's a different question than whether

09:30:10AM  17   or not you -- you knew at the time or that the label was

09:30:15AM  18   appropriate and all of those things.  But it is a --

09:30:22AM  19   plaintiffs have to show cause in fact --

09:30:22AM  20           MS. BYARD:  Yes.

09:30:25AM  21           THE COURT:  -- whether it causes it today, whether it

09:30:28AM  22   caused it yesterday is of no moment.  It's an issue of fact.

09:30:32AM  23   Does it cause this?  And the defendants have taken the

09:30:34AM  24   position that it does not.  And if Sanofi today knows that it

09:30:38AM  25   does, is not that specific fact relevant?

| | | |
|---|---|---|
| 09:30:47AM | 1 | Now, the label change, I don't think -- |
| 09:30:47AM | 2 | MS. BYARD:  Yes. |
| 09:30:50AM | 3 | THE COURT:  -- those internal dialogues are not, but |
| 09:30:52AM | 4 | it is a fact of causation. |
| 09:30:55AM | 5 | MS. BYARD:  So, Your Honor, the document that they're |
| 09:30:57AM | 6 | talking about is a labeling document. |
| 09:30:59AM | 7 | THE COURT:  Right.  I understand that. |
| 09:31:01AM | 8 | MS. BYARD:  And so what they're talking about when |
| 09:31:04AM | 9 | they say cause is the labeling standard for cause, that |
| 09:31:07AM | 10 | reasonable evidence of a causal association, remember why |
| 09:31:12AM | 11 | they have a regulatory expert and then they have medical |
| 09:31:16AM | 12 | causation argument -- experts, so the document that we're |
| 09:31:19AM | 13 | discussing and the testimony surrounding it is where they're |
| 09:31:21AM | 14 | looking at for regulatory labeling.  It's not legal causation |
| 09:31:27AM | 15 | and it is not medical causation.  They're looking at as a |
| 09:31:27AM | 16 | labeling proposition and so it's not actually probative of |
| 09:31:31AM | 17 | our medical causation defense of Sanofi.  And I think that's |
| 09:31:36AM | 18 | worn out by a related issue, Your Honor, which is that if we |
| 09:31:40AM | 19 | walk into this 2015 labeling change, we're walking into |
| 09:31:44AM | 20 | preemption land.  Because a 2015 label does not say that |
| 09:31:49AM | 21 | Taxotere causes permanent alopecia.  It doesn't.  It says |
| 09:31:54AM | 22 | cases have been reported. |
| 09:31:54AM | 23 | THE COURT:  Reported. |
| 09:31:56AM | 24 | MS. BYARD:  So it's not probative of the medical |
| 09:31:58AM | 25 | causation question either.  And if anything, we then get into |

09:32:01AM  1    a mini trial about the jury saying we're liable for having

09:32:05AM  2    something that FDA never has -- even today has said we can

09:32:08AM  3    do.  That's preemption land.

09:32:10AM  4         The other thing, too, is if you look at the document,

09:32:13AM  5    I think there's been an argument made that it suggests that

09:32:18AM  6    the Kahn label, the hair generally grows back label, doesn't

09:32:27AM  7    include the concept that your hair could never come back,

09:32:30AM  8    which is, of course, the center piece of the defendant's case

09:32:32AM  9    that we took reasonable care to provide an adequate labeling.

09:32:35AM  10   We said that hair generally grows back and it varies from

09:32:38AM  11   patient to patient.  They've taken the position, my opponents

09:32:41AM  12   have, that if we defend our label at all that we're opening

09:32:45AM  13   the door to the 2015 label change.

09:32:45AM  14        THE COURT:  No.

09:32:49AM  15        MS. BYARD:  And that -- and this confuses me, too --

09:32:51AM  16        THE COURT:  That's not -- that's not -- mine was much

09:32:51AM  17   more nuanced --

09:32:51AM  18        MS. BYARD:  Yes.  Okay.  Okay.

09:32:51AM  19        THE COURT:  -- than that, than saying, well, you

09:32:59AM  20   know, your label should have said this and this is what else.

09:33:01AM  21        MS. BYARD:  Got it.  Got it.

09:33:03AM  22        Okay.  And then the final two points that I would

09:33:06AM  23   make just for purposes of the record, I don't expect Your

09:33:09AM  24   Honor's rulings to change at all for *Earnest*, but we do have

09:33:13AM  25   the nurse tear sheet in the plaintiff's designations and

| | |
|---|---|
| 09:33:18AM | 1 |

09:33:18AM  1  there is no foundation for that document with Mr. Aussel

09:33:20AM  2  either.  We think that that document under motion in limine

09:33:22AM  3  17 is not a document discussed at opening, and if anything,

09:33:25AM  4  maybe Your Honor has contemplated it would come in through

09:33:25AM  5  Ruth Avila.

09:33:31AM  6       And then, finally, the final point is that Mr. Aussel

09:33:35AM  7  has asked for pages and pages and pages of testimony about

09:33:38AM  8  whether the label, the hair generally grows back label, if

09:33:45AM  9  that includes the possibility of permanent alopecia and

09:33:49AM  10  they've done a lot of stuff with Mr. Aussel on labeling.

09:33:54AM  11  You'll remember that he's the witness that they wanted

09:33:55AM  12  subtitles on because of his in fluency in English and he

09:34:01AM  13  didn't do anything with labeling, Your Honor.

09:34:01AM  14       THE COURT:  No.  I know.

09:34:03AM  15       MS. BYARD:  So -- but we did -- the *Earnest* court did

09:34:05AM  16  hear that, the *Earnest* jury did hear that testimony.  We've

09:34:07AM  17  taken a renewed objection to that and tried to give Your

09:34:10AM  18  Honor more context about his role and why that testimony is

09:34:12AM  19  inappropriate.  That's it on Mr. Aussel.  Thank you, Your

09:34:12AM  20  Honor.

09:34:23AM  21       THE COURT:  Thank you.

09:34:23AM  22       MS. SASTRE:  Your Honor, can I just make a comment

09:34:27AM  23  for just 10 seconds if I may?  And Ms. Byard did a perfect

09:34:31AM  24  job --

09:34:31AM  25       THE COURT:  Now, you know, Ms. Sastre, you're not

09:34:36AM 1   going to be 10 seconds, but okay.

09:34:36AM 2        MS. SASTRE:  Okay.  Okay.  So Mr. Bachus just came up

09:34:38AM 3   here and he said several times that there was somehow some

09:34:41AM 4   connection between Sanofi's inaction, if you will, and this

09:34:45AM 5   idea of wanting to make more money and I just want to correct

09:34:50AM 6   the record.  I'm going to be very, very clear here.  There is

09:34:51AM 7   not a shred of evidence in this case from a witness or from a

09:34:55AM 8   document where that is even a conversation that is taking

09:34:58AM 9   place.  That may be an argument that he thinks will be

09:35:03AM 10  effective in front of this jury, but there is no evidence to

09:35:04AM 11  support that idea.  And that was something we didn't hear in

09:35:07AM 12  *Earnest*.  We're hearing it now.  It is just really made up

09:35:10AM 13  out of whole cloth.  There is nothing that you could even

09:35:15AM 14  make that reasonable inference.  This isn't the Ford Pinto

09:35:15AM 15  litigation.  It's nothing like that, Your Honor.  So I just

09:35:17AM 16  wanted to correct that.

09:35:20AM 17       MR. BACHUS:  Thank you, Your Honor.

09:35:24AM 18       The evidence paints a picture that the jury is

09:35:27AM 19  entitled to reach conclusions.  I'm not here to reach

09:35:30AM 20  conclusions.  That's for the jury to do.

09:35:37AM 21       Briefly, just because the nurse tear sheet has come

09:35:43AM 22  up, the nurse tear sheet and it's -- I think what you're

09:35:44AM 23  going to find as we move through these depositions is these

09:35:48AM 24  are the same issues, so don't be concerned these are going to

09:35:50AM 25  take as long as we move through, as this one deposition,

09:35:53AM  1   because the issues are very similar.  They're just contained

09:35:56AM  2   in different depositions and have different sources.

09:35:59AM  3        But on the nurse tear sheet issue, the nurse tear

09:36:02AM  4   sheet to remind the court and for the record is a document

09:36:05AM  5   created by Sanofi, disseminated by Sanofi, at a time frame

09:36:10AM  6   before Ms. Kahn's use of Taxotere.  And in that document,

09:36:14AM  7   Sanofi itself defines the word "alopecia" to mean temporary

09:36:18AM  8   hair loss.  That's their words.

09:36:22AM  9        The MIL on this issue we talked about opening the

09:36:27AM 10   door, the moment that one of these lawyers or one of their

09:36:32AM 11   witnesses gets up and says or insinuates that the word

09:36:37AM 12   "alopecia" in their label means something other than

09:36:40AM 13   temporary, the door is open for their own written statement

09:36:46AM 14   against their own interest which says that it means

09:36:50AM 15   temporary.  So I would just say with respect to -- I think

09:36:54AM 16   that the Court had made an inquiry of, am I thinking about

09:36:54AM 17   things with the door open or with the door closed?  With this

09:36:57AM 18   particular issue, I think you can ask them right now whether

09:37:00AM 19   they intend to say to the jury or bring a witness in or argue

09:37:03AM 20   in any way that the word "alopecia" in their label means

09:37:07AM 21   something other than temporary because as soon as it does,

09:37:09AM 22   then their statement that it means temporary should come in.

09:37:12AM 23   And that is what is in Mr. Aussel's testimony, and to be

09:37:17AM 24   specific, it's page 126 through page 132 where this nurse

09:37:21AM 25   tear sheet is addressed by Mr. Aussel.  It's also addressed

09:37:24AM  1   by others as the Court knows and including it was addressed

09:37:28AM  2   previously in live testimony with Ms. Avila in the *Earnest*

09:37:36AM  3   trial.

09:37:38AM  4          Shall I move on to another deposition?

09:37:41AM  5          THE COURT:  Yes, but I'm going to limit -- are we

09:37:45AM  6   talking about just the nurse tear sheet as presented in

09:37:48AM  7   Mr. Aussel's deposition designation or are you presenting the

09:37:51AM  8   deposition of Ms. Avila?

09:37:54AM  9          MR. BACHUS:  I'm sorry.  To be clear for the Court,

09:37:57AM  10  we were talking about Aussel's deposition.

09:37:57AM  11         THE COURT:  Right.

09:37:59AM  12         MR. BACHUS:  And Adrienne brought up that there is a

09:37:59AM  13  piece in Aussel's deposition --

09:37:59AM  14         THE COURT:  That's correct.

09:38:04AM  15         MR. BACHUS:  -- where the tear sheet is addressed.  I

09:38:05AM  16  was simply -- I was addressing that because she brought it

09:38:10AM  17  up, but I was also just trying --

09:38:11AM  18         THE COURT:  But, again, he was unfamiliar with it.

09:38:14AM  19         MR. BACHUS:  He was unfamiliar with that.  Yes.  That

09:38:17AM  20  witness was unfamiliar with it.  Yes, Your Honor.

09:38:18AM  21         THE COURT:  Okay.  Thank you.

09:38:18AM  22         MS. SASTRE:  Your Honor, I do think it would be

09:38:20AM  23  helpful if we responded to the argument -- I'm sorry, Judge

09:38:23AM  24  -- Mr. Bachus just made with regards to what we are going to

09:38:26AM  25  say with regard to the label and alopecia and generally how

| | | |
|---|---|---|
| 09:38:32AM | 1 | hair grows back.  So if I may address that. |
| 09:38:33AM | 2 | THE COURT:  Yeah, maybe let's do that. |
| 09:38:35AM | 3 | MS. SASTRE:  I know there's a lot. |
| 09:38:37AM | 4 | THE COURT:  There's a lot. |
| 09:38:39AM | 5 | MS. SASTRE:  I know.  Well, Your Honor, so I'm glad |
| 09:38:42AM | 6 | that Mr. Bachus said that because a lot of what we're seeing |
| 09:38:48AM | 7 | in the pretrial motions and briefing and a lot of what we're |
| 09:38:53AM | 8 | hearing today and, candidly, a lot of what we are going to |
| 09:38:55AM | 9 | hear during trial is going to be this opening of the door, |
| 09:38:59AM | 10 | opening the door and, in particular, when you get to |
| 09:39:02AM | 11 | post-injury evidence documents or testimony. |
| 09:39:04AM | 12 | So Mr. Bachus just said that we should not be able to |
| 09:39:10AM | 13 | come up here and in opening and do essentially the flip side |
| 09:39:15AM | 14 | of exactly what plaintiffs are going to say.  So what they |
| 09:39:20AM | 15 | have said repeatedly, what they've designated, the way that |
| 09:39:23AM | 16 | Mr. Schanker opened last time and I'm sure he's going to open |
| 09:39:25AM | 17 | this time, there's two issues as Your Honor is aware of with |
| 09:39:28AM | 18 | the label.  One is it says "alopecia."  The second part is it |
| 09:39:30AM | 19 | says "hair generally grows back," right?  After you lose it, |
| 09:39:30AM | 20 | hair generally grows back. |
| 09:39:33AM | 21 | With regard to alopecia, the drum that plaintiffs |
| 09:39:37AM | 22 | have beat during *Earnest* and will during this trial and open, |
| 09:39:41AM | 23 | they will say, look, it says alopecia.  All Sanofi had to do |
| 09:39:44AM | 24 | is put the word "permanent" there.  It doesn't say |
| 09:39:47AM | 25 | "permanent," right?  We get up, Your Honor, and, of course, |

09:39:50AM  1    we're going to say, well, listen, that's right.  I mean,

09:39:54AM  2    everyone can see what it says.  It says "alopecia."  It also

09:39:58AM  3    doesn't say temporary.  So it's a goose-gander situation.

09:40:01AM  4    They know that we're going to do that and it does not open

09:40:04AM  5    the door.

09:40:05AM  6             With regard to the generally grows back and this was

09:40:09AM  7    part of a motion in limine, Your Honor, that candidly was not

09:40:13AM  8    argued and the title was somewhat misleading, the title was

09:40:17AM  9    essentially to prevent counsel from making unsupported

09:40:19AM  10   statements, right?  This is supported by a mountain of

09:40:22AM  11   evidence.  Now, the evidence conflicts, but that's what the

09:40:25AM  12   trial is for and that's what the jury has to decide.

09:40:27AM  13            And I'm going to be done in just a second, Your

09:40:30AM  14   Honor, but with regard to generally grows back, plaintiffs

09:40:33AM  15   point to some testimony that they like, because Your Honor is

09:40:37AM  16   aware, with regard to some company folks where they comment

09:40:41AM  17   on that.  What we will put in in this case, in the *Kahn* case,

09:40:47AM  18   is, number one, both of the prescribing doctors and you have

09:40:50AM  19   two of them in this case, Dr. Kardinal, who we already know

09:40:52AM  20   his testimony is in the can as Your Honor is aware of, and

09:40:58AM  21   Dr. Larned who's here in New Orleans and will testify live at

09:41:00AM  22   this trial and they both say -- and I have a quote here that

09:41:00AM  23   I can read, Your Honor.

09:41:02AM  24            Dr. Kardinal says, "Generally doesn't mean always,"

09:41:05AM  25   to him, which he is allowed to say.  And Dr. Larned says,

| | |
|---|---|
| 09:41:11AM | 1 |
| 09:41:16AM | 2 |
| 09:41:18AM | 3 |
| 09:41:21AM | 4 |
| 09:41:22AM | 5 |
| 09:41:25AM | 6 |
| 09:41:28AM | 7 |
| 09:41:33AM | 8 |
| 09:41:36AM | 9 |
| 09:41:40AM | 10 |
| 09:41:44AM | 11 |
| 09:41:48AM | 12 |
| 09:41:48AM | 13 |
| 09:41:52AM | 14 |
| 09:41:54AM | 15 |
| 09:41:58AM | 16 |
| 09:41:59AM | 17 |
| 09:42:01AM | 18 |
| 09:42:03AM | 19 |
| 09:42:07AM | 20 |
| 09:42:08AM | 21 |
| 09:42:12AM | 22 |
| 09:42:13AM | 23 |
| 09:42:17AM | 24 |
| 09:42:20AM | 25 |

"When it says generally grows back, it doesn't conclude one way or the other what's going to happen to your hair."

With regard to what I think will be plaintiff's first witness, which I think is going to be Dr. Plunkett in this case and now she's different than last time, Judge, because she is now commenting on the adequacy of the warning or the label, Dr. Plunkett, this is plaintiff's expert, she testified and this is really important, Judge.

She said as clean as it could be, you know that the jury has heard that the Taxotere label has said, quote, "Once you've completed all your treatments, hair generally grows back."

QUESTION:  "As an oncologist with decades' experience, what does that language mean to you?"

"It means hair usually grows back."  That's plaintiff expert.

So, of course, when we open, when I stand up there in just a couple of weeks in front of the jury, of course, I'm going to say to them that the evidence in this case will show, witnesses are going to come here and tell you what that language means.  Plaintiffs aren't just entitled to a summary judgment on the adequacy of the label and they get to put in, well, generally grows back, they just get to put in their version of it, right, or they get to point out that it doesn't say permanent.  So it's a goose-gander situation,

09:42:23AM   1    Your Honor, and I did want to raise it because we do not

09:42:25AM   2    think -- and I wanted it to be very clear, I wanted to

09:42:28AM   3    preview to the court, that is the evidence in this case.  And

09:42:30AM   4    my statements to this jury in opening as I've just detailed

09:42:34AM   5    will absolutely be supported by evidence.

09:42:35AM   6         There's also company witnesses who say those very

09:42:38AM   7    things and our own expert, Dr. Glasby, will say the same

09:42:42AM   8    thing.  So as I said, there's a mountain of evidence to

09:42:44AM   9    support that.

09:42:44AM  10         You did rule on this motion, but it was un-argued,

09:42:47AM  11    and with all due respect, I'm only assuming because of the

09:42:51AM  12    title that perhaps in the absence of argument I don't believe

09:42:56AM  13    that Your Honor intended to allow plaintiffs to get up and do

09:42:59AM  14    what I just described and then I have to stand up and I'm not

09:43:02AM  15    allowed to talk about what the evidence will show on the

09:43:04AM  16    label.  We also, of course, Your Honor, once all of this

09:43:07AM  17    comes in and it will, including with the first witness,

09:43:10AM  18    Plunkett, we do not believe it opens the door in any way.

09:43:14AM  19    And so we'll talk about that as well.  But I wanted to raise

09:43:17AM  20    that with Your Honor because I do think it's an important

09:43:19AM  21    point of clarification that we need from the Court.

09:43:23AM  22         THE COURT:  Okay.  Thank you.

09:43:27AM  23         MR. BACHUS:  Your Honor, all I said is that they take

09:43:34AM  24    the position that the word "alopecia" means something other

09:43:37AM  25    than temporary.  The door is open to their own statement that

09:43:41AM 1   contradicts that, that's written, that says alopecia does

09:43:45AM 2   mean temporary.  That's the point.

09:43:48AM 3           THE COURT:  Let's move on.

09:43:50AM 4           MR. BACHUS:  Yes, Your Honor.

09:43:50AM 5           In Fierro, I just want to let the Court know that we

09:43:57AM 6   agreed to withdraw conditionally subject to our objections,

09:44:01AM 7   but based upon your MIL orders in Fierro withdraw the

09:44:08AM 8   designations with regard to the Facebook which is testimony

09:44:11AM 9   about Exhibits 13, 14 and 17, but we believe the rest of the

09:44:18AM 10  deposition designations are appropriate.  But I want to let

09:44:21AM 11  the Court know that so that if you haven't reviewed that,

09:44:21AM 12  then that testimony if you would like us to officially do

09:44:30AM 13  that in some capacity so that you have --

09:44:30AM 14          THE COURT:  I've looked at that deposition, but okay.

09:44:33AM 15          MR. BACHUS:  The next deposition that I wanted to

09:44:37AM 16  talk about is Gupta.  In Sanofi's objections in the Gupta

09:44:46AM 17  deposition, they indicate that they intend to withdraw large

09:44:49AM 18  parts of their designations based upon MIL 27.  In our

09:44:52AM 19  conferral, we ask them to let us know which parts that would

09:44:56AM 20  be so that the Court can be informed.  And if you've already

09:44:59AM 21  read the deposition, there's no sense in talking about it.

09:45:02AM 22  If you haven't read Gupta, then we believe based upon your

09:45:06AM 23  rulings that Sanofi should withdraw in full their

09:45:10AM 24  designations in Gupta, but they did not provide us post

09:45:15AM 25  conferral with the portions -- I think Adrienne said she was

09:45:18AM   1   contemplating it.  And so I'm just bringing it up to the

09:45:23AM   2   Court.  Maybe they're at a position now to tell you what

09:45:25AM   3   they're going to withdraw.  I don't know.  But we believe it

09:45:26AM   4   should be withdrawn in full based upon your rulings.

09:45:28AM   5          THE COURT:  All right.

09:45:33AM   6          MR. BACHUS:  Did you want to speak to Gupta?

09:45:36AM   7          MS. BYARD:  Sure.

09:45:36AM   8          THE COURT:  You know, I've kind of already read all

09:45:38AM   9   of these depositions.

09:45:38AM  10          MS. BYARD:  Your Honor --

09:45:39AM  11          THE COURT:  I would rather us spend our time doing --

09:45:43AM  12   because, again, for the record, I did not know what today

09:45:49AM  13   would look like and I asked, like, many times for you to

09:45:55AM  14   explain to me what this process was going to be.  I thought

09:45:59AM  15   perhaps I was going to have depositions and we were going to

09:46:03AM  16   do something because if you recall during the *Earnest* trial,

09:46:08AM  17   I found myself at Irwin Fritchie at all hours of the day and

09:46:14AM  18   night and weekend and --

09:46:16AM  19          MS. BYARD:  And me in front of a spread sheet trying

09:46:20AM  20   to reconcile --

09:46:20AM  21          THE COURT:  I didn't know that that's what we were

09:46:22AM  22   doing.  I can tell you that I did read the depositions

09:46:26AM  23   already and some -- made some rulings.  I'm going to look at

09:46:32AM  24   some of them again post, just large swaps as we spoke of, the

09:46:39AM  25   areas that you feel like need to be discussed, but I've done

09:46:43AM 1    this.  So I'm a little bit perplexed.

09:46:45AM 2         Now, there were some, I will tell you, I started

09:46:49AM 3    reading it, and if you just hold on a minute, just stay right

09:46:53AM 4    there --

09:46:53AM 5         MS. BYARD:  Yes, please.  We would love to address

09:46:57AM 6    the issues that you need clarification on.

09:47:35AM 7         THE COURT:  This is my very sophisticated notes and

09:47:41AM 8    she's going to get my binders.  Some included lots of sticky

09:47:44AM 9    notes.  But there were some that as I was reading I just

09:47:48AM 10   didn't know what I was supposed to do with and that would

09:47:51AM 11   include Dr. Gupta.  I thought he should be excluded.

09:47:58AM 12   Dr. Hangai, if that's the name --

09:48:00AM 13        MS. BYARD:  Yes, we agree.

09:48:02AM 14        THE COURT:  Fierro has been done; Amy Freedman,

09:48:08AM 15   Matthew Goyer --

09:48:10AM 16        MS. BYARD:  He's out.

09:48:13AM 17        THE COURT:  -- done.  And I said but he should be

09:48:13AM 18   excluded.  I didn't know what I was supposed to do with him.

09:48:14AM 19        MS. BYARD:  Yes, he's excluded under both your ruling

09:48:16AM 20   on Sanofi's motions and plaintiff's motion to include --

09:48:19AM 21        THE COURT:  And Ortmanis?  Ortmanis?

09:48:22AM 22        MS. BYARD:  He's out.

09:48:23AM 23        THE COURT:  Okay.  Because there was a big question

09:48:23AM 24   mark on that one, too --

09:48:23AM 25        MS. BYARD:  Yes.  Now my colleagues --

```
09:48:23AM   1              THE COURT:  -- what am I doing with these --

09:48:25AM   2              MS. BYARD:  -- will have counter-argument --

09:48:25AM   3              MR. BACHUS:  No.  No.  Ortmanis is not out, Your

09:48:28AM   4    Honor.  She's making her own -- she's making her own rulings

09:48:30AM   5    I think.

09:48:31AM   6              THE COURT:  Okay.  Well, I'm telling you my note has

09:48:35AM   7    a big question mark.  What am I supposed to do with this?

09:48:36AM   8              MR. BACHUS:  I'm happy to address it.

09:48:38AM   9              MS. BYARD:  We're in agreement.

09:48:39AM  10              MR. BACHUS:  I just don't want her --

09:48:39AM  11              MS. BYARD:  We're in agreement.

09:48:41AM  12              MR. BACHUS:  -- to make representations to the Court

09:48:43AM  13    that are her opinion, not our opinion.

09:48:46AM  14              THE COURT:  Okay.  Fine.  I have to pull this

09:48:50AM  15    deposition.  Oh, gosh.  Look at this.  I'm sorry.

09:49:20AM  16              Let's just -- I have to find Mr. Ortmanis --

09:49:20AM  17              MS. BYARD:  Yes.

09:49:25AM  18              THE COURT:  -- to see what the problem was and that

09:49:28AM  19    necessarily requires me --

09:49:30AM  20              MS. BYARD:  Yes.

09:49:31AM  21              THE COURT:  -- to do this.

09:49:34AM  22              MS. BYARD:  If I may, Your Honor --

09:49:38AM  23              THE LAW CLERK:  His is right here, Judge.

09:49:41AM  24              THE COURT:  He's in this one.  What is he --

09:49:47AM  25              MS. BYARD:  He's a marketing head.
```

```
09:49:47AM   1          THE COURT:  Oh, yeah.
09:49:48AM   2          MS. BYARD:  So, Your Honor, Ortmanis was the
09:49:53AM   3   gentleman whose testimony was argued at length with respect
09:49:56AM   4   to Motion in Limine 34, punitive damages, which my colleague
09:50:01AM   5   Mr. Ratliff argued with Mr. Schanker and you'll remember
09:50:04AM   6   Mr. Schanker essentially gave an opening or closing where he
09:50:08AM   7   argued a block buster drug, billion dollars in profits,
09:50:14AM   8   bonuses tied to the profitability of the drug and we argued
09:50:16AM   9   that that was all excluded, Your Honor granted that motion.
09:50:19AM  10          So in conferring with my co-defendants, I'm sorry, my
09:50:21AM  11   co-counsel on my other side, we said that under Motion in
09:50:27AM  12   Limine 17, which is the marketing motion in limine, under the
09:50:28AM  13   corporate profits or compensation motion in limine, which I
09:50:32AM  14   think is 7, although I want to check myself, 9, excuse me,
09:50:37AM  15   and then under the punitive damages motion in limine which is
09:50:42AM  16   34, which Your Honor also conditionally granted, there is
09:50:45AM  17   nothing left of Mr. Ortmanis' testimony that Your Honor would
09:50:49AM  18   need to rule on.
09:50:50AM  19          THE COURT:  Okay.  Let me hear from Mr. Bachus --
09:50:50AM  20          MS. BYARD:  Yes.
09:50:53AM  21          THE COURT:  -- because that --
09:50:53AM  22          MS. BYARD:  Yes.
09:50:55AM  23          THE COURT:  -- I'm trying to determine what of his
09:50:58AM  24   testimony is possibly admissible.
09:51:01AM  25          MS. BYARD:  But just for housekeeping --
```

09:51:04AM 1        THE COURT:  But, you know --

09:51:04AM 2        MS. BYARD:  Yes.  Yes.

09:51:04AM 3        THE COURT:  -- I would go through some of these

09:51:06AM 4    depositions and I thought --

09:51:06AM 5        MS. BYARD:  Yes.

09:51:07AM 6        THE COURT:  -- what am I supposed to do with them?

09:51:09AM 7        MS. BYARD:  Just for housekeeping, the parties are in

09:51:13AM 8    agreement that Goyer is excluded or not -- it doesn't need to

09:51:14AM 9    be ruled on.  There's nothing that either party would intend

09:51:19AM 10   to offer at this time based on Your Honor's in limine

09:51:21AM 11   rulings.  So Goyer we've agreed to be set aside.  The same is

09:51:24AM 12   true for Gupta.  We've agreed to set that witness aside.

09:51:26AM 13   Sanofi doesn't reasonably anticipate calling him.  There is

09:51:29AM 14   an argument about Hangai and there's an argument about

09:51:33AM 15   Ortmanis.  Sanofi's position on both is that Your Honor's

09:51:36AM 16   rulings have essentially excluded them.  There would be

09:51:40AM 17   nothing left that would be appropriate for the management of

09:51:43AM 18   the trial to offer.

09:51:45AM 19       THE COURT:  Okay.  Thank you.

09:51:54AM 20       I have to confess, I don't have these people -- these

09:52:00AM 21   deposition designations.  I haven't saved them to memory.

09:52:05AM 22   I've read them and I just have lots of question marks, like

09:52:08AM 23   what am I supposed to do with this?

09:52:10AM 24       MS. BYARD:  Yes.

09:52:10AM 25       THE COURT:  But that's as much as I can --

09:52:10AM   1            MS. BYARD:  Yes.

09:52:14AM   2            THE COURT:  -- recall.

09:52:16AM   3            MS. BYARD:  And as a concept for this meeting, Sanofi

09:52:19AM   4   has always felt confident that Your Honor, just as you did in

09:52:23AM   5   *Earnest*, was capable of marching through and applying the

09:52:28AM   6   motion in limine rulings to the individual page and line.  We

09:52:30AM   7   understand it's a laborious process.  I can't wait for the

09:52:35AM   8   day to get those binders and we are able to sit down and once

09:52:37AM   9   and for all stop the arguments about the limines which have

09:52:41AM  10   already been ruled on and just --

09:52:42AM  11            THE COURT:  All right.  Let me -- what do you want me

09:52:43AM  12   to do --

09:52:43AM  13            MS. BYARD:  -- incorporate Your Honor's rulings.

09:52:43AM  14            THE COURT:  -- what do you want me to do with

09:52:44AM  15   Mr. Ortmanis, Mr. Bachus?

09:52:47AM  16            MR. BACHUS:  Thank you, Your Honor.

09:52:51AM  17            THE COURT:  I mean, I got as far as his name and what

09:52:54AM  18   he does and then I thought almost virtually everything's

09:52:59AM  19   excluded.

09:52:59AM  20            MR. BACHUS:  This morning we talked about Aussel and

09:53:02AM  21   the Court raised whether he was in a position to be

09:53:07AM  22   commenting on the marketing documents with respect to the

09:53:12AM  23   motive and intent generally speaking.  And I explained to you

09:53:17AM  24   what -- he was cc'd and he was involved.  This is -- this is

09:53:19AM  25   the marketing unit of the company that promulgated the same

09:53:27AM 1    set of information.  And so we believe that if you look at

09:53:33AM 2    the testimony of Ortmanis as it relates to Motion in Limine

09:53:40AM 3    No. 11 and that is non-speculative factual documentation

09:53:48AM 4    regarding defendant's intent, motive or state of mind, that

09:53:54AM 5    this is coming directly from the mouth of the unit that was

09:53:57AM 6    promulgating that information.  And so while some portions of

09:54:06AM 7    Ortmanis are likely to be excluded, we believe that there are

09:54:11AM 8    portions of Ortmanis -- and I'm happy to highlight those

09:54:14AM 9    particular portions for you if you would like --

09:54:17AM 10           THE COURT:  No, I get it.  I get it.

09:54:18AM 11           MR. BACHUS:  -- but it just goes to that piece of --

09:54:20AM 12           THE COURT:  I get it.

09:54:21AM 13           MR. BACHUS:  Okay.  And then Hangai, with Hangai, the

09:54:27AM 14   vast majority of Hangai we agree is -- would be out as well.

09:54:32AM 15   It's our position that there are a couple of swaps of

09:54:38AM 16   information that should come in as statements against

09:54:41AM 17   interest and that is page 262 through page 277 which, again,

09:54:49AM 18   addressed this 2015 Power Point presentation at the safety

09:54:55AM 19   management committee, a slide show that was created by Hangai

09:54:59AM 20   that included in one of the slides what they titled a

09:55:03AM 21   Scientific Adjudication on Causal Association Finding That

09:55:07AM 22   the Cumulative Evidence Shows Taxotere Causes PCIA.  We

09:55:12AM 23   believe that that statement comes in because it directly

09:55:14AM 24   rebuts Sanofi's denial of general causation in this

09:55:14AM 25   litigation.

09:55:19AM   1        And in addition, there's a portion on page 278,

09:55:25AM   2   line 10 through 18, where this same Power Point looks

09:55:29AM   3   particularly at the historical label and reaches the

09:55:33AM   4   conclusion that the United States label included, quote, "no

09:55:37AM   5   mention of" -- well, it's reversible, well, I use PCIA,

09:55:42AM   6   includes -- so it's not exactly a quote, includes no mention

09:55:44AM   7   of PCIA whatsoever in the label.  And this directly rebuts

09:55:49AM   8   Sanofi and its lawyers' position in this litigation that

09:55:51AM   9   Sanofi has always warned about PCIA and the label.  Their own

09:55:56AM   10   safety management committee looking historically at the label

09:55:59AM   11   says there's never been any mention of PCIA on the label and

09:56:02AM   12   those are the only two sections of the Hangai deposition that

09:56:06AM   13   we believe should remain in for the reasons I just stated.

09:56:06AM   14        THE COURT:  Thank you.

09:56:10AM   15        MR. BACHUS:  Did you want me to move on now to -- I

09:56:12AM   16   think there's just -- there's Kardinal, which Mr. Miceli is

09:56:17AM   17   going to address, and then Palatinsky I think is the last or

09:56:25AM   18   Polizzano, so there's three more.

09:56:27AM   19        THE COURT:  Okay.  Let me hear from --

09:56:27AM   20        Mr. MOORE:  Real quickly, Judge, Ms. Byard will

09:56:32AM   21   address some of the substantive points, but as it relates to

09:56:36AM   22   Hangai, that was a Sanofi witness.  They didn't list Hangai

09:56:40AM   23   as a witness.  They didn't make affirmative designations and

09:56:42AM   24   we conferred at Your Honor's request at the last liaison

09:56:47AM   25   meeting over which witnesses you don't need to look at.  And

09:56:51AM 1  we notified the Court through an e-mail to Brittany that Dawn

09:56:53AM 2  and Palmer were copied on and that we agreed these are the

09:56:57AM 3  witnesses you don't need to look at and Hangai was one of

09:57:00AM 4  those.  And so I wanted to make sure that the Court was clear

09:57:02AM 5  that -- or it was clear that that was one of the witnesses

09:57:05AM 6  that we already told the Court you don't need to look at in

09:57:08AM 7  light of the MIL ruling.

09:57:23AM 8          MR. MICELI:  I saw that Ms. Byard was in line.  I

09:57:26AM 9  didn't know if she was going to continue to step up to the

09:57:32AM 10 microphone.

09:57:34AM 11         Your Honor, I don't know where to start with

09:57:39AM 12 Dr. Kardinal there.  We are satisfied with our objections and

09:57:43AM 13 responses that were in the spread sheet.

09:57:45AM 14         THE COURT:  Good.

09:57:46AM 15         MR. MICELI:  But -- but --

09:57:48AM 16         THE COURT:  Well, you know, this is a -- I feel like

09:57:51AM 17 I'm back at motion in limine stage.  We had that argument.

09:57:55AM 18 And so I'm not going to lie to you.  I'm getting a little bit

09:58:00AM 19 frustrated but go ahead.

09:58:02AM 20         MR. MICELI:  And as you know, the defendants filed

09:58:05AM 21 13078 and 13079.  We filed responses to those last week and

09:58:10AM 22 there are really four items that were addressed and I can

09:58:13AM 23 address those or I can rely upon what we have in the spread

09:58:17AM 24 sheet, but because the defendants went beyond what they

09:58:20AM 25 stated, they restate what they do in the spread sheet and

| | | |
|---|---|---|
| 09:58:23AM | 1 | then they go further. |
| 09:58:25AM | 2 | I don't know if Your Honor would like to hear the |
| 09:58:28AM | 3 | argument of why the four points that they state in |
| 09:58:30AM | 4 | Document 13079 you should overrule those objections.  And |
| 09:58:35AM | 5 | they're very quick and I can state them. |
| 09:58:40AM | 6 | First, dear healthcare provider letters, the |
| 09:58:45AM | 7 | defendants seek to -- first of all, Your Honor has already |
| 09:58:48AM | 8 | denied their motion in limine concerning dear healthcare |
| 09:58:52AM | 9 | provider letters and then they restate it.  So this is just |
| 09:58:55AM | 10 | simply re-argument of their prior motion in limine.  But |
| 09:58:58AM | 11 | what's important is the defendants try to redefine the |
| 09:59:03AM | 12 | questions that were asked to Dr. Kardinal.  They were not |
| 09:59:06AM | 13 | limited to dear healthcare provider letters.  Our response to |
| 09:59:07AM | 14 | 13079 makes that clear that 21200.5 of the CFRs sets out what |
| 09:59:15AM | 15 | a dear healthcare provider letter is and it's very |
| 09:59:19AM | 16 | particular.  We're not talking about dear healthcare provider |
| 09:59:21AM | 17 | letters when we're questioning Dr. Kardinal.  We're talking |
| 09:59:26AM | 18 | about any communications.  You've already overruled or denied |
| 09:59:29AM | 19 | their motion in limine for dear healthcare provider letters, |
| 09:59:33AM | 20 | how companies communicate with doctors. |
| 09:59:35AM | 21 | Dr. Kardinal goes over that.  He reads the letters |
| 09:59:38AM | 22 | that they send him, not dear healthcare provider letters, any |
| 09:59:41AM | 23 | letter, and if there's new information, he incorporates it |
| 09:59:46AM | 24 | with what he speaks to his patients about.  That's important |
| 09:59:48AM | 25 | in this case. |

09:59:48AM  **1**        Number two, testimony not tied to the treatment of

09:59:52AM  **2**   Ms. Kahn is how the defendants cite or title that section of

09:59:59AM  **3**   their filing, their pleading 13079.  What we asked

10:00:04AM  **4**   Dr. Kardinal was, was he aware of any drug that warns about

10:00:08AM  **5**   permanent chemotherapy-induced alopecia, and his answer is,

10:00:14AM  **6**   no, because Taxotere is included in that universe of any

10:00:17AM  **7**   drug.  That's important because the defendants are going to

10:00:20AM  **8**   stand up and say we've always warned.  And here is the

10:00:24AM  **9**   treating physician for the patient plaintiff in this case

10:00:29AM  **10**  saying nobody has ever warned me about PCIA.  That's

10:00:32AM  **11**  relevant, should be admissible or it is admissible and the --

10:00:34AM  **12**  and the objection should be overruled.

10:00:37AM  **13**       Third, they complain about -- this talking about

10:00:40AM  **14**  Taxotere, Exhibit 13, to Dr. Kardinal's deposition.  It's

10:00:45AM  **15**  very important.  Plaintiffs never attempt to admit Exhibit 13

10:00:49AM  **16**  and the questions we asked Dr. Kardinal after we looked at

10:00:55AM  **17**  Exhibit 13 go generally to what he expects as far as accurate

10:01:00AM  **18**  information being communicated so that he can communicate

10:01:04AM  **19**  accurately with his patients.  There's nothing about talking

10:01:07AM  **20**  about Taxotere.  So that needs to be overruled.

10:01:10AM  **21**       And, fourth, there's this partnering with patients

10:01:14AM  **22**  binder.  Now, the Court and the parties I would -- I would

10:01:17AM  **23**  propose have been mischaracterizing this exhibit by referring

10:01:21AM  **24**  to it as a tear sheet on alopecia.  What it is, is it is a

10:01:28AM  **25**  letter, it is a binder that has a letter included in it that

| | | |
|---|---|---|
| 10:01:31AM | 1 | is not a dear healthcare provider letter that is sent to a |
| 10:01:36AM | 2 | healthcare provider that describes the contents as a |
| 10:01:40AM | 3 | comprehensive chemotherapy patient care kit and it explains |
| 10:01:49AM | 4 | to the chemotherapy nurse -- and Dr. Kardinal states he uses |
| 10:01:53AM | 5 | nurses to educate his patients, so we know that the target |
| 10:01:57AM | 6 | audience of the letter is somebody that Dr. Kardinal uses in |
| 10:02:01AM | 7 | the process of educating his patients.  But then it tells the |
| 10:02:06AM | 8 | nurse we give you essential information to communicate to |
| 10:02:09AM | 9 | your patient.  The ultimate recipient of Sanofi's |
| 10:02:14AM | 10 | representation that alopecia is a common yet temporary side |
| 10:02:18AM | 11 | effect of chemotherapy drugs, including Taxotere, is their |
| 10:02:27AM | 12 | representation to patients as it is written and as it is |
| 10:02:32AM | 13 | communicated to those chemotherapy nurses the intention by |
| 10:02:34AM | 14 | way of the letter signed by the head -- |
| 10:02:34AM | 15 | THE COURT:  I got it. |
| 10:02:35AM | 16 | MR. MICELI:  Okay.  There's that.  And then the last |
| 10:02:38AM | 17 | thing, the last point that we wanted to point out is that |
| 10:02:39AM | 18 | Your Honor in 11803, Document 11803, that your ruling on the |
| 10:02:47AM | 19 | Larned and Kardinal MIL on what they could and could not |
| 10:02:50AM | 20 | discuss, you drew a distinction between comments that go to |
| 10:02:56AM | 21 | the core, necessary core of treatment, and those that are |
| 10:03:00AM | 22 | general.  The first were admissible, the latter, excuse me, |
| 10:03:09AM | 23 | the former admissible, the latter were not.  There is simply |
| 10:03:11AM | 24 | one statement that we seek to exclude because Sanofi's |
| 10:03:13AM | 25 | counsel asked Dr. Kardinal generally whether Taxol was more |

10:03:20AM 1   neurotoxic than Taxotere generally speaking.  And that's what

10:03:24AM 2   we seek to exclude based on your ruling.

10:03:26AM 3        Now, later in the deposition when we were questioning

10:03:28AM 4   Dr. Kardinal, the reason we say we want to exclude that is

10:03:31AM 5   that he doesn't know the comparative rates of neurotoxicity

10:03:37AM 6   and that's in our response to 13079.  But I would like to

10:03:42AM 7   point out just a couple of things that have been mentioned

10:03:46AM 8   that Ms. Sastre stood up and said what she was going to

10:03:53AM 9   describe to the jury or explain to the jury through

10:03:58AM 10  Dr. Larned about what she thought was in the label or what

10:04:01AM 11  she thought should be in the label.  In that same order on

10:04:04AM 12  the motion in limine, 11803, Your Honor excluded Dr. Larned

10:04:11AM 13  from describing what she thought should be in the label, what

10:04:15AM 14  she thought about alopecia and what she thought is not what

10:04:20AM 15  is necessary for a labeling decision.  That goes to the

10:04:22AM 16  regulatory experts.  And you've already excluded that, yet we

10:04:26AM 17  were just listening to Ms. Sastre explain that she's going to

10:04:29AM 18  put forth evidence before this jury, the jury that's going to

10:04:32AM 19  hear this case, that violates your 11803 ruling on what Dr.

10:04:38AM 20  Larned could say.

10:04:39AM 21       And why -- and that's important beyond just this

10:04:43AM 22  because she mentioned the MIL the plaintiffs filed that's

10:04:49AM 23  titled Unsupported Statements and you may recall the very end

10:04:54AM 24  of Ms. Sastre's closing arguments -- if not, you can go back

10:04:57AM 25  in the record and look at it.  She said three things, Your

10:05:01AM 1   Honor.  She said, "Taxotere saved her life."  She said,

10:05:04AM 2   "Taxotere gave her the best chance of her cancer not coming

10:05:08AM 3   back", and she said, "Taxotere causes fewer serious side

10:05:11AM 4   effects."

10:05:12AM 5        I quoted her when I deposed Dr. John Glasby.  I said,

10:05:19AM 6   "Dr. Glasby, can you support one, two, three, those three

10:05:23AM 7   statements?"  To each statement, "No, I can't say that.  No,

10:05:27AM 8   I can't say that.  No, I can't say that."  So we're very

10:05:31AM 9   concerned when Ms. Sastre stands up and explains that she's

10:05:33AM 10  going to violate the Court's ruling on MIL 16 which is your

10:05:37AM 11  order, Document 11803.

10:05:41AM 12       And, finally, before I --

10:05:42AM 13       THE COURT:  I mean, you're going to object during

10:05:43AM 14  trial, right?  What are we doing?

10:05:45AM 15       MR. MICELI:  We'll object during trial, but I can't

10:05:49AM 16  pull it out of their ears, Your Honor.  If she's going to

10:05:49AM 17  stand up here and misrepresent the scientific facts that even

10:05:53AM 18  her expert will not support, I want to prevent her from

10:05:55AM 19  opening her mouth about it.  That's the thing.

10:05:57AM 20       THE COURT:  Okay.

10:05:58AM 21       MR. MICELI:  And, finally, and I have sat by while

10:06:03AM 22  everybody else is arguing, they stand up and say can I make a

10:06:04AM 23  comment.  Mr. Aussel is important because of all the

10:06:07AM 24  witnesses we're going to hear from Sanofi he is the only

10:06:11AM 25  witness who is involved in every clinical trial --

| | | |
|---|---|---|
| 10:06:11AM | 1 | THE COURT:  Right. |
| 10:06:15AM | 2 | MR. MICELI:  -- in the development of Taxotere, and |
| 10:06:18AM | 3 | so when we talk about the strategic marketing plan or we talk |
| 10:06:23AM | 4 | about what their motive is, everything in all of Sanofi's |
| 10:06:26AM | 5 | witnesses will say, anything we discuss has to be consistent |
| 10:06:29AM | 6 | with the label.  What the clinical trials show, the data he |
| 10:06:34AM | 7 | collected and as he describes in his resume or CV that he was |
| 10:06:39AM | 8 | involved in not only performing and collecting data from |
| 10:06:43AM | 9 | those clinical studies, he also was involved in the |
| 10:06:47AM | 10 | submission and the writing of what went into the approval for |
| 10:06:53AM | 11 | the actual indication in both Europe and in America. |
| 10:06:56AM | 12 | So when Mr. Aussel said something, he may not be a |
| 10:07:00AM | 13 | marketing executive, but the marketing people have to be |
| 10:07:03AM | 14 | consistent with what the scientific evidence shows.  And |
| 10:07:06AM | 15 | that's why Mr. Aussel is so important in what he knows about |
| 10:07:10AM | 16 | what marketing is saying because the right hand knowing what |
| 10:07:15AM | 17 | the left is doing is very important and that's what we're |
| 10:07:18AM | 18 | going to show. |
| 10:07:19AM | 19 | THE COURT:  All right. |
| 10:07:22AM | 20 | MR. STRONGMAN:  Good morning, Jon Strongman on behalf |
| 10:07:28AM | 21 | of Sanofi.  Your Honor has ruled on almost all of these |
| 10:07:32AM | 22 | issues in motion.  I'm not going to re-argue them.  We won |
| 10:07:35AM | 23 | some, we lost some, and we can apply them and Your Honor can |
| 10:07:38AM | 24 | apply them to the deposition and we will -- we will go with |
| 10:07:40AM | 25 | that. |

```
10:07:40AM   1        I have one clarification I do want to raise with
10:07:42AM   2   regards to Dr. Kardinal that I think would help for planning
10:07:47AM   3   purposes and for our technology purposes.  We have raised in
10:07:51AM   4   our spread sheet leading objections to questions by Mr.
10:07:59AM   5   Miceli.  And the reason that we have done so is if you were
10:08:03AM   6   to look at --
10:08:04AM   7        THE COURT:  Mr. Strongman, if I struck every leading
10:08:07AM   8   objection in these depositions, there would be no
10:08:10AM   9   testimony --
10:08:11AM  10        MR. STRONGMAN:  I understand.
10:08:12AM  11        THE COURT:  -- from anybody.
10:08:12AM  12        MR. STRONGMAN:  I understand.
10:08:12AM  13        THE COURT:  And on very few questions I did, but
10:08:15AM  14   that's -- therein lies a problem with having a witness by
10:08:18AM  15   deposition is I can't -- I cannot say rephrase your question
10:08:22AM  16   and so -- but proceed.  It has been a source of frustration,
10:08:28AM  17   again, another source of frustration.  But I have given the
10:08:33AM  18   parties I think appropriate leeway understanding that we got
10:08:36AM  19   to get testimony from these witnesses.
10:08:40AM  20        MR. STRONGMAN:  I understand.  And, Your Honor, my
10:08:42AM  21   point, second kind of piece to this is that in the
10:08:49AM  22   negotiations on the pretrial order there has been discussions
10:08:52AM  23   back and forth about how depositions would be played in the
10:08:54AM  24   trial.  And in the *Earnest* trial, the depositions were played
10:08:59AM  25   chronologically, and so our point on the leading objections
```

```
10:09:01AM    1    would be that if, in fact, Dr. Kardinal's testimony is played

10:09:07AM    2    as it was asked in the deposition, what Mr. Miceli asked,

10:09:10AM    3    whether we have other objections, we asserted them, you can

10:09:12AM    4    rule on them, but it is cross-examination as it sits in the

10:09:15AM    5    deposition.  However -- and I'm not -- we have not come to a

10:09:20AM    6    resolution on this.  I don't know exactly what the

10:09:22AM    7    plaintiff's point will ultimately be, but if their intent is

10:09:27AM    8    to play Mr. Miceli's questions first before our questions

10:09:32AM    9    even though in the deposition we asked questions first and

10:09:35AM   10    then Mr. Miceli did, then the leading becomes a whole

10:09:39AM   11    different issue.  So as long as the deposition is played

10:09:44AM   12    chronologically, it makes sense and the objections are stated

10:09:48AM   13    and you can rule on them.  So that is the only clarification

10:09:51AM   14    I have.  The rest of these issues have been ruled on already,

10:09:54AM   15    so thank you.

10:09:54AM   16           THE COURT:  Thank you.

10:09:55AM   17           MR. MICELI:  I would say that with -- I don't know if

10:09:58AM   18    you just read the excerpts that have been designated and

10:10:03AM   19    counter-designated in Dr. Kardinal's deposition or if you

10:10:06AM   20    read the entirety of it, it was quite an entertaining read if

10:10:10AM   21    you read the whole thing.

10:10:12AM   22           THE COURT:  I did not.

10:10:14AM   23           MR. MICELI:  It went much longer than anticipated.

10:10:16AM   24    And, first, I would say look at my questions.  I don't

10:10:19AM   25    suggest the answer --
```

10:10:20AM 1          THE COURT:  Okay.  Gosh.  Gosh.  Okay.  What are we

10:10:22AM 2  doing here?

10:10:24AM 3          MR. MICELI:  All I was going to say, Your Honor, is

10:10:27AM 4  we have designated -- much of the questioning we've

10:10:32AM 5  designated actually comes from Sanofi's counsel's questions

10:10:34AM 6  and some of the objections that are raised are from -- we

10:10:36AM 7  intend for Kardinal to be played as it was taken.

10:10:40AM 8          THE COURT:  Well, that's the only way it would make

10:10:42AM 9  sense.

10:10:42AM 10          MR. STRONGMAN:  That's a different issue.

10:10:43AM 11          THE COURT:  But the jury has got to be able to

10:10:45AM 12  understand what's happening.

10:10:46AM 13          MR. MICELI:  In that particular deposition I agree

10:10:49AM 14  with Your Honor because I didn't rehash all the background

10:10:52AM 15  with him.  I didn't go back over his education for that --

10:10:54AM 16  for that particular witness, we agree it needs to be played

10:11:00AM 17  as it was taken.

10:11:00AM 18          MS. SASTRE:  Your Honor, there were a number of

10:11:02AM 19  comments about what I'm going to say in all this and I'm

10:11:04AM 20  going to exercise restraint.  I'm just not going to address

10:11:06AM 21  them, but let's just say I completely disagree, but I'll let

10:11:10AM 22  it go for now unless you feel like you do want to hear more

10:11:15AM 23  on that if it's of interest to you, Judge.

10:11:15AM 24          THE COURT:  I don't want to hear anymore.

10:11:17AM 25          MS. SASTRE:  I didn't think so.  Okay.  I'm going to

10:11:19AM  1   go sit back down.  Thank you.

10:11:20AM  2       THE COURT:  Thank you.  Mr. Bachus?

10:11:22AM  3       MR. BACHUS:  I come bearing good news.  I think we

10:11:26AM  4   can be done within the next five to ten minutes.

10:11:29AM  5       THE COURT:  Make it five.

10:11:30AM  6       MR. BACHUS:  Okay.  There are -- the next deposition

10:11:31AM  7   I want to discuss is Palatinsky --

10:11:31AM  8       THE COURT:  Palatinsky.

10:11:36AM  9       MR. BACHUS:  -- and the most important portion are

10:11:39AM  10  two different post-treatment conduct swaps that I want to ask

10:11:51AM  11  the Court's permission to play.  The first is beginning on

10:11:54AM  12  page 399 and concludes at about page 405 and this is a

10:12:00AM  13  December of 2010 e-mail with Palatinsky's safety team where

10:12:08AM  14  one of the pharmacovigilance scientists, Noel Quinn, admits

10:12:17AM  15  in writing that PCIA is not in the label.  For the Court's

10:12:23AM  16  purposes, she doesn't say not in the label, she uses the

10:12:27AM  17  terminology, the pharmacovigilance and labeling terminology,

10:12:32AM  18  "unlisted event".  And so she is -- this is post-treatment

10:12:35AM  19  but acknowledging that permanent alopecia is an unlisted

10:12:40AM  20  event, meaning not in the label.  It's a statement against

10:12:45AM  21  interest.  It contradicts the claim that Sanofi has always

10:12:49AM  22  warned of PCIA as promulgated by its lawyers and the company

10:12:55AM  23  in this litigation.

10:12:55AM  24      The second, Your Honor, is on page 406 to 408.  This

10:13:00AM  25  is another comment regarding the safety management

10:13:07AM  1    committee's determinations that there is no mention of PCIA

10:13:13AM  2    in the USPI, meaning the US label.  This is also -- although

10:13:19AM  3    post-treatment, it is appropriate because it is completely

10:13:23AM  4    contradictory to Sanofi's position in litigation, that it has

10:13:27AM  5    always warned of PCIA in the label when this statement is

10:13:30AM  6    made.

10:13:31AM  7          That's all that I have.  There are a couple of

10:13:33AM  8    portions of Palatinsky that are from regulatory agencies that

10:13:39AM  9    we asked Sanofi to withdraw so that we can inform the Court

10:13:43AM  10   about that, but they did not get back with us in the

10:13:47AM  11   conferral on their decision on withdrawing those portions of

10:13:52AM  12   regulatory communications that are in their designations.

10:13:53AM  13   That's all I have.

10:13:58AM  14         THE COURT:  Thank you.

10:13:58AM  15         MS. SASTRE:  Your Honor, I do think that this ties in

10:14:00AM  16   with the earlier point that I was making.  The words that are

10:14:04AM  17   used in the label are apparent to anybody including all the

10:14:08AM  18   jurors who can read the label.  So as a matter of fact, the

10:14:12AM  19   language that Mr. Bachus has come up here and talked about

10:14:14AM  20   over and over, it doesn't say permanent chemotherapy-induced

10:14:20AM  21   alopecia.  That's great.  I mean, there's no contest about

10:14:22AM  22   that.  Those words are not used.

10:14:24AM  23         The issue is what information is conveyed, what

10:14:28AM  24   information was conveyed to Dr. Larned and Dr. Kardinal by

10:14:32AM  25   the words that are used in the label.  And on that, you have

10:14:37AM  1    all of the testimony that I referred to earlier, obviously.

10:14:40AM  2    There's no limiting language like temporary and you have

10:14:43AM  3    witness after witness including the prescribing doctors in

10:14:47AM  4    this case saying those words "generally grows back" means

10:14:51AM  5    hair usually comes back.  Kardinal specifically said, "It

10:14:54AM  6    doesn't mean always."  That's what it meant to him.

10:14:58AM  7        And by us putting on that kind of evidence after

10:15:02AM  8    plaintiffs, I mean, this is the lynchpin of their failure to

10:15:06AM  9    warn case.  They are the ones that have to get testimony as

10:15:11AM  10   to what information was conveyed in this label, and if

10:15:15AM  11   different information had been conveyed, would it have made a

10:15:18AM  12   difference as Your Honor is aware.  So, of course, we get to

10:15:20AM  13   respond by saying, okay, well, what information was in the

10:15:23AM  14   label and what did it mean to the folks that read it, the

10:15:27AM  15   prescribing doctors, what did it mean in their hands?  By

10:15:29AM  16   putting on that kind of case, that doesn't open the door to

10:15:33AM  17   all this other testimony, again, sort of after the fact to

10:15:37AM  18   whether those words were present.

10:15:39AM  19       And, again, I would submit to the Court you don't

10:15:40AM  20   need anybody to testify on whether those words are present.

10:15:44AM  21   The jury can see that for themselves.  So I just wanted to

10:15:46AM  22   touch on that again.  Big picture.  I know Your Honor is

10:15:48AM  23   getting tired out, but it has been a reoccurring theme all

10:15:52AM  24   day and this issue is going to come to a head when we open in

10:15:56AM  25   this case.

10:15:57AM 1       So thank you, Judge.  Ms. Byard will take over.

10:15:58AM 2       MS. BYARD:  With respect to the designations by

10:16:02AM 3  plaintiffs on Dr. Palatinsky, you see that they designate

10:16:05AM 4  testimony relating to nine exhibits, seven of those exhibits

10:16:09AM 5  are post-treatment.  I think the various -- easiest exercise

10:16:12AM 6  for Your Honor is consistent with your rulings in *Earnest*

10:16:15AM 7  that the testimony related to the Danish doctor e-mail was

10:16:21AM 8  previously allowed, again, reserving our objections, but

10:16:22AM 9  previously allowed.  And then there is testimony surrounding

10:16:25AM 10 that Canadian consent form that Dr. Palatinsky weighed in on

10:16:31AM 11 which was previously allowed in *Earnest* and is within the

10:16:35AM 12 treatment period for Ms. Kahn.  Other than that, everything

10:16:37AM 13 relates to the 2011 analysis we were doing with the foreign

10:16:41AM 14 regulatory authorities about alopecia and the 2015 labeling

10:16:44AM 15 change.  All of that is excluded.

10:16:46AM 16      But we've talked about whether the door is somehow

10:16:49AM 17 opened to the 2015 evidence in a really strange way in my

10:16:53AM 18 opinion because I don't think Your Honor envisioned this

10:16:58AM 19 meeting as the prior conferral, and if the other side

10:17:01AM 20 believes the door has been opened -- because there has been

10:17:03AM 21 no argument or evidence presented in the *Kahn* trial, right?

10:17:06AM 22 We're a month away.  So no doors have been opened.  No one

10:17:10AM 23 has addressed the jury.  But Your Honor understands, I think,

10:17:13AM 24 very well the two principle arguments for leaving out the

10:17:17AM 25 2015, which are Rule 407, and that this is a regulatory

10:17:22AM  1   standard.  It's not medical causation.

10:17:24AM  2        But there's two other pieces I would make.  In the

10:17:27AM  3   2015 era, when they're talking about whether the label

10:17:32AM  4   includes a term or not, what they're saying is literally in

10:17:36AM  5   quotes, there is no irreversible in the label, there is no

10:17:40AM  6   permanent in the label, right?  And so they're looking at the

10:17:43AM  7   label and saying, are those words present there?  It's not

10:17:46AM  8   whether or not the label is covering within the concept of

10:17:49AM  9   alopecia the idea that hair may not come back.  And so it's

10:17:52AM 10   not again probative of the question that this jury will be

10:17:56AM 11   asked to answer.

10:17:57AM 12        The second point that I would make adding on to our

10:18:03AM 13   2015 door-opening argument that's bene made is that when

10:18:08AM 14   Sanofi and the FDA are deciding whether or not in 2015 the

10:18:14AM 15   label should be updated, they are not looking at the *Kahn*

10:18:19AM 16   label.  So when Ms. Kahn was treated, we had the hair

10:18:29AM 17   generally grows back language, but in 2010, the agency had

10:18:31AM 18   come in on its own accord and struck out that language and

10:18:36AM 19   just put bullet point hair loss.  I don't know, neither can

10:18:40AM 20   the jury, what the FDA would have done with the hair

10:18:44AM 21   generally grows back language.  That's not the label that

10:18:48AM 22   they were looking at.  Had they been looking at the hair

10:18:53AM 23   generally grows back language from when Ms. Kahn was treated,

10:18:56AM 24   they might have very well, as many of the Sanofi witnesses

10:18:59AM 25   and the physicians in this case have testified, said that

10:19:02AM   1   there aren't any guarantees.  It's not telling women that

10:19:06AM   2   their hair will absolutely regrow.  It's not talking about

10:19:09AM   3   whether or not any assurances can be made for each patient.

10:19:13AM   4   But when we get to 2015, we're just looking at a label that

10:19:18AM   5   says "hair loss."  That's it.  That's the only information.

10:19:22AM   6   Hair loss.

10:19:23AM   7        And so my point, my last point here is if opponents

10:19:30AM   8   will argue to you that the door swings open to 2015 if we

10:19:36AM   9   defend the adequacy of the label, we're really having to

10:19:40AM  10   start talking about all of these changes to the agency that

10:19:42AM  11   had happened after that point -- and I think Your Honor for

10:19:45AM  12   reasons of Rule 407 and Rule 403 have said, no, the evidence

10:19:49AM  13   in this case stops with the data treatment.  That's it.

10:19:53AM  14        THE COURT:  Thank you.

10:19:57AM  15        MR. BACHUS:  Your Honor, briefly with respect to the

10:20:06AM  16   post-treatment conduct described and Noel Quinn's was in 2010

10:20:12AM  17   as I described, not 2015, and then there's 2015, these are

10:20:18AM  18   Sanofi's own safety employees and labeling people looking at

10:20:23AM  19   a label and looking to see if there's a warning regarding

10:20:27AM  20   PCIA and coming to the conclusion that none exist in the

10:20:30AM  21   label despite the fact that they're saying that it's always

10:20:33AM  22   been there.  That is a statement against this company's

10:20:35AM  23   interest.

10:20:36AM  24        THE COURT:  Okay.

10:20:36AM  25        MR. BACHUS:  Moving on to Polizzano, the last

10:20:39AM   1   deposition, Your Honor, there are two -- well, there are --

10:20:45AM   2   there's one post-treatment conduct swap and that's page 130

10:20:56AM   3   to 135.  And this is a 2015 e-mail from Polizzano and

10:21:01AM   4   Polizzano is working as the labeling manager of consumer

10:21:09AM   5   products and was the senior manager of oncology products and

10:21:12AM   6   in 2015 sends an e-mail confirming that PCIA is not in the

10:21:20AM   7   USPI and that it's not in the company core data sheet which

10:21:25AM   8   she testifies is the company's position on the side effects

10:21:28AM   9   related to the drug.  So she's not only looking at the label,

10:21:33AM   10  she's looking at their own core data sheet and providing an

10:21:36AM   11  e-mail saying there's nothing in here about PCIA.  We believe

10:21:39AM   12  that that directly contradicts Sanofi's position that they

10:21:42AM   13  have always warned about PCIA.

10:21:44AM   14          The second document, the second little swap is

10:21:48AM   15  page 369 to 371 and this is Sanofi's, Mr. Ratliff was

10:21:54AM   16  questioning Dr. Polizzano and asked Dr. Polizzano what the

10:22:01AM   17  word "alopecia" means.  And Dr. Polizzano says that it

10:22:07AM   18  encompasses everything from a day of alopecia to permanent

10:22:15AM   19  alopecia.  That testimony designated by Sanofi as trial

10:22:19AM   20  testimony in this case has not been withdrawn.  That in and

10:22:23AM   21  of itself opens the door to what I'm -- what I was talking

10:22:25AM   22  about in terms of nurse tear sheet.  We have a document by

10:22:30AM   23  Sanofi predating our client's treatment where Sanofi says

10:22:31AM   24  alopecia means temporary, yet their witness through

10:22:36AM   25  Mr. Ratliff's direct examination says it means something --

10:22:39AM  1    that it encompasses more than temporary hair loss and we

10:22:41AM  2    believe that that opens the door.  That's all I have on this.

10:22:47AM  3        MS. BYARD:  My arguments would be no different than

10:22:52AM  4    they were previously.

10:22:52AM  5        THE COURT:  Good.  Sit down.  Thank you.

10:22:56AM  6        I want briefing.  I will tell you I did not know Dr.

10:23:04AM  7    Kopreski had been subpoenaed until I think Brittany sent me

10:23:09AM  8    the agenda Friday and I thought, I didn't see this.  This

10:23:12AM  9    needs to be briefed and it needs to be to me by Friday.

10:23:19AM  10   What?

10:23:19AM  11       MR. RATLIFF:  Well, Your Honor --

10:23:22AM  12       THE COURT:  I said it needs to be briefed and to me

10:23:25AM  13   by Friday and I don't need you to give me a lecture, Mr.

10:23:30AM  14   Ratcliff, but if you want to, go ahead.

10:23:32AM  15       MR. RATLIFF:  No.  No.  No.  No lecture and we will

10:23:35AM  16   obviously --

10:23:35AM  17       THE COURT:  Thank you.

10:23:35AM  18       MR. RATLIFF:  -- comply.  Whenever you want a brief,

10:23:36AM  19   we will submit a brief.  There is a procedural issue though.

10:23:37AM  20       THE COURT:  I understand that.

10:23:37AM  21       MR. RATLIFF:  Okay.

10:23:38AM  22       THE COURT:  I'm asking for briefing on all of it.

10:23:41AM  23       MR. RATLIFF:  Okay.  Understood.

10:23:43AM  24       THE COURT:  Leave it there.

10:23:45AM  25       MR. RATLIFF:  Understood.

10:23:46AM   **1**         THE COURT:  But I don't need a lesson in civil

10:23:50AM   **2**   procedure and all that right now.

10:23:51AM   **3**         MR. RATLIFF:  I just want to be clear what the

10:23:54AM   **4**   procedural issue is --

10:23:56AM   **5**         THE COURT:  I know what the procedural issue is and

10:23:58AM   **6**   I'm assuming you do, too.  Brief it.  I need somebody to

10:24:06AM   **7**   outline to me how on Earth this transpired --

10:24:06AM   **8**         MR. RATLIFF:  Understood, Your Honor --

10:24:11AM   **9**         THE COURT:  -- and what it means and what procedural

10:24:13AM   **10**   hoops -- should it exist and whether or not they were covered

10:24:17AM   **11**   and that sort of thing.  I don't know what else you want me

10:24:20AM   **12**   to say.

10:24:21AM   **13**         MR. RATLIFF:  Your Honor, we will address that.  The

10:24:23AM   **14**   only thing I was going to say, Your Honor, is this is also

10:24:27AM   **15**   something that may be an issue that has been adjudicated by

10:24:31AM   **16**   the District of New Jersey.

10:24:33AM   **17**         THE COURT:  I understand that too.

10:24:34AM   **18**         MR. RATLIFF:  Okay.  You'll have your brief on

10:24:38AM   **19**   Friday.  Are they simultaneous briefs?

10:24:40AM   **20**         THE COURT:  Yes, because we're knocking on the door

10:24:43AM   **21**   of a trial.

10:24:43AM   **22**         MR. RATLIFF:  Understood, Your Honor.  And that's why

10:24:43AM   **23**   we put it on the agenda.

10:24:43AM   **24**         THE COURT:  And at the conclusion of this trial, I

10:24:45AM   **25**   anticipate we'll start working towards trial packages and

10:24:49AM  1   this will be before me again.

10:24:52AM  2          MR. RATLIFF:  Your Honor --

10:24:54AM  3          THE COURT:  And, very frankly, I have ideas on how

10:24:57AM  4   I'm going to do this in a trial package and it might be

10:25:02AM  5   everybody taking a trip to New Jersey and doing trial

10:25:05AM  6   depositions --

10:25:05AM  7          MR. RATLIFF:  Your Honor.

10:25:05AM  8          THE COURT:  -- which is what ought to happen.

10:25:05AM  9          MR. RATLIFF:  Your Honor.

10:25:05AM  10         THE COURT:  You want to keep talking?

10:25:07AM  11         MR. RATLIFF:  I just wanted clarity for the sake of

10:25:14AM  12  the parties, Friday deadline close of business?

10:25:18AM  13         THE COURT:  Yes.

           14         MR. RATLIFF:  Thank you, Your Honor.  That's all.

           15         THE COURT:  Thank you.

           16                         *  *  *  *

           17         (WHEREUPON, the proceedings were adjourned.)

           18                         *  *  *  *

           19                    REPORTER'S CERTIFICATE

           20         I, Nichelle N. Wheeler, RPR, CRR, Official Court
               Reporter, United States District Court, Eastern District of
           21  Louisiana, do hereby certify that the foregoing is a true and
               correct transcript, to the best of my ability and
           22  understanding, from the record of the proceedings in the
               above-entitled and numbered matter.

           23

           24              /s/ Nichelle N. Wheeler
                          Official Court Reporter

           25