ROBERT J. DAVID
GERALD E. MEUNIER
IRVING J. WARSHAUER
MICHAEL J. ECUYER
WALTER C. MORRISON IV*
M. PALMER LAMBERT
RACHEL M. NAQUIN
CLAIRE E. BERG
BRITTANY R. WOLF

OF COUNSEL STEVAN C. DITTMAN

*ALSO ADMITTED IN MISSISSIPPI

LAW OFFICES
**GAINSBURGH, BENJAMIN,**
**DAVID, MEUNIER & WARSHAUER, L.L.C.**
2800 ENERGY CENTRE
1100 POYDRAS
**NEW ORLEANS 70163-2800**

TELEPHONE
(504) 522-2304

TELECOPIER
(504) 528-9973

SAMUEL C. GAINSBURGH
(1926-2003)
JACK C. BENJAMIN
(1927-2018)

NEWROADS OFFICE:
143 EAST MAIN STREET
SUITE 3
NEW ROADS, LA 70760
TELEPHONE: (225) 638-8511

JACKSON OFFICE:
240 TRACE COLONY PARK DR.
SUITE 100
RIDGELAND, MS 39157
TELEPHONE: (601) 933-2054

*REPLY TO NEW ORLEANS OFFICE*

November 10, 2021

*Via Email (Brittany_Flanders@laed.uscourts.gov)*
The Honorable Jane Triche Milazzo
United States District Court of the Eastern District of Louisiana
500 Poydras Street
Room C206
New Orleans, LA 70130

   Re: Bellwether Trial 2A (*Kahn v. Sanofi-Aventis U.S. LLC*)
      *In Re: Taxotere (Docetaxel) Products Liability Litigation*, MDL 2740

Dear Judge Milazzo,

  Plaintiff respectfully submits the following letter brief with regard to the improper cross-examination of Dr. Bosserman regarding bias/compensation elicited by counsel for Sanofi.

## REQUEST FOR CURATIVE MEASURE IN RESPONSE TO IMPROPER QUESTIONING RE: EXPERT WITNESS COMPENSATION

  During day two of trial, Sanofi's attorney Douglas Moore attempted to impeach Plaintiff's expert oncologist Dr. Linda Bosserman with bias by eliciting testimony that she had only ever performed plaintiff-side expert work. When Dr. Bosserman clarified that this MDL marked her first time as an expert *in any litigation*, she did so gingerly—referring only to "this case," as not to improperly reference the existence of this MDL and its 12,500 member cases for which she has performed substantial common benefit work. But Sanofi immediately—and intentionally—seized on Dr. Bosserman's answer to suggest her approximately $250,000 of MDL-related invoices were attributable solely to work done on behalf of Ms. Kahn.

  Dr. Bosserman was thus put in the difficult position of choosing between: (a) violating the common prohibition in MDL bellwether trials against referencing other plaintiffs' lawsuits; and (b) combatting the false suggestion that she had been paid a quarter-million dollars to testify in Ms. Kahn's case alone. *See In re Welding Fume Prods. Liab. Litig.*, 2010 WL 7699456, at *93-94

(N.D. Ohio 2010) (noting plaintiffs like Ms. Kahn "are stuck in a bind" because "they cannot explain to the jury that one reason they have paid large[,] aggregated amounts to their experts … is because there are so many … cases, because the fact of so many cases is prejudicial, but so is the fact of the large aggregate payments.").

Dr. Bosserman ultimately opted not to violate the common prohibition on "other-claims" testimony—she did not raise the eight other bellwether plaintiffs whose cases she had been paid to work up for trial, nor the common benefit she provided for the 12,500 plaintiffs in this MDL. As a result, and as the Court acknowledged on the record, Mr. Moore's questioning left the jury with false impressions as to the witness's financial bias and to the amount litigation resources at Ms. Kahn's disposal. And it certainly "opened the door," as the Court has regularly admonished, to evidence that Dr. Bosserman has worked on behalf of many MDL plaintiffs bringing claims against Sanofi for the same injury. (MIL Hr'g Tr. 56, Aug. 26, 2021.)

There can be no doubt that when Mr. Moore, who is Defendants' Liaison Counsel, initiated this line of impeachment questioning, he was well aware that Dr. Bosserman's only litigation experience was her work in the Taxotere MDL. In each of the multiple test cases in which expert reports were exchanged, the witness specifically disclosed that her expert work has been limited to this MDL, just as she testified yesterday. This should not be news to Sanofi's counsel.

Furthermore, counsel must have been aware that the work for which Dr. Bosserman was paid $250,000 related to at least eight other bellwether cases[1] worked up for the benefit of nearly 12,500 MDL Plaintiffs over several years. To be sure, case-specific breakdowns of Dr. Bosserman's compensation have come up in multiple depositions taken by Defendants. (*See, e.g.*, Bosserman Depo. Tr. 54-56, Sept. 14, 2020, attached hereto as Ex. A; Bosserman Depo. Tr. 23-24, Sept. 20, 2021, attached hereto as Ex. B.) But regardless of whether Moore conduct during cross-examination was intentional or a mistake, the prejudicial effect is the same: the bias bell cannot be un-ring. The jury is likely to keep this $250,000 figure in mind both when assessing Dr. Bosserman's credibility and, if necessary, awarding damages to Ms. Kahn—unless the Court takes some action to combat these improper impressions.[2] *See In re Welding Fume Prods. Liab. Litig*, 2010 WL 7699456, at *93-94. ("[S]afeguards need to be put into place to ensure the introduction of this [MDL compensation] evidence is not repetitive or overstated, to the unfair prejudice of" parties).

---

[1] These are: Tanya Francis, Antoinette Durden, Barbara Earnest, Cynthia Thibodeaux, Wanda Stewart, Alice Hughes, Claire Guilbault, and Audrey Plaisance.

[2] This is especially so considering that some jurors—as was witnessed during *voir dire*—may be tempted to minimize her PCIA injury in light of her status as a cancer survivor. Indeed, Sanofi has expressly advanced this defense theme—best characterized as "the pricetag for survival"—to jurors in both this case and *Earnest*.

The Court therefore must take steps to contextualize Dr. Bosserman's work within this MDL. Plaintiff proposes that the Court take one of two actions to remedy this prejudice:

(1) permit counsel to elicit testimony from Dr. Bosserman on re-direct examination that her fees in "this case" actually encompass work done in other bellwether trial selections for the common benefit of approximately 12,500 other MDL plaintiffs; or

(2) directly issue a curative instruction to the same effect.

This approach finds support from other MDL courts that considered this same dilemma in advance of trial. *See, e.g., In re Wright Med. Tech. Inc.*, 2015 WL 6690046, at *8 (N.D. Ga. Oct. 30, 2015) (holding before trial that cross-examination on expert fees is permissible only to establish a "pattern of compensation in past cases" because "[w]hat is relevant is that … witnesses received significant compensation, over time, for their expert work" in the MDL). It is also consistent with the Court's clear warning that otherwise precluded evidence come in during trial if the door was opened to it. (MIL Hr'g Tr. 56, Aug. 26, 2021.)

Although other courts have addressed this problem in advance of trial in the opposite fashion—that is, by excluding questioning regarding fees from other MDL cases, that approach is not feasible here, where Sanofi's counsel has already put the aggregate fee amount before the jury and used it to imply Dr. Bosserman's bias. *See, e.g., In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab., Litig.*, No. 2:18-CV-01509, 2020 WL 6605648, at *1 (S.D. Ohio Sept. 11, 2020). Even if Plaintiff's counsel attempted to segregate out Dr. Bosserman's fees attributable solely to the *Kahn* case, Mr. Moore's $250,000 bell cannot be un-rung before the jury. And it would be prejudicial to Plaintiff to solve this problem by having Dr. Bosserman tell the jury that she simply misspoke yesterday evening, as such testimony would undermine her credibility with them.

For the foregoing reasons, the Court should attempt to cure any prejudice from Sanofi's cross-examination of Dr. Bosserman by permitting testimony on re-direct on the full scope of her MDL work, as described *supra*, or by giving a curative instruction to the same effect.

Respectfully submitted,

M. Palmer Lambert

cc:    Plaintiffs' and Defendants' Liaison Counsel

# EXHIBIT A

Page 54

1  A. Two come to mind. There may have been
2  others.
3  Q. And were those cases on -- did you testify
4  on behalf of the plaintiffs or the defendants?
5  A. The one I recall was on behalf of a woman
6  with breast cancer. And the second one, I think,
7  was also on behalf of the patient.
8  Q. Currently, how many cases a year do you
9  review on behalf of Shernoff Bidart?
10  A. I haven't reviewed any --
11      MR. MICELI: Object to the form.
12      THE WITNESS: -- cases in the last few
13  years for them. I think the last time I reviewed a
14  case was several years ago.
15  BY MR. HOLDEN:
16  Q. And in the past three years, how many
17  times have you reviewed a case on behalf of NSF?
18  A. I don't understand the question.
19  Q. I believe NSF, that is your -- I'm sorry,
20  or NDA Partners, is that your company who you work
21  for Taxotere through?
22  A. Yes. I've taken no other cases.
23  Q. And you -- you haven't reviewed any other
24  cases either?
25  A. No.

Page 55

1  Q. Do you recall ever testifying as an expert
2  witness in a case against Sandoz before today?
3  A. I don't have any recollection of that.
4  Q. And I understand your -- your billing rate
5  for expert witness work is -- is $650 per hour; is
6  that correct?
7  A. Correct.
8  Q. And that's also your rate for depositions,
9  correct?
10  A. Correct.
11  Q. And I did receive a collection of your
12  invoices relating to the Taxotere litigation, which
13  I believe I received yesterday, and we're marking
14  that as Exhibit 12.
15      (Whereupon Exhibit 12 was marked for
16      identification.)
17  BY MR. HOLDEN:
18  Q. And did you help pull these invoices
19  together?
20  A. No.
21  Q. You relied on counsel to do that?
22  A. Yes.
23  Q. I'll represent to you that I added up
24  the -- the total for fees in all those invoices, not
25  including costs or expenses, but just the fees, and

Page 56

1  the total ended $210,000.
2      Does that sound correct to you?
3  A. I'll take your word for it.
4  Q. The most recent entry on the invoices that
5  I received was -- was on June 8, 2020, and that's
6  the date that your report in this case was
7  submitted.
8      My question to you is, have you billed any
9  time on the Taxotere litigation since June 8th?
10  A. I haven't submitted any invoices, no.
11  Q. Have you done any work that you intend to
12  submit invoices for?
13  A. Yes.
14  Q. Could you estimate how much -- how many
15  hours you've spent since June 8, 2020?
16  A. I don't know, 10 to 15 preparing.
17  Q. Preparing for your deposition?
18  A. Yes. That's the high side. I -- I --
19  somewhere.
20      [Reporter requests clarification.]
21      THE WITNESS: That's the high side.
22      I -- I don't know exactly. I -- I keep
23  track of my calendar and then I add it up once a
24  month and send an invoice. I do make all the
25  invoices myself.

Page 57

1  BY MR. HOLDEN:
2  Q. In the collection of invoices that I
3  received, I didn't see any invoices for
4  December 2018 when you were deposed twice in this
5  case.
6      I assume you did submit an invoice for
7  your time spent that month, correct?
8  A. I hope so.
9  Q. NDA Partners is the only expert witness
10  service that you're affiliated with, correct?
11  A. Correct.
12      MR. MICELI: Object to the form.
13  BY MR. HOLDEN:
14  Q. Doctor, have you ever had any type of
15  formal consulting arrangement with Sandoz?
16  A. Not that I recall.
17  Q. And I'm pulling up -- I saw something on
18  your CV. I think we're pulling it up here. It's
19  No. 46.
20      MR. MICELI: What page are you looking to,
21  Evan? I can --
22      MR. HOLDEN: 30 --
23      MR. MICELI: -- I've got a second here.
24      MR. HOLDEN: 39 of the CV, Dave.
25      MR. MICELI: Thank you.

# EXHIBIT B

Page 22

1  which we've already talked about; correct?
2  A. Yes.
3  Q. And then all your articles and your
4  testimonies included on your CV and your other
5  attachments that we had already been provided; correct?
6  A. Yes.
7  Q. And then I was also provided with an updated
8  invoice.
9      Is that correct?
10 A. Yes.
11 Q. And then I was provided with some typewritten
12 notes on Ms. Guilbault and Ms. Plaisance.
13     Is that correct?
14 A. Correct.
15 Q. And those typewritten notes, were those
16 prepared by you in your review?
17 A. Yes.
18 Q. Then I also received what appeared to be a
19 printout from a medical journal on staging.
20     Is that correct?
21 A. Correct. I'll go back to see where it was
22 printed from, but I believe it was the AGCC chart.
23 Q. Okay. And I'm probably going to mark those as
24 we go through rather than mark them all now, if that's
25 okay with you.

Page 23

1  A. Yes.
2  Q. Seems more logical to me.
3      At your last deposition in September of 2020,
4  your invoices had been produced through June 8th of
5  2020.
6      Is the invoice that I'm going to mark as
7  Exhibit 4 that was produced to me this morning --
8      And that's Tab O, Amy.
9      -- would this be the only invoice that has
10 been submitted between June 8th of 2020 and today?
11 A. I don't believe so because I would have sent
12 an invoice for the depo in September of '20.
13         (Defendants' Exhibit 4 was
14         marked for identification.)
15 BY MR. ROTOLO:
16 Q. So this invoice that I have marked as
17 Exhibit 4 that was produced today seems to encompass
18 your work from May 18th of 2021 until August 16th of
19 2021; correct?
20 A. Yes.
21 Q. And would this work on this invoice be related
22 to either the Plaisance or the Guilbault case?
23 A. Yes. That was work for both those cases.
24 Q. And the invoice ends on August 16th of 2021;
25 correct?

Page 24

1  A. Yes.
2  Q. And the total of the invoice is $46,475?
3  A. Correct.
4  Q. Can you estimate how much time you've spent on
5  the Plaisance case since that invoice that ended in
6  August 16th of 2021?
7  A. Between the two cases in review for this,
8  maybe four hours, maybe five, you know, somewhere in
9  that range. I haven't added them up.
10 Q. Just so I'm clear, that would be for both
11 Ms. Plaisance and Ms. Guilbault's case together?
12 A. Yes. And I believe there was also time I did
13 a declaration, as you know.
14 Q. Okay. What did you do to prepare for your
15 deposition today?
16 A. I read through my Rule 26 reports. I read
17 through my deposition from last September. I most
18 reviewed my notes on just their history because -- to
19 address the areas I'm an expert for, the treatment of
20 breast cancer, the staging, the treatment options, the
21 risk profiles, I reviewed my notes so I could answer any
22 questions and refresh my mind on that.
23 Q. Did you meet with counsel in preparation for
24 your deposition?
25 A. We spoke. We haven't met in person.

Page 25

1  Q. Without telling me anything that was said in
2  those conversations with counsel, how many times did you
3  communicate with counsel in preparation for this
4  deposition?
5  A. Oh, wow.
6      MR. MICELI: Let me interpose an objection.
7  But really just ask you, if you want -- as you know,
8  there's other things going on --
9      THE WITNESS: Right.
10     MR. MICELI: -- like the Khan trial. So if
11 you want to break it down and ask separately, it
12 doesn't -- I hate to interrupt, but I know I'm supposed
13 to say object to the form, but you know that and it's
14 just to sort of an asterisk.
15     MR. ROTOLO: Right. And my --
16     MR. MICELI: More to look at --
17 BY MR. ROTOLO:
18 Q. And my question was only limited to
19 preparation for this deposition of Ms. Guilbault and
20 Ms. Plaisance. Not any other work you may be doing for
21 other plaintiffs' cases.
22 A. I would guess two to three possible calls.
23 Q. Again, without telling me what was discussed
24 on those calls, who were those calls with in preparation
25 for this deposition?