# EXHIBIT 3

                                1

1   RABIA LATIF CATTIE, MD - November 3, 2021

2       ||| UNCERTIFIED ROUGH DRAFT |||

3

4       REPORTER'S NOTE:  This unedited

5   rough draft of the proceedings was produced

6   in Realtime instant form and is not

7   certified.  The rough draft transcript may

8   not be cited or used in any way or at any

9   time to rebut or contradict the final

10  certified transcription of proceedings.

11      There will be discrepancies

12  between this form and the final form of the

13  transcript, because this Realtime

14  instant-form transcript has not been fully

15  edited, proofread, corrected, finalized,

16  indexed, bound, or certified.

17      There will also be a discrepancy

18  between the page and line numbers appearing

19  on this unedited rough draft and the edited,

20  proofread, corrected, certified final

21  transcript.

22      Also, please be aware that your

23  Realtime browser screen and/or the unedited,

24  uncertified rough draft transcript may

25  prognosis, risk of recurrence, and risk of

34

1  benefits of undergoing different treatments,

2  if you take endocrine therapy this is your

3  risk of recurrence, if we add chemotherapy to

4  the mix this, you know, we might reduce your

5  risk or not.  That kind of discussion.

6       Q.   In Ms. Plaisance's case,

7  don't have any critique or problem with her

8  oncologist using Oncotype testing as was done

9  in her case?

10      A.   No, that is completely within

11  the guidelines to test a Stage I cancer for

12  Oncotype to see if there's benefit with

13  chemotherapy.

14      Q.   What about KI67 testing, is

15  that something that you use and how do you

16  use it since 2012?

17      A.   KI67 is another one of those

18  prognostic markers, it's a protein that is

19  seen to be high in rapidly divided cells.

20  The higher the KI67, the more unfavorable the

21  response might be.  It's always used in

22  context with other things.  It's not part of

23  staging, but it is helpful to know, and the

24  pathologist will routinely test a KI67 on a

25  which is is a T 1 B, to be very specific,

91

1  three node were negative, that would make it

2  an N 0, and she did not have metastatic

3  disease clinically so that would be an M 0.

4  That translates into a Stage I A disease,

5  that's as per the AGGC, the seventh edition

6  guidelines that were available at the time of

7  her diagnosis.  She was estrogen receptor

8  positive and HER2/neu negative, and her

9  Oncotype DX was 27 which was the additional

10  factor.  So she had a Stage I A disease.

11      Q.   And Ms. Plaisance's as her

12  physicians recommendations underwent a

13  lumpectomy, is that correct?

14      A.   That is correct.

15      Q.   And that was an an appropriate

16  choice in terms of treatment in your opinion?

17      A.   As per my review of her

18  records, yes, it's appropriate choice.

19      Q.   What was Ms. Plaisance's

20  10-year overall survival rate based on her

21  Stage I cancer?

22           MS. WADHWANI:  Objection to

23  form.

24      A.   So given that she had an early

25  van would have been outside of the standard

97

1  of care and inappropriate for Ms. Plaisance?

2          MS. WADHWANI:  Objection to

3      form.

4      A.   They're included in the

5  guidelines.  If there is a compelling reason

6  not to use the preferred regimens, there was

7  other regimens could have been considered.

8  BY MR. LAMBERT:

9      Q.   Dr. Cattie, do you have any

10  criticisms of Dr. Show van who was

11  Ms. Plaisance's oncologist treating her early

12  stage breast cancer?

13          MS. WADHWANI:  Objection to

14      form.

15      A.   No, I do not have any

16  criticism.

17  BY MR. LAMBERT:

18      Q.   Okay.  And do you have any

19  criticisms of any other of Ms. Plaisance's

20  healthcare providers involved in her care and

21  treatment that you reviewed as part of your

22  review of this case?

23          MS. WADHWANI:  Same objection.

24      A.   No, I do not have any

25  don't always agree.  That doesn't mean that

117

1  somebody is less competent.  I'm not implying

2  that.

3  BY MR. LAMBERT:

4      Q.    Understood. Okay.  I think we

5  are saying the same thing.  You disagree with

6  Dr. Bosserman's conclusions, but you don't

7  have any criticisms of her methodology,

8  correct?

9           MS. WADHWANI:  Objection to

10     form.  Mischaracterizes testimony.

11     A.    So methodology, you have to

12  clarify, what methodology is part of this

13  statement?

14  BY MR. LAMBERT:

15     Q.    I'll go ahead and move on.

16           Do you have any criticisms of

17  Ms. Plaisance in terms of her decision-making

18  or her compliance with medical

19  recommendations that she agreed with?

20           MS. WADHWANI:  Objection to

21     form.

22     A.    Criticisms of whether she

23  complied?  I mean it appears that she

24  received the chemotherapy that was discussed

25  with her and she consented to it, and she

118

1  took the endocrine therapy, so no, no

2  criticism there.

3  BY MR. LAMBERT:

4     Q.   I guess I'll ask in a different

5  way.  You're not going to suggest to the jury

6  that Ms. Plaisance failed to mitigate her

7  damages by not complying with her healthcare

8  providers' guidance?

9          MS. WADHWANI:  Objection to

10     form.  Calls for a legal conclusion.

11     A.   Are we talking about Guilbault

12  or Plaisance, I get confused, because we were

13  on Guilbault right now.

14  BY MR. LAMBERT:

15     Q.   I'm sorry, I'm going back and

16  forth.  I'm talking about Ms. Plaisance right

17  now.

18     A.   Okay, you are talking about

19  Ms. Plaisance.  Okay.  So let me just pull

20  that part of my report.  So my mind is in the

21  right place I need to refresh.  Okay.  So

22  please ask the question with Ms. Plaisance.

23     Q.   Sure.  Are you going to testify

24  that Ms. Plaisance failed to mitigate her

25  damages by not following the guidance of her

119

1  physicians?

2         MS. WADHWANI:  Objection to

3     form.  Calls for a legal conclusion.

4     A.   I have no reason to believe

5  that she did not follow the advice of her

6  physicians.

7  BY MR. LAMBERT:

8     Q.   And you don't have any qualms

9  with her decision-making in terms of the

10  treatment choices that she elected to

11  undergo?

12         MS. WADHWANI:  Objection to

13     form.

14     A.   I cannot speak for her.  It

15  looks like she was counseled and received an

16  appropriate chemotherapy regimen.

17  BY MR. LAMBERT:

18     Q.   Okay.  Same questions for

19  Ms. Guilbault.  Do you have any opinion that

20  you're going to express at trial that

21  Ms. Guilbault failed to mitigate her damages

22  by not following the guidance of her

23  healthcare providers?

24         MS. WADHWANI:  Objection to