# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

---o0o---

IN RE: TAXOTERE (DOCETAXEL) )
PRODUCTS LIABILITY LITIGATION )
)
) MDL NO. 16-2740
)
______________________________)

---o0o---

Videotaped Zoom Deposition of

LINDA BOSSERMAN, MD

Monday, September 20, 2021

---o0o---

Katy E. Schmidt
RPR, RMR, CRR, CSR 13096

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
---o0o---

IN RE: TAXOTERE (DOCETAXEL) )
PRODUCTS LIABILITY LITIGATION )
)
)MDL NO. 16-2740
)
_______________________________)

BE IT REMEMBERED that, pursuant to Notice, and on Monday, the 20th day of September, 2021, commencing at the hour of 9:08 a.m., thereof, in Newport Beach, California, before me, KATY E. SCHMIDT, a Certified Shorthand Reporter in and for the County of Yolo, State of California, there virtually personally appeared

LINDA BOSSERMAN, MD

called as a witness herein, who, being by me first duly sworn, was thereupon examined and interrogated as hereinafter set forth.

APPEARANCES:

For The Plaintiff:

(Appeared via Zoom)

LAW OFFICES OF DAVID F. MICELI
BY: DAVID F. MICELI, Esq.
PO Box 2519
Carrollton, Georgia 30112
404.915.8886
dmiceli@miceli-law.com

GAINSBURGH BENJAMIN
BY: M. PALMER LAMBERT, Esq.
New Orleans, Louisiana
877.591.2354
plambert@gainsben.com

For Hospira:

(Appeared via Zoom)

CHAFFE MCCALL LLP
BY: PETER J. ROTOLO, Esq.
1100 Poydras Street, Energy Centre
New Orleans, Louisiana 70163
504.585.7000
rotolo@chaffe.com

For Sandoz, Inc.:

(Appeared via Zoom)

GREENBERG TRAURIG LLP
BY: EVAN HOLDEN, Esq.
Terminus 200 3333
Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
678.553.7320
holdene@gtlaw.com

Also present:

Jennifer Heis, Esq.
Geoffrey Coan, Esq.
Emily Knight, Esq.

Anthony Gulino, videographer
---o0o---

INDEX OF EXAMINATION
---o0o---

| | Page |
|---|---|
| Examination by Mr. Rotolo | 10 |

---o0o---

QUESTIONS INSTRUCTED NOT TO ANSWER

Page Line

(NOTHING OFFERED.)

---o0o---

INDEX OF EXHIBITS

---o0o---

| | | Page |
|---|---|---|
| Exhibit 1 | CV of Linda D. Bosserman, MD FACP, FASCO | 15 |
| Exhibit 2 | CV of Linda D. Bosserman, MD FACP, FASCO | 15 |
| Exhibit 3 | Notice of Videotaped Deposition of Linda Bosserman, MD | 21 |
| Exhibit 4 | Invoice | 23 |
| Exhibit 5 | Linda Bosserman, MD Material Considered | 28 |
| Exhibit 6 | Linda Bosserman, MD Material Considered | 28 |
| Exhibit 7 | Taxotere Rule 26 Report: Audrey Plaisance | 39 |
| Exhibit 8 | Taxotere Rule 26 Report: Clare Guilbault | 40 |
| Exhibit 9 | American Joint Committee on Cancer Breast Cancer Staging | 55 |
| Exhibit 10 | Audrey Plaisance Medical Summary for R26 R5 Report | 64 |
| Exhibit 11 | Deposition Transcript of Laura Chauvin, MD taken on 10/15/20 | 71 |
| Exhibit 12 | Medical History Clare Guibalt (sic) for R26 R6 | 97 |
| Exhibit 13 | Predict Breast Calculation Summaries and References for Clara Guilbault for R26 R6 done 8-15-2021 | 97 |

///

| | | |
|---|---|---|
| Exhibit 14 | Deposition Transcript of Chris Theodossiou, MD taken on 11/11/20 | 105 |

---o0o---

NEWPORT BEACH, CALIFORNIA

MONDAY, SEPTEMBER 20, 2021; 9:08 A.M.

---o0o---

THE VIDEOGRAPHER: Okay. Good morning everyone. We are going on the record at 9:08 a.m. Pacific daylight time on Monday, September 20th, 2021.

Please note that the microphones are sensitive and may pick up whispering, private conversations, and phone interference.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Dr. Linda Bosserman, taken by counsel for defendant in the matter of Taxotere (Docetaxel) Products Liability Litigation, filed in the United States District Court for the Eastern District of Louisiana.

The MDL number is 16 dash 2740.

This deposition is being held remotely using Veritext virtual technology. All parties are appearing remotely via Zoom, and the witness is located in Newport Beach, California.

My name is Anthony Gulino from the firm Veritext Legal Solutions, and I'm the videographer.

The court reporter is Kathryn Schmidt from the

firm Veritext Legal Solutions.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and everyone attending remotely will now state their appearances and affiliations for the record.

If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. ROTOLO: This is Peter Rotolo -- Peter Rotolo appearing for Hospira Worldwide, LLC, formally doing business as Hospira Worldwide, Inc. and Hospira, Inc. And I have no objection to proceeding.

MR. MICELI: This is David Miceli on behalf of the PFC and plaintiff. And we have no objection to proceeding.

And with me is Palmer Lambert, also on behalf of the plaintiff and PFC.

THE COURT REPORTER: Shall I swear the witness?

THE VIDEOGRAPHER: Yep. Will the court reporter please swear in the witness?

---o0o---

LINDA BOSSERMAN, M.D.,

called as a witness by the Defendants, who, being first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. ROTOLO

BY MR. ROTOLO:

Q. Good morning, Dr. Bosserman. I'm Peter Rotolo and I represent Hospira, and I will be taking your deposition today.

Can you hear me okay?

A. Yes. Good morning.

Q. Good morning.

Before we start, can you just state your name for the record?

A. Linda Bosserman, M.D.

Q. And Dr. Bosserman, I know you have given depositions before; correct?

A. Correct.

Q. And I know at least one, if not more of your depositions, have been remote, as you and I are doing today.

Is that right?

A. Correct.

Q. So I know you know the rules and the drill but let me just remind you of a couple things.

If you could pause after you think I've finished my question before you start your answer, because sometimes there's a lag, and that will also give Dave a chance to object, if he needs to, and I'll try to pause when I think you're done with your answer before I start next so the court reporter can get everything down.

Is that fair?

A. Yes.

Q. Okay. And also, I don't think you will do it, but no head shakes or "uh-huh" because the court reporter can't -- is probably not looking at the video when she's typing things.

A. I understand.

Q. And one last thing, if you don't hear or understand my question, please let me know. I'll be happy to repeat it or rephrase it. Because if you answer it, I'm going to assume you heard it and you understood it.

Is that fair?

A. That's fair.

Q. Given this is a remote deposition, where are you physically located today?

A. I'm physically in my home in Newport Beach, California.

Q. And lucky you.

Is anyone in the room with you today?

A. No. My partner, John, may walk behind. He sees -- has an office behind me, and I'm glad to turn off this -- I have a long office and he has a separate office. But otherwise no one else is here.

Q. All right. And I know I had sent you a binder of potential exhibits we may use today and I think you have that in front of you; correct?

A. I do.

Q. And do you have any other notes or papers in front of you other than the binder with the potential exhibits?

A. Yes. I have the ones that we sent this morning.

Q. Okay. And we'll go over those in a minute.

If you need to refer to any documents or notes, just let me know what you're referring to so that I know what you're looking at if you're using it as a basis to answer a question.

Okay?

A. Okay.

Q. We're going to be talking today about two cases, Ms. Plaisance and Ms. Guilbault.

Do you understand that?

A. Yes.

Q. And so there may be some questions that I ask that are the same or very similar for both of the plaintiffs, but in order to keep them separate as two separate cases, we're going to have to do that.

Okay?

A. I hope so.

Q. Okay. And if I counted right, you have been deposed six time previously in this litigation; correct?

A. I'll count on you. I haven't independently counted them but...

Q. You've testified a number of times in this litigation; correct?

A. In deposition, yes.

Q. Yes.

A. And once in trial, yes.

Q. And that was my next question.

You testified at the Earnest (phonetic) case here in New Orleans at trial; correct?

A. Correct.

Q. And in all of your depositions and your trial testimony, you were under oath when you gave your testimony; correct?

A. Correct.

Q. And looking at the depositions you gave, it

Page 14

appears that your last deposition occurred on September 14th and 15th of 2020 in the Stewart and Yuse case.

Does that sound correct to you?

A. I'll count on you for that. I didn't independently look up my notes, but sounds reasonable.

Q. Since the time of that deposition that was in September of 2020, have you authored or co-authored any article that has been published or submitted for publication on Docetaxel or on chemotherapy regimes that include Docetaxel?

A. Not specifically. My CV is updated, and I wrote a major paper on halfway use and nothing specific on regimens.

Q. And since September of 2020, when you were last deposed, have you authored or co-authored any article that has been published or submitted for publication on Docetaxel and alopecia?

A. I have not.

Q. Now, attached to your expert reports in these cases was your CV at that time, which was dated August 15th of 2021. And I'm going to go ahead and mark that into evidence as Exhibit 1, which is Tab B for both Amy and everyone that has the hard documents.

///

Page 15

(Defendants' Exhibit 1 was marked for identification.)

MR. ROTOLO: And then less than an hour before this deposition this morning, I got an up dated CV from you that has a date of September the 15th of 2021 on it. And I'll move that one into evidence.

And, Amy, I think that is going to be Tab T in Exhibit -- that will be Exhibit 2.

(Defendants' Exhibit 2 was marked for identification.)

BY MR. ROTOLO:

Q. Doctor, I haven't had a tremendous amount of time to compare your August 15th of 2021 to your September 15th, 2021 CV since I just got it.

Do you know what the difference in that -- the month, anything that was added to your CV during that month?

A. The major things is I am a full professor. They have promoted -- I'm no longer a clinical professor. I'm a full professor. Official start date is October 1st but the notices were sent in September and it was finalized by the board of directors.

Second thing is I've stepped down as editor-in-chief of the Journal of Clinical Oncology Oncology Practice, and will be a contributing editor at

Page 16

my request to have more free time.

Q. I did see that on the CV that was attached.

Let me ask you just a couple other questions on your CV. And I'm looking at the one from August 15th, but I'm just now looking at the September 15th, and it looks like it's the same with what we're going to talk about.

You did not renew your Massachusetts medical license in 2021; correct?

A. Correct.

Q. And so the only state you're licensed to practice medicine now is in California; correct?

A. Correct.

Q. And you've already talked about going from the editor-in-chief to the deputy editor of the Journal of Oncology Practice; correct?

A. Actually, I changed it to consulting editor. I have very specific projects and more limited time so I can work on some other projects at work really.

Q. Sure.

And then I noticed on page 2 of your CV, it looked like there was a change in your position at the City of Hope in 2020 from medical advisor for Center of International Medicine and Value Realization Project Core Team to medical director of value-based

Page 17

care and center for international medicine.

Is that correct?

A. That's correct.

Q. And could you tell me what that change was and how that affects your duties and responsibilities?

A. All right. So City of Hope had two main organizations, a foundation and a medical center. And some people employed by one, some another.

Because my duties are primarily administrative, and I see patients for international medicine and others by video, they switched me from the foundation essentially December 27th of '19, so essentially January 1st, I worked for the medical center.

In the medical center they actually could give titles of your work you've been doing all along. And I've been the medical director of value-based care and I've been the medical director for international medicine. But the foundation doesn't have those titles, so it's really a technical issue.

I can still see patients. It just -- you know, two budgets. And it was the preference of the medical director and the senior leadership since I do so much work in value-based care and international medicine.

Q. In your expert report, in the introductory part, you noted that you were having video consultations with physicians and patients in China and Brazil.
Is that correct?
A. Mm-hm. That is correct.
Q. Is that part of your new responsibilities or were you doing that beforehand?
A. I was doing that before in China and we launched the Brazil relationship late last year, and I've been actively involved in leading that this year. And the China work, you know, with our current political milieu is lessened so the Brazil program is growing substantially.
We actually have our first fellow on site starting today for two months. And I've developed all the oversight of the tumor board, the discussions, the case reviews. I've reviewed the breast cancer cases. And now will be mentoring this fellow in breast cancer so...
Q. Is there any special licensure that's required for consulting in China or Brazil?
A. It's complicated. So I actually went to China to teach for a week in '19. It's on my CV. I had to have a special visa, but I didn't -- I worked in a consulting capacity, did not regard it. They recognized

my city voc license to give advice to doctors and patients.
So in China the rules are that you can give advice to physicians. And all the consults I do are the patients and/or their family with their physicians.
So we very much follow the rules of the country.
In Brazil, all the consults have been through the physicians, the leadership of the Albert Einstein Cancer Center, which is their No. 1 cancer center in Brazil, has the highest certification, and I talk to the fellows and the faculty about the cases they present but not patients directly to date.
Q. Then on page 21 of your CV it looked like in October of 2020, you became a consultant to and member of the board of managers of Integra Connect?
A. That actually -- if I put the date wrong, I'm sorry. That started '21. I resigned my editorship as of September 1st, '21. And as of October 1st, '21, I'm officially on the board of managers and consultant.
I have consulted for Integra Connect before that. And while I was the editor-in-chief, I could consult but was prevented from being paid for my work which had something to do with my willingness to resign my position because I -- you know, this is a group

really working on value-based care across the country, and one of my real expertise areas.
Q. And is that what you're doing with Integra Connect is consulting on value-based care?
A. Right. Pathways, standardization electronic record, structure of care, high-quality care.
Q. Since your last deposition in September of 2020, is it still correct that the last time that you wrote prescriptions for chemotherapy on a regular basis was the year 2017?
A. For direct patients, yes. But you will see under -- you won't see probably there the detail of value-based care.
One of the major components -- value-based care means setting up all the tools across your organization and the teams and the processes to deliver a standard of care that obviously gets personalized.
Part of that, I've overseen an oral chemotherapy and regimen update progress. I've written chemotherapy orders and order sets for the entire epic electronic records system for City of Hope. I oversee that for different tumors and meet with the tumor directors and work with our PharmDs to oversee all these regimen bills of standardization.
And so I actually -- I write the orders that

the doctors then write for the patients. How's that? I help filled all those. But I'm not directly ordering chemo for patients --
Q. Go ahead. I'm sorry.
Since September of 2020, have you seen patients in clinic for the treatment of breast cancer?
A. Only through video.
We have another program that I helped start, our Access Hope, where we serve a lot of -- we serve many employers for second opinions, and I do video second opinions. I don't know how many I've done since September, but at least one or two where I do video second opinions for breast cancer when I'm called on or if they need my help.
(Defendants' Exhibit 3 was marked for identification.)
BY MR. ROTOLO:
Q. I'm going to mark as Exhibit 3, the Notice of Deposition in this case, which is going to be actually Tab A in the notebook, if you need to refute -- refer to it. And there was a list of items to be produced, Doctor.
Are you familiar with that?
A. I'm aware of that, yes.
Q. And this morning I received an updated CV,

Page 22

which we've already talked about; correct?
A. Yes.
Q. And then all your articles and your testimonies included on your CV and your other attachments that we had already been provided; correct?
A. Yes.
Q. And then I was also provided with an updated invoice.
Is that correct?
A. Yes.
Q. And then I was provided with some typewritten notes on Ms. Guilbault and Ms. Plaisance.
Is that correct?
A. Correct.
Q. And those typewritten notes, were those prepared by you in your review?
A. Yes.
Q. Then I also received what appeared to be a printout from a medical journal on staging.
Is that correct?
A. Correct. I'll go back to see where it was printed from, but I believe it was the AGCC chart.
Q. Okay. And I'm probably going to mark those as we go through rather than mark them all now, if that's okay with you.

Page 23

A. Yes.
Q. Seems more logical to me.
At your last deposition in September of 2020, your invoices had been produced through June 8th of 2020.
Is the invoice that I'm going to mark as Exhibit 4 that was produced to me this morning --
And that's Tab O, Amy.
-- would this be the only invoice that has been submitted between June 8th of 2020 and today?
A. I don't believe so because I would have sent an invoice for the depo in September of '20.
(Defendants' Exhibit 4 was marked for identification.)
BY MR. ROTOLO:
Q. So this invoice that I have marked as Exhibit 4 that was produced today seems to encompass your work from May 18th of 2021 until August 16th of 2021; correct?
A. Yes.
Q. And would this work on this invoice be related to either the Plaisance or the Guilbault case?
A. Yes. That was work for both those cases.
Q. And the invoice ends on August 16th of 2021; correct?

Page 24

A. Yes.
Q. And the total of the invoice is $46,475?
A. Correct.
Q. Can you estimate how much time you've spent on the Plaisance case since that invoice that ended in August 16th of 2021?
A. Between the two cases in review for this, maybe four hours, maybe five, you know, somewhere in that range. I haven't added them up.
Q. Just so I'm clear, that would be for both Ms. Plaisance and Ms. Guilbault's case together?
A. Yes. And I believe there was also time I did a declaration, as you know.
Q. Okay. What did you do to prepare for your deposition today?
A. I read through my Rule 26 reports. I read through my deposition from last September. I most reviewed my notes on just their history because -- to address the areas I'm an expert for, the treatment of breast cancer, the staging, the treatment options, the risk profiles, I reviewed my notes so I could answer any questions and refresh my mind on that.
Q. Did you meet with counsel in preparation for your deposition?
A. We spoke. We haven't met in person.

Page 25

Q. Without telling me anything that was said in those conversations with counsel, how many times did you communicate with counsel in preparation for this deposition?
A. Oh, wow.
MR. MICELI: Let me interpose an objection. But really just ask you, if you want -- as you know, there's other things going on --
THE WITNESS: Right.
MR. MICELI: -- like the Khan trial. So if you want to break it down and ask separately, it doesn't -- I hate to interrupt, but I know I'm supposed to say object to the form, but you know that and it's just to sort of an asterisk.
MR. ROTOLO: Right. And my --
MR. MICELI: More to look at --
BY MR. ROTOLO:
Q. And my question was only limited to preparation for this deposition of Ms. Guilbault and Ms. Plaisance. Not any other work you may be doing for other plaintiffs' cases.
A. I would guess two to three possible calls.
Q. Again, without telling me what was discussed on those calls, who were those calls with in preparation for this deposition?

Page 26

A. I believe there was one call with Palmer and David, possibly two. And otherwise I generally talked to David.
Q. Okay. And I'm talking about preparation for your deposition currently.
In preparation for your deposition, did you communicate with any of Ms. Plaisance's treating physicians?
A. No.
Q. In preparation for your deposition, did you communicate with any of Ms. Guilbault's treating physicians?
A. No.
Q. And, Doctor, this is where I've talked about that I have to ask the similar or same question for each case so we could keep them separate. I apologize.
A. Mm-hm.
Q. Did you communicate with Ms. Plaisance in preparation for your deposition?
A. No.
Q. Did you communicate with Ms. Guilbault in preparation for your deposition?
A. No.
Q. Did you communicate with any of the other plaintiffs' experts about Ms. Plaisance in preparation

Page 27

for your deposition?
A. No.
Q. Did you communicate with any of the other plaintiffs' experts about Ms. Guilbault in preparation for your deposition?
A. No.
Q. Other than counsel, did you communicate with anyone else about Ms. Plaisance in preparation for your deposition?
A. No.
Q. Other than counsel, did you communicate with anyone else about Ms. Guilbault in preparation for your deposition?
A. No.
Q. Did you review any medical records of Ms. Plaisance in preparation for your deposition?
A. Only the notes that I took.
Q. And were the notes that you took based upon medical records that you had previously reviewed?
A. Yes.
Q. And did you review any medical records of Ms. Guilbault in preparation for your deposition?
A. Only the notes I had made from review of the records.
Q. Did you review any depositions taken in

Page 28

Ms. Plaisance's case in preparation for your deposition?
A. Not that I recall, no.
Q. Did you review any depositions taken in Ms. Guilbault's case in preparation for your deposition?
A. Nope.
Q. Did you do anything else to prepare for your deposition here today that we haven't talked about?
A. Not that I recall.
Q. Doctor, I'm going to mark as Exhibit 5, your materials considered list that was attached to Ms. Plaisance's report as Exhibit 5, and your materials considered list that was attached to your Guilbault report as Exhibit 6. And I will note that those are Tab No. C1 and D1 for both Amy and Dr. Bosserman and Dave, if you want to look at those.
(Defendants' Exhibits 5 and 6 were marked for identification.)
BY MR. ROTOLO:
Q. Doctor, first I'm going to ask questions about both of them before we look at them each individually.
Are the materials that you considered in rendering your opinions contained in your Rule 26 report on these two materials considered list?
A. Yes.
Q. Are there any materials you relied upon to

Page 29

form your opinions contained in your Rule 26 report that are not included on these lists?
A. I don't believe so.
Q. Are there any materials that you considered in forming your opinions contained in your reports that are not included on this list?
A. Not that come to mind. I mean, assuming my CV is there, then that means my years of experience come into that as well. But these are --
Q. Sure.
A. -- the materials that I looked at. Yes.
Q. Sure.
Let's first look at Ms. Plaisance's materials considered list, which is Exhibit 5 that I've marked and is going to be C1 in the tabs.
There's a listing of deposition transcripts and exhibits.
Do you see that, Dr. Bosserman?
A. Yes.
Q. And other than the deposition transcripts and exhibits that are listed here, did you read or consider any other depositions in Ms. Plaisance's case?
A. Not that I recall.
Q. Now, you reviewed under the "Deposition Prescriptions and Exhibits" of Ms. Plaisance, that you

Page 30

reviewed the depositions of Mr. and Ms. Plaisance, and her son and daughter-in-law; correct?
A. Correct.
Q. And you reviewed the deposition of Dr. Lauren Chauvin; correct?
A. Correct.
Q. And Dr. Chauvin was Ms. Plaisance's medical oncologist.
Is that right?
A. Yes.
Q. And then you reviewed the deposition of Dr. Ryan Matherne.
Is that right?
A. Yeah. But much briefer.
Q. And do you know what Dr. Matherne's specialty is?
A. I don't recall.
Q. Let's turn to Exhibit 6, which is Ms. Guilbault's materials considered list, and, Doctor, that's D1 in the tab.
And there's also a listing of deposition transcripts and exhibits that you reviewed for Ms. Guilbault; correct?
A. Correct.
Q. And did you review any other depositions other

Page 31

than those listed here for Ms. Guilbault's report?
A. Not that I recall.
MR. MICELI: Object to the form.
BY MR. ROTOLO:
Q. And you reviewed Mr. and Ms. Guilbault's deposition; correct?
A. Correct.
Q. And you reviewed the deposition of Dr. Chris Theodossiou, who is Ms. Guilbault's treating oncologist; correct?
A. Yes.
Q. Did you review the depositions of either Dr. Nia Terezakis or Dr. Douglas Koppel for Ms. Guilbault's case?
A. Not that I recall.
Q. Did you review the deposition of the chemotherapy nurse, Suzanne Murray, in Ms. Guilbault's case?
A. I don't think that was provided to me. I have to look at my report. I don't recall that.
Q. Did you review the depositions of Ms. Guilbault's sons and sisters?
A. Not that I recall.
Q. In the list, the remaining nine depositions that are listed, do you know who the depositions of

Page 32

these nine people are on your material considered list?
A. I remember some are from earlier cases. I remember Hangai was an earlier case. The others, I don't recall offhand. Of course, Dr. Glaspy I know is the -- an expert for Sanofi, may also be -- I don't recall, but I know Dr. Glaspy and his work.
Q. I will represent that none of these nine depositions were taken in Ms. Plaisance or Ms. Guilbault's case against Hospira.
Do you know why they're on the materials considered list for these two cases?
MR. MICELI: Object to the form.
THE WITNESS: I don't know except that I've reviewed them in the past so -- for cases related to the action.
BY MR. ROTOLO:
Q. Would it be fair to say that the depositions of those nine people you did not rely upon in forming your opinions in Ms. Plaisance's case?
MR. MICELI: Object to the form.
THE WITNESS: I don't recall any material there that I relied on.
BY MR. ROTOLO:
Q. And would it be fair to say that the depositions of those nine people you did not rely on to

Page 33

form your opinions in Ms. Guilbault's case?
MR. MICELI: Same objection.
THE WITNESS: Yeah. I don't remember relying on anything in their depositions from my report.
BY MR. ROTOLO:
Q. The next section in your materials considered list is "Rule 26 Reports."
Do you see that?
A. Yes.
Q. Other than the specific expert reports listed here, did you review any other Rule 26 expert reports to render your opinions in Ms. Plaisance or Ms. Guilbault's case?
A. Not that I recall for either.
Q. Are you aware that Dr. David Kessler and Dr. John Glaspy are not experts in Ms. Plaisance or Guilbault's case?
A. I believe or I may be told, I wasn't sure about Mr. Glaspy, and I do remember hearing that Dr. Kessler is not testifying in this case.
Q. So would it be fair to say that you did not rely on those reports to render your opinions in Ms. Guilbault or Ms. Guilbault's -- Ms. Plaisance's case?
MR. MICELI: Object to the form.

Page 34

THE WITNESS: Did not rely on them, that's true. I think I have to disclose everything considered. That's why it's on the list. But I did not rely on those.
BY MR. ROTOLO:
Q. Now, you list the expert reports of Dr. Madigan, Dr. Plunkett, and Dr. Feigal on your list; correct?
A. Correct.
Q. And the dates beside those names, are those -- is that the date of the expert report that you reviewed?
A. Yes.
Q. If I represent that those expert reports with those dates are not the ones that were issued for the cases we are here to discuss, did you rely upon those expert reports in preparation of your reports in these cases?
MR. MICELI: Object to the form.
THE WITNESS: I'm not testifying on the issues if they're the experts for, so their information I did not rely on to make my report.
BY MR. ROTOLO:
Q. Did you review the expert reports of either Dr. Ross or Dr. Thompson?
A. Don't recall those.

Page 35

Q. Did you review any depositions taken of any Hospira employees or representatives?
A. Not that I recall.
Q. I see you've listed on your materials considered list company documents from Sanofi.
Have you reviewed any company documents of Hospira?
A. No.
Q. Have you reviewed any internal documents drafted or received by Hospira employees?
A. Employees, no.
And when you say documents from Hospira, I do have the label listed there, but whether you consider that a Hospira document, that's the only one I have on my list.
Q. Okay. Did you look at any company documents produced by Hospira in this litigation?
A. No.
Q. With regard to the -- what's listed as "Taxotere Labels" and there's numerous dates under that, are those referring to the Sanofi brand name Taxotere labels?
A. I believe so.
Q. Then you've listed the "Hospira Docetaxel label effective December of 2013"; correct?

Page 36

A. Correct.
Q. Is that the only Hospira label that you reviewed in preparation for your reports in this case?
A. I want to note that it's on my considered list, but I am not the expert on the labels. So my report is involving the areas that I've been asked to give expert testimony on. I don't recall another label that I reviewed for Hospira.
Q. And then on Ms. Plaisance's considered list -- materials considered list, you reviewed certain medical records of Ms. Plaisance that are listed on Exhibit 5; correct?
A. Let me go back to that.
We're on the materials considered list for --
Q. Ms. Plaisance.
A. -- Ms. Plaisance?
Q. Yeah.
A. Okay. Can you repeat your question? I'm sorry.
Q. Sure. Sure.
For Ms. Plaisance materials considered list, there are a listing of medical records on your materials considered list; correct?
A. Let me just find them.
Yes. Medical records, yes.

Page 37

Q. Are these the medical records that you reviewed in Ms. Plaisance's case for your report?
A. Yes.
Q. The list of medical records on the materials considered list for Ms. Guilbault, which is Exhibit 6, are those the medical records that you reviewed in preparation for Ms. Guilbault's report?
A. Yes.
Q. And did you receive these medical records from plaintiff's counsel?
A. Yes.
Q. Based upon your review of the medical records, did you notice any medical records that appeared to be missing during your review?
A. Well, I have no --
MR. MICELI: Object to the form. Excuse me.
Go ahead, Linda.
THE WITNESS: I don't have any independent recollection.
So as I go through, if I'm missing something, you know, if I say -- let's say I didn't see the -- in Ms. Plaisance's case, the Genomic Health Onco DX Report, I would say, okay, did I miss it in the file? I need it. Where is it?
So there's records I know that were referred

Page 38

to. If somehow I looked at the documents and didn't have something, I asked for it.
That would be my standard procedure. But I don't independently recall if everything was there. I do go through every record I'm given. But sometimes, you know, a record is not there, and then it's -- they find it.
BY MR. ROTOLO:
Q. Do you remember if you've asked for any record that you thought was missing in either Ms. Plaisance or Ms. Guilbault's case?
A. I remember needing to track down the Onco DX report because I like to see it directly, as you'll notice from my notes, rather than having it referred to.
Let me look at my notes here on the medical history summary for Clare. I don't -- see if I'm missing anything.
As I recall, I found everything I needed in those records so I don't recommend -- I don't remember something specific. I do recommend -- remember wanting to specifically go through and find the Onco DX report I hadn't seen at the beginning.
Q. And in preparing your Rule 26 report, did you communicate with Ms. Plaisance?
A. No.

Page 39

Q. In preparing your Rule 26 report, did you communicate with Ms. Guilbault?
A. No.
Q. In preparing your Rule 26 report did you communicate with any of Ms. Plaisance's medical providers?
A. I did not.
Q. In preparing your Rule 26 report, did you communicate with any of Ms. Plaisance -- I mean any of Ms. Guilbault's medical providers?
A. No.
Q. In preparing your expert report, did you communicate with any of the other plaintiff experts?
A. I don't recall any phone calls regarding this with those other experts.
Q. Doctor, I'm going to mark your Rule 26 expert report in the Plaisance case as Exhibit 7.
(Defendants' Exhibit 7 was marked for identification.)
MR. ROTOLO: And that's going to be Tab D, by the way.
And then I'm going to mark your expert report in the Guilbault case as Exhibit 8, and that's going to be Tab D.
///

Page 40

(Defendants' Exhibit 8 was marked for identification.)
BY MR. ROTOLO:
Q. And I'm just going to ask you beginning some general questions before we look at them each independently.
Okay?
A. Okay.
Q. Does your Rule 26 expert report in Plaisance, Exhibit 7, encompass all the opinions you will be giving in that case?
A. It does.
Q. Does your Rule 26 report in Guilbault, which is Exhibit 8, encompass all the opinions you will be giving in that case?
A. It does.
Q. And does your report include the basis of your opinions as well?
A. I believe it extensively establishes the basis for my opinions, yes.
Q. And everything you reviewed or consulted in forming your opinions is either cited in your report or listed on your materials considered list; correct?
A. I think so.
Q. Now, Dr. Bosserman, the Khan expert report was

Page 41

submitted as your general opinions prior to the submission of your Exhibit 7 and your Exhibit 8, which were your expert reports.
Then your expert reports in Plaisance and Guilbault were produced, and it looks like they encompass all your general and your specific opinions in these cases.
Am I correct about that?
A. Let me make sure I understand.
Q. Sure.
A. I tried to have structure of the standards that are ongoing on their board and then I tried to have a section that's patient specific. And of course it's not perfect, but I try to make it -- there are overlaps in all the basic information.
And then I try to go through and personalize it for each patient, how things apply.
I did the date of the staging change. Were the NCCN guidelines in effect at the time different? Were there any other risk models that applied to this patient that didn't apply to a different one? And I run the risk models individually for each patient.
Q. I guess what I'm trying to find out and shorten this down is because the Khan report was initially submitted for your general opinions, and then

Page 42

you submitted these two reports later on because more time was needed, I didn't see any difference in your general opinions between Khan and your general opinions in Exhibits 7 and 8, which was your Guilbault and Plaisance reports.

Do you know of any general opinions that were different between those two reports?

A. I'm not aware of general opinions that were different.

Q. Okay. That will save some time so we don't have to go through the Khan report and can focus on the ones you issued in this case.

Is that fair?

A. I'll leave that to you.

Q. Okay. So just to make it clear, Exhibit 7, which is your Plaisance report, contains all your general and specific opinions that you are giving in the Plaisance case; correct?

A. Correct.

Q. And Exhibit 8, which is the Guilbault expert report, it contains all your general and specific opinions in the Guilbault case; correct?

A. Correct.

Q. Okay. Now, I'll try to narrow down a little bit more what we're going to talk about today with these

Page 43

questions, Doctor, so bear with me.

You are not offering any expert opinions that Dr. Chauvin breached the standard of care in the treatment of Ms. Plaisance; correct?

A. Correct.

Q. And you're not offering any expert opinions that Dr. Theodossiou breached the standard of care in the treatment of Ms. Guilbault; correct?

A. Correct.

Q. And you're not offering any opinion that Dr. Chauvin was wrong to recommend a Docetaxel-containing regime to Ms. Plaisance; correct?

A. Correct.

MR. MICELI: Object to the form.

BY MR. ROTOLO:

Q. And you're not offering any opinion that Dr. Theodossiou was wrong to recommend a Docetaxel-containing regime to Ms. Guilbault; correct?

MR. MICELI: Object to the form.

THE WITNESS: Correct.

BY MR. ROTOLO:

Q. And you're not offering any criticism of Dr. Chauvin's treatment of Ms. Plaisance; correct?

A. Correct.

Q. And you're not offering any criticism of

Page 44

Dr. Theodossiou's treatment of Ms. Guilbault; correct?

A. Correct.

Q. Are you offering any expert opinions on the treatment of Ms. Plaisance after she agreed to undergo chemotherapy?

A. Can you repeat that? I'm sorry.

Q. Sure.

Are you giving any opinions on the care and treatment of Ms. Plaisance after she agreed to undergo chemotherapy?

A. No.

Q. And are you giving any opinions as to Ms. Guilbault's care and treatment after she agreed to undergo chemotherapy?

A. No.

Q. And you're not -- are you offering an expert opinion as to what Dr. Chauvin knew or didn't know about Docetaxel and alopecia?

MR. MICELI: Object to the form.

THE WITNESS: Only in what he put in his deposition. He'll speak for himself.

BY MR. ROTOLO:

Q. And you're not offering any opinion as to what Dr. Theodossiou knew or didn't know about Docetaxel or alopecia; correct?

Page 45

MR. MICELI: Same objection.

THE WITNESS: Only -- only as what was in their deposition statement. But they will speak for themselves.

BY MR. ROTOLO:

Q. And both Dr. Chauvin and Dr. Theodossiou will be the best person to testify as to their knowledge; correct?

A. Correct.

Q. And you're not offering an opinion on what actions Dr. Chauvin would have taken had she had additional or other information on Docetaxel or alopecia; correct?

A. Only as it was in their deposition, if it was addressed.

Q. And you're not offering any opinion as to what actions Dr. Theodossiou would have taken had he had additional or other information on Docetaxel or alopecia; right?

A. Only as was in their deposition.

Q. And you would agree that Dr. Chauvin and Dr. Theodossiou would be in the best position to testify as to what they would or would not have done; correct?

A. Correct.

Q. And you are not offering any expert opinions

Page 46

as to what Ms. Plaisance knew about chemotherapy and alopecia or Docetaxel and alopecia; correct?
A. Only as to what was in their deposition testimony.
Q. You're not offering any opinion as to what Ms. Guilbault knew about chemotherapy and alopecia or Docetaxel and alopecia; correct?
A. Only as in their deposition testimony.
Q. And you would agree that both Ms. Plaisance and Ms. Guilbault would be in the best position to testify as to what they knew or did not know; correct?
A. Correct.
Q. And you are not offering an expert opinion as to what Ms. Plaisance would have done if she had additional information about Docetaxel or alopecia?
A. Only to the extent she addressed it in her deposition.
Q. And you are not offering any opinion as to what Ms. Guilbault would have done if she had additional or other information about Docetaxel or alopecia?
A. Only to the extent it was in their deposition or discussions.
Q. And you would agree that both Ms. Plaisance and Ms. Guilbault would be the best person to testify as to what they would or would not have done, given certain

Page 47

information?
A. Yes.
Q. And it is not your opinion that Docetaxel is an ineffective drug; correct?
A. Correct.
Q. And it is not your opinion that a Docetaxel-containing regime is never the recommended option for a patient; correct?
A. Correct.
Q. And you agree that Docetaxel is a highly-effective drug in the treatment of breast cancer; correct?
MR. MICELI: Object to the form.
THE WITNESS: Correct.
BY MR. ROTOLO:
Q. And you're not offering an opinion criticizing the design or formulation of Docetaxel; correct?
A. Correct.
Q. And you're not offering any expert pharmacology opinions.
Is that right?
A. Correct.
Q. And you're not offering any expert dermatology opinions; correct?
A. Correct.

Page 48

Q. You're not offering any expert dermatopathology opinions; correct?
A. Correct.
Q. You're not offering any expert opinion on the FDA or regulatory matters; correct?
A. Yes.
Q. And you're not offering any expert opinions on labeling requirements for Docetaxel or Hospira.
Is that right?
A. Correct.
Q. And you're not offering any expert opinions on what the Hospira label should have said?
A. Correct.
Q. And you're not --
A. I will discuss from the doctor's point of view that we expect the truth to be stated, but I'm not your expert on the label development and wording.
Q. And that means you would also not be offering an expert opinion on what -- on when the Hospira label should have said what; correct?
A. Correct.
Q. And you're not offering any expert opinions on foreign pharmaceutical labeling requirements; correct?
A. Correct.
Q. And you're not offering opinions as to what

Page 49

Hospira knew about Docetaxel and permanent hair loss; correct?
A. Since I'm not the timing expert in that, what -- there's come an awareness when information was available. So my testimony is about the oncologist, what we rely on. We expect the manufacturers to produce information and tell the truth about known side effects. That's my area of expertise from the clinical expert point of view.
The dates and details are by -- going to be discussed by the regulatory experts.
Q. So just so I'm clear, you're not going to be testifying as to when Hospira knew what about Docetaxel and pCIA?
A. Correct.
Q. And you're not offering any general causation opinions that Docetaxel causes pCIA; correct?
A. That's not my area of expert testimony.
Q. And you're not offering any specific causation opinions on the cause of Ms. Plaisance's hair loss; correct?
A. Correct. I'm not the causation expert for this case.
Q. And you're not offering any specific causation opinions on the cause of Ms. Guilbault's hair loss;

Page 50

correct?

A. Correct. I'm not the causation expert for the case.

Q. And you're not offering any expert causation opinions on any other chemotherapy drug other than Docetaxel and pCIA; correct?

A. Correct.

MR. MICELI: Object to the form.

BY MR. ROTOLO:

Q. And you have not done a causation analysis with regard to Docetaxel; correct?

A. Dr. Feigal is the expert that will discuss the causation data.

Q. And you have not done a causation analysis of any other chemotherapy drug and permanent alopecia; correct?

A. Correct. I'm not the causation expert for this case.

Q. Are you offering an expert opinion as to whether Ms. Plaisance suffered hair loss?

A. I believe Dr. Tosti is the expert that will address that.

Q. But you're not giving that expert opinion; correct?

A. Correct. I have noted in the notes where it

Page 51

was there, but that's not my area of expertise for this case to address.

Q. And you're not offering an expert opinion as to whether Ms. Guilbault suffered hair loss; correct?

A. Correct. Our other expert will address that.

Q. Have you reviewed the Court's order regarding your testimony at the upcoming Khan trial?

A. I believe so.

Q. Do you plan to offer any case specific opinions relating to Ms. Plaisance?

MR. MICELI: Object to the form.

THE WITNESS: I believe that's my area of expertise is the -- again, the staging, the treatment options, the risk analysis showing how those treatment options or the standards available and alternatives were in abundance to Taxotere; and that decisions are made based on the information provided by the manufacturers from the reports and clinical trials; and that the physicians expect the truth of those reports to be shared in a timely fashion that they then share with patients.

That is the essence of my testimony, which I believe is pretty clear from my reports.

BY MR. ROTOLO:

Q. And you answered my next question, but what

Page 52

are those case specific opinions?

So let me ask you: Do you plan to offer case specific opinions relating to Ms. Guilbault?

A. Yes.

Q. And would those opinions be the same as the ones that you have just outlined?

A. The same areas of opinion, yes; the correct staging, the treatment options, the risk of even using chemotherapy, the different options and their impact, and how those are used in shared decision making for patients. And the importance of honestly knowing the risks and benefits, as disclosed by the manufacturers, that clinicians rely on to share with patients.

Q. Let me ask you: Are you going to be opining as to which of the chemotherapy options contained in the NCCN guidelines would or would not be recommended for Ms. Plaisance, based upon her specific clinical and tumor presentation?

MR. MICELI: Object to the form.

THE WITNESS: Yes.

BY MR. ROTOLO:

Q. And are you going to be opining as to which of the chemotherapy options contained in the NCCN guidelines would or would not be recommended for Ms. Guilbault based upon her specific presentation?

Page 53

MR. MICELI: Same objections.

THE WITNESS: Yes. As much as you'll let me opine.

BY MR. ROTOLO:

Q. Are you going to be opining as to and applying the Predict model to the specific cancer presentation of Ms. Plaisance?

A. Yes.

Q. And are you going to be opining and applying the Predict model to the specific cancer presentation of Ms. Guilbault?

A. Yes.

Q. All right. Doctor, I'm about to go to another topic. I don't know if you and Dave want to take a quick break before we do that or if you want to keep going. It's up to you or up to Dave.

MR. MICELI: Whatever you want, Dr. Bosserman.

THE WITNESS: I think a five-minute break so I could grab another cup of coffee, if you don't mind. I'll be really quick.

MR. ROTOLO: Sure. That's fine. We can go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 10:05 a.m. and this is the end of Media Unit No. 1.

Page 54

(Break taken in proceedings.)

THE VIDEOGRAPHER: We are going back on the record. The time is 10:20 a.m. and this is the start of Media Unit No. 2.

BY MR. ROTOLO:

Q. Dr. Bosserman, would you agree that the No. 1 objective when treating a woman for breast cancer is cure?

MR. MICELI: Object to the form.

THE WITNESS: No.

BY MR. ROTOLO:

Q. What is the No. 1 objective when treating a patient for breast cancer?

A. It's a discussion with the patient about what their goals are, given their disease, their treatment options, the toxicity and the cost.

So most people I will agree, cure will be the No. 1 goal, but not for everyone.

Q. And for those people who don't choose cure as the No. 1 goal, what would they choose?

A. Generally they're focused on quality of life for some reason, and for some it's cost. They might choose a different regimen because of various substantial cost differences. And I have had that happen in my 40 years of practice, 35.6, whatever it is.

Page 55

Q. And when the objective is cure, that includes both preventing local and distance recurrence; correct?

A. That's correct. That's the ideal is to have that cancer or a new cancer not come back.

Q. In your expert report you discuss cancer staging; correct?

A. Correct.

Q. And cancer staging is based on the American Joint Committee on Cancer, the AJCC?

A. That is the standard in America that almost every institution uses, yes.

Q. And this morning I received, which I'll mark as Exhibit 9, something called Breast Cancer Staging, American Joint Committee on Cancer, 7th Edition.

(Defendants' Exhibit 9 was marked for identification.)

BY MR. ROTOLO:

Q. Did you produce that this morning?

A. Yes. I believe it's also in my reports, both reports, I believe, were included. And I just -- you're asking what notes I have in front of me, and since this comes up, I thought it would be nicer to have an independent copy printed.

Q. I'll mark that as Exhibit 9, which for Amy is Tab T.

Page 56

And for both Ms. Plaisance and Ms. Guilbault, I think you said in your report that the AJCC 7th Edition would be the one that was in effect at the time of their diagnosis and treatment; correct?

A. That is correct.

Q. And staging is based on tumor nodule and metastasis criteria.

Is that right?

A. In general, that is correct. There's also the timing, whether it's clinical, whether it's after surgery, pathologic, or whether you've given chemotherapy and/or surgery and then stage it called YP. So there's the setting of it. There's T, the tumor, the node, and the metastasis. And for some, other criteria comes in as to the grade, sometimes now molecular marker.

So, again, in this specific staging system, it was based on timing and TNM.

Q. And the breast cancer staging, the 7th Edition from the AJCC, that did not take into account the Oncotype DX test scores; correct?

A. Correct. That officially came into the 8th Edition, which went live in 2018.

Q. And in your report, you give some general survival statistics based upon a particular stage of a patient's cancer.

Page 57

Is that right?

A. Yes. I provided in the general section general information. But as you see, it's very specific to patients which are now available through programs that can take the randomized clinical trials and apply it through all their databases and metanalysis to individual patients.

Q. But with regard to those general survival statistics that you quoted in your report based upon staging, you say on page 6 of your Plaisance report, which is Exhibit 7, you say:

"It's important to note, however, that these statistics are averages and each person's chance of recovery depends on many factors, including the size of the tumor, the number of lymph nodes that contain cancer, and other features of the tumor that affect how quickly a tumor will grow, whether it may have spread microscopically before diagnosis and how well treatment works"; correct?

A. Correct.

Q. So those general survival statistics based upon staging, those are just averages; correct?

A. Correct.
Q. Would you agree that the NCCN guidelines are just that, guidelines?
A. Yes. The NCCN are guidelines for the treatment of cancer.
Q. Would you agree while most physicians consult and use them, the guidelines are recommendations and are not mandated?
A. It's correct they are not mandated.
Q. And those recommendations and guidelines in the NCCN are based on the best evidence available at the time; correct?
A. No. And the reason is that depending on the guideline, they have levels of evidence. And so it may be, as you say, based on the best available evidence but it also can be consensus of expert opinion when there isn't enough evidence.
So they will specifically tell you each of the guideline recommendations, the level of the decision making.
I believe I put a reference into that. If not, I can provide one from the NCCN about Category 1, 2, 2A, 3, exactly what that means for each recommendation.
Q. Would you agree that guidelines are not, for

lack of a better terminology, cookie cutter; that you can't just choose one and move on?
A. The guidelines are not --
MR. MICELI: Object to form -- I'm sorry, Linda. It's delayed. I apologize.
THE WITNESS: Go ahead.
MR. MICELI: I object. I just want to make sure my objection was on the record.
THE COURT REPORTER: Excuse me. I'm not sure what's happening, if anybody else is hearing this, but there is major overlap, and I cannot -- hello? I'm sorry. Does anybody hear me?
MR. ROTOLO: Yes. We hear you.
MR. MICELI: I hear you.
MS. MCINTIRE: Someone's not on mute.
THE COURT REPORTER: I need to pause.
MR. ROTOLO: Okay. Off the record.
MR. MICELI: Off the record.
THE VIDEOGRAPHER: The time is 10:28 a.m. and this is the end of Media No. 2.
(Pause in proceedings.)
THE VIDEOGRAPHER: Okay. We are going back on the record. The time is 10:30 a.m. and this is the start of Media Unit No. 3.
///

BY MR. ROTOLO:
Q. Dr. Bosserman, we had to go off the record because we had a technical glitch and the court reporter was not able to hear what we were saying.
Let me ask my question again and maybe that's a way to do this so she gets it all.
Would you agree that the guidelines aren't, for lack of a better terminology, cookie cutter, and that you just can't go choose any one of them and apply it to that patient?
MR. MICELI: Object to the form.
THE WITNESS: Yeah. I don't think that explanation is correct.
All options on a guideline referring to a specific setting and type of cancer can be appropriate.
Your idea is can you say there's one for every patient as a cookie cutter from that list? That would be -- that's not what the guideline is, but any of them on the guideline can be appropriate.
BY MR. ROTOLO:
Q. And because any -- and the medical oncologist's role is to look at those recommendations, the specific profile of the plaintiff, and decide in the medical judgment which ones he would recommend; correct?
A. Well, not just medical judgment. That's why I

put in the essential key is shared decision making. It is not a paternalistic practice of medicine.
You have to talk to the patient, understand their goals, their understanding, and how they understand the efficacy, toxicity, and cost before choosing one of those final ones, or something that may not be on the guideline because -- because circumstances don't really apply. So it has to be within a shared decision–making process.
Q. But would you agree that when an oncologist is coming up with what to recommend to a patient, they have to look at the specific patient's cancer presentation and health?
A. I agree with that.
Q. And would you agree that one chemotherapy regime may be an appropriate recommendation for one patient but not for another?
MR. MICELI: Object to the form.
THE WITNESS: I agree that after taking things into account, you might choose a different regimen within a guideline for one patient over another.
BY MR. ROTOLO:
Q. And different chemotherapy regimes on the NCCN guidelines have different -- effectiveness on different patients?

Page 62

MR. MICELI: Object to the form.

THE WITNESS: Okay. That's a pretty compound question.

So often within a certain group, there's exact same outcome for specific patient circumstances, but that outcome may come with different toxicities and different costs. And that's why the shared decision making is so important.

BY MR. ROTOLO:

Q. So would it be fair to say that each chemotherapy regime has its own benefit and risk profile?

A. Correct.

Q. And would you agree with this statement that I found in your expert report on Plaisance's page 8, that:

"The treatment of breast cancer requires multiple specialists and is guided by the application of evidence-based guidelines to the patient's specific presentation"?

Do you agree with that statement?

A. I agree with that, yes.

Q. And when it comes to presenting patients the alternatives for treatment, would you agree that only reasonable alternatives need to be presented to the

Page 63

patients?

A. Okay. So reasonable, right, is probably from the eye of the beholder.

So, you know, we like -- I think traditional medicine presents evidence-based treatment. And, again, we get into conflict when there's something without any evidence a patient might want and look at it as not a huge problem.

In breast cancer, I don't think it applies to these cases.

Q. Doctor, I was actually quoting from your report on page 32.

A. Mm-hm.

Q. So would you agree -- it's at the bottom, the quote at the bottom.

"Alternatives for proposed treatment and associated risk. Physicians should inform patients about reasonable alternatives to the proposed treatment, and what is reasonable would depend on the circumstances of the patient's case, the patient's medical, social, and personal concerns, and the judgment of the physician."

Do you agree with that?

Page 64

A. Yes. In this context, yes.

Q. Let's talk about Ms. Plaisance. And, Doctor, I noted this morning you provided some notes that you had taken on the Plaisance case, so I'm going to go ahead and mark those as Exhibit 10.

And, Amy, that's Tab R.

(Defendants' Exhibit 10 was marked for identification.)

BY MR. ROTOLO:

Q. And I think you told me the notes that I've marked as Exhibit 10, which is called "Audrey Plaisance Medical Summary for R26 R5 Report," that these were notes you prepared when you reviewed her medical records and when you prepared the report?

A. Yes.

Q. And you typed these notes out yourself?

A. I did. Because my handwriting is so bad, often I can't read it after a while.

Q. You're not alone there, Doctor.

A. I find typing is more helpful.

Q. So Ms. Guilbault's expert report is Exhibit 7. And just for your convenience, it is Tab C in the notebook.

A. Okay. I have Tab C as Plaisance.

Q. I'm sorry. I meant Plaisance. I'm sorry.

Page 65

A. Okay. Got it.

Q. Too many names to keep track of here.

So we're going to look at the Plaisance expert report, which is your Tab C, which is Exhibit 7, just so I make sure the record's clear.

Doctor -- and you can feel free to look at your notes that I have marked as Exhibit 10, if you need it to answer these questions.

Ms. Plaisance was diagnosed in December of 2013 at the age of 69 years old with breast cancer; correct?

A. That is correct.

Q. And I think the breast cancer was in her right breast?

A. Yes.

Q. And she initially had surgery as part of her treatment and I think she had a lumpectomy.

Is that correct?

A. Yes.

Q. And would surgery have been the recommended course for Ms. Plaisance to give her the best chance of a cure?

MR. MICELI: Object to the form.

THE WITNESS: Surgery is an important aspect of treatment for this type of early breast cancer, and

Page 66

the surgery she got was certainly the most recommended option.

BY MR. ROTOLO:

Q. And her tumor size was seven millimeters; correct?

A. Correct.

Q. And she had no nodes positive and no metastasis.

Is that right?

A. Correct.

Q. And her cancer was invasive ductal carcinoma with some ductal carcinoma in situ; correct?

A. Correct.

Q. And she was ER positive, PR positive, HER2 negative; right?

A. Correct.

Q. And that is Stage I-A early breast cancer; right?

A. Correct.

Q. And because she had a lumpectomy, radiation was recommended for Ms. Plaisance?

A. Correct. To the breast.

Q. Right.

And you have no criticism of Ms. Plaisance receiving radiation therapy; correct?

Page 67

A. I do not.

Q. Now, Ms. Plaisance had some underlying health issues.

Did you note that in your review?

A. I believe I wrote down, yes, her previous -- what was in her notes. Yes.

Q. And she had Type 2 diabetes?

A. I have diabetes on medication and controls. That would be Type 2, yes.

Q. She had high blood pressure?

A. Yes.

Q. She had a history of TIAs?

A. Yes. It's in the notes but nothing is documented or any residual that I could find. So I saw the documentation. There was all well before her breast cancer documentation, but I couldn't find anything otherwise on it, just...

Q. And she had a history of bilateral pulmonary embolism?

A. Yes. This is the woman with the interesting history of the bilateral pulmonary embolism, yes, that she had long before a very long plane ride, an arduous tour, and a long plane ride back, and she got treated for and had no sequela.

Sorry. They're not supposed to be calling me.

Page 68

Q. If you need to take it for business purposes, just let me know.

A. No, no, no. Only if my offer on a house comes through do I have to make a response.

Q. And we can go off the record for that, Doctor.

A. Yeah. Yeah.

Q. And she had sciatica neuralgia?

A. That was noted but it wasn't bothering her and she used some PRN medicine for it.

Q. And then I think she had been on hormone replacement therapy for about 40 years; correct?

A. Yes. I got a coherent history all pulled together from her records. Yes.

Q. Great.

A. And, in fact, it was Dr. Chauvin that connected that long history with the likelihood of her pulmonary embolism that hadn't been seen by the hematology specialist she saw at the time. Interesting. So...

Q. And Ms. Plaisance was also ultimately placed on endocrine therapy with an aromatase inhibitor, Femara, for five years; correct?

A. Correct.

Q. And you have no criticism of Ms. Plaisance undergoing endocrine therapy; correct?

Page 69

A. I do not.

Q. Endocrine therapy would have been part of a comprehensive care for Ms. Plaisance's breast cancer; correct?

A. Yes.

Q. And Ms. Plaisance also had genetic testing done on her actual tumor.

Is that right?

A. Yes.

Q. And that's what's called Oncotype DX?

A. That's the type of genetic testing she had. There's a lot you can do now. So it's a very specific risk -- goal-oriented risk tumor testing panel.

Q. And the Oncotype, am I correct that that looks at an expression of 21 genes in the actual tumor tissue?

A. Yes.

Q. And Oncotype DX, that's a prognostic indicator and not a diagnostic indicator.

Is that correct?

A. You don't use it -- you have to have -- it's done only on tumor. You have to have a -- the breast cancer, and it tests only the breast cancer cells.

Q. And I think we discussed earlier Oncotype at that time was not part of staging?

A. It wasn't included in the formal staging, but

Page 70

it was included in thinking about how you would incorporate into treatment. And it's a long story, what happened in -- which I could discuss in detail, if you were interested, but it doesn't really apply here.

Q. And then the Oncotype test calculates a recurrent score based upon that gene expression?

A. Yes.

Q. And am I correct that the recurrent score calculates the chance of distant recurrence in 10 years if treated with five years of Tamoxifen?

A. Correct. Versus Tamoxifen in CMF, MF chemotherapy.

Q. And Ms. Plaisance had an Oncotype score of 27?

A. Yes.

Q. And that score of 27 was considered intermediate?

A. Yes.

Q. And that was read on the Oncotype as equating to a 17 percent chance of distant recurrence within 10 years if she was treated with hormone therapy alone?

A. Actually, I -- that's an extrapolated number from the chart that the pathologist quoted.

When I read through this and use my line, I really see it about 12 percent. You can take your own ruler and blow that up.

Page 71

Q. And, Dr. Bosserman, did you -- you read Dr. Chauvin's deposition; correct?

A. Yes.

Q. Okay. And Dr. Chauvin was Ms. Plaisance's treating oncologist.

Is that right?

A. Correct.

Q. I'm going to mark Dr. Chauvin's deposition as Exhibit 11.

(Defendants' Exhibit 11 was marked for identification.)

BY MR. ROTOLO:

Q. And, Doctor, for your convenience, that is going to be Tab F in your binder.

A. Do you want me to switch to that.

Q. Yeah. You may want to keep a finger or pen back on the report, but I'll tell you back where it is when we go back.

A. That's fine.

Q. And if you could look in Dr. Chauvin's deposition, on page 42 of the actual deposition itself. I think it's going to be page 12 of the actual condensed pages. But page 42 of the actual deposition.

A. Okay.

Q. And I'll refer you to line 5, and it says:

Page 72

"And what was Ms. Plaisance's Oncotype diagnosis score?

"Answer: 27.

"What does that diagnosis score relate to in terms of risk of recurrence?"

Answer of Dr. Chauvin: "Well, it suggests she's at a relatively high risk of recurrence for someone with Stage I-A breast cancer on the criteria used for staging. Oncotype is not part of staging."

Do you agree with Dr. Chauvin's assessment of the Oncotype test score?

MR. MICELI: Object to the form.

THE WITNESS: I would not -- I think we're into semantics now. So whether it's a 12 percent distant recurrence risk or 17, some would think that was low, 'cause we see women with 80 percent, and others say, "Wow, that's -- that's significant enough to talk about what to do about it."

So I think whether it's relatively high risk, that's a semantic issue.

I don't disagree that Oncotype DX wasn't technically part of changing the stage at that time but it certainly was part of considering what treatment was

Page 73

given.

BY MR. ROTOLO:

Q. And you note in your expert report that your review of the medical records show that Ms. Plaisance was agreeable to chemotherapy, if it was recommended.

Do you remember that?

A. I do. And I...

Q. And Dr. Chauvin recommended adjuvant chemotherapy with TC, which is Docetaxel and Cyclophosphamide; correct?

A. Correct.

Q. And that regime, am I correct, is both medicines are given together every three weeks for four cycles?

A. Yes.

Q. Do you have any criticism of that regime being prescribed by Dr. Chauvin for Ms. Plaisance?

A. No.

Q. Will you be offering an expert opinion as to whether the informed consent process between Dr. Chauvin and Ms. Plaisance was proper?

A. Am I criticizing the process?

Q. Yes.

A. No.

Q. And you will not be offering an expert opinion

Page 74

on the warnings or the risks that were given to Ms. Plaisance by Dr. Chauvin, are you?
A. I'm not criticizing that.
Q. And will you be offering an expert opinion on the warnings or risks that should have been given to Ms. Plaisance by Dr. Chauvin?
A. That's a complex answer. With the knowledge that he had, I don't criticize what he did at all.
As you know, my issue is the fact that information was withheld from physicians and not provided truthfully. So it's a different aspect of that. I don't criticize what he did.
Q. And, Doctor, just for the record, Dr. Chauvin is a female, Dr. Lauren --
A. Yes. I'm sorry. I keep forgetting --
Q. No. It's okay. I just want to make sure the record was clear, we knew which doctor we're talking about.
A. Thank you.
Q. And in your expert report in the Plaisance case, which we previously marked as Exhibit 7, you set forth the chemotherapy regimes that were listed on the NCCN guidelines at the time of Ms. Plaisance's diagnosis and treatment.
Is that right?

Page 75

A. Yes.
Q. And I think that's around page 16 to -- starts on page 16, I think, maybe goes to page 18, if I'm correct on that, if you want to refer to it.
A. Yes.
Q. And you note that there were at the time three preferred regimes listed on the NCCN guidelines at that time.
Is that right?
A. Correct.
Q. And those three preferred regimes were "dose dense AC, followed by paclitaxel every two weeks, dose dense AC followed by weekly paclitaxel times 12, and TC."
Is that right?
A. That is correct.
Q. And Ms. Plaisance received the TC regime; correct?
A. Correct.
Q. And you note in your expert report on page 15 that TC is a consideration for women who are at a lower risk of recurrence; correct?
A. In general, that's how doctors think about it at that time, yes.
Q. And TC is a -- was a preferred regime at the

Page 76

time Ms. Plaisance underwent chemotherapy?
A. Correct. It was one of the three preferred regimens.
Q. And then you list the additional regimes that were listed -- regiments that were listed in the NCCN guidelines in your report; correct?
A. Yes. In my report I then list the other two, yes.
Q. And on page 18 of your report -- of your Plaisance report, you quote the guidelines as saying that:
"Preferred regimes are defined as interventions that are based on superior efficacy, safety, and evidence and when appropriate, affordability."
Is that correct?
A. That's a direct quote from the NCCN.
Q. And that describes the TC regime that Ms. Plaisance received; correct?
A. Yes. As of 2013, with the available knowledge, that is correct.
Q. And on page 19 of your report, you quote from the Lancet, and then in the second paragraph, the last part of that paragraph it says:
"However, the non-anthracycline-based

Page 77

regimes of TC given every three weeks for four cycles may be an appropriate alternative for patients who have indications for chemotherapy but who have lower risk disease (for example, those with node-negative, hormone receptor-positive breast cancer)"; correct?
A. Yes.
Q. And you agree that Ms. Plaisance had no negative hormone receptor positive breast cancer; right?
A. Yes.
Q. Do you disagree with Dr. Chauvin's deposition testimony -- and we can look at it. It's on page 57 -- that the standard of care at the time was to use Docetaxel plus Cyclophosphamide?
A. What page are you on now?
MR. MICELI: Object to the form.
BY MR. ROTOLO:
Q. That is going to be Tab F again, Doctor, which is Exhibit 11, and that is page -- make sure I wrote it down right -- it's on page -- it starts on page 56 and goes on to page 57. And you can let me know when you're there and I'll point out the line number.
A. I'm here.

Page 78

Q. Starts on page 56, line 17. Dr. Chauvin is asked:

"Okay. And these other preferred regimes, would those have been something that she could have had?

"Answer: I don't think anyone would recommend it, but when you say could, that's a vague way to put it for cancer.

"I think around that time and maybe within a year or two before that, we had pretty much indicated for overtreating Stage I and some Stage II cancers with the first two regimes. So when you had a Stage I cancer, even though high risk or intermediate risk on the Oncotype test, then it was the standard of care to use only the Docetaxel and Cyclophosphamide."

Do you agree that Docetaxel and Cyclophosphamide were the standard of care at the time Ms. Plaisance was treated?

A. No.

MR. MICELI: Object to the form.

THE WITNESS: Sorry. You objected.

MR. MICELI: Let me make sure the court reporter got that.

Page 79

MR. ROTOLO: You've gotta just take a breath.

MR. MICELI: Kathryn, did you get my objection?

THE COURT REPORTER: Yes, I heard it. Thank you.

THE WITNESS: No, I don't agree.

MR. MICELI: Thank you.

THE WITNESS: The standard of care were the three preferred regimens. Again, we might be parsing. I would agree that based on the available evidence, the real change in those years was not using any chemotherapy, as we came to understand more.

But the real -- the issue that I think he's correct about is that probably the majority of doctors use TC based on what they knew about the side effects for the very -- the early Stage I-A breast cancer. I think that's what he was trying to say, but I don't agree with exactly how he said it.

Q. So you --

A. It wasn't the standard of care. The standard of care of the three preferred and the other regimens, according to the NCCN. In practice, I believe TC was the most common regimen used for these lower risk patients when chemotherapy was given.

Q. So if Dr. Chauvin thinks that the standard of

Page 80

care was TC, you would disagree with that, based upon the reasons you just gave?

A. Right. I wouldn't call it the standard of care. I think what he was trying to say was it was probably the most common choice of the three preferred regimens when you gave chemotherapy.

Q. You go through the other NCCN regimes that were there. And I believe in total, you say there were 14 listed regimes on the NCCN guidelines at the time of Ms. Plaisance's treatment; correct?

A. I believe that's correct. We could go back to that page.

You'll notice on one of the lines there's two options. So you'll Count 13 lines but one of them has either/or tax dollar, Taxotere. So that's really two regimens. That's how you get to 14.

Q. And are you giving an expert opinion as to which of those 14 chemotherapy regimes would have been recommended for Ms. Plaisance?

A. No. My discussion is the informed consent, based on what the doctors knew, what was common understanding of side effects, and how that affected the choices.

If we saw this lady today, you wouldn't give her any chemotherapy.

Page 81

Q. And so you're not opining that Ms. Plaisance needed an Anthracycline with a taxane; correct?

A. I'm opining that that was an option --

Sorry, Dave. Go ahead.

MR. MICELI: Object to the form.

THE WITNESS: I'm saying it was an option. I'm not saying what she should have gotten. If you'll look at the Onco DX and my -- well, we know, you know, that was the time of transition and treating, these patients with no chemotherapy, as you see, there's little to no benefit to her overall impact.

But it was common at that time to treat these patients, and any of those three preferred will be the most common choices. I believe that TC was often the most common choice, based on the available knowledge of efficacy toxicity.

And so that's -- as you know, my testimony is about having the truth provided based on the scientific research that the doctors count on in weighing these decisions. And if information is withheld, then they don't have all the information that influences which of those choices are made.

BY MR. ROTOLO:

Q. Are you giving an expert opinion that Ms. Plaisance in 2013, early 2014, did not need

Page 82

chemotherapy?
A. I'm not going to discuss that as a criticism. I think certainly it -- you know, if you look at the data, what we know now, that was in a transition period, and based on what he was provided and the NCCN, it was perfectly appropriate to give her adjuvant chemotherapy as a choice.
Q. So let me just make sure I'm clear.
So your opinion regarding the treatment of Ms. Plaisance is that there were these 14 chemotherapy regimes listed in the guidelines at that time; correct?
A. Correct. They would all have been appropriate options to consider.
Q. That was my next question.
These 14 were all options or alternatives for Dr. Chauvin to evaluate and consider for Ms. Plaisance?
A. Correct. As well as the option not to use chemotherapy. That all comes into his decision making as he developed the plan.
Q. And we have look at the quote from Dr. Chauvin's deposition where she said she would not recommend the other two preferred regimes with dose-dense Paclitaxel; correct?
A. Let's -- I don't remember where that is. If you --

Page 83

Q. That was page 56 of Exhibit 11, which is your Tab -- I'm sorry. Exhibit -- hold on. Getting mixed up with my numbers.
Exhibit -- Tab F for you.
A. So I read that she says "We tend not to recommend it."
So I don't think she said it was inappropriate. She said they tend not to recommend it.
Q. She said she would not recommend it; correct?
A. She says -- yes. She does say, "I would really" -- "I wouldn't have really recommended the treatment that included it." She said both those statements, I guess.
Q. And if you look on page 82 of Dr. Chauvin's deposition, which is Exhibit 11, your Tab F --
A. Which page? 82 of her deposition?
Q. 82. Yes, 82.
A. Okay.
Q. Starting on Line 5, and she was asking:
"Would a Taxol regime have required additional cycles of therapy?"
"Answer: Right. It would have been twice as much time and really more chemo than is needed to treat her stage of disease.

Page 84

"You know, if you went to this breast cancer meeting that I told you about and you said you had done all that chemo, there would be a lot of people coughing and hacking in the audience, and you would end up trying to make a fool of you for having to use that whole shemozzle.
"The standard of care" -- "The standard then was definitely to limit to four cycles with TC."
Do you see that, Doctor?
A. I see that.
Q. So do you agree with her testimony that she was not going to consider giving the Taxol regimes?
A. I see that based on what she knew at the time, she didn't prefer to choose those. And she felt, as I mentioned, that the more common choice was TC.
Q. And if you would look at the bottom of page 57 of her deposition.
A. Page 57?
Q. Yes.
A. Let me go back to that.
Okay.
Q. And she's answering a long question. Starting at 21, line 21, she says:

Page 85

"And I wouldn't have really recommended the treatments that included Adriamycin, Cytoxan, and Taxol, just way overtreatment of a Stage I-A cancer."
And then she continues:
"All the other regimes listed have similar problems."
And then she talks about the Epirubicin, the Adriamycin, and the others.
So she had weighed the alternatives in the NCCN guidelines; correct?
MR. MICELI: Object to the form.
THE WITNESS: Based on what she knew, this was her take on reviewing the different options.
BY MR. ROTOLO:
Q. And do you remember her testifying that she may have offered, but she wouldn't have recommended the AC regime?
A. I believe that was just following the last stop you had in your deposition.
Q. And --
A. I don't remember it independently.
Q. And have there been clinical trials showing TC has superior disease-free survival as opposed to AC?
A. There have --
MR. MICELI: Object to the form.

Page 86

THE WITNESS: -- the Jones study.
BY MR. ROTOLO:
Q. And you have not in your expert report offered any discussion or opinion about the efficacy of TC versus AC and Ms. Plaisance's case; correct?
A. Only in the sense that we looked at the Predict Breast results in the second and third line. You'll see there's almost no difference. So AC would be considered a second line therapy and TC -- if you look at the technical way the breast -- Predict Breast was developed, it was primarily based on the Anthracycline, followed by taxane regimen, and that is -- was the standard of care across the world.
So TC, because as a taxane, is often thought of as third generation, mostly third generation data, though, is based on Anthracycline taxane clinical trial results, just to be very technical.
Q. And you mentioned the Predict model, so let's move to that next and talk about the Predict model for -- for Ms. Plaisance.
Before we get -- and I think you said you intend to apply the Predict model to Ms. Plaisance's specific cancer presentation; correct?
A. I did apply it and I believe I provided the actual printout, and then I actually made a summary that

Page 87

might make it easier to read.
Q. And that was included on your notes that I marked as Exhibit 10; correct? Second page of those notes?
A. Correct. Correct.
Q. Let's start out in general, if you don't mind.
What is the Predict model?
A. Okay. So I put all of that specifically in my report and referenced it and quoted it.
But basically you're asking doctors who are very busy to apply any number of clinical trial results to individual patients.
So what has been needed and provided over time is a way to say, okay, there's 10 clinical trials. There's often what's called meta-analysis where there's very validated scientific approach to look at the correct trials that you can -- in very agreed-upon statistical methods that are not my expertise, but they're the agreed-upon methods, often done by the early breast cancer trialist collaborative group to say, okay, for this particular patient, what do we know from the trial information that we could tell this patient they may benefit or not from various treatments?
And so early on -- and Peter Ravdin and the MD Anderson Group developed a program online that was

Page 88

free called "Adjuvant exclamation point Online," and the European group with the exact same data developed Predict UK and now it's called Predict Breast, and there's other Predicts.
For funding reasons, Adjuvant! Online went offline, crisscrossing right over this time.
So it used to be I could go on and show you the side by side, but it's not even available to show you. But it's based on the exact same data, and I put all that foundation in.
But Predict Breast was available during the same time of Audrey Plaisance's and Clare's diagnosis. So that's available now for me to do and print out for you.
So I provided that. And it will show you, okay, let's talk about the specific patient. Let's talk about general results of trials. Because for any trial that has a benefit, it might sound terrific. There's a 30 percent benefit from using this treatment in these types of patients. But they will also depend on what the incidence of that episode is for the patient; right?
So you have no chance of recurrence. You can't get any benefit from getting chemo. If you have a certain level of risk of recurrence, you could reduce that to be 30 percent, but that may be, in fact,

Page 89

minuscule if your risk of the event is low. And I've walked through that in my report, and I walked through it with all the patients that I saw in practice. This is something I used with my patients and put in their medical records and gave them, and it was available.
So basically it will show you, okay, what about surgery alone for this patient? And that generally is surgery/radiation, if you're doing breast conservation.
And then what's the additional benefit, if anything, of hormonal blockade or endocrine therapy, or people whose tumors are estrogen positive and HER2 negative?
And then what's the benefit of chemotherapy in addition to that, if any?
And I ran those for Audrey Plaisance and it's quite consistent. And you can check second generation, which might be an AC, and it really -- it's a standard from ASCO, the American Society of Clinical Oncology, to use these validated models that could be applied to individual patients because they're so informative. And really understanding what was the actual potential benefit of any chemotherapy third generation for this patient or second generation. And I found it very helpful in helping patients make decisions then based

Page 90

on the options available.

So you could run it for a five-year overall survival, 10-year, and 15. You can do it -- I put in the exact data you could put in for the patient. And it gives you much more information.

Q. Has the Predict model been updated over the years?

A. It's updated -- I believe the last one was based on the Lancet 2012 article, so the data I have was the data relevant at the time of this patient and Clare Guilbault's treatment time frame.

Q. So it's your understanding the Predict has not been updated since 2012; correct?

A. I --

MR. MICELI: Object to the form.

THE WITNESS: Yeah. I actually don't know. You can go on and every update is noted, and I believe it's likely there have been some subsequent updates in all kinds of areas. But the specific material that applies to this patient was based on the 2012 meta-analysis.

BY MR. ROTOLO:

Q. Are you aware whether Ms. -- whether Dr. Chauvin used the Predict model in deciding how to treat Ms. Plaisance?

Page 91

A. I don't recall any reference to that.

Q. Would you have any criticism of Dr. Chauvin if she had not used the Predict model in determining how to treat Ms. Plaisance?

A. That's not part of my expert testimony.

Q. Would you agree that the Predict model generates estimates based on women who have undergone treatment in the past?

A. Correct. It's based on generally randomized clinical trials of patients, and then you're able to put in the similar features of your patient to what was specifically looked at in the clinical trials.

Q. And would you agree that the Predict model cannot say whether an individual will survive their cancer or not; correct?

A. Right. It predicts the probability based on additional treatment or not so that patients can understand whether that treatment is likely to have any benefit for them or not.

Q. And would you agree that the Predict model can only provide the average survival rate for people in the past of a similar age with similar cancers?

A. Well, the results are based on clinical trials that have been completed but it's actually quite predictive for the current patient based on doing the

Page 92

same thing for the same set of circumstances.

Q. But you agree that the Predict model is the best guess of the sort of benefit that a treatment option may give a particular patient?

MR. MICELI: Object to the form.

THE WITNESS: Best guess of a sort of -- I wouldn't describe it that way.

I think it's the strongest validated evidence that allows you to really -- instead of getting out every clinical trial and your ruler and going through the major results yourself, these highly respected international national experts have synthesized the data in a way that is open and validated and accepted that you can apply it to individual patients. It's very high confidence.

BY MR. ROTOLO:

Q. And I think you testified about this earlier, the Predict model does not take into account side effects; correct?

A. The Predict model tells you the benefit of giving the treatment. It doesn't discuss side effects.

Q. And the Predict model does not take into account the Oncotype DX testing of Ms. Plaisance; correct?

A. Correct. It's -- the version then did not

Page 93

include that.

Q. Isn't the Oncotype DX testing a better prognostic tool since it considers the actual tumor of Ms. Plaisance?

A. I think it's an excellent tool to go with it and I think they're saying the exact same thing, if you look at it.

Q. Are you giving the opinion that the Predict model shows that Ms. Plaisance did not need chemotherapy?

A. I'm giving the opinion that not giving chemo is an option, and therefore if you were going to give chemotherapy, you had a lot of options within that NCCN group, and thus the side effect profile becomes the most important factor in the patient, considering that they might want to have it.

Q. And the Predict model also doesn't include the chemotherapy regime CMF or similar regimes like that; correct?

A. The Predict model doesn't have a CMF which is considered first generation.

Q. Are you using the Predict model to give the opinion that all chemotherapy options were equal in effectiveness as to Ms. Plaisance?

A. I -- yes and no. So the yeses that I believe

Page 94

all third generation would have the same efficacy, all second generation would have that efficacy, so they do divide it into generation.

As you mentioned, CMF, which is on the other options in NCCN, is not included in the Predict model but it's a perfectly valid choice.

Q. So am I correct that it's your testimony that Dr. Chauvin could have chosen one of the third-generation chemotherapy regimes and gotten the same efficacy for Ms. Plaisance?

A. That is my opinion.

Q. And is it your opinion that Dr. Chauvin could have chosen any one of the second-generation chemotherapy regimes and gotten the same effectiveness as to Ms. Plaisance?

A. That's correct.

Q. And that decision would be without looking at anything else with Ms. Plaisance's clinical presentation or cancer presentation?

A. Well, that's all completely based on her clinical presentation with the factors that go into the analysis, and it's completely consistent with the Onco DX.

So they're quite consistent with each other.

Q. Well, the Predict model doesn't take into

Page 95

account any of Ms. Plaisance's underlying health conditions, correct?

A. It doesn't have separate entries for that, but the patients in the clinical trials, you can go through and they have, you know, all the common side effects that people in that age group have. But it -- you can't enter yes or no for diabetes, yes or no any side effect. It's for the population, which is the general population in which most patients have diabetes and hypertension and the common American comorbidities.

Q. Is it your expert opinion that Ms. Plaisance received no benefit from her chemotherapy?

A. I'm not giving an expert opinion on that. I think it's clear what my personal opinion is based on the evidence, but I'm not criticizing in any way her having gotten chemotherapy in that setting at that time.

Q. Is there any evidence that you saw in the medical records or other documents that you reviewed that cooling caps were available to Ms. Plaisance at the institution where she received chemotherapy?

A. I didn't read anything whether that was available or not. I know it -- they were at that time available -- they ordered and delivered across the country privately, but I didn't see any discussion of that.

Page 96

Q. As far as you know, Ms. Plaisance has had no recurrence of her cancer since her treatment in 2014; correct?

A. Yes. As of the last notes that I had available, I have not seen any evidence of recurrence.

MR. ROTOLO: Doctor, do you want to take a break -- Doctor and Dave, do you want to take a break before we go on to Ms. Guilbault?

MR. MICELI: Yeah. I think that's a good idea.

MR. ROTOLO: Okay.

THE WITNESS: I'm flexible.

MR. ROTOLO: Doctor, do you want to take your lunch on or do you want to just take a 15-minute break here and come back?

THE WITNESS: I'm very flexible. Whatever works best.

MR. ROTOLO: Well, you're the one sitting in the hot seat so I'm good with whatever you want to do.

THE VIDEOGRAPHER: We're still on the record everyone.

MR. MICELI: The question is probably -- yeah. Let's go off the record.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 11:20 a.m. and this is the end of

Page 97

Media Unit No. 3.

(Break taken in proceedings.)

THE VIDEOGRAPHER: Okay. We're going back on the record. The time is 11:35 a.m. and this is the start of Media Unit No. 4.

BY MR. ROTOLO:

Q. Dr. Bosserman, I want to next move to Ms. Guilbault's case. And I had previously marked your expert report on Ms. Guilbault as Exhibit 8. And for your benefit, that Tab D in your notebook.

A. Okay. Let me move to that.

Okay.

Q. And before we do that, Doctor, you had provided through counsel some notes that you had made entitled "Medical History Clare Guilbault for R26, R6," two pages that I'm going to mark as Exhibit 12.

(Defendants' Exhibit 12 was marked for identification.)

MR. ROTOLO: And then you had also provided some typewritten notes through counsel this morning entitled "Predict Breast Calculation Summaries and References for Clare Guilbault for R26, R6, Done 8/15/21," which I'll mark as Exhibit 13.

(Defendants' Exhibit 13 was marked for identification.)

Page 98

BY MR. ROTOLO:
Q. And, Doctor, before we begin discussing Ms. Guilbault, the medical history of Clare Guilbault that I marked as Exhibit 12, are those notes that you took upon your review of Ms. Guilbault's medical records?
A. Yes.
Q. And the Predict calculation, which I marked as Exhibit 13, is that a summary of the Predict calculation that is also included in your expert report?
A. Yes. I ran all of them. I think I provided all three in the report as well.
Q. And you're more than welcome to refer to the Exhibit 12, your notes as we move along.
A. Thank you.
Q. You talked about Ms. Guilbault's cancer presentation in your expert report beginning on page 5 and then on 14. But let's just go briefly through her clinical history.
She was diagnosed with breast cancer in August of 2013.
Is that correct?
A. That's why I make my cheat sheet.
Yes. That's when the mammogram was abnormal and then she had the core biopsy. Yes.

Page 99

Q. And at that time she was 61 years old?
A. Yes. If I remember, yes.
Q. And was she postmenopausal at the time of her cancer diagnosis?
A. Yes.
Q. And was she diagnosed with invasive ductal carcinoma?
A. Yes.
Q. And that was in the left breast.
Am I right?
A. Yes.
Q. And she had an MRI of her left breast; correct?
A. Yes.
Q. And at the -- on MRI, her tumor measured 2.2 centimeters?
A. Correct.
Q. And showed multiple enlarged left axillary lymph nodes to 2.3 centimeters; correct?
A. Correct.
Q. And her mass was palpable; correct?
A. Yes.
Q. And she was ER positive, PR positive, HER2 negative; correct?
A. Her tumor, yes, was --

Page 100

Q. I'm sorry. Yes.
Her tumor was ER positive, PR positive, HER2 negative?
A. Correct.
Q. In your expert report, you stage her cancer as Stage II-B because of the clinical findings; correct?
A. Correct.
Q. Do you disagree with Dr. Theodossiou's assessment that it was Stage III?
A. I do not. Most clinicians, without this super technical review, which for a lot of reasons I spend a lot of hours with, would have called it III-A, and the treatment is exactly the same. So this is a very technical difference, and in fact pathologically is good for them to be III-A.
So it would have made no impact in the treatment thinking differences either.
Q. So is the difference that you're looking at the information for staging when she first presented as opposed to the pathological stage after surgery?
A. Well, yes. And once again, most people do not realize that after giving chemotherapy, when we do this YP, which is the designation that you're staging the elements after an intervention of chemotherapy and surgery provided, that there actually is not a summary

Page 101

stage in the AJCC.
Clinically people put those together in the same way and apply it to a number. But if you look technically -- and I've specifically spoken to the AJCC experts -- I think it's an oversight, because people think of it as summing it up to a stage for treatment.
But to be honest, YP components do not have an official stage.
Q. If you were staging it clinically, at that time you wouldn't have known her exact node involvement; correct?
A. No. And that's where when you look clinically -- and that's why I've provided that AJCC sheet that's so technical.
When you have involved Level 1 and 2 lymph nodes that are not matted, it's an N1. If you think they're matted or there's other palpable involvement, it would be N2, and that would be a III-A.
So she's right on the verge there. But technically, from what I could read, no one said there was a big mat of lymph nodes they measured individuals so technically it's an N1, and that becomes a Stage II-B, whereas if they're matted, it's -- an N1, and that's Stage II-B clinically, and if they're matted or there's other involvement of lymph nodes, it becomes

Page 102

N2 and that's a clinical III-A.

So it's -- you know, they're right on that edge there. And essentially they're treated the same. I have no criticism of that.

But technically this is my daily work of expertise for a lot of reasons.

Q. Do you disagree with Dr. Theodossiou if he testified that Ms. Guilbault did not have early stage breast cancer?

A. Yes. Only because -- and, again, I think what he's saying is while it wasn't a I or II, and he maybe considers III-A advanced. But in point of fact, the technical definition of early stage breast cancer is I through III-A.

So, you know, if I met him in person, I might make that nuance, you know, but that's a regular doctor, every day in clinic, thinking this is more advanced and clearly it was than what he might consider earlier.

Q. And when Ms. Guilbault was undergoing her evaluation, there was a suspicious legion found on her T12 vertebrae; correct?

A. Correct.

Q. Doctor, do you need to take a break?

A. I should say I have a neuropathy and sometimes my throat gets irritated and I cough. And I'm so sorry.

Page 103

And then it goes away.

Q. No, no. Just want to make sure you're fine.

And the lesion she had on her spine was determined or thought to be suspicious of a bone metastasis to the T12; correct?

A. It was suspicious but not diagnostic. And that's the difference between the FDG PET showing activity but the CT not showing an abnormality.

And, you know, we see these -- you do scans, you find abnormalities all the time that, you know, it could be cancer. But as they reviewed it all, they decided it was not likely, and therefore they would treat her for the curable Stage II-B, III-A.

Q. There was some question, though, as to whether it's cancer or not; correct?

A. The suspicion was raised, yes.

Q. And the lesion that she had on T12 initially was not subject to biopsy before her chemotherapy; correct?

A. The notes say they did not feel it was the minimal to biopsy, correct.

Q. You note on page 6 of your expert report, which I had marked as Exhibit 8 -- you state that:

"In addition, even if the suspicious lesion at T12 had been a small metastasis, using an NCCN Category 1 third generation chemotherapy would have been the same initial therapy given her multiple axillary nodes and otherwise good health at age 61"; correct?

Page 104

A. Correct.

Q. And that's your opinion; correct?

A. Yes. Unless the patient said no, the majority of people with that small -- if they thought it was a metastasis, would try to treat it for cure and would use a third generation after discussing with the patient if they accepted the side effects.

Q. And if the T12 lesion had been cancerous, would you agree that then Ms. Guilbault would have Stage IV cancer; correct?

A. Correct.

Q. And stage IV cancer is not curable cancer; correct?

A. No. Don't agree with that.

So it turns out there's a small fraction of Stage IV disease that's curable. We tell patients in general it's not curable. There is a fraction of people with Stage IV that are curable, and I've had them in my practice.

Q. Doctor, you indicated you read

Page 105

Dr. Theodossiou's deposition; correct?

A. Correct.

(Defendants' Exhibit 14 was marked for identification.)

BY MR. ROTOLO:

Q. I'm going to mark his deposition as Exhibit 14. And for your information, it's going to be Tab G in your notebook.

A. Should I open that now?

Q. And I'm going to refer you to page 54 of Dr. Theodossiou's deposition, which is Exhibit 14, and if you could let me know when you're there.

A. I'm sorry. Which page number?

Q. 54.

A. 54. Okay.

Q. Are you there?

A. Yes.

Q. Starting on line 3, Dr. Theodossiou is asked:

"So if that lesion on T12 was cancer, then she would not need chemotherapy; correct?

"Answer: Correct. Correct.

"Question: Because that would mean her cancer was not curable?

"Answer: Let me rephrase that. She

Page 106

would not need to start with chemotherapy. Eventually she would have received chemotherapy but typically we start with hormonal agents. We sequence the patients through three or four hormonal agents and once we exhaust the endocrine option, we go to chemotherapy."

Do you agree with Dr. Theodossiou's assessment of how he would treat Ms. Guilbault if T12 had been cancerous?

A. It's not what I would have done, but it would have been an option to discuss with the patient to use hormone therapy alone, and now it would actually be hormone therapy and a CD4K inhibitor.

So there were alternatives to using chemo up front if it was Stage IV. And it gets to whether you think it's a curable Stage IV or just the tip of the iceberg, and then we always want to treat with the more gentle option.

Q. Would you agree at the time Dr. Theodossiou made his decision on chemotherapy, it was unknown whether Ms. Guilbault was Stage III or Stage IV?

A. I agree it was -- you could not be a hundred percent certain. That's correct.

Q. And then if you look at Dr. Theodossiou's

Page 107

deposition, which is Exhibit 14, Tab G for you on page 61 --

A. Okay. Wait, wait. I'm sorry. Page 61 of the depo.

Q. Yes.

A. Okay.

Q. And then at the bottom of page 61, he's talking about her treatment, starting on line 17, he says:

"We give them the benefit of the doubt. You know, someone that we think that is likely they are not Stage IV - someone who has a small nodule in the lung that is not amenable to biopsy, someone who has a small bone lesion that's not amenable to biopsy, we give them the benefit of the doubt and we treat them with curative intent which means chemotherapy.

"Question: And when you determine the chemotherapy regime when you cannot rule out a Stage IV, are you balancing the need to cure them if they're Stage III and to slow progression if they're Stage IV?"

Then there's an objection. And then he says:

Page 108

"When we cannot rule out Stage IV, we treat them aggressively for our presumptive curable cancer."

Do you agree with Dr. Theodossiou's approach?

A. Yes, I do agree with it.

Q. Are you giving an expert opinion that Dr. Theodossiou should have been approached Ms. Guilbault's cancer differently?

A. No.

Q. Do you agree with Dr. Theodossiou's opinion that if the spot on T12 had been cancer, Ms. Guilbault would have had a median life expectancy of 30 months in 2013?

MR. MICELI: Object to the form.

THE WITNESS: I think that's a reasonable number to use, yes.

BY MR. ROTOLO:

Q. Do you agree that given Ms. Guilbault's cancer presentation that she needed to be treated with a third generation chemotherapy regime with an Anthracycline and a taxane?

A. I believe that is the best approach based on going back to that Lancet 2012. Everything that I quoted in there as the most effective known therapies for her type of breast cancer --

Page 109

Q. Go ahead. I'm sorry. I didn't mean to interrupt?

A. -- to include an Anthracycline regimen and a taxane.

Q. Now, in your report, you note at the time of Ms. Guilbault's treatment that there were 13 Category 1 chemotherapy regimes on the NCCN guidelines; correct?

A. Let's go back. Where is that?

Q. That would be in your report -- Doctor, the one thing I didn't write the page number on.

I think it begins on page 15 or 16 of your report for Ms. Guilbault.

A. Looking for the actual regimens here. If I put the chart in, it makes it easier.

Q. Yeah. I think the chart is on page 17.

A. Yeah. There it is. Okay.

So this was Version 3 of 13. Okay.

Q. And I think you put in your report that four on the NCCN guidelines, four of the chemotherapy regimes on the NCCN guidelines, were third generation with Docetaxel; correct?

A. I can't see that -- let's see. Oh, page 15. Yes.

Q. And there were --

A. Let me see.

Page 110

Q. And then there were four --
A. Okay. That's on page 18 of my report. Okay.
Q. Thank you, Doctor.
The one page number I didn't write down on my outline.
So there were four of the chemotherapy regimes on the NCCN guidelines that were third generation with Docetaxel; correct?
A. Correct.
Q. And there were four that were third generation with Paclitaxel; correct?
A. Correct.
Q. And then there were five that were second generation without a taxane?
A. Correct.
Q. And would you agree that the second generation chemotherapy regimes without a taxane would not have been recommended for Ms. Guilbault?
A. Not unless she refused to have the toxicity. So it's not that it was the wrong choice. But we believe that she would have the best chance of cure, especially with this question in the spine of having what were the more effective regimens of an Anthracycline with the taxane.
Q. And Dr. Theodossiou testified in his

Page 111

deposition that he based his recommendation to use AC plus Docetaxel on the NSABP27 clinical trial.
Do you remember reading that in his deposition?
A. I remember reading that, yes.
Q. And I don't see that study on your reliance list or in your report.
Do you plan to have -- do you plan to give an expert opinion on the NSABP27 clinical trial in its application to Ms. Guilbault's treatment?
A. I'm happy to do so, but I don't -- I thought that was part of the rough part to collaborate. I have to review that.
That's why I don't think I called that study out separately.
Q. Let's turn back to Dr. Theodossiou's deposition, which is your Tab G, and I've marked as Exhibit 14. And let's turn to page 79.
A. Okay.
Q. Beginning on page 79 at line 8, Dr. Theodossiou says:
"What I based my recommendation on was a very well-known trial done by NSABP. I believe it was NSABP31.
And, Dr. Bosserman, I will just tell you, it

Page 112

was actually 27. He realized he was wrong.
"The standard of care used to be just four cycles of preoperative Adriamycin Cyclophosphamide.
"And then this trial came along where one-third of the patients got four cycles of AC and then got surgery; another third of the patients got four cycles of AC, followed by four cycles of Taxotere and then surgery; and the third cohort got four cycles of AC, surgery" -- "AC, surgery, and four cycles of Taxotere."
"So the findings were that if you only got four cycles of AC, your chance of complete response to the regime was 12 percent. If you got four cycles of AC and four cycles of Docetaxel, your chance of complete response was 24.6 percent. So it doubled the response rate."
And continuing on page 80:
"And we know that if you achieve a complete response remission with preoperative chemotherapy, those are the patients that have the best chance of a cure.

Page 113

"So basically you went from a 12 percent complete response rate with just AC to a 24.6 percent. So it doubled the response rate; and that's how it became the standard of care. So that's the study I based my recommendation on."
Do you agree with Dr. Theodossiou's summary of NSABP27?
MR. MICELI: Object to the form.
THE WITNESS: And with -- with the summary of the results, not that that is -- remember, the standard of care is the NCCN. It's the three preferred regimens for adjuvant and neoadjuvant. That's a neoadjuvant trial.
And so the standard of care, that is one study that goes into that NCCN guideline. There are others that felt Taxol are equally effective, so...
BY MR. ROTOLO:
Q. And so you disagree that AC plus Docetaxel was the standard of care in December of 2013?
A. Yes. As the only standard of care, absolutely.
Q. Are you aware of any clinical trial before December of 2013 that studied the effectiveness of AC plus Paclitaxel in the neoadjuvant setting?

A. Not offhand.
Q. Therefore the only clinical trial evidence on effectiveness with neoadjuvant chemotherapy was with Docetaxel; correct?
A. I'd have to go --
MR. MICELI: Object to the form.
Linda, you've gotta take a breath. Let me --
THE WITNESS: Sorry.
I'd have to review that in the NCCN guidelines of the experts clearly feel that AC Taxol is a perfectly adequate equal regimen as neoadjuvant is stated in the guidelines. And they have the references. I haven't reviewed that issue specifically.
BY MR. ROTOLO:
Q. So if Dr. Theodossiou said that to use AC plus Paclitaxel he extrapolates into the adjuvant setting, would that be something he would have to disclose in the informed consent process?
A. I mean, it depends on the depth of what he was reviewing. Because the NCCN guidelines fully support it. So we're saying based on the guidelines, the experts who treat breast cancer across the country feel these are equal, you could say that. You could go into every clinical trial, depending on the depth that the patient wanted.

Q. Now, in your expert report on page 41, you claim that Dr. Theodossiou only uses Docetaxel in HER2 positive patients; correct?
A. Let me go back to that. What page?
Q. 41 of your report.
A. Where are we?
Q. It's in the first paragraph, middle, you say:
"Since that time, Dr. Theodossiou has stopped Docetaxel with the exception of HER2 positive patients due to risk of permanent alopecia."
A. Yes. That was from his statement.
Q. Do you remember in his deposition him testifying that he uses it in the preoperative setting for HER2 positive patients like you said here, but he also uses it in the adjuvant setting with node negative patients with the TC regime?
A. I'd have to go look --
MR. MICELI: Object to the form.
BY MR. ROTOLO:
Q. Sure.
A. I'd have to go look at that. If...
Q. We can go back to his deposition, which is Exhibit 14, your Tab G. And on page 20.
A. The deposition page 20?

Q. Yes.
A. I see it. Okay.
Q. And if you look on page 20 of his deposition, which is Exhibit 14, starting at page -- line 22:
"Question: In what situations would that be?"
Would you use Docetaxel?
Answer: There's specifically two types of breast cancer patients where we use it. One is some patients who express a protein called HER2 and for those patients we treat them preoperatively, we use Docetaxel.
A. I'm not on the right page as you. My page 20, line 22, says "Was it drug company, this was a group trial."
I'm not on the right page with you.
Q. Are you on Tab G?
A. Tab F. Okay. Sorry.
Tab G. I'm sorry. Then 20. Sorry.
Q. No problem.
A. Okay.
Q. So page 20, line 22.
"In what situations would that be?
"Answer: There's specifically two

types of breast cancer patients where we use it. One is some of the patients express a protein called HER2, and for those patients, when we treat them pre-operatively, we use Docetaxel. The other cohort of patients are patients who have been operated and their lymph nodes were clean, and then we use Docetaxel with Cytoxan because this is a regime with the best survival data."
Do you see that?
A. Yes.
Q. And so he uses it in those two -- those two groups of patients?
A. Yes. I see that.
Q. And then if you look further down -- you're welcome to look at -- beginning at line 7, when he uses Docetaxel in those patients, he doesn't see the hair -- the permanent hair loss.
A. I don't -- where is he saying this?
MR. MICELI: Object to the form.
BY MR. ROTOLO:
Q. Line 7. "And when using" -- on page 21.
And when using those regimes, have you had patients who, as you described,

Page 118

had lack of hair regrowth?
"Answer: I don't recall specific patients. I think most of the patients where have encountered the alopecia were treated in the preoperative setting."
Do you see that?
MR. MICELI: Object to the form.
THE WITNESS: I see where he states that his patients are feeling differently.
BY MR. ROTOLO:
Q. So he doesn't see any alopecia issues when he uses Docetaxel in other settings?
MR. MICELI: Object to the form.
THE WITNESS: That's what he says.
BY MR. ROTOLO:
Q. Are you aware of studies or clinical trials that have found that Docetaxel was superior to Paclitaxel in terms of overall survival and timed progression with patients with metastatic breast cancer?
A. I'm really not here to discuss metastatic breast cancer and all the trials. So if you want to talk about specific trials, there are different ones.
Again, you go to the summary of the NCCN where it talked about early stage breast cancer, not metastatic breast cancer. So if you want to review

Page 119

that, I'd have to review that. I didn't do that for deposition.
Q. Fair enough.
Your report also includes the Predict model for Ms. Guilbault; correct?
A. Correct.
Q. And that is also on your summary that I marked as Exhibit 13 that you provided to me today; correct?
A. Correct.
Q. Are you going to offer an expert opinion that the Predict model also applies to Ms. Guilbault?
A. I put the caveats in, that the Predict model was developed for adjuvant, but I also put in the quotes that it can be thought of to be used as neoadjuvant, and then I put the specific MP Anderson tools in that help us predict outcome for neoadjuvant therapy, both before and then after with results.
Q. So you would not agree that the Predict model is not applicable to the neoadjuvant setting; correct?
A. According to the Predict model itself, they gave you the rules for applying it. You could apply the results after surgery to it to get an -- a general prediction.
Q. And because you don't have all the needed information before chemotherapy to apply the Predict

Page 120

model, it's not helpful when making the decision in the neoadjuvant setting as to whether to give chemotherapy or not; correct?
A. I don't agree with that because if you had a situation which was likely really low grade -- remember you asked before, might we start somebody with endocrine therapy alone -- that information gives you some kind of indication based on your clinical diagnosis, knowing that it may not be exact in the pathologic diagnosis, which is what the exact model was based on. But they actually have caveats for that.
Again, I don't think anybody disagrees that this patient was appropriate to get a third-generation chemotherapy.
Q. And that's my underlying question, Doctor, is the Predict model here even relevant given that this patient, without question, needed a third-generation chemotherapy regime with Anthracycline and a taxane?
A. I think it shows a significant benefit and it shows, again, somewhat the value of the model, that even though she had surgery, even though she was going to get even 10 years of endocrine therapy, the chemo added significantly to her potential to increase her survival.
So I think it's quite supportive of the treatment.

Page 121

Q. And when you use the Predict model, am I correct that you used the 2.2 centimeter MRI tumor size?
A. Yes. Because we -- you know, the four centimeter palpable could be inflammation, affecting different things, the mammogram. We tend to take that middle ground and then the lymph nodes.
So you just have to get some idea if the patient says, "Well, what do you think the benefit is, Doctor"; right?
You don't quote the trial, there's a 30 percent reduced risk, because it depends what your risk is to start with.
So this gives you some idea, "Look, we think a significant amount of women per hundred who undergo this chemotherapy will have an improvement in their long-term survival at five, 10, and 15 years. Are the side effects worth it to you?"
And as you know, there's patients who will want something for potential one percent benefit and some people that want a much higher benefit.
So I think it gives you good information.
Q. And when you calculated the Predict model in your report and on your summary, you used the seven nodes that were known after surgery; correct?
A. Correct.

Q. Can I ask you to look at your Exhibit A to the Guilbault report?
A. Exhibit A. Okay.
Q. It's behind your report at Tab D.
A. Tab D.
I have Tab D. Is it in D, or 1, 2, 3-D?
Q. No. It's at the end of just D. I'm sorry. Just kept your Exhibit 8 attached to your report.
A. No worries.
Is there a page number?
Q. I'm looking at your Exhibit A, page 1 of 7.
A. Exhibit A. Okay. I'm here.
Q. And, Doctor, I just want to make sure I'm not confused and this may have been just an error.
Looking at the Predict Inputs this -- on the Guilbault report, is this the input for the Guilbault case?
A. Let's see. It's supposed to be. Did I type something wrong?
Q. Well, I see we have -- if you're looking at page 1 of 7, your Exhibit A to the Guilbault report, it has positive nodes as zero, and the invasive tumor size is seven millimeters.
So is this the underlying data for Ms. Guilbault or is this just an error in attachment?

A. I don't think it's an attachment error. Seven -- invasive tumor size is seven millimeters. You know what, this looks like it's the one that goes with Plaisance's.
Q. Okay.
A. I think this is Ms. Plaisance. Let me see if they got mixed up.
Q. Yeah. I'm looking at your Tab C, Plaisance report, Exhibit A, and it looks like it's identical to what's attached to the Guilbault. So maybe it got attached twice.
A. Yeah. Definitely the wrong one got attached because I sent all those in. So thank you for picking that up.
Q. And you talked about those calculations in your expert report; correct?
A. Yes. Per the actual ones. And I actually have them. I know we could send them over, and we should get that corrected. Thank you.
Q. And the summary that you provided today that I've marked as Exhibit 13, can you look and see if those have the correct input data?
A. The -- E12 and, yeah, E13. Let me pull that up.
Q. It would be E13 I think is what I marked,

Exhibit 13.
A. Yeah.
Q. That would be the correct input data for Ms. Guilbault?
A. 2.2 centimeter, seven lymph nodes, 10 years of Endocrine, because they decided on that, five, 10, or 15-year charts. Yes.
Q. Okay. Great.
And just so I'm clear, according to Dr. Theodossiou's testimony, there was no question she was going to get a third generation chemotherapy regime with an Anthracycline and a taxane, and you agree with his view; correct?
A. You know, based on what he knew, that was his recommendation, and I agree with the third-generation recommendation. Then you have to talk to the patient about the side effects that you know and see if they'll accept it.
I've had people take CMF for this. They would not accept whatever the list of side effects are, which is why it's so important to have the truth because we can recommend, but it's really up to the patient to decide.
Q. On page 36 of your expert report for Ms. Guilbault, which is Exhibit 8, and for you, if that

would be Tab D.
A. And what page of Tab D? I'm sorry. Page --
Q. 36.
A. 36. Okay.
Q. You talk on page 36 that:
"The tumor shrunk between the first doses of AC and the last dose of AC before Docetaxel was started."
Do you see that decision?
A. Yes, I do. And I follow that in detail in the clinical chart review, yes, and I put it in my summary.
Q. But is there -- is there a way to determine whether that actual shrinkage was the tumor itself?
A. No, there's not.
Q. It could be inflammation?
A. Can be inflammation, yes.
Q. Isn't the key when you're doing those checks during chemotherapy is making sure that the tumor isn't getting any bigger?
A. That's the goal. And as you say, it could get bigger from inflammation because it's responding.
But in general, you know, having done this a long time, when you see shrinkage, shrinkage, and then all of a sudden they could no longer feel all the axillary nodes that have been enlarged, you can

generally expect an excellent surgical result after that. Not always. And you're absolutely right, there's nothing a hundred percent in that.

Q. In fact, Ms. Guilbault at surgery had a 1.5 centimeter residual tumor; correct?

A. Right.

Q. And she had seven of 17 positive nodes; correct?

A. Correct.

Q. And do you agree with Dr. Theodossiou that the seven positive nodes was a terrible prognostic factor.

A. Well, I don't know. Thirty nodes is worse. So I think -- you know, again, I try to not use these general statements.

I would say she had significant risk of subsequent recurrence even after the third-generation regimen. And it's why they added the radiation and 10 years of hormonal therapy, and, you know, she has a recurrence risk out to, you know, 20 years.

Q. And you agree with Dr. Theodossiou's assessment that Ms. Guilbault's risk of recurrence was very high?

A. I agree it was significant, both before the neoadjuvant and after the neoadjuvant. I don't remember which statement you're referring to. But I would agree

at both those time periods, she had a significant recurrent risk.

Q. He was talking after the chemotherapy, the surgery, and --

A. Yes.

Q. -- her other treatments.

A. Yeah. And that's why I put in that second MD Anderson tool where you can put in the actual results of neoadjuvant therapy, and it will show you what the recurrence risks are just so you can...

Q. Right.

And if you look at -- if you look at Dr. Theodossiou's deposition, which is your Tab G, and I marked as Exhibit 11, if you go to page 106 of the deposition, Dr. Theodossiou's deposition, Tab G.

A. Okay. Tab G for me is -- I have it as E 14.

You're saying it's E 11?

Q. I'm sorry. It's E 14. I'm sorry, Doctor.

A. Thank you. Okay. Go ahead. What page?

Q. Page 106.

A. Okay. I'm here.

Q. We begin at line 19, Dr. Theodossiou is asked:

"Do you know what percentage risk of recurrence is for someone who has a 1.5 residual tumor and seven of 17 positive

nodes?"

"Answer: It's not the 1.5 centimeter residual tumor. It's the seven lymph nodes. And I'll quote a study from MD Anderson where if you went through chemotherapy with Anthracyclines and taxanes and you had more than four positive nodes, your chance of recurrence was more than 90 percent.

"Question: Is that over a particular number of years?

"Answer: Yes. You're looking over a 10-year period usually. I mean, make no mistake, Ms. Guilbault is still at a very high risk of recurrence, even though she's seven years out."

Do you agree with that statement?

A. I agree she's at a significant risk. I don't know that it's 90 percent from the calculations I ran from the MD Anderson tool. I have to go look at that. That's why I put it in my report specifically.

Q. Do you have any basis to disagree with Dr. Theodossiou's testimony? And we can look at it on page 75 of his deposition.

A. Page 75.

Q. Line 7 on page 75.

"Question: Were the cooling caps available back in 2019?

"Answer: No. No, they weren't available."

Do you have any reason to believe that cooling caps were not available at Ochsner when Ms. Guilbault underwent chemotherapy in 2013, 2014?

MR. MICELI: Object to the form.

THE WITNESS: I'm sorry. He said they were not available at his clinic in 2013.

BY MR. ROTOLO:

Q. Yeah. I just read on page 75 of his testimony.

A. Right.

Q. Do you have any reason to dispute that they were available?

A. Well, I think, again, it's semantic. Their clinic didn't provide them. The individual patients could go and get them on the private market and bring them. So in the country they were available from 2008 on. I think he's saying his clinic didn't have available.

Whether or not this patient could, would, or should, we don't know because she was never given the

Page 130

information about the risk, and therefore the opportunity to explore that option.

Q. Was there any question that Ms. Guilbault needed radiation therapy?

A. It would be the standard of care for the NCCN guidelines to offer adjuvant radiation therapy after surgery when there's significant residual lymph nodes, as well as tumor of the breast. So that would be a standard of care with the significant benefit.

Q. Would it be the standard of care with the significant benefit for Ms. Guilbault to undergo endocrine therapy for 10 years?

A. Yes. That would be a standard of care, very important benefit, given that she had significant residual after the third-generation chemotherapy. And actually endocrine therapy may be one of the most effective treatments in this subtype of cancer. So it would be very important to try to get it and see if we can get through the side effects and hopefully she benefits from it.

Q. And as far as you could determine from your review of the medical records, Ms. Guilbault is without any evidence of disease today; correct?

A. Correct. As of the last time I saw a note in '21, she did not have a recurrence.

Page 131

Q. And given the extent of Ms. Guilbault's cancer and recurrence risk, she has had a good outcome so far.

Would you agree with that statement?

A. As far as the cancer recurrence, I think it's great. It hasn't recurred.

Q. Doctor, moving on to another topic.

Do you know if Hospira had sales reps for Docetaxel?

A. I'm not aware whether they did or didn't.

Q. Do you know if Hospira had medical liaisons for Docetaxel?

A. I don't remember that offhand. I'm not testifying about that.

Q. Again, did you know if Hospira had speakers on Docetaxel?

A. I don't remember any specific speakers.

Q. And I think we talked about this briefly. You cite the Feigal report in your expert report, but you're not doing any independent analysis of her findings; correct?

A. Correct. She's the expert on that by far.

Q. And you're not giving an expert opinion on any topics in her report; correct?

A. Correct.

Q. You state on page 23 --

Page 132

A. Dave froze. Was Dave objecting?

MR. MICELI: No, no. I'm sorry. I think I made some noise because I was switching my ear buds out.

THE WITNESS: Okay.

BY MR. ROTOLO:

Q. You state on page -- despite what you state on page 23 of your report, you're not giving an expert opinion on what Hospira's obligation was to monitor adverse events as a 505B2 manufacturer; correct?

A. That's not part of my expert testimony area.

Q. And despite what it states on page 59 of your report, you're not giving an expert opinion that Hospira failed to timely and accurately warn physicians of pCIA, are you?

MR. MICELI: Object to the form.

THE WITNESS: Listen to exactly what you're saying. Because I think they had an obligation to tell the truth, and the doctors with that truth would have then shared it with patients, who would have had the opportunity to consider that in their option for care. So --

BY MR. ROTOLO:

Q. But you're not -- I'm sorry. Go ahead.

A. So I think they had an obligation to tell the truth about the drug.

Page 133

Q. I think you already testified you're not here to testify about when and what they knew; correct?

A. Yes. I'm not the regulatory expert for that, for their disclosures.

MR. ROTOLO: Doctor and Dave, do you mind if we take a 10-minute break? Because I think I am pretty much done but I just need to check over my notes.

MR. MICELI: Okay. Yeah.

THE WITNESS: If you don't want to come back and then we'll have to do lunch then. If we're going to do done, that's great, so...

MR. ROTOLO: Yeah. Let's take a 15-minute break and then come back.

THE WITNESS: Okay. Come back.

MR. ROTOLO: And I'll look at my notes, but I think we're close to being done.

THE WITNESS: Okay. Thank you.

THE VIDEOGRAPHER: We're going off the record. The time is 12:22 p.m. and this is the end of Media Unit No. 4.

(Break taken in proceedings.)

THE VIDEOGRAPHER: Okay. We are going back on the record. The time is 12:37 p.m. and this is the start of Media Unit No. 5.

///

BY MR. ROTOLO:

Q. Dr. Bosserman, when we were talking about Ms. Guilbault's expert report in Exhibit 8, we noticed that there was an error in the attachment.

If you could provide the correct Exhibit 8 for Ms. Guilbault's report today, then he could send it to me, that way we make sure it's accurate and complete.

A. Great.

MR. ROTOLO: With that, I have no further questions, Doctor, and I appreciate your time. Unless Dave has some questions for you.

MR. MICELI: We have no questions. Thank you.

MR. ROTOLO: Then we can go off the record.

THE VIDEOGRAPHER: Okay. With that being said, we are off the record at 12:37 p.m. Pacific daylight time. And this concludes today's testimony given by Dr. Linda Bosserman. The total number of media units used was five, and will be retained by Veritext Legal Solutions.

(Whereupon, the deposition adjourned at 12:38 p.m.)

---o0o---

CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

__________________________

LINDA BOSSERMAN, M.D.

SUBSCRIBED AND SWORN before and to me this ____ day of ________________, 20___.

____________________________

NOTARY PUBLIC

My Commission expires:

REPORTER'S CERTIFICATE

---o0o---

STATE OF CALIFORNIA )
) ss.
COUNTY OF YOLO )

I, KATY E. SCHMIDT, a Certified Shorthand Reporter in and for the State of California, duly commissioned and a disinterested person, certify:

That the foregoing deposition was taken before me at the time and place herein set forth;

That LINDA BOSSERMAN, MD, the deponent herein, was put on oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me to the best of my ability and thereafter transcribed into typewriting;

That the foregoing deposition is a record of the testimony of the examination.

IN WITNESS WHEREOF, I subscribe my name on this 27th day of September, 2021.

Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
Certified Shorthand Reporter
in and for the
County of Sacramento,
State of California

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Guilbault, Clare v. Hospira Inc., Et Al.
DATE OF DEPOSITION: 9/20/2021
WITNESSES' NAME: Linda Bosserman , M.D.

| PAGE | LINE (S) | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

________________________
Linda Bosserman , M.D.

SUBSCRIBED AND SWORN TO BEFORE ME THIS ____ DAY OF ____________, 20__.

____________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.