# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL)**<br>**PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Audrey Plaisance, Case No. 2:18-cv-08086<br>Clare Guilbault, Case No. 2:16-cv-17061 |

## HOSPIRA'S MEMORANDUM IN SUPPORT OF
## <u>MOTION TO EXCLUDE OR LIMIT OPINIONS OF DR. ELLEN G. FEIGAL</u>

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD............................................................................................................2

ARGUMENT ........................................................................................................................3

I.     THE COURT SHOULD EXCLUDE DR. FEIGAL'S OPINIONS THAT HAVE BEEN PREVIOUSLY EXCLUDED OR DISCLAIMED. ...................................3

     A.     The Court Should Exclude Any Case-Specific Opinions. ......................................3

     B.     The Court Should Exclude Dr. Feigal's Disclaimed Opinions on (1) the Standard of Care and (2) Alternative Treatments. .....................................5

          1.     Standard of Care. ...................................................................................5

          2.     Alternative Treatments........................................................................5

     C.     The Court Should Exclude Dr. Feigal's Opinions on Regulatory and Labeling Issues.....................................................................................6

          1.     Regulatory Issues. ................................................................................6

          2.     Labeling. ...............................................................................................7

          3.     Foreign Labeling. ..................................................................................8

          4.     Notice. ...................................................................................................8

          5.     Signal Detection....................................................................................9

II.     DR. FEIGAL'S MECHANISM OF ACTION THEORY LACKS RELIABILITY AND SHOULD BE EXCLUDED. ...................................................................10

III.     THE COURT SHOULD EXCLUDE DR. FEIGAL'S CASE-COUNTING CALCULATIONS.......................................................................................13

IV.     THE COURT SHOULD EXCLUDE DR. FEIGAL'S GENERAL CAUSATION OPINIONS.............................................................................................15

     A.     Dr. Feigal's Conclusions Are Unreliable...............................................16

          1.     Dr. Feigal relied on another expert's since-discredited analysis. .............16

          2.     Dr. Feigal failed to consider several other potential causes of PCIA. ....................................................................................................17

CONCLUSION ........................................................................................................................ 19

CERTIFICATE OF SERVICE ............................................................................................... 21

**INTRODUCTION**

Plaintiffs designate oncologist, Dr. Ellen Feigal, M.D., primarily to offer opinions on general causation between docetaxel and permanent chemotherapy-induced alopecia ("PCIA"). Her expert report, however, also contains additional opinions that have either been excluded by the Court or that she has disclaimed—including (i) case-specific opinions, (ii) opinions on the standard of care and alternative treatments, and (iii) regulatory and liability opinions. The Court should exclude those opinions here.

In addition, the Court should further limit Dr. Feigal's testimony as follows:

*First*, Dr. Feigal's opinion about the mechanism of action between docetaxel and PCIA remains an unproven, hypothetical theory that must be excluded. Dr. Feigal conceded in her deposition testimony that the mechanism of action remains a hypothesis. Because of this lack of scientific support backing her conclusion, the Court should exclude Dr. Feigal's unreliable and unsupported mechanism of action opinion.

*Second*, the Court should exclude Dr. Feigal's purported calculations of the number of case reports in the medical literature. Specifically, Dr. Feigal opines that "the number of published cases of PCIA in Taxotere/docetaxel-based regimens are 6.4 to 6.7 times higher than in non-Taxane based regimens and are 6.8 to 8.1 times higher than in the Taxol/paclitaxel-based regimens." Ex. A, Expert Report of Dr. Feigal (June 8, 2020) ("Feigal Rep."), at 60. Dr. Feigal has not provided any basis for why simply counting case reports in the medical literature provides any relevant statistical or epidemiological information. Nor could she, because, as this Court recognized in excluding Dr. Madigan's meta-analysis, there are significant differences in the design of the studies, and it is improper to combine their results without accounting for these differences. Moreover, Dr. Feigal's calculations are confusing to the jury because they would likely be misinterpreted as representing an increased *risk*. Her percentages calculate the numerator (number of reported cases), but do not provide a dominator (total number of patients who took each drug). As such, they do not represent any increased risk, yet the jury could easily be misled into this conclusion.

*Third*, the Court should exclude Dr. Feigal's general causation opinions in their entirety because the data and methodologies she uses to support her conclusions are unreliable.  To support her general causation opinion, Dr. Feigal relies on Dr. David Madigan's observational meta-analysis that the Court has since excluded.  And she also conceded that there could be other causes of cancer patients' permanent hair loss, further undermining her general causation conclusion.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under the Rule, the witness must be qualified as an expert, and her opinions must be both reliable and relevant.  *See* Fed. R. Evid. 702.  Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  *Daubert* instructs courts to serve as gatekeepers, "impos[ing] a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'"  *Kumho Tire Co.*, 526 U.S. at 147 (alteration in original) (quoting *Daubert*, 509 U.S. at 589); *see Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013).

The threshold inquiry under Rule 702 is whether the individual is "qualified to testify in a particular field or on a given subject," based on her "knowledge, skill, experience, training, or education."  *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702).  After defining the permissible scope of the expert's testimony, the Court then assesses whether the opinion is reliable and relevant.  *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (per curiam).

To assess reliability, the Court considers whether the reasoning and methodology underlying the expert's testimony is "valid and can be reliably applied to the facts of the case."  *Id.*  This "analysis applies to all aspects of an expert's testimony," including the "methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion."

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).  If the opinion is based on mere "subjective belief or unsupported speculation," then the Court should exclude it.  *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("Since *Daubert* … parties relying on expert evidence have had notice of the *exacting standards* of reliability such evidence must meet." (second emphasis added)).  The party offering the expert testimony bears the burden of establishing that the expert's findings and conclusions are reliable.  *See Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)).

The Court also evaluates whether the testimony is relevant.  In assessing relevance, the Court considers whether the expert's "reasoning or methodology 'fits' the facts of the case." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015) (citation omitted); *see also Daubert*, 509 U.S. at 591 (discussing Rule 702's relevancy requirement in terms of "fit" (citation omitted)).  In other words, the expert opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue.'"  *Sandifer*, 907 F.3d at 809 (quoting Fed. R. Evid. 702).

Finally, Federal Rule of Evidence 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if (1) they are of the kind reasonably relied upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect.  Fed. R. Evid. 703.

## ARGUMENT

## I.     THE COURT SHOULD EXCLUDE DR. FEIGAL'S OPINIONS THAT HAVE BEEN PREVIOUSLY EXCLUDED OR DISCLAIMED.

The primary opinion that Dr. Feigal offers in her expert report relates to general causation.  Her expert report, however, contains additional opinions that have been either disclaimed or previously excluded.  Those opinions should be excluded here.

### A.     The Court Should Exclude Any Case-Specific Opinions.

The Court has previously precluded Dr. Feigal from offering case-specific opinions.  *See, e.g.*, *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 12, 2021), ECF No. 11810, at 5

3

("*Kahn*"); *see also In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)* (Aug. 23, 2019), ECF No. 8094, at 18-19 ("*Earnest*"). Here, Dr. Feigal agreed that she is "not offering any patient-specific or physician-specific opinions, and that includes the two plaintiffs in this case." Ex. B, Deposition of Dr. Feigal (Sept. 29, 2021) ("Feigal Dep."), at 75:6-8. Nor could she, because Dr. Feigal has no connection to either Ms. Plaisance or Ms. Guilbault. Dr. Feigal is not aware of the cancer treatments that either Plaintiff received, aside from their exposure to docetaxel, nor has she reviewed their medical records. *Id.* at 17:12-16, 18:3-5, 18:11-13, 19:1-10. Thus, all case-specific opinions should be excluded.

The Court should also exclude any "reasonable physician" testimony. Dr. Feigal opines that, "[h]ad physicians been informed of the risk of permanent chemotherapy-induced alopecia, they would and could have included a discussion of the risk of permanent chemotherapy induced alopecia in their benefit-risk interaction with patients." Ex. A (Feigal Rep.) at 76. In *Kahn*, the Court correctly excluded this testimony because it was nothing more than "thinly veiled case-specific testimony" that "would carry little relevance." *Kahn* at 5. This testimony is "thinly-veiled case-specific testimony" because speculating about what a "reasonable" oncologist would have done in the face of a different label is just a backdoor way of opining about how the Plaintiffs' own doctors would have acted. Moreover, the testimony carries little relevance to a failure-to-warn claim, because the causation inquiry for that claim asks whether "a proper warning would have changed the decision of the *treating* physician"—not whether it would have changed the decision of a *reasonable, third-party* physician. *See Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098-99 (5th Cir. 1991) (emphasis added). Accordingly, where, as here, Plaintiffs' own treating physicians will be available to testify at trial, Dr. Feigal's testimony bears little relevance to the causation question. For these reasons, the Court should follow the *Kahn* decision and exclude Dr. Feigal's "reasonable physician" testimony.

**B.      The Court Should Exclude Dr. Feigal's Disclaimed Opinions on (1) the Standard of Care and (2) Alternative Treatments.**

In *Earnest* and *Kahn*, the Court permitted Dr. Feigal to testify about (1) the standard of care required of physicians informing patients through the decision-making process, and (2) alternative treatments available to Taxotere patients.  *See Earnest* at 18-19; *Kahn* at 5.  For purposes of Trial 5, however, Dr. Feigal expressly disclaimed these opinions in her deposition.  The Court should hold Dr. Feigal to her word and exclude her testimony on these topics.

**1.      Standard of Care.**

Dr. Feigal writes in the "Scope of this Report" section of her expert report that it will cover "how decisions regarding the risks and benefits of treatment options are discussed between physicians and their patients," alluding to the fact that she will opine on the standard of care that physicians must follow when helping patients through the decision-making process.  Ex. A (Feigal Rep.) at 7.  Dr. Feigal has previously been allowed to testify about the standard of care because, according to the Court, it is "the kind of material [she] would cover in the college courses she taught."  *Kahn* at 5.  But the facts are different for Trial 5.  Dr. Feigal testified that any topics mentioned in the "Scope of this Report" section of her expert report *other than* general causation serve as "more of a preamble" and "just a background."  Ex. B (Feigal Dep.) at 133:1, 135:2.  By disclaiming her opinions on any topic other than general causation, Dr. Feigal concedes that she should not be allowed to testify about the standard of care.  The Court should apply Dr. Feigal's disclaimer and preclude these opinions at trial.  *Cf. Markel v. Douglas Techs. Grp., Inc.*, 968 F.3d 888, 890 (8th Cir. 2020) (explaining that the plaintiff's "contention … is belied by the expert's report and by the expert's deposition testimony, in which he specifically disclaims an opinion").

**2.      Alternative Treatments.**

Similarly, with regard to alternative treatments, Dr. Feigal testified that she would not "give any opinions about the medical care and treatment" of either Plaintiff.  Ex. B (Feigal Dep.) at 51:21-25, 56:9-15; *see id.* at 135:15-18 ("I'm not offering opinions on … how to treat [breast

cancer]."). She further disclaimed any opinions on "treatment options" as merely "preamble" and "background." *Id.* at 133:1, 135:2. Yet Dr. Feigal's expert report discusses various breast cancer treatment options. *See* Ex. A (Feigal Rep.) at 28-36. Dr. Feigal should not be permitted to testify on these topics that she has expressly disclaimed.

In addition, allowing Dr. Feigal to testify about alternative treatments for breast cancer—even in general terms—would serve as a backdoor route to impermissible case-specific testimony. Any testimony about alternative treatments would give the jury the impression that the Trial 5 Plaintiffs *could* have received those treatments as an adequate alternative to docetaxel. In other words, allowing Dr. Feigal to testify about alternative treatments, albeit couched in general terms, would be another thinly-veiled opportunity to inappropriately opine on case specifics. This testimony should be excluded.

### C. The Court Should Exclude Dr. Feigal's Opinions on Regulatory and Labeling Issues.

Repeatedly throughout her deposition, Dr. Feigal reiterated that she will not testify as a regulatory expert and will not offer opinions about the adequacy of Hospira's 505(b)(2) application for docetaxel or its labeling. Her expert report states that she is "not offering regulatory opinions about FDA requirements." Ex. A (Feigal Rep.) at 1. Yet, Dr. Feigal's report then goes on to spend several pages explaining in detail the FDA approval process for pharmaceutical medications, including the 505(b)(2) pathway, and the "prescribing information" or labeling attached to drugs. *See id.* at 16-20. To the extent her expert report offers opinions on regulatory or labeling issues, the Court should hold Dr. Feigal to her word and prohibit such testimony.

#### 1. Regulatory Issues.

Dr. Feigal should be precluded from offering any regulatory opinions, including those on pages 16 to 20 of her report. Dr. Feigal has expressly conceded that she will *not* provide *any* regulatory opinions and that she lacks expertise on the topic. She makes this point crystal clear throughout her deposition testimony:

Q: So I take it - - and I think you've already said today - - that you're not appearing as the plaintiffs' regulatory expert in this case against Hospira, correct?

A: That is correct.

Q: Is it your understanding that Dr. Ross will be the plaintiffs' regulatory expert in this case?

A: Yes.

Ex. B (Feigal Dep.) at 69:2-10.

"I am offering no regulatory opinions."

*Id.* at 69:16-17.

"I am not offering any opinion critical or positive as to the 505(b)(2) pathway Hospira has taken."

*Id.* at 70:20-22.

Q: And I take it, then, you're not offering any opinions about the content of Hospira's submissions to the FDA related to its docetaxel product?

A: That is correct.

Q: And I take it that you're not providing any opinions about whether Hospira complied with the FDA regulations, correct?

A: That is correct.  I am not the regulatory expert for this case.

*Id.* at 70:24-71:8.

Q: Dr. Feigal, I take it because you're not being offered as the regulatory expert in this case, that you're not offering opinions as to what kind of pharmacovigilance was required by any pharmaceutical manufacturer under the FDA regulations, correct?

A: No.

*Id.* at 115:6-11.

### 2. Labeling.

In a similar vein, Dr. Feigal testified specifically that she will *not* offer any opinions on the adequacy of Hospira's labeling.  Her expert report contains general references to labeling, *see* Ex. A (Feigal Rep.) at 19-20, 76 ¶ 6, yet, in her deposition testimony, Dr. Feigal made clear that

she disclaims any opinions on whether Hospira breached any duties regarding its labeling.  The

Court should hold her to her word:

> Q:   Are you offering any opinion that Hospira breached any type of legal, regulatory, or ethical duty as it relates to docetaxel?
>
> MR. MICELI: Object to the form.
>
> THE WITNESS: I am not providing any legal opinions on anything, and I'm not providing any regulatory opinions.

Ex. B (Feigal Dep.) at 75:10-16.

> Q:   But you're not providing any opinions about the accuracy of Hospira's labeling at any point in time, correct?
>
> A:   I'll just re-answer -- I'll just try to re-answer it the only way I can.  I'm not offering any regulatory opinions about Hospira's label.

*Id.* at 76:10-15.

### 3.      Foreign Labeling.

Dr. Feigal also mentions in her expert report that Hospira's docetaxel labels included the

risk of PCIA in Israel, Hungary, and the United Kingdom.  Ex. A (Feigal Rep.) at 76, ¶ 6.  In

addition to her general disclaimer about labeling opinions, Dr. Feigal concedes that she has never

reviewed any of these foreign labels, is not offering opinions on foreign countries' regulatory

regimes, and that she simply relied on Dr. Ross's expert report for this statement.  *See* Ex. B

(Feigal Dep.) at 78:25-80:22.  She cannot "merely accept[] as true the facts given [to her] by" Dr.

Ross and "perform[] no independent analysis." *JRL Enters., Inc. v. Propcorp Assocs., Inc.*, 2003

WL 21284020, at *8 (E.D. La. June 3, 2003).  Thus, Dr. Feigal should not be permitted to refer

to these foreign labels for this additional reason.

### 4.      Notice.

Relatedly, Dr. Feigal also should not be permitted to opine on what Hospira knew or

should have known about the risk of PCIA.  Her expert report states that "[a]ny 505(b)(2)

manufacturer of docetaxel that conducted an analysis of the available data would have reached

the same conclusion, i.e., docetaxel can cause permanent chemotherapy-induced alopecia."  Ex.

A (Feigal Rep.) at 76.  Dr. Feigal has since backtracked from this statement, testifying that she was *"not here to comment on what [docetaxel manufacturers] should have or could have done*." Ex. C, Deposition of Dr. Feigal, *Hughes v. Accord Healthcare, Inc.*, No. 2:17-cv-11769, & *Stewart v. Sandoz, Inc.*, No. 2:17-cv-10817 (Sept. 1, 2020), at 304:18-22 (emphasis added).  Dr. Feigal thus has disclaimed any opinion on what Hospira knew or should have known about the risk of permanent alopecia and whether Hospira should have included that information in its labeling.

### 5.    Signal Detection

In her conclusions, Dr. Feigal cites Dr. Madigan's signal detection opinions: "Dr. Madigan's Expert Report demonstrated that no other chemotherapy used in early stage breast cancer, other than Taxotere/docetaxel, has a safety signal consistently demonstrated from the first quarter of 2000 to the present day." Ex. A (Feigal Rep.) at 76.  This opinion should be excluded for three reasons.

*First*, Dr. Feigal has admitted that this signal detection analysis is unrelated to her causation opinion: "That's just Dr. Madigan's result of the earliest point at which he detected a signal.  It has nothing to do with causation -- my causation opinion in the first part …."  Ex. B (Feigal Dep.) at 125:14-17; *see also id.* at 127:7-9 ("I just want to make clear, the signal detection has nothing to do with my assessment of causation.").

*Second*, opinions on signal detection would only be potentially relevant to the issues of Hospira's notice and whether its labeling is adequate—issues that Dr. Feigal has disclaimed as outside the scope of her opinions.

*Third*, Dr. Feigal blindly cites Dr. Madigan's FAERS signaling opinions without any meaningful independent analysis of her own.  Dr. Feigal did not conduct her own independent analysis of the FAERS data.  She acknowledged that she "would have to defer to Dr. Madigan to offer the technical aspects of what he followed and how he did" the FAERS analysis, and she did not attempt to double check his signal identification. Ex. B (Feigal Dep.) at 116:12-16; *see id.* at

9

113:21-22 ("Did I use the software to go look at it again?  No.").  Thus, Dr. Feigal's opinion

should be excluded for this additional reason.  *See, e.g., JRL Enters., Inc.*, 2003 WL 21284020,

at *8 (excluding opinion where expert "merely accepted as true the facts given him by" the client

and "performed no independent analysis of the numbers" he was provided).

*     *     *

Thus, by her own admissions, Dr. Feigal is not a regulatory or labeling expert and will

not offer opinions on these topics.  The Court should accordingly not allow her to offer *any*

regulatory or labeling opinions—whether general in nature or specific to Hospira.

## II.   DR. FEIGAL'S MECHANISM OF ACTION THEORY LACKS RELIABILITY AND SHOULD BE EXCLUDED.

The phrase "mechanism of action," although related to the concept of general causation,

is more precisely a "term used to describe how a drug or other substance produces an effect in

the body."[1]  In her expert report, Dr. Feigal postulates about the biological mechanism of action

that leads to permanent hair loss.  She hypothesizes:

> PCIA is thought to be likely a result of the hair follicle being permanently
> damaged, and the hair density is markedly reduced.  It has been hypothesized that
> this may be due to irreversible damage of the stem cells/hair matrix cells of the
> hair bulb, or disturbance of the signaling pathways to the secondary hair germ.

Ex. A (Feigal Rep.) at 40.

The problem with Dr. Feigal's mechanism of action hypothesis is that it is just that—only

a hypothesis.  The two sources that Dr. Feigal relies on confirm that her mechanism of action

theory is merely a hypothesis.  *See* Ex. A (Feigal Rep.) at 40 n.75 (citing two sources).  The

Tallon article acknowledges that it is only "*postulated* that permanent damage to the hair follicle

may result from direct toxicity of high-dose chemotherapy on stem cells or hair matrix cells, or

separation of the matrix cells from the dermal papilla," or that "*maybe* the chemotherapy affects

the signaling to the secondary hair germ."  Ex. D, Ben Tallon et al., *Permanent Chemotherapy-*

---

[1]   *Mechanism of Action*, National Cancer Institute,
https://www.cancer.gov/publications/dictionaries/cancer-terms/def/mechanism-of-action (last
visited November 10, 2021).

*Induced Alopecia: Case Report and Review of the Literature*, 63(2) J. Am. Acad. Dermatology 333, 335 (2010) (emphasis added).  Similarly, the Prevezas article speculates that "[a] *possible* explanation of the irreversibility *could be* the permanent damage of the stem cells situated in the hair bulge or the matrix keratinocytes along with an idiopathic sensitivity of the hair follicle to these agents."  Ex. E, C. Prevezas et al., *Irreversible and Severe Alopecia Following Docetaxel or Paclitaxel Cytotoxic Therapy for Breast Cancer*, 160 Brit. J. Dermatology 881, 885 (2009) (emphasis added).

Dr. Feigal herself accepts that her mechanism of action opinion is nothing more than a theory.  In her report, she acknowledged that the mechanism of action opinion "has been hypothesized."  Ex. A (Feigal Rep.) at 40.  And during her deposition, she conceded that the mechanism of action has been "theorize[d]" in academic papers, but that "it's not concluded right now."  Ex. B (Feigal Dep.) at 130:8-14, 131:7-13; *see also id.* at 132:6 ("So is it proven? No.").  What is more, Dr. Feigal offers no indication suggesting that her hypothesis has been widely accepted in the scientific community.  *See id.* at 131:17-25 (deferring the question whether the mechanism of action is "generally accepted in the dermatological community" to a "dermatologic expert").

In the end, Dr. Feigal's mechanism of action theory is devoid of scientific support and based on nothing more than unsupported speculation.  A "working hypothesis," however, as is the case with Dr. Feigal's theory, is "not admissible scientific 'knowledge.'"  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting Fed. R. Evid. 702); *see also United States v. DeLeon*, 423 F. Supp. 3d 1210, 1231 (D.N.M. 2019) ("An untested hypothesis does not provide a scientific basis to support an expert opinion.").  Indeed, a hypothesis "is not 'knowledge,' nor is it 'based upon sufficient facts or data' or the 'product of reliable principles and methods … applied … reliably to the facts of the case.'"  *Tamraz*, 620 F.3d at 670 (alterations in original) (quoting Fed. R. Evid. 702).  At bottom, nothing in Federal Rule of Evidence 702 or *Daubert* "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997); *see also Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009)

("Where an expert's opinion is based on insufficient information, the analysis is unreliable.").

Thus, Dr. Feigal's mechanism of action theory should be excluded because it is grounded in an

untested hypothesis and is not "based on sufficient facts or data." Fed. R. Evid. 702(b); *see also*

*Tamraz*, 620 F.3d at 670.

What is more, Dr. Feigal's mechanism of action theory should not be allowed on the

basis that it relates to "biological plausibility"—one of the nine Bradford Hill factors.  The

concept of biological plausibility "asks whether the hypothesized causal link is credible in light

of what is known from science and medicine about the human body and the potentially offending

agent." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 25 (1st Cir. 2011).

Biological plausibility does not require definitive proof of the mechanism. *In re Johnson &*

*Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 177

(D.N.J. 2020).  "[B]ut any such opinion must nonetheless [still] be "derived from and supported

by reliable scientific knowledge and reasoning." *Id.* (quoting *In re Abilify (Aripiprazole) Prods.*

*Liab. Litig.*, 299 F. Supp. 3d 1291, 1308 (N.D. Fla. 2018)); *see In re Seroquel Prods. Liab. Litig.*,

2009 WL 3817866, at *5 (M.D. Fla. Feb. 11, 2009) (finding a biological plausibility opinion

reliable where each step of the expert's methodology had "ample scientific support" from

literature, clinical data, or first-hand clinical observation, and was supported by "sound scientific

reasoning").  Again, the Court need not "admit opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

Thus, for all the reasons discussed above, Dr. Feigal has not provided reliable scientific

support to offer her mechanism of action theory to the jury.  In addition to her own concessions,

the two papers on which she relies to support her theory state only that her purported mechanism

of action has been "postulated" and that it is a "possible explanation."  At bottom, her theory is

not derived from any reliable scientific knowledge or reasoning; it instead is unsupported

"scientific guesswork." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (Posner, J.)

("[T]he courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags

science; it does not lead it.").  Dr. Feigal's proposed mechanism of action opinion therefore should be excluded.

## III.    THE COURT SHOULD EXCLUDE DR. FEIGAL'S CASE-COUNTING CALCULATIONS.

Dr. Feigal opines that "the number of published cases of PCIA in Taxotere/docetaxel-based regimens are 6.4 to 6.7 times higher than in non-Taxane based regimens and are 6.8 to 8.1 times higher than in the Taxol/paclitaxel-based regimens."  Ex. A (Feigal Rep.) at 60; *see also id.* at 73 ("6.4 to 8 times increased number of reported cases in the 19 published studies").  This opinion should be excluded because Dr. Feigal provides no valid basis for offering this calculation, and it will likely confuse or mislead the jury.

For starters, Dr. Feigal has not provided any valid basis for why simply counting case reports in the medical literature provides any relevant statistical or epidemiological information.  Her case-counting exercise—which is derived from the articles listed in Table 2 of her expert report—merely represents the number of purported cases of PCIA in Taxotere/docetaxel-based regimens as compared to the number of purported cases of PCIA in other regimens:

|  | *Cases of PCIA in Taxotere/docetaxel-based regimens* | *Cases of PCIA in non-Taxane based regimens* | *Dr. Feigal's Calculation* |
|---|---|---|---|
| Total | 347 | 54 | 347/54 = 6.4 |
| Total (81% applied to Freites-Martinez numbers) | 341 | 51 | 341/51 = 6.7 |

|  | *Cases of PCIA in Taxotere/docetaxel-based regimens* | *Cases of PCIA in Taxol/paclitaxel-based regimens* | *Dr. Feigal's Calculation* |
|---|---|---|---|
| Total | 347 | 51 | 347/51 = 6.8 |
| Total (81% applied to Freites-Martinez numbers) | 341 | 42 | 341/42 = 8.1 |

*See* Ex. A (Feigal Rep.) at 59-60.

These case-counting calculations do not assist the jury in determining the causation issues. *See Sandifer*, 907 F.3d at 809 (explaining expert opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue'" (quoting Fed. R. Evid. 702)).  Dr. Feigal does not claim that these calculations represent an *increased risk* of experiencing PCIA as a result of docetaxel exposure.  Nor could she, because she does not perform any relevant statistical calculation that could be used to show an increased risk—such as a relative risk or an odds ratio.  Her case counts could not calculate risk because they only calculate the numerator (number of reported cases), and do not provide any denominator (total number of patients who took each drug in the studies).  Thus, Dr. Feigal's opinions should be excluded because she does not provide any support for why her case-counting method is relevant to support any statistical or epidemiological calculation.[2]

Her case-counting method is also unreliable because it does not account for the differences in the patients involved in the studies.  As this Court recognized in excluding Dr. David Madigan's meta-analysis, when there are significant differences in the design of the various studies, it is improper to combine their results without accounting for those differences. *See In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 29, 2021), ECF No. 12098, at 12–13 ("*Kahn II*") (excluding Dr. Madigan's meta-analysis as unreliable due to the high level of heterogeneity among the studies—a limitation of the analysis that Dr. Madigan himself acknowledged); *see also* Ex. G, Expert Report of Dr. Jon Fryzek (Oct. 8, 2021), at ¶ 136 (explaining Dr. Feigal's method "is not a standard epidemiological method for comparing the risk of an adverse event between two chemotherapy regimens or to evaluate the strength of association, as the numbers depend on the selected studies considered").  If anything, Dr.

---

[2]   During the *Kahn* trial, one of Plaintiffs' other experts—Dr. Tosti—agreed that increased risk cannot be calculated by simply adding up case reports from the literature. Ex. F, Trial Tr. (Afternoon), *Kahn v. Sanofi-Aventis U.S. LLC,* No. 16-cv-17039 (Nov. 10, 2021), at 704:10-13 ("Q:  [Y]ou would agree with me that you cannot just count the reports in a paper and make a conclusion on which one of the drugs in that paper has a greater risk, right?  A:  Yes."); *see id.* at 704:21-22 ("I agree that's not the right methodology.").

Feigal's calculations are even *more* unreliable than Dr. Madigan's because she provides a calculation without even attempting to address the differences in the studies.  Thus, Dr. Feigal should not be allowed to opine that the number of PCIA cases is *x* times higher in docetaxel-based regimens as compared to other regimens, when she did not account for differences in the designs of the studies used in this calculation.

Finally, even if Dr. Feigal's calculations were somehow relevant, they should nonetheless be excluded because they are confusing to the jury and would likely be misinterpreted as representing an increased risk.  Under Federal Rule of Evidence 403, the Court may exclude evidence "if its probative value is substantially outweighed by a danger of … confusing the issues [or] misleading the jury …."  Fed. R. Evid. 403.  Because "[e]xpert evidence can be both powerful and quite misleading," a court should "exercise[] more control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595.

Here, any probative value is substantially outweighed by the undue risk of misleading the jury.  Although Dr. Feigal's calculations do not represent any increased risk, the jury could easily be misled into this conclusion.  Allowing Dr. Feigal to provide specific numerical calculations stating that the number of PCIA cases in Taxotere/docetaxel-based regimens are 6.4 to 6.7, or 6.8 to 8.1, times higher than in other regimens will very likely confuse the jury into thinking that these figures mean there was an increased risk.  Yet Dr. Feigal provides no support for this conclusion, nor could she.  For these reasons, the Court should exclude Dr. Feigal's unhelpful and misleading calculations.

## IV.    THE COURT SHOULD EXCLUDE DR. FEIGAL'S GENERAL CAUSATION OPINIONS.

Dr. Feigal's principal opinions in her expert report relate to general causation.  She opines:

> (1) "Taxotere/docetaxel has been shown by reliable scientific evidence to cause permanent chemotherapy-induced alopecia," Ex. A (Feigal Rep.) at 75; and

> (2) "Reliable scientific evidence from randomized clinical trials, published peer-reviewed literature, and the Sanofi safety database consistently demonstrates a

significant increased risk of permanent chemotherapy-induced alopecia with Taxotere/docetaxel.  The level of risk of permanent chemotherapy-induced alopecia with Taxotere/docetaxel is substantially higher than any other comparator chemotherapy drugs, including those often used in Taxotere/docetaxel regimens." Ex. A (Feigal Rep.) at 75-76.

In reaching these conclusions, Dr. Feigal relies on the data she examined, as reflected in a chart (labeled Table 2) in her expert report.  *See* Ex. A (Feigal Rep.) at 44-60.  Dr. Feigal's general causation opinions should be excluded because the underlying data and methodology used to reach her opinions are unreliable.

### A.  Dr. Feigal's Conclusions Are Unreliable.

#### 1.  Dr. Feigal relied on another expert's since-discredited analysis.

An expert may rely on the work of another expert in forming her opinion, but only if that underlying reliance is reasonable.  *See* Fed. R. Evid. 703; *see also Earnest* at 9 & n.33. Consistent with Rule 703, where a court has previously excluded one expert's theory, the district court may properly exclude a second expert's opinion if it relies on the initial expert's inadmissible testimony.  *See Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 405-06 (5th Cir. 2016); *see also Fuesting v. Zimmer, Inc.*, 362 F. App'x 560, 564 (7th Cir. 2010) ("[B]ecause [Expert 1's] testimony on causation primarily relies on an excluded expert opinion (in this case, [Expert 2's]), the district court did not err in excluding it."); *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, 2016 WL 3180776, at *11 (E.D. La. June 7, 2016) ("Rule 703 does not necessarily allow a witness to rely on the methodology of another expert, if that expert's methodology would be deemed unreliable under *Daubert*.").

Dr. Feigal's general causation opinion lacks reliability because it is based on an excluded opinion from one of Plaintiff's other experts: Dr. Madigan.  *See* Ex. A (Feigal Rep.) at 60 n.110 (relying on Dr. Madigan for support).  For his part, Dr. Madigan conducted a random-effects meta-analysis of four observational studies (Crown, Martin, Sedlacek, and King) and concluded that the studies yielded an Odds Ratio ("OR") of "4.13, 95% CI (4.13,11.81), p = 0.008." *Id.* Dr. Feigal relies on this meta-analysis, as well as his opinion that the adverse event data from the

FDA's Adverse Event Report System ("FAERS") database showed a safety signal for alopecia beginning in 2000. *Id.* at 60 n.110, 76. The problem for Dr. Feigal (and Dr. Madigan), however, is that Dr. Madigan's observational meta-analysis has since been discredited by the Court in *Kahn* as lacking in reliability. *Kahn II* at 12-13 (excluding Dr. Madigan's meta-analysis as unreliable due to the high level of heterogeneity among the studies—a limitation of the analysis that Dr. Madigan himself acknowledged).[3]

The Court's exclusion of Dr. Madigan's observational meta-analysis substantially undermines the reliability of Dr. Feigal's general causation opinions. Dr. Feigal does not herself perform any meta-analysis of the medical literature or opine that it shows a statistically significant risk. Dr. Feigal no longer will be allowed to parrot Dr. Madigan's discredited opinion as a foundation for her own. Without Dr. Madigan's underlying meta-analysis, Dr. Feigal's opinion rests on shaky ground. *See, e.g.*, *Sims*, 839 F.3d at 405-06 ("[T]he district court properly excluded [Expert 1's] theory about fuel tank straps, because it relied on [Expert 2's] inadmissible downward displacement theory."). As in *Sims*, then, Dr. Feigal should not be permitted to testify about general causation, because she reached her conclusions by relying on and incorporating data from Dr. Madigan's since-discredited observational meta-analysis. *See id.*

## 2. Dr. Feigal failed to consider several other potential causes of PCIA.

Dr. Feigal testified that the only drug she is aware of that causes PCIA is Taxotere/docetaxel, in part because she has "not seen any evidence for causation for any other chemotherapy drug." Ex. B (Feigal Dep.) at 99:6-11, 99:16-100:1. Dr. Feigal has admitted, however, that she reached her general causation opinion without considering whether the other drugs used in combination with docetaxel as a chemotherapy regimen could cause the PCIA. Dr. Feigal's general causation opinions are accordingly not the result of reliable methodology and should be excluded.

---

[3]   Although the Court has previously admitted Dr. Feigal's causation opinions, it has not ruled on the issue presented here—whether her reliance on Dr. Madigan renders her opinion unreliable.

The data on which Dr. Feigal relies to reach her general causation opinions is reflected in Table 2 in her expert report.  *See* Ex. A (Feigal Rep.) at 44-60.  Table 2 includes data from the following three categories:  (1) Sanofi's randomized clinical trial data, including the TAX 316 data and GEICAM 9805 data, (2) published medical literature, and (3) the Sanofi pharmacovigilance database.  *See id.*  From these three categories of data, Dr. Feigal documented 347 patients, and she asserts that each of them developed PCIA after receiving cancer treatment with docetaxel-containing combination regimens.  *See id.*  In addition to receiving Taxotere/docetaxel as part of their regimen, most of the 347 patients also received Adriamycin and/or Cyclophosphamide, and many received aromatase inhibitors and/or Tamoxifen.  *See id.* at 60-72 (providing summaries of the studies).  Dr. Feigal's general causation opinions, then, depend on the (unproven) fact that Taxotere/docetaxel—and not some other cancer-treating drug in a combination regimen, such as Cytoxan/Cyclophosphamide or Adriamycin—can cause a breast cancer patient's PCIA.

But Dr. Feigal has never examined whether these other cancer-treating drugs may be the cause of PCIA, nor has she conducted Bradford Hill analyses for other potential causes of PCIA. This fatal flaw in her methodology was made clear during the *Earnest* trial.  Dr. Feigal admitted that she reached her general causation opinion without weighing other potential causes of the patients' permanent alopecia, and testified as follows:

> Q:   Doctor, sitting here today, can you tell me, yes or no, whether it was [Adriamycin] that caused the permanent alopecia in those 16 patients?
>
> A:   It could be either [Adriamycin] or [Cytoxan/Cyclophosphamide] or both.
>
> Q:   And so you would agree with me that it could have been the [Adriamycin], [Cytoxan/Cyclophosphamide] or both, correct?
>
> A:   It could have been both, right.

Ex. H, Trial Tr. (Morning), *Earnest v. Sanofi-Aventis U.S. LLC,* No. 16-cv-17144 (Sept. 20, 2019), at 1236:16-22; *see also* Ex. B (Feigal Dep.) at 102:19-25 (confirming Dr. Feigal did not

conduct a Bradford Hill analysis to determine whether endocrine therapy can cause permanent alopecia).

Dr. Feigal's own admissions weaken her methodology beyond repair.  A district court may reject an expert's reliance on "studies [that] note that the subjects were exposed to a range of substances and then nonspecifically note increases in disease incidence."  *LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010) (per curiam).  Other courts have similarly concluded that an expert's failure to rule out other plausible causes as part of the general causation analysis undermines the admissibility of the expert's ultimate conclusions.  *See, e.g.*, *Joiner*, 522 U.S. at 146 (holding an expert's reliance on a study to be misplaced because the subjects of the study "had been exposed to numerous potential carcinogens"); *Knight*, 482 F.3d at 353 ("Of all the organic solvents the study controlled for, it could not determine which led to an increased risk of cancer.…  The study does not provide a reliable basis for the opinion that the types of chemicals appellants were exposed to could cause their particular injuries in the general population.").

Here, Dr. Feigal admitted that she cannot, and did not attempt to, exclude several other potential causes of permanent hair loss among the participants of the studies in Table 2.  As a result, there is too big of an analytical gap between the data on which Dr. Feigal relies and her conclusion that docetaxel alone—and not other chemotherapy drugs—can cause PCIA.[4]

In the end, Dr. Feigal's general causation conclusion fails to satisfy Rule 702's "exacting standards of reliability" and should be excluded.  *Weisgram*, 528 U.S. at 455.

## CONCLUSION

For the reasons herein, the Court should preclude or limit (1) any opinions that have been excluded or that Dr. Feigal has disclaimed, (2) Dr. Feigal's opinions on the biological

---

[4]    The data underlying Dr. Feigal's faulty methodology contains other shortfalls.  For example, Dr. Feigal admitted at her deposition that the TAX 316 and GEICAM 9805 studies did not have a specific objective of evaluating the risk of permanent or irreversible alopecia.  *See* Ex. B (Feigal Dep.) 142:2-21, 155:4-10.

mechanism of action between docetaxel and permanent alopecia, (3) Dr. Feigal's purported

calculations of the number of case reports in the literature, and (4) her general causation opinions

in their entirety.

Dated: November 12, 2021                     Respectfully submitted,

                                             */s/ Heidi K. Hubbard*
                                             Heidi K. Hubbard
                                             Richmond T. Moore
                                             Neelum J. Wadhwani
                                             **WILLIAMS & CONNOLLY LLP**
                                             725 Twelfth Street, N.W.
                                             Washington, D.C. 20005-5901
                                             Telephone: 202-434-5000
                                             hhubbard@wc.com

                                             John F. Olinde (Bar No.1515)
                                             Peter J. Rotolo (Bar No. 21848)
                                             **CHAFFE MCCALL LLP**
                                             1100 Poydras Street
                                             New Orleans, LA 70163
                                             Telephone: 504-858-7000
                                             olinde@chaffe.com

                                             *Counsel for Defendants Hospira, Inc.,*
                                             *Hospira Worldwide, LLC, and Pfizer Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Heidi K. Hubbard*