# EXHIBIT B

 1            UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   IN RE:  TAXOTERE (DOCETAXEL)  )Case Nos.

     PRODUCTS LIABILITY LITIGATION )2:16-cv-17061 and

 6                                  )2:18-cv-08068

     _____)

 7

 8

 9

10

11

12

13

14

15

16        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                 ELLEN FEIGAL, M.D.

18            Wednesday, September 29, 2021

19

20

21

22   Reported by:

     CARLA SOARES

23   CSR No. 5908

24

25

Page 2

1    UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF LOUISIANA
3
4
5    IN RE:  TAXOTERE (DOCETAXEL)  )Case Nos.
     PRODUCTS LIABILITY LITIGATION )2:16-cv-17061 and
6                                   )2:18-cv-08068
     _____)
7
8
9
10
11
12
13
14
15
16        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17   ELLEN FEIGAL, M.D., Volume I, taken on behalf of
18   Defendants, beginning at 9:14 a.m., and ending at
19   2:06 p.m., on Wednesday, September 29, 2021, before
20   CARLA SOARES, Certified Shorthand Reporter No. 5908.
21
22
23
24
25

Page 3

1    APPEARANCES VIA VIDEOCONFERENCE:
2
3    For the Plaintiffs:
4        MICELI LAW, LLC
5        BY:  DAVID F. MICELI, Attorney at Law
6        P.O. Box 2519
7        Carrollton, Georgia 30116
8        404.915.8886
9        dmiceli@miceli-law.com
10
11       DAVIS & CRUMP, PC
12       BY:  TREVOR B. ROCKSTAD, Attorney at Law
13       BY:  TAYLOR HARDENSTEIN, Attorney at Law
14       2601 14th Street
15       Gulfport, Mississippi 36501
16       228.863.6000
17       trevor.rockstad@daviscrump.com
18       taylor.hardenstein@daviscrump.com
19
20
21
22
23
24
25

Page 4

1    APPEARANCES VIA VIDEOCONFERENCE (Continued):
2
3    For Hospira:
4        WILLIAMS & CONNOLLY LLP
5        BY:  NEELUM J. WADHWANI, Attorney at Law
6        BY:  APARNA DATTA, Attorney at Law
7        BY:  JACK PARARAS, Attorney at Law
8        725 12th Street NW
9        Washington, DC 20005
10       202.434.5148
11       nwadhwani@wc.com
12       adatta@wc.com
13       jpararas@wc.com
14
15       CHAFFE McCALL LLP
16       BY:  PETER J. ROTOLO, Attorney at Law
17       2300 Energy Centre
18       1100 Poydras Street
19       New Orleans, Louisiana 70163
20       504.585.7022
21       rotolo@chaffe.com
22
23
24
25

Page 5

1    APPEARANCES VIA VIDEOCONFERENCE (Continued):
2
3    For Accord:
4        TUCKER ELLIS LLP
5        BY:  JULIE A. CALLSEN, Attorney at Law
6        950 Main Avenue, Suite 1100
7        Cleveland, Ohio 44113
8        216.696.2286
9        julie.callsen@tuckerellis.com
10
11
12   For Sun Pharmaceutical Industries, Inc.:
13       HINSHAW & CULBERTSON LLP
14       BY:  ROBERT M. BUCHHOLZ, Attorney at Law
15       222 North LaSalle Street, Suite 300
16       Chicago, Illinois 60601
17       617.213.7000
18       rbuchholz@hinshawlaw.com
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1   APPEARANCES VIA VIDEOCONFERENCE (Continued):
2
3   For Sandoz, Inc.:
4        GREENBERG TRAURIG LLP
5        BY:  EVAN C. HOLDEN, Attorney at Law
6        Terminus 200
7        3333 Piedmont Road NE
8        Atlanta, Georgia 30305
9        678.553.2100
10       holdene@gtlaw.com
11
12
13  For Actavis Pharma, Inc., Actavis LLC f/k/a Actavis
14  Inc., and Sagent Pharmaceuticals, Inc.:
15       ULMER & BERNE LLP
16       BY:  MICHAEL J. SUFFERN, Attorney at Law
17       600 Vine Street, Suite 2800
18       Cincinnati, Ohio 45202
19       513.698.5000
20       msuffern@ulmer.com
21
22
23  ALSO PRESENT:  Scott Slater, Video Operator
24
25            --o0o--

Page 8

1              EXHIBITS
2   NUMBER         DESCRIPTION         PAGE
3   Exhibit 5               159
4        Amended Notice of Videotaped
5        Deposition of Ellen Feigal, M.D.
6
7   Exhibit 6               161
8        Curriculum Vitae
9
10  Exhibit 7               167
11       NDA Partners LLC invoice, dated
12       8-31-20
13
14            --o0o--
15
16
17
18
19
20
21
22
23
24
25

Page 7

1              INDEX
2   WITNESS
3   ELLEN FEIGAL, M.D.           EXAMINATION
    Volume I
4
5        BY MS. WADHWANI           13
6
7              EXHIBITS
8   NUMBER         DESCRIPTION         PAGE
9   Exhibit 1          19
10       Document entitled "Expert Report of
11       Ellen G. Feigal, M.D."
12
13  Exhibit 2               25
14       Document entitled "Appendix B"
15
16  Exhibit 3          141
17       Document headed "Clinical Study
18       Report," Bates Sanofi_00724262 - 4342
19
20  Exhibit 4          152
21       Document headed "Clinical Study
22       Report," Bates Sanofi_00799597 - 9797
23
24
25

Page 9

1          REFERENCED EXHIBITS
2        EXHIBIT     PAGE
3          (None)
4
5
6        INSTRUCTIONS NOT TO ANSWER
7        PAGE     LINE
8          (None)
9
10           --o0o--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 10

1  Witness Location: Santa Rosa Valley, California
2  Wednesday, September 29, 2021
3        9:14 a.m.
4
5        P R O C E E D I N G S
6        THE VIDEO OPERATOR: Good morning. We are
7  on the record at 9:14 a.m. Pacific Daylight Time on
8  September 29th, 2021.
9        Please note that the microphones are
10 sensitive and may pick up whispering, private
11 conversations, or cellular interference.
12       Audio- and video-recording will continue
13 to take place unless all parties agree to go off the
14 record.
15       This is Media Unit 1 of the video-recorded
16 deposition of Ellen Feigal, MD, In Re: Taxotere
17 (Docetaxel) Products Liability Litigation, filed in
18 the United States District Court for the Eastern
19 District of Louisiana, MDL No. 16-2740.
20       This deposition is being held as a virtual
21 deposition via Zoom, with the witness located in
22 Santa Rosa Valley, California.
23       My name is Scott Slater from the firm
24 Veritext Legal Solutions, and I am the videographer.
25 The court reporter is Carla Soares from the firm

Page 11

1  Veritext Legal Solutions.
2        I'm not related to any party in this
3  action, nor am I financially interested in the
4  outcome.
5        Counsel and all present will now state
6  their appearances and affiliations for the record.
7  If there are any objections to proceeding, please
8  state them at the time of your appearance, beginning
9  with the noticing attorney.
10       MS. WADHWANI: Good afternoon. This is
11 Neelum Wadhwani on behalf of Hospira, and I have
12 with me today Aparna Datta and Jack Pararas.
13       MR. MICELI: Hello. This is David Miceli.
14 I'm representing the PSC and presenting Dr. Feigal.
15 On the phone as well from the firm of Davis & Crump
16 is Trevor Rockstad.
17       THE VIDEO OPERATOR: Are there any other
18 appearances?
19       MR. BUCHHOLZ: Yes. Robert Buchholz, from
20 Hinshaw & Culbertson, on the phone representing H.J.
21 Harkins and ScieGen Pharmaceuticals [sic]. No
22 objections.
23       MR. HARDENSTEIN: Taylor Hardenstein, from
24 Davis & Crump, also for plaintiff Audrey Plaisance.
25       THE VIDEO OPERATOR: Thank you very much.

Page 12

1        Will the court reporter please administer
2  the oath.
3        MR. MICELI: Before we administer the
4  oath, I do notice there are other -- it looks like
5  there are other persons in attendance from other
6  defendants. I see Evan Holden and I see Julie
7  Callsen. Should they state their appearances as
8  well, please?
9        MS. CALLSEN: This is Julie Callsen. I
10 didn't know you missed me. Julie Callsen on behalf
11 of defendant Accord.
12       MR. HOLDEN: Evan Holden, Greenberg
13 Traurig, on behalf of defendant Sandoz, Inc.
14       MR. ROTOLO: Peter Rotolo on behalf of
15 Hospira.
16       THE VIDEO OPERATOR: Thank you very much.
17       MR. SUFFERN: One more on the phone. My
18 name is Michael Suffern. It's S, like "Sam," U, two
19 F's, like "Frank," E-R-N, and I represent Actavis
20 Pharma, Inc., Actavis LLC, and Sagent
21 Pharmaceuticals, Inc. Thank you.
22       MR. MICELI: Thank you all.
23       ELLEN FEIGAL, M.D.,
24 having been administered an oath, was examined and
25 testified as follows:

Page 13

1              EXAMINATION
2  BY MS. WADHWANI:
3        Q  Good afternoon, Dr. Feigal. Or as it is
4  for you, good morning.
5        A  Good morning.
6        Q  How are you today?
7        A  I'm good. Thank you.
8        Q  Good.
9        My name is Neelum Wadhwani. I briefly
10 introduced myself to you off the record before we
11 began today.
12       But before this morning, you and I have
13 never met before, correct?
14       A  Correct.
15       Q  So is this the first time I've taken your
16 deposition?
17       A  Yes.
18       Q  But you have given depositions in the past
19 regarding docetaxel, right?
20       A  Correct.
21       Q  And you've also provided testimony in a
22 trial involving docetaxel, correct?
23       A  Correct.
24       Q  Were you under oath at those depositions
25 and at trial?

4 (Pages 10 - 13)

1     A  Yes.
2     Q  Did you provide truthful testimony in each
3  of those depositions and at trial?
4     A  Yes.
5     Q  Is there any testimony, sitting here
6  today, that you gave at any of those depositions or
7  at trial you can think of was not truthful?
8     A  No.
9     Q  I'm going to do my best to be efficient
10  today and to not go over some of the same testimony
11  that you've given in the past.  Okay?
12     A  Yes.
13     Q  Do you plan to testify at the upcoming
14  Kahn trial scheduled for November 2021?
15     A  Yes, I believe so.
16     Q  Is there anything to prevent you from
17  giving me complete and accurate testimony today?
18     A  No.
19     Q  Have you participated in Zoom depositions
20  in the past?
21     A  Yes, once.
22     Q  Dr. Feigal, are you having any trouble
23  hearing me?  Would you like me to increase the
24  volume of my speech or are you okay?
25     A  I'm okay.  Thank you.  Can you hear me

1  okay?
2     Q  I can hear you very well.  Thank you.  I
3  just wanted to make sure that you weren't having
4  trouble hearing me.
5     A  I'll let you know if I cannot.  Thanks.
6     Q  Thank you.
7     Where are you located today, Dr. Feigal?
8     A  Santa Rosa Valley, California.
9     Q  Is there anyone in the room where you are
10  having this deposition taken?
11     A  No.
12     Q  Are there any programs open on your
13  computer other than the Zoom program?
14     A  No.
15     Q  Do you have any hard copy documents in
16  front of you?
17     A  I have my expert report from June 8th,
18  2020.
19     Q  Is that the expert report you submitted
20  for Trial 5?
21     A  That's the expert report that was
22  submitted.  Correct.
23     Q  Do you understand that expert report from
24  June 8th, 2020, is the report that you are
25  submitting for Trial 5?

1     THE WITNESS:  Is that correct, Mr. Miceli?
2     MR. MICELI:  Yes.  We adopted --
3  BY MS. WADHWANI:
4     Q  I'm asking your understanding, Dr. Feigal.
5     MR. MICELI:  Okay.
6     THE WITNESS:  I'm sorry.  Say that again.
7  BY MS. WADHWANI:
8     Q  I said, I'm asking your understanding,
9  Dr. Feigal.
10     A  That is my understanding.
11     Q  Do you know who the plaintiffs are in the
12  case that could be Trial 5?
13     A  Are you talking about this case?
14     Q  Yes.
15     A  I was given the names of the individuals.
16  Yes.
17     Q  And what are those names?
18     A  The names that I was given are on the --
19  it's on the notice of deposition.  I think it was
20  Plaisance and Guilbault.  And I may be
21  mispronouncing them.
22     Q  Is it your understanding that plaintiffs
23  in whose cases you've submitted your expert report
24  are Audrey Plaisance and Clare Guilbault?
25     A  Correct.

1     Q  Have you ever spoken with Mrs. Plaisance?
2     A  No.
3     Q  Have you had any communications of any
4  sort, verbal or written, with her at any time?
5     A  No.
6     Q  Have you ever had any communications,
7  verbal or written, of any sort at any time, with
8  Mrs. Plaisance's healthcare providers?
9     A  No.
10     Q  How about her family or friends?
11     A  No.
12     Q  Do you know what chemotherapy medications
13  Mrs. Plaisance took?
14     A  I only know she was exposed to docetaxel.
15  I don't know the other concomitant meds she may have
16  received.
17     Q  Do you know when Mrs. Plaisance received
18  chemotherapy?
19     A  Approximately.
20     Q  What's your understanding?
21     A  For both of the individuals, I believe it
22  was either 2013 or 2014.
23     Q  And how do you have that understanding?
24     A  I was provided that information.
25     Q  Did you receive that information from

1 counsel?
2    A  Correct.
3    Q  Did you review any medical records of
4 Mrs. Plaisance?
5    A  No.
6    Q  Did you review Mrs. Plaisance's plaintiff
7 fact sheet?
8    A  No.
9    Q  Do you know when -- sorry.  Strike that.
10 I already asked you that question.
11       Do you know what other treatments
12 Mrs. Plaisance had for her breast cancer?
13    A  No.
14    Q  Have you ever spoken with Mrs. Guilbault?
15    A  No.
16    Q  Have you had any communications of any
17 sort, verbal or written, with her at any time?
18    A  No.
19    Q  How about Mrs. Guilbault's healthcare
20 providers?  Have you had any verbal or written
21 communications with them at any time?
22    A  No.
23    Q  How about Mrs. Guilbault's family or
24 friends?
25    A  Have I had communications with them?  No.

1    Q  Do you know what chemotherapy medications
2 Mrs. Guilbault took?
3    A  Only -- other than the docetaxel, I do
4 not.
5    Q  Do you know what other treatments
6 Mrs. Guilbault had for her breast cancer?
7    A  Other than the docetaxel, no.
8    Q  Have you looked at any of Mrs. Guilbault's
9 medical records?
10    A  No.
11    Q  Have you looked at her plaintiff fact
12 sheet?
13    A  No.
14       MS. WADHWANI:  I'm going to mark as
15 Exhibit 1 the June 8th, 2020, expert report that you
16 were just referring to, Dr. Feigal.
17       (Exhibit 1 was marked for identification
18       and is attached hereto.)
19 BY MS. WADHWANI:
20    Q  And we're going to put it up in Exhibit
21 Share as well, but I understand you have a
22 copy of that report in front of you.
23    A  Correct.
24    Q  Whichever version you would prefer to look
25 at, either the hard copy in front of you or in the

1 Exhibit Share, is completely up to you.
2    A  Thank you.
3    Q  Do you understand that there is a
4 bellwether trial scheduled for either
5 Mrs. Plaisance's or Mrs. Guilbault's case in
6 March 2022?
7    A  I recall.  I may not recall the exact
8 date, but I do recall something is being planned.
9 Correct.
10    Q  Sitting here today, do you intend to
11 testify at that trial?
12    A  I intend to if asked.
13    Q  Have you been asked yet to testify at the
14 trial in March 2022?
15    A  I believe I have.
16    Q  Who is the defendant in that case?
17    A  Hospira.
18    Q  And what is Hospira?
19    A  It's a pharmaceutical company.
20    Q  Have you ever worked for Hospira?
21    A  Have I worked for them?  No.
22    Q  Have you ever done any consulting for
23 Hospira?
24    A  Not that I recall.
25    Q  Do you know when Hospira's docetaxel was

1 approved by the FDA?
2    A  Yes.
3    Q  When was it approved?
4    A  I believe it was approved in March of
5 2011.
6    Q  Can you please turn to page 77 of your
7 expert report?
8    A  I have.
9       MR. MICELI:  Neelum, I have refreshed the
10 folder for "Ellen Feigal Marked Exhibits," and I
11 don't see anything in there yet.
12       THE WITNESS:  Oh.  I haven't tried to --
13 is it in "Marked Exhibits"?  Is that where it is?  I
14 have it.
15       MS. WADHWANI:  Can you see it now, Dave?
16       MR. MICELI:  I will try to refresh.
17       The folder is not refreshing.  I can pull
18 it up through different means.
19       MS. WADHWANI:  Okay.  And are you okay if
20 we proceed?
21       MR. MICELI:  Excuse me?
22       MS. WADHWANI:  I said, are you okay if we
23 proceed?
24       MR. MICELI:  Yes.
25 ///

1  BY MS. WADHWANI:
2      Q  So Dr. Feigal, we're on page 77 of your
3  report that we've marked as Exhibit 1.
4        Is that your signature on page 77?
5      A  Correct.
6      Q  Have you reviewed this report since
7  June 8th, 2020?
8      A  Yes.
9      Q  When was the last time you reviewed it?
10      A  This morning.
11      Q  Does this report that we've marked as
12  Exhibit 1 contain a complete statement of all the
13  opinions you intend to express in Trial 5 against
14  Hospira?
15      A  This includes all the opinions that I
16  could potentially express.
17      Q  And does your report contain a complete
18  statement of the bases and the reasons for those
19  opinions?
20      A  I believe it does.
21        MR. MICELI:  Object to the form.
22        THE WITNESS:  I think I have a comment
23  here, "I reserve the right to supplement this
24  report."
25        But to my understanding, this -- this is

1  comprehensive in terms of what I might present.
2  BY MS. WADHWANI:
3      Q  Sitting here today, do you have any bases
4  or reasons for the opinions you have offered in your
5  expert report that you have not included in that
6  report?
7      A  I don't think so.
8      Q  Have you had any communications, written
9  or verbal, with any of the plaintiffs' other experts
10  in this case?
11      A  No.
12      Q  Have you read any of the reports prepared
13  by any of plaintiffs' other experts in this case?
14      A  I think I note what expert reports I have
15  read in my reliance report and in my footnotes to
16  this report.
17        I'm not sure if the screen is frozen or if
18  you're thinking.
19        MR. MICELI:  Neelum, are you there?
20        Jack, are you there?
21        I don't think we can assume that it's over
22  yet, Doctor.
23        THE WITNESS:  She's awfully still if she's
24  moving.
25        THE REPORTER:  Shall we go off the record

1  for a moment?
2        MR. MICELI:  Sure.  Let's go off the
3  record.
4        THE VIDEO OPERATOR:  We are off the
5  record.  The time is 9:31 a.m.
6        (Recess, 9:31 a.m. - 9:34 a.m.)
7        THE VIDEO OPERATOR:  We are back on the
8  record.  The time is 9:34 a.m.
9  BY MS. WADHWANI:
10      Q  Dr. Feigal, before the technical hiccup
11  that I experienced, I had asked you if you had read
12  any of the reports prepared by any of the other
13  plaintiffs' experts in this case, and I believe what
14  you had said was that you note in your reliance list
15  and in the footnotes to your report that we've
16  marked as Exhibit 1 the expert reports that you have
17  read in this case; is that correct?
18      A  Yes.
19      Q  Have you read any expert reports authored
20  by plaintiffs' experts that are not referred to in
21  your report or your reliance list?
22      A  No.
23      Q  Have you read the expert reports prepared
24  by any of the defendants in this MDL?
25      A  It would be listed --

1        MR. MICELI:  Object to form.
2  BY MS. WADHWANI:
3      Q  So those would also be listed in your
4  reliance list if you had read the expert reports of
5  other defense experts in this case?
6      A  Correct.
7      Q  Did those reports that you read have any
8  impact on your opinions in this case?
9      A  No, other than what I footnote in my
10  report.
11      Q  What did you do to prepare for your
12  deposition today?
13      A  I reviewed some of the materials I had
14  previously had access to as well as my expert
15  report.
16      Q  What materials did you review?
17      A  Some of the materials in my reliance
18  report.
19        MS. WADHWANI:  Let's go ahead and mark as
20  Exhibit 2 your reliance report, and then we can go
21  through that.
22        (Exhibit 2 was marked for identification
23        and is attached hereto.)
24        THE WITNESS:  I'm seeing one of those
25  infinite circles instead of the -- there it goes.

7 (Pages 22 - 25)

Page 26

1  BY MS. WADHWANI:
2      Q   Unfortunately we're going to just have to
3  muddle through this together.
4      A   Okay.  Exhibit 2?
5      Q   Yeah.  Is that available to you now?
6      A   Yes.
7      Q   Let me know when you've had a chance to
8  open that up.
9      A   It's open.
10     Q   What is Exhibit 2?
11     A   Appendix B.
12     Q   And is Appendix B your list of materials
13  reviewed that you submitted in connection with your
14  expert report in this case?
15     A   Yes.
16     Q   Which of the materials listed on your
17  "Materials Reviewed" list that we've marked as
18  Exhibit 2 did you review in preparation for your
19  deposition today?
20     A   Are you able to scroll the document or am
21  I able to do that?
22     Q   I believe you are able to scroll the
23  document.
24     A   Okay.  So in terms of the reports I
25  reviewed, I reviewed the Madigan report and the

Page 27

1  David Ross report.
2      Q   You reviewed Dr. Madigan's and Dr. Ross's
3  reports in preparation for your deposition today?
4      A   Correct.  That's what you asked, right,
5  which expert reports did I review?
6      Q   Yes.
7      A   Okay.
8      Q   And then did you review anything else
9  that's listed here on your "Materials Reviewed" list
10  in preparation for your deposition today?
11     A   Let me see if I can scroll through this.
12         I actually don't know the Bates numbers by
13  memory, so I can't -- I can't say if I did or did
14  not look at any of those.
15         The other things I looked at I recall is
16  the 2017 Hospira clinical overview and the approval
17  documents for the 505(b)(2), as well as the labels.
18     Q   Did you look at the approval documents in
19  preparation for your deposition today for Sandoz'
20  505(b)(2) NDA?
21     A   No.
22     Q   Did you look at the approval documents for
23  Accord's 505(b)(2) NDA?
24     A   Not in preparation for this depo.  I
25  looked at them in the past.

Page 28

1      Q   In preparation for your deposition today,
2  did you look at the approval documents for Hospira's
3  505(b)(2) NDA?
4      A   Yes.
5      Q   Which specific approval documents did you
6  look at?
7      A   Well, it's a website, so it's pretty easy
8  to look at the exhibits for it.
9          I know I looked at 2011.  I also looked at
10  2019, the label.  And I may have looked at some of
11  the other labels along -- along the way.
12     Q   Did you look at the FDA approval letter
13  from 2011 for Hospira's docetaxel?
14     A   Yes.  I looked at the basis of approval
15  for Hospira's product.
16     Q   Did you look at any of the reviews, for
17  example, the medical officer's review?
18     A   Yes.  I looked at the basis of approval.
19     Q   Did you look at any other reviews or
20  letters as part of the documents that you reviewed
21  on that website?
22     A   I looked at all the approval documents for
23  Hospira's 505(b)(2) that was on the website.
24     Q   Did you look at any documents that you
25  understood to be documents produced by Sanofi in

Page 29

1  preparation for your deposition today?
2      A   No.
3      Q   Did you look at any documents produced by
4  Hospira other than the 2017 clinical overview in
5  preparation for your deposition today?
6      A   No, other than what was contained in
7  Dr. Ross's report.
8      Q   Let me try and understand that a little
9  bit better.
10         Did you look at Dr. Ross's report in
11  preparation for your deposition today?
12     A   Yes.
13     Q   Did you look at any of the other
14  underlying documents cited by Dr. Ross in
15  preparation for your deposition today?
16     A   The only source documents I looked at
17  today were the 2017 Hospira clinical overview and
18  the approval documents for Hospira's 505(b)(2) and
19  the labels.
20     Q   Were the labels that you looked at
21  Hospira's labels?
22     A   Yes.
23     Q   And I think you said you believe you
24  looked at the 2011 Hospira label for docetaxel,
25  correct?

8 (Pages 26 - 29)

Page 30

1    A   Correct.
2    Q   You looked at, if I understood you
3    correctly, the 2017 Hospira docetaxel label,
4    correct?
5    A   I recall that being the year that I looked
6    at.
7    Q   And you might have looked at some of the
8    Hospira docetaxel labels between 2011 and 2019; is
9    that right?
10   A   Correct.
11   Q   Sitting here right now, do you have a
12   specific recollection of reviewing any particular
13   year label between 2011 and 2019 for Hospira's
14   docetaxel?
15   A   I don't recall.
16   Q   Were these all Hospira's U.S. labeling for
17   docetaxel?
18   A   Yeah.  The source documents I looked at
19   were U.S. labels.
20   Q   Did you look at any of Hospira's foreign
21   labeling for docetaxel in preparation for your
22   deposition today?
23   A   No.  I referred to Dr. Ross's report for
24   that and footnoted it in my report.
25   Q   So to your understanding, all Hospira's

Page 31

1    labeling outside the United States for docetaxel,
2    you relied on the descriptions of those as they were
3    represented in Dr. Ross's report, right?
4    A   That is correct.
5    Q   Have you ever looked at the foreign
6    labeling for Hospira's docetaxel at any time?
7    A   I have not.
8    Q   Turning your attention just briefly back
9    to Exhibit 2, which is your "Materials Reviewed"
10   list, are there any other documents on this list
11   that you reviewed in preparation for your deposition
12   today?
13   A   Not specifically for this deposition, no.
14   I reviewed all of them in the past.
15   Q   Did you review any deposition transcripts
16   in preparation for your deposition today?
17   A   Let's see.  I reviewed my own deposition.
18   Is that what you're asking?
19   Q   Yeah.  I'm asking if you reviewed any
20   deposition transcripts in preparation for your
21   deposition today.  So we can start with your own
22   transcripts.
23      Did you review any of your own transcripts
24   in preparation for your deposition today?
25   A   I reviewed my last deposition.  I believe

Page 32

1    it was in September of 2020.  And that deposition,
2    by the way, didn't have any exhibits.  It was just
3    the verbal.
4       And then I reviewed my trial section, and
5    that was it.
6    Q   Okay.  So let me just make sure we're
7    clear for the record.
8       You reviewed your deposition testimony
9    from September of 2020, but you did not review the
10   accompanying exhibits, correct?
11   A   I wasn't provided them.  They weren't in
12   what was provided to me.
13   Q   Okay.  So you just reviewed your testimony
14   from September of 2020, correct?
15   A   Correct.
16   Q   And then I believe that you reviewed your
17   trial testimony from the Earnest trial, correct?
18   A   That is correct.
19   Q   Did you review any of your other
20   deposition testimony in the docetaxel matters in
21   preparation for your deposition?
22   A   No.
23   Q   Did you review the deposition testimony of
24   any other expert in this case in preparation for
25   your deposition today?

Page 33

1    A   No.
2    Q   So I take it you have not read the
3    deposition testimony of Dr. Madigan that he provided
4    last week.
5    A   No.
6    Q   I'm sorry.  I asked that in a really bad
7    way.  So we have a clean record, let me ask it
8    again.
9       Did you review the deposition testimony of
10   Dr. Madigan from last week in preparation for your
11   deposition today?
12   A   No.
13   Q   Have you read Dr. Madigan's testimony from
14   last week at any point?
15   A   No.
16   Q   Did you read the deposition testimony from
17   Dr. Plunkett from last week for your --
18   A   I didn't hear the last name.  Say it
19   again.
20   Q   Have you read the deposition testimony
21   that Dr. Plunkett offered last week?
22   A   No.
23   Q   Have you read the deposition testimony
24   that Dr. Bosserman offered last week?
25   A   No.

9 (Pages 30 - 33)

Page 34

1    Q  Have you read the deposition testimony
2  from anyone you understand to be an expert for the
3  plaintiffs in this case who has provided testimony
4  in the last month?
5    A  No.
6    Q  Did you speak with any of the plaintiffs'
7  experts prior to their providing deposition
8  testimony in this matter?
9    A  No.
10    Q  How about since they gave their deposition
11  today testimony?  Have you spoken with any of
12  plaintiffs' experts in this matter since that time?
13    A  No.
14    Q  Any other kind of communications?  Text
15  messages, e-mails, letters, with any of plaintiffs'
16  experts concerning these matters?
17    A  No.
18    Q  Did you meet with or have any
19  teleconferences with any individuals to prepare for
20  your deposition today?
21    A  Just Mr. Miceli.
22    Q  When did you speak with Mr. Miceli?
23    A  I last spoke to Mr. Miceli this morning
24  about mainly the logistics.
25    Q  And I am not --

Page 35

1        MR. MICELI:  No need to disclose what we
2  talked about, Ellen.
3  BY MS. WADHWANI:
4    Q  I was just going to say, I'm not looking
5  for the content of your communications with
6  Mr. Miceli.
7        So let me ask it this way:  How much time
8  did you spend speaking with Mr. Miceli in
9  preparation for your deposition today?
10    A  Oh.  At most, maybe a phone call or two
11  that I recall.  Not -- not a lot.
12    Q  Approximately how long were those phone
13  calls?
14    A  At most, one hour.
15    Q  One hour each or one hour total that you
16  spent talking with Mr. Miceli in preparation for
17  your deposition today?
18    A  At most, one hour each.
19    Q  Do you think there were two calls or more
20  than two calls?
21    A  I think there were approximately two
22  calls, but I don't do my invoices until the end of
23  the month.
24    Q  Sitting here today, your best recollection
25  is that you spent approximately two hours talking

Page 36

1  with Mr. Miceli in preparation for your deposition
2  today; is that right?
3    A  That's approximately correct.
4    Q  Did you do anything else that we have not
5  covered to prepare for your deposition today?
6    A  No.
7    Q  I want to keep a little bit, Dr. Feigal,
8  with your "Materials Reviewed" list that we marked
9  as Exhibit 2.
10        Does this -- we had just talked about it
11  in connection with your preparation for your
12  deposition, right?
13    A  Yes.
14    Q  Now I want to move to talking about your
15  "Materials Reviewed" list in connection with the
16  preparation of your expert report that we marked as
17  Exhibit 1.  Okay?
18    A  Yes.
19    Q  Does this "Materials Reviewed" list
20  reflect the list of materials you considered in
21  writing your expert report in this case?
22        MR. MICELI:  Object to the form.
23        THE WITNESS:  This plus all the footnotes
24  in my report are what I reviewed.
25  ///

Page 37

1  BY MS. WADHWANI:
2    Q  So your materials reviewed plus any
3  documents referenced in the footnotes to your report
4  in this case reflect the materials you considered in
5  writing your expert report, correct?
6    A  Can you restate your question?
7    Q  Sure.
8        Are the materials listed in your
9  "Materials Reviewed" list and any additional
10  materials identified in the footnote to your report
11  the complete list of materials you considered in
12  preparing your expert report?
13    A  Yes, those are the tangible materials.
14    Q  I'm going to focus your attention on
15  Exhibit 2, your materials listed.
16        And you identify several Rule 26 reports,
17  correct?
18    A  Yes.
19    Q  How did you decide to review those
20  specific reports?
21    A  They were the defendants' expert reports,
22  and I asked to -- and I think -- I'm trying to look
23  at one of them.
24        Anyway, I believe I just asked for them.
25    Q  You asked for Dr. Madigan, Dr. Glaspy,

10 (Pages 34 - 37)

1  Dr. Chang, Dr. Freites-Martinez, and Dr. Ross's
2  reports in preparation for this report that we've
3  marked as Exhibit 1?
4       MR. MICELI:  Object to the form.
5       THE WITNESS:  Well, I'm trying -- the
6  report is dated June 8th.  So I've looked at the --
7  I footnote the material that I -- anyway, your
8  question is -- my report, I reviewed materials.
9  These are the materials I reviewed that both inform
10  my opinion and inform my report.
11  BY MS. WADHWANI:
12      Q  Right.  All I'm asking, Dr. Feigal, is how
13  you came to decide to review these particular
14  reports in preparing your expert report.
15      MR. MICELI:  Object to the form.
16      THE WITNESS:  How did I decide?  Well, I
17  was -- wanted to review the reports to -- because
18  one is the biostatistical expert.  The other is the
19  regulatory expert.  Dr. Madigan is the biostats;
20  David Ross is the regulatory expert for, you know,
21  the -- for the plaintiffs.  And then the others were
22  more on the defense side.
23      So I wanted to look at the clinically
24  relevant documents and the epidemiologist.
25  ///

1  BY MS. WADHWANI:
2       Q  When you say "the clinically relevant
3  documents," what do you mean by that?
4       A  Clinically relevant perspective from
5  Dr. Glaspy.
6       Q  Who is Dr. Glaspy?
7       A  He's an oncologist.
8       Q  What did you take away from Dr. Glaspy's
9  report?
10      A  I was reading it for his opinions.
11      Q  Did his opinions influence your own?
12      A  No.
13      MR. MICELI:  Object to the form.
14  BY MS. WADHWANI:
15      Q  Did you disagree with anything you read in
16  Dr. Glaspy's report?
17      MR. MICELI:  Object to the form.
18      THE WITNESS:  I have -- did I disagree
19  with anything?  I don't -- I don't have an opinion
20  on his report.  I was just reading it to look at his
21  opinions.
22  BY MS. WADHWANI:
23      Q  Well, when you were reading it, did you
24  find yourself saying, "Oh, I don't agree with that
25  statement," or "I don't agree with that opinion" --

1       MR. MICELI:  Object to the form.
2  BY MS. WADHWANI:
3       Q  -- or did you find Dr. Glaspy's reports --
4  the opinions to be reasonable?
5       MR. MICELI:  Object to the form.
6       THE WITNESS:  As I said, I don't have an
7  opinion on his report.  I was just reading it to
8  understand what he was -- what he was saying.
9  BY MS. WADHWANI:
10      Q  Did --
11      A  It didn't impact my report.
12      Q  I'm sorry for interrupting you.
13      So sitting here today, is it your
14  testimony that you neither agree nor disagree with
15  Dr. Glaspy's reports that you've identified here in
16  Exhibit 2?
17      MR. MICELI:  Object to the form.
18      THE WITNESS:  I don't have total recall,
19  sentence by sentence, of everything Dr. Glaspy wrote
20  in his reports, so I don't think I can say
21  everything -- I'm just saying I don't have an
22  opinion on it.
23      I'm not saying I agree or disagree.  There
24  may be something in there I disagree with.  But it
25  didn't impact my report.

1  BY MS. WADHWANI:
2       Q  Why did you review the reports of
3  Dr. Chang?
4       A  Once again, to see what her perspectives
5  and opinions were.
6       Q  Was there anything in Dr. Chang's reports
7  that you read that you disagreed with?
8       MR. MICELI:  Object to the form.
9       THE WITNESS:  I have -- well, this is a
10  litigation.  I obviously have different opinions
11  than Dr. Chang.
12  BY MS. WADHWANI:
13      Q  Which opinions of Dr. Chang's do you
14  differ with?
15      MR. MICELI:  Object to the form.
16      THE WITNESS:  I did not review her report
17  right before this depo, so I cannot go line by line
18  with which parts of it I disagree with.  But in
19  general, we have different opinions.
20  BY MS. WADHWANI:
21      Q  Sitting here today, do you have any
22  specific opinions of Dr. Chang's that you recall
23  disagreeing with?
24      MR. MICELI:  Object to the form.
25      THE WITNESS:  Yes.  I have a different

11 (Pages 38 - 41)

Page 42

1 opinion about interpretation of the data and the
2 selection of materials that form the basis for my
3 opinions.
4 BY MS. WADHWANI:
5 Q And which data are you referring to?
6 A As I said, I went -- you have my report
7 with all the papers, the trials, the
8 pharmacovigilance data. Those are the bases of my
9 opinions.
10 Dr. Chang has a different set of
11 statements she's making. I -- I don't agree with
12 everything she's written. I can't be more explicit
13 than that because I don't have her document right in
14 front of me, so I can't go line by line.
15 Q And sitting here today, just as you're
16 sitting here, do you recall there being anything you
17 agreed with in Dr. Chang's reports?
18 A I just don't recall. I'm sure there's
19 something in there I agree with.
20 Q And then turning to Dr. Freites-Martinez's
21 report, why did you review that report?
22 A You know, I don't recall that one offhand.
23 Sorry.
24 Q Sitting here today, is there anything you
25 recall of the opinions that Dr. Freites-Martinez

Page 43

1 offered in that report?
2 A I actually --
3 MR. MICELI: Object to the form. Sorry
4 about that.
5 THE WITNESS: I didn't recently review it,
6 so I can't comment on it.
7 BY MS. WADHWANI:
8 Q And as you sit here today, you don't
9 recall anything about Dr. Freites-Martinez's report?
10 MR. MICELI: Same objection.
11 THE WITNESS: As I said, I didn't recently
12 review it, so I can't comment on the specifics about
13 it.
14 BY MS. WADHWANI:
15 Q You note in the next section that you
16 reviewed some deposition transcripts and exhibits,
17 correct?
18 A Yes.
19 Q And just generally speaking right now,
20 with respect to the deposition transcripts you
21 identify here, how did you decide which ones to
22 review?
23 A I reviewed ones that were -- where I
24 wanted to know their opinions and perspectives.
25 Q Did any of those deposition transcripts

Page 44

1 influence your opinions in your expert report?
2 A No.
3 MR. MICELI: Object to the form.
4 BY MS. WADHWANI:
5 Q Do any of the opinions that you offer in
6 your expert report either implicitly or explicitly
7 respond to the deposition testimony you read?
8 A If I could --
9 MR. MICELI: Excuse me. Object to the
10 form.
11 THE WITNESS: If I -- if I could, I'd like
12 to say that some of the deposition -- I'd like to go
13 back and correct that some of the depositions were
14 helpful in forming my opinions. So I just want
15 to -- it wasn't a simple yes or no. Some of them
16 were helpful to inform my opinions.
17 BY MS. WADHWANI:
18 Q Which of these deposition transcripts were
19 helpful in forming your opinions?
20 A As I said, I have reviewed none of these
21 recently, so I can't go back and forth on all these
22 different individuals. You'd have to show me the
23 document, and then I can tell you.
24 But I was interested in Nanae Hangai's and
25 what she had to say from Sanofi. I think there were

Page 45

1 other individuals. Some of these are from Sanofi.
2 I think some of these are from Sandoz. None of them
3 are from Hospira.
4 Q And how was Ms. Hangai's deposition
5 testimony helpful to you?
6 MR. MICELI: Object to the form.
7 THE WITNESS: As I said, I haven't
8 recently reviewed these, so I really can't get into
9 specifics about it.
10 She was head of safety, and so I did have
11 the overview conclusions that she had on the
12 pharmacovigilance, and that was -- that was very
13 helpful.
14 BY MS. WADHWANI:
15 Q How was that helpful?
16 A For showing the causal association of
17 docetaxel to permanent chemotherapy-induced
18 alopecia.
19 Q And that was your takeaway from her
20 deposition testimony?
21 A That was my takeaway --
22 MR. MICELI: Object to the form. Excuse
23 me. Object to the form.
24 I want to make sure -- just take a breath,
25 a beat. Thank you.

12 (Pages 42 - 45)

1      THE WITNESS:  I'm talking now, I think,
2  more about her report than her deposition.
3  BY MS. WADHWANI:
4      Q   And I'm focused on her deposition
5  testimony, Dr. Feigal.
6      I'm really just trying to understand, you
7  know, as you sit here today, what you remember about
8  this deposition testimony that might have been
9  helpful to you, because you said you had found some
10  of the deposition testimony helpful.
11      MR. MICELI:  Object to the form.
12      Go ahead.
13      THE WITNESS:  As I have answered multiple
14  times, I have not recently reviewed these, so I
15  can't comment on the specifics of what may or may
16  not have been helpful.
17      I'd have to -- you'd have to actually show
18  me the document, and I could review it and let you
19  know, to refresh my memory.  I don't have total
20  recall.  There's a lot of documents involved.
21  BY MS. WADHWANI:
22      Q   If you turn to page 2 of your "Materials
23  Reviewed" list --
24      A   I think I'm on that page.
25      Q   Okay.  Great.

1      A   Maybe not.  Okay.
2      Q   The second bullet down on page 2 of your
3  "Materials Reviewed" list is "Taxotere/Docetaxel
4  Labels."
5      In preparing your expert report, which
6  Taxotere/docetaxel labels did you specifically
7  review?
8      A   Well, some of it is redundant with the
9  last three bullets.  But I reviewed the Sanofi
10  Taxotere/docetaxel labels, and in addition, I've
11  reviewed Sandoz's, Accord's, and Hospira's.
12      Q   And in preparation for your report, do you
13  recall what year or years the Hospira labels were
14  that you reviewed?
15      A   I think -- as you asked and I answered
16  previously, I think I said it was 2011, 2019, and
17  there may have been some labels that I reviewed in
18  the intervening years.
19      Q   So when I asked you that question last
20  time, that was a little bit of a different question.
21  I asked you what labels you reviewed in preparation
22  for your deposition.
23      Your answer may be the same, but what I'm
24  asking you now is, when you prepared this report,
25  did you review the 2011 and 2019 Hospira docetaxel

1  labels?
2      A   Yes.
3      MR. MICELI:  Object to the form.
4      THE WITNESS:  Yes.  I wasn't sure if you
5  heard my response.
6  BY MS. WADHWANI:
7      Q   Thank you very much.  Sometimes I have a
8  bit of a tough time hearing, so I appreciate that.
9      We've already touched on the 2017 Hospira
10  clinical overview and the approval documents for
11  Hospira's NDA when we talked earlier this morning
12  about documents you reviewed in preparation for your
13  deposition.
14      Are the approval documents for Hospira's
15  505(b)(2) NDA that you reviewed in preparing your
16  report the same ones that you reviewed in preparing
17  for your deposition today?
18      A   Yes.
19      Q   Did you read any additional approval
20  documents for Hospira's 505(b)(2) in preparation of
21  your report?
22      A   The clinical overview, 2017.
23      Q   Now, Dr. Feigal, it's true that your
24  expert report does not mention the two specific
25  plaintiffs in this case, Audrey Plaisance and Clare

1  Guilbault, correct?
2      A   Correct.
3      Q   And I want to first focus my next set of
4  questions on Mrs. Plaisance, and then we'll move to
5  Mrs. Guilbault.  Okay?
6      A   Yes.
7      Q   Have you read Mrs. Plaisance's deposition?
8      A   No.
9      Q   What about the depositions of
10  Mrs. Plaisance's family members?  Have you read
11  those?
12      A   No.
13      Q   Have you reviewed the depositions of
14  Mrs. Plaisance's physicians?
15      A   No.
16      Q   Do you know why Mrs. Plaisance's
17  oncologist prescribed docetaxel to her?
18      A   I think so.
19      Q   What's your understanding?
20      A   Because she has breast cancer.
21      Q   Do you have an understanding of why
22  Mrs. Plaisance's oncologist chose docetaxel
23  specifically?
24      A   I do not.
25      MR. MICELI:  Object to the form.

13 (Pages 46 - 49)

Page 50

1  BY MS. WADHWANI:
2      Q  Do you know what materials
3  Mrs. Plaisance's oncologist reviewed and considered
4  when deciding to prescribe docetaxel to her?
5          MR. MICELI:  Object to the form.
6          THE WITNESS:  No.
7  BY MS. WADHWANI:
8      Q  Would you agree that Mrs. Plaisance's
9  oncologist would be the best source of information
10  regarding what she reviewed and considered in
11  deciding to prescribe docetaxel to Mrs. Plaisance?
12          MR. MICELI:  Object to the form.
13          THE WITNESS:  Are you asking if asking the
14  physician who treated her would be the best person
15  to ask about what they reviewed before prescribing
16  it?  My answer to that question would be yes.
17  BY MS. WADHWANI:
18      Q  So I take it then that you're not here to
19  offer opinions on what information Mrs. Plaisance's
20  oncologist relied upon in prescribing breast cancer
21  treatments to Mrs. Plaisance, correct?
22      A  That is correct.
23          MR. MICELI:  Object to the form.
24  BY MS. WADHWANI:
25      Q  Do you know what discussions

Page 51

1  Mrs. Plaisance had with her oncologist and her other
2  healthcare providers regarding her breast cancer
3  treatment options?
4      A  I do not.
5      Q  Do you know what discussions
6  Mrs. Plaisance had with her oncologist and other
7  healthcare providers regarding the risks and
8  benefits of her cancer treatment options?
9          MR. MICELI:  Object to the form.
10          THE WITNESS:  I do not.
11  BY MS. WADHWANI:
12      Q  Do you know what information
13  Mrs. Plaisance was provided regarding the risks and
14  benefits of her cancer treatments?
15      A  No.
16          MR. MICELI:  Same objection.
17  BY MS. WADHWANI:
18      Q  Do you have any knowledge of
19  Mrs. Plaisance's current medical condition?
20      A  I do not.
21      Q  So I take it that you're not going to give
22  any opinions about the medical care and treatment of
23  Mrs. Plaisance, correct?
24      A  That is correct.
25      Q  And that you're not providing any opinion

Page 52

1  that docetaxel caused Mrs. Plaisance to have
2  permanent hair loss, correct?
3          MR. MICELI:  Object to the form.
4          THE WITNESS:  I am not providing any
5  specific causation to a patient -- for a patient's
6  cause of their alopecia.  That is correct.
7  BY MS. WADHWANI:
8      Q  And that would apply to Mrs. Plaisance.
9  You're not here or not planning to testify
10  concerning Mrs. Plaisance's alopecia and any causes
11  of that, right?
12          MR. MICELI:  Object to the form.
13          THE WITNESS:  I think I've answered the
14  question, but no, I'm not offering any specific
15  opinions about the patient Plaisance.
16  BY MS. WADHWANI:
17      Q  Now I'm going to turn to Mrs. Guilbault.
18          Have you read Mrs. Guilbault's deposition?
19      A  No.
20      Q  What about the depositions of
21  Mrs. Guilbault's family members?  Have you read
22  those?
23      A  No.
24      Q  Have you talked with any of
25  Mrs. Guilbault's physicians about their care and

Page 53

1  treatment of her?
2      A  No.
3      Q  Have you read any of Mrs. Guilbault's
4  depositions?
5          Let me start again.  Have you reviewed the
6  depositions of any of Mrs. Guilbault's physicians?
7      A  No.
8      Q  Do you know why Mrs. Guilbault's
9  oncologist prescribed docetaxel to her?
10          MR. MICELI:  Object to the form.
11          THE WITNESS:  I think I know why.  Because
12  she has breast cancer.
13  BY MS. WADHWANI:
14      Q  Do you know why Mrs. Guilbault's
15  oncologist chose docetaxel specifically as part of
16  her treatment for breast cancer?
17      A  I do not.
18          MR. MICELI:  Object to the form.
19  BY MS. WADHWANI:
20      Q  Do you know what materials
21  Mrs. Guilbault's physicians reviewed and considered
22  when prescribing docetaxel to her?
23      A  No.
24          MR. MICELI:  Object to the form.
25  ///

14 (Pages 50 - 53)

Page 54

1  BY MS. WADHWANI:
2      Q   And would Mrs. Guilbault's physicians be
3  the best source of the information as to what they
4  considered in deciding to recommend docetaxel to
5  her?
6          MR. MICELI:  Object to the form.
7          THE WITNESS:  Her physician would be the
8  best person to ask about what they reviewed.
9  BY MS. WADHWANI:
10     Q   And so I take it that you're not here to
11 offer opinions on what information Mrs. Guilbault's
12 oncologist relied upon in prescribing breast cancer
13 treatments to Mrs. Guilbault, correct?
14         MR. MICELI:  Object to the form.
15         THE WITNESS:  I am not providing an
16 opinion on what that specific physician had in hand
17 before prescribing docetaxel to that patient.
18 BY MS. WADHWANI:
19     Q   Do you know what discussions
20 Mrs. Guilbault had with her oncologist and other
21 healthcare providers regarding her breast cancer
22 treatment options?
23         MR. MICELI:  Object to the form.
24         THE WITNESS:  No.
25 ///

Page 55

1  BY MS. WADHWANI:
2      Q   Do you know what discussions
3  Mrs. Guilbault had with her oncologist and other
4  healthcare providers regarding the best -- regarding
5  the risks and benefits --
6          MR. MICELI:  Object to the form.
7          MS. WADHWANI:  Sorry.
8          MR. MICELI:  I --
9          MS. WADHWANI:  That's all right.  We'll
10 start again so we get a clear record.
11         MR. MICELI:  Thank you.
12 BY MS. WADHWANI:
13     Q   Do you know what discussions
14 Mrs. Guilbault had with her oncologist and her other
15 healthcare providers regarding the risks and
16 benefits of her cancer treatment options?
17         MR. MICELI:  Object to the form.
18         THE WITNESS:  No.
19 BY MS. WADHWANI:
20     Q   Was that a no?
21     A   That was a no.
22     Q   Do you know what information
23 Mrs. Guilbault was provided regarding the risks and
24 benefits of her cancer treatment options?
25         MR. MICELI:  Object to the form.

Page 56

1          THE WITNESS:  No, and I'm not providing
2  any patient-specific opinions.
3  BY MS. WADHWANI:
4      Q   Do you have any knowledge of
5  Mrs. Guilbault's current medical condition?
6          MR. MICELI:  Object to the form.
7          THE WITNESS:  I do not.
8  BY MS. WADHWANI:
9      Q   I take it that you're not providing any
10 opinions about the medical care and treatment of
11 Mrs. Guilbault, correct?
12         MR. MICELI:  Same objection.
13         THE WITNESS:  I -- I am not providing any
14 opinions on her specific medical care.  That is
15 correct.
16 BY MS. WADHWANI:
17     Q   And I take it then that you're not
18 providing any opinions that docetaxel caused
19 Mrs. Guilbault's hair loss, correct?
20         MR. MICELI:  Object to the form.
21         THE WITNESS:  To answer your question, I'm
22 not providing a specific cause for her.  I clearly
23 am looking at the general causation issue of
24 docetaxel and permanent chemotherapy-induced
25 alopecia.

Page 57

1  BY MS. WADHWANI:
2      Q   Fair enough, Dr. Feigal.  And we'll be
3  getting to your general causation opinion in a
4  little bit.
5          What I'm asking you, though, is, are you
6  planning to say that Mrs. Guilbault experienced
7  permanent hair loss as a result of docetaxel?
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  I think I've answered --
10 I've been asked and answered.  But I'm not offering
11 any patient-specific opinions on this individual.
12 BY MS. WADHWANI:
13     Q   Including any opinions that Mrs. Guilbault
14 experiences permanent chemotherapy-induced hair loss
15 from docetaxel, correct?
16         MR. MICELI:  Object to the form.
17         THE WITNESS:  I'll just repeat my answer.
18 I'm not providing any opinions on this patient.
19 BY MS. WADHWANI:
20     Q   Even with our blips, we have been going
21 over an hour.  Would you like to take a break?
22     A   Are you talking to me?
23     Q   Yes.
24     A   I'm fine.  But if you want to, just let me
25 know.

15 (Pages 54 - 57)

Page 58

1    Q  I'm good.  I'm good.  I just wanted to
2  make sure you're okay.
3    A  Yeah.
4    Q  You are not a regulatory expert, correct?
5    A  For this case, I am not a -- the
6  regulatory expert.  That is correct.
7    Q  If you could please turn to page 16 of
8  your report that we've marked as Exhibit 1, and let
9  me know when you're there.
10   A  I am there.
11   Q  Page 16 includes a section in your report
12  called "Approval for New Drugs," correct?
13   A  Correct.
14   Q  And this section discusses the approval
15  pathways for pharmaceutical medications, right?
16   A  Yes.
17   Q  What was the approval pathway for
18  Hospira's docetaxel?
19   A  505(b)(2).
20   Q  And at a high level, what do you
21  understand that to mean?
22   A  At a high level, it's a new drug
23  application that's reviewed by the new drug division
24  at the FDA.  And at a high level, it means some of
25  the data is provided for safety and efficacy that

Page 59

1  the -- Hospira does not have right of reference.
2    Q  And what do you mean by "right of
3  reference"?
4    A  That it's based on the reference listed
5  drugs material or some other material in the
6  literature.
7    Q  And the 505(b)(2) pathway specifically
8  provides for and allows for that, correct?
9    A  Correct.
10   Q  Generally speaking here on pages 16
11  through 20 of your report, is it fair to say that
12  you discuss the approval processes and labeling
13  requirements for pharmaceutical medications?
14   A  Could you restate your question?
15   Q  Sure.
16      Well, let me ask you, because you can
17  probably put it in better words than I can, on pages
18  16 through 20 of your report, what information are
19  you providing?
20   A  I'm providing, at a high level, the
21  regulatory pathways for a -- for a product at the
22  FDA.
23      And on page 18, I'm providing the
24  post-marketing commitments and the post-marketing
25  safety surveillance.

Page 60

1      And then also on page 19, I'm describing
2  the type of information that goes into the
3  prescribing information, what goes on the label.
4      And then on page 20, at least the top half
5  is just continuing that discussion.  Section 5 gets
6  into more specifics that are separate from
7  Section 4.
8    Q  Correct.  And in Section 4 of your report,
9  pages 16 through 20 that you were just nicely
10  describing, is there anything specific to Hospira in
11  that portion of your report?
12   A  The regulatory pathway and the
13  responsibilities of a sponsor regarding
14  post-marketing commitments and responsibilities for
15  ensuring safety and ensuring the label is correct
16  and accurate and up to date.
17   Q  And do you refer to Hospira specifically
18  at all in this section?
19   A  It's relevant to Hospira.  Do I use the
20  company name in this section?  Is that what you're
21  asking?
22   Q  I'm asking if you refer to Hospira
23  specifically in this section.
24   A  In this section, I do not think I use the
25  name "Hospira," if that's your question.

Page 61

1    Q  Do you refer to any Hospira-specific
2  materials in this section of your report?
3      MR. MICELI:  Object to the form.
4      THE WITNESS:  The purpose of this section
5  is the background, and it's highly pertinent to
6  Hospira, but I don't use the name "Hospira" in these
7  four pages.
8  BY MS. WADHWANI:
9    Q  And do you cite to any Hospira documents
10  or documents specific to Hospira in these four
11  pages?
12     MR. MICELI:  Same objection.
13     THE WITNESS:  Well, I do not specifically
14  use the name "Hospira" in these four pages of my
15  77-page report.  But it's -- as I said, the
16  background is highly relevant to Hospira.
17  BY MS. WADHWANI:
18   Q  All I'm asking, Dr. Feigal, is, do you
19  cite to or refer to any Hospira documents in this
20  section?
21   A  In these four pages, no.
22     MR. MICELI:  Objection.  A day late and a
23  dollar short, but object to the form.
24     Just take a heartbeat there, Dr. Feigal.
25     THE WITNESS:  You can't kick me under the

16 (Pages 58 - 61)

Page 62

1 table.
2      MS. WADHWANI: A lot of changes when we do
3 these remotely.
4      Q  Do you know whether Hospira does or does
5 not have sales representatives for docetaxel?
6      MR. MICELI: Object to the form.
7      THE WITNESS: I do not.
8 BY MS. WADHWANI:
9      Q  Do you know whether Hospira had marketing
10 materials for docetaxel?
11     MR. MICELI: Object to the form.
12     THE WITNESS: Marketing materials? Other
13 than the label? Is that what you're asking?
14 BY MS. WADHWANI:
15     Q  Other than the label.
16     A  Yeah, I do not know about any of their
17 other promotional material.
18     Q  Do you consider labeling of a medication a
19 promotional material?
20     A  No. It's just -- it's -- it's part of the
21 product.
22     Q  Sorry. I didn't catch that -- that first
23 part of what you said before you said "product."
24     A  Well, the labeling is -- it's the product.
25 It's supposed to be accurate and up to date. It's

Page 63

1 part of what they -- it forms presumably the basis
2 of what they can promote.
3      Q  Right. But my question is, do you
4 consider labeling for a pharmaceutical medication to
5 be promotional material?
6      MR. MICELI: Object to the form.
7      THE WITNESS: Not -- not specifically.
8 BY MS. WADHWANI:
9      Q  Is pharmaceutical labeling FDA approved?
10     A  The pharmaceutical labeling is reviewed at
11 the time of approval of the product. That's
12 correct.
13     Q  And the FDA approves the labeling,
14 correct?
15     MR. MICELI: Object to the form.
16     THE WITNESS: At the time of approval,
17 yes.
18 BY MS. WADHWANI:
19     Q  Are you aware of whether Hospira did or
20 did not conduct clinical trials for docetaxel?
21     A  According to the basis of approval, I'm
22 not aware that Hospira conducted any clinical
23 trials.
24     Q  And do you agree it was not a regulatory
25 requirement for Hospira to conduct clinical trials

Page 64

1 for approval on its docetaxel?
2      A  Can you rephrase your question?
3      Q  Sure.
4      Is there -- was there a regulatory -- I'm
5 going to try not to trip over my own tongue today.
6 I seem to not be successful so far. I apologize.
7      Hospira's docetaxel is a 505(b)(2)
8 medication, correct?
9      A  Yes.
10     Q  Is there any regulatory requirement that a
11 505(b)(2) manufacturer conduct clinical trials for
12 approval of its product?
13     MR. MICELI: Object to the form.
14     THE WITNESS: It depends.
15 BY MS. WADHWANI:
16     Q  And it depends on --
17     A  Yes. It depends on what is available from
18 the reference listed drug.
19     So were you asking a general question or
20 were you asking a Hospira-specific question?
21     Sorry. I know I'm not supposed to ask
22 questions of you.
23     Q  I think you're anticipating my next
24 question.
25     Was there a regulatory requirement for

Page 65

1 Hospira to conduct clinical trials for approval of
2 its docetaxel product?
3      A  Your question is hard to answer as asked.
4 Do you mind if I rephrase it and answer it?
5      Q  Well, what's difficult about my question?
6      A  Well, there are regulatory requirements,
7 whether it's Hospira or Sandoz or Accord or Sanofi,
8 that have to be met in terms of safety and efficacy.
9      So when we get down to it, as it turns
10 out, the regulatory requirements were met for
11 approval of this product without requiring Hospira
12 to conduct additional clinical trials.
13     Q  So your understanding is that the FDA did
14 not require Hospira to conduct additional clinical
15 trials for approval of its docetaxel product; is
16 that what you're saying?
17     A  For the indications for which it has, that
18 is correct.
19     Q  And one of those indications was for the
20 treatment of breast cancer, right?
21     A  Correct.
22     Q  Are you aware of what the differences were
23 in Hospira's version of docetaxel as compared to
24 Taxotere?
25     A  Yes.

17 (Pages 62 - 65)

Page 66

1    Q   What's your understanding of those
2  differences?
3    A   There were at least three differences with
4  the formulation.  I believe it had citrase, a higher
5  concentration of anhydrous alcohol, and it also had
6  polyethylene glycol.
7        So there were differences in the
8  formulation and there were differences in the
9  strengths.
10       So they had a 20 milligrams per 2 ml, and
11  80 milligrams per 8 ml, and I believe 160 milligrams
12  per 16 ml.  And the latter two strengths were
13  offered in multi-dose vials.
14       So those are the differences.  There were
15  differences in formulation and there were
16  differences in strength.
17   Q   Any other differences?
18   A   Those are the ones that I recall.
19   Q   Did the differences in Hospira's docetaxel
20  versus Sanofi's affect your opinions in this case in
21  any way?
22   A   Only to the extent that it is a new drug
23  and not a generic.
24   Q   How did they affect your opinions in this
25  case?

Page 67

1    A   Because it's a -- it did go down a
2  505(b)(2).  It is a new drug.  The responsibilities
3  for the sponsor of a new drug are the same as the
4  responsibilities for a (b)(1).  So that's how it
5  affected it.
6    Q   Are all the responsibilities for a
7  505(b)(1) manufacturer the same as a 505(b)(2)
8  manufacturer?
9    A   That is correct.
10       MR. MICELI:  Object to the form.
11       Again, Ellen, please take a breath.  I
12  need to interpose objections on some questions.
13       Object to the form.
14       THE WITNESS:  They are responsible for the
15  same post-marketing surveillance, updating labels.
16  They do have the same responsibilities and
17  commitments.
18  BY MS. WADHWANI:
19   Q   So I take it that pre-approval, your
20  opinion is that they do not have the same
21  responsibilities and requirements, correct?
22       MR. MICELI:  Object to the form.
23       THE WITNESS:  The 505(b)(2) has a
24  different set of requirements because they are
25  referencing another company's data.

Page 68

1        Just to be clear, to be encompassing, it
2  could be they can also reference published
3  literature.
4        MS. WADHWANI:  Why don't we take a short
5  five-minute break.  Does that work for everyone?
6        MR. MICELI:  Okay.
7        THE WITNESS:  That's fine.
8        THE VIDEO OPERATOR:  We are off the
9  record.  The time is 10:31 a.m.
10       (Recess, 10:31 a.m. - 10:47 a.m.)
11       THE VIDEO OPERATOR:  We are back on the
12  record.  The time is 10:47 a.m.
13  BY MS. WADHWANI:
14   Q   Dr. Feigal, are you okay to proceed?
15   A   Yes.
16   Q   We had been looking at your expert report
17  in this case, which we've marked as Exhibit 1, on
18  pages 16 through 20.  And I just want to continue to
19  focus there a little while longer.
20  Specifically, I would like you to turn to page 16.
21   A   I'm there.
22   Q   I'm looking under subset 1, "Approval
23  Pathways," which says, "A description of the
24  approval pathways for a drug are provided in this
25  section as context, and I understand Dr. Ross will

Page 69

1  be the expert providing regulatory opinions."
2        So I take it -- and I think you've already
3  said today -- that you're not appearing as the
4  plaintiffs' regulatory expert in this case against
5  Hospira, correct?
6    A   That is correct.
7    Q   Is it your understanding that Dr. Ross
8  will be the plaintiffs' regulatory expert in this
9  case?
10   A   Yes.
11   Q   So I take it then that you're not offering
12  any opinions that are critical of Hospira's
13  505(b)(2) application for docetaxel; is that right?
14   A   I am offering --
15       MR. MICELI:  Object to the form.
16       THE WITNESS:  I am offering no regulatory
17  opinions.  Does that answer your question?
18  BY MS. WADHWANI:
19   Q   I just want to -- I want to make sure that
20  you and I are on the same page then so we don't have
21  any misunderstandings down the road.
22   A   Right.  And just so you understand, this
23  report is background, not just for Hospira, but this
24  report -- as you know, I've been through multiple
25  depositions, so this isn't uniquely configured for

18 (Pages 66 - 69)

1 Hospira.
2     Q   Correct.  And so I just want to make sure,
3 though, that I understand -- since I represent
4 Hospira, and we are here in a deposition involving
5 claims brought against Hospira -- that I understand
6 the full scope of your opinions specific to Hospira.
7         That's all I'm trying to understand when I
8 ask you these questions is, you know, what your
9 opinions are specific to Hospira, understanding that
10 you offer other opinions in this report that are not
11 specific to Hospira.  Correct?
12        MR. MICELI:  Object to the form only
13 because I got lost in there somewhere, Neelum.
14        MS. WADHWANI:  Strike that.  Fair enough.
15 Let's go back to the original question.
16     Q   Do you offer any opinions that are
17 critical of Hospira's 505(b)(2) application for
18 docetaxel?
19        MR. MICELI:  Object to the form.
20        THE WITNESS:  I am not offering any
21 opinion critical or positive as to the 505(b)(2)
22 pathway Hospira has taken.
23 BY MS. WADHWANI:
24     Q   And I take it, then, you're not offering
25 any opinions about the content of Hospira's

1 submissions to the FDA related to its docetaxel
2 product.
3     A   That is correct.
4     Q   And I take it that you're not providing
5 any opinions about whether Hospira complied with FDA
6 regulations, correct?
7     A   That is correct.  I am not the regulatory
8 expert for this case.
9     Q   And so then you're not offering opinions
10 about the bases and approval of FDA's Hospira's
11 docetaxel product, correct?
12     A   If I understand your question right, I
13 think that is correct.
14     Q   And because you're not appearing as a
15 regulatory expert in this case, I take it that you
16 are not here to offer opinions concerning adequacy
17 of Hospira's docetaxel labeling, correct?
18        MR. MICELI:  Object to the form.
19        THE WITNESS:  I am not offering opinions
20 as to -- it's hard to say all the things I'm not
21 doing to know what I am doing, so let me try and
22 answer your question.
23        I'm not offering regulatory opinions on
24 what -- that will be Dr. Ross who's offering
25 opinions on that, including on Hospira's label.

1 BY MS. WADHWANI:
2     Q   So you understand that Dr. Ross is
3 offering opinions concerning adequacy of Hospira's
4 labeling and that you are not, right?
5        MR. MICELI:  Object to the form.
6        THE WITNESS:  I think that is correct from
7 how you're phrasing the question.
8 BY MS. WADHWANI:
9     Q   Are you -- I didn't see in your report,
10 and so I assume that you're not going to opine that
11 Hospira's docetaxel labeling was inadequate; is that
12 correct?
13        MR. MICELI:  Same objection.
14        THE WITNESS:  I think you've asked this
15 question.  I am not -- I am not providing an opinion
16 whether it's correct or incorrect.  I'm not
17 providing an opinion on the label.  I think that
18 answers your question.
19 BY MS. WADHWANI:
20     Q   You're offering no opinions whatsoever on
21 Hospira's labeling for docetaxel; is that right?
22        MR. MICELI:  Object to the form.
23        THE WITNESS:  I -- I'm just going to
24 answer it the way I've answered.  I'm not offering a
25 regulatory opinion on Hospira's label.  That's --

1 BY MS. WADHWANI:
2     Q   I'm asking you, are you offering any
3 opinions on Hospira's labeling?
4        I didn't see any in your report, so I take
5 it you are not.
6        But I'm asking you, are you offering any
7 opinions on Hospira's labeling for docetaxel?
8        MR. MICELI:  Same objection.
9        THE WITNESS:  I think I've answered your
10 question.  I'm looking at my opinions where I
11 reference labels from Hospira.  I think I'll just
12 have to leave it as I've already answered it.
13        I think Dr. Ross is providing -- Dr. Ross
14 is the regulatory expert for this case.  He'll be
15 offering regulatory opinions.
16        I think in my opinions, I may cite some of
17 the labels from Hospira, but that's all.  I don't
18 offer a regulatory opinion on them.
19 BY MS. WADHWANI:
20     Q   And because you're not offering regulatory
21 opinions, you're not offering an opinion one way or
22 the other on the adequacy of Hospira's labeling,
23 right?
24     A   I think I've answered your question as
25 well as I can.

19 (Pages 70 - 73)

Page 74

1    Q  Well, I think, Dr. Feigal, with all due
2  respect, it's why I keep asking, because I, sitting
3  here today, don't have an understanding of whether
4  you are opining concerning the adequacy of Hospira's
5  labeling.
6        If your response is -- and I'm not
7  understanding -- "That is a regulatory question and
8  I am not offering regulatory opinions," then I think
9  I understand what you're saying.
10        So are you telling me that the question of
11  the adequacy of Hospira's labeling is a regulatory
12  question, and you are not offering regulatory
13  opinions?  Is that --
14    A  Correct.
15    Q  Thank you.
16        Are you offering any opinions about what
17  Mrs. Plaisance's oncologist would have done
18  differently if he or she would have provided a
19  different warning on the docetaxel label?
20      MR. MICELI:  Object to the form.
21      THE WITNESS:  No.  And as I mentioned
22  earlier, I'm not providing any patient- or
23  physician-specific opinions.
24  BY MS. WADHWANI:
25    Q  So just for the record, I take it then you

Page 75

1  would also say that you are not offering any
2  opinions about what Mrs. Guilbault's doctor would
3  have done differently if he had been provided a
4  different warning on the docetaxel label, correct?
5      MR. MICELI:  Same objection.
6      THE WITNESS:  I am not offering any
7  patient-specific or physician-specific opinions, and
8  that includes the two plaintiffs in this case.
9  BY MS. WADHWANI:
10    Q  Are you offering any opinion that Hospira
11  breached any type of legal, regulatory, or ethical
12  duty as it relates to docetaxel?
13      MR. MICELI:  Object to the form.
14      THE WITNESS:  I am not providing any legal
15  opinions on anything, and I'm not providing any
16  regulatory opinions.
17  BY MS. WADHWANI:
18    Q  Are you providing an opinion that Hospira
19  breached any kind of ethical duty as it relates to
20  its docetaxel products?
21    A  I don't think --
22      MR. MICELI:  Object to the form.
23      THE WITNESS:  I don't think I have any
24  opinion regarding the ethics of the company in my
25  report.

Page 76

1  BY MS. WADHWANI:
2    Q  Are you offering any opinions about what
3  Hospira should or should not have done with respect
4  to any drug safety signal for docetaxel?
5    A  Not as it pertains to regulatory issues.
6  I do bring up safety issues and how safety issues
7  can be communicated to physicians.  Not a specific
8  physician, but to physicians.  It needs to be
9  accurate; it needs to be up to date.
10    Q  But you're not providing any opinions
11  about the accuracy of Hospira's labeling at any
12  point in time, correct?
13    A  I'll just re-answer -- I'll just try to
14  re-answer it the only way I can.  I'm not offering
15  any regulatory opinions about Hospira's label.
16    Q  Can you please turn to page 74 of your
17  expert report?
18    A  Sure.  Okay.
19    Q  And the bottom of page 74, and turning
20  over to the top of page 75 of your Trial 5 report,
21  you note that your "understanding and opinions on
22  the 505(b)(2) companies are supported by the
23  analysis and opinions of plaintiffs' expert witness
24  Dr. David Ross.  I have reviewed his expert report,
25  agree with and consider his assessments valid, and

Page 77

1  incorporate his opinion regarding available
2  scientific evidence to the 505(b)(2) companies into
3  my report by reference."
4        Did I read that correctly?
5    A  You did.
6    Q  Thankfully, I did not stumble over that.
7        What did you mean by that statement?
8      MR. MICELI:  Object to the form.
9      THE WITNESS:  Well, one of my -- my
10  opinions include the fact of what was available to
11  the company and what was -- well, what the company
12  put on its ex-U.S. labels, and also -- and the fact
13  that these labels were -- what was on their label
14  regarding alopecia and its permanence or resistance
15  was on those labels, I believe, in 2012 and 2013,
16  well before it came on the label in the United
17  States.
18  BY MS. WADHWANI:
19    Q  Okay.  And so which specific assessment of
20  Dr. Ross's are you incorporating into your report?
21  Is it his assessment regarding labeling?
22    A  I think it's exactly what I --
23      MR. MICELI:  Object to the form.
24      THE WITNESS:  I think it's exactly what I
25  said.  I think it's -- he references when the labels

1  had information regarding the persistence or the
2  permanence of the alopecia.  I believe it was U.K.,
3  Israel and Hungary in 2012, and I think it was five
4  other European countries in 2013.  That's what I'm
5  referencing.
6  BY MS. WADHWANI:
7      Q  Let's turn to page 76 of your report.  I'm
8  looking specifically at No. 6 of your conclusions
9  here.
10     A  Right.
11     Q  Do you refer in that paragraph to
12  Hospira's labeling in Israel, Hungary, and the
13  United Kingdom?
14     A  That's exactly what I was referring to and
15  footnoted in the Ross expert report.
16     Q  And is the labeling from those three
17  countries for Hospira's docetaxel what you were
18  reviewing and considering as assessments in
19  Dr. Ross's report?
20         MR. MICELI:  Object to the form.
21         THE WITNESS:  When I read Dr. Ross's
22  report, those are the pertinent details I thought
23  were supportive of my Opinion No. 6.
24  BY MS. WADHWANI:
25     Q  I think you told me earlier today that you

1  have not reviewed Hospira's labeling from Israel,
2  correct?
3      A  I have not reviewed any -- I have not
4  reviewed the label from Israel.  That is correct.
5      Q  Do you have expertise in the Israeli
6  health regulatory regime and pharmaceutical
7  labeling?
8      A  For the purposes of this case, I'm not
9  providing regulatory opinions on the U.S. or on
10  foreign agencies.
11         As part of what I do in consulting, I have
12  worldwide experience.  But for purposes of this
13  case, no, I'm not doing that.
14     Q  And so for purposes of this case, you're
15  not coming in to talk about Hungary's regulatory
16  regime, correct?
17     A  That is correct.
18     Q  For purposes of this case, you're not
19  coming in to talk about requirements of labeling in
20  Hungary?
21     A  That is correct.
22     Q  Similarly, you're not planning on giving
23  opinions in this case on the labeling requirements
24  for pharmaceutical medications in Israel or the
25  United Kingdom, right?

1      A  That is correct.
2      Q  And I believe you already said this, but
3  just so that I'm clear, did you review the labeling
4  for Hospira's docetaxel from Hungary?
5      A  I did not.
6      Q  Did you review the labeling for Hospira's
7  docetaxel from the United Kingdom?
8      A  I did not.  I was relying on Dr. Ross's
9  review of those labels.
10     Q  Are there any other reviews or assessments
11  from Dr. Ross's report that you are relying upon for
12  your own?
13         MR. MICELI:  Object to the form.
14         THE WITNESS:  Not that I can recall.  I
15  think it was primarily to inform that opinion.
16         I just want to clarify, too, as it relates
17  to my reliance materials, that those are materials I
18  reviewed over the course of multiple depositions and
19  other instances where that information was useful.
20  It was not specifically for this specific Hospira
21  case, just so you understand that, in case you
22  didn't.  Yeah.
23  BY MS. WADHWANI:
24     Q  I appreciate that clarification.
25         Some of the information that you have

1  reviewed over the course of your expert work in the
2  docetaxel matter is not relevant or applicable to
3  Hospira, I take it.
4      A  They may not be uniquely important for
5  Hospira's case.  Correct.
6      Q  So for example, there would be documents
7  produced by Sanofi about Sanofi and its clinical
8  trials that are not Hospira clinical trials,
9  correct?
10     A  No.  All I'm saying is that this is the
11  laundry list of materials reviewed over the course
12  of what I have had to be deposed on or go to a trial
13  for for this multi-district litigation.  That's all
14  I'm saying.
15     Q  Since we're on the "Materials Reviewed"
16  list, let's turn to that for a moment.  We've marked
17  it as Exhibit 2.
18     A  Okay.
19     Q  You're welcome to follow me in Exhibit
20  Share or you're welcome to use your hard copy in
21  front of you.
22     A  Well, I'm just -- the only copy I have
23  is -- the reliance document, I'm just looking at
24  what's on the screen.
25     Q  Okay.

21 (Pages 78 - 81)

Page 82

1    A  Okay.
2    Q  There are several documents on your
3  materials reviewed that you referred to earlier that
4  include a Bates stamp from Sanofi, right?
5    A  I'm sorry.  That include what?  Oh, the
6  Bates numbers?  Is that what you're saying?  Yeah.
7    Q  And those are Sanofi Bates numbers, right?
8    A  Those are Bates numbers.  I don't know --
9  I don't know whose ownership they are, but that's
10  how the documents are named.
11    Q  Well, I think you told me that in terms of
12  Hospira documents, the documents that you had
13  reviewed produced by Hospira were the 2017 Hospira
14  clinical overview, right?
15    A  I think what I said is -- you asked me
16  what did I review before this deposition, and I told
17  you what I reviewed before this deposition.  That
18  was your question.
19    Q  In your "Materials Reviewed" list here at
20  Exhibit 2, you note the 2017 Hospira clinical
21  overview, right?
22    A  That's correct.
23    Q  And you told me earlier this morning that
24  in terms of preparing your expert report, in
25  addition to that clinical overview, you believe you

Page 83

1  also looked at at least the 2011 and 2019 Hospira
2  label, correct?
3    A  I think I need to clarify a few things.
4    I've written a few versions of the report
5  over time and so I reviewed all of this for the
6  report.
7    Q  Correct.  And in your "Materials Reviewed"
8  list, the specific Hospira documents that you note
9  are the 2017 Hospira clinical overview, the approval
10  documents for Hospira's 505(b)(2) NDA that you
11  accessed at drugs@fda.gov, and some Hospira
12  docetaxel labeling, correct?
13    A  The Hospira-specific documents are what
14  you stated.  That doesn't mean none of the other
15  ones are relevant.  But the Hospira-specific
16  documents are as you stated.
17    Q  And you understand that there were
18  documents that you have reviewed in preparation of
19  this report that were produced by Sanofi in this
20  litigation, correct?
21    A  Yes.  They were -- you know, they were all
22  provided to me.  I'm assuming Sanofi had to supply
23  them to legal counsel.
24    Q  You understand that Sanofi has produced
25  documents in this litigation, right?

Page 84

1    A  Correct.
2    Q  You have reviewed at least some of those
3  documents produced by Sanofi, correct?
4    A  Yeah.  And obviously you know I get
5  everything through legal.
6    Q  Fair enough.
7    A  Yeah.
8    Q  Are some of the documents that you have
9  reviewed over the years that were produced by Sanofi
10  documents internal to Sanofi?
11    MR. MICELI:  Object to the form.
12    THE WITNESS:  Are you asking are any of
13  them internal?  I mean, I don't think all of them
14  are.
15  BY MS. WADHWANI:
16    Q  Are at least some of them internal Sanofi
17  documents, company documents?
18    A  I can't tell --
19    MR. MICELI:  Object to the form.
20    THE WITNESS:  I can't tell by looking at
21  the numbers.  I'd actually have to look at the
22  documents.
23  BY MS. WADHWANI:
24    Q  As you sit here today, is it your
25  understanding generally that some of the documents

Page 85

1  you have reviewed that have been produced by Sanofi
2  are internal Sanofi company documents, just as any
3  company has its internal documents?
4    MR. MICELI:  Object to the form.
5    THE WITNESS:  I agree that these documents
6  were generated by Sanofi.  I don't know how
7  accessible or shared they were.  But I agree these
8  are -- the ones labeled Sanofi Bates numbers are
9  produced by Sanofi.
10  BY MS. WADHWANI:
11    Q  Do you have any information indicating
12  that Hospira had access to any of Sanofi's internal
13  company documents?
14    MR. MICELI:  Object to the form.
15    THE WITNESS:  I don't.  I don't have any
16  opinion on that because I didn't ask for -- I
17  don't -- I haven't reviewed any Hospira documents
18  other than what I reviewed.  So I don't know what
19  Hospira has access to.
20  BY MS. WADHWANI:
21    Q  Based on what you've seen and learned in
22  this litigation so far, do you have any knowledge as
23  to whether Hospira had access to Sanofi's internal
24  company documents?
25    MR. MICELI:  Object to the form.

22 (Pages 82 - 85)

Page 86

1     THE WITNESS:  I do not know whether they
2  had access to internal documents.
3     As I stated later -- earlier, I mean --
4  they obviously have access to data because it's on
5  the foreign labels of Hospira.
6     So whether that was from source documents
7  or from something else, I don't know.  But there was
8  stuff on the label that would have had to have come
9  from Sanofi.
10 BY MS. WADHWANI:
11    Q  But you haven't read the labels, correct?
12 The foreign labels?
13    A  The foreign labels, as I said, I referred
14 to Dr. Ross's report.
15    Q  And you don't know what information form
16 the basis for Hospira's labeling in Hungary, Israel,
17 or the United Kingdom, right?
18    A  I don't have any internal documents, I
19 don't believe, other than the 2017 clinical overview
20 from Hospira.
21    Q  And so then you can't say what data formed
22 the basis for Hospira's labeling in Hungary, Israel,
23 and the United Kingdom, right?
24    MR. MICELI:  Object to the form.
25    THE WITNESS:  I don't know the specific

Page 87

1  documents Hospira had access to to inform what they
2  put on foreign labels.
3  BY MS. WADHWANI:
4     Q  Would you defer to Hospira and its
5  employees as to whether they had access to Sanofi's
6  internal company documents or not?
7     A  I have no opinion on that because I'm not
8  opining on that for opinions about this case.
9     Q  I appreciate that.
10    All I'm asking is, would you defer to
11 Hospira's employees as to what access they did or
12 did not have to any of Sanofi's internal company
13 documents?
14    MR. MICELI:  Object to the form.
15    THE WITNESS:  I don't have any reason
16 to -- I don't have any basis to form an answer to
17 that.  Apologies.
18    Dr. Ross is the one who's the regulatory
19 expert who's looking at materials from -- internal
20 to Hospira.  Not me.
21 BY MS. WADHWANI:
22    Q  So is it your opinion that if Hospira
23 employees stated that Hospira did not have access to
24 Sanofi's internal documents, you would have a basis
25 to disagree with that?

Page 88

1     MR. MICELI:  Object to the form.
2     THE WITNESS:  I have no --
3     MR. MICELI:  Take a breath, please.
4     THE WITNESS:  I have no opinion on it.
5  You know, it's not -- it's not important to my
6  opinions.  It doesn't inform my opinions.
7  BY MS. WADHWANI:
8     Q  Dr. Feigal, you have consulted with
9  pharmaceutical companies before, correct?
10    A  Correct.
11    Q  And you have worked for pharmaceutical
12 companies before, correct?
13    A  Correct.
14    Q  And in the course of that employment, did
15 you have access to internal company documents?
16    A  Yes.
17    Q  And was it your understanding for at least
18 some of those internal company documents that you
19 were not to disclose those outside of that company?
20    A  Right, unless it's with a collaborator or
21 in licensing or some other reason.  But it would be
22 with permission.  That's correct.
23    Q  So you understand that there are documents
24 internal to pharmaceutical companies which they do
25 not share with outsiders, including other

Page 89

1  pharmaceutical companies, right?
2     MR. MICELI:  Object to the form.
3     THE WITNESS:  Yeah.  I mean, all I can say
4  is, yeah, there is confidential, proprietary
5  information.  All companies have that.  And to
6  different degrees, they exercise sharing or not
7  sharing of confidential and proprietary information.
8  BY MS. WADHWANI:
9     Q  Do you have an understanding whether
10 Sanofi shared its confidential and proprietary
11 information with Hospira related to docetaxel?
12    A  I have no knowledge of that.
13    MR. MICELI:  Object to the form.
14    THE WITNESS:  I would have no knowledge of
15 that.
16 BY MS. WADHWANI:
17    Q  Can you please turn to the top of page 72
18 of your report, which is Exhibit 1?
19    A  I'm on page 72.
20    Q  I'm right at the very top where you state
21 in that first sentence on page 72, "I had access to
22 Sanofi's review of their global pharmacovigilance
23 database that they conducted in 2011 and in 2015."
24    Are you aware of any evidence that Hospira
25 had access to Sanofi's internal analyses in 2011 or

23 (Pages 86 - 89)

1 2015?
2          MR. MICELI: Object to the form.
3          THE WITNESS: I would have no way of
4 knowing that.
5 BY MS. WADHWANI:
6     Q  Would you defer to Hospira as to whether
7 they had access to the 2011 and 2015 internal
8 analyses conducted by Sanofi?
9          MR. MICELI: Object to the form.
10         THE WITNESS: I guess all I can say is I'm
11 not -- I'm not opining on what they did or did not
12 have access to in terms of internal documents.
13 That's not part -- perhaps Dr. Ross is. Anyway,
14 it's not part -- it doesn't inform my opinions.
15         I can't answer your question. I really
16 don't know what Hospira had access to. Yes, you
17 could ask Hospira what they had access to.
18 BY MS. WADHWANI:
19    Q  And would you defer to Hospira as to what
20 they had access to in terms of Sanofi's internal
21 documents and data?
22    A  It makes no --
23         MR. MICELI: Object to the form.
24         THE WITNESS: Yeah. I don't have to defer
25 to Hospira. It makes no difference to my opinions.

1 You can defer to them. I don't have any opinion on
2 that because it doesn't -- it doesn't help inform my
3 opinions.
4 BY MS. WADHWANI:
5     Q  So if Hospira said they did not have
6 access to such information, would you say you don't
7 believe them?
8     A  It has no --
9          MR. MICELI: Object to the form.
10         Go ahead, Dr. Feigal.
11         THE WITNESS: What you're asking me has no
12 impact on my -- on my report or my opinions.
13 BY MS. WADHWANI:
14    Q  I'm not asking you if what I'm asking you
15 has an impact on your opinions.
16         All I'm asking you, Dr. Feigal, is if
17 Hospira said they did not have access to Sanofi's
18 internal documents --
19         (Proceedings interrupted due to technical
20         issues.)
21         MR. MICELI: Let's just go off the record
22 and figure out how we rectify the problem, if that's
23 okay with you, Neelum.
24         MS. WADHWANI: Sure.
25         THE VIDEO OPERATOR: We are off the

1 record. The time is 11:20 a.m.
2         (Recess, 11:20 a.m. - 11:38 a.m.)
3         THE VIDEO OPERATOR: We are back on the
4 record. The time is 11:38 a.m.
5         MS. WADHWANI: Okay. I think for the
6 record, where I understand we left off, there might
7 have been a question pending. If there was, I'll
8 just withdraw that question and we'll move on. If
9 there's not a question pending, we have the question
10 and then the answer from Dr. Feigal, and it was my
11 turn to ask another question anyway.
12         Is that fair?
13         THE WITNESS: Fine with me.
14         MR. MICELI: Fair enough.
15 BY MS. WADHWANI:
16    Q  Dr. Feigal, can you please turn to page 71
17 of your expert report?
18    A  Okay. I'm there.
19    Q  Okay. And I'm looking at the sentence
20 right at the bottom of page 71. Would you mind
21 reading that for me, please?
22    A  "During the time these studies were being
23 published, the European Medicines Agency had ongoing
24 iterative discussions with the company regarding
25 PCIA."

1     Q  When you wrote the statement, were you
2 referring to Hospira as the company here?
3     A  As stated earlier, this is a report that
4 was applicable to multiple different defendants. I
5 may have been referring to Sanofi, although I think
6 a part of that does apply to Hospira as well.
7         But -- does that answer your question?
8     Q  Let me ask another follow-up just so I'm
9 clear.
10         Did you review any communications that
11 Hospira has had with the EMA related to docetaxel?
12    A  I have no internal documents from Hospira,
13 so no.
14    Q  Have you reviewed --
15    A  Well, I do have one document. I guess the
16 2017 clinical overview, I do -- I do have that,
17 where I think there is a reference in there about a
18 regulatory agency interaction.
19         But in my report, I was -- I was probably
20 referring to the Sanofi interaction, but I am aware
21 that other interactions have taken place with other
22 of the defendants.
23         But no, I have -- sorry for the
24 long-winded answer -- I have no internal documents
25 from Hospira.

24 (Pages 90 - 93)

1    Q   Do you have any documents showing direct
2  communications between the EMA and Hospira related
3  to docetaxel?
4    A   No.
5       And I'm sorry to retract.  I do have one
6  internal document, that 2017 clinical overview.  I
7  think there's a reference to a regulatory
8  interaction in that document.
9       I don't have the document right in front
10 of me, but I think Hospira -- maybe it's Pfizer, the
11 company that acquired Hospira -- makes reference to
12 an agency interaction in that document.
13   Q   Do you have any letters or submissions
14 that were sent by Hospira to the EMA?
15   A   No, I do not.
16   Q   Do you have any communications that were
17 authored by the EMA and sent to Hospira?
18   A   No.
19   Q   Now, Dr. Feigal, in your report, you cite
20 the NCCN guidelines, correct?
21   A   Correct.
22   Q   What are the NCCN guidelines?
23   A   So they're the National Comprehensive
24 Cancer Network, and they've been in existence for
25 over 25 years to provide comprehensive information

1  regarding treatment options for a variety of cancer
2  indications.  And I'll stop there.
3    Q   I'm sorry.  I'm not meaning to cut you
4  off.  If you were going to say something more,
5  please go ahead.
6    A   I could go on and on, but you don't want
7  me to.
8    Q   You, in your report, on pages 32 through
9  34, cite to a few different versions of the NCCN
10 guidelines.  For the NCCN guidelines for early-stage
11 breast cancers, in general, you cite to the
12 January 2008 Version 2 NCCN guidelines and the 2018
13 Version 3 NCCN guidelines.
14      Why do you cite to those particular
15 versions?
16   A   I -- as I mentioned to you earlier, this
17 report is a leveraged version that's applicable to a
18 multitude of defendants in the multi-district
19 litigation.
20      And so at the time, I was providing
21 specific guidance relevant to the years in which
22 those patients may have been treated.
23   Q   And you also cite to the May 2013 version
24 of the NCCN guidelines for HER2-positive breast
25 cancers on page 33, correct?

1    A   That's right.  That's correct.
2    Q   Is your reason for citing to those
3  particular guidelines the same reason you just gave
4  me?
5    A   Exactly.  Yes.
6    Q   In your report, you do not cite to the
7  2013 NCCN guidelines for HER2-negative breast
8  cancer, right?
9    A   No.  At one point I decided it's probably
10 too much information because there's so many
11 different cases that were treated in different
12 years.
13      And since I'm not doing patient-specific
14 opinions, I felt it probably was not critical to
15 have a yearly blow-by-blow of what the NCCN
16 guidelines said.
17   Q   Do you know one way or the other whether
18 Mrs. Plaisance had HER2-positive or HER2-negative
19 breast cancer?
20   A   It's my recall that she was HER2-negative.
21   Q   And do you know one way or the other
22 whether Mrs. Guilbault had HER2-positive or
23 HER2-negative breast cancer?
24   A   It's my recall she was negative, also.
25   Q   I think you told me earlier today that

1  it's your recollection that Mrs. Plaisance received
2  chemotherapy in either 2013 or 2014, right?
3    A   Correct.
4    Q   And that it's also your recollection that
5  Mrs. Guilbault received chemotherapy in either 2013
6  or 2014, right?
7    A   That is correct.
8    Q   Can you please turn to page 36 of your
9  report?
10   A   I'm there.
11   Q   You cite in the basically last paragraph
12 of page 36 published clinical trial results from
13 TAILORx, right?
14   A   Correct.
15   Q   And the specific article you refer to is
16 Footnote 67, right?
17   A   Correct.
18   Q   Was that article published in 2018?
19   A   Yes, that's what I have as the date.
20   Q   And would you agree that the findings in
21 that publication were not available to
22 Mrs. Guilbault's prescribers in 2013?
23   A   I agree that the results from that study,
24 unless some interim results were shared, were not
25 available.  Certainly the final results were not

1  available at an earlier point in time.
2      Q  Okay.  So just so we're clear on the
3  record, you agree that the final results from the
4  study as reported in the article at Footnote 67 were
5  not available in 2013, correct?
6          MR. MICELI:  Object to the form.
7          THE WITNESS:  That is -- that is correct.
8  Final results reported in 2018 would not have been
9  available five years earlier in 2013.
10  BY MS. WADHWANI:
11      Q  Dr. Feigal, do you agree that there are
12  many potential causes of hair loss?
13          MR. MICELI:  Object to the form.
14          THE WITNESS:  You mean hair loss in
15  general, not related to chemotherapy?
16  BY MS. WADHWANI:
17      Q  Hair loss in general.  There are many
18  causes of alopecia, correct?
19      A  That is correct.
20      Q  And do you agree that there are many
21  medications that can cause alopecia?
22          MR. MICELI:  Object to the form.
23          THE WITNESS:  Can you define -- are you
24  talking about reversible alopecia?
25          It's sort of a broad term, "alopecia."

1  Can you restrict it a little bit more?
2  BY MS. WADHWANI:
3      Q  Do you agree that there are medicines that
4  can cause temporary hair loss?
5      A  Yeah.  Chemotherapy.
6      Q  And do you agree that there are medicines
7  that can cause permanent hair loss?
8      A  That can cause?
9          MR. MICELI:  Object to the form.
10          THE WITNESS:  The only one that I'm aware
11  of is docetaxel/Taxotere.
12  BY MS. WADHWANI:
13      Q  What's your basis for saying that the only
14  medicine that can cause permanent hair loss is
15  docetaxel?
16      A  Based on the extensive review I have
17  conducted for this litigation.  I looked into it
18  with randomized clinical trials, published
19  literature, looking at the database, a variety of
20  methods where I've used the -- you know, to look at
21  specific scientific methods to evaluate the data
22  that was forming my opinion for the causation of
23  docetaxel and the causation of permanent
24  chemotherapy-induced alopecia.
25          I have not seen any evidence for causation

1  for any other chemotherapy drug.
2      Q  Have you done the same kind of review and
3  examination that you conducted in preparing your
4  opinions in this case in your report with any other
5  chemotherapy medication?
6      A  Well, I looked at all the other
7  chemotherapy medications that are given to patients
8  with early-stage, you know, non-metastatic breast
9  cancer.
10          And in my review of the worldwide
11  literature and the papers, the abstracts, the
12  randomized clinical trials, I -- I saw no evidence
13  for causation with the other -- with the other
14  products.
15      Q  Have you conducted a similar type of
16  review of any other non-chemotherapy medications to
17  determine whether they can cause permanent hair
18  loss?
19      A  Well, since the topic of the litigation
20  was permanent chemotherapy-induced alopecia, no, I
21  didn't look at non-chemotherapy.
22      Q  So fair to say, Dr. Feigal, that you're
23  not in a position to give an opinion that there is
24  no other medication than docetaxel that can cause
25  permanent hair loss, correct?

1          MR. MICELI:  Object.  Object to the form.
2          THE WITNESS:  I think your question was
3  non-chemotherapy, and that was the response I was
4  giving.
5          I did look at chemotherapy and didn't see
6  any evidence for causation other than for docetaxel.
7          Maybe restate your question.  Maybe I'm
8  answering a question you haven't asked.
9  BY MS. WADHWANI:
10      Q  My question is, have you performed an
11  examination of other medications, non-chemotherapy,
12  to determine whether they can cause permanent hair
13  loss?
14          MR. MICELI:  Object to the form.
15          THE WITNESS:  I think you've asked this
16  question, and I answered it.
17          Since the litigation is about permanent
18  chemotherapy-induced alopecia, I looked at
19  chemotherapy.  I did look at confounders, but I was
20  focused on chemotherapy because that's the topic of
21  the litigation.
22  BY MS. WADHWANI:
23      Q  So I take it you did not perform an
24  analysis and take all the steps you took in
25  preparing your report to determine whether endocrine

26 (Pages 98 - 101)

Page 102

1  therapy can cause permanent hair loss, correct?
2      A  Well, some of my -- the articles I looked
3  at, many of the patients are -- some of them take
4  endocrine therapy, some of them do not, and many of
5  the studies are controlled for endocrine therapy,
6  and the risk is still there for docetaxel.
7      Q  Did you undertake a review to determine
8  whether or not endocrine therapy can cause permanent
9  alopecia?
10      MR. MICELI:  Same objection.
11      THE WITNESS:  Only in the -- only in the
12  context that many patients -- that the studies I
13  looked at, many of the cases, the women never
14  received endocrine therapy, or in other cases, the
15  study was controlled for the exposure to endocrine
16  therapy.
17      Does that answer your question?
18  BY MS. WADHWANI:
19      Q  Did you perform a Bradford Hill analysis
20  to determine whether or not endocrine therapy can
21  cause permanent alopecia?
22      MR. MICELI:  Object to the form.
23      THE WITNESS:  Since the topic was
24  permanent chemotherapy-induced alopecia, no, I
25  didn't perform a separate analysis about

Page 103

1  endocrine-induced alopecia, which I think is the
2  appropriate term for endocrine-induced alopecia.
3  BY MS. WADHWANI:
4      Q  Can you turn to the top of page 76 of your
5  expert report, please?
6      A  Correct.  I mean, yes, I have done that.
7      Q  And you note at the top there, continuing
8  over from Opinion 4 on page 75, that "Dr. Madigan's
9  expert report demonstrated that no other
10  chemotherapy used in early-stage breast cancer,
11  other than Taxotere/docetaxel, has a safety signal
12  consistently demonstrated from the first quarter of
13  2000 to the present day."
14      Did I read that correctly?
15      A  You read that correctly.  Yes.
16      Q  Is it your opinion that there has been a
17  signal demonstrated for alopecia with docetaxel
18  since 2000?
19      A  According to the analysis that he
20  performed, yes.
21      Q  And do you agree with Dr. Madigan's
22  analysis?
23      A  He's an expert in that field, and yes, I
24  think his findings are valid.
25      Q  So is it your opinion that that signal has

Page 104

1  been consistent since 2000?
2      A  Yes.  That was the conclusion that was
3  reached.
4      Q  Can you turn to page 42 of your report,
5  please?
6      A  Okay.
7      Q  And I'm looking at the first full
8  paragraph of your report on that page that starts
9  out with, "Multiple abstracts."
10      Do you mind reading that just to give my
11  voice a little break?
12      A  You know, you're going to have to tell me
13  where on page 42.
14      Q  It's the first full paragraph starting on
15  page 42, "Multiple abstracts, publications and
16  reports."
17      A  I don't see -- oh.  It's on page 41 for
18  me.  Okay.  "Multiple abstracts" --
19      Q  One second, though, Dr. Feigal, because I
20  want to make sure that we're using the same report
21  in this case.
22      A  Why don't you -- why don't I look at what
23  you're -- we're generally using the same version,
24  but maybe pagination is sometimes a little bit
25  different between PDFs and Word documents.

Page 105

1      Do you want me to go to the exhibit?
2      Q  Well, let me just ask you a couple of
3  questions first then.
4      Is the report that you're looking at where
5  our pagination is different a printout of a Word
6  document?
7      A  Mine is a Word document.  Is yours a PDF?
8      Q  Mine is what was served on us by your
9  counsel, which, yes, was a PDF.  And it was
10  pre-paginated for us.
11      A  That's fine.
12      Q  What I have as page 42, I just want to
13  make sure the report you've been referring to, to
14  the extent you've used the report you printed
15  throughout the day, is still your June 8th, 2020,
16  report, correct?
17      A  Yeah.  Right.  I'm pulling up the exhibit
18  right now.
19      You're right.  It's on page 42 of the PDF.
20  The content is identical.  It's just the pagination
21  is a little bit -- between the Word document and the
22  PDF, the pagination probably just had some minor
23  changes.
24      Q  I just want to establish, Dr. Feigal, that
25  we are looking at -- referring to the same exact

27 (Pages 102 - 105)

Page 106

1  report today, right?
2      A  Correct.
3      Q  So I'm on the first full paragraph on
4  page 42.
5      A  Yeah.  I went to the online PDF version,
6  so I see it.  It says, "Multiple abstracts."
7      Q  Yes.  Do you mind reading that?
8      A  Yeah.  "Multiple abstracts,
9  publications and reports after FDA approval of
10  Taxotere/docetaxel have noted PCIA, starting in 2001
11  and extending into 2019.  Post-marketing
12  surveillance has demonstrated PCIA as a
13  Taxotere/docetaxel adverse event.  The cases of PCIA
14  started in 2001 and continue into 2019, and are
15  listed in Table 2, as well as briefly described in
16  the narratives below."
17      Q  Thank you.
18          Do you believe that the literature
19  establishes a signal for permanent alopecia with
20  docetaxel starting in 2001?
21      A  Yeah, absolutely.
22      MR. MICELI:  Object to the form.
23      THE WITNESS:  Let me explain the
24  difference between -- he's looking at the FAERS
25  database.  He's not looking at publications.  He's

Page 107

1  looking --
2  BY MS. WADHWANI:
3      Q  I'm just asking you -- Dr. Feigal, I think
4  you're answering a question I haven't asked you.
5          I'm just saying, do you believe the
6  literature, the scientific literature, establishes a
7  signal for alopecia with docetaxel starting in 2001?
8      MR. MICELI:  Object to the form.
9      THE WITNESS:  I agree with Dr. Madigan's
10  analysis that the signal started in 2000 based on
11  evaluating thousands and thousands of adverse
12  reports in the FDA's database, and he used valid
13  methods for doing that.
14          I am looking at published papers.  So I'm
15  just saying, we're looking at different pieces of
16  evidence.  And yes, the first paper that I found was
17  in the published paper, which means the study, and
18  adverse event reporting would have been done before
19  publication of the paper.  But I'm saying what I
20  found started in 2001.
21  BY MS. WADHWANI:
22      Q  And is it your opinion that the signal for
23  permanent alopecia with docetaxel, which was shown
24  around 2000 or 2001, has remained consistent through
25  till present day?

Page 108

1      A  Let me try and just take one step back.
2          A signal is what is being looked at with
3  evaluating thousands and thousands of adverse
4  reports in a database.
5          What I was looking for is not just a
6  signal, but I'm looking for evidence of causation.
7          He's looking at signals that you need to
8  then evaluate.  I'm looking for evidence of
9  causation.
10          So I just -- I just wanted to make that
11  clear in case it wasn't.
12      Q  And is it your opinion, then, that there
13  was evidence of causation of permanent alopecia with
14  docetaxel starting in at least 2001?
15      A  I would say there was evidence that was
16  pertinent to the conclusion of causality.  So I'm
17  looking at the totality of data.  I'm not just
18  looking at a single paper.
19          Does -- I hope that's clear.
20          I'm looking at those nine criteria when I
21  search for relevant articles.  And then when I read
22  the articles, I'm looking for how they do or do not
23  satisfy scientific criteria that are important for
24  causation.
25          And so my conclusion is based on the

Page 109

1  totality of evidence that I have evaluated.
2      Q  Okay.  Are you going to offer an opinion
3  that scientific literature from after 2009 contains
4  new information that, for the first time, provides a
5  basis to believe there's a causal relationship
6  between docetaxel and permanent alopecia?
7      MR. MICELI:  Object to the form.
8      THE WITNESS:  Yeah.  As you know, for
9  causation, I can use all data that comes in.
10          So I guess what you're asking me, as a --
11  well, at any rate, I use all data.  Does data
12  continue to come in that could strengthen the case?
13  Yes.
14  BY MS. WADHWANI:
15      Q  When do you identify the first time there
16  was information to provide a basis to believe
17  there's a causal relationship between docetaxel and
18  permanent alopecia?
19      MR. MICELI:  Object to the form.
20      THE WITNESS:  Well, let me look at my
21  tables that start on page -- so I'm looking at -- so
22  there was data from the database that I think was
23  available as early as 2011 on adverse event reports
24  coming in.  The randomized clinical trials I think
25  were all completed with follow-up by 2009 or 2010.

28 (Pages 106 - 109)

Page 110

1  I'd have to check whether they were even published
2  by that time, granted, not with -- anyway, the
3  randomized trials had been completed.
4       And the papers started appearing in 2001,
5  and quite interestingly, around the time that
6  docetaxel was approved in breast cancer.
7       All these other drugs had been around for
8  decades, and there was no permanent
9  chemotherapy-induced alopecia that had been
10 published in the literature.
11      So as I look at my table, it looks like
12 the first ones came in 2001.  The randomized
13 clinical trials had been completed -- I believe,
14 even with the long-term follow-up -- were completed
15 by 2009 or 2010.  And the database was accumulating
16 with signals as early as -- it sounds like, from
17 Dr. Madigan's report, as early as 2000.
18      So -- so I think data continues to
19 accumulate, but there was certainly data available
20 by 2011 in terms of information that was coming in
21 regarding docetaxel and the persistence,
22 irreversibility, or permanence of the alopecia that
23 was occurring.
24 BY MS. WADHWANI:
25   Q  And do you think that information that was

Page 111

1  available by 2011 provided a basis to believe that a
2  causal relationship between docetaxel and permanent
3  alopecia existed?
4       MR. MICELI:  Object to the form.
5       THE WITNESS:  I think -- yeah.  I think
6  from what I've reviewed, and from the results from
7  the randomized clinical trials, from the papers, I'm
8  looking at those that are -- yeah, I think Sedlacek
9  was already published by 2006.  I think we figured
10 out the odds ratio for that was around 54, so it was
11 a very significant odds ratio for that particular
12 study.
13      I think that the Nabholtz paper had
14 already been published.
15      Let me just see what else is during that
16 time.
17      I think Bourgeious had published his work
18 in 2010, and I think he had earlier information
19 published before then.
20      I'm just going through my table real
21 quickly.
22      And then I believe there were
23 retrospective case reports from Mitteva, from
24 Tallon; there was a Masidonski and Mahon paper; the
25 letter to the editor on permanent

Page 112

1  chemotherapy-induced alopecia; Palamaras papers.
2       So anyway, I listed by year when the
3  publications occurred.  They're not listed
4  sequentially by year because I was categorizing them
5  by the strength of the study design.
6       So there was certainly information
7  available in the public literature that were the
8  results from the randomized clinical trial, and
9  there is the FAERS database that a sponsor can
10 analyze at any point in time to look for signals for
11 their -- for their drug.
12 BY MS. WADHWANI:
13   Q  And so is it your opinion that by the end
14 of 2010, there was a basis to believe there was a
15 causal relationship between docetaxel and permanent
16 alopecia?
17   A  Well, by the information that I've been
18 reviewing and analyzing, yes, it does appear that
19 there's key pieces of information that fit the
20 scientific criteria for causation.
21   Q  Now, you mentioned Dr. Madigan and his
22 FAERS analysis.  Do you know how Dr. Madigan
23 conducted his FAERS analysis?
24   A  Yeah.  There's statistical tools that are
25 used that are called proportionality ratios, and

Page 113

1  there's three other softwares.  I think -- anyway,
2  there's a variety of abbreviations that are given
3  for -- I think there's four separate ways that he
4  analyzed the data in the FAERS database, and he
5  plotted out when the signal was first detected
6  according to these different tools that he used.
7       And as I said, it's to look for a signal.
8  It's not to look for causation.  It's to look for a
9  signal.
10   Q  And do you defer to Dr. Madigan's signal
11 identification and evaluation approach that he
12 reaches in his report?
13      MR. MICELI:  Excuse me.  Object to the
14 form.
15      THE WITNESS:  Well, to be clear, his
16 signal detection is not -- does not inform my
17 opinions other than the fact of when he thought a
18 signal was first present and could have led to
19 further investigations by the sponsor.
20      But I have -- I'm looking at all the
21 papers and the pharmacovigilance data that was
22 available to me to come to my conclusion about
23 causation.
24 BY MS. WADHWANI:
25   Q  Did you do anything to validate or

29 (Pages 110 - 113)

1  double-check Dr. Madigan's conclusions regarding
2  signal identification and evaluation?
3       MR. MICELI: Object to the form.
4       THE WITNESS: Yeah. He predefines what
5  constitutes a signal. I think it was a number of
6  two and a chi-squared of four. I don't have his
7  report right in front of me.
8       But I believe he predefined what the
9  threshold was. And I think they're pretty standard
10 for each of these different tools is what -- I mean,
11 companies have been doing signal detection for
12 decades. And this database is just full of data on
13 a broad variety of drugs. And sponsors are --
14 should be or could be very aware of what the methods
15 are to look for signals. That's part of the
16 responsibility of the sponsor.
17      And I think the FDA makes available the
18 PRR tool, open access. And I think they make some
19 of the other tools -- they're easily accessible as
20 well to do that.
21      But no. Did I use the software to go look
22 at it again? No. The only thing Dr. Madigan asked
23 me, and I did -- this was sometime back -- he wanted
24 to have me check his terms he was using, I believe,
25 for alopecia, and to check the types of drugs he was

1  looking at, you know, the types of chemotherapy
2  drugs patients with breast cancer would receive.
3       So I did give him that input. He asked
4  for it, and I provided that.
5  BY MS. WADHWANI:
6       Q  Dr. Feigal, I take it because you're not
7  being offered as the regulatory expert in this case,
8  that you're not offering opinions as to what kind of
9  pharmacovigilance was required by any pharmaceutical
10 manufacturer under the FDA regulations, correct?
11      A  No.
12      MR. MICELI: Object to the form.
13      THE WITNESS: As context, the
14 responsibility for a 505(b)(2) is the same as (b)(1)
15 for post-marketing.
16      But no, I'm not offering a regulatory
17 opinion about what Hospira should or should not have
18 done. That is correct.
19 BY MS. WADHWANI:
20      Q  Do you know if Dr. Madigan conducted his
21 signal analyses consistent with FDA best practices?
22      MR. MICELI: Object to the form.
23      THE WITNESS: I think that's a question
24 best for Dr. Madigan. But he explained what he did,
25 and, you know, he was following standard methods.

1  So I have no reason to believe they aren't
2  acceptable. But you'd have to ask him that
3  question.
4  BY MS. WADHWANI:
5       Q  Did you expect that Dr. Madigan would
6  conduct his signal identification and evaluation
7  according to FDA's best practices?
8       MR. MICELI: Object to the form.
9       THE WITNESS: I think he used the best
10 biostatistical practices, because the database is
11 open to, you know, all sponsors.
12      And since that's not something I do, I
13 would have to defer to Dr. Madigan to offer the
14 technical aspects of what he followed and how he did
15 it, but he's very familiar with using these
16 statistical approaches.
17      As I said, you should ask the
18 biostatistician, not me, regarding his use of
19 biostatistical tools.
20 BY MS. WADHWANI:
21      Q  You understand that the FDA issues best
22 practices and guidance regarding appropriate signal
23 identification and evaluation, right?
24      A  I am.
25      MR. MICELI: Object.

1       Excuse me. Dr. Feigal, I have to
2  interpose an objection.
3       And Neelum, I think we may need to go off
4  the record and you and I have a telephone
5  conversation, because I'm going to start telling the
6  witness not to answer questions based on the fact
7  that you're far afield of what her opinions are.
8  You're investigating not her opinions but her --
9  well, I'm not going to say anything further.
10      MS. WADHWANI: Dave, I respectfully
11 disagree.
12      MR. MICELI: Should we go off the record?
13      MS. WADHWANI: I respectfully disagree.
14      MR. MICELI: That's fine.
15      MS. WADHWANI: I'm just following up on
16 the things that Dr. Feigal is testifying to. My
17 questions are directly --
18      MR. MICELI: She's not testifying to
19 statistics.
20      THE WITNESS: I am not --
21      MR. MICELI: She is not --
22      Hold on, Dr. Feigal. This is not -- let's
23 just -- if you could go on mute for a second, mute
24 and turn off your speaker so you can't hear nor
25 speak at this point.

30 (Pages 114 - 117)

Page 118

1    She is not testifying about biostatistics.
2  She's already referred you to Dr. Madigan.  And
3  you're going far afield of where her opinions are.
4  I don't know that you've touched on her opinions
5  much yet.
6    And there's going to come a point in time
7  where we have to call Judge North.  I want to make
8  sure we do it early enough in this deposition if we
9  continue down this road.
10    MS. WADHWANI:  Well, Dave, I disagree with
11  you.  She is the one who points out that she cites
12  Dr. Madigan in her report.  She cites his signal
13  identification and evaluation.  She cites his FAERS
14  analysis.  She's testified to the same today.  She
15  said she relies on that information in her report.
16  I'm entitled to ask --
17    MR. MICELI:  No, she doesn't.
18    MS. WADHWANI:  -- questions related to
19  that.  That's all I've done.
20    MR. MICELI:  Well, there's --
21    MS. WADHWANI:  She has given testimony
22  that is not responsive to anything I've asked.
23    I asked her a question about Dr. Madigan,
24  and she starts talking about the sponsors of the
25  medications.

Page 119

1    So if she's going to start throwing out a
2  bunch of things, I'm entitled to follow up with
3  whatever she puts out there.
4    If your witness would constrain herself to
5  answering the question asked, I wouldn't have all
6  these follow-up questions.
7    MR. MICELI:  Well, there's two things --
8  two points we need to make.
9    First of all, you say she relies upon
10  Dr. Madigan's signal detection and signal
11  evaluation.
12    Dr. Madigan, as you know, testified that
13  he does not do signal evaluation, nor does
14  Dr. Feigal rely upon signal evaluation.  And, in
15  fact, Judge Milazzo has written three separate
16  Daubert opinions pointing out the difference between
17  signal detection and signal evaluation and pointing
18  out that Dr. Madigan does the former and not the
19  latter.
20    Secondly, she is not relying upon it.  She
21  recognizes his opinion and his signal detection.
22  She is not going to testify on signal detection or
23  evaluation.
24    And this is far afield of general
25  causation.

Page 120

1    MS. WADHWANI:  If you want to withdraw her
2  opinion on page 76, which, under "Conclusions," she
3  says, starting on page 75, "It is my opinion to a
4  reasonable degree of certainty that" -- go over to
5  the top of page 76, Conclusion 4 -- "Dr. Madigan's
6  expert report demonstrated that no other
7  chemotherapy used in early-stage breast cancer other
8  than Taxotere/docetaxel has a safety signal
9  consistently demonstrated from the first quarter of
10  2000 to present day," if she's planning to withdraw
11  that as an opinion in this case, I won't ask her
12  questions about it.
13    But she's made that an opinion in her
14  case.  She's not only made it an opinion in her
15  case, she's called attention to the fact that it is
16  one of her opinions in her case by stating, "Here
17  are my eight opinions in this case."
18    So if you want to talk to her and have her
19  come in and say she's withdrawing that opinion,
20  that's fine, Dave.
21    MR. MICELI:  She's not withdrawing that
22  opinion.
23    If you look at the top of page 76, the
24  sentence that begins with "Dr. Madigan," she points
25  out that Dr. Madigan's expert report demonstrated

Page 121

1  that no other chemotherapy drug in early-stage
2  breast cancer other than Taxotere has a safety
3  signal consistently demonstrated from 2000 to today,
4  and she makes one reference, and that is to
5  Dr. Madigan's report.
6    She is recognizing Dr. Madigan's opinion,
7  and the rest -- the prior portion of that paragraph
8  is about the published peer-reviewed literature, the
9  safety database consistently demonstrating
10  significant increased risk of permanent chemotherapy
11  alopecia -- chemotherapy-induced alopecia with
12  Taxotere/docetaxel.
13    There is a difference between her opinion
14  and her recognition of what Dr. Madigan's opinion
15  is.  That's -- she is not offering statistical
16  opinions in that paragraph.
17    MS. WADHWANI:  She's relied on Dr. Madigan
18  in her opinions.  She states it clearly.
19    Now, my suggestion is -- we can go round
20  and round and round, several rounds, and keep your
21  witness waiting, which I don't think she wants to
22  do, I don't think you want to do it, I certainly
23  don't want to do it.  I want her to be able to get
24  on with her day and get through this deposition.
25    So I suggest we, you know, take a moment,

31 (Pages 118 - 121)

Page 122

1  we come back to the deposition.  If you and I
2  continue to have disputes that we think are
3  preventing the continuation of the deposition, then
4  we can talk about whether we should call Judge
5  North.
6       MR. MICELI:  That is absolutely fine.
7       MS. WADHWANI:  Okay.  Why don't we take a
8  few minutes and go off the record and take a break,
9  and then we'll come back.
10      THE VIDEO OPERATOR:  We are off the
11  record.  The time is 12:22 p.m.
12      (Recess, 12:22 p.m. - 12:37 p.m.)
13      THE VIDEO OPERATOR:  We are back on the
14  record.  The time is 12:37 p.m.
15  BY MS. WADHWANI:
16      Q  Dr. Feigal, are you okay to proceed?
17      A  Yes.
18      Q  Dr. Feigal, are you relying on any of
19  Dr. Madigan's opinions as a basis to support any of
20  your opinions in this case?
21      A  Only the statistical -- only the
22  statistical values, and I cite it where I use it.
23      Q  And how are you relying on statistical
24  values to support your opinions in this case?
25      A  He's providing the statistical -- he's

Page 123

1  providing the statistical results.
2      Q  Are you relying on the statistical results
3  presented by Dr. Madigan in his report as a basis
4  for your opinion that docetaxel causes permanent
5  chemotherapy-induced alopecia?
6      A  He provides the statistical analysis to
7  support the strength of association.
8      Q  So --
9      A  And I cite --
10      Q  -- is that one of the bases for your
11  opinions, is his statistical analysis?
12      A  No.  He's doing the statistical analysis.
13  Not me.
14      Q  Correct.  Is the result of his statistical
15  analysis one of the bases of your opinions that
16  docetaxel --
17      MR. MICELI:  Object to the form.
18  BY MS. WADHWANI:
19      Q  -- causes permanent chemotherapy-induced
20  alopecia?
21      MR. MICELI:  Objection noted.
22      THE WITNESS:  His analysis supports the
23  statistical significance of the statistical results.
24  BY MS. WADHWANI:
25      Q  And that was useful to you in arriving at

Page 124

1  your conclusions; is that right?
2      A  The statistical result for the clinical
3  studies is what was supportive of my opinion.  It
4  didn't inform my opinion, but it was supportive.
5      Q  When you say that Dr. Madigan's expert
6  report demonstrated that no other chemotherapy used
7  in early-stage breast cancer other than
8  Taxotere/docetaxel has a safety signal consistently
9  demonstrated from the first quarter of 2000 to the
10  present day, how did that figure into your opinions
11  in this case?
12      A  I'm sorry.  Say that -- I didn't hear the
13  last part of your question.
14      Q  If you turn to page 76 --
15      A  I see the sentence.
16      Q  Do you see that last sentence that's part
17  of your Conclusion No. 4 in this case?
18      A  It has nothing to do with the first part
19  of my opinion.
20      My opinion, I think if you read it, is
21  about the peer-reviewed literature, the database,
22  all that.  That has nothing to do with signal
23  detection.
24      I'm just noting he noted a signal that was
25  detected as early as 2000.  But the first part of

Page 125

1  the bullet has nothing to do with signal detection.
2      Q  So why are you noting Dr. Madigan's expert
3  conclusions?
4      MR. MICELI:  Object to the form.
5      THE WITNESS:  His expert conclusions --
6  I'm just noting when he noted the signal is
7  detected.  That's all I'm noting.
8  BY MS. WADHWANI:
9      Q  For what purpose?  Go ahead.
10      MR. MICELI:  Object to the form.
11  BY MS. WADHWANI:
12      Q  Did you hear me, Dr. Feigal?
13      A  I said the signal detection is just --
14  that's just the result.  That's just Dr. Madigan's
15  result of the earliest point at which he detected a
16  signal.  It has nothing to do with causation -- my
17  causation opinion in the first part of that.  I was
18  just noting that's when a signal was first detected.
19  That's all.
20      Q  Why were you noting that?
21      MR. MICELI:  Same objection.
22      THE WITNESS:  Because that's when the
23  signal was first detected.  I don't know how else to
24  say it.
25  ///

32 (Pages 122 - 125)

Page 126

1  BY MS. WADHWANI:
2      Q   And are you relying on Dr. Madigan's
3  analysis for the identification of when the signal
4  was first detected?
5      A   Not at all.
6      Q   Then are you relying on Dr. Madigan at all
7  in your opinions?
8      A   As I said earlier --
9          MR. MICELI:  Object to the form.
10         THE WITNESS:  -- he did a statistical
11 analysis and calculated the P value for the -- I
12 believe the randomized clinical trials as well as
13 the -- I think four other studies that had
14 comparators, and that's supportive.
15         You can talk to Dr. Madigan about
16 specifics of that.  I'm just noting in the
17 appropriate place the strength of association.
18 BY MS. WADHWANI:
19     Q   Right.  And I'm just trying to understand
20 about your report, Dr. Feigal, and your opinions,
21 how, if at all, Dr. Madigan's results and P values
22 figure into those.
23         MR. MICELI:  Object to the form.
24         THE WITNESS:  He's the biostatistician for
25 the case and calculated, using his experience and

Page 127

1  tools, that is supportive of the strength of the
2  association, the magnitude.
3  BY MS. WADHWANI:
4      Q   So are you using Dr. Madigan's conclusions
5  to support your conclusion?
6          MR. MICELI:  Object to the form.
7          THE WITNESS:  I just want to make clear,
8  the signal detection has nothing to do with my
9  assessment of causation.  So his signal detection
10 had nothing to do with causation.
11 BY MS. WADHWANI:
12     Q   I understand your testimony, Dr. Feigal.
13         I'm really just trying to understand, if
14 Dr. Madigan's signal identification had nothing to
15 do with your causation opinion, why you're citing
16 him in your "Conclusions" section of your report.
17         MR. MICELI:  Object to the form.
18         THE WITNESS:  Only because -- only because
19 it just identifies when a signal was first detected
20 and could have been evaluated.
21 BY MS. WADHWANI:
22     Q   What purpose does that serve for your
23 opinions?
24         MR. MICELI:  Object to the form.
25         THE WITNESS:  It just is -- it aligns with

Page 128

1  the papers and everything else that was coming out
2  about alopecia and docetaxel.
3  BY MS. WADHWANI:
4      Q   So do you cite him in support of your
5  opinion?
6      A   I'm just trying to understand --
7          MR. MICELI:  Object to the form.
8          THE WITNESS:  I don't know how much more I
9  can explain this.
10         All it was doing -- and for that
11 particular bullet, I have my causation, which is
12 based on the randomized clinical trials, the
13 published papers, and the -- what I know about the
14 pharmacovigilance database.
15         I was only noting his signal detection as
16 just a time point for when the signal first
17 happened.  It's not a -- I'm not -- it's his result.
18 I'm just stating that it's the timing of when the
19 signal was detected.
20 BY MS. WADHWANI:
21     Q   I take it that you agree with
22 Dr. Madigan's conclusion.
23         MR. MICELI:  Object to the form.
24         THE WITNESS:  I -- I defer to Dr. Madigan,
25 and I suggest, if you have questions, talk to

Page 129

1  Dr. Madigan about what he did.
2          I only put it there because it sets a time
3  of when the signal was detected.
4  BY MS. WADHWANI:
5      Q   Can you turn to page 40 of your report,
6  please?
7      A   Yes.
8      Q   I'm trying to make sure I'm actually on
9  the right page.  Yep, I am.  I'm looking at 41.
10         Okay.  Let me direct your attention on
11 page 40, Dr. Feigal, to Section B,
12 "Chemotherapy-Induced Permanent, Irreversible
13 Alopecia."
14         Do you see that?
15     A   Yes.
16     Q   And I'd like to direct your attention to
17 the second sentence under that, which says, "PCIA is
18 thought to be likely a result of the hair follicle
19 being permanently damaged, and the hair density is
20 markedly reduced.  It has been hypothesized that
21 this may be due to irreversible damage of the stem
22 cells/hair matrix cells of the hair bulb, or
23 disturbance of the signaling pathway ways to the
24 secondary hair germ."
25         Is there a generally accepted view in the

33 (Pages 126 - 129)

Page 130

1  medical community concerning how docetaxel causes
2  PCIA?
3      A  I think it's a plausible -- it's a
4  plausible biologic rationale.
5      Q  Is it a generally accepted view in the
6  medical community as to the mechanism of action?
7      MR. MICELI:  Object to the form.
8      THE WITNESS:  I think there have been
9  multiple papers that theorize that if you're going
10 to have permanent chemotherapy-induced alopecia,
11 it's likely due to some irreversible damage of the
12 stem cells or the hair matrix cells of the bulb, or
13 there's some disturbance with signaling, so that the
14 signal isn't getting through.
15     Yes, so that's been in the literature, in
16 the published scientific literature.
17 BY MS. WADHWANI:
18     Q  Do you know of any peer-reviewed
19 literature that identifies a generally accepted
20 mechanism of action by which docetaxel causes
21 permanent alopecia?
22     MR. MICELI:  Object to the form.
23     THE WITNESS:  It's a plausible biologic
24 rationale.  There may be additional ones that come
25 up, but it's certainly a plausible biologic

Page 131

1  rationale that scientists have looked at.
2  BY MS. WADHWANI:
3      Q  Has the dermatological community concluded
4  that there is a generally accepted mechanism of
5  action by which docetaxel causes permanent alopecia?
6      MR. MICELI:  Object to the form.
7      THE WITNESS:  All I can say is it's a
8  plausible biologic rationale that the stem cells
9  must somehow be affected, or the signaling pathway,
10 but there may, in addition, be other reasons why it
11 can happen.
12     So it's not -- it's not concluded right
13 now.  It's plausible.
14 BY MS. WADHWANI:
15     Q  I understand your testimony about biologic
16 plausibility.
17     My question is, has it been generally
18 accepted in the dermatological community that there
19 is a known mechanism of action by which docetaxel
20 causes permanent alopecia?
21     MR. MICELI:  Object to the form.
22     THE WITNESS:  I can't speak for the whole
23 dermatologic, you know, community.  I think we have
24 a dermatologic expert you could perhaps try and
25 address that to.

Page 132

1      But it certainly has biologic plausibility
2  given what we know about the hair and given what we
3  know about stem cells.
4      So there's only so many ways I can respond
5  to your question.
6      So is it proven?  No.
7  BY MS. WADHWANI:
8      Q  Can you please turn to page 7 of your
9  report?
10     A  7?  Okay.
11     Q  Yes.
12     A  I'm there.
13     Q  I'm looking specifically at --
14     MR. MICELI:  Hold on.  I'm not there yet.
15 I'm having to scroll through my copy.  I'm sorry.
16 All right.  I'm on 7 with you.
17 BY MS. WADHWANI:
18     Q  I'm focused on the section called "Scope
19 of this Report."
20     Do you see that?
21     A  Yes.
22     Q  And that section, as it announces,
23 describes the parameters of your opinions; fair to
24 say?
25     A  I think the last sentence is more to the

Page 133

1  opinion.  The other is more of a preamble.
2      Q  Okay.  So just so I understand you
3  correctly, Dr. Feigal, are you saying that the --
4  your opinion relates to this statement you have
5  here, "I have also been asked to provide my
6  assessment on the causal relationship of
7  Taxotere/docetaxel to permanent chemotherapy-induced
8  alopecia in the adjuvant treatment of patients with
9  breast cancer"?
10     A  Correct.
11     Q  Is that what your opinions are that you
12 intend to offer, are opinions related to the causal
13 relationship of docetaxel to permanent
14 chemotherapy-induced alopecia in the adjuvant
15 treatment of breast cancer?
16     A  Correct.
17     Q  Are you providing any assessment of the
18 causal relationship of docetaxel to PCIA in the
19 neoadjuvant setting?
20     A  I don't distinguish.  I'm just assessing
21 the causal relationship of the chemotherapy in
22 patients who had breast cancer.  They may have
23 received it in the neoadjuvant setting.  They may
24 have received it in the adjuvant setting.
25     Q  Is there a reason that you specifically

34 (Pages 130 - 133)

1   noted the adjuvant treatment here?
2       A   Since in the report I talk about
3   neoadjuvant and adjuvant, it should be inclusive.
4   It includes whether it's neoadjuvant or adjuvant.
5   It's just treatment of patients who have
6   non-metastatic early-stage breast cancer.
7           I was thinking over this "adjuvant," just
8   the big term.  Neoadjuvant is just before surgery.
9       Q   And you understand that neoadjuvant and
10  adjuvant are different kinds of treatment regimens,
11  right?
12      A   And I describe that --
13          MR. MICELI:  Object to the form.
14          THE WITNESS:  I describe that in my
15  report, the difference between neoadjuvant and
16  adjuvant.
17          But in this -- in regard to this, it was
18  more of the broader term.  The early -- the
19  treatment of patients who are getting chemotherapy
20  in connection with either surgery or radiation.
21  They're treatable.  They're resectable patients.
22  BY MS. WADHWANI:
23      Q   And then turning to your first sentence
24  still in this section, "Scope of the Report," how
25  would you characterize that in terms of what you're

1   looking at here?
2       A   That's just a background.
3           MR. MICELI:  Excuse me.  Again, object to
4   the form only because I'm not sure I understand the
5   question.
6           MS. WADHWANI:  Well, Dr. Feigal is
7   answering the question.  So if she doesn't
8   understand it, she can ask, Dave.  But it sounds
9   like Dr. Feigal --
10          MR. MICELI:  That's why I'm objecting.
11  BY MS. WADHWANI:
12      Q   Go ahead, Dr. Feigal.
13      A   Well, I think what you're -- you know, I
14  included in this particular section the things that
15  I looked at.  I'm not offering opinions on
16  epidemiology, on how to diagnose breast cancer, how
17  to treat it.  I'm just saying those are the things I
18  looked at.
19      Q   Okay.
20      A   I tried to explain in the report.
21  Basically in the report, I'm setting the context.
22      Q   Dr. Feigal, do you agree that the
23  505(b)(2) pathway is an important method for
24  medicines to gain FDA approval?
25          MR. MICELI:  Object to the form.

1           THE WITNESS:  I'm trying to decide how to
2   answer because I'm not the regulatory expert.
3           But if your question is is it -- is it --
4   it's certainly an acceptable pathway for those,
5   where it's appropriate, to get a drug approved.
6   BY MS. WADHWANI:
7       Q   I take it you agree, as you state in your
8   report, that the 505(b)(2) pathway is intended to
9   encourage innovation in drug development?
10      A   That -- my answer is that's certainly the
11  intent of the pathway.
12      Q   Do you disagree with Congress for creating
13  this pathway?  Do you think it was inappropriate?
14          MR. MICELI:  Object to the form.
15          THE WITNESS:  I think Congress was wise in
16  putting this kind of pathway in place.
17  BY MS. WADHWANI:
18      Q   Why is that?
19      A   I think that these pathways are important
20  for medicines to get -- be reviewed and be provided
21  access to patients who need them.
22      Q   Do you agree that 505(b)(2) drugs mean
23  that there are more products available to patients
24  to use?
25          MR. MICELI:  Object to the form.

1           THE WITNESS:  Products that are approved
2   for the 505(b)(2) pathway and are approved, of
3   course, add to the number of products that are out
4   there.
5   BY MS. WADHWANI:
6       Q   Can you please turn to page 40 of your
7   report?
8       A   I'm there.
9       Q   Okay.  In this section,
10  "Chemotherapy-Induced Permanent, Irreversible
11  Alopecia," which you cover across several pages, as
12  part of your discussion in this section, you discuss
13  two docetaxel clinical trials, in particular the
14  TAX316 trial and the GEICAM905 [sic] trial, correct?
15      A   I -- yeah.  I discuss TAX316 and
16  GEICAM9805.
17      Q   Do you understand that those are clinical
18  trials that Sanofi conducted?
19      A   Yes.
20      Q   Do you understand that those are trials
21  that Hospira did not conduct?
22      A   Yes.
23      Q   And I take it, based on your earlier
24  testimony, that you don't know one way or the other
25  whether Hospira at any point received the clinical

Page 138

1  trial data for these studies from Sanofi, correct?
2      A  I know that Hospira had enough data to
3  have labels referring to it in their ex-U.S. levels.
4      Q  Do you know --
5      A  I do not know how they got the data.
6      Q  You don't know if Sanofi turned over their
7  SAS clinical trial files to Hospira, do you?
8      MR. MICELI:  Object to the form.
9      THE WITNESS:  I have -- since it's not
10  relevant to any of the opinions in my report, I
11  would have no knowledge of any exchange of
12  information of anything between Sanofi and Hospira.
13      MS. WADHWANI:  We're going to put up a
14  document in your Exhibit Share, Dr. Feigal.
15      THE WITNESS:  Okay.
16      MS. WADHWANI:  I'm just asking my
17  colleague to make it available to you.
18      MR. MICELI:  If you could have somebody
19  text it to me or e-mail it to me.  Thank you.
20      MS. WADHWANI:  It's just taking us a
21  second, so we appreciate your patience.
22      MR. MICELI:  That's fine.
23  BY MS. WADHWANI:
24      Q  You might want to -- let me know if when
25  you refresh you see it or whether it's still having

Page 139

1  some delays.
2      A  I see it.
3      Q  Let me know when you have that open.
4      A  I -- I see it.
5      Can you hear me?
6      MR. MICELI:  I don't have the copy yet.
7      MS. WADHWANI:  Oh, okay.
8      THE WITNESS:  I can see it.  Is it the
9  clinical study report?
10  BY MS. WADHWANI:
11      Q  Yes.
12      A  Okay.
13      MR. MICELI:  Which one is it, Neelum?
14  Because I may be able to just pull it up.
15      MS. WADHWANI:  Sure.  It's the TAX316.
16      MR. MICELI:  TAX316?
17      MS. WADHWANI:  Dated September 9th, 2010.
18      MR. MICELI:  Yeah, that's the final
19  report.  Let me see.  I'm sure I can pull this up.
20      I've got it.  I'm getting it up right now.
21      All right.  I have it up.  Thank you.
22  BY MS. WADHWANI:
23      Q  Okay.  I was going to ask, Dr. Feigal,
24  since we are just now moving into something new, and
25  you are on West Coast time -- we've only taken short

Page 140

1  breaks -- would you like to take a short break for
2  lunch and get something to eat?
3      A  I'm okay.  I'll tell you if my stomach
4  starts to growl.
5      Q  Okay.  Please do not hesitate.
6      MR. MICELI:  Thanks for checking, Neelum.
7      THE WITNESS:  Yeah, thank you.
8      MS. WADHWANI:  Okay.  So are we ready to
9  proceed?
10      MR. MICELI:  Yes, we are.
11  BY MS. WADHWANI:
12      Q  Dr. Feigal, what document are you looking
13  at in front of you that we just asked you to look
14  at?
15      A  I'm looking at the clinical study report
16  from TAX316.
17      Q  What's the date of that report?
18      A  Well, the date of the report, where would
19  that be?
20      Q  If you look on the first page about
21  two-thirds of the way down --
22      A  Okay.  Let me scroll down.
23      Q  -- you see the date September 9th, 2010.
24      Do you see that?
25      A  I'll see it in a minute.  I have to

Page 141

1  scroll.
2      MR. MICELI:  Neelum, while she's locating
3  that --
4      THE WITNESS:  I see it.
5      MR. MICELI:  -- I know that you have shown
6  her her report and the "Materials Reviewed" list.
7      Were those Exhibits 1 and 2, and this will
8  now be 3?
9      MS. WADHWANI:  Correct.  Yes.  I was just
10  about to say -- thank you, Dave -- for the record
11  that this clinical study report for Study No.
12  TAX316, dated September 9th, 2010, will be Exhibit
13  No. 3.
14      MR. MICELI:  Thank you.
15      (Exhibit 3 was marked for identification
16      and is attached hereto.)
17  BY MS. WADHWANI:
18      Q  Have you seen this report before,
19  Dr. Feigal?
20      A  Yes, I believe so.
21      Q  You refer to this report in your expert
22  report in this case, correct?
23      A  I think it's in my reliance documents, and
24  I think I refer to it on Footnote 78.
25      Q  Can you turn to page 2 of this clinical

1 study report, please?
2    A  Yes.
3    Q  I'm going to take you about halfway down
4 to objectives.
5       Do you see that?
6    A  Yes.
7    Q  Would you agree with me that the primary
8 objectives listed here are to compare disease-free
9 survival with the two chemotherapy regimens that
10 were being studied in TAX316?
11    A  Yes.
12    Q  And would you agree with me that the
13 secondary objectives are to compare overall
14 survival, toxicity, and quality of life between the
15 two regimens being studied in TAX316?
16    A  Yes.
17    Q  Is it correct that these objectives do not
18 say anything specifically about permanent or
19 irreversible alopecia?
20    A  Correct.  Presumably they're incorporated
21 in toxicity.
22    Q  Is it correct that, according to the
23 objectives identified on page 2 of Exhibit 3 here,
24 that there was not a specific objective to evaluate
25 the risk of permanent or irreversible alopecia with

1 docetaxel?
2    A  I agree that this synopsis of the clinical
3 trial is being correctly read.
4    Q  And that on page 2 of this clinical study
5 report, it lists the objectives of this TAX316
6 study, correct?
7    A  Correct.
8    Q  Can you please turn to page 41 of your
9 expert report?  And I would ask you, as cumbersome
10 as this is, to not put aside the clinical study
11 report we just marked as Exhibit 3 because I'm going
12 to go back and forth between the two.
13    A  Okay.
14    MR. MICELI:  What page?  You said 41?
15    MS. WADHWANI:  41.
16    MR. MICELI:  Okay.
17    THE WITNESS:  I'm there.
18 BY MS. WADHWANI:
19    Q  Okay.  Thank you.
20       Do you see at the top page 41 of your
21 report, it says, in connection with the TAX316
22 study, "At the end of the 10-year follow-up period,
23 PCIA was seen in 3.9 percent (n equals 29) of
24 patients on a Taxotere/docetaxel-containing regimen
25 (TAC) and 2.2 percent (n equals 16) on the control

1 (FAC)"?
2       Did I read that correctly?
3    A  You read that correctly.
4    Q  Sorry for the clunkiness.
5       Can you please turn then to page 37 of the
6 clinical study report?
7    A  Of the clinical study report?  Okay.
8 Okay.  I'm there.
9    Q  Did you base the conclusion in your report
10 that we just read that PCIA was seen in 29 TAX316
11 patients at the end of the 10-year follow-up on
12 Table 7 on page 37 of the clinical study report?
13    A  I think it must have been slightly
14 modified because I have the percentage as
15 3.9 percent rather than 4.2 percent, and for 16, I
16 have the percentage as 2.2 instead of 2.5.
17    Q  Generally speaking, were you using this
18 table for your conclusion that there were 29
19 patients who, at the end of the 10-year follow-up,
20 were experiencing PCIA?
21    A  The ongoing category, yes.  And there may
22 be other aspects of the clinical study report.  But
23 that's -- it looks like the absolute numbers are
24 correct.
25    Q  The 29 patients, in other words, are

1 included here in Table 7, right?
2    A  Yeah.  It may be in other parts of the
3 study report as well.  But anyway, yes, those
4 absolute numbers look consistent with what I have in
5 my report.
6    Q  Is there anything in this critical study
7 report that says that these patients had permanent
8 hair loss?
9    MR. MICELI:  Object to the form.
10    THE WITNESS:  They define -- I'm sorry.  I
11 might have interrupted somebody.  Did I -- do you
12 want me to answer?
13 BY MS. WADHWANI:
14    Q  I think your counsel just lodged an
15 objection.
16       And my question was, is there anything in
17 this clinical study report that says that those 29
18 patients had permanent hair loss?
19    A  My recollection is that they called it
20 ongoing.
21    Q  Do you know how Sanofi defined "ongoing"
22 in this clinical study report?
23    A  Not resolved by the end of the study
24 period.
25    Q  Is there anything in this clinical study

37 (Pages 142 - 145)

Page 146

1  report that states that these patients have
2  permanent hair loss?
3      A  In this clinical study report, you know,
4  honestly, I'd have to read it.  My recollection is
5  it's ongoing by the end of the study follow-up.
6      Q  And you interpret here "ongoing" to mean
7  permanent hair loss, right?
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  Well, by definition, by
10 definition, if it hasn't resolved within at least
11 six months, it's permanent.
12 BY MS. WADHWANI:
13     Q  So your interpretation of this table was
14 that those 29 patients had permanent hair loss,
15 right?
16     A  My interpretation of "ongoing" is based on
17 what's accepted in the literature regarding
18 permanent chemotherapy-induced alopecia, and the
19 general definition is at least six months after the
20 completion of chemotherapy.
21         My comment is it's not just my opinion.
22 It's the definition that's in the literature.
23     Q  Does the literature define what "ongoing"
24 means in this clinical study report?
25     A  The literature defines what they mean by

Page 147

1  "permanent chemotherapy-induced alopecia."  And in
2  general, if the hair does not completely recover or
3  incompletely is resolved at least six months after
4  the completion of chemotherapy, that's generally
5  accepted.  And that's in my report as well.  And I
6  think I reference where I took it from.
7      Q  And do you know whether, in this clinical
8  study report, it was ever characterized that these
9  29 patients had permanent hair loss?
10     A  In this particular clinical study report,
11 I am not aware that they categorized ongoing as
12 permanent.  I haven't read it recently, so I can't
13 guarantee it, but I -- I think they refer to it as
14 "ongoing."
15     Q  For these 29 patients, I take it you did
16 not review their medical records, correct?
17     A  I did not review the medical records of
18 these individuals.  That is correct.
19     Q  And for these 29 individuals, you did not
20 review the underlying case report forms, correct?
21     A  No, I did not review case report forms.
22     Q  For these 29 patients, you did not review
23 the patient narratives describing their medical
24 conditions, right?
25         MR. MICELI:  Object to the form.

Page 148

1          THE WITNESS:  I did not review charts or
2  case report forms.
3  BY MS. WADHWANI:
4      Q  So it's the case that other than this
5  classification as ongoing, you have not done any
6  further investigation to determine whether these 29
7  patients actually had permanent hair loss?
8          MR. MICELI:  Object to the form.
9          THE WITNESS:  The sponsor has a predefined
10 protocol and a way to could their statistical
11 analysis plans and reporting to the FDA.  And this
12 is -- the numbers that you see are consistent with
13 how things are reported to the FDA and what they put
14 on their own label.
15         So I -- I'll leave it at that.  I did not
16 re-analyze 1,491 charts and case report forms.
17 BY MS. WADHWANI:
18     Q  Did Sanofi change its label after this
19 study to say that there are 29 cases of permanent
20 hair loss in the TAX316 study?
21     A  In certain labels ex-U.S. they may have
22 done so, but I think that's the point of the whole
23 litigation.
24     Q  I'm asking you, Dr. Feigal, in the United
25 States labels, is it your testimony that Sanofi

Page 149

1  changed its label to say that there were 29 cases of
2  permanent hair loss in the TAX316 study?
3          MR. MICELI:  Object to the form.
4          THE WITNESS:  Eventually they put it in
5  their label.
6  BY MS. WADHWANI:
7      Q  They put in those words; is that your
8  testimony?
9      A  Eventually they put in the TAX316 data.
10     Q  Did Sanofi change its label to say there
11 were 29 cases of permanent hair loss in the TAX316
12 study in their label?
13     A  If you give me the label, I can tell you
14 exactly what they said.  They put the numbers down.
15 How they characterized it, I'd have to re-look at
16 the label.
17     Q  So you don't know, sitting here today,
18 what the Sanofi label says about permanent hair
19 loss, correct?
20     A  No.
21         MR. MICELI:  Object to the form.
22         THE WITNESS:  I do know that they say
23 cases -- permanent cases of alopecia have appeared,
24 and they do have the 29 and the 16.
25         What I can't definitively say is if they

38 (Pages 146 - 149)

Page 150

1  call it ongoing, persisting, or permanent.
2      But in their other documents, they
3  certainly have referred to what's going on as
4  permanent chemotherapy-induced alopecia in documents
5  that have been shared.
6  BY MS. WADHWANI:
7      Q   I'm going to move now to the GEICAM9805
8  study.
9      A   Okay.
10     Q   GEICAM9805 also compared two groups of
11 patients, correct?
12     A   Correct.
13     Q   And one group of patients used docetaxel,
14 doxorubicin, and cyclophosphamide, or the TAC
15 regimen, correct?
16     A   That is correct.
17     Q   And the other group of patients used
18 5-fluorouracil, doxorubicin and cyclophosphamide, or
19 the FAC regimen, correct?
20     A   That is correct.
21     MS. WADHWANI:  We're going to put up
22 another document for you, Dr. Feigal, so I'll just
23 beg your indulgence for the minute it takes.
24     THE WITNESS:  Okay.
25     MR. MICELI:  I'm having a little bit of

Page 151

1  trouble locating my GEICAM -- I think this may be
2  it.
3      Are you going to use the interim or the
4  final study report for TAX301 or GEICAM9805?
5      MS. WADHWANI:  We have the final study
6  report.
7      MR. MICELI:  Okay.  Can somebody forward
8  that to me?
9      MS. WADHWANI:  Yeah.  Aparna will send it
10 to you, Dave.
11     THE WITNESS:  Okay.  It came up.
12     MS. WADHWANI:  Dave, do you have it as
13 well?
14     MR. MICELI:  I don't, but I'm trying.
15     MS. WADHWANI:  Yeah, I think it's still
16 making its way over to you.
17     MR. MICELI:  Is this the one that's dated
18 November 9?  You know, I've only got excerpts, so
19 I'll just wait for yours.  Unless you're planning on
20 going to Table 47 ultimately, I think I can -- I
21 think I'll be fine with my excerpts.
22     MS. WADHWANI:  I am going to go to
23 Table 47 in a couple of minutes.
24     MR. MICELI:  Okay.  All right.
25     THE WITNESS:  I have it on my screen.

Page 152

1      MR. MICELI:  Okay.  We can go ahead.
2      MS. WADHWANI:  Dr. Feigal, it's your
3  counsel who is still getting it.
4      Are you okay for us to go forward?
5      MR. MICELI:  You can go ahead.  I think
6  I -- can we do the same thing we just walked through
7  with TAX316?  If I need to ask a question, I will.
8      MS. WADHWANI:  Okay.
9      MR. MICELI:  Thank you.
10 BY MS. WADHWANI:
11     Q   Dr. Feigal, can you identify the document
12 we have just put in front of you?
13     A   It's clinical study report on the
14 docetaxel study, and the date is November 9th, 2009.
15     Q   And this is for a study that in part is
16 described or named GEICAM9805, correct?
17     A   Yes.  TAX301, GEICAM9805.
18     MS. WADHWANI:  Okay.  We're going to mark
19 this as Exhibit 4 to your deposition.
20     (Exhibit 4 was marked for identification
21     and is attached hereto.)
22 BY MS. WADHWANI:
23     Q   You refer to this clinical study report in
24 your expert report, correct?
25     A   Correct.  For some reason it has a

Page 153

1  slightly different Bates number.
2      Q   As we look through it, if you think that
3  this is different than the version you looked at,
4  you just let us know.
5      A   Okay.  It had a different -- different
6  series of numbers after it.
7      Q   It may be that there are multiple copies.
8  It may be something else.  So I'll just let you tell
9  me.  Okay?
10     A   Okay.
11     Q   Turn, please, to page 3.
12     A   Okay.
13     Q   Do you see halfway down the page on page 3
14 for "Objectives"?
15     A   Yes.
16     Q   What's the primary objective listed for
17 this study?
18     A   "To compare disease-free survival after
19 treatment with docetaxel in combination with
20 doxorubicin and cyclophosphamide (TAC) to
21 5-fluorouracil in combination with doxorubicin and
22 cyclophosphamide (FAC) as adjuvant treatment of
23 high-risk operable breast cancer patients with
24 negative axillary lymph nodes."
25     Q   So the primary objectives listed here are

39 (Pages 150 - 153)

1   to compare disease-free survival with the two
2   regimens, right?
3       A   Correct.
4       Q   And the difference here in the primary
5   objective of GEICAM9805 compared to TAX316 is that
6   in GEICAM9805, it's in breast cancer patients with
7   negative axillary lymph nodes, whereas in TAX316, it
8   is looking at patients with positive axillary lymph
9   nodes, correct?
10      A   Correct.
11      Q   Are the secondary objectives of the
12  GEICAM9805 clinical trial, to compare overall
13  survival, toxicity, and quality of life between the
14  two regimens?
15      A   Is that a question?
16      Q   Yes.  Do you want me to say it again?
17      A   Yeah.  Tell me what your question is.
18      Q   Okay.  Are the secondary objectives of
19  GEICAM9805 to compare overall survival, toxicity,
20  and quality of life between the two regimens?
21      A   Correct.  And in both of them, there was
22  this exploratory third, but that's fine.
23      Q   And in the objectives described for the
24  GEICAM9805 study, there's no notation here that
25  permanent hair loss is an identification -- sorry --

1   is an objective of the study, correct?
2       A   No.  And as previously stated, that kind
3   of adverse event would be captured under "Toxicity."
4       Q   And so this study, GEICAM9805, according
5   to the clinical study report, was not designed with
6   a specific objective of evaluating the risk of
7   permanent or irreversible alopecia with docetaxel,
8   correct?
9       A   The study was not designed with that as
10  its primary endpoint.  That's correct.
11      Q   If you could turn, please, to page 111,
12  which is Table 47.
13      A   Okay.  I'm there.
14      Q   Okay.  Great.
15          In Table 47 of this clinical study report,
16  it shows that three of the TAC patients were
17  reported to have ongoing alopecia at their last
18  follow-up, correct?
19      A   Correct.
20      Q   And that's what you note in your report on
21  page -- paragraph 41, right?  Sorry.  Page 41 of
22  your report also notes in the first full paragraph
23  that three of the 49 patients on TAC had ongoing
24  alopecia, correct?
25      A   Yes.  That's correct.

1       Q   And then Table 47 on Exhibit 4 also states
2   that there was one patient in the non-docetaxel arm
3   that had ongoing alopecia, correct?
4       A   Correct.
5       Q   And your conclusion in your report that
6   these patients in GEICAM had permanent hair loss is
7   based on the designation here of ongoing hair loss,
8   correct?
9       A   Well, ongoing in the fact that it wasn't
10  resolved at the end of follow-up.  So it met the
11  definition of at least six months after completion
12  of chemotherapy.
13      Q   And you base that conclusion on the term
14  "ongoing" that appears in Table 47, correct?
15      A   Ongoing at the completion of the follow-up
16  period.  It hadn't been marked as resolved.
17      Q   Right.  There's nothing in this report
18  that states specifically that these patients had
19  permanent or irreversible hair loss, correct?
20      A   I'm not -- without refreshing my memory,
21  I'm not aware that they categorized those patients
22  that way.  They call them ongoing at the end of the
23  follow-up period.
24      Q   And that categorization of "ongoing" at
25  the end of the follow-up period forms the basis for

1   your conclusion that these patients had permanent
2   chemotherapy-induced alopecia, correct?
3           MR. MICELI:  Object to the form.
4           THE WITNESS:  It's based on the fact that
5   the ongoing follow-up period -- I can't recall if
6   the median follow-up period was eight years or the
7   final was ten years -- but at any rate, it was
8   longer than six months.
9           So yes, it was based on the accepted
10  definition of at least six months after completion
11  of chemotherapy and the fact that these patients
12  were on the long-term follow-up.
13  BY MS. WADHWANI:
14      Q   And you use that definition based on the
15  use of the word "ongoing" in Table 47, right?
16          MR. MICELI:  Object to the form.
17          THE WITNESS:  I think I've answered it.
18  It's based on ongoing at the end of the long-term
19  follow-up period and what's been generally accepted
20  as a definition for permanent chemotherapy-induced
21  alopecia.
22  BY MS. WADHWANI:
23      Q   Did you review these patients' medical
24  records to see if they were diagnosed with permanent
25  or irreversible alopecia?

40 (Pages 154 - 157)

1    A   The study report -- did I review case
2   reports?  No.  Is that what you asked?
3    Q   I asked if you reviewed the medical
4   records of these four patients to see if they were
5   diagnosed with permanent or irreversible alopecia.
6   I take it that answer is also no, correct?
7    A   I did not -- no.  This is like a
8   1,000-person study.  No, I did not review medical
9   records or charts of all the patients in this
10  clinical trial.
11   Q   Did you review the medical records,
12  charts, or case report forms for any of the patients
13  in this study?
14   A   You mean for a cherry-picked example?  No,
15  I did not.
16   Q   Did you check to see if the alopecia of
17  any of these four patients had resolved?
18   A   I did not review the medical records of
19  these patients.  That is correct.
20       Their investigators follow a protocol.
21  There's NCEI criteria for how to evaluate alopecia.
22  The sponsor has an analysis plan for how they look
23  at data from their own study, which they designed.
24       And so no, I did not go back and re-look
25  at -- I did not go back and look at medical records.

1        MS. WADHWANI:  We're going to send another
2   document your way, Dr. Feigal.
3        THE WITNESS:  Okay.
4        MR. MICELI:  Which one is this, Neelum?  I
5   may be able to find it.
6        MS. WADHWANI:  Yes, you probably will be
7   able to.  This is going to be the notice of
8   deposition.
9        MR. MICELI:  Oh, okay.  I think I may have
10  that.
11       (Exhibit 5 was marked for identification
12       and is attached hereto.)
13       THE WITNESS:  Okay.  I've opened that
14  document.
15  BY MS. WADHWANI:
16   Q   Have you seen this document before,
17  Dr. Feigal?
18   A   Yes.
19   Q   Sorry.  I'm having some issues with my own
20  paperwork here.
21       If you look at page 3 of this notice, you
22  see there is a list of documents that were
23  requested.
24       Did you see those before?
25   A   I saw it with the notice of deposition,

1   yes.
2    Q   We received from Mr. Miceli last night
3   some invoices and a CV.  Is that -- are those
4   documents you provided to him in response to this
5   notice of deposition?
6        MR. MICELI:  Neelum, just before she
7   answers that, I believe I also sent you her list of
8   testimony --
9        MS. WADHWANI:  Yes.
10       MR. MICELI:  -- which is all in this MDL,
11  but I want to make sure you received this.
12       MS. WADHWANI:  Yes.  Sorry.  That was -- I
13  forgot to mention that.  But yes, we received that.
14       MR. MICELI:  Thank you.  Okay.
15       THE WITNESS:  Right.  And you already have
16  my report and reliance materials as well; is that
17  correct?
18  BY MS. WADHWANI:
19   Q   Correct.
20       And so we issued this notice of
21  deposition, which is what brought us all here today.
22  As part of that, we made some document requests as
23  you saw, these four requests that we're looking at
24  right now on Exhibit 5, the notice of deposition.
25       And my question was, did you provide

1   documents to your counsel that you thought were
2   responsive to these requests?
3    A   Yes.
4    Q   Did those documents include an updated CV?
5    A   Yes.
6    Q   And did those documents include invoices?
7    A   Yes.
8    Q   And did those documents include a list of
9   prior testimony?
10   A   Yes.
11   Q   Was there any information that you had
12  that was responsive to these requests that you did
13  not provide to Mr. Miceli to send on to us?
14   A   No, not that I'm aware of.
15       MS. WADHWANI:  So let's turn first,
16  Dr. Feigal, to your updated CV, which we will mark
17  as Exhibit 6, and send to you in just a moment.
18       (Exhibit 6 was marked for identification
19       and is attached hereto.)
20       THE WITNESS:  I've got it open.
21  BY MS. WADHWANI:
22   Q   Is this your most up-to-date CV,
23  Dr. Feigal?
24   A   Yes.
25   Q   And I may have missed it.  What was the

41 (Pages 158 - 161)

Page 162

1　date that this was updated?
2　　A　It's in the suffix of the CV. 2021. This
3　year.
4　　Q　Do you know approximately when this year
5　it was updated?
6　　A　It's up to date. I don't remember the
7　exact date, but it's up to date.
8　　Q　Do you know what the changes were from the
9　CV that you submitted with your June 8th, 2020,
10　report?
11　　A　I don't think there were any updates.
12　　Q　So effectively the 2021 CV that we
13　received last night is the same as the one that was
14　part of your disclosures with your report; is that
15　right?
16　　A　Yeah. I didn't have any updates from the
17　last one I'd already provided.
18　　Q　I think we just answered this question
19　from your counsel, but I just want to ask you, does
20　it remain true that you've not provided expert
21　testimony except for in this multi-district
22　litigation?
23　　A　Was that a question? Yeah. Correct. You
24　have all the -- you have everything that I've done,
25　and it's all connected with this multi-district

Page 163

1　litigation.
2　　Q　And setting aside this litigation, have
3　you ever provided any expert opinions on the cause
4　of hair loss?
5　　A　I'm sorry. On what?
6　　Q　On the cause of hair loss.
7　　A　No.
8　　Q　Setting aside this litigation, have you
9　ever provided expert opinions that a medication
10　causes permanent alopecia?
11　　A　Other than this litigation, no.
12　　MS. WADHWANI: Dr. Feigal, let's take a
13　break right now. It's going to be a short one. I
14　just have a couple of papers that I need to organize
15　a little bit better before I move on to the next
16　thing, and I don't want to waste your time.
17　　So I will actually leave it up to you
18　whether you want to take a break to get something to
19　eat or whether you just want to do five or ten
20　minutes.
21　　THE WITNESS: Part of whether I eat now
22　depends on how long we think this is going to go.
23　Do you have a guesstimate?
24　　MS. WADHWANI: I think that I am getting
25　close to wrapping up, you know, my examination of

Page 164

1　you, but I'm going to have to ask your counsel
2　whether he intends to ask you questions. And, of
3　course, if he asks you questions, that may cause me
4　to ask you a few additional follow-up questions.
5　　MR. MICELI: Well, Neelum, I can say that
6　if I ask her any questions, it will be less than a
7　half dozen and will be very brief. But I don't --
8　at this point, I'm not certain I'm going to ask
9　anything.
10　　MS. WADHWANI: Okay. Well -- you speak,
11　Dr. Feigal. This is for you.
12　　THE WITNESS: Oh. I'm fine with a short
13　break then. I can wait until -- yeah. I'm fine to
14　continue going. I'll just take a short break. How
15　short? When would you like me to come back?
16　　MS. WADHWANI: How about ten minutes?
17　　THE WITNESS: Okay. Thank you.
18　　MR. MICELI: Very good. Thank you.
19　　THE VIDEO OPERATOR: We are off the
20　record. The time is 1:39 p.m.
21　　(Recess, 1:39 p.m. - 1:56 p.m.)
22　　THE VIDEO OPERATOR: We are back on the
23　record. The time is 1:56 p.m.
24　BY MS. WADHWANI:
25　　Q　Dr. Feigal, are you okay to proceed?

Page 165

1　　A　I am. Thank you.
2　　Q　Dr. Feigal, you were last deposed in a
3　docetaxel litigation in September of last year,
4　September of 2020, correct?
5　　A　Correct.
6　　Q　As of that time, September 2020, you
7　testified in that deposition that you had, at this
8　point, been paid roughly $250,000 in connection with
9　the docetaxel litigation.
10　　Do you recall that?
11　　A　I recall the estimate, and I think that's
12　over a three-year period.
13　　Q　Right. But as of September 2020, do you
14　recall that your testimony was you had been paid
15　roughly $250,000 in the docetaxel litigation?
16　　A　The only caveat I would say is the company
17　was paid that. I get about 80 percent of what the
18　company receives.
19　　Q　So if I understand you correctly, NDA
20　Partners, who you consult on behalf of, billed
21　$250,000, approximately, as of September 2020 for
22　your work in the docetaxel litigation, right?
23　　A　Yeah. I don't have that in front of me.
24　But if that's what I said and agreed to in the last
25　depo, then I continue to agree with that. Yes.

42 (Pages 162 - 165)

1    Q  Now, you submitted and we received last
2  night a number of invoices for work that you had
3  done from September '20 through August 2021,
4  correct?
5    A  I think I also included August.  Through
6  August is my recollection.
7    Q  Yes.  Sorry if I was not clear.  I think
8  we're on the same page.
9        You submitted a series of invoices that
10  are dated August 2020 through August 2021, correct?
11    A  Correct, and that's for the whole
12  multi-district litigation, not specific to this
13  depo.
14    Q  Correct.  And many of the opinions that
15  you're offering in this particular matter, in this
16  particular case, Mrs. Plaisance's case or
17  Mrs. Guilbault's case, were based on opinions that
18  you had prepared as of June of last year, correct?
19        MR. MICELI:  Object to the form.
20        THE WITNESS:  What you have is my current
21  set of informed opinions.  That's correct.  And the
22  latest report I think captures the essence of those
23  opinions.
24  BY MS. WADHWANI:
25    Q  And that report that we have for Trial 5

1  is dated June 8th, 2020, correct?
2    A  That is correct.
3        MS. WADHWANI:  I'm going to mark as
4  Exhibit 7 the invoices that were produced to us last
5  night.  Those will show up in your Exhibit Share in
6  just a moment.  Let me know when you get them.
7        (Exhibit 7 was marked for identification
8        and is attached hereto.)
9        MR. MICELI:  Neelum, if you have those as
10  one composite exhibit, can you have your folks send
11  me a copy of it?  Because I have mine individually
12  month to month.
13        MS. WADHWANI:  Sure.
14    Q  Okay, Dr. Feigal.  I'm told if you
15  refresh, you should be able to access Exhibit 7 on
16  Exhibit Share now.
17    A  Right.  Is it Exhibit 7 now?
18    Q  Yes.
19    A  That's what I've been doing is refreshing.
20  Thanks.  So it's up.
21    Q  And I think we're just waiting for your
22  counsel to receive his set of the invoices he
23  produced to us last night.
24        MR. MICELI:  If you just have a total and
25  you're going to go through them, I'm fine if you

1  start asking.  I'm still having a problem.  I'll
2  deal with Veritext to get whatever fixed.  I'm just
3  not getting it refreshed, and I'm hardwired in now.
4  BY MS. WADHWANI:
5    Q  Dr. Feigal, why don't you take a moment to
6  look through what we've marked as Exhibit 7, and
7  then let me know if these reflect the invoices that
8  you have submitted for your work from August 2020
9  through August 2021.
10    A  Yes, this looks like what I provided to
11  Mr. Miceli.
12    Q  Now, you are free to take as much time as
13  you want to look at these.  I will represent to you
14  that our calculation of each of these invoices that
15  are in Exhibit 7, they reflect more than $30,000 in
16  payments from August 2020 to August 2021.
17        Does that amount sound correct to you?
18    A  I would say approximately 30,000 is
19  probably correct.  And that's on all cases, not just
20  this depo.
21    Q  By "all cases," you mean for the docetaxel
22  litigation, correct?
23    A  Correct.  For the MDL.  I think some of
24  this -- well, I don't need to go into details, I
25  guess.  But at any rate, it's not specific to this

1  particular case.
2    Q  Does some of the amount that you billed
3  over the last year reflect work that you have done
4  for the Trial 5 cases?
5    A  Tell me what you mean by "Trial 5 cases."
6    Q  Mrs. Plaisance's and Mrs. Guilbault's
7  cases.
8    A  Probably hardly any of them are related to
9  this case.
10    Q  Do you have an approximation of how much
11  is related to these cases?
12    A  I'm not sure any of it is.
13    Q  Did you have any work that you did
14  specific to a particular plaintiff?
15    A  For this, it would have been probably
16  captured -- I haven't submitted my September
17  invoice.  I imagine it will be captured on my
18  September invoice.
19    Q  So help me understand that, Dr. Feigal,
20  because I understood your testimony earlier today to
21  be that you are not offering case-specific opinions,
22  that you are offering general opinions in the
23  docetaxel litigation.  So how are you parsing out
24  what work is done for specific cases?
25    A  Well, only that I probably wouldn't even

43 (Pages 166 - 169)

Page 170

1  have begun preparing until I knew when the depo date
2  was.
3      I don't think I -- I don't think I even
4  knew the depo date until recently.
5      Q  Do you know how many hours you spent
6  preparing for this deposition?
7      A  Oh, in total?  Exclusive of the
8  deposition -- I don't know -- maybe in total, with
9  phone calls and reviewing documents, maybe up to 15
10  hours.
11      Q  And would those 15 hours be paid at your
12  regular hourly rate of $650?
13      A  That would be an estimate, and yes.  And
14  that would be to the company.  I don't get the full
15  amount.
16      Q  And is your testimony today also being
17  billed at a rate of $650 an hour?
18      MR. MICELI:  Dr. Feigal, I lost you in the
19  middle of a word.
20      THE WITNESS:  I'm here.
21  BY MS. WADHWANI:
22      Q  Dr. Feigal, are you able to hear me?
23      A  I can hear you.
24      Q  Okay.
25      MR. MICELI:  Okay.

Page 171

1  BY MS. WADHWANI:
2      Q  So my question to you, Dr. Feigal -- I'll
3  repeat it for you -- is, is your testimony today
4  also being billed at a rate of $650 an hour?
5      A  That's correct, to the company.
6      MS. WADHWANI:  I don't think I have any
7  further questions right now.  I can pass the
8  witness.
9      MR. MICELI:  Okay.  I have nothing.  I
10  have no questions.
11      We will read and sign.  I think that's the
12  usual in our standing order, but I think that's it.
13  Thank you so much.
14      MS. WADHWANI:  Thank you so much for your
15  time, Dr. Feigal.
16      THE WITNESS:  Thank you.
17      MS. WADHWANI:  Thank you.
18      THE WITNESS:  Bye-bye now.
19      THE VIDEO OPERATOR:  Do you want me to
20  take us off the record?
21      MR. MICELI:  Yes, please.
22      THE VIDEO OPERATOR:  We are off the
23  record.  The time is 2:06 p.m. on September 29th,
24  2021.  This concludes today's testimony given by
25  Dr. Ellen Feigal.  The total number of media units

Page 172

1  used was six and will be retained by Veritext Legal
2  Solutions.
3      (TIME NOTED:  2:06 p.m.)
4      --o0o--
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 173

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12      Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [X] was [ ] was not requested.
16      I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19      IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21  Dated: October 5th 2021.
22
23      *Carla Soares*
24      CARLA SOARES
       CSR No. 5908
25

44 (Pages 170 - 173)

Page 174

1  Palmer Lambert, Esq.
2  plambert@gainsben.com
3          October 5th, 2021
4  RE: Taxotere (Docetaxel) Products Liability Litigation
5    9/29/2021, Ellen Feigal , MD (#4818230)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 175

1  In Re: Taxotere (Docetaxel) Products Liability Litigation v.
2  Ellen Feigal , MD (#4818230)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Ellen Feigal , MD                    Date
25

Page 176

1  In Re: Taxotere (Docetaxel) Products Liability Litigation v.
2  Ellen Feigal , MD (#4818230)
3      ACKNOWLEDGEMENT OF DEPONENT
4    I, Ellen Feigal , MD, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Ellen Feigal , MD                    Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18 _____
19 NOTARY PUBLIC
20
21
22
23
24
25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.