# EXHIBIT G



A DIVISION OF TOXSTRATEGIES, INC.

October 8, 2021

Jon P. Fryzek, MPH, PhD
EpidStrategies, a Division of ToxStrategies
9601 Medical Center Drive
Rockville, MD

## I.     Introduction

1.  I have been asked by counsel for Hospira, Inc., a subsidiary of Pfizer, Inc., to provide an expert opinion in the Taxotere (Docetaxel) Products Liability Litigation.   Counsel asked me to evaluate whether the available scientific evidence establishes a causal relationship between docetaxel and permanent alopecia.

2.  Docetaxel is a taxane used in the treatment of number of cancers including breast, lung, prostate, gastric, head and neck, and ovarian cancer.  It is currently listed as an essential medicine by the World Health Organization Expert Committee on the Selection and Use of Essential Medicines.  This committee of international, renowned scientists evaluated the scientific evidence for the comparative effectiveness, safety, and cost-effectiveness of Docetaxel[1].

3.  For this report, I reviewed two Sanofi clinical trials (TAX-316 and TAX-301).  I also conducted a systematic literature review of scientific papers on permanent alopecia in patients on various chemotherapy regimens, and I analyzed the publicly available FAERS database to assess reports of permanent alopecia among patients taking docetaxel.  I also reviewed the expert reports of Plaintiff's experts, including Dr. David Madigan, Dr. Ellen Feigal, Dr. Laura Plunkett, and Dr. Antonella Tosti.

4.  In summary, none of the information I reviewed supports a causal relationship between docetaxel and permanent alopecia.  The vast majority of the literature included case series, which are insufficient to show causality.  Moreover, the studies contained significant flaws that made them unreliable to support a causal association, including the use of other confounding medications that cause alopecia and the lack of a clear definition for permanent alopecia.

Jon P. Fryzek, MPH, PhD                                           EpidStrategies

5.  I do not agree with the opinions of Plaintiffs' experts.  The reviews of the
    literature conducted by Drs. Madigan, Feigal, and Plunkett were not performed in
    a systematic manner, and their conclusions, as well as Dr. Feigal's causality
    assessment, are not scientifically valid.  Finally, Dr. Madigan's analysis of the
    FAERS data, by his own admission, cannot show a causal link between docetaxel
    and permanent alopecia.   Nor does it establish any safety signal because it is
    based on an incorrect method of identifying cases of permanent alopecia, and
    even under this analysis shows that the alleged cases were very rare.

6.  All the opinions in this report are stated to a reasonable degree of scientific
    certainty.  I reserve the right to supplement or amend my opinions based on any
    new information or literature that subsequently becomes available.  I further
    reserve the right to comment on any opinions offered by plaintiffs' experts at
    deposition or trial.  In addition, I reserve the right to discuss general concepts
    within the field of epidemiology to provide context for the opinions presented in
    this report.  Finally, I reserve the right to use graphics or demonstratives at trial to
    illustrate the concepts discussed in my report.

## II.    Background and Qualifications

7.  I am qualified as a specialist in the field of epidemiology as it relates to
    pharmaceutical drug utilization and safety.  I am currently a Principal
    Epidemiologist and the Practice Director of EpidStrategies, a consulting firm that
    specializes in epidemiology research studies.  In addition, I am an Adjunct
    Professor in the Department of Medicine at Georgetown University, Washington,
    DC.

8.  I received my undergraduate degree in biology from Creighton University,
    Omaha, Nebraska, in 1985.  After two years of service in rural Africa with the
    Peace Corps, I returned to graduate school and received my Master's degree in
    Public Health from the University of Michigan, Ann Arbor, Michigan, in 1991
    and my Ph.D. degree in Epidemiologic Science from the University of Michigan
    in 1996.  While at the University of Michigan, I received a Cancer Prevention and
    Control Fellowship from the National Cancer Institute.

9.  On completion of my training in 1996, I joined the faculty of the University of
    Nebraska Medical School, where I was engaged in research in the epidemiology
    of cancer and other diseases.  I then left to join the International Epidemiology
    Institute, where I conducted epidemiologic studies of pharmaceuticals, chronic
    diseases, and infectious diseases.

10. I worked in the pharmaceutical industry from 2006 to 2012.  My first position was
    as head of Oncology Therapeutics for the Department of Epidemiology at Amgen.
    After three years at Amgen, I worked as head of the Oncology therapeutic area for
    Health Outcomes and Pharmacoeconomics at MedImmune (the biotechnical arm

2

Jon P. Fryzek, MPH, PhD                                      EpidStrategies

of AstraZeneca).  In both positions, I was involved in the development of Risk
Assessment Plans and Risk Evaluation and Mitigation Strategy Plans for several
products.

11. I was elected a member of the American College of Epidemiology (ACE) in 2000.
I also am a member of the International Society of Pharmacoepidemiology
(ISPE).  I serve as a reviewer of scientific papers for multiple journals, including
the *American Journal of Industrial Medicine; American Journal of Epidemiology;
Annals of Epidemiology; BMC Public Health; Cancer; Cancer, Causes and
Control; Cancer Epidemiology; Biomarkers and Prevention; Clinical
Epidemiology; Environmental Health Perspectives; Epidemiology;
Gastrointestinal Cancer: Targets and Therapy*, *International Journal of Cancer*;
*Journal of Cancer Epidemiology; Journal of Exposure Analysis and
Environmental Epidemiology; Journal of Medical Economics;* and *Oncology*.

12. I have performed studies elucidating the natural history of various diseases in
support of drug development and safety, including descriptive incidence studies,
"real-world" disease treatment pattern studies, and co-morbidity assessments.
Many of these studies are developed to assist in the identification of early
potential adverse events associated with therapeutics.

13. I have taught courses and lectured at the University of Nebraska Medical Center,
Georgetown University, the University of Michigan, Johns Hopkins University,
and the University of Pittsburgh, on general epidemiology,
pharmacoepidemiology, and statistical methods, including the calculation and
interpretation of odds ratios, risk ratios, p-values, and meta-analysis summary
results to assess signal detection and causality.  Further, I have over 200
publications using these techniques.

14. My background and qualifications are set forth in my *curriculum vitae*, which is
attached as Exhibit A and includes all publications of which I have been an author
in the last ten years.

15. In the last four years, I have testified thirteen times at deposition and two times at
trial.  These cases are attached as Exhibit B.

16. For my work in this matter, my employer, EpidStrategies, is paid $505.00 dollars
per hour.

## III.    Materials Reviewed

17. Attached in Exhibit C is a list of materials that I reviewed and considered in
preparing this report.  I have also included in my report citations to specific
materials that I reviewed and considered.

18. This report contains confidential material and is subject to the order governing the production, exchange, and filing of confidential information in this matter.


## IV.    Introduction to Epidemiologic Study Designs

19. It is important to understand the strengths and limitations of study designs when evaluating studies reported in the scientific literature. Broadly speaking, there are two types of epidemiologic studies: descriptive and analytic.

20. Descriptive studies, which are most often conducted on data from disease and mortality registries maintained by public health departments and government agencies, are generally used as surveillance tools to monitor the temporal trends and spatial distribution of disease or outcome occurrence. Such studies can raise concern if either the temporal trends or the spatial distribution show unusual or unexpected patterns, but these studies cannot establish causal associations between a factor and an outcome of interest.

21. Descriptive studies include anecdotal evidence and case reports (i.e., descriptions of individuals with a particular factor or disease), which can raise suspicion that a specific factor is associated with an outcome; however, properly designed analytic epidemiologic studies need to be performed to establish associations between factors and outcomes, as discussed below. Clinical reports or case series cannot, by themselves, establish associations, let alone causality, between the factor and the outcome, because they lack a critical element of a properly designed study—namely, a control group.

22. The inadequacy of case reports and anecdotal evidence to establish associations between putative risk factors and outcome has been recognized for many years. For example, a well-regarded textbook states:

> "While case reports and case series are very useful for hypothesis formulation, they cannot be used to test for the presence of a valid statistical association.  One fundamental limitation of the case report is that it is based on the experience of only one person. The presence of any risk factor, however suggestive, may simply be coincidental.  Although case series are frequently sufficiently large to permit quantification of frequency of an exposure, the interpretability of such information is severely limited by the lack of an appropriate control group.  This lack can either obscure a relationship or suggest an association where none actually exists."[2]

23. Properly designed analytic epidemiologic studies are necessary to either confirm or refute the suspicions raised by case reports or descriptive studies. Analytic studies aim to identify associations of disease with possible risk factors and to test hypotheses regarding causation.  The aspect of an analytic study that enables an epidemiologist to consider causality is the use of comparison groups.

Jon P. Fryzek, MPH, PhD                                    EpidStrategies

24. Randomized controlled trials are specialized epidemiologic studies in which participants are randomly (by chance) assigned to receive one of two or more clinical interventions. The "control" intervention may be the standard treatment practice, a placebo, or no treatment.

25. Randomized controlled trials are typically conducted to understand the efficacy of a treatment in relation to a comparison group. In choosing a comparison group, researchers must consider ethical standards, particularly in terms of the current standard of care. At a minimum, clinical trial patients should be offered the standard of care for their disease.

26. Because clinical trials are conducted among selected population groups with pre-specified inclusion and exclusion criteria, they cannot identify all potential adverse events in all population groups that may eventually use the treatment. Therefore, observational prospective cohort studies are typically used to capture adverse event rates.

27. The two most commonly used types of analytic observational studies in epidemiology are cohort studies and case-control studies. Other, less informative study designs include cross-sectional and ecologic studies.

28. Cohort studies are analytic epidemiologic studies in which defined populations are observed over time for the comparison of outcomes across risk factors. Cohort studies may be prospective, meaning that risk factors are collected in the present, prior to the outcome, and participants are followed forward in time. Alternatively, cohort studies may be retrospective, meaning that past risk-factor information is reconstructed based on existing information for participants, some or all of whom have already developed the outcome(s) or disease(s) of interest.

29. Case-control studies are analytic epidemiologic studies in which individuals with the outcome of interest are compared with a suitable control group of individuals without the outcome to determine differences in risk factors between the groups. Case-control studies are typically retrospective in design, meaning that they evaluate risk factors in the past, with assessment after the outcome has occurred in cases.

30. Cross-sectional studies examine the relationship between risk factors and the prevalence of an outcome in a defined population at a specified point in time, thereby providing a "snapshot" of the relationship at a particular point in time. Because risk factors and outcomes are typically assessed simultaneously in a cross-sectional study, it may not be possible to determine whether the risk factor preceded or followed the outcome, thereby obscuring cause-and-effect relationships.

31. Ecologic studies are epidemiologic studies in which the units of analysis are populations or groups, rather than individuals.  Observations at the group level may not apply to individuals; for example, general or average risk factors do not apply to every member of a population.  Erroneous conclusions may be reached if inferences about individuals are made based on aggregate observations—a logical error known as the ecologic fallacy.  However, ecologic studies can be useful for informing policy decisions that affect entire groups.

32. Epidemiological studies can be designed to measure the frequency of some disease or outcome among a population of individuals.  In this instance, understanding the representativeness of the population under study is critical.

33. When evaluating the results of epidemiological studies, it is important to assess the impact of bias on your results to determine whether the relationship you have measured may be causal or not.  One of the most important of these biases is selection bias, which is an error due to systematic differences between the characteristics of the people selected for a study and those who are not selected for the study.  This may occur when a non-random sample of the population under study is considered.  A selected group of retrospective cases are non-random samples that could potentially be affected by this type of bias.

34. Another example is confounding bias.  Confounding is an apparent association between a disease or outcome and exposure or intervention caused by a third factor not taken into consideration.  A confounder is a variable that is associated with the exposure or intervention and, independent of that exposure or intervention, is a risk factor for the disease.

## V.    Evaluation of epidemiological research

35. In this section, I discuss the available scientific evidence, including (i) two Sanofi clinical trials (TAX-316 and TAX-301); (ii) the published scientific literature; and (iii) adverse event data from the FAERS database.   For the reasons explained below, this information does not support a causal relationship between docetaxel and permanent alopecia.

### A.    Sanofi clinical trials

36. Sanofi conducted two clinical trials evaluating the efficacy and safety of a docetaxel-containing regimen compared with a similar adjuvant chemotherapy regimen.  Specifically, both trials compared combinations of (i) Taxotere (docetaxel) with Adriamycin (doxorubicin) and cyclophosphamide (TAC) vs. (ii) 5-fluorouracil with Adriamycin (doxorubicin) and cyclophosphamide (FAC) among patients with operable breast cancer. The first trial was conducted among patients with positive axillary lymph nodes (TAX-316), while the second trial only included patients with negative axillary lymph nodes (TAX-301).

Jon P. Fryzek, MPH, PhD                                            EpidStrategies

37. The main objectives of both trials were to compare disease free survival, overall survival, safety, and quality of life between the two study arms, and to evaluate pathologic markers for predicting efficacy. The evaluation of permanent alopecia was not a primary or secondary objective for either trial.

38. Under the study protocols, patients were followed every 3 months for the first two years of the studies, every 6 months for years three through five, and then once a year for years six through ten. As part of the safety evaluation, adverse events (AE) experienced by trial participants were captured during follow-up visits.

39. The National Cancer Institute Common Toxicity Criteria (NCI-CTC) (now known as the National Cancer Institute's Common Terminology Criteria for Adverse Events [CTCAE]) was used to evaluate and grade AEs, including alopecia.

40. There were 1491 randomized patients in the TAX-316 trial and 1060 in the TAX-301 trial. The median age (range) was 49 (23-70) in TAX-316 and 50 (23-74) in TAX-301. Approximately 60% of patients in TAX-316 had a prior mastectomy compared to 45% of TAX-301 patients. Per trial inclusion criteria, all patients in TAX-316 had metastasis to regional lymph nodes, while all patients in TAX-301 had no regional lymph node metastasis at the time of randomization. Three-quarters of patients in the TAX-316 trial had positive estrogen-receptor (ER) and/or progesterone receptor (PR) status compared to 65% of patients in TAX-301; 69% of TAX-316 patients and 63% of TAX-301 patients had adjuvant hormonal therapy. After study chemotherapy, 70% of TAX-316 patients and 54% of TAX-301 patients had adjuvant radiotherapy.

## 1. TAX-316 Results

41. The 10-year final clinical study report for TAX-316 showed that the docetaxel-regimen (TAC) reduced the risk of mortality by 25.8% compared to FAC. The docetaxel treatment reduced the risk of disease recurrence by 20.5% compared with FAC.

42. In TAX-316, 45 patients (29 TAC [3.9%] and 16 FAC [2.2%]) were classified as having "ongoing" alopecia at their last follow-up. This information does not show an increased risk of permanent alopecia for two reasons.

43. First, there is no statistically significant difference between the TAC and FAC groups regarding "ongoing" alopecia. While no statistical test was conducted by the study scientists to determine whether the difference in incidence of "ongoing" alopecia was statistically significant between the two treatment groups, I conducted a test of the difference in proportions using Fisher's exact test and found a p-value of 0.0683, indicating that there was no statistically significant difference in the incidence of "ongoing" alopecia between treatment groups.

Jon P. Fryzek, MPH, PhD                                        EpidStrategies

44. Second, if patients were classified as having "ongoing" alopecia it does not mean they had permanent alopecia.   The definition of "ongoing" alopecia is not the same as permanent alopecia.  As Sanofi explained in response to an inquiry from Health Canada, the Canadian national health agency, "'ongoing' does not necessarily mean that these AEs were ongoing for the entire 10-year follow-up period; rather, it means that they were noted as ongoing at the last follow-up visit" (Sanofi_02368845).   Under the study protocols, when a patient receives alternative chemotherapy (other than radiation and surgery), the follow-up continues only for certain AEs, but not for alopecia.  (Sanofi_01062463-Sanofi_01062537).  Thus, there was no follow up for many patients on the risk of alopecia for the entire ten years.   If a patient's alopecia was still ongoing at their last follow-up visit, and that visit was <6 months after the last study treatment, the alopecia would be listed as "ongoing," even though this would not meet the definition of permanent alopecia lasting >6 months after completion of therapy.

45. Moreover, some patients could withdraw from the study for various reasons, limiting the ability of the investigator to ascertain potential AEs after their withdrawal.  In fact, 6% (82/1480) of the patients did not have follow-up for any AE for the entire 10 years.

46. Sanofi's response provides the follow-up duration in years for the 45 patients who were classified as having "ongoing" alopecia at the last follow-up (Sanofi_02368848-9). Among these patients, 30 (66.7%) had a follow-up duration less than 6 months. These patients were not followed for a sufficient duration to evaluate whether they had permanent alopecia.

47. Further, there is evidence in the study case report files that some of the patients in TAX-316 who were listed as having "ongoing" alopecia at their last follow-up actually had the condition resolve. In his deposition dated December 12-13, 2018, Dr. Michael Kopreski, former head of Sanofi Oncology Pharmacovigilance, stated that he reviewed the individual case documentation of the 45 patients from TAX-316 listed as having ongoing alopecia at their last follow-up. After evaluating the patient records, Dr. Kopreski concluded that only 9 patients actually had ongoing alopecia at their last follow-up (Kopreski deposition 12/13/2018; p. 566-579).

48. I reviewed the documentation of the 45 patients in TAX-316 listed as having "ongoing alopecia" at their last follow-up (Sanofi_02368848-9) (Table 1). Thirty (66.7%) of these patients had less than 6 months of follow-up time, and it cannot be concluded that they had permanent alopecia. One patient had insufficient data about follow-up (Subject ID ending in 29307). Five patients had documentation that their alopecia had actually resolved.  Excluding these patients, only 9 (6 TAC [0.8%], 3 FAC [0.4%]) patients could be reasonably concluded as possibly having permanent alopecia at their last follow-up visit (time from last treatment: median 0.98 years; range 0.52-5.1 years).  This information is presented below in Table 1.

Jon P. Fryzek, MPH, PhD                                      EpidStrategies

Table 1. Case Documentation of 45 Patients from TAX-316 with Ongoing Alopecia During Follow-Up

| Subject ID | Follow-up time (years since last treatment) | Potential Permanent alopecia? | Comment |
|---|---|---|---|
| *TAC Patients* | | | |
| 000316-124-017-11702 | 10.13 | Y | Alopecia ongoing as of last AE follow-up at 5.1 years (Sanofi_14674) |
| 000316-124-017-11724 | 3.05 | Y | Alopecia ongoing as of last follow-up at 3.05 years (Sanofi_14856) |
| 000316-124-017-11738 | 0.32 | N | <6 months follow-up |
| 000316-124-022-12211 | 0.23 | N | <6 months follow-up |
| 000316-124-023-12314 | 0.22 | N | <6 months follow-up |
| 000316-124-023-22312 | 0.32 | N | <6 months follow-up |
| 000316-124-024-12403 | 6.07 | N | Alopecia resolved after 0.06 years follow-up (Sanofi_14380) |
| 000316-124-026-12612 | 2.61 | N | Alopecia resolved after 1.81 years (Sanofi_17758) |
| 000316-124-027-22702 | 0.28 | N | <6 months follow-up |
| 000316-300-036-13605 | 0.27 | N | <6 months follow-up |
| 000316-300-036-13607 | 0.19 | N | <6 months follow-up |
| 000316-300-036-13610 | 0.29 | N | <6 months follow-up |
| 000316-300-036-13615 | 0.39 | N | <6 months follow-up |
| 000316-348-039-23907 | Not reported | * | Alopecia ongoing at last and only follow-up, date not provided |
| 000316-724-050-15002 | 0.19 | N | <6 months follow-up |
| 000316-724-050-15005 | 0.56 | Y | Alopecia ongoing as of last follow-up at 0.56 years (Sanofi_18445) |
| 000316-724-050-15006 | 0.17 | N | <6 months follow-up |
| 000316-724-050-25010 | 0.32 | N | <6 months follow-up |
| 000316-724-056-15606 | 0.10 | N | <6 months follow-up |
| 000316-724-058-15808 | 0.32 | N | <6 months follow-up |
| 000316-826-068-26802 | 0.32 | N | <6 months follow-up |
| 000316-826-068-26809 | 9.22 | Y | Alopecia ongoing as of last AE follow-up at 3.5 years (Sanofi_19450) |
| 000316-840-074-17407 | 0.52 | Y | Alopecia ongoing as of last follow-up at 0.52 years (Sanofi_21134) |
| 000316-840-076-17603 | 1.00 | N | Alopecia resolved at last follow-up at 1 year (Sanofi_20654) |
| 000316-840-076-17608 | 0.25 | N | <6 months follow-up |
| 000316-840-081-28101 | 0.98 | Y | Alopecia ongoing as of last follow-up at 0.98 years (Sanofi_21636) |
| 000316-840-097-29701 | 0.35 | N | <6 months follow-up |
| 000316-840-104-40401 | 0.22 | N | <6 months follow-up |
| 000316-840-107-30702 | 0.37 | N | <6 months follow-up |
| *FAC Patients* | | | |
| 000316-032-122-32207 | 0.31 | N | <6 months follow-up |
| 000316-124-006-20610 | 0.19 | N | <6 months follow-up |
| 000316-124-017-11710 | 1.09 | Y | Alopecia ongoing as of last AE follow-up at 0.6 years (Sanofi_14736) |
| 000316-300-036-13608 | 0.26 | N | <6 months follow-up |
| 000316-616-044-24411 | 0.25 | N | <6 months follow-up |
| 000316-616-045-24520 | 0.11 | N | <6 months follow-up |
| 000316-724-055-25501 | 0.24 | N | <6 months follow-up |

Jon P. Fryzek, MPH, PhD                                   EpidStrategies

| Subject ID | Follow-up time (years since last treatment) | Potential Permanent alopecia? | Comment |
|---|---|---|---|
| 000316-724-056-25601 | 0.45 | N | <6 months follow-up |
| 000316-724-063-16301 | 0.32 | N | <6 months follow-up |
| 000316-826-068-26804 | 0.32 | N | <6 months follow-up |
| 000316-840-073-27304 | 0.08 | N | <6 months follow-up |
| 000316-840-076-27601 | 0.39 | N | <6 months follow-up |
| 000316-840-076-27610 | 0.77 | N | Alopecia resolved after 0.7 years follow-up (Sanofi_20792) |
| 000316-840-098-19801 | 1.92 | N | Alopecia resolved after 0.15 years follow-up (Sanofi_21340) |
| 000316-840-100-30001 | 1.11 | Y | Alopecia ongoing as of last follow-up at 1.11 years (Sanofi_21347) |
| 000316-840-102-30204 | 0.55 | Y | Alopecia ongoing as of last follow-up at 0.55 years (Sanofi_21379) |

*Cannot determine due to inadequate follow-up data

49. Based on a review of the full available individual case information, there is no statistically significant difference between the TAC and FAC groups regarding patients with possible permanent alopecia (i.e., alopecia lasting more than six months after treatment without evidence of subsequent resolution).   Updating with these numbers resulted in p=0.5065 using Fisher's exact test, indicating that there was no statistically significant difference in the incidence of potential permanent alopecia between the two treatment groups.


## 2.    TAX-301 Results

50. The 10-year final clinical study report for TAX-301 showed that the docetaxel regimen reduced the risk of disease recurrence by 32% compared with FAC.  The docetaxel-regimen (TAC) reduced the risk of mortality by 24% compared to FAC, but that result was not statistically significant.

51. TAX-301 reported "ongoing" alopecia in 3 of 352 patients (0.56%) in the docetaxel (TAC) group and 1 of 519 (0.19%) in the FAC group.

52. The TAX-301 results do not show a risk of permanent alopecia.   First, as explained above in Paragraph 44, classifying patients as having "ongoing" alopecia does not mean that they have permanent alopecia.

53. Second, the TAX-301 study did not have sufficient follow-up data to evaluate the risk of permanent alopecia.  In the TAX-301 trial, the clinical study report (CSR) was produced after all patients had completed at least 5 years of follow-up.  In TAX-316, after 5 years of follow-up, 67.5% of patients treated with TAC and 65.2% of patients treated with FAC had at least one AE that persisted into the follow-up period. In comparison, at 5 years of follow-up for TAX-301, only 15.8% of patients treated with TAC and 13.7% of patients treated with FAC

Jon P. Fryzek, MPH, PhD                                          EpidStrategies

experienced at least one AE. Given that the dosing regimens were the same
between both trials, these results indicate that evaluation of AEs in the follow-up
period of TAX-316 was not as thorough as in TAX-316. Without consistent
follow-up beyond treatment, it is not possible to determine what percent of
patients experienced irreversible alopecia in TAX-301.

54. Thus, the results of the Sanofi clinical trials TAX-301 and TAX-316 do not show
    that docetaxel causes permanent alopecia.

## B.    Published Literature

55. I conducted a systematic literature review based on standard techniques for
    systematic review (PRISMA Guidelines)[3] to identify relevant literature describing
    the rate of permanent alopecia in patients treated with various chemotherapies.
    Specifically, the literature search aimed to identify studies describing rates of
    permanent alopecia among patients treated with taxane therapies (docetaxel,
    paclitaxel, cabazitaxel, nab-paclitaxel), or other anti-microtubule therapies such as
    vinca alkaloids (vincristine, vinblastine, vinorelbine, vindesine) and epithilone B
    analogs (ixabepilone).  I also included therapies mentioned in Dr. Madigan's
    report (5-flourouracil, cyclophosphamide, doxorubicin, cisplatin).  The literature
    review was completed on September 2, 2021.

56. The following comprehensive search strings were used to identify relevant
    epidemiologic studies in the PubMed (www.pubmed.gov), EMBASE
    (www.embase.com), and Web of Science (www.webofknowledge.com)
    databases:

    a.  PubMed: (irreversible[All Fields] OR chronic[All Fields] OR
        permanent[All Fields] OR persist*[All Fields] OR long term[All Fields]
        OR incomplete[All Fields]) AND (Alopecia[MeSH] OR alopecia[All
        Fields] OR "hair loss"[All Fields] OR "hair growth"[All Fields]) AND
        (Docetaxel[MeSH] OR docetaxel[All Fields] OR docefrez[All Fields] OR
        Paclitaxel[MeSH] OR paclitaxel[All Fields] OR  taxol[All Fields] OR
        onxal[All Fields] OR 5-fluourouracil[All Fields] OR fluorouracil[All
        Fields] OR adrucil[All Fields] OR Cyclophosphamide[MeSH] OR
        Cyclophosphamide[All Fields] OR neosar[All Fields] OR cytoxan[All
        Fields] OR Doxorubicin[MeSH] OR Doxorubicin[All Fields] OR
        adriamycin[All Fields] OR rubex[All Fields] OR Cisplatin[MeSH] OR
        Cisplatin[All Fields] OR briplatin[All Fields] OR cisplatyl[All Fields] OR
        ixabepilone[MeSH] OR Ixabepilone[All Fields] OR ixempra[All Fields]
        OR Vincristine[MeSH] OR Vincristine[All Fields] OR oncovin[All
        Fields] OR vincasar[All Fields] OR Vinblastine[MeSH] OR
        Vinblastine[All Fields] OR velban[All Fields] OR alkaban-AQ[All Fields]
        OR Vinorelbine[MeSH] OR Vinorelbine[All Fields] OR navelbine[All
        Fields] OR Vindesine[MeSH] OR Vindesine[All Fields] OR eldisine[All

Jon P. Fryzek, MPH, PhD                                                EpidStrategies

Fields] OR Cabazitaxel[MeSH] OR Cabazitaxel[All Fields] OR
jevtana[All Fields] OR 130-nm albumin-bound paclitaxel [MeSH] OR
"130-nm albumin-bound paclitaxel"[All Fields] OR "nab-paclitaxel"[All
Fields] OR abraxane[All Fields] OR Taxane[MeSH] OR Taxane[All
Fields] OR Taxoid[MeSH] OR Taxoid[All Fields] OR Vinca
alkaloids[MeSH] OR Vinca alkaloids[All Fields] OR Epothilone[MeSH]
OR Epothilone[All Fields] OR "epothilone B analog"[All Fields])
[limited to English language]

b. Embase: ((Irreversible OR chronic OR permanent OR persist* OR long-
term OR incomplete) AND (Alopecia/exp OR "hair loss" OR "hair
growth")) AND (Docetaxel OR docefrez OR Paclitaxel OR taxol OR
onxal OR 5-fluourouracil OR fluorouracil OR adrucil OR
Cyclophosphamide OR neosar OR Cytoxan OR Doxorubin OR
Adriamycin OR rubex OR Cisplatin OR briplatin OR cisplatyl OR
Ixabepilone OR ixempra OR Vincristine OR oncovin OR vincasar OR
Vinblastine OR velban OR alkaban-AQ OR Vinorelbine OR navelbine
OR Vindesine OR eldisine OR Cabazitaxel OR jevtana OR Nab-paclitaxel
OR abraxane OR "albumin-bound paclitaxel" OR Taxane/exp OR
taxoid/exp OR Vinca alkaloids/exp OR Epothilone OR "epothilone B
analog") [limited to English language]

c. Web of Science: (Irreversible OR chronic OR permanent OR persist* OR
long term OR incomplete) AND (alopecia OR "hair loss" OR "hair
growth") AND (Docetaxel OR docefrez OR Paclitaxel OR taxol OR onxal
OR 5-fluourouracil OR fluorouracil OR adrucil OR Cyclophosphamide OR
neosar OR Cytoxan OR Doxorubin OR Adriamycin OR rubex OR
Cisplatin OR briplatin OR cisplatyl OR Ixabepilone OR ixempra OR
Vincristine OR oncovin OR vincasar OR Vinblastine OR velban OR
alkaban-AQ OR Vinorelbine OR navelbine OR Vindesine OR eldisine OR
Cabazitaxel OR jevtana OR Nab-paclitaxel OR abraxane OR "albumin-
bound paclitaxel" OR Taxane OR taxoid OR Vinca alkaloids OR
Epothilone OR "epothilone B analog") [limited to English language]

57. Studies were included if they met the following criteria:

a. Study design: Observational studies (cohort, case-control, case series with
n≥20 patients), clinical trials
b. Population: Cancer patients
c. Exposures: Docetaxel, paclitaxel, 5-fluourouracil, cyclophosphamide,
doxorubicin, cisplatin, ixabepilone, vincristine, vinblastine, vinorelbine,
vindesine, cabazitaxel, nab-paclitaxel, taxanes, epothilone B analogs,
vinca alkaloids
d. Outcomes: alopecia as permanent, irreversible, or chronic, lasting >6
months after completion of treatment.  To be as complete as possible, we

Jon P. Fryzek, MPH, PhD                                    EpidStrategies

also included studies that did not specify whether the alopecia was permanent or temporary.

58.   Studies were excluded if they exhibited any of the criteria below:

    a.   Study design: Case series with n<20, case reports, opinions, reviews, editorials
    b.   Population: Non-cancer patients
    c.   Exposures: No exposures of interest, outcomes not specific to a particular chemotherapy regimen
    d.   Outcomes: No description of alopecia or specification that alopecia was temporary, not permanent
    e.   Other: Study not in English language; another included article has more updated data for trial/cohort.

59.   After the articles were de-duplicated across databases, 927 articles were reviewed for relevance by title and abstract. After removing irrelevant articles, 298 articles remained and were reviewed by examining the full text of the article. An additional 15 articles were included for full-text review after reviewing the bibliographies of review articles. Among these articles, 209 were included in this report and abstracted into the abstraction database. Of the 104 articles that were eliminated after reviewing the full text, 29 were excluded for study design, 2 for population, 17 for exposures, 52 for outcomes, and 4 for other reasons. The PRISMA flow diagram is presented in Figure 1.

Jon P. Fryzek, MPH, PhD                                        EpidStrategies

Figure 1. Flow Diagram of Study Inclusion



60. Among the 209 included studies, 20 studies described alopecia for patients taking docetaxel as part of their chemotherapy regimen,[4-23] 32 studies examined taxanes other than docetaxel,[5,11,13,14,20,22,24-49] 87 examined other anti-microtubules besides taxanes,[27,50-135] and 176 studies evaluated chemotherapies that were included as a comparator to docetaxel in Dr. Madigan's report (e.g., 5-FU, cyclophosphamide, doxorubicin, cisplatin).[11,13,16,17,19,20,22-25,27,28,30,32,33,36-40,42,50,51,53-59,61,62,64-95,97-102,104-107,109-112,114-211]

61. Some studies explicitly described an outcome of "permanent" or "persistent" alopecia, while others reported alopecia as one of several AEs, graded using a scale. The most common scales used were the National Cancer Institute's Common Terminology Criteria for Adverse Events (CTCAE) (formerly known as the NIC-CTC)[212] or the World Health Organization (WHO) Toxicity Scale[213] (Table 2).

14

Jon P. Fryzek, MPH, PhD                                          EpidStrategies

62. Importantly, no version of the CTCAE scale includes a timing component indicating whether the hair loss was permanent or persistent. Additionally, only the first version of the CTCAE scale (used in the early 1990s) includes an option for Grade 3 alopecia (total body hair loss); all other versions of the CTCAE scale, only report Grades 1-2 alopecia. The current CTCAE scale has no definitions for Grade 3 (after 1999) or 4 alopecia; it can only be scored as Grade 1 or 2, and no version of the CTCAE scale allows for the distinction of permanent alopecia. In comparison, the WHO scale defines Grade 4 as non-reversible alopecia.

Table 2. Grading Scales for Alopecia

| Alopecia Grade | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| CTCAE Scale V1 (1994) | Mild hair loss | Pronounced or total head hair loss | Total body hair loss | - |
| CTCAE Scale V2 (1999) | Mild hair loss | Pronounced hair loss | - | - |
| CTCAE Scale V3 (2003) | Thinning or patchy | Complete | - | - |
| CTCAE Scale V4-V5[212] (2010 – present) | Hair loss of <50% of normal for that individual that is not obvious from a distance but only on close inspection; a different hair style may be required to cover the hair loss but it does not require a wig or hair piece to camouflage | Hair loss of >=50% normal for that individual that is readily apparent to others; a wig or hair piece is necessary if the patient desires to completely camouflage the hair loss; associated with psychosocial impact | - | - |
| WHO Scale[213] | Minimal hair loss | Moderate, patchy alopecia | Complete alopecia | Non-reversible alopecia |

63. Several of the included studies scored alopecia as Grade 3 or 4 using the CTCAE scale[25,56,58,117,119,156,162,175]. Misuse of adverse events grading scales is not uncommon in clinical trials, but a lack of standardized definitions hinders evaluation of these events across studies. A review of misuse of CTCAE terminology in phase III clinical trials found that alopecia was graded as 3 or higher in 19 of 77 studies (25%), even though the maximum grade was 2[214]. Without further definition provided, it is impossible to know what the authors meant as CTCAE Grade 3/4 alopecia.

Jon P. Fryzek, MPH, PhD                                    EpidStrategies

1.      **Studies Regarding Docetaxel and Permanent or Persistent Alopecia.**

64. 10 of the 20 studies that treated patients with docetaxel as part of their chemotherapy regimen contained information regarding permanent or persistent alopecia.

65. Martin et al. (2018)[9] described the prevalence of persistent alopecia (PA) among consecutive breast cancer patients seen in the outpatient clinics of three different Spanish institutions.  Grade 2 PA was defined as complete alopecia that required a wig after at least 18 months from the end of adjuvant chemotherapy. Of 417 women included in the study at three different Spanish institutions treated with docetaxel-containing regimens, 7.6% of women reportedly had Grade 2 PA (0%–12% of the women depending on the combination chemotherapy they were administered; supplementary Table 1B in the article).  However, the authors did not report study participation rates, nor did they attempt to understand the representativeness of their study population.  Therefore, a selection bias, where women that underwent adjuvant chemotherapy and had alopecia were more likely to participate, cannot be ruled out.

66. A meeting abstract (Sedlacek 2006[11]) was presented that evaluated alopecia among consecutive breast cancer patients treated by one physician between the years 1994 and 2004.  Persistent significant alopecia (PSA) was defined as hair regrowth less than 50% of the pre-chemotherapy amount of hair, as judged by both the patient and the author.  Of the 112 patients treated with doxorubicin plus docetaxel, 7 (6.3%) were reported to have had PSA.  Of the 126 patients treated with doxorubicin plus paclitaxel, 0 (0%) were reported to have had PSA.  Because this publication is a meeting abstract, no information is reported on the representativeness of the authors' patients compared to all women who undergo treatment with docetaxel in combination with other chemotherapies, and the reported percentage of PSA may not be applicable to other women treated with these chemotherapies.  Further, this was a descriptive study, and causality could not be evaluated.

67. Permanent alopecia was described among a group of patients who received either a taxane (docetaxel or paclitaxel) or anthracyclines either with or without a taxane (Crown et al. 2017[13]).  Alopecia was ascertained through a telephone survey at least one year after completion of therapy.  Ongoing alopecia was defined as 0 (full hair recovery), 1 (mild hair loss), or 2 (severe/total). Severe/total hair loss was reported in 4% of patients regardless of chemotherapy regimen.  The proportion of patients reported with severe/total hair loss among patients treated with docetaxel regimens varied from 0% (docetaxel 300 mg/m$^2$) to 5% (docetaxel 450 mg/m$^2$).  Among patients treated with paclitaxel and an anthracycline, the proportion reported with severe/total hair loss was 9%.  Among 24 patients treated with docetaxel and cyclophosphamide, the proportion reported to have

severe/total hair loss was 16%.  This study cannot show causality, because the authors did not control for major confounders associated with hair loss, including patient age.  Further, the study may be associated with selection bias because those who developed alopecia may have been more likely to participate.  Finally, hair loss was self-reported, and no independent validation was performed.  Therefore, an information bias is present as well.

68. A small number (n=61) of breast cancer patients seen at a single institution in South Korea were studied for alopecia (Kang et al. 2019[8]). The study outcome was permanent chemotherapy-induced alopecia (PCIA), defined as absent or incomplete hair regrowth at ≥6 months after chemotherapy.  Incomplete hair regrowth (PCIA) was defined as hair density or thickness at 6 months being two standard deviations (SDs) or more below the baseline mean (before chemotherapy).  The authors did not report the proportion of patients with PCIA by specific regimen. The study concluded that patients treated with a taxane-based regimen (only docetaxel was listed among included regimens; n=32) were 8.01 (95% CI: 1.20-53.26) times more likely to have alopecia three years after completion of chemotherapy compared to patients not taking a taxane, after controlling for age, hair density, and hair thickness at time of diagnosis. The study is limited by the small sample size (as evidenced by the wide confidence intervals), selection of study patients (because it is unclear whether patients included in the study were more concerned or more susceptible to alopecia than patients not included), and study representativeness. The latter is because only one institution in South Korea was involved, and it is not clear whether the patients seen at that clinic are similar to other breast cancer patients or not.  No information is presented on participation rate or loss to follow-up, which would help us evaluate these potential biases.

69. A cross-sectional study was conducted among 265 Korean female breast cancer patients at one center (Kim et al. 2017[22]) to understand the prevalence of severe alopecia (defined as hair loss in more than 50% of the scalp 6 months or longer after completion of chemotherapy), among women treated with either (1) Adriamycin (doxorubicin) and cyclophosphamide or (2) Adriamycin and cyclophosphamide followed by a taxane, either docetaxel or paclitaxel.  Among women treated with Adriamycin and cyclophosphamide, 2.7% reported severe alopecia, while among women treated with Adriamycin and cyclophosphamide followed by a taxane, 10.5% reported severe alopecia.  This study demonstrated that severe alopecia occurred with both chemotherapy regimens, though multivariate logistic regression analyses demonstrated that the addition of a taxane to the regimen increased the odds of chemotherapy-induced irreversible alopecia by over four times (OR: 4.75; 95% CI: 2.29-9.86).  As noted by the authors, the study has a number of limitations that preclude drawing definitive conclusions about the differences in the percentages between the regimens, including sampling bias (37.2% of eligible patients refused to respond to the survey) and the tendency of patients with alopecia to be more likely to respond to the survey, and information bias, in that the data on severe alopecia are based on

patient self-report rather than physician review. Further, the authors did not distinguish between docetaxel and paclitaxel, so it is unclear which regimen was more likely to be associated with severe alopecia.

70. Another cross-sectional study reported on the results of questionnaires sent in 2013, 2014, 2015, and 2017 to patients receiving docetaxel- or paclitaxel-based chemotherapy regimens from 2010-2012, 2010-2013, or 2010-2014, or 2010-2016, respectively (Chan et al. 2020[14]; update of Thorp et al. 2015[215]). The questionnaire asked respondents, who had completed taxane chemotherapy at least one year prior to study commencement, to use the Savin pictorial hair loss scale to best describe their current extent of scalp hair, identify any appliances or products they use to manage scalp hair loss, and compare their current eyebrow, eyelashes, and nostril hair growth with that prior to initiation of chemotherapy, specify if they had sought advice or support regarding their scalp hair loss, and to offer any general additional hair loss information in free text. The authors used a one-year time interval assuming that if hair had not re-grown by this time frame, it was likely to be permanent. Significant hair loss was defined using the Savin pictorial hair loss scale (1-4 through "advanced"). Though only 64% of 383 docetaxel patients returned the questionnaire, 166 (67.8%) reported no scalp hair loss and 57 (23.3%) reported significant scalp hair loss. For paclitaxel patients, 138/222 patients responded (62% response rate); 103 (74.6%) reported no hair loss and 14 (10.1%) reported significant scalp hair loss. Although there was a significant difference in the rate of reported significant scalp alopecia between docetaxel- and paclitaxel-treated patients (p<0.01), the results of this study should be interpreted with caution as the response rate was only 64% for docetaxel and 62% for paclitaxel (patients experiencing hair loss would be more likely to respond), the analysis was not adjusted for any potential confounding factors, and the outcomes were self-reported.

71. A meeting abstract described long-term hair loss in patients receiving docetaxel-containing non-anthracycline adjuvant therapy for early-stage breast cancer (Crown et al. 2018[16]). All patients had completed therapy at least one year before the interview date (median follow-up >5 years). Alopecia was defined using CTCAE grades 0, 1, or 2. Among 368 patients, 74 (20.1%) had CTCAE Grade 1 alopecia and 24 (6.5%) had Grade 2.

72. A clinical trial comparing epirubicin and cyclophosphamide followed by docetaxel (EC-T) with epirubicin and docetaxel followed by capecitabine (ET-X) in patients with early-stage breast cancer (NCT00129389) provided patients with an optional alopecia questionnaire that was completed 1-2 years after therapy ended (Martin et al. 2015[19]). Among 1384 patients enrolled in the trial, 360 patients (26%) completed the alopecia questionnaire. Incomplete scalp hair recovery was reported in 30% of patients receiving EC-T and 14% of patients receiving ET-X. All of the patients in the ET-X arm and 95% of patients in the EC-T arm were able to remove their wigs (median duration of wig use: 6.03 months and 8.35 months, respectively). Among 669 patients in the EC-T arm, 111

Jon P. Fryzek, MPH, PhD                                          EpidStrategies

patients (17%) completed the alopecia questionnaire. Incomplete scalp hair recovery was reported in 30% of patients receiving EC-T. Five patients (4.5%) wore a wig permanently after therapy, and the remainder were able to remove their wigs (median duration of wig use: 8.35 months).

73. A cohort of 215 breast cancer patients treated with docetaxel-based regimens followed for 1.5-10 years after completion of therapy compared genetic variants of patients with and without persistent chemotherapy-induced alopecia (pCIA) (Nuñez-Torres et al. 2020[21]). In this study, pCIA was defined as lack of scalp hair recovery 18 months or more after treatment was ended. While 71/215 (33%) of patients in this cohort had pCIA, the authors found that patients with *ABCB1* genetic variants had four times the odds of developing pCIA. This study suggested that there is a genetic risk component to pCIA.

74. A meeting abstract reported on the results of the ERALOP study, a multicenter retrospective cohort study aimed to estimate the risk of developing persistent alopecia following adjuvant chemotherapy for breast cancer with cycles of the FEC regimen (5-fluorouracil, epirubicin, and cyclophosphamide) followed by cycles of docetaxel (Jamet et al. 2014[23], update of Bourgeois et al. 2014[216]). Persistent alopecia was defined as hair regrowth patterns not regressive 6 months after the date of the last cycle of chemotherapy with docetaxel, without overall improvement at the time of the survey, with an important psychological impact, and affecting over 50% of hair. Among 839 patients sent the alopecia questionnaire, 653 responded (77.8%), The rate of persistent alopecia was 8.7% (95% CI: 6.5-10.8%), which was reduced to 6.8% (5.1-8.5%) to account for non-response. The authors reported that increasing age was a significant risk factor for persistent alopecia, while decreasing the dose of docetaxel by at least 10% after acute toxicity was a protective factor.

75. Two studies of docetaxel-containing regimens evaluated alopecia using the WHO scale, but none of the patients in either of these studies had Grade 4 alopecia (Koizumi 2001; Koukourakis 2000[17,18]).

76. The remaining eight studies[4-7,10,12] did not use the WHO scale or specifically report whether the alopecia was permanent or temporary. Moreover, they reported alopecia among patients who had been administered docetaxel in combination with other chemotherapy drugs. While it was unclear whether the alopecia was permanent, the studies reported that 13%[20] to 100%[12] of the patients treated with docetaxel in combination with other drugs had some type of alopecia.

2.      **Analysis of Published Literature**

77. The 10 studies addressing docetaxel and permanent hair loss[8,9,11,13,14,16,19,21-23] contain several significant methodological issues that limit their interpretation and prevent them from being able to support a causal association. These are discussed below.

Jon P. Fryzek, MPH, PhD                                              EpidStrategies

78. First, most of the studies did not specifically address the issue of permanent or persistent hair loss associated with docetaxel. Only four of the ten studies specifically evaluated the risk of permanent alopecia with taxanes and two of them did not specifically compare the incidence of permanent alopecia between patients treated with docetaxel to those treated with other taxanes.

   a. The first, a cross-sectional study of 265 Korean female breast cancer patients at one center (Kim et al. 2017[22]), reported a risk of permanent alopecia when a taxane was added to the doxorubicin/ cyclophosphamide regimen. Not only was the study limited by selection bias and information bias and was conducted at a single center, but the authors did not distinguish between docetaxel and paclitaxel, so it is unclear which drug was more likely to be associated with permanent alopecia.

   b. The second study was a clinical trial of breast cancer patients in which both treatment arms included docetaxel-containing regimens (Martin et al. 2015[19]). Authors reported that patients in the epirubicin/docetaxel/ capecitabine arm had a shorter duration of wig use than patients in the epirubicin/cyclophosphamide/docetaxel arm. Thus, because docetaxel was in both groups, its potential association with permanent alopecia cannot be ascertained.

   c. The incidence of permanent alopecia was compared between regimens with or without docetaxel in the small study (n=61) of South Korean breast cancer patients (Kang et al. 2019[8]). The authors reported that patients treated with taxanes (only docetaxel is included in the list of regimens in the article's Table 1) were at a higher risk for alopecia than patients treated with other therapies. However, the study was limited by the small sample size, unknown participation and follow-up rates, and study representativeness. Further, the number of patients experiencing permanent alopecia was not reported by regimen, so the analyses cannot be verified independently.

   d. Chan et al. 2020[14] evaluated the incidence of self-reported alopecia >1 year after completing therapy with docetaxel- or paclitaxel-based regimens. Although there was a significant difference in the rate of reported significant scalp alopecia between docetaxel- and paclitaxel-treated patients (p<0.01), the results of this study should be interpreted with caution as the response rate was only 64% for docetaxel and 62% for paclitaxel (patients experiencing hair loss would be more likely to respond), the analysis was not adjusted for any potential confounding factors, and the outcomes were self-reported.

Jon P. Fryzek, MPH, PhD                                           EpidStrategies

    e.   The other 6 studies either did not include a comparison group of patients treated with other regimens[16,21,23] or provided rates for both docetaxel- and paclitaxel-based regimens without conducting any statistical comparisons.[9,11,13]

    f.   Thus, there is insufficient data in the literature specifically addressing the risk of permanent hair loss from docetaxel to conclude that there is a causal association.

79. Second, 9 of the 10 studies evaluating docetaxel and risk of permanent alopecia included docetaxel as part of a chemotherapy regimen that included other drugs known to cause alopecia (Martin et al. 2018,[9] Sedlacek 2006,[11] Crown et al. 2017,[13] Kim et al. 2017,[22] Chan et al. 2020,[14] Crown et al. 2018,[16] Martin et al. 2015,[19] Nuñez-Torres et al. 2020,[21] Jamet et al. 2014[23]).   In addition, two of these studies contained study arms evaluating other non-docetaxel chemotherapy regimens that also reported permanent alopecia (Crown et al. 2017,[13] Kim et al. 2017[22]) (Table 3).

Table 3. Permanent Alopecia Reported in Studies Evaluating Docetaxel-Based Regimens

| Study | Therapy | Permanent Alopecia |
|---|---|---|
| Martin et al. 2018[9] | docetaxel 75 mg/m$^2$ plus cyclophosphamide 4 cycles | 0/28 = 0% |
| | docetaxel 75 mg/m$^2$ plus cyclophosphamide 6 cycles | 5/48 = 10.4% |
| | Epirubicin 90 mg/m$^2$ plus docetaxel 75 mg/m$^2$ x 4 cycles →   Capecitabine x 4 cycles | 0/31 = 0% |
| | docetaxel 75 mg/m$^2$, doxorubicin, cyclophosphamide 6 cycles | 12/149 = 8% |
| | docetaxel 75 mg/m$^2$, carboplatin AUC 6, trastuzumab 6 cycles | 3/31 = 9.7% |
| | doxorubicin or epirubicin plus cyclophosphamide followed by docetaxel 100mg/m$^2$ x 4 cycles +/- trastuzumab | 16/130 = 12.3% |
| | Any docetaxel-containing regimen | 36/417 = 8.63% |
| Sedlacek 2006[11] | Doxorubicin regimen without taxane | 0/258 = 0% |
| | Doxorubicin + paclitaxel | 0/126 = 0% |
| | Doxorubicin + docetaxel | 7/112 = 6.3% |
| Crown et al. 2017[13] | Docetaxel | 8/260 = 3% |
| | Anthracycline without taxane | 1/12 = 8% |

Jon P. Fryzek, MPH, PhD                                    EpidStrategies

|  | Anthracycline without taxane | 2/23 = 9% |
|---|---|---|
|  | Docetaxel 300 or 450 mg/m$^2$ without anthracycline | 9/185 = 5% |
|  | Docetaxel 300 mg/m$^2$ without anthracycline | 0/90 = 0% |
|  | Docetaxel 450 mg/m$^2$ without anthracycline | 5/95 = 5% |
|  | Paclitaxel with anthracycline | 2/23 = 9% |
| Kim et al. 2017[22] | Anthracycline + cyclophosphamide only | 3/112 = 2.7% |
|  | Anthracycline + cyclophosphamide + taxane | 16/153 = 10.5% |
| Chan et al. 2020[14] | Docetaxel-based combination chemotherapy regimens (75-100 mg/m$^2$) | 57/245 = 23.3% |
|  | Paclitaxel-based combination chemotherapy regimens (80 mg/m$^2$) | 14/138 = 10.1% |
| Crown et al. 2018[16] | Docetaxel 75 mg/m$^2$ + cyclophosphamide 600 mg for 4 cycles | 4/140 = 3% |
|  | Docetaxel 75 mg/m$^2$ + cyclophosphamide 600 mg for 6 cycles | 10/96 = 10% |
|  | Docetaxel 75 mg/m$^2$ + carboplatin AUC 6 and trastuzumab | 10/132 = 8% |
| Martin et al. 2015[19] | four cycles of epirubicin (90 mg/m$^2$) plus cyclophosphamide (600 mg/m$^2$) followed by four cycles of docetaxel (100 mg/m$^2$), all administered on day 1 every 3 weeks. | 5/111 = 4.5% |
|  | four cycles of epirubicin (90 mg/m$^2$) plus docetaxel (75 mg/m$^2$) administered on day 1 every 3 weeks followed by four cycles of capecitabine (1,250 mg/m$^2$ twice a day on days 1 to 14). | 0/130 = 0% |
| Nuñez-Torres et al. 2020[21] | Docetaxel-based regimens | 17/215 = 7.9% |
| Jamet et al. 2014[23] | 5-fluorouracil, epirubicin, cyclophosphamide, docetaxel | 6.8% (5.1-8.5%) |

80. Notably, the drugs that were included in combination therapy with docetaxel in the studies above (Table 3) also have reported cases of permanent alopecia. Table 4 presents reports of permanent alopecia in 4 studies that evaluated some of these drugs (cyclophosphamide, carboplatin, doxorubicin) without docetaxel as part of the study arm (de Jonge et al. 2002,[143] Rogers et al. 2011,[54] Bergmann 1995,[75] Unterhalt et al. 1996[127]).

Jon P. Fryzek, MPH, PhD                                                    EpidStrategies

Table 4. Permanent Alopecia Reported in Studies Evaluating Non-Docetaxel-Based Regimens

| Study | Therapy | Permanent Alopecia |
|---|---|---|
| de Jonge et al. 2002[143] | Cyclophosphamide, thiotepa and carboplatin | 8/24 = 33.3% |
| Rogers et al. 2011[54] | Surgery followed by radiotherapy (35 Gy in 21 fractions followed by a boost to the posterior fossa of 20 Gy in 12 fractions) and chemotherapy (vincristine, etoposide, carboplatin, cyclophosphamide) | 4/30 = 13.3% |
| Bergmann 1995[75] | 2 mg vincristine dl, 25 mg/m$^2$ doxorubicin dl-3, 800 mg cyclophosphamide dl, 60 mg/m$^2$ prednisone dl-7 and 120 mg/m$^2$ etoposide dl- | 2/73 = 2% |
| Unterhalt et al. 1996[127] | Cyclophosphamide, vincristine, prednisone | 1/123 = 0.2% |

a.  Permanent alopecia was evaluated in 24 patients who were treated with a high-dose chemotherapy regimen of cyclophosphamide, thiotepa, and carboplatin for a number of different cancers (de Jonge et al. 2002[143]). Hair growth was evaluated 6-24 months after the last chemotherapy treatment, and permanent alopecia was defined as requiring a wig. Thirty-three percent of the patients had permanent alopecia.

b.  Two hundred and twenty-seven children with medulloblastoma (aged 3–18 years old) were treated with either surgery followed by craniospinal radiotherapy (CSRT) or surgery followed by chemotherapy (including vincristine in combination with other (non-docetaxel) therapies) and radiotherapy (C-CSRT) as part of the SIOP PNET III study (Rogers et al. 2011[54]). Sixty children, 30 in each treatment group, were studied for hair loss a minimum of one year after completion of radiotherapy to allow time for hair regrowth.  The difference in hair loss (none vs. some) for the cranial field and the type of hair loss (visible thinning vs. virtual/complete loss) for the posterior fossa boost field between the two treatment groups was compared.  The proportion of patients exhibiting virtual/complete hair loss in the cranial field was 13.3% (C-CSRT) versus 3.3% (CSRT). The C-CSRT group also experienced more virtual/complete hair loss over the posterior fossa boost (70%) than did the CSRT group (43.3%).

c.  A study of non-Hodgkin's lymphoma (NHL) patients treated with vincristine, doxorubicin, cyclophosphamide, prednisone, and etoposide observed 2% of 73 patients with WHO Grade 4 irreversible alopecia (Bergmann 1995[75]).

23

d. Another study of NHL patients treated with cyclophosphamide, vincristine, and prednisone reported that 1/123 (0.2%) of patients had WHO Grade 4 irreversible alopecia (Unterhalt et al. 1996[127]).

e. Thus, because permanent alopecia has also been reported in studies of other drugs often included in combination with docetaxel, analyses evaluating the relationship between docetaxel and reported permanent hair loss may be confounded by the other drugs.

81. Third, the majority of studies on permanent alopecia were descriptive (Martin et al. 2018,[9] Sedlacek 2006,[11] Crown et al. 2017,[13] Crown et al. 2018,[16] Nuñez-Torres et al. 2020,[21] Jamet et al. 2014[23]), in that they reported only the proportion of patients undergoing various chemotherapy regimens that experienced alopecia without controlling for important confounders of hair loss (not specified as permanent), such as patient age,[217,218] family history of hair loss,[218,219] and smoking[218], among others. For example, a recent study included in my literature review also suggested that there may be a genetic component to permanent alopecia, as patients with *ABCB1* genetic variants had four times the odds of developing permanent alopecia than those without.[21]

82. Fourth, many of the studies had substantial bias. Five studies used self-reported measures of hair loss, in which alopecia was not independently verified and patients with alopecia were more likely to respond than those without alopecia (Martin et al. 2018,[9] Crown et al. 2017,[13] Kim et al. 2017,[22] Chan et al. 2020,[14] Martin et al. 2015,[19] Jamet et al. 2014[23]).

## C.    FAERS data (case reports)

83. The Food and Drug Administration (FDA) Adverse Event Reporting System (FAERS) is a post-marketing database which contains case reports from manufacturers, consumers, and healthcare professionals of adverse events that were submitted to the FDA.

84. While FAERS is used by the FDA to look for potential safety signals, the FDA states that it cannot be used to determine causation[220] as there are a number of limitations to the database, including that the reported event may not be related to the product, not all events occurring with the use of a given product are reported to the database, many factors such as publicity can influence whether an event will be reported or not, and duplicate reports may be included. Therefore, the database cannot be used to show causation or even to calculate the incidence of an event in the United States (US) population.

Jon P. Fryzek, MPH, PhD                                              EpidStrategies

85. In fact, in order to access the FDA public FAERS data from the FDA website, a researcher must read and sign a disclaimer that states, in part (bold emphasis is mine):

    a. "Submission of a safety report **does not** constitute an admission that medical personnel, user facility, importer, distributer, manufacturer or product **caused or contributed** to the event."

    b. "**FAERS data alone cannot be used** to establish rates of events, evaluate a change in event rates over time or **compare event rates between drug products**."

    c. "The **number of reports cannot be interpreted** or used in isolation to reach conclusions about the **existence, severity, or frequency** of problems associated with drug products."

    d. "Confirming whether a drug product actually **caused** a specific **event can be difficult** based solely on information provided in a given report."

    e. "Importantly, safety reports submitted to FDA **do not necessarily reflect a conclusion** by FDA that the **information in the reports constitutes an admission** that the drug caused or contributed to an adverse event."

86. Plaintiffs' experts agree that FAERS data cannot show causation. Dr. Madigan states: "Both the FDA and pharmaceutical manufacturers routinely look to the FAERS database to provide context for specific drug safety concerns. **The nature of the database does not permit definitive causal inferences**, but the evidence therein nonetheless forms an important component of any drug safety investigation." Dr. Madigan's June 7, 2020 Report, p. 18.

87. Thus, the FAERS data is not valid evidence of a causal association between docetaxel and permanent alopecia.

### D.   Causality Guidelines

88. Causality guidelines provide a framework for evaluating all the scientific evidence and reaching judgements on the likelihood of an association being causal. An association between two factors does not mean there is a causal relationship between them. When weighing evidence from epidemiologic studies, we use "causal criteria." The scientific community widely endorses nine causality guidelines considerations set out by Sir Austin Bradford Hill[221]: strength of association, consistency, specificity, temporality, biological gradient, biological plausibility, coherence of evidence, experiment, and analogy.

89. The Bradford-Hill criteria are used to examine the totality of the evidence. Using one or two studies for each criterion is not an acceptable method to use the criteria. One must evaluate all the evidence together in context of the criteria.

Jon P. Fryzek, MPH, PhD                                                      EpidStrategies

90. <u>Strength of Association</u>

    a.  This guideline refers to the magnitude of the effect of an exposure on a disease. Strong associations are less likely to be explained by confounding or bias than weak associations. It should be emphasized that one does not even reach the point of examining the strength of a reported association unless the study in question is free of significant bias and confounding. That is, that bias, chance, and confounding must be ruled out as plausible explanations for the association observed in the study.

    b.  The gold standard in epidemiology is a randomized clinical trial. It provides the most reliable evidence of the strength of association as the results are less likely due to confounding or bias through the randomization of study participants. Here, the only available randomized clinical trials (TAX-301 and TAX-316) did not show a statistically significant association between docetaxel and alopecia.

    c.  Moreover, the observational studies do not show a trustworthy association because of their methodological flaws discussed above. They do not evaluate an association between docetaxel and permanent hair loss and contain the confounder of other drug use. They are also subject to selection bias.

    d.  While one study (Kang et al. 2019[8]) reported an odds ratio of 8.01 for the odds of permanent alopecia among patients receiving docetaxel-containing regimens, one does not even reach the point of examining the strength of a reported association unless the study in question is free of significant bias and confounding. That is, that bias, chance, and confounding must be ruled out as plausible explanations for the association observed in the study. As noted above, this study suffers from numerous biases that limit its utility. In addition, this estimate was imprecise, with the 95% confidence interval spanning 1.20 to 53.26.

    e.  None of the other observational studies provided a measure of association comparing the risk or odds of permanent alopecia among patients treated with and without docetaxel.

    f.  As Sir Bradford Hill himself explained, his criteria are only applied after an association that is "perfectly clear-cut and beyond what we would care to attribute to the play of chance" exists[221]. In this case, the studies do not demonstrate a consistent statistically significant relationship between docetaxel and permanent alopecia and, therefore, additional criteria need not be considered. Nonetheless, for completeness I analyze the remaining criteria below.

Jon P. Fryzek, MPH, PhD                                                    EpidStrategies

91. <u>Dose Response</u>

    a.  This consideration focuses on whether the study data exhibit a dose-response relationship between the exposure of interest and the disease, such that an increase in exposure is associated with an increase in the incidence of the disease, and vice versa.

    b.  No dose-response relationship was seen between increasing risk of alopecia with increasing exposure to docetaxel in the one study that reported risk of alopecia with increasing levels of docetaxel.

    c.  The Crown et al. 201713 meeting abstract reported a higher rate of Grade 1 or 2 persistent alopecia at year 1 after completing chemotherapy (considered permanent alopecia) among patients treated with regimens containing 450 mg/m2 docetaxel (18/95 = 19%) than those treated with 300 mg/m2 docetaxel (6/90 = 7%) without an anthracycline. Combination therapies for these regimens included carboplatin or cyclophosphamide. The authors performed a chi-square test to evaluate the difference in alopecia of any Grade by docetaxel dose and reported a significant result (p=0.02). However, other drugs known to be associated with alopecia (carboplatin and cyclophosphamide) were also included in these regimens.

    d.  No dose-response relationship was seen between increasing risk of permanent alopecia with increasing exposure to docetaxel in any study.

92. <u>Replication</u>

    a.  Repetition of the same or similar results in a number of different independent studies lessens the likelihood that the association observed in a particular study or studies was due to chance, unsuspected bias, or confounding. Thus, replication of significant positive results supports a causal relationship. If results have not been replicated, this factor weighs against finding a causal relationship.

    b.  Due to the presence of confounding in the studies we reviewed, especially the confounding associated with other chemotherapies that cause alopecia that were also used in the studies, this criterion was not met.

93. <u>Specificity</u>

    a.  As originally articulated by Sir Austin Bradford Hill, the inquiry is whether (a) the reported association is limited to a specific characteristic (such as exposure to a particular drug at a certain dose) and to particular sites and types of disease, and (b) there is no association between that characteristic or exposure and other causes of disease.

Jon P. Fryzek, MPH, PhD                                          EpidStrategies

b. In the vast majority of available studies, docetaxel was administered as part of a regimen with other cytotoxic chemotherapies (Martin et al. 2018,[9] Sedlacek 2006,[11] Crown et al. 2017,[13] Kim et al. 2017,[22] Chan et al. 2020,[14] Crown et al. 2018,[16] Martin et al. 2015,[19] Nuñez-Torres et al. 2020,[21] Jamet et al. 2014[23]).  As many of these drugs also have associated reports of permanent alopecia, a relationship between docetaxel and permanent alopecia cannot be determined without ruling out the potential role of the other drugs.

94. Biologic Plausibility

a. This guideline relates to whether there are known biological mechanisms that explain the hypothesized causal relationship between the exposure and the disease.  While it has been established that many chemotherapy drugs cause alopecia, to my knowledge, the medical community has not developed a consensus on a mechanism of action for permanent alopecia.

95. Temporality

a. Some of the reports of permanent alopecia in the studies I reviewed were preceded by exposure to docetaxel.  Thus ,this criterion was met in the studies I reviewed.

96. Coherence

a. Coherence requires that no serious conflict between a causal interpretation of the association and established knowledge of the natural history and biology of the disease in question exists.

b. This criterion was not met given that reports of permanent alopecia have been associated with multiple chemotherapy drugs.

97. Analogy

a. This Bradford Hill guideline asks whether a persuasive analogy can be drawn between the hypothesized cause-and-effect relationship being evaluated and a known causal relationship involving a similar (type of) agent and similar diseases.

b. As multiple chemotherapy drugs are associated with alopecia, any association between docetaxel and permanent alopecia must be evaluated in the absence of other drugs known to cause hair loss.

98. Experimental evidence

    a. There is no experimental evidence that reducing exposure to docetaxel reduces the incidence of permanent alopecia.

    b. Thus, criteria for causation do not support a conclusion that docetaxel alone causes permanent alopecia.

## VI.    Plaintiff Expert Reports

99. I was asked to review the expert reports and deposition of Plaintiffs' experts Dr. David Madigan, Dr. Ellen Feigal, Dr. Laura Plunkett, and Dr. Antonella Tosti. The following is a discussion of their opinions.

### A.    Dr. David Madigan

100. Dr. Madigan is a statistician who offers opinions on four topics: (1) whether there was a safety signal for docetaxel and permanent alopecia in the FAERS database; (2) whether there was a safety signal based on the Sanofi internal pharmacovigilance database; (3) a meta-analysis of observational studies evaluating docetaxel and permanent alopecia; and (4) reports of permanent alopecia in the Sanofi clinical trials (TAX-301 and TAX-316).

#### 1.    FAERS Data (case reports)

101. Dr. Madigan analyzed data from the FAERS database for docetaxel and permanent hair loss to look for a potential signal. However, his approach for identifying adverse events was incorrect and his methodology for conducting his analysis did not follow standard FDA guidance.

102. The FDA's guidance document on good pharmacovigilance practices and pharmacoepidemiologic assessment[222] defines a safety signal as "a concern about an excess of adverse events compared to what would be expected to be associated with a product's use" and describes that signals indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event.

103. Per the guidance document, one of the first steps in signal detection is a review of the individual case reports with the outcome of interest so that a case definition can be developed. The case definition involves the clinical characteristics of the event of interest, without regard to the causal mode of the medication under investigation.[223]

Jon P. Fryzek, MPH, PhD                                           EpidStrategies

104. Once the case series has been assembled from the individual case reports, a review of the individual case reports is necessary to determine whether there is a plausible causal relationship between the medication and the adverse event. In general, this involves a systematic review of each case report to understand the temporal relationship between a medication and suspected adverse event, an assessment of any coexisting diseases or medications that could confound the relationship between the medication and the suspected adverse event, and, if possible, the clinical course after withdrawal of the medication.[223]

105. Disproportionality analyses may be performed if warranted to determine whether a given adverse event is reported for a particular drug more often than would be expected based on the number of reports of that adverse event for all other drugs in the databases. A variety of data mining techniques can be used, including proportional reporting ratio, reporting odds ratio, the Bayesian Confidence Propagation Neural Network, and the empirical Bayes method.[224] It has been shown that the choice of signal detection algorithm is not as important as the signal detection criteria.[225]

106. The FDA guidance document affirms that data mining in the FAERS database is inherently exploratory or hypothesis generating and cautions against making comparisons between patterns of adverse events reported for a given product relative to other products in the same class or to all other products. This is because the FAERS database is subject to a variety of reporting biases, such as observations reflecting concomitant treatment or other factors, including the disease being treated, other confounding factors, or underlying comorbidities.

107. The FDA document also states that the FAERS data may be affected by the submission of incomplete or duplicate reports, underreporting, or reporting stimulated by publicity or litigation. Hauben et al. state that, as an adverse reaction becomes well-known, the number of spontaneous reports increases, known as the "bandwagon phenomenon."[226]

108. Dr. Madigan's signal detection analysis contains several fundamental methodological flaws.

109. First, Dr. Madigan does not perform any valid method of identifying cases of permanent hair loss. To identify adverse events of permanent hair loss, Dr. Madigan ran a search using the MedDRA term "alopecia" along with the terms "permanent damage" and "disability." However, this is not a reliable search method.

110. As an initial matter, neither of these terms means that the reported event was permanent. The term "disability" does not say anything about whether the event was permanent or not. A patient may have a treatable condition that would fall

Jon P. Fryzek, MPH, PhD                                                    EpidStrategies

into this category and would not be permanent and irreversible.   Thus, Dr. Madigan's inclusion of this imprecise category makes his results unreliable from the outset.

111. Moreover, multiple conditions other than "alopecia" can be included in one report.   For example, as explained below, reports of docetaxel and "alopecia" and "disability" in the FAERS database include other reactions, including cardiac disorders, visual acuity reduced, balance disorder, general physical health deterioration, pulmonary edema, neurotoxicity, depression, renal failure, gait disturbance, myalgia, peripheral neuropathy, impairment of activities of daily living, decreased mobility, muscle spasticity, and others.   Many of the other reported reactions could be associated with an outcome of disability.   It is not possible to tell from the FAERS database whether the outcome of "disability" was related to the reaction of alopecia or the many other reactions reported for these cases.

112. As an example, using the FAERS Public Dashboard, I identified the only six reports of alopecia with an outcome of disability before Q1 2008 that had docetaxel as a suspect drug.  Dr. Madigan also identifies six reports during that time period.  It is clear from their narratives that these reports contain false positives. Exhibits 17-21 to Deposition of Dr. David Madigan, dated 11/14/2019.

113. To further illustrate, a search of FAERS for instances where a reaction of "alopecia" was matched with an outcome of "death" yields over 1,000 results.  It is not reasonable to conclude that these are instances where reporters concluded that the patient died from alopecia.  This further demonstrates that Dr. Madigan's analysis, without pulling the underlying case reports, cannot sustain his conclusions about irreversible alopecia.

114. As stated in the recent FDA guidance on Postmarket Safety Surveillance[227], a careful review of the case reports to verify the data must first be conducted in order to form a well-defined case series.  Dr. Madigan did not do this.  Dr. Madigan had no process to try attempt to determine if the outcome "permanent damage" or "disability" was related to alopecia or one of the other conditions listed on the adverse event report.  In fact, Dr. Madigan has confirmed that his method could include cases that are not actually reports of permanent alopecia, (Deposition of Dr. David Madigan, dated 9/17/2021, pp. 94-95) as it cannot be determined if the outcome "permanent damage" or "disability" is associated with alopecia or one of the other conditions listed on the report.

115. In addition, Dr. Madigan denies that he is doing "data mining," but he provides no valid explanation for why his analysis is using data mining techniques, such as reporting ratios.   Further, he failed to follow the FDA's guidance for data mining, including not reviewing individual case reports to check for false positives.

Jon P. Fryzek, MPH, PhD                                                    EpidStrategies

### 2.    Sanofi Internal Data

116. Dr. Madigan also reviewed the Sanofi pharmacovigilance database to identify reports of "irreversible" alopecia.  His analysis suffers from several pitfalls.

117. First, Dr. Madigan's process for identifying alleged cases of "permanent" alopecia is unreliable.  For example, he uses searches that do not show whether there was a "permanent" condition for "alopecia" or other conditions reported in the adverse event.

118. Second, these are also case reports and suffer from the same issues as the FAERS database.  They cannot be used to show causality, as discussed above in Section IV.

119. Third, as this was internal Sanofi data, Hospira was unable to access this database to evaluate any potential signal for docetaxel.

### 3.    Meta-Analysis

120. Dr. Madigan conducted a literature review and meta-analysis and presented four scientific publications that compared the risk of irreversible alopecia among docetaxel and non-docetaxel treated patients.  He did not follow guidelines (PRISMA) that are well accepted for conducting and reporting systematic reviews and meta-analyses.[3]

121. First, no information is presented in his report that describes the methodological approach for identifying these articles.  Therefore, it is not clear if the articles were identified in a systematic manner or were "cherry-picked."

122. Second, given the uncontrolled confounding and bias in these studies, as well as the differences in patient groups, indications, and other important factors, it would not be consistent with the standards of my field to compare results from one paper to another without careful consideration.  Specific to the Madigan meta-analysis, Dr. Madigan combined four studies into a random-effects meta-analysis without consideration of study design or patient population.  As set forth in Table 6 below, however, there were significant differences between the studies.  Although patients in all four studies had breast cancer, they were treated with various chemotherapy regimens.  The method of determining the outcome as well as the outcome definition varied across studies. Combining these studies does not result in a meaningful outcome.  Further, patients were from different geographic populations, with varying ages and stages of breast cancer. These studies should not be simply combined into a meta-analysis without consideration of the heterogeneity between patient populations.

Table 6. Studies Included in Dr. Madigan's Meta-Analysis

Jon P. Fryzek, MPH, PhD                                                    EpidStrategies

| Author (Year) | Country | Median Age (Range) | Cancer Stage | Post-menopausal | Chemotherapy Regimen | Alopecia Ascertainment | Permanent Alopecia Definition |
|---|---|---|---|---|---|---|---|
| Kang (2019)[8] | South Korea | Mean 47.1 (NR) | I-III | 36.1% | AC, TC, FAC, TAC, AC+T | Photo-trichogram evaluation | Absent or incomplete hair regrowth at ≥6 months after chemotherapy |
| Martin (2018)[9] | Spain | 53 (26-84) | I-III | 58% | FAC, FEC, AC, EC, ET+X, TC, TAC, TCH, AE±C+T±H | Patient interview or dermatologist examination | Complete alopecia requiring a wig after at least 18 months from the end of adjuvant therapy, alone or followed by adjuvant endocrine therapy and/or trastuzumab |
| Sedlacek (2006)[11] | USA | NR | NR | NR | AC, FAC, A/CMF, AC+T, AT+T, ATC, AC+TH, AT+CAF, CAF+T, AC+TX | "Judged by patient and author" | Hair regrowth <50% of pre-chemotherapy amount at least 1 year after therapy completion |
| Crown (2017)[13] | Ireland | NR | NR | NR | T, Anthracycline ± T or P | Telephone interview (self-report) | "severe/total" alopecia >1 year after completing therapy |

A, doxorubicin; C, cyclophosphamide; E, epirubicin; F, fluorouracil; H, trastuzumab; M, methotrexate; NR, not reported; P, paclitaxel; T, docetaxel; X, capecitabine

## 4.      Sanofi clinical trials (TAX-301 and TAX-316)

123. Dr. Madigan's attempt to support his conclusion by combining the results of TAX-301 and TAX-316 contains serious methodological flaws.

124. As an initial matter, combining the two studies does not resolve the problems with each study. As explained above, both studies rely on a definition of "ongoing" that does not equate with permanent alopecia. Neither study reports a statistically significant risk for ongoing alopecia in the docetaxel arm. And the TAX-301 study does not even contain sufficient data to be evaluated. Combining the two studies only compounds those problems and does not resolve them.

125. Moreover, Dr. Madigan's use of a random-effects meta-analysis model to combine the two studies is not appropriate. A random-effects meta-analysis combines studies that estimate different, yet related, treatment effects (as compared to a fixed-effects meta-analysis, which assumes that the studies estimate the same underlying treatment effect). The random-effects model relies on a few basic assumptions—namely, (1) that studies are similar in design and

participating patient populations, and (2) that the distribution of study effects (the risk ratios evaluating the effect of the treatment versus the control in the included studies) follows a normal distribution.[228]  The model used by Dr. Madigan does not meet either criterion, indicating that a random-effects model is not appropriate.

126.  First, there are some important differences in the patient populations between TAX-316 and TAX-301, as described above. Per trial inclusion criteria, patients in TAX-316 had more advanced-stage disease than patients in TAX-301 (node-positive vs. node-negative disease), which may affect patients' outcomes and rates of adverse events. TAX-316 also had a higher proportion of hormone-receptor positive patients than TAX-301 (76% vs. 65%), and TAX-301 required patients to have ≥1 of the St. Gallen high-risk criteria (tumor size >2cm, hormone receptor negative, tumor histologic grade 2 or 3, or age <35 years). Results from heterogenous populations should not be combined without a thorough evaluation of how their differences may affect the outcomes.  Dr. Madigan does not provide any analysis of this heterogeneity and its impact on the observed results.

127.  Second, validation of the second assumption is impossible, as a distribution cannot be created from only two studies.  The problems associated with a standard random-effects meta-analysis involving a small number of studies are well documented.[229] Without a sufficient number of studies, random-effects models tend to falsely point in the direction of a significant outcome when there is none.

128.  Finally, Dr. Madigan's opinion that TAX-316 shows a statistically significant risk of permanent hair loss after two years is invalid.   Again, this analysis is based on the faulty assumption that "ongoing" alopecia equates with permanent alopecia.  Moreover, Dr. Madigan does not base his analysis on a standard p-value, which the standard method of measuring statistical significance.  Using the standard p-value, the results are not statistically significant.  Instead, Dr. Madigan uses a mid-p value.  Dr. Madigan attempts to justify this method because of the very small number of patients (5 vs. 0), but that does not make it a reliable method.  Rather, this conclusion-driven approach only highlights that there is not enough data to draw a meaningful statistical conclusion.  This limitation is further demonstrated by the fact that there were only 3 FAC patients who were followed for more than one year (Patient IDs 11710, 19801, 30001), and two of them relapsed and were no longer followed for AEs before the two-year follow-up (Patient IDs 11710 and 30001).  We therefore do not know whether they would have had ongoing alopecia at the two-year mark.  Thus, there are no statistically significant results, whether measured at six months or two years after treatment.

129.  Three additional plaintiff experts also reviewed the scientific literature and offered opinions as to whether docetaxel causes permanent alopecia (Dr. Ellen

Feigal, Dr. Laura Plunkett, and Dr. Antonella Tosti). These three experts' opinions contain similar methodological issues:

      i.   None of the experts conducted a systematic literature review to evaluate all available published literature. Evidence needs to be identified in a manner that is transparent and reproducible.

     ii.   All three experts rely on descriptive studies, including case series and case reports, to support their claims, and do not account for the methodological issues discussed above (combination chemotherapy regimens, confounding factors, self-reported outcomes).

   iii.   All three experts combine study results together without considering the heterogeneity of the underlying studies (populations, ages, geographies, treatment combinations).

I discuss these issues below with more specificity.

## B.    Dr. Ellen Feigal

130.  I was asked to review Dr. Ellen Feigal's expert report dated June 8, 2020. Dr. Feigal discusses various publications of permanent alopecia and docetaxel and uses the Bradford Hill criteria to opine a causal relationship. Dr. Feigal's opinions contain a series of significant flaws.

131.  First, Dr. Feigal did not conduct a systematic literature review of the scientific literature on docetaxel and permanent alopecia. She relies on a limited selection of literature to reach her conclusions, rather than conducting a thorough evidence-based assessment of the literature. Additionally, she reports that she conducted comprehensive searches in Endnote, which is not a database of scientific literature, but a software program used to manage libraries of references.

132.  Second, Dr. Feigal cites the rates of ongoing alopecia in the two Sanofi clinical trials as evidence for causation demonstrating an "almost doubling of the odds of PCIA with the Taxotere/docetaxel regimen compared to the control arm" (Feigal Report, p. 73). As discussed above, this does not account for the potential role of chance in the analysis. While the TAX-316 clinical study report did not evaluate whether there was any statistically significant difference in rate of ongoing alopecia between the study arms, my calculations demonstrated no statistically significant difference in ongoing alopecia between the docetaxel-containing arm and the control arm. No statistically significant difference between study arms was seen after revising the analyses by removing patients who did not have permanent alopecia. Dr. Feigal did not conduct a statistical evaluation of the difference in the rate of ongoing alopecia between study arms and thus cannot rule out the role of chance in these findings.

Jon P. Fryzek, MPH, PhD                                    EpidStrategies

133. Third, Dr. Feigal relies on multiple descriptive case series of patients reported to have permanent alopecia within her evaluation of causation (Feigal Report, Table 2). As discussed above, case reports and case series cannot be used to determine causality as they lack a control group. A brief description of these articles is provided below:

   a. Freites-Martinez (2019)[230] describes a cohort of women reported to have persistent alopecia. The objective of this study was to report the clinical presentation of these patients and describe their quality of life. All included patients had persistent alopecia and there was no control group without persistent alopecia. Therefore, this study cannot be used to compare the risk of persistent alopecia for one therapy versus another.

   b. Kluger (2012)[231] described the clinical features and quality of life of 20 women reported to have permanent alopecia. Again, there were no patients without permanent alopecia in this study, and the risk of permanent alopecia cannot be calculated without a control group. Moreover, there were significant confounding factors because the patients received other chemotherapy treatments, as well as hormone therapy and radiation therapy.

   c. Bourgeois (2009)[232] described 66 cases of persistent alopecia or suboptimal hair regrowth after adjuvant chemotherapy.

   d. Fonia (2017)[233] reviewed the cases of 10 breast cancer patients with permanent alopecia who were treated with taxanes and adjuvant hormonal chemotherapy.

   e. Miteva (2011)[234] discuss the features of 10 cases of permanent alopecia after chemotherapy with taxanes, busulfan, or cisplatin + etoposide.

   f. Tallon (2010)[235] is a case report of permanent alopecia in a patient receiving adjuvant chemotherapy with docetaxel, carboplatin, and trastuzumab.

   g. Werbel (2018)[236] is a case report of persistent alopecia in a breast cancer patient treated with pertuzumab, docetaxel, carboplatin, and trastuzumab.

   h. Masidonski and Mahon (2009)[237] identified 13 cases of permanent alopecia in women treated with an anthracycline and cyclophosphamide, with and without a taxane.

   i. Palamaras (2011)[238] describes 7 cases of chemotherapy0induced permanent alopecia after treatment with buslphan or taxanes.

Jon P. Fryzek, MPH, PhD                                    EpidStrategies

    j.   Tosti (2013)[239] reports five patients with permanent alopecia following docetaxel chemotherapy for breast cancer.

    k.   Prevezas (2009)[240] describes two cases of irreversible alopecia following chemoerhapy with taxanes.

    l.   All of these case reports or case series relied upon by Dr. Feigal do not include a control group and therefore cannot be used to determine causality.

    m.   Dr. Feigal also relied upon two additional studies that did not include a comparison group. The first was a single-arm clinical trial of breast cancer patients treated with docetaxel, doxorubicin, and cyclophosphamide (Nabholtz et al. 2001[241]). The second, a cohort of breast cancer patients treated with docetaxel, 5-FU, epirubicin, and cyclophosphamide (Bertrand et al. 2013[242]). While these studies are not case series or case reports, they lack a control group that was not treated with docetaxel. Without a comparison group, the risk of permanent alopecia cannot be calculated.

134.   Fourth, Dr. Feigal relies upon the meta-analysis of four observational studies conducted by Dr. Madigan in her evaluation of causality (Feigal Report p. 60, n.110). As discussed above, this meta-analysis was not appropriate and did not account for important sources of heterogeneity between studies.

135.   Fifth, Dr. Feigal's application of the Bradford Hill criteria did not consider the totality of the literature or evidence.  Only limited information was considered for each of the criterion.  Dr. Feigal never considered the underlying populations of the studies she included in her causality analysis, the follow-up times, or how information on permanent alopecia was collected.  These are all important factors when considering the validity of studies to include in a causality assessment.

136.   Finally, in Dr. Feigal's application of the Bradford Hill criterion "strength of association," she adds up the total number of cases of permanent alopecia by chemotherapy regimen among the selected studies she chose to include in her evaluation (Feigal Report, p. 73).  She then states that among the 19 studies she considered, there were 6.4-8 times the number of reported cases of PCIA in docetaxel regimens than in non-docetaxel regimens. *Id.*  This is not a standard epidemiologic method for comparing the risk of an adverse event between two chemotherapy regimens or to evaluate the strength of association, as the numbers depend on the selected studies considered.

137.   Thus, Dr. Feigal's report did not evaluate the scientific literature in a methodologically rigorous manner in the support of her conclusions.  She used descriptive studies and case series in her evaluation of causation, which can only be conducted using analytical studies.  She did not account for the role of

Jon P. Fryzek, MPH, PhD                                          EpidStrategies

chance or bias by performing statistical evaluations of the difference in rates of ongoing alopecia between study arms in the Sanofi clinical trials. Her causality evaluation relied heavily on the methodologically flawed meta-analysis conducted by Dr. Madigan.

### C.    Dr. Laura Plunkett

138. I was asked to review Dr. Laura Plunkett's expert report dated June 3, 2020. Without conducting a systematic review of the literature, Dr. Plunkett selects various publications of permanent alopecia and docetaxel and opines that "[w]hen the published literature relevant to the relationship between docetaxel exposure and CIPAL/ PCIA is considered as a whole . . . , the weight-of-the-evidence indicates that it is biologically plausible that Taxotere/ docetaxel can cause CIPAL/ PCIA when the drug is used as an adjuvant to treat early stage breast cancer, that the risk of permanent, irreversible alopecia is not rare, that Taxotere/ docetaxel use carries an independent risk of CIPAL/ PCIA, and that Taxotere/ docetaxel use is associated with an increased risk of CIPAL/ PCIA as compared to other drugs used in breast cancer treatment" (Plunkett Report, pp. 21-22). For several reasons, Dr. Plunkett's opinions are not supported by valid scientific methodology.

139. First, she does not consider the entirety of evidence using a systematic literature review, but rather relies on case reports and case series and other selected literature without discussing the inherently methodological issues of these articles (as I discussed above). *See* Plunkett Report, pp. 19-21. In addition to many of the case reports and case series cited by Dr. Feigal, Dr. Plunkett also cites the following articles that cannot be used to determine causality:

   a. Bourgeois (2012)[243] describes a database of >100 patients with persisting alopecia or suboptimal hair growth after chemotherapy for early breast cancer. No control group was reported in the study.

   b. Namini (2016)[244] is a systematic review of case reports of permanent alopecia and docetaxel therapy.

   c. Sibaud (2016)[245] is a review of potential adverse effects of taxane therapies. The section on chemotherapy-induced persistent alopecia references case reports including Kluger 2012, Bourgeois 2009, Prevezas 2009, and Tosti 2013.

140. Second, Dr. Plunkett does not conduct a causation evaluation using the Bradford Hill criteria. She states that she uses a weight-of-the-evidence approach, which she defines as "evaluating individual studies and determining what the studies describe, when considered as a whole" (Plunkett Report p. 4). Her methodology is not transparent or reproducible by other scientists.  Rather than considering the Bradford Hill criteria, she only discusses three factors of a causation

analysis: whether causation is "biologically plausible," whether the risk of PCIA is "not rare," whether there is an "independent risk" of PCIA with docetaxel, and whether docetaxel has an "increased risk" of PCIA compared to other drugs. *See, e.g.*, Plunkett Report, pp. 17-23. Without conducting a standard causation evaluation using Bradford Hill criteria, Dr. Plunkett has no basis to opine as to causation.

141.  Third, Dr. Plunkett provides no valid basis for her opinions regarding the "independent" and "increased" risk of PCIA with docetaxel compared to other drugs. She cites the meeting abstract by Sedlacek[11] as evidence of an "independent" and "increased" risk of PCIA for patients taking docetaxel compared with those taking other regimens. *See* Plunkett Report, pp. 16-17. However, as I noted above in Part V.B., because this publication is a meeting abstract, no information is reported on the representativeness of the authors' patients compared to all women who undergo treatment with docetaxel in combination with other chemotherapies, and the reported percentage of PCIA may not be applicable to other women treated with these chemotherapies. Further, as this was a descriptive study, the authors did not attempt to calculate a statistical difference in the risk of PCIA between chemotherapy regimens. For this reason, this study cannot be used as evidence of an independent risk of PCIA with docetaxel. Dr. Plunkett also cited the TAX-316 trial as evidence of an independent risk of PCIA, (Plunkett Report, p. 27), though no tests for statistical significance were conducted for ongoing alopecia in this trial, and my calculations did not demonstrate a statistically significant difference between study arms.

142.  Thus, in my opinion, Dr. Plunkett does not have a valid scientific basis for her opinions.

### D.     Dr. Antonella Tosti

143.  I was asked to review Dr. Antonella Tosti's expert report dated August 2, 2021. Without conducting a standard causation evaluation using the Bradford Hill criteria, or conducting a systematic review of the published literature, Dr. Tosti states that "Taxotere/docetaxel are the only chemotherapy regimens that have been consistently shown to cause Permanent Chemotherapy-Induced Alopecia" (Tosti Report, p. 15). Dr. Tosti states that she reviewed 22 articles and abstracts regarding distinct cases of permanent chemotherapy-induced alopecia in the context of adjuvant breast cancer chemotherapy. *Id.*

144.  Dr. Tosti states that in the adjuvant treatment of breast cancer, there were 52 cases of permanent alopecia reported with non-taxane regimens (anthracyclines and/or cyclophosphamide) in comparison with 650 reported cases with taxane regimens (487 Taxotere/docetaxel; 93 unidentified taxane regimens; 66 Taxol/paclitaxel) (Tosti Report, p. 15). Given this information, Dr. Tosti claims that "[t]here is consistent, sufficient, and reliable evidence within the scientific

Jon P. Fryzek, MPH, PhD                                          EpidStrategies

literature that Taxotere/docetaxel, when used in regimens with anthracyclines and/or cyclophosphamide, is a substantially contributing factor to PCIA" (Tosti Report, p. 15).

145.    Dr. Tosti has not fully evaluated the published literature for articles evaluating the risk of permanent alopecia with chemotherapy.  It is not standard practice in epidemiology to add up case reports from a selection of literature and compare them across regimens, as a) the literature was not reviewed systematically, b) the denominators for the various chemotherapy regimens are not taken into account to calculate rates, and c) the populations of the studies have not been considered to address heterogeneity.  Additionally, Dr. Tosti did not address the reports of permanent alopecia occurring with anthracyclines and/or cyclophosphamide.

146.    Finally, Dr. Tosti did not conduct any statistical tests to evaluate the difference in permanent alopecia between docetaxel or any other chemotherapy regimen. Thus, when she states that "Taxotere/docetaxel is far more commonly reported as being associated with PCIA than any other chemotherapy regimen," (Tosti Report, p. 16), her opinion is not based on standard scientific methodology.

147.    On page 16 of her report, Dr. Tosti states that the randomized studies with Taxotere/docetaxel regimens for breast cancer "had a statistically increased rate of PCIA, when controlled for Adriamycin/doxorubicin and cyclophosphamide." The references she cites as evidence for this statement include the TAX-316 interim study report at page 5, the TAX-316 10-year clinical study report at page 37, and the TAX-301 10-year clinical study report at page 111.  As discussed above in my report, no statistical tests for a difference in the rate of ongoing alopecia between study arms were conducted for these trials, and my calculations resulted in no statistically significant difference. It is unclear why Dr. Tosti stated that there was a statistically increased risk of ongoing alopecia between study arms.

148.    Dr. Tosti did not conduct a systematic review of the literature and her opinions are not based on standard epidemiologic methodology.

## VII.    Conclusions

149.    The following is a summary of my conclusions.

150.    Based on my review of the scientific literature, there is not an adequate basis to conclude that docetaxel causes permanent alopecia.

151.    The Sanofi trials (TAX-316 and TAX-301) do not offer evidence that docetaxel is related to permanent alopecia.  As described in my report, my calculation of the risk of permanent alopecia between the docetaxel and non-docetaxel arms of TAX-316 demonstrated no statistically significant difference in the risk of

permanent alopecia between the two arms. Further, a review of the documentation of patients in TAX-316 listed as having "ongoing" alopecia at their last follow-up demonstrated that several had their last follow-ups for alopecia prior to six months after finishing treatment with docetaxel, and several did in fact have their condition resolve. Follow-up was not as rigorous in TAX-301, limiting the utility of this trial in the study of permanent alopecia.

152. A review of the scientific literature does not support a finding of causality between docetaxel and permanent alopecia. The vast majority of the studies published in the scientific literature on chemotherapy and permanent alopecia are descriptive studies and cannot show causality.  Only one small, limited study, Kang et al,[8] was specifically designed to look at the relationship between docetaxel and permanent alopecia, and its conclusions are limited by its inherent biases, including the small sample size (as evidenced by the wide confidence intervals), selection of study patients (it is unclear whether patients included in the study were more concerned or more susceptible to alopecia than patients not included), and study representativeness. The latter is because only one institution in South Korea was involved, and it is not clear whether the patients seen at that clinic are similar to other breast cancer patients or not.  No information is presented on participation rate or loss-to-follow-up, which would help us evaluate these potential biases.

153. Case reports from the FAERS database or Sanofi's internal database cannot show causation. Limitations of the FAERS database include the inability to identify actual cases of permanent alopecia for docetaxel and other drugs.  The FDA does not require causation to be established for filing the reports,[220] so even if permanent alopecia is clinically present in a report, the suspect drug may not be the causative agent.

154. Plaintiffs' experts did not provide a valid scientific basis for their causation opinions.  Dr. Madigan's analysis of the Sanofi clinical trials, the FAERS data, and the Sanofi internal data did not have a reliable method of identifying cases of "permanent" alopecia, and this fundamental flaw undermines all his analyses. Drs. Madigan, Feigal, Plunkett, and Tosti conducted incomplete and selective reviews of the literature and failed to take into account the methodological limitations of the included studies.  Given the uncontrolled confounding and bias in the literature, as well as the differences in patient groups, indications, and other important factors, it would not be consistent with the standards of my field to compare results from one paper to another without careful consideration.  The meta-analysis performed by Dr. Madigan is problematic given the differences in populations, treatments, geographies, and ages.

155. Finally, Dr. Madigan's analysis of the FAERS data, by his own admission, cannot show a causal link between docetaxel and permanent alopecia, nor does it establish any safety signal because of his incorrect method of identifying cases of permanent alopecia.  Even under this flawed method, analysis of the

Jon P. Fryzek, MPH, PhD                                        EpidStrategies

FAERS database revealed that only a very small proportion of patients reported permanent alopecia with docetaxel.

156.  I reserve the right to supplement these opinions as needed to reflect new information that I may receive or to respond to claims raised by other witnesses.


Sincerely,


Jon Fryzek, MPH, PhD