**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Audrey Plaisance, Case No. 2:18-cv-08086<br>Clare Guilbault, Case No. 2:16-cv-17061 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO EXCLUDE OR LIMIT OPINIONS OF**
**<u>DR. DAVID MADIGAN</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................2

LEGAL STANDARD.......................................................................................................3

ARGUMENT ...................................................................................................................5

I.      DR. MADIGAN'S CAUSATION OPINION SHOULD BE EXCLUDED.....................5

II.     DR. MADIGAN IS NOT OFFERING REGULATORY OR LABELING
        OPINIONS. ...........................................................................................................5

III.    DR. MADIGAN'S ANALYSIS OF THE FAERS DATABASE SHOULD BE
        EXCLUDED. .........................................................................................................6

        A.      Dr. Madigan's FAERS analysis is not admissible evidence of a safety
                signal to Hospira. .......................................................................................6

                1.      Dr. Madigan's FAERS analysis is unreliable and contrary to FDA
                        guidance on signal identification. .................................................7

                2.      Dr. Madigan's FAERS analysis is irrelevant because it does not
                        identify a new signal after Hospira's docetaxel was approved.................10

        B.      Dr. Madigan's FAERS analysis is neither relevant nor reliable to the issue
                of causation. .............................................................................................12

IV.     DR. MADIGAN'S ANALYSIS OF SANOFI'S INTERNAL SAFETY
        DATABASE DOES NOT FIT THIS CASE. ..............................................................13

        A.      Hospira did not have access to Sanofi's internal database. ..................................14

        B.      Sanofi's internal database is not evidence of causation.........................................14

V.      DR. MADIGAN'S ANALYSIS OF SANOFI'S CLINICAL TRIAL DATA IS
        NOT ADMISSIBLE. ...............................................................................................15

        A.      The Sanofi Clinical Trial Data Is Irrelevant To Show a Safety Signal as to
                Hospira. ...................................................................................................16

        B.      Dr. Madigan's Analysis of the Sanofi Clinical Trials Is Unreliable
                Evidence of Causation. .............................................................................16

VI.     DR. MADIGAN'S META-ANALYSIS BASED ON OBSERVATIONAL
        STUDIES HAS BEEN EXCLUDED. .......................................................................17

CONCLUSION.................................................................................................................17

CERTIFICATE OF SERVICE ...........................................................................................19

i

## INTRODUCTION

Plaintiffs' biostatistician, David Madigan, Ph.D., offers statistical analyses on the relationship between docetaxel and permanent hair loss. Specifically, his report analyzes four sources: (1) adverse event report data from FDA's Adverse Event Reporting System ("FAERS") database; (2) adverse event reports from the Sanofi internal adverse event database; (3) Sanofi clinical trials (TAX 316 and TAX 301); and (4) a meta-analysis of four observational studies. Plaintiffs apparently intend to rely on Dr. Madigan's analyses in support of their arguments on two separate issues: (1) notice to Hospira of a safety signal for permanent alopecia with docetaxel (as a component of their failure-to-warn case), and (2) general causation. But Dr. Madigan's analyses are neither reliable nor relevant to either of these issues, and they should be excluded.

As an initial matter, it is undisputed that Dr. Madigan is not offering either failure-to-warn or causation opinions on his own. By his own admission, he is not a regulatory expert and he does not intend to offer regulatory opinions or opinions on the adequacy of Hospira's labeling. Ex. A, Deposition of David Madigan, Ph.D. (Sept. 17, 2021) ("Madigan Dep.") at 29:1-15. And the Court has already precluded him from offering an ultimate opinion on general causation. *See In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 29, 2021), ECF No. 12098 ("*Kahn*"). Those opinions therefore should be excluded here.

Moreover, Dr. Madigan's analyses do not provide any admissible evidence in support of either issue. Although the Court has allowed Dr. Madigan to offer certain opinions against Sanofi, the record here is different, and the Court should exclude Dr. Madigan's opinions because they are inadmissible in this case against Hospira.

Regarding failure-to-warn, Dr. Madigan does not provide any valid basis for an opinion that Hospira was or should have been on notice of a safety signal for permanent alopecia. He does not opine that the alleged safety signal he identifies was available to any company other than Sanofi, and the word "Hospira" does not appear anywhere in his report. *See* Ex. B,

*Docetaxel and Irreversible Alopecia*, Expert Report of David Madigan, Ph.D. (Mar. 23, 2020) ("Madigan Rep.") ¶ 68 (Summary of Opinions) ("This statistical evidence was available [to] ***Sanofi*** years before Sanofi reached its conclusion in 2015 that there is a causal association between docetaxel and permanent/irreversible alopecia." (emphasis added)). He conceded that he has not reviewed any Hospira documents, and he is not aware of any evidence that Hospira had access to the sources he identifies as alleged safety signals. Moreover, he has not identified any new safety signal that arose ***after*** the approval of Hospira's docetaxel in March 2011. Ex. A (Madigan Dep.) at 79:14-18 (He is "not saying there was a new safety signal in 2012 that wasn't already present going back to the 2000s."). His signal detection analyses are also unreliable and inconsistent with FDA guidance; as he admitted, the FDA's best practices are "a million miles … from anything I did." *Id.* at 116:21-117:13. Thus, based on the record in this case, the Court should exclude Dr. Madigan's signal detection opinions.

As for causation, Dr. Madigan's opinions also should be excluded. Three of his four sources are plainly inadmissible on the issue of causation. Dr. Madigan admits that adverse event reports, the subject of his FAERS analysis and his analysis of the Sanofi internal adverse event database, do not show causation. And this Court has excluded—not once, but twice—his meta-analysis of observational studies on *Daubert* grounds. *See Kahn* at 12-13; *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Apr. 7, 2021), ECF No. 12403 ("*Kahn II*"). Thus, the only causation-related analysis that has not been disclaimed or excluded is Dr. Madigan's meta-analysis of the two Sanofi clinical trials, and this analysis is also based on an unreliable methodology. Accordingly, Dr. Madigan's opinions are also inadmissible on the issue of causation and should be excluded.

Thus, Hospira requests that the Court exclude or limit the opinions of Dr. Madigan.

## BACKGROUND

Dr. Madigan's report in this case is identical to the expert report he previously submitted in the matter of Elizabeth Kahn—a case against Sanofi that did not involve Hospira. *See* Ex. C,

Expert Disclosure (July 9, 2021) (designating Dr. Madigan as an expert in this case "through

[his] general expert report[], previously submitted in the matter of Elizabeth Kahn").

Dr. Madigan offers four statistical analyses:

1. **FAERS database**.  Dr. Madigan opines that FDA's FAERS database "shows the emergence of a safety signal at various times dating back to as early as 2000." Ex. B (Madigan Rep.) ¶ 48.  Using search terms provided by Dr. Kessler, an undesignated expert from another MDL case, and his own software, Dr. Madigan claims to have identified 31 Adverse Event Reports ("AERs") for permanent chemotherapy-induced alopecia ("PCIA") from the FAERS database between 1990 and 2017.  The specific AERs underlying those 31 cases have never been disclosed to the defense, and Dr. Madigan admitted that he has not reviewed any of the underlying case narratives to determine whether the patients actually had PCIA.  *See* Ex. A (Madigan Dep.) at 95:3-8.

2. **Sanofi's internal safety database.**  Dr. Madigan concludes that Sanofi's internal adverse events database had sufficient cases of permanent alopecia to support a causal association by 2011 and that this information was consistent with the data in 2015, when he alleges Sanofi acknowledged this causal association. Ex. B (Madigan Rep.) ¶¶ 49-54.

3. **Sanofi's clinical studies (TAX 301 and TAX 316).**  Dr. Madigan performs a meta-analysis of these two studies and concludes, based on their reports of "ongoing" alopecia, that the combined results show a statistically significant risk of permanent alopecia. Ex. B (Madigan Rep.) ¶¶ 59-67.

4. **Meta-analysis of four observational studies.**  Dr. Madigan performs a meta-analysis of four studies and concludes that their combined results show a statistically significant risk of permanent alopecia with docetaxel.  This Court has held that Dr. Madigan's meta-analysis of observational studies is unreliable and thus not admissible on *Daubert* grounds.  *See Kahn* at 12-13 (excluding Dr. Madigan's meta-analysis based on "significant heterogeneity"); *Kahn II* (denying reconsideration).

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under the

Rule, the witness must be qualified as an expert, and his opinions must be both reliable and

relevant.  *See* Fed. R. Evid. 702.  Rule 702 reflects the Supreme Court's decisions in *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526

U.S. 137 (1999).  *Daubert* instructs courts to serve as gatekeepers, "impos[ing] a special

obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only

relevant, but reliable.'"  *Kumho Tire Co.*, 526 U.S. at 147 (second alteration in original) (quoting

*Daubert*, 509 U.S. at 589); *see Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013).

The threshold inquiry under Rule 702 is whether the individual is "qualified to testify in a particular field or on a given subject," based on her "knowledge, skill, experience, training, or education." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). After defining the permissible scope of the expert's testimony, the Court then assesses whether the opinion is reliable and relevant. *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

To assess reliability, the Court considers whether the reasoning and methodology underlying the expert's testimony is "valid and can be reliably applied to the facts of the case." *Id.* This "analysis applies to all aspects of an expert's testimony," including the "methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted). If the opinion is based on mere "subjective belief or unsupported speculation," then the Court should exclude it. *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("Since *Daubert* … parties relying on expert evidence have had notice of the *exacting standards* of reliability such evidence must meet." (emphasis added)). The party offering the expert testimony bears the burden of establishing that the expert's findings and conclusions are reliable. *See Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018) (en banc)).

The Court also evaluates whether the testimony is relevant. In assessing relevance, the Court considers whether the expert's "reasoning or methodology 'fits' the facts of the case." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015); *see also Daubert*, 509 U.S. at 591 (discussing Rule 702's relevancy requirement in terms of "fit"). In other words, the expert opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Sandifer*, 907 F.3d at 809 (quoting Fed. R. Evid. 702).

Finally, Federal Rule of Evidence 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if (1) they are of the kind reasonably relied

4

upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect.  Fed. R. Evid. 703.

## ARGUMENT

### I.      DR. MADIGAN'S CAUSATION OPINION SHOULD BE EXCLUDED.

Dr. Madigan's report includes his opinion that "there is adequate statistical evidence that docetaxel causes permanent / irreversible alopecia." Ex. B (Madigan Rep.) ¶ 68.  The Court already ruled, however, that "Dr. Madigan will be precluded from testifying that Taxotere causes permanent alopecia." *Kahn* at 6.  As this Court correctly recognized, general causation is a two-prong inquiry: first, there must be evidence of a "statistically significant association" between the agent and the disease, and second, an expert must apply a reliable methodology, such as the Bradford Hill criteria to assess whether a true causal relationship underlies the association.  *Id.* at 5 (quoting *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 803-04 (E.D. La. 2011)).  Because Dr. Madigan has not conducted a Bradford Hill analysis, he "has not assessed whether a true causal relationship underlies the statistical association he has identified," and for that reason "cannot tell the jury that there is evidence 'that docetaxel causes irreversible alopecia.'" *Id.*  Dr. Madigan's opinion on causation should likewise be excluded in this case.

### II.     DR. MADIGAN IS NOT OFFERING REGULATORY OR LABELING OPINIONS.

During his deposition for this case, Dr. Madigan conceded that he has not reviewed any Hospira-specific documents, including its internal files, labeling, or correspondence with FDA. Ex. A (Madigan Dep.) at 26:1-28:3.  He also admitted that he is "not a regulatory expert," *id.* at 29:1-3, and agreed that he is not providing any opinions about:  "whether Hospira complied with FDA regulations"; "the regulatory requirements for drugs approved under section 505(b)(2) of the Food, Drug, and Cosmetic Act"; or "the adequacy of Hospira's docetaxel labeling," *id.* at 29:4-15.  Accordingly, Dr. Madigan should be precluded from offering any regulatory or labeling opinions in this case.

III.    **DR. MADIGAN'S ANALYSIS OF THE FAERS DATABASE SHOULD BE EXCLUDED.**

In Section 4 of his report, Dr. Madigan performs an analysis of FAERS data.  Although the Court has previously allowed Dr. Madigan to offer his FAERS analysis in cases against Sanofi, the record establishes that it is inadmissible against Hospira on either signal detection or causation.

A.    **Dr. Madigan's FAERS Analysis Is Not Admissible Evidence of a Safety Signal to Hospira.**

Dr. Madigan's own testimony shows that his FAERS analysis—as applied to Hospira—is neither reliable nor relevant.

As to reliability, the Court has acknowledged that Dr. Madigan's methodology has "limitations," but has permitted Dr. Madigan to opine that FAERS contained a safety signal for permanent alopecia with docetaxel on the grounds that his methodology "is accepted in the industry" and "used by drug companies and the FDA."  *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Earnest)* (Aug. 23, 2019), ECF No. 8094, at 9 ("*Earnest*").  In his deposition, however, Dr. Madigan testified that the FDA's best practices for signal identification are "a million miles … from anything I did," and that he did not "do what safety reviewers do."  Ex. A (Madigan Dep.) at 116:21-117:13.  Accordingly, the Court's prior reasoning does not apply in this case.

As to relevance, this case is different from the Sanofi cases in which Dr. Madigan was allowed to offer his FAERS analysis because Hospira is a 505(b)(2) manufacturer.  Accordingly, for signal detection, the relevant question is whether there was "newly acquired information" *after* Hospira's docetaxel product was approved in 2011.  21 C.F.R. § 314.70 (c)(6)(iii)(A); *see* Mem. Supp. Hospira's Mot. Summ. J. Re Preemption.  By his own admission, Dr. Madigan's FAERS analysis does not identify any new signal after 2011; thus, it is not relevant to Hospira's alleged failure to warn in this case.

1.      **Dr. Madigan's FAERS Analysis Is Unreliable and Contrary to FDA Guidance on Signal Identification.**

A fundamental flaw with Dr. Madigan's FAERS methodology is that he did not look at individual case narratives for the 31AERs he identifies as cases of PCIA to see whether they were false positives.  Dr. Madigan's analysis identifies cases of permanent/irreversible alopecia based on events coded with the term "alopecia" from the Medical Dictionary for Regulatory Activities ("MedDRA") and tagged with an outcome of "Disability or Permanent Damage." Ex. B (Madigan Rep.) ¶ 40.  But the reports submitted to the FAERS database ("MedWatch forms") may contain multiple adverse events for a single outcome.  *See* Ex. A (Madigan Dep.) at 92:10-94:20.  Thus, as Dr. Madigan admitted, "If there's more than one adverse event in a MedWatch form, … the outcome could apply to all of them or just one of them or some of them. The form is not specific in that regard."  *Id.* at 94:11-20.  As a result, "you don't know which adverse event in the adverse event report is associated with the outcome of disability."  *Id.* at 93:2-23.  Because Dr. Madigan has not reviewed the underlying case narratives "to determine whether the outcome of disability was connected to the alopecia," he cannot say that the 31 cases he identifies of PCIA actually involve irreversible alopecia as opposed to temporary alopecia co-incident with some other adverse event causing disability or permanent damage.  *Id.* at 95:3-8.

The Court has previously been willing to accept these limitations as matters for cross-examination based on Plaintiffs' representations that Dr. Madigan's methodology "is accepted in the industry" and "used by drug companies and the FDA."  *Earnest* at 9.  Most recently, in *Kahn*, the Court addressed Dr. Madigan's compliance with the FDA's most recent guidance on signal detection—the 2019 Best Practices.  The Court explained that "signal detection" implicates two separate inquiries:  signal identification, in which a potential signal is located in safety data, and signal evaluation, in which that signal is more extensively evaluated to determine whether the signal poses a safety risk.  *Kahn* at 13-14.  It allowed Dr. Madigan to offer his FAERS analysis as relevant to signal *identification*, while recognizing that Dr. Madigan is not qualified to

conduct signal *evaluation*, which would involve an "epidemiologic assessment … outside Dr. Madigan's realm of expertise."  *Id.* at 13-14.

Dr. Madigan has since admitted, however, that he is ***not*** following FDA's best practices for signal *identification*.  Ex. A (Madigan Dep.) 116:21-117:13.  As such, the Court's previous reasoning no longer applies, and his opinions should be excluded.  In November 2019, FDA issued its *Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff*, which includes two separate sections for "Safety Signal Identification" (Section 6) and "Signal Evaluation and Documentation" (Section 7).  Ex. D ("2019 Best Practices").  In *Kahn*, the Court agreed that Dr. Madigan is not qualified to conduct signal evaluation under Section 7, but that did not preclude him from offering a signal identification opinion under Section 6.  *Kahn* at 13-14 (noting that Sanofi "quotes from Section 7 of the FDA draft guidance, which is titled 'Signal Evaluation and Documentation,'" but that Dr. Madigan's signal identification analysis "would be governed by Section 6 of the FDA document, which is titled 'Safety Signal Identification'").

In this case, however, Dr. Madigan admitted that his analysis also did not follow the ***signal identification*** guidance in Section 6.  The FDA signal identification process described in Section 6 includes a review of individual case reports.  Ex. D (2019 Best Practices) at 21-25. The FDA describes two different processes for identifying a signal based on FAERS—individual screening of Individual Case Safety Reports ("ICSRs") and cumulative screening—both of which involve looking at individual case reports.  In individual ICSR screening, reviewers "use[] the information in the narrative and other sections of the ICSR … to determine if there is sufficient support for further evaluation of the potential safety signal."  *Id.* at 22.  Likewise, cumulative screening of ICSRs involves a collective review of reported adverse events ("AEs") for new potential safety concerns, in the course of which "the reviewer may identify one or more AE(s) that may cause the reviewer to read in detail all ICSRs for the AE(s)."  *Id.* at 23. Moreover, "cumulative screening of ICSRs ***complements*** ongoing screening at the individual

case report level," *id.*; thus, the two types of screening go together, and cumulative screening does not replace individual screening.

Accordingly, Dr. Madigan agreed that Section 6 of FDA's 2019 Best Practices requires review of individual case reports as part of signal identification. Ex. A (Madigan Dep.) at 113:3-13 (admitting that Section 6.1.1 "is describing the process for safety signal identification in the FAERS database"); *id.* at 117:22-118:8 (stating that Section 6 "includes looking at the reports. Sure.  If I'm a safety officer of the FDA, these reports are flowing in, sure, I should look at them.").

He also admitted that was not what he did.  *Id.* at 117:22-118:8 ("I'm doing something completely different, I'm doing a statistical analysis of the FAERS database."); *id.* at 95:3-8 (reviewing case narratives is "[o]utside of my area of expertise, not something I've done, not something I would do.").  He agreed that his FAERS analysis did not follow FDA's best practices for signal identification:

> Q.  And as I understand what you are telling me, though, your analysis and what you did in your statistical analysis does not follow the FDA best practices that are described here in [Section 6]?
>
> A.  ***No***. … I know safety reviewers, I'm friends with some safety reviewers, ***this is what they do***.  The reports are coming in, ***they look at them***, they are doing quantitative analysis, they are doing highly qualitative analysis of these reports.  That's what they do.  There's nothing wrong with that.  I'm all for that.  ***It's not what I did***.  What I did was a statistical analysis of the FAERS database.  And I'm not qualified to the clinical qualitative analysis of these reports.

*Id.* at 118:18-120:1.  As Dr. Madigan put it, Section 6 of FDA's 2019 Best Practices is "a million miles here from anything I did."  *Id.* at 116:21-117:2.[1]

---

[1]   Dr. Madigan also admitted that his methodology does not follow FDA guidance for other methods of signal identification such as data mining, which FDA recommends "should always be used in conjunction with, and not in place of, analyses of single case reports."  Ex. E, Guidance for Industry E2E Pharmacovigilance Planning (April 2005) ("2005 Guidance") at 11; Ex. A (Madigan Dep.) at 104:21-105:5 (acknowledging that FDA guidance and stating he is not "doing data mining"); *see also id.* at 108:22-25 (agreeing that "since you say you

These new admissions therefore remove the basis on which Dr. Madigan's FAERS analysis has been previously admitted.  Dr. Madigan's methodology is not "accepted in the industry" or "used by drug companies and the FDA."  *Kahn* at 9.  Quite the opposite:  It is contrary to FDA guidance even for signal identification, much less for a signal evaluation that would be necessary for a drug company to act on a safety signal.  Therefore, Dr. Madigan's analysis is not reliable as evidence of a safety signal and should be excluded.

### 2. Dr. Madigan's FAERS analysis is irrelevant because it does not identify a new signal after Hospira's docetaxel was approved.

Apart from the unreliability of Dr. Madigan's FAERS analysis, it is inadmissible as evidence of a safety signal because it does not fit this case against Hospira—a 505(b)(2) manufacturer.  Dr. Madigan's safety signal analysis is only relevant as a component of Plaintiffs' failure-to-warn case if it provides evidence that Hospira should have updated its docetaxel label regarding the risk of permanent alopecia based on that signal.  As a 505(b)(2) manufacturer, however, Hospira could only update its docetaxel label after approval under FDA's Changes Being Effected ("CBE") procedure if it had "newly acquired information"—meaning information that, among other things, was "not previously submitted to the [FDA]"—supporting the label change.  21 C.F.R. § 314.3(b); *see* Mem. Supp. Hospira's Mot. Summ. J. Re Preemption.  However, Dr. Madigan admitted that his analysis of FAERS does not identify a new signal after Hospira's docetaxel label was approved in March 2011.  Thus, it is not relevant in this case. *See Bocanegra v. Vicmar Servs.*, 320 F.3d 581, 584 (5th Cir. 2003) (explaining the proposed expert testimony must be relevant "not simply in the sense that all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue").

As outlined in Hospira's memorandum in support of its motion for summary judgment regarding preemption, when FDA granted Hospira's 505(b)(2) application in March 2011, it

---

are not doing data mining, your methodology did not follow this FDA guidance on data mining").

required Hospira's label to match Sanofi's then-existing label for Taxotere.  Mem. Supp.

Hospira's Mot. Summ. J. Re Preemption.  Indeed, Plaintiffs' regulatory expert, Dr. David Ross,

is not offering any opinion "that the Hospira label for docetaxel approved by FDA was

inadequate at the time of approval in March of 2011."  Ex. F, Deposition of Dr. David Ross

(Sept. 30, 2021) ("Ross Dep.") at 107.  Instead, Plaintiffs take the position that Hospira should

have used the CBE regulation to update its docetaxel labeling regarding the risk of permanent

alopecia after approval.  Ex. G, Expert Report of David Ross (June 8, 2020) ("Ross Rep.") ¶ 59.

But the CBE process is available only to manufacturers who have "newly acquired information,"

defined as follows:

> data, analyses, or other information ***not previously submitted to the Agency,***
> which may include (but is not limited to) data derived from new clinical studies,
> reports of adverse events, or new analyses of previously submitted data (e.g.,
> meta-analyses) ***if the studies, events, or analyses reveal risks of a different type***
> ***or greater severity or frequency than previously included in submissions to***
> ***FDA***.

21 C.F.R. § 314.3(b) (emphasis added).  Accordingly, for a safety signal to be relevant to the

adequacy of Hospira's docetaxel label, it must identify "newly acquired information" after

March 2011.

The safety signal Dr. Madigan purports to identify in the FAERS database does not meet

this standard.  Dr. Madigan's report, which is directed at Sanofi, states that a signal was

identifiable in FAERS "as early as 2000."  Ex. B (Madigan Rep.) ¶ 43.  Depending on which

statistic he utilizes, he identifies signals at various points in time starting in 2000 and appearing

"permanently by the middle of 2008."  *Id.*  Only one of his statistics identifies a signal

potentially appearing after Hospira's approval, "by the middle of 2012."  *Id.*  However, he

confirmed at his deposition "that doesn't mean that the safety signal appeared for the first time in

2012."  Ex. A (Madigan Dep.) at 78:16-79:13; *see id.* at 76:11-22.  To the contrary, he agreed

that the signal appearing in 2012 was the same signal that other methods flag earlier and that Dr.

Madigan is "not saying there was a new safety signal in 2012 that wasn't already present going

back to the 2000s."  *Id.* at 79:14-18.

Therefore, Dr. Madigan's FAERS analysis does not "fit" the facts of this case because it does not identify a signal of "newly acquired information" that Hospira could have acted on through a label change. His FAERS analysis thus does not prove any issue relevant to signal detection in this case and should be excluded.

**B.    Dr. Madigan's FAERS Analysis Is Neither Relevant nor Reliable to the Issue of Causation.**

Dr. Madigan's FAERS data is also inadmissible on the issue of causation.

*First,* as Dr. Madigan readily concedes, a "safety signal doesn't mean the drug causes a safety risk," and it does not "in and of itself … establish causation."  Ex. A (Madigan Dep.) at 101:10-12, 101:19-23; *see also id.* at 74:7-13 (agreeing that "just because someone reports an adverse event report about a drug and a medical event doesn't necessarily mean that those two things are causally related").  FDA agrees, explaining in its 2005 signal detection guidance that "[s]ignals generally indicate the need for further investigation, which ***may or may not*** lead to the conclusion that the product caused the event."  Ex. E (2005 Guidance) at 4 (emphasis added).

*Second,* Dr. Madigan's FAERS analysis is unreliable on the issue of causation for the same reasons it is unreliable for signal detection.  As explained above, Dr. Madigan's FAERS analysis does not even meet the FDA's guidance on signal identification.  A statistical analysis that cannot reliably show a signal identification certainly cannot be admissible as evidence of causation.

*Finally*, Dr. Madigan's FAERS analysis suffers from an additional reliability defect because he used search terms provided by an undesignated expert from another MDL case, Dr. Kessler.  Dr. Madigan has repeatedly disclaimed knowledge of any support for his search methodology, claiming it was a "good question for Dr. Kessler."  Ex. H, Deposition of Dr. David Madigan, *Durden v. Sanofi S.A.*, No. 2:16-cv-16635; *Francis v. Sanofi S.A.*, No. 2:16-cv-17410; *Earnest v. Sanofi S.A.*, No. 2:16-cv-17144 (Dec. 7, 2018) ("Dec. 7, 2018 Madigan Dep."), at 97:10-98:4.  However, Dr. Kessler is not available to be questioned in this case.  Dr. Kessler's

absence precludes the typical safeguards of disclosure and deposition allowed for expert discovery.  *See* Fed. R. Civ. P. 26(a)(2).

Moreover, the Federal Rules of Evidence "do not permit experts to simply 'parrot' the ideas of other experts."  *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008); *see also Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009) (explaining experts may not "merely regurgitate another expert's opinion").  On the contrary, "[i]t is only when the expert takes some independent investigation of the underlying opinions that his testimony may be considered reliable."  *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014).  Because Dr. Madigan did not independently review the search terms and methodology prescribed by Dr. Kessler, nor did he examine the results to check for false positives, his analysis of the FAERS database is not reliable for this additional reason.

## IV.    DR. MADIGAN'S ANALYSIS OF SANOFI'S INTERNAL SAFETY DATABASE DOES NOT FIT THIS CASE.

In Section 5 of his report, Dr. Madigan identifies reports of permanent alopecia in Sanofi's internal adverse event database—while saying nothing about what this information has to do with Hospira.  Dr. Madigan attempts to use this internal Sanofi data as evidence of general causation based on Sanofi's statement in 2015 that the "'cumulative weighted evidence is sufficient to support a causal association between docetaxel and permanent / irreversible alopecia.'"  Ex. B (Madigan Rep.) ¶ 53.  Dr. Madigan opines that "[t]he information available to Sanofi at this time [2015] was not appreciably different from what was available" to Sanofi in its 2011 review of its database.  *Id.* ¶¶ 51-53.  This analysis does not "fit" this case.  It is not relevant to signal detection because Dr. Madigan has no evidence that Hospira had access to Sanofi's database.  It is not relevant to causation because it depends on an admission by Sanofi and is directed at Sanofi.  It therefore should be excluded.

## A.      Hospira Did Not Have access to Sanofi's Internal Database.

Dr. Madigan's analysis of Sanofi's proprietary, internal safety database is no relevance to the issue whether **Hospira** should have detected a safety signal for permanent alopecia with docetaxel.  As Dr. Madigan admitted, he is "not offering an opinion that the information in Sanofi's safety [data]base was a safety signal to Hospira"  Ex. A (Madigan Dep.) at 144:19-23. Nor could he, because Hospira did not have access to that information.  Dr. Madigan admitted he has no "information showing that Hospira had access to the internal Sanofi documents" that he identifies in his reliance materials, *id.* at 28:9-14, and, more specifically, that he is "not aware of any evidence that Hospira had access to the Sanofi internal database" or to "Sanofi's internal analysis from 2011 and 2015," *id.* at 143:20-144:12.  Dr. Madigan testified that "I don't think Hospira knows—had access to this *at all*, as far as I know."  *Id.* at 144:13-18 (emphasis added).

Moreover, Dr. Madigan has not reviewed Hospira's internal adverse event database.  He did not review "any information about what adverse events were reported to Hospira"; "any internal analysis by Hospira with respect to docetaxel and permanent alopecia"; "any Hospira periodic safety update reports or submissions to FDA regarding adverse events"—or, indeed, "any internal Hospira documents that Hospira has produced in this litigation," including "any of Hospira's internal files related to docetaxel or alopecia."  *Id.* at 26:1-28:3.

Thus, the Sanofi internal database is not relevant to the issue of what Hospira knew about the risk of permanent alopecia.

## B.      Sanofi's Internal Database Is Not Evidence of Causation.

Nor is Dr. Madigan's analysis of Sanofi's internal database reliable or relevant to the issue of causation.

*First*, Section 5 of Dr. Madigan's report suffers from the same reliability defects as his analysis of the FAERS database.  He admitted that "the same limitations we talked about with regard to case reports in the FAERS database" would "generally" also apply to his analysis of Sanofi's internal database. Ex. A (Madigan Dep.) at 145:6-10.  He has admitted that adverse event reports alone do not establish causation.  *See supra*.  And like his analysis of FAERS, Dr.

Madigan did not examine the underlying case narratives in his analysis of Sanofi's internal database.  Ex. H (Dec. 7, 2018 Madigan Dep.) at 228:2-9.  In addition, the "incidence rate" of cases of permanent alopecia based on Dr. Madigan's analysis is trivial.  *See Kahn* at 10.

*Second*, Dr. Madigan's analysis of Sanofi's database does not "fit" because it is based on an alleged admission by Sanofi and is not directed at Hospira.  Dr. Madigan argues that there was data in 2011 that was consistent with Sanofi's 2015 analysis, which found "a causal association between docetaxel and permanent / irreversible alopecia" based on 117 reports.  Ex. B (Madigan Rep.) ¶ 52.  But this comparison is irrelevant to Hospira.  Dr. Madigan does not cite any alleged admission by Hospira, and the Sanofi statement is not an admission by ***Hospira***. *See, e.g.*, *Goode v. City of Southaven*, 2019 WL 1089510, at *9 (N.D. Miss. Mar. 7, 2019) ("[A] statement against a party opponent will 'only be admitted against the declarant-defendant, but not against his co-defendant.'") (quoting *United States v. Reed*, 908 F.3d 102, 119 (5th Cir. 2018)).  Accordingly, Dr. Madigan's analysis of Sanofi's safety database does not fit this case and should be excluded.

## V.   DR. MADIGAN'S ANALYSIS OF SANOFI'S CLINICAL TRIAL DATA IS NOT ADMISSIBLE.

Section 7 of Dr. Madigan's report focuses on two clinical trials conducted by Sanofi regarding name-brand Taxotere—TAX 316 and TAX 301—neither of which involved Hospira. Although Dr. Madigan has admitted that neither clinical study finds a statistically significant risk of permanent alopecia with Taxotere on its own, Ex. A (Madigan Dep.) at 65:17-66:1, he combines the two studies in a meta-analysis and concludes that the combination of the two studies shows a statistically significant risk of "ongoing" alopecia after follow-up with patients. Ex. B (Madigan Rep.) ¶ 66.  Dr. Madigan disagrees with the study sponsor, Sanofi, about what it means for a patient to have "ongoing" alopecia, and that in his view, "ongoing" alopecia equates with irreversible alopecia, and the combined studies show a statistically significant risk of irreversible alopecia with docetaxel.  *Id.* ¶ 67.

A.    **The Sanofi Clinical Trial Data Is Irrelevant To Show a Safety Signal as to Hospira.**

Dr. Madigan's analysis of Sanofi's clinical trial data is not relevant as evidence of a safety signal to Hospira.  Dr. Madigan has not reviewed any Hospira documents and has no evidence that Hospira had access to the underlying data from Sanofi's clinical trials.  *See* Ex. A (Madigan Dep.) at 66:9-67:5.  In particular, the data regarding cases of "ongoing" alopecia was not accessible to Hospira, and Dr. Madigan admitted that he is "not aware of any publicly available information about the Sanofi clinical trial data that was available to Hospira that it could have used to do the same analysis" he did in his meta-analysis.  *Id.* at 70:1-13.  Dr. Madigan is "not aware of any place in the public domain where you can find that information." *Id.*; *see also id.* at 68:1-69:25 (explaining that information on government website ClinicalTrials.gov, does not contain "any information about how many individuals had ongoing alopecia," and thus Hospira "couldn't have obtained from ClinicalTrials.gov the information on ongoing alopecia" that he used to prepare his analysis)

Thus, because Dr. Madigan has no evidence that Hospira had access to the data needed to undertake his meta-analysis of TAX 301 and TAX 316, and he is not offering any opinion that Hospira could have obtained such access, it is not relevant to the issue of a safety signal to Hospira.

B.    **Dr. Madigan's Analysis of the Sanofi Clinical Trials Is Unreliable Evidence of Causation.**

In prior cases, Sanofi has demonstrated why Dr. Madigan's novel combination of the TAX 316 and TAX 301 studies is unreliable, in particular because (1) the results of each study individually produced no statistically significant results, and Dr. Madigan's combination of their results does not show statistical significance; and (2) because it is based on the inaccurate premise that patients with "ongoing" alopecia had permanent alopecia.  *See* ECF Nos. 6144, 11003.  Although the Court has previously rejected those arguments, *see Earnest* at 10, *Kahn* at 6-9, Hospira renews and incorporates them by reference here.  The Court should exclude Dr. Madigan's analysis of Sanofi's clinical trial data as evidence of causation.

## VI.    DR. MADIGAN'S META-ANALYSIS BASED ON OBSERVATIONAL STUDIES HAS BEEN EXCLUDED.

In Section 6 of his report, Dr. Madigan offers a meta-analysis of four observational studies, which he opines shows a statistically significant risk of permanent alopecia with docetaxel.  This meta-analysis is identical to the one Dr. Madigan offered in the *Kahn* case, and that this Court held is inadmissible.  *See Kahn* at 12-13 (excluding Dr. Madigan's meta-analysis based on "significant heterogeneity"); *Kahn II* (denying reconsideration of same).  Nothing has changed that would make Dr. Madigan's meta-analysis either reliable or relevant to signal detection or causation in this case.

*First*, as to both signal detection and causation, Dr. Madigan's meta-analysis is not reliable because it relies on heterogenous studies, as this Court has already found, and Dr. Madigan has made no attempt to rescue his meta-analysis through new analysis or testimony. *See Kahn* at 12-13; *Kahn II.*

*Second*, even if it were reliable, which it is not, Dr. Madigan's meta-analysis is not admissible as evidence of a relevant signal.  In his report, Dr. Madigan does not even attempt to offer an opinion that the four observational studies included in his meta-analysis contained a safety signal for permanent alopecia prior to Ms. Plaisance or Ms. Guilbault's use of docetaxel. Nor could he; three of the four studies are dated in 2017 or later, several years ***after*** Ms. Plaisance and Ms. Guilbault took docetaxel.  Ex. B (Madigan Rep.) ¶ 55 (citing Crown et al. (2017); Kang et al. (2019); and Martin et al (2018)).  And the fourth study was published in 2006 and was not newly acquired evidence after Hospira's approval in March 2011.  *Id.* (citing Sedlacek (2006)).

## CONCLUSION

For the foregoing reasons, Dr. Madigan's opinions in this case should be excluded in their entirety.

Dated: November 12, 2021

Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Telephone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc.,*
*Hospira Worldwide, LLC, and Pfizer Inc.*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

/s/ *Heidi K. Hubbard*