# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MDL NO.: 2740
SECTION: H

IN RE: TAXOTERE (DOCETAXEL)
PRODUCTS LIABILITY LITIGATION

This Document Relates To:
Antoinette Durden, Case No. 2:16-cv-16635;
Tanya Francis, Case No. 2:16-cv-17410;
Barbara Earnest, Case No. 2:16-cv-17144.
__________________________________________/

December 7, 2018
8:13 a.m.

VIDEOTAPED DEPOSITION of DAVID MADIGAN, PHD, held at the offices of Napoli Shkolnik PLLC, located at 360 Lexington Avenue, New York, New York 10017, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

Job No. NJ3151484

Page 94

category?
A I could have. But I wouldn't.
Q And you didn't?
A And I didn't.
Q And you didn't because?
A Because I'm using an endpoint, which is the higher-level term alopecias, which is what Sanofi used. And it's what Dr. Kessler said was the appropriate endpoint.
Q To perform your search or analysis, better term?
A Sure.
Q Of the FAERS database?
A Yeah.
Q You search for a higher-level term of alopecias; so far?
A Okay, yeah.
Q Analyzed?
A Yup.
Q For a higher-level term of alopecias?
A That's the endpoint.
Q Combined with an outcome of

Page 95

disability or permanent damage?
A That's right.
Q The outcome of disability or permanent damage, where do you get that language?
A From the MedWatch form.
Q Do all of the forms that feed into FAERS database use that same term?
MR. MICELI: Object to the form.
Q Let me ask it a different way.
You're saying there's a MedWatch form, and on the MedWatch form, there's a box you can check for disability or permanent damage; right?
A Yes.
Q Are there other forms that can be submitted to the FAERS database other than a MedWatch form?
MR. MICELI: Object to the form.
A Pretty sure it's on the CIOMS form and on the MedWatch form.

Page 96

Q Is it the same language on the CIOMS form?
A I believe so, yes. It's certainly the language that's used in the standardized version of the data from DrugLogic that I'm using.
MR. MICHELMAN: Let's go off the record for a second.
THE VIDEOGRAPHER: The time now is approximately 10:18. We're going off the record.
(A short recess was taken.)
THE VIDEOGRAPHER: The time now is 10:21 a.m. We're back on the record.
Q Doctor, we talked about the two aspects of your FAERS analysis: The higher-level alopecias and the endpoint of disability or permanent damage; fair?
A Okay.
Q You've already described your conversation with Dr. Kessler when you came up with that approach.
MR. MICELI: Object to the form.

Page 97

A Not a conversation, a communication.
MR. MICHELMAN: Was that your objection?
MR. MICELI: Yes.
Q You've already described the extent to which Dr. Kessler was involved in that process?
A I believe I have, yes.
Q Can you point me to any literature, scientific or otherwise, that says the way to analyze FAERS for irreversible alopecia is to combine higher-level term of alopecias plus an outcome of disability or permanent damage?
A Not sitting here, I can't. But maybe it exists. I don't know.
Q Other than your work in this case, are you aware of anybody anywhere who has determined that the appropriate way to analyze the FAERS database for irreversible alopecia is to combine the higher-level term of alopecias, plus an outcome of disability or permanent

Page 98

damage?

A I'm not. But it's not something I've looked for. Good question for Dr. Kessler.

Q In your methodology in this case, do you make any assumptions about how people filling out the adverse event reports interpret the term disability or permanent damage?

A Do I make any assumptions about that?

Q Do you assume for your opinions in this case that everyone who checks the box for disability or permanent damage means the same thing by checking that box?

MR. MICELI: Object to the form.

A In my analysis, you know, the endpoint is irreversible alopecia. And how I identify that mechanically is higher-level term alopecias in the MedDRA codes on the form and that the box is checked. That's what my analysis looks like precisely.

Page 99

Q Your analysis doesn't consider, one way or the other, what the reporter meant when he or she checked the box disability or permanent damage?

MR. MICELI: Object to the form.

A What the reporter meant, I mean -- you know, it is the definition of my endpoint. So I don't -- I'm not going deeper than that. I have no ability to go deeper than that in terms of -- let me just leave it at that. I analyze it as is.

Q In the endpoint of disability or permanent damage, there's an or in there; correct?

A Correct.

Q Are you focused on the disability part of it or the permanent damage part of it?

A I don't distinguish between those. My endpoint is higher-level term alopecias, plus that box is checked. That's the endpoint.

Q The box said disability or

Page 100

permanent damage.

Why do you believe that's an appropriate way to reach your endpoint?

A In terms of what's on that form, that is the box. That is the term that's used. This is one of the reasons I consulted with Dr. Kessler, is this a reasonable way to capture the concept of irreversible alopecia. And he said it was.

Q Is that because the outcome includes the word permanent?

MR. MICELI: Object to the form.

A That's certainly part of it. This is -- this is really -- you should ask Dr. Kessler.

Q Okay.

If the outcome -- if the option -- the box you're going to check for outcome only said disability, it did not have -- or permanent damage, would you still believe that was the appropriate way to search for your endpoint?

Page 101

MR. MICELI: Object to the form.

A I'd ask Dr. Kessler.

Q So if there's an adverse event report that only had higher-level terms of alopecia, plus a box checked for disability, you don't know whether that would still be an appropriate way to analyze the FAERS database?

MR. MICELI: Object to the form.

A As I said, I'd consult Dr. Kessler in deciding how to formulate my endpoint.

Q Well, without consulting Dr. Kessler, I only have you here today.

You told me that you came up with the outcome initially, and by that, I mean the outcome you included with the higher-level terms, and then you ran it by Dr. Kessler; right?

A That's right.

Q Through counsel?

MR. MICELI: Right.

MR. MICHELMAN: I don't mean

Page 226

counted twice in your Table 4?

A No.

Q How did you exclude it from being counted twice?

A There's an ID associated with each report. I'm counting IDs here. Each one only gets counted once, at most once.

Q You have an ID for each of the 291 reports you identified in Table 4?

MR. MICELI: Object to the form.

A I don't. But my program doesn't spit it out. But it could.

Q But you looked at the IDs?

A No, never. My program looks at them.

Q And this is a program you've provided us?

A Yes. That's the program: Tosti F.PL.

Q How did your program determine that these terms were being used in connection with alopecia?

Page 227

A So the -- it's restricted to reports of alopecia. So I'm looking in -- in the SITS database. So the SITS database contains 2,000 plus reports that the company identified as cases of alopecia, using the higher-level term, the MedDRA term that I used for my FAERS analysis.

So they identified -- is the number here? No. We could -- if we looked at the file, we could figure it out very quickly. But it's 2,000 plus reports of alopecia in their internal database that were extracted from their central pharmacovigilance database and put in this SITS database. 2,179, actually, I think is the number. That was my starting point. And then these -- these searches are intended to try and zero in on the irreversible ones.

Q If a record -- if a report mentions alopecia as a higher-level term and anywhere in the report one of these search terms occurs, that report gets counted in your Table 4?

Page 228

A That's right.

Q Did you or anyone look at any of the individual narratives to determine whether the search term actually described the alopecia?

A I didn't. I just ran the analysis with -- you know, with these terms. And the code is in the appendix. You can see exactly what I did.

Q So if there's a report with a higher-level term of alopecia and in the narrative, there's a comment that this individual's headache is permanent, that report would be counted as one of your 291 in Table 4?

A I suppose that could happen. I don't know.

Q If the report has a higher-level term of alopecia and the narrative describes the individual having chronic back pain, that report would be counted and included in your Table 4?

MR. MICELI: Object to the form.

A You know, I don't know if

Page 229

that ever happened. That could happen.

Q The methodology you used to search wouldn't prevent that from happening?

A That's true.

Q I want to understand something about how you did this searching.

And I understand that you through counsel have provided us several different databases. And there was some back-and-forth on that.

A On the stick -- the data files that were used for this analysis are on the thumb drive.

Q You performed this search on Sanofi's database using the PERL script that you wrote?

A Right.

Q There was a master data file that had all events, 38,000-some-odd records.

A If you say so. Okay.

Q And your report ultimately discusses 291 or includes 291 of them?

Page 322

C E R T I F I C A T I O N

I, ANTHONY GIARRO, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, DAVID MADIGAN, PH.D, was duly sworn on the date indicated, and that the foregoing, to the best of my ability, is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

______________________
ANTHONY GIARRO

Page 323

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS
800-227-8440
ASSIGNMENT NO. NJ3151484
CASE NAME: Durden, Antoinette v. Sanofi S.A.
DATE OF DEPOSITION: 12/7/2018
WITNESS' NAME: David Madigan ,

PAGE/LINE(S)/ CHANGE REASON
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________
____/______/________________/__________

______________________
David Madigan ,
(Notary not required in California)
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF______________, 2018.

______________________
NOTARY PUBLIC
MY COMMISSION EXPIRES________________

Page 324

Veritext Legal Solutions
290 W. Mt. Pleasant Ave. - Suite 3200
Livingston, New Jersey 07039
Toll Free: 800-227-8440 Fax: 973-629-1287

_____________, 2018

David Madigan, Ph.D.

Case Name: Durden, Antoinette v. Sanofi S.A.

Veritext Reference Number: 3151484

Witness: David Madigan Deposition Date: 12/7/2018

Dear Sir/Madam:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly waived, please review the transcript and note any changes or corrections on the jurat/errata sheet included, indicating the page, line number, change and reason for the change. Sign at the bottom of the sheet in the presence of a notary except in California where you are signing under penalty of perjury and forward the errata sheet back to us at the address shown above.

If the jurat is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

Encl.
cc: Scott Michelman, Esq.
Magan Ennis
Palmer Lambert
Harley Ratliff