# EXHIBIT B

Page 1

1           UNITED STATES DISTRICT COURT

      FOR THE EASTERN DISTRICT OF LOUISIANA

2    _____

3                               MDL No. 16-2740

4                               Relating to:

                                Clare Guilbault

5                               Case No. 2:16-cv-17061

                                Audrey Plaisance

6                               Case No. 2:18-cv-08068

     _____

7

8    IN RE:  TAXOTERE (DOCETAXEL)

9    PRODUCTS LIABILITY LITIGATION

10   _____

11

     --------------------------------------------------

12

13           REMOTE VIDEOTAPED DEPOSITION OF

14             LAURA M. PLUNKETT, PhD, DABT

15

16

17   DATE:  September 24, 2021

18   TIME:  8:30 a.m. (Central)

19   PLACE:  Veritext Virtual Videoconference

20

21

22

23

24   Reported By:  Christine K. Herman, RPR, CRR

25

Page 2

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4   GAINSBURGH, BENJAMIN, DAVID, MEUNIER & WARSHAUER
       By:  Matthew Palmer Lambert, Esquire
 5        1100 Poydras Street
          Suite 2800
 6        New Orleans, Louisiana 70163
          (504)522-2314
 7        plambert@gainsben.com
 8   AND
 9   DAVIS & CRUMP, PC
       By:  Taylor Hardenstein, Esquire
10        2601 14th Street
          Gulfport, Mississippi 39501
11        Phone:  (228)863-6000
          Email:  taylor.hardenstin@daviscrump.com
12
13
     ON BEHALF OF DEFENDANT HOSPIRA WORLDWIDE, LLC:
14
     WILLIAMS & CONNOLLY LLP
15   By:  Richmond T. Moore, Esquire
          Lori Interlicchio, Esquire
16        Isia Jasiewicz, Esquire
          725 12th Street NW
17        Washington, DC 20005
          Phone:  (202)434-5000
18        Email:  rtmoore@wc.com
                 linterlicchio@wc.com
19               ijasiewicz@wc.com
20   ON BEHALF OF DEFENDANT ACCORD:
21   TUCKER ELLIS, LLP
       By:  Emily S. Knight, Esquire
22        233 South Wacker Drive
          Suite 6950
23        Chicago, Illinois 60606
          Phone:  (312)624-6300
24        Email:  emily.knight@tuckerellis.com
25
```

Page 3

```
 1   ON BEHALF OF DEFENDANT ACTAVIS PHARMA, INC.; ACTAVIS
     LLC AND SAGENT PHARMACEUTICALS, INC:
 2
     ULMER & BERNE, LLP
 3   By:  Michael J. Suffern, Esquire
          600 Vine Street
 4        Suite 2800
          Cincinnati, Ohio 45202
 5        Phone:  (513)698-5064
          Email:  msuffern@ulmer.com
 6
 7
 8   ON BEHALF OF DEFENDANT SANOFI-AVENTIS:
 9   SHOOK, HARDY & BACON, LLP
       By:  Torrey M. Peterson, Esquire
10        2555 Grand Boulevard
          Kansas City, Missouri 64108
11        Phone:  (816)474-6550
          Email:  tpeterson@shb.com
12   and
13   By:  Adrienne Byard, Esquire
          555 Mission Street
14        Suite 2300
          San Francisco, California 94105
15        Phone:  (415)544-1900
          Email:  abyard@shb.com
16
17
18   ON BEHALF OF DEFENDANT SANDOZ:
19   GREENBERG TRAURIG, LLP
       By:  Evan C. Holden, Esquire
20        Terminus 200
          3333 Piedmont Road NE
21        Suite 2500
          Atlanta, Georgia 30305
22        Phone:  (678)553-2100
          Email:  holdene@gtlaw.com
23
24
25
```

Page 4

```
 1   ON BEHALF OF DEFENDANT SUN PHARMACEUTICAL INDUSTRIES:
 2   HINSHAW & CULBERTSON, LLP
       By:  Geoffrey M. Coan, Esquire
 3        53 State Street
          27th Floor
 4        Boston, Massachusetts 02109
          Phone:  (617)213-7045
 5        Email:  gcoan@hinshawlaw.com
 6
 7
 8   ALSO PRESENT:  Marc Friedman, Videographer
                    David Johnson, Veritext Concierge
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1   INDEX:
 2                  PAGE:
 3   WITNESS:  LAURA M. PLUNKETT, PhD, DABT
 4   Examination by Mr. Moore . . . . . . . . . . .   7
       Examination by Mr. Lambert . . . . . . . . . . 139
 5   Further Examination by Mr. Moore . . . . . . . 140
 6   EXHIBITS MARKED:
 7   Deposition Exhibit Number 1 . . . . . . . .   9
       Expert Report of Dr. Plunkett
 8
     Deposition Exhibit Number 2 . . . . . . . . .  11
 9     List of Documents Reviewed
10   Deposition Exhibit Number 3 . . . . . . . .  13
       CV of Dr. Plunkett
11
     Deposition Exhibit Number 4 . . . . . . . . .  14
12     Updated List of Testimony
13   Deposition Exhibit Number 5 . . . . . . . .  24
       CV of Dr. Plunkett,
14     Exhibit 8 from September 2020 deposition
15   Deposition Exhibit Number 6 . . . . . . . .  48
       TAXOTERE-FOIA-003516
16
     Deposition Exhibit Number 7 . . . . . . . .  60
17     Final Clinical Study Report for TAX 316
18   Deposition Exhibit Number 8 . . . . . . . .  81
       Final Clinical Study Report for TAX 301
19
     Deposition Exhibit Number 9 . . . . . . . . . 108
20     Clinicaltrials.gov literature
       regarding TAX 316
21
     Deposition Exhibit Number 10 . . . . . . . . 140
22     Invoices of Dr. Plunkett
23
24   Certificate of Witness . . . . . . . . . . . 143
25   Certificate of Court Reporter  . . . . . . . . 145
```

2 (Pages 2 - 5)

Page 6

1     THE ZOOM/VIDEOTAPED DEPOSITION OF
2  LAURA M. PLUNKETT, PhD, DABT, was attended remotely by
3  all parties and was taken on the 24th day of September,
4  2021, commencing at approximately 8:43 a.m.
5
6     THE VIDEOGRAPHER:  Good morning.  We are
7  going on the record at 8:43 a.m. Central Standard
8  Time on Friday, September 24th, 2021.
9     Please silence your cell phone, computer
10 tone, or any other electronic devices you have near
11 you.  Audio and video recording will continue to
12 take place unless all parties agree to go off the
13 record.
14    This is Media Unit Number 1 of the
15 video-recorded deposition of Dr. Laura M. Plunkett,
16 PhD, in the matter of Taxotere (docetaxel) Products
17 Liability Litigation.
18    This case is filed in the United States
19 District Court, For the Eastern District of
20 Louisiana, MDL Number 16-2740, Case
21 No. 2:16-cv-17061 and Case No. 2:18-cv-08068.
22    My name is Marc Friedman.  I'm the
23 certified legal video specialist.  Your court
24 reporter today is Christine Herman.  And we are both
25 from the firm of Veritext Legal Solutions.

Page 7

1     This deposition is being held via remote
2  videoconference.  All counsel consent to this remote
3  video arrangement and waive any objections to this
4  matter recording.
5     If there are any objections to the court
6  reporter swearing the witness remotely and this
7  remote video arrangement, please state them now.
8     (No response.)
9     THE VIDEOGRAPHER:  There being no
10 objections, counsel will be noticed on the
11 stenographic record.
12    And at this time our court reporter will
13 swear in our witness, and we can proceed.
14
15 Whereupon,
16    LAURA M. PLUNKETT, PhD, DABT,
17    a witness in the above-entitled matter,
18    after having been first duly sworn,
19    deposes and says as follows:
20       EXAMINATION
21 BY MR. MOORE:
22    Q.  Good morning, Dr. Plunkett.
23    A.  Good morning.
24    Q.  My name is Rich Moore.  I'm with the law
25 firm of Williams & Connolly.  We just met this

Page 8

1  morning virtually for the first time, right?
2     A.  Yes.  And if I have met you before I
3  apologize.  But I believe that's true; this is the
4  first time.
5     Q.  And we're having a remote deposition
6  today.  Where are you located physically?
7     A.  So I'm located, the city, Houston, state
8  of Texas, and this is my office.
9     Q.  And you've been deposed several times in
10 this litigation, right?
11    A.  Yes.
12    Q.  And you also testified once in a trial,
13 correct?
14    A.  Yes.  Yes.  That's correct.
15    Q.  And last time you were deposed early --
16 was earlier this year, in April 2021, in a case
17 against Sanofi, right?
18    A.  Yes.  That's correct.
19    Q.  You were under oath when you testified in
20 each of those depositions and at trial, correct?
21    A.  Yes.
22    Q.  You testified truthfully in each of those
23 depositions and at trial?
24    A.  Yes.
25    Q.  So I am going to do my best to be

Page 9

1  efficient today and not go over the same testimony
2  you've given previously, okay?
3     A.  That would be fine.
4     Q.  Now, you understand that you've been named
5  as an expert in cases brought against my client,
6  Hospira, by two plaintiffs, Audrey Plaisance and
7  Clare Guilbault; is that right?
8     A.  Yes.
9     Q.  And I'm going to mark as Exhibit 1, tab
10 1 -- I'm going to mark as Exhibit 1 your expert
11 report that you served in this case.  Okay?
12    A.  Okay.
13    (Deposition Exhibit Number 1 marked for
14 identification.)
15    Q.  Can you see that, Dr. Plunkett?
16    A.  I can.
17    Q.  And you understand that this is the expert
18 report that you served in this case, correct?
19    A.  Yes.
20    Q.  And this report contains a complete
21 statement of the opinions that you plan to offer in the
22 Plaisance and Guilbault cases against my client,
23 Hospira, correct?
24    A.  Yes.  I believe it does.  That and the
25 fact that I -- I would say, in addition to what is

3 (Pages 6 - 9)

Page 10

1  in here, I would refer you to my previous
2  depositions in the 505(b)(2) cases as well.
3      Q.  And those two depositions you're referring
4  to were in September 2020, correct?
5      A.  Yes.  I think on the 3rd and the 8th of
6  September.
7      Q.  Right.  So even though this deposition
8  is -- Excuse me.  Strike that.
9          This expert report is dated June 3rd,
10  2020, right?
11      A.  It is.
12      Q.  But that's -- even though it's dated
13  June 3rd, 2020, you're offering it again in this
14  case, just to be clear about that, right?
15      MR. LAMBERT:  Object to form.
16      A.  This report is a report that I have
17  prepared that addresses the different 505(b)(2)
18  defendants, including Hospira.
19      Q.  (BY MR. MOORE)  Okay.  And the opinions
20  that you've offered in this report, as well as your
21  depositions on September 3rd and 8th, 2020, explain
22  the opinions that you're going to offer in this case
23  against Hospira, correct?
24      A.  Yes.  I believe that they do.
25      Q.  So you're not offering any new opinions in

Page 11

1  this case against Hospira that were not in your
2  June 2020 report or the previous depositions,
3  correct?
4      A.  That is correct.
5      Q.  Now, I'm going to mark a document that's
6  tab 3.  And this will be marked as Exhibit 2.
7      (Deposition Exhibit Number 2 marked for
8  identification.)
9      Q.  And this is your list of documents
10  reviewed, which is Exhibit B to your report?
11      A.  It should be.  Yes.  That's correct.
12      Q.  Dr. Plunkett, do you recognize this
13  document, Exhibit B, as the list of documents
14  reviewed that you served with your expert report?
15      A.  Yes.  I do.  And I would state that I
16  think this was clarified in my depositions of
17  September 2020, that there's also a list of
18  references cited in the body of the report, and
19  those are also -- if they're -- in some cases
20  they're listed both places, but in some cases
21  they're not.  So I would say both the list at the
22  back of my report and this are the -- is the list of
23  the information that I have reviewed and relied
24  upon.
25          The only additional things that I have

Page 12

1  reviewed and relied upon were part of a report I
2  related to Sanofi but not to the 505(b)(2)s.
3      Q.  Right.  So let me just break that down.
4          For this case I'm talking about, the list
5  of documents that you reviewed and relied on are
6  contained in Exhibit 2, as well as your expert
7  report and the list that's attached to your
8  expert -- included within your expert report, right?
9      A.  Yes.  That's correct.  I just want to be
10  clear on that, because I believe, at the
11  September 2020 deposition, it was pointed out that
12  there were some things in the report list under
13  references cited that were not included here, and so
14  I didn't want to be -- I didn't want you to
15  understand that all of those are things that would
16  be relevant to my opinions for Hospira.
17      Q.  Okay.  This list that we have here as
18  Exhibit 3 (sic) and the -- and what's mentioned in
19  your report are the entire universe of materials
20  that you relied upon in forming the opinions in this
21  case, right?
22      A.  In the case that we're here to talk about,
23  that is correct.
24      Q.  So I'm going to mark as Exhibit 3 your CV.
25      MR. MOORE:  And this is tab A1, David.

Page 13

1      (Discussion held off the written record.)
2      (Deposition Exhibit Number 3 marked for
3  identification.)
4      Q.  (BY MR. MOORE)  So this is the document
5  that we've marked as Exhibit 3.  And this is the CV
6  that you served -- your attorney served on us last
7  night that's been updated for this deposition.
8          Do you recognize this document,
9  Dr. Plunkett?
10      A.  Yes.  Yes, I do.  That is correct.
11      Q.  And I've compared it against the CV that
12  you served in your September 2020 505(b)(2)
13  deposition, just to see what was new on there.  And
14  as I -- as I see it, the first thing that's new is,
15  you have a new publication in 2020, an article on
16  toxicology studies related to -- I'm not going to
17  pronounce those words right --
18  cannabidiol-containing products.
19          Do you see where I'm talking about?  It's
20  item number 1 under publications.  Can you turn to
21  that page?
22      A.  Cannabidiol.  Yes.  That should be right.
23  That's one of the differences.  That's correct.
24      Q.  And that publication doesn't relate to
25  alopecia, correct?

4 (Pages 10 - 13)

Page 14

1    A.  No, it does not.
2    Q.  It doesn't relate to docetaxel, correct?
3    A.  No.  It's not discussing chemotherapy
4  drugs of any type, and specifically does not discuss
5  docetaxel.  That is correct.
6    Q.  Maybe we could short-circuit this.
7  Dr. Plunkett, is there any -- any information here
8  on your new CV that relates to alopecia?
9    A.  No.
10    MR. LAMBERT:  Object to form.
11    Q.  (BY MR. MOORE)  Is there any new
12  information here on your CV that relates to
13  docetaxel?
14    A.  No.
15    Q.  Is there any new information on your CV
16  that you served last night, since September 2020,
17  that relates to chemotherapy drugs?
18    A.  No.
19    Q.  You also served on us last night an
20  updated list of your testimony.
21    MR. MOORE:  And I will pull that up as
22  Exhibit 4, please, David.  And that's tab A2.
23    (Deposition Exhibit Number 4 marked for
24  identification.)
25    Q.  (BY MR. MOORE)  Dr. Plunkett, this -- do

Page 15

1  you recognize this as your updated list of
2  testimony, dated September 22nd, 2021?
3    A.  Yes.  I do.
4    Q.  And it looks to me like you have added a
5  few matters from 2021, starting on page 7?
6    A.  Yes.
7    Q.  Sorry.  Let me just ask that question
8  better.  You've added a few matters on your list of
9  testimony since your deposition in the Kahn case in
10  April 2021, correct?
11    A.  April of 2020.  That is correct.  Yes.
12    Q.  So, actually, I'm asking about any
13  testimony that you've given since your Kahn
14  deposition in April 2021.
15    A.  Oh, I'm sorry.  Okay.  There's an
16  April 2020 deposition for the Kahn case, as well, if
17  you go up there, and that's why I'm confused.
18    Okay.  So, yes, I see that.  Yes.  That's
19  true.
20    Q.  And -- well, let's go back.  So
21  starting -- we can talk about your September 3rd and
22  September 8th, 2020 depositions in the 505(b)(2)
23  cases.  That's listed on here, correct?
24    A.  It is.
25    Q.  Okay.  So since then you've given another

Page 16

1  deposition in this litigation.  That's the Kahn
2  deposition in April of 2021, right?
3    A.  Yes.
4    Q.  Okay.  And then right above that there's
5  another matter, State of Hawaii vs. Bristol-Myers
6  Squibb.
7    Do you see that?
8    A.  I do.
9    Q.  And was that a product liability matter?
10    A.  Consumer fraud issues.  I was working on
11  behalf of the attorney general of the state of
12  Hawaii.  And it was a consumer fraud, I believe is
13  the statute that was -- the case was being addressed
14  under.  The drug is Plavix.  And that was actually a
15  trial, so that was an interesting experience.  It
16  was a Zoom trial.
17    Q.  And you represented -- Sorry.  You
18  appeared on behalf of the plaintiff, which was the
19  State of Hawaii in that case, right?
20    A.  Yes.  That's correct.
21    Q.  And that didn't have anything to do with
22  alopecia or chemotherapy, correct?
23    A.  No.  It did not.
24    Q.  And since your Kahn deposition in April of
25  2021, you've testified -- one, two, three -- four

Page 17

1  more times in the talc litigation; is that right?
2    A.  Yes.  That's correct.
3    Q.  Talc litigation is personal injury
4  litigation, also?
5    A.  Yes.  It involves cancer, but, yes, that's
6  correct.  Ovarian cancer and its relationship to
7  talc exposure.
8    Q.  And you represented -- or appeared on
9  behalf of the plaintiff in those cases, correct?
10    A.  Yes.  The injured parties.
11    Q.  And none of those cases related to
12  alopecia or chemotherapy; is that right?
13    A.  Did not relate to the issue of treatment
14  of the cancer -- that is correct -- with any drug,
15  and it also did not deal with alopecia.  It deals
16  with -- it was dealing -- it deals with toxicity of
17  talc in tissues that lead to ovarian cancer.
18    Q.  But they didn't involve docetaxel, right?
19    A.  I can't tell you that women in the cases
20  are not being treated with docetaxel.  That is very
21  possible.  But it was not -- I am not focusing on
22  the toxicity of any drug.  I'm looking at the issue
23  of how talc can be associated, or whether talc is
24  associated with ovarian cancer, and then the
25  regulatory issues around cosmetics, which is what

5 (Pages 14 - 17)

Page 18

1   the product is.
2      Q.  You didn't offer any opinions in those
3   cases related to docetaxel or chemotherapy
4   treatment, right?
5      A.  That is correct.  I did not.
6      Q.  What did you do to prepare for your
7   deposition today?
8      A.  I re-reviewed my report, the June report
9   that you have up.  I went back and reviewed the
10  depositions I gave in September of 2020, in the
11  505(b)(2) case at issue there.  I think the
12  defendant was Accord, Sandoz-Accord, maybe, or just
13  Accord.  I think Sandoz-Accord.  And then I looked
14  at the notice of deposition, the subpoena you sent,
15  to see if there was anything else that I needed to
16  provide, which is why you were provided with the
17  updated CV and the updated trial list.
18      And, um, looked back at a few of the -- of
19  the documents that were discussed in my first
20  deposition with Mr. Fowler.  And there were
21  exhibits, and I pulled some of those up.
22      Q.  Do you recall which documents from your
23  previous deposition you reviewed?
24      A.  Um, I reviewed the WHO document that he
25  was asking about.  I reviewed the -- looked at the

Page 19

1   Sparano papers again.  I -- actually, I pulled -- in
2   addition to the Exhibit C, I did go back and pull
3   some of the other articles that are cited in my
4   report that deal with permanent alopecia and its
5   association with Taxotere or docetaxel use, such as
6   Miteva, Palamaras.  I don't -- there's a whole list
7   of them.  I don't think I can tell you.  They are
8   cited in -- it's the ones that are cited in
9   paragraph 62 of my report.
10      And I have my report, by the way, open
11  here, next to me, just because it's sometimes easier
12  to look at a hard copy.
13      And what other paragraphs?  I think
14  earlier on there's another paragraph that talks
15  about the literature with alopecia as well.  51.
16      Q.  Okay.  So let me just -- that was a long
17  answer.  Let me just tease that out.
18      You didn't review any documents in
19  preparation that weren't cited in your report or
20  used in your previous deposition, correct?
21      A.  Um, that I had in my possession, that is
22  correct.  The only -- the only -- the reason I
23  mentioned the WHO document is, Mr. Fowler spent a
24  good bit of time on the issue that the WHO document
25  I cite in my report on the issue of

Page 20

1   interchangeability was draft.  And I went and looked
2   again and spent -- took a while, about 40 minutes,
3   and I did finally find, buried in the WHO website, a
4   non-draft version of the WHO Essential List of
5   Medicines from 2012 or 2013, where indeed that WHO
6   did add the Taxanes to their list, and they are,
7   indeed, listed there as being interchangeable.  So
8   it is actually not a draft form anymore.
9      Q.  Okay.  So you gave me the exception of one
10  document, which is the non-draft version of the WHO
11  document that you just discussed.  Other than that,
12  you didn't review any documents in preparation for
13  today's deposition that were not cited in your
14  report or used in your September 2020 deposition.
15  Fair enough?
16      A.  Yes.  That is correct.
17      Q.  And other than the ones that you described
18  to me, do you recall reviewing any other documents
19  within your previous deposition or your report in
20  preparation for today's deposition?
21      A.  I did look again at my file on, um, FDA
22  documents.  I think I told Mr. Fowler the last time
23  that he and I met, in September 2020, that, when I
24  first started the litigation, I had pulled down from
25  the FDA website some of the summary review documents

Page 21

1   for each of the 505(b)(2)s.  And so I did go again
2   to look at -- you know, I didn't actually go through
3   them in any detail, because I'm not giving
4   regulatory opinions.  But I did go to look to make
5   sure, and, yes, I did, indeed -- I had downloaded
6   Hospira's documents, so I have those.  And I don't
7   think he asked me about Hospira.  He asked me,
8   obviously, about the defendant that he was dealing
9   with.
10      But I did go to check, and, yes, I did.
11  So you have notice that, you know, that I don't cite
12  to them in my report, but I did pull those down.
13  And I think I had told him that I had done more than
14  one company at the time, and indeed I had.
15      Q.  Well, we'll talk about, um -- well, let's
16  talk about that now.  So you're not giving
17  regulatory opinions in this case, correct?
18      A.  No, I'm not.  That's correct.
19      Q.  And when you say that -- and you don't
20  cite in your report or in your reliance materials
21  any of -- any regulatory documents related to
22  Hospira, correct?
23      A.  That's correct.
24      Q.  And so when you talk about additional
25  documents that you went back and looked at related

Page 22

1 to Hospira, what are you talking about? You're
2 talking about something that's not on your reliance
3 list, right?
4    A. Well, if you look in -- and I need to pull
5 up -- I can go look. I thought, in my Exhibit B to
6 my -- my report, that I had listed documents
7 available at the FDA website for the 505(b)(2)s.
8 And I had disclosed that, in September of 2020, to
9 Mr. -- Mr. Fowler as well, so --
10    Q. Well, this is -- if we could look at
11 Exhibit B. This is marked as Exhibit 2.
12    A. Yes. That's correct. Let me --
13    I -- if you want me to look at it, my
14 document, I can't do that when you're sharing
15 screen, it doesn't look like. I don't know how to
16 do that. Let me open my ShareFile and look real
17 quick, and I'll tell you.
18    I'm refreshing my page, so it'll take just
19 a second.
20    Q. We have to muddle through a little bit in
21 this new age.
22    A. Okay. I've got it. Okay. Now I have it
23 open, so let me look real quick.
24    So, no, it's not here. And I believe this
25 was when Mr. -- it's not in Exhibit B. But I

Page 23

1 believe, when -- if you look at my deposition
2 testimony from 2020, September, there was a
3 discussion on the record with Mr. Fowler about
4 having gone to the FDA website to look at the
5 summary reviews that FDA had and the labels, just
6 because I was confirming that indeed they were
7 all -- all the different drugs were indeed approved
8 for the indication of adjuvant treatment of breast
9 cancer, the 505(b)(2)s, and they were.
10    And that was the -- my reasoning for doing
11 it initially was to understand that which docetaxel
12 formulations were relevant in terms of my opinions
13 in my report, because it deals with the treatment,
14 use of docetaxel, pharmacology and toxicology as it
15 relates to -- as it relates to use in patients for
16 adjuvant treatment of breast cancer. So there were
17 no opinions formed in those documents, but certainly
18 I have those in my file.
19    Q. Okay. So let's just -- let's just break
20 this down. Your actual Exhibit B, which is attached
21 to your report, your list of materials reviewed,
22 does not contain any Hospira documents, correct?
23    A. That is correct.
24    Q. In Exhibit 8 of your September 2020
25 deposition, you provided a supplemental list of

Page 24

1 materials reviewed for 505(b)(2) defendants. And
2 that's what you're referring to, correct?
3    A. I believe so, yes. I don't recall the
4 number of exhibit. But I know we talked about it,
5 because when I reviewed my deposition again with
6 him -- yeah.
7    MR. MOORE: We might have to take a quick
8 five-minute break, just to make sure David can pull
9 that one up. Or we could just go off the record for
10 a second. If we can just go off the record for just
11 a minute, I think we can do it.
12    THE VIDEOGRAPHER: The time is 9:12 a.m.
13 We are going off the record.
14    (Discussion held off the record.)
15    THE VIDEOGRAPHER: The time is 9:13. We
16 are back on the record.
17    Q. (BY MR. MOORE) Okay. So we've pulled up
18 Exhibit 8. And we'll mark that -- I'm sorry. It's
19 marked as Exhibit 5 for this deposition.
20    (Deposition Exhibit Number 5 marked for
21 identification.)
22    MR. MOORE: If you turn to page 26 of the
23 PDF, please, David.
24    Q. (BY MR. MOORE) Is this the list of
25 materials that you're referring to, Dr. Plunkett?

Page 25

1    A. Um, the miscellaneous part would be, yes.
2 That's correct. So, um, those -- that link to the
3 FDA website for docetaxel, when you click on that
4 you can choose the different versions, and so I
5 had -- just like I had looked at the labels at this
6 time for Sandoz and Accord, I also looked at other
7 docetaxel labels that are listed or linked in the
8 page for Hospira as well.
9    Q. Okay. So this document actually lists
10 specific labels for Accord and Sandoz and Taxotere,
11 as items 1 through 15, section 1, right?
12    A. Yes. And then the next -- it's the next
13 item.
14    Q. Wait. I'm just asking about the first
15 section, section 1, Labels, lists Accord, Sandoz and
16 Taxotere labels, correct?
17    A. Yes.
18    Q. And that section does not mention any
19 Hospira labels specifically, correct?
20    A. It does not.
21    Q. In section 2, Miscellaneous, you have
22 website for access FDA. And that doesn't actually
23 say Hospira on the list. You'll agree with that,
24 right?
25    A. That's correct. It does not. But when

7 (Pages 22 - 25)

Page 26

1  you go to drugs@FDA, type in docetaxel, you will
2  have a choice of company, um, products to link to.
3  And I have gone and linked to all of the 505(b)(2)s,
4  including the Hospira, in the past.  And that is
5  what I believe I had said in September, but
6  obviously I was focusing, at the time, because that
7  was a deposition that was being taken by Sandoz and
8  Accord.
9      Q.  Okay.  The number that you listed under
10 number 1 in the website is 201195.
11      Do you see that?
12     A.  Yes.  I do.
13     Q.  And you understand that's the application
14 number for Accord, right?
15     A.  Yes.  And the one below it is for Sandoz,
16 but --
17     Q.  So neither of these websites actually link
18 to the Hospira labels, right?
19     A.  These particular links, that's correct.
20 But to get to these links --
21     Q.  One question at a time, please.
22     Neither of these links -- neither of these
23 links that are listed on your list of materials
24 reviewed link directly to the Hospira label.  You'll
25 agree with that, right?

Page 27

1      A.  I do, but the -- to get to --
2      MR. LAMBERT:  Object to form.
3      Q.  (BY MR. MOORE)  You agree that -- what
4  you're saying is, you went to this link, and then
5  you went to another link that was connected to
6  access the Hospira label; is that right?
7      A.  No.  That's not what I'm saying.  That's
8  why I was trying to explain.
9      In order to get to this link, you first
10 get to the part of the link that says
11 drugs@FDA_docs.  And when you go to there, you have
12 a choice.  There's different NDAs you can -- numbers
13 you can link to.  And one of those NDA numbers is
14 for the Hospira label, the Hospira NDA as well.  I
15 don't have the number memorized.
16     So I was trying to explain to you that
17 there's two steps to get to this final link, and the
18 first step is to go to the website called drugs@FDA,
19 type in docetaxel, and then you get a variety of
20 NDAs listed, one of which is for Hospira.  So I
21 have, in my files -- I've had since I first -- when
22 I was preparing my first -- the report for the
23 505(b)(2)s, I had downloaded materials for all of
24 the ones that are listed there.
25     We prepared this document because we were

Page 28

1  going to be giving a deposition specific to Accord
2  and Sandoz.  And I guess -- I guess I apologize that
3  we didn't do the same thing for you.  But, um, I
4  believe I said, in my deposition in September, that,
5  indeed, I had linked to all of the 505(b)(2)s.
6      Q.  So you're saying that you went to a
7  website that's not specifically listed here in your
8  materials to access the 505 -- excuse me -- the
9  Hospira labeling.
10     MR. LAMBERT:  Object to form.
11     A.  No.  Well, that's not exactly what I'm
12 saying.  I'm saying to you that, to get to the links
13 that are listed here, you have to first go to a
14 page that lists all -- this is just how it happens.
15 This is all the docetaxel NDAs, one of which is an
16 NDA page for the Hospira product.  And I have done
17 that as well.  Did that well over a year ago, back
18 in April of 2020, or before.  Probably earlier in
19 2020.  And, again, that is something that I have in
20 my files.
21     Q.  (BY MR. MOORE)  And -- well, just to be
22 clear, you keep talking about the NDA.  When you say
23 you went and looked at the Hospira documents, you
24 looked at the Hospira label, right?
25     A.  No.  There's summary reviews.  So it's

Page 29

1  what -- there's a number -- there's three
2  different -- three different pages that are -- if
3  you click on Hospira, there's three different pages
4  that come up that are linked through the one main
5  page.  And you can look at labels and approval
6  history, and if you go to that you get, also -- at
7  that page with the labels, up above, at the top of
8  the web page, you get the different FDA reviews; the
9  letter that they sent when the product was approved
10 by FDA, back in March of 2011; you get the review
11 documents that went with the NDA that was filed by
12 Hospira, some of which were reviewed -- it was back
13 in time, but it has the pharmacology review, the
14 clinical chemistry review -- the clinical review,
15 the chemistry review.  I forget.  There's about
16 eight documents there.
17     Q.  Okay.
18     MR. MOORE:  Well, Palmer, we're going to
19 object, obviously.  This is not in the materials
20 having been disclosed.  And the idea that we have to
21 go and link to any other website that's also
22 connected to a website on her reliance list doesn't
23 meet the requirements of Rule 26.  But we'll take
24 that to the judge.  We just note our objection.
25     MR. LAMBERT:  Noted.  I mean, she's got

8 (Pages 26 - 29)

1  Footnote 18 in her report, listing of FDA documents
2  related to Hospira, and where she went and looked
3  for them. So you can take it to the judge if you
4  want. But I'm happy to, as Dr. Plunkett just said,
5  ask her to supplement her list to include all of the
6  specific Hospira labels that she reviewed, if you'd
7  like me to.
8      But I think we can move on, unless you
9  want to talk about it some more.
10     Q. (BY MR. MOORE) So, Dr. Plunkett, you did
11 not -- Well, let me strike that.
12     You said you reviewed the Hospira label
13 and regulatory materials. But you're not offering
14 any opinions on regulatory issues, right?
15     A. That is correct. There's another expert,
16 it's my understanding, that will handle those
17 issues.
18     Q. And you explained this same issue, I
19 believe, in your September deposition, about --
20     Do you remember that colloquy?
21     A. Yes. That's why -- that's what triggered
22 me to remember that I had done that, so --
23     Q. And the same -- the same limitations that
24 you described in that deposition about your -- your
25 not giving regulatory opinions, they also apply here

1  as to Hospira, right?
2      A. Yes. That's correct.
3      Q. And in particular, just so we're not -- so
4  there's no confusion, on paragraph 51 of your
5  report, you do have a brief discussion of labeling.
6      Do you see that?
7      A. That's correct. And that's -- that's the
8  footnote that Mr. -- sorry -- Mr. Lambert was
9  referring to. That's correct.
10     Q. And you testified, in your September '20
11 deposition, that, even though this factual
12 information is in your report, you're not going to
13 be providing any opinions in this case based on
14 paragraph 51, correct?
15     A. Yes. I would agree. I mean, to me, this
16 is just -- it's a paragraph, I think as I stated,
17 that describes the facts of what -- you know, in
18 other words, there is a Hospira NDA. There is a
19 Hospira label, or there was a Sandoz label, or
20 whatever. That's what it's just -- it's giving
21 context around what the drug is and the fact that
22 it, indeed, is one that is -- has been approved by
23 FDA.
24     Q. Okay. So you're not offering any --
25 outside the fact that it's been approved by the FDA,

1  you're not offering any opinions based on paragraph
2  51?
3      A. I don't plan to, no. It depends what
4  questions are asked of me at trial. But obviously
5  this is in my report. If, at trial, someone wants
6  to ask me questions about this paragraph, I
7  certainly would be -- would be able to provide what
8  is here.
9      Q. Okay. Unless someone asks you, you're not
10 intending to offer any affirmative opinions in this
11 case based on paragraph 51 of your report, correct?
12     A. That is correct.
13     Q. And you don't -- so you're not -- you're
14 not going to opine, for example, that Hospira's
15 docetaxel labeling was inadequate?
16     MR. LAMBERT: Object to form.
17     A. That is correct.
18     Q. (BY MR. MOORE) You're not going to
19 make -- offer any opinion that Hospira should have
20 changed its labeling earlier to include the risk of
21 permanent hair loss?
22     A. That is correct. There are others that
23 will be handling those issues.
24     Q. And you're not going to offer any opinion
25 that Hospira failed to warn the plaintiffs'

1  prescribing physicians about the risk of docetaxel,
2  correct?
3      A. That is correct. There are others that
4  will be handling that.
5      Q. And you mentioned -- I just want to be
6  clear. You mentioned this 505(b)(2) of the Food,
7  Drug and Cosmetic Act. You're not going to be
8  offering any opinions on Hospira's duties under that
9  section of the code, correct?
10     A. That is correct. I believe others will
11 handle that.
12     Q. And you're not offering any opinions that
13 are criticizing Hospira about its labeling, right?
14     A. That is correct. Again, others will be
15 handling that.
16     Q. And you're not offering any opinions about
17 what knowledge Hospira had about the risk of
18 docetaxel and hair loss?
19     MR. LAMBERT: Object to form.
20     A. That is correct. That is correct, in
21 terms of the way that you would do if you were
22 reviewing company depositions and things like that,
23 no, because I haven't reviewed those things.
24     Q. (BY MR. MOORE) So you haven't reviewed
25 any Hospira depositions, for example, right?

9 (Pages 30 - 33)

Page 34

1    A.   That is correct.  I have not.
2    Q.   And you're not offering any criticisms of
3  Hospira specifically, right?
4    A.   That is correct.  Based upon what is in my
5  report today, that is true.
6    Q.   You're not offering any opinion that
7  Hospira breached any type of legal, regulatory or
8  ethical duty as it relates to docetaxel?
9    A.   I have not formed those opinions at this
10  time.  That is true.
11    Q.   Now, as we discussed, there are two
12  plaintiffs in the case, Audrey Plaisance and Clare
13  Guilbault.  Actually two separate cases.  You
14  understand that, right?
15    A.   Yes.  I do.
16    Q.   Have you ever communicated with
17  Ms. Plaisance?
18    A.   No.  I have not.
19    Q.   Have you ever communicated with
20  Ms. Guilbault?
21    A.   No.  I have not.
22    Q.   Have you ever reviewed the medical records
23  of Ms. Plaisance?
24    A.   No.  I'm not a case-specific expert, so I
25  haven't reviewed medical records for any of the

Page 35

1  plaintiffs in any of the cases I've worked on.
2    Q.   And that's what I'm getting at, but I just
3  have a series of questions here, just to get some
4  specifics and make sure I understand the
5  limitations, what that means, not to be a
6  case-specific expert.  Okay?
7    A.   Okay.
8    Q.   Have you ever reviewed the medical records
9  of Ms. Guilbault?
10    A.   No.  Same answer.  I have not.
11    Q.   Just bear with me.  We have two plaintiffs
12  in separate cases, so I'm going to ask each one
13  separately.
14        Have you read the deposition of
15  Ms. Plaisance?
16    A.   No, I have not.
17    Q.   Have you read the deposition of
18  Ms. Guilbault?
19    A.   No, I have not.
20    Q.   Have you ever communicated with
21  Ms. Plaisance's physicians?
22    A.   No, I have not.
23    Q.   Have you --
24    A.   I should say, at least I'm not aware of
25  it.  I would assume that there's no physician that

Page 36

1  she has that I've ever interacted with before.
2  Obviously I don't know who they are.  It's possible
3  that's somebody that I'm aware of.  But I have not,
4  in my work on this case, communicated with any of
5  the -- any physician about any of the plaintiffs.
6    Q.   So as part of your work for this case, you
7  never communicated with Ms. Plaisance's physicians,
8  right?
9    A.   It would be the same answer.  That is
10  correct.
11    Q.   And as part of your work in this case have
12  you ever communicated with Ms. Guilbault's
13  physicians?
14    A.   No, I have not.
15    Q.   Have you reviewed the depositions of
16  Ms. Plaisance's physicians?
17    A.   No, I have not.
18    Q.   Have you reviewed the depositions of
19  Ms. Guilbault's physicians?
20    A.   No, I have not.
21    Q.   Do you know why Ms. Plaisance's physician
22  prescribed docetaxel for her?
23    A.   I do not know specifically.  I haven't
24  seen a document.  I would assume it was for
25  treatment -- adjuvant treatment of breast cancer,

Page 37

1  but I don't know.
2    Q.   Do you know why Ms. Guilbault's physician
3  prescribed docetaxel for her?
4    A.   It would be the same answer.  I haven't
5  had any -- any documents to show me any facts like
6  that.  But I would, again, assume, based on general
7  conversations I've had with attorneys, that she also
8  was being treated with docetaxel as adjuvant
9  treatment of breast cancer.
10    Q.   Do you have any knowledge of
11  Ms. Plaisance's current medical condition?
12    A.   No, I do not.
13    Q.   Do you have any knowledge of
14  Ms. Guilbault's current medical condition?
15    A.   No, I do not.
16    Q.   And are you giving any opinions about the
17  medical care and treatment of Ms. Plaisance?
18    A.   No.  I'm not a physician, so I wouldn't be
19  doing that.
20    Q.   Are you giving any opinions about the
21  medical care and treatment of Ms. Guilbault?
22    A.   Same answer.  No, I'm not.  I am not a
23  physician, so I would not do that.
24    Q.   So you're not offering any opinion that
25  docetaxel caused Ms. Plaisance to have permanent

1  hair loss?
2     A.  That is correct.  I'm not a case-specific
3  causation expert or even a general causation expert.
4     Q.  Are you offering any opinions that
5  docetaxel caused Ms. Guilbault to have permanent
6  hair loss?
7     A.  It would be the same answer.  No, because
8  I'm not a case-specific causation expert.
9     Q.  And you're not a general causation expert,
10 either, correct?
11    A.  That's correct.  I'm not.  I'm not here to
12 offer those opinions.
13    Q.  Now, I want to go back.  We didn't finish
14 our conversation about preparation.  I think we -- I
15 think we've covered what documents you've reviewed.
16       And you mentioned that you reviewed your
17 deposition transcripts for the September 3rd and
18 September 8th depositions.  Do I remember that
19 correctly?
20    A.  Yes.  That's correct.
21    Q.  Did you review any other deposition
22 transcripts in preparation for today's deposition?
23    A.  I had recently reviewed -- wasn't to
24 prepare specifically for this, but I very recently
25 had reviewed my, um, April 2021 deposition for

1  corrections, so something that I had done in the
2  past.  But not for this case.  So it is not
3  something I did in the last, say, two weeks.
4     Q.  Did you review your trial testimony in the
5  Earnest case in preparation --
6     A.  No.
7     Q.  -- for this deposition?
8     A.  I'm sorry.  I didn't mean to interrupt
9  you.  No.  I did not.
10    Q.  Did you review any other depositions,
11 other than your own, in preparation for today's
12 deposition?
13    A.  No.  I did not.
14    Q.  Did you review any expert reports in
15 preparation for today's deposition, other than the
16 expert report that you provided in this case?
17    A.  Not in preparation for this deposition,
18 no.  I have read other expert reports in the past,
19 but not specifically to get ready for this, no.
20    Q.  Did you review any medical records to
21 prepare for today's deposition?
22    A.  No.  I did not.
23    Q.  Did you communicate with any individuals
24 to prepare for your deposition today?
25    A.  Um, I had a phone conversation with

1  Mr. Lambert and Mr. Miceli two days ago.
2     Q.  And how long did that last?
3     A.  About an hour and a half.
4     Q.  Was there anyone else on the call?
5     A.  Not that I was aware of, no.
6     Q.  Have you -- Well, strike that.
7        Have you communicated with any other
8  experts retained by the plaintiffs since your last
9  deposition, in April 2021?
10    A.  No.  Well, in this case, no.  None of
11 the experts retained in this case, no.
12    Q.  Have you communicated with any other
13 expert retained in the Taxotere litigation since
14 your last deposition, in April 2021?
15    A.  No.  I have not.
16    Q.  Have you reviewed the reports of any other
17 experts in the Taxotere litigation since the last
18 deposition, in April 2021?
19    A.  I don't believe so, no.  I did review them
20 before that deposition, several that I talk about in
21 that deposition.  But, no --
22    Q.  You described in that deposition,
23 April 2021, what -- what you had reviewed before
24 that deposition, correct?
25    A.  Yes, I did, so you can go there and find

1  out.
2     Q.  I'm asking you about since then, since
3  then, since your deposition.  Have you reviewed the
4  reports of any experts?
5     A.  And I answered, no, I don't believe I
6  have.  But I did do it before the April 2021 depo.
7     Q.  Since your April 2021 deposition, what
8  work have you done relating to the Taxotere
9  litigation?
10    A.  I prepared for this deposition, reviewed
11 the deposition transcript of the 2021 -- April 2021
12 deposition itself.  I did -- I believe, a couple
13 months ago, I did do -- about every three months or
14 so I do literature searches, but I didn't identify
15 anything new to review at this time.  And that's
16 about it.
17    Q.  How much time do you estimate that you
18 spent doing the activities that you described to
19 prepare for today's deposition?
20    A.  I would say 10 to 12 hours of time over
21 the last couple of weeks.  I haven't sent a bill
22 yet.  There will be a bill sent for the month of
23 September, which will include that time, and the
24 time spent here at deposition today.
25    Q.  Have you submitted any invoices to counsel

11 (Pages 38 - 41)

Page 42

1 in the Taxotere litigation since your last
2 deposition, in April 2021?
3    A.  Um, yes.  I would have sent an invoice
4 that encompassed the work done in March and early
5 April, through that deposition, so, um, that would
6 have been -- it would have been sent in April of
7 2021, after the deposition.
8    Q.  And have you sent any other invoices after
9 that invoice?
10    A.  No.  I don't believe I have.
11       MR. MOORE:  So, Palmer, I notice you
12 objected to providing any invoices, and I just want
13 to state on the record that it's our position that
14 these -- that this work is relevant to -- to the
15 case, and that we request that you reconsider and
16 provide that March/April invoice, as well as any
17 other -- she says there are no other invoices, but,
18 if there are, anything else that hasn't been already
19 provided.
20       MR. LAMBERT:  I'll ask our team to send me
21 whatever invoices we have.  And our position stated
22 in the response document that, you know, the billing
23 related to this particular case would be relevant.
24 But I'll do that.  And I assume you have all of the
25 invoices that were shown at the prior deposition.

Page 43

1       MR. MOORE:  Yeah.  All the ones that were
2 shown at the deposition we do, of course.  Thank
3 you.
4       MR. LAMBERT:  Okay.
5       MR. MOORE:  We've been going for about an
6 hour.  This is probably a good time to take a break,
7 if that suits you, Dr. Plunkett?
8       THE WITNESS:  That's fine.  I mean, and I
9 will tell you, as I always tell attorneys -- I don't
10 know that you've seen this in my depositions -- I
11 can go longer, but I'm happy to break if you're
12 ready to break.  I know that sometimes the court
13 reporter needs a break.
14       MR. MOORE:  Okay.  Let's take a quick
15 break.  It's 10 -- I have 10:38.  We can make it
16 short, come back at 10:45, if that will work for
17 everyone.
18       THE WITNESS:  Okay.
19       MR. MOORE:  Is that okay with you,
20 Christine?
21       THE COURT REPORTER:  Yes.  Thank you so
22 much.  That's great.
23       THE VIDEOGRAPHER:  The time is 9:38.  We
24 are going off the record.  This will end Media Unit
25 Number 1.

Page 44

1       (Whereupon, the proceedings were in recess
2 at 9:38 a.m. and subsequently reconvened at
3 9:47 a.m., and the following proceedings were
4 entered of record:)
5       THE VIDEOGRAPHER:  The time is 9:47 a.m.
6 We are back on the record.  This will be the start
7 of Media Unit Number 2.
8       Counsel?
9    Q.  (BY MR. MOORE)  Dr. Plunkett, I just want
10 to go back to Exhibit 2, your reliance list.  Can
11 you pull that up, please?
12       THE CONCIERGE:  Do you want it on the
13 screen?
14       MR. MOORE:  Yes.
15    Q.  (BY MR. MOORE)  And we had a long
16 discussion about FDA documents in Exhibit 5.  I'm
17 not going back to talk about that.  I'm talking
18 about Exhibit Number 2, which is your reliance list.
19 And just to -- just to be clear, um, the -- I think
20 you said none of the documents on this reliance list
21 are Hospira documents, right?
22    A.  That is correct.  If, by that, you mean
23 documents that I consider to be internal company
24 documents or company depositions, that is correct.
25    Q.  Right.  And I just want to be -- so we

Page 45

1 don't have an unclear record, we can just go through
2 the categories.  Depositions and deposition
3 exhibits, you've listed some here.  None of those
4 are Hospira depositions or deposition exhibits,
5 correct?
6    A.  That's my understanding.  That is correct.
7    Q.  So you haven't reviewed any Hospira
8 depositions, correct?
9    A.  Yes.  I think you asked me that earlier,
10 and I said, no, I have not.
11    Q.  And we've already talked about FDA
12 documents.
13       Um, the next category is clinical trials
14 and related documents.  Do you see that?
15    A.  So it's further -- I know it's there later
16 on in this document, yes, there are.
17       MR. MOORE:  David, if you could -- the
18 very end of that -- of this document.  Right.  The
19 previous page as well.  Okay.  Are we all there?
20    Q.  (BY MR. MOORE)  Dr. Plunkett, do you
21 see -- do you see, on this page of your reliance
22 list, a list of documents under the heading Clinical
23 Trials and Related Documents?
24    A.  Yes, I do.
25    Q.  And those documents are Sanofi documents,

12 (Pages 42 - 45)

Page 46

1  right?
2      A.  Yes.  Or a FOIA.  There's a Freedom of
3  Information request document down there as well, at
4  the very -- at the very end.
5      Q.  Right.  So the ones before that are -- all
6  have Sanofi Bates numbers, right?
7      A.  Yes.  And the only reason I was pointing
8  that out is, that's not an internal Sanofi document.
9  It's a document obtained through a Freedom of
10 Information request to the FDA.
11     Q.  Right.  But it's a Sanofi document that
12 you obtained -- or that -- who obtained it through
13 the FD -- from the FOIA request?
14     A.  I don't know.  To me, it was part of the
15 discovery provided for me to access, so I don't know
16 who actually did it.  I could go look on the
17 document.  I don't remember.  But it lists the
18 individual party, though, or parties.
19     Q.  Okay.  The other documents that you --
20 that you've listed here above that, those are Sanofi
21 internal documents, correct?
22     A.  They were accessed -- I can't -- they're
23 not all, necessarily, internal Sanofi documents by
24 their origination, but they certainly were in terms
25 of the discovery and my access, because they're all

Page 47

1  stamped with a Bates number, with Sanofi, so they
2  were documents that were made available to me based
3  upon discovery through Sanofi.  That's my
4  understanding.
5      Q.  Okay.  And that's what I was getting at.
6  So these were documents that the attorneys provided
7  to you, plaintiffs' attorneys provided to you,
8  correct?
9      A.  Or -- yes, or were cited in depositions,
10 so as a result -- and those were provided to me
11 through the attorneys as well.
12     Q.  Right.  But they're not -- these aren't
13 documents that were provided by Hospira.  That's all
14 I'm asking.
15     A.  I believe that's true, yes.  I haven't
16 asked that question, but I believe that's true.
17     Q.  And you haven't -- you don't have any
18 information that Hospira had access to any of these
19 documents, correct?
20     A.  No.  I don't have any of that information,
21 so I can't answer that.
22         MR. MOORE:  So if we could pull up the
23 FOIA document, please.
24         THE CONCIERGE:  Do you have a number, a
25 file name?

Page 48

1         MR. MOORE:  It's going to be -- it's
2  called TAXOTERE-FOIA-003516.  Just give us a second,
3  David.
4         (Discussion held off the written record.)
5         (Deposition Exhibit Number 6 marked for
6  identification.)
7      Q.  (BY MR. MOORE)  Dr. Plunkett, can you see
8  the document yet?
9      A.  It's loading.  I see a -- I see the first
10 page, and the second page looks like the approval
11 package for application, yes.
12     Q.  Right.  Okay.  So my question is, you
13 referred earlier to one document on your reliance
14 list that was obtained through FOIA.  Is the
15 document that you were referring to?
16     A.  If you show me the Bates number.  I
17 believe this is, yes.  Yes.  I believe this is it.
18 Yes.
19     Q.  And this is a Sanofi FDA approval package,
20 correct?
21     A.  Yes.  And I believe that's the -- I think
22 it's a long document, but it has all of those
23 reviews, yes.
24     Q.  But this is not -- this is not a document
25 that's related to the Hospira documents, right?

Page 49

1      A.  Well, it is related, in that you're a
2  505(b)(2) holder, and this is the information that
3  was relied upon by FDA when they approved the
4  Hospira document.  That way it's relevant.  But it
5  is certainly not -- it was not a document generated
6  by Hospira.  That is true.
7      Q.  So just so we're -- so we're clear on
8  this, there aren't any Hospira internal files on any
9  of your reliance lists or in your report, right?
10     A.  Yes.  I think I already answered that.
11 One of the questions you asked was about that.  No,
12 there are not.
13     Q.  You didn't review any information about
14 what adverse events were reported to Hospira, right?
15     A.  No.  I did not have -- have Hospira's
16 internal files related to that.  That is true.
17     Q.  And you haven't -- reviewed any internal
18 analyses by Hospira with respect to docetaxel and
19 permanent alopecia, correct?
20     A.  No, I have not.
21     Q.  Now, I want to turn to your opinions in
22 the case, starting with your conclusion on page 32.
23         MR. MOORE:  I'm sorry.  This is the expert
24 report, David, so it would be Exhibit 1, I believe.
25     Q.  (BY MR. MOORE)  Paragraph 63 of your

13 (Pages 46 - 49)

1 report on page 32. Is everyone on the same page?
2     Dr. Plunkett, are you with us?
3     A.  Oh, yeah. I'm sorry. I didn't know you
4 were asking me that. Yes. I am aware of this.
5 Like I said, I have this printed out in front of me,
6 too. But, yes, I see it on the screen as well.
7     Q.  Great. Okay. So my question is, in your
8 conclusions to your report, toward the middle of
9 that paragraph, you'll see a sentence that starts
10 with, Moreover. And you state, Moreover, available
11 evidence indicates that docetaxel --
12 Taxotere/docetaxel use is associated with a greater
13 risk of CIPAL/PCIA as compared to some other
14 anti-neoplastic drug products, including Taxol and
15 paclitaxel.
16     Did I read that right?
17     A.  Yes, you did.
18     Q.  Just by the way, you refer to -- Well,
19 strike that.
20     You understand that docetaxel -- the word
21 docetaxel is sort of the generic name and Taxotere
22 is the brand name, but they're -- they're the same
23 product; is that right? Is that your understanding?
24     MR. LAMBERT:  Object to the form.
25     A.  They're the same active -- they refer to

1 the same active ingredient. And Taxotere is the
2 drug sold by Sanofi under that brand name, and
3 docetaxel is the active ingredient in different
4 formulations sold by a variety of companies,
5 including Hospira's product.
6     Q.  (BY MR. MOORE) But your opinions, in
7 terms of the way that the products -- Well, I'll
8 strike that.
9     So going back to this sentence in your
10 report, I want to focus on this opinion that we just
11 talked about. Okay?
12     A.  Okay.
13     Q.  Now, when you say that it's --
14 Taxotere/docetaxel use is associated with a greater
15 risk of permanent alopecia as compared to some other
16 drugs, including Taxol and paclitaxel, you're not
17 saying that docetaxel causes permanent hair loss,
18 right? That's not part of your opinions?
19     A.  That's correct. I have not -- I'm not the
20 causation expert. So the words I'm using are
21 consistent with my work, which was looking at, as a
22 pharmacologist and a toxicologist, what are the
23 risks associated with Taxotere use, and specifically
24 what -- looking at the risk of CIPAL or permanent or
25 irreversible hair loss in individuals exposed to

1 docetaxel.
2     Q.  Okay. So you're not going to come in and
3 testify that docetaxel causes permanent alopecia.
4 That's not part of your --
5     A.  No. I have not done a causation analysis
6 at this time. So that opinion, to me, would be the
7 general causation expert's opinion, and someone else
8 is handling that.
9     Q.  And from the terminology standpoint, if I
10 refer to permanent alopecia, instead of CIPAL or
11 PCIA, that's what I mean, okay?
12     A.  Yeah. That's fine. I think I use that
13 also somewhere in my report. I tried to be
14 consistent with the literature, and CIPAL/PCIA is
15 the term -- is the abbreviation/acronym used most
16 frequently by physicians in the literature. But
17 that's fine.
18     Q.  If I -- I'm sorry. I didn't mean to
19 interrupt you. Were you finished?
20     A.  Yeah. I'm just saying, so it's fine if
21 you just want to call it permanent alopecia.
22     Q.  And can we agree that the word
23 irreversible alopecia and permanent alopecia are
24 interchangeable for purposes of this deposition?
25     A.  Yes. We can do that.

1     Q.  So going back to your opinion, you state
2 that it's -- docetaxel is associated with an
3 increased risk.
4     Now, you haven't attempted to quantify any
5 increased risk of docetaxel as compared to any other
6 drugs, correct?
7     A.  So what do you mean by quantify? I can
8 interpret that several ways.
9     Q.  Okay.
10     A.  There is a quantification -- there is
11 quantification --
12     Q.  You said what do I mean? Yeah. So I'll
13 explain.
14     So when I say quantify, I mean, have you
15 offered any statistical analysis that would quantify
16 the level of increased risk of docetaxel as compared
17 to another drug.
18     MR. LAMBERT:  Object to the form.
19     A.  I haven't -- I have not done my own
20 calculations, but certainly you have that
21 quantification, in terms of the clinical data that
22 was collected in the -- in the Taxotere clinical
23 trials, where there is an increased percentage of
24 individuals, TAC versus FAC. So there is a number
25 there that provides a quantification of the risks.

14 (Pages 50 - 53)

1  But I haven't done -- I haven't done an
2  independent -- like a meta-analysis, or I haven't --
3  there is no -- I don't have a -- I haven't done an
4  epidemiological study on my own.  I rely upon what
5  was done and reported in the literature or within
6  the clinical trial data for Taxotere.
7      Q.  (BY MR. MOORE)  So as part of your reports
8  and your opinions, I think what you're saying is,
9  you haven't independently provided any
10  quantification of the level of increased risk of
11  docetaxel as compared to other drugs.
12      MR. LAMBERT:  Object to form.
13      A.  That is correct, when I am -- when I am
14  defining what you're asking me as, have I done an
15  analysis across studies to come up with a unique
16  number that is different than what may be reported
17  in some other source.  So I rely upon any of the
18  quantification that was done to be something from
19  documents that I review and rely upon, but not
20  another analysis.
21      For example, Dr. Madigan does some
22  analyses, where he -- where he looks at and reports
23  on statistically -- statistical analyses of data.  I
24  don't do that.  He's doing that.
25      Q.  (BY MR. MOORE)  And so when you say that

1  docetaxel is associated with an increased risk,
2  you're not offering an opinion that this is a
3  statistically significant association, right?
4      A.  I haven't done a statistical analysis of
5  it.  I'm using the words "associated with"
6  consistent with how I would use them when I do what
7  I've done here, which is a weight of the evidence,
8  looking across the evidence, and determining what
9  analysis and what is available, what pieces of
10  scientific information are available.
11      Q.  Okay.  And part of your weighted -- as
12  part of your weight of the evidence analysis, you
13  did not perform any analysis to determine whether
14  there was a statistically significant increased
15  risk, right?
16      A.  I didn't do my own calculations.  I think
17  that's what you're asking me.  If I'm wrong -- I
18  think you're asking me, did I -- did I do a -- take
19  data and numbers, put them into a spreadsheet, do a
20  calculation or a statistical analysis separate and
21  apart from what may or may not have been done in
22  documents that I've relied upon.  No.  I did not do
23  that.  Dr. Madigan's done that, and he'll speak to
24  that issue.  I have not.
25      I'm relying, as I typically would when I

1  do this kind of a review, a weight of the evidence,
2  a review, in looking at the data as it is calculated
3  or described by the individuals who have done that
4  in the pieces I'm relying on, such as in the
5  clinical trial data, the published literature,
6  things like that.
7      Q.  So if the -- if the clinical trial data
8  doesn't report a statistically significant increased
9  risk, you would rely on them?
10      A.  Well, I rely on the clinical trial data,
11  yeah.  I mean, I don't just rely on --
12      (Cross-talk.  Reporter admonition.)
13      Q.  Focus on my question.  Focus on my
14  question, the specific question.
15      You said -- my question is, on the issue
16  of statistical significance, you have not done your
17  own analysis, correct?
18      A.  I have not -- I have not re-analyzed the
19  data on my own.  That is true.
20      Q.  And you rely on the individuals conducting
21  the study and their findings of statistical
22  significance.  I believe that's what you said.
23  Right?
24      A.  I rely on -- I rely on -- I think what
25  I -- let me restate, because I'm not sure it's

1  exactly how I said it.
2      What I am saying is that I rely on pieces
3  of information that I -- as I cite in my report,
4  where, in the case of at least the clinical trial
5  data, they will report percentages of people in FAC
6  versus TAC arm of the clinical study that
7  experienced or are reported or listed as suffering
8  from permanent alopecia, where the hair did not
9  regrow at the end of the -- at the end of the study.
10      Q.  Right.  And we'll get to those -- we'll
11  get to those in particular later, okay?  I'm just
12  asking your question -- you did not do an
13  independent analysis, in your report, of whether the
14  information that was reported in those clinical
15  trials was statistically significant, correct?
16      MR. LAMBERT:  Object to form.
17      A.  No.  I don't -- I don't think that's true.
18  I think you're asking -- the question you're asking,
19  I can't answer that as being correct, because --
20  because I do an independent analysis of data that
21  included where individuals may be reporting
22  statistics.  That's true.  And I relied on that.  I
23  didn't re-analyze or do any type of my own
24  statistical analysis, apart from the pieces of
25  information that are provided within the documents I

Page 58

1  cite in my report.
2      Q.  (BY MR. MOORE)  Okay.  Fair enough.
3      So you haven't calculated any relative
4  risk of docetaxel compared to any other drug, right?
5      A.  No, I have not.  I think I was asked that
6  in my last deposition, and I said, no, I have not
7  done that.
8      Q.  So you mentioned the clinical trials.  I'd
9  like to turn to paragraph 33 of your report.  Are
10  you with me?
11      A.  I will be.  Yes.
12      Q.  And I'd just like to focus you on the part
13  that starts with, A review of the available data
14  indicate that Taxotere/docetaxel has been associated
15  with irreversible hair loss to a greater extent than
16  other chemotherapy drugs, including Taxol/paclitaxel
17  (discussed below in more detail).  In fact, the
18  evidence linking Taxotere/docetaxel exposure with
19  permanent, irreversible hair loss includes
20  controlled clinical trial data (Taxotere), as well
21  as epidemiological data (case series;
22  Taxotere/docetaxel) and individual case reports
23  (Taxotere/docetaxel).
24      Did I read that correctly?
25      A.  You did.

Page 59

1      Q.  So I just want to -- just so we get
2  oriented, I just want to talk to you about, in that
3  order, these three sources that you cited.  Okay?
4      A.  Okay.
5      Q.  So the first of those sources that you've
6  cited in support of your opinion is controlled
7  clinical data.  Is that right?
8      A.  Yes.  That's correct.
9      Q.  Just so I make sure I understand your
10  report, are you referring to the -- to clinical
11  trial -- the Sanofi clinical trials?
12      A.  Yes.  Those are the only clinical trials
13  that have been done that address this end point.
14      Q.  By end point, you mean permanent alopecia?
15      A.  Yes.  That's correct.  They have data that
16  was collected as part of their clinical trials, when
17  they extended the trial data at the time, where they
18  looked at long-term evidence for different adverse
19  events and the issue of hair loss, the failure to
20  regrow, or irreversible hair loss, was addressed in
21  their clinical study.
22      Q.  And the two Sanofi clinical trials that
23  we're referring to are, first, TAX 316.  That's one
24  of them, right?
25      A.  Yes.  That's correct.

Page 60

1      Q.  And the second one is known as GEICAM, or
2  also TAX 301, correct?
3      A.  Yes.  I believe that's true.  Yes.
4      Q.  And those two studies were conducted by
5  Sanofi, correct?
6      A.  Yes.  They were.
7      Q.  Hospira did not conduct those studies?
8      A.  I don't believe that I -- I haven't seen
9  any information that Hospira had any part in that or
10  any Hospira employees had any part in that.  From
11  what I understand, they were investigators that were
12  linked with Sanofi.
13      Q.  So let's just start with TAX 316.
14      MR. MOORE:  And if we could look at tab 6,
15  please, David.  This is a Sanofi clinical study for
16  TAX 316.
17      THE CONCIERGE:  This is a bigger file.
18  It's taking a second.
19      (Deposition Exhibit Number 7 marked for
20  identification.)
21      Q.  (BY MR. MOORE)  We've marked this as
22  Exhibit Number 7.  And this is the final clinical
23  study report for the TAX 316 study, right,
24  Dr. Plunkett?
25      A.  Yes.  That's true.

Page 61

1      Q.  This is a document that you -- you relied
2  on in your report, right?
3      A.  Yes.
4      Q.  And so on the second page, under SYNOPSIS,
5  on the second page, it has a section called
6  Objectives.
7      Do you see that?
8      A.  Yes.
9      Q.  And it describes a study.  Just to break
10  it down a little bit, so TAX 316 was a randomized
11  clinical trial, right?
12      A.  Yes.
13      Q.  And in the study, the two groups of
14  patients were given two different chemotherapy
15  regimens, right?
16      A.  Yes.
17      Q.  One group was given docetaxel in
18  combination with doxorubicin and cyclophosphamide,
19  right?
20      A.  Yes.
21      Q.  The other group was given 5-fluorouracil
22  in combination with doxorubicin and
23  cyclophosphamide.  Right?
24      A.  Yes.
25      Q.  Doxorubicin and cyclophosphamide, they're

16 (Pages 58 - 61)

1  both chemotherapy drugs, right?
2      A.  Yep.
3      Q.  And the patients in both groups took those
4  drugs, right?
5      A.  Yep.
6      Q.  Is doxorubicin also known as Adriamycin?
7      A.  Yes.
8      Q.  And, now, you state in paragraph 56 of
9  your report, that, Although these studies involved
10  combination drug treatment, the study design allows
11  for isolation of the increase in risk as being
12  linked to Taxotere/docetaxel use; the difference
13  when TAC and FAC groups are compared is the
14  substitution of Taxotere for 5-fluorouracil (5-FU).
15      That's in paragraph 56, right?
16      A.  Yes.  That is towards the end of the
17  paragraph.  Yes.
18      Q.  Right.  So as I understand what you're
19  saying, you're saying this study compares docetaxel
20  with 5-FU on the risk of permanent alopecia.  That's
21  your opinion, right?
22      A.  Yes.
23      Q.  And --
24      A.  Well, I mean, the study wasn't designed to
25  only look at that issue, but that is data that was

1  collected that is available within the study.  That
2  is true.
3      Q.  Okay.  Fair enough.
4      So the -- the primary objective of TAX 316
5  was not to look at permanent or irreversible
6  alopecia, right?
7      A.  No.  It was data that was collected, but
8  it was not the -- if you look at -- where you are,
9  on your objectives, there's two major objectives for
10  the study that are listed, as all clinical studies
11  will have.  And that's what's -- in the exhibit you
12  have up, there's a primary and a secondary
13  objective.
14      But as part of that, they collected a
15  wider range of data, obviously, on different end
16  points of toxicity or different types of adverse
17  events, and so that data that was collected, because
18  it goes long-term, included looking at the issue of
19  hair loss that was present long-term, where the hair
20  didn't regrow, as well as the initial hair loss
21  often associated with these types of cytotoxic
22  chemotherapeutic drugs.
23      Q.  Right.  So just -- you're getting ahead of
24  me a little bit on this.
25      So the primary objective of TAX 316 were

1  to compare disease-free survival between the two
2  regimens, right?
3      A.  Yes.  That's the efficacy end point.  It
4  was the primary end point.  As in almost all
5  Phase III trials that were done like this, they're
6  looking at efficacy, but then also looking at
7  safety.
8      Q.  Right.  And I'm really not trying to ask
9  trick questions here, Doctor.  And I understand
10  you've already said that.  I'm just asking you a
11  narrower question.  I'm going to get to the
12  secondary part.  I promise.  Okay?
13      A.  Fine.  I always start --
14      Q.  The primary -- start with primary, and
15  then we'll get to the secondary.  So the primary
16  objective of TAX 316 is to compare the disease-free
17  survival between the two regimens.  Right?
18      A.  That's what is stated on this document.
19  Yes.
20      Q.  The secondary objective is to compare
21  overall survival toxicity and quality of life
22  between the two regimens.
23      A.  That's fair.  That is correct.  That is
24  what is stated in this document.
25      Q.  And so my question is just, the primary

1  objective of TAX 316 was not designed specifically
2  to address the issue of permanent or irreversible
3  alopecia.  Correct?
4      MR. LAMBERT:  Object to form.
5      A.  That is correct.  But it certainly was an
6  end point of data collected within this primary -- a
7  study that was designed primarily as an efficacy
8  study.
9      Q.  (BY MR. MOORE)  And so when you -- when
10  you were explaining earlier that the -- as part of
11  this data collection, it provided information
12  comparing docetaxel with 5-FU on the risk of
13  permanent alopecia.  Is that fair?
14      A.  What was the first part of your statement
15  again?
16      Q.  We were talking about what information
17  this study provided on the risk of permanent
18  alopecia.  Then we got off on a side detour about
19  objectives.  Okay?  So I want to ask you about what
20  information this study provided on the risk of
21  permanent alopecia.  I believe, in paragraph 56 of
22  your report, you're saying that TAX 316 compares
23  docetaxel with 5-FU on the risk of permanent
24  alopecia.  Provides data.
25      I'll ask a better question.

17 (Pages 62 - 65)

1    In your opinion, does TAX 316 provide
2  information to compare docetaxel and 5-FU on the
3  risk of permanent alopecia?
4    A.  Yes.  That's what I'm stating in my
5  report, because the issue is, you had two -- you
6  have two arms with a three-drug regimen.  But the
7  only difference between the two arms is when you are
8  substituting either 5-FU or Taxotere/docetaxel.
9  And that allows you -- allows me, as a
10  pharmacologist and a toxicologist, to focus in on
11  what was different, in terms of the toxicity
12  profile, when one of those two drugs was
13  interchanged.
14    Q.  Okay.  But TAX 316 does not provide any
15  information that allows you to compare the risk of
16  docetaxel with any other chemotherapy drug on the
17  risk of permanent alopecia, right?
18    A.  By itself, no.  That's where the weight of
19  the evidence comes in, in looking at what other
20  information is available for Adriamycin/doxorubicin
21  and cyclophosphamide from other sources.
22    Q.  So I'm not talking about any other sources
23  right now.  I'm just focused on this particular
24  source, TAX 316.  Does TAX 316 provide any
25  information that would allow you to compare the risk

1  of docetaxel with any other chemotherapy drug as to
2  the risk of permanent alopecia?
3    A.  Yeah.  It allows you to look at the
4  differences among the groups, where the difference
5  is 5-FU versus Taxotere.
6    Q.  We've already gone -- Sorry.  We've
7  already gone through that.  I'm not talking about
8  5-FU.  You've already answered that question.  So
9  I'm not asking about 5-FU.  I'm talking about
10  chemotherapy drugs other than 5-FU.  Okay?
11    A.  I understand what you're asking me.  And
12  the way you asked the question --
13    Q.  Let me ask the question again.
14    Does TAX 316 provide any information that
15  allows you to compare the risk of docetaxel with any
16  chemotherapy drug other than 5-FU on the risk of
17  permanent alopecia?
18    A.  Are you asking me, by itself only that
19  study, or are you asking me about does it provide
20  evidence that builds on what we also know from other
21  sources?
22    Q.  I'm asking you about this clinical trial,
23  in and of itself.
24    A.  As a pharmacologist and a toxicologist, my
25  answer would be that the appropriate interpretation

1  of this study would be related to looking at the
2  differences when you add Taxotere versus 5-FU, not a
3  specific issue of just Adriamycin or
4  cyclophosphamide.  Those are in both regimens.  So
5  that's why this study, as I state, talks about the
6  difference -- allows you to focus in on Taxotere
7  versus 5-FU and look at the difference in the risk
8  that you see.
9    Q.  Okay.  I think we're in agreement, but
10  it's a lot.  It's a lot there.  Let me see if I can
11  ask it in a way that will satisfy.
12    Does TAX 316, in itself, provide any
13  information that allows you, as a toxicologist, to
14  compare the risk of docetaxel with any other
15  chemotherapy drug, other than 5-FU, on the risk of
16  permanent alopecia?
17    MR. LAMBERT:  Object to form.
18    A.  I think it does, yes, because it -- it --
19  the only difference between the groups is the
20  substitution of Taxotere for 5-FU.  So even if there
21  were some background effect of Adriamycin and
22  cyclophosphamide, that would be controlled for when
23  you look at the fact that both of them occurred --
24  both of them were in both groups.  But the only
25  difference, when you look across the arms, is when

1  you're substituting Taxotere for 5-FU.
2    Does that answer your question?
3    Q.  (BY MR. MOORE)  No.  Does -- does TAX 316,
4  in and of itself, provide the information that would
5  allow you to compare docetaxel with paclitaxel on
6  the risk of permanent alopecia?
7    A.  Not only on this study, no.  You have to
8  look across multiple sources of information.
9    Q.  Now -- so you're not relying on TAX 316 in
10  and of itself to provide any information of any
11  increased risk of docetaxel compared to paclitaxel
12  on the risk of permanent alopecia?
13    A.  I guess that question doesn't make sense
14  to me, the way you're asking it.  Could you try
15  again?  Because this piece of evidence is part of --
16  is part of the evidence for the statement I'm making
17  in my report, which talks about, as compared even to
18  paclitaxel.  But it is -- if what you're asking me,
19  does this -- if I only have 316, can I speak to
20  paclitaxel specifically?  No, I can't, if I only had
21  316.  But I have more than that.
22    Q.  Now, in your report, paragraph 57, you
23  state that 3.9 percent of the patients in the TAC
24  group had unresolved or irreversible alopecia, while
25  2.2 percent of the patients in the FAC group had

1  unresolved or irreversible alopecia.
2      Do you see that?
3      A.  I do.
4      Q.  Now, this information is on page 37 of the
5  clinical study report, Bates number 724298, internal
6  page 37.
7          THE CONCIERGE:  Is this Exhibit 7?
8          MR. MOORE:  Tab 6, Exhibit 7.
9      Q.  (BY MR. MOORE)  So, Dr. Plunkett, I
10  don't -- I know there's an issue with the actual
11  percentages here that you've explained.  Let me go
12  back up.
13      So this is Table 7 of the clinical study
14  report, you're familiar with this, right?
15      A.  Yes.
16      Q.  Okay.  And it shows the number of patients
17  in the TAC arm as 29 patients having ongoing
18  alopecia, right?
19      A.  Yes.
20      Q.  And it shows 16 patients in the FAC arm as
21  having ongoing alopecia; is that right?
22      A.  Twenty-nine for the TAC arm and 16 for the
23  FAC arm, yes.
24      Q.  So there were patients in both arms that
25  were reported as having ongoing alopecia, right?

1      A.  Yes, there were.
2      Q.  And this report uses the term ongoing, not
3  permanent or irreversible alopecia, right?
4      A.  I agree that's the term used in the
5  report.  Yes.
6      Q.  So there's nothing in the clinical study
7  report that says any of these patients had permanent
8  hair loss, right?
9      A.  They do not use those words.  And I think
10  I went through this with Mr. Fowler.  I agree.
11  Those words are not in this study report.  But the
12  issue of ongoing is consistent with the definitions
13  that you see in the published literature for
14  something that is defined as permanent or
15  irreversible CIPAL or PCIA.
16      Q.  And, now, for these patients, you didn't
17  actually review their medical records to see whether
18  they had permanent hair loss, right?
19      A.  I did not.  I answered that question for
20  Mr. Fowler as well.  I did not pull any of the
21  individual medical records.  I relied upon the data
22  as described here in these documents.
23      Q.  And by saying you relied on the data as
24  described in the documents, you relied on the fact
25  that these patients were characterized as having

1  ongoing alopecia specifically, right?
2      A.  Yes, but -- that's correct.  But, again,
3  as I have discussed -- described in my depositions
4  before, that is consistent with the definitions in
5  the literature that talk about an adverse event
6  called CIPAL or PCIA, where there's different time
7  periods given.  Even the company -- company gives
8  different time periods, one year or two years or six
9  months.  But essentially it's something that here
10  was ongoing for 10 years in some of the patients.
11  Some a little shorter than that, but some of them
12  are as long as 10 years.
13      Q.  And you rely on the people who conducted
14  the study and what they define ongoing to mean?  Is
15  that something that you rely on?
16      A.  What do you mean by that?  Are you asking
17  me -- are you asking me am I relying on the fact
18  that they have definitions in their documents?
19  Yeah.  I certainly am aware they are.  Yes.
20      Q.  Sanofi conducted this study, right?
21      A.  Yes.  They did.
22      Q.  Right.  So their definition of ongoing is
23  what you're relying on, right?
24      A.  Yes.  But, also, in the context of how the
25  Sanofi -- Sanofi's own employees describe this as

1  being a permanent issue.  I mean, you have to
2  remember -- in my report I talk about that as well.
3  It's not just what this table says, but there are
4  employees of the company that recognize this as
5  being something that was different.
6      Q.  Right.  And Sanofi has more information
7  about these patients and whether they have ongoing
8  alopecia than you do, right?
9      A.  I would assume they do.  I mean, I would
10  assume that they did --
11          (Cross-talk.  Reporter admonition.)
12      Q.  They had underlying medical --
13          MR. MOORE:  I apologize.
14      Q.  (BY MR. MOORE)  They had the -- they --
15  Sanofi has the underlying medical records for these
16  patients, and you don't, right?
17      A.  Well, I mean, I do not have the underlying
18  medical records.  There are -- there would -- there
19  were some additional documents that are there, but
20  not the underlying medical records, no.
21      Q.  You don't have the information available
22  to you that allows you to verify whether or not
23  these patients have permanent alopecia, right?
24      A.  I did not -- I did not attempt to do my
25  own diagnosis, for example, of the patients, no.  I

19 (Pages 70 - 73)

Page 74

1  relied upon what was reported by the company.
2      Q.  And your report -- Well, let me strike
3  that.
4          This clinical study report does not state
5  that there's any statistically significant
6  difference in the risk of hair loss between the
7  patients taking docetaxel and those not taking
8  docetaxel, right?
9      A.  They do not.  That is true.
10     Q.  And are you aware of any published medical
11 literature that shows there was a statistically
12 significant difference in the risk of hair loss
13 between the patients taking docetaxel and those not
14 taking docetaxel in TAX 316?
15     A.  Not in the peer-reviewed medical
16 literature.  But I am aware that Dr. Madigan has
17 done an analysis of the data, where he finds
18 statistically significant differences across the
19 data that he looks at from the clinical trials.
20     Q.  Right.  And he's the plaintiffs' expert,
21 Dr. Madigan, right, in this litigation?
22     A.  Yes.  But he's also a very well-known and
23 very renowned statistician who works for plaintiffs
24 in this litigation, but he also works for industry,
25 at times, as well.

Page 75

1      Q.  And you'll agree Dr. Madigan agrees that
2  there's no statistical significance in the results
3  of TAX 316 alone as it relates to permanent hair
4  loss, right?
5      A.  I don't -- I haven't seen him answer that
6  specific question.  But I believe, if you read
7  his -- as I have -- I have read his report, and I
8  think in his report he describes the statistically
9  significant findings when he looks and does a
10 meta-analysis across the studies that are available.
11     Q.  Right.  And that's what I was -- that's
12 why I was being very specific with my question.
13         He only finds a statistical significance
14 when he combines the result of TAX 316 and TAX 301,
15 correct?
16     A.  I think that's true, but I would refer you
17 to Dr. Madigan's report for how he describes it.
18 That's my memory, as I sit here.  But I believe
19 that's true.
20     Q.  And you'll defer to Dr. Madigan's
21 testimony on what he believes is statistically
22 significant and what's not statistically
23 significant, or not?
24     A.  Absolutely.  Dr. Madigan and I -- I expect
25 him to speak to these issues in this -- in this

Page 76

1  particular case, yes.
2      Q.  And you defer to him on that?
3      A.  I would -- he should describe his own
4  work.  Yes.  Absolutely.
5          I -- I have looked at these documents and
6  evaluated them using my background and my expertise
7  and my experience, and I have formed the opinions
8  set forth in my report.  He has opinions that he
9  sets forth in his report that are beyond the scope
10 of the things that I have done.
11     Q.  Right.  So you haven't done any
12 statistical significant analysis, for example.
13 That's correct?
14     A.  I've already answered that for you two to
15 three times.  Yes.  I have not done that.
16     Q.  Okay.  And you -- and you haven't done
17 any -- made any attempt to combine the results of
18 TAX 316 and TAX 301 into a meta-analysis that
19 addresses the issue of statistical significance,
20 right?
21     A.  No.  I already answered those questions
22 for you.  I have not done that.
23     Q.  And other than Dr. Madigan, you're not
24 aware of any other individual who has found that
25 there's a statistically significant risk, in

Page 77

1  TAX 316, between patients taking docetaxel and those
2  not taking docetaxel as to the risk of permanent
3  hair loss, correct?
4          MR. LAMBERT:  Object to form.
5      A.  Um, I don't believe I'm aware of any other
6  expert who's done that, but that doesn't mean it
7  hasn't been done.  I haven't looked for it.  I
8  haven't attempted to look for that, so I can't -- I
9  really can't answer that fully, because I haven't
10 done that analysis.
11     Q.  (BY MR. MOORE)  Well, I think you can.
12         My question is, are you aware of any
13 doctor, other than Dr. Madigan, who has found
14 there's a statistically significant risk of patients
15 taking docetaxel and those not taking docetaxel as
16 to the risk of permanent hair loss?
17     A.  And I attempted to answer that for you.  I
18 said, I -- I can't answer that, because I haven't
19 done that work, to look to see if there's other
20 experts that have or have not said it.  I don't
21 know.
22     Q.  I'm not --
23     A.  So if you're -- if you're going to say
24 that that means I'm not aware, I would say to you, I
25 guess I'm not.  But the full answer to the question

20 (Pages 74 - 77)

Page 78

1  is, I haven't -- I haven't done that analysis.
2  That's beyond the scope of what I have done.
3      Q.  Okay.  Well, let me -- let me see if I can
4  address that concern.  You have not looked for and
5  you are not aware of anyone, other than Dr. Madigan,
6  who has found a statistically significant difference
7  in the risk of hair loss between patients taking
8  docetaxel and those not taking docetaxel in the
9  TAX 316 study; is that fair?
10     A.  Other than what is reported by the
11  company, that's correct.  I have not.
12     Q.  Are you aware of any -- the company
13  reporting any statistically significant difference
14  in the risk of hair loss between patients taking
15  docetaxel and those taking -- not taking docetaxel
16  in TAX 316?
17     A.  I'm looking at my report here, because I
18  believe this was asked of an employee in deposition.
19  I don't know whether I described that or not, so let
20  me look just a second.  I'd have to pull documents
21  out.
22         The reason I'm hesitating to say
23  absolutely no is because I know these questions were
24  part of the testimony of Nanae Hangai and
25  Dr. Palatinsky.  And I believe they had done some

Page 79

1  analyses internally, and I'd have to go look.  I
2  can't answer that, without looking, as I sit here.
3  And it's not in my paragraph here, that I see.
4      Q.  Okay.  So your report doesn't cite any
5  example of Sanofi concluding that there was a
6  statistically significant risk in TAX 316 of the
7  risk of permanent hair loss between the patients
8  taking docetaxel and those not taking docetaxel.
9  You'll agree with that, right?
10     A.  In the four corners of my report, that's
11  true.  But I believe, when I -- in depositions, when
12  I talked about these issues in the past.  But I did
13  not look at those depositions before this, so -- in
14  the very recent past, like in the last three or four
15  months, so I'd have to go look.
16     Q.  And you can't sit here -- as we sit here
17  today in this deposition, you cannot identify any
18  statement by Sanofi in which it concluded that, in
19  TAX 316, there was a statistically significant
20  difference in the risk of permanent hair loss
21  between patients taking docetaxel and those not
22  taking docetaxel, correct?
23     A.  That's why -- I can't answer that without
24  looking.  I believe that there is.  Maybe it was the
25  interim analysis, or maybe it was something that was

Page 80

1  discussed within the -- um, either the Palatinsky or
2  the Hangai depos, but I don't -- exhibits.  But I'd
3  have to go and look.  I don't know as I sit here
4  today.
5         That was not a question that was asked.  I
6  would say that is a new question.  Mr. Fowler did
7  not ask that exact question.  So when I reviewed my
8  depos, I didn't see that.  So I'd have to go look.
9  I don't know.
10     Q.  And you just can't identify it as we sit
11  here right now.  That's what you're saying, right?
12     A.  Well, I'd tell you where to go look.  I'm
13  telling you where I -- but, no, I can't identify it
14  off the top of my head.  No.  I cannot.
15     Q.  But with respect, this is my time to ask
16  you questions about what you're going to say at
17  trial, so I need you to tell me if you have any
18  information that you're going to opine at trial that
19  says that Sanofi concluded that there was a
20  statistically significant risk in TAX 316, on the
21  risk of permanent hair loss between patients taking
22  docetaxel and those not taking docetaxel.  Can you
23  tell me today if there is any such document?
24     A.  I can't tell you specifically --
25         MR. LAMBERT:  Object to form.

Page 81

1      A.  I can't tell you specifically the name of
2  the document, but I've pointed you to three sources,
3  and I'd have to go look to do that.
4      Q.  (BY MR. MOORE)  Those three sources are
5  what?  Interim analysis, Polasky deposition, and who
6  else?
7      A.  Palatinsky deposition and exhibits, and
8  then Nanae Hangai, H-A-N-G-A-I, deposition and
9  exhibits.  That's where I would go.  And I -- like I
10  said, I believe these issues were discussed there.
11  And I just -- it's been a while since I've looked at
12  those, so I'd have to go refresh my memory.
13     Q.  Okay.  Now, in TAX 301 --
14         MR. MOORE:  If we turn to tab 7, please.
15  Mark that as Exhibit 8.
16         (Deposition Exhibit Number 8 marked for
17  identification.)
18         THE CONCIERGE:  Slightly bigger file.
19  Taking a second.
20     Q.  (BY MR. MOORE)  While it's loading,
21  Dr. Plunkett, this is the final clinical study
22  report for TAX 301, which is something you cited in
23  your report, right?
24     A.  I believe I discuss -- it's discussed in
25  paragraph 57, yes.  That's true.

21 (Pages 78 - 81)

Page 82

1    Q.  Can you see it now?
2    A.  I see it on the screen.  Yes.
3    Q.  This is a document you rely on in your
4  report as well, right?
5    A.  In my reliance materials, yes.
6    Q.  And, again, if we go to the primary and
7  secondary end point --
8        THE CONCIERGE:  Do you have a page number?
9        MR. MOORE:  Second page.  Third page.
10    Q.  (BY MR. MOORE)  Is it fair to say this
11  study was similar to the TAX 316 study, except the
12  main difference is that it studied patients with
13  negative auxillary lymph nodes?
14    A.  Yes.  That's the main difference between
15  the two.  Node positive in the 316 study and node
16  negative here.
17    Q.  And as with TAX 316, this study compared
18  docetaxel with 5-FU, right?
19    A.  Yes.  That's correct.
20    Q.  We had a discussion already about TAX 316,
21  so I'm going to ask you the same thing here.  This
22  was not a study that compared the risk of docetaxel
23  with other chemotherapy drugs on the risk of
24  permanent alopecia, right?
25    A.  Well, you can do that based on the data.

Page 83

1  But it was not a primary objective of the study.
2  That is true.
3    Q.  Well, this was not a secondary objective
4  of the study, either, to compare the risk of
5  docetaxel and other -- with other chemotherapy drugs
6  regarding the risk of permanent alopecia, right?
7    A.  I would disagree, because it falls within
8  to compare the toxicity and the quality of life.  So
9  within that secondary objective, which you can just
10  barely see on the screen there -- it's showing on my
11  screen, after the second bullet there under
12  secondary.  That's where the data was collected.
13    Q.  Right.  So -- and the primary objective of
14  this study was to look at disease-free survival,
15  correct?
16    A.  Yes.
17    Q.  And the secondary objective was to compare
18  overall survival, toxicity, quality of life.  Those
19  are secondary objectives, right?
20    A.  Yes.
21    Q.  And I believe what you're saying is, as
22  part of the secondary objective, the information
23  collects -- collected allows you to compare
24  docetaxel with 5-FU on the risk of permanent
25  alopecia.  Is that what you're saying?

Page 84

1    A.  It does.  But it, generally, also, first,
2  allows you to look at the difference between the two
3  groups, in terms of the occurrence of the event.
4  And then, within that -- that's my interpretation
5  that I discuss in paragraph 57 -- you can look at
6  the data and focus in on the difference, and the
7  difference in the two groups was substitution of
8  Taxotere or 5-FU in the regimen.
9    Q.  Right.  So TAX 301 is not a study that
10  compares the risk of docetaxel with paclitaxel, or
11  Taxol, regarding the risk of permanent alopecia,
12  right?
13    A.  No.  They did not look at Taxol in this
14  particular study, so this study by itself, no.  But
15  this study, as well as the TAX 316 study, provides
16  part of the weight of the evidence, where I have
17  looked across and formed an opinion where I make a
18  statement about docetaxel versus paclitaxel.
19    Q.  Right.  Well, we talked about 316.  I'm
20  asking you about TAX 301 at this point.  Okay?
21    A.  I understand.  And I'm answering your
22  question at the start, and then I'm clarifying for
23  you why it is that this is discussed in my report.
24    Q.  Right.
25    A.  And linked to paclitaxel.

Page 85

1    Q.  Right.  I'm asking you specifically about
2  this -- the results of this study, TAX 301, and not
3  the other sources cited in your report or TAX 316.
4        And so my question is, with regard to the
5  results of TAX 301 alone, it is not a study that
6  provides any information on the risk of docetaxel
7  compared to paclitaxel on the risk of permanent
8  alopecia, right?
9    A.  I disagree with the way you just stated
10  that, because -- I would say the answer to that
11  question is, I disagree.  It does provide
12  information that allows you to do that comparison,
13  when you look across the data you have.  But I did
14  agree with you already.  This particular study does
15  not study paclitaxel in the patients.  That I agree
16  with.
17    Q.  Right.  So this particular study, TAX 301,
18  does not provide any information that allows you to
19  compare docetaxel with other -- with Taxol or
20  paclitaxel on the risk of permanent alopecia, right?
21    A.  No.  That's the problem.  You're using the
22  words --
23        MR. LAMBERT:  Object to form.
24    A.  -- provides no information.  It does
25  provide information that is useful when you go to

22 (Pages 82 - 85)

1  look at that assessment.  I think the answer to
2  the -- the better way to ask the question is, does
3  this study provide data specific to the risk of
4  permanent alopecia with paclitaxel in these
5  patients.  No, it does not.  That I agree with.
6  It does not.
7        (Discussion held off the record.)
8        Q.  (BY MR. MOORE)  So this study, TAX 301,
9  does not provide data specific to paclitaxel or
10 Taxon on the risk of permanent alopecia, right?
11       A.  Yes.  That's true.  And I would agree with
12 that.  Yes.
13       Q.  And so this study doesn't provide
14 information that would allow you to compare the risk
15 of paclitaxel on permanent alopecia with the risk of
16 permanent alopecia for docetaxel, right?
17       MR. LAMBERT:  Object to form.
18       A.  That's -- no.  That's where I'm
19 disagreeing with you.  The way you're asking that
20 question, that means to me that there's nothing in
21 this study I could use when I do that comparison.
22 And I'm saying to you that this is indeed a piece of
23 relevant information when I do that comparison.  So
24 I don't know how else to state it for you.
25       Q.  (BY MR. MOORE)  How can you compare

1  docetaxel to paclitaxel when there's no information
2  on paclitaxel?
3        A.  Because there's other information on
4  paclitaxel in my assessment.  Again, the way --
5        Q.  I'm not asking you for other information.
6  I'm asking you about this study.  Doctor, can you
7  answer my question about this study and this study
8  alone?  Do you understand my question?
9        MR. LAMBERT:  Object to form.  Hold on.
10 Hold on one second.  Object to form.
11       I'm not allowed to make speaking
12 objections, but for the court reporter's sake, we
13 can't be interrupting each other.  So I understand
14 that you don't like the answer, but you gotta let
15 her finish, and then you can ask it again if you
16 want to.
17       MR. MOORE:  Well, she's not answering my
18 question.  She's talking about something else.
19       Q.  (BY MR. MOORE)  I'm asking a specific
20 question about TAX 301 alone, not any of the other
21 information that you've cited in your report.
22       With respect to TAX 301 alone and the
23 results of TAX 301 alone, and not any of the other
24 sources that you've cited in your report, it does
25 not provide information that allows you to compare

1  the risk of permanent alopecia with docetaxel and
2  paclitaxel; is that right?
3        A.  No, unless you add the words, based on
4  this data by itself only, at the very end of your
5  sentence.
6        I'm listening very carefully to your
7  questions.  I apologize.  But those are important
8  distinctions.  And you've asked the question three
9  or four times.  And the problem is, when I hear it,
10 I'm hearing that you are not limiting, at the end of
11 your sentence, that issue.  And I understand that
12 you would like me to assume what you're assuming,
13 but I can't.  I'm answering the question the way I
14 hear it and my understanding of the question.
15       So, again, I would agree with you if you
16 say, in the four corners of this document, is there
17 data on paclitaxel?  No, there's not.  So, as a
18 result, I wouldn't take this study by itself and say
19 that this study provides data on paclitaxel that
20 allows me to compare it to docetaxel, but the study
21 does have data on docetaxel that is -- informs on
22 what I know about paclitaxel.
23       And that's the best way to answer it for
24 you.  And that, to me, scientifically, is the most
25 correct way to answer the question.

1        Q.  You're not going to answer it.  We'll try
2  it one more time.
3        Based on this -- based on the data in
4  TAX 301 study alone, does it provide information on
5  the risk of permanent alopecia that would allow you
6  to compare that risk for docetaxel with Taxol or
7  paclitaxel?
8        MR. LAMBERT:  Object to form.
9        A.  That's where you're getting into trouble.
10 Stop your question with, does this data alone
11 provide information on the risk of paclitaxel
12 itself.  No, it does not.  And that's what this
13 study does or doesn't do.
14       The next part of your sentence, and the
15 next part of your question, opens up, to me, when I
16 hear what you're asking me, to -- to say, is there
17 nothing in here that allows me to make a comparison?
18 There is.  It gives me the data I can use on
19 docetaxel to compare to what I know about
20 paclitaxel.
21       So I've tried very carefully to answer
22 your question.  And I don't think I'm avoiding your
23 question.  I'm just telling you that the question
24 the way you're asking it is best answered the way I
25 am answering it, and I'm sorry that -- but that's my

1  answer.  And I will repeat it again if you would
2  like, but that's my answer.
3      Q.  (BY MR. MOORE)  We'll move on.
4      You'll agree that the -- that there was
5  poor follow-up in TAX 301, right?
6      A.  Yes.  I described that in my paragraph 57.
7      Q.  Okay.  So in paragraph -- page 111 of the
8  report, you -- you see a table on the number of
9  patients who were reported as having ongoing
10  alopecia.
11      MR. MOORE:  I'm sorry.  This is on
12  Exhibit 8.
13      THE CONCIERGE:  So are we introducing a
14  new exhibit?
15      MR. MOORE:  I'm sorry.  I had -- Exhibit 8
16  was tab --
17      THE CONCIERGE:  My fault.
18      MR. MOORE:  Tab 7 was Exhibit 8, right?
19      THE CONCIERGE:  My fault.  I thought you
20  said A, but you said 8.  And the page?
21      MR. MOORE:  Page 111 internally, or 8041.
22      Q.  (BY MR. MOORE)  And, Dr. Plunkett, these
23  are -- this is the results of the TAX 301 study,
24  right?
25      A.  Of Table 47 from the results, yes.

1      Q.  And it shows that three patients in the
2  TAC arm had ongoing alopecia, right?
3      A.  Yes.
4      Q.  And one patient in the FAC arm had ongoing
5  alopecia, right?
6      A.  Yes.
7      Q.  So less than 1 percent of the patients in
8  the docetaxel arm were reported as having ongoing
9  alopecia, right?
10      MR. LAMBERT:  Object to form.
11      A.  Well, they reported a 6.1 percent for TAC
12  and 2.9 percent for FAC, in terms of the end point
13  that was measured at the time of their follow-up.
14      Q.  (BY MR. MOORE)  But you say in your report
15  that's inaccurate, right?
16      A.  Yeah.  Well, what I say is -- I say that
17  there were problems with follow-up.  And here's what
18  I say:  The remaining 43 study sites reported no
19  study subjects with alopecia that's persistent,
20  which is suspect given the known toxicities of the
21  drug.  It also demonstrates that neither the
22  6.1 percent originally reported, nor the 0.6 percent
23  reported based on the n=532 in the TAC arm of 301
24  that was later reported can be seen as an accurate
25  value that can be applied to all sites.  Yet, even

1  if 6.1 is not representative of all sites, the data,
2  when considered in conjunction with data from
3  TAX 316, provides important evidence that
4  irreversible alopecia is not a rare event with
5  Taxotere use in women.
6      Q.  So you don't think that 6.1 or the
7  1 percent is accurate, if that's what I understand
8  you to be saying.  Right?
9      A.  Yes, because of the lack of follow-up.
10  That is correct.
11      Q.  So the TAX 301 data, in your view, doesn't
12  provide reliable information on how many patients
13  had ongoing alopecia, either in the TAC arm or the
14  FAC arm, because of the poor follow-up, right?
15      MR. LAMBERT:  Object to form.
16      A.  I wouldn't state it quite that way.  Would
17  you like me to explain?
18      Q.  (BY MR. MOORE)  Did -- did TAX 301, in
19  your view, provide reliable data on how many
20  patients had ongoing alopecia in either arm of the
21  study?
22      MR. LAMBERT:  Object to form.
23      A.  Um, I -- I wouldn't -- wouldn't state
24  it -- let me say that I think the word I've used is
25  that the data is -- the percentage values are

1  suspect.  However, the data, as presented, are what
2  the data are.
3      So, um, if you want to call that -- when I
4  use the word suspect, if you want to use the word
5  unreliable, I'd say something different.  I'd say
6  that the data is not an accurate reflection of what
7  the study could have found if it had had appropriate
8  follow-up.
9      Q.  (BY MR. MOORE)  And by that you mean --
10  you just don't know how many patients had ongoing
11  alopecia in the groups where there was no follow-up.
12  Is that what you're saying?
13      A.  I would say to you that neither of the
14  values reported are accurate, based on what we know
15  the follow-up was not -- on the lack of follow-up.
16  That's why I -- that's why I read you my sentence.
17  My sentence is, here -- says, neither value can be
18  seen as an accurate value that can be applied to all
19  sites -- in the value that can be applied to the
20  sites that reported, but not to all the sites
21  because of that problem.
22      Q.  And so my only point is that this lack of
23  follow-up was for both groups, the TAC and the FAC,
24  right?
25      A.  Yes.

24 (Pages 90 - 93)

Page 94

1    Q.  Yeah.  So for those patients in the --
2  where there was no follow-up, you don't have the
3  data to say whether more of them had ongoing
4  alopecia in the TAC arm or whether more of them had
5  ongoing alopecia in the FAC arm.  You just don't
6  have that information, right?
7    A.  I don't have that information.
8    MR. LAMBERT:  Object to form.
9    THE WITNESS:  I'm sorry.  Palmer, when he
10  has the document up -- I apologize -- I can't see
11  you on the screen, and so that's -- I don't mean to
12  talk over you.  I'll try to pause longer.
13    THE CONCIERGE:  What you can do -- I'm
14  sorry.  This is David Johnson, the concierge.  You
15  could go to the upper right-hand corner, and there's
16  a word View.  You can click on that and get the
17  gallery view.
18    THE WITNESS:  Thank you.  Let me do that.
19  Much better.  Thank you.
20    MR. LAMBERT:  I'm slow on the draw on the
21  objection sometimes.  And that's my fault.  I'm
22  sorry.
23    THE WITNESS:  Now I can see your face.  I
24  can see when you're getting ready to form a word.
25  Thank you.  That helps.

Page 95

1    Q.  (BY MR. MOORE)  Okay.  Now, turning to a
2  different subject --
3    MR. MOORE:  Are we okay in terms of
4  needing a break, or -- what's the -- how does
5  everyone feel?  Christina?  Christine?
6    THE COURT REPORTER:  I could take five, if
7  everybody else wants five.
8    MR. MOORE:  That's fine.  I think we've
9  been going about an hour.  I could take a break now.
10    THE VIDEOGRAPHER:  The time is 11:03.  We
11  are going off the record.  And this will end Media
12  Unit Number 2.
13    (Whereupon, the proceedings were in recess
14  at 11:03 a.m. and subsequently reconvened at
15  11:12 a.m., and the following proceedings were
16  entered of record:)
17    THE VIDEOGRAPHER:  The time is 11:12.
18  We're back on the record.  This will be the start of
19  Media Unit Number 3.
20    Q.  (BY MR. MOORE)  Dr. Plunkett, just to
21  finish up on TAX 301, you agree that the clinical
22  study report does not say there's statistically
23  significant risk of permanent hair loss between the
24  patients taking docetaxel and those not taking
25  docetaxel, right?

Page 96

1    A.  Yes.  I believe that's true.
2    Q.  Are you aware of any published medical
3  article that found a statistically significant risk
4  in TAX 301 of permanent hair loss between patients
5  taking docetaxel and those not taking docetaxel?
6    A.  I don't believe so, no.
7    Q.  And in terms of the description of the
8  patients in TAX 301 as having ongoing hair loss,
9  that's the same definition as TAX 316, right?
10    A.  I believe that's true.  I'd have to
11  refresh my memory to tell you if it's exactly the
12  same, but I believe so, yes.  I believe they used
13  the same definition.
14    Q.  And so you've already answered the
15  questions about TAX 316 as to that definition, and
16  those apply here as well.  Fair?
17    A.  Yeah.  No.  I believe all of this issue
18  we've just been going through has been addressed in
19  previous depositions.
20    Q.  I'm not asking about previous depositions.
21  I'm saying today, we talked about 316.  Remember?
22  And now we moved to 301.  So I'm just going to say,
23  we can go through the questions on 301 about
24  ongoing, or I could ask you this question:  You
25  testified earlier about TAX 316 and your

Page 97

1  understanding of the meaning of ongoing.
2    Do you remember those questions?
3    A.  Yes.  Generally, I do.
4    Q.  And do those questions and answers also
5  apply to the definition of ongoing in TAX 301?
6    A.  Yes.  With the full description or the
7  full discussion I gave, yes.
8    Q.  And just with TAX 316, you didn't do any
9  underlying review of the medical records in TAX 301
10  to see whether these patients had permanent hair
11  loss, right?
12    A.  No.  And I think I said this before, with
13  316, to me, that's not something that you would --
14  that you would do as a pharmacologist and a
15  toxicologist.  I'm not a physician, for example.
16    Q.  I think you said no to my answer.  My
17  question was, did you do a review of the patients'
18  underlying medical records in TAX 301 to determine
19  whether or not the patients who were designated as
20  ongoing had permanent hair loss?
21    A.  And the answer is, I did not.  But I think
22  I answered more than that when I answered it.  So I
23  did not.  And I would say that it -- it's the same
24  reasons that I gave before.  Because I gave you some
25  reasons, to start the discussion, I believe, around

Page 98

1   that.
2      Q.  I'm sure you did.
3      Did -- now, we've been talking about the
4   Sanofi clinical trials.  And I'll just refer to
5   TAX 301 and 316 collectively as the Sanofi clinical
6   trials.  Is that okay?
7      A.  Yes.
8      Q.  Are you aware of any evidence showing that
9   Sanofi provided the data from the Sanofi clinical
10   trials to Hospira?
11      A.  When you say provided, as in specifically
12   sent it to them individually, I am not, if that's
13   what you're asking.
14      Q.  Are you aware of any evidence showing that
15   Hospira had access to any of the Sanofi clinical
16   trial data?
17      A.  Well, they did from the peer-reviewed
18   literature, where some of this was -- was published,
19   but -- and they would, based upon having potentially
20   later on seen some of the labeling where some of
21   this was described is public.
22      But I thought what you're asking me is,
23   did they specifically share it with Hospira in a
24   back and forth, you know, in other words, a directed
25   sharing.  That I'm not aware of.

Page 99

1      Q.  So that was my first question.  Now my
2   second question is, are you aware of any evidence
3   showing that Hospira had access to the Sanofi
4   clinical trial data, from any source?
5      A.  I don't have a specific document that
6   shows they looked at specific things or deposition
7   testimony.  However, based on my experience in this
8   world, they had a duty to follow the literature.  So
9   I would assume that they had, indeed, access to
10   that.  But, again, I think that's beyond the scope
11   of some of the opinions that I have developed in my
12   report.
13      Q.  So what -- what information in the medical
14   literature -- Strike that.  Strike that.
15      You are aware that Sanofi changed its
16   labeling for Taxotere product in December of 2015,
17   right?
18      A.  Yes.
19      Q.  What published medical literature, before
20   December 2015, disclosed the results and the data
21   from the Sanofi clinical trials?
22      MR. LAMBERT:  Object to form.
23      A.  Um, generally, the data from the clinical
24   trial was described -- I think there's an article by
25   Jones, um, and there is another article -- I'd have

Page 100

1   to go look -- that is generally on the data.  And
2   that was your question, generally.  So, yes,
3   generally, the data was described.
4      Q.  (BY MR. MOORE)  So Jones -- the Jones
5   article.  Is that Jones in 2005?  Is that what
6   you're referring to?
7      A.  Let's see if I have it printed out.  Hold
8   on.
9      It may be.  I'd have to see it.  If you
10   want to put it up, I can tell you if that's it or
11   not.  I don't know if I had printed these out.  No.
12   I do not -- Hold on.  Yes.  I have one of those
13   printed out.
14      Yes.  There is a 2005 article, one of the
15   ones I was thinking about.  It's in -- it's in the
16   Journal of Clinical Oncology, 2005, Volume 23.  And
17   it's S.E. Jones, et al.  But this is a different
18   clinical trial.  This is the metastatic breast
19   cancer, so --
20      Q.  So just to close the loop on that -- I
21   think I was going to ask you that, but I realized it
22   already.  So, actually, the Jones article is not
23   about the Sanofi clinical trials, as we've described
24   them, as TAX 316 and TAX 301, right?
25      A.  That is correct.  There is a publication,

Page 101

1   though.
2      Q.  Hold on.  Before we get -- can I just -- I
3   just want to clarify about Jones.  Jones is an
4   article about Tax 311, right?  That's another --
5      A.  Yes.
6      Q.  And Tax 311 doesn't have information on
7   permanent alopecia, as you say in your report,
8   right?
9      A.  Yes.  That is correct.  But there is --
10      Q.  Wait, wait.  Hold on.  So Jones is not an
11   example of a medical journal article that published
12   the results of the TAX 316 and TAX 301 studies on
13   the risk -- or at all, right?
14      A.  That is correct.  But then there is a
15   publication on the adjuvant breast cancer.  And so I
16   obviously am naming the wrong article.  So if you
17   need me to look, I'll see if I can look and get you
18   the name.
19      Q.  Yeah.  I appreciate that.  Go ahead and
20   take a minute.  It's in your report, right?
21      A.  In my reliance materials, I believe.
22      THE CONCIERGE:  Mr. Moore, are we
23   introducing a new exhibit?
24      MR. MOORE:  No.  Not right yet.  Not right
25   now.

26 (Pages 98 - 101)

1    THE CONCIERGE:  Thank you.
2    Q.  (BY MR. MOORE)  Dr. Plunkett, the question
3  is, are you able to -- have you been able to
4  identify any publication, before December 2015, that
5  discloses the clinical trial data from the Sanofi
6  clinical trial?
7    A.  I'm looking.  I had to go and pull up
8  Exhibit Share of Appendix B, so I'm looking there.
9  It took a minute.  I apologize.  I had gotten logged
10  out.
11    So these are -- the documents I'm thinking
12  about -- and I don't see them quickly in looking at
13  Exhibit B, so I'm going to close this out -- have
14  been discussed in previous depositions, and I'd have
15  to -- I'd have to go back to the deposition I did
16  with Mr. Fowler to pull those out.
17    Q.  So the documents you're saying that -- you
18  can't identify, as we sit here today, and the only
19  ones that you can refer to are the ones you
20  discussed in the last deposition?  Is that what
21  you're saying?
22    A.  In the last deposition we went through
23  this line of questioning about, um, publications of
24  the clinical data versus this clinical study
25  reports.  And there are publications in the clinical

1  data.  I just, off the top of my head -- I
2  apologize -- I can't recall the first author of
3  those.  But they certainly were discussed at my
4  previous deposition.
5    Q.  And you can't identify it today, though.
6  That's what you're saying?
7    A.  Well, if you want me to take the time to
8  go back and pull the deposition exhibits I can try
9  to find it for you.  As I sit here today, no.  Off
10  the top of my head, I can't.
11    Q.  Okay.  Well, one of the -- one of the
12  documents that you referred in your deposition, I
13  believe, was clinicaltrials.gov.  Is that what
14  you're referring to?
15    A.  Yes.  You can go to clinicaltrials.gov and
16  find these.  That's correct.  But there's also -- I
17  believe there's also something else, so -- again,
18  sorry.  Off the top of my head, I can't -- I believe
19  it was one that Mr. Fowler put in as an exhibit,
20  so -- because he was asking me about the data that
21  is not reported in that paper, versus -- a full
22  report of all the data.
23    Q.  Well, okay.  Let's take it one step at a
24  time.  Is it your testimony that you can -- you can
25  get the data on ongoing alopecia from the clinical

1  trial, Sanofi clinical trials from
2  clinicaltrials.gov?
3    A.  No.  That wasn't the question you asked
4  me.  The question you asked me was whether or not
5  there is public access to the clinical trial data
6  for 316.  You didn't say persistent, permanent
7  alopecia.  And that's the discussion Mr. Fowler and
8  I had, because he was -- that was his point.  He
9  said he can't -- it's not in the publication.
10    I don't know what else to tell you.  I
11  mean, that's what I recall, where this was gone over
12  in some detail in my last deposition.
13    Q.  Maybe you didn't understand -- maybe I
14  didn't ask it -- make sure you understand the
15  question.
16    Are you aware of any published medical
17  literature, before December of 2015, that disclosed
18  the data from the Sanofi clinical trials regarding
19  the risk of ongoing alopecia?
20    MR. LAMBERT:  Object to form.
21    A.  So that wasn't the question you asked
22  before.  So I am sorry.  You asked a broader
23  question before, and I tried to answer the question
24  you asked.
25    So the answer to that question, they did

1  not publish in the literature the -- all of their
2  data on this end point when they published the
3  results of the clinical trial itself, so that's --
4  the paper I'm thinking about doesn't have that in
5  it.
6    There are -- I think, as I answered with
7  Mr. Fowler, there are some reports of -- in either
8  case series by some investigators of Sanofi that
9  talk about doing clinical studies and finding
10  reports of permanent alopecia.  But certainly the
11  final analysis, as we just saw on that table, for
12  either of those, those were not provided,
13  unfortunately, in the peer-reviewed literature.
14    Q.  (BY MR. MOORE)  Okay.  I think we're on
15  the same page, so let me just make sure.  That was a
16  long answer.
17    Before December of 2015, the medical
18  literature did not publish the risk -- any
19  information about the risk of ongoing alopecia from
20  the Sanofi clinical trials, correct?
21    A.  No.  That's what I just answered.  I
22  believe that there are papers, case series from
23  investigators that are reporting.
24    The question you're trying to ask me, I
25  think, is what I answered for you.  There is no

27 (Pages 102 - 105)

Page 106

1 peer-reviewed publication that lists the data as it
2 is listed either in those clinical study reports we
3 went over, or even in the labeling that then shows
4 up specifically when they pull it out in 2015. I
5 would agree with that. That is true. But there is
6 information on patients in clinical studies with --
7 by Sanofi investigators that are reporting
8 persistent alopecia in patients.
9     Q. Right. I think we are saying the same
10 thing, but let me -- let me try it again.
11        So we looked earlier at clinical study
12 reports for TAX 316 and TAX 301. Do you remember
13 those questions?
14     A. Yes. Generally, I do.
15     Q. And those clinical study reports contain
16 the information about patients having ongoing
17 alopecia. Fair enough?
18     A. Yes. That's right.
19     Q. The information that's contained in the
20 clinical study reports about patients having ongoing
21 alopecia in TAX 316 and TAX 301 was not made
22 available in the medical literature before
23 December 2015, right?
24        MR. LAMBERT: Object to form.
25     A. Not in the form as they show within the --

Page 107

1 in the study reports. But I was trying to tell you
2 that there are individual patients that were
3 investigators in the trial that are talking about
4 cases. But you're talking about -- again, I'm just
5 trying to be very specific. The way -- this is
6 exactly what I discussed with Mr. Fowler. This is
7 how I described it in September of 2020, and my
8 opinion is the same.
9     Q. (BY MR. MOORE) There may be a report in
10 the medical literature about one patient or two
11 patients. The results and data about all the
12 patients in the study and which ones have ongoing
13 alopecia, that was not information that was
14 available in the public medical literature before
15 2015, correct?
16     A. Yes. That's what I already answered.
17 That's what I said. I think that's the question you
18 want to ask. And, yes, I would agree, that is true.
19     Q. And the -- you said -- you mentioned
20 clinicaltrials.gov. I just want to be clear about
21 that. Clinicaltrials.gov also does not provide
22 information about how many patients in the study had
23 ongoing alopecia, correct?
24     A. I don't think I confirmed that. What I
25 said to Mr. Fowler was --

Page 108

1     Q. Let's just forget it. We'll look at it.
2 Let's look at it.
3        MR. MOORE: Let's go to tab -- so the next
4 exhibit is tab 9. Tab 8, Exhibit 9.
5        (Deposition Exhibit Number 9 marked for
6 identification.)
7     Q. (BY MR. MOORE) Are you familiar with
8 clinicaltrials.gov website, Dr. Plunkett?
9     A. Yes, I am. I go there for different
10 projects at different times.
11     Q. And that's what this is, right?
12     A. Yes, it is. Well, this isn't the entire
13 entry, but this is the first page when you're
14 searching for 316. That's true.
15     Q. I'll withhold comment about your previous
16 testimony about what's contained within the website.
17        So going back to Exhibit Number 9, this is
18 the clinicaltrials.gov website regarding TAX 316,
19 right?
20        MR. LAMBERT: Object to form.
21     A. It is certainly a page from that. That is
22 true. There's different tabs and different places,
23 and there's different information. In other words,
24 you showed one of 14 pages, so this is the first
25 page.

Page 109

1     Q. (BY MR. MOORE) Right. Now, this page --
2 it describes the results of the TAX 316 study,
3 right?
4     A. I don't know, 'cause I only can see this
5 first page. If you want me -- I can go -- I can go
6 and look at it, if you'd like me to do that.
7     Q. No. I'll show it to you. That's fine.
8        MR. MOORE: If we can go to page 12,
9 please.
10     Q. (BY MR. MOORE) And do you see where it
11 mentions alopecia?
12     A. Yes.
13     Q. So it does have information about the
14 number of patients who had alopecia in this study,
15 right?
16     A. The drug-induced alopecia. This would be
17 the number consistent with the initial hair loss
18 associated with use of the regimen in the patients.
19     Q. But it does not contain information about
20 how many patients in the study had ongoing alopecia,
21 right?
22     A. In -- that you're showing me, it does not
23 have that entry. That is true.
24     Q. So you don't have any information that
25 would allow you to say that Hospira had access to

28 (Pages 106 - 109)

1 the Sanofi clinical trial data on ongoing alopecia
2 based on the clinicaltrials.gov website, right?
3     A.   Can you go down to the next page, please?
4     Q.   Sure.
5     A.   There is the names of one of the articles.
6 Martin.  There's one of them for you.  2005.
7         No.  This page here would not give you
8 that information.
9     Q.   Well, do you want to go look at those
10 articles?  I'm happy to do it.
11     A.   No, no.  I just wanted to make sure there
12 was --
13     Q.   I know there are articles listed there,
14 and I'm prepared to show them to you.  But are you
15 going to state -- is it your opinion that those
16 articles contain information on how many patients
17 had ongoing alopecia in the Sanofi clinical trial?
18         MR. LAMBERT:  Object to form.
19     A.   I already thought -- I already thought I
20 answered that for you.  I said that, in the -- in
21 the -- in my previous deposition, this may have been
22 the one we went through.  I believe it might have
23 been.  As I testified, that, unfortunately, the
24 company did not put a full accounting of all the
25 data in that publication.  The clinical study report

1 has a full accounting of the data.
2     Q.   (BY MR. MOORE)  Okay.  So this
3 clinicaltrials.gov website doesn't contain any
4 information on how many patients in the Sanofi
5 clinical trials had ongoing alopecia, right?
6     A.   Based on what you've just shown me, I
7 would agree that is true.  Based on this -- this was
8 printed out this week, so I would agree that is
9 true.
10     Q.   And you're not -- but you haven't done any
11 review of the clinicaltrials website and found any
12 information about ongoing alopecia in the Sanofi
13 clinical trials that was available for 2015, right?
14     A.   I have not done that, no.  That would have
15 been before I started working in this litigation.
16     Q.   So you're not in a position to testify,
17 and you won't testify, that there was information
18 available in the clinicaltrials.gov website before
19 2015 on the number of patients in the Sanofi
20 clinical trials who had ongoing alopecia, right?
21     A.   At this time, based on what I have
22 available to me, no, I would not be doing that.
23         THE COURT REPORTER:  Mr. Moore, I don't
24 know if you're aware you're muted.
25

1         MR. MOORE:  I'm sorry.
2     Q.   (BY MR. MOORE)  I was just going to say,
3 let's shift gears a little bit and switch over to
4 the other sources that you cited in your report.
5 We've been talking about clinical trials so far.
6 That's your understanding, right?
7     A.   And the specifics, yes.  That's correct.
8     Q.   Just trying to stay organized here.  I'm
9 trying to do this methodically.  So we've been
10 talking about clinical trial data so far, right?
11     A.   Yes.
12     Q.   And the other sources, two sources, I
13 believe you cited in paragraph 33 are
14 epidemiological data, case series and individual
15 case reports, right?
16     A.   Yes.  That's correct.
17     Q.   So just as a point of clarification,
18 some -- when you say epidemiological data, are you
19 referring to published medical literature?  Is that
20 what you're talking about?
21     A.   Published medical literature, which would
22 include full-length articles, abstracts or
23 presentations made at scientific meetings, yes.
24     Q.   And they're described in your report.  At
25 paragraphs 33 to 44 of your report, you go through

1 and do a survey of the epidemiological data, is my
2 understanding of what you're doing there.  Is that
3 right?
4     A.   Yes.  That's correct.
5     Q.   And that -- so when you talk about
6 epidemiological data, that's what you're -- that's
7 what you're describing.  And you also -- you also
8 mention individual case reports.  And I know that
9 some of the articles that you cited are case series.
10 That's true, right?
11     A.   Yes.
12     Q.   So when you say case report, individual
13 case reports, you didn't do an analysis of the FARES
14 database.  That's not something you did, right?
15     A.   No.  Dr. Madigan has done that, and he
16 will be addressing that.  I did not do that.
17     Q.   So I'm just trying to understand what you
18 mean by individual case reports.  Are you talking
19 about the individual case reports that are reported
20 in the medical literature that you cite?
21     A.   Yes.  That's correct.  And then, also,
22 there are individual cases reported in the clinical
23 trials as well, some of which documents are
24 described as exhibits to depositions and different
25 things that I've looked at.

29 (Pages 110 - 113)

1    Q.  Okay.  So there are case reports as part
2  of the clinical trials, case reports that are
3  reported in the medical literature.  And that's what
4  you're referring to when you say case reports?
5    A.  Yes.  That's correct.
6    Q.  And so you said you didn't do a
7  meta-analysis of the various literature.  But would
8  you call it a survey?  I mean, how would you
9  describe it?  You did a review?  Is that -- is
10  that -- are you happy with that?  Review?
11    MR. LAMBERT:  Object to form.
12    A.  I did a weight of the evidence evaluation
13  of the information that I could identify, which
14  included clinical trial data, as well as
15  epidemiological data and case reports.
16    Q.  (BY MR. MOORE)  Okay.  Now, when you did
17  your evaluation of the medical literature, that
18  information came from a variety of different medical
19  publications, right?
20    A.  Yes.
21    Q.  And you -- and those -- and those
22  publications discuss different groups of patients,
23  right?
24    A.  Yes.
25    Q.  And the patients in those -- discussed in

1  those articles had different individual
2  characteristics, right?
3    A.  Yes.  I would -- yes.  I mean, yes.  When
4  you read -- read the papers, you'll see that, yes.
5    Q.  Like different ages, for example, right?
6    A.  Yes.
7    Q.  Different underlying medical conditions
8  would be another example?
9    A.  Well, they don't always describe that.
10  Typically what's being described is -- in these
11  cases are women that have been treated with
12  docetaxel or a combination of other
13  chemotherapeutics for breast cancer, but also for
14  other cancers as well.
15    Q.  Is it your testimony that all the women in
16  these various articles had the same underlying
17  medical conditions?
18    A.  I already answered that for you.  I
19  said -- I said that -- that -- the women are
20  described within the papers, and the medical
21  condition that caused the treatment tends to be a
22  cancer treatment.  But if what you mean by that is,
23  did they describe details?  No.  Many of the papers
24  don't give you the details on all of that.  That's
25  why I'm answering it the say I'm asking (sic) it.  I

1  mean, every reporter doesn't give a complete
2  evaluation of the medical history of the patients,
3  no.
4    Q.  Okay.  I don't think you're understanding
5  my question.
6        Do the patients that are discussed in
7  these articles all have the same underlying medical
8  history?
9    A.  I can't answer that, because --
10    Q.  You don't know.
11    A.  -- because, in many cases, the paper does
12  not describe all of the underlying medical history.
13  Sometimes they have some, but it's never going to be
14  complete.
15    Q.  But in the -- in the information that you
16  did review and that was provided in the medical
17  journal articles, do all of the patients have the
18  same underlying medical conditions?
19    A.  No.  Not where it is described.  That's a
20  better question.
21    Q.  And you didn't -- Okay.  And did all of
22  the patients in these various articles have the same
23  chemotherapy regimens?
24    A.  In every article?  No.  In some articles
25  they have -- they have a series of patients who had

1  all the same regimens, and the doctor talks about
2  that series of regimens.
3    Q.  And so you'll agree there's some
4  heterogeneity in the studies that you looked at with
5  regard to the patients' characteristics, right?
6    A.  Yes.  All epidemiological literature, or
7  all types of human experience data, that would be
8  true.  It wouldn't matter whether you're talking
9  about this case or a variety of other types of
10  analyses that are done on different end points with
11  drug exposure.
12    Q.  And you haven't done any analysis in your
13  report that attempts to address this heterogeneity
14  between the patient population, right?
15    A.  So that's a really broad question.  Do you
16  mean a -- an analysis, such as a re-analysis and
17  putting it into a meta-analysis type paradigm?  Or
18  are you asking me, did I analyze each paper and look
19  at those issues?  I did.  I looked at what the
20  individual physicians said, in terms of what they
21  report for their patients, and whether or not I
22  believe they had, you know, applied a -- a reliable
23  description of what -- what it is that they're
24  describing for their patient experience.
25    Q.  And I appreciate that, but I'm asking a

30 (Pages 114 - 117)

1  more specific question.  Are you familiar with what
2  a heterogeneity analysis is?
3      A.  Are you asking me in terms of a type of
4  analysis that would go into the design of a
5  meta-analysis or an epidemiological pooling of data?
6  Yes.  I am familiar with that.
7      Q.  And is it your understanding that that
8  type of analysis analyzes the difference in the
9  patient populations and whether it takes that into
10  account as part of the meta-analysis?  Is that
11  right?
12      A.  So, yes, but that's beyond the scope of
13  what I've done.  I mean, if you're just asking me
14  generally do I understand that, yes, I understand
15  that that can be done.
16      Q.  Okay.  And all I'm asking is, when you did
17  your evaluation of the meta -- excuse me.  When you
18  did an evaluation of the medical information and the
19  various information contained in it, you didn't do
20  any type of heterogeneity study, right?
21      A.  No, because I was not attempting to pull
22  data across studies and come to putting those
23  individuals together in one analysis.  That is not
24  what I'm doing.  I'm doing a weight of the evidence,
25  where you take individual pieces of information and

1      A.  38.  I'm sorry.
2      Q.  I just read to you the first sentence of
3  paragraph 38.
4      A.  Yes.  I see that.
5      Q.  Okay.  So is it your opinion, by 2009,
6  that cases of permanent hair loss had been reported
7  in that medical literature?
8      A.  Yes.  That's correct.  And I would state,
9  my opinion is as you just read.
10      Q.  And is it your opinion there was
11  sufficient evidence in the medical literature by
12  2009 to conclude that docetaxel use is associated
13  with an increased risk of permanent alopecia as
14  compared to other drugs used in breast cancer
15  treatment?
16      A.  So you're asking for a different -- you're
17  stating that a different way than I stated it.  I
18  would say -- I would say my opinion is as expressed
19  in paragraph 38.  Whether it was by 2009.  So what
20  you're asking is different than the way I've
21  expressed it, and so I would point you to what I say
22  in 38.  That's my opinion about 2009.
23      Q.  I'm actually using the exact same words in
24  your report.  That's what I'm trying to -- trying to
25  do here.

1  weigh those individually based on whether or not you
2  believe they're reliable, they address the question,
3  and then what conclusions you can draw based on
4  those -- those pieces of information when combined.
5      Q.  Now, this information in your evaluation,
6  as we've talked about earlier, it supports your
7  position that docetaxel/Taxotere use is associated
8  with an increased risk of permanent hair loss as
9  compared with other drugs used in breast cancer
10  treatment.  And I'd just like to discuss with you
11  when there was sufficient evidence in the medical
12  literature to allow you to reach your conclusion.
13      Okay?  Are you with me?
14      A.  Yep.  I'm with you.
15      Q.  Okay.  So in paragraph 38 you say that, In
16  each of these papers and presentations reported
17  through 2009, the authors were describing a new
18  finding of irreversible or irreversible alopecia
19  that was different than the chemotherapy-induced
20  alopecia that had been associated with taxanes
21  previously, and also appear to be more common in
22  Taxotere (docetaxel) -treated patients.
23      A.  Which paragraph are you at?  I'm sorry.  I
24  missed the number.
25      Q.  Paragraph 38.

1      A.  No.  No, you didn't.
2      Q.  Let me just -- your opinion -- your
3  ultimate opinion, that's what I'm quoting, okay?
4  Your ultimate opinion in this case is, docetaxel is
5  associated with an increased risk of permanent hair
6  loss as compared to other drugs used in breast
7  cancer treatment.  That's your opinion, right?
8      A.  Yes.  And you'll notice that, in that
9  opinion, my ultimate opinion, I don't give a date.
10  Instead, in this part of the literature, when I go
11  through different literature building, that is my
12  opinion as of that date.  So in 2009, I'm saying
13  what you read into the record.
14      And so you're asking for -- you're asking
15  for something that is -- that is not something the
16  way I've expressed it in my report.  And I'm saying,
17  I would point you to the way I express it in my
18  report.
19      Q.  Right.  And that's --
20      A.  That is the opinion that I would be --
21      Q.  Okay.  The reason I'm asking you is
22  because I need to clarify the timing of when you had
23  enough information available to reach your opinion.
24  So your opinion about docetaxel having an increased
25  risk as compared to other drugs, my question to you

31 (Pages 118 - 121)

1  is, when was there sufficient evidence available in
2  the medical literature to allow you to form that
3  opinion?
4      A.  Before March of 2011, when Hospira
5  received marketing authorization, there would have
6  been.  That is an opinion that isn't stated quite
7  that way in my report, but that certainly would be
8  my opinion.
9      Q.  And you go on to talk about how other
10  drugs, I guess -- I mean, other articles after
11  2000 -- March 2011.  So I take it that none of
12  the -- none of the articles that you cited after
13  March 2011 provide any new information that was
14  necessary for you to reach your conclusion that
15  docetaxel use is associated with an increased risk
16  of permanent alopecia as compared to other drugs
17  used in breast cancer treatment.
18      A.  That's totally wrong.  No.
19          MR. LAMBERT:  Object to the form.
20      A.  No.  No.  No.
21      Q.  (BY MR. MOORE)  Well, you just said -- you
22  just said --
23      A.  No.  Let me finish.
24          Again, you're -- you asked a question that
25  is not expressed in my report.  So I'm trying to

1  answer you truthfully.  I will tell you, the opinion
2  that I would be prepared to express at trial hasn't
3  been put into a particular box of notice.  I'm not
4  the regulatory expert, and, as a result, the issue
5  of timing is not something that is important to
6  describing the pharmacology and the toxicology of
7  the drug.  As a result, that is the way I have
8  expressed my opinions.  But then, when you ask that,
9  it is true, if you look at the literature, when you
10  get to 2011, there is information to show that
11  Taxotere is different.
12          But I'm not saying that the information
13  beyond 2011 is exactly the same, because it's not.
14  After 2011 you get -- you get additional people, in
15  additional comparisons, with additional strengths
16  and weaknesses to their studies.  So, no, I disagree
17  with the statement that you're making.  That's
18  absolutely not true, which is why I'm telling you,
19  you need to look at what my opinion is.  My ultimate
20  opinion is not limited by time.
21      Q.  So are you saying the information that was
22  published after March 2011 was necessary for you to
23  reach your conclusion?
24      A.  Not that it was necessary.  It's what I
25  did.

1          MR. LAMBERT:  Object to form.
2      A.  It's what I did.  I can't -- when I
3  reached my conclusions in this -- because I'm not
4  the regulatory expert, and I'm not trying to tie
5  notice to a particular date.  What I am doing,
6  instead, is saying that, based upon the weight of
7  the evidence at the time I did my evaluation, this
8  is the information that was available, and I have
9  drawn my conclusions based on consideration of all
10  that, which includes papers after 2011.
11      Q.  (BY MR. MOORE)  So are you offering the
12  opinion that the information that was published
13  after 2011 contains information that, for the first
14  time, provides a basis to believe there's a causal
15  relationship between docetaxel and permanent
16  alopecia?
17          MR. LAMBERT:  Object to form.
18      A.  So that's beyond the scope of what I did.
19  I was not doing a causation analysis.  So, again,
20  that's an important distinction I thought we already
21  understood and we already agreed to that.
22      Q.  (BY MR. MOORE)  Right.  So I just want to
23  be clear, you're not going to -- you're not going to
24  offer any opinion at trial that the scientific
25  information that became available after March 2011

1  contained new information that, for the first time,
2  provided a basis to believe there is a causal
3  relationship between docetaxel and permanent
4  alopecia.
5          MR. LAMBERT:  Object to form.
6      A.  Beyond -- it's beyond the scope of what I
7  was asked to do for this case.  I believe Dr. Ross
8  will be answering those questions, because those
9  questions, in my view, deal with the issue of the
10  regulatory notice and the standard for adding a
11  warning to the label.  What I'm doing is different,
12  so -- in this case.  So maybe you're confused,
13  because --
14      Q.  (BY MR. MOORE)  I'm not confused.  I just
15  want to make sure you're not going to -- that you're
16  not offering any such opinion.  I think we're in
17  agreement on that, right?
18      A.  Well, I'm going to answer -- I will answer
19  whatever questions are asked.  I do not believe
20  those questions will be asked of me in this case.
21      Q.  And those wouldn't be within the scope --
22  you wouldn't be within the scope of your report or
23  your opinions to provide that -- to provide that
24  testimony, is what you're saying, right?
25      A.  Based on the work that I've done today for

32 (Pages 122 - 125)

1  Hospira specifically, that is true.
2     Q.  Now, you've also said that -- in your
3  conclusions, that it's biologically plausible that
4  Taxotere/docetaxel exposure can cause permanent
5  alopecia, right?
6     A.  Yes.
7     Q.  I just want to make sure I understand what
8  you're saying there.
9        So when you're evaluating whether
10 something is biologically plausible, you consider
11 whether there's a mechanism of action that explains
12 why the event occurred; is that fair?
13    A.  I wouldn't put it quite that way.  I would
14 say that, when I say it's biologically plausible, it
15 means that, in my -- in my evaluation of the
16 evidence, that, as a pharmacologist and a
17 toxicologist, there's information about the drug
18 that is consistent with the ability of something to
19 affect that end point, being the issue of rapidly
20 dividing cells.  I think I talked about that in my
21 last deposition.  But we don't know the exact
22 molecular mechanism by which it occurs.
23    Q.  Okay.  I think -- I think that's -- I
24 think we're on the same page, but I just want to
25 make sure I understand what you're saying.

1        So when you say something's biologically
2  plausible, that means there's information about the
3  drug that is consistent with the ability of
4  something to affect that end point.
5     A.  Yes.  That's exactly right.  So -- and the
6  reason that's important is because --
7     Q.  Well, I just want to make sure I get the
8  definition first.  That's what -- that's what you
9  mean when you say biologically plausible.  So then
10 you can explain why it's important.  But, first,
11 that's the definition?
12    A.  Yes.  I answered that already for you.
13 And then I'm trying to give you some context to why
14 I'm answering it that way.
15    Q.  Okay.  I just want -- if we can just take
16 it step by step, please.
17       Now, one of the factors that you look at
18 for addressing whether something's biologically
19 possible is whether there is a mechanism of action
20 that explains why the event occurred; is that fair?
21    A.  I'd say to you that that isn't exactly how
22 it's stated.  I'd go back to what I told you, which
23 is, you may not know the mechanism to explain it
24 exactly, but you have some information about the
25 mechanism or the pharmacology, the toxicology.

1  Could be observations from cellular studies or
2  animal studies, or even human experience, that
3  indicates that the end points you're looking at make
4  sense, based on what we know the drug does; what we
5  do know the drug does, even though we don't know
6  everything.
7     Q.  And you -- will you agree that mechanism
8  of action is a relevant consideration?
9     A.  Yep.  It is a relevant consideration.
10 That's a different question, though, than the way
11 you were stating it.
12    Q.  Okay.  So -- and by mechanism of action,
13 that's just a description that -- of -- that helps
14 explain why the event can occur?  Is that how you
15 define mechanism of action?
16    A.  Well, it depends what context you're
17 defining mechanism of action.  You can define it
18 as --
19    Q.  Let's just make it concrete.  In this
20 case, paragraph 50, I think you describe the
21 mechanism of action for docetaxel, right?
22    A.  Yes.  I have a paragraph about the
23 mechanism of action of the drug as a cancer
24 treatment, so talking about what it does in terms of
25 efficacy.

1     Q.  And you testified about this before, I
2  believe, but I think the mechanism of action is that
3  it -- it attacks and kills rapidly dividing cells.
4     A.  Yes.  That's a general statement.
5     Q.  And those -- and those cells can include
6  cells in the hair follicles, right?
7     A.  Yes.
8     Q.  And you've explained why there's a
9  difference, in your view, between drug-induced
10 alopecia which is reversible and permanent alopecia.
11 That's part of your opinions, right?
12    A.  Yes.  There is a different -- there is a
13 different toxicity.  Yes.
14    Q.  And in your opinion, this process of
15 killing rapidly dividing cells is a mechanism of
16 action for drug-induced alopecia, right?
17    A.  Well, for drug-induced, yes.  The initial
18 hair loss, yes, that's correct.
19    Q.  And you haven't identified any other
20 mechanism of action for irreversible or permanent
21 alopecia, other than this process of killing rapidly
22 dividing cells, correct?
23    A.  So I did not find in the literature a
24 consensus, other than to tell you that I know this
25 is being addressed by the causation expert, because

33 (Pages 126 - 129)

1  one of the underpinnings, typically, of an analysis
2  in terms of general causation is to describe the
3  potential mechanisms of action that we do know.
4  And, generally, what I would say to you, and as I've
5  said in my previous depositions, unfortunately we
6  don't know the exact molecular mechanism whereby
7  this injury of permanent alopecia occurs.
8      Q.  Okay.  So I understand there's a separate
9  causation.  I'm asking about your opinions.  And you
10  have not, in your report, identified any other
11  mechanism of action for permanent alopecia other
12  than the process of killing rapidly dividing cells.
13  Right?
14     A.  Well, I don't think I ever state that
15  that's the mechanism of action for permanent
16  alopecia.  I say that's consistent with the biologic
17  plausibility.  In other words -- this is where this
18  comes into biologic plausibility.  If we know that
19  the cells that deal with hair growth are in the hair
20  follicle, and we know that the drug has the ability
21  to affect the biology of those cells, generally, it
22  would be biologically plausible that you could not
23  only see initial hair loss, but it's not surprising
24  that someone could also be reporting something
25  different.

1      And this is the issue of, then, what is
2  that mechanism.  And, again, this is what the
3  general causation expert can address.  And then it's
4  also something, unfortunately -- like I said, I
5  think, if you go to the literature, and then in the
6  labeling, the company doesn't even describe that for
7  what it is.
8      But certainly there are -- there are
9  things out there that are informative on it, but I
10  have not given you -- in my report, I have not
11  formed an opinion of what the exact molecular
12  mechanism or that difference in the injury is.
13  Instead, we know that there is a difference, in
14  terms of the fact that the doctors are identifying
15  it as being a different type of toxicity.
16     Q.  So that's a long answer.  But I think what
17  you're saying is, you don't know and aren't prepared
18  to testify as to what the mechanism of action is for
19  permanent alopecia.
20     A.  The exact molecular mechanism, that is
21  true.  I have not formed that opinion.  But I
22  believe these issues are going to be discussed by
23  the general causation expert.
24     MR. MOORE:  Okay.  I don't have much more.
25  I'm happy to just kinda keep going here for a few

1  more minutes, if that works for everyone.
2      THE WITNESS:  That's fine with me.  I
3  sometimes can go two hours.  I just know that the
4  court reporter might not appreciate that, so -- I'm
5  fine.
6      THE COURT REPORTER:  I'm good.
7      Q.  (BY MR. MOORE)  Now, turn your attention
8  to your opinion about docetaxel being
9  interchangeable.  Do you remember that?
10     A.  Yes.  That's earlier in my report.  Yes.
11     Q.  Now, you agree that all prescription drugs
12  have risk, right?
13     A.  Yes.  That's true.
14     Q.  And you're not saying that docetaxel and
15  paclitaxel have exactly the same risk, are you?
16     A.  No.  And I think that's clear if you read
17  my deposition testimony.
18     Q.  Well, I don't think anything's clear from
19  your testimony, Doctor, so I thought I'd reask it.
20      Now, you say that you have not -- I
21  believe what you were saying is, you have not done a
22  specific comparison between docetaxel and paclitaxel
23  as to specific risks.  Is that right?
24     MR. LAMBERT:  Object to form.
25     A.  I don't think I understand.  I have -- in

1  terms of alopecia, permanent alopecia, I have.
2      Q.  (BY MR. MOORE)  Fine.  Fine.  I'm talking
3  about -- I'm not talking about permanent alopecia,
4  so I'll ask a better question.
5      You're aware that docetaxel and paclitaxel
6  have other risks associated with them that don't
7  relate to alopecia, right?
8      A.  Yes.  They share some -- a number of the
9  risk profile, and then, in some cases, they have the
10  same basic risk, but there may be differences, yes,
11  in terms of propensity.  That's true.
12     Q.  And so for these non-alopecia risks, you
13  haven't done a specific comparison of those risks
14  individually as part of your report, right?
15     A.  Oh.  I see what you're asking me.  And
16  that's -- as I have testified before, that is true.
17  The focus of my report is looking at the comparative
18  risk here, or the risk of permanent alopecia, and
19  whether for Taxotere it appears to be different or
20  not from other drugs, including Taxol.
21     Q.  Okay.  And so it's not part of your report
22  and your opinion to do a specific comparison, for
23  example, between docetaxel and paclitaxel as to the
24  risk of neuropathy?
25     A.  I have not done that analysis, but I will

34 (Pages 130 - 133)

Page 134

1  tell you that I have discussed some of the evidence
2  with defense counsel at different points in time
3  during my depositions.  So if you go look, you'll
4  see what I say in terms of my opinions of the
5  information I had that were put before me.
6        But, no, I have not done a complete
7  assessment.  And I don't believe that I would be
8  asked at trial by counsel to provide that analysis.
9     Q.  And you haven't done a specific comparison
10  between docetaxel and paclitaxel as to the
11  cardiovascular risks of the two drugs?
12     A.  It would be the same answer to you.  If
13  you read my report, I am focusing on the end point
14  of permanent alopecia.
15     Q.  And you haven't done a specific comparison
16  between docetaxel and Adriamycin as to
17  cardiovascular risks?
18     A.  Mr. Fowler asked all these questions.  The
19  same answer; that is correct.
20        What I have done is formed an opinion --
21  and maybe this is where we should just end with --
22  this conversation, is, I do have an opinion that
23  there is clinical data to show that, overall,
24  Taxotere is more toxic than Taxol, when -- when the
25  investigators have talked about their overall

Page 135

1  findings from their clinical study.  But if you hone
2  in on individual end points, I haven't done them all
3  individually, no.
4     Q.  Right.  And you understand that the judge
5  has excluded your opinion on more toxic, right?
6  You're aware of that, right?
7     A.  Well, I don't know --
8        MR. LAMBERT:  Object to form.
9     A.  -- if the judge has done that in your case
10  or not, but --
11     Q.  (BY MR. MOORE)  In previous cases --
12     A.  In previous cases, there have been
13  limitations on that area, yes, that is true.
14     Q.  And I think you've talked about it before.
15  You're not an oncologist, right?
16     A.  No.  I'm not an oncologist or a physician
17  of any type.
18     Q.  So you haven't prescribed chemotherapy to
19  any patient, right?
20     A.  No.  I have not.
21     Q.  So in terms of determining the appropriate
22  medication for a particular patient, that's
23  something that the treating oncologist has to
24  decide, right?
25     A.  Yes.  Or the treater, if they're not an

Page 136

1  oncologist.  I would assume they would be.  But
2  whoever is treating the patient would make those
3  decisions.
4     Q.  And they would take into account the
5  individualized medical facts regarding that specific
6  patient?
7     A.  I would hope so, yes.  That's typically
8  what doctors do as part of their process.
9     Q.  And you understand that different patients
10  have different risks associated with drugs based on
11  their underlying medical history?
12     A.  In general, that is true.  Yes.
13     Q.  And drugs can have different benefits for
14  different patients, depending on the patient's
15  underlying medical history as well, right?
16     A.  I don't think I understand your question.
17  The drugs have the benefits that have been proven
18  based on their clinical trials.  Those are what they
19  are.
20        Are you asking me are there -- will
21  certain patients maybe respond differently than
22  others, even on that side of efficacy?  Yes.  That
23  is true.
24     Q.  Yeah.  So whether -- that's the role of
25  the oncologist, the doctor, to evaluate the risk and

Page 137

1  benefits and decide which chemotherapy is right for
2  each individual patient based on these individual
3  medical characteristics, right?
4     A.  Yes.  That's correct.  Typically, though,
5  in my experience, in terms of the literature and the
6  information, as a pharmacologist and toxicologist
7  I've looked at, those kinds of patient
8  characteristics most commonly are related to
9  choosing drugs focused on minimizing the risks.
10  Although you're right; there may be, for example, a
11  particular patient population, because of liver
12  function, they can't metabolize the drug, so they
13  can't get the benefit.  The cyclophosphamide has to
14  metabolize in order to produce a benefit.  So, yes,
15  it could come in.  It's more common on the toxicity
16  of risk side.
17     Q.  So you're not willing to agree with me
18  that different patients may have different benefits
19  from different drugs, depending on their individual
20  medical underlying conditions?
21     A.  I don't agree, because it's not different
22  benefits.  The benefit is treatment of the cancer.
23  I would say it's the same benefit you're looking
24  for.  What I'm saying to you is that individual
25  patients may end up, because of their

35 (Pages 134 - 137)

Page 138

1  characteristics, having a different response.
2      But are you -- are you saying that there's
3  more than one -- the benefit is treatment of cancer,
4  stopping the recurrence of the cancer. That's the
5  same benefit, regardless of the patient. If you're
6  giving people docetaxel in a regimen for adjuvant
7  early stage breast cancer, the benefit is treatment
8  of early stage breast cancer. But people can
9  respond differently. That I agree with. Yes. They
10  can.
11      Q. Again, it's the role -- it's the role of
12  the doctor to determine what chemotherapy drug to
13  give to a particular patient, right?
14      A. Yes. I've already agreed to that. That
15  is true.
16      Q. You're not offering any opinions on what
17  chemotherapy is better for any individual patient,
18  right?
19      A. No. Because I am not a physician, I don't
20  do -- I don't diagnose and treat patients.
21      MR. MOORE: I think we may be done. Let
22  me take a few minutes and check, and maybe we can
23  get back on -- 10 minutes?
24      THE WITNESS: That's fine with me.
25      THE VIDEOGRAPHER: The time is 12:15 p.m.

Page 139

1  Central time. We are going off the record.
2      (Whereupon, the proceedings were in recess
3  at 12:15 p.m. and subsequently reconvened at
4  12:28 p.m., and the following proceedings were
5  entered of record:)
6      THE VIDEOGRAPHER: The time is 12:28 p.m.
7  We are back on the record.
8      MR. MOORE: That's all the questions I
9  have, Dr. Plunkett. Thank you.
10      THE WITNESS: Thank you.
11      MR. LAMBERT: I just have a couple of
12  questions, Dr. Plunkett.
13          EXAMINATION
14  BY MR. LAMBERT:
15      Q. Is it fair to say that your opinions have
16  not changed, in terms of pharmacology and
17  toxicology, since your June 3rd, 2020 report and the
18  depositions you gave in September 2020 related to
19  the report?
20      A. Yes. That is fair. That is correct.
21      Q. Okay. And have you seen the Court's
22  Daubert rulings related to your expert opinions in
23  the Taxotere MDL?
24      A. Yes.
25      Q. Okay. Is it fair to say you intend to

Page 140

1  comply with the limitations of the Court with regard
2  to your pharmacology and toxicology opinions in this
3  case for Ms. Plaisance and Ms. Guilbault?
4      A. Yes. That is correct. I will.
5      MR. LAMBERT: That's all the questions I
6  have. Thank you.
7      MR. MOORE: Can we just go off the record
8  one second, please?
9      THE VIDEOGRAPHER: The time is 12:30.
10  We're going off the record.
11      (Discussion held off the record.)
12      THE VIDEOGRAPHER: The time is 12:31 p.m.
13  We are back on the record.
14          FURTHER EXAMINATION
15  BY MR. MOORE:
16      Q. Dr. Plunkett, I did have just a couple of
17  extra questions here. Your counsel has provided to
18  us a set of invoices.
19      MR. MOORE: David, they're in the folder
20  called, I think, Laura Plunkett invoices.
21      (Deposition Exhibit Number 10 marked for
22  identification.)
23      Q. (BY MR. MOORE) And these have been marked
24  as Exhibit 10. And if you recall, earlier,
25  Dr. Plunkett, we didn't have copies of this earlier

Page 141

1  today. But I just want to confirm with you that,
2  here on page 1, there's a June 2021 invoice. And
3  that's some of the work that you did after your
4  April 2021 deposition that you discussed; is that
5  right?
6      A. Yes. That is true. And I forgot about
7  this, because I think we were initially -- you're
8  correct. In June we were actually thinking that the
9  Kahn case was getting ready to go to trial, so
10  that's probably what this was about. I apologize.
11  I forgot about this one.
12      Q. Okay. This is actually -- this is
13  additional work that you didn't recall at the time.
14  But there was an invoice in June 2021 for trial
15  preparation, and that's the first page.
16      The second page is the April 2021 invoice.
17  And that's what you did talk about earlier this
18  morning; is that right?
19      A. Yes. That's correct.
20      Q. And that was for your deposition in April?
21      A. Yes. That's correct.
22      Q. Have you sent any other invoices in the
23  Taxotere litigation other than those contained in
24  this exhibit?
25      A. No. I will send one at the end of this

36 (Pages 138 - 141)

Page 142

1 month that will include the preparation time for
2 this deposition and giving the deposition here
3 today.
4      MR. MOORE:  Okay.  That's all I have.
5      THE VIDEOGRAPHER:  Anybody else?
6      MR. LAMBERT:  No.
7      THE VIDEOGRAPHER:  Okay.  I'm going to
8 close record.
9      The time is 12:34 p.m. Central Standard
10 Time.  This concludes today's deposition of
11 Dr. Plunkett.  The number of media units used is
12 three.  They'll be retained by Veritext Legal
13 Solutions.  And off the record at 12:35 p.m. Central
14 Standard Time.
15      (Whereupon, at 12:35 p.m., Friday,
16 September 24, 2021, the taking of the Deposition of
17 LAURA M. PLUNKETT, PhD, DABT was adjourned.)
18           * * *
19
20
21
22
23
24
25

Page 143

1 STATE OF MINNESOTA:  )
                     )  ss.       CERTIFICATE
2 COUNTY OF ANOKA:    )
3      Be it known that I took the deposition of
  LAURA M. PLUNKETT, PhD, DABT on the 24th day of
4 September, 2021;
5
       That I was then and there a Notary Public
6 in and for the County of Anoka, State of
  Minnesota, and that by virtue thereof, I was duly
7 authorized to administer an oath;
8      That the witness, before testifying, was
  by me first duly sworn to testify the whole truth
9 and nothing but the truth relative to said cause;
10      That the testimony of said witness was
  recorded in shorthand by me and was reduced to
11 typewriting under my direction;
12      That the cost of the original transcript
  has been charged to the party noticing the
13 deposition, unless otherwise agreed upon by Counsel,
  and that copies have been made available to all
14 parties at the same cost, unless otherwise agreed
  upon by Counsel;
15
       That I am not related to any of the parties
16 hereto nor interested in the outcome of the action;
17      That the reading and signing of the
  deposition by the witness and the Notice of Filing
18 were reserved.
19      WITNESS MY HAND AND SEAL this 1st day of
  October, 2021.
20
21
22     _____
       Christine K. Herman, RPR, CRR
23
24
25

Page 144

1 Matthew Palmer Lambert, Esquire
2 plambert@gainsben.com
3      October 1st, 2021
4 RE:   Guilbault, Clare v. Hospira Inc., Et Al.
5    9/24/2021, Laura M. Plunkett , Ph.D. (#4811175)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 145

1 Guilbault, Clare v. Hospira Inc., Et Al.
2 Laura M. Plunkett , Ph.D. (#4811175)
3      E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5      _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8      _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11      _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14      _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17      _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20      _____
21 REASON_____
22
23 _____      _____
24 Laura M. Plunkett , Ph.D.          Date
25

37 (Pages 142 - 145)

Page 146

1  Guilbault, Clare v. Hospira Inc., Et Al.

2  Laura M. Plunkett , Ph.D. (#4811175)

3        ACKNOWLEDGEMENT OF DEPONENT

4    I, Laura M. Plunkett , Ph.D., do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Laura M. Plunkett , Ph.D.          Date

13  *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15        _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

24

25

38 (Page 146)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.