# EXHIBIT D

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

    _____
3   IN RE:  TAXOTERE (DOCETAXEL)      MDL NO. 2740
    PRODUCTS LIABILITY LITIGATION
4                                     SECTION: H
5   This Document Relates To:
6   Sheila Crayton, Case
    No. 2:17-CV-05923;
7   Cynthia Thibodeaux, Case
    No. 2:16-CV-15859
8   _____
9
10
11          VIDEOTAPED DEPOSITION OF
              LAURA MASSEY PLUNKETT, M.D.
12
              November 19, 2019
13                 9:05 A.M.
14       1230 Peachtree Street, NE
                Suite 1200
15            Atlanta, Georgia
16   Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC
17
18
19
20
21
22
23
24
25

|  | Page 78 |  | Page 80 |
|---|---|---|---|
| 1 | have a variety of different lines of evidence that | 1 | allow me to -- to make that statement that I believe |
| 2 | build to this -- | 2 | that it is associated with. |
| 3 | Q.  I -- | 3 | Q.  Is associated in your mind equal to cause |
| 4 | A.  -- this opinion. | 4 | and effect? |
| 5 | MR. RATLIFF:  Yeah, that's -- I'm going to | 5 | A.  It's not a full causation analysis, no. |
| 6 | move -- | 6 | Q.  Okay. |
| 7 | MR. MICELI:  Are you finished with your | 7 | A.  But it's a -- so it is different.  When |
| 8 | answer? | 8 | I -- it's -- I try to be very careful in my report. |
| 9 | MR. RATLIFF:  I'm going to move to strike | 9 | If I'm doing a full causation analysis, I will use |
| 10 | the last half of that. | 10 | "caused" or "can cause."  When I use the word |
| 11 | Q.  (By Mr. Ratliff)  All I want to know is | 11 | "associated," it's because I'm looking at sort of |
| 12 | what the definition of "associated" means. | 12 | the understanding of what is either biologically |
| 13 | MR. MICELI:  Well, during -- during the | 13 | plausible or an understanding of the mechanism and |
| 14 | course, she was explaining it, I believe.  But | 14 | I'm looking at the data in that way. |
| 15 | we've been asked in other depositions and I | 15 | Q.  Okay. |
| 16 | will ask that the witness be allowed to respond | 16 | A.  But I haven't done a full Bradford Hill |
| 17 | fully to your question.  If you want to say | 17 | analysis to use the word "cause." |
| 18 | "move to strike," the -- Judge North has told | 18 | Q.  Right. |
| 19 | us all that that's sort of humorous but -- | 19 | A.  Because that's how I would use it.  When I |
| 20 | because we're not playing judge ourselves, but | 20 | draft reports, that's what I would do. |
| 21 | that the witness be allowed to answer -- answer | 21 | Q.  Understand.  And that's all -- all I |
| 22 | you question. | 22 | really wanted to know was whether when you say |
| 23 | MR. RATLIFF:  And to respond in a very | 23 | "associated," if that is a synonym for "cause." |
| 24 | Kyle Backus way, I would ask for the witness to | 24 | A.  I don't mean it to be. |
| 25 | just answer the questions that are being asked. | 25 | Q.  Okay. |
|  | Page 79 |  | Page 81 |
| 1 | MR. MICELI:  And I think she -- she is | 1 | A.  That's why I have not used the word |
| 2 | doing her best to do that. | 2 | "cause" there.  That means I would have done a full |
| 3 | Q.  (By Mr. Ratliff)  Okay.  So "associated," | 3 | analysis -- |
| 4 | when you use that term, is in reference to that | 4 | Q.  And you've done no -- |
| 5 | there's evidence of a biological plausibility; is | 5 | A.  -- under -- |
| 6 | that correct? | 6 | Q.  Carry on. |
| 7 | A.  In this sentence that's how I'm using it, | 7 | A.  A full analysis using, for example, the |
| 8 | yes. | 8 | Bradford Hill criteria. |
| 9 | Q.  Okay. | 9 | Q.  Okay.  And you've not done a full |
| 10 | A.  And I would say that in the answer, the | 10 | analysis -- you've not done a Bradford Hill criteria |
| 11 | reason I wasn't finished was because you didn't just | 11 | analysis; correct? |
| 12 | say define "associated."  You asked me what does | 12 | A.  That's correct.  And that's consistent |
| 13 | this mean, and what this means is what I was trying | 13 | with what I stated in my first deposition. |
| 14 | to explain to you. | 14 | Q.  Right.  Well, new report, new deposition, |
| 15 | Q.  Okay. | 15 | so we've got to confirm all of these things. |
| 16 | A.  That it's what evidence -- when I use the | 16 | A.  Right.  But I'm -- when I'm saying that to |
| 17 | word associated, it's because I have a certain type | 17 | you, I just wanted you to understand this is -- I |
| 18 | of information or evidence that lets me choose that | 18 | believe that I've already told you this, I haven't |
| 19 | word instead of just "reported," for example. | 19 | changed that opinion.  I'm just letting you know |
| 20 | Q.  Is it -- | 20 | that that is still there. |
| 21 | A.  Reported -- if I'd used the reported here, | 21 | Q.  And your fourth opinion, or as I have it |
| 22 | there is -- there is permanent alopecia reported for | 22 | in this list, would be that "it's biologically |
| 23 | some other drugs -- | 23 | plausible that Taxotere causes PCIA."  Is that |
| 24 | Q.  Uh-huh. | 24 | correct? |
| 25 | A.  -- but the evidence that exists does not | 25 | A.  Or CIPAL.  Right? |

Page 142

1  that are 5-FUs, cyclophosphamide, for example,
2  doxorubicin.
3      Q.  Okay.  So Taxotere attacks rapidly
4  dividing cells, which would include hair follicles;
5  correct?
6      A.  Yes.
7      Q.  Taxol attacks rapidly dividing cells,
8  which includes hair follicles; correct?
9      A.  Yes.
10     Q.  Adriamycin attacks rapidly dividing cells,
11 which includes hair follicles; correct?
12     A.  Yes.
13     Q.  Cyclophosphamide does the same; correct?
14     A.  Yes.
15     Q.  5-FU does the same; correct?
16     A.  Yes.
17     Q.  Okay.
18     A.  Cisplatin would be another.
19     Q.  Would you say -- what about -- are you
20 familiar with a chemotherapy called gemcitabine?
21     A.  Gemcitabine?
22     Q.  Uh-huh.
23     A.  I am familiar with it generally, yes.
24     Q.  Do you know if it attacks rapidly dividing
25 cells?

Page 143

1      A.  Yes, it does.
2      Q.  Would those include the hair follicles?
3      A.  It should.  I mean --
4      Q.  Okay.
5      A.  -- rapidly -- essentially the -- these
6  agents that attack the rapidly dividing cells find
7  them in the body.  Sometimes they don't get to the
8  brain, but the brain is not tipped -- considered
9  rapidly dividing.  So that's a difference.
10     Q.  Okay.  What about Avastin?
11         Does Avastin target rapidly dividing cells
12 including the hair follicles?
13     A.  I believe it does cause hair loss or
14 alopecia.  Avastin has a different mechanism of
15 action, though.
16     Q.  But your testimony --
17     A.  It's an -- it's an angiogenesis inhibitor.
18     Q.  Yeah.
19     A.  So I wouldn't -- wouldn't put it quite the
20 same way.  But it does -- I -- it is -- I have seen
21 reports of alopecia with it as well.
22     Q.  With Avastin?
23     A.  Yes.
24     Q.  Okay.  So would you say, then, all of the
25 drugs that we just listed, Taxotere, Taxol,

Page 144

1  Adriamycin, cyclophosphamide, 5-FU, carboplatin,
2  gemcitabine, and Avastin, it is biologically
3  plausible for every one of those drugs to cause hair
4  loss?
5      A.  Drug-induced alopecia, yes, that is true,
6  which is the reversible that you typically see with
7  those drugs.
8      Q.  And you say you typically see with those
9  drugs.
10         Do you always see reversible alopecia with
11 those drugs?
12     A.  Well, some --
13         MR. MICELI:  Object to the -- excuse me.
14     Object to the form.
15         THE WITNESS:  So there is a difference, I
16     believe, in the risk, as I've already told you
17     in my report for Taxotere.  But for the -- of
18     those drugs we've just listed, the only one
19     that has evidence coming from a variety of
20     different lines of evidence would be Taxotere.
21     Q.  (By Mr. Ratliff)  Each -- is it
22 biologically plausible that each one of those drugs
23 can cause hair loss --
24         MR. MICELI:  Object to the form.
25     Q.  (By Mr. Ratliff)  -- correct?

Page 145

1      A.  In -- in relation to the reversible
2  drug-induced alopecia as I've defined in my report,
3  yes, I would agree that that is biologically
4  plausible.
5      Q.  Did you do any analysis on gemcitabine or
6  Avastin prior to this deposition?
7      A.  I have looked at them before.  I didn't do
8  it specifically to come here today.
9      Q.  Okay.  When someone goes through
10 chemotherapy with a cytotoxic agent, whether it's
11 Taxotere or one of the other ones we mentioned,
12 would you say there's a strong likelihood that
13 they're going to experience some degree of alopecia.
14         MR. MICELI:  Object to the form.
15         THE WITNESS:  In terms of the drug-induced
16     kind that is typically reversible, yes, that is
17     true.
18     Q.  (By Mr. Ratliff)  Okay.  And you can look
19 at any of the data in the labels for those
20 particular drugs and you're going to see, let's say,
21 a relatively high percentage of patients who report
22 alopecia after taking those particular medications;
23 correct?
24         MR. MICELI:  Object to the form.
25         THE WITNESS:  Are you going to the whole

37 (Pages 142 - 145)

Page 146

1    list again?
2        Q.   (By Mr. Ratliff)  Correct.
3        A.   Because the last question was limited.
4        I would expect to see that in the label,
5    yes.
6        Q.   Okay.  And you say that
7    chemotherapy-induced alopecia --
8        A.   So where are you?
9        Q.   Well, I'm just -- now I'm just talking.
10       A.   Oh, okay.
11       Q.   -- is normally reversible?
12       A.   Yes.
13       Q.   Is it always reversible?
14       A.   Well, that is -- no.  That's the issue
15   here.  There's -- with -- with this particular drug,
16   we have something that doesn't regrow.
17       Q.   Okay.
18       A.   So you've gone from hair loss to lack of
19   regrowth.
20       Q.   Okay.  So is it your testimony that if
21   somebody takes a chemotherapy, that their hair --
22   and they lose their hair, that it should regrow
23   exactly as it was before?
24            MR. MICELI:  Object to the form.
25            THE WITNESS:  So what do you mean by

Page 147

1    "exactly as it was before"?  I --
2        Q.   (By Mr. Ratliff)  I don't --
3        A.   There -- I'm sorry.  What did you say?
4        Q.   So if someone experiences hair loss during
5    chemotherapy, your expectation is their hair would
6    regrow exactly as it was before; is that correct?
7            MR. MICELI:  Same objection.
8            THE WITNESS:  Depends what you mean by
9        "exactly as it grows before."  So, for example,
10       there are reports that after chemotherapy hair
11       will regrow, may have a different texture.
12       Q.   (By Mr. Ratliff)  Uh-huh.
13       A.   May have a different color.
14       Q.   May be thinner?
15            MR. MICELI:  Object to the form.
16            THE WITNESS:  You want me to finish or do
17       you want to ask?
18       Q.   (By Mr. Ratliff)  Yeah.  Go ahead.  Go
19   ahead.
20       A.   I would agree, it could be -- it could be
21   thinner -- thinner, but there is a difference in
22   that versus what -- what we're talking about here
23   which is the issue of permanent hair loss.
24       Q.   And you've also seen it reported that when
25   someone loses their hair during chemotherapy it may

Page 148

1    grew back -- grow back with reduced density --
2            MR. MICELI:  Object.
3        Q.   (By Mr. Ratliff) -- or reduced volume; is
4    that correct?
5            MR. MICELI:  Object to the form.
6            THE WITNESS:  I have seen people talk
7        about volume, yes.  But there the issue is it's
8        regrowing, and I'm talking about the lack of
9        regrowth with the permanent alopecia.
10       Q.   (By Mr. Ratliff)  What degree of lack of
11   regrowth?  I think you call in your report
12   substantial lack of regrowth.  Will you put a
13   percentage on that for me?
14       A.   I haven't put a percentage.  I -- you can
15   go to the literature and see the different papers I
16   relied upon where they will grade it based upon how
17   different doctors are looking at it.  The key is the
18   time period being them defining it as something that
19   is seen many months to years after the cessation of
20   chemotherapy.
21       Q.   Okay.  So when you say lack of substantial
22   regrowth, will you define that for me?
23       A.   Defining it as -- as recognizable, and I'm
24   defining it based the way that the individuals in
25   the papers do.  They -- that's a term that these --

Page 149

1    these -- some of these physicians will use.  And I'm
2    just trying to put it into context with the
3    literature.
4        Q.   Uh-huh.
5        A.   Where not everyone that is described will
6    be totally bald, but they certainly do not have
7    normal hair regrowth.  And there are significant --
8    the doctors talk about significant pattern within
9    that lack of regrowth of -- of baldness or parts of
10   the hair where it doesn't grow back.
11       Q.   So more than 50 percent?  Less than
12   50 percent?
13           MR. MICELI:  Object to the form.
14           THE WITNESS:  I haven't formed that
15       opinion, and I don't believe the doctors --
16           MR. RATLIFF:  Can you mark that?
17           THE WITNESS:  I haven't seen doctors
18       describe it that way.  It's possible that a
19       dermatologist can tell you something different,
20       and I'd refer you to them.
21       Q.   (By Mr. Ratliff)  When does something
22   become -- go from chemotherapy-induced alopecia,
23   where maybe it grows back with less density, to
24   permanent chemotherapy-induced alopecia, where you
25   say it's a lack of substantial regrowth?  Where is

Page 150

1  that -- where is that bright line for me?
2      MR. MICELI: Object to the form.
3      THE WITNESS: So I don't diagnose it, and
4  I think that's a diagnosis question you're
5  asking me. But I would say to you based on the
6  literature that I look at that the doctors are
7  very clear that they're describing something
8  different when they talk about permanent
9  alopecia --
10  Q. (By Mr. Ratliff) Okay.
11  A. -- or use those two acronyms, as I
12  described, which is why I use them, because you'll
13  see those used actually in the paper.
14  Q. Okay.
15  A. So I'm -- I would -- we can pull out the
16  papers and look how doctors describe it, but I'm
17  not -- I don't diagnose so I would say speak to a
18  dermatologist to get his diagnosis -- or his or her.
19  I shouldn't assume it's a him.
20      MR. RATLIFF: Okay. Can you mark that as
21  Exhibit 6?
22      MR. MICELI: Do you have one of these for
23  me?
24      MR. RATLIFF: There you go.
25      COURT REPORTER: It's Exhibit 7.

Page 151

1      (Defendants' Exhibit 7 was marked for
2      identification.)
3  Q. (By Mr. Ratliff) All right. I'll
4  represent to you that that lady took chemotherapy,
5  and this is her six months after chemotherapy.
6      Would you say that she has permanent
7  chemotherapy-induced alopecia?
8      MR. MICELI: Object to the form. Lack of
9      foundation.
10      THE WITNESS: Well, I can't -- I -- I
11      don't diagnose and treat patients. In order to
12      answer that question I think you would -- you
13      need to talk to a physician, and I would say to
14      you this -- I can only speak to what the
15      literature that I rely upon shows.
16  Q. (By Mr. Ratliff) Okay.
17  A. And this is not necessary -- I don't know
18  that I've seen her picture in the literature so I
19  really can't answer that.
20  Q. Okay. Based on the literature that you
21  reviewed, can you tell me if that constitutes
22  permanent chemotherapy-induced alopecia as it's been
23  defined?
24      MR. MICELI: Object to the form.
25      THE WITNESS: It's the same answer. I

Page 152

1      don't diagnose and treat patients. You're
2      asking me -- to me you're asking me to diagnose
3      what this patient has. I don't do that.
4  Q. (By Mr. Ratliff) I'm just asking whether
5  that constitutes a substantial lack of regrowth as
6  defined in the literature?
7  A. I can't --
8      MR. MICELI: Hold on. Object to the form.
9      THE WITNESS: So, again, I don't -- I --
10  I -- what you're asking me, I believe, is to
11  whether or not I could look at this person and
12  diagnose them with something or not. And I
13  don't do that.
14  Q. (By Mr. Ratliff) I --
15  A. I would defer you to the dermatologist in
16  the case --
17  Q. Right.
18  A. -- to address that issue, and if -- even
19  if I was to try to do that, I would need more
20  information than looking at a picture.
21  Q. I'm not asking you a diagnosis. I'm
22  asking you is that consistent with permanent
23  chemotherapy-induced alopecia as has been reported
24  in the literature? Yes or no?
25      MR. MICELI: Object to the form.

Page 153

1      THE WITNESS: So I've tried to answer it
2      the best I can, and I'm telling you I can't
3      answer that yes or no.
4      Would you like me to explain? That's what
5      I explained for you.
6  Q. (By Mr. Ratliff) No, I'm not -- you
7  said --
8  A. Because I don't di- --
9  Q. -- you said you can't diagnose it.
10      I'm asking you is this --
11      MR. MICELI: Object.
12  Q. (By Mr. Ratliff) -- similar to what
13  you've seen in the literature as reported as
14  permanent chemotherapy-induced alopecia?
15      MR. MICELI: Object to the form.
16  Q. (By Mr. Ratliff) Yes or no?
17  A. I can't an- --
18      MR. MICELI: Object to the form.
19      THE WITNESS: I can't answer that without
20      doing a comparison. So you're asking me now
21      whether or not this looks like somebody I have
22      seen in the literature. To answer that we'd
23      have to pull the papers, and I would answer
24      that. Because I have not attempted to take a
25      photograph of someone that is not presented by

39 (Pages 150 - 153)

Page 194

1  documents that you think exist. I'm going to tell
2  you I know they don't exist.
3     And so all I'm trying to find out is if we
4  go to your reliance list and those documents are not
5  on those reliance list, you would agree with me that
6  you did not review and consider them; is that
7  correct?
8     MR. MICELI: Object to the form.
9     THE WITNESS: Yes. That's correct.
10    Q. (By Mr. Ratliff) Okay.
11    A. And I already answered that question
12  before. It would be the same for any of these. If
13  I -- anything you ask me, if you say to me if I
14  haven't reviewed it or it's not on my list,
15  obviously, then I can't know what -- what is in it.
16    Q. Okay. Did anywhere in the paper -- did
17  the -- the authors of this paper do not refer to
18  those four patients as having irreversible alopecia;
19  is that correct?
20    A. No. They call it, as they did, long-term.
21  But yet that definition of two years would be
22  consistent with the clinical trial protocols that
23  are -- that are typically talked about when they
24  talk about the lowest endpoint standard has to be at
25  least six months.

Page 195

1     Q. Right.
2     A. So this would fit that.
3     Q. They call it partial alopecia.
4        So we don't know the degree of alopecia,
5  is that correct, for those particular patients?
6     A. We -- all I know is what is described by
7  the author. So maybe if that answers your question.
8     Q. Which is there was partial alopecia?
9     A. Long-lasting and --
10    Q. More than two years?
11    A. For -- for more than two years. That's
12  correct.
13    Q. And as we sit here today, none of us knows
14  whether those women's hair grew back, whether they
15  had other conditions, whether they were on other
16  medications that would have impacted the alopecia.
17  Is that true?
18    A. Well, I don't think that's true. I think
19  the design was to -- for the follow-up to know what
20  people were doing during the follow-up. So based
21  upon what I know the clinical trial protocols
22  require, if they were doing follow-up, then there
23  were certain things that were being looked at, so --
24    Q. Is it your testimony here today that you
25  have reviewed the clinical trial protocol for this

Page 196

1  particular Phase II trial?
2     A. I don't -- no, I'm not saying that. I'm
3  saying how -- no, that's not what I'm saying. You
4  want me to tell you what I am saying?
5     Q. Okay. All I'm asking you is have you
6  reviewed the clinical trial protocol for this
7  particular clinical trial which you continue to tell
8  me or pontificate on?
9     MR. MICELI: Object to the form. Object
10    to the colloquy.
11    THE WITNESS: So I'm pointing you to where
12    I would look in order to -- to tell you if I
13    have seen it or not. We'll have to pull
14    materials.
15       But my answer to the question is based on
16    what I had seen in the clinical protocols. I
17    have seen that Sanofi did on similar studies,
18    where they indeed do, during follow-up, have a
19    certain procedure for what is to be included.
20    Q. (By Mr. Miceli) Including for women with
21  metastatic breast cancer?
22    A. Yeah. One of their later trials was a
23  metastatic trial where I've seen -- 311, no. One of
24  the other trials I've seen indeed was metastatic.
25    Q. You'll agree with me, though, that nowhere

Page 197

1  in this study do the authors per- -- attribute those
2  four patients' alopecia to being docetaxel-induced
3  or describing it as irreversible alopecia. Those
4  are your words, not their words?
5     MR. MICELI: Object to the form.
6     THE WITNESS: So I would agree that --
7     what I would agree to is that they have not
8     used those words in my sentence. That is true.
9     They have used other words to describe it.
10    Q. (By Mr. Miceli) Would you say partial
11  alopecia as described in this study constitutes a
12  lack of substantial regrowth as you define it in
13  your expert report?
14    MR. MICELI: Object to the form.
15    THE WITNESS: I don't think I've told
16    you -- told you a specific -- you didn't ask me
17    for a specific definition of that. I told
18    you -- no, you --
19    Q. (By Mr. Ratliff) I most certainly did.
20    MR. MICELI: Well, object to the form.
21    Can you please let her finish.
22    MR. RATLIFF: Okay.
23    MR. MICELI: Keep talking -- you just want
24    to keep talking over. It's your record. I
25    don't care if it's muddled up, but I do care if

50 (Pages 194 - 197)

Page 198

1  you're rude to my witness.
2      Q.  (By Mr. Ratliff)  Can you define for me
3  lack of substantial regrowth?
4          MR. MICELI:  Were you -- were you finished
5      with your answer?  Would you like to read the
6      question and answer back so you can say whether
7      you were done?
8          THE WITNESS:  I was still talking, but I'm
9      willing to let you ask another question because
10     I don't think -- I think my answer to the next
11     question will be the same.  But go right ahead
12     and ask me another -- your next question or
13     re- -- rephrase that question how you just --
14     Q.  (By Mr. Ratliff)  The question was:  Does
15  partial alopecia as described in the Nabholtz study,
16  is that the same or similar to lack of substantial
17  regrowth as discussed in the literature that you
18  reviewed and have opined on, and how did you make at
19  that determination, if so?
20     A.  I believe it is consistent with what I see
21  in the literature, and that's based upon what I read
22  about other -- other physicians who are focusing on
23  their study on this issue mainly from the
24  dermatology literature.  There's dermatologists who
25  have done reviews of their own -- of their own

Page 199

1  practices.
2      Q.  Okay.
3      A.  And they talk about the types of patients
4  that they are categorizing as, quote/unquote, CIPAL
5  or permanent irreversible hair loss.  And this is a
6  pattern, as far as longstanding only partial
7  regrowth would fit some of those papers.  So I would
8  say it's consistent with what some of the doctors --
9  'cause that's the question you're asking me --
10     Q.  Yeah.
11     A.  -- and I do think that's true.
12     Q.  So the term "partial alopecia" at two
13  years you would say is consistent with what has been
14  described in the literature; is that correct?
15     A.  No.  That's a different -- that's a
16  different question.  You're asking me just about
17  partial alopecia.  That could be short-term,
18  drug-induced.
19         If you're asking me -- I thought I
20  answered the question, though.  I said to you that
21  this is a term, what I see described here, is
22  consistent with the literature that then develops
23  over the next -- well, they're still publishing in
24  this area -- over the next decade or 15 years where
25  doctors are focusing in on trying to look at the

Page 200

1  pathology of drug -- of -- of permanent alopecia
2  even in Taxotere-treated patients.
3      Q.  So you can tell me that partial alopecia,
4  that word, is consistent with what you've read in
5  the literature?
6      A.  Not partial alopecia only.  Partial
7  regrowth, lack of regrowth --
8      Q.  Uh-huh.
9      A.  -- in -- in patients that were graded.
10  Some patients with -- identified as permanent had no
11  regrowth.  Some had some regrowth.  So there --
12  again, the clinical literature shows that.
13         MR. MICELI:  Object.
14     Q.  (By Mr. Ratliff)  Would you say that that
15  woman's physical presentation is consistent with
16  what has been described in the literature as
17  permanent chemotherapy-induced alopecia?
18         MR. MICELI:  Same objections as
19     previously.  And let the record reflect that
20     what Mr. Ratliff has placed in front of the
21     witness --
22         MR. RATLIFF:  Is Exhibit 7.
23         MR. MICELI:  -- is Exhibit No. 7 again,
24     which we've had lengthy discussions on.
25         THE WITNESS:  And I can't answer that

Page 201

1  because that's a diagnostic question.  You're
2  asking me to look at her and say clinically
3  what she looked like.  And I'm -- I'm telling
4  you, I don't --
5      Q.  (By Mr. Ratliff)  Okay.
6      A.  That is not what I do.  But certainly I
7  think you could ask the dermatologists in the case
8  that question.
9      Q.  Okay.
10         MR. RATLIFF:  What time is it?
11         MS. PETERSON:  12:17.  Lunch just got
12     here.
13     Q.  (By Mr. Ratliff)  Okay.  Let's go through
14  one more document.
15         So the next paragraph is paragraph 35.
16  This would be related to the Sedlacek article.
17         Have you seen this before?
18     A.  The paragraph?
19     Q.  Oh, I'm sorry.
20     A.  The paragraph I've --
21     Q.  No, sorry.
22         MR. MICELI:  You haven't identified the --
23     can you mark that for Mr. Ratliff, please?
24         MR. RATLIFF:  I apologize.
25         MR. MICELI:  I believe it's going to be

Page 202

1  Exhibit 9; is that right?
2      COURT REPORTER:  Yes.
3      (Defendants' Exhibit 9 was marked for
4  identification.)
5      Q.  (By Mr. Ratliff)  Have you seen -- well,
6  take that back, Dr. Plunkett.
7      Dr. Plunkett, you've certainly seen this
8  abstract before, have you not?
9      A.  Yes.
10     Q.  Okay.  And it's what is the abstract that
11 is identified and discussed in paragraph 35, page 15
12 of your report; is that correct?
13     A.  Yes.
14     Q.  Okay.  Have you ever talked to
15 Dr. Sedlacek?
16     A.  No.
17     Q.  Do you -- are you aware if Dr. Sedlacek
18 has ever published anything further on what he calls
19 "persistent significant alopecia"?
20     A.  He certainly has published additional
21 papers and talks -- or done talks on this general
22 area, yes.
23     Q.  Are those on your reliance list?
24     A.  They should be.  I believe there's a
25 Sedlacek 2010.  I'd have to pull my list to give you

Page 203

1  that.  But, yes, there's at least one.  I believe I
2  have maybe three documents that deal with Sedlacek
3  and his -- and his data and presentations.
4      Q.  And you're saying they're from 2010?
5      A.  Well, I don't know if they're all only
6  from 2000, maybe an '09.  Do you want me to -- let
7  me look at my report list, let me see if I -- see if
8  they're on the reference list here.
9      So, no, they should be in my reliance
10 materials, though.
11     Q.  Okay.  So you're saying you cannot find
12 them in your report, any reference anything other
13 than this one from 2006?
14     A.  I do -- do not reference the others, but I
15 have other Sedlacek documents in my reliance
16 materials.
17     Q.  Okay.  So that is your testimony that in
18 your reliance materials as identified in Appendix B
19 of your report, there are other materials related to
20 Sedlacek which you believe are presentations or
21 papers about permanent or persistent hair loss.
22     Is that roughly correct?
23     A.  That relate to this topic, yes.
24     Q.  Okay.
25     A.  So that's why I pulled them.  But I need

Page 204

1  to -- I can't tell you what they are without
2  looking.
3      Q.  Right.  So you don't have an independent
4  memory of what those articles or presentations say
5  or what year they're from?
6      A.  I believe they're 2009 and 2010.  That's
7  what I do recall.
8      Q.  Okay.
9      A.  But other than that, I'd have to pull them
10 out.
11     Q.  Right.  And so if we go back through your
12 reliance list and we don't find those, you would
13 agree with me they're not something that you
14 actually reviewed and relied upon?
15     A.  I disagree with that.  If you don't have
16 them on my reliance materials, that's a mistake.  It
17 certainly was part of my file.
18     Q.  Okay.
19     A.  And I have -- I have them in my office.
20 And I recall them because every time I go to look at
21 Sedlacek 2006, there are several articles that are
22 saved in a folder.
23     Q.  Okay.  Well, the only reference I see on
24 your reliance materials, Dr. Plunkett, is one
25 reference to this particular abstract in 2006.

Page 205

1      So your testimony is -- this is new to me
2  that you have additional Sedlacek materials from
3  2009 and 2010 that you reviewed and considered.
4      A.  So do you have my -- is the -- is the --
5  what I can't answer for you is whether there is --
6  do you have the original report?  Did you look there
7  to see?
8      Q.  This has a -- I've -- I've combed through
9  all of this.  So maybe Mr. Lambert over there knows
10 where it is on her reliance list.
11     We'll come back to that.
12     A.  Well, that is something if you need, I can
13 have those emailed to me --
14     Q.  That would be wonderful.
15     A.  -- if they're not on my list there --
16     Q.  Okay.
17     A.  -- but...
18     Q.  All right.  So let's talk about this
19 particular article.  You've never talked to
20 Dr. Sedlacek; that's correct?
21     A.  I already answered that, I have not.
22     Q.  Okay.  And other than these other papers
23 that you purport exist that are from 2009 or 2010,
24 you're not aware of any other publications that
25 Dr. Sedlacek has ever done on persistent or

Page 310

1  of TAX 316.
2      A.  Well, I think this is part of where he
3  gets his conclusions from.  But I already told you,
4  I -- TAX 316 data is in here, shows double,
5  essentially; and then he interprets it and he links
6  it to that.  So I think my assessment is not
7  inconsistent with what I read in his paper.
8      Q.  Have you talked to Dr. Namini?
9      A.  No, I have not.
10     Q.  So this is just your interpretation
11 linking one statement from one article to another
12 statement in the other part of the article?
13     A.  Not true.  He uses -- that's -- so as a
14 scien- -- that's -- I disagree with that.  Do you
15 want me to explain why?  I can tell you why I -- I
16 make that -- that -- that association.
17     Q.  No.
18     A.  Okay.  The scientific method issue.
19     Q.  All I was asking is as -- in the section
20 about TAX 316, does he talk about any of the TAX 316
21 being Taxotere-induced irreversible alopecia?
22     A.  I already answered that.
23     Q.  And?
24     A.  He doesn't use those specific words.
25     Q.  Okay.  Thank you.  Those are

Page 311

1  Dr. Plunkett's words; correct?
2      A.  The sentence in my report is absolutely
3  Dr. Plunkett's words.
4      Q.  Okay.
5      A.  But I -- but I would suggest that it is
6  consistent with when you read that paper as a whole.
7      Q.  Okay.
8          (Defendants' Exhibit 18 was marked for
9      identification.)
10         MR. MICELI:  I figured we'd see this.
11     Q.  (By Mr. Ratliff)  Dr. Plunkett, you've
12 been handed what's been marked as Exhibit -- you
13 actually tell me, ma'am.
14     A.  18.
15     Q.  18.  Okay.
16         Have you seen this article before?
17     A.  I'm looking to see if I cite it in my
18 report.  Can you tell me if I cite it?  Let me look.
19 I'll look in my reference list.
20     Q.  You have not, but you're welcome to look
21 at it.
22     A.  Yeah.  So it's not cited in my report.
23     Q.  Okay.
24     A.  Have I ever seen it?  Was that your actual
25 ques- -- is that the next question?

Page 312

1      Q.  Well, let's -- let's break it down.  So
2  it's not cited in your report; correct?
3      A.  That is correct.
4      Q.  Okay.  And are you familiar with -- strike
5  this.
6          Is this an article or a study that you
7  have reviewed and considered in forming your
8  opinions in the expert report that you served on
9  October 21, 2019?
10     A.  I don't believe this is one that was part
11 of my weight of the evidence in my report.  I
12 have -- it seems like I have seen this before.
13 Maybe, if this -- can you tell me if this was put
14 forth before me at trial?  Because I don't recall
15 it, but -- there, but I don't know.
16     Q.  I'm just -- I'm just asking if this was a
17 document that you considered in forming your
18 opinions.
19     A.  It was not part of my weight of the
20 evidence as described in my report.
21     Q.  Okay.
22     A.  If it's on my reliance list, then I have
23 considered it.  And I can't answer that without
24 looking at that.
25     Q.  Okay.  I'll represent to you that this is

Page 313

1  not on your reliance list.
2      A.  Then obviously if it's not there, I did
3  not -- did not do that.
4      Q.  Okay.  You'll see that this was published
5  online on March 6, 2019.  That's in the bottom
6  left-hand corner?
7      A.  Yes.  I see that.
8      Q.  Okay.  You told us earlier that you last
9  ran a literature search to identify potentially
10 relevant medical literature for your report in
11 September of 2019?
12     A.  I did.
13     Q.  Was this an article that would have been
14 pulled up as part of that literature search?
15     A.  It's possible.  Again, I don't recall it,
16 but it's possible.  It -- it would fit some of the
17 keywords, but I can't tell you whether it would have
18 been entered into, you know, PubMed at the time I
19 did my search.
20     Q.  Right.
21     A.  So I can't answer that.
22     Q.  Okay.  But it does have many of the key
23 search terms that you said would have been included
24 when you do literature searches; correct?
25     A.  So not from the title.  So that's what I'd

Page 314

1  have to confirm. I need to know whether this one
2  was one that had an abstract online or just a title.
3       Based on the title, it isn't something I
4  necessarily would have -- if I didn't have an
5  abstract, would have called for. So that might
6  explain it, but I'd have to go to PubMed and look
7  for that.
8     Q. Okay. So persistent postchemotherapy
9  alopecia is not a term that would be relevant to you
10 for doing your literature searches.
11      Is that how I understand that?
12    A. No. That's not what I'm saying.
13    Q. Okay.
14    A. You want me to explain?
15    Q. No. That's fine.
16      Okay. So you have -- why don't you --
17 would you like a few minutes to go through this, or
18 would you like me to start asking you questions?
19    A. Let me very quickly just glance through
20 it. It will take me -- give me just two minutes. I
21 promise no more than that. I just want to look at
22 the tables and the information.
23    Q. Okay.
24    A. Okay. So go ahead and ask your question.
25 If I need to read any more, I will.

Page 315

1     Q. Okay. Now that you've had an opportunity
2  to review this, Dr. Plunkett, are you familiar with
3  this article? Strike that.
4       Now that you've had an opportunity to
5  review this, does it refresh your recollection as to
6  previously reviewing this article?
7     A. I don't believe I have -- I have seen this
8  article. It's very possible I have not. I don't
9  know.
10    Q. Okay. And then the title of the article
11 is "Assessment of Quality of Life and Treatment of
12 Outcomes of Patients with Persistent
13 Postchemotherapy Alopecia"; is that correct?
14    A. You read that correctly.
15    Q. Okay. And did you take -- take an
16 opportunity to look at who some of the authors of
17 this particular article are?
18    A. That, I didn't look at. I was reading the
19 findings, but I -- I can do that right now.
20    Q. Okay. Just tell me if there are any there
21 that are names that you recognize.
22    A. I recognize a -- I think I cite a paper
23 somewhere else by Dr. Sibaud.
24    Q. Yep.
25    A. And I believe Dr. Tosti, and --

Page 316

1     Q. Who's Dr. Tosti?
2     A. Antonella Tosti.
3     Q. Okay. What's her connection to this
4  litigation?
5     A. I don't know her. I believe she may be an
6  expert for Plaintiffs, but I've never read her
7  reports or heard her testimony.
8     Q. Okay.
9     A. I don't know about this case, but I
10 believe she was in the first case --
11    Q. Okay.
12    A. -- I was involved with.
13    Q. You at least are familiar with Dr. Tosti
14 as Plaintiffs' expert dermatologist in this
15 litigation?
16    A. That's not how I was originally familiar
17 with her. I'm familiar with her because she's
18 published in this area. That's how I first
19 recognized her name.
20    Q. I'm not interested in that. I'm curious
21 if you're generally familiar that she is Plaintiffs'
22 expert in dermatology in this litigation?
23      MR. MICELI: Object to the form --
24      THE WITNESS: I'd answer how I already
25    did. I believe she was in the first case. I

Page 317

1  don't know about --
2     Q. (By Mr. Ratliff) Okay.
3     A. -- in all cases.
4     Q. Okay. So you don't know if she issued
5  expert reports in this -- for Trial No. 2?
6     A. I don't, no.
7     Q. Okay. So this study looked at both PCIA
8  and what the authors refer to as endocrine-induced
9  alopecia. I think it's EI -- do I have that right?
10 EIAC. Endocrine-induced alopecia.
11    A. Those are the two acronyms, yes.
12    Q. Okay. And PCIA would be what you
13 described as -- they call it persistent alopecia;
14 correct?
15    A. That's correct.
16    Q. Okay. And do you find there to be -- when
17 you give -- when you talk about permanent alopecia,
18 does that -- do you use that synonymously with
19 persistent alopecia?
20    A. I could because that's used by both --
21 both types of -- some of the literature uses either
22 one.
23    Q. Right.
24    A. So we could do that if you would like. I
25 mean --

Page 318

1  Q.  I'm asking if that's how you -- how you
2  use those terms, just because you see those terms --
3  all kinds of different terms; correct?
4  A.  I do.  I call it, I think more
5  consistently in my report, permanent irreversible
6  alopecia.
7  Q.  Uh-huh.
8  A.  But certainly I don't disagree you could
9  use the word "persistent" as well.
10  Q.  Okay.  And have you ever heard the term
11  "EIAC"?
12  A.  This is the first paper where I've seen
13  that listed that way, but that doesn't mean that
14  it's not somewhere else.
15  Q.  Okay.  So endocrine therapy-induced
16  alopecia after chemotherapy, that's how that's --
17  that's defined.  So that's the first time you've
18  heard that -- that term; correct?
19  A.  It's the first time I've seen it in the
20  literature this way, yes.
21  Q.  Okay.  And if you look at under
22  "Methods" --
23  A.  Are you in the -- the paper, not the
24  abstract?
25  Q.  Sorry.  In the paper now.

Page 319

1  A.  Okay.  Okay.
2  Q.  So, actually, let's look at the beginning,
3  it says, "Incomplete hair regrowth six months after
4  completion of chemotherapy has been described as
5  persistent chemotherapy-induced alopecia and has
6  been reported for 30 percent of patients with breast
7  cancer treated with taxane-based chemotherapy."
8      Do you see that?
9  A.  I do.  I'm looking to what she cites, and
10  she's citing Kang, yes.  Okay.
11  Q.  Okay.  "Furthermore, up to 25 percent of
12  patients with breast cancer receiving adjuvant
13  endocrine therapy may develop endocrine
14  therapy-induced alopecia."
15      Do you see that?
16  A.  You read that correctly.
17  Q.  Okay.  Do you have -- do you have any
18  reason to dispute their percentage about the number
19  of patients who develop endocrine therapy -- or
20  adjuvant -- develop endocrine therapy-induced
21  alopecia?
22  A.  Well, I'm not familiar with the citation
23  so I can only say if it -- if they've cited it
24  correctly, it -- then I wouldn't disagree.  I -- but
25  I haven't looked at this Paper No. 4.

Page 320

1  Q.  Okay.  And this was an eight-year
2  retrospective multicenter cohort study conducted
3  between January 1, 2009, and July 31, 2017.
4      Would you agree with that?
5  A.  That's what is stated under "Methods,"
6  yes.
7  Q.  Okay.  So almost a -- a little under a
8  ten-year study; correct?
9  A.  Yes.  That's true.
10  Q.  Okay.
11  A.  Eight could be almost ten.
12  Q.  It says, "Patients were eligible if they
13  received only systemic cytotoxic chemotherapy with a
14  clinical diagnosis of PCIA or received chemotherapy
15  followed by endocrine therapies but the alopecia was
16  associated with the endocrine therapy."
17      Do you see that?
18  A.  I do.
19  Q.  Does that inform you as to how patients
20  were selected for this particular study?
21  A.  Well, actually, I think it's more
22  informative to look at the flow diagram --
23  Q.  I agree.
24  A.  -- but I -- I -- certainly I see that --
25  that you have read that correctly.  How about that?

Page 321

1  Q.  So if you look at the flow diagram, they
2  started with 385 potential patients; correct?
3  A.  Yes.
4  Q.  Okay.  And 193 of them were excluded for
5  various reasons; correct?
6  A.  Yes, that's true.
7  Q.  Okay.  So 192 ultimately were part of the
8  final study results; correct?
9  A.  That's correct.
10  Q.  Okay.  And they reported 98 of these
11  patients who had what they call persistent
12  chemotherapy-induced alopecia.
13      Do you see that?
14  A.  Yes.
15  Q.  And they define that as "Patients treated
16  with only cytotoxic chemotherapies incomplete hair
17  regrowth six months after the last chemotherapy
18  cycle."
19      Do you see that?
20  A.  I do.
21  Q.  And would you say that is consistent with
22  how others in the medical literature have defined
23  PCIA or however you want to call permanent hair
24  loss?
25  A.  Some of them will use the word "at least

Page 322
1  six months," but I would agree six months appears to
2  be the common -- minimum time period.
3      Q.  Right.  Okay.  And then there are 94
4  patients, let's say on the other side, that are the
5  endocrine-induced alopecia after chemotherapy.
6      Do you see that?
7      A.  I do.
8      Q.  Okay.  And those were patients who had
9  chemotherapy, their hair grew back, and then they
10 started taking endocrine therapy and developed
11 alopecia.
12     Is that how you understand this study?
13     A.  Well, I'd just say that's what is stated
14 here, yes.
15     Q.  Yeah.
16     A.  Yes.
17     Q.  That's how the authors are reporting how
18 the study was conducted; correct?
19     A.  Yes.
20     Q.  Okay.  And just so we're all on the same
21 page, an endocrine therapy would be things like
22 tamoxifen or Arimidex or letrozole; correct?
23     A.  Those would fit, yes.
24     Q.  Those would fit.  Okay.
25         And we talked a little bit about tamoxifen

Page 323
1  earlier.
2      Would you go to page, I guess, E3.  It's
3  the first -- it's the table with the --
4      MR. MICELI:  There's page numbers down
5  here, Harley.  725?
6      THE WITNESS:  726?
7      MR. MICELI:  Do you not have that on
8  yours?
9      MR. RATLIFF:  No.
10     MR. MICELI:  Here, I'll trade you.  I'll
11 take the one with your numbers.
12     MR. RATLIFF:  No, sir.  Although they're
13 not that interesting, to be honest.
14     THE WITNESS:  (Indicating.)
15     MR. RATLIFF:  Yeah, that -- that's the one
16 we're looking at.
17     MR. MICELI:  Which one are we looking at,
18 Doctor?
19     THE WITNESS:  The second page.  There's
20 only one more page on the study other than
21 there's some corrections apparently or
22 supplemental materials at the back.
23     MR. MICELI:  Table of baseline
24 characteristics.  Is that what we're looking
25 at?

Page 324
1      THE WITNESS:  I would assume, yes.
2      Q.  (By Mr. Ratliff) Okay.  Yeah.  The table
3  that's labeled "Baseline Characteristics of Female
4  Patients with Cancer with Alopecia After Cytotoxic
5  Chemotherapy."
6      Do you see that?
7      A.  I do.
8      Q.  Okay.  And the far left-hand column is the
9  baseline characteristics.
10     Do you see that?
11     A.  I do.
12     Q.  And the next column would be the PCIA
13 column with the numerator of 98.
14     Do you see that?
15     A.  I do.
16     Q.  And that, your understanding, would be
17 there would be 98 patients -- 98 women who had been
18 treated with cytotoxic chemotherapy for breast
19 cancer that fell into the category of having been
20 clinically diagnosed with permanent
21 chemotherapy-induced alopecia.
22     Do you see that?
23     A.  I do.
24     Q.  Okay.  And then likewise, in the next
25 column, that would be the endocrine-induced alopecia

Page 325
1  after chemotherapy patients; and there would be 94
2  in that group.
3      Do you see that?
4      A.  I do.
5      Q.  Okay.  So if we go down and we look at the
6  section called "Therapies."
7      Do you see that?
8      A.  I do.
9      Q.  Okay.  And there we have -- what is the
10 first section -- what's the first category of
11 therapies?
12     A.  The first line?
13     Q.  Uh-huh.
14     A.  It says "taxanes."
15     Q.  The one that says "taxane-based
16 chemotherapy"?
17     A.  Oh, I'm sorry.  I was in the first column.
18 Yes.
19     Q.  Sorry.  In the baseline characteristics.
20        And so we see taxanes represented -- a
21 taxane-based -- strike that.
22        A taxane-based chemotherapy.  Would your
23 understanding, Dr. Plunkett, based on all of the
24 research that you've done in forming your opinions
25 in this report that a taxane-based chemotherapy

Page 326

1  would be a tax -- combination chemotherapy that
2  involves a taxane?
3      A.  Yes.
4      Q.  Okay.  You would not read that to be a
5  taxane monotherapy; correct?
6      A.  That's a good question.  He's not --
7  they're not really specific.  I'd have to -- I'd
8  have to investigate further in here to tell you if I
9  agree or disagree.
10     Q.  Okay.
11     A.  I would expect there to be at least some
12 combination therapy.
13     Q.  Okay.  And --
14     A.  Oh, they tell you here.  So, actually, if
15 I read the next column, I'm not really sure whether
16 it would indicate that combo could be combo with
17 other drugs or I assume they mean combination of
18 both Taxol and Taxotere.  So that's unusual.
19     Q.  Okay.  So you don't know one way or the
20 other?
21     A.  I can't tell from this table only.
22     Q.  Okay.
23     A.  I'd have to read the -- if you want me to
24 go and look and see if I can figure it out, I'll
25 try.

Page 327

1      Q.  Okay.  And of the taxane-based
2  chemotherapies, which taxane was reported with the
3  greatest incidence of permanent chemotherapy-induced
4  alopecia?
5          MR. MICELI:  Object to the form.
6          THE WITNESS:  So I can't say this is a,
7      quote/unquote, incidence.  There are more case
8      reports of paclitaxel as compared to docetaxel.
9      Q.  (By Mr. Ratliff)  Okay.
10     A.  But this doesn't have a denominator, a
11 full denominator of total treated at the center, so
12 I can't tell you if it's an incidence or not.  I
13 would say it -- it's not likely an incidence.
14     Q.  Well, we have -- certainty have a
15 denominator of the total patients that were
16 considered; correct?
17         MR. MICELI:  Object to the form.
18         THE WITNESS:  But if -- that's true, but
19     if many more patients were treated with
20     paclitaxel as compared to docetaxel, the
21     incidences could be the same or it could be
22     that docetaxel could be higher.  I don't know.
23     That's -- that's the issue.  That's why the
24     clinical trial data is so important in this
25     case for 316 in the way I formed my opinions.

Page 328

1      Q.  (By Mr. Ratliff)  Because with all of the
2  literature that we've looked at that's cited in your
3  report, whether it's talking about Taxotere, whether
4  it's talking about Taxol, whether it's talking about
5  a non-taxane-based chemotherapy, few, if any, of
6  them have a denominator; correct?  Taking apart the
7  clinical trials.
8      A.  The clinical trials are the only ones that
9  have a true denominator, and that's important -- why
10 that evidence in this case for Taxotere is so
11 important.
12     Q.  So, for example, when Dr. Bourgeois
13 reports that there are 80 cases of what he calls
14 permanent chemotherapy-induced alopecia after
15 FEC-100, what we don't know is how many patients in
16 France were treated with that particular
17 chemotherapy regimen; correct?
18     A.  That is correct, we do not know.
19     Q.  So --
20     A.  So, again, it's part of the weight of the
21 evidence; but the clinical trials is where you would
22 have to go to get --
23     Q.  Okay.
24     A.  -- an incidence date.
25     Q.  Okay.  So whether we're going to call it

Page 329

1  incidence or not, of the number of case reports in
2  this article, this study, this nearly ten-year study
3  performed by Dr. Tosti --
4          MR. MICELI:  Object to the form.
5          Go ahead.  I'll clear this up later.
6      Q.  (By Mr. Ratliff)  There were 59 percent of
7  those cases involved Taxol and not Taxotere;
8  correct?
9          MR. MICELI:  Object to the form.
10         THE WITNESS:  What was your number again?
11     Q.  (By Mr. Ratliff)  59 percent.
12         MR. MICELI:  Object to form.
13         THE WITNESS:  I would agree that there's a
14     59, if that's what you're asking me, the 47 out
15     of 80?
16     Q.  (By Mr. Ratliff)  Yes.
17     A.  With the 59?  I agree that's what is
18 reported.
19     Q.  Okay.  So --
20     A.  In table -- the table on baseline
21 characteristics.
22     Q.  Okay.  The 47 of the 80 patients who had
23 PCIA or 59 percent of the total PCIA population in
24 the study had taken Taxol and not Taxotere; correct?
25     A.  I wouldn't put it quite that way.  I would

83 (Pages 326 - 329)

Page 330

1  say 59 percent of the cases that were -- that were
2  identified as taxane-based chemotherapy.  That's how
3  I would -- I would state it.
4      Q.  Okay.  Fair enough.
5          But in any event, there was a higher
6  percentage and a higher number of case reports
7  involving Taxol than Taxotere; correct?
8      MR. MICELI:  Object to the form.
9      THE WITNESS:  I would agree that the
10     numbers are higher.  But, again, I wouldn't use
11     this to say that this shows an increased risk
12     because of the issue of not having the
13     denominator.
14     Q.  (By Mr. Ratliff)  All -- understood.  All
15  I'm asking for is just a simple confirmation that in
16  the most recent article that you did not consider
17  from 2009 authored by Plaintiffs' expert
18  Dr. Antonella Tosti, her ten-year study showed that
19  there were more cases of Taxol-based permanent
20  chemotherapy-induced alopecia than docetaxel-based
21  chemotherapy-induced alopecia?
22     MR. MICELI:  Object to the form.
23     Q.  (By Mr. Ratliff)  Do you agree with that?
24     A.  So obviously I wouldn't state it that way
25  because I would not characterize her as Plaintiffs'

Page 331

1  expert.  I would say that Dr. Tosti is listed here.
2      Q.  Uh-huh.
3      A.  The corresponding author is a different
4  person, Lacouture, which indicates to me that that's
5  the person that was responsible for the majority of
6  the conduct of the study.
7          However, I don't disagree that you're
8  correct in stating that there were in the -- in this
9  particular -- these particular cases they collected,
10 more cases with paclitaxel.  I would agree that that
11 is true.
12     Q.  And this was a study, besides being an
13 eight-year study, was one where they actually
14 performed a clinical diagnosis to confirm that it
15 was PCIA in these patients?
16     MR. MICELI:  Object to the form.
17     Q.  (By Mr. Ratliff)  Do you agree with that?
18     A.  I'm looking to see if they did an -- I
19 mean, I -- I agree that that was things that they
20 attempted to do.  The question is -- I'm having is
21 did they do it on every patient, and that's what I'm
22 looking for.
23         If you know it's here, you can tell me,
24 but certainly that was the intent, to look at those
25 endpoints in all the patients.

Page 332

1      Q.  In the methods it says, "Patients were
2  eligible if they received only systemic cytotoxic
3  chemotherapy with a clinical diagnosis of PCIA."
4      A.  I agree, that is there.  You've read that
5  correctly.
6      Q.  Okay.  So at the very least, we -- in this
7  paper, we have 47 reports of patients who have a
8  clinical diagnosis of permanent chemotherapy-induced
9  alopecia and were treated with a paclitaxel based
10 chemotherapy, whether that's paclitaxel on its own,
11 paclitaxel in combination with other standard
12 chemotherapy backbones.
13     A.  You're asking if that's true?
14     Q.  Yeah.
15     A.  I believe that we have read that into the
16 record.  That is true.
17     Q.  Okay.  But this is not something that you
18 considered as part of your report; correct?
19     A.  I don't recall this on my reliance
20 materials, no.
21     Q.  Okay.  And then if you'll just look at
22 just briefly the other column.  Well, I'm not quite
23 done with the PCIA column.  We'll -- we'll read
24 through it, though.
25         You also see that there were 13 reports of

Page 333

1  patients in this particular eight-year study who had
2  taken cyclophosphamide, methotrexate, and 5-FU who
3  also had been reported with a clinical diagnosis of
4  permanent chemotherapy-induced alopecia.
5          Do you see that?
6      A.  I do.
7      Q.  Okay.  Do you have any reason to dispute
8  that there is now a report of a -- at least some
9  percentage of patients who have been treated with
10 methotrexate, which is a chemotherapy, who have also
11 been reported with permanent chemotherapy-induced
12 alopecia?
13     A.  So I wouldn't state it quite that way.
14 I'd say methotrexate in combination here is being
15 reported here, yes.  But this alone does not allow
16 us to look at methotrexate by itself.
17         Do you understand what I'm saying?
18     Q.  So are -- is it your testimony that you --
19 you interpret that to be a -- a CMF regimen?
20     A.  Well, it says that; this, this, and this.
21     Q.  Okay.  So --
22     A.  So I -- I am.  I mean, unless you can
23 point me to somewhere else where something else is
24 stated.  That's how I would look at it.
25     Q.  Okay.  So then, at least according to this

Page 386

```
 1            C E R T I F I C A T E
 2
 3   STATE OF GEORGIA:
 4   COUNTY OF FULTON:
 5
 6
         I hereby certify that the foregoing transcript was
 7   taken down, as stated in the caption, and the
     questions and answers thereto were reduced to
 8   typewriting under my direction; that the foregoing
     pages represent a true, complete, and correct
 9   transcript of the evidence given upon said hearing,
     and I further certify that I am not of kin or
10   counsel to the parties in the case; am not in the
     regular employ of counsel for any of said parties;
11   nor am I in anywise interested in the result of said
     case.
12
13
14
15     [signature: Lee Ann Barnes]
16
       LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17
18
19
20
21
22
23
24
25
```

Page 387

```
 1           COURT REPORTER DISCLOSURE
 2
 3   Pursuant to Article 10.B. of the Rules and
     Regulations of the Board of Court Reporting of the
 4   Judicial Council of Georgia which states: "Each
     court reporter shall tender a disclosure form at the
 5   time of the taking of the deposition stating the
     arrangements made for the reporting services of the
 6   certified court reporter, by the certified court
     reporter, the court reporter's employer, or the
 7   referral source for the deposition, with any party
     to the litigation, counsel to the parties or other
 8   entity. Such form shall be attached to the
     deposition transcript," I make the following
 9   disclosure:
10
11   I am a Georgia Certified Court Reporter. I am here
     as a representative of Veritext Legal Solutions.
12   Veritext Legal Solutions was contacted to provide
     court reporting services for the deposition.
13   Veritext Legal Solutions will not be taking this
     deposition under any contract that is prohibited by
14   O.C.G.A. 9-11-28 (c).
15
16   Veritext Legal Solutions has no contract/agreement
     to provide reporting services with any party to the
17   case, any counsel in the case, or any reporter or
     reporting agency from whom a referral might have
18   been made to cover this deposition. Veritext Legal
     Solutions will charge its usual and customary rates
19   to all parties in the case, and a financial discount
     will not be given to any party to this litigation.
20
21
22     [signature: Lee Ann Barnes]
23   LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25
```

Page 388

```
 1   Palmer Lambert, Esq.
 2   plambert@gainsben.com
 3                          November 22, 2019
 4   RE:   In Re: Taxotere Products Liability Litigation
 5       11/19/2019, Laura Massey Plunkett, MD (#3771300)
 6       The above-referenced transcript is available for
 7   review.
 8       Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-ny@veritext.com
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22            Yours,
23            Veritext Legal Solutions
24
25
```

Page 389

```
 1   In Re: Taxotere Products Liability Litigation
 2   Laura Massey Plunkett, MD (#3771300)
 3           E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Laura Massey Plunkett, MD              Date
25
```