UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br><br>Audrey Plaisance, Case No. 2:18-cv-08086<br>Clare Guilbault, Case No. 2:16-cv-17061 |

**MEMORANDUM IN SUPPORT OF
<u>HOSPIRA'S MOTION TO EXCLUDE OR LIMIT OPINIONS OF DR. DAVID ROSS</u>**

**TABLE OF CONTENTS**

BACKGROUND ..................................................................................................................2

LEGAL STANDARD..........................................................................................................4

ARGUMENT ......................................................................................................................6

I. THE COURT SHOULD EXCLUDE DR. ROSS'S OPINION REGARDING "NEWLY ACQUIRED INFORMATION" ..................................................................6

    A. Dr. Ross Failed To Review the Regulatory Record and To Perform Any Analysis of the CBE Criteria ......................................................................6

    B. Dr. Ross's Reliance on Other Experts Does Not Save His Opinions. .............14

II. THE COURT SHOULD EXCLUDE DR. ROSS'S OPINIONS THAT HOSPIRA DID NOT COMPLY WITH POST-APPROVAL REGULATORY RESPONSIBILITIES. ....................................................................16

CONCLUSION..................................................................................................................17

**INTRODUCTION**

Plaintiffs Guilbault and Plaisance proffer Dr. David Ross to offer the expert opinion that, before either Plaintiff received treatment with docetaxel, Hospira[1] unilaterally should have changed the labeling on the product to say, "Cases of permanent alopecia have been reported."[2] The Court should bar Dr. Ross from presenting that opinion at trial because he fails the most basic tests for admissibility under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993): he neither did the "homework" nor performed the analysis necessary to offer a helpful, relevant and reliable expert opinion.

A pharmaceutical manufacturer cannot change the FDA-approved labeling unilaterally unless it possesses "newly acquired information," as defined by the Changes Being Effected ("CBE") regulation, 21 C.F.R. § 314.70 (b) & (c)(6)(iii). Information is not "newly acquired information" unless it meets three conditions. It must be information: (1) "not previously submitted to [FDA]," 21 C.F.R. § 314.3(b); (2) that "reveal[s] risks of a different type or severity or frequency than previously included in submissions to FDA," *id.*; and (3) reflects "evidence of a causal association" between the drug and the risk, *id.* § 314.70 (c)(6)(iii). But Dr. Ross, in his expert report, does not even cite the CBE regulation, and his analysis does not acknowledge the first and second conditions, much less demonstrate that the information available to Hospira satisfied those conditions. And, in his deposition, Dr. Ross admitted that he never reviewed the regulatory record for Hospira's docetaxel, so has no knowledge of what information Hospira provided to the FDA pre- or post-approval and therefore cannot possibly know whether the information possessed by Hospira after 2011 was meaningfully different from the information it

---

[1] "Hospira" refers to Defendants Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc. and Hospira, Inc.

[2] Plaintiff Guilbault began treatment in September 2013; Plaisance, in January 2014. We use the latter date for purposes of this motion and the simultaneously filed motion for summary judgment because Plaisance, at least, could maintain a claim if Hospira had "newly acquired information" before January 2014.

1

possessed and submitted to the FDA before 2011.[3] Indeed, he shrugged off the regulatory record as irrelevant.[4] Emblematic of his casual approach, Dr. Ross's expert report for these two cases did not name Ms. Guilbault or Ms. Plaisance (the reports named the Trial 3 plaintiffs), and, at his deposition, he did not know when either Plaintiff was treated with Hospira's docetaxel.[5]

By definition, Ross's opinion that Hospira should have changed the labeling unilaterally is unreliable, because he did not undertake the review of the regulatory record necessary to determine whether Hospira possessed "newly acquired information." It is doubly unreliable because he did not apply the CBE regulation, with its three criteria for unilaterally submitting a labeling change, to the facts. Dr. Ross's opinion is mere *ipse dixit*, which *Daubert* forbids.

## BACKGROUND

Plaintiffs first disclosed Dr. Ross as an expert in this litigation in June 2020, when he submitted a report for potential Trial 3 cases against 505(b)(2) defendants Accord Healthcare, Inc. (*Hughes*), Sandoz Inc. (*Stewart*), and Hospira (*Sanford*). His report in these cases is identical, such that it refers to Ms. Sanford and never mentions Plaintiffs Guilbault or Plaisance.

Accord and Sandoz moved to exclude Dr. Ross's opinions in the Trial 3 cases for several reasons, including that he could not opine reliably on whether the companies possessed "newly

---

[3] For the same reason, Dr. Ross cannot offer opinions as to any alleged inadequacies of Hospira's pharmacovigilance programs. He did not meaningfully review the programs, or Hospira's submissions to or communications with the FDA.

[4] Ex. A, Deposition of David Ross, M.D., *Hughes v. Accord Healthcare, Inc.*, No. 2:17-cv-11769 & *Stewart v. Sandoz, Inc.*, No. 2:17-cv-10817 (Aug. 31, 2020) ("Aug. 31, 2020 Ross Dep.") at 271:25-272:13 (wouldn't be able to say what FDA did or didn't have when it approved Accord's NDA); *id.* at 348:12-350:14 (doesn't know whether or when any literature submitted to FDA); Ex. B, Deposition of David Ross (Mar. 4, 2021) ("Mar. 4, Ross Dep.") at 242:23-243:10, 244:19-245:2 (saying same during *Kahn* deposition); *id.* at 244:5-12 (whether Sanofi submitted to FDA a January 2011 Clinical Overview analyzing reports of permanent alopecia was irrelevant).

[5] Ex. C, Deposition of David Ross, M.D. (Sept. 30, 2021) ("Ross Dep.") at 27:15-23.

acquired information" when he had failed to review the regulatory record.[6]  As to Accord, Dr. Ross admitted that he "would not be able to tell you what FDA did or didn't have in its possession at the time of approval."[7]  And, as to Sandoz, he admitted that he did not review even its New Drug Application ("NDA") submission, stating that reviewing it would not have "affect[ed] [his] conclusions."[8]  At oral argument, the Court rightly expressed concern about Dr. Ross's failure to review the regulatory record:

> If [Dr. Ross] did not carefully review the initial record that was presented to the FDA at the time of [the 505(b)(2) defendant's] application and approval, then I am concerned as to whether or not he can speak to what they should have done post-approval with newly acquired information because he's got to have known what was in that initial packet to see whether or not the FDA was provided this information.[9]

But the Court did not rule on the Accord and Sandoz *Daubert* motions because it granted summary judgment in *Hughes* and *Stewart*.[10]

In these cases, too, Dr. Ross failed to review the regulatory record.  He did not review the twelve volumes of data Hospira submitted in support of its docetaxel NDA, nor the Periodic

---

[6] *See* ECF Nos. 11446 & 11468.  Because the Court granted summary judgment for Hospira on case-specific grounds, Hospira did not depose Dr. Ross or file a *Daubert* motion in the *Sanford* case.  *See* ECF No. 10807.

Sanofi filed a *Daubert* motion on different grounds.  ECF No. 12576-1; *see In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (July 14, 2021), ECF No. 13063 ("*Kahn*") (denying Sanofi's motion).  Sanofi argued that Dr. Ross's opinions were inadmissible because he was "unwilling or unable to identify the facts and data that provide the foundation for his opinions" and improperly relied on Dr. Madigan's FAERS analysis.  ECF No. 12576-1 at 3-4, 8.

[7] Ex. A (Aug. 31, 2020 Ross Dep.) at 271:25-272:13.

[8] Ex. D, Deposition of David Ross Deposition of David Ross, M.D., *Hughes v. Accord Healthcare, Inc.*, No. 2:17-cv-11769 & *Stewart v. Sandoz, Inc.*, No. 2:17-cv-10817 (Aug. 27, 2020) ("Aug. 27, 2020 Ross Dep.") at 89:25-91:18.

[9] Ex. H, *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, Transcript of Oral Argument on Motions, MDL No. 16-2740, at 57:23:58:7 (E.D. La. Feb. 10, 2021), ECF No. 1228612286 ("OA Tran."); *see also id.* at 55:22-56:2.

[10] *See* ECF Nos. 12521, 12494.

3

Safety Update reports, Periodic Adverse Experience reports and NDA annual reports submitted to the FDA by Hospira, nor the full record of correspondence between Hospira and the FDA regarding docetaxel. From the voluminous documentary record, he reviewed only the six documents cherry-picked for him by Plaintiffs' counsel, plus two more.[11] Thus, this motion presents, in part, the same issue considered, but not decided, by the Court in connection with the Accord and Sandoz *Daubert* motions. But Dr. Ross's failure to review the regulatory record points to a more fundamental flaw in his opinion. Not only did Dr. Ross not do the **homework** necessary to render an opinion about whether Hospira had "newly acquired information" (i.e., reviewing the regulatory record), but he also did not do the **analytical work** of connecting the dots (i.e., showing what information available to Hospira (i) had not previously been submitted to the FDA, (ii) showed that permanent hair loss occurred with greater frequency, and (iii) reflected a potential causal relationship between docetaxel and permanent alopecia).

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under the Rule, the witness must be qualified as an expert, and her opinions must be both reliable and relevant. *See* Fed. R. Evid. 702. Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *Daubert* instructs courts to serve as gatekeepers, "impos[ing] a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'" *Kumho Tire Co.*, 526 U.S. at 147 (alteration in original) (quoting *Daubert*, 509 U.S. at 589); *see Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 881 (5th Cir. 2013).

---

[11] His "List of Documents Reviewed" contained a "Hospira Documents" section that listed only eight documents: two related to FDA approval, two labels, two internal Hospira documents from 2017 (years after Plaintiffs were treated), and two related to foreign regulators. Ex. E, Report of David Ross, M.D., Ph.D., M.B.I. (June 8, 2020) ("Ross Rep.") C-1-7. Apart from the regulatory record, Dr. Ross bases his opinions on the deposition testimony of two former Hospira employees, primarily Jurgen Schmider. *Id.* ¶¶ 30-31, 130-137.

4

Under Rule 702, the expert must be "qualified to testify in a particular field or on a given subject," based on her "knowledge, skill, experience, training, or education." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). The Court then assesses whether the opinion is reliable and relevant. *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

To assess reliability, the Court considers whether the reasoning and methodology underlying the expert's testimony is "valid and can be reliably applied to the facts of the case." *Id.* This "analysis applies to all aspects of an expert's testimony," including the "methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation marks and citation omitted). If the opinion is based on mere "subjective belief or unsupported speculation," then the Court should exclude it. *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("Since *Daubert* … parties relying on expert evidence have had notice of the *exacting standards* of reliability such evidence must meet." (emphasis added)). The party offering the expert testimony bears the burden of establishing that the expert's findings and conclusions are reliable. *See Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)).

The Court also evaluates whether the testimony is relevant. In assessing relevance, the Court considers whether the expert's "reasoning or methodology 'fits' the facts of the case." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015); *see also Daubert*, 509 U.S. at 591 (discussing Rule 702's relevancy requirement in terms of "fit"). In other words, the expert opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Sandifer*, 907 F.3d at 809 (quoting Fed. R. Evid. 702).

Finally, Federal Rule of Evidence 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if (1) they are of the kind reasonably relied

5

upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect. Fed. R. Evid. 703.

**ARGUMENT**

Dr. Ross's opinions concern only the period after the FDA approved Hospira's label in March 2011. He has nothing to say about: (1) whether Hospira met its pre-approval regulatory obligations; (2) whether the FDA properly approved Hospira's 505(b)(2) NDA; or (3) whether Hospira's docetaxel label was adequate as of FDA approval in March 2011.[12] His opinions are that (1) Hospira should have submitted a CBE labeling change before January 2014 to add, "Cases of permanent alopecia have been reported;" and (2) Hospira did not comply with post-approval FDA requirements because it did not submit a CBE label change regarding permanent alopecia.

The first opinion is unreliable, both because Dr. Ross did not make a meaningful review of the regulatory record and did not analyze or explain how the information available to Hospira before January 2014 meets the criteria for "newly acquired information." The second opinion is irrelevant, as the opinion that Hospira did not meet its post-approval responsibilities merely leads back to the opinion that Hospira should have unilaterally changed the labeling to say, "Cases of permanent alopecia have been reported."

**I.     THE COURT SHOULD EXCLUDE DR. ROSS'S OPINION REGARDING "NEWLY ACQUIRED INFORMATION"**

    **A.     Dr. Ross Failed To Review the Regulatory Record and To Perform Any Analysis of the CBE Criteria**

Dr. Ross does not dispute that the Hospira labeling was adequate as of March 2011, when the FDA approved Hospira's NDA. Plaintiffs did not ask Dr. Ross to address the adequacy of the labeling as of that date, and he has no opinion on that subject.[13]

---

[12]   Ex. C (Ross Dep.) at 107:21-108:3.

[13]   Ex. C (Ross Dep.) at 107:9-19 (" Q. … [Y]ou're not offering any opinion that the Hospira label for docetaxel approved by FDA was inadequate at the time of approval in March of

6

Because Dr. Ross does not dispute the adequacy of the Hospira labeling as March 2011, only if Hospira had "newly acquired information"—i.e., only if the three conditions for a CBE labeling change were met—can Ross opine that the company should have added the sentence, "Cases of permanent alopecia have been reported," to the labeling after March 2011, without prior FDA approval.[14] The law is clear—and Dr. Ross does not question—that "[g]enerally, a drug manufacturer cannot change the labeling without FDA approval." *Silverstein v. Boehringer Ingelheim Pharms., Inc.*, 2020 WL 6110909 at *7 (S.D. Fla. Oct. 7, 2020). The "narrow exception to the ban on a manufacturer unilaterally changing the drug's label" is found in the CBE regulations, which permit a manufacturer to act unilaterally if it possesses "newly acquired information." For information to be "newly acquired information" for purposes of making a CBE submission, three conditions must be met. First, the information must be "data, analyses, or other information not previously submitted to [FDA]." 21 C.F.R. § 314.3(b). Second, the information must "reveal risks of a different type or severity or frequency than previously included in submissions to FDA." *Id*. And, third, the information must reflect "evidence of a causal association" between the drug and the risk. 21 C.F.R. § 314.70 (c)(6)(iii).

The reliability of Dr. Ross's analysis is suspect on its face. His expert report does not quote, paraphrase or even cite the CBE regulation. Nowhere in his report does he acknowledge that "newly acquired information" must be information "not previously submitted" to the FDA and must reveal risks of "a different type or severity or frequency." And nowhere in his report does he analyze how the information he points to as somehow significant (several publications, Hospira's foreign labeling, information allegedly known to a Hospira executive by reason of his former employment at Sanofi, and adverse events reported to Hospira) meet the criteria for

---

2011. A. I was not asked to address that question. Q. And so you … will not be offering that opinion. Right? A. Correct.").

[14] *See* Mem. in Supp. of Hospira's Mot. for Summ. J. Re: Preemption (Nov. 12, 2021) ("Summary Judgment Mem.").

"newly acquired information."  Absent that showing, he cannot render a reliable opinion that Hospira could have changed the docetaxel labeling unilaterally.

Dr. Ross's 37-page report devotes only three pages to discussion of the information that, in his opinion, should have prompted Hospira to re-analyze what was known about docetaxel and permanent hair loss and to make a CBE submission.  He identifies three categories of information:  (1) the scientific literature and adverse-event data discussed by Drs. Feigal and Madigan (two other experts); (2) Hospira's own foreign labeling; and (3) the alleged knowledge of Dr. Juergen Schmider, who left Sanofi in 2013 to work for Hospira.  What is missing from his report, however, is any analysis that demonstrates for any specific item of information that it (i) had not been previously submitted to the FDA and (ii) revealed permanent hair loss as more frequent than previously reported.

It was impossible for Dr. Ross to make a comparison of the purportedly "new" information with what had been previously submitted to the FDA, because he did not review the regulatory record for Hospira's docetaxel—not the docetaxel NDA, the Periodic Safety Update reports, the Periodic Adverse Experience reports, the NDA annual reports submitted to the FDA, nor the full record of correspondence between Hospira and the FDA regarding docetaxel.[15]  "I would not be able to tell you what FDA did or didn't have in its possession" in March 2011, he testified.[16]  Even putting aside his ignorance of the regulatory record and the lack of any "baseline" for determining what was "newly acquired information," Dr. Ross's opinion is unsupported by analysis that explains how the purportedly "new" information "reveal[ed] risks of a different type or severity or frequency than previously included in submissions to FDA."

---

[15]  Ex. C (Ross Dep.) at 38:1-5, 42:9-43:1.

[16]  Ex. D (Aug. 27, 2020 Ross Dep.) at 271:25-272:13; *see also id.* at 347:11-15.

8

**The scientific literature**. Between them, Drs. Feigal and Madigan list 19 publications that concern docetaxel and alopecia.[17] But Dr. Ross does not discuss the publications one-by-one to show how each satisfies the criteria for "newly acquired information;" indeed, he does not discuss *any* of the 19 publications to make that showing. As we show in the summary judgment memorandum, filed simultaneously, none of the publications satisfy the criteria.[18] Of the 19, 14 either pre-date the FDA's March 2011 approval of Hospira's docetaxel or post-date Plaintiffs' use of the drug.[19] Of the five publications that could possibly constitute "newly acquired information" because they fall between March 2011 and January 2014, none reported that permanent hair loss was more frequent than reported in the scientific literature before March 2011. Quite the opposite: three of the five publications reported that permanent hair loss was less frequent (occurring at a rate of 0.059, ~2 or 3.9 percent, as compared to the 6+ percent reported in 2001 and 2006) or that the prevalence rate was unknown.[20] Thus, there is a gaping hole in Dr. Ross's analysis: he does not explain how the publications reveal risks of "a different type or severity or frequency;" he simply asserts that "[t]here was adequate scientific literature available prior to Ms. Sanford's [*sic*] initial infusion date."[21] That kind of leap is an earmark of unreliability. *GE v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

---

[17] We refer to "publications," not "articles" or "studies," because a substantial portion of the publications are nothing more than case reports, often submitted as letters to the editor or presented at conferences in poster form.

[18] *See* Summary Judgment Mem.

[19] Dr. Ross does not know when any of that literature was submitted to FDA or by whom. Ex. D (Aug. 27 Ross Dep.) at 348:12-350:14; Ex. B (Mar. 4 Ross Dep.) at 242:23-243:10, 244:19-245:2.

[20] Summary Judgment Mem. at 17-18.

[21] Ex. E (Ross Rep.) ¶ 136.

9

Also an earmark of unreliability is Dr. Ross's indirection and evasive language. When he opines, "[t]here was adequate scientific literature available prior to Ms. Sanford's [*sic*] initial infusion date," he fails to say "adequate" to what purpose. It is telling that he does not say, "there was adequate scientific literature available prior to Ms. Guilbault's initial infusion date ***to constitute "newly acquired information, as defined by the CBE regulations***," just as it is telling that nowhere in his report does he cite the CBE regulation and nowhere does he claim that any of the information discussed constitutes "newly acquired information."

**Foreign labeling**. Beyond the scientific literature, Dr. Ross opines that Hospira should have made a CBE labeling change because its labeling in certain foreign countries included the sentence, "Cases of permanent alopecia have been reported." Sanofi first, followed by Hospira and other 505(b)(2) manufacturers, made the change based on data from the TAX316 study, and it is undisputed that Sanofi submitted the interim TAX316 data to the FDA before March 2011.[22] This fact means that the data was "previously submitted" and did not meet even the threshold condition for a CBE labeling change.[23]

**Purported knowledge of Dr. Schmider**. The same failure of analysis characterizes Dr. Ross's third category of purported "newly acquired information"—the alleged personal knowledge of Dr. Juergen Schmider, who was Vice President of Safety Surveillance and Product Safety for Sanofi from March 2011 through April 2013, then Global Vice President of Pharmacovigilance and Product Safety for Hospira. Dr. Ross opines that Hospira had "unique" knowledge about the risk of permanent hair loss, because Dr. Schmider allegedly knew about the basis for Sanofi's application to the European Medicines Agency to revise the labeling to

---

[22] Indeed, Sanofi submitted the data three times (in March, June and August 2004) and each time requested FDA permission to identify permanent alopecia as a "persistent reaction"—requests that the FDA rejected. Ex. I, Expert Report of Marianne C. Mann, M.D. (Oct. 8, 2021) ("Mann Rep.") at 24.

[23] The final TAX316 data did not differ in any material respect from the interim data regarding permanent alopecia.

identify alopecia as a "persistent" reaction, and somehow that knowledge can be imputed to his later employer Hospira.[24]

First, however, Dr. Schmider did not start working at Hospira until 2013, so any information in his possession cannot possibly form the basis of Dr. Ross's opinion that Hospira had sufficient information to change its label "sometime in 2012."[25]

Second, the basis for amendment of the foreign docetaxel labeling was data from the TAX316 clinical trial—data that had been "previously submitted" to the FDA. Even had it not been previously submitted, however, Dr. Ross offers no analysis of how the TAX316 data reveals risks of "a different type or severity or frequency," again failing to apply the CBE criteria to the facts and making the kind of analytical leap deemed suspect in *General Electric Co. v. Joiner*.[26]

Third, Dr. Schmider's testimony makes clear that he did not have "unique" knowledge that he brought with him to Hospira.[27] Dr. Ross mischaracterizes his testimony or speculates about what he knew.[28] Because Dr. Ross did not review the regulatory record, he was not aware that Sanofi's basis for its European label change—the "unique" information that he opines

---

[24] Ex. E (Ross Rep.) ¶¶ 131-32.

[25] Ex. C (Ross Dep.) at 177:1–16

[26] It is a connection that cannot be made. *See* Summary Judgment Mem. at 18 (explaining that the TAX316 data revealed an incidence rate of only 3.9 percent (according to Dr. Feigal), a lower rate than previously reported in the scientific literature).

[27] Dr. Schmider testified that he was not involved in creation of the Sanofi Core Data sheet or Sanofi's European labeling changes for docetaxel, and that he had no recollection of being aware of permanent hair loss as an issue while at Sanofi. Ex. F, Deposition of Juergen Schmider (June 17, 2019) ("Schmider Dep.") at 143:5-12, 163:2-11, 118:24-120:2, 124:19-125:19, 127:6-13, 131:20-132:8, 137:23-138:5.

[28] Dr. Ross's expert report cites only three pages from Dr. Schmider's deposition that concern what he supposedly knew about permanent hair loss while at Sanofi. Dr. Ross claims, for example, that Dr. Schmider had knowledge of Sanofi's communications with foreign regulators regarding Taxotere and permanent hair loss, Ex. E (Ross Rep.) ¶ 132, but that is incorrect. Ex. F (Schmider Dep.) at 159:1-160:23 (testifying that he did not recall receiving the report referenced in footnote 95 of Dr. Ross's report and had reason to doubt that he ever received it because he was not listed on the original distribution email).

Hospira knew through Dr. Juergen—was the TAX316 data, which had been "previously submitted" to the FDA before Hospira's approval in 2011.[29]

**Adverse event reports**. Dr. Ross also opines that adverse event data from the FAERS database showed a signal "from as early as 2000"[30]—an opinion based solely on what other experts contend, as Ross did not review the database himself.[31] As Plaintiffs' expert, Dr. Madigan, admitted, there was no safety signal in 2012 that was not already present since the early 2000s.[32] Apart from Dr. Madigan's admission, the fact is that by 2016 Hospira had received only two adverse event reports of permanent hair loss where docetaxel was the sole suspect drug.[33] Again, Dr. Ross did not even review the adverse event reports sent to Hospira, much less provide any analysis that explains how two reports (out of 161,000 women treated with Hospira's docetaxel) signaled a greater frequency of permanent hair loss.[34]

Absent analysis that shows how this information—the scientific literature, the foreign labeling, the adverse event reports, etc.—meets the criteria for "newly acquired information," all that Dr. Ross offers is a conclusory opinion, which is not sufficient to satisfy the *Daubert* standard for admissibility. When opinions are conclusory, then the expert can render them freely regardless of the facts, as Dr. Ross has done in this litigation. To date, Dr. Ross has offered opinions against four different defendants (Sanofi, Accord, Sandoz, and Hospira), identifying a different date as to each when it should have changed the docetaxel labeling via the CBE

---

[29] Ex. D (Aug. 27, 2020 Ross Dep). at 346:14-347:25 (agreeing that the TAX316 data had been available to FDA "for years" by the time it approved Hospira's 505(b)(2) NDA in 2011).

[30] Ex. E (Ross Rep.) ¶ 95.

[31] *See* Part I.B *infra*.

[32] Ex. J, Deposition of David Madigan (Sept. 17, 2021) ("Madigan Dep.") 76:11-12, 76:16-79:18.

[33] Summary Judgment Mem. at 22.

[34] Nor did Dr. Ross provide any analysis, in the alternative, to explain why the presence of confounding drugs in other reported cases of alopecia could be disregarded or otherwise accounted for.

regulation, although opining as to Hospira that "I don't believe it's possible to say … you know, on this date."[35]



Regarding the 505(b)(2) Defendants, even though Dr. Ross addresses all three in the same report, he identifies a different date when each Defendant should have submitted a CBE change based on "newly acquired information."[36]

    Naked expert conclusions are not helpful to the trier of fact. Nor are they reliable. The standard-of-care expert who seeks to testify that the defendant doctor committed malpractice must do more than declare that he did so; he must explain *how* defendant's care violated the standard. So, here, in order for Dr. Ross to satisfy the *Daubert* test for admissibility, it was imperative for him to show *how* the scientific literature, the foreign labeling, etc. constituted information that (i) had not been previously submitted to the FDA and (ii) revealed that permanent hair loss occurs more frequently than reported before. Because Dr. Ross did not make that showing, the Court should exclude his opinion that Hospira should have submitted a CBE labeling change.

---

[35]   Ex. C (Ross Dep.) at 177:1-16. The most Dr. Ross could say was "sometime in 2012." *Id.*

[36]   *See* Ex. D (Aug. 27, 2020 Ross Dep.) at 311:21-312:3 (testifying that Accord Healthcare could have updated its label within 90 days of its approval on June 8, 2011, or by September 9, 2011); Ex. G, Deposition of David B. Ross (Sept. 10, 2020) ("Sept. 10, 2020 Ross Dep.") at 513:7-22 (testifying that Sandoz should have updated its label within 90 days of approval on June 29, 2011, or by September 30, 2011); Ex. C (Ross Dep.) at 177:1-16 (testifying that Hospira had sufficient information to change its label by "sometime in 2012").

### B. Dr. Ross's Reliance on Other Experts Does Not Save His Opinions.

The unreliability of Dr. Ross's analysis is underscored by his uncritical reliance on the conclusions of Drs. Madigan, Feigal, and Plunkett.

As an initial matter, none of these experts offers an opinion as to whether the information available to Hospira constituted "newly acquired information."[37] Thus, they have not performed the analysis that is lacking in Dr. Ross's report, and he cannot rely on them to fill that gap. Dr. Ross simply cites the scientific literature included in their expert reports, then fails to perform his own analysis of this data to explain how it meets the CBE criteria.[38]

Dr. Ross's reliance on Dr. Madigan's analysis of the FAERS database has additional problems. First, Dr. Madigan admitted that he did not identify a new signal after March 2011.[39] Thus, Dr. Ross is relying on a null set.

Second, Dr. Madigan's analysis is incomplete, and Dr. Ross did not follow through to finish it. Dr. Ross acknowledges that a thorough safety-signal analysis requires **both** signal identification and signal evaluation.[40] Dr. Madigan performed, at most, only a signal identification, as the Court has recognized.[41] Signal evaluation generally involves "hands-on case reviews," "analysis of other data sources [such as] FDA regulatory databases [and] public

---

[37] *See* Hospira's Mem. Supp. Mot. Exclude Feigal (Nov. 12, 2021); Hospira's Mem. Supp. Mot. Exclude Plunkett (Nov. 12, 2021).

[38] Dr. Ross also relies on opinions from Dr. Feigal and Plunkett that should be excluded for other reasons. *See* Ex. E (Ross Rep.) ¶ 91; Hospira's Mem. Supp. Mot. Exclude Feigal (Nov. 12, 2021) (moving to exclude Dr. Feigal's case-counting calculations); Hospira's Mem. Supp. Mot. Exclude Plunkett (Nov. 12, 2021) (moving to exclude Dr. Plunkett's biological plausibility opinions).

[39] *See supra* n.32.

[40] Ex. C (Ross Dep.) at 147:22-148:2.

[41] *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 29, 2021), ECF No. 12098 at 13-14 ("*Kahn II*"). As explained in Hospira's Motion to Exclude Opinions of Dr. David Madigan, filed simultaneously, Dr. Madigan did not conduct a valid signal identification analysis either.

scientific literature," and "further epidemiologic assessments"[42]—all things that Dr. Ross did not do.

Thus, in two respects, Dr. Ross is guilty of the "unblinking reliance" on another expert's opinion—an opinion that itself is only half an opinion and does not concern the relevant (post-March 2011) period. Such reliance renders his methodology unreliable. *JRL Enters., Inc. v. Procorp Assocs., Inc.*, No. 01-2893, 2003 WL 21284020, at *8 (E.D. La. June 3, 2003) (excluding expert's opinion where expert "merely accepted as true the facts given him by" the party that retained him and "performed no independent analysis of the numbers" he was given); *Kahn* at 9 ("To the extent she relies on opinions from Dr. Feigal, Dr. Bosserman did not validate these opinions in any way in her report. This is the kind of "unblinking reliance" on another expert's opinion that violates Federal Rule of Evidence 703."); *Deutz Corp v. City Light & Power, Inc.*, No. 1:05-cv-3113, 2009 WL 2986415, at *6 (N.D. Ga. Mar. 21, 2009) (experts are not permitted to "simply parrot the opinions of other experts" or use another expert's report "as substantive evidence of one of his ultimate conclusions").[43]

Third, in relying on Dr. Madigan, Dr. Ross has not applied the standards he applies as an expert outside the courtroom. Dr. Ross purports to apply the methodology he used as an FDA reviewer. But he exempts Dr. Madigan from both FDA standards and industry best practices. Asked whether Dr. Madigan followed FDA guidances or industry best practices, Dr. Ross responded, "these are guidances for industry, so I'm not going to look at that with respect to Dr. Madigan."[44] And asked whether Dr. Madigan followed the protocols applicable to an FDA officer, Dr. Ross responded, "it would be … potentially the wrong thing to do" because Dr.

---

[42] Ex. C (Ross Dep.) at 161:21-162:15.

[43] Sanofi, too, sought to exclude Dr. Ross's opinions based on his improper reliance on Dr. Madigan, but the issue presented here is different. Sanofi argued that Dr. Ross's report showed a "total reliance" on Dr. Madigan's incomplete signal detection analysis. ECF No. 13063 at 6. The issue here is whether Dr. Ross can invoke Dr. Madigan's signal identification when Dr. Ross did not follow through and perform a signal evaluation analysis.

[44] Ex. C (Ross Dep.) at 199:15-200:7.

Madigan is "not an FDA employee."[45]  If Dr. Madigan employed any recognized scientific standard (other than the FDA standards), Dr. Ross does not say what it is.  Thus, his adoption of Dr. Madigan's conclusion is not the product of any reliable methodology, but mere *ipse dixit*.[46]  He therefore should not be permitted to render any opinion that relies on Dr. Madigan's safety-signal analysis of adverse event reports (i.e., the FAERS database).

Finally, Dr. Ross relies on Dr. Madigan's meta-analysis of four observational studies—an analysis the Court has ruled inadmissible.  *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL 2740, 2021 WL 311865, at *6 (E.D. La. Jan. 29, 2011).  The Court should also bar Dr. Ross from relying on the meta-analysis.

## II.     THE COURT SHOULD EXCLUDE DR. ROSS'S OPINIONS THAT HOSPIRA DID NOT COMPLY WITH POST-APPROVAL REGULATORY RESPONSIBILITIES.

Dr. Ross's report asserts that Hospira "did not comply with their regulatory responsibilities regarding post-marketing surveillance, pharmacovigilance, and safety reporting to the FDA during the relevant time period" and did not "ensure that their products' labeling was at all times not false and misleading."[47]  This opinion has no relevance except insofar as it means that Hospira did not submit a labeling change to add, "Cases of permanent alopecia have been reported"—in which case the opinion is redundant and should be excluded for the reasons given in Part I.

---

[45]  *Id.* at 200:15–25.  Dr. Madigan admitted in his deposition that he did *not* follow the FDA best practices on signal identification or signal evaluation.  Hospira's Mem. Supp. Mot. Exclude Madigan (Nov. 12, 2021) at 7-10.

[46]  Almost needless to say, his opinions were only formed after he was approached by plaintiffs' lawyers and have never been published or subjected to peer review.  *See Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005) (noting that a court "assessing the scientific reliability of expert testimony" may consider "whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation").

[47]  Ex. E (Ross Rep.) ¶¶ 30-31.

## CONCLUSION

For these reasons, the Court should exclude Dr. Ross's opinion that Hospira unilaterally could have changed the labeling after March 2011 and before January 2014. It could not have done so, because it did not have "newly acquired information," as defined by the CBE regulations.

Dated: November 12, 2021

Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Telephone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., Hospira Worldwide, LLC, and Pfizer Inc.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                                            /s/ *Heidi K. Hubbard*