# EXHIBIT A

1          David B. Ross, M.D., Ph.D., M.B.I.

2              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
3

4    - - - - - - - - - - - - - - - -

5    IN RE: TAXOTERE

6    (DOCETAXEL) PRODUCTS         MDL Number: 2740

7    LIABILITY LITIGATION         Section H(5)

8    This Document Relates to:    Hon. Jane Milazzo

9    Alice D. Hughes vs. Accord   Magistrate Judge
     Healthcare, Inc., Case       Michael B. North
10   Number 2:17-cv-11769

11     - and -

12   Wanda Stewart v. Sandoz,     Section N(5)
     Inc., Civil Case No.
13   2:17-cv-10817
     - - - - - - - - - - - - - - - -+
14

15

16          Remote Videotaped Deposition of

17            DAVID B. ROSS, M.D., Ph.D., M.B.I.

18                      (Volume 2)

19                Monday, August 31, 2020

20                      9:16 a.m.

21

22

23   Job No. 183201

24   Reported by: Laurie Donovan, RPR, CRR, CLR

25

Page 267

David B. Ross, M.D., Ph.D., M.B.I.
materials. If over the years Sanofi had communications with FDA regarding that portion of the label, did you review it all, in any year prior to two thousand -- November and December of 2015?

MR. FRAXEDAS: Object to form.

THE WITNESS: Again, nothing comes to mind, but I will also say that if there was such correspondence, I would have considered it, but in general, that would not have altered my conclusions.

BY MR. MORIARTY:

Q  Hypothetically, Dr. Ross, if the evidence shows that Sanofi gave everything that Drs. Feigal, Plunkett and Madigan suggest should have been given to FDA, and proposed changes to the alopecia part of the label, and FDA rejected those proposed changes, would that affect your opinions in this case?

MR. FRAXEDAS: Object to form.

THE WITNESS: I can't speak to hypotheticals. I can say that in ten and a half years with the FDA, I never saw -- the only time I would see a situation like that

Page 268

David B. Ross, M.D., Ph.D., M.B.I.
is if the agency felt that the sponsor was understating the severity of the problem.

BY MR. MORIARTY:

Q  Well, Dr. Ross, we are entitled to ask hypothetical questions, but can you answer my hypothetical other than the answer you've already given?

MR. FRAXEDAS: Object to form.

THE WITNESS: So can you repeat the question again?

BY MR. MORIARTY:

Q  Yes. If the evidence shows that Sanofi gave FDA everything that Drs. Madigan, Feigal and Plunkett suggest that they should have, and asked for changes to the alopecia part of the label -- the proposed changes, I should say, to the alopecia part of the label, and FDA rejected the proposed changes, would that affect your opinions in this case?

MR. FRAXEDAS: Object to form.

THE WITNESS: It would depend -- it would depend on the rationale that the agency gave. Again, it's hypothetical. You know, certainly if there is such correspondence, I

Page 269

David B. Ross, M.D., Ph.D., M.B.I.
would be happy to take a look at it and provide an answer based on what actually happened, but just to repeat a basic principle here, FDA is in charge of enforcing the Food, Drug & Cosmetic Act. Manufacturers are responsible for complying with it.

BY MR. MORIARTY:

Q  Between 1996 and 2015, did FDA ever unilaterally revise the Taxotere patient brochure, specifically the portion regarding hair loss?

A  Can you clarify what you mean by "unilaterally revise"?

Q  Yes. Without prompting, requesting or proposing by Sanofi.

A  Respectfully, the -- I, I can't answer that question, because the FDA is not the NDA holder. It's the manufacturer's product. I mean the FDA has certain authorities at, at various times, but it's not the FDA's NDA. So I just -- I, I'm -- the FDA doesn't print it, it doesn't distribute the drug. I, I -- so I'm sorry. Respectfully, I don't understand the question.

Q  Okay. It seems to me from your answer you find it hard to believe that FDA would ever do

Page 270

David B. Ross, M.D., Ph.D., M.B.I.
that. My question is: Do you know whether, in fact, they ever did it between 1996 and 2015?

MR. FRAXEDAS: Object to form.

THE WITNESS: So it, it's not -- I'm sorry, Mr. Moriarty. I'm trying to address your question, but the FDA, as far as I know -- and perhaps there's some counter example. I would be happy to look at it. The FDA cannot do that with regard to any drug, and that includes generics.

I mean they can take various enforcement actions, but they themselves do not revise the label. I, I'm just -- I mean they don't print the label. The FDA can't just say, well, we're going to print up a new label and ship it off to pharmacies and say -- I mean the FDA doesn't do that.

BY MR. MORIARTY:

Q  If FDA unilaterally told Sanofi to revise it, do you know whether they did that? I'm not asking whether they printed it themselves and stuck it on drug packages.

A  Well --

Q  Do you know whether they ever

```
                                                              Page 271
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2   unilaterally revised it and told Sanofi that's the
 3   new label or that's the new section?
 4            MR. FRAXEDAS:  Object to form.
 5            THE WITNESS:  So again, I, I --
 6   BY MR. MORIARTY:
 7       Q    I just want to know if you know if they
 8   did that, not how incredible you find it.  I just
 9   want to know, from your review of the materials,
10   whether that happened.
11            MR. FRAXEDAS:  Object to form.
12            THE WITNESS:  So I am not aware of
13       any instance prior to enactment of the FDA
14       Amendments Act in 2007 in which the FDA
15       applied for, through judicial proceedings, to
16       enforce a change in the label with respect to
17       permanent alopecia or, after 2007, issued a,
18       what's known as a labeling safety order with
19       respect to this, under Section 505.04, I
20       believe it is, of the Act, with regard to
21       permanent alopecia.
22            So that's the best I can answer
23       your question.
24   BY MR. MORIARTY:
25       Q    Do you have any reason to dispute that
```

```
                                                              Page 272
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2   FDA had all of Sanofi's clinical trial
 3   information, post-marketing adverse event reports,
 4   and other studies up through June of 2011 when it
 5   approved Accord Healthcare, Inc.'s docetaxel
 6   505(b)(2) application?
 7            MR. FRAXEDAS:  Object to form.
 8            THE WITNESS:  So again with the
 9       understanding that my opinions concern
10       post-approval actions, I actually would not
11       be able to tell you what FDA did or didn't
12       have in its possession at the time of
13       approval.
14   BY MR. MORIARTY:
15       Q    Okay.  In a, in a general setting --
16   well, would you agree that Accord Healthcare, Inc.
17   would not have access to Sanofi's proprietary
18   clinical information, clinical trial information?
19            MR. FRAXEDAS:  Object to form.
20            THE WITNESS:  With the caveat that
21       that is not the question that determined my
22       conclusions, I would agree with that.
23            THE REPORTER:  I'm not sure I got
24       the answer exactly right.
25            THE WITNESS:  Well, let me -- I'm
```

```
                                                              Page 273
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2   sorry.  I'm going to start leaning a little
 3   closer.
 4            I said with the caveat that that
 5       actually did not determine the regulatory --
 6       my regulatory conclusion, I would agree with
 7       that, with what Mr. Moriarty asked about.
 8   BY MR. MORIARTY:
 9       Q    Well, do you agree that Accord would not
10   have access or communication between FDA and
11   Sanofi that occurred post-, post-approval?
12            THE REPORTER:  You said post or
13       pre?
14            THE WITNESS:  Again -- sorry.  Go
15       ahead.
16            THE REPORTER:  You said
17       "post-approval" or "post- or pre-approval"?
18            MR. MORIARTY:  Post-approval.
19            THE REPORTER:  Okay.
20            MR. FRAXEDAS:  Same objection.
21            THE WITNESS:  So with the same
22       caveat that that fact would not affect my
23       conclusions, yes, I would agree with that.
24   BY MR. MORIARTY:
25       Q    And I assume, then, that you'd agree
```

```
                                                              Page 274
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2   that Accord wouldn't have access to Sanofi's
 3   post-marketing adverse event data; that your
 4   answer would be the same, correct?
 5       A    Not completely.  Along with the caveat
 6   that I previously expressed, any data provided
 7   by -- post-marketing data provided by Sanofi to
 8   FDA, which was subsequently made publicly
 9   available through the FDA adverse event reporting
10   system, would be available to the entire public.
11       Q    Now, I know you read some NDA submission
12   material regarding Hospira.  That's mentioned in
13   your reliance list, correct?
14       A    Yes.
15       Q    And we keep calling it "reliance list."
16   You actually call it "list of documents reviewed."
17   Fair, if we're talking about the same thing, can I
18   use that shortcut?
19       A    Yes.
20       Q    Did you read any NDA materials from a
21   company called Actavis?
22       A    Not to the best of my recollection.
23       Q    Did you read any NDA information from
24   companies Pfizer or Sun Pharma?
25       A    Not to the best of my recollection.
```

Page 275

David B. Ross, M.D., Ph.D., M.B.I.

Q    Do you know when FDA approved applications by Actavis, Pfizer or Sun Pharma to market docetaxel?
A    I don't.
Q    Do you have any information to indicate whether the Actavis, Pfizer and Sun Pharma approved labeling was consistent with what the Reference Listed Drug Taxotere label was at that time?
A    So I think I know what you mean by "Reference Listed Drug," but because that term is generally applied to abbreviated NDAs, I'm going to just say assume Taxotere -- and I don't know anything about these drugs -- an NDA, you're referring to it in the context of an NDA that those sponsors relied on, or the, those sponsors relied on the agency's findings of safety and effectiveness. I don't, I don't know anything about that.
Q    Okay. Are you aware of any reason why FDA would accept a pharmaceutically and therapeutically equivalent drug under 505(b)(2) who have different warnings on the, as I'm calling it, the "RLD," or in this case Taxotere?

Page 276

David B. Ross, M.D., Ph.D., M.B.I.

A    I don't know if it's a matter of what FDA would expect about this in terms of what the regulations say in terms of NDA holders' obligations.
Q    Well, if, for example, a company files a 505(b)(2), and the drug is pharmaceutically and therapeutically equivalent to Taxotere, and they ask for FDA to have the [same] warnings, that would be appropriate from a regulatory standpoint, wouldn't it?
        MR. FRAXEDAS: Object to form.
        THE WITNESS: Sure. Could you repeat? I didn't hear all the entire question here.
BY MR. MORIARTY:
Q    That was pretty convoluted.
        THE REPORTER: Do you want me to read it, counsel?
        MR. MORIARTY: Yeah, that would be great, Laurie. Thank you.
        (Whereupon, reporter reads requested material.)
BY MR. MORIARTY:
Q    It should be "the same warnings."

Page 277

David B. Ross, M.D., Ph.D., M.B.I.

        Go ahead, Doctor.
A    Thank you.
        MR. FRAXEDAS: Object to form.
        THE WITNESS: It, it depends. This is not a generic, which is a duplicate. 505(b)(2)s may be different in some respects from the original product and still be pharmaceutically and therapeutically equivalent. You know, in terms of -- for example, I'll just take -- well, actually, this could apply to anything. There may be differences in terms of the formulation excipients, which -- for example, or dilution mechanisms that could result in different warnings.
        So it's not something where I would say generally, unless we were saying it is -- unlike generics, which must, in general, have the same dosage form, strength, route of administration, and conditions for use, those can differ between a 505(b)(2) and the NDA that it is basing the -- on which the sponsor is requesting approval. So it really depends on the details.

Page 278

David B. Ross, M.D., Ph.D., M.B.I.
BY MR. MORIARTY:
Q    And it may, as you said, or it may not require a different warning, right?
A    I would phrase it more, even more generally than that. I would say it may require differences in labeling that would include differences in warning, precautions, adverse events, and so on.
Q    Okay. When there are several manufacturers making a particular drug product, and, like here, they are interchangeable, doesn't FDA strive for uniformity in its -- in the labeling of those drugs?
        MR. FRAXEDAS: Object to form.
        THE WITNESS: Depending on the, A, the signs, and B, the information that actually is submitted to the agency, they strive for it, but the primary consideration is does the label provide adequate directions for its intended use, and that would override uniformity at the cost of communicating those adequate directions.
BY MR. MORIARTY:
Q    Doctor, if there is not uniformity --

Page 347

```
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2              MR. FRAXEDAS:  Object to form.
 3              THE WITNESS:  I, I honestly don't
 4     know.
 5  BY MR. MORIARTY:
 6     Q    Is it significant to your opinions?
 7     A    Is it significant to my opinions?
 8     Q    Is the fact of when that data was given
 9  to FDA significant to your opinions?
10              MR. FRAXEDAS:  Object to form.
11              THE WITNESS:  I'm -- the question I
12     analyzed was not when things became available
13     to FDA.  It's when it became available to the
14     NDA holders.  That's the regulatory question
15     I analyzed.
16  BY MR. MORIARTY:
17     Q    Okay.  So as far as you know, the
18  results, the interim and then final results of
19  TAX316 were available for years to FDA?
20     A    I'm sorry.  Did you say "to FDA" or
21  "through FDA"?
22     Q    To FDA.
23     A    So your question is -- as far as I know,
24  they were available for years to FDA.  I'm going
25  to, I'm going to accept that.
```

Page 348

```
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2     Q    Okay.  There was a study called GEICAM
 3  9805.  I referred to that earlier.  Do you know
 4  who gave it to FDA or when?
 5              MR. FRAXEDAS:  Object to form.
 6              THE WITNESS:  With the caveat that
 7     again my analysis was not focused on when
 8     information became available to FDA, it was
 9     when it became available to NDA holders, I
10     don't know.
11  BY MR. MORIARTY:
12     Q    Let me ask you about some medical
13  articles that Drs. Madigan, Feigal and Plunkett
14  referred to, and then I believe you referred to
15  them in your report as footnotes.
16          There is a Dr. Sedlacek,
17  S-E-D-L-A-C-E-K, who made a presentation in 2006.
18  Do you know when the data underlying his paper was
19  given to FDA or who gave it to FDA?
20              MR. FRAXEDAS:  Object to form.
21              THE WITNESS:  So again, with the
22     caveat that my analysis focused on the
23     availability of new information to the NDA
24     holders, not the FDA, no, I don't know.
25
```

Page 349

```
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2  BY MR. MORIARTY:
 3     Q    Why do you have to keep giving the
 4  caveat?  Can't you just answer no, you don't know?
 5     A    Well, respectfully, no, because I --
 6     Q    I'm asking do you think it's
 7  significant.  You're interpreting this and saying
 8  it's misleading so you can make a speech.  I'm
 9  asking very simple questions, Doctor.
10          Dr. Prevevas, P-R-E-V-E-V-A-S, published
11  an article in 2009.  Do you know who gave it to
12  FDA or when?
13              MR. FRAXEDAS:  Object to form.
14              THE WITNESS:  So with the caveat
15     that every question I addressed is when
16     information became available to the NDA
17     holders, no, I don't know when it was given
18     to the FDA.
19  BY MR. MORIARTY:
20     Q    Doctor Bourgeois, B-O-U-R-G-E-O-I-S,
21  wrote an article in 2010.  Do you know who gave
22  that information to FDA or when?
23              MR. FRAXEDAS:  Object to form.
24              THE WITNESS:  With the caveat that
25     my regulatory analysis, the regulatory
```

Page 350

```
 1            David B. Ross, M.D., Ph.D., M.B.I.
 2     question that I needed to answer is when it
 3     became available to NDA holders, no, I don't
 4     know.
 5  BY MR. MORIARTY:
 6     Q    Maybe to shortcut this, Doctor, do you
 7  know when or who gave the following three medical
 8  articles to FDA?  Dr. Talen's 2010 article,
 9  Dr. Mitevasvs, M-I-T-E-V-A-S-V-S, article in June
10  of 2011, Dr. Kluger's 2012 article; do you know
11  who gave it to FDA or when?
12              MR. FRAXEDAS:  Object to form.
13              THE WITNESS:  Same answer as before
14     with the caveat.
15              MR. MORIARTY:  Ms. Callsen, would
16     you do me a favor, please, and put up our tab
17     7?  That's Exhibit 18.
18              (Exhibit 18 was marked for
19              identification.)
20  BY MR. MORIARTY:
21     Q    Doctor, I'm going to circle back to the
22  approval of the CBE, and I will represent to you
23  that the signature date from the FDA at the end of
24  this document is July 26, 2016.
25          Do you have any reason to dispute me on
```

Page 351
```
 1         David B. Ross, M.D., Ph.D., M.B.I.
 2    that?
 3        A    I'm sorry.  Say the date one more time.
 4        Q    Doctor, do you see the exhibit on your
 5    screen?
 6        A    I don't.  I'm sorry.
 7        Q    Okay.  We have a technical issue.  Let
 8    me see if I can ask some questions while we fix
 9    our technical problems.  I'm going to have to log
10    back in.  It will take a minute, but I need to ask
11    about these.
12             Do you now see the document?
13             MR. FRAXEDAS:  There we go.  You
14        got him now.
15    BY MR. MORIARTY:
16        Q    All right.  This is the July 26, 2016
17    letter from FDA, and I believe you've seen this
18    and it's in your reviewed materials, correct?
19        A    I believe that is correct.
20        Q    All right, and it says in the second
21    paragraph -- from the beginning it just says when
22    FDA received certain information, and then it
23    says, "This Changes Being Effected supplemental
24    new drug application provides for revisions to
25    align with the current package insert for the
```

Page 352
```
 1         David B. Ross, M.D., Ph.D., M.B.I.
 2    Reference Listed Drug Taxotere."
 3             Do you see that?
 4        A    Yes.
 5        Q    And in the next section it says, "We
 6    have completed our review of the supplemental
 7    application, as amended.  It is approved,
 8    effective on the date of this letter, for use as
 9    recommended in the enclosed, agreed-upon labeling
10    text."
11             Did I read that correctly?
12        A    Yes.
13        Q    All right.  So back in December when
14    Accord sent the proposal, is it, is it your
15    testimony that FDA expected Accord to immediately
16    implement the changes before sending out an
17    approval letter similar to the one in Exhibit 18?
18             MR. FRAXEDAS:  Object to form.
19             THE WITNESS:  No, that's not
20        exactly what I'm saying.
21    BY MR. MORIARTY:
22        Q    All right.  From a practical standpoint,
23    does it make sense for a pharmaceutical company to
24    order, print, pay for, and begin to use labels
25    that the FDA may later say are not approved or to
```

Page 353
```
 1         David B. Ross, M.D., Ph.D., M.B.I.
 2    suggest some revisions to it?
 3             MR. FRAXEDAS:  Object to form.
 4             THE WITNESS:  So again I'm -- let
 5        me answer, but this -- respectfully, the
 6        premise is that, oh, the FDA might turn us
 7        down, and then we've got to pull everything
 8        back.
 9             I have never seen that happen, and
10        that's during my time at FDA and since,
11        unless, as I mentioned, there was a company
12        submitting something as a CBE supplement, and
13        the FDA said, no, wait a minute, wait, you're
14        understating things, and converted them to a
15        prior approval supplement.  Never seen that
16        happen.
17             So does it make sense?  Yes, it
18        does, because you're talking -- what you're
19        talking about is a nonexistent risk.  If FDA
20        says, you know, we think it should be phrased
21        like this, and it's not a major change,
22        they're not going to make them pull it all
23        back.  They're going to say at the next
24        printing, please change it.
25
```

Page 354
```
 1         David B. Ross, M.D., Ph.D., M.B.I.
 2    BY MR. MORIARTY:
 3        Q    Do you know what discussions and
 4    amendments may have taken place between Accord
 5    Healthcare, Inc. and FDA between December 30, 2015
 6    and July 26, 2016?
 7             MR. FRAXEDAS:  Object to form.
 8             THE WITNESS:  No.
 9             MR. MORIARTY:  Could you go to our
10        tab 23, please.
11             I'm going to have another exhibit
12        marked.  It's Exhibit 19.
13             (Exhibit 19 was marked for
14             identification.)
15    BY MR. MORIARTY:
16        Q    And Doctor, if you could turn to your
17    report while that's getting teed up, to paragraph
18    112.
19             All right.  So it says -- you're talking
20    about the variation you just testified about, the
21    authority to retroactively block CBE supplements,
22    and in paragraph 112 you say, "On the other hand,
23    manufacturers may consult with the FDA before
24    submitting a CBE supplement.  Based on my
25    background, education, training and experience,
```

```
                                           Page 399                                                   Page 400
 1        David B. Ross, M.D., Ph.D., M.B.I.             1        David B. Ross, M.D., Ph.D., M.B.I.
 2                                                       2              E R R A T A   S H E E T
 3                                                       3    IN RE: TAXOTERE PRODUCTS LIABILITY LITIGATION
 4                                                       4    RETURN BY:
 5                                                       5    PAGE    LINE            CORRECTION AND REASON
 6          ACKNOWLEDGEMENT OF WITNESS                   6    ____    ____   _____
 7              I, David B. Ross, M.D. Ph.D.,            7    ____    ____   _____
 8    M.B.I., do hereby acknowledge that I have          8    ____    ____   _____
 9    read and examined the foregoing testimony,         9    ____    ____   _____
10    and the same is a true, correct and complete      10    ____    ____   _____
11    transcription of the testimony given by me,       11    ____    ____   _____
12    and any corrections appear on the attached        12    ____    ____   _____
13    Errata sheet signed by me.                        13    ____    ____   _____
14                                                      14    ____    ____   _____
15                                                      15    ____    ____   _____
16    _____  _____          16    ____    ____   _____
17    (DATE)            (SIGNATURE)                     17    ____    ____   _____
18                                                      18    ____    ____   _____
19                                                      19    ____    ____   _____
20                                                      20    ____    ____   _____
21                                                      21    ____    ____   _____
22                                                      22    ____    ____   _____
23                                                      23    ____    ____   _____
24                                                      24    _____ _____
25                                                      25    (DATE)          (SIGNATURE)
```

```
                                           Page 401
 1        David B. Ross, M.D., Ph.D., M.B.I.
 2
 3
 4
 5    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 6              I, Laurie Donovan, Registered
      Professional Reporter, Certified Realtime
 7    Reporter, and notary public for the District
      of Columbia, the officer before whom the
 8    foregoing deposition was taken, do hereby
      certify that the foregoing transcript is a
 9    true and correct record of the testimony
      given; that said testimony was taken by me
10    stenographically and thereafter reduced to
      typewriting under my supervision; and that I
11    am neither counsel for, related to, nor
      employed by any of the parties to this case
12    and have no interest, financial or otherwise,
      in its outcome.
13
              IN WITNESS WHEREOF, I have hereunto
14    set my hand and affixed my notarial seal this
      12th day of September, 2020.
15
16    My commission expires:  March 14, 2022
17
18    _Laurie Donovan_
19
20    LAURIE DONOVAN
      NOTARY PUBLIC IN AND FOR
21    THE DISTRICT OF COLUMBIA
22
23
24
25
```