# EXHIBIT B

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3     * * * * * * * * * * * * * * * * * * * * *
 4   ELIZABETH KAHN,                   CASE NO.
         Plaintiff,                    2:16-cv-15397
 5   v.
     SANOFI S.A.,
 6   SANOFI-AVENTIS U.S.,
     L.L.C., SANOFI US
 7   SERVICE, INC.,
         Defendants.
 8
 9
10     * * * * * * * * * * * * * * * * * * * * *
11
                       VIDEOTAPED
12                 EXPERT DEPOSITION
                          OF
13                 DAVID ROSS, M.D.
14       taken on Thursday, March 4, 2021
15          Commencing at 9:11 a.m.
16                       at
17                      Zoom
             Baltimore, Maryland
18
19
20
21
22
23
24
25
```

Page 238

1  Q.  Sitting here today, under oath, can you
2  tell me that you read the Nabholtz study?
3  A.  As I just said, I have to go back and
4  look at it.  So I don't want to guess.
5  Q.  You don't provide a citation to the
6  study, do you?
7       (Witness peruses document.)
8  A.  Uhmm, that's a citation.  And if you're
9  saying, well, it misses -- it doesn't have -- that's
10 a citation.  It's got the author first -- author's
11 name and year of publication.
12 Q.  Where did you first come across the
13 Nabholtz study?
14 A.  So I do not remember, okay?  I do know
15 that I thought that it was an important piece of
16 evidence.  But...
17 Q.  But you don't know if you read it?
18 A.  That is not what I said.  That is not
19 what I said.
20 Q.  I asked you do you know that you read
21 the Nabholtz study and you said that you couldn't
22 tell me.
23       MR. MICELI:  Object to the form.
24 A.  So again, I am saying here and
25 emphasized under oath, but with you I'm going to

Page 239

1  emphasize that I don't have that document in front
2  of me right now.  Okay?  And you're asking well,
3  where did you see it?  I have referenced Dr.
4  Feigal's report and Dr. Madigan's report.  And also
5  I mentioned Dr. Plunkett's report.  So I'm citing
6  that as evidence underlying that.  That doesn't
7  change.  It doesn't matter honestly, to my mind,
8  where I saw it.
9       If it may matter from your purposes, but
10 it doesn't change whether or not it's supportive.
11 Q.  Doctor, if you're going to call out in a
12 specific way in a sub-part like you did here the
13 Nabholtz study in your report, wouldn't you agree
14 that it's pretty darn important that you actually
15 read the study?
16      MR. MICELI:  Object to the form.
17 A.  Uhmm, well, I know this is going to
18 sound irradical (sic), but that is frequently done
19 if you know what the contents of the study are.  And
20 that is, if you look at any FDA review, they are
21 going to cite articles, again, that are no -- you
22 know, have been used to support various scientific
23 concepts.  It does not mean that they've gone
24 through and read them.  Okay?
25 Q.  Do you know whether or not --

Page 240

1       MR. MICELI:  He's not finished, Jon.
2  You can't just cut him off.
3       MR. STRONGMAN:  I thought he was done.
4  I am -- go ahead.  I'm going to object
5  after this because he's answered my
6  question.  But if you need to go on, why
7  don't you go on.
8       THE WITNESS:  I feel strongly that I
9  need to provide some context here.
10      It is an accepted practice in science,
11 in medicine, that if you have a piece of
12 evidence that supports your conclusion to
13 cite it, does not necessarily mean -- and
14 this is not unique to me -- that you've
15 analyzed it.  Certainly that happens with
16 foundational papers.  If this was the
17 only thing that I was citing, you could
18 say that.  But, for example, you know, if
19 I cite a paper by -- I don't know --
20 Robert Poe from the 19th century in an
21 article about bacteria, does that mean
22 that I went back and I read that paper?
23 No.  So that's not something nefarious.
24      If you were to look at any journal and
25 you look at the papers, there are people

Page 241

1  who have cited my papers.  They haven't
2  read them, but they know from the
3  abstract and other summaries what they
4  say.  If somebody says, well, that's not
5  really on point, okay, you can go and do
6  that.  But there is nothing wrong with
7  doing that.  Nothing.  I can't say that
8  more strongly.
9  BY MR. STRONGMAN:
10 Q.  Are you done with your answer, doctor?
11 A.  Yes.
12 Q.  What are the contents of the Nabholtz
13 study?
14 A.  You know, I am not going to quote from
15 memory.  And I'm not going to be bullied into trying
16 to quote from memory.  I'm just not.  If you want
17 to, you can pull it up.  And I can probably get it
18 off the Internet in two seconds.  But just because I
19 don't have a photographic memory, is not a sin.
20 Q.  Did you review the Sedlachek study?
21 A.  Yes.
22 Q.  Is it a published article or is it an
23 abstract?
24 A.  Sedlachek presented his work as an
25 abstract.  Again, I would have to look at my notes

Page 242

1  -- not notes, but what's on Dr. Feigal's report.  So
2  that's an important piece of evidence.
3     Q.   Do you know whether or not Dr. Sedlachek
4  ever published his abstract as a manuscript?
5     A.   No.  Again, I do not want to answer from
6  memory.  If this is a memory contest, then I would
7  have prepared much differently.  I understand that I
8  need to describe the bases for my opinion.  I have
9  never had someone tell me you must be able to quote
10 them from memory.  If that's the rule, that's fine.
11 But I need to know it going forward.
12    Q.   Doctor, you know, for the Nabholtz study
13 I wasn't asking you to quote it from memory.  I was
14 simply asking you to confirm that you've read it.
15         MR. MICELI:  Object to the form.
16    A.   So again, I've said I looked at a lot of
17 documents.  And I said I'm not willing to do that.
18    Q.   Okay.
19         And doctor, Dr. Sedlachek's abstract was
20 publicly available, correct?
21    A.   Sanofi knew about it, which is the
22 operative issue here.
23    Q.   My question was, doctor:  The abstract
24 that Dr. -- strike that.
25         The abstract that Dr. Sedlachek wrote

Page 243

1  was publicly available, correct?
2     A.   He presented them at the San Antonio
3  Breast Cancer Symposium in September of 2006.
4     Q.   Do you know whether the Sedlachek
5  abstract was ever sent to the FDA?
6     A.   By whom?
7     Q.   Anyone.
8     A.   Who?  Well, to send -- the -- so I do
9  not know exactly what Sanofi might have sent to the
10 FDA about Sedlachek or in what form.
11    Q.   Do you know what Sanofi submitted to the
12 FDA about Dr. Nabholtz's study?
13    A.   So again, I'm sorry, I'm going to insist
14 on doing this.  I don't off the top of my head.  But
15 that's not relevant.  What's relevant is did they
16 look at it and say, you know, we should submit a
17 supplemental NDA?  It's that simple.
18         The FDA enforces the law with regard to
19 labeling.  Sanofi is the one responsible for the
20 label.
21    Q.   Doctor, I didn't ask you who was -- are
22 you done answering?
23    A.   Yes.
24    Q.   I didn't mean to cut you off.  I didn't
25 ask you who was responsible for the label.  I didn't

Page 244

1  ask you whether you thought that it mattered, did I?
2          MR. MICELI:  Object to the form.
3          Argumentative.
4  BY MR. STRONGMAN:
5     Q.   The question that I asked was what do
6  you know about whether or not the Nabholtz data was
7  sent to the FDA by Sanofi?
8     A.   So I think what I was trying to say, Mr.
9  Strongman, it's irrelevant.  I don't know off the
10 top of my head.  But it's -- frankly, it's
11 irrelevant.  It was null-able to them.  That is the
12 key point.
13    Q.   You also talk in your report about the
14 2011 and 2015 clinical overviews in Paragraph No.
15 88, sub-part C.
16         Do you see that?
17         (Witness peruses document.)
18    A.   Yes.
19    Q.   Do you know whether or not the 2011
20 clinical overview was ever submitted to the FDA?
21    A.   Again, for my purposes of the opinions
22 that I was asked to provide, and I don't mean the
23 content that I was asked, but the subject, it's
24 irrelevant.  I don't know off the top of my head,
25 but it doesn't matter one way or the other.  What

Page 245

1  I'm saying is what's important is the supplemental
2  NDA be submitted.
3     Q.   Do you know whether or not any of the
4  patients that Dr. Sedlachek reported on in terms of
5  persistent alopecia received Taxotere according to
6  the FDA-approved regimen or an off-label regimen?
7     A.   I'm going to defer to Dr. Feigal and Dr.
8  Madigan on those questions.
9     Q.   That's not something that you know
10 sitting here; fair?
11    A.   It's not something that I needed to
12 know.  No, I don't know.
13    Q.   Do you know anything about any
14 conversations that Sanofi had with the FDA regarding
15 Dr. Sedlachek and his patients?
16    A.   Nothing comes to mind.
17    Q.   Doctor, when you discuss your background
18 in your expert report, you highlight the experience
19 that you had while at the FDA; is that true?
20    A.   That's one of the areas that I describe,
21 yes.
22    Q.   And would you agree that FDA personnel
23 or FDA medical reviewers are uniquely qualified to
24 render opinions on FDA regulatory or labeling
25 matters?

Page 246

1     MR. MICELI:  Object to the form.
2     A.   Uniquely qualified?  That is the
3  question that I'm going to have to ask you to
4  clarify.  I'm sorry.
5     Q.   Do you think that because you worked at
6  FDA you are particularly qualified to render
7  opinions on FDA regulatory and labeling matters?
8     A.   Uhmm, that's what I'm going to say.  I
9  am going to say I am not, not, not, not an attorney.
10 And I keep emphasizing that.  But as I understand
11 what the standards are for expert witnesses
12 providing evidence in the Federal judiciary system
13 and the requirements under -- I guess it's the
14 Daubert rule, that I believe I meet those criteria.
15    Q.   And a critical part of you meeting those
16 criteria has to do with the fact that you worked at
17 the FDA as an FDA reviewer, correct?
18         MR. MICELI:  Object to the form.
19    A.   So I guess the word "critical", I think
20 that is something I cite.  When you say "critical",
21 I just want to make clear are you saying someone who
22 hasn't been at the FDA could never serve as an
23 expert witness on regulatory issues?  I just want to
24 be clear that I understood the use of what the word
25 "critical" means here.

Page 247

1     Q.   What I'm saying is that your experience
2  at the FDA is a critical part of why you believe
3  you're qualified to offer opinions on regulatory and
4  labeling issues?
5         MR. MICELI:  Object to the form.
6     A.   What I would say is, that in terms of
7  the issue that I was asked to opine on, which is
8  what are the regulatory obligations -- let me go
9  back.  I'm sorry -- no, that's what I was asked to
10 do.  The regulatory obligations of drug
11 manufacturers for products approved under the FDCA,
12 with regard to Pharmacovigilance and labeling
13 obligations.  My opinions are based on my
14 regulatory, medical, scientific and clinical
15 education, training, knowledge and experience, in
16 reviewing and evaluating drug labels.  Ten years of
17 that was at the FDA.  So that's part of my --
18 obviously, it's an important part of my
19 qualifications.
20    Q.   Did you know that the Plaintiffs
21 provided Sanofi with a supplemental expert report
22 for Dr. Plunkett that also addressed regulatory
23 issues on the same day that they provided your
24 report to us?
25         MR. MICELI:  Object to the form.

Page 248

1         And I would instruct you not to
2         discuss anything that you may have
3         discussed with any counsel for the PSC.
4     A.   I, respectfully, based on retaining
5  counsel's -- I'm not able to discuss that,
6  respectfully.
7     Q.   Doctor, do you believe that someone who
8  has never worked in a regulatory department at a
9  pharmaceutical company and has never worked at the
10 FDA should be offering regulatory opinions?
11        MR. MICELI:  Object to the form.
12    A.   I am -- I would -- Well, Mr. Strongman,
13 and I'm -- I cannot -- I can't give an opinion on
14 it.  There's too many unknowns with that.
15    Q.   Did you review Dr. Plunkett's
16 supplemental expert report that was served on
17 February 8th?
18    A.   So in looking at my reliance list, my
19 list I mention or cite Dr. Plunkett's report of
20 March 13th, 2020.  I do not cite any other reports
21 by her.
22    Q.   Okay.
23        Doctor, I just wanted to confirm that
24 you indicated in your report that you are not
25 relying on any information in Dr. Madigan's, Dr.

Page 249

1  Plunkett's or Dr. Feigal's expert reports that
2  postdate May 29th, 2008, correct?
3         MR. MICELI:  Object to the form.
4     Q.   Doctor, I can help you if you look at
5  Paragraph No. 51 of your expert report.
6         (Witness peruses document.)
7     A.   Great minds think alike, because that's
8  where I just arrived.  So I just want to make sure
9  I'm quoting it accurately.  So any reliance upon
10 these expert reports is limited to information set
11 out that predates May 29th, 2008.
12    Q.   Doctor, you also mention internal
13 adverse events in Sanofi's database.  Do you know
14 what I'm talking about?
15    A.   Uhmm.
16    Q.   Try 57.
17        (Witness peruses document.)
18    A.   I was going to Paragraph No. 88.  I'm
19 not good with the technology here.  Here we go.
20    Q.   Are you there?
21    A.   Yes, I am.
22    Q.   So --
23    A.   Go ahead, I'm sorry.
24    Q.   Paragraph No. 57 includes a sentence
25 that says:  "In addition to Dr. Madigan's TRR FAERS

Page 278

C E R T I F I C A T E

　　　Certification is valid only for a transcript accompanied by my original signature and Original required seal on this page.

　　　I, Marybeth E. Muir, Certified Court Reporter in and for the State of Louisiana, and Registered Professional Reporter, as the officer before whom this testimony was taken, do hereby certify that DAVID ROSS, M.D., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 277 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships,

Page 279

as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

　　　This 8th day of March, 2021.


　　　_____
　　　MARYBETH E. MUIR, CCR, RPR