# EXHIBIT D

1          David B. Ross, M.D., Ph.D., M.B.I.

2            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
3

4    - - - - - - - - - - - - - - -+
                                  |
5    IN RE: TAXOTERE              |
                                  |
6    (DOCETAXEL) PRODUCTS         |    MDL Number: 2740
                                  |
7    LIABILITY LITIGATION         |    Section H(5)
                                  |
8    This Document Relates to:    |    Hon. Jane Milazzo
                                  |
9    Alice D. Hughes vs. Accord   |    Magistrate Judge
     Healthcare, Inc., Case       |    Michael B. North
10   Number 2:17-cv-11769         |
                                  |
11      - and -                   |
                                  |
12   Wanda Stewart v. Sandoz,     |    Section N(5)
     Inc., Civil Case No.         |
13   2:17-cv-10817                |
     - - - - - - - - - - - - - - -+
14

15

16          Remote Videotaped Deposition of

17          DAVID B. ROSS, M.D., Ph.D., M.B.I.

18                  (Volume 1)

19           Thursday, August 27, 2020

20                  9:00 a.m.

21

22

23   Job No. 183200

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

David B. Ross, M.D., Ph.D., M.B.I.
1   David B. Ross, M.D., Ph.D., M.B.I.
2   that, you know, the exhibits you referred to with
3   Andrea Rau and the exhibits for Brian Watson, that
4   those would include Sandoz documents.
5        Q    And other than those documents, the
6   Andrea Rau and Brian Watson exhibits and the
7   Sandoz documents in the materials reviewed, have
8   you been provided with any other Sandoz-produced
9   documents at all?
10       A    Again, without -- I can't say off the
11  top of my head.
12       Q    Well, how would I find out what other
13  documents you've reviewed other than by looking at
14  the contents of your expert report and what you've
15  listed in your materials reviewed?
16       A    Well, I just want to make sure I
17  understand.  You said "provided" versus
18  "reviewed."
19       Q    Okay.  I'll ask it again.
20            How would I find out what other
21  materials you reviewed other than what's listed in
22  your materials reviewed list and your expert
23  report citations?
24       A    Oh, okay.  I see what you're saying.  So
25  materials reviewed -- so this is for the report.

1   David B. Ross, M.D., Ph.D., M.B.I.
2   That's what I would have reviewed.  The same -- so
3   that, that would be it.
4        Q    Okay.  So the materials reviewed list as
5   well as the citations in your report -- I think
6   you said this before, but those are the sum total
7   of documents you reviewed related to Sandoz?
8        A    Related to the report that I produced.
9        Q    Well, would you, would you have reviewed
10  Sandoz documents outside of your, your analysis
11  that you provided in the report?
12       A    No.  That's not what I said,
13  respectfully.  Materials reviewed in connection
14  with this report are listed here.  Materials that
15  I may have reviewed after the report -- and I'm
16  specifically thinking of things such as FDA
17  reviews in preparation for this, would not be, but
18  those are not what I relied on for the report.
19       Q    Okay.  I think I understand now.
20            So subsequent to the reliance list you
21  have here from your expert report, have you been
22  provided with additional materials by plaintiffs'
23  counsel?
24       A    Not that I, not that I can recall.  I
25  really can't --

1   David B. Ross, M.D., Ph.D., M.B.I.
2        Q    Have you reviewed --
3        A    Go ahead.  I'm sorry.
4        Q    What materials have you reviewed
5   following your issuing of this report related to
6   Sandoz that are not on this list of materials
7   reviewed?
8        A    Did you say related to Sandoz?
9        Q    Yes.
10       A    So I mentioned FDA reviews of the
11  products.  I honestly can't think of any Sandoz
12  documents that would have been produced by Sandoz
13  that come to mind.
14       Q    And with respect to the FDA reviews,
15  what FDA reviews have you looked at?
16       A    So review -- and again, this was after
17  this report.  These were not used or relied on for
18  this report.  I can't say that strongly enough.  I
19  cannot say that strongly enough.
20       Q    Understood, and what were those FDA
21  reviews?
22       A    So the review of the original NDA from
23  Sandoz -- and I, the reason I was kind of
24  shuffling over that is I was trying to think, is
25  that -- am I just referring there to the labels or

1   David B. Ross, M.D., Ph.D., M.B.I.
2   the review itself, but -- I believe it was just
3   the label, but at any rate, the FDA review of the
4   505(b)(2), and for Sanofi, but that, again -- I
5   know you heard me.  I'm just going to say it
6   again.  That was not something relied on or
7   reviewed to write this report, okay?  So it's --
8   again, I very much understand the point that
9   you're making.  The best of my ability, I --
10  here's what I used to produce this, okay?  This is
11  the basis for my opinions.  If there's things --
12  and this is where I was getting a little confused.
13  If there's things that I reviewed after this,
14  first off, if I can refer to my report in
15  paragraph 22 -- and, you know, this is similar to
16  what Dr. Rosic and Dr. Agarwal said.
17            "I reserve the right to amend my
18  opinions and bases if further information and
19  evidence become available," so -- but in terms of
20  those things I'm describing -- and that's why I'm,
21  I'm, again, up a little -- it's -- the whole thing
22  is I'm not -- I'm a little confused, as what I
23  used to produce this report I believe is
24  accurately represented on that list.
25       Q    In your preparation of this report, you

```
 1          David B. Ross, M.D., Ph.D., M.B.I.
 2  didn't review the Sandoz NDA submission or
 3  supporting documentation for docetaxel, correct?
 4      A    I don't believe I have access to that.
 5      Q    That wasn't provided to you by your
 6  counsel?
 7      A    No.  I, I asked -- I, you know, the best
 8  I understand, that's commercial confidential
 9  information that belongs to Sandoz, so no.  I
10  asked about it, it was not available, and so I did
11  not have an opportunity to review it.
12      Q    You asked your counsel for the Sandoz
13  NDA submission, but it wasn't provided to you,
14  correct?
15          MR. FRAXEDAS:  Object to form.
16          THE WITNESS:  Counsel for
17      submission -- I indicated that, you know,
18      that would be something I would need to look
19      at in terms of -- not need to look at.  Let
20      me -- I don't mean that, but there, there
21      were certain questions, not ones connected
22      with this, but really would require looking
23      at the NDA, and -- the actual NDA itself, I
24      do not have that data, so -- that's what I
25      was told.
```

```
 1          David B. Ross, M.D., Ph.D., M.B.I.
 2  BY MR. MERRELL:
 3      Q    Reviewing the NDA -- reviewing the NDA
 4  submission for Sandoz with respect to docetaxel is
 5  something that was important to you in coming to
 6  your report, correct?
 7      A    No.  That's not what I said,
 8  respectfully.  Not what I said.
 9      Q    Reviewing the NDA submission was
10  something that you were interested in looking at
11  for purposes of analysis?
12          MR. FRAXEDAS:  Object to form.
13          THE WITNESS:  I, I wouldn't say
14      that either.  Honestly, I said there were --
15      you know, there's, there's questions that
16      would require looking at that, but not having
17      the answers to those questions would -- did
18      not affect my conclusions.
19  BY MR. MERRELL:
20      Q    What questions would those be?
21      A    Well, if, for example, there was
22  information that was not provided to FDA that, in
23  the NDA submission, you know, that would answer
24  the question, for example, if there had been --
25  and I'm not making any accusations here, but if
```

```
 1          David B. Ross, M.D., Ph.D., M.B.I.
 2  there -- in part of the NDA, certain requisite
 3  information was not provided and that wasn't the
 4  worst case fraud on the FDA, that would answer the
 5  question about whether that was something that led
 6  to the missing safety information on the label,
 7  that sort of thing.
 8      Q    Right.
 9      A    I want to be clear.  I'm not accusing
10  your client of anything.  I'm just saying that's
11  the kind of question I'm looking at here.
12      Q    You couldn't assess whether Sandoz
13  failed to provide the FDA with any information in
14  its NDA submission, because you didn't have the
15  NDA submission to analyze, correct?
16      A    Can you repeat the question?  Sorry.
17      Q    You couldn't assess whether Sandoz
18  failed to provide the FDA with any information as
19  part of its NDA submission for docetaxel, because
20  you didn't have the NDA submission to actually
21  analyze, correct?
22          MR. FRAXEDAS:  Object to form.
23          THE WITNESS:  No.  Just to be
24      clear, if -- because it's actually somewhat
25      broader than that.
```

```
 1          David B. Ross, M.D., Ph.D., M.B.I.
 2          If the information is there but is
 3  not incorporated into the labeling, for
 4  example, which certainly happens all the
 5  time, that information gets buried, that
 6  would mean the label as presented would be --
 7  would have been false and misleading, but
 8  again, I'm not saying that happened, but just
 9  to -- I know this is not something we -- this
10  line I had, but evidence of the new safety
11  information is available, certainly, at the
12  time of approval, was so substantial that
13  it's my assumption that it just either wasn't
14  in there or wasn't effectively communicated
15  to the FDA.
16          You know, certainly I'm always
17  willing to consider new information, but
18  unless Sandoz says, oh, yes, here it is, we
19  put it in this section, we put a big sticker
20  on it saying to FDA it's here, that would be
21  my, that would be my presumption.
22          MR. MERRELL:  Object as
23  nonresponsive.
24          MR. FRAXEDAS:  Cliff, we've at
25  about another hour and a half.  Are you at a
```

David B. Ross, M.D., Ph.D., M.B.I.

1   materials.  If over the years Sanofi had
2   communications with FDA regarding that portion of
3   the label, did you review it all, in any year
4   prior to two thousand -- November and December of
5   2015?
6
7           MR. FRAXEDAS:  Object to form.
8           THE WITNESS:  Again, nothing comes
9       to mind, but I will also say that if there
10      was such correspondence, I would have
11      considered it, but in general, that would not
12      have altered my conclusions.
13  BY MR. MORIARTY:
14      Q   Hypothetically, Dr. Ross, if the
15  evidence shows that Sanofi gave everything that
16  Drs. Feigal, Plunkett and Madigan suggest should
17  have been given to FDA, and proposed changes to
18  the alopecia part of the label, and FDA rejected
19  those proposed changes, would that affect your
20  opinions in this case?
21          MR. FRAXEDAS:  Object to form.
22          THE WITNESS:  I can't speak to
23      hypotheticals.  I can say that in ten and a
24      half years with the FDA, I never saw -- the
25      only time I would see a situation like that

David B. Ross, M.D., Ph.D., M.B.I.

1   is if the agency felt that the sponsor was
2   understating the severity of the problem.
3
4   BY MR. MORIARTY:
5       Q   Well, Dr. Ross, we are entitled to ask
6   hypothetical questions, but can you answer my
7   hypothetical other than the answer you've already
8   given?
9           MR. FRAXEDAS:  Object to form.
10          THE WITNESS:  So can you repeat the
11      question again?
12  BY MR. MORIARTY:
13      Q   Yes.  If the evidence shows that Sanofi
14  gave FDA everything that Drs. Madigan, Feigal and
15  Plunkett suggest that they should have, and asked
16  for changes to the alopecia part of the label --
17  the proposed changes, I should say, to the
18  alopecia part of the label, and FDA rejected the
19  proposed changes, would that affect your opinions
20  in this case?
21          MR. FRAXEDAS:  Object to form.
22          THE WITNESS:  It would depend -- it
23      would depend on the rationale that the agency
24      gave.  Again, it's hypothetical.  You know,
25      certainly if there is such correspondence, I

David B. Ross, M.D., Ph.D., M.B.I.

1       would be happy to take a look at it and
2       provide an answer based on what actually
3       happened, but just to repeat a basic
4       principle here, FDA is in charge of enforcing
5       the Food, Drug & Cosmetic Act.  Manufacturers
6       are responsible for complying with it.
7
8   BY MR. MORIARTY:
9       Q   Between 1996 and 2015, did FDA ever
10  unilaterally revise the Taxotere patient brochure,
11  specifically the portion regarding hair loss?
12      A   Can you clarify what you mean by
13  "unilaterally revise"?
14      Q   Yes.  Without prompting, requesting or
15  proposing by Sanofi.
16      A   Respectfully, the -- I, I can't answer
17  that question, because the FDA is not the NDA
18  holder.  It's the manufacturer's product.  I mean
19  the FDA has certain authorities at, at various
20  times, but it's not the FDA's NDA.  So I just --
21  I, I'm -- the FDA doesn't print it, it doesn't
22  distribute the drug.  I, I -- so I'm sorry.
23  Respectfully, I don't understand the question.
24      Q   Okay.  It seems to me from your answer
25  you find it hard to believe that FDA would ever do

David B. Ross, M.D., Ph.D., M.B.I.

1   that.  My question is:  Do you know whether, in
2   fact, they ever did it between 1996 and 2015?
3           MR. FRAXEDAS:  Object to form.
4           THE WITNESS:  So it, it's not --
5       I'm sorry, Mr. Moriarty.  I'm trying to
6       address your question, but the FDA, as far as
7       I know -- and perhaps there's some counter
8       example.  I would be happy to look at it.
9       The FDA cannot do that with regard to any
10      drug, and that includes generics.
11          I mean they can take various
12      enforcement actions, but they themselves do
13      not revise the label.  I, I'm just -- I mean
14      they don't print the label.  The FDA can't
15      just say, well, we're going to print up a new
16      label and ship it off to pharmacies and
17      say -- I mean the FDA doesn't do that.
18  BY MR. MORIARTY:
19      Q   If FDA unilaterally told Sanofi to
20  revise it, do you know whether they did that?  I'm
21  not asking whether they printed it themselves and
22  stuck it on drug packages.
23      A   Well --
24      Q   Do you know whether they ever

David B. Ross, M.D., Ph.D., M.B.I.

1 unilaterally revised it and told Sanofi that's the
2 new label or that's the new section?
3         MR. FRAXEDAS:  Object to form.
4         THE WITNESS:  So again, I, I --
5 BY MR. MORIARTY:
6    Q    I just want to know if you know if they
7 did that, not how incredible you find it.  I just
8 want to know, from your review of the materials,
9 whether that happened.
10        MR. FRAXEDAS:  Object to form.
11        THE WITNESS:  So I am not aware of
12        any instance prior to enactment of the FDA
13        Amendments Act in 2007 in which the FDA
14        applied for, through judicial proceedings, to
15        enforce a change in the label with respect to
16        permanent alopecia or, after 2007, issued a,
17        what's known as a labeling safety order with
18        respect to this, under Section 505.04, I
19        believe it is, of the Act, with regard to
20        permanent alopecia.
21            So that's the best I can answer
22        your question.
23 BY MR. MORIARTY:
24    Q    Do you have any reason to dispute that

*(Line numbers: 1–25; note numbering in source)*

David B. Ross, M.D., Ph.D., M.B.I.

1 FDA had all of Sanofi's clinical trial
2 information, post-marketing adverse event reports,
3 and other studies up through June of 2011 when it
4 approved Accord Healthcare, Inc.'s docetaxel
5 505(b)(2) application?
6         MR. FRAXEDAS:  Object to form.
7         THE WITNESS:  So again with the
8         understanding that my opinions concern
9         post-approval actions, I actually would not
10        be able to tell you what FDA did or didn't
11        have in its possession at the time of
12        approval.
13 BY MR. MORIARTY:
14    Q    Okay.  In a, in a general setting --
15 well, would you agree that Accord Healthcare, Inc.
16 would not have access to Sanofi's proprietary
17 clinical information, clinical trial information?
18        MR. FRAXEDAS:  Object to form.
19        THE WITNESS:  With the caveat that
20        that is not the question that determined my
21        conclusions, I would agree with that.
22        THE REPORTER:  I'm not sure I got
23        the answer exactly right.
24        THE WITNESS:  Well, let me -- I'm

David B. Ross, M.D., Ph.D., M.B.I.

1 sorry.  I'm going to start leaning a little
2 closer.
3            I said with the caveat that that
4        actually did not determine the regulatory --
5        my regulatory conclusion, I would agree with
6        that, with what Mr. Moriarty asked about.
7 BY MR. MORIARTY:
8    Q    Well, do you agree that Accord would not
9 have access or communication between FDA and
10 Sanofi that occurred post-, post-approval?
11        THE REPORTER:  You said post or
12        pre?
13        THE WITNESS:  Again -- sorry.  Go
14        ahead.
15        THE REPORTER:  You said
16        "post-approval" or "post- or pre-approval"?
17        MR. MORIARTY:  Post-approval.
18        THE REPORTER:  Okay.
19        MR. FRAXEDAS:  Same objection.
20        THE WITNESS:  So with the same
21        caveat that that fact would not affect my
22        conclusions, yes, I would agree with that.
23 BY MR. MORIARTY:
24    Q    And I assume, then, that you'd agree

David B. Ross, M.D., Ph.D., M.B.I.

1 that Accord wouldn't have access to Sanofi's
2 post-marketing adverse event data; that your
3 answer would be the same, correct?
4    A    Not completely.  Along with the caveat
5 that I previously expressed, any data provided
6 by -- post-marketing data provided by Sanofi to
7 FDA, which was subsequently made publicly
8 available through the FDA adverse event reporting
9 system, would be available to the entire public.
10   Q    Now, I know you read some NDA submission
11 material regarding Hospira.  That's mentioned in
12 your reliance list, correct?
13   A    Yes.
14   Q    And we keep calling it "reliance list."
15 You actually call it "list of documents reviewed."
16 Fair, if we're talking about the same thing, can I
17 use that shortcut?
18   A    Yes.
19   Q    Did you read any NDA materials from a
20 company called Actavis?
21   A    Not to the best of my recollection.
22   Q    Did you read any NDA information from
23 companies Pfizer or Sun Pharma?
24   A    Not to the best of my recollection.

1              David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3         Q    Is this -- does the Risk Evaluation and
4    Mitigation Strategies section of the Code apply to
5    the circumstances with docetaxel and Accord?  I
6    mean does the FDA -- was this ever called an REM?
7         A    So I -- again, there's two questions on
8    the table, but before getting to that, I actually
9    reference paragraph B on, on this.
10        Q    It's here.  So you're just going to the
11   definitions section of the Risk Evaluation and
12   Mitigation Strategy section of the Code?
13        A    I don't know that I would say "just,"
14   but that's what the cite refers to.  It doesn't
15   refer to the initial page that you have here.
16   That's why I was saying I wanted to go to
17   paragraph B where the definition of New Safety
18   Information is found.
19        Q    Well, the definition section B says "for
20   purposes of this section," and when the United
21   States legislature, Congress, passes a law and
22   refers to this section, it's referring to 21 USCA
23   355-1, correct?
24        A    Yes.
25             MR. FRAXEDAS:  Object to form.

1              David B. Ross, M.D., Ph.D., M.B.I.
2              THE WITNESS:  But if I, if I may, I
3    discuss new safety information and its
4    significance in paragraph 27, in which I
5    discuss 21 -- the requirements when an update
6    to a label is triggered, and that's under 21
7    C.F.R. 201.57(c)(6) and (c)(7), and it's
8    again paragraph 27(a) and (b).
9    BY MR. MORIARTY:
10        Q    What I'm trying to find out is:  Do you
11   believe that what we have marked as Exhibit 13 is
12   the legal definitions for things outside the Risk
13   Evaluation and Mitigation Strategies section of
14   the United States Code?
15             MR. FRAXEDAS:  Object to form.
16             THE WITNESS:  So I, I am, as I
17   mentioned before, not an attorney.  I'm not
18   offering legal opinions.
19   BY MR. MORIARTY:
20        Q    Okay.  All right.  So we were talking
21   about paragraph 37, and then we went to paragraph
22   35.
23             THE VIDEOGRAPHER:  Mr. Moriarty,
24   this is Rick, the videographer.  Within the
25   next five minutes, we need to take a break so

1              David B. Ross, M.D., Ph.D., M.B.I.
2    I can rename the file.  It's getting pretty
3    big.  We've been on the record about an hour
4    and 26 minutes, and they like me to break
5    about an hour and 30.
6              MR. MORIARTY:  Okay.  Let me ask
7    one question, and then we can take a break.
8    BY MR. MORIARTY:
9         Q    Doctor, I'd like you to look at
10   paragraphs 30 through 44 of your report, okay?
11        A    Okay.
12        Q    In general, Dr. Ross, do those apply to
13   and describe the obligations and what Sanofi did
14   in this case?
15        A    In general, yes.
16             MR. MORIARTY:  All right.  Let's
17   take a break.  We can go off the video
18   record, Rick.
19             THE VIDEOGRAPHER:  12:20.  We are
20   off the record.
21             (Discussion held off the video and
22             stenographic record.)
23             MR. MORIARTY:  Rick, how long have
24   we been on the record today?
25             THE VIDEOGRAPHER:  Two hours and 48

1              David B. Ross, M.D., Ph.D., M.B.I.
2    minutes.
3              (Whereupon, the lunch recess was
4              taken.)
5              THE VIDEOGRAPHER:  1:11.  We're
6    back on the record.
7              MR. MORIARTY:  Dr. Ross, we're
8    going to mark Exhibit 14 and put it up on the
9    screen.
10             (Exhibit 14 was marked for
11             identification.)
12   BY MR. MORIARTY:
13        Q    Okay.  This is a document listed in your
14   list of documents reviewed as "Comparative Label
15   Changes made by Sanofi, Sandoz, Hospira and
16   Accord, June 2011 through December 2015."
17        Did you draft this document?
18        If you're answering, we can't hear you.
19   You may be on mute.
20        A    I am on mute.  I'm sorry.  I apologize.
21   No.
22        Q    Did you receive it from someone other
23   than plaintiffs' counsel?
24        A    No.
25        Q    And it says "Draft" in the upper

Page 311

David B. Ross, M.D., Ph.D., M.B.I.

1  right-hand corner on the first page.  Do you know
2  whether you received more than one of these?
3
4      A    To the best of my recollection, no.
5      Q    Did you ever ask them to create a
6  similar chart but include label changes proposed
7  by any of these entities in that same period of
8  time?
9      A    By "same period of time," you mean the
10 dates in the two right-hand columns, correct?
11     Q    Well, June 2011 through December 2015.
12 Did you ask them to prepare a chart with proposed
13 changes as opposed to the changes actually made?
14     A    To the best of my recollection, no.
15     Q    All right.  I'm done with that.
16          Now, is it your opinion that Accord
17 Healthcare, Inc. could have updated its docetaxel
18 label at some point between the middle of
19 June 2011 and the end of December 2015?
20     A    Yes.
21     Q    I want to know exactly when the earliest
22 date is that, in your opinion, Accord Healthcare,
23 Inc. could have done that.
24     A    The date of approval was June 8, 2011.
25 The first 90-day periodic safety update report was

Page 312

David B. Ross, M.D., Ph.D., M.B.I.

1  due 90 days after that.  That label change should
2  have been put in place by Accord by then.
3
4      Q    All right, and I assume it's your
5  opinion that that duty continued from after those
6  90 days up until at least the end of 2015.  I
7  don't want to ask you every month, every year,
8  every day between those two times.
9          Is that your opinion?
10     A    Yes.
11     Q    All right.  In your opinion, what was
12 the precise regulatory vehicle that Accord
13 Healthcare, Inc. should have used to either apply
14 for or effectuate the change in label that you
15 believe should have been made?
16     A    So with the caveat that there are many
17 additional routes to communicate new safety
18 information about patients and providers in
19 addition to the label, the most appropriate route
20 would have been what we discussed before, which is
21 a changes being effected supplement.
22     Q    Can you be specific about exactly which
23 regulation, including the subpart?
24          MR. FRAXEDAS:  Object to form.
25          THE WITNESS:  So I believe I'm --

Page 313

David B. Ross, M.D., Ph.D., M.B.I.

1
2  subject to checking the exact, the exact
3  citation, I would say it is three -- 21
4  C.F.R. 314.70(c)(6) I believe is the correct
5  citation for that.  If I'm -- I may have the
6  actual letter, construing of letters and
7  numbers, I don't want to . . .
8  BY MR. MORIARTY:
9      Q    This is of vital importance to our
10 client, Accord, to know exactly which regulation
11 you believe -- so you said "21 C.F.R. 314.70," and
12 then I could not hear the subparts after that that
13 you said.
14     A    I, I understand, and I want to be clear.
15 What I'm referring to is the regulation that
16 describes changes being effected.
17     Q    Yes, I understand that.  I'd like to
18 know exactly which subpart.
19          What are you looking at, Doctor?
20     A    I'm just actually looking at the exact
21 citation that you want in the C.F.R. to make sure
22 I'm getting it right.
23     Q    Okay.  That's fine.  I just don't know
24 what you're looking at, and I want to know what
25 you're looking at.

Page 314

David B. Ross, M.D., Ph.D., M.B.I.

1
2      A    Okay, so -- and this would be -- let's
3  see.  21 C.F.R. 314.70(c)(6)(III)(A).
4      Q    All right.  What is the basis for your
5  opinion that Accord Healthcare, Inc. should have
6  initiated that process on or immediately after 90
7  days from June 8, 2011?
8      A    So to clarify, I say that it should have
9  been done within the 90 days --
10     Q    Oh, okay.
11     A    -- from the date of the first required
12 periodic safety update report.
13     Q    So sometime within June 9 through the
14 next 90 days?
15     A    June 9 of 2011, correct.
16     Q    The day after the label was approved by
17 FDA, it's your opinion that Accord Healthcare,
18 Inc. had a duty to initiate a change to it,
19 correct?
20          MR. FRAXEDAS:  Object to form.
21          THE WITNESS:  No, sir.  That's not
22     what I said.
23 BY MR. MORIARTY:
24     Q    You tell me what you said, because that
25 sure sounded like what you said.

David B. Ross, M.D., Ph.D., M.B.I.

1  abundance of evidence from a variety of
2  sources described in my report, yes.  I
3  mean -- and I'm not -- something to say it's
4  permanent alopecia, so yes, that is exactly
5  my contention.
6  BY MR. MORIARTY:
7     Q    I will get back to this subject in a
8  minute with the approval letter, but I want to go
9  to something else first, Dr. Ross.
10          Are you familiar with a clinical study
11  called PAX 702?  P-A-X, all caps.
12    A    I may have seen something about it.  It
13  does not ring a bell.  It does not mean that I
14  haven't seen something about it.
15    Q    Did you read the study and its results
16  yourself?
17          Doctor, you turned your camera off by
18  accident.
19    A    I'm, I'm still on the line here.  I'm
20  afraid it wasn't by accident.  It was probably one
21  of those HAL 9000 computers at work.  Just bear
22  with me.
23          THE VIDEOGRAPHER:  This is the
24          videographer.  Before you went off, you had

David B. Ross, M.D., Ph.D., M.B.I.

1  been locking up on my end.  I don't know if
2  anybody else noticed it, but everybody else
3  was moving in their pictures, and yours was
4  locked up.
5          THE REPORTER:  I noticed it.
6          MR. FRAXEDAS:  Yeah, I noticed that
7  as well.
8          THE WITNESS:  Well, I was trying to
9  get the pavé doors open, I just want you to
10  know.  Hopefully I'll be back up in a minute
11  here.
12          I'm reconnected, but there's no
13  image available for anyone.
14          MR. MORIARTY:  I don't think you
15  feel comfortable answering my questions while
16  you're fiddling with the video, so let's just
17  go off the video record for a few minutes.
18          THE VIDEOGRAPHER:  2:18.  We're off
19  the video record.
20          (Whereupon, a short recess was
21          taken.)
22          THE VIDEOGRAPHER:  2:29.  We're
23  back on the record.

David B. Ross, M.D., Ph.D., M.B.I.

1  BY MR. MORIARTY:
2     Q    All right, Doctor, the question that was
3  pending is:  Did you ever read the study results
4  from the study called PAX 702?
5    A    I don't recall doing so.
6    Q    Do you know who gave that study result
7  to FDA for exam?
8    A    I don't.
9    Q    Would it matter to your opinions in this
10  case?
11    A    I, I would need to know more
12  information.
13    Q    Okay.  You've heard of a study called
14  TAX316, have you not?
15    A    Yes.
16    Q    Did you read the results of that study
17  yourself?
18    A    I just want to make sure.  I know it's
19  mentioned in my report.  I want to just see
20  exactly how I cite it.  I believe I did, but I
21  just want to make sure that I'm . . .
22          THE REPORTER:  Did you say PAX316
23          or TAX316?
24          THE WITNESS:  T-A-X.  Tango, alpha,

David B. Ross, M.D., Ph.D., M.B.I.

1  X-ray.
2          I believe, at the very least, I
3  certainly looked at them.  This is described
4  in paragraph 96.
5  BY MR. MORIARTY:
6     Q    Does that mean you read it yourself, or
7  could Madigan, Feigal or Plunkett have read it,
8  and you just relied on them?
9    A    No.  I certainly looked at the --
10  Sanofi's summary of product characteristics, and
11  that I reviewed myself about the, from PCIA data
12  and TAX316.
13    Q    Do you know who gave the interim results
14  of TAX316 to the FDA?  Do you know?
15    A    I do not.
16    Q    Do you know when it was given to FDA?
17    A    But when you say -- yes.  What
18  specifically are you talking about?  Again, what
19  dataset are you describing here?
20    Q    There were interim results that were
21  available by March of 2004.  There were final
22  results available by September of 2010.  Do you
23  know what company gave that data to FDA or when
24  they gave it to FDA?

   
1                David B. Ross, M.D., Ph.D., M.B.I.
2              MR. FRAXEDAS:  Object to form.
3              THE WITNESS:  I, I honestly don't
4       know.
5  BY MR. MORIARTY:
6       Q    Is it significant to your opinions?
7       A    Is it significant to my opinions?
8       Q    Is the fact of when that data was given
9  to FDA significant to your opinions?
10             MR. FRAXEDAS:  Object to form.
11             THE WITNESS:  I'm -- the question I
12      analyzed was not when things became available
13      to FDA.  It's when it became available to the
14      NDA holders.  That's the regulatory question
15      I analyzed.
16  BY MR. MORIARTY:
17      Q    Okay.  So as far as you know, the
18  results, the interim and then final results of
19  TAX316 were available for years to FDA?
20      A    I'm sorry.  Did you say "to FDA" or
21  "through FDA"?
22      Q    To FDA.
23      A    So your question is -- as far as I know,
24  they were available for years to FDA.  I'm going
25  to, I'm going to accept that.

1                David B. Ross, M.D., Ph.D., M.B.I.
2       Q    Okay.  There was a study called GEICAM
3  9805.  I referred to that earlier.  Do you know
4  who gave it to FDA or when?
5              MR. FRAXEDAS:  Object to form.
6              THE WITNESS:  With the caveat that
7       again my analysis was not focused on when
8       information became available to FDA, it was
9       when it became available to NDA holders, I
10      don't know.
11  BY MR. MORIARTY:
12      Q    Let me ask you about some medical
13  articles that Drs. Madigan, Feigal and Plunkett
14  referred to, and then I believe you referred to
15  them in your report as footnotes.
16             There is a Dr. Sedlacek,
17  S-E-D-L-A-C-E-K, who made a presentation in 2006.
18  Do you know when the data underlying his paper was
19  given to FDA or who gave it to FDA?
20             MR. FRAXEDAS:  Object to form.
21             THE WITNESS:  So again, with the
22      caveat that my analysis focused on the
23      availability of new information to the NDA
24      holders, not the FDA, no, I don't know.
25

1                David B. Ross, M.D., Ph.D., M.B.I.
2  BY MR. MORIARTY:
3       Q    Why do you have to keep giving the
4  caveat?  Can't you just answer no, you don't know?
5       A    Well, respectfully, no, because I --
6       Q    I'm asking do you think it's
7  significant.  You're interpreting this and saying
8  it's misleading so you can make a speech.  I'm
9  asking very simple questions, Doctor.
10             Dr. Prevevas, P-R-E-V-E-V-A-S, published
11  an article in 2009.  Do you know who gave it to
12  FDA or when?
13             MR. FRAXEDAS:  Object to form.
14             THE WITNESS:  So with the caveat
15      that every question I addressed is when
16      information became available to the NDA
17      holders, no, I don't know when it was given
18      to the FDA.
19  BY MR. MORIARTY:
20      Q    Doctor Bourgeois, B-O-U-R-G-E-O-I-S,
21  wrote an article in 2010.  Do you know who gave
22  that information to FDA or when?
23             MR. FRAXEDAS:  Object to form.
24             THE WITNESS:  With the caveat that
25      my regulatory analysis, the regulatory

1                David B. Ross, M.D., Ph.D., M.B.I.
2       question that I needed to answer is when it
3       became available to NDA holders, no, I don't
4       know.
5  BY MR. MORIARTY:
6       Q    Maybe to shortcut this, Doctor, do you
7  know when or who gave the following three medical
8  articles to FDA?  Dr. Talen's 2010 article,
9  Dr. Mitevasvs, M-I-T-E-V-A-S-V-S, article in June
10  of 2011, Dr. Kluger's 2012 article; do you know
11  who gave it to FDA or when?
12             MR. FRAXEDAS:  Object to form.
13             THE WITNESS:  Same answer as before
14      with the caveat.
15             MR. MORIARTY:  Ms. Callsen, would
16      you do me a favor, please, and put up our tab
17      7?  That's Exhibit 18.
18             (Exhibit 18 was marked for
19             identification.)
20  BY MR. MORIARTY:
21      Q    Doctor, I'm going to circle back to the
22  approval of the CBE, and I will represent to you
23  that the signature date from the FDA at the end of
24  this document is July 26, 2016.
25             Do you have any reason to dispute me on

1         David B. Ross, M.D., Ph.D., M.B.I.
2    that?
3         A    I'm sorry.  Say the date one more time.
4         Q    Doctor, do you see the exhibit on your
5    screen?
6         A    I don't.  I'm sorry.
7         Q    Okay.  We have a technical issue.  Let
8    me see if I can ask some questions while we fix
9    our technical problems.  I'm going to have to log
10   back in.  It will take a minute, but I need to ask
11   about these.
12        Do you now see the document?
13        MR. FRAXEDAS:  There we go.  You
14   got him now.
15   BY MR. MORIARTY:
16        Q    All right.  This is the July 26, 2016
17   letter from FDA, and I believe you've seen this
18   and it's in your reviewed materials, correct?
19        A    I believe that is correct.
20        Q    All right, and it says in the second
21   paragraph -- from the beginning it just says when
22   FDA received certain information, and then it
23   says, "This Changes Being Effected supplemental
24   new drug application provides for revisions to
25   align with the current package insert for the

1         David B. Ross, M.D., Ph.D., M.B.I.
2    Reference Listed Drug Taxotere."
3         Do you see that?
4         A    Yes.
5         Q    And in the next section it says, "We
6    have completed our review of the supplemental
7    application, as amended.  It is approved,
8    effective on the date of this letter, for use as
9    recommended in the enclosed, agreed-upon labeling
10   text."
11        Did I read that correctly?
12        A    Yes.
13        Q    All right.  So back in December when
14   Accord sent the proposal, is it, is it your
15   testimony that FDA expected Accord to immediately
16   implement the changes before sending out an
17   approval letter similar to the one in Exhibit 18?
18        MR. FRAXEDAS:  Object to form.
19        THE WITNESS:  No, that's not
20   exactly what I'm saying.
21   BY MR. MORIARTY:
22        Q    All right.  From a practical standpoint,
23   does it make sense for a pharmaceutical company to
24   order, print, pay for, and begin to use labels
25   that the FDA may later say are not approved or to

1         David B. Ross, M.D., Ph.D., M.B.I.
2    suggest some revisions to it?
3         MR. FRAXEDAS:  Object to form.
4         THE WITNESS:  So again I'm -- let
5    me answer, but this -- respectfully, the
6    premise is that, oh, the FDA might turn us
7    down, and then we've got to pull everything
8    back.
9         I have never seen that happen, and
10   that's during my time at FDA and since,
11   unless, as I mentioned, there was a company
12   submitting something as a CBE supplement, and
13   the FDA said, no, wait a minute, wait, you're
14   understating things, and converted them to a
15   prior approval supplement.  Never seen that
16   happen.
17        So does it make sense?  Yes, it
18   does, because you're talking -- what you're
19   talking about is a nonexistent risk.  If FDA
20   says, you know, we think it should be phrased
21   like this, and it's not a major change,
22   they're not going to make them pull it all
23   back.  They're going to say at the next
24   printing, please change it.
25

1         David B. Ross, M.D., Ph.D., M.B.I.
2    BY MR. MORIARTY:
3         Q    Do you know what discussions and
4    amendments may have taken place between Accord
5    Healthcare, Inc. and FDA between December 30, 2015
6    and July 26, 2016?
7         MR. FRAXEDAS:  Object to form.
8         THE WITNESS:  No.
9         MR. MORIARTY:  Could you go to our
10   tab 23, please.
11        I'm going to have another exhibit
12   marked.  It's Exhibit 19.
13        (Exhibit 19 was marked for
14   identification.)
15   BY MR. MORIARTY:
16        Q    And Doctor, if you could turn to your
17   report while that's getting teed up, to paragraph
18   112.
19        All right.  So it says -- you're talking
20   about the variation you just testified about, the
21   authority to retroactively block CBE supplements,
22   and in paragraph 112 you say, "On the other hand,
23   manufacturers may consult with the FDA before
24   submitting a CBE supplement.  Based on my
25   background, education, training and experience,

Page 399

David B. Ross, M.D., Ph.D., M.B.I.

ACKNOWLEDGEMENT OF WITNESS

I, David B. Ross, M.D. Ph.D., M.B.I., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

_____  _____
(DATE)           (SIGNATURE)

---

Page 400

David B. Ross, M.D., Ph.D., M.B.I.

E R R A T A   S H E E T

IN RE:  TAXOTERE PRODUCTS LIABILITY LITIGATION

RETURN BY:

PAGE    LINE                    CORRECTION AND REASON

_____  _____
(DATE)           (SIGNATURE)

---

Page 401

David B. Ross, M.D., Ph.D., M.B.I.

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
          I, Laurie Donovan, Registered Professional Reporter, Certified Realtime Reporter, and notary public for the District of Columbia, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 12th day of September, 2020.

My commission expires:  March 14, 2022

*Laurie Donovan*

LAURIE DONOVAN
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA