# EXHIBIT F

Confidential - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3   IN RE:  TAXOTERE              )

 4   (DOCETAXEL) PRODUCTS          )   MDL No. 2740

 5   LIABILITY LITIGATION          )   SECTION: "H"

 6                                 )   JUDGE MILAZZO

 7   This Document Relates To:     )   MAG. JUDGE NORTH

 8   ALL CASES                     )

 9

10                       CONFIDENTIAL

11              SUBJECT TO THE PROTECTIVE ORDER

12

13       The videotaped 30(b)(6) deposition of HOSPIRA,

14   INC. through JUERGEN SCHMIDER and the videotaped

15   deposition of JUERGEN SCHMIDER, called by the

16   Plaintiffs for examination, taken pursuant to the

17   Federal Rules of Civil Procedure of the United States

18   District Courts pertaining to the taking of

19   depositions, taken before JULIANA F. ZAJICEK, C.S.R.

20   No. 84-2604, a Notary Public within and for the County

21   of Kane, State of Illinois, and a Certified Shorthand

22   Reporter of said state, at the offices of Dechert,

23   LLP, 35 West Wacker Drive, Suite 3400, Chicago,

24   Illinois, on the 17th day of June, at 9:00 a.m.
```

Confidential - Subject to Protective Order

1   12:07 p.m.

2              (WHEREUPON, a recess was had

3                from 12:07 to 1:08 p.m.)

4      THE VIDEOGRAPHER:  We are back on the record at

5   1:08 p.m.

6      MS. LIAKOS:  Okay.  So we are finished now with

7   the 30(b)(6) portion of the dep -- deposition.

8              And you wanted to enter some documents

9   into the record, right?

10     MR. MOORE:  Yes.  So I have two documents to

11  mark as exhibits.  The first is Hospira's Objections

12  and Responses to Plaintiff's Notice of Deposition of

13  this 30(b)(6) deposition and I'll mark that as Exhibit

14  No. 3, I believe.  Is it 3?

15     MS. LIAKOS:  It is 3.

16             (WHEREUPON, a certain document was

17              marked Schmider Deposition Exhibit

18              No. 3, for identification, as of

19              07/17/2019.)

20     MR. MOORE:  And that, I think by agreement

21  we've -- there was a change in the date of the Notice

22  of Deposition.  And I think we agreed that the

23  objections would apply to that updated notice,

24  correct?

Confidential - Subject to Protective Order

1     MS. LIAKOS:  We did.  We did agree to that.

2     MR. MOORE:  And then as Exhibit No. 4 I just

3  want to mark as our Cross-Notice of Deposition.

4              (WHEREUPON, a certain document was

5               marked Schmider Deposition Exhibit

6               No. 4, for identification, as of

7               07/17/2019.)

8     MR. MOORE:  And I have some follow-up questions,

9  but by agreement of the parties we've agreed that I

10  will ask all of my questions at once for this

11  deposition and for the fact deposition at the end of

12  the fact deposition.

13     MS. LIAKOS:  Correct.

14     MR. MOORE:  Is that it?

15     MS. LIAKOS:  Yep.  Agreed.

16         Okay.  So, are you ready to move on?

17     THE WITNESS:  Yes, I am.

18     MS. LIAKOS:  Great.

19              JUERGEN SCHMIDER,

20  called as a witness herein, having been previously

21  duly sworn, was examined and testified as follows:

22              EXAMINATION

23  BY MS. LIAKOS:

24     Q.   Dr. Schmider, when did you first become

Confidential - Subject to Protective Order

1   aware that a regulatory agency was asking questions

2   and was concerned about adverse events of permanent

3   alopecia being reported after exposure with docetaxel?

4       MR. MOORE:  Object to the form.

5           You may answer.

6   BY THE WITNESS:

7       A.    I became aware in the preparation of this

8   deposition.

9   BY MS. LIAKOS:

10      Q.    That's the first time you knew that

11  permanent alopecia was being associated with

12  docetaxel?

13      MR. MOORE:  Object to the form.

14          You can answer.

15  BY THE WITNESS:

16      A.    Alopecia is associated with docetaxel,

17  like many therapeutic cancer agents, and I was aware

18  of that, but about this specific issue I was informed

19  in the context of the preparation for this deposition.

20  BY MS. LIAKOS:

21      Q.    You don't remember in 2011 the EMA raising

22  this issue while you were at Sanofi?

23      MR. DEPAZ:  Object to the form.

24      MR. MOORE:  Yeah, I object to the form.

Confidential - Subject to Protective Order

1    BY THE WITNESS:

2        A.    I have no awareness of that.

3    BY MS. LIAKOS:

4        Q.    Okay.  I'm going to give you what I'm

5    marking as Exhibit 5 to your deposition, and I'll just

6    have you take a look at it.

7               (WHEREUPON, a certain document was

8                marked Schmider Deposition Exhibit

9                No. 5, for identification, as of

10               07/17/2019.)

11       MS. LIAKOS:  I have another one.

12       MR. DEPAZ:  Thank you.

13       MS. LIAKOS:  Yep.

14       MR. DEPAZ:  In an effort to not trample on your

15   examination, are you okay with just a standing

16   agreement that if -- if he objects to the form with

17   respect to Sanofi documents, then I'm joining him --

18       MS. LIAKOS:  You don't need to object to form,

19   yeah, that's fine.  Yep.  In fact, I'd prefer.

20       MR. DEPAZ:  Right, that's what I figured.

21       MR. MOORE:  While he is doing this, if we have a

22   sheet of documents that he reviewed that we need to

23   give you.

24       MS. LIAKOS:  Oh, okay.

Confidential - Subject to Protective Order

1       MR. MOORE:  I don't want to interrupt this

2   question, but maybe we can do it after this question,

3   or we can do it now, whichever you prefer.

4       MS. LIAKOS:  Well, he's...

5       MR. MOORE:  Let's just keep a clean record.  He

6   can answer the question and then I'll hand you this.

7   I don't think it relates to the...

8       MS. LIAKOS:  There is actually not a question

9   pending right now, so.  He is just --

10      MR. MOORE:  There is no question pending?

11      MS. LIAKOS:  No.

12      MR. MOORE:  Okay.  Well, let's do it now.

13          This is a -- a document that contains,

14  pursuant to the orders in the case, the -- the

15  documents reviewed --

16      MS. LIAKOS:  Thanks.

17      MR. MOORE:  -- by the witness for the

18  deposition.

19      MS. LIAKOS:  Do you want to mark it?

20      MR. MOORE:  Sure.

21      MS. LIAKOS:  Okay.  Do you have another one?

22      MR. MOORE:  This will be Exhibit 2?

23      MS. LIAKOS:  6.

24      MR. MOORE:  Oh, oh, we are doing -- keeping

Confidential - Subject to Protective Order

```
 1    going with the numbers for the second deposition?

 2         THE COURT REPORTER:  Yes.

 3         MR. MOORE:  Okay.

 4         MS. LIAKOS:  So for the record, Exhibit 6 is the

 5    list of Bates stamped documents that Dr. Schmider

 6    reviewed in preparation for his deposition.

 7                   (WHEREUPON, a certain document was

 8                    marked Schmider Deposition Exhibit

 9                    No. 6, for identification, as of

10                    07/17/2019.)

11    BY MS. LIAKOS:

12         Q.    Are you ready?

13         A.    Yeah.

14         Q.    Okay.  Great.

15               So the first page of this document is an

16    e-mail.

17               Do you -- do you see that?

18         A.    Yes.

19         Q.    Okay.  And you are one of the recipients

20    of this e-mail, is that right?

21         A.    Correct.

22         Q.    Okay.  And it says "R&D US" behind your

23    name, correct?

24         A.    Yes.
```

Confidential - Subject to Protective Order

```
1        Q.     Okay.

2        A.     That's the e-mail designation, um-hum.

3        Q.     Okay.  And this document pertains to an

4   LRC meeting and the minutes for that meeting, is that

5   right?

6        A.     It pertains to -- yeah.  I don't see it

7   designated as minutes.

8        Q.     Okay.

9        A.     I don't recall this document, and there is

10  just a company core data sheet, core safety

11  information attached to it.

12       Q.     Okay.

13       A.     That's all I see.

14       Q.     So if -- if you look at the subject of --

15  the subject line in the e-mail, it says "LRC meeting

16  minutes" --

17       A.     Okay.

18       Q.     -- "2012" --

19       A.     Yeah.

20       Q.     -- "07_0" -- "17," correct?

21       A.     That is correct, yes.

22       Q.     Okay.  So what does LRC stand for?

23       A.     As far as I recall, that would be labeling

24  review committee.
```

Confidential - Subject to Protective Order

1      Q.    Okay.  And this document is from the time

2   that you were at Sanofi, correct?

3      A.    That's correct.

4      Q.    Did you always attend the labeling review

5   committee meetings when you were at Sanofi or

6   typically?

7      A.    Normally, yes.

8      Q.    Okay.  Okay.  And then it says underneath

9   the Dear All section in the substance of the e-mail,

10   it says -- or it designates you as one of the LRC

11   members, correct?

12      A.    That is correct.

13      Q.    Okay.  And if you look at the -- under

14   Decisions Taken heading in the body of the e-mail, it

15   says, the second line:  "Docetaxel:  Agreed with

16   ed" -- "editorial changes."

17            Do you see that?

18      A.    Yes.

19      Q.    Do you remember participating in a

20   labeling review committee meeting where changes were

21   made to the docetaxel core company data sheet

22   pertaining --

23      A.    I do not remember.

24      Q.    -- pertaining to persistent alopecia?

Confidential - Subject to Protective Order

```
 1      A.     I do not remember.

 2      Q.     Okay.

 3      MR. MOORE:  Just -- I will just also object to

 4  this as being an incomplete document.  It says:

 5  "Attached documents:  Executive summary, set of slides

 6  and CCDS."  I think only one attachment is included.

 7      MS. LIAKOS:  Okay.  Well, that's the only one

 8  I'm going to ask him questions about.

 9      MR. MOORE:  Okay, but it is an incomplete

10  document.

11      MS. LIAKOS:  Okay.

12      MR. MOORE:  You are asking him about the

13  minutes, I thought you said.

14  BY MS. LIAKOS:

15      Q.     Okay.  When did you -- so do you still

16  maintain that the first time you learned permanent

17  alopecia was being associated with docetaxel was when

18  you were preparing for your deposition?

19      A.     To my knowledge, yes.

20      Q.     Okay.  This -- the core data sheet is

21  attached for docetaxel, correct?

22      A.     Yes, that's --

23      Q.     Okay.

24      A.     -- that's what it says on the title.
```

Confidential - Subject to Protective Order

1    Q.    Okay.  And I think we talked earlier about

2  the company core data sheet being the mini -- minimum

3  safety information required to be in the labels

4  worldwide, correct?

5    MR. MOORE:  Well, I'd object to that.  You were

6  asking him in the 30(b)(6) about a Hospira deposition.

7  Now you are showing him a Sanofi document relating to

8  things that happened at Sanofi.

9    MS. LIAKOS:  Okay.

10    MR. MOORE:  That's a misrepresentation of his

11  testimony.

12  BY MS. LIAKOS:

13    Q.    Are core data sheets different from

14  company to company as -- as far as what they contain?

15    A.    They might be.

16    Q.    Okay.  Did the core data sheet at Sanofi

17  represent the minimum safety information required to

18  be in the labels worldwide?

19    A.    The concept was similar.

20    Q.    Okay.  Was the concept the same?

21    A.    There were different processes associated

22  as far as re -- I can recall, but just keep in mind

23  that this is a long time ago now with Sanofi and I

24  have certainly not a complete recollection.

Confidential - Subject to Protective Order

1      Q.    Okay.

2      A.    But I assume that -- I mean, I know that

3  the concept of the core safety information concept,

4  not the core data sheet concept, but the core safety

5  information concept was similar.

6      Q.    Okay.  Were you aware that when you were

7  at Sanofi in 2011 persistent or permanent alopecia

8  went into San -- Sanofi's core data sheet?

9      MR. DEPAZ:  Object to the form.

10     MR. MOORE:  Object to the form.

11  BY THE WITNESS:

12     A.    I -- no, I don't -- I wasn't -- I was not

13  aware, or at least I don't remember.

14  BY MS. LIAKOS:

15     Q.    Okay.  This is a Sanofi document, correct?

16     A.    It indicates so, yes.

17     Q.    And it says on the bottom of the document:

18  "Property of Sanofi Aventis Group, strictly

19  confidential," correct?

20     A.    Yes.

21     Q.    But it was in your Hospira custodial file

22  and produced to us by Hospira.

23          Did you take documents from Sanofi with

24  you when you went to Hospira?

Confidential - Subject to Protective Order

1      A.    No.

2      Q.    Okay.  So do you have any explanation as

3  to where -- how it would have gotten into your

4  custodial file at Hospira?

5      A.    I don't know how it came into my custodial

6  file at Hospira.  I can only speculate.

7      Q.    Okay.  How is your custodial file created?

8      A.    Actually, I -- I was not involved in that,

9  so I don't know.

10     Q.    Did you have documents from Sanofi on your

11  personal computer when you left Hospira?  Or when you

12  left Sanofi?  I'm sorry.

13     A.    I didn't have a personal computer.  I had

14  a company computer.

15     Q.    So you have no idea how it is that

16  confidential documents from Sanofi got into your

17  Hospira custodial file?

18     A.    I do not know.

19     Q.    Okay.  Do you ever remember having a

20  conversation with anyone at Hospira about adverse

21  events pertaining to permanent alopecia that were

22  received while you were at Sanofi?

23     A.    No.  I -- I don't think I've ever had such

24  a conversation with anyone at Hospira.

Confidential - Subject to Protective Order

```
1         A.    3 -- 345, um-hum.

2         Q.    Okay.  And about halfway down the page it

3    says:  "Other persistent reactions."

4               Do you see where I am reading?

5         A.    Yes.

6         Q.    And it says:

7               "The most common adverse events persisting

8    in the follow-up period in Taxotere patients were

9    alopecia, 92.3 percent."

10              Do you see that?

11        MR. DEPAZ:  Object to the form.

12        MR. MOORE:  Object to the form.

13   BY THE WITNESS:

14        A.    I see that, yeah.

15   BY MS. LIAKOS:

16        Q.    Okay.  And -- and you don't remember ever

17   having discussion about persistent alopecia --

18        A.    I do not --

19        Q.    -- being associated with Taxotere during

20   this 2011 timeframe?

21        A.    No, I don't have any recollection.

22        Q.    If you flip to Page 348, and, again, under

23   the section Other Persistent Reactions.

24              Do you see where I am, Doctor?
```

1      A.    Yes, I see Other Persistent Reactions.

2      Q.    Okay.  And then under that it says:  "The

3   following events were observed to be ongoing at the

4   median follow-up time of 77 months."

5            Do you see where I am reading?

6      A.    Yes.

7      Q.    And then it says "alopecia" after that,

8   right?

9      A.    Yes.

10     Q.    So do you agree with me that alopecia

11  that's continued for 77 months was properly

12  characterized as persistent -- a persistent reaction?

13     MR. DEPAZ:  Object to the form.

14     MR. MOORE:  Object to the form.

15  BY THE WITNESS:

16     A.    I -- I have no further information about

17  the reference of this citation.  I can't really

18  know -- give you any -- any assessment of that.

19  BY MS. LIAKOS:

20     Q.    Okay.  Other than this meeting that you

21  attended dealing with these changes in the core data

22  sheet, do you remember other conversations about

23  permanent alopecia while you were at Sanofi --

24     MR. MOORE:  Object to the form.

Confidential - Subject to Protective Order

 1  BY MS. LIAKOS:

 2      Q.    -- pertaining to or associated -- being

 3  at -- being associated with docetaxel?

 4      MR. MOORE:  Object to the form.

 5          You may answer.

 6  BY THE WITNESS:

 7      A.    I have no recollection of any such

 8  conversations taking place.

 9  BY MS. LIAKOS:

10      Q.    And this -- this labeling committee

11  meeting was in 2012, correct?

12      A.    Yes, that's what it refers to.

13      Q.    And you went to Hospira within a year of

14  this time, is that right?

15      A.    Yes.

16      Q.    Okay.

17          Did you have a personal Outlook account

18  that you used while you were at Sanofi to store

19  documents?

20      A.    No.

21      Q.    Okay.

22          I'm going to give you now what I'm marking

23  as Exhibit 7 to your deposition.

24              (WHEREUPON, a certain document was

Confidential - Subject to Protective Order

1           marked Schmider Deposition Exhibit

2           No. 7, for identification, as of

3           07/17/2019.)

4    BY MS. LIAKOS:

5        Q.    My question is:  Do you remember that your

6    signature was required to approve the changes in the

7    core safety sheet for docetaxel that included the

8    changes concerning permanent alopecia we just

9    reviewed?

10       MR. DEPAZ:  Object to the form.

11       MR. MOORE:  Object to the form.  This is a

12   pre -- predates the -- are you suggesting this relates

13   to the previous document?

14       MS. LIAKOS:  Yeah.  If you look at the core data

15   sheet itself, it is dated June 28th, 2011.

16       MR. MOORE:  Okay.

17       MS. LIAKOS:  The same date as the labeling

18   review committee that met for this.

19   BY MS. LIAKOS:

20       Q.    Do you re -- so the -- the question is --

21   do you remember the question, Dr. Schmider?

22       A.    I remember your question, but --

23       Q.    Do you --

24       A.    -- I have no recollection of the changes

Confidential - Subject to Protective Order

1   said.

2       A.    Okay.  All right.

3       Q.    You see where it says "Executive

4   Summaries"?

5       A.    Yes.

6       Q.    It says -- and then it says:  "USPI, EU

7   SmPC, CCDS including the updates/comment dis" --

8   "comments discussed during the LRC meeting."

9             Do you see that?

10      A.    Yes.

11      Q.    Do you know which of those documents, if

12  any, were updated after the laboring -- labeling

13  review committee meeting?

14      A.    Again, I have no recollection of this.

15      Q.    Okay.  Well, we saw that the core data

16  sheet was updated, right?

17      MR. MOORE:  Object to the form.

18  BY MS. LIAKOS:

19      Q.    We just looked at that.

20      MR. MOORE:  Object to the form.

21  BY THE WITNESS:

22      A.    What I saw in Exhibit No. 5 that you

23  provided is that there were -- it refers to editorial

24  changes which typically means that these are not

Confidential - Subject to Protective Order

1    substantive but more changes in -- in wording as far

2    as I recall.

3    BY MS. LIAKOS:

4        Q.    Okay.  But it was updated, correct?

5        MR. MOORE:  Object to the form.

6    BY THE WITNESS:

7        A.    On this, as it is referred to in Exhibit

8    No. 5, yes.

9    BY MS. LIAKOS:

10       Q.    Okay.  Do you have any memory of whether

11   or not the other documents referred to were updated?

12       A.    No.

13       Q.    Okay.

14             I'm going to give you what I'm marking as

15   Exhibit 9 to your deposition.

16                   (WHEREUPON, a certain document was

17                    marked Schmider Deposition Exhibit

18                    No. 9, for identification, as of

19                    07/17/2019.)

20   BY MS. LIAKOS:

21       Q.    Are you ready?

22       A.    Yeah.

23       Q.    Okay.  Do you have -- do you remember that

24   the EMA required a label change to include information

Confidential - Subject to Protective Order

1    about permanent alopecia and a section interpreting

2    data from Taxotere study 316 while you were at Sanofi?

3         MR. DEPAZ:  Objection.

4    BY THE WITNESS:

5         A.    I don't -- I don't recall.

6         MR. MOORE:  I'm going to object to the form of

7    that question belatedly based on time.

8    BY MS. LIAKOS:

9         Q.    So just for clarification, as you sit here

10   today, you don't remember being involved in the

11   process of or discussions involving changing the core

12   data sheet, correct?

13        A.    You mean specifically for docetaxel?

14        Q.    Yes.

15        A.    Or was it --

16        Q.    During 2 -- the 2011 timeframe, you don't

17   remember that?

18        MR. MOORE:  Go ahead, you may -- or objection to

19   the form.

20             You may answer.

21   BY THE WITNESS:

22        A.    I don't have any recollection.

23   BY MS. LIAKOS:

24        Q.    And you don't remember changing the label

Confidential - Subject to Protective Order

1   with respect to permanent alopecia for the EU?

2        MR. DEPAZ:  Object to the form.

3        MR. MOORE:  Object to the form.

4   BY THE WITNESS:

5        A.   I have no recollection.

6   BY MS. LIAKOS:

7        Q.   Okay.  And even though this happened less

8   than a year before you went Hospira -- to Hospira and

9   they had also a dose -- a docetaxel, you don't

10  remember ever having a conversation with anybody in

11  the safety department about permanent alopecia

12  relating to docetaxel, is that right?

13       MR. MOORE:  Object to the form.

14            You may answer.

15  BY THE WITNESS:

16       A.   I have no recollection, really.

17  BY MS. LIAKOS:

18       Q.   Okay.  Can you think of any reason why you

19  wouldn't have had that conversation?

20       MR. MOORE:  Object to the form of that question.

21  BY THE WITNESS:

22       A.   Again, it was a large department that I

23  was leading and there were specific physicians with

24  product responsibilities who made these assessments.

Confidential - Subject to Protective Order

1         Go ahead.

2    BY THE WITNESS:

3         A.    I have no further background on this one.

4    It's stated here, so I presume it was in there, but I

5    have no -- and I have no recollection of this and it's

6    not marked as one of the changes.  The changes I

7    believe are marked, actually, here --

8    BY MS. LIAKOS:

9         Q.    Okay.

10        A.    -- in track changes mode.  That's what I

11   noticed when I went through the document.  So this is

12   not marked accordingly.

13        Q.    And where do you see a change as you flip

14   through here that was marked with track changes mode?

15        A.    There is a -- on Page 334, though it is

16   not clear to me what that was, probably just the

17   reference, I would assume.

18        Q.    Oh, you mean the little line here next to

19   the leukemia?

20        A.    That's the -- usually the -- how track

21   changes are marked in the word processing program.

22   And then there was another section where there were

23   changes, rearrangements, since this is a 75 -- 75 or

24   so page document, it will be a while to go through it

Confidential - Subject to Protective Order

```
 1   again.  I'll find that.

 2            Here, on the page marked 364 there is

 3   another section.  They are the underlined words where

 4   editorial changes were made.  Since...

 5       Q.   Okay.  Were you involved in the original

 6   creation of this core data sheet for docetaxel?

 7       A.   No.

 8       Q.   You were not?

 9       A.   No.  I -- I was not involved in creation

10   of core data sheets.

11       Q.   Okay.  At -- not at Sanofi anyway, right?

12       A.   Yeah.

13       Q.   Okay.  I'm going to give you now what we

14   are going to mark as Exhibit 10.

15            Actually, go back to that one just for a

16   quick minute.

17       A.   Which one now?

18       Q.   The core data sheet, what -- that's

19   Exhibit 5.

20       A.   Exhibit 5?

21       Q.   Yes.

22            I just want to ask you quickly, if you go

23   to the page ending 342, do you see "alopecia" listed

24   there under Table 10?
```

Confidential - Subject to Protective Order

1       A.    Yes.

2       Q.    And that's listed under Other Adverse

3   Events, correct?

4       A.    That's the title of the table.

5       Q.    Okay.  And then, but that wouldn't mean

6   that that was the MedDRA term, right?

7       A.    Again, I don't have -- I don't know how

8   this table was constructed, whether words were

9   extracted or whether this is a database extract.  If

10  it was, then it would be the MedDRA term.

11      Q.    Okay.

12      A.    I -- I have no information, no -- I don't

13  know what the context here -- here is.  I don't know

14  how this was created.

15      Q.    Okay.

16      A.    I was not involved in the creation of this

17  document.

18      Q.    Okay.  But if you were reviewing this

19  document, would you, as -- in your role would you have

20  presumed that that was the MedDRA term?

21      MR. MOORE:  I'm going to object to the form.

22  BY THE WITNESS:

23      A.    Not necessarily.

24  BY MS. LIAKOS:

Confidential - Subject to Protective Order

```
 1        Q.    Okay.  And then if you go to the next
 2   e-mail down, one of the items it's discussing is a
 3   change to the label in Section 4.8.
 4              Do you see where I'm --
 5        A.    Yes, um-hum.
 6        Q.    -- in the second bullet point.
 7              And it says there has been changes:  "With
 8   regards to the risk of renal dysfunction, a
 9   clarification of the risk of alopecia and delete the
10   frequency 'very rare' of leukemia."
11              Do you see that?
12        A.    Um-hum.
13        Q.    Okay.
14        A.    Yes.
15        Q.    And then if you turn the page, it says:
16              "You will find enclosed the assessment
17   reports, the CHMP positive opinions with the
18   timetable, and the revised product informations,"
19   correct?
20        A.    That's what it says.
21        Q.    Okay.
22              Do you have any memory of receiving that
23   information?
24        A.    No.
```

Confidential - Subject to Protective Order

```
1        Q.    Do you have any memory of the SmPC

2   labeling change with respect to Taxotere?

3        A.    No.

4        Q.    Okay.  And if you look back at Exhibit 9

5   that I put on top of your stack there, that -- that is

6   the assessment report that's attached to this e-mail,

7   correct?

8        A.    Um...

9        Q.    It is dated December 15th, 2011.

10       A.    Um-hum, it's -- it is dated 15th

11  December 2011.  I'm just trying to verify it's the

12  e-mail -- the -- the document they are referring to

13  here on the second page on that e-mail.

14       Q.    Okay.

15       A.    It is a different title --

16       Q.    Okay.  But it's a --

17       A.    -- you referred to.

18       Q.    -- it's a --

19       A.    I don't --

20       Q.    -- the title of this document is "CHMP

21  Type II Variation Assessment Report For Docetaxel" --

22  "Docetaxel," sorry.

23       A.    That's your Exhibit No. 9?

24       Q.    Yes.
```

Confidential - Subject to Protective Order

1      A.     Yes, uh-huh.

2      Q.     Okay.  Do you --

3      A.     I'm just saying I cannot establish the

4    relationship to that e-mail.

5      Q.     Sure.

6             Do you remember receiving this CHMP

7    variation assessment report?

8      A.     No.

9      Q.     Okay.  If you turn in the report, do you

10   have any reason to doubt that you received it based on

11   this e-mail and...?

12     A.     I have reason to doubt it.

13     Q.     You do.  What's the reason?

14     A.     Because I'm not on the distribution of

15   that e-mail where that document was attached.

16     Q.     Okay.  So you think that you didn't get

17   this?

18     A.     I don't know, but I have reason to doubt

19   it.  I certainly was not on the e-mail that -- where

20   this -- the original distribution.  And I don't --

21   don't know whether this was a -- whether this was

22   attached to the e-mail when it was sent to Mike

23   Kopreski and me.

24     Q.     Okay.  Do you remember ever having any

Confidential - Subject to Protective Order

```
1    discussions with Mike Kopreski or Emanuel Palatinsky

2    or anyone else regarding the European label changing

3    with respect to Taxotere?

4         A.    I have no recollection.

5         Q.    Okay.  If you turn to -- in the assessment

6    report itself, if you turn to the Bates No. 5 --

7    ending in 562.

8         A.    Yep.

9         Q.    The first paragraph of -- the first full

10   paragraph on that page, where it says:  "Given the

11   serious psychological consequences."

12             Do you see where I am?

13        A.    Yes.

14        Q.    Okay.  Actually, right above that it says:

15             "Alopecia was observed to be ongoing

16   during follow-up in 25 patients out of the 736

17   patients with alopecia at the end of the

18   chemotherapy."

19             Did you see where I'm reading?

20        A.    Yes.

21        Q.    Okay.  And then the next paragraph, it

22   says:

23             "Given the serious psychological

24   consequences of this adverse effect in, often young,
```

Confidential - Subject to Protective Order

```
 1    patients treated mainly in an adjunct" -- "adjuvant

 2    scheme, healthcare professionals and patients should

 3    be informed of the possible irreversibility of

 4    alopecia."

 5            Do you see that?

 6    A.    Yes.

 7    Q.    It says:

 8            "Therefore, the CHMP requested the MHA

 9    (sic) to update the CMPH (sic) in this respect in

10    order to address this risk more clearly."

11            Do you see where I'm reading?

12    A.    Yes.

13    Q.    Does that reflect -- refresh your

14    recollection at all about the concerns regarding

15    permanent alopecia associated with Taxotere during

16    this timeframe?

17    A.    No.

18    Q.    Okay.

19    A.    I was not involved.  Or I have no

20    recollection.

21    Q.    Okay.

22            Are you saying you weren't involved or you

23    just don't remember being involved?

24    A.    I have no recollection.
```

Confidential - Subject to Protective Order

```
 1          Q.    Okay.  Okay.  You can set that aside.

 2                How many times while you were at Sanofi

 3     did the European label -- did -- did the EMA ask for

 4     the label to be changed with respect to docetaxel?

 5          A.    I have no idea.

 6          Q.    Was that a common occurrence?

 7          A.    I don't know.

 8          Q.    Okay.  Were you -- would -- within your

 9     role at Sanofi, would that be something that you were

10     involved in every time the label changed?

11          A.    No.

12          Q.    Okay.

13                Okay.  I'm going to hand you now what I'm

14     marking as Exhibit 12 to your deposition.

15                    (WHEREUPON, a certain document was

16                     marked Schmider Deposition Exhibit

17                     No. 12, for identification, as of

18                     07/17/2019.)

19     BY MS. LIAKOS:

20          Q.    From time to time different agencies do

21     inspections of the pharmacovigilance department in

22     pharmaceutical companies, correct?

23          A.    Yes.

24          Q.    Okay.  And those are often routine type
```

1    inspections, correct?

2          A.    In general, yes.

3          Q.    They are not always routine, sometimes

4    they are for -- for cause, but this was a routine

5    inspection, correct?

6          A.    Yes.

7          Q.    Okay.

8          A.    That's -- I think that's what it

9    indicated, yeah.

10          Q.    And when the -- when a routine inspection

11    occurs, the company has notice that that's going to

12    happen, right?

13          A.    Not always.

14          Q.    Really, I thought they always had notice?

15          A.    FDA doesn't give you notice.  They do

16    routine inspections without notice.  They knock on the

17    door, that's the notice you get.

18          Q.    Wow.  Okay.

19                So this was an inspection from the

20    Federal -- Federal Agency For Medicines and Health

21    Products, correct?

22          A.    Yes.

23          Q.    So this one there was notice, right?

24          A.    I have never been in a Belgium inspection.

Confidential - Subject to Protective Order

1                    REPORTER'S CERTIFICATE

2

3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

4    a Certified Shorthand Reporter, do hereby certify:

5              That previous to the commencement of the

6    examination of the witness herein, the witness was

7    duly sworn to testify the whole truth concerning the

8    matters herein;

9              That the foregoing deposition transcript

10   was reported stenographically by me, was thereafter

11   reduced to typewriting under my personal direction and

12   constitutes a true record of the testimony given and

13   the proceedings had;

14             That the said deposition was taken before

15   me at the time and place specified;

16             That I am not a relative or employee or

17   attorney or counsel, nor a relative or employee of

18   such attorney or counsel for any of the parties

19   hereto, nor interested directly or indirectly in the

20   outcome of this action.

21             IN WITNESS WHEREOF, I do hereunto set my

22   hand on this 23rd day of July, 2019.

23

24             JULIANA F. ZAJICEK, Certified Reporter