# EXHIBIT H

```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
 2

 3  ******************************************************************
    IN RE: TAXOTERE (DOCETAXEL)            MDL NO. 16-2740
 4  PRODUCTS LIABILITY LITIGATION          SECTION "H" (5)
                                           February 10, 2021
 5  This document relates to:
    All cases
 6  ******************************************************************

 7


 8
       TRANSCRIPT OF ORAL ARGUMENTS ON MOTIONS VIA VIDEO CONFERENCE
 9          HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
                      UNITED STATES DISTRICT JUDGE
10

11


12  APPEARANCES:

13  FOR PLAINTIFFS:              Dawn M. Barrios, Esquire
                                 BARRIOS, KINGSDORF & CASTEIX
14                               701 Poydras Street, Suite 3650
                                 New Orleans, LA 70139
15

16
                                 Andre M. Mura, Esquire
17                               GIBBS LAW GROUP
                                 6701 Center Drive West
18                               Suite 1400
                                 Los Angeles, CA 90045
19


20

21  FOR DEFENDANTS:              Douglas J. Moore, Esquire
                                 IRWIN, FRITCHIE, URQUHART & MOORE
22                               400 Poydras Street, Suite 2700
                                 New Orleans, LA 70130
23

24

25


                           OFFICIAL TRANSCRIPT
```

1  information on all of this which is again critical to his
2  opinion.  He didn't review the submissions.  He didn't review
3  the communications.
4           And this is his testimony.  If Mr. Mura, you know,
5  responds and says, "Well, you know, if we look at the later
6  reliance list, it clarifies things," the answer to that is no.
7  What was his opinion, his methodology and his opinion when he
8  reached his opinions initially when he did his report, that's
9  the question before the Court.  And what did he say in his
10 deposition?  I will also tell Your Honor that he did not do an
11 errata sheet or change anything.  So this is the testimony that
12 stands.
13          He said, "I never looked at the approval letter.  I
14 never looked at Sandoz's testing or clinical studies.  I never
15 looked at FDA correspondence, but for that one single document.
16 I never looked at correspondence back and forth between the FDA
17 about labeling.  I never looked at adverse events as well."  We
18 cite all this in our motion, Your Honor, so not to belabor it.
19          Also, on the newly acquired information, to pick up
20 on the discussion you-all had, how will he be able to talk
21 about what is newly acquired if he didn't know what the
22 information was at the time this was approved?  That's a point
23 we make.  How can you know what's newly acquired if you don't
24 know what already existed?
25          The only labeling he looked at, at all as you can see

1  on his reliance list which was, again, part of Exhibit B, one
2  and a half pages, is the approved label, the market launch
3  label.  That's all he looked at.  So all the back and forth,
4  the discussions, the post-market information, he didn't look at
5  any of that.  So again, we would say this witness more than,
6  perhaps, many others that you have considered, Your Honor, in
7  this litigation and others we'll talk about, his evidence he
8  reviewed, his methodology is woefully inadequate.
9           And I used the word "shockingly" before because to
10 get an FDA regulatory expert with this little information as
11 the information for their reliance is pretty surprising.  And
12 if you compare it even to our witnesses on the defense side as
13 well as Dr. Kessler, not to jump back to that argument, totally
14 different scenario in terms of the vast information considered.
15          Pharmacovigilance and information obtained
16 post-market, I won't spend a lot of time on this.  But suffice
17 it to say, he admits repeatedly in his deposition that he did
18 not consider it.  He just said, "Well, it wouldn't have changed
19 my opinion."  He didn't look at the operating procedures on
20 pharmacovigilance.  He didn't look at any internal
21 correspondence on this 505(b)(2) regulation and compliance that
22 he says, you know, that they're proffering him to cover.  So
23 that's very important there.
24          Plaintiff's response, and you'll hear some of this
25 that as we say they unpersuasively argue, "Well, this is

OFFICIAL TRANSCRIPT

1  cross-examination, Ms. Cohen and Sandoz.  You can do it there."
2  That's not the law.
3          "His background is enough.  He went to Yale.  He
4  worked at the FDA 10 years some 15 years ago."  Well, no, that
5  doesn't help them on reliance and methodology, the second prong
6  of *Daubert*, when he fails to review the key critical evidence.
7          And then they say, "Well, there's an incomplete
8  reliance list.  We had him redo part of his deposition."  Yes,
9  but at his deposition, he still admitted, even putting that
10 aside, that he didn't review these key items.  They can't get
11 around that even with a second updated later in fact reliance
12 list.
13         And again, in terms of newly acquired information, I
14 would just go back to what we said in our briefing and what I
15 said earlier is that how can they, as the proponent of him as
16 an expert, talk about him having reliable methodology on this
17 point when he doesn't know what the original information was.
18 He didn't look at the original files and file materials.  So
19 how can he do a proper methodological review of newly acquired
20 information when he doesn't know what Sandoz had in their files
21 or what they looked at or what their labels looked at?
22         So there are big flaws here with Dr. Ross, and he's
23 not just sort of a new Dr. Kessler, you know.  He certainly
24 didn't look at the same amount of material.
25         I find it interesting, and Your Honor may have seen

1  this in plaintiff's opposition, they say, well, look at the
2  *Dolin* case, a Northern District of Illinois case where the
3  federal court there allowed Dr. Ross to testify, and they point
4  to that.  And I thought that was really interesting.  And when
5  I sat down and studied that opinion which I have in front of
6  me, I thought, well, that completely supports our position in
7  this case, and here's why.
8              No. 1, that was a branded pharmaceutical case, not a
9  505(b)(2) case.  So that goes to his qualifications certainly
10 dealt more with the branded pharmaceutical.  But moving to the
11 methodology which is probably more of interest, in this case,
12 the court ruled that he was allowed to testify because of his,
13 you know, substantial review of evidence, substantial review of
14 information, and therefore, making his methodology reliable.
15 He was allowed to testify because he reviewed the regulatory
16 submissions and correspondence of GSK, the defendant in that
17 case.  He reviewed internal GSK documents and analysis.  He
18 reviewed FDA studies.  He reviewed different iterations of
19 labeling.
20             So if you look at that opinion, the court there goes
21 through the laundry list of things he reviewed as part of why
22 his methodology was substantial and adequate to support him
23 under *Daubert*.  Here, in sharp contrast, he didn't review any
24 of this.  We go back to the 47 pages.
25             So actually, the *Dolin* case supports Sandoz as to why

1  he should be excluded based on his, I would say, flimsy and not
2  reliable methodology.  So that's the methodology piece, Your
3  Honor.
4        I know I'm probably taking up too much of my allowed
5  seven minutes, but I'll make a few points on these other
6  issues.  On the parroting point, Your Honor, I've --
7        **THE COURT:** I think what concerns me and what I want
8  to hear from Mr. Mura is his failure to review the record that
9  was presented to the FDA.
10       **MS. COHEN:** Okay, thank you, Your Honor.  So I'll
11 stand on our briefing on these other points.  I think you
12 probably know what our arguments are, and I appreciate very
13 much the time.
14       **THE COURT:** Thank you.  Where is Mr. Mura?
15       **MS. COHEN:** I see him on the bottom right on my
16 screen.
17       **THE COURT:** Okay.  I think, Mr. Mura, you have to
18 speak --
19       **MR. MURA:** Sure.
20       **THE COURT:** -- and then I will see you.  There you
21 are.  That's how it works.
22       I can cut to the chase.  I'm not concerned about his
23 qualifications.  What bothers me is his failure to review the
24 record before the FDA at the time of their approval in 2011,
25 and that's -- because then we have to consider what did they

OFFICIAL TRANSCRIPT

1  look at and how can he then find newly acquired information
2  when we don't know what they were presented with.
3      **MR. MURA:** Yes, Your Honor.  I think part of the
4  argument that's being made is just sort of a snapshot in time.
5  I mean he supplemented his reliance list, and so I would just
6  ask that you look at Exhibit C to the Ross Expert Report.
7      We don't agree with the representations being made
8  about that Dr. Ross simply didn't review relevant information.
9  He reviewed or relied on numerous relevant Sandoz documents,
10 including, the U.S. and foreign docetaxel labels, the PSURs,
11 the PADERS, the NDA documents, meeting summaries, transcripts
12 and exhibits.  So a lot of that is in the updated reliance
13 list.  I think that will give the Court comfort that Dr. Ross
14 did review sufficient information to provide an opinion.
15     And to the extent that Sandoz or even Accord thinks
16 that Dr. Ross should have looked more carefully at one document
17 or another, that's typical fodder for cross-examination.  But
18 he reviewed a significant amount of information, and he based
19 his opinion based partly on that review and based on his
20 experience working for quite a long time at the FDA.  And so I
21 don't think there's any real material -- I don't think there's
22 any daylight between the type of information that he reviewed
23 and the type of information that Dr. Kessler reviewed.  The
24 team that was providing him the information assembled the same
25 information and provided it to him just as they did for

OFFICIAL TRANSCRIPT

1  Dr. Kessler.
2           So a lot of these arguments are, with all due
3  respect, exaggerating, I think, the record; and the record is
4  quite clear that he reviewed a significant amount of
5  information in coming to his opinions.  And those opinions are
6  not either a legal conclusion, nor are they sort of treading or
7  crossing the line in terms of causation.  I think these are all
8  arguments the Court heard previously with Dr. Kessler and
9  provided guidance for Dr. Kessler.  I think the same thing
10 holds for Dr. Ross.
11          He's not going to opine on the law to the extent that
12 he's not going to opine on causation.  He's opining on
13 regulatory standards.  I heard many times the argument that,
14 "Well, he's no Dr. Kessler."  You know, Dr. Kessler is not the
15 *Daubert* standard.  Ross is an incredibly accomplished
16 individual who worked at the FDA and does say in his expert
17 report that he was familiar with and 505(b)(2) issues did come
18 across his desk.  So it's incorrect to say he just has no
19 experience as if he were --
20          **THE COURT:**  I'm not worried about that.  I'm not
21 worried about that.  I am telling you what I'm worried about.
22          **MR. MURA:**  Okay.
23          **THE COURT:**  I can't be clearer.  If he did not
24 carefully review the initial record that was presented to the
25 FDA at the time of Sandoz's application and approval, then I am

1  concerned as to whether or not he can speak to what they should
2  have done post-approval with newly acquired information because
3  he's got to have known what was in that initial packet to see
4  whether or not the FDA was provided this information.
5        And that's my concern because there's a period in
6  time where we have to make that determination.  That's my
7  concern.
8        **MR. MURA:** Yes, Your Honor.  He did review just a ton
9  of information that was provided to him relevant to the drug
10 label.  I mean that's just a fact, and it's discussed in his
11 report.  It's discussed in the supplemental reliance list.
12        I think some of the confusion is he's trying to say,
13 "I'm not attacking the initial launch label."
14        **THE COURT:** That's correct.
15        **MR. MURA:** And so to the extent the focus of his
16 report is on post label launch, I don't think it's fair to sort
17 of take that focus and his, you know, discussion of that just
18 to say that he just has no idea about anything about the
19 initial label launch.  That's not correct.  He was not offering
20 an opinion that the initial label launch was somehow -- that
21 the FDA shouldn't have authorized that.  So he's not sort of
22 delving into the information for that purpose, but he certainly
23 has enough information to offer an opinion about whether the
24 adverse reaction section could have been updated after the
25 initial label launch.

OFFICIAL TRANSCRIPT

1        He knows what the initial label says.  The initial
2   label launch, again, in the context of a 505(b)(2), is not
3   going to have the type of information that you have with a
4   label launch for a 505(b)(1).  That's precisely the point of a
5   505(b)(2) label change.  You're not supposed to submit a ton of
6   this information.  You're allowed to rely on it.  And to say
7   that, "Well, he didn't review something," the drug company is
8   not even submitting a lot of this information.  They're using a
9   streamlined process to get label approval.
10        And so I do think that, you know, you can take
11  snippets of his deposition and read them out of context and
12  make Dr. Ross look bad.  But in reality, Dr. Ross did rely on a
13  lot on this information, did review it, came to his analysis.
14  And to the extent, again, that the defendants disagree, this is
15  all typical grounds for cross-examination.
16        I mean it would be quite extraordinary to exclude
17  Dr. Ross given his qualifications, given the work he did, given
18  his lengthy report, given his lengthy reliance list which I
19  understand was supplemented, but even just looking at the
20  supplementation, I think this is well within the bounds of
21  *Daubert*.  And really, it cannot be said to be in a totally
22  different category from what Dr. Kessler did.
23        So unless the Court has any more questions, thank
24  you, Your Honor.
25        **THE COURT:**  No, I think that's it.  Thank you.

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1 | **CERTIFICATE** |
| 2 | |
| 3 | I, Alexis A. Vice, RPR, CRR, Official Court Reporter for |
| 4 | the United States District Court, Eastern District of |
| 5 | Louisiana, do hereby certify that the foregoing is a true and |
| 6 | correct transcript, to the best of my ability and |
| 7 | understanding, from the record of the proceedings in the |
| 8 | above-entitled and numbered matter. |
| 9 | |
| 10 | /s/Alexis A. Vice, RPR, CRR |
| 11 | Alexis A. Vice, RPR, CRR<br>Official Court Reporter |

OFFICIAL TRANSCRIPT