# EXHIBIT I

### EXPERT REPORT OF MARIANNE C. MANN, M.D.

## I.  INTRODUCTION AND QUALIFICATIONS

Pfizer, Inc. ("Pfizer") has retained me to provide opinions related to docetaxel, a 505(b)(2) approved chemotherapy drug that was originally developed by Hospira, Inc. ("Hospira"), which was acquired by Pfizer in 2015.[1]  For the purposes of this report, the drug will be called Hospira docetaxel and the sponsor will be designated as Hospira, and then Pfizer, as appropriate.  I have been asked to provide opinions in connection with two cases currently selected for trial: *Guilbault* (No. 2:16-cv-17061) and *Plaisance* (No. 2:18-cv-08086), as well as the Taxotere (docetaxel) Multidistrict Litigation more broadly.

This report addresses the FDA's approval of Hospira docetaxel and the appropriateness of Hospira and Pfizer's labeling and pharmacovigilance practices to the present day, focusing on the risk of alopecia, including the risk of permanent alopecia.  I've been asked for my opinions related to Hospira docetaxel injection 20 mg/2mL single dose vial, 80 mg/8 mL multi-dose vial and 160 mg/16 mL multi-dose vial, including its development and regulatory history.  I was also asked to review and comment on the opinions of Plaintiffs' experts.  For this report, I have relied upon my background knowledge, training, expertise, and review of materials provided to me as well as requested by me in connection with this litigation.

As per the attached CV (Appendix A), I am a physician, board certified in internal medicine and trained in pulmonary and critical care medicine.  I obtained my M.D. degree in 1986 after completing an accelerated 6 year BA-MD program at Lehigh University and the Medical College of Pennsylvania.  I then trained as a medical resident and fellow for six additional years through 1992.  My residency was in internal medicine, and was completed at Albert Einstein Medical Center (Philadelphia), and the University of Connecticut Health Center.  My fellowship was in Pulmonary and Critical Care Medicine, completed in 1992 at the University of Connecticut Health Center.  From 1992 to 1994, I worked as a clinician in the critical care (ICU) setting.  As a physician, I am familiar breast cancer, lung cancer, and alopecia as a condition related to chemotherapy, but I am not an oncologist.  I joined the U.S. Food and Drug Administration (FDA) in 1994 but, as noted below, I continued to practice as a physician on a part-time volunteer basis in the out-patient Pulmonary Clinic at the National Naval Medical Center (now known as Walter Reed National Military Medical Center) in Bethesda, MD through 2004.

In 1994, I joined the FDA, remaining there for nine years through 2003.  In my nine years at the Agency, I worked in three Divisions in FDA's Center for Drug Evaluation and Research (CDER), each for approximately three years.  I began work at the FDA as a medical officer in the Division of Antiviral Drug Products from 1994 to 1997.  As part of my responsibilities in this role, I reviewed clinical data carefully and thoroughly in order to come to conclusions about drug efficacy and safety.  I reviewed Investigational New Drug Applications (INDs), New Drug Applications (NDAs), and Supplemental New Drug Applications (sNDAs) during those three years, including clinical development programs, protocol designs, and trial results.  I was the primary reviewer for dozens of IND submissions, and approximately five NDAs.  My work in

---

[1] Pfizer also marketed its own 505(b)(2) formulation of docetaxel for a brief period of time.  That formulation is not at issue in this report.

this Division involved products for AIDS and AIDS-related infections.  I was selected to participate in a new medical officer leadership program at CDER (being one of approximately twenty chosen).  I also received multiple FDA awards, including a high-level FDA award in 1998, the Secretary's Award, given by Donna Shalala, Secretary of the Department of Health and Human Services, for work I had completed as a medical officer.

In 1997, I was promoted to be Deputy Director of the Division of Reproductive and Urologic Drug Products (DRUDP), where I remained for three years through 2000.  This position is essentially "second in command" of a review division, serving under the director and sometimes in place of the director.  In this role I participated in final decisions on, for example, whether to place a study on hold or whether to approve a drug, and if a drug was approved, I often led labeling discussions both within the FDA and with the sponsor.  As Deputy Director in DRUDP, I also managed safety issues that arose with products both pre-market (prior to approval) and in the post-market setting.  I am very familiar with drug labeling changes that are made at the FDA in relation to safety issues.

In 2000, I became the Deputy Director in the Division of Pulmonary and Allergy Drug Products, where I remained for three years until 2003.  While in this role, I was also Acting Director for approximately two months during a time when the Director was busy with another project.  Again, if premarket or postmarket safety issues arose, I helped address the concern, including but not limited to labeling changes that may have been needed.

In total, I have had nine years of FDA experience in three different review divisions, including experience making final regulatory decisions about a wide variety of drugs.  I have been centrally involved or the primary decision maker for key regulatory challenges such as IND holds, NDA reviews and decisions, labeling, and major protocol design issues.  I saw and helped manage many drug safety related issues first-hand.

In 2003, I left FDA to become branch chief of the Respiratory Disease Branch at the National Institutes of Health (NIH).  As branch chief, I was in charge of creating a cohesive and directed research program for a set of respiratory diseases, including SARS and avian influenza.  While at NIH, I continued to be involved in drug development, being responsible for the clinical trials in my branch, including managing INDs under the FDA.

In 2004, after a more than a decade of work for the federal government, I became an independent consultant, chiefly providing expert advice on drug development plans in accordance with FDA regulations and requirements.  I have worked as a clinical and regulatory drug development consultant for the past 17 years, and again drug safety concerns and appropriate labeling, as well as the need for additional studies, have often been a topic of my consultative work.  In total, I have approximately 27 years of drug development experience.

In the previous four years, I have given deposition testimony as follows:

- September 11, 2017:  *In re Testosterone Replacement Therapy Prods. Liability Litig.*, MDL No. 2542, U.S. District Court for the Northern District of Illinois

2

- December 13, 2017:  *McDevitt v. Boehringer Ingelheim Pharmaceuticals, Inc. et al.*, CPL-HHD-CV-15-6057664S, Connecticut Superior Court (taken for purposes of Pradaxa litigation in various jurisdictions)

- August 16, 2018:  *Shabsis v. The Regents of the University of California, et al.*, Case No. BC567668 (Superior Ct. L.A. County)

- August 27, 2021: *Bales v. AstraZeneca Pharmaceuticals LP, et al.*, No. 2:17cv06124, U.S. District Court for the District of New Jersey, Newark Division

    My billing rate is $600/hour.

## II.    MATERIALS REVIEWED AND CORE OPINIONS

I have cited below and/or listed in Appendix B the materials that I have reviewed and materials made available to me in connection with preparing this report.

Based on my background, expertise, and the materials that I have reviewed, it is my opinion, among others set forth in this report, to a reasonable degree of certainty that:

1) Hospira docetaxel has been labeled appropriately from the time of its approval on March 8, 2011 to the present. Labeling has consistently described alopecia as being among the most common adverse events, with tables clarifying the incidence of alopecia in various cancer populations.  More specifically,

    a.  Hospira docetaxel, a 505(b)(2) NDA, was labeled appropriately at the time of its approval on March 8, 2011.  Hospira relied entirely on the FDA's finding of clinical safety and efficacy for the reference listed drug (RLD), Taxotere, to support its NDA.  It therefore was reasonable and appropriate for Hospira to have relied on Sanofi's Taxotere labeling for clinical efficacy and safety information, including all information related to alopecia.

    b.  Hospira docetaxel was labeled appropriately from the time of its approval on March 8, 2011 through the time that Ms. Guilbault and Ms. Plaisance were prescribed Hospira docetaxel.[2]  Neither the medical literature nor the limited post-marketing cases available to Hospira in this timeframe supported an independent Hospira-driven labeling update specific to permanent alopecia.

    c.  Hospira docetaxel continued to be appropriately labeled after Ms. Guilbault and Ms. Plaisance were prescribed Hospira docetaxel through March 31, 2017. During this timeframe, the RLD Taxotere label was updated regarding cases of permanent alopecia on December 15, 2015.  Hospira appropriately updated their

---

[2] Counsel has represented to me that Ms. Guilbault was prescribed Hospira docetaxel on September 25, 2013, and that Ms. Plaisance was prescribed Hospira docetaxel on January 17, 2014.

label once they were made aware of the update to the RLD Taxotere label. Hospira was made aware of the FDA's December 15, 2015 labeling update for Taxotere in August of 2016, after a pharmacovigilance reviewer identified a July 2016 FDA summary of safety labeling changes for various drugs, including docetaxel.  Hospira (by then part of Pfizer) responded by holding an internal risk committee meeting on September 26, 2016, and gaining internal agreement that the modest clarification to labeling was merited.  Pfizer and Hospira docetaxel teams worked to coordinate labeling to address that cases of permanent alopecia had been reported, as well as to address alcohol toxicity. An internal Pfizer labeling committee endorsed the proposed labeling changes on February 17, 2017. On March 31, 2017, a labeling Changes Being Effected (CBE) supplement was submitted to the FDA, and the change to the post-marketing section to note that additional of cases of permanent alopecia had been reported was implemented immediately. The FDA approved the CBE on September 27, 2017, agreeing with the changes related to alcohol toxicity and with the already applied post-marketing statement that "permanent cases of alopecia had been reported."  While the update took Hospira approximately 7 months, from the time of their August 2016 notification to their March 2017 submission, the existing Hospira docetaxel label had always described alopecia very clearly as a safety concern.

d.  Hospira docetaxel remains appropriately labeled from March 31, 2017 to the present day, as per the most recent labeling on the FDA website of 11/24/2020, which includes permanent alopecia as a reported adverse event observed in the post-marketing setting (Section 6.2 Postmarketing Experience).

2) Alopecia, including the risk for permanent alopecia, is most appropriately labeled as an Adverse Drug Reaction for docetaxel.  Alopecia risk, even permanent cases of alopecia, does not belong in the Warnings and Precautions section of labeling.

3) US labeling for any drug product is not, and should not be, identical to that of other countries.  Differences in regulatory authority decisions about labeling reflect years of labeling experience and precedent that are unique and appropriate to each country.  A 505(b)(2) sponsor of a US approved drug must follow US law and FDA regulations and adhere to FDA's ultimate decisions regarding labeling changes.

4) Although it was reasonable for FDA to request that the Taxotere label be updated to note that cases of permanent alopecia had been observed, this change was a modest clarification regarding a risk that had always been included in the label.  FDA never initiated or requested a class-wide label change for all docetaxel products.  Moreover, other chemotherapy drugs that have similarly been associated with a risk for permanent alopecia remain labeled for alopecia without any specific clarification about permanent cases.

5) The potential for a causal link between docetaxel and permanent alopecia exists but is far from certain:  reports have had limited or incomplete data, with patients taking other

chemotherapies, hormonal or radiation therapies that may have also contributed.   I agree with the FDA medical review that the labeling update noting that "cases of permanent alopecia have been reported" is all that could reliably be said given these limitations. NDA 20-449, S-075, Medical Review, Prowell, T., Dec. 4, 2015, (Sanofi_01574962) (HOS01400061999).

6)   Hospira had a robust pharmacovigilance program and their team followed docetaxel's safety profile carefully, consistent with FDA's "Guidance on Good Pharmacovigilance Principles."  Hospira detected the FDA's update to Sanofi Taxotere labeling regarding cases of permanent alopecia observed in the post-marketing setting in August of 2016 and acted in a reasonable timeframe to update their own docetaxel labeling accordingly.

In the event that additional facts emerge from discovery conducted after the date of this report or any Plaintiffs' expert offers a report or opinions after the date of this report, I may revise or supplement these opinions appropriately.

## III.   OVERVIEW OF FDA SAFETY REGULATIONS AND REVIEW PRACTICES

The FDA is composed of approximately 18,000 public health employees who assure that our foods, drugs, cosmetics, medical devices (including radiation devices), and blood supply are effective and well manufactured, and that, once approved, a drug's benefits outweigh its risks for intended use.  See FDA detail of full-time equivalents at: https://www.fda.gov/media/132813/download.  There are nine Centers and Offices within the FDA, of which one is the Office of the Commissioner.  Under the Office of the Commissioner are The Office of Medical Products and Tobacco and within this are various Centers that regulate tobacco, drug products, and device products.  The Center for Drug Evaluation and Research is where new and approved drugs are regulated.  The Center for Drug Evaluation and Research (CDER) is the largest Center within the FDA, with approximately 5600 employees, of whom approximately 80% have scientific backgrounds.  The job of CDER is to evaluate drugs for the American public, to determine for each drug that its benefits outweigh its risks, and to approve the drug with appropriate labeling.  Safety of any drug is a key aspect of the FDA's review, from the first study in humans throughout the approval of the product and post-approval.  Safety issues, including labeling changes that reflect these concerns, are addressed at primarily the CDER Divisional level.

### A.   Center for Drug Evaluation and Research (CDER)

Within CDER, the Office of New Drugs is responsible for the primary review and evaluation of new drug products.  There are approximately fifteen primary drug review divisions within CDER, each with different areas of expertise, including, for example, neurology, oncology, and pulmonology.  A drug review division is the central unit responsible for assessing the safety and efficacy of drug products.  A typical CDER review division includes approximately thirty to fifty scientists from a variety of backgrounds who interact with each other to fully understand a drug from many perspectives.  These scientists include chemists, animal toxicologists, bio-pharmacists, pharmacists, statisticians, and clinicians.  Most of the staff have Ph.D. or M.D. degrees or the equivalent.  Each discipline is responsible for reviewing data specific to their area of expertise.  Chemists, for instance, review how the product is made and its quality, while

toxicologists focus on animal studies.  Cross-disciplinary communication is common:  the chemists may note a structural alert that could lead to a discussion with the toxicologists, or the clinicians may find some data concerning and ask for additional analyses from the statisticians.

Within each CDER discipline, there is a layered structure of primary reviewers and team leaders and those with higher levels of oversight.  Each discipline within a review division is similarly structured, and no single reviewer evaluates data without oversight and a team approach.  The teams come to final decisions about a product after obtaining input from each team member. Most of the final decisions about the drugs are made by the Division Director.

### B.     New Drug Approval Process

The FDA begins reviewing a drug under an IND, or investigational new drug application.  An IND is typically filed by a drug sponsor to begin human studies with a drug in the United States, and the application includes chemistry and manufacturing data, animal data, any prior human experience noted with the drug and a proposed clinical protocol for studying the drug in humans. Under the IND, the drug proceeds through three phases of trials:  phase I (studies of safety and tolerability generally), phase II (studies in the patient population to evaluate safety, efficacy and dose response), and phase III (the pivotal studies that are performed to support the drug's risk/benefit profile).  Following the conclusion of the phase III study or studies, an NDA, or new drug application, is filed with the FDA for review and consideration of approval to market the drug in the United States for a specific indication.  The NDA includes the data compiled on the drug to date and is a comprehensive set of information.  Importantly, however, the FDA will have typically been working very closely with the sponsor on evaluating trial results and designing pivotal studies such that the FDA review team is familiar with the relevant data.  FDA regulations provide explicit guidance on the components of an NDA, including the organizational format for the submission.  Therefore, while an NDA encompasses substantial data, the efficient review of the data is facilitated by FDA's collaborative meetings with the sponsor over time and the regulated, well-understood organization of the data.  At CDER, the review of INDs and NDAs are central to the job process, and often the same reviewers are involved over many years (working closely with the sponsor) throughout the evolving phases of drug development.

### C.     505(b)(2) NDA

Section 505 of the Federal Food, Drug and Cosmetic Act describes three types of new drug applications.  A 505(b)(1) application contains the full reports of the investigations of safety and effectiveness, including all preclinical studies required, and is a "stand alone" application. Sanofi Aventis's filing for docetaxel (Taxotere) as a new chemical entity via NDA 020449, approved in May of 1996, was a 505(b)(1) application.  A 505(b)(1) application is extensive, containing full chemistry/manufacturing information, full preclinical toxicology information, and the full set of clinical trial data needed to support approval.  A 505(j) application is for generic drug products that are identical to the reference product.  These have their own set of requirements, which may vary, depending on the product, but typically require, at a minimum, pharmacokinetic studies that establish comparable bioavailability to the reference product. Approved 505(j) applications yield identical labels to the reference drug product as they rely entirely on the data generated by the innovator.  The third and final type of new drug application

6

is a 505(b)(2) application, where at least some of the information required for approval comes from studies that were not conducted by or for the applicant and for which the applicant has not obtained a right of reference.  In some ways, a 505(b)(2) application is "between" a generic application and an original 505(b)(1) application.

A 1999 draft FDA Guidance for Industry describes the 505(b)(2) application pathway.  Section 505(b)(2) was added to the Act by the Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch-Waxman Amendments).  Food & Drug Administration, Center for Drug Evaluation and Research Draft Guidance for Industry, "Applications Covered by Section 505(b)(2)" (Oct. 1999).  The provision allows FDA to rely on data not developed by the applicant, permitting reliance for approval based on the Agency's findings of safety and/or effectiveness for an already approved drug product.  This allows for the approval of drugs that include the same active chemical moiety as a reference product, but that are not identical/generic versions of the drug. This approach was intended to encourage innovation in drug development without requiring duplicative studies to demonstrate what is already know about a drug.  Two types of information can be relied upon for a 505(b)(2) application:  published literature and/or the Agency's finding of safety and effectiveness for an already approved drug, as reflected in the FDA approved label.

A 2019 FDA Guidance on Determining Whether to Submit an ANDA or a 505(b)(2) application also describes a 505(b)(2) NDA as one which "contains full reports of investigations of safety and effectiveness, where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use."  Food & Drug Administration, Center for Drug Evaluation and Research Guidance Document, "Determining Whether to Submit an ANDA or a 505(b)(2) Application, FDA-2017-D-5974, Section II (May 2019). As one example, this allows a way for sponsors to submit a new drug application that does not include (or require a right of reference to) the pivotal clinical studies that were done for the reference listed drug (RLD).  In these cases, the sponsor of the 505(b)(2) application would rely on the existing label for all clinical sections, and they support that by establishing a bridge to that data, often through comparative bioavailability studies.

Labeling for a 505(b)(2) NDA may be very aligned with the original reference product's labeling, or it may only align modestly.  It depends often on how different the 505(b)(2) drug is from the reference product.  For instance, one example of a 505(b)(2) application would be an entirely new route of administration for an already approved drug moiety, for instance switching from an oral pill as the route of drug administration to an inhaled route.  Such an application, because the route of administration is so unique and different, would need to generate its own clinical data for proper dosing as well as safety and efficacy sections of the labeling, and it would need to generate data for inhaled toxicology as well.  However, if the systemic exposure achieved by the new route of administration was comparable to or lower than the reference drug, some toxicology studies, such as carcinogenicity studies, might be able to be bridged such that these would not need to be repeated.  The sponsor might choose to file a 505(b)(2) NDA referring the RLD label text in order to describe the drug's carcinogenicity risk.  In this example of a 505(b)(2) submission, many new studies would be required for the inhaled drug, but the link for carcinogenicity would still render this a 505(b)(2) application.

7

Other 505(b)(2) applications may require very little new clinical development and rely more heavily on the RLD findings (via their package insert). For instance, a new injectable drug delivery system of epinephrine for prevention of anaphylaxis might align with the RLD almost entirely, only generating pharmacokinetic data to demonstrate the product is similarly bioavailable, and assuring that instructions for use allow for reliable drug administration. In this example, minimal new studies would be required for the new 505(b)(2) product, with the majority of clinical safety and efficacy text referencing the RLD label.

In my experience, 505(b)(2) applications comprise the majority of the NDAs reviewed and approved by the FDA. A Center for Drug Evaluation and Research report entitled 2018 New Drug Therapy Approvals notes: "As in past years, many important advances in 2018 use an already FDA-approved drug to treat a new disease or a new population of patients, such as children." Food & Drug Administration, Center for Drug Evaluation and Research, "Advancing Health Through Innovation: 2018 New Drug Therapy Approvals" (January 2019). The report notes that from 2009 through 2017, "CDER has averaged about 33 entirely new drug approvals per year." These 33 new drug approvals would be 505(b)(1) applications and, if spread evenly across approximately 15 divisions, would represent approximately 2 to 3 applications per division. This is consistent with my experience at the FDA as well. Most of the remaining FDA approvals are labeling supplements that are either extensions of the label that are sought by the innovator, or they represent 505(b)(2) NDAs. Examples of 505(b)(2) NDAs include new dosage forms, such as a pill taken 4 times a day that might be changed to a more extended release formulation taken twice a day. Alternatively, a new route of administration, such as moving from an oral pill to a transdermal patch or an inhaled formulation could also be a 505(b)(2) application. A change in drug concentration to a higher (or lower) strength is an example, as is a new combination of two already approved products. In rare cases, even a new molecular entity can be a 505(b)(2) drug application, for instance if the new drug is a pro-drug of an already approved drug, or if the new drug is the active metabolite of an already approved drug. It is understood that the applicant of a 505(b)(2) application will rely partly or, at times, almost entirely on the RLD label to support approval, addressing the key studies that are necessary to support what is required for the new route/formulation/indication/etc. The 505(b)(2) path exists in order to promote drug development so that patients have many options.

505(b)(2) applications can only be filed after the patent and exclusivity rights of the innovator have passed such that the application is legally acceptable. The FDA's 1999 Guidance for Industry on Applications Covered by Section 505(b)(2) delineates clearly that these types of applications are filed when the approval of the application relies (to any degree) on the Agency's previous findings of safety and/or effectiveness for an already approved drug. Importantly, the applicant need not obtain a right of reference to the raw data, or "own" the data. Rather, reliance is made to approved drug labeling for the sections that are relevant, and for some 505(b)(2) applications, reliance on the RLD is very significant.

###### D.      FDA's Role in Product Labeling

If approved, a prescription drug is accompanied by FDA-approved labeling, which is a compilation of the most important and relevant information about the product, based on FDA's thorough review of the NDA marketing application. In collaboration with the relevant sponsor, FDA takes great care and attention to crafting an accurate yet focused label that reflects the

drug's key benefits and risks.  The label is written for the health care practitioner audience, and contains information deemed necessary for the safe and effective use of the product.  The label is not meant to be a comprehensive overview of all findings on a drug, but serves to highlight the key messages for efficacy and safety.  The label also governs what may be included in promotion and advertising materials related to the drug.

Prior to approval of an NDA, the specific text to be used in the prescription drug label must be approved by the FDA.  Typically, the pharmaceutical company submits initial draft proposed text for product labeling with its initial marketing application.  FDA typically provides comments to the company on the draft label, before arriving at the final text.  In all instances, FDA makes the final decisions on the proper content and language of labeling, including the most appropriate placement of information related to drug safety, such as black box warnings, warnings and precautions, and adverse drug reactions.

The product label provides extensive information about the drug, including its ingredients, directions for use, and summaries of information that might be most useful to the prescriber. This includes information on the mechanism of action, animal toxicology, pharmacokinetics, drug interactions, summaries of the efficacy results of the phase III studies, and safety information from various sources.  The requirements regarding the content, format and organization of the product label are specified by FDA regulations.  For a 505(b)(2) NDA the Agency will determine which sections of a drug label may reflect prior findings of safety and efficacy, and which sections require new data for the new formulation, new dose, new route of administration, new indication, etc.

In addition to the healthcare professional-directed product label, there may be distinct, FDA-approved documents that are intended for the patient.  These may be termed "Patient Package Inserts," "Instructions for Use," or "Medication Guides."  As with the product label, the content of these patient-directed documents must be approved by the FDA.   For all labeling, whether aimed at patients or prescribers, FDA has the final say, yet the Agency works collaboratively with the sponsor to address all key findings appropriately.

Labeling for a 505(b)(2) NDA is often consistent with the label of the RLD, however under certain circumstances it can differ, as it is not a generic drug label. All 505(b)(2) labeling should conform with current best labeling practices, even if this means that there is a difference between the 505(b)(2) label and the RLD label.  For a 505(b)(2) drug that is simply a reformulation of a reference drug, labeling would be nearly identical for each product, particularly if no new clinical studies were performed for the reformulation, and the only link made is a pharmacokinetic one.  All 505(b)(2) sponsors must monitor their own post-marketing adverse event reports and the literature as a part of routine pharmacovigilance, but it would be highly unusual for a 505(b)(2) sponsor of simply a reformulation to initiate a labeling change outside of the reference drug label unless the clinical findings in the literature or the adverse event reports raised a concern specific to their formulation.  FDA will also proactively inform all 505(b)(2) sponsors of any labeling updates that may need to be extended across a set of approved drugs or drug class.

### E.      FDA's Post-Marketing Activities

FDA's evaluation of drug products does not end with marketing approval.  Active investigation of the product continues even after marketing approval has been granted and the product begins to be used by the general public.  FDA can also require risk evaluation mitigation strategies (REMS) or safety-related labeling changes at any time post approval.  All drug sponsors, including 505(b)(2) sponsors, are responsible for assessing the evolving literature as well as their own post-marketing safety data to inform labeling changes. For a drug like docetaxel, which had several 505(b)(2) NDAs approved, each sponsor (including the reference drug sponsor, as well as any 505(b)(2) sponsor) would be responsible for monitoring their specific drug's safety in the post-market setting.  Safety related findings may arise in one (or more) of these individual applications or they may arise in post-marketing literature, and all sponsors would need to follow their own post-marketing drug safety reports and the literature. Depending on the safety findings observed, labeling changes may need to be implemented across all approved products, or only to specific products.  FDA reviews each applicant's findings as well as the literature, and will inform all sponsors if and when any class-wide labeling changes are required for safety.

Upon finding a new safety concern during the post-marketing/post-approval timeframe, FDA has many options to address the new finding, ranging anywhere from product withdrawal (if the benefits no longer outweigh the risks) to updating the label.  Safety changes can range from a Black Box Warning to a Warning/Precaution, to an addition to the Adverse Reaction section, to the more modest change of simply listing the new finding to the Post-Marketing section of the label, noting that some cases have been reported.   For such minor safety labeling changes as the latter, the FDA may not always provide notifications to every sponsor of a comparable product to update their labels.  In my experience, for any significant new safety update to a reference drug label, the FDA has notified all sponsors (across the class) to address the same risk, and, pending their response, will typically update labeling class-wide. Sponsors of any approved drug, even a 505(b)(2) drug, must follow safety, including monitoring of post-marketing adverse event reports they receive, the evolving medical literature, and any pertinent changes made to the reference drug label.  If a 505(b)(2) sponsor is notified by FDA of a required post-marketing label change across the class or finds a pertinent label change to the reference drug label, it is reasonable for them to assess their own experience so that their labeling can be as accurate and informative as possible.

### F.      Pharmacovigilance and Post-Marketing Studies

Once a drug is approved and used by a wider and more diverse patient population, additional important safety information about the drug may emerge.  Pharmaceutical companies actively collect and analyze the reported adverse events that occur in patients who receive the drug, in order to assess for potential new safety issues.  This ongoing risk assessment is often referred to as "pharmacovigilance."

Pharmacovigilance is the collection and analysis of spontaneously reported adverse events including the medical literature with the goal of identifying potential safety concerns, often referred to as safety signals.  In part because of the nature of adverse event reports as well as the patient's underlying medical condition, it may be difficult to definitively determine whether a particular safety signal is in fact a result of the drug.  FDA has a responsibility to continue to

monitor the totality of data related to a given drug's safety following its approval, including data from multiple sponsors, and to address any new safety issues that are identified. Sponsors have a responsibility to report the post-marketing adverse events that they receive to FDA in a clear and informative manner so that safety signals can be assessed. A June 2014 FDA Guidance entitled "Providing Submissions in Electronic Format-Postmarketing Safety Reports" clarifies how sponsors should provide individual case safety reports that are received post-marketing. These can be reported electronically by sponsors through an electronic submissions gateway or a safety reporting portal offered by FDA. Sponsors of a given drug are not required to work together in this process; rather each sponsor, including the reference drug sponsor and any 505(b)(2) sponsor, addresses their post-marketing safety reports independently. The large majority of post-marketing adverse event reports in the FDA Adverse Event Reporting System (FAERS) are reported by drug manufacturers (96%) with relatively few being reported (4%) directly from consumers and healthcare professionals. (FDA 2020 Webinar available at https://www.youtube.com/watch?v=gE-72HYY27g). As per an FDA 2017 Webinar, "FAERS data by themselves are not an indicator that the drug is causing the reported adverse events." (https://www.youtube.com/watch?v=GfYNGifaML4).

All sponsors of approved drugs must collect post-marketing adverse event reports that they receive and appropriately provide these to the FDA in a timely manner. These individual case report summaries include four data elements that at minimum identify a patient (age, initials, gender), a suspect drug, an adverse event, and an identifiable reporter. Serious reports are those that result in death, a life-threatening adverse event, an event leading to hospitalization, a persistent or significant disability, or a congenital anomaly or birth defect. Serious, unexpected (unlabeled) adverse events need to be reported within 15 calendar days. Serious expected or nonserious (expected or unexpected) adverse reports need to be reported in the periodic safety updates. In general, sponsors provide periodic safety updates quarterly within the first 3 years of approval, and annually thereafter.

FAERS collects post-marketing adverse events from sponsors. As of September of 2017, FDA has made the FAERS database accessible by the public on their website. Anyone evaluating data in the FAERS system is cautioned that "a simple search of FAERS cannot be performed with these files by people who are not familiar with creation of relational databases." Food & Drug Administration, "FDA Adverse Event Reporting System (FAERS): Latest Quarterly Data Files," (updated as August 3, 2018), https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-latest-quarterly-data-files. Of note, while searches of the FAERS database can be done for alopecia, the term "permanent alopecia" specifically cannot be searched. The terms used in the FAERS database are: alopecia, alopecia areata, alopecia scarring, alopecia totalis, androgenetic alopecia, diffuse alopecia, radiation alopecia, alopecia universalis, application site alopecia, injection site alopecia and non-scarring alopecia. Although information on permanent alopecia might be understood by reading the actual case report further, the underlying report is not available via the database. Rather, the public can obtain a summary FAERS report under the Freedom of Information Act (FOIA) process, with individual reports requested. These often take a longer time for FDA to process and provide to requestors, as the Agency is always working under tremendous backlogs. In 2009, Obama's Office of Management and Budget called for each Agency with a significant backlog of outstanding FOIA requests to reduce such backlog by ten percent each year. The

Division of Health and Human Services, which includes FDA, made advances from 2009-2011 (going from 19,361 to 6529 backlogged requests), but from 2012 through 2015, the Agency continued to have between roughly 5000-7000 backlogged requests, making little additional progress. (https://docs.google.com/spreadsheets/d/1Zu_DkDlEGAOH5BdhMAB25q5emEKjJX7wwOPlBrxzpLc/edit#gid=0).

FDA's November 2019 Guidance entitled "Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff" outlines how FDA reviews post-market drug safety findings. The guidance notes that it is not possible to identify all risks of a product during clinical trials, and that new information may be learned in the post-marketing period. FDA teams therefore perform periodic cumulative screenings of reported adverse events as well as the medical literature to assess for potential new safety signals that are not already identified in labeling. For instance, with alopecia included in docetaxel labeling as a broadly inclusive term, reviewers may not immediately determine that additional labeling is necessary upon reviewing some initial case reports of permanent alopecia or initial literature reports of more persistent or permanent alopecia. Attribution of the cases of more permanent alopecia directly to docetaxel is challenging when patients have received multiple chemotherapies, hormonal therapies, and radiation. In such a setting, reviewers may reasonably determine that causality is unclear and as well that the term alopecia (broadly) covers cases of more permanent alopecia. As additional cases are reported, however, and particularly as the medical literature evolves with case series, with increasing attention being drawn towards cases of permanent alopecia in patients treated with docetaxel, FDA reviewers and/or sponsors may determine that some type of labeling update is warranted. Depending on the strength of the association, FDA may consider numerous options exist, ranging from a Black Box Warning to a Warning/Precaution, to an Adverse Event listing with additional details, to the most modest update, which would be to add the event to the post-marketing section of the label as an observed finding.

Post-marketing adverse event reports are important and they may contribute to a signal detection, but they also have important limitations. First, there is no certainty that the reported adverse event was actually due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports often do not contain enough detail to assess causality fully. FDA does not receive a report for every adverse event that occurs with a product, and also many factors can influence whether an event will be reported, such as the time the product has been on the market, as well as publicity about a given event. There are also redundant reports where the same report is submitted by a consumer and by a sponsor (and possibly reported as well in the medical literature). Therefore, post-marketing adverse events have significant limitations.

## IV.   Hospira's 505(b)(2) NDA

Hospira filed a 505(b)(2) NDA 022234 on July 7, 2007, with approval granted on March 8, 2011. On September 3, 2015, Hospira was acquired by Pfizer, after which point docetaxel was marketed under Hospira Inc. as a Pfizer subsidiary. Of note, Pfizer received its own 505(b)(2) approval for docetaxel under NDA 202356 on March 13, 2014. After acquiring Hospira, Pfizer

discontinued NDA 202356 on October 31, 2016, maintaining the Hospira docetaxel NDA 022234.

This report addresses the Hospira docetaxel 505(b)(2) product initially marketed by Hospira and subsequently owned and marketed by Pfizer. The report will address the history of Hospira docetaxel from the time of its approval to the present, with a focus on alopecia risk, specifically the risk of permanent alopecia.

A clear definition of permanent alopecia following chemotherapy does not exist, nor do most cases reported use a clear and precise definition. This can make signal detection as well as comparisons for the event between drugs difficult to make with clarity. As Dr. Ross notes in his expert report (footnote 4), there are different definitions of permanent alopecia in the medical literature ranging from 6 months to at least 2 years post-chemotherapy completion.

It is my opinion that Hospira docetaxel has been appropriately labeled with regards to alopecia from the time it was originally approved on March 8, 2011 to the present.

### A.   Hospira's 505(b)(2) NDA 22234 for docetaxel was appropriately labeled for alopecia risk upon approval on March 8, 2011.

Hospira filed their 505(b)(2) NDA for docetaxel injection, 20 mg/2mL single dose vial and 80 mg/8 mL multidose vial and 160 mg/16 mL multidose vial on July 7, 2007. The concentration for each vial was 10 mg/mL. As noted in the FDA's Clinical Pharmacology/Biopharmaceutics Review by Sophia Abraham, Hospira's docetaxel for injection was the same active ingredient, the same route of administration, seeking the same indications as those of the previously approved Sanofi Aventis RLD, Taxotere. NDA 22-234, Clinical Pharmacology and Biopharmaceutics Review, Abraham, S. (January 17, 2011). The key difference between the two products was that the Hospira product's strength was 10 mg/mL, while that of the RLD Taxotere product was more concentrated at 40 mg/mL. The less concentrated Hospira product was ready for immediate injection after just a single dilution, while the more concentrated Taxotere product required a 2-step dilution process prior to injection. Additionally, Hospira's application provided for multi-dose vials of 80 mg/mL and 160 mg/16 mL as dosage forms while the RLD Taxotere was supplied as a single dose vial.

No new clinical data were submitted for the Hospira docetaxel 505(b)(2) NDA. The Sanofi Aventis Taxotere NDA had been previously reviewed for efficacy and safety, and therefore, the medical reviewer recommended approval for all indications, including breast cancer, non-small cell lung cancer, and prostate cancer. NDA 22-234, Medical Review, Snyder, K. (September 23, 2010). All 3 dosage forms and strengths (20 mg/2 mL single dose vial, 80 mg/8 mL multi-dose vial, and 160 mg/16 mL multidose vial) were approved. FDA referred entirely to the prior review of the Sanofi Aventis NDA 20449 for Taxotere to support the clinical safety and efficacy. The main issues raised by FDA during the review were related to chemistry and manufacturing. The sponsor needed to support a new manufacturing site and address matters related to patent certification and patent litigation. NDA 22-234, Administrative and Correspondence Documents, August 11, 2008 Tentative Approval Letter to Judith Zutkis (Hospira) from Ramzi Dagpher, M.D. (FDA) (HOS02500104964); December 11, 2009 Tentative Approval Letter to Wendy Tian (Hospira) from Robert Justice, M.D., M.S. (FDA) (HOS01400252034). Some

13

additional issues addressed during the NDA review involved ensuring that the carton and container provided appropriate instructions for proper use to avoid medication errors given the differences in concentration of the Sanofi Taxotere and Hospira docetaxel. NDA 22-234, Administrative and Correspondence Documents, December 22, 2010 Email from Frank Cross to Laurie Wotjko November 23, 2010 FDA Notice of Telecon. Hospira addressed all of these issues acceptably.

FDA approved Hospira docetaxel on March 8, 2011.  A minor difference in the labeling for the Hospira docetaxel versus Sanofi Aventis Taxotere was in the preparation and administration section of the labeling, in which the Hospira package insert required only a single dilution step versus a 2-step process outlined in the Sanofi Aventis package insert.  Clinically, with respect to clinical trials and findings of efficacy and safety, Hospira labeling matched the existing Taxotere label, as would be expected for a 505(b)(2) product that relied fully on the FDA's finding of safety and efficacy for the RLD.

The approved label for Hospira docetaxel, like the Sanofi Aventis Taxotere label, described alopecia as one of the most common adverse reactions seen across all docetaxel indications. This was noted both in the Highlights section of the label, as well as the Adverse Reaction section of the label.  Additionally, alopecia was mentioned numerous times in a data-driven manner:

- Table 1 describes a summary of the adverse reactions in patients receiving docetaxel at 100 mg/m$^2$ with breakdowns by all tumor types/normal liver function tests, all tumor types/elevated liver function tests, and breast cancer/normal liver function tests.  For each of these 3 categories, alopecia was common, affecting 76%, 62%, and 74% of patients, respectively.

- Table 4 describes clinically important treatment emergent adverse reactions (regardless of causal relationship) in breast cancer patients receiving docetaxel with doxorubicin and cyclophosphamide (TAC), versus patients receiving fluorouracil with doxorubicin and cyclophosphamide (FAC), with alopecia reported in 98% of TAC vs 97% of FAC patients, and with Grade 3 or 4 alopecia reported as "N/A" in each arm.

- Table 5 describes treatment emergent adverse reactions in patients receiving docetaxel as monotherapy for non-small cell lung cancer who were previously treated with platinum-based chemotherapy.  In this table, docetaxel vs best supportive care vs vinorelbine/ifosfamide results are compared, with alopecia reported in 56%, 35%, and 50%, respectively.

- Table 6 describes adverse reactions in patient with lung cancer who were treated with the combination of docetaxel/cisplatin versus vinorelbine/cisplatin.  Alopecia was observed more commonly in the docetaxel/cisplatin arm (75% vs 42%).  Grade 3 alopecia was uncommon in each respective arm (<1% vs 0%).  Under Table 6, a second comparative study of docetaxel/carboplatin vs vinerelbine/cisplatin was described, noting that there were rates of several adverse events in the docetaxel/carboplatin arm, including alopecia as one of those listed events.

14

- Table 7 describes adverse events in patients with prostate cancer treated with docetaxel plus prednisone versus mitoxantrone plus prednisone, with rates of alopecia more common in the docetaxel arm:  65% vs 13%.  Grade 3 or 4 alopecia was recorded as N/A by arm.

- Additionally, the approved label clarified in the Patient Counseling Information section that hair loss was associated with docetaxel, and that it was among the most common side effects.

A review of FDA correspondence with Hospira from the time of the NDA submission in July of 2007 through to its approval on March 8, 2011 supports that FDA was reviewing the reference listed drug (RLD) label for Taxotere as the framework for Hospira's docetaxel labeling.  FDA was clear that the most recent label for the RLD (Taxotere) should be the basis for Hospira labeling and that any changes that Hospira made to the Taxotere label should be provided via a redline version.  November 9, 2010 Letter to Robert Justice (FDA) from Laurie Wojtko (Hospira) re "Telephone Request Labeling," (HOS01400254442).

The most proximate Sanofi Aventis US Taxotere label available to Hospira was the August 2, 2010 Taxotere label approved with supplement 54, which provided for a new one-vial formulation.  Labeling for the Hospira docetaxel 505(b)(2) NDA approved on March 8, 2011 was compared to the US FDA approved Sanofi Aventis Taxotere label approved on August 2, 2010.  Due to exclusivities that were still held by Sanofi Aventis, Hospira carved out all labeling related to gastric cancer and head and neck cancer, as well as all pediatric information.  All alopecia-related areas of the two labels matched identically with 2 exceptions.  Two tables that reflected alopecia rates in those subjects in the Sanofi Aventis label (Table 10 for gastric cancer, and Table 11 for head and neck cancer) were not included in Hospira's original labeling because Hospira did not seek these indications.  Hospira docetaxel was appropriately and accurately labeled for alopecia at the time of its March 8, 2011 approval to be consistent with the Sanofi Aventis Taxotere label.

Few literature reports of persistent alopecia in association with the use of docetaxel had been reported at the time of Hospira's March 8, 2011 approval for docetaxel (see Section VIII of this report).  Reports were retrospective in nature, limited in detail, and confounded by the use of concomitant chemotherapy and hormonal therapy.  These limited literature reports had not supported any change to the Sanofi Aventis Taxotere label nor would they have merited Hospira proposing any changes to their 505(b)(2) docetaxel product label regarding chronic alopecia.

Hospira's docetaxel 505(b)(2) NDA was approved by FDA on March 8, 2011, and was labeled appropriately.  Labeling was based on the Agency's findings of clinical safety and efficacy for the RLD Taxotere, including modest changes required for the instructions on how to administer the new 1-step dilution process, and to address the appropriate indications.  Alopecia was described as being among the most common adverse events associated with the use of docetaxel, and various tables clarified the high incidence of alopecia in various cancer populations.  The term alopecia is inclusive of all types of alopecia, including the potential for more persistent and/or permanent cases.  There was no basis for Hospira to propose any new information on alopecia in its initial labeling at the time of FDA approval.  Hospira relied on the Sanofi clinical safety and efficacy data for its approval, as is permitted under the 505(b)(2) regulations.

15

Hospira did not have access to Sanofi's clinical trial data or internal adverse events.  Moreover, the limited literature reports of persistent or permanent alopecia reported in association with docetaxel through March 8, 2011 had not led to any changes or updates by Sanofi for Taxotere, and they would not have supported Hospira adding any new clarifications to their label.  The FDA's approval of Hospira's 505(b)(2) NDA and final labeling confirms as well that the Agency, who has the final say on all product labeling, agreed that all information, including alopecia risk, was appropriately displayed and had been clearly and accurately communicated.

> **B.    Hospira docetaxel labeling was appropriate regarding alopecia risk from the time of its March 8, 2011 approval through the time Ms. Guilbault and Ms. Plaisance were prescribed docetaxel.**

Hospira monitored their docetaxel product following its approval as a 505(b)(2) NDA on March 8, 2011.  Dr. Juergen Schmider, the head of global safety, addressed Hospira's post-marketing pharmacovigilance processes in his June 17, 2019 deposition. Dr. Schmider was familiar with Hospira's processes both prior to and after the merger with Pfizer, noting that the safety systems for the two companies were fully integrated in May of 2016.  June 17, 2019 Schmider Dep. (12:4-11). He addressed how Hospira collected post-marketing safety case reports.  Dr. Schmider described a tiered process, with first line trained intake personnel (including team leaders with more experience), a higher level of MD supervisory personnel, and ultimately himself as the global lead.  June 17, 2019 Schmider Dep. (21:18-25:3). He described two major sites (Manila and Lake Forest) where the primary intake assessments occurred and information on post-marketing adverse events was added to a Trackwise database. June 17, 2019 Schmider Dep. (25:17-26:10; 27:15-29:7). Assessments about the need for expedited reporting, as well as whether an event was already listed in labeling (or not) were made for each report as well.  June 17, 2019 Schmider Dep. (79:15-80:20). Dr. Schmider described frequent cross-checks between the various team members for such issues as the proper MedDRA term or a listedness determination, or the need for expedited reporting. June 17, 2019 Schmider Dep. (80:21-82:2). As for causality assessments, Dr. Schmider clarified that these are not required for every post-marketing case report, but causality assessments were made by the sponsor for some reports by the intake professional, being confirmed later by the physician. June 17, 2019 Schmider Dep. (82:9-83:16). He noted that causality assessments are difficult to make with confidence due to confounding variables or unknowns in the reports. June 17, 2019 Schmider Dep. (221:13-222:9). Dr. Schmider stated a conservative approach to causality was taken in that if either the investigator (or reporter) or the company said that an event was causally associated, then it was considered causally associated. June 17, 2019 Schmider Dep. (87:2-88:2).

Dr. Schmider described the process for signal detection of a safety concern, clarifying that signal detection was looking for an aberration in adverse event reports beyond what one would normally expect for a drug, to further assess potential drug-related safety concerns. June 17, 2019 Schmider Dep. (89:7-91:14).  He described the intake assessment process, the oversight by medical doctors, the escalation to his level for review, and the review of any safety issue by the corporate safety board, on which he served. June 17, 2019 Schmider Dep. (33:22-34:9; 100:12-101:12). He described the members of the corporate safety board, which included clinicians and regulatory affairs staff. June 17, 2019 Schmider Dep. (33:14-34:6). He explained that any signal would include a review of the postmarketing case report database, a review of the literature, a review of health authority websites and a review of competitor products. June 17, 2019,

Schmider Dep. (95:21-96:9). Following this, the team would be able to recommend further review by the corporate safety board. June 17, 2019 Schmider Dep. (99:11-101:12). Periodic safety updates and annual reports for drugs such as docetaxel also followed a clear process that was well defined within Hospira. June 17, 2019 Schmider Dep. (226:6-17; 228:3-14).

The sources of information related to permanent alopecia that Hospira had access to during this timeframe from approval on March 8, 2011 until Ms. Guilbault and Ms. Plaisance were prescribed docetaxel in September 2013 and January 2014 would have been the medical literature and post-marketing cases reported to Hospira.

The medical literature during that time included a few published articles addressing permanent alopecia with docetaxel. One article published in this timeframe was the November 2012 publication by Kluger et al (Ann Oncol 2012; 23:2879-2884). The title of the article was: *Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel, a prospective study of 20 patients.* The authors followed 1000 patients over 4 years, with 20 patients (0.2%) reported as having permanent alopecia defined as the absence or incomplete hair growth persisting 6 months beyond their breast cancer chemotherapy. All had received FEC followed by docetaxel and many had received other chemotherapy as well. Hormonal and radiation therapy had also been given to all 20 patients. Therefore, many confounding variables aside from docetaxel may have played a role in the cases of permanent alopecia reported by Kluger et al.

The other literature in this timeframe addressed single cases or small numbers of cases, often lacking detail. The 20 patients described in the Kluger 2012 publication were appropriately submitted by Hospira to the FDA as post-marketing adverse event reports and the publication itself was submitted to the Agency as part of Hospira's Annual Signal Detection Report for 01 October 2013 - 01 October 2014 (HOS01100044916). FDA was therefore made aware of the Kluger report in a timely fashion and took no immediate action to change the labeling.

In terms of post-marketing adverse events of alopecia reported to Hospira, I have reviewed the n=146 reports of alopecia described from the time of approval until a September of 2016 Hospira review of this issue, of which n=43 were described as potentially permanent in nature. As is typical with these reports, many suffered from a lack of detail. A large majority were confounded by prior or concomitant chemotherapy, radiation therapy, or hormonal therapy, and indeed 20 of the 43 potential permanent cases were derived from the Kluger article.

From the time of approval of Hospira's docetaxel on March 8, 2011 through the time Ms. Guilbault and Ms. Plaisance were prescribed docetaxel, it was reasonable for the Hospira docetaxel label to have remained consistent with the existing Sanofi Aventis label for Taxotere with respect to alopecia. The small number of permanent alopecia reports in the medical literature and limited post-marketing safety reports of permanent alopecia in the Hospira database was not materially different than the information available before the March 2011 Hospira approval and would not have triggered a labeling change.

> **C.    Hospira docetaxel continued to be appropriately labeled in the time period after Ms. Guilbault and Ms. Plaisance were prescribed docetaxel through to March 31, 2017, when a CBE added cases of permanent alopecia to the post-marketing adverse reactions section.**

In the time period after Ms. Guilbault and Ms. Plaisance were prescribed docetaxel, Hospira's pharmacovigilance efforts led to important safety updates in a timely fashion for a number of key safety issues. For instance, Hospira made appropriate updates to their docetaxel label for new indications as well as safety. On July 10, 2014, the gastric cancer and head and neck cancer indications were added to the Hospira docetaxel label, with information provided that was consistent with the Sanofi Aventis Taxotere label. As well, FDA informed Hospira on April 21, 2014 about a docetaxel class labeling safety concern regarding to ethanol intoxication, clarifying this for the public as well in a safety update on the FDA website on June 20, 2014. Since docetaxel contains ethanol, labeling changes to the Warnings and Precautions section were warranted across the class, including the Sanofi Aventis Taxotere labels and all 505(b)(2) approved docetaxel labels. Hospira appropriately included the alcohol safety concern in their Warnings/Precautions section, as well as other labeling sections, with an NDA supplement approved by FDA on July 10, 2014. The Agency's actions related to alcohol intoxication risk included notifying the public that they were reviewing this concern in a safety update, updating the Sanofi Aventis Taxotere label, and notifying the 505(b)(2) application holder Hospira to similarly update their label. Hospira responded quickly regarding this safety concern and updated their label within 3 months of FDA notification.

Approximately a year later, and unbeknownst to Hospira, in the spring of 2015, the FDA began working with Sanofi to understand more the risk of permanent or irreversible alopecia with the RLD Taxotere. FDA did not make a public safety announcement or give notification to Hospira regarding the risk of permanent alopecia being a concern. The FDA's interaction with Sanofi began with an information request on March 23, 2015 asking for a summary of all cases of permanent, partial, or total alopecia in their internal clinical database. Hospira did not have access to this internal Sanofi information. Sanofi responded on April 10, 2015, and following FDA review of this data, the Taxotere label was updated on December 11, 2015 to address the potential risk for permanent alopecia by adding a sentence to the post-marketing adverse reaction section stating: "Cases of permanent alopecia have been reported."

The FDA clinical review on the issue of permanent alopecia by Dr T. Prowell with team leader Dr. A McKee dated December 4, 2015 provides helpful perspective as to how the concern about permanent alopecia came about, and how FDA viewed the strength of the association. NDA 22-449, S-075, Medical Review, Prowell, T., December 4, 2015 (Sanofi_01574962) (HOS01400061999). FDA reviewers noted that oncology patient advocates had contacted the Agency to express concern that permanent alopecia was not reflected in the Taxotere label. The Agency then sent the aforementioned March 23, 2015 request to Sanofi to provide a summary of all cases of permanent, partial, or total alopecia reported in their internal database accordingly.

Sanofi found 2172 unique solicited and unsolicited case reports of alopecia (of any type) in association with docetaxel. The majority did not provide for the longer term outcome of the alopecia. For 70% of the cases, FDA noted that docetaxel was part of a combination chemotherapy approach that included one or more other agents also known to cause alopecia. Many patients had received endocrine (hormonal) therapies that may also cause alopecia, "significantly confounding the determination of causality." In a small number of cases, 117 of the 2172 cases, or 5.3%, the alopecia was described as "permanent," "irreversible," or "lasting > 2 years." FDA also assessed the risk of permanent alopecia based on data from clinical studies (company sponsored, non-company sponsored, and post-marketing) as well as spontaneous post-

18

market reports collected as part of routine pharmacovigilance.  The FDA concluded that the available evidence supported a potential causal association between docetaxel and permanent alopecia and that Taxotere's label should be updated.  Sanofi and FDA concurred that a statement to the Post-Marketing Experience section under cutaneous reactions would be added stating:  "Cases of permanent alopecia have been reported," along with corresponding updates to the Patient Counseling and Patient Information Sections.

Although FDA came to the conclusion of a potential causal association, there were many confounding risk factors for permanent alopecia, and missing details in many case reports.  The FDA found that virtually all of the described cases were confounded by the use of other cytotoxic agents known to cause alopecia.  The medical officer concluded:  "I think the sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data."  (Prowell T to Diggs F, et al, Congressional Response Letter-Taxotere Adverse Events, December 4, 2015).  Sanofi Taxotere Supplement #75 added information about permanent and irreversible alopecia cases being observed to the label; this supplement was approved by the FDA on December 11, 2015.

Again, Hospira was not aware of any of these discussions nor were they made aware of the December 11, 2015 labeling change.  Unlike their approach with alcohol, FDA did not contact Hospira to request a summary of their experience, nor did they request Hospira to provide a permanent alopecia labeling update.  FDA had these options, but did not pursue them.  It is not clear why the FDA did not take these actions, as the information about permanent alopecia presumably would apply to all approved docetaxel formulations.  However, the fact that the FDA saw "tremendous limitations" in the permanent alopecia case report findings, and the fact that alopecia was already well described in docetaxel labels as a broadly inclusive term, are some potential factors for not taking any immediate action across the wider class of docetaxel therapies.

Hospira became aware of the Taxotere labeling change related to cases of permanent alopecia through internal monitoring in July of 2016.  An August 17, 2016 email from Katya Barbuzenko, a pharmacovigilance associate at Truemed to Liat Haber, the Israel Country Safety lead at Pfizer, identifies a July 2016 notification from the FDA website that summarized safety labeling changes to various drugs, one of which was Taxotere's labeling update for cases of permanent alopecia. HOS01400038636. She provided the link to the FDA's website and noted:  "Please let me know if you are aware of these changes and if the SPC will [be] changed accordingly."  This finding triggered action within the Pfizer/Hospira team to perform a thorough review of docetaxel with respect to alopecia, focusing on permanent/persistent cases.  The team reviewed their database for two safety concerns during this time:  alcohol intoxication and alopecia.  Pfizer/Hospira's approach to assessing alopecia included an evaluation of the FDA's earlier assessment of the Sanofi database for Taxotere, and an internal assessment of their own data submitted to FAERS, as well as the medical literature.

Sanofi's global pharmacovigilance database had identified a total of 2172 cases reports of alopecia in association with docetaxel. The Agency had observed that in 70% of the cases, patients had received a combination chemotherapy regimen that significantly confounded the determination of causality.  It was noted that 117 (5.3%) of the 2172 cases had alopecia described as permanent, irreversible, or lasting more than 2 years.  The FDA's conclusion was

that "While alopecia occurs in virtually all patients who receive docetaxel, there have only been 2172 reports to the sponsor of alopecia, and therefore the true incidence of permanent alopecia is unknown and cannot be reliably estimated given the limitations of the available data." FDA and the sponsor concurred, however, that a <u>potential</u> causal association existed and labeling should be updated. The statement "Cases of permanent alopecia have been reported," was added to the post-marketing Adverse Reactions section of the Taxotere label accordingly.

Pfizer/Hospira performed a search of "alopecia" as a high level term in their own pharmacovigilance safety database. March 17, 2017 Clinical Overview (HOS00200030958). It was observed that a total of 146 post-marketing case reports of alopecia had been reported to Pfizer/Hospira in relation to docetaxel, of which 43 were "permanent" or "irreversible," Among these 43 cases of permanent alopecia were the Kluger literature case series of 20 cases, in which every patient had received the FEC-D regimen. Among the 43 cases of permanent alopecia were 10 cases in which docetaxel was noted as the only suspect drug. These were reviewed carefully.

Review of the 10 cases revealed no major differences from the cases where docetaxel was listed among several suspect drugs. Concomitant and/or prior chemotherapy may have contributed to the event in 5 of the 10 cases, even though docetaxel was the only listed suspect drug. In the remaining 5 cases that listed docetaxel alone: 2 were silent regarding concomitant or past medical therapy, while 3 described concomitant hormonal therapy, a known risk factor for alopecia. Therefore, although 10 cases listed docetaxel as the only suspect drug, there was no support after reviewing these 10 cases that docetaxel was, in fact, the only suspect drug.

On the basis of the Pfizer/Hospira database review and literature review, found to be generally consistent with Sanofi's review of its safety database, Pfizer/Hospira proposed to update the docetaxel USPI's Section 6.2 (Post-Marketing Experiences) and Section 17 (Patient Counseling Information) to include the statement that "Cases of permanent alopecia have been reported." Based on its review, Pfizer/Hospira also proposed to add the statement "Hair loss: in most cases normal hair growth should return. In some cases (frequency not known) permanent hair loss has been observed" to Section 17 (Patient Counseling Information), although this language was later amended by the FDA in September 2017 to state, consistent with the prescriber information: "hair loss: In some people, permanent hair loss has been reported ."

I reviewed the 146 case reports of alopecia found in the Hospira post-marketing database. As a medical officer and deputy director at the FDA and active consultant over the past 25 years, I've routinely done such reviews of post-marketing safety data and advised what actions should be taken. I began with the 20 Kluger cases reported in 2012. These cases all included chemotherapy with FEC-docetaxel, all included prior radiation therapy, and all included prior hormonal therapy with anti-estrogens. Additionally, one patient had a family history of alopecia (case 1513367), one patient appeared to have their hair regrow following docetaxel, and then worsen after receiving Paclitaxel (case 1519412), and one patient had chronic stable mild alopecia treated with minoxidil prior to receiving docetaxel (case 152111). Every patient in the Kluger series had received FEC prior to receiving docetaxel. FEC is chemotherapy consisting of fluorouracil, epirubicin, and cyclophosphamide. Fluorouracil is labeled as a "highly toxic drug with a narrow margin of safety." Labeling for fluorouracil describes that alopecia and dermatitis may be seen in a substantial number of cases. Epirubicin also has multiple toxicities with alopecia described as one of the more common adverse effects, occurring frequently, but usually reversible, with

20

hair regrowth in 2 to 3 months.  Cyclophosphamide labeling describes alopecia as among the most common side effects of the drug.  Incomplete hair growth has been reported after the use of cyclophosphamide as well as busulfan, thiotepa, melphalan, etoposide, carboplatin, as well as the taxanes (docetaxel and paclitaxel).  (REF: Tallon B, et al, J Am Acad Dermatol 2010; 63:333-336).  In my opinion, the Kluger cases included multiple factors aside from docetaxel that may have contributed to permanent alopecia.  Given that docetaxel labeling had, from the time of its original approval, described alopecia as a general comprehensive term, it was reasonable for Hospira not to react to the Kluger article with any further labeling clarification regarding permanent alopecia as the potential causality to docetaxel was unclear in these cases. The adverse events in the Kluger 2012 publication were submitted by Hospira to the FDA as post-marketing adverse event reports and the publication itself was submitted to the Agency as part of Hospira's Annual Signal Detection Report for 01 October 2013 - 01 October 2014 (HOS01100044916). Similarly to Hospira, and similar to my opinion, after reviewing the events in the 2012 Kluger article, FDA took no immediate action to change docetaxel's labeling.

A review of the remaining 126 post-marketing alopecia cases revealed that many cases of these were missing specifics such as the dates of therapy, the duration of therapy, the underlying medical history of the patients, and their concomitant or past medications taken.  Many did not give clear documentation to support that permanent alopecia occurred.  This is not surprising and is typical of post-market reports, which are dependent on the reporter and what they convey.  In almost all cases, the patients were taking other chemotherapy drugs that could have caused alopecia as well.  Because breast cancer is often treated with hormonal therapies or radiation therapy that can be associated with alopecia, these were often additional confounders in many instances.  The 146 case reports of alopecia (of which 43 were described as permanent, of which 20 were in the Kluger publication) alone would not have prompted an independent Pfizer/Hospira decision to update labeling for permanent alopecia.  As discussed above, there had been reports of permanent alopecia in the medical literature before Hospira's March 2011 approval, and these additional case reports were not significantly different than what was already available when the FDA approved Hospira's label.   However, by December 11, 2015, the FDA had already concluded, based on internal Sanofi data that was not accessible to Hospira, that the Taxotere labeling should include a statement in the post-marketing Adverse Reaction section that cases of permanent alopecia have been reported.  As the brand manufacturer and sponsor of the clinical trials, Sanofi had access to far more post-marketing data and clinical trial data on alopecia than Hospira.   Thus, it was reasonable for the Hospira team to conclude, following their review of the Sanofi Taxotere post-marketing data, that labeling for their docetaxel products should be updated in a similar manner.

Pfizer/Hospira's Labeling Executive Committee met and endorsed the RMC's proposed labeling changes to include reports of permanent alopecia on February 17, 2017. February 22, 2017 Email from Anthea Simpson-Ruddock re "Docetaxel permanent alopecia and alcohol intoxication - LEC Cover Pages for Email Endorsement 16-February-2017," (HOS01400066829).  Approximately 6 weeks later, a labeling supplement adding permanent alopecia was submitted to FDA as a Changes Being Effected (CBE) application on March 31, 2017.  Because this was a CBE, the label was updated upon submission. Indeed, the addition of permanent alopecia cases being reported could be seen in docetaxel labeling on the Pfizer website as of May 1, 2017. HOS01400061886. Labeling addressed reports of permanent alopecia in the Post-Marketing Experience section of the label, the Patient Counseling Section of the label, and the Patient

Package Insert.  A CBE was appropriate for addressing that cases of permanent alopecia had been reported, as this was a modest change that could be implemented readily.

The NDA supplement for adding cases of permanent alopecia to labeling (Supplement 08) was reviewed and approved by the FDA approximately 6 months later on September 27, 2017, yet all changes had been implemented as of March 31, 2017. The label approved by FDA on September 27, 2017 contained the following references to permanent alopecia:

- 6.2 Post-Marketing Experience, under Cutaneous Reactions, noting:  "Cases of permanent alopecia have been reported."
- 17.0 Patient Counseling Information noted that it should be explained to patient that side effect associated with docetaxel may include: "hair loss (cases of permanent hair loss have been reported)."
- Patient Information Leaflet noted "hair loss:  In some people permanent hair loss has been observed."

> **D.     Hospira's docetaxel label has remained appropriate regarding alopecia risk from the time of their March 31, 2017 CBE supplement to the present.**

Sanofi Aventis' Taxotere label underwent an update approved October 5, 2018 to address numerous changes, among which were changes to update their experience on various adverse events, including alopecia, during the TAX316 adjuvant breast cancer study that included a median of 8 years long term follow-up.  The new information stated:  "In study TAX316, alopecia persisting into the follow-up period after the end of chemotherapy was reported in 687 of 744 TAC patients (92.3%) and 645 of 736 FAC patients (87.6%).  At the end of the follow-up period (actual median follow-up time of 8 years), alopecia was observed to be ongoing in 29 TAC patients (3.9%) and 16 FAC patients (2.2%)."  It is important to recognize that the 3.9% and 2.2% figures address the rate of ongoing alopecia among patients with alopecia, and not the rate of ongoing alopecia in all treated subjects.  Moreover, many of the patients had follow-up on alopecia for less than six months, so the cases of "ongoing" alopecia are not necessarily cases of permanent alopecia.  Study 316 also demonstrated improved survival with TAC (Taxotere, Adriamycin, cyclophosphamide) vs FAC (fluorouracil, Adriamycin, and cyclophosphamide).  Longer term safety outcomes, like permanent alopecia, need to be interpreted cautiously due to losses to follow-up over time and differential survival rates.  The fact that more patients on TAC survived than patients on FAC may bias the study towards a finding for more cases of ongoing alopecia in the TAC arm.

Following the example set by Sanofi for the RLD Taxotere, Pfizer updated the Hospira docetaxel label in a labeling supplement approved on October 11, 2019 to include language describing the long term follow-up information for TAX316 with regards to ongoing alopecia risk. During this timeframe, although some literature reports continued to be published on permanent alopecia risk, they did not add any meaningfully new information to the risk of permanent alopecia. Hospira docetaxel remains appropriately labeled today regarding the potential risk for permanent alopecia.

## V.     WHERE ALOPECIA BELONGS IN LABELING

Alopecia-related information for docetaxel has been located appropriately in the Adverse Reactions section of the physician package insert and in the patient information leaflet, it is listed in a section entitled: "What are the possible side effects of [docetaxel]?" Alopecia is an adverse reaction, defined in 21 CFR 201.57(c)(7) as an "undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." The definition of alopecia is hair loss. "Alopecia" is a comprehensive term that includes all types of hair loss, whether temporary, persistent/permanent, patchy, localized, or diffuse. Permanent chemotherapy induced alopecia has been broadly defined in the literature as the absence of or incomplete hair regrowth that lasts longer than 6 months after the cessation of chemotherapy (Yang et al. Treatment of permanent chemotherapy induced alopecia with low dose oral minoxidil (Australasian Journal of Dermatology 2015;57 (issue 4), brief report). However, a clear definition is not uniformly agreed upon, and reports of permanent alopecia can be challenging to interpret as they often lack details as to the time that has elapsed since the cessation of chemotherapy as well as the degree and location(s) to which hair had not grown back. Confounding medications, hormonal therapy and radiation therapy also make an attribution to a specific chemotherapy drug challenging.

FDA provides perspective as to how alopecia might be handled in labeling appropriately in their October 2011 Guidance for Industry (Guidance for Industry-Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products, Content and Format, October 2011, page 4). In this document, the FDA notes that the relative seriousness of the disease or condition being treated should be considered when labeling a drug safety issue. FDA states that non-serious adverse reactions (e.g., nausea, pruritis, alopecia) caused by drugs intended to treat minor self-limiting conditions (e.g., allergic rhinitis, cosmetic conditions, transient insomnia) may be considered clinically significant and thus appropriate for inclusion into the Warnings and Precautions section of the label. However, those same adverse reactions caused by drugs intended to treat serious or life-threatening conditions (e.g., cancer) may be considered much less clinically significant and not appropriate for inclusion in the Warnings and Precautions section of the label. Consistent with this logical framework, alopecia has always been in the Adverse Reactions section of the label from the initial approval of docetaxel, a cancer therapy.

Further support for the location of alopecia in the Adverse Reactions section of the package inserts (physician and patient) is that this meets the goal of providing a prioritization of safety information to the prescriber and patient. As per FDA guidance (Guidance for Industry: Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products-Conten and Format, January 2006), typically, adverse reactions for any given drug will have varying clinical significance, ranging from serious to minor, and those that relatively serious are often discussed in the Warnings & Precautions, Contraindications, or Boxed Warning section of the label. Docetaxel's label describes a contraindication in patients hypersensitive to the drug or to polysorbate 80, and also in patients with very low white blood cell counts (neutrophils > 1500 cells/mm$^3$). Warnings appropriately describe the most serious events of death, hepatic impairment, and fluid retention, which can lead to life-threatening edema around the heart, around the lungs or in the abdomen as ascites. Hematologic effects, including neutropenia, can also be life-threatening and are listed appropriately as a key warning. Additional warnings include an increased risk for leukemia, severe skin toxicities, severe neurosensory symptoms,

23

macular edema which can impair vision, and severe asthenia (weakness/fatigue that is profound). Use in pregnancy is warned against and finally the risk for alcohol intoxication is also listed as a warning. These multiple warnings were observed in controlled clinical trials or are simply implicitly important information to convey to prescribers or users such as the risk for pregnancy or the risk for alcohol intoxication. In contrast, the risk for permanent alopecia is most appropriately described in the Adverse Reactions section.

## VI.   FDA LABELING VS EX-US LABELING FOR HOSPIRA DOCETAXEL AND CHRONIC ALOPECIA RISK

As with US labeling, Hospira took a consistent approach to European labeling for their docetaxel, cross-referencing again the most recently available European label for Sanofi Aventis Taxotere, and making appropriate changes. The US and European labels for the RLD Taxotere differ, and as a result, the US and European labels for Hospira docetaxel also differ. Plaintiffs have referenced European labeling for Taxotere (or docetaxel), pointing out that it had more information related to the risk for more persistent or ongoing alopecia. However, this was because the FDA required different labeling information in the United States for the Sanofi's labeling for the RLD Taxotere, and had rejected a proposal by Sanofi to include alopecia as a persistent reaction in the label.

As per Janet Arrowsmith's expert report (paragraphs 69 and 70), on March 17, 2004, as a part of NDA supplement 29, Sanofi submitted a labeling proposal to US regulatory authorities at the FDA that assessment that included a subsection under the Adverse Reactions section to clarify "persistent reactions" observed in the ongoing TAX316 clinical trial:

> Other persistent reactions
>
> The following events were observed to be ongoing in the TAC-treated patients at the median follow-up time of 55 months:  alopecia (22/687), amenorrhea (133/233), neurosensory (9/73) and peripheral edema (18/112). These events were also observed in the FAC arm during the follow-up period (9/642), amenorrhea (101/186), neurosensory (2/15) and peripheral edema (3/19).

Sanofi resubmitted this same proposal to FDA twice more, in June and August of 2004. During labeling discussions, FDA deleted Sanofi's proposal to add "Other persistent reactions" as a subsection to the label (see Arrowsmith report paragraph 70, referencing track changes in Sanofi _04539472.doc). No reason was provided. FDA approved supplement 29 without the "other persistent reactions" section proposed by Sanofi. In contrast, in Europe, labeling for Taxotere included the "Other persistent reactions" section. As noted in Dr. Arrowsmith's report (paragraph 87), the European Medicines Agency accepted "Other persistent reactions" while the US did not accept this section. Thus, these differences in the labeling do not show any inadequacy in the US labeling, but rather reflect the opinions of the regulators, who may interpret longer term safety data differently in terms of their confidence in the findings (with losses to follow-up over time limiting reliable interpretation), and who are also knowledgeable about historical precedence in how such longer term, uncontrolled findings, particularly if confounded, have been handled traditionally in their respective countries.

24

US labeling differs from ex-US labeling in various ways, again related to how the various regulatory agencies in each jurisdiction may view data findings and address them with respect to precedence.  In 2011, for instance, at the request of the French drug regulatory agency, Sanofi conducted a comprehensive signal assessment for persistent alopecia cases.  While this was a request from the French, Sanofi submitted their findings to the FDA as part of a periodic safety update (PSUR 28) on January 27, 2011.  (Paragraph 95, Arrowsmith report).  While the European Rapporteur recommended an update to the EU label to address the risk of persistent alopecia more clearly, the FDA did not suggest any labeling changes to Sanofi Taxotere label based on this data, nor did the FDA suggest persistent alopecia be added to the Hospira docetaxel label approved in this general timeframe on March 8, 2011.  Clearly, FDA was aware of the findings of persistent alopecia reported in association with the use of docetaxel, yet did not add this finding to Taxotere labeling until December, 11 2015, and subsequently to the labeling for the 505(b)2 docetaxel formulations.  In September of 2011, because EU regulatory authorities had recommended an update, Sanofi proposed EU labeling including a statement:  "Cases of persistent alopecia have been reported" in the Undesirable Effects post-marketing section, as well as a statement in the patient information section that "Hair loss (in most cases hair regrowth should resume)."  These changes were agreed upon by the European health authority in December 2011.

Like Sanofi Taxotere, the label for Hospira docetaxel in the US was not (and is not) identical to that in other countries.  Clearly, US regulatory authorities handled the reports of permanent alopecia differently than the EU authorities.  This does not mean that the US approach was "wrong," but rather reflects each country's unique approach to labeling.  Hospira docetaxel's US label, accordingly, would follow the US reference Taxotere label, and not any of the ex-US labels for docetaxel.

## VII.   OTHER CHEMOTHERAPIES ASSOCIATED WITH PERSISTENT ALOPECIA AND THEIR LABELING

Docetaxel is not the only chemotherapy drug associated with a risk for permanent alopecia.  Several approved chemotherapy drugs serve as precedent examples for the risk of alopecia, including literature-based reports of permanent alopecia in the post-market setting.  Chemotherapy-induced alopecia management was addressed in a recent article published by Rossi et al (J Cosmet Dermatol 2017;16(4):537-541).  The article notes that alopecia is one of the most common adverse effects of chemotherapy, affecting approximately 65% of patients who undergo therapy overall.  The scalp is the most affected area, with hairs on the beard, eyebrows, and eyelashes as well as axillary and pubic regions affected as well, depending on the percentage of hairs in anagen (growth phase).  This kind of alopecia is generally reversible and hair usually regrows after 3-6 months.  Perhaps most important, the authors note:  "Although rare, cases of permanent alopecia, with severely retarded or without hair growth, are reported associated with high-dose chemotherapy or with busulfan and cyclophosphamide administration . . . ."  Permanent alopecia is therefore generally recognized as a potential side effect of chemotherapy, and it is also recognized as dose-related.

Busulfan is a chemotherapy drug that is used for patients with blood cancers, often in the post-transplant setting.  As early as 1995, it was recognized that patients exposed to higher busulfan concentrations were at more risk for permanent alopecia than those exposed to lower levels.

25

(Ljungman P, et al, Bone Marrow Transplant 1995;June;15(6): 869-71). In 2005, Tosti et al (British J of Dermatology 2005; 152:1056-1058), reported on two patients who were noted to develop permanent hair loss following induction chemotherapy. The first patient underwent a bone marrow transplant induction regimen with oral busulfan and cyclophosphamide chemotherapy, developing alopecia approximately 10-15 days later, with hair regrowth one month later that was thinner, with hair density greatly reduced, such that the patient needed to wear a wig. The second patient underwent induction chemotherapy with busulfan and melphalan, with severe diffuse alopecia two weeks later. Pathology in both patients confirmed reduced hair follicle density. An additional article observed six cases of permanent alopecia following bone marrow transplant followed in 2007 (Machado et al, Bone Marrow Transplantation 2007;40:979-982), 5 of whom received a busulfan based regimen prior to transplantation as a conditioning regimen. The authors cite six previously reported literature publications (one of which was Tosti et al), which also described permanent alopecia arising largely in busulfan based regimens, yet with one of six occurring in a non-busulfan treated patient. The authors conclude that permanent alopecia is a risk of hematopoetic (e.g., bone marrow) stem cell transplantation and that it can be seen even with non-busulfan containing chemotherapy regimens. Despite these (and possibly other) literature reports, busulfan labels do not address the risk for permanent alopecia specifically. (reference: Busulfex NDA 020954, for the injectable product dated 9/28/2018, and Busulfan NDA 009386 label dated 12/24/2003). Approved US labels for busulfan describe alopecia as a potential risk under the Adverse Reaction section, but are silent on the risks for permanent alopecia.

Cyclophosphamide is another chemotherapy drug that has been associated with cases of permanent alopecia in patients undergoing bone marrow transplant as well as when it is used as part of a breast cancer regimen. (TranD, et al. Aust J Dermatol 2000; 41:106-108) (Ljungman P, et al. Bone Marrow Transplant 1995 15:869-871.) (Baker BW et al. Transplant 1991 7:43-47). (Vowels M et al. Bone Marrow Transplant 1993 12:347-350 and Tallon B, et al, J Am Acad Dermatol 2010; 63:333-336). Despite these reports (and possibly others), labels for various cyclophosphamide formulations (tablet under NDA 012141, injectable under NDA 012142, and lyophilized product under NDA 012142) describe alopecia as a potential risk under the Adverse Reaction section yet offer no information regarding permanent alopecia.

Paclitaxel is a chemotherapy that is often used as an alternative to docetaxel. One case series supported that there is delayed recovery from alopecia with paclitaxel as well as docetaxel. (Freites-Martinez A, et al. JAMA Dermatol 2019;155:724). Despite this report, Taxol (paclitaxel) as per the most recently FDA approved March 3, 2015 label, does not describe cases of permanent alopecia specifically.

Cisplatin and etoposide are additional chemotherapy agents. Both are associated in the literature with dose dependent risk for permanent alopecia (Dillip Gude, International Journal of Trichology, 2012; 4(1):47-48, Tackling Chemotherapy-Induced Alopecia), yet neither is labeled for permanent alopecia. Interestingly, etoposide labeling (most recent on FDA website dated 11/05/2002), describes the severity of alopecia, yet emphasizes reversibility stating: "Reversible alopecia, sometimes progressing to total baldness, was observed in up to 40% of patients."

In each of the aforementioned examples of chemotherapy drugs, labels have focused primarily on alopecia and not permanent alopecia, per se. This is not because permanent alopecia is not a

relevant and important finding, but rather because it is much more challenging to attribute the less common cases of more permanent alopecia to a specific chemotherapy drug. Most patients have received many therapies by that point in time, including radiation therapy, hormonal therapy, or several chemotherapies. As FDA noted in their Taxotere review, "the true incidence of permanent alopecia is unknown and cannot be reliably estimated given the limitations of the available data." NDA 22-449, S-075, Medical Review, Prowell, T., December 4, 2015 (Sanofi_01574962) (HOS01400061999). The fact that drugs with the best survival may also yield the highest longer term follow-up rate for permanent alopecia also serves as a cautionary reminder for discretion when labeling the risk of permanent alopecia. All of these aspects of the risk evaluation must be considered, and support perhaps why many FDA approved chemotherapy drugs do not directly address the risk of permanent alopecia, per se, in their labeling. This is also supported by the FDA medical officer's conclusion regarding the risk for permanent alopecia with Taxotere: "I think the sponsor's simple statement that permanent cases have been reported is all that can reliably be said given the tremendous limitations of the available data." NDA 22-449, S-075, Medical Review, Prowell, T., December 4, 2015 (Sanofi_01574962) (HOS01400061999)

## VIII.   MEDICAL LITERATURE ON DOCETAXEL AND ALOPECIA

I reviewed the medical literature regarding docetaxel and permanent alopecia for four key timeframes: a) through the time of approval of Hospira docetaxel on March 8, 2011, b) from the time of approval on March 8, 2011 through the time that Ms. Guilbault and Ms. Plaisance were prescribed Hospira docetaxel in September 2013 and January 2014, and c) from the time Ms. Guilbault and Ms. Plaisance were prescribed Hospira docetaxel to the present-day cutoff of July 31, 2021. The literature summarized is not meant to be fully comprehensive, but rather representative of the majority of articles related to docetaxel and permanent alopecia.

### A.   Literature on permanent or persistent alopecia associated with taxanes/docetaxel (or other chemotherapy) before March 8, 2011

*Pazdur R, Kudelka AP, Kavanaugh JJ, et al. The taxoids: paclitaxel (Taxol) and docetaxel (Taxotere). Cancer Treatment Reviews 1993;19:351-386.*

*Tosti A, et al. Permanent alopecia after busulfan chemotherapy. Br J Dermatol 2005;152:1056-8.*

*Machado et al. Six cases of permanent alopecia after various conditioning regimens commonly used in hematopoietic stem cell transplantation. Bone Marrow Transplant 2007;40:979-982*

Alopecia is well recognized as a side effect of chemotherapy, including docetaxel. In 1993, Pazdur et al reported on Taxol and Taxotere, observing alopecia as one of the common toxicities. Alopecia association with docetaxel "was common at doses above 40 mg/m2 and was universally seen at doses above 60 mg/m$^2$." It was appreciated very early on in development therefore that alopecia was a dose limiting toxicity of the taxoids. Chemotherapy with busulfan (Tosti et al) was cited in association with permanent alopecia in a 2005 publication, and various chemotherapy regimens used to treat patients undergoing bone marrow transplant were also observed to result in permanent alopecia as cited in a 2007 article (Machado et al).

*Nabholz JM, Mackey JR, Smylie M.  Phase II study of docetaxel, doxorubicin and cyclophosphamide as first-line chemotherapy for metastatic breast cancer.  J Clin Oncol 2001;19:314-321.*

Nabholz et al described a Phase 2, open label study experience in 54 patients with metastatic breast cancer who were treated with TAC (docetaxel, doxorubicin, cyclophosphamide) chemotherapy.   These were advanced breast cancer patients among whom 69% had metastatic visceral disease.  Approximately half (54%) had three or more organs involved with breast cancer.  TAC was effective, with an overall objective response rate of 77%.  Toxicity findings were summarized and among these, alopecia affected 87% of patients, with long lasting (> 2 years) partial alopecia observed in four of the 54 patients.  The breast cancer cases were very advanced in this series, and the use of hormonal and/or radiation therapy, was unclear.

*Sedlacek SM.  Persistent significant alopecia (PSA) from adjuvant docetaxel after doxorubicin/cyclophosphamide (AC) chemotherapy in women with breast cancer.  Breast Cancer Res Treat.  2006;100(supp 11):s116.*

This report was a limited case series of patients treated by the author from December 1994 through December 2004.  Patients in 3 groups were defined:  Group A (n=258) was treated with a doxorubicin regimen without a taxane; Group B (n=126) were treated with doxorubicin plus paclitaxel, and Group C (n=112) were treated with doxorubicin plus docetaxel.  Patients treated with high dose chemotherapy with stem cell rescue were excluded.  Only patients with at least one year of follow-up post adjuvant chemotherapy were included.  A total of 7 women were found with persistent alopecia, defined as hair regrowth less than 50% of the pre-chemotherapy amount of hair.  All 7 of these women were in Group C, and had received AC (doxorubicin plus docetaxel) X 4 (60/600 mg/m2) every 3 weeks followed by docetaxel (100 mg/m2) every 3 weeks.  The authors concluded:  "It appears from this dataset, that when docetaxel is administered after 4 doses of AC, there is a small but significant possibility of poor hair regrowth lasting up to 7 years."

*Masidonski P, Malson SM.  Permanent alopecia in women being treated for breast cancer.  Clin J Oncol Nurs 2009;13:33-34.*

In this letter to the editor of the Clinical Journal of Oncology Nursing, published in February of 2009, two nurses reported that over the past 10 years, they had found 13 women treated for breast cancer at their institution (St Louis University) with permanent alopecia.  No definition for permanent alopecia was given.  A table described various characteristics of the women, including the type of chemotherapy they had received, with 11 of 13 receiving anthracycline plus cyclophosphamide with a taxane (specific type of taxane unspecified) and two receiving just the anthracycline plus cyclophosphamide.  The article also cited that permanent alopecia can be associated with surgical procedures (including breast cancer reconstruction with flaps), as well as insulin resistance and polycystic ovary syndrome, noting that none of these women had these underlying conditions.  The article also notes that aromatase inhibitors may have played a role, as these may cause androgenization of the hair follicles leading to male pattern baldness, and six of the 13 women were on an aromatase inhibitor.  This article helps highlight the complexity of ascribing permanent alopecia to a single drug given the complexity of the patients, their underlying conditions, and their complicated chemotherapy and hormonal therapy regimens.

28

*Prevezas et al.  Irreversible and severe alopecia following docetaxel or paclitaxel cytotoxic therapy for breast cancer.  British J Dermatology 2009;160:881-898*

In April of 2009, Prevezas et al reported through correspondence to the editor on irreversible and severe alopecia in two patients who had received docetaxel (case 1) or paclitaxel (case 2) as chemotherapy for breast cancer.  The authors linked the alopecia findings to the aromatase inhibitor letrozole as a possibility, but felt that the severity of this finding suggested the taxanes were more likely responsible.  To their knowledge, the authors considered their two cases "the first cases of irreversible alopecia linked with the use of the taxanes."

*Bourgeois HP, et al:  Long term persistent alopecia and suboptimal hair regrowth after adjuvant chemotherapy for breast cancer:  alert for an emerging side effect:  ALOPERS Observatory. Cancer Research 2009;69(supplement 24):  Abstract nr 3174.*

*Bourgeois HP et al:  Long term persistent alopecia and suboptimal hair regrowth after adjuvant chemotherapy for breast cancer:  alert for an emerging side effect:  French Alopers Observatory.  Annals of Oncology 2010;21(supplement 8):  Abstract 232P.*

In December 2009, an abstract from Bourgeois et al noted 66 cases of persistent alopecia or suboptimal hair regrowth after adjuvant chemotherapy had been reported to the Breast Cancer Forum in France.  The 66 cases were reported over the previous year, from May 2008 to April 2009, and the article noted that the anthracyclines and taxanes were the cornerstone adjuvant chemotherapy given.  Alopecia was localized in 13 cases, diffuse in 49, and complete in 4 cases. The type of chemotherapy given varied but many regimens involved docetaxel as a component because it was a common standard of care.

In October of 2010, Bourgeois updated his findings now extending through May of 2010, with 108 cases of persistent alopecia or suboptimal hair regrowth after adjuvant chemotherapy, with 96% of patients receiving a docetaxel-based treatment and 77% a hormonal therapy.

*Tallon B, Blanchard E, Goldberg LJ:  Persistent chemotherapy-induced alopecia:  case report and review of the literature.  J Am Acad Dermatol 2010;63:333-336.*

In August of 2010, a single report of persistent alopecia was published by Tallon et al in a patient treated with adjuvant chemotherapy (docetaxel, carboplatin, and trastuzumab) followed by trastuzumab alone).  The authors cite the Prevezas 2009 report in two patients as the only other report like this to their knowledge.  The authors also note that permanent alopecia has been described following the use of busulphan, cyclophosphamide, thietepa, melphalan, etoposide, carboplatin, docetaxel and paclitaxel.

*Palameras J, Misciall C, Veincenzi C, et al.  Permanent chemotherapy-induced alopecia:  a review.  J Am Acad Dermatol 2011;64:604-606.*

In this March 2011 correspondence to the editor, Palameras and others noted their retrospective chart review of all patients who had visited their hair clinic during the previous 7 years.  They reviewed 8430 records of patients with non-scarring alopecia finding 7 cases in which chemotherapy-induced permanent alopecia (CIPAL) was found.  Of the 7 cases, 2 had been treated with busulphan, while 5 had been treated with a taxane.

The literature summary provided covers publications related to permanent alopecia and docetaxel, yet each report is limited in scope, and often confounded by other concomitant chemotherapy or hormonal therapy. These articles, while raising to attention some cases of permanent alopecia in patients who were treated with docetaxel, do not support the potential causality of permanent alopecia due to docetaxel because of these limitations.

> **B.** **Key Literature on permanent or persistent alopecia associated with taxanes/docetaxel from the time of approval on March 8, 2011 through the time that Ms. Guilbault and Ms. Plaisance were prescribed Hospira docetaxel in September 2013 and January 2014**

*Miteva M et al. Permanent Alopecia after systemic chemotherapy a clinicopathological study of 10 cases. Am J Dermatopathol 2011;33(no 4): 345-350.*

In June of 2011, a report of 10 cases of permanent alopecia following systemic chemotherapy was reported by Miteva et al, with 6 of the 10 cases observed in patients treated with docetaxel for breast cancer, 3 treated with busulphan for lung cancer, and 1 treated with cisplatin and etoposide for lung cancer.

*Kluger N, Jacot W, Frouin E, et al. Permanent scalp alopecia related to breast cancer chemotherapy by sequential fluorouracil/epirubicin/cyclophosphamide (FEC) and docetaxel: a prospective study of 20 patients. Ann Oncol 2012;23:2879-84.*

In November 2012, the first prospective case study of 20 patients assessing permanent scalp alopecia related to breast cancer therapy with FEC (fluorouracil/epirubicin/cyclophosphamide) and docetaxel was published. All breast cancer patients from January 1, 2007 to January 1, 2011, a 4-year span, were followed for permanent alopecia, which was defined as absent or incomplete hair regrowth at ≥ 6 months post-chemotherapy. Approximately 1000 patients were treated during this time, therefore the authors estimated an incidence rate of permanent alopecia to be approximately 2%. The affected patients all had breast cancer, with one having two breast cancers (1999 and 2005) and one having bilateral synchronous breast cancer and two patients had been treated for relapsing disease. The chemotherapy regimens differed somewhat, but 95% had received FEC (5-fluorouracil, epirubicin, cyclophosphamide) followed by docetaxel. Hormonal therapy had also been given to many patients including exemestane (in 3 patients), tamoxifen (in 8) anastrozole (in 3) or letrozole (in 6). The clinical and histological picture of the alopecia was considered similar to femal androgenic alopecia, and the authors concluded that it was "probably related to taxane use."

There are limitations of the Kluger study. It lacked a comparative control arm, such as a group of patients with breast cancer who received other chemotherapy. Also, there may have been bias introduced as the study relied upon memory recollection by the patient to determine whether spontaneous hair regrowth did or did not occur. All 20 cases had taken FEC (3 other drugs) followed by docetaxel, but since some of the patients had been treated for relapsing disease, they may have received additional prior chemotherapy. Prior hormonal treatments and radiation were noted in all 20 cases as well, and may have played a role.

*Tosti A, et al. Docetaxel and permanent alopecia. J Am Acad Dermatol 2013, e151.*

In May of 2013, Tosti et al wrote a letter to the editor, noting the Tallon article of 2010 that had described a single case of persistent alopecia in a patient who had received a docetaxel-based chemotherapy regimen.  Tosti et al shared that over the past 4 years, they had observed 5 cases of permanent alopecia following high dose docetaxel chemotherapy for breast cancer.

*Bourgeois HP, et al.  Abstract P5-21-05:  ERALOP study:   Post adjuvant FEC-docetaxel chemotherapy for early breast cancer:  Hair regrowth in the real life.  Cancer Research, May 2015.*

*Bourgeois HP, et al.  Abstract P5-17-04:  Long term hair loss in patients with early breast cancer receiving docetaxel chemotherapy.  Cancer Research, May 2015.*

In May of 2015, Bourgeois updated the experience on persistent signal alopecia with the above 2 abstracts, however these were based on patient surveys that were, on average, returned by approximately 70% of patients, and not confirmed by examinations.  These data are therefore challenging to interpret meaningfully, but Bourgeois did note that persistent alopecia reports continued to be found in docetaxel treated patients.

Thus, the literature in this timeframe had significant limitations: the studies are very limited scope, subject to survey bias when surveys were used, and not compelling. In my opinion, the literature alone did not drive the FDA's decision to include the statement that cases of permanent alopecia have been reported.  Although the FDA's decision for Taxotere labeling to be updated took into account the literature, an essential basis for this decision was data from Sanofi's internal database finding of 2172 case reports of alopecia, of which 117 cases were permanent alopecia reported in association with Taxotere.

> **C.**     **Literature on permanent or persistent alopecia associated with taxanes/docetaxel from the time Ms. Guilbault and Ms. Plaisance were prescribed Hospira docetaxel to the present-day cutoff of July 31, 2021.**

*Bourgeois HP, et al.  Abstract P5-21-05:  ERALOP study:   Post adjuvant FEC-docetaxel chemotherapy for early breast cancer:  Hair regrowth in the real life.  Cancer Research, May 2015.*

*Bourgeois HP, et al.  Abstract P5-17-04:  Long term hair loss in patients with early breast cancer receiving docetaxel chemotherapy.  Cancer Research, May 2015.*

In May of 2015, Bourgeois updated the experience on persistent signal alopecia with the above 2 abstracts, however these were based on patient surveys that were, on average, returned by approximately 70% of patients, and not confirmed by examinations.  These data are therefore challenging to interpret meaningfully, but Bourgeois did note that persistent alopecia reports continued to be found in docetaxel treated patients.

*Sibaud V, Lebeuf NR, Roche H, et al.  Dermatological adverse events with taxane chemotherapy. Eur J Dermatol 2016;26(5):427-448.*

The authors performed a systematic review of the literature for dermatological conditions related to the use of the taxanes.  For alopecia, they describe chemotherapy induced acute reversible alopecia and they suggest that since there are no long-term studies to assess the true permanence

31

of alopecia, a better term might be "chemotherapy induced persistent alopecia (CIPAL). They note that the mechanism of CIPAL has not been elucidated, that risk factors have not been identified. They also note that long term adjuvant hormone-based therapies for breast cancer (antiestrogens or aromatase inhibitors like Tamoxifen) can also cause and/or exacerbate hair loss. For CIPAL management, the authors suggest topical minoxidil for the scalp, and to carefully assess the impact of the condition on the patient's quality of life and self-esteem.

*Kim GM et al. Chemotherapy-induced irreversible alopecia in early breast cancer patients. Breast Cancer Res Treat 2017;163:527-533*

In March of 2017, Kim et al reported on irreversible alopecia in breast cancer patients who had received AC (Adriamycin, cyclophosphamide) or those who received AC-T (AC followed by Taxane) as chemotherapy. This was a questionnaire driven study, with 265 patients responding to the questionnaire, with 19 (7.2% of respondents) reporting they had severe alopecias affecting more than 50% of their scalp. Of these, 2.7% of AC treated patients reported severe alopecia versus 10.5% of AC-T treated patients, which nonetheless confirms that severe alopecia can arise even in patients treated with just Adriamycin and cyclophosphamide. While the study found more cases of severe alopecia in AC-T treated patients, this association may be confounded by survey follow-up (only 265 patients responded of 449 who were considered proper targets for survey), and differences between the AC and AC-T treated patients that may have otherwise conferred more findings of alopecia.

*Crown, et al. Incidence of permanent alopecia following adjuvant chemotherapy in women with early stage breast cancer. Journal of Clinical Oncology 35 No. 15; May 30, 2017Ascopubs .org e21576.*

A telephone interview survey of 295 patients treated for breast cancer found, finding that permanent alopecia (more than one year following treatment) affected patients treated with regimens containing an anthracycline with docetaxel, but that it was also seen in patients treated with an anthracycline and paclitaxel, as well as non-Taxotere chemotherapy regimens. Some patients received docetaxel non-anthracycline regimens and for these 95 patients, there were two levels of docetaxel 300 mg/m2 or 450 mg/m2, and alopecia was more common in the higher dose docetaxel group.

*Martin et al: Persistent major alopecia following adjuvant docetaxel for breast cancer: incidence, characteristics and prevention with scalp cooling. Breast Cancer Research and Treatment 2018;171:627-634.*

This study evaluated breast cancer patients treated with adjuvant breast cancer at three institutions in Spain. A total of 492 subjects were enrolled and followed after receiving a variety of chemotherapy regimens. The median age of the women was 53, with 58% postmenopausal and 42% premenopausal. The authors acknowledge that several randomized phase 3 trials in the 1990s demonstrated the taxane containing regimens were superior to the classical anthracycline containing regimens, and that the addition of a taxane had become the standard of care for breast cancer. Grade 1 alopecia was found with all chemotherapy regimens and aromatase inhibitors, but not with tamoxifen. Patients treated with high doses of docetaxel (cumulative doses $\geq 400$ mmg/m2) had a higher prevalence of grade 1 alopecia (ranging from 33-52%), and were the only patients having grade 2 alopecia (with rates of 5-12%). Although there was a high rate of grade

1 alopecia observed, this was defined as "weakening of hair or partial alopecia and not leading to the use of a wig after at least 18 months post-chemotherapy. Only one site recorded grade 1 alopecia. Two sites did not assess grade 1 minor forms of alopecia "since they were more difficult to agree upon in a homogenous way."

*Rassy E, Ghosn M, Farhat F, et al. Toxicities Associated with Docetaxel-Based Regimens in the Adjuvant Treatment of Early Stage Brest Cancer: A Multicenter Prospective Real-Life Experience. Breast Cancer 2018;13:121-125*

In this more recent article, 698 women with a median age of 51.8 years treated with docetaxel-based chemotherapy regimens were followed prospectively for adverse events. The authors found a rate of alopecia overall in 43.4% of women, with grade 3 or 4 alopecia in 7.4% of women. They attributed the lower rate of alopecia potentially to the preponderant use and high success rate of scalp cooling systems in the vast majority of patients.

*Kang et al. Permanent chemotherapy-induced alopecia in patients with breast cancer: a 3 year prospective cohort study. The Oncologist 2019;24:414-420.*

In 2019, Kang et al followed a small number of women with breast cancer prospectively to determine the long term incidence of permanent chemotherapy induced alopecia (PCIA), which was defined as absent or incomplete hair regrowth at $\geq$ 6 months after chemotherapy. Incomplete hair growth was defined if hair density or thickness at 6 months were two standard deviations below the baseline mean prior to chemotherapy. Using this definition, PCIA was observed overall in approximately 40% of 61 patients. Of the patients reporting hair problems 3 years after completing chemotherapy, hair thinning was the most common problem, followed by reduced hair volume, and then hair loss and grey hair. The taxane treated patients had a higher risk (odds ratio 8 fold) of PCIA 3 years after completing chemotherapy. Kang is the first prospective comparative study of PCIA in taxane based chemotherapy versus non-taxane based chemotherapy. Because of its limitations, however, caution is warranted in interpreting odds ratios as a relative risk. (A Liberman: How much more likely? The implications of odds ratios for probabilities, American Journal of Evaluation 2005;26:253-266) and (Davies et al. When can odds ratios mislead? BMJ 1998;516:989-991).

*Martinez AF, et al. Assessment of Quality of Life and Treatment Outcomes of Patients with persistent Postchemotherapy Alopecia, JAMA Dermatology 2019.*

The authors sought to characterize the clinical presentation of patients with persistent chemotherapy-induced alopecia or endocrine-induced alopecia after chemotherapy assessing quality of life and treatment outcomes. A total of 98 women with persistent postchemotherapy alopecia versus 94 women with post endocrine-induced alopecia were included. The most common agents associated with the post-chemotherapy alopecia were the taxanes (in 80/98 women or 82%) whereas aromatase inhibitors (58/94) were the most common agents in the post-endocrine alopecia group. In comparing the two groups of patients it was found that chemotherapy induced alopecia was more severe and diffuse, however both resulted in a significant negative effect. Of interest, within the chemotherapy group of alopecia, the large majority of alopecia cases, 80 of 98, were taxane based. Within the 80 taxane based cases, paclitaxel was the most common drug used in 47/80 (59%) of patients, while docetaxel was used in 31/80 (39%) of patients, and both therapies were used in the remaining 2/80 (2%) of patients.

33

*Chan, et al.  Permanent Hair Loss Associated with Taxane Chemotherapy Used in Breast Cancer:  A Retrospective Survey at TwoTertiary UK Cancer Centers.  Eur J Cancer Care 2021;3(30)e13395.*

In this study, patients at two UK tertiary cancer treatment centers who had received a taxane based therapy for breast cancer were surveyed.  383 patients responded to the survey (a 63.3% overall response rate). These comprised 245 patients receiving docetaxel and 138 patients treated with paclitaxel. PCIA was reported by 23.3% of patients receiving docetaxel and 10.1% paclitaxel (p < 0.01). Overall, 16.7% of patients in both groups reported the ongoing use of products or appliances such as wigs to camouflage their pCIA. In the docetaxel group, pCIA appeared to be more frequent in post-menopausal women than peri- or pre-menopausal women (37.8%, 12.3% and 19.6% respectively [Chi-square test p < 0.01]). Also in the docetaxel group, there appeared to be a trend for more severe scalp alopecia when the patient also received an aromatase inhibitor (AI) or tamoxifen, and this difference was most marked in those who had received both an AI and tamoxifen as components of their treatment regime (p = 0.04). This finding supports that hormonal therapy may play a role in hair loss associated with the taxanes. The use of scalp cooling was only recorded in the Christie paclitaxel group (n = 12). Of these 12 patients, 83.3% reported no hair loss.  While overall rates of permanent eyebrow, eyelash and nostril hair loss were low, this pattern of hair loss appeared more frequent in the paclitaxel than the docetaxel group 4.3% vs. 1.8% (p = 0.29).

The literature in this timeframe includes additional information on the association between permanent alopecia and docetaxel, but they have not provided any basis for any additional labeling update to the current label, which already adequately states that cases have been reported.

## IX.      RESPONSE TO DR ROSS'S REPORT

Dr. Ross's report included a few comments to which I will respond.

Dr Ross brings up data-mining (Paragraph 95) of the FAERS data, noting that the data are publicly available for download, suggesting that Hospira (or other 505(b)(2) sponsors) could have evaluated a proportionality reporting rate (PRR) signal for docetaxel such as that performed by Dr. Madigan.  I disagree.  The FAERS dashboard has only more recently become available for immediate public access, being announced in September of 2017, well after the docetaxel label was updated by CBE on March 31, 2017. For more complete reports, including a potential to assess cases of permanent alopecia, FAERS data could be requested via Freedom of Information Requests, yet I remain unclear as to how an assessment of these data would have changed or hastened the ultimate labeling change made by FDA with regards to permanent alopecia.  FAERS has many limitations which make it, at best, a method for potential signal detection.  I am not aware of sponsors performing PRR signal assessments for a labeled non-serious/non-life threatening concern such as alopecia.  Indeed, FDA's assessment of permanent alopecia for docetaxel focused on case report findings and the literature, with no PRR assessment performed.  As per the FDA's 2005 Pharmacovigilance Guidance, data mining can be used to augment signal detection, but "is not a tool for establishing causal attributions between products and adverse events."  FDA's own analyses of the cases of permanent alopecia associated with

Taxotere supported at best the modest labeling update to share that such cases have been reported, labeling that remains to this day.

Dr. Ross (Paragraph 98) observes that Hospira's 2012 labels in Israel, Hungary and the UK (among others) showed that alopecia in TAX316 was observed to be ongoing at the median follow-up time of 55 months in 22/687 patients with alopecia at the end of chemotherapy. He points out that Hospira did not add this information to the US labeling until September of 2017. My opinion is that Hospira appropriately followed the US Taxotere label to help inform relevant changes, and indeed the evidence supports that FDA's approach to labeling permanent alopecia clearly differed from that of other countries. Permanent alopecia was reasonably captured as a potential risk as of December 2015 in Taxotere labeling and subsequently in Hospira's docetaxel labeling of March 2017. Any attempt by Hospira to update their label for permanent alopecia prior to the reference drug Taxotere would likely have failed, particularly given Sanofi's many prior failed attempts to include this risk. I believe that any attempt made by Hospira to update their label for permanent alopecia risk between their 2011 approval date and December 15, 2015 would have been considered premature by FDA and not approved. This opinion is supported by the fact that even the data eventually reviewed by FDA for Taxotere in 2015 were considered tremendously limited, supporting at most the modest addition: "cases of permanent alopecia have been reported." In my opinion, the earliest time for Hospira to have successfully updated their label for permanent alopecia would have been after the December 15, 2015 Sanofi update. I find their labeling update of March 31, 2017 reasonable given that the FDA did not inform them of this change, and given that they acted reasonably after they were aware of the change in August of 2016, updating their label by the end of March, 2017.

Dr. Ross addresses specifically Hospira's actions related to docetaxel and updating their label for cases of permanent alopecia risk (Paragraphs 130-140). He asserts that Hospira was unique in its knowledge of docetaxel as a key employee, Dr. Juergen Schmider, had previously been employed by Sanofi and was responsible for Taxotere. My opinion is that it was reasonable and appropriate for Hospira to follow the US labeling for Taxotere with regards to adding the risk of permanent alopecia. It would have been inappropriate for Dr, Schmider to have suggested that the European labeling for Taxotere should guide Hospira's US docetaxel labeling. Moreover, it is apparent that the FDA was already well aware of permanent alopecia as a potential associated risk of docetaxel therapy, and of the TAX316 outcomes. Sanofi had submitted labeling to the Agency on multiple occasions as early as 2004 to add alopecia as a persistent reaction observed in 22/687 patients, yet the Agency declined, while non-US countries updated labels. Sanofi informed the FDA of this issue again in January of 2011 in a periodic safety update, submitting a risk assessment for persistent alopecia that they had performed for the French regulatory agency. While the EU Taxotere label was updated based on this risk assessment, the US FDA took no such action for Taxotere. US and European labels are not meant to be identical, and the US regulatory timeline for adding "cases of permanent alopecia have been observed" to docetaxel labeling was reasonable.

*Marianne Mann, MD*

Marianne C. Mann, M.D.

10/8/21

Date