# EXHIBIT J

                                                    Page 1

1            UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF LOUISIANA

2                 MDL NO. 16-2740

3

4   IN RE: TAXOTERE (DOCETAXEL)              :

    PRODUCTS LIABILITY LITIGATION

5                                            :

    - - - - - - - - - - - - - - - - - - - -

6   This document relates to:               :

7   Clare Guilbault, Case No. 2:16-cv-17061  :

    Audry Mae Plaisance, Case No. 2:18-cv-08068

8   _____    :

9

10           VIDEOTAPED DEPOSITION OF:

11              DAVID MADIGAN, PH.D.

12                 (VIA ZOOM)

13

14       TRANSCRIPT of the stenographic notes of

15   the proceedings in the above-entitled matter, as

16   taken remotely by and before SEVA FLICSTEIN,

17   Certified Court Reporter (New Jersey License

18   No. 30XI000141300, California Certificate

19   No. CSR 8727), Registered Merit Reporter,

20   Certified Realtime Reporter, witness located in

21   Boston, Massachusetts, on Friday, September 17,

22   2021, commencing at 9:34 in the forenoon.

23

24

25

Page 2

```
1  A P P E A R A N C E S :
2  (ALL COUNSEL APPEARING REMOTELY)
3
4  ATTORNEYS FOR PLAINTIFFS AND
     PLAINTIFF STEERING COMMITTEE:
5
6     WILLIAMS HART BOUNDAS EASTERBY, LLP
        BY: BRIAN ABRAMSON, ESQ.
7     8441 Gulf Freeway
        Houston, Texas 77017
8     713-230-2343
        babramson@whlaw.com
9
        -and-
10
        MICELI LAW LLC
11      BY: DAVID F. MICELI, ESQ.
        P.O. Box 2519
12      Carrollton, Georgia 30116
        404-915-8886
13      dmiceli@miceli-law.com
14
15
16 ATTORNEYS FOR PLAINTIFF AUDRY MAE PLAISANCE:
17
        DAVIS & CRUMP
18      BY: TAYLOR HARDENSTEIN, ESQ.
              -and-
19        TREVOR B. ROCKSTAD, ESQ.
        2601 14th Street
20      Gulfport, Mississippi 39501
        228-863-6000
21      taylor.hardenstein@daviscrump.com
        trevor.rockstad@daviscrump.com
22
23
24
25
```

Page 3

```
1  A P P E A R A N C E S   (Cont'd.):
2  (ALL COUNSEL APPEARING REMOTELY)
3
4  ATTORNEYS FOR DEFENDANT HOSPIRA:
5     WILLIAMS & CONNOLLY LLP
        BY: RICHARD T. MOORE, ESQ.
6           -and-
          ISIA JASIEWICZ, ESQ.
7           -and-
          LORI INTERLICCHIO, ESQ.
8     725 12th St NW
        Washington, DC 20005
9     202 434-5688
        rtmoore@wc.com
10      ijasiewicz@wc.com
        linterlicchio@wc.com
11
12
        ATTORNEYS FOR DEFENDANTS SANOFI:
13
14      SHOOK, HARDY & BACON, LLP
        BY: CHRIS McRAE, ESQ.
15           -and-
          TORREY MICHELLE PETERSON, ESQ.
16      2555 Grand Boulevard
        Kansas City, Missouri 64108
17      (816) 474-6550
        cmcrae@shb.com
18      tpeterson@shb.com
19
20
        ATTORNEYS FOR DEFENDANTS ACTAVIS PHARMA, INC.,
21 ACTAVIS LLC F/K/A ACTAVIS INC., AND SAGENT
        PHARMACEUTICALS, INC.:
22
        ULMER & BERNE LLP
23      BY: JENNIFER HEIS, ESQ.
        600 Vine Street, Suite 2800
24      Cincinnati, Ohio 45202-2409
        jheis@ulmer.com
25
```

Page 4

```
1  A P P E A R A N C E S   (Cont'd.):
2  (ALL COUNSEL APPEARING REMOTELY)
3
4  ATTORNEYS FOR DEFENDANT ACCORD:
5     TUCKER ELLIS LLP
        BY: JULIE A. CALLSEN, ESQ.
6     950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113
7     (216) 696-2286
        julie.callsen@tuckerellis.com
8
9
10
11 ATTORNEYS FOR DEFENDANTS SUN PHARMACEUTICAL
        INDUSTRIES, INC. f/k/a CARACO PHARMACEUTICAL
12 INDUSTRIES, LTD.:
13
        HINSHAW & CULBERTSON LLP
14      BY: KATHLEEN E. KELLY, ESQ.
        State Street, 27th Floor
15      Boston, Massachusetts 02109
        (617) 213-7047
16      kekelly@hinshawlaw.com
17
18 ATTORNEYS FOR DEFENDANT SANDOZ, INC.:
19      GREENBERG TRAURIG, ESQ.
        BY: JULIA FAYNGOLD COVEY, ESQ.
20      One International Place
        Suite 2000
21      Boston, Massachusetts 02110
        (617) 310-6231
22
23 ALSO PRESENT:
24      MARCELO RIVERA, Videographer
25      JAYSUN LOUSHIN, Concierge
```

Page 5

```
1           I N D E X
2
3  WITNESS                    EXAMINATION
4  DAVID MADIGAN, PH.D.
5
6     By Mr. Moore            10
7
8
9
        E X H I B I T S
10
        NUMBER    DESCRIPTION           PAGE
11
        Exhibit 1   Report prepared by David      11
12          Madigan, Ph.D., Docetaxel and
            Irreversible Alopecia,
13          dated March 23, 2020
14      Exhibit 2   Plaintiffs' Disclosure of     12
            Witnesses, July 9, 2021
15
        Exhibit 3   David Madigan Reliance List   14
16
        Exhibit 4   Curriculum Vitae, dated       15
17          September 1, 2021
18      Exhibit 5   Deposition and Trial          17
            Testimony - Last Four Years
19
        Exhibit 6   Clinical Study Report, Study  32
20          Number: TAX 316
            (EFC6041/BCIRG001)
21
        Exhibit 7   March 16, 2012 email to       40
22          Matthew Ernst, Ph.D., email
            string, w/attachment,
23          Response to Agency Request
24      Exhibit 8   Clinical Study Report,        56
            Study Number: TAX.ES1.301/
25          GEICAM 9805
```

2 (Pages 2 - 5)

Page 6

1 (INDEX Cont'd.:)
2            E X H I B I T S
    NUMBER        DESCRIPTION              PAGE
3
    Exhibit 9    ClinicalTrials.gov, Docetaxel    68
4                in Node Positive Adjuvant
                 Breast Cancer (TAX316)
5
    Exhibit 10   MedWatch form, Bates-stamped     86
6                Sanofi_00243374,
                 Sanofi_00243375
7
    Exhibit 11   Medical Dictionary for           95
8                Regulatory Activities
9   Exhibit 12   Guidance for Industry E2E        102
                 Pharmacovigilance Planning,
10               April 2005
11  Exhibit 13   Best Practices in Drug and       109
                 Biological Product Postmarket
12               Safety Surveillance for
                 FDA Staff
13
    Exhibit 14   Potential Signals of Serious     125
14               Risks/New Safety Information
                 Identified from the AERS
15               between April-June 2008
16  Exhibit 15   Potential Signals of Serious     125
                 Risks/New Safety Information
17               Identified from the AERS
                 between January-March 2008
18
    Exhibit 16   Potential Signals of Serious     125
19               Risks/New Safety Information
                 Identified from the AERS
20               between July-September 2008
21  Exhibit 17   Potential Signals of Serious     125
                 Risks/New Safety Information
22               Identified from the AERS
                 between October-December 2008
23
    Exhibit 18   January-March 2012 Potential     129
24               Signals of Serious Risks/New
                 Safety Information Identified
25               from the AERS

Page 7

1 (INDEX Cont'd.:)
2            E X H I B I T S
3   NUMBER        DESCRIPTION              PAGE
4   Exhibit 19   April-June 2012 Potential        129
                 Signals of Serious Risks/New
5                Safety Information Identified
                 from the AERS
6
    Exhibit 20   July-September 2012 Potential     129
7                Signals of Serious Risks/New
                 Safety Information Identified
8                from the AERS
9
    Exhibit 21   October-December 2012 Potential   129
10               Signals of Serious Risks/New
                 Safety Information Identified
11               from the AERS
12  Exhibit 22   README.DOC File for Quarterly     132
                 Data Extract from the AERS,
13               Revised March 8, 2006
14  Exhibit 23   Report prepared by David          140
                 Madigan, Ph.D., Docetaxel
15               and Irreversible Alopecia,
                 dated June 7, 2020
16
    Exhibit 24   README.DOC File for Quarterly     168
17               Data Extract from the FAERS,
                 Last Revised:  June 2015
18
19
20
21
22
23
24
25

Page 8

1          THE VIDEOGRAPHER:  Good morning we
2   are going on the record at 9:34 a.m. on
3   September 17, 2021.  This deposition is being
4   taken remotely of Dr. David Madigan in the
5   matter in re Taxotere Products Liability
6   Litigation.
7          My name is Marcelo Rivera from
8   Veritext Legal Solutions and I am the
9   videographer.  The court reporter is Seva
10  Flicstein, in association with Veritext Legal
11  Solutions.  I am not related to any party in
12  this action nor am I financially interested in
13  the outcome.
14         Counsel and all present remotely
15  will now state their appearance and affiliations
16  for the record.  If there are any objections to
17  proceeding, please state them at the time of
18  your appearance, beginning with noticing
19  attorney.
20         MR. ABRAMSON:  This is Brian
21  Abramson from Williams Hart.
22         MR. MOORE:  Good morning.  This is
23  Rich Moore on behalf of Hospira.
24         MS. PETERSON:  Torrey Peterson on
25  behalf of Sanofi.

Page 9

1          MS. COVEY:  Julia Fayngold Covey
2   on behalf of Sandoz.
3          MR. MICELI:  David Miceli on
4   behalf of PSC.
5          MS. HEIS:  Jennifer Heis on behalf
6   of Actavis LLC, Actavis Pharma Inc., and Sagent
7   Pharmaceuticals Inc.
8          MS. CALLSEN:  Julie Callsen on
9   behalf of Accord.
10         MS. KELLY:  Kathleen Kelly on
11  behalf of Sun Pharmaceutical Industries.
12         MR. ROCKSTAD:  Trevor Rockstad on
13  behalf of Audry Plaisance.
14         MR. HARDENSTEIN:  Taylor
15  Hardenstein on behalf of Audry Plaisance.
16         THE VIDEOGRAPHER:  Will the court
17  reporter please swear in the witness.
18         MR. MOORE:  We also have Isia
19  Jasiewicz and Lori Interlicchio from Williams &
20  Connolly as well on behalf of Hospira.
21  D A V I D   M A D I G A N ,   P H . D . ,
22         residing at 27 Colchster Street,
23         Brookline, Massachusetts 02446, having
24         been duly sworn by the Certified Court
25         Reporter, testifies as follows:

1           -----
2           EXAMINATION
3           -----
4  BY MR. MOORE:
5       Q.   Good morning, Dr. Madigan.
6       A.   Good morning.
7       Q.   My name is Rich Moore.  We just
8  met for the first time this morning.  Is that
9  right?
10      A.   Yes.
11      Q.   And we are taking this deposition
12 remotely.  Where are you physically located
13 today?
14      A.   I am in a conference room at
15 Northeastern University.
16      Q.   That's in Boston, Massachusetts?
17      A.   Yes.
18      Q.   Dr. Madigan, you've been deposed
19 four times in this litigation; is that right?
20      A.   That's correct.
21      Q.   And you also testified once at
22 trial; right?
23      A.   That's right.
24      Q.   And I believe the last time you
25 were deposed was about a year ago, in August

1  2020; is that right?
2       A.   I think that's right, yes.
3       Q.   And you were under oath when you
4  testified in those depositions and at trial;
5  correct?
6       A.   Yes, I was.
7       Q.   You testified truthfully in the
8  deposition and at trial?
9       A.   Yes, I did.
10      Q.   Okay.  So I am going to do my best
11 to be efficient today and not go back over the
12 same testimony.  Okay?
13      A.   Thank you.
14      Q.   I want to start with your report
15 that you served in this case.
16      MR. MOORE:  Could we please see
17 tab 4, Jaysun.
18      (Exhibit 1, Report prepared by
19 David Madigan, Ph.D., Docetaxel and Irreversible
20 Alopecia, dated March 23, 2020, was marked for
21 identification.)
22      THE WITNESS:  I've got it.
23 BY MR. MOORE:
24      Q.   Can you see that, Dr. Madigan?
25      A.   Yes, I can.  I also have it in the

1  Exhibit Share as well.
2       Q.   Thank you.  Let's mark -- this has
3  been marked as Exhibit 1.  And you understand
4  that this is the expert report that you served
5  in this case against Hospira; right?
6       A.   I believe so, yes.
7       Q.   And this is the same expert report
8  that you disclosed in March of 2020 in an
9  earlier case against Sanofi; is that right?
10      A.   I'm not certain.  That may well be
11 true, yes.
12      Q.   Are you denying that this is the
13 same report that you served in the Kahn case
14 against Sanofi?
15      A.   I'm not denying it.  I just don't
16 remember whether it's exactly the same one or
17 not.  I just don't know.
18      MR. MOORE:  Okay.  Well, let's
19 look at -- if you could turn to tab 5-A, please,
20 Jaysun.  Tab 5-A is a different document.  Could
21 we pull that up, please, Jaysun.
22      (Exhibit 2, Plaintiffs' Disclosure
23 of Witnesses, July 9, 2021, was marked for
24 identification.)
25      THE WITNESS:  I've got it.

1  BY MR. MOORE:
2       Q.   If you could turn to page 2 of 6.
3       A.   Okay.
4       Q.   Do you see where it says plaintiff
5  disclosed your expert report in the matter of
6  Elizabeth Kahn?
7       Do you see that?
8       A.   I do.
9       Q.   You agree this report that you
10 served in this case is the same report that you
11 served in the Elizabeth Kahn case; correct?
12      A.   Yes.  That's a reasonable
13 inference, yes.
14      MR. MOORE:  And, Jaysun, could we
15 turn back to Exhibit 1.
16      Q.   Dr. Madigan, this report that
17 we've marked as Exhibit 1 contains the opinions
18 that you intend to offer in this case; is that
19 correct?
20      A.   That is correct.
21      Q.   And you made some calculations in
22 this report to support your opinions, and those
23 are in the appendices; am I right?
24      A.   I just -- the way you phrased it
25 there is kind of throwing me for a loop.  You

Page 14

1 said I made some calculations that are in the
2 appendices. There are the results of
3 calculations in the body of the report as well.
4    Q.   Right. So the calculations and
5 the supporting documentation for your report are
6 contained in the four corners of your report and
7 in your appendix; right?
8    A.   Yes.
9    Q.   And you also provided along with
10 your report a list of your reliance materials;
11 correct?
12    A.   Correct.
13       MR. MOORE: Jaysun, could we see
14 tab 4-A, please. Can we introduce that as
15 Exhibit 2.
16       THE WITNESS: You mean 3.
17       MR. MOORE: Correct. Exhibit 3.
18 My apologies.
19       (Exhibit 3, David Madigan Reliance
20 List, was marked for identification.)
21 BY MR. MOORE:
22    Q.   This is your reliance list
23 entitled "David Madigan Reliance List";
24 correct?
25    A.   That's correct.

Page 15

1    Q.   So Exhibit 3 is a list of
2 materials that you relied on to form your
3 opinions in your expert report?
4    A.   Yes, that's the intention.
5    Q.   And the reliance list along with
6 the references in your report provide the entire
7 set of materials that you relied upon to form
8 the opinions in your report in this case;
9 right?
10    A.   That's right.
11       MR. MOORE: Jaysun, could we mark
12 tab 31 as Exhibit 4, please.
13       (Exhibit 4, Curriculum Vitae,
14 dated September 1, 2021, was marked for
15 identification.)
16 BY MR. MOORE:
17    Q.   Dr. Madigan, this is a copy of
18 your CV from September 2021; correct?
19    A.   Yes.
20    Q.   And this was provided to us last
21 night. And is this the most current version of
22 your CV?
23    A.   Yes.
24    Q.   And this was updated since your
25 last CV that you provided and dated July 2020

Page 16

1 for your last deposition; correct?
2    A.   Yes.
3    Q.   And included on your updated CV, I
4 see you have some additional publications from
5 2020 and '21. Is that right?
6    A.   That's right.
7    Q.   And do any of these publications
8 relate to alopecia?
9    A.   No.
10    Q.   Do any of them relate to
11 docetaxel?
12    A.   No.
13    Q.   Have you published any of the
14 opinions that you express in your expert report
15 in any of these publications?
16    A.   No, I have not.
17    Q.   Have you ever published in any
18 scientific or medical publication the opinions
19 that you've set forth in your expert report?
20    A.   Sorry. Was that -- I hope I
21 answered the last question correctly. Was that
22 the same question or a different question?
23    Q.   I just mean for all of the
24 publications on your CV, you've never published
25 the opinions in your expert report in any

Page 17

1 publication?
2    A.   I have not.
3    Q.   And are you aware of any
4 scientific or medical publication that has
5 published the opinions that you've expressed in
6 your expert report?
7    A.   I am not.
8    Q.   You also provided to us an updated
9 list of your testimony. And I am going to mark
10 that as Exhibit 5.
11       MR. MOORE: Jaysun, that's tab 32.
12       (Exhibit 5, Deposition and Trial
13 Testimony - Last Four Years, was marked for
14 identification.)
15 BY MR. MOORE:
16    Q.   Dr. Madigan, do you have access to
17 that already or do you have to wait for it to
18 come up?
19       It's up now. It's up now.
20       Dr. Madigan, you provided some
21 additional testimony, deposition testimony, in
22 '20 and '21 on this list that was not on your
23 previous list in August 2020; correct?
24    A.   Yes.
25    Q.   And specifically, since your last

Page 18

1 deposition, you've given deposition testimony in
2 the following matters:  Abilify, Talc, Combat
3 Arm Earplugs, Asbestos, and Valsartan.  Is that
4 right?  And Navient as well.
5     A.    That is correct.
6     Q.    And you also gave deposition
7 testimony in the Zostavax litigation as well?
8     A.    Yes.  I did in that time frame,
9 yes.
10     Q.    In all of these cases, did you
11 appear for the plaintiff?
12     A.    Yes.
13     Q.    Did any of these cases involve
14 alopecia?
15     A.    No.
16     Q.    Did any of the cases involve
17 docetaxel?
18     A.    No.
19     Q.    So since your last deposition on
20 August 24, you've only testified in cases for
21 the plaintiff.  Is that right?
22     A.    That's right.
23     Q.    Dr. Madigan, what did you do to
24 prepare for your deposition today?
25     A.    So last -- a few days ago I reread

Page 19

1 my -- I read my report, and I read through some
2 of the transcripts of the previous depositions.
3     Q.    When you refer to transcripts of
4 previous depositions, are you referring to the
5 four deposition transcripts in this matter?
6     A.    Yes.
7     Q.    Did you review your trial
8 testimony from the Earnest case?
9     A.    I did not.
10     Q.    Did you review any documents to
11 prepare for this deposition other than
12 transcripts and your expert report?
13     A.    I did not.
14     Q.    Did you communicate with any
15 individuals to prepare for your deposition
16 today?
17     A.    So I had a session with two of the
18 attorneys.
19     Q.    I don't want you to tell me what
20 you talked about, just I would like for you to
21 tell me when that was, please?  When did you
22 meet with these two attorneys?
23     A.    I'm sorry.  I'm just looking at my
24 calendar.  Give me a second.  Sorry.
25         I think it was on Tuesday, Tuesday

Page 20

1 afternoon.
2     Q.    How long did you meet?
3     A.    It was about a half an hour.
4     Q.    Was that remote?
5     A.    Yes.
6     Q.    Have you communicated with any of
7 the other experts in this litigation about your
8 testimony today?
9     A.    No.
10     Q.    Have you communicated with any of
11 the experts in the litigation since your last
12 deposition in August 2020?
13     A.    No.
14     Q.    Have you reviewed the reports of
15 any of the other experts in the litigation since
16 your last deposition in August 2020?
17     A.    No.
18     Q.    Since the last time you were
19 deposed in August 2020, have you done any work
20 related to the March 2020 report that we just
21 discussed?
22     A.    I have not.
23     Q.    Have you sent any invoices
24 regarding the Taxotere litigation since your
25 August 2020 deposition?

Page 21

1     A.    I think I sent an invoice after
2 that deposition; I assume you have that.  But
3 not since then.
4     Q.    So the last invoice that you sent
5 was the one that covered the time period leading
6 up to the August 2020 deposition?
7     A.    That's correct.  Yes.
8     Q.    So since -- you haven't sent any
9 invoices for any work done after the August 2020
10 deposition?
11     A.    I have not.
12     Q.    And that's because you haven't
13 done any work on the litigation other than what
14 you just described in terms of preparing for
15 this deposition; is that right?
16         MR. ABRAMSON:  Objection to form.
17     A.    That's right.  There were also a
18 few hours in July of this year where I was
19 prepped -- I was preparing for a trial, but it
20 was ultimately postponed.
21     Q.    And that was the Kahn trial that
22 we just talked about; is that right?
23     A.    I'm not sure.  It may well be.
24     Q.    And during that prep session, you
25 were discussing the testimony that you provided

6 (Pages 18 - 21)

Page 22

1 in the Kahn case; right?
2      A.   I recall reading my report,
3 reading some of the transcripts.  I don't
4 actually recall anything beyond that.
5      Q.   And that report, as we discussed,
6 is the same report that you've issued in this
7 case; right?
8      A.   That's right.
9      Q.   And how long did you spend in that
10 prep session, approximately?
11      A.   It was about three hours, is my
12 memory.
13      Q.   Is that the only work that you've
14 done since August 2020 in the litigation?
15      A.   Yes, I believe so.
16      Q.   Now, you understand that your
17 opinions in your report in this case relate to
18 cases brought against Hospira by two plaintiffs,
19 Audry Plaisance and Clare Guilbault?
20      A.   I may have seen those names.  I
21 don't know anything about them.
22      Q.   Have you ever communicated with
23 Ms. Plaisance?
24      A.   No.
25      Q.   Have you ever communicated with

Page 23

1 Ms. Guilbault?
2      A.   No.
3      Q.   Have you reviewed any of the
4 medical records of Ms. Plaisance?
5      A.   No.
6      Q.   Have you reviewed the medical
7 records of Ms. Guilbault?
8      A.   No.
9      Q.   Have you read the deposition of
10 Ms. Plaisance?
11      A.   No.
12      Q.   Have you read the deposition of
13 Ms. Guilbault?
14      A.   No.
15      Q.   Have you ever communicated with
16 Ms. Plaisance's physicians?
17      A.   No.
18      Q.   Have you ever communicated with
19 Ms. Guilbault's physicians?
20      A.   No.
21      Q.   Have you ever reviewed the
22 depositions of Ms. Plaisance's physicians?
23      A.   No.
24      Q.   Have you reviewed the depositions
25 of Ms. Guilbault's physicians?

Page 24

1      A.   No.
2      Q.   Do you know why Ms. Plaisance's
3 physician prescribed docetaxel for her?
4      A.   I do not.
5      Q.   Do you know why Ms. Guilbault's
6 physician prescribed docetaxel for her?
7      A.   I do not.
8      Q.   Do you have any knowledge of
9 Ms. Plaisance's current medical condition?
10      A.   I do not.
11      Q.   Do you have any knowledge of
12 Ms. Guilbault's current medical condition?
13      A.   I do not.
14      Q.   Are you giving any opinions about
15 the medical care and treatment of
16 Ms. Plaisance?
17      A.   No.
18      Q.   Are you giving any opinions about
19 the medical care and treatment of
20 Ms. Guilbault?
21      A.   No.
22      Q.   Are you providing any opinions
23 that docetaxel caused Ms. Plaisance to have
24 permanent hair loss?
25      A.   I am not.

Page 25

1      Q.   Are you providing any opinion that
2 docetaxel caused Ms. Guilbault to have permanent
3 hair loss?
4      A.   I am not.
5      Q.   If you turn back to the list of
6 reliance materials, please.  That's Exhibit 3.
7      A.   Yes.
8      Q.   Now, there are several documents
9 on here that have a Sanofi Bates stamp; right?
10      A.   I see that.
11      Q.   And do you understand those
12 documents were produced by Sanofi in this
13 litigation?
14      A.   I presume so.
15      Q.   And plaintiffs' attorneys provided
16 these Sanofi documents to you?
17      A.   Yes.
18      Q.   And there aren't any documents on
19 your reliance list with a Hospira Bates stamp;
20 right?
21      A.   Correct, there are not.
22      Q.   So there aren't any Hospira
23 internal documents that's on your reliance list;
24 right?
25      A.   That's correct.

7 (Pages 22 - 25)

Page 26

1    Q.   You haven't reviewed any internal
2 Hospira documents that Hospira has produced in
3 this litigation; right?
4    A.   I don't believe so.
5    Q.   So you haven't reviewed any of
6 Hospira's internal files related to docetaxel or
7 alopecia?
8    A.   I have not.
9    Q.   You haven't reviewed any Hospira
10 policies or procedures related to
11 pharmacovigilance?
12    A.   I have not.
13    Q.   And you haven't reviewed Hospira's
14 internal event -- adverse event database;
15 right?
16    A.   Correct, I have not.
17    Q.   You didn't review any information
18 about what adverse events were reported to
19 Hospira; correct?
20    A.   Correct.
21        MR. ABRAMSON:  Objection to form.
22 He hasn't reviewed any Hospira documents.  Are
23 we going to list out every single document that
24 he didn't review?
25        MR. MOORE:  Brian, if you would

Page 27

1 like to make an objection you can make an
2 objection.  Otherwise, please stop interfering
3 with the deposition.
4        MR. ABRAMSON:  Objection; form.
5 BY MR. MOORE:
6    Q.   Have you reviewed any internal
7 analysis by Hospira with respect to docetaxel
8 and permanent alopecia?
9    A.   No.
10        MR. ABRAMSON:  Objection to form,
11 asked and answered.
12    A.   I have not.
13    Q.   Have you reviewed any of Hospira's
14 labeling for docetaxel?
15        MR. ABRAMSON:  Objection to form,
16 asked and answered.
17    A.   I have not.
18    Q.   Have you reviewed any
19 correspondence between Hospira and the FDA?
20        MR. ABRAMSON:  Objection; form,
21 asked and answered.
22    A.   I have not.
23    Q.   Have you reviewed any Hospira
24 periodic safety update reports or submissions to
25 FDA regarding adverse events?

Page 28

1        MR. ABRAMSON:  Objection to form,
2 asked and answered.
3    A.   I have not.
4    Q.   Are you aware of any information
5 showing that Hospira had access to the internal
6 Sanofi documents identified in your reliance
7 materials?
8    A.   I have no idea.  I don't know.
9    Q.   You don't have any
10 information -- my question is, do you have any
11 information showing that Hospira had access to
12 the internal Sanofi documents identified in your
13 reliance materials?
14    A.   Fine.  Thank you.  I do not.
15    Q.   Your reliance list also includes
16 several deposition transcripts; correct?
17    A.   Yes.
18    Q.   These deposition transcripts are
19 of Sanofi employees; is that right?
20    A.   I believe that's true in each
21 case, yes.
22    Q.   And so you haven't reviewed the
23 deposition transcripts of any Hospira employees;
24 correct?
25    A.   I have not.

Page 29

1    Q.   Dr. Madigan, you are not a
2 regulatory expert; correct?
3    A.   Correct, I am not.
4    Q.   So you are not providing any
5 opinions about whether Hospira complied with FDA
6 regulations; is that right?
7    A.   Correct, I am not.
8    Q.   You are not offering any opinions
9 about the regulatory requirements for drugs
10 approved under section 505(b)(2) of the Food,
11 Drug, and Cosmetic Act; is that correct?
12    A.   Correct, I am not.
13    Q.   Are you offering any opinions
14 about the adequacy of Hospira's docetaxel
15 labeling?
16    A.   I am not.
17    Q.   Are you offering any opinions
18 about what Hospira knew about docetaxel and hair
19 loss?
20    A.   I am not.
21    Q.   Are you offering any opinions
22 about what Hospira should or should not have
23 done with respect to any safety signal for
24 docetaxel?
25    A.   I am not.

8 (Pages 26 - 29)

Page 30

1    Q.   Are you here to criticize Hospira
2  as a company?
3    A.   I am not.
4    Q.   Do you have any reason to believe
5  that Hospira is not a responsible company?
6    A.   I have no reason to believe
7  that -- I have no information about that company
8  one way or another.
9    Q.   Dr. Madigan, I would like to shift
10 gears here and talk to you about Section 7 of
11 your expert report.
12   A.   Okay.
13   Q.   Section 7 of your expert report is
14 entitled "Irreversible Alopecia in the TAX 301
15 and TAX 316 studies"; is that right?
16   A.   Right.
17   Q.   Just so we can get oriented here,
18 these are Sanofi clinical trials; is that
19 right?
20   A.   That's correct.
21   Q.   I will try to be specific and talk
22 about them as TAX 301 and TAX 316, but I may
23 refer to them together as the Sanofi clinical
24 trials.  Okay?
25   A.   Okay.

Page 31

1    Q.   Now, Hospira didn't conduct these
2  studies; right?
3    A.   I don't believe so, no.
4    Q.   I'm sorry.  I think we have a
5  double negative there.
6         Did Hospira conduct these tests?
7    A.   I'm sorry.  No, they did not.
8    Q.   So let's talk about TAX 316 first.
9  Okay?
10   A.   Okay.
11   Q.   And I will refer to your
12 description in paragraph 59 of your report.
13   A.   Okay.
14   Q.   And I just want to break this down
15 a little bit in terms of just explaining what
16 the study was.  So if you could help me with
17 that.
18        First of all, TAX 316 was a
19 randomized controlled clinical trial; right?
20   A.   Yes.
21   Q.   And in that study they gave two
22 groups of patients two different chemotherapy
23 regimens; right?
24   A.   Yes.
25   Q.   One group was given docetaxel in

Page 32

1  combination with doxorubicin and
2  cyclophosphamide; right?
3    A.   Correct.
4    Q.   And the other group was given
5  5-fluorouracil in combination with doxorubicin
6  and cyclophosphamide; right?
7    A.   Correct.
8    Q.   So doxorubicin and
9  cyclophosphamide are both chemotherapy drugs;
10 right?
11   A.   That's my understanding.  I don't
12 know much about them.
13   Q.   But patients in both groups took
14 those two drugs; right?
15   A.   Yes.
16        MR. MOORE:  If we could see tab 7,
17 please, and introduce that as the next exhibit.
18        (Exhibit 6, Clinical Study Report,
19 Study Number: TAX 316 (EFC6041/BCIRG001), was
20 marked for identification.)
21 BY MR. MOORE:
22   Q.   This has been marked as Exhibit
23 Number 6.
24        And, Dr. Madigan, do you recognize
25 this as the final clinical study report for the

Page 33

1  TAX 316 study?
2    A.   I do.
3    Q.   And this is a document that you
4  relied on; right?
5    A.   Yes, I believe so.  Yes.
6    Q.   It's dated September 9, 2010?
7    A.   Yes.
8    Q.   And if we could just turn to the
9  second page of that document, in the synopsis it
10 has a list of the objectives.  Do you see
11 that?
12   A.   I do.
13   Q.   And the primary objectives of TAX
14 316 were to compare disease-free survival
15 between the two chemotherapy regimens; right?
16   A.   Yeah, that was that primary
17 objective.
18   Q.   And the secondary objection of TAX
19 316 was to compare the overall survival,
20 toxicity, and quality of life between the two
21 regimens; is that right?
22   A.   Yes.  Objective.  I think you said
23 "objection."
24   Q.   Thank you.  I will say it again.
25        The secondary objective of TAX 316

9 (Pages 30 - 33)

1 are to compare overall survival, toxicity, and
2 quality of life between the two regimens;
3 right?
4     A.   Yes.
5     Q.   So nothing in the objections say
6 anything specifically about studying alopecia;
7 right?
8          MR. ABRAMSON:  Objection; form.
9     A.   The word "alopecia" is not in
10 there, right.
11    Q.   So TAX 316 wasn't designed with
12 the specific objection of evaluating alopecia?
13         MR. ABRAMSON:  Objection; form.
14 You keep on saying "objection" instead of
15 "objective."
16    A.   Not specifically, but toxicity is
17 in there so that -- I would interpret that to
18 mean adverse events in general.
19    Q.   A secondary objective is to look
20 at toxicity; correct?
21    A.   That's right.  It's one of the
22 secondary objectives.
23    Q.   But it's not the primary objective
24 of the study to address alopecia; right?
25    A.   It's not the primary endpoint,

1 it's not the primary objective.
2     Q.   And in the report, on page 37,
3 there is a table --
4          Jaysun, that's going to be -- the
5 Bates stamp number 4298 or page 37 as the
6 document is internally numbered.
7          Are you with me, Dr. Madigan?
8     A.   I am, yes.
9     Q.   So I am showing you a Table 7 that
10 appears on page 37 of the TAX 316 final clinical
11 study report; right?
12    A.   Right.
13    Q.   And in this table, it lists 29
14 patients as having ongoing alopecia in their TAC
15 arm; is that right?
16    A.   That's right.
17    Q.   And it lists 16 patients as having
18 ongoing alopecia in the FAC arm; is that
19 right?
20    A.   That's right.
21    Q.   And just so I'm clear, those are
22 the patients that you used to do your analysis
23 of TAX 316; right?  The 29 versus the 16, that's
24 the comparison that you did?
25    A.   That's an odd way to phrase it.  I

1 mean, I used all of the data to do my analysis.
2 But, yes, the number that had -- that I -- that
3 had ongoing alopecia was 29 in the TAC arm and
4 16 in the FAC arm.  Yes, that is true.
5     Q.   And so this table reflects those
6 two numbers; is that right?
7     A.   Sure, yeah.
8     Q.   And the patients that we're
9 talking about are ones that were reported as
10 having ongoing alopecia; right?
11    A.   That's how -- yes, that's how they
12 describe it in this table.
13    Q.   So the clinical study report
14 describes these patients as having ongoing
15 alopecia, but it doesn't say that they have
16 permanent or irreversible alopecia; right?
17         MR. ABRAMSON:  Objection; form.
18    A.   Not in this table.  I'm actually
19 not sure anywhere else in the document.  I just
20 don't know.
21    Q.   Well, this is a document that you
22 relied on; right?
23    A.   Yes.
24    Q.   And is there anything in the
25 clinical study report anywhere that states that

1 these 29 patients had permanent hair loss?
2          MR. ABRAMSON:  Objection; form.
3     A.   I don't know.  I'm not -- I don't
4 know.  I don't have a photographic memory.  I
5 don't know.
6     Q.   Take a moment if you need to to
7 look through the document, and just let me know
8 if there's anywhere in there that refers to
9 permanent or irreversible alopecia.
10    A.   Unfortunately, this version of the
11 document is not searchable.
12         I don't -- I don't believe so, but
13 I can't -- I'm not able to search the document
14 right now so I can't be 100 percent certain.
15    Q.   You are not aware of anything in
16 this clinical study report that states that
17 these 29 patients had permanent hair loss;
18 right?
19         MR. ABRAMSON:  Objection; form.
20    A.   I am not.  I am not aware of such
21 a statement in here.  I just don't know.
22    Q.   Now, am I correct that in your
23 meta-analysis you considered that all of the 29
24 patients that are identified here on Table 7 had
25 ongoing alopecia at the completion of the

Page 38

1 10-year study?
2      A.   I'm sorry.  Try again.  I got lost
3 in the question.  Sorry.
4      Q.   Your meta-analysis considered
5 these 29 patients listed on Table 27 [sic];
6 right?
7           MR. ABRAMSON:  Objection; form.
8      A.   Sure.  And every other patient,
9 yes.
10     Q.   And your meta-analysis considered
11 that these 29 patients had ongoing alopecia at
12 the completion of the 10-year study; right?
13     A.   Sure.
14     Q.   These 29 patients, you didn't
15 review any of their medical records; right?
16     A.   No, I did not.  I mean, all I had
17 looked at is the data from the clinical trials
18 that's in the SAS file.
19     Q.   I will ask a better question.  My
20 apologies.
21          Did you review any of the medical
22 records for these 29 patients?
23     A.   I did not.
24     Q.   Did you review any of the
25 underlying case forms for these 29 patients?

Page 39

1      A.   If you mean the case report forms
2 that would have been completed during the
3 conduct of the trial, no, I did not.
4      Q.   Did you review any of the patient
5 narratives describing any of the medical
6 conditions of these 29 patients?
7      A.   The patient narratives, I did not.
8      Q.   Other than the classification as
9 "ongoing," you haven't done any further
10 investigation to determine whether any of these
11 29 patients actually had permanent hair loss?
12          MR. ABRAMSON:  Objection; form.
13     A.   No, I suppose, is the simple
14 answer to that question.  They had ongoing
15 alopecia at the end of the study, and that was
16 the endpoint I analyzed.
17     Q.   You considered if they had ongoing
18 alopecia, that meant they had permanent hair
19 loss for purposes of your study; is that
20 right?
21     A.   Yeah.  For the purposes of my
22 analysis, I interpret that as
23 irreversible -- irreversible alopecia.
24     Q.   By way of clarification, also, I
25 consider the words "irreversible alopecia" and

Page 40

1 "permanent alopecia" to be the same for purposes
2 of this deposition.  So if I use "permanent
3 alopecia," I know you've used "irreversible
4 alopecia" in your report, can we just agree that
5 those two words are interchangeable for purposes
6 of this deposition?
7      A.   That's fine.
8      Q.   Now, in paragraph 67 you refer to
9 a Sanofi document suggesting a much shorter TAX
10 316 follow-up time for alopecia than those
11 provided in the actual TAX 316 clinical trial
12 SAS data.
13          That's paragraph 67 of your
14 report?
15     A.   Yes.
16          MR. MOORE:  I would like to show
17 you tab 8, please.  We can mark that as
18 Exhibit 7.
19          (Exhibit 7, March 16, 2012 email
20 to Matthew Ernst, Ph.D., email string,
21 w/attachment, Response to Agency Request, was
22 marked for identification.)
23 BY MR. MOORE:
24     Q.   This is the document that you are
25 citing in paragraph 67 and footnote 51 of your

Page 41

1 report; right?
2           I will ask a better question.
3           This is a report from Sanofi to
4 the Canadian Health Authority; correct?
5      A.   Yes.
6      Q.   Is this the document that you are
7 reefing to in paragraph 67 and footnote 51 of
8 your report?
9      A.   Yes.
10     Q.   And you understand that Health
11 Canada is Sanofi's regulator in Canada; right?
12     A.   Sanofi's regulator, that's not a
13 way to phrase it.  They are the pharmaceutical
14 regulator in Canada.
15     Q.   Fair enough.  You understand that
16 Health Canada is the pharmaceutical regulator in
17 Canada?
18     A.   Yes.
19     Q.   And you agree that as a drug
20 manufacturer, Sanofi has a responsibility to
21 provide accurate information to government
22 regulator?
23     A.   I certainly do.
24     Q.   If you turn to page 8842.
25     A.   Yes.

11 (Pages 38 - 41)

Page 42

1    Q.   Am I correct that Health Canada
2  has requested that Sanofi clarify the definition
3  of "ongoing" in its clinical trial?
4    A.   That appears to be the case, yes.
5    Q.   So Health Canada is asking Sanofi
6  to explain the meaning of "ongoing" in Table 7
7  of the TAX 316 clinical study report that we
8  just looked at; right?
9    A.   That appears to be the case.
10    Q.   And if you turn to the page that
11  ends 8845.
12    A.   Okay.
13    Q.   In the last paragraph, Sanofi gave
14  its response to this question; correct?
15    A.   That seems to be what that is,
16  yes.
17    Q.   So you agree that Sanofi's view is
18  that "ongoing" does not necessarily mean that
19  the adverse events were ongoing for the entire
20  10-year follow-up period?
21       MR. ABRAMSON: Objection; form.
22    A.   That's -- you are reading the
23  sentence.  That's what they wrote.
24    Q.   My question though is, Sanofi's
25  view is that "ongoing" does not necessarily mean

Page 43

1  that the adverse events were ongoing for the
2  entire 10-year follow-up period; right?
3       MR. ABRAMSON: Objection to form.
4    A.   You are asking me what does Sanofi
5  think.  I mean, I accept that that's what that
6  sentence says in that document, in their
7  response to Health Canada, yeah.
8    Q.   So Sanofi has stated that
9  "ongoing" does not necessarily mean that the
10  adverse events were ongoing for the entire
11  10-year follow-up period; right?
12       MR. ABRAMSON: Objection to form.
13    A.   You keep repeating that's what
14  they wrote there.  I agree with you.
15    Q.   And according to Sanofi, the last
16  visit could have been at any time during the
17  10-year follow-up period?
18       MR. ABRAMSON: Objection to form.
19    A.   I don't know how -- I don't infer
20  that from that statement, if that's the
21  question.
22    Q.   Let me refer you to the first
23  sentence.
24       It says, "The 'Ongoing' columns in
25  Tables 7 and 9 present data in regards to those

Page 44

1  AEs that were persisting or starting during the
2  follow-up period and that were present at the
3  last follow-up visit (whenever this visit
4  occurred - starting 30 days after the last IV
5  treatment and up to the end of the 10-year
6  follow-up)."
7       Did I read that correctly?
8    A.   You did.
9    Q.   According to Sanofi, the last
10  visit could have been at any time during the
11  10-year follow-up period starting 30 days after
12  the last treatment up to the end of the 10-year
13  follow-up period; right?
14       MR. ABRAMSON: Objection to form.
15    A.   I suppose.  I mean, certainly not
16  all patients were followed for exactly 10 years.
17  From the SAS data I can tell you exactly how
18  long each patient was followed up for and when
19  the last visit was.
20       Am I answering your question?
21    Q.   No, I don't think so.
22       My question is, according to
23  Sanofi, the last visit could have been at any
24  time during the 10-year follow-up?
25       MR. ABRAMSON: Objection to form.

Page 45

1    A.   I see what you are saying.  That's
2  correct, the last visit didn't occur at exactly
3  10 years to the minute.  It occurred -- actually
4  sometimes before 10 years it occurred and in
5  some cases after 10 years.
6    Q.   And it could have been less than
7  six months after the last dose of chemotherapy;
8  correct?
9    A.   It may be.  I'd have to check in
10  the SAS data.  I don't in my head know what the
11  minimum last visit date was.
12    Q.   And do you agree with Sanofi's
13  explanation of what "ongoing" means?
14       MR. ABRAMSON: Objection to form.
15    A.   I'm not entirely sure.  I mean, I
16  can tell you the table we looked at in the
17  clinical study report, the 29 and the 16, I know
18  exactly how they got that number, what their
19  definition is of "ongoing" at the end of the
20  study.  I know precisely what it is because we
21  have a SAS program that has -- the program that
22  computed those numbers.
23       So I know exactly what they meant
24  by those numbers in that table in the clinical
25  study report.

12 (Pages 42 - 45)

1    Q.    Maybe I didn't ask the right
2  question.
3          With regard to Sanofi's
4  explanation of "ongoing" in Exhibit 7, do you
5  agree with their explanation?
6          MR. ABRAMSON:  Objection; form.
7    A.    No, not quite.  So, you know, in
8  actual fact, first of all, what they don't say
9  in there is that they're treatment-emergent
10 adverse events.  So that's something that's
11 missing.
12         And the other thing that's missing
13 is it wouldn't be marked as ongoing if it was
14 marked as resolved, you know, somewhere during
15 follow-up.  That's kind of missing here as well.
16         It's a bit loose, is how I would
17 describe it.
18   Q.    Other than those -- other than
19 those two caveats, do you agree with Sanofi's
20 definition of "ongoing"?
21   A.    No.  That's like telling me other
22 than the fact that it's a bit fuzzy and
23 inaccurate, do I agree with it?
24         No, it's not technically the
25 definition that they used to characterize the

1  number of ongoing alopecias at the end of the
2  study in the definitive clinical study report.
3    Q.    So you have a different view from
4  Sanofi about the meaning of the term
5  "ongoing"?
6          MR. ABRAMSON:  Objection to form.
7    A.    I have Sanofi's view.  I have
8  their program.  I know exactly what they
9  computed to get -- to arrive at the 29 and the
10 16 that we've been talking about.  So I know
11 exactly what they did.
12   Q.    But you have a different view than
13 Sanofi about the meaning of the term
14 "ongoing" -- excuse me.
15         You have a different view than
16 Sanofi's definition of "ongoing" in this
17 document about the meaning of the term
18 "ongoing"?
19         MR. ABRAMSON:  Objection to form.
20   A.    I wouldn't put it that way.  The
21 way I'd phrase it is this is not very precise,
22 it's kind of fuzzy.  We have a formal, very
23 precise, sort of mathematically precise
24 definition of "ongoing" in their SAS program,
25 and that's the one that Sanofi actually

1  implemented.
2    Q.    But you didn't -- did you consider
3  this definition of "ongoing" that Sanofi
4  provided in Exhibit 7 in your analysis?
5          MR. ABRAMSON:  Objection; form.
6    A.    No, I didn't, nor would I.  I used
7  the definition that is in the clinical study
8  report and the SAS program referenced there,
9  therein.
10   Q.    So if we turn to the table that's
11 listed in this document, beginning on the next
12 page.
13         Jaysun, are we able to turn that
14 sideways?  Thank you.
15         If you will go to the previous
16 page, this is the table that you referred to in
17 footnote 51 of your report; right?
18   A.    Yeah.
19   Q.    I can go through these or I can
20 just ask you, I'll start with just asking you,
21 will you agree with me that, according to this
22 chart, the last time many of these patients
23 were recorded as having alopecia, ongoing
24 alopecia, was less than six months after the
25 patient finished chemo?

1          MR. ABRAMSON:  Objection to form.
2    A.    That's a hard question to answer
3  in the sense that these aren't right, these
4  aren't the follow-up times.  They are not -- I'm
5  not sure I ever figured out what they are.  I'm
6  not entirely sure, but they are not correct.
7  These are not the actual follow-up times.
8          But if you want to ask me the
9  numbers in the right-hand column, are many of
10 these numbers less than 0.5, a half a year, yes,
11 I agree.
12   Q.    So let me break that down.
13         I understand you don't agree with
14 the calculations of follow-up duration in this
15 chart.  Right?
16   A.    I don't.  It's not what they did
17 to produce the analysis in the clinical study
18 report.
19   Q.    But according to this chart, the
20 last time that many of the patients were
21 recording having ongoing alopecia was less than
22 six months after the patient finished
23 chemotherapy; correct?
24         MR. ABRAMSON:  Objection to form.
25   A.    There's a document here that has a

13 (Pages 46 - 49)

Page 50

1 column that says "Follow-up duration," and I
2 agree with you that some of the numbers in that
3 column are less than six months.
4    Q.   So you agree that under Sanofi's
5 interpretation of the word "ongoing," that many
6 of these 29 patients who are recorded as having
7 ongoing alopecia had their last follow-up for
8 alopecia less than six months after the patient
9 stopped using chemotherapy?
10       MR. ABRAMSON:  Objection; form.
11    A.   I don't.  I know exactly what
12 Sanofi means by "ongoing," as described in the
13 definitive clinical study report, and this is
14 not it.
15    Q.   Fair enough.  Let me rephrase
16 that.
17       You agree that under Sanofi's
18 presentation in this chart, many of the 29
19 patients who are recorded as having ongoing
20 alopecia had their last follow-up for alopecia
21 less than six months after the patient stopped
22 chemo?
23       MR. ABRAMSON:  Objection to form.
24    A.   That's not an entirely
25 unreasonable interpretation of this at face

Page 51

1 value.  I know it's wrong, they are not the
2 follow-up times.
3    Q.   I am not trying to argue.  I
4 understand that you and I aren't going to agree
5 on that.
6       You disagree with the chart;
7 right?
8    A.   I do, yes.
9    Q.   My question is, this chart that
10 Sanofi prepared shows that many of the 29
11 patients who were recorded as having ongoing
12 alopecia had their last follow-up for alopecia
13 less than six months after the patient stopped
14 using chemotherapy; correct?
15    A.   I am going to give you the same
16 answer, right, which is that at face value,
17 that's a reasonable interpretation, but it's not
18 correct.
19       Actually, two quick things.  One
20 is, I've answered a thousand questions about
21 this in previous depositions, and we've been all
22 over this over and over, and there is another
23 document that looks exactly the same as this one
24 that has follow-up times that agree with what I
25 calculated, what Sanofi's SAS program

Page 52

1 calculates.
2       I was never entirely sure of the
3 problems of this document that we are looking
4 at.  There is another one that is exactly the
5 same that has the correct follow-up times.
6       I've talked about this --
7       (Simultaneous speakers.)
8    Q.   When you did your analysis, you
9 didn't use the calculations that are here
10 provided by Sanofi about the follow-up duration;
11 correct?
12    A.   I didn't use the calculations --
13 I'm not entirely sure how they calculated these.
14 I know how they calculated it for the clinical
15 study report.  I have a SAS program, it's their
16 program.  That's what I did.
17       I'm not entirely sure, at least I
18 don't remember, I don't think I ever figured out
19 where these numbers came from.  But they are not
20 correct.
21    Q.   So I think your answer to my
22 question is you did not use the calculations
23 that Sanofi provided about the follow-up
24 duration in your calculation?
25       MR. ABRAMSON:  Objection; form.

Page 53

1    A.   You asked me did -- I'm just
2 stumbling --
3    Q.   Let me rephrase.
4       You did not use the calculations
5 that Sanofi provided in this document about
6 follow-up durations in your calculations?
7    A.   I didn't use these numbers.  I
8 think these numbers are incorrect.  I used the
9 final locked SAS data and their program to
10 produce the follow-up times.  That's what I did.
11    Q.   So you did not use the numbers on
12 this chart?  That's all I am asking.
13    A.   I did not, nor would I.
14    Q.   And are you familiar with the
15 testimony of Dr. Kopreski?  You relied on his
16 deposition testimony; correct?
17    A.   I read his deposition.
18    Q.   And he's a witness from Sanofi;
19 correct?
20    A.   That's my understanding.
21    Q.   And are you aware that
22 Dr. Kopreski went back and looked at the
23 individual case reports for the patients in
24 TAX 316 who were reported as having permanent
25 alopecia?

14 (Pages 50 - 53)

Page 54

1   A.   So, again, I've answered a lot of
2 questions about this in the past.  It's not
3 particularly fresh in my memory.  For accurate
4 answers you should refer to my previous
5 testimony.  I understand he did something like
6 that.
7   Q.   And I'm not going to have many, I
8 just want to -- just a few.
9       I am just asking, you are aware
10 generally that he went back and examined the
11 individual case reports for the patients in the
12 TAX 316 study who were reported as having
13 permanent alopecia?
14       MR. ABRAMSON:  Objection; form.
15   A.   Broad brush strokes, yeah, he did
16 something like that years after the fact.
17   Q.   And he concluded that only six of
18 the patients in the docetaxel group had ongoing
19 alopecia more than six months.  Are you aware of
20 that?
21   A.   I don't remember the number.
22   Q.   But you didn't apply
23 Dr. Kopreski's analysis in your analysis; is
24 that right?
25   A.   Certainly, nor would I.  It's

Page 55

1 Monday morning quarterbacking.  We have the
2 final locked data from the clinical trial, we
3 have the actual analysis that Sanofi did that is
4 then reflected in the clinical study report.
5 That's what I did.
6   Q.   So my question is simply, when you
7 did your analysis, it doesn't reflect
8 Dr. Kopreski's review of the individual medical
9 records and whether the patients had ongoing
10 alopecia more than six months?
11       MR. ABRAMSON:  Objection to form.
12   A.   It does not, nor would it.
13       MR. MOORE:  We've been going about
14 an hour.  I am happy to keep going or take a
15 break.
16       THE WITNESS:  Short break, two or
17 three minutes.
18       MR. MOORE:  Sure.
19       THE VIDEOGRAPHER:  The time is
20 10:36 a.m.
21       (Break taken.)
22       THE VIDEOGRAPHER:  The time is
23 10:41 a.m.  We are back on the record.
24 BY MR. MOORE:
25   Q.   Dr. Madigan, I am going to switch

Page 56

1 over to the TAX 301 study.
2   A.   Okay.
3   Q.   You refer to that in paragraph 60
4 of your report; right?
5   A.   I do.
6   Q.   And just so we are clear on the
7 terminology, that's a study that is sometimes
8 referred to as the GEICAM 9805 study; right?
9   A.   Right.
10   Q.   So the TAX 301 study and the
11 GEICAM 9805 study are the same study?
12   A.   Yes, that's correct.
13       MR. MOORE:  If you could turn to
14 tab 10, please, let's publish that as the next
15 exhibit, 8.
16       (Exhibit 8, Clinical Study Report,
17 Study Number: TAX.ES1.301/GEICAM 9805, was
18 marked for identification.)
19       CONCIERGE:  Little bit of a larger
20 file, it's taking a second.
21       THE WITNESS:  I've got it.
22 BY MR. MOORE:
23   Q.   Dr. Madigan, do you recognize this
24 as the final clinical study report for the TAX
25 301 study?

Page 57

1   A.   Yes, I believe so.
2   Q.   This is a document you relied
3 on?
4   A.   Yes.
5   Q.   And if we could turn to the
6 objectives page in the synopsis.
7   A.   Yes, I'm there.
8   Q.   And you will agree that in terms
9 of the design of the study, it also compared two
10 groups of patients like TAX 316, one who used
11 TAC and the other used FAC.  Right?
12   A.   Right.
13   Q.   And the main difference in the
14 study between TAX 316 and TAX 301 is the TAX 301
15 studied patients with negative axillary lymph
16 nodes; is that right?
17   A.   That's my understanding, yes.
18   Q.   And you will agree that TAX 301
19 also was not designed with the specific primary
20 objective of evaluating the risk of permanent or
21 irreversible alopecia with docetaxel?
22   A.   I agree.
23   Q.   And on page 111 of the clinical
24 study report, there is a Table 47, Bates-stamped
25 9707.

15 (Pages 54 - 57)

Page 58

1    Are you with me, Dr. Madigan?
2    A.   Yes.
3    Q.   Table 47 contains information
4 about ongoing alopecia in both arms; right?
5    A.   Right.
6    Q.   And it reports that there were
7 three patients who had ongoing alopecia in the
8 TAC arm and one patient who had ongoing alopecia
9 in the FAC arm; is that right?
10    A.   I said yes. I'm not sure if it
11 was audible.
12    Q.   Those are the numbers that you
13 used to perform your analysis; correct?
14    A.   Sure. I analyzed the complete
15 data, but they are the relevant numbers for
16 ongoing alopecia.
17    Q.   And so according to my
18 calculations, less than 1 percent of the
19 patients in the docetaxel arm were reported as
20 having ongoing alopecia. Is that right?
21    A.   That's correct.
22    Q.   And the discussion that we've had
23 about the meaning of "ongoing" with regard to
24 TAX 316 also applies to the definition of
25 "ongoing" in TAX 301; correct?

Page 59

1    A.   I think that's reasonable, yes.
2    Q.   And you didn't do an analysis of
3 the patient medical records to see whether these
4 patients who were classified as ongoing alopecia
5 had permanent or irreversible hair loss;
6 right?
7    A.   I did not. I analyzed the final
8 locked clinical trial data, the quantitative
9 data.
10    Q.   And just to clarify, that
11 quantitative data that you reviewed, that
12 doesn't include any of the patients' individual
13 medical records; correct?
14    A.   I think I'm agreeing with you.
15 But you could argue it is a medical record.
16 It's patient-level data. But, you know, I
17 certainly didn't look at any -- what you would
18 typically call medical records, like notes or
19 anything like that. I don't have that.
20    Q.   You didn't look at the case report
21 form for any of these patients to see if they
22 have permanent or irreversible alopecia;
23 right?
24    A.   I did not look at case report
25 forms. I'm just looking at the SAS data.

Page 60

1    Q.   Now, you noted in your report that
2 in TAX 301 there was poor information on whether
3 the patients in the study had alopecia in the
4 follow-up period; right?
5    A.   Sure. Yeah. There was only -- I
6 think it was 12 of the 55 study sites had
7 follow-up.
8    Q.   And so you are suggesting there
9 was a large group of patients in the study where
10 there was no follow-up?
11    A.   So it appears, for alopecia.
12    Q.   And you agree that in terms of
13 poor follow-up, that applied to the patients who
14 took docetaxel and the ones who didn't take
15 docetaxel; right?
16    A.   Sure. Applies to the patients in
17 this study.
18    Q.   Right. So for the patients with
19 no follow-up, you don't know whether the
20 patients who took docetaxel have more cases of
21 ongoing alopecia than the patients who didn't
22 take docetaxel?
23    A.   That's right. There's --
24    (Simultaneous speakers.)
25    Q.   I didn't mean to interrupt you.

Page 61

1    A.   You know, what they represent is,
2 actually looking at this table, that only about
3 10 percent, less than 10 percent of the patients
4 had alopecia that persisted into follow-up. I
5 have no way of knowing -- we have no way of
6 knowing if that's correct or not.
7    We know it for those patients, the
8 three and the one, you know, they had ongoing
9 alopecia at the end. But for the others, I just
10 don't know.
11    Q.   Right. So the vast majority of
12 the patients, you don't know whether the
13 patients who took docetaxel have more cases of
14 ongoing alopecia than the patients who didn't
15 take docetaxel?
16    A.   I don't know if they had alopecia
17 at all. We just don't know. I analyzed the
18 locked final data and this is what it showed.
19    Q.   I understand that.
20    I am just trying to understand,
21 for most patients, the vast majority of the
22 patients, you just don't have any data as to
23 whether or not they had alopecia or not?
24    A.   It's just not recorded one way or
25 another, you know, for many of these patients.

16 (Pages 58 - 61)

Page 62

1    Q.    Most of them; right?
2    A.    Yeah.  Sure.
3    Q.    So you don't know whether the
4  patients who took docetaxel in that group have
5  more alopecia than the ones who didn't take
6  docetaxel, you just don't know?
7    A.    Well, you know, I'm raising a
8  concern about follow-up.  I'm raising a concern
9  that it appears that there wasn't -- that the
10  follow-up was not complete.
11    But be that as it may, I have the
12  locked final clinical trial data, and it shows
13  three ongoing in one arm, in the TAC arm, and
14  one in the FAC arm.  That's what the clinical
15  trial data showed.
16    Q.    That's not statistically
17  significant --
18    (Court reporter clarification.)
19    Q.    Under the ordinary measurement of
20  statistical significance, you will agree that is
21  not statistically significant, three versus one?
22    A.    So, sure.  If you conduct a
23  statistical test comparing the rate of ongoing
24  alopecia in the TAC arm versus the FAC arm, it's
25  a relative risk of around three, but it does not

Page 63

1  reach statistical significance.  That is
2  correct.
3    Q.    And I think you agree that the
4  results of TAX 316 also were not statistically
5  significant according to that measurement;
6  right?
7    A.    Same kind of answer.  In and of
8  itself, if you conduct a statistical analysis
9  comparing the rate of ongoing alopecia in the
10  TAC arm to that in the FAC arm and conduct a
11  statistical hypothesis test, that produces a
12  p-value that's slightly above 0.05 and therefore
13  you would not call that statistically
14  significant in and of itself.
15    Q.    So you took -- you took the two
16  results of the two studies and you combined them
17  and made an analysis; right?
18    A.    Right.  I performed a
19  meta-analysis of the two studies.
20    Q.    And so even though they weren't
21  statistically significant in and of themselves,
22  you concluded that when they were combined they
23  were statistically significant; is that right?
24    A.    That's just a matter of fact.  If
25  you conduct a meta-analysis of the two studies

Page 64

1  looking at the ongoing alopecia endpoint, that
2  produces an estimate of 1.85 for the rate ratio
3  and the p-value is 0.04, which is -- we refer to
4  that as statistically significant because it's
5  less than 5 percent.
6    Q.    Are you aware of anyone else who
7  has ever combined the results of the two Sanofi
8  clinical trials on the issue of alopecia?
9    A.    Not something I've looked for.  I
10  have no idea.
11    Q.    The investigators who conducted
12  the study never combined the results of the two
13  studies on the issue of alopecia; right?
14    MR. ABRAMSON:  Objection; form.
15    A.    I have no idea.
16    Q.    Are you aware of any information
17  that the investigators who conducted the study
18  ever combined the results of the two studies on
19  the issue of alopecia?
20    A.    I am not.  It's just the way you
21  phrased the question, did the investigators ever
22  do X, Y or Z?  I have no idea whether they did
23  or didn't.  But I am agreeing with you, I have
24  not seen any such analysis.
25    Q.    I will ask a better question.

Page 65

1    Are you aware of any information
2  that the investigators who conducted the studies
3  ever combined the results of the two studies on
4  the issue of alopecia?
5    A.    I am not aware of any such
6  analysis.
7    Q.    Are you aware of any published
8  medical or scientific articles that ever
9  combined the results of the two studies on the
10  issue of alopecia?
11    A.    I'm not.
12    Q.    To your knowledge, has anyone
13  other than you in this litigation ever combined
14  the results of the two studies on the issue of
15  alopecia?
16    A.    I am not aware.  I don't know.
17    Q.    Are you aware of any published
18  medical or scientific article that found a
19  statistically significant risk of permanent
20  alopecia in TAX 316?
21    A.    I am not.
22    Q.    Are you aware of any published
23  medical or scientific article that ever found a
24  statistically significant risk of permanent
25  alopecia in TAX 301?

17 (Pages 62 - 65)

1    A.   I am not.
2    Q.   Are you aware of any published
3  medical or scientific articles that found a
4  statistically significant risk of permanent
5  alopecia when you combine the two Sanofi
6  clinical trials?
7    A.   I am not aware of any such
8  analysis other than my own.
9    Q.   Now, you based your analysis of
10  the Sanofi clinical trials on information you
11  received from Sanofi; right?
12    A.   Sure.  The locked clinical trial
13  data that came from Sanofi.
14    Q.   And you are not aware of any
15  evidence showing that Sanofi provided the data
16  from the TAX 316 and TAX 301 studies to Hospira;
17  right?
18    A.   I am not.
19    Q.   You are not aware of any evidence
20  showing that Sanofi provided the clinical study
21  reports for the TAX 316 and TAX 301 studies to
22  Hospira; right?
23    A.   I am not.
24    Q.   Are you aware of any evidence that
25  Hospira had access to any of the clinical

1  Sanofi -- excuse me.  I will ask that again.
2        Are you aware of any evidence
3  showing that Hospira had access to any of the
4  Sanofi clinical trial data?
5    A.   I am not.
6    Q.   Are you aware that any of the
7  information that you used to prepare your
8  analysis -- strike that.  Let me start over.
9        Are you aware that any of the
10  information about the Sanofi clinical trial data
11  that you used to prepare your analysis was
12  publicly available?
13    A.   Any of the information?
14    Q.   I will ask it again.
15        Are you aware that the information
16  that you used to prepare your meta-analysis was
17  publicly available?
18    A.   I am not actually -- I think you
19  phrased this am I aware.  I am not aware.  It's
20  not something I looked for.  I don't know what's
21  on ClinicalTrials.gov, for example.  It's just
22  not something I've looked for.
23    Q.   Well, let's look at
24  ClinicalTrials.gov.
25        If we can go to tab 11, please.

1        (Exhibit 9, ClinicalTrials.gov,
2  Docetaxel in Node Positive Adjuvant Breast
3  Cancer (TAX316), was marked for identification.)
4  BY MR. MOORE:
5    Q.   ClinicalTrials.gov is a government
6  website that contains information about clinical
7  trials; is that right?
8    A.   Sure.  Yes.
9    Q.   And this is -- this is an
10  example of the website, Exhibit 9?
11    A.   Seems to be, yes.
12    Q.   And this is a ClinicalTrials.gov
13  website on TAX 316.  Do you agree with that?
14    A.   Seems to be, yes.
15    Q.   And you see that it says that the
16  results were first posted in 2011.  Right?
17    A.   Yes.
18    Q.   So on page 12 of the document
19  there is a table that contains information about
20  alopecia; right?
21    A.   Where is it?
22    Q.   Keep scrolling down, please.
23        Do you see where it says
24  "Alopecia"?
25    A.   I do.

1    Q.   So the information on
2  ClinicalTrials.gov doesn't contain any
3  information about how many individuals had
4  ongoing alopecia; right?
5    A.   It appears not.  But you are
6  showing me one place in this document.  I'm sure
7  you're right, but I'd need to look at the whole
8  document, the whole --
9    Q.   Take a minute.  It's not a very
10  big document.  If you would, just take a minute
11  to confirm that this information on the
12  ClinicalTrials.gov web page doesn't contain any
13  information on how many patients had ongoing
14  alopecia.
15    A.   I agree.  I just did a search.
16  Yes, that appears to be the case, it does not
17  provide that information.
18    Q.   You would agree, Hospira couldn't
19  have obtained from ClinicalTrials.gov the
20  information on ongoing alopecia that you used to
21  prepare your analysis; right?
22        MR. ABRAMSON:  Objection to form.
23    A.   Yes, it appears to be the case
24  that ClinicalTrials.gov does not present that
25  information.

18 (Pages 66 - 69)

Page 70

1    Q.   So you are not aware of any
2  publicly available information about the Sanofi
3  clinical trial data that was available to
4  Hospira that it could have used to do the same
5  analysis that you did in your meta-analysis;
6  right?
7        MR. ABRAMSON:  Objection.
8    A.   I am not.  But I just want to make
9  sure, that doesn't mean I looked for it and I
10  know for a fact it's not there.  I don't know
11  that.  But I am not aware of anyplace in the
12  public domain where you can find that
13  information.
14    Q.   Okay.  I am going to ask you some
15  questions about your FAERS analysis.  Okay?
16    A.   Okay.
17    Q.   If you can turn to Section 4 of
18  your report.
19        That's the part of your report
20  where you discuss your docetaxel FAERS analysis;
21  right?
22    A.   Right.
23    Q.   Just a little background here,
24  FAERS stands for the FDA Adverse Event Reporting
25  System; is that right?

Page 71

1    A.   Yes.
2    Q.   And that's an FDA database that
3  collects adverse event reports for various
4  drugs?
5    A.   Sure, yes.
6    Q.   And adverse event reports are also
7  sometimes called case reports; is that right?
8    A.   Sure.  Or spontaneous reports,
9  yes.
10    Q.   In your report you describe
11  adverse event as any medical event coincident
12  with drug therapy regardless of an index of
13  suspicion by the reporter.
14    A.   You are reading something there
15  that sounds familiar, but I'm not sure --
16    Q.   We can look at it, if you'd like.
17  Paragraph 12.
18        I am just trying to understand
19  what an adverse event is in your opinion.  You
20  describe it as a "medical event coincident with
21  drug therapy regardless of an index of suspicion
22  by the reporter."
23        Did I read that right?
24    A.   Sure.
25    Q.   Does that mean that if someone is

Page 72

1  taking the drug and experiences a medical event
2  at the same time, it's considered an adverse
3  event even if the person doesn't suspect that
4  the drug and the medical event are related?
5    A.   Sure.  The one thing I would just
6  add there, you said at the same time, it could
7  be later.
8    Q.   That's a fair point.  So I will
9  ask that again.
10        If someone is taking a drug and
11  experiences a medical event, that's considered
12  an adverse event even if the person doesn't
13  suspect that the drug and the medical event are
14  related; correct?
15    A.   So it's -- this is all in the
16  context of FAERS, in the context of spontaneous
17  reporting systems.  So in that context, yeah,
18  that's correct.
19    Q.   What do you mean by "in that
20  context"?
21        I am asking you about adverse
22  event reports, right, whether they are reported
23  to FAERS or in any other place.  That definition
24  applies to any type of adverse event report;
25  right?

Page 73

1    A.   So in the context of spontaneous
2  reporting, you receive a report -- you are a
3  pharmaceutical company or you are the FDA and
4  you receive a report, and on that report the
5  person says -- they tick the box that they took
6  a certain drug, and they list, you know, that
7  they got a headache.
8        So, you know, the point of this
9  sentence in paragraph 12 is, you know, there is
10  not a place where you ask a person, Do you think
11  that the drug caused the headache?  That
12  question isn't part of the form.  Right.
13        So the person -- one presumes they
14  think the adverse event is related to the drug;
15  otherwise, why are they reporting it.  But
16  regardless, it is what it is.  You receive the
17  form, it has the drug, it has the headache.
18        And like in clinical trials it's
19  different.  In clinical trials you are
20  systematically recording adverse events from
21  patients.  And, in fact, it's standard practice
22  to -- for the clinicians to record whether they
23  think it was causally related to the drug
24  entity, to the intervention or not.
25        So maybe this discussion is

19 (Pages 70 - 73)

Page 74

1 getting too esoteric. But I am drawing
2 distinctions between adverse event reporting in
3 the context of spontaneous reporting system and
4 adverse event reporting in formal clinical
5 trials.
6     Q.   Thank you for that.
7         In the context of adverse events
8 that are reported as spontaneous adverse event
9 reports, just because someone reports an adverse
10 event report about a drug and a medical event
11 doesn't necessarily mean that those two things
12 are causally related; right?
13     A.   That's right.
14     Q.   And in your report, you did an
15 analysis of whether there was a safety signal in
16 the FAERS database for docetaxel and permanent
17 alopecia; right?
18     A.   I did.
19     Q.   And you used various statistical
20 models in your analysis; correct?
21     A.   Sure. I did the analysis in a few
22 different ways.
23     Q.   Okay. And the first way you did
24 it was a PRR analysis. And that's reflected at
25 page 14 of your report, Figure 1. Is that

Page 75

1 right?
2     A.   That's right.
3     Q.   I just want to go through these
4 individually and make sure I understand what
5 they mean.
6         Your PRR analysis, you determined
7 that a safety signal appeared in the first
8 quarter of 2000 and then remained in place until
9 to date. Is that right?
10     A.   That's right.
11     Q.   And then your second model, that's
12 the SEBGM model, the safety signal appeared in
13 the first quarter of 2000, then it disappeared,
14 reappeared in the fourth quarter of 2004, and
15 then reappeared in the second quarter of 2008?
16     A.   That's right.
17     Q.   And the third model, SEB05, the
18 safety signal appeared in the second quarter of
19 2012; right?
20     A.   That's right. Just to be picky,
21 you are referring to these models. They are
22 really statistics. They are not models, per se.
23     Q.   What word can I use? Is it
24 statistical model?
25     A.   Just statistic. It's a statistic.

Page 76

1 SEB05 is a statistic.
2     Q.   It's a statistical analysis;
3 right?
4     A.   Just to be picky, SEB05, strictly
5 speaking, is a statistic. I used that statistic
6 in this statistical analysis.
7     Q.   Well, you will agree that these
8 three statistics show three different results
9 for when the safety signal appeared?
10     A.   Sure, yes.
11     Q.   And there is a 12-year difference
12 between the time that the safety signal appeared
13 in your first statistic, PPR, and the time when
14 the safety signal in the third statistic, SEB05;
15 correct?
16     A.   That's right. They varied -- one
17 is more conservative than the other.
18     Q.   And there is a 12-year difference
19 between when they showed a safety signal?
20     A.   That's kind of what happens when
21 you use these statistics; the more conservative
22 ones don't signal until later.
23     Q.   And you also did a regression
24 analysis; is that right?
25     A.   I did several regression analyses,

Page 77

1 yes.
2     Q.   And those are in Tables 3, 4 and
3 5?
4     A.   That's correct.
5     Q.   And the first version shows a
6 safety signal in 2010, Table 3; right?
7     A.   That's correct. Using a threshold
8 of 2, yes.
9     Q.   Threshold of 2 is the one you
10 used; right?
11     A.   Yeah. I said -- I reported only
12 docetaxel that shows a persisting safety signal
13 using the conventional threshold of 2, yes.
14     Q.   I just want to understand.
15 Because the table, it doesn't jump off the page
16 here as to what you are saying. I just want to
17 clarify.
18         I think you are agreeing with me
19 that version -- the first version of your
20 regression analysis, Table 3, shows a safety
21 signal appearing in 2010 using the conventional
22 threshold of 2?
23     A.   Correct.
24     Q.   And the second version, Table 4,
25 also shows a safety signal in 2010; right?

20 (Pages 74 - 77)

1    A.    That's correct.

2    Q.    And the third version shows a

3 safety signal in 2003?

4    A.    That is correct, yes.

5    Q.    So with regard to the regression

6 analysis, there is a seven-year difference

7 between when the safety signal appeared in the

8 various statistics; right?

9    A.    That's correct.

10    Q.    Now, you conclude that concerning

11 docetaxel and irreversible alopecia, depending

12 on the metric, your analysis shows the emergence

13 of a safety signal at various times dating back

14 as early as 2000; right?

15    A.    Right.

16    Q.    So am I understanding you to say

17 that there was a safety signal present as early

18 as early 2000s, according to your analysis?

19    A.    Yes.

20    Q.    And one of your models, SEB05,

21 shows a safety signal appearing in second

22 quarter of 2012; right?

23    A.    Yeah.  That metric or that

24 statistic doesn't signal until 2012.

25    Q.    But as I understand what you are

1 saying, that doesn't mean that there wasn't

2 a safety -- excuse me.

3         As I understand it, that doesn't

4 mean that the safety signal appeared for the

5 first time in 2012; right?

6    A.    No.  There are different metrics

7 that are in use, different statistics that are

8 in use, and they show signals at different

9 times.  That's perfectly normal.

10         So the PRR is the one that shows

11 the signal at the earliest point in time, and

12 SEB05 is the one that shows it at the latest

13 point in time.  I think that's true, isn't it?

14    Q.    I believe so.

15         But you are not saying there was a

16 new safety signal in 2012 that wasn't already

17 present going back to the 2000s; right?

18    A.    No, I'm not.

19    Q.    Now, let's talk a little bit about

20 your search methods for identifying cases of

21 permanent alopecia.  Okay?

22    A.    Right.

23    Q.    We talked a little bit about

24 adverse event forms.  When a person submits an

25 adverse event to the FDA, they submit it on

1 what's known as a MedWatch form; is that

2 right?

3    A.    Sure.  There's also a CIOMS form,

4 another version.

5    Q.    MedWatch is one example of a form

6 that someone can use to report an adverse event

7 report to the FDA; right?

8    A.    Yes.

9    Q.    And the MedWatch form contains

10 information on the adverse event and details

11 about the adverse event; right?

12    A.    Sure.  Most of them, yes.

13    Q.    You say in your report that when

14 an adverse event report gets reported, they are

15 classified according to standardized adverse

16 event coding dictionaries?

17    A.    That's right.

18    Q.    And an example of an adverse event

19 coding dictionary is MedDRA?

20    A.    Correct.

21    Q.    And that contains standardized

22 adverse event codes; right?

23    A.    That's right.

24    Q.    So when someone reports an adverse

25 event, the information in the narrative section

1 as well as the other information, that gets

2 coded according to these standardized terms;

3 right?

4    A.    That's right.

5    Q.    And there's no standardized code

6 for permanent alopecia; right?

7    A.    There is not.

8    Q.    There is no standard code for

9 irreversible alopecia?

10    A.    There is not.

11    Q.    So you created in this litigation

12 your method for identifying cases of permanent

13 alopecia; right?

14    A.    That's an odd way to phrase it.  I

15 combined the MedDRA term with the outcome.  I've

16 done that type of analysis many times over the

17 years.

18    Q.    So for this -- for purposes of

19 this litigation, your method of identifying

20 cases of permanent alopecia was to combine the

21 code alopecia and the outcome of disability or

22 permanent damage; right?

23    A.    That's right.

24    Q.    And those are the patients that

25 you considered to have permanent alopecia for

21 (Pages 78 - 81)

1 purposes of your report; right?
2      A.   That's right.  And as I testified
3 before, I -- maybe it's in my report, I
4 consulted with Dr. Kessler on this point.
5      Q.   And you identify 31 cases of
6 permanent alopecia by the end of 2017 based on
7 your analysis; right?
8      A.   I'd have to check.  If you say so,
9 it sounds about right.  But I don't have it in
10 front of me.
11      Q.   It's in Appendix 4 to your report.
12 You testified to it before, but I'm happy to
13 show it to you.
14      A.   I'm pulling it up here.  I'm sure
15 it's fine.
16      Q.   My question is, you identified 31
17 cases of permanent alopecia by the end of 2017?
18      A.   Give me a second.
19           You know, you might have to show
20 it to me because the version I have here, it
21 says 31.  So there must be some --
22      Q.   31 was what I --
23      A.   Sorry, I thought you said 37.
24      Q.   My apologies.  Let me just start
25 over.

1           In your analysis, you identified
2 31 cases of permanent alopecia by the end of
3 2017; correct?
4      A.   With Taxotere, yes.
5      Q.   In your analysis, you identified
6 31 cases of permanent alopecia in patients
7 taking Taxotere or docetaxel by the end of 2017;
8 right?
9      A.   Correct.
10      Q.   And all of the statistics that we
11 looked at earlier rely on this calculation of
12 those 31 cases of permanent alopecia; correct?
13      A.   They rely on a lot more than that,
14 but that's one of the things that they rely on.
15      Q.   Okay.  But all of the statistical
16 models that you've used are based on your
17 calculation that there were 31 cases of
18 permanent alopecia by the end of 2017?
19           MR. ABRAMSON:  Objection; form.
20      A.   I mean, it's a funny way to phrase
21 it.  First of all, I do an analysis over time;
22 not just at the end of 2017, I do it quarter by
23 quarter.  I replay history.  But then my
24 analysis relies on all of the -- all of the
25 reports, Taxotere and the background,

1 non-Taxotere reports, and it relies on which
2 ones had alopecia and permanent outcome and
3 which ones didn't.
4      Q.   And understand, I'm not suggesting
5 that this is the only aspect of your analysis.
6 That's not what I am trying to suggest.  I am
7 asking a more narrow question.
8           For purposes of each of your
9 statistical analyses, you identified cases of
10 permanent alopecia that were used in that
11 analysis; right?
12      A.   Right.
13      Q.   And those cases that you
14 identified of permanent alopecia were the 31
15 cases that we just discussed in each of those
16 analyses; right?
17      A.   At the end.  By the time you get
18 to Q4 of 2017, that number is 31.
19      Q.   So if some of the 31 cases were
20 not actually cases of permanent alopecia, then
21 your statistical analysis would change; right?
22      A.   That's tantamount to saying if the
23 data were different, the analysis would be
24 different.  Yes.
25      Q.   All of the statistical analysis

1 would change if your number of 31 cases were
2 incorrect?
3      A.   Sure.  If any -- if any of the
4 inputs in the analysis change, if they are
5 incorrect, as you put it, then the analysis
6 would have been different.  Now, would it be
7 materially different?  That all depends,
8 obviously.
9      Q.   You haven't done that analysis
10 based on any other data?  You've assumed in each
11 of your analysis that 31 cases, and you haven't
12 done any alternate analysis; correct?
13           MR. ABRAMSON:  Objection to form.
14      Q.   I'll withdraw the question.
15           Now, if you look at -- let me ask
16 one question.
17           You mentioned that you don't know
18 whether the analysis would be materially
19 different if your calculation of 31 cases was
20 incorrect.  You don't know whether the analysis
21 would be materially different if that number
22 were incorrect because that's not something that
23 you've done; right?
24      A.   Sure.  I'd need to do that
25 analysis.

22 (Pages 82 - 85)

Page 86

1      MR. MOORE:  Now I am going to show
2  you tab 29.  We will mark that as Exhibit 9, I
3  believe.  Is that the next exhibit?
4      THE WITNESS:  10.
5      MR. MOORE:  10.  Let's mark that
6  as Exhibit 10, please.
7      (Exhibit 10, MedWatch form,
8  Bates-stamped Sanofi_00243374, Sanofi_00243375,
9  was marked for identification.)
10  BY MR. MOORE:
11      Q.   This is an example of a MedWatch
12  form; is that right?
13      A.   Yes.
14      Q.   And it contains narrative
15  information about the medical event; correct?
16      A.   Sure.  Yes.
17      Q.   And most MedWatch forms contain
18  this type of narrative information.  Do you
19  agree with that?
20      A.   Yes.
21      Q.   And that narrative information is
22  not something that you reviewed in your
23  analysis; right?
24      A.   It is not.
25      Q.   And this example, if you turn to

Page 87

1  the second page, it mentions in the narrative
2  section in the -- next to the bottom, third
3  sentence I think from the bottom, "She is also
4  experiencing hair loss, nail changes, and
5  feeling cold all the time."
6      A.   I see that.
7      Q.   So you agree, this has a report of
8  hair loss?
9      A.   Yes.
10      Q.   And this should be coded to
11  alopecia in the database based on that report;
12  right?
13      A.   I don't know.  You are
14  asking -- that's not my expertise.  I'm not a
15  coder.  I don't know.
16      Q.   Right.  But there is a report of
17  alopecia, and you agree that -- if there are
18  reports of alopecia, they should be coded as
19  alopecia in the database?
20      MR. ABRAMSON:  Objection to form.
21      A.   I don't know.
22      Q.   You don't know.
23      A.   Generally speaking, yes.  But I
24  don't know in this particular case --
25      Q.   I understand you don't know

Page 88

1  whether this one was coded as alopecia.  That's
2  what you are saying; right?
3      A.   No, I'm saying more than that.
4  I'm saying I'm not prepared to offer an opinion
5  that the MedDRA term "alopecia" should be
6  applied to this report.  That's outside of my
7  expertise.
8      Q.   But there was an adverse event
9  report for alopecia in this MedWatch?
10      A.   The word "alopecia" appears there.
11  But whether the MedDRA code for alopecia should
12  be attached to this, I have no idea.
13      Q.   That's not something you looked
14  at?
15      A.   That's outside my expertise, I'm
16  not a coder.
17      Q.   Also on the top it's indicated, on
18  the first page, that it's checked "disability";
19  is that right?
20      A.   I see that.
21      Q.   So if this were coded as alopecia,
22  and you will agree that this is an example of a
23  report that would meet your criteria for
24  permanent hair loss because it is also checked
25  with disability; right?

Page 89

1      A.   Could be.  Whether it's in FAERS
2  or not, I have no idea.
3      Q.   That's a different question.  I
4  understand you don't -- you're not prepared to
5  say whether this report was recorded in FAERS.
6  That's what you are saying; right?
7      A.   Yes.
8      Q.   But my question is a little
9  different.
10      If this were coded as alopecia and
11  reported to FAERS, then it would meet the
12  criteria for your permanent hair loss because
13  it's also checked as disabled; right?
14      A.   Yes.  That's correct.
15      Q.   And you didn't actually perform a
16  review to see whether or not -- of this report
17  or any other report to see whether or not these
18  patients had -- actually had permanent alopecia;
19  right?
20      A.   It's outside my expertise.  I
21  conducted a statistical analysis of the FAERS
22  database.  And if you want -- if you wanted to
23  review the underlying reports, it's not my area
24  of expertise, you'd have to look at all of them.
25  You can't just look at the ones that have

23 (Pages 86 - 89)

1 alopecia and permanent outcome, you would have
2 to look at all of them.
3      Q.   So you didn't look at the
4 underlying reports for the patients other than
5 the 31 to see whether or not they had permanent
6 alopecia or not?  That's what you are saying;
7 right?
8      A.   No, no.  That's not what I'm
9 saying.
10          I'm saying I did an analysis of
11 the FAERS database as is, right, as we've been
12 talking about.
13          What you're asking about is could
14 one take a look at the underlying MedWatch
15 reports, like the one that you have on the
16 screen here, and do a different classification,
17 whether it's permanent alopecia or not with some
18 expert judgment.  You could do that.  That's not
19 the nature of my analysis.
20          But what I'm saying is there is
21 kind of a commonness understanding in the hours
22 I've spent answering these questions that you
23 could just look at the 31.  Right.  But you
24 can't.  You also have to look at the background
25 and all the permanent alopecia cases in the

1 background.  Otherwise, you would be biasing the
2 analysis.
3          Strictly speaking, you need to
4 look at all the reports that don't have Taxotere
5 because they enter into the calculation as well.
6          So could one conceivably do
7 something like this?  You could.  But it's a
8 huge -- it's an impractical undertaking,
9 actually.
10     Q.   I understand your position on
11 this.  I'm familiar with that.  I just want to
12 make sure I understand what you did and didn't
13 do.  Okay?
14     A.   Okay.
15     Q.   So let me just ask you first, with
16 regard to the 31 patients that hit on your
17 identification criteria, you did not do a review
18 of the MedWatch forms for those 31 patients?
19     A.   I did not --
20     Q.   That's the first question.  That's
21 the first question.
22     A.   I did not, nor would I.  I'm a
23 statistician, that's outside my area of
24 expertise.
25     Q.   And you are also saying that you

1 did not do a review of the other adverse event
2 reports that are in the FAERS database that did
3 not turn up as part of your 31 cases to see
4 whether or not they had permanent alopecia?
5      A.   Sure.
6      Q.   Right?
7      A.   Same answer.  No, I didn't, nor
8 would I.  It's outside my expertise,
9 impractical.
10     Q.   So looking back at this MedWatch
11 form, there is nothing on the MedWatch form that
12 indicates that the checkmark for disability on
13 page 1 is associated with alopecia.  You will
14 agree with that; right?
15     A.   That's correct.  It covers the
16 entire form, it's not specific to an individual
17 adverse event.
18     Q.   So just because someone checks
19 disability on an adverse event report form and
20 that gets coded as disability in the database
21 doesn't mean that the disability is associated
22 with alopecia; right?
23     A.   Not necessarily.  It's associated
24 with the adverse events in the form.  It doesn't
25 specify, is it all of them, one of them, some of

1 them.  It doesn't specify that.
2      Q.   So you don't know which adverse
3 event report that's reported in the adverse
4 event report is associated with the report of
5 disability?
6      A.   I think you mean, you don't know
7 which adverse event in the adverse event report
8 is associated with the outcome of disability.
9 And, no, it just doesn't have that level of
10 specificity.
11     Q.   I think you are agreeing with me,
12 you don't know which adverse event report -- let
13 me ask -- I see what you are saying.  Let me ask
14 the question again.
15          You don't know which adverse event
16 that's reported in the adverse event report is
17 associated with the outcome of disability?
18     A.   There we go.  No, you can't be
19 sure.  It doesn't specifically tie the outcome
20 to a particular -- to an individual adverse
21 event.  In the event that there is more than
22 one, you know, in this form, there might be more
23 than one code.  I don't know.
24     Q.   So if you look at the second page
25 of this report -- can you refer to the second

24 (Pages 90 - 93)

1 page of the report, please.
2         Do you see where it says, "The
3 patient has experienced fluid buildup so severe
4 she could not walk.  Emergency surgery was
5 performed due to fluid accumulation in her heart
6 and lungs.  She was hospitalized in the
7 intensive care unit for nine days due to this
8 event and was treated with two drugs."
9         Is that right?
10     A.  I see that.
11     Q.   And so when the outcome of
12 disability was checked on the first page of this
13 form, you don't know whether that was related to
14 these events or hair loss; right?
15     A.  You know, I am agreeing with you.
16 If there's more than one adverse event in a
17 MedWatch form, more than one MedDRA code is the
18 way I view it, the outcome could apply to all of
19 them or just one of them or some of them.  The
20 form is not specific in that regard.
21     Q.   I am just trying to understand,
22 the fact that the report is coded as alopecia
23 and has the outcome of disability doesn't mean
24 that those two things are connected?
25     A.  If it's the only adverse event, I

1 think it does.  If it's not the only adverse
2 event, then there's uncertainty.
3     Q.   And you haven't done, again, any
4 review of these narratives to determine to see
5 whether the outcome of disability was connected
6 to the alopecia?
7     A.  Outside my area of expertise, not
8 something I've done, not something I would do.
9     Q.   One of the codes in the MedDRA
10 dictionary is "alopecia," as we've discussed;
11 right?
12     A.   There's a higher level term
13 "alopecias," and then within that, there's
14 so-called preferred terms.  I don't actually
15 have them on my fingertips.
16         MR. MOORE:  Well, let's look at
17 tab 17, please.
18         (Exhibit 11, Medical Dictionary
19 for Regulatory Activities, was marked for
20 identification.)
21 BY MR. MOORE:
22     Q.   Do you recognize this as an online
23 version of the MedDRA terms that we were just
24 talking about?
25     A.   Could be, yeah.  I don't know what

1 this website is, but it looks like it.
2     Q.   You are familiar with the MedDRA
3 dictionary; right?
4     A.  I am.
5     Q.   This appears, based on your
6 experience, to be a screenshot of the MedDRA
7 dictionary?
8     A.  It's a screenshot of some website
9 that pertains to the MedDRA dictionary, it would
10 appear.
11     Q.   You are not disputing -- you are
12 not going to argue with me that this is a
13 correct --
14     A.  I am not.
15     Q.   -- version of the MedDRA
16 dictionary?
17         You were just talking, I think,
18 about the higher level terms and the preferred
19 terms.  Do you see on here where it says "HLT"?
20 Does that refer to "higher level term"?
21     A.  Yes.
22     Q.   And then it says "Alopecias" next
23 to that.  And that's what you were just
24 explaining is the higher level term for alopecia
25 in MedDRA; right?

1     A.  That's right.
2     Q.   And then listed below "Alopecias"
3 is the list of preferred terms, lower
4 level -- let me ask a better question.
5         Below the higher level term
6 "Alopecia," there is a list of the lower level
7 preferred terms; right?
8     A.  The preferred terms.  It's
9 unfortunate to use the term "lower level"
10 because there is a lower level than preferred
11 term.
12         So let me phrase it this way.  It
13 lists the preferred terms within the higher
14 level term "Alopecias."
15     Q.   Very good.  So this chart lists
16 the preferred terms within the higher level term
17 for alopecia?
18     A.  That's right, yes.
19     Q.   And included within those
20 preferred terms are various types of alopecias;
21 right?
22     A.   Yes.
23     Q.   And as I understand your
24 methodology, you included in your identification
25 of the 31 cases any case that was coded with the

Page 98

1 higher level term "Alopecias"; right?
2    A.   Yes.
3    Q.   And you didn't exclude any cases
4 based on how they were recorded with regard to
5 their preferred term; right?
6    A.   That's a funny question.  Maybe I
7 can give you an answer that might be answering
8 the question.
9         So the endpoint I am looking for
10 in my analysis is the higher level term
11 "Alopecias."  On MedWatch forms -- in the FAERS
12 database there are preferred terms.  So if any
13 one of the preferred terms on the list that's on
14 the screen there, if any one or more of those
15 preferred terms appeared in the report in FAERS,
16 I count that, in your words, amongst the 31.
17    Q.   I think we're saying the same
18 thing.
19         So if someone -- if someone coded
20 an event using one of these preferred terms,
21 that would also be coded as a higher level term
22 "Alopecias," and therefore, it would be included
23 within the list of 31 cases that you identify?
24    A.   That's correct.
25    Q.   And so if someone, for example,

Page 99

1 submitted an adverse event report to the FDA and
2 that report was coded as "androgenetic
3 alopecia," that's a report that would be
4 identified in your methodology as a potential
5 case of permanent alopecia?
6    A.   It's conceivable, yeah.  I looked
7 at this at some point.  I'm pretty sure none of
8 these -- the only one that ever actually
9 occurred is the preferred term "Alopecia."
10    Q.   But my question is, if someone
11 coded any adverse event according to any of
12 these lower level preferred terms, they would be
13 included in your list of 31?
14    A.   Yes, conceivably.  Yes.
15    Q.   So if someone coded an event as
16 "scarring alopecia," that still would be
17 considered a potential case of permanent
18 alopecia under your methodology; right?
19    A.   Sure.  And I would point out, this
20 is what Sanofi did when they did their own
21 adverse event analysis, they used the higher
22 level term "Alopecia."
23    Q.   I represent Hospira.  You
24 understand that; right?
25    A.   Yes, sure.

Page 100

1    Q.   So I am asking -- I'm not asking
2 about their internal analysis at this point.
3 We'll get to that later, Sanofi's internal
4 analysis.  I am just asking you about your
5 analysis.
6         Let me stop and ask the question,
7 if someone coded an event as "scarring
8 alopecia," you wouldn't have excluded that from
9 your list of potential cases of permanent
10 alopecia; right?
11    A.   I would not.
12    Q.   If someone coded an event as
13 "radiation alopecia," you would not have
14 excluded that from your list of potential cases
15 of permanent alopecia; right?
16    A.   I would not.
17    Q.   If someone coded something as
18 "androgenetic alopecia," you wouldn't exclude
19 that from your list of potential cases of
20 permanent alopecia; right?
21    A.   I would not.
22    Q.   And your FAERS analysis, as I
23 understand it, is designed to offer an opinion
24 about when there was a safety signal; right?
25    A.   Sure.

Page 101

1    Q.   And I just want to -- let's just
2 be sure we're talking about the same thing when
3 we talk about a safety signal.  Okay?
4    A.   Okay.
5    Q.   A safety signal is a concern about
6 a potential safety risk; right?
7    A.   Sure.
8    Q.   In particular -- well, strike
9 that.
10         It doesn't mean -- a safety signal
11 doesn't mean the drug causes a safety risk;
12 right?
13    A.   Correct.
14    Q.   Safety signal requires further
15 investigation to determine whether it's a
16 potential safety risk; right?
17    A.   Sorry.  You trailed off.  I
18 couldn't hear the last bit.
19    Q.   A safety signal requires further
20 investigation to determine whether it's actually
21 a safety risk?
22    A.   Sure.  I mean, in and of itself it
23 doesn't establish causation.
24    Q.   And you set forth in your report
25 FDA guidances on safety signal identification,

26 (Pages 98 - 101)

1 best practices, et cetera; right?
2      A.   I reference those documents, I
3 believe, yes.
4      Q.   And one of the documents that you
5 referenced is -- it's tab 19.
6           Let's mark that as Exhibit 12,
7 please.
8           (Exhibit 12, Guidance for Industry
9 E2E Pharmacovigilance Planning, April 2005, was
10 marked for identification.)
11 BY MR. MOORE:
12      Q.   You are familiar with this
13 document, which is Guidance for Industry E2E
14 Pharmacovigilance Planning, April 2005;
15 right?
16      A.   Right.
17      Q.   This is a document that was cited
18 in your report?
19      A.   I can't remember.  If you say so,
20 it certainly could have been.
21      Q.   I want to ask you about page 11.
22      A.   Okay.
23      Q.   And --
24      A.   Right.  I'm there.
25      Q.   I'm sorry.  Let me find it.  It's

1 the next page.  There we are, "Systematic
2 Methods for the Evaluation of Spontaneous
3 Reports."
4      A.   I see that.
5      Q.   I just want to read to you the
6 first part of this description.
7           "More recently, systematic methods
8 for the detection of safety signals from
9 spontaneous reports have been used.  Many of
10 these techniques are still in development and
11 their usefulness for identifying safety signals
12 is being evaluated.  These methods include the
13 calculation of proportional reporting ratio, as
14 well as the use of Bayesian and other techniques
15 for signal detection.  Data mining techniques
16 have also been used to examine drug-drug
17 interactions."
18           Did I read that correctly?
19      A.   Yes.
20      Q.   One of the techniques that you
21 used in your report was proportional reporting
22 ratio; right?
23      A.   Yes.
24      Q.   And the other two metrics, EBGM
25 and EB05, those are Bayesian methods; right?

1      A.   Right.
2      Q.   So do you agree that your analysis
3 in your report used data mining techniques?
4      A.   No.  No.
5      Q.   And you explained, I believe, in
6 your report why you don't believe that's true;
7 right, as I understand it?  Paragraph 18.
8      A.   Okay.
9      Q.   I'll help you out.
10      A.   Yes.
11      Q.   And that's your explanation;
12 right?  In paragraph 18 you say because you are
13 looking only at two events, in retrospect,
14 essentially, you don't consider that to be a
15 data mining exercise.
16           Is that my understanding you
17 correctly?
18      A.   That's correct.  And having this
19 document in front of us is making that
20 distinction also.
21      Q.   And it says data mining -- the
22 next sentence, that we didn't read, states,
23 "Data mining techniques should always be used in
24 conjunction with, and not in place of, analyses
25 of single case reports."

1           Is that right?
2      A.   I see that.
3      Q.   So I understand you don't believe
4 you are doing data mining.
5      A.   I'm not.
6      Q.   If you were doing data mining,
7 that should always be used in conjunction with
8 and not --
9           (Court reporter clarification.)
10      Q.   -- and not in place of analyses of
11 single case reports, according to this
12 document?
13           MR. ABRAMSON:  Objection to form.
14      A.   So -- it's complicated.  Right.
15 Data mining, which is not what I am doing here,
16 but certainly one can do data mining and some
17 people do do data mining in this database.
18           I'm certainly not opposed to
19 reviewing individual case reports.  But the
20 data -- like, if I'm doing data mining, I'm not
21 looking at individual case reports, I don't have
22 that expertise.  So I would do a data mining
23 exercise, have done these kinds of things in my
24 life, and I presented the results in different
25 contexts.

27 (Pages 102 - 105)

Page 106

1    You know, would it be reasonable
2 or advisable for other people to look at the
3 underlying case reports?  Sure.  I don't have
4 any problem with that.
5    Q.   Okay.  That's a long answer, and I
6 appreciate that.  Make sure I understand what
7 you are saying.
8    If you were doing a data mining
9 exercise, you think it's reasonable for someone
10 to take a look at and analyze the underlying
11 cases?
12    A.   Sure.  It wouldn't be me.  But,
13 sure, why not.
14    Q.   You don't have the expertise, is
15 what you are saying; right?
16    A.   Absolutely not.
17    Q.   But someone who is involved in the
18 process of analyzing the safety signal and
19 whether or not it presented actual safety risk
20 should analyze the underlying case report if you
21 are doing data mining; right?
22    A.   It's a reasonable thing to do.
23 I'm not being prescriptive here; it's outside my
24 area of expertise.  You certainly could.
25    If you are doing a data mining

Page 107

1 exercise, you are going on a fishing expedition,
2 something pops up, sure, it's reasonable to say,
3 let's look at the underlying reports, let's look
4 at lots of other things too.  I'm not opposed to
5 it.
6    Q.   And it's not only that you are not
7 opposed to it.  The FDA in this document that
8 you cited states that that review of the
9 underlying case reports is something that should
10 always be used in conjunction with a data mining
11 exercise; you don't dispute that.  Right?
12    A.   I don't dispute that that's what
13 they wrote.
14    Q.   You disagree with the FDA -- do
15 you disagree with the FDA on this?  I am trying
16 to --
17    A.   It's overly prescriptive and it's
18 not what they always do themselves.  It's
19 not -- it's not unreasonable.  I'm not saying
20 don't look at the case reports.  Sure, look at
21 the case reports.  That's fine.  But they should
22 always be, certainly not what happens in
23 practice.
24    Q.   And you are aware of FDA data
25 mining exercises in which they don't look at

Page 108

1 underlying case reports?
2    A.   Well, they are running data
3 mining exercises -- some of the safety officers
4 are running data mining exercises all the time.
5 And they might or might not look at the
6 underlying case reports.  Other safety officers
7 there do look at the underlying reports.  So the
8 agency is not uniform in terms of how they go
9 about doing these things.
10    Q.   Can you cite an example of an FDA
11 data mining exercise in which they didn't look
12 at an underlying case report?
13    A.   Not off the top of my head.  We
14 could look at the literature.  I don't know.
15    Q.   You can't sit here as we sit here
16 today and identify an example of the FDA doing a
17 data mining exercise without analyzing the
18 underlying case report; right?
19    A.   Isn't that the same question?  No,
20 I cannot identify such a thing sitting here
21 today.
22    Q.   But since you say you are not
23 doing data mining, your methodology did not
24 follow this FDA guidance on data mining; fair?
25    A.   Sure.  Yeah.

Page 109

1    Q.   Now, there's another document I am
2 going to show you, it's tab 20.
3    Are you familiar with this
4 document?  Let me describe it for you.  It's
5 called "Best Practices in Drug and Biological
6 Product Postmarket Safety Surveillance for FDA
7 Staff," dated November 2019.
8    A.   I'm sorry, I don't have it yet.
9 I'm waiting.  Oh, yeah, sure.  I'm familiar with
10 this document.
11    (Exhibit 13, Best Practices in
12 Drug and Biological Product Postmarket Safety
13 Surveillance for FDA Staff, was marked for
14 identification.)
15 BY MR. MOORE:
16    Q.   It's not something you cited in
17 your report though; right?
18    A.   If you say so.  I don't remember.
19 I don't think it's been finalized.
20    Q.   It's indicated as a draft on here;
21 right?  But it's something you are familiar
22 with; right?
23    A.   Yes.
24    Q.   And these are the FDA's best
25 practices on pharmaceutical safety surveillance;

Page 110

1 is that right?
2      A.   That's what it purports to be,
3 yes.
4      Q.   Do you have disagreement with this
5 document?
6      A.   No.  Don't know much about it.
7 It's been quite a while since I've looked at it.
8      Q.   If you look at the table of
9 contents, Section 6 of this document is entitled
10 "Safety Signal Identification."
11      A.   Okay.
12      Q.   And Section 7 is called "Signal
13 Evaluation and Documentation."
14      A.   Okay.
15      Q.   And if you turn to page 21, there
16 is an explanation, I believe, of the difference
17 between those two phrases.
18      A.   Okay.
19      Q.   It's Section 6 in the preamble
20 under "Safety Signal Identification."
21      A.   I see that.
22      Q.   So it says, "For purposes of this
23 document, the term 'signal identification' is
24 broad in scope.  It includes the activities of
25 screening FAERS, VAERS, and the medical

Page 111

1 literature, as well as accepting other
2 information sources, to identify potential
3 safety signals.  Identified signals are
4 prioritized for more extensive evaluation."
5          Did I read that correctly?
6      A.   Yes.
7      Q.   By the way, VAERS, that stands for
8 the Vaccine Adverse Event Reporting database?
9      A.   That's right.
10      Q.   That's a similar database but it
11 just contains adverse event reports on vaccines
12 rather than --
13      A.   That's right.
14      Q.   -- other prescription drugs?
15          And so you will agree with me that
16 according to this FDA document on best
17 practices, there are two steps in the process:
18 the signal identification and then the signal
19 evaluation.  Right?
20      A.   Sure, yes.
21      Q.   And once a signal is identified,
22 it needs more extensive evaluation to determine
23 whether there is a safety issue; right?
24      A.   Sure.  In general, if you see a
25 signal, you investigate it.

Page 112

1      Q.   And I'm trying to understand,
2 which of these two steps are you performing in
3 your analysis?
4      A.   I'm doing a bit of both.  My FAERS
5 analysis in and of itself is a signal
6 identification analysis.  And I'm doing an
7 evaluation -- I'm doing exactly what the agency
8 does when they evaluate a signal; they look at
9 clinical trial data, they look at observation
10 studies, they look at any data sources that are
11 germane to the question of causation.  And
12 that's what they do when they evaluate a signal.
13      Q.   So your FAERS analysis is a signal
14 identification; right?
15      A.   Right.
16      Q.   And then the other parts of your
17 report you are saying are addressing the second
18 phase of signal evaluation?
19      A.   Yeah.  I didn't sequence it that
20 way, but you can certainly -- it's a reasonable
21 characterization of what I did.
22      Q.   Okay.  So just focusing now
23 specifically on your FAERS analysis, in this
24 document, Section 6.1, it lists a description of
25 data sources that are used in safety signal

Page 113

1 identification; right?
2      A.   Yep.
3      Q.   And the first one under 6.1.1 is
4 entitled "FAERS and VAERS"; right?
5      A.   I see that.
6      Q.   Is it accurate to say that this
7 section of the report is describing the process
8 for safety signal identification in the FAERS
9 database?
10      A.   That seems reasonable.  It's in a
11 section called "Safety Signal Identification,"
12 and then under -- we are looking at the data
13 sources under that section.  Sure.
14      Q.   So the first method for analyzing
15 the FAERS database in the safety signal
16 identification is individual ICSR screening.
17 Correct?
18      A.   I don't know.  There is a section
19 called "Safety Signal Identification," but now
20 we're in the Data Sources section.  The first
21 subsection is FAERS and VAERS.  And now I don't
22 know what they are describing.  They are
23 describing something they are calling individual
24 case report screening, and then they describe
25 what that is.  But I don't -- I don't see them

29 (Pages 110 - 113)

Page 114

1 saying this is the first thing you should do.
2     Q.   Okay.  Fair enough.
3          I will just ask you, in this
4 section there is a description of individual
5 ICSR screening.  Okay?
6     A.   We can agree on that, there is.
7     Q.   And ICSR stands for Individual
8 Case Safety Report; right?
9     A.   Yes, I think that's right.  I
10 think the S is safety.
11    Q.   And this process is describing the
12 FDA's best practice on screening Individual Case
13 Safety Reports; right?
14    A.   I suppose, yeah.  It's in a funny
15 section.
16    Q.   It says, "Using the information in
17 the narrative and other sections of the
18 Individual Case Safety Report, reviewers attempt
19 to establish a temporal relationship between
20 administration of the product and occurrence of
21 the adverse event to determine whether there is
22 sufficient support for further evaluation of the
23 potential safety signal."  Right?
24    A.   You read that correctly.  I see
25 that.

Page 115

1     Q.   So the FDA is recommending as part
2 of its best practices that when you are doing
3 individual case report screening, you look at
4 the narrative report; right?
5     A.   I think you're overstating it
6 there.  They are saying matter of factly, this
7 is what reviewers attempt to do.  You are
8 characterizing it as they are stating this is
9 best practice.  They are stating this is what
10 reviewers do.
11    Q.   In the best practice document,
12 they state that this is what FDA reviewers do
13 when they are doing individual case screening,
14 and that is, they look at the underlying
15 narrative.  Is that fair?
16    A.   Sure.  That's fair.
17    Q.   And in the next section, they also
18 describe a process called cumulative screening;
19 right?
20    A.   I see that.
21    Q.   And that also says in the last
22 sentence that "In the course of cumulative
23 screening, the reviewer may identify one or more
24 adverse events that may cause the reviewer to
25 read in detail all ICSRs for the adverse event."

Page 116

1 Right?
2     A.   Sure.
3     Q.   So when the reviewer -- under the
4 FDA best practices, when a reviewer is doing
5 cumulative screening, they have a choice of
6 whether they want to go and look at the
7 underlying case report or not.  Is that how you
8 understand that, they may choose to do so?
9          MR. ABRAMSON:  Objection to form.
10    A.   I think you are misinterpreting
11 there.  They are free to look at the reports any
12 which way they want any time they want, and they
13 do look at individual case reports.
14         I think here, the spirit of this
15 is more they are seeing reports coming in, they
16 see accumulating evidence or accumulating
17 reports of a particular adverse event, and they
18 may then look at all reports for those adverse
19 events, they might pull reports and look at
20 those.  I understand that's what this is saying.
21    Q.   Yeah, okay.  But the last sentence
22 there, the separate sentence says, "Periodic,
23 cumulative screening of case reports complements
24 ongoing screening at the individual report
25 level."  Right?

Page 117

1     A.   Sure.  You're a million miles here
2 from anything I did.  Just saying.
3     Q.   I think that's what I am trying to
4 establish here, is that you didn't follow this
5 FDA guidance here on how they did case screening
6 of individual case reports; right?
7          MR. ABRAMSON:  Objection to form.
8     A.   That's not the nature -- I did a
9 statistical analysis of FAERS.  I'm not a safety
10 reviewer.  I don't do what safety reviewers do.
11 I did a statistical analysis -- I'm a
12 statistician.  I did a statistical analysis of a
13 data set, and you have the results in my report.
14    Q.   And what I am asking you about --
15 and let me go back to my question -- is under
16 the cumulative screening process, the FDA says
17 that periodic cumulative screening of case
18 reports complements ongoing screening at the
19 individual report level.  Right?
20    A.   All for it.  No problem with that.
21 Good luck to you.
22    Q.   We'll talk about your analysis and
23 your point in a second, I just want to ask you
24 first, the FDA is suggesting that best practices
25 for reviewing these case reports includes

30 (Pages 114 - 117)

1 screening at the individual report level?
2     A.   Yeah.  It includes looking at the
3 reports.  Sure.  If I'm a safety officer of the
4 FDA, these reports are flowing in, sure, I
5 should look at them.
6           I'm doing something completely
7 different, I'm doing a statistical analysis of
8 the FAERS database.
9     Q.   And in your statistical analysis,
10 that's also a signal identification method,
11 right, as I understand?
12     A.   Sure.  I would prefer to call it a
13 statistical analysis of the FAERS database.  I'm
14 using signaling metrics, and I'm trying to
15 identify when, if there is a signal, when the
16 signal became apparent.  That's the nature of my
17 analysis.
18     Q.   And as I understand what you are
19 telling me, though, your analysis and what you
20 did in your statistical analysis does not follow
21 the FDA best practices that are described here
22 in this document?
23           MR. ABRAMSON:  Objection; form.
24     A.   No.  This is, like --
25           (Simultaneous speakers.)

1     Q.   It's different --
2     A.   That's like saying the FDA has a
3 process for analyzing chemicals, and it's like
4 saying you didn't follow that process in doing
5 your analysis here.  You're talking about
6 something different --
7           (Simultaneous speakers.)
8     Q.   I don't mean to -- I don't mean to
9 interrupt --
10           MR. MICELI:  Excuse me, Rich,
11 Rich, could you let the witness finish?
12     Q.   I was just about to say, I'm
13 sorry, Dr. Madigan, did I interrupt you?
14     A.   I was basically finished with my
15 point.  You are looking at, you know -- I know
16 safety reviewers, I'm friends with some safety
17 reviewers, this is what they do.  The reports
18 are coming in, they look at them, they are doing
19 quantitative analysis, they are doing highly
20 qualitative analysis of these reports.  That's
21 what they do.  There's nothing wrong with that.
22 I'm all for that.
23           It's not what I did.  What I did
24 was a statistical analysis of the FAERS
25 database.  And I'm not qualified to do the

1 clinical qualitative analysis of these reports.
2     Q.   I understand.  So let me see if I
3 can summarize.
4           This document we've been looking
5 at that's describing the best practices for
6 pharmacovigilance safety according to the FDA is
7 not the type of analysis that you did in your
8 report?
9           MR. ABRAMSON:  Objection; form.
10     A.   Yes.  This document does not
11 provide guidance on statistical analysis of
12 FAERS.  The other document we looked at is a bit
13 closer to that.  But I'm screening -- I'm
14 glancing at this document up and down, and they
15 don't -- they don't get into -- they don't
16 provide guidance here for statistical analysis
17 in this document.
18     Q.   So your report and this type of
19 statistical analysis that you did is different
20 than the type of analysis that's being described
21 in the FDA best practices.  Is that what you are
22 saying?
23           MR. ABRAMSON:  Objection to form.
24     A.   I'm scanning it up and down here
25 to see if there's any more in here.  In my

1 report I quote several, many FDA analyses that
2 are just like what I did.  They do -- the kind
3 of analysis I did, they do that all the time.
4           Is that described in this
5 particular document?  Maybe not.
6     Q.   In which of the analyses that you
7 cite in the FDA -- back up.
8           You said that you in your report,
9 you quote many FDA analyses that are just like
10 the one you did.  Is that right?
11     A.   Right.
12     Q.   In which one of those analyses did
13 they not review the underlying case report?
14     A.   I have no idea whether they did or
15 they didn't.
16     Q.   So when you say just like the one
17 you did, you don't know whether they reviewed
18 the underlying case report as part of that
19 analysis?
20     A.   There are citations to documents
21 in my report, they are in paragraph 29 to FDA
22 documents where they are presenting analysis
23 like mine.  Did they also look at the underlying
24 reports?  I don't know.
25           I'm not opposed to it.  You are

31 (Pages 118 - 121)

Page 122

1  holding this out as if this is something I think
2  is -- I'm opposed to this, one shouldn't do
3  that. It's fine. It's just not what I do.
4  It's not my role to look at the underlying
5  reports and read narratives.
6      Q.   Right. But when you say the FDA
7  did the same analysis you did, you don't know
8  whether they actually looked at the underlying
9  reports or not?
10     A.   I answered that question already.
11 They may have, they may not. I simply don't
12 know. It's not something I've looked for.
13         MR. ABRAMSON: Rich, we've been
14 going over an hour, let's take a break.
15         MR. MOORE: I think it's about
16 noon here Eastern time. I am happy to take a
17 lunch break now, if it's a good time.
18         THE WITNESS: Fine with me.
19         MR. MOORE: This is probably as
20 good a time as any. We have another hour, I
21 guess, if we can start back.
22         THE VIDEOGRAPHER: We are still on
23 the record.
24         THE WITNESS: Half an hour?
25         MR. MOORE: Fine here.

Page 123

1          THE VIDEOGRAPHER: The time is
2  12:06 p.m. We're going off the record.
3          -----
4          (Lunch break taken.)
5          -----
6          AFTERNOON SESSION
7          -----
8          THE VIDEOGRAPHER: The time is
9  12:33 p.m. We're back on the record.
10 BY MR. MOORE:
11     Q.   Dr. Madigan, are you aware that
12 FDA conducts its own signal protection as part
13 of its process?
14     A.   Sure.
15     Q.   And it publishes those in
16 quarterly reports; right?
17     A.   They publish alerts. I haven't
18 looked at this a while, but, yeah.
19         MR. MOORE: Let's look at, if we
20 could, tab 21.
21         And I will represent to you that
22 these are FDA quarterly reports from 2008.
23         THE WITNESS: That's not very
24 promising.
25         CONCIERGE: Hold on one second. I

Page 124

1  just checked the source and it's the exact same
2  way.
3          MR. MOORE: Can we go off the
4  record for just a couple of minutes, and let me
5  see if I can correct this technical problem and
6  make this document available. We are having a
7  problem with the exhibit apparently.
8          You are not seeing anything,
9  Dr. Madigan, just PDF?
10         THE WITNESS: Yes. For best
11 experience, blah, blah.
12         MR. MOORE: Let's just go off the
13 record very quickly. We will try to efficiently
14 resolve this.
15         THE VIDEOGRAPHER: The time is
16 12:36 p.m. We are going off the record.
17         (Pause in proceedings.)
18         THE VIDEOGRAPHER: The time is
19 12:42 p.m. We're back on the record.
20         MR. MOORE: I would like to
21 introduce the next four documents together as
22 one exhibit. And those are tabs -- we will make
23 it four exhibits. I would like to introduce
24 exhibit 21A, 21B, 21C and 21D.
25         Jaysun, if you could please put

Page 125

1  those in the Marked Exhibits folder.
2          Have those been published?
3          CONCIERGE: No. Do you want me to
4  share the screen for those?
5          MR. MOORE: If you could put all
6  four in the Marked Exhibits.
7          CONCIERGE: All right. I'm doing
8  that now.
9          (Exhibit 14, Potential Signals of
10 Serious Risks/New Safety Information Identified
11 from the AERS between April-June 2008, was
12 marked for identification.)
13         (Exhibit 15, Potential Signals of
14 Serious Risks/New Safety Information Identified
15 from the AERS between January-March 2008, was
16 marked for identification.)
17         (Exhibit 16, Potential Signals of
18 Serious Risks/New Safety Information Identified
19 from the AERS between July-September 2008, was
20 marked for identification.)
21         (Exhibit 17, Potential Signals of
22 Serious Risks/New Safety Information Identified
23 from the AERS between October-December 2008, was
24 marked for identification.)
25 BY MR. MOORE:

32 (Pages 122 - 125)

1    Q.   Dr. Madigan, we originally tried
2  to put these together as one exhibit, I think
3  that's what caused the technical problem.  I
4  will represent to you that these are four
5  quarterly reports from 2008 that are the FDA's
6  signal detection quarterly reports.
7    A.   Okay.
8    Q.   And have you had a chance to
9  review these?
10    A.   You mean right now?
11    Q.   Yeah. I'm just asking, if you
12  look at the first one, for example, you agree
13  with me that's what this is is a quarterly
14  report of the FDA's signal detection activities
15  for the January to March 2008?
16    A.   Actually, the one I'm looking at
17  is April to June.
18    Q.   Okay. The one you are looking at
19  is April to June of 2008.  And so that's the
20  FDA's report of signals that it found in that
21  quarter, second quarter of 2008; is that right?
22    A.   Yeah.  It purports to be, you
23  know, potential signals of serious risks/new
24  safety information that were identified for
25  these products during that quarter, yeah.  I

1  don't know whether it's intended to be
2  comprehensive or not, but it's the ones that
3  they've chosen to put on this alert.
4    Q.   Okay.  And the second quarter of
5  2008, that's the quarter in which you found that
6  your SEBGM statistic showed a safety signal for
7  docetaxel and permanent alopecia; right?
8    A.   That's right.
9    Q.   So in that quarter, the FDA didn't
10  find any signal for docetaxel and permanent
11  alopecia as part of its signal detection review;
12  right?
13    A.   I have no idea.  They didn't put
14  it on this list, we can agree on that.  But
15  whether they detected it or not, I haven't a
16  clue whether they were looking at this issue or
17  not.
18    Q.   You are not aware of any other
19  analysis from the FDA that concluded that there
20  was a safety signal for permanent alopecia and
21  docetaxel in the second quarter of 2008;
22  right?
23    A.   I'm not aware of any such thing.
24  I have no idea if they were looking at this or
25  not.

1    Q.   And so you are not aware of anyone
2  else other than you that's concluded that there
3  was a safety signal for docetaxel and permanent
4  alopecia in 2008 based on FAERS database?
5    A.   I have no idea if anyone else has
6  done this analysis.  I'm not aware of any such
7  analysis, I don't know whether such analysis was
8  done or not.  I have no idea.
9    Q.   It's certainly not reflected in
10  the FDA's published report on their signal
11  detection activities for the second quarter of
12  2008 in Exhibit 14; right?
13    A.   We can certainly agree it's not on
14  this list.
15    Q.   And if we look at your SEB05
16  statistic, you conclude that there was a safety
17  signal in that statistic in 2012; correct?
18    A.   Yes.
19    Q.   And specifically the second
20  quarter of 2012; is that correct?
21    A.   That's right.
22    Q.   And so if you look at tab 22B, I
23  believe.  Is that right?
24    A.   I don't have a tab 22 in the box
25  right now.

1    Q.   One second.  I'm sorry.
2       MR. MOORE:  Jaysun, can you mark
3  as exhibits the documents that are in the folder
4  22A, B, C and D as the next four exhibits.
5       CONCIERGE:  Yes.
6       MR. MOORE:  Those will be exhibits
7  18, 19, 20 and 21.
8       (Exhibit 18, January-March 2012
9  Potential Signals of Serious Risks/New Safety
10  Information Identified from the AERS, was marked
11  for identification.)
12       (Exhibit 19, April-June 2012
13  Potential Signals of Serious Risks/New Safety
14  Information Identified from the AERS, was marked
15  for identification.)
16       (Exhibit 20, July-September 2012
17  Potential Signals of Serious Risks/New Safety
18  Information Identified from the AERS, was marked
19  for identification.)
20       (Exhibit 21, October-December 2012
21  Potential Signals of Serious Risks/New Safety
22  Information Identified from the AERS, was marked
23  for identification.)
24  BY MR. MOORE:
25    Q.   Can you see those now,

33 (Pages 126 - 129)

Page 130

1 Dr. Madigan?
2      A.   Not quite.  Hang on.  I see 22A,
3 that's January to March 2012.  Is that the one
4 you want me to look at?
5      Q.   No.  I'd like you to look at 22B,
6 please, the second quarter.
7      A.   Yes, I have it in front of me.
8      Q.   First of all, I will represent to
9 you tabs 22A, B, C and D are the FDA quarterly
10 reports for its signal detection activities for
11 2012.  Okay?
12      A.   Okay.
13      Q.   And in tab 22B, which is
14 Exhibit 19, I believe --
15      A.   Yes.
16      Q.   -- you will agree with me that
17 this is the FDA's report of the signal detection
18 activities that it did in second quarter of
19 2012; right?
20      A.   No.  You refer to it as their
21 report.  It is a report.  I have no idea of what
22 signals make it on to this list.
23      Q.   It's a report of the FDA signal
24 detection activities in second quarter of 2012
25 and what it found; right?

Page 131

1      A.   Yes.  It's a report.  There is no
2 representation here that this is comprehensive.
3      Q.   You are not aware of any other FDA
4 reports on signal detection in the second
5 quarter of 2012; right?
6      A.   No, I'm not aware of any other
7 reports.  That doesn't mean that there aren't
8 many other signals that they are looking at.
9      Q.   But you are not aware that the FDA
10 found any signal between docetaxel and permanent
11 alopecia in the second quarter of 2012; right?
12      A.   I have no idea.  No idea.  I'm not
13 aware of any such analysis that they did, but I
14 have no idea whether they were even looking at
15 this issue or not.  I haven't a clue.
16      Q.   And this published quarterly
17 report in Exhibit 19 does not contain any
18 finding that there was a signal between
19 docetaxel and permanent alopecia?  You will
20 agree with that; right?
21      A.   Yes, it does not contain any
22 report of such a signal.
23      Q.   Now, in your -- your report, you
24 compare docetaxel to other drugs?
25      A.   Right.

Page 132

1      Q.   And you did that comparison based
2 on the FAERS data; right?
3      A.   That's a funny way to put it.  In
4 my FAERS analysis I also ran comparator drugs.
5      Q.   I think we're saying the same
6 thing but I am just trying to simplify it.
7           You ran a comparison between
8 docetaxel and other drugs in your FAERS
9 analysis?
10      A.   Sure.  Yes.
11      Q.   And your FAERS analysis was based
12 on FAERS data?
13      A.   Sure.
14      Q.   And are you familiar with the
15 instructions for use of FAERS data that are
16 published on the FDA's website when you download
17 it?
18      A.   Yes.  Sure.
19           MR. MOORE:  So if we put up tab 23
20 is the next exhibit, 22, Exhibit 22.
21           (Exhibit 22, README.DOC File for
22 Quarterly Data Extract from the AERS, Revised
23 March 8, 2006, was marked for identification.)
24           THE WITNESS:  Okay.
25 BY MR. MOORE:

Page 133

1      Q.   And these are the instructions
2 that the FDA provides to anyone who downloads
3 the adverse event data from the FDA website; is
4 that fair?
5      A.   I believe that's the case.  I'm a
6 little bit bothered by the -- it hasn't been
7 revised since March 8, 2006.  Is this the
8 current version?
9      Q.   Yes.
10      A.   Okay.
11      Q.   I'm sorry.  I don't know a hundred
12 percent whether there's been a revision since
13 then or not.  But I will note your --
14      A.   Yes.
15      Q.   -- your point on that.
16           According to this version, there
17 is a set of instructions about what anyone who
18 is going to download the adverse event data
19 should follow; right?
20      A.   Sure.  Yeah.  That's not unusual.
21      Q.   And it has some caveat in
22 Section B on the second page?
23      A.   Right.
24      Q.   I'm sorry.  The next page, please,
25 Jaysun.

34 (Pages 130 - 133)

Page 134

1    So you see that there are caveats
2 that are listed there; right?
3    A.  I see that.
4    Q.  And it says there are important
5 things to keep in mind when reviewing or
6 analyzing AERS data.
7    That's the same thing as FAERS
8 data; right?
9    A.  Yes.
10    Q.  It says, "For any given report,
11 there is no certainty that a suspected drug
12 caused the reaction."
13    And you agree with that; right?
14    A.  Sure.  We talked about that
15 earlier this morning.
16    Q.  And then it says, "This is because
17 physicians are encouraged to report suspected
18 reactions; however, the event may have been
19 related to the underlying disease being treated,
20 or caused by some other drug being taken
21 concurrently, or simply occurred by chance at
22 that time."
23    Did I read that correctly?
24    A.  Yes.
25    Q.  Do you agree with that

Page 135

1 statement?
2    A.  Yes.
3    Q.  Do you agree with the statement
4 that "Accumulated reports cannot be used to
5 calculate incidence (occurrence rates) or to
6 estimate drug risk"?
7    A.  Generally, yes.  An instance rate
8 is the rate at which an event occurs.  What
9 fraction of people get a headache after they
10 take a certain drug?  You can't calculate that
11 from FAERS because you don't know the
12 denominator.
13    Q.  Well, the FDA guidance actually
14 does say that there are ways that you can get a
15 rough estimate of the denominator, for example,
16 through statistical data on how many of these
17 drugs are being sold nationwide.  Although not
18 perfect, the FDA guidance says that it is
19 possible to get that information; right?
20    A.  Of course it's possible, but not
21 from FAERS.  That's my point.
22    Q.  Exactly.  But you can compare the
23 information in FAERS, which would be your
24 enumerator, with a denominator, which would be
25 the overall number of patients who took the

Page 136

1 product regardless of whether they reported any
2 adverse event.  That's something you can do;
3 right?
4    A.  Yes, someone can do that.
5    Q.  And the FDA in fact in its
6 guidance encourages people to do that by
7 calculating rough estimates of the overall
8 exposure to the drug in the population.
9    You are familiar with that;
10 right?
11    MR. ABRAMSON:  Objection to form.
12    A.  In general terms, yes.  If your
13 business is to identify incidence rates, then
14 there's various things you can do, yes.
15    Q.  Incidence rate, you consider that
16 to be the same thing as an absolute risk?  Am I
17 right about that?
18    A.  Yeah. It's closely related, yes.
19 The absolute risk is the probability that
20 somebody is going to get an adverse event if
21 they consume a drug.
22    Q.  So if the incidence rate is sort
23 of one in a million, that means there is a one
24 in a million chance you are going to get it,
25 that's kind -- that's the absolute risk?

Page 137

1    A.  Sure.  Yes.
2    Q.  But my point is just you haven't
3 done any -- you haven't done any calculation
4 here in your report about what the actual
5 incidence rate is for permanent alopecia in the
6 population of patients who took docetaxel
7 overall in the general population?
8    A.  That's right, that's not something
9 I've looked at.
10    Q.  And the last sentence of this
11 caveats says, "Comparisons between drugs cannot
12 be made from these data."
13    Do you see that?
14    A.  I see that.
15    Q.  Do you agree with that?
16    A.  No, and the FDA doesn't agree with
17 that.  The FDA -- it's in there, I know it's in
18 there, and there's a sentence like that in one
19 of the 2005 guidances.
20    But the 2005 guidance also -- I
21 quoted in my report, also says, and I quote,
22 "Comparisons of reporting rates and their
23 temporal trends can be valuable, particularly
24 across similar products or across different
25 product classes prescribed for the same

35 (Pages 134 - 137)

Page 138

1 indication."
2        And that's what I do, and that's
3 what the FDA does, and I quote often.  And I
4 cite to several examples where the FDA does
5 that.
6    Q.   We've talked about those already;
7 right?  Those are the examples in paragraph 29
8 of your report; right?
9    A.   Right.
10    Q.   And those are the examples
11 that -- in which you are saying that the FDA
12 does conduct some comparison between drugs; is
13 that right?
14    A.   They do -- yeah, they do analysis
15 just like what I did quite frequently.  That was
16 not meant to be exhaustive, I just cited to
17 several examples where they do that.
18    Q.   Right.  But you are not aware or
19 you can't say whether or not in those analyses
20 or any other FDA analyses they review the
21 underlying case reports as part of that?  We've
22 been over that.
23    A.   That's quite the non sequitur.  Do
24 you really want to go back there?
25    Q.   No, fine.

Page 139

1        This is the same FDA analyses that
2 we talked about earlier; right?
3    A.   Yeah.
4    Q.   Now, in your -- after you
5 submitted this report in the Kahn case in March
6 2020, you actually offered a later report in
7 June 2020.
8        Do you remember that?
9    A.   Not really.  I can --
10    Q.   I can show it to you.  Let's look
11 at tab 28.
12        I believe -- you already testified
13 about this report in your August 2020
14 deposition, and I think you were asked about all
15 the differences between this report and your
16 March 2020 report, which we've been talking
17 about today.  I'm not going to go back over
18 those.  Okay?
19    A.   Okay.
20    Q.   I will represent to you that one
21 of the differences in your two reports is
22 regarding the different drugs that you included
23 on your list of comparator drugs.
24        Does that ring a bell?
25    A.   Yeah.

Page 140

1    Q.   So if we look in particular at the
2 graphs that are in your later report from June
3 2020, can you turn to those please?
4    A.   Yeah.  It's not in the box.  I
5 think I have it in front of me.
6        MR. MOORE:  We're on Exhibit 23,
7 Jaysun.
8        CONCIERGE:  Sorry, I missed the
9 tab number.
10        MR. MOORE:  Tab 28.
11        (Exhibit 23, Report prepared by
12 David Madigan, Ph.D., Docetaxel and Irreversible
13 Alopecia, dated June 7, 2020, was marked for
14 identification.)
15 BY MR. MOORE:
16    Q.   I think you have it, Dr. Madigan,
17 don't you, on your screen?
18    A.   I'm pretty sure I do.
19    Q.   It's on page 14 of the tab 28, it
20 shows three graphs.  And my question is, in this
21 version you replaced two drugs --
22        (Reporter clarification.)
23    Q.   -- you replaced two drugs.  And I
24 can spell it for you, if you'd like.  The first
25 drug is Gemcitabine, the second drug is

Page 141

1 Bevacizumab.
2        So Dr. Madigan, just trying to ask
3 what the difference was between the two reports.
4        So in this report in June 2020 you
5 replace two of the comparator drugs, Gemcitabine
6 and Bevacizumab, with two other drugs,
7 Trastuzumab and Carboplatin.  Is that right?
8    A.   No.  Carboplatin was in the other
9 report.  I think I dropped Gemcitabine and
10 Bevacizumab, and added Trastuzumab, I think is
11 the difference.
12    Q.   So you added -- you added
13 Trastuzumab into your June 2020 report, and
14 that's not a drug that you looked at in your
15 March 2020 report?
16        MR. ABRAMSON:  Objection to form.
17    A.   That's correct.
18    Q.   Do you know that Trastuzumab has
19 the brand name Herceptin?
20    A.   Yeah, I might have known that.
21    Q.   And each of your metrics shows
22 that Herceptin had a safety signal starting in
23 2010 and continuing through the present day;
24 right?
25        MR. ABRAMSON:  Objection to form.

36 (Pages 138 - 141)

1     A.    Through the end of my analysis,
2  yes.
3          Hang on.  Actually, I should be
4  more careful.  You said each of my analyses, is
5  that true?
6     Q.    That's what I was asking.  I
7  believe it is true, but check me on that.
8     A.    It's not true in the regression
9  analysis.
10     Q.    Fair point.  I'm asking
11  specifically about PRR, SEBGM and SEB05.
12     A.    Right.  So it does appear to be
13  the case.  What you said is true with respect to
14  those three metrics.
15     Q.    So I will ask that again then.
16          With respect to the three metrics
17  PRR, SEBGM and SEB05, those three metrics show
18  that Herceptin had a safety signal starting in
19  2010 and continuing to the present day; right?
20          MR. ABRAMSON:  Objection; form.
21     A.    Yes.
22     Q.    And that signal is reflected in
23  the brown dotted line that spikes up in 2010 and
24  then comes back down in each of those three
25  graphs?

1     A.    That's right.
2     Q.    And do you still stand by this
3  report as accurate?
4     A.    Sure.
5     Q.    Now, I want to turn to a different
6  part of your report, and that's Section 5.
7          Could you turn there, please.
8  This is page 20.
9          This is a part of your report that
10  is Analysis of Internal Safety Databases;
11  right?
12     A.    Right.
13     Q.    And I just want to be clear about
14  this.  This is an analysis of Sanofi's internal
15  safety databases?
16     A.    That's right.
17     Q.    This is not an analysis of
18  Hospira's internal safety databases; right?
19     A.    Correct.
20     Q.    And you are not aware of any
21  evidence that Hospira had access to the Sanofi
22  internal safety database; right?
23     A.    I am not.
24     Q.    And you refer in paragraphs 51 and
25  53 to Sanofi's analysis of its internal database

1  in 2011 and 2015; right?
2     A.    Correct.
3     Q.    And this refers to an internal
4  analysis by Sanofi; right?
5     A.    That's right.
6     Q.    This doesn't refer to any internal
7  analysis by Hospira; right?
8     A.    It does not.
9     Q.    You are not aware of any evidence
10  that Hospira had access to Sanofi's internal
11  analysis from 2011 and 2015; correct?
12     A.    I am not.
13     Q.    So you are not opining that this
14  information -- Sanofi's internal safety base was
15  a safety signal to Hospira?
16     A.    I don't think Hospira knows -- had
17  access to this at all, as far as I know.  Maybe
18  they did.  I don't know if they did.
19     Q.    Right.  So you are not offering an
20  opinion that this information in Sanofi's safety
21  base was a safety signal to Hospira?  That's not
22  part of your report; right?
23     A.    Correct.
24     Q.    Now, in Table 6 you do some
25  calculations about the number of reports in the

1  Sanofi database?
2     A.    Right.
3     Q.    And those are case reports as well
4  that were reported to the company?
5     A.    Right.
6     Q.    And so the same limitations we
7  talked about with regard to case reports in the
8  FAERS database would also apply to those in
9  terms of their limitations?
10     A.    Generally, yes.
11          MR. MOORE:  Give me one second, I
12  think we might be done.  Why don't we take a
13  five- or ten-minute break.  Why don't we say 10
14  minutes.
15          THE WITNESS:  1:23 p.m. we'll be
16  back.
17          THE VIDEOGRAPHER:  The time is
18  1:13 p.m.  We are going off the record.
19          (Break taken.)
20          THE VIDEOGRAPHER:  The time is
21  1:23 p.m. and we're back on the record.
22  BY MR. MOORE:
23     Q.    Dr. Madigan, I just want to
24  clarify one thing.
25          We had a discussion before the

37 (Pages 142 - 145)

1 break about Section 5 of your report.  It was
2 brought to my attention that we still had on the
3 screen the June 2020 report and not your March
4 2020 report that's at issue in this case.
5          I just want to clarify, that
6 section of your report is the same in both
7 reports, I believe?
8     A.   Yes, it is.
9     Q.   So those questions that we were
10 asking about Section 5 of your report, those
11 apply to Section 5 of the March 2020 report,
12 which is the one that you issued in this case;
13 right?
14     A.   Yes.
15     Q.   And you had a question with regard
16 to the instructions that we looked at from the
17 FDA and the date of those instructions.  So if
18 we could go back to tab 23.
19     A.   Yes.
20     Q.   I believe you asked about the
21 date, the March 8, 2006 date, and whether that
22 was the current version.
23          Do you remember those questions?
24     A.   Right.
25     Q.   So my understanding is

1 that -- this document is entitled
2 "README.DOC"?
3     A.   Right.
4     Q.   So this is the README.DOC file
5 that downloads automatically with the 2008
6 quarterly data from the FAERS website.
7     A.   Got it.  That makes sense.
8     Q.   And so that was data that you used
9 in your analysis; right?  The 2008 quarterly
10 data?
11     A.   Well, yes.  And all the other
12 quarters.
13     Q.   Exactly.  So my point is that this
14 would have been -- this was the instruction that
15 applies to the data from that time period.
16 Okay.
17     A.   Sure.  Yes.  And I haven't looked
18 at it recently.  Maybe it's still the same, I
19 don't know.
20     Q.   I just wanted to show you the
21 current version.  And that's tab 34.
22     A.   Am I supposed to be seeing tab 34
23 in the share?
24          MR. MOORE:  Jaysun, could you pull
25 up tab 34, please.

1          CONCIERGE:  Sorry, it's spinning.
2 It will be there in a second.
3          THE WITNESS:  Yes, there it is.
4          (Exhibit 24, README.DOC File for
5 Quarterly Data Extract from the FAERS, Last
6 Revised:  June 2015, was marked for
7 identification.)
8 BY MR. MOORE:
9     Q.   Please turn to the second page of
10 that document so you can see the same caveats.
11     A.   Yeah, I see it there.
12     Q.   Are you satisfied,
13 Dr. Madigan -- I know it's changed a little bit
14 in terms of the formatting, putting into bullet
15 points, but are you satisfied now that the same
16 language that we discussed in the 2006 version
17 is also in the current version?
18     A.   Yes.  Thank you.
19     Q.   Now, we talked a little bit about
20 Hospira's access to information and its access
21 in particular to the clinical study reports.
22          I believe in the past you've said
23 that Hospira may have been able to obtain the
24 reports, even though they are not publicly
25 available, but from the FDA through a FOIA

1 request.  Do you remember being asked about
2 that?
3     A.   Yes.
4     Q.   And so have you ever attempted to
5 attain Sanofi's clinical trial data through a
6 FOIA request?
7     A.   Personally, no.
8     Q.   Are you aware of anyone else who
9 has?
10     A.   No.
11     Q.   What are the exemptions to the
12 FOIA and FDA role?  Do you know what they are?
13     A.   I do not.
14     Q.   Do you know anything about the
15 exemption about protecting disclosure of
16 commercial information obtained from a
17 company?
18     A.   I -- not specifically.  I've been
19 involved in FOIA requests once or twice in my
20 life.  I don't know much about it.
21     Q.   You don't know whether or not
22 Hospira would have been able to obtain the
23 clinical study requests through a FOIA request;
24 right?
25     A.   Right, I don't.

38 (Pages 146 - 149)

Page 150

1    MR. MOORE:  I believe that's all I
2 have.  Thank you, Dr. Madigan.
3    THE WITNESS:  Thanks very much.
4    MR. ABRAMSON:  No questions.
5    THE VIDEOGRAPHER:  The time is
6 1:30 p.m.  We are going off the record.
7    (Time noted:  1:30 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 151

1    C E R T I F I C A T E
2
3    I, SEVA FLICSTEIN, a Certified
4 Court Reporter of the State of New Jersey, do
5 hereby certify that prior to the commencement of
6 the examination the witness was sworn by me to
7 testify the truth, the whole truth and nothing
8 but the truth.
9    I DO FURTHER CERTIFY that the
10 foregoing is a true and accurate transcript of
11 the testimony as taken stenographically by and
12 before me at the time, place and on the date
13 hereinbefore set forth.
14    I DO FURTHER CERTIFY that I am
15 neither of counsel nor attorney for any party in
16 this action and that I am not interested in the
17 event nor outcome of this litigation.
18
19
20 _____
   New Jersey Certificate No. XI 01413
21 California Certificate No. 8727
   Registered Merit Reporter
22 Certified Realtime Reporter
23
24
25

Page 152

1
   IN RE: TAXOTERE (DOCETAXEL)          :
2 PRODUCTS LIABILITY LITIGATION
                                        :
3 - - - - - - - - - - - - - - - - - - - -
   This document relates to:            :
4
   Clare Guilbault, Case No. 2:16-cv-17061   :
5 Audry Mae Plaisance, Case No. 2:18-cv-08068
                                             :
6
7
8    I have read the foregoing transcript and
   found it to be a truthful and accurate
9 representation of the testimony I gave in
   connection with the captioned matter on
10 _____.
11
12              _____
13              DAVID MADIGAN, PH.D.
14
15
16
   The State of:
17 County of:
18
   Sworn and subscribed to before me on this
19 day      of          , 2021
20
21 NOTARY PUBLIC _____
22 My commission expires:
23
24
25

Page 153

1    E R R A T A   S H E E T
2
3    Please list any correction with the
   corresponding page and line numbers.
4
5    PAGE  LINE       CORRECTIONS
6 1.        :
7 2.        :
8 3.        :
9 4.        :
10 5.       :
11 6.       :
12 7.       :
13 8.       :
14 9.       :
15 10.      :
16 11.      :
17 12.      :
18 13.      :
19 14.      :
20 15.      :
21 16.      :
22 17.      :
23 18.      :
24 19.      :
25 20.      :

39 (Pages 150 - 153)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.