UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Audrey Plaisance, Case No. 2:18-cv-08086 |

**HOSPIRA'S MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE OR LIMIT
<u>OPINIONS OF DR. CURTIS THOMPSON</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................1

LEGAL STANDARD.....................................................................................................................2

ARGUMENT..................................................................................................................................3

I. DR. THOMPSON FAILED TO FOLLOW HIS OWN METHODOLOGY........................3

    A. Dr. Thompson's Opinion that Ms. Plaisance Has PCIA Is Based on Cherry-Picked and Inconsistent Inclusion Criteria. ..................................................3

    B. Dr. Thompson Failed to Obtain the Information He Admits Is Critical to Diagnosing Biopsies. ...............................................................................................6

    C. The Methodology Dr. Thompson Used for Counting Ms. Plaisance's Hair Follicles Cannot Be Validated or Tested. ................................................................8

    D. Dr. Thompson's "Constellation" of Ms. Plaisance's Biopsies Is Improper. ...........9

II. DR. THOMPSON SHOULD BE PRECLUDED FROM OPINING THAT HAIR LOSS AFTER HAIR RE-GROWTH IS CONSISTENT WITH PCIA.............................10

CONCLUSION.............................................................................................................................12

CERTIFICATE OF SERVICE .....................................................................................................13

## INTRODUCTION

Hospira moves to exclude in their entirety the opinions and testimony of Audrey Plaisance's dermatopathologist, Dr. Curtis Thompson. Dr. Thompson's methodology and resulting opinions are unreliable. Dr. Thompson admits that he cherry-picked the set of histologic criteria he applied to diagnose Ms. Plaisance's PCIA. He further admits that the approach he took to evaluating and diagnosing Ms. Plaisance's pathology was not consistent with the approach he adopts in the regular course of his practice. It was not even consistent with the approach he took in evaluating and diagnosing Ms. Guilbault's pathology.[1] Finally, Dr. Thompson offers the scientifically unsupported opinion that a person with complete hair regrowth after chemotherapy can experience PCIA. Thus, all his opinions should be excluded.

## BACKGROUND

Dr. Thompson is a dermatopathologist who reviewed the biopsy specimens of Ms. Plaisance's scalp taken by Dr. Tosti. Dr. Thompson is not a dermatologist and does not see patients. He did not conduct any exam of Ms. Plaisance's scalp nor review any photographs of her. He does not know what she looks like or what her hair presentation is. He is unfamiliar with her medical history, including a lengthy history of alopecia before beginning chemotherapy. His role in this litigation was to review the biopsy specimens and diagnose the type of alopecia Ms. Plaisance suffered based on histopathological criteria. Dr. Thompson performed this role in the Sanofi trial pool cases as well.

Dr. Thompson's primary opinion, stated in both his pathology report and Rule 26 report, is that Ms. Plaisance has permanent chemotherapy-induced alopecia ("PCIA"). Dr. Thompson did not perform a differential diagnosis.

---

[1] Per the parties' agreement, Hospira's motion to exclude Dr. Thompson's opinions in the *Guilbault* case will be due at a later date. Hospira is not offering arguments here in support of that forthcoming motion. Instead, the very different methodologies used by Dr. Thompson between the two Trial 5 cases only serves to underscore that his opinions must be excluded in the *Plaisance* case.

**LEGAL STANDARD**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under the Rule, the witness must be qualified as an expert, and her opinions must be both reliable and relevant. *See* Fed. R. Evid. 702. Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *Daubert* instructs courts to serve as gatekeepers, "impos[ing] a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'" *Kumho Tire Co.*, 526 U.S. at 147 (alteration in original) (quoting *Daubert*, 509 U.S. at 589); *see Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013).

The threshold inquiry under Rule 702 is whether the individual is "qualified to testify in a particular field or on a given subject," based on her "knowledge, skill, experience, training, or education." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). After defining the permissible scope of the expert's testimony, the Court then assesses whether the opinion is reliable and relevant. *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (per curiam).

To assess reliability, the Court considers whether the reasoning and methodology underlying the expert's testimony is "valid and can be reliably applied to the facts of the case." *Id.* This "analysis applies to all aspects of an expert's testimony," including the "methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted). If the opinion is based on mere "subjective belief or unsupported speculation," then the Court should exclude it. *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("Since *Daubert* … parties relying on expert evidence have had notice of the *exacting standards* of reliability such evidence must meet." (second emphasis added)). The party offering the expert testimony bears the burden of establishing that the expert's findings and conclusions

are reliable. *See Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)).

The Court also evaluates whether the testimony is relevant. In assessing relevance, the Court considers whether the expert's "reasoning or methodology 'fits' the facts of the case." *Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 551 (E.D. La. 2015) (citation omitted); *see also Daubert*, 509 U.S. at 591 (discussing Rule 702's relevancy requirement in terms of "fit" (citation omitted)). In other words, the expert opinion "must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Sandifer*, 907 F.3d at 809 (quoting Fed. R. Evid. 702).

Finally, Federal Rule of Evidence 703 provides that an expert may offer opinions based on otherwise inadmissible facts or data, but only if (1) they are of the kind reasonably relied upon by experts in the particular field; and (2) the testimony's probative value substantially outweighs its prejudicial effect. Fed. R. Evid. 703.

## ARGUMENT

**I.   DR. THOMPSON FAILED TO FOLLOW HIS OWN METHODOLOGY.**

   **A.   Dr. Thompson's Opinion that Ms. Plaisance Has PCIA Is Based on Cherry-Picked and Inconsistent Inclusion Criteria.**

There is no generally accepted set of histological criteria for PCIA within the medical community. According to Dr. Thompson, there is only "scant" scientific literature describing the histological characteristics of PCIA and none since 2018. Ex. A, Deposition of Dr. Thompson (Sept. 15, 2021) ("Thompson Dep.") at 30:20-31:23. Insofar as the limited medical literature attempts to delineate histologic criteria for PCIA, however, Dr. Thompson purportedly relied on it in concluding that Ms. Plaisance has PCIA. But only to a point. Dr. Thompson rejects and does not apply the criteria that would impact his diagnosis of PCIA. This he is not permitted to do. *Vaughn v. Hobby Lobby Stores, Inc.*, 2021 WL 2008469, at *7 (W.D. La. May 19, 2021) (excluding expert's diagnosis of the plaintiff because expert ignored certain "objective criteria"); *Thomas v. Rhodia Inc.*, 2004 WL 7324586, at *3 (M.D. La. Aug. 6, 2004) (excluding expert's

3

diagnosis of the plaintiff because expert "failed to follow the proper methodology" by neglecting to apply an objective test).

In his expert report, Dr. Thompson lists the "[h]istological findings of permanent chemotherapy-induced alopecia" that he used to conclude Ms. Plaisance has PCIA. He attributes those criteria to a textbook by Leonard Sperling, *An Atlas of Hair Pathology with Clinical Correlations*. Ex. B, Expert Report of Dr. Thompson (*Plaisance*) (Aug. 2, 2021) ("Thompson *Plaisance* Rep."), at 2 & n.2. Dr. Sperling's book identifies five histological findings of PCIA. But Dr. Thompson only identified *four* of those in his report and omitted the fifth criterium: preservation of sebaceous glands.[2] Ex. A, (Thompson Dep.) at 120:18-121:18. Likewise, in his pathology report, Dr. Thompson failed to report the preservation or absence of sebaceous glands in Ms. Plaisance's biopsy. This was not because Dr. Thompson failed during his examination of her tissues to determine whether she had sebaceous glands. He did make that determination: she had preservation of the sebaceous glands in one of her biopsy specimens, but not in the other. *Id.* at 122:23-123:1.

Instead, as he conceded at his deposition, he essentially picked and chose the criteria from Sperling that he felt like applying:

> Q. So by not including [preservation of sebaceous glands] in the elements, even though [Dr. Sperling] did, are you choosing your own elements?
>
> A. Yeah.

*Id.* at 121:19-22; *see also id.* at 122:8-22. Dr. Thompson elected not to report on the preservation status of Ms. Plaisance's sebaceous glands because he doesn't "view that as an important element in making a diagnosis of PCIA. I just elected not to report on that." *Id.* at 122:23-123:4.

When it came to Ms. Guilbault's expert report, however, Dr. Thompson *included* preservation of sebaceous glands as a general characteristic of PCIA. Ex. C, Expert Report of

---

[2] Sebaceous glands are microscopic glands in the skin, usually attached to hair follicles, that secrete an oily substance called sebum that lubricates and waterproofs the skin.

4

Dr. Thompson (*Guilbault*) (Aug. 2, 2021) ("Thompson *Guilbault* Rep.") at 2. His purported explanation for including it in *Guilbault* but not *Plaisance* was that one of Ms. Plaisance's two biopsies did not evidence sebaceous glands. But that rationale makes no sense. First, if Dr. Thompson believes—as he cites in his *Guilbault* report—that preservation of sebaceous glands is characteristic of PCIA, then the absence of sebaceous glands on Ms. Plaisance's scalp is **relevant** to whether she has PCIA. Second, Dr. Thompson testified that Dr. Sperling's reason for including "preservation of sebaceous glands" as a criterium of PCIA is that the absence of them suggests lichen planopilaris, which is a **scarring** alopecia. Ex. A (Thompson Dep.) at 122:23-124:7. Plaintiffs' experts and the literature consistently describe PCIA as a **non-scarring** process. *See, e.g.*, Ex. D, Expert Report of Dr. Tosti (Aug. 2, 2021) at 14. Rather than attempt to explain why Ms. Plaisance has PCIA despite the absence of sebaceous glands, Dr. Thompson tries to avoid the issue altogether. The fact that he simply ignored evidence that challenges his ultimate conclusion, however, is fatal to his opinion that Ms. Plaisance has PCIA. *Vaughn,* 2021 WL 2008469, at *7 (excluding expert's diagnosis of because expert ignored certain "objective criteria" that undermined his conclusions). This is especially true, where, as in Ms. Guilbault's case, Dr. Thompson uses the criterium of sebaceous glands when it suits his needs.

It would be one thing if Dr. Thompson had not relied on Dr. Sperling's criteria at all in his opinions for the *Plaisance* and *Guilbault* cases. But he effectively admitted that he applied different histological criteria for determining whether each plaintiff had PCIA after he had already assessed their biopsy features. *Daubert* and its progeny expressly prohibit this, and Dr. Thompson's opinion that Ms. Plaisance has PCIA must be excluded. *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 309-10 (5th Cir. 1989) ("[C]ourts must critically evaluate the reasoning process by which the experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them."); *Burst*, 2015 WL 3755953, at *13 (excluding expert who "cherry-pick[ed] data" that supported his conclusion and "fail[ed] to explain contrary results in a manner that belies the reliability of his methodology").

5

### B. Dr. Thompson Failed to Obtain the Information He Admits Is Critical to Diagnosing Biopsies.

When Dr. Thompson analyzes a patient's biopsy, he considers the clinical determination of whether a patient's hair loss is "diffuse" or "patchy" a critically important component of his evaluation:

> Q. Do you think it would be useful to you in having a clinical history and a full clinical picture of these plaintiffs to see all that information?
>
> A. You know, in pathology there's a -- first of all, if we reviewed all the patients' records, we would read about three biopsies a day, and the medical system would come to a grinding halt. So we really focus on getting the information that's important for each diagnosis and not beyond that. You have to sift through the large amount of data to do this. And the second part of pathology is you want an objective read. So you can be swayed in your diagnosis by too much information.
>
> So the information necessary for these reads is -- is what I asked for, which is the patient's gender, their age, the site of the biopsy. ***In hair loss, the most important clinical finding examination feature is whether the hair loss is diffuse all over the head, or whether it's patchy, small, round areas. This is quite important to know***.

Ex. E, Deposition of Dr. Thompson, *Earnest v. Sanofi S.A.*, *et al.*, No. 16-cv-17144 (Nov. 30, 2018) at 47:5-48:1 (emphasis added). Further, he admits that it can be "impossible" to render an accurate histopathological diagnosis for a patient without such accurate clinical information. Ex. A (Thompson Dep.) at 39:13-18.

Yet, in Ms. Plaisance's case, Dr. Thompson admitted he did not know and did not take steps to find out whether her hair loss was diffuse or patchy:

> Q. So when you reviewed [Ms. Plaisance's] pathology you did not know whether her hair loss was diffuse or patchy or something else, correct?
>
> A. No, I did not.

*Id.* at 62:15-18. Dr. Thompson attempts to excuse this failure by pointing to what he "assumed" Dr. Tosti "implied" when she simply noted "PCIA"—and nothing more—on the requisition form she sent to him with the pathology tissue.

6

> Q. Would it have been important to know whether [Ms. Plaisance's] hair loss was diffuse or patchy?
>
> MS. DAVIS: Objection. Form.
>
> A. I'm assuming because Dr. Tosti wrote PCIA that the loss was more diffuse. So I think it was kind of implied in what was written there.

*Id.* at 63:2-7.

Dr. Thompson's "assumption" as to what Dr. Tosti was "implying" by the simple phrase "PCIA" is unduly speculative. It also relies exclusively and blindly on the ultimate conclusion of another expert in this case. Dr. Thompson's deposition testimony makes clear that he did not validate or do anything to verify that Ms. Plaisance had diffuse alopecia. He did not look at any of the photos taken of her by Dr. Tosti or any other photographs of Ms. Plaisance. *Id.* at 21:5-8; 21:17-20; 102:25-103:2; 137:10-14. He did not ask Dr. Tosti if she had made a finding of a diffuse pattern before or after analyzing Ms. Plaisance's biopsy, nor at any time before submitting his report on August 2. *Id.* at 19:11-13; 65:19-23. The Court has explicitly held that such unverified reliance on another expert is improper. *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Feb. 1, 2021), ECF No. 12109, at 9 ("To the extent she relies on opinions from Dr. Feigal, Dr. Bosserman did not validate these opinions in any way in her report. This is the kind of 'unblinking reliance' on another expert's opinion that violates Federal Rule of Evidence 703." (citation omitted)); *see also In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999) (excluding expert's opinion because "unblinking reliance" on another's opinion demonstrates that the expert's opinion was flawed under *Daubert*); *Burst*, 120 F. Supp. 3d at 554 ("[T]o the extent Dr. Harrison relies on Dr. Infante's report and the studies cited therein, his opinion is inadmissible because it reflects no original analysis or any evaluation of Dr. Infante's methodology or the studies upon which he relies.").

Dr. Thompson failed to follow his own methodology. Thus, his resulting opinion that Ms. Plaisance has PCIA should be excluded. *Thomas*, 2004 WL 7324586, at *3 (holding that an expert's testimony asserting the diagnosis of the plaintiff was inadmissible because the expert "failed to follow the proper methodology" by neglecting to "perform[] a positive metacholine

challenge test"). Indeed, this Court in *Kahn* similarly precluded an expert from offering an opinion that deviated from his previously-articulated standard and methodology. *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (Jan. 29, 2021), ECF No. 12098 at 13. ("[S]ince Dr. Madigan discourages relying on observational data in the face of significant heterogeneity, the Court will not permit him to do so for the sake of this MDL."); *see also Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) ("[E]xpert must employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." (second alteration in original) (internal quotations omitted)). The result should be the same here.

### C. The Methodology Dr. Thompson Used for Counting Ms. Plaisance's Hair Follicles Cannot Be Validated or Tested.

During his deposition, Dr. Thompson described the specific process he applies in his dermatopathology practice outside of litigation for counting patients' hair follicles. As he identifies each hair follicle in a biopsy specimen, he electronically marks it on his computer system. Ex. A (Thompson Dep.) at 87:18-88:4. Here, however, Dr. Thompson admitted that "[t]here's a chance [he] didn't even mark them" in the first place. *Id.* at 88:7-18. Accordingly, Dr. Thompson's counting methodology as applied to these cases cannot be probed or tested:

> Q. Do you know if your markings of the follicle counts were saved?
>
> A. I would have to go in and look. I would have to go in and check it. There's a chance I didn't even mark them too. Sometimes I mark them. If they are very easy to count, I don't even mark them. It's just something I do myself.
>
> Q. So if someone was to go behind you and look at the pathology and wanted to look at your hair count and what you counted as what, how would they do that?
>
> A. They would have to start over and do it themselves. If the catagen/telogens are marked, that's there. But they have to go in and do their own assessment on whether they are terminal or whether they are vellus miniaturized.

*Id.* at 88:14-89:4.

Dr. Thompson's conclusions based on those counts are therefore unreliable and must be excluded. *Daubert*, 509 U.S. at 593 ("[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."); *Cano v. Everest Mins. Corp.*, 362 F. Supp. 2d 814, 846 (W.D. Tex. 2005) (holding that expert methodology was unreliable where expert "admitted that his conclusions and methodology cannot be tested").

### D.     Dr. Thompson's "Constellation" of Ms. Plaisance's Biopsies Is Improper.

In order to reach his conclusion that Ms. Plaisance exhibited the histopathological characteristics of PCIA, Dr. Thompson admitted that he had to mix-and-match two different biopsies, or, in his words, take a "constellation" of findings. *See* Ex. B (Thompson *Plaisance* Rep.) at 2. In his deposition, Dr. Thompson explained that he could not reach his conclusion of PCIA without combining the two different biopsies:

Q. In your 26 -- Rule 26 report, don't you even admit that the biopsy B does not meet PCIA when you say it is most consistent with permanent chemotherapy-induced alopecia?

A. Right.

MS. DAVIS: Objection. Form.

A. Because it has these empty stela, we know that we have had some follicular dropout. Thank goodness she did two biopsies though, huh?

Q. Biopsy A you say is diagnostic?

A. Yeah, I do believe that.

Q. But you don't use that terminology for B.

A. Yeah.

Q. So there is a difference?

MS. DAVIS: Objection. Form.

A. Well, as I said before, we read them together. So to me it's a moot point.

9

> Q. Then in your Rule 26 report in the next to the last paragraph you say -- or I guess third to the last paragraph, right after the histological findings, you say: "The constellation of histological findings between the two biopsies is consistent with a diagnosis of PCIA."
>
> A. Right.
>
> Q. So then to reach your opinion, you have to refer to this constellation of characteristics between A and B, correct?
>
> A. Exactly.

Ex. A (Thompson Dep.) at 126:12-127:15.

The fact that Dr. Thompson was forced to mix-and-match two different biopsies in order to justify his conclusion that Ms. Plaisance exhibited the histopathological characteristics of PCIA is further evidence that his methodology and opinions are unreliable. *Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 790 (E.D. La. 2015) (excluding expert whose "opinions are not based on adequate data and instead demonstrate an effort to produce particular results").

Moreover, Dr. Thompson did not describe a "constellation" of findings for Ms. Guilbault. *See* Ex. C (Thompson *Guilbault* Rep.). In fact, he admitted that Ms. Plaisance's and Ms. Guilbault's biopsies were "different in many ways." Ex. A (Thompson Dep.) at 182:1-5. That Dr. Thompson's approach to evaluating Ms. Plaisance's and Ms. Guilbault's biopsies and the pathological features present for each were so fundamentally different undermines Dr. Thompson's opinions that each has PCIA. As Dr. Thompson admits, he would expect two patients with the same disease process (PCIA) to present the "same histopathological features." *Id.* at 48:5-9. Ms. Plaisance and Ms. Guilbault do not.

## II. DR. THOMPSON SHOULD BE PRECLUDED FROM OPINING THAT HAIR LOSS AFTER HAIR RE-GROWTH IS CONSISTENT WITH PCIA

In his deposition, Dr. Thompson opined that hair loss after hair re-growth is consistent with PCIA:

> Q. So, is it your opinion that her hair could completely regrow then get thinner and that would be PCIA?

10

>   A. I believe that is -- can happen to people, yes. I don't see these patients clinically. So I don't -- the other thing that happens is they get kind of lost between oncology and then dermatology and then hair experts. So they -- and quite a bit of time happens. So I think the story line is often not clear. You know, the clinical progression is often a little bit muddled in these patients. Once again, I'm a dermatopathologist. I don't follow the patients clinically. So I don't know the details of that.

Ex. A (Thompson Dep.) at 178:6-20. Dr. Thompson admits that there is no support for this conclusion and that nobody "knows" if it is true or not:

>   Q. So you don't know from an expert point of view what the mechanism for that occurring would be?
>
>   A. For what occurring?
>
>   Q. For the hair regrowing and then getting thinner but still being PCIA.
>
>   MS. DAVIS: Objection. Form.
>
>   A. Well, I have ideas about the biology behind it but I don't know. I don't think anybody knows.

*Id.* at 178:21-179:5. Dr. Thompson does not know—and admits no one knows—of any support for this opinion. Certainly Dr. Tosti would not agree.

>   Q. Okay. And so you would agree with me that permanent chemotherapy-induced alopecia is not a condition where hair grows back after chemotherapy and then falls out years later down the road, true?
>
>   A. Yes.

Ex. F, Trial Tr. (Afternoon), *Kahn v. Sanofi-Aventis U.S. LLC,* No. 16-cv-17039 (Nov. 10, 2021), at 762:9-13.

Thus, it is purely speculative, unsupported by any reliable methodology, and should be excluded. *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." (internal quotation marks and citation omitted)); *Burst,* 104 F. Supp. 3d at 777 ("The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation."); *id.* at 790 (excluding an expert whose opinions "are undermined by their reliance on speculation" and "are not based on adequate data"); *Allstate Ins. Co. v. Gen. Elec. Co.*, 2002 WL 34373485, at

*10 (W.D. La. Feb. 4, 2002) ("This Court finds Allstate has not shown Mr. Hero has relied upon accepted methodology to support the conclusions noted above. The expert's unsupported statement is insufficient.").

## CONCLUSION

For the reasons herein, Dr. Thompson's reports and testimony should be entirely excluded.

Dated: November 12, 2021          Respectfully submitted,

*/s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Telephone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc., Hospira Worldwide, LLC, and Pfizer Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                                                                 /s/ *Heidi K. Hubbard*