# EXHIBIT A

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF LOUISIANA
 3                         MDL NO. 16-2740
 4
 5
     IN RE:                        )
 6                                 )
     TAXOTERE (DOCETAXEL) PRODUCTS  ) REMOTE
 7   LIABILITY LITIGATION           ) VIDEOTAPED
                                    )
 8                                 )
                                    ) DEPOSITION OF:
 9                                 )
                                    ) CURTIS T.
10                                 ) THOMPSON, M.D.
                                    )
11   _____ )
12
13
14            TRANSCRIPT of the stenographic notes of the
15   proceedings in the above-entitled matter, as taken by
16   and before PATRICIA SMITH, a Certified Shorthand
17   Reporter and Notary Public of the State of New Jersey,
18   held remotely via Zoom teleconference on Wednesday,
19   September 15, 2021, commencing at 12:09 p.m.
20
21
22
23
24
25
```

Page 2

1 A P P E A R A N C E S :
2
3 PENDLEY, BAUDIN & COFFIN, LLP
   BY: LAUREN DAVIS, ESQ.
4 1515 Poydras Street
   Suite 1400
5 New Orleans, Louisana 70112
   Attorneys for Plaintiff
6
7 GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
   WARSHAUER, LLC
8 BY: MATTHEW PALMER LAMBERT, ESQ.
   Energy Centre
9 1100 Poydras Street - Suite 2800
   New Orleans, Lousiana 70163-2800
10 Co-counsel for plaintiff
11
   MICELI LAW, LLC
12 BY: DAVID F. MICELI, ESQ.
   dmiceli@miceli-law.com
13 Attorneys for plaintiff
14 DAVIS & CRUMP, P.C.
   BY: TREVOR B. ROCKSTAD, ESQ.
15 and TAYLOR HARDENSTEIN, ESQ.
   2601 14th Street
16 Gulfport
   Mississippi, 39501
17 Attorneys for plaintiff
18
   GREENBERG & TRAURIG
19 BY: EVAN HOLDEN, ESQ.
   333 Piedmont Road N.E.
20 Suite 2500
   Atlanta , Georgia 30305
21 Attorneys for Sandoz
22
23 CONTINUED...
24
25

Page 3

1 A P P E A R A N C E S :
2
   CHAFFE McCALL, LLP
3 BY: PETER J. ROTOLO, ESQ.
   2300 Energy Center
4 1100 Poydras Street
   New Orleans, Lousiana 70163
5 Attorneys for Hospira Worldwide, LLC
6
   WILLIAMS & CONNOLLY, LLP
7 BY: APARNA DATTA, ESQ.
   725 Twelfth Street N.W.
8 Washington, DC, 20005
   Co-Counsel for Hospira Worldwide, LLC
9
10 TUCKER ELLIS, LLP
   BY: EMILY S. KNIGHT, ESQ.
11 233 South Wacker Drive
   Suite 6950
12 Chicago, Illinois 60606
   Attorneys for Accord Healthcare, Inc.
13
14 ULMER & BERNE, LLP
   BY: MICHAEL J. SUFFERN, ESQ.
15 600 Vine Street
   Suite 2800
16 Cincinatti  Ohio 45202-2409
   Attorneys for Actiavis Pharma, Inc.;
17 Actavis Pharm, LLC; Sagent
   Pharmaceutical
18
   HINSHAW & CULBERTSON, LLP
19 BY: GEOFFREY M. COAN, ESQ.
   53 State Street
20 27th Floor
   Boston Mass 02109
21 Attorneys for Sun Pharmaceutical
   Industries
22
   SHOOK, HARDY & BACON, LLP
23 BY: CONNOR SEARS, ESQ.
   2555 Grand Boulevard
24 Kansas City, MO 64108
   Attorneys for Sanofi
25

Page 4

1        INDEX
2 WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
3 CURTIS T. THOMPSON, M.D.
   By Mr. Rotolo   5
4 By Ms. Davis      186
5
6        E X H I B I T S
7 No.        Description        Page
8 Exhibit 1, Amended notice of deposition        11
9 Exhibit 2, Invoice dated 10/8/20        14
10 Exhibit 3, Exhibit A to Rule 26 Report        25
    for Plaisance
11
    Exhibit 4, Exhibit A to Rule 26 Report        25
12    for Guilbault
13 Exhibit 5, Dermatopathology report for Plaisance 57
14 Exhibit 6, Plaisance requisition form        59
15 Exhibit 7, Rule 26 report for Plaisance        98
16 Exhibit 8, Chapter of Sperling book        118
17 Exhibit 9, Dermatopathology report for Guilbault 139
18 Exhibit 10, Guilbault requisition form        141
19 Exhibit 11, Rule 26 report for Guilbault        164
20 Exhibit 12, Plaintiff's objections and responses 186
    to the defendant's notice of
21    videotaped deposition of Dr. Thompson
22 Exhibit 13, Dr. Tosti progress note for Plaisance 186
23 Exhibit 14, Dr. Tosti progress note for Guilbault 186
24
25

Page 5

1        THE VIDEOGRAPHER:  Good morning.  We are
2 going on the record.  The date today is September 15,
3 2021 and the time is 12:09 p.m. eastern time.
4        This is media unit number one.  The
5 individual recorded deposition of Doctor Curtis
6 Thompson, taken in the matter of In Re:  Taxotere
7 Products Liability Litigation, filed in the U.S.
8 District Court for the Eastern District of Louisiana.
9 MDL No. Number 16-2740.
10        This deposition is being held remotely in
11 multiple locations.  My name is Christopher Hanson.  I'm
12 a certified legal videographer.  Our court reporter
13 today is Patricia Smith.  And we are with Veritext New
14 Jersey.
15        All attorney appearances will appear on the
16 stenographic record.  And at this time I will note that
17 I could not go off the record unless both parties agree.
18        At this time I would ask our court
19 reporter, Ms. Smith, to please administer the oath and
20 we can proceed.
21 DR. CURTIS T. THOMPSON, having been first duly sworn,
22 testified as follows:
23 DIRECT EXAMINATION BY PETER J. ROTOLO:
24    Q.    Good morning, Dr. Thompson.  My name the
25 Peter Rotolo.  Can you hear me okay?

2 (Pages 2 - 5)

Page 6

1     A.    Yes.
2     Q.    I represent Hospira in this litigation
3 and I'm going to be taking your deposition today.
4          Can you please state your name for the
5 record please?
6     A.    Curtis Thompson.
7     Q.    And I know you have given a deposition
8 before, correct?
9     A.    Yes.
10    Q.    And, in fact, I think I have counted
11 that you have been deposed five times previously in
12 this litigation?
13    A.    I believe so, yes. I haven't counted.
14    Q.    At least one, if not more, of those
15 depositions have been conducted remotely as we are
16 doing today. Is that right?
17    A.    Yes.
18    Q.    So while I know you know the drill on
19 how we do this, I just want to give you just a couple
20 of reminders. Given the technology, sometimes
21 there's a delay or a lag. So if you can make sure
22 I'm finished with my question before you start your
23 answer, and I will make sure I think you're finished
24 with your answer before I start my next question,
25 that would be extremely helpful to the court

Page 7

1 reporter. Okay?
2     A.    Okay.
3     Q.    If you could try not to answer your
4 question with a shake of the head and give a verbal
5 yes, no, that makes the court reporter's job a lot
6 easier.
7     A.    Okay.
8     Q.    And most importantly, if you do not hear
9 my question or you do not understand my question,
10 please let me know that and I will be happy to repeat
11 or rephrase the question, because if you answer it
12 I'm going to assume you heard it and you understood
13 it. Is that fair?
14    A.    Yes.
15    Q.    Given this is a remote deposition, just
16 let me ask you a few questions:
17         Where are you physically located today?
18    A.    Portland, Oregon.
19    Q.    Are you at your office or your home?
20    A.    Home.
21    Q.    Okay. Is anyone with you in the room
22 today?
23    A.    No.
24    Q.    Do you have any notes or papers in front
25 of you?

Page 8

1     A.    No.
2     Q.    Do you have access to any cell phone,
3 e-mail or any type of messenger service?
4     A.    No.
5     Q.    I would just ask you not to communicate
6 with anyone in text, e-mail or messenger, while we
7 are on the record. Okay?
8     A.    Okay.
9     Q.    In this case, in this deposition that we
10 are here today, we are going to be talking about two
11 separate plaintiffs, Ms. Plaisance and Ms. Guilbault.
12 There may be some questions that seem repetitive or
13 the same or similar, but I will have to ask the same
14 or similar questions as to both plaintiffs.
15         Do you understand that?
16    A.    Yes.
17    Q.    Where are you employed?
18    A.    My private laboratory's name is Curtis
19 T. Thompson, M.D. and Associates, PLLC.
20    Q.    And what is the primary function of your
21 office? What do you normally do?
22    A.    We're a professional dermatopathology
23 practice.
24    Q.    Now, you're CV was attached to your Rule
25 26 expert report. It was listed as revised on July

Page 9

1 27 of 2021. Is that your most updated CV?
2     A.    Yes.
3     Q.    One other little housekeeping matter.
4         In this deposition I may use the acronym
5 PCIA. Can we agree that when I use that acronym
6 PCIA, I'm referring to persistent or permanent
7 chemotherapy-induced alopecia?
8     A.    Yes.
9     Q.    That will save the court reporter a lot
10 of words as we go through the deposition today.
11         If I look correctly, you were last
12 deposed on September 23, 2020 in the Cahn (sic)
13 matter; is that correct?
14    A.    I believe so, yes. I don't know the
15 date.
16    Q.    Since the time of your last deposition,
17 have you authored any coauthored any articles on PCIA
18 that have been published or submitted for
19 publication?
20    A.    No. No. I don't believe so.
21    Q.    Since the time of your last deposition
22 have you authored any coauthored any articles on the
23 histopathological features of PCIA that have been
24 published or have been submitted for publication?
25    A.    No.

3 (Pages 6 - 9)

1     Q.    During those five previous depositions,
2 you were asked many questions about PCIA, correct?
3     A.    Yes.
4     Q.    And you were asked in those five
5 previous depositions many questions on alopecia in
6 general and the different types of alopecia, correct?
7     A.    Yes.
8     Q.    You were asked in those five previous
9 depositions many questions about the
10 histopathological aspects of PCIA and other types of
11 alopecia, correct?
12     A.    Yes.
13     Q.    And during -- and you were also asked
14 questions about published medical articles and
15 literature on PCIA and alopecia, correct?
16     A.    Yes.
17     Q.    And during those five previous
18 depositions, you were under oath when answering those
19 questions, correct?
20     A.    Yes.
21     Q.    So today I would like to focus more on
22 the two plaintiffs at issue in this case, Ms.
23 Plaisance and Guilbault, in order to move us along a
24 little quicker.
25         Before we get into the substance, I want

1 to show you the amended notice of your deposition?
2         MR. ROTOLO:  Amy, can we pull up Tab A,
3 which I will mark as Exhibit 1.
4         (Exhibit 1, amended notice of
5 deposition, was marked for identification.)
6     Q.    Doctor, that should appear in your file.
7 I can also get Amy to screen share it if it would be
8 easier to do that as well.
9     A.    I'm in the marked exhibits folder.
10     Q.    Sometimes you have to refresh it?
11     A.    Okay.
12         MR. ROTOLO:  Lauren, let me know if you
13 have an issue pulling it up as well.
14         THE VIDEOGRAPHER:  You will have to
15 refresh that every time they upload a document to it.
16         THE WITNESS:  Okay.  I'm able to see it.
17 I see Exhibit 1 through 16.  And Exhibit 1 is a bill.
18         MR. ROTOLO:  I think you may be in the
19 Exhibit Share for an older deposition.  Can we go off
20 the record?
21         THE WITNESS:  You're exactly right.
22     Q.    Do you have it correct now?
23     A.    Yes.
24         THE VIDEOGRAPHER:  We are still on the
25 record.  It sounds like he's almost there.

1         THE WITNESS:  The only deposition folder
2 that's showing up is 9/23/2020.
3         THE VIDEOGRAPHER:  All right.  I'm going
4 to go off the record for a moment if that's okay.
5         MR. ROTOLO:  Sure.
6         THE VIDEOGRAPHER:  The time is 12:17.
7 We are going off the record.
8         (Break in proceedings.)
9         THE VIDEOGRAPHER:  The time is 12:22.
10 We are back on the record.  Continuing media file
11 one.
12     Q.    Doctor, when we took a break I had
13 marked as Exhibit 1 your amended notice of videotaped
14 deposition that we have now put on the screen through
15 Screen Share.
16         Have you seen this document before?
17     A.    I think I pulled it up and looked at it,
18 yes.
19     Q.    There were document requests attached to
20 this amended notice.
21         MR. ROTOLO:  Amy, can we go to the last
22 page, Exhibit A.  Right there.
23     Q.    I did receive a response from counsel
24 last night on this, but I just want to confirm a few
25 things with you.

1         You already said that you're CV attached
2 to your expert report is your most updated CV,
3 correct?
4     A.    Yes.
5     Q.    Then last night I was provided with one
6 invoice that you have submitted since your last
7 deposition.
8         Is that the only invoice that you have
9 responsive to the invoices that you have submitted
10 since your last deposition?
11     A.    Yes, I believe so.
12     Q.    We will talk about that a little bit
13 more in a minute.
14         And last night I received two different
15 -- a requisition form for Ms. Plaisance and for Ms.
16 Guilbault.
17         Is that the only requisition forms that
18 you would have, what produced to me last evening?
19     A.    Yes.
20     Q.    We will talk about those as we get
21 further.
22         Then we had asked for your file.  Is
23 there anything else in your file that you haven't
24 produced?
25     A.    No.

4 (Pages 10 - 13)

Page 14

1    Q.    And we also asked for any photographs.
2 Do you have any additional photographs that haven't
3 been produced?
4    A.    No.
5         MR. ROTOLO:  Amy, you can take the
6 Exhibit 1 down.
7    Q.    Dr. Thompson, according to the Exhibit D
8 of your Rule 26 expert report, you charge $1300 an
9 hour for your work in this litigation, correct?
10    A.    Yes.
11    Q.    And how much have you billed for this
12 litigation so far?
13         MS. DAVIS:  Objection.  Form.
14    A.    I do not know.
15    Q.    At your last deposition on September of
16 2020, it was estimated at that time that you had
17 billed approximately $173,000.  Does that sound
18 correct as of that time?
19    A.    Yes.
20    Q.    Then last night there was another
21 invoice that was submitted to me dated October 8th of
22 2020, which I will mark as Exhibit 2.
23         MR. ROTOLO:  Amy, can you pull up Tab 2,
24 which will be Exhibit 2.
25         (Exhibit 2, Invoice dated 10/8/20, was

Page 15

1 marked for identification.)
2         MR. ROTOLO:  Can you Screen Share when
3 you do?  I apologize, Doctor, our wifi seems to be a
4 little weak after the hurricanes and storms we have
5 had here.
6    A.    Sorry.
7    Q.    Dr. Thompson, I marked as Exhibit 2 an
8 invoice that was produced by counsel last evening
9 dated October 8th of 2020.
10         Is that your invoice that you submitted
11 for work you have done in this litigation?
12    A.    Yes.
13    Q.    And the dates on the invoice are in
14 2020.  So would I be correct that none of this time
15 involves Ms. Plaisance or Ms. Guilbault?
16    A.    Yes.
17    Q.    Does the time on that invoice relate to
18 the Cahn (sic) case?
19         MS. DAVIS:  Object.  Form.
20    A.    Yes.
21    Q.    Have you billed any of your time for
22 review of Ms. Plaisance's pathology and the prep of
23 your derma-path report and Rule 26 report?
24    A.    No.
25    Q.    How much time did it take you to review

Page 16

1 Ms. Plaisance's pathology and prep your derma-path
2 report?
3         MS. DAVIS:  Objection.  Form.
4    A.    I don't remember.  They were read as a
5 regular case in my system.  So I can estimate how
6 long it took, but I don't remember the time required
7 for those.
8    Q.    What was your estimation of how long it
9 took you to review Ms. Plaisance's pathology and prep
10 your derma-path report?
11    A.    Probably 45 minutes to an hour.
12    Q.    How long did it take you to prepare your
13 Rule 26 report on Ms. Plaisance?
14         MS. DAVIS:  Objection.  Form.
15    A.    Probably two and a half hours, two
16 hours, something like that.
17    Q.    Have you billed any of your time for the
18 review of Ms. Guilbault's pathology, the prep of your
19 derma-path report and your Rule 26 report for Ms.
20 Guilbault?
21    A.    No.
22    Q.    How much time did it take you to review
23 Ms. Guilbault's pathology and prep your derma-path
24 report?
25         MS. DAVIS:  Objection.  Form.

Page 17

1    A.    Probably the same, like 45 minutes.
2    Q.    How long did it take you to prepare the
3 Rule 26 report on Ms. Guilbault?
4    A.    Maybe two hours.
5    Q.    When do you anticipate invoicing your
6 time on the Plaisance matter?
7    A.    It's on my "to do" list.  So soon.
8    Q.    When do you anticipate billing your time
9 for the Guilbault case?
10    A.    Probably in the next one, two weeks.
11    Q.    How much time did you spend preparing
12 for this deposition?
13         MS. DAVIS:  Objection.  Form.
14    A.    Several hours.
15    Q.    Doctor, just so we are clear, as we go
16 along, when I refer to your derma-path report, I will
17 be referring to the pathology report you submitted;
18 is that fair?
19    A.    Yes.
20    Q.    If I refer to your Rule 26 report, I'm
21 referring to your expert report that you gave in this
22 case.  Is that clear?
23    A.    Yes.
24         MR. ROTOLO:  Amy, you can take that down
25 off the screen.

5 (Pages 14 - 17)

Page 18

1    Q.    Doctor, what did you do to prep for your
2 deposition today?
3    A.    I reviewed the dermatopathology reports,
4 reviewed the Rule 26 reports, reviewed the literature
5 that related to PCIA and alopecia that we have
6 provided in the reference list.  I did a literature
7 search in PubMed to look for recently published
8 articles on PCIA and alopecia.  Then I met with
9 attorneys who discussed this deposition.
10    Q.    When you said you did a literature
11 search in PubMed for PCIA and alopecia, did you
12 locate any articles in that research?
13    A.    No.  No.
14    Q.    The articles that you indicated that you
15 have reviewed, would all of those articles be
16 contained on your reference's list, which was
17 attached to your Rule 26 report?
18    A.    Yes.
19    Q.    I believe you indicated that you had
20 also met with counsel?
21    A.    Yes.  I also reviewed the microscopic
22 slides on the case.
23    Q.    Without -- we will get back to the
24 microscopic slides.
25         Without telling me or discussing

Page 19

1 anything that you discussed with your counsel about
2 this case, how many times did you meet with counsel
3 to prep for this deposition?
4    A.    Once.
5    Q.    How long was that meeting?
6    A.    I think it was about two hours.
7    Q.    And who did you meet with?
8    A.    Lauren Davis and Palmer Lambert.
9    Q.    When did that meeting occur?
10    A.    Last Friday, the 10th of September.
11    Q.    Did you communicate with Dr. Tosti about
12 Ms. Plaisance?
13    A.    No.
14    Q.    Did you communicate with Dr. Tosti about
15 Ms. Guilbault?
16    A.    No.
17    Q.    Did you review Dr. Tosti's Rule 26
18 expert report in the Plaisance case?
19    A.    No.
20    Q.    Did you review Dr. Tosti's Rule 26
21 expert report in the Guilbault case?
22    A.    No.
23    Q.    Did you communicate with any other
24 plaintiff's expert about Ms. Plaisance?
25    A.    No.

Page 20

1    Q.    Did you communicate with any other
2 plaintiff's expert about Ms. Guilbault?
3    A.    No.
4    Q.    Did you review any other Rule 26 expert
5 reports in the Plaisance case?
6    A.    No.
7    Q.    Did you review any other Rule 26 expert
8 reports in the Guilbault case?
9    A.    No.
10    Q.    Did you communicate with any of Ms.
11 Plaisance's treating dermatologists?
12    A.    No.
13    Q.    Did you communicate with any of Ms.
14 Guilbault's treating dermatologists?
15    A.    No.
16    Q.    Other than counsel, did you communicate
17 with anyone else about Ms. Plaisance?
18    A.    No.
19    Q.    Other than counsel, did you communicate
20 with anyone else about Ms. Guilbault?
21    A.    No.
22    Q.    Did you review any of the medical
23 records of Ms. Plaisance in preparation for your
24 deposition?
25    A.    Yes.

Page 21

1    Q.    What medical records did you review of
2 Ms. Plaisance?
3    A.    The clinic notes from Dr. Tosti, on the
4 one visit when the biopsy was performed.
5    Q.    Did you review just the clinic note or
6 did you also review any photographs that Dr. Tosti
7 had taken?
8    A.    I don't believe I saw photographs.
9    Q.    Did you review any medical records of
10 Ms. Guilbault in preparation for your deposition?
11    A.    Yes.
12    Q.    And what medical records did you review
13 of Ms. Guilbault's in preparation for your
14 deposition?
15    A.    The clinic visit to Dr. Tosti where the
16 biopsy was performed.
17    Q.    Did you review any of the photographs in
18 preparation for your deposition that Dr. Tosti took
19 of Ms. Guilbault at that visit?
20    A.    I don't believe so, no.
21    Q.    Did you review any of the depositions
22 taken in Ms. Plaisance's case in preparation for your
23 deposition?
24    A.    No.
25    Q.    Did you review any depositions taken in

6 (Pages 18 - 21)

1 Ms. Guilbault's case in preparation for your
2 deposition?
3    A.   No.
4    Q.   Did you do anything else to prepare for
5 your deposition that we have not yet discussed?
6    A.   No.
7    Q.   I believe you told me you looked at the
8 microslides in preparation for your deposition?
9    A.   Yes.
10    Q.   Can you tell me what those are?
11    A.   There's a hematoxylin and eosin glass
12 slides that were prepared from the biopsy. There's
13 three slides. Each slide has three cross-sections on
14 it. And the nine cross-sections represent a sampling
15 of the entire biopsy from top to bottom.
16    Q.   Just so I'm clear, in preparation for
17 your deposition today, you looked at the actual three
18 pathology slides of Ms. Plaisance, correct?
19    A.   Digitally, but yes. We read them on
20 computer screens, not with microscopes now. But,
21 yes, I looked at them digitally.
22    Q.   Did you take any microphotographs of
23 those slides?
24    A.   Recently I did not. I can't remember if
25 I took photographs when I first read them and I don't

1 recall whether I did at that time.
2    Q.   Would that be your general practice?
3    A.   We often put a photo, micrograph on the
4 reports. But it's not a hard-and-fast rule. And I
5 did not put them on this case.
6         Sometimes in the prior PCIA cases I have
7 read, I snap JPEGS of the microscopic images and then
8 provide them to the attorneys. But I can't remember
9 if I did it in this case or not.
10    Q.   In response to your document request for
11 your deposition we asked for all photographs in your
12 possession.
13         Did you check to see in response to that
14 notice whether you had micro photos of the pathology
15 slides?
16    A.   Yeah, I didn't have any there.
17    Q.   And these questions I just asked you, we
18 are dealing with Ms. Plaisance.
19         Did you take micro photos of Ms.
20 Guilbault's pathology slides?
21    A.   I don't believe so, no.
22    Q.   And did you check in response to the
23 notice of amended deposition document request to
24 confirm that you had no microslides of Ms.
25 Guilbault's pathology?

1    A.   Yes. No, I did not have any.
2    Q.   Is there a reason you did not take micro
3 photos in Ms. Plaisance's case?
4    A.   They weren't necessary for the report.
5    Q.   Is there a reason you didn't take micro
6 photo slides if Ms. Guilbault's case?
7    A.   Yeah, they weren't necessary for this
8 report.
9    Q.   You say they weren't necessary, what do
10 you mean by that?
11    A.   Usually when we put micrographs on the
12 report, it's for the patient. When the patient comes
13 back, to be able to see a picture. It's a very low
14 quality picture but it just helps with -- the patient
15 feels better knowing that their biopsy has been
16 analyzed carefully. So I didn't feel that was
17 necessary in this case at all.
18         It's not anything that's required by law
19 or -- and it's not standard in pathology reports to
20 put a little micrograph on the report.
21    Q.   Doctor, I next want to turn to your
22 reference list that was attached to your Rule 26
23 reports.
24         First, Exhibit A to your Rule 26 expert
25 report from Ms. Plaisance, I'm going to mark that as

1 Exhibit 3. And your Exhibit A to your Rule 26 report
2 for Ms. Guilbault, your reference list was attached
3 as Exhibit A. I'm going to mark that as Exhibit 4.
4         (Exhibit 3, Exhibit A to Rule 26 Report
5 for Ms. Plaisance; Exhibit 4, Exhibit A to Rule 26
6 Report for Ms. Guilbault, were marked for
7 identification.)
8    Q.   Doctor, were the reference lists for Ms.
9 Plaisance and Ms. Guilbault the same?
10    A.   Yes, I believe so.
11    Q.   And because it's the same, we can show
12 both. I will have Amy pull up what, on her screen,
13 is Tab D, which we marked as Exhibit 3.
14         I will have her slowly scroll through
15 this. Tell her if you need to stop.
16         Was this your reference list, Exhibit A,
17 that was attached to Ms. Plaisance's Rule 26 expert
18 report?
19    A.   Yes.
20    Q.   I will have her take that down and we
21 can pull up Tab E, which is Exhibit 4 that we marked
22 in Ms. Guilbault's case, the Exhibit A reference
23 list, just so you can confirm that they are the same.
24         Doctor, Exhibit-4 that's up on the
25 screen now is your reference list that's attached to

1 Exhibit A to your Rule 26 expert report in Guilbault.
2 Is that correct?
3     A.    Yes.
4     Q.    After looking at Exhibit-3 and -4, three
5 being Plaisance, four being Guilbault, are those
6 reference lists identical?
7     A.    Yes.  I hope so.  They are supposed to
8 be.
9     Q.    What is the significance of the articles
10 on this list?
11        MS. DAVIS: Objection.  Form.
12     A.    That's a broad question.  Mostly they
13 have been referenced in the report, they represent --
14 there's different papers in there for different
15 reasons.  They mostly represent the literature that's
16 been published related to chemotherapy, over quite a
17 number of years.
18        They also represent some of the
19 techniques of the histo -- histology techniques for
20 sectioning these biopsies so we can see the hair
21 follicles better.
22        This transverse sectioning or horizontal
23 sectioning is quite important in being able to make
24 definitive diagnoses in these.
25        So there's paper on the HoVert,

1 horizontal/vertical, that talks about that.  They
2 also have some pertinence to just what is a normal
3 scalp, normal hair follicles, what's the makeup of
4 these with density of hair and subjects like that.
5     Q.    Are all the articles or literature that
6 you relied upon to form your opinions contained in
7 your Rule 26 report on this list?
8        MS. DAVIS: Objection.  Form.
9        THE WITNESS: Can you repeat that?
10     Q.    Sure.  Are all the articles or
11 literature that you relied upon to form your opinions
12 contained in your Rule 26 report on this list?
13        MS. DAVIS: Objection.  Form.
14     A.    Probably not.  Because we are dealing
15 with -- also just had a fairly long career of reading
16 these alopecia biopsies.  And a lot of my forming of
17 my professional opinion comes from my experience
18 doing this, that I didn't get out of books or get out
19 of articles.
20        I mean, they certainly aid, but I
21 believe my professional opinions are aided by these
22 articles but they are also heavily, and even more,
23 weighed just by my experience.
24     Q.    Understood, Doctor.  Other than your
25 personal experience, your professional experience as

1 a derma-pathologist, the actual literature are
2 published articles you relied upon to form your
3 opinions, is that contained in the Exhibit A that was
4 attached to your expert report?
5     A.    Well, you know, the most important ones
6 are certainly in there.  I mean, there's certainly
7 papers and chapters that make small comments about
8 things that don't merit, you know, citation here
9 probably.  But the bulk of the literature on this
10 subject are represented here; the most important
11 papers, yes.
12     Q.    How did you go about locating and
13 selecting the articles that you put on your Exhibit A
14 reference list to your Rule 26 report?
15        MS. DAVIS: Objection.  Form.
16     A.    I certainly have this list from prior
17 Rule 26 reports.  And then -- as I said before, I
18 continue to do PubMed searches and I continue on a
19 regular basis to read the dermatology and
20 dermatopathology published literature.  So I keep up
21 that way.
22        I also go to -- which haven't happened
23 very much with the pandemic -- but I go to academic
24 meetings and learn about these -- this entity and
25 alopecia subjects at meetings.

1     Q.    Looking through the 17 articles that
2 were on your Exhibit A reference list, attached to
3 your Rule 26 report, the latest date of any article
4 or literature that I saw was 2018.  Is that correct?
5     A.    Yes.  I believe so.  I noted that also,
6 nothing has come out.  I can't find anything.  I even
7 searched in 2019, 2020, 2021, just to see if I could
8 find anything.
9     Q.    And you would agree that not all of
10 these 17 reference articles, as you said earlier,
11 discuss the histopathological characteristics of
12 PCIA, some of them discuss other tissues?
13     A.    Yeah, yes.  That's for sure, yes.
14     Q.    And would you agree that there's only, I
15 think, three of those 17 articles on the reference
16 list that discuss PCIA and taxanes, correct?
17        MS. DAVIS: Objection.  Form.
18     A.    You know, I don't -- I haven't paid
19 attention to taxane.  My job is more to make a
20 histopathologic diagnosis.  So I worry less about
21 what drug is actually causing it.  So I haven't
22 really paid attention to that, that specific
23 subject --
24     Q.    I'm sorry?
25     A.    I would have to go back and look.  Like

Page 30

1 those citations 14 and 15, the continuing medical
2 education articles that appeared in the Journal of
3 the American Journal of Dermatology, those are real
4 large review papers. I would have to go back and --
5 I don't know if they mentioned taxanes in that or
6 not. I can't remember. They are very large
7 articles. They are almost like book chapters.
8     Q. Do you remember any other articles on
9 your reference list other than the Miteva, Tallon and
10 Prevezas that talk about taxanes and PCIA?
11         MS. DAVIS: Objection. Form.
12     A. That's what I said. I don't know. I
13 would have to pull them and search through them to
14 see if they say that word.
15     Q. I think you indicated in preparation for
16 this deposition you had done a PubMed search and had
17 not found any other articles on PCIA and alopecia,
18 correct?
19     A. Yes, correct.
20     Q. So as far as your research has
21 indicated, there's been no published literature, that
22 you are aware of, discussing the histopathological
23 characteristics of PCIA since 2018, correct?
24         MS. DAVIS: Objection. Form.
25     A. Yes, correct.

Page 31

1     Q. And that would go for the same for any
2 articles discussing the histopathological
3 characteristics of taxanes and PCIA, correct?
4         MS. DAVIS: Objection. Form.
5         THE WITNESS: Can you say that again?
6 Sorry.
7     Q. Sure. And you're not aware of any
8 published literature discussing taxanes and PCIA and
9 the histopathological characteristics since at least
10 2018, correct?
11         MS. DAVIS: Objection. Form.
12     A. Correct.
13     Q. Are you aware of any study that has been
14 conducted since your last deposition in September of
15 2020 that statistically analyzed the
16 histopathological findings that may occur with PCIA?
17         MS. DAVIS: Objection. Form.
18     A. No.
19     Q. Thank you. You previously testified
20 that the literature on the histopathological findings
21 of PCIA was scant, is that still your opinion?
22         MS. DAVIS: Objection. Form.
23     A. Yes, I think that's fair to say.
24     Q. Are the histopathological findings of
25 PCIA well-defined?

Page 32

1         MS. DAVIS: Objection. Form.
2     A. Yes, I believe, yes, they are.
3     Q. And are they well-defined in the
4 scientific and medical literature?
5         MS. DAVIS: Objection. Form.
6     A. They are mostly defined by -- well, yes,
7 I think so. I think the Miteva article is really
8 nicely -- talks about the features. This was a good
9 article. A lot of the list criteria, the specific
10 criteria comes out of experience of people like me
11 that read these biopsies and see them again and again
12 and a lot of that is out of professional experience.
13 We don't sit down and write an article bout that. I
14 haven't been asked to. That's not the center of my
15 research. But we know these -- the criteria based on
16 experience, professional experience.
17     Q. I think you said that PCIA is not the
18 center of your research, did I hear that correctly?
19         MS. DAVIS: Objection. Form.
20     A. That's correct.
21     Q. What is the center of your research,
22 Doctor?
23     A. Well, it changes over time. I'm an
24 expert of nail pathology and alopecia. In the nail
25 world I have focused a lot on the techniques for

Page 33

1 sectioning these specimens and submission of them so
2 we get better hematoxylin-eosin slides to see. You
3 have hard nail and very delicate tissue below it and
4 quite often the processing of the tissue doesn't go
5 well. So I worked in that, trying to change the
6 standard of submission. And in that, I have
7 published in the melanoma and melanocytic neoplasm
8 world regarding the nail.
9         In alopecia, similarly, we have
10 published techniques that's two millimeter horizontal
11 technique sampling. This is another technique that
12 Dr. Tosti and I published together. Showing --
13 guiding clinicians and histopath laboratories on how
14 to do a smaller biopsy and then section, section the
15 tissue so you get much more precise diagnosis and
16 less scarring of the patients. We have done that.
17         Had a huge focus over the years on the
18 immunohistochemical stain to characterize the
19 different alopecic diseases, both the inflammatory
20 cell infiltrate, mostly centered around the
21 inflammatory cell infiltrate.
22         So that's been -- we have been
23 characterizing diseases like lichen planopilaris and
24 central centrifugal cicatricial alopecia, CCCA. Like
25 differences between that and between these two

9 (Pages 30 - 33)

Page 34

1 diseases and trying to characterize them using
2 immunohistochemistry.
3        I do other things:  I work in -- we were
4 the first laboratory in North America to be fully
5 digital, reading on screens.  So I work with
6 companies in their artificial intelligence
7 development.  Just mostly giving advice regarding
8 from the pathologist side, from a lab that's reading
9 digitally.  That's kind of in general.
10     Q.    Thank you.  I know in your last
11 deposition, I can show it to you, but are you
12 familiar with the 2017 Athena Fonia, F-O-N-I-A,
13 article, Permanent Alopecia in Patients With Breast
14 Cancer After Taxane Chemotherapy?
15     A.    Hang on.  Let me shut my window.  The
16 trash truck is out there.
17     Q.    No problem.
18     A.    Can you repeat that?
19     Q.    Sure.  Are you familiar, I think it was
20 discussed in your last deposition, the 2017 Athena
21 Fonia, F-O-N-I-A, article on permanent alopecia in
22 patients with breast cancer after taxane chemotherapy
23 and adjuvant hormonal therapy?
24     A.    Yes.  But I would have to look at the
25 paper again.

Page 35

1     Q.    Well, I just wanted to ask you if you
2 agreed with a statement in that article.  I can
3 clearly show it to you if you want to look at it.
4        When discussing patients with PCIA and
5 taxanes that the Fonia article said that "the
6 histopathological criteria for this particular subset
7 population are scant and not entirely defined."
8        Do you agree with that?
9        MS. DAVIS:  Objection.  Form.
10     A.    No, well, once again, I don't entirely
11 agree with that.  But at the same time, when I make a
12 diagnosis of PCIA I don't have knowledge and don't
13 need the knowledge of what drugs have been used.  I
14 haven't -- that's never information I have.  The only
15 history I have is that there's been chemotherapy.
16        So I feel like the histologic criteria
17 for PCIA is well-defined.  If you try to attach that
18 to any specific drug, then I don't think -- I think
19 that's scant literature.  And it's certainly
20 something I have never paid attention to
21 professionally.
22        My job is to make the diagnosis of PCIA
23 and that's it.  That's where I stop with that.  I'm
24 not a clinician.
25     Q.    Going back to your practice, outside of

Page 36

1 this litigation, with those patients whose pathology
2 you have reviewed in your practice, how many cases of
3 PCIA have you diagnosed that were outside of this
4 litigation?
5     A.    Maybe 25 over the years.  I have never
6 counted.  We lose -- we changed systems, so I can't
7 search back my entire 20 years.
8     Q.    And the 25 cases you say you have
9 diagnosed, that would have been over approximately
10 how many years?
11     A.    I have been in practice since 1996.
12        MS. DAVIS:  Objection.  Form.
13     A.    So 25 years of practice.
14        THE VIDEOGRAPHER:  This is the
15 videographer.  If you are done with this document, if
16 you don't mind taking it down.
17        MR. ROTOLO:  Yes, we are done with it.
18        THE VIDEOGRAPHER:  Thank you.
19     Q.    Can you estimate out of how many
20 pathologies that would have been over the years?
21        MS. DAVIS:  Objection.  Form.
22     A.    Wow, you're making me feel old.  Maybe
23 10,000 cases a year in 25 years.  So 250,000 cases
24 maybe.
25     Q.    Have you ever diagnosed a patient with

Page 37

1 PCIA from your review of the pathology without
2 knowing that patient had undergone chemotherapy?
3        MS. DAVIS:  Objection.  Form.
4     A.    Yes.  Yes.
5     Q.    How many times?
6     A.    A few.  Maybe three.  Five.  Sometimes I
7 don't get the history and I look into my cryoscope.
8 Because the features are fairly specific, there's not
9 other things that look like PCIA.  Then I asked for
10 the records and asked for the clinical history.
11        So I have gone backwards before and
12 identified that the patient had chemotherapy when I
13 was not given that history.
14     Q.    So in those cases you have gone back and
15 asked the clinician whether the patient had undergone
16 chemotherapy?
17     A.    Yeah.  You look in the microscope, you
18 see telogen bodies, you see there's not enough hairs,
19 and there's miniaturization.  In these three features
20 together, there's nothing else that fits in that.  So
21 you then go and get the history, yes.  It's always
22 there.
23     Q.    But you don't make the diagnosis until
24 you confirm that they have had chemotherapy?
25     A.    Yes.  They have also had chemotherapy in

10 (Pages 34 - 37)

1 those cases.
2     Q.    Doctor, I'm going to switch gears.  We
3 are going to talk about some general alopecia issues
4 quickly.  Do you need to take a break now or are you
5 okay to continue?
6     A.    No, I'm fine.
7     Q.    Do you agree that a person can have more
8 than one disease process going on their scalp at
9 any one time?
10     A.    Yes.
11     Q.    Do you agree that a biopsy tells you
12 what is going on at that particular site on the scalp
13 at that particular time?
14     A.    It's one of the tools for knowing what's
15 going on in the scalp.  It has some limitations but
16 it's certainly one of the big tools.
17     Q.    And what are the limitations?
18     A.    The limitation is that the biopsy may
19 only be two millimeters to four millimeters in
20 diameter.  So you're sampling a very, very small area
21 of a large scalp.  There is variability.  You know,
22 you might have fallen on a rock as a child and your
23 scalp and bled and have a scar there that you don't
24 know about.  That area might get sampled and may not
25 represent the larger alopecic disease that's present.

1         So there is some limitation by the fact
2 that we can't examine the entire scalp.  We are only
3 looking at small pieces of it.
4     Q.    And because you can have more than one
5 disease process on the scalp, do you agree that
6 biopsies need to be taken in the areas of the scalp
7 where it is thought there are different processes?
8         MS. DAVIS: Objection.  Form.
9     A.    Yeah.  If the clinician suspects that
10 there's more than more than one process going on and
11 wants histopathologic confirmation, then I recommend
12 that they sample the different areas, yes.
13     Q.    Did you agree that without accurate
14 clinical information on the patient, it may be
15 impossible to render an accurate histopathological
16 diagnosis for that patient?
17         MS. DAVIS: Objection.  Form.
18         THE WITNESS:  Yes, it can be.
19     Q.    That is out of your article that you
20 coauthored called Primary Scalp Alopecia, correct?
21         MS. DAVIS: Objection.  Form.
22     A.    I would have to look at the article.
23     Q.    Do you remember that article?
24     A.    I would have to see where that is.  But
25 I don't have the article memorized.

1     Q.    Okay.  As an example --
2     A.    We do try to only biopsy -- recommend
3 only one biopsy if possible because the patient's due
4 scar from the biopsy.  So we try to do less if we
5 can, if it's possible.
6     Q.    Following up on the statement on the
7 clinical information.  As an example, if a patient
8 had been diagnosed by a dermatologist with other
9 forms of alopecia after chemotherapy, would that have
10 been important for you to know?
11         MS. DAVIS: Objection.  Form.
12     A.    Yes.  It's good to know any prior
13 diagnoses.
14     Q.    I'm sorry.  Go ahead.  I didn't mean to
15 interrupt.
16     A.    Well, it's important you want to know
17 that because you want to see if the prior diagnosis
18 is evident in the current biopsy.  It can also be --
19 some of these prior diagnoses may -- some of these
20 diseases have active phases and inactive phases.  So
21 it could have been active and then is now inactive.
22         For instance, alopecia areata, people
23 have it as a child.  It may be gone now, so you have
24 a history that there was alopecia areata even though
25 something entirely different is going on years later.

1         So it's important.  But also to make --
2 sometimes it warrants a review of the prior biopsy,
3 if it's still available.  We keep the slides for ten
4 years.  And if we can get the prior slides, it
5 appears that there's been a different diagnosis in
6 the past and it's important to know about, we will
7 try to get the slides and review them and look at
8 them.
9     Q.    As another example, if a patient was
10 previously diagnosed by a dermatologist with a
11 certain type of alopecia, even before undergoing
12 chemotherapy, would that be important for you to
13 know?
14         MS. DAVIS: Objection.  Form.
15     A.    Yeah, it's good to know.  Depends on the
16 dermatologist.  It's much more important if it's a
17 hair loss expert than a general dermatologist.
18     Q.    And why would it important to know if
19 they had been diagnosed with a type of alopecia
20 before undergoing chemotherapy?
21     A.    So you can review the current -- I mean,
22 there's limited clinical history that I want to have
23 when I'm looking at a biopsy and that's just one of
24 them that's good to have.  Like whether the patient
25 has had chemotherapy or not is also one of the

11 (Pages 38 - 41)

Page 42

1 important ones.
2     Q.    And if a patient, for instance, had been
3 treated for alopecia before ever undergoing
4 chemotherapy, would that be something that you would
5 want to know?
6         MS. DAVIS: Objection. Form.
7     A.    Yes, it would be good to know.
8     Q.    And why would that be important?
9     A.    Well, like I said already, just good to
10 know if there's been a prior diagnosis and to be able
11 to look and see if features of the prior diagnosis
12 are present in the current biopsy.
13    Q.    Would that potentially affect your
14 diagnosis?
15        MS. DAVIS: Objection. Form.
16    A.    It could. It could also -- very, very
17 commonly though, there's been a prior diagnosis and
18 then you have a permanent process, like PCIA or
19 lichen planopilaris, come in. You often can't tell
20 whether the prior density was there or not anymore
21 because of the damage from the new process. If it's
22 a scarring alopecia, it's common to say, well, we
23 can't tell you whether there's the prior, you know,
24 is still there because the current scarring process
25 is so bad, so predominant. That's common.

Page 43

1     Q.    So if I'm hearing you, correct me if I'm
2 wrong, are you saying that the PCIA could coverup a
3 process that had been going on before the
4 chemotherapy?
5     A.    Yes.
6         MS. DAVIS: Objection. Form.
7     A.    That's true.
8     Q.    And if that occurred, you wouldn't be
9 able to determine what was causing the hair loss,
10 correct?
11        MS. DAVIS: Objection. Form.
12    A.    Well, you would know -- you would make a
13 diagnosis of PCIA and then say I'm unable in this
14 biopsy to tell you whether, you know, or there's no
15 features of the prior, say, alopecia areata in this
16 biopsy. I not uncommonly say that. I put that in
17 reports not uncommonly.
18    Q.    If a patient had diagnosed alopecia
19 before undergoing chemotherapy, would you expect that
20 the hair would regrow in the places that they had
21 alopecia already even if they had PCIA?
22        MS. DAVIS: Objection. Form.
23    A.    No. I mean, alopecia, as you're saying,
24 it is not one single disease. It depends on what the
25 cause of the hair loss is. The disease prior to the

Page 44

1 PCIA, you know, some of them regrow, some of them
2 don't.
3     Q.    Doctor, I guess in the simplest forms,
4 if a patient had no hair in a part of their scalp
5 before undergoing chemotherapy, undergoes
6 chemotherapy, would you expect the hair to grow back
7 in that spot that they didn't have hair before?
8         MS. DAVIS: Objection. Form.
9     A.    Well, if you are talking about -- I
10 mean, when you talk about regrowth after
11 chemotherapy, we are not talking about PCIA. We are
12 talking about just the normal regrowth from the
13 damage and effluvium of the chemotherapy drug. And
14 you can have a lot of things happen when you regrow
15 your hair there.
16        So if you had alopecia areata, say you
17 had a bald spot from alopecia areata, it's reasonable
18 that you can regrow in that area. But we are not
19 talking about PCIA in that case. We are talking
20 about the regrowth after chemotherapy that occurs in
21 most people.
22    Q.    Could certain treatments to the scalp
23 for alopecia affect the histopathological look of the
24 scalp?
25        MS. DAVIS: Objection. Form.

Page 45

1         THE WITNESS: Can you repeat that?
2     Q.    Sure. Could certain treatments to the
3 scalp for alopecia affect the histopathological look
4 of the scalp?
5         MS. DAVIS: Objection form.
6     A.    Yes.
7     Q.    And what treatments would do that?
8     A.    Steroid injection for alopecia areata
9 could stop the autoimmune attack and let the scalp
10 regrow, you know, where there's been hair loss.
11 Probably the best example, use of minoxidil and -
12 tropical minoxidil, now oral, these can, in a
13 percentage of patients, a small percentage of
14 patients, cause regrowth, cause the hair follicles to
15 get larger again and you would see that through a
16 biopsy.
17        I can't say I have ever appreciated
18 that. Patients that regrow in that case don't get
19 biopsied. So this is speculation. This isn't based
20 on -- people don't go back and biopsy after it
21 regrows, you leave it alone.
22    Q.    If a patient, say, had steroid
23 injections over a period of time before ever
24 undergoing chemotherapy, could that affect the look
25 of the scalp, the histological look of the scalp

12 (Pages 42 - 45)

1 after chemotherapy?
2        MS. DAVIS: Objection. Form.
3    A.   Probably not. But I'm speculating. I
4 don't know. But probably not.
5    Q.   Can seborrheic dermatitis lead to hair
6 loss?
7        MS. DAVIS: Objection. Form.
8    A.   No.
9    Q.   If a patient had hair loss that was
10 documented as a result of seborrheic dermatitis,
11 would that be relevant for you to know?
12        MS. DAVIS: Objection. Form.
13    A.   No. I probably wouldn't believe it. So
14 I probably don't need to know that.
15    Q.   And if a patient had lost hair while on
16 certain medications and before using other
17 medications, is that important to you or not?
18        MS. DAVIS: Objection. Form.
19    A.   Not really, no. That's not -- that's
20 not -- for what I'm doing, like I said, I'm one test
21 in the larger clinical evaluation. So that level of
22 detail isn't really necessary.
23    Q.   You mentioned minoxidil earlier. If a
24 patient used minoxidil to treat hair loss, and once
25 that medication was stopped, the hair loss got worse,

1 would that be something you would want to know?
2        MS. DAVIS: Objection. Form.
3        THE WITNESS: Not really, no. I don't
4 need to know that.
5    Q.   And why not? Why would that not be
6 important?
7    A.   It's just -- like I said, I'm a
8 dermatopathologist, not a clinician. And I don't
9 think that level of detail would affect any diagnosis
10 I'm making.
11    Q.   Are the loss of sebaceous glands a sign
12 of end-stage disease?
13        MS. DAVIS: Objection. Form.
14    A.   Well, end-stage disease, you mean
15 end-stage alopecia?
16    Q.   Yeah.
17    A.   It depends on where the hair follicle is
18 getting attacked. And if it's in the upper
19 infundibular/isthmic portion where the sebaceous duct
20 comes into the hair follicle and around that area
21 where the sebaceous glands live, then they certainly
22 go away. But it alone, and on its own, it's not --
23 it's not a feature. Just entirely alone it's just
24 one item. It's kind of a factor, not really an
25 element, you know, of end-stage disease.

1    Q.   Are empty follicular tracts indicative
2 of scarring alopecia?
3        MS. DAVIS: Objection. Form.
4    A.   No, not necessarily, no.
5    Q.   Would you expect that two patients that
6 share the same disease process would present with the
7 same histopathological features?
8        MS. DAVIS: Objection. Form.
9    A.   Yes, but, there is huge variability, you
10 know, when you're sampling only 12 square millimeters
11 of the scalp, there's going to be a lot of
12 variability. But, in general, that's what allows us
13 to make specific diagnoses, are these constellation
14 of features gathered together in the right clinical
15 setting to make a diagnosis.
16    Q.   Is that why it's important to have
17 defined histopathological characteristics of the type
18 of alopecia?
19        MS. DAVIS: Objection. Form.
20    A.   Yeah, well, we try to. You know, it's
21 an evolving subject. We gain experience over time.
22 So we have to work with criteria that we have to the
23 best of our knowledge at the moment. But we also
24 have to be willing to accept, you know, influx of new
25 information, new technology, new markers, like

1 molecular markers that might help us or change the
2 diagnosis. Not the diagnostic criteria, but at the
3 moment we are practicing this, we do that. A lot of
4 it is experience, professional experience.
5        Like I said, I see these cases of PCIA,
6 and have mostly that experience undersupported by the
7 literature that is somewhat limited, as we said.
8    Q.   Do more hairs in the telogen phase mean
9 the hair is cycling faster?
10        MS. DAVIS: Objection. Form.
11    A.   No, not necessarily.
12    Q.   Why do you say "not necessarily"?
13    A.   More hairs in a telogen phase can mean a
14 number of things, different things.
15    Q.   Is it a characteristic of female pattern
16 hair loss?
17    A.   Generally, not, no.
18    Q.   What are the histopathological
19 characteristics of endocrine-induced chemotherapy
20 alopecia?
21    A.   They are similar to female pattern hair
22 loss but you are driving the process with steroids.
23 You get -- you cause cycling of the hair and
24 miniaturization over time. There's kind of a support
25 now for dividing female pattern hair loss into two

13 (Pages 46 - 49)

1 group.  There's an early group, younger, and they are
2 often women who have polycystic ovarian disease and
3 androgen-driven, a process that is more active, has
4 more telogen bodies than the female pattern hair loss
5 that we mostly see in older woman, where they are
6 just kind of slowly miniaturizing over time, over a
7 lifetime.  So there's kind of an argument that maybe
8 we should be dividing these into two groups.
9     Q.    With regard to alopecia that could be
10 caused by women who are taking endocrine therapy
11 after chemotherapy.  Is there a defined
12 histopathological criteria for that type of alopecia?
13         MS. DAVIS:  Objection.  Form.
14     A.    No.  I don't believe so.  They tend not
15 to get biopsied either.  They have been through so
16 much already.  I think there's not -- they tend not
17 to seek help for anything that may occur.
18         MS. DAVIS:  Peter, we have been going on
19 a little over an hour.  Perhaps we could take a break
20 now, Or when you feel it's a good stopping point.
21         MR. ROTOLO:  I'm almost to a stopping
22 point.  Can we continue on until we finish that?
23         MS. DAVIS:  Sounds good to me.
24     Q.    We will talk about in more detail later,
25 but three, I guess of what you have said before, the

1 histopathological characteristics of PCIA, are
2 miniaturization, the loss of follicles and telogen
3 bodies, is that correct?
4     A.    Yes.
5         MS. DAVIS:  Objection.  Form.
6     Q.    And are all three of those
7 characteristics necessary for there to be PCIA?
8         MS. DAVIS:  Objection.  Form.
9     A.    Once again, there's variability among
10 the patients and among the sites sampled.  So -- and
11 it's not uncommon when I get two biopsies on the same
12 patient for there to be variability and of those
13 three features, between the two biopsies.  But we
14 make the diagnosis as a group, you know?  You have
15 two biopsies from the same person's scalp, so we use
16 them together.  But just that experience of seeing
17 two biopsies on these patients shows that there is
18 variability in the criteria.
19         One of the important things about -- we
20 call it miniaturization, but it's really more based
21 around the loss of the larger follicles.  It's like
22 if you go into a forest and cut down all the big
23 trees and leave the small trees, you're going to
24 count small trees.  So this is what happens in the
25 scalp also.  I think the PCIA removes the larger

1 hairs and leaves you with smaller ones.  That's why
2 we call it miniaturization.  But it's really sort of
3 like the ones left standing are smaller and they
4 count up as miniaturized.  They might have been small
5 all along.
6     Q.    By telogen bodies, what are you
7 referring to?  Are you referring to the type of
8 telogen body that was discussed in the Tallon article
9 or are you talking about something else?
10     A.    We are all seeing the same things.
11 People call them different things.  But we normally
12 see telogen -- you know, the hair follicle has a
13 anagen phase, catagen phase and telogen phase.  And
14 we see most of the hairs in the anagen phase.
15 Depends where you are biopsying on the body.  But on
16 the scalp most of them are in the anagen phase.  As
17 they cycle -- say your hair is on your scalp cycle
18 every three years to seven years, all at different
19 times.  That's why you don't go bald.  So they are
20 all doing it at different times.  When they are in
21 that, after three years, five years, seven years,
22 they go into this catagen phase.  That means they sit
23 in a telogen phase for a short period of time where
24 they start regrowing.
25         So we the feature histologically.  Then

1 we see that in, like, the PCIA, we are seeing this
2 increase number.  We don't know for sure but my
3 professional assumption or belief is that they have
4 gone into these telogen bodies and they are just
5 stuck there.  And they can't turn into an anagen
6 again.  They are stuck looking like that, kind of
7 suspended there.
8         That's why you don't see a regrowth.
9 You don't see the hair coming back.  They are just
10 sitting there.  And, for whatever reason, damage from
11 the chemotherapy, they get suspended in that phase.
12 But we elected to call them telogen bodies or telogen
13 phase.
14     Q.    Is that --
15     A.    Some people argue that they look a
16 little different than the normal ones but it's kind
17 of an academic argument.  I think Miteva definitively
18 said they are the same.  But it doesn't really
19 matter.
20     Q.    But what you are talking about with
21 telogen bodies, that's what Tallon was talking about?
22     A.    Yeah, we are all saying the same thing,
23 yes.
24     Q.    And you're aware that Dr. Tosti
25 disagrees that that's a characteristic of PCIA?

14 (Pages 50 - 53)

1          MS. DAVIS: Objection. Form.
2      A.   I'm not -- I would have to see what Dr.
3   Tosti wrote regarding that.  I would have to look at
4   that.
5      Q.   Go ahead.  Sorry.
6      A.   I would have to look at the article.
7      Q.   You're aware that she wrote a letter in
8   response to the Tallon article, though, correct?
9      A.   Yeah.  I read it.  I can't remember.  I
10  would have to review it again.
11     Q.   Okay.
12     A.   And the Tallon article.
13     Q.   What is your definition of follicular
14  dropout?
15     A.   It's entire -- it's loss of a follicular
16  -- of a follicle, permanent loss.
17     Q.   If you see normal follicular counts,
18  does that rule out PCIA?
19          MS. DAVIS: Objection. Form.
20     A.   No.  Because we have variability in the
21  number of hairs between people and also different
22  sites of the scalp.  And so you're always dealing
23  with this variability.  Like I said, we see this when
24  two biopsies are done on the same patient, you will
25  sometimes get different counts.  Almost always you

1   see a low follicular count.  But there are patients
2   who just normally have twice the number, even twice
3   the number of hair follicles in a four millimeter
4   biopsy.  So you might be dealing with a patient that
5   started out with twice as many, you know, trees in
6   the forest.  So you have lost half of them.  You have
7   to take it into context with evidence of follicular
8   dropout.  Evidence of permanent loss.  So you have to
9   -- you can't just take that in isolation.
10     Q.   Couple more questions, Doctor, then we
11  can take a break.
12          Do you see low follicular counts in
13  scarring alopecia?
14          MS. DAVIS: Objection.
15     A.   It's similar to the PCIA where you
16  generally do, but because of the sampling
17  variability, the counts can vary.  But usually you
18  do.  Depends on the size process too.
19     Q.   Can stress cause alopecia?
20     A.   Yes.
21          MS. DAVIS: Object to the form.
22     A.   Yes.
23     Q.   Can pattern hair loss be unmasked when
24  someone losses their hair from chemotherapy?
25          MS. DAVIS: Objection. Form.

1      A.   You know, I don't know that -- if you're
2   talking about just transient hair loss in
3   chemotherapy.  I don't know.  I don't know, I haven't
4   -- as a dermatopathologist I haven't delved into that
5   level of detail.  And we tend not to see biopsies on
6   people that are getting chemotherapy actively, you
7   know, so we don't know.  I don't see -- they got
8   bigger problems when that's going on and tend not to
9   go to hair loss experts.
10     Q.   Is female pattern hair loss the number
11  one differential diagnosis for PCIA?
12          MS. DAVIS: Objection. Form.
13     A.   Yes.  I think that's true, yes.
14     Q.   And can a person's diet cause alopecia?
15     A.   Yes.
16          MR. ROTOLO: We can take a break,
17  Doctor.  When we come back we will start on Ms.
18  Plaisance.
19          THE VIDEOGRAPHER: Thank you.  This is
20  the videographer.  The time is 1:29.  We are going
21  off the record.  This ends video number one.
22          (Break in proceedings.)
23          THE VIDEOGRAPHER: We are back on the
24  record.  The time is 1:48.  We are beginning media
25  file two.

1   BY MR. ROTOLO:
2      Q.   Dr. Thompson, I want to move now and
3   talk about Ms. Plaisance first, okay?
4          We are going to mark your
5   derma-pathology report for Ms. Plaisance as Exhibit
6   6. I'm sorry, five.  It should be there.
7          (Exhibit 5, Dermatopathology report for
8   Plaisance, was marked for identification.)
9      A.   Yeah.  Yeah.  I see it now.  This is
10  working.
11     Q.   Great.  Can you open it up?  Are you
12  able to look at it?
13     A.   Uh-huh, yes.
14     Q.   Great.  And your derma-path report was
15  attached as Exhibit E to your Rule 26 report,
16  correct?
17     A.   Yes.
18     Q.   And Exhibit 5, that is a two-page
19  document that is entitled derma-pathology report,
20  correct?
21     A.   Dermatopathology report.
22     Q.   Sorry.  Dermatopathology report.  And
23  it's for Audrey Plaisance, correct?
24     A.   Let me check.  Yes.
25     Q.   And did you prepare this document?

15 (Pages 54 - 57)

Page 58

1     A.    Yes.
2     Q.    And what is this document?
3     A.    It's a dermatopathology report,
4 reporting the findings of the two biopsies that I
5 analyzed.
6     Q.    And who did you receive the specimens
7 from that is the subject of this report?
8     A.    Dr. Tosti, her clinic.
9     Q.    Go ahead.  I'm sorry.
10     A.    It seems they were shipped from her
11 clinic.
12     Q.    And what date did you receive these
13 specimens?
14     A.    May 11th, 2021.
15     Q.    And from this report, can you tell us
16 what you received?
17     A.    Yes.  There were two separate specimens,
18 if you look under the gross, and they -- under the
19 gross A and B, they are measured there.  Both of them
20 were four-by-four-by-seven millimeters skin punches.
21     Q.    And what was your task with this
22 pathology of Ms. Plaisance?
23     A.    My task?
24     Q.    Yes.  What were you to do with these
25 specimens?

Page 59

1     A.    Well, we prepared glass slides and
2 analyzed them microscopically.  And to render a
3 diagnosis that has --
4     Q.    Excuse me.  Did you receive a
5 requisition form with the two specimens that were
6 sent to you of Ms. Plaisance?
7     A.    Yes.
8     Q.    And I think you testified in other
9 depositions that a requisition form is required when
10 you receive a pathology specimen?
11     A.    Yes.
12         MR. ROTOLO:  Let's mark Ms. Plaisance's
13 requisition form as Exhibit 6.  Amy, that's Tab five.
14 Sorry Tab S.  You should be able to pull it up if you
15 refresh.
16         (Exhibit 6, Ms. Plaisance's requisition
17 form, was marked for identification.)
18     A.    Yeah, I see it.
19     Q.    Okay.  And, Dr. Thomas, is Exhibit 6 the
20 form that you received with the pathology specimens
21 of Ms. Plaisance?
22     A.    Yes.
23     Q.    And who completed Exhibit 6?
24     A.    I do not know but it would have to be
25 someone in Dr. Tosti's office.

Page 60

1     Q.    And from this requisition form, which is
2 Exhibit 6, the specimens were collected on May 7th of
3 2021, is that correct?
4     A.    Yes.
5     Q.    Was the information on this requisition
6 form, Exhibit 6, the only information you had on Ms.
7 Plaisance when you reviewed her pathology?
8     A.    Yes.
9     Q.    Other than the requisition form, did you
10 have any other information on Ms. Plaisance when you
11 reviewed her pathology?
12     A.    No.
13     Q.    Did you have Dr. Tosti's clinical note
14 when you reviewed the pathology initially?
15     A.    No.
16     Q.    How did the clinical diagnosis on the
17 requisition form and the requisition form itself
18 impact your review of Ms. Plaisance's pathology?
19         MS. DAVIS:  Objection.  Form.
20     A.    Well, it certainly was communicated that
21 the patient had received chemotherapy and presumed
22 that Dr. Tosti's professional opinion, clinical
23 assessment, is that it was PCIA.  Also no --
24 important that I knew was the patient's age and
25 gender.  So that's what impacted the review?

Page 61

1     Q.    And I noted on your derma-pathology
2 report, and you can go back if you need to on Exhibit
3 5, but it has a date of that report of June 2nd of
4 2021.  Would that have been the date that you
5 reviewed the pathology?
6     A.    Let me pull it up one second.
7     Q.    Sure.
8     A.    I reviewed it sometime between -- if it
9 was received on the 11th, I'm not sure what day of
10 the week it was, the next business day I would have
11 been given the images, and sometime after that I
12 reviewed it.  Sometime after the next one or two
13 business days and the second I started to review it.
14     Q.    Do you write your dermatopathology
15 report on the day you review the slides?
16     A.    I can start drafts of it that are in our
17 laboratory information system.  These aren't saved
18 because it's not a signed report.  But it's all done
19 inside the computer.  There's nothing written beyond
20 what preparing the report and the reporting system
21 that generates this report.
22     Q.    So with the requisition form for Ms.
23 Plaisance, which is Exhibit 6, you would have known
24 Ms. Plaisance's date of birth, correct?
25     A.    Yes.

16 (Pages 58 - 61)

Page 62

1    Q.    And, therefore, you would have known her
2  age?
3    A.    Yes.
4    Q.    Which I think was 77 if my math is
5  correct.  Is that right?
6    A.    Yes, I believe so, yes.
7    Q.    Of course you would have known her name?
8    A.    Yes.
9    Q.    And you would have known that she was
10  female?
11    A.    Uh-huh, yes.
12    Q.    And there were no descriptors of Ms.
13  Plaisance' scalp on this form, correct?
14    A.    Correct.
15    Q.    So when you reviewed her pathology you
16  did not know whether her hair loss was diffuse or
17  patchy or something else, correct?
18    A.    No, I did not.
19    Q.    And is that one of the things that is
20  important to note when you're reviewing her
21  pathology?
22        MS. DAVIS:  Objection.  Form.
23    A.    In this case the most important thing
24  was to know that, the patient had chemo and Dr.
25  Tosti, Dr. Tosti is a hair loss expert, he believed

Page 63

1  that it was PCIA.
2    Q.    Would it have been important to know
3  whether her hair loss was diffuse or patchy?
4        MS. DAVIS:  Objection.  Form.
5    A.    I'm assuming because Dr. Tosti wrote
6  PCIA that the loss was more diffuse.  So I think it
7  was kind of implied in what was written there.
8    Q.    But you didn't know for certain?
9    A.    No.  I don't think I needed that for
10  this.  If I didn't have a history of PCIA, I would
11  definitely be more focused on that diffuse versus
12  patchy.
13    Q.    And the clinical diagnosis that was sent
14  to you by Dr. Tosti was permanent alopecia after
15  chemotherapy, correct?
16    A.    Yes.
17    Q.    And that was both for biopsy A and
18  biopsy B, correct?
19    A.    Yes.
20    Q.    You said knowing that it was diffuse or
21  patchy would be important if you did not know that
22  Ms. Plaisance had undergone chemotherapy, correct?
23    A.    Yes.
24    Q.    Doesn't knowing that she underwent
25  chemotherapy, does that create any sort of bias in

Page 64

1  your review that you are concentrating on PCIA rather
2  than defining what alopecia she has?
3        MS. DAVIS:  Objection.  Form.
4    A.    It's, you know, I operate with -- to
5  remain objective in what I do, I want some clinical
6  history but not too much clinical history.  Certainly
7  if I look through the microscope and see a different
8  -- evidence of a different disease, such as lichen
9  planopilaris, then I will go back and ask for more
10  clinical detail or talk to the clinician directly.
11  So if things don't match up, I do that.  But, you
12  know, we don't read these cases in a vacuum.  Like we
13  said, we know the patient's age, the gender, we don't
14  operate without a certain amount of information.
15    Q.    So looking at Ms. Plaisance's pathology,
16  you were looking to determine whether it was PCIA?
17    A.    Or not.  I mean, I don't always make the
18  diagnosis.
19    Q.    There was no differential diagnosis that
20  was provided by Dr. Tosti, was there?
21    A.    No.
22    Q.    Is that unusual not to have a
23  differential diagnosis on a requisition form of a
24  pathology specimen you receive?
25        MS. DAVIS:  Objection.  Form.

Page 65

1    A.    It's more common when it's coming from a
2  hair loss expert than to just tell you what they
3  think it is.  When I get biopsies from general
4  dermatologists who are non hair experts, they more
5  commonly will list more entities.  But that's
6  certainly not -- that's not, like, a requirement for
7  what I do.  Like I said, I go back and ask for more
8  information if I feel the need for it.
9    Q.    Again, in Ms. Plaisance case did you go
10  back and ask for other information that you thought
11  you needed?
12    A.    No.
13    Q.    Do you know if a differential diagnosis
14  was investigated by Dr. Tosti on Ms. Plaisance?
15        MS. DAVIS:  Objection.  Form.
16    A.    I would have to go back and read Dr.
17  Tosti's clinical note more carefully.  So, no, I
18  don't.
19    Q.    I believe you testified that you didn't
20  communicate with Dr. Tosti about Ms. Plaisance's
21  biopsy, correct?
22        MS. DAVIS:  Objection.  Form.
23    A.    Correct.
24    Q.    How many requisition forms do you
25  receive in your medical practice that do not have a

17 (Pages 62 - 65)

Page 66

1 differential diagnosis?
2        MS. DAVIS:  Objection form.
3     A.    I have no idea.  Probably the -- I would
4 say -- for tumors, probably 80 percent of them do
5 exactly what Dr. Tosti did here, where they tell you
6 what they think it is; and maybe 20 percent list more
7 than one possibility, a differential.
8        So the vast majority, I believe, I would
9 have to go look, but I believe they come in just
10 identifying what they think it is.  Might even be 90
11 percent.
12    Q.    That goes for alopecia as well?  I think
13 you said tumors, didn't you?
14    A.    Like I said, if it's a biopsy coming
15 from a hair loss expert, they list one and maybe two.
16 If it's a biopsy -- a hair loss biopsy coming from a
17 general dermatologist, they commonly list everything
18 in the phone book, you know, list everything,
19 multiple entities.
20    Q.    Isn't female pattern hair loss always a
21 differential diagnosis for PCIA?
22        MS. DAVIS:  Objection.  Form.
23    A.    Yes, I think that's something that is
24 considered, yes.
25    Q.    Do you know why it wasn't included

Page 67

1 here --
2        MS. DAVIS:  Objection form.
3     Q.    -- on the requisition form?
4     A.    No.  But I just said that the vast
5 majority of our requisitions come in without a more
6 extensive differential.
7     Q.    For a female of Ms. Plaisance's age,
8 would you expect that female pattern hair loss would
9 be a differential diagnosis?
10        MS. DAVIS:  Objection form.
11    A.    It is certainly one I consider when I
12 look through the microscope, yes.  But it's like --
13 like I said, one thing I do is, I'm just one test in
14 the whole evaluation.  The clinician has other tools
15 and they have the patient there, that they examine.
16 But, yeah, I consider it when I look at these
17 biopsies.
18    Q.    If Dr. Tosti was certain of the
19 diagnosis of permanent alopecia after chemotherapy,
20 why would you do a biopsy?
21        MS. DAVIS:  Objection.  Form.
22    A.    That's a point of contention.  Even
23 though I exist by reading biopsies, I believe that
24 there are entities where the biopsy is not necessary.
25 There are hair loss experts who believe that it's

Page 68

1 important to document the entity when it's a
2 permanent process, even though they already know
3 clinically what it is.  So there's -- there are hair
4 loss experts who believe this is important in the
5 care of the patient.  I defer to them on it, for
6 their interest in the biopsy.
7     Q.    But you would agree in general, you only
8 need a biopsy if you don't know what type of alopecia
9 it is, correct?
10        MS. DAVIS:  Objection.  Form.
11    A.    It's what I just said.  Some of my hair
12 loss experts that send me biopsies believe that it's
13 important to have the gold standard histopathological
14 diagnosis confirmed in a patient with a process like
15 PCIA or lichen planopilaris or alopecic lupus
16 serodermatosis.  They want this diagnosis.  I think
17 in transience processes, like, say shedding after
18 child birth or high fever, they don't biopsy those.
19 But the hair loss experts commonly want documentation
20 for their ongoing care for the patient.
21    Q.    Isn't there a good chance that Ms.
22 Plaisance had some element of female pattern hair
23 loss given her age and gender?
24        MS. DAVIS:  Objection form.
25    A.    Yes.

Page 69

1     Q.    There was no way to be able to tell how
2 much or how little, correct?
3        MS. DAVIS:  Objection.  Form.
4     A.    Yeah, you can't, when you have such
5 prominent PCIA on top of it, you can no longer tell
6 histopathologically.
7     Q.    Based on the requisition form for Ms.
8 Plaisance, which is Exhibit 6, you did not know when
9 Ms. Plaisance underwent chemotherapy, did you?
10    A.    No.
11        MS. DAVIS:  Objection.  Form.
12    Q.    And you did not know what chemotherapy
13 drugs Ms. Plaisance was administered, correct?
14    A.    Correct.
15    Q.    And you did not know what other
16 medications Ms. Plaisance was on at the time of her
17 biopsy, correct?
18    A.    Correct.
19    Q.    You had no information about her history
20 of any alopecia issues, correct?
21    A.    Correct.
22    Q.    You had no information about any history
23 of or treatment for alopecia prior to chemotherapy,
24 correct?
25    A.    Correct.

18 (Pages 66 - 69)

Page 70

1    Q.    And you have no other information about
2  her clinical presentation other than what was
3  included on Exhibit 6, correct?
4    A.    Correct.
5    Q.    And the other information you knew about
6  Ms. Plaisance from Exhibit 6, the requisition form,
7  was that biopsy A was taken from the frontal scalp
8  correct?
9    A.    Yes.
10    Q.    And that biopsy B was from the vertex
11  scalp, correct?
12    A.    Yes, correct.
13    Q.    And from the requisition form you did
14  not know precisely where the biopsies were taken
15  other than in those general areas, correct?
16        MS. DAVIS: Objection.  Form.
17    A.    Correct.
18    Q.    Do you know why Dr. Tosti chose the
19  location of the biopsies?
20        MS. DAVIS: Objection.  Form.
21    A.    I do not.  Dr. Tosti is the hair loss
22  clinical expert.  I defer to Dr. Tosti for that.  I
23  do not.
24    Q.    And from on Exhibit 6, the requisition
25  form for Ms. Plaisance, you knew the size of each

Page 71

1  biopsy as you testified earlier, correct?
2    A.    Well, we measured it when it came in.
3    Q.    But aren't the measurements also on the
4  requisition form?
5    A.    I would have to look back at it.  Those
6  measurements -- hang on.
7    Q.    Exhibit 6.
8    A.    Those are written by -- in my
9  laboratory, that's where we measured it.
10    Q.    So on the requisition form, which is
11  Exhibit 6, under the measurement, that would have
12  been your handwritten notation of how big it was?
13    A.    It's a technician in my laboratory.
14  They checked the box "tan."  They wrote 4 x 4 x 7.
15  Checked the box "entirely."  Then wrote "1 PC."
16  That's probably their initial, D-R.  Then they wrote
17  the word letter -- five letters trans, T-R-A-N-S.  So
18  those were written for both A and for B by the
19  technician in my laboratory.
20    Q.    And the biopsy size, was that a standard
21  punch biopsy for the scalp?
22    A.    Dr. Tosti and I published the paper
23  advocating for use of the two millimeter biopsy,
24  especially for this entity called frontal fibrosing
25  alopecia, where you have to biopsy near the forehead

Page 72

1  or on the eyebrow.  And -- but the standard beyond
2  that is most people do four millimeter biopsies.
3  Sometimes people do three.  Depends on the clinician.
4  Most hair loss experts do a four though.  When you're
5  not biopsying near the frontal hairline.
6    Q.    Is there any other information you knew
7  about the biopsy on Ms. Plaisance from the
8  requisition form, which is Exhibit 6?
9    A.    No.
10    Q.    Let's turn back to your dermatopathology
11  report, which is Exhibit 5 from Ms. Plaisance.
12        Do you have that in front of you,
13  Doctor?
14    A.    Yes.
15    Q.    Is Exhibit 5 the standard form that you
16  use in your practice?
17    A.    Yes.
18    Q.    And when you're preparing this
19  dermatopathology report, do you make every attempt to
20  assure that it is complete and accurate?
21    A.    Yes.
22    Q.    And you document -- do you document the
23  information that you have observed when reviewing the
24  pathology?
25    A.    Yes.

Page 73

1    Q.    And you would agree that it's important
2  for you to document what you have seen in the
3  pathology because it could potentially be used to
4  treat the patient, correct?
5    A.    Yes, correct.
6    Q.    And, again, when you prepared this
7  dermatopathology report, Exhibit 5, from Ms.
8  Plaisance, you had no information other than what was
9  contained in the requisition form, correct?
10    A.    Correct.
11    Q.    Did you follow your normal procedures
12  when reviewing Ms. Plaisance's pathology that you
13  follow when you review pathology outside of
14  litigation?
15    A.    Yes.
16    Q.    In the first block on page one of two of
17  Exhibit 5, it is labeled "Diagnosis."  Do you see
18  that, Doctor?
19    A.    Yes.
20    Q.    Is that your diagnosis after review of
21  the pathology?
22    A.    Yes.
23    Q.    And in the diagnosis box on page one of
24  Exhibit 5 for Ms. Plaisance, your diagnosis was
25  permanent chemotherapy-induced alopecia, correct?

19 (Pages 70 - 73)

Page 74

1    A.    Correct.
2    Q.    And that was both for biopsy A and
3  biopsy B, correct?
4    A.    Yes.
5    Q.    And you also did not include any
6  differential diagnosis either, correct?
7    A.    Right.  That's my job is to try to
8  reduce the differential.
9    Q.    And in your opinion, with regard to
10  biopsy A and biopsy B, it could -- Ms. Plaisance's
11  alopecia could be nothing other than permanent
12  chemotherapy-induced alopecia, correct?
13        MS. DAVIS:  Objection.  Form.
14    A.    Yes.
15    Q.    It couldn't be female pattern hair loss?
16    A.    No.
17    Q.    It couldn't be telogen effluvium?
18    A.    There's different types of telogen
19  effluvium, but there's acute and chronic; but, no, I
20  don't believe.
21    Q.    Couldn't be any type of fibrosing
22  alopecia?
23    A.    As a primary scarring alopecia, no.
24  Like such as lichen planopilaris, no.  There was no
25  scarring.

Page 75

1    Q.    On page two of Exhibit 5 of your
2  dermatopathology report for Ms. Plaisance, there's a
3  section called microscopic.  Do you see that, Doctor?
4    A.    Yes.
5    Q.    Was this section, you talked about this
6  earlier, was this section written or dictated as you
7  were actually looking at the pathology?
8    A.    Yes, I typed it.
9    Q.    Can you tell me how that process works?
10    A.    I work on two computer screens.  And one
11  computer screen has the microscopic photos from our
12  scan that I read the case with.  But I look at the
13  microscopic slides with.  The other screen has our
14  laboratory information system, LIS, called
15  Intellipath, I-N-T-E-L-L-I-P-A-T-H.  And in this
16  system we create the reports.
17        So you can see on the requisition
18  there's a bar code and the case number.  And I scan
19  the bar code or I type the case number, probably scan
20  the bar code, which opens up this specific draft
21  report.
22        Then inside that, I start to construct
23  the report.  Because PCIA is an uncommon diagnosis, I
24  don't have any pre-prepared report for this.  So I
25  type every single bit of it.

Page 76

1        So when you open up the diagnosis box
2  for A, you prepare A and B separately, and type in
3  "permanent chemotherapy-induced alopecia," close that
4  box, then open up the microscopic box for A, in that
5  I typed the sentences, description, then I insert a
6  templated count table that's there, that's empty.
7        So that drops in.  Then by counting the
8  hairs and the types of hairs, the size and all those
9  features that are listed there, I then start noting
10  each of those.  So those are all run by my
11  assessment.
12        Then I calculate, using a calculator,
13  say, follicular structures per millimeters squared.
14  That's done by taking the total 17 and dividing it by
15  12.56.  That's how many square millimeters there are
16  in a four millimeter punch.
17        Then the terminal vellus is also
18  calculated.  Generally, not very specifically, from
19  the counts that are higher up.  Then the anagen to
20  catagen/telogen is also calculated from that, by the
21  six divided by 17.
22        So I do that calculation, I try to do it
23  accurately.  Then I go back and do the same exact
24  thing.  Close that window and hit "save" and it
25  advances to the B diagnosis.  And I proceed to do the

Page 77

1  exact same thing for the B that I just described.
2  And that's done.  Then I hit "save" again.  And it
3  opens it up as a non-verified draft.  I check it.
4  Try to make sure it's all accurate.  Then I
5  electronically sign it.  Then that report goes
6  downstream to our group of medical editors, who then
7  check, verify all of the wording, the grammar, they
8  even check the numbers and the tables that I
9  provided, and come back to me if there's any
10  questions.  Then once they are comfortable that it's
11  all correct, they will -- they deliver the report to
12  the clinician, to Dr. Tosti.
13    Q.    Okay.  Thank you for that.  When you are
14  looking at the pathology on your computer screen, I
15  think you said you do it by computer screen now,
16  correct?
17    A.    Yes.
18    Q.    Is it easy to just print out what you're
19  seeing on the computer screens to a printer?
20    A.    No.
21    Q.    Can you save the images?
22    A.    I often use the snipping tool that's
23  built into the computer and take small areas, JPEG
24  photos if I'm going to use them for teaching or
25  something else.  But as a standard we don't.  These

20 (Pages 74 - 77)

Page 78

1  are -- each file, like this -- these two biopsies on
2  this -- Ms. Plaisance's are two gigabits of storage.
3  They are high resolution images.  So you don't just
4  transfer that image somewhere.  We can take little
5  bits of it and print it.  But we don't do that in
6  normal diagnostics.  That's only if we want to put a
7  picture on the report or want to use the photos for
8  something else.  Mostly teaching is where that
9  occurs, teaching students.
10     Q.    Let's go through your derma-path report
11  for Ms. Plaisance.  Under the microscopic section for
12  biopsy A, you say that "horizontal sections through
13  the entire tissue segment."
14        So am I correct in what that means is
15  that you're looking horizontally but you're also
16  looking down through all the layers of the biopsy?
17     A.    So, as I said before, we get -- three
18  glass slides are prepared.  Each slide has three
19  sections on it.  So we have nine total sections.  And
20  these nine horizontal sections represent samples from
21  the skin surface to the deepest portion of the
22  biopsy.
23        So they take a section and then advance;
24  take a section and then advance; take a section and
25  try to make them evenly spaced out through the

Page 79

1  tissue.  We do store -- obtain unstained slides in
2  between those and keep them.  They get stored with
3  the glass slides, which we keep for ten years, just
4  in case we have another need for them.  You can see
5  on the B, I did a fungal stain, PAS-D stain.  That
6  was done on one of those unstained slides.
7     Q.    Okay.  We will get there.  Then the next
8  thing you note is -- well, I think you said this, but
9  you're seeing all the way down to the deepest levels
10  of the biopsy, correct?
11     A.    Yes.
12     Q.    Then your report, you indicate "low
13  follicular count."  Is that another way of saying low
14  hair density?
15     A.    Yes.
16     Q.    Am I correct that that is the count of
17  the number of follicles in the four millimeter punch
18  biopsy which was marked as biopsy A?
19     A.    Yes.
20     Q.    And I think you mentioned this earlier,
21  but just for my clarification, am I correct that
22  there's 12.56 square millimeters in a four millimeter
23  punch biopsy?
24     A.    Yes.
25     Q.    And I think you testified in other

Page 80

1  depositions that on average there are two hairs per
2  square millimeter?
3        MS. DAVIS:  Objection.  Form.
4     A.    There are racial differences and there
5  are differences among different people and also
6  differences among where you just happen to sample on
7  the scalp.  But two is a good number to start with,
8  yes.
9     Q.    So if you -- two by 12.56 is 25.12, am I
10  correct in my math?
11     A.    I'm sorry?
12     Q.    Two hairs by 12.56?
13     A.    About 25, yeah.  I would have to
14  calculate it.  Yes, that's about right.
15     Q.    Do you know when examining Ms.
16  Plaisance's pathology whether she was Caucasian or
17  African-American?
18     A.    No.
19     Q.    So if you didn't know her race how would
20  you know what her average follicle count would be?
21     A.    Well, you know, these are factors in
22  what I am using.  These are features.  So you have a
23  total count.  But then you also have these empty
24  follicular stela in both of these biopsies on Ms.
25  Plaisance, which shows that there's been loss of

Page 81

1  hair.  So even with the 28 that were in the B, there
2  were still empty stela.  So she started out with more
3  hair there.  There's evidence that there's been loss
4  of the hair.  So you have to step away from, like,
5  racial norms and that this doesn't fit here, because
6  we know that the count has been affected by hair, by
7  loss of some -- permanent loss of some of the
8  follicles, which we saw in both biopsies.
9     Q.    I hear you, Doctor, but that wasn't my
10  question.  My question was:
11        How do you know what the average count
12  would be for this specimen if you did not know the
13  race of the patient?
14        MS. DAVIS:  Objection.  Form.
15     A.    Sorry.  You have to repeat that.
16     Q.    You talked about earlier that the
17  follicular count or the hair density may be different
18  depending if they are African-American or if they are
19  Caucasian, correct?
20     A.    Yes.  Some difference, yes.
21     Q.    Right.  Some difference.
22     A.    It's not marked.
23     Q.    If you don't know the race of the
24  patient, what are you basing the average on, if they
25  are difference between an African-American and a

21 (Pages 78 - 81)

1 Caucasian patient?

2     A.    Well, it's taking the whole, you know,
3 taking the whole biopsy together and assessing
4 whether there's been any follicular dropout or not.

5          As I testified earlier, I see biopsies
6 sometimes where the patients have four hairs per
7 square millimeter, which is their basic normal.  We
8 are not all, you know, all African-American -- women
9 of African descent are not all created exactly the
10 same.

11         So you have to accept the variability
12 that you see that's among people but also where you
13 sample on the scalp, there can be variability too.
14 This can be just the way you were made, you know, you
15 ended up with more hair in one area than another on
16 part of your scalp.  There's a lot of variability in
17 there.

18    Q.    So the 25.12 average, would that be for
19 all patients, to use that as an average for all
20 patients?

21    A.    I think it's a good place to start, yes.

22    Q.    But some patients could have less and
23 some patients could have more, correct?

24    A.    Yes.  That's not all that's based on
25 race either.  And, as I said, they might have more in

1 part of their scalp and less in another part of the
2 scalp on the same patient.

3    Q.    And for Ms. Plaisance's biopsy A, from
4 her -- I think that was her frontal scalp, you
5 calculated a total of 17 follicles, correct?

6    A.    Yes.

7    Q.    Can you tell me specifically how you
8 performed your follicular count?

9    A.    I look at all the three of the slides,
10 the nine cross-sections.  And when I do -- the way
11 the count happens is, I start at the deepest portion
12 of the biopsy and look for the large terminal hairs.
13 That's because they tend to reach all the way down
14 into the dermal, deep dermis into the subcutis.

15         So, in general, they are long enough to
16 stick all the way down into the fat, or the subcutis,
17 then that makes a terminal hair.  So that count of
18 four terminal anagen comes from there.

19         Then as I move up I start to mark these
20 catagen/telogen bodies in the digital system.  And
21 there are sometimes on different levels of these
22 cross-sections.  So you have to compare and you will
23 see -- so over two or three of the sections -- come
24 up with a full count, which was six.  I do this -- I
25 mark them in our system so that I can then summarize

1 them and pull them all together.  Then I move up
2 toward the skin surface.  And the section that's
3 where you haven't yet started to see the skin
4 surface, the epidermis on the skin surface, the
5 section right below that is the one you find and
6 count the total number.  Because that way you're
7 catching all of the vellus or miniaturized hairs.

8          So that comes from reading one
9 cross-section right below the skin surface, the 17.
10 And then i -- so then I have my four terminal anagen.
11 I have my six catagen/telogen, ten.  Then I counted a
12 total of 17.  So I know that there's seven of these
13 vellus or miniaturized hairs there.  So that's where
14 I come up with the seven number.

15    Q.    But am I correct that you look for
16 terminal hairs throughout the entire biopsy not just
17 at the lowest levels?

18    A.    They become harder to identify, you
19 know, as you get more superficial.  So, I mean, the
20 terminal, meaning the larger hairs, is based on the
21 length of them and also on the width of them.  But
22 the length is a really really good way to get that
23 number.  So I generally rely on that to come up with
24 that terminal anagen number.

25    Q.    Which leads me to the question of how do

1 you go about determining the type of follicle,
2 whether it's terminal, vellus or intermediate?

3    A.    It's largely based on how far it extends
4 into the dermis or into the subcutis.  So one point
5 to make is, we look at numbers in books that say when
6 you're young you have three or four terminal hairs
7 for every one vellus hair that's small.  So you have
8 three to one.  But as you age and have -- many people
9 get width of pattern hair loss of aging, they get
10 smaller.  So they are not large one day and then
11 entirely small the next.  There's a slow descent in
12 size over years.

13         So these vellus miniaturized are grouped
14 together and that even includes what I call
15 intermediate hairs.  Kind of halfway between the
16 terminal size and the vellus size.  Those in my
17 system are grouped under the vellus miniaturized.
18 The way I -- so basically the size is largely -- the
19 way I work -- is largely determined by how far the
20 follicles extend into the dermis or into the
21 subcutis.  And then the catagen/telogen is identified
22 through a number of features.

23         In theory you should be able to even
24 separate catagen and telogen.  These are separate
25 phases.  But it's really, in histology, you can't;

22 (Pages 82 - 85)

1 it's not so clean. So, therefore, I just group them
2 together. But the things we look for for those are
3 little singly, S-I-N-G-L-Y, singly necrotic
4 keratinocytes -- keratinocytes within the follicle,
5 that's a clue. Then also a wavy edge to the
6 follicle, basalis, the little line of cells next to
7 the basement membrane becomes wavy. Then the
8 basement membrane becomes thicker, kind of glassy
9 looking. So it's those features together that allow
10 me to identify catagen/telogen phase.
11    Q.    On your report you indicated that there
12 were six catagen/telogen hairs. How many of those
13 were terminal?
14    A.    How many of those are what?
15    Q.    Terminal.
16    A.    I don't know. Because they -- that's
17 actually one of the limitations of what we do. And
18 what I do is that when they are condensed down into
19 those telogen bodies, it's very hard to tell the size
20 of the follicle anymore. And when I do this terminal
21 vellus assessment, that you can see at the bottom of
22 the table, I often have to like, say, the six here, I
23 will put three under the terminal and three under the
24 vellus and then come up with that number. It's a
25 little bit -- that's one of the limitations of what

1 I'm doing. So this 1 to 1.4 is an estimate because
2 it's very hard to tell in the telogen phase whether
3 it's a large follicle or a small follicle.
4    Q.    So here how many did you include?
5    A.    I would have to go back and recalculate
6 it right now, but I think I gave three to each, seven
7 to ten. Yeah. It's about -- I probably counted
8 three of those as terminal and three of them as
9 vellus.
10    Q.    Then you found seven vellus miniaturized
11 hairs, correct?
12    A.    Yes.
13    Q.    How many of those seven would be what
14 you call the intermediate or in between hairs?
15          MS. DAVIS: Objection. Form.
16    A.    I would have to go back and re-analyze
17 that. Didn't really matter.
18    Q.    You indicated that when you count you
19 mark them -- were you finished? Sorry.
20    A.    Well, yeah, the term "miniaturized"
21 encompasses the intermediate in my mind. But I
22 didn't calculate that separately.
23    Q.    You indicated earlier that when you were
24 counting the hairs, you marked them on your system,
25 correct?

1    A.    Uh-huh, yes.
2    Q.    Is that like with an arrow or dot?
3    A.    Yeah, just a little arrow you drop onto
4 the screen.
5    Q.    Are those permanently saved onto your
6 system?
7    A.    They can or can't be -- sometimes I
8 delete them. They are just kind of a tool I'm using.
9 So they are not permanently saved on the glass
10 slides. You know, the glass slides are the true
11 permanent storage for the -- for our laboratory
12 regulation. So there's no mark on the glass slide.
13 It's only on the digital image.
14    Q.    Do you know if your markings of the
15 follicle counts were saved?
16    A.    I would have to go in and look. I would
17 have to go in and check it. There's a chance I
18 didn't even mark them too. Sometimes I mark them.
19 If they are very easy to count, I don't even mark
20 them. It's just something I do myself.
21    Q.    So if someone was to go behind you and
22 look at the pathology and wanted to look at your hair
23 count and what you counted as what, how would they do
24 that?
25    A.    They would have to start over and do it

1 themselves. If the catagen/telogens are marked,
2 that's there. But they have to go in and do their
3 own assessment on whether they are terminal or
4 whether they are vellus miniaturized.
5    Q.    Another dermatopathologist can disagree
6 with your count, correct?
7    A.    Uh-huh, yes.
8    Q.    And would we know who was right in that
9 instance?
10          MS. DAVIS: Objection. Form.
11    A.    Well, I spent a lot of years reading a
12 lot of hair loss biopsies. I assume that counts for
13 something. A lot of what is done here, especially
14 with PCIA, is based on experience and seeing cases.
15    Q.    Other dermatopathologists have
16 experience too as well, correct, Doctor?
17    A.    The vast majority of dermatopathologists
18 have very little experience in hair loss and
19 biopsies. They don't embrace this subspecialty.
20 There's very few people who do.
21    Q.    Now, do you know what Ms. Plaisance's
22 normal hair density was?
23          MS. DAVIS: Objection. Form.
24    A.    No. I know that somewhere north of 1.35
25 and 2.23 because both biopsies had evidence of

1 follicular dropout.
2    Q.   Do you know what Ms. Plaisance's hair
3 density was on other parts of her scalp?
4    A.   No.
5    Q.   Was the biopsy A taken from a frontal
6 part of the scalp where there could be more vellus
7 hairs?
8    A.   You know, the frontal scalp is a larger
9 area.  It's not just the frontal hairline.  And hair
10 loss experts, like Dr. Tosti, know not to biopsy
11 along the frontal hairline unless they need to do it
12 for really specific diseases, such as frontal
13 fibrosing alopecia.  But they know not to do that.
14       So when Dr. Tosti writes "frontal," she
15 is talking about a region of the scalp, not the
16 frontal hairline.
17    Q.   So you -- go ahead.
18    A.   So assuming that that's just frontal
19 scalp and not frontal hairline, then it shouldn't be
20 running into vellus hairs yet.
21    Q.   But you don't know that for sure because
22 you weren't aware of where the biopsy was actually
23 taken when you reviewed the pathology, correct?
24       MS. DAVIS:  Objection.  Form.
25    A.   I know the region.  The frontal scalp.

1    Q.   The next thing you say on your
2 derma-path report is that there were many empty
3 follicular stela.  Can you tell us what that means?
4    A.   In this case the empty follicular stela
5 means there used to be a follicle in that area and
6 it's entirely been lost.  There's been permanent loss
7 of the follicle.  Some of these stela two maybe areas
8 below the catagen/telogen -- the telogen bodies.  So
9 it contracts up to the telogen body and there's empty
10 tract below it.  So it can mean two different things
11 in this case.
12    Q.   Do you know how many were actually not
13 there as opposed to ones --
14    A.   There were -- I actually, in preparing
15 the Rule 26 report, I went back and looked at the
16 slides as I said, and I was verifying that the stela
17 on B, because the count was 2.23 for the density,
18 that they were truly empty stela and not just sitting
19 below a telogen body.  And that was true.  The
20 majority of them are.  You can see them superficially
21 that there's been permanent loss, permanent dropout.
22    Q.   You say that was included in your Rule
23 26 report?
24    A.   No.  In preparing it, I just was
25 interested in the higher count on B and I went back

1 and looked at the slides for that reason.
2    Q.   Are empty follicular stelae the same as
3 fibroelastotic study?
4    A.   I don't know.  I don't use that term.
5    Q.   Do you know what fibroelastotic study
6 are?
7    A.   I know that there's the Arao body,
8 people have tried to ascribe significance to the
9 elastin fibers in the stelae.  I have to look it up.
10 But it's named after somebody, Arao, like A-R-A-O I
11 think, maybe a Portuguese name.  I know people have
12 tried to ascribe significance to the elastic fibers
13 in the empty stelae.  I have never been able to
14 understand that or use it diagnostically.
15       But you can call them empty follicular
16 stelae, tracts, empty fibrous tracts, fibrous tracts.
17 I know the elastic term has been bandied about quite
18 a long time ago.  It was before we had other stains
19 and people were relying more on the elastic stains
20 I never found them useful.  I never found them
21 useful.
22    Q.   So if you don't rely on them or find
23 them useful you didn't look for them?
24       MS. DAVIS:  Object.  Form.
25       (Clarification by reporter.)

1    Q.   I said, if they are not relevant to you,
2 you didn't look for them?
3    A.   Yeah.  No, I can see the empty tracts
4 without them, elastic stain.
5    Q.   On the many empty follicular stelae, did
6 you do a count of how many there were?
7    A.   No.
8    Q.   Next you say the vellus miniaturized
9 follicles predominate, correct?
10    A.   Yes.
11    Q.   Can you explain what you're referring
12 to?
13    A.   We have seven vellus miniaturized and
14 only four of the anagen -- terminal anagen.  So
15 there's more of them.
16    Q.   Did you determine if Ms. Plaisance had
17 thin or fine hair to begin with?
18       MS. DAVIS:  Objection.  Form.
19    A.   No.
20    Q.   If Ms. Plaisance had fine or thin area
21 hair, does that make it more difficult to determine
22 between the vellus hair and indeterminate hair?
23       MS. DAVIS:  Objection.  Form.
24    A.   Not to my knowledge.  I have never -- I
25 have never looked at that clinical feature.  That's

24 (Pages 90 - 93)

Page 94

1 not information that I get as a dermatopathologist.
2    Q.    Then you found in Ms. Plaisance's biopsy
3 A that there were sparse, superficial perifollicular
4 infiltrate of lymphocytes.  Can you explain what you
5 meant by that?
6    A.    Lymphocytes are inflammatory cells, like
7 if you get a rash or -- they're the cells that fight
8 infection and there were a few there.
9    Q.    So it's inflammation?
10    A.    Yeah.  But only trace.  It was almost
11 none there in A.  There were more in the B biopsy and
12 that's why I did the fungal stain.  Because the most
13 common diagnosis that I make on top of hair loss is
14 seborrheic dermatitis.  The predominate criteria that
15 I use to make that diagnosis is two things:  There's
16 presence of lymphocytes and then there's presence of
17 yeast, fungus yeast forms, and so that's why I did
18 the stain on the B.  I didn't do it on A because
19 there were only very few lymphocytes.
20    Q.    Is a finding of inflammation
21 inconsistent with finding PCIA?
22        MS. DAVIS:  Objection.  Form.
23    A.    You commonly see inflammation in the
24 scalp.  And most commonly -- you'd like it to be
25 seborrheic dermatitis or fungal yeast so you have

Page 95

1 something to treat.  It's basically dandruff.  But
2 some people believe it should be considered a norm to
3 have some lymphocytes present, that that's a normal
4 variant.
5    Q.    Did you determine what the inflammation
6 of lymphocytes were on Ms. Plaisance's A biopsy?
7    A.    Well, I knew that there wasn't -- there
8 weren't enough for it to be primary scarring
9 alopecia, such as lichen planopilaris, because you
10 would have much more fibrosis, perifollicular
11 fibrosis, that I call trace, to have a scarring
12 disease, you would have quite a bit more of that.
13 You wouldn't have a catagen/telogen shift.  My guess
14 is that Ms. Plaisance has seborrheic dermatitis and
15 we just didn't see the yeast.  It's possible she
16 treats it.  That's why I'm not seeing it.
17    Q.    Did you note in your derma-path report
18 that there was one small focus of perifollicular
19 subtle fibrosis.  That's scarring, correct?
20        MS. DAVIS:  Object to the form.
21    A.    Little bit of scarring, yes.
22    Q.    And that wouldn't be consistent with
23 PCIA either, would it?
24        MS. DAVIS:  Objection.  Form.
25    A.    No.

Page 96

1    Q.    Would the fibrosis that you found, would
2 that affect the follicular count?
3    A.    No, I don't think so.  It was probably
4 an old zit, an old acne form lesion.  When you only
5 see one little focus, it's usually a resolving zit.
6 Z-I-T, zit.  And it will cause that feature.  When
7 you only see it in one focus, it tells you that it's
8 not a primary scarring alopecia, such as lichen
9 planopilaris.  But, no, we don't see it in PCIA
10 either.  It's an incidental finding.
11    Q.    In your derma-path report for the
12 lymphocytes, you said there was a trace.  What is the
13 scale that is used to determine the amount?
14    A.    My scale, and I use trace to three plus,
15 trace one plus, two plus, three plus.  It's a system
16 I created.
17    Q.    Is a scale the same for the fibrosis?
18    A.    Yes.
19    Q.    And that's your scale as well?
20    A.    Yes.
21    Q.    So is it subjective?
22    A.    Yes.
23    Q.    You calculated the follicular structures
24 per millimeter squared as 1.35, correct?
25    A.    Yes.

Page 97

1    Q.    Is that just the total follicles
2 identified divided by 12.56?
3    A.    Yes.
4    Q.    And if the number of follicles you
5 identified was incorrect, that number would also be
6 different, correct?
7    A.    Yes.
8    Q.    You calculated the terminal vellus ratio
9 at 1 to 1.4.  I think you were trying to do the math
10 earlier on how you came to that.
11        Did you determine how you came to that
12 number?  Was it the three and three?
13    A.    I think it was the three and three.
14    Q.    Is that ratio consistent with female
15 pattern hair loss?
16        MS. DAVIS:  Objection.  Form.
17    A.    It could be, yes.
18    Q.    Then you calculated the catagen/telogen
19 shift at 65/35?
20    A.    Yes.
21        MR. ROTOLO:  I'm going to turn to your
22 Rule 26 report.  Lauren and Dr. Thomas, do you want
23 to take a quick break before we switch topics?  Do
24 you want to take a ten-minute break?
25    A.    Sure.

25 (Pages 94 - 97)

1       MS. DAVIS:  That sounds good.  Then what
2  are people thinking about?
3       THE VIDEOGRAPHER:  Time is 2:50.  We are
4  going off the record.  This ends media file two.
5       (Break in proceedings.)
6       THE VIDEOGRAPHER:  Good afternoon.  We
7  are back on the record.  The time is 3:25.  We are
8  beginning media file three.
9       MR. ROTOLO:  Doctor, now that we have
10  broken for lunch, I want to continue on with Ms.
11  Plaisance.  We are going to look next at her -- the
12  Rule 26 report that you prepared for Ms. Plaisance.
13  I will mark that as Exhibit 7.  It should be in your
14  folder.
15       (Exhibit 7, Rule 26 report for
16  Plaisance, was marked for identification.)
17    A.    Okay.  Got it.
18    Q.    Your Rule 26 report that we just marked
19  as Exhibit 7 is three pages, correct?
20    A.    Let me check.  Yes.
21    Q.    And that is your signature on Page 3 and
22  it's dated August 2, 2021.  Correct?
23    A.    Yes.
24    Q.    Does this Rule 26 report contain the
25  opinions that you are giving in this case regarding

1  Ms. Plaisance?
2    A.    Yes.
3    Q.    In preparing your report, did you make
4  assurances that the information in this report is
5  correct and accurate?
6    A.    Yes.
7    Q.    Did you plan to perform anymore tasks or
8  do anything else with Ms. Plaisance's pathology that
9  you have not already done?
10    A.    No.
11    Q.    How long after you prepared your
12  derma-path report did you prepare this Rule 26
13  report?
14    A.    Several months.  Almost two months.
15    Q.    Okay.  The fourth page of this Rule 26
16  report, that is Exhibit 7, is the materials
17  consulted.  And you listed the derma-path report of
18  Plaisance dated June 2nd and Dr. Tosti's examination
19  of Plaisance on May 7, 2021.  Correct?
20    A.    Yes.
21    Q.    Then you attach those as an exhibit to
22  your report, correct?
23    A.    Yes.
24    Q.    Did you consider anything else in
25  preparing your Rule 26 report other than the

1  pathology itself?
2    A.    No.
3    Q.    Did you review the pathology again when
4  you prepared your Rule 26 report?
5    A.    Yes.
6    Q.    Did you rely on anything included in Dr.
7  Tosti's clinical exam report for your opinions in
8  this case?
9    A.    No, I don't believe so.
10    Q.    Did you review the depositions of any of
11  Ms. Plaisance's doctors, including her treating
12  dermatologist, Dr. Matherne, when preparing your Rule
13  26 report?
14    A.    No.
15    Q.    Did you review any medical records of
16  Ms. Plaisance, including her dermatology records,
17  when preparing your Rule 26 report?
18    A.    Only the medical records from the clinic
19  visit to Dr. Tosti where the biopsy was performed on
20  May 7, 2021.
21    Q.    But you just testified that you didn't
22  rely upon anything in that report?
23    A.    No.  But I read it.  I did read that.
24    Q.    Did you review Ms. Plaisance's
25  deposition in this case when preparing your Rule 26

1  report?
2    A.    No.
3    Q.    Did you review any depositions taken in
4  the Plaisance case when preparing your Rule 26
5  report?
6    A.    Can you repeat that?  Sorry.
7    Q.    Sure.  Did you review any depositions
8  taken in the Plaisance case when preparing your Rule
9  26 report?
10    A.    No.
11    Q.    Were you aware of Ms. Plaisance's family
12  history with regard to alopecia when preparing your
13  report?
14       MS. DAVIS:  Objection.  Form.
15    A.    No.
16    Q.    Were you aware of any medications that
17  Ms. Plaisance was taking when you prepared your Rule
18  26 report?
19    A.    Well I --
20       MS. DAVIS:  Objection.  Form.
21    A.    I looked at the medications that were
22  listed with Dr. Tosti.  So I was aware, yeah, I
23  looked at the meds.  I read the note.
24    Q.    Did any of those medications you read,
25  did you rely upon in your opinions in your Rule 26

26 (Pages 98 - 101)

Page 102

1 report?
2    A.    No.
3    Q.    Did you know if Ms. Plaisance had had
4 any blood work performed and what the results of that
5 blood work were when you prepared your report?
6    A.    I can't remember.  I would have to go
7 back and look at -- no, not to my knowledge.
8    Q.    Did you know if she had any thyroid
9 issues?
10    A.    I'm trying to remember.  I would have to
11 look at the Tosti's progress note, but I can't
12 remember off the top of my head right now.
13    Q.    Do you know if she had any iron
14 deficiency?
15        MS. DAVIS:  Objection.  Form.
16    A.    No.
17    Q.    Do you know if she had any dietary
18 issues?
19        MS. DAVIS:  Objection.  Form.
20    A.    I think she was on a statin for
21 hyperlipidemia or lipid disorder.
22    Q.    Did you know if she was or is on any
23 hormonal treatment?
24    A.    No.
25    Q.    Did you review any photos of Ms.

Page 103

1 Plaisance before she underwent chemotherapy?
2    A.    No.
3    Q.    Do you know if Ms. Plaisance had any
4 history of hair loss?
5        MS. DAVIS:  Objection.  Form.
6    A.    No.
7    Q.    Do you know when Ms. Plaisance lost her
8 hair?
9    A.    I would have to go back and look at the
10 note.  I can't remember.
11    Q.    Do you know when Ms. Plaisance's hair
12 grew back?
13        MS. DAVIS:  Objection.  Form.
14    A.    No.
15    Q.    Do you know if Ms. Plaisance is or was
16 under any stress in her life?
17        MS. DAVIS:  Objection.  Form.
18    A.    No.
19    Q.    Do you know if she had been diagnosed
20 with alopecia before she underwent chemotherapy?
21        MS. DAVIS:  Objection.  Form.
22    A.    I know she had a history of shedding,
23 but I don't know if she had -- what diagnosis she
24 had.  It was just what Dr. Tosti had noted.
25    Q.    Again, that was not something you relied

Page 104

1 upon in your opinions in your Rule 26 report?
2    A.    No.  No, I didn't see that as relevant.
3    Q.    Do you know if she was treated for
4 alopecia before undergoing chemotherapy?
5        MS. DAVIS:  Objection.  Form.
6    A.    Well, she said she had received
7 injections, I believe, which didn't make very much
8 sense to me for shedding.  So it was the patient
9 report only.
10    Q.    Again, you did not look at the
11 dermatologist reports?
12    A.    No.
13    Q.    No?
14    A.    No.  I did not, no.
15    Q.    Do you know if she was treated for
16 alopecia after undergoing chemotherapy?
17        MS. DAVIS:  Objection.  Form.
18    A.    No, I don't.
19    Q.    I would assume you don't know the
20 results of any treatment that she had?
21    A.    No.
22    Q.    Let's look at your Rule 26 report, which
23 is Exhibit 7, which I think you have in front of you.
24        In the second paragraph you talk about
25 the slides.  I think you talked about this before,

Page 105

1 that there were nine sections obtained for each
2 specimen, three on each side.  And earlier, am I
3 correct, that you explained to us how those were put
4 on the slide and how you look at them?
5    A.    Yes.
6    Q.    Okay.  Then you indicate that there were
7 five unstained slides, correct?
8    A.    Yes.
9    Q.    Would that be five unstained slides for
10 each biopsy?
11    A.    Yes.
12    Q.    So there would be a total of ten
13 unstained slides?
14    A.    Yeah.  I presume one was used for the
15 PAS-D stain on B.
16    Q.    If Hospira received nine unstained
17 slides, can you explain why there was only nine?
18    A.    Because we used one for the PAS-D stain.
19    Q.    And you didn't supply the PAS-D stain to
20 Hospira, correct?
21    A.    It should have been.
22    Q.    If we didn't receive it, do you know why
23 we did not receive it?
24        MS. DAVIS:  Objection.  Form.
25    A.    Then my lab didn't mail it.  But I asked

27 (Pages 102 - 105)

1 them to mail the entire case.
2    Q.    You also indicate that a gram stain was
3 prepared for each biopsy?
4    A.    Yes.
5    Q.    What is a gram stain?
6    A.    It's a stain for bacteria.
7    Q.    Was that done on each biopsy A and B?
8    A.    I would have to go back and look.
9    Q.    So it was to check for bacteria?
10    A.    Yes.
11    Q.    Did you provide the gram stain to
12 Hospira?
13         MS. DAVIS: Objection. Form.
14    A.    I asked that the whole case be sent. I
15 don't know if it was sent. I would have to check.
16    Q.    Doctor, I would ask that you check on
17 that because I will say we don't have the PASS-D
18 stain or the gram stain.
19    A.    Okay. Happy to send those.
20    Q.    Now, in your derma-path report that we
21 looked at, which was Exhibit 5, why did you not
22 mention the gram stains in that report?
23    A.    You know, I have to check. I have to
24 check. The gram stain was performed by the lab, not
25 at my request. So I didn't use it in the case. So I

1 have to go in and look and see what is there. But I
2 didn't see it as relevant to the case. And my
3 laboratory does special stains when they anticipate
4 the pathologists asking for them. It wasn't clear to
5 me what led to that gram stain being performed. Then
6 I didn't use it in the case.
7    Q.    Do you know what the results of the gram
8 stain were?
9    A.    I need to go back and look at it. But
10 I'm certain there's no bacteria present. We can take
11 a break and I can look it up if you want.
12    Q.    Let's do it at the next break.
13    A.    Okay.
14    Q.    On your Rule 26 report, which is Exhibit
15 7, you talk about biopsy A starting at the bottom,
16 correct, on page one?
17    A.    Yes.
18    Q.    You first mentioned the telogen bodies.
19 And, by that, are we talking about the telogen bodies
20 that we discussed earlier?
21    A.    Yes.
22    Q.    The ones that are in the Tallon report?
23    A.    Yes.
24    Q.    Can you describe for us what those
25 bodies look like in biopsy A of Ms. Plaisance?

1    A.    Telogen bodies are clusters of
2 epithelium with small blue staining nuclei and they
3 look like little -- almost like little flowers,
4 clusters. They are composed entirely of these small
5 cells with oval blue or purple staining nuclei. They
6 have a wavy outline to them. A really characteristic
7 look.
8    Q.    Then on your Rule 26 report for biopsy A
9 you say "empty follicular tracts." Is that the same
10 as what you said in your derma-path report that you
11 called empty follicular stela?
12    A.    Yes.
13    Q.    I think we talked about it earlier, you
14 didn't count the number of how many there were,
15 correct?
16    A.    Correct.
17    Q.    We talked about the fibrosis. There was
18 a trace of fibrosis found on biopsy A, correct?
19    A.    Yes. Just a --
20    Q.    Sorry. Go ahead.
21    A.    Just a trace, yes.
22    Q.    Would you have not empty follicular
23 tracts where you had that fibrosis?
24    A.    No, no, no, no. The fibrosis is around
25 the existing follicles that still exists, that hasn't

1 been destroyed.
2    Q.    Then you talk about follicular
3 miniaturization, correct?
4    A.    Yes.
5    Q.    And miniaturization is a characteristic
6 of other types of alopecia, correct?
7         MS. DAVIS: Object to the form.
8    A.    Yeah, it's one of the factors that can
9 be seen, sure, yes.
10    Q.    Then you say "low follicular density."
11 Is that the same as the follicular count that was our
12 derma-path report?
13    A.    Yes.
14    Q.    In your Rule 26 report, which is Exhibit
15 7, when you're talking about biopsy A, you do not
16 make any reference in this report to the
17 perifollicular subtle fibrosis are the lymphocytes,
18 do you?
19    A.    I do by saying "no significant
20 scarring." Saying there I didn't think that was
21 significant.
22    Q.    So you reference it in your Rule 26
23 report by just saying there was no significant --
24    A.    Yeah. "Trace" to me is no significant.
25 It was only in one little focus.

28 (Pages 106 - 109)

Page 110

1    Q.   Let's go back to Exhibit 5, which is
2 your derma-path report.  Are you there, Doctor?
3    A.   Yes.
4    Q.   And on page two of Exhibit 5, at the
5 bottom you talk about biopsy B, correct?
6    A.   The microscopic description, yes.
7    Q.   Biopsy B was the biopsy of -- that was
8 taken in the vertex?
9    A.   Yes.
10    Q.   You first report that there was a normal
11 follicle count of 28, correct?
12    A.   Yes.
13    Q.   Given there was a normal follicle count,
14 doesn't that mean that biopsy B is not PCIA?
15        MS. DAVIS:  Objection.  Form.
16    A.   Well, there's a couple things going on
17 here.  No, that doesn't mean that.  But the things
18 that are going on here is, even with the -- as I said
19 already, the count of -- in the normal range of 28
20 still had empty follicular stela.  So we still had
21 the evidence of follicular loss, even though it
22 hadn't dropped the count.  So we do have that.  We
23 have the evidence of the loss.  We have the
24 miniaturization and then we have this catagen/telogen
25 shift to 43 percent.  So those alone are evidence

Page 111

1 that this is PCIA.  But the second part is, we have
2 two biopsies here.  These aren't done in isolation.
3 They are done together.  So we take the two biopsies
4 together.
5        But, anyway, the features are there even
6 with the count of 28 because of the empty follicular
7 stela.  We have to use these factors all together.
8    Q.   Doctor, I thought you told me earlier
9 that a biopsy told you what was going on at a
10 particular point in time at the particular point
11 where the biopsy was taken, correct?
12    A.   Yeah.  But it also has to -- it's one
13 piece of evidence in a larger evaluation of a patient
14 being done by the hair loss expert, the clinical hair
15 loss expert.
16    Q.   And you also said that there can be more
17 than one disease process going on at the scalp at any
18 one time?
19    A.   Yes.
20    Q.   So are you saying now that you can take
21 bits and pieces from each biopsy to get to the
22 characteristic histopathological criteria to meet
23 PCIA?
24        MS. DAVIS:  Objection.  Form.
25    A.   Yeah, you know, this is why I read these

Page 112

1 cases and try to be an expert in hair loss is because
2 you have to use all of the clues, factors you have
3 been given to arrive at a diagnosis.
4    Q.   With regard to the miniaturization in
5 biopsy B, wouldn't you expect there to be
6 miniaturization in a woman at the age of 77?
7        MS. DAVIS:  Objection.
8    A.   Not to the extent that is seen here.
9 The terminal vellus of one to three is entirely
10 flipped.  So if you were just talking about normal
11 pattern hair loss, senescence with aging, you would
12 see it more along two to one or one to one, not one
13 to three where it's entirely flipped.  It's inverse
14 there.  You also wouldn't see the 43 percent
15 catagen/telogen, that has nothing to do with pattern
16 hair loss or senescence in an aging woman.
17    Q.   Now, in biopsy B's description in your
18 derma-path report, you note that there is marked
19 follicular miniaturization.  And in biopsy A you
20 indicate that there was vellus miniaturized follicles
21 predominate.  So was there a difference in the
22 miniaturization between biopsy A and biopsy B?
23    A.   Can you repeat that?  I'm sorry.
24    Q.   Sure.  In biopsy B, you talked about
25 marked follicular miniaturization as the description.

Page 113

1 Yet biopsy A, you talked about vellus miniaturized
2 follicles predominate but don't talk about marked
3 follicular miniaturization.  Was there a difference
4 in the miniaturization between biopsy A and B?
5        MS. DAVIS:  Objection.  Form.
6    A.   Well, since there was some difference,
7 yeah, but they were still both inverted.  You have
8 one to 1.4.  And then one to three.  I mean, there's
9 some difference but not marked.
10    Q.   So in biopsy A it was not marked?
11    A.   It's pretty marked.  I just didn't put
12 that in there.
13    Q.   You just didn't describe it?
14    A.   Yeah.  Well, I did, vellus miniaturized
15 follicles predominate, I think that's another way of
16 saying it.
17    Q.   But you would agree with me that
18 generally it's marked follicular miniaturization that
19 you see in your reports, correct?
20        MS. DAVIS:  Objection.  Form.
21    A.   Yeah.  They both have marked
22 miniaturization, yes.
23    Q.   Then you talk about empty follicular
24 stelae.  I assume you don't mean anything different
25 than what we already talked about for biopsy A,

29 (Pages 110 - 113)

1 correct?
2    A.   Correct.
3    Q.   And you didn't count those, correct?
4    A.   Correct.
5    Q.   Then on biopsy B, you identify
6 superficial infiltrate of lymphocytes, and you say
7 that at one plus, correct?
8    A.   Yes, correct.
9    Q.   So that was greater than what you saw in
10 biopsy A, correct?
11    A.   Correct.
12    Q.   So you had greater -- would that mean
13 you had greater inflammation in biopsy B than you had
14 at biopsy A, correct?
15        MS. DAVIS:   Objection.  Form.
16    A.   Correct.  But it was still, by my system
17 of trace to three pluses, still on the lower end.
18 Because they have trace one plus, two plus, three
19 plus.  So the two were on the lower end of that
20 scale.
21    Q.   And in biopsy B you found no
22 perifollicular fibrosis, correct?
23    A.   Correct.
24    Q.   And that was different than the trace
25 that you had found in biopsy A, correct?

1    A.   Correct.
2    Q.   Was the terminal to vellus ratio in
3 biopsy B within normal range?
4    A.   Not at all, no.  It's entirely reversed.
5    Q.   Did you --
6    A.   Three to one would be normal.  One to
7 three is rarely abnormal.
8    Q.   Did you look for fibroelastotic stelae
9 in biopsy B?
10    A.   We talked about that.
11    Q.   Same answer as A?
12    A.   Yeah.  Exactly.
13    Q.   Now, we talked about the PAS-D stain,
14 correct?
15    A.   Yes.
16    Q.   Say again what that was for.
17    A.   It was because there was some
18 inflammation.  I was trying to prove that the patient
19 has seborrheic dermatitis.  And if yeast are
20 identified and there's the lymphohistiocytic
21 infiltrate, then, by my diagnostic criteria, the
22 patient has seborrheic dermatitis.  And you have
23 something to treat there that's worth treating.
24 Standard I said before.  So it would be for the yeast
25 for that.

1    Q.   What were the results of the PAS-D
2 stain?
3    A.   They were negative.
4    Q.   And you would look into that on the next
5 break as to whether you still have the PAS-D stain?
6    A.   I know we have that.  I wanted to figure
7 out the gram stain.
8    Q.   Okay.  Let's turn back to your Rule 26
9 report, which is Exhibit 7 for Ms. Plaisance.
10    A.   Okay.
11    Q.   Let's look on page two where you talk
12 about biopsy B.  You used -- if I'm looking at this
13 right, you used the same terminology with A and B,
14 except with biopsy B you note that there's a normal
15 follicular density, correct?
16    A.   Yes.  Correct.
17    Q.   Just so it's clear, you're using
18 different terminology in your derma-path report and
19 your Rule 26 report.  In your derma-path report you
20 refer to follicular stelae.
21        In your Rule 26 report you refer to
22 empty follicular tracts.  Is there any difference in
23 those two?
24    A.   No.  They are the same thing.
25    Q.   Then we also talked about that you

1 didn't count or include in any of your reports how
2 many of those empty follicular tracts there were,
3 correct?
4    A.   Correct.
5    Q.   So you can't tell me whether there was
6 less on B than A or less on A than B, correct?
7        MS. DAVIS:   Objection.  Form.
8    A.   Correct.
9    Q.   Then you go in your report, the next
10 section is the histological findings of permanent
11 chemo-induced alopecia, correct?
12    A.   Yes.
13    Q.   And you drop a footnote.  Those were
14 taken from the Sperling book and Atlas of Hair
15 Pathology With Clinical Correlations?
16    A.   Yes.
17    Q.   Okay.  And in your report you list the
18 histological findings of PCIA as marked increase in
19 the percentage of miniaturized hairs as one; two,
20 increase in percentage of telogen follicles
21 especially when miniaturized follicles are included
22 in the counts; three, decreased total number of
23 follicles; and four, significant scarring or
24 destructive inflammation.  Is that correct?
25    A.   Yeah.  No significant scarring or

1 inflammation.
2         (Clarification by reporter.)
3     A.   Okay.  I said "no." I didn't hear you
4 say "no," so I was proceeding that last one.  No
5 significant scarring or destructive inflammation.
6     Q.   Let's mark as Exhibit 8, the chapter in
7 the Sperling book that you took this from.  It should
8 be in your box.
9         (Exhibit 8, Chapter of Sperling book,
10 was marked for identification.)
11     A.   Yup.
12     Q.   When you get there --
13     A.   I'm there.
14     Q.   Sorry.
15     A.   Yeah, it's coming up.
16     Q.   Let me know when you have it in front of
17 you.
18     A.   Yes, I have it now.
19     Q.   Am I correct that this is an Atlas of
20 Hair Pathology with Clinical Correlation, second
21 edition, with Doctor Sperling as the lead author?
22     A.   Yes.
23     Q.   This is chapter 35?  If you would go to
24 Page 197, which is the citation you used in your
25 report.

1     A.   Yeah.
2     Q.   First column, is that where you got the
3 histological findings "permanent alopecia secondary
4 to chemotherapy" on page 197?
5     A.   Yes.
6     Q.   One of the criteria is a marked increase
7 in the percentage of miniaturized hairs.
8         Is it your testimony that even though
9 you didn't use the terminology "marked increase in
10 miniaturized hairs" that is still what you meant
11 in your Rule 26 and your derma-path report for biopsy
12 A?
13     A.   Yes.
14     Q.   You also did not use "marked increase in
15 miniaturized hairs" in your Rule 26 report for either
16 A or B, is that correct?
17     A.   I have to go back and look at it.
18     Q.   Sure.  That's Exhibit 7.
19     A.   Well, the report, the pathology report
20 uses the word "marked" in one of the two biopsies.
21     Q.   But you would agree it didn't for the
22 other one?
23     A.   Right.
24         MS. DAVIS:  Objection.
25     A.   But the other one says that they

1 predominate.
2     Q.   You would agree with me that the word
3 "marked" does not appear in your Rule 26 report?
4         MS. DAVIS:  Objection.  Form.
5     A.   Yes.
6     Q.   Do you agree with the statement that the
7 increased percentage of miniaturized hair suggests
8 the possibility of clinical improvement with the use
9 of topical minoxidil?
10         MS. DAVIS:  Objection.  Form.
11     A.   No, no, I don't.
12     Q.   So you disagree with that statement
13 that's in this Sperling chapter, correct?
14     A.   Let me go back and look at that again.
15         MS. DAVIS:  Objection.
16     Q.   Page 196, up at the top.
17     A.   Yeah, I don't agree with that.
18     Q.   And going back to page 197 of Exhibit 8,
19 which is the Sperling book chapter.  In your Rule 26
20 report, when you're quoting his histological
21 findings, why did you leave out "preservation of
22 sebaceous claims"?
23         MS. DAVIS:  Objection.  Form.
24     A.   It's another one of these -- it was sort
25 of like the elastic stain.  I have had a hard time --

1 it's sort of a light factor in this but not one of
2 the big elements of it, because the elements are the
3 evidence of follicular dropout usually by the
4 decreased total number, the marked increase
5 percentage of the telogen bodies and then the
6 profound miniaturization.  For me the sebaceous gland
7 change is very secondary to this.  And I don't
8 believe it's useful.  It's not always there either.
9 So it's not one of the -- in my opinion, in my
10 professional opinion, it's not one of the big
11 features there.  You can even see in his chapter, on
12 these photomicrographs from Doctor David Whiting,
13 like Figure 35.3, there's some sebaceous lobules
14 there but maybe only in half of those remaining
15 follicles.  So I'm not entirely sure -- to me that's
16 a really soft criteria.  Even the photos in his own
17 chapter kind of call that into question as being a
18 real, you know, important element in this.
19     Q.   So by not including that in the
20 elements, even though he did, are you choosing your
21 own elements?
22     A.   Yeah.
23         MS. DAVIS:  Objection.  Form.
24     Q.   So you're not totally accepting all of
25 Dr. Sperling's criteria for PCIA, correct?

31 (Pages 118 - 121)

Page 122

1          MS. DAVIS:  Objection form.
2      A.   Dr. Sperling and I disagree on a number
3  of -- I respect him a lot but we don't agree on
4  everything.  So, I use his -- he has done great work
5  and his book is useful, medical pathology, but I read
6  a lot of hair loss cases also and have my own
7  opinions.
8      Q.   And in your derma-path report and your
9  Rule 26 report, you did not note any finding about
10  the sebaceous glands of Ms. Plaisance, did you?
11     A.   No.  I don't believe so.  I have to go
12  back and look at it again, but I don't believe I did.
13          MR. ROTOLO:  Let me know when you're
14  finish looking.
15     A.   I'm finished.
16     Q.   Okay.  So the answer to my question?  Or
17  do you remember my question?
18     A.   Can you ask it again?
19     Q.   Sure.  You did not note any finding
20  about the sebaceous glands in your derma-path report
21  or the Rule 26 report for Ms. Plaisance, did you?
22     A.   Correct.
23     Q.   Was there preservation of the sebaceous
24  glands in Ms. Plaisance's biopsy?
25     A.   I think they were present in one of the

Page 123

1  two biopsies and not present in the other because,
2  like I said, because I don't view that as an
3  important element in making a diagnosis of PCIA.  I
4  just elected to not report on that.
5      Q.   And the biopsy where there -- you said
6  there was one biopsy where there was none; one where
7  you thought there was some.  Do you know how many
8  there were in the biopsy --
9      A.   There's really not a grading system for
10  sebaceous glands.  And so, you know, to say present
11  or not present is kind of where you are with this.
12  But in a totally normal skull, you would have very
13  generous sebaceous glands present if you didn't have
14  this overlying disease.
15          The whole -- if you want to go into this
16  subject, the whole idea of the sebaceous glands being
17  there or not, is that the major scarring, primary
18  scarring alopecia that we see called lichen
19  planopilaris, is active in that area.  As I said
20  before, the infundibular isthmic region of the
21  follicle where the sebaceous stuff comes into the --
22  attaches to the follicle and sebaceous glands live.
23          So what Sperling was trying to point out
24  there is that you don't have the perifollicular
25  fibrosis that then destroys these sebaceous glands.

Page 124

1          So it's more him trying to say this is
2  not, you know, a scarring, lichen planopilaris.  It's
3  an argument that this is PCIA.  And so it's sort of
4  -- that's actually where he is coming from in saying
5  that.  I just personally don't -- to me the presence
6  or absence of fibrosis is much more important --
7  perifollicular fibrosis is much more important.
8      Q.   Would there be an absence of sebaceous
9  glands with scarring alopecia?
10     A.   Yes.  Depends on the scarring process.
11  But if you are talking about the most common disease,
12  lichen planopilaris, they are typically gone in that.
13     Q.   Frontal fibrosing, would they be gone?
14     A.   Frontal fibrosing alopecia is a sub-type
15  of lichen planopilaris.  So, yes, it depends on when
16  you biopsy and what you're biopsying.  But if it's
17  set up and marked and causing perifollicular
18  fibrosis, then they are absent.
19          The issue with frontal fibrosing
20  alopecia is it attacks the very small vellus hairs of
21  the body:  eyebrows and then hairs on your face that
22  you can't see.  And these hairs tend to go away
23  before fibrosis is set up.  So we don't get to see it
24  very well.
25     Q.   Even though there was fibrosis and

Page 125

1  inflammation in Ms. Plaisance's biopsy, it is your
2  opinion that that wasn't significant and, therefore,
3  still met the criteria of PCIA, correct?
4      A.   Correct.  Because it was trace and it
5  was only on one follicle.  If you see the typical
6  lichen planopilaris, including frontal fibrosing
7  alopecia subtype, then you see it around multiple
8  follicles across the biopsy.
9      Q.   If you just look at biopsy B from Ms.
10  Plaisance, it doesn't meet the histopathological
11  characteristics of the PCIA, does it?
12          MS. DAVIS:  Objection.  Form.
13     A.   Well, it certainly isn't normal because
14  catagen/telogen percentage of 43 percent.  In a
15  reverse terminal vellus of one to three is -- that
16  means there has to be something else.  But, as I said
17  before, we don't read these biopsies in isolation.
18  If we did, we would put them in entirely different
19  reports and not look at them together.  But it
20  certainly is augmented by the features of A also,
21  given the fact that there were 28 remaining hairs.
22     Q.   I understand that, Doctor, but that
23  wasn't my question.  My question is:
24          If you just had biopsy B, would that
25  meet the characteristics of PCIA, P-C-I-A?

32 (Pages 122 - 125)

1    MS. DAVIS: Objection. Form.
2    A.    You know, it's hard for me -- I would
3  have to have -- we would have to go back in time and
4  read that one entirely separately because I'm so sort
5  of like -- you can't read a case like this without
6  taking in the context of both biopsies. So I would
7  be interested to know what I would do if I were only
8  given that biopsy. I'm pretty sure I would still
9  definitively call it PCIA. Because of the empty
10  follicular stela. But it's certainly -- we use all
11  the evidence we have, which is both biopsies.
12    Q.    In your 26 -- Rule 26 report, don't you
13  even admit that the biopsy B does not meet PCIA when
14  you say it is most consistent with permanent
15  chemotherapy-induced alopecia?
16    A.    Right.
17    MS. DAVIS: Objection. Form.
18    A.    Because it has these empty stela, we
19  know that we have had some follicular dropout. Thank
20  goodness she did two biopsies though, huh?
21    Q.    Biopsy A you say is diagnostic?
22    A.    Yeah, I do believe that.
23    Q.    But you don't use that terminology for
24  B.
25    A.    Yeah.

1    Q.    So there is a difference?
2    MS. DAVIS: Objection. Form.
3    A.    Well, as I said before, we read them
4  together. So to me it's a moot point.
5    Q.    Then in your Rule 26 report in the next
6  to the last paragraph you say -- or I guess third to
7  the last paragraph, right after the histological
8  findings, you say: "The constellation of
9  histological findings between the two biopsies is
10  consistent with a diagnosis of PCIA."
11    A.    Right.
12    Q.    So then to reach your opinion, you have
13  to refer to this constellation of characteristics
14  between A and B, correct?
15    A.    Exactly.
16    MS. DAVIS: Objection. Form.
17    A.    Which is what I do as a hair loss
18  pathology expert.
19    Q.    So by looking at the constellation of
20  the characteristics between A and B, isn't that
21  another way of saying that neither one of them meet
22  the definition of PCIA?
23    MS. DAVIS: Objection. Form.
24    A.    No.
25    Q.    Why not?

1    A.    Because the main criteria of evidence of
2  follicular loss, regardless of what the number is,
3  the presence of these very, very abnormal number of
4  telogen bodies, and then the profound miniaturization
5  together in this clinical context is diagnostic of
6  PCIA.
7    You know, if you take any one of these
8  findings and put it entirely alone, then we have a
9  differential diagnosis. So we have a differential
10  diagnosis for miniaturization that includes more
11  things than PCIA. We have a differential diagnosis
12  just for a catagen/telogen shift that is more than
13  PCIA. And we have a differential diagnosis for
14  follicular dropout or empty stela. And that is more
15  than PCIA. But when you put all these three
16  together, that's how you come up with the diagnosis.
17    Q.    Putting all those three together for A
18  and B, does that necessarily mean that each one of
19  them qualifies on its own as characteristic of PCIA?
20    A.    Well to me it's a moot point.
21    MS. DAVIS: Object to the form.
22    A.    To me it's a moot point because we are
23  taking them together.
24    Q.    Are you taking characteristics from both
25  together or are you taking characteristics from each

1  one?
2    MS. DAVIS: Objection. Form.
3    A.    As I said, I believe that the
4  fundamental features, the three fundamental features
5  that I've already outlined, the catagen/telogen
6  bodies, evidence of follicular loss and marked
7  miniaturization, taken together are present in both
8  of these biopsies.
9    Q.    If that is the case for biopsy B, why
10  didn't you use the word "diagnostic" instead of the
11  word "consistent"?
12    MS. DAVIS: Objection. Form.
13    A.    I don't know. But I still think it's --
14  you know, when I read the biopsies, I was quite
15  comfortable lining each one as PCIA. And I would
16  again. So what -- using that word in the Rule 26
17  report isn't going to change what I'm going to put on
18  the diagnosis of PCIA for both biopsies.
19    Q.    Isn't that the problem with their not
20  being defined criteria for PCIA because you can't
21  pick and choose the characteristics to which you
22  think are important?
23    MS. DAVIS: Objection. Form.
24    A.    This is why I work in hair loss
25  pathology, because most dermatopathologists don't

33 (Pages 126 - 129)

1 want to delve into this kind of gray area of
2 diagnostics. And it helps for someone like me to see
3 a lot, to see more of these cases than other people,
4 to focus on them, and then to pull together not only
5 the published experience but also just my
6 professional experience of reading thousands of hair
7 loss biopsies over time and continuing to learn about
8 this.
9        But this is something where, you know,
10 we have a state-of-the-art now, based upon published
11 literature, and then based upon professional
12 experience, but it's changing over time as we see
13 more of these cases. You know, these drugs are new
14 too. We see new chemotherapeutic drugs out. We see
15 new treatments, we see people living longer. So the
16 ball is always in motion. We are always learning
17 from this and changing, but we do the best we can
18 professionally with what we have at the moment, in
19 the moment.
20    Q.    So are you saying that the
21 histopathological criteria for PCIA is still evolved?
22    A.    I think --
23        MS. DAVIS: Objection.
24    A.    Yeah, it's certainly evolving. It's
25 nice to be getting more experience. But I mean, we

1 really -- and Sperling really did a good job in the
2 book of identifying these fundamental basic features.
3 And I have repeatedly, I said this earlier, gotten
4 cases where I look in the microscope and say "this is
5 PCIA" and I don't have the history of chemo. I call
6 and get the history and, sure enough, it's there.
7        So we know enough to know that what
8 that, you know, looks like. I can tell you most skin
9 pathologists though don't see enough of these cases
10 where they can look in the microscope, look at the
11 image and say "this is PCIA." So it helps to see a
12 lot of these cases. This is one of the reasons I do
13 this.
14    Q.    And the other reason it's evolving is
15 because there hasn't been any new literature since at
16 least 2017, 2018?
17    A.    Yeah, well, there's so few cases. A lot
18 of these women have been through so much with their
19 breast cancer and surgeries and chemo and radiation
20 that people are loath to, you know, do more to them.
21        Then a lot of these women, I think,
22 don't seek help, you know, it's something that
23 happens down the road from their treatment. So we
24 were limited in that experience because of that, for
25 those reasons.

1    Q.    Well, regardless of the reason, the
2 literature is limited, correct?
3        MS. DAVIS: Objection. Form.
4    A.    Yes, the number of biopsies on these
5 women are limited; therefore, the literature is
6 limited.
7    Q.    The next part of your Rule 26 report is
8 your differential diagnosis, correct?
9        MS. DAVIS: Objection. Form.
10    Q.    Bottom of page two.
11    A.    Yes.
12    Q.    And your differential diagnosis includes
13 chronic telogen effluvium, correct?
14    A.    Yes.
15    Q.    You say that: "If this is not chronic
16 telogen effluvium because it would not cause
17 permanent follicular loss," correct?
18    A.    Correct.
19    Q.    What are you referring back to in your
20 Rule 26 report or your derma-path report to call
21 permanent follicular loss? Is it the empty
22 follicular tracts or stelae?
23    A.    Yes. Impaired with the low count on A
24 too. Certainly the empty stela, the empty tracts.
25    Q.    Would all those be permanent?

1    A.    Yes.
2    Q.    Is there scientific or medical
3 literature that says permanent follicular loss is a
4 characteristic of PCIA?
5        MS. DAVIS: Objection. Form.
6    A.    I believe so, yes.
7    Q.    Okay.
8    A.    I think in Sperling, the exhibit with
9 the Sperling chapter --
10    Q.    Anything else?
11    A.    Well, we can go back and go through all
12 of the paper by paper and look at them. But I think
13 that's been the published experience of the two, you
14 have follicular loss, permanent follicular loss,
15 because why you have alopecia. That's why the
16 patient's look bald.
17    Q.    It wasn't a trick question, Doctor. I
18 was just asking if you knew any other literature that
19 said that?
20    A.    We can pull it out and go through that.
21    Q.    You did that in your prior depositions
22 plenty. I will not subject you to that again.
23        Then, what were your other differential
24 diagnosis in paragraph at the bottom of page two of
25 your Rule 26 report for Ms. Plaisance?

34 (Pages 130 - 133)

Page 134

1    A.    What exhibit is that again?
2    Q.    That would be Exhibit 7.
3    A.    Got it.  Well the -- beyond the chronic
4  telogen effluvium?
5    Q.    Right.
6    A.    Well, I put in trichotillomania, pulling
7  the hair out.  Because that, as I said alone, when
8  you just take one of these features, like a
9  catagen/telogen shift, you have a differential there.
10  So when you see a catagen/telogen shift, it can be
11  chronic telogen effluvium, it can be PCIA, but it can
12  also be trichotillomania.
13        So it's specifically addressing those
14  because that was one of the histologic findings.  So
15  trichotillomania, pulling the hair out.  The other
16  features of this are not present at all.  Generally
17  you can tell if they are doing that, they are also
18  rubbing the scalp.  So you can tell the skin surface
19  has been rubbed, when you see these fractured hair
20  shafts.  Then melanin, pigment from the hairs leaks
21  out.  You see that at the end of the microscope.
22        Then I address the scarring, alopecia,
23  primary scarring alopecia, namely lichen
24  planopilaris.  Then I mentioned the CCCA, the central
25  centrifugal cicatricial alopecia also.

Page 135

1    Q.    When you talk about the lichen
2  planopilaris, are you also excluding other types of
3  primary scarring alopecia?
4    A.    Yeah.  But that's the main one.  That's
5  like 99 percent of it.  And I consider the lichen
6  planopilaris and the CCCA to be histologically
7  identical, if not the same, disease.
8    Q.    What about frontal fibrosing alopecia?
9    A.    It's a sub-type of lichen planopilaris.
10    Q.    Your differential diagnosis did not
11  include female pattern hair loss, did it?
12    A.    Well, I didn't address it in here of why
13  it's not female pattern hair loss.  But the finding
14  of this really dramatic catagen/telogen shift.  Then
15  also the evidence of the permanent hair loss ruled
16  that out, ruled that out.
17    Q.    That was my question.  You didn't
18  discuss in your Rule 26 --
19    A.    I did not put it in Rule 26, no.
20    Q.    And you did not include, as a
21  differential diagnosis, any sort of endocrine-induced
22  alopecia, did you?
23    A.    No, which also wouldn't produce those
24  catagen/telogen shift.
25    Q.    If you had not known that Ms. Plaisance

Page 136

1  had undergone chemotherapy what would your diagnosis
2  have been?
3        MS. DAVIS:  Objection.  Form.
4    A.    I would have picked up the phone and
5  called the clinician and said "When did this patient
6  have chemotherapy?"  And gotten the history.
7    Q.    If Ms. Plaisance's hair grew back after
8  chemotherapy, would that have changed your opinion in
9  this case?
10    A.    Well, if you go back to the Sperling
11  book, you have the acute hair loss, then you have the
12  permanent hair loss.  So we have to be specific in
13  separating those two out.
14        So the regrowth after chemo isn't
15  associated with PCIA.  I know there is cases where
16  the people say it never grew back or it never grew
17  after that or I didn't have to get it cut anymore.
18  There's all those histories.  But in general, the
19  regrowth after chemo is entirely separate from
20  whether the patient develops PCIA.
21    Q.    Can the patient have PCIA and still have
22  hair?
23    A.    Yes, for sure.
24    Q.    Does the patient have a lot of hair?
25    A.    I don't know.  I'm not a clinician.  I

Page 137

1  don't think I have ever seen one of these patients
2  live.
3    Q.    So you don't know what Ms. Plaisance's
4  hair looks like?
5    A.    No.
6    Q.    And you didn't look at the pictures from
7  Tosti's clinical exam?
8    A.    I don't think the one I looked at had
9  pictures.
10    Q.    So you didn't even -- you didn't even
11  look at Tosti's clinical exam photos of where the
12  biopsies were taken from, correct?
13    A.    No, I don't believe I had that either,
14  no.
15    Q.    Even if Ms. Plaisance has PCIA, you do
16  not know from your histopathological review which
17  drug caused it, correct?
18    A.    Correct.
19        MR. ROTOLO:  Why don't we take a break
20  and then we will move onto Ms. Guilbault.
21        THE WITNESS:  Okay.  And I will check
22  the gram thing while we are off.
23        THE VIDEOGRAPHER:  Thank you.  This is
24  the videographer.  The time is 4:25.  We are going
25  off the record.  This ends media file three.

35 (Pages 134 - 137)

1          (Break in proceedings.)
2          THE VIDEOGRAPHER:  The time is 4:52.  We
3  are back on the record.  We are beginning media file
4  four.
5  BY MR. ROTOLO:
6      Q.    Mr. Thompson, before we move onto Ms.
7  Guilbault, were you able to check on the PAS-D stains
8  and the gram stains?
9      A.    Yes.  The gram -- there's an error in my
10  Rule 26 report and a gram stain was not performed.
11  That's a sentence that was not supposed to be in
12  there.  So there's no gram stain that was prepared,
13  that was ordered, that was read.  It's an error in
14  the Rule 26 report.
15      Q.    Okay.  What about the PAS-D stain?
16      A.    So the PAS stain, they -- indeed they
17  shipped only the six H&E, three for A and B, and then
18  nine unstained.  And the PAS stain, they are looking
19  for -- there's two slides that was performed on
20  unstained one and unstained two.  I have the digital
21  image of it that I read.  But we can't remember to
22  early May at the moment, but my assistant is thinking
23  that I took the glass slides to look at them through
24  the microscope, the old school microscope, and that
25  they are still sitting in my office on a tray

1  somewhere.
2          So they haven't left the site but they
3  don't know where the two slides are right now.  But I
4  read them and interpreted them as negative.  And as
5  soon as they find them we can send those.  I think
6  they -- the case got sent without those two because I
7  kept them to read them.  Sometimes when we are
8  looking for yeast or bacteria, little things, you
9  still use the old microscope.
10      Q.    Okay.  If you could -- if you determine
11  if you have them and where they are, if you can just
12  let Lauren and Palmer know and I will follow up with
13  both of them after the deposition, fair enough?
14      A.    Okay.
15      Q.    Let's move onto Ms. Guilbault's case.
16  Doctor, I apologize.  Some of the questions are going
17  to be the same; some are going to be very similar,
18  but you understand they are two separate cases so we
19  have to go through some of this again.  Okay?
20      A.    Yup.
21          MR. ROTOLO:  Let me mark as Exhibit 9,
22  Mrs. Guilbault's derma-path report that you prepared.
23  Amy, we will move that into the Exhibit Share box.
24          MS. MCINTIRE:  It should be in.
25          (Exhibit 9, Dermatopathology report for

1  Guilbault, was marked for identification.)
2      Q.    Doctor, Exhibit 9 is two-page derma-path
3  report that you prepared and signed?
4      A.    Yes.
5      Q.    And the date of the report is April 29th
6  of 2021?
7      A.    Yes.
8      Q.    And did you prepare this document?
9      A.    Yes.
10      Q.    And is this document a finding of your
11  review of the pathology of Ms. Guilbault?
12      A.    Yes.
13      Q.    And did you receive the specimens that
14  are the subject of Exhibit 9 from Dr. Tosti?
15      A.    Yes.
16      Q.    And what did you receive from Dr. Tosti?
17      A.    Two specimens that the dimensions, that
18  we measured in the gross section of this report, are
19  four-by-four-by-five millimeters skin punches and
20  four-by-four-by-seven skin punch.
21      Q.    And according to Exhibit 9, you received
22  the specimens on April 27 of 2021, correct?
23      A.    Yes.
24      Q.    You prepared your report on April 29th
25  of 2021, correct?

1      A.    Yes.
2      Q.    Did you receive a requisition form with
3  the two specimens that Dr. Tosti sent you?
4      A.    Yes.
5      Q.    And I believe we talked earlier that a
6  requisition form is necessary when you receive
7  specimens, correct?
8      A.    Correct.
9          MR. ROTOLO:  Let me mark as Exhibit 10
10  the Guilbault requisition form.  Amy, that is Tab R.
11          MS. MCINTIRE:  It should be in.
12          (Exhibit 10, Guilbault requisition form,
13  was marked for identification.)
14      Q.    Doctor, is Exhibit 10 the requisition
15  form you received along with the pathology of Ms.
16  Guilbault?
17      A.    Yes.
18      Q.    And this requisition form was sent to
19  you by Dr. Tosti?
20      A.    Yes.
21      Q.    So someone in Dr. Tosti's office would
22  have completed the form that is Exhibit 10?
23      A.    Yes.
24      Q.    Was the information on the requisition
25  form the only information you had on Ms. Guilbault

36 (Pages 138 - 141)

Page 142

1 when you reviewed her pathology?
2    A.   Yes.
3    Q.   Other than the requisition form, did you
4 have any other information when you reviewed Ms.
5 Guilbault's pathology?
6    A.   No.
7    Q.   You did not review any other records,
8 documents or photographs specifically relating to Ms.
9 Guilbault before or at the time you prepared your
10 derma-path report, correct?
11   A.   Correct.
12   Q.   With regard to Ms. Guilbault's
13 pathology, how did the clinical diagnosis and the
14 requisition form impact your review?
15   A.   Well, I knew what Dr. Tosti, who is a
16 clinical hair loss expert's opinion was of the
17 diagnosis.  I knew the patient's age, gender, and
18 then the two sites, the regions of her scalp.
19   Q.   Did you review -- sorry.  Were you
20 finished?
21   A.   No.  Go ahead.
22   Q.   Did you review Ms. Guilbault's pathology
23 on April 29th of 2021 when you prepared your
24 derma-path report?
25   A.   Yes, I would have reviewed it as I

Page 143

1 prepared the report.
2    Q.   So from the requisition form that was
3 sent along with the specimens of Ms. Guilbault, you
4 knew the date of birth of Ms. Guilbault, correct?
5    A.   Yes.
6    Q.   She was, I think, 69 years old at the
7 time, correct?
8    A.   68 maybe by then.  Yeah.
9    Q.   You knew her name, correct?
10   A.   Yes.
11   Q.   You knew that she was female, correct?
12   A.   Yes.
13   Q.   And, again, there was no descriptors of
14 Ms. Guilbault's scalp on Exhibit 10, the requisition
15 form, correct?
16   A.   Correct.
17   Q.   So you did not know whether Ms.
18 Guilbault's hair loss was diffuse or patchy at the
19 time you reviewed her pathology, correct?
20        MS. DAVIS:  Objection.  Form.
21   A.   I wasn't given that information.
22   Q.   And is that one of the things that is
23 important to know when you were reviewing Ms.
24 Guilbault's pathology?
25   A.   Well, it's -- certainly if you get no

Page 144

1 other information, that's important to know in the
2 context of the patient being seen by Dr. Tosti, as I
3 said before, most -- when it comes from a hair loss
4 clinical expert, they usually tell you what they
5 think it is or two things, if they are not sure.
6        So knowing the PCIA, clinical diagnosis
7 was enough information to work with.
8    Q.   And you mentioned the clinical diagnosis
9 and the clinical diagnosis that was sent to you
10 before you reviewed her pathology, Ms. Guilbault's
11 pathology, was permanent alopecia after chemotherapy;
12 correct?
13   A.   Yes.
14   Q.   And with regard to Ms. Guilbault's case,
15 did that create any sort of bias, knowing, before you
16 reviewed her pathology, that she had chemotherapy?
17        MS. DAVIS:  Objection.  Form.
18   A.   Well, any clinical information creates
19 bias, but it also helps.  So we try to remain
20 objective in the interpretation, but the goal here
21 isn't just to agree with what the clinician is
22 sending in.  The goal is to get the right diagnosis
23 histologically, you know, and agreeing is nice but we
24 are not there to just be nice.  We are there to make
25 the right diagnosis.  It's one test in a bigger, you

Page 145

1 know, evaluation that I assume that Dr. Tosti does.
2 So it's one of the features we use.  But also, as we
3 said earlier today, a lot of hair loss experts want
4 to have a biopsy of a permanent -- where there's a
5 permanent hair loss, permanent alopecia present, they
6 want to have a histopathology report confirming that
7 diagnosis.  A lot of experts want that, want that
8 stamp, want that confirmation in their care of the
9 patient.
10   Q.   Knowing that there was only one
11 diagnosis -- clinical diagnosis of permanent alopecia
12 after chemotherapy, would that be the first thing you
13 would try to look at when you were reviewing Ms.
14 Guilbault's pathology?
15        MS. DAVIS:  Objection.  Form.
16   A.   No.  I try to approach it -- approach it
17 without trying to make it fit that.  You know, if it
18 turns out it's lichen planopilaris, it's lichen
19 planopilaris; if it turns out it's pattern hair loss,
20 then I, at that point, work to acknowledge the
21 clinician's differential or diagnosis they have given
22 me but take that into the context of what I'm seeing.
23 Certainly sometimes the biopsy on the clinical or the
24 true diagnosis don't match up, but that's uncommon.
25   Q.   With regard to Ms. Guilbault, if the

37 (Pages 142 - 145)

1 histopathological characteristics of PCIA were
2 defined, why would you need to know that Ms.
3 Guilbault had undergone chemotherapy to reach that
4 diagnosis?
5         MS. DAVIS: Objection. Form.
6     A.   Can you say that again?
7     Q.   Sure. If the histopathological
8 characteristics of PCIA are defined, why would you
9 need to know that Ms. Guilbault had undergone
10 chemotherapy in order to reach that diagnosis?
11         MS. DAVIS: Objection. Form.
12     A.   I just think it's the responsible thing
13 to do. You know, there's a lot of variability in the
14 world. And telling someone they have
15 chemotherapy-induced alopecia when they might not
16 have had chemotherapy is just easy to confirm this
17 and get the story.
18     Q.   And on the requisition form, which is
19 Exhibit 10, there was no differential diagnosis by
20 Dr. Tosti, correct?
21     A.   No.
22     Q.   And I think you testified earlier that
23 that is not unusual for someone you consider a hair
24 loss expert, correct?
25     A.   Correct.

1     Q.   Isn't female pattern hair loss a
2 differential diagnosis for PCIA that should have been
3 included on the requisition form of Ms. Guilbault?
4         MS. DAVIS: Objection. Form.
5     A.   It doesn't make or break it. If it's
6 there, I assess it the same way. And if I -- if it
7 comes in and just saying PCIA and then I think it's
8 female pattern hair loss, I will call it that. I
9 will sign it out that way. I have done that in
10 review of these PCIA cases. You know, if the
11 features of PCIA are not there, they are not there.
12 So...
13     Q.   For someone of Ms. Guilbault's gender
14 and age, female pattern hair loss should be a
15 differential diagnosis that needs to be ruled out,
16 correct?
17     A.   Yes.
18     Q.   And since Dr. Tosti indicated her
19 clinical diagnosis was permanent chemotherapy (sic)
20 alopecia after chemotherapy, do you know why she
21 would order a biopsy if the clinical diagnosis was
22 only one thing?
23         MS. DAVIS: Objection. Form.
24     A.   It's what I said before. A lot of hair
25 loss experts want to have a pathology report with the

1 diagnosis of a permanent alopecia, if that's what the
2 patient has. I said this before, that I called one
3 of our local hair loss experts and said I really
4 don't think you need to biopsy these, some of these
5 cases. The expert said: "No, I feel like I need to
6 have this in the documented record for ongoing
7 treatment of this patient."
8     Q.   Given Ms. Guilbault's age and gender,
9 would you agree that she had some element of female
10 pattern hair loss?
11         MS. DAVIS: Objection. Form.
12     A.   You know, I don't know in this because
13 the two biopsies I got were so altered from -- with a
14 low follicular count and with the catagen/telogen
15 shift, it wasn't possible in these biopsies to tell.
16         There are women that age that don't have
17 -- not a hundred percent of women, 68, 69 years old,
18 do not have female pattern hair loss.
19     Q.   But because you -- in your opinion she
20 had PCIA. That would prevent you from determining
21 whether she had any preexisting female pattern hair
22 loss?
23     A.   Yeah. We can't tell that.
24         MS. DAVIS: Objection. Form.
25     Q.   You did not know when Ms. Guilbault

1 underwent chemotherapy when you completed your
2 derma-path report, correct?
3     A.   Correct.
4     Q.   And you did not know what chemotherapy
5 drugs Ms. Guilbault was administered when you
6 completed your derma-path report, correct?
7     A.   Correct.
8     Q.   You did not know what other medications
9 Ms. Guilbault was on at the time of her biopsy,
10 correct?
11     A.   Correct.
12     Q.   And you had no information about any
13 history of alopecia issues with Ms. Guilbault at the
14 time you reviewed her pathology, correct?
15     A.   Correct.
16     Q.   And you had no information about any
17 history of alopecia treatments that Ms. Guilbault had
18 at the time you reviewed her pathology, correct?
19     A.   Correct.
20     Q.   And you had no other information about
21 her clinical presentation other than what was in the
22 requisition form at the time you reviewed her
23 pathology, correct?
24         Did you answer, Doctor? I didn't hear
25 you.

38 (Pages 146 - 149)

1    A.    That's correct.  I'm sorry.

2    Q.    You had no information about any
3  treatment she may have received from dermatologists
4  at the time you reviewed her pathology, correct?

5    A.    Correct.

6    Q.    The other information that you had on
7  Ms. Guilbault at the time you reviewed her pathology
8  was that biopsy A was taken from the frontal scalp,
9  is that right?

10   A.    Yes.

11   Q.    And that biopsy B was taken from the
12 vertex scalp, is that correct?

13   A.    Correct.

14   Q.    And where precisely the biopsies of Ms.
15 Guilbault were taken, you don't know; correct?

16   A.    Yeah, I know they were in those regions
17 of the scalp.

18   Q.    And do you know why Dr. Tosti chose
19 those particular sites to take the biopsy?

20        MS. DAVIS:  Objection.  Form.

21   A.    No.

22   Q.    Did you know anything else from the
23 requisition form that has been marked as Exhibit 10?

24   A.    No.

25   Q.    Did you review the Tosti clinical photos

1  before or at the time you prepared your derma-path
2  report?

3    A.    No.

4    Q.    Let's go back and look at your
5  derma-path report, which is Exhibit 9, for Ms.
6  Guilbault.  Are you there, Doctor?

7    A.    Yes.

8    Q.    Exhibit 9 on page one of two, is this
9  the standard derma-path report that you use in your
10 practice?

11   A.    Yes.

12   Q.    And when completing these derma-path
13 reports, do you assure that the information contained
14 in them is accurate and correct?

15   A.    Yes.

16   Q.    And is that because you know that these
17 derma-path reports can be used to treat the patient?

18   A.    Yes.

19   Q.    When you reviewed Ms. Guilbault's
20 pathology for her lawsuit, did you follow your normal
21 procedure for reviewing pathology that you use in
22 your medical practice?

23   A.    Yes.

24   Q.    On the first page of Exhibit 9, your
25 derma-path report, under the diagnosis block, is that

1  your diagnosis that's contained in that block?

2    A.    Yes.

3    Q.    And for both biopsy A and biopsy B, you
4  have diagnosed permanent chemotherapy-induced
5  alopecia, correct?

6    A.    Correct.

7    Q.    And there's no differential diagnosis on
8  your part either in this report, correct?

9    A.    Correct.

10   Q.    And for Ms. Guilbault, was it your
11 diagnosis, based upon the pathology, that she had
12 PCIA?

13   A.    Yes.

14   Q.    And that was for each biopsy, A and B?

15   A.    Yes.

16   Q.    And in your opinion could Ms. Guilbault
17 have no other type of alopecia?

18        MS. DAVIS:  Objection.  Form.

19   A.    I certainly didn't see any other
20 histologic evidence in the two biopsies of another
21 process.

22   Q.    So in your opinion, Ms. Guilbault did
23 not have female pattern hair loss?

24   A.    You know, I would defer to Dr. Tosti for
25 that summary because the two biopsies received, as I

1  said, were so altered by the PCIA change that you
2  can't make another diagnosis.  It's not possible.

3    Q.    And in your opinion did -- was it -- did
4  Ms. Guilbault have chronic telogen effluvium?

5    A.    No.

6    Q.    I know sometimes you consider these the
7  same thing, but did Ms. Guilbault have androgenetic
8  alopecia?  Do you consider that the same as female
9  pattern?

10   A.    Yeah.  I line those two together.

11        As I said, I would defer, once again, to
12 Dr. Tosti's overall clinical evaluation because the
13 two biopsies showed PCIA and I was unable to look for
14 other -- or see evidence of androgenetic alopecia in
15 them given the changes that are present from the
16 PCIA.

17   Q.    So whether Ms. Guilbault had female
18 pattern hair loss, you cannot determine from your
19 review of the pathology, correct?

20        MS. DAVIS:  Objection.  Form.

21   A.    Correct.

22   Q.    Sorry.  We didn't hear your answer.

23   A.    Correct, yes.

24   Q.    On page two of Exhibit 10 of your
25 derma-path report, your section on microscopic.  And

Page 154

1 this was a section that you completed while reviewing
2 the pathologies?
3    A.   Yes.
4    Q.   I may have already asked you this
5 question, Doctor, and I apologize.  But do you
6 remember whether you took any micro photos of Ms.
7 Guilbault's pathology as you were reviewing it?
8    A.   I don't believe so; no, I didn't.
9    Q.   Now, with regard to Ms. Guilbault's
10 pathology, would you agree that biopsy A and biopsy B
11 for Ms. Guilbault were similar?
12    A.   Yes.
13    Q.   And both biopsies had follicular
14 miniaturization?
15    A.   Yes.
16    Q.   Now in neither biopsy A or biopsy B on
17 your derma-path report, that's Exhibit 10, you did
18 not describe that miniaturization as marked, correct?
19    A.   That's Exhibit 9, right?  Exhibit 9, not
20 ten.
21    Q.   Yeah.  Sorry.  Exhibit 9.  Sorry.
22       MS. DAVIS:  Objection.  Form.
23    A.   I did not call them miniaturization
24 marked, correct.
25    Q.   Now, biopsy A had a total follicular

Page 155

1 count of 23; and biopsy B had a total follicular
2 count of 22.  Correct?
3    A.   Correct, yes.
4    Q.   And you describe that as a low
5 follicular density, correct?
6    A.   Yes.
7    Q.   Now you testified earlier, am I right,
8 that 25.12 is the average, correct?
9       MS. DAVIS:  Objection.  Form.
10    A.   Yes.
11    Q.   So with 23 and 22 total follicular
12 count, are you calling that low with an average of
13 25?
14       MS. DAVIS:  Objection.  Form.
15    A.   Yeah, it's low.
16    Q.   We talked earlier about 25 was the
17 average.  It could be less or it could be more,
18 correct?
19    A.   Uh-huh.
20       MS. DAVIS:  Objection.  Form.
21    Q.   What is the determination that makes 23
22 and 22 low, if they can be on either side of 25?
23       MS. DAVIS:  Objection.  Form.
24    A.   Well, you know, once again, it comes
25 down to also is there any other evidence of

Page 156

1 follicular dropout and loss that changes the --  that
2 changes the equation there regardless of the number?
3 But here we have two biopsies.  You know, they both
4 show -- show a low count on both of them.
5    Q.   So in your opinion, 23 total follicles
6 and 22 low follicles is considered low even though
7 the average is 25, correct?
8    A.   Uh-huh.
9       MS. DAVIS:  Objection.  Form.
10    Q.   Is that a yes?
11    A.   Yes.
12    Q.   Can you tell me specifically how you
13 performed the follicular count on Ms. Guilbault's
14 pathology?
15    A.   Yeah.  The sampling for each of the two
16 biopsies has three slides with three cross-sections
17 on each slide, and the nine, so the nine total
18 horizontal sections step through the tissue at barely
19 equal intervals, starting at the skin surface and
20 going down to the deepest portion of the biopsy.
21       And what I do to get the counts is I
22 start at the bottom of the biopsy and count the
23 number of hairs that are long enough to extend into
24 the very deep dermis and into the subcutaneous fat,
25 the subcutis.  And like for A, that would be 7.  As I

Page 157

1 move up, I count the catagen/telogen bodies.  Often,
2 as I said before, marking them in the digital system
3 so that I can keep track of them, they are sometimes
4 on different level sections, and come up with a count
5 of seven on biopsy A.  Then I move upward and find
6 the section that is the highest level in the dermis
7 before you start seeing the surface skin, the surface
8 epidermis.  Go right below that.  Then I do the total
9 count there for 23.  Then I subtract the terminal and
10 the catagen, 14 from the 23, and get nine for the
11 small hairs, the vellus miniaturized hairs.
12    Q.   And for Ms. Guilbault's pathology, how
13 did you go about determining whether a hair was
14 terminal, vellus or indeterminant?
15    A.   As I said, the terminal are longer and
16 extend into the deep dermis and into the subcutis.
17 So I look at the very deepest sections to count the
18 number that are still large.  Then, as I said, the
19 catagen/telogen have specific characteristics that
20 you look for.  Singly, necrotic keratinocytes.  The
21 basement membrane around the hair, follicle, kind of
22 a wavy outline.  Then the telogen bodies also have
23 these, little, like, almost flower-like forms to them
24 with blue staining, small blue cells.  So identify
25 them through those features.

40 (Pages 154 - 157)

1        Then the miniaturize are just left over,
2   the small ones that don't extend far into the dermis.
3        Q.    Can you have terminal hairs that don't
4   go all the way down into the deep tissue?
5        A.    Generally, no.
6        Q.    And do you know what Ms. Guilbault's
7   density was -- hair density was before her
8   chemotherapy?
9        A.    No.
10       Q.    Do you know what her hair -- Ms.
11  Guilbault's hair density is on other parts of her
12  scalp?
13       A.    No.
14       Q.    Doctor, on Ms. Guilbault's pathology you
15  did not look for any fibroelastic stelae in the
16  subcutaneous tissue, did you?
17          MS. DAVIS: Objection. Form.
18       A.    No.
19       Q.    In Ms. Guilbault's case, should there
20  have been a biopsy from a non-androgen dependent area
21  of the scalp?
22          MS. DAVIS: Objection. Form.
23       A.    No, I don't believe that's necessary.
24       Q.    And why is that?
25       A.    While I defer to the, you know, the

1   clinical expert on where they sample, but I think in
2   a woman with -- presumably with diffuse hair loss,
3   it's not -- the most important thing is to try to
4   stay away from the hairline all around. That would
5   be my only direction. But I think beyond that,
6   there's not going to be any difference in the overall
7   findings.
8        Q.    And you're assuming that Ms. Guilbault
9   has diffuse hair loss, correct?
10          MS. DAVIS: Objection. Form.
11       A.    Yes. By the PCIA.
12       Q.    I'm sorry. In both biopsy A and B, were
13  the terminal to vellus ratios consistent with female
14  pattern hair loss?
15          MS. DAVIS: Object to the form.
16       A.    They are generally more profound than I
17  see in female pattern hair loss in a patient of this
18  age. They are actually reversed a little. One to
19  1.2, one to 1.4. Hard to calculate in this because
20  of the catagen, so many catagen/telogen bodies, so
21  it's a little bit harder to calculate. But it's
22  generally the more miniaturized than you see in the
23  run-of-the-mill female pattern hair loss, which also
24  does not have all the telogen bodies present. That's
25  not a feature of female pattern hair loss.

1        Q.    And there was no inflammation or
2   fibrosis in either one of Ms. Guilbault's biopsies,
3   correct?
4        A.    Correct.
5        Q.    On biopsy A, were any of the
6   catagen/telogen follicles terminal?
7        A.    Presumably so, yes.
8        Q.    Do you know how many?
9        A.    You know, I said this before, I
10  generally -- they are hard to assess the size. I
11  generally give half the terminal and half the vellus,
12  which would be three and a half in each direction.
13  It's one of the limitations of doing this type of
14  calculation.
15       Q.    With regard to biopsy B, do you know how
16  many of the catagen/telogen follicles were terminal?
17       A.    No, I don't definitively know.
18       Q.    Would you have allocated them in the
19  same manner?
20       A.    At this moment I don't recall how I
21  allocated them. I don't think I -- but I don't
22  remember if I looked at the size and made a guess or
23  if I just divided them up. I would have to
24  recalculate it. This is the softest, least
25  definitive part of this table that I make.

1        Q.    How many indeterminant hairs were in
2   biopsy A?
3        A.    Well, the vellus -- indeterminate?
4        Q.    Yes.
5        A.    Are you able to define indeterminant?
6   I'm not exactly sure what you're asking.
7        Q.    Well, would you agree with me that what
8   you have in the vellus are not all vellus, correct?
9          Did you allocate any to anything else?
10          MS. DAVIS: Objection. Form.
11       A.    Say again. I don't understand.
12       Q.    Did you allocate any of the vellus hairs
13  to any other category? Are those all vellus hairs?
14       A.    Those are all vellus hairs. Those are
15  all vellus, yes.
16       Q.    Did you note the hair shaft diameters of
17  the hair in Ms. Guilbault's pathology?
18       A.    I don't measure those. One thing that
19  happens in my practice is a lot of the hair shafts
20  fall out of the tissue during processing.
21          So we are left with a follicular
22  epithelium that often the shafts are actually missing
23  from the biopsy. They get washed out during the
24  staining.
25       Q.    In your derma-path report for Ms.

41 (Pages 158 - 161)

1 Guilbault, which is Exhibit 9, you also do not note
2 for either biopsy A, or biopsy B, that there were
3 empty follicular stela, correct?
4      A.   Correct.
5      Q.   And were there none?
6      A.   I believe they are there.  We just
7 didn't mention it.
8      Q.   And why wouldn't you mention it in your
9 derma-path report?
10      A.   Well, both biopsies had a low follicular
11 count.  So I used that instead as evidence of
12 follicular loss, of permanent follicular loss, and
13 didn't zero in on the stelae.
14      Q.   Isn't empty follicular tracts one of the
15 characteristics of PCIA?
16      A.   It's a characteristic that is associated
17 with permanent loss.  So you can see it different
18 ways.  If the count is low, that's one of the ways to
19 see it.  If not, like in the prior case where there
20 was still a normal count, then it becomes more
21 important, a more important feature.
22      Q.   Do you know one way or the other whether
23 there were empty follicular tracts in Ms. Guilbault's
24 pathology?
25           MS. DAVIS: Objection.  Form.

1      A.   Yes, they were there.  Just didn't make
2 that a priority in this case.
3      Q.   And in your derma-path report for Ms.
4 Guilbault, you also do not mention anything about her
5 sebaceous glands, correct?
6      A.   Correct.
7      Q.   Were Ms. Guilbault's sebaceous glands
8 present?
9      A.   I would have to go back and look at the
10 case.  I don't know.
11      Q.   Sitting here today you can't tell me
12 whether --
13      A.   I don't know.
14      Q.   Let me finish my question.  Sitting here
15 today you can't tell me whether her --
16      A.   I didn't mention them in the report.  I
17 did review the case for the Rule 26 report and they
18 were certainly there.  Because the only one they were
19 missing were on the other patient in one of the two
20 biopsies.  So they were there, but I didn't put that
21 in the report either.
22      Q.   Were Ms. Guilbault's sebaceous glands
23 hypertrophic?
24      A.   I don't believe so.
25      Q.   Let's move onto your Rule 26 report for

1 Ms. Guilbault, which I will mark as Exhibit 11.
2           MR. ROTOLO:  Amy, I think that is Tab M.
3           MS. MCINTIRE:  Okay.  It should be in.
4           MR. ROTOLO:  Let me know when it's in
5 front of you.
6           (Exhibit 11, Rule 26 report for
7 Guilbault, was marked for identification.)
8      A.   Okay.  Got it.
9      Q.   Does Exhibit 11, which is the Rule 26
10 report for Ms. Guilbault, contain all the opinions
11 you are giving in this case regarding Ms. Guilbault?
12      A.   Yes.
13      Q.   And in preparing your Rule 26 report,
14 did you make sure that the information contained in
15 this report was accurate and correct?
16      A.   Yes.
17      Q.   Do you have any plans to perform any
18 other --
19      A.   This one has the gram stain also that
20 was not performed in here.
21      Q.   Okay.  Other than the gram stain --
22      A.   There was no gram stain performed.
23      Q.   Other than the gram stain not being
24 prepared, is everything in your Rule 26 report
25 accurate and correct?

1      A.   Yes.
2      Q.   Do you have plans to perform any other
3 review or any other testing on Ms. Guilbault's
4 pathology?
5      A.   No.
6      Q.   And your Rule 26 report was prepared on
7 August 2nd of 2021, correct?
8      A.   Yes.
9      Q.   I think we -- your derma-path report,
10 which is Exhibit 9, you prepared on April 29th of
11 2021, correct?
12      A.   Yes.
13      Q.   So there were several months in between
14 the preparation of both reports, correct?
15      A.   Yes.
16      Q.   Your report, your Rule 26 report for Ms.
17 Guilbault, which is Exhibit 11, states that you
18 consulted your derma-path report and Dr. Tosti's
19 clinical exam report when preparing your Rule 26
20 report, correct?
21      A.   Yes.
22      Q.   And that's Page 4 of Exhibit 11, is that
23 correct?
24      A.   Yes.
25      Q.   According to your report this is all you

42 (Pages 162 - 165)

1  consulted, is that right?
2      A.    Yes.
3      Q.    Did you consult anything else or rely
4  upon any other materials when preparing your Rule 26
5  report?
6      A.    No.
7          MS. DAVIS:  Objection.  Form.
8      Q.    Did you review the pathology of Ms.
9  Guilbault again when preparing your Rule 26 report?
10     A.    Yes.
11     Q.    Did you rely on anything included in Dr.
12 Tosti's clinical exam visit for your opinions in this
13 case?
14     A.    No, I don't believe so.  I don't think
15 it changed any.
16     Q.    Did you see any photographs of Ms.
17 Guilbault when preparing your Rule 26 report?
18     A.    No.
19     Q.    Did you review any depositions of any of
20 Ms. Guilbault's doctors, including her dermatologist,
21 Dr. Terezakis and Dr. Kopcel, when preparing your
22 Rule 26 report?
23     A.    No.
24     Q.    Did you review any medical records of
25 Ms. Guilbault, including any of her dermatology

1  records, when preparing your Rule 26 report other
2  than Dr. Tosti's clinical visit?
3      A.    No.
4      Q.    Did you review the deposition testimony
5  of Ms. Guilbault in this case?
6      A.    No.
7      Q.    Did you review any depositions taken in
8  Ms. Guilbault's case?
9      A.    No.
10     Q.    Were you aware of Ms. Guilbault's family
11 history with regard to alopecia?
12     A.    No.
13     Q.    Were you aware of any medications she
14 had or was taking when you prepared your Rule 26
15 report?
16     A.    I saw the medications she was on from
17 Dr. Tosti's progress note:  The statin for
18 hyperlipidemia and the anastrozole, anastrozone
19 (sic), whatever it's called.
20     Q.    So you were aware that Ms. Guilbault was
21 still on endocrine therapy for her cancer at the time
22 of her biopsy, correct?
23     A.    At the time -- I wasn't until I went to
24 prepare the Rule 26 report.  At the time I made the
25 diagnosis, I wasn't aware of that.

1      Q.    And upon learning of that information,
2  did that have any relevance to your opinions in this
3  case?
4      A.    No.
5      Q.    Did you know if Ms. Guilbault had had
6  any blood work performed and the results of that
7  blood work?
8      A.    No, I don't recall, no.
9      Q.    Did you know if Ms. Guilbault had any
10 thyroid issues?
11     A.    No.
12     Q.    Did you know if Ms. Guilbault had any
13 iron deficiency?
14     A.    No.
15     Q.    Did you know if Ms. Guilbault had any
16 dietary issues?
17     A.    No.
18     Q.    Did you review any photos of Ms.
19 Guilbault that were taken before she underwent
20 chemotherapy?
21     A.    No.
22     Q.    Did you know her history of hair loss
23 when you prepared your Rule 26 report?
24     A.    No.  I don't believe so, no.
25     Q.    Do you know when Ms. Guilbault loss her

1  hair?
2      A.    No.
3      Q.    Do you know how and when Ms. Guilbault's
4  hair regrew?
5      A.    No, I don't recall it, no.
6      Q.    Do you know one way or another if Ms.
7  Guilbault had any serious stressors in her life that
8  may have contributed to her hair loss?
9      A.    No.
10     Q.    Did you know if Ms. Guilbault had been
11 diagnosed with female pattern alopecia at any point?
12     A.    No.
13     Q.    Do you know if she was treated for
14 alopecia after her chemotherapy treatment?
15     A.    I recall that she took Rogaine,
16 minoxidil.  I recall that she took some minoxidil and
17 used it for some time.
18     Q.    Do you know what the results of that
19 treatment were for Ms. Guilbault?
20     A.    No.
21     Q.    In your Rule 26 report, you discuss the
22 histopathological findings of permanent
23 chemotherapy-induced alopecia, correct?
24     A.    Yes.
25     Q.    And you take those from the Sperling

43 (Pages 166 - 169)

1 chapter in his Atlas of Hair Pathology With Clinical
2 Correlations, is that right?
3      A.   To some extent, yes, yes.
4      Q.   And that is cited on page two of your
5 Rule 26 report?
6      A.   Yes.
7      Q.   And in Ms. Guilbault's Rule 26 report,
8 which is Exhibit 11, you list the criteria as a
9 marked increased in percentage of miniaturized hairs,
10 correct, as number one?  I'm sorry.  Decreased.
11      A.   Decreased total number of follicles,
12 yes.
13      Q.   Then number two, increase in the
14 percentage of telogen follicles, especially when
15 miniaturized follicles are included in the counts;
16 correct?
17      A.   Uh-huh.
18      Q.   And number three, marked increase in the
19 percentage of miniaturized hairs, correct?
20      A.   Yes.
21      Q.   Number four, preservation of sebaceous
22 glands, correct?
23      A.   Yes.
24      Q.   And number five --
25      A.   Yes.  Lobules.

1      Q.   Sorry.  Lobules.  Then number five, no
2 significant scarring or destructive inflammation,
3 correct?
4      A.   Yes.
5      Q.   And we looked at Sperling's book chapter
6 as Exhibit 8 in this deposition already, correct?
7      A.   Correct.
8      Q.   I think we've already discussed that an
9 increase in miniaturized hairs is a characteristic of
10 other types of alopecia, is that right?
11      A.   Yeah.  It's one characteristic, yes.
12 There's a differential when you see miniaturized
13 hairs that's beyond PCIA.
14      Q.   But miniaturized hairs is not specific
15 only to PCIA, correct?
16      A.   Correct.
17      Q.   For example, an increase in miniaturized
18 hairs is common with female pattern hair loss, isn't
19 that right?
20           MS. DAVIS:  Objection.  Form.
21      A.   That's correct.  But you don't see the
22 catagen/telogen shift that you see in PCIA.
23      Q.   Now, in your Rule 26 report, for both
24 biopsy A and biopsy B, you describe the follicular
25 miniaturization as marked, but as we already

1 indicated that is not a descriptor you use in your
2 derma-path report, correct?
3           MS. DAVIS:  Objection.  Form.
4      Q.   Is that correct?  I didn't hear you.
5      A.   Yes.
6      Q.   Here, unlike in Plaisance, you included
7 the characteristic of preservation of sebaceous
8 glands in your Rule 26 report as a characterization
9 of PCIA, correct?
10      A.   Uh-huh, yes.
11      Q.   And why did you include it in Ms.
12 Guilbault's report but did not include that
13 characteristic in Ms. Plaisance's report?
14      A.   One, as you said, one of the two
15 biopsies in the Plaisance didn't have sebaceous
16 lobules.  As I explained earlier, the presence of
17 them and what Sperling was getting at is that he is
18 saying there's not perifollicular fibrosis from
19 lichen planopilaris, a primary scarring alopecia
20 there.  So that's -- the point is that it's not a
21 primary scarring alopecia.  So it's one factor that's
22 useful but it's not a hard criteria for presence or
23 absence for PCIA.
24      Q.   So did you leave the preservation of
25 sebaceous glands out of Ms. Plaisance's Rule 26

1 report because Ms. Plaisance didn't have sebaceous
2 glands?
3      A.   One of the two didn't.
4           MS. DAVIS:  Objection.  Form.
5      A.   One of the two biopsies did not.
6      Q.   And going back to Ms. Guilbault, you did
7 not note any finding about sebaceous glands of Ms.
8 Guilbault in your derma-path report but you did in
9 your Rule 26 report, correct?
10      A.   Yes.  I reviewed the slides when I was
11 pulling this together.
12      Q.   And according to your Rule 26 report,
13 there was preservation of Ms. Guilbault's sebaceous
14 glands, correct?
15      A.   Yes.
16      Q.   And you found that in reviewing your
17 pathology when you were preparing your Rule 26
18 report?
19      A.   Yes.
20      Q.   Did you make that finding when you were
21 reviewing the pathology for your derma-path report?
22           MS. DAVIS:  Objection.  Form.
23      A.   You know, as I said before, it's not --
24 without the perifollicular fibrosis, it's not
25 something I use personally in my -- in my expert hair

44 (Pages 170 - 173)

1 loss pathology world.  It's not a large criteria.
2 For me much more important is whether there's
3 perifollicular fibrosis or not.
4     Q.    In your Rule 26 report for Ms.
5 Guilbault, which is Exhibit 11, you also note for
6 both biopsy A and B, empty follicular tracts, but
7 that is not mentioned in your derma-path report for
8 Ms. Guilbault, correct?
9     A.    Correct.
10     Q.    With regard to biopsy A for Ms.
11 Guilbault in your Rule 26 report, Exhibit 11, you
12 note that with regard to that biopsy, that -- well
13 you know with regard to them that they are diagnostic
14 of PCIA, correct?
15         MS. DAVIS:  Objection.  Form.
16     Q.    Was that yes?
17     A.    Yes.
18     Q.    Let me take that back.  Was biopsy A, if
19 you look at number one in your Rule 26 report under
20 biopsy A, you say:  "These features are diagnostic of
21 permanent chemotherapy-induced alopecia."  Correct?
22     A.    Correct.
23     Q.    On page two, when you're talking about
24 biopsy B, under number one, you say:  "These features
25 are most consistent with permanent

1 chemotherapy-induced alopecia."
2         What's the difference between biopsy A,
3 that's diagnostic, and biopsy B --
4     A.    There's no difference.  There's no
5 difference there.  They are both diagnostic.
6     Q.    Go ahead.  Are you done?
7     A.    Yes.
8     Q.    So even though for biopsy B you write in
9 your Rule 26 report that the features are most
10 consistent, am I correct that you're now saying what
11 you meant was they are diagnostic?
12     A.    Yeah.  I think they are diagnostic, yes.
13 The two biopsies are very, very similar.  I think
14 they stand on their own.
15     Q.    So it is your testimony and your opinion
16 that both biopsy A and biopsy B are PCIA, even though
17 there is no indication of follicular loss in your
18 derma-path report?
19         MS. DAVIS:  Objection.  Form.
20     A.    I disagree.  Because there is -- there
21 is evidence with the low follicular counts.
22     Q.    So you're saying the low follicular
23 count is -- should be interpreted as empty follicular
24 tracts?
25         MS. DAVIS:  Objection.  Form.

1     A.    They would both be present, yes.
2     Q.    Then in your Rule 26 report, which is
3 Exhibit 11, you go through your differential
4 diagnosis, correct?
5     A.    Yes.
6     Q.    And your differential diagnosis includes
7 chronic telogen effluvium, correct?
8     A.    Yes.
9     Q.    It also includes the scarring alopecia,
10 correct?
11     A.    Yes, primary scarring alopecia, yes.
12     Q.    And you have determined that, in your
13 Rule 26 report, that for the reasons stated it is
14 your opinion that it is not one of those, correct?
15     A.    Correct.
16     Q.    In your differential diagnosis, in your
17 Rule 26 report for Ms. Guilbault, does not include
18 any discussion of female pattern hair loss, does it?
19     A.    It does not.
20         MS. DAVIS:  Objection.  Form.
21     A.    It does not include a discussion.
22     Q.    In your Rule 26 report, you give no
23 opinion as to why Ms. Guilbault's pathology is not
24 consistent with female pattern hair loss, correct?
25         MS. DAVIS:  Objection.  Form.

1         THE WITNESS:  I do not, correct.
2     Q.    You also didn't include, as a
3 differential diagnosis, endocrine-induced alopecia;
4 correct?
5         MS. DAVIS:  Objection.  Form.
6     A.    Correct.
7     Q.    And that was even though you were aware
8 that Ms. Guilbault was on endocrine therapy, correct?
9         MS. DAVIS:  Objection.  Form.
10     A.    Correct.
11     Q.    Did you discuss your findings on Ms.
12 Guilbault with Dr. Tosti?
13     A.    No.
14     Q.    Did you discuss your findings on Ms.
15 Guilbault's pathology with Ms. Guilbault?
16     A.    No.
17     Q.    If you had not known that Ms. Guilbault
18 had undergone chemotherapy, what would your diagnosis
19 have been?
20         MS. DAVIS:  Objection.  Form.
21     A.    I would have picked up the phone and
22 called Dr. Tosti and asked if the patient had
23 received chemotherapy and looked for that clinical
24 history.
25     Q.    If Ms. Guilbault's hair had regrew and

45 (Pages 174 - 177)

1 then gotten thinner, would that change your opinion
2 in this case?
3          MS. DAVIS:  Objection.  Form.
4     A.    No.  Because we are talking about
5 chronic permanent late -- later alopecia, the PCIA.
6     Q.    So, is it your opinion that her hair
7 could completely regrow then get thinner and that
8 would be PCIA?
9     A.    I believe that is -- can happen to
10 people, yes.  I don't see these patients clinically.
11 So I don't -- the other thing that happens is they
12 get kind of lost between oncology and then
13 dermatology and then hair experts.  So they -- and
14 quite a bit of time happens.  So I think the story
15 line is often not clear.  You know, the clinical
16 progression is often a little bit muddled in these
17 patients.
18          Once again, I'm a dermatopathologist.  I
19 don't follow the patients clinically.  So I don't
20 know the details of that.
21     Q.    So you don't know from an expert point
22 of view what the mechanism for that occurring would
23 be?
24     A.    For what occurring?
25     Q.    For the hair regrowing and then getting

1 thinner but still being PCIA.
2          MS. DAVIS:  Objection.  Form.
3     A.    Well, I have ideas about the biology
4 behind it but I don't know.  I don't think anybody
5 knows.
6     Q.    Even if Ms. Guilbault has PCIA, as you
7 found in your report, you do not know from your
8 histopathological review which drug she received
9 caused it, correct?
10     A.    Correct.
11     Q.    Now, on Dr. Tosti's clinical exam
12 report, which you indicated that you have reviewed,
13 Dr. Tosti noted the presence of yellow dots on Ms.
14 Guilbault's scalp, correct?
15     A.    Correct.
16     Q.    You do not mention yellow dots in your
17 derma-path report or your Rule 26 report, do you?
18     A.    No.
19     Q.    Did you see them?
20     A.    No.
21     Q.    Isn't it true that the presence of
22 yellow dots are seen in female pattern hair loss?
23          MS. DAVIS:  Objection.  Form.
24     A.    You know, I'm not a clinical
25 dermatologist and I'm not exactly sure what the

1 yellow dots represent.
2     Q.    So you don't know whether yellow dots
3 are seen more often in stages of female pattern hair
4 loss?
5          MS. DAVIS:  Object to the form.
6     A.    I never held a trichoscope on a
7 patient's scalp before.  So I don't know the terms.
8 Dr. Tosti and I argue in research on this to define
9 what -- when you see a yellow dot on the patient with
10 your trich -- under trichoscopy what it looks like
11 when you actually biopsy it.  We are doing ongoing
12 work with that.  But I'm not a -- I don't know the
13 finer points of trichoscopy.
14     Q.    In your research with Dr. Tosti, what
15 are the types of alopecia that you are looking at
16 that yellow dots may be present?
17     A.    I don't know.
18     Q.    So am I correct that you don't know what
19 the significance of the presence of yellow dots on
20 the scalp --
21     A.    I'm not a clinical hair loss expert.
22     Q.    So the answer is no?
23          MS. DAVIS:  Objection.
24     A.    No.
25          MS. DAVIS:  Dr. Thomas, just a friendly

1 reminder to let him finish the question before
2 answering.
3     A.    Okay.
4          MS. DAVIS:  Also I'm going to object to
5 the form of that last question.
6     Q.    Have you read any literature on the
7 significance of yellow dots on the scalp?
8     A.    I have seen it mentioned.  I know what
9 it is but -- I have seen it mentioned but I haven't
10 paid attention to it.
11     Q.    Have you seen it mentioned with regard
12 to androgenetic or female pattern alopecia?
13     A.    I don't know.  I work behind a
14 microscope not a trichoscope, so.
15          MR. ROTOLO:  Can we take a ten-minute
16 break?
17          MS. DAVIS:  Yes.
18          THE VIDEOGRAPHER:  Thank you.  This is
19 the videographer.  The time is 5:53.  We are going
20 off the record.  This ends media file four.
21          (Break in proceedings.)
22          THE VIDEOGRAPHER:  We are back on the
23 record.  The time is 6:03 p.m. eastern time.  We are
24 beginning media file five.
25 BY MR. ROTOLO:

46 (Pages 178 - 181)

Page 182

1    Q.    Dr. Thompson, would you agree that the
2  biopsies of Ms. Plaisance and Ms. Guilbault were
3  different in many ways?
4         MS. DAVIS: Objection. Form.
5    A.    Yes.
6    Q.    And don't you agree that if PCIA -- that
7  if they had PCIA, then the biopsy histopathological
8  characteristics would be similar?
9         MS. DAVIS: Objection. Form.
10    A.    Well, they are similar in the basic
11  criteria for making the diagnosis with
12  catagen/telogen shift, the miniaturization, and the
13  evidence of permanent follicular loss. So they all
14  have that in common.
15    Q.    But there were differences in the
16  appearances of those biopsies, between the two
17  plaintiffs?
18    A.    Yes. That's why I have a job.
19    Q.    You stated in other reports that you
20  have done in this litigation that -- and your other
21  Rule 26 reports that you have done for plaintiffs in
22  this litigation, that you would leave it up to the
23  clinician to make the financial diagnosis.
24         Why did you not leave the final
25  diagnosis up to the clinician for Ms. Plaisance?

Page 183

1         MS. DAVIS: Objection. Form.
2    A.    Well, I'm saying that in the context of
3  if there's a difference of opinion. Like if I read a
4  biopsy and I see there's no evidence of lichen
5  planopilaris or PCIA or alopecia areata, then it goes
6  back to the clinician to take my evidence and use it
7  in their larger clinical evaluation, perhaps decide
8  whether to biopsy again or, you know, something else.
9  So it's more to do with the -- if there's discordance
10  in the opinions. Me being able to make a definitive
11  diagnosis is actually what the clinician wants
12  though. Especially when they are treating a patient
13  with permanent hair loss they, as I said before, like
14  having the confirmation in the medical record.
15    Q.    With regard to that testimony, about the
16  clinician, even if it's permanent hair loss, wanting
17  that in the medical record, why is that, when if it's
18  permanent, why does it matter?
19    A.    Well, you know, it's kind of evidenced
20  by the -- even looking at the clinical history that
21  we have been looking at today, where you have a
22  patient come in and they say I was diagnosed with
23  alopecia; oh, and I was treated with this, I was
24  injected but, you know, you get kind of a hearsay,
25  not quite get a firm opinion; whereas if a patient

Page 184

1  can walk in with a biopsy diagnosis that's
2  definitive, it's helpful.
3         Also once you start treating patients
4  sometimes they may look different than they did at
5  the start. So having the biopsy diagnosis also helps
6  to say yes, this is truly what was going on at the
7  time. Maybe there's been a clinical improvement or
8  not.
9         So there's different reasons to do that.
10  And I told you, some of the hair loss experts really
11  firmly believe there should be gold standard
12  histopathological diagnosis in the chart when you're
13  treating a patient with a significant disease. And
14  often hair loss diseases are the biggest issue in the
15  patient's life.
16    Q.    With regard to Ms. Guilbault, you also
17  did not see the need to leave the final diagnosis to
18  the clinician, correct?
19         MS. DAVIS: Objection. Form.
20    A.    Well, my job as a pathologist is to try
21  to make a definitive diagnosis. It's to take the
22  differential diagnosis and reduce them. That's the
23  number one reason that biopsies are done, is to
24  reduce the clinical differential. So it's more
25  useful to the clinician to be definitive.

Page 185

1    Q.    But there was no differential diagnosis
2  here.
3         MS. DAVIS: Objection. Form.
4    A.    You mean provided from the --
5    Q.    Provided from the clinician or provided
6  by you.
7    A.    Well, my job is to not have a
8  differential diagnosis. My job is to decrease it
9  down to the exact diagnosis.
10         If you're a pathologist and you sign
11  everything out with a differential diagnosis, you're
12  doing the world a disservice and shouldn't be
13  practicing pathology.
14         As I said before, probably 80 percent of
15  our biopsies of all types come in with the clinician
16  just telling you the number one item or number one
17  diagnosis on their differential. So this is not --
18  this is common practice to submit it that way.
19  Especially from a hair loss expert.
20         MR. ROTOLO: Thank you, Doctor. I have
21  no further questions.
22         THE VIDEOGRAPHER: Anything else
23  counsel?
24         MS. DAVIS: Yes. Can we go off the
25  record for a few minutes?

47 (Pages 182 - 185)

Page 186

1    THE VIDEOGRAPHER: Sure.  The time is
2  6:09.  We are going off the record.
3    (Break in proceedings.)
4    THE VIDEOGRAPHER: The time is 6:25.  We
5  are back on the record.  Continuing media file five.
6  CROSS-EXAMINATION BY MS. DAVIS:
7    MS. DAVIS: I would like to introduce
8  into evidence as Exhibit 12, the plaintiff's
9  objections and responses to the defendant's notice of
10  videotaped deposition of Dr. Thompson.
11    I would also like to introduce two more
12  exhibits.  The -- as Exhibit 13, I would like to
13  introduce the Dr. Tosti progress note regarding Ms.
14  Plaisance; and as Exhibit 14 I would like to
15  introduce the Dr. Tosti progress note regarding Ms.
16  Guilbault.
17    THE WITNESS: The 13 is actually
18  Guilbault --
19    MS. MCINTIRE: I'm changing them real
20  quick.  I think that should be right now.
21    MR. ROTOLO: I don't need you to Screen
22  Share them.  I have them.
23    Q.   Wonderful.  Dr. Thompson, did you attach
24  Dr. Tosti's clinical exam note regarding Ms.
25  Plaisance to your Rule 26 expert report?

Page 187

1    A.   I don't know if it was attached but it
2  was certainly -- it was certainly -- I certainly
3  reviewed it when I prepared the report.  Does that
4  attach it?
5    Q.   If it says in your materials
6  "consulted" --
7    A.   Yeah.  Yeah.  Yes.  Okay.  I got it.
8    Q.   And, likewise, if it says in your
9  materials "consulted," that you consulted the Dr.
10  Tosti clinical note for Ms. Guilbault in advance of
11  your Rule 26 report and attached it, does that sound
12  correct?
13    A.   Yes.
14    MS. DAVIS: And can we pull up Exhibit
15  14, the clinical note of Dr. Tosti regarding Ms.
16  Plaisance.
17    MS. MCINTIRE: You want me to pull it up
18  and Screen Share it?
19    MS. DAVIS: Yes, please.
20    MS. MCINTIRE: Sorry.  Plaisance?
21    MS. DAVIS: I believe it should be
22  Exhibit 14.
23    MS. MCINTIRE: I think it's 13.
24    MS. DAVIS: Okay.
25    A.   Both 13 and 14 are the same thing right

Page 188

1  now.  They are both Guilbault.
2    MS. MCINTIRE: Doctor, you may need to
3  refresh the marked exhibit page.
4    A.   Okay.  Go back again.  You fixed it.
5  There you go.  I got it.
6    MS. DAVIS: If we can just Screen Share
7  page three of the document, which is technically page
8  two of Dr. Tosti's report.
9    A.   Okay.  I got it.
10    MS. DAVIS: Perfect.  Okay.  Scroll up
11  to the page before that.  Perfect.
12    Q.   Dr. Thompson, does this look familiar to
13  you?
14    A.   Yes.
15    Q.   Do you see the part in bold that says
16  hair history?
17    A.   Not yet.  There; yes, I do.
18    Q.   Can you read for us the first four lines
19  of that section?
20    A.   "Hair before chemotherapy was very good.
21  Had a temporary episode of increased hair shedding
22  years before her breast cancer, possible 2010 but not
23  sure.  Went to see a dermatologist who gave her
24  quote, injections, unquote.  However, she notes it
25  resolved after stopping a diet that she was doing.

Page 189

1    Q.   Do you recall reviewing this in Dr.
2  Tosti's notes before you issued your Rule 26 report
3  regarding Audrey Plaisance?
4    MR. ROTOLO: Object to the form.
5    A.   Yes, I did.
6    Q.   Would this have any bearing on your
7  evaluation of the biopsies of Ms. Plaisance?
8    MR. ROTOLO: Object to the form.
9    A.   No.
10    Q.   Dr. Thompson, are you aware -- oh, we
11  can take that down now.
12    Dr. Thompson, are you aware of an
13  accepted treatment regimen for regrowing hair
14  follicles that have been permanently lost?
15    MR. ROTOLO: Object to the form.
16    A.   No.
17    Q.   Dr. Thompson, are your diagnostic
18  findings in the case of Ms. Plaisance to a reasonable
19  degree of medical certainty?
20    A.   Yes.
21    Q.   And are your diagnostic findings in
22  regards to Ms. Guilbault to a reasonable degree of
23  medical certainty?
24    A.   Yes.
25    Q.   You testified earlier that PAS-D slides

48 (Pages 186 - 189)

Page 190

1  were stained in the case of Ms. Plaisance, is that
2  correct?
3      A.    Yes.
4      Q.    Do findings regarding the PAS-D slides
5  have any impact, one way or another, on your
6  diagnosis for Mrs. Plaisance?
7          MR. ROTOLO:  Object to the form.
8          THE WITNESS:  No, not on the PCIA
9  diagnosis at all.
10     Q.    And why not?
11     A.    Because the question for the PAS was
12  just whether the patient also has seborrheic
13  dermatitis.  It does not have any relation to the
14  PCIA but it's something that could be treated if
15  yeast were there.
16         MS. DAVIS:  I have no further questions.
17         MR. ROTOLO:  I have nothing further.
18         THE VIDEOGRAPHER:  This is the
19  videographer.  The time is 6:33.  We are going off
20  the record.  This ends media file five and that
21  concludes this deposition.
22         (Concluded at 6:33 p.m.)
23
24
25

Page 191

1          CERTIFICATE OF DEPONENT
2
3          I have read the foregoing transcript of
4  my deposition and except for any corrections or
5  changes noted on the errata sheet, I hereby
6  subscribe to the transcript as an accurate record
7  of the statements made by me.
8
9
              _____
10             CURTIS T. THOMPSON, M.D.
11
12         SUBSCRIBED AND SWORN before and to me
13  this _____ day of _____, 20___.
14
15
16             _____
17             NOTARY PUBLIC
18
19
20  My Commission expires:
21
22
23
24
25

Page 192

1              CERTIFICATE
2
3      I, PATRICIA SMITH, a Notary Public and
4  Certified Court Reporter of the State of New Jersey,
5  License No. 30X100103000, do hereby certify that
6  prior to the commencement of the examination, CURTIS
7  T. THOMPSON, M.D. was duly sworn by me to testify the
8  truth, the whole truth and nothing but the truth.
9      I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13     I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither
16  a relative nor employee of such attorney or counsel,
17  and that I am not financially interested in the
18  action.
19
20
21  *Patricia Smith*
22  Patricia Smith, CCR
23  Dated:  September 18, 2021
24
25

Page 193

1                              ERRATA SHEET
                    VERITEXT/NEW YORK REPORTING, LLC
2  CASE NAME: In Re: Taxotere (Docetaxel)
   Products Liability Litigation
3  DATE OF DEPOSITION: 9/15/2021
   WITNESSES' NAME: Curtis T. Thompson , M.D.
4
5  PAGE  LINE (S)    CHANGE         REASON
6  _____|_____|_____|_____
7  _____|_____|_____|_____
8  _____|_____|_____|_____
9  _____|_____|_____|_____
10 _____|_____|_____|_____
11 _____|_____|_____|_____
12 _____|_____|_____|_____
13 _____|_____|_____|_____
14 _____|_____|_____|_____
15 _____|_____|_____|_____
16 _____|_____|_____|_____
17 _____|_____|_____|_____
18 _____|_____|_____|_____
19 _____|_____|_____|_____
20 _____|_____|_____|_____
21 _____
              Curtis T.  Thompson , M.D.
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS _____ DAY OF _____, 20__.
23
24
   _____          _____
25 (NOTARY PUBLIC)              MY COMMISSION EXPIRES:

49 (Pages 190 - 193)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.