UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: TAXOTERE (DOCETAXEL) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2740**<br><br>*This document relates to:*<br>Audrey Plaisance, Case No. 2:18-cv-08086 |

# HOSPIRA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT BASED ON THE <u>LEARNED INTERMEDIARY DOCTRINE</u>

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................1

    A.    Ms. Plaisance's Cancer Diagnosis and Treatment. ...................................................1

    B.    Dr. Chauvin Did Not Review the Hospira Label. .....................................................1

    C.    Dr. Chauvin Prescribed Docetaxel as the Right Breast Cancer Treatment for Ms. Plaisance. ...................................................................................................3

    D.    Ms. Plaisance Relied on Dr. Chauvin's Recommendation. ......................................4

    E.    Ms. Plaisance's Failure To Warn Claim. ..................................................................6

LEGAL STANDARD............................................................................................................7

ARGUMENT .........................................................................................................................7

    A.    There Is No Evidence That Dr. Chauvin Read the Hospira Label ...........................8

    B.    Dr. Chauvin's Prescription Would Not Have Changed. ..........................................9

CONCLUSION.....................................................................................................................12

CERTIFICATE OF SERVICE .............................................................................................14

# INTRODUCTION

Plaintiff Audrey Plaisance's action fails as a matter of law for two reasons. First, Ms. Plaisance has no evidence that her prescribing oncologist, Dr. Laura Chauvin, actually read Hospira's docetaxel label. Second, Ms. Plaisance cannot establish that Dr. Chauvin's prescribing decision would have changed had she been provided a different docetaxel label that warned of permanent hair loss. As a result, Ms. Plaisance cannot establish proximate causation under the Learned Intermediary Doctrine. Therefore, the Court should grant summary judgment in favor of Defendants Hospira, Inc., and Hospira Worldwide, LLC, formerly doing business as Hospira Worldwide, Inc. ("Hospira") and dismiss Plaintiff's case.

# BACKGROUND

### A. Ms. Plaisance's Cancer Diagnosis and Treatment.

Ms. Plaisance was diagnosed with breast cancer on December 2, 2013. Hospira's Statement of Undisputed Material Facts ("SOF") ¶ 4. She underwent surgery for a right partial mastectomy on December 11, 2013. *Id*. ¶ 5. Ms. Plaisance's treating oncologist, Dr. Chauvin, prescribed a chemotherapy regimen consisting of four cycles of docetaxel and Cytoxan administered approximately every three weeks. *Id*. ¶ 6. Ms. Plaisance's chemotherapy treatments began on January 17, 2014 and concluded on March 20, 2014. *Id*.

### B. Dr. Chauvin Did Not Review the Hospira Label.

The Food and Drug Administration ("FDA") approved Hospira's version of docetaxel in March 2011 under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, which permits follow-on medications to gain FDA approval through an abbreviated pathway based on the safety and efficacy data of the branded or reference drug. *Id*. ¶ 15. Hospira's docetaxel was based on Taxotere, the branded docetaxel product developed by Sanofi US Services Inc. and Sanofi-Aventis U.S. LLC., and approved by the FDA in 1996. *Id*.

Dr. Chauvin did not specifically prescribe Hospira's docetaxel product for Ms. Plaisance. When Dr. Chauvin prescribes docetaxel, she does not prescribe a particular manufacturer's

version of docetaxel, and she does not know which manufacturer's product will be administered to the patient:

> Q: [W]hen you're prescribing docetaxel, you're not prescribing that a particular manufacturer's product be used?
>
> A: No.
>
> Q: Is that right?
>
> A: Correct.

SOF ¶ 19; Ex. E (Chauvin Dep.) at 133:13-18.

> Q: And when you prescribed docetaxel, you're not prescribing a particular manufacturer's docetaxel; is that correct?
>
> A: I prescribed the one with which the cancer center has a contract. I am employed. They negotiate the drug and the prices and that's what we use. And I'm not included in those choices.

SOF ¶ 19; Ex. E (Chauvin Dep.) at 132:8-14.

Dr. Chauvin first started prescribing Taxotere, the brand version of docetaxel, when it first came out:

> Q: Do you recall when you first would have begun prescribing docetaxel?
>
> A: I think that came out rather quickly in just a year or two after Taxol came out. So the minute it was out, I'm sure I started using it.

SOF ¶ 16; Ex. E (Chauvin Dep.) at 33:8-12. Taxol was approved for the treatment of metastatic breast cancer by the FDA in 1994, and Taxotere was approved in 1996. SOF ¶¶ 15, 17. Dr. Chauvin thus reviewed the Taxotere label and began prescribing Taxotere around 1996—well before Hospira's docetaxel hit the market in 2011.

Dr. Chauvin testified that before she first started prescribing docetaxel, she read the label:

> Q: And as of 2014, I believe you testified earlier that you had already had experience treating breast cancer with docetaxel; is that correct?
>
> A: Yes.
>
> Q: And before you first prescribed docetaxel, did you review the prescribing information and the drug labeling?

2

> A: Yes.

SOF ¶ 18; Ex. E (Chauvin Dep.) at 88:16-23.

However, Dr. Chauvin did not review *Hospira's* docetaxel label before prescribing docetaxel to Ms. Plaisance:

> Q: And did you review Hospira's docetaxel label before prescribing docetaxel for Mrs. Plaisance?
>
> A: *Not specifically.*

SOF ¶ 18; Ex. E (Chauvin Dep.) at 131:17-20 (emphasis added).

Dr. Chauvin could not say that she relied on Hospira's label when prescribing docetaxel to Ms. Plaisance:

> Q: And so you didn't rely on Hospira's label in prescribing it for her; is that right?
>
> MR. ROCKSTAD: Object to form.
>
> A: No. *I can't tell you whose label I last looked at.* I can put it that way.

SOF ¶ 18; Ex. E (Chauvin Dep.) at 131:21-25 (emphasis added).

> Q: Did you rely on any information from Hospira in prescribing docetaxel for Mrs. Plaisance?
>
> A: When I look up information on chemo medicines, I go to UpToDate, and I don't think it really notes who -- *I don't pay any attention to who the manufacturer is*.

SOF ¶ 20; Ex. E (Chauvin Dep.) at 132:2-7 (emphasis added).

### C. Dr. Chauvin Prescribed Docetaxel as the Right Breast Cancer Treatment for Ms. Plaisance.

Dr. Chauvin testified that the docetaxel regimen she prescribed to Ms. Plaisance "was the right treatment for her cancer." SOF ¶ 21; Ex. E (Chauvin Dep.) at 135:9-16. Dr. Chauvin did not believe there was a better treatment option for Ms. Plaisance:

> Q: And I believe you've testified today that you do not feel that there was another treatment option for Mrs. Plaisance that would have been a better option for her; is that correct?
>
> A: Right.

3

SOF ¶ 22; Ex. E (Chauvin Dep.) at 89:14-19.

Dr. Chauvin would *not* have prescribed Taxol (paclitaxel) to Ms. Plaisance in part because of "the rate of neuropathy that Taxol-containing regimens have." SOF ¶ 24; Ex. E (Chauvin Dep.) at 81:24-25, 83:8-10. Ms. Plaisance has a history of diabetes which "plays into [the] risk of neuropathy," SOF ¶ 24; Ex. E (Chauvin Dep.) at 83:14-15, and compared to Taxol, the "neuropathy risk from Taxotere is relatively low." SOF ¶ 24; Ex. E (Chauvin Dep.) at 83:10-11. If Ms. Plaisance had "absolutely refused TC"—i.e., if she refused the recommended docetaxel regimen—Dr. Chauvin "probably would have given her AC." SOF ¶ 23; Ex. E (Chauvin Dep.) 83:2-3. However, Dr. Chauvin "would have noted the 2 percent risk of deadly acute leukemia from Adriamycin and *recommended against that*." SOF ¶ 23; Ex. E (Chauvin Dep.) 49:25-50:2 (emphasis added).

### D. Ms. Plaisance Relied on Dr. Chauvin's Recommendation.

Ms. Plaisance's primary goal in treatment was to beat her cancer, and she wanted to receive the best treatment to accomplish that goal:

> Q: And how did you feel about your diagnosis when you first learned about it?
>
> A: I was kind of shocked. You know, you -- you don't expect to hear it, you know, that you have cancer and I was just hoping for the very, very best. And I just wanted them, you know, as soon as possible to have them to do what they had to do.
>
> Q: Is it fair to say that your primary goal was to beat the cancer?
>
> A: Oh, definitely.
>
> Q: And you wanted to receive the best treatment for it?
>
> A: Yes.

SOF ¶ 9; Ex. C (Plaisance Dep.) at 165:16-166:3.

Ms. Plaisance was not concerned at the time about hair loss:

> Q: And did Dr. Chauvin speak with you about potential risks of Taxotere and Cytoxan?
>
> A: Are you talking about the side effects? Yes, she did.

4

…

Q: And did you ask Dr. Chauvin any questions about the potential risk of hair loss?

A: No. I just understood that it would be temporary.

Q: Did you tell her that you were concerned about hair loss?

A: No. *I was not concerned about my hair loss at the time*.

SOF ¶ 12; Ex. C (Plaisance Dep.) at 186:17-21, 187:9-16 (emphasis added).

In hindsight, Ms. Plaisance now says that had she been warned of docetaxel's risk of permanent hair loss, she would have asked Dr. Chauvin to "look into" another treatment option:

Q: So you agreed to take on the risk of death with chemotherapy, but it is your testimony that if the word "permanent" had been before "hair loss" there that you would have said, nope, wait a minute, I don't want to take these medicines?

MR. HARDESTIEN: Object to form.

A: *I would have said let's look into another option.*

Q: So the addition -- you see -- sorry, go ahead.

A: Death can occur with anything, but had I known that I could have had permanent hair loss, *I would have asked Dr. Chauvin to look into another option that wouldn't have caused permanent hair loss*. I have nothing against the drug except that. There was no warning for me to be able to have -- to be able to choose -- the right to choose something else.

Q: And do you see that on the list of warnings of potential risks, there is the risk of hair loss is listed there; right?

A: Yes, sir, but it doesn't say permanent.

Q: And it doesn't say temporary either, does it?

A: Right. But reading this, I would have never thought -- I would have never, never thought of permanent -- permanent hair loss.

Q: And if that word had been added here, do you think that would have changed your course of treatment?

A: *I'm pretty sure I would have asked let's look into something else.*

5

SOF ¶ 14; Ex. C (Plaisance Dep.) at 269:14-270:22 (emphasis added); *see* SOF ¶ 13; Ex. C (Plaisance Dep.) at 268:7-9 ("maybe if I would have -- I was told that it could be permanent, maybe I would have said, wait, let's look at something else").

In the end, however, Ms. Plaisance trusted Dr. Chauvin's medical judgment and would have followed her advice:

> Q: And do you generally trust the advice of your doctors?
>
> A: Yes, as far as the knowledge that they have at the moment. Yes.
>
> Q: And you trust their medical judgment?
>
> A: Yes.
>
> \*\*\*
>
> Q: Did you follow the advice of your doctors who treated you for your breast cancer?
>
> A: Yes.
>
> Q: And these doctors included your oncologist, Dr. Laura Chauvin, is that right?
>
> A: Yes. Yes.

SOF ¶ 8; Ex. C (Plaisance Dep.) at 29:13-18, 29:23-30:3.

### E. Ms. Plaisance's Failure To Warn Claim.

Plaintiff asserts a failure-to-warn claim under the Louisiana Product Liability Act. SOF ¶ 26. She alleges that Hospira did not adequately warn of the risk of permanent alopecia and that she developed permanent alopecia because of this failure to warn. *Id.*[1]

---

[1] Plaintiff also asserts that she should be allowed to seek punitive damages under Illinois law. Hospira has moved for summary judgment on that claim because Illinois law does not apply. Hospira's Mot. for Summ. J. on Claims Under Illinois Law, ECF No. 12387. In any event, punitive damages are not a separate claim, but instead, they are a type of damages that is derivative of her underlying failure-to-warn claim and should also be dismissed for the reasons set forth herein.

**LEGAL STANDARD**

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

**ARGUMENT**

Louisiana law applies the learned intermediary doctrine to "claims of failure to warn involving drugs or medical devices dispensed by a physician." *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 765 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001). Under the learned intermediary doctrine, the manufacturer of a prescription drug "has no duty to warn the patient, but need only warn the patient's physician." *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991); *see In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. 17-5372, 2021 WL 4206936, at *7 (E.D. La. Sept. 16, 2021) (holding that because the treating physician never read the drug label, Plaintiff could not "demonstrate that any inadequate warning [from the manufacturer to the physician] was a cause in fact or the proximate cause of the injury").

A plaintiff asserting a failure-to-warn claim under the learned intermediary doctrine must prove (1) "a manufacturer's failure to adequately warn the prescribing physician of a risk associated with the product that the physician did not otherwise know about," and (2) "that the failure to warn was the cause in fact and the proximate, or legal, cause of the plaintiff's injury." *Phillips v. Sanofi*, 994 F.3d 704, 708 (5th Cir. 2021) (citation omitted); *see In re Taxotere (Docetaxel) Prods. Liab. Litig. (Stewart)* (Apr. 19, 2021), ECF No. 12494, at 4-5 ("*Stewart*"). "Regarding the second prong, the law is well established that, to prove causation, 'the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that *but for* the inadequate warning, the treating physician would not have used or prescribed the

7

product.'" *Stewart* at 5 (quoting *Willett v. Baxter Intern., Inc.*, 929 F.2d 1094, 1099 (5th Cir. 1991)) (emphasis added).

Plaintiff's claims should be dismissed under the learned intermediary doctrine for two independent reasons: (1) because Dr. Chauvin did not read the Hospira label, and (2) because, even if warned, Dr. Chauvin's prescribing decision would not have changed.

### A.  There Is No Evidence That Dr. Chauvin Read the Hospira Label.

As the Fifth Circuit and this Court have recognized, "[w]hen a physician does not recall ever reading the label at issue, the learned intermediary doctrine requires summary judgment for the manufacturer." *Id*. at 6 (citing *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010)). In *Pustejovsky*, "the plaintiff's prescribing physician testified that she did not recall ever reading the package insert for the generic drug at issue." *Id.* The Fifth Circuit held that the physician's "lack of memory, of course, does not preclude the possibility that she had read these materials, but neither can it sustain [the plaintiff's] burden." *Id*. This Court applied this precedent in granting summary judgment in *Stewart* because Plaintiff Stewart had "failed to create an issue of fact on whether [her prescribing physician] would have reviewed the Sandoz label or learned of any update to it regarding permanent hair loss." *Id*. at 5.

Ms. Plaisance's case should be dismissed under *Pustejovsky* and *Stewart*. There is no evidence that Dr. Chauvin reviewed the Hospira label before prescribing docetaxel to Ms. Plaisance. She could not "tell you whose label [she] last looked at." SOF ¶ 18; Ex. E (Chauvin Dep.) at 131:24-25. What she reviewed was UpToDate. SOF ¶ 20. Moreover, she did not prescribe Hospira's docetaxel product in particular (vs. another manufacturer's docetaxel). *Id*. ¶ 19. Accordingly, she did not rely on Hospira's docetaxel label before prescribing it to Ms. Plaisance. *Id*. ¶ 18.

Even if it were possible that Dr. Chauvin reviewed the Hospira label at some point, "this is not enough." *Stewart* at 7 (citing *Pustejovsky*, 623 F.3d at 277). Dr. Chauvin subscribed to the "UpToDate" service to "look up information on chemo medicines." SOF ¶ 20; Ex. E

8

(Chauvin Dep.) at 132:4-7. This case is therefore like *Stewart,* where the Court rejected the plaintiff's argument that because the prescriber, Dr. McCanless, "uses a service called UpToDate, he would have learned of a label update for permanent alopecia through this service." *Stewart* at 7. The Court explained that "[a]t best, this is nothing more than a possibility," and therefore, it was not sufficient to defeat summary judgment. *Id.*

Thus, as in *Stewart*, "Plaintiff has failed to create an issue of fact on whether [Dr. Chauvin] would have reviewed the [Hospira] label or learned of any update to it regarding permanent hair loss. Without evidence to establish this, Plaintiff cannot establish that a different warning from [Hospira] would have changed [Dr. Chauvin's] prescribing decision." *Id*. at 5. As a result, "the learned intermediary doctrine requires summary judgment" in Ms. Plaisance's case. *Id*. at 6.

      **B.     Dr. Chauvin's Prescription Would Not Have Changed.**

Plaintiff's claim also fails because she cannot meet her burden of showing that a different label would have changed Dr. Chauvin's prescribing decision.

To establish proximate causation, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that *but for* the inadequate warning, the treating physician would not have used or prescribed the product." *Stewart* at 5 (quoting *Willett,* 929 F.2d at 1099) (emphasis added). "[A] causation analysis in a failure-to-warn claim asserted against a drug's manufacturer … is focused on the prescribing physician's decision to prescribe the drug." *Phillips*, 994 F.3d at 709. "[T]o the extent that patient choice is relevant, that relevance is cabined to helping us decide whether [plaintiff's] evidence—including that of other available treatments and the importance she places on her appearance—is sufficient to introduce a genuine dispute of material fact as to whether [the prescribing physician's] prescribing decision would have been different had [s]he known that [docetaxel's] associated risk of alopecia was potentially permanent rather than temporary." *Id.*

*First*, the undisputed evidence shows that Dr. Chauvin still would prescribe docetaxel for Ms. Plaisance today even if she had known of the risk of permanent hair loss.  Dr. Chauvin believes the docetaxel regimen prescribed to Ms. Plaisance "was the right treatment for her cancer," SOF ¶ 21; Ex. E (Chauvin Dep.) at 135:9-16, and she does "not feel that there was another treatment option for Mrs. Plaisance that would have been a better treatment option for her," SOF ¶ 22; Ex. E (Chauvin Dep.) at 89:14-19.

*Second*, Ms. Plaisance has not offered any evidence that her preferences would have changed Dr. Chauvin's prescribing decision.  Dr. Chauvin identified only one narrow circumstance in which she may have changed her prescription—if Ms. Plaisance had "absolutely refused" to take docetaxel.  SOF ¶ 23; Ex. E (Chauvin Dep.) at 83:2.  Even then, she "probably would have given her [Adriamycin plus Cytoxan]," SOF ¶ 23; Ex. E (Chauvin Dep.) at 83:3, but "would have noted the 2 percent risk of deadly acute leukemia from Adriamycin and *recommended against that*."  SOF ¶ 23; Ex. E (Chauvin Dep.) at 49:25-50:2 (emphasis added).

There is no evidence in the record to support a conclusion that Ms. Plaisance would have "absolutely refused" to take docetaxel and instead gone against Dr. Chauvin's recommendation by taking a different regimen with additional deadly risks.  Her own testimony refutes this argument.  Ms. Plaisance testified that she "would have asked Dr. Chauvin to *look into* another option that wouldn't have caused permanent hair loss."  SOF ¶ 14; Ex. C (Plaisance Dep.) at 270:1-3 (emphasis added).  However, Ms. Plaisance never said that she would have *refused* to take docetaxel or follow Dr. Chauvin's recommendation.  A request to consider other options and an absolute refusal to follow the advice of her doctor are not the same thing.  As she made clear, she trusted Dr. Chauvin's judgment and followed her advice:

Q: Did you follow the advice of your doctors who treated you for your breast cancer?

A: Yes.

Q: And these doctors included your oncologist, Dr. Laura Chauvin, is that right?

   A: Yes.  Yes.

SOF ¶ 8; Ex. C (Plaisance Dep.) at 29:23-30:3.  Thus, this testimony alone shows that Ms. Plaisance's input would not have changed Dr. Chauvin's prescribing decision.

  Moreover, the contemporaneous evidence belies any claim that Ms. Plaisance would have absolutely refused to take docetaxel based on the risk of hair loss.  She admits that she "was not concerned about [her] hair loss at the time."  SOF ¶ 12; Ex. C (Plaisance Dep.) at 187:15-16.  Additionally, she never asked Dr. Chauvin any questions about the potential risk of hair loss.  SOF ¶ 12.  Rather, her primary goal at the time was to beat her cancer, and she wanted to receive the best treatment.  *Id.* ¶ 9.

  The Fifth Circuit and this Court have held that after-the-fact hypothetical testimony from a plaintiff, contrary to this contemporaneous evidence, does not defeat summary judgment.  The Fifth Circuit cited these same factors in *Phillips*:  "[T]here [wa]s no indication that Phillips investigated or asked about alternatives that might avoid the abnormal hair growth or hair loss," and she "'put her faith in [her doctor],' and consented to treatment."  *Phillips*, 994 F.3d at 710.  It held that, "on this record, there is little evidence that Phillips might have steered the conversation in such a way that [her prescribing physician] would have changed his prescribing decision."  *Id.*

  This Court has reached the same conclusion twice.  In *Stewart,* the plaintiff testified that "if [her prescriber] would have offered another option without the permanent hair loss and *with the same result*, [she] *probably* would have went with the other option."  *Stewart* at 10.  But the Court held that this was insufficient because "the evidence shows that she trusted [her physician] and followed his advice, and she never thought to ask about other options."  *Id.*  Furthermore, in *Willie,* the plaintiff testified that "[i]f it had of been some other type of treatment that wouldn't have taken my hair or whatever, you know, I probably would have gone with that or whatever."  *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Willie)* (Apr. 19, 2021), ECF No. 12491, at 7 ("*Willie*").  The Court rejected that argument:  "This testimony alone, however, is not enough to create an issue of fact.  As explained, the record shows that Plaintiff was focused on survival and that she trusted [her prescribing physician].  The record does not support the idea that Willie

would have asked for other options, refused the TC regimen, or chosen the 'more toxic' AC regimen known for cardiac toxicity." *Id*. at 7-8. The same is true here.

*Finally*, this case is distinguishable from *Kahn*, in which the Court denied summary judgment. *In re Taxotere (Docetaxel) Prods. Liab. Litig. (Kahn)* (July 14, 2021), ECF No. 13062 ("*Kahn*"). In *Kahn*, the Court distinguished *Phillips* because the prescriber stated that "paclitaxel is an adequate alternative to Taxotere in terms of its efficacy, and the Court has found no evidence in the record suggesting that paclitaxel was unsuitable for Plaintiff Kahn." *Kahn* at 6. Here, Dr. Chauvin said the opposite: she would *not* have prescribed Taxol to Ms. Plaisance. SOF ¶ 24. Moreover, the Court cited the prescriber's testimony in *Kahn* that "if a patient did not wish to take Taxotere because of such a risk, [the prescriber] would have discussed other options with her," but Dr. Chauvin's testimony is more specific and different. *Kahn* at 6. Dr. Chauvin would have given Ms. Plaisance another regimen—against her recommendation—*only* if Ms. Plaisance had "absolutely refused" to take docetaxel. SOF ¶ 23; Ex. E (Chauvin Dep.) at 83:2. Ms. Plaisance's own testimony established that this would not have happened—she would have followed Dr. Chauvin's recommendation. Thus, *Kahn* is inapposite.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Hospira.

Dated: November 12, 2021                         Respectfully submitted,

                                                                               */s/ Heidi K. Hubbard*
Heidi K. Hubbard
Richmond T. Moore
Neelum J. Wadhwani
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
Telephone: 202-434-5000
hhubbard@wc.com

John F. Olinde (Bar No.1515)
Peter J. Rotolo (Bar No. 21848)
**CHAFFE MCCALL LLP**
1100 Poydras Street
New Orleans, LA 70163
Telephone: 504-858-7000
olinde@chaffe.com

*Counsel for Defendants Hospira, Inc.,
Hospira Worldwide, LLC, and Pfizer Inc.*

## CERTIFICATE OF SERVICE

    I hereby certify that on this 12th day of November 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

                                                  /s/ *Heidi K. Hubbard*